# EXHIBIT 1



1  MARIO R. NICHOLAS (SB #273122)
   mario.nicholas@stoel.com
2  STOEL RIVES LLP
   760 SW Ninth Avenue, Suite 3000
3  Portland, OR 97205
   Telephone: 503.224.3380
4  Facsimile: 503.220.2480

5  Attorneys for Plaintiff
   JH Kelly, LLC

6

7

**FILED**

JAN 29 2019

CLERK OF THE SUPERIOR COURT
BY: S. MURILLO, DEPUTY CLERK

8          SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SHASTA

10  JH KELLY, LLC, a Washington limited        CASE NO. **19CV0172**
    liability company,
11                                             **COMPLAINT FOR:**
                    Plaintiff,
12                                             1. Breach of Contract;
          v.                                   2. Breach of Contract/Total Cost or
13                                                Modified Total Cost;
    AECOM TECHNICAL SERVICES, INC., a          3. Breach of Implied Warranty (Adequacy
14  purported California corporation; and         of Plans and Specifications);
    DOES 1 through 10, inclusive,              4. Breach of the Implied Covenant of
15                                                Good Faith and Fair Dealing;
                    Defendants.                5. *Quantum Meruit*/Abandonment;
16                                             6. Violation of Prompt Payment Laws;
                                                  and
17                                             7. *Quantum Meruit*/Reasonable Value

18                                             Unlimited Jurisdiction

19

20

21       For its Complaint, Plaintiff JH Kelly, LLC ("JH Kelly") alleges as follows:

22                        **THE PARTIES**

23       1.      Plaintiff JH Kelly is a Washington limited liability company.  JH Kelly is duly

24  qualified to do business in the State of California as a contractor under Contractors State License

25  Board License No. 991732.

26       2.      On information and belief, defendant AECOM Technical Services, Inc.

27  ("AECOM") is now, and all relevant times was, a California corporation headquartered in Los

28  Angeles, California.  On information and belief, defendant AECOM is a subsidiary of AECOM, a

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-1-

COMPLAINT

99802670.8 8034592-00012

Delaware corporation, which has 77 offices in the State of California, and domestic main offices in Los Angeles, California and New York, New York, and international main offices in London, England; Moscow, Russia; Hong Kong Sha Tin, China; Abu Dhabi, United Arab Emirates; and Brisbane, Australia.

3.     JH Kelly is ignorant of the true names and capacities of defendants sued herein as Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. JH Kelly will amend this Complaint to allege true names and capacities when ascertained. JH Kelly is informed and believes and therefore alleges that each of the fictitiously named defendants are responsible in some manner for the occurrences herein alleged and for JH Kelly's damages.

4.     At all times mentioned herein, defendants, and each of them, were the agents, servants, and employees of each of the remaining defendants and were, in doing the things complained of, acting within the scope of their agency and/or employment, and acting with the full knowledge or subsequent ratification of their principals or employers.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

5.     This lawsuit arises out of the pervasive design, procurement, permitting, construction management, construction administration, and related performance errors and contract breaches committed by AECOM and Does 1-10 (the "AECOM Defendants"). The AECOM Defendants are the prime contractor on a private construction project generally known as the Burney K2 Replacement Project, owned by Pacific Gas and Electric Company ("PG&E"), and located near the City of Burney, Shasta County, California (the "Project"). As set forth in more detail below, the AECOM Defendants' egregious mismanagement and maladministration of the Project, and unconscionable treatment of JH Kelly, a subcontractor, is underscored by the following nonexhaustive list of facts:

      a.   JH Kelly's work on the Project doubled in duration from an eight-month construction schedule, with a break for winter, to a 16-month construction schedule, working through wet and cold winter conditions;

      b.   JH Kelly's scope of work on the Project doubled from $14,341,281 to $27,871,284 (excluding schedule and productivity impact delays);

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

c. JH Kelly experienced a 238% increase in Project costs;

d. JH Kelly planned to work zero overtime hours, and ended up working 35,039 overtime hours;

e. After terminating its own onsite Project team, the AECOM Defendants brought in a mostly new, modified Project team that directed JH Kelly to accelerate its schedule and failed and refused to pay JH Kelly for its additional costs;

f. The AECOM Defendants' new Project team unilaterally ceased payment under the contractual payment schedule agreed to in the Subcontract (defined below);

g. JH Kelly began work in or around October 2016, and demobilized from the site on or about June 28, 2018, but has not received any payment for 197 days (since on or about July 5, 2018);

h. JH Kelly has not been paid for any work performed after March 25, 2018 (the AECOM Defendants last made payment to JH Kelly on or about July 5, 2018 for work performed through March 25, 2018);

i. The AECOM Defendants failed to process 143 pending change order requests ("CORs" or, if singular, "COR") totaling $9,562,782, the oldest of which was submitted on or about April 28, 2017;

j. JH Kelly has been paid only 62% of the base contract and approved change order amounts;

k. JH Kelly has been paid only 34% of its total costs incurred; and

l. Notwithstanding the foregoing, (i) JH Kelly paid all of its subcontractors, employees, and vendors, (ii) no subcontractors or vendors filed liens against the Project, (iii) no employees filed payment claims regarding the Project, (iv) JH Kelly finished the job with zero recordable injuries; and (v) despite lack of payment, JH Kelly continued to diligently and successfully execute the work until completion in June 2018—which is consistent with JH Kelly's history of never abandoning a project.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592- 00012

6. On or about July 14, 2015, the AECOM Defendants first contacted JH Kelly to inquire regarding its availability to work on the Project.

7. The Project generally involved the replacement of a natural gas compressor unit at the Burney Compressor Station in Burney, California; the performance of various upgrades to the Burney Compressor Station; and the limited demolition of existing equipment and facilities at the Project site. The Burney Compressor Station is a facility located along PG&E's natural gas pipelines that compresses gas to a specified pressure, thereby allowing it to continue traveling along the pipelines from the State of Oregon to its intended recipients in the State of California. It supplies natural gas to the City of Burney and its neighboring communities, and is a part of PG&E's natural gas distribution system that provides service to around 4.2 million customers from Bakersfield, California to the southern border of the State of Oregon.

8. On or about August 12, 2015, the AECOM Defendants provided JH Kelly with a request for proposal from PG&E for the Project.

9. On or about August 25, 2015, JH Kelly attended a pre-bid job walk at the Project site in Burney, California.

10. On or about August 26, 2015, Steven R. Petto, Associate Vice President of Power & Industrial for the AECOM Defendants ("Mr. Petto"), represented to JH Kelly that the AECOM Defendants had rebuilt the Gerber Compressor Station (the "Gerber Project") about 50 miles south of Burney, California; that the Gerber Project was "very similar to what we have now at Burney"; and that the AECOM Defendants had "rebuilt the [Gerber Project] site in 5 months."

11. On or about October 7, 2015, JH Kelly submitted a bid package, JH Kelly Proposal No. 15000.77.505 ("Proposal"), to the AECOM Defendants to perform certain civil, structural, mechanical, electrical, and related construction work on the Project for a lump-sum price of $14,341,281.

12. In preparing its Proposal, including its scope of work and draft schedule narrative, JH Kelly reviewed and relied upon the bid documents provided by the AECOM Defendants, including, but not limited to, the plans, details, material quantities, drawings, specifications, information regarding the Gerber Project, and other information provided by the AECOM

-4-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 5 of 322

Defendants. Included among the documents relied upon by JH Kelly was a batch of roughly 270 pages of emails and material take off ("MTO") information, which JH Kelly relied upon, and which AECOM directed JH Kelly to rely upon, to generate its pricing for the assumed fixed quantities of materials and equipment necessary for JH Kelly's scope of work (these emails and MTO information were ultimately attached to the Subcontract (defined below) as Exhibit B2A). JH Kelly expressly reserved the right to seek additional compensation for changes to the quantities of material and equipment included in its Proposal through change orders. JH Kelly's pricing also excluded winter work and overtime work.

13. JH Kelly's Proposal included a draft schedule narrative for the Project ("JH Kelly's Proposed Construction Schedule"), which JH Kelly prepared based on its pre-bid planning with the AECOM Defendants and review of the Project documents. JH Kelly's Proposed Construction Schedule contemplated JH Kelly's scope of work being complete in one year, with no onsite work during the winter months, and provided, among other things, as follows:

   a. Mobilization to begin in October 2016;

   b. Demobilization would occur in November 2016 to leave the Project for the winter period, which was November 2016 through February 2017 (the "2016-2017 Winter Period");

   c. JH Kelly would perform detailing and fabrication of electrical and piping materials offsite during the 2016-2017 Winter Period;

   d. Re-mobilization and construction work at the Project would occur from March 2017 through September 2017; and

   e. Final demobilization for JH Kelly would occur in October 2017.

14. JH Kelly's plan to demobilize during the 2016-2017 Winter Period was consistent with the Project documents provided by the AECOM Defendants, which provided that "[d]ue to the relatively harsh winters, construction [is] recommended to be scheduled from April to October."

-5-

Stoel Rives LLP
Attorneys At Law
Portland

99802670.8 0034592-00012

15.     On or about February 11, 2016, on information and belief, the AECOM Defendants entered into an Engineering, Procurement, and Construction of Natural Gas & Electric Transmission and Distribution Facilities Agreement (the "EPC Agreement") with PG&E for the Project, with the contract price $40,510,262 under which the AECOM Defendants agreed to act as the design-builder and prime contractor for the Project.

16.     Under the EPC Agreement, the AECOM Defendants were responsible for designing the Project, procurement of all large and long-lead materials for the Project, building the Project, and construction management and administration of the Project. The AECOM Defendants were also responsible for, among other things, developing, maintaining, updating, and achieving the Project schedule per the deadlines in the EPC Agreement, and timely obtaining all building permits.

17.     On or about October 12, 2016, the AECOM Defendants requested that JH Kelly provide a detailed construction schedule for the Project in order for the AECOM Defendants to incorporate into the overall Project schedule. JH Kelly sent the AECOM Defendants the requested detailed construction schedule on or about October 14, 2016.

18.     On or about October 19, 2016, the AECOM Defendants issued an overall Project schedule (the "Project Schedule"). Consistent with JH Kelly's Proposed Construction Schedule, the Project Schedule provided, among other things, as follows:

    a.  Mobilization to begin in October 2016 to early November 2017, along with clearing, grubbing, and other site preparation work;

    b.  Winter demobilization would occur during the 2016-2017 Winter Period (except for the commencement of some limited work in late February 2017);

    c.  The AECOM Defendants would complete all permitting work by October 4, 2016 (which would allow the immediate commencement of construction after the 2016-2017 Winter Period);

    d.  The AECOM Defendants would complete the Issued for Construction ("IFC") drawings by December 1, 2016 (which would allow JH Kelly to perform

detailing and fabrication of the necessary piping and electrical materials during the 2016-2017 Winter Period);

    e.   Re-mobilization and construction work would occur from March 2017 through September 2017; and

    f.   JH Kelly would complete its scope of work in October 2017.

19.    On or about October 14, 2016, Mr. Petto, on behalf of the AECOM Defendants, represented that JH Kelly would be entitled to addition compensation for changes to the quantities of materials and equipment set forth in JH Kelly's Proposal as follows:

> "In hindsight if we weren't scrambling so hard to get everything included before Power Advocate shut the window on proposal entries we might have had a more formal transmittal process to better track the latest quantities; a lessons learned for the next proposal, but for now this is what we've got. If later we find material quantity changes I missed, AECOM will negotiate in good faith to resolve any discrepancies."

20.    JH Kelly believed and relied upon Mr. Petto's representation that "AECOM will negotiate in good faith to resolve any discrepancies" regarding the quantities of materials and equipment in entering into the Subcontract (defined below) with the AECOM Defendants.

21.    On or about October 21, 2016, the AECOM Defendants and JH Kelly entered into the Agreement Between Design-Builder and Subcontractor (Where Subcontractor Does Not Provide Design Services), Subcontract No. 60482831-SC-001 (the "Subcontract"), with a contract price of $14,341,281—the same amount included in JH Kelly's Proposal. A copy of the Subcontract, excluding exhibits (which consist of approximately 2,218 pages), is attached hereto as **Exhibit A** and incorporated herein.

22.    The Subcontract incorporated as Exhibit H the JH Kelly Construction Schedule (the "Subcontract Ex. H Schedule"), which, consistent with JH Kelly's Proposed Construction Schedule and the Project Schedule, provided that:

    a.   Mobilization to begin in October and November 2016;

    b.   Winter demobilization would occur in November 2016 for the 2016-2017 Winter Period;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592- 00012

c. JH Kelly would perform off-site detailing and fabrication of the necessary piping and electrical materials during the 2016-2017 Winter Period;

d. Re-mobilization and construction work would occur from March 2017 through September 2017; and

e. Final demobilization for JH Kelly would occur in October 2017.

23. The Subcontract incorporated as Exhibit A2 a modified major milestone schedule, provided by AECOM, which, consistent with JH Kelly's Proposed Construction Schedule, the Project Schedule, and the Subcontract Ex. H Schedule, provided, among other things, as follows:

a. Mobilization to begin on October 17, 2016;

b. Winter demobilization would occur in November 2016 for the 2016-2017 Winter Period;

c. The AECOM Defendants would complete all IFC drawings by December 1, 2016 (which, as set forth above, would allow JH Kelly to perform its detailing and fabrication for the necessary piping and electrical materials during the 2016-2017 Winter Period);

d. The AECOM Defendants would complete all engineering by January 16, 2016 (which would allow JH Kelly to commence construction immediately after the 2016-2017 Winter Period);

e. Re-mobilization and construction work would occur from March 2017 through November 2017;

f. Substantial completion of the overall Project would occur on November 17, 2017; and

g. Project final completion and demobilization would occur on December 1, 2017.

24. As set forth above, at the time JH Kelly entered into the Subcontract, JH Kelly planned (i) to work on the Project in two phases, commencing in or around October 2016, (ii) to not work onsite during the 2016-2017 Winter Period, during which time JH Kelly planned to perform off-site detailing, fabrication, and related work to prepare for the start of construction in

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

or around March 2017, (iii) to follow a standard sequence of construction, and (iv) to complete its work in or around October 2017.

25. From the outset, for reasons unknown to JH Kelly and not the fault of JH Kelly, the AECOM Defendants fell behind on their engineering, procurement, and permitting obligations.

26. After executing the Subcontract, the AECOM Defendants advised JH Kelly that they would not meet the December 1, 2016 deadline to issue the IFC electrical drawings (the "IFC Electrical"), and that JH Kelly should expect to receive the unstamped IFC Electrical by December 15, 2016, and the stamped IFC Electrical shortly thereafter.

27. On or about January 4, 2017, having not received the IFC Electrical by the December 15, 2016 deadline, JH Kelly contacted the AECOM Defendants to request an update on the status of the IFC Electrical. That same day, the AECOM Defendants responded that the IFC Electrical would not be released until February 24, 2017. JH Kelly further learned the IFC Electrical was going to include electrical re-design and added electrical scope.

28. The AECOM Defendants' message on January 4, 2017 was the first time that the AECOM Defendants notified JH Kelly that the IFC Electrical would not be issued until February 24, 2017—nearly three months later than planned. This delay significantly concerned JH Kelly because material procurement and off-site detailing and fabrication, among other services, could not begin without the IFC Electrical. JH Kelly had arranged a team of electrical detailers to start work on December 1, 2016 based on the previously scheduled issue date for the IFC Electrical. JH Kelly later moved its start date to December 15, 2016 upon learning of AECOM's delay in providing the IFC Electrical. JH Kelly would now need to move the detailing and fabrication work out further based on the AECOM Defendants' notice of delay to February 24, 2017.

29. On or about January 4, 2017, JH Kelly notified the AECOM Defendants that it requested an adjustment under the Subcontract to account for the schedule compression, additional work, loss of productivity, and other issues that flowed from the late issuance of the IFC Electrical, the electrical re-design, added electrical scope, and the AECOM Defendants' failure to manage the sequencing and flow of work. The AECOM Defendants expressly

-9-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

acknowledged receipt of JH Kelly's January 4, 2017 request for adjustment and relief under the Subcontract.

30.     On or about January 24, 2017, JH Kelly again advised the AECOM Defendants of the substantial impact on the construction schedule and Project costs as a result of the late issuance of the IFC Electrical and added electrical scope.  That same day the AECOM Defendants expressly acknowledged that the late issuance of the IFC Electrical impacted the Project Schedule.

31.     The AECOM Defendants did not issue the stamped IFC Electrical on February 24, 2017 as they represented they would.

32.     Over the course of the following nine months, in a disjointed and disorganized manner, the AECOM Defendants modified, corrected, and updated the IFC Electrical.

33.     The AECOM Defendants issued the final update to the IFC Electrical on or about November 15, 2017, over 11 months later than planned.

34.     The AECOM Defendants' 11-month delay in issuing the IFC Electrical, and the extensive changes to the IFC Electrical, fundamentally changed the timing, sequencing, and scope of JH Kelly's work on the Project.

35.     On or about September 12, 2017, JH Kelly submitted COR #70 for compensation for the myriad of changes caused by the IFC Electrical.

36.     On or about September 12, 2017—the same day that JH Kelly formally submitted COR #70—the AECOM Defendants requested that JH Kelly implement an accelerated schedule (the "Accelerated Schedule") to compensate for the delays to the Project.  The Accelerated Schedule contemplated a revised substantial completion date of February 28, 2018 by making the following primary changes to JH Kelly's work on the Project:

    a.  The initiation of overtime for all labor by shifting from a "4-10s" schedule (four consecutive days at 10 hours per day) to a "6-10s" schedule (six consecutive days at 10 hours per day);

    b.  The requirement that JH Kelly to work through the cold and wet winter period from November 2017 through February 2018; and

-10-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

c. The addition of nightshifts for electricians.

37.     On or about November 9, 2017, the AECOM Defendants directed JH Kelly to implement the Accelerated Schedule. JH Kelly implemented the Accelerated Schedule at the specific instance and request of the AECOM Defendants, and based on the understanding that it would be compensated for its additional costs.

38.     In addition to the delayed delivery of the IFC Electrical, and other IFC drawings, the substantial changes in the IFC Electrical, and other IFC drawings, and the implementation of the Accelerated Schedule, JH Kelly's work on the Project was severely impacted as a result of, without limitation, the following issues (for which numerous notices were provided to the AECOM Defendants):

    a. <u>Late and Incomplete Permits</u>: The AECOM Defendants failed to timely procure building permits prior to the start of construction, which directly impacted the progress, sequence, and cost of construction on the Project. The final building permit was applied for on or about August 28, 2017, which was six months after the start of construction and nearly three months prior to the planned substantial completion date of November 17, 2017. JH Kelly was significantly limited from commencing work without the permits, and nearly all aspects of the Project experienced a material permitting delay;

    b. <u>Late Procurement</u>: The AECOM Defendants were responsible for the majority of procurement for the Project, including, without limitation, procurement of all large and long-lead materials, including all two-inch and larger piping materials, and they failed to timely procure the materials, which directly impacted the progress, sequence, and cost of construction;

    c. <u>Defective Coating Procurement</u>: The AECOM Defendants procured piping that did not meet the coating standard defined in the EPC Agreement, and that failed the "jeep" tests in the field, requiring removal of the defective coating and reapplication of the coating to the proper standard in the field, which directly impacted the progress, sequence, and cost of construction;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-11-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 12 of 322

d. <u>Delayed and/or Defective Mechanical Material</u>: Mechanical materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

e. <u>Delayed and/or Defective Steel Building Material</u>: Steel materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

f. <u>Delayed and/or Defective Shop Fabrication Material</u>: Materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

g. <u>Contract Maladministration</u>: During the AECOM Defendants' management and administration of the Project, the AECOM Defendants failed to coordinate and manage the sequencing and flow of work, resulting in extensive delays, work stoppages, and inefficiencies, which forced JH Kelly to perform additional work to resolve the conflicts and changed conditions;

h. <u>Differing Site Conditions</u>: The presence of large rocks and boulders disrupted JH Kelly's foundation work and progress on JH Kelly's underground work at the compressor building, in addition to its underground piping and electrical site utility work, which directly impacted the progress, sequence, and cost of construction;

i. <u>Hydro Vacuum Requirements</u>: Contrary to the AECOM Defendants' instructions at the time JH Kelly submitted its Proposal, JH Kelly was directed to use hydro vacuum excavation in place of mechanical excavation, which directly impacted the progress, sequence, and cost of construction;

j. <u>Base and Corner Trim and Flashing Fabrication Errors</u>: The AECOM Defendants and/or third parties under their control defectively fabricated the

-12-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592-00012

base permitted flashing at several buildings, which directly impacted the progress, sequence, and cost of construction;

k. <u>Missing Fire Coating/Fireproofing to Materials</u>: The AECOM Defendants and/or third parties under their control did not provide the required fire coating on the building steel of Valve Houses 1 and 2, which directly impacted the progress and cost of construction;

l. <u>Door and Frame Location Conflicts</u>: The AECOM Defendants did not properly specify all door and frame locations at the Project, which directly impacted the progress and cost of construction;

m. <u>Late Delivery of the Generator</u>: The AECOM Defendants delivered and set a generator and associated components on or about September 12, 2017, six months later than the planned date of March 8, 2017, which directly impacted the progress and cost of construction;

n. <u>Removal of Security and Communications Conduit</u>: JH Kelly encountered several instances where existing security or communication conduits had to be removed, which directly impacted the progress and cost of construction;

o. <u>Delayed Water Tank Installation</u>: The AECOM Defendants and/or third parties under their control were late in delivering a water tank for installation at the fire water pump building, which directly impacted the progress and cost of construction;

p. <u>Delayed Design for Rebar and Anchor Bolt Procurement</u>: The AECOM Defendants and/or third parties under their control were late in delivering rebar and anchor bolt design for installation at the fire water pump building, which directly impacted the progress and cost of construction; and

q. <u>Disjointed Construction Management</u>: The AECOM Defendants switched construction managers midstream, on or about July 30, 2017, and replaced their entire Project team throughout the course of the Project, which resulted in JH Kelly being forced to re-answer the same questions, re-submit the same

-13-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592- 00012

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 14 of 322

documentation, and adjust to a new team and new approach, all of which impacted the progress and cost of construction, and largely stopped the approval of pending change orders.

39. As a result of the AECOM Defendants' delayed and fragmented issuance of the IFC Electrical and other IFC drawings, mismanagement and maladministration of the Project, lack of transparency, late and incomplete procurement of permits, late procurement of materials, and procurement of defective materials, and the multitude of other issues with the Project, as set forth herein, JH Kelly was forced to perform massive additional work over a far longer period than planned, and incurred substantial damages.

40. JH Kelly timely submitted CORs for all of the foregoing additional work, changed work, and resulting damages. JH Kelly also prepared, at the direction of the AECOM Defendants, Time Impact Analysis ("TIA") reports to support many of its claims, including TIA reports regarding (i) the IFC Electrical, (ii) the AECOM Defendants' late permitting, (iii) the AECOM Defendants' late and defective procurement of piping, valves, and fittings, (iv) the AECOM Defendants' defective coating procurement, (v) the directive that JH Kelly use hydro vacuum excavation, and (vi) JH Kelly's additional electrical excavation. Despite repeated requests, the AECOM Defendants have failed and refused to compensate JH Kelly for its work on the Project, including original contract amounts owed, CORs, retention, schedule, and productivity impacts.

41. The AECOM Defendants are also wrongfully withholding contract funds from JH Kelly's December 2017 and January 2018 invoices, and seeking offsets through bogus backcharges with funds that are lawfully due and owing to JH Kelly on the Project. Specifically, the AECOM Defendants are wrongfully withholding (i) $750,000 from JH Kelly based on PG&E's assessment of $1,500,000 in liquidated damages against the AECOM Defendants for the AECOM Defendants' failure to meet the Project substantial completion deadline, (ii) $1,414,500 from JH Kelly based on delay damages allegedly attributable to JH Kelly, (iii) $813,259 from JH Kelly based on the "Valve Strike" event for which a third party is wholly responsible, and (iv) $300,000 for extra work performed by JH Kelly to paint existing aboveground piping and

-14-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 15
99802670.8 0034592-00012                                of 322

buildings. The AECOM Defendants' withholdings are improper because, among other things, the delays at issue are entirely attributable to the AECOM Defendants, the withholding contradicts their prior admissions that JH Kelly is not responsible for the delays to the Project Schedule, and the AECOM Defendants did not provide adequate evidence or other information to support the basis for the withholdings.

42.     At all times, JH Kelly proactively, diligently, and in good faith did everything reasonably within its power to work with the AECOM Defendants to resolve the myriad of design issues and changes, the late and improper procurement, and the late permits, and to keep the Project moving towards completion. The AECOM Defendants, by contrast, did not act in good faith, failed and refused to promptly respond to CORs, declined to accept responsibility for the delays and cost increases, declined to agree to payment for the indisputably changed work and massive extra work, and ignored JH Kelly's multiple requests for approval of the extra work.

43.     In light of the foregoing, including many months of non-payment, JH Kelly would have been justified in suspending work and/or terminating the Subcontract for cause. However, because JH Kelly has never abandoned a project or had a claim made against its performance bond, and because JH Kelly wanted to complete its scope of work, JH Kelly continued to work towards completing the Project, including the full payment of all subcontractors, vendors and employees, to the significant benefit of the AECOM Defendants. JH Kelly is currently owed approximately $26,402,479.89 (plus interest, costs, attorneys' fees, and penalties), as follows:

    a.  The AECOM Defendants owe JH Kelly $6,839,697.89 for invoiced contract amounts, including amounts wrongfully withheld, as follows:

        i.  JH Kelly Invoice No. MD 200101 in the amount of $1,587,483.56;

        ii.  JH Kelly Invoice No. MD 202353 in the amount of $1,690,275.55;

        iii.  JH Kelly Invoice No. MD 204418 in the amount of $2,053,311.95;

        iv.  JH Kelly Invoice No. MD 205983 in the amount of $506,321.50;

        v.  JH Kelly Invoice No. MD 208892 in the amount of $86,880.35;

        vi.  Release of retention withheld in the amount of $915,424.98;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592- 00012

b.  The AECOM Defendants owe JH Kelly $9,562,782 for pending CORs, as set forth in more detail in **Exhibit B**; and

c.  The AECOM Defendants owe JH Kelly an amount currently estimated at $10,000,000, to be proven at trial, for schedule and productivity impacts on the Project.

44.  On or about June 28, 2018, JH Kelly demobilized from the Project site after successfully completing its scope of work on the Project.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

45.  JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 44 above.

46.  JH Kelly has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Subcontract.

47.  The AECOM Defendants failed to pay their obligations under the Subcontract.

48.  The AECOM Defendants are in breach of the Subcontract and have caused damages to JH Kelly in the amounts set forth in paragraph 43 above, or an amount to be proven at the time of trial, plus interest, penalties, and attorneys' fees and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## SECOND CAUSE OF ACTION

### (Breach of Contract/Total Cost or Modified Total Cost Recovery)

49.  JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 48 above.

50.  JH Kelly's scope of work under the Subcontract has been altered by the AECOM Defendants' changes so significantly that the final Project was significantly different from the original Project.

51.     As a result of the AECOM Defendants' changes to the Project, it is not practical to prove the actual additional costs caused by each individual change demanded by the AECOM Defendants.

52.     JH Kelly's original Proposal that was accepted by the AECOM Defendants was reasonable.

53.     JH Kelly's actual costs on the Project were reasonable.

54.     JH Kelly was not responsible for incurring the additional costs on the Project without compensation from the AECOM Defendants.

55.     As a result of the substantial changes to JH Kelly's scope of work on the Project, JH Kelly is entitled to recover its total costs or modified total costs for its performance of work on the Project, minus Subcontract amounts paid, in the amounts set forth in paragraph 43 above, or an amount to be proven at the time of trial, plus interest, penalties, and attorneys' fees and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## THIRD CAUSE OF ACTION

### (Breach of Implied Warranty (Adequacy of Plans and Specifications))

56.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 55 above.

57.     Under the Subcontract, the AECOM Defendants were solely responsible for design and engineering activities, and JH Kelly had no responsibility for design.  As a matter of law, the AECOM Defendants had the obligation to provide plans and specifications that were timely, adequate, complete, and sufficient to allow JH Kelly to construct the Project as intended when the Project was bid and the Subcontract was executed.  At the time the AECOM Defendants accepted JH Kelly's Proposal and awarded the Subcontract to JH Kelly, the AECOM Defendants impliedly warranted the adequacy, sufficiency, and completeness of the plans and specifications for purposes of bidding and performing construction of the Project.

58.     The plans, specifications, drawings, and other design and Project documents upon which JH Kelly bid were, in fact, late, inadequate, inaccurate, and incomplete.  Moreover, the

-17-

COMPLAINT

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 18 of 322

1 AECOM Defendants failed to timely remedy the defective plans and specifications and failed to

2 timely deliver the corrected IFC drawings, all of which constitute material and substantial

3 breaches of the implied warranty of the adequacy of plans and specifications.

4       59.     As a direct, proximate, and foreseeable result of the AECOM Defendants' breach

5 of the implied warranty of the adequacy of the plans and specifications, JH Kelly incurred

6 significant extra and unanticipated costs and damages, including, but not limited to, disruption

7 and delay in completion of its work. JH Kelly has been damaged in an amount to be proven at the

8 time of trial, which is a portion of the amounts set forth in paragraph 43 above, plus interest,

9 penalties, and attorneys' fees and costs to the extent allowable by law.

10       Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

11 **<u>FOURTH CAUSE OF ACTION</u>**

12 **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

13       60.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein,

14 the allegations in paragraphs 1 through 59 above.

15       61.     Implied in the Subcontract is a covenant of good faith and fair dealing to which the

16 AECOM Defendants are bound. The covenant requires the AECOM Defendants to refrain from

17 any action that would impair the benefits that JH Kelly has a right to expect from the Subcontract.

18       62.     As alleged herein, the AECOM Defendants breached the covenant of good faith

19 and fair dealing by, among other things, their failure and refusal to timely and properly manage

20 and administer the Project; their failure to address and respond to design issues; their refusal to

21 properly and timely respond to CORs; their refusal to pay JH Kelly for both its original and extra

22 work that was directed by the AECOM Defendants; their refusal to provide JH Kelly with timely

23 updates regarding changes to the Project Schedule, including, but not limited to, changes to the

24 delivery dates for the IFC drawings, and the delivery dates for materials; their failure to pay even

25 undisputed amounts owing to JH Kelly in an effort to financially burden JH Kelly and in an

26 attempt to interfere with JH Kelly's relationships with its subcontractors; and their general failure

27 and refusal to negotiate or deal in good faith with JH Kelly.

28

Stoel Rives LLP
Attorneys At Law
Portland

-18-

COMPLAINT

99802670.8 0034592- 00012

63.     As a proximate result of the AECOM Defendants' breaches, JH Kelly has been damaged in an amount to be proven at the time of trial, which is a portion of the amounts set forth in paragraph 43 above,, plus interest, penalties, and attorneys' fees and costs to the extent allowable by statute.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

### FIFTH CAUSE OF ACTION

### (*Quantum Meruit*/Abandonment of Contract)

64.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 63 above.

65.     The AECOM Defendants imposed upon JH Kelly an excessive number of changes such that it can fairly be said that JH Kelly's scope of work under the Subcontract was drastically and cardinally altered.

66.     The changes imposed upon JH Kelly materially increased JH Kelly's costs and caused performance of the work on the Project to be done under disadvantageous circumstances.

67.     The scope of work undertaken by JH Kelly greatly exceeded that called for under the Subcontract, and the final Project was materially different from the contracted work.

68.     As a result of the substantial changes to JH Kelly's scope of work on the Project, the AECOM Defendants have abandoned the Subcontract, and JH Kelly is entitled to recover the reasonable value of the labor, services, and materials supplied on the Project, in an amount to be proven at the time of trial, but estimated at $26,000,000, plus interest, penalties, and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

### SIXTH CAUSE OF ACTION

### (Violation of Prompt Payment Laws [Business and Professions Code § 7108.5 and/or Other Applicable Code Section(s)])

69.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 68 above.

-19-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592- 00012

70. JH Kelly performed all obligations under the Subcontract and duly completed its obligations under the Subcontract, except for those excused by the AECOM Defendants' failures to perform. As of the date of completion, the amount remaining as unpaid contract funds was the sum of $16,402,479.89, or an amount to be proven at the time of trial. That amount has exceeded seven days overdue. No good-faith dispute existed or now exists about the unpaid contract funds.

71. The AECOM Defendants wrongfully withheld payments due and owing to JH Kelly. No good-faith dispute exists or has existed regarding the payments that have been withheld.

72. The conduct of the AECOM Defendants as alleged in this Complaint violates Business and Professions Code section 7108.5, and/or other applicable code section(s).

73. Pursuant to those code sections, JH Kelly is entitled to its attorneys' fees (among other statutory bases) should the Court find in its favor.

74. In addition, JH Kelly is entitled to penalties at a rate of 2% per month.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION

### (*Quantum Meruit*/Reasonable Value)

75. JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 74 above.

76. JH Kelly furnished labor, services, and materials to the AECOM Defendants at their special insistence and request in connection with the Project, for which the AECOM Defendants then and there agreed to pay to JH Kelly the reasonable value of such labor, services, and materials.

77. The reasonable value of such labor, services, and materials, and related costs, was, and is an amount to be proven at time of trial, but estimated at $26,000,000, which remains due, owing, and unpaid by the AECOM Defendants, together with interest at the prevailing legal rate from the time such payments became due.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 21 of 322

**RESERVATION OF RIGHTS**

78.  JH Kelly hereby expressly reserves the right to amend its Complaint and assert additional damages and causes of action, including, but not limited to, causes of action for negligent misrepresentation, fraudulent misrepresentation, fraudulent inducement of contract, and related causes of action, based on facts pled and facts learned through discovery.

**PRAYER FOR DAMAGES**

*On the First, Second, Third, and Fourth Causes of Action (against AECOM and Does 1-10, and each of them)*:

1.  For principal damages of approximately $26,402,479.89, plus contractual fees, or an amount to be proven at the time of trial,

2.  For interest at the contractual rate of 18% per annum, or the prevailing legal rate, whichever is higher;

*On the Fifth and Seventh Causes of Action (against AECOM and Does 1-10, and each of them)*:

3.  For principal damages in an amount to be proven at the time of trial, but approximately $26,000,000;

4.  For interest at the prevailing legal rate;

*On the Sixth Cause of Action (against AECOM and Does 1-10, and each of them)*:

5.  For principal damages of not less than $16,402,479.89, or an amount to be proven at the time of trial;

6.  For interest at the contractual rate of 18% per annum, or the prevailing legal rate, whichever is higher;

7.  For the statutory penalty of 2% per month pursuant to California Business and Professions Code § 7108.5, and/or other applicable code section(s);

8.  For attorneys' fees as provided in California Business and Professions Code § 7108.5, and/or other applicable code section(s ), or as otherwise provided by law;

*Against all defendants on all causes of action*:

9.  For costs of the suit herein incurred; and

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 22 of 322

10.     For such other relief as the Court may deem just and proper.

## **JURY DEMAND**

JH Kelly demands a jury trial.


DATED:  January 29, 2019                          STOEL RIVES LLP


By: _____
MARIO R. NICHOLAS
Attorneys for Plaintiff
JH Kelly, LLC

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-22-

COMPLAINT

99802670.8 0034592-00012



# EXHIBIT A

# AECOM Technical Services, Inc.

### SUBCONTRACT # 60482831-SC-001..........

| Client / Prime Contract / Task Order | AECOM Numbers: |
|---|---|
| Client: PG&E……………….<br>Prime contract #:2501335149…………………. / Task Order #:n/a…….<br>Prime contract (task order) pricing structure: lump sum | Project #: 60482831…………..<br>Vendor #: .TBD...................... |

| Subcontractor: | Issued By: |
|---|---|
| Sub Name:  JH Kelly,LLC<br>Address:      821 3rd Avenue<br>City, State, ZIP   Longview, WA 98632<br><br>Attn:  Steve Lennon<br>Phone: (360) 905-1372<br>Fax:…n/a………………. | AECOM Technical Services, Inc.<br>300 Lakeside Drive, Suite 400………………..<br>Oakland, CA 94612………………..<br><br>Attn:  Ocie Williams…………………, Subcontract Administrator<br>Phone:…(510) 874-3169……………<br>E-Mail:ocie.williams@aecom.com<br>Fax:……n/a……………. |

| Period of Performance: | Price or Not-To-Exceed Ceiling Price: | Payment Terms |
|---|---|---|
| | $14,341,281 | NET 30 days |
| 07/01/2016 through 02/28/2018 | | |

This agreement ("Subcontract") between the parties, when referenced herein shall be deemed to include the documents referenced in the Table of Contents below:

## TABLE OF CONTENTS

Signature Form (this page)
Standard Term and Conditions [Agreement Between Design-Builder And Subcontractor (Where Subcontractor Does Not Provide Design Services)]
EXH A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]
EXH A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]
EXH A2 Modified Flow Down Conditions_FINAL_2016-10-12
EXH B Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]
EXH B1 15000.77.505 PGE Burney Station Proposal 10-7-2015
EXH B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission
EXH B2A Material Quantities
EXH B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1
EXH B4 Unit Pricing for Boulder Removal
EXH C1 CA Conditional Waiver And Release On Progress Payment
EXH C2 CA Unconditional Waiver And Release On Progress Payment
EXH D1 CA Conditional Waiver And Release On Final Payment
EXH D2 CA Unconditional Waiver And Release On Final Payment
EXH E Not Used
EXH F Performance & Payment Bonds (to be provided by JH Kelly)
EXH G Not Used
EXH H JH Kelly Construction Schedule
EXH I1 JHK Time and Material Rates – Labor
EXH I2 JHK Time and Material Rates – Equipment
EXH J JHK Proposed Invoicing Schedule

The effective date of this Subcontract is the date of the last signature below.

The parties acknowledge that there has been an opportunity to negotiate the terms and conditions of this Subcontract and agree to be bound accordingly.

| SUBCONTRACTOR | | AECOM Technical Services, INC. | |
|---|---|---|---|
| _Paul Furth_ | 10/21/16 | _Shawn_ | 10/21/16 |
| Signature | Date | Signature | Date |
| Paul Furth | | SHAWN KELLY | |
| Printed Name | | Printed Name | |
| CFO VP | | Vice President | |
| Printed Title | | Printed Title | |

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 26 of 322

# AGREEMENT BETWEEN DESIGN-BUILDER AND SUBCONTRACTOR (WHERE SUBCONTRACTOR DOES NOT PROVIDE DESIGN SERVICES)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 27 of 322

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 28
of 322

# TABLE OF CONTENTS

| Article | Name | Page |
|---|---|---|

| Article 1 | General | 2 |
| Article 2 | Subcontractor's Services and Responsibilities | 6 |
| Article 3 | Design-Builder's Services and Responsibilities | 11 |
| Article 4 | Ownership of Work Product | 13 |
| Article 5 | Time of Performance | 14 |
| Article 6 | Contract Price | 15 |
| Article 7 | Procedure for Payment | 16 |
| Article 8 | Stop Work and Termination | 20 |
| Article 9 | Representatives of the Parties | 22 |
| Article 10 | Insurance and Bonds | 24 |
| Article 11 | Indemnification | 25 |
| Article 12 | Changes to the Contract Price and Time | 26 |
| Article 13 | Contract Adjustments and Disputes | 29 |
| Article 14 | Miscellaneous | 31 |
| Article 15 | Electronic Data | 33 |
| Article 16 | Confidential Information | 34 |
| Article 17 | Other Provisions | 35 |

AECOM Technical Services, Inc.
300 Lakeside Drive, Suite 400
Oakland, CA 94612

# Agreement Between
# Design-Builder and Subcontractor
# (Where Subcontractor Does Not Provide Design Services)

This **AGREEMENT** is made as of the _____21st_____ day of _____October_____

in the year of 2016, by and between the following parties, for services in connection with the Project
identified below:

**DESIGN-BUILDER:**
*(Name and address)*
*AECOM Technical Services, Inc.*
*300 Lakeside Drive, Suite 400*
*Oakland, CA 94612*

**SUBCONTRACTOR:**
*(Name and address)*
*JH Kelly, LLC*
*821 3rd Avenue*
*Longview, WA 98632*

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*
*Burney K2 Replacement Project*
*37667 Highway 299*
*Burney, CA 96013*

**OWNER:**
*(Name and address)*
*Pacific Gas and Electric Company*
*77 Beale Street*
*San Francisco, California 94105*

In consideration of the mutual covenants and obligations contained herein, Design-Builder and
Subcontractor ( the "Parties") agree as set forth herein.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 30
of 322

# Article 1

## General

**1.1** **Basic Purpose.**

**1.1.1** Design-Builder has contracted with Owner to provide the services necessary for the design and construction of the Project as set forth in the Engineer, Procure, Construct Agreement ("EPC Agreement"). Subcontractor, through itself, and Sub-Subcontractors, agrees to provide all construction and other aspects of the Work consistent with the Contract Documents. Design-Builder and Subcontractor agree that to the extent applicable to the performance of the Work hereunder, Subcontractor shall have the same responsibilities and obligations as to Design-Builder as Design-Builder by the EPC Agreement has against and to Owner, except as may be modified herein. Subcontractor will include in each lower-tier subcontract the appropriate flow-down clauses as required by the EPC Agreement. Any inconsistency, conflict or ambiguity between terms and conditions of this Agreement and the terms and conditions of the EPC Agreement will be resolved by applying the more stringent of the conflicting provisions.

**1.2** **Basic Definitions.**

**1.2.1** Terms used in this Agreement shall have the meanings set forth in the EPC Agreement between Owner and Design-Builder unless otherwise provided herein, with the following specific terms defined as follows:

**1.2.1.1** *Agreement* refers to this executed contract between Design-Builder and Subcontractor.

**1.2.1.2** *Construction Documents* are the documents consisting of Drawings and Specifications, prepared or assembled by Design-Builder in accordance with the EPC Agreement.

**1.2.1.3** *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.1.4** *EPC Agreement* refers to the contract between Design-Builder and Owner for the design and construction of the Project and all exhibits, attachments, and other Contract Documents enumerated and incorporated therein.

**1.2.1.5** *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the EPC Agreement.

**1.2.1.6** *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to any items identified in the punch list prepared under the EPC Agreement and the submission of all documents set forth in Section 7.5.2.

**1.2.1.7** *Force Majeure Events* are those events that are beyond the control of Subcontractor, Design-Builder and Owner, including the events of war, floods, labor disputes, earthquakes, epidemics, adverse weather conditions not reasonably anticipated, and other acts of God.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 31 of 322

**1.2.1.8** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.1.9** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the parties, the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.1.10** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, design performance specifications, design specifications, and LEED® or other sustainable design criteria and other Project-specific technical materials and requirements.

**1.2.1.11** *Project Schedule* refers to the schedule setting forth the dates by which the various stages of both the design and construction, commissioning, substantial completion and completion of the Project that must be attained to satisfy Design-Builder's obligations to Owner.

**1.2.1.12** *Site* is the land or premises on which the Project is located. For purposes of the contract "Burney" shall mean the site.

**1.2.1.13** *Sub-Subcontractor* is any person or entity retained by Subcontractor as an independent contractor to perform a portion of the Subcontractor's Work and shall include materialmen, suppliers, and subcontractors of any tier which will accept certain flow down provisions from the EPC Agreement to the extent required in this Agreement.

**1.2.1.14** *Substantial Completion or Substantially Complete* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and commercially use the Work for its intended purpose.

**1.2.1.15** *Work* is comprised of all Subcontractor's construction and other services required by the Contract Documents, including procuring and furnishing all supervision, labor, inspection, testing and start-up support labor, materials, tools, equipment, machinery, transportation, temporary utilities, temporary facilities, 12 X 60' Trailer connected to site facilities for Design Builder including Parking and porch/steps ready for use, including same items of furniture and appliances Subcontractor supplies for its own trailer(s), and all other items and services specified  in this Agreement and the other Contract Documents necessary to complete the portion of the Project described in **Exhibit B**.

**1.3**     **Contract Documents.**

**1.3.1**     The Contract Documents are comprised of the following:

**1.3.1.1** All written modifications, amendments, minor changes and Change Orders to this Agreement;

**1.3.1.2** This Agreement, including the following exhibits: (*list for example, performance standard requirements, performance incentive arrangements, markup exhibits, allowances, unit prices, or exhibit detailing offsite reimbursable personnel*);

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 32
of 322

Exhibit A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]
Exhibit A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]
Exhibit A2 Modified Flow Down Conditions_FINAL_2016-10-12
Exhibit B: Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]
Exhibit B1_15000.77.505 PGE Burney Station Proposal 10-7-2015
Exhibit B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission
EXH B2A Material Quantities
Exhibit B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1
Exhibit B4 Unit Pricing for Boulder Removal
Exhibit C1 CA Conditional Waiver And Release On Progress Payment
Exhibit C2 CA Unconditional Waiver And Release On Progress Payment
Exhibit D1 CA Conditional Waiver And Release On Final Payment
Exhibit D2 CA Unconditional Waiver And Release On Final Payment
Exhibit E: Not Used
Exhibit F: Performance & Payment Bonds (to be provided by JH Kelly)
Exhibit G: Not Used
Exhibit H: JH Kelly Construction Schedule
Exhibit I1: JHK Time and Material Rates – Labor
Exhibit I2: JHK Time and Material Rates – Equipment (to be provided by JH Kelly)
Exhibit J: JHK Proposed Invoicing Schedule

**1.3.1.3** The Construction Documents; and

**1.3.1.4** The EPC Agreement, but only to the extent the EPC Agreement relates to the Work and the terms and conditions under which the Work shall be performed, as mutually agreed and modified by the parties on the attached Exhibit A2.

## 1.4    Interpretation and Intent.

**1.4.1**    Design-Builder and Subcontractor, prior to execution of the Agreement, shall carefully review all the Contract Documents for any conflicts or ambiguities. Design-Builder and Subcontractor will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**1.4.2**    The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness.

## 1.5    Mutual Obligations and Acknowledgments.

**1.5.1**    Design-Builder and Subcontractor commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents. Design-Builder and Subcontractor shall perform their respective responsibilities, obligations and services in a timely manner to facilitate the other's timely and efficient performance and so as not to unreasonably delay or interfere with the other's performance of its obligations under the Contract Documents.

**1.5.2**    Subcontractor acknowledges that it has reviewed the EPC Agreement, and has met with Design-Builder to review, discuss, and familiarize itself with the EPC Agreement, as well as all

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 33 of 322

documents incorporated therein and attached thereto. Subcontractor will include in each lower-tier subcontract (if any) the appropriate flow-down clauses as required by the EPC Agreement.

**1.6**    **Entire Agreement.**

**1.6.1**    The Contract Documents, as modified and mutually agreed to by the Design-Builder and Subcontractor, all of which are incorporated by reference into this Agreement, and any modifications thereto, are attached to this Agreement, form the entire agreement between Design-Builder and Subcontractor and are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 10 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 34 of 322

# Article 2

## Subcontractor's Services and Responsibilities

**2.1**  **General.**

**2.1.1**  Within seven (7) days after execution of this Agreement, Design-Builder and Subcontractor will meet to discuss issues affecting the administration and schedule of the Work, and implement the necessary procedures, including but not limited to those relating to schedule updates, submittals, and payment, to facilitate the ability of the parties to perform their obligations under this Agreement.

**2.1.2**  Subcontractor's Representative shall be reasonably available to Design-Builder and shall have the necessary expertise and experience required to supervise the Work. Subcontractor's Representative shall communicate regularly with Design-Builder and shall be vested with the authority to act on behalf of Subcontractor. Subcontractor shall replace its Representative upon the reasonable request of Design-Builder.

**2.1.3**  Subcontractor shall only communicate with Owner, Design-Builder's Design Consultant or separate contractors of Design-Builder or Owner through Design-Builder.

**2.2**  **Review of Site and Contract Documents.**

**2.2.1**  Subcontractor represents that it has examined the Site and the Contract Documents prior to executing this Agreement so as to reasonably ascertain the nature of the Work and the various conditions affecting the Work.

**2.2.2**  Subcontractor shall promptly report to Design-Builder any errors, inconsistencies, omissions, or violations of Legal Requirements that Subcontractor discovers. Subcontractor shall be liable to Design-Builder for any damages resulting from any such errors, inconsistencies, omissions, or violations of Legal Requirements which Subcontractor discovers and fails to report to Design-Builder. Nothing in this Agreement shall be deemed to transfer any design liability from Design-Builder to Subcontractor, unless Subcontractor's scope of Work includes design-assist services or Subcontractor must perform any incidental design in order to satisfy the requirements of this Agreement.

2.2.3  Subcontractor disclaims any and all liability with respect to latent structural, soil and subsurface conditions and pre-existing contamination of the jobsite.

**2.3**  **Construction Services Generally.**

**2.3.1**  Subcontractor shall perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents and the Project Schedule.

**2.3.2**  At the request of Design-Builder, Subcontractor shall attend meetings with Design-Builder, Owner, and/or separate design professionals or contractors of Design-Builder or Owner to discuss design and/or construction issues regarding the Subcontractor's Work as listed in Exhibit B which may arise during the Project.

**2.4**  **Submittals and Substitutions.**

**2.4.1**  In accordance with the Contract Documents and the Project Schedule, Subcontractor shall submit for Design-Builder's review and approval submittals, including shop drawings,

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 35
of 322

product data and samples. Design-Builder shall advise Subcontractor on or before the meeting required by Section 2.1.1 hereof of the submittal requirements for the Project. Any variances with the Construction Documents shall be specifically identified in Subcontractor's submittals or included in Exhibit B. Design-Builder's review and approval shall not relieve Subcontractor of its responsibilities to perform the Work in accordance with the Construction Documents unless Design-Builder expressly approves in writing any such variance in its response to Subcontractor's submittals. Subcontractor shall make any necessary revisions to the submittals requested by Design-Builder.

**2.4.2**    Subcontractor shall not make any substitutions in the Work or procedures or methods specified by Owner, Design-Builder or the Construction Documents for performing the Work unless it first receives written approval for such substitution from Design-Builder.

## 2.5    Sub-Subcontractors.

**2.5.1**    Subcontractor shall employ only Sub-Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents. Subcontractor agrees that each Sub-Subcontractor shall be fully bound to Subcontractor in the same manner as Subcontractor is bound to Design-Builder for all the requirements of the Contract Documents to the extent applicable to the Sub-Subcontractor's scope of Work.

**2.5.2**    Subcontractor assumes responsibility to Design-Builder for the proper performance of the Work of Sub-Subcontractors and any acts and omissions in connection with such performance. Subcontractor shall coordinate the activities of all Sub-Subcontractors. Nothing in this Agreement is intended or deemed to relieve Subcontractor from responsibility for the work performed by its Sub-Subcontractors, or create any legal or contractual relationship between Owner or Design-Builder and any Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

## 2.6    Work of Others.

**2.6.1**    Subcontractor agrees to reasonably cooperate with, and coordinate its activities so as not to interfere with, those parties performing work at the Site, including Owner's and Design-Builder's separate contractors, so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.6.2**    If any part of the Work depends upon other work performed by Design-Builder, or Design-Builder's or Owner's separate contractors, Subcontractor shall, prior to proceeding with that part of the Work, inspect such other work and promptly notify Design-Builder of any discovered discrepancies or defects that would render it unacceptable for the proper performance of the Work. Subcontractor shall not proceed with such part of the Work without further direction from Design-Builder. Design-Builder shall promptly correct or cause to be corrected any such discrepancy or defect in the other work. Any delay in the performance of the Work caused by the Owner, or for which the Owner is responsible, will be resolved by the application of Section 5.4.1. Except to the extent such discrepancies or defects in such other work are latent, Subcontractor shall be liable for appropriate losses or damages incurred due to any discrepancies or defects in such other work not reported to Design-Builder by Subcontractor.

## 2.7    Site Cleanup.

**2.7.1**    Subcontractor shall keep the Site reasonably free from debris, trash and construction wastes resulting from the performance of the Work. Upon Substantial Completion of the Work, or a portion of the Work, Subcontractor shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 36 of 322

## 2.8 Inspection.

**2.8.1** At all reasonable times, Subcontractor shall provide sufficient facilities for inspection of the Work by Design-Builder at the Site and at all locations where portions of the Work are in progress or various stages of completion. When appropriate portions of the Work are ready for inspection, Subcontractor shall notify Design-Builder.

**2.8.2** When Subcontractor considers that the Work, or a portion thereof that Owner or Design-Builder agrees to accept separately, is Substantially Complete, Subcontractor will notify Design-Builder in writing, and Subcontractor and Design-Builder will jointly inspect all of the Work or a portion thereof performed by Subcontractor. After the inspection, Subcontractor will prepare and submit to Design-Builder in writing a comprehensive punch list of items to be completed or corrected prior to Final Completion. Design-Builder will have ten (10) days from receipt of the punch list to accept, reject, or add items to such punch list. Failure to include an item on such punch list does not alter the responsibility of Subcontractor to complete all Work in accordance with the Contract Documents.

## 2.9 Patents and Copyrights.

**2.9.1** Subcontractor shall pay all license fees and royalties due for items, materials, methods, systems or processes applicable to the Work which are subject to copyrights or patent rights and which are selected by Subcontractor.

## 2.10 Legal Requirements.

**2.10.1** Subcontractor shall perform the Work in accordance with all applicable Legal Requirements.

**2.10.2** The Contract Price and/or the times for completion of the Work shall be adjusted to compensate Subcontractor for the effects, if any, of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, but only to the extent Design-Builder receives a corresponding adjustment from Owner.

## 2.11 Government Approvals and Permits.

**2.11.1** Subcontractor shall obtain and pay for the permits, licenses, and government charges included in Exhibit B required for the prosecution of the Work.

**2.11.2** Subcontractor shall provide reasonable assistance to Design-Builder in obtaining those permits, inspections, approvals and licenses, if any, that are the responsibility of Owner or Design-Builder and related to the Work.

## 2.12 Project Safety and Security.

**2.12.1** Subcontractor recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, (iii) the work of others on the Project, and (iv) all other property at the Site or adjacent thereto. Subcontractor assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work.

**2.12.2** Subcontractor and Sub-Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific and/or Design-Builder-specific safety requirements set forth in the Contract Documents or established for the Project, provided that such Owner-specific and/or Design-Builder-specific requirements do not violate any applicable Legal Requirement.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 37 of 322

Subcontractor will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Design-Builder's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.12.3** Subcontractor shall cooperate with Design-Builder on all security matters and shall promptly comply with any Project security requirements established by Design-Builder. Subcontractor shall at all times conduct all operations under this Agreement in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage, or other means to any property.

**2.12.4** Subcontractor shall furnish its employees and its Sub-Subcontractors' employees identification badges, approved by Design-Builder, showing Subcontractor's name and employee number. Each employee shall be required to wear his badge in plain sight at all times whenever he is on the Site. Subcontractor, its Sub-Subcontractors, and their employees shall observe all procedures for admission to the Site required by Design-Builder.

**2.12.5** Prior to the start of the Work at the Site, Subcontractor and its Sub-Subcontractors shall submit to Design-Builder a list of all employees to be employed at the Site in connection with the Work under this Agreement. Such list shall include employee's name, and shall be kept current during the course of the Work.

## 2.13 Warranty.

**2.13.1** Subcontractor warrants to Design-Builder that the Work, including all materials and equipment furnished as part of the Work, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner and/or Design-Builder with greater warranty rights than set forth in this Section 2.13 or the Contract Documents. Subcontractor will provide and, if requested, assign to Design-Builder all manufacturers' warranties upon Substantial Completion.

## 2.14 Correction of Defective Work.

**2.14.1** Subcontractor agrees to correct any of the Work that is found not to be in conformance with the Contract Documents, including that part of the Work subject to Section 2.13 hereof, within a period of one (1) year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by any specific warranty included in the Contract Documents. Where defective Work (and damage to other work resulting therefrom) has been corrected or removed and replaced under this Section 2.14.1, the correction period hereunder with respect to such Work will be extended for an additional period of one (1) year after such correction or removal and replacement has been satisfactorily completed.

**2.14.2** Subcontractor shall, within seven (7) days of receipt of written notice from Design-Builder that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work or the Project affected by the nonconforming Work. If Subcontractor fails to commence the necessary steps within such seven (7) day period, Design-Builder, in addition to any other remedies provided under the Contract Documents, may provide Subcontractor with written notice that Design-Builder will commence correction of such nonconforming Work with its own forces. If Design-Builder does perform such corrective Work, Subcontractor shall be responsible for all reasonable costs incurred by Design-Builder in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day period identified herein shall be deemed inapplicable.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 38
of 322

**2.14.3** The one (1) year period referenced in Section 2.14.1 above applies only to Subcontractor's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Design-Builder may have regarding Subcontractor's obligations under the Contract Documents.

**2.15 Start-Up and Training.**

**2.15.1** If required as part of Subcontractor's Work, Subcontractor shall be responsible for the start-up, testing, and commissioning of the Work, and shall train Owner's personnel with respect to the operation and maintenance of the Work.

**2.16 Hazardous Conditions.**

**2.16.1** Subcontractor is responsible for Hazardous Conditions introduced to the Site by itself, Sub-Subcontractors or anyone for whose acts they may be liable. Subcontractor must notify Design-Builder immediately upon the discovery of the presence of any Hazardous Conditions on, or the release of Hazardous Conditions from, the Site. Subcontractor will be responsible for the handling, storage, remediation, or disposal of such Hazardous Conditions (including, but not limited to, any conditions resulting from the presence thereof) in compliance with all applicable Legal Requirements and as directed by Design-Builder.

**2.16.2** Subcontractor shall indemnify, defend and hold harmless Owner, Design-Builder, Design Consultants, and their officers, directors, employees and agents from and against all claims, losses, damages, liabilities, and expenses, including attorneys' fees and expenses, arising out of or resulting from those Hazardous Conditions for which Subcontractor, Sub-Subcontractors or anyone for whose acts they may be liable are responsible under this Agreement.

**2.16.3** Subcontractor and its Sub-Subcontractors will, at their expense, provide suitable facilities to prevent the introduction of any substances or materials into any stream, river, lake or other body of water which may pollute the water or constitute substances or materials deleterious to fish and wildlife.

**2.16.4** Subcontractor and its Sub-Subcontractors will so perform the Work as not to discharge into the atmosphere from any source whatsoever smoke, dust, or other air contaminants in violation of the laws, rules, and regulations of the governmental entities having jurisdiction.

**2.16.5** Nothing furnished by Subcontractor in the performance of the Work or for incorporation into the Work will contain asbestos (i.e. must be "asbestos-free"). Subcontractor must execute and submit a certificate of conformance with this Section in such form as may be required by Design-Builder.

**2.17 Omissions and Misdescriptions**

**2.17.1 In the event Subcontractor discovers** omissions from the drawings or specifications or the misdescription of details of Work which are manifestly necessary to carry out the intent of the Construction Documents, or which are customarily performed, Subcontractor shall immediately bring to the attention of Design-Builder the omission via a Request for Information (RFI) prior to commencement of any work, but shall not relieve the Subcontractor from performing such omitted or misdescribed details of the Work and the Work shall be performed as if fully and correctly set forth and described in the Construction Documents. Variations in quantities from as-bid shall be brought to the attention of Design-Builder via a Request For Information (RFI) prior to any purchase of materials.

**2.18 Underground Installations**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 15 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 39 of 322

**2.18.1** Existing underground installations are indicated on the Construction Documents only to the extent such information was discovered by Owner or Design-Builder in preparing the Construction Documents. There is no guarantee as to the accuracy or completeness of such information, and all responsibility for the accuracy and completeness thereof is expressly disclaimed. Subcontractor shall be responsible for discovery of existing underground installations, in advance of excavating or trenching, by contacting all local utilities and by prospecting. Subcontractor's responsibility for locating underground installations is limited to one initial underground verification as noted in Exhibit B. Subcontractor disclaims any and all liability with respect to soil and subsurface conditions, including undocumented or inaccurate location services provided by others.

**2.19    Publicity**

**2.19.1** Subcontractor shall not engage in any advertising, publicity, or other promotional activities which in any way directly or indirectly mentions or refers to this Agreement, the relationship between the parties created thereby or the services and material furnished thereunder, without obtaining the prior written consent of Design-Builder. Subcontractor shall not display any signs, posters, or other advertising matter in or on any part of the Work or around the Site thereof without specific written approval of Design-Builder. The taking of photographs, videotapes, or other visual images of the Site will not be permitted without the prior written approval of Design-Builder.

**2.20    Labor Requirements**

**2.20.1** All employee taxes, wages, and employer contributions imposed by any Union Affiliations, Federal or State laws shall be paid by Subcontractor or its Sub-subcontractors, including all interest and penalties payable under said laws as a result of any noncompliance therewith. Subcontractor shall also indemnify, defend and hold harmless Design-Builder from and against any and all claims, liabilities, and expenses with respect to the foregoing.

# Article 3

## Design-Builder's Services and Responsibilities

**3.1    Timely Reviews and Approvals.**

**3.1.1** Design-Builder shall provide timely reviews and approvals of all submittals within ten (10) Working Days (consistent with the turnaround times set forth in the Project Schedule), or as agreed to by the parties at the meeting required under Section 2.1.1 hereof.

**3.2    Design-Builder's Representative.**

**3.2.1** Design-Builder's Representative shall be responsible for providing Design-Builder-supplied information and approvals in a timely manner to permit Subcontractor to fulfill its obligations under the Contract Documents.

**3.3    Furnishing of Services and Information.**

**3.3.1** Unless expressly stated to the contrary in the Contract Documents, and to the extent Design-Builder has received such items from Owner, Design-Builder shall provide for Subcontractor's information the items listed below. Design-Builder does not warrant the accuracy

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 40
of 322

or completeness of such items provided, however, that Subcontractor is entitled to rely on these items to the same extent Design-Builder is entitled to rely upon such items in the EPC Agreement:

**3.3.1.1** Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines (underground and above ground);

**3.3.1.2** Geotechnical studies describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site;

**3.3.1.3** Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper construction of the Project and enable Subcontractor to perform the Work;

**3.3.1.4** A legal description of the Site;

**3.3.1.5** Record drawings of any existing structures at the Site;

**3.3.1.6** Environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site;

**3.3.1.7** Owner's Project Criteria;

**3.3.1.8** All permits, approvals, and licenses, if any, set forth in the Owner's Permit List attached as an exhibit to the EPC Agreement; and

**3.3.1.9** Review and submittal of Test and inspection reports as required in Exhibit B.

**3.3.2** Design-Builder shall provide Subcontractor with a copy of the EPC Agreement, including all exhibits, attachments, and other Contract Documents enumerated and incorporated therein. Such copy may be redacted to preserve business confidential information or any other information that Design-Builder deems proprietary.

**3.3.3** Intentionally omitted.

**3.3.4** Design-Builder shall provide Subcontractor with the Project Schedule and appropriate updates thereto.

**3.4** **Notification of Errors.**

**3.4.1** Design-Builder shall notify Subcontractor of any errors, inconsistencies, or omissions Design-Builder discovers in the Work. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall relieve Subcontractor of responsibility for errors, inconsistencies, or omissions in the Work.

**3.5** **Attendance at Design Meetings.**

**3.5.1** Design-Builder shall afford Subcontractor and its Sub-Subcontractors the opportunity to attend all necessary design meetings with Owner, Design-Builder's Design Consultant or others furnishing portions of the design for the Project.

**3.6** **Review and Approval of Submittals.**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 41 of 322

**3.6.1**   Design-Builder shall review and approve submittals, including shop drawings, product data and samples, within fourteen (14) Days after being submitted by Subcontractor. Design-Builder's review and approval of submittals shall be only for the purpose of confirming general conformance with the Construction Documents. Design-Builder's review and approval shall not relieve Subcontractor of its responsibilities to perform the Work in accordance with the Construction Documents unless Design-Builder expressly approves in writing any such variance in its response to Subcontractor's submittals. If revisions are necessary to a submittal prior to Design-Builder's approval, Design-Builder shall inform Subcontractor of any such necessary revisions.

**3.7**    **Design-Builder's Separate Contractors.**

**3.7.1**   Design-Builder is responsible for all work performed on the Project or at the Site by its separate subcontractors under Design-Builder's control. Design-Builder shall contractually require its separate subcontractors to cooperate with, and coordinate their activities so as not to unreasonably interfere with, Subcontractor's ability to timely complete its Work consistent with the Contract Documents.

**3.7.2**   Design-Builder, Owner, other contractors and other subcontractors may be working at the Site during the performance of this Agreement and Subcontractor Work or use of certain facilities may be interfered with as a result of such concurrent activities. Design-Builder reserves the right to require Subcontractor to schedule the order of performance of the Work in such a manner as will minimize interference with work of any of the parties involved.

**3.7.3**   Subcontractor shall cooperate with Design-Builder and other consultants, contractors, and subcontractors working at the Site, and shall coordinate its Work with the others and shall not delay or hinder in any way the progress of the Work as a whole. Subcontractor shall not commit any act that will interfere with the performance of work by any other consultant, contractor, and subcontractor or by Design-Builder or Owner.

# Article 4

## Ownership of Work Product

**4.1**    **Work Product.**

**4.1.1**   The Subcontractor shall have no ownership and property rights in any drawings, specifications, and other documents and electronic data ("Work Product") furnished by Design-Builder to Subcontractor under this Agreement. Design-Builder shall be granted ownership of all Work Product, if any, furnished by Subcontractor to Design- Builder under this Agreement.

**4.2**    **Indemnification for Use of Work Product.**

**4.2.1**   If either Design-Builder or Subcontractor uses the Work Product furnished to them by the other on any other project, it agrees that it shall do so at its sole risk and without liability or legal exposure to the other party, Owner, or anyone working through them. Such party further agrees that it shall defend, indemnify and hold harmless the other party from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from such use of the Work Product on another project.

# Article 5

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 42 of 322

## Time of Performance

**5.1    Date of Commencement.**

**5.1.1**    The Work shall commence five (5) days after Subcontractor's receipt of Design-Builder's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

**5.2    Time of Completion.**

**5.2.1**    Subcontractor shall diligently and continuously prosecute and complete the Work in accordance with the Project Schedule as it may be revised and issued from time to time during the performance of the Work, and any other scheduling requirements listed in the Contract Documents.

**5.2.2**    Subcontractor shall participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Work. Subcontractor shall provide Design-Builder information for the scheduling of the times and sequence of operations required for the Work to meet Design-Builder's overall schedule requirements, shall continuously monitor the Project Schedule, including any revisions thereto, so as to be fully familiar with the timing, phasing and sequence of operation of the Work and of other work on the Project, and shall execute the Work in accordance with the requirements of the Project Schedule including any revisions thereto. Any Owner or Design-Builder directed changes to the scheduling of times, compression, or sequence of operations required for the Work that impact the Subcontractor's cost of performing the Work, including extended general conditions, will be considered a change to the Work and subject to the provisions of Article 12.

**5.2.3**    Subcontractor shall timely perform the various stages of the Work so that Design-Builder can achieve the dates set forth in the Project Schedule, including any revisions thereto.

**5.3    Time is of the Essence.**

**5.3.1**    Design-Builder and Subcontractor mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents and the Project Schedule.

**5.4    Delays to the Work.**

**5.4.1    Owner-Caused Delays.** If Subcontractor is delayed in the performance of the Work due to the acts or omissions of the Owner, or for which Owner is responsible, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder and/or Owner may reasonably require, then Subcontractor's time for performance shall be reasonably extended by Change Order, provided that a corresponding adjustment to Design-Builder's time for performance is made by the Owner under the EPC Agreement. In addition, Subcontractor will also be entitled to an appropriate adjustment of the Contract Price under this Section 5.4.1, provided a corresponding adjustment to Design-Builder's compensation is made by the Owner under the EPC Agreement. Notwithstanding any other provision to the contrary, any disputes between Design-Builder and Subcontractor involving delay and resulting damages that arise out of, or relate to, the acts or omissions by Owner or for which Owner is responsible shall be resolved pursuant to Section 13.3 hereof. Subcontractor's recovery shall be limited to the amount, if any, which Design-Builder, on behalf of Subcontractor, actually receives from Owner on account of such claim.  Payment by Owner shall be by an express condition precedent to Design-Builder's duty of payment to Subcontractor.

**5.4.2    Force Majeure Events, Hazardous Conditions, & Differing Site Conditions.** If Subcontractor is delayed in the performance of the Work due to Differing Site Conditions (as

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 19 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 43 of 322

defined in FAR 52.236-2), Hazardous Conditions (other than those for which Subcontractor is responsible under Section 2.16 hereof), or Force Majeure Events, and due to no fault of its own or those for whom Subcontractor is responsible, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder and/or Owner may reasonably require, then Subcontractor's time for performance will be reasonably extended by Change Order, provided that a corresponding adjustment to Design-Builder's time for performance is made by the Owner under the EPC Agreement. In addition, Subcontractor will also be entitled to an appropriate adjustment of the Contract Price under this Section 5.4.2, provided a corresponding adjustment to Design-Builder's compensation is made by the Owner under the Design-Build Agreement. Notwithstanding any other provision to the contrary, any disputes between Design-Builder and Subcontractor involving delay and resulting damages that arise out of, or relate to, Differing Site Conditions, Hazardous Conditions (other than those for which Subcontractor is responsible under Section 2.16 hereof), or Force Majeure Events shall be resolved pursuant to Section 13.3 hereof.

**5.4.3   Design-Builder-Caused Delays.** If Subcontractor's Work is delayed solely as a result of acts or omissions of Design-Builder, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder may reasonably require, then Subcontractor's time for performance will be reasonably extended by Change Order and Design-Builder will be liable to Subcontractor for Subcontractor's actual direct damages caused by Design-Builder. Design-Builder's exercise of its rights to authorize acceleration of the Work shall not constitute a delay, disruption or interference with Subcontractor's Work.

**5.4.4   Subcontractor-Caused Delays.** If the Project is delayed due to the Subcontractor or anyone for whom Subcontractor is responsible, and not due to Design-Builder or Owner, Subcontractor shall compensate and indemnify Design-Builder for all costs and expenses arising from such delay, including any and all costs incurred by the Owner, and/or any liquidated damages or other damages that Owner may assess against Design-Builder which are attributable to Subcontractor or anyone for whom Subcontractor is responsible pursuant with Specific Conditions Section 5.7. In addition, Subcontractor shall, at the direction of Design-Builder and at Subcontractor's own cost and expense, work such overtime and take such other measures as may be necessary to make up for all time lost in the completion of the Work due to such delay.

**5.4.5**   In no event shall Subcontractor be entitled to any extension of time or any damages for any delays, disruptions or interferences caused by Subcontractor or its Sub-Subcontractors. In the event damages incurred by Design-Builder are caused both by Subcontractor and another entity for whose acts or omissions Subcontractor is not liable, Design-Builder will have the right to reasonably apportion said damages amongst the responsible parties.

# Article 6

## Contract Price

6.1   **Contract Price.**

**6.1.1**   Design-Builder shall pay Subcontractor in accordance with Article 6 hereof the sum of Fourteen Million Three Hundred Forty One Thousand Two Hundred Eighty One and 00/100 Dollars (**$14,341,281.00**) ("Contract Price"), subject to adjustments made in accordance with the Contract Documents. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements. Design-Builder is not responsible for Subcontractor's bidding or estimating mistakes or miscalculation of market conditions.

6.2   **Markups for Changes.**

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 20 of 41

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 44 of 322

**6.2.1** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 12.6.1.3 or 12.6.1.4 hereof, the following markups shall be allowed on such changes:

**6.2.1.1** For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Subcontractor shall receive a Fee of _____ _____ ten _____ percent (_____ 10 _____%) of the additional Costs of the Work incurred for that Change Order.

**6.2.1.2** For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall include:

*[Check one box only]*

☐       No additional reduction to account for Subcontractor's Fee or any other markup.

*or*

☒       An amount equal to the sum of: (a) _____ ten _____ percent (_____ 10 _____%) applied to the direct costs of the net reduction (which amount will account for a reduction associated with Subcontractor's Fee).

# Article 7

## Procedure for Payment

**7.1**     **Schedule of Values.**

**7.1.1**     Unless required by Design-Builder upon execution of this Agreement, within ten (10) days of execution of the Agreement, Subcontractor shall submit for Design-Builder's review and approval a Schedule of Values for all of the Work. The Schedule of Values will (i) subdivide the Work into its respective parts; (ii) include values for all items comprising the Work; and (iii) serve as the basis for monthly progress payments made to Subcontractor throughout the Work.

**7.2**     **Progress Payments.**

**7.2.1**     Beginning with the first month after the Date of Commencement, Subcontractor shall submit on the twenty-eighth (28th) day of each month for Design-Builder's review and approval, Subcontractor's Application for Payment requesting payment for all Work performed as of the date of the Application for Payment. The Application for Payment shall be accompanied by all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.1 hereof, including Subcontractor's Schedule of Values as approved by Design-Builder. As a prerequisite for any payment, Subcontractor must provide with each progress invoice a completed Conditional/Unconditional Waiver and Release on Progress Payment form, as appropriate (attached as **Exhibit C1 and C2**) from Subcontractor and its Sub-subcontractors and suppliers that have filed a Preliminary Notice.  Design-Builder will submit Subcontractor's proper Application for Payment to Owner with Design-Builder's Application. Each Application for Payment shall also show the amount of all previous payments to Subcontractor and the amount of current retainage, and shall include evidence satisfactory to Design-Builder demonstrating that Subcontractor has paid all persons supplying labor, materials or services in accordance with its contractual obligations to these persons in connection with the Work. "Current retainage" shall be calculated by multiplying the value of the Work completed and qualified for payment by the retainage percentage.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 45
of 322

**7.2.2** The Application for Payment may request payment for equipment and materials not yet incorporated into the Project, provided that (i) Design-Builder is satisfied that the equipment and materials are suitably stored at either the Site or another acceptable location, (ii) the equipment and materials are protected by suitable insurance, and (iii) upon payment, Design-Builder will receive the equipment and materials free and clear of all liens and encumbrances.

**7.2.3** The Application for Payment shall constitute Subcontractor's representation that the Work has been performed consistent with the Contract Documents, has progressed to the point indicated in the Application for Payment, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and security interests upon the incorporation of the Work into the Project, or upon Subcontractor's receipt of payment, whichever occurs earlier.

**7.2.4** Design-Builder shall make payment on Subcontractor's properly submitted and accurate Application for Payment within seven (7) days after Design-Builder's receipt of payment from Owner on account of Subcontractor's monthly Application for Payment, but in each case less the total of payments previously made, and less amounts properly withheld under this Agreement. Payment terms not to exceed 30 days from approved invoice date. Balances outstanding after 45 days shall accrue interest at a rate of 1.5% per month.

**7.3**     **Retainage on Progress Payments.**

**7.3.1** Design-Builder will retain from each of Subcontractor's Application for Payment _____ _____ five _____ percent (_____ 5 _____ %). Unless mutually agreed otherwise between the parties, retainage will be included in Design-Builder's final payment to Subcontractor, provided Design-Builder has received such retained amounts from Owner and the Design-Builder agrees that Subcontractor has met all of its obligations under the Agreement.

**7.4**     **Withholding of Payments.**

**7.4.1** If Design-Builder determines that Subcontractor is not entitled to all or part of an Application for Payment, it will notify Subcontractor prior to the date payment is due. The notice shall indicate the specific amounts Design-Builder intends to withhold, the reasons for the withholding, and the specific measures Subcontractor must take to rectify Design-Builder's concerns. Design-Builder and Subcontractor will attempt to resolve Design-Builder's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Design-Builder shall pay Subcontractor the undisputed amount of the Application for Payment, and Subcontractor may pursue its rights under the Contract Documents, including those under Article 13 hereof.

**7.4.2** In addition, any amounts otherwise payable under the Agreement may be withheld, in whole or in part, if (i) any claims or backcharges against Subcontractor by Design-Builder or third parties remain unpaid; or (ii) Subcontractor or its insurance company refuse to promptly defend Design-Builder or Owner for any claim that Subcontractor is required to defend and indemnify Design-Builder and/or Owner under this Agreement.

**7.4.3** Design-Builder will pay such withheld payments if Subcontractor (i) pays, satisfies, or discharges any claim of Design-Builder, or third party against Subcontractor, arising out of or in any way connected with this Agreement; or (ii) cures all defaults in the performance of the Agreement.

**7.5**     **Final Payment.**

**7.5.1** Subcontractor shall submit its Final Application for Payment to Design-Builder in accordance with Section 7.5.2 below. Design-Builder shall make payment on Subcontractor's properly submitted and accurate Final Application for Payment within thirty (30) days after

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 22 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 46
of 322

Design-Builder's receipt of final payment from Owner on account of Subcontractor's Final Application for Payment, but in no event later than thirty (30) days from the date of the Certification of Completion for Final Payment, provided also that Subcontractor has satisfied the requirements for final payment set forth in Section 7.5.2 below.

**7.5.2**  At the time of submission of its Final Application for Payment, Subcontractor shall provide the following information:

**7.5.2.1** Subcontractor's Conditional Waiver Upon Final Payment, and Certification of Completion for Final Payment

**7.5.2.2** Any other data required by Design-Builder;

**7.5.2.3** Consent of Subcontractor's surety, if any, to final payment;

**7.5.2.4** All operating manuals, warranties and other deliverables required by the Contract Documents;

**7.5.2.5** Certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents.

**7.5.2.6** As-built drawings, if required by the Contract Documents; and

**7.5.2.7** Completion of Design-Builder's required closeout procedures including, but not limited to, completion of all punch list items developed as required by Section 2.8.2 of this Agreement.

**7.5.3**  Subcontractor shall submit its Final Application for Payment promptly upon completion of the Work, but in no event later than sixty (60) days from Final Completion of the Work. Design-Builder will have no responsibility or liability for payment to Subcontractor if Subcontractor fails to submit its final invoice within the sixty (60) day period. The final payment, however, shall not relieve the Subcontractor from any responsibility or obligation under this Agreement (including, without limitation, the warranty and indemnification provisions thereof) or constitute a waiver of any claim by Design-Builder against Subcontractor.

**7.6**  **Pay When Paid.**

**7.6.1**  Intentionally Omitted.

**7.7**  **Intentionally Omitted**.

**7.8**  **Advance Payments.**

**7.8.1**  Design-Builder has the right, at its sole option, to advance any payment due Subcontractor under this Agreement.

**7.9**  **Payment Not Acceptance.**

**7.9.1**  No payment to Subcontractor under this Agreement shall be evidence of, or construed to be, acceptance of defective, faulty, improper or non-conforming work.

**7.10**  **Subcontractor's Payment Obligations.**

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 47 of 322

**7.10.1** Subcontractor will pay its Sub-Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Subcontractor has received from Design-Builder on account of their work. Subcontractor will impose similar requirements on its Sub-Subcontractors to pay those parties with whom they have contracted. Subcontractor will indemnify and defend Owner and Design-Builder against any claims for payment and mechanic's liens as set forth in Section 11.3 hereof, providing Design-Builder is not in breach of its contractual obligations to make payment to Subcontractor for its Work.

## 7.11    Record Keeping and Finance Controls.

**7.11.1** With respect to changes in the Work performed on a cost basis by Subcontractor pursuant to the Contract Documents, Subcontractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after final payment of the Work, Design-Builder and Design-Builder's accountants shall be afforded access to and the right to audit from time-to-time, upon reasonable notice, Subcontractor's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to the changes in the Work, all of which Subcontractor shall preserve for a period of three (3) years after final payment. Such inspection shall take place at Subcontractor's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by Subcontractor and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

## 7.12    Sub-subcontractors, Suppliers, and Vendors.

**7.12.1** Subcontractor must (if requested by Design-Builder) furnish an affidavit showing the names and addresses of all persons or companies who have furnished labor, materials or services for the Work and the amount due or to become due to each such person. If Subcontractor fails to promptly pay its Sub-Subcontractors or vendors for all labor, services, and materials furnished in connection with the performance of the Work, in accordance with its contractual obligations to such parties, Design-Builder may, after five (5) days written notice to Subcontractor, pay the amount of such liabilities directly to such parties or in the form of checks payable jointly to Subcontractor and such person or company and recover the amount from Subcontractor directly, or by the application of any portion of the Contract Price due. Subcontractor will (if requested by Design-Builder), provide affidavits from all persons furnishing labor, materials or services to the effect that they have been paid in full.

## 7.13    No Diversion of Funds or False Vouchers.

**7.13.1** Subcontractor is directed to comply with all statutory provisions which prohibit the wrongful diversion of funds or the submission of false vouchers.  Further, if Subcontractor diverts any funds received in payment under this Agreement and does not apply them to their intended purpose or submits false vouchers for payment, in addition to all other remedies, this Agreement shall be subject to termination for cause without any opportunity to cure.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 48
of 322

**7.14    Invoicing**

7.14.1    Invoices shall be submitted only electronically via email in Adobe PDF format to:

- USAPImaging@aecom.com  (AECOM Accounts Payable)
- steven.petto@aecom.com  (AECOM Project Manager)
- ocie.williams@aecom.com   (AECOM Procurement Manager)

Invoices shall include the following information:

- Oracle Purchase Order Number:  *to be determined after award*
- AECOM Project Number:  60482831
- AECOM Task Number:  01.30.030
- Documentation, e.g., an annotated, signed and scanned Schedule of Values, from the AECOM Site Manager (Pat Elliott) attesting that the scheduled work has been completed and that all work covered by the invoice has been satisfactorily completed.

# Article 8

## Stop Work and Termination

**8.1    Design-Builder's Right to Stop Work.**

**8.1.1**    Design-Builder may, without cause and for its convenience, order Subcontractor in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) Days during the duration of the Project.

**8.1.2**    Subcontractor is entitled to seek an adjustment of the Contract Price and/or times for completion of the Work if its cost or time to perform the Work has been adversely impacted by any suspension or stoppage of work by Design-Builder. However, under no circumstances will Subcontractor be entitled to any adjustment if such suspension or stoppage of work is caused by Subcontractor's breach of this Agreement, wrongful acts, or failure to act. Notwithstanding anything to the contrary herein, if Design-Builder's suspension of the Work is the result of Owner's suspension of Design-Builder's work under the EPC Agreement, then Design-Builder shall pay Subcontractor only those amounts Design-Builder actually receives from Owner on account of the Work.

**8.2    Design-Builder's Right to Terminate for Convenience.**

**8.2.1**    Upon ten (10) days' written notice to Subcontractor, Design-Builder may, for its convenience and without cause, elect to terminate this Agreement. In such event, Design-Builder shall have the right to use the existing Work Product, including all materials onsite and offsite in Subcontractor's prefabrication facilities, if any, for purposes of completing the Project, and shall pay Subcontractor for the following:

**8.2.1.1** All Work executed and all unpaid costs or expenses incurred by the Subcontractor in connection with the executed Work; and

**8.2.1.2** The reasonable costs and expenses attributable to such termination, including amounts due in settlement of terminated contracts with Sub-Subcontractors or suppliers. In no event will Subcontractor be entitled to any compensation for loss of anticipated profits, opportunity costs, unallocated overhead on Work not performed, or other amounts with respect to Work that has not been performed prior to termination.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 49 of 322

**8.2.2** If Design-Builder's termination of Subcontractor for convenience is the result of Owner's termination of Design-Builder for convenience under the Design-Build Agreement, then Design-Builder shall pay Subcontractor only those amounts Design-Builder actually receives from Owner on behalf of Subcontractor.

**8.3** **Design-Builder's Right to Terminate for Cause.**

**8.3.1** If Subcontractor persistently fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, its Sub-Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed in accordance with the Project Schedule, as such schedule may be adjusted, or (vi) perform material obligations under the Contract Documents, then Design-Builder shall have the rights, in addition to any other rights and remedies provided in the Contract Documents or by law, set forth in Sections 8.3.2 and 8.3.3 below.

**8.3.2** Upon the occurrence of an event set forth in Section 8.3.1 above, Design-Builder may provide written notice to Subcontractor that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within five (5) days of Subcontractor's receipt of such notice. If Subcontractor fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Subcontractor of such declaration.

**8.3.3** Upon declaring the Agreement terminated pursuant to Section 8.2.1 or 8.3.2 above, Design-Builder may enter upon the premises and take possession, for the purpose of completing the Work, of all materials thereon, which have been purchased or provided for the performance of the Work, all of which Subcontractor hereby transfers, assigns and sets over to Design-Builder for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of termination pursuant to Section 8.3.2, Subcontractor shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. If the Design-Builder incurs any attorneys' fees and expenses in defense of claims arising from Subcontractor's default, subject to the waiver of consequential damages set forth in Section 13.7 hereof, these costs may be deducted from any amounts due to Subcontractor by the Design-Builder.

**8.3.4** If Design-Builder improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Section 8.2 of the Agreement.

**8.4** **Subcontractor's Right to Stop Work.**

**8.4.1** If Design-Builder fails to pay any undisputed amounts due Subcontractor under this Agreement, Subcontractor may, in addition to any other rights afforded under the Contract Documents or at law, stop work in accordance with Section 8.4.2. However, to the extent Design-Builder's failure to pay is related to a dispute between the Parties, the dispute will be resolved in accordance with Article 13 and the parties will continue performance in accordance with Section 13.6 during the pendency of such dispute.

**8.4.2** Subcontractor shall provide Design-Builder with written notice that Subcontractor will stop work unless said failure to pay the undisputed amount is cured within seven (7) Days from Design-Builder's receipt of Subcontractor's notice. If Design-Builder does not cure the problem within such seven (7) day period, Subcontractor may stop work. In such case, Subcontractor shall be entitled to make a claim for adjustment to the Contract Price and the times for completion of the Work to the extent it has been adversely impacted by such stoppage.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 50
of 322

**8.5** **Subcontractor's Right to Terminate For Cause.**

**8.5.1** Subcontractor, in addition to any other rights and remedies afforded under the Contract Documents or at law, may terminate the Agreement for cause in accordance with Section 8.5.2 below if Design-Builder fails to cure the problems set forth in Section 8.4.1 above within thirty (30) days after Subcontractor has stopped the work.

**8.5.2** Upon the occurrence of the event set forth in Section 8.5.1 above, Subcontractor may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure, or reasonably commence to cure, such problem, then Subcontractor may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Subcontractor may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration. In such case, Subcontractor shall be entitled to recover in the same manner as if Design-Builder had terminated this Agreement for its convenience under Section 8.2 of the Agreement, plus any attorney's fees or costs incurred in defense of claims.

**8.6** **Bankruptcy of Design-Builder or Subcontractor.**

**8.6.1** If either Design-Builder or Subcontractor institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

**8.6.1.1** The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

**8.6.1.2** The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

**8.6.1.3** If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 8.

**8.6.2** The rights and remedies under Section 8.6.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code.

# Article 9

## Representatives of the Parties

**9.1** **Design-Builder's Representatives.**

**9.1.1** Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 51
of 322

for avoiding and resolving disputes under Section 13.4 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Shawn Kelly
Vice President
300 Lakeside Drive, Suite 400
Oakland, CA 94612
(858) 775-6523

**9.1.2**  Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 3.2 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Steve Petto
Associate Vice President
300 Lakeside Drive, Suite 400
Oakland, CA 94612
(510) 847-5008

**9.2    Subcontractor's Representatives.**

**9.2.1**  Subcontractor designates the individual listed below as its Senior Representative ("Subcontractor's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 13.4 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Mason Evans
President
2311 E. 1st Street
Vancouver, WA 98661
360-905-1387

**9.2.2**  Subcontractor designates the individual listed below as its Subcontractor's Representative, which individual has the authority and responsibility set forth in Section 2.1.2 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Steve Lennon
Senior Project Manager
2311 E. 1st Street
Vancouver, WA 98661
360-905-1372

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 52
of 322

# Article 10

## Insurance and Bonds

**10.1    Subcontractor's Insurance Requirements.**

**10.1.1**  Subcontractor is responsible for procuring and maintaining, from insurance companies authorized to do business in the state in which the Project is located, the insurance coverages set forth in the **Exhibits A, A1 and A2** to this Agreement, with the minimum ratings set forth in said Exhibits, for certain claims which may arise from or out of the performance of this Agreement and obligations under the Contract Documents.

**10.1.2**  Subcontractor shall require its Sub-Subcontractors to procure and maintain, from insurance companies authorized to do business in the state in which the Project is located, the insurance coverages set forth in the Insurance Exhibit.

**10.1.3**  Subcontractor's and its Sub-Subcontractors' insurance coverage set forth in the Insurance Exhibit shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**10.1.4**  Prior to commencing any services hereunder, Subcontractor shall provide Design-Builder with certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled by the insurer unless at least thirty (30) days prior written notice is given to Design-Builder by the Subcontractor or its Sub-Subcontractor, except for cancellation due to non-payment of premium.

**10.1.5**  Except for Workers' Compensation, Employer's Liability, and Professional Liability Insurance, the insurance policies required herein shall list Design-Builder, and any other entities required by the Contract Documents, if any, as an additional insured.

**10.1.6**  If any of the foregoing coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment.

**10.2    Property Insurance.**

**10.2.1**  In accordance with the Contract Documents, Owner or Design-Builder shall procure and maintain property insurance upon the entire Project.

**10.3    Waiver of Subrogation.**

**10.3.1**  Design-Builder and Subcontractor waive against each other and Owner, Sub-Subcontractors, Design Consultants, Owner's or Design-Builder's separate contractors, agents and employees of each and all of them, all damages covered by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Subcontractor shall, where appropriate, require similar waivers of subrogation from Design Consultant and Sub-Subcontractors and separate contractors of Design-Builder, and shall require each of them to include similar waivers in their contracts. These waivers of subrogation shall not contain any restriction or limitation that will impair the full and complete extent of its applicability to any person or entity unless agreed to in writing prior to the execution of this Agreement.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 53 of 322

**10.4** **Bonds and Other Performance Security.**

**10.4.1** Subcontractor shall provide and Design-Builder shall reimburse Subcontractor for Performance and Payment Bonds each in the amount of one hundred percent (100%) of the Contract Price ("Bonds") in the form prescribed in **Exhibit F.** The Bonds shall be delivered to Design-Builder not later than ten (10) days after award of this Agreement. Subcontractor will not be issued the notice-to-proceed until after Design-Builder receives the Bonds. Such Bonds shall be executed as surety by an entity acceptable to Design-Builder and authorized to issue surety bonds in the state where the Work is to be performed. Subcontractor is solely liable for any delays caused by its failure to provide the Bonds.

# Article 11

## Indemnification

**11.1** **Patent and Copyright Infringement.**

**11.1.1** Subcontractor shall defend any action or proceeding brought against Owner or Design-Builder based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Design-Builder shall give prompt written notice to Subcontractor of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Subcontractor shall indemnify and hold harmless Owner and Design-Builder from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Subcontractor agrees to keep Design-Builder informed of all developments in the defense of such actions.

**11.1.2** If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Subcontractor shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Subcontractor cannot so procure such right within a reasonable time, Subcontractor shall promptly, at Subcontractor's option and at Subcontractor's expense, (i) modify the Work so as to avoid infringement of any patents, or copyrights, or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**11.1.3** Sections 11.1.1 and11.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating to a particular process or product of a particular manufacturer specified by Owner or Design-Builder or (ii) arising from modifications to the Work by Owner or Design-Builder after acceptance of the Work.

**11.1.4** The obligations set forth in this Section 11.1 shall constitute the sole agreement between the parties relating to liability for infringement or violation of any patent or copyright.

**11.2** **Intentionally Omitted.**

**11.3** **Payment Claim Indemnification.**

**11.3.1** Providing that Design-Builder is not in breach of its contractual obligation to make payments to Subcontractor for the Work, Subcontractor shall indemnify, defend and hold harmless Owner and Design-Builder from any claims or mechanic's liens brought against Owner, Design-Builder, or against the Project as a result of the failure of Subcontractor, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for, or in connection with the Work. Within three (3)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 54
of 322

days of receiving written notice from Design-Builder that such a claim or mechanic's lien has been filed, Subcontractor shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond. If Subcontractor fails to do so, Design-Builder will have the right to discharge the claim or lien and hold Subcontractor liable for costs and expenses incurred, including attorneys' fees.

**11.4    Subcontractor's General Indemnification.**

**11.4.1**   Subcontractor, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, Design-Builder, their officers, directors, employees and agents from and against any and all causes of action, demands, claims, losses, damages, and liabilities whatsoever, including attorneys' fees and expenses, including, but not limited to, claims for bodily injury, sickness or death, and property damage or destruction resulting from the acts, errors or omissions of Subcontractor, Sub-Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable. Subcontractor's provision of indemnification shall be limited to damages to property and personal injury and shall be limited solely to the extent of the Subcontractor's negligence.

**11.4.2**   If an employee of Subcontractor, anyone employed directly or indirectly by Subcontractor or anyone for whose acts any of them may be liable has a claim against any party indemnified pursuant to Section 11.4.1 above, Subcontractor's indemnity obligation set forth in Section 11.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Subcontractor, Sub-Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

**11.4.3**   Whenever any suit or other proceeding which involves any matter with respect to which the indemnification provisions of this Section 11.4 are applicable shall be brought against Owner, Design-Builder, or any of their officers, directors, employees, and agents, Subcontractor, to the extent of its negligence, shall upon receipt of timely notice of the institution of such suit or other proceedings assume the defense thereof and defend the same at Subcontractor's own expense and pay any and all costs, charges, attorneys' fees and other expenses and any and all judgments that may be incurred by or obtained against Owner, Design-Builder, or any of their officers, directors, employees, and agents, in such suits or other proceedings, and if any judgment or other lien shall be placed upon or obtained against the property of Owner, Design-Builder, or any of their officers, directors, employees, and agents in or as a result of such suits or other proceedings, Subcontractor shall at once cause the same to be released and discharged by giving bond or otherwise. Owner and Design-Builder shall have the right to approve counsel retained by Subcontractor and to participate in and be informed of the status of any suit or other proceeding.

**11.5    Intentionally Omitted.**

# **Article 12**

## **Changes to the Contract Price and Time**

**12.1    Owner-Generated Changes.**

**12.1.1**   If Owner issues changes affecting the Work, Subcontractor agrees, if directed by Design-Builder, to meet with Design-Builder and Owner to review and discuss the changes. Subcontractor shall only be entitled to adjustments in its Contract Price and the times for

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 55 of 322

completion of the Work attributable to such Owner-generated changes to the extent Design-Builder actually receives such adjustments from Owner. If Subcontractor disputes the adjustment, such dispute shall be resolved pursuant to Section 13.3 of this Agreement. Notwithstanding anything to the contrary in this Article, in order to be entitled to a Change Order, Subcontractor must provide Design-Builder with sufficient details of its proposed Change Order cost breakdown allowing Design-Builder to evaluate the proposed Change Order, or as may otherwise be required or requested by Owner or as required by the EPC Agreement.

**12.2 Design-Builder Generated Changes.**

**12.2.1** Changes to the Work issued by Design-Builder shall be governed by the provisions set forth in the following sections of this Article 12.

**12.3 Change Orders.**

**12.3.1** A Change Order is a written instrument issued after execution of the Agreement signed by Design-Builder and Subcontractor, stating their agreement upon all of the following:

**12.3.1.1** The scope of the change in the Work;

**12.3.1.2** The amount of the adjustment to the Contract Price;

**12.3.1.3** The extent of the adjustment to the times for completion of the Work; and

**12.3.1.4** Such other details, information, or items as may be required or requested by Design-Builder or Owner.

**12.3.2** All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Subcontractor will comply with the change request procedures set forth in the EPC Agreement, including the provision of timely notice sufficient to allow Design-Builder to comply with the notice requirements of the EPC Agreement. Design-Builder and Subcontractor shall negotiate, in good faith and as expeditiously as possible, the appropriate adjustments for such changes. The parties shall mutually agree upon any changes to scope of Work, schedule or price. In the event that cumulative change orders equal or exceed ten percent (10%) of the Contract Price, Subcontractor reserves the right to recover additional general conditions and applicable overhead expense. Subcontractor reserves all rights and remedies for damages and losses incurred by reason of delay by others.

**12.4 Work Change Directives.**

**12.4.1** A Work Change Directive is a written order prepared and signed by Design-Builder directing a change in the Work prior to agreement on an adjustment in the Contract Price and/or the times for completion of the Work.

**12.4.2** Design-Builder and Subcontractor shall negotiate, in good faith and as expeditiously as possible, the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement.

**12.5 Minor Changes in the Work.**

**12.5.1** Minor changes in the Work are changes that do not involve an adjustment in the Contract Price and/or times for completion of the Work and do not materially and adversely affect the

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 56
of 322

Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however, that Design-Builder shall promptly inform Subcontractor of any such changes.

**12.6    Contract Price Adjustment.**

**12.6.1**  The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

**12.6.1.1**  Unit prices set forth in the Agreement or as subsequently agreed between the parties;

**12.6.1.2**  A mutually accepted, lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Design-Builder;

**12.6.1.3**  Costs, fees and any other markups set forth in the Agreement; and

**12.6.1.4**  If an increase or decrease cannot be agreed to as set forth in items 12.6.1.1 through 12.6.1.3 above and Design-Builder issues a Work Change Directive, the cost of the change of the Work shall be determined by the reasonable expense and savings in the performance of the Work resulting from the change, including a reasonable overhead and profit, as may be set forth in this Agreement. If the net result of both additions and deletions to the Work is an increase in the Contract Price, reasonable overhead and profit shall be calculated on the basis of the net increase to the Contract Price. Subcontractor shall maintain a documented, itemized accounting evidencing the expenses and savings associated with such changes.

**12.6.2**  If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Design-Builder or Subcontractor because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted solely in accordance with the EPC Agreement.

**12.6.3**  If Design-Builder and Subcontractor disagree upon whether Subcontractor is entitled to be paid for any services required by Design-Builder, or if there are any other disagreements over the scope of Work or proposed changes to the Work or the times for completion of the Work, Design-Builder and Subcontractor shall resolve the disagreement pursuant to Article 13 hereof. As part of the negotiation process, Subcontractor shall furnish Design-Builder with a good faith estimate of the costs to perform the disputed services and the increase or decrease in the time to complete the changes to the Work in accordance with Design-Builder's interpretations. If the parties are unable to agree and Design-Builder expects Subcontractor to perform the services in accordance with Design-Builder's interpretations, Subcontractor shall proceed to perform the disputed services, conditioned upon Design-Builder issuing a written order to Subcontractor (i) directing Subcontractor to proceed and (ii) specifying Design-Builder's interpretation of the services that are to be performed.

**12.7    Emergencies.**

**12.7.1**  In any emergency affecting the safety of persons and/or property, Subcontractor shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 33 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 57 of 322

Price and/or times for completion of the Work on account of emergency work shall be determined as provided in this Article 12.

# Article 13

## Contract Adjustments and Disputes

**13.1** **Requests for Contract Adjustments and Relief.**

**13.1.1** If either Subcontractor or Design-Builder believes that it is entitled to relief against the other for any event arising out of or related to the Work or the Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall be in accordance with specific notice requirements contained in applicable sections of the Contract Documents and, if possible, be made prior to incurring any cost or expense. Subcontractor shall provide Design-Builder written notice of claims for which Owner or the Design-Builder may be responsible in sufficient time for Design-Builder to meet its notice requirements to Owner set forth in the Contract Documents. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed ten (10) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall be in accordance with the Contract Documents and shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request. Subcontractor shall comply with all documentation requirements set forth in the EPC Agreement when submitting its claim to Design-Builder.

**13.2** **Dispute Avoidance and Resolution.**

**13.2.1** The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Subcontractor and Design-Builder each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**13.3** **Disputes Involving Owner.**

**13.3.1** To the extent a claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for which Owner is responsible ("Owner Disputes"), such Owner Disputes shall be resolved pursuant to the dispute resolution clause set forth in the EPC Agreement. Both Design-Builder and Subcontractor agree to cooperate in the presentation and prosecution or defense of Owner Disputes. If, after a request for an extension of time or additional compensation from Subcontractor, Design-Builder believes that the event causing the delay or additional compensation is the responsibility of Owner, then Design-Builder will cooperate with and assist Subcontractor in presenting a request for an extension of time or additional compensation to Owner. Notwithstanding the above, Design-Builder reserves the right not to submit a claim to Owner. In such cases, the claim shall be resolved pursuant to Section 13.4.

**13.3.2** Notwithstanding any other provisions herein to the contrary, Design-Builder and Subcontractor each agree to accept the relief as to a time extension or additional compensation

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 58 of 322

obtained from Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

**13.3.3**  If Design-Builder asserts a claim against Owner involving Subcontractor, each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against Owner and for any other litigation costs. Each party shall present its portion of the claim to Owner.

## 13.4    Disputes Not Involving Owner.

**13.4.1**  For any claim, dispute or controversy not arising out of, or relating to, problems caused by Owner or for which Owner is responsible, Subcontractor and Design-Builder will first attempt to resolve such claim, dispute or controversy at the field level through discussions between Design-Builder's Representative and Subcontractor's Representative.

**13.4.2**  If a claim, dispute or controversy cannot be resolved through Section 13.4.1, Design-Builder's Senior Representative and Subcontractor's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such claim, dispute or controversy. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving the claim, dispute or controversy.

**13.4.3**  If after meeting the Senior Representatives determine that the claim, dispute or controversy cannot be resolved on terms satisfactory to both parties, the parties shall submit within thirty (30) days of the conclusion of the meeting by the Senior Representatives the claim, dispute or controversy to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by Design-Builder and Subcontractor and consistent with the mediator's schedule, the mediation shall commence within ninety (90) days of the submission of the dispute for mediation. Persons with authority to resolve the dispute shall be present at the mediation.

## 13.6    Duty to Continue Performance.

**13.6.1**  Unless provided to the contrary in the Contract Documents, Subcontractor shall continue to perform the Work and Design-Builder shall continue to satisfy its undisputed payment obligations to Subcontractor, pending the final resolution of any dispute or disagreement between Design-Builder and Subcontractor.

## 13.7    CONSEQUENTIAL DAMAGES.

**13.7.1**  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER DESIGN-BUILDER NOR SUBCONTRACTOR SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 35 of 41

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 59 of 322

# Article 14

## Miscellaneous

**14.1    Assignment.**

    **14.1.1**  Neither Subcontractor nor Design-Builder shall, without the written consent of the other, assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**14.2    Successorship.**

    **14.2.1**  Design-Builder and Subcontractor intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**14.3    Governing Law.**

    **14.3.1**  The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**14.4    Severability.**

    **14.4.1**  If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements or court order, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**14.5    No Waiver.**

    **14.5.1**  The failure of either Design-Builder or Subcontractor to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**14.6    Headings.**

    **14.6.1**  The headings used in this Agreement, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**14.7    Notice.**

    14.7.1  Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement, or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the number of the intended recipient.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 60 of 322

**14.8  Amendments.**

    **14.8.1**  The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

**14.9  Survival.**

    **14.9.1**  Subcontractor's obligations under this Agreement shall not be released and shall specifically survive the completion of all services hereunder by Subcontractor, final payment to Subcontractor, and the termination of this Agreement for any reason.

**14.10  Anti-Bribery**

    **14.10.1** Subcontractor agrees to strictly abide by Design-Builder's Anti-Bribery Policy and Procedure, a copy of which is available to Subcontractor upon request, and which is incorporated herein as if set forth in full. Specifically, Subcontractor shall at all times comply with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and any local anti-bribery (or anti-corruption) laws (collectively the "Anti-Bribery Laws").   In accordance with the Anti-Bribery Laws, Subcontractor will not, with the intent to obtain or retain business or any commercial advantage, offer, pay, promise to pay or authorize another to pay any money, make any gift or provide anything of value on behalf of Design-Builder to any foreign official; any foreign political party or official thereof or any candidate for foreign political office; or any person acting in a commercial capacity.

**14.11  Equal Opportunity and Affirmative Action**

    **14.11.1** Subcontractor shall comply with all equal employment opportunity and affirmative action requirements promulgated by any governmental authority, including, without limitation, the requirements of the Civil Rights Act of 1964. The provisions of the Equal Opportunity Clauses of Executive Order 11246, (41 CFR 60-1.4), Section 503 of the Rehabilitation Act of 1973, (41 CFR 60-741.5(a)), Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, (41 CFR 60-250.5(a)), and, the Jobs for Veterans Act of 2003, (41 CFR 60-300.5(a)), are hereby incorporated by reference and made a part of this Agreement.

**14.12  Export Regulations**

    **14.12.1** The Parties are subject to the export regulations of the United States regarding export and re-export of controlled items, services or technical data from the United States. As part of the express consideration received under this Agreement for access to and/or delivery of any goods, knowledge, information, technical data and/or services from Design-Builder to Subcontractor, Subcontractor agrees that it will not in violation of, or so as to cause any penalty or other liability to Design-Builder under, any applicable U.S. law or regulation export, re-export or otherwise transfer, directly or indirectly, any of Design-Builder's knowledge, information, technical data or other property to which such Subcontractor gains access in connection with this Agreement to any country or person in contravention of the said export regulations, or make any other use of such information or data which, would violate the laws of the United States. Subcontractor shall notify Design-Builder in writing before disclosing to Design-Builder any technical information or data subject to laws restricting export outside the United States. Such notice shall provide a detailed description of the information and identify the applicable laws restricting export.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 61 of 322

**14.13  Financial Assurances**

**14.13.1** If requested by Design-Builder, Subcontractor shall within ten (10) calendar days provide Design-Builder with copies of its most recent annual and quarterly financial statements prepared in accordance with generally accepted accounting principles.  Subcontractor will notify Design-Builder immediately of any material adverse change in its financial condition.

**14.14  Independent Contractor**

**14.14.1** Subcontractor represents that it is fully experienced and properly qualified to perform the class of work provided for herein, and that it is properly licensed, equipped, organized, and financed to perform such work. Subcontractor shall act as an independent contractor and not as the agent of Design-Builder in performing the Work, maintaining complete control over and responsibility for its own employees and operations and those of its Sub-Subcontractors.

**14.14.2** No provisions of this Subcontract or any lower-tier subcontract awarded by Subcontractor shall be construed to create any contractual relationship between any such Sub-Subcontractor and Design-Builder, or obligate Design-Builder to pay or be responsible for the payment of any monies to any Sub-Subcontractor.

# <u>Article 15</u>

## Electronic Data

**15.1  Electronic Data.**

**15.1.1**  The parties recognize that Contract Documents, including drawings, specifications and three-dimensional modeling (such as Building Information Models) and other Work Product may be transmitted among Design-Builder, Subcontractor and others in electronic media as an alternative to paper hard copies (collectively "Electronic Data"). However, Design-Builder reserves the right to determine and direct the extent to which Electronic Data, if at all, may be used as an alternative to paper hard copies in connection with the Project.

**15.2  Transmission of Electronic Data.**

**15.2.1**  Design-Builder shall determine, after consultation with Subcontractor, the software and the format for the transmission of Electronic Data. Each party shall be responsible for securing the legal rights to access the agreed-upon format, including, if necessary, obtaining appropriately licensed copies of the applicable software or electronic program to display, interpret and/or generate the Electronic Data.

**15.2.2**  Neither party makes any representations or warranties to the other with respect to the functionality of the software or computer program associated with the electronic transmission of Work Product. Unless specifically set forth in the Agreement, ownership of the Electronic Data does not include ownership of the software or computer program with which it is associated, transmitted, generated or interpreted.

**15.2.3**  By transmitting Work Product in electronic form, the transmitting party does not transfer or assign its rights in the Work Product. The rights in the Electronic Data shall be as set forth in Article 4 of the Agreement. Under no circumstances shall the transfer of ownership of Electronic Data be deemed to be a sale by the transmitting party of tangible goods.

**15.3  Electronic Data Protocol.**

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 62
of 322

**15.3.1** The parties acknowledge that Electronic Data may be altered or corrupted, intentionally or otherwise, due to occurrences beyond their reasonable control or knowledge, including but not limited to compatibility issues with user software, manipulation by the recipient, errors in transcription or transmission, machine error, environmental factors, and operator error. Consequently, the parties understand that there is some level of increased risk in the use of Electronic Data for the communication of design and construction information and, in consideration of this, agree, and shall require their independent contractors, Subcontractors and Design Consultants to agree, to the following protocols, terms and conditions set forth in this Section 15.3.

**15.3.2** Electronic Data will be transmitted in the format determined in Section 15.2.1 above, including file conventions and document properties, unless prior arrangements are made in advance in writing.

**15.3.3** The Electronic Data represents the information at a particular point in time and is subject to change. Therefore, the parties shall agree upon protocols for notification by the author to the recipient of any changes which may thereafter be made to the Electronic Data, which protocol shall also address the duty, if any, to update such information if such information changes prior to Final Completion of the Project.

**15.3.4** The transmitting party specifically disclaims all warranties, expressed or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the media transmitting the Electronic Data. However, transmission of the Electronic Data via electronic means shall not invalidate or negate any duties pursuant to the applicable standard of care with respect to the creation of the Electronic Data, unless such data is materially changed or altered after it is transmitted to the receiving party, and the transmitting party did not participate in such change or alteration.

**15.4** In the event the EPC Agreement contains a provision governing Electronic Data, and there is a conflict between the provision in the Design-Build Agreement and this Article 15, the provision in the EPC Agreement takes precedence.

# Article 16

## Confidential Information

**16.1** **Confidential and/or Proprietary Information.**

**16.1.1** Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature and: (i) the transmitting party identifies as either confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project.

**16.1.2** Subcontractor may receive information from Design-Builder that is either confidential or proprietary to either Design-Builder or to Owner. Such information shall be labeled as confidential and/or proprietary. Subcontractor agrees to maintain the confidential nature of such information and to execute any such additional agreements as may be required by Owner or Design-Builder with respect to such information.

**16.1.3** In the event the EPC Agreement contains a provision governing Confidential Information, and there is a conflict between the provision in the Design-Build Agreement and this Article 16, the provision in the EPC Agreement takes precedence.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 63
of 322

# Article 17

## Other Provisions

**17.1    Other provisions, if any, are as follows:**
*(Insert any additional provisions, including those that relate to options that might have been selected by Design-Builder and Owner in the Design-Build Agreement related to Warranty Reserves, alternatives to Liquidated Damages, etc. as the parties may deem commercially appropriate.)*

☒        Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof which have not been resolved in accordance with the procedures set forth in Section 13.4 herein shall be resolved in a court of competent jurisdiction in the state in which the Project is located.

*[remainder of page intentionally left blank – signature page follows]*

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 64 of 322

In executing this Agreement, Design-Builder and Subcontractor each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the Work described herein.

**DESIGN-BUILDER:**

AECOM
_(Name of Design-Builder)_

_(Signature)_

Printed Name: SHAWN KELLY

Title: VICE PRESIDENT

Date: 10/21/16

**SUBCONTRACTOR:**

JH Kelly LLC
_(Name of Subcontractor)_

_(Signature)_

Printed Name: Paul Furth

Title: CFO, VP

Date: 10/21/16

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 65 of 322



**EXHIBIT B**

# EXHIBIT B

## Pending Change Order Requests

| COR# | Description | Amount |
|---|---|---|
| 2 | Smart MCCs | ($1,913) |
| 3 | High Resistance Ground Units | $7,987 |
| 4 | N3R Metering Enclosure | $28,380 |
| 5 | Capacitor Bank | $29,510 |
| 12 | Yard Lighting Additions REV1 | $85,753 |
| 14 | Coating of Fittings and Pipe (Fab Shop Only) | $198,954 |
| 24 | RFI 58 response Valve House #2 | $4,716 |
| 31 | Provide electrical support to Tetrad for Fin Fan Work | $6,018 |
| 32 | Purchase Missing AECOM Material | $27,585 |
| 36 | Load and unload damaged MCC | $1,192 |
| 40 | Anode Installation - Cancelled | ($10,537) |
| 44 | Re-work for USSI - G101 piece | $2,789 |
| 45 | Disconnect Security camera and pole removal | $645 |
| 48 | Rework Platform on south side of Turbine | $64,994 |
| 49 | Notch steel and demo and install new piers | $61,852 |
| 53 | Remove and replace siding base trim | $4,390 |
| 55 | SISCORP Auxiliary - Section X Welding at columns | $2,723 |
| 56 | SISCORP Auxiliary Building Rework Cut | $654 |
| 57 | Silencer Base Plate Modifications | $1,591 |
| 58 | Re drill roof Purlin for Aux Building Drawing Revisions | $3,040 |
| 59 | Re-drill canopy steel Aux Building | $1,212 |
| 60 | SISCORP - Aux. Bldg - Notching Canopy A eve strut | $1,969 |
| 61 | SISCORP - Aux. Bldg. - Redrilling Canopy A clip 26CL1 | $1,219 |
| 62 | SISCORP - Aux. Bldg. - Redrill Holes Col. F Girt 101 | $564 |
| 64 | Relocate Existing Silencer Ground Cable | $620 |
| 65 | AECOM New Drawings Issue 8-24-2017 Rework | $87,596 |
| 66 | Time to install temp hangers and build temp spools | $7,010 |
| 67 | Backfill Valve Nesting | $46,057 |
| 68 | SISCORP - Modify window per rep. instructions | $558 |
| 69 | SISCORP - Modify girts at door jams - BC Line | $1,926 |
| 70 | Electrical IFC Reconciliation | $1,196,762 |

99864075.5 0034592-00012

| | | |
|---|---|---|
| 73 | Increase September Outage Support to Actuals | $142,324 |
| 74 | Valve Shelters Reconciliation | $84,710 |
| 75 | Rework Auxiliary Building door frames | $3,066 |
| 76 | Make Opening at Breeze Way | $1,921 |
| 77 | Provide water tanks and transfer pumps for Hydro Water | $84,137 |
| 78 | SISCORP Fuel Gas Building cut/weld clip | $673 |
| 79 | Set Generator in Aux Building | $5,656 |
| 80 | Station Shutdown Over Excavation - Cancelled | ($94,256) |
| 83 | Gas Cooler Conduit Re-Route | $113,006 |
| 84 | Field Sandblast and Coat AECOM supplied pipe fittings, valves | $740,710 |
| 86 | Replace Cathodic Cable and Grounding Revisions Received 9-19 | $13,632 |
| 89 | Seal Gas Filter Drain Valve | $2,080 |
| 93 | Manufactured Building Canopy Revisions (RFI 0352) | $3,644 |
| 100 | Piping - Hanger Revisions; Multiple RFI Responses (327-431) | $168,874 |
| 103 | Winterization of Site | $102,476 |
| 105 | Revised Fire Water Pump House and Fire Tank Ringwall | $76,835 |
| 107 | Access Pads for XFMR and Metering Switch | $2,548 |
| 108 | USSI - Compressor Building - Cut/Weld ladder brackets | $2,217 |
| 109 | Revised Compressor Pendant Light Detail | $44,217 |
| 110 | Pipeline Shutdown Support | $291,746 |
| 111 | Fireproof Blockouts in Auxiliary Building | $39,470 |
| 112 | Cameron Valve Support | $29,406 |
| 121 | RFI 0344 Fuel Gas Building Piping Reroute. | $124,010 |
| 125 | Excavator Stand By Time | $18,274 |
| 127 | VMV7L Photocell Mounting | $8,422 |
| 128 | RSCP*5 Housekeeping Pads | $2,411 |
| 129 | Valve House 1-2 Fixture Substitution | $7,428 |
| 130 | Firewater Pump House Water Tank Heater | $13,656 |
| 131 | Firewater Pipe Heat Trace | $14,306 |
| 132 | Well Pump Electrical | $22,162 |
| 133 | Gas Tube CO-AXIAL Surge Protection Antenna | $11,451 |
| 134 | 24VDC Battery Stand | $1,488 |
| 139 | Instrument Calibration | $34,936 |
| 141 | Valve House 1 & 2  Steel modifications. | $2,620 |
| 144 | Remove and Replace Valves per request from AECOM | $41,567 |

| 145 | Silencer Piping Modification | $7,805 |
| 149 | Blast & Paint Valve House 1 & 2 Columns - Added 3 HR Wall | $213,705 |
| 150 | Stand-by Generator Fuel Gas Revisions | $13,071 |
| 152 | Existing Rectifier Electrical | $6,898 |
| 153 | PCI's Over Time Charges For W/E 10.8.17 - 11.5.17 | $4,965 |
| 156 | 8P-6 8P-7 Panel Stand Modification | $1,629 |
| 159 | Burney Tap L-401 Excavation - Piping - Coating | $58,010 |
| 160 | RFI 475 & 479 Piping Modifications | $3,132 |
| 163 | Boulders Removal from 08.30.17 thru 09.08.17 | $20,430 |
| 178 | Additional Grounding Test Wells | $15,112 |
| 182 | PB-38 Demo and Conduit Re-Route | $21,254 |
| 183 | Fire Detection - Existing Control Room | $9,221 |
| 184 | HVAC Disconnects, Smoke Dampers and Thermostats | $14,570 |
| 185 | Add shoring to existing slope excavation per PGE | $81,190 |
| 187 | Compressor Roll-up Door Control Conduits | $4,337 |
| 188 | Disconnect Switch for Panel B | $4,137 |
| 189 | Install SOV-199 Line LPFG-157-C-1" | $9,357 |
| 191 | Compressor Drain Extensions | $8,864 |
| 192 | AK-4, AK-5 Access Panel Conduit Re-route | $3,631 |
| 193 | Modify Exhaust Platform | $4,076 |
| 196 | Rev 1C Cable Schedule Changes | $53,320 |
| 197 | 3rd Party Time Impact Analysis for Electrical IFC Reconcile | $25,609 |
| 199 | Modify Foam Generator Platform | $7,253 |
| 200 | Added Generator Conduit and Fuel Train Connection | $9,167 |
| 202 | Existing Control Room Trench Fill | $9,075 |
| 203 | New Gas Cooler Contact Blocks | $1,770 |
| 204 | Commissioning Support | $357,988 |
| 206 | Added Conduit For P-DC-01 | $2,269 |
| 207 | Added Conduit Seals at Gas Cooler Pull Boxes | $14,096 |
| 208 | Grounding Grid Revisions | $8,393 |
| 209 | P-LV-01 Ethernet Cable and Wireway | $9,663 |
| 210 | Solid Rock Excavation | $147,581 |
| 211 | Screen Back Fill Material | $58,826 |
| 212 | Hydro Vac vs Mechanical Excavation | $971,407 |
| 213 | Added Fiber Patch Panels to Solar Equipment | $3,144 |

| 215 | Revised 8P-4 Feeder Cable | $3,249 |
|---|---|---|
| 217 | Re-route Existing Conduits at Flowmeter Vaults | $9,319 |
| 220 | Taping and Painting of Fire Walls on Valve Houses 1 & 2 | $22,686 |
| 221 | Fiber Optic Patch Panel Mounting | $5,399 |
| 222 | CWX Vent Gas Piping Revisions 1.18.18 | $52,966 |
| 223 | Valve House 1 & 2 Upstairs Door Clearance Issues | $2,606 |
| 226 | Add Grating Support Between VH 1 & 2 | $2,481 |
| 232 | Rock Chipping at Ultrasonic Vault | $120,903 |
| 233 | Valve House Concrete Existing Floor Demo | $13,200 |
| 235 | Fire Water Bladder Tank Grounding | $3,753 |
| 236 | Replace Pushbutton Switches at Gas Coolers | $1,378 |
| 237 | PB-28 Conduit Sealing & Drain Installation | $1,750 |
| 238 | Storage Building Electrical Work | $225,977 |
| 239 | Storage Building IFC Electrical Changes | $111,888 |
| 240 | Firewater Building Fire Alarm Work (RFI 0611) | $10,334 |
| 241 | Storage Building - Modify concrete floor for roll up doors | $2,078 |
| 242 | Relocate Instruments off Compressor Skid | $10,132 |
| 243 | Modify steel and grating at Valve House 1 | $1,965 |
| 244 | Modify door frames - grating too high | $6,072 |
| 245 | Modify handrail at Compressor platform - IFC 02.05.18 | $7,280 |
| 246 | Additional concrete for Electrical and Inst. supports | $140,240 |
| 247 | Storage Building Modify ramps' concrete | $2,749 |
| 248 | Additional concrete for pipe supports RFI 0464 | $6,449 |
| 249 | Exhaust Duct Ladder Pad | $1,784 |
| 250 | Light Poles different anchor bolt size | $1,484 |
| 251 | JBS-9 drill and epoxy # 5 bars RFI 0541 | $1,048 |
| 254 | Revised Wire Labels | $5,017 |
| 255 | Replace ATS Disconnect Enclosure | $4,859 |
| 256 | Valve Houses 1 and 2 New Access Doors at West Side | $14,772 |
| 258 | Oldcastle PreCast Backcharge | $2,490 |
| 259 | Redundant UPS - Original Scope | $33,991 |
| 260 | SMART MCCS - COR 02 Update to IFC | $6,921 |
| 261 | LPFG PIPING CHANGES AT AUX BLDG | $15,644 |
| 262 | BURNEY TAP FINAL CHANGES | $23,764 |
| 266 | Add Duct Seal to Conduits | $4,618 |

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 70
of 322

| 267 | High Resistance Ground Units - COR 03 Update to IFC | $23,282 |
|-----|-----------------------------------------------------|---------|
| 268 | Yard Lighting - COR 012 Update to IFC | $30,583 |
| 271 | New Compressed and Instrument Air Drawings | $50,328 |
| 273 | G-30 Additional Tie In Transition Pipe | $38,613 |
| 274 | Control Valve Tubing Modifications | $5,936 |
| 275 | Ultrasonic Meter Vault-Additional coating on existing pipes | $22,400 |
| 276 | Added Smoke Detectors in Auxiliary Building | $15,494 |
| 277 | Revised Blue Lights Compressor Building | $21,013 |
| 278 | Internal Wiring Panel Changes | $3,182 |
| 279 | Auxiliary Building Size Increase - COR 08 Electrical Only | $28,702 |
| 280 | Rework and Install SOV 199 | $3,003 |
| 281 | Install rubber at pipe supports | $17,778 |
| 283 | New AECOM issued Drawings As-Found Conditions | $12,037 |
| 284 | Add Seal Offs in Existing Instrument Buildings (RFI 0665) | $3,535 |
| 285 | Added Circuit For AHU-2 (RFI 0655) | $3,207 |
| 286 | Add Missing Solar Circuits (RFI 0662) | $2,282 |
| 287 | Replace Light Switches in Compressor Building | $3,523 |
| 288 | Relocate Compressor Building Temp Transmitter | $4,360 |
| 289 | Revise Existing Underground Conduits at KTB-7 | $14,540 |
| 290 | Heat Trace Adds (RFI 0634) | $4,381 |
| 291 | Add UPS Battery Charger Temp Transmitters (RFI 0652) | $2,419 |
| 293 | Rev D Cable Schedule Adds | $27,300 |
| 296 | Add Power Earth Ground to Solar Equipment | $10,175 |
| 299 | Additional Electrical Excavation Costs | $823,741 |
| 300 | PG&E Legacy pipe coating repairs | $231,814 |
| 301 | Added Cat6 Cables For Commissioning | $4,438 |
| 302 | Supply of V-77 and V-75 Vault | $19,919 |
| 303 | Install V-77 and V-75 Precast Vault | $20,197 |
| 304 | Relief Vents On Actuator Supply tubing | $14,714 |
| 305 | Reroute existing vent lines at vault near Inst. Bldg 3 | $1,681 |
| 306 | OT Premium week ending 3-18-18 | $13,164 |
| 307 | OT Premium week ending 3-25-18 | $30,177 |
| 308 | OT Premium week ending 4-1-18 | $5,849 |
| 313 | Replace broken Rollers for PS-4 | $4,114 |
| 314 | Slot holes on compressor exhaust duct | $9,145 |

| | | |
|---|---|---:|
| 316 | Replace Existing Vibration Switches at Gas Cooler Fans | $6,615 |
| 318 | Replace Existing Light Pole #4 | $6,103 |
| 319 | Lighting and Power for AHU 1-2 Maintenance | $5,864 |
| 321 | Supply and Install Eye Wash Stations (3 each) | $4,818 |
| 322 | Existing Control Building Fire Alarm Updates | $6,570 |
| 323 | Relocate Fire Alarm Beacon Compressor Building | $2,636 |
| 326 | Storage Building - Portable Fire Extinguishers | $1,252 |
| 327 | FE-FG-54 Revisions | $10,869 |
| 328 | Overtime premium paid for week ending 4-8-18 | $12,134 |
| 329 | Overtime premium paid for week ending 4-15-18 | $9,994 |
| 330 | Overtime premium paid for week ending 4-22-18 | $8,174 |
| 331 | Overtime premium paid for week ending 4-29-18 | $2,742 |
| 332 | Machine flanges at MG strainer removable spool | $16,406 |
| 333 | 4 EA. 1-1/2" Valves for LPFG Reg Station | $2,135 |
| 337 | OT Premium Paid for week ending 5-6-18 | $9,102 |
| 339 | Station Electric Gate Control Wiring | $18,603 |
| 341 | Overtime Premium paid for week ending 5-13-18 | $2,298 |
| 342 | Overtime Premium paid for week ending 5-20-18 | $2,684 |
| 343 | Overtime Premium paid for week ending 5-27-18 | $1,183 |
| 344 | Pipeline Liquid Tank Concrete Pad | $12,084 |
| 345 | Asphalt and Drainage Modifications | $132,195 |
| 346 | Added Vent lines at Control valves | $29,181 |
| 347 | Deduct for Installation of Asphalt | ($219,793) |
| 348 | OT Premium paid for week ending 6-3-2018 | $3,060 |
| 349 | OT Premium paid for week ending 6-10-18 | $5,055 |
| 350 | OT Premium Paid for week ending 6/17/18 | $4,343 |
| 351 | Incentive to Retain Ironworkers (4-1-18 thru 7-1-18) | $24,567 |
| 352 | Incentive to Retain Electricians (4-1-18 thru 7-1-18) | $39,506 |
| 353 | Incentive to Retain Pipefitters ( 4-1-18 thru 7-1-18) | $20,533 |
| 354 | Incentive to Retain Carpenter - Laborer (4-1-18 thru 7-1-18) | $64,570 |
| 357 | OT Premium paid for week ending 6-23-2018 | $11,770 |
| 358 | Rev 1D Cable Schedule Holds As-Built | $5,927 |
| 359 | Field Coating Repairs - AECOM Coatings Wrong Spec E-35.4 | $678,736 |
| | **Total:** | **$9,562,782** |

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 72 of 322

# EXHIBIT 2





2018-0030534

| Recorded | REC FEE | 35.00 |
| Official Records | | |
| County of | HOUSING FEE | 75.00 |
| Shasta | | |
| Leslie Morgan | | |
| Assessor-Recorder | | |
| | AA | |
| 12:10PM 01-Nov-2018 | Page 1 of 8 | |

Recording Requested by

Eric A. Grasberger
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

After Recording, Return To:

JH Kelly, LLC
PO Box 2038
Longview, WA 98632

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

## CLAIM OF MECHANICS LIEN

SEPARATE PAGE, PURSUANT TO CA. GOV'T. CODE 27361.6

Recording Requested by

Eric A. Grasberger
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

After Recording Return to:

JH Kelly, LLC
PO Box 2038
Longview, WA 98632

(Space above this line for recorder's use)

## CLAIM OF MECHANICS LIEN

JH KELLY, LLC ("Claimant") hereby claims a mechanics lien for the labor, services, equipment and/or materials described below, furnished for the work of improvement situated upon a certain site located in the County of Shasta, State of California, at 37667 Highway 299, Burney, California, and more particularly described on Exhibit A, which is hereby incorporated by reference herein, as follows:

> Beginning at a point in the north half of the northeast quarter of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S. 2029) marking the northeast corner of said Section 16 bears north 26° 44' east 474.54 feet distant and running thence north 85° 35' west 1218.50 feet; thence westerly on a curve to the right, with a radius of 554.40 feet, through a central angle of 35° 28', an arc distance of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14° 40½' east 1204.15 feet to a point in the southerly boundary line of the north half of the northeast quarter of said Section 16; thence south 89° 48' east, along the southerly boundary line of the north half of the northeast quarter of said Section 16, a distance of 831.89 feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more or less, to the point of beginning; containing 26.69 acres, more or less, and being a portion of the north half of the northeast quarter of said Section 16.

After deducting all just credits and offsets, the sum of $15,881,776.21, plus interest at the legal or contractual rate from the time the sum was due, and recording fees, is due Claimant for the labor, services, equipment and materials furnished at the request of AECOM Technical Services, Inc. ("AECOM") and pursuant to the Subcontract Agreement #60482831-SC-001 dated on or about October 21, 2016, including but not limited to the installation of a new compressor and turbine, and supporting utilities, buildings, concrete, structural steel, electrical equipment and controls for the Burney K2 Replacement Project.

The name of the owner or reputed owner of the site is Pacific Gas and Electric Company. Claimant furnished the labor, services, equipment and/or materials at the request of AECOM. Claimant's address is 821 Third Ave., Longview, WA 98632.

98677907.3 0034592-00012

Date: October 25, 2018                JH KELLY, LLC

By: _____
                    Craig Yabui, Vice President & General
                    Counsel

## VERIFICATION

I am the CLAIMANT and the foregoing Claim of Mechanics Lien is true of my own knowledge, except for matters stated in it on my information or belief, and as to those matters I believe it to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 25, 2018                JH KELLY, LLC

By: _____
                    Craig Yabui, Vice President & General Counsel

Subscribed and sworn to before me on this 25th day of October, 2018 by Craig Yabui, Vice President & General Counsel of JH Kelly, LLC, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: Jamie L Morris-Pease                    (seal)

Notary Public
State of Washington
JAMIE MORRIS-PEASE
MY COMMISSION EXPIRES
AUGUST 18, 2021

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 76 of 322

# NOTICE OF MECHANICS LIEN

## ATTENTION!

Upon the recording of the enclosed MECHANICS LIEN with the county recorder's office of the county where the property is located, your property is subject to the filing of a legal action seeking a court-ordered foreclosure sale of the real property on which the lien has been recorded. That legal action must be filed with the court no later than 90 days after the date the mechanics' lien is recorded.

The party identified in the mechanics lien may have provided labor or materials for improvements to your property and may not have been paid for these items. You are receiving this notice because it is a required step in filing a mechanics lien foreclosure action against your property. The foreclosure action will seek a sale of your property in order to pay for unpaid labor, materials, or improvements provided to your property. This may affect your ability to borrow against, refinance, or sell the property until the mechanics lien is released.

BECAUSE THE LIEN AFFECTS YOUR PROPERTY, YOU MAY WISH TO SPEAK WITH YOUR CONTRACTOR IMMEDIATELY, OR CONTACT AN ATTORNEY, OR FOR MORE INFORMATION ON MECHANICS' LIENS GO TO THE CONTRACTORS STATE LICENSE BOARD INTERNET WEBSITE AT www.cslb.ca.gov.

# PROOF OF SERVICE AFFIDAVIT

On October 25, 2018, at Vancouver, Washington, the undersigned declarant served or caused to be served copies of the above CLAIM OF MECHANICS LIEN and NOTICE OF MECHANICS LIEN on the owner or reputed owner, Pacific Gas and Electric Company, by certified mail, return receipt requested, at the addresses shown below:

> Pacific Gas and Electric Company
> Attn: Legal Department
> 77 Beale Street
> San Francisco, CA 94105

> Pacific Gas and Electric Company
> Attn: Legal Department
> 77 Beale Street, 24th Floor
> San Francisco, CA 94105

> Pacific Gas and Electric Company
> Attn: Legal Department
> 77 Beale Street, 32nd Floor
> San Francisco, CA 94105

The title or capacity of the person or entity served is owner or reputed owner.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 25, 2018

JH KELLY, LLC

By: _____
Craig Yabui, Vice President & General Counsel

AFTER RECORDING, RETURN TO:

FOR RECORDER'S USE ONLY

.01730

Pacific Gas and Electric Company
245 Market St.
San Francisco 6, California
RE: CM 14,5418-R (RW)   Rev. .15.40

RECORDED AT REQUEST OF
NORTH VALLEY TITLE & ESCROW CO.
AT ...3:55... MIN. PAST ./.....M
OFFICIAL RECORDS SHASTA COUNTY, CALIF.

JUL 2 3 1962
Volume 712 Page 636
RECORDER FEE $






FRUIT GROWERS SUPPLY COMPANY, a California corporation, hereinafter called

Fruit Growers, hereby grants to PACIFIC GAS AND ELECTRIC COMPANY, a California

corporation, hereinafter called Pacific, that certain real property, situate in

the County of Shasta, State of California, described as follows:

Beginning at a point in the north half of the northeast quarter
of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from
which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S.
2029) marking the northeast corner of said Section 16 bears north 26°
44' east 474.54 feet distant and running thence north 85° 35' west
1218.50 feet; thence westerly on a curve to the right, with a radius
of 554.40 feet, through a central angle of 35° 28', an arc distance
of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14°
40½' east 1204.15 feet to a point in the southerly boundary line of
the north half of the northeast quarter of said Section 16; thence
south 89° 48' east, along the southerly boundary line of the north
half of the northeast quarter of said Section 16, a distance of 831.89
feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more
or less, to the point of beginning; containing 26.69 acres, more or
less, and being a portion of the north half of the northeast quarter
of said Section 16.

Fruit Growers further grants to Pacific a right of way for ingress to and

egress from said 26.69 acre parcel of land and any other lands which Pacific

shall hereinafter acquire in the vicinity of said 26.69 acre parcel of land with-

in the strip of land described as follows:

Beginning at the most northerly corner of said 26.69 acre parcel
of land and running thence north 50° 07' west 109.5 feet; thence west-
erly on a curve to the left with a radius of 412.2 feet, through a
central angle of 39° 52½', an arc distance of 286.9 feet to a point
in the northerly boundary line of said Section 16; thence along the
northerly boundary line of said Section 16 the following three courses
and distances, namely:  north 89° 59½' west 485.8 feet to the 2 inch
brass cap on  pipe (marked 1/4S 9/16 T.35N.,R.3E., L.S. 2029) marking
the north quarter corner of said Section 16; thence north 89° 42' west

EXHIBIT A
Page 1 of 3

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 79 of 322

445.4 feet to a state highway monument; and thence north 89° 42' west
19.5 feet to a state highway monument in the southeasterly boundary
line of the state highway traversing said Section 16; thence south
35° 19' west, along the southeasterly boundary line of said state
highway, 44.5 feet; thence northeasterly on a curve to the right, with
a radius of 160.0 feet, through a central angle of 16° 22', and tan-
gent at the southwesterly terminus thereof to a line which has a bear-
ing of north 73° 56' east, an arc distance of 45.7 feet to a point
distant 30.0 feet southerly from (measured at a right angle to) the
northerly boundary line of said Section 16; thence parallel with the
northerly boundary line of said Section 16 the following two courses
and distances, namely: south 89° 42' east 445.4 feet; and thence
south 89° 59½' east 485.9 feet; thence easterly on a curve to the
right, with a radius of 382.2 feet, through a central angle of 39°
52½', an arc distance of 266.0 feet; thence south 50° 07' east 151.7
feet to a point in the southwesterly boundary line of said 26.69 acre
parcel of land; thence north 14° 40½' west, along the southwesterly
boundary line of said 26.69 acre parcel of land, 51.7 feet, more or
less, to the point of beginning.

IN WITNESS WHEREOF Fruit Growers has executed these presents this 2nd

day of _____ July _____, 1962.

                                    FRUIT GROWERS SUPPLY COMPANY

                                    By _____
                                      Its   President

                                    And By _____
                                      Its            Secretary

STATE OF CALIFORNIA,            }
County of Los Angeles           } ss.

                                    July 2          , 19 62 , before me,
the undersigned, a Notary Public in and for said County and State, personally appeared
H. A. Lynn
known to me to be the _____ President, and L. A. Yoast
known to me to be the _____ Secretary of Fruit Growers Supply Company

the Corporation that executed the within Instrument, known to me to be the persons who ex-
ecuted the within Instrument, on behalf of the Corporation herein named, and acknowledged
to me that such Corporation executed the within Instrument pursuant to its by-laws or a re-
solution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal.

F. J. JOHNSON                       _____
My Commission Expires Jan. 6, 1965    Notary Public in and for said County and State.
ACKNOWLEDGMENT — CORP. — PKG. & SEC.— WOLCOTTS FORM 226—REV. 12-51

                                    Shasta
                                    GM 145418-R
                                    Dwg. 28295
                                    Section 16,
                                    T.35N.,R.3E.,
                                    M.D.B.& M.

                                    Prepared _____
                                    Checked _____ EXHIBIT A
-2-   BOOK 712 PAGE 637   APR 13 '62   Page 2 of 3

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 80 of 322



PROPOSED ACCESS ROAD TO
BURNEY COMPRESSOR SITE
15 MILES NE OF BURNEY
PACIFIC GAS AND ELECTRIC COMPANY
SAN FRANCISCO, CALIFORNIA

EXHIBIT A
Page 3 of 3.

# EXHIBIT 3

1    MARIO R. NICHOLAS (SB #273122)
     STOEL RIVES LLP
2    760 SW Ninth Avenue, Suite 3000
     Portland, OR 97205
3    Telephone: 503.224.3380
     Facsimile: 503.220.2480
4
     Attorneys for Plaintiff
5    JH Kelly, LLC

6

7

FILED

JAN 2 5 2019

CLERK OF THE SUPERIOR COURT
BY: S. HATCH, DEPUTY CLERK

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SHASTA

10   JH KELLY, LLC, a Washington limited        CASE NO.    **191759**
     liability company,
11                                              COMPLAINT FOR FORECLOSURE OF
                  Plaintiff,                    MECHANICS LIEN
12
13        v.                                    Unlimited Jurisdiction

14   PACIFIC GAS AND ELECTRIC COMPANY,
     a California corporation; and
15
     DOES 1 through 10, inclusive,
16
                  Defendants.
17

18

19        For its Complaint, Plaintiff JH Kelly, LLC ("JH Kelly") alleges as follows:

20                              **THE PARTIES**

21        1.      Plaintiff JH Kelly is a Washington limited liability company.  JH Kelly is duly

22   qualified to do business in the State of California as a contractor under Contractors State License

23   Board License No. 991732.

24        2.      On information and belief, defendant Pacific Gas and Electric Company

25   ("PG&E") is now, and all relevant times was, a California corporation.

26        3.      JH Kelly is ignorant of the true names and capacities of defendants sued herein as

27   Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names. JH

28   Kelly will amend this Complaint to allege true names and capacities when ascertained.  JH Kelly

                                        -1-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND                                COMPLAINT

99861872.4 0034592-00012

1    is informed and believes and therefore alleges that each of the fictitiously named defendants are
2    responsible in some manner for the occurrences herein alleged and for JH Kelly's damages.

3        4.      At all times mentioned herein, defendants, and each of them, were the agents,
4    servants, and employees of each of the remaining defendants and were, in doing the things
5    complained of, acting within the scope of their agency and/or employment, and acting with the
6    full knowledge or subsequent ratification of their principals or employers.

7                                   **FIRST CAUSE OF ACTION**

8                                 **(Foreclosure of Mechanics Lien)**

9        5.      JH Kelly realleges and incorporates by this reference, as if set forth in full herein,
10   the allegations in paragraphs 1 through 4 above.

11       6.      At all relevant times, PG&E and Does 1-10 (the "PG&E Defendants") claimed
12   some right, title, or interest in the real property and improvements constituting the construction
13   project commonly known as the Burney K2 Replacement Project and generally located at 37667
14   Highway 299, Burney, CA 96013 (the "Project" and/or the "Property"), which is situated in the
15   County of Shasta, California.

16       7.      On or about October 21, 2016, AECOM Technical Services, Inc. ("AECOM"), as
17   prime contractor and design-builder, and JH Kelly, as subcontractor, entered into the Agreement
18   Between Design-Builder and Subcontractor (Where Subcontractor Does Not Provide Design
19   Services), Subcontract No. 60482831-SC-001 (the "Subcontract") to perform certain civil,
20   structural, mechanical, electrical, and related construction work on the Project for a lump-sum
21   price of $14,341,281.  A copy of the Subcontract, excluding exhibits (which consist of
22   approximately 2,218 pages), is attached hereto as **Exhibit A** and incorporated herein.

23       8.      JH Kelly furnished labor and services to AECOM and the PG&E Defendants for a
24   work of improvement at the Property and on the Project, and supplied materials and equipment to
25   AECOM and the PG&E Defendants for installation at the Property and on the Project, whereby
26   said materials were then and there incorporated into the Property.

27       9.      JH Kelly has provided all notices required by the California Civil Code.

28

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND
                                                -2-

                                            COMPLAINT

1        10.     After JH Kelly furnished labor, services, materials, and equipment to the work of

2   improvement at the Property and on the Project, on or about November 1, 2018, JH Kelly duly

3   filed and recorded in the official records of Shasta County, as document no. 2018-0030534, a

4   Claim of Mechanics Lien, which was duly verified (the "Claim of Mechanics Lien"). A true and

5   correct copy of JH Kelly's Claim of Mechanics Lien is attached hereto as **Exhibit B** and

6   incorporated herein as if fully set forth. JH Kelly's Claim of Mechanics Lien was recorded within

7   the time specified by the California Civil Code.

8        11.     In its Claim of Mechanics Lien, JH Kelly claimed a mechanics lien on the Property

9   of $15,881,776.21, plus interest at the legal rate or contractual rate from the time the sum was

10   due, and recording fees, which amount represented the principal unpaid balance then owed to JH

11   Kelly for the Project, excluding additional damages for schedule and productivity impacts. There

12   is currently due and owing to JH Kelly the principal sum of $15,881,776.21 (plus additional

13   damages for schedule and productivity impacts), plus interest at the legal rate or contractual rate

14   from the time the sum was due, which is the reasonable value of the labor, materials, and

15   equipment JH Kelly furnished to AECOM and the PG&E Defendants for use in the Property, less

16   all payments made to date.

17        12.     Each of the PG&E Defendants has, or claims to have, some estate, lien, right, title,

18   or interest in or upon said Property premises or some part thereof, which claims are subject,

19   subsequent, and subordinate to the lien of JH Kelly as described above.

20        Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

21                           **PRAYER FOR DAMAGES**

22   *Against all defendants on all causes of action*:

23        1.     For principal damages of not less than $15,881,776.21, or an amount to be proven

24            at the time of trial;

25        2.     For a judgment:

26             a.  declaring that the rights, claims, ownership, liens, title, or demands of the

27                 PG&E Defendants, and each of them, in the above-described real property be

28                 subject to and subordinate to the lien of JH Kelly;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-3-

COMPLAINT

Case: 19-30088 Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 85
of 322

1        b.  ordering that JH Kelly's Claim of Mechanics Lien be foreclosed and that the

2             usual judgment be made for the sale of the Property according to law, by a

3             commissioner to be appointed by the Court;

4        c.  ordering that the proceeds of the sale be applied to the payment of the amounts

5             due, including interest thereon, through the date of entry of judgment due to JH

6             Kelly; and

7        d.  declaring that the title of each of the PG&E Defendants, and all persons

8             claiming under them, be adjusted subsequent to the Claim of Mechanics Lien

9             of JH Kelly, whether the PG&E Defendants claim an interest as lien claimants,

10           judgment creditors, purchasers, encumbrancers, or otherwise, and that they be

11           barred and foreclosed from all rights, claims, interest, or equity in redemption

12           in the Project or on any part thereof after the time for redemption has passed;

13    3.  For interest at the prevailing legal rate on all damages from the time such payment

14        became due through judgment;

15    4.  For costs of the suit herein incurred; and

16    5.  For such other relief as the Court may deem just and proper.

17

18    DATED: January 23, 2019          STOEL RIVES LLP

19

20                            By:

21                            MARIO R. NICHOLAS
                                  Attorneys for Plaintiff

22                            JH Kelly, LLC

23

24

25

26

27

28

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

# AECOM Technical Services, Inc.

## SUBCONTRACT # 60482831-SC-001...........

| Client / Prime Contract / Task Order | AECOM Numbers: |
|---|---|
| Client: PG&E……………….. <br> Prime contract #:2501335149…………………. / Task Order #:n/a……. <br> Prime contract (task order) pricing structure: lump sum | Project #: 60482831………….. <br> Vendor #: .TBD...................... |

| Subcontractor: | Issued By: |
|---|---|
| Sub Name:  JH Kelly,LLC <br> Address:      821 3rd Avenue <br> City, State, ZIP   Longview, WA 98632 <br><br> Attn:  Steve Lennon <br> Phone: (360) 905-1372 <br> Fax:…n/a………………. | AECOM Technical Services, Inc. <br> 300 Lakeside Drive, Suite 400……………….. <br> Oakland, CA 94612……………….. <br><br> Attn:  Ocie Williams…………………., Subcontract Administrator <br> Phone:…(510) 874-3169…………… <br> E-Mail:ocie.williams@aecom.com <br> Fax:……n/a……………. |

| Period of Performance: | Price or Not-To-Exceed Ceiling Price: | Payment Terms |
|---|---|---|
| | $14,341,281 | NET 30 days |
| 07/01/2016 through 02/28/2018 | | |

This agreement ("Subcontract") between the parties, when referenced herein shall be deemed to include the documents referenced in the Table of Contents below:

## TABLE OF CONTENTS

Signature Form (this page)
Standard Terms and Conditions [Agreement Between Design-Builder And Subcontractor (Where Subcontractor Does Not Provide Design Services)]
EXH A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]
EXH A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]
EXH A2 Modified Flow Down Conditions_FINAL_2016-10-12
EXH B Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]
EXH B1 15000.77.505 PGE Burney Station Proposal 10-7-2015
EXH B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission
EXH B2A Material Quantities
EXH B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1
EXH B4 Unit Pricing for Boulder Removal
EXH C1 CA Conditional Waiver And Release On Progress Payment
EXH C2 CA Unconditional Waiver And Release On Progress Payment
EXH D1 CA Conditional Waiver And Release On Final Payment
EXH D2 CA Unconditional Waiver And Release On Final Payment
EXH E Not Used
EXH F Performance & Payment Bonds (to be provided by JH Kelly)
EXH G Not Used
EXH H JH Kelly Construction Schedule
EXH I1 JHK Time and Material Rates – Labor
EXH I2 JHK Time and Material Rates – Equipment
EXH J JHK Proposed Invoicing Schedule

The effective date of this Subcontract is the date of the last signature below.

The parties acknowledge that there has been an opportunity to negotiate the terms and conditions of this Subcontract and agree to be bound accordingly.

| SUBCONTRACTOR | AECOM Technical Services, INC. |
|---|---|
| *Paul Furth* 10/21/16 | *[signature]* 10/21/16 |
| Signature                Date | Signature                Date |
| *Paul Furth* | SHAWN KELLY |
| Printed Name | Printed Name |
| CFO VP | Vice President |
| Printed Title | Printed Title |

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 88 of 322

# AGREEMENT BETWEEN DESIGN-BUILDER AND SUBCONTRACTOR
# (WHERE SUBCONTRACTOR DOES NOT PROVIDE DESIGN SERVICES)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 89 of 322

# TABLE OF CONTENTS

| Article | Name | Page |
|---|---|---|

Article 1     General.................................................................................................. 2

Article 2     Subcontractor's Services and Responsibilities ............................................. 6

Article 3     Design-Builder's Services and Responsibilities............................................ 11

Article 4     Ownership of Work Product........................................................................ 13

Article 5     Time of Performance ................................................................................. 14

Article 6     Contract Price............................................................................................ 15

Article 7     Procedure for Payment.............................................................................. 16

Article 8     Stop Work and Termination........................................................................ 20

Article 9     Representatives of the Parties ................................................................... 22

Article 10    Insurance and Bonds ................................................................................ 24

Article 11    Indemnification ......................................................................................... 25

Article 12    Changes to the Contract Price and Time.................................................... 26

Article 13    Contract Adjustments and Disputes ........................................................... 29

Article 14    Miscellaneous........................................................................................... 31

Article 15    Electronic Data ......................................................................................... 33

Article 16    Confidential Information............................................................................. 34

Article 17    Other Provisions ....................................................................................... 35

AECOM Technical Services, Inc.
300 Lakeside Drive, Suite 400
Oakland, CA 94612

# Agreement Between
# Design-Builder and Subcontractor
# (Where Subcontractor Does Not Provide Design Services)

This **AGREEMENT** is made as of the _____21st_____ day of _October_ in the year of 2016, by and between the following parties, for services in connection with the Project identified below:

## DESIGN-BUILDER:
*(Name and address)*
*AECOM Technical Services, Inc.*
*300 Lakeside Drive, Suite 400*
*Oakland, CA 94612*

## SUBCONTRACTOR:
*(Name and address)*
*JH Kelly, LLC*
*821 3rd Avenue*
*Longview, WA 98632*

## PROJECT:
*(Include Project name and location as it will appear in the Contract Documents)*
*Burney K2 Replacement Project*
*37667 Highway 299*
*Burney, CA 96013*

## OWNER:
*(Name and address)*
*Pacific Gas and Electric Company*
*77 Beale Street*
*San Francisco, California 94105*

In consideration of the mutual covenants and obligations contained herein, Design-Builder and Subcontractor ( the "Parties") agree as set forth herein.

Page **1**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

# Article 1

## General

**1.1    Basic Purpose.**

**1.1.1**    Design-Builder has contracted with Owner to provide the services necessary for the design and construction of the Project as set forth in the Engineer, Procure, Construct Agreement ("EPC Agreement"). Subcontractor, through itself, and Sub-Subcontractors, agrees to provide all construction and other aspects of the Work consistent with the Contract Documents. Design-Builder and Subcontractor agree that to the extent applicable to the performance of the Work hereunder, Subcontractor shall have the same responsibilities and obligations as to Design-Builder as Design-Builder by the EPC Agreement has against and to Owner, except as may be modified herein. Subcontractor will include in each lower-tier subcontract the appropriate flow-down clauses as required by the EPC Agreement. Any inconsistency, conflict or ambiguity between terms and conditions of this Agreement and the terms and conditions of the EPC Agreement will be resolved by applying the more stringent of the conflicting provisions.

**1.2    Basic Definitions.**

**1.2.1**    Terms used in this Agreement shall have the meanings set forth in the EPC Agreement between Owner and Design-Builder unless otherwise provided herein, with the following specific terms defined as follows:

**1.2.1.1**    *Agreement* refers to this executed contract between Design-Builder and Subcontractor.

**1.2.1.2**    *Construction Documents* are the documents consisting of Drawings and Specifications, prepared or assembled by Design-Builder in accordance with the EPC Agreement.

**1.2.1.3**    *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.1.4**    *EPC Agreement* refers to the contract between Design-Builder and Owner for the design and construction of the Project and all exhibits, attachments, and other Contract Documents enumerated and incorporated therein.

**1.2.1.5**    *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the EPC Agreement.

**1.2.1.6**    *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to any items identified in the punch list prepared under the EPC Agreement and the submission of all documents set forth in Section 7.5.2.

**1.2.1.7**    *Force Majeure Events* are those events that are beyond the control of Subcontractor, Design-Builder and Owner, including the events of war, floods, labor disputes, earthquakes, epidemics, adverse weather conditions not reasonably anticipated, and other acts of God.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 93 of 322

**1.2.1.8** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.1.9** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the parties, the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.1.10** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, design performance specifications, design specifications, and LEED® or other sustainable design criteria and other Project-specific technical materials and requirements.

**1.2.1.11** *Project Schedule* refers to the schedule setting forth the dates by which the various stages of both the design and construction, commissioning, substantial completion and completion of the Project that must be attained to satisfy Design-Builder's obligations to Owner.

**1.2.1.12** *Site* is the land or premises on which the Project is located. For purposes of the contract "Burney" shall mean the site.

**1.2.1.13** *Sub-Subcontractor* is any person or entity retained by Subcontractor as an independent contractor to perform a portion of the Subcontractor's Work and shall include materialmen, suppliers, and subcontractors of any tier which will accept certain flow down provisions from the EPC Agreement to the extent required in this Agreement.

**1.2.1.14** *Substantial Completion or Substantially Complete* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and commercially use the Work for its intended purpose.

**1.2.1.15** *Work* is comprised of all Subcontractor's construction and other services required by the Contract Documents, including procuring and furnishing all supervision, labor, inspection, testing and start-up support labor, materials, tools, equipment, machinery, transportation, temporary utilities, temporary facilities, 12 X 60' Trailer connected to site facilities for Design Builder including Parking and porch/steps ready for use, including same items of furniture and appliances Subcontractor supplies for its own trailer(s), and all other items and services specified in this Agreement and the other Contract Documents necessary to complete the portion of the Project described in **Exhibit B**.

## 1.3 Contract Documents.

**1.3.1** The Contract Documents are comprised of the following:

**1.3.1.1** All written modifications, amendments, minor changes and Change Orders to this Agreement;

**1.3.1.2** This Agreement, including the following exhibits: (*list for example, performance standard requirements, performance incentive arrangements, markup exhibits, allowances, unit prices, or exhibit detailing offsite reimbursable personnel*);

Exhibit A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]

Exhibit A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]

Exhibit A2 Modified Flow Down Conditions_FINAL_2016-10-12

Exhibit B: Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]

Exhibit B1_15000.77.505 PGE Burney Station Proposal 10-7-2015

Exhibit B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission

EXH B2A Material Quantities

Exhibit B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1

Exhibit B4 Unit Pricing for Boulder Removal

Exhibit C1 CA Conditional Waiver And Release On Progress Payment

Exhibit C2 CA Unconditional Waiver And Release On Progress Payment

Exhibit D1 CA Conditional Waiver And Release On Final Payment

Exhibit D2 CA Unconditional Waiver And Release On Final Payment

Exhibit E: Not Used

Exhibit F: Performance & Payment Bonds (to be provided by JH Kelly)

Exhibit G: Not Used

Exhibit H: JH Kelly Construction Schedule

Exhibit I1: JHK Time and Material Rates – Labor

Exhibit I2: JHK Time and Material Rates – Equipment (to be provided by JH Kelly)

Exhibit J: JHK Proposed Invoicing Schedule

**1.3.1.3** The Construction Documents; and

**1.3.1.4** The EPC Agreement, but only to the extent the EPC Agreement relates to the Work and the terms and conditions under which the Work shall be performed, as mutually agreed and modified by the parties on the attached Exhibit A2.

## 1.4 Interpretation and Intent.

**1.4.1** Design-Builder and Subcontractor, prior to execution of the Agreement, shall carefully review all the Contract Documents for any conflicts or ambiguities. Design-Builder and Subcontractor will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**1.4.2** The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness.

## 1.5 Mutual Obligations and Acknowledgments.

**1.5.1** Design-Builder and Subcontractor commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents. Design-Builder and Subcontractor shall perform their respective responsibilities, obligations and services in a timely manner to facilitate the other's timely and efficient performance and so as not to unreasonably delay or interfere with the other's performance of its obligations under the Contract Documents.

**1.5.2** Subcontractor acknowledges that it has reviewed the EPC Agreement, and has met with Design-Builder to review, discuss, and familiarize itself with the EPC Agreement, as well as all

documents incorporated therein and attached thereto. Subcontractor will include in each lower-tier subcontract (if any) the appropriate flow-down clauses as required by the EPC Agreement.

**1.6     Entire Agreement.**

    **1.6.1**    The Contract Documents, as modified and mutually agreed to by the Design-Builder and Subcontractor, all of which are incorporated by reference into this Agreement, and any modifications thereto, are attached to this Agreement, form the entire agreement between Design-Builder and Subcontractor and are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

# Article 2

## Subcontractor's Services and Responsibilities

**2.1    General.**

**2.1.1**    Within seven (7) days after execution of this Agreement, Design-Builder and Subcontractor will meet to discuss issues affecting the administration and schedule of the Work, and implement the necessary procedures, including but not limited to those relating to schedule updates, submittals, and payment, to facilitate the ability of the parties to perform their obligations under this Agreement.

**2.1.2**    Subcontractor's Representative shall be reasonably available to Design-Builder and shall have the necessary expertise and experience required to supervise the Work. Subcontractor's Representative shall communicate regularly with Design-Builder and shall be vested with the authority to act on behalf of Subcontractor. Subcontractor shall replace its Representative upon the reasonable request of Design-Builder.

**2.1.3**    Subcontractor shall only communicate with Owner, Design-Builder's Design Consultant or separate contractors of Design-Builder or Owner through Design-Builder.

**2.2    Review of Site and Contract Documents.**

**2.2.1**    Subcontractor represents that it has examined the Site and the Contract Documents prior to executing this Agreement so as to reasonably ascertain the nature of the Work and the various conditions affecting the Work.

**2.2.2**    Subcontractor shall promptly report to Design-Builder any errors, inconsistencies, omissions, or violations of Legal Requirements that Subcontractor discovers. Subcontractor shall be liable to Design-Builder for any damages resulting from any such errors, inconsistencies, omissions, or violations of Legal Requirements which Subcontractor discovers and fails to report to Design-Builder. Nothing in this Agreement shall be deemed to transfer any design liability from Design-Builder to Subcontractor, unless Subcontractor's scope of Work includes design-assist services or Subcontractor must perform any incidental design in order to satisfy the requirements of this Agreement.

2.2.3    Subcontractor disclaims any and all liability with respect to latent structural, soil and subsurface conditions and pre-existing contamination of the jobsite.

**2.3    Construction Services Generally.**

**2.3.1**    Subcontractor shall perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents and the Project Schedule.

**2.3.2**    At the request of Design-Builder, Subcontractor shall attend meetings with Design-Builder, Owner, and/or separate design professionals or contractors of Design-Builder or Owner to discuss design and/or construction issues regarding the Subcontractor's Work as listed in Exhibit B which may arise during the Project.

**2.4    Submittals and Substitutions.**

**2.4.1**    In accordance with the Contract Documents and the Project Schedule, Subcontractor shall submit for Design-Builder's review and approval submittals, including shop drawings,

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 97 of 322

product data and samples. Design-Builder shall advise Subcontractor on or before the meeting required by Section 2.1.1 hereof of the submittal requirements for the Project. Any variances with the Construction Documents shall be specifically identified in Subcontractor's submittals or included in Exhibit B. Design-Builder's review and approval shall not relieve Subcontractor of its responsibilities to perform the Work in accordance with the Construction Documents unless Design-Builder expressly approves in writing any such variance in its response to Subcontractor's submittals. Subcontractor shall make any necessary revisions to the submittals requested by Design-Builder.

**2.4.2** Subcontractor shall not make any substitutions in the Work or procedures or methods specified by Owner, Design-Builder or the Construction Documents for performing the Work unless it first receives written approval for such substitution from Design-Builder.

## 2.5 Sub-Subcontractors.

**2.5.1** Subcontractor shall employ only Sub-Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents. Subcontractor agrees that each Sub-Subcontractor shall be fully bound to Subcontractor in the same manner as Subcontractor is bound to Design-Builder for all the requirements of the Contract Documents to the extent applicable to the Sub-Subcontractor's scope of Work.

**2.5.2** Subcontractor assumes responsibility to Design-Builder for the proper performance of the Work of Sub-Subcontractors and any acts and omissions in connection with such performance. Subcontractor shall coordinate the activities of all Sub-Subcontractors. Nothing in this Agreement is intended or deemed to relieve Subcontractor from responsibility for the work performed by its Sub-Subcontractors, or create any legal or contractual relationship between Owner or Design-Builder and any Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

## 2.6 Work of Others.

**2.6.1** Subcontractor agrees to reasonably cooperate with, and coordinate its activities so as not to interfere with, those parties performing work at the Site, including Owner's and Design-Builder's separate contractors, so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.6.2** If any part of the Work depends upon other work performed by Design-Builder, or Design-Builder's or Owner's separate contractors, Subcontractor shall, prior to proceeding with that part of the Work, inspect such other work and promptly notify Design-Builder of any discovered discrepancies or defects that would render it unacceptable for the proper performance of the Work. Subcontractor shall not proceed with such part of the Work without further direction from Design-Builder. Design-Builder shall promptly correct or cause to be corrected any such discrepancy or defect in the other work. Any delay in the performance of the Work caused by the Owner, or for which the Owner is responsible, will be resolved by the application of Section 5.4.1. Except to the extent such discrepancies or defects in such other work are latent, Subcontractor shall be liable for appropriate losses or damages incurred due to any discrepancies or defects in such other work not reported to Design-Builder by Subcontractor.

## 2.7 Site Cleanup.

**2.7.1** Subcontractor shall keep the Site reasonably free from debris, trash and construction wastes resulting from the performance of the Work. Upon Substantial Completion of the Work, or a portion of the Work, Subcontractor shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 98 of 322

**2.8     Inspection.**

  **2.8.1**   At all reasonable times, Subcontractor shall provide sufficient facilities for inspection of the Work by Design-Builder at the Site and at all locations where portions of the Work are in progress or various stages of completion. When appropriate portions of the Work are ready for inspection, Subcontractor shall notify Design-Builder.

  **2.8.2**   When Subcontractor considers that the Work, or a portion thereof that Owner or Design-Builder agrees to accept separately, is Substantially Complete, Subcontractor will notify Design-Builder in writing, and Subcontractor and Design-Builder will jointly inspect all of the Work or a portion thereof performed by Subcontractor. After the inspection, Subcontractor shall prepare and submit to Design-Builder in writing a comprehensive punch list of items to be completed or corrected prior to Final Completion. Design-Builder will have ten (10) days from receipt of the punch list to accept, reject, or add items to such punch list. Failure to include an item on such punch list does not alter the responsibility of Subcontractor to complete all Work in accordance with the Contract Documents.

**2.9     Patents and Copyrights.**

  **2.9.1**   Subcontractor shall pay all license fees and royalties due for items, materials, methods, systems or processes applicable to the Work which are subject to copyrights or patent rights and which are selected by Subcontractor.

**2.10     Legal Requirements.**

  **2.10.1** Subcontractor shall perform the Work in accordance with all applicable Legal Requirements.

  **2.10.2** The Contract Price and/or the times for completion of the Work shall be adjusted to compensate Subcontractor for the effects, if any, of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, but only to the extent Design-Builder receives a corresponding adjustment from Owner.

**2.11     Government Approvals and Permits.**

  **2.11.1** Subcontractor shall obtain and pay for the permits, licenses, and government charges included in Exhibit B required for the prosecution of the Work.

  **2.11.2** Subcontractor shall provide reasonable assistance to Design-Builder in obtaining those permits, inspections, approvals and licenses, if any, that are the responsibility of Owner or Design-Builder and related to the Work.

**2.12     Project Safety and Security.**

  **2.12.1** Subcontractor recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, (iii) the work of others on the Project, and (iv) all other property at the Site or adjacent thereto. Subcontractor assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work.

  **2.12.2** Subcontractor and Sub-Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific and/or Design-Builder-specific safety requirements set forth in the Contract Documents or established for the Project, provided that such Owner-specific and/or Design-Builder-specific requirements do not violate any applicable Legal Requirement.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 99
of 322

Subcontractor will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Design-Builder's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.12.3**  Subcontractor shall cooperate with Design-Builder on all security matters and shall promptly comply with any Project security requirements established by Design-Builder. Subcontractor shall at all times conduct all operations under this Agreement in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage, or other means to any property.

**2.12.4**  Subcontractor shall furnish its employees and its Sub-Subcontractors' employees identification badges, approved by Design-Builder, showing Subcontractor's name and employee number. Each employee shall be required to wear his badge in plain sight at all times whenever he is on the Site. Subcontractor, its Sub-Subcontractors, and their employees shall observe all procedures for admission to the Site required by Design-Builder.

**2.12.5**  Prior to the start of the Work at the Site, Subcontractor and its Sub-Subcontractors shall submit to Design-Builder a list of all employees to be employed at the Site in connection with the Work under this Agreement. Such list shall include employee's name, and shall be kept current during the course of the Work.

**2.13**  **Warranty.**

**2.13.1**  Subcontractor warrants to Design-Builder that the Work, including all materials and equipment furnished as part of the Work, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner and/or Design-Builder with greater warranty rights than set forth in this Section 2.13 or the Contract Documents. Subcontractor will provide and, if requested, assign to Design-Builder all manufacturers' warranties upon Substantial Completion.

**2.14**  **Correction of Defective Work.**

**2.14.1**  Subcontractor agrees to correct any of the Work that is found not to be in conformance with the Contract Documents, including that part of the Work subject to Section 2.13 hereof, within a period of one (1) year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by any specific warranty included in the Contract Documents. Where defective Work (and damage to other work resulting therefrom) has been corrected or removed and replaced under this Section 2.14.1, the correction period hereunder with respect to such Work will be extended for an additional period of one (1) year after such correction or removal and replacement has been satisfactorily completed.

**2.14.2**  Subcontractor shall, within seven (7) days of receipt of written notice from Design-Builder that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work or the Project affected by the nonconforming Work. If Subcontractor fails to commence the necessary steps within such seven (7) day period, Design-Builder, in addition to any other remedies provided under the Contract Documents, may provide Subcontractor with written notice that Design-Builder will commence correction of such nonconforming Work with its own forces. If Design-Builder does perform such corrective Work, Subcontractor shall be responsible for all reasonable costs incurred by Design-Builder in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day period identified herein shall be deemed inapplicable.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
100 of 322

**2.14.3** The one (1) year period referenced in Section 2.14.1 above applies only to Subcontractor's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Design-Builder may have regarding Subcontractor's obligations under the Contract Documents.

## 2.15 Start-Up and Training.

**2.15.1** If required as part of Subcontractor's Work, Subcontractor shall be responsible for the start-up, testing, and commissioning of the Work, and shall train Owner's personnel with respect to the operation and maintenance of the Work.

## 2.16 Hazardous Conditions.

**2.16.1** Subcontractor is responsible for Hazardous Conditions introduced to the Site by itself, Sub-Subcontractors or anyone for whose acts they may be liable. Subcontractor must notify Design-Builder immediately upon the discovery of the presence of any Hazardous Conditions on, or the release of Hazardous Conditions from, the Site. Subcontractor will be responsible for the handling, storage, remediation, or disposal of such Hazardous Conditions (including, but not limited to, any conditions resulting from the presence thereof) in compliance with all applicable Legal Requirements and as directed by Design-Builder.

**2.16.2** Subcontractor shall indemnify, defend and hold harmless Owner, Design-Builder, Design Consultants, and their officers, directors, employees and agents from and against all claims, losses, damages, liabilities, and expenses, including attorneys' fees and expenses, arising out of or resulting from those Hazardous Conditions for which Subcontractor, Sub-Subcontractors or anyone for whose acts they may be liable are responsible under this Agreement.

**2.16.3** Subcontractor and its Sub-Subcontractors will, at their expense, provide suitable facilities to prevent the introduction of any substances or materials into any stream, river, lake or other body of water which may pollute the water or constitute substances or materials deleterious to fish and wildlife.

**2.16.4** Subcontractor and its Sub-Subcontractors will so perform the Work as not to discharge into the atmosphere from any source whatsoever smoke, dust, or other air contaminants in violation of the laws, rules, and regulations of the governmental entities having jurisdiction.

**2.16.5** Nothing furnished by Subcontractor in the performance of the Work or for incorporation into the Work will contain asbestos (i.e. must be "asbestos-free"). Subcontractor must execute and submit a certificate of conformance with this Section in such form as may be required by Design-Builder.

## 2.17 Omissions and Misdescriptions

**2.17.1  In the event Subcontractor discovers** omissions from the drawings or specifications or the misdescription of details of Work which are manifestly necessary to carry out the intent of the Construction Documents, or which are customarily performed, Subcontractor shall immediately bring to the attention of Design-Builder the omission via a Request for Information (RFI) prior to commencement of any work, but shall not relieve the Subcontractor from performing such omitted or misdescribed details of the Work and the Work shall be performed as if fully and correctly set forth and described in the Construction Documents.  Variations in quantities from as-bid shall be brought to the attention of Design-Builder via a Request For Information (RFI) prior to any purchase of materials.

## 2.18 Underground Installations

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 101 of 322

**2.18.1**  Existing underground installations are indicated on the Construction Documents only to the extent such information was discovered by Owner or Design-Builder in preparing the Construction Documents. There is no guarantee as to the accuracy or completeness of such information, and all responsibility for the accuracy and completeness thereof is expressly disclaimed.  Subcontractor shall be responsible for discovery of existing underground installations, in advance of excavating or trenching, by contacting all local utilities and by prospecting. Subcontractor's responsibility for locating underground installations is limited to one initial underground verification as noted in Exhibit B.  Subcontractor disclaims any and all liability with respect to soil and subsurface conditions, including undocumented or inaccurate location services provided by others.

## 2.19    Publicity

**2.19.1**  Subcontractor shall not engage in any advertising, publicity, or other promotional activities which in any way directly or indirectly mentions or refers to this Agreement, the relationship between the parties created thereby or the services and material furnished thereunder, without obtaining the prior written consent of Design-Builder.  Subcontractor shall not display any signs, posters, or other advertising matter in or on any part of the Work or around the Site thereof without specific written approval of Design-Builder.  The taking of photographs, videotapes, or other visual images of the Site will not be permitted without the prior written approval of Design-Builder.

## 2.20    Labor Requirements

**2.20.1**  All employee taxes, wages, and employer contributions imposed by any Union Affiliations, Federal or State laws shall be paid by Subcontractor or its Sub-subcontractors, including all interest and penalties payable under said laws as a result of any noncompliance therewith. Subcontractor shall also indemnify, defend and hold harmless Design-Builder from and against any and all claims, liabilities, and expenses with respect to the foregoing.

# <u>Article 3</u>

## Design-Builder's Services and Responsibilities

### 3.1    Timely Reviews and Approvals.

**3.1.1**    Design-Builder shall provide timely reviews and approvals of all submittals within ten (10) Working Days (consistent with the turnaround times set forth in the Project Schedule), or as agreed to by the parties at the meeting required under Section 2.1.1 hereof.

### 3.2    Design-Builder's Representative.

**3.2.1**    Design-Builder's Representative shall be responsible for providing Design-Builder-supplied information and approvals in a timely manner to permit Subcontractor to fulfill its obligations under the Contract Documents.

### 3.3    Furnishing of Services and Information.

**3.3.1**    Unless expressly stated to the contrary in the Contract Documents, and to the extent Design-Builder has received such items from Owner, Design-Builder shall provide for Subcontractor's information the items listed below. Design-Builder does not warrant the accuracy

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 102 of 322

or completeness of such items provided, however, that Subcontractor is entitled to rely on these items to the same extent Design-Builder is entitled to rely upon such items in the EPC Agreement:

> **3.3.1.1** Surveys describing the property, boundaries, topography and reference points for use during construction, including existing service and utility lines (underground and above ground);

> **3.3.1.2** Geotechnical studies describing subsurface conditions, and other surveys describing other latent or concealed physical conditions at the Site;

> **3.3.1.3** Temporary and permanent easements, zoning and other requirements and encumbrances affecting land use, or necessary to permit the proper construction of the Project and enable Subcontractor to perform the Work;

> **3.3.1.4** A legal description of the Site;

> **3.3.1.5** Record drawings of any existing structures at the Site;

> **3.3.1.6** Environmental studies, reports and impact statements describing the environmental conditions, including Hazardous Conditions, in existence at the Site;

> **3.3.1.7** Owner's Project Criteria;

> **3.3.1.8** All permits, approvals, and licenses, if any, set forth in the Owner's Permit List attached as an exhibit to the EPC Agreement; and

> **3.3.1.9** Review and submittal of Test and inspection reports as required in Exhibit B.

**3.3.2** Design-Builder shall provide Subcontractor with a copy of the EPC Agreement, including all exhibits, attachments, and other Contract Documents enumerated and incorporated therein. Such copy may be redacted to preserve business confidential information or any other information that Design-Builder deems proprietary.

**3.3.3** Intentionally omitted.

**3.3.4** Design-Builder shall provide Subcontractor with the Project Schedule and appropriate updates thereto.

## 3.4 Notification of Errors.

**3.4.1** Design-Builder shall notify Subcontractor of any errors, inconsistencies, or omissions Design-Builder discovers in the Work. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall relieve Subcontractor of responsibility for errors, inconsistencies, or omissions in the Work.

## 3.5 Attendance at Design Meetings.

**3.5.1** Design-Builder shall afford Subcontractor and its Sub-Subcontractors the opportunity to attend all necessary design meetings with Owner, Design-Builder's Design Consultant or others furnishing portions of the design for the Project.

## 3.6 Review and Approval of Submittals.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

**3.6.1**   Design-Builder shall review and approve submittals, including shop drawings, product data and samples, within fourteen (14) Days after being submitted by Subcontractor. Design-Builder's review and approval of submittals shall be only for the purpose of confirming general conformance with the Construction Documents. Design-Builder's review and approval shall not relieve Subcontractor of its responsibilities to perform the Work in accordance with the Construction Documents unless Design-Builder expressly approves in writing any such variance in its response to Subcontractor's submittals. If revisions are necessary to a submittal prior to Design-Builder's approval, Design-Builder shall inform Subcontractor of any such necessary revisions.

**3.7**   **Design-Builder's Separate Contractors.**

**3.7.1**   Design-Builder is responsible for all work performed on the Project or at the Site by its separate subcontractors under Design-Builder's control. Design-Builder shall contractually require its separate subcontractors to cooperate with, and coordinate their activities so as not to unreasonably interfere with, Subcontractor's ability to timely complete its Work consistent with the Contract Documents.

**3.7.2**   Design-Builder, Owner, other contractors and other subcontractors may be working at the Site during the performance of this Agreement and Subcontractor Work or use of certain facilities may be interfered with as a result of such concurrent activities. Design-Builder reserves the right to require Subcontractor to schedule the order of performance of the Work in such a manner as will minimize interference with work of any of the parties involved.

**3.7.3**   Subcontractor shall cooperate with Design-Builder and other consultants, contractors, and subcontractors working at the Site, and shall coordinate its Work with the others and shall not delay or hinder in any way the progress of the Work as a whole. Subcontractor shall not commit any act that will interfere with the performance of work by any other consultant, contractor, and subcontractor or by Design-Builder or Owner.

# Article 4

## Ownership of Work Product

**4.1**   **Work Product.**

**4.1.1**   The Subcontractor shall have no ownership and property rights in any drawings, specifications, and other documents and electronic data ("Work Product") furnished by Design-Builder to Subcontractor under this Agreement. Design-Builder shall be granted ownership of all Work Product, if any, furnished by Subcontractor to Design- Builder under this Agreement.

**4.2**   **Indemnification for Use of Work Product.**

**4.2.1**   If either Design-Builder or Subcontractor uses the Work Product furnished to them by the other on any other project, it agrees that it shall do so at its sole risk and without liability or legal exposure to the other party, Owner, or anyone working through them. Such party further agrees that it shall defend, indemnify and hold harmless the other party from and against any and all claims, damages, liabilities, losses and expenses, including attorneys' fees, arising out of or resulting from such use of the Work Product on another project.

# Article 5

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 104 of 322

# Time of Performance

**5.1**    **Date of Commencement.**

   **5.1.1**    The Work shall commence five (5) days after Subcontractor's receipt of Design-Builder's Notice to Proceed ("Date of Commencement") unless the parties mutually agree otherwise in writing.

**5.2**    **Time of Completion.**

   **5.2.1**    Subcontractor shall diligently and continuously prosecute and complete the Work in accordance with the Project Schedule as it may be revised and issued from time to time during the performance of the Work, and any other scheduling requirements listed in the Contract Documents.

   **5.2.2**    Subcontractor shall participate and cooperate in the development of schedules and other efforts to achieve timely completion of the Work. Subcontractor shall provide Design-Builder information for the scheduling of the times and sequence of operations required for the Work to meet Design-Builder's overall schedule requirements, shall continuously monitor the Project Schedule, including any revisions thereto, so as to be fully familiar with the timing, phasing and sequence of operation of the Work and of other work on the Project, and shall execute the Work in accordance with the requirements of the Project Schedule including any revisions thereto. Any Owner or Design-Builder directed changes to the scheduling of times, compression, or sequence of operations required for the Work that impact the Subcontractor's cost of performing the Work, including extended general conditions, will be considered a change to the Work and subject to the provisions of Article 12.

   **5.2.3**    Subcontractor shall timely perform the various stages of the Work so that Design-Builder can achieve the dates set forth in the Project Schedule, including any revisions thereto.

**5.3**    **Time is of the Essence.**

   **5.3.1**    Design-Builder and Subcontractor mutually agree that time is of the essence with respect to the dates and times set forth in the Contract Documents and the Project Schedule.

**5.4**    **Delays to the Work.**

   **5.4.1**    **Owner-Caused Delays**. If Subcontractor is delayed in the performance of the Work due to the acts or omissions of the Owner, or for which Owner is responsible, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder and/or Owner may reasonably require, then Subcontractor's time for performance shall be reasonably extended by Change Order, provided that a corresponding adjustment to Design-Builder's time for performance is made by the Owner under the EPC Agreement. In addition, Subcontractor will also be entitled to an appropriate adjustment of the Contract Price under this Section 5.4.1, provided a corresponding adjustment to Design-Builder's compensation is made by the Owner under the EPC Agreement. Notwithstanding any other provision to the contrary, any disputes between Design-Builder and Subcontractor involving delay and resulting damages that arise out of, or relate to, the acts or omissions by Owner or for which Owner is responsible shall be resolved pursuant to Section 13.3 hereof. Subcontractor's recovery shall be limited to the amount, if any, which Design-Builder, on behalf of Subcontractor, actually receives from Owner on account of such claim. Payment by Owner shall be by an express condition precedent to Design-Builder's duty of payment to Subcontractor.

   **5.4.2**    **Force Majeure Events, Hazardous Conditions, & Differing Site Conditions**. If Subcontractor is delayed in the performance of the Work due to Differing Site Conditions (as

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
105 of 322

defined in FAR 52.236-2), Hazardous Conditions (other than those for which Subcontractor is responsible under Section 2.16 hereof), or Force Majeure Events, and due to no fault of its own or those for whom Subcontractor is responsible, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder and/or Owner may reasonably require, then Subcontractor's time for performance will be reasonably extended by Change Order, provided that a corresponding adjustment to Design-Builder's time for performance is made by the Owner under the EPC Agreement. In addition, Subcontractor will also be entitled to an appropriate adjustment of the Contract Price under this Section 5.4.2, provided a corresponding adjustment to Design-Builder's compensation is made by the Owner under the Design-Build Agreement. Notwithstanding any other provision to the contrary, any disputes between Design-Builder and Subcontractor involving delay and resulting damages that arise out of, or relate to, Differing Site Conditions, Hazardous Conditions (other than those for which Subcontractor is responsible under Section 2.16 hereof), or Force Majeure Events shall be resolved pursuant to Section 13.3 hereof.

**5.4.3  Design-Builder-Caused Delays.** If Subcontractor's Work is delayed solely as a result of acts or omissions of Design-Builder, and Subcontractor demonstrates such delay through a critical path analysis or other such proof that Design-Builder may reasonably require, then Subcontractor's time for performance will be reasonably extended by Change Order and Design-Builder will be liable to Subcontractor for Subcontractor's actual direct damages caused by Design-Builder. Design-Builder's exercise of its rights to authorize acceleration of the Work shall not constitute a delay, disruption or interference with Subcontractor's Work.

**5.4.4  Subcontractor-Caused Delays**. If the Project is delayed due to the Subcontractor or anyone for whom Subcontractor is responsible, and not due to Design-Builder or Owner, Subcontractor shall compensate and indemnify Design-Builder for all costs and expenses arising from such delay, including any and all costs incurred by the Owner,and/or any liquidated damages or other damages that Owner may assess against Design-Builder which are attributable to Subcontractor or anyone for whom Subcontractor is responsible pursuant with Specific Conditions Section 5.7. In addition, Subcontractor shall, at the direction of Design-Builder and at Subcontractor's own cost and expense, work such overtime and take such other measures as may be necessary to make up for all time lost in the completion of the Work due to such delay.

**5.4.5**   In no event shall Subcontractor be entitled to any extension of time or any damages for any delays, disruptions or interferences caused by Subcontractor or its Sub-Subcontractors. In the event damages incurred by Design-Builder are caused both by Subcontractor and another entity for whose acts or omissions Subcontractor is not liable, Design-Builder will have the right to reasonably apportion said damages amongst the responsible parties.

# Article 6

## Contract Price

**6.1**  **Contract Price.**

**6.1.1**   Design-Builder shall pay Subcontractor in accordance with Article 6 hereof the sum of       Fourteen Million Three Hundred Forty One Thousand Two Hundred Eighty One and 00/100   Dollars (**$14,341,281.00**) ("Contract Price"), subject to adjustments made in accordance with the Contract Documents. Unless otherwise provided in the Contract Documents, the Contract Price is deemed to include all sales, use, consumer and other taxes mandated by applicable Legal Requirements. Design-Builder is not responsible for Subcontractor's bidding or estimating mistakes or miscalculation of market conditions.

**6.2**  **Markups for Changes.**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

**6.2.1** If the Contract Price requires an adjustment due to changes in the Work, and the cost of such changes is determined under Sections 12.6.1.3 or 12.6.1.4 hereof, the following markups shall be allowed on such changes:

    **6.2.1.1** For additive Change Orders, including additive Change Orders arising from both additive and deductive items, it is agreed that Subcontractor shall receive a Fee of _____ _____ten_____ percent (_____10\_\_\_\_\_%) of the additional Costs of the Work incurred for that Change Order.

    **6.2.1.2** For deductive Change Orders, including deductive Change Orders arising from both additive and deductive items, the deductive amounts shall include:

***[Check one box only]***

☐    No additional reduction to account for Subcontractor's Fee or any other markup.

**or**

☒    An amount equal to the sum of: (a) \_\_\_\_\_ten_____ percent (_____10 %) applied to the direct costs of the net reduction (which amount will account for a reduction associated with Subcontractor's Fee).


# <u>Article 7</u>

## Procedure for Payment

**7.1**    **Schedule of Values.**

    **7.1.1**    Unless required by Design-Builder upon execution of this Agreement, within ten (10) days of execution of the Agreement, Subcontractor shall submit for Design-Builder's review and approval a Schedule of Values for all of the Work. The Schedule of Values will (i) subdivide the Work into its respective parts; (ii) include values for all items comprising the Work; and (iii) serve as the basis for monthly progress payments made to Subcontractor throughout the Work.

**7.2**    **Progress Payments.**

    **7.2.1**    Beginning with the first month after the Date of Commencement, Subcontractor shall submit on the <u>twenty-eighth</u> (28th) day of each month for Design-Builder's review and approval, Subcontractor's Application for Payment requesting payment for all Work performed as of the date of the Application for Payment. The Application for Payment shall be accompanied by all supporting documentation required by the Contract Documents and/or established at the meeting required by Section 2.1.1 hereof, including Subcontractor's Schedule of Values as approved by Design-Builder. As a prerequisite for any payment, Subcontractor must provide with each progress invoice a completed Conditional/Unconditional Waiver and Release on Progress Payment form, as appropriate (attached as **Exhibit C1 and C2**) from Subcontractor and its Sub-subcontractors and suppliers that have filed a Preliminary Notice. Design-Builder will submit Subcontractor's proper Application for Payment to Owner with Design-Builder's Application. Each Application for Payment shall also show the amount of all previous payments to Subcontractor and the amount of current retainage, and shall include evidence satisfactory to Design-Builder demonstrating that Subcontractor has paid all persons supplying labor, materials or services in accordance with its contractual obligations to these persons in connection with the Work. "Current retainage" shall be calculated by multiplying the value of the Work completed and qualified for payment by the retainage percentage.

**7.2.2**    The Application for Payment may request payment for equipment and materials not yet incorporated into the Project, provided that (i) Design-Builder is satisfied that the equipment and materials are suitably stored at either the Site or another acceptable location, (ii) the equipment and materials are protected by suitable insurance, and (iii) upon payment, Design-Builder will receive the equipment and materials free and clear of all liens and encumbrances.

**7.2.3**    The Application for Payment shall constitute Subcontractor's representation that the Work has been performed consistent with the Contract Documents, has progressed to the point indicated in the Application for Payment, and that title to all Work will pass to Owner free and clear of all claims, liens, encumbrances, and security interests upon the incorporation of the Work into the Project, or upon Subcontractor's receipt of payment, whichever occurs earlier.

**7.2.4**    Design-Builder shall make payment on Subcontractor's properly submitted and accurate Application for Payment within seven (7) days after Design-Builder's receipt of payment from Owner on account of Subcontractor's monthly Application for Payment, but in each case less the total of payments previously made, and less amounts properly withheld under this Agreement. Payment terms not to exceed 30 days from approved invoice date.  Balances outstanding after 45 days shall accrue interest at a rate of 1.5% per month.

**7.3**    **Retainage on Progress Payments.**

**7.3.1**    Design-Builder will retain from each of Subcontractor's Application for Payment _____ _____five_____ percent (_____5_____%). Unless mutually agreed otherwise between the parties, retainage will be included in Design-Builder's final payment to Subcontractor, provided Design-Builder has received such retained amounts from Owner and the Design-Builder agrees that Subcontractor has met all of its obligations under the Agreement.

**7.4**    **Withholding of Payments.**

**7.4.1**    If Design-Builder determines that Subcontractor is not entitled to all or part of an Application for Payment, it will notify Subcontractor prior to the date payment is due. The notice shall indicate the specific amounts Design-Builder intends to withhold, the reasons for the withholding, and the specific measures Subcontractor must take to rectify Design-Builder's concerns. Design-Builder and Subcontractor will attempt to resolve Design-Builder's concerns prior to the date payment is due. If the parties cannot resolve such concerns, Design-Builder shall pay Subcontractor the undisputed amount of the Application for Payment, and Subcontractor may pursue its rights under the Contract Documents, including those under Article 13 hereof.

**7.4.2**    In addition, any amounts otherwise payable under the Agreement may be withheld, in whole or in part, if (i) any claims or backcharges against Subcontractor by Design-Builder or third parties remain unpaid; or (ii) Subcontractor or its insurance company refuse to promptly defend Design-Builder or Owner for any claim that Subcontractor is required to defend and indemnify Design-Builder and/or Owner under this Agreement.

**7.4.3**    Design-Builder will pay such withheld payments if Subcontractor (i) pays, satisfies, or discharges any claim of Design-Builder, or third party against Subcontractor, arising out of or in any way connected with this Agreement; or (ii) cures all defaults in the performance of the Agreement.

**7.5**    **Final Payment.**

**7.5.1**    Subcontractor shall submit its Final Application for Payment to Design-Builder in accordance with Section 7.5.2 below. Design-Builder shall make payment on Subcontractor's properly submitted and accurate Final Application for Payment within thirty (30) days after

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
108 of 322

Design-Builder's receipt of final payment from Owner on account of Subcontractor's Final Application for Payment, but in no event later than thirty (30) days from the date of the Certification of Completion for Final Payment, provided also that Subcontractor has satisfied the requirements for final payment set forth in Section 7.5.2 below.

**7.5.2**    At the time of submission of its Final Application for Payment, Subcontractor shall provide the following information:

> **7.5.2.1** Subcontractor's Conditional Waiver Upon Final Payment, and Certification of Completion for Final Payment
>
> **7.5.2.2** Any other data required by Design-Builder;
>
> **7.5.2.3** Consent of Subcontractor's surety, if any, to final payment;
>
> **7.5.2.4** All operating manuals, warranties and other deliverables required by the Contract Documents;
>
> **7.5.2.5** Certificates of insurance confirming that required coverages will remain in effect consistent with the requirements of the Contract Documents.
>
> **7.5.2.6** As-built drawings, if required by the Contract Documents; and
>
> **7.5.2.7** Completion of Design-Builder's required closeout procedures including, but not limited to, completion of all punch list items developed as required by Section 2.8.2 of this Agreement.

**7.5.3**    Subcontractor shall submit its Final Application for Payment promptly upon completion of the Work, but in no event later than sixty (60) days from Final Completion of the Work. Design-Builder will have no responsibility or liability for payment to Subcontractor if Subcontractor fails to submit its final invoice within the sixty (60) day period. The final payment, however, shall not relieve the Subcontractor from any responsibility or obligation under this Agreement (including, without limitation, the warranty and indemnification provisions thereof) or constitute a waiver of any claim by Design-Builder against Subcontractor.


**7.6**    **Pay When Paid.**

**7.6.1**    Intentionally Omitted.

**7.7**    **Intentionally Omitted**.

**7.8**    **Advance Payments.**

**7.8.1**    Design-Builder has the right, at its sole option, to advance any payment due Subcontractor under this Agreement.

**7.9**    **Payment Not Acceptance.**

**7.9.1**    No payment to Subcontractor under this Agreement shall be evidence of, or construed to be, acceptance of defective, faulty, improper or non-conforming work.

**7.10**    **Subcontractor's Payment Obligations.**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 109 of 322

**7.10.1** Subcontractor will pay its Sub-Subcontractors, in accordance with its contractual obligations to such parties, all the amounts Subcontractor has received from Design-Builder on account of their work. Subcontractor will impose similar requirements on its Sub-Subcontractors to pay those parties with whom they have contracted. Subcontractor will indemnify and defend Owner and Design-Builder against any claims for payment and mechanic's liens as set forth in Section 11.3 hereof, providing Design-Builder is not in breach of its contractual obligations to make payment to Subcontractor for its Work.

**7.11      Record Keeping and Finance Controls.**

**7.11.1** With respect to changes in the Work performed on a cost basis by Subcontractor pursuant to the Contract Documents, Subcontractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles and as may be provided in the Contract Documents. During the performance of the Work and for a period of three (3) years after final payment of the Work, Design-Builder and Design-Builder's accountants shall be afforded access to and the right to audit from time-to-time, upon reasonable notice, Subcontractor's records, books, correspondence, receipts, subcontracts, purchase orders, vouchers, memoranda and other data relating to the changes in the Work, all of which Subcontractor shall preserve for a period of three (3) years after final payment. Such inspection shall take place at Subcontractor's offices during normal business hours unless another location and time is agreed to by the parties. Any multipliers or markups agreed to by Subcontractor and Design-Builder as part of this Agreement are only subject to audit to confirm that such multiplier or markup has been charged in accordance with this Agreement, with the composition of such multiplier or markup not being subject to audit.

**7.12      Sub-subcontractors, Suppliers, and Vendors.**

**7.12.1** Subcontractor must (if requested by Design-Builder) furnish an affidavit showing the names and addresses of all persons or companies who have furnished labor, materials or services for the Work and the amount due or to become due to each such person. If Subcontractor fails to promptly pay its Sub-Subcontractors or vendors for all labor, services, and materials furnished in connection with the performance of the Work, in accordance with its contractual obligations to such parties, Design-Builder may, after five (5) days written notice to Subcontractor, pay the amount of such liabilities directly to such parties or in the form of checks payable jointly to Subcontractor and such person or company and recover the amount from Subcontractor directly, or by the application of any portion of the Contract Price due. Subcontractor will (if requested by Design-Builder), provide affidavits from all persons furnishing labor, materials or services to the effect that they have been paid in full.

**7.13      No Diversion of Funds or False Vouchers.**

**7.13.1** Subcontractor is directed to comply with all statutory provisions which prohibit the wrongful diversion of funds or the submission of false vouchers. Further, if Subcontractor diverts any funds received in payment under this Agreement and does not apply them to their intended purpose or submits false vouchers for payment, in addition to all other remedies, this Agreement shall be subject to termination for cause without any opportunity to cure.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
110 of 322

**7.14    Invoicing**

    7.14.1   Invoices shall be submitted only electronically via email in Adobe PDF format to:

- USAPImaging@aecom.com  (AECOM Accounts Payable)
- steven.petto@aecom.com  (AECOM Project Manager)
- ocie.williams@aecom.com  (AECOM Procurement Manager)

    Invoices shall include the following information:

- Oracle Purchase Order Number:  *to be determined after award*
- AECOM Project Number:  60482831
- AECOM Task Number:  01.30.030
- Documentation, e.g., an annotated, signed and scanned Schedule of Values, from the AECOM Site Manager (Pat Elliott) attesting that the scheduled work has been completed and that all work covered by the invoice has been satisfactorily completed.

# Article 8

## Stop Work and Termination

**8.1    Design-Builder's Right to Stop Work.**

    **8.1.1**   Design-Builder may, without cause and for its convenience, order Subcontractor in writing to stop and suspend the Work. Such suspension shall not exceed sixty (60) consecutive days or aggregate more than ninety (90) Days during the duration of the Project.

    **8.1.2**   Subcontractor is entitled to seek an adjustment of the Contract Price and/or times for completion of the Work if its cost or time to perform the Work has been adversely impacted by any suspension or stoppage of work by Design-Builder. However, under no circumstances will Subcontractor be entitled to any adjustment if such suspension or stoppage of work is caused by Subcontractor's breach of this Agreement, wrongful acts, or failure to act. Notwithstanding anything to the contrary herein, if Design-Builder's suspension of the Work is the result of Owner's suspension of Design-Builder's work under the EPC Agreement, then Design-Builder shall pay Subcontractor only those amounts Design-Builder actually receives from Owner on account of the Work.

**8.2    Design-Builder's Right to Terminate for Convenience.**

    **8.2.1**   Upon ten (10) days' written notice to Subcontractor, Design-Builder may, for its convenience and without cause, elect to terminate this Agreement. In such event, Design-Builder shall have the right to use the existing Work Product, including all materials onsite and offsite in Subcontractor's prefabrication facilities, if any, for purposes of completing the Project, and shall pay Subcontractor for the following:

        **8.2.1.1** All Work executed and all unpaid costs or expenses incurred by the Subcontractor in connection with the executed Work; and

        **8.2.1.2** The reasonable costs and expenses attributable to such termination, including amounts due in settlement of terminated contracts with Sub-Subcontractors or suppliers. In no event will Subcontractor be entitled to any compensation for loss of anticipated profits, opportunity costs, unallocated overhead on Work not performed, or other amounts with respect to Work that has not been performed prior to termination.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
111 of 322

**8.2.2** If Design-Builder's termination of Subcontractor for convenience is the result of Owner's termination of Design-Builder for convenience under the Design-Build Agreement, then Design-Builder shall pay Subcontractor only those amounts Design-Builder actually receives from Owner on behalf of Subcontractor.

**8.3** **Design-Builder's Right to Terminate for Cause.**

**8.3.1** If Subcontractor persistently fails to (i) provide a sufficient number of skilled workers, (ii) supply the materials required by the Contract Documents, (iii) comply with applicable Legal Requirements, (iv) timely pay, without cause, its Sub-Subcontractors, (v) prosecute the Work with promptness and diligence to ensure that the Work is completed in accordance with the Project Schedule, as such schedule may be adjusted, or (vi) perform material obligations under the Contract Documents, then Design-Builder shall have the rights, in addition to any other rights and remedies provided in the Contract Documents or by law, set forth in Sections 8.3.2 and 8.3.3 below.

**8.3.2** Upon the occurrence of an event set forth in Section 8.3.1 above, Design-Builder may provide written notice to Subcontractor that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within five (5) days of Subcontractor's receipt of such notice. If Subcontractor fails to cure, or reasonably commence to cure, such problem, then Design-Builder may declare the Agreement terminated for default by providing written notice to Subcontractor of such declaration.

**8.3.3** Upon declaring the Agreement terminated pursuant to Section 8.2.1 or 8.3.2 above, Design-Builder may enter upon the premises and take possession, for the purpose of completing the Work, of all materials thereon, which have been purchased or provided for the performance of the Work, all of which Subcontractor hereby transfers, assigns and sets over to Design-Builder for such purpose, and to employ any person or persons to complete the Work and provide all of the required labor, services, materials, equipment and other items. In the event of termination pursuant to Section 8.3.2, Subcontractor shall not be entitled to receive any further payments under the Contract Documents until the Work shall be finally completed in accordance with the Contract Documents. If the Design-Builder incurs any attorneys' fees and expenses in defense of claims arising from Subcontractor's default, subject to the waiver of consequential damages set forth in Section 13.7 hereof, these costs may be deducted from any amounts due to Subcontractor by the Design-Builder.

**8.3.4** If Design-Builder improperly terminates the Agreement for cause, the termination for cause will be converted to a termination for convenience in accordance with the provisions of Section 8.2 of the Agreement.

**8.4** **Subcontractor's Right to Stop Work.**

**8.4.1** If Design-Builder fails to pay any undisputed amounts due Subcontractor under this Agreement, Subcontractor may, in addition to any other rights afforded under the Contract Documents or at law, stop work in accordance with Section 8.4.2. However, to the extent Design-Builder's failure to pay is related to a dispute between the Parties, the dispute will be resolved in accordance with Article 13 and the parties will continue performance in accordance with Section 13.6 during the pendency of such dispute.

**8.4.2** Subcontractor shall provide Design-Builder with written notice that Subcontractor will stop work unless said failure to pay the undisputed amount is cured within seven (7) Days from Design-Builder's receipt of Subcontractor's notice. If Design-Builder does not cure the problem within such seven (7) day period, Subcontractor may stop work. In such case, Subcontractor shall be entitled to make a claim for adjustment to the Contract Price and the times for completion of the Work to the extent it has been adversely impacted by such stoppage.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
112 of 322

**8.5** **Subcontractor's Right to Terminate For Cause.**

**8.5.1** Subcontractor, in addition to any other rights and remedies afforded under the Contract Documents or at law, may terminate the Agreement for cause in accordance with Section 8.5.2 below if Design-Builder fails to cure the problems set forth in Section 8.4.1 above within thirty (30) days after Subcontractor has stopped the work.

**8.5.2** Upon the occurrence of the event set forth in Section 8.5.1 above, Subcontractor may provide written notice to Design-Builder that it intends to terminate the Agreement unless the problem cited is cured, or commenced to be cured, within seven (7) days of Design-Builder's receipt of such notice. If Design-Builder fails to cure, or reasonably commence to cure, such problem, then Subcontractor may give a second written notice to Design-Builder of its intent to terminate within an additional seven (7) day period. If Design-Builder, within such second seven (7) day period, fails to cure, or reasonably commence to cure, such problem, then Subcontractor may declare the Agreement terminated for default by providing written notice to Design-Builder of such declaration. In such case, Subcontractor shall be entitled to recover in the same manner as if Design-Builder had terminated this Agreement for its convenience under Section 8.2 of the Agreement, plus any attorney's fees or costs incurred in defense of claims.

**8.6** **Bankruptcy of Design-Builder or Subcontractor.**

**8.6.1** If either Design-Builder or Subcontractor institutes or has instituted against it a case under the United States Bankruptcy Code (such party being referred to as the "Bankrupt Party"), such event may impair or frustrate the Bankrupt Party's ability to perform its obligations under the Contract Documents. Accordingly, should such event occur:

**8.6.1.1** The Bankrupt Party, its trustee or other successor, shall furnish, upon request of the non-Bankrupt Party, adequate assurance of the ability of the Bankrupt Party to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

**8.6.1.2** The Bankrupt Party shall file an appropriate action within the bankruptcy court to seek assumption or rejection of the Agreement within sixty (60) days of the institution of the bankruptcy filing and shall diligently prosecute such action.

**8.6.1.3** If the Bankrupt Party fails to comply with its foregoing obligations, the non-Bankrupt Party shall be entitled to request the bankruptcy court to reject the Agreement, declare the Agreement terminated and pursue any other recourse available to the non-Bankrupt Party under this Article 8.

**8.6.2** The rights and remedies under Section 8.6.1 above shall not be deemed to limit the ability of the non-Bankrupt Party to seek any other rights and remedies provided by the Contract Documents or by law, including its ability to seek relief from any automatic stays under the United States Bankruptcy Code.

# Article 9

## Representatives of the Parties

**9.1** **Design-Builder's Representatives.**

**9.1.1** Design-Builder designates the individual listed below as its Senior Representative ("Design-Builder's Senior Representative"), which individual has the authority and responsibility

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 113 of 322

for avoiding and resolving disputes under Section 13.4 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Shawn Kelly
Vice President
300 Lakeside Drive, Suite 400
Oakland, CA 94612
(858) 775-6523

**9.1.2** Design-Builder designates the individual listed below as its Design-Builder's Representative, which individual has the authority and responsibility set forth in Section 3.2 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Steve Petto
Associate Vice President
300 Lakeside Drive, Suite 400
Oakland, CA 94612
(510) 847-5008

9.2      **Subcontractor's Representatives.**

**9.2.1**   Subcontractor designates the individual listed below as its Senior Representative ("Subcontractor's Senior Representative"), which individual has the authority and responsibility for avoiding and resolving disputes under Section 13.4 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Mason Evans
President
2311 E. 1st Street
Vancouver, WA 98661
360-905-1387

**9.2.2**   Subcontractor designates the individual listed below as its Subcontractor's Representative, which individual has the authority and responsibility set forth in Section 2.1.2 of the Agreement: *(Identify individual's name, title, address and telephone numbers)*

Steve Lennon
Senior Project Manager
2311 E. 1st Street
Vancouver, WA 98661
360-905-1372

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

# Article 10

## Insurance and Bonds

**10.1**    **Subcontractor's Insurance Requirements.**

**10.1.1**  Subcontractor is responsible for procuring and maintaining, from insurance companies authorized to do business in the state in which the Project is located, the insurance coverages set forth in the **Exhibits A, A1 and A2** to this Agreement, with the minimum ratings set forth in said Exhibits, for certain claims which may arise from or out of the performance of this Agreement and obligations under the Contract Documents.

**10.1.2**  Subcontractor shall require its Sub-Subcontractors to procure and maintain, from insurance companies authorized to do business in the state in which the Project is located, the insurance coverages set forth in the Insurance Exhibit.

**10.1.3**  Subcontractor's and its Sub-Subcontractors' insurance coverage set forth in the Insurance Exhibit shall specifically delete any design-build or similar exclusions that could compromise coverages because of the design-build delivery of the Project.

**10.1.4**  Prior to commencing any services hereunder, Subcontractor shall provide Design-Builder with certificates evidencing that (i) all insurance obligations required by the Contract Documents are in full force and in effect and will remain in effect for the duration required by the Contract Documents and (ii) no insurance coverage will be canceled by the insurer unless at least thirty (30) days prior written notice is given to Design-Builder by the Subcontractor or its Sub-Subcontractor, except for cancellation due to non-payment of premium.

**10.1.5**  Except for Workers' Compensation, Employer's Liability, and Professional Liability Insurance, the insurance policies required herein shall list Design-Builder, and any other entities required by the Contract Documents, if any, as an additional insured.

**10.1.6**  If any of the foregoing coverages are required to remain in force after final payment, an additional certificate evidencing continuation of such coverage shall be submitted with the final Application for Payment.

**10.2**    **Property Insurance.**

**10.2.1**  In accordance with the Contract Documents, Owner or Design-Builder shall procure and maintain property insurance upon the entire Project.

**10.3**    **Waiver of Subrogation.**

**10.3.1**  Design-Builder and Subcontractor waive against each other and Owner, Sub-Subcontractors, Design Consultants, Owner's or Design-Builder's separate contractors, agents and employees of each and all of them, all damages covered by property insurance provided herein, except such rights as they may have to the proceeds of such insurance. Design-Builder and Subcontractor shall, where appropriate, require similar waivers of subrogation from Design Consultant and Sub-Subcontractors and separate contractors of Design-Builder, and shall require each of them to include similar waivers in their contracts. These waivers of subrogation shall not contain any restriction or limitation that will impair the full and complete extent of its applicability to any person or entity unless agreed to in writing prior to the execution of this Agreement.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
115 of 322

**10.4    Bonds and Other Performance Security.**

**10.4.1**  Subcontractor shall provide and Design-Builder shall reimburse Subcontractor for Performance and Payment Bonds each in the amount of one hundred percent (100%) of the Contract Price ("Bonds") in the form prescribed in **Exhibit F.** The Bonds shall be delivered to Design-Builder not later than ten (10) days after award of this Agreement. Subcontractor will not be issued the notice-to-proceed until after Design-Builder receives the Bonds. Such Bonds shall be executed as surety by an entity acceptable to Design-Builder and authorized to issue surety bonds in the state where the Work is to be performed. Subcontractor is solely liable for any delays caused by its failure to provide the Bonds.

# Article 11

## Indemnification

**11.1    Patent and Copyright Infringement.**

**11.1.1**  Subcontractor shall defend any action or proceeding brought against Owner or Design-Builder based on any claim that the Work, or any part thereof, or the operation or use of the Work or any part thereof, constitutes infringement of any United States patent or copyright, now or hereafter issued. Design-Builder shall give prompt written notice to Subcontractor of any such action or proceeding and will reasonably provide authority, information and assistance in the defense of same. Subcontractor shall indemnify and hold harmless Owner and Design-Builder from and against all damages and costs, including but not limited to attorneys' fees and expenses awarded against Owner or Design-Builder in any such action or proceeding. Subcontractor agrees to keep Design-Builder informed of all developments in the defense of such actions.

**11.1.2**  If Owner is enjoined from the operation or use of the Work, or any part thereof, as the result of any patent or copyright suit, claim, or proceeding, Subcontractor shall at its sole expense take reasonable steps to procure the right to operate or use the Work. If Subcontractor cannot so procure such right within a reasonable time, Subcontractor shall promptly, at Subcontractor's option and at Subcontractor's expense, (i) modify the Work so as to avoid infringement of any patents, or copyrights, or (ii) replace said Work with Work that does not infringe or violate any such patent or copyright.

**11.1.3**  Sections 11.1.1 and11.1.2 above shall not be applicable to any suit, claim or proceeding based on infringement or violation of a patent or copyright (i) relating to a particular process or product of a particular manufacturer specified by Owner or Design-Builder or (ii) arising from modifications to the Work by Owner or Design-Builder after acceptance of the Work.

**11.1.4**  The obligations set forth in this Section 11.1 shall constitute the sole agreement between the parties relating to liability for infringement or violation of any patent or copyright.

**11.2    Intentionally Omitted.**

**11.3    Payment Claim Indemnification.**

**11.3.1**  Providing that Design-Builder is not in breach of its contractual obligation to make payments to Subcontractor for the Work, Subcontractor shall indemnify, defend and hold harmless Owner and Design-Builder from any claims or mechanic's liens brought against Owner, Design-Builder, or against the Project as a result of the failure of Subcontractor, or those for whose acts it is responsible, to pay for any services, materials, labor, equipment, taxes or other items or obligations furnished or incurred for, or in connection with the Work. Within three (3)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
116 of 322

days of receiving written notice from Design-Builder that such a claim or mechanic's lien has been filed, Subcontractor shall commence to take the steps necessary to discharge said claim or lien, including, if necessary, the furnishing of a mechanic's lien bond. If Subcontractor fails to do so, Design-Builder will have the right to discharge the claim or lien and hold Subcontractor liable for costs and expenses incurred, including attorneys' fees.

**11.4    Subcontractor's General Indemnification.**

**11.4.1**   Subcontractor, to the fullest extent permitted by law, shall indemnify, hold harmless and defend Owner, Design-Builder, their officers, directors, employees and agents from and against any and all causes of action, demands, claims, losses, damages, and liabilities whatsoever, including attorneys' fees and expenses, including, but not limited to, claims for bodily injury, sickness or death, and property damage or destruction resulting from the acts, errors or omissions of Subcontractor, Sub-Subcontractors, anyone employed directly or indirectly by any of them or anyone for whose acts any of them may be liable. Subcontractor's provision of indemnification shall be limited to damages to property and personal injury and shall be limited solely to the extent of the Subcontractor's negligence.

**11.4.2**   If an employee of Subcontractor, anyone employed directly or indirectly by Subcontractor or anyone for whose acts any of them may be liable has a claim against any party indemnified pursuant to Section 11.4.1 above, Subcontractor's indemnity obligation set forth in Section 11.4.1 above shall not be limited by any limitation on the amount of damages, compensation or benefits payable by or for Subcontractor, Sub-Subcontractors, or other entity under any employee benefit acts, including workers' compensation or disability acts.

**11.4.3**   Whenever any suit or other proceeding which involves any matter with respect to which the indemnification provisions of this Section 11.4 are applicable shall be brought against Owner, Design-Builder, or any of their officers, directors, employees, and agents, Subcontractor, to the extent of its negligence, shall upon receipt of timely notice of the institution of such suit or other proceedings assume the defense thereof and defend the same at Subcontractor's own expense and pay any and all costs, charges, attorneys' fees and other expenses and any and all judgments that may be incurred by or obtained against Owner, Design-Builder, or any of their officers, directors, employees, and agents, in such suits or other proceedings, and if any judgment or other lien shall be placed upon or obtained against the property of Owner, Design-Builder, or any of their officers, directors, employees, and agents in or as a result of such suits or other proceedings, Subcontractor shall at once cause the same to be released and discharged by giving bond or otherwise. Owner and Design-Builder shall have the right to approve counsel retained by Subcontractor and to participate in and be informed of the status of any suit or other proceeding.

**11.5    Intentionally Omitted.**


# <u>Article 12</u>

## Changes to the Contract Price and Time

**12.1   Owner-Generated Changes.**

**12.1.1**   If Owner issues changes affecting the Work, Subcontractor agrees, if directed by Design-Builder, to meet with Design-Builder and Owner to review and discuss the changes. Subcontractor shall only be entitled to adjustments in its Contract Price and the times for

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
117 of 322

completion of the Work attributable to such Owner-generated changes to the extent Design-Builder actually receives such adjustments from Owner. If Subcontractor disputes the adjustment, such dispute shall be resolved pursuant to Section 13.3 of this Agreement. Notwithstanding anything to the contrary in this Article, in order to be entitled to a Change Order, Subcontractor must provide Design-Builder with sufficient details of its proposed Change Order cost breakdown allowing Design-Builder to evaluate the proposed Change Order, or as may otherwise be required or requested by Owner or as required by the EPC Agreement.

**12.2    Design-Builder Generated Changes.**

**12.2.1**   Changes to the Work issued by Design-Builder shall be governed by the provisions set forth in the following sections of this Article 12.

**12.3    Change Orders.**

**12.3.1** A Change Order is a written instrument issued after execution of the Agreement signed by Design-Builder and Subcontractor, stating their agreement upon all of the following:

**12.3.1.1**   The scope of the change in the Work;

**12.3.1.2**   The amount of the adjustment to the Contract Price;

**12.3.1.3**   The extent of the adjustment to the times for completion of the Work; and

**12.3.1.4**   Such other details, information, or items as may be required or requested by Design-Builder or Owner.

**12.3.2**   All changes in the Work authorized by applicable Change Order shall be performed under the applicable conditions of the Contract Documents. Subcontractor will comply with the change request procedures set forth in the EPC Agreement, including the provision of timely notice sufficient to allow Design-Builder to comply with the notice requirements of the EPC Agreement. Design-Builder and Subcontractor shall negotiate, in good faith and as expeditiously as possible, the appropriate adjustments for such changes.   The parties shall mutually agree upon any changes to scope of Work, schedule or price.  In the event that cumulative change orders equal or exceed ten percent (10%) of the Contract Price, Subcontractor reserves the right to recover additional general conditions and applicable overhead expense.  Subcontractor reserves all rights and remedies for damages and losses incurred by reason of delay by others.

**12.4    Work Change Directives.**

**12.4.1**   A Work Change Directive is a written order prepared and signed by Design-Builder directing a change in the Work prior to agreement on an adjustment in the Contract Price and/or the times for completion of the Work.

**12.4.2**   Design-Builder and Subcontractor shall negotiate, in good faith and as expeditiously as possible, the appropriate adjustments for the Work Change Directive. Upon reaching an agreement, the parties shall prepare and execute an appropriate Change Order reflecting the terms of the agreement.

**12.5    Minor Changes in the Work.**

**12.5.1**   Minor changes in the Work are changes that do not involve an adjustment in the Contract Price and/or times for completion of the Work and do not materially and adversely affect the

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
118 of 322

Work, including the design, quality, performance and workmanship required by the Contract Documents. Design-Builder may make minor changes in the Work consistent with the intent of the Contract Documents, provided, however, that Design-Builder shall promptly inform Subcontractor of any such changes.

**12.6    Contract Price Adjustment.**

**12.6.1**  The increase or decrease in Contract Price resulting from a change in the Work shall be determined by one or more of the following methods:

**12.6.1.1**  Unit prices set forth in the Agreement or as subsequently agreed between the parties;

**12.6.1.2**  A mutually accepted, lump sum, properly itemized and supported by sufficient substantiating data to permit evaluation by Design-Builder;

**12.6.1.3**  Costs, fees and any other markups set forth in the Agreement; and

**12.6.1.4**  If an increase or decrease cannot be agreed to as set forth in items 12.6.1.1 through 12.6.1.3 above and Design-Builder issues a Work Change Directive, the cost of the change of the Work shall be determined by the reasonable expense and savings in the performance of the Work resulting from the change, including a reasonable overhead and profit, as may be set forth in this Agreement. If the net result of both additions and deletions to the Work is an increase in the Contract Price, reasonable overhead and profit shall be calculated on the basis of the net increase to the Contract Price. Subcontractor shall maintain a documented, itemized accounting evidencing the expenses and savings associated with such changes.

**12.6.2**  If unit prices are set forth in the Contract Documents or are subsequently agreed to by the parties, but application of such unit prices will cause substantial inequity to Design-Builder or Subcontractor because of differences in the character or quantity of such unit items as originally contemplated, such unit prices shall be equitably adjusted solely in accordance with the EPC Agreement.

**12.6.3**  If Design-Builder and Subcontractor disagree upon whether Subcontractor is entitled to be paid for any services required by Design-Builder, or if there are any other disagreements over the scope of Work or proposed changes to the Work or the times for completion of the Work, Design-Builder and Subcontractor shall resolve the disagreement pursuant to Article 13 hereof. As part of the negotiation process, Subcontractor shall furnish Design-Builder with a good faith estimate of the costs to perform the disputed services and the increase or decrease in the time to complete the changes to the Work in accordance with Design-Builder's interpretations. If the parties are unable to agree and Design-Builder expects Subcontractor to perform the services in accordance with Design-Builder's interpretations, Subcontractor shall proceed to perform the disputed services, conditioned upon Design-Builder issuing a written order to Subcontractor (i) directing Subcontractor to proceed and (ii) specifying Design-Builder's interpretation of the services that are to be performed.

**12.7    Emergencies.**

**12.7.1**  In any emergency affecting the safety of persons and/or property, Subcontractor shall act, at its discretion, to prevent threatened damage, injury or loss. Any change in the Contract

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
119 of 322

Price and/or times for completion of the Work on account of emergency work shall be determined as provided in this Article 12.

# Article 13

## Contract Adjustments and Disputes

**13.1    Requests for Contract Adjustments and Relief.**

**13.1.1**  If either Subcontractor or Design-Builder believes that it is entitled to relief against the other for any event arising out of or related to the Work or the Project, such party shall provide written notice to the other party of the basis for its claim for relief. Such notice shall be in accordance with specific notice requirements contained in applicable sections of the Contract Documents and, if possible, be made prior to incurring any cost or expense. Subcontractor shall provide Design-Builder written notice of claims for which Owner or the Design-Builder may be responsible in sufficient time for Design-Builder to meet its notice requirements to Owner set forth in the Contract Documents. In the absence of any specific notice requirement, written notice shall be given within a reasonable time, not to exceed ten (10) days, after the occurrence giving rise to the claim for relief or after the claiming party reasonably should have recognized the event or condition giving rise to the request, whichever is later. Such notice shall be in accordance with the Contract Documents and shall include sufficient information to advise the other party of the circumstances giving rise to the claim for relief, the specific contractual adjustment or relief requested and the basis of such request. Subcontractor shall comply with all documentation requirements set forth in the EPC Agreement when submitting its claim to Design-Builder.

**13.2    Dispute Avoidance and Resolution.**

**13.2.1**  The parties are fully committed to working with each other throughout the Project and agree to communicate regularly with each other at all times so as to avoid or minimize disputes or disagreements. If disputes or disagreements do arise, Subcontractor and Design-Builder each commit to resolving such disputes or disagreements in an amicable, professional and expeditious manner so as to avoid unnecessary losses, delays and disruptions to the Work.

**13.3    Disputes Involving Owner.**

**13.3.1**  To the extent a claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for which Owner is responsible ("Owner Disputes"), such Owner Disputes shall be resolved pursuant to the dispute resolution clause set forth in the EPC Agreement. Both Design-Builder and Subcontractor agree to cooperate in the presentation and prosecution or defense of Owner Disputes. If, after a request for an extension of time or additional compensation from Subcontractor, Design-Builder believes that the event causing the delay or additional compensation is the responsibility of Owner, then Design-Builder will cooperate with and assist Subcontractor in presenting a request for an extension of time or additional compensation to Owner. Notwithstanding the above, Design-Builder reserves the right not to submit a claim to Owner. In such cases, the claim shall be resolved pursuant to Section 13.4.

**13.3.2**  Notwithstanding any other provisions herein to the contrary, Design-Builder and Subcontractor each agree to accept the relief as to a time extension or additional compensation

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 120 of 322

obtained from Owner, if any, as well as all other aspects of the final decision following appeal or the expiration of the time for appeal, as full and final resolution of any Owner Dispute.

**13.3.3**   If Design-Builder asserts a claim against Owner involving Subcontractor, each party shall bear its own costs for outside counsel and third-party consultants retained to prosecute claims against Owner and for any other litigation costs. Each party shall present its portion of the claim to Owner.

**13.4**   **Disputes Not Involving Owner.**

**13.4.1**   For any claim, dispute or controversy not arising out of, or relating to, problems caused by Owner or for which Owner is responsible, Subcontractor and Design-Builder will first attempt to resolve such claim, dispute or controversy at the field level through discussions between Design-Builder's Representative and Subcontractor's Representative.

**13.4.2**   If a claim, dispute or controversy cannot be resolved through Section 13.4.1, Design-Builder's Senior Representative and Subcontractor's Senior Representative, upon the request of either party, shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made, to attempt to resolve such claim, dispute or controversy. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving the claim, dispute or controversy.

**13.4.3**   If after meeting the Senior Representatives determine that the claim, dispute or controversy cannot be resolved on terms satisfactory to both parties, the parties shall submit within thirty (30) days of the conclusion of the meeting by the Senior Representatives the claim, dispute or controversy to non-binding mediation. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by Design-Builder and Subcontractor and consistent with the mediator's schedule, the mediation shall commence within ninety (90) days of the submission of the dispute for mediation. Persons with authority to resolve the dispute shall be present at the mediation.

**13.6**   **Duty to Continue Performance.**

**13.6.1**   Unless provided to the contrary in the Contract Documents, Subcontractor shall continue to perform the Work and Design-Builder shall continue to satisfy its undisputed payment obligations to Subcontractor, pending the final resolution of any dispute or disagreement between Design-Builder and Subcontractor.

**13.7**   **CONSEQUENTIAL DAMAGES.**

**13.7.1**   NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, NEITHER DESIGN-BUILDER NOR SUBCONTRACTOR SHALL BE LIABLE TO THE OTHER FOR ANY CONSEQUENTIAL LOSSES OR DAMAGES, WHETHER ARISING IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY OR OTHERWISE, INCLUDING BUT NOT LIMITED TO LOSSES OF USE, PROFITS, BUSINESS, REPUTATION OR FINANCING.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 121 of 322

# Article 14

## Miscellaneous

**14.1    Assignment.**

    **14.1.1**   Neither Subcontractor nor Design-Builder shall, without the written consent of the other, assign, transfer or sublet any portion or part of the Work or the obligations required by the Contract Documents.

**14.2    Successorship.**

    **14.2.1**   Design-Builder and Subcontractor intend that the provisions of the Contract Documents are binding upon the parties, their employees, agents, heirs, successors and assigns.

**14.3    Governing Law.**

    **14.3.1**   The Agreement and all Contract Documents shall be governed by the laws of the place of the Project, without giving effect to its conflict of law principles.

**14.4    Severability.**

    **14.4.1**   If any provision or any part of a provision of the Contract Documents shall be finally determined to be superseded, invalid, illegal, or otherwise unenforceable pursuant to any applicable Legal Requirements or court order, such determination shall not impair or otherwise affect the validity, legality, or enforceability of the remaining provision or parts of the provision of the Contract Documents, which shall remain in full force and effect as if the unenforceable provision or part were deleted.

**14.5    No Waiver.**

    **14.5.1**   The failure of either Design-Builder or Subcontractor to insist, in any one or more instances, on the performance of any of the obligations required by the other under the Contract Documents shall not be construed as a waiver or relinquishment of such obligation or right with respect to future performance.

**14.6    Headings.**

    **14.6.1**   The headings used in this Agreement, or any other Contract Document, are for ease of reference only and shall not in any way be construed to limit or alter the meaning of any provision.

**14.7    Notice.**

    14.7.1   Whenever the Contract Documents require that notice be provided to the other party, notice will be deemed to have been validly given (i) if delivered in person to the individual intended to receive such notice, (ii) four (4) days after being sent by registered or certified mail, postage prepaid to the address indicated in the Agreement, or (iii) if transmitted by facsimile, by the time stated in a machine generated confirmation that notice was received at the number of the intended recipient.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

**14.8     Amendments.**

**14.8.1**   The Contract Documents may not be changed, altered, or amended in any way except in writing signed by a duly authorized representative of each party.

**14.9     Survival.**

**14.9.1**   Subcontractor's obligations under this Agreement shall not be released and shall specifically survive the completion of all services hereunder by Subcontractor, final payment to Subcontractor, and the termination of this Agreement for any reason.

**14.10    Anti-Bribery**

**14.10.1** Subcontractor agrees to strictly abide by Design-Builder's Anti-Bribery Policy and Procedure, a copy of which is available to Subcontractor upon request, and which is incorporated herein as if set forth in full. Specifically, Subcontractor shall at all times comply with the U.S. Foreign Corrupt Practices Act, the U.K. Bribery Act and any local anti-bribery (or anti-corruption) laws (collectively the "Anti-Bribery Laws").   In accordance with the Anti-Bribery Laws, Subcontractor will not, with the intent to obtain or retain business or any commercial advantage, offer, pay, promise to pay or authorize another to pay any money, make any gift or provide anything of value on behalf of Design-Builder to any foreign official; any foreign political party or official thereof or any candidate for foreign political office; or any person acting in a commercial capacity.

**14.11    Equal Opportunity and Affirmative Action**

**14.11.1** Subcontractor shall comply with all equal employment opportunity and affirmative action requirements promulgated by any governmental authority, including, without limitation, the requirements of the Civil Rights Act of 1964. The provisions of the Equal Opportunity Clauses of Executive Order 11246, (41 CFR 60-1.4), Section 503 of the Rehabilitation Act of 1973, (41 CFR 60-741.5(a)), Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, (41 CFR 60-250.5(a)), and, the Jobs for Veterans Act of 2003, (41 CFR 60-300.5(a)), are hereby incorporated by reference and made a part of this Agreement.

**14.12    Export Regulations**

**14.12.1** The Parties are subject to the export regulations of the United States regarding export and re-export of controlled items, services or technical data from the United States. As part of the express consideration received under this Agreement for access to and/or delivery of any goods, knowledge, information, technical data and/or services from Design-Builder to Subcontractor, Subcontractor agrees that it will not in violation of, or so as to cause any penalty or other liability to Design-Builder under, any applicable U.S. law or regulation export, re-export or otherwise transfer, directly or indirectly, any of Design-Builder's knowledge, information, technical data or other property to which such Subcontractor gains access in connection with this Agreement to any country or person in contravention of the said export regulations, or make any other use of such information or data which, would violate the laws of the United States. Subcontractor shall notify Design-Builder in writing before disclosing to Design-Builder any technical information or data subject to laws restricting export outside the United States. Such notice shall provide a detailed description of the information and identify the applicable laws restricting export.

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
123 of 322

**14.13   Financial Assurances**

**14.13.1** If requested by Design-Builder, Subcontractor shall within ten (10) calendar days provide Design-Builder with copies of its most recent annual and quarterly financial statements prepared in accordance with generally accepted accounting principles. Subcontractor will notify Design-Builder immediately of any material adverse change in its financial condition.

**14.14   Independent Contractor**

**14.14.1** Subcontractor represents that it is fully experienced and properly qualified to perform the class of work provided for herein, and that it is properly licensed, equipped, organized, and financed to perform such work. Subcontractor shall act as an independent contractor and not as the agent of Design-Builder in performing the Work, maintaining complete control over and responsibility for its own employees and operations and those of its Sub-Subcontractors.

**14.14.2** No provisions of this Subcontract or any lower-tier subcontract awarded by Subcontractor shall be construed to create any contractual relationship between any such Sub-Subcontractor and Design-Builder, or obligate Design-Builder to pay or be responsible for the payment of any monies to any Sub-Subcontractor.

# Article 15

## Electronic Data

**15.1   Electronic Data.**

**15.1.1**   The parties recognize that Contract Documents, including drawings, specifications and three-dimensional modeling (such as Building Information Models) and other Work Product may be transmitted among Design-Builder, Subcontractor and others in electronic media as an alternative to paper hard copies (collectively "Electronic Data"). However, Design-Builder reserves the right to determine and direct the extent to which Electronic Data, if at all, may be used as an alternative to paper hard copies in connection with the Project.

**15.2   Transmission of Electronic Data.**

**15.2.1**   Design-Builder shall determine, after consultation with Subcontractor, the software and the format for the transmission of Electronic Data. Each party shall be responsible for securing the legal rights to access the agreed-upon format, including, if necessary, obtaining appropriately licensed copies of the applicable software or electronic program to display, interpret and/or generate the Electronic Data.

**15.2.2**   Neither party makes any representations or warranties to the other with respect to the functionality of the software or computer program associated with the electronic transmission of Work Product. Unless specifically set forth in the Agreement, ownership of the Electronic Data does not include ownership of the software or computer program with which it is associated, transmitted, generated or interpreted.

**15.2.3**   By transmitting Work Product in electronic form, the transmitting party does not transfer or assign its rights in the Work Product. The rights in the Electronic Data shall be as set forth in Article 4 of the Agreement. Under no circumstances shall the transfer of ownership of Electronic Data be deemed to be a sale by the transmitting party of tangible goods.

**15.3   Electronic Data Protocol.**

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
124 of 322

**15.3.1**  The parties acknowledge that Electronic Data may be altered or corrupted, intentionally or otherwise, due to occurrences beyond their reasonable control or knowledge, including but not limited to compatibility issues with user software, manipulation by the recipient, errors in transcription or transmission, machine error, environmental factors, and operator error. Consequently, the parties understand that there is some level of increased risk in the use of Electronic Data for the communication of design and construction information and, in consideration of this, agree, and shall require their independent contractors, Subcontractors and Design Consultants to agree, to the following protocols, terms and conditions set forth in this Section 15.3.

**15.3.2**  Electronic Data will be transmitted in the format determined in Section 15.2.1 above, including file conventions and document properties, unless prior arrangements are made in advance in writing.

**15.3.3**  The Electronic Data represents the information at a particular point in time and is subject to change. Therefore, the parties shall agree upon protocols for notification by the author to the recipient of any changes which may thereafter be made to the Electronic Data, which protocol shall also address the duty, if any, to update such information if such information changes prior to Final Completion of the Project.

**15.3.4**  The transmitting party specifically disclaims all warranties, expressed or implied, including, but not limited to, implied warranties of merchantability and fitness for a particular purpose, with respect to the media transmitting the Electronic Data. However, transmission of the Electronic Data via electronic means shall not invalidate or negate any duties pursuant to the applicable standard of care with respect to the creation of the Electronic Data, unless such data is materially changed or altered after it is transmitted to the receiving party, and the transmitting party did not participate in such change or alteration.

**15.4**  In the event the EPC Agreement contains a provision governing Electronic Data, and there is a conflict between the provision in the Design-Build Agreement and this Article 15, the provision in the EPC Agreement takes precedence.

# <u>Article 16</u>

## Confidential Information

**16.1**  **Confidential and/or Proprietary Information.**

**16.1.1**  Confidential Information is defined as information which is determined by the transmitting party to be of a confidential or proprietary nature as follows: (i) the transmitting party identifies as either confidential or proprietary; (ii) the transmitting party takes steps to maintain the confidential or proprietary nature of the information; and (iii) the document is not otherwise available in or considered to be in the public domain. The receiving party agrees to maintain the confidentiality of the Confidential Information and agrees to use the Confidential Information solely in connection with the Project.

**16.1.2**  Subcontractor may receive information from Design-Builder that is either confidential or proprietary to either Design-Builder or to Owner. Such information shall be labeled as confidential and/or proprietary. Subcontractor agrees to maintain the confidential nature of such information and to execute any such additional agreements as may be required by Owner or Design-Builder with respect to such information.

**16.1.3**  In the event the EPC Agreement contains a provision governing Confidential Information, and there is a conflict between the provision in the Design-Build Agreement and this Article 16, the provision in the EPC Agreement takes precedence.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
125 of 322

# Article 17

## Other Provisions

**17.1    Other provisions, if any, are as follows:**
*(Insert any additional provisions, including those that relate to options that might have been selected by Design-Builder and Owner in the Design-Build Agreement related to Warranty Reserves, alternatives to Liquidated Damages, etc. as the parties may deem commercially appropriate.)*


☒    Any claims, disputes, or controversies between the parties arising out of or related to the Agreement, or the breach thereof which have not been resolved in accordance with the procedures set forth in Section 13.4 herein shall be resolved in a court of competent jurisdiction in the state in which the Project is located.


*[remainder of page intentionally left blank – signature page follows]*

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 126 of 322

In executing this Agreement, Design-Builder and Subcontractor each individually represents that it has the necessary financial resources to fulfill its obligations under this Agreement, and each has the necessary corporate approvals to execute this Agreement, and perform the Work described herein.

**DESIGN-BUILDER:**

AECOM
(Name of Design-Builder)

(Signature)

Printed Name: SHAWN KELLY

Title: VICE PRESIDENT

Date: 10/21/16

**SUBCONTRACTOR:**

JH Kelly LLC
(Name of Subcontractor)

Paul Furth
(Signature)

Printed Name: Paul Furth

Title: CFO, VP

Date: 10/21/16

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 127 of 322



8
HF
da

**2018-0030534**

| Recorded | REC FEE | 35.00 |
| Official Records | | |
| County of | HOUSING FEE | 75.00 |
| Shasta | | |
| Leslie Morgan | | |
| Assessor-Recorder | | |
| | AA | |
| 2:10PM 01-Nov-2018 | Page 1 of 8 | |

Recording Requested by

Eric A. Grasberger
Stoel Rives LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

After Recording, Return To:

JH Kelly, LLC
PO Box 2038
Longview, WA 98632

_____

(SPACE ABOVE THIS LINE FOR RECORDER'S USE)

## CLAIM OF MECHANICS LIEN

SEPARATE PAGE, PURSUANT TO CA. GOV'T. CODE 27361.6

Recording Requested by

Eric A. Grasberger
Stoel Rives LLP
760 SW Ninth Ave., Suite 3000
Portland, OR 97205

After Recording Return to:

JH Kelly, LLC
PO Box 2038
Longview, WA 98632

(Space above this line for recorder's use)

## CLAIM OF MECHANICS LIEN

JH KELLY, LLC ("Claimant") hereby claims a mechanics lien for the labor, services, equipment and/or materials described below, furnished for the work of improvement situated upon a certain site located in the County of Shasta, State of California, at 37667 Highway 299, Burney, California, and more particularly described on Exhibit A, which is hereby incorporated by reference herein, as follows:

Beginning at a point in the north half of the northeast quarter of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S. 2029) marking the northeast corner of said Section 16 bears north 26° 44' east 474.54 feet distant and running thence north 85° 35' west 1218.50 feet; thence westerly on a curve to the right, with a radius of 554.40 feet, through a central angle of 35° 28', an arc distance of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14° 40½' east 1204.15 feet to a point in the southerly boundary line of the north half of the northeast quarter of said Section 16; thence south 89° 48' east, along the southerly boundary line of the north half of the northeast quarter of said Section 16, a distance of 831.89 feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more or less, to the point of beginning; containing 26.69 acres, more or less, and being a portion of the north half of the northeast quarter of said Section 16.

After deducting all just credits and offsets, the sum of $15,881,776.21, plus interest at the legal or contractual rate from the time the sum was due, and recording fees, is due Claimant for the labor, services, equipment and materials furnished at the request of AECOM Technical Services, Inc. ("AECOM") and pursuant to the Subcontract Agreement #60482831-SC-001 dated on or about October 21, 2016, including but not limited to the installation of a new compressor and turbine, and supporting utilities, buildings, concrete, structural steel, electrical equipment and controls for the Burney K2 Replacement Project.

The name of the owner or reputed owner of the site is Pacific Gas and Electric Company. Claimant furnished the labor, services, equipment and/or materials at the request of AECOM. Claimant's address is 821 Third Ave., Longview, WA 98632.

98677907.3 0034592-00012

Date: October 25, 2018        JH KELLY, LLC

By: _____
        Craig Yabui, Vice President & General
        Counsel

**VERIFICATION**

I am the CLAIMANT and the foregoing Claim of Mechanics Lien is true of my own knowledge, except for matters stated in it on my information or belief, and as to those matters I believe it to be true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 25, 2018        JH KELLY, LLC

By: _____
        Craig Yabui, Vice President & General Counsel

Subscribed and sworn to before me on this 25th day of October, 2018 by Craig Yabui, Vice President & General Counsel of JH Kelly, LLC, proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

Signature: _Jamie L Morispeare_        (seal)

> **Notary Public**
> **State of Washington**
> **JAMIE MORRIS-PEASE**
> **MY COMMISSION EXPIRES**
> **AUGUST 16, 2021**

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 130 of 322

## NOTICE OF MECHANICS LIEN

## ATTENTION!

Upon the recording of the enclosed MECHANICS LIEN with the county recorder's office of the county where the property is located, your property is subject to the filing of a legal action seeking a court-ordered foreclosure sale of the real property on which the lien has been recorded. That legal action must be filed with the court no later than 90 days after the date the mechanics' lien is recorded.

The party identified in the mechanics lien may have provided labor or materials for improvements to your property and may not have been paid for these items. You are receiving this notice because it is a required step in filing a mechanics lien foreclosure action against your property. The foreclosure action will seek a sale of your property in order to pay for unpaid labor, materials, or improvements provided to your property. This may affect your ability to borrow against, refinance, or sell the property until the mechanics lien is released.

BECAUSE THE LIEN AFFECTS YOUR PROPERTY, YOU MAY WISH TO SPEAK WITH YOUR CONTRACTOR IMMEDIATELY, OR CONTACT AN ATTORNEY, OR FOR MORE INFORMATION ON MECHANICS' LIENS GO TO THE CONTRACTORS STATE LICENSE BOARD INTERNET WEBSITE AT www.cslb.ca.gov.

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
131 of 322

**PROOF OF SERVICE AFFIDAVIT**

On October 25, 2018, at Vancouver, Washington, the undersigned declarant served or caused to be served copies of the above CLAIM OF MECHANICS LIEN and NOTICE OF MECHANICS LIEN on the owner or reputed owner, Pacific Gas and Electric Company, by certified mail, return receipt requested, at the addresses shown below:

Pacific Gas and Electric Company
Attn: Legal Department
77 Beale Street
San Francisco, CA 94105

Pacific Gas and Electric Company
Attn: Legal Department
77 Beale Street, 24th Floor
San Francisco, CA 94105

Pacific Gas and Electric Company
Attn: Legal Department
77 Beale Street, 32nd Floor
San Francisco, CA 94105

The title or capacity of the person or entity served is owner or reputed owner.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: October 25, 2018

JH KELLY, LLC

By: _____
Craig Yabui, Vice President & General Counsel

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 132 of 322

#4943

15.40

AFTER RECORDING, RETURN TO:

Pacific Gas and Electric Company
245 Market St.
San Francisco 6, California
RE: GM 145418-R (RW)

FOR RECORDER'S USE ONLY

RECORDED AT REQUEST OF
NORTH VALLEY TITLE & ESCROW CO.
AT ...35.. MIN. PAST ./....M
OFFICIAL RECORDS SHASTA COUNTY, CALIF.

JUL 23 1962

Volume 712 Page 636
RECORDER FEE $





Rev. $15.40

FRUIT GROWERS SUPPLY COMPANY, a California corporation, hereinafter called

Fruit Growers, hereby grants to PACIFIC GAS AND ELECTRIC COMPANY, a California

corporation, hereinafter called Pacific, that certain real property, situate in

the County of Shasta, State of California, described as follows:

    Beginning at a point in the north half of the northeast quarter
of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from
which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S.
2029) marking the northeast corner of said Section 16 bears north 26°
44' east 474.54 feet distant and running thence north 85° 35' west
1218.50 feet; thence westerly on a curve to the right, with a radius
of 554.40 feet, through a central angle of 35° 28', an arc distance
of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14°
40½' east 1204.15 feet to a point in the southerly boundary line of
the north half of the northeast quarter of said Section 16; thence
south 89° 48' east, along the southerly boundary line of the north
half of the northeast quarter of said Section 16, a distance of 831.89
feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more
or less, to the point of beginning; containing 26.69 acres, more or
less, and being a portion of the north half of the northeast quarter
of said Section 16.

Fruit Growers further grants to Pacific a right of way for ingress to and

egress from said 26.69 acre parcel of land and any other lands which Pacific

shall hereinafter acquire in the vicinity of said 26.69 acre parcel of land with-

in the strip of land described as follows:

    Beginning at the most northerly corner of said 26.69 acre parcel
of land and running thence north 50° 07' west 109.5 feet; thence west-
erly on a curve to the left with a radius of 412.2 feet, through a
central angle of 39° 52½', an arc distance of 286.9 feet to a point
in the northerly boundary line of said Section 16; thence along the
northerly boundary line of said Section 16 the following three courses
and distances, namely: north 89° 59½' west 485.8 feet to the 2 inch
brass cap on pipe (marked 1/4S 9/16 T.35N.,R.3E., L.S. 2029) marking
the north quarter corner of said Section 16; thence north 89° 42' west

EXHIBIT A
Page 1 of 3

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
133 of 322

445.4 feet to a state highway monument; and thence north 89° 42' west 19.5 feet to a state highway monument in the southeasterly boundary line of the state highway traversing said Section 16; thence south 35° 19' west, along the southeasterly boundary line of said state highway, 44.5 feet; thence northeasterly on a curve to the right, with a radius of 160.0 feet, through a central angle of 16° 22', and tangent at the southwesterly terminus thereof to a line which has a bearing of north 73° 56' east, an arc distance of 45.7 feet to a point distant 30.0 feet southerly from (measured at a right angle to) the northerly boundary line of said Section 16; thence parallel with the northerly boundary line of said Section 16 the following two courses and distances, namely: south 89° 42' east 445.4 feet; and thence south 89° 59½' east 485.9 feet; thence easterly on a curve to the right, with a radius of 382.2 feet, through a central angle of 39° 52½', an arc distance of 266.0 feet; thence south 50° 07' east 151.7 feet to a point in the southwesterly boundary line of said 26.69 acre parcel of land; thence north 14° 40½' west, along the southwesterly boundary line of said 26.69 acre parcel of land, 51.7 feet, more or less, to the point of beginning.

IN WITNESS WHEREOF Fruit Growers has executed these presents this 2nd

day of _____ July _____, 1962.

FRUIT GROWERS SUPPLY COMPANY

By _____
Its President

And By _____
Its Secretary

STATE OF CALIFORNIA,  } ss.
County of Los Angeles

On _____ July 2 _____, 19 62, before me,
the undersigned, a Notary Public in and for said County and State, personally appeared
H. A. Lynn

known to me to be the _____ President, and _____ L. A. Yoast
known to me to be the _____ Secretary of Fruit Growers Supply Company

the Corporation that executed the within Instrument, known to me to be the persons who executed the within Instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the within Instrument pursuant to its by-laws or a resolution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal.

F. J. JOHNSON
My Commission Expires Jan. 6, 1985
_____
Notary Public in and for said County and State.

ACKNOWLEDGMENT — CORP. — PRES. & SEC.— WOLCOTTS FORM 224—REV. 12-51

Shasta
CM 145418-R
Dwg. 28295
Section 16,
T.35N.,R.3E.,
M.D.B.& M.

Prepared _____
Checked _____

EXHIBIT A
Page 2 of 3

-2- BOOK 712 PAGE 637    APR 12 '62

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 134 of 322



PROPOSED ACCESS, ROW 0 TO
BURNEY COMPRESSOR SITE
.75 MILES N.E. OF BURNEY
PACIFIC GAS AND ELECTRIC COMPANY
SAN FRANCISCO, CALIFORNIA

EXHIBIT A
Page 3 of 3

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 135 of 322

# EXHIBIT 4

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Mario R. Nicholas (SB #273122)<br>Stoel Rives LLP<br>760 SW Ninth Avenue, Suite 3000<br>Portland, OR 97205<br>TELEPHONE NO.: 503-224-3380   FAX NO. (Optional): 503-220-2480<br>E-MAIL ADDRESS (Optional): mario.nicholas@stoel.com<br>ATTORNEY FOR (Name): Plaintiff JH Kelly, LLC | **FILED**<br><br>JAN 3 1 2019<br><br>CLERK OF THE SUPERIOR COURT<br>BY: S. HATCH, DEPUTY CLERK |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SHASTA |  |
|---|---|
| STREET ADDRESS: 1500 Court Street Room 319 | |
| MAILING ADDRESS: 1500 Court Street Room 319 | |
| CITY AND ZIP CODE: Redding 96001 | |
| BRANCH NAME: Redding Main Courthouse | |

| | |
|---|---|
| PLAINTIFF/PETITIONER: JH KELLY, LLC | CASE NUMBER:<br>191759 |
| DEFENDANT/RESPONDENT: PACIFIC GAS AND ELECTRIC COMPANY, et al. | JUDICIAL OFFICER:<br>Stephen H. Baker |
| **NOTICE OF RELATED CASE** | DEPT.:<br>3 |

*Identify, in chronological order according to date of filing, all cases related to the case referenced above.*

1. a. Title: JH KELLY, LLC V. AECOM TECHNICAL SERVICES, INC., ET AL.

   b. Case number: 19cv0172

   c. Court: [✓] same as above

      [ ] other state or federal court *(name and address):*

   d. Department: 8

   e. Case type: [ ] limited civil [✓] unlimited civil [ ] probate [ ] family law [ ] other *(specify):*

   f. Filing date: 01-29-2019

   g. Has this case been designated or determined as "complex?" [ ] Yes [✓] No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      [ ] involves the same parties and is based on the same or similar claims.

      [ ] arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      [ ] involves claims against, title to, possession of, or damages to the same property.

      [✓] is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

         [✓] Additional explanation is attached in attachment 1h

   i. Status of case:

      [✓] pending

      [ ] dismissed [ ] with [ ] without prejudice

      [ ] disposed of by judgment

2. a. Title:

   b. Case number:

   c. Court: [ ] same as above

      [ ] other state or federal court *(name and address):*

   d. Department:

Page 1 of 3

| Form Approved for Optional Use<br>Judicial Council of California<br>CM-015 [Rev. July 1, 2007] | **NOTICE OF RELATED CASE** | Cal. Rules of Court, rule 3.300<br>www.courtinfo.ca.gov |
|---|---|---|

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 137 of 322

... 

| PLAINTIFF/PETITIONER: JH KELLY, LLC | CASE NUMBER: |
| DEFENDANT/RESPONDENT: PACIFIC GAS AND ELECTRIC COMPANY, ET AL. | 191759 |

2. *(continued)*

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☐ Additional explanation is attached in attachment 2h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

3. a. Title:

   b. Case number:

   c. Court: ☐ same as above

      ☐ other state or federal court *(name and address):*

   d. Department:

   e. Case type: ☐ limited civil ☐ unlimited civil ☐ probate ☐ family law ☐ other *(specify):*

   f. Filing date:

   g. Has this case been designated or determined as "complex?" ☐ Yes ☐ No

   h. Relationship of this case to the case referenced above *(check all that apply):*

      ☐ involves the same parties and is based on the same or similar claims.

      ☐ arises from the same or substantially identical transactions, incidents, or events requiring the determination of the same or substantially identical questions of law or fact.

      ☐ involves claims against, title to, possession of, or damages to the same property.

      ☐ is likely for other reasons to require substantial duplication of judicial resources if heard by different judges.

      ☐ Additional explanation is attached in attachment 3h

   i. Status of case:

      ☐ pending

      ☐ dismissed ☐ with ☐ without prejudice

      ☐ disposed of by judgment

4. ☐ Additional related cases are described in Attachment 4. Number of pages attached: _____

Date: 01-31-2019

Mario R. Nicholas
(TYPE OR PRINT NAME OF PARTY OR ATTORNEY)

▶ _____
(SIGNATURE OF PARTY OR ATTORNEY)

| PLAINTIFF/PETITIONER: JH KELLY, LLC | CASE NUMBER: |
| DEFENDANT/RESPONDENT: PACIFIC GAS AND ELECTRIC COMPANY, ET AL. | 191759 |

## PROOF OF SERVICE BY FIRST-CLASS MAIL
### NOTICE OF RELATED CASE

*(NOTE: You cannot serve the Notice of Related Case if you are a party in the action. The person who served the notice must complete this proof of service. The notice must be served on all known parties in each related action or proceeding.)*

1. I am at least 18 years old and **not a party to this action.** I am a resident of or employed in the county where the mailing took place, and my residence or business address is *(specify):*

   760 SW Ninth Avenue, Suite 3000
   Portland, OR 97205

2. I served a copy of the *Notice of Related Case* by enclosing it in a sealed envelope with first-class postage fully prepaid and *(check one):*

   a. ☐ deposited the sealed envelope with the United States Postal Service.

   b. ☑ placed the sealed envelope for collection and processing for mailing, following this business's usual practices, with which I am readily familiar. On the same day correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service.

3. The *Notice of Related Case* was mailed:

   a. on *(date):* 01-31-2019

   b. from *(city and state):* Portland, Oregon

4. The envelope was addressed and mailed as follows:

   a. Name of person served:

   　　Street address:
   　　City:
   　　State and zip code:

   b. Name of person served:

   　　Street address:
   　　City:
   　　State and zip code:

   c. Name of person served:

   　　Street address:
   　　City:
   　　State and zip code:

   d. Name of person served:

   　　Street address:
   　　City:
   　　State and zip code:

☒ Names and addresses of additional persons served are attached. *(You may use form POS-030(P).)*

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 01-31-2019

Mario R. Nicholas
(TYPE OR PRINT NAME OF DECLARANT)
　　　　　　　　　　　　　　　　　　　　　　　▶ 　　　　　　　　(SIGNATURE OF DECLARANT)

| SHORT TITLE: JH KELLY, LLC V. PACIFIC GAS AND ELECTRIC COMPANY, et al. | CASE NUMBER: 191759 |
|---|---|

## ATTACHMENT TO PROOF OF SERVICE BY FIRST-CLASS MAIL—CIVIL (PERSONS SERVED)

*(This Attachment is for use with form POS-030)*

**NAME AND ADDRESS OF EACH PERSON SERVED BY MAIL:**

| Name of Person Served | Address *(number, street, city, and zip code)* |
|---|---|
| AECOM Technical Services, Inc. c/o CT Corporation System, its Registered Agent | 818 West Seventh Street, Suite 930 Los Angeles, CA 90017 |
| Pacific Gas and Electric Company c/o Linda Y.H. Cheng, its Registered Agent | 77 Beale Street, 24th Floor San Francisco, CA 94105 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 140 of 322

## Attachment 1h

This case and the case referenced above could require duplication of judicial resources because the claims in both cases arise from the same construction project.

# EXHIBIT 5

1   C. Scott Penner (SBN 124826)
    CARNEY BADLEY SPELLMAN, P.S.
2   701 5th Avenue, Suite 3600
    Seattle, WA 98104
3   Telephone: 206.622.8020
    Facsimile: 206.467.8215
4
    Marsha A. Houston (SBN 129956)
5   Christopher O. Rivas (SBN 238765)
    REED SMITH LLP
6   355 South Grand Avenue, Suite 3900
    Los Angeles, CA 90071-1514
7   Telephone: 213.457.8000
    Facsimile: 213.457.8080
8
9   Attorneys for Defendant AECOM TECHNICAL SERVICES, INC.
10
11              UNITED STATES BANKRUPTCY COURT
12              NORTHERN DISTRICT OF CALIFORNIA
13                  SAN FRANCISCO DIVISION
14

| 15 | In re | Bankruptcy Case No. 19-30088 (DM) |
|---|---|---|
| 16 | | Chapter 11 |
| 17 | PG&E CORPORATION | (Lead Case) |
| | - and - | |
| 18 | PACIFIC GAS AND ELECTRIC | (Jointly Administered) |
| 19 | COMPANY, | |
| 20 | Debtors. | |
| | JH KELLY, LLC, a Washington limited | Adversary Case No. 19-03008 (DM) |
| 21 | liability company, | **DEFENDANT AECOM TECHNICAL** |
| | Plaintiff, | **SERVICES, INC.'S ANSWER TO** |
| 22 | | **COMPLAINT, AFFIRMATIVE** |
| | v. | **DEFENSES AND COUNTERCLAIM** |
| 23 | AECOM TECHNICAL SERVICES, INC., a | **AGAINST PLAINTIFF JH KELLY,** |
| 24 | purported California corporation, and DOES | **LLC** |
| | 1 through 10, inclusive, | |
| 25 | Defendants. | |

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER    **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                   701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **1**         Seattle, WA 98104-7010
                                                                  (206) 622-8020
Case: 19-30088  Doc# 15654  Filed: 03/02/05/20  Entered: 03/03/20 19:30:45  Page 1 of 39
                                    143 of 322

**ANSWER**

Defendant AECOM Technical Services, Inc. ("AECOM") answers the Complaint of Plaintiff JH Kelly, LLC ("JH Kelly") as originally filed in California Superior Court, Shasta County, *JH Kelly, LLC v. AECOM Technical Services, Inc., et al.* (Case No. 19CV0172) as follows:

## I.    INTRODUCTION AND GENERAL DENIAL

1.      This dispute arises from delays and cost overruns experienced during the construction of a replacement compressor station along Pacific Gas and Electric Company's ("PG&E") natural gas distribution pipelines. This compressor station, which is located in Burney, California (the "Burney Station"), is one of nine gas compressor stations crucial to the delivery of gas along more than 40,000 miles of PG&E's gas distribution pipelines. The Burney Station, along with other compressor stations, compress and distribute natural gas through PG&E's pipelines. The pipelines provide natural gas to approximately 4.2 million customers from Bakersfield, California to the southern Oregon border.

2.      PG&E entered into an Engineering, Procurement and Construction of Natural Gas & Electric Transmission Facilities Agreement ("EPC Agreement") with AECOM to design, supply and construct a replacement compressor station for Burney, which the parties generally refer to as the "Burney K2 Replacement Project" or the "Project." To complete the construction of the compressor station, AECOM entered into a subcontract with JH Kelly (the "Subcontract") wherein JH Kelly agreed to be responsible for all construction aspects of the compressor station, supply some of the materials, and construction planning and scheduling.

3.      The Project, however, experienced substantial cost overruns and delays. JH Kelly alleges in its Complaint that a primary cause was the late completion of the electrical design drawings. (*See, e.g.*, Complaint ¶¶ 26-37).[1]

---

[1] Indeed, JH Kelly alleges the "11-month delay in issuing the IFC Electrical [drawings], and the extensive changes to the IFC Electrical [drawings], fundamentally changed the timing, sequencing, and scope of JH Kelly's work on the Project." (Complaint ¶ 34).

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **2**

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-30088    Doc# 5654    Filed: 05/18/20    Entered: 05/18/20 19:30:45    Page 2 of 39
144 of 322

4.      To the extent that is true, the cause of this delay was PG&E, not AECOM. Just days before JH Kelly was set to begin construction of the compressor station (and after many rounds of redesign had already occurred at PG&E's direction), PG&E initiated another redesign of the underground electrical distribution system. This redesign was wholly PG&E's choice, not related to any design concerns or safety concerns created by AECOM. This seriously impacted the Project cost, schedule, sequence and safety conditions, especially since it occurred just before JH Kelly was set to begin construction. PG&E's changes to buildings, addition of structures, and specifications for the compressor; and PG&E's failure to timely provide approvals, including but not limited to approvals of pricing of PG&E-directed changes and purchase orders of major equipment, all impacted the project.

5.      While AECOM notified PG&E of the associated risk of delays and resultant cost overruns to the Project, PG&E ignored these warnings and instead insisted that AECOM make the requested changes and push forward with the changed scope of work. These design modifications effected changes to the electrical system, the underground piping and structure that contain the electrical lines (i.e., the electrical conduit and duct banks), and the layout of the civil work (i.e., PG&E rerouted where piping and conduit ran and thus where excavation had to take place): all of which created delays to the schedule and sequence, and increased the costs of design and construction. To overcome these impacts, PG&E directed AECOM (and JH Kelly) to increase the workforce and to work through the winter to accelerate the ultimate completion of the Project.

6.      Despite the efforts to accelerate construction, substantial completion was not achieved until June 6, 2018, nearly seven months later than originally planned. And the Project was not finally complete until January 11, 2019.

7.      In its suit, JH Kelly seeks to recover its cost overruns entirely from AECOM, and in doing so, JH Kelly attributes 100% responsibility of each and every delay and each and every cost to AECOM. Noticeably absent is any acknowledgment that PG&E impacted the

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                          701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 3                Seattle, WA 98104-7010
                                                                                            (206) 622-8020

Case 19-30088   Doc 15654   Filed: 05/03/2020   Entered: 03/03/20 19:30:45   Page 8 of 39
145 of 322

1   Project in any manner whatsoever, even though JH Kelly asserts that the late delivery of the

2   electrical design drawings "fundamentally changed the timing, sequencing, and scope of JH

3   Kelly's work on the Project." (Complaint ¶ 36).

4       8.      Accordingly, AECOM generally denies each and every allegation that

5   indiscriminately attributing responsibility for delay and cost overruns to AECOM. In addition

6   to its last minute redesign of the underground electrical distribution system, PG&E impacted the

7   Project in several other substantial ways, including but not limited to:

8       • Directing the means and methods by which AECOM and JH Kelly completed the

9         excavation of trenches (so that gas piping and electrical conduit could be placed beneath

10        the foundations of the buildings to be constructed);

11      • Failing to provide adequate as-built drawings locating existing utilities so that conflicts

12        between new construction and existing construction could be identified in a timely

13        manner;

14      • Impeding the progression of excavation work by demanding the use of hydro-vacuum

15        excavation to remove large rocks and boulders;

16      • Allowing contaminates in the existing gas system to contaminate and damage new

17        valves;

18      • Rescheduling outages and thereby disrupting the planning and sequencing of work;

19      • Failing to respond to requests for information related to hazardous materials in order to

20        timely obtain permits for structures; and

21      • Refusing to extend the time for the performance of the work and allow for a shutdown

22        of work during winter months.

23      9.      On the foregoing basis, AECOM further asserts that PG&E is a necessary party

24  to this dispute. In addition to its plain involvement in the issues which give rise to JH Kelly's

25  claims, JH Kelly's entitlement to any relief for claims involving PG&E is dependent on JH

26  Kelly's presentation of such claims against PG&E and a determination of PG&E's responsibility

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 4      Seattle, WA 98104-7010
                                                      (206) 622-8020
Case 19:30088   Doc 15654   Filed 05/18/20   Entered 03/18/20 19:30:45   Page 4 of 39
146 of 322

1  for such claims. This is what the Subcontract requires, but JH Kelly has deliberately sought to
2  circumvent its contractual obligations. *See infra*, AECOM Counterclaim, § E, ¶¶111 and 135-
3  137.

4       10.    Finally, in the event not expressly addressed below, AECOM generally denies
5  each and every allegation in the Complaint and further denies that JH Kelly has sustained injuries
6  or damages in any sum or sums, or otherwise, or at all, due to any act or omission on the part of
7  AECOM, or any of its agents, servants, or employees.

8           **II.    ANSWER TO SPECIFIC ALLEGATIONS IN COMPLAINT**

9       1.    In answer to Paragraph 1 of the Complaint, AECOM admits that at material
10  times, JH Kelly was a Washington liability company. AECOM lacks sufficient information to
11  assess the truth or falsity of the remaining allegations contained therein and accordingly denies
12  the same.

13      2.    In answer to Paragraph 2 of the Complaint, AECOM denies that its ultimate
14  parent company, AECOM, operates 77 offices in the State of California. AECOM admits the
15  remainder of the allegations in Paragraph 2 with the qualification that AECOM Technical
16  Services, Inc. is an indirect subsidiary of the ultimate parent company, AECOM.

17      3.    The allegations of Paragraph 3 of the Complaint do not call for a response from
18  AECOM, but to the extent they do, AECOM lacks sufficient information to assess the truth or
19  falsity of the allegations contained therein and accordingly denies the same.

20      4.    The allegations of Paragraph 4 of the Complaint do not call for a response from
21  AECOM, but to the extent they do, AECOM lacks sufficient information to assess the truth or
22  falsity of the allegations contained therein and accordingly denies the same.

23      5.    In answer to Paragraph 5 of the Complaint,[2] AECOM admits that it entered into
24  a contract with PG&E regarding a project generally known as the Burney K2 Replacement

25  _____

26  [2] Throughout the Complaint, JH Kelly does not specifically refer to AECOM but instead references "AECOM Defendants," which it defines to include AECOM and unidentified Doe defendants. AECOM's response to each

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER     **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                                       701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 5                    Seattle, WA 98104-7010
                                                                                                    (206) 622-8020
Case 19-30088  Doc# 5654  Filed: 02/03/20  Entered: 03/03/20 19:30:45  Page 5 of 69
147 of 322

Project, that such Project was owned by PG&E, and that such project was located near the City of Burney, Shasta County, California. AECOM denies the remainder of Paragraph 5 and all of its subparts, and specifically that there has been "egregious mismanagement and maladministration of the Project, and unconscionable treatment of JH Kelly" by AECOM.

6. Paragraph 6 of the Complaint is admitted.

7. In answer to Paragraph 7 of the Complaint, AECOM states that the original scope of work is set forth in the EPC Agreement between PG&E and AECOM and that the contents of the EPC Agreement speak for themselves and do not require a response from AECOM. In further response to Paragraph 7, AECOM admits that the Burney Compressor Station is a facility in PG&E's natural gas transmission system in California, which provides service to approximately 4.2 million customers from Bakersfield, California to the southern Oregon border, and that the natural gas is compressed at the Burney Compressor Station. AECOM lacks sufficient information to assess the truth or falsity of the remaining allegations contained in Paragraph 7 accordingly denies the same.

8. Paragraph 8 of the Complaint is admitted.

9. Paragraph 9 of the Complaint is admitted.

10. In answer to Paragraph 10 of the Complaint, AECOM admits that Steven R. Petto ("Mr. Petto") sent an e-mail on or about August 26, 2015, and that the contents of the e-mail speak for themselves and do not require a response from AECOM. AECOM denies the remainder of Paragraph 10.

11. In answer to Paragraph 11 of the Complaint, AECOM admits that on or about October 7, 2015, JH Kelly submitted a proposal to AECOM numbered 15000.77.505. AECOM

and every allegation is made only on behalf of AECOM Technical Services, Inc. and not on behalf of such other unidentified Doe defendants. To the extent that any response to any allegation in the Complaint is required by AECOM Technical Services, Inc. on behalf of any Doe defendant, which AEOM denies, AECOM is without sufficient information or knowledge to admit or deny such allegation, and therefor denies the same. This denial based on lack of information is hereby incorporated into and asserted as to each and every allegation or claim asserted in the Complaint against the "AECOM Defendants."

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER  **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 6            Seattle, WA 98104-7010
                                                                                                        (206) 622-8020

Case 19-30088   Doc 15654   Filed 08/02/05/20   Entered 08/18/20 17:30:45   Page 6 of 39
148 of 322

1  admits that the final pricing for the proposal, which arrived October 8, 2015, listed a price of

2  $14,341,281, and that the content of the proposal speaks for itself and does not require a response

3  from AECOM. AECOM lacks sufficient information to assess the truth or falsity of the

4  remaining allegations contained in Paragraph 11 and accordingly denies the same.

5       12. AECOM lacks sufficient information to assess the truth or falsity of the

6  allegations contained in Paragraph 12 of the Complaint and accordingly denies the same. To the

7  extent that the allegations in Paragraph 12 reference the Subcontract between AECOM and JH

8  Kelly, and any attachments thereto, the contents of those documents speak for themselves and

9  the allegations do not require a response from AECOM.

10       13. In answer to Paragraph 13 of the Complaint, AECOM responds that the contents

11  of the document described by JH Kelly as "JH Kelly's Proposed Construction Schedule" speak

12  for themselves and do not require a response from AECOM. AECOM lacks sufficient

13  information to assess the truth or falsity of the remaining allegations contained in Paragraph 13

14  and all of its subparts and accordingly denies the same.

15       14. In answer to Paragraph 14 of the Complaint, AECOM responds that the content

16  of the documents referenced by JH Kelly speak for themselves and the allegations do not require

17  a response from AECOM. AECOM lacks sufficient information to assess the truth and falsity

18  of the remaining allegations contained in Paragraph 14 and accordingly denies the same.

19       15. In answer to Paragraph 15 of the Complaint, AECOM admits that it entered into

20  an EPC Agreement with PG&E for a project described in the document as "Burney K2

21  Replacement Project," which contract JH Kelly refers to as the "EPC Agreement," and that the

22  content of the EPC Agreement, and the attachments thereto, speak for themselves and do not

23  require a response from AECOM.

24       16. In answer to Paragraph 16 of the Complaint, AECOM admits that it entered into

25  an EPC Agreement with PG&E for a project described in the document as "Burney K2

26  Replacement Project," which contract JH Kelly refers to as the "EPC Agreement," and that the

Case 19-30088 Doc# 15654 Filed: 08/02/05/20 Entered: 08/02/05/20 17:30:45 Page 7 of 89
149 of 322

1  contents of the EPC Agreement, and the attachments thereto, speak for themselves and do not
2  require a response from AECOM. AECOM denies the remainder of Paragraph 16.

3      17.    In answer to Paragraph 17 of the Complaint, AECOM admits that throughout
4  the Project, it requested that JH Kelly participate and cooperate in the development of project
5  schedules, as contractually required, including providing to AECOM information for the
6  scheduling of the times and sequence of operations required to complete the Project, and that JH
7  Kelly provided one such schedule or about October 14, 2016. AECOM denies the remainder of
8  Paragraph 17.

9      18.    In answer to Paragraph 18 of the Complaint, AECOM admits that on or about
10  October 19, 2016, it circulated a document containing schedule information and that the contents
11  of that document, as well as the contents of the "Proposed Construction Schedule" referenced
12  by JH Kelly, speak for themselves and do not require a response from AECOM. AECOM lacks
13  sufficient information to assess the truth or falsity of the remaining allegations contained in
14  paragraph 18 accordingly denies the same.

15      19.    In answer to Paragraph 19 of the Complaint, AECOM admits that on or about
16  October 14, 2016, Mr. Petto sent an e-mail to JH Kelly, the contents of which speak for
17  themselves and do not require a response from AECOM. AECOM denies the remainder of
18  Paragraph 19.

19      20.    AECOM lacks sufficient information to assess the truth or falsity of the
20  allegations contained Paragraph 20 of the Complaint and accordingly denies the same.

21      21.    In answer to Paragraph 21 of the Complaint, AECOM admits that on or about
22  October 21, 2016, it entered into a subcontract with JH Kelly, the contents of which, as well as
23  the contents of the document referenced by JH Kelly as "JH Kelly's proposal," speak for
24  themselves and do not call for a response from AECOM. AECOM lacks sufficient information
25  to assess the truth or falsity of the remaining allegations contained in Paragraph 21 and
26  accordingly denies the same.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 8

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 1:19-30088  Doc# 5654  Filed: 02/05/20  Entered: 03/03/10.19:30:45  Page 8 of 39
150 of 322

22.     In answer to Paragraph 22 of the Complaint, AECOM admits that it entered into a subcontract with JH Kelly, the contents of which, as well as the contents of the documents referenced by JH Kelly as the "Subcontract Ex. H Schedule," "JH Kelly's Proposed Schedule," and the "Project Schedule," speak for themselves and do not require a response from AECOM. AECOM lacks sufficient information to assess the truth or falsity of the remaining allegations contained in Paragraph 22 and all of its subparts and accordingly denies the same.

23.     In answer to Paragraph 23 of the Complaint, AECOM admits that it entered into a subcontract with JH Kelly, the contents of which, as well as the contents of the documents referenced by JH Kelly as "Exhibit A2," "JH Kelly's Proposed Project Schedule," the "Project Schedule," and "Subcontract Ex. H Schedule," speak for themselves and do not require a response from AECOM. AECOM lacks sufficient information to assess the truth or falsity of the remaining allegations contained in Paragraph 23 and all of its subparts and accordingly denies the same.

24.     AECOM lacks sufficient information to assess the truth or falsity of the allegations contained Paragraph 24 of the Complaint and accordingly denies the same.

25.     In answer to Paragraph 25 of the Complaint, AECOM admits that the Project fell behind due to the numerous acts and omissions of PG&E, examples of which include, PG&E changes to significant aspects of the Project, starting with rejecting the entirety of its own electrical design and the control philosophy (which is the design of how the plant is controlled and operated); PG&E changes to buildings, addition of structures, and specifications for the compressor; and PG&E's failure to timely provide approvals, including but not limited to approvals of pricing of PG&E-directed changes and purchase orders of major equipment. AECOM denies the remainder of Paragraph 25.

26.     In answer to Paragraph 26 of the Complaint, AECOM admits that JH Kelly was advised that as a result of the acts or omissions of PG&E, including but not limited to owner-

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 9

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-30088   Doc# 5654   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 7 of 39
151 of 322

1 directed changes to the electrical design, the issuance of the IFC Electrical drawings would be
2 issued after December 1, 2016. AECOM denies the remainder of Paragraph 26.

3     27. In answer to Paragraph 27 of the Complaint, AECOM admits that as a result of
4 the acts or omissions of PG&E, including but not limited to owner-directed changes to the
5 electrical design, the issuance of the IFC Electrical drawings was delayed. AECOM further
6 admits that there were email communications between AECOM and JH Kelly on January 4,
7 2017 regarding the IFC Electrical drawings, the contents of which speak for themselves and do
8 not require a response from AECOM. AECOM lacks sufficient information to assess the truth
9 or falsity of the remaining allegations contained in Paragraph 27 and accordingly denies the
10 same.

11     28. In answer to Paragraph 28 of the Complaint, AECOM admits that JH Kelly was
12 informed that as a result of acts or omissions of PG&E, including but not limited to owner-
13 directed changes to the electrical design, issuance of the IFC Electrical drawings was delayed.
14 AECOM further admits that there were email communications between AECOM and JH Kelly
15 on January 4, 2017 regarding the IFC Electrical drawings, the contents of which speak for
16 themselves and do not require a response from AECOM. AECOM lacks sufficient information
17 to assess the truth or falsity of the remaining allegations contained in Paragraph 28 and
18 accordingly denies the same.

19     29. In answer to Paragraph 29 of the Complaint, AECOM admits that there were
20 email communications between AECOM and JH Kelly on January 4, 2017 regarding the IFC
21 Electrical drawings, the contents of which speak for themselves and do not require a response
22 from AECOM. AECOM lacks sufficient information to assess the truth or falsity of the
23 remaining allegations contained in Paragraph 29 and accordingly denies the same.

24     30. In answer to Paragraph 30 of the Complaint, AECOM admits that on or about
25 January 24, 2017, it received an email from JH Kelly, that AECOM responded to that email by
26 separate correspondence, and that the contents of those email communications speak for

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 10

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case: 19-30088 Doc# 5651 Filed: 02/05/20 Entered: 02/05/20 19:30:45 Page
152 of 322

1  themselves and do not require a further response from AECOM. AECOM lacks sufficient
2  information to assess the truth or falsity of the remaining allegations contained in Paragraph 30
3  and accordingly denies the same.

4      31.     In answer to Paragraph 31 of the Complaint, AECOM admits that as a result of
5  acts or omissions of PG&E, including but not limited to additional owner-directed changes to
6  the electrical design, issuance of the IFC Electrical drawings was delayed and the drawings were
7  not issued on February 24, 2017.

8      32.     In answer to Paragraph 32 of the Complaint, AECOM admits that as a result of
9  acts or omissions of by PG&E, including but not limited to additional owner-directed changes
10 to the electrical design and equipment, issuance of the IFC Electrical drawings was impacted.
11 AECOM denies the remainder of Paragraph 32.

12     33.     In answer to Paragraph 33 of the Complaint, AECOM admits that as a result of
13 acts or omissions of PG&E, including but not limited to additional owner-directed changes to
14 the electrical design, issuance of the IFC Electrical drawings was impacted.  AECOM denies the
15 remainder of Paragraph 33.

16     34.     In answer to Paragraph 34 of the Complaint, AECOM admits that as a result of
17 acts or omissions of PG&E, including but not limited to additional owner-directed changes to
18 the electrical design, issuance of the IFC Electrical drawings was impacted and that this resulted
19 in various impacts to the Project, including the timing, sequencing, and scope of JH Kelly's work
20 on the Project.  AECOM denies the remainder of Paragraph 34.

21     35.     In answer to Paragraph 35 of the Complaint, AECOM admits that on or about
22 September 12, 2017, JH Kelly submitted the change order request it refers to as "COR #70," the
23 contents of which speak for themselves and do require for a response from AECOM.  AECOM
24 lacks sufficient information to assess the truth or falsity of the remaining allegations contained
25 in Paragraph 35 and accordingly denies the same.

26     36.     Paragraph 36 of the Complaint and all of its subparts is denied.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **11**        Seattle, WA 98104-7010
                                                                                         (206) 622-8020
Case 19-80088   Doc# 5651   Filed 02/05/20   Entered 02/05/20 19:30:45   Page
153 of 322

1    37.    In answer to Paragraph 37 of the Complaint, AECOM admits that on or about
2  November 9, 2017, it sent a letter to JH Kelly regarding the Project schedule, that the contents
3  of the letter speak themselves and do not require a response from AECOM.  AECOM lacks
4  sufficient information to assess the truth or falsity of the remaining allegations contained in
5  Paragraph 37 of the Complaint and accordingly denies the same.

6    38.    In answer to Paragraph 38 of the Complaint, AECOM admits that PG&E made
7  changes to the Project, in addition to owner-directed changes to the electrical design that caused
8  delayed issuance of the IFC Electrical drawings, which had impacts on the Project schedule and
9  work.  The additional changes and/or PG&E direction, include, but are not limited to, increasing
10  the scope of work, directing means and methods for work, directing AECOM and JH Kelly to
11  accelerate the work, and requiring winter work.  AECOM lacks sufficient information to assess
12  the truth or falsity of the remaining allegations contained Paragraph 38 of the Complaint or its
13  subparts, and accordingly denies the same.

14    39.    In answer to Paragraph 39 of the Complaint, AECOM admits that as a result of
15  the acts or omissions of PG&E the Project was impacted.  The remainder of Paragraph 39 is
16  denied.

17    40.    In answer to Paragraph 40 of the Complaint, AECOM admits that JH Kelly
18  prepared analyses it refers to as "TIA reports," the contents of which speak for themselves and
19  do not require a response from AECOM.  AECOM admits that as a result of acts or omissions
20  of PG&E, the Project was impacted.  The remainder of Paragraph 39 is denied.

21    41.    Paragraph 41 of the Complaint is denied.

22    42.    Paragraph 42 of the Complaint is denied.

23    43.    In answer to the second sentence of Paragraph 43 of the Complaint, AECOM
24  lacks sufficient information to assess the truth or falsity of the allegations, and accordingly
25  denies the same.  AECOM denies the remainder of Paragraph 43 and its subparts.

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER    **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                        701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **12**                Seattle, WA 98104-7010
                                                                          (206) 622-8020
Case: 19-30088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 152
of 322

44. In answer to Paragraph 44 of the Complaint, AECOM admits that some JH Kelly personnel left the Project on or about June 28, 2018. AECOM denies the remainder of Paragraph 44.

45. In answer to Paragraph 45 of the Complaint, AECOM restates its prior responses.

46. Paragraph 46 of the Complaint is denied.

47. Paragraph 47 of the Complaint is denied.

48. Paragraph 48 of the Complaint is denied.

49. In answer to Paragraph 49 of the Complaint, AECOM restates its prior responses.

50. Paragraph 50 of the Complaint is denied.

51. Paragraph 51 of the Complaint is denied.

52. Paragraph 52 of the Complaint is denied.

53. Paragraph 53 of the Complaint is denied.

54. Paragraph 54 of the Complaint is denied.

55. Paragraph 55 of the Complaint is denied.

56. In answer to Paragraph 56 of the Complaint, AECOM restates its prior responses.

57. Paragraph 57 of the Complaint states in part, legal conclusions which do not call for a response from AECOM, but to the extent they do, they are denied. The remainder of Paragraph 57 is denied.

58. Paragraph 58 of the Complaint states in part, legal conclusions which do not call for a response from AECOM, but to the extent they do, they are denied. The remainder of Paragraph 58 is denied.

59. Paragraph 59 of the Complaint is denied.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND 701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **13** Seattle, WA 98104-7010
(206) 622-8020

Case: 19-30088 Doc# 5651 Filed: 02/05/20 Entered: 02/05/20 19:30:45 Page
155 of 322

1    60.    In answer to Paragraph 60 of the Complaint, AECOM restates its prior
2    responses.

3    61.    Paragraph 61 of the Complaint states legal conclusions which do not call for a
4    response from AECOM, but to the extent they do, they are denied.  The remainder of Paragraph
5    61 is denied.

6    62.    Paragraph 62 of the Complaint is denied.

7    63.    Paragraph 63 of the Complaint is denied.

8    64.    In answer to Paragraph 64 of the Complaint, AECOM restates its prior
9    responses.

10    65.    Paragraph 65 of the Complaint states in part, legal conclusions which do not call
11    for a response from AECOM, but to the extent they do, they are denied. The remainder of
12    Paragraph 65 is denied.

13    66.    Paragraph 66 of the Complaint states in part, legal conclusions which do not call
14    for a response from AECOM, but to the extent they do, they are denied. The remainder of
15    Paragraph 66 is denied.

16    67.    Paragraph 67 of the Complaint states in part, legal conclusions which do not call
17    for a response from AECOM, but to the extent they do, they are denied. The remainder of
18    Paragraph 67 is denied.

19    68.    Paragraph 68 of the Complaint states in part, legal conclusions which do not call
20    for a response from AECOM, but to the extent they do, they are denied. The remainder of
21    Paragraph 68 is denied.

22    69.    In answer to Paragraph 69 of the Complaint, AECOM restates its prior
23    responses.

24    70.    Paragraph 70 of the Complaint is denied.

25    71.    Paragraph 71 of the Complaint is denied.

26    72.    Paragraph 72 of the Complaint is denied.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                              701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **14**          Seattle, WA 98104-7010
                                                                                          (206) 622-8020

Case 19-80088    Doc# 565-1    Filed 02/05/20    Entered 02/05/20 19:30:45    Page
156 of 322

1  73.  Paragraph 73 of the Complaint is denied.

2  74.  Paragraph 74 of the Complaint is denied.

3  75.  In answer to Paragraph 75 of the Complaint, AECOM restates its prior

4  responses.

5  76.  Paragraph 76 of the Complaint is denied.

6  77.  Paragraph 77 of the Complaint is denied.

7  78.  Paragraph 78 of the Complaint does not call for a response from AECOM.

8  79.  In response to JH Kelley's Prayer for Damages, AECOM denies that JH Kelly

9  is entitled to the relief sought from AECOM.

10  ### III.  AFFIRMATIVE DEFENSES

11  In addition to its responses and answers to the Complaint set forth above, AECOM

12  asserts the following affirmative defenses to the claims made against it by JH Kelly and without

13  admitting it has the burden of proof on any of the issues raised below.  In asserting its

14  affirmative defenses, AECOM alleges and incorporates by reference herein the factual

15  allegations as set forth in its Counterclaim against JH Kelly filed herewith.

16  ### FIRST AFFIRMATIVE DEFENSE
17  **(Failure to State Facts Sufficient to Constitute a Cause of Action)**

18  80.  JH Kelly fails to state facts in its Complaint sufficient to constitute a cause of

19  action against AECOM.

20  ### SECOND AFFIRMATIVE DEFENSE
21  **(Indispensable Party – FRCP 19)**

22  81.  As more fully described in the Counterclaim filed with this Answer and

23  Affirmative Defenses, and the Notice of Removal, PG&E is a necessary and indispensable party

24  in this action and in the event PG&E cannot be made a party, this action should be dismissed or

25  stayed until such time as PG&E can be joined as a party.

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **15**                Seattle, WA 98104-7010
                                                                                   (206) 622-8020

Case: 19-30088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
157 of 322

82. This dispute arises out of a PG&E project and centrally involves PG&E as discussed in the Introduction and General Denial set forth above in the Answer to JH Kelly's Complaint at Paragraphs 1-9.

83. Further, JH Kelly and AECOM have each recorded mechanic's liens against the Burney Property, which is a critical asset of PG&E's bankruptcy estate.

84. On January 29, 2019, PG&E and its parent company, PG&E Corporation, filed voluntary Chapter 11 petitions in this Court, in a jointly administered case assigned Case No. 19-30088 (the "Bankruptcy Case").

85. Prior to the filing of the Bankruptcy Case, JH Kelly filed a lawsuit against PG&E to foreclose on its lien (the "PG&E Foreclosure Action"). JH Kelly's lien foreclosure action is currently pending in Shasta County Superior Court, although it has been automatically stayed as a consequence of the Bankruptcy Case.

86. This action was filed after the filing of the Bankruptcy Case. However, JH Kelly filed a notice of related case in this action notifying Shasta County Superior Court that it is related to the PG&E Foreclosure Action: "[t]his case [this action against AECOM] and the case referenced above [the PG&E Foreclosure Action] could require duplication of judicial resources because the claims in both cases arise from the same construction project."

87. All of JH Kelly's claims in both this suit and the PG&E Foreclosure Action arise out of the same nexus of facts and circumstances related to the construction of the Project. *See, JH Kelly, LLC v. AECOM Technical Services, Inc., et. al.*, Case No. 19CV0172 and *JH Kelly, LLC v. Pacific Gas and Electric Company, et al.*, Case No. 19CV1759.

88. The substantial majority of JH Kelly's claims in both suits involve changes PG&E directed AECOM to implement. While the question of who is ultimately responsible for the changes and resulting delays will undoubtedly be disputed, what is indisputable is that all three parties are necessary to adjudicate this matter.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **16**

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case: 19-30088 1 Doc# 5651 Filed: 02/05/20 Entered: 02/05/20 19:30:45 Page
158 of 322

1  89.  PG&E is an indispensable party to this matter as complete relief cannot be

2  accorded in its absence among those already parties, and PG&E is so situated that the disposition

3  of this action without PG&E may as a practical matter impair or impede PG&E's ability to

4  protect its interest in the Burney Property and it leaves the parties to this action subject to a

5  substantial risk of incurring double, multiple or otherwise inconsistent obligations.

6  **THIRD AFFIRMATIVE DEFENSE**
   **(Breach of Contract)**
7

8  90.  As set forth in AECOM's Counterclaim against JH Kelly, which allegations are

9  hereby incorporated by reference, JH Kelly has breached the Subcontract and therefore is entitled

10  to no recovery against AECOM.

11  **FOURTH AFFIRMATIVE DEFENSE**
   **(Laches)**
12

13  91.  JH Kelly's claims, in whole or in part, are barred by the doctrine of laches.

14  **FIFTH AFFIRMATIVE DEFENSE**
   **(Waiver)**
15

16  92.  JH Kelly's claims, in whole or part, are barred because JH Kelly has waived,

17  relinquished, and/or abandoned any entitlement to relief against AECOM regarding the matters

18  that are the subject of the Complaint by not following the Subcontract's requirements.

19  **SIXTH AFFIRMATIVE DEFENSE**
   **(Consent)**
20

21  93.  JH Kelly's claims, in whole or part, are barred by the doctrine of consent.

22  **SEVENTH AFFIRMATIVE DEFENSE**
   **(Estoppel)**
23

24  94.  JH Kelly's claims, in whole or part, are barred by the equitable doctrine of

25  estoppel. JH Kelly has failed to comply with certain contractual requirements, refused to

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER  **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **17**      Seattle, WA 98104-7010
                                                          (206) 622-8020

Case 19-80088  Doc# 5651-1  Filed 02/05/20  Entered 02/05/20 19:30:45  Page
159 of 322

1  prosecute certain of its claims against PG&E as required by the Subcontract, and is thus estopped

2  from asserting such claims against AECOM.

3  ### EIGHTH AFFIRMATIVE DEFENSE
   ### (Unclean Hands)

4

5  95.  JH Kelly's claims, in whole or part, are barred by the equitable doctrine of

6  unclean hands.  JH Kelly is responsible for damages resulting from its own acts or omissions,

7  including breaches of contract, including but not limited to its failure to timely and efficiently

8  prosecute the work.

9  ### NINTH AFFIRMATIVE DEFENSE
   ### (Failure to Mitigate)

10

11  96.  If JH Kelly has suffered any damages, which AECOM expressly denies,

12  AECOM alleges that JH Kelly's recovery for those damages may be barred, in whole or in part,

13  by its failure to mitigate, reduce, or otherwise avoid its damages.

14  ### TENTH AFFIRMATIVE DEFENSE
   ### (Unjust Enrichment)

15

16  97.  JH Kelly's claims, in whole or part, are barred because it seeks relief that would

17  result in unjust enrichment of JH Kelly.

18  ### ELEVENTH AFFIRMATIVE DEFENSE
   ### (Offset)

19

20  98.  If AECOM has any liability to JH Kelly for the claims made in this action, which

21  AECOM expressly denies, AECOM is entitled to an appropriate set-off for the claims it has

22  asserted in its Counterclaim against JH Kelly and for claims that are the ultimate responsibility

23  of PG&E.

24

25

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                    701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **18**          Seattle, WA 98104-7010
                                                                  (206) 622-8020

Case 19-80088  Doc# 5651  Filed 02/05/20  Entered 02/05/20 19:30:45  Page 160 of
160 of 322

## TWELFTH AFFIRMATIVE DEFENSE
### (Apportionment)

99.     AECOM is informed and believes that, if it has any liability to JH Kelly for the claims made in this action, which AECOM expressly denies, AECOM is entitled to an appropriate apportionment of damages among all parties, including PG&E, whose negligence or fault contributed to the injuries or damages alleged.

## THIRTEENTH AFFIRMATIVE DEFENSE
### (Prompt Payment Laws)

100.     AECOM's decision to withhold amounts from JH Kelly's invoices is justified and supportable under California law. These withholdings were made in good faith, within AECOM's rights under the Subcontract, and permitted by California's Prompt Payment Statutes.

## IV.     RESERVATION OF RIGHTS

101.     AECOM may rely upon any and all further defenses which may be available or which later appear after further factual development in this action and hereby specifically reserves its right to amend this Answer, as of right or with leave of Court, for the purpose of asserting any such additional defenses.

## COUNTERCLAIM

Defendant AECOM states its Counterclaim against Plaintiff JH Kelly as follows:[3]

## I.     PARTIES

102.     AECOM is a California corporation with its principal place of business in Los Angeles, California.

103.     JH Kelly is a Washington limited liability company with its principal place of business in Longview, Washington. JH Kelly describes itself as "one of the largest industrial mechanical contractors in the nation."[4]

---

[3] Capitalized terms in this Counterclaim, unless otherwise defined, are given the same meaning as in the Answer, above.
[4] https://www.jhkelly.com/about.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 19

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-80988   Doc# 5651   Filed 02/05/20   Entered 02/05/20 19:30:45   Page
161 of 322

## II.    CONSENT TO JURISDICTION

104.    AECOM consents to entry of final orders or judgment by the United States Bankruptcy Court for the Northern District of California.

## III.    FACTS RELEVANT TO THE CLAIMS

### A.    Introduction

105.    This dispute arises from delays and cost overruns experienced during the design and reconstruction of a compressor Burney Station in PG&E's natural gas transmission pipelines.

106.    As set forth *supra*, PG&E and AECOM entered into the EPC Agreement for the purposes of designing and replacing the Burney Station. AECOM then entered into a Subcontract with JH Kelly. Under the Subcontract, which incorporates the terms of the EPC Agreement with some modification, JH Kelly agreed to construct the replacement compressor station, supply some material, and be responsible for construction planning and scheduling. Generally, the Project required the design. Supply and construction of new improvement to replace the aging and obsolete facilities serving the PG&E's gas pipeline. This included but was not limited to including the buildings to house the new equipment. This work included installation of significant lengths of large-bore underground facility piping, electrical, pneumatic, and natural gas powered valves, motor control centers and switchgear, station controls, new above and below ground electrical wiring, domestic water, two fire suppression systems, new asphalt drives and parking, as well as general site grading, gravel, and fencing.

107.    In its Complaint, JH Kelly attributes no responsibility to PG&E or to itself. AECOM disputes JH Kelly's complete attribution of responsibility for delay and increased costs on the Project. Rather, AECOM asserts that PG&E and JH Kelly's conduct contributed to such delays and increased costs.

108.    Specifically, and as further described below, JH Kelly's conduct directly and significantly interfered with the progress and completion of construction. JH Kelly failed to

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 20

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-30088    Doc# 5651    Filed 02/05/20    Entered 02/05/20 19:30:45    Page 2 of
162 96322

1 | supply an adequate number of workers and supervisors, which hampered the progress of work,
2 | including the electrical wire installation, field coating of gas pipe, and excavation work.

3 | 109. JH Kelly also delayed completion of work on the critical path of the Project.[5] In
4 | particular, JH Kelly's sequencing of construction activities and lack of appropriate staff to
5 | complete the work, coupled with its direction to its excavation contractor, created delays in
6 | certain excavation work related to the installation of underground electrical conduit—work that
7 | must be completed before the foundations of buildings may be constructed. Likewise, JH
8 | Kelly's work to complete pulling wire through electrical conduit and terminating the connections
9 | was slow. These delays caused damage to AECOM in the form of increased direct costs on the
10 | job and the assessment of liquidated damages by PG&E against AECOM.

11 | 110. JH Kelly also consistently failed to follow proper safety practices on site, which
12 | in one instance resulted in PG&E demanding a change in JH Kelly's supervision, and also
13 | required AECOM to provide additional site safety and supervisory personnel. JH Kelly's lack
14 | of attention to safety resulted in a near-catastrophic accident on site when its fuel supplier drove
15 | a fully-loaded fuel truck on site without adequate supervision or safety spotters - in violation of
16 | protocol - and backed into a live gas main, causing extensive damage to the pipeline. JH Kelly
17 | has failed to indemnify both AECOM[6] and PG&E for the damages associated with this incident.
18 | As a result, PG&E withheld its damages from AECOM, which AECOM in turn withheld from
19 | JH Kelly as permitted by the Subcontract.

20 | 111. Moreover, JH Kelly committed numerous breaches of the Subcontract over the
21 | course of the Project, as detailed below, including, but not limited to: failing to complete its

22 |     [5] Construction project schedules reflect the contractor's plan for the sequence of events to complete the
23 | required work. Schedules will often identify logical ties between the start and completion of one activity to the start of the next activity. The "critical path" is the sequence of activities. The critical path is the sequence of activities (with zero schedule float or contingency) that must be completed to construct a project. This is also the
24 | sequence of activities that shows the minimal time in which a project can be completed. Generally speaking, if there is a delay in one activity on the critical path, the project will be delayed. The critical path is not completely
25 | static, as delays to activities not on the critical path can create situations where that activity can become critical to complete before other progress can be made.
26 |     [6] AECOM incurred costs for the addition of extra supervisory and safety staff to ensure JH Kelly's performance.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 21

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-80088_1.Doc# 5651 Filed 02/05/20 Entered 02/05/20 19:30:45 Page
163 of 322

1   contractually-required scope of work; performing defective work; failing to comply with the
2   contractual requirements for disputed PG&E directed changes; and breaching its duty to
3   cooperate and act in good faith with AECOM in presenting claims for additional compensation
4   from PG&E. By way of example, JH Kelly alleges that its work was delayed and impacted by
5   the late delivery of, and substantial changes to, the final electrical design drawings (referred to
6   in the Complaint as the "IFC Electrical"). JH Kelly blames these delays and impacts on
7   AECOM, but JH Kelly was well aware that the changes to and delays with the IFC Electrical
8   were caused by PG&E, and that PG&E's delayed approvals to purchase associated equipment
9   required by its directed changes further exacerbated the problem. Rather than cooperate with
10  AECOM in presenting a claim for the delay and impacts to PG&E, as required by the
11  Subcontract, JH Kelly now improperly seeks disregard its contractual obligations and attribute
12  these delays and impacts solely to AECOM.

13      112.    Under the terms of the Subcontract, AECOM is entitled to recover for the
14  various breaches of contract, the assessment of liquidated damages imposed by PG&E for JH
15  Kelly's delays, and for AECOM's direct costs. These direct costs include, but are not limited to
16  increased site supervision, increased engineering support, and additional site safety and
17  construction management personnel costs.

18  **B.    Basis of AECOM Bid, EPC Agreement and JH Kelly Subcontract**

19      113.    PG&E solicited bids for the Project on August 3, 2015. In its request for
20  proposal (the "RFP"), PG&E included information upon which bidders were supposed to rely.

21      114.    The RFP included a "30% Design Deliverables package [that] was developed in
22  2014 by others[,]" and expressly stated that "[i]t is the intent of this RFP that a minimum of
23  changes be made to the existing 30% Design Deliverables."

24      115.    AECOM submitted its lump sum bid in reliance on this representation, along
25  with other representations made in the RFP.

26      116.    AECOM provided JH Kelly a copy of the RFP.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER    **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND               701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **22**   Seattle, WA 98104-7010
                                                      (206) 622-8020

1       117.    JH Kelly admits it received the RFP and used it to develop a proposal for the

2 performance of the construction work on the Project.

3       118.    The cost of the work, construction scope, and the project schedule, which are set

4 out in the EPC Agreement and Subcontract, were based on the representations made by PG&E

5 in the RFP, including its representation that it wanted a minimum of changes to the design.

6       119.    PG&E ultimately awarded the Project and a kick-off meeting was held on

7 January 19, 2016.

8       120.    AECOM then commenced the design phase of the Project. However, the

9 progress of the design was immediately impacted by numerous and substantial design changes

10 made by PG&E. At the very outset of the design phase, PG&E's lead electrical engineer

11 informed AECOM that PG&E was rejecting its own electrical design that it used as the

12 foundation from which AECOM was required to base its bid on. This meant AECOM would be

13 developing that design from scratch.

14       121.    Meanwhile, PG&E also: (i) agreed to contractual terms with the supplier of the

15 turbine-driven compressor unit (the equipment that actually moves the gas through the pipeline)

16 that were in conflict with the terms and conditions of the EPC contract with AECOM, resulting

17 in delays to procurement of the unit and incorporation of technical requirements of that

18 equipment into the Project design; (ii) added new buildings to be designed and constructed (e.g.,

19 a new hazardous materials storage building), (iii) expanded the footprint and scope of other

20 buildings (e.g., the new control building (auxiliary building) and fire water pump house were

21 expanded); (iv) changed the concept for how the compressor station electrical systems would be

22 controlled by requiring a "smart" motor control centers; (v) changes in the diameters of the

23 suction and discharge headers; (vi) and changed the power source for some control valves from

24 pneumatic to gas. PG&E then refused to authorize the purchase of the equipment to meet its

25 new "smart" control center requirements. JH Kelly through its participation in design review

26 meetings was aware of all these changes.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND         701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **23**     Seattle, WA 98104-7010
                                      (206) 622-8020

Case: 19-80088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 2 of
165 of 322

122. Nevertheless, AECOM surmounted these obstacles and progressed the design to near completion by October 2016.

123. At each design review (30%, 60% and 90%) step required by PG&E, PG&E, AECOM and JH Kelly attended and participated in a design review meeting.[7]

124. When the design of the compressor station was nearly complete, AECOM entered into the Subcontract with JH Kelly dated on October 21, 2016, pursuant to which JH Kelly agreed to provide all the necessary staff and supervision to complete the construction work for the Project for the agreed the Contract Price of $14,341,281. JH Kelly's scope of work included all construction-related activities to complete the Project. A copy of the Subcontract (excluding some exhibits as the entire Subcontract consists of 2259 pages) was attached as Exhibit A to JH Kelly's Complaint, the terms of which Subcontract are incorporated by reference herein.

C.     **JH Kelly's Requirements Under the Subcontract**

**JH Kelly's Representations & Warranties**

125. In entering into the Subcontract with AECOM, JH Kelly made material representations, which AECOM relied upon, including but not limited to:

    i.   that it would "carefully review all the Contract Documents for any conflicts or ambiguities" (Article 1.4.1);

    ii.  that "it has examined the Site and the Contract Documents prior to executing this Agreement so as to reasonably ascertain the nature of the Work[8] and the various conditions affecting the Work" (Article 2.2.1);

    iii. that it would "perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract

---

[7] After JH Kelly was awarded the contract, AECOM compensated JH Kelly for attending the design review meetings to ensure its understanding of the scope of the work it was being asked to perform and to provide any input on potential changes or construction issues.

[8] "Work" is a defined term in the Subcontract and generally refers to all of JH Kelly's scope of work to complete the Project.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 24     Seattle, WA 98104-7010
                                                      (206) 622-8020
Case 2:19-cv-30088   Doc# 5651-1   Filed 02/05/20   Entered 02/05/20 19:30:45   Page 2 of
166 gb322

Document and the project Schedule" (Article 2.3.1);

    iv.    that "[i]n the event of any inconsistency, conflict or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness" (Article 1.4.2);

    v.    that it would fully cooperate and act in good faith in performing its obligations under the Subcontract (Article 1.5.1);

    vi.    that its Work would be "of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship" (Article 2.14);

    vii.    that it would "immediately" bring "omissions from the drawings or specifications or the misdescription of details of Work…" to the attention of AECOM via a Request for Information (RFI) "prior to the commencement of any work" (Article 2.17); and

    viii.    JH Kelly agreed that "[v]ariations in quantities from as-bid shall be brought to the attention of Design-Builder via a Request for Information (RFI) prior to any purchase of materials" (Article 2.17).

**Timing & Schedule Obligations**

126.    JH Kelly also agreed that "time [wa]s of the essence" in performing the work, (*see* Article 5.3.12), and made additional promises with respect to timely performance of the Work. (Article 5.2.1).

127.    To that end, the Subcontract obligated JH Kelly to provide AECOM with the schedule for the construction related activities, as part of its duty to participate in and cooperate with the development of the Project schedule. (Article 5.2.2).

128.    In the event that PG&E or AECOM directed changes to the schedule or sequence of operations for the Work, and such direction impacted JH Kelly's costs, the Subcontract

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 25

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case: 19-30088  Doc# 5651-1  Filed: 02/05/20  Entered: 02/05/20 19:30:45  Page
167 of 322

required JH Kelly to follow the procedures set forth in Articles 5, 12 and 13 of the Subcontract in order to obtain entitlement for such changes.

129. And in the event there were delays caused by PG&E, JH Kelly agreed it would properly document such delays and follow the contractual process set forth in the EPC Agreement to resolve claims arising out of these delays.

130. The Subcontract provides as follows:

> 5.4.1 **Owner-Caused Delays**. If Subcontractor is delayed in the performance of the Work due to the acts or omissions of the Owner, or for which Owner is responsible … Subcontractor will also be entitled to an appropriate adjustment of the Contract Price under this Section 5.4.1, provided a corresponding adjustment to Design-Builder's compensation is made by the Owner under the EPC Agreement.
>
> …
>
> any disputes between Design-Builder and Subcontractor for involving delay and resulting damages that arise out of, or relate to, the acts or omissions by Owner or for which Owner is responsible shall be resolved pursuant to Section 13.3 hereof. Subcontractor's recovery shall be limited to the amount, if any, which Design-Builder, on behalf of Subcontractor, actually receives from Owner on account of such claim…

131. JH Kelly also agreed that if JH Kelly was responsible for delays, it would compensate and indemnify AECOM for all such costs and expenses, including but not limited to any liquidated damages assessed by PG&E. (Article 5.4.5). And in the event delays or damages were caused by JH Kelly and another entity for which JH Kelly was not liable, AECOM could "reasonably apportion such damages amongst the responsible parties." (Article 5.4.5).

**D. Property Damage Obligations**

132. JH Kelly also agreed to indemnify, hold harmless and defend AECOM against any claims for damages to property. (Article 11.4.1).

133. In the event that JH Kelly caused damage to property, failed to complete work, or its work was defective or deficient, AECOM is entitled to withhold payments if it determined JH Kelly was "not entitled to all or part of an Application for Payment" and for any claims or

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 26

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-80088 Doc# 5651 Filed 02/05/20 Entered 02/05/20 19:30:45 Page 2 of
168 gb322

1 backcharges remaining unpaid; or where JH Kelly's insurance company refused to promptly
2 defend AECOM or PG&E for such claims. (Articles 7.4.1. and 7.4.2).

3 **E.  Dispute Resolution Requirements**

4      134.    The provisions in the Subcontract governing disputes provide that to the extent
5 any "claim, dispute or controversy arises out of, or relates to, problems caused by Owner or for
6 which Owner is responsible ("Owner Disputes")," then JH Kelly would resolve such claims
7 pursuant to the dispute resolution clause set forth in the EPC Agreement. (Article 13.3.1).

8      135.    The Subcontract also requires JH Kelly "to cooperate in the presentation and
9 prosecution or defense of Owner Disputes" and, at AECOM's determination, where the
10 entitlement to additional compensation is the responsibility of PG&E, present such requests for
11 an extension of time or additional compensation to Owner. *Id.*

12      136.    Article 13.3 further provides:

13          13.3.2 Notwithstanding any other provisions herein to the contrary, Design-
14          Builder and Subcontractor each agree to accept the relief as to time extension of
            addition compensation obtained from the Owner, if any, as well as all other
15          aspects of the final decision following appeal or the expiration of the time for
            appeal, as full and final resolution of any Owner Dispute.
16
17          13.3.3 If Design-Builder asserts a claim against Owner involving
            Subcontractor, each party shall bear its own costs for outside counsel and third-
18          party consultants retained to prosecute claims against Owner and for any other
            litigation costs. Each party shall present its portion of the claim to Owner.
19

20 **F.  JH Kelly's Performance on the Project**

21                          **JH Kelly Delay**

22      137.    JH Kelly failed to perform the work by failing to provide enough qualified
23 workers and failing to properly sequence the work, which delayed the timely completion of the
24 Project. More specifically, JH Kelly caused delays by failing to adjust its construction plan (the
25 order in which the work is done) to ensure its work force was progressing the work. And, JH
26 Kelly did not provide adequate supervision to efficiently complete work. JH Kelly also opted

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER  **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                      701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 27              Seattle, WA 98104-7010
                                                                   (206) 622-8020
Case: 19-30088  Doc# 5651  Filed: 02/05/20  Entered: 02/05/20 19:30:45  Page 2 of
169 of 322

to prioritize non-critical work over critical path work (*i.e.*, work that if delayed would impact the timely completion of the Project). In addition, JH Kelly's work to complete pulling the wire through the conduit pipe and making the connections was slower than it should have been even considering other impacts to the work. These delays caused damage to AECOM, including but not limited to, increased direct costs on the job and the assessment of liquidated damages by PG&E against AECOM.

### Failure to Perform Scope (Incomplete or Defective Work)

138. JH Kelly failed or refused to perform certain scopes of work under the Subcontract, including but not limited to, certain demolition work, certain painting and coating work, and the application of protective coatings for certain above and below-ground piping.

139. JH Kelly similarly failed to perform underground pipe coating[9] (as determined in the field by PG&E) which protects the pipe from corrosion, certain asphalt and paving work, and underground water piping in a manner that was free of defects. These, and other defects in JH Kelly's work, caused AECOM to repair and/or redo work at additional costs to AECOM. In addition, AECOM has incurred costs related to rectifying other incomplete or defective work including but not limited to:

a) Faulty heat tracing insulation;

b) Faulty door installation;

c) Incomplete placement of rock/gravel;

d) Omission of a vapor barrier at the Fire Water Pump House;

e) Installation of a well pump with incorrect voltage;

f) Solar rework to realign the compressor;

---

[9] The various contract documents include specifications for the application of protective coatings for all gas pipe. JH Kelly was responsible to apply such coatings in the field in accordance with these specifications. PG&E then used specified testing procedures to ensure that the field or shop applied coatings met the PG&E specification requirements. PG&E's testing found numerous defects in JH Kelly's work, which required JH Kelly to redo the work that filed the PG&E testing. AECOM incurred additional costs related to its on-site personnel for such rework.

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 28

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case: 19-30088 Doc# 5651 Filed: 02/05/20 Entered: 02/05/20 19:30:45 Page
170 of 322

1    g)    Balancing the compressor building exhaust louvers;

2    h)    Installing out of spec concrete in the Compressor Building slab foundation; and

3    i)    Demobilization of equipment, trailers and temporary power.

4    **The Valve Strike**

5    140.    On or about October 14, 2017, a fuel truck operated by a supplier of JH Kelly

6    and for which JH Kelly was responsible, negligently struck a pressurized valve at the site.

7    Pursuant to the Subcontract, AECOM tendered the claim to JH Kelly for defense and indemnity,

8    but this claim has yet to be resolved by JH Kelly or its insurer. The valve damage also shut

9    down work at the site and had a detrimental impact on the progress of work for several days.

10   AECOM is entitled to indemnity and defense, and has a right to offset such amounts from the

11   amounts claimed by JH Kelly against AECOM.

12   **Insufficient Staffing**

13   141.    JH Kelly failed to provide adequate staffing to ensure proper supervision and

14   efficient performance of its work. This included on site supervision/construction management

15   as well as inadequate safety oversight personnel. In particular, PG&E often complained of JH

16   Kelly's supervision, or lack thereof, and its poor safety performance. As a result, AECOM

17   incurred costs to provide additional staff to support the work.

18   **Failure to Cooperate**

19   142.    The Subcontract requires JH Kelly to cooperate with AECOM in presenting and

20   prosecuting its claims for damages for extra work and delays caused by the actions of PG&E,

21   which requirements are set forth in more detail *supra* at ¶¶111, and 135-137. But JH Kelly has

22   routinely refused to comply with its contractual requirements and insists on prosecuting such

23   claims solely against AECOM. (*See, e.g.,* JH Kelly Compl. ¶¶5, and 25-77). In particular, JH

24   Kelly has failed to provide the documentation required under the Subcontract to support its claim

25   for additional compensation (and as repeatedly requested by AECOM). This has directly

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER  **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                             701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 29          Seattle, WA 98104-7010
                                                                                              (206) 622-8020
Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
171 of 322

1  impaired AECOM's ability to present to PG&E JH Kelly's claims for additional compensation
2  related to PG&E conduct.

3      143.    JH Kelly's conduct is a breach of the Subcontract, as well as a violation of the
4  duty of good faith and fair dealing.

5                          **JH Kelly's Mechanic's Lien**

6      144.    On or about November 1, 2018, JH Kelly filed and recorded a Claim of
7  Mechanics Lien ("Claim of Lien") in Shasta County asserting a claim against PG&E's interest
8  in the Project, including the real property in Burney, California on which it is located, claiming
9  $15,881,776.21, plus interest, which it has described as the amount representing "the principal
10  unpaid balance then owed to JH Kelly for the Project, excluding additional damages for schedule
11  and productivity impacts."

12      145.    On information and belief, JH Kelly willfully overstated the Claim of Lien was
13  willfully overstated by JH Kelly, including amounts that were subject to lien waivers executed
14  by JH Kelly, and amounts that are not lienable under California law, in an effort to obtain
15  leverage against AECOM. Such conduct constitutes a breach of contract and a breach of its duty
16  of good faith and fair dealing.

17                      **IV.    FIRST CAUSE OF ACTION**

18                          **(Breach of Contract)**

19      146.    AECOM realleges and incorporates by reference herein its prior allegations set
20  forth in paragraphs 102-145 above.

21      147.    AECOM has performed all of its material obligations required by the terms and
22  conditions of the Subcontract.

23      148.    JH Kelly has failed to perform all of its material obligations required by the
24  terms and conditions of the Subcontract. JH Kelly's breaches of the Subcontract include, but
25  are not limited, to the following:

26

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                              701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **30**                Seattle, WA 98104-7010
                                                                                      (206) 622-8020
Case 19-90088   Doc# 5651   Filed 02/05/20   Entered 02/05/20 19:30:45   Page 30 of
172

a.    **Valve Strike**: On or about October 14, 2017, a fuel truck operated by a supplier of JH Kelly and for which JH Kelly was responsible negligently struck a pressurized valve at the Project site. AECOM tendered the claim to JH Kelly for defense and indemnity. In breach of its contract, JH Kelly has not defended or indemnified AECOM in relation to this claim. On December 21, 2017, PG&E advised AECOM that it was withholding $777,701.91 for costs related to this damage. AECOM incurred an additional $27,705 in costs as a result of the valve strike.

b.    **Painting Scope**: The Subcontract Standard Terms and Conditions Section 1.1.1 requires JH Kelly to "provide all construction and other aspects of the Work consistent with the Contract Documents…" JH Kelly was also required to notify AECOM of any conflicts or ambiguities in the Contract Documents, or omitted or misdescribed work. (Standard Terms and Conditions Sections 1.1.1, 1.4.1, 1.4.2 and 2.17.1). The Project Specific Information Article 17 clearly states that JH Kelly is required to "[p]aint and coat the equipment, piping and related mechanical equipment in accordance with the requirements stated in Attachment 11 of this Specification." The Detailed Specification required JH Kelly to "Paint all above ground pipe and buildings." (*See,* Project Specific Information, Detailed Scope Paragraph 18 Miscellaneous Station Upgrades). The specification for the paint is included in the contract documents in the scope of work paragraph 4.6.17 (Painting and Coatings) and is based on the relevant PG&E Specifications (PG&E E-30 Selecting and Applying Coatings on Exposed Gas Piping; and PG&E E-31 Rev.00: Specifications for Application of Protective Coating to Meters, Regulators, Valve and Connected Piping). AECOM made demand to JH Kelly to complete this work on multiple occasions. In breach of its contract, JH Kelly refused to paint certain existing

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                              701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **31**            Seattle, WA 98104-7010
                                                                                                          (206) 622-8020

Case: 19-30088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
173 of 322

buildings and piping on the Project. As a result of JH Kelly's breach of contract, AECOM incurred $374,017 to perform this painting scope.

c. **Delay**. Pursuant to the Subcontract, JH Kelly agreed that "time is of the essence." JH Kelly further agreed under Article 5.4.4 of the Subcontract that it would "compensate and indemnify [AECOM] for all costs and expenses arising from such delay, including any and all costs incurred by the Owner, and/or any liquidated damages or other damages that Owner may assess against Design-Builder which are attributable to Subcontractor or anyone for whom Subcontractor is responsible pursuant with Specific Conditions Section 5.7." JH Kelly breached these obligations by failing to adequately staff the job, prosecute the work in a safe and efficient manner, adjust its work flow within its own means and methods, and perform the work free from defects. As a result, AECOM incurred additional costs and expenses related to such JH Kelly caused-delay. In addition, as the Project was not completed on the date originally planned, PG&E has withheld liquidated damages in the amount of $1.5 million from AECOM. Pursuant to the terms of the Subcontract, JH Kelly's liability for such liquidated damages is $750,000.

d. **Defective or Incomplete Work**. JH Kelly breached its obligation to "perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Document and the project Schedule." (Article 2.3.1). It also agreed that "[i]n the event of any inconsistency, conflict or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness." (Article 1.4.2). JH Kelly's refusal to perform in scope work, its deficient performance of work, including leaking water pipe, deficient pipe

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **32**

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-30088    Doc# 5651    Filed 02/05/20    Entered 02/05/20 19:30:45    Page 3 of
174 of 322

coatings that failed PG&E's field quality testing, and its violations of safety rules and requirements are breaches of JH Kelly's contractual obligations. JH Kelly has also breached the Subcontract by failing to perform or defectively performing other items of work, including but not limited to, the following:

   i)   Heat tracing;

   ii)  Door repairs;

   iii) Incomplete placement of rock/gravel;

   iv)  Omission of vapor barriers;

   v)   Installation of a well pump with incorrect voltage;

   vi)  Solar rework to realign the compressor;

   vii) Balancing the compressor building exhaust louvers;

   viii) Installing out of spec concrete in the Compressor Building slab foundation; and

   ix)  Demobilization of equipment, trailers and temporary power.

   e.   **Failure to Follow Subcontract Claim and Disputes Provisions**. JH Kelly also breached its express obligation to follow the dispute resolution procedures as set forth in the Subcontract and cooperate in the presentation and prosecution of its claims against PG&E.

149.   As a result of JH Kelly's breaches, AECOM has incurred damages in an amount to be proven at trial.

## V.   SECOND CAUSE OF ACTION

### (Breach of Express Covenants of Good Faith and Fair Dealing)

150.   AECOM re-alleges and incorporates by reference herein its prior allegations set forth in paragraphs 102-149 above.

151.   Pursuant to Article 1.5.1 of the Subcontract, JH Kelly agreed "to cooperate fully" with AECOM and "proceed on the basis of trust and good faith, to permit [AECOM] to

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 33

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-30088   Doc# 5651-1   Filed 02/05/20   Entered 02/05/20 19:30:45   Page
175 of 322

realize the benefits afforded under the Contract Documents." JH Kelly also agreed that "[i]n the event of any inconsistency, conflict or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness." (Article 1.4.2).

152.    JH Kelly has breached this covenant by interfering with AECOM's efforts to manage and timely complete the Project; by interfering with AECOM's relationship with PG&E; by failing to perform all contractual obligations necessary for AECOM to meet its obligations to PG&E; by failing to timely address and respond to request for complete documentation; by failing to negotiate in good faith or provide full documentation to AECOM on pending claims or change orders; by improperly asserting that AECOM failed to meet its obligations under the EPC Agreement or Subcontract; by inaccurately asserting that AECOM caused it to incur costs that were actually the product of acts or omissions of PG&E, all in an effort to improperly blame AECOM and/or avoid the contractual dispute resolution process; and by pursuing duplicitous litigation and claim splitting in order to avoid the contractual dispute resolution process.

153.    As a result of JH Kelly's breaches of its express covenants of good faith and fair dealing, AECOM has incurred damages in an amount to be proven at trial.

## VI.    THIRD CAUSE OF ACTION
### (Breach of Implied Covenant of Good Faith and Fair Dealing)

154.    AECOM re-alleges and incorporates by reference herein its prior allegations set forth in paragraphs 102-153 above.

155.    In addition to the foregoing express covenants of good faith and fair dealing contained in the Subcontract, the obligation of good faith and fair dealing is also implied in the Subcontract.

156.    JH Kelly has breached this covenant by interfering with AECOM's efforts to manage and timely complete the Project; by interfering with AECOM's relationship with PG&E; by failing to perform all contract obligations necessary for AECOM to meet its obligations to

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 34

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case 19-80088   Doc# 1651   Filed 02/05/20   Entered 02/05/20 19:30:45   Page 3 of 176

PG&E; by failing to timely address and respond to issues; by failing to negotiate in good faith with AECOM on pending claims or change orders construction; by improperly asserting that AECOM failed to meet its obligations under the EPC Agreement or Subcontract; by inaccurately asserting that AECOM caused it to incur costs that were actually the product of acts or omissions of PG&E in an effort to improperly blame AECOM and/or avoid the contractual dispute resolution process; and by pursuing duplicitous litigation and claim splitting in order to avoid the contractual dispute resolution process.

157.    As a result of JH Kelly's breaches of the implied covenant of good faith and fair dealing, AECOM has incurred damages in an amount to be proven at trial.

## VII.    FOURTH CAUSE OF ACTION
### (Negligence)

158.    AECOM realleges and incorporates by reference herein its prior allegations set forth in paragraphs 102-157 above.

159.    JH Kelly failed to perform its work with the skill and care reasonably expected of a similarly situated contractor, by failing to perform work without defects, failing to perform work in a safe manner and failing to complete the work (including but not limited to the work identified in Counterclaim paragraphs 138-146).

160.    As a result of JH Kelly's negligent acts, errors and omissions, AECOM has incurred damages in an amount to be proven at trial.

## VIII.    FIFTH CAUSE OF ACTION
### (Express Indemnity)

161.    AECOM realleges and incorporates by reference herein its prior allegations set forth in paragraphs 102-160 above.

162.    Pursuant to Article 11.4.1 of the Subcontract, JH Kelly agreed to "indemnify, hold harmless and defend [PG&E], [AECOM] . . . from and against any and all causes of action demands, claims, losses, damages, and liabilities whatsoever, including attorneys' fees and expenses, including but not limited to, claims for . . . property damage or destruction resulting

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER
TO COMPLAINT, AFFIRMATIVE DEFENSES AND
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 35

**CARNEY BADLEY SPELLMAN, P.S.**
701 Fifth Avenue, Suite 3600
Seattle, WA 98104-7010
(206) 622-8020

Case: 19-80088_1 Doc# 5651-1 Filed: 02/05/20 Entered: 02/05/20 19:30:45 Page
177 of 322

1  from the acts, errors or omissions of [JH Kelly], Sub-Subcontractors, anyone employed directly

2  or indirectly by any of them or anyone for whose acts any of them may be liable.

3  163.    As a result of this incident, PG&E advised AECOM that it was withholding

4  $777,701.91 for costs related to this damage.  AECOM incurred an additional $27,705 in costs

5  caused by the valve strike.  PG&E has withheld payments to AECOM and has alleged additional

6  costs related to the valve strike and for other deficient or defective work as more fully described

7  in this Answer and Crossclaim (including but not limited to the work identified in Counterclaim

8  paragraphs 138-146).  PG&E also has refused to pay AECOM any further amounts owed under

9  the EPC Agreement and has stated that the non-payment is in part due to JH Kelly's overstated

10  Claim of Lien and incomplete and/or defective work (including, but not limited to, missing

11  protective coatings on gas pipe, water leaks, and defective pavement).

12  164.    As a result of JH Kelly's negligent acts, errors and omissions, AECOM has

13  incurred damages and continues to incur damage to which it is entitled to be indemnified,

14  defended and held harmless by JH Kelly.

15  ### IX.    SIXTH CAUSE OF ACTION

16  ### (Equitable Indemnity)

17  165.    AECOM realleges and incorporates by reference herein its prior allegations set

18  forth in paragraphs 102-164 above.

19  166.    PG&E has withheld payments to AECOM and has alleged additional costs

20  related to the valve strike and for other deficient or defective work as more fully described in

21  this Answer and Crossclaim.  PG&E also has refused to pay AECOM any further amounts owed

22  under the EPC Agreement and has stated that the non-payment is in part due to JH Kelly's

23  overstated Claim of Lien and incomplete and/or defective work (including, but not limited to,

24  missing protective coatings on gas pipe, water leaks, and defective pavement).  PG&E's non-

25  payment and withholdings due to failures of JH Kelly to meet its obligations under the

26  Subcontract have caused damage to AECOM, and JH Kelly is responsible to compensate

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER  **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                                    701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **36**          Seattle, WA 98104-7010
                                                                                                            (206) 622-8020

Case 3:19-cv-00088_1.docx Doc# 5651 Filed 02/05/20 Entered 03/20/52019:30:45 Page 36 of
178 of 322

1 | AECOM for the same to the extent that such amounts are not specifically covered by JH Kelly's

2 | express indemnity obligations.

3 | **X.    RESERVATION OF RIGHTS**

4 | 167.    AECOM specifically reserves its right to amend this Counterclaim, as of right

5 | or with leave of Court, for the purpose of amending the allegations contained herein and/or

6 | asserting additional facts and causes of action as appropriate.

7 | **RELIEF REQUESTED**

8 | WHEREFORE, AECOM prays for the following relief:

9 | 1.    For dismissal with prejudice of all claims and causes of action asserted by JH

10 | Kelly.

11 | 2.    For judgment for AECOM on its Counterclaim in an amount to be proven at

12 | trial.

13 | 3.    For a determination of its right to defense and indemnity for certain sum in an

14 | amount to be proven at trial.

15 | 4.    For an award of AECOM's costs and attorneys' fees as provided for by contract

16 | or allowed by law.

17 | 5.    If PG&E, which is an indispensable party, is not made a party to this action, this

18 | action should be dismissed or stayed until such time as PG&E can be made a party.

19 | 6.    For all such other relief as the Court deems just and equitable.

20 |

21 |

22 |

23 |

24 |

25 |

26 |

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                    701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - 37         Seattle, WA 98104-7010
                                                          (206) 622-8020

DATED this 18th day of March, 2019.

CARNEY BADLEY SPELLMAN, P.S.

By: _____
C. Scott Penner (SBN 124826)

and

REED SMITH LLP
Marsha A. Houston (SBN 129956)
Christopher O. Rivas (SBN 238765)

*Attorneys for Defendant AECOM Technical Services, Inc.*

DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER   **CARNEY BADLEY SPELLMAN, P.S.**
TO COMPLAINT, AFFIRMATIVE DEFENSES AND                          701 Fifth Avenue, Suite 3600
COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC - **38**             Seattle, WA 98104-7010
                                                                              (206) 622-8020

AEC002-0006 5717295.docx

Case: 19-80088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 38 of
180 gb322

# CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is REED SMITH LLP, 355 South Grand Avenue, Suite 2900, Los Angeles, CA 90071.

I hereby certify that on March 18, 2019, I caused to be electronically filed the foregoing document with the Clerk of the Court for the United States Bankruptcy Court, Northern District of California, San Francisco Division using the appellate CM/ECF system. I also served the document to be served by the method indicated below to each of the parties listed below:

**DEFENDANT AECOM TECHNICAL SERVICES, INC.'S ANSWER TO COMPLAINT, AFFIRMATIVE DEFENSES AND COUNTERCLAIM AGAINST PLAINTIFF JH KELLY, LLC**

☒ by placing the document(s) listed above in a sealed envelope(s) and consigning it to an express mail service for guaranteed delivery on the next business day following the date of consignment to the address(es) set forth below.

Eric A. Grasberger
Mario R. Nicholas
STOEL RIVES LLP
760 SW Ninth Avenue, Suite 3000
Portland, OR 97205

David B. Levant
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702

*Attorneys for JH Kelly, LLC*

Stephen Karotkin
Jessica Liou
Matthew Goren
Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153

Tobias S. Keller
Keller & Benvenutti LLP
650 California Street, Suite 1900
San Francisco, CA 94108

*Attorneys for Debtor*

I declare under penalty of perjury under the laws of the United States that the above is true and correct. Executed on March 18, 2019, at Los Angeles, California.

/s/ Christopher O. Rivas
Christopher Rivas

REED SMITH LLP
A limited liability partnership formed in the State of Delaware

— 1 —

CERTIFICATE OF SERVICE

US_ACTIVE-145849711.1

# EXHIBIT 6

1  C. Scott Penner (SBN 124826)
   CARNEY BADLEY SPELLMAN, P.S.
2  701 5th Avenue, Suite 3600
   Seattle, WA 98104
3  Tel: 206.622.8020 / Fax: 206.467.8215

4  Marsha A. Houston (SBN 129956)
   Christopher O. Rivas (SBN 238765)
5  REED SMITH LLP
   355 South Grand Avenue, Suite 3900
6  Los Angeles, CA 90071-1514
   Tel: 213.457.8000 / Fax: 213.457.8080

7
   Attorneys for
8  AECOM Technical Services, Inc.

9                    **UNITED STATES BANKRUPTCY COURT**

10          **NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION**

11
    In re                                    Bankruptcy Case No. 19-30088 (DM)
12
    PG&E CORPORATION                          Chapter 11
13
       - and -                               (Lead Case)
14
    PACIFIC GAS AND ELECTRIC                  (Jointly Administered)
    COMPANY,
15
              Debtors.
16  ─────────────────────────────────────
    JH KELLY, LLC, a Washington limited      Adversary Case No. 19-03008 (DM)
    liability company,
17
              Plaintiff and Counter-Defendant,
18
                      v.
19
    AECOM TECHNICAL SERVICES, INC., a
    purported California corporation, and DOES
20  1 through 10, inclusive,

              Defendants and Counter-Claimants.
21  ─────────────────────────────────────
22  AECOM TECHNICAL SERVICES, INC., a        Adversary Case No. 19-03008 (DM)
    California Corporation,
23                                            **DEFENDANT AECOM TECHNICAL**
              Third-Party Plaintiff(s),       **SERVICES, INC.'S THIRD PARTY**
24                                            **COMPLAINT AGAINST PACIFIC GAS**
                      v.                       **AND ELECTRIC COMPANY**
25  PACIFIC GAS AND ELECTRIC
    COMPANY,
26
              Third-Party Defendant.
27

28

                                   – 1 –                    US_ACTIVE-145960374.1-CORIVAS

Defendant and Third-Party Plaintiff, AECOM Technical Services, Inc., by and through its undersigned counsel, files this Third-Party Complaint pursuant to Fed. R. Bank. Pro. 7001, Fed. R. Civ. Pro 14, and Fed R. Civ. Pro. 19 to join Pacific Gas & Electric Company ("PG&E"), which is a necessary and indispensable party, to this action and alleges the following in support of the requested relief:

## I.    JURISDICTION AND VENUE

1.    On January 29, 2019, PG&E filed voluntary Chapter 11 petition in this Court.

2.    This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(b)(1), 1334(b), and § 7001(3).

3.    This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (K) and (O).

4.    Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.    THE PARTIES

5.    Third-Party Plaintiff AECOM Technical Services, Inc. ("AECOM") is a California corporation with its principal place of business located at 300 South Grand Avenue, Los Angeles, California.  AECOM is a duly licensed contractor in the State of California under Contractors State License Board License No. 641639.

6.    Third-Party Defendant PG&E is a California corporation with its principal place of business located at 77 Beale Street, San Francisco, California.  PG&E is also the owner of the real property on which the improvements were constructed and that give rise to all of the facts and circumstances that JH Kelly complains of in this adversary proceeding against AECOM (the "Complaint") and the facts and circumstances relevant to AECOM's Answer, Affirmative Defenses and Counterclaim and this Third-Party Complaint.

## III.    INTRODUCTION

7.    This is a three-party dispute between PG&E, AECOM and JH Kelly.  PG&E engaged AECOM as its prime contractor to design, procure and construct a replacement compressor station (the "Burney Station") servicing PG&E's natural gas transmission pipelines (the "Project").  AECOM, in turn, engaged JH Kelly to construct the Project.

8. The Burney Station is one of nine gas compressor stations that compress and transmit natural gas through PG&E's pipelines that serve approximately 4.2 million customers from Bakersfield, California to the southern Oregon border.

9. PG&E and AECOM (as prime contractor) are parties to an Engineering, Procurement and Construction of Natural Gas & Electric Transmission Facilities Agreement (the "EPC Agreement"). A true and correct copy of the EPC Agreement is attached hereto as **Exhibit 1**. AECOM and JH Kelly (as subcontractor) are parties to a subcontract (the "Subcontract").

10. Under the EPC Agreement, AECOM agreed to design and construct the Burney Station and to procure certain materials and equipment. Under the Subcontract, AECOM assigned its construction obligations to JH Kelly.

11. Based upon PG&E's description of the Project, AECOM and JH Kelly initially expected the design would be complete in time for construction to commence in October 2016. The parties planned for a break in the construction from November 2016 through February 2017,[1] during which time JH Kelly would perform certain work off-site, for the construction. Construction would then re-commence on site in March 2017 and the Project would be fully complete by December 1, 2017.

12. At the core of JH Kelly's Complaint are claims to recover cost overruns stemming from considerable delays and interference with the construction caused by perpetual and arbitrary changes to the scope of the Project. The Project was not completed until **more than a year later than expected**, on January 11, 2019, due, in part, to PG&E's interference in the design and construction of the Project.

13. JH Kelly's Complaint tells only half of the story, however. JH Kelly fails to mention that PG&E – not AECOM – bears responsibility for these changes. When PG&E solicited bids for the Project it provided a design basis for the Burney Station and stated an intent that there would be a "minimum" of design changes. After AECOM and PG&E entered into the EPC Agreement, PG&E immediately rejected the design upon which AECOM (and JH Kelly) had bid the work and thereafter

---

[1] A break that PG&E recognized was necessary in light of historically bad winter conditions in Burney: a remote location in the Sierra Nevadas of Northern California.

continued to revise the design, causing AECOM (and JH Kelly) to suffer substantial cost overruns and delays.

14. These changes included, but are not limited to, ongoing changes to the electrical design (including a complete overhaul of the design when it was supposed to be complete); a fundamental change to the "control philosophy" (i.e., how the compressor station is controlled and operated); changes to building designs (e.g., expanding the footprint and layout of the auxiliary building that houses the control center for Burney Station); and the addition of structures (e.g., the hazardous materials storage building).

15. These changes were almost completely unnecessary in terms of the functioning of the Burney Station, and were dictated (over the objections of AECOM) by PG&E, who arbitrarily decided to abandon the original design basis in exchange for a state of the art compressor station that was not at all contemplated by the EPC Agreement.

16. To make matters worse, although PG&E demanded these changes to the scope of the Project, PG&E refused AECOM's requests for additional compensation and extensions to the construction schedule necessary to address PG&E's considerable changes. The delays resulting from these changes prevented the Project from being completed by December 1, 2017 (and before the 2017/18 winter), at which time PG&E refused to suspend work until spring. PG&E also demanded AECOM increase the workforce and work overtime to "recover" the schedule. Thus, AECOM and JH Kelly were forced to work through the harsh winter season at an accelerated rate, increasing the time, cost and safety risk of performance.

17. PG&E's refusal to compensate AECOM (and its subcontractors) for the increased costs and delays it caused directly impaired AECOM's relationship with its subcontractors, including JH Kelly. And even when PG&E did approve payment for changes it demanded to the Project, it routinely failed to pay for those changes in a timely manner despite the absence of any controversy over AECOM's (or its subcontractors') entitlement to payment.

18. PG&E also repeatedly failed to timely pay AECOM amounts owed under the EPC Agreement. While the EPC Agreement contemplated that AECOM would receive monthly "progress payments" as the work progressed, and that PG&E would approve and issue "change orders" for

- 4 -

Case: 19-30088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 4 of
Case: 19-30088   Doc# 1951   Filed: 03/22/19   Entered: 03/22/19 23:23:19   Page 4 of
186 of 822

AECOM's increased costs resulting from PG&E's changes to the work, PG&E repeatedly ignored these payment obligations. Instead, PG&E continually and improperly withheld amounts it owed to AECOM, failing to pay approved and undisputed change orders, and chronically issued late progress payments (typically after threatening improper withholdings). Today, PG&E threatens in excess of $3 million dollars in withholdings.

19. In sum, the core breaches and contractual violations described in JH Kelly's Complaint are the direct consequence of PG&E's actions. Given PG&E's central role in the Project, there is simply no practical way that any dispute regarding this Project can be adjudicated without PG&E's involvement. It is not only impractical, it is nearly impossible for AECOM and JH Kelly to resolve any dispute between themselves without PG&E participating in discovery and litigation. On that basis, as well as the grounds pled herein, AECOM joins PG&E as a third-party defendant to this suit.

## IV. FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

### A. Project Bidding and Bidding and Award of the EPC Agreement to AECOM

20. AECOM has a long history of performing engineering and construction work for PG&E. This relationship with PG&E and the resulting work has been very important to AECOM. Because of the relationship, PG&E solicited a competitive bid from AECOM by way of a Request for Proposal ("RFP") to reconstruct the aging and outdated Burney Station.

21. The RFP included all of the information (provided by PG&E) upon which bidders were supposed to rely in preparing their bids. In the RFP package, PG&E provided the preliminary design basis for the replacement compressor station (commonly referred to as the "30% design") and claimed that a "minimum of changes [would] be made to the existing 30% Design Deliverables."

22. AECOM prepared and submitted its bid for the Project in reliance on the RFP package.

23. PG&E ultimately awarded the Project to AECOM and a kick-off meeting was held on January 19, 2016.

24. On or about February 11, 2016, AECOM and PG&E officially executed the EPC Agreement for a lump sum price of $40,510,262.

25. JH Kelly and AECOM entered into the Subcontract on or about October 21, 2016.

CARNEY BADLEY SPELLMAN, P.S.

26.     The EPC Agreement specifically contemplated that AECOM would be compensated for the increased costs of delivering the Project where such costs were due to the conduct of PG&E or outside of AECOM's control. The Agreement also contemplated that AECOM would be entitled to additional time and overhead costs for owner-caused delays.

27.     Per the EPC Agreement, AECOM was to be substantially complete with the design of the replacement compressor station by November 7, 2016 and substantially complete with construction just over a year later on November 17, 2017.

**B.     Exemplar PG&E Changes to Design**

**1.     Initial Changes to the Electrical Design**

28.     From the very outset of the Project, PG&E disregarded its own stated intent to keep design changes to a "minimum."

29.     Starting at the "kick-off" meeting that occurred on or about January 19, 2016, PG&E told AECOM that comments to PG&E's 30% electrical design were "omitted" from the RFP and would be forthcoming.

30.     AECOM did not receive the comments until a month later, on February 16, 2016. The "comments" were not "minimum" changes, but required AECOM to entirely scrap the electrical design upon which AECOM bid the Project and to develop an electrical design from scratch.

31.     By August 6, 2016, nearly a year after AECOM had bid the Project, PG&E still had not settled on the fundamental concept for the electrical design. This was so even though the design of the compressor station, per the EPC Agreement, was to be near complete by November 7, 2016.

32.     PG&E's changes pushed out the completion of the electrical design and substantially increased design hours. Accordingly, PG&E agreed to extend AECOM's deadline to complete engineering from November 7, 2016 to January 15, 2017.

33.     However, as a result of the continuing redesign of the electrical (due to no fault of AECOM), this deadline was further extended, ultimately to February 24, 2017.[2]

---

[2] PG&E also continued the date by which the electrical design would be completed by AECOM to accommodate the fact that PG&E selected to purchase a different motor control center than originally planned but refused to agree on a price for the equipment thereby delaying incorporation of the equipment's requirements into the electrical design.

-6-

Case: 19-30088    Doc# 5651    Filed: 02/05/20    Entered: 02/05/20 20:45    Page 6 of
188 of 322
Case: 19-30088    Doc# 1551-1    Filed: 03/22/19    Entered: 03/22/19 23:19:00    Page 6 of

## 2. PG&E's Last Minute Overhaul of the Electrical Design

34. On February 8, 2017, just about two weeks before AECOM was to be complete with the electrical design, PG&E requested a preview of the near finished design (referred to JH Kelly's Complaint as the "IFC Electrical"), which AECOM provided.

35. Then, on or about February 14, 2017, less than a month before JH Kelly was preparing to mobilize at the Project site to begin construction of the replacement compressor station, PG&E demanded another overhaul of the electrical design. The vast majority of changes were not due to any design issues of AECOM. Specifically, PG&E introduced "resiliency"[3] in the design. This involved: maximizing the extent to which conduit was placed underground rather than above ground; increasing the amount of underground conduit; increasing the design ambient temperature, which thereby reduced the amount of current the conductors would be permitted to carry; and changing the depth for below grade conduit, which resulted in increased excavation work and encountering much more rock or boulders.

36. These late changes ultimately increased the total number of conduits, (as well as the amount of underground conduit) and resulted in almost four times the number of electrical pulls. All of this had direct impacts on the scope and cost of the work and the time it took to build the replacement compressor station. These changes also created unanticipated conflicts with existing underground utilities, some of which were not identified on the as built drawings supplied by PG&E.

37. Such changes so late in a project are contrary to accepted practice. A concept like "resiliency" is a design philosophy that should be introduced early in a project. It is standard industry practice to establish design criteria prior to the start of detailed engineering and design activities and seldom is such criteria changed even after the preliminary design basis has been developed, much else when the design is near complete. It was not reasonable nor necessary for PG&E to introduce a new design philosophy (i.e., "resiliency"), especially one that was preferential and not consistent with the original scope of work.

---

[3] "Resiliency" as used here is the concept of creating redundancy to reduce the risk of catastrophic failure in the electrical system.

CARNEY BADLEY SPELLMAN, P.S.

CARNEY BADLEY SPELLMAN, P.S.

38.     AECOM promptly advised PG&E that the changes would involve engineering rework, and would likely increase construction costs and delay the completion of the Project.

39.     PG&E still insisted on these preferential changes to the electrical design and, in an unprecedented move, installed its lead electrical engineer in AECOM's offices from March 13, 2017, to April 9, 2017, in order to effectuate the redesign.

40.     AECOM moved forward with the design and construction in good faith, understanding, based on the parties' conduct and past practices on this and other projects, that PG&E would compensate AECOM for the increased costs of design and construction, and provide an appropriate extension of the schedule to accommodate the impacts resulting from the requested design changes.

41.     AECOM's admonitions to PG&E came true.  The changes did in fact impact completion of the Project.  For example, the changes delayed the start of certain construction activities as follows:

- IFC Electrical for the compressor building was not released until April 7, 2017, delaying work that was anticipated to start in March 2017.
- IFC Electrical for the underground conduit (except for the auxiliary building[4]) was not released until May 5, 2017, delaying work that was anticipated to start in March 2017.
- IFC Electrical for the "plant above ground, equipment & sections" was not released until May 18, 2017, interrupting the planning and sequencing of construction.
- IFC Electrical for the underground conduit for the auxiliary building was not released May 22, 2017, which delayed the excavation and fabrication of conduit.
- IFC Electrical for the lighting power distribution was not released until May 26, 2017, interrupting the planning and sequencing of construction.
- IFC Electrical for the connection diagrams/schematics was not released until August 3, 2017, interrupting the planning and sequencing of construction.

---

[4] The Auxiliary building houses several essential components of the project, including the motor control center and the standby electrical generator.  It is essentially the brains of the Burney Station while the Compressor building is the brawn.

Case: 19-30088    Doc# 5651    Filed: 02/05/20    Entered: 02/05/20 19:00:45    Page 801 of
190 of 822

1    42.     In its Complaint, JH Kelly sums up the impact of the IFC Electrical redesign as follows:

2    "[D]elay in issuing the IFC Electrical, and the extensive changes to the IFC
     Electrical, fundamentally changed the timing, sequencing, and scope of JH Kelly's
3    work on the Project."

4    (Complaint at ¶34.)

5        **3.     PG&E's Failure to Address Its Impacts**

6        43.      In August and September 2017, AECOM continued to release IFC Electrical drawings

7    for construction while JH Kelly tried to progress construction of the replacement compressor station

8    in the field.

9        44.     The EPC Agreement originally contemplated that in August 2017, the old compressor

10   station would be permanently shut down and then decommissioned.   The EPC Agreement also

11   contemplated that the Project would be complete by December 1, 2017. The shutdown meant that the

12   Burney Station could not operate until substantial completion was achieved.

13       45.     By August 2017, it was evident that construction of the Project would not be done by

14   December 1, 2017 due to the impacts to construction resulting from PG&E's last-minute redesign of

15   the IFC Electrical.

16       46.     Thus, in August 2017 (and then again in September 2017), AECOM proposed that

17   PG&E delay the scheduled shutdown and decommissioning of the old compressor station and that

18   PG&E hit pause on construction during the winter months.   This proposal had several benefits.   First,

19   it would have ensured that the old compressor station remained operational during the winter months

20   when natural gas is in high demand by PG&E customers.   This was especially important given the

21   uncertainty around when the new, replacement compressor station would be constructed and

22   operational.   Second, it would have enabled AECOM, JH Kelly, and PG&E to suspend construction

23   while fully evaluating the impacts of PG&E's late design changes.   And finally, hitting pause during

24   the winter months would have avoided safety risks and inefficient working conditions commonly

25   associated with construction in winter weather (particularly in the Sierra Nevadas), as well as the

26   increased costs associated with such challenging conditions.

27

28

47. PG&E rejected this proposal and rejected all responsibility for delays, denying that any of its changes had somehow increased the scope of the Project. In doing so, PG&E failed to mitigate the losses resulting from its late-driven design changes.

48. PG&E also rejected AECOM's request for an extension of its substantial and final completion deadlines due to the impacts resulting from PG&E's changes to the IFC Electrical.

49. PG&E, instead, directed AECOM and JH Kelly[5] to use all efforts to accelerate the construction of the compressor station by the original planned dates (November 17, 2017 for substantial completion, and December 1, 2017 for final completion), while intimating that any delay in the delivery of the Project would have serious and irreparable financial consequences for PG&E and simply could not be tolerated.

50. And then, rather than compensate AECOM for the increased costs associated with the design, in December 2017, over AECOM's objection, PG&E imposed the first of two withholdings for $880,000 in liquidated damages due to 44 days of delay purportedly caused by AECOM and/or its subcontractors.

51. In its Complaint, JH Kelly asserts claims against AECOM for additional costs and delays that it alleges arise from these and other changes, and these changes forced it to perform out-of-sequence work, accelerate its work, adopt an overtime schedule, and work through the winter months in order to satisfy PG&E's direction to complete the work in accordance with the original schedule, none of which were contemplated by any of the parties at the time of contracting. (Complaint at ¶ 36.)

**4. PG&E Interference with Contractor Means and Methods**

52. PG&E also disrupted the Project by directing the means and methods by which AECOM and JH Kelly completed the excavation of trenches for gas piping and electrical conduit. This occurred most often in two areas of excavation. The first was in trenches for large bore pipe or valve nests. These excavations required wider and deeper trenches. PG&E refused to allow code

---

[5] JH Kelly likewise asserts, in its Complaint, that in September of 2017, it was required to "implement an accelerated schedule (the 'Accelerated Schedule') to compensate for the delays to the Project." JH Kelly further alleges that the Accelerated Schedule contemplated: a) the initiation of overtime for all labor; b) the requirement that JH Kelly work through the cold and wet winter period; and c) the addition of nightshifts for electricians. (Complaint ¶36).

CARNEY BADLEY SPELLMAN, P.S.

CARNEY BADLEY SPELLMAN, P.S.

compliant excavations, and instead forced AECOM to have JH Kelly dig larger trenches that were opened up and sloped in a manner far in excess of industry standards. PG&E also required AECOM to obtain third party engineering to approve the excavations. This was an unnecessary, onerous and time-consuming endeavor given that AECOM has licensed civil engineers on staff and required work that was beyond the requirements of the EPC Contract.

53.     PG&E also required AECOM and its subcontractor to use hydro-vacuum trucks or hand digging to perform significant amounts of excavation. The use of low-pressure water and suction excavation as compared to mechanical excavation is incredibly inefficient and time consuming. This is especially so given the pervasive existence of large rocks and boulders in Burney, a volcanic area. PG&E disregarded the impact on the equipment rental costs, added labor and time this required, and refused to allow conventional mechanical excavation throughout much of the site. This direction, and PG&E's ultimate refusal to pay for the added costs, was a direct contradiction of the information provided to bidders in the RFP and PG&E's response to questions, where PG&E specifically directed bidders to assume the use of mechanical excavation for bidding purposes and that PG&E would provide additional compensation where hand or hydro-vacuum was required.

**5.      Additional Project Delays and Impacts Caused by PG&E**

54.     In the end, PG&E imposed a large number of changes to the original scope of the Project, which impacted the entirety of the Project. The large number of changes, coupled with the late timing of significant changes, had a multiplying impact on the overall time and cost to complete the Project and undoubtedly changed the work required to complete the Project.

55.     PG&E has refused to acknowledge many of its changes and the impacts the changes had on the Project.

**C.      Delayed Payment of Invoices, Wrongful Withholdings, And Payments Owed for Increased Costs Caused by PG&E**

**1.      PG&E's Dilatory Change Order Processing Practices**

56.     For the duration of the Project, AECOM consistently provided PG&E with notice of the added costs and delays resulting from PG&E's design changes, increases to the scope of work, interference with the work, and deviations from the EPC Agreement. Indeed, AECOM submitted

nearly 300 requests for information ("RFIs") and over 150 proposed change orders ("PCOs") to PG&E.

57.     In addressing the RFIs and PCOs submitted by AECOM, PG&E wrongfully rejected costs that AECOM incurred as a result of PG&E's design changes, scope increases, and delays and interference with the work.  AECOM remains uncompensated for that work.

58.     Even when PG&E approved PCOs submitted by AECOM, PG&E routinely failed to pay the approved PCOs in a timely manner, despite no controversy over AECOM's entitlement to payment.

59.     Further, on multiple occasions, PG&E refused to pay AECOM for approved and performed change order work because AECOM declined (in exchange for payment to which it was already entitled) to waive all rights for additional compensation related to the work performed, including waiver of AECOM's rights to compensation and schedule extensions for costs and schedule impacts that could not yet be calculated.  Through this practice, PG&E effectively held approved change order amounts hostage.  By way of example, proposed Change Order 7 ("CO 7") for $4,142,761.23 has been held up base on this unreasonable PG&E position. In fact, in Change Order 6 ("CO 6") PG&E refused payment until AECOM agreed to limiting language which forced it to remove any items from that change order where there were costs that were not yet quantifiable or certain.

60.     In other instances, PG&E refused to acknowledge changes to which it had formally agreed.  Instead, in December of 2017, PG&E assessed liquidated damages against AECOM for failing to achieve substantial completion by November 17, 2017.  This was the first of two withholdings for liquidated damages imposed against AECOM.  PG&E provided no evidence (and still has not) to support the imposition of liquidated damages against AECOM.

61.     Additionally, numerous requests for additional compensation submitted by AECOM were simply never addressed by PG&E.

**2.     Withholding of Amounts Owed**

62.     After paying AECOM monthly through July 2017, PG&E stopped paying AECOM for several months, refused to acknowledge that changes it had directed had expanded the scope of work,

extended the duration of the Project, and when payments resumed, PG&E improperly withheld significant sums from the past due amounts owed.

63.     In addition to the liquidated damages of $1,500,000, PG&E also has withheld amounts for alleged property damage arising from a JH Kelly fuel supplier entering the job site and negligently running its loaded fuel truck into a live gas line, causing significant property damage and repair costs. However, the EPC Agreement specifically provided that any amounts withheld by PG&E for property damage would be withheld from the retainage amount.  PG&E ignored this and imposed over $800,000 in withholdings from progress payments owed to AECOM to cover its "estimated" property damage.

64.     Further, PG&E has continued to threaten to withhold additional amounts from payments owed to AECOM based on speculative or non-existent damages.  As a matter of practice, when progress payments and approved change order amounts become due, PG&E asserts withholdings equal to or in excess of the amount due, only relenting after AECOM notifies PG&E that the threatened withholdings are not supported by the EPC Agreement and in violation of California law.

**D.    Project Completion**

65.     Despite the many obstacles created by PG&E, on June 6, 2018, AECOM achieved substantial completion of the Project.  However, even though the Burney Station was commercially operational as of June 6, 2018, and only non-operational work remained, PG&E refused to acknowledge that AECOM had achieved substantial completion under the EPC Agreement.

66.     Thereafter, AECOM continued to perform punch-list work, as well as address warranty items that emerged, in order obtain PG&E's acknowledgment of substantial and final completion but PG&E continued to force AECOM to play whack-a-mole with PG&E's ever expanding punch list work by adding what was appropriately warranty work and items outside the EPC Agreement's scope of work. Nonetheless, AECOM achieved final completion and demobilized from the Project site on January 11, 2019, just two weeks before PG&E filed its Chapter 11 case.

**E.    Procedural History**

67.     On January 25, 2019, AECOM recorded a claim of lien against the Burney Station in the amount of $23,535,812.39, plus interest.

68. That same day, just four days before PG&E filed Chapter 11, JH Kelly commenced this action against AECOM in the Shasta County Superior Court, asserting claims of breach of contract, breach of implied warranty, breach of the implied covenant of good faith and fair dealing, quantum meruit, abandonment, and violation of California's prompt payment laws, alleging damages in the amount of $26,402,479.89. In its Complaint, JH Kelly alleged that it incurred damages as a result of design changes, delays, increased scope of work, and cost impacts that directly arise from the design changes (in particular, the IFC Electrical design changes), acts and omissions of PG&E enumerated above. Many of these costs are associated with changes imposed by PG&E that it has failed to pay, or are amounts that PG&E has withheld.

69. Consequently, on March 1, 2019, AECOM removed this action to the United States Bankruptcy Court for the Eastern District of California.

70. On March 8, 2019, the United States Bankruptcy Court for the Eastern District of California entered an order granting JH Kelly and AECOM's Stipulation Regarding Transfer of Venue of Removed Action, Deadlines, and Other Matters Relating to Removed Action and Anticipated Motion to Remand ("Order"), transferring venue of this action to this Court.

## FIRST CAUSE OF ACTION

### (Determination of Priority and Extent of AECOM's Valid Mechanics' Lien)

71. AECOM incorporates the allegations of paragraphs 7-70 above as if fully stated herein.

72. PG&E is the owner of real property and improvements commonly known as the Burney Station and generally located at 37667 Highway 299 Burney, California 96013, in Shasta County, California (the "Property").

73. On or around February 11, 2016, AECOM and PG&E entered into the EPC Agreement, pursuant to which AECOM, as general contractor, agreed to design, supply and construct the Burney K2 Replacement Project on the Property for a lump sum price of $40,510,262.

74. Pursuant to the EPC Agreement, AECOM furnished labor and services to PG&E for the Burney K2 Replacement Project, a work of improvement on the Property, and supplied materials

CARNEY BADLEY SPELLMAN, P.S.

CARNEY BADLEY SPELLMAN, P.S.

1  and equipment to PG&E for installation at the Property, which were then incorporated into the

2  Property.

3      75.    On January 25, 2019, after AECOM completed its performance of the EPC Agreement,

4  and after furnishing all labor, services, materials and equipment for the Burney K2 Replacement

5  Project on the Property, AECOM filed and recorded a claim of mechanics' lien ("Claim of Lien")

6  against the Property with the Shasta County Assessor-Recorder, which was recorded in the official

7  records of Shasta County as document no. 2019-0002196.  A true and correct copy of the Claim of

8  Lien is attached hereto as **Exhibit 2**.

9      76.    In its Claim of Lien, AECOM asserted a mechanics' lien in the amount of

10  $23,535,812.39, plus interest, which represents the principal unpaid balance then owed to AECOM

11  under the EPC Agreement for the direct costs to complete the Project.

12      77.    AECOM is entitled to the principal sum of $23,535,812.39, plus interest, which is the

13  reasonable value of the labor, services, materials, and equipment furnished by AECOM to PG&E for

14  the labor and materials use in the Burney K2 Replacement Project on the Property, less all payments

15  made to date.

16      78.    These amounts do not include indirect damages, but reflect the actual costs incurred by

17  AECOM to complete base contract and changed work directed by PG&E, including but not limited

18  to, added engineering costs, added field labor, construction management, project management, site

19  safety, and additional manpower.

20      79.    AECOM has satisfied all notice requirements provided in the California Civil Code.

21      80.    AECOM asserts that it holds a valid security interest in and lien on the Property.

22      81.    AECOM is entitled to an order and/or judgment that it holds a duly perfected first-

23  priority lien and security interest on the Property.

24

25                          **SECOND CAUSE OF ACTION**

26                              **(Breach of Contract)**

27      82.    AECOM incorporates the allegations of paragraphs 7-81 as if fully stated herein.

28      83.    AECOM has performed all of the conditions and requirements of the EPC Agreement.

84.    PG&E has breached the EPC Agreement, including but not limited to: the breaches set for the in the preceding paragraphs, failing to process change orders, denying proposed change orders, improperly denying request for schedule extension, refusing to acknowledge agreed to schedule extensions, improperly imposing liquidated damages and other withholdings, and failing to pay amounts owed to AECOM in accordance with the terms of the EPC Agreement and California law.

85.    As a result of PG&E's breaches, AECOM has suffered damages in an amount to proven at trial, plus interest, penalties, attorneys' fees and costs, to the extent allowable by law.

### THIRD CAUSE OF ACTION

### (Breach of Implied Warranty of Adequacy of Plans and Specifications)

86.    AECOM incorporates the allegations of paragraphs 7-85 as if fully stated herein.

87.    Through its RFP and the EPC Agreement, PG&E represented that it would provide a 30% design for the Project and that only a minimum amount of changes to the design should be expected. Further, at the time PG&E accepted AECOM's proposal and awarded the EPC Agreement to AECOM, PG&E impliedly warranted the adequacy, sufficiency, and completeness of the plans and specifications for purposes of bidding, designing and constructing the Project.

88.    The plans, specifications, drawings, and other design documents and information provided to AECOM were in fact inadequate, inaccurate, and incomplete. Moreover, PG&E failed to timely remedy the defective plans and specifications, and in fact imposed a large number of changes to the represented basis for the design throughout the Project, all of which constitute material and substantial breaches of the implied warranty of the adequacy of plans and specifications.

89.    As a direct and foreseeable result of PG&E's breach of the implied warranty of the adequacy of plans and specifications, AECOM incurred significant increased costs and delays in performing its obligations under the EPC Agreement, resulting in damages in an amount to be proven at trial.

CARNEY BADLEY SPELLMAN, P.S.

CARNEY BADLEY SPELLMAN, P.S.

**FOURTH CAUSE OF ACTION**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

90.    AECOM incorporates the allegations of paragraphs 7-89 as if fully stated herein.

91.    Implied in the EPC Agreement is a covenant of good faith and fair dealing, which requires PG&E to refrain from any action that would impair the benefits that AECOM has a right to expect from the EPC Agreement.

92.    PG&E breached the implied covenant of good faith and fair dealing by its conduct, including but not limited to,  making substantial and untimely electrical design changes, failing to properly address AECOM's claims for extra compensation and time extensions via change orders, failing to timely pay approved and undisputed change order work, refusing to recognize AECOM's achievement of project milestones, untimely payment of amounts owed, prematurely and improperly assessing liquidated damages, forcing AECOM to complete the Project while failing itself to comply with the EPC Agreement, threatening AECOM with damages and failing to participate in the dispute resolution process required by the EPC Agreement.

93.    As a direct and foreseeable result of PG&E's breach of the implied covenant of good faith and fair dealing, AECOM incurred damages in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**

**(Negligent Misrepresentation)**

94.    AECOM incorporates the allegations of paragraphs 7-93 as if fully stated herein.

95.    PG&E prepared and issued the RFP for business purposes in the course of its business as a public utility.

96.    In preparing the RFP, PG&E had a duty to communicate accurate information.

97.    By representing in the RFP that PG&E intended only a minimum of changes be made to the existing design, PG&E, without reasonable grounds for believing it to be true, misrepresented the state of completion of the Project's design, misrepresented the scope of work and costs required to complete the Project, and misrepresented its intent regarding changes to the Project design. PG&E

made these misrepresentations in the RFP with the intent of inducing AECOM rely on these misrepresentations in preparing its bid and entering into the EPC Agreement.

98. At all times relevant hereto, AECOM was ignorant of the true state of the Project's completed design, PG&E's intent to make substantial changes the design, and the costs and scope of work required to implement PG&E's intended design, and justifiably relied on the representations made by PG&E in the RFP.

99. As a result of PG&E's misrepresentations, AECOM underbid the Project, entered into the EPC Agreement for an inadequate price, and expended substantial costs, design labor, and Project time in order to complete the Project design actually intended and required by PG&E.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)

100. AECOM incorporates the allegations of paragraphs 7-97 as if fully stated herein.

101. AECOM provided labor, services and materials at the direction and request of PG&E for the design and construction of the Project, for which PG&E agreed to pay AECOM the reasonable value of such labor, services and materials.

102. AECOM is entitled to the reasonable value of unpaid labor, services, materials, and costs, which amount will be proven at trial, together with interest at the prevailing legal rate.

## SEVENTH CAUSE OF ACTION
### (Violations of California Prompt Payment Act)

103. AECOM incorporates the allegations of paragraphs 7-100 as if fully stated herein.

104. Over the course of the Project, PG&E improperly withheld amounts from progress payments due and owing to AECOM for which there was no good faith dispute regarding the work performed under the progress payment at issue. PG&E similarly withheld payment for approved and undisputed change order work and retention amounts from AECOM, for which there was no good faith dispute.

105. These withholdings were in violation of §§ 8800 and 8818 of the California Civil Code.

CARNEY BADLEY SPELLMAN, P.S.

106. Pursuant to §§ 8800 and 8818 of the California Civil Code, AECOM is entitled to 2% monthly interest for the wrongfully withheld amounts and its attorneys' fees and costs.

**PRAYER FOR RELIEF**

1. For an award of damages in an amount to be proven at trial;

2. For a determination of that AECOM holds a duly perfected lien and security interest in the Property;

3. For interest at the prevailing legal rate;

4. For statutory penalty interest at a rate of 2% per month;

5. For attorneys' fees and costs as allowed by contract, statute, at law or in equity; and

6. For all such other relief as the Court may deem just and proper.

DATED: March 22, 2019          CARNEY BADLEY SPELLMAN, P.S.

By: _____
          C. Scott Penner (SBN 124826)

and

REED SMITH LLP
    Marsha A. Houston (SBN 129956)
    Christopher O. Rivas (SBN 238765)

Attorneys for
AECOM Technical Services, Inc.

– 19 –

# Exhibit 1



# Contract (Long Form)

**This is a Contract between the below named Contractor ("Contractor"), a California corporation, and Pacific Gas and Electric Company ("PG&E"), a California corporation with its headquarters located at 77 Beale Street, San Francisco, California 94105.**

| Contractor's Legal Name: | AECOM Technical Services Inc. | PG&E Contract No. 2501335149 |
|---|---|---|
| Contractor's Address: | 515 S. Flower St. 4th Floor Ste. 1050 Los Angeles, CA 90071-2201 | This Contract consists of 1935 pages. |

| | |
|---|---|
| **Project Name**: | Burney K2 Replacement Project |
| **Job Location**: | Burney Compressor Station, California |

**WORK**: Contractor shall, at its own risk and expense, perform the Work described in this Contract and furnish all labor, equipment, and materials necessary to complete the Work as summarized below and as more fully described in Attachment 1, Project Specific Information. Contractor shall perform all engineering procurement and construction services to complete the Burney K2 Replacement project.

**ATTACHMENTS:** Each of the following documents is attached to this Contract and incorporated herein by this reference:
See Page 3 for the listing of the Attachments and Exhibits to this Contract.

| | |
|---|---|
| **CONTRACT TERM:** | This Contract is effective upon signature by both parties and expires on 12/31/2017. |
| **COMPLETION**: | Contractor shall commence performance hereof when directed to do so by PG&E. Work shall be completed by the completion date of 12/31/2017. Time is of the essence. |
| **INSURANCE**: | Contractor shall maintain insurance in accordance with Article 7 of the General Conditions. |
| **TERMS OF PAYMENT**: | In accordance with Section Article 4 of the General Conditions. |

**CONSIDERATION:** As full consideration for satisfactory performance of the Work by Contractor, PG&E's total obligation to Contractor shall not exceed the following amount. This amount is inclusive of all taxes incurred in the performance of the Work. Any change to this amount shall only be authorized in writing by a PG&E Contract Change Order, fully executed by both PG&E and Contractor.

**TOTAL**: $40,510,262.00 @ Lump Sum Pricing

**THE PARTIES, BY SIGNATURE OF THEIR AUTHORIZED REPRESENTATIVES, HEREBY AGREE TO THE TERMS OF THIS CONTRACT.**

| PACIFIC GAS AND ELECTRIC COMPANY | | CONTRACTOR: AECOM Technical Services Inc. | |
|---|---|---|---|
| Signature | | Signature | |
| Name | Gun Shim | Name | Robert K. Turley |
| Title | Vice President, Supply Chain | Title | Vice President |
| Date | 2/11/2016 | Date | 2/8/16 |

Case: 19-30088  Doc# 5651-1  Filed: 02/22/05/20  Entered: 02/22/05/20 19:30:45  Page 202 of 203 of 322



Contract – Long Form

PG&E Contract No. 2501335149
Page 2 of 3

## ADMINISTRATION

| PG&E Negotiator | Francis Del Rosario | Contractor Representative | |
|---|---|---|---|
| Phone | 925-328-5051 | Phone | |
| Email | fpd3@pge.com | Email | |

| Accounting Reference | s/c 1002685122 / Order# 30603707 |
|---|---|

| PG&E Work Supervisor: | Mel Wong | Phone: 510-541-2196 |
|---|---|---|

| INVOICE INSTRUCTIONS: Contractor shall send invoices for each payment when due, showing the Contract number, to: PACIFIC GAS AND ELECTRIC COMPANY | Send ORIGINAL Invoice to: (See note below if using PG&E's electronic invoicing system) | PG&E Accounts Payable* PO Box 7760 San Francisco, CA 94120-7760 |
|---|---|---|
| | Send COPY of Invoice to: | GTInvoicing@pge.com |
| | For information regarding invoice status, call PG&E's Paid Help Line at (800) 756-PAID (7243) or go to AP Web Reporting site at www.pge.com/actpay. | |
| | *Note: Contractors using PG&E's electronic invoicing system do not need to mail a copy of the invoice to PG&E Accounts Payable. | |

## INTERNAL PG&E USE ONLY

| Distribution Date | | |
|---|---|---|
| Distribution of Copies | ☐ Document Services (Signed Original Copy) Mail Code N5D 245 MARKET ST., SAN FRANCISCO | ☒ Contractor (Signed Original Copy) |
| | ☒ Work Supervisor Mel Wong | ☐ Manager |
| | ☒ Invoice Approver | ☐ Supervisor |
| | ☐ V.P. | ☒ Sourcing/ Purchasing |
| | ☐ Director | ☐ Law |

62-4073 (9/26/11)                    Sourcing

Case: 19-30088    Doc# 5651-1    Filed: 08/22/20    Entered: 08/22/20 19:30:45    Page 20 of
204 of 322



## EXHIBITS & ATTACHMENTS

**Each of the following documents is attached to this CWA and incorporated herein by reference:**

Attachment 1: Project Specific Information, Pages 1 through 1829
Attachment 2: General Conditions, Pages 1 through 48
Attachment 3: Specific Conditions, Pages 1 through 22
Attachment 4: Pricing Workbook, Pages 1 of 1
Attachment 5: Material Traceability, Pages 1 through 20
Attachment 6: Risk Register, Pages 1 of 1
Attachment 7: Boulder Pricing, Pages 1 of 1
Attachment 8: Billing Schedule, Pages 1 of 1
Attachment 9: Organization Chart, Pages 1 of 1
Attachment 10: Questions and Clarifications Set, Pages 1 though 6
Attachment 11: Demo Pricing, Pages 1 through 2

Case: 19-30088    Doc# 5651-1    Filed: 02/20/20    Entered: 02/20/20 19:30:45    Page 208 of
205 of 322

Attachment 2 - General Conditions
Contract # 2501335149

AECOM Technical Services, Inc.
Page 37 of 48

01-5873 (Rev 06/14)
Sourcing
Page 1 of 2

**Pacific Gas and Electric Company**

## List of Subcontractors and Disbursement Record

EXHIBIT 1-A

| Prime Contractor/Supplier: AECOM Technical Services, Inc. | Name of Preparer: Steve Petto |
| PG&E Contract Number (if any): 2501335149 | Telephone: (510) 874-1731 |
| PG&E Project/Product: Burney K2 Replacement Project | E-Mail: steven.petto@aecom.com |
| Contract Duration (Year): From: Feb 2016 To: Dec 2017 | Total Bid Value . Same as (9) below: $40,510,262 |

| Name of Subcontractor (1) | WMDVB E/LGBT BE Status Code* (2) | V** (3) | NV* ** (4) | Address (5) | Description of Work (6) | Estimated Amount to be Paid to Subcontractors (7) |
|---|---|---|---|---|---|---|
| BECI Electrical Inc. | WBE | V | | 8137 Capwell Dr., Oakland, CA 94621 | Procurement Agent | $14,394,864 |
| CM Distributor Inc. | WBE | V | | 118 S. Hale Ave., Escondido, CA 92029 | Valve Supplier | $857,493 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

* Refer to Instructions/Codes/Definitions on page 2.
** V = Subcontractor is a verified WMDVBE or LGBTBE
*** NV = Subcontractor is not a verified WMDVBE or LGBTBE

Certification Agencies:

CPUC Clearinghouse : DVBE:
WMBE: Department of General Services LGBT:
National Gay and Lesbian Chamber of
Commerce (NGLCC)

| (8) | Estimated Total Amount to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s): | $15,252,357 |
| (9) | Total Bid Value: | $40,510,262 |
| (10) | Estimated Percentage to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s) (8÷9): | 37.6% |

Signature: _Steve R. Petto_ / Date 2/5/16

I hereby verify that the listed information is true and accurate to the best of my knowledge.

The successful bidder(s) will be expected to register and report all monthly subcontracting spending with verified WMDVBE and LGBTBE subcontractors for the duration of the contract at: https://cvmas10.cvmsolutions.com/pge/default.asp

## EXHIBIT 4

### INJURY AND ILLNESS PREVENTION PROGRAM

Contractor acknowledges that it has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code. Contractor ensures that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract shall also have an effective Injury and Illness Prevention Program. This Compliance Certificate shall be executed by the person with the authority and responsibility for implementing and administering such Injury and Illness and Prevention Program.

### Injury and Illness Prevention Program Compliance Certificate

The undersigned, the _____ Project Manager _____ of
(title/position)

____ AECOM Technical Services, Inc. _____ (Contractor), hereby certifies to PG&E as follows:
(name of Contractor)

1. That Contractor has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code and that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract has an effective Injury and Illness Prevention Program; and

2. That he or she is the person with the authority and responsibility for implementing and administering Contractor's Injury and Illness Prevention Program.

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate on .

_____
Signature

Steven R. Petto
_____
Print Name

## PACIFIC GAS AND ELECTRIC COMPANY
## NONDISCLOSURE AND USE OF INFORMATION AGREEMENT

THIS AGREEMENT is by and between ___AECOM Technical Services, Inc.___ ("Company"),
___Steven R. Petto___ ("Undersigned"), the authorized employee of Company (together, Company and Undersigned are referred to as the "Receiving Party"), and PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") on the date set forth below.

Undersigned and Company agree as
follows:

1. The Receiving Party acknowledges that in the course of the Burney K2 Replacement Project, the Receiving Party will be given access to technical information and materials including, but not limited to, original design and construction drawings and documents in electronic and/or hard-copy format_____, which are owned by PG&E, its parent company, subsidiaries, or affiliates, and/or owned by third parties and in the possession of or licensed to PG&E, and which constitute valuable, confidential and proprietary information, know-how, and trade secrets, belonging to PG&E, its parent company, subsidiaries, or affiliates and/or third parties (hereinafter referred to as "Proprietary Information").

2. In consideration of being made privy to such Proprietary Information, and of the contracting for the Receiving Party's professional services by PG&E, the Receiving Party hereby agrees to hold the same in strict confidence, and not to disclose it, or otherwise make it available, to any person or third party, including but not limited to any affiliate of PG&E that produces energy or energy-related products or services, without the prior written consent of PG&E. The Receiving Party agrees that all such Proprietary Information:

   (a) shall be used only for the purpose of performing the required engineering design activities prerequisite to procuring equipment and materials and developing an Issued For Construction drawing and specifications package for the construction of the new project facilities; and

   (b) shall not be reproduced, copied, in whole or in part, except as specifically authorized and in conformance with PG&E's instructions when necessary for the purposes set forth in (a) above; and

   (c) shall, together with any copies, reproductions or other records thereof, in any form, and all information and materials developed by the Receiving Party therefrom, be returned to PG&E when no longer needed for the performance of Receiving Party's services for PG&E.

3. The Receiving Party hereby agrees that any third parties owning any Proprietary Information are express third party beneficiaries of this Agreement.

4. The Receiving Party hereby agrees that for any violation of any provision of this Agreement, a restraining order and/or injunction may be issued against the Receiving Party in addition to any other remedy PG&E may have at law.

5. This Agreement shall be governed by and interpreted in accordance with the laws of The State of California.

UNDERSIGNED:                                                      COMPANY

                                                                 AECOM Technical Services, Inc.
_____                                      _____
Signature                                                        Company Name
    Steven R. Petto
                                                                 _____
_____                                      Signature of Authorized Agent of Company
Name                                                                 Robert K. Turley
    Project Manager
                                                                 _____
_____                                      Name
Title                                                                Vice President
    AECOM Technical Services, Inc.
                                                                 _____
_____                                      Title
Company                                                              February 5, 2016
    February 5, 2016
                                                                 _____
_____                                      Date
Date

# GENERAL CONDITIONS

# ENGINEERING, PROCUREMENT, CONSTRUCTION

# OF

# NATURAL GAS & ELECTRIC TRANSMISSION AND DISTRIBUTION FACILITIES

**TABLE OF CONTENTS**

PAGE

**PART A: CONSTRUCTION CONDITIONS:**
Article 1.  Definitions ................................................................................................................3
Article 2.  Proposals ................................................................................................................5
Article 3.  Project Data and Specifications ............................................................................6
Article 4.  Pricing and Payments ...........................................................................................7
Article 5.  Certain Obligations and Responsibilities of Contractor ......................................9
Article 6.  Certain Rights and Responsibilities of PG&E .....................................................12
Article 7.  Insurance ............................................................................................................12
Article 8.  Changed Conditions ...........................................................................................15
Article 9.  Delays in Work ....................................................................................................19
Article 10. Contractor's Labor Relations .............................................................................20

**PART B: BASE CONDITIONS:**
Article B-1.  No Guarantee of Work .....................................................................................23
Article B-2.  Indemnification, Liability and Withholding .......................................................23
Article B-3.  Amendments, Subcontracts and Assignments ................................................25
Article B-4.  Royalties, License Fees, Use Rights, Infringement Protection ........................25
Article B-5.  Conflict of Interest/Business Ethics .................................................................26
Article B-6.  Safety Precautions and Protection of Property ................................................27
Article B-7.  Guarantees and Equipment Warranty .............................................................28
Article B-8.  PG&E's Operation ...........................................................................................29
Article B-9.  Availability of Information .................................................................................29
Article B-10. Cancellation and Termination of Contract ......................................................30
Article B-11  General Provisions ..........................................................................................31
Article B-12. PG&E Requirements and Policies ...................................................................33

**EXHIBITS:**
EXHIBIT 1:     Diversity and Equal Opportunity
EXHIBIT 1A:  List of Subcontractors and Disbursement Record
EXHIBIT 2:     Policy Regarding Utilization of Small Business Concerns and Small Disadvantaged
                      Business Concerns
EXHIBIT 3:     Drug and Alcohol Abuse and Testing Policy

Continued on next page

EXHIBIT 4:   Injury and Illness Prevention Program Compliance Certificate
EXHIBIT 5:   Statement of Labor, Material, and Equipment
EXHIBIT 6:   PG&E Contractor Document Retention and Production Requirements
EXHIBIT 6A:  Document and Data List
EXHIBIT 7:   Nondisclosure and Use of Information Agreement
EXHIBIT 8:   Outsourced Gas Asset Management Standard
EXHIBIT 9:   NERC REQUIREMENTS
EXHIBIT 9A:   PG&E NERC CIP Program Non-Employee
             Attestation Form

**[Remainder of the page intentionally blank.]**

## PART A: CONSTRUCTION CONDITIONS

## ARTICLE 1.
## DEFINITIONS

When used in this Contract, the following terms have the specified meaning:

"**As directed**," "**as required**," "**as permitted**," "**approved**," "**written approval**," "**approval**," "**acceptable**," "**satisfactory**," or similar terms, whether appearing as capitalized or lower case words, shall mean by or to PG&E unless otherwise specified.

"**Change Order**": A Contract document signed by both Parties which modifies the price, schedule, or other terms of the Contract.

"**Construction Schedule**" or "**Schedule**": Contractor's construction schedule, a document required by PG&E, that identifies the sequence and timing of Work and other activities necessary to meet Contract completion dates.

"**Contract**" or "**Agreement**:" This executed agreement, between PG&E and Contractor, including the Specification and any other materials specifically incorporated therein.

"**Contractor**": The Party entering into this Contract with PG&E to perform the Work.

"**Days**": Shall mean calendar days unless otherwise specified.

"**Facilities**": Properties of the Joint Trench Parties or PG&E, including without limitation, items which generally comprise the PG&E gas or electric transmission or distribution system, such as the following: gas pipe and fittings (including valves, flow control, cathodic protection, regulation and metering devices), electric cable, conduit, poles, and other gas or electric equipment, boxes, vaults, and related material.

"**Hazardous Materials**" and "**Hazardous Waste**": Any material defined as such in any local, state or federal rule, regulation, law or code for the location in which the Work is performed. This includes, but is not limited to, the definition of Hazardous Material and Hazardous Waste set forth in the California Health and Safety Code, Division 20, Chapter 6.95.

"**Joint Trench Parties**": The additional party or parties, if any, for whom Contractor is performing Work under the Contract.

"**LM&E Sheet**": Daily Statement of Labor, Material, and Equipment (Form 62-5687) completed by Contractor, and attached hereto in form as Exhibit 5.

"**Party**" or "**Parties**": As applicable, PG&E or Contractor or both.

"**PG&E**": Pacific Gas and Electric Company, a California corporation.

"**Proposal**": The bid quotation and package to perform Work under this Contract or an individual Contract as submitted by Contractor to PG&E.

"**Rental Rate Blue Book**": Rental Rate Blue Book for Construction Equipment.

**"Specification"**: PG&E's documents and drawings including the specific conditions and these General Conditions, all of which set forth the requirements for performance of the Work and which shall become incorporated in the Contract.

**"Subcontract"**: An agreement between Contractor and Subcontractor or between Subcontractors at any level for a portion of the Work under this Specification.

**"Subcontractor"**: Party or parties entering into a Subcontract with Contractor or another Subcontractor to perform Work. The obligations of Contractor set forth in this Contract shall also apply to Subcontractors regardless of level or tier.

**"Work"**: The construction contemplated by the Contract, including all labor necessary to complete such construction, all material and equipment incorporated or to be incorporated in such construction and all services, facilities, tools and equipment necessary to complete such construction.

"**Work RFP**": A request by PG&E for a Proposal by Contractor to perform Work under this Specification.

**[Remainder of the page intentionally blank.]**

**ARTICLE 2.**
**PROPOSALS**

2.1   FORM: When required by a Work RFP, Contractor's Proposal shall be made on a Proposal form supplied by PG&E. Contractor's Proposal shall be enclosed in a sealed envelope distinctly marked with the title of the Work, Specification Number, and the word "Proposal," and delivered to the address stated in the Work RFP on or prior to the time specified. The Proposal shall be signed with the full name and local address of Contractor; if a partnership or joint venture, by a member thereof with the name and address of each member; if a corporation, by an officer in the corporate name and with the corporate seal. Late Proposals will be subject to disqualification.

2.2   INFORMATION WITHIN PROPOSAL: Contractor shall submit as part of the Proposal the following information which shall be under Contractor's letterhead: (i) requested information regarding the plant and equipment which Contractor intends to use in the Work; (ii) percentage fees applicable to Sections 8.6.1 through 8.6.4 for Cost-Plus Work charged by Subcontractors; and (iii) if Section 8.5 is included in the Specification, Contractor shall furnish the data required by 8.5(i) therein.

   2.2.1   COMPLIANCE WITH EQUAL OPPORTUNITY LAWS: Contractor must describe with its submission how it will comply with the requirements in Exhibit 1 of the "PG&E SUPPLIER DIVERSITY PROGRAM POLICY". The requirements of Exhibit 1 and the Contractor's response shall be deemed incorporated into the Contract.

   2.2.2   ESTIMATED QUANTITIES AND WEIGHTS: Quantities, weights, or data made available to Contractor by PG&E for preparation of its proposal or for performance of the Work shall not relieve Bidder or Contractor of the responsibility to satisfy itself through investigations as to conditions affecting the cost and performance of the Work. Estimated quantities and information submitted are the best available at the time; however, PG&E assumes no responsibility for the correctness of such information or for Contractor's conclusions drawn therefrom.

   2.2.3   CONTRACTOR'S LICENSE LAW: To qualify for Work subject to the Contractor's License Law, Chapter 9 of Division 3 of the Business and Professions Code of the State of California, Contractor's Proposal shall include a statement that Contractor is licensed under the law and shall indicate the type, number and the expiration date of the license.

2.2.4   RETURN OF MATERIAL: Contractor's Proposal shall be accompanied by the Specification, drawings, and other loaned information. Contractor shall sign in the spaces provided in the Specification and on each drawing used in preparing its Proposal unless otherwise specified.

2.3   SUBMISSION OF PROPOSAL: Once submitted, a Proposal may not be withdrawn by Contractor until its expiration date as provided in the Work RFP. A proposal may be accepted by PG&E up to the Proposal expiration date, and if not so accepted in writing, shall be deemed declined.

2.4   PROPOSAL EVALUATION: Each Proposal will be evaluated using a formula of weighted and defined criteria including, among other things, the strength of its proposed compliance with PG&E's Supplier Diversity Program Policy.

2.5   TIME: Contractor shall perform the Work in as short a time as practicable consistent with good workmanship and without overtime, unless otherwise specified. Time quoted by Contractor for completion of the Work will be an important consideration in making the award of Contract. The time so stated will be incorporated into the Contract. Time is of the essence.

2.6   REJECTION: PG&E RESERVES THE RIGHT TO REJECT ANY AND ALL PROPOSALS AND TO ACCEPT OTHER THAN THE LOWEST PROPOSAL.

## ARTICLE 3.
## PROJECT DATA AND SPECIFICATIONS

3.1   INFORMATION FURNISHED BY PG&E:  Data made available to Contractor by PG&E for preparing Contractor's Proposal and data made available to Contractor by PG&E during performance of the Work shall not relieve Contractor of responsibility for determining, through independent investigation if desired, the conditions affecting the cost and performance of the Work. PG&E makes no representation as to the completeness of the data and is not responsible for Contractor's conclusions drawn therefrom.

3.2   DIMENSIONS: Written or computed dimensions shall be used rather than scaled dimensions. Dimensions which tie into existing work shall be verified by Contractor at the worksite prior to commencing the Work. No claim will be honored which is a result of failure to comply with this requirement.

3.3   PG&E DRAWINGS AND SPECIFICATION: As soon as possible after award of Contract,  PG&E's approved construction drawings will be provided to Contractor. Bidding drawings shall not be used for construction purposes unless otherwise authorized in writing by PG&E.  PG&E anticipates that revisions may be made to the Contract drawings prior to the time they are issued as "Approved for Construction" and to the approved drawings from time to time during the Work.  These revisions are expected to be minor changes in dimensions and in embedded items which may require Contractor to change its proposed construction methods and sequence of operations. Contractor shall plan its operations accordingly to accommodate the changes. Changes, as such, will not necessarily involve additional cost to Contractor. An increase or decrease in material quantities will be paid for or deducted under the appropriate Contract pricing items. Where the change involves an increase in other costs to Contractor, PG&E will pay for the costs that are considered justifiable by PG&E. PG&E shall receive credit from Contractor for any reduction in Contractor's costs caused by the changes. However, PG&E reserves the right to be the final judge as to the amount of payments made after the facts are presented and evaluated.

3.3.1   PERMITS:  If Contractor decides that the drawings and Specification do not comply with laws, rules and regulations, Contractor shall notify PG&E in writing at the time its Proposal is submitted and shall indicate as a separate lump-sum item an adjustment to the Proposal to cover the cost of compliance.

3.3.2 INCONSISTENCIES: The Specification and drawings are complementary and are intended to be consistent with each other. Contractor shall promptly report in writing to PG&E any discrepancies, errors, or inconsistencies in the Specification and drawings.

3.4 CONTRACTOR'S DRAWINGS AND SPECIFICATION: If Contractor prepares specifications, calculations, and drawings, they shall be approved in writing by PG&E prior to use. Notwithstanding such approval, Contractor shall be responsible for the accuracy, practicability, and correctness of its specifications, calculations, and drawings, none of which shall operate to change the Specification or PG&E's drawings unless Contractor submits a written statement clearly describing the specific changes to the Specification or PG&E's drawings and obtains PG&E's written prior approval of the changes. In the event of conflict between this Specification or PG&E's drawings and Contractor's specifications, calculations, or drawings, the former shall prevail. Engineering Work performed by Contractor shall be in accordance with the California Civil and Professional Engineers Act.

3.5 CHANGES TO SPECIFICATIONS AND DRAWINGS: Requests by Contractor for changes in the requirements of the Specification and PG&E's drawings shall be specifically identified in writing and brought to the attention of PG&E for written approval of PG&E. No changes shall be made without such written approval.

3.6 REFERENCES: References within the Specification to standard specifications, codes, and requirements of organizations such as the American Society for Testing Materials (ASTM), the American Institute of Steel Construction (AISC), and others are referenced to the latest issue thereof, unless otherwise specified. Requirements of referenced specifications shall be deemed a part of this Specification, except that in the event of a conflict between the requirements of this Specification and those of the referenced specifications, the most stringent shall govern.

## ARTICLE 4. PRICING AND PAYMENTS

4.1 PRICING OF WORK: Contractor is requested to quote prices for the Work as classified under the items in the Proposal Form. Prices quoted shall include all taxes incurred in the performance of the Work, but shall exclude the premium for any surety bond. PG&E will not honor claims by Contractor resulting from unbalanced bid prices where Contractor has quoted unit prices that are either over or under Contractor's estimated cost.

4.2 COMPENSATION: Consideration to be paid Contractor by PG&E will be a sum calculated as set forth in the Contract and based on the prices quoted by Contractor in its Proposal. Except for work specifically excluded, Work necessary to make a complete installation ready for use or operation shall be considered as included in the price or prices quoted for the Work, whether or not specifically classified for payment under the items of the Proposal.

4.2.1 LUMP-SUM ITEMS: Work classified for payment on a lump-sum basis will not be paid for under unit price items, unless specified. A Proposal shall include the proposed progress payment schedule for lump-sum basis Work.

4.2.2 UNIT-PRICE BASIS: When invoices include Work performed on unit-price basis, Contractor shall attach a list stating the unit price item numbers, unit prices, quantities, dollar amounts and other information as required to identify the Work.

4.2.3 COST-PLUS BASIS: A LM&E Sheet must be completed for all Work performed on a cost plus basis including, but not limited to, additional or changed Work. Contractor may use its own form in place of the PG&E LM&E Sheet as long as (i) it contains all the same information as is to be reported on PG&E's LM&E Sheet and (ii) the information clearly matches the categories of information found on PG&E's LM&E Sheet. Contractor's representative shall prepare the LM&E Sheet daily, providing sufficient detail of Work

performed, including labor employed by Contractor and others performing Work, materials drawn from Contractor's stock, use of Contractor's equipment and rental of equipment from others by Contractor. PG&E shall approve the LM&E Sheet daily and retain a copy of the approved LM&E Sheet for comparison to Contractor's actual billing and Contractor's invoice support shall include a copy of the approved LM&E Sheet, receipted bills for materials, subcontracted Work and rented tools and equipment. PG&E shall have the right to inspect and sign the delivery or shipping documents for all tools, equipment, and materials charged to or credited out of cost-plus Work as they are received or removed. PG&E shall have the option of auditing the Contractor's records for cost-plus Work.

4.2.4    HOURLY RATE BASIS: A LM&E Sheet must be completed for all Work performed on an hourly rate basis including, but not limited to, additional or changed Work, following the procedures and requirements of Section 4.2.3.

4.3    INCIDENTAL WORK: During the progress of the Work, Contractor may be required by PG&E to perform certain selected operations which will require Contractor to pay shift differentials or premium time beyond the normal workday or workweek. For this Work, Contractor will be reimbursed the direct premium cost of labor based upon established Contract rates or applicable union wage rates in effect, plus applicable taxes. No additional fee for overhead or profit will be allowed. Examples of this Work may include clearances, work to expedite certain features, work performed in assisting PG&E in conducting testing and "startup," and certain incidental overtime performed for PG&E's convenience.

4.3.1    CONTRACTOR'S CONVENIENCE: Should Contractor elect to perform any phase of the Work on a premium time basis in order to meet the Construction Schedule or for Contractor's convenience, or if required by PG&E pursuant to Section 9.4, Contractor shall do so at no incremental cost to PG&E.

4.3.2    PG&E'S CONVENIENCE: If, in order to meet certain conditions, PG&E places the Work on an accelerated workweek, Contractor will be reimbursed. No reimbursement will be made except as authorized by a Change Order.

4.4    INVOICES: Contractor shall submit itemized invoices for completed Work accepted by PG&E, unless otherwise agreed. Invoices submitted by Contractor to PG&E for payment must be in accordance with the applicable Contract and include the applicable Contract number.

4.4.1    SUPPLIER DIVERSITY DISBURSEMENT RECORD: With each invoice, Contractor shall submit an updated List of Subcontractors and Disbursement Record (Exhibit 1-A) with a current accounting of actual Subcontractor payments as of the date of the invoice (Exhibit 1-A, Column 6).

4.5    PROGRESS PAYMENTS: If specified under the applicable Contract, then PG&E may retain a percentage of the Contract price until final acceptance of the Work; payment of the retention shall be in accordance with Section 4.6 below. Contractor shall submit monthly for PG&E's acceptance four copies of a written contract progress estimate setting forth the quantities of Work satisfactorily performed to date and invoices covering the Contract price applicable to the Work unless otherwise directed.

4.5.1    LIEN RELEASES: If requested by PG&E, Contractor must furnish conditional lien releases with each progress payment for Contractor and all Subcontractors totaling the amount requested in the progress payment estimate and covering the same time period as the estimate.

4.6    FINAL PAYMENTS: As soon as practicable after satisfactory completion of all Work, Contractor shall submit four copies of a final invoice to PG&E certifying to the completion of the Work and setting forth the total progress payments due Contractor less amount withheld and previous payments. Contractor shall also submit four copies of a second invoice in setting forth the balance

of the Contract price, including any retention amount. Invoices shall include any adjustment in labor or other costs if provision for adjustment is made in these General Conditions. PG&E will thereupon prepare certificates of payment for each. After receipt of invoices, PG&E will pay the amount due Contractor under the first described invoice after the final acceptance of Work performed under the Contract and receipt of lien releases and subject to receipt from Contractor of information required under PG&E's insurance program.

4.6.1 LIEN RELEASE: Prior to submitting a final invoice, Contractor must furnish conditional lien releases for Contractor and Subcontractors covering all labor, materials, and equipment for which a lien could be filed. Within 30 days after final payment, Contractor shall provide unconditional final lien releases for Contractor and all Subcontractors.

4.7 JOINT CHECKS: Should PG&E deem it necessary, checks for payment in Sections 4.5 and 4.6 may be issued to Contractor and Subcontractors or suppliers jointly.

4.8 CLAIMS: If Contractor claims extra compensation or time from PG&E arising out of PG&E's administration or interpretation of the Contract or other action on the part of PG&E, Contractor shall submit to PG&E a written statement supporting the claim as soon as practicable but not more than 30 days after the action or decision giving rise to the claim. Portions of Contractor's claim incurred prior to written notification to PG&E shall be considered waived and failure to submit a statement within 30 days shall constitute a waiver of the entire claim. Acceptance by Contractor of the final payment hereunder shall be deemed a waiver by Contractor of claims against PG&E.

4.8.1 CLAIMS AGAINST CONTRACTOR: Before Contractor is entitled to the final payment, Contractor shall, if requested by PG&E, furnish satisfactory evidence to PG&E that valid claims against Contractor or a Subcontractor have been paid.

4.9 WITHHOLDING FUNDS: PG&E may retain sufficient funds from payments due Contractor to repair or replace Work judged defective or incomplete by PG&E, to provide security for property damage liability as set forth in Section B-2.2, and to discharge liens as specified in Section 5.14.

4.10 LIABILITY: Neither acceptance of the Work by PG&E nor payment for the Work shall relieve Contractor from liability under the indemnity or guarantees contained in or implied by the Contract.

4.11 BOND REQUIREMENTS: If requested by PG&E, Contractor shall, within 5 days of request, obtain a payment and performance bond in the amount specified by PG&E up to 100 percent of the Contract price in a form and with a surety acceptable to PG&E. PG&E will reimburse Contractor for the bond separately within 21 days of receipt from Contractor of the surety company's invoice. Failure of Contractor to obtain the bond as specified will be cause to cancel the Contract.

4.12 ADJUSTMENTS: Contractor shall promptly adjust any inaccuracy in the billings. Adjustments shall accrue interest, compounded monthly, at a rate equal to the prime rate charged by the Bank of America, N.A., Charlotte, North Carolina, at the beginning of each month, from the date of payment of the invoice being adjusted to the date that the adjustment is paid.

## ARTICLE 5. CERTAIN
## OBLIGATIONS
## AND RESPONSIBILITIES OF CONTRACTOR

5.1 WORKSITE CONDITIONS: It will be assumed that Contractor has visited the worksite and that the Proposal is based on a full knowledge of all conditions that would affect the cost and conduct of the

Work.  By appointment, PG&E will conduct Contractor over the worksite and will indicate the various features of the Work. Contractor shall inform itself fully and shall assume the risk as to the physical conditions at the worksite, including as applicable: (1) subsurface geology, borrow pit conditions and spoil disposal areas; (2) the availability, location, and extent of construction and storage areas and other facilities or structures above and below ground, including but not limited to, gas, water, sewer, electrical and communication utilities; (3) necessary safety precautions and safeguards; (4) dimensions not shown on the drawings  (5) the extent of established lines and levels; (6) work to be performed by PG&E or others; and (7) rules, regulations and requirements to be observed by Contractor in the conduct of the Work. UNLESS THE PARTIES AGREE THAT CONTRACTOR IS NOT REQUIRED TO VISIT THE WORKSITE IN ORDER TO PERFORM THE WORK , LACK OF KNOWLEDGE OF EXISTING CONDITIONS WILL NOT BE
ACCEPTED AS AN EXCUSE FOR FAILURE TO PERFORM THE SPECIFIED WORK, NOR SHALL SUCH EXCUSE BE ACCEPTED AS A BASIS FOR CLAIMS FOR ADDITIONAL COMPENSATION.
CONTRACTOR MAY NOT RELY UPON ALL INFORMATION PROVIDED TO IT BY PG&E REGARDING EXISTING CONDITIONS AT THE WORKSITE WITHOUT INDEPENDENT VERIFICATION UNLESS EXPRESSLY INSTRUCTED OTHERWISE BY PG&E IN WRITING.

5.2　INFORMATION AFTER AWARD OF CONTRACT: Within 21 days after award of Contract , unless otherwise specified in writing by PG&E, Contractor shall submit the following information to PG&E:

5.2.1　LABOR AGREEMENTS: Copies of labor-craft agreements for the involved unions containing wage rates and fringe benefits in effect. If, during the Contract period, any changes are negotiated between the construction industry and the unions involved, revised copies of the labor agreements shall be furnished to PG&E.

5.2.2　SEGREGATION: A segregation of Contract price, as directed, for each lump-sum item of the Proposal. The segregation shall itemize the estimated cost of each class of Work, together with an allowance for profit, insurance, and overhead expense, the total of which shall equal the Contract price of the item. When approved, the segregation shall become the basis for determining progress payments for Work performed, unless otherwise specified.

5.2.3　FABRICATORS: Names and addresses of fabricators who will shop fabricate various items of Work included in the Contract, together with Contractor's purchase order number and the approximate dates fabrication will start and be completed. Fabrication shall not start until PG&E has approved shop detail drawings and arranged for inspection.

5.2.4　CONSTRUCTION SCHEDULE: A detailed proposed Construction Schedule complying with requirements of the Specification.

5.2.5　SUBCONTRACTORS: Names and addresses of Subcontractors.

5.3　MAN-HOUR REPORT: If requested by PG&E, Contractor shall submit a daily record of man-hours worked by each of its employees, to facilitate PG&E's accounting.  The transcript shall fully describe the various classes of Work performed in conformance with the applicable classifications set forth in PG&E's item segregation, or the breakdown of the classifications as may be deemed advisable by PG&E.  The transcript shall also indicate the time allotted to each classification of Work and the hourly or daily applicable rates of pay of the employees.

5.4　CONTRACTOR'S REPRESENTATIVE: During construction, Contractor shall retain a qualified representative in charge at the worksite who will supervise and exercise control over the Work, including that of Subcontractors. Contractor shall notify PG&E in writing who is to be Contractor's representative in charge of the Work.

5.5　COORDINATION OF WORK: In order that the entire project will be economically completed with the least delay and inconvenience to involved parties, Contractor shall coordinate its Work with work to be performed by others. Contractor shall make necessary and proper provisions to accommodate the work of others and shall cooperate in the use of equipment and in the exchange of templates and other data to ensure the proper performance of the Work.

5.6   LAYING OUT WORK: PG&E may provide the bench marks and control lines necessary for Contractor to lay out the Work. Contractor shall lay out and construct the Work accurately to the lines and elevations shown on the construction drawings. Survey field notes of points set by Contractor shall be available to PG&E. Contractor shall check the lines, dimensions, and elevations of each portion of the Work as it is completed to insure the proper construction of subsequent Work. Discrepancies shall be reported immediately to PG&E. Contractor shall use reasonable precautions to preserve established lines and grades.

5.7   TIMELY PERFORMANCE OF WORK: Contractor shall schedule and perform its Work to ensure completion in accordance with Contract milestone dates.  Failure to meet Contract milestones or the completion date can result in significant damage to PG&E including but not limited to direct cost to recover time lost, claims paid to other contractors resulting from Contractor's delay, additional cost of inspection and project administration resulting from Contractor's delay and additional actual cost of project financing resulting from Contractor's delay.  Time of completion is a material provision of the Contract.

5.8   CONSERVATION: In view of the national need to conserve resources, material and energy, Contractor shall plan and conduct the Work in the most efficient way practical consistent with accepted construction practices.

5.9   OBSTRUCTIONS, CUTTING AND PATCHING: Cutting of masonry, steel, woodwork, and other materials already in place, to accommodate the Work, shall be at Contractor's expense. Work shall be performed only after securing PG&E's approval regarding the location and extent of such cutting. Obstructions to the Work shall be removed by Contractor, unless otherwise specified. Removed obstructions shall be repaired or replaced at Contractor's expense.

5.10  MATERIALS, FACILITIES, SERVICES, AND STRUCTURES FURNISHED: Materials and workmanship shall be new and first class in every respect and shall comply with the requirements of the Specification and drawings. Materials and workmanship shall be subject to the inspection of PG&E. If Contractor fails to provide materials and workmanship in compliance with the Specifications and drawings, PG&E reserves the right to cancel the Contract. Contractor shall furnish all labor, materials, equipment, and services required for the Work unless otherwise specified.

   5.10.1 BRAND NAME: Items designated within the Specification or drawings by brand name shall be as designated or an equivalent approved by PG&E. Furnishing, installing, or both furnishing and installing an item shall be in accordance with the manufacturer's recommendations or specifications unless otherwise specified.

   5.10.2 ADEQUACY AND SAFETY: Contractor shall inspect, determine to its satisfaction, and be responsible for the adequacy and safety of materials, tools, equipment, plant, temporary or permanent structures incidental to the Work, storage or office space and other facilities and services used in the Work whether furnished or constructed by PG&E, Contractor, or others. Drawings of structures furnished by PG&E will show minimum requirements only and shall not relieve Contractor of any responsibility.

5.11  PG&E'S EQUIPMENT: When Contractor is permitted to use PG&E materials, tools, facilities, or equipment, they shall be maintained by Contractor in first-class condition and good repair. Contractor shall be responsible to PG&E for damage, misuse, or loss thereof.

5.12  CONTRACTOR'S EQUIPMENT: Tools, equipment, and other facilities provided by Contractor shall be maintained in good repair and efficient operating condition and, if found by PG&E to be unfit, shall be removed from the worksite and replaced by Contractor.

   5.12.1 INSTALLATION OF EQUIPMENT: Equipment shall be installed level, properly aligned, and

completely assembled in accordance with the manufacturer's standards and left in acceptable operating condition.

5.12.2 INFORMATION RELATED TO EQUIPMENT: Contractor shall provide to PG&E for use by PG&E, and contractors doing work for PG&E, copies of all instruction manuals, drawings, data, processes and procedures, or other information required to service and maintain the equipment.

5.12.3 EQUIPMENT DESIGN: Equipment and material furnished hereunder shall be so designed and fabricated that when installed it will comply with applicable laws, rules and regulations, including without limitation, the General Industry Safety Orders of the Division of Occupational Safety and Health, Department of Industrial Relations, State of California, which must be complied with before the equipment and material may lawfully be used by PG&E in California. Expenses incurred in complying with these requirements shall be included in the Contract prices.

5.13 LIENS: Contractor shall discharge at once, and hold PG&E harmless from, liens or stop notices that may be filed in connection with the Work. PG&E may retain from Contract payments sufficient funds to discharge delinquent accounts of Contractor or a Subcontractor for which liens on PG&E's property have been or can be filed or for which stop notices have been or can be filed, and PG&E may at any time pay therefrom, for Contractor's account by joint check or otherwise, such amounts as are admittedly due thereon. Contractor must furnish lien releases to PG&E in accordance with the Lien Release provisions of Article 4, Pricing and Payments.

5.14 CONSTRUCTION LENDERS: PG&E represents that there are no construction lenders for this Work.

**ARTICLE 6.**
**CERTAIN RIGHTS**
**AND RESPONSIBILITIES OF PG&E**

6.1 PG&E'S REPRESENTATIVE: Contractor will be notified in writing who will be PG&E's authorized representative for the Work. Contact between Contractor and PG&E shall be through PG&E's authorized representative, unless otherwise specified. Questions concerning the Contract, including the meaning of its terms and the sufficiency of Contractor's performance, shall be promptly submitted to PG&E for a decision. PG&E's decision, in the exercise of reasonable judgment, shall be final.

6.2 PERMITS: PG&E will obtain use permits, grading permits, general building permits and road relocation permits. Contractor shall at its expense obtain all other necessary permits and licenses, serve notices, arrange for inspection, pay fees and deposits and otherwise comply with applicable laws, rules and regulations.

6.3 INSPECTION AND TESTS: PG&E has the right to make field and shop inspections and tests. PG&E's inspectors shall have free access to the Work at all times. Neither the making nor the failure to make inspections and tests by PG&E nor the express or implied approval of the Work shall relieve Contractor of the responsibility to complete and guarantee the Work as specified. Rejected Work shall be remedied at Contractor's expense.

**ARTICLE 7.**
**INSURANCE**

Contractor shall, at its sole cost and expense, procure and maintain the following insurance coverage and be responsible for its Subcontractors maintaining sufficient limits of the appropriate insurance coverage.

7.1 WORKERS' COMPENSATION AND EMPLOYERS' LIABILITY: Workers' Compensation insurance or self-insurance indicating compliance with applicable labor codes, acts, laws or statutes, state or

federal, where Contractor performs Work.

    7.1.1   Employers' Liability insurance shall not be less than $1,000,000 for injury or death each accident.

7.2   COMMERCIAL GENERAL LIABILITY (CGL): Coverage shall be at least as broad as the Insurance Services Office (ISO) Commercial General Liability Coverage "occurrence" form, with no alterations to the coverage form.

    7.2.1   The limit shall not be less than $10,000,000 each occurrence for bodily injury, property damage, personal injury and products/completed operations. Defense costs shall be provided as an additional benefit and not included within the limits of liability. Coverage limits may be satisfied using an umbrella or excess liability policy or an Owners Contractors Protective (OPC) policy.

    7.2.2   Coverage shall: a) by "Additional Insured" endorsement add as insureds PG&E, its directors, officers, agents and employees with respect to liability arising out of the Work performed by or for the Contractor (ISO Form CG2010 1185, or equivalent is preferred). In the event the CGL policy includes a "blanket endorsement by contract," the following language added to the certificate of insurance will satisfy PG&E's additional insured requirement: "PG&E, its affiliates, subsidiaries, parent company, directors, officers, agents and employees with respect to liability arising out of the work performed by or for the Contractor are additional insureds under a blanket endorsement;" b) be endorsed to specify that the Contractor's insurance is primary and that any insurance or self-insurance maintained by PG&E shall not contribute with it; c) be endorsed to remove the Care, Custody and Control exclusion; and d) include a severability of interest clause.

7.3   BUSINESS AUTO: Coverage shall be at least as broad as the Insurance Services Office (ISO) Business Auto Coverage form covering Automobile Liability, code 1 "any auto."

    7.3.1   The limit shall not be less than $2,000,000 each accident for bodily injury and property damage.

    7.3.2   If the scope of Work involves hauling hazardous materials, coverage shall be endorsed in accordance with Section 30 of the Motor Carrier Act of 1980 (Category 2) and the CA 99 48 endorsement.

7.4   PROFESSIONAL LIABILITY INSURANCE: Errors and omissions liability insurance appropriate to Contractor's profession with a limits of not less than $5,000,000 per claim and in the aggregate, covering all professional services provided under the Contract for damages incurred by reason of (a) any negligent act, error or omission committed, or alleged to have been committed with respect to any engineering or design services under the Contract, and (b) any negligent acts, errors or omissions while performing or failing to perform any professional services provided under the Contract.

7.5   ALL RISK PROPERTY INSURANCE: An All Risk Property insurance policy including earthquake and flood shall be maintained during the course of Work being performed and include start-up and testing for installed equipment. Policy shall include coverage for materials and equipment while under the care, custody and control of the Contractor during the course of work, at the site, offsite or while in transit to the site.

    7.5.1   Coverage shall be written to cover the full replacement cost of the property. Limits and deductibles shall be approved by PG&E.

    7.5.2   PG&E shall be named as Loss Payee.

7.6   CONTRACTORS POLLUTION LIABILITY: If the scope of Work involves environmental risk,

Contractors Pollution Liability shall be maintained. Coverage for bodily injury, property damage, including cleanup costs and defense costs resulting from sudden and gradual pollution conditions including the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, hydrocarbons, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.

7.6.1   The limit shall not be less than $1,000,000 each occurrence for bodily injury and property damage.

7.6.2   The policy shall endorse PG&E as additional insured.

7.7   FORM AND CONTENT: All policies or binders with respect to insurance maintained by Contractor shall meet the following requirements.

7.7.1   Documents shall waive any right of subrogation of the insurers hereunder against PG&E, its officers, directors, employees, agents and representatives of each of them, and any right of the insurers to any setoff or counterclaim or any other deduction, whether by attachment or otherwise, in respect of any liability of any such person insured under such policy.

7.7.2   With respect to any additional insured, documents shall provide that such insurance will not be invalidated by any action or inaction of each insured and will insure each such insured regardless of any breach or violation of any warranty, declaration or condition contained in such insurance by the primary named insured.

7.7.3   The insurance documentation shall state that coverage shall not be cancelled except after 30 days prior written notice has been given to PG&E.

7.8   EVIDENCE OF COVERAGE: Before commencing performance of the Work, Contractor shall furnish PG&E with certificates of insurance and endorsements of all required insurance for Contractor. Submittals shall comply with the following requirements.

7.8.1   The insurer shall deliver notification to PG&E in accordance with the policy provisions if any of the above-described policies are cancelled before the stated expiration date.

7.8.2   Certificates of insurance and endorsements shall be signed and submitted by a person authorized by that insurer to issue certificates of insurance and endorsements on its behalf and must be submitted by e-mail or fax only:

Certificate Holder:  Pacific Gas and Electric Company
c/o EXIGIS LLC
E-mail: support@exigis.com
Fax: 646-755-3327

Contractor shall also send a copy of all such insurance documents to PG&E's Contract negotiator and Contract administrator at Contract execution and each time the terms of the insurance policy are renewed or changed.

7.8.3   PG&E may inspect the original policies or require complete certified copies at any time.

7.8.4   Upon request, Contractor shall furnish PG&E the same evidence of insurance for its Subcontractors as PG&E requires of Contractor.

**ARTICLE 8. CHANGED**

**CONDITIONS**

8.1   CONTRACT CHANGE ORDERS: PG&E may require Contractor to perform additional work of a nature similar or related to the Work under the Contract or may require changes or reductions in the Work or in the provisions governing the Work. Additional Work or changes shall be performed by Contractor only when authorized in writing and signed by PG&E.  Contractor shall immediately notify the PG&E representative of any changes, additional Work, or conflicts or discrepancies in the Work, in writing, prior to performing that portion of the Work. Authorization for payment will be by Change Order.  No subsequent claim will be honored for intangible effects or time lost resulting from Work covered and paid for by Change Order.  Pricing in the Change Order shall include indirect or intangible costs.

8.2   CHANGED CONDITIONS: Contractor shall within 72 hours after encountering changed construction conditions or within 5 business days after encountering changed engineering conditions, and before conditions are disturbed, notify PG&E in writing that (i) subsurface or hidden physical conditions at the worksite differ materially from those specified or (ii) unknown physical conditions at the worksite, of an unusual nature, differ materially from those ordinarily encountered and generally recognized as inherent in Work of the character provided for by this Specification. If PG&E agrees with Contractor's claim, an equitable adjustment will be made and a Change Order will be issued. No claim will be allowed unless Contractor has given timely notice.

8.3   WORK NOT COVERED:  If PG&E requires Contractor to perform Work that is in Contractor's opinion not covered by prices under either the Contract or a Change Order and for which Contractor intends to make a claim, Contractor shall notify PG&E in writing prior to starting     the Work, or its subsequent claim will not be considered. If PG&E agrees with Contractor's claim, Contractor will be notified in writing and a Change Order will be issued to cover all or part of the claim. If PG&E does not agree with Contractor's claim, Contractor will be notified in writing. Unless Contractor states in writing within 7 days that it will not accept PG&E's decision and that Contractor intends to make another claim, the subject will be considered closed and will not be reopened at a later date.

8.4   ADJUSTMENT DUE TO CHANGES IN WAGE RATES: For this Contract , Contractor shall provide to PG&E it's applicable wage rates in effect on the date of Contractor's signature to this Contract together with the date(s) on which Contractor anticipates an increase in wage rates that may occur during the Contract period as a result of negotiations between the construction industry and the unions involved. Contractor shall also advise PG&E of any decrease in wage rates.

8.4.1   No increase in wage rates will be accepted during the term of this Contract unless Contractor has submitted to PG&E, with the project-specific proposal, the date and amount of the anticipated wage rate increase together with Contractor's anticipated impact on the project budget and the increase has been accepted by PG&E, in writing, with the award of Work.

8.4.2   APPLICATION: Reimbursement will apply only to field labor employed directly by Contractor and engaged directly and exclusively in the performance of the Work at the worksite and will not apply to Contractor's office or clerical personnel, superintendents or other supervisory personnel other than job foreman, nor to Subcontractors' employees. Contractor will not be reimbursed for increases in wage rates that were negotiated prior to the date of the Contract and that provide for future automatic wage increases of known amounts nor any portion of the wages paid as a bonus. In computing authorized reimbursement, wage rates used shall include subsistence, travel time payments, health, welfare, vacation, pension fund payments, and other "fringe" benefits that Contractor is required to pay by union agreement.

8.4.3 CREDITS: In the event that negotiations between the construction industry and the unions involved result in a decrease in wages rates, Contractor shall credit PG&E in payments due Contractor to the extent of 100 percent of the total savings resulting from decreases, computed on the basis specified.

8.4.4 PAYROLL RECORDS: Adjustments of the Contract price for changes in wage rates shall be computed from Contractor's labor payrolls, and Contractor shall furnish PG&E copies of payrolls for this purpose when so requested.

8.4.5 INVOICES: Invoices covering adjustments due to changes in wage rates for Work performed in any one month shall be presented within 60 days after the end of that month or such invoices may not be accepted for payment.

8.4.6 NO FEE: Amounts payable under this section shall be actual costs without fee for Contractor's home office overhead or profit.

8.5 ADJUSTMENT DUE TO CHANGES IN MATERIAL COSTS: No increase in material costs will be accepted during the term of this Contract. If Contractor has submitted to PG&E, with the project-specific proposal, the date on which quotations from specific suppliers of material will expire and if PG&E delays award of Work beyond the expiration date of Contractor's supplier quotations, Contractor shall acquire new material quotations from its suppliers and submit to PG&E documentation of the change in material costs from the original proposal and provide PG&E the anticipated impact of such increases to the total project budget. PG&E reserves the right to reject the increase in cost and may elect to either perform the Work itself or contract with others. PG&E expects to be reimbursed for decreases in costs of materials.

8.5.1 ALTERNATIVE SUPPLIER: PG&E shall have the option to arrange with a different supplier to furnish acceptable material to Contractor at lower overall cost providing conditions of delivery, service, etc., are acceptable to Contractor.

8.5.2 BASIS FOR ADJUSTMENT: Adjustments in material costs shall be computed from Contractor's actual net costs including discounts. Contractor shall furnish PG&E copies of all paid invoices along with Contractor's computations and requests for reimbursement.

8.5.3 CREDITS: If there is a decrease in the cost of material listed in the Specification, Contractor shall credit PG&E in payments due Contractor to the extent of the total savings resulting from decreases.

8.5.4 INVOICES: Invoices covering adjustments due to changes in material costs for material purchased in any one month pay period shall be presented within 60 days after the end of that pay period or such invoices may not be accepted for payment.

8.5.5 NO FEE: Amounts payable or credited under this section shall be actual costs without fee.

8.6 PRICING OF INCREASE IN WORK: Change Orders that require an increase in the Work will be priced, at PG&E's option, on one of the following bases: lump-sum, unit prices, an hourly rate or a cost reimbursable compensation structure basis. The price for these bases shall include the following fees:

8.6.1 WAGES AND SALARIES: Wages and salaries of Contractor's employees, including job foremen engaged directly in performing the Work. Such wages and salaries will include payroll taxes, vacation, holiday and sick leave allowances, and other fringe benefits Contractor is required to pay as a result of collective

bargaining agreements between the construction industry and the labor unions involved.

8.6.1.1 INVOICE SUPPORT: For all Work performed on an hourly rate basis, Contractor shall itemize the labor classifications, the number of individuals who worked that day in each classification, and the total number of hours worked for each classification on the LM&E Sheets. Contractor shall be compensated for labor at the labor rate quoted in the Contract for the classification worked. Excepting only the labor rates subject to Section 10.12, if Contractor elects to pay any individual(s) a rate higher than the classification rate provided in the Contract, the additional cost shall be borne by Contractor and Contractor shall not invoice PG&E a rate higher than that quoted in the Contract.

8.6.2 MATERIAL AND SUPPLIES: Materials and supplies consumed in the Work at actual cost, less trade and cash discounts, if shown on Contractor's receipt, adjusted for i) sales or use taxes; ii) transportation costs; and iii) fair market value of materials and supplies salvaged and retained by Contractor. PG&E has the option to witness and sign for the receipt of materials and supplies. Material furnished by Contractor shall be itemized on the LM&E Sheets.

8.6.3 INSURANCE: Pro rata amounts of premiums for the insurance required in Article 6 but only up to limits of the insurance specified in Section 7.2. Premiums for other insurance shall not be separately reimbursable.

8.6.4 INCIDENTALS: Incidental direct costs to Contractor arising directly from performance of the Work, provided such costs are approved in writing.

8.6.5 FEE: A fee equal to the percentage stated in Contractor's Proposal of the total of Sections 8.6.1 through 8.6.4 to cover among other things profit, supervision of personnel, field office personnel, overhead (including incidental direct costs and materials and supplies actually consumed in the Work), rental charges for use of tools and equipment valued at less than $10,000 each and other general and indirect expenses. Unless otherwise stated, cost of general foreman shall be included in overhead.

8.6.6 EQUIPMENT Charges for Contractor's use of equipment valued at $10,000 or more. Equipment available at the worksite will be paid for on an hourly, daily, weekly or monthly rate, whichever is the most economic to PG&E, based upon the actual hours used, including overtime, at the rates set forth in the equipment pricing schedule, Rates shall include all costs to PG&E including, but not limited to, fuel, the cost of fueling the equipment including, if applicable, fuel truck on site, insurance, licenses, taxes, and maintenance unless otherwise specified. Equipment shall, in the opinion of the PG&E, be in good working condition and suitable for the purpose for which the equipment is to be used. Equipment time, whether Contractor owned equipment or Contractor-rented equipment, will not be reimbursed by PG&E while equipment is inoperative due to breakdowns or malfunctions or for equipment that is no longer required for the performance of the Work. If PG&E requests Contractor to furnish special equipment not on hand at the worksite for use on Work and Contractor could not reasonably have been expected to know that such equipment was required, PG&E will compensate Contractor for the cost of moving the equipment on and off the worksite. If PG&E requests in writing that Contractor hold certain equipment at the worksite for Work for PG&E's convenience, compensation for standby time will be at the most economic rate quoted in Contractor's equipment rates. No other fees shall be applied to the equipment rental rates whatsoever.

8.6.6.1 If Contractor elects to rent equipment for the Work rather than use its

own equipment, the rate charged to PG&E for such Contractor-rented equipment shall not exceed the rate as quoted in this Contract for Contractor-owned equipment, subject to all of the requirements of Paragraph 8.6.6 above. In the event Contractor requests compensation for the use of Contractor- rented equipment that is higher than the most economic rate for Contractor-owned equipment, Contractor shall provide documentation to PG&E of the reason Contractor has elected to rent the equipment and justification for the higher rate.

8.6.6.2 Contractor shall specify equipment description, vehicle identification number or serial number, company equipment number, number of hours utilized, and whether equipment is owned or rented on the LM&E Sheets. Standby time shall be identified separately on the LM&E Sheets. Operator costs shall be separately reimbursed in accordance with the labor rates quoted in the Contractor's proposal. Contractor shall ensure that the rate charged for each such item of equipment is the most economic rate to PG&E for the total usage of the equipment.

8.6.7 DAMAGED OR DESTROYED WORK: Contingent upon the provisions of the repair and replacement of any portion of the Work destroyed or damaged due to causes beyond Contractor's control, including materials and equipment delivered to the worksite for installation that are not covered by insurance.

8.6.8 SUBCONTRACTOR'S AND FABRICATOR'S FEES: If Contractor requests authorization to have a Subcontractor or fabricator perform additional Work, Contractor shall state in the request the Subcontractor's or fabricator's fee applicable to Sections 8.6.1 through 8.6.4, and not to exceed an amount calculated pursuant to Section 8.6.5. Contractor shall audit and substantiate the data submitted by Subcontractor or fabricator. PG&E shall have the option of auditing Subcontractor's or fabricator's cost-plus records.

8.6.8.1 For approved additional Work or for Work performed on an hourly or time and material basis performed by a Subcontractor, Contractor will be paid the Subcontract amount (including Subcontractor's fee, if any, in conformance with Attachment 3C). This fee shall cover Contractor's profit and expenses incident to administration of the Subcontract. The fee shall not apply to rental of equipment from subsidiaries of Contractor, from its partners or co-adventurers, or from their subsidiaries.

8.6.9 TRANSPORTATION: Cost of transportation to the job site and from the job site to an agreed destination, including loading and unloading of equipment not self-propelled or readily movable, shall be reimbursed at the hourly rates submitted by Contractor in its Proposal, providing these costs have not been reimbursed indirectly under other items of the Contract. Contractor shall itemize transportation costs on the LM&E Sheets as described in Section 4.2.3.

8.6.10 ITEMS EXCLUDED: Compensation to Contractor shall not include (i) the amount of a penalty, judgment, settlement, or other expense paid or incurred by Contractor as a result of Contractor's actual or alleged violation of a contract, law, rule, or regulation, except to the extent that the penalty, judgment, settlement, or other expense represents wages or taxes otherwise reimbursable; or (ii) the amounts paid by Contractor for repair or replacement of defective Work or costs of material wasted due to careless workmanship, or costs of work performed which, in PG&E's opinion, is not necessary for the performance of the authorized Work.

8.7 LUMP-SUM AND UNIT PRICE EXTRA WORK: For additional Work or changes

performed on a lump-sum, or agreed-price basis, Contractor shall submit for approval by PG&E, if required, a complete price breakdown of amounts and fees based on the actual, additional costs to be incurred. The breakdown shall conform to the cost breakdown and include the fees set forth in Section 8.6 and the fees quoted in the Proposal. Extra Work performed on a unit price basis shall be computed on the basis of the Contract unit prices.

8.8   COST-PLUS WORK: For additional Work or changes authorized to be performed on a cost-plus basis, PG&E will reimburse Contractor to the extent additional costs are incurred to perform the additional Work or changes. Contractor agrees that the amount of Work performed under the terms of Section 8.6 is not specified and no claim will be accepted because the Work is greater or less than anticipated. Contractor must complete an LM&E Sheet for all additional Work performed.

8.9   COST SEGREGATION: Charges made under Section 8.6, 8.7 and 8.8 shall be segregated to PG&E cost accounts in accordance with procedures and details as required.

8.10   DECREASE IN WORK: Change Orders that require a reduction in the Work shall entitle PG&E to a credit, at PG&E's option, of either an amount equal to Contractor's reduced costs as agreed upon between PG&E and Contractor or an amount computed on the basis of Contract unit prices for the Work. If required by PG&E, Contractor shall submit a complete price breakdown of amounts and fees.

**ARTICLE 9.**
**DELAYS IN WORK**

9.1   DELAYS: Nothing contained in this Article 9 shall serve to relieve Contractor of its obligations and responsibilities for timely completion of all of the Work hereunder. Contractor shall promptly notify PG&E in writing of any impending cause for delay. If possible, PG&E will assist Contractor in reducing the delay. Failure to promptly notify PG&E will constitute waiver by Contractor of concessions or benefits specified under this section.

9.2   DELIVERY OF MATERIALS: Delivery dates for material to be supplied by others, directly or through PG&E, are specified under the Construction Schedule and are scheduled to allow Contractor sufficient time for installation.

9.3   SUSPENSION OF WORK: PG&E reserves the right to suspend the Work or delivery of materials.

9.4   DELAYS WITHIN CONTRACTOR'S CONTROL: No additional compensation or other concessions will be allowed Contractor for expenses resulting from delays for which Contractor is responsible. If, in PG&E's opinion, the delay is sufficient to prevent Contractor's compliance with the specified Construction Schedule, Contractor shall accelerate the Work by overtime or other means, at Contractor's expense, to assure completion on schedule.

9.5   DELAYS CAUSED BY ADVERSE WEATHER: Delays or Work stoppages due to adverse weather conditions considered normal for the area and time of year will not be considered as delays beyond Contractor's control and no additional compensation or extension of schedule will be allowed. Delays due to weather will be considered beyond the contractor's control if Contractor can show that adverse weather was of greater duration or intensity than normally expected for the job area and time of year.

9.6   DELAYS BEYOND CONTRACTOR'S CONTROL: If there is a delay in delivery of material to be furnished by PG&E or a delay, in PG&E's opinion, caused by circumstances beyond Contractor's control, PG&E will investigate the causes and remedies and may require or authorize one of the following procedures. Contractor will be promptly notified as to which procedure will be followed.

9.6.1   MINOR DELAY: Contractor may be required to complete the Work in accordance with the

specified Construction Schedule, if possible without the use of additional premium or shift work, with no allowance for extra time or extra compensation.

9.6.2 MAJOR DELAY, SCHEDULE CAN BE MET: PG&E will require or authorize the use of overtime and/or shift work as necessary to meet the Construction Schedule. In this case, PG&E will reimburse Contractor for the premium portion only of overtime and any shift differential, with fee, if Contractor was not already working shifts. No other extra compensation including impact, additional supervisory, engineering or clerical expenses required, premium time or shift inefficiencies will be allowed.

9.6.3 MAJOR DELAY, SCHEDULE CANNOT BE MET: PG&E will require or authorize the extension of the Construction Schedule for a period of time equal to the delay plus, in the event of strikes or other causes that make it necessary to close down the Work, an additional 2 days. Contractor will be reimbursed for actual additional expense without fee for (i) job overhead personnel including job superintendent, job engineer, office manager, payroll clerks, and other nonphysical workers; (ii) equipment rental, including automotive, office trailers, etc., both bare and fueled and maintained for equipment required by personnel described in (i); (iii) equipment rental for other equipment that is necessary to be kept at the site at rates shown in current edition of the Rental Rate Blue Book; and (iv) miscellaneous office expenses, including telephone, electric power, and other utilities, office supplies, space rental, etc.

**ARTICLE 10.**
**CONTRACTOR'S LABOR RELATIONS**

10.1  GENERAL: Contractor shall promptly notify PG&E in writing of any labor dispute or anticipated labor dispute which may affect the time, performance or cost of the Work.

10.2  LOCAL BARGAINING: In addition to Contractor's legal obligations under the Labor-Management Relations Act (LMRA), if Contractor is a subscriber to a multi-employer bargaining association or group, Contractor shall, if PG&E directs, participate to the fullest extent in the collective bargaining of that group with any labor organizations claiming jurisdiction over any portion of the Work.

10.3  INTERIM AGREEMENTS: Contractor shall not make interim agreements with labor unions during contract bargaining designed to avoid strikes sanctioned by an international union or by a local building trades council or engage in other activities which might undermine management efforts at the bargaining table.

10.4  STRIKE: In the event of a labor dispute or strike by Contractor's or its Subcontractor's employees which threatens the progress or cost of the Work or PG&E's labor relations, or which disrupts PG&E's operations, or results in a secondary boycott at PG&E facilities, PG&E reserves the right to restrict additional hiring of Contractor's employees, to suspend or discontinue the Work of Contractor and any Subcontractor, or terminate the Contract. This Section shall be applicable whether or not Contractor or any Subcontractor is directly involved in a labor dispute.

10.5  EXISTING UNION CONTRACTS: Contractor shall not make labor agreements with any local construction trade union affecting the performance of the Work or its cost to PG&E, independent of or in conflict with agreements in effect between the local contractors' association and the union, without first obtaining written approval from PG&E.

10.6  NATIONAL AGREEMENTS: Contractor shall, within 15 days after award of Contract, supply PG&E with copies of national agreements to which Contractor is a party. No later than 5 days before the expiration of any local agreement which may affect the Work, Contractor shall meet with PG&E for the purpose of discussing the appropriate course of action.

10.7  JURISDICTIONAL DISPUTES: Contractor and/or Subcontractor shall take steps to resolve violations of collective bargaining agreements and jurisdictional disputes, including without limitation the filing of appropriate process with any court or administrative agency having jurisdiction to settle,

enjoin or to award damages resulting from violations of collective bargaining agreements or from jurisdictional disputes.

10.8 LABOR SUPPLY: Contractor shall provide a sufficient number of skilled workers to fulfill the requirements of the Specification from whatever sources available, including nonunion sources.

10.9 APPRENTICES: It is important to PG&E that the Work be performed in the most economical manner consistent with the Specification requirements. It is also in PG&E's best interest to have an adequate number of trained workers within its service area to perform construction work that may be required.

10.9.1 UNION CONTRACTORS: Contractor shall actively participate in union apprentice programs and exert its best effort to maintain the maximum complement of apprentices in the field work force as permitted by the local collective bargaining agreements. Contractor shall employ during the performance of this Contract the number of apprentices or trainees, or both, in each occupation, called for by each applicable labor agreement; shall take whatever steps may be necessary to assure that 25 percent of the apprentices or trainees in each occupation are in their first year of training; and shall agree to maintain and make available for inspection, upon PG&E's request, Contractor's records on employment of apprentices, trainees, and journeymen, in each occupation.

10.10 USE OF PREFABRICATED MATERIAL: Contractor shall install prefabricated or preassembled equipment where specified or purchased by PG&E, or otherwise where it is deemed to be the most economical alternative whether or not fabricated in a union shop and without necessary change.

10.11 TAX WITHHOLDING: Contractor represents and warrants that it will withhold all taxes, if any, which are required to be withheld under applicable law with respect to payments to persons hired by Contractor who perform services for PG&E. Contractor shall indemnify and hold PG&E harmless, on an after-tax basis, for any liability incurred by PG&E as a result of Contractor's failure to institute any such required withholding.

10.12 PREVAILING WAGES FOR WORK NORMALLY PERFORMED BY IBEW EMPLOYEES: In the event work performed by Contractor under this contract has been identified by PG&E as work normally performed by IBEW represented PG&E employees, Contractor shall pay wages to the Contractor employees which meet or exceed prevailing wages. In addition, pursuant to California Public Utilities Commission Decision 04-12-056 as modified by Decision 04-12-063, Contractor shall pay its workers who are employed on energy utility construction projects, awarded by Pacific Gas and Electric Company on or after December 16, 2004, prevailing wages as determined by the State of California Department of Industrial Relations Department ("DIR"). For purpose of this paragraph, prevailing wages shall be as defined by California Labor Code Part 7, Chapter 1, Article 2, Section 1770, 1773, and 1773.1. Contractor shall provide PG&E a certified copy of their payroll, including benefits, broken out by PG&E department, for all Work performed by Contractor that is identified by PG&E as work normally performed by IBEW represented PG&E employees or subject to the CPUC Decision named above. All requirements of this section shall extend to Contractor's subcontractors. If the provisions of this section conflict with the requirements of other sections of Specific Conditions, if applicable, or these General Conditions, this section will prevail.

10.13 OPERATOR QUALIFICATION: In the event the Work hereunder provides for Contractor to perform tasks or subtasks identified by PG&E as work covered by the Department of Transportation Operation Qualification Guidelines listed in 49 CFR 192 and 195 and in Pacific Gas and Electric Company's Gas Operation Qualification Plan, Contractor and Subcontractor(s) must be qualified to perform such Work. Furthermore, Contractor and Subcontractor(s) must be able to recognize and react appropriately to abnormal operating conditions that may indicate a dangerous situation or a condition exceeding design limits.

10.13.1 DOCUMENTATION OF COMPLIANCE: Contractor and Subcontractor(s) shall, in order to verify compliance with, and qualifications under, both the DOT Operator Qualification Rule

and PG&E's DOT Operator Qualification Plan, provide copies of (i) Contractor's and/or Subcontractor's Qualification Plan; (ii) Certification of compliance with DOT Operator Qualification Guidelines, dated and signed by Contractor; and (iii) Certification of performance-based testing for each Contractor or Subcontractor employee assigned to perform covered tasks/subtasks, clearly identifying the individual certified. The documents listed shall be provided to the PG&E Operator Qualification Specialist, GSM&TS, 375 North Wiget Lane, Suite 200, Walnut Creek, California 94598, prior to commencing Work.

10.13.2 DOCUMENTATION OF INDIVIDUALS: The documentation that supports an individual's qualification must, as a minimum, include: (i) the identity of the individual including, but not necessarily limited to, full name and the last four digits of the Social Security Number or, preferably, the employee number; (ii) identification of each task/subtask for which he/she is qualified; (iii) date of qualification for each task/subtask; (iv) qualification frequency as determined by PG&E; (v) last qualification date; and (vi) Qualification Method – oral, written, and/or performance-based.

10.13.3 PG&E QUALIFICATION: PG&E. at its option, may also require that Contractor and Subcontractor personnel be qualified under PG&E's Gas Operation Qualification Plan. In such event, PG&E's Operator Qualification Specialist will advise Contractor of the location, date and time for qualification. PG&E may require that the entire crew be qualified or that only lead personnel be qualified. PG&E will provide Contractor with copies of all qualification documents prior to start of covered Work.

10.13.4 EXPIRATION OF QUALIFICATIONS: All Contractor and Subcontractor qualifications will expire upon completion of the project or as determined, in writing, by Pacific Gas and Electric Company.

10.13.5 RECORD KEEPING: As defined in Record Keeping in Section 1.8 of Pacific Gas and Electric Company's Operator Qualification – Basic Plan, Contractor and Subcontractor(s) must maintain records of individual qualification while the individual is performing covered tasks/subtasks and for a minimum period of five years after the individual is no longer performing covered tasks/subtasks.

10.13.6 CONTRACTOR RESPONSIBILITIES: Contractor shall be responsible for all penalties and costs associated with Contractor or Subcontractor failure to comply with the foregoing. Contractor shall notify PG&E immediately of any changes in the status of the employee or Subcontractor that affects their qualification to perform covered tasks.

10.14 PERSONNEL REQUIREMENTS: Contractor shall employ personnel qualified to perform the Work. If the PG&E Representative finds Contractor's employee to be unsatisfactory, Contractor or Contractor's Representative shall replace said employee immediately. This provision in no way requires and PG&E neither expressly or impliedly endorses or approves the Contractor to terminate the employment of any employee replaced under the terms of this Section.

10.14.1 EMPLOYEE DATA: If requested, the Contractor shall furnish PG&E the following information on each employee after award of Contract and each Contract, and prior to starting Work: full name, address, date of birth, employee number, and PG&E work location. If required by PG&E, Contractor shall advise PG&E of temporary or permanent changes in personnel and shall provide the same information for such additional employees.

10.14.2 TRADES: Various branches or trades into which the Work is divided are generally specified under separate divisions of the Specification. Contractor shall, in accepting the bid of a Subcontractor for a given trade, be satisfied that the Work to be performed by that trade is included in the Subcontractor's bid, whether or not it is specifically required within the division relating to that trade or class of Work. Journeymen and other workers employed in the Work shall be skilled in their trades. Workers employed by Contractor shall be subject to PG&E approval.

10.15 REPORTING: In accordance with Section 7912 of the California Public Utilities Code, Contractor agrees to report annually to PG&E the number of California residents employed by Contractor, calculated on a full-time or full-time equivalent basis, who are personally providing services to PG&E.

## PART B:
## BASE GENERAL CONDITIONS

## ARTICLE B-1.
## NO GUARANTEE OF WORK; INDEPENDENT CONTRACTOR

B1.1 THIS IS NOT AN EXCLUSIVE CONTRACT. THIS CONTRACT DOES NOT GUARANTEE CONTRACTOR ANY VOLUME OR DURATION OF WORK. PG&E EXPRESSLY RESERVES ALL ITS RIGHTS, INCLUDING BUT NOT LIMITED TO THE RIGHT TO CONTRACT WITH OTHER PARTIES FOR THE PERFORMANCE OF WORK OF THE TYPE CONTEMPLATED BY THIS CONTRACT; THE RIGHT TO REQUEST PROPOSALS FROM OTHERS WITH OR WITHOUT REQUESTING PROPOSALS FROM CONTRACTOR AND THE UNRESTRICTED RIGHT TO PERFORM THE WORK WITH PG&E'S OWN EMPLOYEES.

B-1.2 INDEPENDENT CONTRACTOR: In assuming and performing the obligations of this Contract, Contractor is an independent contractor and shall not be eligible for any benefits which PG&E may provide its employees. All persons, if any, hired by Contractor shall be employees or Subcontractors of Contractor and shall not be construed as employees or agents of PG&E in any respect.

## ARTICLE B-2. INDEMNIFICATION, LIABILITY AND
## WITHHOLDING

B-2.1 INDEMNIFICATION: Contractor shall indemnify, hold harmless and defend PG&E, its affiliates, subsidiaries, parent company, officers, managers, directors, agents, and employees, from and against all claims, demands, losses, damages, costs, expenses, and liability (legal, contractual, or otherwise), which arise from or are in any way connected with any: (i) injury to or death of persons, including but not limited to employees of PG&E or Contractor; (ii) injury to property or other interests of PG&E, Contractor, or any third party; (iii) violation of a local, state, or federal common law, statute or regulation, including but not limited to environmental laws or regulations; (iv) strict liability imposed by any law or regulation; (v) delay or failure to pay any Subcontractor, including but not limited to any demands for payment, invoices, or liens; (vi) delay or failure to pay any employees, laborers, or other personnel of Contractor or any Subcontractor the compensation, monies, wages, benefits or other payment due or allegedly due; so long as such injury, violation, payment or strict liability (as set forth in (i) - (vi) above) arises from or is in any way connected with Contractor's performance of, or failure to perform, this Contract, (a) excepting only such loss, damage, cost, expense, liability, payment, strict liability, or violation of law or regulation for which indemnity is not allowed under applicable law, and (b) except to the extent that the alleged claim relates to provision of professional services on the part of the Contractor or its Subcontractors, in which case the Contractor's obligation to indemnify PG&E shall be to the extent of Contractor's negligence and shall be reduced by any active negligence on the part of PG&E. As used in the preceding sentence, "professional" is defined as services that are primarily intellectual rather than manual, including preparation of engineering, designs, reports, drawings and applications. Contractor shall, on PG&E's request, defend any action, claim, or suit asserting a claim which might be covered by this

indemnity. Contractor shall pay all costs and expenses that may be incurred by PG&E in enforcing this indemnity, including reasonable attorney's fees.

B-2.1.1  HAZARDOUS MATERIAL OR WASTE: Contractor acknowledges that any claims, demands, losses, damages, costs, expenses, and liability that arise from or are in any way connected with the release or spill of any legally designated hazardous material or waste and arise from or are in any way connected with the Work performed under this Contract, are expressly within the scope of this indemnity. However, notwithstanding the foregoing, Contractor  and PG&E recognize and agree that  Contractor bears no responsibility whatsoever for the creation, existence or presence of any toxic, hazardous, radioactive, infectious or other dangerous substances existing at PG&E's work site at the time that Contractor commences performance of services at said site ("Pre-existing Conditions"). Under no circumstances will Contractor assume ownership of or legal liability for PG&E's waste under CERCLA or other laws pertaining to hazardous materials and wastes or assume the status of generator, storage agent, treatment facility, or disposal facility for PG&E's waste under RCRA or any state law governing the treatment, storage or disposal of waste. Contractor will, at PG&E's request, help PG&E identify appropriate alternatives for offsite treatment, storage or disposal of hazardous materials, but, Contractor shall not make any independent determination about the selection of a treatment, storage, or disposal facility. PG&E shall sign all manifests or shall provide written authorization for Contractor to sign manifests as agent for PG&E. Any hazardous materials, substances, pollutants or contaminants generated or encountered in the performance of the Work, except for hazardous materials that are brought onto the worksite by the Contractor, shall be the responsibility of PG&E and shall be disposed of under a RCRA hazardous waste Generator Number obtained by and carried in the name of PG&E.

B-2.2  WITHHOLDING:  PG&E may withhold from the final payment due Contractor hereunder such amounts as, in PG&E's opinion, are sufficient to provide security against all loss, damage, expense, and liability covered by the foregoing indemnity provision for damage to property.

B-2.3  RISK OF LOSS OR DAMAGE TO WORK:  Until the Work is completed and accepted by PG&E, the risk of loss or damage to the Work shall remain with Contractor. No damages or extras will be allowed for unforeseen difficulties or obstructions, except as explicitly set forth herein.

B-2.4  INCIDENTAL AND CONSEQUENTIAL DAMAGES: EXCEPT WITH RESPECT THE CONFIDENTIALITY OBLIGATIONS AND THIRD-PARTY INDEMNIFICATION OBLIGATIONS OF CONTRACTOR FOR DEATH AND PERSONAL INJURY CLAIMS UNDER THIS CONTRACT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY (OR ANY INDIVIDUAL OR ENTITY CLAIMING THROUGH SUCH PARTY) FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, LOSS OF PROFITS OR UNRECOVERED OVERHEAD AND, UNLESS EXPRESSLY AUTHORIZED IN WRITING BY PG&E, COMMITMENTS TO SUBCONTRACTORS, RENTAL OR LEASE AGREEMENTS, AND PERSONAL SERVICES CONTRACTS.

B-2.5  DIRECT DAMAGES:  EXCEPT AS TO THE CONTRACTOR'S INDEMNIFICATION OBLIGATIONS FOR THIRD PARTY DEATH AND PERSONAL INJURY CLAIMS UNDER THIS CONTRACT, CLAIMS FOR DEATH OR PERSONAL INJURY, AND CLAIMS FOR INFRINGEMENT, A PARTY'S TOTAL AGGREGATE LIABILITY TO THE OTHER PARTY (OR ANY INDIVIDUAL OR ENTITY CLAIMING THROUGH SUCH PARTY) WHETHER IN EQUITY, COMMON LAW, CONTRACT, ESTOPPEL, NEGLIGENCE, TORT, STRICT LIABILITY OR ANY OTHER THEORY (REGARDLESS OF THE FORM OF ACTION), ARISING OUT OF, RESULTING FROM OR RELATING TO THE CONTRACT, SHALL NOT EXCEED TWENTY THREE MILLION DOLLARS.).

B-2.6  THE PARTIES AGREE THAT THE LIMITS OF LIABILITY STATED IN THIS SECTION B-2 ARE CUMULATIVE AND THE AMOUNTS OF ANY SUCH LIMITS OF LIABILITY MAY NOT BE COMBINED WITH ANY OTHER LIMITS OF LIABILITY SET FORTH IN SECTION B-2 SO AS TO INCREASE THE FOREGOING LIABILITY CAP IN ANY PARTICULAR INSTANCE OR SERIES OF INSTANCES.

**ARTICLE B-3.**
**AMENDMENTS, SUBCONTRACTS AND ASSIGNMENTS**

B-3.1    AMENDMENT:  No provision of the Contract will be deemed amended or waived by PG&E without prior written approval by Change Order.  No oral statement will modify or otherwise affect the terms and conditions set forth herein.

B-3.2    SUBCONTRACTS:  Contractor shall not enter into Subcontracts and no Subcontractor shall be permitted to perform Work without the prior written approval of PG&E. PG&E's approval of any Subcontract shall not relieve Contractor of its obligations to PG&E under this Contract. The provisions and obligations of this Contract shall apply to any Subcontract and Contractor shall be responsible to PG&E for any damages to PG&E arising out of Subcontracts not in accordance with this Contract. Nothing in the Contract shall create any contractual relations between a Subcontractor and PG&E.

B-3.3    ASSIGNMENT:  Neither party may assign all or any part of this Contract or its rights and obligations hereunder, directly or indirectly, by operation of law or otherwise without the other party's prior written consent, except that Contractor may assign to Contractor's corporate affiliate in which Contractor holds a majority interest, provided that the Contractor and the affiliate remain obligated under this Contract. Subject to the foregoing, this Contract shall be binding upon and inure to the benefit of the successors and assigns of the Parties hereto.

**ARTICLE B-4.**
**ROYALTIES, LICENSE FEES, USE RIGHTS,**
**INFRINGEMENT PROTECTION**

B-4.1    ROYALTIES AND LICENSE FEES:  Royalties, license fees or other charges for patents, copyrights, licenses, or other intellectual property for designs, processes, machinery, equipment, technology, published or unpublished data, information or materials, including but not limited to, manuals, computer programs or other deliverables furnished by Contractor for the Work, or for processes or methods employed by Contractor in performing the Work, shall be included in the Contract price.

B-4.2    OWNERSHIP OF DELIVERABLES: PG&E shall own all data, drawings, designs, reports, information, manuals, computer programs or other written, recorded, photographic or visual materials, or other deliverables produced in the performance of this Contract. Contractor shall retain no ownership, interest, or title in them except as may otherwise be provided in this Contract. Re-use of any such deliverables by PG&E on any extension of the project or on any other project without the written authorization of Contractor shall be at PG&E's sole risk.

B-4.3    PREEXISTING RIGHTS: If and to the extent that Contractor retains any preexisting rights in any materials furnished hereunder, Contractor hereby grants to PG&E the irrevocable, perpetual, non-exclusive, worldwide, royalty-free right and license to (1) make, use, execute, reproduce, display, perform, distribute copies of, and prepare derivative works based upon such preexisting rights and derivative works thereof in connection with PG&E's business, and (2) authorize others to do any or all of the foregoing in connection with PG&E's business. Any claims of Contractor proprietary rights in materials furnished hereunder must be expressly set forth in this Contract or shall have been previously disclosed to PG&E in writing.

B-4.4    CONFIDENTIALITY:  In the course of performing the Work under this Contract, Contractor may have access to confidential, commercial, business or personal information concerning, but not limited to, technological, financial, rate-making, legislative and personnel matters and practices of PG&E, its affiliates, subsidiaries, parent company or members of the public.  Contractor

agrees not to disclose any such confidential information or to otherwise make it available to any other person, including any affiliate of PG&E that provides energy or energy-related products or services, without the prior written approval of PG&E, except to Contractor's employees who need such information to properly perform their duties under this Contract, except to Contractor's employees who need such information to properly perform their duties under this Contract. Prior to execution of this Contract, Contractor shall complete, sign and return Exhibit 7 Nondisclosure Agreement.

B-4.5    USE AND REPRODUCTION RIGHTS:  PG&E shall have the unrestricted right of use and reproduction of all documentation, including but not limited to, instructional manuals, and other materials related to the Work furnished hereunder. Such use and reproduction by PG&E or by contractors doing work for PG&E shall not require further permission by Contractor, nor shall it constitute infringement of Contractor's ownership rights, including copyright, to such materials. Any claims of Contractor to ownership in materials furnished hereunder must be expressly set forth in the Contract or shall be disclosed to PG&E in writing.

B-4.6    INFRINGEMENT PROTECTION:  Contractor represents to PG&E that the Work to be performed, and the materials prepared or used, under this Contract will not infringe upon the copyright, patent or license, or otherwise violate the proprietary rights, including trade secret rights, of any person or entity. Contractor agrees to indemnify and hold PG&E, its affiliates, subsidiaries, parent company, officers, managers, directors, agents, and employees, harmless from any suit, demand or claim alleging any such infringement or violation. In addition to the foregoing, if there is such a claim, Contractor agrees at PG&E's option to either procure for PG&E the right to continue using the material, replace the material with non-infringing material or modify it so it becomes non-infringing, or remove the item and refund the applicable portion of the Contract price; provided, however, that the replaced or modified material shall be equal to that contracted for hereunder and satisfactory to PG&E. Contractor further agrees to pay any judgment or reasonable settlement offer resulting from a suit, demand or claim, and pay any reasonable attorney's fees incurred by PG&E in defense against such suit.

B-4.7    PUBLIC RELEASE OF RESULTS:  Contractor agrees not to release any information relating to the Work performed hereunder for publication, advertising, or for any other purpose, without first providing PG&E with the information sought to be released and a description of the publication for PG&E's prior approval.  Contractor further agrees that a release shall not present any material findings not reasonably inferable from the data. Any public release shall acknowledge PG&E's sponsorship of the Work.

B-4.8    PUBLIC TESTIMONY:  It is further agreed between the Parties that, if requested by PG&E, Contractor shall provide testimony before any federal, state or local court, regulatory body or any other public agency to substantiate any Work performed or data, reports, or materials supplied to PG&E.  Reasonable fees for such testimony will be negotiated at that time.

B-4.9    THIRD PARTY LICENSES:  Contractor represents and warrants that it shall comply (and ensure that its personnel and subcontractors comply) with all third party licenses, terms of use, policies and procedures that apply to or otherwise govern access to and/or use of any third party materials made available by PG&E to Contractor under this Contract.

**ARTICLE B-5.
CONFLICT OF INTEREST/BUSINESS ETHICS**

B-5.1    REASONABLE CARE:  Contractor shall exercise reasonable care and diligence to prevent any actions or conditions which could result in a conflict with PG&E's interest.

B-5.2    OTHER EMPLOYMENT:  During the term of this Contract, Contractor or its employees will not accept any employment or engage in any work which creates a conflict of interest with PG&E or in any way compromises the Work to be performed under this Contract.

B-5.3   GIFTS:  Contractor or its employees shall not offer or cause to be offered gifts, entertainment, payments, loans and/or other services, benefits or considerations of more than a nominal value to PG&E's employees, their families, vendors, Subcontractors and other third parties.

B-5.4   ACCURATE DOCUMENTATION:  All financial statements, reports, billings, and other documents rendered shall properly reflect the facts about all activities and transactions handled for the account of PG&E.

B-5.5   NOTIFICATION:  The Contractor shall immediately notify PG&E of any and all violations of this clause upon becoming aware of such violation.

**ARTICLE B-6.**
**SAFETY PRECAUTIONS AND PROTECTION OF PROPERTY**

B-6.1   REGULATIONS AND CONDUCT OF WORK:  Contractor shall plan and conduct the Work to safeguard persons and property from injury. Contractor shall direct the performance of the Work in compliance with reasonable safety and work practices and with all applicable federal, state, and local laws, rules, and regulations, including but not limited to "Occupational Safety and Health Standards" promulgated by the U.S. Secretary of Labor and the California Division of Occupational Safety and Health, including the wearing of the appropriate Personal Protective Equipment (PPE) at the worksite.  Work in areas adjacent to electrically energized facilities and/or operating natural gas facilities shall be performed in accordance with said practices, laws, rules, and regulations. PG&E may designate safety precautions in addition to those in use or proposed by Contractor. PG&E reserves the right to inspect the Work and to halt construction to ensure compliance with reasonable and safe work practices and with all applicable federal, state, and local laws, rules, and regulations. Neither the requirement that Contractor follow said practices and applicable laws, rules, and regulations, nor adherence thereto by Contractor, shall relieve Contractor of the sole responsibility to maintain safe and efficient working conditions.

B-6.2   CALIFORNIA HEALTH AND SAFETY CODE:  The California Health and Safety Code requires businesses to provide warnings prior to exposing individuals to materials listed by the Governor as chemicals "known to the State of California to cause cancer, birth defects or reproductive harm." PG&E uses chemicals on the Governor's list at many of its facilities. In addition, many of these chemicals are present at non-PG&E-owned facilities and locations. Accordingly, in performing the Work or services contemplated under this Contract, Contractor, its employees, agents and Subcontractors may be exposed to chemicals on the Governor's list. Contractor is responsible for notifying its employees, agents, and Subcontractors that Work performed hereunder may result in exposures to chemicals on the Governor's list.

B-6.3   CONTROLLED SITE ACCESS:  A distinctive visible identification badge shall be furnished by Contractor and worn by its employees when on PG&E's property. Insofar as practicable, PG&E will require Contractor's employees to use one designated access in going to and from the worksite.  Contractor's guests and visitors shall secure a permit from PG&E to enter the worksite, and will be logged in and out of the property with PG&E retaining the permit at the time of logging out. Contractor's employees shall not enter electrically energized equipment areas or other areas out of construction limits except with written permission.

B-6.4   ADDITIONAL PRECAUTIONS:  If PG&E requests Contractor to provide certain safeguards not in use but considered necessary and if Contractor fails to comply with the request within a reasonable time, PG&E may provide the safeguards at Contractor's expense. Failure to comply with safety precautions required by PG&E may result in cancellation of the Contract in accordance with Article B-10.

B-6.5   PROTECTION OF FLOORS AND WALLS:  Contractor shall protect floors and walls from damage and discolorations due to exposure to oils and other discoloring agents during

performance of the Work. Damage or discoloration shall be repaired to PG&E's satisfaction at Contractor's expense.

B-6.6   STORAGE OF HAZARDOUS MATERIALS AND DISPOSAL OF HAZARDOUS WASTES: Surplus Hazardous Materials and Hazardous Wastes are the property and responsibility of Contractor, and may not be stored or disposed of on or at the Work site. Contractor represents and warrants that any facility to which Hazardous Wastes may be moved is in compliance with any and all federal, state, and local laws, rules and regulations pertaining thereto and that the facility is suitable to receive and/or dispose of, and may lawfully receive and/or dispose of the Hazardous Wastes.

B-6.7   DISCOVERY OF HAZARDOUS WASTES OR HAZARDOUS MATERIAL AND NOTICE TO PG&E: In the event that Contractor discovers Hazardous Waste or Hazardous Material on the job site during the performance of the Work, Contractor shall immediately (1) secure the area around the Hazardous Waste or Hazardous Material, and (2) notify PG&E of the situation.

B-6.8   FIRST-AID FACILITIES:  If first-aid facilities are required, Contractor shall furnish, stock, and provide the necessary qualified personnel to maintain such first-aid facility at Contractor's expense unless other provisions are made and agreed upon with PG&E.  Nothing contained in the Contract shall relieve Contractor from providing and maintaining all stretchers, blankets, first-aid material, and first-aid kits as required by applicable safety order of the State of California Department of Industrial Relations, Division of Occupational Safety and Health (Cal/OSHA) or as required by other federal, state or local laws, rules or regulations.

B-6.9   STANDBY VEHICLES(S):  If one or more standby vehicles is required for the transporting of seriously injured personnel, Contractor shall furnish, maintain and operate such vehicle(s) at Contractor's expense unless other provisions are made and agreed upon with PG&E. If a standby vehicle is provided for transporting seriously injured project personnel to medical facilities, Contractor shall have available specifically assigned workers who are qualified to drive the vehicle and to care for the injured in case of emergency.

**ARTICLE B-7.**
**GUARANTEES AND EQUIPMENT WARRANTY**

B-7.1   EQUIPMENT AND MATERIAL GUARANTEES:  In addition to the guarantees provided under this Contract, or implied in fact or in law, Contractor shall leave the entire project in satisfactory working order and repair or replace at its expense any part of the Work that develops defects due to faulty workmanship, materials, or any failure to comply with or perform in accordance with the requirements of the Specification within a period of twelve (12) months after the Work  is accepted by PG&E .Contractor shall promptly repair or replace, at  Contractor's expense, other Work, equipment or property damaged as the result of the defects, or as a result of the repairing thereof, and hold PG&E harmless from PG&E's repair expenses. The warranty period for a repair or replacement shall be one year from the date of acceptance by PG&E of the repair or replacement.

B-7.2   DESIGN AND ENGINEERING GUARANTEES:  In addition to the guarantees provided above, Contractor shall repair or replace at its expense any part of the Work that develops defects due to faulty design or engineering, or any failure to comply with or perform in accordance with the requirements of the Specification within a period of five years after the  Work  is accepted by PG&E and Contractor shall promptly remedy, at  Contractor's expense, other Work, equipment or property damaged as the result of the defects, or as a result of the remedying thereof and hold PG&E harmless from PG&E's repair expenses throughout the duration of the design and engineering warranty period.

B-7.3   EQUIPMENT WARRANTY:  If any third party materials or components are embodied in the Equipment or furnished with or in connection with the Work and are covered by a third party warranty or indemnity, Contractor shall: (a) provide PG&E with a copy of each such warranty or

indemnity; (b) if such warranty or indemnity does not, by its express terms, pass through to the end customer, then to the extent permitted by the third party, Contractor hereby assigns and transfers to PG&E all warranties and/or indemnities provided by such third party or Contractor shall require the third party (at Contractor's sole cost and expense) to grant PG&E the benefit under such warranties and/or indemnities; and (c) unless specifically provided otherwise herein, PG&E shall have no obligation to pay any third party any fees, royalties or other payments for PG&E's use of any third party materials embodied in or furnished with the Equipment. Contractor shall support and maintain such third party materials during the applicable warranty period.

B-7.4   WORK STANDARDS:  Contractor warrants to PG&E that the Work under this Contract shall be performed with the degree of skill and care that is required by current, good and sound professional procedures and practices, and in conformance with generally accepted professional standards prevailing at the time the Work is performed.

B-7.5   REPAIRS BY PG&E: In the event PG&E determines that it is impractical for Contractor to make repairs or replacements, PG&E reserves the right to undertake or have others undertake the repairs or replacements at Contractor's expense. PG&E's exercise of its rights under this Section shall not waive any rights or remedies PG&E may have under this Contract in law or equity.

### ARTICLE B-8.
### PG&E'S OPERATION

B-8.1   PG&E'S OPERATION:  When working in the vicinity of PG&E's plant or offices, Contractor shall conduct the Work in a manner that will cause a minimum of inconvenience to PG&E's employees and the general public. Contractor shall not interfere with PG&E's business or other operations.

B-8.2   USE OF FACILITIES:  PG&E shall have the use of constructed facilities during the Contract period whether facilities are completed or not. If PG&E makes use of an uncompleted facility, PG&E will reimburse Contractor for actual expense Contractor may incur as a result of such use.

B-8.3   ADVERTISING MATTER:  Contractor shall neither advertise nor allow advertising at the worksite without written approval.

B-8.4   CLEANING UP:  With respect to its own operation, Contractor shall maintain the worksite and related structures, equipment, and facilities in a clean, orderly condition during progress of the Work and clean up debris to the satisfaction of PG&E. If, in PG&E's opinion, the worksite is not being kept in a clean, orderly condition and if upon notice to correct the condition Contractor fails to do so, PG&E may shut down the Work until cleanup is performed or order others to perform cleanup work at Contractor's expense.  Building surfaces, including glass, shall be left clean.  Where more than one contractor is working at the worksite, and there is a disagreement in regard to the amount of cleanup each shall perform, PG&E will designate the amount of cleanup work each contractor shall perform. Upon completion of the Work, Contractor shall remove its tools, construction equipment, debris, and waste material from the worksite and leave the area in a clean and orderly condition to PG&E's satisfaction.

### ARTICLE B-9. AVAILABILITY OF
### INFORMATION

B-9.1   ACCESS:  PG&E's duly authorized representatives shall have, during the term of the Contract and for three years thereafter, access at all reasonable times to all of the Contractor's and its Subcontractors' personnel, accounts and records of all description, including but not limited to computer files, pertaining to the Contract to verify or review the quantity, quality, work program and progress of the Work, reimbursable costs, amounts claimed by the Contractor, estimates of cost for fixed rates including those applicable to proposed changes, and for any other reasonable purposes including any and all records of the Contractor for the purpose of verifying

compliance with Article B-5, CONFLICT OF INTEREST/BUSINESS ETHICS.

B-9.2   APPLICABILITY: This Article B-9 shall apply to all PG&E contracts but shall not apply to pricing for contracts performed solely on a lump-sum basis. However, where lump-sum and time and materials work (including unit price, reimbursable cost, fixed rates, etc.) are performed together, either as a part of this Contract or as separate contracts, then the above audit right shall also extend to PG&E's access to all Contractor's records pertaining to all PG&E contracts, including the lump-sum, for assurance that the portions of the Work performed on a time and materials basis are not being charged with time, material or other units or cost which are intended to be covered by lump-sum or fixed rates, etc., provided under this Contract, including Change Orders, or other agreements.

B-9.3   ACCOUNTING: The Contractor's and its Subcontractors' accounts shall be kept in accordance with generally accepted accounting principles in the particular industry and shall be kept in such a manner and in sufficient detail to clearly disclose the nature and amounts of the different items of service and cost pertaining to the Contract and the basis for charges or allocations to the Contract.

B-9.4   SUBCONTRACTORS: The Contractor shall include the necessary provisions in its Subcontracts to ensure that its Subcontractors comply with this Article.

**ARTICLE B-10.**
**CANCELLATION AND TERMINATION OF CONTRACT**

B-10.1   CANCELLATION FOR CAUSE: PG&E may, at its option, cancel or suspend this Contract for cause upon, but not limited to, the: (i) failure, refusal or inability of the Contractor to perform the Work in accordance with this Contract for any reason (except for those reasons that are beyond Contractor's control) after receiving notice from PG&E and an opportunity to cure and Contractor has failed to do so; provided however, at PG&E's option, safety or security violations may result in immediate cancellation; (ii) Contractor's insolvency, failure to pay bills, or receipt of returned checks for payment of its bills due to insufficient funds; (iii) placement of a legal action against Contractor which, in PG&E's opinion, may interfere with the performance of the Work; or (iv) the determination by PG&E that the Work will not be completed in the specified time, request by PG&E that Contractor take steps necessary to accomplish the required progress and completion, and failure of Contractor to do so.

    10.1.1   PG&E will be the sole judge whether Contractor is substantially performing Work in accordance with this Specification. Contractor shall be liable for additional costs to PG&E arising from cancellation.

    10.1.2   If the Contract is canceled, Contractor shall vacate the worksite but shall not remove material, plant, or equipment without the approval of PG&E. In the event of such cancellation, PG&E shall pay Contractor for services satisfactorily performed prior to the date of cancellation which are of benefit to PG&E. In no event shall PG&E be liable for lost or anticipated profits or overhead on uncompleted portions of the Work. Any reports, drawings or other documents prepared for PG&E prior to the effective date of such cancellation shall be delivered to PG&E by Contractor. Contractor shall not enter into any agreements, commitments or Subcontracts which would incur significant cancellation costs without prior written approval of PG&E. Such written approval is a condition precedent to the payment of any cancellation charges by PG&E.

    10.1.3   In addition to other remedies, PG&E may at its option and without prejudice to its other rights, take over and complete all or part of the Work using Contractor's equipment and facilities at the worksite.

B-10.2   TERMINATION FOR PG&E'S REASONS: PG&E may suspend or terminate the Contract, without cause upon written notice to Contractor. Contractor thereupon shall take whatever action with respect to performance of the Work as will tend to minimize its claim against PG&E.

In the event of termination, PG&E shall be liable to Contractor only for the compensation earned on the Work satisfactorily performed to the date of termination, plus direct costs reasonably incurred by Contractor in terminating its operation. Contractor shall not be entitled to any payment for lost or anticipated profits or overhead on uncompleted portions of the Work. Contractor shall not enter into any agreements, commitments or Subcontracts which would incur significant cancellation costs without prior written approval of PG&E. Such written approval is a condition precedent to the payment of any cancellation charges by PG&E.

## ARTICLE B-11.
## GENERAL PROVISIONS

B-11.1   LEGAL REPRESENTATION:  To the extent necessary, each Party was represented by counsel in the negotiation and execution of this Contract.

B-11.2   CHOICE OF LAWS:  This Contract shall be construed and interpreted in accordance with the laws of the State of California, excluding any choice of law rules which may direct the application of the laws of another jurisdiction.  Any controversy or claim arising out of or in any way relating to this Contract which cannot be amicably settled without court action shall be litigated in a California State Court of competent jurisdiction; or if jurisdiction over the action cannot be obtained in a California State Court, in a Federal Court of competent jurisdiction situated in the State of California.

B-11.3   COMPLIANCE WITH LAWS:  Contractor shall comply with all federal, state and local laws, rules and regulations applicable to the Work to be performed under this Contract and to all aspects of the employment relationships between Contractor and its employees assigned to this Contract. Unless prohibited by law, Contractor shall hold PG&E harmless from any liability, fine or penalty incurred as a result of Contractor's failure to comply with applicable legal and regulatory requirements.

   11.3.1  ENVIRONMENTAL LAWS: Contractor shall comply with all environmental and endangered species requirements and shall conduct its operations in a manner that complies with applicable programs and permits. In some cases, PG&E-specific environmental permits or programs may apply to the Work. Contractor is responsible for informing itself about and complying with such permits or programs.

   11.2.1 WORKERS: Contractor will only assign workers who have a current legal right to work in the country where they will be assigned. Contractor assumes all responsibility for immigration law compliance with respect to the workers it assigns pursuant to this Contract.

B-11.4   PG&E'S SOX EFFORTS: Contractor agrees to work with PG&E in good faith to enable PG&E to comply with SOX, including in particular but without limitation PG&E's management assessment and PG&E's auditor's opinion on the adequacy of internal controls over financial reporting pursuant to Section 404 of SOX. To that end, and in addition to Contractor's other obligations set forth in this Contract, Contractor agrees to the following:

   B-11.4.1  Contractor will maintain complete and accurate records and documentation of transactions, processes and controls performed for PG&E or otherwise relating to the Work, especially as it relates to financial information and any required disclosures thereof, which records and documentation will be subject to audit by PG&E or its representatives as provided in this Contract; and

   B-11.4.2  Contractor will notify PG&E immediately of any organization, security-related or other issues that Contractor knows or suspects may reasonably affect the ability of PG&E to comply with SOX.

   B-11.4.3   BACK-UP CERTIFICATES: Contractor will deliver reasonable back-up certificates relating to its Work under the Contract in a form to be mutually agreed to the extent

reasonably necessary to support PG&E in its filing of its applicable SOX and other certifications with the Securities and Exchange Commission.

B-11.5  DISPUTE RESOLUTION:  The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Contract promptly by negotiations between a vice president of PG&E or his or her designated representative and an executive of similar authority of Contractor. Either Party may give the other Party written notice of any dispute. Within 20 days after delivery of said notice, the executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary to exchange information and to attempt to resolve the dispute. If the matter has not been resolved within 30 days of the first meeting, either Party may initiate a mediation of the controversy. Each Party is required to continue to perform its obligations under this Contract pending final resolution of any dispute arising out of or relating to this Contract.

B-11.6  CONFIDENTIALITY:  All negotiations and any mediation conducted pursuant to this section are confidential and shall be treated as compromise and settlement negotiations, to which Section 1119 of the California Evidence Code shall apply, and Section 1119 is incorporated herein by reference.

B-11.7  PRELIMINARY INJUNCTION:  Notwithstanding the foregoing provisions, a Party may seek a preliminary injunction or other provisional judicial remedy if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo.

B-11.8  NON-WAIVER:  The waiver by either Party of any breach of any term, covenant or condition contained in this Contract, or any default in the performance of any obligations under this Contract, shall not be deemed to be a waiver of any other breach or default of the same or any other term, covenant, condition or obligation. Nor shall any waiver of any incident of breach or default constitute a continuing waiver of the same.

B-11.9  ENFORCEABILITY:  In the event that any of the provisions, or application of any of the provisions, of this Contract are held to be illegal or invalid by a court of competent jurisdiction or arbitrator/mediator, PG&E and Contractor shall negotiate an equitable adjustment in the provisions of this Contract with a view toward effectuating the purpose of this Contract. The illegality or invalidity of any of the provisions, or application of any of the provisions, of this Contract will not affect the legality or enforceability of the remaining provisions or application of any of the provisions of the Contract.

B-11.10  INTEGRATION: This Contract constitutes the entire agreement between the Parties and supersedes all prior or contemporaneous communications, representations, or agreements, whether oral or written, with respect to the subject matter hereof and has been induced by no representations, statements or agreements other than those herein expressed.  No provision of this Contract may be modified or waived unless in writing and executed by both Parties.

B-11.11  THIRD PARTY BENEFICIARIES: To the extent the scope of Work under the Contract requires Contractor to perform Work for both PG&E and Joint Trench Parties, Contractor and PG&E hereby agree that the Joint Trench Parties are express third party beneficiaries to the Contract.

B-11.12  PRIOR WORK: Work performed prior to award of Contract pursuant to PG&E's authorization shall be performed in accordance with, and shall be subject to, the provisions of this Contract.

B-11.13  SURVIVAL: The provisions entitled Article B-2 "Indemnification, Liability and Withholding," Section B-3.3 "Assignment," Section B-4.3 "Infringement Protection," Article B-7 "Guarantees and Equipment Warranty" as well as Article B-9 "Availability of Information", shall survive termination, cancellation or expiration of this Contract.

B-11.14  USE OF CERTAIN WORDS: Unless the context requires otherwise, (i) "including" (and any of its derivative forms) means "including but not limited to", (ii) "may" means has the right, but not

the obligation to do something, and "may not" means does not have the right to do something, (iii) "will" and "shall" are expressions of command, not merely expressions of future intent or expectation, (iv) "written" or "in writing" is used for emphasis in certain circumstances, but does not restrict the general application of the notice requirements in Section B-11.14 NOTICES in those and other circumstances, (v) use of the singular imports the plural and vice versa, and (vi) use of a specific gender includes the other gender(s).

B-11.15 NOTICES: All formal notices, requests, demands, approvals and communications under the Contract (other than routine operational communications) (collectively, "*Notices*") will be in writing and may be served either (i) in person or (ii) by registered or certified mail or express shipping services or air freight services that provide proof of delivery, with postage or shipping fees prepaid or (iii) facsimile, and addressed to the Party to be served at the address identified on the signature page of the Contract.

**ARTICLE B-12**
**PG&E'S REQUIREMENTS AND POLICIES**

B-12.1 PG&E'S SUPPLIER DIVERSITY POLICY: It is PG&E's policy that Women, Minority, and Disabled Veteran Business Enterprises (WMDVBEs) shall have the maximum practicable opportunity to participate in providing the products and services PG&E purchases.

    12.1.1    For all PG&E contracts, the Contractor agrees to comply, and to require all Subcontractors and sub-subcontractors to comply, with PG&E's Supplier Diversity Purchasing Policy, as set forth in Exhibit 1 hereto. The Contractor shall provide to each prospective Subcontractor a copy of Exhibit 1.

    12.1.2    In addition, for contracts exceeding $500,000 (or $1 million for construction contracts), the Contractor must comply with the Policy Regarding Utilization of Small Business Concerns and Small Disadvantaged Business Concerns, as described in Exhibit 2 hereto. The Subcontracting Plan for these contracts must include provisions for implementing the terms prescribed in Exhibit 2. However, Small Business and Small Disadvantaged Business Subcontracting Plans are not required for any of the following: (i) small business contractors, (ii) personal service contracts, (iii) contracts that will be performed entirely outside of the United States and its territories, or (iv) modifications to existing contracts which do not contain subcontracting potential.

    12.1.3    For all PG&E contracts, the Contractor shall act in accordance with the Subcontracting Plan in the performance of the Work and in the award of all Subcontracts.

    12.1.4    The requirements of Exhibit 1 and the successful Bidder's response will be incorporated into the Contract.

B-12.2    FEDERAL POLICY

    12.2.1    EQUAL EMPLOYMENT OPPORTUNITY AND AFFIRMATIVE ACTION REGULATIONS POLICY: During the performance of this Contract and to the extent they may be applicable, Contractor agrees to comply with all laws, orders, and regulations included by summary or reference in the following paragraphs

- Executive Order 11246, 41 CFR Part 60-1.4: Equal Opportunity Clause.
- Executive Order 11246, 41 CFR Part 60-1.8: Nonsegregated Facilities.
- Vietnam Era Veterans' Readjustment Assistance Act of 1974, 41 CFR Part 60-250.5.a: Equal Opportunity Clause.
- Vietnam Era Veterans' Readjustment Assistance Act of 1974, 41 CFR Part 60-300.5.a: Equal Opportunity Clause.
- Section 503 of the Rehabilitation Act of 1973, 41 CFR Part 60-741.5.a: Equal Opportunity Clause.

12.2.2   EXECUTIVE ORDER 13496 – EMPLOYEE RIGHTS UNDER THE NATIONAL LABOR RELATIONS ACT. To the extent applicable, the employee notice requirements set forth in 29 C.F.R. Part 471, Appendix A to Subpart A are hereby incorporated by reference into this Contract.

B-12.3   PG&E DRUG AND ALCOHOL POLICY: PG&E is committed to maintain and promote job safety and health for all workers at its facilities. In addition, PG&E is determined to protect its employees, customers, and the general public while they are on PG&E property from any harm caused by illegal drug and alcohol use by non-PG&E personnel.  To accomplish these objectives, PG&E has established a drug and alcohol policy for access to PG&E facilities by its Contractor and Subcontractor personnel. If any personnel of Contractor or its approved Subcontractors perform any Work or services at PG&E offices and/or other PG&E facilities, then Contractor shall comply with PG&E's Drug and Alcohol Abuse and Testing Policies attached as Exhibit 3 to these General Conditions.

B-12.4   INJURY AND ILLNESS PREVENTION PROGRAM:  In the performance of the Work under this Contract, Contractor acknowledges that it has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code. Contractor shall ensure that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract shall also have an effective Injury and Illness Prevention Program. The person with the authority and responsibility for implementing and administering Contractor's Injury and Illness and Prevention Program shall execute the Compliance Certificate attached as Exhibit 4.

B-12.5   DOCUMENT RETENTION AND PRODUCTION REQUIREMENTS: PG&E is committed to maintain documents and records so as to satisfy applicable legal, contractual and regulatory requirements as well as PG&E's on-going business needs; to enable appropriate records management, provide appropriate retrieval and achieve the proper level of security and privacy. In furtherance of this commitment, Contractor agrees to comply with the requirements of Exhibits 6 and 6A, attached to these General Conditions.

B-12.6   WORK ON PG&E OR PG&E CUSTOMER ASSETS OR PREMISES:  The following provisions shall apply to the extent that the Work under the Contract requires any Contractor or Subcontractor personnel (collectively, "Personnel") to have access to PG&E assets, premises, customer property, or logical access to PG&E data or systems (collectively, "Access").

12.6.1   CRIMINAL BACKGROUND CHECKS:

(i)   Contractor warrants and represents that it will not assign any Personnel to work requiring Access unless Contractor has performed a criminal background check on each such individual (either at the time of hiring or during the course of employment). Prior to assigning work requiring Access to any Personnel with one or more criminal convictions during the last seven years, Contractor must consider the gravity of the individual's offense, the time since the conviction, the successful completion of parole/probation, the individual's age at the time of conviction, the number of convictions, and the stability of the individual, including favorable work history. Contractor shall also consider the relation of the offense to the nature of the work the individual will perform.

(ii)   Notwithstanding the foregoing, in no event shall Contractor grant Access to an individual with one or more convictions for a Serious Offense(s), which is defined as violent and sex offenses, crimes against children, domestic violence, fraud, theft (including but not limited to identity theft), embezzlement, all felonies during the last seven years, and/or two or more DUI's in the past three years.

(iii)   Contractor shall maintain documentation related to its criminal background check investigation for all Personnel requiring Access and make it available to PG&E

for audit if requested pursuant to the audit provisions of this Contract.

(iv) Contractor also agrees to notify PG&E if any of its Personnel requiring Access are charged with or convicted of a Serious Offense during the course of a PG&E assignment.

12.6.2   FITNESS FOR DUTY: Contractor shall ensure that its Personnel granted Access report to work fit for duty. Personnel with Access may not consume alcohol while on duty and/or be under the influence of drugs that impair their ability to work safely. PG&E expects each supplier to have policies in place that requires their employees report to work in a condition that allows them to perform the work safely.  For example, employees should not be operating equipment under medication that creates drowsiness. As a federal contractor, PG&E does not recognize nor allow work to be completed under the influence of marijuana, whether or not is it used for medical reasons.

12.6.3   ELIGIBILITY FOR PG&E WORK: When assigning any Personnel to perform Work requiring Access, Contractor shall submit each person's full name and the last four digits of their social security number to PG&E at the following e-mail address: RecruitingOperations@pge.com.  PG&E reserves the right to decline to accept any proposed Personnel, in which case Contractor shall promptly propose a replacement.

B-12.7   COMPLIANCE WITH PG&E'S OUTSOURCED GAS ASSET MANAGEMENT STANDARD: In performance of the Work, Contractor shall comply with the terms and conditions of PG&E's Outsourced Gas Asset Management Standard attached as Exhibit 8 to these General Conditions.

B-12.8   NERC REQUIREMENTS:  Pursuant to a directive from the North American Electric Reliability Corporation (NERC), all employees and contractors with unescorted access to facilities and functions that PG&E deems critical to the support of the electricity infrastructure ("Critical Facilities") shall undergo employment background screening and training prior to being granted access to these PG&E facilities.  To the extent applicable to the Work, Contractor shall comply with the requirements of Exhibits 9 and 9A, attached hereto and incorporated herein.

B-12.9   SUPPLIER CODE OF CONDUCT:  CONTRACTOR, ITS SUBCONTRACTORS AND THEIR SUPPLIERS AT ALL TIERS, SHALL COMPLY WITH PG&E'S SUPPLIER CODE OF CONDUCT IN THE AWARD AND PERFORMANCE OF ALL CONTRACTS AND SUBCONTRACTS.  The Supplier Code of Conduct requires that Contractor and each of its Subcontractors demonstrate a strong commitment to compliance, ethics, sustainability and supplier diversity as a foundation to successful business.  Contractor must complete its Work for PG&E in full compliance with the Supplier Code of Conduct, as it may be modified from time to time.  Contractor shall access, read and comply with PG&E's Supplier Code of Conduct and shall make it available to its Subcontractors and suppliers.  The Supplier Code of Conduct is hereby incorporated by reference into this Contract.  It is available at PG&E's website, www.PGE.com, at the following link: http://www.pge.com/includes/docs/pdfs/b2b/purchasing/suppliers/SupplierCodeofConductPGE.pdf

**[Remainder of the page intentionally blank.]**

**EXHIBIT 1**

**PG&E'S SUPPLIER DIVERSITY POLICY**

CONTRACTOR AND SUBCONTRACTORS OF ALL TIERS MUST COMPLY WITH PG&E'S SUPPLIER DIVERSITY POLICY IN THE AWARD OF ALL SUBCONTRACTS.  This policy requires that Small, Women, Minority, and Disabled Veteran Business Enterprises (WMDVBEs), and Lesbian, Gay, Bisexual, and Transgender Business Enterprises (LGBTBEs) shall have the maximum practicable opportunity to participate in the performance of Work.

1. Contractor shall provide a copy of this Exhibit 1 to each prospective Subcontractor.

2. Women and Minority-owned Business Enterprises (WMBEs) must be verified pursuant to the procedures prescribed in Section 2 of CPUC General Order 156. Disabled Veteran-owned Business Enterprises (DVBEs) must be verified pursuant to the procedures prescribed by the Department of General Services. LGBTBEs must be verified pursuant to the procedures prescribed by The National Gay & Lesbian Chamber of Commerce®.

3. Contractor shall provide a separate, signed prime supplier plan (Exhibit 1A – List of Subcontractors and Disbursement Plan) consisting of a specific list of Subcontractors that will participate in the performance of the Work. Contractor shall also provide a statement setting forth (i) the Contractor's goals for WMDVBE and LGBTBE Subcontracting of all tiers and (ii) a description of the additional good faith efforts the Contractor and Subcontractors will employ to increase the participation of WMDVBE and LGBTBEs in the performance of the Work.

4. No later than the 10th of each month, Contractor shall submit its Subcontracting spend with WMDVBE- and LGBTBE-owned suppliers using PG&E's electronic reporting system located at the following address:  https://cvmas10.cvmsolutions.com/pge/default.asp

   a. To establish a User ID, Contractor shall submit a request via email to the following e-mail address:  PVB1@pge.com.

5. In addition, for Contracts exceeding $500,000 (or $1 million for construction contracts), the Contractor must comply with the Policy Regarding Utilization of Small Business Concerns and Small Disadvantaged Business Concerns, as described in Exhibit 2. The Prime Supplier Plan for these Contracts must include provisions for implementing the terms of this Exhibit 1.

   a. Small Business and Small Disadvantaged Business Prime Supplier Plans are not required for small business contractors, personal service contracts, contracts that will be performed entirely outside of the United States and its territories, or modifications to existing contracts which do not contain Subcontracting potential.

   b. For all PG&E contracts, the Contractor shall act in accordance with the Prime Supplier Plan in the performance of the Work and in the award of all Subcontracts.

   The **Supplier Diversity Subcontracting Goal** for this Contract (including any Contract Work Authorizations) is **34%.** Contractor shall report its supplier diversity goal as Contractor's spend with verified WMDVBE and LGBTBE Subcontractors on PG&E Work under this Contract.

Attachment 2 - General Conditions
Contract # 2501335149

AECOM Technical Services, Inc.
Page 37 of 48

01-5873 (Rev 06/14)
Sourcing
Page 1 of 2

**PG&E** Pacific Gas and Electric Company

EXHIBIT 1-A

## List of Subcontractors and Disbursement Record

Prime Contractor/Supplier: _____
PG&E Contract Number (if any): _____
PG&E Project/Product: _____
Contract Duration (Year): _____ From: _____ To: _____

Name of Preparer: _____
Telephone: ( _____ )
E-Mail: _____
Total Bid Value: _____ Same as (9) below:

| Name of Subcontractor (1) | WMDVB E/LGBT BE Status Code* (2) | V** (3) | NV*** (4) | Address (5) | Description of Work (6) | Estimated Amount to be Paid to Subcontractors (7) |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

(8) Estimated Total Amount to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s): _____
(9) Total Bid Value: _____
(10) Estimated Percentage to be Paid to All Verified WMDVBE and LGBTBE Subcontractor(s) (8÷9): _____

Signature: _____ / Date

I hereby verify that the listed information is true and accurate to the best of my knowledge.

* Refer to Instructions/Codes/Definitions on page 2.
** V = Subcontractor is a verified WMDVBE or LGBTBE
*** NV = Subcontractor is not a verified WMDVBE or LGBTBE

**Certification Agencies:**

WMBE: CPUC Clearinghouse : DVBE:
Department of General Services LGBT:
National Gay and Lesbian Chamber of
Commerce (NGLCC)

The successful bidder(s) will be expected to register and report all monthly subcontracting spending with verified WMDVBE and LGBTBE subcontractors for the duration of the contract at: https://cvmac10-services.hostedbygrms.com/User/default.

# STEP-BY-STEP INSTRUCTIONS

Complete column numbers 1-10 and return this form with your bid proposal. .

(1)  Include the complete name of the subcontractor.
(2)  Indicate the Subcontractor's minority code (see definitions and codes below).
(3)  Place a "V" in the box if the Subcontractor is a verified W MBE, DVBE, or LGBT supplier by the applicable certification agency (see above).
(4)  Place a "NV" in the box if the Subcontractor is not verified by the applicable certification agency (see above).
(5)  Include the address, city, state and zip of the Subcontractor.
(6)  Describe the work that the Subcontractor will be performing.
(7)  Indicated the estimated amount to be paid to each Subcontractor for the duration of the contract.
(8)  Indicate the estimated total amount to be paid to all verified Subcontractors for the duration of the contract.
(9)  Indicate the proposed bid value.
(10)  Indicate the percentage of the bid value to be paid to all verified Subcontractors. Divide the estimated dollars to be paid to all verified WM/DVBE and LGBT Subcontractors by the total bid value.

---

## DEFINITIONS AND CODES

**WBE**  Women Business Enterprise:  A business enterprise that is at least 51 percent owned by a woman or women, or, in the case of any publicly-owned business, at least 51 percent of the stock of which is owned by one or more women, and whose management and daily business operations are controlled by one or more of those individuals

**MBE**  Minority Business Enterprise:  A business enterprise that is at least 51 percent owned by a minority group or groups, or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more minority-group individuals, and whose management and daily business operations are controlled by one or more of those individuals.

**DVBE**  The same meaning as defined in subdivision (g) of the Military and Veterans Code and must meet the "Control" criteria . An enterprise which is 51 percent owned by a California Service Disabled , or the stock is 51 percent owned, by one or more disabled veterans, and whose management and daily business operations are controlled by one or more of those individuals.

**LGBT**  A business enterprise that is at least 51 percent owned by a Lesbian, Gay, Bisexual, Transgender Enterprise (LGBTE), or, in the case of any publicly-owned business, at least 51 percent of the stock of which is owned by one or more LGBTBE and whose management and daily business operations are controlled by one or more of those individuals.

### MINORITY CODES:

| | | | | | |
|---|---|---|---|---|---|
| 001  African American Male | 002  African American Female | 003  Asian Pacific American Male | 004  Asian Pacific Female |
| 005  Native American Male | 006  Native American Female | 007  Hispanic American Male | 008  Hispanic American Female |
| 009  Caucasian Male | 010  Caucasian Female | 011  Multi-Status/Other Male | 012  Multi-Status/Other Female |
| 013  Small Business Enterprise | 014  Service Disabled Business Enterprise | 015  Do Not Use | 016  Handicapped |
| 017  Gay, Lesbian, Bisexual Transgender – Male | | 018  Gay, Lesbian, Bisexual Transgender - Female | |

**African Americans**  Persons having origin in any black racial group of Africa

**Asian Pacific Americans**  Persons having origins in Asia or the Indian Subcontinent, including, but not limited to, persons from Japan, China, the Philippines, Vietnam, Korea, Samoa, Guam, the U.S. Trust Territories of the Pacific, Northern Marianas, Laos, Cambodia, Taiwan, India, Pakistan, and Bangladesh.

**Native American**  Persons having origin in any of the original peoples of North America or the Hawaiian Islands, in particular, American Indians, Eskimos, Aleuts, and Native Hawaiians

**Hispanic Americans**  Persons of Mexican, Puerto Rican, Cuban, South or Central American, Caribbean, or other Spanish culture or origin

**Caucasian**  Includes all people of European and North African descent.

**Multi-Status**  An enterprise that is wholly owned and controlled by a combination of minorities or women but whose majority ownership (at least 51%) is not vested with any one of these individuals.

**Other Groups**  Groups whose members are found to be socially and economically disadvantaged by the Small Business Administration pursuant to Section 8 (d) of the Small Business Act as amended (15 U.S.C. 637 (d), or by the Secretary of Commerce pursuant to Section 5 of Executive Order 11625.

**Small Business Enterprise**  A business defined pursuant to Section 3 of the Small Business Act (SBA) and relevant regulations pursuant thereto.  If unsure, please contact your local Small Business Administration office for clarification or clarification.

**EXHIBIT 2**

**POLICY REGARDING UTILIZATION OF SMALL BUSINESS CONCERNS AND SMALL DISADVANTAGED BUSINESS CONCERNS**

The following policy of the United States shall be adhered to in the performance of this Contract:

a.  It is the policy of the United States that small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals shall have the maximum practicable opportunity to participate in performing contracts let by any Federal Agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems. It is further the policy of the United States that prime contractors establish procedures to ensure the timely payment of amounts due pursuant to the terms of their subcontracts with small business concerns and small business concerns owned and controlled by socially and economically disadvantaged individuals.

b.  Contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with efficient contract performance. Contractor further agrees to cooperate in any studies or surveys as may be conducted by the United States Small Business Administration or the awarding agency of the United States as may be necessary to determine the extent of Contractor's compliance with this clause.

c.  As used in this Contract, the term "small business concern" shall mean a small business as defined in Section 3 of the Small Business Act and relevant regulations promulgated pursuant thereto. The term "small business concern owned and controlled by socially and economically disadvantaged individuals" shall mean a small business concern (1) which is at least 51 percent unconditionally owned by one or more socially and economically disadvantaged individuals; or, in the case of any publicly owned business, at least 51 percent of the stock of which is unconditionally owned by one or more socially and economically disadvantaged individuals; and (2) whose management and daily business operations are controlled by one or more of such individuals.  This term also means a small business concern that is at least 51 percent unconditionally owned by an economically disadvantaged Indian tribe or Native Hawaiian Organization, or a publicly owned business having at least 51 percent of its stock unconditionally owned by one of these entities which has its
management and daily business controlled by members of an economically disadvantaged Indian tribe or Native Hawaiian Organization, and which meets the requirement of 13 CFR part 124. Contractor shall presume that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, and other minorities, or any other individual found to be disadvantaged by the Administration pursuant to Section 8(a) of the Small Business Act. Contractor shall presume that socially and economically disadvantaged entities also include Indian Tribes and Native Hawaiian Organizations.

d.  Contractor acting in good faith may rely on written representations by its subcontractors regarding their status as either a small business concern or a small business concern owned and controlled by socially and economically disadvantaged individuals.[1]

---

[1] Notwithstanding this provision of the federal statute, all WMDVBE subcontractors must be verified pursuant to the procedures prescribed in Section 2 of CPUC General Order 156, as such procedures may be amended periodically.

Exhibit 3

PG&E Drug and Alcohol Testing Policy

I.     PG&E POLICY

1.0 PREFACE: PG&E is committed to maintain and promote job safety and health for all workers at its facilities. In addition, PG&E is determined to protect its employees, customers, and the general public while they are on PG&E property from any harm caused by illegal drug and alcohol use by non-PG&E personnel. To accomplish these objectives, PG&E has established the following drug and alcohol policy for access to PG&E facilities by its Contractor and Subcontractor personnel.

2.0 COVERAGE: This policy applies to the personnel of all PG&E Contractors and Subcontractors performing any work or services at PG&E offices and/or any other PG&E facilities.

3.1     POLICY: PG&E may deny access to, or remove from, its facilities the personnel of any Contractor or Subcontractor, who PG&E has reasonable grounds to believe has:

      3.2     Engaged in alcohol abuse or illegal drug activity which in any way impairs PG&E's ability to maintain safe work facilities, to protect the health and well-being of PG&E employees, customers, and the general public, and to promote the public's confidence in PG&E's service and operations; or

      3.3     Been found guilty, pled guilty, or pled nolo contendere to a charge of sale or distribution of any illegal drug or controlled substance as defined under Federal or California law within the past five years, unless the criminal record was later expunged or sealed by a court order.

4.1     PROHIBITED ACTIVITIES: The following activities are prohibited at all facilities owned or leased by PG&E:

      4.2     Possessing, furnishing, selling, offering, purchasing, using or being under the influence of illegal drugs or other controlled substances as defined under Federal or California law;

      4.3     Possessing, furnishing, selling, offering, or using alcoholic beverage, or being under the influence of alcohol.

5.1     ACTIONS: Where reasonable cause exists that paragraph 4 of this policy has been violated, the Contractor or Subcontractor must inform the PG&E representative responsible for the Contract. The Contractor or Subcontractor is also expected to take any or all of the following actions to the fullest extent they are permitted under governing collective bargaining agreements and/or its applicable security and human resources policies.

      5.2     Search the individual, his or her vehicle, locker, storage area, and personal effects;

      5.3     Require the individual to undergo a medical examination to determine their fitness for duty. Such examination shall include obtaining a urine and/or blood specimen for drug or alcohol analysis unless the examining physician deems such tests to be inappropriate;

      5.4     Take any other appropriate action to determine if there has been a violation of paragraph 4. Refusal to comply with a request made under this paragraph shall be grounds for denying access to, or immediate removal from, any PG&E facility.

6.0   PERMISSION TO RE-ENTER: Any individual who has been denied access to, or removed from, PG&E facilities or violating this policy may obtain permission to enter or reenter provided the individual establishes, to the satisfaction of his or her employer and PG&E, that the previous activity which formed the basis for denying access or removal has been corrected and his or her future conduct will conform with this policy. PG&E retains the right of final approval for the entry or reentry of any individual previously denied access to or removed from PG&E facilities.

**II.    U.S. DEPARTMENT OF TRANSPORTATION REGULATIONS FOR DRUG AND ALCOHOL TESTING OF COMMERCIAL MOTOR VEHICLE DRIVERS AND OF NATURAL GAS PIPELINE WORKERS**

1.0     Contractor agrees that, to the extent it may be applicable to this Contract, Contractor shall comply with the U.S. Department of Transportation's (DOT) regulations for (i) commercial motor vehicle drivers, 49 CFR 382, Controlled Substances and Alcohol Use and Testing and (ii) work on gas, hazardous liquid and carbon dioxide pipelines, and liquefied natural gas pipelines, 49 CFR Parts 192, 193 or 195, Control of Drug Use in Natural Gas, Liquefied Natural Gas and Hazardous Pipeline Operations. Contractor shall establish and maintain a drug and alcohol testing program for its employees consistent with 49 CFR Part 40, Procedures for Transportation Workplace Drug Testing Programs and 49 CFR 199, Drug and Alcohol Testing, as applicable. Contractor shall ensure that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract that is regulated by 49 CFR 192, 193, 195 or 382 shall also have a drug and alcohol testing program that complies with applicable DOT requirements.

2.0     PG&E's duly authorized representatives, the CPUC, DOT and appropriate agencies shall have, during the term of the Contract and for two years thereafter, access at all reasonable times to Contractor's drug and alcohol testing program records for the purpose of monitoring compliance with DOT regulations. Contractor shall ensure that any Subcontractor hired by Contractor to perform any portion of the Work regulated by 49 CFR Part 192, 193, 195 or 382 under this Contract shall also provide access to its drug and alcohol testing program records to PG&E's authorized representatives, the CPUC, DOT and appropriate agencies for the purpose of monitoring compliance with DOT regulations. Failure to comply with this requirement may, at PG&E's option, result in cancellation or termination of existing contracts and the loss of opportunity to bid on future contracts

**EXHIBIT 4**

**INJURY AND ILLNESS PREVENTION PROGRAM**

Contractor acknowledges that it has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code. Contractor ensures that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract shall also have an effective Injury and Illness Prevention Program. This Compliance Certificate shall be executed by the person with the authority and responsibility for implementing and administering such Injury and Illness and Prevention Program.

**Injury and Illness Prevention Program Compliance Certificate**

The undersigned, the _____of
(title/position)

_____(Contractor), hereby certifies to
PG&E as (name of Contractor)

follows:

1. That Contractor has an effective Injury and Illness Prevention Program which meets the requirements of all applicable laws and regulations, including but not limited to Section 6401.7 of the California Labor Code and that any Subcontractor hired by Contractor to perform any portion of the Work under this Contract has an effective Injury and Illness Prevention Program; and

2. That he or she is the person with the authority and responsibility for implementing and administering Contractor's Injury and Illness Prevention Program.

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate on_____.

_____
Signature

_____
Print Name

{00145100.DOC;1}

**Pacific Gas and Electric Company**

## Daily Statement of Labor, Material, and Equipment
Furnished by Contractor

**EXHIBIT 5**

DATE _____

JOB LOCATION _____

CONTRACT OR SPEC. NO. _____

JOB NO. _____
FIRM _____

IF SUBCONTRACT ENTER _____

CHANGE ORDER NO. _____

SHEET _____ OF _____ SHEETS

### CONTRACTOR'S LABOR

| CRAFT | NAME | HRS. | | RATE | AMOUNT |
|-------|------|------|--|------|--------|
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |
| | | | PT | | |
| | | | ST | | |

TOTAL PREMIUM TIME
TOTAL STRAIGHT TIME
TOTAL LABOR
PAYROLL TAXES ON TOTAL LABOR OF $
COMP. INS. ON TOTAL LABOR OF $
W.L. AND P.D. ON TOTAL LABOR OF $
WELFARE
SUBSISTENCE

TOTAL LABOR, P/R TAXES, ETC.

DESCRIPTION OF WORK  ITEM NO.

SUBSISTENCE
1 2 3 4 5 6 7 8 9

Approved as a true similitude of our certified payroll

Name of Contractor

Signature of Contractor Superintendent

Verification of Hours and Quantities for PG&E

Inspector or Foreman

Approved for PG&E

Superintendent, Supervisor, or Resident Engineer

### RENTAL EQUIPMENT

| EQUIPMENT DESCRIPTION | HRS. | RATE | AMOUNT | ITEM |
|----------------------|------|------|--------|------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

TOTAL EQUIPMENT RENTAL

| MATERIAL | | TOTAL | ITEM |
|----------|--|-------|------|
| SEE ATTACHED INVOICES | | | |
| SALES TAX ON MATERIAL | | | |
| TOTAL MATERIAL | | | |

### CONTRACTOR OWNED EQUIPMENT

| EQUIPMENT DESCRIPTION | HRS. | RATE | AMOUNT | ITEM |
|----------------------|------|------|--------|------|
| | | | | |
| | | | | |
| | | | | |
| | | | | |

TOTAL OWNED EQUIPMENT

TOTAL MATERIAL & SALES TAX
TOTAL EQUIPMENT RENTAL
TOTAL LABOR, TAXES, INS.
FEE        % ON $
SUB FEE   % ON $

GRAND TOTAL

Case: 19-30088   Doc# 5651   Filed: 02/05/20   Entered: 02/05/20 19:36:45   Page 250 of 322

Case: 19-03008   Doc# 19   Filed: 03/22/19   Entered: 03/22/19 23:23:15   Page 68 of 107

## PG&E Contractor Document Retention and Production Requirements

1. Contractor agrees to retain all documents and data, whether paper or electronic, created, collected or received for PG&E in the course of performing the Work or furnishing the materials under the Contract, including without limitation, documents, data, plans, drawings, diagrams, investigative notes, field notes, tests, photographs, records, calculations, summaries, and reports; provided that Contractor is not required to retain (i) draft versions of final written documents such as reports, presentations, or other written deliverables and (ii) documents that are inconsequential or ancillary to performance and documentation of the project or its deliverables as follows:

   [ ] a. the documents and data specified in <u>Exhibit 5A</u> to this Contract; or

   [ ] b. all documents and data, whether paper or electronic, created, collected or received for PG&E in the course of performing the Work or furnishing the materials under the Contract.

   If neither Section 1(a) or Section 1(b) is checked, Section 1(b) shall apply. If Section 1(a) is checked, but documents and data are not specified in Exhibit 5A, or in a subsequently issued Contract, Section 1(b) shall apply.  Collectively, the information shall hereinafter be referred to as "PG&E Contractor Documents."

2. Contractor shall store PG&E Contractor Documents in a secure and organized manner. All PG&E Contractor Documents shall be in legible form, whether paper or electronic. In managing and administering PG&E Contractor Documents, Contractor will comply with the requirements of "The Generally Accepted Recordkeeping Principles[®]" (see www.arma.org), or with modified requirements approved in writing by PG&E.

3. Upon completion of the Work or furnishing of the materials under the Contract, or upon completion of the Work or furnishing of the materials under each Contract under the Contract ("Work Completion Date"), PG&E will specify which of PG&E Contractor Documents must be transmitted by Contractor to PG&E ("PG&E Records"), provided however, unless otherwise agreed by PG&E:

   a. Contractor shall transmit to PG&E, or provide PG&E access to, PG&E Records on request within forty eight (48) hours or sooner if needed (without limitation) for regulatory, CPUC, safety, audit and/or litigation requirements;

   b. PG&E may specify that PG&E Records be delivered to PG&E on a regular basis prior to the Work Completion Date;

   c. With respect to PG&E Contractor Documents not transmitted to PG&E as PG&E Records, Contractor shall retain all such documents for twenty four (24) months after the Work Completion Date ("Post- Termination Retention Period"). During the Post-Termination Retention Period, PG&E Contractor Documents shall be retained by Contractor at no additional cost to PG&E until disposed of in accordance with Section 6 below.  To the extent PG&E requests Contractor to retain PG&E Contractor Documents after the Post-Termination Retention Period, the parties will mutually agree on the terms and conditions of such additional retention;

   d. If PG&E Records are kept in electronic form, the following formats are acceptable for transmission to PG&E: (i) PDF, CAD or TIFF for drawings and diagrams and (ii) PDF for all other documents.  If PG&E Records transmitted to PG&E consist of data in a proprietary format, Contractor shall make available to PG&E the proprietary tools or software necessary to access the data including after the transfer of the data to PG&E. This Section 3.d. shall not abrogate Contractor's obligation to produce PG&E Records in an alternative format (e.g., a native format) if set forth elsewhere in the Contract, in which case Contractor shall produce PG&E Records in each of the formats requested.

4. PG&E Contractor Documents shall be treated as confidential and shall not be disclosed to others unless Contractor is required to produce such documents pursuant to legal or regulatory requirements, in which case Contractor shall give PG&E maximum practicable advance notice prior to any production.

5. Contractor shall maintain a system for back-up of electronic PG&E Contractor Documents (e.g., files or databases) so they will be preserved for retrieval in the event that the originals are lost or destroyed.

6. If PG&E directs Contractor to dispose of PG&E Contractor Documents, Contractor shall do so in a confidential and secure manner, whether the format is electronic or paper. Proof of destruction of PG&E Contractor Documents shall be submitted to PG&E upon request.

7. If PG&E provides paper documents to Contractor in order to convert them to digital electronic format, Contractor shall return both the paper documents and the documents converted to digital format to PG&E.

8. Contractor is responsible for ensuring that its Subcontractors regardless of tier comply with the obligations of Contractor where set forth in this Exhibit 5.

9. The terms and conditions of this Exhibit 5, including Exhibit 5A if attached, shall survive the termination of this Contract.

**Exhibit 6A**

If Section 1(a) of Exhibit 5 is checked, Contractor agrees that in connection with this Contract or Contract, as applicable, the following PG&E Contractor Documents will be created, received and/or maintained by Contractor:

**[Insert list of all specific PG&E Contractor Documents required under this Contract]**

PACIFIC GAS AND ELECTRIC COMPANY
NONDISCLOSURE AND USE OF INFORMATION AGREEMENT

THIS AGREEMENT is by and between_____("Company"),
_____("Undersigned"), the authorized employee of Company (together, Company and Undersigned are referred to as the "Receiving Party"), and PACIFIC GAS AND ELECTRIC COMPANY ("PG&E") on the date set forth below.

Undersigned and Company agree as
follows:

1.      The Receiving Party acknowledges that in the course of_____, the Receiving Party will be given access to technical information and materials including, but not limited to, _____ _____, which are owned by PG&E, its parent company, subsidiaries, or affiliates, and/or owned by third parties and in the possession of or licensed to PG&E, and which constitute valuable, confidential and proprietary information, know-how, and trade secrets, belonging to PG&E, its parent company, subsidiaries, or affiliates and/or third parties (hereinafter referred to as "Proprietary Information").

2.      In consideration of being made privy to such Proprietary Information, and of the contracting for the Receiving Party's professional services by PG&E, the Receiving Party agrees to hold the same in strict confidence, and not to disclose it, or otherwise make it available, to any person or third party, including but not limited to any affiliate of PG&E that produces energy or energy-related products or services, without the prior written consent of PG&E. The Receiving Party agrees that all such Proprietary Information:

        (a)      shall be used only for the purpose of _____ _____; and

        (b)      shall not be reproduced, copied, in whole or in part, except as specifically authorized and in conformance with PG&E's instructions when necessary for the purposes set forth in (a) above; and

        (c)      shall, together with any copies, reproductions or other records thereof, in any form, and all information and materials developed by the Receiving Party therefrom, be returned to PG&E when no longer needed for the performance of Receiving Party's services for PG&E.

3.      The Receiving Party hereby agrees that any third parties owning any Proprietary Information are express third party beneficiaries of this Agreement.

4.      The Receiving Party hereby agrees that for any violation of any provision of this Agreement, a restraining order and/or injunction may be issued against the Receiving Party in addition to any other remedy PG&E may have at law.

5.      This Agreement shall be governed by and interpreted in accordance with the laws of The State of California.

UNDERSIGNED:                                          COMPANY

_____           _____
Signature                                            Company Name

_____           _____
Name                                                 Signature of Authorized Agent of Company

_____           _____
Title                                                Name

_____           _____
Company                                              Title

_____           _____
Date                                                 Date

OUTSOURCED GAS ASSET MANAGEMENT ACTIVITY

COMPLIANCE TERMS AND CERTIFICATION

OUTSOURCED GAS ASSET MANAGEMENT ACTIVITIES STANDARD: CONTRACTOR AND ITS SUBCONTRACTORS AND THEIR SUPPLIERS AT ALL TIERS SHALL COMPLY WITH PG&E'S OUTSOURCED GAS ASSET MANAGEMENT ACTIVITIES PROGRAM ("OGAMAP") IN THE PERFORMANCE OF ALL WORK PERFORMED FOR PG&E'S GAS OPERATIONS ORGANIZATION. The OGAMAP requires that Contractor and its Subcontractors and suppliers demonstrate a strong commitment to gas safety excellence and maintain appropriate controls over the gas infrastructure supply chain. Any Work performed for PG&E must be completed in full compliance with the following, as it may be modified from time to time:

1. PG&E's Code of Conduct for Contractors, Consultants, Suppliers and Vendors located at http://www.pgecorp.com/aboutus/ethics_compliance/con_con_ven/index.shtml

2. PG&E's Gas Asset Management Policy TD-01

3. PG&E's Gas Asset Management Strategy and Objectives

4. PG&E's Gas Operations process for raising safety concerns and issues

5. Should PG&E require, Contractors, Consultant, Supplier and Vendors shall obtain a complete understanding of their role(s) supporting PG&E in a gas emergency. As a reference guide, a copy of PG&E's Gas Emergency Response Plan Volumes 1 and 2 ("GERP") and Gas Safety Plan are provided to increase Contractors, Consultant, Supplier and Vendors knowledge and understanding of providing a safe, efficient and coordinated response to emergencies affecting gas transmission and distribution systems. These documents provide emergency response guidance consistent with the Incident Command System (ICS).

6. All terms, conditions, and specifications for the Work as set forth in the Contract.

Contractor shall access and download a copy of PG&E's Code of Conduct for Contractors, Consultants, Suppliers and Vendors at the above referenced internet link item number one (1) referenced above in this Attachment. Contractor shall receive and email invitation to access PG&E's third party internet site www.poweradvocate.com to obtain access and to down load the above referenced documents item numbers two (2) through five (5) in this Attachment.

Contractor hereby represents, warrants, and certifies that Contractor, its Subcontractors, its Suppliers, and their employees performing Work under the Contract have been provided and have reviewed the above-referenced documents and agree to comply with all terms and conditions contained therein.

# Exhibit 9

## NERC REQUIREMENTS

Pursuant to a directive from the North American Electric Reliability Corporation (NERC), all employees and contractors with unescorted access to facilities, systems and functions that PG&E deems critical to the support of the Bulk Electric System ("Critical Facilities and/or Critical Systems") shall undergo employment background screening and training prior to being granted access to these PG&E facilities and/or systems. Contractor hereby agrees to perform background checks ("Personnel Risk Assessments" or "PRA's") on all Contractor and Subcontractor personnel ("Individuals") with unescorted access. PG&E has included in the category of those with unescorted access all Individuals working within PG&E Critical Facilities and/or Critical Systems. Contractor shall perform the following background check and comply with the following provisions for any Work subject to the NERC requirements for unescorted access. The background check can have no findings for any of the criteria (i.e., an acceptable background check):

1. Contractor shall perform a background screening for each Individual that includes each of the following criteria: (i) Social Security Number verification; (ii) City, County, State and Federal Criminal Check for felonies and misdemeanors over the past seven years (in up to three counties where the Individual has lived in the past seven years); (iii) "Global Watch" (check of 19 Federal and International Terrorist Watch lists); (iv) validation of current residence and confirmation of continuous residence at this site for a minimum of the most recent 6 months (confirmed by period of residence, employment, or education at a specific site) and validation of other locations where, during the seven years immediately prior to the date of the criminal check specified in (ii) above, the Individual has resided for six consecutive months or more.

2. After performing an acceptable background check for each Individual with unescorted access, the Contractor shall provide PG&E's Human Resources Department with a Personnel Risk Assessment Attestation Form in the form attached hereto as Exhibit 7A for each Individual on assignment to PG&E prior to the Individual being granted unescorted access. PG&E may request that Contractor provide a copy of complete Personnel Risk Assessment ("PRA") results at the time the Personnel Risk Attestation Form is submitted.

3. Contractor shall require that each Individual with unescorted access complete an initial training and annual PG&E web-based training session on safety, information security, compliance with PG&E codes and procedures including but not limited to CORP-0804 Cyber and Physical Security Awareness training. Contractor shall direct that each Individual complete the PG&E training program by CD or by hard copy format, if Contractor informs PG&E that web based training is not feasible.

4. After Contractor certifies to PG&E completion of the requirements set forth in paragraphs 1-3 above, PG&E will issue each Individual a keycard to access the designated PG&E facility to which they are assigned and/or logical access to the designated Critical System to which they are assigned. PG&E will deny access to Critical Facilities and/or Critical Systems to any Individual for whom Contractor has not certified completion of the requirements set forth in paragraphs 1-3 above.

5. Every seven years, Contractor shall perform NERC background screening as described herein for each Individual on continuing assignment to work at PG&E Critical Facilities and/or Critical Systems.

6. Contractor shall retain documentation supporting the Personnel Risk Assessment Attestation Form for each Individual assigned to PG&E Critical Facilities and/or Critical Systems for a minimum of seven years.

7. PG&E will audit Contractor's background screening methodology and substantiate the accuracy of Personnel Risk Assessment Attestation Forms for each Individual. Contractor shall respond to any auditing requests and activities, including but not limited to data requests, within one business day. PG&E and/or WECC will set the frequency of auditing the Contractor's PRA process and supporting records.

8. In addition to its other indemnity obligations hereunder, Contractor shall indemnify and hold harmless PG&E for any penalties assessed against PG&E (including but not limited to penalties assessed against PG&E by the Western Electricity Coordinating Council (WECC), NERC or the Federal Energy Regulatory Commission (FERC) for a violation of any NERC reliability standard) caused by Contractor's failure to perform its obligations under this Contract.

**Exhibit 9A**

**PG&E NERC CIP PROGRAM**

**NON-EMPLOYEE ATTESTATION FORM**

**COMPLETION OF PERSONNEL RISK ASSESSMENT (PRA) PROCESS**

Please initial next to each line item below to verify that the following Non-Employee has received satisfactory results for each of the required background checks.

Non-Employee                                                                                                  Name:

Vendor                                                                                                              Name:

Requisition and/or PO #: _____

Date NERC Background Check Completed: _____

**Background Investigation – Completed and Passed the Following (Includes International Components When Applicable)** *Initial next to each:*

_____     Criminal Felony / Misdemeanor Search – Past 7 years, all names, all counties off the social trace  (incl. past 7 years residency check)

_____     Federal Criminal Search – Past 7 years, all names off the social trace

_____     Managed Adjudication Standard

_____     Prohibited Parties

_____     SSN Trace

_____     SSN Validation

_____     Statewide Criminal Search

By completing and signing this form, Vendor confirms that the background investigation has been executed and satisfactory results received according to PG&E NERC CIP Program specifications for the above stated Non-Employee.  All supporting documents must be kept on file with Vendor for a minimum of 7 years following the end of the Vendor's last non-employee's assignment at PG&E.  Random audits of supporting documents may be conducted by PG&E or its designee, consistent with its right under the PG&E/Vendor contract, to ensure compliance with the requirements designated in the certification and contract.

☐ **I certify that I am authorized to sign on behalf of the aforementioned Vendor.**

Vendor                                  Representative                              Signature:

Vendor                                  Representative                              Name:

Date Signed: _____

**SPECIFIC CONDITIONS TO TECHNICAL SPECIFICATION NUMBER 12107**
**Engineering, Procurement and Construction of Burney K2 Replacement**
**at the Burney Compressor Station, Order No. 30603707**

## 1.0 INTRODUCTION AND PURPOSE

1.1 These Specific Conditions to the Technical Specification Number 12107 for Engineering, Procurement and Construction services, ("EPC") supporting the Burney K2 Replacement located at Burney Compressor Station (BCS) California as requested by Pacific Gas and Electric Company ("PG&E") supplements the Technical Specification and General Conditions and provides additional PG&E requirements supporting contract management and administration that are not provided in the Technical Specification or General Conditions of this Contract. This document assists PG&E and Contractor to effectively manage and control Contractor's Work cost and schedule. This document also provides a listing of the documents contained within the project workbook which has been electronically transmitted and received by Contractor.

1.2 The purpose of the Work is to replace natural gas compressor unit Burney K2 and to perform various upgrades to the Burney Compressor Station (BCS) to improve the reliability and operability. The Work includes demolition of existing equipment and facilities. PG&E's Project objectives for improving the safety, reliability, and operating flexibility of the facility are summarized below.

    1.2.1 Maintain current gas transmission capacity
    1.2.2 Replace outdated compressor K2 and associated facilities.
    1.2.3 Provide increased flexibility of operation and monitoring.
    1.2.4 Demolish and remove unused equipment in accordance with the proposal contained in Attachment 12 if requested.

## 2.0 DEFINITIONS
The definitions in the General Conditions, Section 1.0, "Definitions," are supplemented with the terms defined below:

2.1 **"Applicable Law"**: Any law including, but not limited to Environmental laws, statute, treaties, rule, regulation, ordinance, code, judgment, enactment, decree, injunction, writ, order, license, permit, consent, approval, agreement or regulation of any Governmental Authority having jurisdiction over a Party or any portion of the Work, in each case applicable to the Work or the rights or obligations of a Party under this Contract.

2.2 **"Claim"**: Any Third Party demand, or any civil, criminal, administrative, or investigative claim, action, or proceeding (including arbitration) asserted, commenced or threatened against an entity or person.

2.3 **"Commercially Reasonable Efforts"**: Taking all such steps and performing in such a manner as a well-managed company would undertake where it was acting in a determined, prudent and reasonable manner to achieve a particular desired result for its own benefit.

2.4 **"Commissioning Complete"**: Commissioning Complete shall be the date on which all start-up and commissioning testing has been completed in accordance with the project Specification 12107.

2.5 **"Demobilization"**: The activity to clear the site of all temporary construction facilities upon completion of the direct Work. Complete demobilization includes but is not limited to a completely cleared/removed of all contractor tools, equipment, materials and supplies for the Work site. This portion of the Contract Price that becomes payable only when Contractor has demobilized all its labor, equipment and temporary facilities from the site and returned the allocated temporary facilities area(s) to its pre-mobilization condition.

2.6 **"Disposal"**: Total cost associated with disposal of equipment, materials, and hazardous waste.

2.7 "**Engineering Completion**": Engineering Completion shall be the date on which PG&E has approved (1) the Issued for Construction Drawings, including civil, mechanical, electrical, and control as well as (2) the procurement specifications for all major equipment listed in the pricing workbook.

2.8 **"Equipment"**: Total cost to provide and operate equipment including all third party equipment (excluding the cost of operating labor), inclusive of associated consumables, overhead and associated profit.

2.9 "**Goods**": Equipment, materials and parts purchased by PG&E from Contractor pursuant to a Contract, whether or not they are manufactured by Contractor.

2.10 "**Governmental Authority**": Any federal, state, local, government, department, commission, board, bureau, agency, official or other regulatory, administrative or governmental authority, including, without limitation, the CPUC.

2.11 "**Governmental Authorization**": Any permit, license, franchise, approval, certificate, consent, ratification, permission, confirmation, endorsement, waiver, registration, qualification or other authorization issued, granted, given or otherwise made available by or under the authority or any Governmental Authority or pursuant to any Legal Requirement.

2.12 "**Hourly Rate**": See "Time-and-Materials."

2.13 **"Labor"**: All indirect and direct labor costs, including payroll burdens, benefits, consumables, and expendable materials, small tools, overhead and associated profit.

2.14 "**Laws**": All laws, including the common law and all statutes, by-laws, rules, regulations, ordinances, decrees, orders and codes (including any requirements for permits, certificates, approvals and inspections) that are applicable to a Party in any jurisdiction in which the Work is performed, provided to or used by PG&E.

2.15 "**Legal Requirement(s)**": Any law, statute, ordinance, decree, requirement, order, writ, judgment, injunction, award, treaty, proclamation, convention, rule or regulation (or interpretation of the foregoing) of, and the terms of any Governmental Authorization issued, required, or promulgated by, any Governmental Authority.

2.16 "**Loss**" or "**Losses**": all damages and other compensation awarded against a Party or agreed to in a settlement approved by the Parties in connection with a Claim, all fines and penalties lawfully imposed on a Party in connection with a Claim and, subject to the provisions of this Contract, all related costs and expenses suffered or incurred as a result of or in connection with such Claim, including reasonable attorneys' fees and disbursements, costs of investigation, litigation, settlement, and judgment, and any taxes, interest and penalties with respect to any of

the foregoing.

2.17 **"Material"**:  Total cost to procure and supply any and all materials including freight, customs duties and taxes.

2.18 **"Mobilization"**:  The act of bringing resources to the Work site including all activities that have the resources full functional to commence the Contract Work.  A portion of the Contract Price, payable when sufficient site establishment has been mobilized at the jobsite to allow Contractor to commence productive Work.

2.19 **"PG&E Authorized Representative"**: Pacific Gas and Electric Company employee authorized to sign a Contract Change Order.

2.20 **"PG&E Work Supervisor"**: The employee representing PG&E's interest in connection with the work described in this Contract or in a subsequent Contract Change Order. Melvin Wong at PG&E shall be the initial PG&E Work Supervisor.

2.21 **"PG&E Project Order Number"**:  The PG&E Project Order Number is: 30603707.

2.22 **"Schedule"**: A document required by PG&E that identifies the sequence and timing of Work and other activities necessary to meet Contract completion dates.

2.23 **"Services"**: Includes all labor, material, and equipment necessary to fully perform the requirements of the Contract.

2.24 **"Substantial Completion"** ("SC") or **"Estimated Date Release to Operations"** ("EDRO").   SC and EDRO shall be the date upon which:  (i) construction is sufficiently complete and is functional for its intended use, in accordance with the Contract Documents, including to enable PG&E to perform full operations, (ii) all systems are tested, commissioned and functioning satisfactorily, (iii) only punch list work or similar minor corrective work remains to be completed, and the completion of such work will not unreasonably interfere with PG&E's operations, and (iv) the remaining punch list work has been agreed by Contractor and PG&E.

2.25 **"Third Party"**: A person or entity that is not a Party to this Contract.

2.26 **"Time-and-Materials"**: A pricing methodology also referred to as "Hourly Rate," which specifies one or more hourly rates for Work, inclusive of all overhead costs and administrative and supervisory support, profit, and taxes, and provides for reimbursement of certain out-of-pocket expenses at actual cost plus any applicable mutually agreed fees.

2.27 **"Transportation"**:  Total cost for transportation of equipment, materials, and hazardous waste offsite for disposal, recycling, or re-use.

# 3   RECITAL AND RELATIONSHIP OF PARTIES.

3.1 Contractor is regularly engaged in the business of providing comprehensive EPC and is fully licensed, financed and qualified to perform such services.

# 4   STATEMENT OF WORK

4.1 Schedule:

| Major Milestone | Phase 1 | Phase 2 | Notes |
|---|---|---|---|
| Select Compressor Supplier | July 30, 2015 | | PG&E Action |
| Award EPC Contract | December 1, 2015 | | PG&E Action |
| NTP | February 5, 2016 | | |
| Begin Phase I | February 8, 2016 | | |
| Procure Compressor Package | March 25, 2016 | | EPC Contractor perform for PG&E |
| 30% Design Review | May 5, 2016 | | |
| 60% Design Review | June 23, 2016 | | |
| 90% Design review | August 25, 2016 | | |
| IFC drawings Complete | October 20, 2016 | | |
| Engineering Completion | November 7, 2016 | | IFCs and Specifications Approved |
| Long Lead Material Purchase | Feb thru Nov 2016 | | |
| Begin Phase II | | October 24, 2016 | |
| Construction Mobilization | | October 24, 2016 | Mobilization at Burney Site |
| Long Lead Materials at Site | | TBD | Compressor Package Delivery |
| Preliminary Construction | | October - November 2016 | Site investigation and site preparation |
| Project Construction at Site | | March – November 2017 | |
| Station outage for Tie-in and Test | | August to Nov 17, | PG&E Station Clearance |
| Tie-In L-400 and L-401 | | August 1, 2017 | End PG&E Clearance |
| Commissioning and Testing | | November 1, 2017 | |
| Substantial Completion | | November 17, 2017 | Final Turnover to PG&E |
| Project Complete and Demob | | December 1, 2017 | |

Contractor's bid proposal and baseline schedule shall indicate sufficient float for inclement weather and a reasonable contingency.

4.3 The Contractor shall not utilize float suppression techniques or artificial restraints, constraints, lags or durations to lessen or control the amount of total or free float contained in the network. Open Ended activities that have either no predecessor or no successor relationships shall be avoided or documented in the schedule narrative.

4.4 Float shall not be considered as time for the exclusive use of or benefit of either PG&E or the Contractor. Float shall be considered as a resource available to both parties for the benefit of the project.

4.5 Major Milestones:

    4.5.1  Based on PG&E Specifications and criteria, Contractor shall purchase compressor package for the project no later than indicated in Section 4.1.

    4.5.2  Contractor shall achieve Engineering Completion no later than indicated in Section 4.1.

4.5.3   Contractor shall achieve Substantial Completion no later than indicated in Section 4.1.

4.5.4   Contractor shall maintain and comply with its BCS Schedule (to be developed) and Contractor shall as required refine its Work schedule as necessary to assure schedule compliance.

4.6   Technical Specification Number 12107 for Engineering, Procurement and Construction services, ("EPC") supporting the BCS K2 Replacement provides the primary source of project information supporting the BCS Project. This document contains a comprehensive specification and work scope information, including but not limited to for example, Scope of Work and Technical Requirements, Testing and Acceptance.

| Section | Section Title | Page Number |
|---|---|---|
| 1 | DEFINITIONS | 3 |
| 2 | OBJECTIVE | 4 |
| 3 | SITE INFORMATION | 5 |
| 4 | SCOPE OF WORK SAFETY | 5 |
| 5 | WORK PHASES ENVIRONMENTAL | 8 |
| 6 | PROJECT SCHEDULE | 9 |
| 7 | COMMUNICATION | 10 |
| 8 | PROJECT AND CONSTRUCTION MANAGEMENT | 15 |
| 9 | UNIFIER DOCUMENT MANAGEMENT | 17 |
| 10 | QUALITY ASSURANCE AND QUALITY CONTROL | 17 |
| 11 | TURBINE/COMPRESSOR UNITS | 20 |
| 12 | PIPING AND MECHANICAL EQUIPMENT | 20 |
| 13 | ELECTRICAL SYSTEM | 24 |
| 14 | CONTROL SYSTEM | 25 |
| 15 | CATHODIC PROTECTION | 27 |
| 16 | CIVIL, STRUCTURAL AND BUILDINGS | 27 |
| 17 | PAINTING | 29 |
| 18 | PG&E WORK SCOPE | 30 |
| 19 | DESIGN DRAFTING | 31 |
| 20 | PRODUCTION ENGINEERING | 33 |
| 21 | PROCUREMENT | 39 |
| 22 | CONSTRUCTION REQUIREMENTS | 40 |
| 23 | CONSTRUCTION SITE SAFETY | 62 |
| 24 | SITE ENVIRNMENTAL AND HAZMAT | 65 |
| 25 | COPNSTRUCTION SUBMITTALS | 69 |
| 26 | PG&E CONSTRUCTION WORK | 72 |
| 27 | DEMOLITION AND REMOVAL | 74 |
| 28 | COMMISSIONING AND ACCEPTANCE TESTS | 75 |
| 29 | MAINTENANCE | 77 |
| 30 | TRAINING FOR PG&E | 78 |
| 31 | DOCUMENTATION, MANUALS AND DRAWINGS | 82 |
| 32 | CODES AND STANDARDS | 88 |

4.7 Attachment Listing:

The following provides a summary of the documents and drawings.

| Attachment 1 | Scope of Work |
|---|---|
| Attachment 2 | Burney Location Map |
| Attachment 3 | Burney Compressor Preliminary Engineering Design Criteria |
| Attachment 4 | Proposed Burney Operating Diagram |
| Attachment 5 | Proposed Burney Main Gas P&ID |
| Attachment 6 | Various Proposed Station Plot Plan Drawings |
| Attachment 7 | Burney Gas Compression Package Specifications |
| Attachment 8 | Burney Gas Com pressor Package Proposal |
| Attachment 9 | Single Line Drawings from Preliminary Engineering |
| Attachment 10 | PG&E Safety, OQ, and GSE Guidelines and Requirements |
| Attachment 11 | PG&E Gas Transmission Standards, Specifications, & Procedures |
| Attachment 12 | PG&E CAD Specification |
| Attachment 13 | Burney Control Philosophy |
| Attachment 14 | Electronic Version of Preliminary Engineering Deliverables |
| Attachment 15 | Wind and Seismic Design Parameters |
| Attachment 16 | PG&E Project Delivery System Forms |

## 5 CONTRACT PRICE FEE, SCHEDULE, AND INVOICES

5.1 Pricing Basis

5.1.1 Full compensation to Contractor for all the Work in compliance with all terms and conditions of this contract, and for Contractor's payment of all obligations incurred in, or applicable to the performance of the Work, shall be the firm, fixed price of $40,510,262.00 (hereinafter, "Contract Price") inclusive of all tax, initial surety bond, and builders risk insurance (See Pricing Workbook). The Work will commence after execution of this Contract and pursuant to a Notice to Proceed Agreement. PG&E shall release Contractor to complete long lead procurement for the Compressors as indicated in Section 4.1 and the remainder of the long lead procurement required in accordance with the Contractor's approved milestone schedule.

5.1.2 The Contract Price and pricing for changes and all other rates set forth herein are firm for the duration of the Work and include all Contractor's costs, expenses, overhead and profit for complete performance of the Work.

5.1.3 The firm, fixed prices for mobilization, demobilization and site establishment shall be fixed and firm and shall not be subject to adjustment based upon any additions or deletions to the Contract Price.

5.1.4 The Contract Price shall include, but shall not be limited to all taxes, duties, and fees except as otherwise set forth in Section 5.3 Taxes.

5.1.5 Failure by Contractor to assess fully the Scope of Work as required and described in the Contract shall not be accepted as a basis for variations to the firm, fixed price and any pricing for changes.

5.1.6 All pricing shall be in U.S. Dollars and such pricing is not subject to change in the event of fluctuation in the rate of exchange of any other currency against the U.S. Dollar.

5.1.7 All pricing shall include all costs associated with and relative to, performing Work in accordance with and working in accordance with all applicable local, state and federal safety regulations and; as applicable and deemed by PG&E, PG&E's safety, security and fire procedures/requirements or Contractor's safety, security and fire procedures/requirements approved by PG&E.

5.2 Pricing Changes: In addition to the requirements for changes set forth in the General Conditions, the following additional terms apply to changes. PG&E may request, and Contractor shall provide, proposals for Scope of Work changes (additions and deletions) which are priced, at PG&E's option, by one or a combination of the following methods:

5.2.1 Price Methods

5.2.1.1 Negotiated firm, fixed price based upon a mutually agreed scope of work.

5.2.1.2 Unit prices agreed to by the parties.

5.2.1.3 On a time and material basis at the labor and equipment rates agreed to by the parties and the terms set forth in Section 5.2.3 below.

5.2.2 Unit Prices for Changes

5.2.2.1 Contractor shall have the responsibility for determine quantities and otherwise establishing the measurement of work that is performed on a unit price basis. The foregoing shall then be subject to PG&E's review and approval.

5.2.2.2 All unit prices shall apply at one hundred percent (100%) of their value for both additions and deletions to the Work.

5.2.2.3 All unit prices shall apply whether the work is performed by Contractor or by a Subcontractor.

5.2.2.4 All unit prices shall be deemed to include each and every item of expense required to perform the work in the respective categories.

5.2.3 Time and Material Basis for Change: If PG&E directs that changes to the work be performed on a time and material basis compensation to Contractor for such changes shall be as follows:

5.2.3.1 All-inclusive labor rates shall be applied to all agreed hours worked. All labor used for changes and which does not resemble the job classifications must be approved by PG&E prior to their use.

5.2.3.2 Construction Equipment rates set forth in Attachment A shall apply for equipment used for extra work requested by PG&E.

5.2.3.3 For equipment which is specifically mobilized to the jobsite for extra work, Contractor shall separately identify firm, fixed prices for mobilization and demobilization including transportation costs (including loading, off-loading, assembly and disassembly, fueled and operable).

5.2.3.4 Transportation costs shall not be applicable to equipment already mobilized on the site and credited to mobilization/demobilization price.

5.2.3.5 When Contractor's equipment does not resemble the equipment having agreed upon rates, such equipment's rate shall be agreed to by the Parties.

5.2.3.6 Compensation to Contractor for equipment used for extra work which is rented or leased from third parties and which does not resemble Contractor's equipment must be approved by PG&E in writing prior to rental and shall be at actual cost to Contractor, including transportation to site, (as substantiated by invoices certified paid or by such documentation as may be required by PG&E) plus a mark-up, for all profit and overhead expense of Contractor thereon 5%.

5.2.3.7 Compensation to Contractor for materials supplied by Contractor for (excluding consumable, expendable, and small tools and which cost Contractor less than $3,000 each, as they are included in the markups on labor rates) shall be at actual invoiced cost to Contractor, (exclusive of taxes) including transportation to site, as substantiated by invoices certified paid or by such documentation as may be required by PG&E, plus a mark-up on the material costs only, for all profit and overhead expense of Contractor thereon 5%.

5.2.3.8 PG&E reserves the right to provide, at no cost to Contractor, materials, equipment, services, supplies or incidentals required to perform the Work.

5.2.3.9 All refunds, trade discounts, rebates on materials, supplies and services, and all monies obtained from the disposal of surplus materials or supplies that were obtained by Contractor for execution of extra work shall accrue to PG&E.

5.2.3.10 Subject to the audit provisions of this Contract, all materials authorized by PG&E to be supplied by Contractor must be procured in such a manner as to ensure their competitiveness in both price and schedule.

5.2.3.11 All subcontracts and services provided by others for performance of changes or extra work requested by PG&E shall be at actual cost to Contractor of such subcontracts or services provided by others plus a mark-up for all profit and overhead expense of Contractor thereon of 5%. In no instance shall the mark-ups or rates for changes provided by Subcontractor to Contractor exceed the mark-ups or rates for changes as stipulated in this Section.

5.2.4 Time Sheets: For all construction work performed on a Time and Material basis, Contractor shall provide on a daily basis a Daily Statement of Labor, Material, and Equipment Sheet ("LM&E Sheet" (Form 62-5687)).

5.2.5 Taxes: Subject to the provisions of Section 5.0 set forth herein, all duties, sales and use taxes, excise taxes and similar taxes applicable to and arising directly out of performance of any time and material Work, which are imposed by any governmental authority, excluding personal property taxes on construction equipment and other property owned by Contractor and taxes on net income of Contractor, shall be at Contractor's actual cost without markup whether paid for by Contractor or Subcontractor.

5.2.6 All costs and expenses (which are not expressly stated in this Section 5.0 to be reimbursable) necessary for Contractor to perform changes to the Work shall be deemed included within the markups for overhead or profit set forth herein. Such costs and expenses shall include all items expressly stated in this Contract that are to be at the cost, expense or for the account of Contractor, or which are stated to be performed by Contractor at no additional cost to PG&E.

5.3 Taxes: The Contract Price includes all taxes, duties and fees. Contractor shall not be reimbursed for personal property taxes on construction equipment and other property owned by Contractor, and taxes on net income of Contractor. Contractor shall pay promptly pay when due all such taxes, duties, fees and other assessments of whatever nature. Contractor shall pay when due, and the compensation set forth herein of this Contract shall be inclusive of, all taxes, duties, fees and other assessments of whatever nature imposed by governmental authorities and applicable to the performance of the Work and this Contract.

5.3.1 Contractor shall be responsible for maintaining and furnishing the necessary records and documentation required by government authorities and PG&E to apply for and obtain tax and duty refund

5.3.2 If Contractor imports and exports materials, equipment, supplies, tools, or any item for performance of the Work, any custom duties, value added, import or export taxes, document fees, handling charges, or other fees related to the importation or exportation of such materials, equipment, supplies, tools or other items shall be paid by Contractor.

5.4 Payment Milestone Schedule and Reporting Requirements: The contract payments to Contractor shall be made based upon measured and verified Work progress as described in this Section 5.4.

5.4.1 Cost and Progress Reporting: Cost reporting only applies to T&M work. Progress reporting applies to all work. Contractor shall use Milestone or Work Package Completion to report project progress. A hierarchical schedule (Work Breakdown Structure, WBS) and integrated cost plan shall be in place with changes to baseline tightly controlled. No change shall be made to the accepted Cost-Loaded Schedule Baseline without the prior written authorization of the PG&E Project Manager. The Cost-Loaded Schedule Baseline shall be the basis for progress payments. The progress payment schedule shall be mutually defined within 90 days of contract execution and implemented with a Contract Change Order.

5.4.1.1 Within ninety (90) days from project kickoff meeting, the Contractor shall prepare and maintain a detailed, resource-loaded schedule in a PG&E standard project management software application (e.g. Primavera Version 6.0, PPMC, etc.) utilizing Critical Path Method (CPM). This schedule will be the Contractor's working schedule and shall be used to identify the sequence of activities and to track time and cost estimates for those activities in order to plan, organize, execute, and monitor the work. The schedule shall be used to record and report actual performance and progress, and to outline how the Contractor plans to integrate engineering, procurement, and construction in order to ensure accurate and timely completion of all required work. The Contractor schedule must include 10 business days to ensure sufficient time for PG&E review of planning and engineering documents where approval is required.

5.4.1.2 The control account (CA) structure will be based upon milestones as defined in the Pricing Workbook and will correspond with the Contractor's Cost Loaded Schedule. In addition, the job cost structure should reflect the PO structure,

Case: 19-30088    Doc# 5 Filed: 01/29/19    Entered: 01/29/19 05:20:31:45    Page of
265 of 822

5.4.1.3 Contractor shall submit weekly P6 progress schedule updates to the Construction Manager no later than two (2) calendar days prior to the day of the weekly meeting. Show the critical path and completion dates for tasks up to project completion. Progress schedule shall be updated to include milestone dates for each permit to be obtained by the Contractor.

5.4.1.4 The Contractor shall develop and deliver to PG&E weekly schedule updates for construction covering the last week's progress and identifying the next three week's work plan at a detailed level. Specific detail may be increased or reduced at the discretion of the Project Manager. The work plan should contain specific activities, durations, materials, locations, and resources required for on-time completion of the scheduled activities.

5.4.1.5 Contractor shall provide schedule updates to PG&E every two weeks and a monthly update submitted with each invoice as a condition of payment. Contractor shall provide PG&E with estimated or actual invoices within 10 days of accrual (required accrual date to be specified at project kick-off).

5.4.1.6 The Contractor's schedule updates shall include a detailed variance analysis narrative explaining significant changes in the schedule and their impact to the schedule, cost, and scope of the project since the last update. Items shall include, but are not limited to, duration changes, logic changes, new activities, milestone changes, change order requirements, and any other scheduling elements. The basis of all constraints and lags utilized in the PMB and subsequent schedule updates must be documented in the schedule narrative.

5.4.1.7 Where requested by PG&E management, include detailed work break down structure for selected activities as well as other information needed by PG&E to track Work performance and regulatory compliance.

5.4.2   Payment Schedule Cost and Performance Reporting

5.4.2.1 Contractor shall establish tangible, measurable deliverables (Completion Milestones and/or Work Packages) within the hierarchical schedule so that every WBS element has at least one work package and that there is at least one work package completing bi-weekly, if there is significant spending over $100,000.

5.4.2.2 Contractor shall assign a dollar amount to each Completion Milestone and/or Work Package representing the value of that Completion Milestone and/or Work Package to PG&E. Once PG&E approves the value assigned to each work package the values will be recorded in the Contractor's Schedule of Values. The value of each Completion Milestone and/or Work Package is earned only when the Completion Milestone and/or Work Package has been fully delivered (100% completed and objectively determined) or objectively measured using unit pricing or defined deliverables (e.g. linear feet). Arbitrary percent complete and percent of budget spent are not acceptable forms of progress.

5.4.2.3 Using PG&E's Unifier Document Management System, Contractor shall report to PG&E all current job cost details, budget vs. actual, Completion Milestone and/or Work Package status, trended forecast of schedule and cost and other requirements as requested by PG&E.

5.4.2.4 Contractor shall provide PG&E with notification of the receipt of any goods and services received within ten (10) business days in order to ensure timely reporting of goods receipts and accruals to the appropriate departments.

5.4.2.5 On a bi-weekly basis PG&E and Contractor will determine the amount of Work satisfactorily completed and which Completion Milestones and/or Work Packages, if any, have been fully delivered. The units of Work satisfactorily completed for the current period and the total project to date, as well as the work packages fully delivered will be recorded in the Schedule of Values and agreement. The amount of Work completed and work packages fully delivered will be signed by PG&E and the Contractor on the Schedule of Values. Contractor shall, via Unifier, send a copy of the week's Schedule of Earned Values to the PM and other designated representatives for recording the contract liability in PG&E's cost and financial records.  In the event of a disagreement regarding Completion Milestone and/or Work Package completion for Earned Value reporting purposes, PG&E shall make the final determination.

5.4.2.6 Project Schedule Reports shall be submitted to PG&E on a bi-weekly basis and should include the following materials and formats:

5.4.2.6.1 An electronic file native to scheduling tool (not graphical or flattened output such as PDF) which is 100% compatible with existing PG&E tool.

5.4.2.6.2 Scheduling tool reports shall be 8 ½" by 11" Minimum but 11"x17" is preferred.

5.4.2.6.3 Time Scaled Logic Diagram or Bar Chart based on early dates and organized by WBS Structure with the longest (critical) path printed in red.

5.4.2.6.4 Estimated Cash Flow Histogram with planned cash flow value per period (bar) and cumulative cash flow to date (curve).

5.4.2.6.5 Earned Value curve charts showing planned value, earned value, and actual costs over time.

5.4.2.6.6 Change order log, if necessary.

5.4.2.6.7 Status of purchase orders, and line item if multiple line items exist.

5.4.2.6.8 Photographs of progress to date.

5.4.2.6.9 Invoice and payment status updates.

5.5 Payment Terms

5.5.1 Payments made to Contractor shall be made in accordance with Section 4 of the General Conditions. PG&E shall retain 5% from each payment made to Contractor in accordance with Article 4 of the General Conditions.

5.5.2 Contractor shall submit a weekly progress report (WPR) meeting the minimum requirements set forth in the document entitled, "Unifier - Weekly Progress Report.pdf," which is located on Unifier in the Gas Shell Document Manager folder entitled, "Training Materials. Complete WPR in the specified format, level detail, and quantity breakdown for each item of the Work. Conduct a visual inspection of the jobsite with PG&E CM near the end of each week in order to reach a mutual agreement on quantity installed in-place or percentage of completion for each item. Submit WPR in Unifier no later than 9:00 a.m. on the Monday morning of the following week.

5.5.3 Contractor shall prepare and submit all invoices in a form that is satisfactory and approved by PG&E in accordance with Section 5.9 of the General Conditions for the Work accomplished. For work performed on a reimbursable or unit price basis, the invoice shall be accompanied by documentation supporting each element of measurement and/or cost. Any invoice submitted, which fails to comply with the terms of this Contract, including the requirements of form and documentation may be returned to Contractor. Any costs associated with the resubmission of a proper invoice shall be to Contractor's account.

5.5.4 In the event PG&E or its contractors perform work for Contractor's account, PG&E shall back charge Contractor for such work. If PG&E effects any work which were otherwise Contractor's responsibility, PG&E may back charge Contractor for the following direct costs of the required work: (i) PG&E union labor at the worker's bare wage times 2.60, (ii) PG&E non-craft labor at the midpoint of the salary or wage range for the job classification of the worker times 2.60, and (iii) for third party rentals, material or outsourced services, the invoice cost times 1.13.

5.5.5 Back charges include but are not limited to the following:

5.5.5.1 Additional work that either PG&E performs or provides in support of Contractor and beyond the materials, equipment and services specified that PG&E will provide or perform. If PG&E performs Contractor's work, equitable reduction in Contractor's price shall be made.

5.5.5.2 Additional PG&E work that supports Contractor beyond PG&E's Work Hours and Work Week.

5.5.5.3 Additional PG&E work from remedial measures that result from non-compliance with the Work and its requirements.

5.5.5.4 For PG&E costs for work where Contractor fails to remediate warranty defects.

## 5.6 Delay Terms

### 5.6.1 Extra Work

5.6.1.1 For purposes of delays, extra scopes of work may or may not affect critical path resources (i.e.; Time Dependent Resources (TDRs) like the project manager or trailer rentals).

5.6.1.2 For extra Work that does not affect critical path, only the resources working directly on the extra Work will be charged.

5.6.1.3 No TDRs will be charged until the extra Work becomes critical path. When the extra Work does extended critical path, the TDRs shall be charged only for the actual amount of time the critical path was extended.

5.6.1.4 TDRs shall include the project manager, other general staff like safety engineering and 'non-hands' staff like shift engineer, common field resources that support and stay at KPP for the duration of the Work.

### 5.6.2 Compensatory Delay Charges Term

5.6.2.1 Delay charges and schedule adjustment (including schedule adjustment for computing schedule incentives, if any) for delays will apply to PG&E-caused delays that are 4 hours or greater per occurrence of delay.

5.6.2.2 Delay charges will only apply if the Schedule is overrun. This term takes priority over all other delay terms. For example, the schedule is for 400 days and the Work is completed in 390 days not including any PG&E-caused delays (delays only greater than 4 hours per occurrence) of 7 days. Then for this example, no delay charges would apply until PG&E-caused delays exceeded 10 days.

5.6.2.3 Delay charges will be reduced if the Contractor can redeploy the delayed resources on other portions of the fixed price Work.

5.6.2.4 For delays of one shift or more, PG&E will provide a minimum of 10 hours advance notice to Contractor for such delays. For these delays only:

5.6.2.4.1 Delay charges will apply for a maximum of 8 hours per day until the delay time and work time equals 40 hours in a weekly pay period. When the delay time and work time exceeds 40 hours for a weekly pay period, then only per diem charges will apply for the days that exceeded the 40 hours and the delay personnel are not required to be at Work Site.

5.6.2.4.2 Contractor will be paid for per diem only for delay days that exceeded 40 hours in a weekly pay period and for those job classifications that are entitled to per diem. However, for delay time that spans a non-working day, no per diem is paid for such non-working day.

5.7 Liquidated Damages

    5.7.1   Late Completion Liquidated Damages

        5.7.1.1 PG&E's construction and commercial operation schedule is based upon the required Phase One and Phase Two completion dates provided in 4.1 above. Contractor's failure to meet either of these dates will result in added project costs and other damages to PG&E.  It will be extremely difficult for Contractor and PG&E to identify the amounts of increased or additional costs attributable to Contractor's failure to meet the required completion dates.  Therefore, should Contractor fail to meet one or all of the specified completion dates, Contractor and PG&E agree that Contractor shall pay PG&E liquidated damages per day of delay, provided the total amount of late completion payments for liquidated damages shall not exceed $1,500,000.00, as follows:

        5.7.1.2 Phase One:  Contractor shall achieve Completion of Phase One Work by the Engineering Completion Date set forth in Section 4.1.  If Phase One completion is not achieved by the Engineering Completion Date, Contractor shall pay to PG&E as liquidated damages and not as a penalty an amount equal to $10,000 per day for each day by which Engineering Completion is not achieved.

        5.7.1.3 Phase Two: Contractor shall achieve Substantial Completion for Phase Two Work by the Date set forth in Section 4.1.  If Phase Two completion is not achieved by the Phase Two Substantial Completion Date, Contractor shall pay to PG&E as liquidated damages and not as a penalty an amount equal to $20,000 per day for each day by which Phase Two Commissioning Completion not achieved.

        5.7.1.4 Contractor and PG&E acknowledge and agree that the terms, conditions and amounts fixed pursuant to Section 5.7.1 above for Late Completion Payments are reasonable, considering the anticipated damages that PG&E will suffer in the event of Contractor's failure to achieve the Phase One and Phase Two Completion Dates.  The amounts of these liquidated damages are agreed upon and fixed hereunder because of the difficulty of ascertaining the exact amount of damage that will be actually incurred by PG&E for late Completion, and PG&E and Contractor agree that the liquidated damage amounts specified in this Section 5.7.1 shall be applicable regardless of the amount of such damages actually incurred by PG&E.

        5.7.1.5 The Late Completion Payment shall be the measure of Contractor's liability only for delay in completing the Work by the Completion Dates, and shall not limit Contractor's liability for defects in the Work or for Contractor's failure to perform its other obligations under the Contract.

5.7.2   Payment of Liquidated Damage

5.7.2.1 Contractor shall pay the Late Completion Payment herein monthly in arrears on the tenth (10th) day of each month beginning after the date for which the respective Late Completion Payment is payable.  PG&E shall be entitled to deduct the Late Completion Payment from any payments made under this Contract.

# 6   MODIFICATIONS TO THE TERMS OF GENERAL CONDITIONS

6.1 Contractors Pollution Liability General Conditions, Section 7.6 shall be amended for this project only as follows: The limit shall not be less than $1,000,000 each occurrence for bodily injury and property damage.

6.2 Business Auto General Conditions Section 7.3 shall be amended for this project only as follows: The limit shall not be less than $2,000,000 each accident for bodily injury and property damage.

6.3 Performance Bond:  In accordance with the General Conditions, Section 4.11, If requested by PG&E, Contractor shall, within 5 days of request, obtain a payment and performance bond in the amount specified by PG&E up to 100 percent of the Contract price in a form and with a surety acceptable to PG&E.

6.4 Builders Risk Insurance:  In accordance with the General Conditions, Section 7.5, Contractor shall obtain an All Risk, Builders Risk Property insurance policy.  PG&E shall reimburse the cost of the policy at cost.

6.5 Professional Liability Insurance:  General Conditions, Section 7.4, shall be amended for this project only as follows:  Errors and omissions liability insurance appropriate to Contractor's profession with a limits of not less than $5,000,000 per claim and in the aggregate, covering all professional services provided under the Contract for damages incurred by reason of (a) any negligent act, error or omission committed, or alleged to have been committed with respect to any engineering or design services under the Contract, and (b) any negligent acts, errors or omissions while performing or failing to perform any professional services provided under the Contract.

6.6 AIRCRAFT LIABILITY: If aircraft is used in the Work, coverage shall be classified for the intended aircraft scope of work and include coverage for bodily injury, property damage including injury sustained by any passenger, applying to all aircraft owned, furnished or used by the Contractor in the performance of this Contract.

6.6.1   The limit shall not be less than Five Million Dollars ($5,000,000) single limit for bodily injury and property damage including passenger liability.

6.6.2   Coverage shall: a) By "Additional Insured" endorsement add as additional insureds PG&E, PG&E's directors, officers, employees, agents, and its parent company, affiliates, subsidiaries with respect to liability arising out of or connected with the Work performed by or for the Contractor; b) Be endorsed to specify that the Contractor's insurance is

primary and that any insurance or self-insurance maintained by PG&E shall not contribute with it; c) include a severability of interest clause.

6.6.3 HULL INSURANCE: Coverage for physical damage for the full value of the aircraft and coverage shall waive all rights of subrogation against PG&E with respect to all physical damage to any aircraft used during the performance of this Contract.

6.7 OCEAN/INLAND MARINE CARGO INSURANCE: An Ocean/Inland Marine Cargo policy shall be provided for site to site coverage, and loss or damage to freight while in the care, custody or control of Contractor. Contractor shall be responsible for the shipments and safe handling, transport and unloading of the shipment at the destination in the manner and location designated.

6.7.1 Coverage shall be in amounts equal to full replacement value. Coverage shall be separate for each vehicle, vessel or other means of transportation of freight.

6.7.2 Carrier shall by endorsement name PG&E as a loss payee.

6.8 CRIME LIABILITY INSURANCE:

6.8.1 Coverage shall include but not be limited to Employee Dishonesty, with limits of One Million Dollars ($1,000,000) per occurrence and in the aggregate.

6.8.2 Coverage shall provide for losses caused by the actual destruction, disappearance, wrongful abstraction or theft by the Contractor or any other person authorized by the Contractor to have custody.

6.9 ALL RISKS BUILDERS RISK PROPERTY INSURANCE: An All Risk Property insurance policy shall be provided to cover all Work, property and delayed opening coverage for the Project; during construction, testing, start-up for any and all materials, equipment and machinery intended for the project while at the site, off-site and during transit to the site. Coverage to include and shall not be limited to fire, earthquake, flood, extended coverage, expediting expense and extra expense, and collapse shall be maintained during the course of work being performed.

6.9.1 Coverage shall be written on a replacement cost basis for the full completed value of the Project. Limits and deductibles shall be approved by PG&E. Such policy shall remain in full force and effect until possession and control of the Project is transferred to Owner.

6.9.2 PG&E shall be named as Loss Payee.

6.10 EQUIPMENT WARRANTY: For this project only and notwithstanding any language to the contrary contained in this agreement, the warranty for all equipment provided by Contractor on this project shall be the manufacturer's warranty that shall be assigned to PG&E by Contractor. No further equipment warranty exists for this Project.

6.11 PROJECT SPECIFIC LIMIT OF LIABILITY: Notwithstanding any language to the contrary contained in this Agreement, including the General Conditions, but subject to specific carve outs contained in Articles B-2.1-B-2.6 of the General Conditions the parties agree that the Contractor's limit of liability for all claims arising out of Contractor's work on the Project shall be capped at Twenty Three Million Dollars ($23,000,000).

# 7 CONTRACTOR'S USE OF PG&E PROPERTY

7.1 All records, reports, computer programs, Documentation, written procedures and similar materials, documents or data, in whatever form, provided by PG&E for Contractor's use in the performance of services under this Contract shall remain the confidential property of PG&E and shall be returned to PG&E immediately upon completion of the Contractor's use for the performance of the Work, or earlier upon the request of PG&E.

7.2 Contractor shall implement documented information security controls to maintain the confidentiality, integrity and availability of PG&E's electronic information and network. These controls include such areas as user access, authentication and password administration; secure network connectivity; electronic control, storage, disposal and transmission of data; security incident reporting and network monitoring to assure compliance. The requirements of this Paragraph shall be extended to Sub suppliers performing activities on Contractor's behalf. These requirements are applicable when connecting to or accessing PG&E's network, protecting PG&E information, or introducing products and services, such as computer programs, code, software, firmware or media, into PG&E's network. Contractor provides PG&E the rights of access for the purpose of verifying these controls at the Contractor's facility. Contractor shall submit its documented controls to PG&E for review upon request. Contractor may utilize PG&E's Information Protection Program in lieu of its documented controls upon request to PG&E.

# 8 MODIFICATION TO EXISTING SERVICES AND CHANGE ORDER

8.1 Additional Services other than those described in this Contract shall be performed by Contractor only if described and authorized in a Contract Change Order (CCO) signed by Contractor and PG&E. Additional work may be requested by PG&E's Work Supervisor. Any Additional work must be authorized in writing by PG&E prior to performance of such additional work, through the issuance of a fully executed Contract Change Order. CCO's which are written pursuant to the Contract and which have completion dates beyond the completion date of the Contract shall continue to be governed by the terms of the Contract until said CCO's completion date.

8.2 PG&E reserves the right to make such changes in work, specifications, or level of effort, as may be necessary or desirable and any difference in Contract price resulting from such changes shall be approved in writing by PG&E before the work is begun.

8.3 Contractor shall on a monthly basis prepare a summary of the work performed for and the number of hours worked on behalf of PG&E. Such a summary shall be given to the PG&E Work Supervisor and shall include the following information, at a minimum, with regard to the status of Work:

8.3.1 PROGRESS. Work performed or completed by Contractor, including significant progress, set-backs, or outstanding issues, for example, permitting, regulatory or PG&E approval.

8.3.2 CHANGES. Changes, additions or decreases, to the scope of Work.

8.3.3 SCHEDULE. Review of the schedule for the Work as compared to actual progress.

8.3.4 Contractor shall immediately notify the PG&E Work Supervisor regarding any problems which may significantly affect the performance of Services by Contractor.

8.3.5 PG&E shall decide, in its reasonable discretion, whether Contractor's performance during the Contract term is satisfactory.

9  **WORK LOCATION.**

    9.1 Services may be performed at Contractor's place of business and in various locations throughout the Pacific Gas and Electric Company service territory, as required for successful completion of the work described in Section 4, Scope of Work and Deliverables.


10 **NOTIFICATION**

    10.1   Contractor shall immediately notify PG&E regarding any problems which may significantly affect performance of Services by immediately notifying PG&E's Work Supervisor.


11 **CONTRACT INTERFACE**

    11.1   In regard to matters relating to this Contract, both parties shall deliver written notices to:

| PG&E Work Supervisor |
| --- |
| Mr. Melvin Wong <br> Sr. Project Manager <br> PG&E <br> 24399 Clawiter Road <br> Hayward CA 94545-2200 <br> 510-784-3375 <br> MXW6@pge.com |


12 **CHANGE CONTROL**

    12.1   Changes or modifications to this Contract may not occur except by a written change order signed by the Contractor's and PG&E's authorized representatives.

    12.2   CONTRACTOR AGREES THAT ALL COSTS FOR ANY SUCH MODIFICATION OR CHANGE THAT IS PERFORMED WITHOUT PG&E'S PRIOR WRITTEN APPROVAL SHALL BE AT CONTRACTOR'S SOLE RISK AND EXPENSE.

13 **ACCEPTANCE & ACCEPTANCE TESTS**

    13.1   Please refer to Specification 12107, Section 28, Commissioning and Acceptance Tests.

    13.2   Acceptance of the Work furnished hereunder will occur when the Work has been placed in operation and tested and found to have met successfully all performance and efficiency warranties made by Contractor. However, if said acceptance tests are delayed beyond a period of two years from the date the Work is placed in operation and provided said operating date is not unreasonably delayed by PG&E, and such delays are not due to Contractor's deliveries or performance limitations, then Contractor's liability for its warranties of efficiency and performance shall terminate unless other terms of liability are mutually agreed upon at the end of the aforementioned two year period.

    13.3   Acceptance tests to demonstrate the ability of the Work to meet performance and efficiency warranties will be made by PG&E as soon as possible after the Work is placed in reliable operation, system conditions permitting.

13.4    The conditions of the acceptance test, methods employed, and the test result calculations shall be in accordance with the latest applicable ASME Power Test Code or IEEE Test Code, except where deviations are mutually agreed upon between Contractor and PG&E. Certified correction curves from such deviations from the Contract conditions shall be supplied by Contractor prior to test.

13.5    Contractor will be notified by PG&E and shall have the right to participate in the acceptance tests but shall make no charge to PG&E for the expense of such participation. PG&E will make all field preparations and pay all expenses incidental to the initial acceptance tests, except for the expense of Contractor's personnel. Contractor shall provide on loan without charge any special equipment necessary for testing. To ensure that the unit in which the Work is installed is in proper adjustment and in condition to undergo tests, Contractor may request that preliminary tests be made under Contractor's general direction and at its expense, subject to PG&E's approval.

13.6    Both Parties shall be bound by the results of the acceptance tests. In the event the Work fails to achieve warranted efficiency and performance, further acceptance tests, mutually agreed upon in writing by the Parties, shall be made at Contractor's expense after repair, replacement, or other correction, adjustment, or modification in or to the Work to correct such nonconformity.

13.7    Upon fulfillment of all the terms of the Contract, including successful completion of acceptance tests, PG&E will so notify Contractor in writing, and only such written notice shall constitute acceptance and fulfillment of the sale, subject, however, to the warranties and conditions contained in the Contract.

# 14  LABOR

14.1    Please refer to General Conditions Section 12.12.  Construction work at the Burney Compressor Station must only be performed by a contractor who is signatory to an agreement with IBEW Local 1245 that covers the identified Work.  Contractor shall not subcontract such construction Work to a non-signatory contractor or to a contractor who is signatory to a union other than IBEW Local 1245, unless Contractor has requested and received the prior written approval of PG&E, which approval may be contingent upon, among other things, receipt of any necessary third party approvals.

# 15  SHIPMENT AND DELIVERY

15.1    DELIVERY CHARGES: Quotations for delivery charges shall be; (1) f.o.b. vessel, car, or other vehicle, point of shipment; or (2) f.o.b. destination. Quotations shall be exclusive of applicable sales, use, or other excise taxes, and PG&E will reimburse Contractor therefore. For quotation (2) herein, Contractor shall include in its proposal a separate statement showing the amount included in the quotation for delivery charges and charges for installation, if any. Delivery charges shall include cost of freight, cartage, dunnage, import duty, and insurance. The total shipping weight and dimensions shall be stated in Contractor's proposal.

15.2    SHIPMENT: PG&E prefers that Contractor submit a firm price for shipment, and this will be an important consideration in making the award. If Contractor includes escalation in its proposal, it shall be based upon U.S. Bureau of Labor Statistics indices for the Goods, applied in accordance with Contractor's established practice.

15.3    SHOP PRODUCTION SCHEDULE: As soon as feasible after award of the Contract, Contractor shall submit to PG&E six copies of a complete and detailed shop production schedule. The schedule shall show all component parts with Subcontractors' names, expected dates of receipt of materials, fabrication dates, proposed shipping dates, and other information of a similar nature.

15.4 MATERIAL LIST: A complete list of all Goods shipped shall be mailed to the worksite. All routings, sketches, material lists, and bills of lading shall be identified with PG&E's Contract number or purchase order number, Specification number, and, if applicable, plant name.

15.4.1 FREIGHT ROUTING: All shipments of material to PG&E shall be routed in accordance with the routing instructions that appear under the "Ship Via" heading located in the upper right hand portion of the PG&E Purchase Order.

15.4.2 CARLOAD SHIPMENTS: 30 days prior to shipment, routings on carload shipments, together with an outlined sketch showing shipping dimensions and weights, shall be forwarded for approval to the address specified in the CWA. Contractor shall be responsible for assuring that the Goods are properly prepared for shipment and loaded so as to prevent damage during shipment. At or prior to the time of shipment, Contractor shall forward to PG&E complete details, including any diagrams or sketches, concerning the methods and techniques used to prepare the Goods for shipment and loading, including those utilized to prevent both external and internal damage during shipment, loading, and unloading.

15.5 FABRICATION AND SHIPMENT TIME: The time quoted for fabrication and shipment will be an important consideration in making the award. Time is of the essence hereof. Contractor shall give immediate written notice to PG&E of each shipment as made, accompanied with full information as to routing, car numbers, and other matters necessary to enable PG&E to monitor the location of the shipment. Changes in the schedule may be directed by PG&E, and these changes shall be complied with by Contractor insofar as possible.

15.6 TITLE: Title to the Work shall automatically and without further action by the Parties transfer to, and be held by, PG&E upon earliest of; (a) incorporation of the Goods into the Work on the Work site; (b) payment for the Work; or (c) Acceptance of the Work. Contractor shall execute and deliver all appropriate instruments, if any, necessary to evidence transfer of title and shall take such actions as PG&E reasonably requests to protect and perfect PG&E's interest in the Work. Contractor warrants that at the time of transfer pursuant to this Article, it holds good and marketable title to all materials, equipment and supplies, free and clear of all liens. Notwithstanding anything to the contrary in this Contract, the passage of title shall not relieve Contractor of any of its obligations to perform the Work or otherwise fulfill its obligations under this Contract.

16  **SITE SAFETY PROVISIONS**

16.1 CONSTRUCTION REGULATION: Contractor will at all times while performing its obligations under this Contract comply with the requirements of CPUC General Orders 95 (Overhead Electric Construction Standards), 112E (Gas System Construction Standards) and 128 (Underground Electric Constructions Standards), as they apply to the Contract. It will be the duty and responsibility of the Contractor or any Contractor performing any cutting or welding to comply with the safety provisions of the National Fire Protections Association's "National Fire Codes", and Factory Mutual Engineering's cutting and welding procedures and the applicable requirements specified in PG&E's associated documents.

16.2 WORK SITE SAFETY: Contractor shall have an ongoing safety training program for Contractor's personnel involved in the Work. Compensation for safety and first aid training shall be included in the Fees for the Work set forth in this Contract, and there shall be no separate compensation for Contractor's personnel to attend such training.

16.2.1 WORK AND SAFETY PROGRAM: Contractor will have a work and safety program and rules for the Work. Contractor shall enforce its work and safety requirements for all Work performed on the work site. Contractor will ensure that all Contractor personnel receive,

read and sign a copy of the work and safety rules. Contractor shall retain proof of compliance for PG&E's inspection upon request. Contractor will designate a safety contact person for all matters concerning Contractor's work and safety programs.

16.2.2   SITE SAFETY PLAN: When required by federal OSHA regulations (29 CFR by other Legal Requirements, or by PG&E, the Contractor shall provide a written site safety plan for acceptance by PG&E and the applicable regulatory agency(s) as required, prior to commencement of Work. The site safety plan shall establish policies and procedures for protecting the health and safety of personnel during all operations conducted at a site with hazardous or suspected hazardous materials. The plan shall contain information about the known or suspected hazards, routine and special safety procedures that must be followed, and other instructions for safeguarding the health and safety of all affected personnel.

16.3   SAFETY EQUIPMENT AND TRAINING: Contractor shall provide its employees with applicable safety equipment and training. Contractor shall have available and if requested, submit to PG&E, a copy of a written respiratory protection program in accordance with Cal-OSHA GISO section 5144 and 29 CFR 1910.134. Contractor shall have available and if requested, submit to PG&E, a copy of other safety and hazardous waste and hazardous material training documentation. Contractor shall have the necessary respiratory equipment required to enter a "Category II" environment as defined in section 6.3 of API Pub 2015.

16.4   WORK HOURS AND REST PERIODS: Contractor's employees shall be in good physical and mental health when involved in the activities described in this Contract. If nature of Work requires continuous activities for greater than twenty four (24) hours, Contractor will ensure that fresh personnel are available to continue the Work. If Work is to continue for a period exceeding 24 hours, Contractor shall implement a plan for ensuring fresh personnel shall be available to do the Work, subject to approval by PG&E. Contractor shall comply with all federal and state laws and regulations and standard industry practices regarding work hours and rest periods for the type of Work involved.

16.5   PG&E'S RIGHTS: PG&E will have the right, from time to time, to undertake a safety performance audit of Contractor's Work, work practices, tools, equipment and materials. PG&E may, at any time and in its sole discretion, suspend all or a portion of the Work for safety-related reasons. Contractor will take immediate, appropriate corrective action. Notwithstanding any other provisions of the order, neither the suspension of the Work nor any corrective action taken will result in any increase in the contract price or extension of the schedule for the Work.

16.6   CONTRACTOR RESPONSIBILITY: Although PG&E may monitor Contractor's safety performance, may review safety performance with Contractor's safety contact person, or may suspend the Work for safety-related reasons, these actions are the primary purpose of protecting PG&E personnel and property. Contractor will remain solely responsible for the safe performance of the Work under this Contract. The provisions of this Article will be interpreted and construed in a manner consistent with Contractor's status as an independent contractor.

16.7   PG&E's receipt of Contractor's emergency action plan, safety plan, environmental plan or any other safety and health related information does not imply that PG&E endorses the plan. Contractor is solely responsible for performing the Work in compliance with all applicable Laws and Legal Requirements.

# 17   ADDITIONAL GENERAL PROVISIONS

17.1    COOPERATION: Commencing upon expiration, or upon notice to Contractor of cancellation or termination of this Agreement, and continuing for so long as PG&E may reasonably request, Contractor will cooperate and provide reasonable assistance requested by PG&E to facilitate the orderly transfer of the Work. To the extent that compensation for such assistance is not already provided for by the Contract, PG&E and Contractor will negotiate reasonable compensation not to exceed Contractor's then-current, standard Hourly Rates for similar work.

17.1.1 Contractor acknowledges that it has an affirmative obligation to act in good faith at all times with respect to PG&E and all aspects of this Contract. Consistent with its obligation of good faith, Contractor agrees, neither by its action or inaction, to do anything to compromise PG&E' ability to efficiently and cost-effectively transition the Work from Contractor; and Contractor shall under no circumstances inhibit PG&E's access to and control over any property of PG&E, PG&E's vendors, and PG&E's customers.

17.1.2 If requested by PG&E with respect to one this Contract, Contractor will fully cooperate with PG&E or a Third Party identified by PG&E in connection with the preparation and implementation of a transition plan by PG&E or such Third Party.

17.2    COPYRIGHT REGISTRATION: Notice of PG&E copyright ownership shall be placed by Contractor on all reports, information or instructional manuals, computer programs or other written, recorded, photographic or visual materials or other deliverables to which PG&E has the right of such ownership as provided in this Contract. Such notice shall be placed on the materials in a manner and location as to give reasonable notice of the claim of copyright, and shall consist of the copyright symbol or the word "Copyright" followed by the year in which the material is produced and the words "Pacific Gas and Electric Company". Application for copyright registration shall be the responsibility of PG&E.

17.3    PROPRIETARY RIGHTS: PG&E shall own all proprietary rights, including, but not limited to, exclusive patent and copyright rights, in and to all inventions, software, works of authorship, designs or improvements of equipment, tools or processes conceived, developed, implemented or produced by Contractor in the performance of this Contract, and Contractor shall retain no ownership, interest or title in or to them except as otherwise provided in this Contract.

17.4    NO INTERFERENCE WITH EXISTING OPERATIONS: When working in the vicinity of PG&E's plant or offices, Contractor shall conduct the Work in a manner that will cause a minimum of inconvenience to PG&E, its employees, other contractors and the general public. PG&E's business operations must be maintained without interruption during the progress of the Work, and Contractor shall plan and carry out the Work so that no unnecessary interference with such business operations occurs. Contractor's Work will not be permitted to interrupt utility services without PG&E's prior written authorization. If Contractor believes that the Work may disrupt PG&E's business operations or utility services, Contractor shall notify the PG&E Representative at least Seventy Two (72) hours in advance of performing the Work. Contractor's failure to so notify PG&E of a disruption will be cause for Contract termination.

18  **CONFLICTS BETWEEN TERMS**

18.1    Where there is any conflict in the Specific Conditions stated herein and the General Conditions contained within the Contract for Consulting Services, the Specific Conditions shall control. Should a conflict exist between the Specific Conditions and General Conditions and applicable Federal, State or local law, rule regulation, order or code, the law, rule, regulation, order or code shall

control.  Varying degrees of stringency between the General Conditions, Specific Conditions, drawings, laws, rules, regulation, order, or codes are not deemed conflicts; and the most stringent requirement shall control.

18.2    Contractor shall immediately notify PG&E Work Supervisor of any conflicts or potential conflicts.

# Exhibit 2

RECORDING REQUESTED BY

C. Scott Penner, Esq
Carney Badley Spellman, PLLC
701 5th Ave, Suite 3600
Seattle, WA 98104-7010

2019-0002196

| Recorded | REC FEE | 38.00 |
| Official Records | | |
| County of | CONFORMED COPY | 0.00 |
| Shasta | HOUSING FEE | 75.00 |
| Leslie Morgan | | |
| Assessor-Recorder | | |
| | EB | |
| 04:06PM 25-Jan-2019 | Page 1 of 9 | |

AFTER RECORDING RETURN TO:

Kate Ides
AECOM Technical Services, Inc.
300 South Grand Avenue, Suite 1100,
Los Angeles, California 90071

9 HF cc -eb

(SPACE ABOVE THIS LINE FOR RECORDER'S

# MECHANICS LIEN

SEPARATE PAGE, PURSUANT TO CA. GOV'T. CODE 27361.6

RECORDING REQUESTED BY
C. Scott Penner, Esq.
Carney Badley Spellman, PLLC
701 5th Ave, Suite 3600
Seattle, WA 98104-7010


AFTER RECORDING RETURN TO:

Kate Ides
AECOM Technical Services, Inc.
300 South Grand Avenue, Suite 1100,
Los Angeles, California 90071

Space above this line for recorder's use only

# MECHANICS LIEN

NOTICE IS HEREBY GIVEN that the undersigned claimant <u>AECOM Technical Services, Inc.</u> ("Claimant"), with an address at <u>300 South Grand Avenue, Suite 1100, Los Angeles, California 90071</u>, claims a Mechanics Lien against <u>Pacific Gas and Electric Company</u> (Name(s) of Owner(s)/Reputed Owner(s) or Tenant(s)/Reputed Tenants) and the following described real property and upon every estate or interest, including leasehold interests, in all structures, fixtures, appurtenances and improvements situated thereon:

(Description)
Located at 37667 Highway 299, Burney, Shasta County, California 96013; Parcel Number 028-370-001

> Beginning at a point in the north half of the northeast quarter of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S. 2029) marking the northeast corner of said Section 16 bears north 26° 44' east 474.54 feet distant and running thence north 85° 35' west 1218.50 feet; thence westerly on a curve to the right, with a radius of 554.40 feet, through a central angle of 35° 28', an arc distance of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14° 40½' east 1204.15 feet to a point in the southerly boundary line of the north half of the northeast quarter of said Section 16; thence south 89° 48' east, along the southerly boundary line of the north half of the northeast quarter of said Section 16, a distance of 831.89 feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more or less, to the point of beginning; containing 26.69 acres, more or less, and being a portion of the north half of the northeast quarter of said Section 16.

(Legal Description) see Exhibit A for more complete description

The lien is claimed for labor, services, equipment, materials or work ("Work") of the following kind: <u>labor, services, equipment and materials furnished at the request of Pacific Gas and Electric Company ("PG&E") and pursuant to the PG&E Contract Agreement #2501335149 dated on or about February 8, 2016, including but not limited to the installation of a new compressor and turbine, and supporting utilities, buildings, concrete, structural steel, electrical equipment and controls for the Burney K2 Replacement Project.</u> Claimant is owed $23,535,812.89 for the Work, after deducting all just credits and offsets, plus interest at the legal rate from <u>April 27, 2018</u>.

The name of the person or company by whom Claimant was employed, or to whom Claimant furnished the work, is <u>Pacific Gas and Electric Company.</u>

Date:    January 25, 2019

AECOM Technical Services, Inc.
(Name of Claimant)

By: _____
(Signature)

**SEE ATTACHED
FOR NOTARY CERTIFICATE**

Steven R. Petto, Authorized Agent
(Print Name & Authorized Capacity)

# ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California

County of _____ Alameda _____ )

On __01__ / __25__ /2019 _____ before me, __Shakush Kattel , Notary Public_____

(insert name and title of the officer)

personally appeared _Steven Richard Petto_____,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SHAKUSH KATTEL
COMM. # 2167055
NOTARY PUBLIC•CALIFORNIA
ALAMEDA COUNTY
My Commission Expires
OCT. 8, 2020
JAS1    JAS1

Signature _____ (Seal)

**VERIFICATION**

I, the undersigned, say: I am the <u>Authorized Agent</u>,
("President Of," "Manager Of," "A Partner Of," "Owner Of," "Agent Of," Etc.)

for the Claimant named in the foregoing claim of mechanics lien; I am authorized to make this verification for the Claimant; I have read the foregoing claim of mechanics lien and know the contents thereof, and the same is true of my knowledge, information and/or belief. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on <u>January 25, 2019</u>, at <u>Oakland, California</u>

_____

(Date this Document was Signed)    (City and State Where Document Signed)

(Signature) ~~Steve R. Petto~~

Steven. R. Petto  SRP

**ACKNOWLEDGMENT**

> A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy or validity of that document.

State of California ( SRC )
County of ~~Cate~~ Alameda )

On <u>01/25/2019</u> before me, <u>Shakush Kattel, notary public</u>
(insert name and title of the officer)

personally appeared <u>Steven R. Petto</u>
authorized capacity(~~ies~~), and that by his/~~her/their~~ signature(~~s~~) on the instrument the person(~~s~~), or the entity upon behalf of which the person(~~s~~) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature_____    (Seal)

SHAKUSH KATTEL
COMM. # 2167055
NOTARY PUBLIC•CALIFORNIA
ALAMEDA COUNTY
Commission Expires
OCT. 8, 2020

## NOTICE OF MECHANICS LIEN

### ATTENTION!

(Civil Code § 8416)

Upon the recording of the enclosed MECHANICS LIEN with the county recorder's office of the county where the property is located, your property is subject to the filing of a legal action seeking a court-ordered foreclosure sale of the real property on which the lien has been recorded. That legal action must be filed with the court no later than 90 days after the date the mechanics lien is recorded.

The party identified in the enclosed mechanics lien may have provided labor or materials for improvements to your property and may not have been paid for these items. You are receiving this notice because it is a required step in filing a mechanics lien foreclosure action against your property. The foreclosure action will seek a sale of your property in order to pay for unpaid labor, materials, or improvements provided to your property. This may affect your ability to borrow against, refinance, or sell the property until the mechanics lien is released.

BECAUSE THE LIEN AFFECTS YOUR PROPERTY, YOU MAY WISH TO SPEAK WITH YOUR CONTRACTOR IMMEDIATELY, OR CONTACT AN ATTORNEY, OR FOR MORE INFORMATION ON MECHANICS LIENS GO TO THE CONTRACTORS' STATE LICENSE BOARD WEBSITE AT www.cslb.ca.gov.

**Note:** Claimant must serve this Notice of Mechanics Lien, together with a copy of Claimant's Mechanics Lien, in accordance with the provisions of Civil Code § 8106 and must complete a Proof of Service Affidavit in accordance with Civil Code § 8416. The Mechanics Lien, Notice of Mechanics Lien and the Proof of Service Affidavit should all be submitted to the County Recorder for recording at one time.

**PROOF OF SERVICE AFFIDAVIT**

(California Civil Code § 8416)

---

**AFFIDAVIT FOR SERVICE ON THE OWNER/TENANT**

(California Civil Code §§ 8416 (a)(7) and (c)(1))

I, _STEVEN R. PETTO_, declare that I served a copy of this Mechanics Lien and Notice of Mechanics Lien by registered mail, certified mail, or first-class mail, evidenced by a certificate of mailing, postage prepaid, addressed as follows to the owner(s) or reputed owner(s) of the property:

Company/Person served: Pacific Gas and Electric Company,

Title or capacity of person or entity served: Owner or Reputed Owner.

Service Address: 77 Beale Street, San Francisco, California 94105.

Said service address is the owner's residence, place of business, or address shown by the building permit on file with the permitting authority for the work or the address identified on the construction trust deed.

Executed on January 25, 2019, at _OAKLAND_, California.

By: _Steven R. Petto_
(Signature of Person Serving)

#4943
15.40

AFTER RECORDING, RETURN TO:

Pacific Gas and Electric Company
245 Market St.
San Francisco 6, California
RE: GM 145418-R (RW)

FOR RECORDER'S USE ONLY

.0120.

Rev. $15.40





RECORDED AT REQUEST OF
NORTH VALLEY TITLE & ESCROW CO.
AT 15.5 MIN. PAST 3 P.M.
OFFICIAL RECORDS SHASTA COUNTY, CALIF.
JUL 23 1952
Volume 712 Page 636
RECORDER FEE $

FRUIT GROWERS SUPPLY COMPANY, a California corporation, hereinafter called

Fruit Growers, hereby grants to PACIFIC GAS AND ELECTRIC COMPANY, a California

corporation, hereinafter called Pacific, that certain real property, situate in

the County of Shasta, State of California, described as follows:

Beginning at a point in the north half of the northeast quarter
of Section 16, Township 35 North, Range 3 East, M. D. B. & M., from
which the 2 inch brass cap (marked 9, 10, 15, 16, T.35N.,R.3E., L.S.
2029) marking the northeast corner of said Section 16 bears north 26°
44' east 474.54 feet distant and running thence south 85° 35' west
1218.50 feet; thence westerly on a curve to the right, with a radius
of 554.40 feet, through a central angle of 35° 28', an arc distance
of 343.18 feet; thence north 50° 07' west 56.76 feet; thence south 14°
40½' east 1204.15 feet to a point in the southerly boundary line of
the north half of the northeast quarter of said Section 16; thence
south 89° 48' east, along the southerly boundary line of the north
half of the northeast quarter of said Section 16, a distance of 831.89
feet to a 3/4 inch pipe; thence north 25° 30½' east 1008.52 feet, more
or less, to the point of beginning; containing 26.69 acres, more or
less, and being a portion of the north half of the northeast quarter
of said Section 16.

Fruit Growers further grants to Pacific a right of way for ingress to and

egress from said 26.69 acre parcel of land and any other lands which Pacific

shall hereinafter acquire in the vicinity of said 26.69 acre parcel of land with-

in the strip of land described as follows:

Beginning at the most northerly corner of said 26.69 acre parcel
of land and running thence north 50° 07' west 109.5 feet; thence west-
erly on a curve to the left with a radius of 412.2 feet, through a
central angle of 39° 52½', an arc distance of 286.9 feet to a point
in the northerly boundary line of said Section 16; thence along the
northerly boundary line of said Section 16 the following three courses
and distances, namely: north 89° 59½' west 485.8 feet to the 2 inch
brass cap on pipe (marked 1/48 9/16 T.35N.,R.3E., L.S. 2029) marking
the north quarter corner of said Section 16; thence north 89° 42' west

-1-

BOOK 712 PAGE 636

EXHIBIT A
Page 1 of 3

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page
287 of 322
Case: 19-30088    Doc# 25    Filed: 03/22/19    Entered: 03/22/19 23:23:13    Page 105 of
170

445.4 feet to a state highway monument; and thence north 89° 42' west 19.5 feet to a state highway monument in the southeasterly boundary line of the state highway traversing said Section 16; thence south 35° 19' west, along the southeasterly boundary line of said state highway, 44.5 feet; thence northeasterly on a curve to the right, with a radius of 160.0 feet, through a central angle of 16° 22', and tangent at the southwesterly terminus thereof to a line which has a bearing of north 73° 56' east, an arc distance of 45.7 feet to a point distant 30.0 feet southerly from (measured at a right angle to) the northerly boundary line of said Section 16; thence parallel with the northerly boundary line of said Section 16 the following two courses and distances, namely: south 89° 42' east 445.4 feet; and thence south 89° 59½' east 285.9 feet; thence easterly on a curve to the right, with a radius of 382.2 feet, through a central angle of 39° 52½', an arc distance of 266.0 feet; thence south 50° 07' east 151.7 feet to a point in the southwesterly boundary line of said 26.69 acre parcel of land; thence north 14° 40½' west, along the southwesterly boundary line of said 26.69 acre parcel of land, 51.7 feet, more or less, to the point of beginning.

IN WITNESS WHEREOF Fruit Growers has executed these presents this 2nd day of July , 1962.

FRUIT GROWERS SUPPLY COMPANY

By _____
Its   President

And By _____
Its   Secretary

STATE OF CALIFORNIA,
County of Los Angeles } ss.

On July 2 , 19 62 before me,
_____, a Notary Public in and for said County and State, personally appeared
H. A. Lynn ,
known to me to be the _____President, and L. A. Yoast ,
known to me to be the _____Secretary of Fruit Growers Supply Company

the Corporation that executed the within instrument, known to me to be the persons who executed the within instrument, on behalf of the Corporation herein named, and acknowledged to me that such Corporation executed the within instrument pursuant to its by-laws or a resolution of its board of directors.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal.

F. J. JOHNSON
My Commission Expires Jan. 6, 1966       Notary Public in and for said County and State.

ACKNOWLEDGEMENT — CORP. — PRES. & SEC.— WOLCOTTS FORM 226—Rev. 12-51

Shasta
GM 145418-R
Dwg. 28295
Section 16,
T.35N.,R.3E.,
M.D.B.& M.

Prepared _____
Checked _____

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
288 of 322
Case: 19-30088   Doc# 25   Filed: 03/22/19   Entered: 03/22/19 23:23:15   Page 106 of
322



EXHIBIT A
Page 3 of 3

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS AECOM Technical Services, Inc. | DEFENDANTS Pacific Gas and Electric Company |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.) Marsha A. Houston Christopher O. Rivas Reed Smith LLP 355 South Grand Ave., Suite 2900, Los Angeles, CA 90071 Tel: 213.457.8000 | ATTORNEYS (If Known) Weil, Gotshal & Manges LLP 767 Fifth Avenue New York, NY 10153-0119 Tel: 212 310 8000 <br><br> Keller & Benvenutti LLP 650 California Street, Suite 1900 San Francisco, CA 94108 |
|---|---|

| PARTY (Check One Box Only) ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor ☒ Other ☐ Trustee | PARTY (Check One Box Only) ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin ☐ Creditor ☒ Other ☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
(1) Determination of Validity, Priority and Extent of AECOM's Valid Mechanics' Lien; (2) Breach of Contract; (3) Breach of Implied Warranty of Adequacy of Plans and Specifications; (4) Breach of the Implied Covenant of Good Faith and Fair Dealing; (5) Negligent Misrepresentation; (6) Quantum Meruit; (7) Violations of California Prompt Payment Act

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 70 01( 1) – Recovery of Money/Property**
☐ 11-Recovery of money/propert y - §542 turnover of property
☐ 12-Recovery of money/property -§547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 70 01 (2) – Validity, Priority or Extent of Lien**
☒ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001( 3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/ Revocation of Discharge**
☐ 41-Objection/re vocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 6 6 -Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 70 01(6) – Dischargeability (continued)**
☐ 61 -Dischargeability- §523(a)(5 ), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 6 5 -Dischargeability - other

**FRBP 70 01(7) – Injunctive Relief**
☐ 71 -Injunctive relief- imposition of stay
☐ 72-Injunctive relief - other

**FRBP 70 01(8) Subordination of Claim or Interest**
☐ 81 -Subordination of claim or interest

**FRBP 70 01(9) Declaratory Judgment**
☒ 91 -Declaratory judgment

**FRBP 70 01(10) Deter mi nation of Remove d Act ion**
☐ 01 -Determination of removed claim or cause

**Other**
☐ SS-SIPA Case - 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☒ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | ☐ Demand $ |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

<table>
<tr><td colspan="3" align="center"><b>BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES</b></td></tr>
<tr><td colspan="2">NAME OF DEBTOR<br>PG&E Corporation and Pacific Gas and Electric Company</td><td colspan="2">BANKRUPTCY CASE NO.<br>19-30088; 19-30089</td></tr>
<tr><td colspan="2">DISTRICT IN WHICH CASE IS PENDING<br>Northern District of California</td><td>DIVISION OFFICE<br>San Francisco</td><td>NAME OF JUDGE<br>Judge Montali</td></tr>
</table>

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

/s/ Christopher O. Rivas

| DATE<br>3/22/19 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Christopher O. Rivas |
|---|---|

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

American LegalNet, Inc.
www.FormsWorkFlow.com


# EXHIBIT 7

1   Eric A. Grasberger (*Pro Hac Vice* Pending)
    Mario R. Nicholas (SBN 273122)
2   STOEL RIVES LLP
    760 SW Ninth Avenue, Suite 3000
3   Portland, OR  97205
    Telephone:  503.224.3380
4   Facsimile:  503.220.2480

5   David B. Levant (Admitted *Pro Hac Vice*)
    STOEL RIVES LLP
6   101 S. Capitol Boulevard, Suite 1900
    Boise, ID  83702
7   Telephone: 208.389.9000
    Facsimile: 208.389.9040
8
9   Attorneys for JH Kelly, LLC

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                  SAN FRANCISCO DIVISION

13

14   In re:                                    Bankruptcy Case
                                               No. 19 - 30088 (DM)
15   PG&E CORPORATION;
                                               Chapter 11
16       -and-                                 (Lead Case)
                                               (Jointly Administered)
     PACIFIC GAS AND ELECTRIC
17   COMPANY,                                  Adversary Proceeding No. 19-03008 (DM)

         Debtors.
18
     JH KELLY, LLC, a Washington limited
19   liability company,                        **JH KELLY'S MOTION TO REMAND
                                               ADVERSARY PROCEEDING AND
20       Plaintiff,                            MEMORANDUM OF POINTS AND
                                               AUTHORITIES**
21       v.

22   AECOM TECHNICAL SERVICES, INC.,
     a purported California corporation, and
23   DOES 1 through 10, inclusive,

         Defendants and Counter-Claimants.
24
     AECOM TECHNICAL SERVICES, INC.,           Hearing Date: May 22, 2019
25   a California Corporation,                 Time:            9:30 a.m.
                                               Courtroom:    Hon. Dennis Montali
26       Third-Party Plaintiff(s),
                                               Objections Due: May 9, 2019
27       v.

     PACIFIC GAS AND ELECTRIC
28   COMPANY,

         Third-Party Defendant.

STOEL RIVES LLP
ATTORNEYS AT LAW

100583907.6 0034592-00012

**TO THE COURT, TO DEBTORS PG&E CORPORATION AND PACIFIC GAS AND ELECTRIC COMPANY, AND TO DEFENDANT AECOM TECHNICAL SERVICES, INC.:**

JH Kelly, LLC hereby moves pursuant to 28 U.S.C. § 1452(b) and Rule 9014 of the Federal Rules of Bankruptcy Procedure to remand this breach of contract action between JH Kelly, LLC and AECOM Technical Services, Inc. to the Superior Court of the State of California for Shasta County.

This Motion is based on the attached Memorandum of Points and Authorities, the concurrently filed Declarations of Craig Yabui and Mario R. Nicholas, the records and files in this adversary proceeding, and such other and further matters as this Court may consider at or before any hearing on this Motion.

Dated: April 16, 2019

STOEL RIVES LLP

By:  /s/ Mario R. Nicholas
     Eric A. Grasberger
     David B. Levant
     Mario R. Nicholas

Attorneys for JH Kelly, LLC

Stoel Rives LLP
ATTORNEYS AT LAW

100583907.6 0034592-00012

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 7 |
| II. | JURISDICTION | 8 |
| III. | FACTUAL BACKGROUND | 8 |
| | A. The Project, the Parties, the EPC Agreement, and the Subcontract | 8 |
| | B. JH Kelly's Scope of Work on the Project Doubles in Cost and Duration as a Result of Substantial Changes to the Project | 9 |
| | C. The Subcontract Provides Alternative Paths for Resolution of the JH Kelly and AECOM Issues, Depending on PG&E's Role in the Claim or Dispute and How AECOM Elects to Proceed | 12 |
| | D. Delay Damages and the "Pay if Paid" Clause of the Subcontract | 13 |
| | E. AECOM Prohibits JH Kelly from Communicating with PG&E | 14 |
| | F. AECOM Elects Not to Present JH Kelly's Claims to PG&E | 15 |
| IV. | PROCEDURAL BACKGROUND | 17 |
| | A. Shasta County Proceedings | 17 |
| | B. Bankruptcy Court Proceedings | 18 |
| V. | ARGUMENT | 19 |
| | A. The Court Has Broad Discretion to Remand on Any Equitable Grounds, Including the 14 Factors Considered by Courts in the Ninth Circuit | 19 |
| | B. The 14 Considerations Applicable to Abstention and Remand Motions Overwhelmingly Favor Remand of This Litigation to the State Court | 21 |
| VI. | RESERVATION OF RIGHTS | 30 |
| VII. | CONCLUSION | 30 |

Case 19-30088   Doc 5654-1   Filed 02/05/20   Entered 02/05/20 18:30:45   Page 3 of 30
Case: 19-30088   Doc# 5654-1   Filed: 04/16/20   Entered: 04/16/20 20:18:10   Page 295 of 322

# TABLE OF AUTHORITIES

**Cases**                                                       **Page**

*In re AmericanWest Bancorporation*,
  No. 10-06097-PCW, 2011 WL 6013779 (Bankr. E.D. Wash. Dec. 2, 2011) ...........................22

*Bally Total Fitness Corp. v. Contra Costa Retail Ctr.*,
  384 B.R. 566 (Bankr. N.D. Cal. 2008) ......................................................................................22

*Matter of Chi., Milwaukee, St. Paul & Pac. R.R. Co.*,
  6 F.3d 1184 (7th Cir. 1993) ......................................................................................................22

*In re Cytodyn of N.M., Inc.*,
  374 B.R. 733 (Bankr. C.D. Cal. 2007) ......................................................................................22

*Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*,
  130 B.R. 405 (S.D.N.Y. 1991) ............................................................................................28, 29

*In re Enron Corp.*,
  296 B.R. 505 (C.D. Cal. 2003) ...........................................................................................20, 29

*Fed. Home Loan Bank of Chi. v. Banc of Am. Sec. LLC*,
  448 B.R. 517 (C.D. Cal. 2011) ..................................................................................................19

*Fed. Home Loan Bank of Seattle v. Barclays Capital, Inc.*,
  No. C10-0139 RSM, 2010 WL 3662345 (W.D. Wash. Sept. 1, 2010) .....................................28

*First Nat'l Bank of Westminster v. Rarick (In re Rarick)*,
  132 B.R. 47 (Bankr. D. Colo. 1991) ..........................................................................................29

*Gaus v. Miles, Inc.*,
  980 F.2d 564 (9th Cir. 1992) .....................................................................................................20

*Hayden v. Wang*,
  No. 13-cv-03139-JST, 2013 WL 6021141 (N.D. Cal. Nov. 13, 2013) .....................................22

*Hendricks v. Detroit Diesel Corp.*,
  No. C-09-3939 EMC, 2009 WL 4282812 (N.D. Cal. Nov. 25, 2009) .......................................22

*Lieber Enters., Inc. v. Morris (In re Morris)*,
  55 B.R. 615 (Bankr. N.D. Tex. 1985) ........................................................................................28

*Lone Star Indus., Inc. v. Liberty Mut. Ins.*,
  131 B.R. 269 (D. Del. 1991) ......................................................................................................28

*Mattingly v. Newport Offshore, Ltd.*,
  57 B.R. 797 (D.R.I. 1986) ..........................................................................................................29

Stoel Rives LLP
ATTORNEYS AT LAW

*McCarthy v. Prince (In re McCarthy)*,
230 B.R. 414 (B.A.P. 9th Cir. 1999) ...................................................19

*In re Mill-Craft Bldg. Sys., Inc.*,
57 B.R. 531 (Bankr. E.D. Wis. 1986) ...................................................28

*In re Roman Catholic Archbishop of Portland*,
338 B.R. 414 (Bankr. D. Or. 2006) ......................................................29

*In re Roman Catholic Bishop of S.D.*,
374 B.R. 756 (Bankr. S.D. Cal. 2007) .............................................19, 20

*Shubert v. Roche Holding Ag*,
157 F. Supp. 2d 542 (E.D. Pa. 2001) ...................................................30

*Thompson v. Magnolia Petroleum Co.*,
309 U.S. 478 (1940) ...........................................................................23

*Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*,
303 F.2d 655 (6th Cir. 1962) ..............................................................24

*Twyman v. Wedlo, Inc.*,
204 B.R. 1006 (N.D. Ala. 1996) ..........................................................28

*Wm. R. Clarke Corp. v. Safeco Ins. Co.*,
15 Cal. 4th 882 (1997) .......................................................................23

*Zweygardt v. Colo. Nat'l Bank of Denver*,
52 B.R. 229 (Bankr. Colo. 1985) .........................................................28

**Statutes**

11 U.S.C. § 157(b) ..............................................................................25

28 U.S.C. § 157(b)(2)(A) ................................................................25, 26

28 U.S.C. § 157(b)(2)(K) ................................................................25, 26

28 U.S.C. § 157(b)(2)(O) ................................................................25, 26

28 U.S.C. § 157(c)(1) ..........................................................................22

28 U.S.C. § 157(c)(2) ..........................................................................22

28 U.S.C. § 1331 ................................................................................25

28 U.S.C. § 1332(a)(1) ........................................................................25

Stoel Rives LLP
ATTORNEYS AT LAW

100583907.6 0034592-00012

**TABLE OF AUTHORITIES**
(continued)

Page

28 U.S.C. § 1334.................................................................................................19, 25

28 U.S.C. § 1334(b)...............................................................................................8, 25

28 U.S.C. § 1334(c)(1)...............................................................................................22

28 U.S.C. § 1452(a)................................................................................................8, 19

28 U.S.C. § 1452(b)......................................................................................19, 20, 30

U.S. Code title 11.........................................................................................................8

**Constitutional Provisions**

Cal. Const. art. XIV, § 3.............................................................................................24

Case 19:30088  Doc#5654-1  Filed: 04/16/20  Entered: 04/16/20 18:30:45  Page 6 of 30
Case: 19-30088  Doc# 5654-1  Filed: 02/05/20  Entered: 02/05/20 19:30:45  Page 298 of 322

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

## I. PRELIMINARY STATEMENT

3   This remand motion (the "***Motion***") concerns a fact-intensive state law dispute (the

4   "***Litigation***") between two non-debtor parties: a prime contractor, AECOM Technical Services,

5   Inc. ("***AECOM***"), and its subcontractor, JH Kelly, LLC ("***JH Kelly***").  Although the subcontract

6   between them (the "***Subcontract***") concerns a construction project (the "***Project***") for Pacific Gas

7   and Electric Company ("***PG&E***" or the "***Debtor***"), PG&E is not a party to the Subcontract and

8   was not a party to the Litigation when it was removed to this Court.

9   Remand is clearly appropriate in this case.  Almost all of the 14 factors that bankruptcy

10  courts consider when exercising their discretion over abstention and remand motions favor

11  remand of the Litigation to state court.  In particular, the Litigation has no implications for the

12  administration of PG&E's bankruptcy case (Lead Case No. 19-30088; the "***Bankruptcy Case***"),

13  does not arise under the Bankruptcy Code or in the Bankruptcy Case, and is only related to the

14  Bankruptcy Case to the extent that JH Kelly's recovery from AECOM will reduce or eliminate its

15  lien claim against the Project.

16  Following removal of the Litigation to this Court, AECOM filed a Third-Party Complaint

17  against PG&E in which it blames PG&E for nearly all of the delays and cost overruns associated

18  with the Project and falsely asserts that it would be "nearly impossible" for AECOM and JH

19  Kelly to resolve the dispute between them without PG&E participating in discovery and

20  litigation.  In reality, AECOM's removal of the Litigation and impleading of PG&E is an attempt

21  to hide behind the Debtor and to delay resolution of JH Kelly's claims against AECOM.  Indeed,

22  AECOM's claim that PG&E must participate in the Litigation is a tactical reversal of its

23  prepetition insistence that JH Kelly *not* involve PG&E in the Project issues.

24  The Subcontract provides an express path for resolution of the Litigation solely between

25  JH Kelly and AECOM, without entangling PG&E, but if for any reason the Debtor must

26  participate in the case, relief from stay can be granted to permit PG&E's participation in the

27  Litigation in state court, either as a party or as a third party from which AECOM seeks discovery.

28  Either way, JH Kelly's overarching goal is a timely resolution of its claims against AECOM.

Case: 19-30088   Doc# 5654   Filed: 02/05/20   Entered: 02/05/20 18:30:45   Page 7 of 30
100583907.6 0034592-00012

Case: 19-30088   Doc# 5654-1   Filed: 04/16/20   Entered: 04/16/20 18:29:15   Page
299 of 322

II.    JURISDICTION

At this time JH Kelly does not dispute that the Bankruptcy Court can exercise its expansive "related to" jurisdiction over the Litigation pursuant to 28 U.S.C. § 1334(b), *see* AECOM's *Notice of Removal of Lawsuit Pending in California Superior Court, Shasta County, to Bankruptcy Court* at 4, ¶ 12 (Dkt. No. 1; the "**Notice of Removal**"), but only on the basis that the resolution of the dispute between JH Kelly and AECOM is likely to reduce or eliminate JH Kelly's statutory lien claim against the Project.    JH Kelly denies AECOM's assertion that its claims in the Litigation "arise under" title 11 of the U.S. Code or "arise in" PG&E's bankruptcy case.    *See id.* at 4, ¶ 12.    JH Kelly and AECOM have stipulated that venue for the removed proceeding is proper in this Court pursuant to 28 U.S.C. § 1452(a).    *See Stipulation Regarding Transfer of Venue of Removed Action, Deadlines, and Other Matters Relating to Removed Action and Anticipated Motion to Remand* at 3, ¶ 9 (Dkt. No. 7, the "**Procedures Stipulation**").

III.    FACTUAL BACKGROUND

Much of the factual context for the Litigation and pending Motion is undisputed as between JH Kelly and AECOM, including the summary of the Project, the parties' respective roles in it, and the relevant contracts between them outlined in part A immediately below, the problems that plagued the Project described in part B, and the Subcontract terms quoted in parts C and D.    The parties' positions diverge with respect to (1) how AECOM chose to address the Project issues with PG&E, and (2) whether resolution of AECOM's third-party claims against PG&E have any effect on AECOM's obligations to JH Kelly, as explained in parts E and F below.    Ultimately, however, it is not necessary to resolve the factual disputes addressed in parts E and F in order to determine whether this Court should remand the Litigation to state court.

A.    The Project, the Parties, the EPC Agreement, and the Subcontract

The Project relates to the Burney compressor station, which is owned by PG&E and located near the town of Burney, Shasta County, California.    The station compresses gas to help move it through pipelines from Oregon to California.    The Project involved the replacement of a natural gas compressor unit, various upgrades to the compressor station, and limited demolition of existing equipment and facilities at the Project site.

Case 19-30088   Doc 5654-1   Filed 02/05/20   Entered 02/05/20 18:30:45   Page 8 of 30
Case 19-30088   Doc 3654   Filed 04/16/19   Entered 04/16/19 23:29:19   Page 8 of 30
100583907.6 0034592-00012                                             300 of 322

1    AECOM was the design-builder and prime contractor on the Project pursuant to an

2    "Engineering, Procurement, and Construction of Natural Gas & Electric Transmission and

3    Distribution Facilities Agreement" with PG&E dated February 11, 2016 (the "**EPC Agreement**").

4    As such, AECOM was responsible for designing the Project, obtaining building permits,

5    procuring large and long-lead-time materials, building the Project, and providing related

6    construction management and administration.  It also was responsible for developing,

7    maintaining, updating, and achieving the Project schedule in the EPC Agreement.

8    AECOM hired JH Kelly as a subcontractor on the Project pursuant to an "Agreement

9    Between Design-Builder and Subcontractor (Where Subcontractor Does Not Provide Design

10   Services), Subcontract No. 60482831-SC-001," dated October 21, 2016 (*i.e.*, the Subcontract).

11   The Subcontract is solely between JH Kelly and AECOM; PG&E is not a party to it.  A copy of

12   the Subcontract—excluding most of the exhibits to it, as the entire Subcontract, including all

13   exhibits is 2,259 pages long—is attached as Exhibit 1 to the Declaration of Craig Yabui (the

14   "**Yabui Decl.**") filed in support of the Motion.

15       **B.      JH Kelly's Scope of Work on the Project Doubles in Cost and
16                 Duration as a Result of Substantial Changes to the Project**

17   When JH Kelly entered into the Subcontract, the schedule for the Project provided: (i) that

18   JH Kelly would work on the Project in two phases, commencing in or around October 2016; (ii)

19   that JH Kelly would not work onsite for the winter period (from November 2016 through

20   February 2017); and (iii) that JH Kelly would complete its work in or around October 2017.  In

21   total, the Project schedule contemplated eight months of construction by JH Kelly with no

22   overtime.  As summarized below and described in much greater detail in the pleadings filed by JH

23   Kelly and AECOM,[1] the Project schedule doubled in duration from eight months with a break for

24   winter to a total of 16 months, working through wet and cold winter conditions with no break, and

25   JH Kelly worked 35,039 overtime hours when none were planned.

26

---

27   [1] *See, e.g., AECOM's Third Party Complaint Against Pacific Gas and Electric Company* at 3, ¶ 12 (Dkt.
     No. 19) ("The Project was not completed until **more than a year later than expected** ...." (emphasis in
28   original)).

STOEL RIVES LLP
ATTORNEYS AT LAW
-9-
100583907.6 0034592-00012

Case 19-30088   Doc 5654-1   Filed 02/05/20   Entered 02/05/20 18:30:45   Page 5 of 30
Case 19-30088   Doc 5654   Filed 04/16/20   Entered 04/16/20 22:23:15   Page 301 of 322

Less than two months after executing the Subcontract, AECOM informed JH Kelly that AECOM would not meet one of the first milestone deadlines under the Project schedule—the December 1, 2016 deadline to issue the "Issued for Construction" electrical drawings (the "***IFC Electrical Drawings***") needed by JH Kelly to meet its obligations.  AECOM told JH Kelly to expect to receive the IFC Electrical Drawings two weeks late, around December 15, 2016, but the IFC Electrical Drawings were not delivered that December.

On or about January 4, 2017, AECOM informed JH Kelly that the IFC Electrical Drawings would not be released until February 24, 2017.  JH Kelly further learned that the IFC Electrical Drawings not only were delayed, but also would include electrical redesign and added electrical scope.

February 24, 2017 came and went, but the stamped IFC Electrical Drawings still were not issued.  Over the following nine months, AECOM modified, corrected, and updated the IFC Electrical Drawings and did not issue the final update to the IFC Electrical Drawings until on or about November 15, 2017, more than 11 months late.

The delay, redesign, and increase in scope impacted JH Kelly's planned construction schedule because material procurement and off-site detailing and fabrication, among other services, could not begin without the IFC Electrical Drawings.  This directly and significantly increased the cost of JH Kelly's work on the Project.

In addition to the extensive problems related to the IFC Electrical Drawings, JH Kelly's work on the Project was impacted by, among other things:

- Accelerated Schedule: On or about November 9, 2017, AECOM directed JH Kelly to implement an accelerated schedule to compensate for delays to the Project, which required that JH Kelly (i) begin working overtime for all labor on the Project by working a "6-10s" schedule (six consecutive days at 10 hours per day), (ii) work through the cold and wet winter period in the Northeastern California mountains from November 2017 through February 2018, and (iii) add nightshifts for electricians;

- Late Permits:  Building permits were not timely procured by AECOM before the start of construction, which directly impacted the progress, sequence, and cost of construction on the Project;

- Late Procurement: Materials and major equipment required for the Project were not timely procured or delivered by AECOM, also directly impacting the progress, sequence, and cost of construction; and

STOEL RIVES LLP
ATTORNEYS AT LAW
100583907.6 0034592-00012

- <u>Defective Coating</u>: The piping procured for the Project by AECOM did not meet the coating standard defined in the EPC Agreement and failed "jeep" tests, requiring removal and reapplication of the coating to the proper standard in the field.

As a result of these and other issues with the Project, JH Kelly incurred substantial damages for which it has not been compensated, including a 238% increase in Project costs, 35,039 overtime hours when none were planned, and a doubling of JH Kelly's scope of work from $14,341,281 to $27,871,284 (*excluding* schedule and productivity impact delays).[2]

While AECOM and PG&E may need to litigate their responsibility for the problems that plagued the Project, *see generally* AECOM's Third Party Complaint against PG&E (blaming PG&E for Project delays and costs overruns), the effects of the problems on JH Kelly are clear. At this time:

- JH Kelly is owed in excess of $26 million for its work on the Project;

- JH Kelly has been paid only 34% of its total costs incurred on the Project and only 62% of the base contract and approved change order amounts;

- JH Kelly has submitted 143 pending change order requests ("***CORs***") totaling $9,562,782 that have yet to be processed, the oldest of which was submitted almost two years ago in April 2017; and

- JH Kelly has not been paid for any work performed after March 25, 2018.

*See* Declaration of Mario R. Nicholas in Support of the Motion ("***Nicholas Decl.***"), Ex. 1 (JH Kelly's Complaint) ¶¶ 5(i), 5(j), 5(k), 43.

Despite being owed over $26 million on the Project, (i) JH Kelly paid all of its subcontractors, employees, and vendors, (ii) no JH Kelly subcontractors or vendors filed liens against the Project, (iii) no employees filed payment claims regarding the Project, (iv) JH Kelly finished the job with zero recordable injuries, and (v) JH Kelly diligently and successfully

---

[2] Other major issues included, without limitation: (i) delayed and defective mechanical materials; (ii) delayed and/or defective steel building material; (iii) delayed and/or defective shop fabrication material; (iv) contract maladministration; (v) differing site conditions; (vi) modified hydro vacuum requirements; (vii) base and corner trim and flashing fabrication errors; (viii) missing fire coating/fireproofing to materials; (ix) door and frame location conflicts; (x) late delivery of the generator; (xi) removal of the security and communications conduit; (xii) delayed water tank installation; (xiii) delayed design for rebar and anchor bolt procurement; and (xiv) disjointed construction management. *See* Declaration of Mario R. Nicholas, Ex. 1 (JH Kelly's Complaint) ¶¶ 38(a)-(q).

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page 106 of 322

executed the work until completion in June 2018, which is consistent with JH Kelly's history of never abandoning a project. *See id.*, Ex. 1 ¶ 5(l).

## C. The Subcontract Provides Alternative Paths for Resolution of the JH Kelly and AECOM Issues, Depending on PG&E's Role in the Claim or Dispute and How AECOM Elects to Proceed

Article 13—the dispute resolution provision of the Subcontract—provides two separate tracks for the resolution of claims and disputes that *do* and those that *do not* involve PG&E:

### 13.3 Disputes Involving [PG&E].

**13.3.1** To the extent a claim, dispute or controversy arises out of, or relates to, problems caused by [PG&E] or for which [PG&E] is responsible ("[PG&E] Disputes"), such [PG&E] Disputes shall be resolved pursuant to the dispute resolution clause set forth in the EPC Agreement.[3] Both [AECOM] and [JH Kelly] agree to cooperate in the presentation and prosecution or defense of [PG&E] Disputes. *If*, after a request for an extension of time or additional compensation from [JH Kelly], *[AECOM] believes that the event causing the delay or additional compensation is the responsibility of [PG&E], then [AECOM] will cooperate with and assist [JH Kelly] in presenting a request for an extension of time or additional compensation to [PG&E]. Notwithstanding the above, [AECOM] reserves the right not to submit a claim to [PG&E]. In such cases, the claim shall be resolved pursuant to Section 13.4.*

. . . .

### 13.4 Disputes Not Involving [PG&E].

**13.4.1** For any claim, dispute or controversy not arising out of, or relating to, problems caused by [PG&E] or for which [PG&E] is responsible, [JH Kelly] and [AECOM] will first attempt to resolve such claim, dispute or controversy at the field level through discussions between [AECOM]'s Representative and [JH Kelly]'s Representative.

---

[3] The dispute resolution clause in the EPC Agreement provides:

The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Contract *promptly* by negotiations between a vice president of PG&E or his or her designated representative and an executive of similar authority of Contractor. Either Party may give the other Party written notice of any dispute. *Within 20 days after delivery of said notice*, the executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary to exchange information and to attempt to resolve the dispute. *If the matter has not been resolved within 30 days of the first meeting, either Party may initiate a mediation of the controversy.* Each Party is required to continue to perform its obligations under this Contract pending final resolution of any dispute arising out of or relating to this Contract.

Yabui Decl., Ex. 1 (Subcontract) at Ex. A (Flow Down General Conditions) § B-11.5 (emphasis added).

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 15:30:45    Page 306 of 322
Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 04/25/20 15:30:45    Page 304 of 90

**13.4.2** If a claim, dispute or controversy cannot be resolved through Section 13.4.1, [AECOM]'s Senior Representative and [JH Kelly]'s Senior Representative, upon the request of either party, *shall meet as soon as conveniently possible, but in no case later than thirty (30) days after such a request is made*, to attempt to resolve such claim, dispute or controversy. Five (5) days prior to any meetings between the Senior Representatives, the parties will exchange relevant information that will assist the parties in resolving the claim, dispute or controversy.

**13.4.3** If after meeting the Senior Representatives determine that the claim, dispute or controversy cannot be resolved on terms satisfactory to both parties, *the parties shall submit within thirty (30) days of the conclusion of the meeting by the Senior Representatives the claim, dispute or controversy to non-binding mediation*. The mediation shall be conducted by a mutually agreeable impartial mediator, or if the parties cannot so agree, a mediator designated by the American Arbitration Association ("AAA") pursuant to its Construction Industry Mediation Rules. The mediation will be governed by and conducted pursuant to a mediation agreement negotiated by the parties or, if the parties cannot so agree, by procedures established by the mediator. Unless otherwise mutually agreed by [AECOM] and [JH Kelly] and consistent with the mediator's schedule, *the mediation shall commence within ninety (90) days of the submission of the dispute for mediation*. Persons with authority to resolve the dispute shall be present at the mediation.

Yabui Decl., Ex. 1 (Subcontract) §§ 13.3.1, 13.4 (emphasis added).

In sum, these dispute resolution terms provide that if JH Kelly submits to AECOM a claim for delay damages or additional compensation, and *if AECOM believes PG&E is responsible for the claim by JH Kelly, then AECOM "will cooperate with and assist" JH Kelly in presenting its claim to PG&E pursuant to Section 13.3 of the Subcontract.* The presentation of the claim to PG&E is accomplished pursuant to the dispute resolution clause in the EPC Agreement, which requires that executives of the parties "promptly" meet, no later than 20 days after delivery of notice of the dispute. If the matter is not resolved within 30 days of the first meeting, then either party may initiate a mediation of the dispute. Conversely, *if AECOM elects not to submit a claim to PG&E, then the claim is to be resolved solely between JH Kelly and AECOM pursuant to Section 13.4 of the Subcontract, regardless of PG&E's responsibility.*

**D.     Delay Damages and the "Pay if Paid" Clause of the Subcontract**

Much like the dispute resolution terms in Section 13, Section 5.4 of the Subcontract distinguishes between issues—specifically, "delay damages"—that *do* versus those that *do not* involve PG&E. With respect to delay damages caused by PG&E, the Subcontract provides that:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*[JH Kelly]'s recovery shall be limited to the amount, if any, which [AECOM],* on behalf of [JH Kelly], ***actually receives from [PG&E]*** on account of such claim. ***Payment by [PG&E] shall be an <u>express condition precedent</u> to [AECOM]'s duty of payment to [JH Kelly].***

*Id.,* Ex. 1 § 5.4.1 (emphasis added). The emphasized language in Section 5.4.1 is commonly referred to in construction law as a "pay if paid" clause because it purports to condition AECOM's liability for payment to JH Kelly on AECOM's receipt of payment from PG&E (*i.e.*, AECOM will only pay JH Kelly *if* it first receives payment from PG&E).

The Third-Party Complaint leaves no doubt that AECOM blames PG&E for the delays that afflicted the Project and the delay damages suffered by JH Kelly. Indeed, AECOM expressly attributes its removal of the Litigation to PG&E-caused delays:

> 68. .... In its Complaint, JH Kelly alleged that it incurred damages as a result of design changes, delays, increased scope of work, and cost impacts that directly arise from the design changes (in particular, the IFC Electrical design changes), acts and omissions of PG&E enumerated above. Many of these costs are associated with changes imposed by PG&E that it has failed to pay, or are amounts that PG&E has withheld.

> 69. Consequently, on March 1, 2019, AECOM removed this action to the United States Bankruptcy Court for the Eastern District of California.

*See* Nicholas Decl., Ex. 8 (AECOM's *Third-Party Complaint against PG&E*) at 14, ¶¶ 68-69.

Section 5.4.1 is relevant to this Motion in two respects discussed in greater detail below: First, it appears that AECOM intends to rely on the "pay if paid" clause to avoid having to pay delay damages to JH Kelly unless or until AECOM itself receives payment from PG&E. Second, substantial legal issues concerning the validity of this clause under the California State Constitution are addressed below at pages 22-24 (*see infra* § V.B.3) in connection with the third remand consideration.

### E. AECOM Prohibits JH Kelly from Communicating with PG&E

AECOM demanded that JH Kelly not communicate any "Project Issues" to PG&E on multiple occasions and at various stages of the Project. For example, on February 22, 2017, Shawn Kelly, AECOM's Vice President, Power and Industrial NorCal, directed JH Kelly not to communicate any "Project Issues" to PG&E:

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 15:30:45   Page of
306 of 322

1 | ***Please refrain on any "Project Issues" when discussing with the Client***—call me
2 | if it is that bad. I can assure you that Steve is doing everything in his power to
overcome your issues and ours—but or [*sic*] client does not care even when most
3 | if not all are because of them.

4 | Yabui Decl., Ex. 4 (emphasis added).

5 | Roughly six months later, on September 8, 2017, AECOM's Major Projects Director

6 | Joseph Rosinski reiterated AECOM's demand that JH Kelly refrain from communicating directly

7 | with PG&E. Mr. Rosinski directed JH Kelly to "[p]lease reinforce and notify your team on site

8 | not to communicate with PG and E [*sic*] at any levels regarding schedule, personnel and other site

9 | issues. Direct them to us." *Id.*, Ex. 7.

10 | Moving up the chain of command, on October 23, 2017 AECOM's Senior Vice President

11 | Don Divers sent JH Kelly a formal letter with the subject line "Improper Communications

12 | Between PG&E and JH Kelly," which provided in full as follows:

13 | Dear Steve,

14 | AECOM Technical Services, Inc. ("AECOM") is aware that ***JH Kelly project***
15 | ***personnel has been in direct communication with Pacific Gas and Electric***
***Company*** ("PG&E") project personnel on matters concerning the Burney K2
Replacement Project ("Project"). ***Such conduct is a breach of your Subcontract***
16 | 60482831-SC-001 ("Subcontract") ***with AECOM, which demands that JH Kelly***
***only communicate with AECOM on Project-related matters. This is a material***
17 | ***obligation of JH Kelly.*** As such, any further violation of this provision shall not
be tolerated. If there is such a violation, AECOM shall avail itself of any and all
18 | recourse provided for in the Subcontract.

19 | Please do not hesitate to contact me if you have any questions or comments.

20 | *Id.*, Ex. 10 (emphasis added).

21 | JH Kelly abided by AECOM's firm directive not to communicate with PG&E "on matters

22 | concerning the Burney K2 Replacement Project." *See id.* As a result, JH Kelly had virtually no

23 | insight into the dealings between AECOM and PG&E on the Project, and JH Kelly had no ability

24 | to present claims or issues to PG&E without AECOM's cooperation.

25 | **F.     AECOM Elects Not to Present JH Kelly's Claims to PG&E**

26 | JH Kelly first requested additional compensation under the Subcontract on January 4,

27 | 2017, *see id.*, Ex. 2, which AECOM acknowledged about three weeks later. *See id.*, Ex. 3. Over

28 | the following 16 months, JH Kelly made further requests to AECOM for additional compensation

under the Subcontract; supported its requests with CORs (written requests for additional payment), detailed time impact analyses, and other reports prepared by JH Kelly and third-party consultants; and answered all questions asked by AECOM. *See*, *e.g.*, *id.*, Exs. 5, 6, 8, 9, 18. JH Kelly also repeatedly reminded AECOM that JH Kelly "does not have any visibility into AECOM's dealings with PG&E," and that "AECOM directed [JH Kelly] in writing to cease all material communication with PG&E." *Id.*, Ex. 12; *see also id.*, Ex. 19. JH Kelly even demanded that AECOM share all of its correspondence and supporting information with PG&E. *See id.*, Ex. 12 ("This is an especially important component of any owner-caused delay claim."); *see also id.*, Exs. 15, 16, 17, 19.

AECOM sent its first formal response to JH Kelly's notices of delay and cost impact in November 2017. *See* Yabui Decl., Ex. 11. In its response, AECOM plainly relied upon the "pay if paid" term in the Subcontract, writing that "JH Kelly has contractually agreed that its recovery is limited to the amount, if any, which AECOM actually receives from PG&E on the claim." *Id.*, Ex. 11. AECOM claimed that it was "actively seeking compensation for these delays and will incorporate impacts incurred by JH Kelly" and "shares JH Kelly's frustration with the numerous changes in this specific instance and on this project as a whole and, as noted previously, is compiling information to pursue additional compensation for AECOM and JH Kelly." *Id.*

Despite JH Kelly's multiple requests to AECOM and responsiveness to AECOM's various requests to it, and despite AECOM having prohibited JH Kelly from communicating with PG&E and having promised to advance JH Kelly's claims, AECOM apparently chose not to pursue JH Kelly's claims with PG&E. Unbeknownst to JH Kelly at the time, on or about December 22, 2017 AECOM requested additional compensation from PG&E for the changes to the IFC Electrical Drawings and related delays and impacts to the Project cost and schedule on its own behalf but not on behalf of JH Kelly. *See id.*, Ex. 13. On or about February 8, 2018—and also unbeknownst to JH Kelly at the time—AECOM initiated a formal dispute resolution process with PG&E under the EPC Agreement without notice to JH Kelly, and without presenting JH Kelly's claims for compensation to PG&E. *See id.*, Ex. 14. JH Kelly did not receive copies of the referenced correspondence between AECOM and PG&E or any substantive information

100583907.6 0034592-00012

regarding the negotiations between AECOM and PG&E until months later, on or about May 8, 2018. *See* Yabui Decl., ¶¶ 15-16. JH Kelly has little insight into what, if anything, occurred pursuant to the dispute resolution process under the EPC Agreement between AECOM and PG&E because AECOM decided not to involve JH Kelly in the process.

For purposes of the pending Motion, the Court need not determine whether or to what extent AECOM presented JH Kelly's claims to PG&E or decide if AECOM made an election under the Subcontract to proceed on a bilateral basis under Section 13.4 without PG&E rather than on a trilateral basis under Section 13.3 including PG&E. Those issues are not before the Court and would require discovery and an evidentiary proceeding to resolve. Rather, JH Kelly points to AECOM's handling of JH Kelly's delay damages claims and requests for additional compensation as evidence of AECOM's use of removal of the Litigation to the Bankruptcy Court and impleading of PG&E as a litigation tactic, a disingenuous gambit designed to frustrate JH Kelly's efforts to obtain a timely adjudication of its claims against AECOM under the Subcontract solely between the two of them, and further grounds for remand.

## IV. PROCEDURAL BACKGROUND

### A. Shasta County Proceedings

On November 1, 2018, in order to preserve its rights to payment, JH Kelly filed and recorded a $15,881,776.21 Claim of Mechanics Lien in the official records of Shasta County (the "***Mechanics Lien***"). *See* Nicholas Decl., Ex. 3. On January 25, 2019, several days prior to filing the Litigation against AECOM, JH Kelly filed a complaint against PG&E in Shasta County Superior Court with a single claim for foreclosure of the Mechanics Lien (the "***Foreclosure Action***"). *See id.*

On January 29, 2019, JH Kelly commenced the Litigation by filing its complaint against AECOM in Shasta County Superior Court (Case No. 19CV0172). *See id.*, Ex. 1. The complaint asserts claims against AECOM for damages exceeding $26 million for (i) breach of contract, (ii) breach of contract/total cost or modified total cost, (iii) breach of implied warranty (adequacy of plans and specifications), (iv) breach of the implied covenant of good faith and fair dealing, (v) *quantum meruit*/abandonment, (vi) violation of prompt payment laws, and (vii) *quantum*

| | |
|---|---|
| 1 | *meruit*/reasonable value.  *Id.*  The complaint expressly seeks a jury trial.  *See id.*, Ex. 1, at 22. |
| 2 | The Shasta County Superior Court assigned the Litigation to the Hon. Tamara L. Wood, |
| 3 | scheduled a mandatory settlement conference for September 30 and a trial date on December 31, |
| 4 | 2019 at 8:45 a.m. in Department 8 of the Shasta County Superior Court.  *See id.*, Ex. 2. |
| 5 | **B.  Bankruptcy Court Proceedings** |
| 6 | On March 1, 2019, AECOM removed the Litigation to the U.S. Bankruptcy Court for the |
| 7 | Eastern District of California (Dkt. No. 1).  *See id.*, ¶ 7.  A week later, on March 8, AECOM and |
| 8 | JH Kelly submitted the Procedures Stipulation to such Bankruptcy Court (Dkt. No. 7).  *See id.*, |
| 9 | ¶ 8.  As its name suggests, the Procedures Stipulation addressed various procedural matters |
| 10 | regarding the transfer of venue of the removed action to this Court, filing deadlines, and other |
| 11 | such matters relating to the removed action and this Motion.  *Id.*  The Bankruptcy Court for the |
| 12 | Eastern District entered an Order granting the Procedures Stipulation on March 8 (Dkt. No. 8). |
| 13 | *See id.*, ¶ 9 & Ex 6. |
| 14 | On March 14, this Court entered a notice of transfer of the removed action to the U.S. |
| 15 | Bankruptcy Court for the Northern District of California (Dkt. No. 11).  *See id.*, ¶ 10.  The next |
| 16 | day, JH Kelly filed its *Objection to the Bankruptcy Court's Entry of Final Orders Pursuant to* |
| 17 | *FRBP 9027(e)(3)* (Dkt. No. 14).  *See id.*, ¶ 11.  On March 18, AECOM filed its *Answer to* |
| 18 | *Complaint, Affirmative Defenses and Counterclaim Against Plaintiff JH Kelly, LLC* (Dkt. No. 16; |
| 19 | the "**Answer & Counterclaim**"), *see id.*, Ex. 7, and on March 22, AECOM filed its *Third-Party* |
| 20 | *Complaint against PG&E* (Dkt. No. 19; the "**Third-Party Complaint**").  *See id.*, Ex. 8.[4] |
| 21 | In both the Answer & Counterclaim and the Third-Party Complaint, AECOM alleges that |
| 22 | PG&E is the cause of the Project delays (*see id.,* Ex. 7 (Answer & Counterclaim) ¶¶ 4, 8, *passim*; |
| 23 | *id.*, Ex. 8 (Third-Party Complaint) ¶ 13, *passim)*, and is a necessary and indispensable party to the |
| 24 | Litigation (*see id.*, Ex. 7 ¶ 81-89; *id.*, Ex. 8 at 2, lines 3-5), but neither pleading asserts that |
| 25 | |
| 26 | |

---

[4] The parties expressly agreed in the Procedures Stipulation that "the timing and sequence of filing of the Motion to Remand vis-à-vis any third-party complaint(s) filed by AECOM in the Removed Action shall not be cited by either Party in support of or in opposition to the Motion to Remand."  Procedures Stipulation at 5, ¶ 20.

Stoel Rives LLP
Attorneys At Law
100583907.6 0034592-00012

1  AECOM is entitled to indemnification by PG&E for AECOM's liabilities to JH Kelly or that the

2  rulings in the JH Kelly Litigation would be preclusive in the AECOM/PG&E dispute.

3  **V.    ARGUMENT**

4      The construction litigation by JH Kelly against AECOM is a complex contract dispute

5  between two non-debtor parties that is entirely governed by state law and belongs in the Shasta

6  County Court.  The Litigation is only before this Court because—after months of insisting that JH

7  Kelly not involve PG&E in addressing the extensive construction issues on the Project—

8  AECOM now wants to hide behind the Debtor.

9      This litigation tactic should be rejected.  Regardless of whether AECOM succeeds in

10  turning the two-party Litigation under the Subcontract into a three-party dispute with PG&E

11  involving the EPC Agreement, the Litigation should be remanded to the State Court in any event,

12  either as a two-party dispute under the Subcontract, or as a three-party action if PG&E is deemed

13  an indispensable party (which JH Kelly denies) and relief from stay is requested and granted.

14  **A.    The Court Has Broad Discretion to Remand on Any Equitable Grounds,
15      Including the 14 Factors Considered by Courts in the Ninth Circuit**

16      Pursuant to 28 U.S.C. § 1452(b), the Court may remand any claim removed under 28

17  U.S.C. §§ 1452(a) and 1334 on "any equitable ground."  *Fed. Home Loan Bank of Chi. v. Banc of*

18  *Am. Sec. LLC*, 448 B.R. 517, 525 (C.D. Cal. 2011) (hereinafter "***BofA Securities***").  This standard

19  gives federal courts broad authority to remand.  *McCarthy v. Prince (In re McCarthy)*, 230 B.R.

20  414, 417 (B.A.P. 9th Cir. 1999) ("This 'any equitable ground' remand standard is an unusually

21  broad grant of authority. It subsumes and reaches beyond all of the reasons for remand under

22  nonbankruptcy removal statutes." (citation omitted)).  "Because the 'any equitable ground'

23  standard is not statutorily defined, case law has imported factors governing discretionary

24  abstention to assist with the remand decision."  *BofA Securities*, 448 B.R. at 525 (*citing In re*

25  *Roman Catholic Bishop of S.D.*, 374 B.R. 756, 761 (Bankr. S.D. Cal. 2007)).

26      Ninth Circuit courts consider up to 14 factors in determining whether to remand a case

27  that is removed on the grounds that it is "related to" a bankruptcy case:

Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
Case: 19-30088   Doc# 5651-1   Filed: 02/05/20   Entered: 02/05/20 19:30:45   Page
311 of 322
90

(1)     the effect or lack thereof on the efficient administration of the estate if the Court recommends [remand or] abstention;

(2)     extent to which state law issues predominate over bankruptcy issues;

(3)     difficult or unsettled nature of applicable law;

(4)     presence of related proceeding commenced in state court or other nonbankruptcy proceeding;

(5)     jurisdictional basis, if any, other than § 1334;

(6)     degree of relatedness or remoteness of proceeding to main bankruptcy case;

(7)     the substance rather than the form of an asserted core proceeding;

(8)     the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9)     the burden on the bankruptcy court's docket;

(10)    the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11)    the existence of a right to a jury trial;

(12)    the presence in the proceeding of nondebtor parties;

(13)    comity; and

(14)    the possibility of prejudice to other parties in the action.

*BofA Securities*, 448 B.R. at 525 (*quoting In re Enron Corp.*, 296 B.R. 505, 508 & n.2 (C.D. Cal. 2003)).

"While these factors assist a court's remand decision, they do not control it." *Roman Catholic Bishop of S.D.*, 374 B.R. at 762. "Because Section 1452(b) affords 'an unusually broad grant of authority,' any one of the relevant factors may provide a sufficient basis for equitable remand." *BofA Securities* at 525 (*quoting Roman Catholic Bishop of S.D.*, 374 B.R. at 761). Finally, there is a "[s]trong presumption against removal [which] means the removing party bears the burden of establishing federal jurisdiction and that removal was proper." *Id.* at 523 (*citing Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992)).

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 02/05/20 19:30:45    Page 206 of 312

Case: 19-30088    Doc# 5651-1    Filed: 02/05/20    Entered: 04/10/20 20:05:25    Page 206 of 90 322

STOEL RIVES LLP
ATTORNEYS AT LAW

**B.** **The 14 Considerations Applicable to Abstention and Remand Motions Overwhelmingly Favor Remand of This Litigation to the State Court**

Almost all of the equitable factors favor remand of the Litigation to the state court, regardless of PG&E's role in the case.

**1.** **Remand Will Promote Efficient Administration of the Estate**

Administration of the bankruptcy estate will be aided by allowing the Litigation to proceed in state court. The amount in controversy in the JH Kelly portion of the Litigation is in the vicinity of $30 million, roughly 1/10th of 1% of the estimated $30 billion of wildfire-related claims against the Debtor in the Bankruptcy Case. Adjudication of the Litigation in the Bankruptcy Court would be an inordinate and unnecessary burden on the Court.

Conversely, the Litigation could proceed to a speedy resolution in the state court without distracting from PG&E's reorganization efforts. The Shasta County Superior Court promptly assigned the Litigation to a judge for all purposes, set a mandatory settlement conference date, and scheduled trial for December 31, 2019. While that trial date may need to be continued as a result of AECOM's removal of the action, there is no reason to doubt that Shasta County Superior Court will provide a prompt, efficient resolution of the Litigation.

The reorganization in the Bankruptcy Court also is not dependent on resolution of the Litigation. It is entirely possible for the reorganization in the Bankruptcy Court to proceed on a parallel track with the Litigation in Shasta County Superior Court. There is no evidence that the Bankruptcy Court cannot confirm a plan without the completion of the Litigation, but even if resolution of the Litigation were necessary for reorganization, which JH Kelly disputes, the state court will likely provide a faster resolution. And if plan confirmation issues regarding claim voting amounts, estimation of claims, and the like were to arise, this Court has procedures available to resolve them without waiting for liquidation of JH Kelly's claims in the Litigation.

By contrast, retention of the Litigation in the Bankruptcy Court will be inefficient because, absent consent of the parties, this Court will not have final authority to adjudicate any claims. JH Kelly has not consented to the entry of final orders or judgment in the Litigation by a bankruptcy judge, *see* JH Kelly's Objection to Jurisdiction (Dkt. No. 14), so the Bankruptcy

100583907.6 0034592-00012

Court cannot enter judgments or final orders over "related to" matters, and can only make recommendations to the District Court, which must review the matter *de novo*. *See* 28 U.S.C. § 157(c)(1), (2). In such circumstances, judicial economy favors remand.

### 2. State Law Issues Predominate over Bankruptcy Issues

The Litigation between JH Kelly and AECOM is based entirely on state law, and no federal law or bankruptcy issues are involved. Courts have found that this factor weighs in favor of remand and that a court may remand solely because exclusively state law claims are at issue and no bankruptcy issues are involved, even when straightforward state law claims are at issue. *See In re AmericanWest Bancorporation*, No. 10-06097-PCW, 2011 WL 6013779, at *3 (Bankr. E.D. Wash. Dec. 2, 2011) (explaining that because "this adversary [proceeding] involves only state law issues ... this factor would ordinarily weigh heavily in favor of remand and in many cases would result in remand without further discussion," but finding to the contrary in that case "[d]ue to the unusual circumstances of this adversary [proceeding]"); *see also Hayden v. Wang*, No. 13-cv-03139-JST, 2013 WL 6021141, at *4 (N.D. Cal. Nov. 13, 2013) (finding this factor weighs in favor of remand where claim was for securities fraud under state law); *Hendricks v. Detroit Diesel Corp.*, No. C-09-3939 EMC, 2009 WL 4282812, at *8 (N.D. Cal. Nov. 25, 2009) (finding this factor weighs in favor of remand where state law claims of negligence, strict liability, and false representation were at issue); *Bally Total Fitness Corp. v. Contra Costa Retail Ctr.*, 384 B.R. 566, 572 (Bankr. N.D. Cal. 2008) (finding this factor weighs in favor of remand of state law unlawful detainer action); *In re Cytodyn of N.M., Inc.*, 374 B.R. 733, 739 (Bankr. C.D. Cal. 2007) (finding this factor weighs "strongly in favor of remand" where "proceeding consists to an overwhelming degree of California state law issues," including fraud, violation of securities laws, interference with contract, and breach of contract). This factor weighs heavily in favor of remand.

### 3. The Litigation Presents a Difficult or Unsettled Issue of State Law

While no single factor is determinative in the Bankruptcy Court's analysis, "because section 1334(c)(1) is concerned with comity and respect for state law, whether a case involves unsettled issues of state law is always significant." *Matter of Chi., Milwaukee, St. Paul & Pac.*

STOEL RIVES LLP
ATTORNEYS AT LAW
100583907.6 0034592-00012

| | |
|---|---|
| 1 | *R.R. Co.*, 6 F.3d 1184, 1189 (7th Cir. 1993) (citing *Thompson v. Magnolia Petroleum Co.*, 309 |
| 2 | U.S. 478, 483 (1940)). While there is no doubt that this Court is capable of determining issues of |
| 3 | state law, JH Kelly respectfully submits that California state courts are in a better position to |
| 4 | determine the legal issues relating to "pay if paid" and "pay when paid" provisions of the |
| 5 | Subcontract discussed above at pages 13-14 (*see supra* § III.D). |
| 6 | First, the lawsuit will involve analysis of California law on "pay if paid" provisions. A |
| 7 | "pay if paid" provision is an attempt to make payment by the owner to the prime contractor a |
| 8 | "condition precedent" to the prime contractor's obligation to pay the subcontractor. *See Wm. R.* |
| 9 | *Clarke Corp. v. Safeco Ins. Co.,* 15 Cal. 4th 882, 885 (1997) ("*Clarke*"). Conversely, a "pay |
| 10 | when paid" provision fixes "the usual time for payment" to the subcontractor, but demands that |
| 11 | payment be made within a "reasonable time" regardless of whether the owner ultimately pays the |
| 12 | general contractor. *Id.* Under California law, "pay if paid" provisions are void as against public |
| 13 | policy. *Id.* at 886 ("We conclude that pay if paid provisions . . . are contrary to the public policy |
| 14 | of this state and therefore unenforceable because they effect an impermissible indirect waiver or |
| 15 | forfeiture of the subcontractors' constitutionally protected mechanic's lien rights in the event of |
| 16 | nonpayment by the owner."). |
| 17 | AECOM has made the argument that it is not required to pay JH Kelly unless it first |
| 18 | receives payment from PG&E. *See* Yabui Decl., Ex. 11 ("JH Kelly has contractually agreed that |
| 19 | its recovery is limited to the amount, if any, which AECOM actually receives from PG&E on the |
| 20 | claim …."). In support of its argument, AECOM relies upon the unenforceable "pay if paid" |
| 21 | provision in the Subcontract—Section 5.4.1, which governs "Owner-Caused Delays" and |
| 22 | provides that "Payment by [PG&E] ***shall*** be an ***express condition precedent*** to [AECOM]'s duty |
| 23 | of payment to [JH Kelly]." *Id.*, Ex. 1 § 5.4.1 (emphasis added). Because this "pay if paid" |
| 24 | provision is void under California law, AECOM cannot hide behind it to justify its failure to pay |
| 25 | JH Kelly. |
| 26 | JH Kelly anticipates that AECOM will dispute that Section 5.4.1 of the Subcontract is an |
| 27 | unenforceable "pay if paid" provision, and this issue will be decided by the Court. The |
| 28 | Bankruptcy Court should defer to California state courts to define the scope of California case |

Stoel Rives LLP
ATTORNEYS AT LAW

100583907.6 0034592-00012

law—especially on important issues such as "pay if paid" provisions, which the California Supreme Court has already held violate Article XIV, Section 3 of the California Constitution. *See Clarke*, 15 Cal. 4th at 886.

Second, the lawsuit will involve analysis of California law on "pay when paid" provisions. A "pay when paid" provision, unlike a "pay if paid" provision, fixes "the usual time for payment" to the subcontractor, but demands that payment be made within a "reasonable time" regardless of when or whether the owner pays the general contractor. *Id.* at 885. JH Kelly anticipates that AECOM will argue that Section 5.4.1 of the Subcontract is a "pay when paid" provision, and is therefore enforceable—albeit subject to a "reasonable time" limitation. While JH Kelly does not believe AECOM will prevail on this argument, if AECOM were to prevail, then the Court would be required to determine what is a "reasonable time" for payment. California law in this area is unsettled, and the Court's analysis of what constitutes a "reasonable time" for payment will profoundly impact contractors throughout California. This is especially true where the owner is insolvent, and the subcontractor faces the risk of being forced to wait years for payment when it did not assume any of the risk associated with the owner's potential insolvency.[5] As held by the Sixth Circuit, there is "no reason why the usual credit risk of the owner's insolvency assumed by the general contractor should be transferred from the general contractor to the subcontractor," and "[t]o construe [the subcontract] as requiring the subcontractor to wait to be paid for an indefinite period of time until the general contractor has been paid by the owner, *which may never occur*, is to give to [the subcontract] an unreasonable construction which the parties did not intend at the time the subcontract was entered into." *Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.,* 303 F.2d 655, 661 (6th Cir. 1962) (emphasis added).

As with "pay if paid" provisions, the Bankruptcy Court should defer to Shasta County Superior Court to interpret the bounds of "pay when paid" provisions under California law. This factor weighs heavily in favor of remand.

---

[5] The inequity to JH Kelly in this matter is particularly strong because JH Kelly has *already* been forced to wait nearly two years for payment of even undisputed contract amounts as a result of AECOM's failure to abide by its obligations under the Subcontract.

**4. The Presence of Related State Court Proceedings is Neutral**

JH Kelly is not aware of any state court or other non-bankruptcy proceedings related to the Litigation, other than the stayed Foreclosure Action filed by JH Kelly against PG&E. While the Foreclosure Action is a proceeding commenced in state court before the Litigation was removed, JH Kelly does not intend to seek relief from the stay to prosecute the Foreclosure Action if it is paid in full by AECOM. This factor is neutral.

**5. There is No Basis for Federal Jurisdiction Other Than Section 1334**

There is no federal question jurisdiction over the Litigation. *See* 28 U.S.C. § 1331. There most likely was diversity jurisdiction over the Litigation between JH Kelly and AECOM, but if PG&E is included as a party, as sought by AECOM, diversity jurisdiction is ruined. *See* Third-Party Complaint at 2, ¶¶ 5-6 (alleging that both AECOM and PG&E are California corporations); 28 U.S.C. § 1332(a)(1). There is no basis for federal jurisdiction other than Section 1334(b). This factor weighs in favor of remand.

**6. The Litigation is Only Remotely Related to the Bankruptcy Case**

The removed Litigation is only remotely related to the PG&E bankruptcy case. The only effect of the Litigation on the PG&E bankruptcy estate will be to reduce and possibly eliminate JH Kelly's lien claim against the Project. The remoteness of the Litigation to the Bankruptcy Case is further described in Section V.B.1 above at pages 21-22. This factor favors remand.

**7. The Litigation is Not a "Core" Proceeding**

The Litigation between JH Kelly and AECOM is not a "core" bankruptcy proceeding. Neither AECOM's Notice of Removal nor its Answer & Counterclaim assert that the Litigation with JH Kelly is a core matter for purposes of 11 U.S.C. § 157(b). In its Third-Party Complaint against PG&E, AECOM identifies 28 U.S.C. Section 157(b)(2)(A), (K) and (O) for its assertion that AECOM's claims against PG&E are core matters. *See* Third-Party Complaint at 2, ¶ 3.

Clause (K) of Section 157(b)(2) ("determinations of the validity, extent, or priority of liens") is implicated by AECOM's First Cause of Action against PG&E for "Determination of Priority and Extent of AECOM's Valid Mechanics' Lien", but is not applicable to the Litigation because JH Kelly is asserting its lien claim against PG&E in a separate state court action that is

STOEL RIVES LLP
ATTORNEYS AT LAW
100583907.6 0034592-00012

stayed. *See supra* § IV.A. The only way that Section 157(b)(2)(K) might apply to the Litigation between JH Kelly and PG&E would be if (i) JH Kelly failed to recover from AECOM under the Subcontract and had a remaining lien claim to pursue against the Burney pipeline, (ii) there was a lien priority dispute between JH Kelly and AECOM, and (iii) it was necessary to resolve the lien priority dispute because the value of the Burney pipeline was less than the amount of the combined lien claims. This scenario appears highly unlikely.

AECOM's references to Section 157(b)(2)(A) ("matters concerning the administration of the estate") and Section 157(b)(2)(O) ("other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor . . . relationship . . .") do not appear applicable to the Litigation between JH Kelly and AECOM. Accordingly, this factor also weighs in favor of remand.

### 8. The State Law Claims Can Easily be Severed from Any Core Bankruptcy Matters to Allow Judgments to Be Entered in State Court with Enforcement Left to the Bankruptcy Court

The state law claims in the Litigation could easily be resolved in the Shasta County Superior Court, with the Bankruptcy Court retaining jurisdiction for enforcement, if necessary. And, if this Court were to find that there is a core lien priority dispute between JH Kelly and AECOM under Section 157(b)(2)(K), and that the issue must be decided in the Bankruptcy Case, it could easily be severed from the Litigation. Thus, this factor also weighs in favor of remand.

### 9. The Litigation Would be a Burden on the Bankruptcy Court's Docket

The Litigation involves a fact-intensive, complex construction dispute that would needlessly burden the Bankruptcy Court's docket. As with most complex construction matters, the Litigation will be document intensive. The Subcontract alone is 2,259 pages, and there are 143 pending CORs—each supported by tens to hundreds of pages—at issue in the Litigation. JH Kelly reasonably anticipates that the court that handles the case be called upon to resolve discovery disputes, motions for summary judgment, and other pretrial motions. While the parties have not yet conferred on the length of trial, the trial is certain to involve numerous witnesses and is likely to be lengthy. JH Kelly anticipates that trial of the two-party Litigation would take at

least four weeks. *See* Nicholas Decl., ¶ 16. If AECOM is successful in adding PG&E to the litigation, trial will take even longer. Accordingly, this factor weighs heavily in favor of remand.

### 10. AECOM's Removal of the Litigation Is a Delay Tactic Tantamount to Forum Shopping

In the absence of a good reason why this Court should adjudicate JH Kelly's state law claims, AECOM's removal of the Litigation to this Bankruptcy Court appears to be a further effort to delay resolution of JH Kelly's claims. AECOM has a clear pattern of delaying tactics since at least January 2017, despite Subcontract terms requiring speedy resolution of claims. For example, the Subcontract provides that the parties "shall negotiate, in good faith and *as expeditiously as possible*, the appropriate adjustments" for changes in the work. Yabui Decl., Ex. 1 § 12.3.2 (emphasis added); *see also id.,* Ex. 1 § 12.4.2. If the parties disagree over the compensation for changes in the work, then AECOM and JH Kelly are required to "resolve the disagreement pursuant to Article 13" (the dispute resolution provision). *Id.,* Ex. 1 § 12.6.3. JH Kelly has submitted 143 CORs (*i.e.*, requests for adjustments due to changes in the work) to AECOM, the oldest of which dates back to April 2017, but AECOM has not paid any of them. On information and belief, AECOM has not even presented the CORs to PG&E. Instead, AECOM forbid JH Kelly from communicating with PG&E (while simultaneously insisting that JH Kelly will not be paid until AECOM is first paid by PG&E). *See supra* § III.E.

In light of this history, AECOM's decision to remove the Litigation from Shasta County, where it was scheduled to proceed to trial in December 2019, to the Bankruptcy Court during the Debtor's "breathing spell" from litigation, knowing that the Litigation would be a very small (but substantially distracting) fraction of an exceptionally large case, is tantamount to forum shopping. Rather than shopping for a "friendlier" or more convenient court, or a court where different legal standards might apply, AECOM appears to be shopping for delay. AECOM's delay tactics should not be condoned, and the Court should find that this factor weighs heavily for remand.

### 11. JH Kelly Has a Right to a Jury Trial

JH Kelly has demanded a jury trial and has not consented to entry of final orders by this Court. As a result, absent remand, a jury trial would have to take place in the District Court,

STOEL RIVES LLP
ATTORNEYS AT LAW
100583907.6 0034592-00012

requiring two different courts and two different judges to advance this factually intensive, complex action to trial. By contrast, Shasta County Superior Court would have one assigned judge to handle the entire case from discovery through jury trial.

This factor weighs heavily in favor of remand. *See Fed. Home Loan Bank of Seattle v. Barclays Capital, Inc.*, No. C10-0139 RSM, 2010 WL 3662345, at *7 (W.D. Wash. Sept. 1, 2010) ("Courts have granted equitable remand solely on the basis of a party's entitlement to a jury trial when that party's action was not a 'core proceeding.'"); *see also BofA Securities,* 448 B.R. at 526 (same); *Zweygardt v. Colo. Nat'l Bank of Denver*, 52 B.R. 229, 235 (Bankr. Colo. 1985) (holding that a jury demand "constitutes sufficient equitable ground to require remand"); *Lone Star Indus., Inc. v. Liberty Mut. Ins.*, 131 B.R. 269, 275 (D. Del. 1991) (observing that "any equitable ground suffices to remand a cause of action" and that the defendants "have requested a state jury trial is an equitable ground which in and of itself argues heavily in favor of remand"); *Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 409 (S.D.N.Y. 1991) (holding that "[d]emands for jury trials in non-core proceedings have been considered a sufficient ground for an equitable remand"); *Twyman v. Wedlo, Inc.*, 204 B.R. 1006, 1020-21 (N.D. Ala. 1996) (collecting cases). JH Kelly properly invoked its right to a jury trial and this is a non-core, related to proceeding. Accordingly, JH Kelly's right to a jury trial alone is sufficient grounds for remand under applicable case law.

### 12. The JH Kelly Proceeding is Solely Between Non-Debtor Parties

Bankruptcy courts should avoid determining controversies between non-debtor parties. *In re Mill-Craft Bldg. Sys., Inc.*, 57 B.R. 531, 534 (Bankr. E.D. Wis. 1986) ("The existence of non-debtor defendants in the ... action raises the possibility of a court being required to resolve disputes solely between non-debtor parties. This is precisely the type of controversy that a bankruptcy court should avoid."); *Lieber Enters., Inc. v. Morris (In re Morris)*, 55 B.R. 615, 617 (Bankr. N.D. Tex. 1985) ("[T]he improper exercise of jurisdiction over the non-debtor co-defendants compel[s] the conclusion that equity will best be served by remanding [the action] to the state court from whence it was removed."). While AECOM recently joined the Debtor as a third-party defendant to this adversary proceeding, the Debtor was not named as a defendant in

the Litigation, and AECOM has not asserted an indemnity claim against PG&E in its Third-Party Complaint. The Litigation was and should remain a dispute between two nondebtor parties. Accordingly, this factor weighs in favor of remand.

### 13. Comity Dictates Remand

There is no reason why the Bankruptcy Court should adjudicate a lawsuit involving pure questions of California substantive law. California state courts are the appropriate forum for such cases. *See In re Enron Corp.,* 296 B.R. 505, 509 (C.D. Cal. 2003) ("Comity dictates that California courts should have the right to adjudicate the exclusively state law claims involving California-centric plaintiffs and California-centric transactions."); *see also In re Roman Catholic Archbishop of Portland*, 338 B.R. 414, 422 (Bankr. D. Or. 2006) ("Comity weighs in favor of remand, because these claims turn largely on state law."); *Drexel Burnham Lambert,* 130 B.R. at 409 ("'Congress has made it plain that, in respect to noncore proceedings such as this (i.e., cases which assert purely state law causes of action), the federal courts should not rush to usurp the traditional precincts of the state court.'" (*quoting Mattingly v. Newport Offshore, Ltd.,* 57 B.R. 797, 799-800 (D.R.I. 1986))); *First Nat'l Bank of Westminster v. Rarick (In re Rarick),* 132 B.R. 47, 52 (Bankr. D. Colo. 1991) ("It would disregard the interest of comity for a federal court to usurp the role of the state court to decide questions of state law where there is no basis of federal jurisdiction other than the bankruptcy code.").

### 14. Removal of the Litigation is Prejudicial to JH Kelly

Finally, JH Kelly would be prejudiced if the Litigation were not remanded to the Shasta County Superior Court. In addition to the delay and added complication of a three-party litigation in this Court, which the District Court would have to review *de novo*, JH Kelly would lose the right to have its claims decided by a jury from Shasta County—the location of the Project. JH Kelly was forced to work through the winter period on the Project, and familiarity with the remote location of the Project, and the wet, cold winter conditions in and around Burney, is central to understanding JH Kelly's claims. Shasta County is roughly 200 miles from San Francisco, and the jury pool there would have a drastically different understanding of the Project location and conditions. JH Kelly's choice of forum should be honored to the extent that it is

STOEL RIVES LLP
ATTORNEYS AT LAW
100583907.6 0034592-00012

possible. *See Shubert v. Roche Holding Ag*, 157 F. Supp. 2d 542, 547 (E.D. Pa. 2001) (finding this factor in favor of remand under § 1452(b) and noting that "remand affords proper deference to the plaintiff's choice of forum"). The Court should find that this factor also favors remand.

## VI.    RESERVATION OF RIGHTS

Nothing herein is intended to or should be construed as a waiver of any right of JH Kelly under the Bankruptcy Code, California law, any other applicable law, or in any other proceeding.

## VII.    CONCLUSION

Almost all of the 14 factors that Bankruptcy Courts normally consider when deciding remand and abstention motions favor remand of the Litigation to Shasta County. Some of the factors weigh heavily in favor of remand and others are relatively neutral, but none appear to support adjudication of the Litigation in this Court.

Most of the factors favoring remand apply with equal force whether or not PG&E is a party to the Litigation. Accordingly, while JH Kelly believes that the Litigation should proceed as a two party dispute between nondebtors, remand would still be appropriate if for any reason the Court perceived that it would be beneficial for PG&E to be a party to the Litigation.

Accordingly, for the reasons stated in this Memorandum of Points and Authorities, JH Kelly respectfully requests that the Court enter an order remanding the Litigation to Shasta County Superior Court, and granting such other and further relief as is just and proper.

Dated:  April 16, 2019                    STOEL RIVES LLP


By:    */s/ Mario R. Nicholas*
         Eric A. Grasberger
         David B. Levant
         Mario R. Nicholas

Attorneys for JH Kelly, LLC