1  UNITED STATES DEPARTMENT OF JUSTICE
2  CIVIL DIVISION
   JOSEPH H. HUNT
3  Assistant Attorney General
   RUTH A. HARVEY
4  Director
   KIRK MANHARDT
5  Deputy Director
   MATTHEW J. TROY (GABN 717258)
6  MICHAEL QUINN (DCBN401376)
   Senior Trial Counsel
7  MICHAEL TYE (DCBN 488101)
   Trial Attorney
8  P.O. Box 875
   Ben Franklin Station
9  Washington, DC 20044-0875
   Telephone:  (202) 305-2419
10 E-mail:  Michael.Tye@usdoj.gov

11 DAVID L. ANDERSON
   United States Attorney (CABN 149604)
12
   Attorneys for the United States of America
13

                    UNITED STATES BANKRUPTCY COURT
14                  NORTHERN DISTRICT OF CALIFORNIA
                         SAN FRANCISCO DIVISION
15

16 | **In re:** | ) | Bankruptcy Case |
   | | ) | No. 19-30088 (DM) |
17 | **PG&E CORPORATION** | ) | |
   | | ) | Chapter 11 |
18 | **- and -** | ) | (Lead Case) |
   | | ) | |
19 | **PACIFIC GAS AND ELECTRIC** | ) | |
   | **COMPANY,** | ) | (Jointly Administered) |
20 | | ) | |
   | **Debtors.** | ) | **UNITED STATES' RESPONSE TO THE** |
21 | | ) | **OMNIBUS OBJECTION OF THE OFFICIAL** |
   | | ) | **COMMITTEE OF TORT CLAIMANTS** |
22 | ☐ Affects PG&E Corporation | ) | **(SUBSTANTIVE) TO NO LIABILITY CLAIMS** |
   | ☐ Affects Pacific Gas and Electric Company | ) | **FILED BY THE DEPARTMENT OF** |
23 | ■ Affects both Debtors | ) | **HOMELAND SECURITY/FEDERAL** |
   | | ) | **EMERGENCY MANAGEMENT AGENCY** |
24 | *All papers shall be filed in the Lead Case,* | ) | **(CLAIMS NO. 59692, 59734 & 59783)** |
   | *No. 19-30088 (DM).* | ) | |
25 | | ) | Date: February 26, 2020 |
   | | ) | Time: 10:00 a.m. (Pacific Time) |
26 | | | Place: United States Bankruptcy Court |
   | | | Courtroom 17, 16th Floor |
27 | | | San Francisco, CA 94102 |
28 | | | Re: Docket No. 4943, 5319 |

# TABLE OF CONTENTS

I.   FEMA HAS STATED A CLAIM UNDER SECTION 317 OF THE STAFFORD
     ACT.................................................................................................................3

II.  FEMA HAS PROPERLY ASSERTED CLAIMS FOR PUBLIC NUISANCE AND
     UNJUST ENRICHMENT .................................................................................8

     A.   FEMA Has Properly Stated Claims For Public Nuisance and Unjust
          Enrichment..........................................................................................8

          1.   Public Nuisance .......................................................................8

          2.   Unjust Enrichment ................................................................11

     B.   The Free Public Services Doctrine Does Not Bar FEMA's Common Law
          Claims...............................................................................................12

     C.   FEMA's Public Nuisance and Unjust Enrichment Claims Are Not Preempted................13

     D.   FEMA's Claims Are Not "Void" As Violating Federal Policy .........................14

IV.  THE TCC'S SUPPLEMENTAL ARGUMENTS ARE PREMATURE AND
     IRRELEVANT TO THE ISSUE BEFORE THE COURT.........................................15

CONCLUSION...............................................................................................16

# TABLE OF AUTHORITIES

## Cases

*Beck Dev. Co. v. S. Pac. Transp. Co.*,
44 Cal. App. 4th 1160 (Cal. Ct. App. 1996) ............................................................ 10

*Bullock v. BankChampaign, N.A.*,
569 U.S. 267 (2013) ............................................................................................ 4

*City of Evansville v. Kentucky Liquid Recycling, Inc.*,
604 F.2d 1008 (7th Cir. 1979) ............................................................................ 12

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
719 F.2d 322 (9th Cir. 1983) ........................................................................ 3, 12

*City of Milwaukee v. Illinois & Michigan*,
451 U.S. 304 (1981) ............................................................................................ 9

*City of Monterey v. Carrnshimba*,
215 Cal. App. 4th 1068 (Cal, Ct. App. 2013) .................................................... 9

*In re Eisen*,
No. SA 06–10372–ES, 2007 WL 7532274 (B.A.P. 9th Cir. Oct. 26, 2007) ......... 2

*In re Heath*,
331 B.R. 424 (B.A.P. 9th Cir. 2005) .................................................................. 1

*In re Holm*,
931 F.2d 620 (9th Cir. 1991) ............................................................................ 1

*In re Pugh*,
157 B.R. 898 (B.A.P. 9th Cir. 1993) .................................................................. 2

*Kale v. Obuchowski*,
985 F.2d 360 (7th Cir. 1993) ............................................................................ 7

*Khasin v. R.C. Bigelow, Inc.*,
Case No. 3:12–cv–02204–WHO, 2015 WL 4104868 (N.D. Cal. July 7, 2015)..... 11

*Michigan v. Army Corps of Engineers*,
667 F.3d 765 (7th Cir. 2011) ............................................................................ 9

*Native Vill. of Kivalina v. ExxonMobil Corp.*,
696 F.3d 849 (9th Cir. 2012) ............................................................................ 9

*Rissetto v. Plumbers and Steamfitters Local 343*,
94 F.3d 597 (9th Cir. 1996) .............................................................................. 7

*Schaeffer v. Gregory Vill. Partners, L.P.*,
105 F. Supp. 3d 951 (N.D. Cal. 2015) ............................................................... 9

*St. Paul Fire & Marine Ins. Co. v. Fort Vancouver Plywood Co.*
*(In re Brazier Forest Products, Inc.)*,
921 F.2d 221 (9th Cir. 1990) ............................................................................ 15

Case: 19-30088   Doc# 5753   Filed: 02/12/20   Entered: 02/12/20 15:34:54   Page 3 of 21

*Town of East Troy v. Soo Line R.R. Co.*,
   653 F.2d 1123 (7th Cir. 1980) ............................................................... 12

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ................................................................................... 4

*United States ex rel. Mei Ling v. City of Los Angeles*,
   No. CV 11-974 PSG (JCx), 2018 WL 3814498 (C.D. Cal. July 25, 2018) ...... 11

*United States v. Chesapeake & Ohio Ry. Co.*,
   130 F.2d 308 (4th Cir. 1942) ................................................................. 12

*United States v. Illinois Terminal R.R. Co.*,
   501 F. Supp. 18 (E.D. Mo. 1980) ........................................................... 12

*United States v. Kimbell Foods, Inc.*,
   440 U.S. 715 (1979) ................................................................................... 8

*United States v. Little Lake Misere Land Co., Inc.*,
   412 U.S. 580 (1973) ................................................................................... 8

*United States v. Morris*,
   No. CR 15-14-BLG-SPW, 2016 WL 6267954 (D. Mont. Oct. 26, 2016) ...... 4

*Wehner v. Syntex Corp.*,
   682 F. Supp. 39 (C.D. Cal. 1987) .......................................................... 11

*Whistler Invs., Inc. v. Depository Trust & Clearing Corp.*,
   539 F.3d 1159 (9th Cir. 2008) ........................................................ 13, 14

**<u>Statutes</u>**

42 U.S.C. § 5122(2) .......................................................................................... 13

42 U.S.C. § 5155(a) .......................................................................................... 14

42 U.S.C. § 5160(a) .................................................................................. 3, 4, 14

Cal. Pub. Res. Code § 4180 ............................................................................ 10

**<u>Rules</u>**

Fed. R. of Bankr. Proc. 3001(f) ......................................................................... 1

**<u>Other Authorities</u>**

3 Lawrence P. King, Collier on Bankruptcy § 502.02 (16th ed. 2011) ............... 2

Prosser and Keeton on Torts § 90 at 643-45 (5th ed. 1984) ............................... 9

Restatement (Second) of Torts § 821B(1) (1979) .............................................. 9

Case: 19-30088    Doc# 5753    Filed: 02/12/20    Entered: 02/12/20 15:34:54    Page 4 of
21

The United States responds to the Objection (Doc. 4943) and Supplemental Objection (Doc. 5319) asserted by the Official Committee of Tort Claimants (the "TCC") against the proofs of claim timely filed by the Federal Emergency Management Agency ("FEMA") in this case. As established below, the TCC's objections are not only contrary to the TCC's own assertions regarding PG&E's culpability for the wildfires it spawned, but they also substantively fail to prove that FEMA's proofs of claim are not cognizable as a matter of law. Although multiple TCC objections quarrel with the amount of recovery, none negate the *prima facie* existence of the claims themselves. For the reasons below, the Court should overrule TCC's objections in their entirety and leave all questions concerning the value of the claim for a later date, if contrary evidence is submitted.[1]

The TCC concedes, as it must, that an express statutory basis exists for FEMA's claims. Instead, the TCC relies on a bald, unsupported assertion that the test for PG&E's conduct for liability under the relevant statute requires proof of arson. No such standard exists. The relevant statute here is the Robert T. Stafford Disaster Relief and Emergency Assistance Act, codified at 42 U.S.C. §5121 *et seq.* ("Stafford Act"). It authorizes federal assistance to alleviate the suffering of those affected by natural disasters. But Stafford Act assistance is intended and available only as a fund of "last resort," when financial assistance is not available from insurance or other defined sources. Specifically, section 317 of the Stafford Act expressly authorizes the United States to recover costs from parties whose intentional actions or omissions cause a condition for which the Stafford Act is invoked and federal aid is provided. Common law public nuisance and unjust enrichment claims supplement the federal government's ability to recoup disaster assistance expenditures caused by another party's conduct.

It is under this legal framework that FEMA discharged its duty under the Stafford Act by filing timely proofs of its claims totaling more than $3.9 billion for assistance it provided arising out of the wildfires caused by PG&E's equipment. The TCC thereafter filed an Objection ("TCC Obj.") asking

---

[1] The United States notes that the several other parties have filed "Joinders" to the Omnibus Objections of the Official Committee of Tort Claimants in the days immediately preceding the United States' Response. *See*, *e.g.*, Doc. 5735 in Case No. 19-30088 (filed Feb. 12, 2020), Doc. 5734 in Case No. 19-30088 (filed Feb. 12, 2020), Doc. 5731 in Case No. 19-30088 (filed Feb. 11, 2020), Doc. 5639 in Case No. 19-30088 (filed Feb. 5, 2020). The Court should disregard any new or additional arguments set forth in these belatedly filed "joinders." However, to the extent that the Court considers any such arguments, the United States requests the opportunity to brief any issues the Court deems to be of importance to the Claim Objection at issue.

this Court to disallow and expunge the FEMA claims in their entirety (as listed on Exhibit A to the TCC's Objection) on a theory that FEMA cannot state a *prima facie* basis for its claims. The TCC later filed a Supplemental Objection, raising three additional defenses to FEMA's claims.

A timely-filed proof of claim constitutes prima facie evidence of the validity and amount of the claim. *See* Fed. R. of Bankr. Proc. 3001(f); *In re Holm*, 931 F.2d 620, 623 (9th Cir. 1991); *In re Heath*, 331 B.R. 424, 433 (B.A.P. 9th Cir. 2005) (Montali, J.); 3 Lawrence P. King, Collier on Bankruptcy § 502.02 (16th ed. 2011). "After an objection is raised, the objector bears the burden of going forward to produce evidence sufficient to negate the prima facie validity of the filed claim." *In re Pugh*, 157 B.R. 898, 901 (B.A.P. 9th Cir. 1993); *see also*, *e.g.*, *In re Eisen*, No. SA 06–10372–ES, 2007 WL 7532274, at *10 (B.A.P. 9th Cir. Oct. 26, 2007) ("A party objecting to the claim, here the Trustee, bears the burden of providing evidence to rebut the prima facie evidentiary presumption of the proof of claim."). As demonstrated below, the Court should reject each of the TCC's arguments because it has failed to meet this burden.

FEMA has properly stated claims under Section 317 of the Stafford Act in three timely-filed proofs of claim, *see* Claims Nos. 59692, 59734, and 59783, and provided more than sufficient facts to establish a *prima facie* basis for recovery. The TCC's arguments rely upon a novel reading of Section 317 that departs from the plain language of the statute, finds no support in case law, and is inconsistent with the prior positions that members of the TCC have taken in this proceeding.

The TCC likewise takes issue with FEMA's public nuisance and unjust enrichment claims, arguing that (1) FEMA has not adequately stated the basis for such claims; (2) the claims are barred by the so-called "free public services doctrine"; (3) they are preempted by federal law; and (4) they are "void" because they are inconsistent with federal policy. As demonstrated below, the Court may easily reject the TCC's arguments. FEMA has presented a *prima facie* basis to assert these federal common law claims. Moreover, even if state law applied to these claims, the Stafford Act contains no express preemption provisions, nor do the doctrines of conflict or field preemption apply to this case. Far from being "void" as inconsistent with federal law, FEMA's claims are directly in line with the Stafford Act's goals of providing a source of financial assistance as a "last resort"—only when other financial assistance is not available.

The TCC devotes much attention to the free public services doctrine, but its emphasis and reliance on that doctrine is misplaced. Established precedent readily recognizes an exception to that doctrine for public nuisance cases brought by government entities. Although the law is less developed with respect to the intersection of the free public services doctrine and unjust enrichment claims that arise from a public nuisance, the same policies underlying the public nuisance exception to the free public services doctrine should also apply to an unjust enrichment claim based upon analogous facts.

In its Supplemental Objection, the TCC asserts three additional defenses to FEMA's claims: (1) the equitable doctrine of "marshaling," (2) "unclean hands," and (3) statute of limitations. None of these arguments undermine the viability of FEMA's claims as a matter of law. Even if applicable, these defenses relate, at most, to the allowed amount of FEMA's claims (or in the case of the statute of limitations to some undefined subset of FEMA's claims), rather than to whether FEMA has a *prima facie* basis to assert these claims. More important, these supplemental objections require fact bound determinations, and the TCC offers no factual record sufficient to meet its burden of proof on these defenses. Rather, the TCC acknowledges that doing so would require additional discovery. As a result, these supplemental arguments are, at best, premature and not relevant to the issue now before the Court: whether FEMA has stated a *prima facie* basis for recovery.

For all of these reasons, this Court should reject each of the TCC's objections.

## I. FEMA HAS STATED A CLAIM UNDER SECTION 317 OF THE STAFFORD ACT

The TCC first asks this Court to disallow FEMA's claims under Section 317 of the Stafford Act on a theory that FEMA has failed to "allege facts sufficient to support legal liability." *See* TCC Obj. at 6. This argument is without merit. As an initial matter, although the TCC begins its argument with a long preamble concerning the free public services doctrine (*see* TCC Obj. at 6-10), the TCC ultimately acknowledges (*see* TCC Obj. at 9-10) that doctrine has no application when—as under the Stafford Act—"[r]ecovery is permitted . . . by statute or regulation." *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 324 (9th Cir. 1983). Rather, the parameters of such statutory claims are defined by the statute itself.

Section 317 of the Stafford Act, in relevant part, provides:

> Any person who intentionally causes a condition for which Federal assistance is provided under this Act or under any other Federal law as a

result of a declaration of a major disaster or emergency under this Act *shall be liable to the United States for the reasonable costs* incurred by the United States in responding to such disaster or emergency *to the extent that such costs are attributable to the intentional act or omission of such person which caused such condition.*

42 U.S.C. § 5160(a) (emphases added). The TCC nakedly interprets this language to require FEMA to prove that the Debtors committed arson—that is, that the Debtors deliberately started the wildfires. TCC Obj. at 12. Nothing in the Stafford Act supports such a narrow construction of the scope of liability, and the TCC cites no cases interpreting Section 317 of the Stafford Act—or any case construing the Stafford Act more generally—to support its novel reading of the statute.

Nor does such a narrow construction follow from the plain language of the statute. Instead, the plain language of the statute provides that FEMA may bring an action to recover costs "attributable to the intentional act *or omission* of such person which caused such condition" for which federal assistance is provided. 42 U.S.C. § 5160(a) (emphasis added). The statute thus does not require any overt action. Moreover, in the plain text of the statute, "intentionally" does not require a specific intent to cause harm. Rather, a party is considered to have "intentionally cause[d]" a condition under Section 317 of the Stafford Act in so far as the condition giving rise to FEMA's costs is attributable to an "intentional act *or* omission." In the phrase "intentional act or omission," the term "intentional" modifies both the term "act" and the term "omission." The use of the terms intentional act and intentional omission in the disjunctive expresses congressional intent that the two terms have different meanings. If Congress meant for these terms to have the same meaning, Congress would have excluded any reference to an intentional omission as unnecessarily duplicative. *See generally TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (discussing principles of statutory construction). The TCC cites no authority to the contrary.

As a result, a party "intentionally causes" a condition under Section 317 of the Stafford Act in so far as the condition giving rise to FEMA's costs is attributable to an intentional act or an intentional omission. The Stafford Act does not define an intentional omission. Therefore, the Court should apply the ordinary meaning of that term and hold that an intentional omission under Section 317 occurs when there has been a failure to act, with a deliberate or reckless disregard for the consequences of that failure to act. *See, e.g., Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273-74 (2013) ("We include as intentional not only conduct that the fiduciary knows is improper but also reckless conduct of the kind

that the criminal law treats as the equivalent."); *United States v. Morris*, CR 15–14–BLG–SPW, 2016 WL 6267954, at *3 (D. Mont. Oct. 26, 2016) (equating intentional omissions with reckless disregard). The facts provided in FEMA's proofs of claim, which FEMA attaches here as Exhibit A and incorporates by reference, are more than sufficient to meet this standard.[2]

For example, with respect to the Camp Fire, Cal FIRE investigators determined that electrical transmission lines, owned and operated by Pacific Gas and Electric Company (PG&E), located in the Pulga area, caused the Camp Fire. *See*, *e.g.*, Cal FIRE News Release, *CAL FIRE Investigators Determine Cause of the Camp Fire* (May 15, 2019) (Ex. B). The investigation also identified a second fire ignition site, which was also caused by PG&E electrical distribution lines. This second fire was consumed by the first. *Id.* The second ignition site was determined to be caused by vegetation contact with electrical distribution lines owned by PG&E. *Id.* The Camp Fire burned a total of 153,336 acres, destroying 18,804 structures and resulting in 85 civilian fatalities and several firefighter injuries. *Id.* Cal FIRE forwarded this investigative report to the Butte County District Attorney. *Id.* Similarly, Cal FIRE also determined that PG&E equipment caused the Butte Fire in Calaveras County in 2015 (which is included in a separate major disaster declaration under the Stafford Act), which ignited and burned 70,868 acres, damaged approximately 965 structures, and resulted in deaths and injuries. *Id.*

In addition, Cal FIRE investigators determined that electrical transmission lines owned and operated by PG&E caused the 37 Fire, Adobe Fire, Atlas Fire, Cherokee Fire, Norrbom Fire, Nuns Fire, Partrick Fire, Pocket Fire, Potter Valley Fire, Pythian Fire, Sulphur Fire, and Redwood Fire. *See* Cal FIRE News Release, *CAL FIRE Investigators Determine Causes of 12 Wildfires in Mendocino, Humboldt, Butte, Sonoma, Lake, and Napa Counties* (June 8, 2018) (Ex. C). Cal FIRE forwarded their investigative report to the County District Attorneys for potential prosecution for eight of these fires. *Id.* Cal FIRE investigators also determined that electrical transmission lines owned and operated by the

---

[2] The United States further relies upon and incorporates by reference the collection of publicly available reports and information from the California Department of Forestry and Fire Protection ("Cal FIRE") and California Public Utilities Commission ("CPUC") concerning the Butte Fire, Camp Fire, 2017 Northern California Wildfires. A collection containing examples of these reports are set forth in FEMA's proofs of claims and are summarized below. Additional reports are available at https://www.cpuc.ca.gov/wildfiresinfo/ and http://investor.pgecorp.com/wildfire-updates/default.aspx. If the Court should wish copies of each of these reports, the United States will provide them upon request.

Debtor caused the Honey Fire, La Porte Fire, Lobo Fire, and McCourtney Fire.  *See* Cal FIRE News Release, *CAL FIRE Investigators Determine Cause of Four Wildfires in Butte and Nevada Counties* (May 25, 2018) (Ex. D).  Again, Cal FIRE forwarded their investigative report to the County District Attorneys for potential prosecution for three of these fires.  *Id.*  Cal FIRE investigators also determined that electrical transmission lines owned and operated by the Debtor caused the Cascade Fire.  *See* Cal FIRE News Release, *CAL FIRE Investigators Determine Cause of the Cascade Fire* (Oct. 8, 2018) (Ex. E).

Moreover, in the years prior to Cal FIRE's findings in these wildfires, the California Public Utilities Commission's ("CPUC") documented continuous safety issues and omissions by PG&E.  On May 6, 2013, the CPUC Safety Enforcement Division received a report of the capital, operations, and maintenance expenditures proposed by PG&E, and found that PG&E's distribution system had "significant safety issues."  *Study of Risk Assessment and PG&E's GRC*, May 6, 2013 (Ex. F). Additionally, the report detailed that PG&E failed to effectively cure critical safety problems and manage risk appropriately.  *Id.* at S-6 and S-10 (The report found that although "PG&E made substantial progress in developing . . . risk assessment processes," "actual follow through at the lines of business has lagged."  Additionally the report details the omissions of critical safety functions in several areas, including that, "[t]here remain corporate cultural barriers that slow the process. . . [PG&E] will need to fully embrace to structure risk management as an integrated part of planning and budgeting", and that "PG&E needs to recognize that the effective implementation of the program requires an inducement of culture change in how the company assesses and uses risk considerations and a sense of greater urgency in moving toward its expected steady state.").  In 2014, an audit of PG&E's North Valley Division revealed significant safety violations, including 3,400 repairs completed past the required date between 2009 and 2014.  CPUC 2014 Audit (Ex. G).  FEMA contends that the Cal FIRE findings, along with the findings by the CPUC, show that PG&E was on notice of safety issues and continually failed to address them with reckless disregard for the consequences.

These identified safety issues should have commanded PG&E's attention.  Curing them would have required the company to allocate appropriate expenditures, but PG&E failed to allocate resources to remedy these life-threatening hazards.  Instead, in the years leading up to the wildfires at issue, PG&E

prioritized "large contributions to political candidates" over "replacing or repairing the aging transmission lines . . . and removing or trimming the backlog of hazard trees, and increasing vegetation management." *United States v. Pacific Gas and Electric Co.*, Case No. CR 14-00175, "Request for Offender PG&E to Supply Information" (July 10, 2019). In addition, in repeated instances over 25 years, PG&E actively misled regulators, withheld data, and hindered investigations, accumulating fines and judgments of $2.5 billion. *PG&E's Long Record of Run-Ins With Regulators: A 'Cat and Mouse Game'*, The Wall Street Journal (Sept. 5, 2019) (Ex. H).

As "omissions," PG&E failed to (1) conduct critically necessary repairs, (2) timely respond to safety issues, (3) manage risk effectively and (4) adequately maintain poles and attachments. PG&E's omissions were intentional under Section 317 of the Stafford Act, because PG&E either intentionally or recklessly disregarded that such an omission was likely to cause a condition for which FEMA assistance would be required. Specifically, PG&E knew that failure to take action left its equipment in a condition that posed a wildfire risk that could cause serious and widespread injury, and still PG&E failed to act.[3] That PG&E's omissions were intentional is further demonstrated through the affirmative acts it took to conceal those omissions—misleading regulators, withholding critical data, and hindering investigations in the years leading up to the wildfires at issue. Indeed, PG&E's efforts to cover up its deliberate disregard of fire hazards are themselves "intentional acts" contributing to the wildfire disasters that required FEMA's declarations of assistance.

The record thus reflects that PG&E intentionally caused conditions that directly led to multiple major disaster declarations, through its intentional acts or omissions. The TCC offers no contrary factual record with respect to any of the wildfires. This failure is not surprising, given that the TCC would likely be judicially estopped from making such an argument in light of its prior positions throughout this proceeding that the Debtors' knowing acts and omissions caused the wildfires at issue. *See, e.g.*, *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) (party judicially estopped from taking a position inconsistent with position taken in achieving a favorable

---

[3] These same omissions caused the greatest wildfire of its time in the previous year. The CPUC told PG&E in 2014 that their poorly maintained poles and attachments caused substantial property damage and repeated loss of life in California.

7

settlement); *Kale v. Obuchowski*, 985 F.2d 360, 362 (7th Cir. 1993) (same). For instance, members of the TCC have stated in previous briefing that "PG&E knowingly ran its transmission infrastructure to failure *with knowledge of the risk of catastrophic wildfire* in order to pay large dividends to its shareholders." *See* Camp Fire Claimants' Brief re Estimation at 2 (Doc. 79) (Ex. I); *see also id.* at 2 ("PG&E *knew* the Caribou Palermo line infrastructure was failing and did not take measures to prevent catastrophic wildfire."). The TCC should not be permitted to argue that the Debtors caused these wildfires through intentional or knowing acts and omissions and are thus liable for billions of dollars in damages, while also arguing that the United States cannot recover under the Stafford Act for those same knowing acts and omissions.

In any event, as demonstrated above, the factual record amply establishes the *prima facie* validity of FEMA's Section 317 claims. Conversely, the factual record is plainly insufficient to sustain the summary disallowance of billions of dollars in claims accrued due to Debtors' acts and omissions. The TCC's Claim Objection should be rejected in its entirety.

## II. FEMA HAS PROPERLY ASSERTED CLAIMS FOR PUBLIC NUISANCE AND UNJUST ENRICHMENT

The TCC contends that FEMA has not met its burden of demonstrating the *prima facie* validity for its public nuisance and unjust enrichment claims because (1) FEMA not adequately alleged those claims; (2) the free public services doctrine bars the claims as a matter of law; (3) the claims are preempted by federal law; and (4) the claims are void as violating federal policy. Each of these arguments fails as a matter of law.

### A. FEMA Has Properly Stated Claims For Public Nuisance and Unjust Enrichment

Without providing any evidence or extended argument, the TCC summarily states that FEMA has failed to properly allege claims for public nuisance and unjust enrichment. *See* TCC Obj. at 12. This argument is incorrect.

#### 1. Public Nuisance

As an initial matter, FEMA's claims for public nuisance on the facts of this case are governed by the federal common law of public nuisance. *See, e.g.*, *U.S. v. Kimbell Foods, Inc.*, 440 U.S. 715, 726 (1979) ("When Government activities 'aris[e] from and bea[r] heavily upon a federal . . . program, the

Constitution and Acts of Congress "'require' otherwise than that state law govern of its own force.") .")
(quoting *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 592 (1973); *see also Clearfield Trust Co. v. United States*, 318 U.S. 363, 366 (1943)).  Put another way, as the Ninth Circuit has stated in the context of public nuisance claims, "[c]laims can be brought under federal common law for public nuisance [] where the courts 'are compelled to consider federal questions which cannot be answered from federal statutes alone." *Native Vill. of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 856 (9th Cir. 2012) (quoting *City of Milwaukee v. Illinois & Michigan*, 451 U.S. 204, 314 (1981)).  Here, FEMA's recovery for public nuisance damages resulting from FEMA's administration of a federal program is not answered by the Stafford Act.  *Native Vill. of Kivalina*, 696 F.3d at 855 ("federal common law develops when courts must consider federal questions that are not answered by statutes").

"Under federal common law, a public nuisance is defined as an 'unreasonable interference with a right common to the general public." *Id.* (quoting Restatement (Second) of Torts § 821B(1) (1979)).  "A successful public nuisance claim generally requires proof that a defendant's activity unreasonably interfered with the use and enjoyment of a public right and thereby caused widespread harm." *Id.* "Public nuisance has traditionally been understood to cover a tremendous range of subjects." *Michigan v. Army Corps of Engineers*, 667 F.3d 765, 771 (7th Cir. 2011).  The Seventh Circuit summarizes its scope as follows:

> It includes interferences with the public health, as in the case of a hogpen, the keeping of diseased animals, or a malarial pond; with the public safety, as in the case of the storage of explosives, the shooting of fireworks in the streets, harboring a vicious dog, or the practice of medicine by one not qualified; with public morals, as in the case of houses of prostitution, illegal liquor establishments, gambling houses, indecent exhibitions, bullfights, unlicensed prize fights, or public profanity; with the public peace, as by loud and disturbing noises, or an opera performance which threatens to cause a riot; with the public comfort, as in the case of bad odors, smoke, dust and vibration; with public convenience, as by obstructing a highway or a navigable stream, or creating a condition which makes travel unsafe or highly disagreeable, or the collection of an inconvenient crowd; and in addition, such unclassified offenses as eavesdropping on a jury, or being a common scold.

*Id.* (citing Prosser and Keeton on Torts § 90 at 643-45 (5th ed. 1984).

FEMA has plainly stated a claim for public nuisance under these standards.[4]  The Debtors created conditions that resulted in the Butte, Camp, and 2017 Northern California Wildfire claims, as was demonstrated for FEMA's section 317 claims, including: the Cal FIRE investigation concluding that Debtors equipment caused the fire, the CPUC's identification of Debtors' repeated failures to cure safety issues and omissions, and Debtors' apparent failure to effectively monitor, maintain, test, inspect, design, or de-energize power lines.  These wildfires also caused severe harm to a substantial number of people.  *See supra* at Section I.  The smoke contained toxic particulate matter that severely affected air quality, impairing the activities, ability to breathe, and health and safety of millions of people across the state.  *Id.*  Tens of thousands of people lost their homes and cherished possessions, while entire towns disappeared in the conflagrations.  *Id.*

Indeed, with respect to the Camp Fire, PG&E transformed a thriving community into millions of tons of toxic debris and ash.  *Id.*  Unfortunately, many people lost their lives, unable to escape the Camp Fire.  Consequently, it is hard to imagine any manmade disaster that could more severely disrupt and injure the comfortable enjoyment of life or property of such a substantial number of people.  The social utility of easy access to electricity does not outweigh the harm of a distribution system that causes massive and destructive fires.  With the State of California's resources overwhelmed, FEMA stepped in to help survivors recover from the largest fire disaster in the history of the State of California.  FEMA provided immediate financial assistance to individuals including temporary housing, direct housing, and crisis counseling.  FEMA also provided financial assistance through its public assistance program, providing financial assistance to rebuild and protect public infrastructure, and to remove debris and toxic

---

[4] The United States notes that even if California law supplied the standard for FEMA's public nuisance claims as the TCC contends, FEMA has set forth in its proof of claim more than sufficient facts to state a prima facie basis for unjust enrichment claims under California law.  "Under California law, a nuisance is 'anything that is injurious to health …, or an obstruction to the free use of property, that interferes with the comfortable enjoyment of life or property . . . '" *Schaeffer v. Gregory Village Partners*, 105 F. Supp. 3d 951, 966 (N.D. Cal. 2015) (citation omitted)).  An action or condition legislatively declared a public nuisance is a nuisance per se.  *City of Monterey v. Carrnshimba*, 215 Cal. App. 4th 1068, 1086 (Cal. Ct. App. 2013). "[W]here the law expressly declares something to be a nuisance, … no inquiry beyond its existence need be made …." *Beck Dev. Co. v. So. Pac. Transport. Co*., 44 Cal. App. 4th 1160, 1207 (Cal. Ct. App. 1996) (citations omitted).  To constitute "nuisance per se[,] the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law." *Id.*  Any uncontrolled fire, regardless of its origin, is a public nuisance by reason of its menace to life and property.  Cal. Pub. Res. Code § 4180.

Case: 19-30088   Doc# 5753   Filed: 02/12/20   Entered: 02/12/20 15:34:54   Page 14 of 21

substances from destroyed public, private, and commercial properties.  The Debtors' conduct, and lack of oversight of the instrumentality causing the public nuisance—namely PG&E's electricity distribution system—caused FEMA's damages described in its proof of claims.  These facts are more than sufficient to state a claim for public nuisance.  The TCC cites no authority to the contrary.

## 2.  Unjust Enrichment

Restitution for unjust enrichment is also an appropriate remedy for the Debtors' conduct.  As with public nuisance, FEMA's unjust enrichment claims are governed by federal common law.  *See*, *e.g.*, *United States ex rel. Mei Ling v. City of Los Angeles*, 2018 WL 3814498, at *33 (C.D. Cal. July 25, 2018) ("the federal common law already recognizes claims for unjust enrichment").[5]  Because federal common law applies, "California's substantive and procedural requirements" related to claims for unjust enrichment do not apply.  *Mei Ling*, 2018 WL 3814498, at *33.  Furthermore ordering restitution is "within the recognized power and within the highest tradition of a court of equity."  *Wehner v. Syntext Corp.*, 682 F. Supp. 39, 40 (C.D. Cal. 1987).  Restitution is appropriate because it is inequitable for PG&E to retain the benefit of FEMA's assistance without paying for its value.  *See*, *e.g.*, *United States v. Park*, 389 F. Supp. 3d 561, 581 (N.D. Ill. 2019); *Khasin v. R.C. Bigelow, Inc.*, Case No. 3:12–cv–02204–WHO, 2015 WL 4104868, at *3 (N.D. Cal. July 7, 2015).  The Debtors have benefitted from FEMA's taxpayer funded programs that aided wildfire survivors.  If the Debtors do not pay restitution to the federal government, they privately gain, by making the government shoulder the financial aftermath of a fire caused by the Debtors' conduct.  In short, in the days, weeks, and months following these disasters when Debtors visited the impacted areas and saw scores of FEMA personnel, heavy equipment trailers, temporary trailers, and other sign of FEMA's response, did it really think a bill for all of those services would never come due?  The answer is plainly no.

Likewise, FEMA alleges that the Debtors have received unjust enrichment by retaining the cost savings that resulted from its decision to leave safety issues unaddressed.  Again, instead of curing safety issues, the Debtors misled regulators, withheld data, hindered investigations, prioritized political

---

[5] The United States maintains that the facts set forth below also meet the standards under California state law.

11

contributions, and enriched shareholders with over $1 billion dollars in dividends.[6] *See supra* at Section I. Providing restitution removes some of the financial benefit and negative incentives of these bad decisions. FEMA has more than met its burden of demonstrating the *prima facie* validity of its unjust enrichment claims. Again, the TCC offers nothing to the contrary other than summarily claiming that FEMA has not stated a claim.

## B. The Free Public Services Doctrine Does Not Bar FEMA's Common Law Claims

The TCC next argues that the free public services doctrine is a bar to any public nuisance or unjust enrichment claim brought by the federal government for costs associated with its disaster recovery response. *See* TCC Obj. at 13. When summarizing the law concerning the free public services doctrine, however, the TCC fails to mention that courts have long recognized that exceptions to the free public services doctrine exist for certain claims brought by government entities. For example, the Ninth Circuit, in a case relied upon by the TCC for the existence of the free public services doctrine itself (*see* TCC Obj. at 9), explicitly acknowledged an exception to the doctrine when "the acts of a private party create a public nuisance which the government seeks to abate." *City of Flagstaff v. Atichison, Topeka & Santa Fe Railway Co.*, 719 F.2d 322, 324 (9th Cir. 1983). Nor is *Flagstaff* an isolated case. Numerous courts have reached the same result as the Ninth Circuit and permitted government entities to bring public nuisance claims for clean-up expenses associated with conditions created by the acts of a private party. *See, e.g., Town of East Troy v. Soo Line Railroad Co.*, 653 F.2d 1123, 1126 (7th Cir. 1980) (permitting government recovery for expense in cleaning up ground water pollution); *City of Evansville v. Kentucky Liquid Recycling, Inc.,* 604 F.2d 1008, 1010 (7th Cir. 1979) (permitting government recovery for costs of cleanup of toxic wastes discharged into drinking water supplies); *United States v. Illinois Terminal Railroad Co.*, 501 F. Supp. 18, 20 (E.D. Mo. 1980) (permitting government recovery for removal of abandoned bridge piers).[7] Here, of course, the United States is seeking to recover in public nuisance from the private party that created the nuisance as set forth in the previous section.

---

[6] In the PG&E criminal proceeding, Judge Alsup noted that inter-company dividends from PG&E to its holding company in 2016 and 2017 resulted in dividends to the parent's common shareholders "during 2017 and 2016 amount[ing] to one billion dollars and $921 million, respectively." Second Order to Show Cause Why PG&E's Conditions of Probation Should Not Be Modified at 7, (entered in *United States v. PG&E,* No. CR 14-0175 WHA (Doc. 1027) (Mar. 5, 2019)) (Ex. J).

[7] Courts have also permitted the government, despite the free public services doctrine, to recover in

Case: 19-30088   Doc# 5753   Filed: 02/12/20   Entered: 02/12/20 15:34:54   Page 16 of 21

Thus, the free public service doctrine does not defeat FEMA's public nuisance claims; they arise under a well-defined exception to this common law bar. Although none of the cases recognizing these exceptions have explicitly addressed a claim for unjust enrichment, the rationale for the public nuisance exception counsels in favor of allowing an unjust enrichment claims here as well. The TCC articulates no basis for treating an unjust enrichment claim differently than a public nuisance claim based on the same factual circumstances.

### C. FEMA's Public Nuisance and Unjust Enrichment Claims Are Not Preempted

The TCC's assertion that FEMA's public nuisance and unjust enrichment claims are preempted by the Stafford Act, *see* TCC Obj. at 13, is mistaken. As an initial matter, given that FEMA is asserting federal common law claims for public nuisance and unjust enrichment, *see* supra at Section II.A, the TCC's preemption arguments based on state law necessarily fail. But even if the Court were to hold that California state law applies to FEMA's public nuisance and unjust enrichment claims, such claims are plainly not preempted for the following reasons. The Stafford Act contains no express preemption provision, and the TCC cites none. Thus, the TCC is left to argue implied preemption. The TCC is not entirely clear whether both conflict or field preemption apply in this case or its arguments are limited to field preemption. *See* TCC Obj. at 13-15. In any event, neither doctrine applies here.

In determining whether conflict preemption applies, courts consider whether current compliance with a federal law and the state standard at issue is possible. Specifically, "[c]onflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives." *Whistler Investments, Inc. v. Depository Trust & Clearing Corp.*, 539 F.3d 1159, 1164 (9th Cir. 2008). There is no such clash of state and federal laws here. It is certainly possible for the Debtors to comply with the requirements of the Stafford Act and satisfy the standards for public nuisance and unjust enrichment.

---

quasi-contract costs of responding to disasters in situations in which "the government incurs expenses to protect its own property." *City of Flagstaff*, 719 F.2d at 324; *United States v. Chesapeake & Ohio Railway Co.*, 130 F.2d 308, 311 (4th Cir. 1942) (permitting government to seek recovery in quasi-contract for expenses incurred in fighting fire which threatened national forest). The Ninth Circuit has explained that such suits "fall into distinct, well-defined categories" that are exceptions to the free public services doctrine. *City of Flagstaff*, 719 F.2d at 324.

Case: 19-30088    Doc# 5753    Filed: 02/12/20    Entered: 02/12/20 15:34:54    Page 17 of 21

1    law.  Nor do state law public nuisance or unjust enrichment claims that are supplementary in nature to

2    the Stafford Act pose an obstacle to the accomplishment of the objectives that Congress set forth in the

3    Stafford Act.  The Stafford Act is clear that assistance under the Act is supplementary.  42 U.S.C.

4    § 5122(2).  The Act expects FEMA to offset taxpayer costs from third parties responsible for the event

5    that resulted in the need for a major disaster declaration.  42 U.S.C. § 5160(a).  The Act further

6    mandates that FEMA avoid duplicating resources available to applicants from insurance and other

7    sources.  42 U.S.C. § 5155(a).  The TCC has thus not articulated any basis for applying conflict

8    preemption in this case.

9         With respect to the TCC's apparent field preemption argument, such "preemption is implied

10   when Congress 'so thoroughly occupies a legislative field,' that it effectively leaves no room for states

11   to regulate conduct in that field."  *Whistler*, 539 F.3d at 1164.  That is plainly not the case here.  The

12   purpose of the Stafford Act is not to limit the set of remedies to the federal government to recover

13   disaster relief.  Instead, it provides a mechanism for which the federal government can be repaid for

14   disaster benefit disbursements when there is another source of financial assistance.  As set forth above,

15   federal common law supplements these claims.  Nothing in the text or legislative history cited by the

16   TCC comes close to meeting their burden that field preemption applies to these claims.  Accordingly,

17   this argument should be rejected as well.

18        **E.    FEMA's Claims Are Not "Void" As Violating Federal Policy**

19        The TCC's brief also contains a two sentence assertion that FEMA's claims fail on "policy

20   grounds" because "FEMA's claims, if successful, would take money from the wildfire victims in

21   contravention of such framework."  TCC Obj. at 15.  The TCC provides no support for this assertion

22   because it is incorrect.  First, under the Debtors' plan supported by the TCC, the Debtors, not the

23   victims, are paying the claims through their funding of the fire trust.  The plan requires FEMA and

24   wildfire victims to share in that trust, but that is the choice the Debtors and the TCC made in formulating

25   the plan without seeking FEMA's input.  They could have just as easily separately classified FEMA's

26   claims and not channeled them to the trust.  At bottom, the TCC's objections are about the treatment and

27   classification of the FEMA claims rather than their validity.  Second, the Stafford Act provides for

28   federal assistance to alleviate the suffering of those affected by natural disasters and to promote

measures that reduce the risk of future loss to life and property from natural hazards. Contrary to the TCC's implication, Stafford Act assistance is intended and available as a fund of "last resort" where other funds are unavailable. This is consistent with the scarce resources available for disaster relief, the many individuals who badly need such relief, and the public equities concerned. Filing proof of claims consistent with the statutory mandates is not in violation of public policy.

## IV. THE TCC'S SUPPLEMENTAL ARGUMENTS ARE PREMATURE AND IRRELEVANT TO THE ISSUE BEFORE THE COURT

The TCC has filed a Supplemental Objection in which they make three additional arguments, all of which fail for related reasons. First, the TCC contends that FEMA's claims should be disallowed under the doctrine of equitable marshalling. TCC Supp. Obj. at 2. Second, they argue FEMA's claims should be disallowed under the doctrine of unclear hands. TCC Supp. Obj. at 3. Third, the TCC "raise[s] [] all statute of limitations defenses available under law," without specifying to which claims such a defense would apply. TCC Supp. Obj. at 4. The fatal flaw with each of these supplemental arguments, however, is that, even if meritorious, which they are not, they do not provide a complete bar to FEMA's claims, as the TCC asserts. Instead, each of these arguments concerns a partial defense that could, if ultimately applicable and proven after developing the applicable factual record, provide a reduction in the quantum of FEMA's recovery. But none of these defenses are a complete bar to recovery for FEMA's claims and the TCC has failed to develop the facts necessary to assert these arguments even as partial defenses. Again, the current factual record does not support the summary disallowance of any of FEMA's claims.

Take, for example, the TCC's argument with respect to equitable marshalling. The gravamen of the TCC's argument is that the doctrine of equitable marshalling should bar FEMA's recovery because FEMA potentially also has duplication of benefits claims under Section 312 of the Stafford Act against public entities and state agencies in addition its Section 317 and state law claims against the Debtors. *See* TCC Supp. Obj. at 2. But equitable marshalling, even where applicable, does not act as a complete bar on recovery, but rather calls for a reduction in recovery in proportion to the amount available from another fund. *See*, *e.g.*, *St. Paul Fire & Marine Ins. Co. v. Fort Vancouver Plywood Co.*, 921 F.2d 221, 223 (9th Cir. 1990). The TCC fails to present the factual record that would be necessary for the United

States, and this Court to assess this partial defense. Rather, they admit that such a defense would ultimately require additional discovery. TCC Supp. Obj. at 2-3. Thus, this argument is irrelevant to the issue before the Court of whether FEMA has stated a *prima facie* basis for its claims. If the TCC wishes to bring an argument with respect to equitable marshalling after developing an appropriate factual record, they are free to do so in the future. But, at this juncture, they have provided no factual basis for the Court to apply such a defense.

Similarly, with respect to the TCC's argument that FEMA's claims should be reduced because "FEMA failed to exercise an appropriate level of care in providing services" and thus has "unclean hands," TCC Supp. Obj. at 3, the TCC fails to provide the factual support necessary to assert such a partial defense. In fact, they acknowledge that to make such an argument the parties would need to conduct further discovery to develop the factual record to present the issue to this Court. *Id.* Thus, this argument is likewise premature and irrelevant to the Claim Objection before the Court.

Finally, in conclusory fashion, the TCC "raises any all [sic] statute of limitation defenses available under applicable law." TCC Supp. Obj. at 4. The TCC's lone sentence on the subject that follows the assertion, however, mentions only one fire and then merely alleges but does not prove a time bar. The United States notes, for example, that the Camp Fire started on November 8, 2018, and thus no statute of limitations in 28 U.S.C. § 2415(b), could possibly have run. If the TCC wishes to bring individual statute of limitations arguments against individual FEMA claims based upon a complete factual record, they are free bring such an objection in the future. But a two sentence assertion without any citation to the factual record cannot possibly provide the basis for disallowing any of FEMA's claims. The Court should thus reject this argument as well.

## **CONCLUSION**

For all of the foregoing reasons, the Court should deny the TCC's Objection to the Claims filed by the FEMA is this proceeding.

Dated: February 12, 2020                          Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General
DAVID L. ANDERSON (CABN 149604)
United States Attorney
/s/ Michael Tye
RUTH A. HARVEY
Director
KIRK MANHARDT
Deputy Director
MATTHEW J. TROY (GABN 717258)
MICHAEL QUINN (DCBN401376)
Senior Trial Counsel
MICHAEL TYE (DCBN 488101)
Trial Attorney

Attorneys for United States