Thomas Tosdal
TOSDAL LAW FIRM
777 S. Highway 101, Suite 215
Solana Beach CA 92075
Telephone: (858) 704-4709
Facsimile: (888) 740-3859
Email: tom@tosdallaw.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In Re:<br><br>PG&E CORPORATION and PACIFIC GAS & ELECTRIC COMPANY,<br><br>Debtors. | Case No. 19-cv-05257-JD<br>Bankr. Case No. 19-30088-DM<br><br>**CAMP FIRE CLAIMANTS' BRIEF RE ESTIMATION**<br><br>Date:  October 7, 2019<br><br>Time:  10:00 a.m. |

## 1.   Introduction

This brief is submitted on behalf of several hundred persons and entities harmed by the 2018 Camp Fire.  The Camp Fire was by far the most destructive of all the wildfires now before the Court.

The Court is alerted to two claims requiring damages estimation for which prior PG&E settlements will not provide a benchmark: (1) punitive damages for causing the Camp Fire, and (2) the economic and non-economic damages arising from the destruction of the Paradise and Magalia communities.

## 2.  Punitive Damages Must Be Estimated For The Camp Fire

The facts giving rise to the worst human-caused disaster in state history – the Camp Fire – scream out for punitive and exemplary damages. Many persons harmed by the

1

1   Camp Fire have filed and will file claims for punitive damages, and their state court

2   complaints allege punitive damages in factual detail.

3       A claim in bankruptcy is deemed allowed unless objection is made by a proper

4   party.  (11 U.S.C. § 502(a).)  In the event of an objection, the Court must estimate the

5   disputed claim, including a claim for punitive damages. (11 U.S.C. § 502(c); In Re Roman

6   Catholic Archbishop Of Portland Oregon, 339 B.R. 215, 227 (Bankr. D. Or. 2006).  "Nothing

7   in § 502 provides for disallowance of punitive damages.  Therefore, punitive damages may

8   not be categorically disallowed under § 502."  (*Ibid.*)

9       **A.  PG&E's Conscious Disregard of The Safety of the Public**

10      The gist of the punitive damages case is PG&E knowingly ran its transmission

11  infrastructure to failure with knowledge of the risk of catastrophic wildfire in order to pay

12  large dividends to its shareholders. The result: the Camp Fire.

13      The Camp Fire ignited at 6:30 a.m. on November 8, 2018, when a J hook attaching a

14  115,000 volt conductor on the Caribou Palermo transmission line failed, causing the

15  energized conductor to fall onto the century old metal tower holding the lines, resulting in

16  sparks which ignited the vegetation below.

17      Before the fire, PG&E knew the Caribou Palermo line infrastructure was failing and

18  did not take measures to prevent catastrophic wildfire.  In 2010, a PG&E senior vice-

19  president (Salas) warned PG&E about a potential catastrophic risk of fires "caused by aged

20  equipment failure that PG&E had not taken timely action to replace." Also in 2010, an

21  outside engineering firm engaged by PG&E (Quanta Technology) wrote a report outlining

22  age, corrosion, and metal fatigue as the primary causes of failure of transmission tower

components and recommended PG&E perform comprehensive climbing inspections of its

transmission towers at three to five year intervals.

Five towers on the Caribou Palermo line collapsed in 2012.  A year before the Camp

Fire, a contractor employee reported to PG&E the following occurrence while recoating a

different tower on the line. From PG&E documents:

> "From working position, he reached to reposition himself grasping a piece of flat
> cross bracing when the "J" hook hardware used to secure the flat bracing to the
> tower leg failed and broke at the "J" part of the "J" hook hardware.  It appears as
> though about 20% of the thickness of the bolt had been compromised through
> corrosion…"

Despite this knowledge PG&E did nothing to prevent the aged infrastructure on the

line from failing and causing catastrophic wildfire.  PG&E failed to perform a climbing

inspection on the subject tower (#22:227) or any of the towers nearby before the fire. PG&E

failed to inspect the J hooks on the line for corrosion and metal fatigue and failed to replace

those hooks in danger of failing.  This failure was based on company policy.  PG&E's

Transmission Overhead Steel Structures policy stated its "strategy" for "low risk"

transmission structures was "Run to Failure" with "No Maintenance."  "Low risk" was a

shorthand for saving maintenance money.

PG&E's failure to perform basic maintenance on the Caribou Palermo line was the

result of its conscious disregard for the safety of the local communities. Despite the age of

the line, its location in the wind driven Feather River Canyon, and its proximity to Paradise

and Magalia, where homes have been nestled in the forest since shortly after the Gold

Rush,  PG&E did not consider the Caribou Palermo line to be high risk.  PG&E's reasoning

defies logic; according to a 2104 PG&E document:

"Caribou Palermo: [less than] 200 score because there is no likely environment event (if structures fail, it will be likely due to heavy rain and no wildfires are possible then).  Also no likely public safety issue with live wires down because it is a remote area.  Reliability score is not that high because although the likelihood of failed structures is high, the affected customers are likely in the order of [more than] 1K."

Only a few miles from the line, the Town of Paradise had 26,000 residents and Magalia 11,000 more.  PG&E's wishful thinking about rain being the likely cause of failure is belied by PG&E's warning to Paradise residents shortly before the fire that it may shut down distribution lines because of fire danger from predicted high winds.

Ironically, operation of the Caribou Palermo line was not necessary to provide electricity to the area, as PG&E discontinued operation of the line after the fire and used other available resources to provide power.

No government agency has yet published a report on the cause of the Camp Fire. PG&E admits the broken J hook on its transmission line caused the fire. (9/10/19 R.T. 24: 5-16) But PG&E does not admit either negligence or its appalling disregard for human life and property that caused the fire. The District Attorney for Butte County is conducting a criminal investigation of PG&E for the Camp Fire.

Where did the money for the much needed maintenance of PG&E's transmission infrastructure go?  To its shareholders, the largest of which are institutional investors, in dividends.  In 2017, PG&E distributed $1.021 billion in dividends.  A total of $5.154 billion in dividends was distributed between 2012 and 2017.

## B.  The Catastrophic Harm Caused By The Camp Fire

The harm caused the residents of Paradise and Magalia was catastrophic in every sense of the word. With little warning, residents fled frantically for their lives through the fire with little else but their children and the shirts on their backs.  Eighty-five people

didn't make it and burned to death in place.  The press describes these communities as "a postapocalyptic wasteland."

The numbers are staggering: 13,972 residences destroyed, upwards of 90% of the pre-fire total, along with 4,293 out-buildings. An additional 528 commercial buildings were also destroyed, among them the emergency room and hospital, medical and dental offices, assisted living and nursing facilities, senior housing, many businesses, most of the schools, accounting offices, churches, grocery stores, shops and restaurants.  The fire contaminated the Town of Paradise's water system, requiring its replacement, which will take a few years to accomplish.

Some residents are still in trailers, tents, hotel rooms, and friends' homes. Those who remain or return face millions of tons of toxic debris, thousands of widow maker burned trees, a closed hospital and schools, the absence of municipal water service, and destroyed septic systems.

### C.  PG&E's Likely Liability For Punitive Damages For the Camp Fire

The Court has articulated a three step inquiry for purposes of estimation:

(1) Would a California state court recognize a particular claim under state law?

 (2) Does the fact pattern fall into the zone of potential liability?

(3) How many people would be covered by this claim?

(9/10/19 R.T. 16:3-16.)

The Camp Fire punitive damages claim will meet these criteria for over 30,000 people. Where it is established a defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.  (*Cal. Civil Code* § 3294(a).) "Malice"

means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights and safety of others. (*Id.* at § 3294(c)(1).) "Oppression" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights. (*Id.* at § 3294(c)(2).) Negligent conduct rising to the level of malice or oppression warrants an award of punitive and exemplary damages. *Seimon v. So. Pacific Transportation Co.* (1977) 67 Cal. App. 3d 600, 606-10.

What's more, PG&E is likely liable for punitive damages under California's *Public Utilities Code* section 2106, which provides a court may award exemplary damages when it finds a public utility willfully acted or failed to act in violation of state law or a PUC order.

PG&E's conduct giving rise to the Camp fire and the harm caused by the fire warrant a hefty estimation of punitive damages. Prior PG&E settlements will not provide a benchmark for these damages.

### C.  Suggested Procedure For Estimating Camp Fire Punitive Damages

The most efficient procedure for estimating Camp Fire punitive damages will involve focused testimony of a Paradise resident or two about the frantic efforts of thousands of people to escape the fast raging Camp Fire, a witness about the extent of damage to Paradise and Magalia, a utility electrical engineer to summarize the progressive failures of PG&E to maintain the Caribou Palermo line, and documentary submission by a materials scientist about the reason for the J hook failure. Other evidence, such as PG&E's policies of run to failure, maintenance failures, profits and financial condition, can be submitted by deposition excerpts and company documents. The submission of this evidence should take one day.

### 3. Damages For Loss of Community and Essential Services

Every community burned by a PG&E fire suffered harm to its fabric. The difference posed by the Camp Fire is the sheer magnitude of the harm.  Two entire communities were destroyed, and most residents displaced.  The harm suffered by residents went beyond harm to their individual properties to a loss of community and essential services. Essential services such as potable water, functional septic systems, hospitals, nursing centers and other essential services are gone and will not be back for a long time. In the words of resident and PG&E's counsel, these communities were "decimated" by the Camp Fire. (9/10/19 R.T. 24:5-7)

Loss of community and essential services is a harm but not a measure of damages. The damages suffered by this harm are both economic and non-economic. Emotional distress, mental anguish, and annoyance and discomfort damages are recoverable for the torts of trespass and nuisance arising from an invasion of a property interest. (*Hensley v. San Diego Gas & Electric Company* (2017) 7 Cal. App. 5th 1337, 1356.) Trespass is an unauthorized entry onto the land of another.  (*Id.* at 1355.) A negligently caused fire which causes damage to a person's property constitutes a trespass.  (*Elton v. Anheuser-Busch Beverage Group, Inc.,* (1996) 50 Cal. App. 4th 1301, 1307.)

Nuisance is an unreasonable interference with the use and enjoyment of a person's property.  (*Hensley* at 1156.) There are two types of nuisance, public and private. A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal.  (*Cal. Civil Code* § 3480.)  Every nuisance not a

public nuisance is a private nuisance.  (*Cal. Civil Code* § 3481.)  Both public and private nuisances are subject to civil actions.  (*Cal. Civil Code* §§ 3491, 3501.)

The measure of damages in tort is the amount which will compensate for all of the detriment proximately caused by the tort, whether or not it could have been anticipated. (*Cal. Civil Code* § 3333.)  Once a cause of action for trespass or nuisance is established, a property owner may recover for annoyance and discomfort, including emotional distress or mental anguish, proximately caused by the trespass or nuisance. (*Hensley* at 1348-9.) Recovery is not limited to mental distress arising from the property damage itself.  Rather, mental distress arising from the activity giving rise to the trespass or nuisance delimits the scope of damages. (*Hensley*  at 1351 (fear for family's safety after learning of fire while traveling, stress watching neighboring homes burn from a distance held compensable); *Alonso v. Hills* (1950) 95 Cal. App. 2d 778, fear from hearing nearby blasting held compensable.)

Economic damages from the loss of community and essential services arise from the need of residents to pay for potable water until the municipal water systems are replaced, increased transportation costs to essential medical and other services, and to remove thousands of widow maker trees for neighborhood safety.

### A.  Suggested Procedure For Estimating These Damages

An efficient procedure for estimating these damages will be testimony by a percipient witness about the scope of community and essential service damage to Paradise and Magalia and an economist to present the economic loss.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4.   **Conclusion**

For these reasons, the Camp Fire Claimants request the Court include in its estimation (1) punitive damages for causing the Camp fire, and (2) economic and non-economic damages caused by the loss of the communities of Paradise and Magalia and their essential services.

Dated:  September 29, 2019

TOSDAL LAW FIRM

By:   _/s/  Thomas Tosdal_

_____

Thomas Tosdal
Attorneys for Camp Fire Claimants