IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> PACIFIC GAS AND ELECTRIC COMPANY, <br><br> Defendant. <br> _____/ | No. CR 14-0175 WHA <br><br> **SECOND ORDER TO SHOW CAUSE WHY PG&E'S CONDITIONS OF PROBATION SHOULD NOT BE MODIFIED** |

This is a revised order to show cause why the Court should not modify PG&E's conditions of probation. This order takes into account the large number of submissions to date and supersedes the order to show cause issued January 9. The essence of the problem is that the offender's unsafe conduct led to a deadly pipeline explosion and to six felony convictions (described below). Now, the offender's unsafe conduct has led to recurring deadly wildfires caused by its electrical system. The question is the extent to which the offender's conditions of probation should be modified to protect the public from further crimes and to help rehabilitate the offender. 18 U.S.C. §§ 3553(a)(1), (a)(2). Now follow the details.

\*      \*      \*

In September 2010, a high-pressure gas transmission pipeline owned and operated by defendant Pacific Gas and Electric Company ruptured in a residential area of San Bruno. The escaping gas ignited an inferno that killed eight individuals and injured 58 others. The fire also damaged 108 homes, 38 of which were completely destroyed. The National Transportation

Safety Board immediately began to investigate the explosion, examining the cause of the explosion, the characteristics and history of the failed pipeline, the adequacy of PG&E's emergency response, and PG&E's operations. Although the jury in PG&E's criminal case was not tasked with determining the cause of the explosion, the NTSB concluded that PG&E's Integrity Management Program was deficient, ineffective, and a probable cause of the San Bruno explosion. The investigation further revealed that PG&E lacked complete and accurate records for its gas transmission pipelines despite receiving notice of recordkeeping deficiencies through employees, regulatory agencies, and third-party auditors and consultants (PSR ¶¶ 13–19).

In August 2016, a jury convicted PG&E on five felony counts of knowingly and willfully violating Natural Gas Pipeline Safety Act safety standards requiring PG&E to identify, assess, prioritize and remediate threats to the integrity of those segments of gas transmission pipelines that could, in the event of leak or failure, pose a significant risk of injury or death. A jury also convicted PG&E of one felony count of obstructing the NTSB's investigation arising out of the San Bruno explosion. The felony judgment that followed imposed the largest fine allowed by law and several conditions of probation, including a prohibition against committing another federal, state, or local crime, and a requirement to notify the probation officer immediately upon learning of any major civil litigation, criminal prosecution, or administrative proceeding against PG&E, or any investigation or formal inquiry by governmental authorities regarding the organization. The felony judgment also provided for an independent Monitor to oversee certain aspects of PG&E's business (Dkt. Nos. 884, 922).

Over the last decade, wildfires have burned a large percentage of California, almost three percent in the last two years alone. In October 2017 in particular, wildfires ravaged large swaths of Northern California. CAL FIRE has so far determined that PG&E equipment or lines started seventeen of these major October 2017 wildfires: the Cherokee, Honey, and La Porte fires in Butte County; the Blue fire in Humboldt County; the Sulphur fire in Lake County; the Redwood fire in Mendocino County; the Atlas and Partrick fires in Napa County; the Lobo and McCourtney fires in Nevada County; the Cascade fire in Yuba County; and the 37, Adobe,

1   Norrbom, Nuns, Pocket, and Pythian fires in Sonoma County. These seventeen fires alone
2   burned 193,743 acres, destroyed 3,256 structures, and killed 22 people.

3   In connection with eleven of these fires, CAL FIRE referred its investigation to the
4   appropriate district attorney's office based on evidence of alleged violations of state law. Of
5   these eleven referrals, at least three fires involved violations of Section 4293 of the California
6   Public Resources Code, which statute requires utilities to maintain a clearance of specified
7   distances "in all directions between all vegetation and all conductors which are carrying electric
8   current" and to trim or remove hazardous trees or limbs that may contact the line from the side
9   or fall on the line. Following the October 2017 wildfires (and before the CAL FIRE findings),
10  the Monitor, the federal prosecutor, and PG&E agreed that the Monitor would begin to evaluate
11  aspects of PG&E's electric-distribution operations, including PG&E's vegetation-management
12  plan, electric pole and equipment maintenance and inspection programs, and emergency
13  response and restoration practices (Dkt. Nos. 956-54, 956-55, 956-56, 958).[*]

14  In November 2018, the Camp Fire in Butte County killed 86 people and burned 18,793
15  structures. A November 2018 order herein then asked the parties to submit an accurate and
16  complete statement of PG&E's role, if any, in causing and reporting California's recent
17  wildfires. PG&E's response, filed in December 2018, spanned hundreds of pages. The Court
18  reviewed this material, asked for follow-up, and received hundreds of pages of additional
19  materials. An order then set forth a tentative finding that the single most recurring cause of the
20  large 2017 and 2018 wildfires attributable to PG&E's equipment had been the susceptibility of
21  PG&E's distribution lines to trees or limbs falling onto them during high-wind events (such as
22  the annual Santa Ana winds). The tentative finding explained that when a tree or limb is blown
23  by high winds onto a conductor of a power line, it can push the conductor, usually uninsulated,
24  onto the other conductor, also usually uninsulated, generating arcing and sparks that fall onto
25  the dry grass below, thus igniting a wildfire (Dkt. Nos. 951, 956–59, 962–63, 970).

---

[*] Section 4293 applies only during CAL FIRE's declared fire season and only in "mountainous land, forest covered land, brush covered land or grass covered land within State Responsibility Areas." Cal. Code Regs. tit. 14 §§ 1252, 1253. State Responsibility Areas are "lands within the state . . . in which the financial responsibility of preventing and suppressing fires is primarily the responsibility of the state." Cal. Pub. Res. Code § 4125(a).

1    On January 9, 2019, United States Probation Officer Jennifer Hutchings filed a Form 12
2  alleging that PG&E violated the conditions of its probation by failing to notify the probation
3  office of a $1.5 million settlement entered into with the Butte County District Attorney's Office,
4  whereby Butte County agreed to forgo criminal prosecution in connection with three October
5  2017 wildfires that CAL FIRE determined had been caused by vegetation contacting PG&E
6  distribution lines.  That same day, another order directed the parties to show cause why PG&E's
7  conditions of probation should not be modified to, among other things, require PG&E to re-
8  inspect its electrical grid, remove or trim all trees or branches that might make contact with
9  PG&E's equipment during high-wind events, and de-energize any part of its electrical grid not
10 yet rated as safe by PG&E for the wind conditions then prevailing (Dkt. Nos. 960–61).

11   The parties, CAL FIRE and the CPUC filed written responses to the order to show
12 cause.  With respect to the Court's tentative finding regarding the primary cause of recent
13 wildfires attributable to PG&E's equipment, PG&E agreed "that vegetation presents an acute
14 risk of wildfire ignition across PG&E's service territory."  In its written submission and at the
15 January 30 hearing on the order to show cause, however, PG&E opined that the proposed
16 conditions of probation would be impossible to achieve and would interfere with state and
17 federal regulators.  PG&E also explained that it would soon submit and implement a wildfire
18 mitigation plan pursuant to Senate Bill 901, a statewide wildfire mitigation framework passed
19 by the California Legislature in 2018 which requires electric utilities to submit wildfire
20 mitigation plans each year to the CPUC.  Pursuant to Senate Bill 901, the PG&E wildfire
21 mitigation plan would include protocols and programs for de-energization, vegetation
22 management and facility inspection and maintenance.  Also at the January 30 hearing, the Court
23 heard from CAL FIRE, the CPUC, the federal government, representatives of San Bruno, and
24 members of the public.  After taking sworn testimony from USPO Hutchings, the Court
25 sustained the allegations contained in the Form 12 and found that PG&E had violated the terms
26 of its probation.  Sentencing on the violation has not yet occurred (Dkt. Nos. 975–76, 986–87,
27 1000).
28

Following the January 30 hearing, PG&E provided further information, including its wildfire mitigation plan filed with the CPUC on February 6. PG&E's filings have included several relevant admissions. Significantly, PG&E acknowledged "that vegetation contact is the primary risk driver with respect to ignitions on its distribution lines." ("Vegetation" means trees and limbs in this context.) In 2016 alone, PG&E experienced approximately 1,400 wires down caused by vegetation contact. As PG&E reported to the CPUC, during 2015 and 2016, vegetation contact with conductors was the leading cause of the 486 fire ignitions associated with PG&E facilities, causing 37% of those fires. PG&E further admitted that as of June 2017, there were 3,962 unworked trees which PG&E had identified in 2016 as hazardous with the potential to "fall into or otherwise impact the conductors, towers or guy wires before the next inspection cycle" (Dkt. Nos. 1004, 1015 at 5, 18, 24–25, 57). And, although CAL FIRE has not yet completed its investigation into the cause of the 2018 Camp Fire in Butte County, PG&E recently announced it "believes it is probable that its equipment will be determined to be an ignition point of the 2018 Camp Fire" (*see* PG&E Corporation February 2019 Earnings Release, http://s1.q4cdn.com/880135780/files/doc_news/2019/02/28/Press-Release-2-28-19.pdf).

Having considered PG&E's wildfire mitigation plan and the various responses and objections to the proposed conditions of probation set forth in the January 9 order to show cause, as well as the totality of the parties' various submissions, the Court now proposes adding the following new conditions of probation in order to protect the public from further death and destruction resulting from PG&E-caused wildfires, to deter similar wrongs by other utilities, and to promote the rehabilitation of PG&E among other goals of 18 U.S.C. §§ 3553(a)(1) and (a)(2):

1. PG&E must fully comply with all applicable laws concerning vegetation management and clearance requirements, including Sections 4292 and 4293 of the California Public Resources Code, CPUC General Order 95, and FERC FAC-003-4. In this connection, the Court accepts CAL FIRE's interpretation of Section 4293 as set forth in its February 6 submission (Dkt. No. 1012).

5

2. PG&E must fully comply with the specific targets and metrics set forth in its amended 2019 wildfire mitigation plan (Dkt. No. 1014-2), including with respect to enhanced vegetation management. Compliance with these targets and metrics, however, will not excuse any failure to fully comply with the vegetation laws as required in paragraph 1.

3. The Monitor shall assess PG&E's wildfire mitigation and wildfire safety work, including through regular, unannounced inspections of PG&E's vegetation management efforts and equipment inspection, enhancement, and repair efforts. The inspections will include both inspections of segments of power lines where PG&E has conducted its enhanced vegetation management efforts pursuant to its amended 2019 wildfire mitigation plan, as well as areas where enhanced vegetation management has yet to occur. The inspections will further include field interviews and questioning of PG&E employees and contractors.

4. PG&E shall maintain traceable, verifiable, accurate, and complete records of its vegetation management efforts. PG&E shall report to the Monitor on the first business day of every month on its vegetation management status and progress, and make available for inspection all related records at the Monitor's request.

5. PG&E shall ensure that sufficient resources, financial and personnel, including contractors and employees, are allocated to achieve the foregoing. If PG&E cannot find enough contractors, then PG&E must hire and train its own crews to trim and remove trees. To ensure that sufficient financial resources are available for this purpose, PG&E may not issue any dividends until it is in compliance with all applicable vegetation management requirements as set forth above.

To address PG&E's complaints that the vegetation-management conditions proposed in the January 9 order would be unduly expensive, require superhuman efforts, and exceed the requirements of state and federal law, the above conditions would now simply require full compliance with existing law and with the metrics proposed in PG&E's own wildfire mitigation plan. This order rejects PG&E's back-up contention that "perfect compliance" with Section 4293 is impossible due to "densely forested, highly dynamic, living environments, in which conditions can rapidly change" (Dkt. No. 1016 at 9). The record demonstrates that PG&E's performance with respect to vegetation management has been dismal. And, not only does the offender provide no evidentiary support for its claim, but anyone who knows the terrain and its vegetation knows that it takes years for trees to grow to the height of PG&E's lines. Regular inspections could easily spot trees that are high enough to present a hazard. If state or federal law is too strict, moreover, PG&E's remedy would be to seek the relaxation of such laws through its well-oiled lobbying efforts.

Notably, although PG&E suspended quarterly cash dividends on its common and preferred stock following the October 2017 wildfires, it previously paid out immense sums in dividends — $798 million and $925 million in 2017 and 2016, respectively, with the vast majority paid to PG&E Corporation, PG&E's holding company and the owner of the entirety of PG&E's oustanding common stock. PG&E Corporation common stock, in turn, is listed on the New York Stock Exchange and dividends paid to common shareholders by PG&E Corporation during 2017 and 2016 amounted to one billion dollars and $921 million, respectively (*see* 2017 Joint Annual Report, https://s1.q4cdn.com/880135780/files/doc_financials/2017/annual/2017-Annual-Report-Final.pdf). Yet, during this same period, PG&E knowingly failed to trim or remove thousands of trees it had already identified as posing a hazard. Put differently, some of these dividends could and should have been kept and used to bring PG&E into compliance with state and federal law with respect to what has become the number one cause of PG&E-induced wildfires. The proposed conditions would help ensure that, going forward, funds are adequately allocated to PG&E's vegetation management and wildfire mitigation costs.

Finally, with respect to the issue of whether the offender should be required to de-energize its lines in high winds unless it is safe to maintain power, this order postpones that issue for a few weeks.

By **MARCH 22, 2019 AT NOON**, all parties are **ORDERED TO SHOW CAUSE** why PG&E's conditions of probation should not be modified as stated above. A hearing on this matter will be held on **APRIL 2, 2019 AT 8:00 A.M.**

**IT IS SO ORDERED.**

Dated: March 5, 2019.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE