1 | MATTHEW D. METZGER (SBN 240437)
mmetzger@belvederelegal.com
2 | BELVEDERE LEGAL, PC
1777 Borel Place, Suite 314
3 | San Mateo, CA 94402
Telephone:     (415) 513-5980
4 | Facsimile:      (415) 513-5985

5 | STUART G. GROSS (SBN 251019)
sgross@grosskleinlaw.com
6 | TIM KLINE (SBN 319227)
tk@grosskleinlaw.com
7 | GROSS & KLEIN LLP
The Embarcadero
8 | Pier 9, Suite 100
San Francisco, CA 94111
9 | t (415) 671-4628
f (415) 480-6688
10 |
| Attorneys for Creditor,
11 | Dan Clarke

12 |                    **UNITED STATES BANKRUPTCY COURT**
13 |                    **NORTHERN DISTRICT OF CALIFORNIA**
                        **SAN FRANCISCO DIVISION**
14 |
15 | **In re**                          | Bankruptcy Case
                                         | Case No.  19-30088 (DM)
16 | **PG&E CORPORATION**               |
                                         | Chapter 11
17 |      **- and -**                   |
                                         | (Lead Case)
18 | **PACIFIC GAS AND ELECTRIC**       |
     **COMPANY,**                        | (Jointly Administered)
19 |                                     |
              **Debtors.**               | **SUPPLEMENTAL MOTION FOR**
20 |                                     | **RELIEF FROM THE AUTOMATIC**
                                         | **STAY; MEMORANDUM OF**
21 |                                     | **POINTS AND AUTHORITIES IN**
                                         | **SUPPORT**
22 | ☐   Affects PG&E Corporation       |
     ☐   Affects Pacific Gas and Electric | **Date:**  March 10, 2020
23 |        Company                      | **Time:** 10:00 a.m.
     ☑   Affects both Debtors           | **Ctrm:** Hon. Dennis Montali
24 |                                     |        450 Golden Gate Avenue
     *All papers shall be filed in the Lead Case,* |        16th Floor, Courtroom No. 17
25 | *No. 19-30088 (DM).*                |        San Francisco, CA 94102
26 |                                     |
                                         | **Objection Deadline:**
27 |                                     |   **March 5, 2020, at 4:00 p.m. (PT)**
28 |

## Table of Contents

I. JURISDICTION AND VENUE ................................................................................ 2

II. STATEMENT OF FACTS AND PROCEDURAL HISTORY ............................................. 2

    A. PRE-PETITION DISTRICT COURT LAWSUIT .................................................. 2

    B. PRE-PETITION, PG&E OBTAINS AUTHORITY TO ESTABLISH A MECHANISM WHEREBY FUNDS ARE HELD IN TRUST TO PAY FOR ENVIRONMENTAL REMEDIATION COSTS ......................................................................... 5

    C. POST-PETITION, PG&E ARGUES, WITHOUT OBJECTION, THAT FUNDS COLLECTED AND DEPOSITED IN THE  HAZARDOUS SUBSTANCE COST RECOVERY ACCOUNT ARE NOT PROPERTY OF THE ESTATE ......................... 7

    D. POST-PETITION, PG&E'S ENVIRONMENTAL ATTORNEYS AND EXPERTS HAVE CONTINUED TO WORK ON ENVIRONMENTAL REMEDIATION ISSUES ............ 8

    E. POST-PETITION, THE PARTIES AGREED TO PERMIT CLARKE TO MOVE FOR SUPPLEMENTAL RELIEF FROM THE AUTOMATIC STAY AFTER ENTRY OF THE SUMMARY JUDGMENT ORDER IN DISTRICT COURT .......................................... 9

III. RELIEF REQUESTED ...................................................................................... 9

IV. ARGUMENT ................................................................................................ 10

    A. THE COURT SHOULD LIFT THE AUTOMATIC STAY FOR CAUSE ....................... 10

    B. PERMISSIVE ABSTENTION ALSO CREATES CAUSE TO LIFE THE STAY ............ 16

    C. THE SCOPE OF THE AUTOMATIC STAY RELIEF SHOULD INCLUDE AUTHORITY TO PROSECUTE THE SECOND AMENDED COMPLAINT THROUGH TO ITS  CONCLUSION INCLUSIVE OF INJUNCTIVE RELIEF AND RECOVERY OF ATTORNEYS FEES AND EXPENSES ......................................................... 17

    D. THE SCOPE OF THE AUTOMATIC STAY RELIEF SHOULD INCLUDE AUTHORITY THE ENFORCE ANY INJUNCTIVE RELIEF AWARDED ............................... 18

    E. CAUSE EXISTS TO WAIVE THE 14-DAY STAY OF ENFORCEMENT UNDER BANKRUPTCY RULE 4001(A)(3). ...................................................... 19

V. CONCLUSION ............................................................................................ 19

# Table of Authorities

Cases

*Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc)*, 912 F.2d 1162 (9th Cir. 1990) ... 11

*Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 759–60 (6th Cir. 2012) ....................... 19

*In re Curtis* 40 B.R. 795 (Bankr.D.Utah 1984) ............................................................................. 11

*In re Hexcel Corp.,* 239 B.R. 564  (N.D. Cal. 1999)...................................................................... 19

*In re Pac. Gas & Elec. Co.*, 279 B.R. 561 (Bankr. N.D. Cal. 2002)............................................... 18

*In re Plumberex Specialty Prod., Inc.* 311 B.R. 551 (Bankr.C.D.2004)........................................ 12

*In re Universal Life Church*, Inc. 127 BR 55 (ED CA 1991) ......................................................... 16

*Sierra Club v. Andrus*, 610 F.2d 581  (9th Cir.1979)...................................................................... 7

## Statutes

## Federal

11 U.S.C. § 362(d) (1).......................................................................................................... 1, 6, 10

11 U.S.C. § 541 (d). .................................................................................................................... 8

11 USC § 1141(d). ..................................................................................................................... 11

28 U.S.C. § 157. .......................................................................................................................... 1

28 U.S.C. § 1334 ......................................................................................................................... 1

33 U.S.C. § 1319 ......................................................................................................................... 1

Clean Water Act, 33 U.S.C. § 3721 *et seq.*................................................................................. 11

Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.*;.......................................... 3

## State

Cal. Civil §§ 3479 *et seq* ........................................................................................................... 3

## Local Rule

Bankruptcy Local Rule 4001-1 ..................................................................................................... 1

## MOTION

Creditor Dan Clarke ("Movant" and/or "Clarke")) hereby moves the court on a supplemental basis[1] for an order granting relief from the automatic stay, for cause, pursuant to 11 U.S.C. § 362(d) (1) (the "Motion"). Clarke seeks supplemental relief from the automatic stay to prosecute the proposed second amended complaint regarding proceeding pending prepetition before the United States District Court, *San Francisco Herring Association and Dan Clarke vs. Pacific Gas and Electric Company; PG&E Corporation*, United States District Court, Northern District of California Case No. 14-cv-04393 WHO (JCS) (the "District Court Case"). On July 22, 2019, the Bankruptcy Court entered an *Order Approving Stipulation Between Debtors and Dan Clarke for Limited Relief from the Automatic Stay*. Dkt. No. 3136. On July 28, 2019, the District Court entered the *Order Granting Motion for Summary Judgment in Part and Denying in Part*.[2] Clarke now requests supplemental relief from stay to prosecute the proposed second amended complaint (the "SAC")[3] in the District Court Case. The SAC seeks to liquidate Clarke's claims related to ongoing waste contamination caused by two manufactured gas plants ("MGPs") in the Marina neighborhood of city and county of San Francisco, the North Beach MGP and the Fillmore MGP, that the Debtor owned and operated.[4] The SAC also seeks injunctive relief arising out of ongoing violations of Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.*, and the recovery of attorneys' fees and costs, including expert witness fees. Mr. Clarke further requests the order granting relief from stay be made effective immediately and that the fourteen (14) day waiting period of Bankruptcy Rule 4001(a)(3) be waived.

The Motion is based on the Declaration of Stuart Gross ("Gross Decl."), the Request for Judicial Notice, the Declaration of Matthew D. Metzger ("Metzger Decl."), the exhibits served with the Motion, any reply, and on such other and further evidence and matters that the Court may

---

[1] Order Approving Stipulation Between Debtors and Dan Clarke for Limited Relief from the Automatic Stay. Dkt. No. 3136.
[2] Declaration of Matthew D. Metzger in Support of Request for Judicial Notice ("Metzger Decl."), ¶2, Exh. A.
[3] Declaration of Stuart G. Gross in Support of Supplemental Motion for Relief from the Automatic Stay ("Gross Decl.") ¶24 Exh. 1.
[4] A separate motion for relief from stay is filed herewith concerning claims arising out of very similar contamination related to the Cannery MGP in the Fisherman's Wharf neighborhood.

consider at the hearing on the Motion, as well as the March 13, 2019 Final Order Pursuant to 11 U.S.C. §§ 105(a) 363(b), and 507(a)(7) and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Maintain and Administer Customer Programs, Including Public Purpose Programs, and (B) Honor Any Prepetition Obligations Relating Thereto; and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers. Dkt. No. 843 and related law and motion in support of said final order. *See, e.g.*, Dkt Nos. 843. In support thereof, Movant submits the following memorandum of points and authorities, representing as follows.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     JURISDICTION AND VENUE

This Court has jurisdiction to hear and determine this Motion pursuant to 28 U.S.C. § 1334 and 157. The Court's consideration of this Motion is a core proceeding under 28 U.S.C. § 157(b). Venue of this proceeding is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory authority for the Motion is 11 U.S.C. § 362(d) (1) and Bankruptcy Local Rule 4001-1, as modified by the Court's Second Amended Order Implementing Certain Notice and Case Management Procedures. Dkt. No. 1996.

### II.     STATEMENT OF FACTS AND PROCEDURAL HISTORY
####     A.     PRE-PETITION DISTRICT COURT LAWSUIT

1. On September 30, 2014, Plaintiffs Daniel Clarke and the San Francisco Herring Association filed the complaint in the District Court Case, *Clarke, et al. v. PG&E Corp., et al.*, Case Number No. 14-cv-04393-WHO (JCS) (N.D. Cal.) (the "Original Federal Complaint"). Gross Decl., ¶ 2, Ex. 1.

2. Plaintiff the San Francisco Herring Association ("SFHA") is a California non-profit, unincorporated association whose membership consists of active San Francisco Bay commercial herring fishermen and buyers. *Id.*, Ex. 1, ¶ 7.

3. Plaintiff Dan Clarke ("Clarke," together with SFHA, "Plaintiffs") is an individual, who, as of the September 30, 2014, resided at and, together with his wife, was the owner, through

a living trust, of the real property commonly known as 1625 North Point St., San Francisco, California, A.P.N. 0460A-029 (the "Clarke Home"). *Id.*, Ex. 1, ¶ 10.

4.    Pacific Gas and Electric Company and PG&E Corporation (collectively "PG&E" and/or the "Debtors") owned and operated three MGPs, in the Marina and Fisherman's Wharf of San Francisco, the North Beach MGP, the Fillmore MGP, and the Beach Street MGP, during the relevant period, and are responsible for the contamination caused thereby. *Id.*, ex. 1, ¶ 14.

5.    The Original Federal Complaint and the SAC concern a noncore dispute centered on the waste contamination caused by MGPs, which were used to create gas used for lighting, heating, and cooking purposes during portions of the nineteenth and twentieth centuries. *Id.*, Ex. 1, ¶ 20; Ex. 11, ¶ 37.

6.    Based on the MGP waste contamination, the Original Federal Complaint alleged that PG&E violated: i) the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901 *et seq.*; ii) the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251 *et seq.*; iii) California State Nuisance Law, Cal. Civil §§ 3479 et seq. – Public Nuisance; iv) California State Nuisance Law, Cal. Civil §§ 3479 et seq. – Private Nuisance; *v.* California State Trespass Law; vi) California State Negligence Law; and vii) California State Strict Liability Law. *Id.*, Ex. 1, ¶¶ 209-248.

7.    The Original Federal Complaint stated two sets of claims: i) claims that related specifically to the Clarke home, which were later defined by the Honorable Judge William H. Orrick as the "Known Clarke Property Claims"; and ii) claims that more broadly concerned the terrestrial contamination of the Marina and Fisherman's Wharf neighborhoods and offshore areas thereof, which were later defined by Judge Orrick as the "Broader Environmental Claims." *See* Gross Decl., ¶ 3, Ex. 2.

8.    The Original Federal Complaint alleged that the MGP waste contamination is ongoing, and based thereon sought primarily injunctive and related declaratory relief.  Gross Decl., ###; Ex. 1 at ¶¶ 87, 146, pp. 70-71.

9.    On February 27, 2015, at roughly the same time that the Judge Orrick denied PG&E's motion to dismiss in its entirety, Gross Decl., ¶ 4; Exh. 3 , Judge Orrick referred the

matter to the Honorable Judge Joseph C. Spero to preside over settlement discussions between Plaintiffs and PG&E, Gross Decl., ¶ 5##; Exh. 4 .

10.     Ultimately, after numerous sessions presided over by Judge Spero, Plaintiffs and PG&E executed an interim settlement, on October 1, 2015, which was referred to  as the "Mediated Investigation Agreement" and under which the parties agreed to jointly investigate the broader contamination at issue under Judge Spero's supervision, as the binding arbiter of disputes. Gross Decl., ¶ 6, Ex. 5.

11.     Previously, on August 11, 2015, while the parties were negotiating the Mediated Investigation Agreement, Judge Orrick severed the Known Clarke Property Claims from Plaintiffs' Broader Environmental Claims. Gross Decl., ¶ 7, Ex. 6.

12.     On July 16, 2016, PG&E and Clarke entered into a settlement resolving the Known Clarke Property Claims, releasing all of his damages claims but maintaining all of his rights to continue to prosecute his Broader Environmental Claims and pursue injunctive and declaratory relief based thereon. Gross Decl., ¶ 8.

13.     Clarke's Broader Environmental Claims were not settled and remained active. *Id.*

14.     On October 31, 2017, the joint investigation under the Mediated Investigation Agreement concluded, but the underlying action remained stayed while the parties attempted negotiation a final resolution of Plaintiffs' Broader Environmental Claims. *Id.*, ¶ 11.

15.     Ultimately, in September 2018, SFHA, on one hand, and PG&E, on the other, reached an agreement to resolve *SFHA's* Broader Environmental Claims, which concerned the solely marine impacts of the contamination at issue. That settlement memorialized in a Consent Decree that was entered by Judge Orrick, on September 27, 2018.  Gross Decl., ¶ 12, Ex. 7.

16.     Movant Clarke is not a party to the Consent Decree, and his Broader Environmental Claims were not settled or otherwise affected by the Consent Decree. *Id.*

17.     On November 6, 2018, Judge Orrick set a case schedule for the expedited resolution of Clarke's remaining claims, with the explicitly stated intent to gain final resolution of this matter—which has been pending since 2014—by the end of 2019. Gross Decl., ¶ 13, Ex. 8.

18.     Pursuant to that schedule, on November 20, 2018, PG&E moved for summary judgment, seeking adjudication in its favor of all of Clarke's remaining claims, primarily on the ground that Clarke's claims were moot, given the requirements of the Consent Decree and voluntary conduct being undertaken PG&E under regulatory oversight .  Gross Decl., ¶ 14.

19.     Clarke opposed the motion for summary judgment.  *Id.*

20.     After extensive briefing by both sides, which totaled approximately 1,000 pages and included detailed results of years of environmental investigations, on January 9, 2019, Judge Orrick heard oral argument on the motion. *Id.*, ¶¶ 14-15.

21.     During oral argument, Judge Orrick took the matter under submission, indicating his inclination to allow Clarke to go forward with, at least, his RCRA claim concerning the continuing contamination of the terrestrial portions of the Marina and Fisherman's Wharf neighborhoods, and to establish a process by which this and any other surviving claim would expeditiously defined—through amendment of the Complaint—and adjudicated. *See* Gross Decl., ¶ 15, Ex. 9 at 4:1-5:21, 34:22-35:5. At no point in the hearing, did PG&E indicate that it was contemplating a bankruptcy filing.

22.     Less than a week later, on January 14, PG&E released a statement indicating its intention to file for bankruptcy, and on January 29, 2019, PG&E filed its petition for bankruptcy. Gross Decl., ¶ 16.

23.     On February 6, 2019, PG&E filed the Notice of Stay. *Id.*, ¶ 17.

24.     On February 11, 2019, Judge Orrick entered the Order Administratively Closing Case. Gross Decl., ¶ 18, Ex. 10.

**B.      PRE-PETITION, PG&E OBTAINS AUTHORITY TO ESTABLISH A MECHANISM WHEREBY FUNDS ARE HELD IN TRUST TO PAY FOR ENVIRONMENTAL REMEDIATION COSTS**

25.     In 1994, the California Public Utilities Commission (the "CPUC") issued a decision that assigned 90% expenses for environmental remediation activities at certain sites—including the North Beach MGP, Fillmore MGP, and Beach St. MGP sites—to ratepayers and 10% to shareholders of PG&E. *In Re: 1991 Hazardous Substance Reasonableness Review*

*Application of Southern California Gas Co., et al.*, Decision No. 94-05-020, 54 CPUC2d 391, 1994 Cal. PUC LEXIS 379 (CPUC May 4, 1994) ("CPUC Dec. No. 94-05-020"); *see also* 1994 Cal. PUC LEXIS 379 at *47 (listing the subject MGPs as those covered by the order); *see also* Metzger Decl, ¶7, Exh. D (PG&E Corp. Form 10-K Annual Report for the fiscal year ending December 31, 2016 (the "2016 Form 10-K") (describing this mechanism as "allow[ing] the Utility rate recovery for 90% of its hazardous substance remediation costs for certain approved sites without a reasonableness review.")

26.     As summarized in the Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a) 363(b), and 507(a) (7) and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtors to (A) Maintain and Administer Customer Programs, Including Public Purpose Programs, and (B) Honor Any Prepetition Obligations Relating Thereto; and (II) Authorizing Financial Institutions to Honor and Process Related Checks and Transfers (the "Customer Programs Mtn."), Dkt. No. 16, and detailed further in PG&E's October 31, 2018 submission to the CPUC, titled Electric Preliminary Statement Part S, Hazardous Substance Mechanism (attached as Exhibit B to Metzger Decl.),[5] pursuant CPUC Dec. No. 94-05-020, PG&E established what is known as the "Hazardous Substance Mechanism" or "HSM," which operates as follows:

      a.  In advance of every year, PG&E submits to the CPUC an estimate of expected hazardous waste remediation expenditures at applicable sites for the upcoming year, which PG&E proposes be paid out of an account known as the Hazardous Substance Cost Recovery Account;

      b.  Once approved by the CPUC, PG&E collects an amount equivalent to 90% of such predicted expenditures from ratepayers, which is held—along with certain percentages of recoveries from insurance and other third parties—in a dedicated

---

[5] The Debtors, in their Customer Programs Mtn. at 25, fn. 18, cited this memo in support for their statement: "The ratemaking accounts and mechanisms which recover the costs associated with these activities include the "Hazardous Substance Mechanism's Hazardous Substance Cost Recovery Account . . . "

interest bearing subaccount of the Hazardous Substance Cost Recovery Account,
which is known as the Hazardous Substance Clean-up Cost Account ("HSCCA");

   c. Shareholder contributions and certain other percentages of recoveries from
insurance and other third parties are held in a similar interest bearing subaccount of
the Hazardous Substance Cost Recovery Account, known as the Hazardous
Substance Clean-up Cost Shareholder Account ("HSCCSA");

   d. "Surplus funds remaining in the Hazardous Substance Cost Recovery Account at
the end of the year are either rolled over and allocated to Environmental Cleanup
Programs for the next fiscal year or refunded to Customers through rate
adjustments." Dkt. No. 16 at 25:1-4.

**C.** **POST-PETITION, PG&E ARGUES, WITHOUT OBJECTION, THAT FUNDS COLLECTED AND DEPOSITED IN THE HAZARDOUS SUBSTANCE COST RECOVERY ACCOUNT ARE NOT PROPERTY OF THE ESTATE.**

27. In the Customer Programs Motion, PG&E unconditionally acknowledges that
"[f]unds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the
trust is statutory or constructive." Dkt. No. 16 at p. 33:24-28 (citing *Official Comm. of Unsecured
Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1054 (3rd Cir.
1993)).

28. PG&E further argued that under this law the funds that it collects from ratepayers
and others and holds in the Hazardous Substance Cost Recovery Account "are likely not property
of the Debtors' estates as they are collected from third parties and held in trust for payments and
obligations in connection with such programs for the benefit of ratepayers and third parties." Dkt.
No. 16. at p.33:17-19.

29. With the exception of two limited objections by regulators and the owners of
certain contaminated properties, represented by one of the attorneys who represents Movant
Clarke here—who were concerned that PG&E continue to perform its environment remediation

obligations (Dkt. No. 158)—no objections were submitted to this motion; and no creditor, nor the trustee objected to PG&E's characterization of these funds as not the property of the estate.

### D. POST-PETITION, PG&E'S ENVIRONMENTAL ATTORNEYS AND EXPERTS HAVE CONTINUED TO WORK ON ENVIRONMENTAL REMEDIATION ISSUES

30.    In June 2001, then Chapter 11 Debtor Pacific Gas and Electric Company ("PG&E") filed a declaration by Mr. Robert C. Doss, Principal Consultant, Site Remediation, detailing PG&E's policies and practices regarding environmental remediation and the details of such programs. Metzger Decl, ¶6, Exh. C.

31.    Mr. Doss' declaration makes clear that PG&E maintains a staff of environmental professionals and internal PG&E legal counsel and where, appropriate, PG&E counsel utilizes the services of outside legal firms to assist in responding to claims.

32.    This is confirmed by counsel for Clarke, who also represents certain other individuals, whose properties are located in the former footprint of the North Beach MGP or Fillmore MGP and are contaminated with wastes for which PG&E.

33.    As the Court may recall, PG&E stipulated with certain of these individuals to continue performing under pre-petition environmental agreements PG&E entered into with them. Gross Dec., ¶ 19. In accordance with that stipulation, an environmental investigation of one such property has been conducted by PG&E, post petition, and the remediation of another property has continued. Moreover, further related agreements between PG&E and these and other homeowners have been, and are being, negotiated. This work has been performed on behalf of PG&E by outside counsel and experts, who are not involved in this bankruptcy action and who have been working on these matters for approximately a decade. *Id.*, ¶ 20.

34.    Environmental counsel for PG&E has, furthermore, confirmed PG&E's intention to comply with its legal obligations under the Consent Decree and such counsel has taken steps necessary to achieve that compliance. *Id.*, ¶ 21.

35.    Accordingly, it is evident that PG&E has adequate personnel and financial resources pre-allocated to litigate Clarke's Broader Environmental Claims and to fund any future

cleanup ordered in resolution thereof, using funds that overwhelmingly are not the property of the estate.

        **E.**      **POST-PETITION, THE PARTIES AGREED TO PERMIT CLARKE TO MOVE FOR SUPPLEMENTAL RELIEF FROM THE AUTOMATIC STAY AFTER ENTRY OF THE SUMMARY JUDGMENT ORDER IN DISTRICT COURT**

36.      On July 2, 2019, Clarke moved for relief from the automatic stay. Dkt No. 2823.

37.      On July 19, 2019, the Debtors and Clarke stipulated to limited relief to permit, inter alia, entry of the order on the summary judgment motion pending as of the petition date; the stipulation also provided that Clarke has the right to seek further relief from the automatic stay as to any or all further proceedings in the District Court Case. The Court previously approved said stipulation. Dkt. Nos. 3113, 3136.

38.      On July 28, 2019, the District Court entered the *Order Granting Motion for Summary Judgment in Part and Denying in Part*.[6]

39.      Clarke has prepared the second amended complaint (the "SAC")[7] in the District Court Case and now seeks supplemental relief from the automatic stay to prosecute the SAC.

## III.    RELIEF REQUESTED

By this Motion, Clarke seeks supplemental relief from the automatic stay to prosecute the proposed second amended complaint regarding proceeding pending prepetition before the United States District Court, *San Francisco Herring Association and Dan Clarke vs. Pacific Gas and Electric Company; PG&E Corporation*, United States District Court, Northern District of California Case No. 14-cv-04393 WHO (JCS) (the "District Court Case"). On July 22, 2019, the Bankruptcy Court entered an *Order Approving Stipulation Between Debtors and Dan Clarke for Limited Relief from the Automatic Stay*. Dkt. No. 3136. On July 28, 2019, the District Court entered the *Order Granting Motion for Summary Judgment in Part and Denying in Part; Denying*

---

[6] Metzger Decl., ¶2, Exh. A.

[7] Gross Decl., ¶24 Exh. 1.

1 | *Motions to Seal; Granting Motion to File Sur-Reply.*[8]  Clarke now requests supplemental relief

2 | from stay to prosecute the proposed second amended complaint (the "SAC")[9] in the District Court

3 | Case.  The SAC seeks to liquidate Clarke's claims related to ongoing waste contamination caused

4 | by manufactured gas plants ("MGPs") in the city and county of San Francisco that the Debtor

5 | owns and operates.  The SAC also seeks injunctive relief for ongoing of violations of Resource

6 | Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.*, and the recovery of

7 | attorneys' fees and costs, including expert witness fees.  Mr. Clarke further requests the order

8 | granting relief from stay be made effective immediately and that the fourteen (14) day waiting period

9 | of Bankruptcy Rule 4001(a)(3) be waived.

10 | **IV.**     **ARGUMENT**

11 |         **A.**     **THE COURT SHOULD LIFT THE AUTOMATIC STAY FOR CAUSE**

12 |         Section 362(d) (1) authorizes the Court to modify or terminate the automatic stay for

13 | "cause," including the lack of adequate protection.  "'Cause' for granting relief from stay has no

14 | clear definition and is determined on a case-by-case basis." *Christensen v. Tucson Estates, Inc. (In*

15 | *re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990) (citation omitted). However, in

16 | determining whether there is "cause" to grant relief in cases where pending pre-petition litigation

17 | exists, courts often consider the factors set out in *In re Curtis* 40 B.R. 795 (Bankr.D.Utah 1984)

18 | as follows:

19 |         (1)     Whether the relief will result in a partial or complete resolution of the issues;

20 |         (2)     The lack of any connection with or interference with the bankruptcy case;

21 |         (3)     Whether the foreign proceeding involves the debtor as a fiduciary;

22 |         (4)     Whether a specialized tribunal has been established to hear the particular cause of

23 |                 action and whether that tribunal has the expertise to hear such cases;

---

26 | [8] Metzger Decl., ¶2, Exh. A.

27 | [9] Gross Decl., ¶24 Exh. 1.

10

(5)     Whether the debtor's insurance carrier has assumed full financial responsibility for defending the litigation;

(6)     Whether the action essentially involves third parties, and the debtor functions only as a bailee or conduit for the goods or proceeds in question;

(7)     Whether the litigation in another forum would prejudice the interests of other creditors, the creditor's committee and other interested parties;

(8)     Whether the judgment claim arising from the foreign action is subject to equitable subordination;

(9)     Whether movant's success in the foreign proceeding would result in a judicial lien avoidable by the debtor under Section 522(f);

(10)    The interests of judicial economy and the expeditious and economical determination of litigation for the parties;

(11)    Whether the foreign proceedings have progressed to the point where the parties are prepared for trial; and

(12)    The impact of the stay and the "balance of hurt."

*In re Curtis*, 40 B.R. at 799-800; *see also In re Plumberex Specialty Prod., Inc.* 311 B.R. 551, 559 (Bankr.C.D.2004) (adopting the *Curtis* factors and recognizing that courts in other circuits have done the same).

Taken together, the *Curtis* factors weigh strongly in favor of relief.

**(1)     Relief from the Stay Will Result in Complete Resolution of the Issues.**

As discussed *supra*, the District Court Case has been pending for almost five and half years and has resulted in three partial settlements.  When PG&E filed its petition and the case was stayed, Judge Orrick was on the cusp of issuing a decision that defined what claims remained and setting a schedule for their expedited resolution. Gross Dec., ¶ 15, Ex. 9 at 4:1-5:21, 34:22-35:5 After this Court granted Clarke's first motion to lift the stay, Judge Orrick issued a decision that defined with precision the claims that are left to be resolved in the case. Lifting the stay now would lead to complete resolution of <u>all</u> legal and factual issues in the case. Clarke does not seek

damages or penalties based on any of his remaining claims but rather only injunctive relief; thus, no issues related to priority of payment or the like would remain. And PG&E already has pledged "full compliance with all applicable environmental laws" (Metzger Decl, ¶ 4, Exh. B) and obtained a final order from the Bankruptcy Court to continue making expenditures to do so (Dkt No. 843), which would include any performing any injunctive relief ordered by Judge Orrick.

### (2) There Is No Connection Between the District Court Case and the Bankruptcy Case; and Lifting the Stay Would Not Interfere in the Bankruptcy Case.

PG&E's bankruptcy had nothing to do with the District Court Case, and lifting the stay would in no way interfere with it.

This is chiefly because the source of funds from which to litigate and cleanup the MGP Waste concerns of Clarke's Broader Environmental Claims are – on PG&E's own assessment – not property of the bankruptcy estate. Dkt. No. 33: p. 33: 16-28. Rather, as discussed *supra*, dedicated funds of ratepayers and others are held in trust by PG&E exclusive for the use by PG&E in addressing contamination of certain listed sites, explicitly including "all covered costs . . . associated with manufactured gas plant sites." Metzger Decl. Metzger Decl,¶3, Exh. B; *see also id.*, ¶7, Exh. D.

Section 541(d) of the Bankruptcy Code provides, in relevant part, that "[p]roperty in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold." 11 U.S.C. § 541(d). Funds that a debtor holds in trust are not property of the debtor's bankruptcy estate whether the trust is statutory or constructive. *Official Comm. of Unsecured Creditors v. Columbia Gas Sys. Inc. (In re Columbia Gas Sys. Inc.)*, 997 F.2d 1039, 1054 (3rd Cir. 1993). And consistent with the Debtors' stated position, surcharge-related funds are held in trust by the debtor, and thus, are not property of its bankruptcy estate. *Id.* at 1062. Accordingly, allowing the District Court Case to go forward and Judge Orrick to make a final determination concerning PG&E's liability concerning the ongoing contamination at issue,

12

and order any injunctive relief in connection therewith, will have no effect on the amount of funds available in the estate to pay the claims of other creditors.

It will also not interfere with the bankruptcy case from the perspective of PG&E's human resources. PG&E has several outside attorneys, and at least one in-house attorney, who have worked on legal matters related to the contamination related to the subject MGPs for approximately a decade and who continue to work on such matters. Gross Decl., ¶ 22. These attorneys are separate and apart from those handling the Bankruptcy Case for Debtors. *Id*. PG&E, furthermore, has outside and in-house technical staff that have worked on these matters for as long and who continue to do so. *Id.*.

(3) Not applicable.

(4) **The District Court Has Exclusive Jurisdiction Over the District Court Case, and Judge Orrick Has Presided Over It for Almost Five Years, Giving Him the Expertise to Resolve Its Remaining Portion.**

District courts are arguably not "specialized tribunals" within the meaning of the fourth *Curtis* factor. However, district courts, located in the district where the violation occurred, have exclusive jurisdiction over citizen suit claims brought under the CWA and RCRA, like those brought by Clarke. *See* 33 U.S.C. § 1365(a); 42 U.S.C. § 6972(a). Moreover, given Judge Orrick's experience with the District Court Case, in particular, he has the expertise regarding it that make his court better suited than any other to resolve its remaining portion.

(5) and (6)  Not Applicable.

(7) **Allowing the District Court Case to Move Forward to Resolution Would Not Prejudice the Interests of Other Creditors, Any Creditor Committee, or Other Interested Party.**

As discussed *supra*, the costs of litigating the District Court Case and that of any injunctive relief ordered by Judge Orrick would be paid out of dedicated funds that PG&E holds in trust, rather than from the estate. Thus, no creditor or interested party would be prejudiced financially if the case is allowed to move forward. Indeed, if there were the possibility of such prejudice, such parties would have been expected to object when the Debtors moved for interim relief, through the Customer Programs Mtn., to continue making such expenditures. However, in fact, the only

objectors were certain interested parties that wanted these expenditures to continue but were concerned with the terms under which PG&E proposed to do so. Furthermore, because different attorneys and technical staff would handle the District Court case than those handling the Bankruptcy Case, there could be no prejudice to other creditors or interested parties in that regard.

Lifting the stay as to the District Court Case would also not "open the floodgates" to numerous other similar claims that are pending. *Cf.* Dkt. No. 1822. To the extent that there are similar cases pending against PG&E, pursuant to the relief granted by this Court (Dkt. 216), PG&E representatives continue to engage with those claimants to resolve their particular claims. Gross Decl., ¶ 23. Moreover, from a public policy perspective, if there are other environmental suits out their that, like the District Court Case, seek to compel PG&E to address ongoing contamination that may present an imminent and substantial endangerment to human health or the environment, the gate should be opened to those claims—just as they should be to Clarke's—so as to stop such harm as soon as possible; and, again, the funds used to pay for this needed work would not come from the estate.

To the contrary, Clarke's Motion is more akin to relief from stay motion filed by the City and County of San Francisco ("CCSF"") regarding the Federal Energy Regulatory Commission ("FERC") litigation, where the court already found "compelling circumstances" to justify relief now. *See* Dkt. No. 153*5; see also* Dkt. No. 1982, p4, n.3. Judge Orrick's experience with Clarke's lengthy, environmental case makes the District Court act very much like the "specialized tribunal" for the FERC Litigation, where the complexities far exceed those of standard personal injury matter.

(8) **Clarke's Success in the District Court Case Would Not Result in Any Judicial Lien.**

Clarke seeks no damages in the District Court Case. Thus, the case would not result in the creation of any judicial lien.

(10) **The Interests of Judicial Economy and the Expeditious and Economical Determination of Litigation for the Parties Waives Heavily in Favor of Lifting the Stay.**

1    Judge Orrick has invested years in the District Court case and, at the time the stay was

2    imposed, was poised—after extensive written and oral argument—to issue an order that would

3    have defined Clarke's remaining claims and established a schedule for their expeditious

4    resolution. That order on summary judgment has issued; Clarke's remaining claims have been

5    defined. It would be directly contrary to the interests of judicial efficiency and the expeditious and

6    economical determination of litigation for the parties if the parties were forced to litigate the

7    Clarke's remaining cases before this Court, and the Court was required to acquaint itself

8    sufficiently with the facts and the law to plot a path for the case's final resolution, as Judge Orrick

9    is prepared and well placed to do.

10   **(11)    The District Court Case Has Progressed to the Point Where the Parties Are Close to Prepared for Trial.**

11

12   The case has been pending for almost five and half years, during which certain claims have

13   been resolved and environmental investigations have been conducted. Thus, while the parties need

     to do some further work before trial, given the complexity of the case and the length of time it has

14   been pending, the time needed for such work is relatively succinct and can be expeditiously

15   completed under Judge Orrick's knowledgeable supervision.

16   **(12)    The "Balance of Hurt" Tips Heavily in Favor of Lifting the Stay.**

17

18   Keeping the stay in place would mean that ongoing contamination, which Clarke alleges

19   and the evidence suggests substantially endangers human health and the environment would

     remain unaddressed. Clarke, furthermore, would be left in a position where, despite being on the

20   cusp of resolving an almost five year long litigation pre-petition, he must now incur legal fees to

21   monitor a reorganization case of myriad complexity where Clarke plays little if any role. On the

22   other hand, PG&E would suffer little to no hardship if the District Court Case is allowed to

23   proceed. PG&E has outside litigation counsel who are already well-briefed on the case, continue

24   to work to on related matters for PG&E, and are paid for from sources that PG&E has admitted are

25   outside the estate.

26

27

28

15

**B.** **PERMISSIVE ABSTENTION ALSO CREATES CAUSE TO LIFE THE STAY**

Abstention also may constitute "cause" for lifting the stay to allow the action to proceed to judgment in a nonbankruptcy forum (state court, federal district court, tax court, or any arbitration panel or administrative tribunal, etc.). *See In re Universal Life Church*, Inc. 127 BR 453, 455(ED CA 1991). The legislative history of § 362(d) (1) states that "a desire to permit an action to proceed to completion in another tribunal may provide [ ] cause" for relief from a stay. H.R. No. 595, 95th Cong., 1st sess. 343, 1977 U.S. Code Cong. & Admin. News 5787, 630.

The factors the Court can consider in determining whether to abstain from exercising jurisdiction are set forth in *In re Tucson Estates, Inc.,* as follows:

(1)    the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention;

(2)    the extent to which state law issues predominate over bankruptcy issues;

(3)    the difficulty or unsettled nature of the applicable law;

(4)    the presence of a related proceeding commenced in state court or other non-bankruptcy court;

(5)    the jurisdictional basis, if any, other than 28 U.S.C. §1334;

(6)    the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7)    the substance rather than form of an asserted "core" proceeding;

(8)    the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9)    the burden of [the bankruptcy court's] docket;

(10)   the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11)   the existence of a right to a jury trial; and

1   (12)    the presence in the proceeding of non-debtor parties.

2   912 F.2d 1162, 1166-1167 (9th Cir. 1990).

3       These factors support permissive abstention as follows:

4       Factor (1) favors abstention.  As discussed *supra*, any liability for Clarke's claims would

5   be sourced from trust funds that are not property of the Debtors' bankruptcy estate. Furthermore,

6   as explained *infra*, Clarke's claims are excepted from discharge and thus have no effect on the

7   Debtors' reorganization.

8       Factor (3) favors abstention. While the law applicable to Clarke's claims is extensive, it is

9   difficult and Judge Orrick is well-versed in it and its application to Clarke's claims.

10      Factors (4), (5), (6), (7) strongly favor abstention.  The District Court is best-position to

11  liquidate the value of Clarke's remaining claims.  Once the claims are liquidated, the Debtors and

12  other creditors will have a much clearer idea how much PG&E will for forced to spend to address

13  said claims.  For these reasons, the bankruptcy judge, not the district court judge, "may, and is the

14  better position to make a preliminary determinations . . . [about abstention and related matter

15  concerning] . . . the efficient and effective administration of a Chapter 11 case." *In re Pac. Gas &*

16  *Elec. Co.*, 279 B.R. 561, 565 (Bankr. N.D. Cal. 2002).

17      Factors (8), (9, (10), (11) and (12) also support abstention.  Clarke's Broader

18  Environmental Claims are all noncore matters.  The court's docket is quite burdened with the

19  PG&E wild fire maters.  There is no forum shopping.  The proposed SAC  demands a jury trial.

20  There are no non-debtor parties to the litigation, besides Clarke.

21      Here, abstention is appropriate. Under *Tucson Estates* cause exists for lifting the stay.

22  **C.      THE SCOPE OF THE AUTOMATIC STAY RELIEF SHOULD INCLUDE
    AUTHORITY TO PROSECUTE THE SECOND AMENDED COMPLAINT
23  THROUGH TO ITS  CONCLUSION INCLUSIVE OF INJUNCTIVE
    RELIEF AND RECOVERY OF ATTORNEYS FEES AND EXPENSES**

24      Via the instant supplemental motion, the Movant is seeking authority to enforce any

25  injunctive relief awarded.  *See section D.infra.*  However, Movant is not seeking to enforce at this

26  time any award of monetary damages, penalties, attorneys' fees, or expense reimbursement.

27

28

17

Rather, Movant seeks relief only to prosecute the SAC to its logical conclusions, in order to fix and quantify all aspects of the relief sought via the SAC. Movant emphasizes that the relief requested via the SAC is limited to equitable relief, with the exception of the recovery of attorneys' fees and costs, including expert witness fees. See also 33 U.S.C. 1319(d).

In seeking to quantify the monetary aspects of the relief requested via the SAC, Clarke is not seeking a pecuniary advantage of any other creditor. Rather, Clarke is seeking only a judicial determination of any award of attorneys' fees and expense reimbursement from the District Court – as well as the right to enforce any injunctive relief awarded.

**D.**     **THE SCOPE OF THE AUTOMATIC STAY RELIEF SHOULD INCLUDE AUTHORITY THE ENFORCE ANY INJUNCTIVE RELIEF AWARDED**

The Bankruptcy Code includes injunctive relief under the definition of a claim. 11 USC § 101(5)(B). The inclusion of equitable relief within the definition of a claim notwithstanding, the Debtor appears to take the position that Clarke's claims are unimpaired and part of the non-voting, Class 4A (HoldCo General Unsecured Claims). Dkt. No. 4101, p. 40: 3-4. The exact classification of Clarke's claim is pending confirmation. Provided the Debtor truly asserts that Clark's claims are unpaired and part of a non-voting class, the Debtor's own admission would appear as additional cause for the Court to find that the automatic stay need (no longer) apply to Clarke's prosecution of the SAC.

To the extent the District Court finds injunctive relief warranted, relief from the automatic stay should also permit Clarke the ability ***to enforce*** any injunctive relief are awarded. The SAC alleges that harm is ongoing. Courts have held that the automatic stay does not protect the Debtor's tortious use of property. See, e.g., *Dominic's Rest. of Dayton, Inc. v. Mantia*, 683 F.3d 757, 759–60 (6th Cir. 2012).

To the extent the District Court does injunctive relief, the Debtor would benefit from such knowledge before finalizing the terms of the chapter 11 plan of reorganization, to frame its position as to whether Clarke's claims are impaired or unimpaired, or even whether Clarke's pre-petition claims for injunctive relief qualify as "claims" under the Bankruptcy Code. ". . [E]ven if a

claim stems from pre-petition conduct, it still may not be discharged if the parties could not fairly contemplate its potential existence during the bankruptcy proceedings. *In re Hexcel Corp.,* 239 B.R. 564, 572 (N.D. Cal. 1999).

**E.**     <u>**CAUSE EXISTS TO WAIVE THE 14-DAY STAY OF ENFORCEMENT UNDER BANKRUPTCY RULE 4001(A)(3).**</u>

The Court may waive the 14-day stay of enforcement of an order granting relief from the automatic stay for cause. Fed. R. Bankr. P. 4001 (a) (3). Cause exists in this case because of the prejudice suffered by Clarke from further delay while Debtor will not suffer any prejudice from allowing the Superior Court to liquidate the claims. Hence, the Court should waive the 14-day stay provided by Bankruptcy Rule 4001(a)(3).

**V.**     <u>**CONCLUSION**</u>

WHEREFORE, Clarke prays for entry of an order:

1.     Granting relief from the automatic stay to liquidate Mr. Clarke's claims as articulated in the proposed Second Amended Complaint without any qualification or restriction, in the matter *San Francisco Herring Association and Dan Clarke vs. Pacific Gas and Electric Company; PG&E Corporation*, United States District Court, Northern District of California Case No. 14-cv-04393 WHO (JCS).

2.     Granting relief from the automatic stay to enforce any equitable relief that Clarke obtains from the District Court case, including injunctive relief;

3.     Granting relief from the automatic stay to prosecute to recovery attorneys' fees and costs, including expert witness fees.

4.     Waiving the 14-day stay of enforcement provided by Bankruptcy Rule 4001(a)(3);

5.     For such other and further relief as the Court deems just, necessary and proper.

Dated: February 13, 2020

BELVEDERE LEGAL, PC

By:     _____/s/ *Matthew D. Metzger*_____
                          Matthew D. Metzger
                          Attorneys for Creditor, Dan Clarke

19