MATTHEW D. METZGER (SBN 240437)
mmetzger@belvederelegal.com
BELVEDERE LEGAL, PC
1777 Borel Place, Suite 314
San Mateo, CA 94402
Telephone:    (415) 513-5980
Facsimile:    (415) 513-5985

STUART G. GROSS (SBN 251019)
sgross@grosskleinlaw.com
TIM KLINE (SBN 319227)
tk@grosskleinlaw.com
GROSS & KLEIN LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

Attorneys for Creditor,
Dan Clarke

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors. | Bankruptcy Case<br>Case No.  19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**DECLARATION OF MATTHEW D. METZGER IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE** |
| ☐  Affects PG&E Corporation<br>☐  Affects Pacific Gas and Electric Company<br>☑  Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | **Date:**  March 10, 2020<br>**Time:**  10:00 a.m.<br>**Ctrm:** Hon. Dennis Montali<br>      450 Golden Gate Avenue<br>      16th Floor, Courtroom No. 17<br>      San Francisco, CA 94102<br><br>**Objection Deadline:**<br>      **March 5, 2020, at 4:00 p.m. (PT)** |

1

I, Matthew D. Metzger, declare as follows:

1. I am principal at Belvedere Legal, PC and am counsel for creditor Dan Clarke. I make this declaration in support of the Request for Judicial Notice. The matters stated below are made and based upon my personal knowledge, except for those matters stated upon information and belief, and as to those matters, I believe them to be true. If called as a witness, I could and would testify to the matters as set forth below.

2. Attached as Exhibit A is a true and correct copy of the July 26, 2019 Order Granting Motion for Summary Judgment in Part and Denying in Part; Denying Motions to Seal; Granting Motion to File Sur-Reply, in the matter *San Francisco Herring Association, et al, Plaintiffs, v. Pacific Gas and Electric Company, et al.*, *Defendants*, United States District Court, Northern District of California, Case No. 14-cv-04393-WHO

3. Attached as Exhibit B is a true and correct copy of the Revised Cal. P.U.C. Sheet No. 43284-E, entitled "Electric Preliminary Statement Part S Hazardous Substance Mechanism", issued by Robert S. Kenney, PG&E Vice President, Regulatory Affairs, Sheets 1-5 ("Revised Cal. P.U.C. Sheet No. 43284-E"), submitted October 31, 2018 and effective November 30, 2018.

4. I obtained the Revised Cal. P.U.C. Sheet No. 43284-E from the following PG&E website, at the following link: https://www.pge.com/tariffs/assets/pdf/adviceletter/ELEC_5418-E.pdf (last accessed July 2, 2019).

5. In June 2001, then Chapter 11 Debtor Pacific Gas and Electric Company ("PG&E") filed a declaration by Mr. Robert C. Doss, Principal Consultant, Site Remediation, detailing PG&E's policies and practices regarding environmental remediation and related programs.

6. Attached as Exhibit C is a true and correct copy of the Declaration of Robert C. Doss in Support of Motion for Authorization to Continue Its Hazardous Substance Cleanup, which PG&E filed June 6, 2001, *In re Pacific Gas and Electric Company,* a California corporation, United States Bankruptcy Court, Northern District of California, Case No. 01 30923 DM, Dkt No. 802.

7.      Attached as Exhibit D is a true and correct copy of the material portion (page 36) of PG&E's Form 10-K for Fiscal Year Ended December 31, 2016 (the "Form 10-K"), which is available from the following link: https://www.sec.gov/Archives/edgar/data/75488/000100498017000006/form10k.htm#_Toc47493 8784 (last accessed June 15, 2019).

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed February 13, 2020 at San Mateo, California.

  /s/ *Matthew D. Metzger*      
Matthew D. Metzger

# EXHIBIT A

1
2
3
4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    SAN FRANCISCO HERRING                      Case No.  14-cv-04393-WHO
     ASSOCIATION, et al.,

8                    Plaintiffs,               **ORDER GRANTING MOTION FOR
                                               SUMMARY JUDGMENT IN PART
9            v.                                AND DENYING IN PART; DENYING
                                               MOTIONS TO SEAL; GRANTING
10   PACIFIC GAS AND ELECTRIC                   MOTION TO FILE SUR-REPLY**
     COMPANY, et al.,
11                                             Re: Dkt. Nos. 183, 185, 190, 193
                     Defendants.
12

13          The remaining issue in this five-year-old environmental case involving hazardous waste

14   left behind in the Marina district area of San Francisco by plants operated roughly one hundred

15   years ago by defendants Pacific Gas and Electric Company and PG&E Corporation (collectively,

16   "PG&E") is the scope of the settlement agreements executed by PG&E and plaintiffs Dan Clarke

17   and the San Francisco Herring Association ("SFHA").  Clarke released his damages claims in

18   February 2016 but not his more general environmental claims.  SFHA and PG&E entered a

19   consent decree in 2018 that, among other things, required remediation, compensation and on-

20   going testing.  PG&E contends in its motion for summary judgment that the settlements moot

21   Clarke's alleged remaining claims.[1]

22          Clarke's concern is the inadequacy of the resolution of terrestrial pollution in the affected

23   area under SFHA's consent decree.  He seeks to assert a citizen suit under the Resource

24   Conservation and Recovery Act ("RCRA") to address this issue.  Because the stay of discovery I

25   _____

26   [1] I heard argument on January 9, 2019.  PG&E then filed for Chapter 11 bankruptcy on January
     29, 2019, resulting in the imposition of an automatic stay before I had finalized this Order.  The
27   stay was lifted on July 22, 2019 to allow me to issue a decision on this motion and to enter an
     order consistent with that decision.
28

United States District Court
Northern District of California

1   entered in February 2015 for settlement proceedings before Chief Magistrate Judge Spero has

2   hampered Clarke's ability to litigate the issue in the interim and it is possible that he has a

3   plausible claim, I will allow him to amend the First Amended Complaint to state it.  His Clean

4   Water Act ("CWA") claim is moot because of the remediation and monitoring required under the

5   consent decree; there is no realistic prospect that CWA violations will continue in light of my

6   supervision over the consent decree.  His other claims are mooted by his settlement agreement

7   with PG&E.  Accordingly, I grant in part and deny in part PG&E's motion for summary judgment.

8                                    **BACKGROUND**

9        The claims in this case arise from PG&E's operation of manufactured gas plants ("MGPs")

10  roughly one hundred years ago.  Although the MGPs no longer exist, plaintiffs Dan Clarke and

11  SFHA alleged that the plants generated waste containing polycyclic aromatic hydrocarbons

12  ("PAHs") at levels highly toxic to humans and other animals.  First Amended Complaint ("FAC")

13  [Dkt. No. 51].  Clarke formerly resided at 1625 North Point St., San Francisco, California (the

14  "Clarke Property"), *Id.* at ¶ 10, which was located within the footprint of the North Beach MGP,

15  comprising of at least four city blocks bounded by Marina Boulevard, Buchanan Street, North

16  Point Street, Laguna Street, Bay Street, and Webster Street.  *Id.* at ¶¶ 31, 55.  Both plaintiffs,

17  represented by Stuart Gross, brought claims for violations of RCRA, violations of CWA, public

18  nuisance, negligence, and strict liability, and sought declaratory, equitable, and legal relief.  *Id.* at

19  58-66.  Individually, Clarke also brought claims for private nuisance and trespass.  *Id.* at 61-62.

20       The case was filed in September 2014.  I referred it to Chief Magistrate Judge Spero in

21  January 2015 for settlement, given the complex nature of the environmental issues involved.  I

22  stayed discovery the following month.  In July 2015, I bifurcated the issues to allow Clarke to

23  pursue his state law damages claims for private nuisance, trespass, negligence, and strict liability

24  in Counts 4-7 (the "Known Clarke Property Claims.")  The remaining environmental issues

25  continued to be stayed.  Trial was scheduled on the Known Clarke Property Claims for August

26  2016.

27       On February 4, 2016, Clarke, Maureen Laney, the Laney Clarke Family Trust, and PG&E

28  reached an on-the-record settlement of the Known Clarke Property Claims.  Settlement

2

United States District Court
Northern District of California

1   Agreement, Release and Covenant Not to Sue ("Clarke Settlement Agreement") attached as

2   Exhibit A to the Declaration of Stuart G. Gross in Support of Plaintiff's Opposition to Defendants'

3   Motion for Summary Judgment ("Gross Decl.") [Dkt. No. 185-3].  PG&E purchased the Clarke

4   Property in exchange for Clarke's release and discharge of PG&E from "any and all claims,

5   demands, obligations, actions, causes of action, damages, costs, expenses, incidental,

6   consequential, ensuing or resulting damages, loses, punitive damages, attorney's fees and

7   expenses of every kind and nature whatsoever, known and unknown, fixed or contingent, which

8   [Clarke] may not have or may hereafter have against PG&E by reason of any matter, cause or

9   thing arising out of and/or connected with the Clarke Property Environmental Conditions or

10  Disputes."[2]  *Id.* at §2.1(a).  The release excepted "Clarke's Broader Environmental Claims, except

11  any claim by Clarke for damages pursuant to the Broader Environmental Claims."  *Id.*

12         The parties continued to negotiate a settlement of the environmental claims.  Ultimately,

13  Clarke withdrew from the settlement discussions, but his lawyer continued to negotiate on behalf

14  of SFHA.  Those negotiations bore fruit.  On September 27, 2018, I entered a revised consent

15  decree (the "Consent Decree") that constituted a full and final compromise of all claims by SFHA

16  against PG&E.  [Dkt. No. 176].  The Consent Decree requires PG&E to investigate, monitor, and

17  report on the level of PAHs within a hundred-foot band along a defined portion of the San

18  Francisco shoreline.  *Id.* at § 4.  PG&E must evaluate the results of the monitoring and submit for

19  approval a remedial action plan to address groundwater conditions to the Regional Water Quality

20  Control Board – San Francisco Region (the "Regional Board").  *Id.*  PG&E is also required to

21  make a number of payments, totaling $4,200,000, toward a number of supplemental

22  environmental projects ("SEPs") to restore and enhance the quality of the waters and subtidal

23  ecosystem in the San Francisco Bay.  *Id.* at § 3.  Additionally, PG&E must reimburse SFHA for its

24  reasonable attorneys' fees and costs and pay $400,000 into the SF Herring Monitoring Qualified

25  Settlement Fund.  *Id.* at § 3.6.  The Consent Decree shall continue in effect under my jurisdiction

26

27  _____
    [2] Clarke no longer lives on or owns the Clarke Property.  Declaration of Sandi L. Nichols in
28  Support of Pacific Gas and Electric Company and PG&E Corporation's Motion for Summary
    Judgment ¶¶ 4-5 [Dkt. No. 183-2].

3

1   until September 27, 2028.  *Id.* at §§ 11.4, 11.7

2       In light of the two agreements, PG&E  moved for summary judgment against Clarke on the

3   grounds that:  (1) Clarke's negligence and strict liability claims fail because the Clarke Settlement

4   Agreement precludes an award of damages; (2) the Consent Decree moots Clarke's remaining

5   claims; (3) Clarke is unable to seek civil penalties under RCRA as a matter of law; (4) Clarke

6   cannot state a claim for relief under the CWA for discharges stemming from historical MGP

7   operations; and (5) Clarke lacks the special injury required to state a claim for public nuisance.

8   Motion for Summary Judgment ("Mot.") [Dkt. No. 183].

9                              **LEGAL STANDARD**

10      Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

11  to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

12  56(a).  In order to prevail, a party moving for summary judgment must show the absence of a

13  genuine issue of material fact with respect to an essential element of the non-moving party's

14  claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.

15  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this showing,

16  the burden then shifts to the party opposing summary judgment to identify "specific facts showing

17  there is a genuine issue for trial."  *Id.*  The party opposing summary judgment must then present

18  affirmative evidence from which a jury could return a verdict in that party's favor.  *Anderson v.*

19  *Liberty Lobby*, 477 U.S. 242, 257 (1986).

20      On summary judgment, the court draws all reasonable factual inferences in favor of the

21  non-movant.  *Id.* at 255.  In deciding a motion for summary judgment, "[c]redibility

22  determinations, the weighing of the evidence, and the drawing of legitimate inferences from the

23  facts are jury functions, not those of a judge."  *Id.*  However, conclusory and speculative testimony

24  does not raise genuine issues of fact and is insufficient to defeat summary judgment.  *See*

25  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

26                               **DISCUSSION**

27  **I.   THE KNOWN CLARKE PROPERTY CLAIMS**

28      The Clarke Settlement Agreement released "any and all claims, demands, obligations,

United States District Court
Northern District of California

4

1    actions, causes of action, damages, costs, expenses, incidental, consequential, ensuing or resulting

2    damages, loses, punitive damages, attorney's fees and expenses of every kind and nature

3    whatsoever, known and unknown, fixed or contingent" with respect to the Known Clarke Property

4    Claims.  Clarke Settlement Agreement at §2.1(a).  It defines these claims as comprising of

5    "Counts 4-7 in the Complaint and Clarke's claims for punitive damages that arise from those

6    counts[.]" *Id.* at Recital F.

7          PG&E argues that it is entitled to summary judgment on Clarke's negligence and strict

8    liability causes of action because Clarke released all claims for damages in the Clarke Settlement

9    Agreement.  Mot. at 9-11.  Clarke contends that although he has released his claims for damages,

10   he may still seek injunctive relief on the Known Clarke Property claims.  Opposition at 24-25

11   [Dkt. No. 185-4].

12         With regards to Clarke's negligence claim, the parties dispute whether a prima facie claim

13   of negligence requires "damages" or "injury."  Mot. at 9-10; Oppo. at 24-25.  This distinction

14   aside, Clarke identified no case where injunctive relief has been awarded as the result of a

15   successful negligence claim.  His reference to *Kesner v. Superior Court*, 1 Cal. 5th 1132, 1158

16   (Cal. 2016) is unhelpful because it does not involve a claim for injunctive relief.  Neither do the

17   cases cited in *Kesener*.  *See e.g. Castellon v. U.S. Bancorp* 220 Cal. App. 4th 994, 998 (Cal. Ct.

18   App. 2013); *Ladd v. County of San Mateo* 12 Cal. 4th 913, 917 (Cal. 1996); *Ortega v. Kmart*

19   *Corp.* 26 Cal. 4th 1200, 1205 (Cal. 2001).  Because injunctive relief is not available as a remedy

20   for negligence and Clarke has released his damages claims, I grant summary judgment on Clarke's

21   negligence claim.

22         Clarke's strict liability claim fails for the same reason.  The only difference between a

23   claim for strict liability and a claim for negligence is that strict liability is not concerned with the

24   standard of care or reasonableness of the defendant.  *Trejo v. Johnson & Johnson*, 13 Cal. App.

25   5th 110, 134, (Cal. Ct. App. 2017) (discussing strict liability in the product liability context).

26   Injunctive relief is not available as a remedy for Clarke's strict liability claim and I grant summary

27   judgment on it as well.

28

United States District Court
Northern District of California

## II. THE PUBLIC NUISANCE CLAIM

In California, a public nuisance is "[a]nything which is injurious to health . . . so as to interfere with the comfortable enjoyment of life or property . . . which affects at the same time an entire community or neighborhood, or any considerable number of persons." Cal. Civ. Code §§ 3479-80. "A private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise." Cal. Civ. Code § 3493. "Under the requirement that a public nuisance be specially injurious to a plaintiff, courts have recognized that a plaintiff suing on this basis must show special injury to himself of a character different in kind—not merely in degree—from that suffered by the general public." *Backus v. Gen. Mills, Inc.*, 122 F. Supp. 3d 909, 930 (N.D. Cal. 2015) (Henderson, J.) (internal quotation marks and citations omitted).

PG&E moves for summary judgment on Clarke's public nuisance claim because he cannot show that he is suffering from any special injury. It argues that since Clarke's previous basis for special injury was derived from "interference with the free use and enjoyment of the Clarke Home[,]" his sale of the home to PG&E in November 2016 deprives him of any interest in the property and the basis to claim special injury. Mot. 24-25 citing FAC ¶ 225.

In opposition, Clarke argues that his special injury was not limited to the use and enjoyment of the Clarke Property and that the question of whether he has suffered other injuries as a result of the alleged contamination creates a disputed issue of material fact. Oppo. at 23-24. He states that his special injury is that he is currently suffering from heightened anxiety and stress stemming from his fear that he is at increased risk of health problems after living for so long in the vicinity of the alleged contamination, which is different in kind from the injury suffered by the general public. *Id.* This argument is insufficient to show special injury. The potential increased health risk posed to Clarke by the MGP activity is not different in kind from the potential harm to the general public, it is a difference of degree. *Backus*, 122 F. Supp. 3d at 930. Although Clarke believes that he is particularly at risk from his prolonged exposure to PAHs and other MGP byproducts, the claimed injury to the public is still based on exposure to the same PAHs and MGP byproducts.

Clarke also argues that he was injured when he was "forced" to move from his home.

United States District Court
Northern District of California

Oppo. at 23-24.  This caused him to incur moving expenses and leave the Clarke home against his wishes.  *Id.*  This argument is unconvincing because Clarke voluntarily executed the Clarke Settlement Agreement and "voluntarily incurred costs do not suffice to satisfy the special injury requirement for public nuisance."  *Rose v. Union Oil Co. of California*, No. 97-cv-3808-FMS, 1999 WL 51819 (N.D. Cal. Feb. 1, 1999) (finding that plaintiff's choice to retain an engineering company to conduct and environmental assessment did not confer standing as the costs were not "required by any public entity").  Clarke is unable to show that he suffered any type of special injury.  PG&E's motion for summary judgment on this claim is granted.

### III.  THE CLEAN WATER ACT CLAIM

#### A.  Mootness

PG&E moves for summary judgment on Clarke's request for further injunctive relief under the CWA on grounds of mootness because his demands for broader investigation and remediation have been addressed by the mandatory Consent Decree.  Mot. at 15-16.  PG&E argues that state regulatory agencies, through enforceable orders and oversight, as well as this court, through its right to enforce the consent decree, already obligate PG&E to undertake the activities Clarke seeks under his CWA claim.  *Id.*

Article III of the United States Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies."  *See* U.S. Const. art. III, § 2, cl. 1.  "The case or controversy requirement, which constitutes the irreducible constitutional minimum of standing, requires that a plaintiff show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 861-62 (9th Cir. 2017) (internal citations and quotation marks omitted).  "The doctrine of mootness, which is embedded in Article III's case or controversy requirement, requires that an actual, ongoing controversy exist at all stages of federal court proceedings."  *Id.* (citing *Pitts v. Terrible Herbst, Inc.*, 653 F.3d 1081, 1086 (9th Cir. 2011).  "The basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted."  *Id.*

United States District Court
Northern District of California

7

1  (citing *Ruiz v. City of Santa Maria*, 160 F.3d 543, 549 (9th Cir. 1998)).

2      Typically, the "party asserting mootness bears the heavy burden of establishing that there

3  remains no effective relief a court can provide." *Id.* (citing *Forest Guardians v. Johanns*, 450 F.3d

4  455, 461 (9th Cir. 2006)).  An action "becomes moot only when it is impossible for a court to

5  grant any effectual relief whatever to the prevailing party." *Id.* (citing *Chafin v. Chafin*, 568 U.S.

6  165, 172 (2013)). "The question is not whether the precise relief sought at the time the case was

7  filed is still available, but whether there can be any effective relief." *Id.* (citing *McCormack v.*

8  *Herzog*, 788 F.3d 1017, 1024 (9th Cir. 2015) (internal citation omitted)).

9      PG&E and Clarke disagree on the correct legal standard I must apply to determine whether

10 the Consent Decree and investigative orders from the Water Board moot his CWA claims.

11 Generally, a defendant's voluntary cessation of a challenged practice "does not deprive a federal

12 court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw*

13 *Envtl. Servs., Inc.*, 528 U.S. 167, 189 (2000) (internal citations and quotation marks omitted).  "If

14 it did, the courts would be compelled to leave the defendant . . . free to return to his old ways." *Id.*

15 (internal citation and quotation marks omitted).  Accordingly, a defendant's voluntary cessation of

16 an allegedly unlawful activity does not render a case moot unless the defendant meets the "heavy

17 burden of persuading" the court that it is "absolutely clear that the allegedly wrongful behavior

18 could not reasonably be expected to recur." *See id.* (internal citation and quotation marks omitted).

19     PG&E points to the Courts of Appeal for the Second, Fifth, and Eighth Circuits, which

20 have applied a separate test where the defendant's cessation results from a consent decree.  *See*

21 *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 528 (5th Cir. 2008) ("ECO"); *Comfort*

22 *Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998); *Atl. States Legal*

23 *Found., Inc. v. Eastman Kodak Co.*, 933 F.2d 124, 128 (2d Cir. 1991).  These courts have held that

24 where a court would not be relying solely on the defendant's assurances that it will not return to its

25 old ways, the citizen-suit plaintiff must prove "that there is a realistic prospect that the violations

26 alleged in its complaint will continue notwithstanding the consent decree." *ECO*, 529 F.3d at 528

27 (internal citations omitted).  The Fifth Circuit reasoned that this less stringent standard for

28 involuntary cessation "respects Congress's intent that citizen suits supplement rather than . . .

United States District Court
Northern District of California

1    supplant government action . . . [because] citizen suits are proper only if the Federal, State, and

2    local agencies fail to exercise their enforcement responsibility." *Id.* (citing *Gwaltney of Smithfield,*

3    *Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 60 (1987) (internal quotation marks omitted).

4        Clarke counters that courts in this district have rejected less stringent tests in cases of

5    involuntary cessation.  He cites *Envtl. Prot. Info. Ctr. v. Pac. Lumber Co.*, 430 F. Supp. 2d 996,

6    1003 (N.D. Cal. 2006) (Patel, J.) and *Communities for a Better Env't v. Tosco Ref. Co.*, No. 00-cv-

7    0248-SI, 2001 WL 114441, at *6 (N.D. Cal. Jan. 29, 2001), but neither case involved a consent

8    decree or any agency enforcement action.  In *Pac. Lumber Co.*, the regulatory action involved the

9    issuance of a permit related to previously unpermitted conduct.  430 F. Supp. 2d at 1003 (receipt

10   of an industrial general permit for logging operations).  In *Tosco Ref. Co.*, there were two issues.

11   2001 WL 114441, at *6.  First, was the defendant's conduct still unlawful after the limit of dioxin

12   that could be discharged changed?  *Id.*  Second, was the defendant still liable after the allegedly

13   polluting facility had been sold?  *Id.*  Unlike here, neither case involved the right of a third party to

14   enforce a detailed Consent Decree in the event of non-compliance by the polluter.

15       I am persuaded by the rationale of the Second, Fifth, and Eighth Circuits that in cases such

16   as this, where cessation is involuntary pursuant to a consent decree, the citizen-suit plaintiff must

17   prove that there is a realistic prospect that the violations alleged in his or her complaint will

18   continue notwithstanding the consent decree.  *ECO*, 529 F.3d at 528 (internal citations omitted).

19   Under this standard, and given the terms of the consent decree stemming from the actions of

20   Clarke's co-plaintiff, I do not find that there is a realistic prospect that the CWA violations alleged

21   in the complaint will continue despite my supervision.[3]  Clarke's claims for further injunctive

22   relief pursuant to the CWA are moot in light of the remediation required by the consent decree.

23   PG&E's motion for summary judgment as to Clarke's CWA claims is granted.[4]

24   _____

25   [3] Clarke also argues that he seeks remediation that is different and more comprehensive than that
     contained in the Consent Decree.  Oppo. at 18-19.  Clarke is not entitled to any specific form of

26   relief.  *ECO*, 529 F.3d at 530 ("[Plaintiff] is not entitled to any particular form of injunctive relief
     under the CWA—and, therefore, was not guaranteed to achieve any other form of relief in its

27   citizen suit than that imposed under the consent decree").

28   [4] PG&E also argues that Clarke's claim for alleged point source discharges in violation of 33
     U.S.C. § 1342 (Section 402) fails because the CWA does not provide for retroactive liability.

9

United States District Court
Northern District of California

### B.   Civil Penalties Under the CWA

PG&E argues that Clarke's demand for civil penalties under the CWA is moot given that PG&E paid $4,200,000 in SEP payments as required by the Consent Decree.  Mot. at 16-17; Reply at 8 n.18 [Dkt. No. 190-2].  The Consent Decree states that the SEP payments were for the express purpose of "restoring and enhancing the quality of the waters and subtidal ecosystem in San Francisco Bay which will serve to enhance the San Francisco Bay herring fishery."  Consent Decree at § 3.2.  PG&E contends that since the SEP payments were expressly intended to resolve all claims raised by SFHA under the CWA and RCRA, PG&E has faced sufficient retribution and will be deterred from committing future violations of the CWA.  Reply at 8 n.18.  Therefore, PG&E argues, no further relief is required or appropriate.

In opposition, Clarke makes two arguments.  First, citing *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1354-55 (9th Cir. 1990) Clarke asserts that he remains free to seek civil penalties despite the SEP payments required by the Consent Decree because these sorts of payments made for environmental projects by a polluter pursuant to a consent decree to resolve a citizen suit are not civil penalties.  Oppo. at 19-20.  Second, his claims are broader than those resolved in the Consent Decree, and even if the SEP payments are civil penalties, they do not moot his claims for penalties arising out of contamination not addressed by the Consent Decree.  Oppo. at 20.

As a technical matter, Clarke is correct that the SEP payments are not civil penalties as a matter of law; the Supreme Court has held that "civil penalties imposed by a court in a citizens' suit under the Clean Water Act must be made payable to the U.S. treasury."  *Sierra Club*, 909 F.2d at 1354-55 (citing *Gwaltney*, 484 U.S. at 53; *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 14 n.25 (1981)).  But the assessment of civil penalties under the CWA is left to the district court's discretion.[5]  *U.S. ex rel. Adm'r of E.P.A. v. CITGO Petroleum*

---

Mot. 18-21.  I have already rejected this argument because an ongoing regulatory violation is sufficient to support a violation of the CWA.  Order Denying Motion to Dismiss at 13-16 [Dkt. No. 44].  *Id.*  But, as discussed above, Clarke's CWA claim is mooted by the Consent Decree.

[5] Some, but not all, courts have stated that once a CWA violation is found, civil penalties are mandatory.  *San Francisco Baykeeper v. W. Bay Sanitary Dist.*, No. 09-cv-5676-EMC, 2011 WL 6012936, at *5 (N.D. Cal. Dec. 1, 2011) (collecting cases).  Here no CWA violation has been

*Corp.*, 723 F.3d 547, 551 (5th Cir. 2013). The CWA cabins exercise of that discretion by requiring courts to consider the following factors:

> [T]he seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any history of prior violations, the nature, extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require.

33 U.S.C. § 1321(b)(8). The process of weighing the penalty factors is "highly discretionary." *Tull v. United States*, 481 U.S. 412, 427 (1987).

In consideration of the above factors, I agree with PG&E and the United States government that the amount of SEP payments will sufficiently punish PG&E for its past conduct and deter PG&E from future violations of the CWA. In its review and comment on the consent decree before execution, the government sought to ensure that the Consent Decree complied with the requirements of the CWA, and among other things, was consistent with its purposes and would deter future violations. Notice of United States' Review of and Comment on Proposed Consent Decree [Dkt. 170]. After reviewing the terms of the SEP payments, the government did not object to the consent decree. I concur that the SEP payments will be sufficient to deter future violations and ensure compliance with the CWA. Clarke's request for civil penalties under the CWA is denied as moot.

## IV.  THE RESOURCE CONSERVATION AND RECOVERY ACT CLAIM

### A.  Standing

PG&E moves for summary judgment on Clarke's RCRA claim on the grounds that Clarke lost standing to pursue a claim under RCRA when he sold the Clarke Property. Mot. at 12-13. More specifically, PG&E contends that Clarke was no longer injured after he voluntarily terminated his connection to the Clarke Property because his injury for the purposes of RCRA was the diminution of the Clarke Property's value from PAHs in the soil. *Id.*

In opposition, Clarke states that because he still recreates in, and enjoys the natural beauty

found.

United States District Court
Northern District of California

1    of, the Marina and Fisherman's Wharf neighborhoods, he remains injured by PG&E's alleged

2    terrestrial contamination.  Oppo. at 1.  Clarke also argues that he and his family are subject to

3    increased risks of health problems, and that he is injured by the attendant stress and anxiety that

4    stem from the increased risk resulting from their time spent residing on the Clarke Property.[6]  *Id.*

5    at 8.

6         As an initial matter, concrete and particularized injuries to a plaintiff's aesthetic and

7    recreational enjoyment of an area are sufficient to support standing in an RCRA claim.  *Ecological*

8    *Rights Found. v. Pac. Gas & Elec. Co.*, 874 F.3d 1083, 1093 (9th Cir. 2017) ("Here, EcoRights'

9    RCRA suit is based on alleged endangerment to San Francisco Bay as a whole posed by PG&E's

10   onsite waste disposal practices at its facilities.  So it suffices for EcoRights to demonstrate

11   concrete and particularized injuries to its members' aesthetic and recreational enjoyment of San

12   Francisco Bay as a whole.").[7]

13        PG&E argues that since this injury was not contained in the FAC, Clarke impermissibly

14   attempts to raise a new theory of standing in his response to a motion for summary judgment and

15   that I should not consider his new unpleaded theory.  Reply at 3.  In his sur-reply,[8] Clarke counters

16   that he was unaware that PG&E would again challenge the adequacy of his standing to bring an

17   RCRA claim and that if he had known, he would have asked me to lift the stay I had placed on

18   Clarke's broader environmental claims.  Sur-Reply at 1-2 [Dkt. No. 193-1].

19        Given that I stayed the broader environmental claims shortly after the case was filed, I

20   _____

21   [6] Clarke also claims that there is evidence of lead contamination and indoor vapor plumes with the
     potential to cause further injury.  Oppo. at 11-14.  PG&E correctly points out that neither of these

22   things were described in the notice of intent letter ("NOI") and as a result cannot form the basis of
     Clarke's claims.  Reply at 7-8; *Ecological Rights Found. v. Pac. Gas & Elec. Co.*, 713 F.3d 502,

23   511 (9th Cir. 2013) ("Because a notice letter is a jurisdictional prerequisite to suit, [plaintiff]
     cannot pursue allegations its notice letter does not contain.").  The NOI in this case focused on the

24   alleged discharge of PAHs into soil, groundwater, and the San Francisco Bay.  *See* Notice of
     Intent Letter attached as Exhibit A to PG&E's motion to dismiss [Dkt. No. 13-2].  Clarke's RCRA

25   claims are necessarily restricted to those based on the discharge of PAHs.

26   [7] PG&E also argues that references to Clarke's personal injuries violate the Clarke Settlement
     Agreement.  Reply at 3.  This argument fails as the Clarke Settlement Agreement only prevents

27   Clarke from seeking damages related to his RCRA claim and damages are not an available remedy
     to him here.

28   [8] Clarke's administrative motion for leave to file sur-reply [Dkt. No. 193] is granted.

12

United States District Court
Northern District of California

1    agree with Clarke that he should have the opportunity to plead his citizen-suit theory.  I deny

2    without prejudice PG&E's motion for summary judgment related to Clarke's standing to bring a

3    RCRA claim in the current posture of the case, after sale of the Clarke Property.[9]  Clarke's request

4    that I lift the stay on his RCRA claim and that he be given leave to amend the FAC with respect to

5    this claim is granted.  Clarke is cautioned that the FAC must be consistent with the entirety of this

6    order and that he may not reattempt to replead his CWA claim, public nuisance claim, or Known

7    Clarke Property Claims.  Further, the RCRA claims must stem from the NOI and cannot be based

8    on conduct not described in the NOI.

9        **B.  Mootness**

10       PG&E argues that the groundwater testing it has already conducted, and the further

11   groundwater testing it will conduct pursuant to the Consent Decree, moot Clarke's RCRA claim in

12   the same way that it moots Clarke's CWA claim.  Mot. at 14-16.  In opposition, Clarke states that

13   the Consent Decree does not address the terrestrial contamination that is at the heart of his RCRA

14   claim and is clearly distinguishable from the Consent Decree's effect on Clarke's CWA claim.

15   Oppo. at 10-16.  He also contends that PG&E's voluntary investigations do not meet mootness

16   requirements under *ECO* as discussed in the CWA section of this order.  *Id.* at 8-9.

17       I agree with Clarke.  In *ECO,* the Fifth Circuit held that where a court would not be relying

18   solely on the defendant's assurances that it will not return to its old ways, the citizen-suit plaintiff

19   must prove "that there is a realistic prospect that the violations alleged in its complaint will

20   continue notwithstanding the consent decree."  529 F.3d at 528.  The investigation and

21   remediation in the Consent Decree is limited to certain offshore locations and a hundred-foot band

22   defined as the area extending inland for one hundred feet from the mean high tide line of the San

23   Francisco Bay.  Consent Decree at § 4.  The hundred-foot band does not cover the allegedly

24   affected terrestrial areas so the investigation and remediation required by the consent decree do not

25   fall under the less stringent *ECO* standard.  *ECO*, 529 F.3d at 528.  Because the Consent Decree

26

27   [9] I agree with PG&E that Clarke's claims of potential harm to his health and the attendant stress
     will not constitute a "credible threat of harm" without detailed scientific evidence at a potential

28   future motion for summary judgment.  Reply at 4 (citing *Cent. Delta Water Agency v. United
     States*, 306 F.3d 938, 948-50 (9th Cir. 2002)).

United States District Court
Northern District of California

13

1   does not address the terrestrial contamination that forms the basis of Clarke's RCRA claim, PG&E

2   is unable to show that any of its voluntary conduct with regards to the investigation and

3   remediation of terrestrial pollutants outside the hundred-foot band make it "absolutely clear that

4   the allegedly wrongful behavior could not reasonably be expected to recur." *Laidlaw*, 528 U.S. at

5   189.  PG&E's motion for summary judgment based on the mootness of Clarke's RCRA claim is

6   denied.

7          **C.   Civil Penalties**

8          PG&E contends that Clarke is not entitled to civil penalties for his RCRA claim as a matter

9   of law.  Mot. 17-18.  Subchapter VII of RCRA contains the citizen suit provision codified as 42

10  U.S.C. § 6972(a)(1)(B).  PG&E cites numerous cases in a number of jurisdictions, including this

11  one, to support the argument that civil penalties are only available in RCRA suits brought by the

12  government pursuant to Subchapter III of RCRA, and that citizen suits brought under Subchapter

13  VII (such as the one here) cannot result in civil penalties.  Mot. at 17-18 (citing *City of Evanston v.*

14  *N. Illinois Gas Co.*, 229 F. Supp. 3d 714, 724 (N.D. Ill. 2017) (granting motion to dismiss prayer

15  for civil penalties in endangerment action where plaintiff did not allege any violations of

16  Subchapter III); *Verse Two Properties, LLC v. MedPlast Fremont, Inc.*, No. 14-cv-03765-EJD,

17  2015 WL 6955133, at *5 (N.D. Cal. Nov. 10, 2015) (dismissing prayer for civil penalties in

18  endangerment action); *Bd. of Cty. Comm'rs of Cty. of La Plata, Colo. v. Brown Grp. Retail, Inc.*,

19  No. 08-cv-00855, 2010 WL 3430919, at *3 (D. Colo. Aug. 30, 2010) (granting motion for

20  summary judgment on civil penalties); *N. California River Watch v. Exxon Mobil Corp.*, No. 10-

21  cv-0534-PJH, 2010 WL 3184324, at *6 (N.D. Cal. Aug. 11, 2010) (granting motion to strike);

22  *Hernandez v. Esso Standard Oil Co. (Puerto Rico)*, 599 F. Supp. 2d 175, 176-177 & n. 2 (D.P.R.

23  2009) (civil penalties not available for endangerment action); *City of Heath, Ohio v. Ashland Oil,*

24  *Inc.*, 834 F. Supp. 971, 984 (S.D. Ohio 1993) (granting motion to dismiss prayer for civil penalties

25  in endangerment action where plaintiff did not allege any violations of Subchapter III)).

26         In opposition, Clarke notes that there is a split in authority among district courts and that

27  the Ninth Circuit has not ruled on this issue.  Oppo. at 22-23 (citing *Clorox Co. v. Chromium*

28  *Corp.*, 158 F.R.D. 120, 128 (N.D.Ill. 1994) (finding that citizen suits can result in civil penalties

14

*United States District Court*
*Northern District of California*

1    under the RCRA); *Davis v. Sun Oil Co.*, 953 F.Supp. 890, 893 (S.D. Ohio 1996) (same).  Clarke

2    also argues that the Ninth Circuit's decision in *Covington v. Jefferson Cty.* supports his argument

3    that civil penalties are available under Subchapter VII: the court stated in a footnote "that the

4    defendant's plan to remedy the RCRA violation rendered the plaintiffs' claims moot "because an

5    injunction or fines would substantially increase the likelihood of compliance with the new Plan".

6    *Id.* (citing 358 F.3d 626, 639 (9th Cir. 2004)).

7         The Ninth Circuit's language in *Covington* is dicta and does not control this question.  I

8    agree with my colleagues in this district, and with the weight of authority, that civil fines are not

9    available under the citizen suit provision of the RCRA.  As the court *in City of Evanston* reasoned:

10        Section 6928(a) addresses civil penalties that may be imposed in an order issued by
          the EPA Administrator subsequent to a determination that a person "has violated or
11        is in violation of this subchapter." 42 U.S.C. § 6928(a).  In turn, § 6928(g) provides
          that "[a]ny person who violates any requirement of this subchapter shall be liable to
12        the United States for a civil penalty in an amount not to exceed $25,000 for each
          such violation." 42 U.S.C. § 6928(g).  In both provisions, the phrase "this
13        subchapter" refers to title 42, subchapter III of the United States Code, the
          subchapter in which § 6928 is situated.

14   229 F. Supp. 3d 724-25.  In contrast, the citizen suit provision is contained Subchapter VII, which

15   contains no civil penalty provision.  Civil penalties pursuant to Subchapter III are not available for

16   Clarke's suit brought for violation for Subchapter VII.

17   **V.   MOTIONS TO SEAL**

18        Clarke moves to seal the Clarke Settlement Agreement attached to his counsel's

19   declaration, as well as all substantive references to the agreement in his opposition to PG&E's

20   motion for summary judgment.  [Dkt. No. 185].  He argues that sealing is justified because the

21   Clarke Settlement Agreement was entered in connection with distinct claims previously asserted

22   and resolved in this case and that the agreement is governed by a confidentiality provision that

23   renders the entire agreement confidential for a period of seven years from July 18, 2016.  *Id.*

24   PG&E moves to do the same for the portions of its reply brief that refer to the Clarke Settlement

25   Agreement.  [Dkt. No. 190].  In support of sealing, PG&E contends that the Clarke Settlement

26   Agreement contains sensitive financial information regarding amounts paid in settlement that do

27   not impact the merits of the case or the pending motion.  *Id.* at 3.  PG&E also states that disclosure

28

1    of the settlement would harm non-party Maureen Laney, who was a signatory to the agreement.

2    *Id.*

3        Courts have long recognized a "general right to inspect and copy public records and

4    documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435

5    U.S. 589, 597 & n.7 (1978).  But this right is not absolute.  To balance the competing interests of

6    the public's right of inspection against litigants' need for confidentiality, a party seeking to file

7    under seal matters related to dispositive motions must provide "compelling reasons" to do so.

8    *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006).

9        The parties' arguments and "[b]road allegations of harm, unsubstantiated by specific

10   examples or articulated reasoning," do not provide "compelling reasons" to seal the document, as

11   required in the context of dispositive proceedings.  *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966

12   F.2d 470, 476 (9th Cir. 1992).  That the parties have agreed to keep the Clarke Settlement

13   Agreement confidential and both move to seal does not constitute a compelling reason to grant

14   their sealing motions.  *See e.g. Ward v. Cty. of Mendocino*, No. 17-cv-00911-PJH, 2019 WL

15   884016, at *6 (N.D. Cal. Feb. 22, 2019); *Select Portfolio Servicing v. Valentino*, No. 12-cv-0334-

16   SI, 2013 WL 1800039, at *3 (N.D. Cal. Apr. 29, 2013); *Bernstein v. Target Stores, Inc.*, No. 13-

17   cv-01018-NC, 2013 WL 5807581, at *3 (N.D. Cal. Oct. 28, 2013).  I deny both motions to seal.//

18                                    **CONCLUSION**

19       Summary judgment is granted on all of Clarke's non RCRA claims.  Clarke may have 30

20   days to amend his RCRA claim after the bankruptcy stay is lifted.  That said, I wonder if

21   amendment is worth it.  The extent to which the Consent Decree effectively moots his RCRA

22   claim is not clear; the Consent Decree addressed the Clean Water Act issues and land within a

23   100' band by the Bay.  Clarke is limited to the NOI filed before suit was brought; it is unclear if

24   his current claims fall within it.  And civil penalties are not available in such a suit.  But the

25   decision to amend is Clarke's to make, not mine.

26

27

28

16

1    Clarke and PG&E's motions to seal are both denied for failure to show compelling reasons

2    why sealing would be justified.

3

4    **IT IS SO ORDERED.**

5    Dated: July 26, 2019

6
7

8    William H. Orrick
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

17

# EXHIBIT B

| | | Revised | *Cal. P.U.C. Sheet No.* | 43284-E |
| Pacific Gas and Electric Company® | *Cancelling* | Revised | *Cal. P.U.C. Sheet No.* | 22710-E |

**PG&E**
U 39  *San Francisco, California*

**ELECTRIC PRELIMINARY STATEMENT PART S**          Sheet 1
HAZARDOUS SUBSTANCE MECHANISM

S.   HAZARDOUS SUBSTANCE MECHANISM (HSM)

1.   PURPOSE:  The Hazardous Substance Mechanism (HSM) provides a uniform methodology for allocating costs and related recoveries associated with covered hazardous substance-related activities, including hazardous substance clean-up and litigation, and related insurance recoveries, as set forth in Decision 94-05-020.  The HSM includes a balancing account, the Hazardous Substance Cost Recovery Account (HSCRA), and an interest-bearing tracking account, the Other Hazardous Substance Tracking Account (OHSTA).  Costs recorded in the HSM shall include generation-related costs pursuant to Assembly Bill X1 6, which prohibits a facility for the generation of electricity owned by a public utility from being disposed of prior to January 1, 2006.

Terms and definitions relating to hazardous substance-related activities are found in Decision 94-05-020, Appendix A.

2.   APPLICABILITY:  The HSCRA applies to all covered costs and recoveries associated with manufactured gas plant sites, presently-identified federal superfund sites, and other identified sites included in Decision 94-05-020, Appendix A.  The OHSTA is an interest-bearing tracking account for costs and recoveries for sites not included within one of the three defined categories set forth in Decision 94-05-020, Appendix A.

3.   REVISION DATE:  Disposition of the balances in this account shall be determined through the advice letter process.

The California Public Utilities Commission (CPUC) will not conduct a reasonableness review of costs under the HSM except, at its discretion, of costs recorded in the OHSTA.

4.   HSM RATES:  The HSM currently does not have a rate component.

5.   REPORTING REQUIREMENTS:  On or before August 2, 1994, PG&E will file an initial report with the Energy Division (ED), describing previously recorded hazardous substance costs transferred to       (T)
the HSCRA.  (Requirements for this initial report are found in Decision 94-05-020, Appendix A, p. 14.)

Commencing March 1, 1995, PG&E will file an annual report with the ED to reflect the costs and       (T)
recoveries recorded by PG&E in the HSM for the 12-month period ending December 31 of the previous year, except for the first year report, which will cover the period from June 3, 1994, through December 31, 1994.  The Annual Report will be served on all parties to Application No. (A) 91-04-044.

(Continued)

Case: 19-30088    Doc# 5768-2    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 23 of 40

| | Revised | Cal. P.U.C. Sheet No. | 15720-E* |
| Cancelling | Revised | Cal. P.U.C. Sheet No. | 15232-E, |
| | | | 15233-E |

**Pacific Gas and Electric Company®**
U 39    San Francisco, California

**ELECTRIC PRELIMINARY STATEMENT PART S**        Sheet 2
HAZARDOUS SUBSTANCE MECHANISM

S.    I HAZARDOUS SUBSTANCE MECHANISM (HSM)

REPORTING REQUIREMENTS:  (Cont'd.)                                    (L)

The Annual Report shall include the following:

a.    The name and location of each site for which costs were incurred or a recovery obtained.

b.    The amount of covered hazardous substance clean-up costs incurred for each site.

c.    The amount of internal PG&E costs included with the hazardous substance clean-up costs.

d.    The total third-party and insurance litigation costs incurred for all sites.

e.    The amount of covered third-party and insurance recoveries obtained for all sites.

f.    A description of the costs in sufficient detail to allow a determination of whether costs have been properly accounted for by PG&E, and whether reported internal PG&E costs are already being recovered through rates.                                    (L)

6.    COST ALLOCATION:  PG&E shall allocate all costs and related recoveries 70 percent to the Gas Department and 30 percent to the Electric Department, with the exception of hazardous substance insurance litigation costs recovered through PG&E's 1993 General Rate Case base revenues.

(Continued)

| Advice | 1735-E-A | Issued by | Date Filed | May 26, 1998 |
| Decision | 97-08-056 97-12-131 | **Robert S. Kenney** | Effective | January 1, 1998 |
| | | Vice President, Regulatory Affairs | Resolution | |

Case: 19-30088    Doc# 5768-2    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 24 of 40

| | | Revised | *Cal. P.U.C. Sheet No.* | 40580-E |
| --- | --- | --- | --- | --- |
| | *Cancelling* Revised | | *Cal. P.U.C. Sheet No.* | 22711-E |

**PACIFIC GAS AND ELECTRIC COMPANY®**
U 39    *San Francisco, California*

**ELECTRIC PRELIMINARY STATEMENT PART S**        Sheet 3
HAZARDOUS SUBSTANCE MECHANISM

S.    HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

    7.    ACCOUNTING PROCEDURE:  The Hazardous Substance Cost Recovery Account (HSCRA) records expenditures and recoveries associated with the HSM in accordance with D.94-05-020.

    The HSCRA consists of five subaccounts:

      a.    Hazardous Substance Clean-up Cost Account (HSCCA)

      This account records the ratepayers' share of covered hazardous substance costs.  Entries shall be made into the HSCCA at the end of each month as follows:

      1)    A debit entry equal to 90 percent of covered hazardous substance costs.

      2)    A credit entry equal to 90 percent of hazardous substance costs recovered from third parties.

      3)    A credit entry equal to 100 percent of hazardous substance insurance litigation costs recovered through PG&E's 1993 General Rate Case base revenues, excluding the allowance for Revenue Fees and Uncollectible (RF&U) accounts expense, for the period from June 3, 1994, through December 31, 1995.        (T)

      4)    A credit entry equal to the lesser of 10 percent of the remaining insurance recoveries, net of contingency fees paid to outside attorneys to obtain recoveries, if any, not applied to entries 7.c.2 and 7.d.2 below, or 11.111 percent of the entry in 7.b.3 below.

      5)    A credit entry for 60 percent of each debit entry under HSIRA Sections 7.e.3 through 7.e.7 for the ratepayers' portion of insurance recoveries under the HSIRA.

      6)    A debit or credit entry, as appropriate, equal to interest on the average balance in the account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

      7)    A credit entry to transfer the balance to another regulatory  account  as appropriate for rate recovery, upon approval by the CPUC.

      b.    Hazardous Substance Clean-up Cost Shareholder Account (HSCCSA)

      This account records the shareholders' share of covered hazardous substance costs.  Entries shall be made into the HSCCSA at the end of each month as follows:

      1)    A debit entry equal to 10 percent of covered hazardous substance costs.

      2)    A credit entry equal to 10 percent of hazardous substance costs recovered from third parties.

      3)    A credit entry equal to the lesser of 90 percent of the remaining insurance recoveries, net of contingency fees paid to outside attorneys to obtain recoveries, if any, not applied to entries 7.c.2 and 7.d.2 below, or the balance in this account.

(Continued)

| *Advice* | 5082-E | *Issued by* | *Date Filed* | June 12, 2017 |
| --- | --- | --- | --- | --- |
| *Decision* | 15-09-001 | **Robert S. Kenney** | *Effective* | January 1, 2017 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088    Doc# 5768-2    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 25 of 40

| | | Revised | Cal. P.U.C. Sheet No. | 22712-E |
|---|---|---|---|---|
| | Cancelling | Original | Cal. P.U.C. Sheet No. | 13419-E |

**Pacific Gas and Electric Company**
San Francisco, California
U 39

**ELECTRIC PRELIMINARY STATEMENT PART S**     Sheet 4
HAZARDOUS SUBSTANCE MECHANISM

S.   HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

    7.   ACCOUNTING PROCEDURE:  (Cont'd.)

        b.   <u>Hazardous Substance Clean-up Cost Shareholder Account (HSCCSA)</u> (Cont'd.)

            4)   A credit entry for 40 percent of each debit entry under HSIRA Sections 7.e.3 through 7.e.7 for the shareholders' portion of insurance recoveries under the HSIRA.

            5)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

        Shareholders are at risk for any balance remaining in this account following final disposition of all covered hazardous substance and insurance litigation costs and related recoveries.

        c.   <u>Hazardous Substance Clean-up Cost Insurance Account (HSCCIA)</u>

        This account records the ratepayers' share of covered insurance litigation costs.  Entries shall be made into the HSCCIA at the end of each month as follows:

            1)   A debit entry equal to 70 percent of covered insurance litigation costs.

            2)   A credit entry equal to the lesser of 70 percent of insurance recoveries net of contingency fees paid to outside attorneys to obtain recoveries, if any, or the balance in this account.  This account cannot have a credit balance.

            3)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

            4)   A credit entry to transfer the balance to another regulatory account as appropriate for rate recovery, upon approval by the CPUC.     (T)
(T)

        d.   <u>Hazardous Substance Clean-up Cost Shareholder Insurance Account (HSCCSIA)</u>
This account records the shareholders' share of covered insurance litigation costs.  Entries shall be made into the HSCCSIA at the end of each month as follows:
    1)   A debit entry equal to 30 percent of covered insurance litigation costs.

            2)   A credit entry equal to the lesser of 30 percent of insurance recoveries net of contingency fees paid to outside attorneys to obtain recoveries, if any, or the balance in this account.  This account cannot have a credit balance.

            3)   A debit or credit entry, as appropriate, equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.
Shareholders are at risk for any balance remaining in this account upon final disposition of all insurance litigation costs and related recoveries.

(Continued)

| Advice | 2617-E | Issued by | Date Filed | January 28, 2005 |
|---|---|---|---|---|
| Decision | | **Robert S. Kenney** | Effective | March 9, 2005 |
| | | Vice President, Regulatory Affairs | Resolution | E-3906 |

Case: 19-30088   Doc# 5768-2   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 26 of 40

S.   HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)      (N)

7.   ACCOUNTING PROCEDURE:  (Cont'd.)

e.   Hazardous Substance Insurance Recovery Account (HSIRA)

Covered insurance recoveries will be tracked by the year received.  Any insurance recovery amounts remaining after allocation to subaccounts a through d, above, will be held in this interest-bearing account for 60 months from the end of the year in which the recovery was received. Entries to the HSIRA are as follows:

1)   A credit entry equal to insurance recoveries net of contingency fees, if any.  Each insurance recovery will be recorded separately and distributed against covered hazardous substance and insurance litigation costs on a first-in, first-out basis.

2)   A debit entry equal to the sum of insurance recoveries allocated to entries 7.a.4, 7.b.3, 7.c.2, and 7.d.2.

3)   A debit entry to the HSIRA 72 months from the end of the year in which the specific insurance recovery was received for one-fifth, or 20 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

4)   A debit entry to the HSIRA 84 months from the end of the year in which the specific insurance recovery was received for one-fourth, or 25 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

5)   A debit entry to the HSIRA 96 months from the end of the year in which the specific insurance recovery was received for one-third, or 33.333 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

6)   A debit entry to the HSIRA 108 months from the end of the year in which the specific insurance recovery was received for one-half, or 50 percent, of the balance for that specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

7)   A debit entry to the HSIRA 120 months from the end of the year in which the specific insurance recovery was received for any remaining portion of the specific insurance recovery in this account.  The entry is only recorded if the recovery has not been fully allocated to offset covered hazardous substance and insurance litigation costs.*

8)   A debit or credit entry, as appropriate, to this account equal to interest on the average balance in this account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

_____

*   A corresponding credit entry will be made to the HSCCA for 60 percent of each debit entry under Section 7.e.3 through 7.e.7. above for the ratepayers' portion of the insurance recovery, and a credit entry will be made to the HSCCSA for 40 percent of each debit entry under Section 7.e.3 through 7.e.7 for the shareholders' portion of the insurance recovery.

(N)

(Continued)

| | | | |
|---|---|---|---|
| Advice | 1477-E | Issued by | Date Filed | July 13, 1994 |
| Decision | 94-05-020 | **Robert S. Kenney** | Effective | June 9, 1994 |
| | | Vice President, Regulatory Affairs | Resolution | |

Case: 19-30088   Doc# 5768-2   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 27 of 40

| | | Revised | *Cal. P.U.C. Sheet No.* | 43285-E |
|---|---|---|---|---|
| | *Cancelling* Revised | *Cal. P.U.C. Sheet No.* | 37601-E |

**Pacific Gas and Electric Company®**

U 39   San Francisco, California

**ELECTRIC PRELIMINARY STATEMENT PART S**     Sheet 6
HAZARDOUS SUBSTANCE MECHANISM

S.   HAZARDOUS SUBSTANCE MECHANISM (HSM) (Cont'd.)

    8.   OTHER HAZARDOUS SUBSTANCE TRACKING ACCOUNT (OHSTA)

        The OHSTA is an interest-bearing tracking account which, at PG&E's option, tracks hazardous substance clean-up, third-party litigation, and insurance litigation costs (collectively, "other hazardous substance costs") relating to sites not included within one of the three defined categories as set forth in D.94-05-020, Appendix A.

        For Manufactured Gas Plant sites not listed in D.92-05-020, Appendix A, an information notice stating the location of the site and which governmental agency, if any, is overseeing the clean-up, must be sent to the CPUC and all parties to A.91-04-044 within 15 days of incurring expenses of $50,000 or more for a specific site.

        PG&E may, at its option, file an advice letter requesting inclusion of other hazardous substance sites in the HSCRA.  Up to $50,000 may be recorded in the OHSTA for each hazardous substance site prior to advice filing.  At such time as the advice letter for inclusion of a specific site is filed, the $50,000 cap shall be removed.

        The advice letter shall include:  (a) the name of the site, (b) location of the site, (c) the source, nature, and approximate date of the contamination, (d) PG&E's operations (historical and current) at the site, if any, and (e) environmental agency actions and oversight, if any, regarding the site.  In addition, D. 96-07-016 requires utilities to demonstrate that: 1) clean-up costs for which recovery is being sought are not being recovered through base rates or through any other recovery procedure, and 2) all of the costs for which recovery is being sought are hazardous waste clean-up costs (including insurance costs) found appropriate for recovery in the Hazardous Substance Cleanup Cost Recovery Collaborative Report.

        The advice letter shall be treated as a compliance filing under General Order 96-A and will be processed by the ED within 40 days after the filing, if unopposed.  If the filing is protested, the ED will either prepare a resolution, or require PG&E to file an application seeking inclusion of the specified other hazardous substance costs in the HSCRA.     (T)

        Or, PG&E may seek full recovery of other hazardous substance costs through the general rate case, by application, or by any other procedure approved by the CPUC.

        The following entries will be recorded to the OHSTA at the end of each month:

        a.   A debit entry equal to costs incurred associated with other hazardous substance sites.  The costs for each site, including interest, will be recorded separately.

        b.   A credit entry equal to specific other hazardous substance costs transferred to the HSCRA upon CPUC approval of an advice letter for such costs.

        c.   A credit entry equal to the amount approved by the CPUC for recovery from ratepayers when PG&E elects to seek full recovery through a process other than the HSCRA.

        d.   A debit or credit entry, as appropriate, equal to interest on the average of the account balance in each account at the beginning of the month and the balance after the monthly entries, at a rate equal to one-twelfth the interest rate on three-month Commercial Paper for the previous month, as reported in the Federal Reserve Statistical Release, G.13, or its successor.

| *Advice* | 5418-E | *Issued by* | *Submitted* | October 31, 2018 |
|---|---|---|---|---|
| *Decision* | | **Robert S. Kenney** | *Effective* | November 30, 2018 |
| | | *Vice President, Regulatory Affairs* | *Resolution* | |

Case: 19-30088   Doc# 5768-2   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 28 of 40

# EXHIBIT C

1    JAMES L. LOPES (No. 63678)
     JEFFREY L. SCHAFFER (No. 91404)
2    JANET A. NEXON (No. 104747)
     HOWARD, RICE, NEMEROVSKI, CANADY,
3       FALK & RABKIN
     A Professional Corporation
4    Three Embarcadero Center, 7th Floor
     San Francisco, California 94111-4065
5    Telephone: 415/434-1600
     Facsimile: 415/217-5910
6

7    Attorneys for Debtor and Debtor in Possession
     PACIFIC GAS AND ELECTRIC COMPANY

8

9             UNITED STATES BANKRUPTCY COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11              SAN FRANCISCO DIVISION

12    In re                       No. 01 30923 DM

13    PACIFIC GAS AND ELECTRIC       Chapter 11 Case
     COMPANY, a California corporation,
14                         Date:    June 26, 2001
             Debtor.         Time:    9:30 a.m.
15                         Place:    235 Pine St., 22nd Floor
                                     San Francisco, California
16    Federal I.D. No. 94-0742640        Judge:   Hon. Dennis Montali

17

18

19      DECLARATION OF ROBERT C. DOSS IN SUPPORT OF DEBTOR'S
        MOTION FOR AUTHORIZATION TO CONTINUE ITS
20          HAZARDOUS SUBSTANCES CLEANUP PROGRAMS

21

22

23

24

25

26

27

28

---

DECL. OF R. C. DOSS ISO OF DEBTOR'S MOT. FOR AUTH. TO CONT. ITS HAZ. SUBST. CLEANUP PROG. No. 01 30923 DM

I, Robert C. Doss, declare as follows:

1. I am employed by Pacific Gas and Electric Company ("PG&E") as its Principal Consultant, Site Remediation, in connection with PG&E's environmental remediation programs. In such capacity, I am familiar with and knowledgeable about PG&E's policies and practices regarding environmental remediation and the details of such programs. I make this Declaration in support of the Debtor's Motion For Authorization To Continue Its Hazardous Substances Cleanup Programs (the "Motion"). This Declaration is based upon my personal knowledge (except as to any matters stated on information and belief, and as to such matters I am informed and believe they are true), and, if called as a witness, I could and would testify competently to the facts stated herein.

2. PG&E has a long history of operations. PG&E or its predecessors have been in existence since the mid-1850s. Its operations include or have included manufactured gas plant sites, natural gas gathering system sites, natural gas compressor station sites, electric transmission and distribution facilities, steam-electric power plant sites, hydroelectric power plant sites, nuclear power plant sites and service centers. PG&E owns numerous separate parcels of real property and is a tenant under more than 250 leases. As a necessary part of its business, PG&E has used and continues to use a variety of different hazardous materials in a number of its sites. Given the size of PG&E's business operations, its long operating history, and the many properties PG&E owns and leases, the cleanup of sites containing hazardous substances is an ordinary and recurring part of PG&E's business and will be for many years to come.

3. The development of PG&E's hazardous substances cleanup programs largely parallels, and is in response to, the emergence of environmental laws which govern the management and cleanup of hazardous wastes and hazardous substances. With the promulgation of federal Resource Conservation and Recovery Act regulations in 1979, PG&E began an overall examination of its operations to determine which facilities may contain historic sites of waste disposal. This effort was intensified in the early 1980s upon discovery of residues from gas manufacturing operations at two PG&E properties. During

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

the same period, the promulgation of a major regulatory program under the Toxic
Substances Control Act regarding the use and disposal of polychlorinated biphenyls
("PCBs") led to PG&E's implementation of voluntary programs to replace the two major
categories of PCB-containing electrical equipment on its system, and placed increasing
emphasis on the cleanup of releases from in-service equipment and from historic discharges.
California's regulations regarding testing, upgrading and cleanup of releases from
underground tanks which store hazardous substances led to a major PG&E program to
remove over 500 such tanks from service, and to conduct investigations and, where
appropriate, remedial actions to mitigate the effects of any historic leaks or releases from the
tanks. Finally, the development of regulatory programs under the federal Comprehensive
Environmental Response, Compensation and Liability Act of 1980 (commonly referred to as
"CERCLA" and the federal "Superfund" statute) and similar state statutes enacted under the
California Health and Safety Code have led PG&E to develop a comprehensive program,
operating under state and federal regulatory oversight, to evaluate known sites of historical
operations and potential releases, and to perform remedial measures at sites where necessary
to address ongoing or potential exposure risks.

    4.    PG&E maintains a staff of environmental professionals to manage its
hazardous substance cleanup programs. These include professional engineers, registered
geologists, certified engineering geologists, and personnel with training or certification in
related environmental fields. The large number of sites involved, as well as the specialized
expertise mandated in site investigations, requires that the PG&E staff serve as "project
managers," setting the technical framework for site investigations, serving as the liaison with
regulatory agencies, local officials and the public, directing the performance of the
investigations and remedial actions, and managing all aspects of contracting, budgeting and
cost reporting. By and large, PG&E uses the services of environmental consulting firms to
perform site investigations, conduct human health and ecological assessments, and to design
and implement any required remedial measures. From time to time, specialized
environmental services are obtained, such as studies of biological habitat and development

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

of measures to provide protection of endangered or threatened species, or forensic analyses of residues to obtain information on their possible sources.

5.     PG&E's environmental professionals are supported in these programs by internal PG&E legal counsel, who assist in the development of environmental policies, provide guidance and direction on legal and regulatory issues, and manage regulatory and third-party claims with respect to environmental issues.  Where appropriate, PG&E counsel utilize the services of outside legal firms to assist in responding to claims.

6.     PG&E's overall approach to the cleanup of hazardous substances sites is predicated on full compliance with all applicable environmental laws.  Remedial measures are developed with the oversight of local, state or federal environmental regulatory agencies.  Sites which present an ongoing exposure risk to human health or the environment are, of course, given first priority in investigation and remedial action.  PG&E's policy is to provide full notice to all involved regulatory agencies of the existence of such sites, and to work cooperatively with the agencies, and under their oversight, throughout all phases of investigation and cleanup.

7.     PG&E's approach to hazardous substance cleanup claims made by third parties is to first ascertain whether the claims arise from conditions which are, or could be, due to operations for which PG&E is responsible.  For those sites where PG&E determines it may be responsible for the environmental conditions, its preference is to work cooperatively with the claimant in investigating site conditions and developing a mutually agreeable plan for remedial actions.  Under certain circumstances, PG&E will agree to share in financing the costs of investigation and cleanup that meet the requirements of the overseeing environmental agency, or will agree to a negotiated, fair and equitable allocation of costs already incurred.  This approach avoids the inefficiencies and extra cost involved in litigating site cleanup responsibility, while at the same time providing some reasonable assurance that PG&E is assuming responsibility only for those conditions brought about by its operations.  In those instances where an equitable allocation based on current California and federal law cannot be reached, PG&E will litigate the claim.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

8.     Although sites rarely qualify as "typical" in all respects, the following is a brief discussion of the most common study and mitigation elements of a cleanup program at sites where releases of hazardous substances have occurred.

a. Preliminary Studies.  A site whose operations potentially could have contributed to hazardous substances contamination typically first undergoes one or more preliminary studies, termed preliminary assessments or Phase 1 environmental site assessments.  In these studies, site operations are summarized and the potential for chemical release is evaluated, spills or other known releases are identified, known disposal repositories are identified and described, interviews are conducted with former employees or local officials to determine the likelihood that a release of a hazardous substance occurred on the site, and nearby sites of known hazardous substance releases are identified.  These assessments generally include a review of public documents in the files of environmental regulatory agencies.

b. Sampling Of Environmental Media. The chemical data that forms the core of the site investigation process is obtained through remedial, or Phase 2, investigations, which involve the sampling of environmental media (soils, sediments, groundwater, surface water, air) to determine the nature and extent of chemical contamination on a site.  These investigations also require that site hydrologic, geologic and geochemical conditions are defined, so that the fate and transport of chemical contaminants can be assessed.

c. Human Health And Environmental Risk Assessments.  Using data obtained during the remedial investigation, an assessment may be made of the extent of risk posed by chemicals present at a site to human health or to ecological receptors, such as indigenous plant or animal species.  These assessments seek to determine the theoretical increase in the probability of developing disease from exposure to the chemical at the site under study.  The use of theoretical risk studies to assess the likelihood of adverse human health effects is widely accepted in both federal and state regulatory programs.  So-called "risk-based cleanups" represent a scientifically defensible, and health-protective, means of establishing how "clean" a site must be made for a given purpose.

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

d. <u>Other Specialized Studies</u>.  The investigation of a site may involve the conduct of highly specialized studies necessary to establish the historical framework for site responsibility or to ascertain specific data on biological or cultural resources.  Historical studies of all site operations, as well as site ownership, are often necessary to determine whether or not, or to what extent, materials present at a site are the responsibility of PG&E, and whether operations of others may be responsible for site conditions.  Forensic chemical analysis is often useful in establishing the likely origins of hazardous substances, particularly organic substances.  Species diversity and habitat studies help identify sites where threatened or endangered species issues may arise.

e. <u>Feasibility Studies</u>.  A feasibility study is a formal evaluation of all alternatives (including taking no action), which may be employed at a site to achieve remedial goals.  Remedial goals may include the reduction of human health risk to a level below an established threshold and/or the reduction in concentration of a chemical to a level below an adopted standard.  Alternative actions are identified and described in the feasibility study, and are evaluated on the basis of diverse criteria including efficacy in achieving remedial goals, effects of the action on public health and safety, effects of the action on beneficial uses of resources, cost, ease of implementation, and permanence.  The feasibility study concludes with a description of the recommended remedial alternative, based on the detailed analysis and ranking of the range of remedial alternatives available.

f. <u>Remedial Action Plans</u>.  A remedial action plan is a conceptual design-level plan for responding to exposure risks posed by hazardous substances at a site.  When prepared following a feasibility study, a remedial action plan will be concerned with the recommended remedial option identified in the feasibility study.  In cases where no feasibility study has been prepared (as in the case of relatively uncomplicated sites where cleanup is expected to be below certain statutorily established cost thresholds) a "remedial action workplan" may be prepared, which combines a brief analysis of a limited range of remedial measures with the identification and conceptual design of a preferred alternative.  Remedial action plans are adopted as part of a public notice and hearing process conducted

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
&RABKIN
A Professional Corporation

Case: 01-30923   Doc# 5028-2   Filed: 06/08/03   Entered: 06/07/03 20:26:05   Page 35 of 40

by environmental regulatory agencies. Following a public hearing to introduce and receive comments on a remedial action plan, a formal comment and response period will commence. At the conclusion of that period, the plan may be adopted by the agency as a final plan.

g. Remedial Design Documents. Upon adoption of a final remedial action plan, a detailed engineering design must be prepared to implement the approved remedial measures. In addition, and depending on the types of remedial measures proposed, workplans may be required for various elements of the remedial measures, including the transportation of wastes and materials to or from the site, the protection of on-site workers and the public during implementation of the remedial measures, and the monitoring of ambient air, water or soil during the remedial actions to ensure that hazardous substances are not dispersed by the remedial actions.

h. Remedial Actions. Upon the conclusion of the investigation phase at a hazardous substance release site (as represented by the various activities described above), remedial measures are implemented in accordance with the approved plans. The basic remedial options are: (1) containment of hazardous substances to eliminate future human health or environmental exposure risks, (2) removal of hazardous substances to an appropriate disposal or treatment facility, and (3) treatment of hazardous substances in-situ to reduce their quantity, mobility, or toxicity.

i. Post-Remedial Measures. Following implementation of remedial measures at a site, a number of post-remedial actions are generally required. Active remedial systems, such as groundwater control, extraction and treatment systems, must be maintained throughout their operating lives (which can range to 30 years or more). Passive remedial facilities, such as soil caps or hydraulic slurry walls, must undergo regular inspections to ensure their continued efficacy. Groundwater monitoring often must continue at a site, and in the vicinity of that site, to ensure the containment and/or reduction of groundwater contamination continues according to the remedial plans. Access restrictions must be maintained at sites where such restrictions are a feature of the remedial measures.

9. PG&E's hazardous substances cleanup programs generally involve sites that

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

can be broadly grouped into the following three categories:

  (1) PG&E-owned sites at which there are active operations;

  (2) PG&E-owned sites at which there are no active operations; and,

  (3) Third-party owned sites.

  10. Pending the Court's hearing and ruling on the Motion, PG&E has suspended its hazardous materials cleanup programs on properties falling within the third category referenced above due to the concern that continuing with such programs may involve the payment of a prepetition claim and may be deemed not to benefit the bankruptcy estate.

  11. PG&E incurred expenditures of approximately $16 million for its hazardous substances cleanup programs in calendar year 1999 and approximately $18.5 million in calendar year 2000. PG&E has budgeted expenditures of approximately $20.6 million for its hazardous substances cleanup programs in calendar year 2001, of which $2.3 million has been spent to date.

  12. As may be expected, the anticipated costs for these programs overall can be highly variable. Unanticipated discoveries at sites not currently in the programs, or new claims relating to formerly owned sites, can add significant costs to a given year's budget. Information gathered during site investigations and from historical or forensic studies can affect dramatically the degree to which PG&E's operations can be considered to have resulted in the presence of hazardous materials at a site, and thus may necessitate a revision of PG&E's estimated cleanup liability at that site.

  13. There is a benefit to the estate in avoiding any prolonged work stoppage at PG&E's cleanup sites. A prolonged stoppage may result in the loss of important consultants and contractors who may have to move on to other projects. It may also increase the costs of cleanup, particularly where the contamination is migrating. In allowing PG&E to continue its cleanup programs with minimal interruption, PG&E not only can avoid unproductive and

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

DECL. OF R. C. DOSS ISO OF DEBTOR'S MOT. FOR AUTH. TO CONT. ITS HAZ. SUBST. CLEANUP PROG. No. 01 30923 DM

7

lengthy squabbles with governmental agencies and third parties, it can better control the costs of the cleanup. PG&E is also benefited by cleaning up its non-operating properties in that it will be able to sell such properties at a higher price in the future. PG&E believes that in most instances the cost of the cleanup is less than the added value it brings to the property. Also, cleaning up the property minimizes the potential for a lawsuit from the buyer or subsequent owners of the property in the future.

14. The magnitude of the costs for which PG&E seeks Court authorization in the Motion is relatively modest in light of PG&E's overall operations and the total assets and liabilities of the estate. PG&E's request for authorization to expend up to $22 million annually in environmental remediation costs is a small fraction of PG&E's total annual operating expenditures, which exceeded $7 billion per year in each of the three most recent calendar years and which averaged over $9 billion per year during such three-year period. The estimated total assets and liabilities of PG&E as set forth in Exhibit "A" to the Voluntary Petition filed in the above-captioned case, are approximately $24.2 billion and $18.4 billion, respectively.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 5th day of June, 2001, at San Francisco, California.

_Robert C. Doss_
ROBERT C. DOSS

WD 060501/1-1419903/gfl/922061/v2

HOWARD
RICE
NEMEROVSKI
CANADY
FALK
& RABKIN
A Professional Corporation

Case: 01-30923   Doc# 5028-2   Filed: 06/08/03/20   Entered: 06/07/03/20:26:05:29   Page 38 of 40

# EXHIBIT D

On June 28, 2016 the California State Lands Commission approved an extension of the Utility's leases of coastal land occupied by the water intake and discharge structures for the nuclear generation units at Diablo Canyon, to run concurrently with Diablo Canyon's current operating licenses. The Utility will be required to obtain an additional lease extension from the State Lands Commission to cover the period of time necessary to decommission the facility. The State Lands Commission and California Coastal Commission will evaluate appropriate environmental mitigation and development conditions associated with the decommissioning project, the costs of which could be substantial.

The Utility also has an obligation to decommission its electricity generation facilities, including its nuclear facilities, as well as gas transmission system assets, at the end of their useful lives. (See Note 2: Summary of Significant Accounting Policies – Asset Retirement Obligations of the Notes to the Consolidated Financial Statement in Item 8.) The CPUC authorizes the Utility to recover its estimated costs to decommission its nuclear facilities through nuclear decommissioning charges that are collected from customers and held in nuclear decommissioning trusts to be used for the eventual decommissioning of each nuclear unit. If the Utility's actual decommissioning costs, including the amounts held in the nuclear decommissioning trusts, exceed estimated costs, PG&E Corporation's and the Utility's financial results could be materially affected.

### Risks Related to Environmental Factors

***The Utility's operations are subject to extensive environmental laws and changes in or liabilities under these laws could adversely affect PG&E Corporation's and the Utility's financial results.***

The Utility's operations are subject to extensive federal, state, and local environmental laws, regulations, orders, relating to air quality, water quality and usage, remediation of hazardous wastes, and the protection and conservation of natural resources and wildlife. The Utility incurs significant capital, operating, and other costs associated with compliance with these environmental statutes, rules, and regulations. The Utility has been in the past, and may be in the future, required to pay for environmental remediation costs at sites where it is identified as a potentially responsible party under federal and state environmental laws. Although the Utility has recorded liabilities for known environmental obligations, these costs can be difficult to estimate due to uncertainties about the extent of contamination, remediation alternatives, the applicable remediation levels, and the financial ability of other potentially responsible parties. (For more information, see Note 13 of the Notes to the Consolidated Financial Statements in Item 8.)

Environmental remediation costs could increase in the future as a result of new legislation, the current trend toward more stringent standards, and stricter and more expansive application of existing environmental regulations. Failure to comply with these laws and regulations, or failure to comply with the terms of licenses or permits issued by environmental or regulatory agencies, could expose the Utility to claims by third parties or the imposition of civil or criminal fines or other sanctions.

The CPUC has authorized the Utility to recover its environmental remediation costs for certain sites through various ratemaking mechanisms. One of these mechanisms allows the Utility rate recovery for 90% of its hazardous substance remediation costs for certain approved sites without a reasonableness review. The CPUC may discontinue or change these ratemaking mechanisms in the future or the Utility may incur environmental costs that exceed amounts the CPUC has authorized the Utility to recover in rates.

Some of the Utility's environmental costs, such as the remediation costs associated with the Hinkley natural gas compressor site, are not recoverable through rates or insurance. (See "Environmental Regulation" in Item 1.) The Utility's costs to remediate groundwater contamination near the Hinkley natural gas compressor site and to abate the effects of the contamination have had, and may continue to have, a material effect on PG&E Corporation's and the Utility's financial results. Their financial results also can be materially affected by changes in estimated costs and by the extent to which actual remediation costs differ from recorded liabilities.

***The Utility's future operations may be affected by climate change that may have a material impact on PG&E Corporation's and the Utility's financial condition, results of operations, and cash flows.***

The Utility has been studying the potential effects of climate change (increased temperatures, changing precipitation patterns, rising sea levels) on the Utility's operations and is developing contingency plans to adapt to those events and conditions that the Utility believes are most significant. Scientists project that climate change will increase electricity demand due to more extreme, persistent and hot weather. While snowpack in the Sierra Nevada Mountains has been at higher than normal levels this winter, California has experienced ongoing drought in the past. If temperatures and the levels of precipitation in the Utility's service territory continue to change, that could impact the levels of snowpack in the Sierra Nevada Mountains. As a result, the Utility's hydroelectric generation could change and the Utility would need to consider managing or acquiring additional generation. If the Utility increases its reliance on conventional generation resources to replace hydroelectric generation and to meet increased