# EXHIBIT 7

1   STUART G. GROSS (#251019)
    sgross@grosskleinlaw.com
2   BENJAMIN H. KLEIN (#313922)
    bklein@grosskleinlaw.com
3   **GROSS & KLEIN LLP**
    The Embarcadero
4   Pier 9, Suite 100
    San Francisco, CA 94111
5   t (415) 671-4628
    f (415) 480-6688
6
7   *Attorneys for Plaintiffs*

8

9

10                  UNITED STATES DISTRICT COURT

11      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

12

13  SAN FRANCISCO HERRING            Case No. 14-cv-04393 WHO (JCS)
    ASSOCIATION; and DAN CLARKE,
14                                   **REVISED CONSENT
         Plaintiffs,                 DECREE BETWEEN THE PLAINTIFF SAN
15                                   FRANCISCO HERRING ASSOCIATION
         vs.                         AND DEFENDANTS**
16
    PACIFIC GAS AND ELECTRIC COMPANY;
17  and PG&E CORPORATION

18       Defendants.

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1

2

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

# TABLE OF CONTENTS

1.   INTRODUCTION ........................................................................................ 1

2.   DEFINITIONS ........................................................................................... 5

3.   SUPPLEMENTAL ENVIRONMENTAL PROJECTS, OTHER MONETARY
     PAYMENTS, FEES AND COSTS ............................................................. 7

     3.2.   Supplemental Environmental Projects – Creosote Removal and Eelgrass
            Restoration ...................................................................................... 7

     3.3.    Environmental Mitigation - Herring Permit Retirement Program .......... 8

            3.3.1.  Proof of Permanent Permit Reduction ................................. 8

            3.3.2.  Costs of Administration ..................................................... 9

            3.3.3.  Contingent Allocation of Funds .......................................... 9

     3.4.   Other SFHA Payment ....................................................................... 10

     3.5.   Wire Instructions for Grosss & Klein  ............................................... 10

     3.6.   Fees and Costs ............................................................................... 11

            3.6.1.  Reimbursement of Accrued Fees and Costs ......................... 11

            3.6.2.  Compliance Monitoring Funds ............................................ 11

4.   INVESTIGATIVE AND REMEDIAL ACTIONS TO BE TAKEN BY PG&E ............. 13

     4.1.   Result of Compromise ..................................................................... 13

     4.2.   Investigation, Monitoring, and Reporting in the Hundred-Foot (100') Band ........ 13

            4.2.1.  Soil Borings ................................................................... 13

            4.2.2.  Groundwater Grab Samples ............................................... 13

            4.2.3.  Groundwater Monitoring Wells .......................................... 13

            4.2.4.  Groundwater Well Sampling Result Reporting ...................... 17

     4.3.   Remediation in the 100' Band ........................................................... 18

            4.3.1.  Groundwater Remedy Triggers .......................................... 18

            4.3.2.  Development and Proposal of Groundwater Remedial Action or NFA
                    Request ......................................................................... 18

            4.3.3.  Implementation of Remedy ............................................... 19

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

i

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 3
of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4.3.4. Post-Remediation Monitoring ............................................................. 21

4.3.5. Post-Remediation Reporting Obligations ............................................. 21

4.3.6. No SFHA Right of Appeal ................................................................... 22

4.4. Offshore Investigation ................................................................................. 23

4.4.1. Offshore Investigation – Bayward and Lateral Extent........................... 23

4.4.2. Offshore Investigation-Vertical Extent ................................................. 24

4.4.3. Offshore Investigation – Boring Locations ........................................... 24

4.5. Offshore Investigation – Sampling Protocol and Methods ................................... 26

4.5.1. Pore Water Sampling Protocol ............................................................. 26

4.5.2. New Boring Sampling Methodology ..................................................... 27

4.6. Offshore Investigation – Sample Analyses ....................................................... 28

4.6.1. PAH Analysis of Pore Water and Bulk Sediment Cores ........................ 28

4.6.2. Supplemental Constituent Analysis of Bulk Sediment Cores................... 28

4.6.3. Non-Filtration of Pore Water Sample ................................................... 29

4.6.4. Trigger Straddle ................................................................................. 29

4.7. Offshore Investigation – Remedy Triggers and Areas......................................... 29

4.7.1. Offshore Areas Subject To Potential Remedy ....................................... 29

4.7.2. Total Trigger PAHs in Pore Water Remedy Trigger .............................. 29

4.7.3. PWeq Remedy Trigger......................................................................... 29

4.7.4. MGP Contamination Identified Below Three Feet Below Sediment
Surface ............................................................................................... 30

4.8. Offshore Remedy – Selection and Implementation ............................................. 30

4.8.1. PG&E Remedy Proposal...................................................................... 30

4.8.2. Implementation of RAP ...................................................................... 31

4.9. Offshore – Post Remediation Compliance Monitoring and Reporting................... 31

4.9.1. All Residue Removed Remedy ............................................................. 31

4.9.2. Engineered Cap Remedy...................................................................... 33

4.9.3. Other Engineered Solution Remedy ..................................................... 35

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

ii

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 4
of 99

| | | |
|---|---|---|
| 4.9.4. | Monitored Natural Recovery (MNR) Remedy | 37 |
| 4.9.5. | All Offshore Remedy Scenarios | 39 |
| 4.10. | West Harbor | 39 |
| 4.10.1. | No Right of Appeal to Panel | 40 |
| 4.11. | Force Majeure | 40 |
| 4.11.2. | Best Efforts to Gain Access, Permits, Consents and Approvals | 40 |
| 5. | APPEALS TO PANEL | 41 |
| 5.1. | Formation of Panel | 42 |
| 5.2. | No Ex Parte Communication | 43 |
| 5.3. | Appeal Process | 43 |
| 5.3.1. | Timing of Appeal | 43 |
| 5.3.2. | Notice of Appeal | 43 |
| 5.3.3. | Submittal of Digital Record | 43 |
| 5.3.4. | Briefing | 44 |
| 5.3.5. | Extension of Deadlines | 44 |
| 5.3.6. | Additional Document Submittals | 45 |
| 5.3.7. | De Novo Review | 45 |
| 5.3.8. | Scope of Panel Role | 46 |
| 5.3.9. | Written Determination by Panel | 46 |
| 5.3.10. | PG&E Work During Appeal | 46 |
| 5.3.11. | Post-Appeal Actions | 47 |
| 5.3.12. | PG&E Right of Appeal | 47 |
| 5.3.13. | Transmittal Definitions | 47 |
| 5.3.14. | Exclusive Remedy | 48 |
| 5.3.15. | Fees and Costs on Appeal | 48 |
| 6. | DISPUTE RESOLUTION | 48 |
| 7. | SUBMISSION OF CONSENT DECREE TO U.S. EPA/DOJ | 49 |
| 8. | DISMISSAL OF COMPLAINT | 49 |

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

iii

9.    BINDING EFFECT, CLAIMS COVERED AND RELEASED ....................................... 49

    9.1.    SFHA's Releases and Waivers ................................................................................. 49

    9.4.    PG&E's Release and Waiver ................................................................................... 51

10.    NOTICES ....................................................................................................................... 52

11.    MISCELLANEOUS PROVISIONS .............................................................................. 53

    11.1.    Integration. ............................................................................................................. 53

    11.2.    Governing Law ....................................................................................................... 53

    11.3.    Effective Date ......................................................................................................... 53

    11.4.    Retention of Jurisdiction. ....................................................................................... 53

    11.5.    Modification ........................................................................................................... 53

    11.6.    Construction ........................................................................................................... 53

    11.7.    Term of Consent Decree ........................................................................................ 54

    11.8.    Severability ............................................................................................................. 54

    11.9.    Assignment ............................................................................................................. 54

    11.10.  Authority to Sign .................................................................................................... 54

    11.11.  Counterparts/Signatures ........................................................................................ 54

    11.12.  Attorney's Fees For Enforcement or Modification of Consent Decree ................. 54

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

iv

# 1. INTRODUCTION

1.1.   **The Parties.** This Consent Decree—inclusive of the Exhibits hereto, which are all incorporated herein by reference —is entered into by and between plaintiff San Francisco Herring Association ("SFHA"), on the one hand, and Pacific Gas and Electric Company and PG&E Corporation (collectively, "PG&E"), on the other hand. SFHA and PG&E collectively are referred to herein as the "Parties" and each of them as a "Party."

1.2.   SFHA is a California non-profit, unincorporated association whose membership at the time this lawsuit was filed was comprised of those members listed on SFHA's "Certificate of Interested Entities or Persons," filed in this action on September 30, 2014 [Dkt. No. 5], and currently is made up of San Francisco Bay commercial herring fishermen. SFHA was formed to protect the San Francisco herring fishery, including without limitation the health and maintenance of the herring stock on which the fishery depends, and to advocate, on behalf of its members, activities related to herring fishing, including protection of the San Francisco Bay herring stock.

1.3.   PG&E Corporation is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California. Pacific Gas and Electric Company is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California, and is a subsidiary of PG&E Corporation.

1.4.   SFHA's co-plaintiff in this action, Daniel Clarke ("Clarke"), is not a party to this Consent Decree and is not bound by its terms.

1.5.   **General Allegations.** SFHA alleges that PG&E formerly owned and operated three manufactured gas plants ("MGPs") in the present-day Marina and Fisherman's Wharf neighborhoods of San Francisco, the North Beach MGP, the Fillmore MGP, and the Beach Street MGP (the "Former MGPs") which manufactured gas used for lighting, heating, and cooking purposes in the late nineteenth century and early 20th century.

1.6.   The "Former North Beach MGP Site" is approximately 9.5 acres in size and is located within the area bounded by Bay Street to the south, Webster Street to the west, Buchanan Street and Laguna Street to the east, and the San Francisco Marina and North Point

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 7 of 99

1

1 Street to the north. The site is comprised of those parcels lying within the area designated by

2 the City and County of San Francisco Office of the Assessor-Recorder as Block Numbers 0459,

3 0460A, 0445A, 0463B, and 0900. The Former North Beach MGP Site is depicted on "**Exhibit**

4 **1**".

5       1.7.    The "Former Fillmore MGP Site" is approximately 9.1 acres in size. It is

6 comprised of those parcels lying within the area designated by the City and County of San

7 Francisco Office of the Assessor-Recorder as Block Nos. 0462A, 0463A, 0466A, 0467A, and

8 0468A. The Former Fillmore MGP Site is depicted on "**Exhibit 2**".

9       1.8.    The "Former Beach Street MGP Site" is approximately 0.3 acres in size and is

10 bordered by Beach Street on the south, Mason Street on the west, and Powell Street on the east,

11 and Jefferson Street (also called Lincoln Highway) on the north. It is identified as San Francisco

12 Assessor's Parcel Number 0014-001. The Former Beach Street MGP Site is depicted on

13 "**Exhibit 3**".

14       1.9.    The Former North Beach MGP Site, the Former Fillmore MGP Site, and the

15 Former Beach Street MGP Site are sometimes collectively referred to herein as the "Former

16 MGP Sites." The term "Former MGP Sites" does not include within its meaning any site other

17 than the Former North Beach MGP Site, the Former Fillmore MGP Site, and the Former Beach

18 Street MGP Site. The term Former MGPs does not include within its meaning any facility other

19 than the North Beach MGP, the Fillmore MGP, and the Beach Street MGP.

20       1.10.   **Notice of Intent to Sue/Complaint.** On or about April 29, 2014, SFHA and

21 Clarke served PG&E and state and federal regulatory enforcement agencies with a document

22 entitled "Notice of Intent to Sue Under the Resource Conservation and Recovery Act ("RCRA")

23 and the Clean Water Act ("CWA") (the "Notice"). The Notice alleged that the former MGP

24 operations by PG&E violated RCRA, specifically, 42 U.S.C. § 6972(A)(1)(B), because PG&E's

25 placement of MGP residues at and in the vicinity of the Former MGP Sites allegedly caused

26 contamination of the soil, groundwater and surface water, which SFHA and Clarke alleged may

27 present an imminent and substantial endangerment to health and/or the environment. In addition,

28 the Notice alleged violations of the CWA (33 U.S.C. §§ 1311, 1342 and 1365) by PG&E for the

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 8
of 99

2

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   alleged discharge of MGP residues from the Former MGP Sites into the San Francisco Bay

2   without a permit. SFHA and Clarke indicated their intention to file a citizen suit under RCRA

3   and the CWA with regard to these alleged violations.

4       1.11.   PG&E has denied and continues to deny these and all other material allegations

5   made by SFHA and Clarke in the Notice. No federal or state agency has commenced or is

6   diligently prosecuting a civil or criminal action in any court relating to the violations alleged in

7   the Notice. Nor has any state or federal agency ever informed PG&E that a permit is required

8   under RCRA or the CWA for any of the Former MGP Sites or for any MGP-related residues.

9       1.12.   On September 30, 2014, SFHA and Clarke filed a complaint against PG&E

10  asserting the RCRA and CWA claims described in the Notice, and also for public nuisance,

11  private nuisance (Clarke), trespass (Clarke), negligence, strict liability, and declaratory relief

12  (SFHA).

13      1.13.   Following the denial of PG&E's motion to dismiss the complaint, SFHA and

14  Clarke filed a first amended complaint on March 9, 2015, asserting the same causes of action as

15  alleged in the complaint (the "First Amended Complaint" or "FAC"). PG&E filed an answer to

16  the First Amended Complaint on March 30, 2015, in which it denied all material allegations of

17  the First Amended Complaint and asserted numerous affirmative defenses.

18      1.14.   **Mediated Investigation Agreement**. On October 1, 2015, SFHA, Clarke, and

19  PG&E entered into a Mediated Investigation Agreement ("MIA") for the purpose of determining

20  the nature and extent of MGP residue in the "Investigation Area," as defined in the MIA. The

21  MIA was subsequently amended six times by the parties to it through five addenda and

22  statements on the record. The MIA, as amended and inclusive of its addenda, is referred to

23  herein as the "MIA". The MIA expired by its terms on December 1, 2017, and is of no further

24  force or effect.

25      1.15.   **MIA Investigations**. PG&E worked jointly with SFHA and Clarke under the

26  MIA to develop and implement work plans for soil and groundwater investigations on and

27  around the Former MGP Sites under the oversight of the Regional Water Quality Control Board

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

3

1   – San Francisco Region ("Regional Board") and the State of California Department of Toxic

2   Substances Control ("DTSC").

3       **1.16.** **Additional PG&E Investigations and Remediations.** PG&E has also conducted

4   and is conducting other soil, soil gas, groundwater, and offshore sediment investigations and

5   certain remedial activities on or around the Former MGP Sites, and in and along San Francisco

6   Bay, including those areas adjacent to the Former North Beach MGP Site and the Former Beach

7   Street MGP Site, pursuant to Voluntary Cleanup Agreements ("VCAs") entered into with DTSC

8   for each of the Former MGP Sites, and pursuant to investigative orders concerning offshore

9   sediment issued by the Regional Board to PG&E and the City and County of San Francisco

10  ("CCSF") in 2017.

11      **1.17.** **Jurisdiction and Venue.** For purposes of this Consent Decree only, the Parties

12  stipulate that this Court has jurisdiction over PG&E as to the allegations contained in the First

13  Amended Complaint, that venue is proper in the Northern District of California, and that this

14  Court has jurisdiction to approve, enter, and enforce this Consent Decree as a full and final

15  binding resolution of all claims that were or could have been asserted by SFHA in the Notice

16  and the First Amended Complaint based on the facts or conduct alleged therein.

17      **1.18.** **No Admissions.** SFHA and PG&E enter into this Consent Decree as a negotiated

18  resolution of disputed claims. PG&E denies all material allegations contained in the Notice and

19  the First Amended Complaint. SFHA denies the adequacy and merit of any defense raised by

20  PG&E to such material allegations. This Consent Decree and any payments made or actions

21  taken pursuant to this Consent Decree do not constitute, nor shall they be construed as, an

22  adjudication, or an admission by PG&E, of any fact, finding, issue of law, conclusion of law, or

23  violation of law, or of any liability, wrongdoing, responsibility, or tortious or illegal conduct

24  whatsoever, such being specifically disputed and denied by PG&E. Except as expressly

25  provided in this Consent Decree, nothing in this Consent Decree shall prejudice, waive or impair

26  any right, remedy, argument or defense the Parties may have in any administrative or judicial

27  proceeding, except all Parties waive any rights of appeal with respect to this Consent Decree and

28  as otherwise set forth herein.  This Consent Decree, its terms and provisions, as well as any

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

4

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 10 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  discussions or other communications relating to this Consent Decree, past, present, or future,

2  shall not be offered or received in evidence in any action or proceeding, whether legal, equitable

3  or administrative, or utilized in any other manner whatsoever, as an admission or concession of

4  liability, wrongdoing, responsibility or tortious or illegal conduct on the part of PG&E.

5       1.19.   This Consent Decree reflects a full, fair and reasonable resolution of SFHA's

6  claims against PG&E raised in this lawsuit and the matters addressed by this Consent Decree.

7  **2.**   **DEFINITIONS.** In addition to definitions defined within the body of this Consent Decree,

8      the following definitions apply.

9       2.1.   **Approved RAP**. The term "Approved RAP" shall mean a remedial action plan

10  ("RAP") that has been: (a) approved by the Regional Board or the State Water Resources

11  Control Board (the "State Water Board," collectively with the Regional Board, the "Board"); (b)

12  approved by any other regulatory agency with jurisdiction; and (c) upheld by the Panel after an

13  appeal, if any, by SFHA under Section 5.

14       2.2.   **Chemical Performance Standard.** The term "Chemical Performance Standard"

15  shall mean 15 µg/L Total Trigger PAHs in pore water.

16       2.3.   **Chemical Performance Standard Testing.** The term "Chemical Performance

17  Standard Testing" shall mean the sampling of pore water and analyzing it to determine whether

18  the Chemical Performance Standard has been exceeded, in accordance with "**Exhibit 12**" and

19  Section 4.5.

20       2.4.   **Compliance Wells.** The term "Compliance Wells" shall have the meaning given

21  in Section 4.2.3.1.

22       2.5.   **Effective Date.** The term "Effective Date" shall have the meaning given in

23  Section 11.3.

24       2.6.   **"Final" as to Board Approvals and Determinations.** The term "final," when

25  referring to Regional Board or State Water Board approvals or determinations, shall have the

26  meaning given in Section 4.3.5.1.

27       2.7.   **First Amended Complaint or FAC.** The term "First Amended Complaint" or

28  "FAC" shall have the meaning given in Section 1.13.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

5

1    2.8.    **GW PAHs.** The term "GW PAHs" shall mean the PAHs that are included in the

2    forty (40) chemical semivolatile suite currently utilized in PG&E's groundwater program in San

3    Francisco.

4    2.9.    **Hundred-Foot Band.** The term "Hundred-Foot Band" ("100' Band") means the

5    area extending inland for one hundred (100) feet from the mean high tide line of San Francisco

6    Bay.

7    2.10.   **Mediated Investigation Agreement or MIA.** The term "Mediated Investigation

8    Agreement" or "MIA" shall have the meaning given in Section 1.14.

9    2.11.   **NAPL.** The term "NAPL" shall mean non-aqueous phase liquid hydrocarbons.

10   2.12.   **Notice.** The term "Notice" shall have the meaning given in Section 1.10.

11   2.13.   **Panel.** The term "Panel" shall have the meaning given in Section 5.

12   2.14.   **Sediment/Pore Water PAHs.** The term "Sediment/Pore Water PAHs" shall have

13   the meaning given in Section 4.6.1, as identified in "**Exhibit 14**".

14   2.15.   **Supporting Documents.** The term "Supporting Documents" shall have the

15   meaning given in Section 5.3.4.1.

16   2.16.   **Term.** The term "Term" shall have the meaning given in Section 11.7.

17   2.17.   **Total Trigger PAHs.** The term "Total Trigger PAHs" shall mean the U.S.

18   Environmental Protection Agency ("U.S. EPA") list of 34 alkyl and parent polycyclic aromatic

19   hydrocarbon ("PAH") compounds on U.S. EPA's PAH-34 list, as shown on "**Exhibit 4**".

20   2.18.   **Upset Event.** The term "Upset Event" shall mean any of the following:  (a) a

21   publicly-reported storm exceeding the design storm (i.e., greater than a 100-year storm); (b) a

22   seismic event with a magnitude greater than 5.0 within 50 kilometers (km) of the location of the

23   respective remedy site, greater than 6.0 within 100 km of the location of the respective remedy

24   site, or greater than 7.0 within 500 km of the location of the respective remedy site; or (c)

25   publicly-reported sand boils occurring within the Marina or Fisherman's Wharf neighborhoods,

26   as shown on the map attached hereto as "**Exhibit 15**".

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

6

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
12 of 99

1  **3.  SUPPLEMENTAL ENVIRONMENTAL PROJECTS, OTHER MONETARY**
2  **PAYMENTS, FEES AND COSTS**

3      3.1.    PG&E shall make the following payments as part of the consideration in

4  exchange for the full and final compromise of all claims by SFHA against PG&E for alleged

5  violations of the CWA and RCRA, and for SFHA's claims under California state statutory and

6  common laws for damages and injunctive relief, as set forth in the Notice and FAC, and in

7  consideration for the releases and covenants not to sue as set forth below:

8      3.2.    **Supplemental Environmental Projects – Creosote Removal and Eelgrass**

9  **Restoration.** Within ninety (90) days of the Effective Date of this Consent Decree, PG&E shall

10 make the following payments for the following supplemental environmental projects ("SEPs"),

11 which are intended for the purpose of restoring and enhancing the quality of the waters and

12 subtidal ecosystem in San Francisco Bay, which will serve to enhance the San Francisco Bay

13 herring fishery:

14      3.2.1.  PG&E shall pay a total of One Million Two Hundred Thousand Dollars

15 ($1.2 million) to the State of California Coastal Conservancy (the "Conservancy"), a state

16 agency whose stated purpose is to preserve, protect, and restore the resources of the California

17 coast, ocean, and the San Francisco Bay Area, with instructions to allocate those funds for the

18 Terminal Four Wharf Creosote Removal Project of the San Francisco Bay Creosote Removal

19 and Pacific Herring Habitat Restoration Project. Said payment shall be made by check payable

20 to the California State Coastal Conservancy, 1515 Clay Street, 10th Floor, Oakland, CA, 94612,

21 with notice to SFHA.

22      3.2.2.  PG&E shall pay a total of One Million Two Hundred Thousand Dollars

23 ($1.2 million) to the Estuary & Ocean Science Center (the "Center") with instructions to allocate

24 those funds for work to be conducted on eelgrass restoration projects in the San Francisco Bay

25 as follows:  (a) Six Hundred Thousand Dollars ($600,000) for a project to determine the best

26 path forward to restoring eelgrass "crop circles" in Richardson Bay, Sausalito, California, which

27 will involve both assessment of restoration potential and active planting of eel grass in the area;

28

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
13 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   and (b) Six Hundred Thousand Dollars ($600,000) for a two-part study to determine sources of

2   eelgrass transplant material and to investigate the utilization of grazer species that enhance

3   eelgrass growth in San Francisco Bay.  Said payment shall be made by check payable to Estuary

4   & Ocean Science Center, 3150 Paradise Drive, Tiburon, CA, 94920, with notice to SFHA. At

5   the time of making its payment, PG&E shall notify the Center that the Center is to provide

6   PG&E and SFHA with annual progress reports on the status of the respective projects, for each

7   of the three years during which the projects are to be implemented with these SEP funds.

8          3.3.   **Environmental Mitigation - Herring Permit Retirement Program**. Subject to

9   Sections 3.3.1 and 3.3.3, PG&E shall pay according to the instructions below the total sum of

10  One Million Eight Hundred Thousand Dollars ($1.8 Million) for the sole and exclusive purpose

11  of providing compensation for the permanent retirement of existing commercial herring gill net

12  permits issued by the California Department of Fish and Wildlife ("Herring Permits") in order to

13  benefit the restoration and improvement of the herring fishery in California (the "Permit

14  Retirement Payment"). PG&E and SFHA agree to cause the permanent retirement of a minimum

15  of forty (40) Herring Permits, with a goal of permanently retiring eighty (80) such permits,

16  within four (4) years of the Effective Date of this Consent Decree (the "Herring Permit

17  Retirement Program" or "HPRP"). SFHA further agrees that it shall provide to PG&E

18  confirmation and evidence of its progress in permanently retiring the Herring Permits on an

19  annual basis.

20         3.3.1.   Proof of Permanent Permit Reduction. PG&E's payment under Section 3.3

21  shall not be due and payable unless and until PG&E receives from SFHA either of the following,

22  either of which shall constitute "Proof of Permanent Permit Reduction": (a) written confirmation

23  from the Department of Fish and Wildlife that the number of available Herring Permits will be

24  permanently reduced by the number of Herring Permits to be retired in accordance with Section

25  3.3 together with evidence of at least forty (40) contracts between SFHA and individual Herring

26  Permit holders (the "HPRP Contract") under which the Herring Permit holder agrees, in

27  consideration for the payment received under the HPRP and conditioned upon his or her receipt

28  of such payment, that he or she shall not renew his or her retired Herring Permit or apply at any

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

8

1    time in the future for a replacement for his or her retired Herring Permit, and includes language

2    that the Herring Permit holder waives and releases PG&E from claims, demands, damages, and

3    liabilities in the same manner and to the same extent as the release and waiver agreed to by

4    SFHA in Section 9 (except without reference to the MIA) (the "HPRP Contract Release"); or (b)

5    alternative legally sufficient proof demonstrating that the total number of Herring Permits

6    available has been reduced by at least forty (40) from the number of Herring Permits outstanding

7    as of the Effective Date and that at least forty (40) participating Herring Permit holders have

8    entered into an HPRP Contract including the HPRP Contract Release.  For purposes of this

9    Section 3.3.1, "alternative legally sufficient proof" shall include, without limitation, an adopted

10    regulation permanently reducing the total number of available Herring Permits together with

11    evidence of the HPRP Contracts, including the HPRP Contract Release. PG&E shall only be

12    referenced in the HPRP Contract in the HPRP Contract Release. SFHA shall be obligated to

13    enforce the HPRP Contracts, with the exception of the HPRP Contract Release, which PG&E

14    shall be entitled to enforce as an express third party beneficiary of the HPRP Contract.

15              3.3.1.1.    Within ninety (90) days following PG&E's receipt of the Proof

16    of Permanent Permit Reduction, PG&E shall make the Permit Retirement Payment in

17    accordance with the wire instructions in Section 3.5; provided, however, that in the event the

18    ninety-day period expires less than sixty (60) days before the end of any calendar year, then

19    PG&E shall not make the Permit Retirement Payment in said calendar year and the due date for

20    said payment shall instead automatically be extended to January 30th of the following calendar

21    year and shall be paid by PG&E in January of said year.

22              3.3.2.    Costs of HPRP Compliance. SFHA shall be solely responsible for the

23    costs of ensuring compliance with the HPRP, which shall be paid for from the Permit

24    Retirement Payment. Such compliance costs must be reasonable and may not exceed Sixty

25    Thousand Dollars ($60,000).

26              3.3.3.    Contingent Allocation of Funds. In the event SFHA believes it will be

27    unable to or otherwise fails to provide PG&E with the required Proof of Permanent Permit

28    Reduction within four (4) years of the Effective Date, then SFHA shall notify PG&E within

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

9

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 15 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  thirty (30) days of its knowledge of its inability to satisfy its obligations under Section 3.3.

2  Within ninety (90) days following PG&E's receipt of the foregoing notice, and in lieu of the

3  payment otherwise required under Section 3.3, PG&E shall make payment of Nine Hundred

4  Thousand Dollars ($900,000) ("Reduced Permit Retirement Payment") in accordance with the

5  wire instructions in Section 3.5; provided, however, that in the event the ninety-day period

6  expires less than sixty (60) days before the end of any calendar year, then PG&E shall not make

7  the Reduced Permit Retirement Payment in said calendar year and the due date for said payment

8  shall instead automatically be extended to January 30th of the following calendar year and shall

9  be paid by PG&E in January of said year.

10      3.4.   **Other SFHA Payment.** Within ninety (90) days of the Effective Date of this

11  Consent Decree, PG&E shall pay the sum of Three Hundred Thousand Dollars ($300,000) (the

12  "Other SFHA Payment") to SFHA in accordance with the wire instructions in Section 3.5 to

13  resolve SFHA's state-law claims; provided, however, that in the event the ninety-day period

14  expires less than fifteen (15) days before the end of any calendar year, then PG&E shall not

15  make the Other SFHA Payment in said calendar year and the due date for said payment shall

16  instead automatically be extended to January 30th of the following calendar year and shall be

17  paid by PG&E to SFHA in January of said year.  PG&E shall have no responsibility or liability

18  for the ultimate transmittal to or distribution or allocation of the funds PG&E has paid to SFHA,

19  which responsibility shall be solely borne by SFHA.

20      3.5.   **Wire Instructions for Gross & Klein**: The following, in combination with the

21  complete account number which shall be provided by SFHA to PG&E, constitute the wire

22  instructions for Gross & Klein.

23          □   Account Name: Gross & Klein LLP

24          □   Last Four Digits of Account Number: x3474

25          □   Bank: Citibank, 245 Market St., San Francisco, CA 94111

26          □   Domestic Routing Number: 321171184

27          □   International Swift Code: CITIUS33

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

10

1

2          3.6.    **Fees and Costs.**

3              3.6.1.    <u>Reimbursement of Accrued Fees and Costs</u>. PG&E shall reimburse SFHA

4    its reasonable attorneys' fees and costs, including expert consultant costs, incurred from and after

5    December 1, 2017, through the execution of this Consent Decree for the court-supervised and

6    out-of-court settlement negotiations and related work, leading up to and including preparation of

7    this Consent Decree, which would be compensable under the standard established by § 505 of

8    the Clean Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting that standard.

9    SFHA shall provide to PG&E the invoices for which reimbursement is sought. SFHA and its

10   counsel, by approving this Consent Decree as to its form, each agree and acknowledge that such

11   payment shall constitute full and final payment of all attorneys' fees, expert/consultant fees, and

12   costs for services rendered by Gross & Klein, EnviroAssets, and all other attorneys and

13   consultants, during said timeframe, and neither SFHA nor its counsel or consultants shall be

14   entitled to seek any additional fees or costs from PG&E relating to said work. In the event that

15   an agreement is reached as to some or all of the reasonable fees and costs to be reimbursed to

16   SFHA under this Section 3.6.1, PG&E shall make such payment within sixty (60) days of the

17   date of that agreement, using wire instructions in Section 3.5. In the event the Parties are unable

18   to reach agreement as to some or all of the fees and costs for which SFHA seeks to be

19   reimbursed under this Section 3.6.1, then SFHA may submit the matter to the Court for

20   resolution upon a properly noticed motion.

21              3.6.2.    <u>Compliance Monitoring Funds</u>. Within ninety (90) days of the Effective

22   Date of this Consent Decree, PG&E shall pay the total sum of Four Hundred Thousand Dollars

23   ($400,000), using wire instructions in Section 3.6.2.3, into the SF Herring Monitoring Qualified

24   Settlement Fund (the "QSF"), established by or on behalf of SFHA, as the full and final payment

25   of attorneys' fees and costs, including expert costs, associated with SFHA's monitoring of

26   PG&E's compliance with this Consent Decree from the Effective Date through the termination

27   of this Consent Decree under Section 11.7.  SFHA warrants and represents to PG&E that the

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

11

1   QSF is a duly constructed and authorized IRC Section 468B Qualified Settlement Fund, as

2   defined by Internal Revenue Code Section 468-B and the associated Treasury Reg. 1-468B-1 of

3   the Internal Revenue Code and is qualified to receive this settlement payment.

4                     3.6.2.1.    SFHA shall defend and indemnify PG&E, and hold PG&E

5   harmless, with respect to any claims, demands, causes of action, rights, suits, obligations, debts,

6   liabilities, damages, penalties, taxes, charges, losses, costs, expenses, attorneys' fees, expert

7   fees, of any nature whatsoever, relating to or arising from the formation, administration, or

8   existence of the QSF or the payment by PG&E into the QSF. Notwithstanding Section 11.7,

9   SFHA's obligations under this Section 3.6.2.1 shall survive the termination of this Consent

10  Decree.

11                    3.6.2.2.    Except as specifically provided under Section 3.6 and subject

12  to Section 5.3.15.2, neither SFHA nor its counsel or consultants are entitled to, nor shall they,

13  seek any additional funds from PG&E for any Compliance Monitoring for work performed by

14  PG&E under this Consent Decree. "Compliance Monitoring," as used in this Section 3.6.2 and in

15  Section 5.3.15.2 shall include, without limitation, review and analysis of (a) technical data; (b)

16  monitoring reports; (c) Remedial Action Completion Reports ("RACRs"); (d) remedial action

17  plans ("RAPs") and related Regional Board responses; (e) requests for "no further action"

18  determinations and related Regional Board responses; and (f) review of Notices of Force

19  Majeure, as described Section 4.11.3.

20                    3.6.2.3.    Wire Instructions for QSF: The following, in combination with

21  the complete account number which shall be provided by SFHA to PG&E, constitute the wire

22  instructions for the QSF.

23                    ☐  Account Name: EPTC Custodial Trust Settlement Trust

24                       Contribution Account

25                    ☐  Account Number: x8544

26                    ☐  Bank: Union First Market Bank

27                    ☐  Domestic Routing Number: 051403164

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)                                              12

☐   Further Credit Instructions: EPTC FBO – SF Herring Monitoring Qualified Settlement Fund

## 4.    INVESTIGATIVE AND REMEDIAL ACTIONS TO BE TAKEN BY PG&E

4.1.    **Result of Compromise.** The actions to be taken by PG&E under this Consent Decree are solely the result of a compromise of this dispute. Consequently, none of the agreements reached herein, or activities contemplated to be undertaken by PG&E pursuant to this Consent Decree, are intended to, nor shall they, have any precedential effect, including, without limitation, with respect to any other soil, soil gas, groundwater, surface water, or sediment investigations and/or remedial actions being undertaken or to be undertaken by or on behalf of PG&E in San Francisco Bay or elsewhere.

4.2.    **Investigation, Monitoring, and Reporting in the Hundred-Foot (100') Band.** PG&E shall undertake the work as set forth in this Section 4.2 within the 100' Band.

4.2.1.    Soil Borings**.** Based upon understandings reached in negotiating this Consent Decree, PG&E already has taken soil borings in the area from Pier 35 to Jones Street, identified as "UB-01" through "UB-09" on **Exhibit 5**. Said locations formed the basis for the locations for the groundwater grab sampling to be conducted by PG&E under Section 4.2.2.

4.2.2.    Groundwater Grab Samples**.** A "groundwater grab" is a single groundwater sample representative of a specific location and depth at a given point in time. PG&E shall complete four additional groundwater grabs at the locations shown on **Exhibit 5** and with sample depth intervals specified in "**Exhibit 17**".

4.2.3.    Groundwater Monitoring Wells**.** PG&E shall undertake the following groundwater sampling in designated existing wells and new groundwater monitoring wells to be installed pursuant to this Consent Decree:

4.2.3.1.    Groundwater Monitoring Well Locations. PG&E shall undertake groundwater sampling in the groundwater monitoring wells that are located, or will be located, in the locations within the 100' Band, which are identified and described on the maps attached hereto as "**Exhibit 6**" and "**Exhibit 7**" and the table attached hereto as **Exhibit 17** (each

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

13

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 19 of 99

1   well, individually referenced as a "Compliance Well" and, if referencing more than one,

2   "Compliance Wells") and which shall be constructed per Sections 4.2.3.2 and 4.2.3.3 and

3   located as close to the Bay as technically feasible.

4                               4.2.3.1.1.       In the event sediment pore water sampling in the

5   agreed-upon location(s) adjacent to Fort Mason shown on **Exhibit 8"** show(s) Total Trigger

6   PAHs consistent with MGP residue that exceed 15 µg/L in pore water, then and only then PG&E

7   shall advance one or more exploratory soil borings in the upland area adjacent to the offshore

8   sampling point(s) with such exceedance. The depth of the boring(s) will extend down to the

9   elevation corresponding with the offshore exceedance or deeper. Soil samples will be analyzed

10  for constituents specified in Section 4.2.3.4. Grab groundwater samples will be collected

11  adjacent to each boring with sample depth intervals selected in accordance with the protocol

12  described in Section 4.2.3.2 and 4.2.3.3. If soil samples indicate the presence of MGP residue in

13  one or more soil samples in the upland area at Fort Mason, and grab groundwater samples

14  exceed 105 µg/L of the Total Trigger PAHs at the adjacent grab groundwater location, PG&E

15  shall install a groundwater monitoring well at the location of the grab groundwater sample(s)

16  with such exceedance in accordance with the 100' Band monitoring well protocol described in

17  Sections 4.2.3.2 and 4.2.3.3.

18                              4.2.3.1.2.       In the event that grab groundwater samples exceed

19  105 µg/L of the Total Trigger PAHs at any of the grab groundwater locations identified on

20  **Exhibit 5"**, then, and only then, PG&E shall install groundwater monitoring wells at the

21  location of the grab groundwater sample(s) with such exceedance in accordance with the 100'

22  Band monitoring well protocol described in Sections 4.2.3.2 and 4.2.3.3.

23                              4.2.3.1.3.       Notwithstanding the foregoing, installation of the

24  groundwater monitoring wells in the locations provided for in this Section 4.2.3 is subject to

25  PG&E's ability to gain access from the property owner, with use of best efforts, for such

26  installations. In the event such access is not granted, the groundwater monitoring well(s) will be

27  installed at the nearest accessible location. Except as expressly provided for in this Section 4.2.3,

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)                                                          14

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page
20 of 99

1  no other additional groundwater monitoring wells are required to be installed or sampled by

2  PG&E within the 100' Band under this Consent Decree.

3                  4.2.3.2.   <u>Screening Depths/Intervals</u>. PG&E shall construct each

4  groundwater monitoring well or well cluster with the following screened intervals: (a) the first

5  encountered groundwater; (b) beneath the first encountered fine-grained interval that is ten (10)

6  inches or greater in thickness and below the interval screened to target first encountered

7  groundwater, with a maximum targeted well depth between twenty-five (25) feet and thirty (30)

8  feet below ground surface ("bgs"); provided, however, in the event no such fine-grained interval

9  is encountered shallower than forty (40) feet bgs, a ten (10) foot screen shall be placed from

10  thirty (30) feet to forty (40) feet bgs, unless a continuous fine grained interval consistent with

11  native Bay Mud (i.e. not post-development sediments) is encountered more shallowly than forty

12  (40) feet bgs that extends to forty (40) feet bgs, in which case a five-foot screened interval shall

13  be installed immediately above said interval which shall complete the monitoring well; (c) at

14  any other depths adjacent to identified NAPL, downgradient of NAPL near shore, or, if there is

15  no room downgradient of NAPL, then within the NAPL.  Other than as indicated above, screen

16  intervals will be five (5) feet in length, unless a different length is needed to achieve any of the

17  above criteria.

18                  4.2.3.3.   <u>Well configuration</u>. Wells will not be configured or maintained

19  in a way that omits the collection of NAPL and/or MGP tar-impacted intervals.

20                  4.2.3.4.   <u>Constituents To Be Sampled</u>. PG&E shall sample and analyze

21  groundwater in wells within the 100' Band, as shown on **Exhibit 6** and **Exhibit 7**, for GW PAHs

22  and total extractable petroleum hydrocarbons ("TEPH"), but no other constituents.

23  Notwithstanding the foregoing, neither Total GW PAHs nor TEPH, alone or in combination,

24  shall be used as the trigger for any groundwater remedy. Instead, only the Total Trigger PAHs

25  shall be used to determine whether a groundwater remedy is triggered under this Consent

26  Decree.

27                  4.2.3.5.   <u>Calculation of Total Trigger PAHs</u>. Total Trigger PAHs shall

28  be calculated using the concentrations as shown in validated laboratory analytical results, or

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

15

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 21 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   laboratory-provided results where data validation is not conducted (the "Laboratory Results")

2   and in accordance with the following:

3                   4.2.3.5.1.   Laboratory Non-Detects. In the event Laboratory

4   Results report non-detections ("ND") for any of the Total Trigger PAHs, Total Trigger PAHs

5   shall be calculated by substituting one-half the reporting limit for each individual Total Trigger

6   PAH concentration reported as non-detect at the laboratory reporting limit.

7                   4.2.3.5.2.   "J" Qualified Positive Detections. Where "J"

8   qualified positive detections are provided in the Laboratory Results, those "J" qualified results

9   will be considered positive detections for the purpose of calculating Total Trigger PAHs. "'J'

10  qualified positive detections," as used in this Section 4.2.3.5.2, means that the particular PAH

11  concentration is reported as an estimate.

12                  4.2.3.5.3.   Neat Analysis. Samples utilized for Total PAH

13  Trigger evaluation shall be submitted for undiluted (or "Neat") analysis. In the unlikely situation

14  where the laboratory is unable to provide undiluted reporting limits or "RLs" (i.e., no Neat

15  sample), and the RLs cause the trigger exceedance, the well will be resampled as soon as

16  reasonably achievable at a similar tidal stage, submitted for undiluted (Neat) analysis, and those

17  results will replace the original results for evaluating whether the remediation trigger has been

18  exceeded. In this circumstance, concurrent with its transmittal of the quarterly groundwater

19  monitoring report that includes such sampling event, as set forth in Section 4.2.4, PG&E will

20  provide to SFHA the correspondence from the laboratory explaining why the undiluted sample

21  results cannot be provided.

22                  4.2.3.5.4.   Trigger Straddle. Where the concentrations of

23  primary and duplicate samples straddle a trigger level and field duplicate relative percent

24  difference ("RPD") goals are met (with goals defined as within 25% for Total Trigger PAHs

25  rather than individual chemicals), the arithmetic mean concentration of Total Trigger PAHs of

26  the two (2) samples shall be determined for trigger evaluation under Section 4.3.1. Where

27  duplicate goals fail, the affected well shall be resampled as soon as reasonably achievable at a

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

16

1   similar tidal stage that the failed duplicates were collected and the resampled results will be used

2   for trigger evaluation under Section 4.3.1.

3         4.2.3.6.     Sampling Frequency. PG&E shall take a single sample per

4   Compliance Well each quarter, such that in a given year the full tidal cycle is represented. This

5   will be accomplished by sampling each Compliance Well within a four-quartile range of high to

6   low tide. This sampling shall be conducted by PG&E according to the following schedules

7   applicable to the Pre-Remediation Phase, the Remediation Phase, and the Post-Remediation

8   Phase, respectively and as applicable:

9         4.2.3.6.1.     Pre-Remediation Phase. At the initiation of the

10  investigation following entry of this Consent Decree (the "Pre-Remediation Phase"), PG&E

11  shall sample Compliance Wells quarterly for eight quarters. If, following the first eight (8)

12  quarters of groundwater monitoring in a Compliance Well during the Pre-Remediation phase

13  there is no exceedance of the remediation trigger set forth in Section 4.3.1, then no further

14  monitoring of such Compliance Well(s) is required and PG&E shall be entitled to seek a no

15  further action ("No Further Action" or "NFA") determination from the Regional Board, and/or

16  any other governmental agency with jurisdiction, and shall be entitled to close and

17  decommission any Compliance Wells that are the subject of an approved NFA.

18  Notwithstanding anything to the contrary in Section 5, SFHA shall have no right of appeal to the

19  Panel from the approval of a request for an NFA in this limited circumstance.

20        4.2.3.6.2.     Remediation Phase. The schedule for sampling

21  during the period of remediation (the "Remediation Phase") is described in Section 4.3.3.

22        4.2.3.6.3.     Attainment/Post-Remediation Phase. The schedule

23  for sampling during the period after a remediation is complete (the "Post-Remediation Phase") is

24  described in Section 4.3.4.

25        4.2.4.   Groundwater Well Sampling Result Reporting. For the Term of this

26  Consent Decree, PG&E shall provide to SFHA, concurrently with PG&E's submittal to the

27  Regional Board: (a) a copy of each groundwater monitoring report for Compliance Wells in the

28  100' Band; and (b) copies of any RACR(s) addressing a Compliance Well.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

17

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
23 of 99

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4.2.4.1.    A RACR shall include. (a) a description of the approved remedial action; (b) a description of the remedial activities; and (c) a recommendation for further action, which shall include a recommendation for at least eight (8) quarters of monitoring.

4.3.    **Remediation in the 100' Band**

4.3.1.    Groundwater Remedy Triggers. Subject to Section 4.3.2, PG&E shall be required to evaluate and submit to the Regional Board for approval a RAP to address groundwater conditions identified in the sampling of the Compliance Wells under Section 4.2.3 only in the following circumstances: (a) where statistically, at the conclusion of eight consecutive quarters of groundwater monitoring following entry of this Consent Decree, applying a 95% UCL of the Total Trigger PAHs data collected over those eight consecutive quarters determined in accordance with the U.S. EPA RCRA Unified Guidance (2009) statistical analysis, the data for the groundwater Compliance Well show an exceedance of 105 µg/L Total Trigger PAHs, with each Compliance Well to be separately evaluated; (b) if, after the first quarter of groundwater monitoring following entry of this Consent Decree, data show an exceedance of 2500 µg/L Total Trigger PAHs in a Compliance Well and such exceedance is confirmed through follow-up sampling in the same Compliance Well(s) in which such exceedance occurred as soon thereafter as reasonably practicable; or (c) if, after the first quarter of groundwater monitoring following entry of this Consent Decree, data show an exceedance of 500 µg/L Total Trigger PAHs but less than 2500 µg/L Total Trigger PAHs in a Compliance Well, then PG&E shall undertake monthly groundwater monitoring sampling at such Compliance Well(s), and if seven (7) consecutive monthly samples thereafter in such Compliance Well(s) show(s) Total Trigger PAHs above 105 µg/L, applying a 95% UCL determined in accordance with the U.S. EPA RCRA Unified Guidance (2009) statistical analysis.

4.3.2.    Development and Proposal of Groundwater Remedial Action or NFA Request. In the event one or more of the triggering circumstances described in Section 4.3.1 occurs, PG&E shall either develop and propose a RAP to address the identified contamination

for the approval of the Regional Board and consideration by other regulatory agencies with jurisdiction or request an NFA determination from the Regional Board. PG&E shall be entitled to evaluate, develop and prepare the RAP and determine the remedy to be proposed in the RAP in the exercise of its sole and absolute discretion. SFHA shall not be entitled or permitted to participate in the development or preparation of such RAP(s), except that SFHA may participate in any public comment process as allowed by the Regional Board and exercise its right to appeal certain RAP approvals pursuant to Section 5. If the remedy proposed in the RAP explicitly includes the technically reasonable removal of any Compliance Well, the remedy must also explicitly address replacement monitoring.

4.3.2.1.   SFHA Right of Appeal. SFHA shall have a right to appeal to the Panel, in accordance with Section 5, any approval or grant by the Regional Board or the State Water Board of:  (a) a "Monitoring Only" remedy (as defined in Section 4.3.3.1); (b) an MNR remedy (as defined in Section 4.8.1), or (c) a request for an NFA determination (except as set forth in Section 4.2.3.6.1).

4.3.3.   Implementation of Remedy. Following approval of a proposed RAP by the Regional Board or the State Water Board, as well as approval by any other regulatory agency with jurisdiction and resolution of any appeal by SFHA, PG&E shall implement the Approved RAP.

4.3.3.1.   Monitoring and Reporting During Implementation of a Non-"Monitoring Only" Remedy within the 100' Band. In the event that a particular remedy explicitly includes the technically reasonable removal of any Compliance Well, the remedy must explicitly address replacement monitoring. At the initiation of a "Non-Monitoring Only" remedy, i.e., a remedy that calls for any actions beyond only further monitoring, then PG&E shall continue quarterly monitoring from the same Compliance Wells that triggered the remedy and those immediately adjacent, beginning at the initiation of the remedy and continuing until the remedy is complete. PG&E shall prepare and provide to the Regional Board and SFHA quarterly monitoring reports containing the results of the monitoring called for in the Approved RAP. PG&E shall submit an annual groundwater monitoring report to the Regional Board, to be

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

19

1    sent concurrently to SFHA, which contains the results of such monitoring. Such annual

2    groundwater monitoring report shall include a request for approval of either further Monitoring

3    Only, a transition to Post-Remediation Monitoring (as described in Section 4.3.4), or another

4    remedy. If an additional Monitoring Only Remedy is approved, subject to SFHA's rights of

5    appeal under Section 5, PG&E shall undertake the monitoring according to the schedule

6    approved by the Regional Board and submit the annual groundwater monitoring reports to the

7    Regional Board and concurrently to SFHA. Except for in-situ chemical or biological

8    remediation, remedy "Completion" for other remedial actions shall be at the time the last

9    demobilization of contractors associated with the remedy approved in the RAP is undertaken (by

10   way of example and not limitation, e.g., the completion of excavation and backfilling, or, in the

11   context of a containment remedy, the completion of construction of the containment remedy).

12   For in-situ chemical or biological treatment remedies, "Completion" is defined as the time that

13   in-situ conditions are no longer conducive to the in-situ remediation technique selected for the

14   remediation, or when remedial action objectives have been met and a request for transition to

15   Post-Remediation Monitoring is approved by the Regional Board.

16           4.3.3.2.    Monitoring and Reporting During Implementation of a

17   "Monitoring Only Remedy." In the event an Approved RAP consists solely of monitoring

18   ("Monitoring Only Remedy"), PG&E shall implement the monitoring as called for under the

19   Approved RAP. PG&E shall submit an annual groundwater monitoring report to the Regional

20   Board, to be sent concurrently to SFHA, which contains the results of such monitoring. Such

21   annual groundwater monitoring report shall include a request for approval of either further

22   Monitoring Only, an NFA determination, or another remedy. If an additional Monitoring Only

23   Remedy is approved, subject to SFHA's rights of appeal under Section 5, PG&E shall undertake

24   the monitoring according to the schedule approved by the Regional Board and submit the annual

25   groundwater monitoring reports to the Regional Board and concurrently to SFHA.

26           4.3.3.3.    SFHA's Right of Appeal. SFHA shall have a right to appeal,

27   pursuant to Section 5, an approval by the Regional Board of a request by PG&E for approval of

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

20

1    a Monitoring Only Remedy or NFA determination pursuant to this Section 4.3.3, but only as to

2    those wells that are covered by such approval.

3                  4.3.4.   <u>Post-Remediation Monitoring</u>. Unless the Approved RAP consists solely

4    of no less than eight (8) quarters of groundwater monitoring, following the Completion of the

5    non-Monitoring Only remedial action under Section 4.3.3.1, PG&E shall undertake eight (8)

6    quarters of groundwater monitoring in the respective Compliance Wells identified in Section

7    4.3.3.1 in accordance with the protocol described in Sections 4.2.3.2 through 4.2.3.5 ("Post-

8    Remediation Monitoring"). In the event the Approved RAP consists solely of at least eight (8)

9    quarters of groundwater monitoring, then no further groundwater monitoring shall automatically

10   be required upon the completion of such monitoring under Section 4.3.3.2.

11                4.3.5.   <u>Post-Remediation Reporting Obligations</u>. PG&E shall report the results of

12   its Post-Remediation Monitoring in an annual report to be submitted to the Regional Board with

13   a concurrent copy to SFHA.

14                  4.3.5.1.   <u>Timing of Annual Reports</u>. PG&E shall issue such annual

15   reports promptly after the eight (8) quarters of Post-Remediation Monitoring required under

16   Section 4.3.4 are satisfied for the respective Compliance Wells, and then every year thereafter

17   for the Term of this Consent Decree until an NFA determination is approved by the Regional

18   Board or State Water Board for the respective Compliance Wells and becomes "final." For

19   purposes of this Consent Decree, a Regional Board or State Water Board determination or

20   approval is "final" if the determination or approval is not appealed to the Panel under Section 5,

21   or, if the determination or approval is appealed, the appeal does not result in the Panel's rejection

22   of the Board approval or determination pursuant to the process set forth in Section 5.

23                  4.3.5.2.   <u>Required Alternative Proposals In Annual Reports</u>. In the

24   annual reports, PG&E shall propose one of the following three options to the Regional Board:

25   (a) additional remedial action; (b) further Monitoring Only; or (c) a request for an NFA

26   determination.

27                     4.3.5.2.1.   <u>SFHA's Right of Appeal</u>. SFHA shall have a right

28   to appeal to the Panel, in accordance with Section 5, any approval or grant by the Regional

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

21

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 27 of 99

1   Board or the State Water Board of a request made by PG&E for approval of a Monitoring Only

2   Remedy or a request for an NFA determination pursuant to Section 4.3.5.2, but only as to such

3   Compliance Wells that are covered by such approval or determination.

4               4.3.5.3.    Non-MGP Residue. In the event PG&E concludes during the

5   groundwater sampling and analyses undertaken pursuant to Section 4.3 that identified PAH

6   contamination in a sampled Compliance Well is not consistent with MGP residue, then PG&E

7   shall request approval of an NFA determination from the Regional Board as to such well.

8                   4.3.5.3.1.    SFHA's Right to Appeal. SFHA shall have a right

9   to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the

10  State Water Board of an NFA determination pursuant to Section 4.3.5.3.

11          4.3.6.   No SFHA Right of Appeal. Notwithstanding anything to the contrary

12  herein, SFHA shall have no right of appeal to the Panel in regards to the 100' Band in the

13  following other circumstances:

14              4.3.6.1.    where, other than in association with a request for Monitoring

15  Only included in an annual report the Regional Board approves a proposal for continued

16  monitoring contained in a quarterly monitoring report;

17              4.3.6.2.    where the Regional Board approves a proposal for continued

18  monitoring contained in an annual report issued during the first eight (8) quarters of monitoring

19  during the Pre-Remediation Phase pursuant to Section 4.2.3.6.1;

20              4.3.6.3.    where the Regional Board approves a request for an NFA

21  determination following the first eight (8) quarters of monitoring during the Pre-Remediation

22  pursuant to 4.2.3.6.1 when there has been no exceedance under Section 4.3.1 at the groundwater

23  monitoring wells that are the subject of the NFA;

24              4.3.6.4.    where the Regional Board approves a proposal for continued

25  monitoring in a groundwater monitoring report issued during the first eight (8) quarters of

26  monitoring following the completion of a non-Monitoring Only remedy under Section 4.3.3; and

27              4.3.6.5.    where the sole basis for appeal of a Monitoring Only remedy

28  or NFA determination would be that PAH concentrations in groundwater monitoring wells

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

22

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
28 of 99

either upgradient of or within a containment remedy, if sampled, continue to exceed the remedy trigger. Containment remedies are designed to contain, and not to remove or reduce, groundwater with PAH concentrations exceeding the groundwater remedy trigger. Whether a containment remedy is effective shall be based upon other factors, including without limitation, water levels, evidence indicating there is no communication of groundwater with the Bay in the subject area, and any sentry wells installed as a part of the containment remedy, as justified in the Board approved remedy plan.

4.4.    **Offshore Investigation.** PG&E shall undertake the work as set forth in this Section 4.4 within the offshore area defined in Section 4.4.1.

4.4.1.   Offshore Investigation – Bayward and Lateral Extent**.** PG&E shall conduct the bayward and lateral delineation of MGP-related impacts in the following areas:

4.4.1.1.    <u>Bayward Extent</u>. The bayward extent of the offshore investigation required under this Section 4.4 shall extend from the mean high tide line and continue bayward until the bayward extent of contamination consistent with MGP residue has been reached, subject to any physical or safety considerations that would present unreasonable risks.

4.4.1.2.    <u>Lateral Extent Relative to Shoreline</u>. The lateral extent of the offshore investigation required under this Section 4.4 relative to the shoreline shall be as follows, unless the lateral extent of contamination consistent with MGP residue relative to the shoreline is reached prior to the limits identified below (in which case the lateral extent shall terminate at such location):

4.4.1.2.1.    <u>Limits in the Marina</u>. From Lyons Street (western limit) to Van Ness Avenue (eastern limit).

4.4.1.2.1.1.    <u>West Harbor</u>. Within the West Harbor (as defined in Section 4.10), but PG&E shall only be required to conduct passive sampling, in the manner and locations described in Section 4.10 and as shown on "**<u>Exhibit 16</u>**".

4.4.1.2.2.    <u>Limits in Pier 39 to Pier 45</u>. From Pier 45 (western limit) to Pier 35 (eastern limit).

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

23

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4.4.2.   Offshore Investigation-Vertical Extent**.** PG&E shall conduct the vertical delineation of MGP-related impacts to practicable limits presented by safety considerations, as determined by a competent person (as defined by OSHA Regulation, 29 C.F.R. 1926.32(f)) performing the work, to sediment depths targeted to twenty-five (25) feet below sediment surface ("bss"), and no less than twenty (20) feet bss; provided, however, that if NAPL consistent with MGP residue is encountered at the lowest sampling depth in a boring location then PG&E shall use TarGOST to continue its vertical delineation until NAPL is no longer present.

### 4.4.3.   **Offshore Investigation – Boring Locations**

4.4.3.1.   <u>Marina</u>. Sampling will be conducted at the locations identified on the map attached hereto as "**Exhibit 9**" (the "New Marina OS Locations"). The sampling for new Marina OS Locations adjacent to the Marina Green Seawall will be located bayward of the seawall apron extending approximately seventy-five (75) feet from the seawall.

4.4.3.1.1.   In the event the bayward extent of contamination consistent with MGP residue has not been reached within the boundaries of the New Marina OS Locations, further sampling, extending beyond the New Marina OS Locations, will be undertaken on an iterative basis until the bayward extent contamination consistent with MGP residue is identified, at which time the outer limits of the MGP residue offshore of the Marina will be deemed to have been identified and PG&E shall not be required to undertake any investigation or sampling further bayward of the Marina.

4.4.3.1.2.   In this iterative process, the first bayward step-outs from the New Marina OS Locations would be no more than fifty (50) feet bayward of the first row of sampling locations; the next step-out distance would be no more than one hundred (100) feet bayward from the first step-out sample locations (one hundred and fifty (150) feet bayward from the first row); and any further step-outs would be no more than one hundred and fifty (150) feet bayward from the previous step-out locations (three hundred (300) feet bayward from the first row, then four hundred and fifty (450) feet, etc.). Any bayward step-outs would be

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

24

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 30 of 99

1   staggered, with one sampling location approximately seventy-five (75) feet to the west of the

2   triggering location and one sampling location approximately seventy-five (75) feet to the east of

3   the triggering location. Any lateral step-outs would be one hundred and fifty (150) feet to east

4   and/or west of the prior step-out location as appropriate, subject to the boundary limitations set

5   forth in Section 4.4.1. (An illustrative example of the step-out scenarios is depicted in "**Exhibit**

6   **10**".)

7                    4.4.3.2.    Fort Mason. Sampling will be conducted at the locations

8   identified on the map attached hereto as **Exhibit 8**.

9                    4.4.3.3.    Pier 35 to Pier 45. PG&E previously conducted sediment

10  sampling in the offshore area between Pier 35 and Pier 45. In lieu of undertaking additional pore

11  water and sediment core sampling in this area, PG&E may instead apply a surrogate predictive

12  pore water equivalent ("PWeq") to evaluate whether any remedy is required, to be developed in

13  accordance with the protocol set forth in "**Exhibit 11**". The formula(s) (the "PWeq Formula(s)")

14  will then be applied to existing data from bulk sediment sampling in other areas of Pier 35 to

15  Pier 45 to generate PWeq values for those locations. Notwithstanding the foregoing, PG&E

16  reserves the right, in its sole and absolute discretion, to collect and analyze actual pore water

17  samples—in accordance with the protocol described in **Exhibit 12**—in lieu of applying the

18  PWeq. In addition, in all instances where PWeq is applied, PG&E shall have the right to take

19  confirmatory pore water samples, in accordance with the protocol described in **Exhibit 12**. In

20  that event, the Laboratory Results from such confirmatory samples would be used to determine

21  whether a remedy is required under Section 4.7, and not the PWeq (i.e., actual measurements

22  will supersede the PWeq predictive analysis).

23                   4.4.3.3.1.    East Harbor. PG&E already has undertaken

24  extensive sampling in the area known as the East Harbor, which is shown on the map attached

25  hereto as "**Exhibit 13**". It is contemplated that the East Harbor area, which is owned and

26  operated by CCSF through its Recreation and Parks Department, will be remediated in

27  coordination with CCSF's renovation or reconfiguration of the East Harbor marina. Contingent

28  upon such remediation occurring, PG&E is not required by this Consent Decree to conduct any

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

25

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   pre-remediation sampling in East Harbor, but shall undertake post-remedial sampling and

2   monitoring, depending upon the nature of the remedy or remedies implemented in the East

3   Harbor, in accordance with Section 4.9. In the event the East Harbor is not remediated in

4   coordination with CCSF's anticipated renovation or reconfiguration of the East Harbor marina,

5   then PG&E shall grid or subdivide the area into five (5) sampling locations, with spacing no less

6   than approximately fifty (50) feet and no greater than approximately one hundred fifty (150)

7   feet. In the event such minimum approximately fifty (50) foot spacing cannot be achieved, the

8   total number of sample locations may be reduced as needed to achieve such minimum spacing,

9   except, in all events, a minimum of two (2) samples will be taken. In the event that such

10  maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only

11  five (5) sampling locations were used, additional sampling locations shall be added as necessary

12  so as not to exceed such maximum spacing. From all of the sample locations, PG&E shall

13  collect and analyze pore water in accordance with the sampling protocol set forth in **Exhibit 12**

14  and Section 4.5 at three depths—zero to half (0-0.5) a foot bss, one to one and one-half (1-1.5)

15  feet bss, and two to three (2-3) feet bss; co-located bulk sediment may also be collected and

16  analyzed. Alternatively, PG&E may apply the PWeq, established under Section 4.4.3.3 and

17  **Exhibit 11** to bulk sediment samples already taken from the East Harbor.

18          4.4.3.4.    Non-MGP Residue. In the event that PG&E finds PAH

19  contamination during the iterative offshore investigation called for by this Section 4.4, but

20  determines that the contamination in an offshore area is not consistent with MGP Residue,

21  PG&E shall request an NFA Determination from the Regional Board for said area.

22                  4.4.3.4.1.    SFHA's Right to Appeal. SFHA shall have a right

23  to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the

24  State Water Board of an NFA determination requested by PG&E pursuant to Section 4.4.3.4.

25      4.5.    **Offshore Investigation – Sampling Protocol and Methods**

26          4.5.1.    Pore Water Sampling Protocol. All pore water samples taken pursuant to

27  this Consent Decree shall follow the sampling protocol set forth in **Exhibit 12**.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

26

1          4.5.2.  <u>New Boring Sampling Methodology</u>.

2                4.5.2.1.  <u>Bulk Sediment Core Samples</u>. For every new boring conducted

following entry of this Consent Decree, lateral and vertical delineation of MGP-related impacts

will be delineated by taking continuous bulk sediment cores using a sampling depth penetration

target of twenty to twenty-five (20 to 25) feet bss, with a best effort to achieve a minimum

sampling depth of twenty (20) feet bss or as close thereto as possible in the event of refusal, and

bulk sediment cores shall be sub-sampled: (a) in co-location with any pore water samples taken

from the first three (3) feet bss; and (b) every two (2) feet thereafter below three (3) foot depth

bss, biased to field observations of potential MGP impacts and/or lithological contacts.

                4.5.2.1.1.  A "best effort" to recover a nominal twenty (20)

foot sediment core (adjusted for recovery) at a planned or step-out station will be defined as

attempting up to three borings within a twenty (20) foot radius. Failing to recover a nominal

twenty (20) foot sediment core, the longest sediment core will be selected for subsampling as

described herein, unless a shorter sediment core yields observations of potential MGP residual-

impacts (NAPL, sheen or odors) that are not observed in the longest core. In such cases, the core

with the greatest vertical extent of the impacts will be selected. In any case, the planned or step-

out station will be relocated approximately fifty (50) feet in the step-out direction (e.g., **Exhibit

10**) to attempt to obtain the nominal twenty (20) foot sediment core recovery. Up to three more

attempts within a twenty (20) foot radius of the relocated station will complete the "best effort"

to achieve the vertical delineation objective, and the same procedure will be used to determine

the core selected for sampling. PG&E is not required to attempt any additional borings, beyond

the six described herein, to achieve the vertical delineation objective for a planned or step-out

station. In addition, no more than two borings are required to be subsampled for chemical

analysis as described in Sections 4.5.2.1, 4.6.1, and 4.6.2. Field observations of potential MGP

impacts in the cores not retained for subsampling will be documented with respect to depth

interval, adjusted for recovery.

                4.5.2.2.  <u>Pore Water Samples</u>. Pore water samples will be taken at three

depth intervals—zero to half (0-0.5) a foot bss, one to one and half (1-1.5) feet bss, and two to

three (2-3) feet bss—using an in situ low flow piezometer method as described in **Exhibit 12**; PWeq will be applied to sediment depths greater than three (3) feet bss.

4.5.2.3.     Deep NAPL. For every new boring conducted following entry of this Consent Decree, if NAPL consistent with MGP residue is encountered in a boring location and extends to or beyond the terminus of the boring, TarGOST will be employed to determine the full vertical extent of such NAPL.

4.5.2.4.     Except as required as part of any remediation plan or in accordance with the Offshore Investigation in Section 4.4.3 or the PWeq study detailed in **Exhibit 11** or the post-remedial monitoring obligations described in Section 4.8 and contingent upon PG&E's application of PWeq to the results of such previously taken samples, PG&E shall not be required to re-sample any offshore locations at which bulk sediment samples already had been taken prior to entry of this Consent Decree.

4.6.     **Offshore Investigation – Sample Analyses**

4.6.1.   PAH Analysis of Pore Water and Bulk Sediment Cores. Pore water samples and bulk sediment cores will be analyzed for Sediment/Pore Water PAHs. "Sediment/Pore Water PAHs" shall mean those PAHs identified on the list of approximately eighty (80) constituents being analyzed under PG&E's current sediment sampling program, as shown on **Exhibit 14**. Notwithstanding the foregoing, Sediment/Pore Water PAHs shall not be used as the trigger for any remedy or Chemical Performance Standard. Instead, only Total Trigger PAHs shall be used for those purposes, in accordance with Section 4.10. The PAHs included in "Total Trigger PAHs" for sediment pore water are the thirty-four (34) alkyl and parent PAH compounds that are included in U.S. EPA's PAH-34 list (**Exhibit 4**).

4.6.2.   Supplemental Constituent Analysis of Bulk Sediment Cores. The following supplemental constituents will be sampled for in bulk sediments, but shall not be a trigger for a remedy under this Consent Decree:  BTEX, styrene, carbon disulfide, and naphthalene using U.S. EPA Method 8260, and TEPH using U.S. EPA Methods 8015/8100 or equivalent (collectively, "Supplemental Constituents").

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

28

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 34 of 99

1    4.6.3.    <u>Non-Filtration of Pore Water Sample</u>. PG&E shall not field filter pore

2    water samples. Upon its submittal of the samples to the analytical laboratory, PG&E will direct

3    that the pore water samples not be filtered, and that the laboratory, instead, flush from pore

4    water samples visual particles that have settled in a separatory funnel.

5    4.6.4.    <u>Trigger Straddle</u>. Where the concentrations of primary and duplicate

6    samples straddle a trigger level and field duplicate relative percent difference ("RPD") goals are

7    met (with goals defined as within 25% for Total Trigger PAHs rather than individual chemicals),

8    the arithmetic mean concentration of Total Trigger PAHs of the two (2) samples shall be

9    determined for evaluation of whether a remedy has been triggered under Section 4.7. Where

10   duplicate goals fail, the higher concentration pore water sample shall be used for evaluation of

11   whether a remedy has been triggered under Section 4.7, unless PG&E resamples the affected

12   station within sixty (60) days after receipt of the draft laboratory data, in which case the

13   resampled results will be used for evaluation of whether a remedy has been triggered under

14   Section 4.7.

15   4.7.    **Offshore Investigation – Remedy Triggers and Areas**

16   4.7.1.    <u>Offshore Areas Subject To Potential Remedy</u>. The offshore areas that are

17   subject to potential remedial action by PG&E pursuant this Section 4.7 include only those

18   offshore areas that are co-extensive with the offshore areas of Pier 35 to Pier 45 and the Marina

19   that are to be investigated pursuant to Section 4.4.

20   4.7.2.    <u>Total Trigger PAHs in Pore Water Remedy Trigger</u>. PG&E shall propose

21   a remedy in accordance with Section 4.8.1 if Total Trigger PAHs from pore water extracted

22   from the first three (3) feet of a sampling location exceed 15 µg/L, as reported in the Laboratory

23   Results, in accordance with Section 4.6.

24   4.7.3.    <u>PWeq Remedy Trigger.</u> Subject to PG&E's rights to take confirmatory

25   pore water samples under Section 4.7.3.1, if the PWeq is being applied, PG&E shall propose a

26   remedy in accordance with Section 4.8.1 if the PWeq of bulk sediment cores from the first three

27

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

29

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   (3) feet exceed 15 µg/L using the statistical analysis for PWeq developed in accordance with

2   **Exhibit 11**.

3                     4.7.3.1.    Right to Take and Analyze Confirmatory Pore Water Samples.

4   Following any application of the PWeq, PG&E shall have the right, but not the obligation, to

5   take and analyze confirmatory pore water samples pursuant to the sampling and analytical

6   protocols and methodologies described in Sections 4.5 and 4.6 and exhibits referenced therein. If

7   such confirmatory samples are taken, the Laboratory Results from such samples would be used

8   (i.e., actual measurements would supersede predictive analysis), in determining whether a

9   remedy has been triggered for such location(s) in accordance with this Section 4.7.

10                    4.7.4.    MGP Contamination Identified Below Three Feet Below Sediment

11  Surface. If Total Trigger PAHs consistent with MGP residue and at levels above the PWeq

12  developed in accordance with **Exhibit 11** are identified at sediment depths below three (3) feet

13  bss, in a location where a remedy has not been triggered under Section 4.10, then PG&E will

14  include such area in a sediment management plan to be provided to the owner of such location,

15  with copies to all agencies participating in the Dredged Material Management Office

16  ("DMMO") in the San Francisco Bay area and to SFHA. The sediment management plan shall

17  include "Upset Event" bathymetry (as defined herein). PG&E shall include with the sediment

18  management plan a transmittal letter that includes a high-level summary of the management plan

19  and a map showing covered areas.

20          4.8.    **Offshore Remedy – Selection and Implementation.**

21                    4.8.1.    PG&E Remedy Proposal. In the event a sediment remedy is triggered

22  under Section 4.7 for a location or locations subject to the offshore investigation under Section

23  4.4, PG&E shall either (1) submit a RAP to the Regional Board for each respective area at which

24  a remedy has been triggered that fall(s) into one or a combination of the following four remedy

25  categories:  (a) removal of all sediment consistent with MGP from the location(s) (the "All

26  Residue Removed Remedy"); (b) coverage of sediment containing contamination consistent

27  with MGP residue by an engineered cap (which includes, without limitation, capping with clean

28  sand and/or amended sand, and armoring as warranted)  (the "Engineered Cap Remedy"); (c)

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page

30

36 of 99

addressing sediment containing contamination consistent with MGP residue using an engineered solution other than a cap (the "Other Engineered Solution Remedy"); or (d) monitoring of natural processes ("Monitored Natural Recovery Remedy" or "MNR Remedy"); or (2) request a No Further Action determination from the Regional Board for an investigated offshore area regardless of an exceedance of the remedy trigger.  Without prejudice to any right of SFHA to appeal an approval of an NFA, monitoring-only, or MNR-remedy based on the consideration thereof, PG&E shall have the right, but not the obligation to consider the Surface Weighted Average Concentration ("SWAC") of Total Trigger PAHs in a proposed remedial action area in the development of a remedy for said area.

4.8.1.1.    Non-MGP Residue. In the event PG&E finds that PAH contamination in an offshore area subject to investigation under Section 4.4 is not consistent with MGP Residue, PG&E shall request an NFA Determination from the Regional Board for that area.

4.8.1.2.    SFHA's Right to Appeal. SFHA shall have a right to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the State Water Board of an MNR Remedy or NFA determination requested by PG&E pursuant to Section 4.8.1.

4.8.2.    Implementation of RAP. Following the approval of a RAP and the resolution of any appeal by SFHA, PG&E shall then implement the RAP, as approved by the Regional Board or the State Water Board.

4.9.    **Offshore – Post Remediation Compliance Monitoring and Reporting**

4.9.1.    All Residue Removed Remedy. In the event that a RAP providing for an All Residue Removed Remedy is approved and implemented by PG&E, PG&E shall perform post-remedial compliance testing, which shall be limited to the Chemical Performance Standard Testing and bathymetry, within a reasonable time following dredging as follows:

4.9.1.1.    Bathymetry Testing. PG&E shall conduct bathymetry testing once following the completion of dredging to verify dredge elevations.

4.9.1.2.    Chemical Performance Standard Testing.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4.9.1.2.1.     Sample Locations Within Dredge Prism. PG&E will grid or subdivide the dredge prism into five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred and fifty (150) feet. In the event such minimum approximately fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such minimum spacing, except, in all events, a minimum of two (2) samples will be taken. In the event that such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were used, additional sampling locations shall be added as necessary so as not to exceed such maximum spacing.

4.9.1.2.2.     Sample Collection and Analysis Within the Dredge Prism. From all of the sample locations described in Section 4.9.1.2.1, PG&E will collect and analyze pore water in accordance with the sampling protocol set forth in **Exhibit 12** at three depths—zero to half (0-0.5) a foot bss, one to one and a half (1-1.5) feet bss, and two to three (2-3) feet bss; co-located bulk sediment may also be collected and analyzed.

4.9.1.2.3.     Sample Locations Along Dredge Perimeter Boundary. PG&E will subdivide the perimeter boundary of the dredged area, extending approximately fifty (50) feet beyond the dredged area, into a minimum of five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred and fifty (150) feet. In the event that such minimum fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such spacing, except, in all events, a minimum of two (2) samples will be taken. In the event such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were used, additional sampling locations shall be added as necessary so as not to exceed such maximum spacing.

4.9.1.2.4.     Sample Collection and Analysis Along Dredge Perimeter. From all of the sample locations described in Section 4.9.1.2.3, PG&E will collect and analyze pore water in accordance with the sampling protocol set forth in **Exhibit 12** at two depths—zero to half (0-0.5) a foot bss and one to one and a half (1-1.5) feet bss—using an in

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

32

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 38 of 99

situ low flow piezometer method to evaluate potential impacts of dredging residuals settling

beyond the dredge prism; co-located bulk sediment may also be collected and analyzed.

4.9.1.3. Reporting and Consequence of Testing Results. Following

completion of the testing described Sections 4.9.1.1 and 4.9.1.2—which shall occur only once,

following completion of dredging—PG&E shall submit a RACR to the Regional Board, with a

copy to SFHA, which shall include a description of the remedial action, sampling results, and a

recommendation for further action, monitoring or an NFA determination.

4.9.1.3.1. SFHA's Right to Appeal. SFHA shall have a right

to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the

State Water Board of a monitoring only or MNR Remedy, or NFA determination recommended

by PG&E pursuant to Section 4.9.1.3.

4.9.2. Engineered Cap Remedy. In the event a RAP providing for an Engineered

Cap Remedy is approved and implemented by PG&E, PG&E shall perform Engineered Cap

Integrity Testing and Chemical Performance Standard Testing, in the first (1st), second (2nd),

third (3rd), and fifth (5th) years following the completion of construction of the engineered cap as

follows:

4.9.2.1. Engineered Cap Integrity Testing. Engineered Cap Integrity

Testing shall consist of performing bathymetry of the cap area, and testing for cap thickness.

4.9.2.1.1. Bathymetry and Cap Thickness Measurement.

PG&E will perform bathymetry in the cap area, extending approximately fifty (50) feet outside

the cap geometry, and will include in its work verification of any dredge elevations.

4.9.2.1.2. Cap Thickness Measurement. PG&E will measure

supplemental cap thickness in the cap area. PG&E may use settlement plates or direct

measurement of cap thickness as the depth of sediment above the armor/isolation/reactive

material layer. Engineered cap designs will typically anticipate accretion of a habitat layer

approximately six (6) to twelve (12) inches.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

33

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 39 of 99

4.9.2.1.3.       Upset Event. In the event of an Upset Event, PG&E will undertake additional monitoring of cap integrity (bathymetry and any measurement of cap thickness) in accordance with Sections 4.9.2.1.1 and 4.9.2.1.2.

4.9.2.2.       Chemical Performance Standard Testing. PG&E shall sample pore water within the capped area and the cap's perimeter boundary as follows:

4.9.2.2.1.       Sample Locations In the Cap Area. PG&E will grid or subdivide the cap area into five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred fifty (150) feet. In the event such minimum approximately fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such minimum spacing, except, in all events, a minimum of two (2) samples will be taken. In the event that such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were used, additional sampling locations shall be added as necessary so as not to exceed such maximum spacing.

4.9.2.2.2.       Collection and Analysis of Pore Water In Cap Area. PG&E shall collect and analyze pore water within the zone from the top of the cap reactive/isolation/armor layer to approximately six (6) inches above the top of said area, in accordance with the protocol set forth in **Exhibit 12**. PG&E may also collect and analyze co-located bulk sediment cores.

4.9.2.2.3.       Sample Locations Within Cap Perimeter Boundary. PG&E shall subdivide a perimeter boundary extending approximately fifty (50) feet beyond the capping footprint into a minimum of five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred and fifty (150) feet. In the event that such minimum fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such spacing, except, in all events, a minimum of two (2) samples will be taken. In the event such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

34

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 40 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  used, additional sampling locations shall be added as necessary so as not to exceed such

2  maximum spacing.

3       4.9.2.2.4.    Collection and Analysis of Pore Water Within the

4  Cap Perimeter Boundary. Within the perimeter boundary, PG&E shall collect and analyze pore

5  water in accordance with the sampling protocol set forth in **Exhibit 12** at three depths in each

6  area—zero to half (0-0.5) a foot bss, one to one and half (1-1.5) feet bss, and two to three (2-3)

7  feet bss. PG&E may also collect and analyze co-located bulk sediment cores.

8       4.9.2.3.    Reporting and Consequence of Testing Results. Following

9  completion of the cap construction, PG&E shall submit a RACR, which shall include a

10  description of the remedial action, to the Regional Board with a copy to SFHA. Following each

11  sampling event, PG&E shall submit to the Regional Board with a copy to SFHA, a monitoring

12  report, which shall include sampling results, and a recommendation for continued monitoring,

13  adaptive maintenance, another remedy, or, in the case of sampling that occurs in the fifth (5th)

14  year after construction of the cap, an NFA determination.

15       4.9.2.3.1.    SFHA's Right to Appeal. SFHA shall have a right

16  to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the

17  State Water Board of a monitoring only or MNR Remedy or NFA determination recommended

18  by PG&E pursuant to Section 4.9.2.3.

19       4.9.3.    Other Engineered Solution Remedy. In the event that a RAP providing for

20  an Other Engineered Solution Remedy is approved and implemented by PG&E, PG&E shall

21  only be required to perform Chemical Performance Standard Testing and Upset Event testing.

22  The frequency of the Chemical Performance Standard Testing will be dependent upon the

23  particular engineered solution remedy implemented, but in no event shall such testing be

24  performed less than once, nor shall it occur more frequently than after construction and then the

25  first (1st), second (2nd), third (3rd), and fifth (5th) years following completion of construction of

26  the remedy.

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

35

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 41 of 99

4.9.3.1.    <u>Chemical Performance Standard Testing</u>. PG&E shall sample pore water within the area of the Other Engineered Solution Remedy and the remedy area's perimeter boundary as follows:

4.9.3.1.1.    <u>Sample Locations Within the Remedy Area</u>. PG&E will grid or subdivide the remedy area footprint into a minimum of five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred fifty (150) feet. In the event such minimum approximately fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such minimum spacing, except, in all events, a minimum of two (2) samples will be taken. In the event that such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were used, additional sampling locations shall be added as necessary so as not to exceed such maximum spacing.

4.9.3.1.2.    <u>Sample Locations Along Remedy Perimeter Boundary</u>. PG&E will subdivide a perimeter boundary of the remedy area, extending a maximum of fifty (50) feet beyond the remedial response footprint, into a minimum of five (5) sampling locations, with spacing no less than approximately fifty (50) feet and no greater than approximately one hundred and fifty (150) feet. In the event that such minimum fifty (50) foot spacing cannot be achieved, the total number of sample locations may be reduced as needed to achieve such spacing, except, in all events, a minimum of two (2) samples will be taken. In the event such maximum approximately one hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were used, additional sampling locations shall be added as necessary so as not to exceed such maximum spacing.

4.9.3.1.3.    <u>Collection and Analysis In All Locations</u>. From all of the sample locations described in Sections 4.9.3.1.1 and 4.9.3.1.2, PG&E will collect and analyze pore water in accordance with the sampling protocol set forth in **Exhibit 12** at three depths—zero to half (0-0.5) a foot bss one to one and half (1-1.5) feet bss, and two to three (2-3) feet bss; co-located bulk sediment may also be collected and analyzed.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

36

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 42 of 99

1    4.9.3.2.    Upset Event. In the event of an Upset Event, PG&E will

2    undertake bathymetry testing in the area of the Other Engineered Solution.

3    4.9.3.3.    Reporting and Consequence of Testing Results. Following

4    completion of construction of the Other Engineered Solution, PG&E shall submit a RACR,

5    which shall contain a description of the remedial activities. Following each sampling event,

6    PG&E shall submit to the Regional Board, with a copy to SFHA, a monitoring report, which

7    shall include sampling results, and a recommendation for continued monitoring, adaptive

8    maintenance, another remedy, or an NFA determination.

9    4.9.3.3.1.    SFHA's Right to Appeal. SFHA shall have a right

10    to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the

11    State Water Board of a monitoring only or MNR Remedy or NFA determination recommended

12    by PG&E pursuant to Section 4.9.3.3.

13    4.9.4.    Monitored Natural Recovery (MNR) Remedy. In the event that a RAP

14    providing for an MNR is approved and implemented by PG&E, PG&E shall perform, within a

15    reasonable time following approval of an MNR remedy, and in the first (1st), second (2nd), third

16    (3rd), and fifth (5th) years following said approval, Chemical Performance Standard Testing and

17    bathymetry as follows:

18    4.9.4.1.    Chemical Performance Standard Testing.

19    4.9.4.1.1.    Sample Locations Within the MNR Footprint.

20    PG&E will grid or subdivide the MNR footprint into a minimum of five (5) sampling locations,

21    with spacing no less than approximately fifty (50) feet and no greater than approximately one

22    hundred fifty (150) feet. In the event such minimum approximately fifty (50) foot spacing

23    cannot be achieved, the total number of sample locations may be reduced as needed to achieve

24    such minimum spacing, except, in all events, a minimum of two (2) samples will be taken. In the

25    event that such maximum approximately one hundred and fifty (150) foot spacing would be

26    exceeded if only five (5) sampling locations were used, additional sampling locations shall be

27    added as necessary so as not to exceed such maximum spacing.

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 43 of 99

37

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1                            4.9.4.1.2.        Sample Locations Along MNR Perimeter

2    Boundary. As part of the year one monitoring event only, PG&E will subdivide a perimeter

3    boundary of the MNR footprint, extending approximately fifty (50) feet beyond the remedial

4    response footprint, into a minimum of five (5) sampling locations, with spacing no less than

5    approximately fifty (50) feet and no greater than approximately one hundred and fifty (150) feet.

6    In the event that such minimum fifty (50) foot spacing cannot be achieved, the total number of

7    sample locations may be reduced as needed to achieve such spacing, except, in all events, a

8    minimum of two (2) samples will be taken. In the event such maximum approximately one

9    hundred and fifty (150) foot spacing would be exceeded if only five (5) sampling locations were

10   used, additional sampling locations shall be added as necessary so as not to exceed such

11   maximum spacing.

12                           4.9.4.1.3.        Collection and Analysis In All Locations. From all

13   of the sample locations described in Sections 4.9.4.1.1 and 4.9.4.1.2, PG&E will collect and

14   analyze pore water in accordance with the sampling protocol set forth in **Exhibit 12** at three

15   depths—zero to half (0-0.5) a foot bss, one to one and half (1-1.5) feet bss, and two to three (2-

16   3) feet bss; co-located bulk sediment may also be collected and analyzed.

17                           4.9.4.2.        Bathymetry. PG&E shall conduct bathymetry to document

18   sediment elevation trends.

19                           4.9.4.3.        Upset Event. In the event of an Upset Event, PG&E will

20   undertake bathymetry testing in the area of the of the MNR footprint.

21                           4.9.4.4.        Reporting and Consequence of Testing Results. PG&E shall

22   establish the boundary of the MNR footprint in the RAP and/or a RACR for constructed

23   remedies with an MNR component. Following each sampling event, PG&E shall submit to the

24   Regional Board, with a copy to SFHA, a monitoring report, which shall include sampling results

25   to be compared against the predicted recovery timeframe. The Year Five (5) monitoring report

26   will include a recommendation for further monitoring, adaptive maintenance, another remedy, or

27   an NFA determination.

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

38

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 44 of 99

4.9.4.4.1.     SFHA's Right to Appeal. SFHA shall have a right to appeal to the Panel, in accordance with Section 5, any approval by the Regional Board or the State Water Board of a monitoring only or MNR Remedy or NFA determination recommended by PG&E pursuant to Section 4.9.4.4.

4.9.5.   All Offshore Remedy Scenarios. In performing the post-remediation monitoring and sampling under Section 4.9, without prejudice to any right of SFHA to appeal an approval of an NFA, monitoring-only, or MNR-remedy based on the consideration thereof, PG&E shall have the right, but not the obligation, to recommend continued monitoring, adaptive maintenance, another remedy, or an NFA determination under application of a SWAC analysis to the Chemical Performance Standard Testing data. In each of the post-remediation monitoring scenarios in Section 4.9, there shall be an allowance of an approximately twenty (20) foot radius of the original location for resampling (including in the perimeter areas to be sampled) should an obstruction be encountered.

4.10.   **West Harbor.**  In the area designated as the "West Harbor," which is shown on **Exhibit 16**, PG&E shall deploy small "passive samplers" in accordance with U.S. EPA-approved passive sampling investigation guidance and methodology, as described in U.S. EPA 2017 Laboratory, Field, and Analytical Procedures for Using Passive Sampling in the Evaluation of Contaminated Sediments:  User's Manual. EPA/600/R-16/357, in the areas previously capped as part of CCSF's San Francisco Marina Yacht Harbor West Harbor Renovation Project (Dredge Areas B2-1 and B2-4), and within a perimeter boundary thereof, in the approximate locations shown on **Exhibit 16**. In the event passive sampling results from a passive sampler within the perimeter indicates a pore water concentration of more than 15 µg/L of Total Trigger PAHs, then PG&E shall undertake further step-out passive sampling, on an iterative basis, staggered and laterally offset in all accessible directions (i.e., west, north, and east) to include the next unsampled one to three closest points in an adjacent row or column, as shown on **Exhibit 16**. PG&E shall perform such passive sampling pursuant to a work plan to be prepared by PG&E and submitted to the Regional Board. PG&E shall place the passive samplers in the West Harbor with spacing no less than approximately fifty (50) feet, and no greater than approximately one

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

39

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 45 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  hundred and fifty (150) feet, between the passive samplers. PG&E shall report the results of the

2  passive sampling in a report submitted to the Regional Board and shall include a

3  recommendation for No Further Action, further Monitoring Only, or a remedy.

4        4.10.1. No Right of Appeal to Panel. SFHA shall have no right of appeal to the

5  Panel under Section 5 from any approvals or determinations pursuant to Section 4.10, and the

6  Panel shall have no authority with respect to any proposals, approvals or actions by PG&E or the

7  Regional Board concerning the West Harbor, or any request by PG&E for a No Further Action

8  determination concerning West Harbor. Other than as expressly set forth in this Section 4.10,

9  PG&E shall have no other obligations under this Consent Decree with respect to the West

10  Harbor.

11      4.11.   **Force Majeure.**

12        4.11.1. PG&E shall not be considered to be in default in the performance of any

13  of its obligations under this Consent Decree when performance becomes impossible due to

14  circumstances beyond PG&E's control, including, without limitation, Force Majeure, which

15  includes, but is not limited to, an act of God, act of war, act of terrorism, fire, explosion,

16  extraordinary weather event, natural catastrophe, restraint by court order or public authority, or

17  other cause beyond PG&E's reasonable control (collectively, "Force Majeure"). Delay in

18  compliance with a specific obligation under this Consent Decree due to a Force Majeure event

19  as defined in this Section shall not excuse or delay compliance with any other obligations

20  required under this Consent Decree.

21        4.11.2. Best Efforts to Gain Access, Permits, Consents and Approvals. With

22  respect to all activities contemplated or required to be undertaken by PG&E pursuant to Section

23  4, it is understood and agreed that PG&E shall use best efforts to obtain all required access,

24  permits, consents and approvals from the CCSF and its respective departments and from any

25  other property owners, if and as needed, and from the governmental agencies with jurisdiction

26  over such work. Such best efforts shall require that PG&E make all reasonable and practicable

27  efforts to satisfy all reasonable contingencies or conditions required to gain all necessary access,

28  permits, consents and approvals, but such best efforts shall not require that PG&E accept

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

40

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 46 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

unreasonable or impracticable terms or conditions in order to obtain such access, permits, consents or approvals. If, after using best efforts, PG&E is unable to obtain required access, permits, consents or approvals to perform an obligation under Section 4, such event shall constitute a Force Majeure.

4.11.3. In the event PG&E claims that compliance with an obligation it has under this Consent Decree was or is impossible due to a Force Majeure, it shall notify SFHA in writing within thirty (30) days of when PG&E first knew, or in the exercise of reasonable diligence under the circumstances should have known, of the event or circumstance that caused or would cause a failure to comply with such obligation (the "Notice of Force Majeure"). The Notice of Force Majeure shall identify the specific obligations under the Consent Decree that are or have been affected by the Force Majeure, the specific nature of the Force Majeure; the anticipated length of time the delay may persist, and/or whether performance has been rendered impossible by the Force Majeure; the measures taken or to be taken by to prevent or minimize delay or impossibility of performance of the affected obligations and any proposed modifications to those obligation(s) under the Consent Decree. PG&E may request a meet and confer, pursuant to the dispute resolution process in Section 6, to reach agreement as to a stipulation to be submitted to the Court for an order modifying this Consent Decree. In the event the Parties do not to reach agreement following the dispute resolution process, PG&E may move the Court for a modification of the Consent Decree based upon the Force Majeure and shall have the burden of establishing the Force Majeure. During the pendency of such a motion to modify the Consent Decree, PG&E shall not be deemed to be in default, breach or violation of this Consent Decree. Subject to the immediately preceding sentence, in the absence of a stipulation or order modifying the Consent Decree, PG&E shall be obligated to comply with all terms of this Consent Decree, notwithstanding any claim by it of a Force Majeure.

4.12. Except as required under Section 4, PG&E is not required by this Consent Decree to undertake any additional investigation, remediation, monitoring or reporting.

**5. APPEALS TO PANEL.** SFHA shall have the following rights of appeal of certain Regional Board and State Water Board (either, the "Board") approvals to a panel to be formed

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)
41

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 47 of 99

1    pursuant to this Section 5 under the appeal process set forth herein. The Panel's sole role shall be

2    to hear appeals in accordance with the procedures set forth herein. The Panel shall serve no other

3    purpose and have no authority other than as expressly provided for in this Section 5.

4        5.1.   Formation of Panel. The Panel shall be comprised of three individuals

5    (collectively "Panelists"): one Panelist to be designated by SFHA; one Panelist to be designated

6    by PG&E; and a third Panelist to be jointly chosen by SFHA's designee and PG&E's designee.

7    If SFHA's designee and PG&E's designee cannot agree on the choice for the third Panelist, the

8    competing choices of the Parties' designees for the third Panelist will be submitted by the Parties

9    to the Court (the then-presiding judge in this matter) for resolution. In the event a Party's

10   Panelist designate is no longer willing or able to serve during the term of this Consent Decree,

11   the Party that appointed such Panelist shall have the right to choose a replacement Panelist. In

12   the event the third Panelist selected hereunder is no longer willing or able to serve as a Panelist

13   during the term of this Consent Decree, the other two Panelists will jointly select his or her

14   replacement. The three selected Panelists shall, together, comprise the "Panel."

15       5.1.1.   Any person who has been or is employed by Haley & Aldrich or

16   EnviroAssets, Inc. is disqualified for service on the Panel. Otherwise, SFHA and PG&E shall

17   not be restricted in the selection of their respective Panelist designees; provided, however, that

18   prior to his/her selection as a potential Panelist, each candidate shall acknowledge and agree that

19   said candidate/Panelist will not be permitted to, and shall not, himself or herself undertake any

20   work for any Party or for counsel to any Party during the Term of the Consent Decree.

21   Notwithstanding the foregoing, the firm with which the Panelist is affiliated, if any, may

22   perform work for a Party or for a law firm that is counsel to a Party on matters that are unrelated

23   to the matters that are the subject of this Consent Decree, but only so long as the total volume of

24   work performed for such Party or such law firm does not exceed ten percent (10%) of that firm's

25   annual revenue in any given year. In the event a Panelist's firm performs any work for a Party or

26   for a law firm that is counsel to a Party, then the Panelist's firm shall ensure that an "ethical

27   wall" is created to assure there is no exchange of any information, data, documents or other

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

42

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
48 of 99

1   communications between the Panelist and anyone else in his/her firm regarding the subject

2   matter of this Consent Decree.

3           5.1.2.   Upon its formation, the Panel shall be provided with a copy of this

4   Consent Decree and their attention shall be drawn to these procedures and to other agreed-upon

5   requirements relating to appeals as set forth herein.

6       5.2.   No Ex Parte Communication. During the Term of this Consent Decree, the

7   Parties shall not communicate on an *ex parte* basis with any Panelist concerning any matters that

8   are relevant to the subject matters of this Consent Decree (including, without limitation, any

9   matters relating to the nature, scope, results or status of work to be performed under this Consent

10   Decree).

11       5.3.   Appeal Process. The following appeal process shall govern all appeals to the

12   Panel permitted under this Consent Decree:

13           5.3.1.   Timing of Appeal. Subject to the prohibitions in Sections 4.2.3.6.1, 4.3.6,

14   and 4.10.1, within thirty (30) days following written notification from PG&E to SFHA of the

15   decision of the Board (which must attach a copy of such Board decision) (a) approving a

16   "monitoring only" remedy; (b) approving a MNR remedy proposal; or (c) approving a request

17   for NFA determination, SFHA shall have the right to appeal the approval through submission of

18   a written "Notice of Appeal" to the Panel and to PG&E. SFHA has no right of appeal of any

19   other Board approvals. Any Notice of Appeal submitted by SFHA to the Panel or to PG&E more

20   than thirty (30) days following PG&E's notification to SFHA of the Board's action shall be

21   deemed void and of no force or effect and the Panel shall take no action in response to such

22   Notice of Appeal.

23           5.3.2.   Notice of Appeal. SFHA's Notice of Appeal shall include, at a minimum,

24   the following information: the specific action of the Board that the Panel is requested to review

25   and a copy of the order or resolution of the Board that is being challenged.

26           5.3.3.   Submittal of Digital Record. Upon receipt from SFHA of a Notice of

27   Appeal, PG&E shall have twenty-one (21) days within which to submit, by email to the Panel

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

43

1   and copied to SFHA, a list with digital links to all documents uploaded to Geotracker from and

2   after and in connection with the approval that is being challenged by the Notice of Appeal.

3       5.3.4.   Briefing. Submittals to the Panel by the Parties are to be made as follows:

4       5.3.4.1.   SFHA's Submission. No later than thirty (30) days after receipt

5   of the digital record provided for in Section 5.3.3, SFHA may submit to the Panel for its review

6   and consideration, and simultaneously to PG&E, a brief of no more than fifteen (15) pages,

7   along with any Supporting Documents. "Supporting Documents," as used in this Section 5, shall

8   mean and be limited to relevant technical data or analyses, and scientific/technical reports or

9   publications but shall not include any additional documentation (letters, briefs, declarations)

10  generated by the parties or any third party to support or oppose the appeal to the Panel. Any

11  brief or Supporting Documents submitted by SFHA after said thirty (30) day deadline shall not

12  be considered by the Panel. Absent a request from the Panel or a grant of permission from the

13  Panel, as provided for in Section 5.3.6, and subject to Section 5.3.6.3, SFHA shall not submit

14  any other documentation to the Panel.

15      5.3.4.2.   PG&E's Submission. No later than thirty (30) days after

16  receipt of SFHA's submittal under Section 5.3.4.1, PG&E may submit to the Panel for its review

17  and consideration, and simultaneously to SFHA, a brief of no more than fifteen (15) pages,

18  along with any Supporting Documents. Any brief or Supporting Documents submitted by PG&E

19  after said thirty (30) day deadline shall not be considered by the Panel. Absent a request from

20  the Panel as provided for in Section 5.3.6, and subject to Section 5.3.6.3, PG&E shall not submit

21  any other documentation to the Panel.

22      5.3.5.   Extension of Deadlines. The deadlines set in Section 5 may be modified

23  by a mutually agreed-upon stipulation between the Parties, without action by the Panel;

24  provided, however, a copy of any such stipulation shall be submitted to the Panel. The deadlines

25  set in this Section 5 may otherwise only be extended by the Panel for good cause, for a period

26  not to exceed ninety (90) days, upon written request of no more three than three (3) pages

27  simultaneously sent to the other Party. The other Party may oppose the request through

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

44

1    submission to the Panel of an opposition of no more than three (3) pages, within seven (7) days

2    of that Party's receipt of the request for an extension.

3            5.3.6.    Additional Document Submittals.

4                5.3.6.1.    Further Briefing Requested by Panelists. Further briefing

5    and/or any additional existing data or information may be requested from either or both Parties

6    by joint written request of at least two Panelists who believe such data or information is

7    necessary to the determination of the subject appeal. In the event a Party is unwilling or unable

8    to comply with the Panel's request, the Party shall so state in writing to the Panel and include a

9    brief statement, of no more three (3) pages, of the Party's reason for not providing the requested

10   data or information. In the event a Party refuses to provide requested documents or information,

11   it shall not be required to provide any log of existing and known documents that are withheld or

12   the basis for the withholding.

13                5.3.6.2.    Further Sampling/Data Analysis Requested by Panelists. In

14   addition, the Panel, by joint request of at least two Panelists, may request, but not order, that

15   PG&E undertake limited additional sampling or data analysis to assist the Panel's evaluation of

16   the subject appeal. Regardless of whether a request for additional sampling is refused, the

17   Panelists, and each of them, are prohibited from independently conducting such additional

18   sampling but not additional analyses of existing data.

19                5.3.6.3.    Party Requests for Permission to Submit Additional

20   Documentation. Absent a request from the Panel pursuant to this Section 5, neither Party may

21   submit to the Panel any additional briefing or other documentation; provided, however, in the

22   event there are relevant data that have been generated or first made available since the Party's

23   previous submission to the Panel on the appeal at issue, a Party may request permission from the

24   Panel, through a brief of no more than three (3) pages, to submit such additional Supporting

25   Documents. The other Party may oppose such a request, through a brief of no more than three

26   (3) pages submitted to the Panel within seven (7) days of receipt of such request.

27            5.3.7.    De Novo Review. The Panel shall undertake a De Novo review of the

28   documentation and information provided to the Panel in accordance with this Section 5. "De

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 51 of 99

45

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

1    Novo," as used herein, shall mean using their own judgment, in accordance with applicable laws

2    and standards, as though reviewed for the first time. Neither SFHA nor PG&E shall bear any

3    burden of proof on appeal to the Panel. The Board's approval of a Monitoring Only Remedy or

4    MNR remedy proposal or NFA determination that is the subject of the appeal shall not be

5    entitled to any presumption of correctness or incorrectness, but rather shall be considered in light

6    of the facts, technical data and information, applicable law and the terms of the Consent Decree**.**

7           5.3.8.   <u>Scope of Panel Role</u>. Subject to certain restrictions on appeals to the Panel

8    as specifically provided in Section 4, the sole determination within the Panel's purview shall be

9    whether to accept or reject the Board's approval of the Monitoring Only Remedy, MNR remedy,

10   or NFA determination that is the subject of the appeal, as provided for under this Consent

11   Decree. Such determination shall be made in accordance with the decision of a majority of the

12   Panel members. The Panel shall make no decision unless there is a quorum of three Panelists on

13   the Panel to hear and decide the appeal. The fact that an applicable performance standard under

14   Section 4 is not achieved in the post-remedy compliance monitoring phase does not mandate the

15   Panel's rejection of the Board's approval of a Monitoring Only or MNR remedy, or a request for

16   an NFA determination. If the Panel rejects the challenged Board approval, it may suggest, but it

17   cannot require, any additional or alternative remedy.

18          5.3.9.   <u>Written Determination by Panel</u>. The Panel shall be required to take

19   reasonable steps to diligently and expeditiously review the documents and information

20   submitted to the Panel, and to promptly issue a written determination to accept or reject the

21   Board's approval of the Monitoring Only or MNR remedy proposal or request for NFA

22   determination. The Panel shall issue a written determination, including the basis for its decision,

23   and simultaneously send it to SFHA and to PG&E. Such Panel determination shall be deemed to

24   be final and binding upon the Parties.

25          5.3.10.  <u>PG&E Work During Appeal</u>. During the pendency of any Panel appeal,

26   PG&E shall be entitled to act in accordance with the Board's determination unless and until

27   overturned by the Panel. PG&E shall not, however, perform any physical work in the area that is

28   the subject of the approval or determination from which an appeal is taken that would

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

46

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1   substantially and materially interfere with the achievement of an alternative action in the event

2   the Board's determination is overturned (such as permanently closing or destroying any

3   groundwater monitoring or extraction wells).

4       5.3.11. <u>Post-Appeal Actions</u>. In the event the Panel rejects the Board's approval at

5   issue in the appeal, then no later than ninety (90) days from the Panel's decision, PG&E shall

6   notify SFHA and the Regional Board in writing of the remedy or remedies PG&E intends to

7   evaluate for the area that was the subject of the Panel's decision. PG&E will be required to

8   propose a different action to the Regional Board from the Monitoring Only or MNR remedy or

9   NFA determination that was rejected. In the event that PG&E's chosen remedy following a Panel

10  decision rejecting the subject Board approval is a Monitoring Only or MNR proposal, PG&E

11  shall submit such proposal to the Regional Board no later than six (6) months from the date of

12  the Panel's decision. In the event PG&E's chosen remedy is other than a Monitoring Only or

13  MNR proposal, PG&E shall submit to the Regional Board a RAP for such area no later than

14  twelve (12) months from the date of the Panel's decision.

15      5.3.12. <u>PG&E Right of Appeal</u>. Notwithstanding any other terms herein, PG&E

16  shall have the right, in accordance with applicable state laws and regulations, to appeal to the

17  State Water Board any rejection by the Regional Board of a proposed Monitoring Only or MNR

18  remedy, or a request for an NFA determination. In the event PG&E initiates such an appeal to

19  the State Water Board, and the term of this Consent Decree expires while that appeal by PG&E

20  is pending, SFHA's right to appeal any subsequent approval of a proposed Monitoring Only or

21  MNR remedy, or a request for an NFA determination by the State Water Board relating to

22  PG&E's appeal shall be preserved, along with the associated rights and obligations of the

23  Parties.

24      5.3.13. <u>Transmittal Definitions</u>. As used in the foregoing sections regarding

25  transmittals to be made in the Panel appeal process, "sent" or "send" means transmittal via email

26  to the addresses provided by a particular Party. "Receipt" or "received," as used herein, shall

27  mean the date on which the transmittal was sent to the Party in question, subject to confirmation

28  of delivery.

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

47

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
53 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

5.3.14. <u>Exclusive Remedy</u>. An appeal to the Panel shall be SFHA's sole and exclusive recourse to challenge the Board's approval of a Monitoring Only or MNR remedy proposal, or a request for NFA determination. SFHA expressly waives any right of administrative or judicial appeal under the state Water Code and related regulations with respect to such approvals. In addition, SFHA shall have no right of appeal to the Panel, and expressly waives and agrees not to pursue any right of administrative or judicial appeal, with respect to any other remedies approved by the Regional Board.

5.3.15. <u>Fees and Costs on Appeal</u>.

5.3.15.1.   <u>Panelist Fees</u>. The reasonable fees for the services of each of the Panelists shall be paid by PG&E, subject to PG&E's timely receipt and review of invoices to be submitted by each of the Panelists to PG&E and to SFHA on a monthly basis. Such invoices shall include a description of work performed each date for which fees are sought, but shall not include information that would reveal the thought process(es) of a Panelist.

5.3.15.2.   <u>Attorney's/Expert's Fees</u>. In the event SFHA prevails in an appeal to the Panel (i.e., the Panel rejects the decision of the Board at issue in the appeal), then SFHA shall be entitled to reimbursement of its reasonable attorneys' and expert fees incurred from and after submission by SFHA of a Notice of Appeal and solely in connection with such appeal and not for Compliance Monitoring. In the event there is a dispute as to the amount of the attorneys' or expert fees to be reimbursed, SFHA may make a motion to the Court to resolve such dispute.

**6.**      **DISPUTE RESOLUTION.** If a dispute under this Consent Decree arises, other than an appeal to the Panel under Section 5, either Party can request a meet and confer within ten (10) business days of receiving written notification from the other Party of a request for a meeting to resolve the dispute. The notice shall set forth the nature of the dispute. The meet and confer under this Section 6 shall be limited to one four-hour meeting unless otherwise agreed by the Parties. In the event the meet and confer process has successfully resolved the dispute, then within sixty (60) days following its receipt of invoices, PG&E shall reimburse SFHA's reasonable attorney's and expert's fees incurred for participation in the meet and confer meeting,

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

48

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page
54 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  using the wire instructions in Section 3.5, provided, however, the total of the fees to be

2  reimbursed for each such meet and confer shall be capped at Five Thousand Dollars ($5,000). If

3  the Parties fail to meet and confer or if the meet and confer does not resolve the issue, then the

4  Parties shall each be entitled to bring a motion before the United States District Court for the

5  Northern District of California, for the limited purpose of enforcing or modifying the terms of

6  this Consent Decree, and will be entitled to seek attorney's fees and costs under Section 11.12.

7  **7.      SUBMISSION OF CONSENT DECREE TO U.S. EPA/DOJ.** Within three (3)

8  business days of receiving all of the Parties' signatures to this Consent Decree, SFHA shall

9  submit this Consent Decree to the U.S. Department of Justice ("DOJ") and the U.S. EPA for

10  agency review consistent with 40 C.F.R. §135.5. The agency review period expires forty-five

11  (45) calendar days after receipt by the DOJ, evidenced by correspondence from DOJ

12  establishing the review period. In the event DOJ or U.S. EPA comments negatively on the

13  provisions of this Consent Decree, the Parties agree to meet and confer to attempt to resolve the

14  issues raised by DOJ or U.S. EPA, as applicable.

15  **8.      DISMISSAL OF COMPLAINT.** Within ten (10) calendar days following the

16  expiration of the forty-five (45) day agency review period, the Parties shall submit a stipulation

17  and proposed order to the Court to (a) request the approval and entry of this Consent Decree and

18  (b) request dismissal of SFHA's claims (but not Clarke's claims) in this action in their entirety

19  with prejudice. Such dismissal shall not affect the rights and obligations of the Parties under this

20  Consent Decree, nor shall it affect the power of the Court to enforce this Consent Decree.

21  **9.      BINDING EFFECT, CLAIMS COVERED AND RELEASED**

22        9.1.    **SFHA's Releases and Waivers.** This Consent Decree is a full, final, and binding

23  resolution between SFHA, acting on behalf of itself, and its present and future members,

24  officers, directors, and each of their respective agents, representatives, heirs, beneficiaries,

25  executors, administrators, attorneys, insurers, successors and assigns, on the one hand ("SFHA

26  Releasors"), and PG&E and its past, present and future agents, representatives, employees,

27  officers, directors, affiliates, parents, subsidiaries, partners, predecessors in interest, related

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)                                                    49

Case: 19-30088    Doc# 5768-10    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page
55 of 99

1  entities, attorneys, insurers, successors and assigns ("Defendant Releasees"), on the other hand,

2  of all claims that were asserted by the SFHA against PG&E in the Notice and the First Amended

3  Complaint, including, without limitation, claims under RCRA, the CWA, and state statutory and

4  common laws.

5        9.2.    Without limiting the generality of the foregoing, SFHA Releasors, and each of

6  them, hereby release, waive and forever discharge Defendant Releasees from any and all manner

7  of actions, causes of action, claims, demands, rights, suits, obligations, debts, contracts,

8  agreements, promises, liabilities, damages, charges, losses, costs, expenses, attorneys' fees and

9  expert fees, of any nature whatsoever, known or unknown, in law or equity, fixed or contingent,

10  now or in the future, arising from or relating to the MIA, PG&E's alleged ownership and

11  operation of any portion of the Former MGPs or Former MGP Sites, and any alleged release of

12  hazardous substances, any alleged handling, storage, treatment, transportation or disposal of

13  solid or hazardous wastes, any alleged discharge of pollutants, or the alleged presence of

14  hazardous substances, hazardous or solid wastes, pollutants or contaminants at, under or

15  emanating from Former MGP Sites or Former MGPs.  Notwithstanding the foregoing, this

16  release and waiver shall not include, and shall have no effect upon, any claim by SFHA that

17  PG&E breached this Consent Decree, any action by SFHA to enforce this Consent Decree, any

18  claim by SFHA arising out of an MGP other than the Former MGPs, or any claim by SFHA

19  arising out of an MGP site other than the Former MGP Sites (collectively, "SFHA's Excepted

20  Claims").

21        9.2.1.1.    SFHA Releasors (except for SFHA's attorneys), and each of

22  them, shall not institute, participate or assist (for example, by providing financial assistance,

23  personnel time, advice or support), directly or indirectly, in any suits, claims or actions against

24  any Defendant Releasees with regard to the claims released and waived under this Section 9,

25  unless such action is to enforce this Consent Decree. By execution of its approval as to the form

26  of this Consent Decree, Gross & Klein agree that neither Gross & Klein, Stuart G. Gross,

27  Benjamin H. Klein, nor any firm with which they are affiliated, nor any attorney working at said

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1  law firm, shall represent any past members of SFHA or any other herring fisherman or herring

2  association with respect to the claims waived and released by the SFHA Releasors.

3       9.3.     With respect to the foregoing waivers and releases in this Section 9, SFHA

4  Releasors, and each of them, hereby specifically waive any and all rights and benefits which any

5  of them now has, or in the future may have, conferred by virtue of the provisions of Section

6  1542 of the California Civil Code, which provides as follows:

7         A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE
       CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER

8         FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN
       BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER

9         SETTLEMENT WITH THE DEBTOR.

       **Initials:** _MR_

10

11       9.4.    **PG&E's Release and Waiver.** PG&E, and its past, present and future agents,

12  representatives, employees, officers, directors, affiliates, parents, subsidiaries, partners,

13  predecessors in interest, related entities, attorneys, insurers, successors, and assigns ("Defendant

14  Releasors") hereby releases, waives and forever discharges SFHA and its current and former

15  members, officers, directors, agents, representatives, heirs, beneficiaries, executors,

16  administrators, and attorneys, and their respective successors and assigns, from any and all

17  manner of actions, causes of action, claims, demands, rights, suits, obligations, debts, contracts,

18  agreements, promises, liabilities, damages, charges, losses, costs, expenses, and attorneys' fees

19  and expert fees, of any nature whatsoever, known or unknown, in law or equity, fixed or

20  contingent, now or in the future, relating to or arising from the Notice, the First Amended

21  Complaint, and the MIA. Notwithstanding the foregoing, this release and waiver shall not

22  include, and shall have no effect upon, any action by PG&E to enforce this Consent Decree, any

23  claim by PG&E that SFHA has breached this Consent Decree, or any rights or defenses relating

24  to any of SFHA's Excepted Claims (PG&E's Excepted Claims").

25       9.5.     With respect to the foregoing waivers and releases in this Section 9, Defendant

26  Releasors, and each of them, hereby specifically waive any and all rights and benefits which any

27  of them now has, or in the future may have, conferred by virtue of the provisions of Section

28  1542 of the California Civil Code, which provides as follows:

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100)
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

51

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

**Initials:** M̶R̶

9.6   Notwithstanding anything to the contrary in this Consent Decree, the waivers and releases contained in Section 9 shall survive the termination of this Consent Decree.

**10. NOTICES**

10.1.   Unless otherwise specified herein, all correspondence and notices required by this Consent Decree shall be in writing and, to the extent feasible, be sent via electronic mail transmission to the e-mail addresses listed below or, if electronic mail transmission is not feasible, personally delivered or sent by first-class, registered or certified mail, return receipt requested, or by overnight courier, to the following addresses:

For SFHA to:

> Matt Ryan, President
> 5145 Graveline Rd.
> Bellingham, WA 98226
> email: mryan50@comcast.net

with a copy (which shall not constitute notice) to:

> Stuart G. Gross
> Gross & Klein LLP
> The Embarcadero
> Pier 9, Suite 100
> San Francisco, CA 94111
> email: sgross@grosskleinlaw.com

For PG&E to:

> Kevin M. Sullivan
> Pacific Gas and Electric Company
> 77 Beale Street, B28P
> San Francisco, CA 94105
> email: Kevin.M.Sullivan@pge.com

with a copy (which shall not constitute notice) to:

> Pacific Gas and Electric Company
> Managing Counsel, Litigation
> 77 Beale Street, Mail Code B30A, San Francisco, CA 94120-7442 (by hand-delivery)

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 58 of 99

52

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

P.O. Box 7442, San Francisco, CA 94120-7442 (by mail)
email: Elizabeth.Collier@pge.com

Any Party may, from time to time, specify in writing to the other Parties a change of address or addressee to which all notices and other communications shall be sent.

## 11. MISCELLANEOUS PROVISIONS

11.1. **Integration.** Except for any agreements that may be entered into in writing by and between the Parties concurrently with this Consent Decree, this Consent Decree contains the sole and entire agreement between the Parties and any and all prior negotiations and understandings related hereto shall be deemed to have been merged into this Consent Decree.

11.2. **Governing Law.** Except as otherwise expressly provided in this Consent Decree, the terms of this Consent Decree shall be governed by, and interpreted and enforced in accordance with, the laws of the State of California.

11.3. **Effective Date.** This Consent Decree shall not be effective until it is approved and entered by the Court, in which case it shall be effective as of the date it is entered ("Effective Date"). If the Court disapproves or otherwise declines to approve and enter this Consent Decree, the Parties shall meet and confer as to whether to modify the terms of this Consent Decree to address the Court's concerns. If the Parties do not agree, in principle, on a modified consent decree within thirty (30) days after the Court enters its order disapproving this Consent Decree, then this Consent Decree shall automatically be null and void, and this action shall proceed on its normal course.

11.4. **Retention of Jurisdiction.** This Court shall retain jurisdiction over this matter for the Term of this Consent Decree to implement, modify, and enforce this Consent Decree.

11.5. **Modification.** This Consent Decree may not be modified or amended except by further written stipulation of the Parties and approval of the Court, or by further order of the Court.

11.6. **Construction.** The language in all parts of this Consent Decree, unless otherwise stated, shall be construed according to its plain and ordinary meaning. The captions, paragraph headings, and Table of Contents used in this Consent Decree are for reference only and shall not

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

53

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 59 of 99

affect the construction of this Consent Decree. The Parties have negotiated this Consent Decree and agree that it shall not be construed against the Party preparing it, but shall be deemed to have been jointly prepared by the Parties, and any uncertainty and ambiguity shall not be interpreted against any one Party.

11.7.   **Term of Consent Decree.** This Consent Decree shall continue in effect for a term of ten (10) years from the Effective Date ("Term"), at which time the Consent Decree, and all obligations under it, shall automatically terminate.

11.8.   **Severability.** If any one or more of the provisions of this Consent Decree shall for any reason be held invalid, illegal or unenforceable in any respect, that invalidity, illegality or unenforceability shall not affect any other provision herein, and this Consent Decree shall be construed as if the invalid, illegal or unenforceable provision had never been included, provided, however, in no event shall any Party be deprived a material consideration by operation of this provision.

11.9.   **Assignment.** All of the rights, duties, and obligations contained in this Consent Decree shall inure to the benefit of and be binding upon each of the Parties and their respective successors and assigns.

11.10.   **Authority to Sign.** The undersigned representatives for the SFHA and for PG&E each represent and warrant that he/she has read, understood and agreed to all of the terms and conditions of this Consent Decree and is authorized by the Party that he/she represents to enter into and execute this Consent Decree on its behalf.

11.11.   **Counterparts/Signatures.** This Consent Decree may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document. The Parties' signatures to this Consent Decree transmitted by facsimile or electronic mail transmission shall be deemed binding.

11.12.   **Attorney's Fees For Enforcement or Modification of Consent Decree.** In the event any action is taken by any Party to enforce or modify this Consent Decree (which does not include any appeal to the Panel under Section 5), reasonable attorney's fees and costs (including

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

54

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 60 of 99

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    expert fees) shall be awarded in accordance with the standard established by § 505 of the Clean

2    Water Act, 33 U.S.C. § 1365(d), and applicable case law interpreting that standard.

3          The Parties hereto enter into this Consent Decree and submit it to the Court for its

4    approval and entry as a final judgment.

5    DATED: 9-15-18                          SAN FRANCISCO HERRING ASSOCIATION

6

7                                            By: _____
                                             Matt Ryan
8                                            Title:  President

9    DATED: 9/1/18                           PACIFIC GAS AND ELECTRIC COMPANY and
                                             PG&E CORPORATION
10

11                                           By: Andrew K. Williams
12                                           Title: VP Land & Environmental Management

13

14   APPROVED AS TO FORM:

15

16   GROSS & KLEIN LLP

17   By: _____
18        STUART G. GROSS
     ATTORNEYS FOR SAN FRANCISCO HERRING
19   ASSOCIATION

20   ALLEN MATKINS LECK GAMBLE MALLORY & NATSIS LLP

21   By: _____
          SANDI L. NICHOLS
22   ATTORNEYS FOR PACIFIC GAS AND ELECTRIC
     COMPANY AND PG&E CORPORATION
23

24   WFBM, LLP,

25   By: _____
          SCOTT D. MROZ
26   ATTORNEYS FOR PACIFIC GAS AND ELECTRIC
     COMPANY AND PG&E CORPORATION
27

28

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION
AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

55

1    **APPROVED AND SO ORDERED.**

2    Dated:____September 27, 2018____      By:_____

3    The Honorable William H. Orrick
     United States District Court Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

[PROPOSED] REVISED CONSENT DECREE BETWEEN THE PLAINTIFF SAN FRANCISCO HERRING ASSOCIATION AND DEFENDANTS; Case No. 14-cv-04393 WHO (JCS)

56

# EXHIBIT 1

Case 3:14-cv-04393-WHO Document 118 Page 63 of 98
SAN FRANCISCO HERRING ASSOCIATION et al. v. PACIFIC GAS AND ELECTRIC COMPANY et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))
EXECUTION VERSION - CONSENT DECREE



LEGEND

APPROXIMATE LIMITS OF HISTORICAL
MANUFACTURED GAS PLANT (MGP)

NOTES

1. ALL LOCATIONS ARE APPROXIMATE.
2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

SCALE IN FEET

HALEY
ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
FORMER NORTH BEACH MANUFACTURED GAS PLANT SITE
SAN FRANCISCO, CALIFORNIA

FORMER NORTH BEACH MGP SITE

JULY 2018

EXHIBIT 1

# EXHIBIT 2

EXECUTION VERSION - CONSENT DECREE



- - - APPROXIMATE LIMITS OF HISTORICAL
       MANUFACTURED GAS PLANT (MGP)

1. ALL LOCATIONS ARE APPROXIMATE.
2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

0    200    400
SCALE IN FEET

HALEY
ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
FORMER FILLMORE MANUFACTURED GAS PLANT SITE
SAN FRANCISCO, CALIFORNIA

FORMER FILLMORE MGP SITE

JULY 2018

EXHIBIT 2

# EXHIBIT 3

EXECUTION VERSION - CONSENT DECREE
SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))



LEGEND

HISTORICAL MANUFACTURED GAS PLANT (MGP) SITE
BOUNDARY

NOTES

1. ALL LOCATIONS ARE APPROXIMATE.

2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014.

SCALE IN FEET

0          150          300

HALEY & ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
FORMER BEACH STREET MANUFACTURED GAS PLANT SITE
SAN FRANCISCO, CALIFORNIA

FORMER BEACH STREET MGP SITE

JULY 2018

EXHIBIT 3

# EXHIBIT 4

**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al.**
**(N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

**EXHIBIT 4: List of "EPA PAH-34" for Analytical Measurement to Quantify "Total Trigger PAHs"**

| PAH | CAS* | Molecular Weight (µg/mol) |
|---|---|---|
| Naphthalene | 91203 | 128.17 |
| C1-Naphthalenes | - | 142.20 |
| Acenaphthylene | 208968 | 152.2 |
| Acenaphthene | 83329 | 154.21 |
| C2-Naphthalenes | - | 156.23 |
| Fluorene | 86737 | 166.22 |
| C3-Naphthalenes | - | 170.25 |
| Anthracene | 120127 | 178.12 |
| Phenanthrene | 85018 | 178.23 |
| C1-Fluorenes | - | 180.25 |
| C4-Naphthalenes | - | 184.28 |
| C1-Phenanthrene/anthracenes | - | 192.26 |
| C2-Fluorenes | - | 194.27 |
| Pyrene | 129000 | 202.26 |
| Fluoranthene | 206440 | 202.26 |
| C2-Phenanthrene/anthracenes | - | 206.29 |
| C3-Fluorenes | - | 208.30 |
| C1-Pyrene/fluoranthenes | - | 216.29 |
| C3-Phenanthrene/anthracenes | - | 220.32 |
| Benz(a)anthracene | 56553 | 228.29 |
| Chrysene | 218019 | 228.29 |
| C4-Phenanthrenes/anthracenes | - | 234.23 |
| C1-Benzanthracene/chrysenes | - | 242.32 |
| Benzo(a)pyrene | 50328 | 252.31 |
| Perylene | 198550 | 252.31 |
| Benzo(e)pyrene | 192972 | 252.32 |
| Benzo(b)fluoranthene | 205992 | 252.32 |
| Benzo(k)fluoranthene | 207089 | 252.32 |
| C2-Benzanthracene/chrysenes | - | 256.23 |
| Benzo(ghi)perylene | 191242 | 276.23 |
| C3-Benzanthracene/chrysenes | - | 270.36 |
| Indeno(1,2,3-cd)pyrene | 193395 | 276.23 |
| Dibenz(a,h)anthracene | 53703 | 278.35 |
| C4-Benzanthracene/chrysenes | - | 284.38 |

* For C# PAHs CAS is not available.

# EXHIBIT 5



Case 3:14-cv-04393-WHO Document 518 Page 71 of 98

SAN FRANCISCO HERRING ASSOCIATION, et al, v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))

EXECUTION VERSION - CONSENT DECREE

PIER 35 TO JONES ST, SOIL BORING/
GRAB GROUNDWATER SAMPLING MAP

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

HALEY ALDRICH

JULY 2018

EXHIBIT 5

1. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

SCALE IN FEET

●   UPLAND BORING

⊕   PROPOSED GRAB GROUNDWATER SAMPLING LOCATION

▨   PIER 39

▨   PIER 39 HARBOR

▨   FORMER BEACH STREET MANUFACTURED GAS PLANT (MGP)

# EXHIBIT 6



EXHIBIT 6

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

100' BAND GROUNDWATER
MONITORING WELL MAP -
BAKER ST. TO LAGUNA ST.

JULY 2018

HALEY
ALDRICH

SAN FRANCISCO BAY

EAST
HARBOR

WEST
HARBOR

MONITORING WELL

AGREED UPON LOCATION OF NEW MONITORING WELL

APPROXIMATE LIMITS OF HISTORICAL MANUFACTURED GAS PLANT (MGP)

1. FINAL WELL LOCATIONS MAY BE ADJUSTED TO
ACCOUNT FOR SUBSURFACE UTILITIES AND/OR
ANY OTHER ACCESS CONSTRAINTS.

2. AERIAL IMAGERY SOURCE: CITY AND COUNTY
OF SF, 2014

SCALE IN FEET

# EXHIBIT 7



**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

MONITORING WELL

PROPOSED MONITORING WELL

PIER 39

PIER 39 HARBOR

FORMER BEACH STREET MANUFACTURED GAS PLANT (MGP)

1. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

0 220 440
SCALE IN FEET

HALEY ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

100' BAND GROUNDWATER MONITORING WELL MAP - JONES ST. TO PIER 39

JULY 2018

EXHIBIT 7

# EXHIBIT 8

Case 3:14-cv-04393-WHO Document 18 Page 77 of 99
SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))
EXECUTION VERSION - CONSENT DECREE



FORT MASON OFFSHORE SEDIMENT
SAMPLING LOCATION MAP

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

JULY 2018

EXHIBIT 8

1. ALL LOCATIONS ARE APPROXIMATE.
2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

SCALE IN FEET

• SEDIMENT STATION

# EXHIBIT 9



Case 3:14-cv-04393-WHO Document 218 Page 79 of 99

SAN FRANCISCO HERRING ASSOCIATION, et al. v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))

EXECUTION VERSION - CONSENT DECREE

OBH-53
OBH-52
OBH-54
OBH-57
OBH-56
OBH-55
OBH-60
OBH-59
OBH-58
OBH-61
OBH-62
OBH-63
OBH-64
OBH-65
OBH-66
OBH-67
OBH-68
OBH-69
OBH-70
OBH-71

SAN FRANCISCO
BAY

FILLMORE ST
MARINA GREEN DR
MARINA BLVD

1. ALL LOCATIONS ARE APPROXIMATE.
2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

● SEDIMENT STATION

SCALE IN FEET
0    150    300

HALEY & ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

NEW MARINA OFFSHORE SEDIMENT
SAMPLING LOCATION MAP

JULY 2018

EXHIBIT 9

# EXHIBIT 10

SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))

EXECUTION VERSION - CONSENT DECREE



ILLUSTRATIVE EXAMPLE OF NEW
MARINA OFFSHORE SEDIMENT
STEP-OUT SAMPLING SCENARIO

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

JULY 2018

EXHIBIT 10

1. ALL LOCATIONS ARE APPROXIMATE.
2. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

● PLANNED SEDIMENT STATION
○ POTENTIAL STEP-OUT SEDIMENT STATION

# EXHIBIT 11

EXECUTION VERSION - CONSENT DECREE
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

**Exhibit 11 –Basis for Developing a Conservative Proxy for PWeq**

This Exhibit describes how bulk sediment PAH data will be used to predict Total PAH (sum of the EPA-34 PAHs) concentrations in pore water, to determine if the Chemical Performance Standard of 15 µg/L Total PAH has been exceeded. If a statistically acceptable correlation ($R^2 > 0.8$) between bulk sediment characteristics and pore water EPA PAH-34 concentrations cannot be demonstrated, the conservative method outlined below (conservative proxy) will be used to estimate total EPA PAH-34 concentrations in sediment pore water using total PAH concentrations in bulk sediment.

Data collected by PG&E during 2017 as part of the Outside East Harbor Shallow Sediment Investigation will be included in the evaluation together with additional samples collected from the Pier 39 to 45 sediment investigation as described below.

**Pier 39 to 45 sediment Sampling Locations.** Twenty (20) stations out of an existing 95 surface sediment sampling stations where bulk sediment sampling has already occurred will be sampled for pore water and co-located bulk sediment. The sampling stations are not geographically equally distributed but instead include stations in areas with anticipated bulk sediment concentrations distributed throughout the range of total Regional Monitoring Program (RMP) PAH-25 concentrations in current surface sediments. The following summarizes the number of stations sampled within various surface sediment total PAH-25 concentration ranges, based on the previous sediment sampling:

- 1 station < 4.5 mg/kg [4.5 mg/kg = SF Bay Ambient for "muddy" sediment]
- 1 station between 4.5 and 10 mg/kg
- 3 stations between 10 and 30 mg/kg
- 4 stations between 30 and 44.8 mg/kg [44.8 mg/kg = ERM, screening level above which adverse effects to invertebrates are considered likely]
- 5 stations between 44.8 and 100 mg/kg
- 6 stations > 100 mg/kg

**Outside East Harbor Shallow Sediment Investigation.** Below is an example plot of the 20 pairs of outside East Harbor data and on a log-log scale, without discarding any data pairs as potential outliers, which demonstrates that there is a somewhat strong relationship between bulk sediment PAH concentrations and pore water PAH concentrations. This relationship is modeled below with a simple 2nd-order polynomial to fit the curvature in the signal (how sediment concentrations change as a function of pore water concentrations). The plot below shows a scatter plot between pore water and bulk sediment PAH concentrations on the log-log scale. The $R^2$ value for this particular model is 0.71

**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**



This limited data set does not result in a correlation $R^2 > 0.8$ but suggests that a larger data set might produce a higher coefficient of determination.  Therefore, additional samples will be collected and used to determine if a statistically acceptable correlation exists.

**Dataset for Developing a Conservative Proxy for PWeq**.  The dataset to be evaluated will include twenty (20) sediment-pore water sample pairs from twenty (20) stations collected in the Outside East Harbor Shallow Sediment Investigation. The dataset will also include sixty (60) additional sample pairs collected from twenty (20) stations at Pier 39 to 45 (3-samples at three depth intervals, 0-0.5', 1-1.5' and 2-3', from 20 locations).  Sediment-pore water sample pairs will be excluded from evaluation for any of the following reasons: 1) presence of NAPL in bulk sediment; and 2) filtered pore water (from the Outside East Harbor filtration comparison).

Case: 19-30088   Doc# 5768-10   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 85 of 99

**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

The following process will be used to determine a relationship between bulk sediment concentrations and pore water, and provides a conservative estimator should it be necessary:

1. Use statistical computing software to find a best fit model for 1st and 2nd order polynomials (i.e., linear or quadratic) on a log-log scale with Ordinary Least Squares or Maximum Likelihood algorithms on all paired bulk and pore water data without outlier removal.

2. Calculate the $R^2$ model for the regression models and select the regression model with the highest $R^2$ coefficient-of-determination.

3. If the highest $R^2$ value for the regression models is at least 0.8, select the regression model with the highest $R^2$ value as sufficient for estimating PWeq.

4. If the highest $R^2$ value for the regression line models is below 0.8, then:

   a. Apply 95% confidence intervals on the best linear fit, exclude data points beyond the 95% confidence intervals, and re-calculate the R2 model for the regression lines with the outliers excluded.

   b. If the highest $R^2$ value for the regression models, excluding 95% confidence interval outliers, is at least 0.8, select the regression model with the highest $R^2$ value as sufficient for estimating PWeq.

5. If the highest $R^2$ value for the regression models is still below 0.8, then:

   a. Identify the bulk concentration that equates to a pore water concentration of Total Trigger PAHs of 15 μg/L for each regression model.

   b. Limit the dataset of bulk sediment concentrations to values two orders of magnitude less than and greater than the bulk concentration that equates to a pore water concentration of Total Trigger PAHs of 15 μg/L for each regression model, then perform steps 1 through 3 on the Trimmed Dataset.

   c. If the highest $R^2$ value for any of the regression models is at least 0.75, select the regression model with the highest $R^2$ value as sufficient for estimating PWeq.

   d. If the highest $R^2$ value determined with the regression models for the Trimmed Dataset resulting from 5.b. ("Trimmed Dataset") is below 0.75, then:

      i. Select the nonlinear regression model from 5.b with the highest $R^2$ value determined for the trimmed dataset, then:

      ii. Calculate projected pore water Total Trigger PAHs ("Projected Pore Water") for all bulk sediment samples in the Trimmed Dataset with the highest $R^2$ value trimmed regression equation;

      iii. Calculate a direct Conversion Factor ("CF") using the following equation: CF = Projected Pore Water concentration divided by the bulk sediment concentration; and

      iv. Select the 95th percentile of the CF dataset to calculate the PWeq conservative proxy that may be used to estimate Total Trigger PAHs in pore water for bulk sediment with PAH concentrations.

# EXHIBIT 12

**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al.**
**(N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

**EXHIBIT 12**
**Pore Water Sampling Protocol**

This Exhibit describes a sediment pore water sampling and analysis protocol to be implemented as part of new offshore sediment investigations and related sediment monitoring performed under the terms of a consent decree

**Pore Water Sampling and Analysis**. At each pore water station, pore water samples will be collected from three depth intervals: 0 to 0.5, 1.0 to 1.5, and 2.0 to 3.0 feet below mudline.  At each station, three pore water samples (one from each depth interval) will be collected simultaneously using an array of screened piezometers inserted into sediment through a metal plate with a minimum size of 18" square fitted with diaphragms to stabilize the sediment surface before penetration of the three piezometers.  Three dedicated screen assemblies (screen size - 0.03- inch screen) will be fabricated for each station.  The only components that are re-used are the metal plate, the weights, and the retrieval wires.  The device includes three 1-inch diameter polyvinyl chloride (PVC) pipes which extend into the sediment, each with a 6-inch or 12-inch long slotted screen at the specified depth interval.  The sampling screens will be isolated from the overlying surface water by an impermeable seal.  The three sets of Teflon tubing will be connected to three separate peristaltic pumps on the sampling vessel.  Low-flow sampling techniques will be used to gently purge the volume of water in the tubing prior to sample collection.

To minimize the chance of vertical pore water migration, all three sample intervals will be sampled simultaneously using low pumping rates to encourage horizontal flow.  For each screened interval, after purging a single tubing volume, a small aliquot of pore water will be collected, and field parameters measured (temperature, salinity, dissolved oxygen, oxidation-reduction potential).  A single 1-Liter sample will then be collected from each screened interval for analysis of PAHs and total organic carbon (TOC).  When there is adequate sample volume, field parameters will be measured (temperature, salinity, dissolved oxygen, oxidation-reduction potential). An ambient sample of San Francisco Bay water will be collected from immediately above the sediment surface and measured for field parameters (temperature, salinity, dissolved oxygen, oxidation-reduction potential). Samples will be retained on ice under chain-of-custody until shipped to the analytical laboratory. Porewater samples will not be filtered; rather, the laboratory will flush from porewater samples visual particles that have settled in the separatory funnel.

**Sediment Sampling and Analysis**. After collection of the pore water samples, co-located sediment samples (0.0 to 0.5, 1.0 to 1.5, and 2.0 to 3.0 feet below mudline) will be collected from a short core, nominally 4 feet in length, advanced by pushing or gravity. The samples will be homogenized for aliquoting sediment into jars for PAH and TOC analysis.  Sufficient remaining bulk sediment will be collected into zip-lock bags for grain size analysis.

# EXHIBIT 13



SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al., (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))

SEDIMENT SAMPLING LOCATION

APPROXIMATE LIMITS OF HISTORICAL MANUFACTURED GAS PLANT (MGP)

1. AERIAL IMAGERY SOURCE: CITY AND COUNTY OF SF, 2014

SCALE IN FEET

0   120   240

EAST HARBOR

HALEY & ALDRICH

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

EAST HARBOR PRIOR SAMPLING
LOCATIONS MAP

JULY 2018

EXHIBIT 13

# EXHIBIT 14

**EXECUTION VERSION - CONSENT DECREE**
**SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al.**
**(N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))**

# EXHIBIT 14

## List of "Sediment/Pore Water PAHs"

Naphthalene*
C1-Naphthalenes
C2-Naphthalenes
C3-Naphthalenes
C4-Naphthalenes
2-Methylnaphthalene*
1-Methylnaphthalene*
2,6-Dimethylnaphthalene*
2,3,5-Trimethylnaphthalene*
Acenaphthylene*
Acenaphthene*
Biphenyl*
Dibenzofuran
Carbazole
Fluorene*
C1-Fluorenes
C2-Fluorenes
C3-Fluorenes
Benzothiophene
C1-Benzo(b)thiophenes
C2-Benzo(b)thiophenes
C3-Benzo(b)thiophenes
C4-Benzo(b)thiophenes
Naphthobenzothiophene
C1-Naphthobenzothiophenes
C2-Naphthobenzothiophenes
C3-Naphthobenzothiophenes
C4-Naphthobenzothiophenes
Dibenzothiophene*
C1-Dibenzothiophenes
C2-Dibenzothiophenes
C3-Dibenzothiophenes
C4-Dibenzothiophenes
1-Methyldibenzothiophene (1MDT)
2/3-Methyldibenzothiophene (2MDT)
4-Methyldibenzothiophene (4MDT)
Anthracene*
Phenanthrene*
C1-Phenanthrenes/Anthracenes
C2-Phenanthrenes/Anthracenes

C3-Phenanthrenes/Anthracenes
C4-Phenanthrenes/Anthracenes
1-Methylphenanthrene (1MP)*
2-Methylphenanthrene (2MP)
3-Methylphenanthrene (3MP)
9/4-Methylphenanthrene (9MP)
2-Methylanthracene (2MA)
1-Methyl-7-isopropylphenanthrene (Retene)
Fluoranthene*
Pyrene*
C1-Fluoranthenes/Pyrenes
C2-Fluoranthenes/Pyrenes
C3-Fluoranthenes/Pyrenes
C4-Fluoranthenes/Pyrenes
1-Methylpyrene
2-Methylpyrene
4-Methylpyrene
Benzo(b)fluorene
Benzo(c)fluorene
Benzo(a)anthracene
Chrysene/Triphenylene*
C1-Chrysenes
C2-Chrysenes
C3-Chrysenes
C4-Chrysenes
Benzo(b)fluoranthene*
Benzo(j)+(k)fluoranthene**
Benzo(a)fluoranthene
Benzo(e)Pyrene*
Benzo(a)Pyrene*
Perylene*
Indeno(1,2,3-cd)pyrene*
Dibenz(a,h)+(a,c)anthracene*
Benzo(g,h,i)perylene*
Bicyclic Aliphatic Hydrocabons
Cis/Trans-Decalin
C1-Decalins
C2-Decalins
C3-Decalins
C4-Decalins

*   Indicates constituents included in Regional Monitoring Program (RMP) PAH-25 list.  PAHs (μg/kg dry wt), related heterocyclic aromatic hydrocarbons, and bicyclic aliphatic hydrocarbons - EPA Method 8270D-SIM (Modified)  Note: dry wt for sediment, wet wt for tissues, ng/L for elutriates.

# EXHIBIT 15

Case 3:14-cv-04393-WHO Document 93 Page 93 of 98

SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al. (N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))
EXECUTION VERSION - CONSENT DECREE



# EXHIBIT 16

Case 3:14-cv-04393-WHO Document 138 Page 95 of 98
SAN FRANCISCO HERRING ASSOCIATION, et al, v. PACIFIC GAS AND ELECTRIC COMPANY, et al., (N.D. Cal.) Case No. 3:14-cv-04393-WHO (JCS)
EXECUTION VERSION - CONSENT DECREE



EXHIBIT 16

PACIFIC GAS AND ELECTRIC COMPANY (PG&E)
SAN FRANCISCO, CALIFORNIA

WEST HARBOR SAMPLING
AND POTENTIAL STEP-OUT
LOCATION MAP

JULY 2018

HALEY
ALDRICH

# EXHIBIT 17

*EXECUTION VERSION - CONSENT DECREE*
*SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al.*
*(N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))*

**EXHIBIT 17**

**Locations and Screen Depth Intervals for Grab Groundwater Samples and Compliance Wells in 100' Band**

| Location ID | Screen Interval (feet bgs) | | Status |
|---|---|---|---|
| | **Top** | **Bottom** | |
| Grab Groundwater Sample Locations shown in Exhibit 5: | | | |
| UB-12 | 10.0 | 12.0 | To be sampled after Consent Decree is entered. |
| | 19.0 | 21.0 | |
| UB-13 | 10.0 | 12.0 | To be sampled after Consent Decree is entered. |
| | 19.0 | 21.0 | |
| UB-14 | 10.0 | 12.0 | To be sampled after Consent Decree is entered. |
| | 18.5 | 20.5 | |
| | 23.0 | 25.0 | |
| UB-15 | 12.0 | 14.0 | To be sampled after Consent Decree is entered. |
| | 18.0 | 20.0 | |
| | 23.0 | 25.0 | |
| Between Baker Street and Scott Street (Locations shown in Exhibit 6 from west to east): | | | |
| MW13A | 9.7 | 14.7 | Existing well approved as 100' Band Compliance Well |
| MW13B | 19.2 | 24.2 | |
| MW14A | 9.8 | 14.8 | Existing well approved as 100' Band Compliance Well |
| MW14B | 20.2 | 25.2 | |
| MW15A | 9.9 | 14.9 | Existing well approved as 100' Band Compliance Well |
| MW15B | 18.8 | 23.8 | |
| MW16A | 9.4 | 14.4 | Existing well approved as 100' Band Compliance Well |
| MW16B | 15.5 | 20.5 | |
| Between Scott Street and Webster Street (Locations shown in Exhibit 6 from west to east): | | | |
| CMT05A | 9.0 | 9.6 | Existing well approved as 100' Band Compliance Well |
| CMT05B | 16.8 | 17.4 | |
| CMT05C | 20.1 | 20.7 | |
| MW17 | 10.3 | 15.3 | Existing well approved as 100' Band Compliance Well |
| MW17B | -- | -- | Proposed location agreed, not installed. Screen interval TBD[1,2] |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| MW18 | 10.6 | 15.6 | Existing well approved as 100' Band Compliance Well |
| MW18B | 20.0 | 25.0 | Agreed location and interval, not installed. |
| MW19 | 10.6 | 15.6 | Existing well approved as 100' Band Compliance Well |
| MW19B | 20.5 | 25.5 | Agreed location and interval, not installed. |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| MW20 | 11.2 | 16.2 | Existing well approved as 100' Band Compliance Well |
| MW20B | 21.0 | 26.0 | Agreed location and interval, not installed. |

*EXECUTION VERSION - CONSENT DECREE*
*SAN FRANCISCO HERRING ASSOCIATION, et al., v. PACIFIC GAS AND ELECTRIC COMPANY, et al.*
*(N.D. Cal. Case No. 3:14-cv-04393-WHO (JCS))*
**EXHIBIT 17**
**Locations and Screen Depth Intervals for Grab Groundwater Samples and Compliance Wells in 100' Band**

| Location ID | Screen Interval (feet bgs) | | Status |
|---|---|---|---|
| | Top | Bottom | |
| Between Webster Street and Laguna Street (Locations shown in Exhibit 6 from west to east): | | | |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| MW21A | 7.3 | 12.3 | Existing well approved as 100' Band Compliance Well |
| MW21B | 21.3 | 26.3 | |
| MW06A | 9.0 | 11.0 | |
| MW06B | 13.0 | 15.0 | Existing well approved as 100' Band Compliance Well |
| MW06C | 17.0 | 19.0 | |
| MW02A | 9.0 | 11.0 | |
| MW02B | 17.0 | 19.0 | Existing well approved as 100' Band Compliance Well |
| MW02C | 24.0 | 26.0 | |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| MW08A | 9.0 | 15.0 | Existing well approved as 100' Band Compliance Well |
| MW08BR | 18.3 | 20.2 | |
| MW08C | 25 - 27 | 29 - 30 | Agreed location; not installed, interval pending [2,3] |
| MW09A | 9.0 | 15.0 | Existing well approved as 100' Band Compliance Well |
| MW09B | 20.0 | 22.0 | |
| (Locations shown in Exhibit 7 from west to east): | | | |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |
| MW01 | 7.0 | 11.8 | Existing well approved as 100' Band Compliance Well |
| MW02 | 8.0 | 12.8 | Existing well approved as 100' Band Compliance Well |
| MW03 | 9.0 | 13.8 | Existing well approved as 100' Band Compliance Well |
| TBD (A) | -- | -- | Proposed location of well pair agreed, not installed. Location ID |
| TBD (B) | -- | -- | and screen interval TBD[1,2.] (A)=shallow interval; (B)=deeper |

**Abbreviations:**
bgs: below ground surface.
TBD: To Be Determined after Consent Decree is entered.

**Notes:**
1. Exploratory boring to be drilled after Consent Decree is entered.
2. Well screen interval to be based on boring log and criteria set forth in Consent Decree paragraph 4.2.3.2.
3. Well screen will be designed to intercept sand zone impacted by NAPL identified in boring log for MW08B at 27 to 29 ft bgs.