# EXHIBIT 11

STUART G. GROSS (#251019)
sgross@grosskleinlaw.com
TIMOTHY S. KLINE (#319227)
tk@grosskleinlaw.com
**GROSS & KLEIN LLP**
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

MATTHEW D. METZGER (#240437)
mmetzger@belvederelegal.com
**BELVEDERE LEGAL, PC**
1777 Borel Place, Ste 314
San Mateo, CA 94402
t (415) 513-5980
f (415) 513-5985

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **DAN CLARKE**, | Case No. 14-04393-WHO |
| Plaintiff, | |
| v. | **PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT** |
| **PACIFIC GAS AND ELECTRIC COMPANY**; and **PG&E CORPORATION**, | |
| Defendants. | |

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

PARTIES ........................................................................................................................... 4

I.   Plaintiff.................................................................................................................. 4

II.  Defendants............................................................................................................ 6

JURISDICTION.................................................................................................................. 7

VENUE .............................................................................................................................. 7

INTRADISTRICT ASSIGNMENT..................................................................................... 7

FACTUAL BACKGROUND ............................................................................................... 8

I.   PG&E's Former Operation of MGPs in the Marina Neighborhood of San Francisco .......... 8

     A.   Background - MGPs and Toxic and Solid Waste Associated Therewith ..................... 8

     B.   Overview of Historic MGPs in the Marina .................................................................. 11

          1.  North Beach MGP ............................................................................................ 11

          2.  Fillmore MGP .................................................................................................. 12

II.  PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous
     MGP Wastes at the Subject MGP Sites and/or in the Vicinity thereof.............................. 14

III. The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or
     Disposed of by PG&E at the Subject MGP Sites and/or in the Vicinity thereof Present,
     and/or May Present, an Imminent and Substantial Endangerment to Health and/or the
     Environment ................................................................................................................... 15

     A.   MGP Wastes in the Soils of the Subject MGP Sites and Their Immediate Vicinity
          Contain Very Dangerous Levels of Lead that PG&E Refuses to Address ..................... 16

     B.   As a Result of Public Relations by PG&E that Understate the Risk, MGP Wastes in
          the Soils of Many Private Properties that Contain High Levels of Numerous Toxic
          Chemicals Have Not Been Remediated or Even Tested .............................................. 19

     C.   MGP Wastes in the Soils of Right of Ways and Other Public Properties on the Subject
          MGP Sites and Their Immediate Vicinity Contain High Levels of Numerous Toxic
          Chemicals for which There Is No Plan to Address ..................................................... 24

IV.  PG&E Has Affirmatively and Repeatedly Taken Advantage of Ineffective Local Regulation
     for More than Two Decades to Avoid Testing and Remediating MGP Wastes at or in the
     Vicinity of the Subject MGP Sites ................................................................................... 26

     A.   In 1991, PG&E Took Advantage of Divided and Weak State Regulatory Agencies to
          Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations
          Around the Marina Substation .................................................................................. 26

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

B. In 1997, PG&E Used Questionable Means to Skirt State Regulatory Agencies and Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Gaslight Building ................................................................................. 28

C. Since 1977, PG&E Has Purposefully Ignored Indications of a Large Plume of MGP Waste from the Fillmore MGP and Failed to Report It to Regulatory Agencies or Initiate an Investigation of It ................................................................................. 31

D. PG&E Has Grossly Misled Plaintiff and the Public About Oversight on Past Investigations of MGP Waste ................................................................................. 33

V. Plaintiff Has Complied with the Notice Requirements under RCRA ................................ 34

CLAIM FOR RELIEF ........................................................................................................ 34

Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.* ...... 34

PRAYER FOR RELIEF ...................................................................................................... 34

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

ii

1    Plaintiff Dan Clarke ("Clarke" or "Plaintiff") alleges on information and belief, except as

2 where based on personal knowledge, as follows:

3                                    **INTRODUCTION**

4    1.    This action arises out of terrestrial contamination caused by manufactured gas

5 plants ("MGPs") owned and operated by PG&E in the Marina neighborhood of San Francisco,

6 the Fillmore MGP and the North Beach MGP (collectively, the "Subject MGPs").



20    2.    MGPs were highly polluting, low-tech refineries that were used, in the nineteenth

21 and early twentieth centuries, to create gas from coal, and later oil, and a combination of coal and

22 oil that was then pumped in pipes to (mainly residential) consumers for lighting, cooking, and

23 heating in their vicinity.

24    3.    The soil and groundwater of the historical footprint of these facilities, which as the

25 above map shows encompassed an area equivalent to several city blocks, as well as the soil and

26 groundwater of the areas in their vicinity, are contaminated with a variety of solid and/or

27 hazardous waste from the MGPs that was disposed of by PG&E on or in the vicinity of the

28 Subject MGP Sites (collectively, "MGP Wastes").

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

---

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

4. The MGP Waste contamination from these MGPs may present an imminent and substantial endangerment to human health and the environment.

5. PG&E has known about this endangerment since at least the 1970s. Nonetheless, PG&E did not even begin to do any type of area-wide investigation until 2010.

6. Even then, it took the filing of the instant lawsuit and the joint investigation conducted by Plaintiffs and PG&E under the mediated supervision of Chief Magistrate Judge Joseph C. Spero (the "Court Mediated Investigation" or "CMI") to compel PG&E to take basic investigative actions.

7. Prior to this lawsuit, PG&E refused to test groundwater in the Marina neighborhood and had not conducted any investigations aimed at identifying the location of MGP tar deposits and investigations of MGP Waste contamination in public right-of-ways.

8. Rather, prior to this lawsuit, PG&E limited its investigation solely to the private properties whose owners—despite misleading statements that falsely played down the health risk of the likely MGP Waste contamination made by PG&E representatives and in materials produced by PG&E and distributed by it and the California Department of Toxic Substance Control ("DTSC")—requested that PG&E investigate contamination of their properties.

9. Such investigations were, in almost all cases, limited to the backyards of the properties and, in all cases, was limited to identifying the concentrations of polyaromatic hydrocarbon ("PAH") concentrations in the properties' soils.

10. If PAH contamination was found, PG&E would generally limit its remediation to the removal of a few feet of soils from the backyard and/or covering it with concrete, without ever even examining to what extent MGP Waste contamination affected soils underneath the home on the property, air quality within the home, or groundwater beneath it.

11. This facially deficient (but cheap) strategy of investigation and remediation was conducted by PG&E pursuant to a Voluntary Clean-Up Agreement (the "VCA") between PG&E and the DTSC, which places DTSC in the position of paid-contractor of PG&E, rather than a supervisory regulator.

---

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

2

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

12.     Under the VCA, which remains in place, DTSC never orders PG&E where or how to investigate the MGP Waste nor does it order PG&E to address the contamination PG&E finds.

13.     Rather, DTSC reviews materials provided to it by PG&E and gives those materials the appearance of regulatory approval that PG&E needs for cover. Further, DTSC acts, at PG&E's request, as the counterparty to land use covenants ("LUCs") with property owners, by which contamination is "addressed" by legally limiting what can be done to a property, instead of by removing the contamination. While these LUCs are entered between DTSC and the homeowner, they are drafted by PG&E.

14.     As a result of the pressure of this litigation and the CMI, PG&E has been compelled to conduct a substantially more comprehensive investigation of the MGP Waste contaminating the Marina neighborhood and has been less able to conduct inadequate remediations of private properties.

15.     However, large gaps still remain that may present an imminent and substantial endangerment to human health or the environment if not addressed. Those gaps will not be addressed without an order by this Court providing the relief requested herein.

16.     Specifically, the following three major gaps remain and will not be filled without intervention by this Court:

a.     <u>Lead</u>: Despite (or because of) overwhelming evidence that MGP Wastes from the Subject MGPs, containing lead at concentrations that are profoundly toxic to children and pregnant women, were stored, transported, and disposed of by PG&E on the sites of the Subject MGPs (the "Subject MGP Sites") and in their immediate vicinity, PG&E had vigorously fought efforts to compel it to even test for the chemical in its investigation, let alone conduct any associated remediation. It is, thus, almost certain that, unless the Court orders that it be addressed, MGP Wastes containing high concentrations of lead will remain unidentified and unremediated, threatening residents and visitors to the Subject MGP Sites and their immediate vicinity.

b.     <u>Public Information</u>: It is now almost 10 years since PG&E first began contacting homeowners in the Marina concerning the potential MGP Waste contamination of their properties. Nonetheless, a large number of likely contaminated properties have not even

been investigated yet. This is largely because the information that PG&E has provided directly and indirectly to homeowners falsely understates the human health risk presented by the MGP Wastes likely on their properties. Accordingly, unless more accurate information is provided, it is likely that the current occupants and visitors or homes located on or in the immediate vicinity of the Subject MGP Sites will expose themselves to MGP Waste contamination that is dangerous for human health and that such contamination will not ultimately be remediated, resulting in a risk of exposure for subsequent occupants and visitors of the properties.

        c.    <u>Public Properties and Right-Of-Ways</u>: The CMI confirmed what is obvious—that public properties and right-of-ways in the vicinity of contaminated private properties are themselves also contaminated. As such, construction and utility workers working on these properties, as well as other members of the public, are routinely exposed to hazardous MGP Wastes. However, PG&E is doing nothing to remediate these properties and is under no order to do so, making it highly likely that this contamination will remain in place and threaten human health and the environment, without action by this Court.

    17.    Given PG&E's consistent and stubborn refusal to address these gaps and the unwillingness or inability of the DTSC or other governmental agencies to force them to do so, it is necessary that the Court order the relief requested below in order to address the remaining threats to human health and the environment that contamination that MGP Wastes may present on the Subject MGP Sites and the vicinities thereof.

<b><u>PARTIES</u></b>

**I.**    **<u>Plaintiff</u>**

    18.    Plaintiff **DAN CLARKE** ("Clarke") is an individual, residing in San Mateo, California, who formerly resided, with his wife, at 1625 North Point St., San Francisco, California, which is on North Beach MGP site.

    19.    Clarke habitually visits the areas affected by the contamination alleged in this action for aesthetic and recreational enjoyment, visiting the affected area alone and with family, friends, and guests from out of town, and he intends to do so in the future. Despite having moved 25 miles away two years ago, Clarke still goes into the City often. It is Clarke's custom to drive to

4

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

the Marina Green and leave his car there, while Clarke, or Clarke and his visitors, walk along the shoreline and through the Marina. There are few places on earth that are more peaceful or inspiring. When Clarke is with others, he likes to show off the area he used to call home. When alone, he just thinks about how lucky he is. The Marina neighborhood and shoreline from the Golden Gate Bridge around to the Ferry Building are a source of continuing pleasure for Clarke. Clarke still loves the Marina and San Francisco and that is one of the reasons he keeps going back there.

20.     When Clarkes walks the shoreline and through the Marina, his thoughts go to the amazingly interconnected world we live in and how we share this beautiful environment with all God's creatures.

21.     Clarke's enjoyment of the affected area is diminished by the harm that the complained of contamination is causing to the environment of the affected area. Clarke believes humans have a responsibility to take care of the environment and it stresses Clarke to think about the way MGP contamination in this area is impacting the environment of his former neighborhood.

22.     Clarke is concerned for others. Clarke's enjoyment of the affected area is diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment.  It pains Clarke to think that there are children attending a school on top of contamination and is frustrated and angered by PG&E's unconscionable neglect and failure to have fully informed parents of the possibility of this threat.

23.     Clarke intends to visit the affected areas in the future, alone and with guests, for the same types of aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged in this action is addressed.

24.     Before moving in November 2017, Clarke lived in the Marina in the home he sold to PG&E, for eighteen years. During this time, for 10 years, Clarke and his wife routinely handled "black rocks" that they found in the backyard. Clarke later learned that these rocks were a form of MGP Waste and that MGP waste contains high levels of cancer-causing chemicals, particularly PAHs, as well as other toxins such as lead. This has placed Clarke and his wife at an increased

Gross & Klein LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111

risk of developing cancer and other health problems, which has caused Clarke significant stress and anxiety.

25.   A source of that anxiety is the lack of certainty Clarke has concerning the full nature and extent of the MGP Wastes to which Clarke and his wife were exposed while living in the Marina neighborhood. This lack of certainty also makes it difficult for Clarke to assess the extent of the health risks that Clarke and his wife face as a result of that exposure and thus make intelligent decisions concerning measures to address and mitigate those risks. Accordingly, a complete and comprehensive investigation of the nature and extent of the MGP contamination in the Marina neighborhood would both lessen the stress and anxiety from which Clarke currently suffers and assist him in addressing the health risks Clarke and his wife face.

26.   The sale of the Clarke Home to PG&E was not something that Clarke considered voluntary. Rather, Clarke loved living in the Marina neighborhood and planned to do so for the rest of his life. Clarke swore he would never leave. However, as a result of the contamination of the neighborhood and the inability to reach an agreed-upon plan for remediating Clarke's property with PG&E, Clarke was forced to sell it to PG&E, and move to a different home in a different town. If it wasn't for the contamination, Clarke would never have done so. As a result of the move, Clarke not only was dislodged from the neighborhood and severed from his social connections there, but also incurred significant financial costs for such things as moving and storage.

27.   Because of Clarke's continued interest in seeing the contamination alleged in this action fully investigated and remediated, after selling his home to PG&E, Clarke continued to spend countless hours pursuing an adequate investigation of the contamination through the CMI, then more hours again pursuing a negotiated resolution of the claims in this action. Clarke now diligently works to have the contamination investigated and remediated.

**II.   Defendants**

28.   Defendant **PG&E CORPORATION** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

29. Defendant **PACIFIC GAS AND ELECTRIC COMPANY** is a corporation organized and existing under the laws of the State of California, with its principal place of business in San Francisco, California. Pacific Gas and Electric Company is the wholly owned operating company of PG&E Corporation.

30. Defendants Pacific Gas and Electric Company and PG&E Corporation, with their respective predecessors, successors, subsidiaries, and parents, are referred to collectively herein as "PG&E" or "Defendants."

31. PG&E owned and operated the North Beach MGP and the Fillmore MGP during the relevant period and are responsible for the contamination caused thereby alleged herein.

32. At all relevant times, each of the Defendants was an agent, employee, servant, partner, alter ego, and/or joint venturer of his co-Defendant in the acts and omissions that have caused the injuries to Plaintiff and was at all times, acting within the course and scope of said agency, employment, service, partnership, conspiracy, alter ego status, and/or joint venture.

## JURISDICTION

33. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, as this action arises under the laws of the United States, specifically, 42 U.S.C. §§ 6901 *et seq*.

34. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201. This Court may grant declaratory relief, and additional relief, including an injunction, pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. § 6972.

## VENUE

35. Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(e), because a substantial part of the events or omissions giving rise to the claims at issue in this action occurred in this judicial district. The MGP waste contamination at issue is located in the City and County of San Francisco ("CCSF"), including without limitation the Marina neighborhood. Furthermore, PG&E is headquartered in the CCSF.

## INTRADISTRICT ASSIGNMENT

36. This action substantially arises out of actions in the CCSF. Thus, under Civil L.R. 3-2(d) this action is to be assigned to the San Francisco or Oakland Division.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

# FACTUAL BACKGROUND

## I. PG&E's Former Operation of MGPs in the Marina Neighborhood of San Francisco

### A. Background - MGPs and Toxic and Solid Waste Associated Therewith

37. As the name suggests, manufactured gas plants ("MGPs") were plants that manufactured gas used for lighting, heating, and cooking purposes throughout most of the nineteenth century and the first half of the 20th century. The manufacturing process for "synthetic fuel gases" (also known as "manufactured fuel gas," "manufactured gas" or simply "gas") typically consisted of the gasification of combustible materials, almost always coal, but also wood and oil, and, especially in the later period of their operations, a combination of coal and oil. The coal and/or other fuel stock were gasified by heating it in enclosed ovens with an oxygen-poor atmosphere. The fuel gases generated were mixtures of many chemical substances, including hydrogen, methane, carbon monoxide and ethylene, and could be burnt for heating and lighting purposes. Coal gas, for example, also contains significant quantities of unwanted sulfur and ammonia compounds, as well as heavy hydrocarbons, and so the manufactured fuel gases needed to be purified before they could be used.

38. Once manufactured, the gas would be pumped directly to residential and other users through pipes. Thus, as is the case with the MGPs at issue here, the plants were often situated in close vicinity to residential areas.

39. MGPs commonly (and here) consisted of several component operations/buildings, often colloquially referred to collectively as "gas-works," spread across an area of several city blocks. The heart of an MGP was the "retort bench," which would generally be housed in its own building known as the "retort house." The retort bench was the construction in which the retorts were located. Retorts were where the coal and/or other fuel stock would be heated and the gas evolved. Depending on the sophistication of the retort, a greater or lesser amount of the fuel stock would be carbonized. Within the retort house on top of the retort benches were "hydraulic mains," in which the gas evolved from the fuel stock, as well as MGP tar and ammoniac liquor, would collect through pipes that carried off the gas from the retorts. One of the principal purposes of the

---

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 12 of 39

hydraulic mains was to draw off some of the large amounts of MGP tar, with which gas from the retorts was laden.

40.     Even with the drawing off of some MGP tar by the hydraulic mains, the gas coming directly from the bench was a noxious soup of chemicals. Components of that soup that needed to be reduced in quantity before the gas was distributed included: MGP tar, which could be sold; ammonia vapors, which could also be sold; naphthalene; and hydrogen sulfide. The main components of an MGP used to accomplish this reduction were the "purifier" and the "scrubber."

41.     Chief among the contaminants that operators sought to remove was hydrogen sulfide, which caused the gas to smell like rotten eggs. Thus, the principal purpose of purifiers was the reduction of this chemical from the gas. This was originally done through either a dry or wet lime process, each involving lime through which the gas was passed. The resulting waste from the wet lime process was a material commonly known as "blue billy," which contains cyanides and is recognized as one of the first historical toxic wastes. Blue billy, along with other MGP Wastes like MGP tar, debris from MGP facilities, and waste maintenance materials, was often disposed of by depositing it into a nearby body of water, such a canal or bay. It was also frequently piled into heaps and buried onsite.

42.     Scrubbers were used principally to remove ammonia from the gas.

43.     Once through the purifier and the scrubber, the gas would then be stored in what was referred to as "gasholders" made of brick, stone, concrete, steel, or wrought iron, until pumped to customers.

44.     In addition, gas works often had various other facilities within their footprints, including: MGP tar refineries, tanks, and vats, which were collectively used to collect, store, process through fractional distillation the MGP tar byproduct created in the gas making process, recovering tar, benzole, creosote, phenol, and cresols for sale; a "lampblack separator" used to extract carbon black for sale from coke, the byproduct that would remain in the retort after evolution of the gas; boilers used to generate steam for the powering of MGP operations, often through the burning of coke; a generator house, in which electricity would be generated; and oil tanks.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

45.     From their inception, MGPs had the reputation for being dirty and polluting, both as to the smoke and the waste their operations created. The wastes produced by MGPs are persistent in nature, and often still contaminate the site of former MGPs, as well as areas where MGP waste was intentionally deposited and/or to which it has migrated. These wastes come in several forms including coal residue solids, MGP tar, blue billy, "ammoniac liquor," debris from MGP facilities, and waste maintenance materials.

46.     Ammoniac liquor, MGP tar that was not further refined and sold, and washes were often allowed to leach into the ground or dumped into waterways. These types of MGP Wastes and others were also often buried on site, including in what were referred to as "wells" or "tar wells."

47.     Coal residue solids and MGP tar contain mixed long-chain aromatic and aliphatic hydrocarbons, a byproduct of coal carbonization, types of chemicals that are commonly referred to, in the collective, as polycyclic aromatic hydrocarbons or PAHs. Many of the PAHs associated with MGP Waste are known carcinogens and are identified as "toxic pollutants" by the United States Environmental Protection Agency ("US/EPA") under 40 C.F.R. § 401.15. PAHs, in general, are recognized as extremely hazardous compounds to human health and the environment. Not only are many known carcinogens, they are also lipophilic, meaning they can dissolve into fats, a characteristic that allows them to easily cross biological membranes and accumulate inside organisms. PAHs are also genotoxic, meaning that once accumulated in an organism they damage the genetic information within the organism's cells, causing mutations.

48.     Blue billy contains cyanides and lime.

49.     MGP Wastes also contain significant amounts of lead. Lead was contained in feedstocks, and lead from this source is associated with purifier box wastes. Lead was also used in paint at MGPs, as caulking for gas holders, in pipework, for roofing, in batteries, and as lead arsenate insecticide in MGP facilities. It was also used in maintenance activities where the common pit-putty was an equal-parts (by weight) mixture of red lead, white lead, and litharge, litharge being another term for lead oxide. Additionally, mortars used in MGP facilities contained

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page
14 of 39

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    litharge because of its resistance to the acid environment and coal acid products from coal

2    pyrolysis.

3         50.    The traditional pathways for contact between these wastes and humans and/or the

4    environment include direct contact with contaminated soils, groundwater, and/or aboveground

5    water and contact with toxic vapor off-gassing from contaminated soils and/or groundwater.

6         **B.    Overview of Historic MGPs in the Marina**

7         51.    PG&E operated two MGPs (the "Subject MGPs") in the Marina neighborhood of

8    San Francisco during the early 20th century (the "Subject MGP Sites"). These facilities processed

9    into gas coal and, especially during the later period of their operation, other hydrocarbons, such as

10   crude oil, often in combination with coal, which was then pumped through pipes to houses and

11   businesses for cooking, heating, and lighting.

12        **1.    North Beach MGP**

13        52.    The North Beach MGP Site is comprised of at least four city blocks bounded by

14   Marina Boulevard, Buchanan Street, North Point Street, Laguna Street, Bay Street, and Webster

15   Street, designated by the CCSF Office of the Assessor-Recorder as Blocks 0459, 0460A, 0445A,

16   and 0463B. The site also includes a triangular area of vacant land and paved parking (Marina

17   Green) situated northeast of Marina Boulevard. PG&E produced gas at the North Beach MGP

18   near the area north of Bay and Buchanan Streets until at least April 1906, when it was damaged in

19   the Great Earthquake. Following the earthquake, PG&E used the gasholders at the site to store

20   and distribute gas that was manufactured at the Beach St. MGP and piped to the gasholders at the

21   North Beach MGP.

22        53.    A schema prepared by agents of PG&E showing the footprint of the North Beach

23   MGP, with certain of the facilities that made up its gasworks, laid over an area of the modern-day

24   Marina neighborhood is attached hereto as Exhibit A. The schema shows *inter alia* that the

25   gasworks included a large retort house, a purifying house, scrubbers, tar wells, gas holders, deep

26   wells, and crude petroleum tanks, including one near the CCSF owned marina in an inlet of San

27   Francisco Bay ("Gashouse Cove"). The latter crude petroleum tank was built on an artificial

28

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

1   earthen mole that extended into the Bay. The tar wells were used by PG&E as means of disposing

2   of MGP tar wastes underground in the vicinity of the water table.

3       54.     A map from the years following the Great Earthquake of 1906 shows the partially

4   damaged structures of the North Beach MGP. It further shows that facilities consistent with and

5   in addition to those presented on Exhibit A. These include facilities titled "tar refinery," "tar

6   tanks," and "tar vats." The refinery was located in the middle of present-day Beach St. at a

7   location immediately south of where the schema indicates a "tar well" was located. Other

8   components were located North of this location, including the tar tanks. The map further shows a

9   boiler located north of these tanks.

10      55.     Following the Great Earthquake of 1906, PG&E demolished the structures that

11  were not in continued use and disposed of the MGP Wastes created through their demolish on the

12  North Beach MGP Site or in its immediate vicinity.

13      56.     Investigations thus far conducted within the North Beach MGP Site and areas in its

14  immediate vicinity shows very significant levels of MGP Waste contamination. This includes:

15  large deposits of MGP Waste contamination that has been characterized as MGP tar; large

16  amounts of MGP Waste contamination in the soils, including solid MGP Waste containing high

17  levels of lead and PAHs; and high levels of groundwater MGP Waste contamination. The North

18  Beach MGP Site and areas in its immediate vicinity are now primarily residential with some

19  small commercial buildings including at least one school.

20              **2.      Fillmore MGP**

21      57.     The Fillmore MGP Site is comprised of at least four city blocks bounded by

22  Fillmore Street, Cervantes Street, Mallorca Way, Pierce Street, and Toledo Way, designated by

23  the CCSF Office of the Assessor-Recorder as Blocks 0462A, 0463A, 0466A, and 0467A. PG&E

24  owned and operated the Fillmore MGP near the area west of Fillmore and Bay Streets until at

25  least April 1906, when it was damaged in the Great Earthquake. The Marina Middle School is

26  located on part of this site.

27

28

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page
16 of 39

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

58.    Following the Great Earthquake of 1906, PG&E demolished the structures that were not in continued use and disposed of the MGP Wastes created thereby on the Fillmore MGP Site or in its immediate vicinity.

59.    A schema prepared by PG&E agents showing the footprint of the Fillmore MGP, with certain of the facilities that made up its gasworks, laid over an area of the modern-day Marina neighborhood is attached hereto as Exhibit B. The schema shows *inter alia* that the gasworks included two purifying houses, a tar reservoir, gas holders, a generator, crude oil tanks, and a wharf. One of the gasholders was below the playground of Marin Middle School. The US Geological Survey map below indicates that these gas holders were damaged at some point, presumably in the Great Earthquake

60.    Though not explicitly represented on the schema, the gasworks of the Fillmore MGP included 72 retorts and seven generators for manufacturing gas by the Lowe process. The gas was stored in three gas holders; two holders located on the main Fillmore MGP premises and one gas holder located at what is now Marina Middle School. By 1892, the Fillmore MGP had expanded west one block to Pierce Street and was manufacturing both coal and water gas. The layout of the Fillmore MGP is as follows. The two gas holders, each with a capacity of 335,000 cubic ft, stood along Francisco Street on the southern part of the Fillmore MGP. To the east and northeast of the gasholders stood two purifying houses, each with an attached oxide room. To the north of the western gasholder was the generator room, which housed the 72 coal retorts and several Lowe water gas generators. North of the generator room laid the coal and coke shed. West of the generator room stood the coal yard and two crude petroleum tanks. A wharf used to supply coal and other supplies was north of the generator house.

61.    The existence of this wharf also highlights another characteristic of this MGP and one that it shared with the North Beach MGP; it was on the immediate shoreline during the time of its operations. The above map also shows this. In the mid-1800s, a seawall, named Fair's Seawall, was constructed on the north edge of what is now Marina Green. Until approximately

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page
17 of 39

1912, behind this seawall was a "lagoon" in an area now diagonally bisected by Cervantes St., into which the Fillmore MGP's wharf jutted.

62.    Investigations thus far conducted indicate significant soil contamination in the historical footprint of the MGP and its vicinity, including highly elevated levels of PAHs and lead, as well as large MGP tar deposits within what was the artificial bay and is now fill on which residents of the Marina live.

## II.    PG&E Handled, Stored, Treated, Transported and/or Disposed of Solid and/or Hazardous MGP Wastes at the Subject MGP Sites and/or in the Vicinity thereof

63.    During the course of its operations of the Subject MGPs and upon its closure of the Subject MGPs, PG&E handled, stored, treated, transported and/or disposed of solid and/or hazardous MGP wastes at the Subject MGP Sites and/or the vicinity thereof.

64.    The operation of the Subject MGPs centered on the separation of gas from coal and/or oil and then the purification of the gas. During these processes, PG&E created, handled, stored, transported and/or disposed of at various locations within the grounds of the Subject MPG Sites and/or in the vicinity thereof significant amounts of solid and hazardous toxic wastes, including wastes

65.    During the course of PG&E's operation of the Subject MGPs, debris from damaged facilities as well as unused maintenance materials, which included high levels of PAHs, lead, and other toxic substances, were stored, transported, and disposed of by PG&E on the Subject MGP Sites and in the immediate vicinity thereof.

66.    When portions of the facilities of Subject MGP Sites were decommissioned and demolished, the demolition debris, which included high levels of PAHs, lead, and other toxic substances, were stored, transported, and disposed of by PG&E on the Subject MGP Sites and in the immediate vicinity thereof.

67.    Accordingly, soil sampling on the Subject MGP Sites and in the immediate vicinity thereof has revealed high concentrations of brick and other building materials intermixed with lead and PAHs, from the surface to 10 feet below ground surface ("bgs").

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

III. **The Solid and/or Hazardous MGP Wastes Handled, Stored, Treated, Transported by, and/or Disposed of by PG&E at the Subject MGP Sites and/or in the Vicinity thereof Present, and/or May Present, an Imminent and Substantial Endangerment to Health and/or the Environment**

68.     PG&E's handling, storage, treatment, disposal and/or transportation of solid and/or hazardous MGP wastes at the Subject MGP Sites and/or the vicinity thereof has resulted in the contamination of the soil and groundwater of the terrestrial portions of those locations. This contamination presents an imminent and substantial endangerment to health and/or the environment and/or may present an imminent and substantial endangerment to health and/or the environment in the future.

69.     In locations where sampling has been conducted, contaminants associated with former MGP operations have been detected in soils and groundwater throughout the footprint of the former MGPs and in the vicinity of the Subject MGPs.

70.     The concentrations of the MGP Waste contaminants detected to date are significant and pose an imminent and substantial endangerment to both human health and the environment, and/or may present an imminent and substantial endangerment to health and/or the environment in the future.

71.     Attached hereto as Exhibit [C] is an investigation report prepared by the environmental consultants of Plaintiffs based on the results of the CMI that details the contamination of the Subject MGP Sites and areas in their vicinity ("Plaintiffs Investigation Report").

72.     The full extent of the contamination associated with the former MGP plants has not yet been defined. It is highly probable that additional significant levels of contamination exist in areas not yet evaluated at, and in the vicinity of, the Subject MGPs that would also pose an imminent and substantial endangerment to human health and the environment, and/or may present an imminent and substantial endangerment to health and/or environment in the future.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**A.  MGP Wastes in the Soils of the Subject MGP Sites and Their Immediate Vicinity Contain Very Dangerous Levels of Lead that PG&E Refuses to Address**

73.     PG&E does not dispute the existence of high levels of lead in soils on the Subject MGP Sites; and PG&E's own "Guidance for Disturbing Soil at Former Manufactured Gas Plant Sites" (which is attached as Appendix F to Plaintiffs' Investigation Report) lists lead and arsenic as the "most common" metal byproducts "associated with former MGP sites."

74.     Nonetheless, PG&E steadfastly refuses to acknowledge that lead is a contaminant of concern at the Subject MGP Sites or investigate lead contamination in the soils of the Subject MGP Sites or their immediate vicinity.

75.     In fact, so as to suppress the creation of data supporting the conclusion that lead is a contaminant of concern related to the Subject MGP Sites, after PG&E recognized that testing soils removed from remediated properties for waste disposal purposes was creating data showing high concentrations of lead on properties located on the Subject MGP Sites, PG&E stipulated with its waste disposal contractor that the soils removed from remediated properties constituted toxic waste, thereby avoiding the further creation of such incriminating data.

76.     PG&E has also offered a varying set of counter explanations for the very high levels of lead found on properties located on the Subject MGP Sites and their immediate vicinity.

77.     These explanations include:

a.     The Selby Smelter – PG&E has suggested that the Shelby smelter, which operated, from approximately 1879 to 1884 at the location described as "the foot of Hyde Street, North Beach," is the source of lead found in the soils of properties on the Subject MGP Sites, rather than the Subject MGPs;

b.     Lead paint – PG&E has suggested that lead paint used at the Pan Pacific International Exposition ("PPIE") or on current residential structures is the source of lead rather than the Subject MGPs;

c.     PPIE exhibits – PG&E has suggested that source of lead is a "lead mill" exhibit that was operated that during the PPIE by W.P. Fuller;

Case: 19-30088   Doc# 5768-14   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 20 of 39

d.    Ubiquitous lead – PG&E has also suggested that lead is ubiquitous in San Francisco; and

e.    DTSC and CCSF requests – PG&E, finally, has suggested that DTSC and CCSF requested that lead be excluded from the contaminant of concerns that would be investigated as part of PG&E's investigation of the Subject MGP Sites.

78.    None of these hold explanations hold.

79.    First, as reported in Appendix E of Plaintiffs Investigation Report, concentrations of lead in soil proximate to the terrestrial footprints of the former Fillmore and North Beach MGP are significantly higher than those outside of the facilities' footprints. This is inconsistent with: (a) an aerial deposition pattern from the Selby Smelter, which would not have concentrated in areas localized in the footprints of the Fillmore and North Beach MGPs; (b) lead paint from the PPIE and current residential structures, which would not have concentrated in areas localized in the footprints of the Fillmore and North Beach MGPs; (c) lead from W.P. Fuller's "lead mill," which would not have concentrated in areas localized in the footprints of the Fillmore and North Beach MGPs; and (d) the proposition that lead is simply ubiquitous, which is inconsistent with higher levels of lead being found in certain locations, specifically the footprints of the Fillmore and North Beach MGPs.

80.    Second, elevated lead concentrations were observed throughout the soil column of the Subject MGP Sites, including well below the surface, commingled with brick debris indicative of demolished MGP facilities, and in areas of the North Beach MGP footprint, where remaining MGP building foundations clearly demonstrate the elevated lead concentrations are below fill placed after MGP demolition. This, again, is inconsistent with PG&E's alternative explanations (a) through (d) for reasons, including, without limitation, that lead does not migrate vertically in soils and, if these alternative explanations were correct, it would not be found commingled with MGP building debris.

81.    PG&E's counter explanations also fail for reasons specific to each:

a.    The prevailing winds place the Selby Smelter downwind of the eastern boundary of the Marina Basin and east of a topographic high; and a historical record of

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

complaints related to the Selby smelter exhaust reveals that all are from locations south and east of the smelter – in the direction of the prevailing winds and away from the Marina.

b. The vast majority of exterior surfaces at the PPIE were finished with plaster and were not painted. Instead, the plaster was impregnated with three pigments that did not contain lead, including: burnt sienna (a hydrated oxide of iron, alumina silicate, lime, and barium sulphate ), raw umber (containing ferric oxide, manganese dioxide, carbonate of lime, alumina, and silica ), and yellow ochre (a natural mineral consisting of silica and clay owing its color to an iron oxyhydroxide mineral, goethite). Lead paint, on the other hand, was used in very limited ways, i.e.: on decorative pools, millwork, exterior and interior woodwork, doors and windows, ironwork, sheet metal, and plaster walls in bathrooms up to a height of 6-feet.

c. The PPIE "lead mill" exhibit was located a significant distance from either the North Beach MGP or the Filmore MGP footprints and, given the relatively small scale and controlled conditions of a public exhibit, this lead mill was unlikely to contribute a significant amount of lead to the environment.

d. The claim of the ubiquity of lead has not been substantiated by data in the Marina and is contradicted by statistical review. For example, PG&E contractor, Jacobson James & Associates ("JJA") refers, in a 2015 report, to "ubiquitous" lead concentrations in shallow soils in the East Marina area, without providing a basis for this statement. The mean and 95% upper confidence limit ("95% UCL") of lead in the 23 samples collected by JJA in 2014 at depths within two feet of ground surface north of the terrestrial footprint of the former North Beach MGP and next to the East Harbor, where JJA considered lead "to be ubiquitous in the marina area," were found to be 61 mg/Kg and 83 mg/Kg, respectively. These levels of lead are substantially below that identified on the footprints of the Subject MGP Sites, disproving the assertion that lead is "ubiquitous."

e. And, on April 8, 2016, as part of the CMI, Plaintiffs and PG&E jointly requested that DTSC verify PG&E's contention that the DTSC and CCSF had requested that lead be excluded from the investigation of the Subject MGP Sites. On October 10, 2017, the DTSC responded that "DTSC contacted prior staff involved in the early stages of the PG&E MGP

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

program as well as all records related to this inquiry" and "was unable to determine whether such a decision had been made." In other words, PG&E sought cover for its omission of lead from the list of toxic chemicals for which it tests in a purported affirmative decision by DTSC, but no evidence supports that DTSC made such a decision. Rather, the evidence further supports the conclusion that PG&E has defined for itself the extent of its obligations concerning contamination caused by the MGP Wastes, and the DTSC has not played any active role in that regard.

82. Finally, regulatory guidance and industry references all identify lead as a common contaminant of concern at MGP Sites, a fact that PG&E representatives have acknowledged.

83. Nonetheless, PG&E has refused to include lead in the contaminants of concern for which it tests soils collected from the Subject MGP Sites or even to inform residents of homes in the area that such contaminations may exist in their soils—soils that their children play in.

### B. As a Result of Public Relations by PG&E that Understate the Risk, MGP Wastes in the Soils of Many Private Properties that Contain High Levels of Numerous Toxic Chemicals Have Not Been Remediated or Even Tested

84. PG&E's aforementioned refusal to test properties on the Subject MGP Sites and their immediate vicinity for likely elevated levels of lead from MGP Wastes is part of a broader strategy by PG&E's to misinform private property owners of the health risk presented by MGP Wastes on their properties.

85. During the approximate decade-long life of its program to address MGP Waste contamination in the Marina neighborhood, PG&E has consistently understated the health risk presented by such waste, in order to dissuade private property owners from demanding adequate (and expensive) remediations of their properties.

86. Consistent with PG&E's intentions and as a result of this strategy, a substantial number of private properties on or in the vicinity of the Subject MGP Sites still have not been investigated, almost ten years since the program to address to the contamination began.

87. In the mid-1980s, PG&E tested surface soils at approximately two dozen private properties in the vicinities of the North Beach MGP and Fillmore MGP. PG&E used these tests to (falsely) demonstrate to the US/EPA that the areas are safe for humans and there was no need to raise the Subject MGPs to the National Priority List under the Comprehensive Environmental

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Response, Compensation, and Liability Act ("CERCLA"). In stark contrast to that mid-1980s determination, recent testing has revealed the area unsafe for humans without adequate remediation. In fact, seven out of nine of the exact same private properties that were tested at both times have now required removing large quantities of contaminated soils and restricting access in order to make the residences safe for human habitation. PG&E informed the owners that the mid-1980s tests showed low contamination levels but, "as a courtesy," sent men around with rakes to "clean up" yards.

88. In fact, PG&E knew that such "clean ups" were inadequate and that the levels of contaminants were not low. However, PG&E's management had determined that an adequate remediation of Subject MGP Sites—given their location in San Francisco's Marina neighborhood—would be difficult and expensive. Thus, PG&E set about investigating and remediating dozens of other MGPs in its service area, first, and leaving the Subject MGP Sites till last. In the meantime, PG&E did not inform Marina residents for decades about the health risks of the likely contamination on their properties.

89. During this period, PG&E not only had an increasing body of knowledge from other MGP sites that indicated the likely contamination of those in the Marina, it had specific knowledge of MGP Waste contamination in the Marina based on several events, including without limitation the following:

- 1977, signs of a large plume of MGP Wastes from the Fillmore MGP behind Fair's Seawall;

- 1986, signs of MGP Wastes spread on the surface of yards in the Marina district;

- 1989, another sign of a large plume of MGP Wastes from the Fillmore MGP in the center of the lagoon formed by Fair's Seawall;

- 1991, confirmed MGP Waste contamination in saturated soils and groundwater at the Marina Substation and calls by DTSC, Regional Water Quality Control Board (the "RWQCB"), and PG&E's own consultant to investigate the larger North Beach MGP site;

- 1994 and subsequent years, confirmed and reconfirmed MGP Waste contamination in Gashouse Cove;

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1    • 1994, confirmed MGP Waste contamination in saturated soils and groundwater at the

2        Gaslight Building;

3    • 1997, confirmed MGP Waste contamination in soil and groundwater, and signs of MGP

4        Waste on the surface which was later deemed similar to the "black Rocks" at Clarke's

5        residence, at the Gaslight Building which required a remediation; and

6    • 2006, confirmed MGP Waste contamination on the perimeter of Gashouse Cove suspected

7        to be an upland source continuously contaminating the Bay.

8        90.    However, none of this information nor the health risks that was likely posed by

9    MGP Wastes on their properties was shared with Marina residents.

10       91.    When PG&E finally got around to addressing the MGP Waste contamination in

11   the Marina neighborhood, in 2010, it shifted its public information strategy: it admitted the

12   possibility of MGP Wastes on people's properties, but, in an effort to dissuade residents from

13   demanding an adequate remediation of their properties—particularly removal of contamination

14   from below their homes—PG&E aggressively spread a false narrative that the contamination

15   presented little to no health risk to residents and flatly refused to conduct certain types of

16   investigation activities, including sampling of groundwater contamination, sampling of indoor air

17   vapor, sampling below structures, or testing soil samples for lead.

18       92.    This false narrative has been consistently spread by PG&E in its correspondence

19   with Marina residents, fact sheets prepared by it and distributed under its name and that of DTSC,

20   statements made by it in public and private meetings, and various other communications; and a

21   key component of this false narrative is the assertion that the MGP Waste is only dangerous to

22   human health if there is direct contact with the waste, and that such contact is very unlikely

23   because of the depth of the MGP Wastes in the soil.

24       93.    PG&E supports the false narrative by keeping damaging information effectively

25   hidden from the public and by selectively reporting favorable information while not reporting

26   countervailing information.

27       94.    The following is an example of PG&E keeping information effectively hidden. In

28   March 2017, liquid coal tar, a highly concentrated form of MGP contamination, was discovered

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 25 of 39

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

within three feet of the surface at a residence on the North Beach MGP Site. This discovery belies the assertion about contamination being at depth and it directly relates to risk to area residents. Despite the serious implications—including that it is now known that the possibility that similar contamination might be at other locations is no longer remote—PG&E has not informed Marina residents of it. PG&E's only "public disclosure" of the discovery is a deliberate obfuscation: it was briefly mentioned deep inside an obscure report published on DTSC's website more than two years after the discovery. In addition, the phrase used to describe liquid coal tar, "… considered representative of the tar-like material and not soils …" is obfuscated as techno-speak. PG&E's actions in this matter are clearly designed to give it the ability to claim transparency while effectively keeping the public uninformed of information pertinent to their wellbeing.

95.     The following is an example of PG&E selectively reporting some information while not reporting information which might counteract the false narrative. A private elementary school, kindergarten through fourth grade, is located atop the retorts of the North Beach MGP Site in an area where there has been confirmed contamination requiring remediation on every property tested. PG&E tested the school, but not for contamination, as it had for every other property in the vicinity. Instead, PG&E tested the school only for sub-slab vapor and indoor air and delivered a "report" pointing to possible sources other than MGP contamination for the anomalies found in the vapor and air. While all other reports have at least the veneer of objectivity, the report for the school is unambiguously worded in a way that persuades the reader there is nothing to worry about. Most reprehensible is that PG&E decided to leave out certain facts, including the fact that nearby properties have installed vapor management systems either as precaution or because DTSC required such systems. PG&E obviously wants people to feel safe, but it is not entitled to make decisions for others. PG&E's actions in this matter not only dismiss contamination under the school as unimportant, but deprive the building owner, school staff, parents, and students of relevant facts related to likely health risks to consider for their decision making.

96. PG&E has, furthermore, in its communications with Marina residents sought to encourage the understanding that residents will be much better off if they simply go along with what PG&E proposes, rather than fight it.

97. For example, at a 2010 public meeting with homeowners likely to be affected because their property is in the vicinity of the Subject MGPs, a veteran PG&E employee knowledgeable of many MGP investigations was brought in to speak. The employee introduced himself, briefly alluded to his knowledge and experience on MGP projects, and proceeded to tell the story of two MGP cleanup projects. These two projects had completely opposite outcomes for the residents triggered by the behavior of the residents. In one project, the residents fought PG&E through legal means and, of course, PG&E defeated them. PG&E was not inclined to be very generous with those residents. In the other project, the residents were naturally inconvenienced by the cleanup but saw that it was inevitable and went along without a fuss. PG&E helped these residents both physically and financially. The message was hard to miss.

98. PG&E has also falsely downplayed the likelihood that homeowners would be required to enter into a land use covenant ("LUC"), which would likely permanently stigmatize the property and reduce its value, if they agree to the sort of minimal remediation for which PG&E has advocated. In fact, virtually every property in the vicinity of the Subject MGPs investigated to date has enough contamination to warrant remediation and, almost always, such remediation includes the requirement of an LUC.

99. PG&E has not corrected or modified the false narrative that MGP Wastes on people's properties presents no health risk.

100. This is particularly disturbing in light of not only the significant amounts of lead-containing MGP Wastes consistently found near the surface of properties on the Subject MGP Sites and their immediate vicinities, but also the ubiquity on the surface of such properties of solid MGP Wastes, sometimes called black rocks, lampblack, clinkers, etc., which are known to contain very high levels of PAHs that are known carcinogens. Moreover, given the significant levels of PAH contamination contained in shallow groundwater in many portions of the affected areas, there is a real and substantial risk of indoor air vapor contamination.

101.    To save money, PG&E has created a false impression among Marina residents that no health risks are presented by the MGP Wastes on their properties, which has resulted (as PG&E hoped) in a large number of such residents doing nothing about the contamination.

102.    The self-serving bias of PG&E's public information campaign has caused a large number of Marina residents and visitors to be needlessly exposed to MGP Wastes and, if not ordered by the Court to be remedied, will allow the continuation of these exposures into the future.

C.    **MGP Wastes in the Soils of Right of Ways and Other Public Properties on the Subject MGP Sites and Their Immediate Vicinity Contain High Levels of Numerous Toxic Chemicals for which There Is No Plan to Address**

103.    In addition to private properties, the Subject MGP Sites and immediate vicinities contain large areas consisting of rights-of-way ("ROWs") and other public properties, such as the Marina Green, triangle area, and parking area opposite the Safeway store, all of which are downgradient of probable MGP contamination sources. There are also public properties adjacent to the probable MGP contamination sources that are equal gradient or upgradient of those sources, such as Fort Mason and Moscone park.

104.    As part of the CMI, PG&E and Plaintiffs sampled the soils and groundwater in many of the ROWs located on the Subject MGP Sites and their immediate vicinity.

105.    This sampling revealed what one would expect: the ROWs and other public properties in the vicinity of contaminated private properties are also contaminated.

106.    However, nothing is being done to address this contamination and there are no plans to address it.

107.    PG&E, in fact, has recently made its intention to do nothing about the contamination clear. It recently issued "guidance" concerning contamination that—in addition to its inadequacy as guidance—abdicates any responsibility or plan by PG&E to remediate the contamination. Rather, the guidance purports to shift the burden of addressing contamination encountered in ROWs to those who encounter it. The document, moreover, understates the nature and extent of the contamination that is likely to be encountered in the ROWs and the risks to human health presented thereby. Together with the way it recommends contaminated soils be

handled, this makes it very likely, if followed, that persons who come in contact with soils in the ROWs will be exposed to harmful chemicals and MGP Wastes contained therein will remain there to expose others later.

108. CCSF is not filling this gap. It has taken a passive role with respect to MGP contamination, acting only to facilitate permitting for investigations and private property remediations, and doing nothing to secure the investigation, let alone remediation of MGP contamination of ROWs and other public properties in the terrestrial portions of Marina neighborhood.

109. DTSC has explicitly represented that it has no active role in addressing *any* of the MGP contamination at the Subject Sites or their vicinity—whether on public or private property—and will not order PG&E to do anything in that regard. Rather, DTSC's self-defined role is limited to reviewing and approving investigation and remediation plans proposed and submitted by PG&E.

110. DTSC, thus, has not ordered and will not order PG&E to address the MGP Wastes contaminating ROWs and other public properties.

111. Nor will RWQCB fill this gap. Pursuant to an agreement with DTSC, RWQCB has limited its attention to MGP Waste contamination in the Bay and its shoreline. Accordingly, RWQCB has not issued any orders and will not issue any orders concerning the contaminated ROWs or other public properties.

112. No government agency has indicated even any interest in addressing the MGP Waste contamination in the soils and groundwater of the ROWs and other public properties located on the Subject MGP Sites and their immediate vicinity.

113. As a result, despite the existence for years of data showing substantial MGP contamination in ROWs and other public properties, there have been no ROWs or public property remediations to date; and unless this Court grants Plaintiff the relief he requests herein, the MGP Wastes located in ROWs and other public properties will remain unremediated, exposing the public to risks of exposure and the attendant health risks.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 29 of 39

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**IV.    PG&E Has Affirmatively and Repeatedly Taken Advantage of Ineffective Local Regulation for More than Two Decades to Avoid Testing and Remediating MGP Wastes at or in the Vicinity of the Subject MGP Sites**

114.    Since 1991, PG&E has effectively controlled state regulators so as to avoid its responsibility to do comprehensive testing for and remediation of MGP Wastes at the Subject MGP Sites and the vicinity thereof. The relative strengths of California Environmental Protection Agency ("Cal/EPA") and PG&E are such that adequate regulation has systematically been thwarted and is continuing to be bypassed

**A.    In 1991, PG&E Took Advantage of Divided and Weak State Regulatory Agencies to Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Marina Substation**

115.    In 1984, the United States Environmental Protection Agency ("US/EPA") identified a number of former MGP sites across the country that could pose a threat to health or the environment.

116.    In 1986, PG&E and the US/EPA met and discussed a plan for investigating and remediating MGP sites in PG&E's service area. PG&E's plan included coordination with the Cal/EPA.

117.    US/EPA has a policy to transfer the administration of national programs to state and local governments to the fullest extent possible. Consistent with that policy, US/EPA deferred to Cal/EPA the responsibility for oversight of testing and remediation of the Subject MGP Sites. The US/EPA has not been involved since.

118.    Subsequently, two branches of Cal/EPA became involved in these investigations: the DTSC and the RWQCB.

119.    PG&E took advantage of ineffective regulation by Cal/EPA when the Marina Substation, a very small part of the North Beach MGP, was tested in 1991.

120.    DTSC was the lead agency for oversight and classified the project as a State Response or National Priority List ("NPL").

121.    Testing of the Marina Substation revealed significant PAHs in soil and groundwater.

Case: 19-30088    Doc# 5768-14    Filed: 02/13/20    Entered: 02/13/20 14:35:29    Page 30 of 39

122.    The Preliminary Endangerment Assessment (the "PEA") produced based on the investigation of MGP Waste contamination of the Marina Substation indicated that contamination existed beyond the small 0.25 acre area that was tested. The PEA noted that the Marina Substation was a part of the larger North Beach MGP, which spanned three city blocks. It also indicated that groundwater played a role in the migration of contamination from one site to another. The PEA recommended further investigation over a larger geographic area.

123.    RWQCB wrote a memorandum after reviewing the PEA in October 1991 that expressed concern for the high PAHs found in both soil and groundwater. RWQCB's report clearly and unambiguously indicated that PG&E needed to test the wider area for MGP contamination.

124.    There was distrust between the Cal/EPA branches at that time. RWQCB's memo stated: "should watch this case. I'm concerned that DTSC will sign off or not push [groundwater and environmental] risk issues. Also 'side' boundry [sic] definition could become an issue (RWQCB vs. DTSC)."

125.    DTSC did attempt to "push" the risk issues initially - but ultimately failed. The Site Evaluation Tracking Sheet written by DTSC in December 1991 was unambiguous. It stated *inter alia*:    "chemicals of concern are present in soil and groundwater . . . Additional investigations needed regarding sources and/or transport of chemicals in soil and groundwater . . . PEA high priority . . . Further investigation must include entire 9.5 acres [North Beach MGP site] . . .  Confirmed groundwater contamination at the site."

126.    Then in June 1992, DTSC wrote a strongly worded letter to PG&E stating that further action across the larger site was necessary. The letter cited the significant levels of PAHs found in both soil and groundwater. It said these were hazardous substances known to cause cancer. The letter emphasized the threat to health and the environment. DTSC wanted PG&E to test both soil and groundwater across the entire 9.5 acre site. The letter was a call to action.

127.    PG&E ignored the request, and no remediation of the substation—let alone even an investigation of the entire North Beach MGP Site—was done by PG&E for twenty years.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

128.    And when PG&E returned after two decades to begin a broader investigation of the MGP Waste contamination at the site, it limited its investigation to soil sampling, studiously avoiding sampling groundwater until compelled to do so as a result of the instant action.

129.    Notwithstanding its strongly worded letter, DTSC did not pursue the matter further. This was despite the fact that DTSC had responsibility for oversight of an investigation that started from a US/EPA initiative in the 1980s and that this investigation was a State Response or NPL, as opposed to a voluntary action.

130.    DTSC effectively closed its file on the Marina Substation in 1992. At some point, DTSC changed the status of the project from active to "refer to RWQCB." However, there is no evidence that DTSC actually did anything to refer the Marina Substation investigation to RWQCB. There is no evidence that DTSC referred or initiated an investigation of the larger North Beach MGP with RWQCB either. Accordingly, RWQCB did not open a project or take action of any kind. Indeed, except for the memorandum already mentioned, RWQCB has denied any involvement with this Marina Substation project.

131.    These actions (and failures to act) by state regulatory agencies, in 1991, allowed PG&E to affirmatively avoid testing and remediating toxic MGP Wastes in the North Beach MGP Site that have been endangering the health and the environment for over twenty years. As DTSC suspected then, but did nothing about, it is now known that the larger area does, in fact, contain significant contamination from MGP Waste in soil and groundwater. Furthermore, extensive remediation has been necessary at almost every site investigated in the North Beach MGP Site to date.

**B.    In 1997, PG&E Used Questionable Means to Skirt State Regulatory Agencies and Affirmatively Avoid Testing and Remediating MGP Wastes in Suspected Locations Around the Gaslight Building**

132.    Adjacent to the Marina Substation and sharing a large border is a property known as the Gaslight Building. The Gaslight Building is private property and ownership was changing hands in 1997. An investigation was initiated because one of the lenders was concerned about potential liability from contamination on the property.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

133.    As noted elsewhere herein, the 1997 testing of the Gaslight Building revealed significant PAHs from MGP Wastes at the site. The report for that investigation is called a Phase II Environmental Site Assessment ("P2ESA").

134.    Between the 1991 testing at the Marina Substation and the 1997 testing at the Gaslight Building, there was a little-known testing for MGP contamination at the Gaslight Building. This occurred in 1994. The testing is little known because it was not reported to any regulator at the time and only indirectly reported later by way of inclusion as a reference within a subsequent report. The contractor in 1994, soon after communications with PG&E, warned the owner of "close scrutiny" due to the history of the site and the fact that the North Beach MGP was listed in the CERCLA database. PG&E engaged in misconduct by its failure to report the contamination in 1994 and by conducting the 1997 investigation in a manner designed to avoid the regulators' demand for a wider investigation as had occurred after finding contamination during the 1991 investigation. PG&E's misconduct was an attempt to avoid both its responsibility for MGP contamination in the area and the likelihood that close scrutiny would reveal its nefarious activities.

135.    Not surprisingly, the 1997 P2ESA for the Gaslight Building contained findings similar to the 1991 PEA for the Marina Substation: significant PAHs; soil and groundwater contamination; and the suggestion that contamination was migrating through groundwater. In addition, the P2ESA identified high levels of naphthalene in shallow groundwater. The 1997 results reinforced what was known in 1991 – there was contamination throughout the larger North Beach MGP site.

136.    Despite these findings, PG&E, in an operation later called "scoop and run" by one regulator, performed a minimal remediation at the Gaslight Building. A narrow landscaping strip along one side of the property was excavated a few feet deep and the area replenished with clean soil and new plants. PG&E's justification for doing so little was: it is a commercial site rather than residential; most of the site is covered by buildings, patios, etc.; gardeners might be the only people coming into contact with contaminated soil. Groundwater and its ability to transport known highly toxic PAHs from the site to other locations, including residences, were ignored.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

137.    Oversight of the 1997 Gaslight Building investigation and remediation was dubious.

138.    DTSC does not have the P2ESA or any other information about the 1997 Gaslight Building project in its files. A responsible individual at DTSC denies any knowledge of the 1997 Gaslight Building investigation and remediation.

139.    Plaintiff received from PG&E a copy of the P2ESA along with a cover letter addressed to RWQCB. The letter asked for a review of the P2ESA relative to RWQCB standards. The letter also asked if RWQCB concurs with the proposed remediation. The letter had the proper address for an RWQCB office at the time.

140.    RWQCB also did not have any information about the 1997 Gaslight Building project in its files. Responsible individuals at the RWQCB, as well, said they had no prior knowledge of the cover letter or P2ESA, until those documents were brought to their attention by Clarke in 2014. Similar to the Marina Substation in 1991, the RWQCB did not believe it had nor has oversight responsibility for the Gaslight Building investigation or remediation.

141.    Indeed, there are questions about the cover letter and P2ESA and the way they were given to RWQCB. The cover letter was addressed to a "Mr. Vic Powell" at the RWQCB. However, there was nobody by the name of Vic Powell employed by the RWQCB in 1997 or at any other time.

142.    In 1997, there existed at the RWQCB a department which dealt with underground storage tanks and which had no expertise in MGPs or personnel who worked on, or connection in any way with, the prior 1991 investigation of MGP contamination at the Marina Substation. A man named Vic Pal, an inexperienced new hire, worked in the department. PG&E concocted and executed a scheme to use the P2ESA to obtain RWQCB "approval" for the 1997 investigation and remediation of the Gaslight Building by passing the report through inexperienced personnel, specifically not Mr. Vic Pal, but another agent, while simultaneously avoiding any scrutiny by experienced personnel familiar with the prior findings at the Marina Substation.

143.    It is clearly evident that in connection with the 1997 Gaslight Building activity, PG&E once again actively ignored signs of contamination in the larger North Beach MGP area

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

and thereby allowed the endangerment to health and the environment to persist for many years. There could be no question that, by 1997, PG&E knew that soil contamination, groundwater contamination, and the spreading of contamination via groundwater existed on a site that contained residences, schools, parks, etc. and bordered on the San Francisco Bay. PG&E also, again, exhibited a careless attitude—at the very least—toward state regulators in order to further its agenda.

144.    It is an unmistakable example of PG&E's irresponsible behavior that it remediated the Gaslight Building in 1997 to protect gardeners, while at the same time deliberately ignoring that conditions similar to those at the Gaslight building were likely to exist at other locations and thereby pose a threat to other members of the public. Indeed, the "black rocks" found in Clarke's home were later, in 2010, confirmed by PG&E to be the same material as found at the Gaslight Building. Thus, it is PG&E's own twin actions – protecting one group of people from a known threat (for which PG&E is responsible) while simultaneously using devious means to avoid knowing if that same threat exists nearby (as is likely in the circumstances) – demonstrate a reckless disregard for the safety of the public.

**C.    Since 1977, PG&E Has Purposefully Ignored Indications of a Large Plume of MGP Waste from the Fillmore MGP and Failed to Report It to Regulatory Agencies or Initiate an Investigation of It**

145.    In 1977, test borings for a box sewer along Marina Boulevard found the area between Scott and Webster extensively contaminated with what was characterized as a "creosote" residue, but which would now be described as "MGP tar." The report said the contamination probably resulted from previous MGP activities in the area. PG&E, as the owner-operator of those MGPs, would have been informed at that time.

146.    CCSF discovered the deposits in 1977 but did little more than record the findings in their report. The box sewer along Marina Boulevard got built, and no department in CCSF apparently saw the health and environmental endangerment caused by this contamination as part of their mission to address.

147.    The MGP Waste deposits along Marina Boulevard are located in what was historically a lagoon confined by Fair's Seawall when the North Beach and Fillmore MGPs were

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

in operation. The Fillmore MGP fronted onto this lagoon in the same way the North Beach MGP fronted onto Gashouse Cove. The sediments in Gashouse Cove today are heavily contaminated with MGP Wastes. The area inland from Fair's Seawall was filled after the MGP ceased operations, in approximately 1912. That filling created a sizable part of the Marina district. Today, the lagoon and whatever contamination it contains is covered over by the Marina Green and perhaps 50 acres of San Francisco residential property.

148. In 2010, PG&E was asked about their plans for investigation of the likely contamination behind Fair's Seawall. PG&E's initial response was that the soil and soil-gas investigation they initiated in 2010 would eventually include groundwater and that that testing would define any impacts in the subject area. Later, PG&E settled into the position that no investigation is needed because all the contamination is below the water table, i.e. in the groundwater. PG&E maintains that contamination in the groundwater cannot harm humans because no one comes in contact with it and no one drinks it. PG&E maintains that MGP contamination that is capped and left in place cannot harm the environment because PAHs are insoluble and immobile.

149. As a result of the CMI, testing for MGP contamination in the lagoon was begun. However, as a result of the ending of the CMI before it fulfilled its purpose, that work is far from complete. There remains, at this writing, more that is unknown than what is known about contamination in this area.

150. Indeed, despite the US/EPA's initiative in the 1980s to investigate MGP sites that might pose a threat to health or the environment, neither DTSC nor RWQCB have any information in their files about the 1977 creosote discovery or any projects to investigate the area.

151. Nor do DTSC and RWQCB show any signs that they will order PG&E to investigate ROWs and other public spaces in the area. That leaves PG&E as the sole decision-maker, a fox guarding the henhouse. Unless the Court orders it, contamination in the area will remain unknown, as will threats to people and the environment.

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

**D.** **PG&E Has Grossly Misled Plaintiff and the Public About Oversight on Past Investigations of MGP Waste**

152.    Since the beginning, PG&E has been using fact sheets to shape the public perception of the MGP Waste situation at the Subject MGP Sites. It contains very carefully worded but nonetheless false and misleading statements about earlier investigations. For example:

a.    Concerning the Gaslight Building remediation in the 1990s, PG&E says: "We worked with one of these owners to remove soil from a portion of their property – no further work was requested by the owner. This work was completed under the oversight of the Regional Water Quality Control Board." This is referring to the "scoop and run" at the Gaslight Building in 1997 discussed above.

b.    Concerning Marina Substation testing in the 1990s, PG&E says: "The other owner was satisfied with the test results and made no request for further work." This is referring to the Marina Substation testing in 1991 discussed above.

153.    In the first quote, PG&E uses the word "oversight" to imply something significantly more than what actually took place. As discussed, RWQCB had no knowledge of this work and PG&E skirted the oversight through dubious means.

154.    In the second quote, PG&E speaks of an "other owner" who was apparently satisfied with the test results and makes no request for further work. But the property is the Marina Substation, so PG&E is committing a deception of omission by failing to mention that ***PG&E itself*** is the "other owner." The fact that the entity liable for any remediation costs made the decision that no remediation was necessary is a much different reality that is intentionally and falsely suggested by the quote: to whit, that an independent third party gave the property a passing grade. This is made further misleading by the fact that, while PG&E was satisfied and made no request for further work, DTSC, RWQCB, and its own consultant were not at all satisfied; and all three requested further work. Indeed, that the lead agency overseeing this investigation, DTSC demanded (but was ignored) further work across the whole 9.5 acre North Beach MGP Site and that both soil and groundwater be tested.

---

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

**V.  Plaintiff Has Complied with the Notice Requirements under RCRA**

155.    On April 29, 2014, Plaintiff sent, via certified mail return receipt requested, PG&E, DTSC, US/EPA, CAL/EPA, the State Water Resources Control Board, and the San Francisco RWQCB, with written notice of PG&E's violations of RCRA.

## CLAIM FOR RELIEF

**Violations of the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et seq.***

156.    Plaintiff incorporates by reference all the allegations contained in the previous paragraphs as though fully set forth herein.

157.    PG&E has contributed to the handling, storage, treatment, transportation, and disposal of MGP Waste on the Subject MGP Sites and the vicinity thereof.

158.    PG&E dumped, leaked, discharged, spilled, injected, and/or placed MGP Waste on the Subject MGP Sites and the vicinity thereof.

159.    Such MGP Waste may present an imminent and substantial threat to health and/or the environment.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and further relief as follows:

1.    This Court declare PG&E in violation of RCRA.

2.    This Court order the establishment of an independent environmental remediation trust (the "ERT") that will be responsible for remediating the MGP Waste contamination of the Subject Sites and their vicinity as alleged herein.

3.    This Court declare PG&E responsible for funding the ERT.

4.    This Court order and restrain PG&E to pay into the ERT, over time, funds sufficient to affect the remediation of the MGP Waste contamination of the Subject Sites and their vicinity as alleged herein.

5.    This Court award Plaintiffs the costs of suit herein, including attorneys' fees and expert witness fees, including without limitation pursuant to 42 U.S.C. § 6972(e); and

Case: 19-30088   Doc# 5768-14   Filed: 02/13/20   Entered: 02/13/20 14:35:29   Page 38 of 39

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

1       6.     This Court grant such other and further equitable or legal relief as the Court deems

2 just and proper.

3

4 Dated: February ___, 2020           **GROSS & KLEIN LLP**

5

6

7                   By: _____

                        STUART G. GROSS

8                         *Counsel for Plaintiff*

GROSS & KLEIN LLP
THE EMBARCADERO
PIER 9, SUITE 100
SAN FRANCISCO, CA 94111

PLAINTIFF DAN CLARKE'S SECOND AMENDED COMPLAINT; Case No. 14-04393-WHO

35