MATTHEW D. METZGER (SBN 240437)
mmetzger@belvederelegal.com
BELVEDERE LEGAL, PC
1777 Borel Place, Suite 314
San Mateo, CA 94402
Telephone:     (415) 513-5980
Facsimile:     (415) 513-5985

STUART G. GROSS (SBN 251019)
sgross@grosskleinlaw.com
TIM KLINE (SBN 319227)
tk@grosskleinlaw.com
GROSS & KLEIN LLP
The Embarcadero
Pier 9, Suite 100
San Francisco, CA 94111
t (415) 671-4628
f (415) 480-6688

Attorneys for Creditor,
Dan Clarke

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re**<br><br>**PG&E CORPORATION**<br><br>   **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                   **Debtors.** | Bankruptcy Case<br>Case No.  19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**DECLARATION OF STUART G. GROSS IN SUPPORT OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY (CANNERY MGP LITIGATION)** |
| ☐   Affects PG&E Corporation<br>☐   Affects Pacific Gas and Electric<br>       Company<br>☑   Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | **Date:**  March 10, 2020<br>**Time:**  10:00 a.m.<br>**Ctrm:** Hon. Dennis Montali<br>          450 Golden Gate Avenue<br>          16th Floor, Courtroom No. 17<br>          San Francisco, CA 94102<br><br>**Objection Deadline:**<br>     **March 5, 2020, at 4:00 p.m. (PT)** |

I, Stuart G. Gross, declare as follows:

1.      I am a partner at Gross & Klein LLP and am co-counsel for creditor Dan Clarke ("Clarke"). I make this declaration in support of the Motion for Relief from the Automatic Stay concerning environmental contamination litigation arising out of a manufactured gas plant ("MGP") known as the "Cannery MGP" or "CAN MGP" in the Ghirardelli Square area of San Francisco that debtors Pacific Gas and Electric Company and PG&E Corporation owned and operated ("Cannery MGP Litigation"). The matters stated below are made and based upon my personal knowledge, except where based on information and belief in which case I believe them to be true. If called as a witness, I could and would testify to the matters as set forth below.

**A.  Marina MGP Case**

2.      I am counsel for Plaintiff Dan Clarke in the matter, *San Francisco Herring Association and Dan Clarke vs. Pacific Gas and Electric Company; PG&E Corporation*, United States District Court, Northern District of California Case No. 14-cv-04393 WHO (JCS) which concerns environmental contamination from two other MGPs, which are located in the Marina neighborhood of San Francisco   (the "Marina MGP Case").

3.      Concurrently herewith, Clarke filed a *Supplemental Motion for Relief from the Automatic Stay* re the Marina MGP Case.

4.      Pursuant to Clarke's stipulation with the Debtors, the stay of the Marina MGP Case was lifted for the limited purpose of allowing the Honorable Judge William H. Orrick to rule on the Debtors' motion for summary judgment that had been fully briefed at the time of the petition.[1]

5.      Subsequent thereto, Judge Orrick issued a summary judgment order in the Marina MGP Case on July 26, 2019 that denied Debtors summary judgment motion as to Clarke's claim in the Marina MGP Case for injunctive relief under the Resource Conservation and Recovery Act ("RCRA") for terrestrial contamination and associated requests for recovery of attorneys' fees and costs, including expert witness fees, and granted it as Clarke's other claims.

---

[1] *See* Dkt. Nos. 3113, 3136.

2

**B. Cannery MGP Litigation**

6. My firm also represents Clarke in proposed litigation hereby summarized as the "Cannery MGP Litigation."

7. While litigation in the Marina MGP case has been pending for almost 5.5 years and has resulted in several settlements, no litigation has been initiated as to the Cannery MGP.

8. Furthermore, there have been no significant investigations of the contamination caused by the Cannery MGP and no remedial actions.

9. On October 23, 2018 – prior to Debtor's January 29, 2019 petition date – our firm sent Debtors and all necessary notice parties a *Notice of Intent to Sue Under the Resource Conservation and Recovery Act and Clean Water Act,* pursuant to the 60 day notice of period of 33 U.S.C. § 1365(b) of the Clean Water Act ("CWA") and the 90 day notice of period 42 U.S.C. § 6972(b) of RCRA the ("NOI Letter")

10. Said NOI Letter concerns allegations that Debtors violated the CWA and RCRA arising out of Debtors' ownership and/or operation of the Cannery MGP ("CAN MGP"), and PG&E's handling, storage, treatment, transportation and/or disposal of the waste generated by the operation and/or demolition of the MGP ("MGP Waste").

11. A true and correct copy of the October 23, 2018 *Notice of Intent to Sue Under the Resource Conservation and Recovery Act and Clean Water Act* is attached hereto as Exhibit 1.

12. Clarke's claims in the Cannery MGP Litigation will include: *a)* a RCRA claim for injunctive relief for both marine and terrestrial contamination; *b)* a CWA claim for injunctive relief and penalties; *c)* attorneys' fees and costs, including expert witness fees under both RCRA and the CWA; *d)* public nuisance claims for injunctive relief compensatory and punitive damages and related fees and costs.

**C. Potential for Case Consolidation of MGP Litigation Matters**

13. There is a likelihood that Judge Orrick will consolidate the Marina MGP Case and the CAN MGP litigation due to common questions of law and fact and to avoid unnecessary cost and delay.

3

14. At the November 6, 2018 case management conference in the Marina MGP Case, Judge Orrick queried the appropriate litigation structure and specifically ". . . whether the claims of Mr. Clarke concerning the Cannery should be consolidated at some point."

15. Attached as Exhibit 2 is a true and correct copy of the minute order from the November 6, 2018 case management conference.

16. For said reason, Clarke moved for relief from stay concurrently on both matters to allow this Court to consider the propriety of granting relief from stay at the same time.

**D. PG&E Already Has Dedicated Resources Allocated for MGP Litigation**

17. PG&E has several outside attorneys, and at least one in-house attorney, who have worked on legal matters related to the contamination related to the subject MGPs for approximately a decade and who continue to work on such matters. These attorneys are separate and apart from those handling the Bankruptcy Case for Debtors. PG&E, furthermore, has outside and in-house technical staff that have worked on these matters for as long and who continue to do so.

18. To the extent that there are similar cases pending against PG&E, pursuant to the relief granted by this Court (Dkt. 216), PG&E representatives continue to engage with those claimants to resolve their particular claims.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed February 13, 2020 at San Francisco, California.

_____

Stuart G. Gross

4

# EXHIBIT 1



October 23, 2018

| | |
|---|---|
| *Via Certified Mail – Return Receipt Requested*<br>Scott Mroz<br>Walsworth LLP<br>601 Montgomery Street, Ninth Floor<br>San Francisco, CA 94111 | *Via Certified Mail – Return Receipt Requested*<br>Barbara A. Lee, Director<br>Cal. Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, CA 95812-0806 |
| *Via Certified Mail – Return Receipt Requested*<br>Andrew R. Wheeler<br>Administrator<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | *Via Certified Mail – Return Receipt Requested*<br>Mike Stoker<br>Region 9 Administrator<br>Environmental Protection Agency<br>75 Hawthorne Street<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Matt Rodriquez<br>Secretary for Environmental Protection<br>California Environmental Protection Agency<br>P.O. Box 2815<br>Sacramento, CA 95812-2815 | *Via Certified Mail – Return Receipt Requested*<br>Linda Y.H. Cheng<br>Agent for Service of Process<br>Pacific Gas & Electric Company<br>77 Beale Street, 32nd Floor<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Eileen Sobeck<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 | *Via Certified Mail – Return Receipt Requested*<br>Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street / Suite 1400<br>Oakland, CA 94612 |
| *Via Certified Mail – Return Receipt Requested*<br>Sandi Nichols<br>Allen Matkins<br>Three Embarcadero Center, 12th Floor<br>San Francisco CA 94111-4074 | |

> Re:   Notice of Intent to Sue Under the Resource Conservation and Recovery
> Act and Clean Water Act[1]

To Whom It May Concern:

This letter constitutes the NOTICE OF INTENT TO SUE Pacific Gas & Electric
Company and PG&E Corporation (collectively and inclusive of their predecessors,
"PG&E") of Dan Clarke ("Noticer") for violations of the Resource Conservation and
Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.* and the Clean Water Act ("CWA"),

---

[1] If you are represented by counsel in this matter, request is specifically made that this
communication be directed to such counsel, and this communication shall be deemed to
have been made directly to such counsel.


33 U.S.C. §§ 1251, *et seq.* arising out of PG&E's ownership and/or operation of a manufactured gas plant ("MGP") known as the Cannery MGP ("CAN MGP") in the present day Fisherman's Wharf neighborhood of San Francisco, CA, and PG&E's handling, storage, treatment, transportation and/or disposal of the waste generated by the operation and/or demolition of the MGP ("MGP Waste"). Specifically, this letter gives notice of Noticer's intent to seek redress for the contamination by MGP Waste of soil and groundwater in and around the Fisherman's Wharf neighborhood and the illegal discharge of pollutants from MGP Waste into the waters of the San Francisco Bay and disposal of MGP Waste in the San Francisco Bay.

## I.        Persons Giving Notice

Clarke visits the areas affected by the contamination alleged herein for aesthetic and recreational enjoyment, visiting the affected area alone and with guests from out of town. Clarke enjoys, in particular, viewing seabirds, sea mammals, and other inhabitants of the marine areas offshore of the CAN MGP. Clarke's enjoyment of the affected area is diminished by the harm that the complained of contamination is causing to the environment of the affected area, including the harm caused to herring, which are a critical food source for the marine life that Clarke enjoys viewing. Clarke's enjoyment of the affected area is further diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment. Mr. Clarke intends to visit the affected areas in the future, alone and with guests, for the same types of aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged herein is addressed. Clarke can be contacted through the undersigned counsel at the address and phone number above.

## II.       Person Responsible for the Alleged Violations:

PG&E as the owner and operator of the CAN MGP, formerly located in the Fisherman's Wharf neighborhood of San Francisco is responsible for the violations that give rise to this notice.

## III.      Location of the Violations

PG&E's violations have occurred and continue to occur at the former location of the CAN MGP, which is located on the western portion of the square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., within the Fisherman's Wharf Neighborhood in San Francisco, CA, as well as in areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP where, upon information and belief, PG&E disposed of MGP Waste. The CAN MGP Site includes, without limitation, such areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP.

## IV.      Dates of the Violations

The violations that are the subject of this notice began sometime during or prior to the year 1903 and are ongoing.



## V.    **Description of PG&E's RCRA Violations**

Pursuant to 42 U.S.C. § 6972 of the RCRA, Noticer intends to sue PG&E for handling, storage, treatment, transportation and/or disposing of solid waste, in the form of MGP Waste, in a manner that may present an imminent and substantial endangerment to health or the environment. 42 U.SC. § 6972(a)(1)(B). Liability under RCRA is retroactive, and the ongoing contamination resulting from PG&E's disposal of MGP Waste and the ongoing discharges therefrom into groundwater, navigable waters, and the air is illegal and subject to liability under the RCRA. 42 U.S.C. § 6972(a)(1)(l); *Gwaltney of Smithfied, Ltd. v. Chesapeake Bay Fnd., Inc*., 484 U.S. 49 (1987).

PG&E's placement of MGP Waste at the CAN MGP Site, and in the surrou nding area, constitutes disposal of solid waste under the RCRA. "Disposal" under the RCRA is defined to include the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste . . . into or on any land." 42 U.S.C. § 6903(3). MGP Waste qualifies as a "solid waste," defined by the RCRA as a "discarded material . . . resulting from industrial, commercial, mining and agricultural operations." 42 U.S.C. § 6903(27).

While an adequate investigation of the CAN MGP Site has not yet been conducted, based on information and belief, including the results of investigations of other MGP sites owned and operated by PG&E in San Francisco, and limited sampling on the CAN MGP Site, itself, PG&E disposed of MGP Wastes on the CAN MGP Site in several different ways, including, without limitation: dumping the MGP Wastes into the San Francisco Bay; dumping the MGP Wastes into onshore wells; dumping MGP wastes into onshore depressions; abandoning MGP Wastes in tanks and other components of the former CAN MGP; spreading MGP Wastes throughout the surface of the terrestrial portion of the CAN MGP Site; and abandoning below ground, and/or spreading above ground, components of the MGP that contain toxic MGP Wastes, at the time of the decommissioning and demolition of the CAN MGP.

Furthermore, PG&E handled, stored, treated, and transported MGP Waste on the CAN Site. Based on information and belief, this included, without limitation: the handling of liquid form MGP Wastes, including MGP tars and liquor, generated by the MGP process; the storage of such liquid form MGP Wastes in locations, including, without limitation tar wells on the CAN MGP Site; the transportation of liquid form MGP Wastes from various locations to other locations on the CAN MGP Site; the handling of solid form MGP Wastes generated by the MGP process; the storage of solid form MGP Wastes in locations on the CAN MGP Site; and the transportation of solid form type MGP Wastes from various locations to other locations on the CAN MGP Site; and the treatment of MGP Wastes to remove certain components of it for sale or otherwise.

The MGP Wastes disposed of, handled, stored, treated, and/or transported by PG&E on the CAN MGP Site may present an imminent and substantial endangerment to health or the environment. MGP Wastes contain toxic chemicals including, without limitation:

- Polyaromatic hydrocarbons ("PAHs"), which are carcinogenic and are well known to be harmful to marine life, including without limitation fertilized herring

Case: 19-30088    Doc# 5771-1    Filed: 02/13/20    Entered: 02/13/20 14:42:56    Page 8 of 48



eggs and larval herring. Indeed, several of the PAHs known to exist in the MGP Waste are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15.

- Lead, which is a well-known human neurotoxin.

- Cyanide, which is highly poisonous to humans and other animals.

- Benzene, a human carcinogen for which the World Health Organization has found there is no safe level of human exposure.

Noticer needs only show that the MGP Waste "may" present such endangerment in order to show a violation of the RCRA. "Congress preceded the standard of liability with the term 'may,' to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Olson v. Beck*, 06-07487, 2011 U.S. Dist. LEXIS 114805, \*57 (N.D. Cal. Oct. 5, 2011). Furthermore, "'[e]ndangerment' means a threatened or potential harm and does not require proof of actual harm." *Id.*, at \*57-58 (internal quotation omitted). "A finding of 'imminence' does not encompass a showing that actual harm will occur immediately so long as the risk of threatened harm is present. An endangerment need not be immediate to be 'imminent' and thus warrant relief. An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Id.*, at \*58. "'Substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) . . . endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *Id.* at \*58-59.

The MGP Wastes on the CAN MGP Site meet this standard. On information and belief, including that garnered from other MGPs in San Francisco owned and operated by PG&E, and from limited sampling on the CAN MGP site, there exist on the CAN MGP Site:

- Significantly elevated concentrations of PAHs, cyanide, benzene, and lead from MGP Wastes in shallow soil – from the ground surface to groundwater interface – at concentrations that greatly exceed risk-based standards. There is a reasonable cause for concern that residents, visitors to the hotel, museum, and restaurant on the CAN MGP Site, commercial/industrial workers, and construction workers will be exposed to such high-risk shallow soil contamination.

- Significantly elevated concentrations of PAHs, benzene, and cyanide in groundwater and seawater that has flowed through terrestrial portions of the CAN MGP Site and come in contact with MGP Wastes thereon. There is a reasonable cause for concern that residents, visitors, commercial/industrial workers, and construction workers will be exposed to these and other toxic chemicals in groundwater/seawater flowing through the CAN MGP Site, in the form of contaminated indoor air vapor. Furthermore, such chemicals are transported via the groundwater/seawater flowing through the CAN MGP Site into the waters of


San Francisco Bay, whereupon a reasonable cause for concern that herring and other marine animals will be exposed to and harmed by the chemicals so transported.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes in the shallow sediment of offshore portions of the CAN MGP Site. There is a reasonable cause for concern that marine animals will be exposed to, and harmed by, these and other toxic chemicals in MGP Wastes through both direct contact with MGP Wastes and contact with porewater that has been contaminated as a result of the MGP Wastes in the sediment of offshore portions of the CAN MGP Site.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes, which are in liquid and solid form and which exist in deeper portions of the CAN MGP Site. In addition to harm caused by the transport of toxic chemicals from these deposits via groundwater, seawater, or porewater, there is a reasonable cause for concern that these MGP Wastes will migrate shallower and/or become exposed, as a result of natural or manmade scouring, seismic activity, excavation related construction or landscaping, and/or other causes, resulting in harm to humans and animals that come in contact with them.

Again, an adequate investigation of the CAN MGP Site has yet to be conducted. However, the foregoing concerns are confirmed not only by the results of investigations of other MGPs owned and operated by PG&E during the same time period in San Francisco. They are also confirmed by the results of a test pit sampling conducted in or around 1985 on or around the location of the former Haslett Warehouse. That test pit sampling revealed PAH levels of approximately 6,000 parts per million ("ppm"). The risk based screening level for PAHs established by the United State Environmental Protection Agency ("USEPA") is 0.016 ppm. PAH levels on CAN MGP Site are 375,000 times higher than that risk-based screening level. They are further confirmed by limited surface testing conducted in approximately the same period, which revealed highly elevated lead levels.

The foregoing list of RCRA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

**VI.** **Description of PG&E's CWA Violations**

The facts described in the foregoing sections are incorporated by reference here to the same extent as if repeated in full.

Pursuant to Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a)-(b), Noticer intends to sue PG&E for violating, and continuing to violate, effluent standards and limitations as defined under section 505(f) of the CWA, 33 U.S.C. § 1365(f), by discharging pollutants into the waters of the United States without a permit as required by CWA section 301(a), 33 U.S.C. § 1311(a).

The CWA prohibits the discharge of pollutants from a point source to the waters of the United States except when pursuant to, and in compliance with, a permit.[2] *See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342. The Act defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source" and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). This includes where "the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water," even if the discharge is not directly into the navigable water. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). "Point source" is defined by the CWA as "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The toxic chemicals from the MGP Waste located in the soil of the CAN MGP Site qualifies as a pollutant, as they contain carcinogenic PAHs that are known to be harmful to marine life, including without limitation fertilized herring eggs and larval herring. Indeed, several of the PAHs that upon information and belief to exist in the MGP Waste located on the CAN MGP Site are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15. The CWA defines "toxic pollutants" as "those pollutants, or combinations of pollutants . . . which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will . . . cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring." 22 U.S.C. § 1362(13). This definition is on all fours in relation to PAHs and their effects on fertilized herring eggs and larval herring.

The CAN MGP Site, including the former CAN MGP itself (inclusive of its former tanks and wells), upon which the MGP Waste was abandoned or disposed of by PG&E, qualifies as a point source of these pollutants. The San Francisco Bay—into which these pollutants are discharged into the Bay via the groundwater that flows through the terrestrial portions of the CAN MGP Site, via seawater that flows as a result of tidal action in and out of the terrestrial portions of the CAN MGP Site, via San Francisco's combined stormwater and sewage transport and sewage transport system, or directly via contaminated soils on the Bay's shoreline, tidelands or submerged lands—qualifies as navigable waters of the United States.

---

[2] The State of California was delegated authority by the Environmental Protection Agency to administer the Nation Pollution Discharge Elimination System ("NPDES") permit program pursuant to 33 U.S.C. § 1342(b).



The foregoing list of CWA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

_____

Noticer believes that this Notice of Intent to Sue sufficiently states grounds for filing suit under both the RCRA and the CWA. Each day the above-described violations are not remedied constitute a separate violation under the applicable regulations and PG&E will remain in violation until the contamination described is not remedied. The CWA and 40 CFR § 19.4 authorizes significant penalties for each violation of the CWA. The RCRA and 30 CFR § 19.4 authorizes significant penalties for each violation of the RCRA. At the close of the 60-day CWA notice period and the 90-day RCRA notice period, Noticer intends to file a citizen suit against PG&E for the violations discussed above. Noticer intends to seek injunctive relief, penalties, attorneys' fees and costs, including expert witness fees.

Very Best,

STUART G. GROSS

# EXHIBIT 2

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### CIVIL MINUTES

| **Date:** November 6, 2018 | **Time:** 43 minutes 2:16 p.m. to 2:59 p.m. | **Judge:** WILLIAM H. ORRICK |
|---|---|---|
| **Case No.:** 14-cv-04393-WHO | **Case Name:** San Francisco Herring Association v. Pacific Gas and Electric Company | |

**Attorney for Plaintiff:** Stuart G. Gross
**Attorneys for Defendant:** Scott D. Mroz and Sandi L. Nichols

**Deputy Clerk:** Jean Davis                    **Court Reporter:** FTR Recording

## PROCEEDINGS

Counsel appear for case management conference. The Court queries counsel as to dispositive legal issues which defendants would like to address.  Counsel heard on their opinions regarding the potentially dispositive issues and the coordination of the litigation of those issues and the discovery schedule.

The Court queries counsel on appropriate litigation structure, specifically whether the claims of Mr. Clarke concerning the Cannery should be consolidated at some point.  Counsel agree that there are no damages available to Mr. Clarke; the remedies will be in the form of injunctive relief and penalties and will be for determination by the Court rather than a jury.

The defense asks to file more than one motion for summary judgment, which is granted. The initial defense motion for summary judgment will be filed by November 20, 2018.  Plaintiff is directed to respond within three (3) weeks.  Any reply is due a week later.  If plaintiff believes that discovery is necessary to respond to the motion--and the parties are not in agreement as to that issue--a joint letter should be filed within five (5) days of the filing of the motion that identifies the specific discovery necessary.  **Hearing on the motion is set for January 9, 2019 at 2:00 p.m.**

**Further Case Management Conference set for May 7, 2019 at 2:00 p.m.**

**PRETRIAL SCHEDULE:**

| | |
|---|---|
| **Fact discovery cutoff:** | **May 15, 2019** |
| **Expert disclosure:** | **May 15, 2019** |
| **Expert rebuttal:** | **June 7, 2019** |
| **Expert discovery cutoff:** | **July 1, 2019** |

**Dispositive Motions heard by:** **August 28, 2019**
**Pretrial Conference:** **October 21, 2019 at 2:00 p.m.**
**Trial:** **November 12, 2019 at 8:30 a.m. by Jury**

# EXHIBIT 1



San Francisco | New York

The Embarcadero, Pier 9, Suite 100, San Francisco, CA 94111  ph:  415.671.4628  fx: 415.480.6688
www.grosskleinlaw.com

sender's email: sgross@grosskleinlaw.com

October 23, 2018

| | |
|---|---|
| *Via Certified Mail – Return Receipt Requested*<br>Scott Mroz<br>Walsworth LLP<br>601 Montgomery Street, Ninth Floor<br>San Francisco, CA 94111 | *Via Certified Mail – Return Receipt Requested*<br>Barbara A. Lee, Director<br>Cal. Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, CA 95812-0806 |
| *Via Certified Mail – Return Receipt Requested*<br>Andrew R. Wheeler<br>Administrator<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | *Via Certified Mail – Return Receipt Requested*<br>Mike Stoker<br>Region 9 Administrator<br>Environmental Protection Agency<br>75 Hawthorne Street<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Matt Rodriquez<br>Secretary for Environmental Protection<br>California Environmental Protection Agency<br>P.O. Box 2815<br>Sacramento, CA 95812-2815 | *Via Certified Mail – Return Receipt Requested*<br>Linda Y.H. Cheng<br>Agent for Service of Process<br>Pacific Gas & Electric Company<br>77 Beale Street, 32nd Floor<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Eileen Sobeck<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 | *Via Certified Mail – Return Receipt Requested*<br>Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street / Suite 1400<br>Oakland, CA 94612 |
| *Via Certified Mail – Return Receipt Requested*<br>Sandi Nichols<br>Allen Matkins<br>Three Embarcadero Center, 12th Floor<br>San Francisco CA 94111-4074 | |

Re:     *Notice of Intent to Sue Under the Resource Conservation and Recovery Act and Clean Water Act*[1]

To Whom It May Concern:

This letter constitutes the NOTICE OF INTENT TO SUE Pacific Gas & Electric Company and PG&E Corporation (collectively and inclusive of their predecessors, "PG&E") of Dan Clarke ("Noticer") for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.* and the Clean Water Act ("CWA"),

---

[1] If you are represented by counsel in this matter, request is specifically made that this communication be directed to such counsel, and this communication shall be deemed to have been made directly to such counsel.



33 U.S.C. §§ 1251, *et seq.* arising out of PG&E's ownership and/or operation of a manufactured gas plant ("MGP") known as the Cannery MGP ("CAN MGP") in the present day Fisherman's Wharf neighborhood of San Francisco, CA, and PG&E's handling, storage, treatment, transportation and/or disposal of the waste generated by the operation and/or demolition of the MGP ("MGP Waste"). Specifically, this letter gives notice of Noticer's intent to seek redress for the contamination by MGP Waste of soil and groundwater in and around the Fisherman's Wharf neighborhood and the illegal discharge of pollutants from MGP Waste into the waters of the San Francisco Bay and disposal of MGP Waste in the San Francisco Bay.

## I.      Persons Giving Notice

Clarke visits the areas affected by the contamination alleged herein for aesthetic and recreational enjoyment, visiting the affected area alone and with guests from out of town. Clarke enjoys, in particular, viewing seabirds, sea mammals, and other inhabitants of the marine areas offshore of the CAN MGP. Clarke's enjoyment of the affected area is diminished by the harm that the complained of contamination is causing to the environment of the affected area, including the harm caused to herring, which are a critical food source for the marine life that Clarke enjoys viewing. Clarke's enjoyment of the affected area is further diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment. Mr. Clarke intends to visit the affected areas in the future, alone and with guests, for the same types of aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged herein is addressed. Clarke can be contacted through the undersigned counsel at the address and phone number above.

## II.      Person Responsible for the Alleged Violations:

PG&E as the owner and operator of the CAN MGP, formerly located in the Fisherman's Wharf neighborhood of San Francisco is responsible for the violations that give rise to this notice.

## III.      Location of the Violations

PG&E's violations have occurred and continue to occur at the former location of the CAN MGP, which is located on the western portion of the square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., within the Fisherman's Wharf Neighborhood in San Francisco, CA, as well as in areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP where, upon information and belief, PG&E disposed of MGP Waste. The CAN MGP Site includes, without limitation, such areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP.

## IV.      Dates of the Violations

The violations that are the subject of this notice began sometime during or prior to the year 1903 and are ongoing.


## V.   **Description of PG&E's RCRA Violations**

Pursuant to 42 U.S.C. § 6972 of the RCRA, Noticer intends to sue PG&E for handling, storage, treatment, transportation and/or disposing of solid waste, in the form of MGP Waste, in a manner that may present an imminent and substantial endangerment to health or the environment. 42 U.SC. § 6972(a)(1)(B). Liability under RCRA is retroactive, and the ongoing contamination resulting from PG&E's disposal of MGP Waste and the ongoing discharges therefrom into groundwater, navigable waters, and the air is illegal and subject to liability under the RCRA. 42 U.S.C. § 6972(a)(1)(l); *Gwaltney of Smithfied, Ltd. v. Chesapeake Bay Fnd., Inc.*, 484 U.S. 49 (1987).

PG&E's placement of MGP Waste at the CAN MGP Site, and in the surrou nding area, constitutes disposal of solid waste under the RCRA. "Disposal" under the RCRA is defined to include the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste . . . into or on any land." 42 U.S.C. § 6903(3). MGP Waste qualifies as a "solid waste," defined by the RCRA as a "discarded material . . . resulting from industrial, commercial, mining and agricultural operations." 42 U.S.C. § 6903(27).

While an adequate investigation of the CAN MGP Site has not yet been conducted, based on information and belief, including the results of investigations of other MGP sites owned and operated by PG&E in San Francisco, and limited sampling on the CAN MGP Site, itself, PG&E disposed of MGP Wastes on the CAN MGP Site in several different ways, including, without limitation: dumping the MGP Wastes into the San Francisco Bay; dumping the MGP Wastes into onshore wells; dumping MGP wastes into onshore depressions; abandoning MGP Wastes in tanks and other components of the former CAN MGP; spreading MGP Wastes throughout the surface of the terrestrial portion of the CAN MGP Site; and abandoning below ground, and/or spreading above ground, components of the MGP that contain toxic MGP Wastes, at the time of the decommissioning and demolition of the CAN MGP.

Furthermore, PG&E handled, stored, treated, and transported MGP Waste on the CAN Site. Based on information and belief, this included, without limitation: the handling of liquid form MGP Wastes, including MGP tars and liquor, generated by the MGP process; the storage of such liquid form MGP Wastes in locations, including, without limitation tar wells on the CAN MGP Site; the transportation of liquid form MGP Wastes from various locations to other locations on the CAN MGP Site; the handling of solid form MGP Wastes generated by the MGP process; the storage of solid form MGP Wastes in locations on the CAN MGP Site; and the transportation of solid form type MGP Wastes from various locations to other locations on the CAN MGP Site; and the treatment of MGP Wastes to remove certain components of it for sale or otherwise.

The MGP Wastes disposed of, handled, stored, treated, and/or transported by PG&E on the CAN MGP Site may present an imminent and substantial endangerment to health or the environment. MGP Wastes contain toxic chemicals including, without limitation:

- Polyaromatic hydrocarbons ("PAHs"), which are carcinogenic and are well known to be harmful to marine life, including without limitation fertilized herring



eggs and larval herring. Indeed, several of the PAHs known to exist in the MGP Waste are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15.

- Lead, which is a well-known human neurotoxin.

- Cyanide, which is highly poisonous to humans and other animals.

- Benzene, a human carcinogen for which the World Health Organization has found there is no safe level of human exposure.

Noticer needs only show that the MGP Waste "may" present such endangerment in order to show a violation of the RCRA. "Congress preceded the standard of liability with the term 'may,' to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Olson v. Beck*, 06-07487, 2011 U.S. Dist. LEXIS 114805, *57 (N.D. Cal. Oct. 5, 2011). Furthermore, "'[e]ndangerment' means a threatened or potential harm and does not require proof of actual harm." *Id.*, at *57-58 (internal quotation omitted). "A finding of 'imminence' does not encompass a showing that actual harm will occur immediately so long as the risk of threatened harm is present. An endangerment need not be immediate to be 'imminent' and thus warrant relief. An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Id.*, at *58. "'Substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) . . . endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *Id.* at *58-59.

The MGP Wastes on the CAN MGP Site meet this standard. On information and belief, including that garnered from other MGPs in San Francisco owned and operated by PG&E, and from limited sampling on the CAN MGP site, there exist on the CAN MGP Site:

- Significantly elevated concentrations of PAHs, cyanide, benzene, and lead from MGP Wastes in shallow soil – from the ground surface to groundwater interface – at concentrations that greatly exceed risk-based standards. There is a reasonable cause for concern that residents, visitors to the hotel, museum, and restaurant on the CAN MGP Site, commercial/industrial workers, and construction workers will be exposed to such high-risk shallow soil contamination.

- Significantly elevated concentrations of PAHs, benzene, and cyanide in groundwater and seawater that has flowed through terrestrial portions of the CAN MGP Site and come in contact with MGP Wastes thereon. There is a reasonable cause for concern that residents, visitors, commercial/industrial workers, and construction workers will be exposed to these and other toxic chemicals in groundwater/seawater flowing through the CAN MGP Site, in the form of contaminated indoor air vapor. Furthermore, such chemicals are transported via the groundwater/seawater flowing through the CAN MGP Site into the waters of


San Francisco Bay, whereupon a reasonable cause for concern that herring and other marine animals will be exposed to and harmed by the chemicals so transported.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes in the shallow sediment of offshore portions of the CAN MGP Site. There is a reasonable cause for concern that marine animals will be exposed to, and harmed by, these and other toxic chemicals in MGP Wastes through both direct contact with MGP Wastes and contact with porewater that has been contaminated as a result of the MGP Wastes in the sediment of offshore portions of the CAN MGP Site.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes, which are in liquid and solid form and which exist in deeper portions of the CAN MGP Site. In addition to harm caused by the transport of toxic chemicals from these deposits via groundwater, seawater, or porewater, there is a reasonable cause for concern that these MGP Wastes will migrate shallower and/or become exposed, as a result of natural or manmade scouring, seismic activity, excavation related construction or landscaping, and/or other causes, resulting in harm to humans and animals that come in contact with them.

Again, an adequate investigation of the CAN MGP Site has yet to be conducted. However, the foregoing concerns are confirmed not only by the results of investigations of other MGPs owned and operated by PG&E during the same time period in San Francisco. They are also confirmed by the results of a test pit sampling conducted in or around 1985 on or around the location of the former Haslett Warehouse. That test pit sampling revealed PAH levels of approximately 6,000 parts per million ("ppm"). The risk based screening level for PAHs established by the United State Environmental Protection Agency ("USEPA") is 0.016 ppm. PAH levels on CAN MGP Site are 375,000 times higher than that risk-based screening level. They are further confirmed by limited surface testing conducted in approximately the same period, which revealed highly elevated lead levels.

The foregoing list of RCRA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

## VI.    Description of PG&E's CWA Violations

The facts described in the foregoing sections are incorporated by reference here to the same extent as if repeated in full.

Pursuant to Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a)-(b), Noticer intends to sue PG&E for violating, and continuing to violate, effluent standards and limitations as defined under section 505(f) of the CWA, 33 U.S.C. § 1365(f), by discharging pollutants into the waters of the United States without a permit as required by CWA section 301(a), 33 U.S.C. § 1311(a).

The CWA prohibits the discharge of pollutants from a point source to the waters of the United States except when pursuant to, and in compliance with, a permit.[2] *See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342. The Act defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source" and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). This includes where "the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water," even if the discharge is not directly into the navigable water. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). "Point source" is defined by the CWA as "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The toxic chemicals from the MGP Waste located in the soil of the CAN MGP Site qualifies as a pollutant, as they contain carcinogenic PAHs that are known to be harmful to marine life, including without limitation fertilized herring eggs and larval herring. Indeed, several of the PAHs that upon information and belief to exist in the MGP Waste located on the CAN MGP Site are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15. The CWA defines "toxic pollutants" as "those pollutants, or combinations of pollutants . . . which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will . . . cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring." 22 U.S.C. § 1362(13). This definition is on all fours in relation to PAHs and their effects on fertilized herring eggs and larval herring.

The CAN MGP Site, including the former CAN MGP itself (inclusive of its former tanks and wells), upon which the MGP Waste was abandoned or disposed of by PG&E, qualifies as a point source of these pollutants. The San Francisco Bay—into which these pollutants are discharged into the Bay via the groundwater that flows through the terrestrial portions of the CAN MGP Site, via seawater that flows as a result of tidal action in and out of the terrestrial portions of the CAN MGP Site, via San Francisco's combined stormwater and sewage transport and sewage transport system, or directly via contaminated soils on the Bay's shoreline, tidelands or submerged lands—qualifies as navigable waters of the United States.

---

[2] The State of California was delegated authority by the Environmental Protection Agency to administer the Nation Pollution Discharge Elimination System ("NPDES") permit program pursuant to 33 U.S.C. § 1342(b).



The foregoing list of CWA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

_____

Noticer believes that this Notice of Intent to Sue sufficiently states grounds for filing suit under both the RCRA and the CWA. Each day the above-described violations are not remedied constitute a separate violation under the applicable regulations and PG&E will remain in violation until the contamination described is not remedied. The CWA and 40 CFR § 19.4 authorizes significant penalties for each violation of the CWA. The RCRA and 30 CFR § 19.4 authorizes significant penalties for each violation of the RCRA. At the close of the 60-day CWA notice period and the 90-day RCRA notice period, Noticer intends to file a citizen suit against PG&E for the violations discussed above. Noticer intends to seek injunctive relief, penalties, attorneys' fees and costs, including expert witness fees.


Very Best,

STUART G. GROSS

# EXHIBIT 2

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### CIVIL MINUTES

| **Date:** November 6, 2018 | **Time:** 43 minutes 2:16 p.m. to 2:59 p.m. | **Judge:** WILLIAM H. ORRICK |
|---|---|---|
| **Case No.:** 14-cv-04393-WHO | **Case Name:** San Francisco Herring Association v. Pacific Gas and Electric Company | |

**Attorney for Plaintiff:** Stuart G. Gross
**Attorneys for Defendant:** Scott D. Mroz and Sandi L. Nichols

**Deputy Clerk:** Jean Davis          **Court Reporter:** FTR Recording

### PROCEEDINGS

Counsel appear for case management conference. The Court queries counsel as to dispositive legal issues which defendants would like to address.  Counsel heard on their opinions regarding the potentially dispositive issues and the coordination of the litigation of those issues and the discovery schedule.

The Court queries counsel on appropriate litigation structure, specifically whether the claims of Mr. Clarke concerning the Cannery should be consolidated at some point.  Counsel agree that there are no damages available to Mr. Clarke; the remedies will be in the form of injunctive relief and penalties and will be for determination by the Court rather than a jury.

The defense asks to file more than one motion for summary judgment, which is granted. The initial defense motion for summary judgment will be filed by November 20, 2018.  Plaintiff is directed to respond within three (3) weeks.  Any reply is due a week later.  If plaintiff believes that discovery is necessary to respond to the motion--and the parties are not in agreement as to that issue--a joint letter should be filed within five (5) days of the filing of the motion that identifies the specific discovery necessary.  **Hearing on the motion is set for January 9, 2019 at 2:00 p.m.**

**Further Case Management Conference set for May 7, 2019 at 2:00 p.m.**

**PRETRIAL SCHEDULE:**

| | |
|---|---|
| **Fact discovery cutoff:** | **May 15, 2019** |
| **Expert disclosure:** | **May 15, 2019** |
| **Expert rebuttal:** | **June 7, 2019** |
| **Expert discovery cutoff:** | **July 1, 2019** |

**Dispositive Motions heard by:**   **August 28, 2019**
**Pretrial Conference:**   **October 21, 2019 at 2:00 p.m.**
**Trial:**   **November 12, 2019 at 8:30 a.m. by Jury**

# EXHIBIT 1



# GROSS & KLEIN LLP

San Francisco | New York

The Embarcadero, Pier 9, Suite 100, San Francisco, CA 94111  ph: 415.671.4628  fx: 415.480.6688
www.grosskleinlaw.com

sender's email: sgross@grosskleinlaw.com

October 23, 2018

| | |
|---|---|
| *Via Certified Mail – Return Receipt Requested*<br>Scott Mroz<br>Walsworth LLP<br>601 Montgomery Street, Ninth Floor<br>San Francisco, CA 94111 | *Via Certified Mail – Return Receipt Requested*<br>Barbara A. Lee, Director<br>Cal. Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, CA 95812-0806 |
| *Via Certified Mail – Return Receipt Requested*<br>Andrew R. Wheeler<br>Administrator<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | *Via Certified Mail – Return Receipt Requested*<br>Mike Stoker<br>Region 9 Administrator<br>Environmental Protection Agency<br>75 Hawthorne Street<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Matt Rodriquez<br>Secretary for Environmental Protection<br>California Environmental Protection Agency<br>P.O. Box 2815<br>Sacramento, CA 95812-2815 | *Via Certified Mail – Return Receipt Requested*<br>Linda Y.H. Cheng<br>Agent for Service of Process<br>Pacific Gas & Electric Company<br>77 Beale Street, 32nd Floor<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Eileen Sobeck<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 | *Via Certified Mail – Return Receipt Requested*<br>Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street / Suite 1400<br>Oakland, CA 94612 |
| *Via Certified Mail – Return Receipt Requested*<br>Sandi Nichols<br>Allen Matkins<br>Three Embarcadero Center, 12th Floor<br>San Francisco CA 94111-4074 | |

> Re:    *Notice of Intent to Sue Under the Resource Conservation and Recovery Act and Clean Water Act[1]*

To Whom It May Concern:

This letter constitutes the NOTICE OF INTENT TO SUE Pacific Gas & Electric Company and PG&E Corporation (collectively and inclusive of their predecessors, "PG&E") of Dan Clarke ("Noticer") for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.* and the Clean Water Act ("CWA"),

---

[1] If you are represented by counsel in this matter, request is specifically made that this communication be directed to such counsel, and this communication shall be deemed to have been made directly to such counsel.



33 U.S.C. §§ 1251, *et seq.* arising out of PG&E's ownership and/or operation of a manufactured gas plant ("MGP") known as the Cannery MGP ("CAN MGP") in the present day Fisherman's Wharf neighborhood of San Francisco, CA, and PG&E's handling, storage, treatment, transportation and/or disposal of the waste generated by the operation and/or demolition of the MGP ("MGP Waste"). Specifically, this letter gives notice of Noticer's intent to seek redress for the contamination by MGP Waste of soil and groundwater in and around the Fisherman's Wharf neighborhood and the illegal discharge of pollutants from MGP Waste into the waters of the San Francisco Bay and disposal of MGP Waste in the San Francisco Bay.

## I.     Persons Giving Notice

Clarke visits the areas affected by the contamination alleged herein for aesthetic and recreational enjoyment, visiting the affected area alone and with guests from out of town. Clarke enjoys, in particular, viewing seabirds, sea mammals, and other inhabitants of the marine areas offshore of the CAN MGP. Clarke's enjoyment of the affected area is diminished by the harm that the complained of contamination is causing to the environment of the affected area, including the harm caused to herring, which are a critical food source for the marine life that Clarke enjoys viewing. Clarke's enjoyment of the affected area is further diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment. Mr. Clarke intends to visit the affected areas in the future, alone and with guests, for the same types of aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged herein is addressed. Clarke can be contacted through the undersigned counsel at the address and phone number above.

## II.     Person Responsible for the Alleged Violations:

PG&E as the owner and operator of the CAN MGP, formerly located in the Fisherman's Wharf neighborhood of San Francisco is responsible for the violations that give rise to this notice.

## III.     Location of the Violations

PG&E's violations have occurred and continue to occur at the former location of the CAN MGP, which is located on the western portion of the square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., within the Fisherman's Wharf Neighborhood in San Francisco, CA, as well as in areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP where, upon information and belief, PG&E disposed of MGP Waste. The CAN MGP Site includes, without limitation, such areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP.

## IV.     Dates of the Violations

The violations that are the subject of this notice began sometime during or prior to the year 1903 and are ongoing.



## V.     Description of PG&E's RCRA Violations

Pursuant to 42 U.S.C. § 6972 of the RCRA, Noticer intends to sue PG&E for handling, storage, treatment, transportation and/or disposing of solid waste, in the form of MGP Waste, in a manner that may present an imminent and substantial endangerment to health or the environment. 42 U.SC. § 6972(a)(1)(B). Liability under RCRA is retroactive, and the ongoing contamination resulting from PG&E's disposal of MGP Waste and the ongoing discharges therefrom into groundwater, navigable waters, and the air is illegal and subject to liability under the RCRA. 42 U.S.C. § 6972(a)(1)(l); *Gwaltney of Smithfied, Ltd. v. Chesapeake Bay Fnd., Inc*., 484 U.S. 49 (1987).

PG&E's placement of MGP Waste at the CAN MGP Site, and in the surrou nding area, constitutes disposal of solid waste under the RCRA. "Disposal" under the RCRA is defined to include the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste . . . into or on any land." 42 U.S.C. § 6903(3). MGP Waste qualifies as a "solid waste," defined by the RCRA as a "discarded material . . . resulting from industrial, commercial, mining and agricultural operations." 42 U.S.C. § 6903(27).

While an adequate investigation of the CAN MGP Site has not yet been conducted, based on information and belief, including the results of investigations of other MGP sites owned and operated by PG&E in San Francisco, and limited sampling on the CAN MGP Site, itself, PG&E disposed of MGP Wastes on the CAN MGP Site in several different ways, including, without limitation: dumping the MGP Wastes into the San Francisco Bay; dumping the MGP Wastes into onshore wells; dumping MGP wastes into onshore depressions; abandoning MGP Wastes in tanks and other components of the former CAN MGP; spreading MGP Wastes throughout the surface of the terrestrial portion of the CAN MGP Site; and abandoning below ground, and/or spreading above ground, components of the MGP that contain toxic MGP Wastes, at the time of the decommissioning and demolition of the CAN MGP.

Furthermore, PG&E handled, stored, treated, and transported MGP Waste on the CAN Site. Based on information and belief, this included, without limitation: the handling of liquid form MGP Wastes, including MGP tars and liquor, generated by the MGP process; the storage of such liquid form MGP Wastes in locations, including, without limitation tar wells on the CAN MGP Site; the transportation of liquid form MGP Wastes from various locations to other locations on the CAN MGP Site; the handling of solid form MGP Wastes generated by the MGP process; the storage of solid form MGP Wastes in locations on the CAN MGP Site; and the transportation of solid form type MGP Wastes from various locations to other locations on the CAN MGP Site; and the treatment of MGP Wastes to remove certain components of it for sale or otherwise.

The MGP Wastes disposed of, handled, stored, treated, and/or transported by PG&E on the CAN MGP Site may present an imminent and substantial endangerment to health or the environment. MGP Wastes contain toxic chemicals including, without limitation:

- Polyaromatic hydrocarbons ("PAHs"), which are carcinogenic and are well known to be harmful to marine life, including without limitation fertilized herring



eggs and larval herring. Indeed, several of the PAHs known to exist in the MGP Waste are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15.

- Lead, which is a well-known human neurotoxin.

- Cyanide, which is highly poisonous to humans and other animals.

- Benzene, a human carcinogen for which the World Health Organization has found there is no safe level of human exposure.

Noticer needs only show that the MGP Waste "may" present such endangerment in order to show a violation of the RCRA. "Congress preceded the standard of liability with the term 'may,' to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Olson v. Beck*, 06-07487, 2011 U.S. Dist. LEXIS 114805, *57 (N.D. Cal. Oct. 5, 2011). Furthermore, "'[e]ndangerment' means a threatened or potential harm and does not require proof of actual harm." *Id.*, at *57-58 (internal quotation omitted). "A finding of 'imminence' does not encompass a showing that actual harm will occur immediately so long as the risk of threatened harm is present. An endangerment need not be immediate to be 'imminent' and thus warrant relief. An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Id.*, at *58. "'Substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) . . . endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *Id.* at *58-59.

The MGP Wastes on the CAN MGP Site meet this standard. On information and belief, including that garnered from other MGPs in San Francisco owned and operated by PG&E, and from limited sampling on the CAN MGP site, there exist on the CAN MGP Site:

- Significantly elevated concentrations of PAHs, cyanide, benzene, and lead from MGP Wastes in shallow soil – from the ground surface to groundwater interface – at concentrations that greatly exceed risk-based standards. There is a reasonable cause for concern that residents, visitors to the hotel, museum, and restaurant on the CAN MGP Site, commercial/industrial workers, and construction workers will be exposed to such high-risk shallow soil contamination.

- Significantly elevated concentrations of PAHs, benzene, and cyanide in groundwater and seawater that has flowed through terrestrial portions of the CAN MGP Site and come in contact with MGP Wastes thereon. There is a reasonable cause for concern that residents, visitors, commercial/industrial workers, and construction workers will be exposed to these and other toxic chemicals in groundwater/seawater flowing through the CAN MGP Site, in the form of contaminated indoor air vapor. Furthermore, such chemicals are transported via the groundwater/seawater flowing through the CAN MGP Site into the waters of


San Francisco Bay, whereupon a reasonable cause for concern that herring and other marine animals will be exposed to and harmed by the chemicals so transported.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes in the shallow sediment of offshore portions of the CAN MGP Site. There is a reasonable cause for concern that marine animals will be exposed to, and harmed by, these and other toxic chemicals in MGP Wastes through both direct contact with MGP Wastes and contact with porewater that has been contaminated as a result of the MGP Wastes in the sediment of offshore portions of the CAN MGP Site.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes, which are in liquid and solid form and which exist in deeper portions of the CAN MGP Site. In addition to harm caused by the transport of toxic chemicals from these deposits via groundwater, seawater, or porewater, there is a reasonable cause for concern that these MGP Wastes will migrate shallower and/or become exposed, as a result of natural or manmade scouring, seismic activity, excavation related construction or landscaping, and/or other causes, resulting in harm to humans and animals that come in contact with them.

Again, an adequate investigation of the CAN MGP Site has yet to be conducted. However, the foregoing concerns are confirmed not only by the results of investigations of other MGPs owned and operated by PG&E during the same time period in San Francisco. They are also confirmed by the results of a test pit sampling conducted in or around 1985 on or around the location of the former Haslett Warehouse. That test pit sampling revealed PAH levels of approximately 6,000 parts per million ("ppm"). The risk based screening level for PAHs established by the United State Environmental Protection Agency ("USEPA") is 0.016 ppm. PAH levels on CAN MGP Site are 375,000 times higher than that risk-based screening level. They are further confirmed by limited surface testing conducted in approximately the same period, which revealed highly elevated lead levels.

The foregoing list of RCRA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

## VI.     Description of PG&E's CWA Violations

The facts described in the foregoing sections are incorporated by reference here to the same extent as if repeated in full.

Pursuant to Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a)-(b), Noticer intends to sue PG&E for violating, and continuing to violate, effluent standards and limitations as defined under section 505(f) of the CWA, 33 U.S.C. § 1365(f), by discharging pollutants into the waters of the United States without a permit as required by CWA section 301(a), 33 U.S.C. § 1311(a).

The CWA prohibits the discharge of pollutants from a point source to the waters of the United States except when pursuant to, and in compliance with, a permit.[2] *See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342. The Act defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source" and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). This includes where "the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water," even if the discharge is not directly into the navigable water. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). "Point source" is defined by the CWA as "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The toxic chemicals from the MGP Waste located in the soil of the CAN MGP Site qualifies as a pollutant, as they contain carcinogenic PAHs that are known to be harmful to marine life, including without limitation fertilized herring eggs and larval herring. Indeed, several of the PAHs that upon information and belief to exist in the MGP Waste located on the CAN MGP Site are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15. The CWA defines "toxic pollutants" as "those pollutants, or combinations of pollutants . . . which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will . . . cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring." 22 U.S.C. § 1362(13). This definition is on all fours in relation to PAHs and their effects on fertilized herring eggs and larval herring.

The CAN MGP Site, including the former CAN MGP itself (inclusive of its former tanks and wells), upon which the MGP Waste was abandoned or disposed of by PG&E, qualifies as a point source of these pollutants. The San Francisco Bay—into which these pollutants are discharged into the Bay via the groundwater that flows through the terrestrial portions of the CAN MGP Site, via seawater that flows as a result of tidal action in and out of the terrestrial portions of the CAN MGP Site, via San Francisco's combined stormwater and sewage transport and sewage transport system, or directly via contaminated soils on the Bay's shoreline, tidelands or submerged lands—qualifies as navigable waters of the United States.

---

[2] The State of California was delegated authority by the Environmental Protection Agency to administer the Nation Pollution Discharge Elimination System ("NPDES") permit program pursuant to 33 U.S.C. § 1342(b).


The foregoing list of CWA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

---

Noticer believes that this Notice of Intent to Sue sufficiently states grounds for filing suit under both the RCRA and the CWA. Each day the above-described violations are not remedied constitute a separate violation under the applicable regulations and PG&E will remain in violation until the contamination described is not remedied. The CWA and 40 CFR § 19.4 authorizes significant penalties for each violation of the CWA. The RCRA and 30 CFR § 19.4 authorizes significant penalties for each violation of the RCRA. At the close of the 60-day CWA notice period and the 90-day RCRA notice period, Noticer intends to file a citizen suit against PG&E for the violations discussed above. Noticer intends to seek injunctive relief, penalties, attorneys' fees and costs, including expert witness fees.

Very Best,

STUART G. GROSS

# EXHIBIT 2

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### CIVIL MINUTES

| **Date:** November 6, 2018 | **Time:** 43 minutes 2:16 p.m. to 2:59 p.m. | **Judge:** WILLIAM H. ORRICK |
|---|---|---|
| **Case No.:** 14-cv-04393-WHO | **Case Name:** San Francisco Herring Association v. Pacific Gas and Electric Company | |

**Attorney for Plaintiff:** Stuart G. Gross
**Attorneys for Defendant:** Scott D. Mroz and Sandi L. Nichols

**Deputy Clerk:** Jean Davis                **Court Reporter:** FTR Recording

## PROCEEDINGS

Counsel appear for case management conference. The Court queries counsel as to dispositive legal issues which defendants would like to address. Counsel heard on their opinions regarding the potentially dispositive issues and the coordination of the litigation of those issues and the discovery schedule.

The Court queries counsel on appropriate litigation structure, specifically whether the claims of Mr. Clarke concerning the Cannery should be consolidated at some point. Counsel agree that there are no damages available to Mr. Clarke; the remedies will be in the form of injunctive relief and penalties and will be for determination by the Court rather than a jury.

The defense asks to file more than one motion for summary judgment, which is granted. The initial defense motion for summary judgment will be filed by November 20, 2018. Plaintiff is directed to respond within three (3) weeks. Any reply is due a week later. If plaintiff believes that discovery is necessary to respond to the motion--and the parties are not in agreement as to that issue--a joint letter should be filed within five (5) days of the filing of the motion that identifies the specific discovery necessary. **Hearing on the motion is set for January 9, 2019 at 2:00 p.m.**

**Further Case Management Conference set for May 7, 2019 at 2:00 p.m.**

**PRETRIAL SCHEDULE:**

| | |
|---|---|
| **Fact discovery cutoff:** | **May 15, 2019** |
| **Expert disclosure:** | **May 15, 2019** |
| **Expert rebuttal:** | **June 7, 2019** |
| **Expert discovery cutoff:** | **July 1, 2019** |

**Dispositive Motions heard by:**    **August 28, 2019**
**Pretrial Conference:**    **October 21, 2019 at 2:00 p.m.**
**Trial:**    **November 12, 2019 at 8:30 a.m. by Jury**

# EXHIBIT 1



# GROSS & KLEIN LLP

San Francisco | New York

The Embarcadero, Pier 9, Suite 100, San Francisco, CA 94111  ph: 415.671.4628  fax: 415.480.6688
www.grosskleinlaw.com

sender's email: sgross@grosskleinlaw.com

October 23, 2018

| | |
|---|---|
| *Via Certified Mail – Return Receipt Requested*<br>Scott Mroz<br>Walsworth LLP<br>601 Montgomery Street, Ninth Floor<br>San Francisco, CA 94111 | *Via Certified Mail – Return Receipt Requested*<br>Barbara A. Lee, Director<br>Cal. Department of Toxic Substances Control<br>P.O. Box 806<br>Sacramento, CA 95812-0806 |
| *Via Certified Mail – Return Receipt Requested*<br>Andrew R. Wheeler<br>Administrator<br>Environmental Protection Agency<br>1200 Pennsylvania Avenue, N.W.<br>Washington, DC 20460 | *Via Certified Mail – Return Receipt Requested*<br>Mike Stoker<br>Region 9 Administrator<br>Environmental Protection Agency<br>75 Hawthorne Street<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Matt Rodriquez<br>Secretary for Environmental Protection<br>California Environmental Protection Agency<br>P.O. Box 2815<br>Sacramento, CA 95812-2815 | *Via Certified Mail – Return Receipt Requested*<br>Linda Y.H. Cheng<br>Agent for Service of Process<br>Pacific Gas & Electric Company<br>77 Beale Street, 32nd Floor<br>San Francisco, CA 94105 |
| *Via Certified Mail – Return Receipt Requested*<br>Eileen Sobeck<br>Executive Director<br>State Water Resources Control Board<br>P.O. Box 100<br>Sacramento, California 95812 | *Via Certified Mail – Return Receipt Requested*<br>Executive Officer<br>Regional Water Quality Control Board<br>San Francisco Bay Region<br>1515 Clay Street / Suite 1400<br>Oakland, CA 94612 |
| *Via Certified Mail – Return Receipt Requested*<br>Sandi Nichols<br>Allen Matkins<br>Three Embarcadero Center, 12th Floor<br>San Francisco CA 94111-4074 | |

> Re:   *Notice of Intent to Sue Under the Resource Conservation and Recovery Act and Clean Water Act*[1]

To Whom It May Concern:

This letter constitutes the NOTICE OF INTENT TO SUE Pacific Gas & Electric Company and PG&E Corporation (collectively and inclusive of their predecessors, "PG&E") of Dan Clarke ("Noticer") for violations of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6972 *et seq.* and the Clean Water Act ("CWA"),

---

[1] If you are represented by counsel in this matter, request is specifically made that this communication be directed to such counsel, and this communication shall be deemed to have been made directly to such counsel.


33 U.S.C. §§ 1251, *et seq.* arising out of PG&E's ownership and/or operation of a manufactured gas plant ("MGP") known as the Cannery MGP ("CAN MGP") in the present day Fisherman's Wharf neighborhood of San Francisco, CA, and PG&E's handling, storage, treatment, transportation and/or disposal of the waste generated by the operation and/or demolition of the MGP ("MGP Waste"). Specifically, this letter gives notice of Noticer's intent to seek redress for the contamination by MGP Waste of soil and groundwater in and around the Fisherman's Wharf neighborhood and the illegal discharge of pollutants from MGP Waste into the waters of the San Francisco Bay and disposal of MGP Waste in the San Francisco Bay.

## I.      Persons Giving Notice

Clarke visits the areas affected by the contamination alleged herein for aesthetic and recreational enjoyment, visiting the affected area alone and with guests from out of town. Clarke enjoys, in particular, viewing seabirds, sea mammals, and other inhabitants of the marine areas offshore of the CAN MGP. Clarke's enjoyment of the affected area is diminished by the harm that the complained of contamination is causing to the environment of the affected area, including the harm caused to herring, which are a critical food source for the marine life that Clarke enjoys viewing. Clarke's enjoyment of the affected area is further diminished by the knowledge that the affected area is contaminated by chemicals toxic to human health and the environment. Mr. Clarke intends to visit the affected areas in the future, alone and with guests, for the same types of aesthetic and recreational enjoyment; and such enjoyment would be substantially increased if the contamination alleged herein is addressed. Clarke can be contacted through the undersigned counsel at the address and phone number above.

## II.      Person Responsible for the Alleged Violations:

PG&E as the owner and operator of the CAN MGP, formerly located in the Fisherman's Wharf neighborhood of San Francisco is responsible for the violations that give rise to this notice.

## III.      Location of the Violations

PG&E's violations have occurred and continue to occur at the former location of the CAN MGP, which is located on the western portion of the square block bounded by Leavenworth St., Hyde St., Jefferson St., and Beach St., within the Fisherman's Wharf Neighborhood in San Francisco, CA, as well as in areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP where, upon information and belief, PG&E disposed of MGP Waste. The CAN MGP Site includes, without limitation, such areas in the terrestrial vicinity and immediately offshore of the former location of the CAN MGP.

## IV.      Dates of the Violations

The violations that are the subject of this notice began sometime during or prior to the year 1903 and are ongoing.



## V.     Description of PG&E's RCRA Violations

Pursuant to 42 U.S.C. § 6972 of the RCRA, Noticer intends to sue PG&E for handling, storage, treatment, transportation and/or disposing of solid waste, in the form of MGP Waste, in a manner that may present an imminent and substantial endangerment to health or the environment. 42 U.SC. § 6972(a)(1)(B). Liability under RCRA is retroactive, and the ongoing contamination resulting from PG&E's disposal of MGP Waste and the ongoing discharges therefrom into groundwater, navigable waters, and the air is illegal and subject to liability under the RCRA. 42 U.S.C. § 6972(a)(1)(l); *Gwaltney of Smithfied, Ltd. v. Chesapeake Bay Fnd., Inc*., 484 U.S. 49 (1987).

PG&E's placement of MGP Waste at the CAN MGP Site, and in the surrou nding area, constitutes disposal of solid waste under the RCRA. "Disposal" under the RCRA is defined to include the "discharge, deposit, injection, dumping, spilling, leaking or placing of any solid waste . . . into or on any land." 42 U.S.C. § 6903(3). MGP Waste qualifies as a "solid waste," defined by the RCRA as a "discarded material . . . resulting from industrial, commercial, mining and agricultural operations." 42 U.S.C. § 6903(27).

While an adequate investigation of the CAN MGP Site has not yet been conducted, based on information and belief, including the results of investigations of other MGP sites owned and operated by PG&E in San Francisco, and limited sampling on the CAN MGP Site, itself, PG&E disposed of MGP Wastes on the CAN MGP Site in several different ways, including, without limitation: dumping the MGP Wastes into the San Francisco Bay; dumping the MGP Wastes into onshore wells; dumping MGP wastes into onshore depressions; abandoning MGP Wastes in tanks and other components of the former CAN MGP; spreading MGP Wastes throughout the surface of the terrestrial portion of the CAN MGP Site; and abandoning below ground, and/or spreading above ground, components of the MGP that contain toxic MGP Wastes, at the time of the decommissioning and demolition of the CAN MGP.

Furthermore, PG&E handled, stored, treated, and transported MGP Waste on the CAN Site. Based on information and belief, this included, without limitation: the handling of liquid form MGP Wastes, including MGP tars and liquor, generated by the MGP process; the storage of such liquid form MGP Wastes in locations, including, without limitation tar wells on the CAN MGP Site; the transportation of liquid form MGP Wastes from various locations to other locations on the CAN MGP Site; the handling of solid form MGP Wastes generated by the MGP process; the storage of solid form MGP Wastes in locations on the CAN MGP Site; and the transportation of solid form type MGP Wastes from various locations to other locations on the CAN MGP Site; and the treatment of MGP Wastes to remove certain components of it for sale or otherwise.

The MGP Wastes disposed of, handled, stored, treated, and/or transported by PG&E on the CAN MGP Site may present an imminent and substantial endangerment to health or the environment. MGP Wastes contain toxic chemicals including, without limitation:

- Polyaromatic hydrocarbons ("PAHs"), which are carcinogenic and are well known to be harmful to marine life, including without limitation fertilized herring



eggs and larval herring. Indeed, several of the PAHs known to exist in the MGP Waste are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15.

- Lead, which is a well-known human neurotoxin.

- Cyanide, which is highly poisonous to humans and other animals.

- Benzene, a human carcinogen for which the World Health Organization has found there is no safe level of human exposure.

Noticer needs only show that the MGP Waste "may" present such endangerment in order to show a violation of the RCRA. "Congress preceded the standard of liability with the term 'may,' to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate any risk posed by toxic wastes." *Olson v. Beck*, 06-07487, 2011 U.S. Dist. LEXIS 114805, *57 (N.D. Cal. Oct. 5, 2011). Furthermore, "'[e]ndangerment' means a threatened or potential harm and does not require proof of actual harm." *Id.*, at *57-58 (internal quotation omitted). "A finding of 'imminence' does not encompass a showing that actual harm will occur immediately so long as the risk of threatened harm is present. An endangerment need not be immediate to be 'imminent' and thus warrant relief. An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Id.*, at *58. "'Substantial' does not require quantification of the endangerment (e.g., proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) . . . endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *Id.* at *58-59.

The MGP Wastes on the CAN MGP Site meet this standard. On information and belief, including that garnered from other MGPs in San Francisco owned and operated by PG&E, and from limited sampling on the CAN MGP site, there exist on the CAN MGP Site:

- Significantly elevated concentrations of PAHs, cyanide, benzene, and lead from MGP Wastes in shallow soil – from the ground surface to groundwater interface – at concentrations that greatly exceed risk-based standards. There is a reasonable cause for concern that residents, visitors to the hotel, museum, and restaurant on the CAN MGP Site, commercial/industrial workers, and construction workers will be exposed to such high-risk shallow soil contamination.

- Significantly elevated concentrations of PAHs, benzene, and cyanide in groundwater and seawater that has flowed through terrestrial portions of the CAN MGP Site and come in contact with MGP Wastes thereon. There is a reasonable cause for concern that residents, visitors, commercial/industrial workers, and construction workers will be exposed to these and other toxic chemicals in groundwater/seawater flowing through the CAN MGP Site, in the form of contaminated indoor air vapor. Furthermore, such chemicals are transported via the groundwater/seawater flowing through the CAN MGP Site into the waters of



San Francisco Bay, whereupon a reasonable cause for concern that herring and other marine animals will be exposed to and harmed by the chemicals so transported.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes in the shallow sediment of offshore portions of the CAN MGP Site. There is a reasonable cause for concern that marine animals will be exposed to, and harmed by, these and other toxic chemicals in MGP Wastes through both direct contact with MGP Wastes and contact with porewater that has been contaminated as a result of the MGP Wastes in the sediment of offshore portions of the CAN MGP Site.

- Significantly elevated concentrations of PAHs, benzene, and cyanide that exist in MGP Wastes, which are in liquid and solid form and which exist in deeper portions of the CAN MGP Site. In addition to harm caused by the transport of toxic chemicals from these deposits via groundwater, seawater, or porewater, there is a reasonable cause for concern that these MGP Wastes will migrate shallower and/or become exposed, as a result of natural or manmade scouring, seismic activity, excavation related construction or landscaping, and/or other causes, resulting in harm to humans and animals that come in contact with them.

Again, an adequate investigation of the CAN MGP Site has yet to be conducted. However, the foregoing concerns are confirmed not only by the results of investigations of other MGPs owned and operated by PG&E during the same time period in San Francisco. They are also confirmed by the results of a test pit sampling conducted in or around 1985 on or around the location of the former Haslett Warehouse. That test pit sampling revealed PAH levels of approximately 6,000 parts per million ("ppm"). The risk based screening level for PAHs established by the United State Environmental Protection Agency ("USEPA") is 0.016 ppm. PAH levels on CAN MGP Site are 375,000 times higher than that risk-based screening level. They are further confirmed by limited surface testing conducted in approximately the same period, which revealed highly elevated lead levels.

The foregoing list of RCRA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

## VI.     Description of PG&E's CWA Violations

The facts described in the foregoing sections are incorporated by reference here to the same extent as if repeated in full.

Pursuant to Sections 505(a) and (b) of the CWA, 33 U.S.C. §§ 1365(a)-(b), Noticer intends to sue PG&E for violating, and continuing to violate, effluent standards and limitations as defined under section 505(f) of the CWA, 33 U.S.C. § 1365(f), by discharging pollutants into the waters of the United States without a permit as required by CWA section 301(a), 33 U.S.C. § 1311(a).

The CWA prohibits the discharge of pollutants from a point source to the waters of the United States except when pursuant to, and in compliance with, a permit.[2] *See* 33 U.S.C. § 1311(a); 33 U.S.C. § 1342. The Act defines "pollutant" to include "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). The CWA defines "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source" and "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft." 33 U.S.C. § 1362(12). This includes where "the pollutants are fairly traceable from the point source to a navigable water such that the discharge is the functional equivalent of a discharge into the navigable water," even if the discharge is not directly into the navigable water. *Hawai'i Wildlife Fund v. Cty. of Maui*, 886 F.3d 737, 749 (9th Cir. 2018). "Point source" is defined by the CWA as "any discernable, confined and discrete conveyance . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

The toxic chemicals from the MGP Waste located in the soil of the CAN MGP Site qualifies as a pollutant, as they contain carcinogenic PAHs that are known to be harmful to marine life, including without limitation fertilized herring eggs and larval herring. Indeed, several of the PAHs that upon information and belief to exist in the MGP Waste located on the CAN MGP Site are on a list of identified "toxic pollutants" issued by the EPA. These include: acenaphthene; fluoranthene; and naphthalene. *See* 40 C.F.R. § 401.15. The CWA defines "toxic pollutants" as "those pollutants, or combinations of pollutants . . . which after discharge and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will . . . cause death, disease, behavioral abnormalities, cancer, genetic mutations, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring." 22 U.S.C. § 1362(13). This definition is on all fours in relation to PAHs and their effects on fertilized herring eggs and larval herring.

The CAN MGP Site, including the former CAN MGP itself (inclusive of its former tanks and wells), upon which the MGP Waste was abandoned or disposed of by PG&E, qualifies as a point source of these pollutants. The San Francisco Bay—into which these pollutants are discharged into the Bay via the groundwater that flows through the terrestrial portions of the CAN MGP Site, via seawater that flows as a result of tidal action in and out of the terrestrial portions of the CAN MGP Site, via San Francisco's combined stormwater and sewage transport and sewage transport system, or directly via contaminated soils on the Bay's shoreline, tidelands or submerged lands—qualifies as navigable waters of the United States.

---

[2] The State of California was delegated authority by the Environmental Protection Agency to administer the Nation Pollution Discharge Elimination System ("NPDES") permit program pursuant to 33 U.S.C. § 1342(b).



The foregoing list of CWA violations is not exhaustive. Noticer intends to include in his lawsuit additional violations, legal or factual, revealed in the course of investigation or discovery.

———————————————————

Noticer believes that this Notice of Intent to Sue sufficiently states grounds for filing suit under both the RCRA and the CWA. Each day the above-described violations are not remedied constitute a separate violation under the applicable regulations and PG&E will remain in violation until the contamination described is not remedied. The CWA and 40 CFR § 19.4 authorizes significant penalties for each violation of the CWA. The RCRA and 30 CFR § 19.4 authorizes significant penalties for each violation of the RCRA. At the close of the 60-day CWA notice period and the 90-day RCRA notice period, Noticer intends to file a citizen suit against PG&E for the violations discussed above. Noticer intends to seek injunctive relief, penalties, attorneys' fees and costs, including expert witness fees.

Very Best,

STUART G. GROSS

# EXHIBIT 2

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### CIVIL MINUTES

| **Date:** November 6, 2018 | **Time:** 43 minutes 2:16 p.m. to 2:59 p.m. | **Judge:** WILLIAM H. ORRICK |
|---|---|---|
| **Case No.:** 14-cv-04393-WHO | **Case Name:** San Francisco Herring Association v. Pacific Gas and Electric Company | |

**Attorney for Plaintiff:** Stuart G. Gross
**Attorneys for Defendant:** Scott D. Mroz and Sandi L. Nichols

**Deputy Clerk:** Jean Davis                              **Court Reporter:** FTR Recording

### PROCEEDINGS

Counsel appear for case management conference. The Court queries counsel as to dispositive legal issues which defendants would like to address.  Counsel heard on their opinions regarding the potentially dispositive issues and the coordination of the litigation of those issues and the discovery schedule.

The Court queries counsel on appropriate litigation structure, specifically whether the claims of Mr. Clarke concerning the Cannery should be consolidated at some point.  Counsel agree that there are no damages available to Mr. Clarke; the remedies will be in the form of injunctive relief and penalties and will be for determination by the Court rather than a jury.

The defense asks to file more than one motion for summary judgment, which is granted. The initial defense motion for summary judgment will be filed by November 20, 2018.  Plaintiff is directed to respond within three (3) weeks.  Any reply is due a week later.  If plaintiff believes that discovery is necessary to respond to the motion--and the parties are not in agreement as to that issue--a joint letter should be filed within five (5) days of the filing of the motion that identifies the specific discovery necessary.  **Hearing on the motion is set for January 9, 2019 at 2:00 p.m.**

**Further Case Management Conference set for May 7, 2019 at 2:00 p.m.**

**PRETRIAL SCHEDULE:**

| | |
|---|---|
| **Fact discovery cutoff:** | **May 15, 2019** |
| **Expert disclosure:** | **May 15, 2019** |
| **Expert rebuttal:** | **June 7, 2019** |
| **Expert discovery cutoff:** | **July 1, 2019** |

**Dispositive Motions heard by:** **August 28, 2019**
**Pretrial Conference:** **October 21, 2019 at 2:00 p.m.**
**Trial:** **November 12, 2019 at 8:30 a.m. by Jury**