Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

David B. Rivkin, Jr. (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
Telephone: 202.861.1731
Facsimile: 202.861.1783
Email: drivkin@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11<br>(Lead Case)<br>(Jointly Administered) |
| -and- | |
| **PACIFIC GAS AND ELECTRIC COMPANY,**<br>              **Debtors.** | **REPLY IN SUPPORT OF OMNIBUS OBJECTION TO NO LIABILITY CLAIMS FILED BY THE DEPARTMENT OF HOMELAND SECURITY / FEDERAL EMERGENCY MANAGEMENT AGENCY** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | Date: February 26, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Relates to Dkt. Nos. 4943, 5319 & 5753 |

# **TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................................. 1

II. ARGUMENT ................................................................................................................... 3

    A. Section 317 of the Stafford Act ............................................................................. 3

        1. The Plain Language of Section 317 Supports the TCC's Construction ...... 3

        2. Other Provisions of the Stafford Act Support the TCC's Construction...... 4

        3. Legislative History Supports the TCC's Construction ............................... 7

        4. FEMA's Construction Runs Afoul of the Free Public Services Doctrine ................................................................................................... 10

        5. The "Void-For-Vagueness" Doctrine Precludes FEMA's Construction... 11

    B. FEMA's Public Nuisance and Unjust Enrichment Claims Fail ............................ 12

    C. FEMA's Arguments Against Preemption are Wrong .......................................... 14

    D. FEMA's Claims Are Void as a Matter of Public Policy ...................................... 15

    E. The TCC's Supplemental Objection Need Not be Decided at this Time ............. 15

III. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allentown Volunteer Fire Dep't v. Soo Line R.R.*,
372 F. Supp. 422 (E.D. Was. 1974) .................................................................................. 10

*American Elec. Power Co., Inc. v. Connecticut*,
564 U.S. 410, 131 S. Ct. 2527 (2011) .......................................................................... 12, 13

*Augilar v. Atl. Richfield Co.*,
25 Cal. 4th 826 (Cal. 2001) .................................................................................................. 8

*Baldwin v. United States*,
921 F.3d 836 (9th Cir. 2019) .............................................................................................. 10

*California v. Trump*,
379 F. Supp. 3d 928 (N.D. Cal. 2019) ................................................................................ 15

*Calvillo-Silva v. Home Grocery*,
19 Cal. 4th 714 (Cal. 1998) ............................................................................................. 8, 9

*Chelsea Court Condo. Homeowners Ass'n, Inc. v. WNP Const.*,
No. G031447, 2004 WL 605193 (Cal. Ct. App. Mar. 29, 2004) .......................................... 8

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
719 F.2d 322 (9th Cir. 1983) ................................................................................. 10, 13, 14

*City of Milwaukee v. Illinois*,
541 U.S. 304 (1981) ........................................................................................................... 12

*Clark v. Martinez*,
543 U.S. 371 (2005) ........................................................................................................... 11

*Co. of San Mateo v. Chevron Corp.*,
294 F. Supp. 3d 934 (N.D. Cal. 2018) ................................................................................ 12

*Colombo v. BRP US Inc.*,
230 Cal. App. 4th 1442, 179 Cal. Rptr. 3d 580 (Cal. Ct. App. 2014) .................................. 8

*Cty. of Erie, N.Y. v. Colgan Air, Inc.*,
No. 10-CV-157S, 2012 WL 1029542 (W.D.N.Y. Mar. 26, 2012) ..................................... 13

*Cuenca v. Barr*,
941 F.3d 1213 (9th Cir. 2019) ............................................................................................ 11

*English v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ............................................................................................................. 14

*Hillman v. Maretta*,
569 U.S. 483 (2013) ........................................................................................................... 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*Hines v. Davidowitz*,
 312 U.S. 52 (1941) .................................................................................................... 14

*Johnson v. U.S.*,
 135 S. Ct. 2551 (2015) ............................................................................................... 11

*Estate of Kramme v. Kramme*,
 20 Cal. 3d 567, 573 P.2d 1369 (Cal. 1978) ................................................................. 9

*Lockett v. Flying U Rodeo Co.*,
 No. A102814, 2004 WL 2113066 (Cal. Ct. App. Sept. 22, 2004) ............................... 8

*M & H Realty Partners IV L.P. v. Zora*,
 No. D040402, 2004 WL 542233 (Cal. Ct. App. Mar. 19, 2004) ................................. 8

*Michigan v. U.S. Army Corps. of Engineers*,
 667 F.3d 765 (7th Cir. 2011) ..................................................................................... 13

*Mobil Oil Corp. v. Higginbotham*,
 436 U.S. 618 (1978) ................................................................................................... 12

*Native Village of Kivalina v. ExxonMobil Corp.*,
 696 F.3d 849 (9th Cir. 2012) ............................................................................... 12, 13

*People v. Superior Court of Los Angeles County*,
 70 Cal. 2d 123 (Cal. 1969) .......................................................................................... 9

*Rice v. Santa Fe Elevator Corp.*,
 331 U.S. 218 (1947) ................................................................................................... 14

*Schaeffer v. Gregory Village Partners, L.P.*,
 105 F. Supp. 3d 951 (N.D. Cal. 2015) ......................................................................... 7

*Sessions v. Dimaya*,
 138 S. Ct. 1204 (2018) ............................................................................................... 11

*Silvers v. Sony Pictures Entm't Inc.*,
 402 F.3d 881 (9th Cir. 2005) ..................................................................................... 10

*Swiss Re Int'l SE v. Comac Invs., Inc.*,
 212 F. Supp. 3d 797 (N.D. Cal. 2016) ......................................................................... 8

*United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*,
 413 U.S. 548 (1973) ................................................................................................... 11

*United States v. City of Los Angeles*,
 No. CV 11-974, 2018 WL 3814498 (C.D. Cal. July 25, 2018) ................................. 13

*United States v. Ron Pair Enters., Inc.*,
 489 U.S. 235 (1989) ..................................................................................................... 3

*United States v. Standard Oil Co. of Cal.*,
 332 U.S. 301 (1947) ................................................................................................... 10

*United States v. Texas*,
   695 F.2d 136 (5th Cir. 1983) .................................................................................................. 14

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................................................... 11

*Walker County v. Tri-State Crematory*,
   284 Ga. App. 34, 643 S.E.2d 324 (Ga. 2007) ....................................................................... 13

*Webb v. Smart Document Solutions, LLC*,
   499 F.3d 1078 (9th Cir. 2007) ............................................................................................... 10

**Statutes**

42 U.S.C. § 5121(b) ..................................................................................................................... 14

42 U.S.C. § 5122 ............................................................................................................................ 4

42 U.S.C. § 5133 ............................................................................................................................ 5

42 U.S.C. § 5160(a) ................................................................................................................ passim

42 U.S.C. § 5170 ............................................................................................................................ 5

42 U.S.C. §§ 5170a-5170c, 5171-5189e ....................................................................................... 5

42 U.S.C. § 5170c ........................................................................................................................... 5

42 U.S.C. § 5187 ............................................................................................................................ 5

**Other Authorities**

134 Cong. Rec. H10840-02 ........................................................................................................... 7

134 Cong. Rec. H938-03 ............................................................................................................... 7

80 *Fed. Reg.* 60165 (Oct. 5, 2015) ............................................................................................... 4

82 *Fed. Reg.* 50662 (Nov. 1, 2017) .............................................................................................. 4

83 *Fed. Reg.* 64352 (Dec. 14, 2018) ............................................................................................ 4

David M. Lawrence, *Trying to Recover Public Costs Incurred in Dealing with
   Man-Made Disasters: The Free Public Services Doctrine*, 134 Local Gov't L.
   Bulletin 1 (2013) .................................................................................................................... 13

Prosser & Keaton, *The Law of Torts* 34 (5th ed. 1984) ............................................................... 9

RESTATEMENT (SECOND) OF TORTS § 8A (1965) ........................................................................... 9

5 Witkin, Summary 11th Torts § 24 (2019) ............................................................................. 7, 9

The Official Committee of Tort Claimants (the "**TCC**"), for its Reply in support of its objection to FEMA's claims (Dkt. No. 4943) (the "**Objection**"),[1] respectfully states as follows:

## I. INTRODUCTION

The TCC's Objection to the FEMA Claims is akin to a motion to dismiss. The TCC's position is that the facts alleged in the FEMA Claims do not give rise to liability under Section 317 of the Stafford Act, which creates liability if a person intentionally causes a major disaster. Since the TCC filed its Objection, the TCC has conducted targeted discovery to firmly grasp the basis for FEMA's claims, which threaten to derail this bankruptcy and cause fire victims to vote against plan confirmation. The TCC will begin with what that discovery shows. With this context, the TCC will address the arguments made by FEMA in its Response (Dkt. No. 5753).

FEMA asserts a right to recover $3.9 billion in federal assistance provided in response to the Butte Fire, the North Bay Fires and the Camp Fire under Section 317 of the Stafford Act. There is no case law interpreting Section 317 because, as FEMA admits, FEMA has never asserted a claim under this statute before. FEMA Tr. 167-68, 218-20. This is not to say that there have not been disasters for which there was a potentially responsible party. FEMA provided assistance in response to the September 11th terrorist attacks, the Oklahoma City bombing, and a chemical plant explosion that happened in Texas last year. *Id.* at 219-22. None of these incidents involved natural disasters. Two incidents involved acts of terrorism and a clear intent to take human life. PG&E is the first person from whom FEMA has ever attempted to recover costs under Section 317. *Id.*

At deposition, the TCC asked FEMA if it conducted any investigation or inquiry prior to asserting the FEMA Claims in this case. *Id.* at 59-66. FEMA testified that it conducted an "internal analysis" that included of a review of reports created by other agencies—namely, Cal Fire and the California Public Utilities Commission (the "**CPUC**"). *Id.* at 65-66, 69, 83-85. When asked to identify any part of any Cal Fire or CPUC report or press release that contains a finding that PG&E intentionally caused any of the wildfires, FEMA could not do so. *Id.* at 107-111, 118-122, 126-28, 131-153, 214-16. FEMA admitted that none of the materials upon which it bases its claims

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Objection. In support of this Reply, the TCC relies on the Declaration of Eric Goodman filed contemporaneously herewith, as well as the transcript of the deposition of FEMA's Rule 30(b)(6) designee attached thereto as Exhibit 1 (the "**FEMA Tr.**").

conclude that PG&E intentionally caused the wildfires. *Id.* In fact, none of the materials upon which FEMA bases its claims purport to find that PG&E intentionally caused any wildfires. *Id.*

FEMA further admitted that it did not perform its own investigation into the causes of the wildfires and that FEMA did not take any actions to independently verify any of the conclusions reached by Cal Fire or the CPUC. *Id.* at 111-12, 123-24, 128-29, 154-55, 216-17. FEMA also admitted that it has no "guidelines" or "published policy" that explain when it will assert a claim to recover disaster-related payments. *Id.* at 59-64. FEMA attorneys reviewed reports created by Cal Fire and the CPUC and, based on this internal review, FEMA filed claims totaling $3.9 billion against PG&E invoking Section 317 for the first time in FEMA's history. *Id.* at 65-66, 216-17. FEMA first notified PG&E of its intent to asserts such claims in August of 2019—nearly four years after the Butte Fire and eight months after PG&E filed for bankruptcy. *Id.* at 114-16.

The TCC served FEMA with written discovery in order to ascertain the basis for FEMA's claims. *See* Goodman Decl. at Ex. 2-3. FEMA failed to provide adequate responses and objected to interrogatories using the terms "intentionally" and "condition," as defined by reference to Section 317, as "vague and ambiguous." *Id.* at Ex. 4, Rog Resp. 1-6. At deposition, FEMA testified that it is not alleging, and in fact has "no evidence," that PG&E acted with a "specific intent" to cause harm. FEMA Tr. 90-92. FEMA is not alleging that PG&E, or anyone who works for PG&E, committed "arson" or is an "arsonist." *Id.* at 85-86. FEMA does not contend that PG&E's "goal or desire" was to cause the wildfires. *Id.* at 86-87, 152-53. FEMA does not allege that "PG&E actually wanted to destroy the town of Paradise, California." *Id.* at 91.

The thrust of FEMA's claims is allegations of "intentional omissions"—namely, that PG&E failed to maintain its electrical grid. *Id.* at 99-102. FEMA contends that PG&E failed to conduct critically necessary repairs, timely respond to safety issues, manage risk effectively, adequately maintain poles and attachments, and properly conduct its vegetation management program. *Id.* FEMA contends that PG&E intentionally made such omissions where it was "reasonably likely to cause a condition for which FEMA assistance would be required." *Id.* at 103. If this sounds like allegations that would support a finding of negligence, it is because that is exactly what FEMA is contending. The problem with FEMA's position is that Section 317 is an intentional tort statute

2

and not a negligence statute. FEMA wanted Section 317 to create liability based on negligence, but Congress said no. Notwithstanding this refusal, the true basis for FEMA's claim is that PG&E was negligent, which does not support a finding of liability under the Stafford Act.

## II. ARGUMENT

FEMA filed its Response two days after its deposition. FEMA allocates the bulk of its Response to defending its construction of Section 317 of the Stafford Act. FEMA also attempts to defend its claims for public nuisance and unjust enrichment. Finally, FEMA argues that the free public services doctrine does not bar its common law claims, and that its common law claims are not preempted or void as violating public policy. The TCC will address each in turn.

### A. Section 317 of the Stafford Act

As in any case requiring statutory construction, the Court must begin with the statutory text. *See United States v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989). The text of Section 317 of the Stafford Act is straightforward. Section 317 provides that:

> Any person who intentionally causes a condition for which Federal assistance is provided under this Act or under any other Federal law as a result of a declaration of a major disaster or emergency under this Act shall be liable to the United States for the reasonable costs incurred by the United States in responding to such disaster or emergency to the extent that such costs are attributable to the intentional act or omission of such person which caused such condition. Such action for reasonable costs shall be brought in an appropriate United States district court.

42 U.S.C. § 5160(a). FEMA's entire argument rests on an incorrect assumption that "condition for which Federal assistance is provided" here was PG&E's failure to conduct necessary repairs and maintenance on the power lines that malfunctioned and ignited the wildfires. But, the most straightforward and natural reading of the term "condition" in this context is that it refers to the damage caused by the wildfires. For PG&E to have liability under Section 317, FEMA must prove that PG&E intentionally caused the wildfires and the damage resulting therefrom.

      1. The Plain Language of Section 317 Supports the TCC's Construction

The fact that this is the only rational interpretation of Section 317 is supported by the plain language of the statute. FEMA cannot advance its argument without rewriting the statute to provide: "Any person who intentionally causes a condition giving rise to Federal assistance being provided under this Act or under any other Federal law as a result of a declaration of a major disaster

3

or emergency under this Act." Resp. at 4. But, the phrase "giving rise to" does not appear in the statute. The "condition" is the "condition for which Federal assistance is provided"—*i.e.*, the conditions that arise due to the disaster—not a condition that gave rise to the disaster occurring. As plainly and conclusively stated in the President's major disaster declaration: "I have determined that the *damage* in the State of California resulting from wildfires beginning on November 8, 2018, and continuing, is of sufficient severity and magnitude to warrant a major disaster declaration under the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121 et seq." 83 *Fed. Reg.* 64352 (Dec. 14, 2018) (emphasis added).[2]

### 2. Other Provisions of the Stafford Act Support the TCC's Construction

The fact that this is the only rational interpretation of Section 317 is supported by other provisions of the Stafford Act. Several things must occur before FEMA will provide disaster assistance. <u>First</u>, there must be a major disaster. The term "major disaster" is defined in Section 102 of the Stafford Act as follows:

> "Major disaster" means any natural catastrophe (including any hurricane, tornado, storm, high water, winddriven water, tidal wave, tsunami, earthquake, volcanic eruption, landslide, mudslide, snowstorm, or drought), or, regardless of cause, any fire, flood, or explosion, in any part of the United States, which in the determination of the President causes damage of sufficient severity and magnitude to warrant major disaster assistance under this Act to supplement the efforts and available resources of States, local governments, and disaster relief organizations in alleviating the damage, loss, hardship, or suffering caused thereby.

42 U.S.C. § 5122. Notably absent from this definition is any reference to faulty power lines or equipment. FEMA does not go around repairing power lines to prevent wildfires from occurring. FEMA Tr. 48-49. Even FEMA admits that "FEMA would not consider repairing power lines prior to disaster as an eligible event under the definition of a major disaster declaration for the Stafford Act." *Id.* at 49. Since faulty power lines and equipment are not a "condition for which Federal assistance is provided under the Stafford Act," the term "condition" cannot logically include faulty power lines and equipment.

---

[2] Similar language appears in the other declarations FEMA cites in its claims. *See* 82 *Fed. Reg.* 50662 (Nov. 1, 2017) ("I have determined that the damage in certain areas of the State of California resulting from wildfires . . . is of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act]."); 80 *Fed. Reg.* 60165 (Oct. 5, 2015) ("I have determined that the damage in certain areas of the State of California resulting from the Valley Fire . . . is of sufficient severity and magnitude to warrant a major disaster declaration under the [Stafford Act].").

4

<u>Second</u>, there must be a finding that the disaster is beyond the State and local government's own response capabilities. Section 401 of the Stafford Act provides that requests for a declaration by the President that a "major disaster exists … shall be based on a finding that the disaster is of such severity and magnitude that effective response is beyond the capabilities of the State and the affected local governments and that Federal assistance is necessary." 42 U.S.C. § 5170. The faulty state of PG&E's power lines was never the subject of petition by the Governor of California based on a finding that such power lines constituted a disaster beyond California's own capabilities. And, FEMA does not contend that the state of PG&E's power lines itself was a "disaster" of such "severity and magnitude" that an effective response was beyond the State of California's own capabilities. If FEMA truly believes in its own construction of Section 317, it should be noted that FEMA failed to take any action to address this purported "disaster" before the wildfires occurred.

<u>Third</u>, once a major disaster is declared by the President, federal assistance can be provided to effect disaster relief, including fire management assistance. *See* 42 U.S.C. § 5187; *see generally* 42 U.S.C. §§ 5170a-5170c, 5171-5189e. Although this aid may include "hazard mitigation measures . . . [to] reduce the risk of future damage" in the affected area, *see* 42 U.S.C. § 5170c, no provision is made for federal prevention assistance before a disaster occurs, particularly in a form that would have permitted federal spending on the rectification of PG&E's infrastructure.

"Predisaster hazard mitigation" is addressed in Section 203 of the Stafford Act, which permits the President to "establish a program to provide technical and financial assistance to States and local governments to assist in the implementation of predisaster hazard mitigation measures that are cost-effective and are designed to reduce injuries, loss of life, and damage and destruction of property, including damage to critical services and facilities under the jurisdiction of the States or local governments." 42 U.S.C. § 5133. But Section 317 of the Stafford Act does not apply to this program by its own terms, as these funds are not expended based on "a declaration of a major disaster or emergency." 42 U.S.C. § 5160(a). FEMA concedes that it has no "authority" to make repairs to a utility's infrastructures to prevent wildfires from happening, FEMA Tr. at 47-50, yet FEMA nevertheless insists that the state of this infrastructure is the very "condition" that permits it to recover $3.9 billion in funds spent on disaster relief under Section 317 of the Stafford Act.

5

FEMA's testimony cannot be reconciled with the position advanced by FEMA in its Response.

<u>Finally</u>, the term "condition" as used in the preceding Section 316 of the Stafford Act shows that the term condition in Section 317 is used to refer to damage or the state of being caused by the disaster. Section 316 provides that assistance which restores a facility to "its condition prior to the disaster or emergency" is not an action affecting the environment under the National Environmental Policy Act. 42 U.S.C. § 5159. The term "condition" here refers to the structure's state of being as they existed prior to the wildfires and not a condition that led to the wildfires occurring. Likewise, the term "condition" in Section 317 refers to the state of being that existed as a result of the wildfires—*i.e.*, the damage to the property—and not a condition that led to the wildfires occurring. This is the "condition for which" FEMA provided Federal assistance.

To escape these problems, FEMA focuses on Section 317's measure of damages language, rather than the operative language that establishes liability in the first instance. FEMA pulls the phrase "intentional act or omission" set forth in the main clause of the first sentence of Section 317 and argues that it modifies the term "condition" in the dependent clause in the same sentence. FEMA argues that this shows that an intentional omission—*i.e.*, PG&E's failure to maintain its equipment—is a condition for which Federal assistance was provided. But this argument fails for the reasons set forth above. The term "condition" does not refer to the condition that gave rise to the wildfires occurring. The term "condition" refers to the damage caused by the wildfires, as this is the condition for which FEMA provided Federal assistance under the Stafford Act as a result of a declaration of a major disaster.

Moreover, the phrase "intentional act or omission" cannot logically be read to modify the term "condition" as used in the clause imposing liability under Section 317, as they appear in different clauses. Section 317 is a conditional sentence which contains a dependent clause expressing a condition—*i.e.*, a person who intentionally causes a major disaster—and a main clause expressing the consequence—*i.e.*, that person is liable to the United States for the reasonable costs of responding to such disaster. If the condition is not satisfied—*i.e.*, FEMA does not allege that PG&E intentionally caused a wildfire and the resulting damage—the main clause is of no consequence since the condition is not satisfied. Again, FEMA is attempting to rewrite the statute

6

to fit its objectives in this case.

### 3. Legislative History Supports the TCC's Construction

The fact that the TCC's construction is the only rational interpretation of Section 317 is supported by the legislative history. Congress considered, and rejected, the very negligence standard FEMA now champions. Section 317 of the Stafford Act was enacted as part of the Disaster Relief and Emergency Assistance Amendments of 1988, Pub. L. No. 100-707, 102 Stat. 4689, 4695. When the bill was reported out of committee and brought to the floor of the House of Representatives, the language established liability for "[a]ny person who negligently or intentionally causes or contributes to a condition." 134 Cong. Rec. H938-03, 1988 WL 1084748, *30 (Mar. 17, 1988); H.R. No. 100-517, 1988 U.S.C.A.A.N. 6085, 6090 (Mar. 15, 1988).

However, the bill was then amended to eliminate the negligence standard. *See* 134 Cong. Rec. H938-03, 1988 WL 1084748, *48. Instead of "negligently or intentionally causes or contributes," the relevant language was revised to read "intentionally causes." As explained when this amendment was offered, its purpose was to bring the legislation into line "with the record testimony supporting the need for corrective legislation, and will also preserve existing jurisprudence in evaluating the requisite causation necessary to show intentional acts of harm." *Id.* Congress thus considered and rejected language that would have imposed liability based on negligence. *Compare* 134 Cong. Rec. H938-03, 1988 WL 1084748 (Mar. 17, 1988) (language in Section 317 created liability for any "person who negligently or intentionally causes or contributes to a condition …"); *with* 134 Cong. Rec. H10840-02, 1988 WL 182206 (Oct. 21, 1988) (language in Section 317 creates liability for any "person who intentionally causes a condition …"). There is no doubt that Congress rejected the type of negligence liability on which FEMA relies to ensure that recovery could be had only for "intentional acts of harm" under the ordinary rules of tort law.

Under California law, an intentional tort is "one in which the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act." 5 Witkin, Summary 11th Torts § 24 (2019). In contrast, a person is negligent "if he or she does something that a reasonably careful person would not do in the same situation or fails to do something that a reasonably careful person would do in the same situation." *Schaeffer v. Gregory Village Partners, L.P.*, 105 F. Supp.

7

3d 951, 961 (N.D. Cal. 2015). And, a person is reckless when he or she "knows or has reason to know of facts which create a high degree of risk of harm to another, and proceeds to act, or fails to act, in conscious disregard of or indifference to that risk." *Colombo v. BRP US Inc.*, 230 Cal. App. 4th 1442, 1457, 179 Cal. Rptr. 3d 580, 595 (Cal. Ct. App. 2014).

FEMA's theory is that PG&E failed to do something that a reasonably careful person would do in the same situation—*i.e.*, adequately maintain its equipment. Or, that PG&E knew or had reason to know of facts which created a high degree of risk of harm to another and failed to act in conscious disregard of that risk. Specifically, FEMA claims that PG&E failed "to 1) conduct critically necessary repairs, 2) timely respond to safety issues, 3) manage risk effectively and 4) adequately maintain poles and attachments," and FEMA argues that PG&E's acts and omissions are intentional because "PG&E knew that failure to take action left its equipment in a condition that posed a wildfire risk that could cause serious and widespread injury." Resp. at 7. FEMA also claims "[t]hat PG&E's omission was intentional is further demonstrated through the affirmative acts it took to aid its omission—misleading regulators, withholding critical data, and hindering investigations in the years leading up to the wildfires at issue." *Id.* These allegations, if proven, could support findings of negligence or recklessness. But, Section 317 requires intentionality—*i.e.*, the intent to cause the wildfires and the damage caused therefrom.

FEMA argues that "intentionality" does not require a specific intent to produce harm, but only an act or omission that is intentional. But, as California case law shows, FEMA is wrong—when intentional or willful conduct is required, the intent must relate to the misconduct and not merely to the fact that some act or omission was intentionally done.[3] Unlike negligence, which

---

[3] *See Swiss Re Int'l SE v. Comac Invs., Inc.*, 212 F. Supp. 3d 797, 805-06 (N.D. Cal. 2016) ("While the word willful implies an intent, the intention must relate to the misconduct and not merely to the fact that some act was intentionally done. [Citations.] Thus, even though some cases of negligence may involve intentional actions, the mere intent to do an act which constitutes negligence is not enough to establish willful misconduct."); *Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 729-30 (Cal. 1998) ("While the word 'willful' implies an intent, the intention must relate to the misconduct and not merely to the fact that some act was intentionally done."), disapproved on other grounds in *Augilar v. Atl. Richfield Co.*, 25 Cal. 4th 826 (Cal. 2001); *Lockett v. Flying U Rodeo Co.*, No. A102814, 2004 WL 2113066, at *7 (Cal. Ct. App. Sept. 22, 2004) ("The mere failure to perform a duty—the mere intent to do an act that constitutes negligence—is not sufficient to plead willful misconduct."); *Chelsea Court Condo. Homeowners Ass'n, Inc. v. WNP Const.*, No. G031447, 2004 WL 605193, at *6 (Cal. Ct. App. Mar. 29, 2004) ("While the word 'willful' implies an intent, the intention must relate to the misconduct and not merely to the fact that some act was intentionally done."); *M & H Realty Partners IV L.P. v. Zora*, No. D040402, 2004 WL 542233, at *11 (Cal. Ct. App. Mar. 19, 2004) ("[T]he intention must relate to the misconduct and not merely to the fact that some act was intentionally done.").

8

implies a failure to use ordinary care, and even gross negligence, which connotes such a lack of care as may be presumed to indicate a passive and indifferent attitude toward results, intentional misconduct involves a positive intent to harm or actual knowledge that harm will occur. *See Calvillo-Silva*, 19 Cal. 4th at 729-30 ("[Willful] involves a more positive intent actually to harm another or to do an act with a positive, active and absolute disregard of its consequences."); *Estate of Kramme v. Kramme*, 20 Cal. 3d 567, 572-73, 573 P.2d 1369, 1372 (Cal. 1978) (for a result to be caused "intentionally," the actor must "either desire the result or know, to a substantial certainty, that the result will occur.")

Even though some cases of negligence involve intentional actions, the mere intent to do an act which constitutes negligence is not enough to establish intentional misconduct. For example, in *Estate of Kramme*, the court held that the phrase "intentionally caused the death of a decedent" in a probate statute should not be interpreted to disinherit a person who intentionally discharged his gun but did not intend to kill the decedent. 20 Cal. 3d at 572-73. Similarly, in *People v. Superior Court of Los Angeles County*, the court interpreted the phrase "intentionally records a confidential communication" to mean that the defendant must have intended to record a confidential communication, not just turn on a recording device which happened to record the communication. 70 Cal. 2d 123, 133-34 (Cal. 1969). This is blackletter law.[4]

Under FEMA's construction, nearly every action that is negligent or reckless would also be intentional. But, as the case law shows, when intentional conduct is required under the law, the actor must intend to produce the harm at issue—*i.e.*, the wildfires and the damage caused therefrom. If FEMA is correct that intentionally failing to do something that a reasonably careful person would have done gives rise to liability under Section 317, then Section 317 is a negligence statute. To state it plainly, FEMA is asking this Court to adopt the very negligence standard that Congress considered and rejected, as evidenced by the legislative history. But Section 317 requires a bad actor to have "intentionally caused" the condition for which federal aid was made available, and

---

[4] *See* 5 Witkin, Summary 11th Torts § 24 (An intentional tort is "one in which the actor intends to produce the harm that ensues; it is not enough that he intends to perform the act."); Prosser & Keaton, *The Law of Torts* 34 (5th ed. 1984) (intent refers to "a state of mind … about the consequences of an act (or omission)."); RESTATEMENT (SECOND) OF TORTS § 8A (1965) (a party acts intentionally if he desires to cause the consequences of an act, or if he knows that consequences are substantially certain to result from that act. It does not mean that the actor intended the act itself).

9

that condition is the damage on which the President based his statutorily required disaster declaration. By conditioning liability on an intent to achieve a particular end, Section 317 demands an act that is more than a violation. PG&E must have purposefully brought about the harm FEMA was authorized to ameliorate before Section 317 applies. As FEMA conceded at deposition, FEMA makes no such "allegation" and has "no evidence" to support such allegation. FEMA Tr. at 92.

### 4. FEMA's Construction Runs Afoul of the Free Public Services Doctrine

FEMA's overly broad construction also runs afoul of the free public services doctrine, which requires a narrow interpretation of Section 317 of the Stafford Act. As set forth in the TCC's Objection, the "free public services doctrine" precludes a governmental entity from recovering the costs of carrying out public services, including response to fires, from a tortfeasor whose conduct caused the need for the services, absent specific statutory authorization or damage to government-owned property.[5] In this case, application of the general rule, based on "the nature of the cost"—public assistance, individual assistance and administrative costs resulting from a major disaster—and the identity of the claimant, FEMA, an agency of the United States Government, would ordinarily preclude the recovery FEMA seeks. *See City of Flagstaff*, 719 F.2d at 324.

Section 317 is an exception to the general rule and permits some recovery of FEMA's costs in specific circumstances—where a person has "intentionally caus[ed] a condition for which Federal assistance is provided." 42 U.S.C. § 5160(a). As this is an exception to the general rule prohibiting recovery in such cases, under the interpretive canon *expressio unius est exclusio alterius*, Section 317 must be read narrowly. "[W]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."[6] This strongly counsels against FEMA's construction of

---

[5] *See United States v. Standard Oil Co. of Cal.*, 332 U.S. 301, 314-17 (1947); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983).

[6] *See Baldwin v. United States*, 921 F.3d 836, 843 (9th Cir. 2019) (quoting *Hillman v. Maretta*, 569 U.S. 483, 496 (2013), *pet. for certiorari docketed*, Sept. 25, 2019)). *See also Webb v. Smart Document Solutions, LLC*, 499 F.3d 1078, 1084 (9th Cir. 2007) ("The canon of statutory construction *expressio unius est exclusio alterius* . . . 'creates a presumption that when a statute designates certain persons, thing, or manners of operation, all omissions should be understood as exclusions.'") (quoting *Silvers v. Sony Pictures Entm't Inc.*, 402 F.3d 881, 885 (9th Cir. 2005)); *Allentown Volunteer Fire Dep't v. Soo Line R.R.*, 372 F. Supp. 422, 423 (E.D. Was. 1974) ("[T]he fact that the legislature specifically authorized recovery of fire-fighting expenses in special aggravated circumstances strongly suggests that a right of recovery was not contemplated as a general rule.").

10

Section 317, which would permit FEMA to recover based on proof of negligence.

          5.      The "Void-For Vagueness" Doctrine Precludes FEMA's Construction

Finally, the Court should reject FEMA's construction of Section 317 under the canon of constitutional avoidance. As the Ninth Circuit recently explained, "'[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statue is found susceptible of more than one construction; and the canon functions as a *means of choosing between them*.'" *Cuenca v. Barr*, 941 F.3d 1213, 1220 (9th Cir. 2019) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005) (emphasis original)). If FEMA is correct that Section 317 includes negligence liability, the section would be unconstitutionally vague.

The "void-for-vagueness" doctrine typically applies to criminal statutes, but it also applies to statutes imposing civil penalties, although a court may require a greater level of ambiguity to find a civil imposition impermissible. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). A statute is impermissibly vague "if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement."[7]

Here, the meaning of Section 317 is clear, but the adoption of FEMA's negligence standard for purposes of Section 317 liability would render it hopelessly and unconstitutionally vague. Section 317 permits FEMA to recover in circumstances where a government agency is ordinarily forbidden such recovery under the free public services doctrine. While framed as "civil liability," Section 317 imposes significant penalties on anyone who falls within its terms—penalties that would amount to $3.9 billion in this case. A person of ordinary intelligence would not understand Section 317 to impose liability for failing to maintain equipment which, if allowed to deteriorate, might cause a fire—assuming that this is the standard of care Congress even intended to impose. There is a world of difference between purposefully starting a fire, with the intent to cause damage, and simply taking (or failing to take) actions over the course of time that might have prevented one. FEMA has never invoked Section 317 before, and FEMA has asserted in this proceeding that the

---

[7] *Johnson v. U.S.*, 135 S. Ct. 2551, 2566 (2015) (Thomas, J., concurring); *see Sessions v. Dimaya*, 138 S. Ct. 1204, 1212-13 (2018); *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982); *United States Civil Serv. Comm'n v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 413 U.S. 548, 568 (1973).

11

statute it is seeking to enforce is "vague and ambiguous." Goodman Decl. at Ex. 4, Rog Resp. 1-6. FEMA's internal inquiry, which involved no independent investigation or compliance with an established policy, strongly indicates conduct that is arbitrary. To avoid this constitutional problem, the Court should construe the statute as it is written, to apply only to intentional, purposeful conduct.

### B. FEMA's Public Nuisance and Unjust Enrichment Claims Fail

FEMA's public nuisance claims can be rejected based on its own authority. FEMA bases these claims on "the federal common law of public nuisance." Resp. at 8. But as the Ninth Circuit stated in *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849, 856 (9th Cir. 2012), the case on which FEMA relies, "the right to assert a federal common law public nuisance claim has limits." Such claims are available "only when the courts are 'compelled to consider federal questions which cannot be answered from federal statutes alone.'" *Id.* (quoting *City of Milwaukee v. Illinois*, 541 U.S. 304, 314 (1981)). Here, Congress has specifically determined how and when FEMA can effect cost recovery in the Stafford Act itself, and FEMA is therefore barred from asserting a claim under federal common law because no such claim exists.

In this respect, Section 317(a) and Section 312(a) establish the sole path through which FEMA can recover the costs of major disaster relief because they "speak[] directly to [the] question at issue." *American Elec. Power Co., Inc. ("AEP") v. Connecticut*, 564 U.S. 410, 131 S. Ct. 2527, 2537 (2011) (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) (internal quotation marks omitted)); *Native Village of Kivalina*, 696 F.3d at 856 ("If Congress has addressed a federal issue by statute, then there is no gap for federal common law to fill."); *Co. of San Mateo v. Chevron Corp.*, 294 F. Supp. 3d 934, 937 (N.D. Cal. 2018) (noting "that federal common law is displaced by the Clean Air Act not only when plaintiffs seek injunctive relief to curb emissions but also when they seek damages for a defendant's contribution to global warming.").

*AEP* is squarely on point. That case involved a suit by several states against private and publicly-owned electric utilities, seeking to abate the "public nuisance" created by their carbon dioxide emissions. *AEP*, 564 U.S. at 415. The plaintiffs relied on federal common law public nuisance, but the Court concluded that the Clean Air Act had displaced any federal common law claims because the "Act itself thus provides a means to seek limits on emissions of carbon dioxide

12

from domestic power plants—the same relief the plaintiffs seek by invoking federal common law. We see no room for a parallel track." *Id.* at 425. The very same rule and reason apply here.

FEMA invokes federal common law as a means of cost recovery when Congress has strictly limited such recovery to suits brought under Section 317. As in *AEP*, there is "no room for a parallel track." *Id.* The Court must reject FEMA's nuisance claims as well as its "unjust enrichment claims," both of which are grounded—it says—in federal common law. Resp. at 9, 11.

This is true even if, as FEMA maintains, a claim for unjust enrichment has been recognized under federal common law, as stated by the court in *United States v. City of Los Angeles*, No. CV 11-974, 2018 WL 3814498, at *33 (C.D. Cal. July 25, 2018). Once Congress spoke directly to the issue of FEMA cost recovery in the Stafford Act, all federal common law actions and remedies that might otherwise apply were displaced. *See Native Village of Kivalina*, 696 F.3d at 857.

FEMA's reliance on *Michigan v. U.S. Army Corps. of Engineers*, 667 F.3d 765 (7th Cir. 2011), is also misplaced. The federal common law nuisance claim in *Michigan* involved a transboundary nuisance—*i.e.*, "shared water resources"—which is actionable under a "long line of cases that have 'approved federal common law suits brought by one State to abate pollution emanating from another State.'" *Id.* at 770-72. The Court found that the federal common law of public nuisance "exists to provide a uniform rule for *interstate disputes* that will serve the national interest." *Id.* at 773 (emphasis added). But this case does not involve an interstate dispute.

FEMA cites no case where courts have applied the federal common law of public nuisance to electric utility infrastructure repair and maintenance. In fact, courts have refused to recognize a public nuisance exception to the free public services doctrine, finding that "'[i]f such an exception were recognized, it would be the exception that swallows the rule, since many expenditures for public services could be re-characterized by skillful litigants as expenses incurred in abating a public nuisance.'"[8] On this point, in *Flagstaff*, the Ninth Circuit held that the cost of abating a hazard created by derailed tank cars carrying liquified petroleum gas could not be assessed against

---

[8] *Cty. of Erie, N.Y. v. Colgan Air, Inc.,* No. 10-CV-157S, 2012 WL 1029542, at *4 (W.D.N.Y. Mar. 26, 2012) (*citing Walker County v. Tri-State Crematory,* 284 Ga. App. 34, 643 S.E.2d 324, 328 (Ga. 2007)), *aff'd sub nom. City. of Erie, N.Y. v. Colgan Air, Inc.,* 711 F.3d 147 (2d Cir. 2013)); David M. Lawrence, *Trying to Recover Public Costs Incurred in Dealing with Man-Made Disasters: The Free Public Services Doctrine*, 134 Local Gov't L. Bulletin 1, 5 (2013) (recognizing rejection of attempts to create a public nuisance exception to the free public services doctrine).

13

the railroad whose negligence created the disaster. FEMA quotes from dicta in *Flagstaff* because the actual holding in *Flagstaff* is fatal to FEMA's position.

### C. FEMA's Arguments Against Preemption are Wrong

FEMA's arguments against preemption of any state law claims (which FEMA now disavows, *see* Resp. at 13), are also incorrect. The Stafford Act is a comprehensive law governing federal relief assistance. Its stated purpose was "to provide an orderly and continuing means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters." 42 U.S.C. § 5121(b). The statute fully addresses the mechanisms for determining when federal assistance is required and authorized, what that assistance may be, and how it is to be administered. In that context, Congress enacted Section 317, which addresses when and how the federal government may effect a cost recovery of major disaster assistance. It limits such recovery to cases where an intentional wrongdoer has caused the damage for which the federal assistance was authorized.

Congress has, in other words, occupied the entire field of federal disaster assistance, a field in which the states had no role to play to begin with. *See United States v. Texas*, 695 F.2d 136, 138 (5th Cir. 1983). And, even if the state had a legitimate interest in the conditions upon which a federal agency may recover expended federal funds from private tortfeasors, that interest would have to give way "'where an Act of Congress 'touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'" *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). This is such a case. As explained in the TCC's Objection, there simply is "no room" here for action by the states. *See* TCC Objection at 13.

In addition, a state cause of action permitting FEMA to recover disaster relief funds on the basis of a negligence or reckless standard would be conflict preempted, as it would interfere with Congress's determination to limit such recoveries to intentional torts only. *Id.* (state law preempted where it "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The fact that Congress has not affirmatively barred FEMA from seeking recovery under state law cannot change

14

this conclusion, and this argument suggests that the Executive Branch, rather than Congress, controls the federal spending power. As Judge Gilliam explained in another context, "it is not Congress's burden to prohibit the Executive from spending the Nation's funds: it is the Executive's burden to show that its desired use of those funds was 'affirmatively approved by Congress.'" *California v. Trump*, 379 F. Supp. 3d 928, 950 (N.D. Cal. 2019). The same is true of cost recovery.

### D. FEMA's Claims Are Void as a Matter of Public Policy

The gravity of this situation cannot be understated. The TCC has been informed in no uncertain terms that a plan under which FEMA holds an allowed claim for $3.9 billion that is channeled to the victims' trust will be overwhelmingly rejected by the victims. FEMA's response is to disavow responsibility for the fact that, as in nearly every case, there is not enough money to pay every asserted claim in full. On this point, the TCC agrees—there is not $3.9 billion available to pay FEMA. If FEMA's claims are allowed and channeled against the victims' trust, the victims will suffer, and their recovery will be substantially reduced. FEMA testified that its "number one priority is helping and supporting our disaster survivors. So we would not threaten anyone." FEMA Tr. 191. FEMA's public statements[9] and positions in this case speak for themselves.

### E. The TCC's Supplemental Objection Need Not be Decided at this Time

FEMA contends that the issues raised in the TCC's Supplemental Objection (Dkt. No. 5319) are not ripe. The TCC agrees that discovery is necessary before these matters can be decided. The TCC submits that the *prima facie* validity of FEMA's claims can and should be decided now.

## III. CONCLUSION

The Objection should be sustained, and the FEMA Claims should be disallowed.

Dated: February 19, 2020                          BAKER & HOSTETLER LLP

By: /s/ Eric R. Goodman
　　　Eric R. Goodman
*Attorney for The Official Committee of Tort Claimants*

---

[9] *See* Goodman Decl. at Ex. 5 ("FEMA Says It May Bill Fire Victims If It Can't Get $4 Billion from PG&E."); *Id.* at Ex 6 ("FEMA officials said the agency is bound by federal statute to seek reimbursement for any type of aid—including legal settlements—received by disaster victims and local governments that might duplicate what they got from the federal government."); *Id.* at Ex. 7 ("[FEMA] planned to seek repayment of a portion of the $3.9 billion bill that it incurred in the fires from the victims if it can't get the money from PG&E").

15