Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

David B. Rivkin, Jr. (*pro hac vice*)
BAKER & HOSTETLER LLP
1050 Connecticut Ave., N.W., Suite 1100
Washington, D.C. 20036
Telephone: 202.861.1731
Facsimile: 202.861.1783
Email: drivkin@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re:**

**PG&E CORPORATION**

**-and-**

**PACIFIC GAS AND ELECTRIC COMPANY,**

**Debtors.**

□ Affects PG&E Corporation

□ Affects Pacific Gas and Electric Company

■ Affects both Debtors

**All papers shall be filed in the Lead Case, No. 19-30088 (DM)*

Bankruptcy Case No. 19-30088 (DM)

Chapter 11
(Lead Case)
(Jointly Administered)

**REPLY IN SUPPORT OF OMNIBUS OBJECTION TO CLAIMS FILED BY CALIFORNIA GOVERNOR'S OFFICE OF EMERGENCY SERVICES**

Date: February 26, 2020
Time: 10:00 a.m. (Pacific Time)
Place: United States Bankruptcy Court
Courtroom 17, 16th Floor
San Francisco, CA 94102

Relates to Dkt. Nos. 5096, 5320 & 5743

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF CONTENTS

I. INTRODUCTION .... 1

II. ARGUMENT .... 2

A. Cal OES' Statutory Claims Fail as a Matter of Law .... 2

B. Cal OES' Subrogation Claims Fail as Matter of Law .... 4

C. Cal OES Does Not Owe FEMA a Right of Reimbursement .... 5

1. The Unambiguous Language of Section 312(c) Does Not Apply Here .... 6

2. Allowance of Claims Predicated on Section 312(c) Is Unreasonable .... 10

3. Allowing Cal OES' FEMA Claims Is Contrary to Federalism Principles .... 11

D. TCC's Supplemental Objection Need Not be Decided at this Time .... 18

III. CONCLUSION .... 18

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine*,
527 U.S. 706 (1999) ........ 13, 17

*Atascadero State Hosp. v. Scanlon*,
473 U.S. 234 (1985) ........ 12, 13

*Hawaii ex rel. Attorney Gen. v. FEMA*,
294 F.3d 1152 (9th Cir. 2002) ........ 9, 10, 11

*In re Border Infrastructure Envtl. Litig.*,
915 F.3d 1213 (9th Cir. 2019) ........ 11

*City & Cty. of San Francisco v. Sessions*,
349 F. Supp. 3d 924 (N.D. Cal. 2018) ........ 14, 16, 17

*In re Dow Corning Corp.*,
244 B.R. 705 (Bankr. E.D. Mich. 1999) ........ 4

*In re Dow Corning Corp.*,
250 B.R. 298 (Bankr. E.D. Mich. 2000) ........ 4

*Fischer v. United States*,
529 U.S. 667 (2000) ........ 8

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ........ 12, 13

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982) ........ 11

*In re Hamada*,
291 F.3d 645 (9th Cir. 2002) ........ 4

*Holmes v. Sec. Inv'r Prot. Corp.*,
503 U.S. 258 (1992) ........ 3

*Hunt v. Check Recovery Sys., Inc.*,
478 F. Supp. 2d 1157 (N.D. Cal. 2007) ........ 3

*Los Angeles Cty. Metro. Transp. Auth. v. Superior Court*,
123 Cal. App. 4th 261, 20 Cal. Rptr. 3d 92 (Cal. Ct. App. 2004) ........ 3

*Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*,
877 F.2d 1333 (7th Cir. 1989) ........ 3

*Murphy v. NCAA*,
138 S. Ct. 1461 (2018) ........ 13, 14, 15, 16

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 17

*New York v. United States*,
505 U.S. 144 (1992) .......... 13, 14, 17

*Palmer v. Stassinos*,
348 F. Supp. 2d 1070 (N.D. Cal. 2004) .......... 3

*Pennhurst State School & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 12, 13, 17

*Printz v. United States*,
521 U.S. 898 (1997) .......... 14, 15

*Renda v. Nevarez*,
223 Cal. App. 4th 1231, 167 Cal. Rptr. 3d 874 (Cal. Ct. App. 2014) .......... 3

*Return Mail, Inc. v. U.S. Postal Serv.*,
139 S. Ct. 1853 (2019) .......... 7

*Rice v. Santa Fe Elevator Corp.*,
331 U.S. 218 (1947) .......... 13

*Rowland v. Cal. Men's Colony*,
506 U.S. 194 (1993) .......... 7

*Santa Clara Valley Water Dist. v. Olin Corp.*,
655 F. Supp. 2d 1048 (N.D. Cal. 2009) .......... 3

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 17

*In re Spirtos*,
103 B.R. 240 (Bankr. C.D. Cal. 1989) .......... 4

*Steward Mach. Co. v. Davis*,
301 U.S. 548 (1937) .......... 17

*United States v. Mine Workers of America*,
330 U.S. 258 (1947) .......... 7

*Vander Lind v. Superior Court*,
146 Cal. App. 3d 358, 194 Cal. Rptr. 209 (Cal. Ct. App. 1983) .......... 3, 4

*Ventura Cty. Employees' Ret. Ass'n v. Pope*,
87 Cal. App. 3d 938, 151 Cal. Rptr. 695 (Cal. Ct. App. 1978) .......... 3

*Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*,
529 U.S. 765 (2000) .......... 7

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) .......... 7, 11

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 4 of 23

*Wilson v. Omaha Tribe*, 442 U.S. 653 (1979) ........ 7

**Statutes**

1 U.S.C. § 1 ........ 7

42 U.S.C. § 5121(b) ........ 6

42 U.S.C. § 5122 ........ 6

42 U.S.C. § 5155 ........ passim

42 U.S.C. § 5160(a) ........ 15

**Other Authorities**

44 C.F.R. § 204.62 ........ 5, 14, 15, 16

44 C.F.R. § 206.2 ........ 6, 7

S. Rep. No. 100-524 (1988) ........ 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 5 of 23

The Official Committee of Tort Claimants ("**TCC**"), for its Reply in support of its objection to Cal OES' claims (Dkt. No. 5096) (the "**Objection**"),[1] respectfully states as follows:

## I. INTRODUCTION

The TCC's Objection to the Cal OES Claims is akin to a motion to dismiss. The TCC's position is that the facts alleged in the Cal OES Claims do not give Cal OES the right to recover from PG&E. Since the TCC filed its Objection, the TCC has conducted target discovery to firmly grasp the basis for Cal OES' claims, which threaten to derail this bankruptcy and cause fire victims to vote against plan confirmation. *See* Goodman Decl. at Exs. 1-3. Cal OES' discovery responses have narrowed the issues. *Id.* at Exs. 4-6. The TCC will begin with what that discovery shows, and then address the arguments made by Cal OES in its Response (Dkt. No. 5743), including Cal OES' claim that it must do FEMA's bidding.

Cal OES spent $290 million providing disaster assistance in response to the wildfires. Yet, Cal OES asserts claims totaling $2.69 billion—because it directed $2.4 billion in FEMA funds to other state agencies and public entities. In other words, Cal OES is asserting a claim for $2.4 billion of FEMA's expenditures that FEMA is asserting in its $3.9 billion claim. Hence, the FEMA and Cal OES claims are duplicative of each other in that $2.4-billion-dollar amount. Cal OES has never asserted claims of this nature or character before.

Case law applying the "free public services doctrine" is well developed and limits Cal OES' ability to recover from PG&E absent [1] clear statutory language making PG&E liable to Cal OES or [2] damage to property owned by Cal OES. Cal OES can only credibly cite two statutes as exceptions to this doctrine: Sections 13009 and 13009.1 of the California Health and Safety Code ("**Sections 13009 and 13009.1**"), Resp. at § III.A, and Section 13009.6 of the California Health and Safety Code ("**Section 13009.6**"), *id.* at § III.B. The TCC served discovery on Cal OES to determine if Cal OES performed any of the services identified in these statutes. The answer is no.

Cal OES did not perform any fire suppression or any rescue or emergency services in connection with the wildfires. Goodman Decl. at Ex. 5, Rog Resp. Nos. 1-2, 7-8, 13-14. Cal OES

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Objection. In support of this Reply, the TCC relies on the Declaration of Eric Goodman filed contemporaneously herewith.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

did not perform any investigations or produce any reports regarding the causes of the wildfires. *Id.* at Ex. 5, Rog Resp. Nos. 3-4, 9-10, 15-16. Cal OES did not provide any services to confine, prevent, or mitigate the release, escape, or burning of hazardous substances in connection with the wildfires. *Id.* at Ex. 5, Rog Resp. Nos. 5, 11, 17. Cal OES does not claim any amounts for damages caused by the wildfires to its own property. *Id.* at Ex. 6, Rfa Resp. Nos. 1-3.

Cal OES also served discovery on the TCC. In response, the TCC stated that if its Objection is not sustained, Cal OES must prove PG&E's negligence. *Id.* at Ex. 7, Rfa Resp. Nos. 1-3. Cal OES also asked the TCC to admit that $13.5 billion is enough money to fully satisfy all the Fire Victim Claims as that term is defined in PG&E's plan. The TCC denied this request. *Id.* at Ex. 7, Rfa Resp. No. 7. $13.5 billion is not enough to fully compensate the fire victims, even assuming that FEMA's and Cal OES' claims are disallowed. The allowance of FEMA's and Cal OES' claims would make the fire victims' recovery the lowest of any creditor group in this bankruptcy. That is what is at stake here.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## II. <u>ARGUMENT</u>

Cal OES makes three main arguments in its Response. First, Cal OES claims that it can avail itself of Sections 13009 and 13009.1 and Section 13009.6 even though it did not perform the services identified in those statutes. Second, Cal OES argues that it has subrogation rights and is subrogated to the claims of property owners and other agencies that benefited from the disaster relief. Third, Cal OES argues that it must pursue claims for FEMA's benefit. Cal OES is wrong.

### A. <u>Cal OES' Statutory Claims Fail as a Matter of Law</u>

Cal OES presents a narrow legal question: Can an agency that did not perform any of the services identified in Sections 13009 and 13009.1 and Section 13009.6 recover from a tortfeasor where it claims a role in funding the cost of such services? The answer is no. Neither the plain language of the statutes nor case law supports Cal OES' construction. The phrase "incurring those costs" in Section 13009.1(e) must be read in context. This phrase plainly refers to the costs incurred in "fighting the fire," "providing rescue or emergency medical services," "investigating and making reports," and "accounting for that fire." The term "expenses" in Section 13009.6(a)(2) refers to the "expense of an emergency response" to protect against the release of hazardous substances. A party



Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 7 of 23

that does not perform any of those services does not directly incur "those costs" or "expenses."

Cal OES tries to expand these statutes to include anyone in the funding pipeline. Thus, if Cal Fire incurs $30 million fighting a PG&E fire, and Cal OES pays Cal Fire $20 million (inclusive of $15 million from FEMA), PG&E's liability could be $65 million—$30 million to Cal Fire, $20 million to Cal OES, and $15 million to FEMA. If funding parties fall within the statutes, PG&E could face double liability. But, California law "bars multiple recoveries for the same loss."[2]

The California Court of Appeals found that Section 2106 of the California Public Utilities Code—one of the other statutes Cal OES invokes to stitch together its claims—only permits recovery by persons or corporations who are "direct victims" of a utility's willful act or omission. *Vander Lind v. Superior Court*, 146 Cal. App. 3d 358, 367, 194 Cal. Rptr. 209, 215 (Cal. Ct. App. 1983). The Court of Appeals found that a "contrary conclusion" would expand the class of plaintiffs eligible to recover "beyond precedent and reason" and would create the potential for "double punishment for the same wrongful conduct"—*i.e.*, one claim by the "direct victim" and a second claim by a party that is "remotely affected." *Id.*[3] Recovery by the agencies with direct claims would result in the tortfeasor paying the full cost of the services. Justice does not require more—particularly here, where funds available to pay victims are finite.

Cal OES contends that the "vast majority of agencies that provided fire suppression and rescue and emergency medical services in connection with the Wildfires did not file proofs of

---

2 *Hunt v. Check Recovery Sys., Inc.*, 478 F. Supp. 2d 1157, 1167 (N.D. Cal. 2007); *see also Renda v. Nevarez*, 223 Cal. App. 4th 1231, 1237, 167 Cal. Rptr. 3d 874, 878 (Cal. Ct. App. 2014); *Los Angeles Cty. Metro. Transp. Auth. v. Superior Court*, 123 Cal. App. 4th 261, 267–68, 20 Cal. Rptr. 3d 92, 96 (Cal. Ct. App. 2004); *Ventura Cty. Employees' Ret. Ass'n v. Pope*, 87 Cal. App. 3d 938, 952, 151 Cal. Rptr. 695, 705 (Cal. Ct. App. 1978).

3 *Accord Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992) (limiting application of RICO statute and finding that "recognizing claims of the indirectly injured would force courts to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"); *Mid-State Fertilizer Co. v. Exch. Nat'l Bank of Chicago*, 877 F.2d 1333, 1336 (7th Cir. 1989) ("If … we allow the corporation to litigate in its own name and collect the whole sum (as we do), we must exclude attempts by the participants in the venture to recover for their individual injuries. A fire that causes $100 worth of damage to 'the corporation', and therefore reduces the value of investors' stock by $100, does not cause a total injury of $200—the net loss is $100, and everyone is made whole by an award of that sum to the firm."); *Santa Clara Valley Water Dist. v. Olin Corp.*, 655 F. Supp. 2d 1048, 1055 (N.D. Cal. 2009) (finding provision of CERCLA "prohibits double recovery and a party who has already received compensation for its incurred costs … cannot recover those same costs again"); *Palmer v. Stassinos*, 348 F. Supp. 2d 1070, 1082 (N.D. Cal. 2004), *order clarified on reconsideration*, 419 F. Supp. 2d 1151 (N.D. Cal. 2005) (finding California statute reflects law that generally bars multiple recoveries for the same loss because it allows the face amount of a check to only be recovered once).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

claim" because "there was no need to: Cal OES already paid those costs." Resp. at 18. But Cal Fire filed its own proofs of claim. Further, this proves the TCC's point: *Cal OES did not pay "those costs"* because it was acting as a conduit for FEMA. The TCC's position does not offend California's collateral source rule because restricting recovery to the agencies that actually performed the services, as shown above, means that PG&E will be required to pay the full amount of the costs incurred. It is Cal OES that tries to turn this doctrine on its head by seeking to create a door through which any entity that directly or indirectly funds fire suppression costs could assert claims. The reason why Cal OES has never asserted claims of this nature or character before is because they truly are "beyond precedent and reason." *Vander Lind*, 146 Cal. App. 3d at 367.

**B. <u>Cal OES' Subrogation Claims Fail as Matter of Law</u>**

Cal OES' fallback position is to assert subrogation claims. First, Cal OES did not file claims using the subrogation claim form. Even if this defect is cured, Cal OES' subrogation claims would fail under the free public services doctrine. There is no common law right of recovery by a governmental entity for the costs of performing a public service. Cal OES spends pages discussing equitable subrogation, ignoring the fact that equitable subrogation is a common law doctrine. *In re Hamada*, 291 F.3d 645, 649-50 (9th Cir. 2002) (noting distinction between equitable subrogation under common law and statutory subrogation); *In re Spirtos*, 103 B.R. 240, 245 (Bankr. C.D. Cal. 1989) (discussing "common law doctrine of equitable subrogation"). Section 509 of the Bankruptcy Code also does not create an exception to the free public services doctrine.

Cal OES also does not satisfy the elements for subrogation. Allowing Cal OES to pursue its claims would work an injustice to the rights of others—namely, the victims whose recovery would be substantially diminished. The TCC also notes that the *Dow* case upon which Cal OES relies, *see In re Dow Corning Corp.*, 244 B.R. 705, 715 (Bankr. E.D. Mich. 1999), if followed here to support a finding of co-liability under section 509(a), would mandate the subordination of Cal OES' claims under section 509(c). *See In re Dow Corning Corp.*, 250 B.R. 298, 365 (Bankr. E.D. Mich. 2000) (subrogation claims under section 509 subject to mandatory subordination).

Finally, even assuming *arguendo* that Cal OES has subrogation claims, the Court should disallow the Cal OES Claims as a "Fire Victim Claim" under PG&E's plan (Dkt. No. 5590)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

(the "**Plan**"). Under the Plan, the term "Fire Victim Claim" is defined to mean any Fire Claim that is not a … Subrogation Wildfire Claim …." Plan at § 1.76. The term "Subrogation Wildfire Claim" is defined to include, among other things, any Fire Claim "that arises from subrogation (whether such subrogation is contractual, equitable, or statutory)." *Id.* at § 1.195. If Cal OES is proceeding based on subrogation rights (equitable or statutory), it has no claim against the Fire Victim Trust and can only recover from the Subrogation Wildfire Trust. *Id.* at § 6.4.

**C. <u>Cal OES Does Not Owe FEMA a Right of Reimbursement</u>**

The TCC will now address the elephant in the room. Cal OES has never asserted derivative claims like this before. The question is why now, particularly given that $2.4 billion of the $2.69 billion that Cal OES seeks to recover would go to FEMA. Cal OES' answer is that "FEMA requires Cal OES to pursue potential tort claims" against PG&E. Resp. at 13. Cal OES states that "if Cal OES recovers on its claims, Cal OES has the duty to reimburse FEMA for the amounts Cal OES received from FEMA." *Id.* at 33. Cal OES admits that it has filed claims because if it did not, FEMA would attempt to de-obligate, or claw back, those funds under the Stafford Act.

The purpose of the "duplication of benefits" provision in Section 312 of the Stafford Act, 42 U.S.C. § 5155 ("**Section 312**"), is to "assure that no such person, business concern, or other entity will receive such [federal disaster] assistance with respect to any part of such loss as to which he has received financial assistance under any other program or from insurance or any other source." *Id.* § 5155(a). To effectuate this goal, subsection (c) states, "A person receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates benefits available to the person for the same purpose from another source." *Id.* at § 5155(c).

FEMA's regulations implementing Section 312(c) are even more specific: "If the applicant suspects negligence by a third party causing a condition for which FEMA made assistance available under this Part, the applicant is responsible for taking all reasonable steps to recover costs attributable to the negligence of the third party. FEMA considers such amounts to be duplicated benefits available to the recipient . . . ." 44 C.F.R. § 204.62(c). Pursuant to its regulations, FEMA threatens to claw back over $2.4 billion of funding it provided to aid California's recovery after the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 10 of 23

wildfires, on the basis that these funds duplicate "benefits available" to Cal OES because Cal OES has tort claims against PG&E. Resp. at 14. Cal OES believes it must pursue claims against PG&E.

But Cal OES is wrong or does not want to admit that it is trying to take money from victims. Cal OES does not owe any reimbursement under Section 312(c)'s plain language. Even if Section 312(c) is ambiguous, the Court should not construe it to allow Cal OES' FEMA-based claims because doing so would be inconsistent with the policy of the Stafford Act and lead to absurd results. Cal OES' interpretation of Section 312(c) is also contrary to federalism principles, including the clear statement rule and the anti-commandeering/anti-coercion doctrine.

1. <u>The Unambiguous Language of Section 312(c) Does Not Apply Here</u>

The express purpose of the Stafford Act is to provide a "means of assistance by the Federal Government to State and local governments in carrying out their responsibilities to alleviate the suffering and damage which result from such disasters . . . ." 42 U.S.C. § 5121(b). The Stafford Act achieves this goal by establishing disaster relief programs, coordinating those programs, and "encouraging individuals, States, and local governments to protect themselves by obtaining insurance coverage to supplement or replace governmental assistance." *Id.* at § 5121(b)(4).

The Stafford Act's "duplication of benefits" provision declares, "A ***<u>person</u>*** receiving Federal assistance for a major disaster or emergency shall be liable to the United States to the extent that such assistance duplicates ***<u>benefits</u>*** ***<u>available</u>*** to the ***<u>person</u>*** for the same purpose from another source." *Id.* at § 5155(c) (emphasis added). But neither the Act nor its implementing regulations defines the words "person," "benefits" or "available." The TCC submits that these terms do not mean what Cal OES assumes they mean.

<u>Person</u>. The ordinary meaning of "person" does not include States. Section 312(c) applies to a "person" who receives federal assistance. Neither the Stafford Act nor FEMA's implementing regulations define the word "person." *See* 42 U.S.C. § 5122; 44 C.F.R. § 206.2. The Stafford Act and FEMA's implementing regulations do define the word "State," 42 U.S.C. § 5122(4); 44 C.F.R. § 206.2(a)(22), thus suggesting that Congress and FEMA are aware that "persons" and "States" are distinct. FEMA's regulations reflect this awareness, defining the term "applicant" to encompass "[i]ndividuals, families, States and local governments, or private nonprofit organizations who apply

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

for assistance as a result of a declaration of a major disaster or emergency." 44 C.F.R. § 206.2(a)(2).

Congress has directed, in the Dictionary Act, that federal statutes using the word "person" should be construed to refer to individuals and businesses but not sovereign States, declaring, "In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies and joint stock companies, as well as individuals." 1 U.S.C. § 1.[4]

As the Supreme Court stated in *United States v. Mine Workers of America*, 330 U.S. 258 (1947), the Dictionary Act's inclusion of partnerships and corporations in the definition of "person" is telling: "The absence of any comparable provision extending the term to sovereign governments implies that Congress did not desire the term to extend to them." *Id*. at 275. Or, as the Court put it recently in *Return Mail*, "Notably absent from the list of 'person[s]' is the Federal Government," or for that matter, States. 139 S. Ct. at 1862.

The Supreme Court has found that there is a "longstanding interpretive presumption that 'person' does not include the sovereign[,]" whether federal or state.[5] "This presumption reflects 'common usage'" of the word "person." *Return Mail*, 139 S. Ct. at 1862 (quoting *Mine Workers*, 330 U.S. at 275). When a statute imposes monetary liability—as with Section 312(c), which states that any "person" who receives federal aid "shall be liable" for duplicate benefits available to them—the Supreme Court has instructed that construing the word "person" to exclude States is "particularly applicable." *Will*, 491 U.S. 64; *accord Return Mail*, 139 S. Ct. at 1863. Since both the Supreme Court and Congress have instructed that the word "person" should not be construed to include States absent clear evidence otherwise, Section 312(c) does not apply to Cal OES.

Benefits. Cal OES' tort claims against PG&E are also not "benefits." Section 312(c) uses

---

[4] The Dictionary Act's reference to "context" refers to "the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts, and this is simply an instance of the word's ordinary meaning." *Rowland v. Cal. Men's Colony*, 506 U.S. 194, 199 (1993). The party seeking to overcome the presumption against construing "person" to include sovereign entities bears the burden of establishing that the Stafford Act's context indicates otherwise, by "point[ing] to some indication in the text or context of the statute that affirmatively shows Congress intended to include the Government." *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1863 (2019).

[5] *Return Mail*, 139 S. Ct. at 1861-62 (quoting *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 780-81 (2000)); *accord Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989); *Wilson v. Omaha Tribe*, 442 U.S. 653, 667 (1979); *Mine Workers of Am.*, 330 U.S. at 275.

the word "benefits" as a plural noun. The ordinary meaning of the plural noun "benefits" is a payment, entitlement or gift that is conferred by an insurance contract, public assistance program, or employer. Black's Law Dictionary, for example, defines it as "[f]inancial assistance that is received from an employer, insurance, or a public program (such as social security) in time of sickness, disability, or unemployment." Black's Law Dictionary (11th ed. 2019). Similarly, the Merriam-Webster dictionary defines "benefits" as "a payment or service provided for under an annuity, pension plan, or insurance policy" and "a service (such as health insurance) or right (as to vacation time) provided by an employer in addition to wages or salary."[6]

The Supreme Court has endorsed this construction of the word "benefits" in analogous statutes. In *Fischer v. United States*, 529 U.S. 667 (2000), the defendant argued that Medicare "benefits" could only be received by Medicare "beneficiaries" (*i.e.*, the elderly or disabled), but not health care providers. *Id.* The government argued that any individual or organization could receive Medicare "benefits" so long as the Medicare program was the source of payment. *Id.* at 676-77. The Court recited the dictionary definition of the noun "benefit" and found that Medicare beneficiaries receive "benefits," but so do others such as providers, who "derive significant advantage by satisfying the [Medicare] participation standards imposed by the Government." *Id.* at 677-78. The advantages health care providers obtain *because of the Medicare program* thus constituted "benefits," as that term is ordinarily understood. *Id.* at 678.

Here, Cal OES' tort claims against PG&E are not "benefits" to Cal OES. Such claims, even if successful, are not conferred upon Cal OES by an insurance policy, employer, or public assistance program (such as the Medicare program in *Fischer*). While a tort claim, if successful, "benefits" the plaintiff in the verb sense of the word, it is not considered to be a "benefit" in the ordinary noun sense of the word. Cal OES' tort claims against PG&E are not benefits under Section 312(c).

---

[6] *Merriam-Webster.com Dictionary*, *available at* https://www.merriam-webster.com/dictionary/benefits?src=search-dict-hed; *accord Cambridge Dictionary*, *available at* https://dictionary.cambridge.org/us/dictionary/english/benefit?q=benefits ("an advantage such as medical insurance, life insurance, and sick pay, that employees receive from their employer in addition to money" and "the money given by the government to people who need financial help, for example because they cannot find a job."); *Macmillan Dictionary* ("extra money or other advantages that you get in addition to your salary from your employer as part of your job" and "money or help that an insurance company gives to you"); *American Heritage Dictionary* 171 (2d College Ed. 1985) ("Payments made or entitlements available in accordance with a wage agreement, insurance contract, or public assistance program.").

Baker & Hostetler LLP
Attorneys at Law
San Francisco

Available. Nor are Cal OES' claims against PG&E "available." The plain meaning of the adjective "available," in its broadest sense, is accessible or obtainable. Black's Law Dictionary defines available as "legally valid or colorable <available claims><available defenses>." *Black's Law Dictionary* (11th ed. 2019). The Merriam-Webster dictionary defines "available" as "present or ready for immediate use//available resources" or "accessible, obtainable." *Merriam-Webster.com Dictionary, available at* https://www.merriam-webster.com/dictionary/available.

Is important to note that, as an adjective, the word "available" describes or modifies the noun to which it is attached. The noun to which the word "available" is attached under Section 312(c) is "benefits." Under a plain language analysis, it is not enough that Cal OES' tort claims against PG&E are "colorable" or "accessible" or "obtainable" (and thus "available"); rather, it is the "benefit"—*i.e.*, the money recoverable from such claims—that must be "accessible" or "obtainable" under Section 312(c).

The Ninth Circuit has found that the word "available" in Section 312(c) refers only to two things: (1) money actually received by the FEMA aid applicant; or (2) any money it would have obtained if the applicant had acted in a "commercially reasonable manner." *Hawaii ex rel. Attorney Gen. v. FEMA*, 294 F.3d 1152, 1161 (9th Cir. 2002). In *Hawaii*, the Circuit found that "available" was ambiguous as used in the context of Section 312(c). *Id.* It then found that "practical considerations such as risk, cost and uncertainty are inherent in the more usual concept of availability." *Id.* at 1162. The term was to be construed in this practical manner, leading the Circuit to reject a broader meaning advocated by FEMA as "not reasonable." *Id.* at 1165.

Under the Circuit's construction of "available," Cal OES' tort claims are not "available" because the commercial reasonableness standard does not require Cal OES to pursue them. As the *Hawaii* court found, commercial reasonableness requires assessment of how a party would act "on his own behalf," without regard to the "interests of a third involved party," such as FEMA. *Id.* at 1164. The Circuit found that "the commercially reasonable standard does not require a party to do whatever it takes to acquire benefits no matter how remote the chance of success and no matter how costly the effort." *Id.* It noted that "the cost, time and riskiness of litigation" may make the pursuit "not worthwhile" and thus, not required by the commercial reasonableness standard. *Id.*

Baker & Hostetler LLP
Attorneys at Law
San Francisco

That is the case here. Cal OES could pursue its tort claims against PG&E, but it is not required to do so under Section 312(c). Cal OES states that it is asserting its claims because "FEMA requires" it to do so and the Stafford Act establishes a "duty" for it to recover FEMA disaster relief on FEMA's behalf, Resp. at 13, 33, inferring that Cal OES would not pursue these claims on its own, absent the threat of de-obligation. *Id.* at 13-14. Cal OES has policy reasons why, if left to its own devices, it may decide that pursuing claims against PG&E is too costly, risky, or contrary to the wildfire victims' best interests. Under *Hawaii*, Cal OES' tort claims are not "available."

2. Allowance of Claims Predicated on Section 312(c) Is Unreasonable

The construction of the words "benefits" and "available" proffered above is confirmed by Section 312(c)'s legislative history, which shows that Congress did not intend for "benefits available" to refer to tort claims. As the Ninth Circuit found in *Hawaii*, the impetus for Section 312(c) was a study that "showed 'that in some cases, disaster assistance provided what should have been covered by an applicant's insurance. It appears that insurance companies are not paying claims in a timely manner, or that applicants are not filing claims for items which should have been covered.'" 294 F.3d at 1163 (quoting S. Rep. No. 100-524, at 13 (1988)).

The Circuit noted that Section 312(c) was intended "[t]o remedy this situation" by giving "'FEMA and other disaster assistance agencies and organizations a strong new mandate to provide disaster assistance only when insurance proceeds to which a person is entitled have been considered and the need for supplemental assistance remains.'" *Id.* (quoting S. Rep. No. 100-524, at 13 (1988)). According to the Circuit, "Congress's concern, then, was that when there was the safety net of federal disaster relief, covered parties and insurers were not seeking or providing insurance coverage as they otherwise would." *Id.* While subsections (a) and (c) of Section 312 refer, respectively, to "any other source" and "any source," interpreting these phrases to include tort claims would be contrary to the ordinary meaning of "benefits" and "available," and would undermine congressional intent to provide a "safety net of federal disaster relief," while also making sure that "disaster relief victims and insurers not take advantage of federal largess." *Id.* Neither of these goals—providing disaster relief or preventing recipients from taking advantage of federal largess—would be furthered by interpreting Section 312(c) as requiring aid recipients to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

pursue tort claims, particularly where, as here, such tort claims compete with the claims of fire victims.

Interpreting Section 312(c) to require aid recipients to pursue tort claims (or face claw back of aid) would create absurd results and must be "avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1223 (9th Cir. 2019). Because Section 312(c) deems all "person[s] receiving Federal assistance" liable for duplicate "benefits available . . . from another source[,]" this would mean that all such recipients—not just States such as California, but also individuals and businesses—would be obligated to pursue tort claims, at their own expense, whenever FEMA thinks they should, or face claw back.

As the Ninth Circuit recognized in *Hawaii*, this construction would require disaster victims "to spend unreasonable amounts of time and money better spent directly on clean up from the disaster." 294 F.3d at 1165. It "would require disaster victims to pursue reckless litigation," thereby undermining the Act's primary goal of enabling and speeding disaster victims' recovery. *Id.* While there is evidence in the legislative history that Congress intended recipients to be liable for duplicative benefits available from other governmental programs and insurance coverage, there is no indication that Congress intended aid recipients to be liable merely because they could theoretically pursue tort claims. Construing the Stafford Act to force aid recipients to bring tort claims or face federal claw back liability would not only be a breathtakingly capacious interpretation of the Stafford Act's text, but is antithetical to the goal of aiding victims, imposing a broad obligation on those very victims to pursue speculative, expensive and time-consuming tort claims. Such a result is absurd, and inconsistent with the Ninth Circuit's approach in *Hawaii*.

3. Allowing Cal OES' FEMA Claims Is Contrary to Federalism Principles

There are additional reasons why Cal OES is wrong about Section 312(c). Cal OES' position that it is required to do FEMA's bidding is contrary to federalism principles, specifically the clear statement rule, the anti-commandeering doctrine, and the anti-coercion doctrine.

Clear Statement Rule. The Supreme Court has instructed that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

intention to do so 'unmistakably clear in the language of the statute.'" *Will*, 491 U.S. at 65 (quoting *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). Thus, "where statutory intent is ambiguous," the Court "will not attribute to Congress an intent to intrude on state governmental functions" absent a clear, unambiguous statement to the contrary. *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991). Under this standard, the *Gregory* Court held that it was ambiguous whether the term "employee" in the Age Discrimination in Employment Act encompassed state judges. *Id.* at 467, 470. Since Congress did not make it clear that "employee" included judges, the Court refused to construe the statute to include them, avoiding intrusion on state governmental functions. *Id.*

While *Atascadero* applied this rule to Congress's Enabling Clause authority under the Fourteenth Amendment (to waive States' Eleventh Amendment immunity) and *Gregory* applied it to the commerce power (the ADEA), the rule also applies to exercises of Congress's spending power, such as the Stafford Act. In *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), the Court found that a provision of the Developmentally Disabled Assistance and Bill of Rights Act (DDA) did not create substantive rights enforceable against the States since Congress did not provide a clear statement otherwise. Like the Stafford Act, the DDA created a "federal-state grant program whereby the Federal Government provides financial assistance to participating States to aid them" in creating certain programs to benefit a category of citizens. *Id.* at 1. Also like the Stafford Act, the DDA was "voluntary and the States are given the choice of complying with the conditions set forth in the Act or forgoing the benefits of federal funding." *Id.* at 11.

The *Pennhurst* Court concluded that the DDA was "a typical funding statute," *id.* at 22, but it failed to declare "in clear terms" that the recipient States were obligated to provide substantive rights for the developmentally disabled. *Id.* at 23. The Court declared that, when exercising its spending power, "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.* at 24. It emphasized that the clear statement "canon applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate." *Id.* The "crucial inquiry," said the *Pennhurst* majority, is "whether Congress spoke so clearly that we can fairly say that the State could make an informed choice." *Id.* at 25.

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 17 of 23

Here, construing Section 312(c) to render States "person[s]" who are liable for duplicate "benefits available" when those States have tort claims against third parties will, by definition, impose potential obligations upon States that are "largely indeterminate." *Pennhurst*, 451 U.S. at 24. If Section 312(c) is capacious enough to permit the federal government to claw back disaster relief aid whenever States have a tort claim against a third party related to the underlying disaster, States will be at risk for losing enormous, indeterminate sums of money because the amount "available" to the States via the tort claims will be highly speculative and fact-dependent.

Cal OES' claims against PG&E, for example, are based on various negligence-based statutes and common law. Whether negligence has occurred requires the trier of fact to determine if the alleged wrongdoer has acted in a way that deviates from the applicable "standard of care." *See* Cal. Civ. Prac. Torts § 1.19 (2019). Whether an alleged wrongdoer has breached such standard of care is inevitably a fact-sensitive inquiry. *Id.* If Section 312(c) imposes liability upon States because they fail to pursue tort claims against third parties, it imposes liability that is "largely indeterminate," *Pennhurst*, 451 U.S. at 24, and federalism demands that Congress provide an "unmistakably clear" statement of intent to do so. *Gregory*, 501 U.S. at 460-61 (quoting and citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985)). This Court should reject a construction of Section 312(c) that permits the federal government to interfere with the "historic police powers of the States," *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), which includes the States' sovereign decision regarding what litigation to pursue in their own name. States have sovereign immunity under the Constitution precisely because haling a State into court against its will is inconsistent with an essential attribute of sovereignty itself—namely, the power to decide when the sovereign engages in litigation. *Cf. Alden v. Maine*, 527 U.S. 706 (1999).

<u>Anti-Commandeering Doctrine</u>. FEMA also cannot command or coerce California's executive branch to pursue tort claims. "[C]onspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The "Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York v. United States*, 505 U.S. 144, 166 (1992). The Supreme Court has "consistently respected this choice" by insisting that "even

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *Id.* The anti-commandeering and anti-coercion doctrines enforce this understanding.

In *New York v. United States*, 505 U.S. 144 (1992), the Court invalidated a provision of federal law because it directed States to either "take title" to low-level radioactive waste or to "regulat[e] according to the instructions of Congress." *Id.* at 175. This "choice" was no real choice at all, because whichever "choice" the States made, their legislative or executive branches were required to act in accordance with a federal command. The *New York* Court found "the Constitution does not empower Congress to subject state governments to this type of instruction." *Id.* at 176. Similarly, in *Printz v. United States*, 521 U.S. 898 (1997), the Court invalidated a provision of the Brady Act that required state and local law enforcement officials to perform background checks and related ministerial tasks related to handgun license applications. The *Printz* Court reiterated that the federal government lacks power to "command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Id.* at 935.

The anti-commandeering principle serves three purposes that are applicable here. First, it is a structural protection for individual liberty, ensuring that the federal government's power does not become too capacious. *Murphy*, 138 S. Ct. at 1477. Second, it promotes political accountability by ensuring that voters "know who to credit or blame." *Id.* Third, it "prevents Congress from shifting the costs of regulation to the States." *Id.*

Here, the applicable FEMA regulation, 44 C.F.R. § 204.62(c), commands all aid "applicants" to "tak[e] all reasonable steps to recover all costs attributable to the negligence of the third party." *Id.* This command is unconstitutional as applied to California because it dictates "what a state legislature [or executive] may or may not do." *Murphy*, 138 S. Ct. at 1478. Under the regulation, States receiving FEMA aid are commanded to "take all reasonable steps" to recover the costs of negligence attributable to a third party. The FEMA regulation, in other words, commands the States to sue third parties such as PG&E. As Cal OES has admitted, its claims against PG&E have been made only because FEMA's regulation directs it to pursue them. Resp. at 13, 33. But, under the anti-commandeering doctrine, FEMA cannot "conscript state governments

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 19 of 23

as its agents." *New York*, 505 U.S. at 178; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953.

FEMA cannot command or coerce California's executive branch to pursue tort claims. "[T]he Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs" such as FEMA's duplication of benefits regulatory program. *Printz*, 521 U.S. at 925. It is telling that another subsection of the same FEMA regulation—subsection (d)—permits FEMA itself to pursue recovery for duplication of benefits predicated on "intentional acts" of third parties. 44 C.F.R. § 204.62(d); *see also* 42 U.S.C. § 5160(a) ("Any person who intentionally causes a condition for which Federal assistance is provided . . . as a result of a declaration of a major disaster or emergency . . . shall be liable to the United States . . . .").[7] FEMA has filed claims against PG&E under this "intentional acts" provision of the Stafford Act. If FEMA can seek reimbursement of duplicated funds directly against a third party who commits "intentional acts," it can also seek reimbursement directly against a third party who commits negligence. Yet, under FEMA's regulations, it is States such as California, not FEMA itself, who must pursue negligence-based claims on FEMA's behalf. It is the States, therefore, who must do FEMA's bidding and pursue negligence-based claims using *State* resources to recover money to which the federal government is entitled. But, whether based upon intentional acts or negligence, duplication of benefits claims inure to the benefit of FEMA, not the States. It is thus a federal policy—duplication of benefits—that is being effectuated by Section 312(c). Thus, the responsibility for bringing such negligence-based claims, and the costs associated therewith, should be borne solely by the federal government. *Murphy*, 138 S. Ct. at 1477.

Indeed, absent this regulation, California could decide not to pursue claims against PG&E. Cal OES' claims, if successful, will substantially reduce the wildfire victims' recovery. California could prefer to use its resources to help victims. Like all States, California has limited resources, and it would rationally prefer to use those resources to compensate wildfire victims rather than

---

[7] The FEMA regulation states that the applicant must "agree[ ] . . . to cooperate with FEMA in efforts to recover the cost of the assistance from the liable party." 44 C.F.R. § 204.62(d). Despite the regulatory command that the applicant "cooperate" in the effort to obtain recovery from the intentional wrongdoer, the responsibility for initiating and prosecuting that effort lies solely with FEMA. The initiation and prosecution of efforts to pursue recovery from negligent third-party wrongdoers, by contrast, lies solely with the applicant, including State entities such as Cal OES. *Id.* at § 204.62(c).

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 20 of 23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

pursuing negligence claims against PG&E. This regulation purports to nullify California's ability to make a rational choice by forcing California to litigate. The regulation "undermines existing state and local policies and strips local policy makers of the power to decide for themselves" whether to pursue a tort claim against PG&E. *City & Cty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 951 (N.D. Cal. 2018), *argued sub nom. City & Cty. of San Francisco v. Barr*, No. 18-17308 (9th Cir. Dec. 2, 2019).

Should this anger California citizens, FEMA Officials will presumably assert that California's decision to file claims against PG&E was made by the State alone. If Californians turn their ire toward the State, California officials will presumably point the finger at FEMA, as Cal OES has done in its Response. Resp. at 13-14. Yet, as demonstrated above, Section 312(c)'s plain language does not require Cal OES to assert its tort claims. If it does apply, however, it forces States to litigate on FEMA's behalf, impermissibly commandeering State executive branches to effectuate federal duplication of benefits policy. If Cal OES is going to diminish the wildfire victims' recovery in this case for FEMA's benefit, California voters should know whom to blame. *See Murphy*, 138 S. Ct. at 1477.

Finally, by commanding States to "tak[e] all reasonable steps to recover all costs attributable to the negligence of the third party," 44 C.F.R. § 204.62(c), the FEMA regulation "shift[s] the cost of regulation to the States." *Murphy*, 138 S. Ct. at 1477; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 952. Rather than directly litigating against third parties who are negligent, the FEMA regulation requires the States to do so. This permits Congress to avoid appropriating federal funds needed to administer its duplication of benefits policy, foisting the costs thereof onto the States. *Id*

Anti-Coercion Doctrine. While States could theoretically decline to accept any FEMA funds, this "choice" is not meaningful. Under this logic, States have the following "choices": (1) accept federal aid in times of major disasters and be conscripted to litigate negligence claims against third parties on FEMA's behalf; (2) accept federal aid, refuse to litigate such tort claims against third parties, and be liable to FEMA for "largely indeterminate" claw back liability; or (3) forego all federal disaster relief funds and let victims suffer.

Under the anti-coercion doctrine, these "choices" are not meaningful. The first "choice"

Case: 19-30088 Doc# 5836 Filed: 02/19/20 Entered: 02/19/20 15:14:01 Page 21 of 23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

commandeers the States to litigate on FEMA's behalf, conscripting the State as an agent of the federal government. *New York*, 505 U.S. at 178; *City & Cty. of San Francisco*, 349 F. Supp. 3d at 953. The second "choice" imposes a "largely indeterminate" claw back liability upon the States, *Pennhurst*, 451 U.S. at 24, that interferes with an essential attribute of State sovereignty—namely, its power to decide what policies to pursue and whether to pursue litigation in its own name. *Cf. Alden v. Maine*, 527 U.S. 706 (1999) (discussing the history and importance of State sovereign immunity); *see also City & Cty. of San Francisco*, 349 F. Supp. 3d at 951. Given the indeterminacy of tort liability, one cannot "fairly say that the State could make an informed choice" about whether to accept federal disaster aid given the multiple layers of textual ambiguity—and concomitant lack of clear statement—in Section 312(c). *Pennhurst*, 451 U.S. at 25.

The third choice—foregoing all federal disaster aid—is likewise an unconstitutional choice, forbidden by the anti-coercion doctrine. Like the Affordable Care Act's ("ACA") withholding of 100 percent of Medicaid funding if States did not expand their Medicaid programs according to federal commands, withholding 100 percent of federal disaster assistance if States do not agree to cede their sovereignty to the federal government and litigate on its behalf "'pass[es] the point at which 'pressure turns into compulsion.'" *South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (quoting *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590 (1937)).

In this case, as with the ACA's Medicaid withholding, "the financial 'inducement' Congress has chosen is much more than 'relatively mild encouragement'—it is a gun to the head." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (plurality opinion of Roberts, C.J.) and an offer "no State could refuse." *Id.* at 689 (Scalia, J., dissenting). The amount of claw back liability that States could face if Section 312(c) is interpreted as FEMA contends is in the billions of dollars, with much higher amounts in some years due to large-scale disasters such as hurricanes and the California wildfires.[8] Even more disturbingly, the intense pressure Section 312(c) imposes on States to litigate tort claims on FEMA's behalf is amplified by the fact that such pressure is

[8] *See Natural Disaster Mitigation Spending Not Comprehensively Tracked*, Pew Charitable Trusts 2 (2018), available at https://www.pewtrusts.org/-/media/assets/2018/09/fiscal_federalism_federal_and_state_funding_issue_brief_v1.pdf; Jeff Stein & Andrew Van Dam, *Taxpayer Spending on U.S. Disaster Fund Explodes Amid Climate Change, Population Trends*, Washington Post, Apr. 22, 2019, available at https://www.washingtonpost.com/us-policy/2019/04/22/taxpayer-spending-us-disaster-fund-explodes-amid-climate-change-population-trends/.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

applied during the States' (and their citizens') greatest time of need, when disasters have already devastated communities and stressed States' financial resources. Because FEMA is forcing Cal OES to litigate its tort claims, these claims should be disallowed under the anti-commandeering and anti-coercion doctrines.

**D. <u>TCC's Supplemental Objection Need Not be Decided at this Time</u>**

In response to the TCC's Supplemental Objection (Dkt. No. 5320), Cal OES does not deny that it asserts the right to recover from public entities and local governments on account of its wildfire-related claims but argues that marshalling does not apply here because the TCC has not alleged that there are two funds belonging to a single debtor. Cal OES cannot point to any language in Section 3433 of the California Civil Code supporting this argument because there is none.

Cal OES' sovereign immunity defense also fails. The TCC is not claiming that Cal OES is liable for an injury; rather, the TCC is arguing that the amount of Cal OES' claim should be reduced where it caused damage to property. The TCC's contention that Cal OES cannot recover for damages it caused does not implicate California's sovereign immunity. These issues require further discovery and should not be addressed now. The issues that can and should be decided now are whether Cal OES has stated a *prima facie* basis for liability and whether FEMA can force Cal OES to assert claims on its behalf. All remaining issues, including those raised in the TCC's Supplemental Objection, should be reserved until further discovery is completed.

## III. CONCLUSION

For the reasons set forth in the Objection and herein, the Objection should be sustained, and the Cal OES Claims should be disallowed and expunged in their entirety.

Dated: February 19, 2020

BAKER & HOSTETLER LLP

By: */s/ Eric R. Goodman*
Eric R. Goodman

*Attorney for The Official Committee of Tort Claimants*