1            UNITED STATES BANKRUPTCY COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                        -oOo-

4   In Re:                      ) Case No. 19-30088
                                ) Chapter 11
5   PG&E CORPORATION AND PACIFIC   )
    GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                ) Thursday, February 20, 2020
                        Debtor.  ) 1:30 PM
7   _____ )
                                    SECURITIES LEAD PLAINTIFF'S
8                                   MOTION TO APPLY BANKRUPTCY
                                    RULE 7023 TO CLASS PROOF OF
9                                   CLAIM [5042]

10               TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE DENNIS MONTALI
11            UNITED STATES BANKRUPTCY JUDGE

12  APPEARANCES:
    For the Debtor:             STEPHEN KAROTKIN, ESQ.
13                              RICHARD W. SLACK, ESQ.
                                (Telephonically)
14                              Weil, Gotshal & Manges LLP
                                767 Fifth Avenue
15                              New York, NY 10153
                                (212)310-8000
16

17  For PG&E Shareholders:      BRUCE BENNETT, ESQ.
                                Jones Day
18                              555 South Flower Street
                                Fiftieth Floor
19                              Los Angeles, CA 90071
                                (213)489-3939
20

21  For Official Committee of   DAVID J. RICHARDSON, ESQ.
    Tort Claimants:             BakerHostetler LLP
22                              11601 Wilshire Blvd
                                14th Floor
23                              Los Angeles, CA 90025
                                (310)442-8858
24

25

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

```
 1

 2    For Public Employees       RANDY MICHELSON, ESQ.
      Retirement Association of   Michelson Law Group
 3    New Mexico:                 220 Montgomery Street
                                  Suite 2100
 4                                San Francisco, CA 94104
                                  (415)512-8600
 5
      For Public Employees       MICHAEL S. ETKIN, ESQ.
 6    Retirement Association of   Lowenstein Sandler LLP
      New Mexico:                 One Lowenstein Drive
 7                                Roseland, NJ 07068
                                  (973)597-2500
 8
      For Public Employees       THOMAS A. DUBBS, ESQ.
 9    Retirement Association of   (Telephonically)
      New Mexico:                 Labaton Sucharow LLP
10                                140 Broadway
                                  New York, NY 10005
11                                (212)907-0700

12    For the Debtors:            JANE KIM, ESQ.
                                  Keller & Benvenutti LLP
13                                650 California Street
                                  Suite 1900
14                                San Francisco, CA 94108
                                  (415)364-6793
15

16

17    Court Recorder:            ANKEY THOMAS
                                  United States Bankruptcy
18                                Court
                                  450 Golden Gate Ave.
19                                San Francisco, CA 94102

20
      Transcriber:               EMILY HOWARD
21                                eScribers, LLC
                                  7227 N. 16th Street
22                                Suite #207
                                  Phoenix, AZ 85020
23                                (973)406-2250

24    Proceedings recorded by electronic sound recording;
      transcript provided by transcription service.
25
```

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    SAN FRANCISCO, CALIFORNIA, THURSDAY, FEBRUARY 20, 2020, 1:30 PM

2                              -oOo-

3        (Call to order of the Court.)

4            THE COURT:  Good afternoon.

5            IN UNISON:  Good afternoon.

6            THE COURT:  I didn't expect to see so many of you

7    here.

8            THE CLERK:  Matter of PG&E Corporation.

9            THE COURT:  Appearances?  Mr. Karotkin, I didn't

10   expect you here, but here you are.

11           MR. KAROTKIN:  Can't stay away, sir.

12           THE COURT:  All right.  Well, let's -- are you going

13   to make the presentation?

14           MR. KAROTKIN:  Yes, sir.

15           THE COURT:  Okay.  Well, then I'll get the appearances

16   from the others when they hear.  So you've got my questions.

17           MR. KAROTKIN:  I do.

18           THE COURT:  Why don't we start with that?

19           MR. KAROTKIN:  I'd like to digress, if I could.

20           THE COURT:  Okay.

21           MR. KAROTKIN:  If you can indulge me.  I'll address

22   your questions --

23           THE COURT:  No --

24           MR. KAROTKIN:  -- in the mediation order, but --

25           THE COURT:  You can digress.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. KAROTKIN:  If you could indulge me, I think that

2    it's important, Your Honor, to put this matter into context and

3    to understand why we're here today in dealing with this issue,

4    at this critical stage of these cases.  I may tread over some

5    ground that was tread the other day, but I think, again, it's

6    important for the purpose of today's hearing as to what's

7    really motivating the plaintiffs and what's in the best

8    interest of this successful and timely --

9          THE COURT:  Well, what's motivating me, in terms of

10   what's the right thing to do for this case, so --

11         MR. KAROTKIN:  Well, exactly.  I think --

12         THE COURT:  Okay.

13         MR. KAROTKIN:  Again, it's important that -- I think

14   it's important to go back to see where we are and what's

15   happened.

16         THE COURT:  All right.

17         MR. KAROTKIN:  And as I'm sure you'll recall, Your

18   Honor, in connection with the establishment of the bar date,

19   back last summer, there were extensive hearings before the

20   Court, multiple hearings, multiple pleadings, concerns raised

21   about proper notice and a lot of the input, a lot of the input

22   from various parties.  And not only, Your Honor, the fire

23   victims, who obviously were deeply involved, but a lot of

24   parties as to what the appropriate notice was.  And as, again,

25   you know, Your Honor, as a result of those efforts, you

PG&E Corporation

1    approved a bar date order, a bar date notice that was the most

2    widespread and the most robust bar date notices -- noticing

3    program, perhaps, Your Honor, in the history of a Chapter 11

4    case.  And again, not just from the perspective of the fire

5    claimants, but from the perspective of all potential claimants

6    in this case.

7            And I think, again, it's important to note, Your

8    Honor, going back to those hearings before Your Honor, that

9    were noticed to everyone, including the plaintiffs, who were

10   seeking class -- seeking to file the class claim, where were

11   they when that process was ongoing?  They were conspicuously

12   absent, despite having notice of it.  They put in no pleadings.

13   They put in no objection.  Not one word, Your Honor.  Not one

14   word.  Not one pleading as to due process, as to whether that

15   notice that you approved was appropriate.  Not one complaint

16   about the matters that were raised the last couple of weeks.

17   Not one thing --

18           THE COURT:  You're a little loud.

19           MR. KAROTKIN:  Okay, despite the fact that they were

20   actively involved in these cases.  So where were they back

21   then, Your Honor?  And why didn't they raise those issues?  And

22   I know you don't want to hear this, but I think it's important

23   to hear this.

24           THE COURT:  I'll hear it.

25           MR. KAROTKIN:  The answer is quite obvious, because

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    raising those concerns at that time, as to notice and whether

2    the notice should have been modified to address the concerns

3    they're now raising, would have completely eliminated any

4    chance for there to be a class claim.  And what would that have

5    done?  Eliminated any chance for the plaintiff lawyers to get a

6    fee.

7            And that's what this is all about.  And let's be

8    honest about what it's all about.  If they were really

9    concerned, Your Honor, about the rights of the so-called class,

10   the putative class members, and due process, where were they

11   six months ago?  Where were they six months ago?

12           THE COURT:  No, I -- that's a fair question, but the

13   question is, therefore, what do I do about it?

14           MR. KAROTKIN:  Okay.  I'm going to tell you what we

15   should do about it.

16           THE COURT:  Okay.

17           MR. KAROTKIN:  Number one, I think you should

18   reconsider whether notice was appropriate.  Because again, that

19   was the most robust notice ever given in any Chapter 11 case,

20   and more than sufficient to address any issues of due process.

21   And they --

22           THE COURT:  So if I were to do --

23           MR. KAROTKIN:  -- strategically --

24           THE COURT:  If I were to do that, I would deny the

25   motion and deny the alternative of --

PG&E Corporation

1        MR. KAROTKIN:  Exactly.  And that's -- Your Honor,

2   that's what I think the right answer is.

3        THE COURT:  But what would be the result for the

4   people that were denied notice?

5        MR. KAROTKIN:  They were not -- the fact of the matter

6   is that they were not denied notice.

7        THE COURT:  Well, how --

8        MR. KAROTKIN:  There was more than adequate notice.

9        THE COURT:  Where would their rights be vindicated

10  under the plan?  What would happen to them?

11       MR. KAROTKIN:  Just like in any other Chapter 11 case,

12  where constructive notice is appropriate, there was

13  constructive notice.  There was constitutional notice.  In

14  fact, it was better notice than -- as I said, than has ever

15  been given in a case.

16       THE COURT:  Okay.

17       MR. KAROTKIN:  But they remained silent and they

18  remained strategically silent.  And then what did they do, Your

19  Honor?  They waited until the very last day, the very last day

20  of the bar date to file their claim.  Then they waited two

21  months to bring this motion before the Court.  Again, very

22  strategic to advance their own economic interests.  And

23  that's -- again, now why today, Your Honor, are they fighting

24  against a new bar date?  Simple answer to that question and

25  it's the same answer.  Because again, Your Honor, if you were

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1   to extend the bar date, they're out of the box on a fee.  And

2   that's what this is all about.  And I think it's important to

3   recognize that.  Now, I'm more than happy to address your other

4   issues, but I think that --

5           THE COURT:  Well, what you need to address is, you

6   know, why didn't the notice go and reach out to the -- through

7   the nominees.  In other words, these are -- see, the reason why

8   I don't want to get into a lot of the -- what might have

9   happened, it's what should happen.  And so what you're telling

10  me is, to go back to the last hearing, when I talked about Mr.

11  A and Mr. B, what you're saying is Mr. B didn't get actual

12  notice, but therefore, Mr. B's claim will be discharged.

13          MR. KAROTKIN:  Your Honor, if construct --

14          THE COURT:  Whereas, under the alternative, one of

15  the -- either of the alternatives today or the third one I've

16  just passed through, you haven't told me whether you -- whether

17  that's a feasible one.  Then B is discharged, maybe -- maybe.

18          MR. KAROTKIN:  And that's how Chapter 11 works, Your

19  Honor.  Because that's how constructive notice works.  And if

20  constructive notice is ever appropriate, then it was

21  appropriate here.

22          THE COURT:  Is it appropriate when there is a

23  mechanism for giving actual notice?

24          MR. KAROTKIN:  There was no requirement to give actual

25  notice in the context of these cases.  And I think that's what

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  escapes everybody.  But let's address the issues you have

2  today.  Number one, and I can go through those issues, but --

3         THE COURT:  Well, yeah, I made them up.  The other --

4  the plaintiff's didn't come up with them.  They wanted me to

5  grant their motion and I did my research and read the briefs

6  and saw alternatives and threw out, in an expedited basis --

7  that's why I didn't want to change people's travel schedules or

8  do otherwise.  I just wanted to move quickly on this.  So yeah,

9  why not just do nothing, divide everything and let nature take

10 its course and pass through?

11        MR. KAROTKIN:  Because there's a very simple answer to

12 that question.  Number one, Your Honor, the securities claims

13 are subordinated.

14        THE COURT:  Right.  I know, but they're --

15        MR. KAROTKIN:  Most of them are --

16        THE COURT:  But they're in the money.

17        MR. KAROTKIN:  Pardon me?

18        THE COURT:  They're in the money.

19        MR. KAROTKIN:  But they're treated the same as equity.

20        THE COURT:  I know.  Well --

21        MR. KAROTKIN:  And they're to be treated the same as

22 equity under the plan.

23        THE COURT:  No, I know that.

24        MR. KAROTKIN:  And if you were to let them ride

25 through, they wouldn't be treated the same as equity and there

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    would be disparate treatment.  If they rode through, they would

2    be treated as --

3            THE COURT:  Why is that?  I don't -- guess I don't --

4            MR. KAROTKIN:  -- dollar claims.  They would be --

5    they would have to be paid in cash, if their claims were

6    sustained.

7            THE COURT:  Well --

8            MR. KAROTKIN:  And that's now how equity's being

9    treated.

10            THE COURT:  Some of the securities claims.

11            MR. KAROTKIN:  Most of them.  Most of these are

12    equity-based.

13            THE COURT:  Well, I under -- but see, I can't quantify

14    it.  There are some bondholders and there are some

15    shareholders.  The shareholders get to be shareholders.  The

16    bondholders get to be subordinated something or other.

17            MR. KAROTKIN:  Well, I don't know how you let the

18    shareholder claims ride through and how they would be treated

19    as unimpaired under the plan and be treated in the same way as

20    existing shareholders.  It's impossible.

21            THE COURT:  What would've happened --

22            MR. KAROTKIN:  Existing shareholders are being

23    significantly diluted under the plan.

24            THE COURT:  Well, no, I understand they're being

25    diluted.  I understand.  But what would've happened -- well,

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation

1    okay.  You say that ride through is not an option.

2          MR. KAROTKIN:  Ride through is absolutely not an

3    option.

4          THE COURT:  Under the existing plan, there are --

5    well, what -- suppose I go with the alternative of a

6    deferred -- reopen a bar date.  What happens to the plan?  In

7    other words, what do you do with the plan?  You've got, if I

8    read it correctly, the common stock of the parent is impaired,

9    and the bonds of the sub are unimpaired.

10          MR. KAROTKIN:  Correct.

11          THE COURT:  So there's potential for different -- at

12    least two different classifications anyway.

13          MR. KAROTKIN:  And they currently are classified

14    separately and would be treated separately.

15          THE COURT:  Right, right, but what --

16          MR. KAROTKIN:  So if you were to open the bar date, I

17    think the concerns that you raise, well, what if the bar date

18    were after the disclosure statement was approved?  How would we

19    address that?

20          THE COURT:  I don't know.

21          MR. KAROTKIN:  Again, I'll tell you.  It's a very

22    simple answer.  Number one, under the plan, the claims based on

23    the bonds, which are subordinated but not subordinated to the

24    level of equity, are unimpaired and paid in full.  So there is

25    no issue as to voting.  They do not vote.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          THE COURT:  Right, there are -- they'd stay

2    unimpaired.  That's right.

3          MR. KAROTKIN:  So the disclosure statement issue is

4    irrelevant, and voting is irrelevant.

5          THE COURT:  Slow down for a minute.  I think you're

6    stating what I believe, too.  The securities plaintiffs would

7    be subordinated and unimpaired.  They'd --

8          MR. KAROTKIN:  The debt securities.

9          THE COURT:  Yes, the debt -- that's correct.  The debt

10   securities, to the extent that they have a claim.  Maybe they

11   have no claim.

12         MR. KAROTKIN:  Correct.

13         THE COURT:  But if Mr. B files a claim for X dollars

14   and isn't challenged, then he will get equity.

15         MR. KAROTKIN:  Exactly.

16         THE COURT:  In that amount.

17         MR. KAROTKIN:  No, he will get cash.

18         THE COURT:  Oh, okay, cash.

19         MR. KAROTKIN:  He will get cash.

20         THE COURT:  All right.  So what's wrong with that

21   result?

22         MR. KAROTKIN:  There's nothing wrong with that result.

23   And in fact, there's no disclosure issue there, either, because

24   they don't vote.

25         THE COURT:  No, I --

of 119   (973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    MR. KAROTKIN:  And if you were to have a bar date,

2    that would be fine.  No one's rights would be prejudiced.

3    THE COURT:  Well, it's not fine.  But it seems to me

4    that you're complaining about the plaintiff's lawyers and I

5    don't want to get into the plaintiff's lawyers.  If I open a

6    bar date for debt bond -- debt bond purchasers to the extent

7    that they have allowed claims, they'd get paid.

8    MR. KAROTKIN:  Correct.

9    THE COURT:  And so they're unimpaired and --

10    MR. KAROTKIN:  And there's no issue as to disclosure,

11    because they're not voting anyway.

12    THE COURT:  No, I understand.  And that's what

13    would've happened to that group of people if there had never

14    been an bankruptcy and they just participated and the district

15    court had allowed the matter to get to class, you know, the

16    whole process, right?

17    MR. KAROTKIN:  That's correct.

18    THE COURT:  Okay.  But what happens to the stock

19    purchasers?

20    MR. KAROTKIN:  Again, the stock purchasers, to the

21    extent they have valid claims, are to be treated at the same

22    level as equity holders.

23    THE COURT:  Right.

24    MR. KAROTKIN:  That's how it works.  That's what the

25    statute says.

of 119   operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation

1          THE COURT:  Right, that's what I understood.

2          MR. KAROTKIN:  Okay.  Now as to -- again, now the

3     thrust of -- one of the -- one of your questions was, well,

4     when to disclosure and voting and how we would address that if

5     the bar date were after you approved the disclosure statement.

6     Again, easy answer for this -- for the debt securities claims.

7     They don't vote.

8          THE COURT:  We'd passed that --

9          MR. KAROTKIN:  And the same easy answer for equity, by

10    the way.  Because it doesn't matter whether equity accepts or

11    rejects the plan for purposes of confirmation.  It doesn't

12    matter.

13         THE COURT:  Well, do -- but what do we do about the

14    disclosure requirements?

15         MR. KAROTKIN:  The disclosure requirements, Your

16    Honor, those claims -- in fact, the only way we will know the

17    magnitude of those claims, the only way we will know the

18    magnitude of those claims, for purposes of a confirmation and

19    addressing feasibility -- not feasibility, but other issues

20    relevant to confirmation, is if those claims are actually

21    filed, so we can see what they are.  Having a class proof of

22    claim will not give us any idea as to the magnitude of those

23    claims, either the debt claims or the shareholder claims.  The

24    only people who know whether they suffered a loss are those

25    people --

PG&E Corporation

1          THE COURT:  Who suffered the loss.

2          MR. KAROTKIN:  Who suffered the loss.

3          THE COURT:  All right, okay.

4          MR. KAROTKIN:  The class claimants do not know it.  So

5    again, Your Honor, if you are inclined to find that there was

6    not due process, the only way to satisfy that is to open up the

7    bar date.  That's the only way to do it.

8          THE COURT:  Okay, but --

9          MR. KAROTKIN:  A class claim --

10         THE COURT:  Mr. Karotkin --

11         MR. KAROTKIN:  -- will not satisfy that.

12         THE COURT:  You're going too fast.  Come back to my

13   question.  Let's assume I open up the bar date.  You've

14   persuaded me and I've figured out myself that the people who

15   bought bonds, security -- debt instruments are unimpaired.

16   What about the people that bought equity?  Are they impaired or

17   not?

18         MR. KAROTKIN:  They are impaired.

19         THE COURT:  Then what do I do about them for purposes

20   of complying with the disclosure rules.

21         MR. KAROTKIN:  As I said, Your Honor, the disclosure

22   rules go to voting.  That's what a --

23         THE COURT:  Okay, but -- but the rule -- well, but

24   they --

25         MR. KAROTKIN:  It doesn't -- again, a disclosure

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation

1  statement, unless I'm missing something here, is for voting on

2  a plan.

3          THE COURT:  And aren't the equity going to vote on the

4  plan as it is?

5          MR. KAROTKIN:  Whether they vote on the plan is

6  irrelevant, because it doesn't matter for purposes of

7  confirmation whether the class of equity accepts or rejects the

8  plan.  It doesn't matter.

9          THE COURT:  Then why -- why do we have an impaired

10 class that's getting disclosure under the disclosure statement

11 presently?  In other words, if I take your advice and toss this

12 whole thing out, the equity class of the parent company will

13 get their disclosure, right?

14         MR. KAROTKIN:  They will.

15         THE COURT:  But we don't count their votes?

16         MR. KAROTKIN:  It doesn't matter.

17         THE COURT:  I know it doesn't matter.

18         MR. KAROTKIN:  It doesn't matter.  It has no impact on

19 anything, Your Honor.

20         THE COURT:  Then why didn't you tell me that we didn't

21 need to disseminate a disclosure statement to that class of

22 equity?  We just --

23         MR. KAROTKIN:  You know, Your Honor, that's certainly

24 an option.  That's certainly an option.

25         THE COURT:  But we've already done it.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. KAROTKIN:  No, we haven't.  We haven't sent out

2    the disclosure statement and we haven't sent out ballots yet.

3          THE COURT:  Well, of course.  But you've sent out the

4    notice of the hearing.

5          MR. KAROTKIN:  Yes.  And people have a right to be

6    heard and they can object to confirmation.  But again --

7          THE COURT:  I've been --

8          MR. KAROTKIN:  If you're concerned about disclosure

9    for voting purposes, it's a red herring.  It's not an issue.

10   What is the issue is how do we understand the magnitude of the

11   claims?  And the only way to --

12         THE COURT:  I think we're -- I'm sorry to interrupt

13   you.  I think we're talking about two different things.  I

14   fully appreciate the issue of, well, if I allow a class claim,

15   how do we quantify it versus if I allow an open deadline or a

16   fixed deadline to file claims, that will quantify it?  And

17   therefore, there's a choice.

18         MR. KAROTKIN:  And Your Honor --

19         THE COURT:  But if you're telling me it doesn't matter

20   for voting purposes, then I have to ask the broader question.

21   Should there be a revisiting of whether there needs to be a

22   promulgation of a notice of a deadline for disclosure and --

23   excuse me, a deadline for voting under the notice procedure,

24   even for the existing equity?  And you seem to be saying no, we

25   don't have to solicit the votes.  And I might agree with you,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  but that's not the -- this is the first time we've had that

2  discussion.

3          MR. KAROTKIN:  Again, but for purposes of today's

4  hearing --

5          THE COURT:  Yes.

6          MR. KAROTKIN:  -- it doesn't matter.  That's what I'm

7  trying to tell you.

8          THE COURT:  Okay.

9          MR. KAROTKIN:  You know, they complain about

10  disclosure and participating in the disclosure statement

11  hearing.  Again, it doesn't matter for purposes of voting on

12  the plan and confirmation.  Whether that class of equity votes

13  yes or no is irrelevant to whether or not we can meet the

14  requirements under Section 1129.  It's not a cramdown -- it is

15  a cramdown issue, but you're cramming down an equity,

16  effectively.

17          THE COURT:  But I guess I -- I have to -- I think I

18  disagree with you because I haven't thought it through because

19  I didn't think this was an issue.  Until this discussion, I've

20  been assuming that the equity class will vote, but I've also

21  been assuming that it's probably not a big issue because you've

22  probably got the votes.

23          MR. KAROTKIN:  That's correct.  And Your Honor --

24          THE COURT:  That's different from saying they're not

25  going to be a vote.

escribers
(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    MR. KAROTKIN:  But I'm trying to address your concerns

2  about disclosure, okay, and how it really is a red herring.

3  But look, even if we were to have a bar date in the timing

4  we're proposing, it would be finished by March 31st and there's

5  still forty-five days to vote.

6    THE COURT:  Well, I know, but you have the anomaly of

7  having a disclosure process open up at the time that the

8  deadline to object to disclosure has closed.  And that's a bit

9  of a problem.  Look, I've got to be honest with you.  Why the

10  hell did this even happen in the first place?  And don't -- you

11  know, you can say we had this robust hearing on the bar date,

12  but why didn't the original notice include a procedure for

13  giving notice through the nominee?

14    MR. KAROTKIN:  Because there's no requirement under

15  applicable law.

16    THE COURT:  How about under applicable common sense,

17  because there was an existing district court class action that

18  was fully defended by the debtor and the officers and directors

19  and people knew that it was a potential to deal with it.  So

20  why -- and you don't have to answer the question, but it's a

21  rhetorical question.  Why wasn't there as much notice as

22  could've been given, so we never would have had this

23  discussion?  I mean, I'm frustrated from that point of view,

24  because I -- I agree with you.  We shouldn't be having this

25  discussion.  But I don't think we would've had the discussion

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1  if the notice was a little more robust than you say was more

2  than robust.

3          MR. KAROTKIN:  Okay, well, Your Honor, look, as I

4  said, I think the notice was more than sufficient.  We are

5  where we are today.  And we -- what we have proposed -- again,

6  if you believe the notice was not sufficient, we have proposed

7  a solution to that problem, which assures due process.  A class

8  claim does not assure due process.  What would you do -- what

9  are you going to do, Your Honor, if you allow the class claim,

10  you don't have an extended bar date.  Then there has to be a

11  class certification procedure.

12          THE COURT:  I know.

13          MR. KAROTKIN:  And you determine they can't satisfy

14  that.  Then what?

15          THE COURT:  I don't know.  I -- Mr. --

16          MR. KAROTKIN:  So why doesn't -- why doesn't the

17  notice of the bar date fix all of that?

18          THE COURT:  Mr. Karotkin, I have -- and I suspect you

19  have, too -- been struggling with this since it came to light.

20  Like, what in the hell am I supposed to do, if I may be so

21  blunt?

22          MR. KAROTKIN:  Right.

23          THE COURT:  Because I don't like either of the

24  outcomes, you know?

25          MR. KAROTKIN:  Okay, but I'm saying if -- again, if

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1　you're concerned about due process, the only way to assure that

2　your concern is addressed is an extended bar date.  That's the

3　only way to do it.  A class claim does not do it.  It will

4　never do it.

5　　　　　THE COURT:  Well, but you're suggesting that the

6　system then, in our federal system of class claims is deficient

7　from a due process point of view.  But you know what, it works,

8　too, right?

9　　　　　MR. KAROTKIN:  Your Honor, let me -- can I ask you a

10　question?

11　　　　　THE COURT:  In fact, what would you do if this were a

12　Chapter 7 liquidating, so you -- and it was -- everybody is

13　out.  So it means nothing.  If you don't get noticed in time to

14　find a claim, you're out of luck no matter what.

15　　　　　MR. KAROTKIN:  That's right.

16　　　　　THE COURT:  The advantage here of passing through is

17　if you have a claim, and we can speculate all day long, whether

18　anybody really has a claim, that claim will survive under a

19　pass through.

20　　　　　MR. KAROTKIN:  But you can't pass through the equity

21　claim.

22　　　　　THE COURT:  Well, I guess I don't agree with you.  I

23　don't know why you can't.

24　　　　　MR. KAROTKIN:  Because how would those claims be

25　satisfied?

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1         THE COURT:  They'd get equity.

2         MR. KAROTKIN:  In what amounts?

3         THE COURT:  I don't know.  But they -- to me, in a

4    simple world, you say that --

5         MR. KAROTKIN:  And how are the investors in this

6    company -- how are the investors in this company supposed to

7    know how much equity's going to be issued and diluted?

8         THE COURT:  I'm trying to answer your question.  I'm

9    doing my best to answer your question.

10        MR. KAROTKIN:  I'm sorry.

11        THE COURT:  You have a hundred percent of equity, of

12   which twenty percent has been allocated to the victims.  So out

13   of that other eighty percent, you take care of whatever you

14   have to take care of, period, the same as that -- what you do

15   if there was a class action for defrauded stockholders outside

16   a bankruptcy.

17        MR. KAROTKIN:  And how do the equity investors in this

18   company, who are putting in substantial amounts of money, know

19   the impact of -- impact of that, which won't happen until after

20   confirmation?

21        THE COURT:  I don't know.

22        MR. KAROTKIN:  Well, that's a serious problem.

23        THE COURT:  Maybe you have an estimation under 502(c).

24        MR. KAROTKIN:  And how -- exactly, Your Honor.  And if

25   they filed claims, we would have the best information for that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  estimation.  The best information.

2         THE COURT:  I understand.  You're making an argument

3  for plan B, if you will, for the alternative, which you want me

4  to reject both of the alternatives.  And as I say, I wish I

5  didn't have to even choose.  I wish this hadn't happened.  Let

6  me just look at one thing I meant to look up earlier.

7         Yeah, come to think of it, see, this is something I

8  was thinking about last night, before I looked at the book.

9  502(c) works great, but it doesn't work for equity, I don't

10  think.  I don't know, or does it?

11         MR. KAROTKIN:  It's still a claim.

12         THE COURT:  Yeah, I guess for those purposes, it's a

13  claim.  It's a contingent claim, but I mean, it's a claim based

14  upon an equity position that, under the statute, remains

15  equity.  And I guess -- I guess that's true.

16         MR. KAROTKIN:  Yes, but it's still -- it's still --

17         THE COURT:  If you're a defrosted -- if you're a

18  defrauded shareholder, you're still a shareholder for -- no,

19  it's a claim.  Well -- is it -- it's a claim --

20         MR. KAROTKIN:  It's a dollar claim --

21         THE COURT:  -- for estimation purposes, but it's

22  still --

23         MR. KAROTKIN:  Yes, it's a claim for estimation

24  purposes.

25         THE COURT:  But it's still equity.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1        MR. KAROTKIN:  It's still --

2        THE COURT:  Once a shareholder, always a shareholder,

3  right?

4        MR. KAROTKIN:  You can't bootstrap your position.

5  That's an intent of the statute.

6        THE COURT:  Right, no, I agree.  But we agree on the

7  law.

8        MR. KAROTKIN:  Yes.  And what I'm saying -- again, I

9  understand.  You are concerned about due process.  The only way

10  to fix that today is with an extended bar date.  Not only will

11  that give notice to everybody, which a class proof of claim

12  will not.  It avoids the problem of opt-outs.  And then what do

13  you?  Do they have to get notice later?

14        THE COURT:  I don't know why in an opt-out, when you

15  have a discharge, why anybody would opt-out.  Because opting

16  out means you opt right out, into the sewer.

17        MR. KAROTKIN:  I mean, if they opted out, why aren't

18  they, then, entitled to another bar date?

19        THE COURT:  Well, come on.  That's not a good answer.

20        MR. KAROTKIN:  I don't know the answer to that.

21        THE COURT:  If you have notice of a bankruptcy and you

22  don't assert a claim, you're out.  You have opt out because

23  you've chosen to opt out.  I don't think this is like a class

24  notice, where you can opt out and preserve your right, because

25  in the more traditional class action, you don't have a

escribers
(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1  discharge in the middle of it, right?

2  MR. KAROTKIN:  I'm not sure I agree with you and I'm

3  not sure exactly --

4  THE COURT:  But isn't that true?  What if you got --

5  you know, you got a notice in the mail saying you're going to

6  get five dollars because somebody charged you too much for your

7  car repair.  And so you say opt out, you have a right to sue

8  the company, right?

9  MR. KAROTKIN:  Well, yeah --

10  THE COURT:  Judge Breyer, right upstairs, doing the

11  Volkswagen --

12  MR. KAROTKIN:  Again, but you're assuming, Your Honor,

13  that that person had adequate notice to begin with.

14  THE COURT:  Correct..

15  MR. KAROTKIN:  And you're concerned about that.  And

16  what I'm saying, you can't fix that like that.  It can't be

17  fixed.  And if you don't certify the class, then what?  And we

18  haven't even gotten there, to those issues.  Again --

19  THE COURT:  No, I know.  Listen --

20  MR. KAROTKIN:  -- the most elegant way to do this is

21  to have the bar date.  Again --

22  THE COURT:  You're a good lawyer, Mr. Karotkin.  But

23  you keep switching the argument on me.  You started this

24  argument by saying I should throw everything out because --

25  MR. KAROTKIN:  I know, but you're --

PG&E Corporation

1          THE COURT:  -- notice was adequate.  And then you're

2     saying --

3          MR. KAROTKIN:  Okay.

4          THE COURT:  But then, what you're saying is the class

5     claimants are here.  They're just trying to get paid as

6     lawyers.  And there are all these other problems with the Rule

7     23 process.  So let's go to the bankruptcy process, which is

8     what I wrote in the first place.

9          MR. KAROTKIN:  Okay.

10         THE COURT:  Show me why that might not be a good thing

11    to do.

12         MR. KAROTKIN:  Okay.  So let me -- let me address it.

13    Okay, number one, I think there was adequate notice.  You don't

14    agree with me, okay.  I accept the fact that you don't agree

15    with me, okay?

16         THE COURT:  Okay.

17         MR. KAROTKIN:  If you don't agree with me, what I'm

18    saying is the right solution is to extend the bar date.

19         THE COURT:  Okay.

20         MR. KAROTKIN:  And that will assure due process and

21    that will assure the more orderly administration of this case.

22    And let's keep in mind June 30th and getting distribution to

23    the fire victims.

24         THE COURT:  No, there's no issue there.  For reasons

25    that you've stated, the company has chosen not to just shortcut

1    this by pass through.  And you've said okay.  We think that was

2    adequate notice, but if the Judge disagrees, we'd prefer the

3    plan -- the notice plan.  I agree with you.  So if we have an

4    extended bar date, whether it's twenty-eight days or two days

5    plus ten plus -- some number, your advice to me is that I

6    shouldn't worry about the schedule that has been discussed

7    about disclosure approval.  We can address separately, either

8    today or elsewhere, whether that means you should change what

9    is going to be disclosed and to whom, because I think what

10   you're saying is that for all practical purposes, there doesn't

11   need to be disclosure to equity.  I'm still not a hundred

12   percent sure that that's right, but I won't debate it with you.

13          But whether it's twenty-eight days or a little longer

14   or it doesn't matter, if notice goes out and my hypothetical

15   Mr. B is the only one that files a claim for five hundred

16   dollars, it's going to be easy.  But if 10,000 Mr. Bs file a

17   claim for 50,000 each, you've got a problem.  You've got to

18   deal with it, right?

19          MR. KAROTKIN:  I have to deal with it and --

20          THE COURT:  You've got to deal with it.

21          MR. KAROTKIN:  -- certainly --

22          THE COURT:  And I don't know what the answer is.  I

23   haven't figured out the answer.  I've been struggling with it.

24          MR. KAROTKIN:  Certainly, the Bankruptcy Code -- the

25   Bankruptcy Code has the tools to deal with those circumstances.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    THE COURT:  Well, but let's take a less-than-favorable

2    result.  Suppose there is a robust amount of claims filed.

3    Somebody's going to have to figure out how to finance the exit

4    strategy and deal with that potential, right?  It's the same as

5    any other kind of liability.  It's the same kind of question

6    that has to be answered if there had been some other event --

7    MR. KAROTKIN:  Or Your Honor --

8    THE COURT:  -- that you hadn't anticipated.

9    MR. KAROTKIN:  -- or Your Honor may have to estimate

10   that amount.  But at least we'll have the information to do it,

11   rather than a class claim, which is pure speculation.

12   THE COURT:  Okay.

13   MR. KAROTKIN:  All right?  Now, Your Honor --

14   THE COURT:  Yes, sir?

15   MR. KAROTKIN:  You did issue the order the other day,

16   with respect to mediation, which does -- which does --

17   THE COURT:  And if I -- I want to apologize if I

18   confused anybody.  I didn't mean to be in conflict with what I

19   wanted to hear today and the fact that I wanted the mediation.

20   I wanted the mediation to go forward if -- no matter what I do

21   here, whether I do nothing or something.

22   MR. KAROTKIN:  Yes.

23   THE COURT:  And it was just the timing, I wouldn't.

24   But that, there's nothing more -- no hidden agenda there.

25   MR. KAROTKIN:  And we certainly agree with that and in

PG&E Corporation

1  fact, before you issued your order, we had already been in

2  discussions with the plaintiffs to schedule mediation.

3           THE COURT:  Okay.

4           MR. KAROTKIN:  And we want that to pursue and we're

5  anxious to have that pursue with -- to be pursued with Judge

6  Newsome.  We think he can be constructive.

7           THE COURT:  Do you want to put this issue on a short

8  hold?

9           MR. KAROTKIN:  No, but -- no, but we can't really put

10  this on a short hold, because if we're going to --

11           THE COURT:  Well, a short hold.

12           MR. KAROTKIN:  Well, if we're going to have a notice,

13  you know, we need to get that process going as soon as

14  possible.  A short hold of a couple of days or a week, maybe.

15  But longer than that, I just don't think --

16           THE COURT:  Well, again --

17           MR. KAROTKIN:  -- mechanically, it works.

18           THE COURT:  I want you to understand something.  I

19  wasn't sitting here plotting who to make life miserable for.

20  The way this thing came to me, and the law that I learned from

21  both sides, and the cases suggested to me that I've got to move

22  quickly on this either way, because if I -- if I say, sorry,

23  Mr. Karotkin, you're out of luck, you're stuck with Rule 23,

24  it's got to be dealt with.  If I say sorry, plaintiffs, you're

25  stuck with another claims deadline, that's got to be dealt

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    with.

2         And so, independent of that, for -- you know, that's

3    where I thought why not see if there can be a mediation any --

4    at the same time.  So I certainly didn't imply, and I hope you

5    didn't get the message that somehow I was going to use the

6    mediation as a way to stall this.  My job is to make a decision

7    on this, and I will do so, I promise you.  And even if I make a

8    ruling, you still can have a mediation on this.

9         MR. KAROTKIN:  Yes, absolutely.

10        THE COURT:  So I'd encourage you to do it.

11        MR. KAROTKIN:  And we intend to.  As I said, we had

12   already discussed mediation and we intend to pursue it.

13        THE COURT:  Okay.  Well, good.  I'm glad you did.

14   Again, I don't want to know if mediation is being discussed.  I

15   don't discuss it with Judge Newsome.  I look at what's

16   happening in the case and I look at and think about the

17   horrible of horrible choices here.  And I promise you, I

18   agonize over is this going to screw up the timeline to get to

19   June 30th.  But what do I do?  Do I disregard the rights of

20   prospective claimants.  And the same is true, by the way,

21   unrelated to this, on the FEMA and OES claims.  I just said --

22   I'm going to remind the mediator, if you're still there, go do

23   something until I -- maybe something will happen on there, too.

24   Okay, I appreciate you clarifying that.

25        MR. KAROTKIN:  Thank you, sir.

PG&E Corporation

1        THE COURT:  So let me just say one more.

2        Oh, well, Mr. Bennett, why don't I hear from you on

3   that same subject?  I didn't know --

4        MR. BENNETT:  Yes.

5        THE COURT:  -- you'd be here, but I assume it's

6   related to this.

7        MR. BENNETT:  It is.  Obviously, we've been heavily

8   involved in developing a plan and even more heavily involved in

9   developing the financing for the plan.

10       THE COURT:  Right.

11       MR. BENNETT:  So my first point for you is I think

12  achieving the June 30th confirmation deadline and the

13  subsequent financing deadline, which is hovering around

14  somewhere in August, is absolutely achievable.  But it is

15  certainly threatened by the way we deal with this problem that

16  we have today.  I do want to say that for the record, that we

17  agree that the debtors did actually give adequate notice.  I

18  think, by the way, there's another solution that no one ever

19  talked about here, which is that if there really are persons be

20  out there that didn't actually have notice of what was going on

21  in this case, which I kind of suspect is a very small

22  population, given how heavily institutionally held the common

23  stock of this company was, then they can get relief from the

24  bar date.  But --

25       THE COURT:  Yeah, but that's not practical.  Come on,

PG&E Corporation

1    you know that's not practical.

2          MR. BENNETT:  I actually don't --

3          THE COURT:  I don't want fifteen different motions for

4    relief from stay from fifteen investors.

5          MR. BENNETT:  Okay.  I'm going to move on to try to

6    solve some problems.

7          THE COURT:  Okay.

8          MR. BENNETT:  Okay, so Your Honor is concerned about

9    the prospect that the disclosure statement that will emerge

10   from the process we're about to enter will not be adequate from

11   the perspective of equity holders that have disputed claims

12   arising from the prospects of the -- allegations of inadequate

13   disclosure.  And by the way, they are disputed claims.  I don't

14   know if you realize this, but in the -- in the district court,

15   where the claims are being asserted against individuals, there

16   have been motions to dismiss filed.

17         THE COURT:  Oh, I know.  I know that.

18         MR. BENNETT:  And it's about to be heard.  The

19   briefing is complete.

20         THE COURT:  No, it's submitted.  It's not being heard.

21         MR. BENNETT:  Right.  I'm saying --

22         THE COURT:  I'm telling you.  It's submitted.

23         MR. KAROTKIN:  Right, okay.  It's about to be decided,

24   I should've said.  I apologize.

25         THE COURT:  Well, but I mean -- you know, I know that.

PG&E Corporation

1   But --

2           MR. BENNETT:  Okay.

3           THE COURT:  One of the things that I'll ask the other

4   side, the other side in the papers for today said I should let

5   the district court take care of things.  As far as I know, I'm

6   taking care of all the claims here and the Judge Davila is

7   taking care of all the claims there.

8           MR. BENNETT:  That is correct, Your Honor.

9           THE COURT:  Okay.

10          MR. BENNETT:  Absolutely correct.  Okay, so if there

11  is a disclosure problem that develops, you will still be in the

12  solicitation period.  There could be a supplemental disclosure

13  statement, so --

14          THE COURT:  Well, what do you think?  Do you agree

15  with Mr. Karotkin?

16          MR. BENNETT:  I -- I completely agree with Mr.

17  Karotkin.

18          THE COURT:  Well, okay, so let's clarify --

19          MR. BENNETT:  Because my -- my primary objective here

20  is to do everything possible in this court to quantify the

21  potential maximum scope of the problem --

22          THE COURT:  Okay.

23          MR. BENNETT:  -- which we really think is near zero.

24          THE COURT:  Stick with me.  I take alternative B, I

25  open up a claims deadline and two claims are filed:  one by Mr.

1   A, the bondholder, and one by Ms. B, the shareholder.

2           MR. BENNETT:  Okay.

3           THE COURT:  Do you agree that the bondholder is

4   unimpaired and doesn't need any notice of anything?  And the --

5           MR. BENNETT:  He -- he's -- he or she is unimpaired,

6   and they will, nevertheless, receive lots of notice?

7           THE COURT:  Well, they'll need -- they'll see notice

8   of the -- of the hearing, like anybody will.  But they won't

9   get a solicitation and an invitation to vote, because they

10  won't be voters.

11          MR. BENNETT:  That remains to be seen.  They might or

12  might not.

13          THE COURT:  For the bondholders?

14          MR. BENNETT:  They might or might not.  I happen to

15  believe that the -- that it is advantageous for the debtors to

16  solicit votes from the -- from the class of equity, because I

17  believe the class of equity will, in fact, support the plan --

18          THE COURT:  No, you -- no.  I said the bondholder.

19          MR. BENNETT:  Oh, I'm sorry.  The bondholder class

20  will be --

21          THE COURT:  One claim comes from a bondholder.  One

22  claim comes from a shareholder.

23          MR. BENNETT:  Okay.  The bondholder claim will be

24  unimpaired.  They will not be solicited.

25          THE COURT:  And under the plan, as presently filed,

PG&E Corporation

1    the bondholders are unimpaired.  And so you don't even have to

2    change anything.  In fact, the plan even contemplates any

3    510(b) entitlements.

4         MR. BENNETT:  That is correct.  The bond side will not

5    change.

6         THE COURT:  We're in agreement on that.  So what

7    happens if Mr. B files a claim, because he got defrauded as a

8    shareholder?  What -- is there going to be solicitation or not?

9    And is it to everybody?  Every equity holder, right?

10        MR. BENNETT:  Okay.  I don't know.  There's two

11   questions that have to be answered.  And quite frankly, there's

12   discussions going on about this right now.

13        THE COURT:  Okay.

14        MR. BENNETT:  Whether or not there's a way to put both

15   in the same class or whether they are going to be in separate

16   classes.  And they --

17        THE COURT:  I would think they would have to be in

18   one -- the same class.

19        MR. BENNETT:  Actually, there's one --

20        THE COURT:  But I'll leave it to you.  I'll leave it

21   to you.

22        MR. BENNETT:  I will suggest to Your Honor that

23   there's one problem with that right off the bat, which is that

24   there's insurance that covers the securities class action

25   claims.  And they're all disputed.  The fact that there's

PG&E Corporation

1    insurance as an additional source of distribution creates a

2    problem if it's in one class.

3            THE COURT:  Well, I understand.

4            MR. BENNETT:  So --

5            THE COURT:  Insurance is a different issue.  I'm just

6    thinking vis-à-vis a bondholder who -- I mean, a shareholder

7    who didn't buy stock during the class period and a bondholder

8    who did, I would think that they would be treated the same.

9    But I -- I'll leave that for another day.

10           MR. BENNETT:  There are -- it turns out to be a little

11   more complex than that.  I think you should leave that for

12   another day.  The next version of the plan will have to deal

13   with this no matter what, so --

14           THE COURT:  Okay.

15           MR. BENNETT:  -- the next version of the plan, we'll

16   deal with it.  And as to solicitation, whether there will be an

17   effort to obtain acceptances from this class, this -- if it's a

18   separate class of securities litigation claimants, there may or

19   may not be an effort to solicit acceptances from that class.

20   It may well be that we come to court and say that class has to

21   be crammed down.

22           THE COURT:  Well, if I go with the alternative of

23   opening up a claims bar date, there will be a finite number of

24   members.  And you can -- maybe you don't know the amounts, but

25   you can at least identify them.  And -- but I think you or

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    debtors' counsel is going to have to tell me at some point,

2    well, are we soliciting every equity holder?  Or only the

3    previous -- you know, the non-defrauded ones?  Or the allegedly

4    defrauded ones?  And if so, you know, what do you do?  And it

5    might make no difference.  As I say, it might be that no matter

6    what number of votes they had, it's a non-issue.  I don't know.

7              MR. BENNETT:  That's correct.  That is a possibility.

8              THE COURT:  Okay.

9              MR. BENNETT:  I would ask Your Honor to leave that

10   with us in the first instance --

11             THE COURT:  Yeah, I will.  I will.

12             MR. BENNETT:  -- which is the correct procedure in any

13   event.

14             THE COURT:  I agree.

15             MR. BENNETT:  There'll be a plan amendment.  We will

16   address this.  Okay, so I want to come back to if there's any

17   problems at all with this process, and I don't think there will

18   be.  I am -- I am with Mr. Karotkin that opening up the bar

19   date is the -- is not necessarily the perfect solution, but

20   it's the best solution we've got.  I think the shortest

21   possible period that comports with due process is what Your

22   Honor should order, because we do have the June 30th deadline

23   and we don't really have the luxury of going as long as we want

24   to.  So we want to have the shortest possible period.  But even

25   if that period extends past the disclosure statement hearing,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  if there's a problem with the disclosure statement hearing, we

2  can send a supplement just for this class.

3  　　　　THE COURT:  Well, I think you could have a supplement

4  disclosure, right?

5  　　　　MR. BENNETT:  Right, we could do --

6  　　　　THE COURT:  You could have this finite group of

7  disclosees and make an adequate disclosure to them.

8  　　　　MR. BENNETT:  Correct.  If we get it --

9  　　　　THE COURT:  Okay, we're on the same page.

10  　　　　MR. BENNETT:  If we get it wrong in the first

11  instance.  But I don't think we will, but I'm saying there's a

12  failsafe.  There's -- there'll be enough period time in the

13  solicitation period so that that could happen, okay?  So I

14  think that's it.

15  　　　　But I want to keep coming back to -- and I don't think

16  I have to come back to it, but pass through is not an option,

17  because it leaves a possibility of undefined dilution.  Forget

18  the existing shareholders.  But it's the new shareholders, the

19  ones who are going to pay cash --

20  　　　　THE COURT:  No, I -- I -- listen.

21  　　　　MR. BENNETT:  Right.

22  　　　　THE COURT:  I don't like that either.  I don't like

23  any of these options.  I wish there had been full notice, so

24  that the plaintiffs could never have argued about defective

25  notice.  But you know, I can't change that.

1    MR. BENNETT:  Okay, all right.  So what I think is

2   most important, at the end of the day, what is the most

3   important objective here is quantification of the maximum

4   possible amount of these claims.  Like, what is really being

5   claimed?  Okay?  And here's where I think the pleadings are

6   decisive.  So we have the pleading that was filed by the class

7   claimants.  And the pleading filed by the class claimants

8   basically say that they don't have the faintest idea how big

9   their class is, in either the debt side or the equity side.

10   They've made a series of assumptions.  When if you read it,

11   Your Honor, you'll see that those series of assumptions are

12   based upon the idea that this has to be a retail stock.  It

13   was, to a degree.  But it was also heavily institutionally

14   held.  So the idea that we're going to have the kinds of

15   numbers that they want to throw up in the air is totally,

16   totally absurd.  We will prove that --

17    THE COURT:  But it's academic, if we give notice.

18    MR. BENNETT:  It is -- we get to find -- that's

19   exactly my point.

20    THE COURT:  Okay.

21    MR. BENNETT:  We need to find out -- by the way,

22   ultimately, the class would have to find out.  But they would

23   only find out years from now, when they either had a settlement

24   or whether, if they ever achieved a judgment, because they

25   don't have to get any information from the class plaintiffs

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation

1    until they actually have something to distribute.

2            THE COURT:  But wait a minute.  We're divide -- you're

3    talking about the district court?

4            MR. BENNETT:  I'm talking about the -- no, if you --

5    if you had --

6            THE COURT:  Oh, oh, if we had it here.

7            MR. BENNETT:  -- a class claim here.

8            THE COURT:  You mean if we had the Class 23 here?

9    Okay, okay, all right.

10           MR. BENNETT:  Exactly.  If we had --

11           THE COURT:  I gotcha.

12           MR. BENNETT:  -- if they -- we -- the class claims

13   that were filed -- I don't know if you read them.  They don't

14   say a word about how many people we're dealing with.

15           THE COURT:  No, I --

16           MR. BENNETT:  They don't say a word --

17           THE COURT:  I read what you read.

18           MR. BENNETT:  Right.  So there's nothing there.  So

19   the -- whether we have to do discovery and estimation with the

20   class proof of claim, or we can have the simpler, much more

21   direct method of soliciting -- you know, giving another

22   notice --

23           THE COURT:  Not soliciting.  Not soliciting.

24           MR. BENNETT:  -- and seeing what comes in.  Not

25   soliciting.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          THE COURT:  Sending out a notice.

2          MR. BENNETT:  Sending out notice and seeing what comes

3    in.

4          THE COURT:  And if --

5          MR. BENNETT:  Now, let's talk about our contingencies.

6          THE COURT:  -- if five claims come in, your problem's

7    solved, right?

8          MR. BENNETT:  And I don't have to visit this topic

9    with you again.  But if we have more than that, it's possible

10   that I will have to visit this topic with you again.

11         THE COURT:  Okay.

12         MR. BENNETT:  And I'm hoping that we don't.  If it's

13   a -- but it can't not be a discreet universe.  It may be a big

14   universe or a small universe.  But we'll know exactly what

15   we're dealing with.

16         THE COURT:  Well, what you're saying, Mr. Bennett, I

17   think, because you're a career bankruptcy lawyer and I used to

18   be one, is we're used to how the bankruptcy system works, and

19   we have this place called notice and claims.  And that's a

20   whole different ballgame from the way they do it in the world

21   where you don't know how many people bought a defective

22   whatchamacallit.  But I want to ask you what I should've asked

23   Mr. Karotkin and that's what wasn't mentioned -- it wasn't

24   responded to in my docket text, is how do we divide the -- make

25   sure the claimants aren't filing proofs of claim on derivative

(973) 406-2250 operations@escribers.net | www.escribers.net

1    claims?  They don't have a right to assert a derivative claim

2    in this case, right?

3          MR. BENNETT:  We have to look at the claims that come

4    in and decide and we may have to object to a bunch.

5          THE COURT:  How about in the notice?  Is there a way

6    to put it in the notice, what not to do?

7          MR. BENNETT:  We can --

8          THE COURT:  And I want the plaintiffs to tell me that,

9    too, because that -- that to me is one of those very iffy

10   things.  And you know, the TCC's concerned about it, as well.

11         MR. BENNETT:  Okay.  We can -- I'm all for including

12   whatever appropriate cautionary language everyone can agree to

13   to make sure that frivolous claims -- claims that shouldn't be

14   filed aren't filed.

15         THE COURT:  No, I didn't -- I didn't mean frivolous.

16   It could be the best claim in the world, but it's a derivative

17   claim.

18         MR. BENNETT:  Understood, right.  Okay.  But frivolous

19   by the person doing it.  All right, yes.

20         THE COURT:  No, but I --

21         MR. BENNETT:  I think that's -- that's right.

22         THE COURT:  I had to think about this, too.  And I

23   looked at that proof of claim form and I'm going, what do I do

24   if I'm this investor, not in Northern California, in Paris,

25   France, and I get this notice?  Well, what do I do?  How do I

1   know what's a derivative claim and what is my own claim?  And

2   the answer is most people have no clue, probably.  Right?

3           MR. BENNETT:  It -- it -- I, frankly, think that

4   almost no matter what we say, we'll have the potential problem

5   anyway.  But that's why we process claims.

6           THE COURT:  Yeah.

7           MR. BENNETT:  We figure it out.

8           THE COURT:  I agree.

9           Mr. Karotkin, do you agree with that analysis?  I

10  mean, I meant to ask you that same question and -- but you

11  don't need to restate it, if you believe --

12          MR. KAROTKIN:  No, I agree.  And the way the proof of

13  claim form can be drafted, and I think we have, is directed as

14  to whether this individual person suffered a loss.

15          THE COURT:  Well, you -- you did --

16          MR. KAROTKIN:  And that's personal to that person.

17          THE COURT:  But --

18          MR. KAROTKIN:  That's not a derivative claim.  So if

19  it's written in that way, it should be clear.  But again, as

20  Mr. Bennett said, we can address that if the claims are filed.

21          THE COURT:  If Mr. Bennett's right, that a number of

22  the investors are institutions that have in-house general

23  counsel, that's one thing.  If there are people out there

24  getting this notice that aren't trained in the law, they

25  aren't -- shouldn't be assumed to know the difference between a

PG&E Corporation

1    derivative claim and a direct claim.  The guy says, yeah, I

2    bought that stock.  I paid fifty-five bucks for it and now it's

3    trading at eight bucks.  I guess I have a claim.  So how does

4    that person have any way of knowing where we, in the bankruptcy

5    world, would say you only get to assert your direct claims

6    here.  You take your derivative claims elsewhere?

7            MR. KAROTKIN:  I think that they will file their

8    claims, and then we can look at them and make those

9    determinations.  That's how it would always work.  But again,

10   if the --

11           THE COURT:  Well, but on --

12           MR. KAROTKIN:  The issue is --

13           THE COURT:  -- but on the --

14           MR. KAROTKIN:  -- they will file -- they will be

15   notified to file a claim if they suffered a direct loss on

16   account of --

17           THE COURT:  You were able, obviously, for the hundreds

18   and hundreds of thousands of fire survivors, to make it clear

19   how they're supposed to assert their claim.  I found that --

20   and again, add this to the list of things that I too have been

21   struggling with, is what happens if we do send this claim out?

22   Is it going to be more confusing rather than less confusing?

23   And I don't know the answer on how to make it more helpful to

24   those who should get due process but not muddy up the process

25   by asserting what they shouldn't be asserting.  So it just adds

PG&E Corporation

1    to the problem.

2         MR. KAROTKIN:  But I think that's easily addressed.

3    If they believe they have a claim, they can file the claim.

4    And like in any other situation, if they had gotten the

5    original notice of the bar date, they would have either filed a

6    claim or not filed a claim, and we would have --

7         THE COURT:  And we'd be done --

8         MR. KAROTKIN:  -- figured it out.

9         THE COURT:  -- and we never would have had this

10   discussion.

11        MR. KAROTKIN:  But again, you would have the same

12   issue as the derivative or a nonderivative, and we would have

13   figured it out.

14        THE COURT:  Okay, I'm going to hear from the

15   plaintiffs.  Let me -- make an opening statement on the

16   plaintiffs' side.  And I'm --

17        MR. RICHARDSON:  Your Honor, did you not want to hear

18   from the same side entirely before hearing the plaintiffs?

19        THE COURT:  Oh.  I wasn't even looking who -- yeah.

20   Go ahead.  From the TCC?

21        MR. RICHARDSON:  Thank you, Your Honor.

22        THE COURT:  Is that -- yeah, just state your name for

23   the record.

24        MR. RICHARDSON:  Good afternoon, Your Honor.  David

25   Richardson of BakerHostetler, on behalf of the official

PG&E Corporation

1    committee of --

2           THE COURT:  Mr. Richardson, I --

3           MR. RICHARDSON:  -- tort claimants.

4           THE COURT:  -- I expected you to be here; I just

5    didn't identify you and I wasn't --

6           MR. RICHARDSON:  Also with me is --

7           THE COURT:  -- looking carefully.  So -- no, I know

8    who you are.

9           MR. RICHARDSON:  Also with me is Mr. Julian, Robert

10   Julian, today.

11          THE COURT:  I know.  I know who he is, too.

12          MR. RICHARDSON:  Your Honor, there's four issues I'd

13   like to address.  First, as the Court knows from the letters

14   it's received, some of the briefs that have been filed, the TCC

15   has a challenge ahead of it, getting fire victims to vote in

16   favor of the debtors' plan --

17          THE COURT:  I'm well aware of that.

18          MR. RICHARDSON:  -- both for accurate understandings

19   of what's in the plan, such as concerns about FEMA claims, and

20   some misunderstandings, such as how stock will be handled and

21   whether or not they will receive it.  But when the RSA was

22   negotiated, there was no two-billion-dollar stock claim at

23   issue.  There was a district-court action, but the bar date had

24   passed.  No class claim had been filed.  No motion for a class

25   claim had been filed.  And the TCC negotiated its settlement

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation

1  with the debtors on the understanding that there was no such

2  claim.

3          So we come here with a dual concern:  first, an

4  outcome that doesn't impact the interests of fire victims --

5          THE COURT:  Well, you got to -- I got to stop you for

6  a minute.  Look, I'm not trying to go back to question how the

7  negotiation led to the RSA.  But the district-court action

8  started with the debtor alive and well, and a defendant.  And

9  sure, there was no motion to file a 7023 claim, but one could

10 not have assumed there was no exposure of the corporate debtor.

11         And so it just is what it is.  The claim that was

12 filed was filed a couple of months after the bar date.  And I

13 heard extensive argument about it and made a decision through

14 my tentative ruling, and that's where we are.  So we're there.

15         MR. RICHARDSON:  Yes, Your Honor.

16         THE COURT:  I understand.  And you made the point

17 before about making sure that this doesn't somehow undermine

18 what was negotiated for the benefit of fire survivors.  And I'm

19 fully aware of that.

20         MR. RICHARDSON:  But the TCC has a different

21 perspective on this.  First, a lead plaintiff in a class-action

22 case has a fiduciary to their putative class.  If they are

23 truly a class-action plaintiff with a direct claim against the

24 debtors, they had a duty to act on behalf of their class in

25 this case.  Not only did they not come forward during the

escribers
(973)406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    notice period to address any notice concerns, but the TCC was

2    of the view, and remains of the view, that that class action is

3    really stating nothing but derivative claims.

4           Now, I don't expect the Court to rule on that issue

5    here.  We will be filing under an adversary proceeding shortly

6    that addresses that issue.  All the --

7           THE COURT:  Against whom?

8           MR. RICHARDSON:  Against the plaintiffs -- the lead

9    plaintiffs in that action.

10          THE COURT:  Well, what if I grant this alternative

11   motion?  Then --

12          MR. RICHARDSON:  It will still be a relevant adversary

13   proceeding --

14          THE COURT:  Well, who's going to be the defendant?

15          MR. RICHARDSON:  The lead plaintiffs.

16          THE COURT:  But wait a minute.  If I don't grant their

17   motion and I open up the bar date, the lead plaintiffs are

18   still the defendants on your adversary proceeding?

19          MR. RICHARDSON:  Yes, because the district-court

20   action still goes forward.

21          THE COURT:  But the defendants --

22          MR. RICHARDSON:  The district --

23          THE COURT:  -- the defendants -- these defendants are

24   protected by the stay.

25          MR. RICHARDSON:  Yes, but the action that we believe

escribers
(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    is derivative is being signed (sic) to the trust.

2              THE COURT:  Okay, I'll tell you what; if you believe

3    an adversary proceeding is necessary, we'll deal with it.

4    Let's stick with "for now".

5              MR. RICHARDSON:  Our dual concern here today is an

6    outcome that doesn't impact the interests of fire victims by

7    giving priority to an equity claim over the interests of fire

8    victims.

9              THE COURT:  And how does it do that?

10             MR. RICHARDSON:  It does it by the possibility of

11   passthrough or ride-through.  At the moment, this is a pre-

12   petition claim that is subordinated under 510(b), below the

13   interests of fire victims.

14             THE COURT:  Right.

15             MR. RICHARDSON:  If it passes through, it becomes a

16   two-billion-dollar claim against the reorganized debtor, in

17   which the trust is the largest single shareholder.  It will

18   have an impact on the value of shares that are being held for

19   the benefit of fire victims.

20             THE COURT:  Still subordinated.  It's still

21   subordinated.  510 still works, doesn't it?

22             MR. RICHARDSON:  Post -- for a ride-through claim --

23             THE COURT:  Well, but --

24             MR. RICHARDSON:  -- post-confirmation?

25             THE COURT:  -- but it all arises pre-petition.  In

1    other words, a debtor could say, "I'm not going to deal with

2    this group of creditors.  I will deal with them later."  I

3    don't think you suddenly lose the benefit of the subordination.

4    It doesn't matter.  The debtors' counsel rejected the idea of a

5    passthrough.  I don't know that, if you're worried about that,

6    I'm just going to go impose it on them.  I don't know that I

7    have the right to do that.  I suppose the real issue is, if I

8    deny both the class and the new claims deadline, then I guess

9    I'm creating the problem.  But I'm the one that wrote the

10   tentative ruling saying I should consider a new deadline.

11   So --

12           MR. RICHARDSON:  Your Honor, I don't believe you

13   are --

14           THE COURT:  Let's --

15           MR. RICHARDSON:  I don't believe you are --

16           THE COURT:  Let's --

17           MR. RICHARDSON:  -- creating a problem if you deny

18   both of those options and deny the motion.

19           THE COURT:  What would happen?

20           MR. RICHARDSON:  You've asked where does Shareholder B

21   go if their rights are not protected in this case.  Shareholder

22   B still has a pending class-action lawsuit in district court.

23   If Shareholder B has a valid direct claim, Shareholder B has a

24   lawsuit against directors and officers, who have an insurance-

25   policy tower worth at least two --

PG&E Corporation

1          THE COURT:  What about Shareholder B's claim against

2    the debtor?

3          MR. RICHARDSON:  It's the same claim.  They just

4    separated it out from their lawsuit --

5          THE COURT:  But what happens to it --

6          MR. RICHARDSON:  -- to address (sic) with it here.

7          THE COURT:  What happens to it analytically?  If I

8    deny the motions today -- my hypothetical Mr. B --

9          MR. RICHARDSON:  Yep.  If --

10         THE COURT:  -- went to law school and learned that he

11   could have a direct claim against the corporate debtor.

12   Haven't I just discharged him or --

13         MR. RICHARDSON:  If he had a direct claim.

14         THE COURT:  -- or, alternatively, denied him due

15   process, in which case the claim survives?

16         MR. RICHARDSON:  If he had a direct claim, we believe

17   notice was sufficient.  His representatives, who had a

18   fiduciary duty to him, did not act to protect his rights.  And

19   his claim remains active in a district-court action, not only

20   against officers and directors but against twenty-three of the

21   largest financial institutions in the country.

22         THE COURT:  But how about against the corporate

23   debtor?

24         MR. RICHARDSON:  That claim -- as is typical in

25   bankruptcy, when a debtor is one of the defendants and goes

PG&E Corporation

1  through bankruptcy, that claim might get discharged.

2          THE COURT:  But we're back to the question of due

3  process.

4          MR. RICHARDSON:  We are.

5          THE COURT:  So --

6          MR. RICHARDSON:  And his representative --

7          THE COURT:  -- isn't there lots of law that says,

8  notwithstanding the language of Chapter 11 that says a

9  confirmation discharges everything, that in fact it doesn't

10 discharge everything?  It doesn't discharge claims to which due

11 process has not been afforded.  Right?  Isn't that fundamental?

12         MR. RICHARDSON:  Except that we believe and agree with

13 the debtors, the due process has been done here.

14         THE COURT:  Well, I know, but no court has determined

15 it.

16         MR. RICHARDSON:  Correct.

17         THE COURT:  And --

18         MR. RICHARDSON:  But I believe one of the important

19 factors in determining whether due process was done here is the

20 fact that the lead plaintiffs, who were involved in the entire

21 process, owe a fiduciary duty to Shareholder B --

22         THE COURT:  Well, you -- what you --

23         MR. RICHARDSON:  -- and did not step forward in a

24 timely basis.

25         THE COURT:  But Mr. Richardson -- this is like -- I

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    won't draw a bad analogy here.  What you're saying is the

2    plaintiffs didn't do their job, therefore we should say it was

3    okay for the debtor not to have done its job, and therefore

4    there may be a finite group or a large group of people who have

5    been denied due process; they can either blame the lawyers for

6    the debtor or blame the lawyers for the class, but either way

7    they're out of luck.  That doesn't seem like the right way to

8    do it.

9            MR. RICHARDSON:  Because the way we look at it, we

10   believe the debtor did their job.

11           THE COURT:  I know you do.  But you don't deny that

12   there was a method to provide more direct notice to actual

13   known people; do you?

14           MR. RICHARDSON:  Think there could --

15           THE COURT:  You don't deny that; do you?

16           MR. RICHARDSON:  There could always be more notice.

17           THE COURT:  But we have, in the record from the

18   papers, a method -- an established method in the securities

19   world, through nominees, to give better notice than was given.

20   And it doesn't give every person on Earth notice with bells and

21   whistles, but it is a methodology that wasn't followed here.

22   You can't deny that.

23           MR. RICHARDSON:  I don't deny that, Your Honor --

24           THE COURT:  Okay.  Okay.

25           MR. RICHARDSON:  -- but I don't agree that the -- by

operations@escribers.net | www.escribers.net

1    not following that procedure, there was necessarily a denial of

2    due process.

3         THE COURT:  Well, one of -- okay, fine.  I want you to

4    make the rest of your argument so I can hear the other side.

5         MR. RICHARDSON:  Your Honor, the third point --

6         THE COURT:  One of my -- well, no, but I'm just going

7    to -- I'm going to -- I'm going to finish my thought.

8         I obviously felt that I needed to explore what the

9    case law told us we could do as this alternative, because I was

10   satisfied that it appeared that there could have been a better

11   effort to do the process.  So I want to go back to what you're

12   concerned about, and -- go ahead.

13        MR. RICHARDSON:  Thank you, Your Honor.  As is clear

14   from everything I've just said, the TCC continues to believe

15   that denying the motion is the proper outcome.  Upending the

16   claims process at this late stage, for a putative-class claim

17   that is not certified, hasn't been tested, remains subject to a

18   pending motion to dismiss, and has no concept of what its own

19   damages is -- damages are for the class, is too disruptive in a

20   case that is proceeding along the schedule that it is.

21        The parties knew of the compressed schedule, they were

22   aware of the claims bar date, they were aware of the claims-

23   noticing procedure, and they did not follow through with their

24   fiduciary duties.  Their mistake should not be a burden on this

25   Court or a burden on the parties or the claims of other

PG&E Corporation

1    creditors.  For those reasons, we think denial is the proper

2    result.  To whatever extent the Court does not agree with us

3    and believes that there needs to be a remedy, we concur with

4    the debtors that the individual proof-of-claim process would be

5    the only alternative process that would make sense here, and we

6    believe that the debtors have set out a proper procedure.

7         THE COURT:  Okay.  Thank you very much, Mr.

8    Richardson.

9         Mr. Michelson.

10        MR. SLACK:  Your Honor, Richard Slack from Weil.  Will

11   you indulge me with one point in response to a question that

12   you --

13        THE COURT:  Actually --

14        MR. SLACK:  -- asked earlier?

15        THE COURT:  Mr. Slack, I thought I was going to get

16   you as the point guy today, but your colleague, Mr. Karotkin,

17   took the heat.  So I'm happy to hear from you.  What can you

18   help me on?

19        MR. SLACK:  So Your Honor, you asked a question of Mr.

20   Karotkin about why didn't the debtor give actual notice,

21   through the nominees, to absent class members.  And I wanted to

22   address that really in a couple different ways, but the first

23   is, to really understand what the situation was at the time, we

24   had a -- we had a pleading by plaintiffs.  That pleading -- and

25   they could have written down any number.  They could have said

PG&E Corporation

1    three-and-a-half years, which is what they did as a class.

2    They could have wrote five years.  They could have wrote seven

3    years.  That pleading has not yet -- and it's what the

4    Musicland factors -- and one of the reasons the Musicland

5    factors take into account a class that's already been

6    certified -- that facts here is that that pleading, which just

7    said, hey, we think their claims for two-and-a-half years was

8    untested, because there was no class ever certified, nor was it

9    not certified.

10        And we gave notice that (indiscernible), that notice

11   is given.  We included Ms. Pullo's declaration that said she'd

12   been involved in a number of cases (indiscernible) has been a

13   full-pay (ph.) case, and debtors don't do notice in the way

14   that the plaintiffs here suggest we needed to do.

15        And Your Honor, you put it, I think, correctly.  Maybe

16   there is a way of doing better notice, but the fact is that

17   that doesn't make it an unconstitutional way of giving notice

18   by giving instructive notice to a class that has not yet been

19   certified.  And as I think is pretty clear, we actually didn't

20   note in the actual shareholders rule (ph.) where you could

21   potentially get notice through the nominees.  But we didn't

22   know.  And the fact is that just because a plaintiff asserts --

23   again, just to make an assertion of a class doesn't make those

24   people known creditors such that you have to give notice.

25        So Your Honor, I don't know whether that helps you

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    there, but I think that's an answer to the question that you

2    asked.

3            THE COURT:  Mr. Slack, my frustration is that the

4    district-court action was underway, the class wasn't certified,

5    but the allegations of the complaint identify the universe of

6    people for whom the plaintiffs were purporting to act.  And it

7    didn't -- to me, it was, in retrospect -- and hindsight is

8    cheap.  But it seems to me that, for what looked like a

9    relatively easy way to extend to at least that universe is

10   something that, if it had been done, I don't know that we ever

11   would have gotten to this point.  But it doesn't matter.  We're

12   here now.  And for all the reasons that we've said, we're

13   trying to do something about it.  So my choices are to deny

14   everything and move on, or to go to one of these alternatives.

15           So I'm not asking anybody to go back and reinvent the

16   wheel.  We're just dealing with it on February 20th rather than

17   last October.  Okay?

18           MR. SLACK:  I think, Your Honor, the -- I sure do

19   appreciate that.  And I would just say that I think Your Honor

20   had the (indiscernible) proceeding in the district court, that

21   had not yet been tested, is the point.  There have been --

22           THE COURT:  Well, I know.

23           MR. SLACK:  -- no class certifica --

24           THE COURT:  You keep saying that but, I mean, that --

25   there were a lot of things that weren't tested, and that -- it

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    would be a whole different situation if that action hadn't been

2    filed and suddenly after the fact we're saying, "Well, hey,

3    somebody created this.  Let's make up a class."  I mean, what

4    would I do if the plaintiff said, "We're asserting claims on

5    behalf of people for the last ten years who bought stock"?  You

6    know?  They picked three-and-a-half; whether it was the right

7    amount or not, it doesn't matter.

8             Anyway.  Let's go out of it.  Ms. Michelson, are you

9    standing -- are you going to make the argument, or your

10   colleagues on the phone?  And you're welcome to.

11            MS. MICHELSON:  Your Honor, Randy Michelson for the

12   movant party.  While I would love to make the argument that

13   Bankruptcy Rule 7023 is the solution to the problem that was

14   caused by the failure of the debtors to provide notice, Mr.

15   Etkin, who is on the phone, will make that argument.

16            THE COURT:  Okay.

17            MS. MICHELSON:  Thank you.

18            THE COURT:  Mr. Etkin, I thought maybe I'd hear from

19   you.  And you took me up on the offer to appear by phone, so

20   you're up.

21            MR. ETKIN:  I did, Your Honor.  Well, our fees aren't

22   being, one (ph.), written by the estate, and we took you up on

23   your offer.

24            So after listening to the last hour, well, we have

25   obviously a lot to unpack and a lot of territory that was gone

PG&E Corporation

1 over again, though we had a full-blown hearing on the 29th, and

2 we --

3       THE COURT:  Yeah, but let's not go there.  I want you

4 to focus on what are my choices now, going forward.  I don't

5 want to go back into Ms. Pullo's declaration, whether the

6 record was closed, and whether you could have done something or

7 they could have done something.  That's not constructive.  I

8 got to deal with the problem now, February 20th, going forward.

9 So help me.

10       MR. ETKIN:  Well, I understand that, Your Honor, and I

11 think we tried to help you, and I want to help you, but there's

12 been a lot of stuff brought up against the world (ph.) over the

13 last hour and, frankly, and despite the fact that I've been

14 doing this a long time, I'm finding it difficult not to address

15 folks who think they're aware and understand more what our

16 fiduciary duties are, as lead counsel, and --

17       THE COURT:  I know.  I know you feel that way --

18       MR. ETKIN:  -- folks who are saying --

19       THE COURT:  -- but you don't have to --

20       MR. ETKIN:  -- that it's all about the --

21       THE COURT:  -- you don't have to --

22       MR. ETKIN:  -- that it's all about the money.

23       THE COURT:  Mr. Etkin, you don't have defend your

24 professionalism.  You don't have to worry.  This isn't a fee

25 hearing.  Tell me what to do to fix the problem, and why I

PG&E Corporation

1  should ignore Mr. Bennett and Mr. Karotkin and Mr. Slack and go

2  with your Rule 23 fix.

3          MR. ETKIN:  Right.  Well, Mr. Bennett's kind of new to

4  the party, so I'm going to (indiscernible) an objection again.

5  I even can take advantage of --

6          THE COURT:  I don't care.  He's not new to me.

7          MR. ETKIN:  If the Court can be patient on the --

8          THE COURT:  Mr. Etkin, he's not new to me.

9          MR. ETKIN:  I understand.

10         THE COURT:  He's a major representative of a major

11  group of equity holders.  So help me go --

12         MR. ETKIN:  I --

13         THE COURT:  -- fix the problem.

14         MR. ETKIN:  Okay.  Your Honor, I think that we'd

15  outlined the best way to fix the problem here, and that is by

16  the Court moving forward with its inclination in the

17  (indiscernible), which we led, obviously.  And given that the

18  Musicland factors have been satisfied by the lead plaintiffs,

19  the best (indiscernible) to avoid -- not to create but to avoid

20  this so-called parade of horribles is simply to have Rule 23

21  apply.  There is no reason why all of the issues, even

22  certification of the class, has (sic) to be resolved in advance

23  of confirmation.  Although if the Court ordered us to move

24  forward quickly with the certification motion, we could do

25  that.  But it's unnecessary.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1          The Court has recognized again the subordinated

2     claims.  And the debtor has recognized, in their papers, that

3     the only ones who stand to be potentially diluted in this case

4     are the equity holders, to the extent that our claims on a

5     classwide basis are upheld.

6          THE COURT:  Well, wait a minute.  That --

7          MR. ETKIN:  And quite frankly, Your Honor --

8          THE COURT:  Wait.  Hold on.  Mr. Etkin, that

9     oversimplifies it, because we're not going to -- we're not

10    dealing just with current equity holders.  We know, from the

11    record, there're going to be new equity holders.  And the

12    question is --

13         MR. ETKIN:  That's right.

14         THE COURT:  -- how do we quantify who they're sharing

15    the load with if this class comes in.

16         MR. ETKIN:  Well, the way that I see it, Your Honor,

17    the plan contemplates a rights offering that, to the extent

18    people buy into the rights offering, they get their shares.

19    Their shares aren't available for distribution to current

20    equity holders by virtue of the current equity holders' status

21    as a current equity holder.

22         So there's stock in the reorganized entity that is

23    going to be available, and the plan very clearly says that it's

24    subject to dilution.  So everyone appreciates and understands

25    that whatever's made available to current equity holders under

PG&E Corporation

1    a plan is subject to dilution.  And that is the pool that's

2    available, as we understand it, for distribution to current

3    equity holders and, to the extent that there's an allowed class

4    claim, to those claimants.

5              THE COURT:  Mr. Etkin, what --

6              MR. ETKIN:  Your Honor --

7              THE COURT:  -- what happens if I grant this motion and

8    we then proceed with the certification process and, down the

9    line, whether it's in the next two months or the next two

10   years, the class certification is denied?  Then what happens?

11             MR. ETKIN:  Your Honor, I'm not entirely sure, but at

12   that point there's no class and there're class claims.  And to

13   the extent that there are folks out there, they still have

14   their rights with respect to the pending securities litigation.

15             THE COURT:  Well, forget that.  No, I want to --

16             MR. ETKIN:  But

17             THE COURT:  -- I want to forget the pending

18   litigation.  Again, as I said, maybe -- I don't know if you

19   picked this up in my comments, but one of the things that

20   confused me about your submission was that you seem to imply

21   that somehow this Court sends something back over to the

22   district court.  And I don't see it that way.  I see that --

23             MR. ETKIN:  So let me clarify that, Your Honor.

24             THE COURT:  Well --

25             MR. ETKIN:  Let me clarify that for you --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation

1          THE COURT:  Well, clarify it, but --

2          MR. ETKIN:  -- because I think there might be a --

3          THE COURT:  Go --

4          MR. ETKIN:  -- there might be a misunderstanding.

5          THE COURT:  Go ahead.

6          MR. ETKIN:  We think -- the mention of the district

7    court was solely for purposes of having a venue available to

8    distribute whatever distribution there might be out of the

9    Chapter 11 case, to class members --

10         THE COURT:  Well, why would that be?

11         MR. ETKIN:  -- not --

12         THE COURT:  What good would -- what would the purpose

13   of that be?  The debtor -- if the debtor has --

14         MR. ETKIN:  Because it would save --

15         THE COURT:  If the debtor has something to pay to this

16   group of folks, it can pay them:  either pay them in money or

17   pay them in distribution of equity.  Why should the district

18   court be involved in that in any way?  I don't understand that.

19         MR. ETKIN:  Your Honor -- only for administrative

20   convenience, Your Honor, quite frankly.  I've been involved in

21   a number of these cases over the years, and I have one that

22   comes to mind immediately; is a case called ResCap, in New

23   York, Residential Capital, where there was a resolution with

24   the securities class in the bankruptcy and, rather than

25   spending the time, effort, and money, through the Chapter 11

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1   case, to distribute that settlement -- the settlement proceeds,

2   it was handled through the district court, where a case was

3   pending --

4           THE COURT: Okay, but that --

5           MR. ETKIN: So it's strictly administrative

6   convenience.

7           THE COURT: All right. But let's go back to my

8   problem today. So walk me through your best-case timeline if I

9   grant your 723 motion. And we talked about it at the prior

10   hearing, but I've got to be realistic. So it's February 20th.

11   Just imagine that I am persuaded by your side and I issue an

12   order. And so what do you -- what's the timeline, going

13   forward, that you see happening in your role on behalf of the

14   plaintiffs in the bankruptcy court, not in the district court?

15           MR. ETKIN: All right, I'm going to -- that's all I'm

16   talking about, Your Honor: in the district court.

17           THE COURT: So what's the timetable?

18           MR. ETKIN: The timetable -- I think it's important to

19   note that there is nothing in the plan, nothing in the

20   disclosure statement -- no provision of any RSA has been cited

21   which requires the class claim -- and Your Honor, let's face

22   it: there are bankruptcy cases -- large bankruptcy cases

23   throughout the country, where there are large contingent and

24   unliquidated claims that have to be dealt with and, more often

25   than not, they're dealt with on a post-confirmation basis.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    THE COURT:  Yeah, you're not -- Mr. Etkin, you're

2    not --

3    MR. ETKIN:  So --

4    THE COURT:  -- you're not answering my question.  I

5    don't know another bankruptcy case in the country, big or

6    large -- big or small, that had 80,000 victims of massive fires

7    and an attempt to get a plan confirmed in the next four months.

8    So let's get to my case in this court.  So what is the

9    timetable that you would follow as counsel if I grant your

10   motion to assert the class claim?  What comes next?  What's on

11   your to-do list?

12   MR. ETKIN:  Well, our to-do list, Your Honor, would be

13   that -- as we indicated in our motion as originally filed, is

14   to set a briefing schedule with respect to class certification,

15   in the bankruptcy court --

16   THE COURT:  Okay, so you have to --

17   MR. ETKIN:  -- and have that determined.

18   THE COURT:  To get a briefing schedule, you have to

19   file your motion; right?

20   MR. ETKIN:  Well, Your Honor, I think part of it would

21   be filing our motion for class certification, in the first

22   instance.

23   THE COURT:  Okay.

24   MR. ETKIN:  And then there'd be responses.  And then

25   it would be dealt with.  And if discovery is necessary, that

PG&E Corporation

1 could take place as well. All I'm trying to point out to the

2 Court is that nothing that we're doing, in our view -- and I

3 haven't heard anything that's credible to the contrary -- is

4 going to stand in the way of the fire victims getting the

5 benefit of their bargain with respect to the RSA if it's -- if

6 the plan is ultimately confirmed, and for creditors to get paid

7 as contemplated under the plan.

8 THE COURT: Okay, Mr. Etkin, I have --

9 MR. ETKIN: Uh --

10 THE COURT: Mr. Etkin, I have to interrupt for one

11 second.

12 (The Court and the clerk confer.)

13 THE COURT: No, Mr. Etkin, I want to -- I got -- I'm

14 back to you again. I don't think you're answering my question.

15 I know about those broad issues. I want a timetable of when

16 you will be -- would file something. So you would file your

17 motion for class certification. Then there would be --

18 MR. ETKIN: Correct.

19 THE COURT: -- an opportunity for some preliminary-

20 type dealings, right, like whether there's a representative

21 class or whether there's an internal conflict. I mean, let me

22 ask you a question. Could you, if you were in that position,

23 represent both the equity claimants and the bond claimants?

24 MR. ETKIN: Well, I would, frankly --

25 MR. DUBBS: Your Honor --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. ETKIN:  Go ahead.

2          THE COURT:  Well, now somebody else is talking.

3          MR. DUBBS:  Your Honor, excuse me.  This is Thomas

4    Dubbs.  I'm lead counsel in the securities case.

5          The securities case has, as a subclass, the debt.  So

6    whatever issues there are with respect to the debt are handled

7    by counsels for that subclass.  So there's no conflict there.

8          But let me get back to the question --

9          THE COURT:  Well, no, don't get back.  That --

10          MR. DUBBS:  -- that I think Your Honor --

11          THE COURT:  That means there's a separate law firm

12    that isn't even involved yet; right?

13          MR. DUBBS:  No, it's already involved.  They're

14    already in the papers.  They're already up to speed.

15          THE COURT:  I know, but they're not -- they haven't

16    appeared in this court, have they?

17          MR. DUBBS:  No, they haven't appeared in this court,

18    as we're lead counsel --

19          THE COURT:  Okay.

20          MR. DUBBS:  -- and they work under our direction.

21          THE COURT:  Okay.  Okay.  All right, so there's a --

22    look, just give me some basics.  So now we have at least two --

23          MR. DUBBS:  Well, what I'm trying to -- now, in terms

24    of the timeline, all of the major law firms on the other side

25    have class-action departments that do this stuff routinely.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation

1    And they know us, and we know them. We can make a motion for

2    class certification within two to three weeks. We can get this

3    teed up for Your Honor in less than a month. I mean, this is

4    not nuclear physics.

5         And most of the issues involved in this, in many

6    cases, are stipulated to. I mean, PG&E is a huge company;

7    right? (Indiscernible) it doesn't trade on an official market

8    is ludicrous. Everybody knows that. It's followed by a

9    gazillion analysts. This is not a -- this is not an instance

10   where you have a straw (ph.) company with all kinds of class-

11   certification issues running around. This is fairly

12   straightforward.

13        Now, they have their defenses and have put forward

14   their defenses, but they're very experienced at this, and this

15   can be done very, very quickly, and Your Honor can decide this

16   up or down very, very quickly. I mean, this is not a big deal.

17        THE COURT: So what's the --

18        MR. DUBBS: And --

19        THE COURT: -- definition of "quickly"? What's the

20   definition of when you would believe it would be submitted for

21   decision if your motion itself is filed in three weeks? So

22   let's --

23        MR. DUBBS: I think we can have a hearing before Your

24   Honor within a month.

25        THE COURT: Okay, so the hearing would be in early

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation

1  April.

2          MR. KAROTKIN:  Do we get to respond, or not?

3          THE COURT:  Yeah, you will in a minute.  No, refile

4  (sic) to the motion or respond to the argument?

5          MR. KAROTKIN:  To the motion.  Yeah, the motion.

6          THE COURT:  Oh, no, they get to respond.

7          MR. DUBBS:  They --

8          THE COURT:  So --

9          MR. DUBBS:  Your Honor, they --

10         THE COURT:  No, that's why I -- that's why I set the

11  hearing in April.  Yeah, the way -- you gentlemen have

12  suggested that this motion would be filed in two to three

13  weeks, so that takes us out -- that takes us out to mid-March.

14  So they get to respond to that motion sometime.  So that

15  strikes me as a -- and the earliest, late April.  But am I

16  wrong about that, gentlemen on the phone?

17         MR. DUBBS:  Well, I mean, it could be done earlier if

18  the other side cooperates.  I mean, these things are set piece

19  barter (ph.), Your Honor, to be blunt.

20         THE COURT:  Okay.

21         MR. DUBBS:  And there aren't that many moving pieces.

22  And Weil Gotshal is one of the world's leading experts in these

23  things.  So this is not a big deal in terms of time --

24         THE COURT:  Okay, so let's suppose --

25         MR. DUBBS:  -- investment, to happen.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1      THE COURT:  -- let's suppose the world experts do it

2  and we have a hearing in late April, and let's suppose you've

3  got the rocket judge and the judge says, "Motion granted" on

4  May 1st.  Then what happens?

5      MR. DUBBS:  Well, then we have -- then we have a

6  certified class and then, as day follows night, we would sit

7  down and negotiate, because that's what almost always happens.

8      THE COURT:  Well, that'll happen either --

9      MR. DUBBS:  Now, as a --

10      THE COURT:  -- that'll happen here.

11      MR. DUBBS:  We've had -- what?

12      THE COURT:  That'll happen if I grant -- deny the

13  motion.

14      MR. DUBBS:  Your Honor --

15      THE COURT:  Right?

16      MR. DUBBS:  Well, it may, but -- it may, but remember

17  what's going on, Your Honor, with all due respect, is how big

18  is the class, and how many people are going to file certain

19  pieces of paper by the bar date, and are they going to

20  understand those pieces of paper, and have they been given

21  sufficient notice.

22      And the comment was made, which is completely

23  (indiscernible) it, which is that the overwhelming majority of

24  PG&E stock was owned by institutions.  It is true, there is

25  significant institutional holdings.  It's also true that

(973) 406-2250   operations@escribers.net | www.escribers.net

1    utilities stocks, as a practical matter, are also held by

2    elderly Americans, because they view them as safe, and they

3    have predictable dividends, et cetera, et cetera.  They're the

4    opposite of a growth stock.  Are those people going to

5    understand this notice?  No.  That's why we need a class,

6    because otherwise all those people are going to be fed up.

7              THE COURT:  Well --

8              MR. DUBBS:  And if they're fed up, that means there's

9    going to be no need to spread stock around --

10             THE COURT:  Well, hold on.  Gentlemen --

11             MR. DUBBS:  -- to other people.

12             THE COURT:  -- what would have happened if I had the

13   wisdom back in October, or you had told me to make them make

14   sure they're giving notice at least through known owners,

15   through brokerage houses and nominees?  And just suppose the

16   notice had gone out in whatever the date it was mailed out.  I

17   remember the bar date.  Just suppose it had gone out to all

18   those elderly people like me, or institutional lenders, or

19   people on their boat in Tahiti, or living in Paris.  They would

20   have filed claims or not filed claims, and here we'd be, just

21   like any other bankruptcy.  Why is this different except for

22   timing?

23             MR. DUBBS:  Well, they would have -- they would have

24   not filed a bankruptcy claim, but they would have filed

25   detailed motions as -- or detailed information as to what their

PG&E Corporation

1    losses are and valuated them -- the basis for incorporating

2    them under the plan, as opposed to what's happened now, which

3    is that everybody's ignored them and says, "Go get the

4    insurance money."

5            THE COURT:  Well, I don't know anything --

6            MR. DUBBS:  So we are where we are --

7            THE COURT:  -- I don't know anything about the

8    insurance money.

9            MR. DUBBS:  -- even if we had assumed that the

10   class --

11           THE COURT:  What --

12           MR. DUBBS:  -- even if you assume that the class

13   notice, rewinding the clock, had been impeccable and perfect --

14           THE COURT:  Well, but look, if the --

15           MR. DUBBS:  -- which it is not.

16           THE COURT:  Okay, so what's wrong with the notice that

17   the debtors' counsel have proposed, whether -- again, leaving

18   aside whether it's twenty-eight days or some other number of

19   days?  Do you have a quarrel with the notice of extended

20   deadline and the form of proof of claim?

21           MR. DUBBS:  Well, yes, in terms of the definition of a

22   class, in terms of the process that has been well established

23   as set forth before the Court in prior proceedings, which I

24   won't go through --

25           THE COURT:  But this isn't --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. DUBBS:  -- as to how this notice --

2          THE COURT:  But this isn't the other proceeding.

3          MR. DUBBS:  -- is given.

4          THE COURT:  This is not -- as I said in my docket

5    text, this is not a notice of a class settlement.  This is a

6    question of a notice of a --

7          MR. DUBBS:  It's not a notice of --

8          THE COURT:  -- bankruptcy claim.

9          MR. DUBBS:  -- a class settlement but, if you give --

10   if the requirement is to give actual notice to people that we

11   know are out there, then there's an established way to do that.

12   That is (indiscernible) point.

13         THE COURT:  And where would I --

14         MR. DUBBS:  I'm not making a legal point.  If --

15         THE COURT:  Where do I find that?  Where do --

16         MR. DUBBS:  You find that by issuing an order to all

17   of the broker-dealers and giving them specific time and

18   information to do what they're supposed to do, and class

19   counsel bug them to make sure that it's being done, so that the

20   maximum -- you'll never give a hundred-percent notice, but

21   we'll give very, very high level of notice, if they do that.

22   And that's -- I mean, this is -- that's what should have been

23   done before, but it wasn't.

24         THE COURT:  Well, maybe it should have been done

25   before.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. DUBBS:  And we are where we are.

2          THE COURT:  And I haven't asked you, gentlemen --

3          MR. DUBBS:  It should have been done.

4          THE COURT:  Wait.  I haven't --

5          MR. DUBBS:  It should have been done.

6          THE COURT:  The criticism came from --

7          MR. DUBBS:  I'm sorry.

8          THE COURT:  -- from Mr. Karotkin that you guys were

9    asleep and didn't make a noise.  And I didn't want to go there.

10   And so the question is, if --

11         MR. DUBBS:  I don't want to go there either,

12   because --

13         THE COURT:  -- if --

14         MR. DUBBS:  -- our view is all they had to do is walk

15   down the halls and talk to their class-action partners and make

16   this thing right.

17         THE COURT:  But what if the --

18         MR. DUBBS:  And they ignore this.

19         THE COURT:  Wait a minute.  What if the notice that

20   they have proposed now had been sent out last summer?  What

21   would have been wrong with that?

22         MR. DUBBS:  I think I just answered that, that it is

23   insufficient.

24         THE COURT:  Well, again, can you be more specific as

25   to why it was inefficient (sic)?

PG&E Corporation

1    MR. DUBBS:  It is insufficient as to the definition of

2    the class, the details of the class, the details of what is

3    being argued over.  And that's as to the (indiscernible) piece

4    of paper.  That is the second connected question that Your

5    Honor's talked about, which is, the method by which it gets

6    distributed, which is still not adequate.

7    THE COURT:  I'm having trouble knowing what to tell

8    the debtors' counsel if I go with their proposal, not yours,

9    which I know you're not pleased with that.  But if I go with

10   their procedure, I don't know what to tell them to do with what

11   is sent out to this group of people.  And I --

12   MR. DUBBS:  I think it's really simple.  I think it's

13   really simple.  These class notices are -- I won't say they're

14   forms, but they are routine documents.  Any one of these

15   gentlemen has partners who do this every single day.  Their

16   (ph.) view that they don't know what goes into these notices is

17   just bizarre.  They can (indiscernible) that out if that's the

18   way to go.

19   Now, the (indiscernible) the problem as opposed to

20   arguing about the notices, if I may digress, is to grant the

21   motion -- grant the motion tentatively and let us go to

22   mediation and maybe this'll go away.  Now, if it doesn't go

23   away, we're going to know pretty soon, and you can listen to a

24   tape recording of this hearing or read the transcript and you

25   can decide.

PG&E Corporation

1       THE COURT:  Well, I want to -- I want to go back

2  again.  I don't pretend to have extensive experience with class

3  actions.  I probably have received more notices than I've been

4  involved in giving them.  But my recollection is that normally,

5  not in a bankruptcy, the first time the person -- a civilian

6  out there in the world gets notice is notice of a prospective

7  settlement.  And there's multiple steps that happens with

8  preliminary hearings and what have you.  On the other hand, the

9  first notice you get in a bankruptcy is -- there is a notice of

10  a bankruptcy and there's a deadline to file a claim.

11       Now, I'm looking at the notice that the Weil Gotshal

12  lawyers for the debtors have proposed, and right on page 2 of

13  the notice, under big black letters, "Who must submit a

14  securities claim?", it says, "If you believe you have a claim

15  for purchase of equity securities between April 29, 2015 and

16  November 15th, 2018", et cetera, et cetera, et cetera.  That

17  seems to be a fair warning to people.  What would you have this

18  notice say beyond that?  This is the -- if you --

19       MR. DUBBS:  Can I back up a second?

20       THE COURT:  -- suffered a --

21       MR. DUBBS:  Because there's one analytical flaw in

22  your premise --

23       THE COURT:  What's that?

24       MR. DUBBS:  -- you gave me --

25       THE COURT:  What's that?

PG&E Corporation

1　　　　MR. DUBBS:  -- which is that in a suffused (ph.) class

2　action where two times -- where notice is given, even though in

3　many cases where there's a settlement, as a practical matter,

4　it's one plan.  Initially -- and if you go through the class-

5　action process and the court says the class is certified, then

6　a notice goes out.  And then you have the opportunity to opt

7　out or not opt out.

8　　　　THE COURT:  I know, but that's not --

9　　　　MR. DUBBS:  Then the litigation proceed --

10　　　　THE COURT:  -- but that's not what we're talking

11　about.  This is not a certification motion.

12　　　　MR. DUBBS:  I know that, Your Honor, but my point is

13　it's a relevant point, with all due respect, because the notice

14　is different for that stage of the proceeding than it is for a

15　settlement, which Your Honor's obviously familiar with, that

16　you get in consumer cases.

17　　　　Now, in the first notice -- the first notice gives

18　them more detail than what is on the (indiscernible) now,

19　because of how -- it goes into more detail as to what the

20　allegations are, what the dates of purchase are, and so on and

21　so forth.  Now, could that notice arguably be made legitimate?

22　Yes.  But we have the same problem all through this, which is

23　that if you do that, you're effectively cutting out a lot of

24　people who have valid claims, because they will get this

25　notice, maybe; they may understand it maybe, even if they get

PG&E Corporation

1    it through the broker-dealers.

2           And one practical real fact is that the notice -- and

3    remember, the notice (indiscernible) action on behalf of

4    investors depends in large part on whether there's any money on

5    the table.  And if there's money on the table, big, small, or

6    intermediate, people will pay attention.  If it's just another

7    piece of paper in the mail, they generally don't pay attention

8    to it, which is why, if you want to do substantial justice and

9    make sure that as many people who bought stock in the debtor

10   are heard, one -- the way to go is to do it the way you have

11   suggested:  let's get through this notice process, see if we

12   can settle; if not, we can have a very quick class-

13   determination issue and go from there.

14          THE COURT:  You know, in the bankruptcy world --

15          MR. DUBBS:  And no one could --

16          THE COURT:  -- in the --

17          MR. DUBBS:  No one can complain about that.

18          THE COURT:  In the bankruptcy world, you get a notice

19   that says, don't file a claim, there's no money, or it says,

20   file a claim, period.  It doesn't say, file a claim because

21   there's a gazillion dollars.  It says, file a claim.  That's

22   what I think the debtors' draft here is saying; it's saying, if

23   you were in this category of two-and-a -- three-and-a-half

24   years, you must file a claim.  I'm not hearing from your side,

25   Mr. Etkin, why I shouldn't go with this -- I mean, I understand

PG&E Corporation

1    generally you don't want me to allow this at all, but I don't

2    understand what's wrong with this existing notice if I go with

3    the alternative.  I think I've got -- we're --

4            MR. ETKIN:  Well, Your --

5            THE COURT:  -- beating this to death.  I want to --

6            MR. ETKIN:  Your Honor --

7            THE COURT:  Go ahead, wrap up.

8            MR. ETKIN:  Your Honor, if I may.  If I may.  And I

9    appreciate Mr. Dubbs stepping in with respect to the class-

10   action situation.

11           Your Honor, we do have Rule 7023 in the Bankruptcy

12   Code.  It's there for a reason.  It's not there as window

13   dressing.  And Your Honor, the -- I mean, I can go through some

14   (indiscernible) and some issues with respect to the content of

15   the notice; like, for example, the statement that, well, if

16   you're a current holder of stock, you don't need to file

17   anything.  Well, that's incredibly confusing.  And that's what

18   the original notice said.  And that's why holders, as opposed

19   to holders of claims based upon the purchase of stock -- people

20   aren't going to get that.  People aren't going to understand

21   that.

22           So if you want me to spend time this afternoon going

23   through some of the ways we would change the notice, we can do

24   that.  But the other question that you asked in your document

25   tree (ph.) was timing.  And timing is a big deal here, despite

1   the fact that Mr. Karotkin tries to pooh-pooh it and say, well,

2   we don't have cares about equity and 510(b) holders anyway,

3   because we'll cram them down, so they're irrelevant.  Well, you

4   know, that's, at best, (indiscernible).

5           And I think that what this is all about is giving

6   folks an opportunity to be heard in this bankruptcy case and be

7   heard as a collective.  And the idea that -- if we feel this is

8   perfect -- let's assume that the notice is perfect.  Let's

9   assume that, according to the debtors' own consultant, there's

10  a thirty- to forty-percent success rate that he accomplished in

11  the past.  And that's in our papers.  And let's assume that

12  there're 111,000 -- Your Honor, there're 111,000 holders as of

13  the record date.  We also indicated in our papers how many

14  class members there must be, given the turnover of the float

15  (ph.) during the class period.

16          So the number of purchasers during the class period

17  could very well be in the hundreds of thousands.  So apply a

18  thirty- to forty-percent success rate, and you have, what,

19  100,000 claims that were filed?  And you better have the

20  audacity to step up and say, well, administratively, that's

21  easy, we can deal with 100,000 claims and deal with resolving

22  100,000 proofs of claim.  But it's much more difficult to deal

23  with a court-appointed lead plaintiff and court-appointed lead

24  counsel to try to resolve this in a way that makes sense, that

25  doesn't upset the apple cart, and that provides some recovery

PG&E Corporation

1   for the sort of investors, who, frankly, Your Honor, did --

2   there should have been a dialogue from the get-go.

3        You know, it's very interesting, Your Honor.  If you

4   read the Connaught decision, which you referred to and we

5   referred to in our papers, what (indiscernible) judge there

6   said -- the same judge who decided Musicland, I might add.

7   What (indiscernible) judge said there was, you guys knew about

8   this class action from day one, you froze them out of

9   discussions, you didn't discuss anything with respect to the

10  plan and try to get it resolved, you filed your plan, ignoring

11  their claims, so you're as much to blame as anybody for the

12  situation that we're in.  And I think the same applies here,

13  Your Honor.

14       The debtors chose, and had to choose, quite frankly,

15  ultimately, despite all the fighting that occurred at the

16  beginning of the case, to try to engage constituencies and come

17  up with a resolution that works.  They have not done that with

18  us.  They think it's better to deal with 10,000, 50,000, 80,000

19  proofs of claim.  That's easier than sitting down with court-

20  appointed fiduciaries and try to get a resolution that's

21  acceptable and that can work.  They think that that's easier

22  for the administration of the estate.

23       Nothing can be further from the truth, Your Honor,

24  than the idea of dealing with things that way.  The Court

25  doesn't need 10,000, 20-, 50,000 additional claims

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    (indiscernible) to really get this done.  That's why 7023 is

2    part of the bankruptcy system.  That's why class actions

3    generally are part of our system of jurisprudence:  to get

4    things done on a collective basis.

5              THE COURT:  Okay --

6              MR. ETKIN:  And Mr. Karotkin spent some -- if I may,

7    Your Honor.  I'm sorry.  But Mr. Karotkin spent some time

8    talking about what he thinks this is really all about.  Let me

9    tell you what I think this is really all about.  This is all

10   about the debtor and others assuming that few people are going

11   to file a proof of claim.  They won't have to deal with a lead

12   plaintiff and lead counsel who are sophisticated enough to sit

13   down and try to work out a solution.  They won't have to deal

14   with them.  They can pick off God knows how many potential

15   class members and end up simply dealing with a handful of

16   proofs of claim that -- they'll just steamroll them.  These

17   folks won't have their own lawyer.  They're not in a position

18   to obtain their own lawyer.  They don't have the benefit of

19   court-appointed plan counsel and a sophisticated lead

20   plaintiff.  And the debtor will go on its merry way

21   (indiscernible) of the fact that probably hundreds of thousands

22   of folks who invested in this stock during the class period

23   have lost significant money.

24              And I'm not looking to make any comparisons, Your

25   Honor.  And I'll say that upfront.  But we're victims too.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1   We're victims too.

2         THE COURT:  Well, I think you'd be better off not

3   dwelling on that at the moment.  I understand that that might

4   be a theory, but I don't -- that's not going to play very well,

5   so I'd rather that you not dwell on that.

6         What would have happened, Mr. Etkin, if we're back in

7   time?  Leaving aside what might have been a cause, what if I

8   had, on my own -- what if you had been here?  What if somebody

9   had said there has to be a more robust notice, you have to

10  reach out to get to the street accounts at least, and you have

11  to give, in the original notice, a little more information

12  about the nature of the claim?  And just as a hypothetical.

13        Now, the notice would have gone out, and it wouldn't

14  have said, by the way, there's going to be a payday for you.

15  It wouldn't have said, there's a class settlement and there's

16  money that -- you'd have the apathy or the proactiveness of

17  claimants.  And whether that resulted in 100 proofs of claim or

18  100,000 proofs of claim, the debtors would have to deal with

19  it.

20        So why -- if they would have had to deal with it then,

21  why can't I just -- what's wrong with making them deal with it

22  now if that's the preferred way and, indeed, if it appears to

23  be less threatening to the reorganization effort for the

24  benefit of the fire victims primarily and all the other

25  creditors who are creditors of this case?  Can you help me with

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1    that one?

2         MR. ETKIN:  Well, Your Honor, I mean, there're several

3    assumptions in there which I can't really embrace.  I can't

4    embrace that this is going to be a problem with respect to the

5    debtor moving forward and confirming its plan.  There's been no

6    evidence of that whatsoever --

7         THE COURT:  What do you mean?

8         MR. ETKIN:  -- Your Honor.  There's been --

9         THE COURT:  What do you mean, "no evidence"?

10        MR. ETKIN:  -- conclusory statements --

11        THE COURT:  No evidence that they can confirm the

12   plan?  I'm not sure --

13        MR. ETKIN:  No.  No evidence that having to deal at

14   some point, and likely post-confirmation, with the resolution

15   of the class proof of claim is going to preclude them from

16   confirming the plan by the June 30th deadline.

17        THE COURT:  No, that -- I don't --

18        MR. ETKIN:  There's been no evidence --

19        THE COURT:  I don't think --

20        MR. ETKIN:  -- of that whatsoever.

21        THE COURT:  I don't think you understood my question,

22   so I'll try it again.  Mr. Karotkin said your side should have

23   been -- made noise last year.  And I'm not getting into who

24   should have or shouldn't have done something, because your side

25   has said, well, the debtor and their lawyers should have been

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    more forthcoming and the notice should have been --

2            MR. ETKIN:  I didn't cast aspersions at any --

3            THE COURT:  I know.

4            MR. ETKIN:  I didn't cast aspersions --

5            THE COURT:  I --

6            MR. ETKIN:  -- at any lawyer, Your Honor.

7            THE COURT:  -- the notice should have been more

8    robust.  So what I'm getting at is we can't go back in time

9    but, if we go back in time to try to replicate what could have

10   been done, what could have been done is a broader, more robust

11   notice, at least through the street accounts, and that might

12   have -- and maybe there are 100,000 defrauded investors out

13   there, but -- and maybe most of them would ignore the notice,

14   because they go, "Fire.  Fire claim.  Bad stock."  You know,

15   that's a little attenuated.

16           So I'm trying to say you're arguing that the debtors'

17   lawyers want to cut out the plaintiffs' lawyers and they'll

18   instead deal with 100,000 proofs of claim.  And my response is,

19   well, what if they had 100,000 proofs of claim from last

20   summer?  What would be different?  And I don't know what would

21   be different.

22           MR. ETKIN:  Your Honor, that's a very difficult

23   question to answer because we are where we are.  But let me try

24   to answer it for you.  Okay?

25           THE COURT:  Um-hum.

PG&E Corporation

1    MR. ETKIN:  If notice would have been better -- and I

2    don't know how much better, and I don't know what crosses the

3    threshold.  But if notice would have been better from the get-

4    go, we'd be in a different position in terms of our Rule 7023

5    argument on the merits; we'd still be making it, we'd still be

6    urging you to apply 7023, for a whole host of reasons.  But

7    obviously, if that were the case, then -- and there were no

8    due-process issues upfront, it would have created a different

9    landscape.  But that's not where we are.

10    And the idea that you can cover up a supplemental bar

11   date now at March 31st, given the prior testimony of Ms. Pullo

12   in her original declaration, given the testimony that was

13   provided with the declaration of Mr. Walter, given the fact

14   that the debtor has essentially done an about-face with respect

15   to that and now thinks that all of this can be accomplished and

16   done and notice can be in the hands of every class member

17   within a matter of days so that they have thirty days in order

18   to file a proof of claim, is just a fantasy.  It's an absolute

19   fantasy.

20    THE COURT:  Okay.  I'm --

21    MR. ETKIN:  I mean, I can quote you the language from

22   Ms. Pullo's --

23    THE COURT:  No, no, no.  I don't --

24    MR. ETKIN:  -- original declaration.

25    THE COURT:  I don't want to do that.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation

1          MR. ETKIN:  It just can't be done.

2          THE COURT:  Mr. Etkin, I don't --

3          MR. ETKIN:  It can't be done.

4          THE COURT:  I don't want you to do that.

5          MR. ETKIN:  We can go -- we --

6          THE COURT:  I'm going to --

7          MR. ETKIN:  The idea that this can get done and we can

8  give due process of some fundamental fairness to class members

9  by a lightning-speed attempt to get notice out and to have them

10 respond, it just -- it's an actual fantasy --

11         THE COURT:  Okay --

12         MR. ETKIN:  -- especially given the amount of time

13 that was given to creditors under the original bar-date orders.

14         THE COURT:  Okay, Mr. Etkin, I'm going to -- I'm going

15 to stop you at that point and I'm going to give Mr. Karotkin or

16 Mr. Bennett a brief response, and then I'm going to decide what

17 to do next.

18         So Mr. Bennett, are you going to do the heavy lifting

19 here?

20         MR. ETKIN:  Your Honor, there --

21         MR. BENNETT:  Very briefly, Your Honor.

22         MR. ETKIN:  I feel -- Your Honor, I apologize, but I

23 feel -- there was a lot said, during the initial hour that was

24 given to the debtor and others, that really rings totally

25 untrue --

(973) 406-2250 operations@escribers.net | www.escribers.net

1          THE COURT:  I know.

2          MR. ETKIN:  -- by the --

3          THE COURT:  I know, but I tried to tell you, I'm not

4    interested in anything other than to figure out what's the

5    right thing to do going forward.  And you've been very helpful

6    with your comments.  I don't -- it's not helpful and doesn't

7    advance the issue or the cause to go back with that.  So I

8    apologize to you; I'm going to cut you off for now.

9          MR. ETKIN:  No, I appreciate that, Your Honor.

10          THE COURT:  I'm going to let Mr. Bennett speak, and

11    then I might not take any further comments.  I'll decide.

12          Mr. Bennett?

13          MR. BENNETT:  Thank you very much, Your Honor.  I'm

14    going to focus a little bit on the very last part, which is

15    whether or not there's any special problem about giving a

16    notice now, and whether or not this particular audience needs a

17    lot of time, or what a reasonable amount of time is for this

18    particular audience.

19          Your Honor was specially solicitous to the fire

20    victims, for two fundamental reasons, I think; you may have had

21    more:  one was, they were involuntary creditors, they didn't

22    walk in and say, "I want to be an investor in PG&E;" and the

23    second thing is that they were a lot of unsophisticated people

24    that may well have been scattered as a result of the fires, and

25    dislocated.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1         This particular audience is a different audience.

2    This is an -- this is an investor class -- if there is really a

3    class, by the way -- which has not been established in any

4    court.

5         THE COURT:  It's a group of --

6         MR. BENNETT:  It's a --

7         THE COURT:  -- investors; why don't we say that.

8         MR. BENNETT:  It's investors, okay, investors who

9    voluntarily bought securities, who know what it's like to get

10   statements from their brokers.  Your Honor knows what it's like

11   to get statements from their brokers.  I don't think we have

12   to --

13        THE COURT:  What, you think I have a broker?

14        MR. BENNETT:  Pardon?

15        THE COURT:  You think I have a broker?

16        MR. BENNETT:  I -- you have a --

17        THE COURT:  I work for the federal government.

18        MR. BENNETT:  Okay.  However -- you said you got

19   notices in the past.  When you get these notices -- when people

20   have brokerage accounts that own common stock, they get things

21   in the mail; they get proxy statements with voting documents,

22   they get annual reports.  They get things.  They know they have

23   to open them.  They know they have to read them --

24        THE COURT:  Right.

25        MR. BENNETT:  -- or deal with them.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1    So this is not the same kind of class that requires a

2  six-month period.  This is a class that very easily can deal

3  with a twenty-one-day or a twenty-eight-day period.  To me, the

4  biggest problem is making sure there's enough time to get the

5  notices out from the debtor, in to the brokers, and out to the

6  customers.  That's the big deal, and which augurs for getting

7  started soon.

8    And by the way, the class-action plaintiffs, when --

9  not if -- when they have to substantiate their claims, when

10  they have to tell us how much they would have to do the very

11  same thing, albeit it would come much, much later --

12    THE COURT:  Well, but on the proof-of-claim form, the

13  investor at least is supposed to quantify what he or she claims

14  is a loss.  So it could be --

15    MR. BENNETT:  Exactly.

16    THE COURT:  -- unknown or it could be --

17    MR. BENNETT:  Well, it --

18    THE COURT:  -- a trillion dollars, but --

19    MR. BENNETT:  It's hard to --

20    THE COURT:  -- it's something.

21    MR. BENNETT:  It's hard to imagine -- you could accept

22  "unknown" in circumstances where someone lost their house and

23  their records and whatnot.  You're not -- can't really accept

24  completely "unknown" in the context where a person knows what

25  they bought at and knows what they sold at.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE COURT:  Right.

2          MR. BENNETT:  So I actually think, in this instance,

3     when the debtor says they want a liquidated-loss amount from

4     the holder, it would be eminently reasonable to require them do

5     to it.

6          THE COURT:  You mean with the supplement to the proof

7     of claim --

8          MR. BENNETT:  Exactly.  Yeah.

9          THE COURT:  -- the CUSIP numbers, and all that other

10    stuff, and --

11         MR. BENNETT:  Exactly.  Totally different scheme.  And

12    I think that's --

13         THE COURT:  Well, but -- okay.

14         MR. BENNETT:  -- fundamentally important.  All right?

15         So I want to go back to the schedule, the -- Your

16    Honor tried to get a schedule; so where would we be -- when

17    would we be where.  Okay?  So two to three weeks for filing

18    their papers.  Couple weeks for the debtors to respond and for

19    perhaps us to respond.  Presumably they want to reply.  We

20    forgot something:  discovery about the adequacy of the class

21    representatives.  I want to point out --

22         THE COURT:  Well, I asked the question about

23    subclasses and so on, at least one of them.

24         MR. BENNETT:  So the bottom line is -- and by the way,

25    worth noting, they keep using the words "court-appointed".

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1    They're not court-appointed for purposes of this Court, by

2    anybody.

3              THE COURT:  I know.

4              MR. BENNETT:  So -- okay.  They're self-selected

5    representatives of investors.

6              THE COURT:  But that's -- again, that's the way it's

7    done in the world of class action.

8              MR. BENNETT:  I just want to make sure people

9    adequately identify themselves.

10             So what do we have to do?  Okay?  We have to somehow

11   get all the way through the class process, the Rule 23 process,

12   including discovery, and only then are we ready for estimation,

13   for discovery about what the amounts really are, all these

14   things which have to happen.  Why do they have to happen?  Why

15   can't we be here two years from now, worrying about this?  Why

16   can't we defer it?  Your Honor's nailed it:  it's because it's

17   not just about historical equity, who you could choose or not

18   choose to put burdens on at this stage in the case.  You're

19   also putting dilution risk on people who are buying new shares.

20   You're putting dilution risk on the TCC.  That's the problem

21   that can't really be solved, because we can't hold up the whole

22   case to wait for all these things to happen.

23             So our best shot -- and I agree; we don't know how

24   many claims there're going to be.  We could well be creating a

25   mess here.  I kind of doubt it.  The debtors and shareholders

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation

1    have talked about it, and we figured out this is the right way

2    to proceed. Let's see what's out there. The only way to see

3    what's out there is actually to give notice, actually to give

4    (ph.) back claims, and actually do a little bit of processing

5    (ph.), just like we always do.

6          Happy to answer any questions Your Honor has.

7          THE COURT: Well, I want to go back again where --

8    well, never mind.

9          Anyone else want to be heard?

10          MR. SLACK: Your Honor, Richard Slack on the phone.

11          THE COURT: Yes, sir. Yes, sir.

12          MR. SLACK: If I could -- if I could just respond to

13    two, again, discrete points --

14          THE COURT: Yes, sir.

15          MR. SLACK: -- that were made by the (indiscernible)

16    plaintiffs; the first, Your Honor, was their citing of the

17    thirty- to forty-percent success rate of returns. They do cite

18    something in their papers; it's an internet link. And what

19    (sic) the internet link they cite to is a nonbankruptcy class-

20    action settlement. And as Your Honor, I think, will correctly

21    identify, those are very different. If you're telling

22    investors, "Hey, we have a pot of money. Do you want to share

23    in it?" -- and I think Mr. Dubbs, in his comments, suggested

24    that those situations are much different in terms of returns.

25          So I don't think -- putting aside whether or not --

PG&E Corporation

1    what the right number is, it's clear that the thirty- to forty-

2    percent number is apples to oranges in our bankruptcy situation

3    today.

4           The second point, Your Honor, and I think I'd be

5    (indiscernible) if I didn't comment on this because there are a

6    number of defense lawyers for the class actions and then you

7    have Mr. Dubbs talking about this is simple; reclass

8    certification can be done simply.

9           That should not pertain to -- and this a very complex

10   class.  There are numerous subclasses, and as we cite in our

11   papers, Your Honor, there are really two things that can

12   happen.  We could deny class as a whole, but also very

13   importantly in class certification, we could pare it back

14   substantially.  And if you pare this class back by a quarter, a

15   half, three-quarters that would change the damages

16   dramatically.  And those are the kinds of things that Your

17   Honor can consider.

18           And I would say that the other claim we make in our

19   papers, and why this is a very complex matter, is the supreme

20   court recently, a couple of years ago, decided the Halliburton

21   case, which we cite.  It says that you know, as a matter of

22   what would be defense due process, defendants can raise

23   causation issues and class certification; the claimants have a

24   right to do that.

25           And that usually -- and in fact, I've never seen

1  (indiscernible) in these situations and these class security

2  cases recently that the defendants go out and get experts, the

3  plaintiff's get exerts with respect to causation issues.

4         And I can tell you, Your Honor, that -- and the

5  defendants here -- I'm not representing (indiscernible) class,

6  but the defendants' counsel believes that there are very

7  significant challenges to class certification that are going to

8  require more than just, you know, a couple of days of discovery

9  and a month of briefing.

10        So I think that's the challenge we have from a due

11  process standpoint, that this court's going to face if it goes

12  through and tries to have a Rule 23 motion on top of and before

13  it could reach any of the estimation or other issues that Mr.

14  Barrent just talked about.

15        Your Honor, those are the two points I wanted to make.

16        THE COURT:  Okay.

17        MR. DUBBS:  Your Honor, this is Mr. Dubbs, may I

18  respond to that in one minute?

19        THE COURT:  Yes, sir.  One minute.

20        Well, wait.  Ms. Michelson was trying to stand up,

21  your local co-counsel.

22        Did you want to be heard?

23        MS. MICHELSON:  I defer to Mr. Dubbs, Your Honor.

24        THE COURT:  Oh, you're doing a text with him, huh?

25        MR. DUBBS:  She's smarter than I am, so let her go.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1          THE COURT:  See, in this day and age people text back

2     and forth and say, let the judge make -- get him to let me

3     talk.

4          Okay, Mr. Dubbs, you're up.

5          MS. MICHELSON:  Well, I think he just deferred.  I

6     have one point to make, Your Honor.

7          It seems to me that the argument boils down, in large

8     part -- on the debtors part, is they're concerned about

9     dilution.  And the sophisticated investors that are going to

10    make determinations about whether or not to invest, and the

11    organized debtor need to have information.

12         Well, there's also sophisticated investors; we know

13    that they're not the mom and pops, they're not the individual

14    unfortunate victims who found themselves creditors here.

15    They're people who can look at these issues and come up with

16    their own evaluations of what the dilution might be.  And that

17    is what should happen here.

18         Nothing about this process -- if it goes to a 7023

19    evaluation -- needs to be fully and finally determined by

20    confirmation.  There can be estimation proceedings, as Your

21    Honor has said.  There can be ranges put in disclosure

22    statements about what the dilution can be; we do this all the

23    time -- Your Honor does it all the time.

24         You know, when people come in and say I want the

25    disclosure statement to say that, well, this could happen or

PG&E Corporation

1    that could happen.

2          THE COURT:  Right.  You heard Mr. Karotkin say two

3    hours ago, there don't have to be disclosures.

4          MS. MICHELSON:  Well, that's new, today isn't it, Your

5    Honor?  I mean the Court noted that.

6          THE COURT:  Well, it's not new for a portion of the

7    plan because I say -- from at home when I looked at these

8    things, I saw we've got at least a half of -- you know, some

9    impaired, some unimpaired and that seems to be the way the plan

10   is at least drafted right now.

11         And Mr. Bennett and Mr. Karotkin seem to even downplay

12   whether there needs to be a formal disclosure for the equity.

13   You know, I realize there's a different opinion about that, and

14   I can see that that's something that's an open issue for the

15   moment.

16         What you're saying if I could give it back to you is

17   sophisticated people that are going to invest in this company

18   can make decisions on whether they want to do the investing.

19   But what if they want to -- what if gets more expensive?  Or

20   what if it threatens the process for some other reason?  That's

21   the unknown here, isn't it?

22         MS. MICHELSON:  Well, nobody wants to threaten the

23   process, but on the other hand, Your Honor, the securities

24   claimants are entitled to notice, they're entitled to make

25   their claims and they didn't get adequate notice.

PG&E Corporation

1        But if it's necessary, why can't the people in this

2    room and the people on the phone sit down and come up with

3    language to insert in a plan that says the claims of the

4    securities investors may range from X to Y?  And in deciding

5    whether you would like to invest in the reorganized debtor, you

6    should take that into account.  I mean, that's notice; they can

7    make their own determinations, or it can be more complete than

8    that.

9        But simply to say because these claims are not finally

10    known, this threatens the process, doesn't answer the question.

11    The question is how can we deal with these claims in a fair way

12    that gives due process to the claimants, but allows the process

13    that this court and everyone in this room is determined to have

14    concluded by the end of June happen in a fair way?  And I think

15    that that can happen.

16        THE COURT:  Well, do you have reason to believe it can

17    be concluded by the end of June?

18        MS. MICHELSON:  What can be concluded?

19        THE COURT:  Well, what -- yeah, what.  That's the

20    question -- what.

21        MS. MICHELSON:  The parties can draft a paragraph to

22    add into the plan arrearization and in the disclosure statement

23    that talks about this.  It gives the notice that will allow

24    people to make determination --

25        THE COURT:  It's hard for me to imagine the fire

PG&E Corporation

1   survivors trying to understand any of this, but then on top of

2   everything else focusing on issues that maybe will be resolved

3   maybe not, but will they get stock will they not get stock,

4   will FEMA be in there will FEMA not be in there.

5          To also focus on whether some unknown investor is

6   going to get more or less stock, to me is have little to do

7   with what the victims are going to get.

8          MS. MICHELSON:  They're always going get twenty

9   percent of the stock.

10          THE COURT:  Of what?

11          MS. MICHELSON:  Of the reorganization.

12          THE COURT:  Well, I know.  That's right.  Twenty

13   percent of --

14          MS. MICHELSON:  That's not going to change.

15          THE COURT:  That's not -- well, it's not going to

16   change unless it has to change.  But you're right, it's not

17   going to change.  So your point is, I mean, who's going to make

18   this informed judgment that doesn't have any bearing on their

19   outcome?

20          In other words, what -- if I'm a fire victim, why do I

21   care who divides up the eighty percent?  I don't care, do I?

22          MS. MICHELSON:  The fire victim, you get your

23   proportionate share of the twenty percent.

24          THE COURT:  My share of the twenty percent, or not.

25          MS. MICHELSON:  And the other eighty percent --

PG&E Corporation

1          THE COURT:  That's right.

2          MS. MICHELSON:  -- it will be determined by other

3    issues.  It's not going to affect them.

4          THE COURT:  Well, that's right, and you -- and if I

5    follow you correctly, is those prospective investors can make a

6    decision on how much they're getting for their money -- their

7    investment.

8          Are they going to have some claimants in the -- not

9    fire claimants but security fraud claimants -- sharing in

10   their -- in the eighty percent.

11         MS. MICHELSON:  And that was always known because the

12   class action was filed -- it pre-dated the bankruptcy case.

13   One of the first things that the debtor did, in this case, was

14   try to enjoin the securities class action as against third

15   parties.  This was not news to anybody --

16         THE COURT:  That's right.

17         MS. MICHELSON:  -- whose been following this case.

18         THE COURT:  That's right.

19         MS. MICHELSON:  So.

20         THE COURT:  Okay.

21         MS. MICHELSON:  I defer to Mr. Dubbs.

22         THE COURT:  All right, I'm going to --

23         MR. DUBBS:  I withdraw my request, Your Honor.  Thank

24   you for your time.

25         THE COURT:  Mr. Karotkin, I'll ask you the question

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1    that I asked you two hours ago.  Is there any benefit in my

2    just doing nothing for a short period of time if there is going

3    to be some active attempts with Judge Newsome or otherwise?

4         Because I have to make a decision and I told you

5    that's my job, that's why I get the big bucks, right?  But this

6    is not a fun decision.  It's not something I want to do, and I

7    would rather not do it if I can avoid it.  Is there any benefit

8    in sitting tight for a short period of time?

9         Mr. KAROTKIN:  Your Honor, nothing will preclude us

10   from sitting down and meditating and negotiating anyway.  I

11   think, you know, perhaps three or four days when we get a

12   little more direction from Judge Newsome, but I really don't

13   see a benefit of deferring.

14        THE COURT:  Okay.  All right, I want to thank everyone

15   for their time.  I'll do my best to figure out what -- I will

16   figure out what I think is the best result.  I don't think I'm

17   going to make everybody happy; I understand that, but I

18   appreciate the effort and under the time circumstances.

19        And the matter will stand submitted -- and submitted

20   in my mind means I'm going to issue a decision one way or the

21   other as quickly as I can.  And that's what I'll promise you

22   all.

23        MR. KAROTKIN:  Thank you, Your Honor.

24        THE COURT:  I have a question for you, Mr. Karotkin.

25   Can you give me a clue for next week on the exit financing?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  Have you resolved whether that's going to involve testimony or?

2          MR. KAROTKIN:  Actually, Your Honor, we did file a

3  notice that the hearing on the exit financing will not take

4  place next week.

5          THE COURT:  Oh, you didn't file it in the last two

6  hour -- you must have filed it -- or maybe Ms. Kim might have

7  filed it to what I didn't look at it.

8          Okay, so that's not going forward next week.

9          MS. KIM:  I think we filed it on Monday.

10         MR. KAROTKIN:  I think we filed it Monday or Tuesday.

11         THE COURT:  I thought it was over to next week?  No?

12         MR. KAROTKIN:  We filed another notice on Monday.  I

13  apologize, but we filed another notice.

14         THE COURT:  It's okay.  I just can't keep up with all

15  the notices.

16         MR. KAROTKIN:  So it's not going forward next week.

17         MS. KIM:  The FEMA and the government claims

18  objections are going forward next week.

19         THE COURT:  Well, have you -- someone reported back,

20  Mr. Karotkin?  Did we get that back, so?  Because I had asked

21  for a status report on whether that was going forward.

22         MR. KAROTKIN:  I believe Mr. Julian replied to that.

23         THE COURT:  Yeah.  But I haven't checked in with my

24  court --

25         MR. KAROTKIN:  I think, Ms. -- yeah, I believe she has

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation

1  that.

2        THE COURT:  -- room deputy yet.  So that's still on

3  for next Wednesday.

4        MR. KAROTKIN:  Correct.  Yes.  But not the financing.

5        THE COURT:  Okay.  Thank you very much, everybody.

6        MR. KAROTKIN:  Thank you, sir.

7        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8     (Whereupon these proceedings were concluded at 3:30 PM)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

of 119

1          C E R T I F I C A T I O N

2

3    I, Emily Howard, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ EMILY HOWARD

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:   February 21, 2020

16

17

18

19

20

21

22

23

24

25

of 119
(973) 406-2250 | operations@escribers.net | www.escribers.net

## A

**able (1)**
44:17
**about-face (1)**
86:14
**absent (2)**
5:12;55:21
**absolute (1)**
86:18
**absolutely (4)**
11:2;30:9;31:14;
33:10
**absurd (1)**
39:16
**academic (1)**
39:17
**accept (3)**
26:14;90:21,23
**acceptable (1)**
81:21
**acceptances (2)**
36:17,19
**accepts (2)**
14:10;16:7
**accomplished (2)**
80:10;86:15
**according (1)**
80:9
**account (3)**
44:16;56:5;98:6
**accounts (3)**
83:10;85:11;89:20
**accurate (1)**
46:18
**achievable (1)**
31:14
**achieved (1)**
39:24
**achieving (1)**
31:12
**act (3)**
47:24;51:18;57:6
**action (22)**
19:17;22:15;24:25;
35:24;46:23;47:7;48:2,
9,20,25;51:19;57:4;
58:1;77:2,5;78:3;
79:10;81:8;92:7;93:20;
100:12,14
**actions (3)**
76:3;82:2;94:6
**active (2)**
51:19;101:3
**actively (1)**
5:20
**actual (8)**
8:11,23,24;53:12;
55:20;56:20;73:10;
87:10
**actually (13)**
14:20;31:17,20;32:2;

35:19;40:1;55:13;
56:19;91:2;93:3,3,4;
102:2
**add (3)**
44:20;81:6;98:22
**additional (1)**
36:1;81:25
**address (18)**
3:21;6:2,20;8:3,5;
9:1;11:19;14:4;19:1;
26:12;27:7;37:16;
43:20;46:13;48:1;51:6;
55:22;59:14
**addressed (2)**
21:2;45:2
**addresses (1)**
48:6
**addressing (1)**
14:19
**adds (1)**
44:25
**adequacy (1)**
91:20
**adequate (10)**
7:8;25:13;26:1,13;
27:2;31:17;32:10;38:7;
75:6;97:25
**adequately (1)**
92:9
**administration (2)**
26:21;81:22
**administrative (2)**
63:19;64:5
**administratively (1)**
80:20
**advance (3)**
7:22;60:22;88:7
**advantage (2)**
21:16;60:5
**advantageous (1)**
34:15
**adversary (4)**
48:5,12,18;49:3
**advice (2)**
16:11;27:5
**affect (1)**
100:3
**afforded (1)**
52:11
**afternoon (4)**
3:4,5;45:24;79:22
**again (45)**
4:5,13,24;5:4,7;6:18;
7:21,23,25;11:21;
13:20;14:2,6;15:5,25;
17:6;18:3,11;20:5,25;
24:8;25:12,18,21;
29:16;30:14;41:9,10;
43:19;44:9,20;45:11;
56:23;59:1;60:4;61:1;
62:18;66:14;72:17;
74:24;76:2;84:22;92:6;
93:7,13

**against (14)**
7:24;32:15;47:23;
48:7,8;49:16;50:24;
51:1,11,20,20,22;
59:12;100:14
**age (1)**
96:1
**agenda (1)**
28:24
**ago (5)**
6:11,11;94:20;97:3;
101:1
**agonize (1)**
30:18
**agree (24)**
17:25;19:24;21:22;
24:6,6;25:2;26:14,14,
17;27:3;28:25;31:17;
33:14,16;34:3;37:14;
42:12;43:8,9,12;52:12;
53:25;55:2;92:23
**agreement (1)**
35:6
**ahead (6)**
45:20;46:15;54:12;
63:5;67:1;79:7
**air (1)**
39:15
**albeit (1)**
90:11
**alive (1)**
47:8
**allegations (3)**
32:12;57:5;77:20
**allegedly (1)**
37:3
**allocated (1)**
22:12
**allow (5)**
17:14,15;20:9;79:1;
98:23
**allowed (3)**
13:7,15;62:3
**allows (1)**
98:12
**almost (2)**
43:4;70:7
**along (1)**
54:20
**alternative (10)**
6:25;8:14;11:5;23:3;
33:24;36:22;48:10;
54:9;55:5;79:3
**alternatively (1)**
51:14
**alternatives (4)**
8:15;9:6;23:4;57:14
**Although (1)**
60:23
**always (7)**
24:2;44:9;53:16;
70:7;93:5;99:8;100:11
**amendment (1)**

37:15
**Americans (1)**
71:2
**amount (8)**
12:16;28:2,10;39:4;
58:7;87:12;88:17;91:3
**amounts (4)**
22:2,18;36:24;92:13
**analogy (1)**
53:1
**analysis (1)**
43:9
**analysts (1)**
68:9
**analytical (1)**
76:21
**analytically (1)**
51:7
**annual (1)**
89:22
**anomaly (1)**
19:6
**answered (3)**
28:6;35:11;74:22
**anticipated (1)**
28:8
**anxious (1)**
29:5
**apathy (1)**
83:16
**apologize (5)**
28:17;32:24;87:22;
88:8;102:13
**appear (1)**
58:19
**Appearances (2)**
3:9,15
**appeared (3)**
54:10;67:16,17
**appears (1)**
83:22
**apple (1)**
80:25
**apples (1)**
94:2
**applicable (2)**
19:15,16
**applies (1)**
81:12
**apply (3)**
60:21;80:17;86:6
**appointed (1)**
81:20
**appreciate (6)**
17:14;30:24;57:19;
79:9;88:9;101:18
**appreciates (1)**
61:24
**appropriate (8)**
4:24;5:15;6:18;7:12;
8:20,21,22;42:12
**approval (1)**
27:7

**approved (4)**
5:1,15;11:18;14:5
**April (5)**
69:1,11,15;70:2;
76:15
**arguably (1)**
77:21
**argued (2)**
38:24;75:3
**arguing (2)**
75:20;85:16
**argument (11)**
23:2;25:23,24;47:13;
54:4;58:9,12,15;69:4;
86:5;96:7
**arises (1)**
49:25
**arising (1)**
32:12
**around (3)**
31:13;68:11;71:9
**arrearization (1)**
98:22
**aside (1)**
72:18;83:7;93:25
**asleep (1)**
74:9
**aspersions (2)**
85:2,4
**assert (5)**
24:22;42:1;44:5,19;
65:10
**asserted (1)**
32:15
**asserting (3)**
44:25,25;58:4
**assertion (1)**
56:23
**asserts (1)**
56:22
**assume (6)**
15:13;31:5;72:12;
80:8,9,11
**assumed (3)**
43:25;47:10;72:9
**assuming (4)**
18:20,21;25:12;
82:10
**assumptions (3)**
39:10,11;84:3
**assure (4)**
20:8;21:1;26:20,21
**assures (1)**
20:7
**attempt (2)**
65:7;87:9
**attempts (1)**
101:3
**attention (2)**
78:6,7
**attenuated (1)**
85:15
**audacity (1)**

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 105
of 119

80:20
**audience (4)**
88:16,18;89:1,1
**augurs (1)**
90:6
**August (1)**
31:14
**available (5)**
61:19,23,25;62:2;
63:7
**avoid (3)**
60:19,19;101:7
**avoids (1)**
24:12
**aware (5)**
46:17;47:19;54:22,
22;59:15
**away (3)**
3:11;75:22,23

**B**

**back (35)**
4:14,19;5:8,20;8:10;
15:12;37:16;38:15,16;
47:6;52:2;54:11;57:15;
59:5;62:21;64:7;66:14;
67:8,9;71:13;76:1,19;
83:6;85:8,9;88:7;
91:15;93:4,7;94:13,14;
96:1;97:16;102:19,20
**bad (2)**
53:1;85:14
**BakerHostetler (1)**
45:25
**ballgame (1)**
41:20
**ballots (1)**
17:2
**bankruptcy (31)**
13:14;22:16;24:21;
26:7;27:24,25;41:17,
18;44:4;51:25;52:1;
58:13;63:24;64:14,22,
22;65:5,15;71:21,24;
73:8;76:5,9,10;78:14,
18;79:11;80:6;82:2;
94:2;100:12
**bar (36)**
4:18;5:1,1,2;7:20,24;
8:1;11:6,16,17;13:1,6;
14:5;15:7,13;19:3,11;
20:10,17;21:2;24:10,
18;25:21;26:18;27:4;
31:24;36:23;37:18;
45:5;46:23;47:12;
48:17;54:22;70:19;
71:17;86:10
**bar-date (1)**
87:13
**bargain (1)**
66:5
**Barrent (1)**

95:14
**barter (1)**
69:19
**based (4)**
11:22;23:13;39:12;
79:19
**basically (1)**
39:8
**basics (1)**
67:22
**basis (6)**
9:6;52:24;61:5;
64:25;72:1;82:4
**bat (1)**
35:23
**bearing (1)**
99:18
**beating (1)**
79:5
**becomes (1)**
49:15
**begin (1)**
25:13
**beginning (1)**
81:16
**behalf (5)**
45:25;47:24;58:5;
64:13;78:3
**believes (2)**
55:3;95:6
**bells (1)**
53:20
**below (1)**
49:12
**benefit (9)**
47:18;49:19;50:3;
66:5;82:18;83:24;
101:1,7,13
**Bennett (85)**
31:2,4,7,11;32:2,5,8,
18,21;33:2,8,10,16,19,
23;34:2,5,11,14,19,23;
35:4,10,14,19,22;36:4,
10,15;37:7,9,12,15;
38:5,8,10,21;39:1,18,
21;40:4,7,10,12,16,18,
24;41:2,5,8,12,16;42:3,
7,11,18,21;43:3,7,20;
60:1;87:16,18,21;
88:10,12,13;89:6,8,14,
16,18,25;90:15,17,19,
21;91:2,8,11,14,24;
92:4,8;97:11
**Bennett's (2)**
43:21;60:3
**best (12)**
4:7;22:9,25;23:1;
37:20;42:16;60:15,19;
80:4;92:23;101:15,16
**best-case (1)**
64:8
**better (10)**
7:14;53:19;54:10;

56:16;80:19;81:18;
83:2;86:1,2,3
**beyond (1)**
76:18
**big (13)**
18:21;39:8;41:13;
65:5,6;68:16;69:23;
70:17;76:13;78:5;
79:25;90:6;101:5
**biggest (1)**
90:4
**bit (3)**
19:8;88:14;93:4
**bizarre (1)**
75:17
**black (1)**
76:13
**blame (3)**
53:5,6;81:11
**blunt (2)**
20:21;69:19
**boat (1)**
71:19
**boils (1)**
96:7
**bond (2)**
13:6,6;35:4;66:23
**bondholder (8)**
34:1,3,18,19,21,23;
36:6,7
**bondholders (4)**
10:14,16;34:13;35:1
**bonds (3)**
11:9,23;15:15
**book (1)**
23:8
**bootstrap (1)**
24:4
**both (7)**
23:4;29:21;35:14;
46:18;50:8,18;66:23
**bottom (1)**
91:24
**bought (8)**
15:15,16;41:21;44:2;
58:5;78:9;89:9;90:25
**box (1)**
8:1
**Breyer (1)**
25:10
**brief (1)**
87:16
**briefing (4)**
32:19;65:14,18;95:9
**briefly (1)**
87:21
**briefs (2)**
9:5;46:14
**bring (1)**
7:21
**broad (1)**
66:15
**broader (2)**

17:20;85:10
**broker (2)**
89:13,15
**brokerage (2)**
71:15;89:20
**broker-dealers (2)**
73:17;78:1
**brokers (3)**
89:10,11;90:5
**brought (1)**
59:12
**Bs (1)**
27:16
**B's (2)**
8:12;51:1
**bucks (3)**
44:2,3;101:5
**bug (1)**
73:19
**bunch (1)**
42:4
**burden (2)**
54:24,25
**burdens (1)**
92:18
**buy (2)**
36:7;61:18
**buying (1)**
92:19

**C**

**CALIFORNIA (2)**
3:1;42:24
**Call (1)**
3:3
**called (2)**
41:19;63:22
**came (3)**
20:19;29:20;74:6
**can (83)**
3:21,25;9:2;14:21;
17:6;18:13;19:11;21:9,
17;24:24;27:7;29:6;
30:3,8;31:23;36:24,25;
38:2;40:20;42:7,11,12;
43:13,20;44:8;45:3;
53:5;54:4;55:17;60:5,
7;63:16;68:1,2,15,15,
23;74:24;75:17,23,25;
76:19;78:12,12,17;
79:13,23;80:21;81:21,
23;82:14;83:25;84:11;
86:10,15,16,21;87:5,7,
7;90:2;94:8,11,17,22;
95:4;96:15,20,21,22;
97:14,18;98:6,7,11,15,
16,18,21;100:5;101:7,
21,25
**Capital (1)**
63:23
**car (1)**
25:7

**care (8)**
22:13,14;33:5,6,7;
60:6;99:21,21
**career (1)**
41:17
**carefully (1)**
46:7
**cares (1)**
80:2
**cart (1)**
80:25
**case (36)**
4:10;5:4,6;6:19;7:11,
15;26:21;30:16;31:21;
42:2;47:22,25;50:21;
51:15;54:9;20;56:13;
61:3;63:9,22;64:1,2;
65:5,8;67:4,5;80:6;
81:16;83:25;86:7;
92:18,22;94:21;
100:12,13,17
**cases (12)**
4:4;5:20;8:25;29:21;
56:12;63:21;64:22,22;
68:6;77:3,16;95:2
**cash (5)**
10:5;12:17,18,19;
38:19
**cast (2)**
85:2,4
**category (1)**
78:23
**causation (2)**
94:23;95:3
**cause (2)**
83:7;88:7
**caused (1)**
58:14
**cautionary (1)**
42:12
**certain (1)**
70:18
**certainly (7)**
16:23,24;27:21,24;
28:25;30:4;31:15
**certifica (1)**
57:23
**certification (15)**
20:11;60:22,24;62:8,
10;65:14,21;66:17;
68:2,1;77:11;94:8,13,
23;95:7
**certified (8)**
54:17;56:6,8,9,19;
57:4;70:6;77:5
**certify (1)**
25:17
**cetera (5)**
71:3,3;76:16,16,16
**challenge (2)**
46:15;95:10
**challenged (1)**
12:14

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 106
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) audience - challenged

**challenges (1)**
95:7
**chance (2)**
6:4,5
**change (11)**
9:7;27:8;35:2,5;
38:25;79:23;94:15;
99:14,16,16,17
**Chapter (8)**
5:3;6:19;7:11;8:18;
21:12;52:8;63:9,25
**charged (1)**
25:6
**cheap (1)**
57:8
**checked (1)**
102:23
**choice (1)**
17:17
**choices (3)**
30:17;57:13;59:4
**choose (4)**
23:5;81:14;92:17,18
**chose (1)**
81:14
**chosen (2)**
24:23;26:25
**circumstances (3)**
27:25;90:22;101:18
**cite (4)**
93:17,19;94:10,21
**cited (1)**
64:20
**citing (1)**
93:16
**civilian (1)**
76:5
**claim (106)**
5:10;6:4;7:20;8:12;
12:10,11,13;14:22;
15:9;17:14;20:8,9;
21:3,14,17,18,18,21;
23:11,13,13,13,19,19,
20,23;24:11,22;27:15,
17;28:11;34:21,22,23;
35:7;40:7,20;41:25;
42:1,16,17,23;43:1,1,
13,18;44:1,1,3,15,19,
21;45:3,3,6,6;46:22,24,
25;47:2,9,11,23;49:7,
12,16,22;50:23;51:1,3,
11,13,15,16,19,24;
52:1;54:16;62:4;64:21;
65:10;71:24;72:20;
73:8;76:10,14,14;
78:19,20,20,21,24;
80:22;81:19;82:11,16;
83:12,17,18;84:15;
85:14,18,19;86:18;
91:7;94:18
**claimants (20)**
5:5,5;15:4;26:5;
30:20;36:18;39:7,7;

41:25;46:3;62:4;66:23,
23;83:17;94:23;97:24;
98:12;100:8,9,9
**claimed (1)**
39:5
**claims (76)**
9:12;10:4,5,10,18;
11:22;13:7,21;14:6,16,
17,18,20,23,23,23;
17:11,16;21:6,24;
22:25;28:2;29:25;
30:21;32:11,13,15;
33:6,7,25,25;35:25;
36:23;39:4;40:12;41:6,
19;42:1,3,13,13;43:5,
20;44:5,6,8;46:19;
48:3;50:8;52:10;54:16,
22,25;56:7;58:4;61:2,
4;62:12;64:24;71:20,
20;77:24;79:19;80:19,
21;81:11,25;90:9,13;
92:24;93:4;97:25;98:3,
9,11;102:17
**claims- (1)**
54:22
**clarify (4)**
33:18;62:23,25;63:1
**clarifying (1)**
30:24
**class (127)**
5:10,10;6:4,9,10;
13:15;14:21;15:4,9;
16:7,10,12,21;17:14;
18:12,20;19:17;20:7,9,
11;21:3,6;22:15;24:11,
23,25;25:17;26:4;
28:11;34:16,17,19;
35:15,18,24;36:2,7,17,
18,19,20;38:2;39:6,7,9,
22,25;40:7,8,12,20;
46:24,24;47:22,24;
48:2;50:8;53:6;54:19;
55:21;56:1,5,8,18,23;
57:4,23;58:3;60:22;
61:15;62:3,10,12,12;
63:9,24;64:21;65:10,
14,21;66:17,21;68:2;
70:6,18;71:5;72:10,12,
22;73:5,9,18;75:2,2,13;
76:2;77:1,5;80:14,15,
16;81:8;82:2,15,22;
83:15;84:15;86:16;
87:8;89:2,3;90:1,2;
91:20;92:7,11;94:6,10,
12,13,14,23;95:1,5,7;
100:12,14
**class- (5)**
68:10;77:4;78:12;
79:9;93:19
**class-action (6)**
47:21,23;50:22;
67:25;74:15;90:8
**classes (1)**

35:16
**classifications (1)**
11:12
**classified (1)**
11:13
**classwide (1)**
61:5
**clear (5)**
43:19;44:18;54:13;
56:19;94:1
**clearly (1)**
61:23
**CLERK (2)**
3:8;66:12
**clock (1)**
72:13
**closed (2)**
19:8;59:6
**clue (2)**
43:2;101:25
**co-counsel (1)**
95:21
**Code (3)**
27:24,25;79:12
**colleague (1)**
55:16
**colleagues (1)**
58:10
**collective (2)**
80:7;82:4
**coming (1)**
38:15
**comment (2)**
70:22;94:5
**comments (4)**
62:19;88:6,11;93:23
**committee (1)**
46:1
**common (4)**
11:8;19:16;31:22;
89:20
**company (10)**
16:12;22:6,6,18;
25:8;26:25;31:23;68:6,
10;97:17
**comparisons (1)**
82:24
**complain (2)**
18:9;78:17
**complaining (1)**
13:4
**complaint (2)**
5:15;57:5
**complete (2)**
32:19;98:7
**completely (4)**
6:3;33:16;70:22;
90:24
**complex (3)**
36:11;94:9,19
**complying (1)**
15:20
**comports (1)**

37:21
**compressed (1)**
54:21
**concept (1)**
54:18
**concern (3)**
21:2;47:3;49:5
**concerned (9)**
6:9;17:8;21:1;24:9;
25:15;32:8;42:10;
54:12;96:8
**concerns (7)**
4:20;6:1,2;11:17;
19:1;46:19;48:1
**concluded (4)**
98:14,17,18;103:8
**conclusory (1)**
84:10
**concur (1)**
55:3
**confer (1)**
66:12
**confirm (1)**
84:11
**confirmation (11)**
14:11,18,20;16:7;
17:6;18:12;22:20;
31:12;52:9;60:23;
96:20
**confirmed (2)**
65:7;66:6
**confirming (2)**
84:5,16
**conflict (3)**
28:18;66:21;67:7
**confused (2)**
28:18;62:20
**confusing (3)**
44:22,22;79:17
**Connaught (1)**
81:4
**connected (1)**
75:4
**connection (1)**
4:18
**consider (2)**
50:10;94:17
**conspicuously (1)**
5:11
**constituencies (1)**
81:16
**constitutional (1)**
7:13
**construct (1)**
8:13
**constructive (6)**
7:12,13;8:19,20;
29:6;59:7
**consultant (1)**
80:9
**consumer (1)**
77:16
**contemplated (1)**

66:7
**contemplates (2)**
35:2;61:17
**content (1)**
79:14
**context (3)**
4:2;8:25;90:24
**contingencies (1)**
41:5
**contingent (2)**
23:13;64:23
**continues (1)**
54:14
**contrary (1)**
66:3
**convenience (2)**
63:20;64:6
**cooperates (1)**
69:18
**corporate (3)**
47:10;51:11,22
**Corporation (1)**
3:8
**correctly (4)**
11:8;56:15;93:20;
100:5
**counsel (14)**
37:1;43:23;50:4;
59:16;65:9;67:4,18;
72:17;73:19;75:8;
80:24;82:12,19;95:6
**counsels (1)**
67:7
**count (1)**
16:15
**country (3)**
51:21;64:23;65:5
**couple (7)**
5:16;29:14;47:12;
55:22;91:18;94:20;
95:8
**course (2)**
9:10;17:3
**Court (455)**
3:3,4,6,9,12,15,18,
20,23,25;4:9,12,16,20;
5:18,24;6:12,16,22,24;
7:3,7,9,16,21;8:5,14,
22;9:3,14,16,18,20,23;
10:3,7,10,13,21,24;
11:4,11,15,20;12:1,5,9,
13,16,18,20,25;13:3,9,
12,15,18,23;14:1,8,13;
15:1,3,8,10,19,21,23;
16:3,9,15,17,20,25;
17:3,7,12,19;18:5,8,17,
24;19:6,16,17;20:12,
15,18,23;21:5,11,16,
22;22:1,3,8,11,21,23;
23:2,12,17,21,25;24:2,
6,14,19,21;25:4,10,14,
19,22;26:1,4,10,16,19,
24;27:20,22;28:1,8,12,

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 107
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) challenges - Court

14,17,23;29:3,7,11,16,
18;30:10,13;31:1,5,10,
25;32:3,7,14,17,20,22,
25;33:3,5,9,14,18,20,
22,24;34:3,7,13,18,21,
25;35:6,13,17,20;36:3,
5,14,20,22;37:8,11,14;
38:3,6,9,20,22;39:17,
20;40:2,3,6,8,11,15,17,
23;41:1,4,6,11,16;42:5,
8,15,20,22;43:6,8,15,
17,21;44:11,13,17;
45:7,9,14,19,22;46:2,4,
7,11,13,17;47:5,16;
48:4,7,10,14,16,21,23;
49:2,9,14,20,23,25;
50:14,16,19,22;51:1,5,
7,10,14,22;52:2,5,7,14,
14,17,22,25;53:11,15,
17,24;54:3,6,25;55:2,7,
13,15;57:3,20,22,24;
58:16,18;59:3,17,19,
21,23;60:6,7,8,10,13,
16,23;61:1,6,8,14;62:5,
7,15,17,21,22,24;63:1,
3,5,7,10,12,15,18;64:2,
4,7,14,14,16,17;65:1,4,
8,15,16,18,23;66:2,8,
10,12,13,19;67:2,9,11,
15,16,17,19,21;68:17,
19,25;69:3,6,8,10,20,
24;70:1,8,10,12,15;
71:7,10,12;72:5,7,11,
14,16,23,25;73:2,4,8,
13,15,24;74:2,4,6,8,13,
17,19,24;75:7,16;76:1,20,
23,25;77:5,8,10;78:14,
16,18;79:5,7;81:24;
82:5;83:2;84:7,9,11,17,
19,21;85:3,5,7,25;
86:20,23,25;87:2,4,6,
11,14;88:1,3,10;89:4,5,
7,13,15,17,24;90:12,
16,18,20;91:1,6,9,13,
22;92:1,3,6;93:7,11,14;
94:20;95:16,19,24;
96:1;97:2,5,6;98:13,16,
19,25;99:10,12,15,24;
100:1,4,16,18,20,22,
25;101:14,24;102:5,11,
14,19,23,24;103:2,5
**court- (1)**
  81:19
**court-appointed (5)**
  80:23,23;82:19;
  91:25;92:1
**court's (1)**
  95:11
**cover (1)**
  86:10
**covers (1)**
  35:24
**cram (1)**

  80:3
**cramdown (2)**
  18:14,15
**crammed (1)**
  36:21
**cramming (1)**
  18:15
**create (1)**
  60:19
**created (2)**
  58:3;86:8
**creates (1)**
  36:1
**creating (3)**
  50:9,17;92:24
**credible (1)**
  66:3
**creditors (9)**
  50:2;55:1;56:24;
  66:6;83:25,25;87:13;
  88:21;96:14
**critical (1)**
  4:4
**criticism (1)**
  74:6
**crosses (1)**
  86:2
**current (7)**
  61:10,19,20,21,25;
  62:2;79:16
**currently (1)**
  11:13
**CUSIP (1)**
  91:9
**customers (1)**
  90:6
**cut (2)**
  85:17;88:8
**cutting (1)**
  77:23

**D**

**damages (3)**
  54:19,19;94:15
**date (38)**
  4:18;5:1,1,2;7:20,24;
  8:1;11:6,16,17;13:1,6;
  14:5;15:7,13;19:3,11;
  20:10,17;21:2;24:10,
  18;25:21;26:18;27:4;
  31:24;36:23;37:19;
  45:5;46:23;47:12;
  48:17;54:22;70:19;
  71:16,17;80:13;86:11
**dates (1)**
  77:20
**David (1)**
  45:24
**Davila (1)**
  33:6
**day (12)**
  4:5;7:19,19;21:17;

28:15;36:9,12;39:2;
  70:6;75:15;81:8;96:1
**days (11)**
  19:5;27:4,4,13;
  29:14;72:18,19;86:17,
  17;95:8;101:11
**deadline (15)**
  17:15,16,22,23;19:8;
  29:25;31:12,13;33:25;
  37:22;50:8,10;72:20;
  76:10;84:16
**deal (31)**
  19:19;27:18,19,20,
  25;28:4;31:15;36:12,
  16;49:3;50:1,2;59:8;
  68:16;69:23;79:25;
  80:21,21,22;81:18;
  82:11,13;83:18,20,21;
  84:13;85:18;89:25;
  90:2,6;98:11
**dealing (7)**
  4:3;40:14;41:15;
  57:16;61:10;81:24;
  82:15
**dealings (1)**
  66:20
**dealt (5)**
  29:24,25;64:24,25;
  65:25
**death (1)**
  79:5
**debate (1)**
  27:12
**debt (11)**
  12:8,9,9;13:6,6;14:6,
  23;15:15;39:9;67:5,6
**debtor (29)**
  19:18;47:8,10;49:16;
  50:1;51:2,11,23,25;
  53:3,6,10;55:20;61:2;
  63:13,13,15;78:9;
  82:10,20;84:5,25;
  86:14;87:24;90:5;91:3;
  96:11;98:5;100:13
**debtors (15)**
  31:17;34:15;47:1,24;
  52:13;55:4,6;56:13;
  58:14;76:12;81:14;
  83:18;91:18;92:25;
  96:8
**debtors' (8)**
  37:1;46:16;50:4;
  72:17;75:8;78:22;80:9;
  85:16
**decide (5)**
  42:4;68:15;75:25;
  87:16;88:11
**decided (3)**
  32:23;81:6;94:20
**deciding (1)**
  98:4
**decision (8)**
  30:6;47:13;68:21;

81:4;100:6;101:4,6,20
**decisions (1)**
  97:18
**decisive (1)**
  39:6
**declaration (5)**
  56:11;59:5;86:12,13,
  24
**deeply (1)**
  4:23
**defective (2)**
  38:24;41:21
**defend (1)**
  59:23
**defendant (2)**
  47:8;48:14
**defendants (8)**
  48:18,21,23,23;
  51:25;94:22;95:2,5
**defendants' (1)**
  95:6
**defended (1)**
  19:18
**defense (2)**
  94:6,22
**defenses (2)**
  68:13,14
**defer (3)**
  92:16;95:23;100:21
**deferred (2)**
  11:6;96:5
**deferring (1)**
  101:13
**deficient (1)**
  21:6
**definition (4)**
  68:19,20;72:21;75:1
**defrauded (5)**
  22:15;23:18;35:7;
  37:4;85:12
**defrosted (1)**
  23:17
**degree (1)**
  39:13
**denial (2)**
  54:1;55:1
**denied (5)**
  7:4,6;51:14;53:5;
  62:10
**deny (13)**
  6:24,25;50:8,17,18;
  51:8;53:11,15,22,23;
  57:13;70:12;94:12
**denying (1)**
  54:15
**departments (1)**
  67:25
**depends (1)**
  78:4
**deputy (1)**
  103:2
**derivative (10)**
  41:25;42:1,16;43:1,

18;44:1,6;45:12;48:3;
  49:1
**despite (5)**
  5:12,19;59:13;79:25;
  81:15
**detail (2)**
  77:18,19
**detailed (2)**
  71:25,25
**details (2)**
  75:2,2
**determination (2)**
  78:13;98:24
**determinations (3)**
  44:9;96:10;98:7
**determine (1)**
  20:13
**determined (5)**
  52:14;65:17;96:19;
  98:13;100:2
**determining (1)**
  52:19
**developing (2)**
  31:8,9
**develops (1)**
  33:11
**dialogue (1)**
  81:2
**difference (2)**
  37:5;43:25
**different (21)**
  11:11,12;17:13;
  18:24;32:3;36:5;41:20;
  47:20;55:22;58:1;
  71:21;77:14;85:20,21;
  86:4,8;89:1;91:11;
  93:21,24;97:13
**difficult (3)**
  59:14;80:22;85:22
**digress (3)**
  3:19,25;75:20
**diluted (4)**
  10:23,25;22:7;61:3
**dilution (5)**
  38:17;61:24;62:1;
  92:19,20;96:9,16,22
**direct (10)**
  40:21;44:1,5,15;
  47:23;50:23;51:11,13,
  16;53:12
**directed (1)**
  43:13
**direction (2)**
  67:20;101:12
**directors (3)**
  19:18;50:24;51:20
**disagree (1)**
  18:18
**disagrees (1)**
  27:2
**discharge (4)**
  24:15;25:1;52:10,10
**discharged (4)**

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 108
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(4) court- - discharged

8:12,17;51:12;52:1
**discharges (1)**
52:9
**disclosed (1)**
27:9
**disclosees (1)**
38:7
**disclosure (38)**
11:18;12:3,23;13:10;
14:4,5,14,15;15:20,21,
25;16:10,10,13,21;
17:2,8,22;18:10,10;
19:2,7,8;27:7,11;32:9,
13;33:11,12;37:25;
38:1,4,7;64:20;96:21,
25;97:12;98:22
**disclosures (1)**
97:3
**discovery (6)**
40:19;65:25;91:20;
92:12,13;95:8
**discreet (1)**
41:13
**discrete (1)**
93:13
**discuss (2)**
30:15;81:9
**discussed (3)**
27:6;30:12,14
**discussion (6)**
18:2,19;19:23,25,25;
45:10
**discussions (3)**
29:2;35:12;81:9
**dislocated (1)**
88:25
**dismiss (2)**
32:16;54:18
**disparate (1)**
10:1
**disputed (3)**
32:11,13;35:25
**disregard (1)**
30:19
**disruptive (1)**
54:19
**disseminate (1)**
16:21
**distribute (3)**
40:1;63:8;64:1
**distributed (1)**
75:6
**distribution (6)**
26:22;36:1;61:19;
62:2;63:8,17
**district (4)**
13:14;19:17;32:14;
33:5;40:3;48:22;50:22;
57:20;62:22;63:6,17;
64:2,14,16
**district-court (5)**
46:23;47:7;48:19;
51:19;57:4

**divide (3)**
9:9;40:2;41:24
**dividends (1)**
71:3
**divides (1)**
99:21
**docket (2)**
41:24;73:4
**document (1)**
79:24
**documents (2)**
75:14;89:21
**dollar (2)**
10:4;23:20
**dollars (5)**
12:13;25:6;27:16;
78:21;90:18
**done (29)**
6:5;16:25;45:7;
52:13,19;53:3;57:10;
59:6,7;68:15;69:17;
73:19,23,24;74:3,5;
81:17;82:1,4;84:24;
85:10,10;86:14,16;
87:1,3,7;92:7;94:8
**doubt (1)**
92:25
**down (14)**
12:5;18:15;36:21;
55:25;62:8;68:16;70:7;
74:15;80:3;81:19;
82:13;96:7;98:2;
101:10
**downplay (1)**
97:11
**draft (2)**
78:22;98:21
**drafted (2)**
43:13;97:10
**dramatically (1)**
94:16
**draw (1)**
53:1
**dressing (1)**
79:13
**dual (2)**
47:3;49:5
**DUBBS (62)**
66:25;67:3,4,10,13,
17,20,23;68:18,23;
69:7,9,17,21,25;70:5,9,
11,14,16;71:8,11,23;
72:6,9,12,15,21;73:1,3,
7,9,14,16;74:1,3,5,7,11,
14,18,22;75:1,12;
76:19,21,24;77:1,9,12;
78:15,17;79:9;93:23;
94:7;95:17,17,23,25;
96:4;100:21,23
**due (25)**
5:14;6:10,20;15:6;
20:7,8;21:1,7;24:9;
26:20;37:21;44:24;

51:14;52:2,10,13,19;
53:5;54:2;70:17;77:13;
87:8;94:22;95:10;
98:12
**due-process (1)**
86:8
**during (6)**
36:7;47:25;80:15,16;
82:22;87:23
**duties (2)**
54:24;59:16
**duty (3)**
47:24;51:18;52:21
**dwell (1)**
83:5
**dwelling (1)**
83:3

# E

**earlier (3)**
23:6;55:14;69:17
**earliest (1)**
69:15
**early (1)**
68:25
**Earth (1)**
53:20
**easier (2)**
81:19,21
**easily (2)**
45:2;90:2
**easy (5)**
14:6,9;27:16;57:9;
80:21
**economic (1)**
7:22
**effectively (2)**
18:16;77:23
**effort (6)**
36:17,19;54:11;
63:25;83:23;101:18
**efforts (1)**
4:25
**eight (1)**
44:3
**eighty (4)**
22:13;99:21,25;
100:10
**either (15)**
8:15;12:23;14:23;
20:23;27:7;29:22;
38:22;39:9,23;45:5;
53:5,6;63:16;70:8;
74:11
**elderly (2)**
71:2,18
**elegant (1)**
25:20
**eliminated (2)**
6:3,5
**else (3)**
67:2;93:9;99:2

**elsewhere (2)**
27:8;44:6
**embrace (2)**
84:3,4
**emerge (1)**
32:9
**eminently (1)**
91:4
**encourage (1)**
30:10
**end (4)**
39:2;82:15;98:14,17
**engage (1)**
81:16
**enjoin (1)**
100:14
**enough (3)**
38:12;82:12;90:4
**enter (1)**
32:10
**entire (1)**
52:20
**entirely (2)**
45:18;62:11
**entitled (3)**
24:18;97:24,24
**entitlements (1)**
35:3
**entity (1)**
61:22
**equity (48)**
9:19,22,25;11:24;
12:14;13:22;14:9,10;
15:16;16:3,7,12,22;
17:24;18:12,15,20;
21:20;22:1,11,17;23:9,
14,15,25;27:11;32:11;
34:16,17;35:9;37:2;
39:9;49:7;60:11;61:4,
10,11,20,20,21,25;
62:3;63:17;66:23;
76:15;80:2;92:17;
97:12
**equity-based (1)**
10:12
**equity's (2)**
10:8;22:7
**escapes (1)**
9:1
**especially (1)**
87:12
**essentially (1)**
86:14
**established (4)**
53:18;72:22;73:11;
89:3
**establishment (1)**
4:18
**estate (2)**
58:22;81:22
**estimate (1)**
28:9
**estimation (8)**

22:23;23:1,21,23;
40:19;92:12;95:13;
96:20
**et (5)**
71:3,3;76:16,16,16
**Etkin (76)**
58:15,18,21;59:10,
18,20,22,23;60:3,7,8,9,
12,14;61:7,8,13,16;
62:5,6,11,16,23,25;
63:2,4,6,11,14,19;64:5,
15,18;65:1,3,12,17,20,
24;66:8,9,10,13,18,24;
67:1;78:25;79:4,6,8;
82:6;83:6;84:2,8,10,13,
18,20;85:2,4,6,22;86:1,
21,24;87:1,2,3,5,7,12,
14,20,22;88:2,9
**evaluation (1)**
96:19
**evaluations (1)**
96:16
**even (19)**
17:24;19:3,10;23:5;
25:18;30:7;31:8;35:1,
2;37:24;45:19;60:5,21;
67:12;72:9,12;77:2,25;
97:11
**event (2)**
28:6;37:13
**everybody (9)**
9:1;21:12;24:11;
35:9;68:8;101:17;
103:5
**everybody's (1)**
72:3
**everyone (5)**
5:9;42:12;61:24;
98:13;101:14
**evidence (5)**
84:6,9,11,13,18
**exactly (11)**
4:11;7:1;12:15;
22:24;25:3;39:19;
40:10;41:14;90:15;
91:8,11
**example (1)**
79:15
**Except (2)**
52:12;71:21
**excuse (2)**
17:23;67:3
**exerts (1)**
95:3
**existing (7)**
10:20,22;11:4;17:24;
19:17;38:18;79:2
**exit (3)**
28:3;101:25;102:3
**expect (3)**
3:6,10;48:4
**expected (1)**
46:4

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 109
of 119

**expedited (1)**
9:6
**expensive (1)**
97:19
**experience (1)**
76:2
**experienced (1)**
68:14
**experts (3)**
69:22;70:1;95:2
**explore (1)**
54:8
**exposure (1)**
47:10
**extend (3)**
8:1;26:18;57:9
**extended (5)**
20:10;21:2;24:10;
27:4;72:19
**extends (1)**
37:25
**extensive (3)**
4:19;47:13;76:2
**extent (8)**
12:10;13:6,21;55:2;
61:4,17;62:3,13

**F**

**face (2)**
64:21;95:11
**fact (23)**
5:19;7:5,14;12:23;
14:16;21:11;26:14;
28:19;29:1;34:17;35:2,
25;52:9,20;56:16,22;
58:2;59:13;78:2;80:1;
82:21;86:13;94:25
**factors (4)**
52:19;56:4,5;60:18
**facts (1)**
56:6
**failsafe (1)**
38:12
**failure (1)**
58:14
**faintest (1)**
39:8
**fair (4)**
6:12;76:17;98:11,14
**fairly (1)**
68:11
**fairness (1)**
87:8
**familiar (1)**
77:15
**fantasy (3)**
86:18,19;87:10
**far (1)**
33:5
**fast (1)**
15:12
**favor (1)**

**46:16**
**feasibility (2)**
14:19,19
**feasible (1)**
8:17
**FEBRUARY (4)**
3:1;57:16;59:8;
64:10
**fed (2)**
71:6,8
**federal (2)**
21:6;89:17
**fee (3)**
6:6;8:1;59:24
**feel (4)**
59:17;80:7;87:22,23
**fees (1)**
58:21
**felt (1)**
54:8
**FEMA (5)**
30:21;46:19;99:4,4,
102:17
**few (1)**
82:10
**fiduciaries (1)**
81:20
**fiduciary (5)**
47:22;51:18;52:21;
54:24;59:16
**fifteen (1)**
32:3,4
**fifty-five (1)**
44:2
**fighting (2)**
7:23;81:15
**figure (5)**
28:3;43:7;88:4;
101:15,16
**figured (5)**
15:14;27:23;45:8,13;
93:1
**file (24)**
5:10;7:20;17:16;
27:16;44:7,14,15;45:3;
47:9;65:19;66:16,16;
70:18;76:10;78:19,20,
20,21,24;79:16;82:11;
86:18;102:2,5
**filed (36)**
14:21;22:25;28:2;
32:16;33:25;34:25;
39:6,7;40:13;42:14,14;
43:20;45:5,6;46:14,24,
25;47:12,12;58:2;
65:13;68:21;69:12;
71:20,20,24,24;80:19;
81:10;100:12;102:6,7,
9,10,12,13
**files (3)**
12:13;27:15;35:7
**filing (4)**
41:25;48:5;65:21;

**91:17**
**finally (2)**
96:19;98:9
**finance (1)**
28:3
**financial (1)**
51:21
**financing (5)**
31:9,13;101:25;
102:3;103:4
**find (8)**
15:5;21:14;39:18,21,
22,23;73:15,16
**finding (1)**
59:14
**fine (3)**
13:2,3;54:3
**finish (1)**
54:7
**finished (1)**
19:4
**finite (3)**
36:23;38:6;53:4
**fire (20)**
4:22;5:4;26:23;
44:18;46:15;47:4,18;
49:6,7,13,19;66:4;
83:24;85:14,14;88:19;
98:25;99:20,22;100:9
**fires (2)**
65:6;88:24
**firm (1)**
67:11
**firms (1)**
67:24
**first (17)**
18:1;19:10;26:8;
31:11;37:10;38:10;
46:13;47:3,21;55:22;
65:21;76:5,9;77:17,17;
93:16;100:13
**five (4)**
25:6;27:15;41:6;
56:2
**fix (7)**
20:17;24:10;25:16;
59:25;60:2,13,15
**fixed (2)**
17:16;25:17
**flaw (1)**
76:21
**float (1)**
80:14
**focus (3)**
59:4;88:14;99:5
**focusing (1)**
99:2
**folks (7)**
59:15,18;62:13;
63:16;80:6;82:17,22
**follow (3)**
54:23;65:9;100:5
**followed (2)**

**53:21;68:8**
**following (2)**
54:1;100:17
**follows (1)**
70:6
**Forget (1)**
38:17;62:15,17
**forgot (1)**
91:20
**form (4)**
42:23;43:13;72:20;
90:12
**formal (1)**
97:12
**forms (1)**
75:14
**forth (3)**
72:23;77:21;96:2
**forthcoming (1)**
85:1
**forty- (1)**
94:1
**forty-five (1)**
19:5
**forty-percent (3)**
80:10,18;93:17
**forward (16)**
28:20;47:25;48:20;
52:23;59:4,8;60:16,24;
64:13;68:13;84:5;88:5;
102:8,16,18,21
**found (2)**
44:19;96:14
**four (3)**
46:12;65:7;101:11
**France (1)**
42:25
**FRANCISCO (1)**
3:1
**frankly (8)**
35:11;43:3;59:13;
61:7;63:20;66:24;81:1,
14
**fraud (1)**
100:9
**frivolous (3)**
42:13,15,18
**froze (1)**
81:8
**frustrated (1)**
19:23
**frustration (1)**
57:3
**full (2)**
11:24;38:23
**full-blown (1)**
59:1
**full-pay (1)**
56:13
**fully (4)**
17:14;19:18;47:19;
96:19
**fun (1)**

**101:6**
**fundamental (3)**
52:11;87:8;88:20
**fundamentally (1)**
91:14
**further (2)**
81:23;88:11

**G**

**gave (2)**
56:10;76:24
**gazillion (2)**
68:9;78:21
**general (1)**
43:22
**generally (3)**
78:7;79:1;82:3
**gentlemen (5)**
69:11,16;71:10;74:2;
75:15
**get- (1)**
86:3
**get-go (1)**
81:2
**gets (3)**
75:5;76:6;97:19
**given (6)**
6:19;7:15;19:22;
31:22;53:19;56:11;
60:17;70:20;73:3;77:2;
80:14;86:11,12,13;
87:12,13,24
**gives (3)**
77:17;98:12,23
**giving (1)**
8:23;19:13;40:21;
49:7;56:17,18;71:14;
73:17;76:4;80:5;88:15
**glad (1)**
30:13
**God (1)**
82:14
**goes (8)**
27:14;48:20;51:25;
75:16;77:6,19;95:11;
96:18
**Good (8)**
3:4,5;24:19;25:22;
26:10;30:13;45:24;
63:12
**gotcha (1)**
40:11
**Gotshal (2)**
69:22;76:11
**government (2)**
89:17;102:17
**grant (9)**
9:5;48:10,16;62:7;
64:9;65:9;70:12;75:20,
21
**granted (1)**
70:3

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 110
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) expedited - granted

**great (1)**
23:9
**ground (1)**
4:5
**group (9)**
13:13;38:6;50:2;
53:4,4;60:11;63:16;
75:11;89:5
**growth (1)**
71:4
**guess (8)**
10:3;18:17;21:22;
23:12,15,15;44:3;50:8
**guy (2)**
44:1;55:16
**guys (2)**
74:8;81:7

**H**

**half (2)**
94:15;97:8
**Halliburton (1)**
94:20
**halls (1)**
74:15
**hand (2)**
76:8;97:23
**handful (1)**
82:15
**handled (3)**
46:20;64:2;67:6
**hands (1)**
86:16
**happen (21)**
7:10;8:9;19:10;
22:19;30:23;34:14;
38:13;50:19;69:25;
70:8,10,12;92:14,14,
22;94:12;96:17,25;
97:1;98:14,15
**happened (9)**
4:15;8:9;10:21,25;
13:13;23:5;71:12;72:2;
83:6
**happening (2)**
30:16;64:13
**happens (11)**
11:6;13:18;35:7;
44:21;51:5,7;62:7,10;
70:4,7;76:7
**happy (4)**
8:3;55:17;93:6;
101:17
**hard (3)**
90:19,21;98:25
**hear (11)**
3:16;5:22,23,24;
28:19;31:2;45:14,17;
54:4;55:17;58:18
**heard (11)**
17:6;32:18,20;47:13;
66:3;78:10;80:6,7;

93:9;95:22;97:2
**hearing (20)**
4:6;8:10;17:4;18:4,
11;19:11;34:8;37:25;
38:1;45:18;59:1,25;
64:10;68:23,25;69:11;
70:2;75:24;78:24;
102:3
**hearings (4)**
4:19,20;5:8;76:8
**heat (1)**
55:17
**heavily (1)**
31:7,8,22;39:13
**heavy (1)**
87:18
**held (4)**
31:22;39:14;49:18;
71:1
**hell (2)**
19:10;20:20
**help (6)**
55:18;59:9,11,11;
60:11;83:25
**helpful (3)**
44:23;88:5,6
**helps (1)**
56:25
**here's (1)**
39:5
**herring (2)**
17:9;19:2
**hey (3)**
56:7;58:2;93:22
**hidden (1)**
28:24
**high (1)**
73:21
**hindsight (1)**
57:7
**historical (1)**
92:17
**history (1)**
5:3
**hold (7)**
29:8,10,11,14;61:8;
71:10;92:21
**holder (5)**
35:9;37:2;61:21;
79:16;91:4
**holders (13)**
13:22;32:11;60:11;
61:4,10,11,20,25;62:3;
79:18,19;80:2,12
**holders' (1)**
61:20
**holdings (1)**
70:25
**home (1)**
97:7
**honest (2)**
6:8;19:9
**Honor (123)**

4:2,18,22,25;5:3,8,8,
13,21;6:9;7:1,19,23,25;
8:13,19;9:12;14:16;
15:5,21;16:19,23;
17:18;18:23;20:3,9;
21:9;22:24;25:12;28:7,
9,13;32:8;33:8;35:22;
37:9,22;39:11;45:17,
21,24;46:12;47:15;
50:12;53:23;54:5,13;
55:10,19;56:15,25;
57:18,19;58:11,21;
59:10;60:14;67:1,16;
62:6,11,23;63:19,20;
64:16,21;65:12,20;
66:25;67:3,10;68:3,15,
24;69:9,19;70:14,17;
77:12;79:6,8,11,13;
80:12;81:1,3,13,23;
82:7,25;84:2,8;85:6,
22;87:20,21,22;88:9,
13,19;89:10;91:16;
93:6,10,16,20;94:4,11,
17;95:4,15,17;23;96:6,
21,23;97:5,23;100:23;
101:9,23;102:2;103:7
**Honor's (3)**
75:5;77:15;92:16
**hope (1)**
30:4
**hoping (1)**
41:12
**horrible (2)**
30:17,17
**horribles (1)**
60:20
**host (1)**
86:6
**hour (4)**
58:24;59:13;87:23;
102:6
**hours (2)**
97:3;101:1
**house (1)**
90:22
**houses (1)**
71:15
**hovering (1)**
31:13
**huge (1)**
68:6
**huh (1)**
95:24
**hundred (3)**
22:11;27:11,15
**hundred-percent (1)**
73:20
**hundreds (4)**
44:17,18;80:17;
82:21
**hypothetical (3)**
27:14;51:8;83:12

**I**

**idea (9)**
14:22;39:8,12,14;
50:4;80:7;81:24;86:10;
87:7
**identify (5)**
36:25;46:5;57:5;
92:9;93:21
**iffy (1)**
42:9
**ignore (3)**
60:1;74:18;85:13
**ignored (1)**
72:3
**ignoring (1)**
81:10
**imagine (3)**
64:11;90:21;98:25
**immediately (1)**
63:22
**impact (6)**
16:18;22:19,19;47:4;
49:6,18
**impaired (5)**
11:8;15:16,18;16:9;
97:9
**impeccable (1)**
72:13
**imply (2)**
30:4;62:20
**important (12)**
4:2,6,13,14;5:7,22;
8:2;39:2,3;52:18;
64:18;91:14
**importantly (1)**
94:13
**impose (1)**
50:6
**impossible (1)**
10:20
**inadequate (1)**
32:12
**inclination (1)**
60:16
**inclined (1)**
15:5
**include (1)**
19:12
**included (1)**
56:11
**including (3)**
5:9;42:11;92:12
**incorporating (1)**
72:1
**incredibly (1)**
79:17
**indeed (1)**
83:22
**independent (1)**
30:2
**indicated (2)**

65:13;80:13
**indiscernible (24)**
56:10,12;57:20;60:4,
17,19;68:7;70:23;
73:12;75:3,17,19;
77:18;78:3;79:14;80:4;
81:5,7;82:1,21;93:15;
94:5;95:1,5
**individual (3)**
43:14;55:4;96:13
**individuals (1)**
32:15
**indulge (3)**
3:21;4:1;55:11
**inefficient (1)**
74:25
**information (8)**
22:25;23:1;28:10;
39:25;71:25;73:18;
83:11;96:11
**informed (1)**
99:18
**in-house (1)**
43:22
**initial (1)**
87:23
**Initially (1)**
77:4
**input (1)**
4:21,21
**insert (1)**
98:3
**instance (1)**
37:10;38:11;65:22;
68:9;91:2
**instead (1)**
85:18
**institutional (2)**
70:25;71:18
**institutionally (2)**
31:22;39:13
**institutions (3)**
43:22;51:21;70:24
**instructive (1)**
56:18
**instruments (1)**
15:15
**insufficient (2)**
74:23;75:1
**insurance (5)**
35:24;36:1,5;72:4,8
**insurance- (1)**
50:24
**intend (2)**
30:11,12
**intent (1)**
24:5
**interest (1)**
4:8
**interested (1)**
88:4
**interesting (1)**
81:3

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 111
of 119

**interests (5)**
7:22;47:4;49:6,7,13
**intermediate (1)**
78:6
**internal (1)**
66:21
**internet (2)**
93:18,19
**interrupt (2)**
17:12;66:10
**into (12)**
4:2;8:8;13:5;24:16;
56:5;59:5;61:18;75:16;
77:19;84:23;98:6,22
**invest (3)**
96:10;97:17;98:5
**invested (1)**
82:22
**investing (1)**
97:18
**investment (2)**
69:25;100:7
**investor (5)**
42:24;88:22;89:2;
90:13;99:5
**investors (17)**
22:5,6,17;32:4;
43:22;78:4;81:1;85:12;
89:7,8,8;92:5;93:22;
96:9,12;98:4;100:5
**invitation (1)**
34:9
**involuntary (1)**
88:21
**involve (1)**
102:1
**involved (12)**
4:23;5:20;31:8,8;
52:20;56:12;63:18,20;
67:12,13;68:5;76:4
**irrelevant (5)**
12:4,4;16:6;18:13;
80:3
**issue (26)**
4:3;11:25;12:3,23;
13:10;17:9,10,14;
18:15,19,21;26:24;
28:15;29:7;36:5;44:12;
45:12;46:23;48:4,6;
50:7;64:11;78:13;88:7;
97:14;101:20
**issued (2)**
22:7;29:1
**issues (21)**
5:21;6:20;8:4;9:1,2;
14:19;25:18;46:12;
60:21;66:15;67:6;68:5,
11;79:14;86:8;94:23;
95:3,13;96:15;99:2;
100:3
**issuing (1)**
73:16

**J**

**job (5)**
30:6;53:2,3,10;101:5
**Judge (13)**
25:10;27:2;29:5;
30:15;33:6;70:3,3;
81:5,6,7;96:2;101:3,12
**judgment (1)**
39:24;99:18
**Julian (3)**
46:9,10;102:22
**June (7)**
26:22;30:19;31:12;
37:22;84:16;98:14,17
**jurisprudence (1)**
82:3
**justice (1)**
78:8

**K**

**Karotkin (174)**
3:9,11,14,17,19,21,
24;4:1,11,13,17;5:19,
25;6:14,17,23;7:1,5,8,
11,17;8:13,18,24;9:11,
15,17,19,21,24;10:4,8,
11,17,22;11:2,10,13,
16,21;12:3,8,12,15,17,
19,22;13:1,8,10,17,20,
24;14:2,9,15;15:2,4,9,
10,11,18,21,25;16:5,
14,16,18,23;17:1,5,8,
18;18:3,6,9,23;19:1,14;
20:3,13,16,18,22,25;
21:9,15,20,24;22:2,5,
10,17,22,24;23:11,16,
20,23;24:1,4,8,17,20;
25:2,9,12,15,20,22,25;
26:3,9,12,17,20;27:19,
21,24;28:7,9,13,15,22,
25;29:4,9,12,17,23;
30:9,11,25;32:23;
33:15,17;37:18;41:23;
43:9,12,16,18;44:7,12,
14;45:2,8,11;55:16,20;
60:1;69:2,5;74:8;80:1;
82:6,7;84:22;87:15;
97:2,11;100:25;101:9,
23,24;102:2,10,12,16,
20,22,25;103:4,6
**keep (6)**
25:23;26:22;38:15;
57:24;91:25;102:14
**Kim (3)**
102:6,9,17
**kind (6)**
28:5,5;31:21;60:3;
90:1;92:25
**kinds (3)**
39:14;68:10;94:16

**knew (3)**
19:19;54:21;81:7
**knowing (2)**
44:4;75:7
**known (5)**
53:13;56:24;71:14;
98:10;100:11
**knows (6)**
46:13;68:8;82:14;
89:10;90:24,25

**L**

**landscape (1)**
86:9
**language (4)**
42:12;52:8;86:21;
98:3
**large (6)**
53:4;64:22,23;65:6;
78:4;96:7
**largest (2)**
49:17;51:21
**last (15)**
4:19;5:16;7:19,19;
8:10;23:8;57:17;58:5,
24;59:13;74:20;84:23;
85:19;88:14;102:5
**late (3)**
54:16;69:15;70:2
**later (3)**
24:13;50:2;90:11
**law (9)**
19:15;24:7;29:20;
43:24;51:10;52:7;54:9;
67:11,24
**lawsuit (3)**
50:22,24;51:4
**lawyer (5)**
25:22;41:17;82:17,
18;85:6
**lawyers (11)**
6:5;13:4,5;26:6;53:5,
6;76:12;84:25;85:17,
17;94:6
**lead (14)**
47:21;48:8,15,17;
52:20;59:16;60:18;
67:4,18;80:23,23;
82:11,12,19
**leading (1)**
69:22
**learned (2)**
29:20;51:10
**least (13)**
11:12;28:10;36:25;
50:25;57:9;67:22;
71:14;83:10;85:11;
90:13;91:23;97:8,10
**leave (5)**
35:20,20;36:9,11;
37:9
**leaves (1)**

**knew (3)** section continues...
38:17
**leaving (2)**
72:17;83:7
**led (2)**
47:7;60:17
**legal (1)**
73:14
**legitimate (1)**
77:21
**lenders (1)**
71:18
**less (4)**
44:22;68:3;83:23;
99:6
**less-than-favorable (1)**
28:1
**letters (2)**
46:13;76:13
**level (3)**
11:24;13:22;73:21
**liability (1)**
28:5
**life (1)**
29:19
**lifting (1)**
87:18
**light (1)**
20:19
**lightning-speed (1)**
87:9
**likely (1)**
84:14
**line (1)**
62:9;91:24
**link (2)**
93:18,19
**liquidated-loss (1)**
91:3
**liquidating (1)**
21:12
**list (3)**
44:20;65:11,12
**Listen (3)**
25:19;38:20;75:23
**listening (1)**
58:24
**litigation (4)**
36:18;62:14,18;77:9
**little (10)**
5:18;20:1;27:13;
36:10;83:11;85:15;
88:14;93:4;99:6;
101:12
**living (1)**
71:19
**load (1)**
61:15
**local (1)**
95:21
**long (3)**
21:17;37:23;59:14
**longer (2)**
27:13;29:15

**look (15)**
19:3,9;20:3;23:6,6;
30:15,16;42:3;44:8;
47:6;53:9;67:22;72:14;
96:15;102:7
**looked (4)**
23:8;42:23;57:8;
97:7
**looking (4)**
45:19;46:7;76:11;
82:24
**lose (1)**
50:3
**loss (6)**
14:24;15:1,2;43:14;
44:15;90:14
**losses (1)**
72:1
**lost (2)**
82:23;90:22
**lot (12)**
4:21,21,23;8:8;
57:25;58:25,25;59:12;
77:23;87:23;88:17,23
**lots (2)**
34:6;52:7
**loud (1)**
5:18
**love (1)**
58:12
**luck (3)**
21:14;29:23;53:7
**ludicrous (1)**
68:8
**luxury (1)**
37:23

**M**

**magnitude (4)**
14:17,18,22;17:10
**mail (1)**
25:5;78:7;89:21
**mailed (1)**
71:16
**major (3)**
60:10,10;67:24
**majority (1)**
70:23
**makes (1)**
80:24
**making (6)**
23:2;47:17;73:14;
83:21;86:5;90:4
**many (11)**
3:6;40:14;41:21;
68:5;69:21;70:18;77:3;
78:9;80:13;82:14;
92:24
**March (2)**
19:4;86:11
**market (1)**
68:7

**massive (1)**
65:6
**Matter (29)**
3:8;4:2;7:5;13:15;
14:10,12;16:6,8,16,17,
18;17:19;18:6,11;
21:14;27:14;28:20;
36:13;37:5;43:4;50:4;
57:11;58:7;71:1;77:3;
86:17;94:19,21;101:19
**matters (1)**
5:16
**maximum (3)**
33:21;39:3;73:20
**may (21)**
4:4;20:20;28:9;
36:18,19,20;41:13;
42:4;53:4;70:4,16,16;
75:20;77:25;79:8,8;
82:6;88:20,24;95:17;
98:4
**maybe (19)**
8:17,17;12:10;22:23;
29:14;30:23;36:24;
56:15;58:18;62:18;
73:24;75:22;77:25,25;
85:12,13;99:2,3;102:6
**mean (28)**
19:23;23:13;24:17;
28:18;32:25;36:6;40:8;
42:15;43:10;57:24;
58:3;66:21;68:3,6,16;
69:17,18;73:22;78:25;
79:13;84:2,7,9;86:21;
91:6;97:5;98:6;99:17
**means (6)**
21:13;24:16;27:8;
67:11;71:8;101:20
**meant (2)**
23:6;43:10
**mechanically (1)**
29:17
**mechanism (1)**
8:23
**mediation (11)**
3:24;28:16,19,20;
29:2;30:3,6,8,12,14;
75:22
**mediator (1)**
30:22
**meditating (1)**
101:10
**meet (1)**
18:13
**member (1)**
86:16
**members (7)**
6:10;36:24;55:21;
63:9;80:14;82:15;87:8
**mention (1)**
63:6
**mentioned (1)**
41:23

**merits (1)**
86:5
**merry (1)**
82:20
**mess (1)**
92:25
**message (1)**
30:5
**method (5)**
40:21;53:12,18,18;
75:5
**methodology (1)**
53:21
**Michelson (22)**
55:9;58:8,11,11,17;
95:20,23;96:5;97:4,22;
98:18,21;99:8,11,14,
22,25;100:2,11,17,19,
21
**middle (1)**
25:1
**mid-March (1)**
69:13
**might (20)**
8:8;17:25;26:10;
34:11,12,14,14;37:5,5;
52:1;63:2,4,8;81:6;
83:3,7;85:11;88:11;
96:16;102:6
**mind (4)**
26:22;63:22;93:8;
101:20
**minute (9)**
12:5;40:2;47:6;
48:16;61:6;69:3;74:19;
95:18,19
**miserable (1)**
29:19
**missing (1)**
16:1
**mistake (1)**
54:24
**misunderstanding (1)**
63:4
**misunderstandings (1)**
46:20
**modified (1)**
6:2
**mom (1)**
96:13
**moment (3)**
49:11;83:3;97:15
**Monday (3)**
102:9,10,12
**money (15)**
9:16,18;22:18;59:22;
63:16,25;72:4,8;78:4,5,
19;82:23;83:16;93:22;
100:6
**month (3)**
68:3,24;95:9
**months (6)**
6:11,11;7:21;47:12;

62:9;65:7
**more (36)**
6:20;7:8;8:3;20:1,1,
4;24:25;26:21;28:24;
31:1,8;36:11;40:20;
41:9;44:22,23;53:12,
16;59:15;64:24;74:24;
76:3;77:18,19;80:22;
83:9,11;85:1,7,10;
88:21;95:8;97:19;98:7;
99:6;101:12
**most (12)**
5:1,2;6:19;9:15;
10:11,11;25:20;39:2,2;
43:2;68:5;85:13
**motion (31)**
6:25;7:21;9:5;46:24;
47:9;48:11,17;50:18;
54:15,18;60:24;62:7;
64:9;65:10,13,19,21;
66:17;68:1,21;69:4,5,5,
12,14;70:3,13;75:21,
21;77:11;95:12
**motions (4)**
32:3,16;51:8;71:25
**motivating (2)**
4:7,9
**movant (1)**
58:12
**move (5)**
9:8;29:21;32:5;
57:14;60:23
**moving (3)**
60:16;69:21;84:5
**much (15)**
19:21;22:7;25:6;
40:20;55:7;80:22;
81:11;86:2;88:13;
90:10,11,11;93:24;
100:6;103:5
**muddy (1)**
44:24
**multiple (3)**
4:20,20;76:7
**Musicland (4)**
56:4,4;60:18;81:6
**must (4)**
76:13;78:24;80:14;
102:6
**myself (1)**
15:14

**N**

**nailed (1)**
92:16
**name (1)**
45:22
**nature (2)**
9:9;83:12
**near (1)**
33:23
**necessarily (2)**

37:19;54:1
**necessary (3)**
49:3;65:25;98:1
**need (13)**
8:5;16:21;27:11;
29:13;34:4,7;39:21;
43:11;71:5,9;79:16;
81:25;96:11
**needed (2)**
54:8;56:14
**needs (2)**
17:21;55:3;88:16;
96:19;97:12
**negotiate (1)**
70:7
**negotiated (3)**
46:22,25;47:18
**negotiating (1)**
101:10
**negotiation (1)**
47:7
**nevertheless (1)**
34:6
**new (12)**
7:24;38:18;50:8,10;
60:3,6,8;61:11;63:22;
92:19;97:4,6
**news (1)**
100:15
**Newsome (4)**
29:6;30:15;101:3,12
**next (14)**
36:12,15;62:9,9;
65:7,10;87:17;101:25;
102:4,8,11,16,18;103:3
**night (2)**
23:8;70:6
**nobody (1)**
97:22
**noise (2)**
74:9;84:23
**nominee (1)**
19:13
**nominees (5)**
8:7;53:19;55:21;
56:21;71:15
**nonbankruptcy (1)**
93:19
**non-defrauded (1)**
37:3
**nonderivative (1)**
45:12
**non-issue (1)**
37:6
**nor (1)**
56:8
**normally (1)**
76:4
**Northern (1)**
42:24
**note (3)**
5:7;56:20;64:19
**noted (1)**

97:5
**notice (136)**
4:21,24;5:1,12,15;
6:1,2,18,19;7:4,6,8,12,
13,13,14;8:6,12,19,20,
23,25;17:4,22,23;
19:12,13,21;20:1,4,6,
17;24:11,13,21,24;
25:5,13;26:1,13;27:2,3,
14;29:12;31:17,20;
34:4,6,7;38:23,25;
39:17;40:22;41:1,2,19;
42:5,6,25;43:24;45:5;
48:1,1;51:17;53:12,16,
19,20;55:20;56:10,10,
13,16,17,18,21,24;
58:14;70:21;71:5,14,
16;72:13,16,19;73:1,5,
6,7,10,20,21;74:19;
76:6,6,9,9,11,13,18;
77:2,6,13,17,17,21,25;
78:2,3,11,18;79:2,15,
18,23;80:8;83:9,11,13;
85:1,7,11,13;86:1,3,16;
87:9;88:16;93:3;97:24,
25;98:6,23;102:3,12,13
**noticed (2)**
5:9;21:13
**notices (9)**
5:2;75:13,16,20;
76:3;89:19,19;90:5;
102:15
**noticing (2)**
5:2;54:23
**notified (1)**
44:15
**noting (1)**
91:25
**notwithstanding (1)**
52:8
**November (1)**
76:16
**nuclear (1)**
68:4
**Number (17)**
6:17;9:2,12;11:22;
26:13;27:5;36:23;37:6;
43:21;55:25;56:12;
63:21;72:18;80:16;
94:1,2,6
**numbers (2)**
39:15;91:9
**numerous (1)**
94:10

**O**

**object (3)**
17:6;19:8;42:4
**objection (2)**
5:13;60:4
**objections (1)**
102:18

Min-U-Script®
Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 113
of 119
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) massive - objections

**objective (2)**
33:19;39:3
**obtain (2)**
36:17;82:18
**obvious (1)**
5:25
**obviously (8)**
4:23;31:7;44:17;
54:8;58:25;60:17;
77:15;86:7
**occurred (1)**
81:15
**October (2)**
57:17;71:13
**OES (1)**
30:21
**off (4)**
35:23;82:14;83:2;
88:8
**offer (2)**
58:19,23
**offering (2)**
61:17,18
**officers (1)**
19:18;50:24;51:20
**official (1)**
45:25;68:7
**often (1)**
64:24
**Once (1)**
24:2
**one (61)**
5:13,13,14,15,17;
6:17;8:14,15,17;9:2,
12;11:22;14:3,3;23:6;
26:13;27:15;31:1,18;
33:3,25;34:1,21,21;
35:18,19,23;36:2;
41:18;42:9;43:23;47:9;
50:9;51:25;52:18;54:3,
6;55:11;56:4;57:14;
58:22;62:19;63:21;
66:10;69:22;75:14;
76:21;77:4;78:2,10,15,
17;81:8;84:1;88:21;
91:23;95:18,19;96:6;
100:13;101:20
**ones (4)**
37:3,4;38:19;61:3
**one's (1)**
13:2
**ongoing (1)**
5:11
**only (22)**
4:22;14:16,17,24;
15:6,7;17:11;21:1,3;
24:9,10;27:15;37:2;
39:23;44:5;47:25;
51:19;55:5;61:3;63:19;
92:12;93:2
**oOo- (1)**
3:2
**open (10)**

11:16;13:5;15:6,13;
17:15;19:7;33:25;
48:17;89:23;97:14
**opening (3)**
36:23;37:18;45:15
**opinion (1)**
97:13
**opportunity (3)**
66:19;77:6;80:6
**opposed (3)**
72:2;75:19;79:18
**opposite (1)**
71:4
**opt (7)**
24:16,22,23,24;25:7;
77:6,7
**opted (1)**
24:17
**opting (1)**
24:15
**option (5)**
11:1,3;16:24,24;
38:16
**options (2)**
38:23;50:18
**opt-out (2)**
24:14,15
**opt-outs (1)**
24:12
**oranges (1)**
94:2
**order (9)**
3:3,24;5:1;28:15;
29:1;37:22;64:12;
73:16;86:17
**ordered (1)**
60:23
**orderly (1)**
26:21
**orders (1)**
87:13
**organized (1)**
96:11
**original (7)**
19:12;45:5;79:18;
83:11;86:12,24;87:13
**originally (1)**
65:13
**others (3)**
3:16;82:10;87:24
**otherwise (3)**
9:8;71:6;101:3
**out (74)**
8:1,6;9:6;15:14;
16:12;17:1,2,3;21:13,
14;22:12;24:16,16,17,
22,22,23,24;25:7,24;
27:14,23;28:3;29:23;
31:20;36:10;39:21,22,
23;41:1,2;43:7,23;
44:21;45:8,13;51:4;
53:7;55:6;58:8;62:13;
63:8;66:1;69:13,13;

71:16,16,17;73:11;
74:20;75:11,17;76:6;
77:6,7,7,23;81:8;
82:13;83:10,13;85:12,
17;87:9;88:4;90:5,5;
91:21;93:1,2,3;95:2;
101:15,16
**outcome (4)**
47:4;49:6;54:15;
99:19
**outcomes (1)**
20:24
**outlined (1)**
60:15
**outside (1)**
22:15
**over (9)**
4:4;30:18;49:7;59:1,
12;62:21;63:21;75:3;
102:11
**oversimplifies (1)**
61:9
**overwhelming (1)**
70:23
**owe (1)**
52:21
**own (10)**
7:22;43:1;54:18;
80:9;82:17,18;83:8;
89:20;96:16;98:7
**owned (1)**
70:24
**owners (1)**
71:14

**P**

**page (3)**
38:9;76:12
**paid (6)**
10:5;11:24;13:7;
26:5;44:2;66:6
**paper (4)**
70:19,20;75:4;78:7
**papers (11)**
33:4;53:18;61:2;
67:14;80:11,13;81:5;
91:18;93:18;94:11,19
**parade (1)**
60:20
**paragraph (1)**
98:21
**Pardon (2)**
9:17;89:14
**pare (2)**
94:13,14
**parent (2)**
11:8;16:12
**Paris (2)**
42:24;71:19
**part (7)**
65:20;78:4;82:2,3;
88:14;96:8,8

**participated (1)**
13:14
**participating (1)**
18:10
**particular (3)**
88:16,18;89:1
**parties (6)**
4:22,24;54:21,25;
98:21;100:15
**partners (2)**
74:15;75:15
**party (2)**
58:12;60:4
**pass (5)**
9:10;21:19,20;27:1;
38:16
**passed (3)**
8:16;14:8;46:24
**passes (1)**
49:15
**passing (1)**
21:16
**passthrough (2)**
49:11;50:5
**past (3)**
37:25;80:11;89:19
**patient (1)**
60:7
**pay (7)**
38:19;63:15,16,16,
17;78:6,7
**payday (1)**
83:14
**pending (5)**
50:22;54:18;62:14,
17;64:3
**people (44)**
7:4;13:13;14:24,25;
15:14,16;17:5;19:19;
40:14;41:21;43:2,23;
53:4,13;56:24;57:6;
58:5;61:18;70:18;71:4,
6,11,18,19;73:10;
75:11;76:17;77:24;
78:6,9;79:19,20;82:10;
88:23;89:19;92:8,19;
96:1,15,24;97:17;98:1,
2,24
**people's (1)**
9:7
**percent (12)**
22:11,12,13;27:12;
94:2;99:9,13,21,23,24,
25;100:10
**perfect (4)**
37:19;72:13;80:8,8
**perhaps (3)**
5:3;91:19;101:11
**period (17)**
22:14;33:12;36:7;
37:21,24,25;38:12,13;
48:1;78:20;80:15,16;
82:22;90:2,3;101:2,8

**person (2)**
25:13;42:19;43:14,
16;44:4;53:20;76:5;
90:24
**personal (1)**
43:16
**persons (1)**
31:19
**perspective (4)**
5:4,5;32:11;47:21
**persuaded (2)**
15:14;64:11
**pertain (1)**
94:9
**petition (1)**
49:12
**PG&E (4)**
3:8;68:6;70:24;
88:22
**ph (12)**
56:13,20;58:22;
59:12;68:10;69:19;
75:16;77:1;79:25;
80:15;93:4,5
**phone (6)**
58:10,15,19;69:16;
93:10;98:2
**physics (1)**
68:4
**pick (1)**
82:14
**picked (2)**
58:6;62:19
**piece (3)**
69:18;75:3;78:7
**pieces (3)**
69:21;70:19,20
**place (5)**
19:10;26:8;41:19;
66:1;102:4
**plaintiff (8)**
6:5;47:21,23;56:22;
58:4;80:23;82:12,20
**plaintiffs (23)**
4:7;5:9;12:6;29:2,
24;38:24;39:25;42:8;
45:15,18;48:8,9,15,17;
52:20;53:2;55:24;
56:14;57:6;60:18;
64:14;90:8;93:16
**plaintiffs' (2)**
45:16;85:17
**plaintiff's (4)**
9:4;13:4,5;95:3
**plan (46)**
7:10;9:22;10:19,23;
11:4,6,7,22;14:11;16:2,
4,5,8;18:12;23:3;27:3,
3;31:8,9;34:17,25;
35:2;36:12,15;37:15;
46:16,19;61:17,23;
62:1;64:19;65:7;66:6,
7;72:2;77:4;81:10,10;

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 114
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(10) objective - plan

82:19;84:5,12,16;97:7,
9;98:3,22
**play (1)**
83:4
**pleading (7)**
5:14;39:6,7;55:24,
24;56:3,6
**pleadings (3)**
4:20;5:12;39:5
**pleased (1)**
75:9
**plotting (1)**
29:19
**plus (2)**
27:5,5
**PM (2)**
3:1;103:8
**point (23)**
19:23;21:7;31:11;
37:1;39:19;47:16;54:5;
55:11,16;57:11,21;
62:12;66:1;73:12,14;
77:12,13;84:14;87:15;
91:21;94:4;96:6;99:17
**points (2)**
93:13;95:15
**policy (1)**
50:25
**pooh-pooh (1)**
80:1
**pool (1)**
62:1
**pops (1)**
96:13
**population (1)**
31:22
**portion (1)**
97:6
**position (5)**
23:14;24:4;66:22;
82:17;86:4
**possibility (3)**
37:7;38:17;49:10
**possible (6)**
29:14;33:20;37:21,
24;39:4;41:9
**Post (1)**
49:22
**post-confirmation (3)**
49:24;64:25;84:14
**pot (1)**
93:22
**potential (7)**
5:5;11:11;19:19;
28:4;33:21;43:4;82:14
**potentially (2)**
56:21;61:3
**practical (6)**
27:10;31:25;32:1;
71:1;77:3;78:2
**pre- (1)**
49:11
**preclude (2)**

84:15;101:9
**pre-dated (1)**
100:12
**predictable (1)**
71:3
**prefer (1)**
27:2
**preferred (1)**
83:22
**prejudiced (1)**
13:2
**preliminary (1)**
76:8
**preliminary- (1)**
66:19
**premise (1)**
76:22
**pre-petition (1)**
49:25
**presentation (1)**
3:13
**presently (2)**
16:11;34:25
**preserve (1)**
24:24
**Presumably (1)**
91:19
**pretend (1)**
76:2
**pretty (2)**
56:19;75:23
**previous (1)**
37:3
**primarily (1)**
83:24
**primary (1)**
33:19
**prior (3)**
64:9;72:23;86:11
**priority (1)**
49:7
**proactiveness (1)**
83:16
**probably (5)**
18:21,22;43:2;76:3;
82:21
**problem (27)**
19:9;20:7;22:22;
24:12;27:17;31:15;
33:11,21;35:23;36:2;
38:1;43:4;45:1;50:9,
17;58:13;59:8,25;
60:13,15;64:8;75:19;
77:22;84:4;88:15;90:4;
92:20
**problems (3)**
26:6;32:6;37:17
**problem's (1)**
41:6
**procedure (8)**
17:23;19:12;20:11;
37:12;54:1,23;55:6;
75:10

**proceed (3)**
62:8;77:9;93:2
**proceeding (8)**
48:5,13,18;49:3;
54:20;57:20;73:2;
77:14
**proceedings (3)**
72:23;96:20;103:8
**proceeds (1)**
64:1
**process (49)**
5:11,14;6:10,20;
13:16;15:6;19:7;20:7,
8;21:1,7;24:9;26:7,7,
20;29:13;32:10;37:17,
21;43:5;44:24,24;
51:15;52:3,11,13,19,
21;53:5;54:2,11,16;
55:4,5;62:8;72:22;
77:5;78:11;87:8;92:11,
11;94:22;95:11;96:18;
97:20,23;98:10,12,12
**processing (1)**
93:4
**professionalism (1)**
59:24
**program (1)**
5:3
**promise (3)**
30:7,17;101:21
**promulgation (1)**
17:22
**proof (10)**
14:21;24:11;40:20;
42:23;43:12;72:20;
82:11;84:15;86:18;
91:6
**proof-of-claim (2)**
55:4;90:12
**proofs (8)**
41:25;80:22;81:19;
82:16;83:17,18;85:18,
19
**proper (4)**
4:21;54:15;55:1,6
**proportionate (1)**
99:23
**proposal (1)**
75:8
**proposed (5)**
20:5,6;72:17;74:20;
76:12
**proposing (1)**
19:4
**prospect (1)**
32:9
**prospective (3)**
30:20;76:6;100:5
**prospects (1)**
32:12
**protect (1)**
51:18
**protected (2)**

48:24;50:21
**prove (1)**
39:16
**provide (2)**
53:12;58:14
**provided (1)**
86:13
**provides (1)**
80:25
**provision (1)**
64:20
**proxy (1)**
89:21
**Pullo (1)**
86:11
**Pullo's (3)**
56:11;59:5;86:22
**purchase (3)**
76:15;77:20;79:19
**purchasers (4)**
13:6,19,20;80:16
**pure (1)**
28:11
**purporting (1)**
57:6
**purpose (2)**
4:6;63:12
**purposes (14)**
14:11,18;15:19;16:6;
17:9,20;18:3,11;23:12,
21,24;27:10;63:7;92:1
**pursue (3)**
29:4,5;30:12
**pursued (1)**
29:5
**put (11)**
4:2;5:12,13;29:7,9;
35:14;42:6;56:15;
68:13;92:18;96:21
**putative (2)**
6:10;47:22
**putative-class (1)**
54:16
**putting (4)**
22:18;92:19,20;
93:25

**Q**

**quantification (1)**
39:3
**quantify (6)**
10:13;17:15,16;
33:20;61:14;90:13
**quarrel (1)**
72:19
**quarter (1)**
94:14
**quick (1)**
78:12
**quickly (7)**
9:8;29:22;60:24;
68:15,16,19;101:21

**quite (5)**
5:25;35:11;61:7;
63:20;81:14
**quote (1)**
86:21

**R**

**raise (3)**
5:21;11:17;94:22
**raised (2)**
4:20;5:16
**raising (2)**
6:1,3
**Randy (1)**
58:11
**range (1)**
98:4
**ranges (1)**
96:21
**rate (3)**
80:10,18;93:17
**rather (6)**
28:11;44:22;57:16;
63:24;83:5;101:7
**reach (3)**
8:6;83:10;95:13
**read (9)**
9:5;11:8;39:10;
40:13,17,17;75:24;
81:4;89:23
**ready (1)**
92:12
**real (2)**
50:7;78:2
**realistic (1)**
64:10
**realize (2)**
32:14;97:13
**really (25)**
4:7;6:8;19:2;21:18;
29:9;31:19;33:23;
23;75:12,13;82:1,8,9;
84:3;87:24;89:2;90:23;
92:13,21;94:11;101:12
**reason (5)**
8:7;60:21;79:12;
97:20;98:16
**reasonable (2)**
88:17;91:4
**reasons (6)**
26:24;55:1;56:4;
57:12;86:6;88:20
**recall (1)**
4:17
**receive (2)**
34:6;46:21
**received (2)**
46:14;76:3
**recently (2)**
94:20;95:2
**reclass (1)**

Min-U-Script®

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 115
of 119

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**(11) play - reclass**

94:7

**recognize (1)**
8:3

**recognized (2)**
61:1,2

**recollection (1)**
76:4

**reconsider (1)**
6:18

**record (6)**
31:16;45:23;53:17;
59:6;61:11;80:13

**recording (1)**
75:24

**records (1)**
90:23

**recovery (1)**
80:25

**red (2)**
17:9;19:2

**referred (2)**
81:4,5

**refile (1)**
69:3

**reinvent (1)**
57:15

**reject (1)**
23:4

**rejected (1)**
50:4

**rejects (2)**
14:11;16:7

**related (1)**
31:6

**relatively (1)**
57:9

**relevant (3)**
14:20;48:12;77:13

**relief (2)**
31:23;32:4

**remained (2)**
7:17,18

**remains (3)**
23:14;34:11;48:2;
51:19;54:17

**remedy (1)**
55:3

**remember (3)**
70:16;71:17;78:3

**remind (1)**
30:22

**reopen (1)**
11:6

**reorganization (2)**
83:23;99:11

**reorganized (3)**
49:16;61:22;98:5

**repair (1)**
25:7

**replicate (1)**
85:9

**replied (1)**
102:22

**reply (1)**
91:19

**report (1)**
102:21

**reported (1)**
102:19

**reports (1)**
89:22

**represent (1)**
66:23

**representative (3)**
52:6;60:10;66:20

**representatives (3)**
51:17;91:21;92:5

**representing (1)**
95:5

**request (1)**
100:23

**require (2)**
91:4;95:8

**requirement (3)**
8:24;19:14;73:10

**requirements (3)**
14:14,15;18:14

**requires (2)**
64:21;90:1

**ResCap (1)**
63:22

**research (1)**
9:5

**Residential (1)**
63:23

**resolution (4)**
63:23;81:17,20;
84:14

**resolve (1)**
80:24

**resolved (4)**
60:22;81:10;99:2;
102:1

**resolving (1)**
80:21

**respect (13)**
28:16;62:14;65:14;
66:5;67:6;70:17;77:13;
79:9,14;81:9;84:4;
86:14;95:3

**respond (9)**
69:2,4,6,14;87:10;
91:18,19;93:12;95:18

**responded (1)**
41:24

**response (3)**
55:11;85:18;87:16

**responses (1)**
65:24

**rest (1)**
54:4

**restate (1)**
43:11

**result (8)**
4:25;7:3;12:21,22;
28:2;55:2;88:24;

101:16

**resulted (1)**
83:17

**retail (1)**
39:12

**retrospect (1)**
57:7

**returns (2)**
93:17,24

**revisiting (1)**
17:21

**rewinding (1)**
72:13

**rhetorical (1)**
19:21

**Richard (2)**
55:10;93:10

**RICHARDSON (48)**
45:17,21,24,25;46:2,
3,6,9,12,18;47:15,20;
48:8,12,15,19,22,25;
49:5,10,15,22,24;
50:12,15,17,20;51:3,6,
9,13,16,24;52:4,6,12,
16,18,23,25;53:9,14,
16,23,25;54:5,13;55:8

**ride (4)**
9:24;10:18;11:1,2

**ride-through (2)**
49:11,22

**right (87)**
3:12;4:10,16;7:2;
9:14;11:15,15;12:1,2,
20;13:16,23;14:1;15:3;
16:13;17:5;20:22;21:8,
15;24:3,6,16,24;25:1,7,
8,10;26:18;27:12,18;
28:4,13;31:10;32:21,
23;35:9,12,23;38:4,5,
21;39:1;40:9,18;41:7;
42:1,2,18,19,21;43:2,
21;49:14;50:7;52:11;
53:7;58:6;60:3;61:13;
64:7,15;65:19;66:20;
67:12,21;68:7;70:15;
74:16;76:12;88:5;
89:24;91:1,14;93:1;
94:1,24;97:2,10;99:12,
16;100:1,4,16,18,22;
101:5,14

**rights (9)**
6:9;7:9;13:2;30:19;
50:21;51:18;61:17,18;
62:14

**rings (1)**
87:24

**risk (2)**
92:19,20

**Robert (1)**
46:9

**robust (9)**
5:2;6:19;19:11;20:1,
2;28:2;83:9;85:8,10

**rocket (1)**
70:3

**rode (1)**
10:1

**role (1)**
64:13

**room (3)**
98:2,13;103:2

**routine (1)**
75:14

**routinely (1)**
67:25

**RSA (4)**
46:21;47:7;64:20;
66:5

**rule (12)**
15:23;26:6;29:23;
48:4;56:20;58:13;60:2,
20;79:11;86:4;92:11;
95:12

**rules (2)**
15:20,22

**ruling (3)**
30:8;47:14;50:10

**running (1)**
68:11

**S**

**safe (1)**
71:2

**same (26)**
7:25;9:19,21,25;
10:19;13:21;14:9;
22:14;28:4,5;30:4,20;
31:3;35:15,18;36:8;
38:9;43:10;45:11,18;
51:3;77:22;81:6,12;
90:1,11

**SAN (1)**
3:1

**satisfied (3)**
21:25;54:10;60:18

**satisfy (3)**
15:6,11;20:13

**save (1)**
63:14

**saw (2)**
9:6;97:8

**saying (23)**
8:11;17:24;18:24;
20:25;24:8;25:5,16,24;
26:2,4,18;27:10;32:21;
38:11;41:16;50:10;
53:1;57:24;58:2;59:18;
78:22,22;97:16

**scattered (1)**
88:24

**schedule (8)**
27:6;29:2;54:20,21;
65:14,18;91:15,16

**schedules (1)**
9:7

**scheme (1)**
91:11

**school (1)**
51:10

**scope (1)**
33:21

**screw (1)**
30:18

**second (5)**
66:11;75:4;76:19;
88:23;94:4

**Section (1)**
18:14

**securities (19)**
9:12;10:10;12:6,8,
10;14:6;35:24;36:18;
53:18;62:14;63:24;
67:4,5;76:14,15;89:9;
97:23;98:4;100:14

**security (3)**
15:15;95:1;100:9

**seeing (2)**
40:24;41:2

**seeking (2)**
5:10,10

**seem (4)**
17:24;53:7;62:20;
97:11

**seems (5)**
13:3;57:8;76:17;
96:7;97:9

**self-selected (1)**
92:4

**send (2)**
38:2;44:21

**Sending (2)**
41:1,2

**sends (1)**
62:21

**sense (3)**
19:16;55:5;80:24

**sent (5)**
17:1,2,3;74:20;75:11

**separate (3)**
35:15;36:18;67:11

**separated (1)**
51:4

**separately (3)**
11:14,14;27:7

**series (2)**
39:10,11

**serious (1)**
22:22

**set (5)**
55:6;65:14;69:10,18;
72:23

**settle (1)**
78:12

**settlement (11)**
39:23;46:25;64:1,1;
73:5,9;76:7;77:3,15;
83:15;93:20

**seven (1)**

Case: 19-30088    Doc# 5870    Filed: 02/24/20    Entered: 02/21/20 14:50:42    Page 116
of 119

56:2
**several (1)**
84:2
**sewer (1)**
24:16
**share (3)**
93:22;99:23,24
**shareholder (17)**
10:18;14:23;23:18,
18;24:2,2;34:1,22;
35:8;36:6;49:17;50:20,
21,23,23;51:1;52:21
**shareholders (9)**
10:15,15,15,20,22;
38:18,18;56:20;92:25
**shares (4)**
49:18;61:18,19;
92:19
**sharing (2)**
61:14;100:9
**short (6)**
29:7,10,11,14;101:2,
8
**shortcut (1)**
26:25
**shortest (2)**
37:20,24
**shortly (1)**
48:5
**shot (1)**
92:23
**Show (1)**
26:10
**sic (6)**
49:1;51:6;60:22;
69:4;74:25;93:19
**side (14)**
33:4,4;35:4;39:9,9;
45:16,18;54:4;64:11;
67:24;69:18;78:24;
84:22,24
**sides (1)**
29:21
**signed (1)**
49:1
**significant (3)**
70:25;82:23;95:7
**significantly (1)**
10:23
**silent (2)**
7:17,18
**Simple (7)**
7:24;9:11;11:22;
22:4;75:12,13;94:7
**simpler (1)**
40:20
**simply (4)**
60:20;82:15;94:8;
98:9
**single (2)**
49:17;75:15
**sit (3)**
70:6;82:12;98:2

**sitting (4)**
29:19;81:19;101:8,
10
**situation (6)**
45:4;55:23;58:1;
79:10;81:12;94:2
**situations (2)**
93:24;95:1
**six (2)**
6:11,11
**six-month (1)**
90:2
**Slack (13)**
55:10,10,14,15,19;
57:3,18,23;60:1;93:10,
10,12,15
**Slow (1)**
12:5
**small (4)**
31:21;41:14;65:6;
78:5
**smarter (1)**
95:25
**so-called (2)**
6:9;60:20
**sold (1)**
90:25
**solely (1)**
63:7
**solicit (3)**
17:25;34:16;36:19
**solicitation (5)**
33:12;34:9;35:8;
36:16;38:13
**solicited (1)**
34:24
**soliciting (5)**
37:2;40:21,23,23,25
**solicitous (1)**
88:19
**solution (7)**
20:7;26:18;31:18;
37:19,20;58:13;82:13
**solve (1)**
32:6
**solved (2)**
41:7;92:21
**somebody (4)**
25:6;58:3;67:2;83:8
**Somebody's (1)**
28:3
**somehow (4)**
30:5;47:17;62:21;
92:10
**someone (2)**
90:22;102:19
**sometime (1)**
69:14
**somewhere (1)**
31:14
**soon (3)**
29:13;75:23;90:7
**sophisticated (5)**

82:12,19;96:9,12;
97:17
**sorry (7)**
17:12;22:10;29:22,
24;34:19;74:7;82:7
**sort (1)**
81:1
**source (1)**
36:1
**speak (1)**
88:10
**SPEAKER (1)**
103:7
**special (1)**
88:15
**specially (1)**
88:19
**specific (2)**
73:17;74:24
**speculate (1)**
21:17
**speculation (1)**
28:11
**speed (1)**
67:14
**spend (1)**
79:22
**spending (1)**
63:25
**spent (2)**
82:6,7
**spread (1)**
71:9
**stage (4)**
4:4;54:16;77:14;
92:18
**stall (1)**
30:6
**stand (4)**
61:3;66:4;95:20;
101:19
**standing (1)**
58:9
**standpoint (1)**
95:11
**start (1)**
3:18
**started (3)**
25:23;47:8;90:7
**state (1)**
45:22
**stated (1)**
26:25
**statement (17)**
11:18;12:3;14:5;
16:1,10,21;17:2;18:10;
32:9;33:13;37:25;38:1;
45:15;64:20;79:15;
96:25;98:22
**statements (5)**
84:10;89:10,11,21;
96:22
**stating (2)**

12:6;48:3
**status (2)**
61:20;102:21
**statute (3)**
13:25;23:14;24:5
**stay (4)**
3:11;12:1;32:4;
48:24
**steamroll (1)**
82:16
**step (2)**
52:23;80:20
**stepping (1)**
79:9
**steps (1)**
76:7
**Stick (2)**
33:24;49:4
**still (24)**
19:5;23:11,16,16,18,
22,25;24:1;27:11;30:8,
22;33:11;48:12,18,20;
49:20,20,21;50:22;
62:13;75:6;86:5,5;
103:2
**stipulated (1)**
68:6
**stock (24)**
11:8;13:18,20;31:23;
36:7;39:12;44:2;46:20,
22;58:5;61:22;70:24;
71:4,9;78:9;79:16,19;
82:22;85:14;89:20;
99:3,3,6,9
**stockholders (1)**
22:15
**stocks (1)**
71:1
**stop (2)**
47:5;87:15
**straightforward (1)**
68:12
**strategic (1)**
7:22
**strategically (2)**
6:23;7:18
**strategy (1)**
28:4
**straw (1)**
68:10
**street (2)**
83:10;85:11
**strictly (1)**
64:5
**strikes (1)**
69:15
**struggling (3)**
20:19;27:23;44:21
**stuck (2)**
29:23,25
**stuff (3)**
59:12;67:25;91:10
**sub (1)**

11:9
**subclass (2)**
67:5,7
**subclasses (2)**
91:23;94:10
**subject (4)**
31:3;54:17;61:24;
62:1
**submission (1)**
62:20
**submit (1)**
76:13
**submitted (5)**
32:20,22;68:20;
101:19,19
**subordinated (9)**
9:13;10:16;11:23,23;
12:7;49:12,20,21;61:1
**subordination (1)**
50:3
**subsequent (1)**
31:13
**substantial (2)**
22:18;78:8
**substantially (1)**
94:14
**substantiate (1)**
90:9
**success (3)**
80:10,18;93:17
**successful (1)**
4:8
**suddenly (2)**
50:3;58:2
**sue (1)**
25:7
**suffered (6)**
14:24;15:1,2;43:14;
44:15;76:20
**sufficient (5)**
6:20;20:4,6;51:17;
70:21
**suffused (1)**
77:1
**suggest (2)**
35:22;56:14
**suggested (4)**
29:21;69:12;78:11;
93:23
**suggesting (1)**
21:5
**summer (3)**
4:19;74:20;85:20
**supplement (3)**
38:2,3;91:6
**supplemental (2)**
33:12;86:10
**support (1)**
34:17
**suppose (8)**
11:5;28:2;50:7;
69:24;70:1,2;71:15,17
**supposed (5)**

Case: 19-30088   Doc# 5870   Filed: 02/21/20   Entered: 02/21/20 14:50:42   Page 117
of 119

20:20;22:6;44:19;
73:18;90:13
**supreme (1)**
94:19
**sure (16)**
4:17;25:2,3;27:12;
41:25;42:13;47:9,17;
57:18;62:11;71:14;
73:19;78:9;84:12;90:4;
92:8
**survive (1)**
21:18
**survives (1)**
51:15
**survivors (3)**
44:18;47:18;99:1
**suspect (2)**
20:18;31:21
**sustained (1)**
10:6
**switching (1)**
25:23
**system (5)**
21:6,6;41:18;82:2,3

**T**

**table (2)**
78:5,5
**Tahiti (1)**
71:19
**talk (3)**
41:5;74:15;96:3
**talked (6)**
8:10;31:19;64:9;
75:5;93:1;95:14
**talking (8)**
17:13;40:3,4;64:16;
67:2;77:10;82:8;94:7
**talks (1)**
98:23
**tape (1)**
75:24
**TCC (7)**
45:20;46:14,25;
47:20;48:1;54:14;
92:20
**TCC's (1)**
42:10
**teed (1)**
68:3
**telling (4)**
8:9;17:19;32:22;
93:21
**ten (2)**
27:5;58:5
**tentative (2)**
47:14;50:10
**tentatively (1)**
75:21
**terms (7)**
4:9;67:23;69:23;
72:21,22;86:4;93:24

**territory (1)**
58:25
**tested (3)**
54:17;57:21,25
**testimony (3)**
86:11,12;102:1
**that'll (3)**
70:8,10,12
**theory (1)**
83:4
**there'd (1)**
65:24
**therefore (5)**
6:13;8:12;17:17;
53:2,3
**There'll (2)**
37:15;38:12
**there're (5)**
61:11;62:12;80:12,
12;84:2;92:24
**thinking (2)**
23:8;36:6
**third (3)**
8:15;54:5;100:14
**thirty (1)**
86:17
**thirty- (4)**
80:10,18;93:17;94:1
**this'll (1)**
75:22
**Thomas (1)**
67:3
**though (2)**
59:1;77:2
**thought (6)**
18:18;30:3;54:7;
55:15;58:18;102:11
**thousands (3)**
44:18;80:17;82:21
**threaten (1)**
97:22
**threatened (1)**
31:15
**threatening (1)**
83:23
**threatens (2)**
97:20;98:10
**three (5)**
68:2,21;69:12;91:17;
101:11
**three-and-a-half (3)**
56:1;58:6;78:23
**three-quarters (1)**
94:15
**threshold (1)**
86:3
**threw (1)**
9:6
**throughout (1)**
64:23
**throw (2)**
25:24;39:15
**thrust (1)**

14:3
**THURSDAY (1)**
3:1
**tight (1)**
101:8
**timeline (4)**
30:18;64:8,12;67:24
**timely (2)**
4:8;52:24
**times (1)**
77:2
**timetable (4)**
64:17,18;65:9;66:15
**timing (3)**
19:3;28:23;71:22;
79:25,25
**today (17)**
4:3;7:23;8:15;9:2;
20:5;24:10;27:8;28:19;
31:16;33:4;46:10;49:5;
51:8;55:16;64:8;94:3;
97:4
**today's (2)**
4:6;18:3
**to-do (2)**
65:11,12
**told (4)**
8:16;54:9;71:13;
101:4
**took (3)**
55:17;58:19,22
**tools (1)**
27:25
**top (2)**
95:12;99:1
**topic (2)**
41:8,10
**tort (1)**
46:3
**toss (1)**
16:11
**totally (4)**
39:15,16;87:24;
91:11
**tower (1)**
50:25
**trade (1)**
68:7
**trading (1)**
44:3
**traditional (1)**
24:25
**trained (1)**
43:24
**transcript (1)**
75:24
**travel (1)**
9:7
**tread (2)**
4:4,5
**treated (10)**
9:19,21,25;10:2,9,18,
19;11:14;13:21;36:8

**treatment (1)**
10:1
**tree (1)**
79:25
**tried (3)**
59:11;88:3;91:16
**tries (2)**
80:1;95:12
**trillion (1)**
90:18
**trouble (1)**
75:7
**true (5)**
23:15;25:4;30:20;
70:24,25
**truly (1)**
47:23
**trust (2)**
49:1,17
**truth (1)**
81:23
**try (10)**
32:5;80:24;81:10,16,
20;82:13;84:22;85:9,
23;100:14
**trying (11)**
18:7;19:1;22:8;26:5;
47:6;57:13;66:1;67:23;
85:16;95:20;99:1
**Tuesday (1)**
102:10
**turnover (1)**
80:14
**turns (1)**
36:10
**twenty (5)**
22:12;99:8,12,23,24
**twenty-eight (3)**
27:4,13;72:18
**twenty-eight-day (1)**
90:3
**twenty-one-day (1)**
90:3
**twenty-three (1)**
51:20
**two (22)**
7:20;11:12;17:13;
27:4;33:25;35:10;
50:25;62:9,9;67:22;
68:2;69:12;77:2;88:20;
91:17;92:15;93:13;
94:11;95:15;97:2;
101:1;102:5
**two-and-a (1)**
78:23
**two-and-a-half (1)**
56:7
**two-billion-dollar (2)**
46:22;49:16
**type (1)**
66:20
**typical (1)**
51:24

**U**

**Uh (1)**
66:9
**ultimately (3)**
39:22;66:6;81:15
**Um-hum (1)**
85:25
**unconstitutional (1)**
56:17
**undefined (1)**
38:17
**under (26)**
7:10;8:14;9:22;
10:13,19,23;11:4,22;
16:10;17:23;18:14;
19:14,16;21:18;22:23;
23:14;34:25;48:5;
49:12;61:25;66:7;
67:20;72:2;76:13;
87:13;101:18
**undermine (1)**
47:17
**understandings (1)**
46:18
**understands (1)**
61:24
**understood (3)**
14:1;42:18;84:21
**underway (1)**
57:4
**unfortunate (1)**
96:14
**UNIDENTIFIED (1)**
103:7
**unimpaired (12)**
10:19;11:9,24;12:2,
7;13:9;15:15;34:4,5,
24;35:1;97:9
**UNISON (1)**
3:5
**universe (5)**
41:13,14,14;57:5,9
**unknown (5)**
90:16,22,24;97:21;
99:5
**unless (2)**
16:1;99:16
**unliquidated (1)**
64:24
**unnecessary (1)**
60:25
**unpack (1)**
58:25
**unrelated (1)**
30:21
**unsophisticated (1)**
88:23
**untested (1)**
56:8
**untrue (1)**
87:25

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 118
of 119

**up (37)**
9:3,4;15:6,13;19:7;
23:6;30:18;33:25;
36:23;37:18;39:15;
44:24;48:17;58:3,19,
20,22;59:12;62:19;
67:14;68:3,16;71:6,8;
76:19;79:7;80:20;
81:17;82:15;86:10;
92:21;95:20;96:4,15;
98:2;99:21;102:14
**Upending (1)**
54:15
**upfront (2)**
82:25;86:8
**upheld (1)**
61:5
**upon (3)**
23:14;39:12;79:19
**upset (1)**
80:25
**upstairs (1)**
25:10
**urging (1)**
86:6
**use (1)**
30:5
**used (2)**
41:17,18
**using (1)**
91:25
**usually (1)**
94:25
**utilities (1)**
71:1

**V**

**valid (3)**
13:21;50:23;77:24
**valuated (1)**
72:1
**value (1)**
49:18
**various (1)**
4:22
**venue (1)**
63:7
**version (2)**
36:12,15
**versus (1)**
17:15
**victim (2)**
99:20,22
**victims (17)**
4:23;22:12;26:23;
46:15;47:4;49:6,8,13,
19;65:6;66:4;82:25;
83:1,24;88:20;96:14;
99:7
**view (8)**
19:23;21:7;48:2,2;
66:2;71:2;74:14;75:16

**vindicated (1)**
7:9
**virtue (1)**
61:20
**vis-à-vis (1)**
36:6
**visit (2)**
41:8,10
**Volkswagen (1)**
25:11
**voluntarily (1)**
89:9
**vote (10)**
11:25;12:24;14:7;
16:3,5;18:20,25;19:5;
34:9;46:15
**voters (1)**
34:10
**votes (6)**
16:15;17:25;18:12,
22;34:16;37:6
**voting (11)**
11:25;12:4;13:11;
14:4;15:22;16:1;17:9,
20,23;18:11;89:21

**W**

**wait (8)**
40:2;48:16;61:6,8;
74:4,19;92:22;95:20
**waited (2)**
7:19,20
**walk (3)**
64:8;74:14;88:22
**Walter (1)**
86:13
**wants (1)**
97:22
**warning (1)**
76:17
**way (59)**
10:19;14:10,16,17;
15:6,7;17:11;21:1,3;
24:9;25:20;29:20,22;
30:6,20;31:15,18;
32:13;35:14;39:21;
41:20;42:5;43:12,19;
44:4;53:6,7,9;56:13,16,
17;57:9;59:17;60:15;
61:16;62:22;63:18;
66:4;69:11;73:11;
75:18;78:10,10;80:24;
81:24;82:20;83:14,22;
89:3;90:8;91:24;92:6,
11;93:1,2;97:9;98:11,
14;101:20
**ways (2)**
55:22;79:23
**Wednesday (1)**
103:3
**week (7)**
29:14;101:25;102:4,

8,11,16,18
**weeks (6)**
5:16;68:2,21;69:13;
91:17,18
**Weil (3)**
55:10;69:22;76:11
**welcome (1)**
58:10
**weren't (1)**
57:25
**whatchamacallit (1)**
41:22
**whatever's (1)**
61:25
**whatnot (1)**
90:23
**what's (24)**
4:6,7,9,10,14;12:20;
30:15;43:1;46:19;
64:12,17;65:10;68:17,
19;70:17;72:2,16;
76:23,25;79:2;83:21;
88:4;93:2,3
**whatsoever (2)**
84:6,20
**wheel (1)**
57:16
**Whereas (1)**
8:14
**Whereupon (1)**
103:8
**whistles (1)**
53:21
**whole (7)**
13:16;16:12;41:20;
58:1;86:6;92:21;94:12
**who's (2)**
48:14;99:17
**whose (1)**
100:17
**widespread (1)**
5:2
**window (1)**
79:12
**wisdom (1)**
71:13
**wish (3)**
23:4,5;38:23
**withdraw (1)**
100:23
**within (3)**
68:2,24;86:17
**word (4)**
5:13,14;40:14,16
**words (6)**
8:7;11:7;16:11;50:1;
91:25;99:20
**work (6)**
23:9;44:9;67:20;
81:21;82:13;89:17
**works (9)**
8:18,19;13:24;21:7;
23:9;29:17;41:18;

8,11,16,18
**world (11)**
22:4;41:20;42:16;
44:5;53:19;59:12;70:1;
76:6;78:14,18;92:7
**world's (1)**
69:22
**worried (1)**
50:5
**worry (2)**
27:6;59:24
**worrying (1)**
92:15
**worth (2)**
50:25;91:25
**wrap (1)**
79:7
**written (3)**
43:19;55:25;58:22
**wrong (8)**
12:20,22;38:10;
69:16;72:16;74:21;
79:2;83:21
**wrote (4)**
26:8;50:9;56:2,2

**Y**

**year (1)**
84:23
**years (11)**
39:23;56:1,2,3,7;
58:5;62:10;63:21;
78:24;92:15;94:20
**Yep (1)**
51:9
**York (1)**
63:23

**Z**

**zero (1)**
33:23

**1**

**1:30 (1)**
3:1
**10,000 (3)**
27:16;81:18,25
**100 (1)**
83:17
**100,000 (7)**
80:19,21,22;83:18;
85:12,18,19
**11 (7)**
5:3;6:19;7:11;8:18;
52:8;63:9,25
**111,000 (2)**
80:12,12
**1129 (1)**
18:14
**15th (1)**

76:16
**1st (1)**
70:4

**2**

**2 (1)**
76:12
**20 (1)**
3:1
**20- (1)**
81:25
**2015 (1)**
76:15
**2018 (1)**
76:16
**2020 (1)**
3:1
**20th (1)**
57:16;59:8;64:10
**23 (7)**
26:7;29:23;40:8;
60:2,20;92:11;95:12
**29 (1)**
76:15
**29th (1)**
59:1

**3**

**3:30 (1)**
103:8
**30th (5)**
26:22;30:19;31:12;
37:22;84:16
**31st (2)**
19:4;86:11

**5**

**50,000 (3)**
27:17;81:18,25
**502c (2)**
22:23;23:9
**510 (1)**
49:21
**510b (3)**
35:3;49:12;80:2

**7**

**7 (1)**
21:12
**7023 (7)**
47:9;58:13;79:11;
82:1;86:4,6;96:18
**723 (1)**
64:9

**8**

**80,000 (2)**
65:6;81:18

Case: 19-30088    Doc# 5870    Filed: 02/21/20    Entered: 02/21/20 14:50:42    Page 119
of 119