WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and –<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DECLARATION OF DMITRY KRIVIN IN SUPPORT OF THE DEBTORS' APPLICATION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) FOR AUTHORITY TO ENTER INTO, PERFORM UNDER AND MAKE PAYMENTS UNDER CERTAIN CONSULTING CONTRACTS WITH MCKINSEY & COMPANY, INC. UNITED STATES**<br><br>Date: **March 10, 2020**<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

I, Dmitry Krivin, declare as follows:

1. I am employed as a partner at McKinsey & Company, Inc. United States ("McKinsey US") with an office at 175 Greenwich Street, New York City, NY, 10007. McKinsey & Company, Inc. ("McKinsey & Co.") is the ultimate parent company of McKinsey US and the Retained Affiliates (as defined below, and such Retained Affiliates collectively with McKinsey US, the "Proposed Professionals"). I am duly authorized to make this declaration (this "Declaration") on behalf of the Proposed Professionals in support of the application (as supplemented, the "Application")[1] of PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company (the "Utility") as debtors and debtors in possession (together, "PG&E" or the "Debtors") for authority to enter into, perform under, and make payments under three consulting and operational contracts with McKinsey US: (i) the Gas Stewardship contract dated February 23, 2017, (ii) the Digital Locate and Mark contract dated October 16, 2018, and (iii) the postpetition supplemental contract (the "Supplemental Service Contract") to extend the Digital Locate & Mark Service Contract (collectively, the "Service Contracts").

2. On February 26, 2020, PG&E filed a supplement to the Application seeking authority to enter into and perform under certain additional agreements that were recently entered into between the Debtors and McKinsey US in the ordinary course of business that relate to the Application and the Service Contracts.

3. I have been employed with McKinsey US since 2006, and I am a partner in the Risk practice and a leader of our North American Operational Risk sub-service line. I serve clients on coordinating and executing supervisory remediation programs, setting up operational risk

---

[1] All capitalized terms used but not defined herein shall have the meanings set forth in the Application and the Service Contracts, as applicable.

and compliance programs, and developing operational and risk processes to meet regulatory requirements and enforcement actions.

4.     Except as otherwise noted, the statements set forth herein are based on knowledge I have from my employment position and diligence undertaken by me or professionals reporting to me and, if called and sworn as a witness, I would testify competently thereto.

**Engagement Team and Corporate Structure**

5.     Pursuant to the Application, PG&E seeks authority to enter into, perform under, and make payments under the Service Contracts, which are unrelated to these chapter 11 cases and the Debtors' restructuring. McKinsey US has been providing consulting services to the Debtors since 2006. Such historical services include, among other things, efforts to improve the Debtors' operations performance, information technology, and customer care performance and to address various strategic issues.

6.     As used in this Declaration, the term "Engagement Team" means consultants of McKinsey US, as well as consultants of McKinsey Recovery and Transformation Services U.S., LLC ("RTS") and McKinsey & Company Canada/McKinsey & Compagnie Canada ("McKinsey Canada" and, together with RTS, the "Retained Affiliates"),[2] who comprise the working group that are directly providing the postpetition services to the Debtors.[3] While the Service Contracts

---

[2]     McKinsey & Co. is not included in the definition of Proposed Professionals. The term Proposed Professionals is defined to only include McKinsey US, McKinsey Canada and RTS. The term "McKinsey" includes any McKinsey entity that provides consulting or bankruptcy advisory services. The term "McKinsey" does not include MIO Partners, Inc. ("MIO") or MIO employees in as much as MIO does not provide consulting and bankruptcy advisory services.

[3]     Although the Protocol (as defined below) contemplates excluding personnel that only episodically provide such services, personnel serving the Debtors were not excluded from the definition of the Engagement Team on this basis. *See* Ex. A, Defined Terms (defining "Proposed Professional Personnel" as the "primary working group within a Proposed Professional entity

are between PG&E and McKinsey US, as is customary, McKinsey US utilizes certain consultants employed by the Retained Affiliates in providing consulting services to the Debtors.

7.     McKinsey US, McKinsey Canada, and RTS are all wholly-owned indirect subsidiaries of McKinsey & Co.

## Disclosure Regarding Connections of the Proposed Professionals

### General

8.     McKinsey is an ordinary course professional and not performing work as a "professional" that would require an application for employment pursuant to section 327(a) of the Bankruptcy Code, and accordingly would not be required to make Bankruptcy Rule 2014 disclosures except to the extent ordered by the Court.  McKinsey US notified the Debtors that it would be unwilling to accept payment for its postpetition services unless the Debtors agreed to seek Court authority to enter into and perform under the Service Contracts.  The Proposed Professionals are voluntarily filing disclosures of connections for the sake of transparency.

9.     The Proposed Professionals maintain a global database of client engagements but do not have in place any computerized conflicts database akin to the types used by a legal or accounting firm. More specifically, the Proposed Professionals' client database stores information relating to clients and client engagements, but does not capture information about third parties because consultants, unlike lawyers, do not always have adverse parties in their engagements.  In addition, the Proposed Professionals and their affiliates at times serve companies with competing and overlapping interests, and thus maintain processes designed to ensure that the confidential information of their clients is protected.  To that end, the Proposed Professionals and their affili-

that directly provides the services for which the Proposed Professional is retained in the particular bankruptcy case, and excludes personnel that only episodically provide such services").

ates have in place information barriers that prohibit confidential information from being shared within the firm, except on a need-to-know basis.

10. I led a working group of McKinsey professionals (the "Working Group")[4] that undertook a multi-stage analysis of the Proposed Professionals' client and other relationships with parties on the Interested Parties List guided by a disclosure protocol ("Protocol") filed in the bankruptcy case *In re Westmoreland Coal Company, Inc.*, Case No. 18-35672-DRJ (Bankr. S.D. Tex.), on May 31, 2019. The Protocol is attached to this Declaration as Exhibit A. Consistent with the Protocol, the Working Group's process examined connections during the period commencing three years prior to the Petition Date, starting on January 29, 2016, and ending on September 30, 2019 (the "Look-Back Period"), when the Working Group began its analysis.

11. On October 1, 2019, counsel for the Proposed Professionals received a list of potential parties in interest from the Debtors' counsel at Weil, Gotshal & Manges LLP ("Weil").

12. On December 20, 2019, counsel for the Proposed Professionals received an updated Interested Parties List from Weil. This December 20, 2019 version of the list is the "Interested Parties List" and is attached hereto as **Schedule 1**.

### Client Connections

13. The first step in the Working Group's review was to expand the Interested Parties List to include all corporate affiliates that shared a common parent with each corporate party listed on the Interested Parties List (the "Expanded IPL"; the people and entities listed on the

---

[4]     The Working Group consisted of a core team of myself, Francisco Arruda, Maxine Gibb, and Noah Greenfield, and included additional support on specific tasks from Ariel Silverman, Cameron Davis, Cian Saunders, Dimitrius Keeler, Djavaneh Bierwirth, Karthik Rao, Larry Fulton, Ravi Yelleswarapu, Royi Horowitz, Sophia Sterling-Angus, Suhavi Tucker and Yick Lam.

Expanded IPL are the "Interested Parties").[5] The Working Group was able to extract the relevant corporate trees using information available on the S&P Capital IQ platform ("Capital IQ"), which is a widely-used third-party platform that provides extensive capital structure and related information to facilitate the identification of such affiliates. Where the names of the entities on the Interested Parties List were incomplete or ambiguous, the scope of the Capital IQ searches was intentionally broad and inclusive. Affiliate relationships were deemed to exist where a parent company owned 20% or more of the equity of a subsidiary, analogous to the definition of a debtor affiliate in section 101(2) of the Bankruptcy Code. Where Capital IQ's data indicated a corporate parent or subsidiary relationship existed but did not provide information sufficient to determine whether the parent would constitute an affiliate based on this definition, the entity was assumed to fall within the definition and was included on the Expanded IPL out of an abundance of caution.[6] In sum, the Expanded IPL expanded the Interested Parties List from 9,730 unique parties to 192,007 unique Interested Parties and their affiliates.[7]

14. As a separate retention step, the Working Group obtained a list of all members of the Engagement Team. The McKinsey entities that employ the members of the Engagement Team, based on their individual Firm Member Number GOC code, were considered the Proposed Professionals. McKinsey's finance department then identified (i) each client engagement where time was charged by a consulting professional belonging to a Proposed Professional dur-

---

[5] Because of the voluminous nature of the Expanded IPL, it is not attached to this Declaration. Copies are available upon request to the Proposed Professionals' counsel.

[6] This step was performed first on the October 1, 2019 version of the interested parties list and then again on the additional interested parties added to the December 20, 2019 Interested Parties List. No interested parties were removed from the Interested Parties List when it was updated in December 2019.

[7] The Protocol does not require such an expansion of the Interested Parties List. The Proposed Professionals undertook this analysis out of an abundance of caution, in part to account for the lack of a computerized conflict-checking database.

Case: 19-30088   Doc# 5924   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 6 of 22

ing the Look-Back Period, and (ii) each client engagement opened during the Look-Back Period for which the project office (i.e., the project GOC code) is a part of a Proposed Professional. The resulting list of 9,473 client names for these engagements formed the client list (the "Client List"), which was checked against the Expanded IPL.

15. The Working Group then checked the names on the Client List against the Expanded IPL, and the scope of the check was intentionally broad and inclusive. The resulting matches, other than the Debtors, are set forth on **Schedule 2**. Based upon the questionnaire process discussed below, to the best of my knowledge, (i) none of these client relationships constitute interests adverse to the Debtors, and (ii) all of these client relationships involved consulting matters unrelated to the Debtors, except as set forth below.

### Vendor Connections and Banking Relationships

16. The Working Group also compared the Proposed Professionals' records of ordinary-course vendor and banking relationships during the Look-Back Period against the Expanded IPL. The resulting matches are set forth on **Schedule 2**. To the best of my knowledge, as ordinary-course vendor and banking relationships, none of these relationships constitute interests adverse to the Debtors.

### Questionnaires

17. In addition to the connection checking process described above, three different sets of surveys were prepared and distributed by the Working Group as part of preparing this Declaration (collectively, the "Surveys"). First, an email survey substantively identical to Protocol Exhibit B was sent to all professional personnel (as distinguished from staff, support, or administrative personnel) of McKinsey's consulting affiliates worldwide, inquiring if any such person (i) held debt, equity, or other claims against any of the Debtors (other than investments, in-

cluding through mutual funds and other investment vehicles, that are managed by third parties with delegated investment authority and discretion) at any time after 90 days prior to the Petition Date; or (ii) had any connections to any of the Bankruptcy Judges, to the United States Trustee, or to anyone employed in the office of the United States Trustee, in each case for the Northern District of California. The results of this survey are reflected in the disclosures set forth herein.

18. Second, an email survey was sent to each director of client services ("<u>DCS</u>") for each of the engagements for a client listed on **<u>Schedule 2</u>**. The DCS for an engagement is the leader of the client services team and the lead client contact. This survey included the names of the Debtors and requested that each DCS indicate, to the best of his or her knowledge, whether the work for his or her client, in any engagement for the client known to the DCS, was in any way related to the Debtors. If the answer was yes, the DCS was asked to provide additional information concerning the relationship with the Debtors for further review by the Proposed Professionals and their counsel. The results of this survey are reflected in the disclosures set forth herein.

19. Third, an email survey was sent to each member of the Engagement Team including a link to the Interested Parties List and asking whether such member (i) had personal connections with parties on the Interested Parties List, i.e., connections other than professional client relationships already being reviewed as part of the client checking process described above, including direct equity holdings in such parties, (ii) knew of any person or entity not included on the Interested Parties List that, to such member's knowledge, should have been included because such party was an interested party in the Debtors' chapter 11 cases (for example, because it is or was a creditor of, or has or had some other business connection to, the Debtors, the Debtors' assets, or the work being performed by the Engagement Team), (iii) had worked with anyone who,

during the Look-Back Period, was a member of the MIO Partners Inc. ("MIO") board of directors in his or her capacity as an MIO director, and/or (iv) was related to or had a relationship with any such MIO director other than arising out of having McKinsey as a common employer. The results of this survey are reflected in the disclosures set forth herein.

20. Upon receiving the updated Interested Party List in December 2019, the Working Group sent supplemental Surveys to determine whether there were any additional connections relating to the parties added to the Interested Parties List and the Expanded IPL. The results of these supplemental Surveys are reflected in the disclosures set forth herein.

<u>MIO Disclosures</u>

21. MIO is a wholly-owned indirect subsidiary of McKinsey & Co. and is registered with the U.S. Securities and Exchange Commission (the "SEC") as an investment adviser.[8] The Debtors are not seeking to engage MIO in these chapter 11 cases, nor have they engaged MIO in the past. MIO does not provide any client consulting services. Rather, it manages assets for (i) pension plans sponsored by McKinsey & Co. ("Pension Plans") in which roughly 30,000 current and former McKinsey employees participate ("Pension Participants"), and (ii) privately offered investment vehicles ("MIO Funds") in which McKinsey partners, former partners, and their immediate family members can invest. Substantially all the assets under management at MIO are owned for the benefit (direct or indirect) of current and former McKinsey employees and their immediate family members.

22. By design, MIO is operated separately from McKinsey's consulting services, including for the purpose of ensuring McKinsey's unbiased service to its consulting clients. The staff of MIO is dedicated to MIO. No MIO investment professional, meaning the members of

---

[8] The only common parent company of the Proposed Professionals, on the one hand, and MIO, on the other, is McKinsey & Co.

MIO's investment management team who are responsible for all investment decisions made by MIO, is engaged in McKinsey client service activities or is an employee of any McKinsey affiliate that provides client consulting services.[9] Except to the extent described in paragraphs 25 and 26 regarding MIO board members, McKinsey consulting professionals and staff, including those employed by the Proposed Professionals, have no control over the investments made by the Pension Plans or the MIO Funds, no ability to direct purchases or sales of any asset in the Pension Plans or the MIO Funds, and have no access to non-public information about any underlying investment in the fund of funds structure. McKinsey does not earn money from the operations of MIO; to the contrary, McKinsey subsidizes MIO's operations.

23. Pursuant to McKinsey data protection protocols, client information obtained in the course of serving clients is maintained on systems that MIO employees lack the credentials to access. Similarly, MIO maintains information (electronic documents and files) related to its past and existing investments on servers that are controlled by MIO, and only New York-based MIO employees have access to the information contained on these servers. There are also physical barriers to ensure no confidential information or resources are shared, including separate MIO and McKinsey office spaces.

24. The operational separation between MIO and McKinsey is designed to restrict the flow of information between MIO staff and McKinsey consultants and ensure that information regarding MIO investments will not influence McKinsey's client engagements and that infor-

---

[9] The term "investment professional" excludes MIO's Client Services and Advisory Personnel. These personnel are wealth management professionals who provide wealth management advice and services to McKinsey partners, operate independently from MIO's investment professional team, do not have access to non-public information regarding the identities of third-party managers or security level investments made by third-party managers or MIO directly, and are not incentivized to recommend MIO-managed or -sponsored investment products.

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 10 of 22

mation from McKinsey's client engagements will not influence MIO's investment decisions. MIO and McKinsey maintain policies and procedures to ensure separation. MIO staff and McKinsey consultants, including the Proposed Professionals, must regularly certify compliance with these policies and procedures. These MIO and McKinsey policies and procedures are designed to ensure that (i) MIO's investment decisions described above do not violate the laws prohibiting trading on the basis of material non-public information, and (ii) the Proposed Professionals have no participation in, control of or knowledge concerning investment decisions made by MIO.

25.    MIO's board of directors includes current and retired McKinsey partners, including current McKinsey & Co. partners employed by McKinsey US (but no other Proposed Professional). Two members of the board are independent and are not current or retired partners of McKinsey. While members of the MIO board of directors have oversight responsibilities with respect to MIO's management of the assets of the Pension Plans and the MIO Funds, to the best of my knowledge, based on the results of the Surveys, no member of the Engagement Team served on that board, or worked with any members of that board in their capacities as board members, during the Look-Back Period.

26.    The MIO board has delegated responsibility for making investment decisions on behalf of the Pension Plans and the MIO Funds to MIO's professional staff. This professional staff is principally responsible for selecting and overseeing third-party managers who make specific instrument-level investment decisions based on their own discretion.[10] MIO contracts with

---

[10]    Notwithstanding the disclosures made herein, the Proposed Professionals reserve their rights to rely upon information barriers to maintain the confidentiality of all MIO investment information.

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 11 of 22

third-party managers to invest approximately 90% of its assets under management.[11] Any information that MIO receives from third-party managers regarding their investments is subject to the strict information barriers that are the subject of formal compliance training and monitoring as described above. For approximately 10% of MIO's assets under management, MIO professional staff makes instrument-level investment decisions on behalf of the Pension Plans and the MIO Funds in investment vehicles operated by MIO. As a matter of MIO policy, however, primarily to avoid any appearance of conflicts of interest with McKinsey's consulting businesses, MIO is prohibited from directly investing in the debt or equity of single-named issuers or governmental issuers, except securities issued by sovereign governments. This policy has been in effect since at least 2012.

27. MIO qualifies as a "Type 2 AMA" under the Protocol,[12] because it (i) employs robust information barriers; (ii) is registered with the SEC and is subject to its regulatory oversight; (iii) obtains most or all of its assets under management from related investors and not from third parties; (iv) does not make direct investments in the debt or equity of individual corporate

---

[11] The number of third-party fund managers MIO invests with varies over time, but is, typically, over 100. MIO currently invests MIO's assets under management with approximately 170 third-party managers.

[12] Under the Protocol, a Type 2 AMA is an "affiliate or division of a Proposed Professional that is actively engaged in managing or owning financial investments" that: (i) employs information barriers, (ii) is subject to both (a) registration (and attendant regulation) as an investment advisor by the SEC, as a securities broker/dealer by FINRA, or under the requirements of the CFTC, and (b) periodic regulatory examinations by the SEC, FINRA, or the NFA, (iii) obtains most or all of its assets under management from a proposed professional's current and former ultimate beneficial owners, employees and their immediate family members, and not from third parties; (iv) does not make direct investments in named issuers (i.e., issuers of debt or equity securities, including parties that could become a debtor in a bankruptcy case), but only, if at all, holds investments in named issuers as investments that are managed by third parties with delegated investment authority and discretion; and (v) does not have independent personnel and management (as described in the Protocol).

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 12 of 22

or governmental issuers, except securities issued by sovereign governments; and (v) has at least one active McKinsey employee on its board of directors. *See* Ex. A § 5.

28. Consistent with the Protocol, counsel for the Proposed Professionals sent the Interested Parties List and the Expanded IPL to counsel for MIO to facilitate MIO's search for connections to Interested Parties. MIO then compared the Interested Parties List and the Expanded IPL to a list, compiled to the best of its knowledge, of its third-party investment managers, direct investments, financial counterparties and service providers (such as vendors). MIO then delivered the results of this comparison, which are set forth on **Schedule 3**. Based on the results provided by MIO, to the best of my knowledge, none of these relationships result in any Proposed Professional holding an interest adverse to the Debtors.

Other Disclosures

29. The Protocol provides:

> **Process to Check for Conflicts and Connections.** Every Proposed Professional should perform (in connection with its other new matter intake procedures) a process to check such Proposed Professional's client databases for conflicts and Connections with IPL Parties. A Proposed Professional should utilize a process designed to identify Connections adequately in the context of the size and organizational complexity of the Proposed Professional. For entities with a significant number of professionals, this process often utilizes computer software. For Proposed Professionals with a large number of professionals, this Protocol recommends deployment of adequate software within a reasonable time. Pending such deployment, a Proposed Professional may retain an independent third party to assess the adequacy of the alternative procedures the Proposed Professional uses to identify and appropriately disclose Connections.

Ex. A § 7(b).

30. In accordance with this guidance, because, as noted above, the Proposed Professionals do not maintain a computerized conflicts database, RTS, on behalf of the Proposed Professionals, retained BDO USA, LLP ("BDO") to assess the

13

adequacy of the connections-checking procedures used by the Working Group to identify and disclose Connections. Upon completion of its assessment of those procedures, BDO determined that the Proposed Professionals developed and implemented reasonable and adequate procedures in accordance with the general guidelines and recommendations included in the Protocol to identify and disclose connections. A copy of BDO's report is attached hereto as **Exhibit B**.

31.     McKinsey US and the other Proposed Professionals provide services to an array of clients in restructuring and turnaround engagements. They also serve clients across a broad range of industries, functions and geographies, and, within industries, serve competitors, in each case in a manner and through use of means, including information barriers between client service teams that are described more fully below, that protect the confidentiality of each client's information (including the confidentiality of the engagement itself, unless otherwise public). As a result, the Proposed Professionals and their affiliates may have served or have been served by, and may in the future serve or may be served by, certain Interested Parties in matters unrelated to the Debtors, either individually or as part of an engagement for an ad hoc or official committee of creditors or interest holders. To the best of my knowledge, (i) all such relationships during the Look-Back Period are described in this Declaration or listed on **Schedule 2**, and (ii) based on the results of the Surveys, (a) none of these relationships constitute interests adverse to the Debtors and (b) except as otherwise set forth below, all of these relationships involved consulting matters unrelated to the Debtors.

32.     Pursuant to the McKinsey Firmwide Information Sharing Policy, confidential information acquired or developed in connection with a client engagement may only be shared within the firm on a need-to-know basis. In particular, any information developed from nonpub-

lic client sources, whether written or not, is confidential to that client, including information from third-party sources that is available to the client service team only through access provided by the client. Such confidential client information may not be shared outside of the client service team. McKinsey employees are subject to annual compliance training and certification on this and other policies.

33. McKinsey also uses password-protected "virtual team rooms"—secure electronic workspaces accessible only by members of the client service team—to store work product and confidential client information. Moreover, at the time they begin their employment, McKinsey employees are required to sign nondisclosure agreements which prohibit disclosure of confidential client information, even to other employees of the firm. Employees are required to report potential or actual violations of McKinsey's policies.

34. Other than as disclosed below, no Interested Party listed on **<u>Schedule 2</u>** accounted for more than 1.00% of the gross revenue of any Proposed Professional during the period from February 1, 2018 through January 31, 2019 (the "<u>Revenue Period</u>"). To the best of my knowledge, based on the results of the Surveys, none of the services provided to any of these clients is or was related to the Debtors or their chapter 11 cases.

35. To the best of my knowledge, other than the Debtors, the following clients accounted for more than 1.00% of RTS's gross revenue during the Revenue Period. To the best of my knowledge, based on the results of the Surveys, none of the services provided to any of these clients is or was related to the Debtors or their chapter 11 cases.

a. Advance Auto Parts Inc., American International Group (AIG), Bain Capital, Cargill, Discovery Communications, Inc., MetLife Inc., Nestlé S.A., The Mosaic Co., Time, Inc., SoftBank Group Corp., Sprint Corp., and

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 15 of 22

TransAlta Corp. each accounted for 1.01–3.00% of RTS's gross revenue during the Revenue Period.

    b.    Johnson Controls Inc., MassMutual Financial Group, and TPG Capital Management L.P each accounted for 3.01–5.00% of RTS's gross revenue during the Revenue Period.

    c.    GenOn Energy, Inc.[13] and Weatherford International each accounted for 5.01–9.00% of RTS's gross revenue during the Revenue Period.

36.    To the best of my knowledge, the following clients accounted for more than 1.00% of McKinsey US's gross revenue during the Revenue Period. To the best of my knowledge, based on the results of the Surveys, none of the services provided to any of these clients is or was related to the Debtors or their chapter 11 cases.

    a.    Boeing Company, Citigroup Inc., Computer Sciences Corp., Johnson & Johnson, Verizon Communications, and Wells Fargo & Company each accounted for 1.01–3.00% of McKinsey US's gross revenue during the Revenue Period.

37.    To the best of my knowledge, the following clients accounted for more than 1.00% of McKinsey Canada's gross revenue during the Revenue Period. To the best of my knowledge, based on the results of the Surveys, none of the services provided to any of these clients is or was related to the Debtors or their chapter 11 cases.

---

[13] GenOn was previously a wholly owned subsidiary of NRG Energy, Inc. On December 14, 2018, the chapter 11 plan of reorganization for GenOn and its debtor affiliates became effective in accordance with its terms, and all equity interests in GenOn, including those held by NRG Energy Inc., were cancelled for no consideration. McKinsey US has, in the past, served NRG Energy Inc., but not since late 2014.

Case: 19-30088   Doc# 5924   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 16 of 22

a.  Bain Capital, BC Community Owned Institution, CAE, Inc., Canadian Imperial Bank of Commerce, NiSource, Rio Tinto PLC, Royal Bank Financial Group, State Street Corporation, Suncor Inc., TC Energy, Toronto-Dominion Bank, and TransAlta Corp. each accounted for 1.01–3.00% of McKinsey Canada's gross revenue during the Revenue Period.

b.  Bank of Nova Scotia, CN Government - Fed/Prov., and Power Corporation of Canada each accounted for 3.01–5.00% of McKinsey Canada's gross revenue during the Revenue Period.

38.  The Proposed Professionals and their affiliates, from time to time, provide overall strategic analysis and advice to companies that operate in the wholesale power generation and North American energy sectors in which the Debtors operate, which analysis and advice could include review of and comment on strategic considerations with respect to the Debtors, among others, based on publicly available information. The provision of overall strategic analysis and advice by the Proposed Professionals and their affiliates to other companies in the industry in which the Debtors operate focuses on the macro landscape of the industry and has no direct effect on the Debtors. To the best of my knowledge, based on the results of the Surveys, all such Proposed Professional client relationships with any Interested Party during the Look-Back Period are set forth in this Declaration and its schedules.

39.  As part of their practice, the Proposed Professionals and their affiliates provide support to clients on purchasing and supply management relating to direct and indirect materials and services, including in the wholesale power generation and energy sectors. Generally, the services consist of fact-based analysis to understand the client's costs and who other potential vendors are, support in developing requests for proposals, and analysis of and advice relating to

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 17 of 22

the responses from vendors. The Proposed Professionals and their affiliates generally do not directly contact or negotiate with vendors for their clients. To the best of my knowledge, because of its generalized nature and based on the results of the Surveys, (i) none of these relationships constitute interests adverse to the Debtors, and (ii) all such Proposed Professional client relationships with any Interested Party during the Look-Back Period are set forth in this Declaration and its schedules. Out of an abundance of caution, and in accordance with the Protocol, I note that RTS's work for the Edison Mission debtors in their 2012-2014 bankruptcy cases included this kind of purchasing and supply support and that PG&E was a former contract counterparty to Edison Mission; RTS did not directly contact or negotiate with PG&E in the course of this work.

40. McKinsey & Co. owns a proprietary program management tool (the "Program Management Tool") used by McKinsey clients, including the Debtors and other clients of the Proposed Professionals and their consulting affiliates. The Program Management Tool enables the client service teams and the client to define initiatives and track progress. The Program Management Tool is created by uploading and processing information obtained from clients; however, confidential information (the "Program Management Confidential Information") is segregated by client and strictly maintained confidentially. Access to confidential client information is provided, on a "need to know" basis, to members of the team of McKinsey & Co. employees and agents who are dedicated to supporting the Program Management Tool (the "Program Management Tool Team") and are bound to maintain the confidentiality of client information. During the Look-Back Period, no member of the Engagement Team served on the Program Management Tool Team and, as such, no member of the Engagement Team had access to Program Management Confidential Information during that time. Members of a client service team who are serving a client that is using the proprietary Program Management Tool have access to their

client's confidential information through the tool, but do not have access generally to Program Management Confidential Information. Certain professionals employed by the Proposed Professionals and their affiliates may have mortgages, consumer loans, investments, brokerage accounts or other banking, brokerage or customer relationships with Interested Parties or with funds sponsored by or affiliated with such parties. The results of the Surveys establish that no such professional holds an interest adverse to the Debtors. As described above, certain professionals employed by the Proposed Professionals and their affiliates may also invest in certain pre-tax (Pension Plan) or after-tax funds, with assets managed by MIO. The third-party managers under contract with MIO to invest those assets, including those disclosed in **<u>Schedule 3</u>**, may maintain investment funds that invest in the securities of the Debtors or other interested parties.

41. One or more McKinsey consulting affiliates—but not McKinsey US or any of the Retained Affiliates—have invested funds with MIO solely for the purpose of satisfying obligations to guarantee benefits to Pension Participants in defined-benefit pension plans in Germany and Japan.[14]

42. Based on the results of the Surveys, six professionals employed by McKinsey do or did hold interests in equity securities issued by the Debtors while McKinsey was engaged to do work for the Debtors (including prepetition). None of the six is on the Engagement Team, and therefore all of them are subject to the information barriers and other protections safeguarding the Proposed Professionals' non-public information about the Debtors. Pursuant to McKinsey's personal trading policy, employees are, absent an approved exception, strictly prohibited from buying or selling securities of any McKinsey client, but they are permitted to own securities of a McKinsey client if the securities were acquired prior to the employee joining McKinsey or

---

[14] Those obligations include funding shortfalls in the defined benefit for certain pensioners when they retire and remain until all employees who participate in those plans retire.

Case: 19-30088   Doc# 5924   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 19 of 22

prior to the period during which the issuer was a McKinsey client. In addition, based on current stock values, none of these professionals who had enough information to form a view of the value of their positions believed their stock had a value over approximately $2,600. The results of the Surveys, and subsequent follow up, accordingly established that no such professional holds a material interest adverse to the Debtors.[15]

43.    Out of an abundance of caution, and in accordance with the Protocol, I note the following connections to the Interested Parties disclosed in the Survey results or otherwise known to me. To the best of my knowledge, none of these relationships constitute interests adverse to the Debtors or, except as described below, is related to the Debtors.

      a.    Certain employees of the Proposed Professionals not on the Engagement Team, have made charitable contributions to certain entities on the Interested Parties List.

      b.    Nick Waugh, a member of the Engagement Team, is the brother-in-law of a partner at Akin Gump Strauss Hauer & Feld LLP, which is counsel to an ad hoc committee of senior unsecured noteholders in these bankruptcy cases, and whom he does not believe is working on these cases. While seeking to become a partner of McKinsey, Waugh was evaluated by a senior partner from McKinsey Germany who is also an MIO director.

      c.    Alexander D'Amico, an employee of one of the Proposed Professionals not on the Engagement Team, is married to a partner at Cravath, Swaine &

---

[15]    Consistent with Protocol Exhibit B, the Surveys did not seek responses regarding ownership or beneficial interests in such securities constituting investments (including through mutual funds and other investment vehicles) that are managed by third parties with delegated investment authority and discretion.

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 20 of 22

Moore LLP, which represents the Debtors in these bankruptcy cases, and whom he does not believe is working on these cases.

d. Elizaveta Malashenko, who joined one of the Proposed Professionals in January 2020 and is not on the Engagement Team, was previously employed by the California Public Utilities Commission.

e. Sheila Narang and Caroline Veys, employees of the Proposed Professionals not on the Engagement Team, were previously employed by PG&E.

44. I am not related or connected to and, to the best of my knowledge based on the Surveys, no other professional of the Proposed Professionals is related or connected to, any United States Bankruptcy Judge for the Northern District of California or the United States Trustee, or any employee in the Office of the United States Trustee, for Region 17, except in each case as described in this paragraph. Out of an abundance of caution, and in accordance with the Protocol, I note that, based on the results of the Surveys or as otherwise known to me, (i) Samantha Mostovoy, an employee of the Proposed Professionals not on the Engagement Team, has a personal connection to an individual who previously clerked for a judge sitting on the U.S. District Court for the Northern District of California, and (ii) Matthew Rogers, who is a leader of the Engagement Team, is married to a judge who sits on the U.S. District Court for the Northern District of California, for whom appropriate recusals are in place for all matters related to the Debtors.

45. The Proposed Professionals will endeavor to further supplement this Declaration in the event they become aware of any relationship or other information that requires disclosure.

[*Remainder of page left intentionally blank*]

Case: 19-30088    Doc# 5924    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 21 of 22

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:    February 26, 2020
          New York, NY

                              By:    /s/ *Dmitry Krivin*
                                     Dmitry Krivin
                                     Partner
                                     McKinsey & Company, Inc. United States