# **Exhibit A**

Disclosure Protocol

## HOUSTON DISCLOSURE PROTOCOL

**Summary**

The following Houston Disclosure Protocol addresses the complex legal and business issues surrounding the disclosure obligations arising from a Proposed Professional's retention under Section 327[1] in bankruptcy cases involving more than $50 million in claims. The Protocol addresses Proposed Professionals of varying types, including law, accounting, financial advisory, and investment banking firms, that seek compensation from a bankrupt estate.  A Schedule of Defined Terms immediately follows this Summary, and capitalized terms used in this Summary and in the Protocol have the meanings ascribed to them there. This Summary outlines the Protocol's disclosure recommendations and the means or process to satisfy them.

The Protocol focuses on a Proposed Professional's disclosure regarding Connections to parties that could affect the Proposed Professional's "disinterestedness" and contemplates that the debtor will create and maintain an Interested Party List to facilitate identification of Connections (Exhibit "A" to the Protocol addresses the IPL).  The Protocol recommends that a Proposed Professional obtain the data to support disclosure of Connections by procedures that include, as applicable, a computerized search of client databases, distribution of a questionnaire (a proposed form of which is provided in Exhibit 'B" to the Protocol), and inquiry of the Proposed Professional's AMAs (if any), as discussed below. While recognizing that a Proposed Professional bears the burden of adequate disclosure in its retention application and an Estate Professional bears that burden in all appropriate supplemental disclosures, the Protocol provides that disclosure of Connections should be based on a Proposed Professional's actual knowledge of them, including from the results of a computer search and questionnaire process, as applicable.

The Protocol distinguishes Connections arising from the different kinds of the Proposed Professional's affiliates, including: (a) Retained Affiliates, which the Protocol classifies as generating Direct Connections of the Proposed Professional, and (b) Unretained Affiliates (including AMAs), which the Protocol classifies as generating Indirect Connections. As set forth in the Protocol, the disclosure of known Connections and the process to obtain knowledge of them should vary in accordance with the characteristics of each Proposed Professional and its AMAs and other Unretained Affiliates.

The Protocol classifies AMAs into 4 Types and recommends a process to obtain and disclose information regarding Connections that varies based on the extent to which the AMA: (i) is subject to Securities Registration, Regulatory Oversight, and/or Independent Personnel and Management; (ii) refrains from investing directly in Named Issuers; and (iii) accepts investment funds from third parties rather than Related Investors. The Protocol recommends that: (a) Proposed Professionals that qualify as Type 1 Financial Organizations or have Type 1 AMAs disclose only Direct Connections known to the Proposed Professional without review of the IPL by an AMA; (b) Proposed Professionals with Type 2, 3 or 4 AMAs should also disclose Direct Connections known to the Proposed Professional; (c) Proposed Professionals with Type 2 AMAs should also disclose the names of IPL Parties with Indirect Connections known to the Type 2 AMA as reported by the Type 2 AMA to the Proposed Professional; (d) Proposed Professionals

---

[1]  This Protocol does not address retention applications filed by claims and noticing agents under 28 U.S.C. § 156.

1

with Types 3 and /or 4 AMAs should disclose Indirect Connections known to the AMA(s) and reported to the Proposed Professional, including direct investments in Named Issuers that are IPL Parties, and (e) Proposed Professionals with Type 4 AMAs should make such additional disclosures, if any, as may be appropriate in the circumstances.

The Protocol recognizes that disclosure of Connections may vary in response to, *inter alia*, the size of the bankruptcy case and should exclude *de minimis* matters. The *de minimis* concept is applicable to both the IPL and the disclosure of Connections in a Proposed Professional's retention application.  *De minimis* exclusions can be based, for example, on the small value of a claim, the small ownership percentage and value of an equity interest, or other, similar considerations. An IPL, and a Proposed Professional's disclosure of Connections in its retention application, should state the criteria applied in making *de minimis* exclusions.

## DEFINED TERMS

**AMA** means an affiliate or division of a Proposed Professional that is actively engaged in managing or owning financial investments. For clarity, AMA does not refer either to assets that might be held through investment vehicles or to such investment vehicles, e.g., mutual funds, but does refer to the entity managing such investment vehicles, i.e., a mutual fund manager.

**CFTC** means the Commodities Futures Trading Commission.

**Connection** means, in the context of Section 327 and Rule 2014, an association or relationship with an IPL Party that a reasonable person might find bears on whether the Proposed Professional "holds or represents an interest adverse to the estate" and is "disinterested" under Section 327 and Section 101(14), based on the facts of a particular bankruptcy case.

***De minimis*** means a matter too distant in time, remote in probability, or insignificant to warrant consideration in the context of a particular bankruptcy case.

**Direct Connection** means a known Connection between a Proposed Professional and an IPL Party (other than an Indirect Connection).

**Estate Professional** means a Proposed Professional whose retention has been approved by the Bankruptcy Court.

**FINRA** means the Financial Industry Regulatory Authority.

**Immediate Indirect Connection** means a known Connection between an IPL Party and a Proposed Professional's Unretained Affiliate (including an AMA).

**Independent Personnel and Management** means, with respect to an AMA of a Proposed Professional, the employment or engagement of management, professional and other personnel separate from those of such  Proposed Professional, (e.g., excluding the Proposed Professional's active employees from the AMA's management, so that only independent directors/managers or professionals that are not active employees of (or that have retired from) the related Proposed Professional serve on the AMA's board of directors (or other equivalent governing body)).

**Indirect Connection** means an Immediate Indirect Connection or a Remote Indirect Connection.

**Information Barriers** means policies and procedures of a referenced entity (including but not limited to policies and procedures adopted in compliance with Rule 10b5-1) that seek reasonably to ensure that (a) such entity's investment decisions not violate the laws prohibiting trading on the basis of MNPI, and (b) Proposed Professional Personnel have no participation in or knowledge concerning investment decisions made by the Proposed Professional or its affiliates.

**Interested Party List** or **IPL** means a list of parties with Connections to the debtor's estate (other than *de minimis* connections).

**IPL Parties** means the persons or parties listed on an IPL.

3

**MNPI** means material non-public information.

**Named Issuers** means an issuer of debt or equity securities (including a municipality), including parties that could become a debtor in a bankruptcy case.

**NFA** means the National Futures Association.

**Other Regulatory Oversight** means examination by any federal, state or foreign regulatory authority regarding compliance with regulatory requirements, other than Regulatory Oversight.

**Proposed Professional** means a professional person or entity proposed to be retained in connection with a pending bankruptcy case under Section 327. As used in this Protocol, the term "Proposed Professional" includes Retained Affiliates.

**Proposed Professional Personnel** means the primary working group within a Proposed Professional entity that directly provides the services for which the Proposed Professional is retained in the particular bankruptcy case, and excludes personnel that only episodically provide such services.

**Regulatory Oversight** means periodic regulatory examinations by the SEC, FINRA, or the NFA.

**Related Investors** means, with respect to a Proposed Professional, the Proposed Professional's current and former ultimate beneficial owners, employees and their immediate family members.

**Remote Indirect Connection** means a known Connection arising from a relationship between a Proposed Professional's Unretained Affiliate (including an AMA) and a third party, which third party, in turn, has a Connection with an IPL Party.

**Retained Affiliates** means those affiliates of a Proposed Professional that employ professional personnel for whom the Proposed Professional will seek compensation pursuant to Section 330 of the Bankruptcy Code.

**Rule 10b5-1** means 17 C.F.R. 240.10b-5.

**Rule 2014** means Federal Rule of Bankruptcy Procedure 2014.

**SEC** means the United States Securities and Exchange Commission.

**Section 101(14)** means 11 U.S.C. § 101(14).

**Section 327** means 11 U.S.C. § 327.

**Securities Registration** means, with respect to a referenced entity, such entity's registration (and attendant regulation) as an investment advisor by the SEC, as a securities broker/dealer by FINRA, or under the requirements of the CFTC.

4

**Survey** means the Summary of Industry Affiliate Investment Disclosures. *In re: Westmoreland Coal Co.,* Case No. 18-35672 (Bankr. S.D. Tex.), ECF No. 1659-1 pp. 2-66.

**Third-Party Managed Investments** means investments (including through mutual funds and other investment vehicles) that are managed by third parties with delegated investment authority and discretion.

**Type** means one of the four (4) types of AMAs that are classified in this Protocol.

**Type 1 AMA** means an AMA that either:

> A.  (i) employs Information Barriers, (ii) is subject to both Securities Registration and Regulatory Oversight, and (iii) obtains most or all of its assets under management from third parties (i.e., parties other than Related Investors); or
>
> B.  qualifies under the criteria provided in subsections (A)(i) and (ii), above, but obtains most or all of its assets under management from Related Investors and not from third parties, and also insulates its personnel and management by means of Independent Personnel and Management.

**Type 2 AMA** means an AMA that: (i) qualifies under the criteria provided in subsections (A)(i) and (ii) in the definition of Type 1 AMA, above; (ii) obtains most or all of its assets under management from Related Investors and not from third parties; (iii) does not make direct investments in Named Issuers but only, if at all, holds investments in Named Issuers as Third-Party Managed Investments; and (iv) does not have Independent Personnel and Management.

**Type 3 AMA** means an AMA that: (i) employs Information Barriers; (ii) is subject to either: (A) Regulatory Oversight, or (B) Other Regulatory Oversight; (iii)   obtains its assets under management from Related Investors or third parties; and (iv) may make direct investments in the debt or equity of Named Issuers, whether or not it also holds such investments as a result of Third-Party Managed Investments.

**Type 4 AMA** means an AMA not qualifying as a Type 1, Type 2 or Type 3 AMA.

**Type 1 Financial Organization** means a Proposed Professional, including an investment banking or similar institution (including a financial advisor affiliated with an investment bank), that has Information Barriers and other characteristics of and would therefore qualify as a Type 1 AMA. A Type 1 Financial Organization retains its classification as such even if it does not have assets under management.  A Type 1 Financial Organization also retains its classification as such notwithstanding that it may include affiliates of other Types (e.g., Type 3 AMAs engaged in insurance activities, and Type 4 AMAs acting in various capacities in ownership and/or management of investment assets).

**Unretained Affiliate** means an affiliate of a Proposed Professional other than a Retained Affiliate.

## Introduction

Rule 2014 requires disclosure of connections between a Proposed Professional and certain parties in interest in bankruptcy cases.   None of Rule 2014, Section 327, or the decisional law construing any of them provides Proposed Professionals (and Estate Professionals) and in particular, those having an AMA, any clear guidance regarding adequate disclosure of their AMA's connections with parties in interest in a bankruptcy case.  This Protocol: (a) suggests definitions for a Connection requiring disclosure and categorizes such Connections; (b) classifies AMAs within four Types; (c) differentiates the disclosure of Connections recommended for the four Types of AMAs; (d) discusses knowledge of Connections and the means to obtain it; and (e) addresses confidentiality concerns and requirements for updating disclosure of Connections.

This Protocol does not endeavor to and could not effectively provide definitive guidance to all Proposed Professionals in all circumstances. Proposed Professionals range from sole practitioners or single office practices to complex international firms with thousands of professionals and multiple AMAs of various Types. Proposed Professionals may similarly be subject to a wide range of regulation, including self-regulatory rules and standards governing legal and accounting professionals, and Securities Registration and/or Regulatory Oversight to which financial advisory and investment banking firms may be subject. Proposed Professionals also are subject to a broad range of consequences for violation of the respective rules, regulations and laws that govern them, including license suspension or loss, enforcement under Securities Registration and/or Regulatory Oversight, and potential civil and criminal liabilities for misuse of MNPI. This Protocol therefore provides general guidance regarding how Proposed Professionals may obtain information and make proper disclosures to support their retention in U.S. bankruptcy cases that are within the scope of this Protocol, but this Protocol does not provide specific guidance for all Proposed Professionals, regardless of their type, size and structure, or in all bankruptcy cases, regardless of their size, scope, or operative facts. This Protocol recognizes that a Proposed Professional may deviate from its suggested data gathering procedures and disclosure recommendations based upon its particular facts and circumstances. No such deviation, *per se,* however, should support a contention that a Proposed Professional is not disinterested or that its retention should not be approved.

A Proposed Professional bears the burden of making appropriate disclosure of Connections in its initial retention application and an Estate Professional bears a continuing burden to supplement that disclosure as appropriate in the circumstances. This Protocol proposes a framework for disclosure of Connections by Proposed Professionals, Estate Professionals, and their affiliates in bankruptcy cases involving more than $50 million in liabilities.

Connection should be broadly defined to respect the term's ordinary meaning and accomplish the important purposes of Rule 2014 and Section 327 to ensure that a Proposed Professional is a "disinterested person" as defined in Section 101(14). Section 327's primary functions include: (a) allowing the estate to obtain and retain expertise to fulfill its essential functions; (b) requiring disclosure of matters that might affect Estate Professionals' performance of their duty of loyalty; and (c) maintaining the integrity of the bankruptcy process and promoting the parties' and the public's confidence in that integrity. Section 327 requires that Proposed Professionals "not hold or represent an interest adverse to the estate" and are "disinterested persons." Section 101(14)(c) requires that a disinterested person "not have an

interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor, or for any other reason." Rule 2014 disclosure is intended to provide the Bankruptcy Court and parties in interest in a bankruptcy case with information adequate to evaluate whether a Proposed Professional is a disinterested person and qualified to serve under Section 327.

The definition of Connection and Rule 2014's related disclosure obligations should not impair an effective evaluation of disinterestedness by requiring disclosure of every possible connection, no matter how *de minimis*. Further, Rule 2014 disclosure should not impractically require disclosure of unknown information or ignore valid confidentiality concerns.

The formulation of this Protocol has been informed by the Survey. The Survey reflects that, in the absence of any definition of Connection and disclosure guidelines, Proposed Professionals have adopted widely disparate practices governing disclosure of Connections, even among similarly situated Proposed Professionals. This Protocol was further informed by the results of telephonic interviews conducted with representatives of more than a dozen separate professional firms with significant Chapter 11 experience, who expressed their willingness to discuss (for themselves and not as an expression of their firm's policies or procedures), in a candid, off-the-record context and not for attribution in the Protocol, disclosure issues arising from the retention application process. This Protocol provides guidance to Proposed Professionals regarding such disclosures.

1. **Description of Connections**

   a. **Requirement of Disclosure**. Rule 2014 requires disclosure of the Connections of the "person to be employed," and Section 101(14) refers to "direct or indirect relationships," but neither Rule 2014 nor related decisional law addresses whether Indirect Connections (i.e., Connections created by affiliates of a Proposed Professional) must be disclosed.

   b. **Interested Parties and Interested Party List.** In order to facilitate a Proposed Professional's disclosure of Connections, the debtor, in consultation with its outside restructuring counsel, should prepare and make an Interested Party List (or IPL) available to all Proposed Professionals. If a Proposed Professional believes that the then-current IPL should be amended, such Proposed Professional should so advise the debtor's counsel. If no IPL has been prepared when a Proposed Professional files its retention application, the retention application should disclose that fact and explain how the Proposed Professional identified Connections. Exhibit "A" to this Protocol includes an IPL template, as well as guidelines for a debtor's consideration in preparing an IPL in light of the particular facts and circumstances of a bankruptcy case.

   c. **Retained Affiliates**. A Proposed Professional should: (i) seek retention (and include the identity) of Retained Affiliates in its retention application; and (ii) ensure that its retention application discloses all known Connections (other than *de minimis* connections) among IPL Parties and such Retained Affiliates.

   d. **Protocol Organization**. Paragraph 2 provides for certain disclosures relating to Immediate Indirect Connections. Paragraph 6 addresses what constitutes knowledge in connection with preparing retention application disclosures. Paragraph 8 discusses confidential treatment for Connections and IPL Parties in certain circumstances.

e.      *De Minimis* **Exclusions.**  Effective disclosure in large bankruptcy cases requires reasonable exclusion of *de minimis* connections and parties that should not qualify as IPL Parties (e.g., small creditor, vendor, customer exclusions, and investments falling below a threshold), as described on Exhibit "A." Section 101(14)(c)'s reference to "material" supports excluding *de minimis* connections.  For instance, a Proposed Professional may determine that an equity investment in an IPL Party of less than 1% of the outstanding equity or debt (with a value the Proposed Professional determines to be *de minimis*) need not be disclosed.  Each IPL and each Proposed Professional's retention application that excludes *de minimis* parties or connections should state the criteria, based on the facts and circumstances of the case (commonly, a dollar and/or percentage amount) applied to make such exclusions from disclosure.

f.      **Disclosure under this Protocol**.  Subject to *de minimis* exclusions as set forth herein, this Protocol recommends:

(i) A Proposed Professional (including Retained Affiliates) should disclose all known Direct Connections, and also disclose all Indirect Connections known to its Unretained Affiliates (including AMAs) and reported to it. Except as otherwise provided in this Protocol (including in Paragraph 8 regarding confidentiality), disclosed Connections should be identified by name and adequately described.

(ii)  A Proposed Professional should obtain knowledge of Connections through its new matter intake process, by computer database searches, questionnaires and otherwise as described in this Protocol.

(iii)  A Proposed Professional should disclose whether it has any AMAs, and if it does, it should  describe such AMAs' classification by Type  as provided for in this Protocol, including (as applicable) such AMAs': (A) Information Barriers; (B) Related Investors; (C) practices regarding direct investments in Named Issuers and/or through Third-Party Managed Investments; (D) Independent Personnel and Management; and (E) Regulatory Oversight and/or Other Regulatory Oversight.

(iv)  A Proposed Professional that does not qualify as a Type 1 Financial Organization or have a Type 1 AMA, and does have one or more Type 2, 3 and/or 4 AMAs, should provide the IPL to such Type 2, 3 and/or 4 AMAs and request the AMAs to report Indirect Connections to the Proposed Professional as provided in this Protocol (including enhanced disclosure for Type 3 and 4 AMAs).

**2.      Indirect Connections**

a.      **Requirement of Disclosure**. Immediate Indirect Connections should be disclosed, as bearing upon whether the Proposed Professional "holds or represents an interest adverse to the debtor," including Immediate Indirect Connections of: (i) Unretained Affiliates (as disclosed pursuant to an applicable questionnaire process), and (ii) Type 2, 3 and 4 AMAs (as disclosed in response to the distribution of the IPL), all as discussed below.

b.      **Remote Indirect Connection**.  The Survey reflects that Remote Indirect Connections are not generally disclosed, likely because Proposed Professionals have no knowledge of them. This Protocol recommends disclosure of a Remote Indirect Connection (other than a *de minimis* connection) only if the Proposed Professional has knowledge thereof. A

8

Proposed Professional's retention application should disclose the potential existence of unknown Remote Indirect Connections with IPL Parties. A Proposed Professional is not required to conduct procedures other than those set forth in this Protocol to identify Remote Indirect Connections.

**3.** **Indirect Connections through Asset Management Affiliates**

a. **AMA Disclosure**. When a Proposed Professional (including, without limitation, a law, accounting, financial advisory or investment banking firm) has an Unretained Affiliate that is an AMA, additional disclosure may be required to explain the AMA's Connections and their impact, if any, on the Proposed Professional's disinterestedness. That additional disclosure should also describe whether the AMA accepts funds from third parties or Related Investors, and whether the AMA makes direct investments in the debt or equity securities (i.e., buys or sells short, long, option or other positions) of Named Issuers or holds investments in Named Issuers through Third-Party Managed Investments, or both. Based on the Survey, many Proposed Professionals do not identify such AMAs individually by name, but rather identify them descriptively and generically. This Protocol does not intend to change that practice. The description of such AMAs should categorize them by reference to the applicable "Types" described below. Most Proposed Professionals (in common with most employers) maintain 401(k) programs and support various other pension and/or other retirement account programs for their employees' benefit as Third-Party Managed Investments and without using an AMA; such arrangements do not trigger any requirement for analysis as an AMA under this Protocol.

b. **Material Non-Public Information; Regulation and Oversight**. Proposed Professionals, Estate Professionals and their respective AMAs frequently possess MNPI and often implement Information Barriers to address this. These entities may also be subject to regulation and oversight, including Securities Registration and/or Regulatory Oversight.

c. **AMA Classification**. This Protocol identifies four Types of AMAs (Types 1, 2, 3 and 4) and proposes corresponding disclosure requirements for each Type. If a Proposed Professional believes its AMA has characteristics of more than one Type, its retention application should discuss these characteristics and include disclosure applicable to the higher numbered Type (e.g., an AMA with characteristics of both a Type 3 and Type 4 AMA should make the disclosure required for a Type 4 AMA). If a Proposed Professional believes its AMA should be classified differently from these Types, its retention application should discuss this and include disclosure most appropriate to such AMA.

d. **Change in AMA Type**. An AMA's classification can change over time. For example: a Type 4 can qualify as a Type 3 by implementing Information Barriers and becoming subject to Regulatory Oversight or Other Regulatory Oversight; a Type 3 can qualify as a Type 2 by becoming subject to Securities Registration (and, if applicable, Regulatory Oversight rather than Other Regulatory Oversight) and holding investments in Named Issuers only as Third-Party Managed Investments; and a Type 2 can become a Type 1 by implementing Independent Personnel and Management. With respect to each bankruptcy case in which a Proposed Professional files a retention application, however, the Proposed Professional should classify its AMA(s) (as a Type 1, 2, 3 or 4) based on the AMA's characteristics when the Proposed Professional files its initial retention application in such case, and this classification should remain in effect throughout the course of such case (i.e., the same classification should apply to

9

an Estate Professional's updated retention application disclosures). Accordingly, the same AMA of a Proposed Professional may be classified differently in different bankruptcy cases, based on its characteristics at the time that the Proposed Professional files its initial retention application in the different bankruptcy cases.

4.      **Disclosures Relating to Type 1 Financial Organizations and Type 1 AMAs**

        a.      **Present Type 1 Financial Organization and Type 1 AMA Disclosure**. The Survey indicates that a retention application for a Proposed Professional qualifying as a Type 1 Financial Organization or having an AMA that this Protocol categorizes as a Type 1 AMA commonly discloses only Direct Connections known to the Proposed Professional Personnel because its Information Barriers, Securities Registration and Regulatory Oversight fully protect MNPI, and insulate the Proposed Professional Personnel from any effects that MNPI could potentially create with respect to the Proposed Professional's disinterestedness. Such Proposed Professional Personnel generally have no knowledge of (and therefore the Proposed Professional does not disclose) debt or equity investments in IPL Parties because of the effectiveness of the Information Barriers applicable to communication and misuse of MNPI and insulating Proposed Professional Personnel from participation in or knowledge of investment decisions.

        b.      **Proposed Type 1 Financial Organization and Type I AMA Disclosure**. This Protocol proposes that the disclosures of Connections in a retention application of a Proposed Professional qualifying as a Type 1 Financial Organization or having a Type 1 AMA may properly be limited to identifying the names (subject to confidentiality considerations) of Direct Connections (other than *de minimis* connections) known to such Proposed Professional in reliance on the presumed effectiveness of Information Barriers. Such named entities should ordinarily be described as "a current or former client, but with respect to matters unrelated to the Debtor," absent facts or circumstances that require enhanced disclosure. Bankruptcy Courts have consistently approved retention applications based upon such disclosures.

5.      **Disclosures relating to Type 2, 3 and 4  AMAs**

        a.      **Present Type 2, 3 and 4 AMA Disclosure**. The Survey indicates that retention applications for a Proposed Professional with an AMA that this Protocol categorizes as a Type 2, 3, or 4 AMA include increased disclosures because: (i) such a firm accepts most or all of its investments from Related Investors; (ii) a Type 3 AMA may be subject only to Other Regulatory Oversight (and may not by subject to any Securities Registration); (iii) a Type 4 AMA may not be subject to regulatory examinations or Securities Registration at all; and (iv) a Type 3 or 4 AMA may make direct investments in Named Issuers, rather than investing exclusively through Third-Party Managed Investments.

        b.      **Considerations for Type 2 AMA Disclosures.** A Proposed Professional with an AMA that this Protocol categorizes as a Type 2 AMA could credibly contend that its disclosure obligations in respect of its Type 2 AMA should be the same as the disclosure obligations in respect of Type 1 AMAs because its Type 2 AMA protects MNPI by means of the same Information Barriers enforced by the same Securities Registration and Regulatory Oversight as those that apply to Type 1 AMAs. In addition, a Type 2 AMA refrains from direct investments in Named Issuers, and a Type 1 AMA may make direct investments in Named Issuers. Nonetheless, this Protocol recommends increased disclosure by a Proposed Professional with a Type 2 AMA in order to advance the purposes of (i) protecting public confidence in the integrity

of the restructuring process, and (ii) ensuring an absence of self-dealing because a Type 2 AMA obtains most or all of its funds under management from Related Investors and may be managed and controlled by active professional personnel that also manage and control the related Proposed Professional (rather than utilizing Independent Personnel and Management).

      c.    **Proposed Type 2 AMA Disclosure**.  A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 2 AMA should disclose known (i) Direct Connections of the Proposed Professional, and (ii) Immediate Indirect Connections of its Type 2 AMA, in each case other than *de minimis* connections.  Disclosure of known Immediate Indirect Connections (other than *de minimis* connections) of a Type 2 AMA will consist of identifying the IPL Parties, if any, to which the Type 2 AMA has Immediate Indirect Connections, if and as reported by the Type 2 AMA to its related Proposed Professional. A Proposed Professional with a Type 2 AMA should provide the IPL to its Type 2 AMA, and request its Type 2 AMA to inform it of known Immediate Indirect Connections (other than *de minimis* connections) to IPL Parties for potential disclosure in the Proposed Professional's retention application pursuant to this Protocol, including Paragraph 6, below, regarding knowledge.

      d.    **Proposed Type 3 AMA Disclosure**.  A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 3 AMA should contain enhanced disclosure that reflects (i) such AMA's Regulatory Oversight or Other Regulatory Oversight, as applicable; and (ii) the extent of any Securities Registration applicable to such AMA. Such retention application disclosure should also address how, if at all, these characteristics of its AMA could cause any potential impairment to the Proposed Professional's perceived or actual disinterestedness. Because Type 3 AMAs may make direct investments in Named Issuers, the disclosures required from such a Proposed Professional with a Type 3 AMA should  disclose known Indirect Connections (other than *de minimis* connections) between the Type 3 AMA and IPL Parties including those arising from any such direct investments in Named Issuers that appear in the IPL, in each case as reported by the Type 3 AMA to its related Proposed Professional.

      e.    **Proposed Type 4 AMA Disclosure**.  A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 4 AMA should contain enhanced disclosure that sets forth the Securities Registration, Regulatory Oversight and/or Other Regulatory Oversight (or lack thereof) applicable to the Proposed Professional. Such retention application disclosure should also address how, if at all, these characteristics of its AMA could cause any potential impairment to the Proposed Professional's perceived or actual disinterestedness. If the applicable Type 4 AMA makes direct investments in Named Issuers, the disclosures required from such a Proposed Professional with such Type 4 AMA should disclose known Indirect Connections (other than *de minimis* connections) between the Type 4 AMA and IPL Parties, including those arising from any such direct investments in Named Issuers that appear in the IPL, in each case if and as reported by the Type 4 AMA to its related Proposed Professional.  The disclosures required in a retention application of a Proposed Professional with a Type 4 AMA should be informed by the disclosure provided with respect to other categories of AMAs and supplemented as appropriate based on the facts and circumstances applicable to the particular AMA and bankruptcy case.

6.    **Disclosure Based on Actual Knowledge**

The disclosure obligations of a Proposed Professional under this Protocol derive from the Proposed Professional's knowledge of Connections (other than *de minimis* connections), including the knowledge of Connections of a Proposed Professional's AMAs (if any) which the AMA may report to the Proposed Professional. In the case of Type 2, 3 and 4 AMAs with only Third-Party Managed Investments, disclosure of investments in Named Issuers included in the IPL Parties that such managers may make from time to time would be impractical because of, *inter alia*, the frequency of trading in such positions, and the AMA's limited knowledge thereof (if any). To be sure, Proposed Professionals cannot disclose unknown Connections, and this Protocol does not suggest that they do so.  Instead, this Protocol provides procedures to obtain such knowledge. For purposes of this Protocol, a Proposed Professional's knowledge of Connections means actual knowledge derived from its new matter intake process and the results of the Proposed Professional's: (a) computer client database check (as described in Paragraph 7, below); (b) any applicable inquiry of its professional personnel (and Unretained Affiliates other than AMAs) by a questionnaire process or otherwise (also as described in Paragraph 7, below); (c) review of the report it receives of its AMA's (if applicable) check for conflicts and Connections (or any other applicable) process; and (d) review of any other process for its Unretained Affiliates (if any, and other than an AMA). All references to "knowledge" in this Protocol refer to actual knowledge. As discussed in Paragraph 7(e), below, if a Proposed Professional limits its retention application disclosure to the knowledge of Proposed Professional Personnel, that limitation should be disclosed in the retention application.   A retention application of a Proposed Professional with knowledge of Direct Connections or Indirect Connections with IPL Parties (other than *de minimis* connections), should disclose all such Connections. In addition, if a Proposed Professional has knowledge of a Connection (other than a *de minimis* connection) with a person not included in the IPL, such Connection should be disclosed.

7.    **Determination of Whether a Connection Exists**

Proposed Professionals should obtain knowledge of whether Connections exist generally by following the procedures discussed below, subject to adaptations to disclose particular circumstances affecting a particular Proposed Professional and bankruptcy case. Each retention application for a Proposed Professional should describe the process and procedures it utilized to obtain knowledge of Connections.

a.    **Interested Party List**.   Subject to Paragraph 6 of this Protocol regarding knowledge, Proposed Professionals can reasonably and in good faith rely on the list of IPL Parties, consistent with the description and template attached as Exhibit "A," prepared (and periodically updated, with information derived from the debtor's bankruptcy schedules and otherwise, as described in Exhibit "A" and in Paragraph 10, below) by the debtor.

b.    **Process to Check for Conflicts and Connections**. Every Proposed Professional should perform (in connection with its other new matter intake procedures) a process to check such Proposed Professional's client databases for conflicts and Connections with IPL Parties. A Proposed Professional should utilize a process designed to identify Connections adequately in the context of the size and organizational complexity of the Proposed Professional. For entities

with a significant number of professionals, this process often utilizes computer software.[1] For Proposed Professionals with a large number of professionals, this Protocol recommends deployment of adequate software within a reasonable time. Pending such deployment, a Proposed Professional may retain an independent third party to assess the adequacy of the alternative procedures the Proposed Professional uses to identify and appropriately disclose Connections.

A Proposed Professional (other than a Type 1 Financial Organization or a Proposed Professional with Type 1 AMAs) should distribute the IPL to its Type 2, 3 and 4 AMAs, request them to report any Connections (other than de minimis connections) to the Proposed Professional, and disclose in its retention application all Connections so reported. In addition, a Proposed Professional should distribute the IPL to its Proposed Professional Personnel, request them to report any Connections (other than *de minimis* connections) to the Proposed Professional, and disclose in its retention application all Connections so reported.

c.    **Questionnaires.** A Proposed Professional should disclose in its retention application the results from written inquiries of the Proposed Professional's professional personnel (as distinguished from staff, support or administrative personnel), and (to the extent, if any, appropriate) Unretained Affiliates (if any) controlled by the Proposed Professional regarding: (i) their known equity or debt investments in the debtor (e.g., excluding Third-Party Managed Investments); and (ii) other connections or relationships with the debtor (other than the Proposed Professional's proposed engagement), the Bankruptcy Court judges, or United States Trustee personnel.  Exhibit "B" to this Protocol presents a sample questionnaire. Particularly for Proposed Professionals organized in complex global structures, Exhibit "B" may require substantial modification, or a different (or even no) approach to seeking this information from certain of its professional employees and affiliates may be appropriate.

d.    **AMA's Report**. A Proposed Professional should set forth in its retention application the results reported to the Proposed Professional from its AMA's (if applicable) search with respect to IPL Parties (including any alternative processes or rationale for omission thereof).

e.    **Type 1 Financial Organizations and Type 1 AMAs**. As discussed above, Type 1 Financial Organizations and Type 1 AMAs are subject to Information Barriers that not only protect against misuse of MNPI but also insulate Proposed Professional Personnel from participation in or knowledge concerning investment decisions. Accordingly, it may be appropriate for such Proposed Professionals to obtain knowledge of Connections from their new matter intake procedures and computer client database reviews and base their disclosures on the knowledge of their Proposed Professional Personnel derived therefrom, without using questionnaires (other than directed to its Proposed Professional Personnel) or other procedures.

## 8.    Confidentiality Considerations

If a Connection (or the identity of an IPL Party) that should be disclosed under this Protocol is subject to confidentiality considerations and the Proposed Professional seeks not to disclose the Connection or the name of the IPL Party, the following steps should be taken:

---

[1]    Law firms generally use proprietary software licensed from vendors, while financial advisory firms more typically develop such software themselves or through third-party consultants.

13

a. **Description in IPL**. The Connection (or IPL Party) should be described (but not identified) in sufficient detail to permit informed decisions concerning the Proposed Professional's "disinterestedness" (as defined in Section 101 (14));

b. **Identity Filed Under Seal**. The party seeking to preserve confidentiality with respect to IPL Parties or Connections may file a motion for leave to file the identity of the confidential party under seal under Rule 9018, Federal Rules of Bankruptcy Procedure,  on notice to the Office of the U.S. Trustee, the Debtor, any official committee, the holders of the 20 largest claims against the Debtor, any party that has requested notice pursuant to Rule 2002, Federal Rules of Bankruptcy Procedure, any applicable local rule, and all other parties entitled to notice of motions of this type under orders of the Bankruptcy Court in the Debtor's bankruptcy case.  If the Bankruptcy Court enters an order granting such relief, in whole or in part, the party obtaining such relief should proceed in accordance therewith; and

c. **Access to Sealed Information**.  Subject to the provisions of any particular Bankruptcy Court's sealing order, any party in interest, including the United States Trustee, may ask the Bankruptcy Court for permission to review (or for their counsel to review) the sealed information, and the party seeking access to the information bears the burden of proof regarding such request.  The Bankruptcy Court order granting such access may protect the information's continuing confidentiality. *See, e.g.,* Order Authorizing Evercore Group L.L.C. To File Under Seal Certain Confidential Information Related to Evercore's Retention Application*, In re: Jones Energy, Inc., et al.,* Case No. 19-32112 (Bankr. S. D. Tex.), ECF No.210.

9. **Look-back Period and Diligence**

a. **Time Period**.  A Proposed Professional should disclose Connections during the three years preceding the commencement of the bankruptcy case unless the circumstances reasonably warrant a longer period.  For example, if a Proposed Professional represented a party in interest in a leveraged buy-out of the debtor eight years before the petition date, the Connection should be disclosed. Conversely, if a Proposed Professional represented a creditor of the debtor in a matter unrelated to the debtor four years before the petition date, no disclosure of that connection should be required.

b. **Additional Processes**.  A Proposed Professional (and AMAs and other Unretained Affiliates) may, but should not be required to, conduct a process or procedure to identify Connections in addition to those set forth in this Protocol.

10. **Updates**

A Proposed Professional, once retained, has ongoing disclosure obligations. The debtor has the continuing obligation to update the IPL. This Protocol recommends that a debtor update, file and serve the IPL in a manner that clearly identifies changes thereto from prior versions no less frequently than every 90 days, including in connection with the filing of the debtor's schedules and statements, the passage of the claims bar date, the commencement of adversary proceedings, and filings under Bankruptcy Rule 2019 or by prospective purchasers of the debtor's assets.  Estate Professionals should supplement their Rule 2014 disclosures, to the extent necessary as a result of updated IPLs and other developments in the bankruptcy case, including by reason of newly discovered or inadvertently omitted Connections. Without limiting Estate Professionals' obligations relating to prompt disclosure of known Connections, Estate

Professionals may maintain continuing compliance with their supplemental disclosure obligations under Rule 2014 by updating their disclosures in accordance with this Protocol within a reasonable time after the debtor's filing of updated IPLs, to the extent required as a result thereof.

**EXHIBIT A TO HOUSTON DISCLOSURE PROTOCOL**[3]

---

[3] Defined terms used and not otherwise defined in this Exhibit have the meanings ascribed to them in the Protocol.

Exhibit A - 1

## GUIDELINES AND TEMPLATE FOR INTERESTED PARTY LIST

"Interested Parties List" or "IPL" means a list of people and entities, grouped into categories of their Connections, identified by name, and prepared to assist Proposed Professionals in complying with disclosure obligations under Rule 2014. The debtor, with the assistance of its outside restructuring counsel, should compile the initial IPL as part of due diligence leading up to the bankruptcy filing. An IPL categorizes each IPL Party in accordance with the nature of the Connection it has with the debtor, parties associated with the debtor (e.g., current directors, executive officers and debt and equity holders), and other IPL Parties (e.g., vendors, customers, contract, lease and litigation counterparties). Proposed Professionals rely on the IPL to provide the names of parties to review for possible Connections. In bankruptcy cases involving issuers of public debt or equity securities, it may be most efficient to construct the IPL using commercially available databases that offer exact legal names of entities and their affiliates.

An IPL may be both broader and narrower than the persons or entities the debtor lists in schedules and statements of financial affairs. An IPL (and updates to it as provided for in the Protocol) should include, without limitation, members of official committees, proposed purchasers of the debtor's assets, and other Estate Professionals, none of which may appear in the debtor's schedules and statements. An IPL may exclude *de minimis* potential IPL Parties that the debtor's schedules and statements will include. Particularly in larger cases, the debtor's schedules and statements may not be available before a Proposed Professional files its retention application. Accordingly, an IPL that the debtor makes available may form the best source of this information available to a Proposed Professional filing its retention application early in the bankruptcy case.

As set forth in the Protocol, a debtor should change and update the IPL during the course of a bankruptcy case, at intervals no less than 90 days, to reflect changing facts and circumstances in the case, including new developments, as well as to cure inadvertent omissions. Updates should reflect, among other things, the matters, events and circumstances addressed in the template provided below.

**EXHIBIT "A"**

**IPL TEMPLATE**

In its initial compilation of the IPL, the debtor should consider including the following categories of parties with Connections, as applicable:

- Debtor(s)
- Debtor affiliates and subsidiaries
- Current and former officers and directors (within the last 3 years)
- Affiliates of current and former officers and directors
- Significant equity holders (more than 5%)
- Prepetition lenders / noteholders
- Prepetition Indenture trustees / agents
- Initial DIP lenders
- U.S. Bankruptcy Court Judges serving in the District (as updated, only the Bankruptcy Judge presiding over the bankruptcy case will remain an IPL Party)
- U.S. District Court Judges for the applicable district
- U.S. Trustee (for the applicable region) and Staff Attorneys and Trial Attorneys in the District in which the case is filed
- Top 50 unsecured creditors
- Identified bankruptcy professionals
- Ordinary course professionals
- Contract counter-parties (other than *de minimis*)
- Vendors / suppliers (other than *de minimis*)
- Customers (other than *de minimis*)
- Competitors (other than *de minimis*)
- Landlords and lease counter-parties (other than *de minimis*)
- Licensees and licensors (including under intellectual property rights) (other than *de minimis*)
- Utility companies (other than *de minimis*)
- Litigation counter-parties (other than *de minimis*)
- Regulatory agencies / governmental bodies
- Taxing authorities (other than *de minimis*)
- Labor unions
- Depository banks (other than *de minimis*)
- L/C issuers
- Lien claimants
- Insurance providers and agents
- Surety bonds and surety providers
- Other IPL Parties significant to the bankruptcy case, and not included above.

The parameters for excluding *de minimis* parties from the IPL depend on the facts and circumstances of each particular bankruptcy case. In each category appropriate for *de minimis* exclusions, the debtor should consider a practical *de minimis* limitation so that category will contain only IPL Parties that bear on a Proposed Professional's disinterestedness. The IPL should

disclose the dollar amount, percentage amount or other criteria (e.g., limiting equity holders to thresholds based on value and percentage interest) chosen for *de minimis* exclusions in each applicable category.

**Updates**

As set forth in the Protocol, the IPL is a dynamic document, and a debtor should change and update the IPL during the course of a bankruptcy case. The debtor should update the IPL no less frequently than every 90 days to reflect changing facts and circumstances, new developments, and information learned during the bankruptcy case, as well as to cure inadvertent omissions. After the filing of the bankruptcy case, the IPL should be updated to include additional IPL Parties identified in:

- The debtor's schedules and statements (including any amendments)
- Proofs of Claim
- Notices of appearance
- Adversary proceedings and other motions or applications
- Filings by prospective purchasers of debtor's assets, plan proponents and under Bankruptcy Rule 2019
- Appointments of official committees and retention of Estate Professionals

**EXHIBIT B TO HOUSTON DISCLOSURE PROTOCOL**

**Exhibit B**
**Form of  Questionnaire**

**Urgent Request for Information**

THIS IS AN URGENT REQUEST FOR INFORMATION THAT REQUIRES YOUR IMMEDIATE ATTENTION AND RESPONSE IF YOU HAVE ANY INFORMATION TO REPORT OR MATTERS TO DISCLOSE. YOUR FAILURE TIMELY TO RESPOND WILL CONSTITUTE YOUR AFFIRMATION THAT YOU HAVE NO INFORMATION TO REPORT OR MATTERS TO DISCLOSE.  IF  YOU WOULD SELECT OPTION #1 TO EACH OF THE THREE QUESTIONS BELOW, YOU NEED NOT RESPOND TO THIS QUESTIONNAIRE.  THANK YOU IN ADVANCE FOR YOUR PROMPT ASSISTANCE.

(**Name of Proposed Professional**) represents (or is applying for Bankruptcy Court authorization to represent)  (**name of entity)** and its affiliates listed below (collectively, the "**Debtors**") or (the Official Committee of Unsecured Creditors) (or other applicable official committee or party; as the case may be, the "Client")) in their (recently filed) (contemplated) chapter 11 bankruptcy cases in the United States Bankruptcy Court for the _____ District of _____.

As an advisor to the Client, there are several types of disclosures that we must make in order for the Bankruptcy Court to approve retention of our firm.  Most of the information required to be disclosed can be obtained from the databases and conflicts records our firm maintains.  That process is underway.  A limited amount of information, however, may most efficiently be obtained directly from professionals employed by our firm and affiliates of our firm who receive this Questionnaire (collectively, the "Questionnaire Recipients").  This request relates to the second type of material listed above, which is why you are being contacted.  The specific disclosures that we are required to make are listed below.

**First**, we must disclose to the Bankruptcy Court presiding over the Debtors' cases any holdings by the Questionnaire Recipients in either the debt or equity securities of the Debtors (e.g., excluding any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; "Third-Party Managed Investments"),as well as the existence of any other claims against the Debtors held by any Questionnaire Recipient.

**Second,** we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to the United State Trustee or any person employed in the Office of the United States Trustee for the _____ District of _____.

**Third,** we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to any of the Bankruptcy Judges for the _____ District of _____.

**Please respond to this email no later than [_____,     20    ] at noon EST:**

Exhibit B - 2

**1.    Debt or Equity Securities, or Other Claims Against the Debtors.**

Please indicate by replying to this email whether you, on or after [90 days prior to the date of this questionnaire] have owned or held a beneficial interest in any debt or equity securities (other than Third Party Managed Investments) of, or claims against, any of the Debtors. **To reply, review the options listed below and (electronically check the appropriate box)  (select the appropriate button at the top of this message)**.

Option #1 -- I have not held and do not hold debt or equity securities of, or other claims against, any of the Debtors.

Option #2 -- I have held but no longer hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, any of the Debtors.

Option #3 -- I currently hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, one or more of the Debtors. (If selecting this option, please describe in your reply the type of debt or equity securities that you hold, the name of the issuer, and/or the nature of any claim that you may hold or assert. To do this, select "Edit the response before sending" option to enter your comments.)

**2.    Connections to the United States Trustee or any Person Employed by the Office of the United States Trustee for the _____ District of _____.**

The names of the United States Trustee and employees in the office of the United States Trustee for the _____ District of _____ are listed below.

_____

_____

_____

_____

_____

_____

_____

_____

**To reply, review the options listed below and (electronically check the appropriate box) or (select the appropriate button at the top of this message)**.

Option #1 - I have no connections to the United States Trustee or to anyone employed in the office of the United States trustee for the _____District of _____

Option #2 - I have the following connections to the United States trustee or to someone employed in the office of the United States Trustee for the _____ District of _____.  (If selecting this option, please describe in your reply the connections that you have to the United States Trustee or to anyone employed in the office of the United States

Trustee for the _____ District of _____.   To do this, select "Edit the response before sending" option to enter your comments.)


**3.**        **Connections to any Bankruptcy Judges in the** _____ **District of** _____.   The names of the Bankruptcy Judges in the _____ District of _____ are listed below.

_____

_____

_____

_____


**To reply, review the options listed below and (electronically check the appropriate box) or ( select the appropriate button at the top of this message)**.

Option #1 - I have no connections to any of the Bankruptcy Judges for the _____ District of _____.

Option #2 - I have the following connections to a Bankruptcy Judge for the _____ District of _____   (If selecting this option, please describe in your reply the connections that you have to a Bankruptcy Judge for the _____ District of _____.   To do this, select "Edit the response before sending" to enter your comments).


(Insert "Edit Response Before Sending" option at appropriate point to facilitate electronic response)


**If you have any questions concerning this urgent request for information, please call (_____) at (   )  ___  -  ____.**


**THANK YOU VERY MUCH FOR YOUR PROMPT ATTENTION TO THIS MATTER**

**List of [_____] Debtors:**

**(Each Debtor entity)**


Exhibit B - 4