**<u>Exhibit B</u>**

BDO Report

# Assessment of McKinsey & Company, Inc.'s Procedures to Disclose Connections in Accordance with the Baker Protocol in the PG&E Corporation and Pacific Gas and Electric Company Bankruptcy Cases

## BDO USA, LLP Report

## February 26, 2020



# TABLE OF CONTENTS

Defined Terms………………………………………………………………………………... 3

I    Introduction
    A.  Scope of Retention…………………………………………………………. 6
    B.  Limitations of Analysis Performed…………………………………………. 6

II    Summary of Findings and Opinion……………………………………………8

III    Background…………………………………………………………………….. 11

IV    Assessment of The Working Group's Procedures to Disclose
    Connections Based on Original IPL
    A.  Review and Expansion of the Debtors' Original IPL
        1.  Review of Debtors' Original IPL………………………………………… 14
        2.  Expansion of Debtors' Original IPL……………………………………… 17

    B.  Identified Direct Connections
        1.  Identified the Proposed Professionals……………………………………19
        2.  Identify the Proposed Professionals' Third-Party Relationships…………20
        3.  Compare Expanded IPL Based on Original IPL to Third Parties with
            Connections to the Proposed Professionals………………………………… 23
        4.  Surveys Distributed……………………………………………………24

    C.  Identify Indirect Connections Arising from Asset Management Affiliates………27

    D.  Disclosure of Revenues In Excess of 1% for Clients for Proposed Professionals..28

V    Assessment of The Working Group's Procedures to Disclose
    Connections on the Updated IPL Received December 20, 2019
    A.  Review and Expansion of the Updated IPL………………………………… 30
    B.  Compare Updated IPL to Third Parties with Connections to the Proposed
        Professionals………………………………………………………………30
    C.  BDO Review and Testing…………………………………………………31
    D.  Surveys Distributed to DCS' Based on the Updated IPL…………………………31
    E.  Surveys Distributed to Engagement CSPs Based on the Updated IPL……………31

VI    BDO Assessment of Krivin Declaration Dated February 26, 2020  …………………33

Exhibits
A       Baker Protocol
B       Firm-Wide CSP Survey
C       DCS Survey
D       Engagement CSP Survey

Case: 19-30088   Doc# 5924-2   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 3
of 88

## <u>DEFINED TERMS</u>[1]


- **AMA**:  The Protocol defines Asset Management Affiliates to be "an affiliate or division of a Proposed Professional that is actively engaged in managing or owning financial investments."

- **Baker Protocol ("<u>Protocol</u>")**:  Exhibit A to McKinsey Recovery & Transformation Services U.S., LLC's Eighth Status Report in Accordance with Order on Joint Motion in Furtherance of Mediation Agreement [Dkt 1427], dated May 31, 2019 filed in the Westmoreland Coal Company, et al., bankruptcy case no. 18-35672.  The Protocol "addresses the complex legal and business issues surrounding the disclosure obligations arising from a Proposed Professional's retention under Section 327 in bankruptcy cases involving more than $50 million in claims."[2]

- **BDO Report**:  This report dated February 26, 2020 prepared by BDO USA, LLP ("<u>BDO</u>") regarding BDO's assessment of McKinsey & Company's Inc.'s procedures to disclose Connections in accordance with the Baker Protocol in the PG&E Corporation and Pacific Gas and Electric Company Bankruptcy cases.

- **Client Serving Professional ("<u>CSP</u>")**:  McKinsey professional that provides services to clients.  CSPs provide either consulting services directly for clients or indirect services such as internal research for project teams.

- **Connection**:  The Protocol defines Connection to be an "association or relationship with an IPL Party that a reasonable person might find bears on whether the Proposed Professional 'holds or represents an interest adverse to the estate' and is 'disinterested' under Section 327 of the Bankruptcy Code."

- **Debtors**:  See definition for PG&E below.

- **Direct Connection**:  The Protocol defines Direct Connection to be "a known Connection between a Proposed Professional and an IPL Party."

- **Director of Client Service ("<u>DCS</u>")**:  Project leader assigned to client projects responsible for maintaining the client relationship and the overall execution of the project.  There can be multiple DCSs working on different projects for an individual client.

- **Expanded Interested Parties List ("<u>Expanded IPL</u>")**:  The additional entities consisting of related parties such as corporate parents or subsidiaries voluntarily added to the Original and Updated Interested Parties Lists by the Proposed Professionals.

---

[1] Defined Terms from the Baker Protocol as are stated in the Protocol's Defined Terms, pages 3-4.
[2] Baker Protocol, Summary, page 1.

3

- **Gross Office Contribution ("GOC")**: A unique identification code assigned to each McKinsey office. Each GOC is associated with a McKinsey legal entity.

- **Indirect Connection**: The Protocol defines Indirect Connection to be "a known Connection between an IPL Party and a Proposed Professional's Unretained Affiliate (including an AMA)" or "a known Connection arising from a relationship between a Proposed Professional's Unretained Affiliate (including an AMA) and a third party, which third party, in turn, has a Connection with an IPL Party."

- **Interested Parties ("IPs")**: Entities included on the PG&E IPL.

- **Krivin Declaration**: Refers to the Declaration of Dmitry Krivin in Support of the Debtors' Application Pursuant to 11 U.S.C. Section 363(b) and 105(a) for Authority to Enter into, Perform Under and Make Payments Under Certain Consulting Contracts with McKinsey & Company, Inc. United States.

- **Look-Back Period**: January 29, 2016 through September 30, 2019.

- **Original Interested Parties List ("Original IPL")**: The Protocol defines IPL to be "a list of parties with connections to the debtor's estate (other than *de minimis* connections)." In this report, IP refers to the interested parties listed on the PG&E IPL provided by the Debtors' on October 1, 2019. See below for the definition of the Updated IPL.

- **PG&E**: Refers to PG&E Corporation ("PG&E Corp.") and its primary operating subsidiary, Pacific Gas and Electric Company (together with PG&E Corp., "PG&E" or the "Debtors") Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Northern District of California.

- **PG&E Interested Parties List ("PG&E IPL")**: List of interested parties provided by PG&E in the bankruptcy cases, including both the Original IPL and Updated IPL.

- **Post-Petition Period**: Refers to the time period January 30, 2019 through September 30, 2019

- **Proposed Professionals**: The Protocol defines Proposed Professional to be "a professional person or entity proposed to be retained in connection with a pending bankruptcy case under Section 327." For McKinsey in the PG&E bankruptcy case, they include McKinsey & Company, Inc. United States ("McKinsey US"), McKinsey & Company Canada/McKinsey & Compagnie Canada ("McKinsey Canada") and McKinsey Restructuring and Transformation Services U.S., LLC ("RTS"), also called the Retained Affiliates.

- **Proposed Professional Personnel**: The Protocol defines Proposed Professional Personnel to be "the primary working group within a Proposed Professional entity that directly provides the services for which the Proposed Professional is retained in the particular bankruptcy case, excludes personnel that only episodically provide such services." For the Proposed

4

Professionals, this refers to the engagement team as described in the Krivin Declaration paragraph 9.

- **Revenue Period**:  Refers to the time period from February 1, 2018 through January 31, 2019.

- **RTS**:  Refers to McKinsey Restructuring and Transformation Services U.S., LLC.

- **S&P Capital IQ**:  A market intelligence platform designed by Standard and Poor's ("S&P") that utilizes software and analytics to consolidate detailed company information for U.S. and international public and private companies and investment firms.  Additionally, Capital IQ is a database that houses data related to corporate ownership including corporate families.

- **Service Contracts**:  Refers to three McKinsey consulting and operational contracts with the Debtors.

- **The Working Group**:  Refers to the working group described in the Krivin Declaration paragraph 10.

- **Unretained Affiliate**:  The Protocol defines an Unretained Affiliate to be "an affiliate of a Proposed Professional other than a Retained Affiliate."

- **Updated IPL**:  Refers to the updated IPL received from Debtors' counsel on December 20, 2019.

5

# I.      INTRODUCTION

## A.  Scope of Retention

BDO USA, LLP ("BDO"), was retained by McKinsey Restructuring and Transformation Services U.S., LLC ("RTS") as an independent third party to assess the reasonableness and adequacy of the Proposed Professionals' procedures to identify and appropriately disclose Connections in accordance with the Baker Protocol in the PG&E Corporation ("PG&E Corp.") and its primary operating subsidiary, Pacific Gas and Electric Company (together with PG&E Corp., "PG&E" or the "Debtors") Chapter 11 bankruptcy cases in the United States Bankruptcy Court for the Northern District of California.

## B.  Limitations of Analysis Performed

The data and information referenced herein[3] regarding The Working Group's procedures to review its connections to the PG&E Interested Parties List (both the Original IPL and Updated IPL), and all the information we considered and tested, was provided to us by The Working Group's personnel or through data available on the S&P Capital IQ platform.[4]

The analysis performed by BDO, and any resulting findings and conclusions, are based on the information made available to us.  New information that might be provided to us subsequent to the issuance of this report (the "BDO Report") could affect the results or our analysis or conclusions.  We reserve the right to update the BDO Report to reflect any new information which becomes available to us subsequent to the date of the issuance of the BDO Report.

---

[3] The Working Group provided BDO with all data requested by BDO.
[4] BDO did not conduct audits of financial records as required by Generally Accepted Auditing Standards on any of the materials in the BDO Report that we obtained from The Working Group.

BDO understands that the BDO Report will be disclosed in the Krivin Declaration in connection with the PG&E bankruptcy matter, but should not be used for any other purpose.

THE REST OF THIS PAGE IS INTENTIONALLY LEFT BLANK

## II.    SUMMARY OF FINDINGS AND OPINIONS

The Proposed Professionals developed and implemented reasonable and adequate procedures in accordance with the general guidelines and recommendations included in the Protocol to identify and disclose Connections.  These procedures included the review and expansion of the Original IPL and Updated IPL, the identification of Direct Connections arising from the Proposed Professionals, and the identification of Indirect Connections arising from Unretained Affiliates.

The Working Group utilized the Original IPL, which contained 10,810[5] entities, and voluntarily performed additional procedures to expand the Original IPL to include all corporate affiliates and related parties that shared a common parent with each corporate party listed on the Original IPL.[6]

In accordance with the Protocol, The Working Group developed reasonable and adequate procedures to identify and appropriately disclose Direct Connections to 1,717 unique Interested Parties on the IPL.[7]  The Working Group procedures included:

- Identifying the Proposed Professionals,
- Gathering Proposed Professionals' client, vendor, and banking relationship information,
- Comparing the relationship information to the Expanded IPL, and
- Sending out surveys to Proposed Professional Personnel and reviewing the responses.

The Proposed Professionals were identified based upon professional time charged to the Debtors during the Post-Petition Period for client facing activities.

---

[5] After The Working Group performed various procedures described in Section IV.A to remove duplicate IPL parties, the number of Original IPL parties was reduced to 9,598 unique entities.

[6] The Proposed Professionals received the Updated IPL on December 20, 2019.  The Updated IPL contained 11,021 entities or 211 new parties not included in the Original IPL.  The Working Group performed similar procedures for the 211 new entities added to the Updated IPL to include in the Expanded IPL.  *See* Section V of the BDO Report for additional information.

[7] The Original IPL contained 1,684 unique Interested Parties and 33 additional unique Interested Parties were added based on the Updated IPL that were Connections to the Proposed Professionals' clients and vendors.

8

The Working Group extracted the Proposed Professionals' client, vendor, and banking relationships from various in-house systems during the Look-Back Period. The Working Group then compared these entities against the Expanded IPL to identify Connections, which resulted in the identification of client Connections for 975 Interested Parties[8], vendor Connections for 723 Interested Parties, and bank relationships for 19 Interested Parties, which were appropriately disclosed.

The Working Group sent three different surveys to groups of employees: the Firm-wide CSP Surveys, the DCS Surveys, and the Engagement CSP Surveys, which are discussed in more detail in the following paragraphs.

First, in accordance with the Protocol, The Working Group developed reasonable and adequate procedures to identify and appropriately disclose Direct and Indirect Connections for Interested Parties by sending questionnaires to Proposed Professionals' and Unretained Affiliates' CSPs (the "Firm-wide CSP Surveys") and inquiring whether the professionals had Connections to the Debtors, the U.S. Trustee, or the bankruptcy judges in the United States Bankruptcy Court for the Northern District of California.

Second, The Working Group sent a survey to all the Directors of Client Services (the "DCS Surveys") for each Proposed Professionals' client relationships identified from the Expanded IPL to determine whether the client Connection had any relation to the Debtors. Based upon the results of the surveys, The Working Group identified no clients with a Connection to the Debtors.

---

[8] There were client connections for 952 Interested Parties based on the Original IPL and 23 additional client connections were added based on the Updated IPL. There were vendor connections for 713 Interested Parties based on the Original IPL and 10 additional vendor connections were added based on the Updated IPL.

Third, The Working Group sent the Original IPL and surveys to each professional that charged time during the Post-Petition Period to the Debtors (the "Engagement CSP Surveys") to identify any personal Connections. Based upon the results of the surveys, The Working Group identified two professionals with a personal Connection to the Debtors, which were appropriately disclosed.[9]

In accordance with the Protocol, The Working Group developed reasonable and adequate procedures to identify and appropriately disclose Indirect Connections for Interested Parties by reporting on its AMA Connections to the Expanded IPL, of which Indirect Connections for 198 Interested Parties were identified and appropriately disclosed.

---

[9] See Section IV.B.4 for further information on the surveys and results.

## III.    BACKGROUND

On January 29, 2019, PG&E filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the Northern District of California.

On May 31, 2019, RTS filed the Protocol with the Bankruptcy Court in the Westmoreland Coal Company case.[10]  The Protocol was developed by Jan Baker and Paul Singerman for review of connections in bankruptcy cases.  The Protocol *"… provides general guidance regarding how Proposed Professionals may obtain information and make proper disclosures to support their retention in U.S. bankruptcy cases that are within the scope of the Protocol."*[11]  The Protocol states that a Proposed Professional should perform the following general procedures to obtain knowledge regarding potential Connections in support of its disclosures:

1.  Obtain and review the IPL,

2.  Establish a process to check a Proposed Professional's client database,

3.  Distribute the IPL to Type 2, 3 and 4 Asset Management Affiliates ("AMAs") and request them to report any Connections to the Proposed Professional, and

4.  Send written inquiries (e.g., Questionnaires) to the Proposed Professional's professional personnel and Unretained Affiliates.[12]

The Protocol focuses on a Proposed Professional's disclosures regarding Connections to parties identified on the debtor's interested party list, which could impact the Proposed Professional's disinterestedness.  The Protocol distinguishes between Direct and Indirect

---

[10] Application of Debtors Pursuant to 11 U.S.C. §§ 363(b) and 105(a) For Authority To Enter Into, Perform Under And Make Payments Under Certain Consulting Contracts With McKinsey & Company, Inc. United States, DI#3919, filed 9/17/19 (pages 11-12).
[11] Baker Protocol, Introduction (page 6).
[12] Baker Protocol, Section 7 "Determination of Whether a Connection Exists" (page 12).

11

Connections arising from the different kinds of affiliates of the Proposed Professional.[13] The Protocol also acknowledges that Proposed Professionals may deviate from the suggested data gathering procedures and disclosure recommendations based on the facts and circumstances of a particular matter.[14] Therefore, the Protocol provides a Proposed Professional with some flexibility to decide how to best implement the general guidance and recommendations.

For entities with a significant number of professionals, like the Proposed Professionals, the Protocol recommends using a software-based process to identify Connections. If a software-based process is not available, the Protocol states the Proposed Professional "may retain an independent third party to assess the adequacy of the alternative procedures the Proposed Professional uses to identify and appropriately disclose Connections."[15]

On September 17, 2019, the Debtors filed an application with the Bankruptcy Court for authority to enter into, perform under, and make payments under three consulting and operational contracts (the "Service Contracts") with the Proposed Professionals. Although the Debtors do not believe that the Proposed Professionals are performing work as a "professional" in the bankruptcy case,[16] in an abundance of caution, the Debtors brought the contracts to the Court's attention to seek Court authority to enter into and perform under the Service Contracts[17]. The Proposed Professionals notified the Debtors that they were unwilling to accept payment for their post-petition services unless the Debtors agreed to seek Court authority to enter into and perform under the Service Contracts. The Proposed Professionals are voluntarily filing

---

[13] Baker Protocol, Sections 1-3 (pages 7-9).
[14] Baker Protocol, Introduction (page 6).
[15] Baker Protocol, Section 7 "Determination of Whether a Connection Exists" (page 13).
[16] The Proposed Professionals are providing operational consulting services rather than serving in any legal, accounting, restructuring advisory, or other similar function, and the Proposed Professionals' work is unrelated to the chapter 11 restructuring.
[17] Application of Debtors Pursuant to 11 U.S.C. §§ 363(b) and 105(a) For Authority To Enter Into, Perform Under And Make Payments Under Certain Consulting Contracts With McKinsey & Company, Inc. United States, DI#3919, filed 9/17/19, Introduction (page 3).

12

disclosures of their connections in the PG&E Chapter 11 Cases for the sake of full transparency.[18]

      In September 2019, RTS, on behalf of the Proposed Professionals, engaged BDO as an independent third party to assess the reasonableness and adequacy of the Proposed Professionals' procedures to identify and appropriately disclose Connections in accordance with the Protocol. BDO's procedures did not include an assessment of the adequacy of the general guidance and recommendations within the Protocol.

---

[18] Ibid.

## IV.    ASSESSMENT OF THE WORKING GROUP'S PROCEDURES TO DISCLOSE CONNECTIONS

The Proposed Professionals' procedures for identifying relationships with the Debtors' Interested Parties included the following:

- Reviewed and expanded the IPL,
- Identified Direct Connections arising from the Proposed Professionals, and
- Identified Indirect Connections arising from Unretained Affiliates, including AMAs.

### A.  Review and Expansion of the Debtors' Original IPL

1.  <u>Review of Debtors' Original IPL</u>

**Proposed Professionals' Procedures**:

The Protocol recommends that a Proposed Professional obtain knowledge of whether Connections exist by obtaining and reviewing a copy of the IPL from the debtor.[19]  The Protocol states that Proposed Professionals "…*can reasonably and in good faith rely on the list of IPL Parties.*"[20]

The Proposed Professionals received the Original IPL from PG&E's counsel on October 1, 2019.[21]  The Original IPL consisted of 10,810 parties categorized into 47 distinct groupings including, but not limited to, the following:

- Bank accounts
- Bankruptcy judges and staff in the Northern District of California
- Contract counterparties
- Officers & Directors
- Landlords and parties to leases
- Lenders
- Litigation counterparties / Litigation pending lawsuits
- Office of the United States Trustee for Region 17
- Significant competitors
- Suppliers
- Taxing authorities

---

[19] Baker Protocol, Section 1.b. (page 7).
[20] Baker Protocol, Section 7.a. (page 12).
[21] See Section V of the BDO Report for a discussion of the steps performed on the Updated IPL.

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 15 of 88

- Largest unsecured creditors
- Vendors / suppliers

The Working Group performed procedures to remove duplicate Interested Parties from

the 10,810 entities on the Original IPL as follows:

- Used the Microsoft Excel TRIM function to remove unnecessary spaces between words.[22]

- Removed all comments that were included with the name of the Interested Party using various Excel functions and performed a subsequent manual review. For example, (formerly PCG management) would have been removed from "PCG Capital, Inc. (formerly PCG management)."

- Performed a "text cleansing" procedure, which utilized the Microsoft Excel SUBSTITUTE[23] and TRIM functions to remove semi-colons, forward slashes, periods, commas for corporations, and to make the order of first name and last name consistent.

- Reviewed and reclassified each of the 10,810 parties on the Original IPL into one of the following three categories: 1) Corporate Parties or "Corporate IPs", 2) Governmental Parties, or 3) Individuals. Note that this reclassification process was a manual process, and if there was any doubt, an Interested Party was classified as a Corporate IP out of an abundance of caution.

- Quantified the Interested Parties on the Original IPL by reclassified category, after performing the procedures above, which resulted in 5,359 Corporate Parties, 502 Governmental Parties, and 4,949 Individuals.

- Utilized the Microsoft Excel REMOVE DUPLICATES[24] function to identify and remove duplicate Interested Parties, which resulted in a reduction of the Original IPL by 846 parties from 10,810 to 9,964 broken down as follows: 4,640 Corporate Parties, 449 Governmental Parties, and 4,875 Individuals.

- Utilized a Microsoft Excel SIMILARITY[25] formula to prioritize their review of the remaining 4,640 Corporate Parties to identify and remove additional parties determined to be duplicates. After prioritizing the Corporate Parties based on how similar they were, a manual review of those most similar was performed and additional parties determined to be duplicates were removed. As a result, The Working Group removed an additional 212 Corporate Parties, which reduced the number of unique Corporate Parties on the Original IPL from 4,640 to 4,428.

---

[22] The Microsoft Excel TRIM function strips extra spaces from text, leaving only single spaces between words and no space characters at the start or end of the text.
[23] The SUBSTITUTE function in Excel replaces one or more instances of a given character or text string with a specified character(s).
[24] Excel provides the capability to automatically remove exact duplicates from a set of data using the REMOVE DUPLICATES functionality.
[25] This formula compares two strings of text and returns a similarity score indicating how similar the two are.

15

- Utilized the S&P Capital IQ formula function in Excel to identify S&P Capital IQ identification numbers ("Cap IQ IDs") for the 4,428 Corporate Parties on the Original IPL to be used to query each corporate tree structure. Of the 4,428 Corporate Parties researched, 2,954 were determined to be matches and returned the corresponding Cap IQ ID. The remaining 1,474 either did not return a Cap IQ ID or returned a Cap IQ ID that was not reasonably related to the Corporate Parties being searched.

- Performed a review of the 2,954 matched Cap IQ IDs to remove duplicates, which decreased the number of Corporate Parties on the Original IPL to research corporate tree information for from 2,954 to 2,800. After adding the 1,474 Corporate Parties that did not return a Cap IQ ID to the 2,800, the total number of unique Corporate Parties was 4,274.

The final number of Interested Parties on the Original IPL was determined to be 9,598[26] broken down as follows: 4,274 Corporate Parties, 449 Governmental Parties, and 4,875 Individuals.

The Working Group emailed 69 client-serving Proposed Professional Personnel to confirm whether they were aware of any parties that should have been included on the Original IPL. All 69 client-serving Proposed Professional Personnel responded and indicated no additional parties needed to be added to the Original IPL. See Section IV.B.4.b for further discussion of the surveys sent to the Proposed Professionals' personnel.

**BDO Review & Testing**:

BDO reperformed the above procedures and agreed the results to the same 10,810 entities on the Original IPL. Based upon BDO's review and testing of Proposed Professionals' procedures, the Proposed Professionals' procedures are reasonable and adequate and aligned with the general guidelines and recommendations set forth in the Protocol.

---

[26] The 9,598 IPs on the Original IPL were increased based on the Updated IPL provided on December 20, 2019 to include an additional 27 new corporate interested parties, 15 new government interested parties and 90 new individuals resulting in 9,730 unique parties on the Updated IPL.

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 17 of 88

2. Expansion of Debtors' IPL

**The Working Group Procedures:**

The Working Group elected to perform additional procedures not explicitly recommended by the Protocol to expand the Original IPL for Corporate Parties to include corporate affiliates and related parties.

The Working Group elected to expand the Original IPL to include all corporate affiliates that shared a common parent with each Corporate Party listed on the IPL (the "Expanded IPL") increasing the number of unique IPL Parties to 190,139[27]. Including Corporate Parties' affiliates provided a larger number of parties that might generate Connections. The Working Group expanded the IPL using the following process:

- Utilizing the Cap IQ IDs for the 2,800 Corporate Parties identified above, The Working Group performed research in S&P Capital IQ to identify the Cap IQ IDs for each of the Ultimate Parent Companies for purposes of expanding the Original IPL.

- The Working Group created watch lists (company screening lists) in S&P Capital IQ using the Cap IQ IDs for each of the Ultimate Parent Companies, which were designed to capture for all subsidiary and investment companies, the following information: company name, company Cap IQ ID, immediate parent company, known ownership percentage, and the ultimate parent company, company status (operating, acquired, subsidiary, liquidating, reorganizing, out of business, no longer investing), and type of company.

- After aggregating the corporate affiliate trees for the Corporate Parties with the 449 Governmental Parties and the 4,875 Individuals, there were 677,065 Interested Parties included on the Expanded IPL based on the Original IPL.

- The Working Group removed several Corporate Parties where the percentage ownership in the related entity was less than 20%, reducing the Expanded IPL based on the Original IPL by 44,310 from 677,065 to 632,755.

- The Working Group removed duplicate Corporate Parties using Alteryx Designer,[28] which resulted from certain Interested Parties being part of multiple corporate trees. At this stage, the Expanded IPL of 632,755 parties was further reduced by 442,616 to 190,139 unique Interested Parties.

---

[27] The 190,139 unique IPL parties increased to 192,007 based on the Updated IPL (see Section V of the BDO Report). The Updated IPL added 1,763 corporate entities, 15 government entities and 90 individuals.
[28] Alteryx Designer is a software platform that allows the user to process large volumes of data.

The Working Group used the Expanded IPL based on the Original IPL in its procedures to identify Direct and Indirect Connections.

**BDO Review & Testing**:

BDO utilized S&P Capital IQ to extract corporate affiliate trees for a sample of Corporate Parties on the Original IPL and agreed the results to parties present on the Proposed Professionals' Expanded IPL based on the Original IPL.

## B. Identified Direct Connections

The Working Group performed four procedures to identify Direct Connections to the Original IPL as follows:[29]

- Identified the Proposed Professionals,
- Obtained client, vendor, and banking information for the Proposed Professionals,
- Compared the client, vendor, and banking information to the Expanded IPL for Connections, and
- Surveyed the Proposed Professionals' Personnel to obtain information on their personal Connections, if any.

The Proposed Professionals developed reasonable and adequate procedures in accordance with the Protocol to identify its relationships with clients, vendors, and banks and compared those relationships to the Expanded IPL based on the Original IPL, resulting in the disclosure of Connections to 1,684 unique Interested Parties as follows:[30]

- Client Relationships: 952 Connections
- Vendor Relationships: 713 Connections
- Banking Relationships: 19 Connections

---

[29] The Protocol Section 7.b., page 12, recommends that a Proposed Professional obtain knowledge of whether Direct Connections exist by performing the following two procedures: (1) perform a process to check such Professional's client databases for Connections, and (2) distribute the IPL to its Proposed Professional Personnel, request them to report any Connections (other than de minimis connections), and disclose in its retention application all Connections so reported.

[30] See Section V for a discussion of the additional work performed by The Working Group to identify Connections based on the Updated IPL received December 20, 2019.

18

1. <u>Identified the Proposed Professionals</u>

**The Working Group Procedures**:

In accordance with the Protocol, The Working Group identified Direct Connections in the PG&E bankruptcy case by contacting the Proposed Professionals' Personnel. The Working Group utilized the PG&E project codes to identify the Proposed Professionals' personnel using the following process:

First, the Proposed Professionals' Finance Department ran a query using its time and expense system to identify 73 CSPs that provided services and charged hours to the PG&E project codes during the Post-Petition Period. The Proposed Professionals' professionals record their hours charged to unique project charge codes. Through their Oracle financial system, the Proposed Professionals' Finance Department and local office management create and approve project codes, which are used to track information such as the hours charged and the Gross Office Contribution ("<u>GOC</u>").

Second, The Working Group reviewed the list of 73 CSPs who charged hours to the PG&E project codes, which included both client facing and non-client facing professionals (e.g. people that provided research or general support).

The Working Group identified 4 CSPs who charged hours to PG&E for general support or research (non-client facing) and 69 client facing professionals. The Working Group determined the work location and associated Proposed Professional legal entity for the 69 client-facing CSPs by reviewing each professional's GOC code. The Working Group then used the Proposed Professionals' client, vendor and banking relationship information to identify the Proposed Professionals' Connections to parties on the Expanded IPL based on the Original IPL.

19

**BDO Review & Testing**:

BDO reviewed the query utilized by The Working Group to extract the project code data and reviewed the resulting extracted information. BDO also reperformed The Working Group's procedures to determine the Proposed Professional personnel that were used to develop the list of Proposed Professionals. Based upon BDO's review and testing of The Working Group's procedures, BDO determined that the Proposed Professionals' procedures were reasonable and adequate to identify the Proposed Professionals in accordance with the Protocol.

2. <u>Identify the Proposed Professionals' Third-Party Relationships</u>

The Protocol recommends that Proposed Professionals check their firms' internal databases for Connections to clients. In addition to checking client databases, The Working Group decided to perform additional procedures not explicitly recommended by the Protocol to check its internal databases for vendor and banking relationships. In order to identify third-party relationships for comparison to the Expanded IPL based on the Original IPL, The Working Group obtained information from their Finance and Treasury Departments on its clients, vendor and banking relationships for the Proposed Professionals for the Look-Back Period.

The Proposed Professionals' client and vendor relationship data is maintained by their Finance Department within its Oracle financial system database, which contains all of the firm's client, project-related data and vendor information. The Proposed Professionals' vendor database maintains invoice line item level data and general ledger accounting details. This database is updated daily with an automated feed from the Oracle payment data and tracks vendor payments to the legal entity submitting the payment.

20

The Proposed Professionals' banking relationship information, including all bank accounts, is contained within its Kyriba[31] database maintained by the Proposed Professionals' Corporate Treasury Department. When a new banking relationship is established, or when an existing bank account is closed, the U.S. Corporate Treasury team updates Kyriba with the appropriate information. The global list of bank accounts is reviewed annually by the Proposed Professionals' legal entities and local offices.

**The Working Group's Procedures**:

    a. <u>Client Relationships</u>

The Working Group obtained the Proposed Professionals' project codes to identify the Proposed Professionals' clients for comparison to the Expanded IPL based on the Original IPL. The Working Group collected the client data for CSPs related to the Proposed Professionals during the Look-Back Period as follows:

- The Working Group used the Reporting Data Warehouse interface within its Oracle financial system database to extract all project codes worked on by CSPs from the Proposed Professionals. This file represents all projects where a Proposed Professionals' professional charged time, regardless of location.
- The Working Group also used the Reporting Data Warehouse interface to extract all project codes assigned to Proposed Professionals' office locations belonging to each of the Proposed Professionals.

The Working Group combined both sets of data files resulting in a total population of 26,888 project codes and 9,473 clients for comparison against the Expanded IPL based on the Original IPL.

---

[31] Kyriba is a treasury management cloud-based solution which provides cash management technology on a global scale. The database stores information relating to account balances, transactions, as well as supporting documentation as accounts are opened and closed.

Case: 19-30088   Doc# 5924-2   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 22 of 88

b. <u>Vendor Relationships</u>

The Working Group obtained vendor relationship information for the Proposed Professionals' during the Look-Back Period for comparison to the Expanded IPL based on the Original IPL. The Working Group utilized the Alteryx Designer platform to extract vendor data from its Oracle database for the Proposed Professionals. The extracted data included details such as vendor name, payment date, invoice type, and legal entity making the payment. The Working Group identified 13,646 vendors for comparison against the Expanded IPL based on the Original IPL.

c. <u>Banking Relationships</u>

The Working Group obtained the Proposed Professionals' banking relationship information during the Look-Back Period for comparison to the Expanded IPL based on the Original IPL. The Working Group collected the banking relationship data as follows:

- First, The Working Group extracted all bank accounts (both open and closed) by exporting the Kyriba data directly into Microsoft Excel, which yielded 1,201 bank accounts. For each bank account, the extracted data included details such as the legal entity controlling the account and the financial institution managing the account.
- Second, within Microsoft Excel, The Working Group manually filtered the account listing by legal entity to focus on the accounts held by the Proposed Professionals, resulting in 26 distinct accounts.
- Third, since a single bank could involve multiple accounts with similar names, The Working Group manually searched the listing to identify unique bank names, which resulted in 19 banking relationship Connections to the Expanded IPL based on the Original IPL.

**BDO Review & Testing**:

BDO discussed The Working Group's process with the Proposed Professionals' Finance Department personnel with first-hand knowledge of client and vendor reporting data and the systems used firm-wide to store client and vendor information. BDO also reviewed the queries used by The Working Group to extract the client and vendor data during the Look-Back Period.

22

Based upon our review and testing, the queries used were accurate to identify the relevant client and vendor data to check for Connections.

BDO also discussed banking relationship data and the systems used by The Working Group to store banking relationship information with the Proposed Professionals' Treasury Department personnel. BDO reviewed the queries used by The Working Group to extract the banking data during the Look-Back Period. Based upon our review and testing, the queries used were accurate to identify the relevant banking data to check for Connections.

3. <u>Compare Expanded IPL Based on Original IPL to Third Parties with Connections to the Proposed Professionals</u>

**The Working Group Procedures**:

The Working Group used the client, vendor and banking relationship lists to perform the following procedures:

- The Working Group compared the Expanded IPL based on the Original IPL to the client, vendor and banking relationships using various keyword searches to expedite the comparison to this Expanded IPL. However, the actual comparison process between the names on this Expanded IPL and the client, vendor and banking relationship lists was primarily a manual process.

- The manual comparison process performed by The Working Group included researching publicly available information to determine whether a potential match was the same as the entity on the Expanded IPL based on the Original IPL. There were instances where The Working Group was unable to determine whether a potential match was the same party noted on this Expanded IPL. In those instances, The Working Group included the party as a match.

- The Working Group combined all client names and related project codes, banking names, and vendor names for confirmed matches, resulting in client Connections for 952 Interested Parties, vendor Connections for 713 Interested Parties and banking Connections for 19 Interested Parties on the Original IPL.[32]

---

[32] See Section V for a discussion of the additional work performed by The Working Group to identify Connections based on the Updated IPL received December 20, 2019.

23

**BDO Review & Testing**:

BDO reviewed The Working Group's comparison of the Expanded IPL based on the Original IPL to the lists of vendor, client, and banking relationships, and tested a sample of searches where Connections were either identified or not identified, without exceptions.

4. <u>Surveys Distributed</u>

**The Working Group's Procedures**:

The Working Group prepared and distributed three separate surveys to groups of its professionals to collect information on potential Connections to PG&E as part of the process to compare its Connections to the Expanded IPL based on the Original IPL, as follows:[33]

- Firm-Wide CSP
- DCS Survey
- Engagement CSP Survey

a. <u>Firm-Wide CSP Survey</u>

The Proposed Professionals' Human Resources ("<u>HR</u>") Department extracted the distribution list of all CSPs globally by querying its HR system for professionals listed as having a CSP type role. Rather than limit the distribution of the CSP survey to subsidiaries or affiliates controlled by the Proposed Professionals as suggested in the Protocol, The Working Group elected to survey all firm CSPs. As such, The Working Group sent email surveys to all 18,664 CSPs located globally. CSPs were required to respond to the survey if they had any such Connections to report. If the survey recipients identified Connection(s), the survey instructed the recipient to describe the nature of such connection(s).

---

[33] For purposes of the BDO Report, BDO requested that The Working Group provide the content of the survey template, including references to the mandatory fields and instructions. BDO reviewed the on-line survey to confirm they matched.

24

The CPSs were asked to disclose the following:

- Debt, equity securities, or other claims against PG&E (other than third-party managed investments) at any time after 90 days prior to the Petition Date (October 31, 2018), and
- Any Connections to any of the Bankruptcy Judges, the U.S. Trustee or any person employed by the Office of the U.S. Trustee for the Northern District of California.[34]

Based upon the results of the surveys, The Working Group identified six professionals that did or do hold PG&E securities, two professionals that were former employees and four professionals with personal connections to Interested Parties, which were appropriately disclosed.[35]

The Working Group reviewed the responses to determine whether the response identified a Connection and appropriately disclosed the Connection(s). The Firm-Wide CSP survey template is attached to the BDO Report as **Exhibit B**.

b. DCS Survey

The Working Group sent e-mail surveys to 1,270 DCSs to confirm whether the project(s) associated with the client matches, to the best of the DCSs' knowledge, were in any way related to PG&E. The surveys included a list of relevant engagement projects, as well as the list of PG&E and its debtor affiliates for their review. If the DCS answered "yes" to any one of the questions on the survey, the respondent was asked to describe how the services were related to PG&E.[36]

---

[34] The Protocol, Section 7.c., page 13, recommends that a Proposed Professional obtain knowledge of whether Connections exist by distributing questionnaires to Proposed Professional's professional personnel and Unretained Affiliates controlled by the Proposed Professional inquiring of their (i) known equity or debt investments in the debtor (e.g., excluding Third-Party Managed Investments); and (ii) other connections or relationships with the debtor (other than the Proposed Professional's proposed engagement), the Bankruptcy Court judges, or United States Trustee personnel.

[35] None of these six professionals worked on the engagement with the Debtors and the value of their stock was de minimis.

[36] Nineteen of the respondents surveyed reported a potential client connection with PG&E. The Working Group reviewed the responses and determined that none of the nineteen potential client connections were indeed Connections.

25

The Working Group developed a process to track survey responses and, where necessary, to obtain additional information on client relationships.[37] The DCS survey template is attached to the BDO Report as **Exhibit C**.

      c.   <u>Engagement CSP Survey</u>

The Working Group distributed the Original IPL and e-mail surveys to 69 client serving Proposed Professional Personnel previously identified. The survey recipients were asked to identify:

- Whether the CSP has any personal Connections with any parties on the Original IPL (other than Connections through their work at the Proposed Professionals),

- Whether the CSP was aware of any person or entity not included on the Original IPL[38] that they think should have been included because it is an interested party in PG&E's bankruptcy (for example, because it is or was a creditor of, or has or had some other business Connection to PG&E, PG&E's assets, or the work being performed by the PG&E team), and

- Whether the CSP was related to or had a relationship with any of the MIO Partners, Inc.'s ("<u>MIO</u>") directors (listed in the body of the email) in their capacities as MIO board members.

The Working Group received responses from all currently employed survey recipients. If the survey recipient identified a Connection or Connections, the survey instructed the recipient to describe the name of each Connection(s). The Working Group reviewed the survey responses to determine whether the response identified a Connection and appropriately disclosed the Connection(s). The Engagement CSP survey template is attached to the BDO Report as **Exhibit D**.

---

[37] BDO asked The Working Group to provide the content of the survey template, including the references to the mandatory fields and instructions, to include as an Exhibit to its report.

[38] The Working Group provided the Original IPL as an attachment to the survey and to the email communication.

**BDO Review & Testing**:

BDO reviewed the survey templates[39] and the survey distribution lists that were sent to the list of Firm-Wide CSPs,[40] the DCS Surveys and the Engagement CSP Surveys. BDO also sampled responses to these surveys to ascertain whether The Working Group conducted a reasonable process to review identified Connections arising from the surveys. Based on BDO's review of the procedures performed by The Working Group, the procedures were reasonable and adequate in identifying the Proposed Professionals' Personnel's Connections.

## C. Identify Indirect Connections Arising from Asset Management Affiliates

**The Working Group Procedures**:

Based on the general guidelines and recommendations included in the Protocol, the Proposed Professionals determined that their affiliate, MIO, is a Type 2 AMA.[41] As such, as set forth in the Protocol for a Type 2 AMA, The Working Group provided the Original IPL to MIO and requested that it identify and report Connections to IPL Parties.[42]

---

[39] BDO asked The Working Group to provide the content of the survey templates, including references to the instructions and mandatory fields, to include as Exhibits to the BDO Report. BDO also reviewed the online survey to confirm the surveys matched.

[40] The Protocol Section 7.b., page 13, recommends that the Proposed Professional distribute the IPL to its Proposed Professional Personnel and request them to report any Connections (other than *de minimis* connections) to the Proposed Professional.

[41] According to the Protocol defined terms, pages 3-5, an AMA is an affiliate or division of a Proposed Professional that is actively engaged in managing or owning financial investments. A Type 2 AMA means an AMA that:

    (i)    (a) employs Information Barriers, (b) is subject to both Securities Registration and Regulatory Oversight, and (c) obtains most or all of its assets under management from third parties (i.e., parties other than Related Investors [current and formed ultimate beneficial owners, employees and their immediate family members]);

    (ii)    obtains most or all of its assets under management from Related Investors and not from third parties;

    (iii)    does not make direct investments in Named Issuers but only, if at all, holds investments in Named Issuers as Third-Party Managed Investments; and

    (iv)    does not have Independent Personnel and Management.

[42] The Protocol Section 7.b., page 12, recommends the Proposed Professional distribute the IPL to its Type 2 AMAs, request them to report any Connections (other than de minimis connections) to the Proposed Professional, and disclose in its retention application all Connections so reported. In addition, Protocol Section 5.c., page 11, provides that "Disclosure of known Immediate Indirect Connections (other than *de minimis* connections) of a Type 2 AMA will consist of identifying the IPL Parties, if any, to which the Type 2 AMA has immediate Indirect Connections, if and as reported by the Type 2 AMA to its related Proposed Professional. A Proposed Professional with a Type 2 AMA should provide the IPL to its Type 2 AMA, and request its Type 2 AMA to inform it of known Immediate

27

In addition, although not required by the Protocol, The Working Group also provided the Expanded IPL based on the Original IPL to MIO for MIO's search for Connections to Interested Parties.

The Working Group identified and disclosed indirect Connections to 198 Interested Parties through the review of a report received from its AMA. A copy of the report issued by MIO to the Proposed Professionals to report Connections to the Expanded IPL based on both the Original IPL and Updated IPL is attached to the Proposed Professionals' February 26, 2020 Krivin Declaration as Schedule 3.[43]

**BDO Review & Testing**:

Based on its understanding that MIO is a Type 2 AMA, the Proposed Professionals' procedures were reasonable and adequate in identifying and disclosing Connections arising from AMAs.

## D. <u>Disclosure of Revenues In Excess of 1% for Clients for Proposed Professionals</u>

**The Working Group's Procedures**:

The Proposed Professionals' Finance Department generated a revenue report by client for each Proposed Professional during the Revenue Period. The Proposed Professionals identified, and disclosed in the Krivin Declaration, clients with Connections to the Expanded IPL that contributed more than 1.0% of revenues for each Proposed Professional. In conjunction with the results of the surveys sent to CSPs, The Working Group determined that none of the services performed for these clients were related to PG&E or their Chapter 11 cases.

---

Indirect Connections (other than *de minimis* connections) to IPL Parties for potential disclosure in the Proposed Professional's retention application pursuant to this Protocol…"

[43] The Protocol Section 7.d., page 13, provides that "A Proposed Professional should set forth in its retention application the results reported to the Proposed Professional from its AMA's (if applicable) search with respect to IPL Parties (including any alternative processes or rationale for omission thereof)."

**BDO Review & Testing**

      BDO reperformed the test of clients generating more than 1.0% of revenues for each Proposed Professional and determined that the Proposed Professionals properly disclosed these clients in the Krivin Declaration.

## V. ASSESSMENT OF THE WORKING GROUP'S PROCEDURES TO DISCLOSE CONNECTIONS ON THE UPDATED IPL

**The Working Group Procedures**:

A. **Review and Expansion of the Updated IPL**

On December 20, 2019, the Proposed Professionals received an Updated IPL from

Debtors' counsel. The Working Group compared the Updated IPL of 11,021 entities to the

Original IPL of 10,810 entities using the following procedures:

- The Working Group used the Microsoft Excel TRIM, ISERROR and VLOOKUP functions and identified 181 potential new IPs to be manually reviewed and categorized by corporate (60), government (31) or individual (90)[44].

- The Working Group manually reviewed the 60 potential corporate connections to the Original IPL and identified 21 new entities on the Updated IPL to review for Connections to the Proposed Professionals' client list.[45]

- For the 21 new IP entities with CapIQ IDs, The Working Group created the corporate trees which yielded 2,450 entities.

- The Working Group compared the Ultimate Corporate Parent names of the 2,450 entities to the 21 new interested party entities.

- The Working Group removed 5 names where ownership was less than 20% and 193 duplicates from the list of 2,450 resulting in an additional 2,252 IPL entities for the Expanded IPL.

- 489 of the additional 2,252 IPL entities were already included in the existing list, resulting in 1,763 new corporate IPL entities for the Expanded IPL.

B. **Compare Updated IPL to Third Parties with Connections to the Proposed Professionals**

The Working Group compared the 1,763 IPL entities to the client relationships using

Alteryx Designer and identified 81 new Connections to clients.

---

[44] After review, The Working Group reduced the actual number of corporates and governments entities to 27 and 15, respectively.

[45] The Working Group identified 22 entities, but one unique name did not have a CapIQ ID. This name was manually checked against the client list and was determined not to be a Connection yielding 21 entities with CapIQ IDs.

### C. BDO Review & Testing:

BDO reperformed The Working Group's procedures to identify the same 2,252 new IPL parties. BDO also agreed the Proposed Professionals' 81 new Connections identified in the Krivin Declaration. In addition, BDO tested a sample of searches where Connections were not identified and appropriately excluded from the Connections disclosed. Based upon BDO's review and testing of The Working Group's procedures, the Proposed Professionals' procedures are reasonable and adequate and aligned with the general guidelines and recommendations set forth in the Protocol.

### D. Surveys Distributed to DCS' Based on the Updated IPL

The Working Group sent surveys to 22 additional <u>DCS'</u> to confirm whether the identified client Connection had any relation to the Debtors. Based upon the results of the surveys, The Working Group identified no clients with a Connection to the Debtors.

Based upon BDO's review of the 22 survey responses and the procedures performed by The Working Group, the procedures were reasonable and adequate in identifying the Proposed Professional Personnel's Connections.

### E. Surveys Distributed to Engagement CSPs Based on the Updated IPL

The Working Group sent the Updated IPL and e-mail surveys to 77 <u>Engagement CSPs</u>.[46] The 77 survey recipients were asked to identify whether the CSP has any personal Connections with any parties on the Updated IPL (other than Connections through their work at the Proposed Professionals).

---

[46] The Working Group distributed the Updated IPL and e-mail surveys to the 69 previously identified Engagement CSPs discussed on page 26 of the BDO Report and eight new Engagement CSPs that joined the PG&E engagement after the first survey was sent, for a total of 77 Engagement CSPs surveyed. The eight new Engagement CSPs received the Original IPL, the Updated IPL and the first and second email surveys.

31

The Working Group received responses from the 77 survey recipients. If the survey recipient identified a Connection or Connections, the survey instructed the recipient to describe the name of each Connection(s). The Working Group reviewed the survey responses to determine whether the response identified a Connection and appropriately disclosed the Connection(s).

Based upon BDO's review of the 77 survey responses and the procedures performed by The Working Group, the procedures were reasonable and adequate in identifying the Proposed Professional Personnel's Connections.

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 33 of 88

## VI.    BDO ASSESSMENT OF KRIVIN DECLARATION DATED FEBRUARY 26, 2020

Based on the procedures performed by The Working Group and reviewed and tested by BDO as described in the BDO Report, the procedures performed by The Working Group on behalf of the Proposed Professionals to identify Connections as disclosed in the Krivin Declaration dated February 26, 2020 to the Bankruptcy Court in the PG&E bankruptcy case were reasonable and adequate and consistent with the general guidelines and recommendations in the Protocol.

In addition, The Working Group elected to perform additional procedures not recommended in the Protocol.

BDO reviewed the Krivin Declaration and verified that the Connections for Interested Parties identified by The Working Group process and procedures were disclosed.

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 34 of 88

# Exhibit A
# Houston Disclosure Protocol

## HOUSTON DISCLOSURE PROTOCOL

### Summary

The following Houston Disclosure Protocol addresses the complex legal and business issues surrounding the disclosure obligations arising from a Proposed Professional's retention under Section 327[1] in bankruptcy cases involving more than $50 million in claims. The Protocol addresses Proposed Professionals of varying types, including law, accounting, financial advisory, and investment banking firms, that seek compensation from a bankrupt estate. A Schedule of Defined Terms immediately follows this Summary, and capitalized terms used in this Summary and in the Protocol have the meanings ascribed to them there. This Summary outlines the Protocol's disclosure recommendations and the means or process to satisfy them.

The Protocol focuses on a Proposed Professional's disclosure regarding Connections to parties that could affect the Proposed Professional's "disinterestedness" and contemplates that the debtor will create and maintain an Interested Party List to facilitate identification of Connections (Exhibit "A" to the Protocol addresses the IPL). The Protocol recommends that a Proposed Professional obtain the data to support disclosure of Connections by procedures that include, as applicable, a computerized search of client databases, distribution of a questionnaire (a proposed form of which is provided in Exhibit 'B' to the Protocol), and inquiry of the Proposed Professional's AMAs (if any), as discussed below. While recognizing that a Proposed Professional bears the burden of adequate disclosure in its retention application and an Estate Professional bears that burden in all appropriate supplemental disclosures, the Protocol provides that disclosure of Connections should be based on a Proposed Professional's actual knowledge of them, including from the results of a computer search and questionnaire process, as applicable.

The Protocol distinguishes Connections arising from the different kinds of the Proposed Professional's affiliates, including: (a) Retained Affiliates, which the Protocol classifies as generating Direct Connections of the Proposed Professional, and (b) Unretained Affiliates (including AMAs), which the Protocol classifies as generating Indirect Connections. As set forth in the Protocol, the disclosure of known Connections and the process to obtain knowledge of them should vary in accordance with the characteristics of each Proposed Professional and its AMAs and other Unretained Affiliates.

The Protocol classifies AMAs into 4 Types and recommends a process to obtain and disclose information regarding Connections that varies based on the extent to which the AMA: (i) is subject to Securities Registration, Regulatory Oversight, and/or Independent Personnel and Management; (ii) refrains from investing directly in Named Issuers; and (iii) accepts investment funds from third parties rather than Related Investors. The Protocol recommends that: (a) Proposed Professionals that qualify as Type 1 Financial Organizations or have Type 1 AMAs disclose only Direct Connections known to the Proposed Professional without review of the IPL by an AMA; (b) Proposed Professionals with Type 2, 3 or 4 AMAs should also disclose Direct Connections known to the Proposed Professional; (c) Proposed Professionals with Type 2 AMAs should also disclose the names of IPL Parties with Indirect Connections known to the Type 2 AMA as reported by the Type 2 AMA to the Proposed Professional; (d) Proposed Professionals

---

[1] This Protocol does not address retention applications filed by claims and noticing agents under 28 U.S.C. § 156.

1

with Types 3 and /or 4 AMAs should disclose Indirect Connections known to the AMA(s) and reported to the Proposed Professional, including direct investments in Named Issuers that are IPL Parties, and (e) Proposed Professionals with Type 4 AMAs should make such additional disclosures, if any, as may be appropriate in the circumstances.

The Protocol recognizes that disclosure of Connections may vary in response to, *inter alia*, the size of the bankruptcy case and should exclude *de minimis* matters. The *de minimis* concept is applicable to both the IPL and the disclosure of Connections in a Proposed Professional's retention application. *De minimis* exclusions can be based, for example, on the small value of a claim, the small ownership percentage and value of an equity interest, or other, similar considerations. An IPL, and a Proposed Professional's disclosure of Connections in its retention application, should state the criteria applied in making *de minimis* exclusions.

## DEFINED TERMS

**AMA** means an affiliate or division of a Proposed Professional that is actively engaged in managing or owning financial investments. For clarity, AMA does not refer either to assets that might be held through investment vehicles or to such investment vehicles, e.g., mutual funds, but does refer to the entity managing such investment vehicles, i.e., a mutual fund manager.

**CFTC** means the Commodities Futures Trading Commission.

**Connection** means, in the context of Section 327 and Rule 2014, an association or relationship with an IPL Party that a reasonable person might find bears on whether the Proposed Professional "holds or represents an interest adverse to the estate" and is "disinterested" under Section 327 and Section 101(14), based on the facts of a particular bankruptcy case.

***De minimis*** means a matter too distant in time, remote in probability, or insignificant to warrant consideration in the context of a particular bankruptcy case.

**Direct Connection** means a known Connection between a Proposed Professional and an IPL Party (other than an Indirect Connection).

**Estate Professional** means a Proposed Professional whose retention has been approved by the Bankruptcy Court.

**FINRA** means the Financial Industry Regulatory Authority.

**Immediate Indirect Connection** means a known Connection between an IPL Party and a Proposed Professional's Unretained Affiliate (including an AMA).

**Independent Personnel and Management** means, with respect to an AMA of a Proposed Professional, the employment or engagement of management, professional and other personnel separate from those of such Proposed Professional, (e.g., excluding the Proposed Professional's active employees from the AMA's management, so that only independent directors/managers or professionals that are not active employees of (or that have retired from) the related Proposed Professional serve on the AMA's board of directors (or other equivalent governing body)).

**Indirect Connection** means an Immediate Indirect Connection or a Remote Indirect Connection.

**Information Barriers** means policies and procedures of a referenced entity (including but not limited to policies and procedures adopted in compliance with Rule 10b5-1) that seek reasonably to ensure that (a) such entity's investment decisions not violate the laws prohibiting trading on the basis of MNPI, and (b) Proposed Professional Personnel have no participation in or knowledge concerning investment decisions made by the Proposed Professional or its affiliates.

**Interested Party List** or **IPL** means a list of parties with Connections to the debtor's estate (other than *de minimis* connections).

**IPL Parties** means the persons or parties listed on an IPL.

3

**MNPI** means material non-public information.

**Named Issuers** means an issuer of debt or equity securities (including a municipality), including parties that could become a debtor in a bankruptcy case.

**NFA** means the National Futures Association.

**Other Regulatory Oversight** means examination by any federal, state or foreign regulatory authority regarding compliance with regulatory requirements, other than Regulatory Oversight.

**Proposed Professional** means a professional person or entity proposed to be retained in connection with a pending bankruptcy case under Section 327. As used in this Protocol, the term "Proposed Professional" includes Retained Affiliates.

**Proposed Professional Personnel** means the primary working group within a Proposed Professional entity that directly provides the services for which the Proposed Professional is retained in the particular bankruptcy case, and excludes personnel that only episodically provide such services.

**Regulatory Oversight** means periodic regulatory examinations by the SEC, FINRA, or the NFA.

**Related Investors** means, with respect to a Proposed Professional, the Proposed Professional's current and former ultimate beneficial owners, employees and their immediate family members.

**Remote Indirect Connection** means a known Connection arising from a relationship between a Proposed Professional's Unretained Affiliate (including an AMA) and a third party, which third party, in turn, has a Connection with an IPL Party.

**Retained Affiliates** means those affiliates of a Proposed Professional that employ professional personnel for whom the Proposed Professional will seek compensation pursuant to Section 330 of the Bankruptcy Code.

**Rule 10b5-1** means 17 C.F.R. 240.10b-5.

**Rule 2014** means Federal Rule of Bankruptcy Procedure 2014.

**SEC** means the United States Securities and Exchange Commission.

**Section 101(14)** means 11 U.S.C. § 101(14).

**Section 327** means 11 U.S.C. § 327.

**Securities Registration** means, with respect to a referenced entity, such entity's registration (and attendant regulation) as an investment advisor by the SEC, as a securities broker/dealer by FINRA, or under the requirements of the CFTC.

4

**Survey** means the Summary of Industry Affiliate Investment Disclosures. *In re: Westmoreland Coal Co.,* Case No. 18-35672 (Bankr. S.D. Tex.), ECF No. 1659-1 pp. 2-66.

**Third-Party Managed Investments** means investments (including through mutual funds and other investment vehicles) that are managed by third parties with delegated investment authority and discretion.

**Type** means one of the four (4) types of AMAs that are classified in this Protocol.

**Type 1 AMA** means an AMA that either:

> A. (i) employs Information Barriers, (ii) is subject to both Securities Registration and Regulatory Oversight, and (iii) obtains most or all of its assets under management from third parties (i.e., parties other than Related Investors); or

> B. qualifies under the criteria provided in subsections (A)(i) and (ii), above, but obtains most or all of its assets under management from Related Investors and not from third parties, and also insulates its personnel and management by means of Independent Personnel and Management.

**Type 2 AMA** means an AMA that: (i) qualifies under the criteria provided in subsections (A)(i) and (ii) in the definition of Type 1 AMA, above; (ii) obtains most or all of its assets under management from Related Investors and not from third parties; (iii) does not make direct investments in Named Issuers but only, if at all, holds investments in Named Issuers as Third-Party Managed Investments; and (iv) does not have Independent Personnel and Management.

**Type 3 AMA** means an AMA that: (i) employs Information Barriers; (ii) is subject to either: (A) Regulatory Oversight, or (B) Other Regulatory Oversight; (iii)  obtains its assets under management from Related Investors or third parties; and (iv) may make direct investments in the debt or equity of Named Issuers, whether or not it also holds such investments as a result of Third-Party Managed Investments.

**Type 4 AMA** means an AMA not qualifying as a Type 1, Type 2 or Type 3 AMA.

**Type 1 Financial Organization** means a Proposed Professional, including an investment banking or similar institution (including a financial advisor affiliated with an investment bank), that has Information Barriers and other characteristics of and would therefore qualify as a Type 1 AMA. A Type 1 Financial Organization retains its classification as such even if it does not have assets under management. A Type 1 Financial Organization also retains its classification as such notwithstanding that it may include affiliates of other Types (e.g., Type 3 AMAs engaged in insurance activities, and Type 4 AMAs acting in various capacities in ownership and/or management of investment assets).

**Unretained Affiliate** means an affiliate of a Proposed Professional other than a Retained Affiliate.

**Introduction**

Rule 2014 requires disclosure of connections between a Proposed Professional and certain parties in interest in bankruptcy cases.  None of Rule 2014, Section 327, or the decisional law construing any of them provides Proposed Professionals (and Estate Professionals) and in particular, those having an AMA, any clear guidance regarding adequate disclosure of their AMA's connections with parties in interest in a bankruptcy case.  This Protocol: (a) suggests definitions for a Connection requiring disclosure and categorizes such Connections; (b) classifies AMAs within four Types; (c) differentiates the disclosure of Connections recommended for the four Types of AMAs; (d) discusses knowledge of Connections and the means to obtain it; and (e) addresses confidentiality concerns and requirements for updating disclosure of Connections.

This Protocol does not endeavor to and could not effectively provide definitive guidance to all Proposed Professionals in all circumstances. Proposed Professionals range from sole practitioners or single office practices to complex international firms with thousands of professionals and multiple AMAs of various Types. Proposed Professionals may similarly be subject to a wide range of regulation, including self-regulatory rules and standards governing legal and accounting professionals, and Securities Registration and/or Regulatory Oversight to which financial advisory and investment banking firms may be subject. Proposed Professionals also are subject to a broad range of consequences for violation of the respective rules, regulations and laws that govern them, including license suspension or loss, enforcement under Securities Registration and/or Regulatory Oversight, and potential civil and criminal liabilities for misuse of MNPI. This Protocol therefore provides general guidance regarding how Proposed Professionals may obtain information and make proper disclosures to support their retention in U.S. bankruptcy cases that are within the scope of this Protocol, but this Protocol does not provide specific guidance for all Proposed Professionals, regardless of their type, size and structure, or in all bankruptcy cases, regardless of their size, scope, or operative facts. This Protocol recognizes that a Proposed Professional may deviate from its suggested data gathering procedures and disclosure recommendations based upon its particular facts and circumstances. No such deviation, *per se,* however, should support a contention that a Proposed Professional is not disinterested or that its retention should not be approved.

A Proposed Professional bears the burden of making appropriate disclosure of Connections in its initial retention application and an Estate Professional bears a continuing burden to supplement that disclosure as appropriate in the circumstances. This Protocol proposes a framework for disclosure of Connections by Proposed Professionals, Estate Professionals, and their affiliates in bankruptcy cases involving more than $50 million in liabilities.

Connection should be broadly defined to respect the term's ordinary meaning and accomplish the important purposes of Rule 2014 and Section 327 to ensure that a Proposed Professional is a "disinterested person" as defined in Section 101(14). Section 327's primary functions include: (a) allowing the estate to obtain and retain expertise to fulfill its essential functions; (b) requiring disclosure of matters that might affect Estate Professionals' performance of their duty of loyalty; and (c) maintaining the integrity of the bankruptcy process and promoting the parties' and the public's confidence in that integrity. Section 327 requires that Proposed Professionals "not hold or represent an interest adverse to the estate" and are "disinterested persons." Section 101(14)(c) requires that a disinterested person "not have an

6

interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in the debtor, or for any other reason." Rule 2014 disclosure is intended to provide the Bankruptcy Court and parties in interest in a bankruptcy case with information adequate to evaluate whether a Proposed Professional is a disinterested person and qualified to serve under Section 327.

The definition of Connection and Rule 2014's related disclosure obligations should not impair an effective evaluation of disinterestedness by requiring disclosure of every possible connection, no matter how *de minimis*. Further, Rule 2014 disclosure should not impractically require disclosure of unknown information or ignore valid confidentiality concerns.

The formulation of this Protocol has been informed by the Survey. The Survey reflects that, in the absence of any definition of Connection and disclosure guidelines, Proposed Professionals have adopted widely disparate practices governing disclosure of Connections, even among similarly situated Proposed Professionals. This Protocol was further informed by the results of telephonic interviews conducted with representatives of more than a dozen separate professional firms with significant Chapter 11 experience, who expressed their willingness to discuss (for themselves and not as an expression of their firm's policies or procedures), in a candid, off-the-record context and not for attribution in the Protocol, disclosure issues arising from the retention application process. This Protocol provides guidance to Proposed Professionals regarding such disclosures.

1. **Description of Connections**

    a.    **Requirement of Disclosure.** Rule 2014 requires disclosure of the Connections of the "person to be employed," and Section 101(14) refers to "direct or indirect relationships," but neither Rule 2014 nor related decisional law addresses whether Indirect Connections (i.e., Connections created by affiliates of a Proposed Professional) must be disclosed.

    b.    **Interested Parties and Interested Party List.** In order to facilitate a Proposed Professional's disclosure of Connections, the debtor, in consultation with its outside restructuring counsel, should prepare and make an Interested Party List (or IPL) available to all Proposed Professionals. If a Proposed Professional believes that the then-current IPL should be amended, such Proposed Professional should so advise the debtor's counsel. If no IPL has been prepared when a Proposed Professional files its retention application, the retention application should disclose that fact and explain how the Proposed Professional identified Connections. Exhibit "A" to this Protocol includes an IPL template, as well as guidelines for a debtor's consideration in preparing an IPL in light of the particular facts and circumstances of a bankruptcy case.

    c.    **Retained Affiliates.** A Proposed Professional should: (i) seek retention (and include the identity) of Retained Affiliates in its retention application; and (ii) ensure that its retention application discloses all known Connections (other than *de minimis* connections) among IPL Parties and such Retained Affiliates.

    d.    **Protocol Organization.** Paragraph 2 provides for certain disclosures relating to Immediate Indirect Connections. Paragraph 6 addresses what constitutes knowledge in connection with preparing retention application disclosures. Paragraph 8 discusses confidential treatment for Connections and IPL Parties in certain circumstances.

e.     *De Minimis* **Exclusions.**  Effective disclosure in large bankruptcy cases requires reasonable exclusion of *de minimis* connections and parties that should not qualify as IPL Parties (e.g., small creditor, vendor, customer exclusions, and investments falling below a threshold), as described on Exhibit "A." Section 101(14)(c)'s reference to "material" supports excluding *de minimis* connections.  For instance, a Proposed Professional may determine that an equity investment in an IPL Party of less than 1% of the outstanding equity or debt (with a value the Proposed Professional determines to be *de minimis*) need not be disclosed.  Each IPL and each Proposed Professional's retention application that excludes *de minimis* parties or connections should state the criteria, based on the facts and circumstances of the case (commonly, a dollar and/or percentage amount) applied to make such exclusions from disclosure.

f.     **Disclosure under this Protocol**.  Subject to *de minimis* exclusions as set forth herein, this Protocol recommends:

(i) A Proposed Professional (including Retained Affiliates) should disclose all known Direct Connections, and also disclose all Indirect Connections known to its Unretained Affiliates (including AMAs) and reported to it. Except as otherwise provided in this Protocol (including in Paragraph 8 regarding confidentiality), disclosed Connections should be identified by name and adequately described.

(ii) A Proposed Professional should obtain knowledge of Connections through its new matter intake process, by computer database searches, questionnaires and otherwise as described in this Protocol.

(iii) A Proposed Professional should disclose whether it has any AMAs, and if it does, it should  describe such AMAs' classification by Type  as provided for in this Protocol, including (as applicable) such AMAs': (A) Information Barriers; (B) Related Investors; (C) practices regarding direct investments in Named Issuers and/or through Third-Party Managed Investments; (D) Independent Personnel and Management; and (E) Regulatory Oversight and/or Other Regulatory Oversight.

(iv) A Proposed Professional that does not qualify as a Type 1 Financial Organization or have a Type 1 AMA, and does have one or more Type 2, 3 and/or 4 AMAs, should provide the IPL to such Type 2, 3 and/or 4 AMAs and request the AMAs to report Indirect Connections to the Proposed Professional as provided in this Protocol (including enhanced disclosure for Type 3 and 4 AMAs).

## 2.     Indirect Connections

a.     **Requirement of Disclosure**. Immediate Indirect Connections should be disclosed, as bearing upon whether the Proposed Professional "holds or represents an interest adverse to the debtor," including Immediate Indirect Connections of: (i) Unretained Affiliates (as disclosed pursuant to an applicable questionnaire process), and (ii) Type 2, 3 and 4 AMAs (as disclosed in response to the distribution of the IPL), all as discussed below.

b.     **Remote Indirect Connection**.  The Survey reflects that Remote Indirect Connections are not generally disclosed, likely because Proposed Professionals have no knowledge of them. This Protocol recommends disclosure of a Remote Indirect Connection (other than a *de minimis* connection) only if the Proposed Professional has knowledge thereof. A

Proposed Professional's retention application should disclose the potential existence of unknown Remote Indirect Connections with IPL Parties. A Proposed Professional is not required to conduct procedures other than those set forth in this Protocol to identify Remote Indirect Connections.

### 3.   Indirect Connections through Asset Management Affiliates

a.   **AMA Disclosure.** When a Proposed Professional (including, without limitation, a law, accounting, financial advisory or investment banking firm) has an Unretained Affiliate that is an AMA, additional disclosure may be required to explain the AMA's Connections and their impact, if any, on the Proposed Professional's disinterestedness. That additional disclosure should also describe whether the AMA accepts funds from third parties or Related Investors, and whether the AMA makes direct investments in the debt or equity securities (i.e., buys or sells short, long, option or other positions) of Named Issuers or holds investments in Named Issuers through Third-Party Managed Investments, or both. Based on the Survey, many Proposed Professionals do not identify such AMAs individually by name, but rather identify them descriptively and generically. This Protocol does not intend to change that practice. The description of such AMAs should categorize them by reference to the applicable "Types" described below. Most Proposed Professionals (in common with most employers) maintain 401(k) programs and support various other pension and/or other retirement account programs for their employees' benefit as Third-Party Managed Investments and without using an AMA; such arrangements do not trigger any requirement for analysis as an AMA under this Protocol.

b.   **Material Non-Public Information; Regulation and Oversight.** Proposed Professionals, Estate Professionals and their respective AMAs frequently possess MNPI and often implement Information Barriers to address this. These entities may also be subject to regulation and oversight, including Securities Registration and/or Regulatory Oversight.

c.   **AMA Classification.** This Protocol identifies four Types of AMAs (Types 1, 2, 3 and 4) and proposes corresponding disclosure requirements for each Type. If a Proposed Professional believes its AMA has characteristics of more than one Type, its retention application should discuss these characteristics and include disclosure applicable to the higher numbered Type (e.g., an AMA with characteristics of both a Type 3 and Type 4 AMA should make the disclosure required for a Type 4 AMA). If a Proposed Professional believes its AMA should be classified differently from these Types, its retention application should discuss this and include disclosure most appropriate to such AMA.

d.   **Change in AMA Type.** An AMA's classification can change over time. For example: a Type 4 can qualify as a Type 3 by implementing Information Barriers and becoming subject to Regulatory Oversight or Other Regulatory Oversight; a Type 3 can qualify as a Type 2 by becoming subject to Securities Registration (and, if applicable, Regulatory Oversight rather than Other Regulatory Oversight) and holding investments in Named Issuers only as Third-Party Managed Investments; and a Type 2 can become a Type 1 by implementing Independent Personnel and Management. With respect to each bankruptcy case in which a Proposed Professional files a retention application, however, the Proposed Professional should classify its AMA(s) (as a Type 1, 2, 3 or 4) based on the AMA's characteristics when the Proposed Professional files its initial retention application in such case, and this classification should remain in effect throughout the course of such case (i.e., the same classification should apply to

9

an Estate Professional's updated retention application disclosures). Accordingly, the same AMA of a Proposed Professional may be classified differently in different bankruptcy cases, based on its characteristics at the time that the Proposed Professional files its initial retention application in the different bankruptcy cases.

**4.     Disclosures Relating to Type 1 Financial Organizations and Type 1 AMAs**

a.     **Present Type 1 Financial Organization and Type 1 AMA Disclosure**. The Survey indicates that a retention application for a Proposed Professional qualifying as a Type 1 Financial Organization or having an AMA that this Protocol categorizes as a Type 1 AMA commonly discloses only Direct Connections known to the Proposed Professional Personnel because its Information Barriers, Securities Registration and Regulatory Oversight fully protect MNPI, and insulate the Proposed Professional Personnel from any effects that MNPI could potentially create with respect to the Proposed Professional's disinterestedness. Such Proposed Professional Personnel generally have no knowledge of (and therefore the Proposed Professional does not disclose) debt or equity investments in IPL Parties because of the effectiveness of the Information Barriers applicable to communication and misuse of MNPI and insulating Proposed Professional Personnel from participation in or knowledge of investment decisions.

b.     **Proposed Type 1 Financial Organization and Type I AMA Disclosure**. This Protocol proposes that the disclosures of Connections in a retention application of a Proposed Professional qualifying as a Type 1 Financial Organization or having a Type 1 AMA may properly be limited to identifying the names (subject to confidentiality considerations) of Direct Connections (other than *de minimis* connections) known to such Proposed Professional in reliance on the presumed effectiveness of Information Barriers. Such named entities should ordinarily be described as "a current or former client, but with respect to matters unrelated to the Debtor," absent facts or circumstances that require enhanced disclosure. Bankruptcy Courts have consistently approved retention applications based upon such disclosures.

**5.     Disclosures relating to Type 2, 3 and 4 AMAs**

a.     **Present Type 2, 3 and 4 AMA Disclosure**. The Survey indicates that retention applications for a Proposed Professional with an AMA that this Protocol categorizes as a Type 2, 3, or 4 AMA include increased disclosures because: (i) such a firm accepts most or all of its investments from Related Investors; (ii) a Type 3 AMA may be subject only to Other Regulatory Oversight (and may not by subject to any Securities Registration); (iii) a Type 4 AMA may not be subject to regulatory examinations or Securities Registration at all; and (iv) a Type 3 or 4 AMA may make direct investments in Named Issuers, rather than investing exclusively through Third-Party Managed Investments.

b.     **Considerations for Type 2 AMA Disclosures**. A Proposed Professional with an AMA that this Protocol categorizes as a Type 2 AMA could credibly contend that its disclosure obligations in respect of its Type 2 AMA should be the same as the disclosure obligations in respect of Type 1 AMAs because its Type 2 AMA protects MNPI by means of the same Information Barriers enforced by the same Securities Registration and Regulatory Oversight as those that apply to Type 1 AMAs. In addition, a Type 2 AMA refrains from direct investments in Named Issuers, and a Type 1 AMA may make direct investments in Named Issuers. Nonetheless, this Protocol recommends increased disclosure by a Proposed Professional with a Type 2 AMA in order to advance the purposes of (i) protecting public confidence in the integrity

10

of the restructuring process, and (ii) ensuring an absence of self-dealing because a Type 2 AMA obtains most or all of its funds under management from Related Investors and may be managed and controlled by active professional personnel that also manage and control the related Proposed Professional (rather than utilizing Independent Personnel and Management).

      c.    **Proposed Type 2 AMA Disclosure**. A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 2 AMA should disclose known (i) Direct Connections of the Proposed Professional, and (ii) Immediate Indirect Connections of its Type 2 AMA, in each case other than *de minimis* connections. Disclosure of known Immediate Indirect Connections (other than *de minimis* connections) of a Type 2 AMA will consist of identifying the IPL Parties, if any, to which the Type 2 AMA has Immediate Indirect Connections, if and as reported by the Type 2 AMA to its related Proposed Professional. A Proposed Professional with a Type 2 AMA should provide the IPL to its Type 2 AMA, and request its Type 2 AMA to inform it of known Immediate Indirect Connections (other than *de minimis* connections) to IPL Parties for potential disclosure in the Proposed Professional's retention application pursuant to this Protocol, including Paragraph 6, below, regarding knowledge.

      d.    **Proposed Type 3 AMA Disclosure**. A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 3 AMA should contain enhanced disclosure that reflects (i) such AMA's Regulatory Oversight or Other Regulatory Oversight, as applicable; and (ii) the extent of any Securities Registration applicable to such AMA. Such retention application disclosure should also address how, if at all, these characteristics of its AMA could cause any potential impairment to the Proposed Professional's perceived or actual disinterestedness. Because Type 3 AMAs may make direct investments in Named Issuers, the disclosures required from such a Proposed Professional with a Type 3 AMA should  disclose known Indirect Connections (other than *de minimis* connections) between the Type 3 AMA and IPL Parties including those arising from any such direct investments in Named Issuers that appear in the IPL, in each case as reported by the Type 3 AMA to its related Proposed Professional.

      e.    **Proposed Type 4 AMA Disclosure**. A retention application for a Proposed Professional (other than a Type 1 Financial Organization) with a Type 4 AMA should contain enhanced disclosure that sets forth the Securities Registration, Regulatory Oversight and/or Other Regulatory Oversight (or lack thereof) applicable to the Proposed Professional. Such retention application disclosure should also address how, if at all, these characteristics of its AMA could cause any potential impairment to the Proposed Professional's perceived or actual disinterestedness. If the applicable Type 4 AMA makes direct investments in Named Issuers, the disclosures required from such a Proposed Professional with such Type 4 AMA should disclose known Indirect Connections (other than *de minimis* connections) between the Type 4 AMA and IPL Parties, including those arising from any such direct investments in Named Issuers that appear in the IPL, in each case if and as reported by the Type 4 AMA to its related Proposed Professional. The disclosures required in a retention application of a Proposed Professional with a Type 4 AMA should be informed by the disclosure provided with respect to other categories of AMAs and supplemented as appropriate based on the facts and circumstances applicable to the particular AMA and bankruptcy case.

6.   **Disclosure Based on Actual Knowledge**

The disclosure obligations of a Proposed Professional under this Protocol derive from the Proposed Professional's knowledge of Connections (other than *de minimis* connections), including the knowledge of Connections of a Proposed Professional's AMAs (if any) which the AMA may report to the Proposed Professional. In the case of Type 2, 3 and 4 AMAs with only Third-Party Managed Investments, disclosure of investments in Named Issuers included in the IPL Parties that such managers may make from time to time would be impractical because of, *inter alia*, the frequency of trading in such positions, and the AMA's limited knowledge thereof (if any). To be sure, Proposed Professionals cannot disclose unknown Connections, and this Protocol does not suggest that they do so. Instead, this Protocol provides procedures to obtain such knowledge. For purposes of this Protocol, a Proposed Professional's knowledge of Connections means actual knowledge derived from its new matter intake process and the results of the Proposed Professional's: (a) computer client database check (as described in Paragraph 7, below); (b) any applicable inquiry of its professional personnel (and Unretained Affiliates other than AMAs) by a questionnaire process or otherwise (also as described in Paragraph 7, below); (c) review of the report it receives of its AMA's (if applicable) check for conflicts and Connections (or any other applicable) process; and (d) review of any other process for its Unretained Affiliates (if any, and other than an AMA). All references to "knowledge" in this Protocol refer to actual knowledge. As discussed in Paragraph 7(e), below, if a Proposed Professional limits its retention application disclosure to the knowledge of Proposed Professional Personnel, that limitation should be disclosed in the retention application. A retention application of a Proposed Professional with knowledge of Direct Connections or Indirect Connections with IPL Parties (other than *de minimis* connections), should disclose all such Connections. In addition, if a Proposed Professional has knowledge of a Connection (other than a *de minimis* connection) with a person not included in the IPL, such Connection should be disclosed.

7.   **Determination of Whether a Connection Exists**

Proposed Professionals should obtain knowledge of whether Connections exist generally by following the procedures discussed below, subject to adaptations to disclose particular circumstances affecting a particular Proposed Professional and bankruptcy case. Each retention application for a Proposed Professional should describe the process and procedures it utilized to obtain knowledge of Connections.

   a.   **Interested Party List**. Subject to Paragraph 6 of this Protocol regarding knowledge, Proposed Professionals can reasonably and in good faith rely on the list of IPL Parties, consistent with the description and template attached as Exhibit "A," prepared (and periodically updated, with information derived from the debtor's bankruptcy schedules and otherwise, as described in Exhibit "A" and in Paragraph 10, below) by the debtor.

   b.   **Process to Check for Conflicts and Connections**. Every Proposed Professional should perform (in connection with its other new matter intake procedures) a process to check such Proposed Professional's client databases for conflicts and Connections with IPL Parties. A Proposed Professional should utilize a process designed to identify Connections adequately in the context of the size and organizational complexity of the Proposed Professional. For entities

12

Case: 19-30088   Doc# 5924-2   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 48 of 88

with a significant number of professionals, this process often utilizes computer software.[1] For Proposed Professionals with a large number of professionals, this Protocol recommends deployment of adequate software within a reasonable time. Pending such deployment, a Proposed Professional may retain an independent third party to assess the adequacy of the alternative procedures the Proposed Professional uses to identify and appropriately disclose Connections.

A Proposed Professional (other than a Type 1 Financial Organization or a Proposed Professional with Type 1 AMAs) should distribute the IPL to its Type 2, 3 and 4 AMAs, request them to report any Connections (other than de minimis connections) to the Proposed Professional, and disclose in its retention application all Connections so reported. In addition, a Proposed Professional should distribute the IPL to its Proposed Professional Personnel, request them to report any Connections (other than *de minimis* connections) to the Proposed Professional, and disclose in its retention application all Connections so reported.

c.    **Questionnaires.** A Proposed Professional should disclose in its retention application the results from written inquiries of the Proposed Professional's professional personnel (as distinguished from staff, support or administrative personnel), and (to the extent, if any, appropriate) Unretained Affiliates (if any) controlled by the Proposed Professional regarding: (i) their known equity or debt investments in the debtor (e.g., excluding Third-Party Managed Investments); and (ii) other connections or relationships with the debtor (other than the Proposed Professional's proposed engagement), the Bankruptcy Court judges, or United States Trustee personnel.  Exhibit "B" to this Protocol presents a sample questionnaire. Particularly for Proposed Professionals organized in complex global structures, Exhibit "B" may require substantial modification, or a different (or even no) approach to seeking this information from certain of its professional employees and affiliates may be appropriate.

d.    **AMA's Report**. A Proposed Professional should set forth in its retention application the results reported to the Proposed Professional from its AMA's (if applicable) search with respect to IPL Parties (including any alternative processes or rationale for omission thereof).

e.    **Type 1 Financial Organizations and Type 1 AMAs**. As discussed above, Type 1 Financial Organizations and Type 1 AMAs are subject to Information Barriers that not only protect against misuse of MNPI but also insulate Proposed Professional Personnel from participation in or knowledge concerning investment decisions. Accordingly, it may be appropriate for such Proposed Professionals to obtain knowledge of Connections from their new matter intake procedures and computer client database reviews and base their disclosures on the knowledge of their Proposed Professional Personnel derived therefrom, without using questionnaires (other than directed to its Proposed Professional Personnel) or other procedures.

8.    <u>**Confidentiality Considerations**</u>

If a Connection (or the identity of an IPL Party) that should be disclosed under this Protocol is subject to confidentiality considerations and the Proposed Professional seeks not to disclose the Connection or the name of the IPL Party, the following steps should be taken:

---

[1]    Law firms generally use proprietary software licensed from vendors, while financial advisory firms more typically develop such software themselves or through third-party consultants.

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 49 of 88

a.    **Description in IPL**. The Connection (or IPL Party) should be described (but not identified) in sufficient detail to permit informed decisions concerning the Proposed Professional's "disinterestedness" (as defined in Section 101 (14));

b.    **Identity Filed Under Seal**. The party seeking to preserve confidentiality with respect to IPL Parties or Connections may file a motion for leave to file the identity of the confidential party under seal under Rule 9018, Federal Rules of Bankruptcy Procedure, on notice to the Office of the U.S. Trustee, the Debtor, any official committee, the holders of the 20 largest claims against the Debtor, any party that has requested notice pursuant to Rule 2002, Federal Rules of Bankruptcy Procedure, any applicable local rule, and all other parties entitled to notice of motions of this type under orders of the Bankruptcy Court in the Debtor's bankruptcy case. If the Bankruptcy Court enters an order granting such relief, in whole or in part, the party obtaining such relief should proceed in accordance therewith; and

c.    **Access to Sealed Information**.  Subject to the provisions of any particular Bankruptcy Court's sealing order, any party in interest, including the United States Trustee, may ask the Bankruptcy Court for permission to review (or for their counsel to review) the sealed information, and the party seeking access to the information bears the burden of proof regarding such request. The Bankruptcy Court order granting such access may protect the information's continuing confidentiality. *See, e.g.,* Order Authorizing Evercore Group L.L.C. To File Under Seal Certain Confidential Information Related to Evercore's Retention Application, *In re: Jones Energy, Inc., et al.,* Case No. 19-32112 (Bankr. S. D. Tex.), ECF No.210.

9.    **Look-back Period and Diligence**

a.    **Time Period**.  A Proposed Professional should disclose Connections during the three years preceding the commencement of the bankruptcy case unless the circumstances reasonably warrant a longer period. For example, if a Proposed Professional represented a party in interest in a leveraged buy-out of the debtor eight years before the petition date, the Connection should be disclosed. Conversely, if a Proposed Professional represented a creditor of the debtor in a matter unrelated to the debtor four years before the petition date, no disclosure of that connection should be required.

b.    **Additional Processes**.  A Proposed Professional (and AMAs and other Unretained Affiliates) may, but should not be required to, conduct a process or procedure to identify Connections in addition to those set forth in this Protocol.

10.    **Updates**

A Proposed Professional, once retained, has ongoing disclosure obligations. The debtor has the continuing obligation to update the IPL. This Protocol recommends that a debtor update, file and serve the IPL in a manner that clearly identifies changes thereto from prior versions no less frequently than every 90 days, including in connection with the filing of the debtor's schedules and statements, the passage of the claims bar date, the commencement of adversary proceedings, and filings under Bankruptcy Rule 2019 or by prospective purchasers of the debtor's assets. Estate Professionals should supplement their Rule 2014 disclosures, to the extent necessary as a result of updated IPLs and other developments in the bankruptcy case, including by reason of newly discovered or inadvertently omitted Connections. Without limiting Estate Professionals' obligations relating to prompt disclosure of known Connections, Estate

Case: 19-30088   Doc# 5924-2   Filed: 02/26/20   Entered: 02/26/20 21:37:07   Page 50 of 88

Professionals may maintain continuing compliance with their supplemental disclosure obligations under Rule 2014 by updating their disclosures in accordance with this Protocol within a reasonable time after the debtor's filing of updated IPLs, to the extent required as a result thereof.

15

## EXHIBIT A TO HOUSTON DISCLOSURE PROTOCOL[3]

---

[3] Defined terms used and not otherwise defined in this Exhibit have the meanings ascribed to them in the Protocol.

Exhibit A - 1

## GUIDELINES AND TEMPLATE FOR INTERESTED PARTY LIST

"Interested Parties List" or "IPL" means a list of people and entities, grouped into categories of their Connections, identified by name, and prepared to assist Proposed Professionals in complying with disclosure obligations under Rule 2014. The debtor, with the assistance of its outside restructuring counsel, should compile the initial IPL as part of due diligence leading up to the bankruptcy filing. An IPL categorizes each IPL Party in accordance with the nature of the Connection it has with the debtor, parties associated with the debtor (e.g., current directors, executive officers and debt and equity holders), and other IPL Parties (e.g., vendors, customers, contract, lease and litigation counterparties). Proposed Professionals rely on the IPL to provide the names of parties to review for possible Connections. In bankruptcy cases involving issuers of public debt or equity securities, it may be most efficient to construct the IPL using commercially available databases that offer exact legal names of entities and their affiliates.

An IPL may be both broader and narrower than the persons or entities the debtor lists in schedules and statements of financial affairs. An IPL (and updates to it as provided for in the Protocol) should include, without limitation, members of official committees, proposed purchasers of the debtor's assets, and other Estate Professionals, none of which may appear in the debtor's schedules and statements. An IPL may exclude *de minimis* potential IPL Parties that the debtor's schedules and statements will include. Particularly in larger cases, the debtor's schedules and statements may not be available before a Proposed Professional files its retention application. Accordingly, an IPL that the debtor makes available may form the best source of this information available to a Proposed Professional filing its retention application early in the bankruptcy case.

As set forth in the Protocol, a debtor should change and update the IPL during the course of a bankruptcy case, at intervals no less than 90 days, to reflect changing facts and circumstances in the case, including new developments, as well as to cure inadvertent omissions. Updates should reflect, among other things, the matters, events and circumstances addressed in the template provided below.

Exhibit A - 2

**EXHIBIT "A"**

**IPL TEMPLATE**

In its initial compilation of the IPL, the debtor should consider including the following categories of parties with Connections, as applicable:

- Debtor(s)
- Debtor affiliates and subsidiaries
- Current and former officers and directors (within the last 3 years)
- Affiliates of current and former officers and directors
- Significant equity holders (more than 5%)
- Prepetition lenders / noteholders
- Prepetition Indenture trustees / agents
- Initial DIP lenders
- U.S. Bankruptcy Court Judges serving in the District (as updated, only the Bankruptcy Judge presiding over the bankruptcy case will remain an IPL Party)
- U.S. District Court Judges for the applicable district
- U.S. Trustee (for the applicable region) and Staff Attorneys and Trial Attorneys in the District in which the case is filed
- Top 50 unsecured creditors
- Identified bankruptcy professionals
- Ordinary course professionals
- Contract counter-parties (other than *de minimis*)
- Vendors / suppliers (other than *de minimis*)
- Customers (other than *de minimis*)
- Competitors (other than *de minimis*)
- Landlords and lease counter-parties (other than *de minimis*)
- Licensees and licensors (including under intellectual property rights) (other than *de minimis*)
- Utility companies (other than *de minimis*)
- Litigation counter-parties (other than *de minimis*)
- Regulatory agencies / governmental bodies
- Taxing authorities (other than *de minimis*)
- Labor unions
- Depository banks (other than *de minimis*)
- L/C issuers
- Lien claimants
- Insurance providers and agents
- Surety bonds and surety providers
- Other IPL Parties significant to the bankruptcy case, and not included above.

The parameters for excluding *de minimis* parties from the IPL depend on the facts and circumstances of each particular bankruptcy case. In each category appropriate for *de minimis* exclusions, the debtor should consider a practical *de minimis* limitation so that category will contain only IPL Parties that bear on a Proposed Professional's disinterestedness. The IPL should

Exhibit A - 3

disclose the dollar amount, percentage amount or other criteria (e.g., limiting equity holders to thresholds based on value and percentage interest) chosen for *de minimis* exclusions in each applicable category.

**Updates**

As set forth in the Protocol, the IPL is a dynamic document, and a debtor should change and update the IPL during the course of a bankruptcy case. The debtor should update the IPL no less frequently than every 90 days to reflect changing facts and circumstances, new developments, and information learned during the bankruptcy case, as well as to cure inadvertent omissions. After the filing of the bankruptcy case, the IPL should be updated to include additional IPL Parties identified in:

- The debtor's schedules and statements (including any amendments)
- Proofs of Claim
- Notices of appearance
- Adversary proceedings and other motions or applications
- Filings by prospective purchasers of debtor's assets, plan proponents and under Bankruptcy Rule 2019
- Appointments of official committees and retention of Estate Professionals

Exhibit A - 4

**EXHIBIT B TO HOUSTON DISCLOSURE PROTOCOL**

## Exhibit B
## Form of Questionnaire

### Urgent Request for Information

**THIS IS AN URGENT REQUEST FOR INFORMATION THAT REQUIRES YOUR IMMEDIATE ATTENTION AND RESPONSE IF YOU HAVE ANY INFORMATION TO REPORT OR MATTERS TO DISCLOSE. YOUR FAILURE TIMELY TO RESPOND WILL CONSTITUTE YOUR AFFIRMATION THAT YOU HAVE NO INFORMATION TO REPORT OR MATTERS TO DISCLOSE. IF YOU WOULD SELECT OPTION #1 TO EACH OF THE THREE QUESTIONS BELOW, YOU NEED NOT RESPOND TO THIS QUESTIONNAIRE. THANK YOU IN ADVANCE FOR YOUR PROMPT ASSISTANCE.**

(**Name of Proposed Professional**) represents (or is applying for Bankruptcy Court authorization to represent) (**name of entity**) and its affiliates listed below (collectively, the "**Debtors**") or (the Official Committee of Unsecured Creditors) (or other applicable official committee or party; as the case may be, the "Client")) in their (recently filed) (contemplated) chapter 11 bankruptcy cases in the United States Bankruptcy Court for the _____ District of _____.

As an advisor to the Client, there are several types of disclosures that we must make in order for the Bankruptcy Court to approve retention of our firm. Most of the information required to be disclosed can be obtained from the databases and conflicts records our firm maintains. That process is underway. A limited amount of information, however, may most efficiently be obtained directly from professionals employed by our firm and affiliates of our firm who receive this Questionnaire (collectively, the "Questionnaire Recipients"). This request relates to the second type of material listed above, which is why you are being contacted. The specific disclosures that we are required to make are listed below.

**First**, we must disclose to the Bankruptcy Court presiding over the Debtors' cases any holdings by the Questionnaire Recipients in either the debt or equity securities of the Debtors (e.g., excluding any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; "Third-Party Managed Investments"),as well as the existence of any other claims against the Debtors held by any Questionnaire Recipient.

**Second**, we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to the United State Trustee or any person employed in the Office of the United States Trustee for the _____ District of _____.

**Third**, we must disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to any of the Bankruptcy Judges for the _____ District of _____.

### Please respond to this email no later than [ , 20 ] at noon EST:

Exhibit B - 2

1.   **Debt or Equity Securities, or Other Claims Against the Debtors.**

Please indicate by replying to this email whether you, on or after [90 days prior to the date of this questionnaire] have owned or held a beneficial interest in any debt or equity securities (other than Third Party Managed Investments) of, or claims against, any of the Debtors. **To reply, review the options listed below and (electronically check the appropriate box) (select the appropriate button at the top of this message).**

Option #1 -- I have not held and do not hold debt or equity securities of, or other claims against, any of the Debtors.

Option #2 -- I have held but no longer hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, any of the Debtors.

Option #3 -- I currently hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, one or more of the Debtors. (If selecting this option, please describe in your reply the type of debt or equity securities that you hold, the name of the issuer, and/or the nature of any claim that you may hold or assert. To do this, select "Edit the response before sending" option to enter your comments.)

2.   **Connections to the United States Trustee or any Person Employed by the Office of the United States Trustee for the _____ District of _____.**

The names of the United States Trustee and employees in the office of the United States Trustee for the _____ District of _____ are listed below.

_____
_____
_____
_____
_____
_____
_____

**To reply, review the options listed below and (electronically check the appropriate box) or (select the appropriate button at the top of this message).**

Option #1 - I have no connections to the United States Trustee or to anyone employed in the office of the United States trustee for the _____ District of _____

Option #2 - I have the following connections to the United States trustee or to someone employed in the office of the United States Trustee for the _____ District of _____. (If selecting this option, please describe in your reply the connections that you have to the United States Trustee or to anyone employed in the office of the United States

Exhibit B - 3

Trustee for the _____ District of _____.   To do this, select "Edit the response before sending" option to enter your comments.)

3.       **Connections to any Bankruptcy Judges in the** _____ **District of** _____.       The names of the Bankruptcy Judges in the _____ District of _____ are listed below.

_____
_____

_____

_____

**To reply, review the options listed below and (electronically check the appropriate box) or ( select the appropriate button at the top of this message).**

Option #1 - I have no connections to any of the Bankruptcy Judges for the _____ District of _____.

Option #2 - I have the following connections to a Bankruptcy Judge for the _____ District of _____ (If selecting this option, please describe in your reply the connections that you have to a Bankruptcy Judge for the _____ District of _____.   To do this, select "Edit the response before sending" to enter your comments).

(Insert "Edit Response Before Sending" option at appropriate point to facilitate electronic response)

**If you have any questions concerning this urgent request for information, please call (_____) at ( ) ___ - ____.**

**THANK YOU VERY MUCH FOR YOUR PROMPT ATTENTION TO THIS MATTER**

**List of [ _____ ] Debtors:**

**(Each Debtor entity)**

Exhibit B - 4

# Exhibit B
# Firm-Wide CSP Survey

**THIS IS AN URGENT REQUEST FOR INFORMATION THAT REQUIRES YOUR ATTENTION AND RESPONSE IF YOU HAVE ANY INFORMATION TO REPORT OR MATTERS TO DISCLOSE. PLEASE COMPLETE THE SURVEY BY END OF DAY NOVEMBER 22, 2019.**

**IF YOU WOULD RESPOND IN THE NEGATIVE TO EACH OF THE THREE QUESTIONS BELOW, YOU DO NOT NEED TO RESPOND TO THIS QUESTIONNAIRE OR CLICK ON THE SURVEY LINK PROVIDED. FAILURE TO TIMELY RESPOND WILL CONSTITUTE YOUR AFFIRMATION THAT YOU HAVE NO INFORMATION TO REPORT OR MATTERS TO DISCLOSE.**

**THANK YOU IN ADVANCE FOR YOUR PROMPT ASSISTANCE.**

Dear Noah,

PG&E Corporation (together with its affiliate Pacific Gas and Electric Company, "PG&E") has been a long-standing Firm Client. Since PG&E petitioned for bankruptcy protection, we made a decision to continue our service to PG&E (but are not serving PG&E as an advisor on bankruptcy matters). Nonetheless, because of this ongoing service to our client, we are filing a formal application to be retained in the matter.

That submission will contain disclosures, including McKinsey US and certain of its affiliates' connections with entities previously identified as parties in interest to PG&E in the bankruptcy case.

As an advisor to PG&E, there are several types of disclosures that we will make to the Bankruptcy Court. Most of the information to be disclosed can be obtained from the Firm's databases and records. That process is underway. We also need a limited amount of information from Client Service Professionals ("**CSPs**") through questionnaires ("**Questionnaire Recipients**"). We ask these questions of all CSPs, not only CSPs who worked for PG&E.

**First,** we will disclose to the Bankruptcy Court presiding over the PG&E cases any holdings by Questionnaire Recipients in either the debt or equity securities of PG&E (excluding any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; "**Third-Party Managed Investments**"), as well as the existence of any other claims against PG&E held by any Questionnaire Recipient.

**Second,** we will disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to the United States Trustee, or any person employed in the Office of the United States Trustee, for the Northern District of California.

**Third,** we will disclose to the Bankruptcy Court whether any Questionnaire Recipient has any connections to any of the Bankruptcy Judges for the Northern District of California.

Please review the categories of connections below and click on the survey link provided to submit your response ONLY IF you have a connection of the nature described.

## 1. Debt or Equity Securities, or Other Claims Against PG&E

Have you, on or after October 31, 2018, owned or held a beneficial interest in any debt or equity securities (other than Third-Party Managed Investments) of, or claims against, any of PG&E Corporation or its affiliate, Pacific Gas and Electric Company?

## 2. Connections to the United States Trustee, or any Person Employed by the Office of the United States Trustee, for the Northern District of California.

The names of the United States Trustee, and employees in the office of the United States Trustee, for the Northern District of California are listed below. Do you have any connection to the United States Trustee or to someone employed in the office of the United States Trustee for the Northern District of California?

| | |
|---|---|
| Alison S. Manning | Allen C. Massey |
| Anabel Abad-Santos | Ankey To |
| Avis J. Haynes | Cameron Gulden |
| Carla K. Cordero | D A Clarke Finneran |
| Donna S. Tamanaha | Edward M. McDonald |
| Gregory Powell | Ianthe V. Del Rosario |
| Irma H. Garcia | Jared A. Day |
| Jason Blumberg | Joan C. Caskey |
| JoAnne David | Kimberly Massey-Flores |
| Kristin McAbee | Kristine Kinne |
| Laurie Brugger | Lisa M. Grootendorst |
| Lynette C. Kelly | Lynne C. Knight |
| Margaret H. McGee | Marta Villacorta |
| Melinda R. Davis | Michael O. Sorgaard |
| Michelle Forrest | Monette Semana |
| N. Bryan Green | Nathalie Brumfield-Brown |
| Nicholas Strozza | Patricia Vargas |

| Robbin D. Little | Robert S. Gordon |
|---|---|
| Robin Tubesing | Sue Wolny |
| Teresa B. Field | Terri Didion |
| Timothy S. Laffredi | Tina Spyksma |
| Tracy Hope Davis | Trevor Fehr |
| Yung Nor Wong | |

### 3. Connections to any Bankruptcy Judges and Staff in the Northern District of California

The names of the Bankruptcy Judges and their staff in the Northern District of California are listed below. Do you have any connection to a Bankruptcy Judge or staff member for the Northern District of California?

| Chief Judge Charles Novack | Judge Hannah L. Blumenstiel |
|---|---|
| Judge Roger L. Efremsky | Judge M. Elaine Hammond |
| Judge Stephen L. Johnson | Judge William Lafferty |
| Judge Dennis Montali | Edward Emmons (Clerk of the Court) |
| Amy Leitner | Anna Lee |
| Anna Rosales | Audrey Gervasi |
| Benjamin V. Gapuz | Cindy Fan |
| Dina Kakalia | Emily Keller |
| Jane Fabian | Jane Galvani |
| Kay Fransson | Kenneth Conlan |
| Laura Dripps | Laurent Chen |
| Lorena Parada | Monica Burley |
| Peggy E. Brister | Rachel Stoian |
| Raenna J. Rorabeck | Rahmon Brown |
| Ruby Bautista | Shannon Mounger-Lum |

Exhibit B: Firmwide CSP Survey

| Terence Desouza | |
|---|---|

LINK TO SURVEY HERE

If you have questions about this survey or need clarification, please reach out to us at pge_mckinseyus@mckinsey.com and we will respond promptly.

If you are having any technical issues filling out this survey, please contact the **Global Helpdesk.**

Thank you for your attention to this request.

**Exhibit B: Firmwide CSP Survey**

Firm Wide Survey

**Instructions: Please check the most relevant option as it applies to you in each of the categories below and provide additional information as relevant. Press submit at the bottom of this survey once you are done. In case you have erroneously entered this survey, please exit by closing this browser window.**

**I. Debt or Equity Securities, or Other Claims Against PG&E Corporation or Pacific Gas and Electric Company**

If you have owned or held a beneficial interest in any debt or equity securities (other than any investments, whether held through mutual funds or other investment vehicles, that are managed by third parties with delegated investment authority and discretion; '**Third-Party Managed Investments**') of, or claims against, PG&E Corporation or its affiliate Pacific Gas and Electric Company on or after October 31, 2018, please check the appropriate box below and provide the requested information.

☐ I currently hold debt or equity securities of, or other claims against, PG&E Corporation or its affiliate Pacific Gas and Electric Company. (If selecting this option, please describe in your reply the type of debt or equity securities that you hold, the legal name of the issuer, and/or the nature of any claim that you may hold or assert in the text field below.)

☐ I have held but no longer hold debt or equity securities (other than Third-Party Managed Investments) of, or other claims against, PG&E Corporation or its affiliate Pacific Gas and Electric Company. (If selecting this option, please describe in your reply the date on which you sold or otherwise disposed of your securities or claims, the type of debt or equity securities that you hold, the legal name of the issuer, and/or the nature of any claim that you may hold or assert in the text field below.)

**II. Connections to the United States Trustee, or any Person Employed by the Office of the United States Trustee, for the Northern District of California.** The names of the United States Trustee, and employees in the office of the United States Trustee, for the Northern District of California are listed below:

| |
|---|
| Alison S. Manning |
| Anabel Abad-Santos |
| Avis J. Haynes |
| Carla K. Cordero |
| Donna S. Tamanaha |
| Gregory Powell |
| Irma H. Garcia |

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 67 of 88

**Exhibit B: Firmwide CSP Survey**

Firm Wide Survey

| |
|---|
| Kristin McAbee |
| Laurie Brugger |
| Lynette C. Kelly |
| Margaret H. McGee |
| Melinda R. Davis |
| Michelle Forrest |
| N. Bryan Green |
| Nicholas Strozza |
| Robbin D. Little |
| Robin Tubesing |
| Teresa B. Field |
| Timothy S. Laffredi |
| Tracy Hope Davis |
| Yung Nor Wong |
| Allen C. Massey |
| Ankey To |
| Cameron Gulden |
| D A Clarke Finneran |
| Edward M. McDonald |
| Ianthe V. Del Rosario |
| Jared A. Day |
| Joan C. Caskey |
| Kimberly Massey-Flores |
| Kristine Kinne |
| Lisa M. Grootendorst |
| Lynne C. Knight |
| Marta Villacorta |
| Michael O. Sorgaard |

Case: 19-36608    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 68 of 88

**Exhibit B: Firmwide CSP Survey**

Firm Wide Survey

| |
|---|
| Patricia Vargas |
| Robert S. Gordon |
| Sue Wolny |
| Terri Didion |
| Tina Spyksma |
| Trevor Fehr |

☐ I have connections to the United States Trustee, or to someone employed in the office of the United States Trustee, for the Northern District of California.

**III. Connections to any Bankruptcy Judges in the Northern District of California. The names of the Bankruptcy Judges in the Northern District of California are listed below:**

| |
|---|
| Chief Judge Charles Novack |
| Judge Roger L. Efremsky |
| Judge Stephen L. Johnson |
| Judge Dennis Montali |
| Amy Leitner |
| Anna Rosales |
| Benjamin V. Gapuz |
| Dina Kakalia |
| Jane Fabian |
| Kay Fransson |
| Laura Dripps |
| Lorena Parada |
| Peggy E. Brister |
| Raenna J. Rorabeck |
| Ruby Bautista |
| Terence Desouza |
| Judge Hannah L. Blumenstiel |

**Exhibit B: Firmwide CSP Survey**

Firm Wide Survey

| |
|---|
| Edward Emmons (Clerk of the Court) |
| Anna Lee |
| Audrey Gervasi |
| Cindy Fan |
| Emily Keller |
| Jane Galvani |
| Kenneth Conlan |
| Laurent Chen |
| Monica Burley |
| Rachel Stoian |
| Rahmon Brown |
| Shannon Mounger-Lum |

☐ I have connections to a Bankruptcy Judge for the Northern District of California.

**Previous**

Submit

# Exhibit C
# DCS Survey

**This email requires your response by November 15, 2019. We appreciate your time in completing this survey.**

**CONFIDENTIAL**

Dear Noah,

PG&E Corporation (together with its affiliate Pacific Gas and Electric Company, "PG&E") has been a long-standing Firm Client. Since PG&E petitioned for bankruptcy protection, we made a decision to continue our service to PG&E (but are not serving PG&E as an advisor on bankruptcy matters). Nonetheless, because of this ongoing service to our client, we are filing a formal application to be retained in the matter.

You are receiving this email in connection with McKinsey US's engagement by PG&E during their Chapter 11 bankruptcy, and a submission that McKinsey US will file with the U.S. Bankruptcy Court for that engagement. That submission will contain disclosures, including McKinsey US and certain of its affiliates' connections with entities previously identified as parties in interest to PG&E in the bankruptcy case.

As a result of the above, we need to disclose if any of our service to these interested parties since January 2016 was related to PG&E and we are using the below survey to collect that information.

Of the clients that you served, the following ones – – are indicated as interested parties (or the affiliates of interested parties) in the PG&E bankruptcy. Below, you will find two links: (1) a unique spreadsheet containing a list of all charge codes since January 2016 for your aforementioned clients identified as interested parties and (2) a unique survey with questions related to these clients. Your response is required only for these engagements.

It is important that you complete your own survey. Please complete your response by November 15, 2019.

If you do not have enough information about your designated engagements to complete the survey, please discuss with your colleagues who can provide you this information and then complete the survey.

This submission will be a public filing and will include the client names noted in the list of engagements linked below on a schedule with Firm clients that are, or are affiliates of, a party in interest. Provided the work was not related to PG&E, the disclosure will be limited to listing the client's name, among a list of what we expect will be hundreds of Firm clients, with no further detail. In the event the work was related to PG&E, we will need more information to evaluate further and to draft the relevant disclosure.

In the event revenues associated with a client exceed certain thresholds, we also will disclose that fact. We are undertaking an analysis to determine which, if any, clients meet such a threshold and will reach out to the relevant DCSs in advance of such disclosure.

**Please find the list of engagements that require your review here – [LIST OF ENGAGEMENTS]**

In case you require the names of the engagements listed above, please reach out to pge_mckinseyus@mckinsey.com

**Please find the survey link here – [LINK TO SURVEY]**

Contacts for Questions

If you have questions, please review the FAQ provided through this link: **LINK TO FAQ.**

Should you have any further questions please reach out to **pge_mckinseyus@mckinsey.com**.

If you are having any technical issues filling out this survey, please contact the **Global Helpdesk.**

Thanks in advance for your help.

Exhibit C: DCS Survey

DCS Survey

**Instructions: Please answer the questions below and provide additional information as relevant. Press submit at the bottom of this survey once you are done. In case you have erroneously entered this survey, please exit by closing this browser window.**

**To your knowledge, is (or was) our work for the clients below, with respect to your designated engagements, or any other engagements with these clients, in any way related to PG&E?**

AT&T

Please select your answer

Cargill

Please select your answer

CRH/Oldcastle

Please select your answer

United States Steel Corp

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 75 of 88

Exhibit C: DCS Survey

DCS Survey

**Please see the list of engagements copied below . Please note that the table layout may change if viewed on a mobile phone. For best results, please access this link on a computer.**

List of Engagements

Submit

Case: 19-36088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 76 of 88

| Master client name | Client name | Chargecode | DCS | ED |
|---|---|---|---|---|
| AT&T | AT&T | 1513RO | | Egleston, Eric |
| AT&T | AT&T | 3197EW | Schneider, Jeremy | Lamb, Michael |
| AT&T | AT&T | 4517JS | | Egleston, Eric |
| AT&T | AT&T | 5669SU | Atluri, Venkata | Bar Gat, Moran |
| AT&T | AT&T | 6533IY | | Egleston, Eric |
| AT&T | AT&T | 6534FS | | Lamb, Michael |
| AT&T | AT&T | 7091PV | Corb, Laura | Jabs, Nicolas |
| AT&T | AT&T | 7294UG | Corb, Laura | Surana, Kushan |
| AT&T | AT&T | 7470PO | | Egleston, Eric |
| AT&T | AT&T | ATT384 | Khanna, Rakesh | Khanna, Rakesh |
| AT&T | AT&T | ATT386 | Goldstrom, Seth | Dorton, David |
| AT&T | AT&T | ATT388 | Goldstrom, Seth | Fedewa, David |
| AT&T | AT&T | ATT394 | Khanna, Rakesh | Sareen, Lia |
| AT&T | AT&T | ATT398 | Khanna, Rakesh | Imtiaz, Mohsin |
| AT&T | AT&T | ATT399 | Goldstrom, Seth | Jain, Pallav |
| AT&T | AT&T | ATT400 | Goldstrom, Seth | Sareen, Lia |
| AT&T | AT&T | ATT402 | Goldstrom, Seth | Jain, Pallav |
| AT&T | AT&T | ATT403 | Goldstrom, Seth | Jain, Pallav |
| AT&T | AT&T | ATT407 | Khanna, Rakesh | Imtiaz, Mohsin |
| AT&T | AT&T | ATT413 | Goldstrom, Seth | Miller, Duncan |
| AT&T | AT&T | ATT416 | Khanna, Rakesh | Imtiaz, Mohsin |
| AT&T | AT&T | ATT417 | Goldstrom, Seth | Miller, Duncan |
| AT&T | AT&T | ATT418 | Corb, Laura | Dunn, Jonathan |
| AT&T | AT&T | ATT419 | Schneider, Jeremy | Schneider, Jeremy |
| AT&T | AT&T | ATT420 | Atluri, Venkata | Imtiaz, Mohsin |
| AT&T | AT&T | ATT421 | Atluri, Venkata | Imtiaz, Mohsin |
| AT&T | AT&T | ATT422 | Goldstrom, Seth | Jain, Pallav |
| AT&T | AT&T | ATT423 | Atluri, Venkata | Imtiaz, Mohsin |
| AT&T | AT&T | ATT424 | Goldstrom, Seth | Ahuja, Kabir |
| AT&T | AT&T | ATT425 | Corb, Laura | Ahuja, Kabir |
| AT&T | AT&T | ATT426 | Goldstrom, Seth | Ahuja, Kabir |
| AT&T | AT&T | ATT427 | Ortega, Francisco | Diehl, Rodrigo |
| AT&T | AT&T | ATT428 | Dorton, David | Goldstrom, Seth |
| AT&T | AT&T | ATT429 | Goldstrom, Seth | Ritter, David |
| AT&T | AT&T | ATT430 | Goldstrom, Seth | Miller, Duncan |
| AT&T | AT&T | ATT431 | Goldstrom, Seth | Dorton, David |
| AT&T | AT&T | ATT433 | Schneider, Jeremy | Ahuja, Kabir |
| AT&T | AT&T | ATT434 | Kutcher, Eric | Surana, Kushan |
| AT&T | AT&T | ATT435 | Jain, Pallav | Burns, Tiffany |
| AT&T | AT&T | ATT436 | Kutcher, Eric | Surana, Kushan |
| AT&T | AT&T | ATT437 | Goldstrom, Seth | Ahuja, Kabir |
| AT&T | AT&T | ATT438 | Kutcher, Eric | Egleston, Eric |
| AT&T | AT&T | ATT439 | Fagan, Travis | Egleston, Eric |
| AT&T | AT&T | ATT440 | Corb, Laura | Ahuja, Kabir |
| AT&T | AT&T | ATT441 | Kutcher, Eric | Imtiaz, Mohsin |
| AT&T | AT&T | ATT442 | Goldstrom, Seth | Egleston, Eric |
| AT&T | AT&T | ATT443 | Atluri, Venkata | Surana, Kushan |
| AT&T | AT&T | ATT444 | Schneider, Jeremy | Ahuja, Kabir |
| AT&T | AT&T | ATT445 | Fagan, Travis | Egleston, Eric |
| AT&T | AT&T | ATT446 | Imtiaz, Mohsin | O'Neill, Brian |
| AT&T | AT&T | ATT447 | Kutcher, Eric | Egleston, Eric |
| AT&T | AT&T | ATT448 | Kutcher, Eric | Surana, Kushan |
| AT&T | AT&T | ATT449 | Imtiaz, Mohsin | Surana, Kushan |
| AT&T | AT&T | ATT450 | Jain, Pallav | Surana, Kushan |
| AT&T | AT&T | ATT451 | Kutcher, Eric | Surana, Kushan |

| Master client name | Client name | Chargecode | DCS | ED |
|---|---|---|---|---|
| AT&T | AT&T | ATT452 | Atluri, Venkata | Imtiaz, Mohsin |
| AT&T | AT&T | ATT453 | Schneider, Jeremy | Schneider, Jeremy |
| AT&T | AT&T | ATT457 | Corb, Laura | Ahuja, Kabir |
| AT&T | AT&T | ATT460 | Fagan, Travis | Egleston, Eric |
| AT&T | AT&T | ATT461 | Corb, Laura | Ahuja, Kabir |
| AT&T | AT&T | ATT462 | Miller, Duncan | O'Neill, Brian |
| AT&T | AT&T | ATT463 | Corb, Laura | Ahuja, Kabir |
| AT&T | AT&T | ATT464 | | Surana, Kushan |
| AT&T | AT&T | ATT465 | | Surana, Kushan |
| AT&T | AT&T | ATT466 | Kutcher, Eric | Deimund, Matthew |
| AT&T | AT&T | ATT467 | | Ahuja, Kabir |
| AT&T | Sky Brasil Serviços Ltda. | 7939PH | Stul, Fábio | Codo, Gabriel |
| AT&T | Sky Brasil Serviços Ltda. | 9590YE | Stul, Fábio | Codo, Gabriel |
| CRH/Oldcastle | CRH Americas | OPL068 | Goldstrom, Seth | Paulowsky, Ryan |
| CRH/Oldcastle | CRH Americas | OPL075 | Paulowsky, Ryan | O'Connell, Sean |
| CRH/Oldcastle | CRH plc | 8787DQ | Birshan, Michael | Morgan, Paul |
| CRH/Oldcastle | Oldcastle | OPL051 | Niemeyer, Alex | Bueno, Juan |
| CRH/Oldcastle | Oldcastle | OPL053 | Niemeyer, Alex | Bueno, Juan |
| CRH/Oldcastle | Oldcastle | OPL056 | Goldstrom, Seth | Bueno, Juan |
| CRH/Oldcastle | Oldcastle – APG (Architectural Products Group) | OPL084 | Birshan, Michael | Paulowsky, Ryan |
| CRH/Oldcastle | Oldcastle Inc. | OPL071 | Goldstrom, Seth | Paulowsky, Ryan |
| Cargill | Cargill | 0450OY | | Soon, Suyin |
| Cargill | Cargill | 1103ZV | Stockdale, Owen | Fiocco, David |
| Cargill | Cargill | 1875GW | Kuijpers, Dymfke | Soon, Suyin |
| Cargill | Cargill | 2112TZ | | Roth, Brian |
| Cargill | Cargill | 3387PN | | Soon, Suyin |
| Cargill | Cargill | 3569DC | Stockdale, Owen | Fiocco, David |
| Cargill | Cargill | 3724VZ | Uchoa de Paula, Roberto | Lyn, Sheldon |
| Cargill | Cargill | 7217QQ | Stockdale, Owen | Fiocco, David |
| Cargill | Cargill | 7795SH | Kuijpers, Dymfke | Soon, Suyin |
| Cargill | Cargill | 7804WN | Johnston, Matthew | Ganina, Irina |
| Cargill | Cargill | 8169UT | Uchoa de Paula, Roberto | Camp, Alexandra |
| Cargill | Cargill | CLE079 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE086 | Frei, Robert | Houston, Patrick |
| Cargill | Cargill | CLE089 | Frei, Robert | Hansen, Doan |
| Cargill | Cargill | CLE093 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE094 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE095 | Frei, Robert | Frei, Robert |
| Cargill | Cargill | CLE096 | Frei, Robert | Hansen, Doan |
| Cargill | Cargill | CLE105 | Goldstrom, Seth | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE106 | Bender, Michael | Shah, Akash |
| Cargill | Cargill | CLE107 | Fritzen, Søren | Theunissen, Rob |
| Cargill | Cargill | CLE110 | Fritzen, Søren | Theunissen, Rob |
| Cargill | Cargill | CLE111 | Frei, Robert | Leviatan, Adi |
| Cargill | Cargill | CLE112 | Fritzen, Søren | Pucks, Kersten |
| Cargill | Cargill | CLE115 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE116 | Uchoa de Paula, Roberto | Winkler, Georg |
| Cargill | Cargill | CLE117 | Goldstrom, Seth | Uchoa de Paula, Roberto |
| Cargill | Cargill | CLE118 | Bender, Michael | Defossez, Katya |
| Cargill | Cargill | CLE119 | Fritzen, Søren | Theunissen, Rob |
| Cargill | Cargill | CLE121 | Frei, Robert | Hansen, Doan |
| Cargill | Cargill | CLE122 | Fritzen, Søren | Pucks, Kersten |
| Cargill | Cargill | CLE124 | Uchoa de Paula, Roberto | Naumann, Ivo |
| Cargill | Cargill | CLE125 | Schaninger, Bill | Schaninger, Bill |
| Cargill | Cargill | CLE127 | Frei, Robert | Uchoa de Paula, Roberto |

# Exhibit C: DCS Survey

| Master client name | Client name | Chargecode | DCS | ED |
|---|---|---|---|---|
| Cargill | Cargill | CLE134 | Frei, Robert | Hirose, Rogerio |
| Cargill | Cargill | CLE136 | Frei, Robert | Hirose, Rogerio |
| Cargill | Cargill | CLE137 | Stul, Fábio | Stul, Fábio |
| Cargill | Cargill | CLE138 | Furtado, Bruno | Teixeira, Henrique |
| Cargill | Cargill | CLE139 | Teixeira, Henrique | Teixeira, Henrique |
| Cargill | Cargill | CLE140 | Frei, Robert | Stul, Fábio |
| Cargill | Cargill | CLE141 | Frei, Robert | Stul, Fábio |
| Cargill | Cargill | CLE142 | Frei, Robert | Teixeira, Henrique |
| Cargill | Cargill | CLE145 | Stul, Fábio | Teixeira, Henrique |
| Cargill | Cargill | CLE148 | Stul, Fábio | Teixeira, Henrique |
| Cargill | Cargill | CLE150 | Frei, Robert | Naumann, Ivo |
| Cargill | Cargill | CLE151 | Uchoa de Paula, Roberto | Stockdale, Owen |
| Cargill | Cargill | CLE152 | Frei, Robert | Stul, Fábio |
| Cargill | Cargill | CLE153 | Hansen, Doan | Naumann, Ivo |
| Cargill | Cargill | CLE154 | Hansen, Doan | Naumann, Ivo |
| Cargill | Cargill | CLE155 | Hansen, Doan | Naumann, Ivo |
| Cargill | Cargill | CLE156 | Frei, Robert | Stul, Fábio |
| Cargill | Cargill | CLE159 | Uchoa de Paula, Roberto | Stockdale, Owen |
| Cargill | Cargill | CLE161 | Stul, Fábio | Stul, Fábio |
| Cargill | Cargill | CLE162 | Stul, Fábio | Stul, Fábio |
| Cargill | Cargill | CLE168 | Hansen, Doan | Naumann, Ivo |
| Cargill | Cargill | CLE169 | Hansen, Doan | Naumann, Ivo |
| Cargill | Cargill Animal Nutrition | CLE102 | Frei, Robert | Holte, Martin Bech |
| Cargill | Cargill Animal Nutrition | CLE120 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill Corn Milling North America | CLE104 | Frei, Robert | Smith, Micah |
| Cargill | Cargill Corn Milling North America | CLE114 | Frei, Robert | Sclove, Jared |
| Cargill | Cargill Feed & Nutrition | CLE088 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Cargill Feed & Nutrition | CLE092 | Frei, Robert | Houston, Patrick |
| Cargill | Mosaic | CLE085 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE099 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE100 | Frei, Robert | Uchoa de Paula, Roberto |
| Cargill | Mosaic | CLE101 | Frei, Robert | Goulder, Michael |
| Cargill | Mosaic | CLE126 | Sternfels, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE143 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE144 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE146 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE149 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE157 | Frei, Robert | Rubinstein, Bernardo |
| Cargill | Mosaic | CLE158 | Frei, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE160 | Ferreira, Nelson | Rubinstein, Bernardo |
| Cargill | Mosaic | CLE163 | Sternfels, Robert | Stockdale, Owen |
| Cargill | Mosaic | CLE164 | Frei, Robert | Rubinstein, Bernardo |
| Cargill | Mosaic | CLE165 | Frei, Robert | Rubinstein, Bernardo |
| Cargill | Mosaic | CLE166 | Frei, Robert | Rubinstein, Bernardo |
| Cargill | Mosaic | CLE167 | Frei, Robert | Rubinstein, Bernardo |
| Cargill | The Mosaic Company | 0565MZ | Sternfels, Robert | Blackburn, Scott |
| United States Steel Corp | US Steel | UTS019 | Padhi, Asutosh | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS026 | Padhi, Asutosh | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS030 | Padhi, Asutosh | Ebenstein, David |
| United States Steel Corp | US Steel | UTS031 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS037 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS043 | Padhi, Asutosh | Nariman, Khushrav |
| United States Steel Corp | US Steel | UTS046 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS049 | Padhi, Asutosh | Ebert, Joachim |
| United States Steel Corp | US Steel | UTS057 | Padhi, Asutosh | Ondas, Martin |

| Master client name | Client name | Chargecode | DCS | ED |
|---|---|---|---|---|
| United States Steel Corp | US Steel | UTS058 | Padhi, Asutosh | Padhi, Asutosh |
| United States Steel Corp | US Steel | UTS059 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS065 | Padhi, Asutosh | Phaf, Niels |
| United States Steel Corp | US Steel | UTS066 | Goldstrom, Seth | Davies, Ryan |
| United States Steel Corp | US Steel | UTS067 | Padhi, Asutosh | Ondas, Martin |
| United States Steel Corp | US Steel | UTS068 | Padhi, Asutosh | Sellschop, Richard |
| United States Steel Corp | US Steel | UTS069 | Goldstrom, Seth | Sellschop, Richard |
| United States Steel Corp | US Steel | UTS072 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS073 | Goldstrom, Seth | Cyriac, Joseph |
| United States Steel Corp | US Steel | UTS075 | Padhi, Asutosh | Davies, Ryan |
| United States Steel Corp | US Steel | UTS076 | Padhi, Asutosh | Noor, Muhammad |
| United States Steel Corp | US Steel | UTS078 | Padhi, Asutosh | Paulowsky, Ryan |
| United States Steel Corp | US Steel | UTS079 | Padhi, Asutosh | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS080 | Padhi, Asutosh | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS081 | Padhi, Asutosh | Padhi, Asutosh |
| United States Steel Corp | US Steel | UTS082 | Padhi, Asutosh | Lehmitz, Soenke |
| United States Steel Corp | US Steel | UTS083 | Padhi, Asutosh | Padhi, Asutosh |
| United States Steel Corp | US Steel | UTS084 | Padhi, Asutosh | Parsons, Matthew |
| United States Steel Corp | US Steel | UTS085 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS086 | Padhi, Asutosh | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS087 | Padhi, Asutosh | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS090 | Padhi, Asutosh | Noor, Muhammad |
| United States Steel Corp | US Steel | UTS091 | Padhi, Asutosh | Svoboda, Daniel |
| United States Steel Corp | US Steel | UTS092 | Padhi, Asutosh | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS093 | Padhi, Asutosh | Noor, Muhammad |
| United States Steel Corp | US Steel | UTS095 | Padhi, Asutosh | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS098 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS099 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS100 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS101 | Goldstrom, Seth | Melrose, Craig |
| United States Steel Corp | US Steel | UTS102 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS105 | Goldstrom, Seth | Ebenstein, David |
| United States Steel Corp | US Steel | UTS107 | Lehmitz, Soenke | Wijpkema, Jacobus |
| United States Steel Corp | US Steel | UTS109 | Goldstrom, Seth | Melrose, Craig |
| United States Steel Corp | US Steel | UTS110 | Goldstrom, Seth | Melrose, Craig |
| United States Steel Corp | US Steel | UTS111 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS112 | Padhi, Asutosh | Melrose, Craig |
| United States Steel Corp | US Steel | UTS119 | Padhi, Asutosh | Goldstrom, Seth |
| United States Steel Corp | US Steel | UTS120 | Goldstrom, Seth | Gentzel, Matthew |
| United States Steel Corp | US Steel | UTS121 | Padhi, Asutosh | Evans, Robert |
| United States Steel Corp | US Steel | UTS122 | Ebenstein, David | Parsons, Matthew |
| United States Steel Corp | US Steel | UTS123 | Relyea, Charlotte | Yueh, Emily |
| United States Steel Corp | US Steel | UTS124 | Wijpkema, Jacobus | Paulowsky, Ryan |
| United States Steel Corp | US Steel | UTS125 | Relyea, Charlotte | Yueh, Emily |
| United States Steel Corp | US Steel | UTS127 | Goldstrom, Seth | Horah, Andrew |
| United States Steel Corp | US Steel | UTS128 | Padhi, Asutosh | Evans, Robert |
| United States Steel Corp | US Steel | UTS129 | Padhi, Asutosh | Hazarika, Abhisek |
| United States Steel Corp | US Steel | UTS130 | Padhi, Asutosh | Chandra, Pranav |
| United States Steel Corp | US Steel Corporation | UTS096 | Goldstrom, Seth | Goldstrom, Seth |
| United States Steel Corp | US Steel Corporation | UTS097 | Goldstrom, Seth | Parsons, Matthew |
| United States Steel Corp | US Steel Corporation | UTS103 | Goldstrom, Seth | Ebenstein, David |
| United States Steel Corp | US Steel Corporation | UTS104 | Padhi, Asutosh | Ebenstein, David |
| United States Steel Corp | US Steel Corporation | UTS106 | Padhi, Asutosh | Hensley, Russell |
| United States Steel Corp | US Steel Corporation | UTS108 | Dorton, David | Relyea, Charlotte |
| United States Steel Corp | US Steel Corporation | UTS113 | Padhi, Asutosh | Lehmitz, Soenke |

# Exhibit D
# Engagement CSP Survey

This email requires your response by November 22, 2019. You may receive multiple emails on this subject.

You are required to respond to each email.

Dear Noah,

PG&E Corporation (together with its affiliate Pacific Gas and Electric Company, "PG&E") has been a long-standing Firm Client. Since PG&E petitioned for bankruptcy protection, we made a decision to continue our service to PG&E (but are not serving PG&E as an advisor on bankruptcy matters). Nonetheless, because of this ongoing service to our client, we are filing a formal application to be retained in the matter.

In order for McKinsey US's engagement to be approved by the U.S. Bankruptcy Court, we will submit certain disclosures, including McKinsey US's connections with entities identified by PG&E as parties in interest in the bankruptcy case. The list of interested parties can be accessed using the link provided at the bottom of this email or directly through the survey link. Please review this list before completing the survey.

McKinsey US has identified you as a member of the team providing services to PG&E. Accordingly, we are reaching out to you to determine:

(1) whether you have any personal connections with any parties in interest (i.e., other than connections through your work at McKinsey);

(2) whether you are aware of any person or entity not included on the interested parties list that you think should have been included because it is an interested party in PG&E's bankruptcy (for example, because it is or was a creditor of, or has or had some other business connection to, PG&E, PG&E's assets, or the work being performed by the PG&E team);

(3) whether you have worked with any of the MIO Partners, Inc. ("MIO") directors listed below in their capacities as MIO board members

MIO Directors

1. Tom Barkin

2  Ivo Bozon

3. Kevin Buehler

4. Christine Cumming

5. Toos Daruvala

6. Timothy Flynn

7. Jon Garcia

8. Martin Huber

9. Elizabeth Lempres

10. Vikram Malhotra

11. Jean-Christophe Mieszala

12. Gordon Orr

13. Stefan Spang

14. Kevin Speicher

15. Magnus Tyreman

16. Don Waite III

17. Paal Weberg

18  Adil Zainulbhai

; and

(4) whether you are related to or have any relationship with any of those MIO board members, other than one arising out of having McKinsey as a common employer.

**Please answer the questions below by clicking on the appropriate option in the survey link provided. Your response is required by close of business on <u>November 22, 2019.</u>**

If you have any questions, please do not hesitate to reach out to pge_mckinseyus@mckinsey.com

Thanks in advance for your help.

**Interested Parties List**

**Please find the survey link here –** **[LINK TO SURVEY]**

Exhibit D: Engagement CSP Survey

Deal team survey

Please answer the questions below by clicking on the appropriate option. Your response is required by close of business on <u>November 22, 2019</u>.

From <u>October 31, 2018</u> to the present, to your knowledge, did you or do you have any connections, other than professional client relationships in your capacity as a McKinsey professional, with any entity, person, or any person employed by any entity on the <span style="color:blue">linked interested parties list</span>?

This would include, for example, social or family relationships with, stock you hold directly in (but not through mutual funds and other investment vehicles that are managed by third parties with delegated investment authority and discretion), or prior employment by a party or someone employed by a party on the <span style="color:blue">linked interested parties list</span>.

     Yes

     No

Are you aware of any person or entity not included on the linked interested parties list that you think should have been included because it is an interested party in PG&E's bankruptcy (for example, because it is or was a creditor of, or has or had some other business connection to, PG&E, PG&E's assets, or the work being performed by the PG&E team)?

     Yes

     No

Have you worked with any of the MIO Partners, Inc. ("MIO") directors listed below and in the survey email in their capacities as MIO board members?

1. Tom Barkin
2. Ivo Bozon
3. Kevin Buehler
4. Christine Cumming
5. Toos Daruvala
6. Timothy Flynn
7. Jon Garcia
8. Martin Huber

Case: 19-30088    Doc# 5950-4    Filed: 02/26/20    Entered: 02/26/20 21:57:07    Page 86 of 88

**Exhibit D: Engagement CSP Survey**

Deal team survey

11. Jean-Christophe Mieszala

12. Gordon Orr

13. Stefan Spang

14. Kevin Speicher

15. Magnus Tyreman

16. Don Waite III

17. Paal Weberg

18. Adil Zainulbhai

☐ Yes

☐ No

**Are you related to or do you have a relationship with any of the MIO directors listed below and in the survey email, other than one arising out of having McKinsey as a common employer?**

1. Tom Barkin

2. Ivo Bozon

3. Kevin Buehler

4. Christine Cumming

5. Toos Daruvala

6. Timothy Flynn

7. Jon Garcia

8. Martin Huber

9. Elizabeth Lempres

10. Vikram Malhotra

11. Jean-Christophe Mieszala

12. Gordon Orr

13. Stefan Spang

14. Kevin Speicher

15. Magnus Tyreman

16. Don Waite III

17. Paal Weberg

18. Adil Zainulbhai

☐ Yes

☐ No

Case: 19-30088    Doc# 5924-2    Filed: 02/26/20    Entered: 02/26/20 21:37:07    Page 87 of 88

**Exhibit D: Engagement CSP Survey**

Deal team survey

Previous　　　　　　　　　　　　　　　　　　　　　　　　Submit

Case: 19-36088　　Doc# 5924-2　　Filed: 02/26/20　　Entered: 02/26/20 21:37:07　　Page 88 of 88