1          UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                    -oOo-

4   In Re:                    ) Case No. 19-30088
                              ) Chapter 11
5   PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY   ) San Francisco, California
6                              ) Wednesday, February 26, 2020
                    Debtors.   ) 10:01 AM
7   _____  )
                              OMNIBUS OBJECTION OF THE
8                             OFFICIAL COMMITTEE OF TORT
                              CLAIMANTS (SUBSTANTIVE) TO
9                             NO-LIABILITY CLAIMS, FILED BY
                              THE DEPARTMENT OF HOMELAND
10                            SECURITY / FEDERAL EMERGENCY
                              MANAGEMENT AGENCY (CLAIM NOS.
11                            59692, 59734 & 59783) FILED
                              BY OFFICIAL COMMITTEE OF TORT
12                            CLAIMANTS [4943]

13                            OMNIBUS OBJECTION OF THE
                              OFFICIAL COMMITTEE OF TORT
14                            CLAIMANTS (SUBSTANTIVE) TO
                              CLAIMS, FILED BY CALIFORNIA
15                            GOVERNOR'S OFFICE OF
                              EMERGENCY SERVICES (CLAIM
16                            NOS. 87748, 87754, & 87755)
                              [5096]
17
                              COURT'S INTENTIONS RE:
18                            PROPOSED ORDER RE: MOTION TO
                              APPLY RULE 7023, AND ORDER
19                            SETTING DEADLINE [5042]

20              TRANSCRIPT OF PROCEEDINGS
              BEFORE HONORABLE DENNIS MONTALI
21            UNITED STATES BANKRUPTCY JUDGE

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   APPEARANCES:
     For the Debtors:            STEPHEN KAROTKIN, ESQ.
 2                               Weil, Gotshal & Manges LLP
                                 767 Fifth Avenue
 3                               New York, NY 10153
                                 (212) 310-8000
 4
                                 PAUL H. ZUMBRO, ESQ.
 5                               Cravath, Swaine & Moore LLP
                                 85 Eighth Avenue
 6                               New York, NY 10019
                                 (212) 474-1000
 7
     For the Official Committee  ROBERT A. JULIAN, ESQ.
 8   of Tort Claimants:          DAVID J. RICHARDSON, ESQ.
                                 Baker & Hostetler LLP
 9                               11601 Wilshire Boulevard
                                 Suite 1400
10                               Los Angeles, CA 90025
                                 (310) 820-8800
11
                                 ERIC R. GOODMAN, ESQ.
12                               Baker & Hostetler LLP
                                 Key Tower, 127 Public Square
13                               Suite 2000
                                 Cleveland, OH 44114
14                               (216) 621-0200

15   For California Governor's   MATTHEW HEYN, DAG
     Office of Emergency         California Department of Justice
16   Services (Cal OES):         Business & Tax Section
                                 300 S. Spring Street
17                               Suite 1702
                                 Los Angeles, CA 90013
18                               (213) 897-2444

19   For California State        PAUL J. PASCUZZI, ESQ.
     Agencies:                   Felderstein Fitzgerald Willoughby
20                               Pascuzzi & Rios LLP
                                 500 Capitol Mall
21                               Suite 2250
                                 Sacramento, CA 95814
22                               (916) 329-7400
     For Public Employees        RANDY MICHELSON, ESQ.
23   Retirement Association of    Michelson Law Group
     New Mexico:                 220 Montgomery Street
24                               Suite 2100
                                 San Francisco, CA 94104
25                               (415) 512-8600
```

```
 1   For Public Employees       MICHAEL S. ETKIN, ESQ.
     Retirement Association of  (Telephonically)
 2   New Mexico (cont'd.):      Lowenstein Sandler LLP
                                One Lowenstein Drive
 3                              Roseland, NJ 07068
                                (973) 597-2500
 4
                                NICOLE M. ZEISS, ESQ.
 5                              (Telephonically)
                                Labaton Sucharow
 6                              140 Broadway
                                New York, NY 10005
 7                              (212) 907-0867

 8   For the United States of   MATTHEW JORDAN TROY, ESQ.
     America:                   MICHAEL TYE, ESQ.
 9                              US Department of Justice, Civil
                                Division
10                              P.O. Box 875
                                Ben Franklin Station
11                              Washington, DC 20044
                                (202) 305-2419
12

13

14

15

16

17

18

19

20   Court Recorder:            ANKEY THOMAS

21   Transcriber:               CLARA RUBIN
                                eScribers, LLC
22                              7227 N. 16th Street
                                Suite #207
23                              Phoenix, AZ 85020
                                (973)406-2250
24

     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    SAN FRANCISCO, CALIFORNIA, WEDNESDAY, FEBRUARY 26, 2020,

2                            10:01 AM

3                            -oOo-

4        (Call to order of the Court.)

5        THE CLERK:  All rise.  Court is now in session, the

6    Honorable Dennis Montali presiding.

7        THE COURT:  Good morning, everyone.

8        IN UNISON:  Good morning, Your Honor.

9        THE CLERK:  Matter of PG&E Corporation.

10       THE COURT:  All right, we're scheduled to go with the

11   oral arguments on the claim objection.  I'm ready to go.

12   Anybody want to take any out of order first?

13       All right, let's go with the TCC's objections to the

14   FEMA claim.  You going to do that argument, Mr. Julian?  I have

15   one question for you, but go ahead.  Are you going to -- do you

16   have anything preliminary?

17       MR. JULIAN:  Yeah, I'm just going to set it up, Your

18   Honor.  The TCC and the debtors have allocated twenty-five

19   minutes to their opening and reserving five minutes.  Mr.

20   Goodman of BakerHostetler will argue the TCC objection filed by

21   Mr. Zumbro for the debtors.

22       THE COURT:  Okay.

23       MR. JULIAN:  I wish to state only that the factual

24   issues that we have raised in our objections and supplemental

25   objections, including our January 9 supplemental objection

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    detailing FEMA's alleged negligence, is not before you today.

2              THE COURT:  Right.

3              MR. JULIAN:  Legal issue only.  The Sharon Zimmerman

4    type of letters that you received, therefore, are not before

5    you as to why FEMA's claim should be denied.

6              THE COURT:  Well, if I agree with your basic premise,

7    we never get to the supplement.

8              MR. JULIAN:  Exactly.

9              THE COURT:  Okay.  All right.

10             MR. JULIAN:  I'll turn it over to Mr. Goodman, Your

11   Honor.  Thank you.

12             THE COURT:  Mr. Goodman, good morning.

13             MR. GOODMAN:  Good morning.

14             THE COURT:  Let me make one preliminary comment, Mr.

15   Goodman.  I've read extensive briefs, and the time is somewhat

16   limited.  So you can make whatever argument you want, but I

17   think the question of the literal wording of Section 317 in the

18   FEMA's -- in the Stafford Act is pretty laid out, and I don't

19   think you need to go back and -- go back and do that.

20             I have one specific question, though.  In your

21   thorough briefing -- and I compliment both sides for extensive

22   briefing.  But in your reply, what you didn't comment on are

23   three cases that were cited by FEMA, I believe; but whether

24   they were cited by FEMA, they were cited by now-retired

25   Justice -- Former Judge Kennedy in the City of Flagstaff case.

PG&E Corp. and Pacific Gas and Electric Company

1    And so in that case, when the Court is deciding the

2  free-services issue and interpretation, it -- the decision

3  cites three cases that are out of circuit -- one Seventh

4  Circuit -- no, two Seventh Circuit, excuse me, and one district

5  court, I think.  And there was no discussion of those.  And so

6  if you don't know them offhand -- this isn't a quiz; I'm not

7  going to grade you.  But what the decision seems to say is that

8  there are exceptions, and then they gave examples of

9  government -- getting around the free-services doctrine.

10    So to the extent that you can help me on that and then

11  on anything you think that are (sic) particularly pertinent to

12  the alternative arguments that FEMA has made about nuisance and

13  unjust enrichment or anything else you want to argue -- and I'm

14  not going to limit you beyond that, but that's the question

15  that's on my mind.

16    MR. GOODMAN:  Sure.  If it's a quiz --

17    THE COURT:  Yeah, it's a quiz.

18    MR. GOODMAN:  -- we're prepared --

19    THE COURT:  Go for it.

20    MR. GOODMAN:  -- for that one.  So we're on page --

21    THE COURT:  I'm not going to grade you this morning.

22    MR. GOODMAN:  Well, you'll let me know.

23    We're on page 324 of the Flagstaff decision --

24    THE COURT:  That's right.

25    MR. GOODMAN:  -- at 719 F.2d 322; 1983 --

PG&E Corp. and Pacific Gas and Electric Company

1        THE COURT:  Right.

2        MR. GOODMAN:  -- Ninth Circuit decision.  This follows

3   from the Ninth Circuit's conclusion that the City of Flagstaff

4   would not have a claim, based on the free-public-services

5   doctrine, for the trail derailment containing hazardous

6   materials.  So the city has at this point lost.

7        THE COURT:  Right.

8        MR. GOODMAN:  Right.  And the Court is now addressing

9   some of the cases that have been raised by the city.  So I

10  would note I don't view this as part of the core holding, but

11  let's --

12       THE COURT:  No, it's not.

13       MR. GOODMAN:  -- let's go through it.

14       THE COURT:  It's a throwaway.  I mean, it's sort of

15  like we'll deal with that some other time.

16       MR. GOODMAN:  Right.  So let's go through each of the

17  cases that the Ninth Circuit referred to on page 324 of the

18  decision.  And the quote I think that you're keying on is,

19  "Recovery has also been allowed where the acts of a private

20  party create a public nuisance which the government seeks to

21  abate".

22       THE COURT:  Correct.

23       MR. GOODMAN:  So the first case is Town of East Troy

24  v. Soo Line Railroad Co.; it's a Seventh Circuit case from

25  1980.  That case involved the application of a Wisconsin

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    statute that gave "any person, county, city, village, or town"

2    a right to assert an action to abate a public nuisance.  So

3    that case actually involved a statutory claim, which would be

4    similar to California law permitting CAL FIRE to recover fire-

5    suppression costs.

6         THE COURT:  Like the health and safety in --

7         MR. GOODMAN:  Correct.

8         THE COURT:  -- 19-003 or --

9         MR. GOODMAN:  Right.

10        THE COURT:  You know the numbers.

11        MR. GOODMAN:  Right; nothing unusual about that one.

12        The next case referred to by the Seventh Circuit is

13   the City of Evansville v. Kentucky Liquid Recycling.  This is

14   another decision by the Seventh Circuit.  That case involved an

15   intrastate dispute over the discharge of contaminants into the

16   Ohio River.  The federal common law of nuisance applied there

17   because it was an intrastate dispute where federal common law

18   has been found to exist.  There's no such dispute here.  So

19   that would fall --

20        THE COURT:  Well, there's no intrastate concept,

21   obviously.

22        MR. GOODMAN:  Correct.  There's no federal common law

23   that would apply to PG&E in this context, would be my point, in

24   terms of the federal-common-law rule that was developing,

25   involving riparian rights and water moving between states; a

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1 creature that was specific to that context. So that case would

2 fall squarely within that line of authority.

3 The next decision that's cited by the Ninth Circuit is

4 United States v. Illinois Terminal Railroad. Again, that was

5 another case involving navigable waters, and in that case it

6 was the Illinois River.

7 And fourth, we have the United States v. Chesapeake &

8 Ohio Railway. That case involved a claim by the United States

9 Forest Service to recover the costs of a fire that had

10 threatened public lands. And that's a key distinction. If a

11 government entity is appearing based on damage done to public

12 property, it would not necessarily be barred by the free-

13 public-services doctrine, because at that point it would be

14 asserting a claim --

15 THE COURT: Oh, a national forest.

16 MR. GOODMAN: -- just like any other --

17 THE COURT: The court said national forest, yeah.

18 MR. GOODMAN: Correct. Right.

19 THE COURT: Okay.

20 MR. GOODMAN: So none of these cases that are cited by

21 the Ninth Circuit on page 324 of the Flagstaff decision would

22 lend any support to FEMA's claims in this case.

23 THE COURT: So if FEMA had taken some expense --

24 incurred some expense dealing with any fire damage to public

25 land, maybe we'd have a different outcome for that.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1      MR. GOODMAN:  Right.  And there are claims in this

2  case, asserted by federal agencies, for damage to public

3  property; the FEMA claim is just not one of them.

4      THE COURT:  Okay.  Thank you.  That's helpful.

5      MR. GOODMAN:  Okay.  Secondly, I'd also add on to that

6  point, it's not just the free-public-services doctrine that

7  would bar FEMA's nonstatutory claims, but you also have the

8  issue of whether a common-law claim would exist, given the

9  enactment of Section 317 and 312 of the Stafford Act.  This

10  would follow under the American Electric Power decision that we

11  cite in our brief.  Simply, there can't be no dual track where

12  FEMA can rely on a statute to assert its claims.  There's no

13  common-law backup rule at this point.  So --

14      THE COURT:  Well, but you're not -- this is not a

15  preemption argument, though.  This is something else, right?

16  You're not -- I mean, you make -- there is a preemption issue

17  floating around here.  But --

18      MR. GOODMAN:  It's --

19      THE COURT:  -- that's not what we're talking about, is

20  it?

21      MR. GOODMAN:  Well, it's both.  I think that you get

22  to the same result.  If you start with the free-public-services

23  doctrine, I think the conclusion you would reach is that FEMA's

24  claim rises and falls on Section 317 of the Stafford Act.  If

25  you come at it from a preemption perspective, again, looking at

PG&E Corp. and Pacific Gas and Electric Company

1  the American Electric Power decision from the Supreme Court in

2  2011, "The test for whether congressional legislation excludes

3  the declaration of federal common law is simply whether the

4  statute 'speak[s] directly to [the] question' at issue."  Here

5  we have a statute that speaks directly to the question at

6  issue, which is whether FEMA can recover the disaster-related

7  costs for the disaster-related assistance that are (sic)

8  provided here.  So all roads lead to the same conclusion, which

9  is that it's Section 317 or bust.

10      THE COURT:  Well, but how do I reconcile the argument

11  that, even if Section 317 is not available, not -- I mean, it's

12  available but the words don't work.  I mean, you make the point

13  that we're not talking about willful torts.  But what about

14  FEMA's argument:  well, we've got this common-law California

15  law, common-law nuisance, Health and Safety Code, and whatever.

16  Can't FEMA rely on that?

17      MR. GOODMAN:  No.

18      THE COURT:  Okay.

19      MR. GOODMAN:  They cannot.

20      THE COURT:  But again, is it because of preemption or

21  because of this American Electric doctrine or -- what's the

22  label that in your mind closes the door to FEMA coming in that

23  way?

24      MR. GOODMAN:  I think the door's closed twice and it's

25  welded shut.  There's no escape.  Right.

PG&E Corp. and Pacific Gas and Electric Company

1    THE COURT:  Case over.

2    MR. GOODMAN:  It's over.  Yes, it is.  It really, I

3  think, comes down to that point.  I mean, you can't have a

4  dual-track federal-common-law claim when you have a statute

5  that you're invoking this directly on point.  I think that's

6  just a basic preemption.  There's no federal common law to be

7  had.

8    So even if the federal common law at one point existed

9  that they could rely on, it was negated the second Section 317

10 came into being.

11    THE COURT:  Yeah, the Supreme Court yesterday issued a

12 decision on federal common law.  You --

13    MR. GOODMAN:  Yes.

14    THE COURT:  -- familiar with that?

15    MR. GOODMAN:  That would be the decision that --

16    THE COURT:  The Rodriguez case.

17    MR. GOODMAN:  Yes.

18    THE COURT:  But it talks about a narrowing of the

19 federal common law.

20    MR. GOODMAN:  Right.  That decision involved the

21 question of whether a federal tax refund --

22    THE COURT:  Yeah, it's a sharing between --

23    MR. GOODMAN:  -- would be considered --

24    THE COURT:  -- a parent, a sub.

25    MR. GOODMAN:  Right.  Although, I --

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  Yeah.  I'm quite familiar with the history

2    of that case.

3          MR. GOODMAN:  Ironically, though, that decision I

4    always viewed as based on California law, the doctrine of

5    specific trust, which would be a state-law principle.  But

6    notwithstanding, the Supreme Court made clear that it doesn't

7    appreciate anything coming under the heading of a federal-

8    common-law claim.

9          THE COURT:  It seemed to say that this narrow --

10   very -- it's a very narrow band of jurisprudence called federal

11   common law, because the state law generally occupies these

12   areas, except very specifically.  And the court mentioned, for

13   example, admiralty.

14         MR. GOODMAN:  Right.  And again, riparian rights

15   between states, where you have states fighting over waterways,

16   would be another example where that body of case law has

17   developed.  And again, that comes back to two of the cases that

18   were cited by the Ninth Circuit in its decision.

19         THE COURT:  Okay.  Thank you.

20         MR. GOODMAN:  So with that, I think we're down to

21   Section 317 of the Stafford Act, which we would pose at this

22   point.  There's a very narrow question to the Court, which is,

23   is that statute an intentional-tort statute or is it a

24   negligence statute?  Our position is that it's an intentional-

25   tort statute.  And I think that that's fairly obvious

PG&E Corp. and Pacific Gas and Electric Company

1    conclusion if you look at the legislative history and the

2    language of the act.

3         And the other thing I would also just note -- and

4    papers on the other side make the point that there's no cases

5    that we've been able to cite involving Section 317 of the

6    Stafford Act.  And of course, the reason for that is that FEMA

7    has never invoked Section 317 --

8         THE COURT:  Well, but isn't it --

9         MR. GOODMAN:  -- of the Stafford Act before.

10        THE COURT:  -- isn't that because FEMA generally deals

11   with floods and hurricanes and tornadoes and only rarely the

12   more specific thing like -- and then the cites were to the

13   9/11, and Oklahoma bombing, and things that are acts of

14   tortfeasors.  Here we have an act of an alleged tortfeasor.

15   Maybe there's no case cited because it hasn't happened.  That

16   doesn't mean --

17        MR. GOODMAN:  Well --

18        THE COURT:  -- it's not good legal principle.

19        MR. GOODMAN:  It's also -- there's a chemical spill in

20   Texas as well.

21        THE COURT:  Correct.  I understand that.

22        MR. GOODMAN:  But, yes.

23        THE COURT:  Well, what about Deepwater Horizon?  Does

24   that -- did FEMA get involved in that?  And is there any help

25   in what happened there?  I don't know.  I just read the

of 134
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    newspaper.  Do you know?

2         MR. GOODMAN:  I recall asking that question during the

3    deposition, and I'm not recalling the precise answer --

4         THE COURT:  Okay.  Well, then don't worry about it.

5         MR. GOODMAN:  -- offhand.  But I think the answer was

6    no.

7         THE COURT:  That's okay.  The point -- we both agree.

8    I think, and I suspect that FEMA's counsel will agree too,

9    happily there aren't many intentional tort events that cause

10   FEMA to getter-up and do what it has to do.

11        MR. GOODMAN:  Well, I think, if you look at the

12   Oklahoma City bombing and 9/11 as examples, it's not just an

13   intentional tort act but it also seems to be the availability

14   of a potential recovery.  Right?  And they didn't pursue the

15   claim in the Oklahoma City bombing, but I'm not sure that there

16   would have been a recovery to pursue.

17        THE COURT:  No, I'm sure not, but that doesn't mean

18   that they couldn't have if there had been a recovery.  I mean,

19   the point -- there's no -- there was no legal prohibition.  I

20   mean --

21        MR. GOODMAN:  Right.  In that context --

22        THE COURT:  -- we know what happened there.  Okay.

23        MR. GOODMAN:  -- where you have someone blowing up a

24   building, I would agree that you would have an intentional act

25   that would give rise to a claim under Section 317.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  All I'm saying is, if you had a tragedy of

2   that nature where there was a culpable person or entity that

3   could respond, maybe there would have been some precedent.  The

4   fact that there wasn't doesn't mean that there might not be in

5   some case in the future.

6          MR. GOODMAN:  I would agree.

7          THE COURT:  That's all.

8          MR. GOODMAN:  Yeah.  Well, I'm not sure -- you've

9   clearly read our papers quite --

10          THE COURT:  Well, that's what I'm --

11          MR. GOODMAN:  -- extensively --

12          THE COURT:  -- supposed to do, you know?

13          MR. GOODMAN:  Yeah.  -- and seem very familiar with

14   the arguments that we've set forth in terms of the legislative

15   history, how the word "condition" --

16          THE COURT:  What would you have done if I said I

17   haven't read the briefs yet, just -- you got twenty-five

18   minutes to educate me?

19          MR. GOODMAN:  I think I would go through the reply

20   brief almost verbatim, Your Honor.  But you've --

21          THE COURT:  No, go ahead, and make whatever argument

22   you want.

23          MR. GOODMAN:  Again, I think it's just -- it comes

24   down to a very straightforward question of statutory

25   interpretation, which is, does Section 317 apply when what you

PG&E Corp. and Pacific Gas and Electric Company

1   have -- what you're faced with are allegations of negligence.

2         THE COURT:  Right.

3         MR. GOODMAN:  And we --

4         THE COURT:  Well, let's switch topics again, then.  I

5   focused on your arguments about nuisance and unjust enrichment.

6   And I'll certainly ask counsel on the other side to -- this

7   unjust enrichment I don't quite understand at all.  But you

8   also have this other argument about void.  And I understand;

9   you're talking a very broad policy.  But I don't know what to

10  make of that argument.  I mean, it -- you're making it, so do

11  you want to help me understand what --

12        MR. GOODMAN:  Sure.  If --

13        THE COURT:  -- I do there?

14        MR. GOODMAN:  Again, if the Court agrees with our

15  reading of the statute, I don't know that the Court would

16  even --

17        THE COURT:  No.

18        MR. GOODMAN:  -- get to that point.

19        THE COURT:  That's true.

20        MR. GOODMAN:  I think that the voidness issue comes

21  when you look holistically at the impact of these claims in

22  this case, and the fact that an agency that is committed to

23  providing assistance to fire victims, yet, given the fact that

24  we are in bankruptcy where you have limited dollars, not

25  everyone can walk away from this proceeding paid in full.  The

PG&E Corp. and Pacific Gas and Electric Company

1    consequence of the allowance of a claim of this magnitude, 3.9

2    billion dollars, is that it would severely dilute the recovery

3    of the --

4            THE COURT:  But we don't know that.

5            MR. GOODMAN:  -- the fire victims of the case.

6            THE COURT:  Again, a lot of people that your committee

7    represents feel strongly that that's the case.  But we don't

8    know that that's the outcome.  And it's not supposed to be -- I

9    mean, it's supposed to be -- you know what the statute says and

10   the laws require, so I won't talk about it.  That's essentially

11   what your argument -- but that's not something the Court can do

12   anything about.

13           I mean, how can I -- how can I say a legal theory that

14   defeats one claimant in favor of their opponents applies

15   because of the outcome that it might bear on the surviv -- I

16   mean -- I don't mean -- "survivor"'s not the word I want in

17   terms of the fire, but the residual effect on the equity

18   holders or, if there are (sic) no value for equity to share

19   among the creditors of an insolvent estate, if that's the way

20   out.  I don't know that I have any discretion to apply an

21   outcome test here.  I have to apply the statute, I think, and

22   the legal principles.

23           MR. GOODMAN:  If the Court is the most comfortable

24   with the statute and the legal principles, I feel sufficiently

25   confident in our interpretation of the statute, the plain

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    language, the legislative history; I mean, they all point in

2    the same direction, which is, this is an intentional-tort

3    statute.

4            THE COURT:  Okay.  Now, you want to reserve some time?

5    I mean, you're welcome to do what you want.  I don't want to

6    cut you off --

7            MR. GOODMAN:  I think --

8            THE COURT:  -- Mr. Goodman.

9            MR. GOODMAN:  -- at this point I would yield the

10   floor.  Thank you.

11           THE COURT:  Okay, thank you, Mr. Goodman.

12           Mr. Zumbro, good morning.

13           MR. ZUMBRO:  Good morning, Your Honor.  Paul Zumbro

14   from Cravath, Swaine & Moore, on behalf of the debtors.

15           Your Honor, you began your colloquy with Mr. Goodman

16   with the Court's observation that the literal wording of

17   Section 317 is clear.  We agree with that.  Your Honor, there's

18   been a lot of bad things said about PG&E over the last couple

19   of years, both inside and outside of this courtroom, but nobody

20   has accused PG&E of intentionally --

21           THE COURT:  Well, I think some people have, but at

22   least there hasn't been a --

23           MR. ZUMBRO:  There's been no --

24           THE COURT:  -- formal procedure --

25           MR. ZUMBRO:  Correct.  And even taking all of FEMA's

PG&E Corp. and Pacific Gas and Electric Company

1    claims, as asserted, as true, they don't rise to a level of

2    intent.  I think FEMA makes that clear in the deposition of the

3    30(b)(6) witness.  It was clear that they didn't allege that

4    there was an intentional act.  They try to sort of come up with

5    this flawed theory of intentional omission.

6          THE COURT:  Yeah, that seems to be the way they're

7    trying to get to that point.  And I don't know what an

8    intentional omission is.

9          MR. ZUMBRO:  I don't know what an intentional omission

10   is either, Your Honor, but I do know that it would have to be

11   an omission that would have the intent of causing the fire.  So

12   if, for example, a transformer wasn't maintained because we

13   wanted to start a fire and it started sparking and we

14   intentionally didn't put it out because we intended a fire to

15   start, maybe that would support a claim.  But that's clearly

16   not what happened here.  They're trying to convert a negligence

17   standard -- excuse me; they're trying to convert an

18   "intentional" standard into a negligence standard.  And Mr.

19   Goodman noted, as we point out in our papers, Congress

20   considered that and specifically rejected that.  The

21   legislative history is clear that this is an intentional act

22   that's required.

23         THE COURT:  Well, but I think the argument's made that

24   there's a whole pattern over a span of years of vegetation

25   management, paying the shareholders, not attending to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  transmission lines -- and you know more specifically than I --

2  and that that rises to the level of some sort of culpable

3  omission.  I think.  I mean, that's what I gather from the

4  argument.

5           MR. ZUMBRO:  That seems to be what they're saying,

6  Your Honor, but I don't think that rises to the level of an

7  intent.  We did not intend to cause the fires.  Even if you

8  take everything that they say, all of those omissions, it would

9  at most amount to negligence, maybe recklessness.  But that's

10  not what the standard requires.

11          THE COURT:  Is there -- I mean, even if there's a

12  gross negligence, if there's a difference -- and sometimes who

13  knows what the difference is?  But even that isn't sufficient;

14  is it?

15          MR. ZUMBRO:  Correct.  It has to be an intent.  I

16  mean, Congress -- this is a very narrow and specific

17  circumstance in which FEMA can recover.  As Your Honor pointed

18  out, most of the disasters that FEMA deals with are acts of

19  God, right?  It's a hurricane; it's an earthquake.  There's

20  nobody you can look to.  But in the very limited specific

21  category of manmade acts -- fire, explosion -- that cause --

22          THE COURT:  Well, Mr. Goodman touched on one that was

23  not 9/11 or Oklahoma:  the chemical spill.

24          MR. ZUMBRO:  Correct.  Mr. Timothy McVeigh, he went

25  out, he bought the fertilizer --

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  Right.

2          MR. ZUMBRO:  -- he rented the truck, he parked the

3    truck in front of the federal building, and he caused the

4    explosion with an intent to destroy the building.

5          THE COURT:  Right.

6          MR. ZUMBRO:  That is a far cry from anything that

7    PG&E --

8          THE COURT:  Well, and he was --

9          MR. ZUMBRO:  -- is alleged to have done.

10          THE COURT:  -- and he was prosecuted and convicted

11    under the criminal standard.

12          MR. ZUMBRO:  Correct.

13          THE COURT:  But what about in -- I don't know what the

14    underlying facts are with the chemical spill that Mr. Goodman

15    described, but what if you had something like that?  You could

16    end up with evidence to support an intentional conduct; right?

17          MR. ZUMBRO:  You could, but that's not in this case.

18    There is no --

19          THE COURT:  Got it.  I understand.

20          MR. ZUMBRO:  There is no allegation.  So I think it's

21    very clear that the applicable law that Your Honor needs to

22    consider when thinking about Section 502(b)(1) of the

23    Bankruptcy Code -- there's no dispute as to what that

24    applicable law is, I don't think; any real dispute.  FEMA

25    raises the, sort of, throwaway claims of unjust enrichment or

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  public nuisance.  I think it's clear that the Stafford Act is a

2  comprehensive federal statute that takes the whole area, and

3  there's no alternative mechanism --

4          THE COURT:  Well, you go back --

5          MR. ZUMBRO:  -- for FEMA to --

6          THE COURT:  I mean, you're going back to the same

7  thing that Mr. Goodman was touching on:  preemption.

8          MR. ZUMBRO:  Correct.  Well, it's preemption or

9  preclusion, I guess.  The Stafford Act is a comprehensive

10  federal statute; it's designed --

11          THE COURT:  I -- yes, I --

12          MR. ZUMBRO:  It says specifically.

13          THE COURT:  -- I realize that constitutional federal

14  scholars draw a line between preempt and preclude.  But as a

15  practical matter, bottom line's the same.

16          What about the Native Village case?  That case helps

17  you, doesn't it?

18          MR. ZUMBRO:  The Native Village case does help --

19          THE COURT:  Yeah.

20          MR. ZUMBRO:  -- under the Clean Air Act.  And it says,

21  if there's a statute -- there's a comprehensive statute at

22  issue, that's the only mechanism under which a recovery can be

23  pursued.  Here there's a comprehensive statute.  Luckily, we

24  don't have to talk about all of the details.  There's a lot of

25  aspects of the Stafford Act that we're not talking about today.

PG&E Corp. and Pacific Gas and Electric Company

1    It's a very complicated statute.  But the one area that's

2    relevant for purposes of us today are (sic) clear, as Your

3    Honor said.  The words lead to no other interpretation other

4    than the fact that it requires an intentional act.  That is the

5    applicable law.

6         THE COURT:  Well, there's a lot spent -- and this is

7    perhaps a question better for Mr. Goodman; he wrote the

8    principal brief.  But I'll ask you anyway.  There seems to

9    be -- the word "intentional act or omission" shows up twice in

10   the same statute.  What am I to make of that, other than

11   redundancy?

12        MR. ZUMBRO:  Well, it does.  Unfortunately, "omission"

13   only shows up once.

14        THE COURT:  Yeah -- I guess that's --

15        MR. ZUMBRO:  "Omission" shows up at the end.  I'll

16   read it.  It says --

17        THE COURT:  Yeah; no, you're correct.

18        MR. ZUMBRO:  It says --

19        THE COURT:  Right.

20        MR. ZUMBRO:  -- "a person who intentionally causes a

21   condition for which federal assistance is provided", the

22   condition there, in our case, being the wildfires.  "A personal

23   who intentionally causes a condition".  Right?  And then it

24   goes on to say, "is liable to the United States to the extent

25   such costs are attributable to the intentional act or omission

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    of such person which caused such condition".  So you have to

2    read those all together.  It clearly says that you have to

3    intend the condition, the condition in this case being the

4    2015, the 2017, and the 2018 --

5               THE COURT:  But that seems to draw --

6               MR. ZUMBRO:  -- wildfires.

7               THE COURT:  -- a fine line between an act of, for

8    example, not taking care of a defective device on a power line

9    versus attending -- the result that follows is the ignition

10   that causes the fire.  That -- how do -- that's a very fine

11   line; isn't it?

12              MR. ZUMBRO:  It is, but I think it's clear what

13   Congress intended, was, to the extent you need to sort of think

14   about that line, we need to be across the line where you

15   actually intended the result of your action.  You have to

16   intend the disaster.

17              THE COURT:  Well, that's the standard, for example --

18   and FEMA cites the Bullock case and 523(a)(4), which is --

19   strange cite to fit.  But if we look at 523(a)(6) that we in

20   the bankruptcy court do all the time -- I don't know if you're

21   familiar with that section, but it's "willful and malicious";

22   you have to intend what you did and intend the outcome.

23              MR. ZUMBRO:  Correct.

24              THE COURT:  And that --

25              MR. ZUMBRO:  Correct.

of 134   (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1      THE COURT:  And so that seems to be that would have be

2  here too; right?

3      MR. ZUMBRO:  Correct.

4      THE COURT:  So --

5      MR. ZUMBRO:  Correct.  And so I think FEMA does try,

6  in its papers, to obscure the very straightforward legal issue,

7  the legal infirmity of its claims, with a bunch of statements

8  about prima facie validity and burdens of proof, and the like.

9  I don't think any of that is relevant to the pure legal issue

10  which is before the Court today, which is, 502(b)(1) says, if a

11  claim is not enforceable, as a matter of applicable law,

12  against the debtor, you must disallow that claim.

13      THE COURT:  Well, that's PG&E/Travelers, the United

14  States Supreme Court.  We're looking at the losing judge in

15  that case.  9-0.

16    (Laughter.)

17      THE COURT:  But that's -- I mean, the Supreme Court

18  just reiterated the point:  you look to see is there a defense

19  to the claim, outside of the Bankruptcy Code.

20      MR. ZUMBRO:  Correct.  We think this claim -- it's not

21  a matter of defense.  It's a matter that the claim is facially

22  valid under the law.  FEMA cannot -- it has not and cannot

23  bring the assertions that it would need to support a claim of

24  intentional --

25      THE COURT:  Well, no, I understand.  And one of the

PG&E Corp. and Pacific Gas and Electric Company

1    things that was a little surprising from the TCC reply brief is

2    that it suddenly becomes like a 12(b)(6).  And I don't know

3    if --

4              MR. ZUMBRO:  Correct.

5              THE COURT:  -- FEMA or the state agencies have a

6    quarrel with that argument.  But it comes down to the same

7    thing.  I mean, this is a claim objection, and the claim is

8    like the complaint:  that it must be treated as true for

9    purposes of testing the validity of it.  And your objection

10   says, taking all those facts, a 12(b)(6) motion to dismiss

11   would be granted if you're right.

12             MR. ZUMBRO:  Correct.

13             THE COURT:  Same as sustaining the objection.

14             MR. ZUMBRO:  That's right.  I mean, we looked --

15             THE COURT:  Same result.

16             MR. ZUMBRO:  -- into that.  There doesn't seem to be a

17   lot of law on that.

18             THE COURT:  It's the --

19             MR. ZUMBRO:  I think --

20             THE COURT:  It's the same result.

21             MR. ZUMBRO:  There was a case that -- a BAP case that

22   I think Your Honor was actually on the panel, that sort of said

23   that, effectively, it's a 12(b)(6) standard; even though it's

24   not technically a 12(b)(6) standard, it effectively is, because

25   you look at 502(b)(1) and it effectively says --

PG&E Corp. and Pacific Gas and Electric Company

1      THE COURT:  Well --

2      MR. ZUMBRO:  -- if it's not a valid case --

3      THE COURT:  Well, I don't remember --

4      MR. ZUMBRO:  -- claim --

5      THE COURT:  -- the BAP case, but certainly in the

6  context of claims objection it's not -- not infrequently I will

7  say to parties, just make your summary-judgment motion or your,

8  essentially, 12(b)(6)-type motion.  You can do it in the

9  context of a claim objection.

10      MR. ZUMBRO:  Exactly.

11      THE COURT:  Okay.

12      MR. ZUMBRO:  And that's effectively where we are here

13  today.  I think that the FEMA claim -- it fails as a matter of

14  law, Your Honor.  And I guess, with that, we would join

15  respectfully with the TCC's request that the Court disallow

16  those claims in their entirety.

17      THE COURT:  Okay.  Thank you, Mr. Zumbro.

18      MR. ZUMBRO:  Thank you, Mr. -- sir.

19      THE COURT:  For FEMA, who -- Mr. Troy, are you on duty

20  today, or your colleague?  Good morning.

21      MR. TROY:  Good morning, Your Honor.  Matthew Troy,

22  Civil Division, United States Department of Justice, on behalf

23  of federal agencies and FEMA in this case.  I am not making the

24  argument today --

25      THE COURT:  Oh.

PG&E Corp. and Pacific Gas and Electric Company

1          MR. TROY:  -- Your Honor.

2          THE COURT:  Okay.

3          MR. TROY:  My colleague from my office, Michael Tye,

4   T-Y-E, will be making the argument.

5          THE COURT:  Is he --

6          MR. TROY:  He's --

7          THE COURT:  -- Mr. Tye here?

8          Okay, good morning, Mr. Tye.  Yeah, I saw your name on

9   the briefs.

10         So, Mr. Tye, just before -- same as I did with the

11  other side, I'm going to give you as much time as you're

12  allowed.  And I try to limit my questions, but please help me

13  on this one.  There seems to be confusion perhaps among the

14  fire survivors and the public and so on.  Is there in fact a

15  duplication of claims here between FEMA and the state agencies,

16  by at least two-and-a-half billion dollars?

17         MR. TYE:  There is a duplication with respect to some

18  of the claims but, with respect to FEMA's claims, there's over

19  a billion dollars in claims that wouldn't be duplicated with --

20         THE COURT:  There wouldn't be.  No, I understand --

21         MR. TYE:  Yes.

22         THE COURT:  -- it wouldn't be.  But if your claim were

23  allowed in full, then am I correct, the FEMA piece of the state

24  claim goes away, and vice versa?  It's duplicate counting,

25  isn't it?

PG&E Corp. and Pacific Gas and Electric Company

1    MR. TYE:  I would have to confer with my colleagues on

2    that.  There's a one-billion-dollar discrepancy with respect to

3    the two -- I mean, the claim objection here with respect to

4    what the TCC and what the debtors have raised, raised an

5    objection with respect to the whole claim --

6    THE COURT:  They do.

7    MR. TYE:  -- rise or fall on the same claim.

8    THE COURT:  Of course.  They do.  And I will -- and

9    I'm not trying to turn this into a discussion that isn't the

10   relevant issue.  It's a perception -- when I read the briefs

11   and when I read things like criticisms about what's going on in

12   this case, whether public letters, comments, things, everybody

13   uses an aggregate claim of the two federal -- the federal and

14   state agencies, that seems to be double-counting by a

15   substantial sum of money.

16   But leave on -- stick with your argument.  You got the

17   full thirty minutes, Mr. Tye.  Whatever you want to say.  And

18   you've heard the issue, and focus on whatever you think is

19   helpful for your side.

20   MR. TYE:  Okay.  Great.  Just to make clear for the

21   record; my name's Michael Tye.  I'm here from the U.S.

22   Department of Justice, on behalf of FEMA and the federal

23   entities.

24   I think I'd like to start, Your Honor, with the

25   Section 317 claims.

PG&E Corp. and Pacific Gas and Electric Company

1      THE COURT:  Okay.

2      MR. TYE:  And as Your Honor noted, the issue before

3 you with respect to the TCC's claim objection is a narrow one.

4 The TCC has specifically conceded that the issue before Your

5 Honor is akin to a motion to dismiss.  They're challenging

6 simply the legal validity of the claims.  They're not

7 challenging any specific amount with respect to any fire, or

8 any specific claim.  They're just challenging the overall legal

9 validity of the claims.

10      Now, with respect to the Stafford Act, both the TCC

11 and the debtors have argued that FEMA's claim is in essence a

12 negligence claim.  And that is incorrect.  FEMA is not alleging

13 a negligence claim.  FEMA's alleging that the conduct set forth

14 in its proof of claim satisfies the standards set forth in the

15 Stafford Act, that there is sufficient intentional conduct here

16 to meet the requirements of the Stafford Act.

17      So their argument that we have asserted a negligence

18 claim is essentially a straw man.  We're not arguing that

19 negligence satisfies the statute.  We're arguing that the facts

20 of this case satisfy the intentional-conduct element of Section

21 317.

22      THE COURT:  But intentional tort typically means you

23 intend the act and intend the consequences of the act; right?

24      MR. TYE:  I -- we --

25      THE COURT:  So what's the act that was intentional

PG&E Corp. and Pacific Gas and Electric Company

1  here?

2      MR. TYE:  Right.  First, I disagree with the premise,

3  first of all.  If you look to page 14 in the TCC's reply brief,

4  they cite the Restatement of Torts, Section 8A, that sets forth

5  the principles underlying an intentional act.  And that section

6  provides that "[a]ll consequences which the actor desires to

7  bring about are intended, as that word is used in this

8  Restatement.  Intention, however (sic), is not limited to

9  consequences which are desired.  If the actor knows that the

10  consequences are certain, or substantially certain, to result

11  from his act, and [he] still goes ahead, he is treated by the

12  law as if he in fact desired to produce the result."  And

13  that's exactly what we have here.

14      THE COURT:  Well, what is the act?  What specific act?

15  I mean, if -- the restatement talks about if you intend to kill

16  A and you throw a bomb into a room where A -- you believe A is,

17  and you kill B, it's still an intentional act.  But what is the

18  intentional act that is specific?

19      MR. TYE:  Sure.  The intentional acts and omissions

20  that are at issue here are the failure to maintain PG&E's

21  lines, with knowledge --

22      THE COURT:  Any particular line?

23      MR. TYE:  What's that?

24      THE COURT:  Any particular line?

25      MR. TYE:  I mean, the lines -- the evidence has been

PG&E Corp. and Pacific Gas and Electric Company

1    set forth in PG&E's -- or, excuse me, in FEMA's claim

2    objection.  And we would note that the 2013 CPUC report

3    specifically found that PG&E's distribution system had

4    significant safety issues --

5              THE COURT:  But, Mr. Tye, suppose you had a completely

6    negligently maintained power line that never ignited, and then

7    you had one that was perfectly maintained that did ignite.

8    Would there be intentional tort as to both of -- I mean, well,

9    the one that doesn't -- the one that's negligently maintained

10   doesn't create a fire, so there's no tort.

11             MR. TYE:  But I --

12             THE COURT:  So the wrong, if you will, is neglecting

13   the power -- the component of the power line.  But if there's

14   no fire, there's no tort.

15             MR. TYE:  But --

16             THE COURT:  So how do we draw the line here?

17             MR. TYE:  We draw the line based on the knowledge that

18   substantial risk of this was going to happen in the future.

19   Just as the restatement says --

20             THE COURT:  But that requires a reasonable likelihood

21   that the risk will lead to the result; right?

22             MR. TYE:  Right, and that's --

23             THE COURT:  But in my example, if you throw the bomb

24   into the room, you're probably going to kill somebody, even

25   though it may not be your target.  That's right out of the

PG&E Corp. and Pacific Gas and Electric Company

1    restatement, by the way.  I didn't make it up.

2         MR. TYE:  Right.  No, and I --

3         THE COURT:  Okay.

4         MR. TYE:  -- I think that's akin to what happened

5    here.  The debtor specifically knew that a fire -- wildfire was

6    likely to result from their faulty maintenance of the lines.

7    And the evidence in this case shows that.  There was a fire in

8    2015 and yet the debtor didn't change their conduct.  There was

9    a fire in 2017 and yet the debtor didn't change their conduct.

10   They had specific knowledge of what would happen based on their

11   faulty line, that wildfires would ignite, and yet they chose

12   not to act.  That type of conduct satisfies the intentional-

13   conduct requirement under Section 317.

14        And just with respect to -- Mr. Goodman went into his

15   interpretation of the statute.  And we would like to point you

16   to the second part of that statute, which provides that a party

17   shall be liable to the United States for the reasonable costs

18   incurred in responding to a disaster or emergency, to the

19   extent that such costs are attributable to the intentional acts

20   or omission of such person which caused the condition for which

21   federal assistance is required.  And the conduct that we have

22   alleged in our proof of claims satisfies that standard.  We're

23   not arguing that negligence is sufficient to satisfy the

24   standard.

25        This is a very unusual case where you have a pattern

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  of conduct on the part of a party, over a course of many years,

2  where not only did they have knowledge that these faulty lines

3  existed, but they had knowledge that fires would result from

4  them.  And they had several fires in succession, giving them

5  actual knowledge of what would happen with the result.  In this

6  situation, under the restatement standard, that is intentional

7  conduct.

8      THE COURT:  But no court has ever used 317 to apply

9  that restatement; right?

10     MR. TYE:  That is correct but, Your Honor, we would

11 point out that no case has -- no court has been called upon --

12     THE COURT:  No, I --

13     MR. TYE:  -- to look at Section 317.

14     THE COURT:  I understand --

15     MR. TYE:  Yeah.

16     THE COURT:  -- but now one has.

17     MR. TYE:  Correct, and --

18     THE COURT:  Okay.

19     MR. TYE:  -- and we would argue that --

20     THE COURT:  And so it --

21     MR. TYE:  -- the conduct satisfies the standard.

22     THE COURT:  But remember, I'm a bankruptcy judge and

23 we deal with things like intentional torts often, and we focus

24 on conduct that has a target, has a consequence.  How would

25 I -- if I were going to buy your argument, how would I explain

PG&E Corp. and Pacific Gas and Electric Company

1  to PG&E what specific event caused the harm?  I don't have any

2  one thing to point to; right?  I can't point -- I can point to

3  the allegations, perhaps, for the Camp Fire, the particular

4  hanging device that appears to have been the culprit.  Not for

5  Tubbs Fire, though; right?  What would I do about the -- do we

6  divide and take your claim and break it down into -- and

7  there's a week (ph.) trial of all the specific things, or --

8  how does it get administered, from your point of view?

9            MR. TYE:  I think --

10           THE COURT:  So, contrast Camp and Tubbs.

11           MR. TYE:  Right.  I think Your Honor's statement

12  earlier that this is equivalent to a 12(b)(6) motion is where

13  this comes in here.  And they've alleged that, if you take all

14  the facts and you believe that all of those are true with

15  respect to the proof of claims, that our claims are still -- do

16  not satisfy -- or do not provide a legal basis for a claim.

17  And that just is incorrect.

18           THE COURT:  Do you have any reported federal civil

19  cases where 12(b)(6) motions have been denied because of --

20  well, I should say granted and survive because of general

21  allegations of a pattern as distinguished from a specific

22  event?

23           MR. TYE:  I don't have those right before me, Your

24  Honor, but we would be happy to provide those if that's

25  material to your decision.

(970) 926-1842 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1        THE COURT:  Well, I don't know if it's material or

2    not, but I thought you were focusing on omission as kind of a

3    way to get to the intent.  And so what you're saying is, well,

4    no, we look at this whole pattern.  And I'm saying, okay, the

5    whole pattern has a panoply of events, and some of them might

6    have contributed to the outcome, but some of them might not

7    have contributed to any outcome.

8        So how would I -- I don't know how I would then dice

9    the claim.  You would say it's all or nothing on your claim,

10   then; right?

11       MR. TYE:  I think we would say that, with respect to

12   this claim objection, it's all or nothing because of the way

13   that the issue has been presented.  Now, if the TCC wanted to

14   make specific objections to specific fires and they wanted to

15   build a record with respect to specific objections to specific

16   fires, that would be a different story and we could respond to

17   those claims.  But they haven't done that.  Just, that record

18   doesn't exist for them to make specific objections with respect

19   to specific claims.

20       I mean, they specifically provided, in their briefs,

21   that there is supplemental arguments that were --

22       THE COURT:  No.

23       MR. TYE:  -- targeted at specific --

24       THE COURT:  That's -- no, I understand, I understand.

25   So, no, we're back to the question -- using the 12(b)(6)

PG&E Corp. and Pacific Gas and Electric Company

1  standard, your view would be, on a motion to dismiss, that

2  motion should be denied because you've alleged in your proofs

3  of claim, the three proofs of claim, a pattern that, when taken

4  as an aggregate series of allegations, arises to the conclusion

5  that, on those uncontested facts, a trier of fact could

6  conclude that the debtors are liable under an intentional-tort

7  standard?  Right?  Have I got it right?

8          MR. TYE:  I think you have it partially right, Your

9  Honor.

10         THE COURT:  Okay.

11         MR. TYE:  So we are arguing that there is -- there are

12 two, essentially, aspects to this.  First you have to have --

13 first you have the evidence of PG&E's repeated failure to

14 maintain its lines over a period of time.  And second, you have

15 evidence that the actor knew that the consequences were certain

16 or they were substantially certain to result from those acts.

17 When you have both of those elements together, that would

18 satisfy the requirements of Section 317.

19         THE COURT:  Well, again, I'm having trouble getting,

20 to be more specific -- and you're going to tell me we're not

21 talking specifics, and I'm agreeing with you, but that's the

22 dilemma.  What if we had hypothetically two situations, two

23 places, where PG&E was grossly negligent in how it maintained

24 the transformer.  One of them blew up and burned some people

25 and killed them.  The other one didn't do anything.  So are

PG&E Corp. and Pacific Gas and Electric Company

1    they intentionally liable -- for what?  In other words -- in

2    other words, how do we quantify the conduct?  I don't know what

3    to do with that.

4         So how would I answer that example?  Concede that two

5    transformers were negligently maintained, but only one of them

6    ignited and caused harm.

7         MR. TYE:  Right, but --

8         THE COURT:  Therefore, what?

9         MR. TYE:  -- until you have the ignition that causes

10   the harm, you don't have the tort.  So if it's just in its

11   state of not causing harm, then there's no tort.  I don't think

12   there's -- I don't think there's a question between those two

13   decisions --

14        THE COURT:  Okay.

15        MR. TYE:  -- which would provide liability.

16        THE COURT:  Okay.  All right.  I got you.  Do you want

17   to say anything about the preemption issue or the --

18        MR. TYE:  Yeah.  Yeah, yeah.

19        THE COURT:  -- preclusion issue?

20        MR. TYE:  So let's go and move on to the public-

21   nuisance claims.  And the United States takes the position that

22   these public-nuisance claims are governed by federal common

23   law.  And federal common law applies in this case because,

24   under the United States v. Kimbell Foods, Inc. -- that's 440

25   U.S. 715, 726 (1979), a Supreme Court case, which provides that

                    PG&E Corp. and Pacific Gas and Electric Company

1    federal law governs questions involving the rights of the

2    United States arising under nationwide federal programs.  And

3    that's the situation we have here.  The question of whether the

4    United States can maintain a claim for public nuisance with

5    respect to FEMA's activities arises under federal law and,

6    thus, federal common law governs that claim.

7              THE COURT:  What does Native Village say in the Ninth

8    Circuit?

9              MR. TYE:  Native Village is -- we would say, is

10   distinguishable from the present --

11             THE COURT:  But it is --

12             MR. TYE:  -- situation.

13             THE COURT:  -- binding on me and the trial courts.

14   Ninth Circuit case.  So why is it distinguishable?  It's a

15   different statute, I agree; it's clean-water.  But --

16             MR. TYE:  Right.  And I think it's the nature of the

17   statute that makes it distinguishable.  In Native Village you

18   had a statute, the Clean Air and the Clean Water Act, that

19   governed the question -- the climate-change questions at issue

20   in that case.  And that was a comprehensive statute in which

21   the EPA had opined on a specific standard and the specific

22   causes of action.  And you had a state bringing a claim,

23   seeking to expand the claims beyond what the federal government

24   had -- both what Congress had said and what (sic) the agency

25   had interpreted that statute.

PG&E Corp. and Pacific Gas and Electric Company

1          But here this issue of a public-nuisance claim is not

2     addressed at all one way or another in the statute.  Congress

3     created the statute knowing that the federal common law

4     existed.  The courts have long applied a public-nuisance claim

5     under federal common law.  And this statute just isn't the same

6     kind of comprehensive statute that is at issue in --

7          THE COURT:  Okay.  So let's go back --

8          MR. TYE:  Sure.

9          THE COURT:  -- let's go back -- and we can forget --

10    we'll put Native Village aside -- and let's pretend for the

11    moment that Section 317 isn't available to you.  So FEMA comes

12    to the rescue after something has gone wrong.  And in fact, if

13    somebody is the worst tortfeasor ever but never causes damage,

14    FEMA never gets the call.  So isn't that different?  I mean,

15    what -- I don't remember what the facts of Kimbell Food -- or

16    if they even are relevant facts.  But it seems to me that this

17    notion of federal common law -- what's the principle of common

18    law that applies here?

19         MR. TYE:  The principle of common law that applies

20    here is just the public-nuisance claim itself.

21         THE COURT:  But the nuisance only manifests itself

22    after the fact.  It's not like -- it's not like the hog farm or

23    the other cases that are decided, where the nuisance is

24    ongoing.  Right?  Something -- it's only when it all comes

25    together, when the -- the careless conduct, the ignition, the

PG&E Corp. and Pacific Gas and Electric Company

1    injury.  And FEMA still doesn't come until the president does

2    his declaration and the governor -- you know, all the things

3    that make FEMA work.  And this is not a criticism of FEMA, but

4    it's only then that FEMA is in the job of cleaning up the mess.

5    Right?

6          MR. TYE:  I don't disagree with that, but I don't

7    think that's the standard.  Federal common law provides the

8    standard for which -- unjust-enrichment claims in this case.

9    And the standard, the Ninth Circuit has made clear, for public-

10   nuisance claims under the federal common law, is an

11   unreasonable interference with a right common to the general

12   public, and that that unreasonable interference caused

13   widespread harm to the public.

14         THE COURT:  When I went to law school, unjust

15   enrichment was you got something that you weren't entitled to.

16         MR. TYE:  Oh, I -- excuse me.  I misspoke.

17         THE COURT:  You know the drill.

18         MR. TYE:  I meant public nuisance.  Yes.

19         THE COURT:  Yeah.  But I want -- let's go to unjust

20   enrichment.

21         MR. TYE:  Okay.  Sure.  Yes.

22         THE COURT:  So, okay, then we both know what unjust

23   enrichment was:  I got something that I shouldn't have.  You

24   inadvertently leave your wallet here today when you leave, and

25   I say, "Hah, Mr. Tye left his wallet.  I'll keep the money."

PG&E Corp. and Pacific Gas and Electric Company

1    That's unjust enrichment, and you're entitled to it back.

2    Where's the unjust enrichment here --

3            MR. TYE:  Sure.  Yeah --

4            THE COURT:  -- for PG&E's conduct and the damage that

5    followed, to the --

6            MR. TYE:  Right.  The debtors have benefited from

7    FEMA's taxpayer-funded programs that aided the survivors.  If

8    the debtors don't pay restitution to the federal government,

9    they privately gain, making the government shoulder the

10   financial aftermath --

11           THE COURT:  Why is that --

12           MR. TYE:  -- caused by the debtor's conducts.

13           THE COURT:  Why is that unjust enrichment?  That's

14   just -- I mean, first of all, the debtors are being asked to

15   pay.  And they will have to pay; a lot.  They may not pay FEMA

16   if the arguments are persuasive here.  But I don't know -- why

17   does that translate to unjust enrichment?

18           MR. TYE:  Because they're retaining a benefit --

19           THE COURT:  What's the benefit?

20           MR. TYE:  The benefit is that they were -- that the

21   federal government provided all this disaster assistance --

22           THE COURT:  Okay, well, then you're equating unjust

23   enrichment as to something that someone else took

24   responsibility for, for whatever reason -- and in FEMA's case,

25   it's a statutory creature; Congress said FEMA's there as a last

        PG&E Corp. and Pacific Gas and Electric Company

1    resort to take care of victims of tragedies, which is --

2            MR. TYE:  Right, and we would --

3            THE COURT:  Okay.

4            MR. TYE:  -- we would pose it with this hypothetical,

5    Your Honor:  In the days, weeks, and months following the

6    disasters, when the debtors saw the scores of FEMA personnel,

7    the heavy equipment, tractors, and trailers, did FEMA -- or did

8    the debtors really think that a bill would never come due --

9            THE COURT:  Well, it doesn't matter --

10           MR. TYE:  -- in that situation?

11           THE COURT:  -- what they thought.  I mean, maybe I

12   didn't think it either, because -- I mean, that's not the

13   question; is it?

14           MR. TYE:  But it --

15           THE COURT:  The question is whether the law imposes on

16   the company the consequences of -- or the cost for what FEMA

17   did.

18           MR. TYE:  Right, and the benefit that they provided

19   was the disaster assistance itself.

20           THE COURT:  But you're going back to did somebody at

21   PG&E say, "Golly, I wonder who's going to pay for that."

22   That's -- but even if they ask that question, that's not the

23   relevant question.  The question is whether FEMA, who did the

24   cleanup work, can be compensated, reimbursed, for its effort.

25   Why is that -- I mean, you're making the argument that that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    is -- that's unjust enrichment, that it's because of the

2    principle of unjust enrichment that PG&E has to pay.  One of

3    the -- the alternative, obviously:  you got your statutory

4    argument and your common-law nuisance.  But this is an

5    alternative argument; right?

6              MR. TYE:  Correct.

7              THE COURT:  Okay.  Okay.  Anything else?  I mean, you

8    have ten more minutes to do what you want, Mr. Tye.

9              MR. TYE:  Unless Your Honor has any further questions,

10   I think we're --

11             THE COURT:  Okay.

12             MR. TYE:  -- finished.

13             THE COURT:  Thank you very much for your time and

14   presentation.

15             Mr. Goodman?

16             MR. JULIAN:  We're going to divide it up a little bit,

17   Your Honor.

18             THE COURT:  You can do it.

19             MR. JULIAN:  I'm going to answer three questions that

20   you asked; the first one is, essentially, what does the statute

21   say about your hypothetical where the transformer doesn't cause

22   damage.  And --

23             THE COURT:  Even though it's negligently, if not

24   grossly negligently, almost intentionally, ignored.

25             MR. JULIAN:  You hit the nail on the head on the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    differences between the statutory construction between both

2    sides.  The statute says, "Any person who intentionally causes

3    a condition for which federal assistance is provided", et

4    cetera.  Three elements:  intentional, causes a condition,

5    federal assistance.

6         Their definition of "condition" -- everyone's been

7    arguing about what "intent" means.  Their definition of the

8    condition that PG&E intentionally caused was the failure to

9    maintain the line.  I wrote it down when he said it.  They've

10   helped us.  Our definition of the condition is the property

11   damage that occurred when the fire destroyed the homes.

12        THE COURT:  Well, because if there hadn't been damage,

13   FEMA never would have been called upon to begin with.

14        MR. JULIAN:  Bingo.  So when I got this issue -- Mr.

15   Goodman filed the objection -- I word-searched the word

16   "condition" throughout the whole statute, to determine what is

17   Congress' definition of the word "condition".

18        THE COURT:  Well, I think it's in the brief too.

19        MR. JULIAN:  And it's defined in Section 316.  It

20   refers to the condition of the facility before it was damaged

21   and assistance was granted to restore the facility.

22        ##

23        So if you put the word "damage" into the sentence, any

24   person who intentionally causes the property damage for which

25   federal assistance is required, you see that they have to

PG&E Corp. and Pacific Gas and Electric Company

1  intentionally cause property damage caused by a fire.  And all

2  they've alleged in their claim and in their discovery answers

3  is that PG&E intentionally caused -- as Mr. DOJ Counsel just

4  said --

5          THE COURT:  Tye.

6          MR. JULIAN:  -- Tye?  Yeah.  He said the intentional

7  act was "failure to maintain the line".  And if you put that

8  into the sentence of the condition, you see that federal

9  assistance was not granted to restore equipment or for the

10  failure to maintain the equipment line.

11         THE COURT:  But that's circular also, right?  Because

12  for each hypothetical that says there was no fire, we can talk

13  about what about if there was a fire, therefore FEMA did deal

14  with the condition.

15         MR. JULIAN:  But that's not --

16         THE COURT:  And where --

17         MR. JULIAN:  -- what the --

18         THE COURT:  -- where do -- but where do we draw the

19  line to the condition?

20         MR. JULIAN:  The condition is property damage.  That's

21  where we differ.  The condition is property damage.  There's no

22  evidence that PG&E intended to cause property damage.  And they

23  admit it in their discovery responses, which is why --

24         THE COURT:  No, I know they did --

25         MR. JULIAN:  -- our 12(b)(6) has turned into a summary

PG&E Corp. and Pacific Gas and Electric Company

1  judgment motion, which is the point we make --

2      THE COURT:  It doesn't matter if it's 12(b)(6) or

3  summary judgment.  I mean --

4      MR. JULIAN:  Yeah.

5      THE COURT:  -- come on.  We're not going to turn this

6  into summary judgment.  Mr. Tye didn't complain about the

7  argument you made in your reply brief, nor did I.  And so --

8      MR. JULIAN:  Good.

9      THE COURT:  -- but I guess what I'm feeling like this

10  is little angels on a pin in terms of condition.  The argument

11  that they're making is PG&E caused the condition.

12      Now of course it didn't cause FEMA have to bring its

13  trailers and its bulldozers.  And that was the consequence of

14  FEMA carrying out its mission.  You've not -- I mean, I know

15  there are criticisms of FEMA, but the TCC institutionally or

16  organization, isn't questioning FEMA's role here, right?  I

17  mean, they did what they were supposed to do.

18      Whether they did it --

19      MR. JULIAN:  Not at this hearing; at the next hearing.

20      THE COURT:  Right, whether they did it adequately or

21  not, is not the point.  They did it.  And they had to, because

22  that was their statutory responsibility to do it.

23      But I guess what I'm telling you -- I'm having

24  trouble -- just like I asked Mr. Tye to help me know where we

25  draw the line between the act of the actor and the consequence

(970) 962-834| operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    of the act, I don't know how to draw the line to put this

2    condition -- you want me to put it only on the damage that

3    FEMA's fixing versus the circumstances that led to the damage.

4            MR. JULIAN:  I think the statute, if you look at 316

5    and 317 together, says that you must do that, Your Honor.

6            THE COURT:  Okay.

7            MR. JULIAN:  That they must -- PG&E must have

8    intentionally caused the property damaged caused --

9            THE COURT:  Caused the condition.

10           MR. JULIAN:  -- by a fire.  The condition.

11           THE COURT:  Cause a condition.

12           MR. JULIAN:  "Condition" means property damage cause

13   by --

14           THE COURT:  So --

15           MR. JULIAN:  -- disaster.

16           THE COURT:  -- so again -- love my hypotheticals.  If

17   we had a wrongdoer who had a flamethrower, and he's standing

18   there next to a PG&E power line, and he shoots the flamethrower

19   into the brush, that would be an intentional act that causes

20   the condition, right?

21           MR. JULIAN:  If the mens rea was to intentionally

22   cause a fire --

23           THE COURT:  Right.

24           MR. JULIAN:  -- an arsonist, right, it would cover --

25           THE COURT:  Well, the --

PG&E Corp. and Pacific Gas and Electric Company

1          MR. JULIAN:  -- an arsonist.

2          THE COURT:  -- word "arson", of course -- on your

3    side -- the whole question -- I didn't find arson in your

4    briefs, but FEMA argued that you were accusing them -- I mean,

5    I'm sorry, they were accusing you of arson.  But I don't think

6    arson ever shows up in the brief.  Right?  But arson would be

7    necessary for a criminal conviction.  But you can have an

8    intentional tort without arson, I presume.

9          MR. JULIAN:  You could.  But where the intentional

10   tort is causing fire property damage, the statute commands that

11   the claimant prove with evidence that the tortfeasor

12   intentionally caused fire property damage.  And that's just

13   missing in this case.

14         THE COURT:  Okay.

15         MR. JULIAN:  All right, Your Honor, two other things.

16   I don't want to write a law-review article on this.  But unjust

17   enrichment is a remedy; it's not a statutory claim for relief.

18         And last, I'd like to answer your question about the

19   overlap.  I think the discovery has shown that FEMA is

20   asserting a 3.9-billion-dollar claim for all the fires.

21         THE COURT:  Right.  I know that.

22         MR. JULIAN:  1.5 of that relates to Tubbs.  And so

23   that's why Cal OES only has a 2.4-billion-dollar overlap.  If I

24   said "million", I meant "billion".

25         THE COURT:  No, I know.

PG&E Corp. and Pacific Gas and Electric Company

1          MR. JULIAN:  The overlap --

2          THE COURT:  I know how the numbers play out, and I

3    read the two claims.

4          Well, let's try -- let me try it this way.  If I agree

5    with your side and I strike the FEMA claims, doesn't the Cal

6    OES claim itself go down by 2.4 billion?

7          MR. JULIAN:  We think so, yes.

8          THE COURT:  I mean -- well, I'll ask them -- their

9    counsel if they agree.  It seems to me it's obvious that it

10   should.  But I need to -- I need to get a clarification on

11   that.  Not that my decision will be based upon the dollars, but

12   rather the consequences.  I want to make sure we're not talking

13   about a bigger problem -- I mean, it's a horribly big problem,

14   but maybe it isn't as big as it seems to be.

15         MR. JULIAN:  That's our view.  And I'd like Mr.

16   Goodman to wrap up with those points.

17         THE COURT:  Okay.

18         MR. JULIAN:  Thank you.

19         THE COURT:  All right, Mr. Goodman, you reserved some

20   time, so --

21         MR. GOODMAN:  Yeah.

22         THE COURT:  -- you're going to be back for Cal OES, I

23   presume, right?

24         MR. GOODMAN:  Yes, I will.

25         THE COURT:  All right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1     MR. GOODMAN:  Thank you, Your Honor.

2     THE COURT:  All right.

3     MR. GOODMAN:  I just want to clarify one point.  It

4  was said earlier that there's no record in this case and that

5  we're just talking about the allegations in the proof of claim.

6  And I think that that's not entirely true.

7     Here, yes, we have the point made that there is an

8  absence of allegations in the FEMA claims about the intent to

9  cause harm, right?  But we also do have a record here.  We took

10  FEMA's deposition.  We took a 30(b)(6) exam of FEMA.  And I

11  want to share with you some of the testimony that was offered

12  by FEMA at that deposition, because I think that this would get

13  us to summary judgment in and of itself.  So --

14     THE COURT:  Well, I think if we start to get to facts,

15  then we have to treat it as summary judgment.

16     MR. GOODMAN:  Well, listen to --

17     THE COURT:  I mean, they're facts that aren't --

18     MR. GOODMAN:  -- this answer.

19     THE COURT:  -- they're facts that aren't framed by the

20  pleading.  No.  I'll let you read it.  I'm not saying -- but I

21  read it --

22     MR. GOODMAN:  Sure.

23     THE COURT:  -- in the brief.  You summarized in in the

24  brief.  But you can -- you can go ahead and summarize it.

25     MR. GOODMAN:  Yeah, the --

PG&E Corp. and Pacific Gas and Electric Company

1    THE COURT:  But it does bring facts outside the record

2    of the claim and the objection.

3    MR. GOODMAN:  Well, the testimony that I'm going to

4    share with you, it's not just that they don't make the

5    allegation that there was no specific intent to cause harm.

6    They have specifically admitted that they have no evidence to

7    prove that there was a specific intent to cause harm.

8    "Q.  Does FEMA contend that PG&E had a specific intent to cause

9    harm in the proof of claim that it has filed against PG&E?

10   "A.  Well, as stated in the interrogatory, FEMA does not

11   believe that the statute requires a specific intent to cause

12   harm.  So we are not going to make that allegation.

13   "Q.  Does FEMA have any evidence that PG&E had a specific

14   intent to cause harm in relation to the wildfires for which

15   proofs of claim have been filed?

16   "A.  So again, our reading of the statute is that a specific

17   intent to harm is not required, so we will not make such

18   allegation.

19   "Q.  The question is, though, do you have any evidence that

20   would support that allegation?

21   "A.    --"

22   MR. GOODMAN:  And this is critical --

23   "A.  We are not making the allegation, and we have no evidence

24   that would support such an allegation."

25   MR. GOODMAN:  Admission, FEMA, they have no evidence

PG&E Corp. and Pacific Gas and Electric Company

1    of any specific intent to cause harm.

2           THE COURT:  Now, one of the arguments they made is

3    they've got half-a-dozen briefs from Robert Julian telling us

4    all how bad PG&E is and how criminal they were and all their

5    intentional acts.  Is that legally relevant to today's issue,

6    that Mr. Julian made that argument and others have too -- or

7    that's not -- that's not a -- he doesn't get estopped from

8    making the argument, does he?

9           MR. GOODMAN:  I will admit that we have said some

10   things about PG&E in this case, but we have never accused them

11   of arson.  And the word "arson" does appear in their --

12          THE COURT:  I know, but --

13          MR. GOODMAN:  -- in our brief.

14          THE COURT:  -- but come on.

15          MR. GOODMAN:  And we specifically asked the question.

16          THE COURT:  I know.  A number of people on your

17   side -- I don't think you've been here in court much, if at

18   all -- but a number of people on the TCC side have not been

19   bashful about using strong words directed at PG&E.

20          The question I'm asking you is does that have any

21   bearing on the challenge that I have to decide today on whether

22   FEMA has a claim or not?  I think the answer is it shouldn't be

23   relevant.

24          MR. GOODMAN:  I think that's correct, Your Honor.

25          THE COURT:  Okay.

PG&E Corp. and Pacific Gas and Electric Company

1     MR. GOODMAN:  In fact, even more to the point, again,

2  we specifically asked FEMA -- because I was curious myself as

3  to what they were really saying in their proof of claim.  I

4  read it, and it didn't make sense to me.

5     So we specifically asked at deposition, "Is FEMA

6  claiming that PG&E or anyone that works for PG&E is an

7  arsonist?

8  "A.  FEMA contends that intentional omissions", whatever that

9  means, "of the debtor resulted in a condition related to the

10  fires, but that does not include arson.

11  "Q.  Okay.  Just to make sure I have a clear answer to this

12  question, we just want to know:  is FEMA claiming that PG&E or

13  anyone that works for PG&E is an arsonist?

14  "A.  So again, FEMA's claim is that intentional omissions by

15  PG&E resulted in the fires but not that anyone at PG&E is an

16  arsonist."

17     THE COURT:  But again, if we get into the whole

18  question of arson, that invites all sorts of criminal-law

19  consequences.  I think if what you say is they are not

20  contending that -- I think what they're saying, although not

21  the words -- no one at PG&E intentionally caused the fire.

22     MR. GOODMAN:  Correct.  And on that point, let's come

23  back to the statute again.  And again, this was a question

24  where I was struggling to understand exactly how they were

25  reading the statute and how you could get from condition for

PG&E Corp. and Pacific Gas and Electric Company

1    which assistance is provided to a power line.

2            So again, at deposition, we asked this question:  "Has

3    FEMA ever gone out and required power lines that it suspects

4    could be faulty in order to prevent a wildfire from happening?

5            "Answer" -- this surprised me -- "Such activity would

6    be outside the scope of FEMA's authority.

7    "Q.  Has FEMA ever reviewed power lines that are in need of

8    repair as a major disaster in the absence of a wildfire?

9    "A.  It would not meet the definition of a major disaster under

10   the Stafford Act.

11   "Q.  So the answer would be no, FEMA has never viewed power

12   lines that are in need of repair as a major disaster in the

13   absence of a wildfire?

14   "A.  I think the answer would be that FEMA would not consider

15   repairing power lines prior to disaster as an eligible event

16   under the definition of a major disaster declaration for the

17   Stafford Act."

18           MR. GOODMAN:  The term "condition" can't mean the

19   power lines.  You can't have a major disaster declaration to

20   fix power lines.  That's it.  It's over.  The claim should be

21   disallowed on that basis.

22           THE COURT:  I don't -- I don't know how -- I mean,

23   this -- talk about hypotheticals, maybe you could have a

24   disaster involving power lines that doesn't involve wildfires.

25   I don't know.

PG&E Corp. and Pacific Gas and Electric Company

1          MR. GOODMAN:  But --

2          THE COURT:  It could be -- it could be a grid

3    meltdown -- a grid power loss that is caused by something that

4    causes an enormous disaster but doesn't ignite homes and farms

5    and schools and hospitals, but still causes a lot of damages.

6          But I want to go back to one point, procedurally, and

7    then we're going to be finished.  You said -- and your papers

8    said -- this is like a 12(b)(6).  Then you said it's like a

9    summary judgment.  You don't really want me, do you, to make a

10   ruling -- if I come out your way -- a ruling that finds that

11   there is no -- there was no intention, there was no arson;

12   because if I start making findings on, essentially, a motion, I

13   am inviting error.

14          Trial judges aren't supposed to make findings on

15   motions for summary judgment or 12(b)(6) motions or legal

16   argument on claim objections.

17          MR. GOODMAN:  Your Honor, again, we teed this up as

18   akin to a motion to dismiss and through the bankruptcy universe

19   of procedure being what it is.

20          THE COURT:  Right.

21          MR. GOODMAN:  Because we looked at the proof of claim

22   and realized or concluded that there was no allegations

23   contained within it that would satisfy Section 317.

24          THE COURT:  Right.

25          MR. GOODMAN:  But we do have very strong admissions

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    made by a 30(b)(6) deponent --

2         THE COURT:  No, I understand.

3         MR. GOODMAN:  -- that we think --

4         THE COURT:  You do.

5         MR. GOODMAN:  -- the Court can take into account.

6         THE COURT:  There's no question that if somehow we

7    were not dealing with time pressures and we weren't dealing

8    with the procedural setting of a claim objection, which is a

9    bankruptcy animal -- contested matter -- in a time frame where

10   we're trying to get the claims quantified to deal with

11   disclosure statements and plans; and if this were just running

12   its normal course, maybe you would have made a motion for

13   summary judgment, and you would have supported the motion with

14   the excerpts from the deponent.  And maybe the other side would

15   have had nothing to rebut it and you would have gotten you

16   summary judgment.

17        But all I'm saying procedurally is my training is to

18   avoid fact determinations at a point when I'm not supposed to

19   make them.

20        The matter is submitted for FEMA.  I appreciate the

21   briefing on both sides.  I'm going to go --

22        MR. TYE:  Your Honor, if I may just make a couple

23   points --

24        THE COURT:  Yes, sir.

25        MR. TYE:  -- just very briefly.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  Yes, sir, Mr. Tye.

2          Well, okay.

3          MR. ZUMBRO:  Just one final point of --

4          THE COURT:  Okay, Mr. Zumbro, I'd like to -- okay.

5          MR. ZUMBRO:  -- rebuttal.  Sorry, Your Honor.  Paul

6    Zumbro from Cravath, on behalf of the debtors.

7          Just two quick points.  I also wrote down a failure to

8    maintain lines, which the Court quickly pointed out was a

9    negligence standard.

10          But what I also just wanted to note:  when Mr. Tye was

11   presenting to the Court, he noted -- he stated that the proofs

12   of claims refers to intentional conduct that caused the

13   wildfires.  And while he was giving his presentation, I went

14   back and looked at their actual proof of claims.  I'm looking

15   at docket number 4943-5, which is the FEMA proof of claim

16   relating to the Camp Fire.

17          And what it actually says is, "FEMA asserts that the

18   costs expended in disaster assistance were required by a

19   condition caused by the debtor."  And what word is missing from

20   that sentence, Your Honor?  The word that's missing is the word

21   "intentionally".

22          On that same page the cite the Stafford Act, which

23   says "a person who intentionally causes a condition", but in

24   what they actually assert in the legally relevant document,

25   which is akin to the complaint that we've been discussing, is

PG&E Corp. and Pacific Gas and Electric Company

1  just that we caused it.  They don't even assert in their

2  pleadings that we intentionally caused it.

3          Your Honor mentioned is it all or nothing.  We think

4  it is all or nothing.  And, Your Honor, we think the full 3.9

5  billion must be disallowed --

6          THE COURT:  Okay.

7          MR. ZUMBRO:  -- disallowed as a matter of law.

8          THE COURT:  Thank you.

9          MR. ZUMBRO:  Thank you.

10          THE COURT:  Mr. Tye, you have the final comments,

11  please.

12          MR. TYE:  All right.  Just a couple of points, Your

13  Honor.

14          With respect to that last point that was made that

15  there's no allegation of intentional conduct in the proof of

16  claim, I'm also looking at the proof of claim right here.  And

17  in the very heading of that proof of claim, intentional acts or

18  omission causing a condition resulting in a major disaster, are

19  specifically alleged in the proof of claim.  And we've alleged

20  that in the briefs.

21          THE COURT:  That's --

22          MR. TYE:  So I don't think there's any --

23          THE COURT:  -- that's 4943-5?

24          MR. TYE:  Yes.

25          THE COURT:  What page?

PG&E Corp. and Pacific Gas and Electric Company

1          MR. TYE:  The very first -- or page 2.

2          THE COURT:  Oh, the heading page.

3          MR. TYE:  Yes.

4          THE COURT:  Okay.  Yeah, I didn't take the time when

5    you were up to ask you more specifically about the proof of

6    claim.  But because of the complexity of these and obviously

7    the enormity of the claim, I just -- it took a lot to work

8    through them.  But I appreciate both Mr. Zumbro and your

9    pointing me to the language.

10          I mean, your point is, I take it, that the heading

11   speaks for itself, and it's consistent with your argument.

12          MR. TYE:  Correct, Your Honor.

13          THE COURT:  Okay.

14          MR. TYE:  The second point is, Counsel mentioned

15   Section 316 of the Stafford Act and suggested that "condition"

16   was defined in that section.  And it just isn't, Your Honor.

17          That section has to do with a NEPA exclusion that is

18   irrelevant to this matter, and it's not using the term

19   "condition" in any similar way to the way the term "condition"

20   is used in Section 317.  So Section 317 -- or excuse me --

21   Section 316 is irrelevant to how one would interpret the term

22   "condition" in Section 317.

23          THE COURT:  Okay.

24          MR. TYE:  There's no definition --

25          THE COURT:  Thank you very much.

PG&E Corp. and Pacific Gas and Electric Company

1        MR. TYE:  -- of that.

2        The other thing with respect to the term "condition"

3   that we would like to point out for Your Honor is the statute,

4   when it means "disaster" or "emergency" -- and that's what

5   counsel for TCC and counsel for debtors is essentially arguing

6   that "condition" here is equivalent to the disaster itself --

7   but the statute itself makes a distinction between "disaster"

8   and "emergency".

9        Later in the statute, the statute uses those terms.

10  So clearly Congress, when they wanted the statute to refer

11  specifically to the disaster or emergency, knew how to use that

12  language.

13        THE COURT:  In what section?  Is that still in 317?

14        MR. TYE:  That's in -- it's in 317 itself.

15        THE COURT:  It's in 317.  Yeah, I have it here.  I

16  just didn't take the time to look at it while you were --

17        MR. TYE:  Correct.  And so when they use the terms

18  "condition", they use the condition purposefully to mean

19  something different from "disaster" or "emergency".

20        THE COURT:  Well, what would have happened if somebody

21  up in the North Bay saw several instances of absolute gross-

22  negligent maintenance of power transformers or lines, if they

23  called up FEMA and says PG&E is not doing its job, what would

24  have -- other than a hang-up, what would FEMA have done?

25        MR. TYE:  But I --

PG&E Corp. and Pacific Gas and Electric Company

1    THE COURT:  They probably would have said call PG&E,

2  right?

3    MR. TYE:  Right, but I don't --

4    THE COURT:  They wouldn't have done anything.

5    MR. TYE:  -- think that -- I don't think that's

6  relevant for the purposes here.  The statute isn't asking us

7  about that hypothetical, they're asking about the conduct that

8  actually occurred in this case.

9    THE COURT:  Well, no, but they're talking about who

10  caused the condition.  And Mr. Julian argued -- again, whether

11  it's 316 or 317, he's focusing on you haven't pinned down that

12  there was an intention to cause the condition, because you

13  haven't alleged that there was an intent to cause the fire.

14    You're saying it was an intent to cause some other

15  condition that was obviously a predicate -- maybe a predicate

16  to the fire.  Actually, there could have been -- the fire could

17  have been caused by lightning too, we don't know.

18    MR. TYE:  But I --

19    THE COURT:  In every --

20    MR. TYE:  -- I think it's incorrect to suggest that

21  we've only alleged that there's an intent to cause the

22  condition.  As I set forth in the previous argument, the

23  Restatement section provides for intentional conduct in

24  situations where there is a substantial certainty of knowing

25  that the event will occur.  Right?

(973)006-234| operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1         And that isn't keyed off of this distinction between

2  "condition" and -- what we think of a condition and what they

3  think a condition. Even if you grant what they think of as the

4  correct interpretation of "condition", under the Restatement

5  section, we've alleged sufficient evidence to meet that

6  standard.

7         THE COURT: Okay, I got you.

8         MR. TYE: And one final point, Your Honor. Just with

9  respect to the issue of whether this should be treated as akin

10  to a 12(b)(6) motion. We think Your Honor is exactly correct

11  that you would be inviting error by delving past the proofs of

12  claims themselves into the record in making additional

13  findings.

14         THE COURT: Well -- and findings. But I still --

15  you're not suggesting that I can't make a legal determination

16  on the state of the pleadings, right?

17         MR. TYE: Correct.

18         THE COURT: Okay. All right. Thank you for -- again,

19  the matter stands submitted. We'll go straight to the TCC

20  objection to the Cal OES claim.

21         MR. TYE: Thank you, Your Honor.

22         THE COURT: Thank you.

23         And, Mr. Goodman, you're back up? We'll use the same

24  allocations, I presume?

25         MR. GOODMAN: Yes, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  Mr. Julian, is that true; are you going to

2     share with --

3          MR. JULIAN:  Yes.

4          THE COURT:  -- the same way?

5          Okay, Mr. Goodman, again, you've got -- I don't have

6     any specific questions for you at the outset.

7          MR. GOODMAN:  You don't have any specific questions;

8     what?

9          THE COURT:  You want some questions.

10         MR. GOODMAN:  That's not fair.

11         This brings us to the Cal OES claim.  I also think of

12    this as FEMA claim part 2, because again, all but 290 million

13    of what Cal OES has included in its claims is money that came

14    from FEMA.  So I'd just like to dial the clock back for a

15    moment.

16         We're in the 1980s.  FEMA goes to Congress and says we

17    would like to have a negligence statute.  And Congress says no,

18    you can't.  We're going to give you an intentional-torts

19    statute, and that's the end of it.

20         So Section 317, though, isn't the sole statute that

21    FEMA can use to recover disaster-related costs.  In fact, a

22    statute that it typically would invoke or has utilized in the

23    past, in the Ninth Circuit, is Section 312.

24         THE COURT:  312.  That's the --

25         MR. GOODMAN:  312.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1        THE COURT:  -- the Iniki Hurricane case.

2        MR. GOODMAN:  Yes.

3        THE COURT:  Right.

4        MR. GOODMAN:  That is the hurricane case, absolutely.

5 And that this the duplication-of-benefits statute.  And that

6 would apply, under the Ninth Circuit case law, in a situation

7 where you have property owned by a public entity or a state

8 that's damaged by the disaster, right, and FEMA comes in and

9 provides assistance with respect to that, whether it's

10 rebuilding a school or a hospital.  And there's insurance on

11 the property.

12        And it takes some time to work the insurance claim

13 through the system --

14        THE COURT:  Right.

15        MR. GOODMAN:  -- but eventually there is a recovery

16 from the insurance, and the owner of the property can't have it

17 twice.  You can't have the assistance from FEMA and the

18 duplicate recovery from the insurance company.  So under 312,

19 the money -- the way it sort of works through the system, is it

20 would go through the victim and then back to FEMA, under

21 Section 312.

22        FEMA, as I noted, had asked Congress for a negligence

23 statute and didn't get it.  So recently, though, they came up

24 with a very interesting workaround.  They have put in a

25 regulation in place that on its face says that a negligence-

PG&E Corp. and Pacific Gas and Electric Company

1   based tort claim is a benefit that's available under Section

2   312 of the Stafford Act.  So here's what FEMA, in effect, is

3   doing -- or believes that it has the ability to do under this

4   regulation.

5           FEMA can say to the State of the California:

6   California, if you don't pursue a negligence claim against

7   PG&E, we, FEMA, will assume that if California had pursued a

8   claim against PG&E, California would have won.  And in our

9   view, that would make California liable to FEMA and subject to

10  a clawback claim to the tune of 2.4 billion dollars.  This is

11  the proverbial second bite at the apple, or the Congressional

12  end-around, if you will.

13          THE COURT:  Right.

14          MR. GOODMAN:  Here's why this doesn't work.  First

15  point:  Cal OES does not have any direct claims against PG&E.

16  Cal OES is stuck with the same legal framework as FEMA.  In

17  fact, the free-public-services doctrine is probably more well

18  developed in the State of California than in any other state.

19          So again, Cal OES, just like FEMA, is stuck with a

20  statute that would specifically give it -- or a government

21  entity -- the ability to recover.

22          So we ask -- the other, of course, exception would be

23  that if there was damage to property owned by Cal OES.

24          THE COURT:  But which isn't our case.  But that --

25          MR. GOODMAN:  Which is not the case.

(970) 952-4400 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  -- that takes you back to the Health and

2     Safety Code, right?

3          MR. GOODMAN:  Right.

4          THE COURT:  Okay.

5          MR. GOODMAN:  So again, we asked Cal OES:  does your

6     claim include any damage to property owned by Cal OES?  The

7     answer is no.

8          The next question is:  did Cal OES perform any of the

9     services referenced in the statutory exceptions to the free-

10    public-services doctrine?  Again, the answer to that question

11    is no.

12         In our view, that ends the inquiry.  And we have, I

13    think, another narrow question to submit to the Court, which is

14    this:  is a funding party -- so Cal OES isn't CAL FIRE.  CAL

15    FIRE was out performing the fire suppression costs.  Cal OES

16    didn't perform those services.  It was part of a funding

17    pipeline.  It wasn't even using its own money, for the most

18    part.  It was the party through whom monies flowed.

19         Does that party or a party who is just simply part of

20    the funding mechanism have a direct claim under these statutes?

21    And our position is no, that can't be the case; because if it

22    were, every agency standing in the pipeline would have a

23    duplicative claim against PG&E.  And again, we just don't think

24    that that makes sense.

25         THE COURT:  But what happens if I -- well, am I

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  correct, if I sustain your objection to FEMA, I believe you

2  believe that I should therefore sustain at least the same

3  dollar amount -- I mean, not the same dollar amount -- all the

4  Cal OES claim that is the so-called pass-through.  But if FEMA

5  takes it out on Cal OES in the future, that's their problem.

6         MR. GOODMAN:  Well --

7         THE COURT:  I mean, I don't know whether they will or

8  not.  But the point is, under this regulation that you

9  described, that's not -- am I right -- that's not a matter for

10 the bankruptcy court to be concerned about?

11        MR. GOODMAN:  Well, here's a point I want to flag for

12 you.  If Cal OES's claims against PG&E fail, because the Court

13 is unwilling to interpret the California statutes in question

14 as giving a funding party a direct claim -- so you rule against

15 Cal OES -- FEMA would no longer have a claim against the State

16 of California.

17        And let me say that again.  If Cal OES's claims

18 against PG&E fail, that then means that FEMA would have no

19 claim against Cal OES under Section 312 of the Stafford Act.

20        THE COURT:  But that's -- why is that for me to say?

21        MR. GOODMAN:  Well, I --

22        THE COURT:  It may be a consequence.

23        MR. GOODMAN:  Correct.

24        THE COURT:  But it's not -- there's no -- I haven't

25 been asked to decide a dispute between FEMA and Cal OES.

PG&E Corp. and Pacific Gas and Electric Company

1    MR. GOODMAN:  You have not.  But I would submit that

2    the consequence of Cal OES coming in, proceeding under the

3    regulation, and asserting the claims that it has asserted, is

4    that if those claims against PG&E which are before you are

5    denied as not having any statutory basis, Cal OES will have

6    checked the box; it will have done its duty; it will have

7    pursued the claims; it didn't win.  Right?

8    THE COURT:  But again, am I to be concerned about

9    that?  In other words --

10   MR. GOODMAN:  Not necessarily.  But I think that --

11   again, it's one of those things where -- a lot of times in

12   bankruptcy court there's discussions that -- like to sort of

13   make the court understand the context.  Because again, Cal OES

14   is here for the first time.

15   THE COURT:  I think I understand the context.

16   MR. GOODMAN:  Okay.  Very good.

17   Cal OES, again, is like FEMA, here for the first time.

18   Normally --

19   THE COURT:  But the one thing I don't know that I'm

20   supposed to do is interpret a FEMA regulation that's directed

21   at Cal OES.

22   MR. GOODMAN:  I don't know that you need to.

23   THE COURT:  I don't.  If I am persuaded as a matter of

24   law that FEMA doesn't have a claim, I think it follows that Cal

25   OES can't have the same -- the same dollar claim has to fail

PG&E Corp. and Pacific Gas and Electric Company

1    from Cal OES, but perhaps for a different reason, because it's

2    a pass-through.  And how can you be liable for something that

3    you don't -- that the claimant has no right to in the first

4    place?

5         MR. GOODMAN:  Correct.  But I guess the argument that

6    I'm heading off is I think you're going to hear from other

7    parties that they disagree with that.

8         THE COURT:  Okay.

9         MR. GOODMAN:  So their position is going to be:  no,

10   no, no, no, no; Cal OES would still have this claim even if the

11   FEMA claim fails.

12        And my point is simply this; if you were to take that

13   position, I still think that you would end up ruling that the

14   Cal OES claim is disallowed, because the statutes that they're

15   invoking -- just like FEMA's trying to rely on 317, 13009 of

16   the California Health and Safety Code doesn't help Cal OES

17   either.

18        THE COURT:  That's what I'm going to ask them about.

19   And therefore -- well, therefore that would appear to gut the

20   big chunk of the Cal OES claim, if the legal argument is sound.

21        What about the 390 million -- or 329 -- I'm not sure

22   where that falls out.  Is that still subject to your challenge

23   under the Health and Safety Code?

24        MR. GOODMAN:  Yes.  It would, because again, the 390

25   million, even though that would be Cal OES's money that they're

PG&E Corp. and Pacific Gas and Electric Company

1    putting into the funding pipeline, we don't believe that they

2    would have a direct claim against PG&E --

3           THE COURT:  Because under 3008, that's a liability to

4    the owner of the neighboring property, and that's not the case

5    here.  And this is a narrow indication of what can be collected

6    by somebody under 3009.

7           MR. GOODMAN:  Right, it's just -- the issue then

8    becomes does 13009 provide Cal OES with a claim when it didn't

9    provide any of the services --

10          THE COURT:  Right.

11          MR. GOODMAN:  -- set forth in the statute.

12          THE COURT:  And so the --

13          MR. GOODMAN:  The answer to that is no.

14          THE COURT:  Yeah.

15          MR. GOODMAN:  I think the entire claim gets flushed.

16          THE COURT:  Okay, but for two different reasons.

17          MR. GOODMAN:  Yes.

18          THE COURT:  All right.  But and Cal OES can make the

19   argument -- and I'll make a decision one way or the other --

20   but I don't -- again, I'm not sure that I can make the next

21   leap and say, and by the way, Cal OES has no claim -- no

22   liability to FEMA.  I don't know that there's any authority to

23   make that -- or jurisdiction to -- it may be the consequence.

24          MR. GOODMAN:  Correct.  I'll reserve the rest of my

25   time for rebuttal, Your Honor.

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  Okay.

2          And Cal OES -- oh, Mr. Zumbro, sure.

3          MR. ZUMBRO:  Thank you, Your Honor.  Paul Zumbro for

4    the debtors.

5          Similar to the FEMA claims, the debtors agree with the

6    TCC that the Cal OES claims must be disallowed as a matter of

7    law.  The applicable law here is the free-services doctrine --

8          THE COURT:  Right.

9          MR. ZUMBRO:  -- the free-services doctrine, which

10   holds that governmental entities like Cal OES may not recover

11   emergency-response costs absent a specific authority allowing

12   for the cost -- the recovery of such costs.

13         That has deep roots both in California as well as

14   Ninth Circuit case law.  Your Honor referenced the Flagstaff

15   case earlier, which is a Ninth Circuit case that holds that --

16   and I'm quoting -- "the cost of public services for protection

17   from fire or safety hazards is to be borne by the public as a

18   whole, not assessed against the tortfeasor whose negligence

19   creates the need for the assistance."

20         Of course, we're not --

21         THE COURT:  Except --

22         MR. ZUMBRO:  -- admitting negligence, Your Honor, just

23   to be clear.  But the law --

24         THE COURT:  Except where a statute creates it.

25         MR. ZUMBRO:  Correct.  Except --

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  So then you're back to --

2          MR. ZUMBRO:  -- except were statute applies.

3          THE COURT:  Okay.

4          MR. ZUMBRO:  And so we agree with the TCC that Cal OES

5   is sort of a conduit.  All of its costs were conduit costs.

6   They had no boots on the ground.

7          These are different than the CAL FIRE claims, where

8   CAL FIRE is asserting costs for the direct fire suppression

9   costs.  Those are different.  The Cal OES claims fail because

10  they have no statutory basis under California law.

11         THE COURT:  Well, they have -- if I can restate it.

12  To the extent -- the portion of the Cal OES claim that isn't

13  FEMA-related has a statute that doesn't apply, because it

14  doesn't fit Cal OES --

15         MR. ZUMBRO:  Correct.

16         THE COURT:  -- but may indeed fit some other Cal

17  agency.

18         MR. ZUMBRO:  It may fit some other --

19         THE COURT:  Like CAL FIRE.

20         MR. ZUMBRO:  -- Cal agency, but that's not what we're

21  here for today.

22         THE COURT:  But that's not what we're here for today.

23         MR. ZUMBRO:  Correct.  For today's purposes, we're

24  just focused on the Cal OES claims.  Those claims are not

25  recoverable, because they didn't directly incur the costs under

PG&E Corp. and Pacific Gas and Electric Company

1    a statute that would allow them to recover.

2         Your Honor asked a question -- I agree with Your Honor

3    that the issue of any claim between PG&E and the State of

4    California is not relevant for today's purposes.  The only

5    thing that's really relevant today is whether Cal OES has a

6    cognizable state-law claim against PG&E for the claims it's

7    asserting --

8         THE COURT:  Right.

9         MR. ZUMBRO:  -- against PG&E.

10        THE COURT:  Right, that's -- I mean, if there's a --

11   if there's a theory, I guess -- I'll take this up again with

12   Cal OES's lawyers -- if there's some sort of a fallback theory

13   that of course Cal OES has a claim, because they're on the hook

14   to FEMA, we're back to well, how can you be on the hook to FEMA

15   if FEMA doesn't have a claim in the first place?

16        MR. ZUMBRO:  Correct.  We don't think FEMA has a

17   claim.  And then to the extent -- well, the only basis for

18   FEMA -- FEMA's trying to shoehorn -- as Mr. Goodman noted --

19   it's trying to shoehorn a negligence standard in through a

20   regulation where it can collect through the State of

21   California.

22        We think that's improper, because the State of

23   California needs to have a viable cause of action against PG&E

24   for that claim to work.  So it's quite different than the

25   situation in the Hawaii case, the Hurricane Iniki, where the

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    State of Hawaii had insurance available to it, which was

2    clearly to cover the event.  This is quite different, where

3    there is no viable claim against PG&E under the free-public-

4    services doctrine.

5         THE COURT:  Right.

6         MR. ZUMBRO:  So FEMA's Section 312 claim fails as a

7    matter of law, because Cal OES has no corresponding claim

8    against PG&E, unlike the insurance company that the State of

9    Hawaii had in that case.  It's quite a different circumstance.

10        THE COURT:  Well, but there's a whole -- the whole

11   question of whether there is subrogation entitlement, in any

12   event.  That's another question.

13        MR. ZUMBRO:  That's not for today's purposes, and we

14   also don't believe that that's an appropriate way to address

15   this.  We think the claims fail.

16        THE COURT:  But we go back to, if I make a ruling that

17   the debtors and TCC want and I say sorry, FEMA, you're out of

18   luck under the Stafford argument and your argument, and sorry

19   Cal OES, you're out of luck because there is -- to the extent

20   that your claim is a pass-through to FEMA, FEMA doesn't have a

21   claim; and to the extent that you have claims of your own,

22   you're barred by the factual predicate of the statute --

23        MR. ZUMBRO:  Yeah.

24        THE COURT:  -- and it seems to me I have to stop at

25   that point.  I don't say:  and by the way, Cal, you -- this is

PG&E Corp. and Pacific Gas and Electric Company

1    a good-news/bad-news joke, because the good news is you have no

2    liability to FEMA.  But I don't know that I'm allowed to do

3    that.  That's all I'm saying.

4              MR. ZUMBRO:  We're not asking you to.

5              THE COURT:  Okay.

6              MR. ZUMBRO:  I don't think you need to either.  I

7    mean, for bankruptcy purposes, what we're trying to address

8    today is what are the claims against the estate.  We don't

9    think that -- the fact that FEMA seems to be putting pressure

10   on California to bring these claims is irrelevant from our

11   purposes.  We care about whether Cal OES has viable claims

12   against us, which they don't.

13             That background is important for context, as Mr.

14   Goodman referenced, but it doesn't go to the legal-liability

15   question that Your Honor needs to decide.

16             THE COURT:  Okay.

17             MR. ZUMBRO:  I would also note, as I think Your Honor

18   alluded to, the overhang of this sort of some 6.6 billion

19   dollars of these claims is putting a great deal of pressure on

20   the case because of the complex and intricate settlement

21   framework that has gone into place.

22             I do think the time is now to remove that overhang and

23   disallow the FEMA claims and the Cal OES claims, so that going

24   forward we can, for example, have a more productive mediation

25   or otherwise mechanism for dealing with the underlying

PG&E Corp. and Pacific Gas and Electric Company

1  California state agencies, the non-OES claims.

2      THE COURT:  Well, yeah, but from my point of view, I

3  have to decide things that are presented to me, and I don't

4  ignore letters from fire survivors, but I don't -- I can't

5  really act on them.  But I read the newspaper, and I read the

6  papers, and I read over and over and over again, this thirteen-

7  and-a-half-billion-dollar fund has been undermined by more than

8  half because of two governmental agencies.

9      And I'm going, you know, if that's true, there are --

10  that's true; but it's -- the numbers are horribly distorted.

11  But then I say, well, okay, but if the two agencies together

12  really aren't owed seven, they're owed four-and-a-half -- I'm

13  not making light of the losses here -- but it's two-and-a-half

14  billion dollars less pressure on the money for the survivors.

15      And if it's just a question of doesn't anybody

16  understand that, and why don't they understand that, sure, I

17  might make a ruling at some point.  But rulings are rulings;

18  and rulings get appealed; and rulings get questioned.  And at

19  least the public perception seems to be:  why is this -- why is

20  this overinflated?  I don't know what the answer is.  It's

21  frustrating, from my point of view.  But nothing I can do about

22  it.

23      MR. ZUMBRO:  Well, Your Honor, from our perspective,

24  the thirteen-and-a-half billion is meant to go to the fire

25  victims themselves -- the individual fire victims.  We don't

                PG&E Corp. and Pacific Gas and Electric Company

1       think it should be two-and-a-half or four-and-a-half billion.

2                THE COURT:  Well, I understand.  But that --

3                MR. ZUMBRO:  We think it's zero.

4                THE COURT:  -- but that gets back to the legal

5       question.  And if you're right, you're right.  And that's true.

6                But if I reach the conclusion that either or both of

7       these agencies have a claim, at least that's my decision,

8       subject to whatever further review there would be, it's still

9       something people have to deal with right now.

10               MR. ZUMBRO:  Correct.  But I think this is one of the

11      unique places where the legal decision and the practical and

12      the moral decision or the right -- are the same thing.

13               The legal decision is to disallow these claims.

14               THE COURT:  Right.

15               MR. ZUMBRO:  And the practical consequences of that is

16      to leave the 13.5 billion dollars.

17               I understand that that can't be the basis of your

18      decision.  But the legal decision that you do have to make,

19      which is an easy decision, because the claims are not valid on

20      their face, is to cut them out to zero, and then we don't have

21      to deal with the practical question.

22               THE COURT:  Well, that's a good argument for an

23      advocate.  And if you persuade me, then you'll have me in your

24      camp.  But the other side maybe doesn't agree with that.  And

25      we know what Mr. Tye thinks.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          Let's hear from Cal OES's counsel, now.

2          MR. ZUMBRO:  Thank you, sir.

3          THE COURT:  I didn't know if I'd see you today, Mr.

4    Pascuzzi, or someone else.

5          MR. PASCUZZI:  Well --

6          THE COURT:  You got the watch?

7          MR. PASCUZZI:  -- you're going to see me, but not for

8    long, Your Honor.  Paul Pascuzzi, Felderstein Fitzgerald

9    Willoughby Pascuzzi & Rios, co-counsel with the Attorney

10   General's Office.

11         Mr. Matt Heyn, from the Attorney General's --

12         THE COURT:  Okay.

13         MR. PASCUZZI:  -- Office, will be arguing it, Your

14   Honor, for Cal OES.  Thank you.

15         THE COURT:  Okay.  I expected to see Mr. Heyn.  Are

16   you here, Mr. Heyn?  Good morning.

17         MR. HEYN:  Good morning, Your Honor.

18         THE COURT:  Okay, under the -- under the rules, you've

19   got thirty minutes.  And I don't have any specific questions to

20   you other than -- well, other than do you agree that this

21   overlap applies to some extent, no matter what; is that a fair

22   statement?

23         MR. HEYN:  It is a fair statement that all but about

24   290 million in the Cal OES proofs of claim, represent FEMA

25   dollars.  And if we were to -- the claim were to be allowed, we

PG&E Corp. and Pacific Gas and Electric Company

1    would pay those -- all but 290 million dollars back to FEMA,

2    under the regulation.

3         THE COURT:  But what if -- what if I sustain the

4    objection to the FEMA claim; what's Cal OES's -- what's the

5    impact on Cal OES?

6         MR. HEYN:  If you sustain the FEMA objection, then

7    FEMA's going to rely even more heavily on Cal OES to assert its

8    rights to recover everything that it's legally entitled to.

9         THE COURT:  Well, okay.  But what I'm getting at is

10   that if I -- if I sustain the objection vis-a-vis FEMA, and

11   that that, for my purposes and perhaps the public's purposes,

12   I've just thrown out a 3.9-billion-dollar claim -- again,

13   leaving aside FEMA's right to take appeals, et cetera, but just

14   focusing on the impact, at the trial level, if I -- if I then

15   say and Cal OES's pass-through claim fails for the same reason,

16   that's as far as I can go on that issue, I believe, right?  And

17   if FEMA has a quarrel with OES, that's for another day.

18        MR. HEYN:  Well, to be clear, FEMA has two sets of

19   rights that are relevant for the hearing today.  One is their

20   right directly against PG&E --

21        THE COURT:  Right.

22        MR. HEYN:  -- under the theories they've asserted in

23   their proof of claim.  Another set of rights is the rights they

24   have against us.

25        THE COURT:  Right.

(970) 926-1234   operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1          MR. HEYN:  Their expectation that Cal OES do

2     everything commercially reasonable to prosecute its causes of

3     action.

4          And Cal OES's claims do not include anything based on

5     the FEMA statute.  Cal OES's claims are sound purely in

6     California law.  And so the question Your Honor has today is

7     given that Cal OES funded all these amounts -- and I don't

8     disagree with the assertion that we don't have the boots on the

9     ground putting out fires -- given that we fund all these

10    claims, given that we task other agencies and call other state

11    agencies in to help out with the fires and are responsible to

12    pay those state agencies back, do we have a claim under

13    California law, right?

14         And before -- I'm going to launch into that, but

15    before I do, I just want to make clear, the Office of Emergency

16    Services is staffed with committed civil servants whose mission

17    it is to help survivors from disasters.  At the outset it's

18    really important to kind of correct a statement that's made in

19    the reply brief.

20         I'm reading from page 6 of the TCC's reply brief:

21    "Cal OES is wrong or does not want to admit that it is trying

22    to take money from victims.  Cal OES does not owe any

23    reimbursement under Section 312(c)'s plain language."

24         This is fundamentally incorrect for two important

25    reasons.  First is that Cal OES doesn't have the liberty to

PG&E Corp. and Pacific Gas and Electric Company

1    fail to assert claims.  The TCC makes a lot of novel arguments

2    in their reply brief about this requirement of FEMA that we

3    pursue commercially reasonable tort claims and say well, it's

4    invalid.  There's all the -- reasons X, Y, and Z.

5         But the important part about the novel arguments is

6    they're novel.  It's not really something that Cal OES can rely

7    on.  In the years at issue, 2015, 2017, 2018, FEMA provided

8    billions to victims, and they provided it by giving it to Cal

9    OES and say use it appropriately.  And it said -- as a

10   condition of that aid, it said you're going to need to pursue

11   any valid claims that you have.  You have an obligation to go

12   after tortfeasors.

13        If that requirement is invalid, that might be an

14   argument that I make later on, down the line, when FEMA sues

15   me.  But it's not really an argument that we can rely on in not

16   asserting proofs of claim or in backing away from the proofs of

17   claim.  Cal OES has to pretend that the regulations are valid,

18   at this point, because not doing so is malpractice.

19        As Your Honor is well aware, in the Hawaii v. FEMA

20   case, FEMA really did sue Hawaii for failing to fully pursue

21   its insurance claims.  California doesn't need that.  And it

22   doesn't need a situation where FEMA de-obligates funds from

23   survivors or fails to fund future disasters.

24        The second area where that statement rubs Cal OES

25   particularly the wrong way is it relies on the false premise

PG&E Corp. and Pacific Gas and Electric Company

1    that if Cal OES has an allowed claim it must come from

2    survivors.  But that's not something that's necessary about

3    bankruptcy case law and it's not something necessary about this

4    case.  That's a construct created by the TCC RSA.

5            THE COURT:  Well, but it -- but it's the state of play

6    today; isn't it?

7            MR. HEYN:  It is the state of play today.

8            THE COURT:  Okay.

9            MR. HEYN:  But the important point is, the agencies

10   didn't negotiate that RSA.  We weren't present when it was

11   negotiated.  The TCC wasn't representing us when it was

12   negotiated.  And we object -- we object to the plan structure.

13   We don't think that this is an appropriate plan structure.

14   We've been very clear.  We think that the survivors should get

15   paid all of the 13.5 billion, and PG&E needs to find a way to

16   separately pay the government agencies.

17           THE COURT:  No, I understand.  But again --

18           MR. HEYN:  P --

19           THE COURT:  -- at the moment, there's nothing pending

20   to deal with that, I understand.  And Mr. Pascuzzi has made it

21   clear in the past, there may be motions or challenges on

22   classification --

23           MR. HEYN:  Right.

24           THE COURT:  -- and we have the whole confirmation

25   issue coming down the road.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    MR. HEYN:  If PG&E wants to set forth a plan that

2  makes substantial distributions to equity holders, it needs to

3  pay the wildfire survivors in full and pay all of the -- all of

4  the allowable government claims.

5    Right now, I checked this morning, PG&E stock is

6  trading at $17.33 and market capitalization of about 9.1

7  billion.

8    THE COURT:  Well, I wonder what it was two days ago,

9  since we have some other issues going on out there in the real

10  world except for the President.  And he says it's not a

11  problem.

12    MR. HEYN:  They can find the money to pay all their

13  just claims if they want to pay shareholders.

14    THE COURT:  Mr. Heyn I need to go -- I need to go back

15  to understand more specifically what you're -- how to deal with

16  this inter-agency issue.  So go ahead and make further

17  arguments that you want, but I'm going to circle back to this

18  question.

19    And I don't want to cut you off, because I do

20  understand that this is important for the fire survivors and

21  for the State of California.  So just keep in mind, I'm going

22  to come back to this interplay between the two agencies.

23    MR. HEYN:  Sure.  Sure.

24    I was going to talk right now about our theories of

25  recovery, because I think that the TCC is right, that there are

PG&E Corp. and Pacific Gas and Electric Company

1    essentially a legal -- that these proofs of claim, at this

2    point, boil down to a legal dispute -- a legal dispute under

3    the -- whether the facts we've asserted in the proofs of claim

4    are adequate to support any right of recovery.

5           And what are those facts?  PG&E negligently and in

6    violation of law caused the fires.  The governor and the

7    President declared a state of emergency.  Cal OES, while it

8    didn't have boots on the ground, it tasked other agencies to

9    respond to the fires, including out-of-state agencies.  I think

10   we've cited appropriately the EMAC statute which says that

11   we're liable for those out-of-state agencies coming in and

12   providing services.

13          We paid those amounts.  And then following the fires

14   we had a debris-removal program that removed substantial

15   amounts of toxic substances.  Those are the facts -- and that

16   we got paid a substantial sum from FEMA.  Those are the facts.

17          So what are the -- what are the theories of law?  I

18   mean, I think our proofs of claim are not a model of clarity.

19   We threw everything in there.  But there are -- the opposition

20   to the claim objection has four theories:  13009 for the fire

21   suppression and emergency services; 13009.6 for the cleanup of

22   hazardous substances; we've got the equitable subrogation

23   argument under California law; and we've got the Bankruptcy

24   Code Section 509 argument.  So let's deal with those in turn.

25          13009 gives California agencies the right to recover

PG&E Corp. and Pacific Gas and Electric Company

1  costs that they incur.  So the question is, who incurred the

2  costs?  Is it the out-of-state agencies that were covered by

3  Cal OES that Cal OES had an obligation to pay back?  Or was it

4  Cal OES that actually paid back those costs when it tasked

5  those agencies to come in?

6       This is not just firefighters, it's all kinds of first

7  responders:  people that evacuated survivors; people that

8  provided medical care to survivors.  Who incurred those costs?

9  We would say it's clear, Cal OES incurred the costs.  It asked

10 these agencies to come in and it was liable to pay them.

11      Even in the absence of asking somebody and being

12 liable to pay them, really the incurred standard here should

13 be:  who had to -- who paid them?  Right?  We're not looking

14 for a double recovery.  What we're saying is is that once

15 you're paid, the person that pays really ought to be the one

16 that recovers from the tortfeasor under 13009.

17      THE COURT:  But the statute's pretty clear on who can

18 recover, right?

19      MR. HEYN:  Right.  Whoever incurs the costs.  So

20 that's the question:  who incurred these costs?

21      THE COURT:  Well, incurred it when?  Incurred it

22 first, or incurred them second?  I mean --

23      MR. HEYN:  Well --

24      THE COURT:  When those first responders went out

25 there, weren't their employers paying them and then Cal OES is

                    PG&E Corp. and Pacific Gas and Electric Company

1    simply reimbursing them?

2            MR. HEYN:  Right.  But they were out there at the

3    behest of Cal OES, knowing that Cal OES would pay them.  So are

4    they incurring the costs?

5            And let me be clear.  I think that either could

6    probably assert these claims.  I don't think there could be a

7    double recovery, but I think you'd have to be clear about who

8    pay -- and if they did, they wouldn't be allowed to keep the

9    money.  Right?  Once they've been paid back, they don't get to

10   also recover from PG&E.  That would be a double recovery.

11           What we're seeking -- what we're seeking here is a

12   single recovery.  What we're seeking here is saying the party

13   that's out the money gets the money back.

14           THE COURT:  So we're back to the question that I asked

15   you before, is it -- is it the 290 million or is it the

16   billions?

17           MR. HEYN:  Well, what I would --

18           THE COURT:  If I buy your argument and say you win,

19   how much do you win?  Do you win 290 million or do you win 2.4

20   billion.

21           MR. HEYN:  Everything that we're liable to pay,

22   subject to the duty to pass it along to FEMA to the --

23           THE COURT:  Well --

24           MR. HEYN:  -- to the extent it represent their money.

25           THE COURT:  Well, but paying -- but paying the

PG&E Corp. and Pacific Gas and Electric Company

1  agencies that you called upon to provide service is different

2  from paying back to FEMA; isn't it?

3          MR. HEYN:  Yeah.  No, no, so --

4          THE COURT:  Yeah?

5          MR. HEYN:  -- as an initial matter, we paid the

6  agencies and we paid the first responders on the ground.

7          THE COURT:  So let's just stop right there.

8          MR. HEYN:  Sure.

9          THE COURT:  So maybe it was a fire department or a

10  recovery -- some disaster agency in another state, and they

11  answered your call, they went in there, and they did their

12  thing, and now Cal OES has paid them --

13          MR. HEYN:  Right.

14          THE COURT:  -- and you want to be paid for that.

15  Okay?

16          MR. HEYN:  Correct.

17          THE COURT:  And that then is the 290-million-dollar

18  aggregate, no?

19          MR. HEYN:  No.  No.  The amount that we -- the amount

20  that we incur is the full amount that we had to pay, because we

21  are the --

22          THE COURT:  Which is the full amount of your claim?

23          MR. HEYN:  Right.

24          THE COURT:  I know, but --

25          MR. HEYN:  We don't get to keep it.  We have to --

PG&E Corp. and Pacific Gas and Electric Company

1          THE COURT:  I know you don't get to keep it, but
2     you -- all right, never mind.  Go ahead.
3          MR. HEYN:  I mean, the simpler way to think of this,
4     perhaps, is to think about what if there were a car accident.
5     The victim of a car accident, even though they were paid from
6     their insurance for a lot of their damages, would still have a
7     claim in the full amount of the -- to the extent that they were
8     damaged by the tortfeasor, right?
9          THE COURT:  By the defendant, yes.
10         MR. HEYN:  But they would have an obligation to pay
11    the insurance company back or the insurance company could
12    directly assert the claim for the amount it's out.
13         THE COURT:  Well, but that's the very common, very
14    normal subrogation concepts.
15         MR. HEYN:  Correct.
16         THE COURT:  Okay.
17         MR. HEYN:  And all I'm saying is there's no reason
18    that it shouldn't apply in this circumstance.  In fact, we've
19    asserted subrogation claims.
20         So I mean, let's move on to 13009.6.  It broadly
21    provides that the costs of toxic cleanup are charged under --
22    that's under subdivision (a).  And it says -- who can collect
23    the charge?  Well, it says any participating agency.  So the
24    question is did Cal OES participate?  Well, the cleanup program
25    is Cal OES' cleanup program.  It mans that program.  It made

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  sure that the soil samples were taken.  It didn't directly do

2  it, but it paid for all this work to be done, and it went out

3  and directed that the work be done.

4          I would say that under those facts we clearly

5  participated in the cleanup program, and so we clearly have a

6  right under 13009.6, which leads us to subrogation, both

7  equitable and statutory.

8          The principle is basic.  Under principle of equity, if

9  you harm somebody, and somebody else is required to pay for

10 that harm, the debt doesn't vanish like smoke in the breeze.

11 You still have an obligation to pay back the loss.  You just

12 pay it to a different person.  In this case, PG&E harmed

13 several cities by destroying their infrastructure.  In this

14 case it harmed a lot of individual wildfire victims by

15 destroying their homes and leaving a mess, candidly.  A toxic

16 mess.

17         Cal OES went in, and it funded a lot of the

18 rebuilding.  Cal OES went in and it funded the cleanup.  Does

19 PG&E get to fully escape liability just because Cal OES is

20 required to clean up the mess?  We would say no.  We hit all --

21         THE COURT:  Well, the answer is you don't get it if

22 the free-service doctrine applies unless you have a statute,

23 and then that gets back to the 13009.6, and then that's -- it's

24 just how the statute reads, doesn't it?

25         MR. HEYN:  It's an excellent point.  So I --

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    THE COURT:  Well, but isn't -- isn't it -- but --

2    MR. HEYN:  Well --

3    THE COURT:  But doesn't that answer the question?

4    MR. HEYN:  No, I don't think so.

5    THE COURT:  Okay.

6    MR. HEYN:  Because the free-public-service doctrine is

7    different from the concept of equitable subrogation.  The free-

8    public-service doctrine says that the state, in its role of

9    doing the things that a state does, doesn't have a separate

10   cause of action for putting out fires, providing for public

11   safety.  Equitable subrogation says who has a claim and who can

12   step into the shoes of it?

13        It's separate to say well, Cal OES is asserting

14   because it's out all this money from having to pay victims.

15   But it's a separate thing to say look, all these victims had

16   great proofs of claim, and we took care of them, and we want to

17   bring the proof of claim on our own behalf, or as a subrogee.

18        So if you think about the U.S. Supreme Court case that

19   they cited, right, you've got the serviceman.  This is United

20   States v. Standard Oil.  Standard Oil hits a serviceman.  And

21   it goes to the Supreme Court, and the Supreme Court has to

22   really address two questions.  Can the military cover for the

23   pay that it paid this victim?  And the Supreme Court says no.

24   It's a free-public service.  You had to pay that already.  You

25   need a statute.

PG&E Corp. and Pacific Gas and Electric Company

1    But it also, in a footnote, addressed well, can the

2 army step into the shoes of the soldier and bring claims that

3 the soldier might bring?  And in a footnote they say nope, that

4 doesn't work.  And it doesn't work because the solider already

5 settled its claim.

6    Now, if the free-public-service doctrine encompassed

7 the concept of subrogation, you really couldn't have that,

8 right?  You wouldn't need to go into well, there's a separate

9 theory under which this army can recover for stepping into the

10 shoes of the victim, because it would all be encompassed in the

11 free-public-service doctrine.

12    And in particular, I point Your Honor to the case we

13 cited from the restatement, the Ford v. United States.  That

14 was a case in which, again, the army paid a victim based on

15 theft by a soldier, and the army pursued a claim against the

16 soldier directly, saying we paid this victim.  Now we're going

17 to take the money from you, because you owed this money to the

18 victim.  That's a pretty similar context to what's going on

19 here.

20    We paid for PG&E's loss.  We covered -- or we paid for

21 some of PG&E's damages.  We step into the shoes for the damages

22 we paid for.

23    THE COURT:  Okay.  I --

24    MR. HEYN:  There are --

25    THE COURT:  Well, go ahead.  You wanted to make your

PG&E Corp. and Pacific Gas and Electric Company

1    509 argument too, I guess, right?

2          MR. HEYN:  Well, I think the 509 speaks for itself.

3    Either we meet the standards of 509 or we don't.

4          THE COURT:  But don't you -- if your 509 controls,

5    don't you have to wait until the victims are paid in full?

6          MR. HEYN:  Well, that's the hope of this --

7          THE COURT:  But full might not be a negotiated number

8    or the RSA number.  It might be the literal term in full.  I

9    don't know.  I'm not sure.  I don't know.  Why wouldn't it be

10   the latter, regardless of what the negotiated RSA amount is?

11         MR. HEYN:  Well, on the theory that Your Honor has a

12   lot to decide today, I can deal with the 509 issue very

13   briefly.

14         There's nothing in the record to suggest that the

15   victims won't get paid in full.

16         THE COURT:  Well, that may be true.

17         MR. HEYN:  Or can't get paid in full.

18         THE COURT:  But the point is, if I buy your other

19   arguments, then you don't need 509.  If I --

20         MR. HEYN:  Right.

21         THE COURT:  If I believe that 509 is your only hope,

22   you're going to be -- I don't think you get an assurance that

23   you get reimbursed just when the -- well, I don't know what

24   happens, because if the 13.5 isn't enough in fact, then you're

25   out of luck.

PG&E Corp. and Pacific Gas and Electric Company

1    MR. HEYN:  Well, I think the appropriate scenario in a

2   509 world would be to subordinate Cal OES' proof of claim, and

3   then Cal OES is in its own class, and it can decide whether

4   it's appropriate for this 13.5 billion dollars to short victims

5   and to not pay us, with all this money going to shareholders.

6    THE COURT:  Well, at the moment -- well, that may be

7   an option, but at the moment you're not in a separate class.

8    MR. HEYN:  Well, I think that Your Honor should decide

9   the claims based on the law, and then we'll let the plan

10  implications fall out where they may.

11    THE COURT:  Yeah.  I agree.  I mean, that's all I can

12  do.  I mean, I can't --

13    MR. HEYN:  Yes.

14    THE COURT:  I can't sit here and say you win because

15  the plan's going to be changed.  I have to say you win or you

16  lose, and then which --

17    MR. HEYN:  Based on the legal merits.

18    THE COURT:  Okay.  So I want to go back to the

19  interplay between the two entities, because I'm still --

20    MR. HEYN:  Sure

21    THE COURT:  I'm still missing something.  So let's

22  contrast the fire department from Las Vegas and FEMA.  So the

23  fire occurs in Santa Rosa, and Cal OES calls out for help, and

24  the fire department from Las Vegas comes up, and the guys on

25  the trucks help solve the problem, and Las Vegas City Fire

PG&E Corp. and Pacific Gas and Electric Company

1 Department sends Cal OES a bill, and you pay it.  And now that

2 amount that you've paid to that first responder, or that

3 entity, is part of your claim.

4    But you've also gotten money from FEMA.

5    MR. HEYN:  Correct.

6    THE COURT:  Are they the same?  Is the claim -- is Cal

7 OES' role vis-à-vis this third-party vendor -- I mean first

8 responder -- legally the same as what FEMA is asking you to

9 pay?

10    MR. HEYN:  What I'm struggling with is legally the

11 same.  What I would say is that this Las Vegas first

12 responder --

13    THE COURT:  Well, I just picked that.  It could have

14 been --

15    MR. HEYN:  Yeah, yeah.  No, no.

16    THE COURT:  -- Oakland.

17    MR. HEYN:  Yes.

18    THE COURT:  It doesn't really matter.  I intentionally

19 made it out-of-state because you referred to that.  But it

20 doesn't matter.  It could be Oakland.

21    MR. HEYN:  Right.

22    THE COURT:  I just -- I don't know whether you would

23 argue that they are the same or different.  And I need to know

24 whether --

25    MR. HEYN:  Our relationship to the --

PG&E Corp. and Pacific Gas and Electric Company

1      THE COURT:  -- whether --

2      MR. HEYN:  Sorry.

3      THE COURT:  No, you go ahead.

4      MR. HEYN:  Our relationship to the fire department in

5  Oakland is different than the relationship of FEMA to the fire

6  department in Oakland.

7      THE COURT:  Right.  FEMA sent you a lot of money, and

8  Oakland sent you a firefighter.

9      MR. HEYN:  Right.

10      THE COURT:  Okay.  But that --

11      MR. HEYN:  I'm just really struggling to track what

12  you're --

13      THE COURT:  I'm trying to figure out this role.  Then

14  I'll ask the question differently.  If what -- you heard the

15  TCC argument about FEMA, if I accept that argument, and I say

16  FEMA has no claim in this bankruptcy --

17      MR. HEYN:  Right.

18      THE COURT:  -- for whatever reason, I'm still not

19  clear what happens to your reimbursement obligation in terms of

20  whether you have a claim in this case.

21      Now, the -- or the TCC -- most creditors -- and Mr.

22  Zumbro said it too.  You don't have any -- you're not likely to

23  have a claim that you owe to FEMA.  But is that true or not?

24  What do I do about that?

25      MR. HEYN:  Well, I mean, I think that we have an

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    obligation to be commercially reasonable in pursuing claims.

2         THE COURT:  Well, you filed a proof of claim, and

3    you're defending it.

4         MR. HEYN:  I think I've been eminently reasonable.

5         UNIDENTIFIED SPEAKER:  So sit there with it.

6         THE COURT:  No, but look.  I don't have any doubt

7    about that.  My question is when I'm sitting here working

8    through it in the context of two substantial claims, I

9    understand the consequences and what the law -- or I have to

10   conclude what the law says that I do vis-à-vis FEMA.  And in

11   some respects, if I accept FEMA's argument, then maybe what

12   happens with Cal OES goes away, to some extent.

13        But if I say sorry, FEMA.  For all the reasons we

14   heard this morning you don't have a claim at all, I still, Mr.

15   Heyn, am having trouble knowing what is the impact on the

16   portion of Cal OES' claim that is the so-called pass-through to

17   FEMA.  I don't have a problem with analyzing what about the

18   Oakland firefighter.  You're going to win it or lose it based

19   upon some other legal principles that you've described.

20        MR. HEYN:  Right.

21        THE COURT:  So help me know what is the legal

22   consequence of the -- for convenience, we're calling the 2.4

23   billion dollar FEMA portion of the Cal OES claim.

24        MR. HEYN:  Right.  Right.  And so what you would say

25   is sorry, FEMA.  You don't have a claim against PG&E.  But as

PG&E Corp. and Pacific Gas and Electric Company

1  you said earlier, you really are not in a position to say FEMA,

2  you don't have a claim against Cal OES, right?

3        THE COURT:  Correct.  I don't think so.  You'd like me

4  to say that.

5        MR. HEYN:  I would love it.

6        THE COURT:  You'd like me to, but I don't --

7        MR. HEYN:  I would stipulate to it.

8        THE COURT:  I don't believe I have the right to do

9  that.

10       MR. HEYN:  So --

11       THE COURT:  So --

12       MR. HEYN:  If FEMA doesn't have a claim against PG&E,

13 it can only assert its claims against Cal OES, and it's --

14       THE COURT:  But what do we do with the portion of your

15 claim --

16       MR. HEYN:  Right.

17       THE COURT:  -- that's the FEMA portion?  I think it

18 has to be disallowed, but you've got to tell me why I'm wrong,

19 unless you -- I mean, I know you'd like me to disallow it and

20 like me to say you're off the hook, but that's not the point.

21       What if FEMA shows up, stands up today and says we

22 just heard from the president and we're withdrawing our claim?

23 What do I do with your claim?

24       MR. HEYN:  My claim is still allowed on the merits,

25 right?  And so the only merits argument there is on this, I

PG&E Corp. and Pacific Gas and Electric Company

1    think, is well, Cal OES doesn't have a claim under the statutes

2    or under subrogation, because it's not out-of-pocket.  That, I

3    think, gets to what troubles you.  I hope it is.  I don't want

4    to talk about three different things.

5            THE COURT:  Well, I mean, this isn't something any of

6    us do every day.  Maybe you do, but the rest of us don't.  So

7    the whole thing troubles me.  But I'm trying to figure it out.

8    So I don't -- I'll try a different hypothetical.

9            So Mr. Julian's a capable lawyer, and he likes to win,

10   and when good lawyers win, they love it when the judge says

11   prepare your order.  So if I announce that FEMA loses.  Mr.

12   Julian, prepare the order and work with Mr. Heyn to make the

13   order.  What would the order say about your claim?  Would it

14   say your claim is reduced by 2.4 billion because FEMA has no

15   claim?

16           MR. HEYN:  I'd love for it to say that, but I don't

17   think it --

18           THE COURT:  But what would it -- as an officer of the

19   court, what would you concede that it has to say?

20           MR. HEYN:  I think it has to say that FEMA's claim is

21   disallowed, and to the extent Your Honor thinks that we don't

22   have a legally valid right of recovery against PG&E, then you

23   have to disallow our claim in a certain amount.

24           THE COURT:  Okay.

25           MR. HEYN:  But the point is that the legal validity of

of 134
(977) 406-1234 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1  our claim doesn't have anything to do with the legal validity

2  of FEMA's claim.

3        THE COURT:  Well, but if that were true, this would be

4  easy, I guess, but I have no trouble looking at the Health and

5  Safety Code and reading your arguments about the so-called

6  pass-through.  Do you get a claim because you've paid the

7  Oakland Fire Department, or is that your problem?  But I don't

8  know what the legal consequences are of whether Cal OES has an

9  allowed claim for its so-called pass-through obligation to FEMA

10  when FEMA, based upon my theoretical ruling, doesn't have a

11  claim.

12        And listen.  I don't have -- if there isn't an easy

13  answer, I don't want to put you on the spot, where as an

14  advocate for Cal OES you'd like to have no liability to FEMA,

15  but as a lawyer familiar with the issues, you might have a

16  different take on it.

17        MR. HEYN:  I'm going to take one more try at it.

18        THE COURT:  And Mr. Troy's going to help you too.

19        Yes?

20        MR. TROY:  I was just -- I was going to -- Matthew

21  Troy, Your Honor, Civil Division, on behalf of FEMA.  I think

22  Your Honor needs to focus on Section 312.

23        THE COURT:  Okay.

24        MR. TROY:  That's why Cal OES is filing these claims.

25        THE COURT:  Right.

PG&E Corp. and Pacific Gas and Electric Company

1          MR. TROY:  312 is not dependent upon 317.  317 is not

2    dependent on 312.

3          THE COURT:  Okay.

4          MR. TROY:  317 is FEMA's direct cause of action

5    against PG&E in this case.

6          Let me pose it another way, a hypothetical.  I think

7    you came pretty close to it with your President Trump tells me

8    to withdraw the claim.  If only.  I was going to come up with

9    the hypothetical, what if FEMA just never filed a claim in the

10   first place --

11         THE COURT:  Well, the same thing.

12         MR. TROY:  -- which is what everybody here wants.  Or

13   wanted.

14         THE COURT:  Well, the same result.  It would be --

15   you'd be barred.

16         MR. TROY:  Cal OES and Mr. Heyn would still be filing

17   a proof of claim, because they have a liability under 312.

18         THE COURT:  Okay.

19         MR. TROY:  And if -- I can --

20         THE COURT:  FEMA --

21         MR. TROY:  I don't know for sure.

22         THE COURT:  So --

23         MR. TROY:  But I would submit it would not be

24   commercially reasonable to neglect to prepare and file a proof

25   of claim to recover disaster assistance from another source.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1      THE COURT:  Okay.  But then the question is, is PG&E

2  another source as the statute reads?

3      MR. TROY:  Yes.

4      THE COURT:  And but there's different --

5      MR. TROY:  The Hawaii case makes that clear, and other

6  cases make that clear.  It is broadly interpreted.

7      THE COURT:  The Hawaii case has to do with insurance

8  companies, though, right?

9      MR. TROY:  Any other source, Your Honor.

10      THE COURT:  Well, no.

11      MR. TROY:  It doesn't say any other tort -- I mean,

12  that's what 312 says.

13      THE COURT:  I understand your point.  But the point is

14  I believe the TCC argues that the other source is other folks.

15  It's not the tortfeasor.  But that's a point of dispute.  Your

16  point, if I got it right, is even if FEMA is out under 317, Cal

17  OES has a right to assert the claim under 312, and the debtor

18  and TCC have a right to oppose it, obviously.

19      MR. TROY:  Let me clarify.  It has a right to assert a

20  claim for the theories asserted in its proofs of claim here.

21      THE COURT:  Yes.  Yes.

22      MR. TROY:  It doesn't have a right against PG&E by

23  virtue of 312.  It is asserting the theories in its proofs of

24  claim against PG&E because of 312.

25      THE COURT:  Okay.  I got it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1      MR. TROY:  So 317 and 312 are not in any way dependent

2  upon each other.  Let me go back to another of your

3  hypotheticals.  I always like to answer your hypotheticals,

4  because I think it makes you happy.

5      The order you give to Mr. Julian and say prepare it,

6  what does it say about Cal OES' claim when I have ruled only,

7  hypothetically, that FEMA is out.  The proposed order says

8  nothing about Cal OES' claim.  It say absolutely nothing.  And

9  if it does, Your Honor, then you're venturing into that

10  territory that I think you've recognized you can't and shan't.

11  You don't have jurisdiction to tell Cal OES that it's off the

12  hook to FEMA.

13      THE COURT:  Well, I agree I can't tell Cal OES that

14  it's off the hook to FEMA.  But I can tell PG&E it's off the

15  hook to Cal OES.  I mean, it's my job to do that.  If I'm

16  incorrect, that's why we have appellate courts.

17      MR. TROY:  You can on the basis that the theories that

18  Heyn's put forward in the proofs of claim and that he's argued

19  about here today --

20      THE COURT:  Yes.

21      MR. TROY:  You determine are not not legally viable.

22      THE COURT:  Correct.

23      MR. TROY:  But not on the basis that oh, FEMA doesn't

24  have a direct claim under 317.  That cannot be the basis for

25  disallowing Cal OES' claim.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1        THE COURT:  Okay.  I got you.

2        MR. TROY:  Thank you.

3        THE COURT:  All right.  Mr. Heyn, do you want to make

4    any final comments?  I think I'm ready to put this to bed.  I'm

5    not going to make a ruling this moment.  Do you want to make

6    any further argument?

7        MR. HEYN:  Let me just address a couple of points made

8    in the opposition about the subrogation issue.  There are five,

9    I think.  First, there's this argument that Cal OES used the

10   wrong form.  If we have a --

11       THE COURT:  That's not a --

12       UNIDENTIFIED SPEAKER:  All right.

13       THE COURT:  That's not going to drive the bus.

14       MR. HEYN:  Second is that there's this free-public-

15   service doctrine.  And as I said, it doesn't really cover

16   subrogation.  Free-public-service says the state doesn't have a

17   claim in its own right.  Subrogation is we step into the rights

18   of others once we pay their claim.

19       They say Section 509 doesn't have an explicit

20   exception to the free-public-service doctrine.  That's not what

21   the free-public-service doctrine is.  The free-public-service

22   doctrine says if there's a statute, and you recover under the

23   statute, you can recover.

24       Argument 4 is the injustice to the victims.  I think

25   we've talked about that.  You allow the claims as they stand,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    and we'll figure out the plan confirmation, the structure, at

2    another hearing.

3            THE COURT:  Okay.

4            MR. HEYN:  And then the fifth argument is we should be

5    somehow disallowed as a fire victim claim but then allowed as a

6    subrogation claim.  I think we can deal with a motion to

7    reclassify at a different time.  I understand that subrogation

8    attorneys are here to --

9            THE COURT:  Well, the subrogation attorneys, they

10   filed a paper that preserves their position, and I understand

11   their point.  All I'm deciding from today's hearing is whether

12   your client and FEMA have viable claims in this bankruptcy.

13   That's all I'm deciding today.

14           MR. HEYN:  Yes, Your Honor.  Thank you.

15           THE COURT:  Okay.  Thank you very much for your

16   efforts.

17           Closing comments from Mr. Goodman and Mr. Zumbro, and

18   then the matter will be submitted.

19           MR. GOODMAN:  Good afternoon.  No, I'm sorry.  Yes,

20   good afternoon.  It's now afternoon.

21           Closing comment.  On the subrogation issue I think we

22   would argue one argument and one argument alone, which is that

23   fire suppression costs, the kind of costs that we're talking

24   about, can only be recovered where specifically authorized by

25   statute.  Subrogation is just another equitable end-around or

PG&E Corp. and Pacific Gas and Electric Company

1   try a way to get around that doctrine.  It's an equitable

2   theory.  If it worked, it would completely blow apart the free-

3   public-services doctrine in its entirety, because, for example,

4   in the City of Flagstaff decision -- sorry.  It says I'm -- the

5   train derailment, I mean, you could get around the free-public-

6   services doctrine just by pointing to someone who benefitted

7   from the cleanup and the services that were provided and say

8   well, ignore the fact that I'm the government.  I'm going to

9   step into that person's shoes.  It's still an equitable theory.

10  It's still the kind of claim, in its very nature, that is not

11  the specific statutory authorization that the doctrine

12  requires.

13         So again, we think that at the end of the day it all

14  comes down to whether California has a statutory claim against

15  PG&E.  And on that point, I would say this.

16         Free California.  Free them.  If this Court finds that

17  the Cal OES claim fails under California law because of the

18  free-public-services doctrine and because the statutes do not

19  afford California the right to recover from PG&E, thereby

20  knocking out the 2.7-billion-dollar claim in its entirety, and

21  our view is I don't now see -- now again, we wouldn't be asking

22  the Court to rule, but I'm just saying the practical

23  consequence of that is likely that FEMA really can't complain

24  about what Cal OES did.  They did their job.  They filed their

25  claim.

of 134
(970) 351-0500  operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1       As Mr. Heyn noted, they threw in the kitchen sink.  I

2   mean, they threw in every statute they could think of.  I know,

3   because I had to go through each and every one of them and come

4   up with a response as to why they don't apply.  They have gone

5   the extra mile here in terms of pursuing a claim that is of

6   first impression.

7       If the Court says thank you, Cal OES, but the statutes

8   don't give you the right to recover, and they give the Las

9   Vegas Fire Department the right to recover, but it doesn't give

10  you the right to recover, a huge cloud in this case is

11  instantly lifted.  You said if you handed me a piece of paper

12  and said Mr. Goodman, would you write an order up, what would

13  it say?  It would say two things.  One, it would say FEMA's

14  claim under Section 317 is out, and it would say two, that Cal

15  OES' claim under the California statutes that it has cited is

16  out as well.  Period.  It is so ordered.

17      Thank you.

18      THE COURT:  Mr. Zumbro, do you need any more?

19      MR. ZUMBRO:  Thank you, Your Honor.  Paul Zumbro from

20  Cravath, Swaine & Moore on behalf of the debtors.

21      Just to sum up, Your Honor.  From the debtors'

22  perspective, the real issue here, which I think the Court has

23  astutely picked up on, is the whipsaw affect of the FEMA

24  claims, both the direct claims brought by FEMA, the 3.9-

25  billion-dollar claim, and the indirect claims that Cal OES has

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1   brought because it believes that the Stafford Act requires it

2   to do so, the 2.4 billion dollars of the 2.7 billion dollars in

3   claims asserted by the Cal OES.

4           Whether the law, in fact, requires Cal OES to assert

5   those claims is not an issue that's before the Court today.

6   What's important for today's purposes is whether the claims

7   asserted by FEMA and Cal OES are valid as a matter of law.

8           Under the Stafford Act, the FEMA claims are not.

9   Under the free-public-services doctrine, the Cal OES claims are

10  not.  And just to finish the thought in terms of the colloquy

11  that Your Honor was having with Mr. Heyn and Mr. Troy, I think

12  Mr. Troy's right that they are two separate causes of action.

13  There's the 317 cause of action for FEMA's direct claim, which

14  fails for the reason we talked about earlier today.

15          I think the best way to think about the Cal OES and

16  FEMA relationship is that California has a contingent liability

17  to FEMA for potential duplication of benefits.  But that

18  liability is very, very contingent, because unlike the claim

19  against the insurance company in the Hawaii case, the Cal OES

20  has no viable claim against PG&E.

21          So I think Your Honor was asking the right question,

22  are those two claims different, or are they the same?  They are

23  different, but I think they both fail, because neither of them

24  has the underlying validity of a legal claim.

25          So I think they both fail together.  Mr. Troy's right

PG&E Corp. and Pacific Gas and Electric Company

1    that they're separate claims.  I think Mr. Goodman's right that

2    the order has to say they're both disallowed in full.

3         THE COURT:  Okay.

4         MR. ZUMBRO:  Thank you, sir.

5         THE COURT:  Thank you, everyone for the spirited

6    debate and well-briefed issues.  I will take the matter under

7    advisement, do my best as quickly as I can.  And I'm not going

8    to go past 12:30.

9         Mr. Karotkin, are you going to speak to the question

10   on the claim thing, or is Mr. Slack?  Who's going to -- are we

11   going to resolve it quickly or not?  What do you want to do on

12   that?  And if you're on duty for this I -- I assume you were.

13   What would you like me to do?

14        MR. KAROTKIN:  First, for the record, Stephen

15   Karotkin, Weil, Gotshal & Manges, for the debtors.  We received

16   this morning from counsel for the putative class --

17        THE COURT:  The plaintiffs.  Yes.

18        MR. KAROTKIN:  From, I guess, the Lowenstein firm and

19   from the Michelson Law Group, proposed revisions to the notice

20   and order.

21        THE COURT:  And I got it, and I got yours.  I just

22   haven't had a chance to read them.

23        MR. KAROTKIN:  Yes.  I don't think there are many

24   issues that we should have problems with, either of us.  I

25   think there's some clarification language.  I think there's a

(979) 966-3911   operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1   couple of substantive items that they've raised that we don't

2   think are appropriate, namely postmarked as opposed to claims

3   being actually received, language that we included that they

4   struck as to no need to file a proof of claim solely on account

5   of equity interest, which is a very, very standard provision in

6   any notice of a bar date.

7          We think that they've added language to be able to

8   file claims electronically, which -- not electronically, but by

9   email -- which we don't think is appropriate, because they

10  could email it to anybody.  And we'd just like to clarify with

11  them -- they severely or significantly limited the number of

12  CUSIP numbers, and we would just -- if that's the basis for

13  what they've asserted in the class claim, and it's accurate,

14  we're fine with that.  But I think, perhaps, if we could spend

15  some time with them and try to resolve these issues, that may

16  be the best way to proceed.

17         THE COURT:  Well, that's encouraging.

18         Ms. Michelson, I see you here.  Are you covering for

19  this today or is someone else?  I'll just make a brief

20  statement.  I'll tell you what seems important to me, but are

21  you on duty today?

22         MS. MICHELSON:  I am here, Your Honor, but my

23  colleague Mickey Etkin and also Nicole Zeiss are on the line

24  and are prepared to argue any issues.

25         THE COURT:  Okay.  I'm not ready.  I don't want to

PG&E Corp. and Pacific Gas and Electric Company

1    take the argument today.

2         So, Mr. Etkin, you don't need to state your

3    appearance.  As long as you're here on the line.  Here's my

4    thinking on the subject.  I want to explain one thing that may

5    be obvious, but the reason why it was important to me to put

6    more information in the stuff about it -- in the opening part

7    of the notice -- was because I worried about people who were

8    getting their very first notice of not having a context.  Like,

9    why am I getting this proof of claim, and what am I supposed to

10   make of it?  And so neither of you, apparently, had a problem

11   with what I added in there, a little language about

12   impaired/not impaired and these other deadlines.

13        My preference would be for counsel to work on an

14   agreed form, and if you can do it on your own, I'm happy to

15   wait and take your advice on that.  If you think it would be

16   constructive, I could have a meet and confer as long as you

17   want it or as short as you want it.  I could have a hearing at

18   2 o'clock this afternoon, or I could just let you work it out.

19   I'm really up to having your agreement what to do, but maybe

20   would be to have a hearing either later today or tomorrow, by

21   phone, and I would just decide any matters that aren't

22   resolved.  But if you got it all resolved, we don't have to

23   have a hearing.

24        So, Mr. Karotkin, any preference of how to do that,

25   and then I'll ask Mr. Etkin the same thing?

(979) 864-2454 | operations@escribers.net | www.escribers.net

PG&E Corp. and Pacific Gas and Electric Company

1    MR. KAROTKIN:  As I said, I think if we had the

2  chance, perhaps we could work it all out.

3    THE COURT:  Yes.

4    MR. KAROTKIN:  But I would ask that if we cannot, that

5  at least we schedule a phone conference for the morning.

6    THE COURT:  Okay.

7    MR. KAROTKIN:  Because we have time pressures.

8    THE COURT:  Yes.  Well, I know you have time

9  pressures, and that's why I thought -- and I have time

10  pressures, not only what I worked on this morning, but I

11  haven't even had a chance to look at these.  And one of the

12  things that I don't want to waste my time is trying to work my

13  way through a redline if both sides have agreed to a solution.

14    Mr. Etkin, is that agreeable to you, to work it for

15  the rest of today, if necessary, and have a telephone hearing

16  our time tomorrow morning if there's still a dispute, and then

17  I will simply listen to brief argument and make a decision on

18  items that are still in dispute?  That work for you?

19    MR. ETKIN:  Your Honor, that does would work.  I'd be

20  happy.  We'll try to work things out.  Listening to Mr.

21  Karotkins' list of things that they find that they have issues

22  with, I would think that we may wind up with very little extra

23  to argue about and --

24    THE COURT:  Okay.

25    MR. ETKIN:  -- we've have a very short hearing, if at

PG&E Corp. and Pacific Gas and Electric Company

1    all, tomorrow.

2          THE COURT:  Okay.  And listen.  If you work it out,

3    all you have to do, and Mr. Karotkin and Ms. Kim know how to

4    communicate with my courtroom deputy, and if the message comes

5    in to Ms. Parada that everything's been resolved, then we don't

6    have to have a hearing, and I'll just await an agreed order and

7    notice.

8          Okay.  And are you speaking for the committee?

9          MR. RICHARDSON:  Yes, Your Honor.  David Richardson on

10   behalf of the TCC.

11         THE COURT:  Yes.

12         MR. RICHARDSON:  Just we have a couple of issues of

13   our own, one of which has been addressed.  All we ask is that

14   we be part of this process.

15         THE COURT:  Yes.

16         MR. KAROTKIN:  Oh, absolutely.

17         THE COURT:  Okay.  So all right.  Let's do this then.

18   Mr. Etkin and Ms. Michelson, to the extent that you're going to

19   be involved.  Again, that's not my business who's involved.  I

20   will invite the principal counsel that have spoken to see and

21   make a good faith effort to come to a resolution, and I'll set

22   a hearing time for --

23         Ms. Parada, what time?  10 o'clock?

24         THE CLERK:  10 o'clock?

25         THE COURT:  At 10 o'clock tomorrow we'll just be

　　　　　　PG&E Corp. and Pacific Gas and Electric Company

1　available, with the promise that --

2　　　　　　Mr. Karotkin, I'll let you be the spokesperson.  You

3　notify us or Ms. Parada if we don't need a hearing.  And --

4　　　　　　MR. KAROTKIN:  I assume we'd do if by telephone?

5　　　　　　THE COURT:  Yes.

6　　　　　　MR. KAROTKIN:  Okay.

7　　　　　　THE COURT:  Yes.  Are you going to be here or back

8　east again?

9　　　　　　MR. KAROTKIN:  I think I've been summoned by Judge

10　Newsome, so I'll be here.

11　　　　　　THE COURT:  I don't care where you are.  If you want

12　to be by the phone -- well, good.  Go see Judge Newsome.  Have

13　fun.

14　　　　　　Okay.  Then good luck, Counsel, for that.  I again,

15　as you know, there were difficult issues on this class issue

16　both ways.  I'm not happy with a lot of it, and I'm sure both

17　sides of you are not, but I appreciate your working together to

18　try to get it done, and my goal is to get these notices out the

19　door just as soon as we can.

20　　　　　　So good luck.  Hopefully I don't talk to you tomorrow.

21　　　　　　IN UNISON:  Thank you, Your Honor.

22　　　　　　THE COURT:  All right.  We're going to adjourn unless

23　someone wants to be heard.  Okay.  Thank you, all, for your

24　time.

25　　　　　　(Whereupon these proceedings were concluded at 12:17 PM)

(973)406-2250 | operations@escribers.net | www.escribers.net

1                    C E R T I F I C A T I O N

2

3    I, Clara Rubin, certify that the foregoing transcript is a true

4    and accurate record of the proceedings.

5

6

7

8

9

10

11   _____

12   /s/ CLARA RUBIN

13

14   eScribers

15   7227 N. 16th Street, Suite #207

16   Phoenix, AZ 85020

17

18   Date:   February 27, 2020

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

# #

## ## (1)
46:22

# $

## $17.33 (1)
85:6

# [

## [a]ll (1)
32:6
## [he] (1)
32:11
## [the] (1)
11:4

# A

**abate (2)**
7:21;8:2
**ability (2)**
67:3,21
**able (2)**
14:5;111:7
**absence (4)**
52:8;56:8,13;87:11
**absent (1)**
73:11
**absolute (1)**
62:21
**absolutely (3)**
66:4;104:8;114:16
**accept (2)**
97:15;98:11
**accident (2)**
90:4,5
**account (2)**
58:5;111:4
**accurate (1)**
111:13
**accused (2)**
19:20;54:10
**accusing (2)**
50:4,5
**across (1)**
25:14
**Act (47)**
5:18;10:9,24;13:21;
14:2,6,9,14;15:13,24;
20:4,21;23:1,9,20,25;
24:4,9,25;25:7;31:10,
15,16,23,23,25;32:5,
11,14,14,17,18;34:12;
40:18;47:7;48:25;49:1,
19;56:10,17;59:22;
61:15;67:2;69:19;78:5;
109:1,8
**action (9)**
8:2;25:15;40:22;

75:23;82:3;92:10;
102:4;109:12,13
**activities (1)**
40:5
**activity (1)**
56:5
**actor (4)**
32:6,9;38:15;48:25
**acts (9)**
7:19;14:13;21:18,21;
32:19;34:19;38:16;
54:5;60:17
**actual (2)**
35:5;59:14
**actually (9)**
8:3;25:15;27:22;
59:17,24;63:8,16;87:4;
111:3
**add (1)**
10:5
**added (2)**
111:7;112:11
**additional (1)**
64:12
**address (4)**
76:14;77:7;92:22;
105:7
**addressed (3)**
41:2;93:1;114:13
**addressing (1)**
7:8
**adequate (1)**
86:4
**adequately (1)**
48:20
**adjourn (1)**
115:22
**administered (1)**
36:8
**admiralty (1)**
13:13
**Admission (1)**
53:25
**admissions (1)**
57:25
**admit (3)**
47:23;54:9;82:21
**admitted (1)**
53:6
**admitting (1)**
73:22
**advice (1)**
112:15
**advisement (1)**
110:7
**advocate (2)**
79:23;101:14
**affect (1)**
108:23
**afford (1)**
107:19
**aftermath (1)**
43:10

**afternoon (4)**
106:19,20,20;112:18
**Again (44)**
9:4;10:25;11:20;
13:14,17;16:23;17:4,
14;18:6;38:19;49:16;
53:16;55:1,14,17,23,
23;56:2;57:17;63:10;
64:18;65:5,12;67:19;
68:5,10,23;69:17;70:8,
11,13,17;71:24;72:20;
75:11;78:6;81:12;
84:17;93:14;107:13,
21;114:19;115:8,14
**against (35)**
26:12;53:9;67:6,8,
15;68:23;69:12,14,15,
18,19;70:4;72:2;73:18;
75:6,9,23;76:3,8;77:8,
12;81:20,24;93:15;
98:25;99:2,12,13;
100:22;102:5;103:22,
24;107:14;109:19,20
**agencies (24)**
10:2;27:5;28:23;
29:15;30:14;78:1,8,11;
79:7;82:10,11,12;84:9,
16;85:22;86:8,9,11,25;
87:2,5,10;89:1,6
**agency (7)**
17:22;40:24;68:22;
74:17,20;89:10;90:23
**aggregate (3)**
30:13;38:4;89:18
**ago (1)**
85:8
**agree (16)**
5:6;15:7,8,24;16:6;
19:17;40:15;51:4,9;
73:5;74:4;75:2;79:24;
80:20;95:11;104:13
**agreeable (1)**
113:14
**agreed (3)**
112:14;113:13;114:6
**agreeing (1)**
38:21
**agreement (1)**
112:19
**agrees (1)**
17:14
**ahead (8)**
4:15;16:21;32:11;
52:24;85:16;90:2;
93:25;97:3
**aid (1)**
83:10
**aided (1)**
43:7
**Air (2)**
23:20;40:18
**akin (5)**
31:5;34:4;57:18;

59:25;64:9
**allegation (8)**
22:20;53:5,12,18,20,
23,24;60:15
**allegations (7)**
17:1;36:3,21;38:4;
52:5,8;57:22
**allege (1)**
20:3
**alleged (12)**
5:1;14:14;22:9;
34:22;36:13;38:2;47:2;
60:19,19;63:13,21;
64:5
**alleging (2)**
31:12,13
**allocated (1)**
4:18
**allocations (1)**
64:24
**allow (2)**
75:1;105:25
**allowable (1)**
85:4
**allowance (1)**
18:1
**allowed (10)**
7:19;29:12,23;77:2;
80:25;84:1;88:8;99:24;
101:9;106:5
**allowing (1)**
73:11
**alluded (1)**
77:18
**almost (2)**
16:20;45:24
**alone (1)**
106:22
**along (1)**
88:22
**alternative (4)**
6:12;23:3;45:3,5
**Although (2)**
12:25;55:20
**always (2)**
13:4;104:3
**American (3)**
10:10;11:1,21
**among (2)**
18:19;29:13
**amount (3)**
21:9;31:7;69:3,3,
89:19,19,20,22;90:7,
12;94:10;96:2;100:23
**amounts (3)**
82:7;86:13,15
**analyzing (1)**
98:17
**and-a-half-billion-dollar (1)**
78:7
**angels (1)**
48:10
**animal (1)**

58:9
**announce (1)**
100:11
**answered (1)**
89:11
**apart (1)**
107:2
**apparently (1)**
112:10
**appealed (1)**
78:18
**appeals (1)**
81:13
**appear (2)**
54:11;71:19
**appearance (1)**
112:3
**appearing (1)**
9:11
**appears (1)**
36:4
**appellate (1)**
104:16
**apple (1)**
67:11
**applicable (5)**
22:21,24;24:5;26:11;
73:7
**application (1)**
7:25
**applied (2)**
8:16;41:4
**applies (7)**
18:14;39:23;41:18,
19;74:2;80:21;91:22
**apply (9)**
8:23;16:25;18:20,21;
35:8;66:6;74:13;90:18;
108:4
**appreciate (4)**
13:7;58:20;61:8;
115:17
**appropriate (6)**
76:14;84:13;95:1,4;
111:2,9
**appropriately (2)**
83:9;86:10
**area (3)**
23:2;24:1;83:24
**areas (1)**
13:12
**argue (7)**
4:20;6:13;35:19;
96:23;106:22;111:24;
113:23
**argued (4)**
31:11;50:4;63:10;
104:18
**argues (1)**
103:14
**arguing (7)**
31:18,19;34:23;
38:11;46:7;62:5;80:13

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 117
of 134

**argument (50)**
4:14;5:16;10:15;
11:10,14;16:21;17:8,
10;18:11;21:4;27:6;
28:24;29:4;30:16;
31:17;35:25;44:25;
45:4,5;48:7,10;54:6,8;
57:16;61:11;63:22;
71:5,20;72:19;76:18,
18;79:22;83:14,15;
86:23,24;88:18;94:1;
97:15,15;98:11;99:25;
105:6,9,24;106:4,22,
22;112:1;113:17
**arguments (12)**
4:11;6:12;16:14;
17:5;37:21;43:16;54:2;
83:1,5;85:17;94:19;
101:5
**argument's (1)**
20:23
**arises (2)**
38:4;40:5
**arising (1)**
40:2
**army (4)**
93:2,9,14,15
**around (4)**
6:9;10:17;107:1,5
**arson (11)**
50:2,3,5,6,6,8;54:11,
11;55:10,18;57:11
**arsonist (5)**
49:24;50:1;55:7,13,
16
**article (1)**
50:16
**aside (2)**
41:10;81:13
**aspects (2)**
23:25;38:12
**assert (12)**
8:2;10:12;59:24;
60:1;81:7;83:1;88:6;
90:12;99:13;103:17,
19;109:4
**asserted (11)**
10:2;20:1;31:17;
70:3;81:22;86:3;90:19;
103:20;109:3,7;111:13
**asserting (8)**
9:14;50:20;70:3;
74:8;75:7;83:16;92:13;
103:23
**assertion (1)**
82:8
**assertions (1)**
26:23
**asserts (1)**
59:17
**assessed (1)**
73:18
**assistance (17)**

11:7;17:23;24:21;
34:21;43:21;44:19;
46:3,5,21,25;47:9;
56:1;59:18;66:9,17;
73:19;102:25
**assume (3)**
67:7;110:12;115:4
**assurance (1)**
94:22
**astutely (1)**
108:23
**attending (2)**
20:25;25:9
**Attorney (2)**
80:9,11
**attorneys (2)**
106:8,9
**attributable (2)**
24:25;34:19
**authority (4)**
9:2;56:6;72:22;
73:11
**authorization (1)**
107:11
**authorized (1)**
106:24
**availability (1)**
15:13
**available (6)**
11:11,12;41:11;67:1;
76:1;115:1
**avoid (1)**
58:18
**await (1)**
114:6
**aware (1)**
83:19
**away (4)**
17:25;29:24;83:16;
98:12

**B**

**back (39)**
5:19,19;13:17;23:4,
6;37:25;41:7,9;43:1;
44:20;51:22;55:23;
57:6;59:14;64:23;
65:14;66:20;68:1;74:1;
75:14;76:16;79:4;81:1;
82:12;85:14,17,22;
87:3,4;88:9,13,14;
89:2;90:11;91:11,23;
95:18;104:2;115:7
**background (1)**
77:13
**backing (1)**
83:16
**backup (1)**
10:13
**bad (2)**
19:18;54:4
**BakerHostetler (1)**

4:20
**band (1)**
13:10
**bankruptcy (14)**
17:24;22:23;25:20;
26:19;35:22;57:18;
58:9;69:10;70:12;77:7;
84:3;86:23;97:16;
106:12
**BAP (2)**
27:21;28:5
**bar (2)**
10:7;111:6
**barred (3)**
9:12;76:22;102:15
**based (13)**
7:4;9:11;13:4;33:17;
34:10;51:11;67:1;82:4;
93:14;95:9,17;98:18;
101:10
**bashful (1)**
54:19
**basic (3)**
5:6;12:6;91:8
**basis (10)**
36:16;56:21;70:5;
74:10;75:17;79:17;
104:17,23,24;111:12
**Bay (1)**
62:21
**bear (1)**
18:15
**bearing (1)**
54:21
**becomes (2)**
27:2;72:8
**bed (1)**
105:4
**began (1)**
19:15
**begin (1)**
46:13
**behalf (8)**
19:14;28:22;30:22;
59:6;92:17;101:21;
108:20;114:10
**behest (1)**
88:3
**believes (2)**
67:3;109:1
**benefit (5)**
43:18,19,20;44:18;
67:1
**benefited (1)**
43:6
**benefits (1)**
109:17
**benefitted (1)**
107:6
**best (3)**
109:15;110:7;111:16
**better (1)**
24:7

**beyond (2)**
6:14;40:23
**big (3)**
51:13,14;71:20
**bigger (1)**
51:13
**bill (2)**
44:8;96:1
**billion (20)**
18:2;29:16,19;50:24;
51:6;60:5;67:10;77:18;
78:14,24;79:1,16;
84:15;85:7;88:20;95:4;
98:23;100:14;109:2,2
**billion-dollar (1)**
108:25
**billions (2)**
83:8;88:16
**binding (1)**
40:13
**Bingo (1)**
46:14
**bit (1)**
45:16
**bite (1)**
67:11
**blew (1)**
38:24
**blow (1)**
107:2
**blowing (1)**
15:23
**body (1)**
13:16
**boil (1)**
86:2
**bomb (2)**
32:16;33:23
**bombing (3)**
14:13;15:12,15
**boots (3)**
74:6;82:8;86:8
**borne (1)**
73:17
**both (22)**
5:21;10:21;15:7;
19:19;31:10;33:8;
38:17;40:24;42:22;
46:1;58:21;61:8;73:13;
79:6;91:6;108:24;
109:23,25;110:2;
113:13;115:16,16
**bottom (1)**
23:15
**bought (1)**
21:25
**box (1)**
70:6
**break (1)**
36:6
**breeze (1)**
91:10
**brief (16)**

10:11;16:20;24:8;
27:1;32:3;46:18;48:7;
50:6;52:23,24;54:13;
82:19,20;83:2;111:19;
113:17
**briefing (3)**
5:21,22;58:21
**briefly (2)**
58:25;94:13
**briefs (8)**
5:15;16:17;29:9;
30:10;37:20;50:4;54:3;
60:20
**bring (8)**
26:23;32:7;48:12;
53:1;77:10;92:17;93:2,
3
**bringing (1)**
40:22
**brings (1)**
65:11
**broad (1)**
17:9
**broadly (2)**
90:20;103:6
**brought (2)**
108:24;109:1
**brush (1)**
49:19
**build (1)**
37:15
**building (3)**
15:24;22:3,4
**bulldozers (1)**
48:13
**Bullock (1)**
25:18
**bunch (1)**
26:7
**burdens (1)**
26:8
**burned (1)**
38:24
**bus (1)**
105:13
**business (1)**
114:19
**bust (1)**
11:9
**buy (3)**
35:25;88:18;94:18

**C**

**CAL (129)**
8:4;50:23;51:5,22;
64:20;65:1,13;67:15,
16,19,23;68:5,6,8,14,
14,14,15;69:4,5,12,15,
17,19,25;70:2,5,13,17,
21,24;71:1,10,14,16,
20,25;72:8,18,21;73:2,
6,10;74:4,7,8,9,12,14,

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 118
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) argument - CAL

16,19,20,24;75:5,12,
13;76:7,19,25;77:11,
23;80:1,14,24;81:4,5,7,
15;82:1,4,5,7,21,22,25;
83:6,8,17,24;84:1;
86:7;87:3,3,4,9,25;
88:3,3;89:12;90:24,25;
91:17,18,19;92:13;
95:2,3,23;96:1,6;98:12,
16,23;99:2,13;100:1;
101:8,14,24;102:16;
103:16;104:6,8,11,13,
15,25;105:9;107:17,
24;108:7,14,25;109:3,
4,7,9,15,19
**CALIFORNIA (32)**
4:1;8:4;11:14;13:4;
67:5,6,7,8,9,18;69:13,
16;71:16;73:13;74:10;
75:4,21,23;77:10;78:1;
82:6,13;83:21;85:21;
86:23,25;107:14,16,17,
19;108:15;109:16
**Call (5)**
4:4;41:14;63:1;
82:10;89:11
**called (5)**
13:10;35:11;46:13;
62:23;89:1
**calling (1)**
98:22
**calls (1)**
95:23
**came (4)**
12:10;65:13;66:23;
102:7
**Camp (4)**
36:3,10;59:16;79:24
**can (56)**
5:16;6:10;10:12;
11:6;17:25;18:11,13,
13;21:17,20;23:22;
28:8;36:2;40:4;41:9;
44:24;45:18;47:12;
50:7;52:24,24;58:5;
65:21;67:5;71:2;72:5,
18,20;74:11;75:14,20;
77:24;78:21;81:16;
83:6,15;85:12;87:17;
90:22;92:11,22;93:1,9;
94:12;95:3,11;99:13;
102:19;104:14,17;
105:23;106:6,24;
110:7;112:14;115:19
**candidly (1)**
91:15
**capable (1)**
100:9
**capitalization (1)**
85:6
**car (2)**
90:4,5
**care (6)**

25:8;44:1;77:11;
87:8;92:16;115:11
**careless (1)**
41:25
**carrying (1)**
48:14
**case (78)**
5:25;6:1;7:23,24,25;
8:3,12,14;9:1,5,5,8,22;
10:2;12:1,16;13:2,16;
14:15;16:5;17:22;18:5,
7;22:17;23:16,16,18;
24:22;25:3,18;26:15;
27:21,21;28:2,5,23;
30:12;31:20;34:7,25;
35:11;39:23,25;40:14,
20;42:8;43:24;50:13;
52:4;54:10;63:8;66:1,
4,6;67:24,25;68:21;
72:4;73:14,15,15;
75:25;76:9;77:20;
83:20;84:3,4;91:12,14;
92:18;93:12,14;97:20;
102:5;103:5,7;108:10;
109:19
**cases (10)**
5:23;6:3;7:9,17;
9:20;13:17;14:4;36:19;
41:23;103:6
**category (1)**
21:21
**cause (25)**
15:9;21:7,21;45:21;
47:1,22;48:12;49:11,
12,22;52:9;53:5,7,8,11,
14;54:1;63:12,13,14,
21;75:23;92:10;102:4;
109:13
**caused (24)**
22:3;25:1;34:20;
36:1;39:6;42:12;43:12;
46:8;47:1,3;48:11;
49:8,8,9;50:12;55:21;
57:3;59:12,19;60:1,2;
63:10,17;86:6
**causes (15)**
24:20,23;25:10;39:9;
40:22;41:13;46:2,4,24;
49:19;57:4,5;59:23;
82:2;109:12
**causing (4)**
20:11;39:11;50:10;
60:18
**certain (5)**
32:10,10;38:15,16;
100:23
**certainly (2)**
17:6;28:5
**certainty (1)**
63:24
**cetera (2)**
46:4;81:13
**challenge (2)**

54:21;71:22
**challenges (1)**
84:21
**challenging (3)**
31:5,7,8
**chance (3)**
110:22;113:2,11
**change (2)**
34:8,9
**changed (1)**
95:15
**charge (1)**
90:23
**charged (1)**
90:21
**checked (2)**
70:6;85:5
**chemical (3)**
14:19;21:23;22:14
**Chesapeake (1)**
9:7
**chose (1)**
34:11
**chunk (1)**
71:20
**circle (1)**
85:17
**circuit (18)**
6:3,4,4;7:2,17,24;
8:12,14;9:3,21;13:18;
40:8,14;42:9;65:23;
66:6;73:14,15
**Circuit's (1)**
7:3
**circular (1)**
47:11
**circumstance (3)**
21:17;76:9;90:18
**circumstances (1)**
49:3
**cite (5)**
10:11;14:5;25:19;
32:4;59:22
**cited (11)**
5:23,24,24;9:3,20;
13:18;14:15;86:10;
92:19;93:13;108:15
**cites (3)**
6:3;14:12;25:18
**cities (1)**
91:13
**City (10)**
5:25;7:3,6,9;8:1,13;
15:12,15;95:25;107:4
**Civil (4)**
28:22;36:18;82:16;
101:21
**claim (198)**
4:11,14;5:5;7:4;8:3;
9:8,14;10:3,8,24;12:4;
13:8;15:15,25;18:1;
20:15;26:11,12,19,20,
21,23;27:7,7;28:4,9,13;

29:22,24;30:3,5,7,13;
31:3,8,11,12,13,14,18;
33:1;36:6,16;37:9,9,
12;38:3,3;40:4,6,22;
41:1,4,20;47:2;50:17,
20;51:6;52:5;53:2,9,
15;54:22;55:3,14;
56:20;57:16,21;58:8;
59:15;60:16,16,17,19;
61:6,7;64:20;65:11,12;
66:12;67:1,6,8,10;68:6,
20,23;69:4,14,15,19;
70:24,25;71:10,11,14,
20;72:2,8,15,21;74:12;
75:3,6,13,15,17,24;
76:3,6,7,20,21;79:7;
80:24,25;81:4,12,15,
23;82:12;83:16,17;
84:1;86:1,3,18,20;
89:22;90:7,12;92:11,
16,17;93:5,15;95:2;
96:3,6;97:16,20,23;
98:2,14,16,23,25;99:2,
12,15,22,23,24;100:1,
13,14,15,20,23;101:1,
2,6,9,11;102:8,9,17,25;
103:17,20,20,24;104:6,
8,18,24,25;105:17,18;
106:5,6;107:10,14,17,
20,25;108:5,14,15,25;
109:13,18,20,24;
110:10;111:4,13;112:9
**claimant (3)**
18:14;50:11;71:3
**claiming (2)**
55:6,12
**claims (90)**
9:22;10:1,7,12;
17:21;20:1;22:25;26:7;
28:6,16;29:15,18,18,
19;30:25;31:6,9;34:22;
36:15,15;37:17,19;
39:21,22;40:23;42:8,
10;51:3,5;52:8;58:10;
59:12,14;64:12;65:13;
67:15;69:12,17;70:3,4,
7;73:5,6;74:7,9,24,24;
75:6;76:15,21;77:8,10,
11,19,23,23;78:1;
79:13,19;82:4,5,10;
83:1,3,11,21;85:4,13;
88:6;90:19;93:2;95:9;
98:1,8;99:13;101:24;
105:25;106:12;108:24,
24,25;109:3,5,6,8,9,22;
110:1;111:2,8
**clarification (2)**
51:10;110:25
**clarify (3)**
52:3;103:19;111:10
**clarity (1)**
86:18
**class (5)**

95:3,7;110:16;
111:13;115:15
**classification (1)**
84:22
**clawback (1)**
67:10
**Clean (4)**
23:20;40:18,18;
91:20
**cleaning (1)**
42:4
**cleanup (8)**
44:24;86:21;90:21,
24,25;91:5,18;107:7
**clean-water (1)**
40:15
**clear (24)**
13:6;19:17;20:2,3,
21;22:21;23:1;24:2;
25:12;30:20;42:9;
55:11;73:23;81:18;
82:15;84:14,21;87:9,
17;88:5,7;97:19;103:5,
6
**clearly (7)**
16:9;20:15;25:2;
62:10;76:2;91:4,5
**CLERK (3)**
4:5,9;114:24
**client (1)**
106:12
**climate-change (1)**
40:19
**clock (1)**
65:14
**close (1)**
102:7
**closed (1)**
11:24
**closes (1)**
11:22
**Closing (2)**
106:17,21
**cloud (1)**
108:10
**Co (1)**
7:24
**co-counsel (1)**
80:9
**Code (8)**
11:15;22:23;26:19;
68:2;71:16,23;86:24;
101:5
**cognizable (1)**
75:6
**colleague (3)**
28:20;29:3;111:23
**colleagues (1)**
30:1
**collect (2)**
75:20;90:22
**collected (1)**
72:5

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 119
of 134

**colloquy (1)**
19:15;109:10
**comfortable (1)**
18:23
**coming (5)**
11:22;13:7;70:2;
84:25;86:11
**commands (1)**
50:10
**comment (3)**
5:14,22;106:21
**comments (4)**
30:12;60:10;105:4;
106:17
**commercially (4)**
82:2;83:3;98:1;
102:24
**committed (2)**
17:22;82:16
**committee (2)**
18:6;114:8
**common (21)**
8:16,17,22;11:3;
12:6,8,12,19;13:11;
39:22,23;40:6;41:3,5,
17,17,19;42:7,10,11;
90:13
**common-law (6)**
10:8,13;11:14,15;
13:8;45:4
**communicate (1)**
114:4
**companies (1)**
103:8
**company (6)**
44:16;66:18;76:8;
90:11,11;109:19
**compensated (1)**
44:24
**complain (1)**
107:23
**complaint (3)**
27:8;48:6;59:25
**completely (2)**
33:5;107:2
**complex (1)**
77:20
**complexity (1)**
61:6
**complicated (1)**
24:1
**compliment (1)**
5:21
**component (1)**
33:13
**comprehensive (6)**
23:2,9,21,23;40:20;
41:6
**Concede (2)**
39:4;100:19
**conceded (1)**
31:4
**concept (3)**

8:20;92:7;93:7
**concepts (1)**
90:14
**concerned (2)**
69:10;70:8
**conclude (2)**
38:6;98:10
**concluded (2)**
57:22;115:25
**conclusion (6)**
7:3;10:23;11:8;14:1;
38:4;79:6
**condition (52)**
16:15;24:21,22,23;
25:1,3,3;34:20;46:3,4,
6,8,10,16,17,20;47:8,
14,19,20,21;48:10,11;
49:2,9,10,11,12,20;
55:9,25;56:18;59:19,
23;60:18;61:15,19,19,
22;62:2,6,18,18;63:10,
12,15,22;64:2,2,3,4;
83:10
**conduct (19)**
22:16;31:13,15;34:8,
9,12,13,21;35:1,7,21,
24;39:2;41:25;43:4;
59:12;60:15;63:7,23
**conducts (1)**
43:12
**conduit (2)**
74:5,5
**confer (2)**
30:1;112:16
**conference (1)**
113:5
**confident (1)**
18:25
**confirmation (2)**
84:24;106:1
**confusion (1)**
29:13
**Congress (10)**
20:19;21:16;25:13;
40:24;41:2;43:25;
62:10;65:16,17;66:22
**Congress' (1)**
46:17
**congressional (2)**
11:2;67:11
**consequence (9)**
18:1;35:24;48:13,25;
69:22;70:2;72:23;
98:22;107:23
**consequences (11)**
31:23;32:6,10;
38:15;44:16;51:12;
55:19;79:15;98:9;
101:8
**consider (2)**
22:22;56:14
**considered (2)**
12:23;20:20

**consistent (1)**
61:11
**constitutional (1)**
23:13
**construct (1)**
84:4
**construction (1)**
46:1
**constructive (1)**
112:16
**contained (1)**
57:23
**containing (1)**
7:5
**contaminants (1)**
8:15
**contend (1)**
53:8
**contending (1)**
55:20
**contends (1)**
55:8
**contested (1)**
58:9
**context (11)**
8:23;9:1;15:21;28:6,
9;70:13,15;77:13;
93:18;98:8;112:8
**contingent (2)**
109:16,18
**contrast (2)**
36:10;95:22
**contributed (2)**
37:6,7
**controls (1)**
94:4
**convenience (1)**
98:22
**convert (2)**
20:16,17
**convicted (1)**
22:10
**conviction (1)**
50:7
**core (1)**
7:10
**Corporation (1)**
4:9
**corresponding (1)**
76:7
**cost (3)**
44:16;73:12,16
**costs (27)**
8:5;9:9;11:7;24:25;
34:17,19;59:18;65:21;
68:15;73:11,12;74:5,5,
8,9,25;87:1,2,4,8,9,19,
20;88:4;90:21;106:23,
23
**counsel (12)**
15:8;17:6;47:3;51:9;
61:14;62:5,5;80:1;
110:16;112:13;114:20;

115:14
**counting (1)**
29:24
**county (1)**
8:1
**couple (6)**
19:18;58:22;60:12;
105:7;111:1;114:12
**course (9)**
14:6;30:8;35:1;
48:12;50:2;58:12;
67:22;73:20;75:13
**Court (455)**
4:4,5,7,10,22;5:2,6,9,
12,14;6:1,5,17,19,21,
24;7:1,7,8,12,14,22;
8:6,8,10,20;9:15,17,17,
19,23;10:4,14,19;11:1,
10,18,20;12:1,11,11,
14,16,18,22,24;13:1,6,
9,12,19,22;14:8,10,18,
21,23;15:4,7,17,22;
16:1,7,10,12,16,21;
17:2,4,13,14,15,17,19;
18:4,6,11,23;19:4,8,11,
21,24;20:6,23;21:11,
22;22:1,5,8,10,13,19;
23:4,6,11,13,19;24:6,
14,17,19;25:5,7,17,20,
24;26:1,4,10,13,14,17,
17,25;27:5,13,15,18,
20;28:1,3,5,11,15,17,
19,25;29:2,5,7,20,22;
30:6,8;31:1,22,25;
32:14,22,24;33:5,12,
16,20,23;34:3;35:8,8,
11,12,14,16,18,20,22;
36:10,18;37:1,22,24;
38:10,19;39:8,14,16,
19,25;40:7,11,13;41:7,
9,21;42:14,17,19,22;
43:4,11,13,19,22;44:3,
9,11,15,20;45:7,11,13,
18,23;46:12,18;47:5,
11,16,18,24;48:2,5,9,
20;49:6,9,11,14,16,23,
25;50:2,14,21,25;51:2,
8,17,19,22,25;52:2,14,
17,19,23;53:1;54:2,12,
14,16,17,25;55:17;
56:22;57:2,20,24;58:2,
4,5,6,24;59:1,4,8,11;
60:6,8,10,21,23,25;
61:2,4,13,23,25;62:13,
15,20;63:1,4,9,19;64:7,
14,18,22;65:1,4,9,24;
66:1,3,14;67:13,24;
68:1,4,13,25;69:7,10,
12,20,22,24;70:8,12,
13,15,19,23;71:8,18;
72:3,10,12,14,16,18;
73:1,8,21,24;74:1,3,11,
16,19,22;75:8,10;76:5,

10,16,24;77:5,16;78:2;
79:2,4,14,22;80:3,6,12,
15,18;81:3,9,21,25;
84:5,8,17,19,24;85:8,
14;87:17,21,24;88:14,
18,23,25;89:4,7,9,14,
17,22,24;90:1,9,13,16;
91:21;92:1,3,5,18,21,
21,23;93:23,25;94:4,7,
16,18,21;95:6,11,14,
18,21;96:6,13,16,18,
22;97:1,3,7,10,13,18;
98:2,6,21;99:3,6,8,11,
14,17;100:5,18,19,24;
101:3,18,23,25;102:3,
11,14,18,20,22;103:1,
4,7,10,13,21,25;
104:13,20,22;105:1,3,
11,13;106:3,9,15;
107:16,22;108:7,18,22;
109:5;110:3,5,17,21;
111:17,25;113:3,6,8,
24;114:2,11,15,17,25;
115:5,7,11,22
**courtroom (2)**
19:19;114:4
**courts (3)**
40:13;41:4;104:16
**Court's (1)**
19:16
**cover (4)**
49:24;76:2;92:22;
105:15
**covered (2)**
87:2;93:20
**covering (1)**
111:18
**CPUC (1)**
33:2
**Cravath (3)**
19:14;59:6;108:20
**create (2)**
7:20;33:10
**created (2)**
41:3;84:4
**creates (2)**
73:19,24
**creature (2)**
9:1;43:25
**creditors (2)**
18:19;97:21
**criminal (3)**
22:11;50:7;54:4
**criminal-law (1)**
55:18
**critical (1)**
53:22
**criticism (1)**
42:3
**criticisms (2)**
30:11;48:15
**cry (1)**
22:6

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 120
of 134

**culpable (1)**
16:2;21:2
**culprit (1)**
36:4
**curious (1)**
55:2
**CUSIP (1)**
111:12
**cut (3)**
19:6;79:20;85:19

# D

**damage (21)**
9:11,24;10:2;41:13;
43:4;45:22;46:11,12,
23,24;47:1,20,21,22;
49:2,3,12;50:10,12;
67:23;68:6
**damaged (4)**
46:20;49:8;66:8;
90:8
**damages (4)**
57:5;90:6;93:21,21
**date (1)**
111:6
**David (1)**
114:9
**day (3)**
81:17;100:6;107:13
**days (2)**
44:5;85:8
**deadlines (1)**
112:12
**deal (12)**
7:15;35:23;47:13;
58:10;77:19;79:9,21;
84:20;85:15;86:24;
94:12;106:6
**dealing (4)**
9:24;58:7,7;77:25
**deals (2)**
14:10;21:18
**debate (1)**
110:6
**debris-removal (1)**
86:14
**debt (1)**
91:10
**debtor (7)**
26:12;34:5,8,9;55:9;
59:19;103:17
**debtors (18)**
4:18,21;19:14;30:4;
31:11;38:6;43:6,8,14;
44:6,8;59:6;62:5;73:4,
5;76:17;108:20;110:15
**debtors' (1)**
108:21
**debtor's (1)**
43:12
**decide (8)**
54:21;69:25;77:15;

**78:3;94:12;95:3,8;**
112:21
**decided (1)**
41:23
**deciding (3)**
6:1;106:11,13
**decision (27)**
6:2,7,23;7:2,18;8:14;
9:3,21;10:10;11:1;
12:12,15,20;13:3,18;
36:25;51:11;72:19;
79:7,11,12,13,18,18,
19;107:4;113:17
**decisions (1)**
39:13
**declaration (1)**
11:3;42:2;56:16,19
**declared (1)**
86:7
**deep (1)**
73:13
**Deepwater (1)**
14:23
**defeats (1)**
18:14
**defective (1)**
25:8
**defendant (1)**
90:9
**defending (1)**
98:3
**defense (2)**
26:18,21
**defined (2)**
46:19;61:16
**definition (7)**
46:6,7,10,17;56:9,
16;61:24
**delving (1)**
64:11
**denied (4)**
5:5;36:19;38:2;70:5
**Dennis (1)**
4:6
**de-obligates (1)**
83:22
**Department (10)**
28:22;30:22;89:9;
95:22,24;96:1;97:4,6;
101:7;108:9
**dependent (3)**
102:1,2;104:1
**deponent (2)**
58:1,14
**deposition (6)**
15:3;20:2;52:10,12;
55:5;56:2
**deputy (1)**
114:4
**derailment (2)**
7:5;107:5
**described (3)**
22:15;69:9;98:19

**designed (1)**
23:10
**desired (2)**
32:9,12
**desires (1)**
32:6
**destroy (1)**
22:4
**destroyed (1)**
46:11
**destroying (2)**
91:13,15
**detailing (1)**
5:1
**details (1)**
23:24
**determination (1)**
64:15
**determinations (1)**
58:18
**determine (2)**
46:16;104:21
**developed (2)**
13:17;67:18
**developing (1)**
8:24
**device (2)**
25:8;36:4
**dial (1)**
65:14
**dice (1)**
37:8
**differ (1)**
47:21
**difference (2)**
21:12,13
**differences (1)**
46:1
**different (24)**
9:25;37:16;40:15;
41:14;62:19;71:1;
72:16;74:7,9;75:24;
76:2,9;89:1;91:12;
92:7;96:23;97:5;100:4,
8;101:16;103:4;106:7;
109:22,23
**differently (1)**
97:14
**difficult (1)**
115:15
**dilemma (1)**
38:22
**dilute (1)**
18:2
**direct (9)**
67:15;68:20;69:14;
72:2;74:8;102:4;
104:24;108:24;109:13
**directed (3)**
54:19;70:20;91:3
**direction (1)**
19:2
**directly (8)**

**11:4,5;12:5;74:25;**
81:20;90:12;91:1;
93:16
**disagree (4)**
32:2;42:6;71:7;82:8
**disallow (6)**
26:12;28:15;77:23;
79:13;99:19;100:23
**disallowed (9)**
56:21;60:5,7;71:14;
73:6;99:18;100:21;
106:5;110:2
**disallowing (1)**
104:25
**disaster (23)**
25:16;34:18;43:21;
44:19;49:15;56:8,9,12,
15,16,19,24;57:4;
59:18;60:18;62:4,6,7,
11,19;66:8;89:10;
102:25
**disaster-related (3)**
11:6,7;65:21
**disasters (4)**
21:18;44:6;82:17;
83:23
**discharge (1)**
8:15
**disclosure (1)**
58:11
**discovery (3)**
47:2,23;50:19
**discrepancy (1)**
30:2
**discretion (1)**
18:20
**discussing (1)**
59:25
**discussion (2)**
6:5;30:9
**discussions (1)**
70:12
**dismiss (4)**
27:10;31:5;38:1;
57:18
**dispute (11)**
8:15,17,18;22:23,24;
69:25;86:2,2;103:15;
113:16,18
**distinction (3)**
9:10;62:7;64:1
**distinguishable (3)**
40:10,14,17
**distinguished (1)**
36:21
**distorted (1)**
78:10
**distribution (1)**
33:3
**distributions (1)**
85:2
**district (1)**
6:4

**divide (2)**
36:6;45:16
**Division (2)**
28:22;101:21
**docket (1)**
59:15
**doctrine (27)**
6:9;7:5;9:13;10:6,
23;11:21;13:4;67:17;
68:10;73:7,9;76:4;
91:22;92:6,8;93:6,11;
105:15,20,21,22;107:1,
3,6,11,18;109:9
**document (1)**
59:24
**DOJ (1)**
47:3
**dollar (1)**
69:3,3;70:25;98:23
**dollars (14)**
17:24;18:2;29:16,19;
51:11;67:10;77:19;
78:14;79:16;80:25;
81:1;95:4;100:2,2
**done (10)**
9:11;16:16;22:9;
37:17;62:24;63:4;70:6;
91:2,3;115:18
**door (2)**
11:22;115:19
**door's (1)**
11:24
**double (3)**
87:14;88:7,10
**double-counting (1)**
30:14
**doubt (1)**
98:6
**down (13)**
12:3;13:20;16:24;
27:6;36:6;46:9;51:6;
59:7;63:11;83:14;
84:25;86:2;107:14
**draw (7)**
23:14;25:5;33:16,17;
47:18;48:25;49:1
**drill (1)**
42:17
**drive (1)**
105:13
**dual (1)**
10:11
**dual-track (1)**
12:4
**due (1)**
44:8
**duplicate (2)**
29:24;66:18
**duplicated (1)**
29:19
**duplication (3)**
29:15,17;109:17
**duplication-of-benefits (1)**

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 121
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(5) culpable - duplication-of-benefits

66:5
**duplicative (1)**
68:23
**during (1)**
15:2
**duty (5)**
28:19;70:6;88:22;
110:12;111:21

**E**

**earlier (5)**
36:12;52:4;73:15;
99:1;109:14
**earthquake (1)**
21:19
**East (2)**
7:23;115:8
**easy (3)**
79:19;101:4,12
**educate (1)**
16:18
**effect (2)**
18:17;67:2
**effectively (4)**
27:23,24,25;28:12
**effort (2)**
44:24;114:21
**efforts (1)**
106:16
**either (9)**
20:10;44:12;71:17;
77:6;79:6;88:5;94:3;
110:24;112:20
**Electric (3)**
10:10;11:1,21
**electronically (2)**
111:8,8
**element (1)**
31:20
**elements (2)**
38:17;46:4
**eligible (1)**
56:15
**else (7)**
6:13;10:15;43:23;
45:7;80:4;91:9;111:19
**EMAC (1)**
86:10
**email (2)**
111:9,10
**emergency (8)**
34:18;62:4,8,11,19;
82:15;86:7,21
**emergency-response (1)**
73:11
**eminently (1)**
98:4
**employers (1)**
87:25
**enactment (1)**
10:9
**encompassed (2)**

93:6,10
**encouraging (1)**
111:17
**end (5)**
22:16;24:15;65:19;
71:13;107:13
**end-around (2)**
67:12;106:25
**ends (1)**
68:12
**enforceable (1)**
26:11
**enormity (1)**
61:7
**enormous (1)**
57:4
**enough (1)**
94:24
**enrichment (15)**
6:13;17:5,7;22:25;
42:15,20,23;43:1,2,13,
17,23;45:1,2;50:17
**entire (1)**
72:15
**entirely (1)**
52:6
**entirety (3)**
28:16;107:3,20
**entities (3)**
30:23;73:10;95:19
**entitled (3)**
42:15;43:1;81:8
**entitlement (1)**
76:11
**entity (5)**
9:11;16:2;66:7;
67:21;96:3
**EPA (1)**
40:21
**equating (1)**
43:22
**equipment (3)**
44:7;47:9,10
**equitable (7)**
86:22;91:7;92:7,11;
106:25;107:1,9
**equity (5)**
18:17,18;85:2;91:8;
111:5
**equivalent (2)**
36:12;62:6
**error (2)**
57:13;64:11
**escape (2)**
11:25;91:19
**essence (1)**
31:11
**essentially (8)**
18:10;28:8;31:18;
38:12;45:20;57:12;
62:5;86:1
**estate (2)**
18:19;77:8

**estopped (1)**
54:7
**et (2)**
46:3;81:13
**Etkin (7)**
111:23;112:2,25;
113:14,19,25;114:18
**evacuated (1)**
87:7
**Evansville (1)**
8:13
**even (23)**
11:11;12:8;17:16;
19:25;21:7,11,13;
27:23;33:24;41:16;
44:22;45:23;55:1;60:1;
64:3;68:17;71:10,25;
81:7;87:11;90:5;
103:16;113:11
**event (6)**
36:1,22;56:15;63:25;
76:2,12
**events (2)**
15:9;37:5
**eventually (1)**
66:15
**everybody (2)**
30:12;102:12
**everyone (3)**
4:7;17:25;110:5
**everyone's (1)**
46:6
**everything's (1)**
114:5
**evidence (13)**
22:16;32:25;34:7;
38:13,15;47:22;50:11;
53:6,13,19,23,25;64:5
**Exactly (5)**
5:8;28:10;32:13;
55:24;64:10
**exam (1)**
52:10
**example (9)**
13:13,16;20:12;25:8,
17;33:23;39:4;77:24;
107:3
**examples (2)**
6:8;15:12
**excellent (1)**
91:25
**except (6)**
13:12;73:21,24,25;
74:2;85:10
**exception (2)**
67:22;105:20
**exceptions (2)**
6:8;68:9
**excerpts (1)**
58:14
**excludes (1)**
11:2
**exclusion (1)**

61:17
**excuse (5)**
6:4;20:17;33:1;
42:16;61:20
**exist (3)**
8:18;10:8;37:18
**existed (3)**
12:8;35:3;41:4
**expand (1)**
40:23
**expectation (1)**
82:1
**expected (1)**
80:15
**expended (1)**
59:18
**expense (2)**
9:23,24
**explain (2)**
35:25;112:4
**explicit (1)**
105:19
**explosion (2)**
21:21;22:4
**extensive (2)**
5:15,21
**extensively (1)**
16:11
**extent (14)**
6:10;24:24;25:13;
34:19;74:12;75:17;
76:19,21;80:21;88:24;
90:7;98:12;100:21;
114:18
**extra (2)**
108:5;113:22

**F**

**F2d (1)**
6:25
**face (2)**
66:25;79:20
**faced (1)**
17:1
**facially (1)**
26:21
**facie (1)**
26:8
**facility (2)**
46:20,21
**fact (18)**
16:4;17:22,23;24:4;
29:14;32:12;38:5;
41:12,22;55:1;58:18;
65:21;67:17;77:9;
90:18;94:24;107:8;
109:4
**facts (16)**
22:14;27:10;31:19;
36:14;38:5;41:16;
52:14,17,19;53:1;86:3,
5,15,16;91:4

**factual (5)**
4:23;76:22
**fail (8)**
69:12,18;70:25;74:9;
76:15;83:1;109:23,25
**failing (1)**
83:20
**fails (7)**
28:13;71:11;76:6;
81:15;83:23;107:17;
109:14
**failure (6)**
32:20;38:13;46:8;
47:7,10;59:7
**fair (3)**
65:10;80:21,23
**fairly (1)**
13:25
**faith (1)**
114:21
**fall (4)**
8:19;9:2;30:7;95:10
**fallback (1)**
75:12
**falls (2)**
10:24;71:22
**false (1)**
83:25
**familiar (5)**
12:14;13:1;16:13;
25:21;101:15
**far (2)**
22:6;81:16
**farm (1)**
41:22
**farms (1)**
57:4
**faulty (4)**
34:6,11;35:2;56:4
**favor (1)**
18:14
**FEBRUARY (1)**
4:1
**federal (40)**
8:16,17,22;10:2;
11:3;12:6,8,12,19,21;
13:10;22:3;23:2,10,13;
22;34:21;36:18;39:22,
23;40:1,2,5,6,23;41:3,
5,17;42:7,10;43:8,21;
46:3,5,25;47:8
**federal- (1)**
13:7
**federal-common-law (2)**
8:24;12:4
**feel (2)**
18:7,24
**feeling (1)**
48:9
**Felderstein (1)**
80:8
**FEMA (161)**

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 122
of 134

4:14;5:23,24;6:12;
9:23;10:3,12;11:6,16,
22;14:6,10,24;15:10;
20:2;21:17,18;22:24;
23:5;25:18;26:5,22;
27:5;28:13,19,23;
29:15,23;30:22;31:12;
41:11,14;42:1,3,3,4;
43:15;44:6,7,16,23;
46:13;47:13;48:12,14,
15;50:4,19;51:5;52:8,
10,12;53:8,10,13,25;
54:22;55:2,5,8,12;56:3,
7,11,14;58:20;59:15,
17;62:23,24;65:12,14,
16,21;66:8,17,20,22;
67:2,5,7,9,16,19;69:1,
4,15,18,25;70:17,20,
24;71:11;72:22;73:5;
75:14,14,15,16,18;
76:17,20,20;77:2,9,23;
80:24;81:1,4,6,10,17,
18;82:5;83:2,7,14,19,
20,22;86:16;88:22;
89:2;95:22;96:4,8;
97:5,7,15,16,23;98:10,
13,17,23,25;99:1,12,
17,21;100:11,14;101:9,
10,14,21;102:9,20;
103:16;104:7,12,14,23;
106:12;107:23;108:23,
24;109:7,8,16,17

**FEMA-related (1)**
74:13
**FEMA's (33)**
5:1,5,18;9:22;10:7,
23;11:14;15:8;19:25;
29:18;31:11,13;33:1;
40:5;43:7,24,25;48:16;
49:3;52:10;55:14;56:6;
71:15;75:18;76:6;81:7,
13;98:11;100:20;
101:2;102:4;108:13;
109:13
**fertilizer (1)**
21:25
**fifth (1)**
106:4
**fighting (1)**
13:15
**figure (1)**
97:13;100:7;106:1
**file (3)**
102:24;111:4,8
**filed (8)**
4:20;46:15;53:9,15;
98:2;102:9;106:10;
107:24
**filing (2)**
101:24;102:16
**final (4)**
59:3;60:10;64:8;
105:4

**financial (1)**
43:10
**find (4)**
50:3;84:15;85:12;
113:21
**findings (4)**
57:12,14;64:13,14
**finds (2)**
57:10;107:16
**fine (3)**
25:7,10;111:14
**finish (1)**
109:10
**finished (2)**
45:12;57:7
**FIRE (57)**
8:4;9:9,24;17:23;
18:5,17;20:11,13,14;
21:21;25:10;29:14;
31:7;33:10,14;34:5,7,
9;36:3,5;46:11;47:1,
12,13;49:10,22;50:10,
12;55:21;59:16;63:13,
16,16;68:14,15,15;
73:17;74:7,8,8,19;78:4,
24,25;85:20;86:20;
89:9;95:22,23,24,25;
97:4,5;101:7;106:5,23;
108:9
**fire- (1)**
8:4
**firefighter (2)**
97:8;98:18
**firefighters (1)**
87:6
**fires (14)**
21:7;35:3,4;37:14,
16;50:20;55:10,15;
82:9,11;86:6,9,13;
92:10
**firm (1)**
110:18
**first (27)**
4:12;7:23;32:2,3;
38:12,13;43:14;45:20;
61:1;67:14;70:14,17;
71:3;75:15;82:25;87:6,
22,24;89:6;96:2,7,11;
102:10;105:9;108:6;
110:14;112:8
**fit (4)**
25:19;74:14,16,18
**Fitzgerald (1)**
80:8
**five (2)**
4:19;105:8
**fix (1)**
56:20
**fixing (1)**
49:3
**flag (1)**
69:11
**Flagstaff (6)**

5:25;6:23;7:3;9:21;
73:14;107:4
**flamethrower (2)**
49:17,18
**flawed (1)**
20:5
**floating (1)**
10:17
**floods (1)**
14:11
**floor (1)**
19:10
**flowed (1)**
68:18
**flushed (1)**
72:15
**focus (3)**
30:18;35:23;101:22
**focused (2)**
17:5;74:24
**focusing (3)**
37:2;63:11;81:14
**folks (1)**
103:14
**follow (1)**
10:10
**followed (1)**
43:5
**following (2)**
44:5;86:13
**follows (3)**
7:2;25:9;70:24
**Food (1)**
41:15
**Foods (1)**
39:24
**footnote (2)**
93:1,3
**Ford (1)**
93:13
**Forest (3)**
9:9,15,17
**forget (1)**
41:9
**form (2)**
105:10;112:14
**formal (1)**
19:24
**Former (1)**
5:25
**forth (8)**
16:14;31:13,14;32:4;
33:1;63:22;72:11;85:1
**forward (2)**
77:24;104:18
**found (2)**
8:18;33:3
**four (1)**
86:20
**four-and-a-half (2)**
78:12;79:1
**fourth (1)**
9:7

**frame (1)**
58:9
**framed (1)**
52:19
**framework (2)**
67:16;77:21
**FRANCISCO (1)**
4:1
**Free (2)**
107:16,16
**free- (4)**
9:12;68:9;92:7;
107:2
**free-public (1)**
92:24
**free-public- (3)**
76:3;105:14;107:5
**free-public-service (7)**
92:6;93:6,11;105:16,
20,21,21
**free-public-services (6)**
7:4;10:6,22;67:17;
107:18;109:9
**free-service (1)**
91:22
**free-services (4)**
6:2,9;73:7,9
**front (1)**
22:3
**frustrating (1)**
78:21
**full (14)**
17:25;29:23;30:17;
60:4;85:3;89:20,22;
90:7;94:5,7,8,15,17;
110:2
**fully (2)**
83:20;91:19
**fun (1)**
115:13
**fund (3)**
78:7;82:9;83:23
**fundamentally (1)**
82:24
**funded (3)**
82:7;91:17,18
**funding (5)**
68:14,16,20;69:14;
72:1
**funds (1)**
83:22
**further (4)**
45:9;79:8;85:16;
105:6
**future (3)**
16:5;33:18;69:5;
83:23

## G

**gain (1)**
43:9
**gather (1)**

21:3
**gave (2)**
6:8;8:1
**general (2)**
36:20;42:11
**generally (2)**
13:11;14:10
**General's (2)**
80:10,11
**gets (6)**
41:14;72:15;79:4;
88:13;91:23;100:3
**getter-up (1)**
15:10
**given (5)**
10:8;17:23;82:7,9,10
**gives (1)**
86:25
**giving (4)**
35:4;59:13;69:14;
83:8
**goal (1)**
115:18
**God (1)**
21:19
**goes (6)**
24:24;29:24;32:11;
65:16;92:21;98:12
**Golly (1)**
44:21
**Good (23)**
4:7,8;5:12,13;14:18;
19:12,13;28:20,21;
29:8;48:8;70:16;77:1;
79:22;80:16,17;
100:10;106:19,20;
114:21;115:12,14,20
**Goodman (135)**
4:20;5:10,12,13,15;
6:16,18,20,22,25;7:2,8,
13,16,23;8:7,9,11,22;
9:16,18,20;10:1,5,18,
21;11:17,19,24;12:2,
13,15,17,20,23,25;
13:3,14,20;14:9,17,19,
22;15:2,5,11,21,23;
16:6,8,11,13,19,23;
17:3,12,14,18,20;18:5,
23;19:7,8,9,11,15;
20:19;21:22;22:14;
23:7;24:7;34:14;45:15;
46:15;51:16,19,21,24;
52:1,3,16,18,22,25;
53:3,22,25;54:9,13,15,
24;55:1,22;56:18;57:1,
17,21,25;58:3,5;64:23,
25;65:5,7,10,25;66:2,4,
15;67:14,25;68:3,5;
69:6,11,21,23;70:1,10,
16,22;71:5,9,24;72:7,
11,13,15,17,24;75:18;
77:14;106:17,19;
108:12

Min-U-Script®

Case: 19-30088    Doc# 5927    eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net    Filed: 02/27/20    Entered: 02/27/20 07:50:49    (7) FEMA-related - Goodman    Page 123
of 134

**Goodman's (1)**
110:1
**good-news/bad-news (1)**
77:1
**Gotshal (1)**
110:15
**governed (2)**
39:22;40:19
**government (11)**
6:9;7:20;9:11;40:23;
43:8,9,21;67:20;84:16;
85:4;107:8
**governmental (2)**
73:10;78:8
**governor (2)**
42:2;86:6
**governs (2)**
40:1,6
**grade (2)**
6:7,21
**grant (1)**
64:3
**granted (4)**
27:11;36:20;46:21;
47:9
**Great (3)**
30:20;77:19;92:16
**grid (2)**
57:2,3
**gross (1)**
21:12
**gross- (1)**
62:21
**grossly (2)**
38:23;45:24
**ground (4)**
74:6;82:9;86:8;89:6
**Group (1)**
110:19
**guess (10)**
23:9;24:14;28:14;
48:9,23;71:5;75:11;
94:1;101:4;110:18
**gut (1)**
71:19
**guys (1)**
95:24

**H**

**Hah (1)**
42:25
**half (1)**
78:8
**half-a-dozen (1)**
54:3
**handed (1)**
108:11
**hanging (1)**
36:4
**hang-up (1)**
62:24
**happen (3)**

33:18;34:10;35:5
**happened (6)**
14:15,25;15:22;
20:16;34:4;62:20
**happening (1)**
56:4
**happens (4)**
68:25;94:24;97:19;
98:12
**happily (1)**
15:9
**happy (5)**
36:24;104:4;112:14;
113:20;115:16
**harm (15)**
36:1;39:6,10,11;
42:13;52:9;53:5,7,9,12,
14,17;54:1;91:9,10
**harmed (2)**
91:12,14
**Hawaii (8)**
75:25;76:1,9;83:19,
20;103:5,7;109:19
**hazardous (2)**
7:5;86:22
**hazards (1)**
73:17
**head (1)**
45:25
**heading (5)**
13:7;60:17;61:2,10;
71:6
**health (6)**
8:6;11:15;68:1;
71:16,23;101:4
**hear (2)**
71:6;80:1
**heard (5)**
30:18;97:14;98:14;
99:22;115:23
**hearing (13)**
48:19,19;81:19;
106:2,11;112:17,20,23;
113:15,25;114:6,22;
115:3
**heavily (1)**
81:7
**heavy (1)**
44:7
**help (13)**
6:10;14:24;17:11;
23:18;29:12;48:24;
71:16;82:11,17;95:23,
25;98:21;101:18
**helped (1)**
46:10
**helpful (2)**
10:4;30:19
**helps (1)**
23:16
**here's (4)**
67:2,14;69:11;112:3
**Heyn (85)**

80:11,15,16,17,23;
81:6,18,22;82:1;84:7,9,
18,23;85:1,12,14,23;
87:19,23;88:2,17,21,
24;89:3,5,8,13,16,19,
23,25;90:3,10,15,17;
91:25;92:2,4,6;93:24;
94:2,6,11,17,20;95:1,8,
13,17,20;96:5,10,15,
17,21,25;97:2,4,9,11,
17,25;98:4,15,20,24;
99:5,7,10,12,16,24;
100:12,16,20,25;
101:17;102:16;105:3,
7,14;106:4,14;108:1;
109:11
**Heyn's (1)**
104:18
**history (5)**
13:1;14:1;16:15;
19:1;20:21
**hit (2)**
45:25;91:20
**hits (1)**
92:20
**hog (1)**
41:22
**holders (2)**
18:18;85:2
**holding (1)**
7:10
**holds (2)**
73:10,15
**holistically (1)**
17:21
**homes (3)**
46:11;57:4;91:15
**Honor (74)**
4:8,18;5:11;16:20;
19:13,15,17;20:10;
21:6,17;22:21;24:3;
27:22;28:14,21;29:1;
30:24;31:2,5;35:10;
36:24;38:9;44:5;45:9,
17;49:5;50:15;52:1;
54:24;57:17;58:22;
59:5,20;60:3,4,13;
61:12,16;62:3;64:8,10,
21,25;72:25;73:3,14,
22;75:2,2;77:15,17;
78:23;80:8,14,17;82:6;
83:19;93:12;94:11;
95:8;100:21;101:21,
22;103:9;104:9;
106:14;108:19,21;
109:11,21;111:22;
113:19;114:9;115:21
**Honorable (1)**
4:6
**Honor's (1)**
36:11
**hook (6)**
75:13,14;99:20;

104:12,14,15
**hope (3)**
94:6,21;100:3
**Hopefully (1)**
115:20
**Horizon (1)**
14:23
**horribly (2)**
51:13;78:10
**hospital (1)**
66:10
**hospitals (1)**
57:5
**huge (1)**
108:10
**hurricane (4)**
21:19;66:1,4;75:25
**hurricanes (1)**
14:11
**hypothetical (7)**
44:4;45:21;47:12;
63:7;100:8;102:6,9
**hypothetically (2)**
38:22;104:7
**hypotheticals (4)**
49:16;56:23;104:3,3

**I**

**ignite (3)**
33:7;34:11;57:4
**ignited (2)**
33:6;39:6
**ignition (3)**
25:9;39:9;41:25
**ignore (2)**
78:4;107:8
**ignored (1)**
45:24
**Illinois (2)**
9:4,6
**impact (4)**
17:21;81:5,14;98:15
**impaired (1)**
112:12
**impaired/not (1)**
112:12
**implications (1)**
95:10
**important (9)**
77:13;82:18,24;83:5;
84:9;85:20;109:6;
111:20;112:5
**imposes (1)**
44:15
**impression (1)**
108:6
**improper (1)**
75:22
**inadvertently (1)**
42:24
**Inc (1)**
39:24

**include (2)**
55:10;68:6;82:4
**included (2)**
65:13;111:3
**including (2)**
4:25;86:9
**incorrect (5)**
31:12;36:17;63:20;
82:24;104:16
**incur (3)**
74:25;87:1;89:20
**incurred (10)**
9:24;34:18;87:1,8,9,
12,20,21,21,22
**incurring (1)**
88:4
**incurs (1)**
87:19
**indeed (1)**
74:16
**indication (1)**
72:5
**indirect (1)**
108:25
**individual (2)**
78:25;91:14
**infirmity (1)**
26:7
**information (1)**
112:6
**infrastructure (1)**
91:13
**infrequently (1)**
28:6
**Iniki (2)**
66:1;75:25
**initial (1)**
89:5
**injury (1)**
42:1
**injustice (1)**
105:24
**inquiry (1)**
68:12
**inside (1)**
19:19
**insolvent (1)**
18:19
**instances (1)**
62:21
**instantly (1)**
108:11
**institutionally (1)**
48:15
**insurance (12)**
66:10,12,16,18;76:1,
8;83:21;90:6,11,11;
103:7;109:19
**intend (3)**
21:7;25:3,16,22,22;
31:23,23;32:15
**intended (5)**
20:14;25:13,15;32:7;

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 124
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(8) Goodman's - intended

47:22
intent (18)
    20:2,11;21:7,15;
    22:4;37:3;46:7;52:8;
    53:5,7,8,11,14,17;54:1;
    63:13,14,21
Intention (3)
    32:8;57:11;63:12
intentional (37)
    15:9,13,24;20:4,5,8,
    9,18,21;22:16;24:4,9,
    25;26:24;31:15,22,25;
    32:5,17,18,19;33:8;
    34:19;35:6,23;46:4;
    47:6;49:19;50:8,9;
    54:5;55:8,14;59:12;
    60:15,17;63:23
intentional- (2)
    13:24;34:12
intentional-conduct (1)
    31:20
intentionally (19)
    19:20;20:14;24:20,
    23;39:1;45:24;46:2,8,
    24;47:1,3;49:8,21;
    50:12;55:21;59:21,23;
    60:2;96:18
intentional-tort (3)
    13:23;19:2;38:6
intentional-torts (1)
    65:18
inter-agency (1)
    85:16
interest (1)
    111:5
interesting (1)
    66:24
interference (2)
    42:11,12
interplay (2)
    85:22;95:19
interpret (1)
    61:21;69:13;70:20
interpretation (6)
    6:2;16:25;18:25;
    24:3;34:15;64:4
interpreted (2)
    40:25;103:6
interrogatory (1)
    53:10
into (28)
    8:15;12:10;20:18;
    27:16;30:9;32:16;
    33:24;34:14;36:6;
    46:23;47:8,25;48:6;
    49:19;55:17;58:5;
    64:12;72:1;77:21;
    82:14;92:12;93:2,8,9,
    21;104:9;105:17;107:9
intrastate (3)
    8:15,17,20
intricate (1)
    77:20

invalid (2)
    83:4,13
invite (1)
    114:20
invites (1)
    55:18
inviting (2)
    57:13;64:11
invoke (1)
    65:22
invoked (1)
    14:7
invoking (2)
    12:5;71:15
involve (1)
    56:24
involved (8)
    7:25;8:3,14;9:8;
    12:20;14:24;114:19,19
involving (5)
    8:25;9:5;14:5;40:1;
    56:24
Ironically (1)
    13:3
irrelevant (3)
    61:18,21;77:10
issue (36)
    5:3;6:2;10:8,16;11:4,
    6;17:20;23:22;26:6,9;
    30:10,18;31:2,4;32:20;
    37:13;39:17,19;40:19;
    41:1,6;46:14;54:5;
    64:9;72:7;75:3;81:16;
    83:7;84:25;85:16;
    94:12;105:8;106:21;
    108:22;109:5;115:15
issued (1)
    12:11
issues (11)
    4:24;33:4;85:9;
    101:15;110:6,24;
    111:15,24;113:21;
    114:12;115:15
items (2)
    111:1;113:18

J

January (1)
    4:25
job (4)
    42:4;62:23;104:15;
    107:24
join (1)
    28:14
joke (1)
    77:1
Judge (6)
    5:25;26:14;35:22;
    100:10;115:9,12
judges (1)
    57:14
judgment (9)

48:1,3,6;52:13,15;
    57:9,15;58:13,16
Julian (41)
    4:14,17,23;5:3,8,10;
    45:16,19,25;46:14,19;
    47:6,15,17,20,25;48:4,
    8,19;49:4,7,10,12,15,
    21,24;50:1,9,15,22;
    51:1,7,15,18;54:3,6;
    63:10;65:1,3;100:12;
    104:5
Julian's (1)
    100:9
jurisdiction (2)
    72:23;104:11
jurisprudence (1)
    13:10
Justice (3)
    5:25;28:22;30:22

K

Karotkin (15)
    110:9,14,15,18,23;
    112:24;113:1,4,7;
    114:3,16;115:2,4,6,9
Karotkins' (1)
    113:21
keep (5)
    42:25;85:21;88:8;
    89:25;90:1
Kennedy (1)
    5:25
Kentucky (1)
    8:13
key (1)
    9:10
keyed (1)
    64:1
keying (1)
    7:18
kill (3)
    32:15,17;33:24
killed (1)
    38:25
Kim (1)
    114:3
Kimbell (2)
    39:24;41:15
kind (5)
    37:2;41:6;82:18;
    106:23;107:10
kinds (1)
    87:6
kitchen (1)
    108:1
knew (3)
    34:5;38:15;62:11
knocking (1)
    107:20
knowing (4)
    41:3;63:24;88:3;
    98:15

knowledge (6)
    32:21;33:17;34:10;
    35:2,3,5
knows (2)
    21:13;32:9

L

label (1)
    11:22
laid (1)
    5:18
land (1)
    9:25
lands (1)
    9:10
language (9)
    14:2;19:1;61:9;
    62:12;82:23;110:25;
    111:3,7;112:11
Las (5)
    95:22,24,25;96:11;
    108:8
last (4)
    19:18;43:25;50:18;
    60:14
Later (3)
    62:9;83:14;112:20
latter (1)
    94:10
Laughter (1)
    26:16
launch (1)
    82:14
law (58)
    8:4,16,17,22;11:3,
    15;12:6,8,12,19;13:4,
    11,11,16;22:21,24;
    24:5;26:11,22;27:17;
    28:14;32:12;39:23,23;
    40:1,5,6;41:3,5,17,18,
    19;42:7,10,14;44:15;
    60:7;66:6;70:24;73:7,
    7,14,23;74:10;76:7;
    82:6,13;84:3;86:6,17,
    23;95:9;98:9,10;
    107:17;109:4,7;110:19
law-review (1)
    50:16
laws (1)
    18:10
lawyer (2)
    100:9;101:15
lawyers (2)
    75:12;100:10
lead (3)
    11:8;24:3;33:21
leads (1)
    91:6
leap (1)
    72:21
least (6)
    19:22;29:16;69:2;

78:19;79:7;113:5
leave (4)
    30:16;42:24,24;
    79:16
leaving (2)
    81:13;91:15
led (1)
    49:3
left (1)
    42:25
Legal (30)
    5:3;14:18;15:19;
    18:13,22,24;26:6,7,9;
    31:6,8;36:16;57:15;
    64:15;67:16;71:20;
    79:4,11,13,18;86:1,2,2;
    95:17;98:19,21;
    100:25;101:1,8;109:24
legal-liability (1)
    77:14
legally (7)
    54:5;59:24;81:8;
    96:8,10;100:22;104:21
legislation (1)
    11:2
legislative (4)
    14:1;16:14;19:1;
    20:21
lend (1)
    9:22
less (1)
    78:14
letters (3)
    5:4;30:12;78:4
level (4)
    20:1;21:2,6;81:14
liability (9)
    39:15;72:3,22;77:2;
    91:19;101:14;102:17;
    109:16,18
liable (10)
    24:24;34:17;38:6;
    39:1;67:9;71:2;86:11;
    87:10,12;88:21
liberty (1)
    82:25
lifted (1)
    108:11
light (1)
    78:13
lightning (1)
    63:17
likelihood (1)
    33:20
likely (3)
    34:6;97:22;107:23
likes (1)
    100:9
limit (2)
    6:14;29:12
limited (5)
    5:16;17:24;21:20;
    32:8;111:11

Case: 19-30088    Doc# 5927    Filed: 02/24/20    Entered: 02/27/20 07:50:49    Page 125
of 134

**Line (26)**
7:24;9:2;23:14;25:7,
8,11,14,14;32:22,24;
33:6,13,16,17;34:11;
46:9;47:7,10,19;48:25;
49:1,18;56:1;83:14;
111:23;112:3

**lines (15)**
21:1;32:21,25;34:6;
35:2;38:14;56:3,7,12,
15,19,20,24;59:8;62:22

**line's (1)**
23:15

**Liquid (1)**
8:13

**list (1)**
113:21

**listen (4)**
52:16;101:12;
113:17;114:2

**Listening (1)**
113:20

**literal (3)**
5:17;19:16;94:8

**little (5)**
27:1;45:16;48:10;
112:11;113:22

**long (4)**
41:4;80:8;112:3,16

**longer (1)**
69:15

**look (15)**
14:1;15:11;17:21;
21:20;25:19;26:18;
27:25;32:3;35:13;37:4;
49:4;62:16;92:15;98:6;
113:11

**looked (3)**
27:14;57:21;59:14

**looking (6)**
10:25;26:14;59:14;
60:16;87:13;101:4

**lose (2)**
95:16;98:18

**loses (1)**
100:11

**losing (1)**
26:14

**loss (3)**
57:3;91:11;93:20

**losses (1)**
78:13

**lost (1)**
7:6

**lot (16)**
18:6;19:18;23:24;
24:6;27:17;43:15;57:5;
61:7;70:11;83:1;90:6;
91:14,17;94:12;97:7;
115:16

**love (3)**
49:16;99:5;100:10,
16

**Lowenstein (1)**
110:18

**luck (1)**
76:18,19;94:25;
115:14,20

**Luckily (1)**
23:23

**M**

**magnitude (1)**
18:1

**maintain (7)**
32:20;38:14;40:4;
46:9;47:7,10;59:8

**maintained (6)**
20:12;33:6,7,9;
38:23;39:5

**maintenance (2)**
34:6;62:22

**major (6)**
56:8,9,12,16,19;
60:18

**makes (8)**
20:2;40:17;62:7;
68:24;83:1;85:2;103:5;
104:4

**making (11)**
17:10;28:23;29:4;
43:9;44:25;48:11;
53:23;54:8;57:12;
64:12;78:13

**malicious (1)**
25:21

**malpractice (1)**
83:18

**man (1)**
31:18

**management (1)**
20:25

**Manges (1)**
110:15

**manifests (1)**
41:21

**manmade (1)**
21:21

**mans (1)**
90:25

**many (3)**
15:9;35:1;110:23

**market (1)**
85:6

**material (2)**
36:25;37:1

**materials (1)**
7:6

**Matt (1)**
80:11

**Matter (24)**
4:9;23:15;26:11,21,
21;28:13;44:9;48:2;
58:9,20;60:7;61:18;
64:19;69:9;70:23;73:6;

76:7;80:21;89:5;96:18,
20;106:18;109:7;110:6

**matters (1)**
112:21

**Matthew (2)**
28:21;101:20

**may (15)**
33:25;43:15;58:22;
69:22;72:23;73:10;
74:16,18;84:21;94:16;
95:6,10;111:15;112:4;
113:22

**maybe (16)**
9:25;14:15;16:3;
20:15;21:9;44:11;
51:14;56:23;58:12,14;
63:15;79:24;89:9;
98:11;100:6;112:19

**McVeigh (1)**
21:24

**mean (64)**
7:14;10:16;11:11,12;
12:3;14:16;15:17,18,
20;16:4;17:10;18:9,13,
16,16;19:1,5;21:3,11,
16;23:6;26:17;27:7,14;
30:3;32:15,25;33:8;
37:20;41:14;43:14;
44:11,12,25;45:7;48:3,
14,17;50:4;51:8,13;
52:17;56:18,22;61:10;
62:18;69:3,7;75:10;
77:7;86:18;87:22;90:3,
20;95:11,12;96:7;
97:25;99:19;100:5;
103:11;104:15;107:5;
108:2

**means (6)**
31:22;46:7;49:12;
55:9;62:4;69:18

**meant (3)**
42:18;50:24;78:24

**mechanism (4)**
23:3,22;68:20;77:25

**mediation (1)**
77:24

**medical (1)**
87:8

**meet (5)**
31:16;56:9;64:5;
94:3;112:16

**meltdown (1)**
57:3

**mens (1)**
49:21

**mentioned (3)**
13:12;60:3;61:14

**merits (3)**
95:17;99:24,25

**mess (4)**
42:4;91:15,16,20

**message (1)**
114:4

**Michael (2)**
29:3;30:21

**Michelson (4)**
110:19;111:18,22;
114:18

**Mickey (1)**
111:23

**might (10)**
16:4;18:15;37:5,6;
78:17;83:13;93:3;94:7,
8;101:15

**mile (1)**
108:5

**military (1)**
92:22

**million (8)**
50:24;65:12;71:21,
25;80:24;81:1;88:15,
19

**mind (4)**
6:15;11:22;85:21;
90:2

**minutes (4)**
4:19,19;16:18;30:17;
45:8;80:19

**missing (4)**
50:13;59:19,20;
95:21

**mission (2)**
48:14;82:16

**misspoke (1)**
42:16

**model (1)**
86:18

**moment (6)**
41:11;65:15;84:19;
95:6,7;105:5

**money (19)**
30:15;42:25;65:13;
66:19;68:17;71:25;
78:14;82:22;85:12;
88:9,13,13,24;92:14;
93:17,17;95:5;96:4;
97:7

**monies (1)**
68:18

**Montali (1)**
4:6

**months (1)**
44:5

**Moore (2)**
19:14;108:20

**moral (1)**
79:12

**more (14)**
14:12;21:1;38:20;
45:8;55:1;61:5;67:17;
77:24;78:7;81:7;85:15;
101:17;108:18;112:6

**morning (18)**
4:7,8;5:12,13;6:21;
19:12,13;28:20,21;
29:8;80:16,17;85:5;

98:14;110:16;113:5,
10,16

**most (5)**
18:23;21:9,18;68:17;
97:21

**motion (14)**
27:10;28:7,8;31:5;
36:12;38:1,2;48:1;
57:12,18;58:12,13;
64:10;106:6

**motions (4)**
36:19;57:15,15;
84:21

**move (2)**
39:20;90:20

**moving (1)**
8:25

**much (6)**
29:11;45:13;54:17;
61:25;88:19;106:15

**must (8)**
26:12;27:8;49:5,7,7;
60:5;73:6;84:1

**myself (1)**
55:2

**N**

**nail (1)**
45:25

**name (1)**
29:8

**namely (1)**
111:2

**name's (1)**
30:21

**narrow (7)**
13:9,10,22;21:16;
31:3;68:13;72:5

**narrowing (1)**
12:18

**national (2)**
9:15,17

**nationwide (1)**
40:2

**Native (6)**
23:16,18;40:7,9,17;
41:10

**nature (3)**
16:2;40:16;107:10

**navigable (1)**
9:5

**necessarily (2)**
9:12;70:10

**necessary (4)**
50:7;84:2,3;113:15

**need (24)**
5:19;25:13,14;26:23;
51:10,10;56:7,12;
70:22;73:19;77:6;
83:10,21,22;85:14,14;
92:25;93:8;94:19;
96:23;108:18;111:4;

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 126
of 134

112:2;115:3
**needs (6)**
22:21;75:23;77:15;
84:15;85:2;101:22
**negated (1)**
12:9
**neglect (1)**
102:24
**neglecting (1)**
33:12
**negligence (19)**
5:1;13:24;17:1;
20:16,18;21:9,12;
31:12,13,17,19;34:23;
59:9;65:17;66:22;67:6;
73:18,22;75:19
**negligence- (1)**
66:25
**negligent (2)**
38:23;62:22
**negligently (6)**
33:6,9;39:5;45:23,
24;86:5
**negotiate (1)**
84:10
**negotiated (4)**
84:11,12;94:7,10
**neighboring (1)**
72:4
**neither (2)**
109:23;112:10
**NEPA (1)**
61:17
**news (1)**
77:1
**Newsome (1)**
115:10,12
**newspaper (2)**
15:1;78:5
**next (6)**
8:12;9:3;48:19;
49:18;68:8;72:20
**Nicole (1)**
111:23
**Ninth (13)**
7:2,3,17;9:3,21;
13:18;40:7,14;42:9;
65:23;66:6;73:14,15
**nobody (2)**
19:19;21:20
**none (1)**
9:20
**non-OES (1)**
78:1
**nonstatutory (1)**
10:7
**nope (1)**
93:3
**nor (1)**
48:7
**normal (2)**
58:12;90:14
**Normally (1)**

70:18
**North (1)**
62:21
**note (5)**
7:10;14:3;33:2;
59:10;77:17
**noted (6)**
20:19;31:2;59:11;
66:22;75:18;108:1
**notice (5)**
110:19;111:6;112:7,
8;114:7
**notices (1)**
115:18
**notify (1)**
115:3
**notion (1)**
41:17
**notwithstanding (1)**
13:6
**novel (3)**
83:1,5,6
**now-retired (1)**
5:24
**nuisance (14)**
6:12;7:20;8:2,16;
11:15;17:5;23:1;39:21;
40:4;41:21,23;42:10,
18;45:4
**number (6)**
54:16,18;59:15;94:7,
8;111:11
**numbers (4)**
8:10;51:2;78:10;
111:12

## O

**Oakland (7)**
96:16,20;97:5,6,8;
98:18;101:7
**object (2)**
84:12,12
**objection (22)**
4:11,20,25;27:7,9,
13;28:6,9;30:3,5;31:3;
33:2;37:12;46:15;53:2;
58:8;64:20;69:1;81:4,
6,10;86:20
**objections (7)**
4:13,24,25;37:14,15,
18;57:16
**obligation (7)**
83:11;87:3;90:10;
91:11;97:19;98:1;
101:9
**obscure (1)**
26:6
**observation (1)**
19:16
**obvious (3)**
13:25;51:9;112:5
**obviously (5)**

8:21;45:3;61:6;
63:15;103:18
**occupies (1)**
13:11
**occur (1)**
63:25
**occurred (2)**
46:11;63:8
**occurs (1)**
95:23
**o'clock (4)**
112:18;114:23,24,25
**OES (104)**
50:23;51:6,22;64:20;
65:11,13;67:15,16,19,
23;68:5,6,8,14,15;69:4,
5,15,19,25;70:2,5,13,
17,21,25;71:1,10,14,
16,20;72:8,18,21;73:2,
6,10;74:4,9,12,14,24;
75:5,13;76:7,19;77:11,
23;80:14,24;81:5,7,17;
82:1,7,21,22,25;83:6,9,
17,24;84:1;86:7;87:3,
3,4,9,25;88:3,3;89:12;
90:24;91:17,18,19;
92:13;95:3,23;96:1;
98:12,23;99:2,13;
100:1;101:8,14,24;
102:16;103:17;104:11,
13,15;105:9;107:17,
24;108:7,25;109:3,4,7,
9,15,19
**OES' (8)**
90:25;95:2;96:7;
98:16;104:6,8,25;
108:15
**OES's (9)**
69:12,17;71:25;
75:12;80:1;81:4,15;
82:4,5
**off (8)**
19:6;64:1;71:6;
85:19;99:20;104:11,
14,14
**offered (1)**
52:11
**offhand (2)**
6:6;15:5
**office (4)**
29:3;80:10,13;82:15
**officer (1)**
100:18
**often (1)**
35:23
**Ohio (2)**
8:16;9:8
**Oil (2)**
92:20,20
**Oklahoma (4)**
14:13;15:12,15;
21:23
**omission (12)**

20:5,8,9,11;21:3;
24:9,12,15,25;34:20;
37:2;60:18
**omissions (4)**
21:8;32:19;55:8,14
**once (4)**
24:13;87:14;88:9;
105:18
**one (47)**
4:15;5:14,20;6:3,4,
20;8:11;10:3;12:8;
18:14;21:22;24:1;
26:25;29:13;31:3;33:7,
9,9;35:16;36:2;38:24,
25;39:5;41:2;45:2,20;
52:3;54:2;55:21;57:6;
59:3;61:21;64:8;70:11,
19;72:19;79:10;81:19;
87:15;101:17;106:22,
22;108:3,13;112:4;
113:11;114:13
**one-billion-dollar (1)**
30:2
**ongoing (1)**
41:24
**only (22)**
4:23;5:3;14:11;
23:22;24:13;35:2;39:5;
41:21,24;42:4;49:2;
50:23;63:21;75:4,17;
94:21;99:13,25;102:8;
104:6;106:24;113:10
**oOo- (1)**
4:3
**opening (2)**
4:19;112:6
**opined (1)**
40:21
**opponents (1)**
18:14
**oppose (1)**
103:18
**opposed (1)**
111:2
**opposition (2)**
86:19;105:8
**option (1)**
95:7
**oral (1)**
4:11
**order (13)**
4:4,12;56:4;100:11,
12,13,13;104:5,7;
108:12;110:2,20;114:6
**ordered (1)**
108:16
**organization (1)**
48:16
**others (2)**
54:6;105:18
**otherwise (1)**
77:25
**ought (1)**

87:15
**out (49)**
4:12;5:18;6:3;18:20;
20:14,19;21:18,25;
33:25;35:11;48:14;
51:2;56:3;57:10;59:8;
62:3;68:15;69:5;71:22;
76:17,19;79:20;81:12;
82:9,11;85:9;87:24;
88:2,13;90:12;91:2;
92:10,14;94:25;95:10,
23;97:13;100:7;
103:16;104:7;106:1;
107:20;108:14,16;
112:18;113:2,20;
114:2;115:18
**outcome (7)**
9:25;18:8,15,21;
25:22;37:6,7
**out-of-pocket (1)**
100:2
**out-of-state (4)**
86:9,11;87:2;96:19
**outset (2)**
65:6;82:17
**outside (4)**
19:19;26:19;53:1;
56:6
**over (14)**
5:10;8:15;12:1,2;
13:15;19:18;20:24;
29:18;35:1;38:14;
56:20;78:6,6,6
**overall (1)**
31:8
**overhang (1)**
77:18,22
**overinflated (1)**
78:20
**overlap (4)**
50:19,23;51:1;80:21
**owe (1)**
82:22;97:23
**owed (3)**
78:12,12;93:17
**own (7)**
68:17;76:21;92:17;
95:3;105:17;112:14;
114:13
**owned (3)**
66:7;67:23;68:6
**owner (1)**
66:16;72:4

## P

**page (10)**
6:20,23;7:17;9:21;
32:3;59:22;60:25;61:1,
2;82:20
**paid (25)**
17:25;84:15;86:13,
16;87:4,13,15;88:9;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(11) needs - paid

Case: 19-30088   Doc# 5927   Filed: 02/27/20   Entered: 02/27/20 07:50:49   Page 127
of 134

89:5,6,12,14;90:5;
91:2;92:23;93:14,16,
20,20,22;94:5,15,17;
96:2;101:6
**panel (1)**
27:22
**panoply (1)**
37:5
**paper (2)**
106:10;108:11
**papers (1)**
14:4;16:9;20:19;
26:6;57:7;78:6
**Parada (3)**
114:5,23;115:3
**parent (1)**
12:24
**parked (1)**
22:2
**part (11)**
7:10;34:16;35:1;
65:12;68:16,18,19;
83:5;96:3;112:6;
114:14
**partially (1)**
38:8
**participate (1)**
90:24
**participated (1)**
91:5
**participating (1)**
90:23
**particular (4)**
32:22,24;36:3;93:12
**particularly (2)**
6:11;83:25
**parties (2)**
28:7;71:7
**party (9)**
7:20;34:16;35:1;
68:14,18,19,19;69:14;
88:12
**Pascuzzi (7)**
80:4,5,7,8,9,13;84:20
**pass (1)**
88:22
**pass-through (7)**
69:4;71:2;76:20;
81:15;98:16;101:6,9
**past (4)**
64:11;65:23;84:21;
110:8
**pattern (6)**
20:24;34:25;36:21;
37:4,5;38:3
**Paul (5)**
19:13;59:5;73:3;
80:8;108:19
**pay (31)**
43:8,15,15,15;44:21;
45:2;81:1;82:12;84:16;
85:3,3,12,13;87:3,10,
12;88:3,8,21;89:20;

90:10;91:9,11,12;
92:14,23,24;95:5;96:1,
9;105:18
**paying (5)**
20:25;87:25;88:25,
25;89:2
**pays (1)**
87:15
**pending (1)**
84:19
**people (9)**
18:6;19:21;38:24;
54:16,18;79:9;87:7,7;
112:7
**perception (2)**
30:10;78:19
**perfectly (1)**
33:7
**perform (2)**
68:8,16
**performing (1)**
68:15
**perhaps (8)**
24:7;29:13;36:3;
71:1;81:11;90:4;
111:14;113:2
**period (2)**
38:14;108:16
**permitting (1)**
8:4
**person (10)**
8:1;16:2;24:20;25:1;
34:20;46:2,24;59:23;
87:15;91:12
**personal (1)**
24:22
**personnel (1)**
44:6
**person's (1)**
107:9
**perspective (3)**
10:25;78:23;108:22
**persuade (1)**
79:23
**persuaded (1)**
70:23
**persuasive (1)**
43:16
**pertinent (1)**
6:11
**PG&E (63)**
4:9;8:23;19:18,20;
22:7;36:1;38:23;44:21;
45:2;46:8;47:3,22;
48:11;49:7,18;53:8,9,
13;54:4,10,19;55:6,6,
12,13,15,15,21;62:23;
63:1;67:7,8,15;68:23;
69:12,18;70:4;72:2;
75:3,6,9,23;76:3,8;
81:20;84:15;85:1,5;
86:5;88:10;91:12,19;
98:25;99:12;100:22;

102:5;103:1,22,24;
104:14;107:15,19;
109:20
**PG&E/Travelers (1)**
26:13
**PG&E's (7)**
32:20;33:1,3;38:13;
43:4;93:20,21
**ph (1)**
36:7
**phone (3)**
112:21;113:5;115:12
**picked (2)**
96:13;108:23
**piece (2)**
29:23;108:11
**pin (1)**
48:10
**pinned (1)**
63:11
**pipeline (3)**
68:17,22;72:1
**place (5)**
66:25;71:4;75:15;
77:21;102:10
**places (2)**
38:23;79:11
**plain (2)**
18:25;82:23
**plaintiffs (1)**
110:17
**plan (5)**
84:12,13;85:1;95:9;
106:1
**plans (1)**
58:11
**plan's (1)**
95:15
**play (3)**
51:2;84:5,7
**pleading (1)**
52:20
**pleadings (2)**
60:2;64:16
**please (2)**
29:12;60:11
**PM (1)**
115:25
**point (61)**
7:6;8:23;9:13;10:6,
13;11:12;12:3,5,8;
13:22;14:4;15:7,19;
17:18;19:1,9;20:7,19;
26:18;34:15;35:11;
36:2,2,2,8;48:1,21;
52:3,7;55:1,22;57:6;
58:18;59:3;60:14;
61:10,14;62:3;64:8;
67:15;69:8,11;71:12;
76:25;78:2,17,21;
83:18;84:9;86:2;91:25;
93:12;94:18;99:20;
100:25;103:13,13,15,

16;106:11;107:15
**pointed (2)**
21:17;59:8
**pointing (2)**
61:9;107:6
**points (5)**
51:16;58:23;59:7;
60:12;105:7
**policy (1)**
17:9
**portion (5)**
74:12;98:16,23;
99:14,17
**pose (3)**
13:21;44:4;102:6
**position (7)**
13:24;39:21;68:21;
71:9,13;99:1;106:10
**postmarked (1)**
111:2
**potential (2)**
15:14;109:17
**Power (17)**
10:10;11:1;25:8;
33:6,13,13;49:18;56:1,
3,7,11,15,19,20,24;
57:3;62:22
**practical (5)**
23:15;79:11,15,21;
107:22
**precedent (1)**
16:3
**precise (1)**
15:3
**preclude (1)**
23:14
**preclusion (2)**
23:9;39:19
**predicate (3)**
63:15,15;76:22
**preempt (1)**
23:14
**preemption (8)**
10:15,16,25;11:20;
12:6;23:7,8;39:17
**preference (2)**
112:13,24
**preliminary (2)**
4:16;5:14
**premise (3)**
5:6;32:2;83:25
**prepare (4)**
100:11,12;102:24;
104:5
**prepared (2)**
6:18;111:24
**present (2)**
40:10;84:10
**presentation (2)**
45:14;59:13
**presented (2)**
37:13;78:3
**presenting (1)**

59:11
**preserves (1)**
106:10
**president (5)**
42:1;85:10;86:7;
99:22;102:7
**presiding (1)**
4:6
**pressure (3)**
77:9,19;78:14
**pressures (4)**
58:7;113:7,9,10
**presume (3)**
50:8;51:23;64:24
**pretend (2)**
41:10;83:17
**pretty (4)**
5:18;87:17;93:18;
102:7
**prevent (1)**
56:4
**previous (1)**
63:22
**prima (1)**
26:8
**principal (2)**
24:8;114:20
**principle (7)**
13:5;14:18;41:17,19;
45:2;91:8,8
**principles (4)**
18:22,24;32:5;98:19
**prior (1)**
56:15
**private (1)**
7:19
**privately (1)**
43:9
**probably (4)**
33:24;63:1;67:17;
88:6
**problem (8)**
51:13,13;69:5;85:11;
95:25;98:17;101:7;
112:10
**problems (1)**
110:24
**procedural (1)**
58:8
**procedurally (2)**
57:6;58:17
**procedure (2)**
19:24;57:19
**proceed (1)**
111:16
**proceeding (2)**
17:25;70:2
**proceedings (1)**
115:25
**process (1)**
114:14
**produce (1)**
32:12

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 128
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(12) panel - produce

**productive (1)**
77:24
**program (5)**
86:14;90:24,25,25;
91:5
**programs (2)**
40:2;43:7
**prohibition (1)**
15:19
**promise (1)**
115:1
**proof (23)**
26:8;31:14;34:22;
36:15;52:5;53:9;55:3;
57:21;59:14,15;60:15,
16,17,19;61:5;81:23;
92:17;95:2;98:2;
102:17,24;111:4;112:9
**proofs (15)**
38:2,3;53:15;59:11;
64:11;80:24;83:16,16;
86:1,3,18;92:16;
103:20,23;104:18
**property (18)**
9:12;10:3;46:10,24;
47:1,20,21,22;49:8,12;
50:10,12;66:7,11,16;
67:23;68:6;72:4
**proposed (2)**
104:7;110:19
**prosecute (1)**
82:2
**prosecuted (1)**
22:10
**protection (1)**
73:16
**prove (2)**
50:11;53:7
**proverbial (1)**
67:11
**provide (6)**
36:16,24;39:15;72:8,
9;89:1
**provided (11)**
11:8;24:21;37:20;
43:21;44:18;46:3;56:1;
83:7,8;87:8;107:7
**provides (7)**
32:6;34:16;39:25;
42:7;63:23;66:9;90:21
**providing (3)**
17:23;86:12;92:10
**provision (1)**
111:5
**public (18)**
7:20;8:2;9:10,11,24;
10:2;23:1;29:14;30:12;
40:4;42:12,13,18;66:7;
73:16,17;78:19;92:10
**public- (2)**
39:20;42:9
**public-nuisance (4)**
39:22;41:1,4,20

**public's (1)**
81:11
**public-service (1)**
92:8
**public-services (3)**
9:13;68:10;107:3
**pure (1)**
26:9
**purely (1)**
82:5
**purposefully (1)**
62:18
**purposes (11)**
24:2;27:9;63:6;
74:23;75:4;76:13;77:7,
11;81:11,11;109:6
**pursue (6)**
15:14,16;67:6;83:3,
10,20
**pursued (4)**
23:23;67:7;70:7;
93:15
**pursuing (2)**
98:1;108:5
**put (11)**
20:14;41:10;46:23;
47:7;49:1,2;66:24;
101:13;104:18;105:4;
112:5
**putative (1)**
110:16
**putting (5)**
72:1;77:9,19;82:9;
92:10

## Q

**quantified (1)**
58:10
**quantify (1)**
39:2
**quarrel (2)**
27:6;81:17
**question' (1)**
11:4
**quick (1)**
59:7
**quickly (3)**
59:8;110:7,11
**quite (6)**
13:1;16:9;17:7;
75:24;76:2,9
**quiz (3)**
6:6,16,17
**quote (1)**
7:18
**quoting (1)**
73:16

## R

**Railroad (2)**
7:24;9:4

**Railway (1)**
9:8
**raised (5)**
4:24;7:9;30:4,4;
111:1
**raises (1)**
22:25
**rarely (1)**
14:11
**rather (1)**
51:12
**rea (1)**
49:21
**reach (2)**
10:23;79:6
**read (16)**
5:15;14:25;16:9,17;
24:16;25:2;30:10,11;
51:3;52:20,21;55:4;
78:5,5,6;110:22
**reading (5)**
17:15;53:16;55:25;
82:20;101:5
**reads (2)**
91:24;103:2
**ready (5)**
4:11;105:4;111:25
**real (3)**
22:24;85:9;108:22
**realize (1)**
23:13
**realized (1)**
57:22
**really (21)**
12:2;44:8;55:3;57:9;
75:5;78:5,12;82:18;
83:6,15,20;87:12,15;
92:22;93:7;96:18;
97:11;99:1;105:15;
107:23;112:19
**reason (8)**
14:6;43:24;71:1;
81:15;90:17;97:18;
109:14;112:5
**reasonable (7)**
33:20;34:17;82:2;
83:3;98:1,4;102:24
**reasons (4)**
72:16;82:25;83:4;
98:13
**rebuilding (2)**
66:10;91:18
**rebut (1)**
58:15
**rebuttal (2)**
59:5;72:25
**recall (1)**
15:2
**recalling (1)**
15:3
**received (3)**
5:4;110:15;111:3
**recently (1)**

66:23
**recklessness (1)**
21:9
**reclassify (1)**
106:7
**recognized (1)**
104:10
**reconcile (1)**
11:10
**record (9)**
30:21;37:15,17;52:4,
9;53:1;64:12;94:14;
110:14
**recover (20)**
8:4;9:9;11:6;21:17;
65:21;67:21;73:10;
75:1;81:8;86:25;87:18;
88:10;93:9;102:25;
105:22,23;107:19;
108:8,9,10
**recoverable (1)**
74:25
**recovered (1)**
106:24
**recovers (1)**
87:16
**Recovery (17)**
7:19;15:14,16,18;
18:2;23:22;66:15,18;
73:12;85:25;86:4;
87:14;88:7,10,12;
89:10;100:22
**Recycling (1)**
8:13
**redline (1)**
113:13
**reduced (1)**
100:14
**redundancy (1)**
24:11
**refer (1)**
62:10
**referenced (3)**
68:9;73:14;77:14
**referred (3)**
7:17;8:12;96:19
**refers (2)**
46:20;59:12
**refund (1)**
12:21
**regardless (1)**
94:10
**regulation (7)**
66:25;67:4;69:8;
70:3,20;75:20;81:2
**regulations (1)**
83:17
**reimbursed (2)**
44:24;94:23
**reimbursement (2)**
82:23;97:19
**reimbursing (1)**
88:1

**reiterated (1)**
26:18
**rejected (1)**
20:20
**related (1)**
55:9
**relates (1)**
50:22
**relating (1)**
59:16
**relation (1)**
53:14
**relationship (4)**
96:25;97:4,5;109:16
**relevant (12)**
24:2;26:9;30:10;
41:16;44:23;54:5,23;
59:24;63:6;75:4,5;
81:19
**relief (1)**
50:17
**relies (1)**
83:25
**rely (7)**
10:12;11:16;12:9;
71:15;81:7;83:6,15
**remedy (1)**
50:17
**remember (3)**
28:3;35:22;41:15
**remove (1)**
77:22
**removed (1)**
86:14
**rented (1)**
22:2
**repair (2)**
56:8,12
**repairing (1)**
56:15
**repeated (1)**
38:13
**reply (8)**
5:22;16:19;27:1;
32:3;48:7;82:19,20;
83:2
**report (1)**
33:2
**reported (1)**
36:18
**represent (2)**
80:24;88:24
**representing (1)**
84:11
**represents (1)**
18:7
**request (1)**
28:15
**require (1)**
18:10
**required (8)**
20:22;34:21;46:25;
53:17;56:3;59:18;91:9,

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 129
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(13) productive - required

20
**requirement (3)**
34:13;83:2,13
**requirements (2)**
31:16;38:18
**requires (7)**
21:10;24:4;33:20;
53:11;107:12;109:1,4
**rescue (1)**
41:12
**reserve (2)**
19:4;72:24
**reserved (1)**
51:19
**reserving (1)**
4:19
**residual (1)**
18:17
**resolution (1)**
114:21
**resolve (2)**
110:11;111:15
**resolved (3)**
112:22,22;114:5
**resort (1)**
44:1
**respect (18)**
29:17,18;30:2,3,5;
31:3,7,10;34:14;36:15;
37:11,15,18;40:5;
60:14;62:2;64:9;66:9
**respectfully (1)**
28:15
**respects (1)**
98:11
**respond (3)**
16:3;37:16;86:9
**responder (3)**
96:2,8,12
**responders (3)**
87:7,24;89:6
**responding (1)**
34:18
**response (1)**
108:4
**responses (1)**
47:23
**responsibility (2)**
43:24;48:22
**responsible (1)**
82:11
**rest (3)**
72:24;100:6;113:15
**restate (1)**
74:11
**Restatement (10)**
32:4,8,15;33:19;
34:1;35:6,9;63:23;
64:4;93:13
**restitution (1)**
43:8
**restore (2)**
46:21;47:9

**result (13)**
10:22;25:9,15;27:15,
20;32:10,12;33:21;
34:6;35:3,5;38:16;
102:14
**resulted (2)**
55:9,15
**resulting (1)**
60:18
**retaining (1)**
43:18
**review (1)**
79:8
**reviewed (1)**
56:7
**revisions (1)**
110:19
**Richardson (3)**
114:9,9,12
**right (159)**
4:10,13;5:2,9;6:24;
7:1,7,8,16;8:2,9,11;
9:18;10:1,15;11:25;
12:20,25;13:14;15:14,
21;17:2;21:19;22:1,5,
16;24:19,23;26:2;
27:11,14;31:23;32:2;
33:21,22,25;34:2;35:9;
36:2,5,11,23;37:10;
38:7,7,8;39:7,16;
40:16;41:24;42:5,11;
43:6;44:2,18;45:5;
47:11;48:16,20;49:20,
23,24;50:6,15,21;
51:19,23,25;52:2,9;
57:20,24;60:12,16;
63:2,3,25;64:16,18;
66:3,8,14;67:13;68:2,
3;69:9;70:7;71:3;72:7,
10,18;73:8;75:8,10;
76:5;79:5,5,9,12,14;
81:13,16,20,21,25;
82:13;84:23;85:5,24,
25;86:4,25;87:13,18,
19;88:2,9;89:7,13,23;
90:2,8;91:6;92:19;
93:8;94:1,20;96:21;
97:7,9,17;98:20,24,24;
99:2,8,16,25;100:22;
101:25;103:8,16,17,18,
19,22;105:3,12,17;
107:19;108:8,9,10;
109:12,21,25;110:1;
114:17;115:22
**rights (8)**
8:25;13:14;40:1;
81:8,19,23,23;105:17
**Rios (1)**
80:9
**riparian (2)**
8:25;13:14
**rise (4)**
4:5;15:25;20:1;30:7

**rises (3)**
10:24;21:2,6
**risk (2)**
33:18,21
**River (2)**
8:16;9:6
**road (1)**
84:25
**roads (1)**
11:8
**Robert (1)**
54:3
**Rodriguez (1)**
12:16
**role (4)**
48:16;92:8;96:7;
97:13
**room (2)**
32:16;33:24
**roots (1)**
73:13
**Rosa (1)**
95:23
**RSA (4)**
84:4,10;94:8,10
**rubs (1)**
83:24
**rule (4)**
8:24;10:13;69:14;
107:22
**ruled (1)**
104:6
**rules (1)**
80:18
**ruling (7)**
57:10,10;71:13;
76:16;78:17;101:10;
105:5
**rulings (4)**
78:17,17,18,18
**running (1)**
58:11

**S**

**safety (9)**
8:6;11:15;33:4;68:2;
71:16,23;73:17;92:11;
101:5
**same (31)**
10:22;11:8;19:2;
23:6,15;24:10;27:6,13,
15,20;29:10;30:7;41:5;
59:22;64:23;65:4;
67:16;69:2,3;70:25,25;
79:12;81:15;96:6,8,11,
23;102:11,14;109:22;
112:25
**samples (1)**
91:1
**SAN (1)**
4:1
**Santa (1)**

95:23
**satisfies (5)**
31:14,19;34:12,22;
35:21
**satisfy (5)**
31:20;34:23;36:16;
38:18;57:23
**saw (3)**
29:8;44:6;62:21
**saying (15)**
16:1;21:5;37:3,4;
52:20;55:3,20;58:17;
63:14;77:3;87:14;
88:12;90:17;93:16;
107:22
**scenario (1)**
95:1
**schedule (1)**
113:5
**scheduled (1)**
4:10
**scholars (1)**
23:14
**school (2)**
42:14;66:10
**schools (1)**
57:5
**scope (1)**
56:6
**scores (1)**
44:6
**second (8)**
12:9;34:16;38:14;
61:14;67:11;83:24;
87:22;105:14
**Secondly (1)**
10:5
**Section (45)**
5:17;10:9,24;11:9,
11;12:9;13:21;14:5,7;
15:25;16:25;19:17;
22:22;25:21;30:25;
31:20;32:4,5;34:13;
35:13;38:18;41:11;
46:19;57:23;61:15,16,
17,20,20,21,22;62:13;
63:23;64:5;65:20,23;
66:21;67:1;69:19;76:6;
82:23;86:24;101:22;
105:19;108:14
**seeking (4)**
40:23;88:11,11,12
**seeks (1)**
7:20
**seem (2)**
16:13;27:16
**seemed (1)**
13:9
**seems (16)**
6:7;15:13;20:6;21:5;
24:8;25:5;26:1;29:3;
30:14;41:16;51:9,14;
76:24;77:9;78:19;

111:20
**sends (1)**
96:1
**sense (2)**
55:4;68:24
**sent (2)**
97:7,8
**sentence (3)**
46:23;47:8;59:20
**separate (7)**
92:9,13,15;93:8;
95:7;109:12;110:1
**separately (1)**
84:16
**series (1)**
38:4
**servants (1)**
82:16
**Service (4)**
9:9;89:1;92:24;
105:15
**serviceman (2)**
92:19,20
**services (10)**
68:9,16;72:9;73:16;
76:4;82:16;86:12,21;
107:6,7
**session (1)**
4:5
**set (10)**
4:17;16:14;31:13,14;
33:1;63:22;72:11;
81:23;85:1;114:21
**sets (2)**
32:4;81:18
**setting (1)**
58:8
**settled (1)**
93:5
**settlement (1)**
77:20
**seven (1)**
78:12
**Seventh (5)**
6:3,4;7:24;8:12,14
**several (3)**
35:4;62:21;91:13
**severely (2)**
18:2;111:11
**shall (1)**
34:17
**shan't (1)**
104:10
**share (4)**
18:18;52:11;53:4;
65:2
**shareholders (3)**
20:25;85:13;95:5
**sharing (1)**
12:22
**Sharon (1)**
5:3
**shoehorn (2)**

Min-U-Script®
Case: 19-30088   Doc# 5927   Filed: 02/27/20   Entered: 02/27/20 07:50:49   Page 130
of 134
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(14) requirement - shoehorn

75:18,19

**shoes (5)**
92:12;93:2,10,21;
107:9

**shoots (1)**
49:18

**short (3)**
95:4;112:17;113:25

**shoulder (1)**
43:9

**shown (1)**
50:19

**shows (6)**
24:9,13,15;34:7;
50:6;99:21

**shut (1)**
11:25

**sic (6)**
6:11;11:7;18:18;
24:2;32:8;40:24

**side (10)**
14:4;17:6;29:11;
30:19;50:3;51:5;54:17,
18;58:14;79:24

**sides (5)**
5:21;46:2;58:21;
113:13;115:17

**significant (1)**
33:4

**significantly (1)**
111:11

**similar (4)**
8:4;61:19;73:5;
93:18

**simpler (1)**
90:3

**Simply (7)**
10:11;11:3;31:6;
68:19;71:12;88:1;
113:17

**single (1)**
88:12

**sink (1)**
108:1

**sit (2)**
95:14;98:5

**sitting (1)**
98:7

**situation (7)**
35:6;40:3,12;44:10;
66:6;75:25;83:22

**situations (2)**
38:22;63:24

**Slack (1)**
110:10

**smoke (1)**
91:10

**so-called (4)**
69:4;98:16;101:5,9

**soil (1)**
91:1

**soldier (4)**
93:2,3,15,16

**sole (1)**
65:20

**solely (1)**
111:4

**solider (1)**
93:4

**solution (1)**
113:13

**solve (1)**
95:25

**somebody (8)**
33:24;41:13;44:20;
62:20;72:6;87:11;91:9,
9

**somehow (2)**
58:6;106:5

**someone (6)**
15:23;43:23;80:4;
107:6;111:19;115:23

**sometimes (1)**
21:12

**somewhat (1)**
5:15

**Soo (1)**
7:24

**soon (1)**
115:19

**sorry (9)**
50:5;59:5;76:17,18;
97:2;98:13,25;106:19;
107:4

**sort (11)**
7:14;20:4;21:2;
22:25;25:13;27:22;
66:19;70:12;74:5;
75:12;77:18

**sorts (1)**
55:18

**sound (2)**
71:20;82:5

**source (4)**
102:25;103:2,9,14

**span (1)**
20:24

**sparking (1)**
20:13

**speak (1)**
110:9

**speak[s] (1)**
11:4

**SPEAKER (2)**
98:5;105:12

**speaking (1)**
114:8

**speaks (3)**
11:5;61:11;94:2

**specific (36)**
5:20;9:1;13:5;14:12;
21:16,20;31:7,8;32:14,
18;34:10;36:1,7,21;
37:14,14,15,15,18,19,
23;38:20;40:21,21;
53:5,7,8,11,13,16;54:1;

65:6,7;73:11;80:19;
107:11

**specifically (18)**
13:12;20:20;21:1;
23:12;31:4;33:3;34:5;
37:20;53:6;54:15;55:2,
5;60:19;61:5;62:11;
67:20;85:15;106:24

**specifics (1)**
38:21

**spend (1)**
111:14

**spent (1)**
24:6

**spill (3)**
14:19;21:23;22:14

**spirited (1)**
110:5

**spoken (1)**
114:20

**spokesperson (1)**
115:2

**spot (1)**
101:13

**squarely (1)**
9:2

**staffed (1)**
82:16

**Stafford (21)**
5:18;10:9,24;13:21;
14:6,9;23:1,9,25;31:10,
15,16;56:10,17;59:22;
61:15;67:2;69:19;
76:18;109:1,8

**stand (1)**
105:25

**standard (25)**
20:17,18,18;21:10;
22:11;25:17;27:23,24;
34:22,24;35:6,21;38:1,
7;40:21;42:7,8,9;59:9;
64:6;75:19;87:12;
92:20,20;111:5

**standards (2)**
31:14;94:3

**standing (2)**
49:17;68:22

**stands (2)**
64:19;99:21

**start (6)**
10:22;20:13,15;
30:24;52:14;57:12

**started (1)**
20:13

**state (31)**
4:23;13:11;27:5;
29:15,23;30:14;39:11;
40:22;64:16;66:7;67:5,
18,18;69:15;75:3,20,
22;76:1,8;78:1;82:10,
12;84:5,7;85:21;86:7;
89:10;92:8,9;105:16;
112:2

**stated (2)**
53:10;59:11

**state-law (1)**
13:5;75:6

**statement (6)**
36:11;80:22,23;
82:18;83:24;111:20

**statements (2)**
26:7;58:11

**states (16)**
8:25;9:4,7,8;13:15,
15;24:24;26:14;28:22;
34:17;39:21,24;40:2,4;
92:20;93:13

**statute (72)**
8:1;10:12;11:4,5;
12:4;13:23,23,24,25;
17:15;18:9,21,24,25;
19:3;23:2,10,21,21,23;
24:1,10;31:19;34:15,
16;40:15,17,18,20,25;
41:2,3,5,6;45:20;46:2,
16;49:4;50:10;53:11,
16;55:23,25;62:3,7,9,9,
10;63:6;65:17,19,20,
22;66:5,23;67:20;
72:11;73:24;74:2,13;
75:1;76:22;82:5;86:10;
91:22,24;92:25;103:2;
105:22,23;106:25;
108:2

**statutes (7)**
68:20;69:13;71:14;
100:1;107:18;108:7,15

**statute's (1)**
87:17

**statutory (13)**
8:3;16:24;43:25;
45:3;46:1;48:22;50:17;
68:9;70:5;74:10;91:7;
107:11,14

**step (5)**
92:12;93:2,21;
105:17;107:9

**Stephen (1)**
110:14

**stepping (1)**
93:9

**stick (1)**
30:16

**still (23)**
32:11,17;36:15;42:1;
57:5;62:13;64:14;
71:10,13,22;79:8;90:6;
91:11;95:19,21;97:18;
98:14;99:24;102:16;
107:9,10;113:16,18

**stipulate (1)**
99:7

**stock (1)**
85:5

**stop (2)**
76:24;89:7

**story (1)**
37:16

**straight (1)**
64:19

**straightforward (2)**
16:24;26:6

**strange (1)**
25:19

**straw (1)**
31:18

**strike (1)**
51:5

**strong (2)**
54:19;57:25

**strongly (1)**
18:7

**struck (1)**
111:4

**structure (3)**
84:12,13;106:1

**struggling (3)**
55:24;96:10;97:11

**stuck (2)**
67:16,19

**stuff (1)**
112:6

**sub (1)**
12:24

**subdivision (1)**
90:22

**subject (5)**
67:9;71:22;79:8;
88:22;112:4

**submit (3)**
68:13;70:1;102:23

**submitted (3)**
58:20;64:19;106:18

**subordinate (1)**
95:2

**subrogation (17)**
76:11;86:2;90:14,
19;91:6;92:7,11;93:7;
100:2;105:8,16,17;
106:6,7,9,21,25

**subrogee (1)**
92:17

**substances (2)**
86:15,22

**substantial (7)**
30:15;33:18;63:24;
85:2;86:14,16;98:8

**substantially (2)**
32:10;38:16

**substantive (1)**
111:1

**succession (1)**
35:4

**suddenly (1)**
27:2

**sue (1)**
83:20

**sues (1)**
83:14

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 131
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(15) shoes - sues

**sufficient (4)**
21:13;31:15;34:23;
64:5
**sufficiently (1)**
18:24
**suggest (2)**
63:20;94:14
**suggested (1)**
61:15
**suggesting (1)**
64:15
**sum (3)**
30:15;86:16;108:21
**summarize (1)**
52:24
**summarized (1)**
52:23
**summary (9)**
47:25;48:3,6;52:13,
15;57:9,15;58:13,16
**summary-judgment (1)**
28:7
**summoned (1)**
115:9
**supplement (1)**
5:7
**supplemental (3)**
4:24,25;37:21
**support (7)**
9:22;20:15;22:16;
26:23;53:20,24;86:4
**supported (1)**
58:13
**suppose (1)**
33:5
**supposed (8)**
16:12;18:8,9;48:17;
57:14;58:18;70:20;
112:9
**suppression (5)**
8:5;68:15;74:8;
86:21;106:23
**Supreme (10)**
11:1;12:11;13:6;
26:14,17;39:25;92:18,
21,21,23
**Sure (24)**
6:16;15:15,17;16:8;
17:12;32:19;41:8;
42:21;43:3;51:12;
52:22;55:11;71:21;
72:20;73:2;78:16;
85:23,23;89:8;91:1;
94:9;95:20;102:21;
115:16
**surprised (1)**
56:5
**surprising (1)**
27:1
**surviv (1)**
18:15
**survive (1)**
36:20

**survivors (12)**
29:14;43:7;78:4,14;
82:17;83:23;84:2,14;
85:3,20;87:7,8
**survivor's (1)**
18:16
**suspect (1)**
15:8
**suspects (1)**
56:3
**sustain (5)**
69:1,2;81:3,6,10
**sustaining (1)**
27:13
**Swaine (2)**
19:14;108:20
**switch (1)**
17:4
**system (3)**
33:3;66:13,19

**T**

**talk (7)**
18:10;23:24;47:12;
56:23;85:24;100:4;
115:20
**talked (2)**
105:25;109:14
**talking (9)**
10:19;11:13;17:9;
23:25;38:21;51:12;
52:5;63:9;106:23
**talks (2)**
12:18;32:15
**target (2)**
33:25;35:24
**targeted (1)**
37:23
**task (1)**
82:10
**tasked (2)**
86:8;87:4
**tax (1)**
12:21
**taxpayer-funded (1)**
43:7
**TCC (23)**
4:18,20;27:1;30:4;
31:4,10;37:13;48:15;
54:18;62:5;64:19;73:6;
74:4;76:17;83:1;84:4,
11;85:25;97:15,21;
103:14,18;114:10
**TCC's (5)**
4:13;28:15;31:3;
32:3;82:20
**technically (1)**
27:24
**teed (1)**
57:17
**telephone (2)**
113:15;115:4

**telling (2)**
48:23;54:3
**tells (1)**
102:7
**ten (1)**
45:8
**term (6)**
56:18;61:18,19,21;
62:2;94:8
**Terminal (1)**
9:4
**terms (9)**
8:24;16:14;18:17;
48:10;62:9,17;97:19;
108:5;109:10
**territory (1)**
104:10
**test (2)**
11:2;18:21
**testimony (2)**
52:11;53:3
**testing (1)**
27:9
**Texas (1)**
14:20
**theft (1)**
93:15
**theoretical (1)**
101:10
**theories (7)**
81:22;85:24;86:17,
20;103:20,23;104:17
**theory (8)**
18:13;20:5;75:11,12;
93:9;94:11;107:2,9
**thereby (1)**
107:19
**therefore (6)**
5:4;39:8;47:13;69:2;
71:19,19
**thinking (2)**
22:22;112:4
**third-party (1)**
96:7
**thirteen- (1)**
78:6
**thirteen-and-a-half (1)**
78:24
**thirty (2)**
30:17;80:19
**thorough (1)**
5:21
**though (13)**
5:20;10:15;13:3;
27:23;33:25;36:5;
45:23;53:19;65:20;
66:23;71:25;90:5;
103:8
**thought (4)**
37:2;44:11;109:10;
113:9
**threatened (1)**
9:10

**three (6)**
5:23;6:3;38:3;45:19;
46:4;100:4
**threw (3)**
86:19;108:1,2
**throughout (1)**
46:16
**throw (2)**
32:16;33:23
**throwaway (2)**
7:14;22:25
**thrown (1)**
81:12
**thus (1)**
40:6
**times (1)**
70:11
**Timothy (1)**
21:24
**today (29)**
5:1;23:25;24:2;
26:10;28:13,20,24;
42:24;54:21;74:21,22;
75:5;77:8;80:3;81:19;
82:6;84:6,7;94:12;
99:21;104:19;106:13;
109:5,14;111:19,21;
112:1,20;113:15
**today's (6)**
54:5;74:23;75:4;
76:13;106:11;109:6
**together (7)**
25:2;38:17;41:25;
49:5;78:11;109:25;
115:17
**tomorrow (5)**
112:20;113:16;
114:1,25;115:20
**took (5)**
43:23;52:9,10;61:7;
92:16
**topics (1)**
17:4
**tornadoes (1)**
14:11
**tort (14)**
13:25;15:9,13;31:22;
33:8,10,14;39:10,11;
50:8,10;67:1;83:3;
103:11
**tortfeasor (7)**
14:14;41:13;50:11;
73:18;87:16;90:8;
103:15
**tortfeasors (2)**
14:14;83:12
**torts (3)**
11:13;32:4;35:23
**touched (1)**
21:22
**touching (1)**
23:7
**Town (2)**

**7:23;8:1**
**toxic (3)**
86:15;90:21;91:15
**track (2)**
10:11;97:11
**tractors (1)**
44:7
**trading (1)**
85:6
**tragedies (1)**
44:1
**tragedy (1)**
16:1
**trail (1)**
7:5
**trailers (2)**
44:7;48:13
**train (1)**
107:5
**training (1)**
58:17
**transformer (3)**
20:12;38:24;45:21
**transformers (2)**
39:5;62:22
**translate (1)**
43:17
**transmission (1)**
21:1
**treat (1)**
52:15
**treated (3)**
27:8;32:11;64:9
**trial (4)**
36:7;40:13;57:14;
81:14
**trier (1)**
38:5
**trouble (4)**
38:19;48:24;98:15;
101:4
**troubles (2)**
100:3,7
**Troy (29)**
7:23;28:19,21,21;
29:1,3,6;101:20,21,24;
102:1,4,12,16,19,21,
23;103:3,5,9,11,19,22;
104:1,17,21,23;105:2;
109:11
**Troy's (3)**
101:18;109:12,25
**truck (2)**
22:2,3
**trucks (1)**
95:25
**true (12)**
17:19;20:1;27:8;
36:14;52:6;65:1;78:9,
10;79:5;94:16;97:23;
101:3
**Trump (1)**
102:7

Min-U-Script®

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 132
of 134

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(16) sufficient - Trump

**trust (1)**
13:5
**try (11)**
20:4;26:5;29:12;
51:4,4;100:8;101:17;
107:1;111:15;113:20;
115:18
**trying (13)**
20:7,16,17;30:9;
58:10;71:15;75:18,19;
77:7;82:21;97:13;
100:7;113:12
**Tubbs (3)**
36:5,10;50:22
**tune (1)**
67:10
**turn (4)**
5:10;30:9;48:5;
86:24
**turned (1)**
47:25
**twenty-five (2)**
4:18;16:17
**twice (3)**
11:24;24:9;66:17
**two (26)**
6:4;13:17;30:3,13;
38:12,22,22;39:4,12;
50:15;51:3;59:7;72:16;
78:8,11;81:18;82:24;
85:8,22;92:22;95:19;
98:8;108:13,14;
109:12,22
**two-and-a-half (3)**
29:16;78:13;79:1
**Tye (95)**
29:3,7,8,10,17,21;
30:1,7,17,20,21;31:2,
24;32:2,19,23,25;33:5,
11,15,17,22;34:2,4;
35:10,13,15,17,19,21;
36:9,11,23;37:11,23;
38:8,11;39:7,9,15,18,
20;40:9,12,16;41:8,19;
42:6,16,18,21,25;43:3,
6,12,18,20;44:2,4,10,
14,18;45:6,8,9,12;47:5,
6;48:6,24;58:22,25;
59:1,10;60:10,12,22,
24;61:1,3,12,14,24;
62:1,14,17,25;63:3,5,
18,20;64:8,17,21;79:25
**T-Y-E (1)**
29:4
**type (2)**
5:4;34:12
**typically (2)**
31:22;65:22

**U**

**uncontested (1)**
38:5

**under (62)**
10:10;13:7;15:25;
22:11;23:20,22;26:22;
34:13;35:6;38:6;39:24;
40:2,5;41:5;42:10;
56:9,16;64:4;66:6,18,
20;67:1,3;68:20;69:8,
19;70:2;71:23;72:3,6;
74:10,25;76:3,18;
80:18,18;81:2,22;
82:12,23;86:2,23;
87:16;90:21,22;91:4,6,
8;93:9;100:1,2;102:17;
103:16,17;104:24;
105:22;107:17;108:14,
15;109:8,9;110:6
**underlying (1)**
22:14;32:5;77:25;
109:24
**undermined (1)**
78:7
**Unfortunately (1)**
24:12
**UNIDENTIFIED (2)**
98:5;105:12
**unique (1)**
79:11
**UNISON (1)**
4:8;115:21
**United (13)**
9:4,7,8;24:24;26:13;
28:22;34:17;39:21,24;
40:2,4;92:19;93:13
**universe (1)**
57:18
**unjust (15)**
6:13;17:5,7;22:25;
42:14,19,22;43:1,2,13,
17,22;45:1,2;50:16
**unjust-enrichment (1)**
42:8
**Unless (4)**
45:9;91:22;99:19;
115:22
**unlike (2)**
76:8;109:18
**unreasonable (2)**
42:11,12
**unusual (2)**
8:11;34:25
**unwilling (1)**
69:13
**up (32)**
4:17;15:23;20:4;
22:16;24:9,13,15;34:1;
38:24;42:4;45:16;50:6;
51:16;57:17;61:5;
62:21,23;64:23;66:23;
71:13;75:11;91:20;
95:24;99:21,21;102:8;
108:4,12,21,23;112:19;
113:22
**upon (8)**

35:11;46:13;51:11;
89:1;98:19;101:10;
102:1;104:2
**use (6)**
62:11,17,18;64:23;
65:21;83:9
**used (4)**
32:7;35:8;61:20;
105:9
**uses (2)**
30:13;62:9
**using (4)**
37:25;54:19;61:18;
68:17
**utilized (1)**
65:22

**V**

**valid (7)**
26:22;28:2;79:19;
83:11,17;100:22;109:7
**validity (7)**
26:8;27:9;31:6,9;
100:25;101:1;109:24
**value (1)**
18:18
**vanish (1)**
91:10
**Vegas (5)**
95:22,24,25;96:11;
108:9
**vegetation (1)**
20:24
**vendor (1)**
96:7
**venturing (1)**
104:9
**verbatim (1)**
16:20
**versa (1)**
29:24
**versus (2)**
25:9;49:3
**viable (6)**
75:23;76:3;77:11;
104:21;106:12;109:20
**vice (1)**
29:24
**victim (8)**
66:20;90:5;92:23;
93:10,14,16,18;106:5
**victims (14)**
17:23;18:5;44:1;
78:25,25;82:22;83:8;
91:14;92:14,15;94:5,
15;95:4;105:24
**view (9)**
7:10;36:8;38:1;
51:15;67:9;68:12;78:2,
21;107:21
**viewed (2)**
13:4;56:11

**village (7)**
8:1;23:16,18;40:7,9,
17;41:10
**violation (1)**
86:6
**virtue (1)**
103:23
**vis-a-vis (1)**
81:10
**vis-à-vis (2)**
96:7;98:10
**void (1)**
17:8
**voidness (1)**
17:20

**W**

**wait (2)**
94:5;112:15
**walk (1)**
17:25
**wallet (2)**
42:24,25
**wants (3)**
85:1;102:12;115:23
**waste (1)**
113:12
**watch (1)**
80:6
**water (2)**
8:25;40:18
**waters (1)**
9:5
**waterways (1)**
13:15
**way (26)**
11:23;18:19;20:6;
34:1;37:3,12;41:2;
51:4;57:10;61:19,19;
65:4;66:19;72:19,21;
76:14,25;83:25;84:15;
90:3;102:6;104:1;
107:1;109:15;111:16;
113:13
**ways (1)**
115:16
**WEDNESDAY (1)**
4:1
**week (1)**
36:7
**weeks (1)**
44:5
**Weil (1)**
110:15
**welcome (1)**
19:5
**welded (1)**
11:25
**well-briefed (1)**
110:6
**weren't (4)**
42:15;58:7;84:10;

87:25
**what's (10)**
11:21;30:11;31:25;
32:23;41:17;43:19;
81:4,4;93:18;109:6
**Where's (1)**
43:2
**Whereupon (1)**
115:25
**whipsaw (1)**
108:23
**whole (13)**
20:24;23:2;30:5;
37:4,5;46:16;50:3;
55:17;73:18;76:10,10;
84:24;100:7
**who's (3)**
44:21;110:10;114:19
**whose (2)**
73:18;82:16
**widespread (1)**
42:13
**wildfire (6)**
34:5;56:4,8,13;85:3;
91:14
**wildfires (6)**
24:22;25:6;34:11;
53:14;56:24;59:13
**willful (2)**
11:13;25:21
**Willoughby (1)**
80:9
**win (10)**
70:7;88:18,19,19,19;
95:14,15;98:18;100:9,
10
**wind (1)**
113:22
**Wisconsin (1)**
7:25
**wish (1)**
4:23
**withdraw (1)**
102:8
**withdrawing (1)**
99:22
**within (2)**
9:2;57:23
**without (1)**
50:8
**witness (1)**
20:3
**won (1)**
67:8
**wonder (2)**
44:21;85:8
**word (12)**
16:15;18:16;24:9;
32:7;46:15,17,23;50:2;
54:11;59:19,20,20
**wording (2)**
5:17;19:16
**words (7)**

Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 133
of 134

11:12;24:3;39:1,2;
54:19;55:21;70:9
**word-searched (1)**
46:15
**work (21)**
11:12;42:3;44:24;
61:7;66:12;67:14;
75:24;91:2,3;93:4,4;
100:12;112:13,18;
113:2,12,14,18,19,20;
114:2
**workaround (1)**
66:24
**worked (2)**
107:2;113:10
**working (2)**
98:7;115:17
**works (3)**
55:6,13;66:19
**world (2)**
85:10;95:2
**worried (1)**
112:7
**worry (1)**
15:4
**worst (1)**
41:13
**wrap (1)**
51:16
**write (2)**
50:16;108:12
**wrong (6)**
33:12;41:12;82:21;
83:25;99:18;105:10
**wrongdoer (1)**
49:17
**wrote (3)**
24:7;46:9;59:7

**Y**

**years (4)**
19:19;20:24;35:1;
83:7
**yesterday (1)**
12:11
**yield (1)**
19:9

**Z**

**Zeiss (1)**
111:23
**zero (2)**
79:3,20
**Zimmerman (1)**
5:3
**Zumbro (82)**
4:21;19:12,13,13,23,
25;20:9;21:5,15,24;
22:2,6,9,12,17,20;23:5,
8,12,18,20;24:12,15,
18,20;25:6,12,23,25;

26:3,5,20;27:4,12,14,
16,19,21;28:2,4,10,12,
17,18;59:3,4,5,6;60:7,
9;61:8;73:2,3,3,9,22,
25;74:2,4,15,18,20,23;
75:9,16;76:6,13,23;
77:4,6,17;78:23;79:3,
10,15;80:2;97:22;
106:17;108:18,19,19;
110:4

**1**

**1.5 (1)**
50:22
**10 (3)**
114:23,24,25
**12:17 (1)**
115:25
**12:30 (1)**
110:8
**12b6 (12)**
27:2,10,23,24;36:12,
19;37:25;47:25;48:2;
57:8,15;64:10
**12b6-type (1)**
28:8
**13.5 (4)**
79:16;84:15;94:24;
95:4
**13009 (5)**
71:15;72:8;86:20,25;
87:16
**13009.6 (4)**
86:21;90:20;91:6,23
**14 (1)**
32:3
**19-003 (1)**
8:8
**1979 (1)**
39:25
**1980 (1)**
7:25
**1980s (1)**
65:16
**1983 (1)**
6:25

**2**

**2 (3)**
61:1;65:12;112:18
**2.4 (6)**
51:6;67:10;88:19;
98:22;100:14;109:2
**2.4-billion-dollar (1)**
50:23
**2.7 (1)**
109:2
**2.7-billion-dollar (1)**
107:20
**2011 (1)**
11:2

**2013 (1)**
33:2
**2015 (3)**
25:4;34:8;83:7
**2017 (3)**
25:4;34:9;83:7
**2018 (2)**
25:4;83:7
**2020 (1)**
4:1
**26 (1)**
4:1
**290 (5)**
65:12;80:24;81:1;
88:15,19
**290-million-dollar (1)**
89:17

**3**

**3.9 (2)**
18:1;60:4
**3.9- (1)**
108:24
**3.9-billion-dollar (2)**
50:20;81:12
**3008 (1)**
72:3
**3009 (1)**
72:6
**30b6 (3)**
20:3;52:10;58:1
**312 (18)**
10:9;65:23,24,25;
66:18,21;67:2;69:19;
76:6;101:22;102:1,2,
17;103:12,17,23,24;
104:1
**312c's (1)**
82:23
**316 (5)**
46:19;49:4;61:15,21;
63:11
**317 (38)**
5:17;10:9,24;11:9,
11;12:9;13:21;14:5,7;
15:25;16:25;19:17;
30:25;31:21;34:13;
35:8,13;38:18;41:11;
49:5;57:23;61:20,20,
22;62:13,14,15;63:11;
65:20;71:15;102:1,1,4;
103:16;104:1,24;
108:14;109:13
**322 (1)**
6:25
**324 (3)**
6:23;7:17;9:21
**329 (1)**
71:21
**390 (2)**
71:21,24

**4**

**4 (1)**
105:24
**440 (1)**
39:24
**4943-5 (2)**
59:15;60:23

**5**

**502b1 (3)**
22:22;26:10;27:25
**509 (10)**
86:24;94:1,2,3,4,12,
19,21;95:2;105:19
**523a4 (1)**
25:18
**523a6 (1)**
25:19

**6**

**6 (1)**
82:20
**6.6 (1)**
77:18

**7**

**715 (1)**
39:25
**719 (1)**
6:25
**726 (1)**
39:25

**8**

**8A (1)**
32:4

**9**

**9 (1)**
4:25
**9.1 (1)**
85:6
**9/11 (3)**
14:13;15:12;21:23
**9-0 (1)**
26:15

Min-U-Script®
Case: 19-30088    Doc# 5927    Filed: 02/27/20    Entered: 02/27/20 07:50:49    Page 134
of 134
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(18) word-searched - 9-0