William B Abrams
1519 Branch Owl Place
Santa Rosa, CA 95409
Tel: 707 397 5727
End2endconsulting@gmail.com

*Claimant*



**FILED**

FEB 2 7 2020

UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>-and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>X   Affects both Debtors<br>*   All papers shall be filed in the Lead Case,<br>No. 19-30088(DM). | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11<br><br>(Lead Case)<br>(Jointly Administered)<br><br>**MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF** |

1

MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF

## 1. UNDERLYING FACTS

### A. Order Denying Motion for Reconsideration

Claimant William B. Abrams ("Mr. Abrams") seeks leave from the United States District Court for the Northern District of California (the "District Court") under 28 U.S.C.§158(a)(3) to appeal the Order Denying Motion for Reconsideration of the Order Denying Motion for Reconsideration of the Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 (I) Authorizing the Debtors and TCC to Enter in to Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief ("the Order).

### B. Motion for Tort Claimants' RSA

On December 9, 2019, PG&E Corporation and Pacific Gas and Electric Company ("Debtors") filed a Motion Pursuant to 11 U.S.C. §§363B) and 105(a) and Fed. R. Bankr.P. 6004 and 9010 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter in to Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief.

### C. Order Granting Motion for Tort Claimants' RSA

On December 19, 2019, the court issued an Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 (I) Authorizing the Debtors and TCC to Enter in to Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief, filed and entered on December 19, 2020 . ("the Tort Claimants' RSA Order). (Docket #5174).

## 2. THE QUESTIONS TO BE RAISED IN THIS APPEAL

The Restructuring Support Agreement with the TCC ("the Tort Claimants RSA") does not represent a valid and sound exercise of the Debtors' business judgment, and is not in the best interest of the tort claimants, and should be vacated and renegotiated

. MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF

### 3. THE RELIEF SOUGHT

The Order denying Mr. Abrams' Motion for Reconsideration should be reversed. The Restructuring Support Agreement with the TCC ("the Tort Claimants RSA") should be vacated and renegotiated.

## LEAVE TO APPEAL SHOULD BE GRANTED

The underlying subject of Mr. Abrams' Motion for Reconsideration was the Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 (I) Authorizing the Debtors and TCC to Enter in to Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief, filed and entered on December 19, 2020 (Docket #5174)("the December Order"). The purpose of this appeal is to engender substantial fairness and transparency to the tort claimants in the restructuring process, and put the interests of the tort claimants on equal footing with the Debtors. The purpose of this appeal is to engender substantial fairness and transparency to the tort claimants in the restructuring process, and put the interests of the tort claimants on equal footing with the Debtors.

### A. The Restructuring Support Agreement with the TCC ("the Tort Claimants RSA") does not represent a valid and sound exercise of the Debtors' business judgment

Although the Court found the Restructuring Support Agreement with the TCC ("the Tort Claimants RSA") represented a valid and sound exercise of the Debtors' business judgment, such is not the case. The Tort Claimants' RSA does not provide accountability for the Debtors as to safety to the public and its customers, nor sufficient financing that would enable the Debtors to pay for needed safety improvements.

Indeed, the Tort Claimants' RSA does not provide any path for current victims to receive sufficient funds to be anything close to "made whole" while endangering future PG&E wildfire

MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF

1 victims who will have no recourse facing an insolvent PG&E. This TCC RSA only serves the

2 interests of the Debtor at the exclusion of all other party interests.

3 The Tort Claimants RSA is a disaster for the Fire Victims, in favor of the Debtors. The fire

4 victims getting $13.5 billion, all cash, on the date the Debtors exit bankruptcy, along with the

5 Ghost Ship victims receiving $150 million in a separate fund, and with all of the public entities

6 being paid separately, which was the proposed settlement from the Bondholders, that offer – which

7 maximized recovery for all fire victims – was rejected in favor of the Debtor's less valuable

8 settlement. The only way for the fire victims to achieve any semblance of a just outcome is if the

9 current Tort Claimants' RSA to be vacated and renegotiated.

10 **B. The Tort Claimants RSA is not in the best interest of the tort claimants, and**

11 **should be renegotiated**

12 **1. The Tort Claimants RSA**

13 Claimants have not been informed and therefore could not have provided feedback

14 regarding significant material provisions within the RSA. This lack of meaningful disclosure to,

15 and consultation with, claimants prior to the RSA and the provisions within the RSA virtually

16 guarantee that claimants, regulators, elected officials and other stakeholders in this bankruptcy will

17 at best be left in the dark and at worst left with one-sided debtor approved information disguised as

18 a balanced professional opinion of the TCC attorneys. The TCC to date has been precluded from

19 participation in these forums to date because of these gag and hush clauses in the TCC RSA.

20 **2. There is a sound proposal/offer that would provide funds to the tort claimants**

21 without the delay set out in the existing Tort Claimants' RSA. In their letter of December 20, 2019

22 to Gov. Gavin Newsom, the Ad Hoc Committee of Senior Unsecured Noteholders proposed an Ad

23 Hoc Committee Plan which included the payment of $13.5 billion to the fire victims in cash up

24 ///

25 ///

26

27

28

4

MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF

Case: 19-30088    Doc# 5951    Filed: 02/27/20    Entered: 02/28/20 07:43:32    Page 4 of 22

front on the effective date of the proposed plan.  A copy of that letter is attached hereto as **Exhibit A**.

DATED: February 27, 2020

Respectfully submitted,

William B. Abrams
Claimant

MEMORANDUM IN SUPPORT OF MOTION FOR LEAVE TO APPEAL ORDER DENYING MOTION FOR RECONSIDERATION OF THE ORDER PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 6004 AND 9019 (I) AUTHORIZING THE DEBTORS AND TCC TO ENTER INTO RESTRUCTURING SUPPORT AGREEMENT WITH THE TCC, CONSENTING FIRE CLAIMANT PROFESSIONALS, AND SHAREHOLDER PROPONENTS, AND (II) GRANTING RELATED RELIEF

# Exhibit A

December 20, 2019

The Honorable Gavin Newsom
Governor, State of California
State Capitol, First Floor
Sacramento, CA 95814

Dear Governor Newsom:

The Ad Hoc Committee of Senior Unsecured Noteholders (the "Ad Hoc Committee") writes in response to recent developments in the bankruptcy cases of PG&E Corporation and Pacific Gas and Electric Company (collectively, "PG&E" or "the Debtors"), beginning with your December 13th letter to the CEO of PG&E.

In your letter, you correctly asserted that "To be approved under AB 1054, any plan of reorganization must position the emerging new entity for transformation. Such plan should include stringent governance and management requirements, enforcement mechanisms, and a capital structure that allows the company to make critical safety investments."

As PG&E bondholders, we completely agree with this assessment. That is why the plan of reorganization that we have put forward (the "Ad Hoc Committee Plan") has always envisioned:

- a reconstituted board of directors comprised of a majority of California residents, with significant representation from independent experts who are dedicated to serving the public interest;
- new commitments from management to open communication, transparency and accountability;
- a long-term sustainable capital structure resulting in strong organic cash flow generation and enhanced credit metrics;
- long-term investor equity commitments to facilitate emergence from bankruptcy;
- significant investments in safety and infrastructure-hardening;
- commitments to PG&E's frontline employees; and
- rate-neutrality for PG&E customers.

Regarding the Debtors' Plan, we agree with your statement that it falls "woefully short of the requirements of AB 1054."

We also agree with the sentiment expressed in your office's December 16th filing with the bankruptcy court that, with respect to PG&E's $13.5 billion settlement with the

Official Committee of Tort Claimants ("TCC"), "Progress toward fair treatment of victims is good." That is why we were the first to offer the TCC $13.5 billion, a significant improvement upon the $8.4 billion being offered at the time by PG&E.

Nevertheless, in your December 16th filing, you stated that the Ad Hoc Committee Plan "also does not meet AB 1054."

We respect your office's position. In an effort to improve our plan and facilitate the expeditious emergence of a resilient, reliable and reimagined PG&E, we wanted to make clear certain additional commitments that our group either (i) already indicated directly to your office that we are prepared to make or (ii) plans to make formally to all PG&E stakeholders and to the bankruptcy court in the near future.

For the purposes of making these commitments fully transparent and holding ourselves accountable, we are making this letter public. We have also attached an abbreviated term sheet summarizing these commitments as an appendix to this letter (Appendix A).

## New Commitments to the Victims of PG&E-Caused Fires

We share the satisfaction of all parties in seeing the claims of individual fire victims settled once and for all at $13.5 billion. As some of PG&E's largest creditors, we are pleased that the specter of estimating the claims of these fire victims has been unequivocally removed from these proceedings. As U.S. District Judge James Donato put it at a December 17th estimation hearing, "Settlement or not, you have both [PG&E and the TCC] estimated the value to be 13.5 billion."

However, we believe the victims still do not have the deal they deserve. The Debtors' Plan only offers them $5.4 billion of cash up front – the rest comes from (i) deferred payments derived from certain tax breaks that can only be realized over time, and (ii) equity in the newly reorganized PG&E.

This consideration stands in stark contrast to the settlement that PG&E entered into with a group of insurance companies (including hedge funds holding billions of dollars of insurance claims purchased at a steep discount on the secondary market). Under the terms of PG&E's settlement, the holders of these insurance claims would receive their entire settlement – $11 billion – in cash.

The Ad Hoc Committee has decided to change our plan to make sure that the individual victims are prioritized, as they should be. **To that end, we are committing today to**

2

pay the victims their full claim of $13.5 billion in cash up front on the effective date of the plan.

We believe this is simply a better deal for the true victims of PG&E's fires, the individuals who need this money as soon as possible so they can rebuild and move on. With estimation off the table and a 100% cash option available for fire victims, we believe there are strong arguments that the victims' representatives have a fiduciary obligation to carefully consider these new terms. In fact, these representatives have already stated in court that "We would have loved to get cash in an amount adequate to address tort claims," and "We would prefer not to have stock."

To ensure that the victims themselves are aware of the benefits of this $13.5 billion all-cash deal, we believe it will be important to engage with them directly in California and communicate broadly the availability of these new terms throughout the areas that were worst-hit by the relevant fires.

## New Commitments to the State of California

As large creditors and potential shareholders in a newly reorganized PG&E, we believe that the only acceptable outcome of these bankruptcy cases is a PG&E that is fully reimagined, well capitalized, and completely focused on safety, reliability, transparency and accountability. Anything less risks destabilizing the utility and the critical delivery of basic power services to Californians.

We believe the proposals and plans we have put forward over the course of these cases have always embodied these principles. However, in light of your office's recent comments regarding our plan, we felt compelled to demonstrate additional commitments to meet these critical goals, in the following areas:

*Corporate Governance*

Following the tragic fires of 2017 and 2018, which themselves were consequences of decades of mismanagement at PG&E, we believe corporate governance at the utility must be completely transformed. That is why our plan not only overhauls the PG&E Board with stakeholder-appointed directors who will bring a clear public-interest focus, but also reimagines the company's long-term incentive compensation programs to reward management for achieving key public safety, infrastructure-hardening and other long-term metrics – not just a higher stock price.

3

In addition, consistent with the clear guidance provided by your office, at least one-third of the new directors under our plan will be public-interest directors. To further ensure alignment of interests, we envision that a majority of the Board will be California residents. Finally, because our group is completely independent from PG&E's current Board and management, we are better positioned than the current conflicted Board and management to work with your office to determine the right Board and management for a reimagined PG&E.

*Capital Structure*

The Ad Hoc Committee Plan would fortify the newly reorganized PG&E with a strong financial profile and investment-grade credit metrics upon emergence. Importantly, this plan now includes **no debt at the public reorganized holding company.**

We believe that this absence of HoldCo debt is likely necessary to prevent PG&E from becoming a junk-bond issuer, a rare and unenviable status in the utility sector. The cost of junk debt would meaningfully burden the utility's cash flows and put it in a precarious position were future demands on cash to materialize. Californians are now suffering through PG&E's second bankruptcy in as many decades. The importance of avoiding yet another bankruptcy by ensuring that PG&E emerges from this one with the strongest possible balance sheet cannot be overstated.

In addition, the Ad Hoc Committee Plan does **not** rely on securitization, new legislation permitting ratepayer-backed tax-exempt bonds, rate recovery of prior wildfire-related costs or any other form of financial engineering that falls on the backs of ratepayers. The Debtors have now tried twice to get the California State Legislature to pass new legislation permitting them to securitize billions of dollars of costs related to pre-petition wildfires. Given the holes in the financing of the Debtors' Plan today, it is widely expected that they will try a third time when the Legislature reconvenes in January.

The superiority of the Ad Hoc Committee's approach lies in its use of fresh equity capital to finance PG&E's payments to victims and emergence from bankruptcy – as opposed to the risky HoldCo debt and ratepayer-backed financial engineering that underpins the Debtors' Plan.

*Wildfire and Power Shutoff Prevention*

We fully agree with your unequivocal position that devastating wildfires and disruptive power shutoffs must not be California's "new normal." That is why our plan calls for full cooperation with PG&E's current management, the CPUC, the Office of the Governor

4

and other relevant California state agencies and officials on the creation, prior to PG&E's emergence, of a near-term safety, reliability and operating improvement plan. Our plan would maximize cash flows available for spending on and investment in wildfire safety mitigation.

Our plan will also commit that PG&E's implementation of any public safety power shutoff ("PSPS") post-emergence will be decided at the senior management level with the appropriate consultation with state and applicable local officials, including but not limited to the CPUC, California Department of Forestry and Fire Protection, California Governor's Office of Emergency Services, and applicable local city, county and municipality executives, as well as other state officials. These shutoffs must be a last resort, not a substitute for the infrastructure-hardening that PG&E needs, so our plan calls for increased investment in PG&E's infrastructure to render these shutoff events increasingly unnecessary.

Finally, the Ad Hoc Committee Plan will commit to creating a new Wildfire Safety and Power Shutdown Oversight Committee of the Board that will be operative for at least five years post-emergence. This Committee will serve as an active oversight committee with respect to safety, wildfire risk mitigation, and the implementation of policies and procedures to govern – and eventually reduce the incidence of – PSPS events. Further, as a complement to this Board-level committee on the management side, the company's Chief Risk Officer will play an expanded role under our plan, with an oversight function overseeing all potential risks related to public safety, wildfire prevention and PSPS events.

*PG&E Employees*

PG&E's frontline utility workers put themselves in harm's way on a daily basis to maintain the power system. They played no part in the decisions and failures that caused this bankruptcy, and it is important that, to whatever extent possible, they not suffer from its disruptions. That is why our plan keeps the promises made to these workers by extending their Collective Bargaining Agreements until December 31, 2025, including a 4% general wage increase for each of the extension years and a prohibition on any involuntary layoffs during that term.

In addition, our plan commits to additional spending on employee medical programs, and includes a contribution of equity to employee pension plans to help retain PG&E's talented employees at a time when they are sorely needed.

Case: 19-30088    Doc# 5951    Filed: 02/27/20    Entered: 02/28/20 07:43:32    Page 11 of 22

*PG&E Customers*

The Ad Hoc Committee's proposals and plans have always included commitments to maintain rate-neutrality and not to seek recovery from ratepayers of costs related to pre-petition wildfires. Today, we also commit that through at least December 31, 2023, customer rates for the reorganized PG&E will be capped to grow no faster than anticipated economic growth in PG&E's service territory.

*Escalating Enforcement*

With respect to your view that any reorganized PG&E must be subject to an escalating enforcement process, including a streamlined process for transferring the license and the operating assets to the state or a third party when circumstances warrant, we are prepared to commit to such a process as outlined in the abbreviated term sheet attached.

Under our plan, if reorganized PG&E is found to have acted in a manner consistent with willful misconduct related to the ignition of a qualifying potential future wildfire following its emergence from bankruptcy, the State of California will have an option to purchase reorganized PG&E. This option would include the right for other third parties to bid for PG&E, so that the utility does not automatically become the responsibility of the State and its taxpayers. However, it gives the State final say by providing the State with the right to match any bid if the state determines that public ownership is in the best interest of the utility's stakeholders.

Greater detail regarding our commitments in each of the areas outlined above can be found in the abbreviated term sheet attached as Appendix A to this letter.

---

At this time, there are only two plans before the bankruptcy court – the Ad Hoc Committee Plan and the Debtors' Plan. The Ad Hoc Committee Plan was shaped with significant input from your office and from numerous other PG&E stakeholders, including victims, employees, ratepayers and key legislators. The Debtors' Plan, as your counsel correctly stated at a bankruptcy court hearing on December 4th, was developed "with one goal, and that is to get an equity-sponsored plan done." With their single-minded focus on serving the narrow interests of this one group, it is unclear whether the Debtors will ever be able to put forward a plan that meets the requirements of AB 1054.

6

**We believe that all PG&E stakeholders with long-term interests in the State of California would be best served by the Ad Hoc Committee Plan, with whatever appropriate modifications are needed to bring it into full and unquestioned compliance with AB 1054.** We share your view that Californians cannot afford a plan of reorganization that falls woefully short of the standards you have so clearly laid out in your public statements.

We are looking forward to continuing our dialogue with your office as we refine our plan with the above-stated goal in mind. We believe we are fully aligned with your office and your constituents in seeking to reimagine PG&E as a utility that fairly compensates its fire victims while emerging from bankruptcy a stronger, safer and more reliable provider of gas and electricity to the citizens of California.

Thank you.

The Ad Hoc Committee of Senior Unsecured Noteholders

# Appendix A

*THIS IS NOT A SOLICITATION OF A VOTE ON A PLAN OF REORGANIZATION. SUCH A SOLICITATION MAY ONLY OCCUR FOLLOWING APPROVAL BY THE BANKRUPTCY COURT OF A DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE*

*In re PG&E Corporation* and *Pacific Gas and Electric Company*

**Term Sheet to Revised Plan of Reorganization with Respect to Terms Requested by the Office of the Governor of California**

December 20, 2019

This supplemental term sheet (the "**Term Sheet**") is proposed by the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "**Ad Hoc Committee**") and sets forth certain supplemental terms and conditions for the proposed reorganization (the "**Reorganization**") of PG&E Corporation and Pacific Gas and Electric Company, each of which commenced cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**") on January 29, 2019 (the "**Petition Date**"). The terms included in this Term Sheet supplement the terms included in the proposed joint chapter 11 plan of reorganization (the "**Plan**") filed by the Official Committee of Tort Claimants and the Ad Hoc Committee with the Bankruptcy Court on October 17, 2019. To the extent that there is any conflict between the terms of the Plan and this Term Sheet, the terms included in this Term Sheet will control and will ultimately be included in an amended Plan filed with the Bankruptcy Court. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to them in the Plan.

| WILDFIRE VICTIM TRUST CONSIDERATION | |
|---|---|
| **All Cash Consideration to the Fire Victim Trust** | The Plan will commit to provide $13.5 billion on the Effective Date to the Fire Victim Trust for the benefit of all uninsured and underinsured tort claimants and certain other claims. The Plan will further commit that 100% of the value contributed to the Fire Victim Trust will be in the form of cash; provided, that, the TCC shall have the option to elect on behalf of their constituents to receive up to $3.5 billion in New HoldCo Common Stock (at plan value) in lieu of cash. As a result, the Fire Victim Trust will receive no equity consideration (unless the TCC elects to receive equity) and, accordingly, will have no risk related to valuation, monetization and/or lock-ups related to any potential equity consideration. |

8

| CAPITALIZATION | |
|---|---|
| **Strong Financial Profile and Credit Metrics** | The Plan will project that, based on its capital structure at emergence and all other commitments to be included in the Plan, Reorganized HoldCo will have a strong financial profile and credit metrics throughout the period from the Effective Date through December 31, 2023 (the "***Emergence Period***"). At emergence, under the Plan, Reorganized HoldCo will be capitalized at a total enterprise value ("***TEV***") of approximately $65.5 billion, including the following components:<br>• $37.9 billion of approximate total equity value<br>   • Note that total rate recoverable equity portion of rate base will be an average ~$23.4 billion for the full-year 2020, based on PG&E's regulated equity-to-capitalization of 52%<br>• $27.6 billion of total debt, including the following components:<br>   • $22.3 billion of rate recoverable utility company debt, based on PG&E's regulated debt-to-capitalization of 47.5%<br>   • $5.0 billion of non-rate recoverable Utility debt, which will be the source of proceeds used to make reorganized PG&E's first installment payment to the AB 1054 wildfire fund<br>   • No Reorganized HoldCo debt<br>   • No securitization debt or other off-balance sheet debt<br><br>These debt levels equate to less than 4x debt / EBITDA and greater than 20% FFO / Debt. The AHC proposed plan currently projects reorganized PG&E's credit metrics to approximate:<br>• Total Debt / EBITDA: 3.8x in 2021  3.8x in 2022  3.8x in 2023<br>• Total FFO / Debt:  21% in 2021  21% in 2022  21% in 2023<br><br>As reference, these credit metrics compare to the following approximate credit metrics for Southern California Edison Company ("SoCalEd") and its parent company Edison International ("EIX"):<br>• EIX Debt / EBITDA:    4.0x in 2021<br>• EIX FFO / Debt:    18% in 2021<br><br>Importantly, the figures above are consistent with generally accepted accounting definitions employed by the major credit ratings agencies and include all direct and indirect debt of Reorganized HoldCo. |
| **Secondary Offering** | The Plan will commit Reorganized HoldCo to use commercially reasonable efforts to conduct a secondary offering of the New HoldCo Common Stock underwritten by a nationally recognized investment bank at plan value for up to $6 billion. The secondary offering will increase the public float, liquidity, and diversity of holders of the New HoldCo Common Stock. |

Case: 19-30088   Doc# 5951   Filed: 02/27/20   Entered: 02/28/20 07:43:32   Page 15 of 22

| GOVERNANCE & OVERSIGHT | |
|---|---|
| **Board of Directors of Reorganized HoldCo and the Reorganized Utility** | • The board of directors Reorganized HoldCo shall have 9 members, consisting of (i) the CEO, (ii) the Executive Chairman, (iii) four independent directors to be selected by the Ad Hoc Committee, (iv) an appointee from IBEW Local 1245; (v) an appointee from the Wildfire Fund; and (vi) an appointee from the Office of the Governor of the State of California. The directors appointed by IBEW Local 1245 and the Wildfire Fund will be appointed in conjunction with the Office of the Governor of the State of California.<br>• The board of directors of the Reorganized Utility shall be the same nine directors plus the president of the Reorganized Utility.<br>• The directors appointed by IBEW Local 1245, the Wildfire Fund and the Governor shall be Public Interest Directors (as described below).<br>• The three initial Public Interest Directors (and, if applicable, their successor appointees) will remain in place on the board(s) from the Effective Date through December 31, 2023.<br>• All directors will be independent from the investment firms in the Ad Hoc Committee. Independent directors will qualify as "independent" in all material respects in accordance with the rules and regulations of the New York Stock Exchange (the "*NYSE*").<br>• All directors and boards in their entirety will comply with California Corporate Code Section 301.3.<br>• A majority of the directors will be Californians.<br>• In order to qualify as a Public Interest Director, a person must qualify as an independent director under NYSE rules and have at least one of the following qualifications: former state or federal (non-energy) regulators; present or former executives of environmental, employee, consumer or safety organizations; former attorneys general or consumer affairs officials; former legislators, academics or economics experts with relevant public interest background; individuals with a demonstrated reputation and record of commitment to safety, employee, consumer or climate issues; energy office officials (state or federal ALJs, judges, etc.); or strategic planners or public policy experts. |
| **Wildfire Safety and Power Shutdown Oversight Committee** | The Plan will commit to creating a new Wildfire Safety and Power Shutdown Oversight Committee of the Reorganized Utility board that will be operative for at least five years post-emergence. This Committee will be comprised of six members, including the Executive Chairman, the Reorganized HoldCo CEO, and the Reorganized Utility President, in addition to three independent directors, at least two of whom will be Public Interest Directors, and will be populated with the most qualified directors (based on utility operation, safety, and/or engineering experience and other appropriate factors). The Chief Risk Officer of Reorganized HoldCo will also be a non-voting member of the Committee. |

Case: 19-30088   Doc# 5951   Filed: 02/27/20   Entered: 02/28/20 07:43:32   Page 16 of 22

| | |
|---|---|
| | The Wildfire Safety and Power Shutdown Oversight Committee will serve as an active oversight committee with respect to safety, wildfire risk mitigation, and PSPS policies, procedures, and events. The Committee will oversee and make regular reports and recommendations to the Reorganized Utility Board regarding the Reorganized Utility's Wildfire Mitigation Plan.<br><br>The Wildfire Safety and Power Shutdown Oversight Committee will be actively engaged in an oversight function with the management team and the Community Wildfire Safety Program ("*CWSP*"), the organization within PG&E currently charged with the responsibility for ensuring wildfire safety. The CWSP will include an internal audit-type function with responsibility for monitoring performance and providing timely reporting to the Reorganized Utility and HoldCo boards regarding safety, wildfire risk mitigation, and PSPS activities. |
| **Chief Risk Officer** | The Plan will commit that the Chief Risk Officer of Reorganized HoldCo will have an expanded role and function within Reorganized HoldCo. The Chief Risk Officer will be tasked with oversight of traditional public company and utility company-associated risks. Additionally, the Chief Risk Officer will have an expanded oversight function overseeing all potential risks related to public safety, wildfire(s) and wildfire prevention, and power shutoff(s)/PSPS events. The Chief Risk Officer will report to the Reorganized Utility President, the Reorganized HoldCo CEO, and a newly formed Wildfire Safety and Power Shutdown Oversight Committee of the Reorganized Utility board. |
| **Elements of Corporate Governance and Metrics with Public Interest in Mind - LTIP** | The Plan will commit to requiring the new boards to revise the long-term incentive compensation programs ("*LTIP*") of both Reorganized HoldCo and the Reorganized Utility by increasing the proportion of LTIP awards subject to performance-based vesting criteria. Performance criteria for LTIP awards will be modified by increasing/implementing performance weightings that are based on achievement of public safety, infrastructure hardening and other related strategic long-term objectives. All executive incentive compensation plans and contracts will be in compliance with Public Utilities Code section 8389, as amended by AB 1054. |
| **WILDFIRE SAFETY, PSPS, CAPITAL & OPERATING PLANS** | |
| **Wildfire Safety Plan** | The Plan will commit that prior to the Effective Date, certain principals of the Ad Hoc Committee (and all of their advisors, consultants and experts), along with certain board members selected to be on the board of directors of Reorganized HoldCo after the Effective Date in accordance with this Term Sheet, will work in full cooperation with current management of the Debtors, the CPUC, the Office of the Governor, and other relevant California state agencies and officials (and all of their advisors, consultants and experts) on a near-term safety, reliability and operating improvement plan. |

11

| | |
|---|---|
| **PSPS Plan** | The Plan will commit that the Reorganized Utility's implementation of any PSPS shut down post-emergence will be decided at the senior management level with the appropriate consultation with state and applicable local officials, including but not limited to the CPUC, California Department of Forestry and Fire Protection, California Governor's Office of Emergency Services, and applicable local city, county and municipality executives, and other state officials. |
| **New Five-Year Comprehensive Capital and Operating Plan Focused on Safety and Reliability Enhancements, System Modernization and Infrastructure Improvement** | The Plan will commit that new Reorganized HoldCo management (with input and approval from the new board) will build and submit a new five-year comprehensive capital and operating plan ("**Capital and Operating Plan**"), focused on safety and reliability enhancements, system modernization and infrastructure improvement, within 180 days post-emergence.<br><br>The Capital and Operating Plan will include input from relevant engineering, equipment, technology companies / vendors, wildfire experts, and other utility operating companies.<br>• The capital portion of the plan will directly address all transmission and distribution grid issues, including details such as necessary equipment and technology upgrades (e.g., system segmentation/sectionalization, monitoring/sensors, appropriate undergrounding, insulated line technologies and equipment, advanced weather forecasting technologies, better electricity shut-off technologies, etc.).<br>• The operating portion of the plan will address, among other things, structural changes needed in the organization to prevent delay in inspections, vegetation management, and general maintenance that have contributed to wildfire ignitions. This may, for instance, include carving out a separately organized unit focused on prevention and mitigation strategies.<br><br>This Capital and Operating Plan will include highly transparent and regular milestones (aka "scorecard") and have associated appropriate levels of measurability and accountability for utility managers and the board. The Capital and Operating Plan will be dynamic and continue to evolve as work and learning progresses over time. |
| **WILDFIRE SAFETY, SYSTEM HARDENING RESILIENCY & OTHER INVESTMENTS** ||
| **Increased Spending on System Hardening, Modernization, Fire Safety and Resiliency** | PG&E's publicly-available plan currently specifies approximately $28.0 billion of capital spend over the four years 2020-2023. Included in this figure is approximately $3.6 billion of Wildfire Mitigation Plan ("**WMP**") spend. Additionally, based on the information available to the Ad Hoc Committee, we believe that PG&E's publicly-available plan contains $12.5 billion of total spending on system hardening, modernization, fire safety and resiliency for the 5 years 2019-2023 (including the WMP amounts described above). We believe this spend includes both operating costs |

12

| | |
|---|---|
| | and expenses (estimated at ~40% of total spending) as well as capital spending (estimated at ~60% of total spending). |
| | The Plan will commit that Reorganized HoldCo shall spend a minimum of these amounts over this period to enhance the safety and reliability of the Reorganized Utility's electric and gas infrastructure. The Plan will commit that in addition to these amounts and as part of any potential settlement on any potential fines and penalties related to the 2017 NorCal fires, 2018 Camp Fire and the 2019 Kincade Fire, that may require future system spending (in addition to foregoing recovery of past system spending), over and above the amounts already specified in PG&E's current publicly-filed plan, Reorganized HoldCo shall spend $3.8 billion of additional spending on System Hardening, Modernization, Fire Safety and Resiliency. Based on PG&E's public projection (as stated above), this new $3.8 billion additional spending on System Hardening, Modernization, Fire Safety and Resiliency commitment increases overall spending on system hardening, modernization, fire safety and resiliency by ~30%. |
| | All of this capital spend shall occur on an expedited basis over the period from the Effective Date through December 31, 2023 -- this schedule is approximately 50% faster than current management's recent statements that "it could take as long as ten years." These incremental capital expenditures will not be limited to traditional utility capital investment and may include research grants, investments in California-based start-ups, and other innovative technologies focused on fire safety and prevention, all consistent with the Governor's recent Strike Force report. Among many other important areas of investment and improvement, these capital expenditures will enhance system redundancies (e.g., building micro-grids, energy storage, fuel cells, etc.) that will enable more localized electricity shut-downs on a go-forward basis during severe weather events. |
| **Increased Spending on Security and Cybersecurity** | The Plan will commit that in addition to any amounts already budgeted in future spend for security and cybersecurity, the Reorganized Utility will spend an incremental $50 million during the Emergence Period to enhance system security and cybersecurity and on an expedited basis. The Plan will commit not to request any return on or return of any of these amounts in any rate proceeding or securitization request. Accordingly, while customers/ratepayers will receive direct benefits from these funding amounts, they will bear no direct or indirect burden. This commitment is expected to provide initial annual rate savings to Utility customers/ratepayers of approximately $7 million per year. The present value benefit to Utility customers/ratepayers is estimated to be approximately $63 million. |
| **Additional Investment in Climate Initiatives** | The Plan will commit that in addition to any amounts PG&E has already budgeted in future capital spend for renewables infrastructure, the Reorganized Utility will fund $50 million of investment on climate initiatives in disadvantaged communities in its service territory (determined in |

13

| | |
|---|---|
| | consultation with environmental justice groups) during the Emergence Period to further the State of California's objectives of achieving its nation-leading renewable energy standards and also enabling these benefits to spread to the widest array of recipients. The Plan will commit not to request any return on or return of any of these amounts in any rate proceeding or securitization request. Accordingly, while customers/ratepayers and all citizens of the State of California, particularly including disadvantaged communities, will receive direct benefits from these funding amounts, they will bear no direct or indirect burden. This commitment is expected to provide initial annual rate savings to Utility customers/ratepayers of approximately $7 million per year. The present value benefit to Utility customers/ratepayers is estimated to be approximately $63 million. |

## CUSTOMER RATES

| | |
|---|---|
| **Maximum Rate Increase** | To ensure that overall utility rates for utility customers track overall economic growth, the Plan will commit that during the period beginning January 1, 2018 and ending December 31, 2023, Utility customer rate increases shall be capped at a total compound annual growth rate ("*CAGR*") of 3.0% over these five (5) years. While customer rate increases may exceed or be below 3.0% in any given year, the five (5) year CAGR during this five year period shall not exceed a 3.0% CAGR. |

## OFF-RAMP MECHANISMS

| | |
|---|---|
| **Company Sale if No Path to Emergence by June 30, 2020** | The Plan will provide for a pre-wired sale of HoldCo under certain limited circumstances if there is no clear path for the Debtors to successfully exit Chapter 11 by June 30, 2020. Specifically, if the Debtors are unable to demonstrate a clear path to confirmation of a plan of reorganization and a date for that plan to go effective by August 29, 2020, the State of California will receive a right to purchase and take over the Debtors. This determination will be made by the Bankruptcy Court (and will be subject to full appellate rights). |
| | The State of California's purchase option will be at a price equivalent to 1.50 times the Utility's total rate base. Total rate base for these purposes will be determined as of the latest quarterly period/reporting immediately prior to the consummation of the sale. In order for the State of California to exercise this purchase option and consistent with the fiduciary duties of the board of HoldCo, HoldCo will have the right to run a limited 60-day sale process to solicit potential superior bids. If, after that 60-day period, no superior bid is received by HoldCo, the State of California may exercise its purchase option. If a superior bid is received, the State of California will have the right to match (on customary timing for public company merger transactions) the superior bid plus a 3.0% premium to exercise its purchase option of HoldCo. The closing of any sale will be subject to the receipt of all applicable regulatory approvals. |

14

| | |
|---|---|
| **Company Sale Under Certain Circumstances Post-Emergence** | The Plan will provide a pre-wired sale of Reorganized HoldCo under certain limited circumstances during the Emergence Period. If Reorganized HoldCo or the Reorganized Utility is found to have acted in a manner consistent with willful misconduct related to the ignition of a qualifying potential future wildfire during the Emergence Period, the State of California will have an option to purchase Reorganized HoldCo. A qualifying potential future wildfire for these purposes is defined as any single wildfire that destroys more than 5,000 structures during the Emergence Period. Additionally, a qualifying potential future wildfire must include findings by CalFire, the CPUC, and the relevant court of competent jurisdiction that the Reorganized Utility was the sole ignition source of the wildfire and that the Reorganized Utility acted in a manner consistent with willful misconduct related to that ignition. All of these determinations are subject to the Reorganized Utility's full appellate rights.<br><br>The State of California's purchase option will be at a price equivalent to 1.50 times the Reorganized Utility's total rate base. Total rate base for these purposes will be determined as of the latest quarterly period/reporting immediately prior to the consummation of the sale. In order for the State of California to exercise this purchase option and consistent with the fiduciary duties of the board of Reorganized HoldCo, Reorganized HoldCo will have the right to run a 180-day sale process to solicit potential superior bids. If, after that 180-day period, no superior bid is received by Reorganized HoldCo, the State of California may exercise its purchase option. If a superior bid is received, the State of California will have the right to match (on customary timing for public company merger transactions) the superior bid plus a 3.0% premium to exercise its purchase option of Reorganized HoldCo. The closing of any sale will be subject to the receipt of all applicable regulatory approvals. |
| **OTHER** | |
| **Employee Commitments** | The Plan will commit that after confirmation of the Plan, the Reorganized Utility company shall extend the three Collective Bargaining Agreements currently in place with IBEW Local 1245 until December 31, 2025, which shall provide for:<br>&bull; a reasonable and appropriate four percent (4.0%) general wage increase for each of the extension years (to be included in go-forward allowed rates)<br>&bull; a prohibition on any involuntary layoffs during the term of the extended CBAs (excluding individual employee terminations or displacements and will not apply to contract workforce or non-bargaining unit members)<br><br>In addition, the Plan will commit to provide additional operating spend going forward on account of union represented employee medical programs to effectively eliminate all union represented employee contributions for medical premiums effective January 1, 2021. The Plan will commit that beginning in 2021, Reorganized HoldCo will provide an additional $15 |

15

| | |
|---|---|
| | million annual operating spend on account of employee medical programs for the direct benefit of employees and managers (such amount to be eligible for full rate pass-through recovery treatment in utility rates beginning in 2021). |
| | The Plan will also commit to provide $150 million value equivalent New HoldCo Common Stock into the employee stock ownership plan(s) for the benefit of employees. This equity contribution will be provided to such plan(s) in accordance with applicable laws, including ERISA, tax laws and securities laws. This commitment will help to retain IBEW 1245 represented employees who are critical to operating and enhancing the Utility's electric and gas systems and to make the PG&E electric and gas systems more reliable and safer. |
| **Renaming/ Rebranding** | The Plan commits to rename, rebrand, and provide a new logo for the Reorganized Utility and Reorganized HoldCo post-emergence. This process will include employee input and will be selected on an expedited basis. This change is an important element of working to rebuild and enhance goodwill with customers, employees, investors and other key stakeholders. |
| | For the first 60 days following emergence, all employees of Reorganized HoldCo and the Reorganized Utility will have the opportunity to submit recommendations for renaming or rebranding the Reorganized Utility. If, after a period of 90 days following emergence, if no employee recommendation is selected for renaming or rebranding the company, the Reorganized Utility shall effect a change of name to "Golden State Power Light & Gas Co.," and Reorganized HoldCo shall effect a change of name to "GSPL&G Corp." |

16