## Exhibit A

Subrogation Wildfire Trust Agreement

## SUBROGATION CLAIMS DECLARATION OF TRUST

This Subrogation Claims Declaration of Trust, dated as of [DATE] (as amended, supplemented, or otherwise modified from time to time, this "Agreement"), by and among (i) the undersigned members of the subrogation trust advisory board ("Trust Advisory Board," and each such member, a "Member") and (ii) [  ], as trustee of the Subrogation Trust (in such capacity, the "Trustee"), creates and governs the subrogation trust ("Subrogation Trust") referenced in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020* [Docket No. 5590][1] (as amended, supplemented, or otherwise modified from time to time, "Plan") and order approving such Plan ("Confirmation Order"). The Trust Advisory Board and Trustee are each referred to herein individually as a "Party" and, collectively, as the "Parties."

## RECITALS

**WHEREAS**, each of PG&E Corporation and Pacific Gas and Electric Company (collectively, "Debtors") filed a voluntary petition for relief (collectively, "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on January 29, 2019 in the United States Bankruptcy Court for the Northern District of California ("Bankruptcy Court")[2];

**WHEREAS**, the Plan provides that holders of Subrogation Claims[3] shall have an allowed aggregate claim of $11,000,000,000.00, and that the distribution on account of such Subrogation Claims ("Aggregate Subrogation Recovery") shall be transferred to the Subrogation Trust on the effective date of the Plan ("Effective Date") for the benefit of holders of Subrogation Claims ("Subrogation Trust Beneficiaries");

**WHEREAS**, upon the occurrence of the Effective Date, this Agreement shall become effective and govern payments to Subrogation Trust Beneficiaries on account of Subrogation Claims which payments shall be made either (i) with respect to Subrogation Trust Beneficiaries who are parties to the Subrogation Wildfire Claim Allocation Agreement dated as of September 30, 2019, as may be amended and restated from time to time ("Allocation Agreement"), in accordance with the Allocation Agreement, or (ii) with respect to Subrogation Trust Beneficiaries who are not parties to the Allocation Agreement, in accordance with the terms hereof;

**WHEREAS**, the Subrogation Trust is intended to qualify as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.* for all U.S. federal and

---

[1]    NTD: To be updated for title and docket number of final plan.

[2]    As used herein, the term "Bankruptcy Court" shall include the United State Bankruptcy Court for the Northern District of California or any court sitting in appellate jurisdiction thereof, and, in the event that the foregoing courts lack or decline to exercise jurisdiction, Courts of the State of California and the United States District Court of the Northern District of California or any other court of competent jurisdiction.

[3]    As used herein, the term "Subrogation Claim" means any Subrogation Wildfire Claim as defined in the Plan relating to the 2017 and 2018 wildfires that occurred in Northern California prior to January 29, 2019, as set forth on **Exhibit A** hereto (the "Wildfires").

applicable state and local income tax purposes, subject to the Debtors' right to make an election to treat the Subrogation Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes;

**WHEREAS**, the Trustee shall have all powers necessary (a) to implement this Agreement, the Allocation Agreement and the provisions of the Plan, and Confirmation Order relating to Subrogation Claims, and (b) to administer the Subrogation Trust as provided herein; and

**WHEREAS**, the Trustee and Trust Advisory Board are familiar with the terms of the Allocation Agreement and are entering into (i) this Agreement to distribute the Aggregate Subrogation Recovery consistent with the terms of the Allocation Agreement to the parties thereto and (ii) to otherwise distribute the Aggregate Subrogation Recovery to Subrogation Trust Beneficiaries not party to the Allocation Agreement in accordance with the terms hereof.

**NOW**, **THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the mutual agreements of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## ESTABLISHMENT OF THE SUBROGATION TRUST

1.1 <u>Establishment and Purpose of the Subrogation Trust</u>.

(a) <u>Establishment of Subrogation Trust</u>. Pursuant to Sections 4.23(b) and 6.4 of the Plan, on the Effective Date, in full satisfaction of the Subrogation Claims, the Debtors shall irrevocably transfer, assign and deliver the Aggregate Subrogation Recovery to either (i) one or more accounts established by the Trustee, or (ii) such other account(s) as agreed to by a majority of members of the Steering Committee of the Ad Hoc Subrogation Group, in each case for the purpose of receiving, holding, and distributing the Aggregate Subrogation Recovery for the benefit of all Subrogation Trust Beneficiaries. The Aggregate Subrogation Recovery shall be transferred in any and all cases free and clear of all liens, encumbrances, Claims and Interests (legal, beneficial, or otherwise, as Claims and Interests are defined in the Plan) for the sole benefit of the Subrogation Trust Beneficiaries. For the avoidance of doubt, upon the transfer of the Aggregate Subrogation Recovery, the Subrogation Trust shall succeed to all of the Debtors' rights, title, and interest in the Aggregate Subrogation Recovery, and the Debtors shall have no further right or interest in or with respect to the Aggregate Subrogation Recovery.

(b) <u>Purpose of Subrogation Trust</u>. The primary purposes of the Subrogation Trust are, in an expeditious and orderly manner, (i) to make timely Distributions (as defined in Section 6.1) in accordance with the Allocation Agreement and this Agreement to holders of Paid

Case: 19-30088   Doc# 5971-1   Filed: 02/28/20   Entered: 02/28/20 16:02:40   Page 3 of 37

Claims and (ii) to object to and/or resolve Non-Party Claims (as defined in Section 1.2(a)) and make Distributions thereon.[4]

(c)  Relationship.  This Agreement is intended to create a trust and a trust relationship and is to be governed and construed in all respects as a trust.  The Subrogation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company, or association, nor shall the Trustee, the Trust Advisory Board (or any Member or Alternate Representative), or the Subrogation Trust Beneficiaries for any purpose be, or be deemed to be or treated in any way whatsoever be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Subrogation Trust Beneficiaries, on the one hand, to the Trustee and the Trust Advisory Board, on the other hand, shall be solely that of a beneficiary of a trust and shall not be deemed a principal and agency relationship, and the parties' rights shall be limited to those conferred upon them by the Plan, Confirmation Order, Allocation Agreement and this Agreement.

(d)  Financial and Status Reports.  The fiscal year of the Subrogation Trust shall be the calendar year.  During the term of the Subrogation Trust, within forty-five (45) days after the close of each calendar quarter and ninety (90) days after the end of each calendar year, and as soon as practicable upon termination of the Subrogation Trust, the Trustee shall upload to a password-protected data room (the "Data Room"), with credentials made available to the Subrogation Trust Beneficiaries, a written report (each, a "Financial and Status Report") which shall include:  (i) (x) for each calendar quarter, financial statements of the Subrogation Trust for such calendar quarter prepared in accordance with U.S. generally accepted accounting principles, and (y) for the end of a calendar year, financial statements for such calendar year prepared in accordance with U.S. generally accepted accounting principles, (ii) a summary description of any action taken by the Subrogation Trust that, in the judgment of the Trustee, materially affects the Subrogation Trust and of which notice has not previously been given to the Subrogation Trust Beneficiaries, (iii) details of aggregate funds distributed by the Trustee and the Aggregate Subrogation Recovery, if any, remaining, (iv) details of income earned on the Aggregate Subrogation Recovery, (v) details of the amount of any reserves, (vi) details of the Holdback Amount, (vii) the then in effect Implied Recovery Percentage and Adjustment Percentage (as defined in and calculated in accordance with Section 3(b) of the Allocation Agreement) and information necessary to show the Trustee's calculation of the Implied Recovery Percentage and Adjustment Percentage and (viii) a description of the progress of making Distributions to the Subrogation Trust Beneficiaries and any other material information relating to the Aggregate

---

[4]  As used herein, the terms "Paid Claims," and "Assignor Insurer" shall have the same meanings as they do in the Allocation Agreement.

Paid Claims means payments and legally recoverable expenses made to or on behalf of insureds in connection with the Wildfires and the insuring agreement between a Claimholder or Assignor Insurer and its insured, but not including payments of any personal injury or death claims, non-recoverable expenses (including deductibles voluntarily refunded), damages unrelated to the Wildfires and/or arising from the insurer's negligence or bad faith.  For the avoidance of doubt, Paid Claims shall also include payments and recoverable expenses made by a Claimholder to or for the benefit of insureds in connection with Wildfires required by California law as a result of an insurer's insolvency.

Assignor Insurer means an insurer from whom the holder of Subrogation Claims directly or indirectly acquired Subrogation Claims.

Case: 19-30088    Doc# 5971-1    Filed: 02/28/20    Entered: 02/28/20 16:02:40    Page 4 of 37

Subrogation Recovery and the administration of the Subrogation Trust, including Subrogation Trust Costs and Expenses incurred during such period and cumulative for the duration of the Subrogation Trust. To the extent practicable, the Trustee will promptly provide additional information related to the Subrogation Trust as requested from time to time by any Subrogation Trust Beneficiary, provided, that such information shall be uploaded to the Data Room. Each Financial and Status Report shall be delivered to the Trust Advisory Board upon being uploaded to the Data Room. The Trustee shall provide access to the Data Room to any third party that executes a customary confidentiality agreement, unless the Trustee demonstrates that there is a good reason to not do so to the satisfaction of a majority of Members of the Trust Advisory Board.

(e)     Service without Bond. The Trustee and Members (and any Alternate Representative) shall serve without bond and shall have no obligation to file any accountings with any state or federal court.

1.2     Funding of the Subrogation Trust Costs and Expenses.

(a)     Funding. On the Effective Date, $10,000,000.00 of the Aggregate Subrogation Recovery (the "Initial Trust Cost and Expense Funding") shall be reserved by the Trustee to administer the Subrogation Trust and deposited in a segregated account established and maintained by the Trustee (the "Expense Reserve") at a bank selected by the Trustee with the consent of the Trust Advisory Board. To the extent the professional fees incurred by the ad hoc group of subrogation claim holders ("Ad Hoc Subrogation Group") are not fully reimbursed by the Debtors on the Effective Date pursuant to the Plan, any unpaid amounts owed shall be paid by the Trustee from the Expense Reserve to the applicable Ad Hoc Subrogation Group professionals. To the extent the reasonable fees, costs and expenses of administering the Subrogation Trust and the Aggregate Subrogation Recovery and the professional fees of the Ad Hoc Subrogation Group paid from the Expense Reserve at any time exceed the Initial Trust Cost and Expense Funding, the Trustee may, in consultation with the Trust Advisory Board, replenish the Expense Reserve in an amount not to exceed $2,000,000.00 in the aggregate from the funds in the Holdback Amount to pay such amounts as are reasonably expected to cover the reasonable fees, costs and expenses of administering the Subrogation Trust and Aggregate Subrogation Recovery, including any costs and expenses relating to objecting to and/or resolving any disputed Subrogation Claims not held by a party to the Allocation Agreement ("Non-Party Claims" and, individually a "Non-Party Claim"), notwithstanding that such replenishment may diminish the Aggregate Subrogation Recovery. To the extent more than an additional $2,000,000.00, in the aggregate, is required beyond the original $10,000,000.00 in funding to cover the reasonable fees, costs and expenses of administering the Subrogation Trust and Aggregate Subrogation Recovery until the termination of the Subrogation Trust, the Trustee shall only replenish the Expense Reserve by more than $2,000,000.00 with the unanimous consent of the Trust Advisory Board.

(b)     Retention of Professionals. The Trustee and Trust Advisory Board may, without further order of the Bankruptcy Court, employ professionals to assist them in fulfilling their respective obligations under the Plan and this Agreement. Professional service agreements entered into by the Trustee pursuant to this Section 1.2(b) shall be approved by the Trust

- 4 -

Advisory Board, shall include reasonable and customary fee and expense provisions, and shall not be duplicative of other professional service engagements. Compensation of the Trustee reimbursable under this Agreement shall be governed by separate agreement by and between the Trustee and the Trust Advisory Board pursuant to Section 2.2 hereof and shall include reasonable and customary fee and expense provisions. Professional expenses of the Trust Advisory Board reimbursable under this Agreement shall be limited to fees and expenses paid to a single law firm representing the entire Trust Advisory Board (rather than some or all of its Members), shall include reasonable and customary fee and expense provisions, and shall not be duplicative of other professional service engagements. Any law firm retained by the Trustee shall not also represent the Trust Advisory Board or any Subrogation Trust Beneficiary in connection with any matter relating to the Subrogation Trust or the Debtors, and any law firm retained by the Trust Advisory Board shall not also represent the Trustee or any of the Subrogation Trust Beneficiaries in connection with any matter relating to the Subrogation Trust or the Debtors. For the avoidance of doubt, fees and expenses of professionals retained pursuant to this Section 1.2(b) shall be paid out of the Expense Reserve. At the direction and discretion of the Trust Advisory Board, the Trustee may hire an accounting firm to prepare financial statements and tax filings, as may be required to be made by the Subrogation Trust.

## ARTICLE II
## THE TRUSTEE

2.1     <u>Appointment of Trustee</u>.  The Trustee is hereby appointed trustee of the Subrogation Trust as of the Effective Date and agrees to accept and hold the Aggregate Subrogation Recovery, plus any accrued interest and earnings thereon, in trust for the Subrogation Trust Beneficiaries.  Other than as provided in Section 2.8(a) hereof, the Trustee may not be a Member of the Trust Advisory Board.

2.2     <u>Trustee's Compensation and Reimbursement</u>.  The Trustee shall be compensated for its services and reimbursed for its expenses in accordance with, and pursuant to the terms of, a separate agreement to be negotiated and executed by the Trustee and the Trust Advisory Board, which agreement shall not be subject to any third-party notice or approval, <u>provided</u>, that, the Trustee shall not earn a management fee for the Trustee's management of the assets of the Subrogation Trust.  Compensation and reimbursement under this Section 2.2 will be paid from the Expense Reserve.

2.3     <u>Power and Responsibilities</u>.  The Trustee, in consultation with the Trust Advisory Board, shall have all powers necessary to implement this Agreement and the provisions of the Plan relating to the Subrogation Trust, in accordance with the Plan, Confirmation Order, Allocation Agreement, this Agreement, and applicable law, including the power to execute any agreement or other document consistent with the terms thereof.  The Trustee shall, in a manner consistent with the terms of this Agreement:  (i) administer and make Distributions to Subrogation Trust Beneficiaries from the Aggregate Subrogation Recovery in accordance with this Agreement and the Allocation Agreement, (ii) dispute and/or resolve any Subrogation Claims held by parties to the Allocation Agreement in accordance with the terms of Articles IV and V hereof and the Allocation Agreement, and (iii) object to and/or resolve Non-Party Claims in accordance with the Objection Procedures set forth on **Exhibit B** hereto (the "<u>Non-Party</u>

- 5 -

Objection Procedures"); provided that, if, after following the Non-Party Objection Procedures, the Trustee cannot resolve a disputed Non-Party Claim, the Trustee may resolve such disputed Non-Party Claim with the consent of the Trust Advisory Board. The Trustee is expressly prohibited from engaging in the conduct of, or to further, any trade or business, including employing any persons or entities other than as provided herein. In consultation with the Trust Advisory Board, the Trustee shall acquire insurance covering the actions of the Trustee and Trust Advisory Board.

2.4     Tenure.  The powers and responsibilities of the Trustee shall continue in full force and effect until the Subrogation Trust is terminated in accordance with Section 9.1 hereof. The Trustee will serve until the earlier of (a) the termination of the Subrogation Trust or (b) the Trustee's earlier death, resignation or removal.

2.5     Resignation.  The Trustee may resign by giving not less than ninety (90) days' prior written notice to the Trust Advisory Board, and to the extent permitted by law, without judicial approval. Such resignation shall become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor by the Trust Advisory Board, as provided in Section 2.8(a) hereof, and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date, the Trustee shall be deemed to have resigned. The Trustee shall be deemed to have resigned upon the incapacity of the Trustee, which determination shall be made by, and in the sole discretion of, the Trust Advisory Board.

2.6     Removal.  The Trustee may be removed by the unanimous written consent of the Members with or without Cause (as defined in Section 3.8 hereof) immediately upon notice to the Trustee thereof.

2.7     Effect of Resignation or Removal.   The death, dissolution, bankruptcy, resignation, incompetency, incapacity, or removal of the Trustee, as applicable, shall not operate to terminate the Subrogation Trust created by this Agreement or to revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee or any prior Trustee. In the event of the resignation or removal of the Trustee, such Trustee will promptly (i) execute and deliver such documents, instruments, and other writings as may be reasonably requested by Trust Advisory Board or the successor Trustee (as appointed pursuant to Section 2.8 hereof) to effect the termination of such Trustee's capacity under this Agreement, (ii) deliver to the Trust Advisory Board and/or the successor Trustee (as appointed pursuant to Section 2.8 hereof) all documents, instruments, records, and other writings related to the Subrogation Trust as may be in the possession of such Trustee (provided, however, that such Trustee may retain one copy of such documents for archival purposes or as required by law), and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

2.8     Appointment of Successor Trustee.

(a)     Appointment Procedure.  In the event of the death (in the case of a Trustee that is a natural person), dissolution (in the case of a Trustee that is not a natural person), incompetency, or removal of the Trustee, the Member of the Trust Advisory Board selected in

- 6 -

accordance with Section 5(b)(iii) of the Allocation Agreement shall immediately become the interim Trustee, solely for legal purposes, and whose powers as interim Trustee shall be limited solely to maintaining the legal existence of the Subrogation Trust and who shall stay all actions of the Subrogation Trust, including those in Article IV, V, and VI pending appointment of a successor Trustee. The interim Trustee shall continue to be a Member of the Trust Advisory Board. As soon as practicable thereafter, the Trust Advisory Board by a unanimous vote shall designate a successor Trustee, who, for the avoidance of doubt, may not be a Member of the Trust Advisory Board. In the case of resignation of the Trustee (i) the Trust Advisory Board by a unanimous vote shall appoint a successor Trustee as soon as practicable thereafter, and (ii) if a successor Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of the notice of resignation, the Member of the Trust Advisory Board selected in accordance with Section 5(b)(iii) of the Allocation Agreement shall immediately become the interim Trustee and serve consistent with the limitations set forth in the preceding sentences of this section pending appointment of a successor Trustee.

(b) _Acknowledgment of Successor Trustee_. Every successor Trustee appointed hereunder shall execute, acknowledge, and deliver to the Trust Advisory Board an instrument accepting the appointment under this Agreement and agreeing to be bound as Trustee hereto. Thereupon the successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Trustee. No successor Trustee shall be personally liable for any act or omission of a predecessor Trustee.

2.9 _Confidentiality_. [Notwithstanding anything to the contrary, including any agreement to which the Trustee is a party, the Trustee shall hold strictly confidential and not use for personal gain or for any purpose other than carrying out the duties of the Trustee any non-public information of or pertaining to any Subrogation Trust Beneficiary or their insureds to which any of the Aggregate Subrogation Recovery relates or of which the Trustee has become aware in the Trustee's capacity as Trustee, including, but not limited to, the contents of the Allocation Agreement, except as otherwise required by law, _provided_, that the Trustee may share non-public information with Subrogation Trust Beneficiaries in accordance with the terms of this Agreement. This section shall survive termination of this Agreement and/or the Trustee's removal or resignation.]

2.10 _Investment of Cash_. The Trustee shall have the right and power to invest all or a portion of the Aggregate Subrogation Recovery or any income earned by the Subrogation Trust only in Cash and U.S. Federal Government securities with a term of one year or less, as defined in section 2(a)(16) of the Investment Company Act; _provided_, _however_, that (i) the scope of any such permissible investments shall be further limited to include only those investments that a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 _et seq._, may be permitted to invest in, pursuant to the Treasury Regulations, or any modification in Internal Revenue Service ("IRS") guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (ii) the Trustee, with the consent of the Trust Advisory Board, may expend the assets of the Subrogation Trust (a) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Subrogation Trust, (b) to pay reasonable administrative expenses (including any taxes imposed on the Subrogation Trust), and (c) to satisfy other liabilities incurred or assumed by the Subrogation Trust (or to which the assets are

Case: 19-30088    Doc# 5971-1    Filed: 02/28/20    Entered: 02/28/20 16:02:40    Page 8 of 37

otherwise subject) in accordance with the Plan, Confirmation Order, Allocation Agreement, or this Agreement. For the avoidance of doubt, all income earned with respect to the Aggregate Subrogation Recovery shall be added to the assets in the Subrogation Trust, held as part thereof, and distributed in accordance with the Allocation Agreement including, without limitation, Section 3(b) and footnote 4 thereof.

2.11 <u>Limitations on Power and Authority of the Trustee</u>. Notwithstanding anything in this Agreement to the contrary, the Trustee will not have the authority to do any of the following:

(a) take any action in contravention of the Plan, Confirmation Order, Allocation Agreement, this Agreement, or applicable order of the Bankruptcy Court;

(b) take any action that would make it impossible to carry on the activities of the Subrogation Trust;

(c) possess property of the Subrogation Trust or assign the Subrogation Trust's rights in specific property for any purpose other than as provided herein;

(d) cause or permit the Subrogation Trust to engage in any trade or business or employ any persons or entities other than as provided herein;

(e) receive transfers of any listed stocks or securities or any readily marketable assets or any operating assets of a going business, other than Non-cash Recovery provided for under the Plan, or as is otherwise necessary or required under the Plan, the Confirmation Order, or this Agreement; <u>provided</u>, <u>however</u>, that in no event shall the Trustee receive any such investment that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 <em>et seq.</em>, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law);

(f) exercise investment power beyond what is provided in Section 2.10 hereof;

(g) receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets, except as is necessary or required under the Plan, the Confirmation Order, or this Agreement; <u>provided</u>, <u>however</u>, that in no event shall the Trustee receive or retain any such asset or interest that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 <em>et seq.</em>, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law);

(h) take any other action or engage in any investments or activities that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 <em>et seq.</em>, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law); or

- 8 -

(i)     assign or delegate any of the Trustee's rights or obligations to any third party except as expressly provided herein.

## ARTICLE III
## SUBROGATION TRUST ADVISORY BOARD

3.1     Appointment of Trust Advisory Board.  The Trust Advisory Board shall consist of three (3) members initially appointed in accordance with the Allocation Agreement.  The initial Members of the Trust Advisory Board are [_____], [_____], and [_____].  Each Member, to the extent that it is an institution may, from time to time, designate an employee or other designee as its representative (each an "Alternate Representative") to attend meetings and participate in activities of the Trust Advisory Board.  Such designation may be revoked at any time by the designating Member.  The Alternate Representative shall not be entitled to compensation except as provided in Section 3.2 hereof.  In the event an Alternate Representative ceases to be employed by a Member (or ceases to act as its legal counsel), the Member shall designate a replacement Alternate Representative.

3.2     Trust Advisory Board Compensation and Reimbursement.  Starting on the Effective Date, the Members of the Trust Advisory Board appointed in accordance with Section 5(b)(i) and (ii) of the Allocation Agreement shall be compensated $[____] per month for their services, and the Member of the Trust Advisory Board appointed in accordance with Section 5(b)(iii) of the Allocation Agreement shall be compensated $[___] per month for his or her services.  Members of the Trust Advisory Board and any Alternate Representative shall be reimbursed for their reasonable and necessary expenses incurred in performance of obligations under this Agreement.  Members shall be compensated for their services on the first business day of every month, beginning with the first business day of the month following the Effective Date.  Compensation and reimbursement under this Section 3.2 will be paid from the Expense Reserve.

3.3     Responsibilities.  The Trust Advisory Board shall monitor, consult with and advise the Trustee as to the administration and management of the Subrogation Trust in accordance with the Plan, the Confirmation Order, the Allocation Agreement and this Agreement.

3.4     Authority.  The Trust Advisory Board shall have the authority to perform its duties and obligations hereunder and to reasonably require the Trustee to provide information to the Trust Advisory Board.  The Trust Advisory Board shall have the authority to remove the Trustee in accordance with Section 2.6 hereof.

3.5     Meetings of the Trust Advisory Board.

(a)     Timing.  Meetings of the Trust Advisory Board are to be held not less often than quarterly.  Special meetings of the Trust Advisory Board may be held whenever and wherever called for by the Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing to each Member and the Trustee no less than 48 hours prior to such meeting (such notice being subject to waiver by the Members), and attendance at a special meeting shall constitute waiver of such notice.  The Trust Advisory Board shall keep minutes of each meeting.  Unless the Trust Advisory Board decides otherwise, the Trustee and

Case: 19-30088   Doc# 5971-1   Filed: 02/28/20   Entered: 02/28/20 16:02:40   Page 10 of 37

the Trustee's advisors may, but are not required to, attend meetings of the Trust Advisory Board, provided, however, the Trust Advisory Board may, at its discretion, meet without the Trustee or the Trustee's advisors.

(b)     Actions.  All meetings of the Trust Advisory Board shall consist of all Members.  Unless otherwise provided for in this Agreement, the majority vote of the Members at a duly called meeting at which all Members are present throughout shall be an act of the Trust Advisory Board.  The Trust Advisory Board may take action without a meeting by unanimous written consent as evidenced by one or more writings (including electronic mail) describing the action agreed to by all Members.  Notwithstanding the foregoing, if (a) a Member of the Trust Advisory Board, or any Alternate Representative of such Member, fails to attend three (3) consecutive, duly noticed meetings, including special meetings, of the Trust Advisory Board, and (b) if such Member, or any Alternate Representative for such Member, fails to attend the next duly noticed meeting, including special meetings, of the Trust Advisory Board, then, (x) the attendance of two (2) Members of the Trust Advisory Board or their Alternate Representatives at such next duly notice meeting (or special meeting) shall be deemed a proper meeting of the Trust Advisory Board in all respects (the "Two-Member Meeting"), and (y) the vote of two (2) Members of the Trust Advisory Board or their Alternate Representatives at the Two-Member Meeting shall be deemed the unanimous consent of the Trust Advisory Board in all respects at the Two-Member Meeting.  Thereafter, all meetings of the Trust Advisory Board shall consist of all Members or their Alternate Representatives, provided, that, if any Member of the Trust Advisory Board or their Alternate Representative subsequently fails to attend three (3) consecutive, duly noticed meetings, including special meetings, of the Trust Advisory Board, the preceding provisions with respect to a Two-Member Meeting shall apply.

(c)     Form of Participation.  Any or all of the Members may participate in a meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof.  Any Member participating in a meeting by these means is deemed to be present in person at the meeting.

3.6     Tenure.  The authority of the Members continues in full force and effect until the Subrogation Trust is terminated in accordance with Section 9.1 hereof.  Each Member will serve until the earlier of (a) the termination of the Subrogation Trust or (b) such Member's earlier death, resignation or removal.

3.7     Resignation.  A Member may resign by giving not less than ninety (90) days' prior written notice thereof to the Trustee and the other Members, and to the extent permitted by law, without judicial approval, provided, that, the non-resigning Members may waive the ninety (90) days' notice.  Such resignation shall become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 3.9 hereof.

3.8     Removal.  Two Members of the Trust Advisory Board may remove the other Member for Cause immediately upon notice thereof.  "Cause" shall mean (i) a Person's willful

- 10 -

failure to perform his material duties hereunder (including with respect to a Member, failing to regularly attend meetings of the Trust Advisory Board; it being understood that missing three (3) meetings in a row shall be deemed to constitute Cause) that is not remedied within fifteen (15) days' notice, if curable, (ii) a Person's commission of an act of fraud, theft, or embezzlement (iii) a Person's conviction of a felony (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his duties hereunder, or (v) incapacity due to illness or other circumstances.

3.9     Appointment of a Successor Member.  In the event of a vacancy on the Trust Advisory Board for any reason including, without limitation, resignation or removal of a Member, the vacant seat on the Trust Advisory Board shall be filled according to the method initially used to appoint such Member as provided in section 5(b) of the Allocation Agreement. The appointment of a successor Member will be evidenced in the reports provided by the Trustee to Subrogation Trust Beneficiaries pursuant to Section 1.1(d) hereof.  Immediately upon the appointment of any successor Member, all rights, powers, duties, authority, and privileges of the predecessor Member hereunder will be vested in and undertaken by the successor Member without any further act, and such successor Member will not be liable personally for any act or omission of the predecessor Member.  Every successor Member appointed hereunder shall execute, acknowledge and deliver to the Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound hereto.

3.10    [Confidentiality.  Notwithstanding anything to the contrary, including any agreement to which a Member is a party, each Member shall hold strictly confidential and not use for personal gain any non-public information of or pertaining to any Subrogation Trust Beneficiary or their insureds to which any of the Aggregate Subrogation Recovery relates or of which the Member has become aware in its capacity as a Member, including, but not limited to, the contents of the Allocation Agreement, except as otherwise required by law, provided, that each Member may share non-public information with Subrogation Trust Beneficiaries.  This section shall survive termination of this Agreement and/or the Member's removal or resignation.]

3.11    Common Legal Interest.  The Trustee and the Trust Advisory Board have a "common legal interest" relating to the Subrogation Claims, the Subrogation Trust, the Plan, Confirmation Order, Allocation Agreement and this Agreement (other than Section 2.6 and Section 2.7 hereof), including without limitation, (i) the formation of the Subrogation Trust, (ii) the retention and direction of professional advisors, (iii) the administration of the Subrogation Trust, (iv) making Distributions in accordance with this Agreement and the Allocation Agreement, (v) disputing and/or resolving any Subrogation Claims held by parties to the Allocation Agreement in accordance with the terms of Articles IV and V hereof, and (vi) objecting to and/or resolving any Non-Party Claims in accordance with the Non-Party Objection Procedures or as otherwise provided herein (the "Common Legal Interest Matters").  Any discussion, evaluation, or other communications and exchanges of information relating to the Common Legal Interest Matters shall at all times remain subject to all applicable privileges, immunities and protections from disclosure, including without limitation, the attorney-client privilege, work-product doctrine and common legal interest privilege.  It is the express intent of the Trustee and the Trust Advisory Board to preserve intact to the fullest extent applicable, and

Case: 19-30088    Doc# 5971-1    Filed: 02/28/20    Entered: 02/28/20 16:02:40    Page 12 of 37

not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all privileges, protections and immunities.

## ARTICLE IV
## REPORTING, REVIEW, VERIFICATION AND TRANSFERS OF PAID CLAIMS

4.1    Beneficiary Reporting Requirements.

(a)    General Reporting Requirement.  The Trustee and Trust Advisory Board understand and acknowledge that Subrogation Trust Beneficiaries shall provide updated information to the Trustee regarding Paid Claims and Subrogation Claims reserved for but not paid ("Reserved Claims") in accordance with the terms of the Allocation Agreement and using a form substantially similar to the form attached hereto as **Exhibit C** (along with any attachments thereto, "Distribution Request").  In developing or modifying its procedures for submitting Subrogation Claims for payment, the Trustee shall evaluate whether the Subrogation Trust can provide claimants with the opportunity to utilize currently available technology, including filing claims and supporting documentation through web-based systems, the internet and/or electronic media.  The form of the Distribution Request may be changed and the foregoing alternative procedures for electronic claims submission may be adopted by the Subrogation Trust with the consent of the Trust Advisory Board.

(b)    Timing.  The deadlines by which Subrogation Trust Beneficiaries shall provide updated information to the Trustee regarding Paid Claims and Reserved Claims (each a "Reporting Deadline") is set forth in Section 2 of the Allocation Agreement.  The Trustee shall only make Distributions on account of Distribution Requests that are timely filed on or before each Reporting Deadline, in the manner set forth in the Allocation Agreement and according to the procedures set forth in **Exhibit D** hereto ("Subrogation Claims Review Protocol").

4.2    Review and Verification by Trustee.

(a)    Establishment of Wildfire Parameters.  Prior to the Effective Date, Berger Kahn ALC ("Berger Kahn"), in consultation with the steering committee of the Ad Hoc Subrogation Group established parameters regarding (i) affected areas for the Wildfires (each such area, an "Affected Zone"), and (ii) a range of dates within which the Subrogation Claims associated with such Wildfire are presumed to have been incurred (each, a "Date of Loss Range").  The final Affected Zones and Date of Loss Ranges are attached hereto as **Exhibit E**.

(b)    Retention of Claims Review Professionals.  As soon as practicable after the Effective Date, the Subrogation Trust shall retain Berger Kahn ALC, the law firms comprising the Subrogation Review Committee (as defined in the Subrogation Claims Review Protocol), and [X] as the Third Party Reviewer, (collectively, the "Claims Review Professionals"), for the roles set forth in the Subrogation Claims Review Protocol.  The Subrogation Trust shall retain the Claims Review Professionals pursuant to engagement letters acceptable to the Trust Advisory Board which shall provide that the applicable Claims Review Professionals agrees to be bound by the applicable terms of this Agreement (including the Subrogation Claims Review Protocol).

- 12 -

(c)     Review and Verification Process.   The Subrogation Trust shall review Distribution Requests as set forth in the Subrogation Claims Review Protocol.  The Trustee may, with the consent of the Trust Advisory Board, adopt claims processing instructions or other materials to guide individual reviewers at any level of the review process in order to ensure compliance with the Subrogation Claims Review Protocol.

(d)     Subrogation Claims Review Reports.  Promptly following each level of review set forth in the Subrogation Claims Review Protocol, the Trustee shall notify each Subrogation Trust Beneficiary as to the results of such review level.

(e)     Distribution Notices to Subrogation Trust Beneficiaries.  In advance of each quarterly Distribution, the Trustee shall send a notice to each applicable Subrogation Trust Beneficiary detailing the amount such Subrogation Trust Beneficiary will be paid on the subsequent distribution date in accordance with the Allocation Agreement (a "Distribution Notice").  The Distribution Notice shall set forth the calculation of the subsequent Distribution to be made to the Subrogation Trust Beneficiary, including the then in effect Implied Recovery Percentage and Adjustment Percentage (as calculated in accordance with Section 3(b) of the Allocation Agreement) and information necessary to show the Trustee's calculation of the Implied Recovery Percentage and Adjustment Percentage.  Disputed Subrogation Claims (or portions thereof) identified in a Distribution Notice following a Level Four Review shall be referred to herein as a "Disputed Claim."

4.3     Replacement of Claims Review Professionals.  At any time during the term of this Agreement, (a) the Trustee, with the unanimous consent of the Trust Advisory Board, or the Trust Advisory Board (acting unanimously), may immediately terminate the services of any Claims Review Professional, and (b) if the services of any Claims Review Professional are terminated, the Trustee shall retain a different firm to perform such duties in a substantially similar manner with the unanimous consent of the Trust Advisory Board.

4.4     Transfers of Paid Claims

(a)     Subject to the terms and conditions of this section 4.4, Subrogation Trust Beneficiaries shall be entitled to sell, assign, transfer, hypothecate, convey, or otherwise dispose, directly or indirectly any interest in Paid Claims in whole or in part (each, a "Transfer").  The Trustee shall work with the Subrogation Trust Beneficiaries to effectuate any Transfer and to ensure the correct Distributions are paid upon any transferred Paid Claim and shall provide cooperation to facilitate the Transfer.

(b)     Notwithstanding anything to the contrary herein, no Paid Claims may be transferred to any Person unless:  (i) such Person (x) is either a party to the Allocation Agreement, or (y) executes and delivers a joinder to the Allocation Agreement to the Trustee prior to the Transfer, (ii) such Person is either (x) already a Subrogation Trust Beneficiary prior to such Transfer or (y) an "accredited investor" as such term is defined under Regulation D of the Securities Act; (iii) the transferee is acquiring the Paid Claims for its own account and constitutes one person for purposes of Section 12(g)(1)(A) of the Exchange Act; (iv) the aggregate amount of Paid Claims transferred is not less than the lesser of $10,000,000.00 and

- 13 -

100% of the Paid Claims owned by such transferor; and (v) the Transfer is done in compliance with all applicable laws, and after giving effect to such Transfer, the Subrogation Trust would not be subject to the reporting requirements of Section 12(g) of the Exchange Act or any successor rule thereto.

(c)     In the event of any Transfer, the transferee and transferor will provide to the Subrogation Trust (i) prior notice, including the specific Subrogation Claims to which the Transfer relates and (ii) such representations, certifications, and information as reasonably requested by the Subrogation Trust to confirm that such Transfer is in compliance with this Agreement.

(d)     Any purported Transfer in violation of the terms of this Agreement shall be void *ab initio*.

**ARTICLE V**
**CLAIM DISPUTES**

5.1     <u>Claim Disputes</u>.

(a)     <u>Disputed Claims</u>.     In accordance with the Allocation Agreement, a Subrogation Trust Beneficiary that believes one or more of its submitted Subrogation Claims (or any portions thereof) was identified as a Disputed Claim in error shall notify the Trustee (an "<u>Appeal Notice</u>") within ten (10) business days after receipt of the applicable Distribution Notice (the "<u>Appeal Period</u>").  An Appeal Notice shall constitute a duly submitted Appeal Notice if it (i) identifies the Disputed Claim in reasonable detail, and (ii) states that the Subrogation Trust Beneficiary disputes the calculation of the Disputed Claim.  If a Subrogation Trust Beneficiary does not respond to a Distribution Notice by the end of the Appeal Period, the claim amounts set forth by the Trustee in such Distribution Notice shall be binding on the Subrogation Trust Beneficiary.  If a Subrogation Trust Beneficiary timely submits an Appeal Notice, the Trustee shall reserve for any Disputed Claim identified on such Appeal Notice pending resolution of the dispute in accordance with this Article V ("<u>Claim Dispute</u>") by treating the disputed portion of such claim as a Reserved Claim for all purposes with respect to the Allocation Agreement. Following receipt of an Appeal Notice, the Trustee and the applicable Subrogation Trust Beneficiary shall attempt in good faith to consensually resolve the Claim Dispute.

(b)     <u>Mediation</u>.  If the Trustee, with the consent of the Trust Advisory Board, and the applicable Subrogation Trust Beneficiary, cannot consensually resolve the Claim Dispute, the applicable Subrogation Trust Beneficiary may request formal mediation, provided at least ten (10) business days have passed since the Trustee's receipt of the Appeal Notice, and the Trustee and the applicable Subrogation Trust Beneficiary shall attempt in good faith to promptly resolve the Claim Dispute through mediation.  The mediation shall take place at the offices of counsel to the Trustee unless otherwise agreed to by the parties to such Claim Dispute and the mediator shall be mutually agreed upon by the Trustee and the applicable Subrogation Trust Beneficiary, <u>provided</u>, <u>that</u>, if the parties cannot mutually agree on a mediator, the Trust Advisory Board shall select one.  Each party shall bear its own costs with respect to the mediation, and the cost of the mediator shall be split evenly between the parties.  Except as

- 14 -

explicitly set forth herein, the mediation shall be administered pursuant to the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association. If the Trustee and the applicable Subrogation Trust Beneficiary have not consensually resolved the Claim Dispute and the applicable Subrogation Trust Beneficiary has not requested formal mediation within [sixty (60)] days of the Trustee's receipt of the Appeal Notice, the claim amounts set forth by the Trustee in the applicable Distribution Notice shall be binding on the Subrogation Trust Beneficiary and shall be deemed to resolve any Disputed Claims that were the subject of the Appeal Notice for the purposes of making Distributions hereunder.

(c)     <u>Litigation</u>.    Only if the Trustee and the applicable Subrogation Trust Beneficiary cannot resolve the Claim Dispute through formal mediation within forty-five (45) days after the appointment of the mediator, the Subrogation Trust Beneficiary shall have the right to move in the Bankruptcy Court to have the Disputed Claim treated as a Paid Claim for all purposes hereunder and under the Allocation Agreement. If such Subrogation Trust Beneficiary has not filed a motion with the Bankruptcy Court within the earlier of (i) ninety (90) days after appointment of a mediator, and (ii) thirty (30) days after mediation concludes with no resolution of the Claim Dispute, the claim amounts set forth by the Trustee in the applicable Distribution Notice shall be binding on such Subrogation Trust Beneficiary and shall be deemed to resolve any Disputed Claims that were the subject of the Appeal Notice for the purposes of making Distributions hereunder. The Trustee shall have the right to object to such motion or to such Subrogation Trust Beneficiary's claim in the Bankruptcy Court (solely on the basis of a determination regarding the verification of its status as a Paid Claim in accordance with the terms of this Allocation Agreement), and such Claim Dispute shall be resolved by entry of a final order of the Bankruptcy Court unless the applicable Subrogation Trust Beneficiary and the Trustee (with the consent of the Trust Advisory Board) consensually resolve such Claim Dispute prior to the Bankruptcy Court's determination and the finality of its order. Any litigation pursuant to this Section 5.1(c) shall be governed by Section 17(b) and 17(c) of the Allocation Agreement, unless the applicable Party and the Trustee (with the consent of the Trust Advisory Board) consensually resolve such Claim Dispute.

(d)     <u>Miscellaneous</u>.    The Trustee may consult with any Claims Review Professionals regarding any Disputed Claim at any time during the applicable Claim Dispute. The procedures set forth in this Article V shall apply only to Subrogation Trust Beneficiaries party to the Allocation Agreement, and the Trustee shall have the right to object in the Bankruptcy Court to Non-Party Claims in accordance with the Non-Party Objection Procedures.

- 15 -

**ARTICLE VI**
**DISTRIBUTIONS**

6.1     Distributions Only on Account of Paid Claims.  Notwithstanding anything to the contrary herein the Trustee shall only make distributions ("Distributions") (a) with respect to Subrogation Claims asserted by parties to the Allocation Agreement, in accordance with this Agreement and the Allocation Agreement or (b) with respect to Non-Party Claims in accordance with the Non-Party Objection Procedures or as otherwise provided herein.

6.2     Non-Cash Recovery.

(a)     Subrogation Trust Beneficiary Election.  In the event the Plan is amended to accommodate an individual Subrogation Trust Beneficiary's election to have all or a portion of its Initial Distribution (defined below) paid in a Non-cash Recovery (as defined in the Plan), the Trustee shall work with the Debtors, and take such reasonable steps necessary, to effect the distribution of such Non-cash Recovery to such Subrogation Trust Beneficiary in connection with the Initial Distribution.  A Subrogation Trust Beneficiary who elects to receive a Non-cash Recovery in connection with the Initial Distribution shall receive all other Distributions from the Subrogation Trust in the form of cash.

(b)     Value of Non-Cash Recovery.  The Trustee shall value all Non-cash Recovery, as of the Effective Date pursuant to the valuation metrics set forth in the Plan, or if no such value is set forth in the Plan, as otherwise ordered by the Bankruptcy Court.

6.3     Payment of Distributions

(a)     Dates of Distributions.  The Trustee shall make Distributions to Subrogation Trust Beneficiaries who are parties to the Allocation Agreement on account of Verified Paid Claims as set forth in the Allocation Agreement and the Subrogation Claims Review Protocol.  The initial Distribution made by the Trustee under the Allocation Agreement shall be referred to herein as the "Initial Distribution."  The final Distribution made by the Trustee under the Allocation Agreement shall be referred to herein as the "Final Distribution."

(b)     Distribution Formula.  Notwithstanding anything herein to the contrary, the Trustee shall calculate the amount to be distributed in each Distribution to each Subrogation Trust Beneficiary party to the Allocation Agreement in accordance with the Allocation Agreement and the Subrogation Claims Review Protocol.

(c)     Holdback Amount.  The Trustee shall hold back from each Distribution on Paid Claims, other than the Final Distribution, only those amounts required by the Allocation Agreement (the "Holdback Amount").

(d)     Distribution Agent.  The Trustee, with the consent of the Trust Advisory Board, shall have the authority to enter into agreements with one or more entities to make or facilitate Distributions required by the Plan, Confirmation Order, Allocation Agreement and this Agreement (the "Distribution Agent").  The Trustee shall pay to the Distribution Agent all

- 16 -

reasonable and documented fees and expenses of the Distribution Agent in accordance with Section 1.2 hereof.

(e) <u>Destination of Payments</u>. The Trustee shall make Distributions either: (i) directly to each Subrogation Trust Beneficiary (or its designee) in accordance with the wire transfer instructions included on such Subrogation Trust Beneficiary's most recently submitted Distribution Request or (ii) to the Distribution Agent for further Distribution to Subrogation Trust Beneficiaries.

(f) <u>Payments Returned as Undeliverable</u>. In the event that any Distribution to any Subrogation Trust Beneficiary is returned as undeliverable, the Trustee shall not make a subsequent Distribution to such Subrogation Trust Beneficiary unless and until the Trustee has made reasonable efforts to determine the then-current address of such Subrogation Trust Beneficiary, at which time such Distribution shall be made to such Subrogation Trust Beneficiary without interest if such address can be identified; <u>provided</u>, <u>however</u>, that, if such address cannot be identified after reasonable efforts, an undeliverable Distribution shall be deemed unclaimed property at the expiration of one year after date of the attempted undeliverable payment (an "<u>Initial Undeliverable Distribution</u>") and such Subrogation Trust Beneficiary (the "<u>Undeliverable Subrogation Trust Beneficiary</u>") shall be deemed to forever relinquish the Initial Undeliverable Distribution, and any subsequent future Distributions to which such Subrogation Trust Beneficiary would otherwise be entitled (collectively, the "<u>Undeliverable Distributions</u>"). After such date, all Undeliverable Distributions shall be returned to the Aggregate Subrogation Recovery and distributed in accordance with the Allocation Agreement to other Subrogation Trust Beneficiaries (but, for the avoidance of doubt, an Undeliverable Subrogation Trust Beneficiary shall not receive the Final Distribution).

(g) <u>De Minimis Distributions</u>. Notwithstanding anything herein to the contrary, the Trustee shall not be required to make on account of a Paid Claim (i) payments of fractions of dollars, or (ii) a Distribution if the amount to be distributed is or has an economic value of less than $100.00. Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions. Unless otherwise provided for in this Agreement, all funds in the Subrogation Recovery Reserve (as defined in the Allocation Agreement) shall be distributed in the Final Distribution.

(h) <u>Distributions Less than Zero</u>. The Trustee shall not make any Distributions less than or equal to $0.

6.4 <u>Treatment of Non-Parties to the Allocation Agreement</u>

(a) <u>Objections</u>. Pursuant to Section 1.54 of the Plan, Non-Party Claims shall be Disputed (as defined in the Plan) as of the Effective Date. The Trustee shall be responsible for litigating and otherwise resolving all Non-Party Claims in accordance with the Non-Party Objection Procedures.

(b) <u>Reserves for Non-Parties</u>. The Trustee shall reserve funds in the Subrogation Recovery Reserve (as defined in the Allocation Agreement) for Non-Party Claims either (i) in an amount agreed upon by the holder of such Non-Party Claims and the Trustee (in

- 17 -

consultation with the Trust Advisory Board) or (ii) if such amount cannot be agreed upon in accordance with subsection (i), in such amount as the Bankruptcy Court estimates is sufficient to reserve for Distributions on account of such Non-Party Claims. Such reserves shall remain in the Subrogation Recovery Reserve until such Non-Party Claims are resolved in accordance with the Non-Party Objection Procedures.

        (c)    Distributions to Non-Parties. In the event (i) the Bankruptcy Court enters a final order pursuant to which a Non-Party Claim is resolved and all or part of such Non-Party Claim becomes Allowed (as defined in the Plan) or (ii) the Trustee and holder of such Non-Party Claims resolve the Non-Party Claims in accordance with the Non-Party Objection Procedures, then the Trustee shall make a Distribution to such holder in accordance with the Bankruptcy Court's order or terms of the consensual resolution. Any excess reserves held by the Trustee on account of such Non-Party Claims shall be available for future Distributions pursuant to this Agreement and the Allocation Agreement. For the avoidance of doubt, the Trustee shall not make a Distribution to any holder of a Non-Party Claim if such Non-Party Claim is Disputed and/or subject to an unresolved objection filed by the Trustee in the Bankruptcy Court.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

        7.1    No Further Liability. Each of the Trustee, the Members, and any Alternate Representative, and their respective representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Subrogation Trust to the extent permissible under New York law. In no event shall the Trustee, the Trust Advisory Board, any Member, or any Alternate Representative be liable for indirect, punitive, special, incidental, or consequential damages or loss (including but not limited to lost profits) whatsoever, provided, however, that the provisions of this section shall not apply to the Trustee, the Members, any Alternate Representative and their respective representatives, to the extent any such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from the fraud, gross negligence, or willful misconduct of such party. In performing its duties under this Agreement, the Trustee, the Members, any Alternate Representative and their respective representatives (as applicable) shall have no liability for any action taken by each such Person in accordance with the advice of counsel, accountants, appraisers, and/or other professionals retained by the Members, the Trustee, or their respective representatives, provided that such professionals have been selected with reasonable care. Without limiting the generality of the foregoing, the Trustee, the Members, any Alternate Representative, and their respective representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon. Except as otherwise provided herein, none of the provisions of this Agreement shall require the Trustee, the Members, any Alternate Representative, or their respective representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Trustee, the Members, any Alternate Representative, and their respective representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan or the Confirmation Order that such Person reasonably believes to be genuine and to have been properly given. Any action taken or

- 18 -

omitted to be taken in the case of the Trustee or the Trust Advisory Board with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of fiduciary duty, or gross negligence. No termination of this Agreement or amendment, modification, or repeal of this Section 7.1 shall adversely affect any right or protection of the Trustee, the Members of the Trust Advisory Board, any Alternate Representative, or their respective designees, professional agents, or representatives that exist at the time of such amendment, modification, or repeal.

      7.2    <u>Indemnification of the Trustee and Trust Advisory Board</u>.

      (a)    <u>Scope of Indemnification</u>. Each of the Trustee, the Subrogation Trust, the Trust Advisory Board, any Alternate Representative, and each of their respective professionals and representatives (each, a "<u>Subrogation Trust Indemnified Party</u>" and collectively, the "<u>Subrogation Trust Indemnified Parties</u>") shall be, and hereby is, indemnified and held harmless by the Subrogation Trust, to the fullest extent permitted by applicable law, from and against any and all Claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Subrogation Trust Indemnified Party's exercise of what such Subrogation Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Subrogation Trust Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order, the Allocation Agreement, or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except as prohibited by New York law), <u>provided</u>, <u>however</u>, that the indemnification provided in this Section to any Subrogation Trust Indemnified Party shall not apply to any such loss to the extent such loss is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from the fraud, gross negligence, or willful misconduct of such Subrogation Trust Indemnified Party. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement, (ii) the services to be rendered pursuant to this Agreement, or (iii) any document or information, whether oral or written, referred to herein or supplied to the Trustee. To the extent reasonable, pursuant to the foregoing indemnification provision, the Trustee shall pay in advance or reimburse reasonable and documented out-of-pocket expenses (including advancing reasonable costs of defense) incurred by the Subrogation Trust Indemnified Party who is or is threatened to be named or made a defendant or a respondent in a proceeding concerning the business and affairs of the Subrogation Trust, solely out of the Expense Reserve; <u>provided</u>, <u>however</u>, that any Subrogation Trust Indemnified Party receiving any such advance shall execute a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by final order, that such Subrogation Trust Indemnified Party is not entitled to indemnification hereunder. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Subrogation Trust's expense, subject to the foregoing terms and conditions. In addition, the Trustee shall purchase, using funds from the Expense Reserve for the benefit of the Trustee and the Members, insurance coverage, including, without limitation, liability insurance covering the Trustee and the Members and any errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses the Trustee or the Members may incur, including, but not limited to, attorneys' fees, arising out of or due to its actions or omissions, or

- 19 -

consequences of such actions or omissions with respect to the implementation and administration of the Plan or this Agreement. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation, or removal, as may be applicable, of the Trustee, the Trust Advisory Board, any Member, or any other Subrogation Trust Indemnified Party and shall inure to the benefit of the Trustee's, each Member's, and each other Subrogation Trust Indemnified Party's respective heirs, successors, and assigns.

(b) <u>Term of Indemnification</u>. The foregoing indemnity in respect of any Subrogation Trust Indemnified Party shall survive the termination of such Subrogation Trust Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not affect any indemnification rights or obligations set forth herein.

(c) <u>Waiver of Indemnification Rights</u>. Any Subrogation Trust Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Subrogation Trust Indemnified Party and delivered to the Trustee.

(d) <u>Indemnification Rights Not Exclusive</u>. The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Subrogation Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

(e) <u>Indemnitor of First Resort</u>. The Subrogation Trust shall be the indemnitor of first resort for the Subrogation Trust Indemnified Parties (*i.e.*, the indemnification obligations of the Subrogation Trust to any Subrogation Trust Indemnified Party are primary and any obligation of any third-party to provide advancement or indemnification for the same indemnified expenses and liabilities (including all interest, assessment and other charges paid or payable in connection with or in respect of such indemnified expenses and liabilities) incurred by such Subrogation Trust Indemnified Party indemnitee, are secondary). If any third-party pays or causes to be paid on behalf of a Subrogation Trust Indemnified Party, for any reason, any amounts otherwise indemnifiable by the Subrogation Trust, then (i) such third-party shall be fully subrogated to all rights of the applicable Subrogation Trust Indemnified Party to indemnification hereunder with respect to such payment, and (ii) the Subrogation Trust shall reimburse such third-party for the payments actually made.

7.3 <u>Subrogation Trust Liabilities</u>. All liabilities of the Subrogation Trust, including indemnity obligations under Section 7.2 of this Agreement, will be liabilities of the Subrogation Trust as an entity and will be paid or satisfied solely from the Expense Reserve. No liability of the Subrogation Trust will be payable in whole or in part by any Subrogation Trust Beneficiary individually or in the Subrogation Trust Beneficiary's capacity as a Subrogation Trust Beneficiary, by the Trustee individually or in the Trustee's capacity as Trustee, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner,

- 20 -

shareholder, director, officer, professional, employees, agent, affiliate, or advisor of any Subrogation Trust Beneficiary, any Member, the Trustee, or their respective affiliates.

7.4    Limitation of Liability.  None of the Subrogation Trust Indemnified Parties shall be liable for indirect, punitive, exemplary, consequential, special, or other damages for a breach of this Agreement under any circumstances.

7.5    Burden of Proof.  In making a determination with respect to entitlement to indemnification hereunder, the court, Person, or entity making such determination shall presume that any Subrogation Trust Indemnified Party is entitled to indemnification under this Agreement and any Person or entity seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    Transfer of Aggregate Subrogation Recovery.  The transfer of the Aggregate Subrogation Recovery to the Subrogation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code.  Pursuant to Section 6.19 of the Plan, the transfer of any equity interest as a component of the Aggregate Subrogation Recovery to the Subrogation Trust shall be exempt from registration requirements under applicable securities laws under Section 1145 of the Bankruptcy Code.

8.2    Tax Reporting.

(a)    The "taxable year" of the Subrogation Trust shall be the "calendar year" as such terms are defined in section 441 of the U.S. Internal Revenue Code of 1986, as amended ("IRC").  The Subrogation Trust shall use the accrual method of accounting as defined in IRC section 446(c).

(b)    The Trustee, acting for this purpose as the administrator (as defined in Treasury Regulations section 1.468B-2(k)) shall (i) obtain an employer identification number for the Subrogation Trust, and (ii) prepare and file, or cause to be prepared and filed, U.S. federal, state, local and foreign tax returns (as applicable) for the Subrogation Trust, consistent with Treasury Regulations section 1.468B-2(k) and corresponding or similar provisions of state and local law, and in accordance with this Section 8.2 and Article 6 of the Plan.

(c)    The Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Subrogation Trust that is required by any governmental unit, including but not limited to information reporting as described in Treasury Regulations section 1.468B-2(l) (or corresponding or similar provisions of state, local, or foreign law).

(d)    The Trustee shall obtain from the Debtors a statement required pursuant to Treasury Regulations section 1.468B-3(e) no later than February 15th of the year following each calendar year in which Debtors make a transfer to the Subrogation Trust.

- 21 -

(e)    The Trustee shall be responsible for payment, out of the Aggregate Subrogation Recovery, of any taxes imposed on the Subrogation Trust or the Aggregate Subrogation Recovery.

8.3    Withholding of Taxes.  The Trustee shall withhold and pay to the appropriate tax or governmental authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or Distribution to the Subrogation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Subrogation Trust Beneficiaries for all purposes of this Agreement.  The Trustee shall be authorized to collect such tax information from the Subrogation Trust Beneficiaries (including social security numbers or other tax identification numbers of such Subrogation Trust Beneficiary) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and this Agreement.  In order to receive Distributions under the Plan, all Subrogation Trust Beneficiaries will need to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate, including a taxpayer identification number ("TIN") as assigned by the IRS or, in the case of Subrogation Trust Beneficiaries that are not United States persons for federal income tax purposes, a properly completed applicable IRS Form W-8 (with required attachments, if any).  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  The Trustee may refuse to make a Distribution to any Subrogation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; provided, however, that, upon the delivery of such information by a Subrogation Trust Beneficiary, the Trustee shall make such Distribution to which the Subrogation Trust Beneficiary is entitled, without interest.

8.4    Expedited Determination of Taxes.  The Trustee may request an expedited determination of taxes of the Subrogation Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Subrogation Trust for all taxable periods through the termination of the Subrogation Trust.

8.5    Foreign Tax Matters.  The Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Trustee or the Subrogation Trust under non-United States law relating to taxes.

8.6    Qualified Settlement Fund.  The Parties, Subrogation Trust, and Subrogation Trust Beneficiaries intend that the Subrogation Trust be classified as a "qualified settlement fund" under Treasury Regulations section 1.468B-1 et seq. (and corresponding or similar provisions of state, local, or foreign law, as applicable), and the Trustee may take any action that it determines is necessary to maintain the Subrogation Trust's status as such; provided, however, that the Debtors may elect to treat the Subrogation Trust as a "grantor trust" for U.S. federal income tax purposes, in which case the Parties, Subrogation Trust, and Subrogation Trust Beneficiaries shall be bound by such election notwithstanding anything in this Agreement to the contrary and, to the extent permitted under applicable law, the Subrogation Trust shall be treated consistently for state and local tax purposes.

- 22 -

## ARTICLE IX
## TERMINATION OF SUBROGATION TRUST

9.1     <u>Termination</u>.  The Trust Advisory Board and the Subrogation Trust shall be dissolved at such time as all of the Aggregate Subrogation Recovery including any investment income earned thereon, has been distributed pursuant to the Plan, Confirmation Order, Allocation Agreement, and this Agreement.  If at any time the Trustee determines, in consultation with the Trust Advisory Board and in reliance upon the recommendation of such professionals as the Trustee or Trust Advisory Board may retain, that the expense of administering the Subrogation Trust so as to make a Final Distribution to the Subrogation Trust Beneficiaries is likely to exceed the value of the assets remaining in the Subrogation Trust, the Trustee, with the unanimous consent of the Trust Advisory Board, may (i) reserve any amount necessary to dissolve the Subrogation Trust, (ii) donate any balance to a charitable organization (a) described in section 501(c)(3) of the IRC, (b) exempt from U.S. federal income tax under section 501(a) of the IRC, (c) not a "private foundation," as defined in section 509(a) of the IRC, and (d) that is unrelated to the Debtors, the Subrogation Trust, the Trustee and any insider of the Trustee, and the Members of the Trust Advisory Board, and (iii) dissolve the Subrogation Trust. Such date upon which the Subrogation Trust shall finally be dissolved shall be referred to herein as the "<u>Termination Date</u>."  The Aggregate Subrogation Recovery including any investment income earned thereon shall be distributed in accordance with the Allocation Agreement on or before the Termination Date.  In no event shall the Debtors have any right to refund or reversion with respect to the Aggregate Subrogation Recovery.  The Termination Date shall be no later than the date that is five and one-half years after the Effective Date, provided that the Termination Date may be extended for one year to the date that is six and one-half years after the Effective Date if the Trustee (with the consent of the Trust Advisory Board) determines that such an extension is warranted and such extension is approved by the Bankruptcy Court upon a finding that the extension is necessary to the liquidating purpose of the Subrogation Trust.  Any such extension must be approved by the Bankruptcy Court on or prior to the date on which the Subrogation Trust would otherwise terminate.

9.2     <u>Continuance of Subrogation Trust for Winding Up</u>.  After the termination of the Subrogation Trust and solely for the purpose of liquidating and winding up the affairs of the Subrogation Trust, the Trustee shall continue to act as such until its duties have been fully performed and shall continue to be entitled to receive the fees pursuant to Section 2.2 hereof for a period of time not to exceed three (3) months following the date of termination of the Subrogation Trust.  Upon Distribution of all the Aggregate Subrogation Recovery, the Trustee shall retain the books, records, and files that shall have been delivered or created by the Trustee. At the Trustee's discretion, all of such records and documents may be destroyed no earlier than two years following the date of Final Distribution of Aggregate Subrogation Recovery as the Trustee deems appropriate (unless such records and documents are necessary to fulfill the Trustee's obligations hereunder).  Except as otherwise specifically provided herein, upon the termination of the Subrogation Trust, the Trustee shall have no further duties or obligations hereunder.

- 23 -

## ARTICLE X
## AMENDMENT AND WAIVER

10.1     This Agreement shall be irrevocable; <u>provided</u>, <u>that</u>, the Trustee, with the prior unanimous consent of the Trust Advisory Board, may amend, supplement or waive any provision of this Agreement, in a writing signed by the Trustee, without notice to or the consent of the Subrogation Trust Beneficiaries, or the approval of the Bankruptcy Court; <u>provided</u>, <u>further,</u> no amendment, supplement or waiver of or to this Agreement shall (i) adversely affect the payments and/or Distributions to be made under the Plan, the Allocation Agreement, or this Agreement, or (ii) adversely affect the U.S. federal income tax status of the Subrogation Trust as a "qualified settlement fund". Notwithstanding anything to the contrary, if the Allocation Agreement is amended at any time in writing, this Agreement will be deemed to be amended automatically to incorporate any provisions of the Allocation Agreement that are referenced or incorporated by reference herein.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1     <u>Limitations on Claim Interests for Securities Law Purposes</u>.

(a)     The entitlements of the Subrogation Trust Beneficiaries will not be represented by certificates, securities, receipts or in any other form or manner whatsoever, except as maintained on the books and records of the Subrogation Trust by the Trustee as provided in Section 11.2 herein. The death, incapacity or bankruptcy of any Subrogation Trust Beneficiary during the term of the Subrogation Trust shall not (i) operate to terminate the Subrogation Trust, (ii) entitle the representatives or creditors of the deceased party to an accounting, (iii) entitle the representatives or creditors of the deceased party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Subrogation Trust's assets or for a partition thereof or (iv) otherwise affect the rights and obligations of any of the Subrogation Trust Beneficiaries hereunder.

(b)     It is intended that the entitlements of the Subrogation Trust Beneficiaries hereunder shall not constitute "securities." To the extent the entitlements of the Subrogation Trust Beneficiaries hereunder are deemed to be "securities," the issuance of any entitlements hereunder or under the Plan shall be exempt, pursuant to Section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and any applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the Subrogation Trust is required to comply with registration and/or reporting requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), the Trust Indenture Act of 1939, as amended (the "<u>Trust Indenture Act</u>"), or the Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>"), then the Trustee shall, after consultation with the Trust Advisory Board, take any and all actions to comply with such registration and reporting requirements, if any, and file reports with the Securities and Exchange Commission (the "<u>SEC</u>") to the extent required by applicable law. Notwithstanding the foregoing procedure, nothing herein shall be deemed to preclude the Trust Advisory Board and Trustee from amending this Agreement to make such

- 24 -

changes as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to ensure that the Subrogation Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act or the Investment Company Act.

(c)     Except as (i) permitted in this Agreement, including Section 4.4, or (ii) as consented to by the Trustee (such consent not to be unreasonably withheld), no transfer of any entitlement of a Subrogation Trust Beneficiary hereunder may be effected or made; provided, that entitlements of Subrogation Trust Beneficiary hereunder and/or under the Plan may be made by operation of law or by will or the laws of descent and distribution.

11.2     Books and Records.

(a)     Information Retention.  The Trustee shall receive, manage, analyze and protect all information provided to it by or on behalf of Subrogation Trust Beneficiaries regarding Subrogation Claims.

(b)     General Records.  The Trustee, and any professionals or advisors retained by or on behalf of the Trustee or the Subrogation Trust, shall maintain good and sufficient books and records of their work relating to the Subrogation Trust including without limitation, as applicable:  (i) the Aggregate Subrogation Recovery and the management thereof; (ii) all transactions undertaken by the Trustee; (iii) all expenses incurred by or on behalf of the Trustee, the Trust Advisory Board, and/or the Subrogation Trust; and (iv) all Distributions to Subrogation Trust Beneficiaries contemplated or effectuated, in each case, in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and in accordance with New York law.  Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Subrogation Trust.  Nothing in this Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Subrogation Trust or as a condition for making any payment or Distribution out of the Aggregate Subrogation Recovery.

(c)     Subrogation Claim Records.  The Trustee, and any professionals or advisors retained by or on behalf of the Trustee or the Subrogation Trust, shall maintain good and sufficient books and records as applicable relating to each Subrogation Claim reported to it or asserted against the Debtors pursuant to a proof of claim filed in the Chapter 11 Cases, including without limitation:  (i) a copy of any proof of claim filed with respect to such Subrogation Claim, including the amount of any claim asserted thereunder, (ii) a copy of each Distribution Request related to such Subrogation Claim; (iii) the identity of the current owner of each Subrogation Claim, (iv) the identity of former owners of each Subrogation Claim, (v) the disposition of each individual Paid Claim, including whether such Subrogation Claim is a Verified Paid Claim, (vi) the amount and date of all Distributions made on account of each Paid Claim, and confirmation of such Distributions (*e.g.* copies of checks), and (vii) any documentation submitted by or on behalf of a Subrogation Trust Beneficiary with respect to such Subrogation Claim.

- 25 -

11.3    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law thereof that would result in the application of law of another jurisdiction).

11.4    Jurisdiction and Waiver of Trial by Jury.  The Parties agree that the Bankruptcy Court shall have continuing jurisdiction over any matters concerning or arising out of this Agreement and the Subrogation Claims, including exclusive jurisdiction over disputes arising out of this Agreement or otherwise in connection with the Aggregate Subrogation Recovery.  Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

11.5    Severability.  In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by final order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.6    Notices.

(a)    Trustee or Members.  Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by facsimile, by electronic communication from a Party or its counsel, or by nationally recognized overnight delivery service or mailed by first-class mail.  The date of receipt of such notice shall be the earliest of (i) the date of actual receipt by the receiving Party, (ii) the date of personal delivery (or refusal upon presentation for delivery), (iii) the date of the transmission confirmation, or (iv) three business days after service by first-class mail, to the receiving Party's below address(es):

(i)    if to the Trustee, to:

Attn:
E-mail Address:
Address:

(ii)    if to a Member of the Trust Advisory Board, to:

[____]
Attn:
E-mail Address:
Address:

[____]

- 26 -

Attn:
E-mail Address:
Address:

[_____]
Attn:
E-mail Address:
Address:

(b) _Subrogation Trust Beneficiaries_. Any notices or other communications required or permitted to be made to Subrogation Trust Beneficiaries shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by facsimile, by electronic communication or by nationally recognized overnight delivery service or mailed by first-class mail to the notice address identified on such Subrogation Trust Beneficiary's signature page to the Allocation Agreement or such notice address as may be provided or amended in conjunction with a Distribution Request made by such Subrogation Trust Beneficiary.

11.7 _Headings_. The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.8 _Entire Agreement_. This Agreement and the exhibits attached hereto contain, and the Allocation Agreement, the Plan, and the Confirmation Order, contain the entire agreement between the Parties and supersede all prior and contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof, provided, that, the Allocation Agreement (as that agreement may be amended from time to time) is incorporated by reference into this Agreement.

11.9 _Meanings of Other Terms_. Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations, corporations, and other entities. All references herein to Articles, Sections, and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute, or regulation, refer to the corresponding Articles, Sections, and other subdivisions of this Agreement, and the words "herein," "hereof," or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement. The term "including" shall mean "including, without limitation."

11.10 _Counterparts_. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute one and the same instrument. A facsimile or electronic mail signature of any Party shall be considered to have the same binding legal effect as an original signature.

11.11 _Conflict_. In the event of any conflict between this Agreement and the Allocation Agreement, the Plan, or Confirmation Order, the Allocation Agreement (as that agreement may

- 27 -

be amended from time to time) shall control and govern, _provided, that_, the provisions of Article V hereof shall supersede section 10(c) of the Allocation Agreement, and the provisions of Section 1.2(a) hereof shall supersede section 1(d) of the Allocation Agreement, to the extent of any conflicts.

_[remainder of page left intentionally blank]_

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives, or agents, effective as of the date first above written.

Trust Advisory Board Member[5]

By:_____
Name:
Title:

Trustee

By:_____
Name:
Title:


Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:


Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

---

[5]     All signatures must be notarized.

- 29 -

Trust Advisory Board Member

By:_____
Name:
Title:

Trust Advisory Board Member

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Case: 19-30088    Doc# 5971-1    Filed: 02/28/20    Entered: 02/28/20 16:02:40    Page 31 of 37

## EXHIBIT A

1. 2017 North Bay Wildfires
   a. 37
   b. Atlas
   c. Blue
   d. Cascade/LaPorte Complex
   e. Cherokee
   f. Honey
   g. Lobo
   h. Maacama
   i. McCourtney
   j. Nuns Complex (including Adobe, Norrbom, Nuns, Partrick, Pressley, Pythian/ Oakmont)
   k. Pocket
   l. Point
   m. Redwood/Potter Valley Complex
   n. Sullivan
   o. Sulphur
   p. Tubbs

2. 2018                       Camp                              Fire

# EXHIBIT B

## Non-Party Objection Procedures

[TO COME]

## EXHIBIT C

### Form Distribution Request

[TO COME]

**<u>EXHIBIT D</u>**

**Subrogation Claims Review Protocol**


[TO COME]

## EXHIBIT E

## Affected Zones and Date of Loss Ranges

<u>Date of Loss Ranges for all 2017 North Bay Fires</u>

**October 8, 2017 - November 30, 2017**

<u>Date of Loss Range for 2018 Camp Fire</u>

**November 8, 2018 – November 30, 2018**

<u>Affected Zones for North Bay Fires</u>[6]



---

[6] Claims falling outside of the designated North Bay Fire Affected Zones may require Subrogation Trust Beneficiaries to submit additional detail to confirm that they are wildfire related losses.

Affected Zones for Camp Fire[7]



---