**EXHIBIT 2**

FILED
San Francisco County Superior Court
OCT 23 2018
CLERK OF THE COURT
BY: _____
    Deputy Clerk

FILED BY FAX

1  ROBBINS GELLER RUDMAN
      & DOWD LLP
2  SHAWN A. WILLIAMS (213113)
   Post Montgomery Center
3  One Montgomery Street, Suite 1800
   San Francisco, CA 94104
4  Telephone: 415/288-4545
   415/288-4534 (fax)
5     – and –
   TRAVIS E. DOWNS III (148274)
6  ERIK W. LUEDEKE (249211)
   655 West Broadway, Suite 1900
7  San Diego, CA 92101-3301
   Telephone: 619/231-1058
8  619/231-7423 (fax)

9  Attorneys for Plaintiff

10 [Additional counsel appear on signature page.]

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| CITY OF WARREN POLICE AND FIRE RETIREMENT SYSTEM, Derivatively on Behalf of PG&E CORPORATION,<br><br>        Plaintiff,<br><br>vs.<br><br>LEWIS CHEW,<br>FRED J. FOWLER,<br>RICHARD C. KELLY,<br>ROGER H. KIMMEL,<br>RICHARD A. MESERVE,<br>FORREST E. MILLER,<br>ERIC D. MULLINS,<br>ROSENDO G. PARRA,<br>BARBARA L. RAMBO,<br>ANNE SHEN SMITH,<br>GEISHA J. WILLIAMS,<br>JASON P. WELLS,<br>PATRICK M. HOGAN and<br>ANTHONY F. EARLEY, JR.,<br><br>        Defendants,<br><br>– and –<br><br>PG&E CORPORATION, a California corporation,<br><br>        Nominal Party. | VIA FAX<br>CGC-18-570820<br><br>Case No.<br><br>SHAREHOLDER DERIVATIVE COMPLAINT FOR:<br><br>(1) BREACH OF FIDUCIARY DUTY;<br>(2) CORPORATE WASTE; AND<br>(3) UNJUST ENRICHMENT<br><br><br><br><br>Business Tort/Unfair Business Practice (07)<br><br>DEMAND FOR JURY TRIAL |

SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

## INTRODUCTION

1. This is a shareholder derivative action on behalf of nominal defendant PG&E Corporation ("PG&E" or the "Company") for breach of fiduciary duty, corporate waste and unjust enrichment. Defendants are PG&E's current and former directors and/or top officers – defendants Lewis Chew, Fred J. Fowler, Richard C. Kelly, Roger H. Kimmel, Richard A. Meserve, Eric D. Mullins, Forrest E. Miller, Rosendo G. Parra, Barbara L. Rambo, Anne Shen Smith, Anthony F. Earley, Jr., Jason P. Wells, Patrick M. Hogan and Geisha J. Williams (together, "defendants").

2. PG&E is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company (the "Utility"), a San Francisco, California-based public utility operating in Northern and Central California. As PG&E's corporate fiduciaries, defendants owed the Company fiduciary duties to direct the corporation's business and affairs lawfully and to protect and preserve PG&E's valuable corporate assets. While under the stewardship of defendants, however, PG&E operated without a legally compliant vegetation management program, thereby exposing the Company to massive losses arising from the disastrous 2017 wild fires that ravaged several Northern California counties, including Butte, Del Norte, Humboldt, Lake, Mendocino, Napa, Nevada, Sonoma and Sutter counties (the "2017 Northern California Wildfires").

3. More specifically, PG&E is subject to numerous fire prevention regulations, including Public Resources Code ("PRC") §4293, which requires the Company to maintain a four-foot vegetation clearance for power lines operating at 2,400 or more volts, but less than 72,000 volts; a six-foot vegetation clearance for power lines operating at 72,000 or more volts, but less than 110,000 volts; and a ten-foot vegetation clearance for power lines operating at 110,000 or more volts. As such, PG&E is required to and purports to employ a vegetation management program that trims or removes "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the [power] line" in order to remove potential fire hazards.

4. Before the 2017 Northern California Wildfires, however, an April 2016 investigation by the California Department of Forestry and Fire Protection ("Cal Fire") into the deadly 2015 Butte Fire put defendants and PG&E on notice of its failure to collect the information necessary to conclude that

- 2 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

the Company was in compliance with PRC §4293. According to Cal Fire, on September 9, 2015, a gray pine came into contact with a PG&E power line and ignited the Butte Fire, which burned through 70,000 acres, destroyed 965 structures, and claimed the lives of two elderly residents. Even after the Butte Fire findings, on April 28, 2016, defendants caused PG&E to issue a press release seeking to reassure its customers and shareholders that the Company's vegetation management practices exceeded industry peers and were sufficient to address risks associated with recent drought conditions, stating:

> "Our vegetation management program is among the very best in the industry and was expanded in 2014 in response to California's historic drought to include special air and foot patrols, funding for lookout towers and cameras for early fire detection and funding for fire fuel reduction and emergency access projects and public education."

5. California regulators, however, cited PG&E for late repairs and maintenance jobs far more frequently than any other utility in the state between 2013 and 2017. Indeed, the most recent audit of PG&E's work in Sonoma County found that over 3,500 maintenance and repair jobs were finished past their scheduled due dates. By comparison, no other utility in the state had more than 1,000 late corrective actions.

6. The California Public Utilities Commission ("CPUC") ultimately fined PG&E a total of $8.3 million for several violations related to the Butte Fire, including violations of General Order 95, Rule 31.1, failing to safely and properly maintain 12 kV overhead conductors, and violation of General Order 95, Rule 35, failing to maintain a minimum clearance of 18 inches between its 12 kV conductor and the Butte Fire's "subject tree." As of the filing of its most recent annual report on Form 10-K on February 9, 2018, PG&E estimated it will incur a material loss of at least $1.1 billion in connection with the Butte Fire.

7. On October 8, 2017, several major wildfires began to spread rapidly throughout areas in the Northern California counties of Butte, Del Norte, Humboldt, Lake, Mendocino, Napa, Nevada, Sonoma and Sutter. At the peak, 21 major wildfires swept through Northern California – turning entire neighborhoods into charred ruins. In total, the wildfires burned 245,000 acres, destroyed 10,000 structures, killed more than 40 people, and became the costliest fires in the state's history, with claims reaching $9.4 billion. Ultimately, Cal Fire determined that PG&E equipment caused all of the 16 major

- 3 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:27    Page 4 of 20

PGE-BK-0000001169

wildfires it had investigated and that there was evidence that the Company violated state law in 11 of those instances.

8. On October 13, 2017, defendants announced that Cal Fire was investigating whether PG&E equipment caused the fires. In the release, defendants also recognized that, if found at fault, the Company's liability for financial losses could be above PG&E's available insurance coverage. On this news, the trading price of PG&E's common stock collapsed, falling from $69.15 per share on October 11, 2017 to a close of $53.43 per share on October 16, 2017, wiping out $8.1 billion in once valuable shareholder equity. A few weeks later, just as PG&E shareholders were digesting this negative development, on December 20, 2017, defendants stunned shareholders again by announcing that the Company was suspending its cash dividend due to "uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires." On this news, the trading price of PG&E stock collapsed again, falling from $51.12 per share on December 20, 2017 to $44.50 per share on December 21, 2017, wiping out an additional $3.4 billion in shareholder equity.

9. As early 2018 unfolded, Cal Fire's investigation into PG&E's responsibility for the 2017 Northern California Wildfires continued. Then, on May 25, 2018, Cal Fire reported that four of the 2017 Northern California Wildfires were in fact caused by trees coming into contact with PG&E's power lines and that it had found evidence that PG&E violated PRC §4293 in three of the four instances. Cal Fire also announced that it would be referring those three investigations to the appropriate county district attorney's offices due to potential violations of state law.

10. On June 11, 2018, in light of Cal Fire's findings and contrary to prior assurances that PG&E was in compliance with all regulatory requirements, including PRC §4293, defendants were forced to acknowledge that PG&E faced significant liability. Specifically, the Company disclosed that, although its analysis was ongoing, "based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with" all but two of the 16 fires. As for the Atlas and Highway 37 fires, PG&E added that "it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in the accrual of a liability in the future, the amount of which could be

- 4 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

significant." PG&E further acknowledged that it could be subject to "material fines or penalties" if the CPUC or any other law enforcement agency determined that PG&E failed to comply with applicable laws and regulations.

11. On this news, the trading price of PG&E stock declined again, falling to $39.76 per share on June 11, 2018, wiping out an additional $873 million in shareholder equity. Worse yet, the Company has been named as a primary defendant in costly and expensive-to-defend lawsuits brought by fire damage victims and PG&E shareholders for potentially massive damages.

12. Although PG&E has been severely injured, defendants have not fared nearly so badly. On the contrary, defendants have collectively pocketed more than $20.4 million in cash, fees and other incentive-based compensation not justified in light of PG&E's performance while under their stewardship. These payments wasted valuable corporate assets and unjustly enriched defendants.

13. Nevertheless, the PG&E Board of Directors (the "Board") has not taken any legal action against the directors and officers responsible for this debacle. Accordingly, by this action, plaintiff seeks to vindicate PG&E's interests against its wayward fiduciaries. A pre-suit demand upon the PG&E Board is excused in this case because at least a majority the members of the PG&E Board are disabled from fairly, independently and/or objectively considering such a demand.

## JURISDICTION AND VENUE

14. This Court has jurisdiction under the California Constitution, Article VI, §10, and California Corporations Code §800. The amount in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of this Court.

15. Venue is proper in this Court because PG&E is a California corporation headquartered in San Francisco, California. Moreover, each of the defendants has had extensive contacts with California as a director and/or officer of PG&E, which makes the exercise of personal jurisdiction over them proper.

## THE PARTIES

16. Plaintiff City of Warren Police and Fire Retirement System is and has been a shareholder of PG&E since at least 2016.

- 5 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

17. Nominal party PG&E is a California corporation with its principal executive offices located at 77 Beale Street, San Francisco, California 94177.

18. Defendant Lewis Chew ("Chew") has served as a director of PG&E since 2009. He also served on the Audit and Compliance and Public Policy Committees of the PG&E Board. Chew received at least $293,630 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

19. Defendant Fred J. Fowler ("Fowler") has served as a director of PG&E since 2012. He also served on the Finance Committee of the PG&E Board. Fowler received at least $277,835 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

20. Defendant Richard C. Kelly ("Kelly") has served as a director of PG&E since 2013. He also served on the Audit and Compensation Committees of the PG&E Board. Kelly received at least $284,752 in directors' fees, consisting of cash and option awards, from PG&E not justified by the Company's performance while under his stewardship.

21. Defendant Roger H. Kimmel ("Kimmel") has served as a director of PG&E since 2009. He also served on the Finance and Compliance and Public Policy Committees of the PG&E Board. Kimmel received at least $265,965 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

22. Defendant Richard A. Meserve ("Meserve") has served as a director of PG&E since 2006. He also served on the Compliance and Public Policy and Safety and Nuclear Oversight Committees of the PG&E Board. Meserve received at least $275,085 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

23. Defendant Forrest E. Miller ("Miller") has served as a director of PG&E since 2009. He also served on the Audit and Compensation Committees of the PG&E Board. Miller received at least $318,904 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

24. Defendant Eric D. Mullins ("Mullins") has served as a director of PG&E since 2016. He also served on the Audit and Safety and Nuclear Oversight Committees of the PG&E Board. Mullins received at least $260,085 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

25. Defendant Rosendo G. Parra ("Parra") has served as a director of PG&E since 2009. He also served on the Compensation and Safety and Nuclear Oversight Committees of the PG&E Board. Parra received at least $261,085 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under his stewardship.

26. Defendant Barbara L. Rambo ("Rambo") has served as a director of PG&E since 2005. She also served on the Finance and Compensation Committees of the PG&E Board. Rambo received at least $270,085 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under her stewardship.

27. Defendant Anne Shen Smith ("Smith") has served as a director of PG&E since 2015. She also served on the Finance and Compliance and Public Policy Committees of the PG&E Board. Smith received at least $272,585 in directors' fees, consisting of cash and stock awards, from PG&E not justified by the Company's performance while under her stewardship.

28. Defendant Geisha J. Williams ("Williams") has served as a director of PG&E since May 2017. She has also served as Chief Executive Officer of PG&E since March 2017. Previously, Williams served as President, Electric (August 2015 to February 2017) and Executive Vice President, Electric Operations (June 2011 to August 2015) of the Utility. Williams received at least $8,597,220 in cash and incentive-based compensation from PG&E not justified by the Company's performance while under her stewardship.

29. Defendant Jason P. Wells ("Wells") has served as Chief Financial Officer of PG&E since January 2016. Wells received at least $3,108,134 in cash and incentive-based compensation from PG&E not justified by the Company's performance while under his stewardship.

30. Defendant Patrick M. Hogan ("Hogan") has served as Senior Vice President of Electric Operations and Vice President of Electric Strategy and Assets of the Utility since 2013.

-7-
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:23    Page 8 of 20

PGE-BK-0000001173

31.     Defendant Anthony F. Earley, Jr. ("Earley") served as a director of PG&E from September 2011 to December 2017. He also served as Chief Executive Officer of PG&E from 2011 to December 2017. Earley received at least $6,012,329 in cash and incentive-based compensation from PG&E not justified by the Company's performance while under his stewardship.

### THE FIDUCIARY DUTIES OF PG&E'S DIRECTORS AND OFFICERS

32.     By reason of their positions as PG&E's directors and/or officers and because of their ability to direct and control the Company's business and corporate affairs, defendants owed PG&E and its shareholders a fiduciary duty to use their utmost ability to control and manage PG&E in an honest and lawful manner. Towards this end, PG&E's directors and officers owed the Company and its shareholders fiduciary duties to exercise good faith and loyal and reasonable supervision over the management, policies, practices and internal controls of the Company.

33.     More specifically, as PG&E's directors and officers, defendants' fiduciary duties required them to, among other things: (i) remain fully informed as to how PG&E conducted its operations and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith and take steps to correct such conditions or practices, and especially those around the Company's vegetation management conditions and practices; (ii) conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to lawfully maximize the value of the Company's stock; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (v) ensure that PG&E was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules and regulations, including the federal securities laws, rules and regulations; and (vi) refrain from breaching their duty of loyalty to the Company by adopting practices and procedures and controls inconsistent with their fiduciary duty of loyalty.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

34. In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design. In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

35. Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

**Background**

36. Based in San Francisco, California, PG&E is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company. The Company generates revenues mainly through the sale and delivery of electricity and natural gas throughout Northern and Central California.

37. PG&E is regulated by the CPUC. Under CPUC and related laws, rules and regulations, PG&E had a legal duty to properly construct, inspect, repair, maintain, manage and/or operate its power lines and/or other electrical equipment and to keep vegetation properly trimmed and maintained so as to prevent foreseeable contact with such electrical equipment. Correlatively, defendants had a fiduciary duty to ensure PG&E's legal compliance with safety laws, rules and regulations.

38. More specifically, under numerous fire prevention regulations, including PRC §4293, the Company was legally bound to maintain a four-foot vegetation clearance for power lines operating at 2,400 or more volts, but less than 72,000 volts; a six-foot vegetation clearance for power lines operating at 72,000 or more volts, but less than 110,000 volts; and a ten-foot vegetation clearance for power lines operating at 110,000 or more volts. Accordingly, PG&E is required to and purports to employ a vegetation management program that trims or removes "[d]ead trees, old decadent or rotten trees, trees

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:27    Page 10 of 20

PGE-BK-0000001175

weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the [power] line" in order to remove potential fire hazards.

39. Before the 2017 Northern California Wildfires, an April 2016 Cal Fire investigation into the deadly 2015 Butte Fire put PG&E on notice of its failure to collect the information necessary to conclude that it was in compliance with PRC §4293. According to Cal Fire, on September 9, 2015, a gray pine came into contact with a PG&E power line and ignited the Butte Fire, which burned through 70,000 acres, destroyed 965 structures, and claimed the lives of two elderly residents. Even after the Butte Fire findings, on April 28, 2016, PG&E issued a press release seeking to reassure its customers and investors that its vegetation management practices exceeded industry peers and were sufficient to address risks associated with recent drought conditions, stating:

> "*Our vegetation management program is among the very best in the industry and was expanded in 2014* in response to California's historic drought to include special air and foot patrols, funding for lookout towers and cameras for early fire detection and funding for fire fuel reduction and emergency access projects and public education."

40. California regulators, however, cited PG&E for late repairs and maintenance jobs far more frequently than any other utility in the state between 2013 and 2017. Indeed, the most recent audit of PG&E's work in Sonoma County found that over 3,500 maintenance and repair jobs were finished past their scheduled due dates. By comparison, no other utility in the state had more than 1,000 late corrective actions.

41. In 2017, a California Superior Court found that "[t]he Butte Fire was caused by contact between a tree and PG&E's power line" and that the Company could therefore be held liable for damages caused by the wildfire under California's inverse condemnation doctrine. As a result, the CPUC ultimately fined PG&E a total of $8.3 million for several violations related to the Butte Fire, including violations of General Order 95, Rule 31.1, failing to safely and properly maintain 12 kV overhead conductors, and violation of General Order 95, Rule 35, failing to maintain a minimum clearance of 18 inches between its 12 kV conductor and the Butte Fire's "subject tree."

**The 2017 Northern California Wildfires**

42. On October 8, 2017, several major wildfires began to spread rapidly throughout areas in the Northern California counties of Butte, Del Norte, Humboldt, Lake, Mendocino, Napa, Nevada,

- 10 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

Sonoma and Sutter. At the peak, 21 major wildfires swept through Northern California – turning entire neighborhoods into charred ruins. In total, the wildfires burned 245,000 acres, destroyed 10,000 structures, killed more than 40 people, and became the costliest fires in the state's history, with claims reaching $9.4 billion. Ultimately, Cal Fire determined that PG&E equipment caused all of the 16 major wildfires it had investigated and that there was evidence that the Company violated state law in 11 of those instances.

43. By October 11, 2017, numerous news outlets began reporting that authorities and other officials were investigating whether PG&E's power lines were the cause of the deadly fires. Two days later, on October 13, 2017, defendants caused PG&E to issue a press release announcing that Cal Fire was investigating whether PG&E equipment caused the fires. Defendants also recognized in the release that, if found at fault, the Company's liability for financial losses could be above its available insurance coverage. On this news, the trading price of PG&E common stock collapsed, fallings from a close of $69.15 per share on October 11, 2017 to a close of $53.43 per share on October 16, 2017, wiping out $8.1 billion in shareholder equity. Shortly thereafter, defendants stunned PG&E shareholders again by announcing that the Company was suspending its cash dividend due to "uncertainty related to causes and potential liabilities associated with the extraordinary October 2017 Northern California wildfires." On this news, PG&E's stock price declined to $44.50 per share on December 21, 2017, wiping out an additional $3.4 billion in shareholder equity.

**The 2017 Northern California Wildfires Significantly Damaged PG&E**

44. On May 25, 2018, Cal Fire announced that four of the 2017 Northern California Wildfires were in fact caused by trees coming into contact with PG&E's power lines and that it had found evidence that PG&E violated PRC §4293 in three of the four instances. Cal Fire also announced that it would be referring those three investigations to the appropriate county district attorney's offices due to potential violations of state law. Cal Fire's findings, in relevant part, are as follows:

- The La Porte Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 8,417 acres, destroying 74 structures. CAL FIRE has determined the fire was caused by tree branches falling onto PG&E power lines. . . .

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:27    Page 12 of 20
PGE-BK-0000001177

- The McCourtney Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 76 acres, destroying 13 structures. . . . CAL FIRE has determined the fire was caused by a tree falling onto PG&E power lines. The investigation found evidence that PG&E allegedly failed to remove a tree from the proximity of a power line, in violation of [PRC §4293].

- The Lobo Fire, in Nevada County, started the evening of Oct. 8 and burned a total of 821 acres, destroying 47 structures. . . . CAL FIRE has determined the fire was caused by a tree contacting PG&E power lines. The investigation found evidence that [PRC §4293] . . . was allegedly violated.

- The Honey Fire, in Butte County, started in the early morning hours of Oct. 9 and burned a total of 76 acres. . . . CAL FIRE has determined the fire was caused by an Oak branch contacting PG&E power lines. The investigation found evidence that [PRC §4293] . . . was allegedly violated.

45. Cal Fire's reported findings caused PG&E's share price to decline an additional 5.2%, closing at $42.34 per share on May 29, 2018.

46. On June 8, 2018, Cal Fire issued a report stating that 12 additional wildfires were all caused by PG&E's equipment. Cal Fire also reported that it was referring eight of the 12 investigations to the appropriate county district attorney's offices due to evidence of alleged violations of state law. Cal Fire's findings, in relevant part, are as follows:

| Northern California Fire | Cause as determined by Cal Fire |
| --- | --- |
| The Redwood Fire burning 36,523 acres, destroying 543 structures. | Tree parts falling into PG&E power line. |
| The Sulphur Fire burning 2,207 acres, destroying 162 structures. | PG&E power lines and equipment contacting the ground. |
| The 37 Fire burning 1,660 acres, destroying 3 structures. | Electrical and was associated with the PG&E distribution lines in the area. |
| The Cherokee Fire burning 8,417 acres, destroying 6 structures. | PG&E power line contacting tree limbs. |
| The Blue Fire burning a total of 20 acres. | PG&E power line conductor falling to the ground, starting the fire. |
| The Pocket Fire burning 17,357 acres, destroying 6 structures. | Tree breaking and contacting PG&E power line. |
| The Atlas Fire burning 51,624 acres, destroying 783 structures. | Tree limb contacting PG&E power line. |

47. Rather than focusing all of its energy on fire relief efforts, PG&E instead cast blame on the weather, local governments, and even first responders. For example, two days after the first wildfire began, the Company issued a statement describing a "historic wind event that swept across PG&E's service area . . . pack[ing] hurricane-strength winds in excess of 75 mph in some cases." Local media,

1 in turn, were quick to point out the inaccuracy of PG&E's statement. Sustained winds were only about half the strength PG&E claimed throughout the most affected areas, and substantially under the speed of 56 mph, the speed that power lines must withstand under state law.

48. The *Bay Area News Group* also reported that for the better part of a decade, PG&E and other utilities helped stall regulators' efforts to map the areas where power lines present the highest risk for wildfires, an initiative that could have forced the Company to strengthen power poles and increase its maintenance efforts before the 2017 Northern California Wildfires. In fact, just three months before the fires, PG&E argued that some proposed regulations would "'add unnecessary costs to construction and maintenance projects in rural areas.'"

49. PG&E also filed claims against various local governments, contending that if the Company were to be found liable for the wildfires, "then those governments may share responsibility because of the 'inadequacy' of the local fire response and preparations." As an attorney for one of the local governments explained, "[PG&E is] trying to put the blame on the governmental entities, the tax payers, and the brave men and women who are doing their very best and who did their very best to react to one of the most devastating wildfires that struck in the middle of the night."

50. Finally, on June 11, 2018, in light of Cal Fire's findings and contrary to PG&E's assurances that it was in compliance with all regulatory requirements, including PRC §4293, PG&E confirmed in a Form 8-K filed with the SEC that it faced significant liability. Specifically, PG&E disclosed that, although its analysis was ongoing, "based on the current state of the law on inverse condemnation, the information currently available to the Utility, and the CAL FIRE determinations of cause, PG&E Corporation and the Utility currently expect that they will record a significant liability for losses associated with" all but two of the 16 fires. As for the Atlas and Highway 37 fires, PG&E added that "it is reasonably possible that facts could emerge that lead PG&E Corporation and the Utility to believe that a loss is probable, resulting in the accrual of a liability in the future, the amount of which could be significant." PG&E further acknowledged that it could be subject to "material fines or penalties" if the CPUC or any other law enforcement agency determined that PG&E failed to comply with applicable laws and regulations.

51. Following the publication of the Cal Fire findings, PG&E's share price fell to $39.76 per share on June 11, 2018 from $41.45 per share June 8, 2018, wiping out an additional $873 million in shareholder equity.

52. The corporate culture at PG&E while under defendants' stewardship put profits before safety. Rather than spend the money obtained from customers for infrastructure maintenance and safety, defendants caused PG&E to funnel this funding to boost its own corporate profits and compensation. This pattern and practice of favoring profits over having a solid and well-maintained infrastructure that would be safe and dependable for years to come left PG&E vulnerable to an increased risk of a catastrophic event such as the 2017 Northern California Wildfires.

53. Notwithstanding the severe damages and injuries suffered by PG&E, however, defendants have not, and will not, bring legal action against the directors and officers responsible for this debacle. Therefore, by this action, plaintiff seeks to vindicate PG&E's rights against its wayward fiduciaries.

## DERIVATIVE ALLEGATIONS

54. Plaintiff incorporates ¶¶1-53.

55. Plaintiff brings this action derivatively on behalf of PG&E to redress injuries suffered, and to be suffered, by PG&E as a result of defendants' breaches of fiduciary duty, corporate waste and unjust enrichment. Plaintiff will adequately and fairly represent the interests of PG&E in enforcing and prosecuting these derivative claims. Plaintiff caused a copy of this Complaint to be delivered to PG&E before its filing with the Court.

56. The PG&E Board has 12 members: defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith and Williams, and non-defendant Benito Minicucci. A majority of its members are disabled from fairly, independently and objectively considering any pre-suit demand that plaintiff may make.

57. First, the members of the PG&E Board participated in, approved and/or permitted the wrongs alleged herein by, among other things, failing to adopt and maintain an effective vegetation management program designed to bring PG&E into compliance with fire prevention laws, rules and regulations. They have also participated in efforts to conceal or disguise those wrongs from PG&E's

- 14 -
SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:27    Page 15 of 20

PGE-BK-000001180

shareholders or recklessly disregarded the wrongs complained of herein, and are therefore not disinterested parties. As a result of their access to and review of internal corporate documents, or conversations and connections with other corporate officers, employees, and directors and attendance at management and/or Board meetings, each of the defendants knew, or recklessly disregarded, adverse material non-public information regarding the efficacy of the Company's vegetation management program as well as its overall legal compliance with the laws, rules and regulations applicable to PG&E's business. Therefore, a majority of the members of the PG&E Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or is dependent upon other defendants who did.

58. Pursuant to their specific duties as Board members, the members of the PG&E Board are charged with the management of the Company and to conduct its business affairs. Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith and Williams breached their fiduciary duty of loyalty (and candor and good faith) owed to PG&E by failing to adopt and maintain an effective vegetation management program designed to bring PG&E into compliance with fire prevention laws, rules and regulations. Defendants have also breached their fiduciary duty of loyalty by making materially false statements and/or omissions in the Company's shareholder reports about the efficacy of its vegetation management program and its legal and regulatory compliance. Thus, a majority of the members of the PG&E Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because each of its members participated personally in the wrongdoing or is dependent upon other defendants who did.

59. Second, a majority of the members of the PG&E Board have demonstrated an unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends, and with whom they have entangling financial alliances, interests and dependencies. Therefore, defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith and Williams are not able to and will not vigorously prosecute any such action.

60. Third, any suit by the directors of PG&E to remedy these wrongs would likely further expose the liability of defendants under California and federal law, including the federal securities laws, which could result in additional and/or new civil and/or criminal actions being filed against one or more of the defendants. As a result, at least a majority of the members of the PG&E Board are hopelessly conflicted in making a fair, objective and/or independent determination whether to sue themselves.

61. Fourth, a majority of the members of the PG&E Board have benefited, and will continue to benefit, from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites derived thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action. Therefore, a demand upon the PG&E Board is excused as futile.

62. Fifth, PG&E has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the PG&E Board has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for PG&E any part of the damages PG&E suffered and will suffer thereby.

63. Sixth, defendant Williams is employed by the Company as its Chief Executive Officer and has received, and will continue to receive, substantial monetary compensation as a result of that employment. Defendant Williams will act to preserve and not threaten her position of control and the perquisites thereof and, therefore, is incapable of exercising independent objective judgment in deciding whether to bring this action.

**FIRST CAUSE OF ACTION**

**For Breach of Fiduciary Duty Against All Defendants**

64. Plaintiff incorporates ¶¶1-63.

65. By their wrongful acts and omissions, defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith, Williams, Earley, Wells and Hogan breached their fiduciary duty of loyalty by, among other things, failing to adopt and maintain an effective vegetation management program designed to bring PG&E into compliance with fire prevention laws, rules and regulations. Defendants have also breached their fiduciary duty by making materially false statements and/or omissions regarding the efficacy of the Company's vegetation management program and legal

Case: 19-30088    Doc# 5973-2    Filed: 02/28/20    Entered: 02/28/20 16:23:27    Page 17 of 20

PGE-BK-0000001182

and regulatory compliance. Similarly, defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith, Williams, Earley, Wells and Hogan breached their fiduciary duty to direct PG&E's business and affairs in accordance with the laws, rules and regulations applicable to its business, including the federal securities laws, rules and regulations.

66. As a result of defendants' faithless misconduct, PG&E has suffered substantial damages, injuries and losses.

67. Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### For Corporate Waste Against Defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith, Williams, Earley and Wells

68. Plaintiff incorporates ¶¶1-63.

69. By their wrongful acts and omissions, defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith, Williams, Earley and Wells wasted PG&E's valuable corporate assets by, among other things, causing the Company to pay improper compensation, including fees, and other incentive-based benefits to themselves and other PG&E insiders who breached their fiduciary duties owed to PG&E. PG&E received no benefit from these improper payments. As a result, defendants damaged PG&E and are liable to the Company for corporate waste.

70. Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### For Unjust Enrichment Against All Defendants

71. Plaintiff incorporates ¶¶1-63.

72. By their wrongful acts and omissions, defendants Chew, Fowler, Kelly, Kimmel, Meserve, Mullins, Miller, Parra, Rambo, Smith, Williams, Earley, Wells and Hogan were unjustly enriched at the expense of and to the detriment of PG&E.

73. All the payments and benefits provided to defendants were at the expense of PG&E. The Company received no benefit from these payments.

74. Plaintiff, on behalf of PG&E, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

75. Plaintiff, on behalf of PG&E, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A. Awarding money damages against all defendants, jointly and severally, for all damages, injuries and losses suffered, and to be suffered, as a result of the acts and transactions complained of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

B. Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees and insider sales proceeds, and imposing a constructive trust thereon;

C. Directing PG&E to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal securities laws, rules and regulations, and state corporation laws regarding fiduciary duties;

D. Awarding punitive damages;

E. Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

F. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October 23, 2018

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS

/s/ SHAWN A. WILLIAMS

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
TRAVIS E. DOWNS III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)
travisd@rgdlaw.com
eluedeke@rgrdlaw.com

VANOVERBEKE, MICHAUD & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

Attorneys for Plaintiff