WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DECLARATION OF KENNETH S. ZIMAN IN SUPPORT OF DEBTORS' SECOND AMENDED MOTION FOR ENTRY OF ORDERS (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EQUITY BACKSTOP COMMITMENT LETTERS, (II) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, DEBT FINANCING COMMITMENT LETTERS AND (III) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES AND/OR PREMIUMS, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS**<br>Date: March 16, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Objection Deadline: March 12, 2020, 4:00 p.m. (Pacific) |

I, Kenneth S. Ziman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director in the Restructuring Group at Lazard Frères & Co. LLC ("**Lazard**"), an investment banking firm that has its principal office at 30 Rockefeller Plaza, New York, New York 10112. Lazard is the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory, and asset management firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees and buyers in chapter 11 cases. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

2. At Lazard, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling, or acquiring financially distressed businesses. I have nearly 30 years of experience in corporate finance and restructuring. I joined Lazard in March 2016 after a more than 25-year career as a bankruptcy and restructuring lawyer, previously as a partner at Simpson Thacher & Bartlett LLP and most recently as the Deputy Practice Leader of Skadden, Arps, Slate, Meagher & Flom LLP's Corporate Restructuring department. Throughout my career I have represented debtors, individual creditors, official creditors' committees, unofficial bondholder committees, and other parties in interest in numerous in-court and out-of-court restructurings and recapitalizations involving companies in multiple industries, including those of Takata Corporation, Cobalt International Energy, Inc., ManorCare Inc., SunEdison, Inc., CGG Holdings (U.S.) Inc., Millennium Health, LLC, Dendreon Corporation, Exide Technologies, Savient Pharmaceuticals, Inc., Energy Future Holdings

1

Corporation, Residential Capital, LLC, Select Staffing, iPayment, Inc. and MF Global Holdings Ltd. I have submitted declarations and/or affidavits or have had testimony proffered in CGG, SunEdison and GCX Limited, among other cases.

3.     I graduated from Colgate University with a B.A. and I have a law degree from the University of Pennsylvania Law School.

4.     I submit this Declaration in support of the *Debtors' Second Amended Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Equity Backstop Commitment Letters, (ii) Approving Terms of, and Debtors' Entry into and Performance Under, Debt Financing Commitment Letters and (iii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* (the "**Second Amended Motion**").[1]

5.     Lazard is a long-time advisor to PG&E Corporation ("**PG&E Corp.**"), and its primary operating subsidiary, Pacific Gas and Electric Company (the "**Utility**"; together with PG&E Corp., "**PG&E**", the "**Company**" or the "**Debtors**"), with the initial engagement for advisory services starting in 2011. Since that time, Lazard has provided financial advisory and investment banking services to PG&E Corp. with respect to a variety of matters, including, without limitation: analysis of the financial condition of the Company, evaluation of potential transactions that the Company may pursue, assessment of financing options, and shareholder advisory services. Given Lazard's long history with PG&E Corp., Lazard has significant familiarity with and knowledge of the Debtors' business, operations, and financial challenges.

6.     Lazard currently serves as advisor to the Debtors in their Chapter 11 Cases. In such capacity, Lazard assists the Company in its assessment of the Company's ability to raise capital and its evaluation of the sources of financing required in order to successfully emerge from chapter 11. During the course of these cases, Lazard has engaged in dialogue with the legal counsel and

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Second Amended Motion.

2

advisors to a number of significant shareholders, including in regards to their willingness to invest in the Company to finance its emergence from chapter 11.

7.       Along with management, Lazard has also engaged in communications with certain money-center banks regarding the Company's ability to access capital from the traditional equity markets.  Feedback received from these discussions indicated that regular-way equity markets access would require resolution of the Company's 2020 general rate case and cost of capital proceedings, as well as a clear understanding of the aggregate wildfire claims liability, how those claims will be treated under a chapter 11 plan and the plan's compliance with AB 1054.  Feedback received further indicated that banks would potentially be willing to commit, at the time, to a volume underwriting of any equity financing; this would mean that while a bank might guarantee an amount of equity proceeds, there would not be a floor price at which that equity would be raised, thereby presenting unlimited dilution risk to current shareholders.

8.       In connection with efforts to terminate the Debtors' exclusivity by the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") and the Ad Hoc Group of Subrogation Claim Holders in July and August 2019, two large shareholders of PG&E Corp., Knighthead Capital Management ("**Knighthead**") and Abrams Capital Management ("**Abrams**"; together with Knighthead, the "**13D Parties**"), submitted a letter to the Chair of PG&E Corp. setting forth an unsolicited financing proposal to provide $1.5 billion of equity capital commitments in support of the Company's Plan of Reorganization (as defined below) (the "**Initial Equity Backstop Commitment Letter**").  This proposal was made public by the 13D Parties on August 8, 2019, through a Schedule 13D filing with the Securities and Exchange Commission. The 13D Parties' proposal contemplated raising up to $15 billion of equity, with the additional capital being provided by other shareholders.  Subsequently, without any active solicitation the Company received equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate.

3

9.      Starting on August 17, and continuing through September, the Company and its financial and legal advisors engaged in negotiations with the 13D Parties concerning the terms of the Initial Equity Backstop Commitment Letter.  Over the course of these discussions, the Debtors improved upon several of the terms initially proposed by the 13D Parties, including with respect to structure, conditionality, length of commitment and flexibility to pursue a variety of equity financing options.  At a board meeting on September 8, the PG&E Corp. board (the "**Board**") authorized PG&E Corp. to enter into backstop commitment letters that had been revised to reflect the outcome of these discussions and negotiations (as revised, the "**September Equity Backstop Commitment Letters**") with affiliates of the 13D Parties.  On September 9, PG&E Corp. entered into the September Equity Backstop Commitment Letters with certain affiliates of the 13D Parties for aggregate commitments of $1.5 billion, and such backstop commitment letters were filed with the Court as an exhibit to the Debtors' "Summary of Key Elements of Debtors' Joint Chapter 11 Plan of Reorganization" [Docket No. 3844].

10.      Shortly after entering into the September Equity Backstop Commitment Letters, the Debtors reached a settlement with the Ad Hoc Group of Subrogation Claim Holders.  As the September Equity Backstop Commitment Letters did not incorporate this settlement, the Company and the 13D Parties negotiated a revised form of the September Equity Backstop Commitment Letters that was publicly disclosed on September 13, 2019 via a Current Report on Form 8-K, which, among other matters, reflected contemplated amendments to the Company's Plan of Reorganization to incorporate the subrogation settlement.

11.      On September 14, 2019, the Company initiated a process to obtain an additional $12.5 billion of equity commitments from current shareholders and others.  Of the $14 billion of Equity Backstop Commitments sought during this process, 60% was available only to shareholders who offered Equity Backstop Commitments to the Company, to be further allocated among such shareholders based on shareholdings.  The other 40% of the Equity Backstop Commitments was made available to shareholders and non-shareholders who offered Equity Backstop Commitments

4

to the Company, which was to be further allocated pro rata based on the amount of Equity Backstop Commitments offered by such parties. All parties were permitted to include in their shareholdings shares purchased between the time they delivered their commitments and the allocation date.

12. As part of this process, Lazard distributed the form backstop agreement to a diverse group of accredited investors (as defined in Rule 501 of Regulation D under the Securities Act of 1933, as amended). The Debtors actively engaged with non-shareholders during this process and, overall, provided non-shareholders with a meaningful opportunity to participate in the Equity Backstop Commitments. In addition, the Company made a presentation available on its website that described the backstop commitment structure and other key information about the Debtors and the Chapter 11 Cases. The Company also hosted an informational meeting on September 17, 2019 and the Company and Lazard engaged with potential investors via individual phone calls and one-on-one meetings. Any accredited investors that expressed interest to the Company or Lazard in participating in the backstop received a copy of the form of September Equity Backstop Commitment Letters. The Company addressed comments to the September Equity Backstop Commitment Letters from certain of these investors in an amendment distributed on September 20, 2019 to parties that received the September Equity Backstop Commitment Letters. Subsequently, the Company received equity capital commitments from more than 50 investors, representing equity backstop commitments in excess of $14 billion in the aggregate.

13. As a result of negotiations with representatives of the wildfire victims, the Debtors amended their Plan of Reorganization to, among other things, accommodate a higher wildfire claim settlement amount. This amendment necessitated that negotiations be re-opened around the equity backstop commitments to raise the wildfire claim cap therein. On November 16, 2019, the September Equity Backstop Commitment Letters were superseded and replaced as the Debtors entered into new Equity Backstop Commitment Letters with Knighthead, Abrams and additional Equity Backstop Parties that contemplated reduced total commitments of $12 billion (the "**November Equity Backstop Commitment Letters**"). This reduced commitment amount

5

reflected that a portion of the trust that will satisfy claims held by the wildfire victims was expected to be funded with stock. However, the November Equity Backstop Commitment Letters also permitted a higher overall amount of compensation to be paid to the wildfire victims. On November 17, 2019, the Debtors began soliciting more broadly for additional commitments, and on December 6, 2019 the Debtors announced they had reached the commitment objective of $12 billion under the November Equity Backstop Commitment Letters.

14. On December 13, 2019, the Debtors announced they were seeking an extension of the Court approval deadline for the November Equity Backstop Commitment Letters. In connection with this extension, on December 13, the Board authorized PG&E Corp. to enter into new Equity Backstop Commitment Letters with the Equity Backstop Parties, which the Debtors then entered into on December 23, that superseded and replaced the prior Equity Backstop Commitment Letters (the "**December Equity Backstop Commitment Letters**").

15. On January 27, 2020, in light of the Noteholder RSA, the holders of substantially all of the Equity Backstop Commitments consented and agreed to (a) the filing of the Plan of Reorganization of January 31, 2020, reflecting the terms and conditions of the Noteholder RSA, and (b) an extension of the deadline for Court approval of the December Equity Backstop Commitment Letters from January 31, 2020 to February 28, 2020.

16. Most recently, to align the Equity Backstop Commitments with the OII Capital Structure, on March 1, 2020, the Board authorized PG&E Corp. to enter into new Equity Backstop Commitment Letters with the Equity Backstop Parties that will supersede and replace the prior Equity Backstop Commitment Letters (the "**Final Equity Backstop Commitment Letters**" and, together with the Initial Equity Backstop Commitment Letter, September Equity Backstop Commitment Letters, the November Equity Backstop Commitment Letters and the December Equity Backstop Commitment Letters, as applicable, the "**Equity Backstop Commitment Letters**"). The Final Equity Backstop Commitment Letters extend the deadline for Court approval of the Final Equity Backstop Commitment Letters from February 28, 2020 to March 15, 2020,

6

accommodate the OII Capital Structure, including the expected incurrence of the Temporary Utility Debt and the post-emergence securitization transaction based on shareholder tax attributes, and amend the terms of the Equity Commitment Premium. On March 1, 2020, the Debtors entered into Final Equity Backstop Commitment Letters with Knighthead and Abrams representing commitments of $700 million in total. The Debtors are soliciting consents to the modifications from the other Equity Backstop Parties to their Equity Backstop Commitment Letters and expect to obtain the such consents by the hearing on March 10, 2020.

17. Pursuant to recent negotiations between the Debtors and certain Equity Backstop Parties, the Final Equity Backstop Commitment Letters now provide that the aggregate Equity Commitment Premium is a fixed 119 million shares of New PG&E Corp. Common Stock.[2] In the event the market value of those 119 million shares would be less than $764 million based on the mean volume weighted average share price for the 20 business days immediately following the Effective Date, the Equity Backstop Parties will receive additional shares so that they receive at least $764 million of aggregate value, up to an aggregate cap of approximately 139 million shares. The value of the Equity Commitment Premium on the Effective Date will depend on the market value of PG&E Corp.'s common stock and the number of shares of New PG&E Corp. Common Stock issued on the Effective Date pursuant to the Plan of Reorganization. However, assuming that the Debtors implement the OII Capital Structure by drawing on the Equity Backstop Commitments and based on the Debtors' forecasted Normalized Estimated Net Income, the value of the Equity Commitment Premium would be approximately $1.2 billion at the currently estimated Equity Backstop Price. The value of the Equity Commitment Premium could exceed this amount in the event that PG&E Corp successfully consummates a marketed equity offering or rights offering in lieu of drawing on the Equity Backstop Commitments or if the Debtors

---

[2] The Equity Commitment Premium is generally payable in stock; however, in the following limited circumstances each Equity Backstop Party may elect to be paid in stock or cash: (i) PG&E Corp. exercises its right to terminate the Equity Backstop Commitment Letters in order to enter into a transaction for the sale of the company or (ii) a plan of reorganization other than the Debtors' Plan of Reorganization is confirmed. If paid in cash, the Equity Commitment Premium would be approximately $764 million (6.364% of the full $12 billion commitment).

7

implement a more leveraged capital structure. Based on the closing price of PG&E Corp. common stock on February 28, 2020, the value of the Equity Commitment Premium would be approximately $1.8 billion. Notably, except as described in footnote 2, the Equity Commitment Premium is payable in shares of New PG&E Corp. Common Stock.

18.     Over the multiple iterations of the Equity Backstop Commitment Letters, the Company and its advisors were able to negotiate terms within the Final Equity Backstop Commitment Letters to the Company's advantage relative to the terms of the Initial Equity Backstop Commitment Letter. The Debtors simplified the equity offering mechanics from the Initial Equity Backstop Commitment Letter, which are structured in the Final Equity Backstop Commitment Letters based on the price-to-earnings multiple the Debtors are able to achieve with respect to the future equity raises contemplated to occur closer to the Effective Date of the Debtors' Plan of Reorganization. In the event that the price-to-earnings multiple implied by an equity raise is equal to or exceeds $13.5x^3$, the Debtors can pursue a Permitted Equity Offering (*i.e.*, raise equity at best terms / structure available in the market). If the price-to-earnings multiple implied by an equity raise is less than $13.5x^3$ but equals or exceeds $12.0x^3$, then the Debtors must raise at least 80% of equity proceeds through a Rights Offering, but may still consummate certain Permitted Equity Offerings for up to 20% of equity proceeds. The features of the Rights Offering, including freely tradeable rights and oversubscription privileges, are intended to allow all stakeholders to participate in the capital raise. At any multiple lower than the Rights Offering threshold multiple, the Debtors will rely on the Backstop Commitments, which are priced at $10.0x^3$. This structure affords the Debtors significant flexibility in financing their emergence from the Chapter 11 Cases, while ensuring that the Debtors will be able to raise the anticipated necessary equity capital in time for the Debtors to emerge in accordance with the timelines in AB 1054. Absent the Backstop Commitments, the Debtors could face a situation where they seek to raise equity financing upon emergence from chapter 11 with no guarantee of availability or price. As ultimately negotiated,

---

[3] Subject to adjustment in accordance with the Final Equity Backstop Commitment Letters.

8

the Backstop Commitments mitigate this downside risk and provide flexibility for the Debtors to also raise equity financing at higher prices via a Rights Offering or a Permitted Equity Offering if there is sufficient demand in the public markets. Importantly, the equity investment contemplated by the Final Equity Backstop Commitment Letters is also structured in a manner that permits the Debtors to monetize their significant net operating loss carryforwards and other tax attributes, an important component to maximizing the value of the Debtors' estates. The Final Equity Backstop Commitment Letters provide that the OII Capital Structure is deemed to include a $6 billion Tax Benefits Monetization Transaction; the $6 billion Temporary Utility Debt is expected to be repaid post-emergence from the proceeds of a $7 billion securitization financing transaction that is expected to be rate-neutral, on a net present value basis, to customers. Assuming the Debtors are able to obtain confirmation by the June 30, 2020 AB 1054 deadline, Lazard is confident that the Debtors will be able to raise the $6 billion Temporary Utility Debt at emergence.

19.     As described above, the Debtors negotiated the Final Equity Backstop Commitment Letters such that in the event of a Rights Offering, the Company maintains the option of raising up to 20% of the total equity proceeds through another form of primary equity offering (*e.g.*, a private placement), subject to certain consent rights of the Equity Backstop Parties in the case of equity offerings that are not broadly syndicated. This flexibility could be valuable in bringing long-term utility investors back into the stock and allowing the Company to diversify its shareholder base immediately upon emergence from chapter 11. The Initial Equity Backstop Commitment Letter featured no such option.

20.     While the Equity Commitment Premium increased as compared to the Initial Equity Backstop Commitment Letter, the increased Equity Commitment Premium is fair and reasonable under the circumstances and reflects market feedback from likely Equity Backstop Parties in response to the significant changes requested by the Debtors related to the OII Capital Structure, the use of the NOLs and the timing of Court approval of the Equity Backstop Commitment Letters. The Equity Backstop Parties' continued willingness to engage with the Debtors over the course of

9

more than six months of negotiation and to enter into the Final Equity Backstop Commitment Letters has been predicated on the expectation that the Equity Backstop Parties, who have provided commitments to purchase the Debtors' equity at a 10 times multiple since September 2019, even at times when the Debtors' stock price has been materially below that level, would be able to participate in the value increase that they have helped create through a share-based Equity Commitment Premium. Even though the Equity Commitment Premium represents an opportunity for the Equity Backstop Parties to realize a portion of this upside, the Debtors have obtained several protections to ensure that the Equity Backstop Parties continue to support the Debtors following approval of the Final Equity Backstop Commitment Letters. Notably, the Debtors negotiated changes to the structure of the Equity Commitment Premium to provide for a rolling premium clawback reduction schedule that allows the Equity Commitment Premium to be significantly reduced with respect to an Equity Backstop Party in the event that such party terminates its commitments. Generally, the terminating Equity Backstop Party's Equity Commitment Premium will be reduced by:

    i) 85% if the commitments are terminated on or prior to January 20, 2020;

    ii) 60% if the commitments are terminated after January 20, 2020 and on or prior to April 30, 2020; and

    iii) 10% if the commitments are terminated after April 30, 2020 and prior to the Effective Date.

However, if an Equity Backstop Party terminates its commitments because (i) asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding all ordinary course administrative expense claims, all professional fee claims, all disallowed administrative expense claims and the portion of an administrative expense claim that is covered by insurance (collectively, the "**Excluded Administrative Expense Claims**"), (ii) the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims or (iii) the Plan of Reorganization, any

10

plan supplement or any plan document has been amended, modified or changed, in each case without the consent of the entities holding at least 66 2/3% of the aggregate Equity Backstop Commitments, to include a process for transferring the license and operating assets of the Utility to the State of California or a third party, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by 75%.  Additionally, if an Equity Backstop Party terminates its commitments in connection with PG&E Corp.'s receipt of written waivers or specified amendments from entities holding 60% or more of the aggregate Equity Backstop Commitments, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by:

       i)   75% if the commitments are terminated on or prior to April 30, 2020;

       ii)  50% if the commitments are terminated after April 30, 2020 and on or prior to May 31, 2020; and

      iii) 25% if the commitments are terminated after May 31, 2020.

I believe that these features of the Final Equity Backstop Commitment Letters benefit the Debtors by incentivizing the Equity Backstop Parties to maintain their commitments in the event that termination rights are triggered.[4]  Moreover, the clawback features enables the Debtors to retain any portion of the Equity Commitment Premiums that was subject to clawback, which the Debtors could then use as consideration to attract a replacement Equity Backstop Party.

       21.    The Debtors' Final Equity Backstop Commitment Letters are unprecedented in many respects, most notably in size, complexity and duration.  The Equity Backstop Commitments underpin the largest bankruptcy equity raise ever that—outside of bankruptcy—would also rank among the largest capital raises in the last 20 years across all industries.  In addition, the Equity Backstop Commitments are being obtained against the backdrop of significant regulatory and political scrutiny, and under significant time pressure imposed by AB 1054.  Furthermore, the

---

[4] The termination rights are exercisable on an individual basis—one Equity Backstop Party's decision to exercise its termination right does not terminate the commitments of the other Equity Backstop Parties.

11

extended duration of the Equity Backstop Commitments is also unique. Typical chapter 11 equity capital commitments are no more than approximately 60-90 days. Likewise, in the secondary equity markets, deals are priced and executed in a matter of days. Here, the Equity Backstop Commitments have been outstanding since September 2019 and will remain outstanding for nearly an additional six months. In order to secure the Equity Backstop Commitments, it was necessary to provide investors the Equity Commitment Premium. Over the past six months, the Debtors have marketed the equity backstop on three separate occasions—in no instance was the equity backstop materially oversubscribed. In fact, in light of the changes reflected in the OII Capital Structure, the Equity Backstop Parties are being asked to fund an additional $3 billion of equity (compared to the December Equity Backstop Commitment Letters, which would have required that the $12 billion of commitments be reduced to $6 billion as a result of the mix of capital sources contemplated by the OII Capital Structure) and allow the Debtors to retain their wildfire-related tax benefits, which the Debtors expect to use to obtain $7 billion of financing. These are major economic concessions from the Equity Backstop Parties. Based on discussions, absent the Equity Commitment Premium the Equity Backstop Parties would not have been willing to provide the Equity Backstop Commitments. As described above, the magnitude of the Equity Commitment Premium is fair and reasonable under the unprecedented circumstances of these Chapter 11 Cases. First, the Equity Backstop Parties have provided significant value to the Debtors and the estates, particularly existing shareholders, by providing and continuing to maintain their commitments, even at times when the market price of the shares was below the estimated Equity Backstop Price in November 2019. This support preserved market value and facilitated settlements with both the TCC and individual plaintiffs' representatives and the Ad Hoc Noteholder Committee, resolving two of the most significant open issues in the Debtors' Chapter 11 Cases. Substantial value has already been realized by existing PG&E shareholders, who constitute the sole group that bears the cost of the Equity Commitment Premium as reflected in a more than 100% increase in share price from mid-November. In light of the significant value that the Equity Backstop Parties have

12

provided to the Debtors and their existing shareholders through the Equity Backstop Commitments, the Equity Commitment Premium is a reasonable price to pay for the unprecedented value afforded from the Equity Backstop Commitment. Second, while the Equity Backstop lacks any true comparables, the fee structure nonetheless compares favorably with equity backstop pricing in certain other chapter 11 scenarios. The $1.2 billion fee at the Equity Backstop Price is approximately 10.2% of the total commitment of $12 billion and 13.6% of the intended $9 billion need under the OII Capital Structure. These percentages are not outside the range for other cases when considering the effective compensation provided to backstop parties in those cases (nominal fee plus gross-up for discounted backstop share issuance) without even taking into account the value provided in direct investments at a discount to plan value.

22. Furthermore, the reimbursement and advancement of the reasonable fees and expenses of Jones Day, legal advisor to certain of the Equity Backstop Parties, of up to $31.0 million, Orrick Harrington & Sutcliffe LLP, legal advisor to certain of the Equity Backstop Parties, of up to $3.0 million, and a financial advisor to certain of the Equity Backstop Parties of up to $19.0 million, as contemplated by the Final Equity Backstop Commitment Letters, is a necessary component of the agreement and without which the equity capital would not otherwise have been provided on the present terms. Based on the totality of the circumstances, I believe that the full Equity Commitment Premium of up to approximately 139 million shares of New PG&E Corp. Common Stock, in addition to the expense reimbursement structure described above, is fair and reasonable.

23. In addition to the work on the Final Equity Backstop Commitment Letters, the Debtors have been working in parallel with money-center banks to ensure needed access to debt capital at emergence. The Debtors' Joint Chapter 11 Plan of Reorganization filed on September 9, 2019 and amended on September 23, 2019, November 4, 2019, December 12, 2019 and January 31, 2020 (as amended, the "**Plan of Reorganization**") contemplates up to $10.825 billion

13

of new debt financing,[5] consisting of up to $5.825 billion at the Utility and up to $5 billion at PG&E Corp. to fund their emergence from chapter 11.[6]

24.     The Plan of Reorganization contemplates debt financing at both the Utility and PG&E Corp. to establish a capital structure upon emergence consistent with other peer utilities.  The Plan of Reorganization seeks to maximize the value of the Debtors' estates by incurring up to $10.825 billion in new debt financing and exchanging or reinstating approximately $21.425 billion of pre-petition Utility debt, which is expected to reduce the cost of the Utility's long-term debt by over $1 billion to the benefit of the Utility's customers and all stakeholders.

25.     Since the second quarter of 2019, the Debtors and their advisors have maintained ongoing dialogue with money-center banks to discuss debt financing options relative to the Debtors' emergence from chapter 11.  These conversations ultimately culminated in five banks providing highly confident letters ("**HCLs**") relative to raising debt and equity financing at emergence; the Debtors provided these HCLs to the Court as part of the September 9, 2019 filing of their Plan of Reorganization.  Furthermore, throughout the course of the third quarter of 2019, several banks developed illustrative debt financing structures and term sheets for presentation to the Debtors, to assist the Debtors in considering exit financing options.

26.     In late September 2019, following the filing of the second motion of the Ad Hoc Noteholder Committee to terminate the Debtors' exclusive periods, the Board determined that the Company should seek to obtain committed debt financing to bolster the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors' Plan of Reorganization, the best available alternative, can be consummated in accordance with statutory

---

[5] Excluding the $6 billion Temporary Utility Debt.  The Debtors continue to evaluate the most efficient and effective means for raising the Temporary Utility Debt given its intended short-term nature.

[6] Prior to January 31, 2020, the Plan of Reorganization contemplated up to $34.35 billion of new debt financing. However, under the terms of the Plan of Reorganization (accounting for the Noteholder RSA) up to $21.425 billion of prepetition notes and other funded debt will be exchanged or reinstated, reducing the new debt financing needed under the Plan of Reorganization.  In addition, ongoing discussions regarding the treatment of $100 million of prepetition pollution control bonds may result in the exchange (rather than refinancing) of those pollution control bonds.

14

requirements (both under the Bankruptcy Code and AB 1054). Much like the Final Equity Backstop Commitment Letters, committed debt financing would act as a backstop for the debt capital necessary to effectuate the Debtors' Plan of Reorganization at an acceptable price. The Debtors sought debt commitments in the form of investment grade "bridge" financing, which is short-term in nature (usually with a maturity within one year) and commonly used to provide certainty of execution on large, complex transactions by offering protection against market dislocation that could frustrate access to regular-way capital markets transactions at the specific dates or periods required by the transaction terms. As is typical, it is not expected that the Debt Commitments (as defined below) will be drawn—rather, they serve as an insurance policy to ensure that adequate funds at an acceptable price will be available when the Debtors need them. However, even if funded, the backstop debt facilities would be expected to be refinanced well in advance of their 364-day maturity. Given this expectation (coupled with the fact that the Debt Commitments are not expected to be drawn), I do not believe that the 364-day maturity raises any feasibility issues with respect to the Debtors' Plan of Reorganization. In light of this, the Debtors determined in their business judgment that a 364-day debt commitment struck the right balance between certainty and cost, as a longer term commitment if even available would come with much higher fees. The Debt Commitments will allow the Debtors to proceed with the prosecution and consummation of their Plan of Reorganization in a manner that will allow them to successfully emerge from chapter 11.

27. Following the Company's decision to obtain backstop debt commitments, the Debtors and their advisors commenced negotiations regarding backstop debt commitments, with the intention of finalizing the commitments by October 4, 2019, in advance of the October 7, 2019 hearing on the motion to terminate the Debtors' exclusivity. As such, the Debtors and their advisors contacted money-center banks on September 25 and 26 requesting initial proposals for backstop debt commitments. The Company and Lazard contacted nine leading banks and requested term sheet proposals for total Utility backstop debt commitments of $27.35 billion and

15

PG&E Corp. backstop debt commitments of $7.0 billion. All of the aforementioned banks delivered proposals by October 1, 2019.

28. After analysis of the initial proposals, which the Debtors evaluated based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors, the Debtors developed and shared a counterproposal based on anticipated market-clearing terms and selected JPMorgan, Citi, Bank of America, Barclays and Goldman Sachs as initial commitment parties (the "**Initial Backstop Debt Commitment Parties**")[7]. The Board approved the Debtors' entry into the backstop debt commitments on October 11, 2019; the Debtors executed the backstop debt commitments on the same day (as amended, the "**Debt Commitments**"). The Debt Financing Commitment Letters executed on October 11, 2019 contemplated obtaining Court approval by November 20, 2019.

29. On October 28, 2019, the Debtors joined BNP Paribas, Credit Suisse AG, Cayman Islands Branch, Morgan Stanley Bank, N.A., MUFG Union Bank, N.A. and Wells Fargo Bank, National Association, as additional Commitment Parties to the Debt Commitment Letters. On November 18, 2019, the Debtors amended the Debt Commitment Letters to extend the deadline for obtaining Court approval from November 20, 2019 to December 20, 2019. On December 2, 2019, the Debtors joined Mizuho Bank, Ltd. as an additional Commitment Party to the Debt Commitment Letters. On December 20, 2019, the Debtors further amended the Debt Commitment Letters to, among other things, extend the deadline for obtaining Court approval from December 20, 2019 to January 31, 2020.

30. On January 30, 2020, in view of the Noteholder RSA, the Debtors amended the Backstop Debt Fee Letters and the Debt Commitment Letters to (a) extend the deadline for obtaining Court approval of the Debt Commitment Letters from January 31, 2020 to February 28,

---

[7] The Initial Backstop Debt Commitment Parties are also engaged to act as arrangers and underwriters for market-based "take-out financing" through a combination of bank debt and bond placement at both PG&E Corp. and the Utility.

16

2020, (b) reduce the aggregate Debt Commitments from $27.35 billion to $5.825 billion at the Utility and from $7 billion to $5 billion for PG&E Corp., for a total of $10.825 billion and (c) add termination events including, among others, termination events relating to the failure to obtain approval of the Noteholder RSA, summarized below. To align the Debt Commitments with the OII Capital Structure, the Debtors amended the Debt Commitment Letters on February 14, 2020 to account for the OII Capital Structure including the expected incurrence of the Temporary Utility Debt and the post-emergence securitization transaction based on shareholder tax attributes. On February 28, 2020, the Debtors further amended the Debt Commitment Letters to extend the deadline for obtaining Court approval of the Debt Commitment Letters from February 28, 2020 to March 31, 2020.

31. Subject to the terms of the Debt Commitment Letters and Backstop Debt Fee Letters, the Debtors are obligated to pay certain fees (the "**Backstop Debt Fees**") to the Backstop Debt Commitment Parties to compensate them for their Debt Commitments. Similar to the Equity Commitment Premiums in the Final Equity Backstop Commitment Letters, the Backstop Debt Fees are necessary and market-based compensation for the Backstop Debt Commitment Parties, and, absent the Backstop Debt Fees, the Backstop Debt Commitment Parties would not be willing to provide the Debt Commitments. If the entire $10.825 billion in Debt Commitments remain open until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate Backstop Debt Fees payable by the Debtors with respect to such Debt Commitments would be approximately $72 million. While significant in dollar terms, on a percentage basis this represents 0.67% of the committed debt quantum, which Lazard's analysis shows to be consistent with or below market rates for bridge commitments. The Debt Commitments provide certainty of financing within a range of pricing outcomes. Absent the Debt Commitments, the Company could be forced to raise exit financing at prevailing terms during a time of market dislocation. The incremental interest cost of raising debt financing in the absence of a debt backstop could expose the Company to increased interest costs that exceed the fees on the Debt Commitments. By agreeing to a fee of

17

approximately $72 million, the Company is buying insurance; a 100 basis points increase in interest rate spreads across its capital structure results in more than $108 million of incremental annual interest expense for the Company.

32.     In addition to the Backstop Debt Fees, the Debtors would be required to pay additional amounts (including fees and interest) if the Debt Commitments are actually drawn at emergence from chapter 11. The pricing of the Debt Commitments, summarized below, provides certainty to the Debtors of the availability and cost of debt capital if the Debt Commitments are utilized upon exit from chapter 11. Furthermore, the Debt Commitments have added significance here given the importance of timely emergence to obtain the benefits of the AB 1054 wildfire fund and limited ability to delay emergence to allow credit markets to settle if there is volatility in the markets at the time the Debtors must emerge from chapter 11 to meet the AB 1054 and related deadlines. The interest rates associated with the Debt Commitments are as follows:

    i)   for the Utility: L[8]+112.5-175 bps (subject to a credit rating grid); 25 bps increase every 90 days after funding; maximum 75 bps increase; and

    ii)  for PG&E Corp.: L[8]+175-225 bps (subject to a credit rating grid); 25 bps increase every 90 days after funding; maximum 75 bps increase.

33.     As a result of negotiations led by the Company and Lazard, the Backstop Debt Fees were negotiated down relative to the initial proposals. Also, the Debt Commitments can be reduced or terminated to the extent there are changes to the financing needs or the Debtors' Plan of Reorganization, including any determination to utilize Additional Capital Sources, as defined in the Equity Backstop Commitment Letters. Based on analysis conducted by Lazard of financing fees for large bridge financing transactions since 2014, the terms are consistent with (or better than) those for similarly large, complex transactions. I believe that the Backstop Debt Fees were the subject of arms'-length and good faith negotiations between the Debtors and the Initial

---

[8] The interest rate under the facilities will be, at the option of the Utility or PG&E Corp., as applicable, (a) the Adjusted LIBO Rate (as defined in the Debt Commitment Letters) plus the specified margin or (b) the ABR (as defined in the Debt Commitment Letters) plus the specified margin, and minus 100 bps.

18

Backstop Debt Commitment Parties, are integral components of the overall terms of the Debt Commitments, were required by the Initial Backstop Debt Commitment Parties as consideration for the extension of the Debt Commitments and are reasonable under the circumstances, including the unique timing requirements of these Chapter 11 Cases.

34.    I believe the Equity Backstop Commitments and the Debt Commitments align the incentives of the Debtors with those of leading financial institutions and investors in favor of the ultimate success of the Debtors' Plan of Reorganization. These financial institutions and investors have committed significant capital to ensure the viability of the Debtors' Plan of Reorganization and I believe therefore have an interest in seeing it through to completion. I believe these commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will timely emerge from chapter 11 as a financially sound utility.

19

1            I declare under penalty of perjury that, to the best of my knowledge and after

2    reasonable inquiry, the foregoing is true and correct.

3

4    Dated:  March 2, 2020

5                                  /s/ *Kenneth S. Ziman*

6                                  Kenneth S. Ziman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28