| | |
|---|---|
| REBECCA J. WINTHROP (CA Bar No. 116386)<br>ROBIN BALL (CA Bar No. 159698)<br>NORTON ROSE FULBRIGHT US LLP<br>555 South Flower Street Forty-First Floor<br>Los Angeles, California 90071<br>Telephone: (213) 892-9200<br>Facsimile: (213) 892-9494<br>rebecca.winthrop@nortonrosefulbright.com<br><br>Attorneys for Creditors ADVENTIST HEALTH SYSTEM/WEST and FEATHER RIVER HOSPITAL D/B/A ADVENTIST HEALTH FEATHER RIVER | |

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19 - 30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**[BULLET POINT] OBJECTION OF THE ADVENTIST CLAIMANTS TO THE DEBTORS' (A) PROPOSED DISCLOSURE STATEMENT AND (B) MOTION FOR ENTRY OF AN ORDER (I) APPROVING FORM AND MANNER OF NOTICE OF HEARING ON PROPOSED DISCLOSURE STATEMENT; (II) ESTABLISHING AND APPROVING PLAN SOLICITATION AND VOTING PROCEDURES; (III) APPROVING FORMS OF BALLOTS, SOLICITATION PACKAGES, AND RELATED NOTICES; AND (IV) GRANTING RELATED RELIEF**<br><br>**Hearing Date and Time:**<br>Date: March 10, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA 94102 |

DOCUMENT PREPARED ON RECYCLED PAPER

99476500.15

Creditors Adventist Health System/West, a California religious non-profit corporation ("Adventist Health"), and Feather River Hospital, a California religious non-profit corporation, d/b/a Adventist Health Feather River ("AHFR" and, collectively with Adventist Health, the "Adventist Claimants"), in accordance with the Court's *Amended Order Establishing Schedule for Disclosure Statement Approval and Plan Confirmation* [ECF No. 5732], hereby serve this objection (the "Objection") to the *[Proposed] Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [ECF No. 5700] (the "Disclosure Statement") and the *Debtors' Motion for Entry of an Order (I) Approving Form and Manner of Notice of Hearing on Proposed Disclosure Statement; (II) Establishing and Approving Plan Solicitation and Voting Procedures; (III) Approving Forms of Ballots, Solicitation Packages, and Related Notices; and (IV) Granting Related Relief* [ECF No. 5835] (the "Solicitation Procedures Motion"). In support of the Objection, the Adventist Claimants respectfully set forth and represent as follows:[1]

I. **OBJECTIONS TO THE DISCLOSURE STATEMENT**

The Adventist Claimants' objections to the proposed Disclosure Statement are, in accordance with the Scheduling Order, set forth in bullet-point format.[2]

    A. *The Disclosure Statement Does Not Contain Adequate Information Regarding Expected Recoveries To Enable Fire Victim Claimants to Evaluate their Treatment Under the Plan.*

- Lack of Information on Expected Recoveries. No information is provided regarding the expected percentage return on account of Fire Victim Claims, the span of time over which Fire Victim Claimants can expect to receive payment, or an estimated aggregate dollar amount of claims in the class. Accordingly, Fire Victim Claimants have no means to understand, or evaluate (a) the value of what is being provided under the Plan, (b) whether the TCC's settlement satisfies AB 1054, or (c) whether Fire Victim Claimants are being treated fairly vis-à-vis other similarly situated classes of creditors (*e.g.*, the Subrogation Claimants and the Public Entity Claims). Similarly, the Disclosure Statement does not include the expected percentage return, dollar amount and estimated amount of Subrogation Wildfire Claims and the Public Entities Wildfire Claims in their respective

---

[1] The Adventist Claimants provided an objection to the Disclosure Statement and Solicitation Procedures Motion to the parties on February 28, 2020, as required by the Court's Scheduling Order. In a meet and confer with the Debtors, certain matters were clarified and the Adventist Claimants further understand that there may be some language changes to the Disclosure Statement. However, the matters discussed herein have not been resolved.

[2] Capitalized terms used but not defined in this Section I shall have the meanings ascribed to such terms in the Disclosure Statement or in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020* [ECF No. 5591] (the "Plan").

classes, in order to enable Fire Victim Claimants to understand and evaluate the proposed treatment of their claims as compared to other similarly situated creditors.

- <u>Lack of Pro Rata Treatment</u>. The Plan does not require distributions to Fire Victim Claimants to be made *pro rata* and does not establish a disputed claims reserve so that funds will be available when disputed claims are resolved. Neither do the Proposed Fire Victim Trust Agreement and Claims Resolution Procedures. *See* Exhibit "A" to *Notice of Filing of Proposed Fire Victim Trust Agreement and Proposed Fire Victim Claims Resolution Procedures* filed on March 3, 2020 [ECF No. 6049] (the "Proposed Trust Agreement").[3] All that is said in the Proposed Trust Agreement is a vague statement that the establishment and amount of reserves are left to the Trustee's discretion "to ensure all Approved Fire Victim Claims are paid in an equitable manner" – leaving unsated the requirement to provide *pro rata* treatment. [Proposed Trust Agreement, Section 2.2(e)(xxii).] Fire Victim Claimants therefore have no assurance that they will receive equal treatment from the Fire Victim Trust, particularly if their claims are disputed. The Disclosure Statement should either disclose the lack of such protections and the risks, or the Plan and trust-related documents should be revised to remedy the issue.

- <u>Lack of Meaningful Information on Claims Process</u>. The *Notice of Filing of Proposed Fire Victims Claims Resolution Procedures Summary,* filed on February 21, 2020 [ECF No. 5873] (the "Claims Procedures Summary"), does not provide meaningful information regarding the terms of the Trust Agreement, the Claims Resolution Procedures, the Bylaws or the other trust governance provisions.

    - Fire Victim Claimants must be given adequate information as to the Claims Resolution Procedures and related matters that impact the consideration and allowance of their claims. There are several aspects to the claim resolution process and trust agreement that themselves are confirmation issues, but also for which disclosure should be made. The Claims Procedures Summary should be updated to reflect the procedures just filed.

- <u>No Ability to Have Claims Resolved in Court/By Jury Trial</u>. On December 17, 2019, the TCC represented to the Court that "every tort claimant is preserving their ability to go to trial and have their claim resolved" in court. [12/17/19 Transcript, 155:3-12.] Yet, the Proposed Trust Agreement (§2.4(c)) and the new

---

[3] The Proposed Trust Agreement, including proposed Claims Resolution Procedures attached as an exhibit thereto, were filed on March 3, 2020. Given the short time frame to review these documents, the Adventist Claimants reserve and do not waive any of their rights to raise objections to these documents, whether discussed herein or not, in connection with disclosure objections. As an initial and preliminary matter, the Adventist Claimants note that the Proposed Trust Agreement contradicts the Proposed Plan by requiring all claimants to provide a "made whole" release to the insurance companies, notwithstanding that the Proposed Plan (with the Consenting Subrogation Claimholders' agreement) carves the Adventist Claimants out of such requirement pursuant to a stipulation negotiated among the Debtors, the Adventist Claimants and the Consenting Subrogation Claimholders [ECF No. 5153] and approved by a final and non-appealable order of this Court dated December 19, 2019 [ECF No. 5172]. Further, a revised Disclosure Statement and Plan may belatedly alter the language regarding the Adventist Claimants' carve-out in a manner contrary to the terms of the Stipulation and this Court's Order, agreed upon by the Debtors, but which, for reasons that are unknown, were not communicated to and may prejudice the Adventists Claimants. Finally, there are other issues in connection with the Proposed Trust Agreement, including limited court oversight of the Trust, lack of balanced Fire Victim representation (i.e., a lack of sufficient business and economic loss claimants outside of personal injury lawyers) on the TOC, and the ability to alter the Trust governing documents following confirmation of the Plan without any court review.

DOCUMENT PREPARED ON RECYCLED PAPER

Claims Resolution Procedures (Article VIII, Dispute Resolution) indicate that such redress is **not** available. The Claims Procedures Summary, however, states only that if a Fire Victim Claimant does not accept either the "Trust's determination that [its] claim is ineligible for payment" or "the amount awarded by the Trust for [its] claim," the Claimant's redress is to "seek review of the determination" pursuant to undisclosed "forthcoming procedures." The Claims Procedure Summary should clearly disclose to all fire victims as follows: "If you disagree with the outcome of the claims resolution process, you will have no right to a jury trial or further review of your claims by the Bankruptcy Court or any other court once your claims are decided by the Trustee, the Claims Administrator and one of the Neutrals."

- Use of "Neutrals." The Proposed Trust Agreement and Claims Resolution Procedures provide for the Trustee's and Claims Administrator's use of the same "neutrals" to both address the Trustee's initial claim determination (*see* Proposed Trust Agreement, §2.3(b)(iii) and §7.2(a)), and mediate and arbitrate claims issues and disputes following that initial determination (*see* Proposed Trust Agreement, §7.2(b)). Those same "neutrals" will also hear claimants' appeals of the Trustee's and Claims Administrator's claim determinations (*see* Claims Resolution Procedures, Article VIII Dispute Resolution) and, at the same time, meet with the Trustee and Claims Administrator to discuss the liquidation of claims. *See* Proposed Trust Agreement, §7.4. In short, the Neutrals' overlapping role as part of the Trustee's staff and part of the initial claim determinations, as well as mediators, arbitrators and reviewers of both their own decisions and those of the Trustee and Claims Administrator, is inherently in conflict. While this is a substantive issue for confirmation, the Disclosure Statement (or some other summary document geared to inform Fire Victims) should updated to advise fire victims in detail how the claims process will work and what rights they will have, as well as the dual role of the "neutrals."

- No Liquidation Analysis. Finally, the Disclosure Statement does not include a liquidation analysis enabling Fire Victim Claimants to compare their recoveries under the Plan to those in a liquidation. This information should be included in the Disclosure Statement.

B.  *The Crediting for Insurance Held by Fire Victim Claimants Is Not Adequately Described.*

- Neither the Disclosure Statement nor any summary for Fire Victim Claimants adequately describes how Fire Victim Claimants with insurance will be treated. This is first a confirmation issue, in that the Debtors are not entitled to a credit for any insurance separately paid for by Fire Victims Claimants, let alone the so-called face amount of a policy. While the Adventist Claimants are not seeking a double recovery on account of their claims, the Plan's proposed credit referenced on page 28 of the Disclosure Statement appears to violate California law and the collateral source rule. Under that rule, a tort victim's claim against a tortfeasor (here the Debtors) cannot be reduced based on recoveries from the victim's own insurance (much less a victim's *potential* recoveries). *Helfend v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 6-18 (1970); *Diamant v. Kasparian (In re S. Cal. Plastics, Inc.),* 165 F.3d 1243, 1247 (9th Cir. 1999) ("In the allowance process, the validity and legality of claims are determined by applicable nonbankruptcy law).

- Section 2.6 of the Proposed Trust Agreement contains a mechanic that seeks to address the treatment of claimants' insurance. It *differs* from what is described in the Disclosure Statement and provides that claimants with insurance will be

DOCUMENT PREPARED ON RECYCLED PAPER

- required to credit the **face amount** of their insurance coverage, regardless of what is paid or the coverage limitations. At the same time, the Proposed Trust Agreement (section 2.6(a)(iii)), provides that claims limited to diminution in value for property damage will only have to offset actual insurance recoveries. This is disparate treatment and appears to target businesses that are fire victims with inferior treatment.

- As a disclosure matter, the Disclosure Statement is unclear as to exactly what is proposed to be credited. All Fire Victims are entitled to know what purportedly will be credited against their claims (i.e., amounts actually received by claimants from their carriers, versus amounts based on some determination made in some unspecified fashion of what claimants might or could receive from the insurer). Similarly, the disparate treatment described above must be adequately described.

- Finally, if the TCC or others are taking the position that fire claimants such as the Adventist Claimants, which have received partial payments from their insurers, hold both Subrogation Wildfire Claims to the extent of those payments and Wildfire Victim Claims for the balance, then that treatment and the disposition of any plan payments that would be allowed on account of such claims should be disclosed to all creditors.

## II. OBJECTIONS TO THE SOLICITATION PROCEDURES MOTION

The Adventist Claimants' objections to the proposed Solicitation Procedures and the Solicitation Procedures Motion are, in accordance with the Scheduling Order, set forth below in bullet-point format.[4]

    A. *Claims Should Be Temporarily Allowed in the Amounts Asserted in the Applicable Proofs of Claim or if Otherwise Adjusted Should Be Commensurate With Creditors' Respective Economic Interests in These Cases.*

Through the Solicitation Procedures, the Debtors seek to estimate any and all Fire Victim Claims at $1.00 each for voting purposes only (whether or not such Claims are, in whole or in part, non-contingent, liquidated, or undisputed). The Solicitation Procedures provide that:

> Any Fire Victim Claim (including, for the avoidance of doubt, any Fire Victim Claim asserted by any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code)), whether listed in the Schedules or for which a Proof of Claim has been timely filed, regardless of whether such Fire Victim Claim is marked as wholly or partially contingent or non-contingent, liquidated or unliquidated, or disputed or undisputed, is accorded one (1) vote and valued at $1.00 for voting purposes only with respect to the Plan, and not for purposes of allowance or distribution, unless such Claim is disputed in the manner set forth in subparagraph (g) below.

---

[4] Capitalized terms used but not defined in this Section II shall have the meanings ascribed to such terms in the Solicitation Procedures Motion.

DOCUMENT PREPARED ON RECYCLED PAPER

99476500.15

Solicitation Procs. Mot. 16. The Adventist Claimants timely filed proofs of claim for actual damages (i.e. property damage, business losses, economic damages and others losses and expenses, but excluding any claims for punitive damages) in an amount not less than $506,030,602.00 (together, the "Adventist Fire Damage Claims").[5] The Adventist Claimants submit that the Adventist Fire Damage Claims must be temporarily allowed in these amounts or otherwise be estimated for voting purposes in a manner that aligns their voting power with their economic interests in these cases for the following reasons:

- Bankruptcy Code section 1126(c) sets forth the requirements for acceptance of the Plan by a Class of Claims. A Class has accepted the Plan only if (a) **at least two thirds in amount** and (b) more than one half in number of the creditors that voted accepted the Plan. *See* 11 U.S.C. § 1126(c). Thus, the Bankruptcy Code itself expressly prohibits the temporary-allowance "$1.00 one vote" methodology that the Debtors have proposed. The Debtors' proposal rewrites the Bankruptcy Code by removing the two thirds in amount requirement, converting Section 1126(c) to a two-thirds in number test.

- Nothing in the applicable Bankruptcy Code provisions, Bankruptcy Rules, or case law permits the Debtors to arbitrarily set valid claims at $1.00 for voting purposes over the objection of an affected creditor.[6] Instead, the Debtors ground their request in a handful of decisions that have little in common with these chapter 11 cases: *In re A.H. Robins Co., Inc.*, 88 B.R. 742, 747 (E.D. Va. 1988) *aff'd*, 880 F.2d 694 (4th Cir. 1989); *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *Lloyd E. Mitchell, Inc.*, 373 B.R. 416, 428 (Bankr. D. Md. 2007); and *Pension Ben. Guar. Corp. v. Enron Corp.*, No. 04-CIV-5499 (HB), 2004 WL 2434928, at *5 (S.D.N.Y. Nov. 1, 2004). ***None*** of these cases actually **hold** that the Debtors' procedure is consistent with Bankruptcy Code section 1126.[7]

---

[5] On February 12, 2020, the Committee filed the *Omnibus Objection of the Official Committee of Tort Claimants (Substantive) to Claims Filed by Adventist Health System/West and Feather River Hospital d/b/a Adventist Health Feather River (Claim Nos. 59459 & 59996)* [ICF No. 5760] (the "TCC Objection") seeking classify the Proof of Claim as a subrogation claim or, in the alternative, disallowing the Adventist Fire Damage Claims. However, concurrently with this filing, the Adventist Claimants will file a motion seeking to temporarily allow the Adventist Wildfire Claims for voting purposes.

[6] Although not cited or mentioned in the Solicitation Procedures Motion, the foundation for any estimation is Section 502(c). The Debtors have contended in this case that all of the Adventist Claimants' claims are somehow unliquidated because the Debtors dispute their liability for the Camp Fire. *See Debtors' Response to the Oppositions Filed by the United States of America, the State of California and Adventist Health on Certain Claims Subject to Estimation Under Section 502(c) of the Bankruptcy Code*, 2:16-20 [ECF No. 5004]. It is hard to imagine that the Debtors could legitimately and in good faith question that liability. At any rate, liability is now moot under the Plan and its use of the Fire Victim Trust mechanism to pay fire victims. Additionally, this legal position is incorrect given that, by its terms, Section 502(c) only applies and allows for the estimation of contingent and unliquidated claims – not disputed claims and not claims as to which liability may be questioned. *See The Adventist Claimants' Objection to the Notice of Debtors' Designation of Claims Filed by the United States of America, Etc.* [ECF No. 4783], 7:12-24, incorporated herein by this reference, demonstrating that nearly $143 million of their claims are liquidated and hence not subject to estimation under Section 502(c) at all. *Id.* at 3.

[7] For example, the court in *Pension Ben. Guar. Corp. v. Enron Corp.*, No. 04-CIV-5499 (HB), 2004 WL 2434928, at *5 (S.D.N.Y. Nov. 1, 2004) estimated for voting purposes certain claims asserted by the Pension Benefit Guaranty

Document Prepared on Recycled Paper

- In fact, courts in the leading cases—*Johns-Manville* and *A.H. Robins*—expressly **declined** to address the issue, finding instead that, given the overwhelming acceptance of the plan by the affected creditors, the temporary-allowance procedure was, at worst, "harmless error." *See, e.g., Johns-Manville*, 843 F.2d at 647 ("We need not decide whether the special Class-4 voting procedures violate the Code because, in view of the outcome of the vote, the alleged irregularities were at most harmless error."); *A.H. Robbins Co.*, 880 F.2d at 698 ("We do not decide whether the district court's voting procedure violated § 1126(c) because, in view of the outcome of the vote, the challenged procedure was at most harmless error.").

- Other decisions relied on by the Debtors recognize that the Debtors' proposed procedures may well be improper. For example, in *In re Quigley*, 346 B.R. 647 (Bankr. S.D.N.Y. 2006), cited at the very end of a string cite of inapposite cases, the court explores the potential injustice of estimating different claims at the same low value for voting purposes. The *Quigley* debtor and its parent company entered into a number of prepetition settlements with asbestos-exposure claimants, which information was used to assign amounts to claims based on the particular type of asbestos-related illnesses – which they called "impairments." The debtor proposed to calculate plan acceptances by estimating and temporarily allowing each asbestos-exposure claim at $1.00. However, certain asbestos-exposure claimants and the tort claimants' committee objected, arguing that the debtor should use a methodology based on the relative values of a creditors' asbestos-related impairment. While the plan was accepted by 85% of the claimants, <u>the ballots still allowed creditors to identify their applicable impairments. The debtor then used this mechanism to demonstrate that using either a claim amount or an impairment-based methodology would not change the outcome of the vote.</u>

- As in *Johns-Manville* and *A.H. Robins*, the *Quigley* court observed that the use of the debtor's "$1.00 per vote" procedure would be, at most, "harmless error." Nevertheless, the court still ***agreed*** with the objectors and declined to estimate the claims at $1.00, instead weighing the votes in accordance with the values assigned to the particular impairment under the plan. *See* 346 B.R. at 649. The court found that estimation for voting purposes should ensure that ***voting power is commensurate with a claimant's economic interests in the case*** and that, in Quigley's case, <u>the impairment-based method prevents smaller claims from disenfranchising those with greater impairments</u>. *See* 346 B.R. at 654.

- According to the *Quigley* court, "[i]t appears, then, that the $1.00 per vote method can be used when support is overwhelming ***and*** a different voting method will not change the result. Where the harmless error rule cannot be applied, another approach may be necessary. The alternative is to weigh each vote based on the nature and impairment of each claimant's injury. This method more accurately aligns the voting strength with the ultimate claim value and prevents the holders of relatively small claims from disenfranchising the more severely impaired who

---

Corporation pursuant to Bankruptcy Rule 3018(a) at $321.8 million solely against the Enron parent company, rather than the $76 billion in claims it sought to vote across the Enron enterprise. The *Enron* decision did ***not*** address temporarily allowing each claim in an entire class at $1.00. Similarly, the unpublished orders the Debtors cite are inapplicable and unpersuasive. With the exception of the *Quigley* decision discussed in more detail herein, in each case, no party appears to have even objected to a debtor's request to temporarily allow claims at $1.00 for voting purposes. *See, e.g., In re Plan Insulation Co.*, Case No. 09-31347 (TC) [ECF No. 1000] (Bankr. N.D. Cal. Feb. 1, 2011) (no objection to proposed estimation of certain claims at $1.00 for voting purposes); *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del. May 17, 2019) [ECF No. 241] (same); *In re TK Holdings, Inc.*, Case No. 17-11375 (BLS) (Bankr. D. Del. Jan. 5, 2018) [ECF No. 1639] (same).

DOCUMENT PREPARED ON RECYCLED PAPER

hold larger claims. . . . In addition, this approach fulfills the expectations of the claimants since their votes are presumably cast, in part, based upon the amount the creditors expect to receive from the Trust." *Id.* at 654-55 (internal citations omitted) (emphasis added).

- The court in *Lloyd E. Mitchell*, *supra*, a mass-tort case with approximately 19,000 creditors holding asbestos-exposure claims, came to the same result. In *Mitchell*, the debtor and creditors' committee proposed to estimate and temporarily allow asbestos-exposure claims at $1.00 for voting purposes. Certain insurance companies objected to the procedure. The court overruled the objections, but did ***not*** rule that the procedure was permissible. Rather, the court observed that "[s]eriously-injured claimants [may] object [to the estimation of their claims at $1.00] because their claims are to be allowed for voting purposes in the same amount as claimants whose injuries have not yet manifested. ***In these types of plans, the "one dollar/one vote" procedures are questionable***." 373 B.R. at 427 (emphasis added). The *Mitchell* court further generally agreed with *Quigley*'s "wait-and-see" approach, and found the insurers' objections premature. The proposed ballot included information that would allow the parties to revisit the issue ***after*** voting closed if the competing methodologies produced different results. *See id.* at 428 ("If, however, a situation were to arise in which the actual vote of the Class 3 claimants could be subject to mathematical challenge, the Joint Proponents have a contingency plan. There is language at page 7 of each master ballot providing that each master ballot shall include an attachment with a designation of disease category for each holder of an Unliquidated Asbestos Claim. Using this information, if the Court later determines that it is necessary, a calculation pursuant to § 1126(c) of the Bankruptcy Code could be performed.").

- Here, the Debtors have not provided any reasonable methodology to support their motion, instead using the questionable $1.00 per vote scheme in a one-size fits all approach. The Fire Victim Claims in this case are not analogous to the asbestos-related or product-liability exposure to the estates in *Johns-Manville*, *A.H. Robins*, *Lloyd E. Mitchell*, *Quigley*, or any similar cases. Resolving issues related to medical conditions and similar injuries for voting purposes are perhaps uncertain and, unavoidably, requires some guesswork as to amount. For many other creditors, including the Adventist Claimants, a substantial portion of their claims flow from wildfire damage to real and personal property, as well as business and economic losses. These are, by their nature, more likely to have specific dollar amounts asserted, akin to a contract damage claim with specific claim amounts and numbers asserted, as opposed to the personal injury type claims addressed in the cases cited by the Debtors.

- Moreover, the Debtors cannot—and likely do not—presume that the Plan will be accepted by 96% of the Fire Victim Claims (as was the case in *Johns-Manville* and *A.H. Robins*). The docket already contains many letters, petitions or other pleadings from fire victims expressing their objections to the TCC settlement being implemented in the Plan. *See, e.g.,* ECF Nos. 5739, 5875 (purportedly containing 1630 signatures). It is clear here that the Debtors, having achieved a settlement with representatives of perhaps nearly 70% in number of holders of Fire Victim Claims, overwhelming made up of personal injury claimants and their lawyers, are essentially using a result oriented methodology to try to achieve a Class vote to accept the Plan.

- Consistent with the well-settled policy against any manner of voting manipulation, the Debtors' proposed temporary-allowance procedure should be closely scrutinized by the Court. *See, e.g., In re Art & Architecture Books of the*

DOCUMENT PREPARED ON RECYCLED PAPER

*21st Century*, No. 2:13-BK-14135-RK, 2016 WL 1118743, at *9 (Bankr. C.D. Cal. Mar. 18, 2016) ("a plan proponent is allowed considerable discretion to classify claims and interests according to the facts and circumstances of the case *so long as the classification scheme does not* violate basic priority rights or *manipulate voting*") (emphasis added); *see also Barakat v. The Life Ins. Co. of Virginia (In re Barakat)*, 99 F.3d 1520, 1525 (9th Cir. 1996) (collecting cases).

- Nothing in the case law permits the Debtors to write out of the Bankruptcy Code the clear voting thresholds and other requirements for the Plan's acceptance and confirmation. *See* 11 U.S.C. § 1126(c) (providing for acceptance of a plan by a class of creditors if more than half in number and two-thirds in amount of voting creditors accept the plan); *id.* at § 1129(a)(8) (requiring that each class of impaired claims has accepted the plan); *id.* at § 1129(b) (permitting "cram down" where, among other things, at least one impaired class has voted to accept the plan).

- While there is precedent for allowing the "$1.00 per vote" procedure under ***different circumstances***, the Debtors have presented no legal support for the procedure where the affected creditors object, the proposed procedure would effectively disenfranchise large claim holders, and an alternative methodology could be developed. In this regard, multiple creditors in the instant case, including the Adventist Claimants, have gone to great lengths to assert specific damage amounts in their Proofs of Claims. The TCC also has represented to the Court that it and "many parties" have been working on a "resolution trust agreement and a matrix which describes the treatment of individual claims within the resolution trust," all of which will be "brought before this Court." *See, e.g.,* [12/17/19 Transcript, 154: 11-17**]** Yet, the parties apparently chose not to adopt any of those values or that approach to set voting amounts—which in theory align with *Quigley* and the other cases discussed above. Instead, they have chosen a methodology that disenfranchises large creditors.

- In short, the Debtors must permit Fire Victim Claims to vote in the amounts asserted in their respective proofs of claim (excluding punitive damages), or otherwise propose an alternative methodology that is consistent with creditors' rights under applicable bankruptcy and non-bankruptcy law and their economic interests in these cases. *See Quigley*, 346 B.R. at 654 ("In the end, any estimation should ensure that the voting power is commensurate with the creditor's economic interests in the case") (citing *Enron*, 2004 WL 2434928, at *5).

- Given the Bankruptcy Code's plain language and the lack of legal support for the Debtor's proposed temporary-allowance procedure, the Adventist Claimants assert that the Debtors should work with all major stakeholders to develop an alternative temporary-allowance methodology that balances the parties' desire for efficiency with the need to ensure that the Debtors' largest creditors are not disenfranchised. *See id.* The Adventist Claimants submit that the parties should agree to an alternative temporary-allowance methodology now, which in turn would promote efficiency and prevent confirmation litigation that, if successful, could threaten the viability of the proposed Plan.

### III. RESERVATION OF RIGHTS

The Adventist Claimants hereby reserve the right to amend, modify, and/or supplement this Objection. The Adventist Claimants further reserve (a) the right to respond to or adopt any

DOCUMENT PREPARED ON RECYCLED PAPER

statements or legal theories raised or advanced by any party in connection with this Objection, the Disclosure Statement or the Solicitation Procedures Motion and (b) any other rights in respect of this Objection, the Disclosure Statement, the Solicitation Procedures Motion, and any related matters.

## IV. CONCLUSION

WHEREFORE, the Adventist Claimants respectfully request that the Debtors modify the Disclosure Statement and the Solicitation Procedures, Ballots, and any related documents consistent with this Objection.

Dated: March 6, 2020

REBECCA J. WINTHROP
ROBIN BALL
NORTON ROSE FULBRIGHT US LLP

By: */s/ Rebecca J. Winthrop*
REBECCA J. WINTHROP
Attorneys for Creditors ADVENTIST HEALTH SYSTEM/WEST and FEATHER RIVER HOSPITAL D/B/A ADVENTIST HEALTH FEATHER RIVER

DOCUMENT PREPARED ON RECYCLED PAPER

99476500.15