WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**[PROPOSED] DISCLOSURE STATEMENT FOR DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>Dated: San Francisco, California<br>        March 9, 2020 |

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

Page

I.   Introduction ................................................................................................ 1

     A.   Notice to Creditors .......................................................................... 3

II.  Overview of the Debtors ............................................................................ 4

     A.   Business Operations ......................................................................... 4
     B.   Corporate and Capital Structure ...................................................... 5
     C.   State Legislative and Regulatory Framework .................................. 6
     D.   Events Leading to Commencement of the Chapter 11 Cases .......... 7
     E.   Postpetition State Legislative and Regulatory Matters ................... 7
     F.   Other Federal Regulatory Matters ................................................. 12

III. Overview of the Chapter 11 Cases .......................................................... 12

     A.   Commencement of Chapter 11 Cases ............................................ 12
     B.   First Day Motions .......................................................................... 13
     C.   Other Significant Events During the Chapter 11 Cases ................ 13
     D.   Related Pending Proceedings ........................................................ 20

IV.  Background and Overview of the Plan ..................................................... 22

     A.   Plan Background ............................................................................ 22
     B.   Classification and Treatment of Claims and Interests................... 24
     C.   Treatment and Satisfaction of Fire Claims ................................... 28
     D.   Treatment and Satisfaction of All Other Prepetition Claims and Interests .......... 33
     E.   Equity Financing ........................................................................... 34
     F.   Debt Financing .............................................................................. 36
     G.   Injunction, Exculpation, Release, and Related Provisions............ 37

V.   Voting Procedures and Requirements ...................................................... 42

     A.   Holders of Claims and Interests Entitled to Vote......................... 42
     B.   Voting Deadline ............................................................................ 42
     C.   Voting Procedures ......................................................................... 43

VI.  Conditions Precedent to Confirmation of the Plan and Effective Date ........... 44

VII. Confirmation of the Plan ......................................................................... 44

     A.   Acceptance of the Plan ................................................................. 44
     B.   Best Interest Test .......................................................................... 45
     C.   Feasibility...................................................................................... 47
     D.   Alternatives to the Plan ................................................................ 47
     E.   Notices and Confirmation Hearing ............................................... 48

VIII. Factors to Consider Before Voting ......................................................... 50

     A.   Business Risk Factors to Be Considered....................................... 50
     B.   General Risks Associated with the Bankruptcy Process............... 50
     C.   General Risks Associated with the State Legislative and Regulatory Process ..... 51
     D.   Certain Securities Laws Matters ................................................... 52

E.    Certain Tax Consequences of the Plan ................................................... 53

IX.   Conclusion ............................................................................................... 65

**EXHIBITS**

EXHIBIT A    Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization

EXHIBIT B    Financial Projections

# I. **INTRODUCTION**

On January 31, 2020, PG&E Corporation ("**PG&E Corp.**" or "**HoldCo**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., "**PG&E**" or the "**Debtors**"), and certain funds and accounts managed or advised by Abrams Capital Management, LP and certain funds and accounts managed or advised by Knighthead Capital Management, LLP (the "**Shareholder Proponents**" and, together with the Debtors, the "**Plan Proponents**") filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020* [Docket No. 5590] (as it may be amended, modified or supplemented, and together with any exhibits or schedules thereto, the "**Plan**"). This disclosure statement (as it may be amended, modified or supplemented, and together with any exhibits or schedules hereto, the "**Disclosure Statement**") is being provided to you in connection with the solicitation of votes to accept or reject the Plan. A copy of the Plan is annexed to this Disclosure Statement as **Exhibit A**. Unless otherwise defined herein, capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

The Plan is supported by the following parties:

1. The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company, consisting of major holders of the Utility's outstanding prepetition funded debt claims (the "**Ad Hoc Noteholders Committee**");

2. The Ad Hoc Group of Subrogation Claim Holders, consisting of major holders of claims arising from insurance payments made to victims in connection with the wildfires (the "**Ad Hoc Subrogation Group**");

3. Several Public Entities in the areas in which the wildfires occurred (the "**Public Entities**"); and

4. Certain major shareholders of PG&E Corp.

**THESE PARTIES BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS THE FASTEST WAY FOR FIRE VICTIMS AND OTHER CLAIMANTS TO RECEIVE PAYMENTS ON THEIR CLAIMS, AND THAT IF THE PLAN IS NOT APPROVED THOSE PAYMENTS WILL BE SIGNIFICANTLY DELAYED AND FIRE VICTIMS AND OTHER CLAIMANTS MAY RECEIVE SIGNIFICANTLY LESS THAN WHAT THEY WOULD RECEIVE UNDER THE PLAN.**

It is important to note that (as described in more detail below) under the Plan, aggregate consideration of $13.5 billion will be transferred to a trust to satisfy Fire Victim Claims (the "**Fire Victim Trust**") as follows:

1. $5.4 billion in Cash on the Effective Date of the Plan;

2. An additional $1.35 billion in Cash, consisting of (i) $650 million to be paid in Cash on or before January 15, 2021 pursuant to a Tax Benefits Payment Agreement, and (ii) $700 million to be paid in Cash on or before January 15, 2022 pursuant to a Tax Benefits Payment Agreement;

3. $6.75 billion in common stock of Reorganized PG&E Corp. (using equity valued using a multiple equal to 14.9 multiplied by the Normalized Estimated Net Income

as of a date to be agreed upon among the parties to the Tort Claimants RSA (defined below)), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date;

**THE $6.75 BILLION VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP. IS BASED ON A FORMULA SET FORTH IN THE TORT CLAIMANTS RSA AND INCORPORATED IN THE PLAN. THE $6.75 BILLION VALUE DOES NOT NECESSARILY REFLECT THE ACTUAL VALUE OF THE STOCK TO BE HELD BY THE FIRE VICTIM TRUST ON THE EFFECTIVE DATE AND THEREAFTER. THE ACTUAL VALUE OF THE STOCK ON THE EFFECTIVE DATE AND THEREAFTER COULD BE GREATER OR LESS THAN $6.75 BILLION BASED ON THE FUTURE TRADING VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP.;**

4. The assignment to the Fire Victim Trust of certain claims that the Fire Victim Trust may pursue for the benefit of holders of Fire Victim Claims; and

5. The assignment of rights under the 2015 Insurance Policies to resolve any Claims related to Fires in those policy years, other than the rights of the Debtors to be reimbursed under the 2015 Insurance Policies for claims submitted to and paid by the Debtors prior to the Petition Date.

Pursuant to the Plan, all Allowed Fire Victim Claims will be paid from the assets described above that will be transferred to the Fire Victim Trust. All Fire Victim Claims will be resolved and satisfied by the Fire Victim Trust pursuant to claims resolution procedures to be adopted by the Fire Victim Trust. **Although common stock of Reorganized PG&E Corp. is to be transferred to the Fire Victim Trust pursuant to the Plan, NOTHING IN THE PLAN OR THE FIRE VICTIM TRUST AGREEMENT REQUIRES A FIRE VICTIM TO RECEIVE PAYMENT IN STOCK.**

The aggregate consideration of $13.5 billion described above to be contributed to the Fire Victim Trust (plus the assigned claims) was determined by a settlement among the Debtors, the Tort Claimants Committee and the law firms (the "**Consenting Fire Claimant Professional Group**") that represent Fire Victims holding over 70% of the in excess of 70,000 fire claims that have been filed. The sole source of recovery for holders of Fire Victim Claims is the Fire Victim Trust. Holders of Fire Victim Claims will not be able to otherwise pursue their claims against the Debtors, Reorganized PG&E, or their respective assets or properties.

**IF YOU ARE A FIRE VICTIM, PLEASE SEE THE ENCLOSED "FIRE VICTIM CLAIM PLAN TREATMENT SUMMARY" FOR ADDITIONAL INFORMATION.**

It is also important to note that the Plan Proponents believe that the Plan will enable the Debtors to support California's clean energy goals and ensure that PG&E has access to sufficient resources to aggressively invest in capital improvements and wildfire mitigation and to provide safe and reliable service to its customers and communities.

Finally, the Plan Proponents believe that upon implementation of the Plan, PG&E will be able to participate in the recently authorized Go-Forward Wildfire Fund, which is designed to support the

creditworthiness of California electrical corporations and provide a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers.

**THE DEBTORS, THE AD HOC NOTEHOLDERS COMMITTEE, THE AD HOC SUBROGATION GROUP, THE PUBLIC ENTITIES, AND THE SHAREHOLDER PROPONENTS RECOMMEND THAT HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN AND RETURN THEIR BALLOTS BY THE VOTING DEADLINE (AS DEFINED BELOW) FOLLOWING THE METHODS SET FORTH BELOW.**

## A. <u>Notice to Creditors</u>

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the treatment of Claims and Interests under the Plan, including the treatment of Claims held by Fire Victims, (ii) advises holders of Claims and Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed. The Bankruptcy Court previously set certain dates and deadlines with respect to approval of the Disclosure Statement and confirmation of the Plan by Order, dated February 11, 2020 [Docket No. 5732] (the "**Scheduling Order**").

**IT IS THE OPINION OF THE PLAN PROPONENTS, THE AD HOC SUBROGATION GROUP, AND THE PUBLIC ENTITIES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS (INCLUDING ALL FIRE VICTIMS), AND SHAREHOLDERS.**

**THEREFORE, THE DEBTORS, THE AD HOC NOTEHOLDERS COMMITTEE, THE AD HOC SUBROGATION GROUP, THE PUBLIC ENTITIES, AND THE SHAREHOLDER PROPONENTS RECOMMEND THAT ALL CLAIMANTS AND SHAREHOLDERS, WHO ARE ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY MAY 15, 2020 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "<u>VOTING DEADLINE</u>"). THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND INTERESTS MAY VOTE ON THE PLAN IS MARCH [●], 2020 (THE "<u>RECORD DATE</u>").**

**THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "<u>CONFIRMATION HEARING</u>") WILL BE HELD BEFORE THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, COURTROOM 17, 16TH FLOOR, 450 GOLDEN GATE AVENUE, SAN FRANCISCO, CA 94102 ON MAY 27, 2020 AT 10:00 A.M. (PREVAILING PACIFIC TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.**

**THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE MAY 15, 2020 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "<u>CONFIRMATION OBJECTION DEADLINE</u>"). PURSUANT TO THE SCHEDULING ORDER, PRINCIPAL COUNSEL**

**REPRESENTING A PARTY, OR ANY PRO SE PARTY, OBJECTING TO CONFIRMATION OF THE PLAN MUST APPEAR IN PERSON AT A PRE-CONFIRMATION SCHEDULING CONFERENCE ON MAY 19, 2020 AT 10:00 A.M. (PREVAILING PACIFIC TIME) TO DISCUSS SCHEDULING ANY EVIDENTIARY MATTERS TO BE DEALT WITH IN CONNECTION WITH THE CONFIRMATION HEARING AND SCHEDULING FOR BRIEFING OF CONTESTED LEGAL ISSUES. FAILURE TO APPEAR MAY RESULT IN THE OBJECTION BEING STRICKEN.**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL.**

The draft Fire Victim Trust Agreement and the draft Fire Victim Claims Resolution Procedures describing the establishment and administration of the Fire Victim Trust have been filed with the Bankruptcy Court, as has the substantially final form of Subrogation Wildfire Trust Agreement describing the establishment and administration of the Subrogation Wildfire Trust. Certain documents necessary to the effectuation of the Plan will be filed with the Bankruptcy Court no later than 14 days before the Confirmation Objection Deadline. These documents are referred to collectively as the Plan Supplement and will include, but not be limited to: (i) the Schedule of Rejected Contracts; (ii) the New Organizational Documents; (iii) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code as to the officers and directors of the Reorganized Debtors on the Effective Date of the Plan; (iv) the Exit Financing Term Sheets; (v) the Schedule of Assigned Rights and Causes of Action; (vi) the Tax Benefits Payment Agreement; (vii) the Fire Victim Trust Agreement; and (viii) the Fire Victim Claims Resolution Procedures. Such documents will be consistent with the terms of the Plan, *provided*, that, through the Effective Date, the Plan Proponents will have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**WHERE TO FIND ADDITIONAL INFORMATION:** The Debtors currently file annual, quarterly and current reports with, and furnish other information to, the Securities and Exchange Commission (the "**SEC**"). Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx. Further information can be found in the following filings (but later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede that information):

- Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on February 18, 2020 (the "**2019 Form 10-K**"); and

- Form 8-Ks filed with the SEC during the pendency of these Chapter 11 Cases.

## II. OVERVIEW OF THE DEBTORS

### A. Business Operations

PG&E Corp., incorporated in California in 1995, is a holding company whose primary operating subsidiary is Pacific Gas and Electric Company, a public utility operating in northern and central

California. The Utility was incorporated in California in 1905 and became a subsidiary of PG&E Corp. in 1997. The Utility generates revenues mainly through the sale and delivery of electricity and natural gas to customers.

**Electric Utility Operations**. The Utility generates electricity and provides electric transmission and distribution services throughout its service territory in northern and central California to residential, commercial, industrial, and agricultural customers. The Utility provides "bundled" services (*i.e.*, electricity, transmission, and distribution services) to customers in its service territory. In 2018, the Utility generated over $12 billion in revenue based on the sale or delivery of electricity.

**Natural Gas Utility Operations**. The Utility provides natural gas transportation services to "core" customers (*i.e.*, small commercial and residential customers) and to "non-core" customers (*i.e.*, industrial, large commercial, and natural gas-fired electric generation facilities) that are connected to the Utility's gas system in its service territory. Core customers can purchase natural gas procurement services (*i.e.*, natural gas supply) from either the Utility or third-party gas procurement service providers (referred to as "core transport agents"). Core transport agents can use the Utility to deliver, meter, and bill customers for natural gas sold by the core transport agent to the core customers. Currently, more than 97% of core customers, representing approximately 80% of the annual core market demand in the Utility's service territory, receive bundled natural gas service from the Utility. In 2018, the Utility generated over $3.8 billion in revenue based on the sale or delivery of natural gas.

For a more detailed description of the Debtors' business operations, please see the 2019 Form 10-K and the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**").

**B.    Corporate and Capital Structure**

As of the Petition Date, the Debtors had approximately $22 billion of outstanding funded indebtedness. PG&E Corp.'s common stock is traded on the New York Stock Exchange under the symbol "PCG." The following is a general summary of the Debtors' prepetition capital structure and indebtedness. For a more detailed description, please see the latest reports filed with the SEC, available at http://investor.pgecorp.com/financials/sec-filings/default.aspx.

**1.    Common Stock.** As of the Petition Date, PG&E Corp. had approximately 529,000,000 shares of common stock outstanding. PG&E Corp. holds all of the shares of outstanding common stock of the Utility. On December 20, 2017, the Board of Directors of PG&E Corp. suspended quarterly cash dividends on PG&E Corp.'s common stock, beginning with the fourth quarter of 2017 due to the uncertainty related to the causes of and potential liabilities associated with the 2017 Northern California wildfires. That suspension has remained in effect through the Petition Date and during the pendency of the Chapter 11 Cases.

**2.    Preferred Stock.** PG&E Corp. has authorized 75 million shares of no par value preferred stock and 5 million shares of $100 par value preferred stock. No such preferred stock is outstanding. The Utility has authorized 75 million shares of $25 par value preferred stock and 10 million shares of $100 par value preferred stock outstanding. As of December 31, 2018, the Utility's preferred stock outstanding included $145 million of shares with dividend rates between 5% and 6% designated as non-redeemable preferred stock and $113 million of shares with dividend rates between 4.36% and 5% that are redeemable between $25.75 and $27.25 per share. The Utility's preferred stock outstanding is not subject to mandatory redemption. On December 20, 2017, the Boards of Directors of the Utility

suspended quarterly cash dividends on the Utility's preferred stock, beginning with the three-month period ending January 31, 2018, due to the uncertainty related to the causes and potential liabilities associated with the 2017 Northern California wildfires. That suspension has remained in effect through the Petition Date and during the pendency of the Chapter 11 Cases.

**3. Prepetition Indebtedness.** The prepetition funded indebtedness of the Debtors primarily consists of the following (this summary does not include any potential liabilities associated with the 2017 and 2018 Northern California wildfires):

*Revolving Credit Facilities.* Each of PG&E Corp. and the Utility are party to a separate revolving credit agreement with Wilmington Trust, National Association, and Citibank, N.A., respectively, as administrative agents (each a "**Revolving Credit Facility**" and collectively, the "**Revolving Credit Facilities**"). As of December 31, 2018, PG&E Corp.'s aggregate borrowings outstanding under its Revolving Credit Facility were $300 million. As of December 31, 2018, the Utility's aggregate borrowings under its Revolving Credit Facility were $2.965 billion, which included $2.888 billion of revolving credit loans and approximately $80 million in letters of credit outstanding. For a more detailed description of the Revolving Credit Facilities and the terms thereof, please refer to the Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on February 28, 2019 (the "**2018 Form 10-K**") and the Wells Declaration.

*Term Loans.* PG&E Corp. has an outstanding prepetition unsecured term loan in the principal amount of $350 million and the Utility has an outstanding prepetition unsecured term loan in the principal amount of $250 million.

*Utility Senior Notes.* The Utility has approximately $17.5 billion in principal amount of senior unsecured notes (the "**Utility Senior Notes**") outstanding with varying interest rates and maturities ranging from 2020 to 2047. The Utility Senior Notes are not guaranteed by PG&E Corp.

*Pollution Control Bonds.* Prior to the Petition Date, the California Pollution Control Financing Authority and the California Infrastructure and Economic Development Bank issued approximately $863 million of fixed-rate and multi-modal tax-exempt pollution control bonds for the benefit of the Utility. Approximately $760 million in principal amount of such pollution control bonds were backed by letters of credit issued by certain banks for which the Utility has reimbursement obligations. Following the commencement of the Utility's Chapter 11 Case, the letters of credit for the series of pollution control bonds supported by reimbursement agreements were fully drawn. The obligations under the reimbursement agreements entered into by the Utility in connection with the issuance of the letters of credit are prepetition unsecured obligations of the Utility and are not guaranteed by PG&E Corp.

## C. State Legislative and Regulatory Framework

The Debtors' business is subject to applicable federal, state and local law and the regulatory jurisdiction of various agencies at the federal, state, and local levels. At the state level, the Utility is regulated primarily by the California Public Utility Commission (the "**CPUC**"). At the federal level, the Utility is subject to the jurisdiction of the Federal Energy Regulatory Commission ("**FERC**") and the Nuclear Regulatory Commission ("**NRC**"). The Utility is also subject to the requirements of other federal, state and local regulatory agencies, including with respect to safety, the environment, and health. For a more detailed description of the regulatory framework, please see the latest reports filed with the SEC, available at http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### D.    Events Leading to Commencement of the Chapter 11 Cases

The Chapter 11 Cases were necessitated by a confluence of factors resulting from the catastrophic and tragic wildfires that occurred in Northern California in 2017 and 2018, and PG&E's potential liabilities arising therefrom. The multitude of pending claims and lawsuits, and the thousands of additional claims that the Debtors expected to be asserted, made it clear that PG&E could not continue to address those claims and potential liabilities in the California state court system, while at the same time continuing to deliver safe and reliable service to its over 15 million customers and remaining economically viable.

In view of the circumstances confronting PG&E, it did not have the ability to access the capital necessary to (i) address and resolve the thousands of wildfire claims that already had been asserted and would be asserted against it over the next several months and years; (ii) operate its business and provide prudent and efficient electric and gas services to its millions of customers; (iii) properly invest in its infrastructure and critical initiatives to provide safe and reliable service and to mitigate future wildfire risks in an environment impacted by climate change; and (iv) service and, as required, refinance or satisfy its approximately $22 billion in outstanding funded debt obligations.

PG&E's decision to seek relief under chapter 11 followed a comprehensive review of all realistic alternatives and the consideration and balancing of a variety of factors, including (i) the need for an orderly, fair, and expeditious process to assess and resolve PG&E's potential liabilities resulting from the 2017 and 2018 Northern California wildfires; and (ii) how to best preserve and maximize the value of PG&E's business enterprise for the benefit of all of its economic stakeholders, including wildfire claimants, PG&E's other creditors, and PG&E Corp.'s shareholders.

For a more detailed description of the events leading to the commencement of the Chapter 11 Cases, please refer to the 2018 Form 10-K and the Wells Declaration.

### E.    Postpetition State Legislative and Regulatory Matters

#### 1.    Wildfire Legislation.[1]

On July 12, 2019, Governor Newsom signed into law Assembly Bill 1054 ("**AB 1054**" or the "**Wildfire Legislation**"), which, among other things, establishes a statewide fund that participating utilities may access to pay for liabilities arising in connecting with future wildfires occurring after July 12, 2019 (the "**Go-Forward Wildfire Fund**"). The Wildfire Legislation also provides details regarding the conditions to and costs of participating in the Go-Forward Wildfire Fund and sets the criteria by which participating utilities can access the fund.

Each of California's large investor-owned electric utility companies that are not currently subject to chapter 11, Southern California Edison ("**SCE**") and San Diego Gas & Electric Company ("**SDG&E**"), has elected to participate in the Go-Forward Wildfire Fund. AB 1054 provides that the Go-Forward Wildfire Fund is established upon SCE and SDG&E funding their initial contributions.

The Utility has provided notice to the CPUC of its intent to participate in the Go-Forward Wildfire Fund, and on August 26, 2019, the Bankruptcy Court issued an order [Docket No. 3689]

---

[1] This summary is qualified in its entirety by the actual text of AB 1054.

authorizing the Debtors to participate in the Go-Forward Wildfire Fund. Under AB 1054, however, to participate in the Go-Forward Wildfire Fund, the Utility must satisfy several additional conditions. Upon emergence from chapter 11, the Utility must pay the initial and annual contributions required for participation in the Go-Forward Wildfire Fund. Additionally, the Utility must satisfy the following conditions by June 30, 2020:

> (A) The [Utility's Chapter 11 Case] has been resolved pursuant to a plan or similar document not subject to a stay.

> (B) The [B]ankruptcy [C]ourt or a court of competent jurisdiction, in the [Chapter 11 Cases], has determined that the resolution of the [Chapter 11 Case] provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the [Utility] in the [Chapter 11 Cases] in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court.

> (C) The [CPUC] has approved the reorganization plan and other documents resolving the [Utility's Chapter 11 Cases], including the [Utility's] resulting governance structure, as being acceptable in light of the [Utility's] safety history, criminal probation, recent financial condition, and other factors deemed relevant by the [CPUC].

> (D) The [CPUC] has determined that the [Utility's] reorganization plan and other documents resolving the [Chapter 11 Cases] are (i) consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (ii) neutral, on average, to the ratepayers of the [Utility].

> (E) The [CPUC] has determined that the reorganization plan and other documents resolving the [Chapter 11 Cases] recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the [CPUC], which may include sharing of value appreciation.

Cal. Pub. Util. Code §3291(b)(1)(A)-(E).

If the Utility satisfies the requirements to participate in the Go-Forward Wildfire Fund, the Utility's required contributions to the Go-Forward Wildfire Fund will be substantial. The Go-Forward Wildfire Fund is expected to be funded with approximately (i) $10.5 billion of proceeds of bonds supported by a 15-year extension of the Department of Water Resources charge to ratepayers, (ii) $7.5 billion in initial contributions from California's three investor-owned electric utility companies and (iii) $300 million in annual contributions paid by California's three investor-owned electric utility companies. The contributions from the investor-owned electric utility companies will be effectively borne by their respective shareholders, as they will not be permitted to recover these costs from ratepayers. The costs of the initial and annual contributions are allocated among the three investor-owned electric utility companies pursuant to a "Wildfire Fund allocation metric" set forth in AB 1054 based on land area in the applicable utility's service territory classified as high fire threat districts and adjusted to account for risk mitigation efforts. The Utility's initial Go-Forward Wildfire Fund allocation

metric will be 64.2% (representing an initial contribution of approximately $4.8 billion and annual contributions of approximately $193 million). In addition, all initial and annual contributions will be excluded from the measurement of the Utility's authorized capital structure.

Participation in the Go-Forward Wildfire Fund is expected to have a material impact on the Reorganized Debtors' financial condition, results of operations, liquidity and cash flows. The Utility is currently evaluating the accounting and tax treatment of the required initial and annual contributions. The timing and amount of any potential charges associated with shareholder contributions would also depend on various factors, including the timing of resolution of the Chapter 11 Cases. Furthermore, there can be no assurance that the expected benefits of participating in the Go-Forward Wildfire Fund ultimately outweigh its substantial costs.

In addition to establishing the Go-Forward Wildfire Fund, AB 1054 also provides that the first $5.0 billion in the aggregate spent by SCE, SDG&E and the Utility on fire risk mitigation capital expenditures included in their approved wildfire mitigation plans will be excluded from their respective equity rate bases. The $5.0 billion of capital expenditures will be allocated among the investor-owned utilities in accordance with their Go-Forward Wildfire Fund allocation metrics (described above) and may be securitized through a customer charge.

While the Plan Proponents believe the Plan complies with all of the requirements of AB 1054 and will be approved by the CPUC, certain state and federal government agencies disagree. Such state and federal government agencies, however, have no approval rights over the CPUC's determination of such compliance.

### 2. Governor's Letter Regarding Compliance with the Wildfire Legislation.

On December 13, 2019, Governor Gavin Newsom sent a letter to the Utility's management stating, among other things, that the Governor believed that the draft *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* shared on December 6, 2019 with the Governor's Office (the "**December 6 Plan**") did not comply with AB 1054. The Governor's letter set forth a number of governance and management requirements that the Governor believed were necessary to comply with AB 1054. The Governor's letter further stated that the capital structure set forth in the December 6 Plan would contribute to a reorganized company that, in the Governor's view, would not be positioned to provide safe, reliable, and affordable electric service. The Debtors have taken the views of the Governor's Office into account in formulating the Plan, which the Debtors believe complies with AB 1054. The Debtors and the Governor's Office remain in continuous discussions.

### 3. CPUC Approvals.

Given the Utility's status as a public utility regulated by the CPUC, there are a number of issues in pending or anticipated regulatory proceedings that will need to be addressed by the CPUC prior to or in connection with confirmation or effectiveness of the Plan. These regulatory matters are summarized below:

*Plan OII.* Under applicable state and federal law, certain provisions of the Plan, including any ratemaking implications of the Plan, must be reviewed and approved by the CPUC in the ordinary course of its regulatory duties. In addition, as discussed above, the California legislature has passed, and the Governor has signed into law, AB 1054. As a result, there are certain regulatory approvals that the Utility must or may desire to obtain prior to or as part of and in connection with

confirmation or effectiveness of the Plan with respect to participation in the Go-Forward Wildfire Fund, including satisfaction of the conditions set forth in AB 1054 as determined, where applicable, by the CPUC. To facilitate this review, on October 4, 2019, the CPUC commenced Investigation (I.) 19-09-016, Order Instituting Investigation on the Plan (the "**Plan OII**") to consider the ratemaking and other implications that will result from the confirmation of a plan of reorganization and other regulatory approvals necessary to resolve the Chapter 11 Cases. This proceeding, among other things, affords parties the opportunity to be heard and comment on any CPUC regulatory approvals required pursuant to Public Utilities Code Section 3292 in order for PG&E to become eligible to participate in the wildfire fund established pursuant to Assembly Bill 1054 (AB) 1054 and other state law, any other regulatory approvals required by AB 1054, and any other matters that may need to be decided by the CPUC in connection with a plan. The CPUC expects to render its decision sufficiently in advance of the June 30, 2020 statutory deadline contained in AB 1054 to allow the Bankruptcy Court to address and approve any modifications made to the Plan pursuant to CPUC orders.

On January 31, 2020, the Utility served prepared testimony in the Plan OII outlining key elements of the Plan, including, but not limited to: (i) key aspects of the Utility's governance structure; (ii) implementing a plan to regionalize PG&E's operations; (iii) appointing an independent safety advisor; (iv) strengthening the roles of the Chief Risk Officer and the Chief Safety Officer; (v) utilizing an Independent Safety Oversight Committee with non-PG&E Corporation and non-Utility employees to provide independent review of PG&E's operations; (vi) paying value in excess of $25.5 billion to wildfire victims through the settlements reached; and (vii) emerging from chapter 11 with a financing structure that seeks to protect customer rates and position PG&E for long term success.

On February 11, 2020, the Administrative Law Judge issued a ruling setting a schedule for, among other things, testimony and evidentiary hearings for the Plan OII (the "**Schedule**"). On February 18, 2020, the assigned Commissioner issued a ruling setting forth certain proposals ("**Proposals**") as potential conditions on CPUC approval under AB 1054 and proposing a modified schedule that provided for supplemental testimony and briefing on the Proposals. Evidentiary hearings and live testimony began on February 25, 2020 and concluded on March 4, 2020 pursuant to the Schedule. On February 26, 2020, the Administrative Law Judge amended the Schedule to provide for combined post-hearing briefing and comments on the Proposals on March 13, 2020 and replies on March 26, 2020, and noted that, if necessary, an evidentiary hearing on the Proposals would occur on March 18, 2020.

***Other Relevant Pending Enforcement Proceedings.*** There are a number of pending enforcement proceedings that relate to prepetition conduct by the Debtors and could result in monetary fines, penalties or other remedies. The Debtors' financial condition, results of operations, liquidity, and cash flows could be materially affected by the outcomes of these proceedings. Accordingly, satisfactory resolution of these proceedings is a condition precedent to the effectiveness of the Plan, unless waived. These pending proceedings include:

(i)     **Wildfire OII.** Investigation (I.) 19-06-015, Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017. On December 17, 2019, the Utility, the CPUC's Safety and Enforcement Division ("**SED**"), the Coalition of California

Utility Employees ("**CUE**"), and the CPUC's Office of Safety Advocates filed a motion seeking approval of a settlement agreement that would, if approved by the CPUC, resolve the proceeding. Pursuant to the settlement, the Utility would not seek rate recovery of $1.625 billion in wildfire related expenditures and would spend $50 million in shareholder funds on system enhancement initiatives. On February 27, 2020, the Administrative Law Judge served a Presiding Officer's Decision, which would approve the proposed settlement, subject to the settling parties' acceptance of certain modifications to the settlement. The modified settlement, if accepted by the settling parties, increases the financial obligations imposed by the proposed settlement agreement. The modified settlement would require the Utility to (i) not seek rate recovery of $1.823 billion in wildfire-related expenditures, (ii) spend $114 million in shareholder funds on system enhancement initiatives, (iii) pay a cash fine of $200 million to the general fund of the State of California out of funds that would not otherwise be available to satisfy the claims of wildfire claimants, and (iv) agree that any future tax savings associated with shareholder payments under the settlement would be "returned to the benefit of ratepayers." The parties to the settlement may accept the modified settlement or request other relief on or before March 18, 2020. Parties have until March 30, 2020 to appeal the Presiding Officer's Decision. The CPUC believes that payment of any fines or penalties, including the proposed cash fine contained in the modified settlement, should not diminish funds available to satisfy Fire Victim Claims from the Fire Victim Trust and has requested that the Plan be modified accordingly. The Plan Proponents disagree and believe that payment of any such fines and penalties are to be made from the assets of the Fire Victim Trust.

(ii)     **Locate and Mark OII.**     Investigation (I.) 18-12-007, Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. On October 3, 2019, the Utility, SED and CUE filed a motion for approval of a settlement agreement that would, if approved by the CPUC, resolve the proceeding. On January 17, 2020, the Administrative Law Judge served a Presiding Officer's Decision, which would approve the proposed settlement, subject to the settling parties' acceptance of certain modifications to the settlement. On February 6, 2020, the settling parties filed a pleading suggesting certain modifications to the terms set forth in the Presiding Officer's Decision, but also stating their willingness to accept the terms as set forth in the Presiding Officer's Decision in the event their suggestions are not accepted. On February 14, 2020, the Administrative Law Judge denied the settling parties' request to modify the terms of the Presiding Officer's Decision, and granted the settling parties' acceptance of the terms of the Presiding Officer's Decision as proposed. On February 20, 2020, the Presiding Officer's Decision became the decision of the CPUC.

### F.  Other Federal Regulatory Matters

Section 203 of the Federal Power Act ("**FPA**") has been interpreted to require, among other things, that entities involved in wholesale sales or transmission of electricity in interstate commerce obtain FERC's authorization prior to engaging in transactions that transfer control of FERC-jurisdictional facilities.  Such changes in control can occur either directly, via a sale of the facilities themselves, or indirectly via a change in the corporate control of a utility like PG&E, or a utility holding company like PG&E Corp.  Section 203 provides that FERC will approve transactions that are consistent with the public interest, and that FERC may grant approval of a transaction on conditions FERC finds necessary or appropriate.

Because the Plan calls for the Fire Victim Trust to acquire at least 20.9% of the equity of Reorganized PG&E Corp., FERC may consider the Plan to result in an indirect change in control over the FERC-jurisdictional facilities of the Utility.  As a result, the Debtors may be required to seek and obtain authorization from FERC under Section 203 of the FPA before engaging in the transactions called-for by the Plan.  On March 2, 2020, the Debtors submitted an application (the "**FERC Application**") seeking such authorization and requested FERC action on its application in advance of the June 30, 2020 statutory deadline provided for in AB 1054.  The deadline to comment on the FERC Application is March 23, 2020.

### III.  OVERVIEW OF THE CHAPTER 11 CASES

### A.  Commencement of Chapter 11 Cases

On January 29, 2019, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The principal objectives of the Chapter 11 Cases are:

- First, to establish a process for PG&E to fully address and resolve its liabilities resulting from the 2017 and 2018 Northern California wildfires and to provide compensation to those entitled to compensation from the Debtors fairly and expeditiously – more quickly and more equitably than those liabilities could be addressed and resolved in the state court system;

- Second, to restore PG&E's financial stability and assure that PG&E has access to the capital and resources necessary to sustain and support its ongoing operations and to enable PG&E to continue investing in its systems infrastructure and critical safety and wildfire prevention initiatives, including investing in PG&E's Community Wildfire Safety Program (a program to further reduce wildfire risks and help keep the customers and communities PG&E serves safe through enhanced real-time monitoring and intelligence, safety measures, and electrical system equipment);

- Third, to work collaboratively and constructively with State regulators and policy makers to (i) address safety, operational and structural reforms; (ii) determine the most effective way for PG&E to provide safe and reliable electric and natural gas service to its customers and communities for the long term; and (iii) address the significant increase

in wildfire risk in an environment that continues to be challenged by climate change and its ongoing and future impact on California, including on PG&E and its operations; and

- <u>Fourth</u>, to enable PG&E to continue its extensive restoration and rebuilding efforts to assist the communities affected by the 2017 and 2018 Northern California wildfires.

For further information regarding the commencement of the Chapter 11 Cases, please refer to the 2018 Form 10-K and the Wells Declaration.

### B. First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things, (i) continue paying employee wages and benefits, (ii) continue the use of the Debtors' cash management system, bank accounts, and business forms, (iii) continue insurance, surety bond, and workers' compensation programs, (iv) pay certain prepetition taxes and assessments, (v) satisfy prepetition claims of certain shippers, warehousemen, and other lien claimants, (vi) maintain and administer certain customer deposit and public purpose programs and initiatives, and honor certain prepetition obligations related thereto, (vii) pay prepetition claims of certain vendors, suppliers, service providers, and other similar parties and entities that are essential to protecting the public health and safety and maintaining the integrity of the Debtors' business operations, (viii) establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service, and (ix) enter into a $5.5 billion postpetition financing facility. The relief requested in the First Day Motions was granted on a final basis in February and March of 2019. The final orders can be viewed at https://restructuring.primeclerk.com/pge/Home-Index.

### C. Other Significant Events During the Chapter 11 Cases

The following sections briefly summarize certain significant events occurring during the Chapter 11 Cases.

#### 1. Appointment of Official Unsecured Creditors Committee

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed the Official Committee of Unsecured Creditors (the "**Creditors Committee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in the Chapter 11 Cases. A list of the members of Creditors Committee can be found at Docket No. 962.

The Creditors Committee retained Milbank LLP as its counsel; FTI Consulting, Inc., as its financial advisor; Centerview Partners LLC, as its investment banker; Epiq Corporate Restructuring, LLC, as information agent; and Axiom Advisors, as its government affairs consultant. The Creditors Committee has actively participated in all aspects of the Chapter 11 Cases since its appointment.

#### 2. Appointment of Tort Claimants Committee

On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and together with the Creditors Committee, the "**Statutory**

Committees") pursuant to section 1102 of the Bankruptcy Code to represent the interests of tort claimants in the Chapter 11 Cases (*i.e.*, the Fire Victims); however the Tort Claimants Committee does not represent the interests of Governmental Units in the Chapter 11 Cases, including but not limited to the state and federal government agencies seeking to hold the Debtors responsible for the costs of fire suppression, hazardous waste clean-up and damage to government property. A list of the members of the Tort Claimants Committee can be found at Docket No. 530.

The Tort Claimants Committee retained Baker & Hostetler LLP as its counsel; Lincoln Partners Advisors LLC, as financial advisor; and Epiq Corporate Restructuring LLC, as information agent. The Tort Claimants Committee has actively participated in all aspects of the Chapter 11 Cases since its appointment, including, significantly, in the negotiations on behalf of the Fire Victims that led to the Tort Claimants RSA described below.

### 3. Establishment of Claims Bar Date

On July 1, 2019, the Bankruptcy Court entered an order (the "**Bar Date Order**"), which, among other things, (i) established October 21, 2019 at 5:00 p.m. (Prevailing Pacific Time) (the "**Bar Date**") as the deadline for claimants, including all Fire Claimants (as defined in the Bar Date Order) (including holders of Fire Victim Claims and Subrogation Wildfire Claims) and Governmental Units, to file Proofs of Claim in the Chapter 11 Cases and (ii) approved the form and manner of the Bar Date notice procedures, including a comprehensive supplemental noticing plan to provide notice to potential unknown wildfire-related claimants. On November 12, 2019, the Court entered an order [Docket No. 4672] extending the Bar Date to December 31, 2019 (the "**Extended Bar Date**") solely for Fire Victims who are not Governmental Units. On February 27, 2020 the Court entered an order [Docket No. 5943] extending the Bar Date to April 16, 2020 solely with respect to certain claimants who purchased or acquired the Debtors' publicly traded debt and equity securities from April 29, 2015 through November 15, 2018 and may have claims against the Debtors for rescission or damages under applicable securities laws (the "**Further Extended Bar Date**").

### 4. Termination of Exclusivity

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that if the debtor files a plan within the initial Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusivity Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the initial Exclusive Plan Period and Exclusive Solicitation Period (to up to 18 months and 20 months, respectively).

The Debtors' Exclusive Plan Period and Exclusive Solicitation Period were initially set to expire on May 29, 2019 and July 29, 2019, respectively. By order dated May 24, 2019, the Bankruptcy Court granted the Debtors a four-month extension of the Exclusivity Periods, extending the Exclusive Plan Period and Exclusive Solicitation Period through and including September 26, 2019 and November 26, 2019, respectively.

On June 25, 2019, the Ad Hoc Noteholders Committee filed a motion to terminate the Debtors' Exclusivity Periods with respect to the Ad Hoc Noteholders Committee to allow it to file its own chapter

11 plan. Similarly, on July 23, 2019, the Ad Hoc Subrogation Group, filed a motion to terminate the Debtors' Exclusivity Periods with respect to the Ad Hoc Subrogation Group to allow it to file its own chapter 11 plan. The motions were heard by the Bankruptcy Court on August 13, 2019 and, on August 16, 2019, the Bankruptcy Court issued a memorandum decision and entered orders denying the motions and preserving the Debtors' Exclusivity Periods.

On September 19, 2019, the Tort Claimants Committee and the Ad Hoc Noteholders Committee filed a joint motion to terminate the Debtors' Exclusivity Periods to pursue their own joint plan of reorganization. On October 9, 2019, the Court granted the joint motion, terminating the Debtors' Exclusivity Periods solely with respect to the Tort Claimants Committee and Ad Hoc Noteholders Committee's joint plan. On October 17, 2019, the Tort Claimants Committee and the Ad Hoc Noteholders Committee filed their joint chapter 11 plan of reorganization (the "**TCC/Noteholder Plan**") [Docket No. 4257]. As discussed further below, on December 19, 2019, following approval of the Tort Claimants RSA (defined below), the Tort Claimants Committee formally withdrew as a plan proponent of the TCC/Noteholder Plan. Following Bankruptcy Court approval of the Noteholder RSA (defined below), the Ad Hoc Noteholders Committee formally withdrew the TCC/Noteholder Plan [Docket No. 5644].

## 5. Estimation of Aggregate Wildfire Liabilities

On July 18, 2019, the Debtors filed a motion in the Bankruptcy Court to establish procedures for the estimation of PG&E's aggregate liability for claims arising out of the 2015 Butte Fire and the 2017 and 2018 Northern California wildfires for Plan confirmation purposes [Docket No. 3091] (the "**Estimation Motion**").

On August 21, 2019, the Bankruptcy Court issued a recommendation to the United States District Court for the Northern District of California (the "**District Court**") requesting the District Court withdraw its reference in part so that the District Court – and not the Bankruptcy Court – would decide key questions relating to the estimation process. On August 22, 2019, the District Court accepted the Bankruptcy Court's recommendation and assigned the matter to United States District Judge James Donato.

These estimation proceedings are currently pending as Case No. 19-cv-05257-JD in the District Court (the "**Estimation Proceedings**") but, as further discussed below, have been stayed in light of the settlement approved in connection with the Tort Claimants RSA.

## 6. Bankruptcy Court Lifts Automatic Stay to Allow Tubbs Cases to Proceed in State Court

The Tort Claimants Committee and the Ad Hoc Subrogation Group, on July 2 and 3, 2019, respectively, filed motions (the "**Tubbs Lift Stay Motions**") seeking relief from the automatic stay to allow certain elderly or infirm individuals (collectively, with certain indispensable parties, the "**Tubbs Preference Claimants**") to pursue state court litigation relating to the 2017 Tubbs fire (the "**Tubbs Cases**"). The Bankruptcy Court considered the Tubbs Lift Stay Motions at the hearing on August 14, 2019. On August 21, 2019, the Bankruptcy Court entered an order granting the Tubbs Lift Stay Motions, allowing the Tubbs Cases to proceed to trial in Superior Court for the State of California (the "**Superior Court**").

In light of the Tort Claimants RSA, the Superior Court entered an order vacating the existing trial dates for the Tubbs Cases and setting a hearing for March 2, 2020, to show cause regarding dismissal of the Tubbs Cases. Upon entry into and pursuant to the Tort Claimants RSA, the Debtors promptly entered into settlement discussions with the Tubbs Preference Claimants to resolve the Tubbs Cases. On January 6, 2020, the Debtors filed a motion (the "**Tubbs Settlement Motion**") seeking approval of settlement agreements settling and liquidating the claims of the Tubbs Preference Claimants for payment by the Fire Victim Trust, as provided in the Tort Claimants RSA. On January 30, 2020, the Bankruptcy Court entered an order [Docket No. 5571] granting the relief requested in the Tubbs Settlement Motion.

### 7. Debtors Settle Plan Treatment of Public Entities Wildfire Claims and Enter Into Public Entities Plan Support Agreements

On June 18, 2019, the Debtors and the Public Entities[2] entered into those certain *Plan Support Agreements as to Plan Treatment of Public Entities' Wildfire Claims* (the "**Public Entities Plan Support Agreements**"). Pursuant to the Public Entities Plan Support Agreements, the Public Entities agreed to support and vote in favor of a chapter 11 plan proposed by the Debtors that provides that, among other things, the Public Entities Wildfire Claims will be satisfied with $1 billion in Cash, to be distributed from a trust account in accordance with the "Public Entities Settlement Distribution Protocol," and the Reorganized Debtors will establish a $10 million segregated defense fund for the benefit of the Public Entities.

The Public Entities Plan Support Agreements provide that each may be terminated by the applicable Public Entity under certain circumstances, including (i) if the Federal Emergency Management Agency ("**FEMA**") or the California Governor's Office of Emergency Services ("**Cal OES**") fails to agree that no reimbursement is required from the Public Entities on account of assistance rendered by either agency in connection with the Fires, and (ii) by any individual Public Entity, if a material amount of Public Entities Third Party Claims is filed against such Public Entity and such Public Entity and such Public Entities Third Party Claims are not released pursuant to the Plan.

### 8. Debtors Settle Subrogation Wildfire Claims and Enter Into Subrogation Claims RSA

On September 24, 2019, the Debtors filed a motion seeking Bankruptcy Court approval of that certain Restructuring Support Agreement, dated as of September 22, 2019 and related settlement agreement (together, as amended and restated, and as may be further amended, restated and supplemented, the "**Subrogation Claims RSA**") with the Consenting Creditors (as defined in the Subrogation Claims RSA). Pursuant to the Subrogation Claims RSA, holders of approximately 96% of all Subrogation Wildfire Claims (in dollar amount) agreed, among other things, to support and vote in

---

[2] The "**Public Entities**" include the City of Clearlake, the City of Napa, the City of Santa Rosa, the County of Lake, the Lake County Sanitation District, the County of Mendocino, Napa County, the County of Nevada, the County of Sonoma, the Sonoma County Agricultural Preservation and Open Space District, the Sonoma County Community Development Commission, the Sonoma County Water Agency, the Sonoma Valley County Sanitation District and the County of Yuba (collectively, the "**North Bay Public Entities**"); the Town of Paradise; the County of Butte; the Paradise Recreation & Park District; the County of Yuba; and the Calaveras County Water District.

favor of the Plan, in consideration of, among other things, an Allowed Subrogation Wildfire Claim of $11 billion that will be paid in full in Cash under the Plan, and the payment of up to $55 million in reasonable, documented and contractual fees of certain of the Ad Hoc Subrogation Group's professionals. On December 19, 2019, the Bankruptcy Court entered an order [Docket No. 5173] authorizing the Debtors to enter into, and approving the terms of, the Subrogation Claims RSA and the settlement embodied therein.

### 9. Bankruptcy Court Appoints a Mediator

On October 28, 2019, the Bankruptcy Court appointed retired Bankruptcy Judge Randall Newsome as mediator in the Chapter 11 Cases to identify and mediate issues to progress the cases towards timely confirmation of a chapter 11 plan. Beginning on October 31, 2019, Judge Newsome facilitated confidential settlement discussions among a number of key parties to the Chapter 11 Cases, including the Debtors, the Tort Claimants Committee, certain plaintiffs' attorneys for individuals holding Fire Victim Claims, the Creditors Committee, the Ad Hoc Noteholders Committee, certain agencies of the United States of America and the State of California asserting fire-related Claims, as well as the Shareholder Proponents.

### 10. Debtors Settle Plan Treatment of Fire Victim Claims and Enter Into Tort Claimants RSA

On December 6, 2019, the Debtors, the Tort Claimants Committee, the Consenting Fire Claimant Professional Group, and the Shareholder Proponents, entered into that certain Restructuring Support Agreement, dated December 6, 2019 (as amended on December 16, 2019 and may be further amended, restated and supplemented, the "**Tort Claimants RSA**") that, among other things, resolved the treatment of all Fire Victim Claims under the Plan. The agencies of the United States of America and the State of California asserting fire-related Claims are not signatories to the Tort Claimants RSA. On December 19, 2019, the Bankruptcy Court entered an order [Docket No. 5174] authorizing the Debtors' and TCC's entry into, and approving the terms of, the Tort Claimants RSA and the settlements embodied therein.

The Tort Claimants RSA provides, among other things, that (i) pursuant to the Plan, the Debtors will fund a Fire Victim Trust, to be established for the benefit of all holders of Fire Victim Claims, with cash and stock valued at $13.5 billion, and contribute certain assigned rights and causes of action to the Fire Victim Trust; (ii) the parties agree to a stay of the Estimation Proceedings; (iii) the Debtors would promptly negotiate a settlement of the claims of the Tubbs Preference Claimants; and (iv) the Tort Claimants Committee and Consenting Fire Claimant Professional Group will support the Plan.

### 11. Debtors Settle with Ad Hoc Noteholders Committee and Enter Into Noteholder RSA

On January 22, 2020, the Debtors, the Shareholder Proponents, and the Ad Hoc Noteholders Committee entered into that certain Restructuring Support Agreement, dated January 22, 2020 (as may be amended, restated and supplemented, the "**Noteholder RSA**"). The Noteholder RSA provides, among other things, that the Ad Hoc Noteholders Committee will (i) withdraw their alternative plan, (ii) suspend their motion to reconsider the order approving the Subrogation Claims RSA and Tort Claimants RSA, (iii) withdraw all discovery issued in connection with and support the relief requested in the Debtors' Exit Financing Motion (as defined below), and (iv) support the Plan. On February 5, 2020, the Bankruptcy Court entered an order [Docket No. 5637] authorizing the Debtors to enter into,

and approving the terms of, the Noteholder RSA and the settlements embodied therein. On February 5, 2020, the Ad Hoc Noteholders Committee withdrew the TCC/Noteholder Plan [Docket No. 5644].

### 12. Briefing on Plan Confirmation Issues

On October 31, 2019, the Bankruptcy Court entered an order [Docket No. 4540] (the "**Pre-Confirmation Scheduling Order**") establishing briefing and hearing schedules for the following issues related to plan confirmation: (i) whether the doctrine of inverse condemnation applies to a privately-owned utility, (ii) what is the appropriate postpetition interest rate for unsecured claims in a solvent debtor case, (iii) whether holders of the Utility Senior Notes are entitled to Allowed Claims for make-whole premiums or similar amounts, and (iv) whether the Subrogation Claimants are impaired under the Plan.

*Inverse Condemnation:* On November 27, 2019, following briefing and oral argument on the issue, the Bankruptcy Court issued a memorandum decision determining that the doctrine of inverse condemnation applies to the Utility. Following the decision, the Bankruptcy Court certified the issue for appeal to the Ninth Circuit. On January 16 and 17, 2020, the Debtors concurrently filed a petition for direct appeal with the United States Court of Appeals for the Ninth Circuit (the "**Ninth Circuit**") and a motion to stay the proceedings pending confirmation of the Plan (and the settlements encompassed therein) by the Bankruptcy Court. On January 31, 2020, the Ninth Circuit issued an order granting the Debtors' motion to stay the proceedings.

*Postpetition Interest:* On December 30, 2019, following briefing and oral argument on the issue, the Bankruptcy Court issued a memorandum decision [Docket No. 5226] (the "**Memorandum Decision**") determining that the appropriate rate of postpetition interest on unsecured claims in a solvent debtor case is the federal judgment interest rate as of the Petition Date calculated pursuant to 28 U.S.C. § 1961(a). On February 6, 2020, the Bankruptcy Court entered the *Interlocutory Order Regarding Postpetition Interest* [Docket No. 5669] (the "**PPI Order**") consistent with the Memorandum Decision. On February 20, 2020, the Ad Hoc Committee of Holders of Trade Claims (the "**Trade Committee**") filed a motion seeking a determination that the Memorandum Decision and PPI Order are final orders that may be appealed without leave, or, to the extent the Memorandum Decision and PPI Order are not final orders, leave to appeal the Memorandum Decision and PPI Order to be heard in the District Court. On March 4 and 5, 2020, Mizuho Bank, Ltd., in its capacity as HoldCo Term Loan Administrative Agent, the Creditors Committee, Citibank, NA, and BOKF, NA also filed notices of appeal and cross-motions for leave to appeal the Memorandum Decision and PPI Order, similarly requesting its appeal be heard in the District Court. (collectively, the "**PPI Appeals**").

Consistent with the PPI Order and Memorandum Decision, the Plan provides for payment of postpetition interest on General Unsecured Claims at the applicable Federal Judgment Rate—2.59%. The Trade Committee asserts that postpetition interest on General Unsecured Claims should be paid consistent with state law, and that under Cal. Civ. Code § 3289, this requires payment of postpetition interest on contract-based claims, such as trade claims, at the rate set forth in the applicable contract, or in the absence of a contract rate, at the statutory rate of 10%. If the PPI Order and Memorandum Decision are overturned by a final non-appealable decision, the amount of postpetition interest the Debtors or Reorganized Debtors are required to pay with respect to General Unsecured Claims could significantly increase. The Debtors contend that the PPI Order and Memorandum Decision are not final orders and are opposing the PPI Appeals, including the motions for leave to pursue the PPI Appeals.

*Make-Whole Claims:* The parties have fully briefed the question of whether holders of Utility Senior Notes are entitled to Allowed Claims for make-whole premiums or similar amounts in accordance with the Pre-Confirmation Scheduling Order. Pursuant to the terms of the Noteholder RSA, the parties have agreed to adjourn the matter without a further hearing date.

*Subrogation Claims Impairment:* On November 27, 2019, the Debtors and the Ad Hoc Subrogation Group filed a joint opening brief arguing the Subrogation Wildfire Claims, as settled under the Subrogation Claimants RSA, are impaired for plan purposes. The Ad Hoc Noteholders Committee filed a reservation of rights on the issue and, on January 10, 2020, the Creditors Committee filed a responsive brief. In view of the Noteholder RSA, the parties have agreed to remove the issue from the Bankruptcy Court's calendar without prejudice.

### 13. Exit Financing Motion

On October 23, 2019, the Debtors filed the *Debtors' Motion for Entry of Orders (I) Approving Terms of, and Debtors' Entry into and Performance Under, Exit Financing Commitment Letters and (II) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* [Docket No. 4446] (as amended at Docket Nos. 5267 and 6013, and as may be further amended, modified or supplemented, the "**Exit Financing Motion**"), seeking approval of certain exit financing commitment letters providing for up to $12 billion in equity commitments (as further amended, modified and supplemented, the "**Equity Backstop Commitment Letters**") and up to $34.35 billion in debt commitments (as further amended, modified and supplemented, the "**Debt Backstop Commitment Letters**," and together with the Equity Backstop Commitment Letters, the "**Exit Financing Commitment Letters**"). On January 22, 2020, the Governor filed an objection to the Exit Financing Motion [Docket No. 5445] (the "**Governor's Objection**"), which focused primarily on the Governor's proposal to alter the Debtors' corporate governance structure. On January 27, 2020, the Debtors reached a settlement with the Ad Hoc Noteholders Committee regarding the treatment of the Utility's pre-petition funded debt under the Plan. The Bankruptcy Court approved the settlement on February 5, 2020. In light of the settlement with the Ad Hoc Noteholders Committee, the Debtors further amended the Exit Financing Commitment Letters to, among other things, reduce the aggregate Utility debt commitments and revise the provisions of the letters affected thereby. On March 3, 2020, the Debtors filed an amended Exit Financing Motion to reflect the updated Exit Financing Commitment Letters. The Debtors also filed a notice of hearing for the amended Exit Financing Motion to be heard on March 16, 2020. The Debtors remain in ongoing discussions with the Governor's Office to attempt to resolve the issues raised in the Governor's Objection before the March 16 hearing.

### 14. Objections to FEMA and Cal OES Claims and Classification of Government Agency Claims

Certain federal agencies, including FEMA, and certain agencies of the State of California, including Cal OES, have asserted Claims in the Chapter 11 Cases against the Debtors in excess of $7.7 billion, for the majority of which the Debtors do not believe they have liability. On December 2, 2019, the Tort Claimants Committee filed an objection [Docket No. 4943] (as joined by the Debtors at Docket No. 5639, the "**FEMA Claims Objection**") to all Claims asserted by FEMA, which total approximately $3.9 billion (the "**FEMA Claims**"), and on December 12, 2019, the Tort Claimants Committee filed an objection [Docket No. 5096] (as joined by the Debtors at Docket No. 5734, the "**Cal OES Claims Objection**" and, together with the FEMA Claims Objection, the "**Government Claims Objections**"), to all Claims asserted by Cal OES, which total approximately $2.7 billion (the "**Cal OES Claims**").

The Cal OES Claims Objection also contested approximately $2.4 billion of the Cal OES Claims as being duplicative of the FEMA Claims. At a hearing on February 26, 2020, the Bankruptcy Court heard oral argument to consider the Government Claims Objections and took the matters under advisement. As of the date hereof, the Bankruptcy Court has not ruled on the Government Claims Objections.

In connection with the Government Claims Objections and other contested matters, on February 18, 2020, the Bankruptcy Court issued an order [Docket No. 5810] for, among other things, mediation of classification issues related to the FEMA Claims and Cal OES Claims. Pursuant to the Plan, and as described in more detail below, the FEMA Claims, Cal OES Claims, and other Fire-related government agency Claims are classified as Fire Victim Claims to be channeled to and, if Allowed, paid from the Fire Victim Trust. FEMA, Cal OES, and certain other federal and state governmental agencies, however, contend that their Claims should be classified and treated as General Unsecured Claims under the Plan and, as such, expressed their intent to file formal motions challenging the Debtors' proposed classification of such Claims. In lieu of formal motion practice, the Plan Proponents and the government agencies stipulated to a briefing and hearing schedule on this classification issue, with a hearing before the Bankruptcy Court currently scheduled for April 1, 2020.

### D. Related Pending Proceedings

#### 1. Securities Class Action

Prior to the Petition Date, the Public Employees Retirement Association of New Mexico ("**PERA**") filed a securities class action lawsuit in the U.S. District Court for the Northern District of California, Case No. 18-03509 (the "**Securities Litigation**") against the Debtors, a number of the Debtors' current and former directors and officers, and investment-bank underwriters of certain of the Debtors' notes offerings.

In the Securities Litigation, PERA asserts securities claims relating to, among other things, allegedly misleading statements the defendants made regarding their wildfire safety practices. The claims are being asserted on behalf of investors who acquired the Debtors' notes and equity securities during the class period of April 29, 2015 through November 15, 2018.

The Securities Litigation has been and remains stayed with respect to the Debtors. PERA continues to pursue the Securities Litigation against the non-Debtor defendants. The non-Debtor defendants have filed motions to dismiss PERA's complaint in the District Court.

On October 21, 2019, PERA filed proofs of claim in the Bankruptcy Court asserting a claim on behalf of itself. On December 9, 2019, PERA filed a motion to treat its proof of claim as a class proof of claim on behalf of the equity and debt securities holders covered by the Securities Litigation under Bankruptcy Rule 7023. On February 3, 2020, the Court issued a ruling indicating that it had tentatively determined either to allow the proof of claim filed by PERA to be treated as a class proof of claim (subject to Plaintiffs meeting the requirements of Rule 23 of the Federal Rule of Civil Procedure) or, instead, to allow certain additional noticing and an extension of the Bar Date in the Chapter 11 Cases for potential class members. The Court directed the parties to file supplemental briefs addressing why an extension of the Bar Date for these class members was not preferable. On February 18, 2020, the Court issued an order [Docket No. 5810], among other things, directing the parties to participate in mediation regarding the allowance of the class proof of claim or an extension of the Bar Date. The parties were ultimately unable to come to a resolution and, following a hearing on the issue, on February

27, 2020, the Court issued an Order denying the motion by PERA to have its proof of claim treated as a class proof of claim, ordering notice be provided to claimants that purchased the Debtors' publicly traded debt and equity equity securities from April 29, 2015 through November 15, 2018 and who may have claims under securities laws against the Debtors for rescission or damages and extending the Bar Date for those debt and equity holders to file claims to the Further Extended Bar Date of April 16, 2020.

Any such Claims that are filed in advance of the Further Extended Bar Date, if substantiated and Allowed, will (i) if such Claims are for rescission or damages with respect to notes, be subordinated under section 510(b) of the Bankruptcy Code relative to Claims that are senior or of equal priority, and need to be funded and paid in full under the Plan, or (ii) if such Claims are for rescission or damages with respect to equity, be afforded the same priority as that afforded to holders of the Debtors' common stock.

### 2. Butte County District Attorney Investigation and Potential Claims

As disclosed in the 2019 Form 10-K, the Butte County District Attorney's Office and the California Attorney General's Office opened a criminal investigation of the 2018 Camp fire. The Debtors have produced documents and continue to produce documents and respond to other requests for information and witness testimony in connection with the criminal investigation of the 2018 Camp fire, including, but not limited to, documents related to the operation and maintenance of equipment owned or operated by the Debtors. The Debtors have also cooperated with the Butte County District Attorney's Office and the California Attorney General's Office in the collection of physical evidence from equipment owned or operated by the Debtors. The Debtors currently are unable to predict the outcome of the criminal investigation into the 2018 Camp fire.

Potential criminal charges that could be filed against the Debtors and current or former employees with respect to the 2018 Camp fire include recklessly causing a fire, manslaughter and related environmental charges. The Debtors could be subject to material fines, penalties, or restitution orders if it is determined that the Debtors failed to comply with applicable laws and regulations in connection with the 2018 Camp fire, as well as non-monetary remedies such as oversight requirements. If the Debtors were found criminally liable, the Debtors could also be liable for claims of restitution on behalf of certain Fire Victims under the California Penal Code. The Debtors believe that any claims for such restitution would constitute Fire Victim Claims and under the Plan would be satisfied solely out of the Fire Victim Trust. The criminal investigation is not subject to the automatic stay under the Bankruptcy Code.

The filing of criminal charges against the Debtors, the creation of any potential material indemnification obligation on the Debtors or any determination that any such claim for restitution is not satisfied solely out of the Fire Victim Trust may have a material impact on the ability of the Debtors to have the Plan confirmed by June 30, 2020.

### 3. Adversary Proceeding Related to Public Safety Power Shutoffs ("PSPS")

On December 19, 2019, an individual plaintiff commenced a putative class action Adversary Proceeding No. 19-03061 (the "**PSPS Adversary Proceeding**") against the Debtors in the Bankruptcy Court seeking to certify a class alleging damages in the amount of $2.5 billion and seeking injunctive relief related to certain planned power outages instituted by the Debtors in October and November of 2019. The Debtors do not believe there is any merit to the claims asserted in the PSPS Adversary Proceeding or that it is capable of being sustained as a class action. On January 21, 2020 the Debtors

filed a motion to dismiss the PSPS Adversary Proceeding and alternatively to strike class allegations. The motion is currently being briefed and is scheduled to be heard by the Bankruptcy Court on March 10, 2020.

## IV. BACKGROUND AND OVERVIEW OF THE PLAN[3]

This section summarizes certain key provisions of the Plan. This section is intentionally not a recitation of the entirety of the Plan, a copy of which is annexed hereto as **Exhibit A**. For additional information regarding the Plan not discussed in this section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Treatment of Claims and Interests | Article IV |
| Provisions Governing Distributions to Holders of Claims and Interests | Article V |
| Means for Implementation and Execution of the Plan | Article VI |
| Procedures for Disputed Claims | Article VII |
| Treatment of Executory Contracts and Unexpired Leases | Article VIII |
| Retention of Causes of Action of the Debtors and Reorganized Debtors | Article X.11 |
| Miscellaneous Provisions | Article XII |

### A. Plan Background

Over the past several months, the Debtors and their advisors have worked diligently with their key economic stakeholders, regulators, and other parties in interest on the terms of a comprehensive, global restructuring that will fairly and equitably address all Fire Victim Claims and other prepetition claims and equity interests, maximize value for all parties in interest, and ensure that the Utility will be positioned to deliver safe and reliable service to its customers.

The resulting Plan incorporates the settlements regarding treatment of various claims against the Debtors reached with each of the following four key constituencies in these cases: (i) the Tort Claimants Committee, which acts as a fiduciary on behalf of those holding Fire Victim Claims, and the Consenting Fire Claimant Professional Group representing individuals holding over 70% in number of Fire Victim Claims; (ii) the insurers (or their assignees), as represented by the Ad Hoc Subrogation Group holding over 96% in amount and over 70% in number of Subrogation Wildfire Claims; (iii) certain local governmental Public Entities within the State of California; and (iv) the Ad Hoc Noteholders Committee. The settlements with (i) the Tort Claimants Committee together with the Consenting Fire Claimant Professional Group, (ii) the Ad Hoc Subrogation Group, and (iii) the Ad Hoc Noteholders

---

[3] **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any of the Debtors' or creditors' rights, claims, or causes of action if the Plan is not confirmed. You should read the Plan, attached hereto as **Exhibit A** in its entirety before voting to accept or reject the Plan.

Committee, are each memorialized in three restructuring support agreements and related amendments filed at Docket Nos. 5038 (amended at Docket No. 5143), 3992 (amended at Docket Nos. 4554, 4711, 4806, 5011, 5063, 5122, and 5160), and 5519, respectively, and as approved by the Bankruptcy Court at Docket Nos. 5174, 5173, and 5637 respectively. The support of the Public Entities is memorialized in chapter 11 plan support agreements, filed by the Debtors in a publicly available Form 8-K with the Securities and Exchange Commission on June 18, 2019.

The Plan will enable the Debtors to (i) fairly and expeditiously satisfy prepetition wildfire claims in full compliance with AB 1054; (ii) achieve a solution that is neutral, on average, for the Debtors' over 15 million customers; (iii) meet the AB 1054 June 30, 2020 timeline for confirmation of the Plan; (iv) obtain the required CPUC approvals; (v) support California's clean energy goals; and (vi) ensure that the Reorganized Debtors have access to sufficient financial resources upon emergence from chapter 11 to continue to aggressively invest in capital improvements and wildfire mitigation and provide safe and reliable electric and gas services.

The Plan provides for (i) payment of $13.5 billion in cash and stock to settle and discharge in full all prepetition Fire Victim Claims; (ii) payment of $11 billion to settle and resolve all Subrogation Claims; (iii) payment of $1 billion to settle and resolved the Public Entities Wildfire Claims; (iv) satisfaction or Reinstatement of all prepetition funded debt obligations; (v) payment in full of all prepetition trade claims and employee-related claims; (vi) the assumption of all power purchase agreements and community choice aggregation servicing agreements; (vii) the assumption of all pension obligations, collective bargaining agreements, and other employee obligations, to the benefit of the Debtors' 23,000 employees; (viii) participation in the Go-Forward Wildfire Fund, subject to satisfaction of the conditions set forth in AB 1054 as determined, where applicable, by the CPUC; and (ix) flexible options for emergence financing, permitting the Debtors to obtain a substantial infusion of cash raised from marketed equity offerings, a Rights Offering to shareholders or, if necessary, a draw-down from the Equity Backstop Commitment Letters.

A central component of the Plan is approximately $47.1 billion of capital to be provided through any combination of (i) new credit facilities, including exit revolving loan facilities, senior term loan facilities and/or bridge loan facilities; (ii) new debt securities issued by the Utility (the "**New Utility Notes**"); (iii) new debt securities issued by HoldCo (the "**New Holdco Notes**" and, together with the New Utility Notes, the "**New Debt Securities**"); (iv) issuance of new PG&E Corp. common stock ("**New HoldCo Common Stock**") pursuant to one or more public or private equity offerings and/or the Rights Offering (if implemented); (v) the reinstatement of certain of the Utility's prepetition debt in accordance with the existing terms of such prepetition debt; and (vi) the exchange of certain of the Utility's prepetition debt for new debt (the capital sources described in the foregoing (i) through (vi), collectively, the "**Plan Financing Sources**"). The capital resulting from the Plan Financing Sources will allow the Debtors to consummate the Plan, and will position them as a stronger utility for years to come.

### B. Classification and Treatment of Claims and Interests[4]

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan.

| Claims and Interests | Summary of Treatment |
|---|---|
| **Impaired Claims Entitled to Vote** | |
| Fire Victim Claims | (a) Description: All Fire Victim Claims, including claims of individuals for personal injury, wrongful death, or property damage and claims of Governmental Units, arising out of the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018) (other than Public Entities Wildfire Claims, Subrogation Wildfire Claims, and Subrogation Butte Fire Claims). This includes the Fire Victim Claims of both uninsured and underinsured claimants.<br>(b) Treatment: On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall establish the Fire Victim Trust. The Fire Victim Trust will be funded with consideration with an aggregate value of $13.5 billion as follows: (i) $5.4 billion in Cash on the Effective Date of the Plan; (ii) an additional $1.35 billion in Cash, consisting of (a) $650 million to be paid in Cash on or before January 15, 2021 pursuant to a Tax Benefits Payment Agreement, and (b) $700 million to be paid in Cash on or before January 15, 2022 pursuant to a Tax Benefits Payment Agreement; (iii) $6.75 billion in common stock of Reorganized PG&E Corp. (using an equity value equal to 14.9 multiplied by the Normalized Estimated Net Income as of a date to be agreed upon among the parties to the Tort Claimants RSA), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date; and (iv) the assignment of certain causes of action and insurance rights on the Effective Date. All Fire Victim Claims shall be satisfied solely from the Fire Victim Trust with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties. Funding of the Fire Victim Trust as provided above shall be in full and final satisfaction, release, and discharge of all Fire Victim Claims. Each holder of a Fire Victim Claim shall receive payment as determined in accordance with the Fire Victim Claims Resolution Procedures, a draft of which were filed with the Bankruptcy Court on March 3, 2020 along with a draft of the Fire Victim Trust Agreement. These documents will be included in the Plan Supplement.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| Subrogation Wildfire Claims | (a) Description: All Fire Claims (other than Fire Claims arising from the Butte Fire (2015)) held by insurers or their assignees in connection with payments made on account of damages or losses arising from such wildfires.<br>(b) Treatment: The Subrogation Wildfire Claims shall be settled and Allowed in the aggregate amount of $11 billion. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall fund the Subrogation Wildfire Trust with Cash in the amount of $11 billion. On the Effective Date, the Debtors' liability for all Subrogation Wildfire Claims shall be fully assumed by, and be the sole responsibility of, the Subrogation Wildfire Trust, and all such Claims shall be satisfied solely from the assets of the Subrogation Wildfire Trust. Pursuant to the Channeling Injunction, each holder of a Subrogation Wildfire Claim shall have its Claim permanently channeled to the Subrogation Wildfire Trust, and such Claim shall be asserted exclusively against the Subrogation Wildfire Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties. Each holder of a Subrogation Wildfire Claim shall receive payment as determined in accordance with the |

---

[4] The following categories of claims and equity interests are presented in a summary form for ease of reference, and do not correspond exactly to the more detailed classes of claims and equity interests contained in the Plan.

| | |
|---|---|
| | Subrogation Wildfire Trust Agreement, a substantially final form of which was filed with the Bankruptcy Court on February 28, 2020 and will be included in the Plan Supplement.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| Public Entities Wildfire Claims | (a) Description: Claims held by those Public Entities that entered into Plan Support Agreements with the Debtors that, among other things, settled their claims relating to the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018).<br>(b) Treatment: Payment of the settlement amount of $1 billion in cash, plus the establishment of a fund in the amount of $10 million to reimburse the Public Entities for legal fees and costs associated with any third party claims relating to the wildfires that may be brought against the Public Entities.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| Utility Impaired Senior Note Claims | (a) Description: Any Claims arising under, or related to, the Utility Impaired Senior Note Documents.<br>(b) Treatment: On the Effective Date, holders of Utility Impaired Senior Note Claims shall receive Cash equal to their Utility Impaired Senior Note Claim Interest Amount and equal amounts of each issue of New Utility Long-Term Notes in an aggregate amount equal to such holder's Utility Impaired Senior Note Claim Principal Amount.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| Utility Short-Term Senior Note Claims | (a) Description: Any Claims arising under, or related to, the Utility Short-Term Senior Note Documents.<br>(b) Treatment: On the Effective Date, holders of Utility Short-Term Senior Note Claims shall receive Cash equal to their Utility Short-Term Senior Note Claim Interest Amount and equal amounts of each issue of New Utility Short-Term Notes in an aggregate amount equal to such holder's Utility Short-Term Senior Note Claim Principal Amount.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| Utility Funded Debt Claims | (a) Description: Any Claims arising under, or related to, the Utility Funded Debt Documents.<br>(b) Treatment: On the Effective Date, holders of Utility Funded Debt Claims shall receive Cash equal to their Utility Funded Debt Claim Interest and Charges Amount and equal amounts of each issue of New Utility Funded Debt Exchange Notes in an aggregate amount equal to such holder's Utility Funded Debt Claim Principal Amount. On the Effective Date, any Utility Letters of Credit outstanding shall be replaced or canceled and returned to the issuing Utility Revolver Lender in accordance with the terms of the applicable Utility Letter of Credit and the Utility Revolver Documents.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| HoldCo Common Interests | (a) Description: The existing publicly traded common stock of PG&E Corp.<br>(b) Treatment: Each holder of a HoldCo Common Interest shall retain such HoldCo Common Interest, subject to dilution from any common stock or securities linked to common stock issued under the Plan. If a rights offering is implemented in connection with the implementation of the Plan, holders of HoldCo Common Interests shall have the right to participate in the rights offering.<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan.** |
| HoldCo Rescission or Damage Claims | (a) Description: Any Claim against HoldCo subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the common stock of HoldCo.<br>(b) Treatment: In full and final satisfaction, settlement, release, and discharge of any HoldCo Rescission or Damage Claim, except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed HoldCo Rescission or Damage Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission/Damage Claim Share of the outstanding number of common stock of HoldCo as of the Petition Date (526,118,408).<br>(c) Impairment and Voting: **Impaired; Entitled to vote on the Plan** |

| Unimpaired Claims Not Entitled to Vote | |
|---|---|
| Administrative Expense Claims | (a) <u>Description</u>: Costs and expenses of administering the chapter 11 cases, including Claims related to the DIP Financing.<br>(b) <u>Treatment</u>: Each holder of an Allowed Administrative Expense Claim will be paid in full on the Effective Date; *provided that* any Allowed Administrative Expense Claim that is not due and payable prior to the Effective Date, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities. For the avoidance of doubt, no Administrative Expense Claims shall be discharged pursuant to the Plan, other than Allowed Administrative Expense Claims that have been paid in Cash or otherwise satisfied in the ordinary course in an amount equal to the Allowed amount of such Claim on or prior to the Effective Date. |
| Priority Tax Claims | (a) <u>Description</u>: Tax and other Claims entitled to priority in payment under the Bankruptcy Code.<br>(b) <u>Treatment</u>: Each holder of an Allowed Priority Tax Claim will be paid in full on the Effective Date, including any applicable postpetition interest. |
| Other Secured Claims | (a) <u>Description</u>: A Secured Claim that is not a DIP Facility Claim or Priority Tax Claim.<br>(b) <u>Treatment</u>: Each holder of an Allowed Secured Claim will, at the option of the Debtors or Reorganized Debtors (i) retain its Other Secured Claim and the Collateral securing such Claim; (ii) receive Cash in an amount equal to such Allowed Claim, or (iii) receive treatment of such Allowed Other Secured Claim in any other manner that is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Priority Non-Tax Claims | (a) <u>Description</u>: Any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.<br>(b) <u>Treatment</u>: Each holder of an Allowed Priority Non-Tax Claim will receive, at the option of the Debtors or Reorganized Debtors, (i) Cash in an amount equal to such Allowed Claim, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| HoldCo Funded Debt Claims | (a) <u>Description</u>: All prepetition Claims against PG&E Corp. arising from the HoldCo Revolver Documents and the HoldCo Term Loan Documents.<br>(b) <u>Treatment</u>: Each holder of an Allowed HoldCo Funded Debt Claim will be paid in full, in Cash on the Effective Date, including payment of postpetition interest at the Federal Judgment Rate.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility PC Bond (2008 F and 2010 E) Claims | (a) <u>Description</u>: Any Claim arising under, or related to, the Utility PC Bond (2008 F and 2010 E) Documents.<br>(b) <u>Treatment</u>: On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility PC Bond (2008 F and 2010 E) Claim shall receive Cash in an amount equal to (i) the principal amount outstanding as of the Petition Date of such holder's Utility PC Bond (2008 F and 2010 E) Claim plus all accrued and unpaid interest owed as of the Petition Date at the non-default contract rate; (ii) all interest accrued from the Petition Date through the Effective Date at the Federal Judgment Rate; and (iii) fees and charges and other obligations owed through the Effective Date, solely to the extent provided for under the applicable PC Bond (2008 F and 2010 E) Documents.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Reinstated Senior Note Claims | (a) <u>Description</u>: Any Claims arising under, or related to, the Utility Reinstated Senior Note Documents.<br>(b) <u>Treatment</u>: On the Effective Date, each holder of a Utility Reinstated Senior Note Claim shall have such holder's Utility Reinstated Senior Note Claim Reinstated.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |

| | |
|---|---|
| General Unsecured Claims | (a) <u>Description</u>: All prepetition unsecured Claims (other than a DIP Facility Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Other Secured Claim, Priority Non-Tax Claim, Funded Debt Claim, Workers' Compensation Claim, 2001 Utility Exchange Claim, Fire Claim, Ghost Ship Fire Claim, Intercompany Claim, Utility Senior Note Claim, Environmental Claim, or Subordinated Debt Claim). Includes all Prepetition Executed Settlement Claims (including but not limited to settlements relating to Subrogation Butte Fire Claims) and Claims for damages resulting from or otherwise based on the Debtors' rejection of executory contracts or unexpired leases. <br> (b) <u>Treatment</u>: Each holder of an Allowed General Unsecured Claim to be paid in full on the Effective Date. The Allowed amount of any General Unsecured Claim shall include all interest accrued from the Petition Date through the Effective Date at the Federal Judgment Rate. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Ghost Ship Fire Claims | (a) <u>Description</u>: Any Claim related to or arising from the Ghost Ship Fire which occurred in Oakland, California on December 2, 2016. <br> (b) <u>Treatment</u>: On and after the Effective Date, each holder of a Ghost Ship Fire Claim shall be entitled to pursue its Claim against the applicable Reorganized Debtor, provided that any recovery or payment with respect to Ghost Ship Fire Claims shall be limited solely to amounts available under the Debtors' Insurance. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Workers' Compensation Claims | (a) <u>Description</u>: Any Claim against the Debtors for the payment of workers' compensation benefits under applicable law. <br> (b) <u>Treatment</u>: Workers' Compensation Claims shall not be affected by the Chapter 11 Cases and on and after the Effective Date holders shall be entitled to pursue their Claims against the Reorganized Debtors. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| 2001 Utility Exchange Claims | (a) <u>Description</u>: Any Claim against the Utility arising solely from (i) amounts due to the CAISO, PX, and/or various market participants based on purchases or sales of electricity, capacity, or ancillary services by the Utility and other market participants in markets operated by the CAISO and the PX that are subject to determination by FERC in refund proceedings bearing FERC Docket Nos. EL00-95-000 and EL00-98-000 and related subdockets, and (ii) amounts due under any settlement agreements, allocation agreements, escrow agreements, letter agreements, other written agreements, or court orders (including orders entered in the chapter 11 case styled In re California Power Exchange Corporation, Case No. LA 01-16577 ES) that expressly relate thereto. <br> (b) <u>Treatment</u>: On and after the Effective Date, each holder of a 2001 Utility Exchange Claim shall be entitled to pursue its Claim against the Reorganized Utility as if the Chapter 11 Cases had not been commenced. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Environmental Claims | (a) <u>Description</u>: Any Environmental Claim (as defined in the Plan) against the Debtors. <br> (b) <u>Treatment</u>: On and after the Effective Date, each holder of an Environmental Claim shall be entitled to pursue its Claim against the Reorganized Debtors as if the Chapter 11 Cases had not been commenced, and each Environmental Order against the Debtors shall also survive the Effective Date as if the Chapter 11 Cases had not been commenced. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Intercompany Claims | (a) <u>Description</u>: Any Claim against a Debtor held either by another Debtor or by a non-Debtor affiliate which is controlled by a Debtor (excluding any Claims of an individual). <br> (b) <u>Treatment</u>: On the Effective Date, all Allowed Intercompany Claims shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined in the sole discretion of the Debtors or the Reorganized Debtors, as applicable. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Subordinated Debt Claims | (a) <u>Description</u>: Any Claims subordinated under section 510(b) of the Bankruptcy Code arising from rescission of a purchase or sale of a debt security of the Debtors, or for damages arising from the purchase or sale of such a debt security, including any related claims for reimbursement, contribution or indemnification, but excluding any HoldCo Rescission or Damage Claims. |

| | |
|---|---|
| | (b) <u>Treatment</u>: Allowed Subordinated Debt Claims to be paid in full on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Preferred Interests | (a) <u>Description</u>: Any Interest in the Utility which results or arises from preferred stock issued by the Utility. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Common Interests | (a) <u>Description</u>: Any Interest held in the Utility that is not a Preferred Interest. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| HoldCo Other Interests | (a) <u>Description</u>: Any Interests held in PG&E Corp. immediately prior to the Effective Date, other than HoldCo Common Interests. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |

**C.**    <u>**Treatment and Satisfaction of Fire Claims**</u>

As described more fully in Articles IV and VI of the Plan and as provided in the settlements embodied in the Tort Claimants RSA, Subrogation Claims RSA, and Public Entities Plan Support Agreements, to the extent you hold a Fire Claim, such Claim shall be satisfied as follows:

    **1.**     **Fire Victim Claims.**

All Fire Victim Claims that have been or could be asserted against the Debtors will be "channeled" to the Fire Victim Trust, a trust created under the Plan for the purpose of evaluating and paying all Fire Victim Claims. The effect of "channeling" the Fire Victim Claims to the Fire Victim Trust is that all Fire Victim Claims can only be pursued through and paid from the Fire Victim Trust and the Debtors and Reorganized Debtors will not have any liability for Fire Victim Claims. All determinations of Fire Victim Claims, including their eligibility to receive payment from the Fire Victim Trust and in what amount, shall be determined solely under the Fire Victim Claims Resolution Procedures and all such determinations shall be final with no recourse to any court.

A Fire Victim Claim is any Claim against the Debtors arising from the Fires listed on Exhibit A attached to the Plan. Fire Victim Claims do not include claims airing from (i) the Ghost Ship Fire (December 2, 2016), (ii) the Kincade Fire (started on October 23, 2019), or (iii) any fire that occurred after January 29, 2019.

The Fire Victim Trust will be overseen by a trustee ("**Fire Victim Trustee**"), and the Fire Victim Trustee and a claims administrator ("**Claims Administrator**") will oversee the administration, resolution and allocation of claims. There will also be an oversight committee formed to consult with the Fire Victim Trustee and to exercise consent rights over certain of the Fire Victim Trust's actions (the "**Fire Victim Trust Oversight Committee**"). The rights and responsibilities of the Fire Victim Trustee, the Claims Administrator, and the Fire Victim Trust Oversight Committee are set forth in the Fire Victim Trust Agreement. The Fire Victim Trust Agreement will be included in the Plan Supplement to be filed with the Bankruptcy Court by May 1, 2020.

The Fire Victim Trustee, the Claims Administrator, and their staff will determine each Fire Victim Claim against the Debtors by looking at publicly available data, data they compile using experts, and information submitted by claimants and fire victims in support of their claims. If and when the Fire Victim Trustee approves a Fire Victim Claim as provided in the Fire Victim Claim Resolution

Procedures, the Fire Victim Trust will pay the approved Fire Victim Claims in accordance with the Plan and related documents. The Fire Victim Trustee may deny invalid and fraudulent Fire Victim Claims. If a claimant asserting a Fire Victim Claim does not agree with the Fire Victim Trustee's determination of the claimant's Fire Victim Claim, the Fire Victim Trust and the Fire Victims Claims Resolution Procedures provide procedures for a claimant to appeal that decision to a panel of neutrals experienced in resolution of wildfire claims and related matters pursuant to the Fire Victim Trust Agreement.

The Fire Victim Trust will be funded with cash and stock of reorganized PG&E Corp. with an aggregate value of approximately $13.5 billion. The Fire Victim Trust will hold and sell the stock, and nothing in the Plan or the Fire Victim Trust Agreement requires stock to be distributed to individual Fire Victims. The Fire Victim Trust will also be assigned certain rights and causes of action that the Fire Victim Trust will have the authority to pursue for the benefit of holders of Fire Victim Claims. More specifically, the following will be contributed to the Fire Victim Trust on the Effective Date of the Plan:

(i) $6.75 billion in cash, of which $5.4 billion will be paid on the Plan Effective Date, $650 million is expected to be paid by January 15, 2021, and $700 million is expected to be paid by January 15, 2022;

(ii) $6.75 billion in common stock of Reorganized PG&E Corp. (using an equity value equal to 14.9 multiplied by the Normalized Estimated Net Income as of a date to be agreed upon among the parties to the Tort Claimants RSA), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date; and

(iii) the assignment by the Debtors and Reorganized Debtors of the Assigned Rights and Causes of Action, and certain rights under the 2015 Insurance Policies.

While the cash and stock contributed to the Fire Victim Trust have an aggregate nominal value of approximately $13.5 billion, the market value of the New HoldCo Common Stock on the Effective Date could be greater or less than $6.75 billion based on the trading value of New HoldCo Common Stock on such date or any subsequent date. In addition, the value of the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust is currently unknown.

The aggregate amount of Fire Victim Claims that will ultimately be eligible for payment from the Fire Victim Trust is currently unknown. To the extent the Fire Victim Trust cannot pay all approved Fire Victim Claims in full, they will be paid in an equal percentage (that is, *pro rata*).

To the extent any holder of an Allowed Fire Victim Claim received or will receive compensation from an insurance company on account of its Fire Victim Claim, such amounts will be credited against such Fire Victim Claim. In addition, to the extent a holder of an Allowed Fire Claim received or will receive a distribution from the Wildfire Assistance Program, such Fire Victim Claim will be reduced by the full amount of distribution by the Wildfire Assistance Program as provided under the Plan and in accordance with the terms of the Fire Victim Trust Agreement.

Confirmation and implementation of the Plan presents certain benefits and risks to the holders of Fire Victim Claims, and those benefits and risks should be considered when deciding how to vote on the Plan. These risks include the risk factors set forth in item 1A of the Debtors' 2019 Form 10-K, and the risks described below.

*Certain Significant Benefits of the Plan.*

Timing: The Plan provides for compensation to holders of Fire Victim Claims with greater certainty and in a more expedited manner than may otherwise be available. One of the most important factors in favor of the Plan is that the Plan encompasses a settlement that avoids the risk and delay in distributions to holders of Fire Victim Claims that would result in a failure of approval of the Plan. If the Plan is not approved, is unclear how long it would take to renegotiate another settlement or the time it would take to litigate the Fire Victim Claims. Also, California's enactment of AB 1054 requires that the Plan be confirmed by June 30, 2020 for the Debtors to participate in the Go-Forward Wildfire Fund. This legislation provides significant financial support for Reorganized PG&E for future wildfires and, per the terms of such legislation, the financial support will not be available for the Debtors if a plan is not confirmed by June 30, 2020. There is no reason to believe that the California legislature will amend such legislation if that deadline is not met. In addition to a substantial delay in distributions, failure to meet this legislative deadline could provide significant risks for holders of Fire Victim Claims if there were a wildfire during the 2020/2021 fire seasons.

Amount: The Plan provides for $13.5 billion in nominal value to be distributed to the Fire Victim Trust. In the event that the Plan is not approved, it is not known how much would be set aside or available for Fire Victim Claims

*Significant Claims Asserted Against Fire Victim Trust*. A number of governmental entities, including FEMA and Cal OES as described above, have filed claims against the Debtors for large or unliquidated amounts that, if Allowed, would be payable from the Fire Victim Trust (the "**Government Claims**"). The asserted Government Claims are in the approximate total amount of $7.7 billion. Similarly, certain businesses have filed claims against the Debtors for large or unliquidated amounts that, if Allowed, would be payable from the Fire Victim Trust (the "**Business Claims**"). For example, Adventist Health System/West and Feather River Hospital have filed claims seeking over $2 billion (the "**Adventist Claims**").

To the extent the Government and Business Claims become Allowed Fire Victim Claims, the payments to other holders of Fire Victim Claims could be substantially reduced. The TCC has (i) filed objections, joined by the Debtors, to two of the largest Government Claims seeking a finding that such Claims should be reduced or disallowed entirely; and (ii) served subpoenas seeking information relating to all or substantially all of the other Government Claims to determine if there is a basis to object to such Claims. Additionally, the TCC has filed an objection to the Adventist Claims. To the extent the TCC is successful in reducing or disallowing the Government Claims and Business Claims, there would be more Fire Victim Trust Assets available to pay the holders of Fire Victim Claims. At this time, it is unknown whether the TCC will be successful in reducing or disallowing the Government and Business Claims. Additionally, regardless of their status before the Bankruptcy Court as of the Effective Date, it is not known what the determination of any single Government Claim or Business Claim will be under the Fire Victim Claims Resolution Procedures. The ultimate resolution of these issues prior to or after the Effective Date may have an impact on payments to other holders of Fire Victim Claims.

*Potential Change in Value of Common Stock of Reorganized PG&E Corp.* As set forth more fully in Section IV(c)(1)(iii) above, the Fire Victim Trust will be funded with approximately $6.75 billion in common stock of Reorganized PG&E Corp. valued in accordance with the terms of the Tort Claimants RSA. The market value of that common stock may fluctuate due to a variety of factors, including, but not limited to: (i) the risk of additional wildfires, (ii) general market and economic conditions and (iii) actual or anticipated changes in operating results. These factors could cause the

market value of common stock in Reorganized PG&E Corp. to increase or decrease, and those changes in price could have a substantial effect (both positively or negatively) on the assets of the Fire Victim Trust. As set forth more fully in Section II(e)(1) above, the Plan contemplates the Debtors participating in the Go-Forward Wildfire Fund created pursuant to AB 1054, which may reduce Reorganized PG&E's liabilities for future wildfires occurring after July 12, 2019. While there are no limitations on the Fire Victim Trust selling its stock under the applicable corporate documents, the ability of the Fire Victim Trust to do so may be limited by applicable securities laws or contractual provisions, such as those that may be found in a registration rights agreement. If the Fire Victims Trust is considered an "affiliate" of Reorganized PG&E or the common stock is deemed to be "restricted" within the meaning of applicable securities laws, then sales of common stock by the Fire Victim Trust must be registered for resale under applicable securities or sold in accordance with certain time, volume and manner of sale limitations. Furthermore, the Fire Victim Trust may take steps to mitigate its exposure to fluctuations in the market price of Reorganized PG&E Corp. common stock. However, there is no assurance that the Fire Victim Trust will be able to enter into arrangements that fully protect the value of the common stock consideration it is to receive under the Plan.

*Administrative Expense Claims and Non-Fire Claims.* It is not possible to fully quantify the aggregate amount of Administrative Expenses payable by the Debtors, such as any claims arising from the Kincade Fire, Public Safety Power Shutoffs, as well as certain General Unsecured Claims and subordinated claims either related to securities fraud claims or otherwise. To the extent these claims are not paid or reserved for on the Effective Date, they could negatively affect the value of the Reorganized PG&E Corp. common stock held by the Fire Victim Trust, which could reduce the amount of Cash ultimately available to distribute to the holders of Fire Victim Claims.

*Cash Payments after Effective Date*. Under a Tax Benefits Payment Agreement[5] contemplated by the Plan, the Reorganized Debtors have agreed to pay the Fire Victim Trust $650 million on or about January 15, 2021 and another $700 million on or about January 15, 2022, subject to acceleration in certain circumstances. These payments relate to certain tax benefits that the Reorganized Debtors would have otherwise received for net operating losses, deductions arising from the payment of Fire Victim Claims and otherwise. To the extent there is a shortfall, Reorganized PG&E has agreed to provide a letter of credit for any remaining amounts to be paid to the Fire Victim Trust on January 15, 2022. To the extent that the aggregate amount of these payments does not equal $1.35 billion, Reorganized PG&E has agreed to a stipulated judgment for any difference. In the event there is a change in control of the Reorganized PG&E or the Reorganized Utility obtains financing of the tax benefits, the full $1.35 billion will be due and payable to the Fire Victim Trust. While there are protections that have been negotiated for Reorganized PG&E's failure to make such payments, there is risk of non-payment either by way of future wildfire or general underlying credit risks.

2. **Subrogation Wildfire Claims.** On the Effective Date, the Subrogation Wildfire Trust will be established to administer, process, settle, resolve, liquidate, satisfy and pay all Subrogation Wildfire Claims, which Claims will be channeled to the trust. On the Effective Date, the Subrogation Wildfire Trust will be funded with $11 billion in Cash, to be distributed to holders of Allowed Subrogation Wildfire Claims in accordance with the terms of the Plan, Confirmation Order, Subrogation

---

[5] The Tax Benefits Payment Agreement has not yet been finalized.

Wildfire Trust Agreement and Subrogation Wildfire Claim Allocation Agreement.[6] The Subrogation Trust Beneficiary Distribution Request Form will be attached as <u>Exhibit C</u> to the Subrogation Wildfire Trust Agreement, and sets forth the information holders of Subrogation Wildfire Claims will be asked to submit to the Subrogation Wildfire Trust for review. The Subrogation Claims Review Protocol will be attached as <u>Exhibit D</u> to the Subrogation Wildfire Trust Agreement, and will govern the Subrogation Wildfire Trust's claims review process. Electronic copies of the Subrogation Wildfire Trust Agreement and the exhibits thereto will be made available on the Solicitation Agent's website, https://restructuring.primeclerk.com/pge/Home-Index.

A Subrogation Wildfire Trustee and Subrogation Wildfire Trust Advisory Board will be appointed to administer and oversee the Subrogation Wildfire Trust. The Subrogation Wildfire Trust Advisory Board will consist of three (3) initial members selected by certain holders of the Subrogation Wildfire Claims in accordance with the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claim Allocation Agreement. The rights and responsibilities of the Subrogation Wildfire Trustee and the Subrogation Wildfire Trust Advisory Board will be set forth in the Subrogation Wildfire Trust Agreement.

Pursuant to Sections 1.54 and 7.3 of the Plan, Subrogation Wildfire Claims shall be Disputed unless held by a claimant that is a party to both the Subrogation Claims RSA and the Subrogation Wildfire Claim Allocation Agreement, and no payment or distribution provided under the Plan shall be made on account of Disputed Subrogation Wildfire Claims unless and until they are Allowed by Final Order of the Bankruptcy Court or resolved in accordance with the Subrogation Wildfire Trust Agreement. Holders of approximately 96% of all Subrogation Wildfire Claims (in dollar amount) have signed both agreements, and may receive Plan distributions pursuant to the terms of the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claims Allocation Agreement. Any holder of Subrogation Wildfire Claims that is not already a party, may become a party to the Subrogation Claims RSA by executing a joinder agreement substantially in the form attached to the Subrogation Claims RSA. Any holder of Subrogation Wildfire Claims that would like to review and sign the Subrogation Wildfire Claim Allocation Agreement should contact counsel to the Ad Hoc Subrogation Group for a non-disclosure agreement using the following contact information:

> Willkie Farr & Gallagher LLP
> Counsel for the Ad Hoc Subrogation Group
> 787 Seventh Avenue
> New York, New York 10019-6099
> Attn: Matthew A. Feldman, Joseph G. Minias, Benjamin P. McCallen, Daniel I. Forman
> Telephone: (212) 728-8000
> Facsimile: (212) 728-8111
> Email: mfeldman@willkie.com, jminias@willkie.com, bmccallen@willkie.com, dforman@willkie.com

    **3.**       **Public Entities Wildfire Claims.**  On the Effective Date, or as soon as reasonably practicable thereafter, but in no event later than thirty (30) days after the Effective Date, a trust account

---

[6] On the Effective Date, the Reorganized Debtors will also pay the reasonable, documented, and contractual professional fees of certain professionals of the Ad Hoc Subrogation Committee up to an aggregate amount of $55 million.

will be funded by the Reorganized Debtors with $1.0 billion in Cash, to be distributed to the Public Entities in accordance with the Plan and the Public Entities Plan Support Agreements.

The Reorganized Debtors will also establish on the Effective Date the Public Entities Segregated Defense Fund for the benefit of the Public Entities in the amount of $10 million, which funds will be used by the Reorganized Debtors solely to reimburse the Public Entities for any and all legal fees and costs associated with the defense or resolution of certain third party claims against a Public Entity, all in accordance with the Public Entities Plan Support Agreements. The segregated defense fund will be maintained by the Reorganized Debtors until the later of (i) the expiration of the applicable statute of limitations period for the applicable third party claims and (ii) the conclusion of all litigation, including appeals, involving the applicable third party claims.

The Public Entities Plan Support Agreements provide that each may be terminated by the applicable Public Entity under certain circumstances, including (i) if FEMA or Cal OES fails to agree that no reimbursement is required from the Public Entities on account of assistance rendered by either agency in connection with the Fires, and (ii) by any individual Public Entity, if a material amount of Public Entities Third Party Claims is filed against such Public Entity and such Public Entity and such Public Entities Third Party Claims are not released pursuant to the Plan.

**D.**     **Treatment and Satisfaction of All Other Prepetition Claims and Interests**

As set forth in the above chart, all prepetition claims against the Debtors (other than Fire Victim Claims, Subrogation Wildfire Claims, the Public Entities Wildfire Claims, Utility Impaired Senior Note Claims, Utility Short Term Senior Note Claims, and Utility Funded Debt Claims) are unimpaired under the Plan and, therefore, under section 1126(f) of the Bankruptcy Code, are deemed to accept and thus are not entitled to vote on the Plan.

Notwithstanding any provision of the Plan to the contrary, distributions to holders of Allowed Funded Debt Claims and Allowed Utility Senior Note Claims shall be made to or at the direction of the applicable Funded Debt Trustee, which shall, to the extent directed by the applicable Funded Debt Trustee, act as Disbursing Agent for distributions to the respective Holders of Allowed Funded Debt Claims and Allowed Utility Senior Note Claims under the applicable Funded Debt Documents. The Funded Debt Trustees, as applicable, may transfer such distributions or direct the transfer of such distributions by the Debtors or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed Funded Debt Claims or Allowed Utility Senior Note Claims to the extent consistent with the customary practices of DTC or the customary practices for administrative agents under syndicated credit facilities (as applicable). Distributions in respect of Allowed Funded Debt Claims and Allowed Utility Senior Notes Claims shall be subject in all respects to the right of the applicable Funded Debt Trustee to assert its Charging Lien, if any, against such distributions. All distributions to be made to holders of Allowed Utility Senior Note Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the applicable Funded Debt Documents.

Pursuant to the Plan, all such claims that are to be paid in full in Cash on the Effective Date shall also receive postpetition interest from the Petition Date to the Effective Date. Such postpetition interest shall be at the Federal Judgment Rate in accordance with the decision of the Bankruptcy Court, dated December 30, 2019 [Docket No. 5226].

Also, as set forth in the above chart, holders of common stock of PG&E Corp. shall retain their shares, subject to dilution from common stock to be issued under the Plan, including such common stock to be issued to the Fire Victim Trust as described above.

**E.  Equity Financing**[7]

In order to finance the transactions contemplated by the Plan, the Debtors expect to raise $9 billion through one or more issuances of new PG&E Corp. common stock. The equity issuances could include one or more of the following structures: public or private offerings in the equity capital markets (a "**Market Offering**"), a rights offering to holders of PG&E Corp.'s common stock (a "**Rights Offering**") or drawing under the Equity Backstop Commitment Letters between PG&E Corp. and the investors party thereto (the "**Backstop Parties**"). Although the amounts, terms and conditions of a Market Offering or Rights Offering have not been determined, the Equity Backstop Commitment Letters outline the circumstances under which the Debtors will be permitted to undertake these offerings and, in the case of the Rights Offering, outline certain terms and conditions that must be included as part of the Rights Offering.

- Market Offering: PG&E Corp. may undertake a Market Offering if the per share price at which shares of common stock are offering in the Market Offering corresponds to an implied price to earnings ratio of at least 13.5 times (subject to adjustment). The implied price to earnings ratio would be measured based on PG&E Corp.'s estimated net income for 2021 and the expected fully diluted number of shares of PG&E Corp. common stock that will be outstanding as of the Effective Date.

- Rights Offering: PG&E Corp. may undertake a Rights Offering to holders of PG&E Corp.'s common stock if the subscription price of the rights issued in the Rights Offering corresponds to an implied price to earnings ratio of 12.0 times (subject to adjustment) based on Normalized Estimated Net Income as provided in the Equity Backstop Commitment Letters. In a Rights Offering, PG&E Corp. would distribute rights to holders of PG&E Corp. common stock ratably based on the number of shares of common stock they hold. The rights would be freely transferable and would include oversubscription privileges, meaning that holders that exercise their rights may request to subscribe for any shares of common stock that were not subscribed for by other holders of rights. The rights would also contain such terms and conditions as are reasonably advisable to avoid an "ownership change" within the meaning of Section 382 of the Internal Revenue Code.

- Backstop Draw: To the extent that PG&E Corp. does not raise the necessary equity capital through a Market Offering or Rights Offering, PG&E Corp. expects to draw on the commitments under the Equity Backstop Commitment Letters, which provide for up to $12 billion of proceeds from the sale of shares to the Backstop Parties. The Backstop Parties would purchase shares under the Equity Backstop Commitment Letters at a price that corresponds to an implied price to earnings ratio of 10.0 times (subject to adjustment) based on Normalized Estimated Net Income as provided in the Equity Backstop Commitment Letters (the "**Backstop Price**"). In order to draw on the commitments

---

[7] The following is a summary of the equity financing contemplated by the Plan and is qualified in its entirety by reference to the terms of the applicable operative documents.

under the Equity Backstop Commitment Letters, certain terms and conditions must be satisfied, including that the Bankruptcy Court approve the Equity Backstop Commitment Letters, and the Backstop Parties have the right to terminate the Equity Backstop Commitment Letters under certain circumstances. As of the date of this Disclosure Statement, the Equity Backstop Commitment Letters have not been approved by the Bankruptcy Court. In addition, the amount of the commitments under the Equity Backstop Commitment Letters is subject to adjustment in the event that the Debtors obtain capital from certain alternative capital sources.

It is important to note that any equity issuance on the Effective Date will be dilutive to existing shareholders, with a Market Offering being the least dilutive and a drawing under the Equity Backstop Commitment Letters being the most dilutive. In addition, if the Equity Backstop Commitment Letters are approved by the Bankruptcy Court, PG&E Corp. will owe a premium to the Backstop Parties (the "**Equity Commitment Premium**"), generally payable in shares of common stock of Reorganized PG&E Corp., equal to 119 million shares in the aggregate.[8] In the event the market value of those 119 million shares would be less than $764 million based on trading prices for the 20 business days immediately following the Effective Date, the Backstop Parties will receive additional shares so that they receive at least $764 million of aggregate value, up to an aggregate cap of approximately 139 million shares. The value of the Equity Commitment Premium on the Effective Date will depend on the market value of PG&E Corp.'s common stock and the total number of shares of common stock issued on the Effective Date pursuant to the Debtors' Plan. However, assuming that the Debtors implement the capital structure described herein by drawing on the equity backstop commitments and based on the Debtors' forecasted net income, the value of the Equity Commitment Premium would be approximately $1.2 billion at the currently estimated Backstop Price. The value of the Equity Commitment Premium could exceed this amount in the event that PG&E Corp. successfully consummates a marketed equity offering or rights offering in lieu of drawing on the equity backstop commitments or if the Debtors implement a more leveraged capital structure. Payment of the Equity Commitment Premium on the Effective Date will also be dilutive to existing shareholders.

If PG&E Corp. determines to undertake a public Market Offering or Rights Offering, it will announce the terms of any offering at a later date through one or more disclosure documents that comply with applicable law, including the Securities Act. In the case of a Rights Offering, all PG&E Corp. shareholders as of a record date to be determined by the PG&E Corp. Board of Directors will have the opportunity to participate.

Termination of the Equity Backstop Commitment Letters could prevent the Debtors from consummating the Plan. There can be no assurance that the conditions precedent set forth in the Equity Backstop Commitment Letters will be satisfied or waived or that events or circumstances will not occur that would permit the Backstop Parties to terminate the Equity Backstop Commitment Letters. Under certain conditions in connection with the termination of the Equity Backstop Commitment Letters, as more fully described therein, the Backstop Parties may be eligible to be paid all or a portion of the Equity

---

[8] The Equity Commitment Premium is generally payable in stock; however, in the following limited circumstances each Backstop Party may elect to be paid in stock or cash: (i) PG&E Corp. exercises its fiduciary out to terminate the Equity Backstop Commitment Letters in order to enter into a transaction for the sale of the company or (ii) a plan of reorganization other than the Debtors' Plan is confirmed. If paid in cash, the Equity Commitment Premium would be approximately $764 million (6.364% of the full $12 billion commitment).

Commitment Premium. Further, under certain conditions, including in the event that a plan of reorganization for the Debtors that is not the Plan is confirmed by the Bankruptcy Court, the Backstop Parties may be eligible to be paid the Equity Commitment Premium in cash. For a detailed description of the Equity Backstop Commitment Letters and the Equity Commitment Premium thereunder, see the Exit Financing Motion.

## F. Debt Financing[9]

In addition to the equity financing, the Plan contemplates incurrence of $4.75 billion of new PG&E Corp. debt (the "**New HoldCo Debt**") and $33.35 billion of Utility debt (the "**New Utility Debt**"). The $33.35 billion of Utility debt is expected to consist of (a) $9.575 billion of reinstated prepetition senior notes, (b) $11.85 billion of new senior notes to be issued to holders of prepetition senior note claims, (c) $5.925 billion of new senior notes or credit facilities to be issued in the market for cash (the "**New Senior Utility Debt**") and (d) $6.0 billion of new short-term debt expected to be refinanced after the Effective Date. The New Senior Utility Debt will be used to, among other things, satisfy in full prepetition high-coupon Utility bonds and other prepetition obligations, and to fund the payment in full, in cash, of the Debtors obligations under the DIP Facilities. Pursuant to the terms of the Debt Backstop Commitment Letters, in the event the New HoldCo Debt or the New Senior Utility Debt is not issued on or prior to the Effective Date, certain money-center banks will fund investment grade 364-day "bridge" loan facilities (the "**Backstop Debt Facilities**") in aggregate amounts of up to $5.0 billion for PG&E Corp. and $5.825 billion for the Utility. In addition, the Debtors have executed fee letters (as amended, the "**Backstop Debt Fee Letters**"), which provide for, among other things, the payment of certain fees associated with the Backstop Debt Facilities, and engagement letters (the "**Debt Financing Engagement Letters**"), which engage the same banks to arrange (*i.e.*, market) the New Debt.

The Debtors do not currently anticipate drawing on the Backstop Debt Facilities, but instead expect to issue new long-term bonds and incur new credit facilities on market terms to fund their emergence. Nevertheless, the Backstop Debt Facilities provide assurance that sufficient funds at an acceptable price will be available if the New HoldCo Debt or the New Senior Utility Debt financings cannot be consummated, which is necessitated here by the requirement to obtain confirmation of the Plan on a specific timeline under AB 1054.

As with the Equity Backstop Commitment Letters, termination of the Debt Backstop Commitment Letters could prevent the Debtors from consummating the Plan and there can be no assurance that the conditions precedent set forth in the Debt Backstop Commitment Letters will be satisfied or waived or that events or circumstances will not occur that would permit the parties thereto to terminate the Debt Backstop Commitment Letters. Under certain conditions in connection with the termination of the Debt Backstop Commitment Letters, as more fully described therein, the parties thereto may be eligible to be paid all or a portion of the fees due under the Backstop Debt Fee Letters, in a maximum aggregate amount of approximately $75 million. For a detailed description of the Equity Backstop Commitment Letters and the commitment premiums thereunder, see the Exit Financing Motion.

---

[9] The following is a summary of the debt financing contemplated by the Plan and is qualified in its entirety by reference to the terms of the applicable operative documents.

### G.    Injunction, Exculpation, Release, and Related Provisions

    The Plan generally provides that subject to the occurrence of the Effective Date, upon confirmation of the Plan, the provisions of the Plan shall bind every holder of a Claim against or Interest in the Debtors and such holders' respective successors and assigns.

    **Below is a summary of important provisions in the Plan that may affect your rights as a holder of a Claim against or Interest in the Debtors. Please do not rely solely on this summary to understand how your rights may be impacted, but refer also to the specific provisions of the Plan cross-referenced below and carefully read the relevant Plan provisions in their entirety.**

    **1.    Releases and Exculpation.**

    **(a)   *Releases by the Debtors of Certain Parties.* As set forth in more detail in Section 10.9(a) of the Plan, and, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, the Released Parties[10] are deemed forever released and discharged by the Debtors, to the maximum extent permitted by law and unless barred by law, from any and all claims, interests, Causes of Action, and other liabilities asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates based on or relating to the Debtors, the Fires, the Chapter 11 Cases (including, among other things, related settlement agreements, transactions, business or contractual arrangements), and the subject matter of, or transactions or events giving rise to, any Claim or Interest that is treated in the Plan.**

    **(b)   *Consensual Releases by Holders of Claims and Interests of the Debtors and Certain Parties.* As set forth in more detail in Sections 10.9(b) and (c) of the Plan, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, certain Releasing Parties,[11] including any holder of a Claim or Interest that is solicited and voluntarily**

---

[10] The "**Released Parties**" are defined in the Plan as: (i) the Debtors and Reorganized Debtors; (ii) the Tort Claimants Committee; (iii) the DIP Facility Agents; (iv) the DIP Facility Lenders; (v) the Exit Financing Agents; (vi) the Exit Financing Lenders; (vii) the Backstop Parties; (viii) the Public Entities Releasing Parties; (ix) the Consenting Creditors (solely in their capacity as holders of Subrogation Wildfire Claims); (x) the Shareholder Proponents; (xi) the Consenting Noteholders; (xii) the Funded Debt Trustees; and (xiii) with respect to each of the foregoing entities (i) through (xii), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

[11] The "**Releasing Parties**" are defined in the Plan as: (i) the Debtors; (ii) the Reorganized Debtors, (iii) any holder of a Claim or Interest that is solicited and voluntarily indicates on a duly completed Ballot submitted on or before the Voting Deadline that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan to the extent permitted by applicable law, provided that for the avoidance of doubt any such a holder who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party, provided further that such holder's decision to opt-in or not to the releases

**indicates on a Ballot that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan, forever release and discharge the Debtors and other non-debtor Released Parties from any and all claims, interests, Causes of Action and other liabilities based on or related to, or in any manner arising from, in whole or in part, among other things, the Debtors, the Fires, the Chapter 11 Cases (including, among other things, related settlement agreements, transactions, business or contractual arrangements), and the subject matter of, or transactions or events giving rise to, any Claim or Interest that is treated in the Plan.**

**Any holder of a Claim or Interest who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party. Additionally, such holder's decision to opt-in or not to the releases shall not in any way affect the classification or treatment of such Claim or Interest. The holder of a Claim or Interest shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor in accordance with the opt-in release procedures set forth in the applicable Ballot.**

**The holders of Environmental Claims, Workers' Compensation Claims and 2001 Utility Exchange Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan. Furthermore, nothing in the Plan shall be deemed to impose a release by holders of Fire Victim Claims of insurance claims arising under their insurance policies against holders of Subrogation Wildfire Claims, other than any rights such holder may elect to release as part of any settlement as set forth in Section 4.23(f)(ii) of the Plan, which addresses the "Made-Whole Releases" described further below.**

**(c) _Made-Whole Releases_. As described in Section 4.23 (f)(ii) of the Plan, any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim, including by the Fire Victim Trust, shall contain as a condition to such settlement or other agreement that the holder or holders of such Claim contemporaneously execute and deliver a release and waiver of any potential made-whole claims against present and former holders of Subrogation Wildfire Claims, which release shall be substantially in the form attached to the Plan as __Exhibit C__ thereto. This provision does not apply to any settlement or other agreement regarding the Fire Victims Claims asserted by Adventist Health System/West and Feather River Hospital d/b/a Adventist Health Feather River**

---

shall not in any way affect the classification or treatment of such Claim or Interest; (iv) the DIP Facility Agents; (v) the DIP Facility Lenders; (vi) the Exit Financing Agents; (vii) the Exit Financing Lenders; (viii) the Funded Debt Trustees; (ix) the HoldCo Revolver Lenders; (x) the HoldCo Term Loan Lenders; (xi) the Utility Revolver Lenders; (xii) the Utility Term Loan Lenders; (xiii) the holders of Utility Senior Notes Claims; (xiv) the Public Entities Releasing Parties; (xv) the Statutory Committees; (xvi) the Backstop Parties; (xvii) the Consenting Creditors; (xviii) the Consenting Noteholders; and (xix) with respect to each of the foregoing entities (i) through (xviii), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

(collectively "**Adventist**"). **However, nothing in this provision and this exception thereto shall affect Adventist's rights and obligations as a claimant under the Fire Victim Trust.**

> (d) *Notice to Holders of Fire Victim Claims Regarding the Release of Made-Whole Claims Against Their Insurers.* The Plan provides, and the Debtors, Shareholder Proponents and members of the Ad Hoc Subrogation Group take the position that a release of made-whole claims will be required as a condition to settling Fire Victim Claims against the Fire Victim Trust. Section 4.23(f)(ii) of the Plan provides as follows: "4.23(f) . . . the Confirmation Order shall contain the following finds and order: . . . (ii) . . . any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim . . . **shall contain as a condition to such settlement or other agreement that the holder or holders of such Claim contemporaneously execute and deliver a release and waiver of any potential made-whole claims against present and former holders of Subrogation Wildfire Claims**, which release shall be substantially in the form attached [to the Plan] as Exhibit C." Accordingly, when voting on the Plan, holders of Fire Victim Claims should **not rely** on the draft of the Fire Victim Trust Agreement with respect to this issue, which was filed with the Bankruptcy Court subject to further revision on March 3, 2020 [Docket No. 6049]. The Debtors, Shareholder Proponents, Ad Hoc Subrogation Group, Tort Claimants Committee, and Consenting Fire Claimant Professional Group intend to work together to make sure the final version of the Fire Victim Trust Agreement is consistent with the Plan. If any inconsistency remains, the Ad Hoc Subrogation Group may object to confirmation of the Plan on that basis at the appropriate time.

> **(e) *Exculpation*. As set forth in more detail in Section 10.8 of the Plan, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, Exculpated Parties[12] are, to the maximum extent permitted by applicable law, released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases, including, but not limited to, those arising in connection with or arising out of the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the Plan Funding, the DIP Facilities, this Disclosure Statement, the Plan, the Restructuring Transactions, the Wildfire Trusts (including the Plan Documents, the Claims Resolution Procedures and the Wildfire Trust Agreements), or any agreement, transaction, or**

---

[12] The "**Exculpated Parties**" are defined in the Plan as: (i) the Debtors and Reorganized Debtors; (ii) the DIP Facility Agents; (iii) the DIP Facility Lenders; (iv) the Exit Financing Agents; (v) the Exit Financing Lenders; (vi) the Funded Debt Trustees; (vii) the HoldCo Revolver Lenders; (viii) the HoldCo Term Loan Lenders; (ix) the Utility Revolver Lenders; (x) the Utility Term Loan Lenders; (xi) the Public Entities Releasing Parties; (xii) the Statutory Committees; (xiii) the Backstop Parties; (xiv) the Consenting Creditors; (xv) the Shareholder Proponents; (xvi) the Consenting Noteholders; and (xvii) with respect to each of the foregoing entities (i) through (xvi), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

document related to any of the foregoing, or the solicitation of votes for, or confirmation of, the Plan; the funding or administration of the Plan; and the distribution of property under the Plan, or other actions taken in furtherance of the Plan. The exculpation does not cover Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

2. **Injunctions**

(a) *General Injunction*. As set forth in Section 10.6 of the Plan and restated herein, except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against a Debtor or an estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

By accepting distributions pursuant to the Plan, each holder of an Allowed Claim will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, the injunctions set forth in Section 10.6 of the Plan.

(b) *Channeling Injunction Applicable to Fire Victim Claims and Subrogation Wildfire Claims*. Upon the Effective Date of the Plan, all Fire Victim Claims shall be channeled to the Fire Victim Trust and all Subrogation Wildfire Claims shall be channeled to the Subrogation Wildfire Trust. The sole source of recovery for holders of Fire Victim Claims and Subrogation Wildfire Claims shall be from the Fire Victim Trust and the Subrogation Wildfire Trust, as applicable. The holders of such Claims shall have no recourse or Claims whatsoever against the Debtors, the Reorganized Debtors or their assets and properties. Consistent with the foregoing, all Persons that have held or asserted, or that hold or assert any Subrogation Wildfire

Claim or Fire Victim Claim shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Reorganized Debtor or its assets and properties with respect to any Fire Claims, including all of the following actions:

(i)  commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Fire Claim, against or affecting any Reorganized Debtor, or any property or interests in property of any Reorganized Debtor with respect to any such Fire Claim;

(ii)  enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim;

(iii)  creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Reorganized Debtor or the property of any Reorganized Debtor with respect to any such Fire Claims;

(iv)  asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim; and

(v)  taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Fire Claim.

*See* Section 10.7 of the Plan.

3.  Release and Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. The discharge, however, shall not extend to any Claims for fires occurring after the Petition Date, including the Kincade fire which shall remain a liability of the Debtors following the Effective Date. In addition, (i) from and after the Effective Date neither the automatic stay nor any other injunction entered by the Bankruptcy Court shall restrain the enforcement or defense of any claims for fires occurring after the Petition Date, including the Kincade fire or the Lafayette fire in any court that would otherwise have jurisdiction if the Chapter 11 Cases had not been filed and (ii) no claims for fires or motion for allowance of claims for fires occurring after the Petition Date need be filed in the Chapter 11 Cases. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Interest in the Debtors.

## V. VOTING PROCEDURES AND REQUIREMENTS

### A. Holders of Claims and Interests Entitled to Vote

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are thus not entitled to vote. Creditors or interest holders whose claims or interests are impaired by a plan, but who receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. Under the Plan, there are no classes of Claims or Interests that will receive no distribution.

Pursuant to the Plan, the Debtors have, in the aggregate, thirty-four (34) separate Classes of Claims against and Interests in PG&E Corp. and the Utility. Of those Classes, eleven (11) Classes are Impaired and are entitled to vote to accept or reject the Plan (collectively, the "**Voting Classes**"). The Voting Classes are listed below:

| Class 5A-I | HoldCo Public Entities Wildfire Claims | Impaired |
| Class 5A-II | HoldCo Subrogation Wildfire Claims | Impaired |
| Class 5A-III | HoldCo Fire Victim Claims | Impaired |
| Class 10A-I | HoldCo Common Interests | Impaired |
| Class 10A-II | HoldCo Rescission or Damage Claims | Impaired |
| Class 3B-I | Utility Impaired Senior Note Claims | Impaired |
| Class 3B-III | Utility Short-Term Senior Note Claims | Impaired |
| Class 3B-IV | Utility Funded Debt Claims | Impaired |
| Class 5B-I | Utility Public Entities Wildfire Claims | Impaired |
| Class 5B-II | Utility Subrogation Wildfire Claims | Impaired |
| Class 5B-III | Utility Fire Victim Claims | Impaired |

The remaining twenty-three (23) Classes are Unimpaired, are presumed to accept the Plan, and are, thus, not entitled to vote to accept or reject the Plan (the "**Non-Voting Classes**"). For a complete summary of the Voting Classes and Non-Voting Classes, see Section III of the Plan.

### B. Voting Deadline

All holders of Claims or Interests, as applicable, that are entitled to vote on the Plan, have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their solicitation agent (the "**Solicitation Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (PREVAILING PACIFIC TIME) ON MAY 15, 2020, UNLESS EXTENDED BY THE DEBTORS**.

### C.  Voting Procedures

By order dated, March [•], 2020 [Docket No. [•]] (the "**Disclosure Statement and Solicitation Procedures Order**"), the Bankruptcy Court, *inter alia*, (i) approved this Disclosure Statement, (ii) approved certain Plan solicitation and voting procedures, and (iii) approved the forms of Ballots, Solicitation Packages, and related notices to be sent to the Debtors' creditors and equity interest holders in connection with confirmation of the Plan.

#### 1.  How to Vote

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and one or more Ballots (collectively, a "**Solicitation Package**") to all holders of Claims or Interests, as applicable, that are entitled to vote on the Plan. All such holders should complete the enclosed Ballot and return it to the Solicitation Agent or Master Ballot Agent, **as set forth in the Ballot so that it is received by the Solicitation Agent before the Voting Deadline.**

#### 2.  Withdrawal of Ballots

Any voter that has delivered a valid Ballot may withdraw its vote, subject to Bankruptcy Rule 3018, by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline, which notice of withdrawal, to be valid, must be (i) signed by the party who signed the Ballot to be revoked and (ii) received by the Solicitation Agent before the Voting Deadline. The Plan Proponents may contest the validity of any withdrawals.

Any voter that has delivered a valid Ballot may not change its vote, except in accordance with the Disclosure Statement and Solicitation Procedures Order and Bankruptcy Rule 3018. In the case where more than one timely, properly completed Ballot voting the same Claim(s) or Interest(s) is received by the Solicitation Agent, only the Ballot that bears the latest date shall be counted unless the holder of the Claim or Interest receives Bankruptcy Court approval to have the Ballot that bears an earlier date counted; *provided, however*, if a holder of Claim(s) or Interest(s) submits both a paper Ballot and an electronic Ballot (an "**E-Ballot**") on account of the same Claim(s) or Interest(s), the E-Ballot shall supersede the paper Ballot, unless the holder receives Bankruptcy Court approval otherwise.

#### 3.  Inquiries

If you have any questions about the packet of materials you have received, please contact the Solicitation Agent, at (844) 339-4217 (domestic toll-free) or +1 (929) 333-8977 (international) or via email at pgeinfo@primeclerk.com.

Additional copies of this Disclosure Statement and the Plan are available upon written request made to the Solicitation Agent at the following address:

| **If by standard, overnight, or hand delivery:** |
| --- |
| PG&E Ballot Processing<br>c/o Prime Clerk, LLC<br>60 East 42nd Street<br>Suite 1440<br>New York, NY 10165 |

Copies of this Disclosure Statement and the Plan are also available on the Solicitation Agent's website, https://restructuring.primeclerk.com/pge/Home-Index.

## VI.   CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND EFFECTIVE DATE

There are certain conditions precedent to confirmation of the Plan and the Effective Date, which may be waived or modified, pursuant to Section 9.4 of the Plan, only by the Plan Proponents with the consent of the Backstop Parties holding a majority of the Aggregate Backstop Commitment Amount (such consent not to be unreasonably withheld, conditioned or delayed) and, in certain instances, the Requisite Consenting Creditors and the Requisite Consenting Fire Claimant Professionals (as such term is defined in the Tort Claimants RSA), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.  For more information on the conditions precedent to confirmation of the Plan, the conditions precedent to the Effective Date, and the waiver or modification of such conditions, please see Sections 9.1, 9.2, and 9.4 of the Plan, respectively.

## VII.   CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan (i) is accepted by all impaired classes of Claims and Interests entitled to vote for or against the Plan or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (iii) is feasible.

### A.   Acceptance of the Plan

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims occurs when holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan.  Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of interests occurs when holders of at least two-thirds (2/3) in amount of allowed interests of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Plan Proponents if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class and that the "absolute priority rule" is satisfied (*i.e.*, unless a class of claims of a senior priority are satisfied in full, no junior class can receive or retain any property under the Plan). As to any rejecting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of Claims or Interests in such Class. The following sets forth the "fair and equitable" test that must be satisfied if a Class rejects the Plan:

- **Rejecting Class of Unsecured Creditors**. Either (i) each holder of an impaired unsecured Claim in the Class receives or retains under the Plan, property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the rejecting Class will not receive or retain any property under the Plan.

- **Rejecting Class of Interests**. Either (i) each Interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such Interest and (b) the value of the Interest, or (ii) the holders of Interests that are junior to the Interests of the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any potential rejecting Class. The agencies of the United States of America and the State of California disagree.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE PLAN PROPONENTS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### B. Best Interest Test

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interest" test.

The first step in determining whether the Plan satisfies the best interest test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation, the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets, and by the payment of such additional administrative expenses and priority claims arising from the use of chapter 7 for the purposes of liquidation. Any remaining Cash would be

allocated to unsecured creditors and interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy as well as those fees that might be payable to attorneys and other professionals that the trustee might engage. Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and Statutory Committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims. Furthermore, additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases. The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

A chapter 7 liquidation would likely result (i) in the incurrence of increased costs and expenses arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) in an erosion of asset values in the context of a forced sale or takeover, and (iii) in the substantial increase in Claims that would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. The Debtors believe the liquidation process in chapter 7 would result in a failure to meet the June 30, 2020 emergence deadline associated with AB 1054, which could significantly impact potential values recoverable in a liquidation. Further, the Governor's office could intervene in a liquidation scenario and develop a plan for takeover by the State of California or certain Northern California Counties, which likely would depress the value realized on the Debtors' assets.

The process of liquidating the Debtors' businesses in chapter 7 would also be subject to review by numerous regulatory agencies, including the CPUC, the FERC, the NRC and the U.S. Department of Justice, which could delay the process of receiving any significant proceeds for two years or more. In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and would likely involve further costs.

With these factors in mind, the Debtors believe that the value, if any, distributable to each Class under the Plan, would be equal to, or, more likely, less than, the value of distributions under the Plan, and such distributions in a chapter 7 case would not occur for a substantial period of time, thus lowering the expected value as of the potential chapter 7 conversion date.

Under the Plan, all funded debt and general unsecured creditors are to be paid in full, with postpetition interest, their Claims will be reinstated or they will receive new notes. In addition, all Fire Victim Claims will be channeled to and satisfied by the Fire Victim Trust in compliance with AB 1054. Lastly, holders of Interests will retain their shares, subject to dilution. Under these circumstances, and where it is patently obvious that a liquidation under chapter 7 could not produce greater value, without even taking into account the substantial delay involved in distributing any proceeds, the Debtors believe that the best interest test clearly is satisfied and that a formal liquidation analysis presentation is not necessary or useful.

### C.   Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is "feasible." A feasible plan is one which will not likely lead to a need for further reorganization or liquidation of a debtor.

As set forth in the financial projections attached hereto as **Exhibit B**, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.

### D.   Alternatives to the Plan

The Plan has the support of the Debtors, the Shareholder Proponents, the Ad Hoc Subrogation Group, the Public Entities, and the Ad Hoc Noteholders Committee. Such parties have determined that the Plan is the best path forward for a successful and timely conclusion to the Chapter 11 Cases. There are, however, potential alternatives to the Plan, that include (i) continuation of the Chapter 11 Cases, which could lead to the filing of one or more alternative plans of reorganization, whether by the Debtors or other parties in interest, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and (ii) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

#### 1.   Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired or is terminated with regard to any other party in interest, such other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, a sale, or an orderly liquidation of their assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell outside of a chapter 11 plan all of their assets under section 363 of the Bankruptcy Code. Holders of any secured claims would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of secured claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for stakeholders than what they would receive under the Plan.

#### 2.   Liquidation under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. A chapter 7 trustee, who could lack the depth of knowledge of the Debtors' businesses and the complex regulatory environment in which the Debtors operate, would be required to invest substantial time and resources to become familiar with the Chapter 11 Cases and investigate the facts underlying the multitude of claims filed against the Debtors' estates.

As discussed above in Section VII.B, and as will be demonstrated in connection with confirmation of the Plan, the Debtors believe that liquidation under chapter 7 could not produce greater value to stakeholders than those provided for in the Plan because of, among other things, the limited market for the Debtors' assets as a result of the complex governmental regulations the Debtors are subject to, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7 and the sale of the Debtors' assets in a heavily regulated industry, the additional administrative expenses associated with the appointment of a chapter 7 trustee, including associated professionals' fees, and the loss in value attributable to a liquidation of the Debtors' assets as required by chapter 7.

## E.   Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing.  The Confirmation Hearing is scheduled for May 27, 2020 at 10:00 a.m. (Prevailing Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Dennis Montali, United States Bankruptcy Judge, in Courtroom 17 of the United States Bankruptcy Court for the Northern District of California, 16th Floor, 450 Golden Gate Avenue, San Francisco, California 94102.  The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan.  Any objection to confirmation of the Plan must (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection or response; (iv) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, the *Order Establishing Procedures for Disclosure Statement and Confirmation Hearing* (N.D. Cal. May 2017) (Montali, J.), and the *Order Establishing Schedule for Disclosure Statement Approval and Plan Confirmation* [Docket No. 5673]; and (v) be served on the following parties so as to be **ACTUALLY RECEIVED** no later than **May 15, 2020, at 4:00 p.m.  (Prevailing Pacific Time)**:

| | |
|---|---|
| Debtors<br>PG&E Corporation and<br>Pacific Gas & Electric Company<br>77 Beale Street<br>San Francisco, CA 94105<br>Attn: Janet Loduca, Senior Vice Present and General Counsel | Weil, Gotshal & Manges LLP<br>Counsel for the Debtors<br>767 Fifth Avenue<br>New York, New York  10153<br>Attn: Stephen Karotkin, Jessica Liou, Matthew Goren<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>E-mail:  stephen.karotkin@weil.com,<br>jessica.liou@weil.com, matthew.goren@weil.com |
| Keller Benvenutti Kim LLP<br>Counsel for the Debtors<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Attn: Tobias S. Keller, Peter J. Benvenutti, Jane Kim<br>Telephone: (415) 496-6723<br>Facsimile: (650) 636-9251<br>Email: tkeller@kbkllp.com, pbenvenutti@kbkllp.com, jkim@kbkllp.com | Cravath, Swaine & Moore LLP<br>Counsel for the Debtors<br>Worldwide Plaza<br>825 Eighth Avenue<br>Attn: Paul H. Zumbro, Kevin J. Orsini, Omid H. Nasab<br>New York, NY 10019<br>Telephone: (212) 474-1000<br>Facsimile: (212) 474-3700<br>Email: pzumbro@cravath.com, korsini@cravath.com, onasab@cravath.com |
| Jones Day<br>Counsel for the Shareholder Proponents<br>555 South Flower Street, Fiftieth Floor | Baker & Hostetler LLP<br>Counsel for the Tort Claimants Committee |

| | |
|---|---|
| Los Angeles, CA 90071<br>Attn: Bruce S. Bennett, Joshua M. Mester, James O. Johnston<br>Telephone: (213) 489-3939<br>Facsimile: (213) 243-2539<br>Email: bbennett@jonesday.com,<br>jmester@jonesday.com, jjohnston@jonesday.com | 1160 Battery Street, Suite 100<br>San Francisco, California 94111<br>Attn: Robert A. Julian, Cecily A. Dumas<br>Telephone: 628.208.6434<br>Facsimile: 310.820.8859<br>Email: rjulian@bakerlaw.com, cdumas@bakerlaw.com<br><br>and<br><br>11601 Wilshire Blvd., Suite 1400<br>Los Angeles, California 90025-0509<br>Attn: Eric E. Sagerman, Lauren T. Attard<br>Telephone: 310.820.8800<br>Facsimile: 310.820.8859<br>Email: esagerman@bakerlaw.com, lattard@bakerlaw.com |
| Milbank LLP<br>Counsel for the Creditors Committee<br>55 Hudson Yards<br>New York, New York 10001-2163<br>Attn: Dennis F. Dunne, Samuel A. Khalil<br>Telephone: (212) 530-5000<br>Facsimile: (212) 530-5219<br><br>and<br><br>2029 Century Park East, 33rd Floor<br>Los Angeles, California 90067<br>Attn: Gregory A. Bray, Thomas R. Kreller<br>Telephone: (424) 386-4000<br>Facsimile: (213) 629-5063 | United States Department of Justice<br>Office of the United States Trustee<br>450 Golden Gate Avenue, Suite 05-0153<br>San Francisco, California 94102<br>Attn: Timothy S. Laffredi, Jason Blumberg, Marta E. Villacorta<br>Telephone: (415) 705-3333<br>Facsimile: (415) 705-3379<br>Email: timothy.s.laffredi@usdoj.gov;<br>jason.blumberg@usdoj.gov, marta.villacorta@usdoj.gov |
| Akin Gump Strauss Hauer & Feld LLP<br>Counsel for the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company<br>One Bryant Park<br>New York, New York 10036<br>Attn: Michael S. Stamer, Ira S. Dizengoff, David H. Botter, Abid Qureshi<br>Telephone: (212) 872-1000<br>Facsimile: (212) 872-1002<br>Email: mstamer@akingump.com,<br>idizengoff@akingump.com, dbotter@akingump.com,<br>aqureshi@akingump.com<br><br>and<br><br>580 California Street, Suite 1500<br>San Francisco, California 94104<br>Attn: Ashley Vinson Crawford<br>Telephone: (415) 765-9500<br>Facsimile: (415) 765-9501<br>Email: avcrawford@akingump.com | Willkie Farr & Gallagher LLP<br>Counsel for the Ad Hoc Subrogation Group<br>787 Seventh Avenue<br>New York, New York 10019-6099<br>Attn: Matthew A. Feldman, Joseph G. Minias, Benjamin P. McCallen, Daniel I. Forman<br>Telephone: (212) 728-8000<br>Facsimile: (212) 728-8111<br>Email: mfeldman@willkie.com, jminias@willkie.com,<br>bmccallen@willkie.com, dforman@willkie.com |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## VIII.   FACTORS TO CONSIDER BEFORE VOTING

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement, together with any attachments, exhibits, or documents incorporated by reference. The factors below should not be regarded as the only risks associated with the Plan.  Documents filed by the Debtors with the SEC contain important risk factors in addition to those discussed below which also should be reviewed and considered in voting on the Plan.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### A.   Business Risk Factors to Be Considered

PG&E Corp.'s and the Utility's financial results can be affected by many factors, including, but not limited to, estimates and assumptions used in the Debtors' financial projections, future wildfires, legislative and regulatory developments, industry changes and technological developments, and environmental factors.  For a detailed description these business risk factors, please refer to the Form 10-K and other reports filed with the SEC, available at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### B.   General Risks Associated with the Bankruptcy Process

#### 1.   Non-Confirmation of the Plan

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.

If the Plan is not confirmed, the Debtors believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to unnecessarily prolong these chapter 11 cases and negatively affect recoveries for holders of claims and interests.  Any delay in confirmation beyond June 30, 2020 will also impair (and may preclude) the Debtors' ability to participate in the Go-Forward Wildfire Fund.

#### 2.   Non-Consensual Plan Confirmation

As discussed above, if any impaired class entitled to vote does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Plan Proponents if at least one impaired class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

#### 3.   Materially Different Financial Projections

In connection with confirmation of the Plan, the Debtors, with the assistance of their advisors, prepared financial projections for the Reorganized Debtors, attached hereto as **Exhibit B**, based on

certain assumptions. The projections have not been compiled, audited, or examined by independent accountants, and the Debtors and their advisors do not make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of a plan, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may materially affect the actual financial results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, regulatory, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorist attacks, or health epidemics, may materially affect the actual financial results achieved. Accordingly, the projections and actual results may materially differ.

### C. General Risks Associated with the State Legislative and Regulatory Process

As discussed above, the Debtors' business is subject to applicable federal, state and local law and the regulatory jurisdiction of various agencies at the federal, state, and local levels. For a detailed description of risk factors associated with such regulations, please refer to the Form 10-K and other reports filed with the SEC, available at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

#### 1. Impact of AB 1054 and Required CPUC Review

For the Utility to be eligible to participate in the Go-Forward Wildfire Fund established by AB 1054, the CPUC must determine that the plan of reorganization resolving the Chapter 11 Cases, including the Utility's resulting governance structure, is acceptable in light of the Utility's safety history, criminal probation, recent financial condition, and other factors deemed relevant by the CPUC. Although the CPUC's review of the Plan is underway and the CPUC has expressed its expectation to complete that review sufficiently in advance of June 30, 2020, there is risk that (i) the CPUC's review will not be completed in time to meet the June 30, 2020 plan confirmation deadline established by AB 1054, (ii) the CPUC may request revisions to the Plan that would require resolicitation of votes, or (iii) the CPUC finds that the Plan does not satisfy the requirements of AB 1054.

#### 2. Other Legislative and Regulatory Developments

The Reorganized Debtors will be subject to extensive regulations and the risk of enforcement proceedings in connection with such regulations. The Reorganized Debtors' financial condition, results of operations, liquidity, and cash flows could be materially affected by the outcomes of the CPUC's future investigative enforcement proceedings, other known or future enforcement matters, and other ongoing state and federal investigations and requests for information. The Reorganized Debtors could incur material costs and fines in connection with compliance with penalties from closed investigations or enforcement actions or in connection with future investigations, citations, audits, or enforcement actions.

The Utility is currently, and may in the future be, the subject of state and federal investigations, including investigations in connection with wildfires. In addition, the Reorganized Utility may in the

future also be the subject of a number of investigations relating to other matters. If these investigations result in enforcement action against or settlements with the Utility or the Reorganized Utility, the Utility or Reorganized Utility could incur or agree to pay additional fines or penalties the amount of which could be substantial and suffer further ongoing negative consequences. Furthermore, a negative outcome in any of these investigations, or future enforcement actions, could negatively affect the outcome of future ratemaking and regulatory proceedings to which the Utility or Reorganized Utility may be subject; for example, by enabling parties to challenge the Utility's or Reorganized Utility's request to recover costs that the parties allege are somehow related to the Utility's or Reorganized Utility's violations.

The Reorganized Debtors could be subject to additional regulatory or governmental enforcement action in the future with respect to compliance with federal, state or local laws, regulations or orders that could result in additional fines, penalties or customer refunds, including those regarding renewable energy and resource adequacy requirements; customer billing; customer service; affiliate transactions; vegetation management; design, construction, operating and maintenance practices; safety and inspection practices; compliance with CPUC general orders or other applicable CPUC decisions or regulations; federal electric reliability standards; and environmental compliance. CPUC staff could also impose penalties on the Reorganized Utility in the future in accordance with its authority under the gas and electric safety citation programs. The amount of such fines, penalties, or customer refunds could have a material effect on the Reorganized Debtors' financial condition, results of operations, liquidity, and cash flows.

### D.   Certain Securities Laws Matters

The securities described in this Disclosure Statement will be issued (i) pursuant to an effective registration statement under the Securities Act or (ii) pursuant to an applicable exemption under the federal securities laws and any applicable state securities laws, including section 1145 of the Bankruptcy Code or Section 4(a)(2) of the Securities Act.

Section 1145(a) of the Bankruptcy Code generally exempts the issuance of securities from the registration requirements of the Securities Act and any applicable state securities laws if the following conditions are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against or interests in the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in exchange for such claim or interest and partly for cash or property. The exemptions of section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Any securities issued pursuant to section 1145 ("**1145 Securities**") may be freely transferred by most recipients after issuance under the Plan, and all resales and subsequent transfers are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Resales of 1145 Securities by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell such securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.

All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act will be considered "restricted securities." Securities held by an affiliate of the issuer are "control securities." Restricted securities and control securities may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the securities is an affiliate of the issuer.

**THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER SECURITIES RECEIVED PURSUANT TO AN EXEMPTION FROM FEDERAL AND STATE SECURITIES LAW. ANY PERSONS RECEIVING SUCH SECURITIES UNDER THE PLAN ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

### E. Certain Tax Consequences of the Plan

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Interests. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury Regulations, judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not as of the date of this disclosure statement requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions. Although the Debtors may request certain rulings from the IRS, the Plan is not conditioned upon the application or receipt of a private letter ruling from the IRS. Accordingly, there is no assurance that the IRS would not take a contrary position as to the federal income tax consequences described herein.

This summary does *not* address foreign, state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.,* non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations (including holders of Public Entities Wildfire Claims), retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims or Interests through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons whose Claims or Interests are part of a straddle, hedging, constructive sale, or conversion transaction, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). In addition, this discussion does not address the Foreign Account Tax Compliance Act, or persons who

acquire any New Utility Long-Term Notes, New Utility Short-Term Notes or New Utility Funded Debt Exchange Notes as secondary purchasers.

The following discussion assumes that all Claims and Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated).

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISOR FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### 1. Consequences to the Debtors

For U.S. federal income tax purposes, each of the Debtors is a member of an affiliated group of corporations of which HoldCo is the common parent and which files a single consolidated U.S. federal income tax return (the "**Tax Group**"). The Debtors estimate that, as of December 31, 2018, the Tax Group had approximately $3.9 billion of federal consolidated net operating losses ("**NOLs**") and other tax attributes. As described below, the Debtors expect to incur additional deductions through the Effective Date, and over time following the Effective Date, in respect of cash or other property transfers by, or on behalf of, the Debtors to the Wildfire Trusts and Go-Forward Wildfire Fund (although not all such transfers may be deductible). The amount of any such NOLs and other tax attributes, including any deductions for payments of Claims under the Plan, remain subject to audit and potential adjustment by the IRS. NOLs arising in taxable years beginning after 2017 may only be used to offset up to 80% of taxable income in a given year.

As discussed below, depending in part on the extent of changes in stock ownership of HoldCo pursuant to the Plan, the utilization of any NOLs (including NOLs resulting from the implementation of the Plan) and certain other tax attributes of the Reorganized Debtors following the Effective Date could be subject to limitation under section 382 of the Tax Code. To assist in preventing any future or further limitation on the Reorganized Debtors' utilization of such tax attributes under section 382 due to any changes in the stock ownership of the Reorganized Debtors following the Effective Date, the Plan allows for the potential imposition of certain stock transfer restrictions in the organizational documents of the Reorganized Debtors.

### (a) *Cancellation of Debt*

In general, the Tax Code provides that, rather than including the amount of cancellation of debt ("**COD**") in taxable income, a debtor in a bankruptcy case must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any COD incurred pursuant to a confirmed chapter 11 plan. The amount of nontaxable COD income incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions also may apply to limit the amount of COD incurred by a debtor for U.S. federal income tax purposes, such as in the case of contested liabilities and the cancellation or discharge of a liability that would have given rise to a deduction when paid. The Debtors do not expect to incur any material amount of COD (if any) as a result of the implementation of the Plan, and thus do not anticipate any material

1    reduction in the NOL carryforwards or other tax attributes of the Tax Group as a result of any COD incurred.

2

3            **(b)**    *Funding and Tax Status of the Wildfire Trusts*

4        On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors will fund, or cause to be funded, the Wildfire Trusts. Pursuant to the Plan, the trusts will be funded with, depending on the particular trust, (i) cash, (ii) New HoldCo Common Stock, (iii) the Assigned Rights and Causes of Action, (iv) the Tax Benefits Payment Agreement, and (v) the assignment of rights under certain insurance policies. For U.S. federal income tax purposes, the Debtors intend to treat all such fundings as made by, or on behalf of, the Utility, on the basis that any Subrogation Wildfire Claims or Fire Victim Claims against HoldCo are derivative of those against the Utility.

5

6

7

8        As discussed below, each trust comprising the Wildfire Trusts should be treated as a "qualified settlement fund" for U.S. federal income tax purposes, unless the Reorganized Debtors elect to treat such trust as a grantor trust (meaning that the trust is treated effectively as an extension of the Reorganized Debtors for U.S. federal income tax purposes). The Debtors do not currently anticipate making a grantor trust election and, unless otherwise noted, the remainder of this discussion so assumes. Accordingly, the Reorganized Debtors generally should be entitled to a current federal income tax deduction for all transfers of cash, stock and other property (other than any new debt or other obligation of the Reorganized Debtors to make cash payments in the future) to each trust to the same extent the Reorganized Debtors would have been entitled to a deduction if such amounts had been paid directly to the holders of the Subrogation Wildfire Claims or Fire Victim Claims. The Reorganized Debtors would only be entitled to a deduction with respect to the entry into the Tax Benefits Payment Agreement as and when payments are made pursuant to the agreement. In addition, the Reorganized Debtors generally will not be entitled to a deduction to the extent the Fire Victims Trust is funded through insurance proceeds or the transfer of the Debtors' rights under various insurance policies.

9

10

11

12

13

14

15

16        Each trust will be subject to a separate entity level tax at the maximum rate applicable to trusts and estates (currently 37%) on the income of the trust, payable out of the assets of the trust. In determining the taxable income of the trust, (i) any amounts of cash, stock and other property transferred by the Debtors to the trusts (other than any accrual of interest income on any amounts payable by the Debtors to the trust after the Effective Date or distributions with respect to New HoldCo Common Stock) will be excluded from the trust's income; (ii) any sale, exchange, or distribution of property by the trust generally will result in the recognition of gain or loss in an amount equal to the difference between the fair market value of the property on the date of disposition and the adjusted tax basis of the trust in such property; and (iii) administrative costs (including state and local taxes) incurred by the trust will be deductible. In general, the adjusted tax basis of property received by the trusts pursuant to the Plan will be its fair market value at the time of such receipt.

17

18

19

20

21

22

23        In contrast, if an applicable grantor trust election is made with respect to a trust, the Reorganized Debtors would not be entitled to any deduction upon the funding of such trust, but rather would only be entitled to deduct any amounts as and when the trust actually satisfies the respective claims. In addition, any income and expenses of such trust would be treated for U.S. federal income tax purposes as the income and expenses of the Reorganized Utility.

24

25

26

27

28

### (c) *Funding of the Go-Forward Wildfire Fund*

Subject to satisfaction of the conditions set forth in AB 1054 as determined, where applicable, by the CPUC, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors will fund, in accordance with the California Public Utilities Code and the Reform Legislation, approximately $4.8 billion to the Go-Forward Wildfire Fund. The Reorganized Debtors will also be responsible for ongoing funding commitments to the Go-Forward Wildfire Fund as required by the terms of the Reform Legislation. The deductibility of the amounts contributed to the Go-Forward Wildfire Fund is uncertain, both as to timing and amount. It is possible that the Reorganized Debtors may be able to deduct the amounts contributed over time (possibly ten or fifteen years), or as the amounts are actually used for the benefit of the Reorganized Debtors (and not subject to repayment), or possibly, only once the fund is terminated and the amounts contributed are not returned.

### (d) *Limitation of NOL Carryforwards and Other Tax Attributes*

Following the Effective Date, any NOL carryforwards and certain other tax attributes allocable to periods prior to the Effective Date ("**Pre-Change Losses**") may be subject to certain limitations. Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change," and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation. In general, losses incurred in the same taxable year as an ownership change can be pro-rated between the pre- and post-change portions of the taxable year, even if a disproportionate amount of such losses were actually incurred on or prior to the date of the ownership change. Only the portion of such losses allocated to the pre-change portion of the year would be subject to the annual limitation. Whether the Debtors will undergo an ownership change is currently uncertain and will depend in part on the terms of the equity financing.

#### (i) Annual Limitation

In the event of an ownership change, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent corporation of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (1.63% for ownership changes occurring in March 2020). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. In addition, as discussed below, the annual limitation potentially may be increased in the event the corporation (or consolidated group) has an overall "built-in" gain in its assets at the time of the ownership change. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

If a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a current IRS notice, treated as recognized)

during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such recognized built-in gain income in addition to its regular annual allowance. Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation. On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS recently amended the proposed effective date provision to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective. The proposed regulations, therefore, should not apply to the Debtors. Accordingly, the Debtors estimate that the Tax Group would have a net unrealized built-in gain in excess of $6 billion as of the Effective Date.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

(ii) Section 382(l)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where "qualified creditors" and existing shareholders of a debtor corporation receive, in respect of their claims or equity interests, at least fifty percent of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The IRS has in private letter rulings applied section 382(l)(5) of the Tax Code on a consolidated basis where the parent corporation is in bankruptcy. Under this exception, a debtor's Pre-Change Losses are not limited on an annual basis, but, instead, are required to be reduced by the amount of certain previously deducted interest with respect to any debt converted into stock in the reorganization. No debt is being exchanged for stock in connection with the Plan. Moreover, if this exception applies, any further ownership change of the Reorganized Debtors within a two-year period after the Effective Date would preclude the Reorganized Debtor's subsequent utilization of any Pre-Change Losses in existence at the time of such ownership change. A debtor that qualifies for the section 382(l)(5) exception may, if it so desires, elect not to have the exception apply and to instead be subject to the annual limitation described above. It is currently uncertain whether the Plan will result in an ownership change and, if an ownership change were to occur, whether the Reorganized Debtors would qualify for the section 382(l)(5) exception.

(e) *Backstop Tax Receivable Agreement*

Pursuant to the Plan and the Equity Backstop Commitment Letters, the Backstop Parties will, under certain circumstances, acquire from the Debtors (through a trust arrangement) a tax receivable agreement pursuant to which the Reorganized Utility would be required to annually make a cash payment in an amount determined based on the utilization of tax benefits arising from the use of NOLs and deductions from the payment of Fire Claims (other than any tax benefits for which the Reorganized Debtors have payment obligations under the Tax Benefits Payment Agreement). The U.S. federal income tax treatment of any amount received (or deemed to be received) by the Reorganized Utility for the tax receivable agreement is currently uncertain and depends on the particular terms of the tax

receivables agreement and the tax characterization of the tax receivable agreement – for example, as a separate contractual property right, as a contingent debt obligation, as an equity interest in the Reorganized Utility, or otherwise. Depending on the appropriate characterization, the Debtors may recognize income with respect to any amount received for the tax receivable agreement and may or may not be entitled to a deduction in the future as payments are made under the agreement. In the event that the Debtors implement the capital structure described in the testimony provided in the Plan OII proceeding referenced above in Section II.E.3, they will not be required to provide the Backstop Parties with the tax receivable agreement. The Debtors' capital structure remains subject to change, in which case they may be required to provide the Backstop Parties with the tax receivable agreement in accordance with the Equity Backstop Commitment Letters.

### 2. Consequences to Holders of Certain Claims and Interests

This summary discusses the U.S. federal income tax consequences to holders of Utility Senior Note Claims (other than Utility Reinstated Senior Note Claims), Utility Funded Debt Claims, Subrogation Wildfire Claims, Fire Victim Claims and HoldCo Common Stock who are U.S. Holders, and does not discuss tax consequences for those who are not U.S. Holders.

As used herein, the term "**U.S. Holder**" means a beneficial owner of such Claims or Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims or Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. *If you are a partner in such a partnership holding any such Claims or Interests, you should consult your own tax advisor.*

### (a) *U.S. Holders of Utility Senior Note Claims and Utility Funded Debt Claims*

Pursuant to the Plan, holders of Allowed Utility Impaired Senior Note Claims, Utility Short-Term Senior Note Claims and Utility Funded Debt Claims will receive (i) cash equal to their Utility Impaired Senior Note Claim Interest Amount, Utility Short-Term Senior Note Claim Interest Amount or their Utility Funded Debt Claims Interest and Charges Amount, as applicable, and (ii) in satisfaction and discharge of the remainder of their Allowed Claims, New Utility Long-Term Notes, New Utility Short-Term Notes or New Utility Funded Debt Exchange Notes (collectively, the "**New Utility Notes**"), as applicable. Pursuant to the Noteholder RSA, certain holders will also receive an additional payment,

termed an Underwriting Fee. The discussion herein does not address the federal income tax treatment of such additional payment; recipients of such payment are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment.

The receipt of a new debt instrument in satisfaction for an existing debt instrument will be treated as an "exchange" for U.S. federal income tax purposes, if the terms of the two instruments (taking into account any related transactions) are significantly different as determined for U.S. federal income tax purposes. The Debtors expect, and the discussion herein assumes, that the receipt of New Utility Notes by a holder of Utility Senior Note Claims or Utility Funded Debt Claims will be respected as an "exchange" for U.S. federal income tax purposes.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of Utility Senior Note Claims or Utility Funded Debt Claims depends, in part, on whether such claims and the New Utility Notes constitute "securities" for U.S. federal income tax purposes. The term "security" is not defined in the Tax Code or in the Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted-average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted-average maturity at issuance of ten (10) years or more constitute securities. The maturity of the Utility Senior Note Claims ranges from approximately five (5) to thirty (30) years. The maturity of the Utility Funded Debt Claims ranges from approximately one (1) to seven (7) years. The New Utility Long-Term Notes will have a 10-year or 30-year maturity, the New Utility Short-Term Notes will have a 5-year or 8-year maturity and the New Utility Funded Debt Exchange Notes will have either a 5.5-year or 20-year maturity. ***U.S. Holders of the Utility Senior Note Claims and Utility Funded Debt Claims are urged to consult their own tax advisors regarding the appropriate status of such claims for U.S. federal income tax purposes***.

(i)  Recapitalization Treatment

In the event that the applicable Utility Senior Note Claims, Utility Funded Debt Claims and New Utility Notes constitute "securities" for U.S. federal income tax purposes, a U.S. Holder's receipt of New Utility Notes in exchange for Allowed Utility Senior Note Claims or Allowed Utility Funded Debt Claims should be treated as a "recapitalization" for U.S. federal income tax purposes. The classification as a recapitalization generally serves to defer the recognition of any gain or loss by the U.S. Holder. However, a U.S. Holder will recognize any gain (computed as discussed in the next section) to the extent of any cash received, other than cash received in respect of accrued but unpaid interest and possibly accrued original issue discount ("**OID**"), which will be separately taxable as ordinary interest income to the extent not previously included in income (*see* —"Distributions in Discharge of Accrued Interest or OID," below). *See* — "Character of Gain or Loss," below.

In a recapitalization exchange, a U.S. Holder's tax basis in the New Utility Notes as it relates to its Allowed Utility Senior Note Claims or Utility Funded Debt Claims should equal such U.S. holder's adjusted tax basis in its Claims, increased by any gain or interest income recognized in the exchange, and decreased by any deductions claimed in respect of any previously accrued but unpaid interest and the amount of cash received. In general, the holder's holding period for such portion of the New Utility

Notes would include the holder's holding period for its Claim, except to the extent that any New Utility Notes are issued in respect of a Claim for accrued but unpaid interest and possibly accrued OID.

### (ii) Taxable Exchange Treatment

In the event that an Allowed Utility Senior Note Claim or Allowed Utility Funded Debt Claim, as applicable, does not constitute a "security" for U.S. federal income tax purposes, or the New Utility Note received does not constitute a "security" for U.S. federal income tax purposes, a U.S. Holder of such an Allowed Claim generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" of the New Utility Notes received and the amount of any cash received in satisfaction of its Claims (other than any cash received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* — "Character of Gain or Loss," below. As discussed below (*see* — "Ownership and Disposition of the New Utility Notes"), the "issue price" of the New Utility Notes is expected to be the fair market value of such notes at issuance. A U.S. Holder will have ordinary interest income to the extent of any cash allocable to accrued but unpaid interest or possibly accrued OID not previously included in income. *See* — "Distributions in Discharge of Accrued Interest or OID," below.

In a taxable exchange, a U.S. Holder of Utility Senior Note Claims or Utility Funded Debt Claims will generally have a tax basis in the New Utility Notes received in satisfaction of its Claims equal to the fair market value of such notes. The holder's holding period in the New Utility Notes should begin the day following the Effective Date.

### (iii) Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, whether the Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction.

A U.S. Holder that acquired a Claim from a prior holder at a "market discount" may be subject to the market discount rules of the Tax Code. A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

In the case of an exchange of any Utility Senior Note Claims or Utility Funded Debt Claims for New Utility Notes that qualifies as a recapitalization exchange, the Tax Code indicates that any accrued market discount in respect of such Claims should only be currently includable in income to the extent of any gain recognized in the recapitalization exchange. However, any accrued market discount that is

not included in income should carry over to such New Utility Notes, such that any gain recognized by a U.S. Holder upon a subsequent disposition of such notes would be treated as ordinary income to the extent of any accrued market discount not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

(iv)     Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

(v)     Ownership and Disposition of the New Utility Notes

The following discussion is based on the preliminary terms of the New Utility Notes, which are subject to change in whole or in part.

In general, payments of stated interest on the New Utility Notes should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received, in accordance with the holder's regular method of tax accounting.

In addition, depending on the issue price, some or all series of New Utility Notes may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its issue price by more than a statutorily defined *de minimis* amount. The "stated redemption price at maturity" of each series of New Utility Notes would include all principal and interest payable over the term of such New Utility Notes, other than qualified stated interest (*i.e.*, other than stated interest that is unconditionally payable at least annually at a constant rate in cash or property other than debt of the issuer). The stated interest payable on the New Utility Notes should be considered qualified stated interest for this purpose.

The "issue price" of any series of New Utility Notes will depend on whether such notes, or a substantial portion of the Allowed Utility Senior Note Claims or Allowed Utility Funded Debt Claims exchanged for such series of New Utility Notes, are traded on an established market. A debt instrument is considered traded on an established market for U.S. federal income tax purposes only if such debt is traded on an established market during the 31-day period ending 15 days after the Effective Date. Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale, or if there is one or more "firm quotes" or "indicative quotes" for the debt instrument, in each case as such terms are defined in applicable Treasury Regulations. The Debtors determination of whether a series of New Utility Notes or a substantial portion of the Allowed Utility Senior Note Claims and Allowed Utility Funded Debt

Claims exchanged for such series is traded on an established market will be binding on a U.S. Holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

If, as the Debtors expect, the New Utility Notes are treated for U.S. federal income tax purposes as traded on an established market, the issue price of the New Utility Notes will equal their fair market value on the Effective Date. If a series of New Utility Notes is not considered traded on an established market, but a substantial portion of the Allowed Utility Senior Note Claims and Allowed Utility Funded Debt Claims exchanged for such series is traded on an established market, the issue price of the New Utility Notes will be based on the fair market value of such Notes (with appropriate adjustments), as determined by the Debtors. Such determination will be binding on a U.S. Holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that its determination differs from the Debtors' determination. If neither a particular series of New Utility Notes nor a substantial portion of the Allowed Utility Senior Note Claims and Allowed Utility Funded Debt Claims exchanged for such series is considered traded on an established market, the issue price for the New Utility Notes should be the stated principal amount of the New Utility Notes.

In general, and subject to the discussion of acquisition and bond premium in the below, a U.S. Holder must include OID in gross income as it accrues over the term of the New Utility Notes using the "constant yield method" without regard to its regular method of accounting for U.S. federal income tax purposes, and regardless of when the holder receives cash payments attributable to that income. The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on its interest in the New Utility Notes for each day during the taxable year on which such holder holds such interest, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the U.S. Holder's interest in the New Utility Notes at the beginning of the accrual period multiplied by the yield to maturity of the New Utility Notes less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of an interest in the New Utility Notes at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on such interest in all prior accrual periods, and decreased by any payments made during all prior accrual periods on such interest other than qualified stated interest.

Any OID that a holder includes in income will increase the holder's adjusted tax basis in its interest in the New Utility Notes. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on its New Utility Notes; instead, such payments will reduce the holder's adjusted tax basis in such interest by the amount of the payment.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases. Accordingly, each holder of New Utility Notes is urged to consult its tax advisor regarding the possible application of the OID rules to the New Utility Notes.

***Acquisition and Bond Premium on the New Utility Notes.*** The amount of OID or stated interest includible in a U.S. Holder's gross income with respect to the New Utility Notes will be reduced if the debt is acquired (or deemed to be acquired) at an "acquisition premium" or with "bond premium."

A debt instrument is acquired at an "acquisition premium" if the holder's tax basis in the debt is greater than the adjusted issue price of the debt at the time of the acquisition, but is less than or equal to the stated redemption price at maturity of the debt. If an exchange qualifies for recapitalization treatment, a U.S. Holder may have acquisition premium. If a U.S. Holder has acquisition premium, the amount of any OID includible in its gross income in any taxable year with respect to the New Utility Notes to which such acquisition premium relates will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to such portion of the holder's interest by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID).

If a U.S. Holder has a tax basis in any New Utility Notes received that exceeds the stated redemption price at maturity of such notes, such New Utility Notes will be treated as having "bond premium" and, if applicable, the U.S. Holder will not include any OID on such notes in income. A U.S. Holder may elect to amortize any bond premium over the period from its acquisition to the maturity date of such notes, using a constant yield-to-maturity method prescribed under applicable Treasury Regulations, in which case the U.S. Holder should have an ordinary deduction as an offset to stated interest income in respect of such New Utility Notes, and a corresponding reduction in its tax basis in such notes for purposes of computing gain or loss. If such an election to amortize bond premium is not made, a U.S. Holder will receive a tax benefit from the premium in computing such holder's gain or loss upon the sale or other taxable disposition of such New Utility Notes, including the repayment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds the interest on which is includible in the U.S. Holder's gross income and that are held at, or acquired after, the beginning of the U.S. Holder's taxable year as to which the election is made. The election may be revoked only with the consent of the IRS.

***Sale, Exchange or Other Disposition of the New Utility Notes***. Upon the sale, exchange or other disposition of the New Utility Notes, a U.S. Holder generally will recognize gain or loss equal to the difference, if any, between the amount realized on the sale, exchange or other disposition (other than amounts attributable to accrued but unpaid stated interest, which generally will be taxable as ordinary income to the extent not previously included in income) and its adjusted tax basis in the New Utility Notes. The gain or loss generally will be treated as capital gain or loss except to the extent the gain is treated as accrued market discount in which case it is treated as ordinary income. *See* — "Character of Gain or Loss," above. Any capital gain or loss generally should be long-term if the U.S. Holder's holding period for its New Utility Notes is more than one year at the time of disposition. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

### (b) *U.S. Holders of Subrogation Wildfire Claims and Fire Victim Claims*

Pursuant to the Plan, and in complete and final satisfaction of their respective Claims, holders of Allowed Subrogation Wildfire Claims will receive cash from the Subrogation Wildfire Trust, and the Debtors expect that holders of Allowed Fire Victim Claims will receive cash distributions from the Fire Victims Trust. All distributions received by holders of such Claims will solely be from the applicable Wildfire Trusts. For U.S. federal income tax purposes, any amounts received by a U.S. Holder of a Subrogation Wildfire Claim or Fire Victim Claim from a Wildfire Trust should be treated by such holder as if distributed directly by the Debtors. For a discussion of the U.S. federal income tax treatment of

the Wildfire Trusts, *see* "Consequences to the Debtors – Funding and Tax Status of the Wildfire Trusts," above.

The U.S. federal income tax consequences to U.S. Holders of Allowed Subrogation Wildfire Claims and Allowed Fire Victim Claims – including whether such holder may have income or loss on account of their Claims – will depend on, among other things, the nature of the Claim, such as whether the Claim is for personal injury or property damage, is a Subrogation Wildfire Claim or a Claim otherwise held by a third-party, and whether the holder has previously claimed losses for U.S. federal income tax purposes with respect to such Claim. To the extent that some or all of the amounts received by a holder of an Allowed Fire Victim Claim are generally attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Tax Code, any such amounts received by the holder generally should be nontaxable. To the extent that some or all of the amounts received by a holder of an Allowed Fire Victim Claim are generally attributable to, and compensation for, damage to or the destruction of such holder's property, amounts received by such holder with respect to such a Claim that are used to restore such holder's damaged or destroyed property to its original condition, or used to replace destroyed property, or a part thereof, with similar property, generally should be nontaxable to the holder, but only to the extent that a loss has not previously been claimed with respect to such property for U.S. federal income tax purposes. Any amount received, however, in respect of property that has been destroyed and will not be replaced by the holder, or for which a loss has previously been claimed, generally may give rise to gain or loss equal to the difference between (i) such amount received and (ii) the adjusted tax basis of the holder in the destroyed property. ***Because the U.S. federal income tax treatment of any amount received by a U.S. Holder will depend on facts particular to such holder, all U.S. Holders should consult their own tax advisors as to the proper tax treatment of such receipts.***

(c)     *U.S. Holders of HoldCo Common Stock*

Pursuant to the Plan, each holder of HoldCo common stock on the Effective Date will retain its shares subject to the terms of the New Organizational Documents and to dilution from any New HoldCo Common Stock issued pursuant to the Plan. In addition, each such holder of HoldCo common stock may be distributed rights (a subscription right) to participate in the Rights Offering on a pro rata basis. In general, U.S. Holders of a HoldCo common stock should not recognize income or gain for United States federal income tax purposes as a result of the Plan.

The U.S. federal income tax treatment of the receipt of subscription rights as the receipt of "options" to acquire stock of Reorganized Holdco or, alternatively, as an integrated transaction pursuant to which holders of HoldCo common stock are treated as receiving the underlying stock (partially for cash and partially in respect of their existing stock interest) is uncertain. Regardless of the characterization of the subscription rights, receipt of a right to participate in the Rights Offering on a pro rata basis under either characterization is not expected to be taxable to a U.S. Holder of HoldCo common stock. A U.S. Holder's basis in subscription rights received generally will be determined by allocating the basis of currently held stock of HoldCo between such stock and the rights received, unless the fair market value of the rights received at the time of the distribution is less than fifteen percent of the fair market of the such holder's HoldCo common stock (and the distribution in not treated as part of a tax "recapitalization" of the existing HoldCo common stock for new stock and rights), in which case no allocation is required and the basis of the rights received will be zero unless the holder elects otherwise. Upon exercise of such rights, a U.S. Holder's tax basis in the stock of Reorganized HoldCo received should generally be equal to the sum of its tax basis in the subscription right, if any, and the amount paid in exercise of the right. If the holder is treated as having received subscription rights of

value, such that the holder obtains a tax basis in the rights, and such rights lapse unexercised, the holder generally should recognize a capital loss in the amount of the holder's tax basis in the rights.

A U.S. Holder's holding period in any New HoldCo Common Stock received upon exercise of a subscription right should begin on the day on which the right was exercised unless considered part of a tax recapitalization, in which event the holder's holding period in the New HoldCo Common Stock and subscription rights received would include the holder's holding period for its HoldCo common stock.

### (d)  *U.S. Holders of HoldCo Rescission or Damage Claims*

Pursuant to the Plan, and in satisfaction and discharge of their respective Claims, each holder of an Allowed HoldCo Rsescission or Damage Claim will receive New HoldCo Common Stock. Allowed HoldCo Rescission or Damage Claims include any Claims subordinated under section 510(b) of the Bankruptcy Code arising from rescission of a purchase or sale of existing common stock of HoldCo common stock, or from damages arising from the purchase or sale of such stock. Accordingly, the U.S. federal income tax treatment of the receipt of New HoldCo Common Stock by U.S. Holders of such Claims will depend on, among other things, the nature of such Claims and the extent to which, if at all, the holder has previously claimed a loss in respect of its Claim. ***Holders of Allowed HoldCo Rescission or Damage Claims are urged to consult their own tax advisors as to the U.S. federal income tax consequences to them of receiving New HoldCo Common Stock, including the extent to which any recovery is taxable (for example, in the case of a prior U.S. holder of HoldCo common stock, it is possible that the receipt of New HoldCo Common Stock might be treated as a tax-free recapitalization or similar non-recognition transaction for U.S. federal income tax purposes) and the character of any income or loss.***

### (e)  *Withholding on Distributions and Information Reporting*

All distributions to holders of Claims and Interests under the Plan are subject to any applicable tax withholding.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  ***Holders of Claims and Interests are urged to consult their tax advisors regarding the potential for and applicable rules governing backup and other tax withholding in connection with the transactions contemplated by the Plan.***

## IX.  CONCLUSION

The Debtors, the Shareholder Proponents, the Ad Hoc Subrogation Group, the Public Entities, and the Ad Hoc Noteholders Committee urge the holders of impaired Claims (Fire Victim Claims, Subrogation Wildfire Claims, Public Entities Wildfire Claims, Utility Impaired Senior Note Claims, Utility Short-Term Senior Note Claims, and Utility Funded Debt Claims) and Interests (HoldCo

Common Interests) to vote to **<u>accept</u>** the Plan and to evidence such acceptance by returning their Ballots so that they will be received not later than **May 15, 2020, at 4:00 p.m. (Prevailing Pacific Time)**.

Dated: San Francisco
[_], 2020

Respectfully submitted,

PG&E CORPORATION

By: _____
      Name:  [Jason P. Wells
      Title:    Executive Vice President and Chief Financial
              Officer]

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
      Name:  [David S. Thomason
      Title:    Vice President, Chief Financial Officer and
              Controller]

SHAREHOLDER PROPONENTS

By: _____

**<u>Exhibit A</u>**

**Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization**

**[Excluded.]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>Exhibit B</u>**

**Financial Projections**

**[To Come]**