WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**[PROPOSED] DISCLOSURE STATEMENT FOR DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>Dated: San Francisco, California<br>       March 16, 2020 |

**THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.**

# TABLE OF CONTENTS

Page

I.    Introduction ................................................................................................. 1

    A.    Notice to Creditors ............................................................................ 3

II.   Overview of the Chapter 11 Cases ............................................................. 5

    A.    Commencement of Chapter 11 Cases ................................................ 5
    B.    Certain Significant Events During the Chapter 11 Cases .................. 5
    C.    Related Pending Proceedings ........................................................... 11

III.  Postpetition Legislative and Regulatory Matters ...................................... 13

    A.    Wildfire Legislation ........................................................................ 13
    B.    Governor's Letter Regarding Compliance with the Wildfire Legislation ........... 15
    C.    CPUC Approvals .............................................................................. 15
    D.    Other Federal Regulatory Matters ................................................... 17

IV.   Background and Overview of the Plan ...................................................... 18

    A.    Plan Background .............................................................................. 18
    B.    Classification and Treatment of Claims and Interests...................... 19
    C.    Treatment and Satisfaction of Fire Claims ..................................... 23
    D.    Treatment and Satisfaction of All Other Prepetition Claims and Interests ......... 30
    E.    Equity Financing ............................................................................. 31
    F.    Debt Financing ................................................................................ 33
    G.    Injunction, Exculpation, Release, and Related Provisions ............... 34
    H.    Certain Preference Actions .............................................................. 39

V.    Voting Procedures and Requirements ........................................................ 39

    A.    Holders of Claims and Interests Entitled to Vote............................ 39
    B.    Voting Deadline ............................................................................... 40
    C.    Voting Procedures ........................................................................... 40

VI.   Conditions Precedent to Confirmation of the Plan and Effective Date .......... 41

VII.  Confirmation of the Plan ........................................................................... 41

    A.    Acceptance of the Plan .................................................................... 41
    B.    Best Interest Test ............................................................................. 43
    C.    Feasibility ....................................................................................... 44
    D.    Alternatives to the Plan.................................................................... 44
    E.    Notices and Confirmation Hearing ................................................. 45

VIII. Factors to Consider Before Voting ............................................................ 47

    A.    Business Risk Factors to Be Considered ......................................... 47
    B.    General Risks Associated with the Bankruptcy Process .................. 47
    C.    General Risks Associated with the State Legislative and Regulatory Process..... 48
    D.    Certain Securities Laws Matters ..................................................... 50
    E.    Certain Tax Consequences of the Plan ............................................ 50

IX.   Conclusion.................................................................................................. 51

**EXHIBITS**

EXHIBIT A    Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization
EXHIBIT B    Financial Projections

# I.    INTRODUCTION

On January 31, 2020, PG&E Corporation ("**PG&E Corp.**" or "**HoldCo**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., "**PG&E**" or the "**Debtors**"), and certain funds and accounts managed or advised by Abrams Capital Management, LP and certain funds and accounts managed or advised by Knighthead Capital Management, LLP (the "**Shareholder Proponents**" and, together with the Debtors, the "**Plan Proponents**") filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020* [Docket No. 5590] (as it may be amended, modified or supplemented, and together with any exhibits or schedules thereto, the "**Plan**"). This disclosure statement (as it may be amended, modified or supplemented, and together with any exhibits or schedules hereto, the "**Disclosure Statement**") is being provided to you in connection with the solicitation of votes to accept or reject the Plan. A copy of the Plan is annexed to this Disclosure Statement as **Exhibit A**. Unless otherwise defined herein, capitalized terms used in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

The Plan is supported by the following parties:

1. The Debtors;

2. The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company, consisting of major holders of the Utility's outstanding prepetition funded debt claims (the "**Ad Hoc Noteholders Committee**");

3. The Ad Hoc Group of Subrogation Claim Holders, consisting of major holders of claims arising from insurance payments made to victims in connection with the wildfires (the "**Ad Hoc Subrogation Group**");

4. Several Public Entities in the areas in which the wildfires occurred (the "**Public Entities**"); and

5. Certain major shareholders of PG&E Corp.

**THESE PARTIES BELIEVE THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS THE FASTEST WAY FOR FIRE VICTIMS AND OTHER CLAIMANTS TO RECEIVE PAYMENTS ON THEIR CLAIMS, AND THAT IF THE PLAN IS NOT APPROVED THOSE PAYMENTS WILL BE SIGNIFICANTLY DELAYED AND FIRE VICTIMS AND OTHER CLAIMANTS MAY RECEIVE SIGNIFICANTLY LESS THAN WHAT THEY WOULD RECEIVE UNDER THE PLAN.**

It is important to note that (as described in more detail below) under the Plan, aggregate consideration of $13.5 billion will be transferred to a trust to satisfy Fire Victim Claims (the "**Fire Victim Trust**") as follows:

1. $5.4 billion in Cash on the Effective Date of the Plan;

2. An additional $1.35 billion in Cash, consisting of (i) $650 million to be paid in Cash on or before January 15, 2021 pursuant to a Tax Benefits Payment Agreement, and (ii) $700 million to be paid in Cash on or before January 15, 2022 pursuant to a Tax Benefits Payment Agreement;

3. $6.75 billion in common stock of Reorganized PG&E Corp. (using equity valued using a multiple equal to 14.9 multiplied by the Normalized Estimated Net Income as of a date to be agreed upon among the parties to the Tort Claimants RSA (defined below)), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date;

**THE $6.75 BILLION VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP. IS BASED ON A FORMULA SET FORTH IN THE TORT CLAIMANTS RSA AND INCORPORATED IN THE PLAN. THE $6.75 BILLION VALUE DOES NOT NECESSARILY REFLECT THE ACTUAL VALUE OF THE STOCK TO BE HELD BY THE FIRE VICTIM TRUST ON THE EFFECTIVE DATE AND THEREAFTER. THE ACTUAL VALUE OF THE STOCK ON THE EFFECTIVE DATE AND THEREAFTER COULD BE GREATER OR LESS THAN $6.75 BILLION BASED ON THE FUTURE TRADING VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP.;**

4. The assignment to the Fire Victim Trust of certain claims that the Fire Victim Trust may pursue for the benefit of holders of Fire Victim Claims; and

5. The assignment of rights under the 2015 Insurance Policies to resolve any Claims related to Fires in those policy years, other than the rights of the Debtors to be reimbursed under the 2015 Insurance Policies for claims submitted to and paid by the Debtors prior to the Petition Date.

Pursuant to the Plan, all Allowed Fire Victim Claims will be paid from the assets described above that will be transferred to the Fire Victim Trust. All Fire Victim Claims will be resolved and satisfied by the Fire Victim Trust pursuant to claims resolution procedures to be adopted by the Fire Victim Trust. **Although common stock of Reorganized PG&E Corp. is to be transferred to the Fire Victim Trust pursuant to the Plan, NOTHING IN THE PLAN OR THE FIRE VICTIM TRUST AGREEMENT REQUIRES A FIRE VICTIM TO RECEIVE PAYMENT IN STOCK.**

The aggregate consideration of $13.5 billion described above to be contributed to the Fire Victim Trust (plus the assigned claims) was determined by a settlement among the Debtors, the Shareholder Proponents, the Official Committee of Tort Claimants (the "**Tort Claimants Committee**") that has a fiduciary duty to represent the interests of all holders of Fire Victim Claims, other than the interests of Governmental Units in the Chapter 11 Cases, and the law firms (the "**Consenting Fire Claimant Professional Group**") that represent Fire Victims holding over 70% of the in excess of 70,000 fire claims that have been filed. The sole source of recovery for holders of Fire Victim Claims is the Fire Victim Trust. Holders of Fire Victim Claims will not be able to otherwise pursue their claims against the Debtors, Reorganized PG&E, or their respective assets or properties.

**IF YOU ARE A FIRE VICTIM, PLEASE SEE THE ENCLOSED "FIRE VICTIM CLAIM PLAN TREATMENT SUMMARY" FOR ADDITIONAL INFORMATION.**

It is also important to note that the Plan Proponents believe that the Plan will enable the Debtors to support California's clean energy goals and ensure that PG&E has access to sufficient resources to aggressively invest in capital improvements and wildfire mitigation and to provide safe and reliable service to its customers and communities.

Finally, the Plan Proponents believe that upon implementation of the Plan, PG&E will be able to participate in the recently authorized Go-Forward Wildfire Fund, which is designed to support the creditworthiness of California electrical corporations and provide a mechanism to attract capital for investment in safe, clean, and reliable power for California at a reasonable cost to ratepayers.

**THE DEBTORS, THE AD HOC NOTEHOLDERS COMMITTEE, THE AD HOC SUBROGATION GROUP, THE PUBLIC ENTITIES, AND THE SHAREHOLDER PROPONENTS RECOMMEND THAT HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN AND RETURN THEIR BALLOTS BY THE VOTING DEADLINE (AS DEFINED BELOW) FOLLOWING THE METHODS SET FORTH BELOW.**

A.      <u>Notice to Creditors</u>

The purpose of this Disclosure Statement is to set forth information that (i) summarizes the treatment of Claims and Interests under the Plan, including the treatment of Claims held by Fire Victims, (ii) advises holders of Claims and Interests of their rights under the Plan, (iii) assists parties entitled to vote on the Plan in making informed decisions as to whether they should vote to accept or reject the Plan, and (iv) assists the Bankruptcy Court in determining whether the Plan complies with the provisions of chapter 11 of the Bankruptcy Code and should be confirmed.  The Bankruptcy Court previously set certain dates and deadlines with respect to approval of the Disclosure Statement and confirmation of the Plan by Order, dated February 11, 2020 [Docket No. 5732] (the "**Scheduling Order**").

**IT IS THE OPINION OF THE PLAN PROPONENTS, THE AD HOC SUBROGATION GROUP, AND THE PUBLIC ENTITIES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES, CREDITORS (INCLUDING ALL FIRE VICTIMS), AND SHAREHOLDERS.**

**THEREFORE, THE DEBTORS, THE AD HOC NOTEHOLDERS COMMITTEE, THE AD HOC SUBROGATION GROUP, THE PUBLIC ENTITIES, AND THE SHAREHOLDER PROPONENTS RECOMMEND THAT ALL CLAIMANTS AND SHAREHOLDERS, WHO ARE ENTITLED TO VOTE, VOTE TO ACCEPT THE PLAN.**

**BALLOTS FOR VOTING TO ACCEPT OR REJECT THE PLAN MUST BE RECEIVED BY MAY 15, 2020 AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "<u>VOTING DEADLINE</u>").  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS AND INTERESTS MAY VOTE ON THE PLAN IS MARCH [●], 2020 (THE "<u>RECORD DATE</u>").**

**THE HEARING TO CONSIDER CONFIRMATION OF THE PLAN (THE "<u>CONFIRMATION HEARING</u>") WILL BE HELD BEFORE THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, COURTROOM 17, 16TH FLOOR, 450 GOLDEN GATE AVENUE, SAN FRANCISCO, CA 94102 ON MAY 27, 2020 AT 10:00 A.M. (PREVAILING PACIFIC TIME), OR AS SOON THEREAFTER AS COUNSEL MAY BE HEARD.**

**THE BANKRUPTCY COURT HAS DIRECTED THAT ANY OBJECTIONS TO CONFIRMATION OF THE PLAN BE SERVED AND FILED ON OR BEFORE MAY 15, 2020**

**AT 4:00 P.M. (PREVAILING PACIFIC TIME) (THE "<u>CONFIRMATION OBJECTION DEADLINE</u>"). PURSUANT TO THE SCHEDULING ORDER, PRINCIPAL COUNSEL REPRESENTING A PARTY, OR ANY PRO SE PARTY, OBJECTING TO CONFIRMATION OF THE PLAN MUST APPEAR IN PERSON AT A PRE-CONFIRMATION SCHEDULING CONFERENCE ON MAY 19, 2020 AT 10:00 A.M. (PREVAILING PACIFIC TIME) TO DISCUSS SCHEDULING ANY EVIDENTIARY MATTERS TO BE DEALT WITH IN CONNECTION WITH THE CONFIRMATION HEARING AND SCHEDULING FOR BRIEFING OF CONTESTED LEGAL ISSUES. FAILURE TO APPEAR MAY RESULT IN THE OBJECTION BEING STRICKEN.**

**PLEASE READ THIS DISCLOSURE STATEMENT, INCLUDING THE PLAN, IN ITS ENTIRETY. THE DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN, BUT THE PLAN ITSELF QUALIFIES ALL SUCH SUMMARIES. ACCORDINGLY, IF THERE ARE ANY INCONSISTENCIES BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN WILL CONTROL.**

The draft Fire Victim Trust Agreement and the draft Fire Victim Claims Resolution Procedures describing the establishment and administration of the Fire Victim Trust have been filed with the Bankruptcy Court, as has the substantially final form of Subrogation Wildfire Trust Agreement describing the establishment and administration of the Subrogation Wildfire Trust. Certain documents necessary to the effectuation of the Plan will be filed with the Bankruptcy Court no later than 14 days before the Confirmation Objection Deadline. These documents are referred to collectively as the Plan Supplement and will include, but not be limited to: (i) the Schedule of Rejected Contracts; (ii) the New Organizational Documents; (iii) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code as to the officers and directors of the Reorganized Debtors on the Effective Date of the Plan; (iv) the Exit Financing Term Sheets; (v) the Schedule of Assigned Rights and Causes of Action; (vi) the Tax Benefits Payment Agreement; (vii) the Fire Victim Trust Agreement; and (viii) the Fire Victim Claims Resolution Procedures. Such documents will be consistent with the terms of the Plan, *provided*, that, through the Effective Date, the Plan Proponents will have the right to amend documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan.

**WHERE TO FIND ADDITIONAL INFORMATION:** The Debtors currently file annual, quarterly and current reports with, and furnish other information to, the Securities and Exchange Commission (the "**SEC**"). Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx. Further information can be found in the following filings (but later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede that information):

- Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on February 18, 2020 (the "**2019 Form 10-K**"); and

- Form 8-Ks filed with the SEC during the pendency of these Chapter 11 Cases.

## II.    OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of Chapter 11 Cases

On January 29, 2019, the Debtors commenced the Chapter 11 Cases.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

The principal objectives of the Chapter 11 Cases are:

- First, to establish a process for PG&E to fully address and resolve its liabilities resulting from the 2017 and 2018 Northern California wildfires and to provide compensation to those entitled to compensation from the Debtors fairly and expeditiously – more quickly and more equitably than those liabilities could be addressed and resolved in the state court system;

- Second, to restore PG&E's financial stability and assure that PG&E has access to the capital and resources necessary to sustain and support its ongoing operations and to enable PG&E to continue investing in its systems infrastructure and critical safety and wildfire prevention initiatives, including investing in PG&E's Community Wildfire Safety Program (a program to further reduce wildfire risks and help keep the customers and communities PG&E serves safe through enhanced real-time monitoring and intelligence, safety measures, and electrical system equipment);

- Third, to work collaboratively and constructively with State regulators and policy makers to (i) address safety, operational and structural reforms; (ii) determine the most effective way for PG&E to provide safe and reliable electric and natural gas service to its customers and communities for the long term; and (iii) address the significant increase in wildfire risk in an environment that continues to be challenged by climate change and its ongoing and future impact on California, including on PG&E and its operations; and

- Fourth, to enable PG&E to continue its extensive restoration and rebuilding efforts to assist the communities affected by the 2017 and 2018 Northern California wildfires.

For further information regarding the commencement of the Chapter 11 Cases, please refer to the Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on February 28, 2019 and the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263].

### B.    Certain Significant Events During the Chapter 11 Cases

The following sections briefly summarize certain significant events occurring during the Chapter 11 Cases.

### 1.      Estimation of Aggregate Wildfire Liabilities

On July 18, 2019, the Debtors filed a motion in the Bankruptcy Court to establish procedures for the estimation of PG&E's aggregate liability for claims arising out of the 2015 Butte Fire and the 2017 and 2018 Northern California wildfires for Plan confirmation purposes [Docket No. 3091] (the "**Estimation Motion**").

On August 21, 2019, the Bankruptcy Court issued a recommendation to the United States District Court for the Northern District of California (the "**District Court**") requesting the District Court withdraw its reference in part so that the District Court – and not the Bankruptcy Court – would decide key questions relating to the estimation process.  On August 22, 2019, the District Court accepted the Bankruptcy Court's recommendation and assigned the matter to United States District Judge James Donato.

These estimation proceedings are currently pending as Case No. 19-cv-05257-JD in the District Court (the "**Estimation Proceedings**") but, as further discussed below, have been stayed in light of the settlement approved in connection with the Tort Claimants RSA.

### 2.      Bankruptcy Court Lifts Automatic Stay to Allow Tubbs Cases to Proceed in State Court

The Tort Claimants Committee and the Ad Hoc Subrogation Group, on July 2 and 3, 2019, respectively, filed motions (the "**Tubbs Lift Stay Motions**") seeking relief from the automatic stay to allow certain elderly or infirm individuals (collectively, with certain indispensable parties, the "**Tubbs Preference Claimants**") to pursue state court litigation relating to the 2017 Tubbs fire (the "**Tubbs Cases**").  The Bankruptcy Court considered the Tubbs Lift Stay Motions at the hearing on August 14, 2019.  On August 21, 2019, the Bankruptcy Court entered an order granting the Tubbs Lift Stay Motions, allowing the Tubbs Cases to proceed to trial in Superior Court for the State of California (the "**Superior Court**").

In light of the Tort Claimants RSA, the Superior Court entered an order vacating the existing trial dates for the Tubbs Cases and setting a hearing for March 2, 2020, to show cause regarding dismissal of the Tubbs Cases.  Upon entry into and pursuant to the Tort Claimants RSA, the Debtors promptly entered into settlement discussions with the Tubbs Preference Claimants to resolve the Tubbs Cases.  On January 6, 2020, the Debtors filed a motion (the "**Tubbs Settlement Motion**") seeking approval of settlement agreements settling and liquidating the claims of the Tubbs Preference Claimants for payment by the Fire Victim Trust, as provided in the Tort Claimants RSA.  On January 30, 2020, the Bankruptcy Court entered an order [Docket No. 5571] granting the relief requested in the Tubbs Settlement Motion.

### 3.      Debtors Settle Plan Treatment of Public Entities Wildfire Claims and Enter Into Public Entities Plan Support Agreements

On June 18, 2019, the Debtors and the Public Entities[1] entered into those certain *Plan Support Agreements as to Plan Treatment of Public Entities' Wildfire Claims* (the "**Public Entities Plan**

---

[1] The "**Public Entities**" include the City of Clearlake, the City of Napa, the City of Santa Rosa, the County of Lake, the Lake County Sanitation District, the County of Mendocino, Napa County, the

**Support Agreements**"). Pursuant to the Public Entities Plan Support Agreements, the Public Entities agreed to support and vote in favor of a chapter 11 plan proposed by the Debtors that provides that, among other things, the Public Entities Wildfire Claims will be satisfied with $1 billion in Cash, to be distributed from a trust account in accordance with the "Public Entities Settlement Distribution Protocol," and the Reorganized Debtors will establish a $10 million segregated defense fund for the benefit of the Public Entities.

The Public Entities Plan Support Agreements provide that each may be terminated by the applicable Public Entity under certain circumstances, including (i) if the Federal Emergency Management Agency ("**FEMA**") or the California Governor's Office of Emergency Services ("**Cal OES**") fails to agree that no reimbursement is required from the Public Entities on account of assistance rendered by either agency in connection with the Fires, and (ii) by any individual Public Entity, if a material amount of Public Entities Third Party Claims is filed against such Public Entity and such Public Entity and such Public Entities Third Party Claims are not released pursuant to the Plan.

4. **Debtors Settle Subrogation Wildfire Claims and Enter Into Subrogation Claims RSA**

On September 24, 2019, the Debtors filed a motion seeking Bankruptcy Court approval of that certain Restructuring Support Agreement, dated as of September 22, 2019 and related settlement agreement (together, as amended and restated, and as may be further amended, restated and supplemented, the "**Subrogation Claims RSA**") with the Consenting Creditors (as defined in the Subrogation Claims RSA). Pursuant to the Subrogation Claims RSA, holders of approximately 96% of all Subrogation Wildfire Claims (in dollar amount) agreed, among other things, to support and vote in favor of the Plan, in consideration of, among other things, an Allowed Subrogation Wildfire Claim of $11 billion that will be paid in full in Cash under the Plan, and the payment of up to $55 million in reasonable, documented and contractual fees of certain of the Ad Hoc Subrogation Group's professionals. On December 19, 2019, the Bankruptcy Court entered an order [Docket No. 5173] authorizing the Debtors to enter into, and approving the terms of, the Subrogation Claims RSA and the settlement embodied therein.

5. **Bankruptcy Court Appoints a Mediator**

On October 28, 2019, the Bankruptcy Court appointed retired Bankruptcy Judge Randall Newsome as mediator in the Chapter 11 Cases to identify and mediate issues to progress the cases towards timely confirmation of a chapter 11 plan. Beginning on October 31, 2019, Judge Newsome facilitated confidential settlement discussions among a number of key parties to the Chapter 11 Cases, including the Debtors, the Tort Claimants Committee, certain plaintiffs' attorneys for individuals holding Fire Victim Claims, the Official Committee of Unsecured Creditors (the "**Creditors Committee**"), the Ad Hoc Noteholders Committee, certain agencies of the United States of America and the State of California asserting fire-related Claims, as well as the Shareholder Proponents.

_____

County of Nevada, the County of Sonoma, the Sonoma County Agricultural Preservation and Open Space District, the Sonoma County Community Development Commission, the Sonoma County Water Agency, the Sonoma Valley County Sanitation District and the County of Yuba (collectively, the "**North Bay Public Entities**"); the Town of Paradise; the County of Butte; the Paradise Recreation & Park District; the County of Yuba; and the Calaveras County Water District.

### 6. Debtors Settle Plan Treatment of Fire Victim Claims and Enter Into Tort Claimants RSA

On December 6, 2019, the Debtors, the Tort Claimants Committee, the Consenting Fire Claimant Professional Group, and the Shareholder Proponents, entered into that certain Restructuring Support Agreement, dated December 6, 2019 (as amended on December 16, 2019 and may be further amended, restated and supplemented, the "**Tort Claimants RSA**") that, among other things, resolved the treatment of all Fire Victim Claims under the Plan. The agencies of the United States of America and the State of California asserting fire-related Claims are not signatories to the Tort Claimants RSA. On December 19, 2019, the Bankruptcy Court entered an order [Docket No. 5174] authorizing the Debtors' and TCC's entry into, and approving the terms of, the Tort Claimants RSA and the settlements embodied therein.

The Tort Claimants RSA provides, among other things, that (i) pursuant to the Plan, the Debtors will fund a Fire Victim Trust, to be established for the benefit of all holders of Fire Victim Claims, with cash and stock valued at $13.5 billion, and contribute certain assigned rights and causes of action to the Fire Victim Trust; (ii) the parties agree to a stay of the Estimation Proceedings; (iii) the Debtors would promptly negotiate a settlement of the claims of the Tubbs Preference Claimants; and (iv) the Tort Claimants Committee and Consenting Fire Claimant Professional Group will support the Plan.

### 7. Debtors Settle with Ad Hoc Noteholders Committee and Enter Into Noteholder RSA

On January 22, 2020, the Debtors, the Shareholder Proponents, and the Ad Hoc Noteholders Committee entered into that certain Restructuring Support Agreement, dated January 22, 2020 (as may be amended, restated and supplemented, the "**Noteholder RSA**"). The Noteholder RSA provides, among other things, that the Ad Hoc Noteholders Committee will (i) withdraw their alternative plan, (ii) suspend their motion to reconsider the order approving the Subrogation Claims RSA and Tort Claimants RSA, (iii) withdraw all discovery issued in connection with and support the relief requested in the Debtors' Exit Financing Motion (as defined below), (iv) have their debt secured on the Effective Date, and (v) support the Plan. On February 5, 2020, the Bankruptcy Court entered an order [Docket No. 5637] authorizing the Debtors to enter into, and approving the terms of, the Noteholder RSA and the settlements embodied therein. On February 5, 2020, the Ad Hoc Noteholders Committee withdrew the TCC/Noteholder Plan [Docket No. 5644].

### 8. Briefing on Plan Confirmation Issues

On October 31, 2019, the Bankruptcy Court entered an order [Docket No. 4540] (the "**Pre-Confirmation Scheduling Order**") establishing briefing and hearing schedules for the following issues related to plan confirmation: (i) whether the doctrine of inverse condemnation applies to a privately-owned utility, (ii) what is the appropriate postpetition interest rate for unsecured claims in a solvent debtor case, (iii) whether holders of the Utility Senior Notes are entitled to Allowed Claims for make-whole premiums or similar amounts, and (iv) whether the Subrogation Claimants are impaired under the Plan.

*Inverse Condemnation:* On November 27, 2019, following briefing and oral argument on the issue, the Bankruptcy Court issued a memorandum decision determining that the doctrine of inverse condemnation applies to the Utility. Following the decision, the Bankruptcy Court certified the issue for appeal to the Ninth Circuit. On January 16 and 17, 2020, the Debtors concurrently filed a

petition for direct appeal with the United States Court of Appeals for the Ninth Circuit (the "**Ninth Circuit**") and a motion to stay the proceedings pending confirmation of the Plan (and the settlements encompassed therein) by the Bankruptcy Court. On January 31, 2020, the Ninth Circuit issued an order granting the Debtors' motion to stay the proceedings.

*Postpetition Interest:* On December 30, 2019, following briefing and oral argument on the issue, the Bankruptcy Court issued a memorandum decision [Docket No. 5226] (the "**Memorandum Decision**") determining that the appropriate rate of postpetition interest on unsecured claims in a solvent debtor case is the federal judgment interest rate as of the Petition Date calculated pursuant to 28 U.S.C. § 1961(a). On February 6, 2020, the Bankruptcy Court entered the *Interlocutory Order Regarding Postpetition Interest* [Docket No. 5669] (the "**PPI Order**") consistent with the Memorandum Decision. On February 20, 2020, the Ad Hoc Committee of Holders of Trade Claims (the "**Trade Committee**") filed a motion seeking a determination that the Memorandum Decision and PPI Order are final orders that may be appealed without leave, or, to the extent the Memorandum Decision and PPI Order are not final orders, leave to appeal the Memorandum Decision and PPI Order to be heard in the District Court. On March 4 and 5, 2020, Mizuho Bank, Ltd., in its capacity as HoldCo Term Loan Administrative Agent, the Creditors Committee, Citibank, NA, and BOKF, NA also filed notices of appeal and cross-motions for leave to appeal the Memorandum Decision and PPI Order, similarly requesting its appeal be heard in the District Court. (collectively, the "**PPI Appeals**").

Consistent with the PPI Order and Memorandum Decision, the Plan provides for payment of postpetition interest on General Unsecured Claims at the applicable Federal Judgment Rate—2.59%. The Trade Committee asserts that postpetition interest on General Unsecured Claims should be paid consistent with state law, and that under Cal. Civ. Code § 3289, this requires payment of postpetition interest on contract-based claims, such as trade claims, at the rate set forth in the applicable contract, or in the absence of a contract rate, at the statutory rate of 10%. If the PPI Order and Memorandum Decision are overturned by a final non-appealable decision, the amount of postpetition interest the Debtors or Reorganized Debtors are required to pay with respect to General Unsecured Claims could significantly increase. The Debtors contend that the PPI Order and Memorandum Decision are not final orders and are opposing the PPI Appeals, including the motions for leave to pursue the PPI Appeals.

*Make-Whole Claims:* The parties have fully briefed the question of whether holders of Utility Senior Notes are entitled to Allowed Claims for make-whole premiums or similar amounts in accordance with the Pre-Confirmation Scheduling Order. Pursuant to the terms of the Noteholder RSA, the parties have agreed to adjourn the matter without a further hearing date.

*Subrogation Claims Impairment:* On November 27, 2019, the Debtors and the Ad Hoc Subrogation Group filed a joint opening brief arguing the Subrogation Wildfire Claims, as settled under the Subrogation Claimants RSA, are impaired for plan purposes. The Ad Hoc Noteholders Committee filed a reservation of rights on the issue and, on January 10, 2020, the Creditors Committee filed a responsive brief. In view of the Noteholder RSA, the parties have agreed to remove the issue from the Bankruptcy Court's calendar without prejudice.

### 9. Exit Financing Motion

On October 23, 2019, the Debtors filed the *Debtors' Motion for Entry of Orders (I) Approving Terms of, and Debtors' Entry into and Performance Under, Exit Financing Commitment Letters and (II) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities,*

*Costs and Expenses as Administrative Expense Claims* [Docket No. 4446] (as amended at Docket Nos. 5267 and 6013, and as may be further amended, modified or supplemented, the "**Exit Financing Motion**"), seeking approval of certain exit financing commitment letters providing for up to $12 billion in equity commitments (as further amended, modified and supplemented, the "**Equity Backstop Commitment Letters**") and up to $34.35 billion in debt commitments (as further amended, modified and supplemented, the "**Debt Backstop Commitment Letters**," and together with the Equity Backstop Commitment Letters, the "**Exit Financing Commitment Letters**"). On January 22, 2020, the Governor filed an objection to the Exit Financing Motion [Docket No. 5445] (the "**Governor's Objection**"), which focused primarily on the Governor's proposal to alter the Debtors' corporate governance structure. On January 27, 2020, the Debtors reached a settlement with the Ad Hoc Noteholders Committee regarding the treatment of the Utility's pre-petition funded debt under the Plan. The Bankruptcy Court approved the settlement on February 5, 2020. In light of the settlement with the Ad Hoc Noteholders Committee, the Debtors further amended the Exit Financing Commitment Letters to, among other things, reduce the aggregate Utility debt commitments and revise the provisions of the letters affected thereby. On March 3, 2020, the Debtors filed an amended Exit Financing Motion to reflect the updated Exit Financing Commitment Letters. Following a hearing on March 16, 2020, the Bankruptcy Court granted the relief requested in the Exit Financing Motion.

### 10. Tentative Settlements in Principle with Federal Agencies and Cal State Agencies

Certain federal agencies, including FEMA, and certain agencies of the State of California (collectively, the "**State Agencies**"), including Cal OES and the California Department of Forestry and Fire Protection ("**CAL FIRE**"), have asserted Fire Claims in the Chapter 11 Cases against the Debtors in excess of $7.7 billion, for the majority of which the Debtors do not believe they have liability. On December 2, 2019, the Tort Claimants Committee filed an objection [Docket No. 4943] (as joined by the Debtors at Docket No. 5639, the "**FEMA Claims Objection**") to all Claims asserted by FEMA, which total approximately $3.9 billion (the "**FEMA Claims**"), and on December 12, 2019, the Tort Claimants Committee filed an objection [Docket No. 5096] (as joined by the Debtors at Docket No. 5734, the "**Cal OES Claims Objection**" and, together with the FEMA Claims Objection, the "**Government Claims Objections**"), to all Claims asserted by Cal OES, which total approximately $2.7 billion (the "**Cal OES Claims**"). The Cal OES Claims Objection also contested approximately $2.4 billion of the Cal OES Claims as being duplicative of the FEMA Claims. At a hearing on February 26, 2020, the Bankruptcy Court heard oral argument to consider the Government Claims Objections and took the matters under advisement. As of the date hereof, the Bankruptcy Court has not ruled on the Government Claims Objections.

In connection with the Government Claims Objections and other contested matters, on February 18, 2020, the Bankruptcy Court issued an order [Docket No. 5810] for, among other things, mediation of classification issues related to the FEMA Claims and Cal OES Claims. Pursuant to the Plan, and as described in more detail below, the FEMA Claims, Cal OES Claims, and other Fire-related government agency Claims are classified as Fire Victim Claims to be channeled to and, if Allowed, paid from the Fire Victim Trust. FEMA, Cal OES, and certain other federal and state governmental agencies, however, contend that their Claims should be classified and treated as General Unsecured Claims under the Plan and, as such, expressed their intent to file formal motions challenging the Debtors' proposed classification of such Claims. In lieu of formal motion practice, the Plan Proponents and the government agencies stipulated to a briefing and hearing schedule on this classification issue, with a hearing before the Bankruptcy Court that was scheduled for April 1, 2020.

Tentative agreements in principle have been reached with each of FEMA and the State Agencies with respect to (a) the FEMA Claims and certain other claims asserted by Federal agencies that constitute Fire Claims (the "**Federal Agency Fire Claims**"), and (b) the State Agencies' Fire Claims that are channeled to the Fire Victim Trust (the "**State Agency Fire Claims**"). Pending the finalization and approval of the settlements by the Bankruptcy Court, the briefing schedule on the classification issues related to the Federal Agency Fire Claims and State Agency Fire Claims has been suspended indefinitely.

Pursuant to the terms of the tentative settlements:

- the FEMA Claims will be reduced and Allowed at $1 billion, channeled to the Fire Victim Trust, and fully subordinated to all other Fire Victim Claims;

- the Federal Agency Fire Claims shall be Allowed in the aggregate amount of $117 million and payable solely from the proceeds of the Assigned Rights and Causes of Action, after the payment of professional fees and costs incurred in connection with the pursuit of such Assigned Rights and Causes of Action;

- the Cal OES Claims will be withdrawn with prejudice;

- CAL FIRE's Fire Claims (*i.e.*, only those claims that are channeled to the Fire Victim Trust under the Plan) will be settled and Allowed at $115.3 million, payable over a period of years by the Fire Victim Trust solely and exclusively from any cash interest earned on the cash holdings of the Fire Victim Trust after the Effective Date;

- the other State Agency Fire Claims (*i.e.*, only those claims that are channeled to the Fire Victim Trust under the Plan) will be settled and Allowed at $89 million, payable by the Fire Victim Trust over a period of years, payable solely from proceeds of the monetization of New HoldCo Common Stock in excess of $6.75 billion and certain available interest on the cash holdings of the Fire Victim Trust; and

- the holders of the above Claims that are being settled shall have no right of recovery from the Debtors or Reorganized Debtors on account of the Fire Claims that are the subject of tentative stettlements.

## C. Related Pending Proceedings

### 1. Securities Class Action

Prior to the Petition Date, the Public Employees Retirement Association of New Mexico ("**PERA**") filed a securities class action lawsuit in the U.S. District Court for the Northern District of California, Case No. 18-03509 (the "**Securities Litigation**") against the Debtors, a number of the Debtors' current and former directors and officers, and investment-bank underwriters of certain of the Debtors' notes offerings.

In the Securities Litigation, PERA asserts securities claims relating to, among other things, allegedly misleading statements the defendants made regarding their wildfire safety practices. The claims are being asserted on behalf of investors who acquired the Debtors' notes and equity securities during the class period of April 29, 2015 through November 15, 2018.

The Securities Litigation has been and remains stayed with respect to the Debtors. PERA continues to pursue the Securities Litigation against the non-Debtor defendants. The non-Debtor defendants have filed motions to dismiss PERA's complaint in the District Court.

On October 21, 2019, PERA filed proofs of claim in the Bankruptcy Court asserting a claim on behalf of itself. On December 9, 2019, PERA filed a motion to treat its proof of claim as a class proof of claim on behalf of the equity and debt securities holders covered by the Securities Litigation under Bankruptcy Rule 7023. On February 3, 2020, the Court issued a ruling indicating that it had tentatively determined either to allow the proof of claim filed by PERA to be treated as a class proof of claim (subject to Plaintiffs meeting the requirements of Rule 23 of the Federal Rule of Civil Procedure) or, instead, to allow certain additional noticing and an extension of the Bar Date in the Chapter 11 Cases for potential class members. The Court directed the parties to file supplemental briefs addressing why an extension of the Bar Date for these class members was not preferable. On February 18, 2020, the Court issued an order [Docket No. 5810], among other things, directing the parties to participate in mediation regarding the allowance of the class proof of claim or an extension of the Bar Date. The parties were ultimately unable to come to a resolution and, following a hearing on the issue, on February 27, 2020, the Court issued an Order denying the motion by PERA to have its proof of claim treated as a class proof of claim, ordering notice be provided to claimants that purchased the Debtors' publicly traded debt and equity securities from April 29, 2015 through November 15, 2018 and who may have claims under securities laws against the Debtors for rescission or damages and extending the Bar Date for those claimants to file claims to the Further Extended Bar Date of April 16, 2020.

Any such Claims that are filed in advance of the Further Extended Bar Date, if Allowed, will (i) if such Claims are for rescission or damages with respect to notes, be subordinated under section 510(b) of the Bankruptcy Code relative to Claims that are senior or of equal priority, and need to be funded and paid in full under the Plan, or (ii) if such Claims are for rescission or damages with respect to equity, be afforded the same priority as that afforded to holders of the Debtors' common stock.

## 2. Butte County District Attorney Investigation and Potential Claims

As disclosed in the 2019 Form 10-K, the Butte County District Attorney's Office and the California Attorney General's Office opened a criminal investigation of the 2018 Camp fire. The Debtors have produced documents and continue to produce documents and respond to other requests for information and witness testimony in connection with the criminal investigation of the 2018 Camp fire, including, but not limited to, documents related to the operation and maintenance of equipment owned or operated by the Debtors. The Debtors have also cooperated with the Butte County District Attorney's Office and the California Attorney General's Office in the collection of physical evidence from equipment owned or operated by the Debtors. The Debtors currently are unable to predict the outcome of the criminal investigation into the 2018 Camp fire.

Potential criminal charges that could be filed against the Debtors and current or former employees with respect to the 2018 Camp fire include recklessly causing a fire, manslaughter and related environmental charges. The Debtors could be subject to material fines, penalties, or restitution orders if it is determined that the Debtors failed to comply with applicable laws and regulations in connection with the 2018 Camp fire, as well as non-monetary remedies such as oversight requirements. If the Debtors were found criminally liable, the Debtors could also be liable for claims of restitution on behalf of certain Fire Victims under the California Penal Code. The Debtors believe that any claims for such

restitution would constitute Fire Victim Claims and under the Plan would be satisfied solely out of the Fire Victim Trust. The criminal investigation is not subject to the automatic stay under the Bankruptcy Code.

The filing of criminal charges against the Debtors, the creation of any potential material indemnification obligation on the Debtors or any determination that any such claim for restitution is not satisfied solely out of the Fire Victim Trust may have a material impact on the ability of the Debtors to have the Plan confirmed by June 30, 2020.

### 3. Adversary Proceeding Related to Public Safety Power Shutoffs ("PSPS")

On December 19, 2019, an individual plaintiff commenced a putative class action Adversary Proceeding No. 19-03061 (the "**PSPS Adversary Proceeding**") against the Debtors in the Bankruptcy Court seeking to certify a class alleging damages in the amount of $2.5 billion and seeking injunctive relief related to certain planned power outages instituted by the Debtors in October and November of 2019. The Debtors do not believe there is any merit to the claims asserted in the PSPS Adversary Proceeding or that it is capable of being sustained as a class action. On January 21, 2020 the Debtors filed a motion to dismiss the PSPS Adversary Proceeding and alternatively to strike class allegations. The motion was fully briefed by the parties and heard by the Bankruptcy Court on March 10, 2020.

## III. POSTPETITION LEGISLATIVE AND REGULATORY MATTERS

### A. Wildfire Legislation[2]

On July 12, 2019, Governor Newsom signed into law Assembly Bill 1054 ("**AB 1054**" or the "**Wildfire Legislation**"), which, among other things, establishes a statewide fund that participating utilities may access to pay for liabilities arising in connecting with future wildfires occurring after July 12, 2019 (the "**Go-Forward Wildfire Fund**"). The Wildfire Legislation also provides details regarding the conditions to and costs of participating in the Go-Forward Wildfire Fund and sets the criteria by which participating utilities can access the fund.

Each of California's large investor-owned electric utility companies that are not currently subject to chapter 11, Southern California Edison ("**SCE**") and San Diego Gas & Electric Company ("**SDG&E**"), has elected to participate in the Go-Forward Wildfire Fund. AB 1054 provides that the Go-Forward Wildfire Fund is established upon SCE and SDG&E funding their initial contributions.

The Utility has provided notice to the California Public Utility Commission (the "**CPUC**") of its intent to participate in the Go-Forward Wildfire Fund, and on August 26, 2019, the Bankruptcy Court issued an order [Docket No. 3689] authorizing the Debtors to participate in the Go-Forward Wildfire Fund. Under AB 1054, however, to participate in the Go-Forward Wildfire Fund, the Utility must satisfy several additional conditions. Upon emergence from chapter 11, the Utility must pay the initial and annual contributions required for participation in the Go-Forward Wildfire Fund. Additionally, the Utility must satisfy the following conditions by June 30, 2020:

---

[2] This summary is qualified in its entirety by the actual text of AB 1054.

(A) The [Utility's Chapter 11 Case] has been resolved pursuant to a plan or similar document not subject to a stay.

(B) The [B]ankruptcy [C]ourt or a court of competent jurisdiction, in the [Chapter 11 Cases], has determined that the resolution of the [Chapter 11 Case] provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the [Utility] in the [Chapter 11 Cases] in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court.

(C) The [CPUC] has approved the reorganization plan and other documents resolving the [Utility's Chapter 11 Cases], including the [Utility's] resulting governance structure, as being acceptable in light of the [Utility's] safety history, criminal probation, recent financial condition, and other factors deemed relevant by the [CPUC].

(D) The [CPUC] has determined that the [Utility's] reorganization plan and other documents resolving the [Chapter 11 Cases] are (i) consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (ii) neutral, on average, to the ratepayers of the [Utility].

(E) The [CPUC] has determined that the reorganization plan and other documents resolving the [Chapter 11 Cases] recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the [CPUC], which may include sharing of value appreciation.

Cal. Pub. Util. Code §3291(b)(1)(A)-(E).

If the Utility satisfies the requirements to participate in the Go-Forward Wildfire Fund, the Utility's required contributions to the Go-Forward Wildfire Fund will be substantial. The Go-Forward Wildfire Fund is expected to be funded with approximately (i) $10.5 billion of proceeds of bonds supported by a 15-year extension of the Department of Water Resources charge to ratepayers, (ii) $7.5 billion in initial contributions from California's three investor-owned electric utility companies and (iii) $300 million in annual contributions paid by California's three investor-owned electric utility companies. The contributions from the investor-owned electric utility companies will be effectively borne by their respective shareholders, as they will not be permitted to recover these costs from ratepayers. The costs of the initial and annual contributions are allocated among the three investor-owned electric utility companies pursuant to a "Wildfire Fund allocation metric" set forth in AB 1054 based on land area in the applicable utility's service territory classified as high fire threat districts and adjusted to account for risk mitigation efforts. The Utility's initial Go-Forward Wildfire Fund allocation metric will be 64.2% (representing an initial contribution of approximately $4.8 billion and annual contributions of approximately $193 million). In addition, all initial and annual contributions will be excluded from the measurement of the Utility's authorized capital structure.

Participation in the Go-Forward Wildfire Fund is expected to have a material impact on the Reorganized Debtors' financial condition, results of operations, liquidity and cash flows. The Utility is

currently evaluating the accounting and tax treatment of the required initial and annual contributions. The timing and amount of any potential charges associated with shareholder contributions would also depend on various factors, including the timing of resolution of the Chapter 11 Cases. Furthermore, there can be no assurance that the expected benefits of participating in the Go-Forward Wildfire Fund ultimately outweigh its substantial costs.

In addition to establishing the Go-Forward Wildfire Fund, AB 1054 also provides that the first $5.0 billion in the aggregate spent by SCE, SDG&E and the Utility on fire risk mitigation capital expenditures included in their approved wildfire mitigation plans will be excluded from their respective equity rate bases. The $5.0 billion of capital expenditures will be allocated among the investor-owned utilities in accordance with their Go-Forward Wildfire Fund allocation metrics (described above) and may be securitized through a customer charge.

While the Plan Proponents believe the Plan complies with all of the requirements of AB 1054 and will be approved by the CPUC, certain state and federal government agencies disagree. Such state and federal government agencies, however, have no approval rights over the CPUC's determination of such compliance.

## B. Governor's Letter Regarding Compliance with the Wildfire Legislation

On December 13, 2019, Governor Gavin Newsom sent a letter to the Utility's management stating, among other things, that the Governor believed that the draft *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* shared on December 6, 2019 with the Governor's Office (the "**December 6 Plan**") did not comply with AB 1054. The Governor's letter set forth a number of governance and management requirements that the Governor believed were necessary to comply with AB 1054. The Governor's letter further stated that the capital structure set forth in the December 6 Plan would contribute to a reorganized company that, in the Governor's view, would not be positioned to provide safe, reliable, and affordable electric service. The Debtors have taken the views of the Governor's Office into account in formulating the Plan, which the Debtors believe complies with AB 1054. The Debtors and the Governor's Office remain in continuous discussions.

## C. CPUC Approvals

Given the Utility's status as a public utility regulated by the CPUC, there are a number of issues in pending or anticipated regulatory proceedings that will need to be addressed by the CPUC prior to or in connection with confirmation or effectiveness of the Plan. These regulatory matters are summarized below:

*Plan OII.* Under applicable state and federal law, certain provisions of the Plan, including any ratemaking implications of the Plan, must be reviewed and approved by the CPUC in the ordinary course of its regulatory duties. In addition, as discussed above, the California legislature has passed, and the Governor has signed into law, AB 1054. As a result, there are certain regulatory approvals that the Utility must or may desire to obtain prior to or as part of and in connection with confirmation or effectiveness of the Plan with respect to participation in the Go-Forward Wildfire Fund, including satisfaction of the conditions set forth in AB 1054 as determined, where applicable, by the CPUC. To facilitate this review, on October 4, 2019, the CPUC commenced Investigation (I.) 19-09-016, Order Instituting Investigation on the Plan (the "**Plan OII**") to consider the ratemaking and other implications that will result from the confirmation of a plan of reorganization and other regulatory approvals necessary to resolve the Chapter 11 Cases. This proceeding, among other things, affords

parties the opportunity to be heard and comment on any CPUC regulatory approvals required pursuant to Public Utilities Code Section 3292 in order for PG&E to become eligible to participate in the wildfire fund established pursuant to AB 1054 and other state law, any other regulatory approvals required by AB 1054, and any other matters that may need to be decided by the CPUC in connection with a plan. The CPUC expects to render its decision sufficiently in advance of the June 30, 2020 statutory deadline contained in AB 1054 to allow the Bankruptcy Court to address and approve any modifications made to the Plan pursuant to CPUC orders.

On January 31, 2020, the Utility served prepared testimony in the Plan OII outlining key elements of the Plan, including, but not limited to: (i) key aspects of the Utility's governance structure; (ii) implementing a plan to regionalize PG&E's operations; (iii) appointing an independent safety advisor; (iv) strengthening the roles of the Chief Risk Officer and the Chief Safety Officer; (v) utilizing an Independent Safety Oversight Committee with non-PG&E Corporation and non-Utility employees to provide independent review of PG&E's operations; (vi) paying value in excess of $25.5 billion to wildfire victims through the settlements reached; and (vii) emerging from chapter 11 with a financing structure that seeks to protect customer rates and position PG&E for long term success.

On February 11, 2020, the Administrative Law Judge issued a ruling setting a schedule for, among other things, testimony and evidentiary hearings for the Plan OII (the "**Schedule**"). On February 18, 2020, the assigned Commissioner issued a ruling setting forth certain proposals ("**Proposals**") as potential conditions on CPUC approval under AB 1054 and proposing a modified schedule that provided for supplemental testimony and briefing on the Proposals. Evidentiary hearings and live testimony began on February 25, 2020 and concluded on March 4, 2020 pursuant to the Schedule. On February 26, 2020, the Administrative Law Judge amended the Schedule to provide for combined post-hearing briefing and comments on the Proposals on March 13, 2020 and replies on March 26, 2020, and noted that, if necessary, an evidentiary hearing on the Proposals would occur on March 18, 2020.

***Other Relevant Pending Enforcement Proceedings.*** There are a number of pending enforcement proceedings that relate to prepetition conduct by the Debtors and could result in monetary fines, penalties or other remedies. The Debtors' financial condition, results of operations, liquidity, and cash flows could be materially affected by the outcomes of these proceedings. Accordingly, satisfactory resolution of these proceedings is a condition precedent to the effectiveness of the Plan, unless waived. These pending proceedings include:

(i) **Wildfire OII.** Investigation (I.) 19-06-015, Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017. On December 17, 2019, the Utility, the CPUC's Safety and Enforcement Division ("**SED**"), the Coalition of California Utility Employees ("**CUE**"), and the CPUC's Office of Safety Advocates filed a motion seeking approval of a settlement agreement that would, if approved by the CPUC, resolve the proceeding. Pursuant to the settlement, the Utility would not seek rate recovery of $1.625 billion in wildfire related expenditures and would spend $50 million in shareholder funds on system enhancement initiatives. On

February 27, 2020, the Administrative Law Judge served a Presiding Officer's Decision, which would approve the proposed settlement, subject to the settling parties' acceptance of certain modifications to the settlement. The modified settlement, if accepted by the settling parties, increases the financial obligations imposed by the proposed settlement agreement. The modified settlement would require the Utility to (i) not seek rate recovery of $1.823 billion in wildfire-related expenditures, (ii) spend $114 million in shareholder funds on system enhancement initiatives, (iii) pay a cash fine of $200 million to the general fund of the State of California out of funds that would not otherwise be available to satisfy the claims of wildfire claimants, and (iv) agree that any future tax savings associated with shareholder payments under the settlement would be "returned to the benefit of ratepayers." The parties to the settlement may accept the modified settlement or request other relief on or before March 18, 2020. Parties have until March 30, 2020 to appeal the Presiding Officer's Decision. The CPUC believes that the payment of any fines or penalties, including the proposed cash fine contained in the modified settlement, should not diminish funds available to satisfy Fire Victim Claims from the Fire Victim Trust and has requested that the Plan be modified accordingly. The Plan Proponents disagree and believe that payment of any such fines and penalties are to be made from the assets of the Fire Victim Trust.

(ii) **Locate and Mark OII.** Investigation (I.) 18-12-007, Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. On October 3, 2019, the Utility, SED and CUE filed a motion for approval of a settlement agreement that would, if approved by the CPUC, resolve the proceeding. On January 17, 2020, the Administrative Law Judge served a Presiding Officer's Decision, which would approve the proposed settlement, subject to the settling parties' acceptance of certain modifications to the settlement. On February 6, 2020, the settling parties filed a pleading suggesting certain modifications to the terms set forth in the Presiding Officer's Decision, but also stating their willingness to accept the terms as set forth in the Presiding Officer's Decision in the event their suggestions are not accepted. On February 14, 2020, the Administrative Law Judge denied the settling parties' request to modify the terms of the Presiding Officer's Decision, and granted the settling parties' acceptance of the terms of the Presiding Officer's Decision as proposed. On February 20, 2020, the Presiding Officer's Decision became the decision of the CPUC.

**D.** **Other Federal Regulatory Matters**

Section 203 of the Federal Power Act ("**FPA**") has been interpreted to require, among other things, that entities involved in wholesale sales or transmission of electricity in interstate commerce obtain the authorization of the Federal Energy Regulatory Commission ("**FERC**") prior to engaging in transactions that transfer control of FERC-jurisdictional facilities. Such changes in control can occur

either directly, via a sale of the facilities themselves, or indirectly via a change in the corporate control of a utility like PG&E, or a utility holding company like PG&E Corp. Section 203 provides that FERC will approve transactions that are consistent with the public interest, and that FERC may grant approval of a transaction on conditions FERC finds necessary or appropriate.

Because the Plan calls for the Fire Victim Trust to acquire at least 20.9% of the equity of Reorganized PG&E Corp., FERC may consider the Plan to result in an indirect change in control over the FERC-jurisdictional facilities of the Utility. As a result, the Debtors may be required to seek and obtain authorization from FERC under Section 203 of the FPA before engaging in the transactions called-for by the Plan. On March 2, 2020, the Debtors submitted an application (the "**FERC Application**") seeking such authorization and requested FERC action on its application in advance of the June 30, 2020 statutory deadline provided for in AB 1054. The deadline to comment on the FERC Application is March 23, 2020.

## IV. BACKGROUND AND OVERVIEW OF THE PLAN[3]

This section summarizes certain key provisions of the Plan. This section is intentionally not a recitation of the entirety of the Plan, a copy of which is annexed hereto as **Exhibit A**. For additional information regarding the Plan not discussed in this section, please refer to the following select Plan provisions:

| Topic | Plan Provision |
|---|---|
| Treatment of Claims and Interests | Article IV |
| Provisions Governing Distributions to Holders of Claims and Interests | Article V |
| Means for Implementation and Execution of the Plan | Article VI |
| Procedures for Disputed Claims | Article VII |
| Treatment of Executory Contracts and Unexpired Leases | Article VIII |
| Retention of Causes of Action of the Debtors and Reorganized Debtors | Article X.11 |
| Miscellaneous Provisions | Article XII |

### A. Plan Background

Over the past several months, the Debtors and their advisors have worked diligently with their key economic stakeholders, regulators, and other parties in interest on the terms of a comprehensive, global restructuring that will fairly and equitably address all Fire Victim Claims and other prepetition

---

[3] **This overview is qualified in its entirety by reference to the Plan**. The treatment of Claims and Interests under the Plan is not intended to, and will not, waive, compromise, or limit any of the Debtors' or creditors' rights, claims, or causes of action if the Plan is not confirmed. You should read the Plan, attached hereto as **Exhibit A** in its entirety before voting to accept or reject the Plan.

claims and equity interests, maximize value for all parties in interest, and ensure that the Utility will be positioned to deliver safe and reliable service to its customers.

A central component of the Plan is approximately $47.1 billion of capital to be provided through any combination of (i) new credit facilities, including exit revolving loan facilities, senior term loan facilities and/or bridge loan facilities; (ii) new debt securities issued by the Utility (the "**New Utility Notes**"); (iii) new debt securities issued by HoldCo (the "**New Holdco Notes**" and, together with the New Utility Notes, the "**New Debt Securities**"); (iv) issuance of new PG&E Corp. common stock ("**New HoldCo Common Stock**") pursuant to one or more public or private equity offerings and/or the Rights Offering (if implemented); (v) the reinstatement of certain of the Utility's prepetition debt in accordance with the existing terms of such prepetition debt; and (vi) the exchange of certain of the Utility's prepetition debt for new debt (the capital sources described in the foregoing (i) through (vi), collectively, the "**Plan Financing Sources**"). The capital resulting from the Plan Financing Sources will allow the Debtors to consummate the Plan, and will position them as a stronger utility for years to come.

**B.    Classification and Treatment of Claims and Interests**[4]

The following table provides a summary of the classification and treatment of Claims and Interests under the Plan and is qualified in its entirety by reference to the Plan.

| Claims and Interests | Summary of Treatment |
|---|---|
| **Impaired Claims Entitled to Vote** ||
| Fire Victim Claims | (a) <u>Description</u>:  All Fire Victim Claims, including claims of individuals for personal injury, wrongful death, or property damage and claims of Governmental Units, arising out of the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018) (other than Public Entities Wildfire Claims, Subrogation Wildfire Claims, and Subrogation Butte Fire Claims).  This includes the Fire Victim Claims of both uninsured and underinsured claimants.<br><br>(b) <u>Treatment</u>:  On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall establish the Fire Victim Trust. The Fire Victim Trust will be funded with consideration with an aggregate value of $13.5 billion as follows: (i) $5.4 billion in Cash on the Effective Date of the Plan; (ii) an additional $1.35 billion in Cash, consisting of (a) $650 million to be paid in Cash on or before January 15, 2021 pursuant to a Tax Benefits Payment Agreement, and (b) $700 million to be paid in Cash on or before January 15, 2022 pursuant to a Tax Benefits Payment Agreement; (iii) $6.75 billion in common stock of Reorganized PG&E Corp. (using an equity value equal to 14.9 multiplied by the Normalized Estimated Net Income as of a date to be agreed upon among the parties to the Tort Claimants RSA), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date; and (iv) the assignment of certain causes of action and insurance rights on the Effective Date.  All Fire Victim Claims shall be satisfied solely from the Fire Victim Trust with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties.  Funding of the Fire Victim Trust as provided above shall be in full and final satisfaction, release, and discharge of all Fire Victim Claims.  Each holder of a Fire Victim Claim shall receive payment as determined in accordance with the Fire Victim Claims Resolution Procedures, a draft of which were filed with the Bankruptcy Court on March 3, 2020 along with a draft of the Fire Victim Trust Agreement.  These documents will be included in the Plan Supplement. |

---

[4] The following categories of claims and equity interests are presented in a summary form for ease of reference, and do not correspond exactly to the more detailed classes of claims and equity interests contained in the Plan.

| | |
|---|---|
| | (c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| Subrogation Wildfire Claims | (a) <u>Description</u>: All Fire Claims (other than Fire Claims arising from the Butte Fire (2015)) held by insurers or their assignees in connection with payments made on account of damages or losses arising from such wildfires. |
| | (b) <u>Treatment</u>: The Subrogation Wildfire Claims shall be settled and Allowed in the aggregate amount of $11 billion. On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall fund the Subrogation Wildfire Trust with Cash in the amount of $11 billion. On the Effective Date, the Debtors' liability for all Subrogation Wildfire Claims shall be fully assumed by, and be the sole responsibility of, the Subrogation Wildfire Trust, and all such Claims shall be satisfied solely from the assets of the Subrogation Wildfire Trust. Pursuant to the Channeling Injunction, each holder of a Subrogation Wildfire Claim shall have its Claim permanently channeled to the Subrogation Wildfire Trust, and such Claim shall be asserted exclusively against the Subrogation Wildfire Trust in accordance with its terms, with no recourse to the Debtors, the Reorganized Debtors, or their respective assets and properties. Each holder of a Subrogation Wildfire Claim shall receive payment as determined in accordance with the Subrogation Wildfire Trust Agreement, a substantially final form of which was filed with the Bankruptcy Court on February 28, 2020 and will be included in the Plan Supplement. |
| | (c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| Public Entities Wildfire Claims | (a) <u>Description</u>: Claims held by those Public Entities that entered into Plan Support Agreements with the Debtors that, among other things, settled their claims relating to the Butte Fire (2015), the North Bay Wildfires (2017), and the Camp Fire (2018). |
| | (b) <u>Treatment</u>: Payment of the settlement amount of $1 billion in cash, plus the establishment of a fund in the amount of $10 million to reimburse the Public Entities for legal fees and costs associated with any third party claims relating to the wildfires that may be brought against the Public Entities. |
| | (c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| Utility Impaired Senior Note Claims | (a) <u>Description</u>: Any Claims arising under, or related to, the Utility Impaired Senior Note Documents. |
| | (b) <u>Treatment</u>: On the Effective Date, holders of Utility Impaired Senior Note Claims shall receive Cash equal to their Utility Impaired Senior Note Claim Interest Amount and equal amounts of each issue of New Utility Long-Term Notes in an aggregate amount equal to such holder's Utility Impaired Senior Note Claim Principal Amount.[5] |
| | (c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| Utility Short-Term Senior Note Claims | (a) <u>Description</u>: Any Claims arising under, or related to, the Utility Short-Term Senior Note Documents. |
| | (b) <u>Treatment</u>: On the Effective Date, holders of Utility Short-Term Senior Note Claims shall receive Cash equal to their Utility Short-Term Senior Note Claim Interest Amount and equal amounts of each issue of New Utility Short-Term Notes in an aggregate amount equal to such holder's Utility Short-Term Senior Note Claim Principal Amount.[6] |
| | (c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| Utility Funded Debt Claims | (a) <u>Description</u>: Any Claims arising under, or related to, the Utility Funded Debt Documents. |
| | (b) <u>Treatment</u>: On the Effective Date, holders of Utility Funded Debt Claims shall receive Cash equal to their Utility Funded Debt Claim Interest and Charges Amount and equal |

[5] The Utility Senior Notes Trustee asserts that the Utility Impaired Senior Note Documents, the Utility Short-term Senior Note Documents and the Bankruptcy Code require the Utility to pay directly in full, the Utility Senior Notes Trustee's outstanding fees, costs, expenses, and indemnities, including attorneys' fees and financial advisors' fees. The Plan Proponents disagree with such assertions. In the event that such fees, costs, expenses and indemnities are satisfied from the applicable Charging Lien and not from a direct payment by the Utility, distributions to holders of the Utility Impaired Senior Note Claims and the Utility Short-term Senior Note Claims will be subject to reduction and dilution.

[6] *See supra* note 5.

| | |
|---|---|
| | amounts of each issue of New Utility Funded Debt Exchange Notes in an aggregate amount equal to such holder's Utility Funded Debt Claim Principal Amount. On the Effective Date, any Utility Letters of Credit outstanding shall be replaced or canceled and returned to the issuing Utility Revolver Lender in accordance with the terms of the applicable Utility Letter of Credit and the Utility Revolver Documents.<br>(c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| HoldCo Common Interests | (a) <u>Description</u>: The existing publicly traded common stock of PG&E Corp.<br>(b) <u>Treatment</u>: Each holder of a HoldCo Common Interest shall retain such HoldCo Common Interest, subject to dilution from any common stock or securities linked to common stock issued under the Plan. If a rights offering is implemented in connection with the implementation of the Plan, holders of HoldCo Common Interests shall have the right to participate in the rights offering.<br>(c) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan.** |
| HoldCo Rescission or Damage Claims | (a) <u>Description</u>: Any Claim against HoldCo subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the common stock of HoldCo.<br>(b) <u>Treatment</u>: In full and final satisfaction, settlement, release, and discharge of any HoldCo Rescission or Damage Claim, except to the extent that the Debtors or the Reorganized Debtors, as applicable, and a holder of an Allowed HoldCo Rescission or Damage Claim agree to a less favorable treatment of such Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission or Damage Claim Share of the outstanding number of common stock of HoldCo as of the Petition Date (526,118,408). HoldCo Rescission or Damage Claim Share means a percentage equal to (i) the dollar amount of a holder's Allowed HoldCo Rescission or Damage Claim less any cash payments received from an Insurance Policy, *divided by* (ii) $35,905,153,932 (which represents HoldCo's market capitalization calculated using the market opening price on October 12, 2017, the day of the first disclosure alleged by PERA, and the fully diluted shares outstanding on or around such date).<br>(a) <u>Impairment and Voting</u>: **Impaired; Entitled to vote on the Plan** |
| **Unimpaired Claims Not Entitled to Vote** | |
| Administrative Expense Claims | (a) <u>Description</u>: Costs and expenses of administering the chapter 11 cases, including Claims related to the DIP Financing.<br>(b) <u>Treatment</u>: Each holder of an Allowed Administrative Expense Claim will be paid in full on the Effective Date; *provided that* any Allowed Administrative Expense Claim that is not due and payable prior to the Effective Date, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities. For the avoidance of doubt, no Administrative Expense Claims shall be discharged pursuant to the Plan, other than Allowed Administrative Expense Claims that have been paid in Cash or otherwise satisfied in the ordinary course in an amount equal to the Allowed amount of such Claim on or prior to the Effective Date. |
| Priority Tax Claims | (a) <u>Description</u>: Tax and other Claims entitled to priority in payment under the Bankruptcy Code.<br>(b) <u>Treatment</u>: Each holder of an Allowed Priority Tax Claim will be paid in full on the Effective Date, including any applicable postpetition interest. |
| Other Secured Claims | (a) <u>Description</u>: A Secured Claim that is not a DIP Facility Claim or Priority Tax Claim.<br>(b) <u>Treatment</u>: Each holder of an Allowed Secured Claim will, at the option of the Debtors or Reorganized Debtors (i) retain its Other Secured Claim and the Collateral securing such Claim; (ii) receive Cash in an amount equal to such Allowed Claim, or (iii) receive treatment of such Allowed Other Secured Claim in any other manner that is necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.<br>(c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |

| | | |
|---|---|---|
| Priority Non-Tax Claims | (a) | <u>Description</u>: Any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code. |
| | (b) | <u>Treatment</u>: Each holder of an Allowed Priority Non-Tax Claim will receive, at the option of the Debtors or Reorganized Debtors, (i) Cash in an amount equal to such Allowed Claim, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| HoldCo Funded Debt Claims | (a) | <u>Description</u>: All prepetition Claims against PG&E Corp. arising from the HoldCo Revolver Documents and the HoldCo Term Loan Documents. |
| | (b) | <u>Treatment</u>: Each holder of an Allowed HoldCo Funded Debt Claim will be paid in full, in Cash on the Effective Date, including payment of postpetition interest at the Federal Judgment Rate. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility PC Bond (2008 F and 2010 E) Claims | (a) | <u>Description</u>: Any Claim arising under, or related to, the Utility PC Bond (2008 F and 2010 E) Documents. |
| | (b) | <u>Treatment</u>: On the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Utility PC Bond (2008 F and 2010 E) Claim shall receive Cash in an amount equal to (i) the principal amount outstanding as of the Petition Date of such holder's Utility PC Bond (2008 F and 2010 E) Claim plus all accrued and unpaid interest owed as of the Petition Date at the non-default contract rate; (ii) all interest accrued from the Petition Date through the Effective Date at the Federal Judgment Rate; and (iii) fees and charges and other obligations owed through the Effective Date, solely to the extent provided for under the applicable PC Bond (2008 F and 2010 E) Documents. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Reinstated Senior Note Claims | (a) | <u>Description</u>: Any Claims arising under, or related to, the Utility Reinstated Senior Note Documents. |
| | (b) | <u>Treatment</u>: On the Effective Date, each holder of a Utility Reinstated Senior Note Claim shall have such holder's Utility Reinstated Senior Note Claim Reinstated. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| General Unsecured Claims | (a) | <u>Description</u>: All prepetition unsecured Claims (other than a DIP Facility Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Other Secured Claim, Priority Non-Tax Claim, Funded Debt Claim, Workers' Compensation Claim, 2001 Utility Exchange Claim, Fire Claim, Ghost Ship Fire Claim, Intercompany Claim, Utility Senior Note Claim, Environmental Claim, or Subordinated Debt Claim). Includes all Prepetition Executed Settlement Claims (including but not limited to settlements relating to Subrogation Butte Fire Claims) and Claims for damages resulting from or otherwise based on the Debtors' rejection of executory contracts or unexpired leases. |
| | (b) | <u>Treatment</u>: Each holder of an Allowed General Unsecured Claim to be paid in full on the Effective Date. The Allowed amount of any General Unsecured Claim shall include all interest accrued from the Petition Date through the Effective Date at the Federal Judgment Rate. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Ghost Ship Fire Claims | (a) | <u>Description</u>: Any Claim related to or arising from the Ghost Ship Fire which occurred in Oakland, California on December 2, 2016. |
| | (b) | <u>Treatment</u>: On and after the Effective Date, each holder of a Ghost Ship Fire Claim shall be entitled to pursue its Claim against the applicable Reorganized Debtor, provided that any recovery or payment with respect to Ghost Ship Fire Claims shall be limited solely to amounts available under the Debtors' Insurance. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Workers' Compensation Claims | (a) | <u>Description</u>: Any Claim against the Debtors by an employee of the Debtors for the payment of workers' compensation benefits under applicable law. |
| | (b) | <u>Treatment</u>: Workers' Compensation Claims shall not be affected by the Chapter 11 Cases and on and after the Effective Date holders shall be entitled to pursue their Claims against the Reorganized Debtors. |
| | (c) | <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |

| | |
|---|---|
| 2001 Utility Exchange Claims | (a) <u>Description</u>: Any Claim against the Utility arising solely from (i) amounts due to the CAISO, PX, and/or various market participants based on purchases or sales of electricity, capacity, or ancillary services by the Utility and other market participants in markets operated by the CAISO and the PX that are subject to determination by FERC in refund proceedings bearing FERC Docket Nos. EL00-95-000 and EL00-98-000 and related subdockets, and (ii) amounts due under any settlement agreements, allocation agreements, escrow agreements, letter agreements, other written agreements, or court orders (including orders entered in the chapter 11 case styled In re California Power Exchange Corporation, Case No. LA 01-16577 ES) that expressly relate thereto. <br> (b) <u>Treatment</u>: On and after the Effective Date, each holder of a 2001 Utility Exchange Claim shall be entitled to pursue its Claim against the Reorganized Utility as if the Chapter 11 Cases had not been commenced. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Environmental Claims | (a) <u>Description</u>: Any Environmental Claim (as defined in the Plan) against the Debtors. <br> (b) <u>Treatment</u>: On and after the Effective Date, each holder of an Environmental Claim shall be entitled to pursue its Claim against the Reorganized Debtors as if the Chapter 11 Cases had not been commenced, and each Environmental Order against the Debtors shall also survive the Effective Date as if the Chapter 11 Cases had not been commenced. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Intercompany Claims | (a) <u>Description</u>: Any Claim against a Debtor held either by another Debtor or by a non-Debtor affiliate which is controlled by a Debtor (excluding any Claims of an individual). <br> (b) <u>Treatment</u>: On the Effective Date, all Allowed Intercompany Claims shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) Reinstated, in each case as determined in the sole discretion of the Debtors or the Reorganized Debtors, as applicable. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Subordinated Debt Claims | (a) <u>Description</u>: Any Claims subordinated under section 510(b) of the Bankruptcy Code arising from rescission of a purchase or sale of a debt security of the Debtors, or for damages arising from the purchase or sale of such a debt security, including any related claims for reimbursement, contribution or indemnification, but excluding any HoldCo Rescission or Damage Claims. <br> (b) <u>Treatment</u>: Allowed Subordinated Debt Claims to be paid in full on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Preferred Interests | (a) <u>Description</u>: Any Interest in the Utility which results or arises from preferred stock issued by the Utility. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| Utility Common Interests | (a) <u>Description</u>: Any Interest held in the Utility that is not a Preferred Interest. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |
| HoldCo Other Interests | (a) <u>Description</u>: Any Interests held in PG&E Corp. immediately prior to the Effective Date, other than HoldCo Common Interests. <br> (b) <u>Treatment</u>: Reinstated on the Effective Date. <br> (c) <u>Impairment and Voting</u>: **Unimpaired**; **Not entitled to vote on the Plan.** |

## C. <u>Treatment and Satisfaction of Fire Claims</u>

As described more fully in Articles IV and VI of the Plan and as provided in the settlements embodied in the Tort Claimants RSA, Subrogation Claims RSA, and Public Entities Plan Support Agreements, to the extent you hold a Fire Claim, such Claim shall be satisfied as follows:

### 1. **Fire Victim Claims.**

All Fire Victim Claims that have been or could be asserted against the Debtors will be "channeled" to the Fire Victim Trust, a trust created under the Plan for the purpose of evaluating and

paying all Fire Victim Claims. The effect of "channeling" the Fire Victim Claims to the Fire Victim Trust is that all Fire Victim Claims can only be pursued through and paid from the Fire Victim Trust and the Debtors and Reorganized Debtors will not have any liability for Fire Victim Claims. All determinations of Fire Victim Claims, including their eligibility to receive payment from the Fire Victim Trust and in what amount, shall be determined solely under the Fire Victim Claims Resolution Procedures and all such determinations shall be final with no recourse to any court.

A Fire Victim Claim is any Claim against the Debtors arising from the Fires listed on Exhibit A attached to the Plan. Fire Victim Claims do not include claims airing from (i) the Ghost Ship Fire (December 2, 2016), (ii) the Kincade Fire (started on October 23, 2019), or (iii) any fire that occurred after January 29, 2019.

The Fire Victim Trust will be overseen by a trustee ("**Fire Victim Trustee**"), and the Fire Victim Trustee and a claims administrator ("**Claims Administrator**") will oversee the administration, resolution and allocation of claims. There will also be an oversight committee formed to consult with the Fire Victim Trustee and to exercise consent rights over certain of the Fire Victim Trust's actions (the "**Fire Victim Trust Oversight Committee***").* The rights and responsibilities of the Fire Victim Trustee, the Claims Administrator, and the Fire Victim Trust Oversight Committee are set forth in the Fire Victim Trust Agreement. The Fire Victim Trust Agreement will be included in the Plan Supplement to be filed with the Bankruptcy Court by May 1, 2020.

The following information has been provided by the Tort Claimants Committee.

*****

The Fire Victim Trustee, the Claims Administrator, and their staff will establish a distribution process that provides fair and expeditious compensation to Fire Victim Claimants.

Nearly 83,000 Fire Victim Claims have been filed in the Chapter 11 Cases. Over 95% of the proof of claim forms submitted by those Fire Victims specified the amount of the claim was "unknown".

As a result, it is not currently possible to predict what any specific claimant will be paid or a percentage recovery on such Claim any specific claimant should expect out of the approximately $13.5 billion in total consideration that will be transferred to the Fire Victim Trust under the Plan.

An intensive analysis is underway to determine which of these fire victim Claims are eligible for compensation. For example, over 4,000 claims identified loss addresses well outside the perimeter of any of the relevant fire zones.

In the upcoming months, the Fire Victim Trustee will develop budgets related to various categories of fire damages. That budgeting process may reveal that a small percentage of claimants may seek amounts large enough to impact the recovery of all remaining claimants in a capped fund. As a result, special consideration may be given to the treatment of those claims in the discretion of the Trustee and the Claims Administrator to ensure that all other claimants receive fair and expeditious compensation.

The Fire Victim Trustee and Claims Administrator will evaluate and determine the amount payable for each valid Fire Victim Claim through a variety of methods, including consideration of publicly available information, expert analysis, and material submitted by claimants. Stipulated

judgments, settlements or similarly liquidated claims shall be paid as expeditiously as the budgeting process permits. Preliminary distributions may be made to enable claimants timely access to a portion of their payment, which will then be supplemented as additional claims are resolved.

Based on the preliminary budgeting and analysis performed to date, general estimates are being developed concerning potential recovery ranges for real and personal property losses based on the following sources of information:

- insurance claim file data reflecting payments made to claimants following the 2017 North Bay Fires and the 2018 Camp Fire;

- an analysis of publicly available data representing the cost of property values in the affected areas prior to the fires;

- published reconstruction and/or rebuilding costs in the affected counties; and

- detailed claims information concerning the 2015 Butte Fire.

Real property losses will be calculated, after setting off available insurance policy limits, using the diminished value of the property or calculated probable cost of rebuilding based upon publicly available data, contractor estimates, and documentary proof submitted by individual claimants.

These estimates may be adjusted depending on a variety of factors, including but not limited to:

- the total number of claims that the Fire Victim Trustee and his staff determines are valid;

- caps on damages in accordance with California law;

- the Trustee's analysis and adjustment of the reasonable and fair value of the claims; and

- the total amount of insurance paid and/or to be paid to each claimant.

Business and commercial losses are expected to be paid based upon data related to business income, business inventory and similar losses as specified in the Claims Resolution Procedures. Distributions for business losses will take into consideration amounts received or potentially recoverable from applicable insurance policies.

Distribution estimates for emotional distress, pain and suffering, bodily injury, nuisance, zone of danger evacuations, other non-economic damage claims, and wrongful death cannot be predicted without an analysis of each individual claim and an understanding of the impact the fire had on that claimant in light of awards and payments made in prior similar cases.

If the Fire Victim Trustee issues a determination approving a Fire Victim Claim award as provided in the Fire Victim Claim Resolution Procedures, and that award is accepted by the claimant, the Fire Victim Trust will pay the approved Fire Victim Claim per the terms of the Plan and related documents. The Fire Victim Trustee may deny invalid, ineligible and fraudulent Fire Victim Claims. If a claimant does not agree with the Fire Victim Trustee's determination, the Fire Victim Trust and the Fire Victims Claims Resolution Procedures enable a claimant to appeal that decision to a panel of

neutrals experienced in resolution of wildfire claims and related matters pursuant to the Fire Victim Trust Agreement.

*****

The Fire Victim Trust will be funded with cash and stock of reorganized PG&E Corp. with an aggregate value of approximately $13.5 billion. The Fire Victim Trust will hold and sell the stock, and nothing in the Plan or the Fire Victim Trust Agreement requires stock to be distributed to individual Fire Victims. The Fire Victim Trust will also be assigned certain rights and causes of action that the Fire Victim Trust will have the authority to pursue for the benefit of holders of Fire Victim Claims. More specifically, the following will be contributed to the Fire Victim Trust on the Effective Date of the Plan:

(i)     $6.75 billion in cash, of which $5.4 billion will be paid on the Plan Effective Date, $650 million is expected to be paid by January 15, 2021, and $700 million is expected to be paid by January 15, 2022;

(ii)    $6.75 billion in common stock of Reorganized PG&E Corp. (using an equity value equal to 14.9 multiplied by the Normalized Estimated Net Income as of a date to be agreed upon among the parties to the Tort Claimants RSA), representing not less than 20.9% of the outstanding common stock of Reorganized PG&E Corp. as of the Effective Date;

(iii)   the assignment by the Debtors and Reorganized Debtors of the Assigned Rights and Causes of Action; and

(iv)    the assignment of rights under the 2015 Insurance Policies to resolve any claims related to Fires in those policy years, other than the rights of the Debtors to be reimbursed under the 2015 Insurance Policies for claims submitted to and paid by the Debtors prior to the Petition Date.

While the cash and stock contributed to the Fire Victim Trust have an aggregate nominal value of approximately $13.5 billion, the market value of the New HoldCo Common Stock on the Effective Date could be greater or less than $6.75 billion based on the trading value of New HoldCo Common Stock on such date or any subsequent date. In addition, the value of the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust is currently unknown, but the Plan Proponents believe it is not material in the context of the aggregate consideration to be transferred to the Fire Victim Trust.

The aggregate amount of Fire Victim Claims that will ultimately be eligible for payment from the Fire Victim Trust is currently unknown. To the extent the Fire Victim Trust cannot pay all approved Fire Victim Claims in full, they will be paid in an equal percentage (that is, *pro rata*).

To the extent any Allowed Fire Victim Claim is covered by insurance, the insurance coverage amounts may be credited to the Fire Victim Trust in accordance with the Fire Victim Trust Agreement. Holders of Subrogation Wildfire Claims and their respective predecessors in interest (if any) are negotiating the scope of production of non-privileged information to the Fire Victim Trust relating to Fire Victim insurance claims at no cost to the Fire Victim Trust. In addition, to the extent a holder of an Allowed Fire Claim received or will receive a distribution from the Wildfire Assistance Program, such Fire Victim Claim will be reduced by the full amount of distribution by the Wildfire Assistance

Program as provided under the Plan and in accordance with the terms of the Fire Victim Trust Agreement.

Confirmation and implementation of the Plan presents certain benefits and risks to the holders of Fire Victim Claims, and those benefits and risks should be considered when deciding how to vote on the Plan. These risks include the risk factors set forth in item 1A of the Debtors' 2019 Form 10-K, and the risks described below.

### *Certain Significant Benefits of the Plan.*

Timing: The Plan provides for compensation to holders of Fire Victim Claims with greater certainty and in a more expedited manner than may otherwise be available. The State of California's enactment of AB 1054 requires that the Plan be confirmed by June 30, 2020 for the Debtors to participate in the Go-Forward Wildfire Fund. There is no reason to believe that the California legislature will amend such legislation if that deadline is not met. As a result, if this Plan is not confirmed by June 30, 2020, distributions on account of Fire Victim Claims will be delayed and may be reduced. The delay may range from months and perhaps years. In addition to a delay in distributions, failure to meet this legislative deadline could provide significant risks for holders of Fire Victim Claims that may arise as a result of any wildfires during the 2020/2021 fire seasons.

Amount: The Plan provides for $13.5 billion in nominal value to be distributed to the Fire Victim Trust. In the event that the Plan is not approved, it is not known how much would be set aside or available for Fire Victim Claims

### *Significant Claims Asserted Against Fire Victim Trust*.

A number of governmental entities, including FEMA and Cal OES as described above, have filed claims against the Debtors for large or unliquidated amounts that, if Allowed, would be payable from the Fire Victim Trust (the "**Government Claims**"), including the Federal Agency Fire Claims and the State Agency Fire Claims. The asserted Government Claims are in the approximate total amount of $7.7 billion. Similarly, certain businesses have filed claims against the Debtors for large or unliquidated amounts that, if Allowed, would be payable from the Fire Victim Trust (the "**Business Claims**"). For example, Adventist Health System/West and Feather River Hospital have filed claims seeking over $1 billion.

As noted above, the Plan Proponents have reached tentative agreements in principle to settle the Federal Agency Fire Claims and the State Agency Fire Claims that are channeled to the Fire Victim Trust under the Plan, however, to the extent the agreements are not finalized, and the Government Claims and the Business Claims become Allowed Fire Victim Claims, the payments to other holders of Fire Victim Claims could be substantially reduced.

### *Potential Change in Value of Common Stock of Reorganized PG&E Corp.*

As set forth more fully in Section IV(c)(1)(iii) above, the Fire Victim Trust will be funded with approximately $6.75 billion in common stock of Reorganized PG&E Corp. valued in accordance with the terms of the Tort Claimants RSA. The market value of that common stock may fluctuate due to a variety of factors, including, but not limited to: (i) the risk of additional wildfires, (ii) general market and economic conditions and (iii) actual or anticipated changes in operating results. These factors could cause the market value of common stock in Reorganized PG&E Corp. to increase or decrease, and those changes in price could have a substantial effect (both positively or negatively) on the assets of the Fire Victim Trust. As set forth more fully in Section II(e)(1) above, the Plan contemplates the Debtors participating in the Go-Forward Wildfire Fund created pursuant to AB 1054, which may reduce Reorganized PG&E's

liabilities for future wildfires occurring after July 12, 2019. While there are no limitations on the Fire Victim Trust selling its stock under the applicable corporate documents, the ability of the Fire Victim Trust to do so may be limited by applicable securities laws or contractual provisions, such as those that may be found in a registration rights agreement. If the Fire Victims Trust is considered an "affiliate" of Reorganized PG&E or the common stock is deemed to be "restricted" within the meaning of applicable securities laws, then sales of common stock by the Fire Victim Trust must be registered for resale under applicable securities or sold in accordance with certain time, volume and manner of sale limitations. Furthermore, the Fire Victim Trust may take steps to mitigate its exposure to fluctuations in the market price of Reorganized PG&E Corp. common stock. However, there is no assurance that the Fire Victim Trust will be able to enter into arrangements that fully protect the value of the common stock consideration it is to receive under the Plan.

**Administrative Expense Claims and Non-Fire Claims.** It is not possible to fully quantify the aggregate amount of Administrative Expenses payable by the Debtors, such as any claims arising from the Kincade Fire, Public Safety Power Shutoffs, as well as certain General Unsecured Claims and subordinated claims either related to securities fraud claims or otherwise. To the extent these claims are not paid or reserved for on the Effective Date, they could negatively affect the value of the Reorganized PG&E Corp. common stock held by the Fire Victim Trust, which could reduce the amount of Cash ultimately available to distribute to the holders of Fire Victim Claims.

**Cash Payments after Effective Date.** Under a Tax Benefits Payment Agreement[7] contemplated by the Plan, the Reorganized Debtors have agreed to pay the Fire Victim Trust $650 million on or about January 15, 2021 and another $700 million on or about January 15, 2022, subject to acceleration in certain circumstances. These payments relate to certain tax benefits that the Reorganized Debtors would have otherwise received for net operating losses, deductions arising from the payment of Fire Victim Claims and otherwise. To the extent there is a shortfall, Reorganized PG&E has agreed to provide a letter of credit for any remaining amounts to be paid to the Fire Victim Trust on January 15, 2022. To the extent that the aggregate amount of these payments does not equal $1.35 billion, Reorganized PG&E has agreed to a stipulated judgment for any difference. In the event there is a change in control of the Reorganized PG&E or the Reorganized Utility obtains financing of the tax benefits, the full $1.35 billion will be due and payable to the Fire Victim Trust. While there are protections that have been negotiated for Reorganized PG&E's failure to make such payments, there is risk of non-payment either by way of future wildfire or general underlying credit risks.

**2. Subrogation Wildfire Claims.** On the Effective Date, the Subrogation Wildfire Trust will be established to administer, process, settle, resolve, liquidate, satisfy and pay all Subrogation Wildfire Claims, which Claims will be channeled to the trust. On the Effective Date, the Subrogation Wildfire Trust will be funded with $11 billion in Cash, to be distributed to holders of Allowed Subrogation Wildfire Claims in accordance with the terms of the Plan, Confirmation Order, Subrogation Wildfire Trust Agreement and Subrogation Wildfire Claim Allocation Agreement.[8] The Subrogation Trust Beneficiary Distribution Request Form will be attached as <u>Exhibit C</u> to the Subrogation Wildfire Trust Agreement, and sets forth the information holders of Subrogation Wildfire Claims will be asked

---

[7] The Tax Benefits Payment Agreement has not yet been finalized.

[8] On the Effective Date, the Reorganized Debtors will also pay the reasonable, documented, and contractual professional fees of certain professionals of the Ad Hoc Subrogation Committee up to an aggregate amount of $55 million.

to submit to the Subrogation Wildfire Trust for review. The Subrogation Claims Review Protocol will be attached as Exhibit D to the Subrogation Wildfire Trust Agreement, and will govern the Subrogation Wildfire Trust's claims review process. Electronic copies of the Subrogation Wildfire Trust Agreement and the exhibits thereto will be made available on the Solicitation Agent's website, https://restructuring.primeclerk.com/pge/Home-Index.

A Subrogation Wildfire Trustee and Subrogation Wildfire Trust Advisory Board will be appointed to administer and oversee the Subrogation Wildfire Trust. The Subrogation Wildfire Trust Advisory Board will consist of three (3) initial members selected by certain holders of the Subrogation Wildfire Claims in accordance with the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claim Allocation Agreement. The rights and responsibilities of the Subrogation Wildfire Trustee and the Subrogation Wildfire Trust Advisory Board will be set forth in the Subrogation Wildfire Trust Agreement.

Pursuant to Sections 1.54 and 7.3 of the Plan, Subrogation Wildfire Claims shall be Disputed unless held by a claimant that is a party to both the Subrogation Claims RSA and the Subrogation Wildfire Claim Allocation Agreement, and no payment or distribution provided under the Plan shall be made on account of Disputed Subrogation Wildfire Claims unless and until they are Allowed by Final Order of the Bankruptcy Court or resolved in accordance with the Subrogation Wildfire Trust Agreement. Holders of approximately 96% of all Subrogation Wildfire Claims (in dollar amount) have signed both agreements, and may receive Plan distributions pursuant to the terms of the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claims Allocation Agreement. Any holder of Subrogation Wildfire Claims that is not already a party, may become a party to the Subrogation Claims RSA by executing a joinder agreement substantially in the form attached to the Subrogation Claims RSA. Any holder of Subrogation Wildfire Claims that would like to review and sign the Subrogation Wildfire Claim Allocation Agreement should contact counsel to the Ad Hoc Subrogation Group for a non-disclosure agreement using the following contact information:

Willkie Farr & Gallagher LLP
Counsel for the Ad Hoc Subrogation Group
787 Seventh Avenue
New York, New York 10019-6099
Attn: Matthew A. Feldman, Joseph G. Minias, Benjamin P. McCallen, Daniel I. Forman
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com, jminias@willkie.com, bmccallen@willkie.com, dforman@willkie.com

**3. Public Entities Wildfire Claims.** On the Effective Date, or as soon as reasonably practicable thereafter, but in no event later than thirty (30) days after the Effective Date, a trust account will be funded by the Reorganized Debtors with $1.0 billion in Cash, to be distributed to the Public Entities in accordance with the Plan and the Public Entities Plan Support Agreements.

The Reorganized Debtors will also establish on the Effective Date the Public Entities Segregated Defense Fund for the benefit of the Public Entities in the amount of $10 million, which funds will be used by the Reorganized Debtors solely to reimburse the Public Entities for any and all legal fees and costs associated with the defense or resolution of certain third party claims against a Public Entity, all in accordance with the Public Entities Plan Support Agreements. The segregated defense fund will be maintained by the Reorganized Debtors until the later of (i) the expiration of the applicable statute of

limitations period for the applicable third party claims and (ii) the conclusion of all litigation, including appeals, involving the applicable third party claims.

The Public Entities Plan Support Agreements provide that each may be terminated by the applicable Public Entity under certain circumstances, including (i) if FEMA or Cal OES fails to agree that no reimbursement is required from the Public Entities on account of assistance rendered by either agency in connection with the Fires, and (ii) by any individual Public Entity, if a material amount of Public Entities Third Party Claims is filed against such Public Entity and such Public Entity and such Public Entities Third Party Claims are not released pursuant to the Plan.

### D. <u>Treatment and Satisfaction of All Other Prepetition Claims and Interests</u>

As set forth in the above chart, all prepetition claims against the Debtors (other than Fire Victim Claims, Subrogation Wildfire Claims, the Public Entities Wildfire Claims, Utility Impaired Senior Note Claims, Utility Short Term Senior Note Claims, Utility Funded Debt Claims, and HoldCo Rescission or Damage Claims) are unimpaired under the Plan and, therefore, under section 1126(f) of the Bankruptcy Code, are deemed to accept and thus are not entitled to vote on the Plan.

Notwithstanding any provision of the Plan to the contrary, distributions to holders of Allowed Funded Debt Claims and Allowed Utility Senior Note Claims shall be made to or at the direction of the applicable Funded Debt Trustee, which shall, to the extent directed by the applicable Funded Debt Trustee, act as Disbursing Agent for distributions to the respective Holders of Allowed Funded Debt Claims and Allowed Utility Senior Note Claims under the applicable Funded Debt Documents. The Funded Debt Trustees, as applicable, may transfer such distributions or direct the transfer of such distributions by the Debtors or through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed Funded Debt Claims or Allowed Utility Senior Note Claims to the extent consistent with the customary practices of DTC or the customary practices for administrative agents under syndicated credit facilities (as applicable). Distributions in respect of Allowed Funded Debt Claims and Allowed Utility Senior Notes Claims shall be subject in all respects to the right of the applicable Funded Debt Trustee to assert its Charging Lien, if any, against such distributions. All distributions to be made to holders of Allowed Utility Senior Note Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the applicable Funded Debt Documents.

Pursuant to the Plan, all such claims that are to be paid in full in Cash on the Effective Date shall also receive postpetition interest from the Petition Date to the Effective Date. Such postpetition interest shall be at the Federal Judgment Rate in accordance with the decision of the Bankruptcy Court, dated December 30, 2019 [Docket No. 5226].

Also, as set forth in the above chart, holders of common stock of PG&E Corp. shall retain their shares, subject to dilution from common stock to be issued under the Plan, including such common stock to be issued to the Fire Victim Trust as described above.

### E.    **Equity Financing**[9]

In order to finance the transactions contemplated by the Plan, the Debtors expect to raise $9 billion through one or more issuances of new PG&E Corp. common stock.  The equity issuances could include one or more of the following structures:  public or private offerings in the equity capital markets (a "**Market Offering**"), a rights offering to holders of PG&E Corp.'s common stock (a "**Rights Offering**") or drawing under the Equity Backstop Commitment Letters between PG&E Corp. and the investors party thereto (the "**Backstop Parties**").  Although the amounts, terms and conditions of a Market Offering or Rights Offering have not been determined, the Equity Backstop Commitment Letters outline the circumstances under which the Debtors will be permitted to undertake these offerings and, in the case of the Rights Offering, outline certain terms and conditions that must be included as part of the Rights Offering.

- Market Offering:  PG&E Corp. may undertake a Market Offering if the per share price at which shares of common stock are offered in the Market Offering corresponds to an implied price to earnings ratio of at least 13.5 times (subject to adjustment).  The implied price to earnings ratio would be measured based on PG&E Corp.'s estimated net income for 2021 and the expected fully diluted number of shares of PG&E Corp. common stock that will be outstanding as of the Effective Date.

- Rights Offering:  PG&E Corp. may undertake a Rights Offering to holders of PG&E Corp.'s common stock if the subscription price of the rights issued in the Rights Offering corresponds to an implied price to earnings ratio of 12.0 times (subject to adjustment) based on Normalized Estimated Net Income as provided in the Equity Backstop Commitment Letters.  In a Rights Offering, PG&E Corp. would distribute rights to holders of PG&E Corp. common stock ratably based on the number of shares of common stock they hold.    The rights would be freely transferable and would include oversubscription privileges, meaning that holders that exercise their rights may request to subscribe for any shares of common stock that were not subscribed for by other holders of rights. The rights would also contain such terms and conditions as are reasonably advisable to avoid an "ownership change" within the meaning of Section 382 of the Internal Revenue Code.

- Backstop Draw:  To the extent that PG&E Corp. does not raise the necessary equity capital through a Market Offering or Rights Offering, PG&E Corp. expects to draw on the commitments under the Equity Backstop Commitment Letters, which provide for up to $12 billion of proceeds from the sale of shares to the Backstop Parties.  The Backstop Parties would purchase shares under the Equity Backstop Commitment Letters at a price that corresponds to an implied price to earnings ratio of 10.0 times (subject to adjustment) based on Normalized Estimated Net Income as provided in the Equity Backstop Commitment Letters (the "**Backstop Price**").  In order to draw on the commitments under the Equity Backstop Commitment Letters, certain terms and conditions must be satisfied, including that the Bankruptcy Court approve the Equity Backstop Commitment Letters, and the Backstop Parties have the right to terminate the Equity Backstop Commitment Letters under certain circumstances.  As of the date of this Disclosure

---

[9] The following is a summary of the equity financing contemplated by the Plan and is qualified in its entirety by reference to the terms of the applicable operative documents.

Statement, the Equity Backstop Commitment Letters have not been approved by the Bankruptcy Court. In addition, the amount of the commitments under the Equity Backstop Commitment Letters is subject to adjustment in the event that the Debtors obtain capital from certain alternative capital sources.

It is important to note that any equity issuance on the Effective Date will be dilutive to existing shareholders, with a Market Offering being the least dilutive and a drawing under the Equity Backstop Commitment Letters being the most dilutive. In addition, if the Equity Backstop Commitment Letters are approved by the Bankruptcy Court, PG&E Corp. will owe a premium to the Backstop Parties (the "**Equity Commitment Premium**"), generally payable in shares of common stock of Reorganized PG&E Corp., equal to 119 million shares in the aggregate.[10] In the event the market value of those 119 million shares would be less than $764 million based on trading prices for the 20 business days immediately following the Effective Date, the Backstop Parties will receive additional shares so that they receive at least $764 million of aggregate value, up to an aggregate cap of approximately 139 million shares. The value of the Equity Commitment Premium on the Effective Date will depend on the market value of PG&E Corp.'s common stock and the total number of shares of common stock issued on the Effective Date pursuant to the Debtors' Plan. However, assuming that the Debtors implement the capital structure described herein by drawing on the equity backstop commitments and based on the Debtors' forecasted net income, the value of the Equity Commitment Premium would be approximately $1.2 billion at the currently estimated Backstop Price. The value of the Equity Commitment Premium could exceed this amount in the event that PG&E Corp. successfully consummates a marketed equity offering or rights offering in lieu of drawing on the equity backstop commitments or if the Debtors implement a more leveraged capital structure. Payment of the Equity Commitment Premium on the Effective Date will also be dilutive to existing shareholders.

If PG&E Corp. determines to undertake a public Market Offering or Rights Offering, it will announce the terms of any offering at a later date through one or more disclosure documents that comply with applicable law, including the Securities Act. In the case of a Rights Offering, all PG&E Corp. shareholders as of a record date to be determined by the PG&E Corp. Board of Directors will have the opportunity to participate.

Termination of the Equity Backstop Commitment Letters could prevent the Debtors from consummating the Plan. There can be no assurance that the conditions precedent set forth in the Equity Backstop Commitment Letters will be satisfied or waived or that events or circumstances will not occur that would permit the Backstop Parties to terminate the Equity Backstop Commitment Letters. Under certain conditions in connection with the termination of the Equity Backstop Commitment Letters, as more fully described therein, the Backstop Parties may be eligible to be paid all or a portion of the Equity Commitment Premium. Further, under certain conditions, including in the event that a plan of reorganization for the Debtors that is not the Plan is confirmed by the Bankruptcy Court, the Backstop Parties may be eligible to be paid the Equity Commitment Premium in cash. For a detailed description

---

[10] The Equity Commitment Premium is generally payable in stock; however, in the following limited circumstances each Backstop Party may elect to be paid in stock or cash: (i) PG&E Corp. exercises its fiduciary out to terminate the Equity Backstop Commitment Letters in order to enter into a transaction for the sale of the company or (ii) a plan of reorganization other than the Debtors' Plan is confirmed. If paid in cash, the Equity Commitment Premium would be approximately $764 million (6.364% of the full $12 billion commitment).

of the Equity Backstop Commitment Letters and the Equity Commitment Premium thereunder, see the Exit Financing Motion.

**F.** **Debt Financing**[11]

In addition to the equity financing, the Plan contemplates incurrence of $4.75 billion of new PG&E Corp. debt (the "**New HoldCo Debt**") and $33.35 billion of Utility debt (the "**New Utility Debt**"). The $33.35 billion of Utility debt is expected to consist of (a) $9.575 billion of reinstated prepetition senior notes, (b) $11.85 billion of new senior notes to be issued to holders of prepetition senior note claims, (c) $5.925 billion of new senior notes or credit facilities to be issued in the market for cash (the "**New Senior Utility Debt**") and (d) $6.0 billion of new short-term debt expected to be refinanced after the Effective Date. The New Senior Utility Debt will be used to, among other things, satisfy in full prepetition high-coupon Utility bonds and other prepetition obligations, and to fund the payment in full, in cash, of the Debtors obligations under the DIP Facilities. Pursuant to the terms of the Debt Backstop Commitment Letters, in the event the New HoldCo Debt or the New Senior Utility Debt is not issued on or prior to the Effective Date, certain money-center banks will fund investment grade 364-day "bridge" loan facilities (the "**Backstop Debt Facilities**") in aggregate amounts of up to $5.0 billion for PG&E Corp. and $5.825 billion for the Utility. In addition, the Debtors have executed fee letters (as amended, the "**Backstop Debt Fee Letters**"), which provide for, among other things, the payment of certain fees associated with the Backstop Debt Facilities, and engagement letters (the "**Debt Financing Engagement Letters**"), which engage the same banks to arrange (*i.e.*, market) the New Debt.

The Debtors do not currently anticipate drawing on the Backstop Debt Facilities, but instead expect to issue new long-term bonds and incur new credit facilities on market terms to fund their emergence. Nevertheless, the Backstop Debt Facilities provide assurance that sufficient funds at an acceptable price will be available if the New HoldCo Debt or the New Senior Utility Debt financings cannot be consummated, which is necessitated here by the requirement to obtain confirmation of the Plan on a specific timeline under AB 1054.

As with the Equity Backstop Commitment Letters, termination of the Debt Backstop Commitment Letters could prevent the Debtors from consummating the Plan and there can be no assurance that the conditions precedent set forth in the Debt Backstop Commitment Letters will be satisfied or waived or that events or circumstances will not occur that would permit the parties thereto to terminate the Debt Backstop Commitment Letters. Under certain conditions in connection with the termination of the Debt Backstop Commitment Letters, as more fully described therein, the parties thereto may be eligible to be paid all or a portion of the fees due under the Backstop Debt Fee Letters, in a maximum aggregate amount of approximately $75 million. For a detailed description of the Equity Backstop Commitment Letters and the commitment premiums thereunder, see the Exit Financing Motion.

---

[11] The following is a summary of the debt financing contemplated by the Plan and is qualified in its entirety by reference to the terms of the applicable operative documents.

### G.   Injunction, Exculpation, Release, and Related Provisions

The Plan generally provides that subject to the occurrence of the Effective Date, upon confirmation of the Plan, the provisions of the Plan shall bind every holder of a Claim against or Interest in the Debtors and such holders' respective successors and assigns.

**Below is a summary of important provisions in the Plan that may affect your rights as a holder of a Claim against or Interest in the Debtors. Please do not rely solely on this summary to understand how your rights may be impacted, but refer also to the specific provisions of the Plan cross-referenced below and carefully read the relevant Plan provisions in their entirety.**

**The United States Trustee and the Creditors Committee believe the releases and exculpations provided for in the Plan are too broad. Additionally, PERA asserts that Article 10.6 of the Plan is overly broad. The Plan Proponents disagree with these assertions.**

#### 1.   Releases and Exculpation.

**(a)   *Releases by the Debtors of Certain Parties.*  As set forth in more detail in Section 10.9(a) of the Plan, and, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, the Released Parties[12] are deemed forever released and discharged by the Debtors, to the maximum extent permitted by law and unless barred by law, from any and all claims, interests, Causes of Action, and other liabilities asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates based on or relating to the Debtors, the Fires, the Chapter 11 Cases (including, among other things, related settlement agreements, transactions, business or contractual arrangements), and the subject matter of, or transactions or events giving rise to, any Claim or Interest that is treated in the Plan.**

**(b)   *Consensual Releases by Holders of Claims and Interests of the Debtors and Certain Parties.*  As set forth in more detail in Sections 10.9(b) and (c) of the Plan, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, certain Releasing Parties,[13] including any holder of a Claim or Interest that is solicited and voluntarily**

---

[12] The "**Released Parties**" are defined in the Plan as: (i) the Debtors and Reorganized Debtors; (ii) the Tort Claimants Committee; (iii) the DIP Facility Agents; (iv) the DIP Facility Lenders; (v) the Exit Financing Agents; (vi) the Exit Financing Lenders; (vii) the Backstop Parties; (viii) the Public Entities Releasing Parties; (ix) the Consenting Creditors (solely in their capacity as holders of Subrogation Wildfire Claims); (x) the Shareholder Proponents; (xi) the Consenting Noteholders; (xii) the Funded Debt Trustees; and (xiii) with respect to each of the foregoing entities (i) through (xii), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

[13] The "**Releasing Parties**" are defined in the Plan as: (i) the Debtors; (ii) the Reorganized Debtors, (iii) any holder of a Claim or Interest that is solicited and voluntarily indicates on a duly completed Ballot

**indicates on a Ballot that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan**, forever release and discharge the Debtors and other non-debtor Released Parties from any and all claims, interests, Causes of Action and other liabilities based on or related to, or in any manner arising from, in whole or in part, among other things, the Debtors, the Fires, the Chapter 11 Cases (including, among other things, related settlement agreements, transactions, business or contractual arrangements), and the subject matter of, or transactions or events giving rise to, any Claim or Interest that is treated in the Plan.

Any holder of a Claim or Interest who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party. Additionally, such holder's decision to opt-in or not to the releases shall not in any way affect the classification or treatment of such Claim or Interest. The holder of a Claim or Interest shall receive the same amount of consideration under the Plan whether or not such holder elects to release a party that is not a Debtor in accordance with the opt-in release procedures set forth in the applicable Ballot.

The holders of Environmental Claims, Workers' Compensation Claims and 2001 Utility Exchange Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan. Furthermore, nothing in the Plan shall be deemed to impose a release by holders of Fire Victim Claims of insurance claims arising under their insurance policies against holders of Subrogation Wildfire Claims, other than any rights such holder may elect to release as part of any settlement as set forth in Section 4.25(f)(ii) of the Plan, which addresses the "Made-Whole Releases" described further below.

(c) *Made-Whole Releases.* As described in Section 4.25(f)(ii) of the Plan, except with respect to any settlement or other agreement regarding the Fire Victim Claims asserted by Adventist Health System/West and Feather River Hospital d/b/a Adventist Health Feather River, any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim, including by the Fire Victim Trust, shall contain as a condition to such settlement or other agreement that the holder or holders of such Claim contemporaneously execute and deliver a release and waiver of any potential made-whole

---

submitted on or before the Voting Deadline that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan to the extent permitted by applicable law, provided that for the avoidance of doubt any such a holder who does not indicate on their Ballot that they opt into granting such releases shall not be a Releasing Party, provided further that such holder's decision to opt-in or not to the releases shall not in any way affect the classification or treatment of such Claim or Interest; (iv) the DIP Facility Agents; (v) the DIP Facility Lenders; (vi) the Exit Financing Agents; (vii) the Exit Financing Lenders; (viii) the Funded Debt Trustees; (ix) the HoldCo Revolver Lenders; (x) the HoldCo Term Loan Lenders; (xi) the Utility Revolver Lenders; (xii) the Utility Term Loan Lenders; (xiii) the holders of Utility Senior Notes Claims; (xiv) the Public Entities Releasing Parties; (xv) the Statutory Committees; (xvi) the Backstop Parties; (xvii) the Consenting Creditors; (xviii) the Consenting Noteholders; and (xix) with respect to each of the foregoing entities (i) through (xviii), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

claims against present and former holders of Subrogation Wildfire Claims, which release shall be substantially in the form attached to the Plan as <u>Exhibit C</u> thereto.

(d) *Notice to Holders of Fire Victim Claims Regarding the Release of Made-Whole Claims Against Their Insurers.* The Plan provides, and the Debtors, Shareholder Proponents and members of the Ad Hoc Subrogation Group take the position that a release of made-whole claims will be required as a condition to settling Fire Victim Claims against the Fire Victim Trust. Section 4.25(f)(ii) of the Plan provides as follows: "4.25(f) . . . the Confirmation Order shall contain the following findings and order: . . . (ii) . . . any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim . . . **shall contain as a condition to such settlement or other agreement that the holder or holders of such Claim contemporaneously execute and deliver a release and waiver of any potential made-whole claims against present and former holders of Subrogation Wildfire Claims**, which release shall be substantially in the form attached [to the Plan] as Exhibit C." The Mutual Made Whole Release attached to the Plan provides as follows: "Whereas, nothing in this Release is an affirmation, representation, or an acknowledgment that the Claimant has in fact been fully compensated for their damages covered by the contract of insurance between the Insurer and the Claimant. The parties agree that Court's approval of the Plan and the Claimants' acceptance of the Total Allocation Award does not establish that the Claimant has been fully compensated under California law for their compensable damages as a result of the fire to the extent those damages are covered by insurance."

Accordingly, when voting on the Plan, holders of Fire Victim Claims should **not rely** on the draft of the Fire Victim Trust Agreement with respect to this issue, which was filed with the Bankruptcy Court subject to further revision on March 3, 2020 [Docket No. 6049]. The Debtors, Shareholder Proponents, Ad Hoc Subrogation Group, Tort Claimants Committee, and Consenting Fire Claimant Professional Group intend to work together to make sure the final version of the Fire Victim Trust Agreement is consistent with the Plan. If any inconsistency remains, the Ad Hoc Subrogation Group may object to confirmation of the Plan on that basis at the appropriate time.

(e) *Exculpation*. **As set forth in more detail in Section 10.8 of the Plan, and except for the Assigned Rights and Causes of Action that will be contributed to the Fire Victim Trust, Exculpated Parties[14] are, to the maximum extent permitted by applicable law, released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim**

---

[14] The "**Exculpated Parties**" are defined in the Plan as: (i) the Debtors and Reorganized Debtors; (ii) the DIP Facility Agents; (iii) the DIP Facility Lenders; (iv) the Exit Financing Agents; (v) the Exit Financing Lenders; (vi) the Funded Debt Trustees; (vii) the HoldCo Revolver Lenders; (viii) the HoldCo Term Loan Lenders; (ix) the Utility Revolver Lenders; (x) the Utility Term Loan Lenders; (xi) the Public Entities Releasing Parties; (xii) the Statutory Committees; (xiii) the Backstop Parties; (xiv) the Consenting Creditors; (xv) the Shareholder Proponents; (xvi) the Consenting Noteholders; and (xvii) with respect to each of the foregoing entities (i) through (xvi), such entities' predecessors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, restructuring advisors, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases, including, but not limited to, those arising in connection with or arising out of the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the Plan Funding, the DIP Facilities, this Disclosure Statement, the Plan, the Restructuring Transactions, the Wildfire Trusts (including the Plan Documents, the Claims Resolution Procedures and the Wildfire Trust Agreements), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of, the Plan; the funding or administration of the Plan; and the distribution of property under the Plan, or other actions taken in furtherance of the Plan.  The exculpation does not cover Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct.

   2.   **Injunctions**

   (a)  *General Injunction*.  As set forth in Section 10.6 of the Plan and restated herein, except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, that nothing contained herein shall preclude such Persons who have held, hold, or may hold Claims against a Debtor or an estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan, the Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

   By accepting distributions pursuant to the Plan, each holder of an Allowed Claim will be deemed to have affirmatively and specifically consented to be bound by the Plan, including, the injunctions set forth in Section 10.6 of the Plan.

(b) *Channeling Injunction Applicable to Fire Victim Claims and Subrogation Wildfire Claims*. Upon the Effective Date of the Plan, all Fire Victim Claims shall be channeled to the Fire Victim Trust and all Subrogation Wildfire Claims shall be channeled to the Subrogation Wildfire Trust. The sole source of recovery for holders of Fire Victim Claims and Subrogation Wildfire Claims shall be from the Fire Victim Trust and the Subrogation Wildfire Trust, as applicable. The holders of such Claims shall have no recourse to or Claims whatsoever against the Debtors, the Reorganized Debtors or their assets and properties. Consistent with the foregoing, all Persons that have held or asserted, or that hold or assert any Subrogation Wildfire Claim or Fire Victim Claim shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Reorganized Debtor or its assets and properties with respect to any Fire Claims, including all of the following actions:

(i) commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Fire Claim, against or affecting any Reorganized Debtor, or any property or interests in property of any Reorganized Debtor with respect to any such Fire Claim;

(ii) enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim;

(iii) creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Reorganized Debtor or the property of any Reorganized Debtor with respect to any such Fire Claims;

(iv) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Reorganized Debtor or against the property of any Reorganized Debtor with respect to any such Fire Claim; and

(v) taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Fire Claim.

*See* Section 10.7 of the Plan.

### 3. Release and Discharge of Debtors

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. The discharge, however, shall not extend to any Claims for fires occurring after the Petition Date, including the Kincade fire which shall remain a liability of the Debtors following the Effective Date. In addition, (i) from and after the Effective Date neither the automatic stay nor any other injunction entered by the Bankruptcy

Court shall restrain the enforcement or defense of any claims for fires occurring after the Petition Date, including the Kincade fire or the Lafayette fire in any court that would otherwise have jurisdiction if the Chapter 11 Cases had not been filed and (ii) no claims for fires or motion for allowance of claims for fires occurring after the Petition Date need to be filed in the Chapter 11 Cases. Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Interest in the Debtors.

### H. Certain Preference Actions

No Person or Entity (each as defined under the Bankruptcy Code) who received payments as a result of damages caused by wildfires shall be sued for receiving a "Preference" as that term is defined in the Bankruptcy Code.

### V. VOTING PROCEDURES AND REQUIREMENTS

### A. Holders of Claims and Interests Entitled to Vote

Under the provisions of the Bankruptcy Code, not all parties in interest are entitled to vote on a chapter 11 plan. Creditors or interest holders whose claims or interests are not impaired by a plan are deemed to accept the plan under section 1126(f) of the Bankruptcy Code and are thus not entitled to vote. Creditors or interest holders whose claims or interests are impaired by a plan, but who receive no distribution under the plan, are also not entitled to vote because they are deemed to have rejected the plan under section 1126(g) of the Bankruptcy Code. Under the Plan, there are no classes of Claims or Interests that will receive no distribution.

Pursuant to the Plan, the Debtors have, in the aggregate, thirty-four (34) separate Classes of Claims against and Interests in PG&E Corp. and the Utility. Of those Classes, eleven (11) Classes are Impaired and are entitled to vote to accept or reject the Plan (collectively, the "**Voting Classes**"). The Voting Classes are listed below:

| Class 5A-I | HoldCo Public Entities Wildfire Claims | Impaired |
|---|---|---|
| Class 5A-II | HoldCo Subrogation Wildfire Claims | Impaired |
| Class 5A-III | HoldCo Fire Victim Claims | Impaired |
| Class 10A-I | HoldCo Common Interests | Impaired |
| Class 10A-II | HoldCo Rescission or Damage Claims | Impaired |
| Class 3B-I | Utility Impaired Senior Note Claims | Impaired |
| Class 3B-III | Utility Short-Term Senior Note Claims | Impaired |
| Class 3B-IV | Utility Funded Debt Claims | Impaired |
| Class 5B-I | Utility Public Entities Wildfire Claims | Impaired |
| Class 5B-II | Utility Subrogation Wildfire Claims | Impaired |
| Class 5B-III | Utility Fire Victim Claims | Impaired |

The remaining twenty-three (23) Classes are Unimpaired, are presumed to accept the Plan, and are, thus, not entitled to vote to accept or reject the Plan (the "**Non-Voting Classes**"). For a complete summary of the Voting Classes and Non-Voting Classes, see Section III of the Plan.

### B. Voting Deadline

All holders of Claims or Interests, as applicable, that are entitled to vote on the Plan, have been sent a Ballot together with this Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their solicitation agent (the "**Solicitation Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE SOLICITATION AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE <u>VOTING DEADLINE OF 4:00 P.M. (PREVAILING PACIFIC TIME) ON MAY 15, 2020</u>, UNLESS EXTENDED BY THE DEBTORS OR FURTHER ORDER OF THE BANKRUPTCY COURT**.

### C. Voting Procedures

By order dated, March [•], 2020 [Docket No. [•]] (the "**Disclosure Statement and Solicitation Procedures Order**"), the Bankruptcy Court, *inter alia*, (i) approved this Disclosure Statement, (ii) approved certain Plan solicitation and voting procedures, and (iii) approved the forms of Ballots, Solicitation Packages, and related notices to be sent to the Debtors' creditors and equity interest holders in connection with confirmation of the Plan.

#### 1. How to Vote

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and one or more Ballots (collectively, a "**Solicitation Package**") to all holders of Claims or Interests, as applicable, that are entitled to vote on the Plan. All such holders should complete the enclosed Ballot and return it to the Solicitation Agent or Master Ballot Agent, **<u>as set forth in the Ballot so that it is received by the Solicitation Agent before the Voting Deadline.</u>**

#### 2. Withdrawal of Ballots

Any voter that has delivered a valid Ballot may withdraw its vote, subject to Bankruptcy Rule 3018, by delivering a written notice of withdrawal to the Solicitation Agent before the Voting Deadline, which notice of withdrawal, to be valid, must be (i) signed by the party who signed the Ballot to be revoked and (ii) received by the Solicitation Agent before the Voting Deadline. The Plan Proponents may contest the validity of any withdrawals.

Any voter that has delivered a valid Ballot may not change its vote, except in accordance with the Disclosure Statement and Solicitation Procedures Order and Bankruptcy Rule 3018. In the case where more than one timely, properly completed Ballot voting the same Claim(s) or Interest(s) is received by the Solicitation Agent, only the Ballot that bears the latest date shall be counted unless the holder of the Claim or Interest receives Bankruptcy Court approval to have the Ballot that bears an earlier date counted; *provided, however*, if a holder of Claim(s) or Interest(s) submits both a paper Ballot and an electronic Ballot (an "**E-Ballot**") on account of the same Claim(s) or Interest(s), the E-Ballot shall supersede the paper Ballot, unless the holder receives Bankruptcy Court approval otherwise.

### 3. Inquiries

If you have any questions about the packet of materials you have received, please contact the Solicitation Agent, at (844) 339-4217 (domestic toll-free) or +1 (929) 333-8977 (international) or via email at pgeinfo@primeclerk.com.

Additional copies of this Disclosure Statement and the Plan are available upon written request made to the Solicitation Agent at the following address:

> **If by standard, overnight, or hand delivery:**
>
> PG&E Ballot Processing
> c/o Prime Clerk, LLC
> 60 East 42nd Street
> Suite 1440
> New York, NY 10165

Copies of this Disclosure Statement and the Plan are also available on the Solicitation Agent's website, https://restructuring.primeclerk.com/pge/Home-Index.

## VI. CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND EFFECTIVE DATE

There are certain conditions precedent to confirmation of the Plan and the Effective Date, which may be waived or modified, pursuant to Section 9.4 of the Plan, only by the Plan Proponents with the consent of the Backstop Parties holding a majority of the Aggregate Backstop Commitment Amount (such consent not to be unreasonably withheld, conditioned or delayed) and, in certain instances, the Requisite Consenting Creditors and the Requisite Consenting Fire Claimant Professionals (as such term is defined in the Tort Claimants RSA), without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan. For more information on the conditions precedent to confirmation of the Plan, the conditions precedent to the Effective Date, and the waiver or modification of such conditions, please see Sections 9.1, 9.2, and 9.4 of the Plan, respectively.

## VII. CONFIRMATION OF THE PLAN

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan (i) is accepted by all impaired classes of Claims and Interests entitled to vote for or against the Plan or, if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class; (ii) is in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (iii) is feasible.

### A. Acceptance of the Plan

Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of claims occurs when holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan. Under the Bankruptcy Code, acceptance of a chapter 11 plan by a class of interests occurs when holders of at least two-thirds (2/3) in amount of allowed interests of that class that cast ballots for acceptance or rejection of the chapter 11 plan vote to accept the plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or

rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Plan Proponents if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code.

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class and that the "absolute priority rule" is satisfied (*i.e.*, unless a class of claims of a senior priority are satisfied in full, no junior class can receive or retain any property under the Plan). As to any rejecting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of Claims or Interests in such Class. The following sets forth the "fair and equitable" test that must be satisfied if a Class rejects the Plan:

- **Rejecting Class of Unsecured Creditors**. Either (i) each holder of an impaired unsecured Claim in the Class receives or retains under the Plan, property of a value, as of the Effective Date, equal to the amount of its Allowed Claim, or (ii) the holders of Claims and Interests that are junior to the Claims of the rejecting Class will not receive or retain any property under the Plan.

- **Rejecting Class of Interests**. Either (i) each Interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such Interest and (b) the value of the Interest, or (ii) the holders of Interests that are junior to the Interests of the rejecting Class will not receive or retain any property under the Plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any potential rejecting Class. The agencies of the United States of America and the State of California disagree.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE PLAN PROPONENTS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

**B.    Best Interest Test**

The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is customarily referred to as the "best interest" test.

The first step in determining whether the Plan satisfies the best interest test is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case.  The gross amount of Cash that would be available for satisfaction of Claims and Interests would be the sum consisting of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case.

The next step is to reduce that gross amount by the costs and expenses of liquidation, the proceeds received from the disposition of encumbered assets that would be distributed to the holders of the liens on such assets, and by the payment of such additional administrative expenses and priority claims arising from the use of chapter 7 for the purposes of liquidation.  Any remaining Cash would be allocated to unsecured creditors and interest holders in strict priority in accordance with section 726 of the Bankruptcy Code.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a trustee in bankruptcy as well as those fees that might be payable to attorneys and other professionals that the trustee might engage.  Other liquidation costs include the expenses incurred during the Chapter 11 Cases allowed in the chapter 7 cases, such as compensation for attorneys, financial advisors, appraisers, accountants, and other professionals for the Debtors and Statutory Committees appointed in the Chapter 11 Cases, and costs and expenses of members of such committees, as well as other compensation Claims. Furthermore, additional Claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts assumed or entered into by the Debtors during the pendency of the Chapter 11 Cases.  The foregoing types of Claims, costs, expenses, fees, and such other Claims that may arise in a liquidation case would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay prepetition priority and unsecured Claims, or available for distribution to the holders of Interests.

A chapter 7 liquidation would likely result (i) in the incurrence of increased costs and expenses arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) in an erosion of asset values in the context of a forced sale or takeover, and (iii) in the substantial increase in Claims that would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases.  The Debtors believe the liquidation process in chapter 7 would result in a failure to meet the June 30, 2020 emergence deadline associated with AB 1054, which could significantly impact potential values recoverable in a liquidation.  Further, the Governor's office could intervene in a liquidation scenario and develop a plan for takeover by the State of California or certain Northern California Counties, which likely would depress the value realized on the Debtors' assets.

The process of liquidating the Debtors' businesses in chapter 7 would also be subject to review by numerous regulatory agencies, including the CPUC, the FERC, the Nuclear Regulatory Commission and the U.S. Department of Justice, which could delay the process of receiving any significant proceeds for two years or more.  In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and would likely involve further costs.

With these factors in mind, the Debtors believe that the value, if any, distributable to each Class under the Plan, would be equal to, or, more likely, less than, the value of distributions under the Plan, and such distributions in a chapter 7 case would not occur for a substantial period of time, thus lowering the expected value as of the potential chapter 7 conversion date.

Under the Plan, all funded debt and general unsecured creditors are to be paid in full, with postpetition interest, their Claims will be reinstated or they will receive new notes. In addition, all Fire Victim Claims will be channeled to and satisfied by the Fire Victim Trust in compliance with AB 1054. Lastly, holders of Interests will retain their shares, subject to dilution. Under these circumstances, and where it is patently obvious that a liquidation under chapter 7 could not produce greater value, without even taking into account the substantial delay involved in distributing any proceeds, the Debtors believe that the best interest test clearly is satisfied and that a formal liquidation analysis presentation is not necessary or useful.

## C. Feasibility

Section 1129(a)(11) of the Bankruptcy Code provides that a chapter 11 plan may be confirmed only if the Bankruptcy Court finds that such plan is "feasible." A feasible plan is one which will not likely lead to a need for further reorganization or liquidation of a debtor.

As set forth in the financial projections attached hereto as **Exhibit B**, the Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.

## D. Alternatives to the Plan

The Plan has the support of the Debtors, the Shareholder Proponents, the Ad Hoc Subrogation Group, the Public Entities, and the Ad Hoc Noteholders Committee. Such parties have determined that the Plan is the best path forward for a successful and timely conclusion to the Chapter 11 Cases. There are, however, potential alternatives to the Plan, that include (i) continuation of the Chapter 11 Cases, which could lead to the filing of one or more alternative plans of reorganization, whether by the Debtors or other parties in interest, or a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, and (ii) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

### 1. Continuation of the Chapter 11 Cases

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired or is terminated with regard to any other party in interest, such other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, a sale, or an orderly liquidation of their assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell outside of a chapter 11 plan all of their assets under section 363 of the Bankruptcy Code. Holders of any secured claims would be entitled to credit bid on any property to which their security interest attaches to the extent of the value of such security interest, and to offset their claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of secured claims would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this

alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for stakeholders than what they would receive under the Plan.

### 2. Liquidation under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. A chapter 7 trustee, who could lack the depth of knowledge of the Debtors' businesses and the complex regulatory environment in which the Debtors operate, would be required to invest substantial time and resources to become familiar with the Chapter 11 Cases and investigate the facts underlying the multitude of claims filed against the Debtors' estates.

As discussed above in Section VII.B, and as will be demonstrated in connection with confirmation of the Plan, the Debtors believe that liquidation under chapter 7 could not produce greater value to stakeholders than those provided for in the Plan because of, among other things, the limited market for the Debtors' assets as a result of the complex governmental regulations the Debtors are subject to, the delay resulting from the conversion of the Chapter 11 Cases to cases under chapter 7 and the sale of the Debtors' assets in a heavily regulated industry, the additional administrative expenses associated with the appointment of a chapter 7 trustee, including associated professionals' fees, and the loss in value attributable to a liquidation of the Debtors' assets as required by chapter 7.

### E. Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold the Confirmation Hearing. The Confirmation Hearing is scheduled for May 27, 2020 at 10:00 a.m. (Prevailing Pacific Time), or as soon thereafter as counsel may be heard, before the Honorable Dennis Montali, United States Bankruptcy Judge, in Courtroom 17 of the United States Bankruptcy Court for the Northern District of California, 16th Floor, 450 Golden Gate Avenue, San Francisco, California 94102. The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any subsequent adjourned confirmation hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection or response; (iv) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, the *Order Establishing Procedures for Disclosure Statement and Confirmation Hearing* (N.D. Cal. May 2017) (Montali, J.), and the *Order Establishing Schedule for Disclosure Statement Approval and Plan Confirmation* [Docket No. 5673]; and (v) be served on the following parties so as to be **ACTUALLY RECEIVED** no later than **May 15, 2020, at 4:00 p.m.** (Prevailing Pacific Time):

| | |
|---|---|
| Debtors<br>PG&E Corporation and<br>Pacific Gas & Electric Company<br>77 Beale Street<br>San Francisco, CA 94105<br>Attn: Janet Loduca, Senior Vice Present and General Counsel | Weil, Gotshal & Manges LLP<br>Counsel for the Debtors<br>767 Fifth Avenue<br>New York, New York  10153<br>Attn: Stephen Karotkin, Jessica Liou, Matthew Goren<br>Telephone: (212) 310-8000<br>Facsimile: (212) 310-8007<br>E-mail:  stephen.karotkin@weil.com, jessica.liou@weil.com, matthew.goren@weil.com |
| Keller Benvenutti Kim LLP<br>Counsel for the Debtors<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Attn: Tobias S. Keller, Peter J. Benvenutti, Jane Kim<br>Telephone: (415) 496-6723<br>Facsimile: (650) 636-9251<br>Email: tkeller@kbkllp.com, pbenvenutti@kbkllp.com, jkim@kbkllp.com | Cravath, Swaine & Moore LLP<br>Counsel for the Debtors<br>Worldwide Plaza<br>825 Eighth Avenue<br>Attn: Paul H. Zumbro, Kevin J. Orsini, Omid H. Nasab<br>New York, NY 10019<br>Telephone: (212) 474-1000<br>Facsimile: (212) 474-3700<br>Email: pzumbro@cravath.com, korsini@cravath.com, onasab@cravath.com |
| Jones Day<br>Counsel for the Shareholder Proponents<br>555 South Flower Street, Fiftieth Floor<br>Los Angeles, CA 90071<br>Attn: Bruce S. Bennett, Joshua M. Mester, James O. Johnston<br>Telephone: (213) 489-3939<br>Facsimile: (213) 243-2539<br>Email: bbennett@jonesday.com, jmester@jonesday.com, jjohnston@jonesday.com | Baker & Hostetler LLP<br>Counsel for the Tort Claimants Committee<br>1160 Battery Street, Suite 100<br>San Francisco, California 94111<br>Attn: Robert A. Julian, Cecily A. Dumas<br>Telephone: 628.208.6434<br>Facsimile: 310.820.8859<br>Email: rjulian@bakerlaw.com, cdumas@bakerlaw.com<br><br>and<br><br>11601 Wilshire Blvd., Suite 1400<br>Los Angeles, California 90025-0509<br>Attn: Eric E. Sagerman, Lauren T. Attard<br>Telephone: 310.820.8800<br>Facsimile: 310.820.8859<br>Email: esagerman@bakerlaw.com, lattard@bakerlaw.com |
| Milbank LLP<br>Counsel for the Creditors Committee<br>55 Hudson Yards<br>New York, New York 10001-2163<br>Attn: Dennis F. Dunne, Samuel A. Khalil<br>Telephone: (212) 530-5000<br>Facsimile: (212) 530-5219<br><br>and<br><br>2029 Century Park East, 33rd Floor<br>Los Angeles, California 90067<br>Attn: Gregory A. Bray, Thomas R. Kreller<br>Telephone: (424) 386-4000<br>Facsimile: (213) 629-5063 | United States Department of Justice<br>Office of the United States Trustee<br>450 Golden Gate Avenue, Suite 05-0153<br>San Francisco, California 94102<br>Attn: Timothy S. Laffredi, Jason Blumberg, Marta E. Villacorta<br>Telephone: (415) 705-3333<br>Facsimile: (415) 705-3379<br>Email: timothy.s.laffredi@usdoj.gov; jason.blumberg@usdoj.gov, marta.villacorta@usdoj.gov |

| Akin Gump Strauss Hauer & Feld LLP | Willkie Farr & Gallagher LLP |
|---|---|
| Counsel for the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company | Counsel for the Ad Hoc Subrogation Group |
| One Bryant Park | 787 Seventh Avenue |
| New York, New York 10036 | New York, New York 10019-6099 |
| Attn: Michael S. Stamer, Ira S. Dizengoff, David H. Botter, Abid Qureshi | Attn: Matthew A. Feldman, Joseph G. Minias, Benjamin P. McCallen, Daniel I. Forman |
| Telephone: (212) 872-1000 | Telephone: (212) 728-8000 |
| Facsimile: (212) 872-1002 | Facsimile: (212) 728-8111 |
| Email: mstamer@akingump.com, idizengoff@akingump.com, dbotter@akingump.com, aqureshi@akingump.com | Email: mfeldman@willkie.com, jminias@willkie.com, bmccallen@willkie.com, dforman@willkie.com |
| | |
| and | |
| | |
| 580 California Street, Suite 1500 | |
| San Francisco, California 94104 | |
| Attn: Ashley Vinson Crawford | |
| Telephone: (415) 765-9500 | |
| Facsimile: (415) 765-9501 | |
| Email: avcrawford@akingump.com | |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT WILL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## VIII. FACTORS TO CONSIDER BEFORE VOTING

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the other information set forth in this Disclosure Statement, together with any attachments, exhibits, or documents incorporated by reference. The factors below should not be regarded as the only risks associated with the Plan. Documents filed by the Debtors with the SEC contain important risk factors in addition to those discussed below which also should be reviewed and considered in voting on the Plan. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### A. Business Risk Factors to Be Considered

PG&E Corp.'s and the Utility's financial results can be affected by many factors, including, but not limited to, estimates and assumptions used in the Debtors' financial projections, future wildfires, legislative and regulatory developments, industry changes and technological developments, and environmental factors. For a detailed description these business risk factors, please refer to the Form 10-K and other reports filed with the SEC, available at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### B. General Risks Associated with the Bankruptcy Process

#### 1. Non-Confirmation of the Plan

Although the Plan Proponents believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court in accordance with the Bankruptcy Code, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no

assurance that modifications to the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes.

If the Plan is not confirmed, the Debtors believe that such action or inaction, as the case may be, will cause the Debtors to incur substantial expenses and otherwise serve only to unnecessarily prolong these chapter 11 cases and negatively affect recoveries for holders of claims and interests. Any delay in confirmation beyond June 30, 2020 will also impair (and may preclude) the Debtors' ability to participate in the Go-Forward Wildfire Fund.

### 2. Non-Consensual Plan Confirmation

As discussed above, if any impaired class entitled to vote does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the request of the Plan Proponents if at least one impaired class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired class that has not accepted the Plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

### 3. Materially Different Financial Projections

In connection with confirmation of the Plan, the Debtors, with the assistance of their advisors, prepared financial projections for the Reorganized Debtors, attached hereto as **Exhibit B**, based on certain assumptions. The projections have not been compiled, audited, or examined by independent accountants, and the Debtors and their advisors do not make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of a plan, inflation, and other unanticipated market and economic conditions. Some assumptions may not materialize, and unanticipated events and circumstances may materially affect the actual financial results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, regulatory, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorist attacks, or health epidemics, may materially affect the actual financial results achieved. Accordingly, the projections and actual results may materially differ.

### C. General Risks Associated with the State Legislative and Regulatory Process

As discussed above, the Debtors' business is subject to applicable federal, state and local law and the regulatory jurisdiction of various agencies at the federal, state, and local levels. For a detailed description of risk factors associated with such regulations, please refer to the Form 10-K and other reports filed with the SEC, available at http://www.sec.gov or by visiting http://investor.pgecorp.com/financials/sec-filings/default.aspx.

### 1. Impact of AB 1054 and Required CPUC Review

For the Utility to be eligible to participate in the Go-Forward Wildfire Fund established by AB 1054, the CPUC must determine that the plan of reorganization resolving the Chapter 11 Cases, including the Utility's resulting governance structure, is acceptable in light of the Utility's safety history, criminal probation, recent financial condition, and other factors deemed relevant by the CPUC. Although the CPUC's review of the Plan is underway and the CPUC has expressed its expectation to complete that review sufficiently in advance of June 30, 2020, there is risk that (i) the CPUC's review will not be completed in time to meet the June 30, 2020 plan confirmation deadline established by AB 1054, (ii) the CPUC may request revisions to the Plan that would require resolicitation of votes, or (iii) the CPUC finds that the Plan does not satisfy the requirements of AB 1054.

### 2. Other Legislative and Regulatory Developments

The Reorganized Debtors will be subject to extensive regulations and the risk of enforcement proceedings in connection with such regulations. The Reorganized Debtors' financial condition, results of operations, liquidity, and cash flows could be materially affected by the outcomes of the CPUC's future investigative enforcement proceedings, other known or future enforcement matters, and other ongoing state and federal investigations and requests for information. The Reorganized Debtors could incur material costs and fines in connection with compliance with penalties from closed investigations or enforcement actions or in connection with future investigations, citations, audits, or enforcement actions.

The Utility is currently, and may in the future be, the subject of state and federal investigations, including investigations in connection with wildfires. In addition, the Reorganized Utility may in the future also be the subject of a number of investigations relating to other matters. If these investigations result in enforcement action against or settlements with the Utility or the Reorganized Utility, the Utility or Reorganized Utility could incur or agree to pay additional fines or penalties the amount of which could be substantial and suffer further ongoing negative consequences. Furthermore, a negative outcome in any of these investigations, or future enforcement actions, could negatively affect the outcome of future ratemaking and regulatory proceedings to which the Utility or Reorganized Utility may be subject; for example, by enabling parties to challenge the Utility's or Reorganized Utility's request to recover costs that the parties allege are somehow related to the Utility's or Reorganized Utility's violations.

The Reorganized Debtors could be subject to additional regulatory or governmental enforcement action in the future with respect to compliance with federal, state or local laws, regulations or orders that could result in additional fines, penalties or customer refunds, including those regarding renewable energy and resource adequacy requirements; customer billing; customer service; affiliate transactions; vegetation management; design, construction, operating and maintenance practices; safety and inspection practices; compliance with CPUC general orders or other applicable CPUC decisions or regulations; federal electric reliability standards; and environmental compliance. CPUC staff could also impose penalties on the Reorganized Utility in the future in accordance with its authority under the gas and electric safety citation programs. The amount of such fines, penalties, or customer refunds could have a material effect on the Reorganized Debtors' financial condition, results of operations, liquidity, and cash flows.

### D. Certain Securities Laws Matters

The securities described in this Disclosure Statement will be issued (i) pursuant to an effective registration statement under the Securities Act or (ii) pursuant to an applicable exemption under the federal securities laws and any applicable state securities laws, including section 1145 of the Bankruptcy Code or Section 4(a)(2) of the Securities Act.

Section 1145(a) of the Bankruptcy Code generally exempts the issuance of securities from the registration requirements of the Securities Act and any applicable state securities laws if the following conditions are satisfied: (i) the securities must be offered and sold under a plan of reorganization and must be securities of the debtor, of an affiliate participating in a joint plan with the debtor or of a successor to the debtor under the plan; (ii) the recipients of the securities must hold prepetition or administrative expense claims against or interests in the debtor or such affiliate; and (iii) the securities must be issued entirely in exchange for the recipient's claim against or interest in the debtor or such affiliate, or principally in exchange for such claim or interest and partly for cash or property. The exemptions of section 1145(a) do not apply to an entity that is deemed an "underwriter" as such term is defined in section 1145(b) of the Bankruptcy Code.

Any securities issued pursuant to section 1145 ("**1145 Securities**") may be freely transferred by most recipients after issuance under the Plan, and all resales and subsequent transfers are exempt from registration under the Securities Act and state securities laws, unless the holder is an "underwriter" with respect to such securities. Resales of 1145 Securities by entities deemed to be "underwriters" are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of 1145 Securities who are deemed to be "underwriters" may be entitled to resell such securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act.

All securities issued pursuant to the exemption from registration set forth in section 4(a)(2) of the Securities Act will be considered "restricted securities." Securities held by an affiliate of the issuer are "control securities." Restricted securities and control securities may not be transferred except pursuant to an effective registration statement under the Securities Act or an available exemption therefrom. Rule 144 provides an exemption for the public resale of "restricted securities" if certain conditions are met. These conditions vary depending on whether the holder of the securities is an affiliate of the issuer.

**THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRANSFER SECURITIES RECEIVED PURSUANT TO AN EXEMPTION FROM FEDERAL AND STATE SECURITIES LAW. ANY PERSONS RECEIVING SUCH SECURITIES UNDER THE PLAN ARE URGED TO CONSULT WITH THEIR OWN COUNSEL CONCERNING THE AVAILABILITY OF AN EXEMPTION FROM REGISTRATION FOR RESALE OF THESE SECURITIES UNDER THE SECURITIES ACT AND OTHER APPLICABLE LAW.**

### E. Certain Tax Consequences of the Plan

There are certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Interests. A summary of these consequences is available at

https://restructuring.primeclerk.com/pge/PlanTaxDisclosure and is fully incorporated herein by reference.

## IX. CONCLUSION

The Debtors, the Shareholder Proponents, the Ad Hoc Subrogation Group, the Public Entities, and the Ad Hoc Noteholders Committee urge the holders of impaired Claims (Fire Victim Claims, Subrogation Wildfire Claims, Public Entities Wildfire Claims, Utility Impaired Senior Note Claims, Utility Short-Term Senior Note Claims, Utility Funded Debt Claims, and HoldCo Rescission or Damage Claims) and Interests (HoldCo Common Interests) to vote to **accept** the Plan and to evidence such acceptance by returning their Ballots so that they will be received not later than **May 15, 2020, at 4:00 p.m. (Prevailing Pacific Time)**.

Dated: San Francisco
[_], 2020

Respectfully submitted,

PG&E CORPORATION

By: _____
    Name: [Jason P. Wells
    Title: Executive Vice President and Chief Financial
          Officer]

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
    Name: [David S. Thomason
    Title: Vice President, Chief Financial Officer and
          Controller]

SHAREHOLDER PROPONENTS

By: _____

**<u>Exhibit A</u>**

**Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization**

**[Excluded.]**

**Exhibit B**

**Financial Projections**

**Introduction[1]**

The following income and cash flow statements for the annual periods from January 1, 2020 through December 31, 2024 (the "**Projection Period**") and the balance sheet as of the of the end of the year for each of the years 2020 through 2024 for the Debtors ("**Consolidated Financial Projections**") are based on forecasts of operating results during the five-year period ending December 31, 2024. Included below is a summary of key assumptions to the Consolidated Financial Projections (in each case, the "**Assumptions**"). The Consolidated Financial Projections and the Assumptions should be read in conjunction with the Plan and the Disclosure Statement.

The Debtors, with the assistance of their advisors, have prepared these Consolidated Financial Projections to assist the Bankruptcy Court in determining whether the Plan meets the feasibility test of section 1129(a)(11) of the Bankruptcy Code.

Other than limited information related to rate base and capital expenditures, the Debtors generally do not publish their projections or their anticipated financial position or results of operations. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated projections to holders of Claims or Interests, or to include such information in documents required to be filed with the U.S. Securities and Exchange Commission (the "**SEC**") or otherwise make public such information.

The Consolidated Financial Projections have been prepared by the management of the Debtors, in consultation with the Debtors' financial and restructuring advisors, Lazard Freres & Co. LLC and AP Services, LLC. The Consolidated Financial Projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants or the rules and regulations of the SEC, and by their nature are not financial statements prepared in accordance with accounting principles generally accepted in the United States of America.

The Debtors independent accountants have neither examined nor compiled the accompanying Consolidated Financial Projections and accordingly do not express an opinion or any other form of assurance with respect to the Consolidated Financial Projections, assume no responsibility for the Consolidated Financial Projections and disclaim any association with the Consolidated Financial Projections.

The Consolidated Financial Projections do not reflect the impact of fresh start reporting in accordance with American Institute of Certified Public Accountants statement of position 90-7, financial reporting by entities in reorganization under the Bankruptcy Code. The Debtors do not expect to be subject to fresh start reporting at or following the Effective Date.

The Consolidated Financial Projections contain forward-looking statements that are not historical facts, including statements about the beliefs, expectations, estimates, future plans and strategies of the Debtors, as well as forecasts based on our Plan which reflects settlements reached with various parties, regarding settlement of liabilities in connection with the 2018 Camp fire, 2017 Northern California wildfires and the 2015 Butte fire, the confirmation of the Plan on the Effective Date, the continuing availability of sufficient borrowing capacity or other financing to fund operations, the Utility's participation in the

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Disclosure Statement to which this Appendix is attached.

statewide wildfire fund created by AB 1054, the Debtors' anticipated sources and uses upon emergence from Chapter 11, the outcome of regulatory cases and the effect on earnings of such cases, projections of wildfire-related expenditures, anticipated regulatory and legislative policy, anticipated capital expenditures of the Debtors, anticipated costs of operations of the Debtors, efficiency initiatives, dividend payments (both Utility preferred stock and PG&E Corporation common stock), credit ratings and the various assumptions described in detail below. These statements are based on current expectations and assumptions, which management believes are reasonable, and on information currently available to management, but are necessarily subject to various risks and uncertainties. In addition to the risk that these assumptions prove to be inaccurate, factors that could cause actual results to differ materially from those contemplated by the forward-looking statements include factors disclosed in PG&E Corporation's and the Utility's annual report on Form 10-K for the year ended December 31, 2019 and other reports filed with the SEC, which are available on PG&E Corporation's website at www.pgecorp.com and on the SEC website at www.sec.gov. Additional factors include, but are not limited to, those associated with the Chapter 11 cases of PG&E Corporation and the Utility that commenced on January 29, 2019. PG&E Corporation and the Utility undertake no obligation to publicly update or revise any forward-looking statements, whether due to new information, future events or otherwise, except to the extent required by law.

The Consolidated Financial Projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by the Debtors, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are beyond the control of the Debtors. The Debtors caution that no representations can be made or are made as to the accuracy of the Consolidated Financial Projections or to the Debtors' ability to achieve the projected results. Some assumptions inevitably will be incorrect. Moreover, events and circumstances occurring subsequent to the date on which these Consolidated Financial Projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. The Debtors do not intend and do not undertake any obligation to update or otherwise revise the Consolidated Financial Projections to reflect events or circumstances existing or arising after the date of these Consolidated Financial Projections. Therefore, the Consolidated Financial Projections may not be relied upon as a guarantee or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of Claims and Interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the Consolidated Financial Projections.

These Consolidated Financial Projections were developed for purposes of the formulation and negotiation of the Plan and to enable the holders of Claims and Interests entitled to vote under the Plan to make an informed judgment about the Plan and should not be used or relied upon for any other purpose, including the purchase or sale of securities of, or Claims or Interests in, the Debtors or any of their affiliates.

**Use of Non-GAAP Financial Measures**

The Consolidated Financial Projections contain financial information based on "non-GAAP core earnings" in order to provide a measure that allows investors to compare the underlying financial performance of the business from one period to another, exclusive of non-core items.

"Non-GAAP core earnings" is a non-GAAP financial measure and is calculated as income available for common shareholders less non-core items. "Non-core items" includes items that management does not consider representative of ongoing earnings and affect comparability of financial results between periods. The Debtors use non-GAAP core earnings to understand and compare operating results across reporting periods for various purposes including internal budgeting and forecasting, short- and long-term operating

planning, and employee incentive compensation. The Debtors believe that non-GAAP core earnings provides additional insight into the underlying trends of the business, allowing for a better comparison against historical results and expectations for future performance.

Non-GAAP core earnings is not a substitute or alternative for GAAP measures such as consolidated income available for common shareholders and may not be comparable to similarly titled measures used by other companies.

## Select Assumptions for PG&E's Financial Forecast 2020-2024

The Consolidated Financial Projections contained herein are based on, but not limited to, factors such as general business, economic, competitive, regulatory, market, financial and environmental conditions, as well as the assumptions detailed below. Many of these factors and assumptions are beyond the control of the Debtors and do not take into account the uncertainty and disruptions of business that may accompany an in-court restructuring. Accordingly, the assumptions should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and in the Debtors' public filings.

### General Assumptions

- In light of the forms of distribution contemplated by the Plan (which include cash as well as new PG&E Corporation common stock and the new debt securities of the Utility), the Consolidated Financial Projections were developed on a consolidated basis rather than on a separate legal entity basis. The Consolidated Financial Projections were developed by management with the assistance of the Debtors' advisors and are presented solely for purposes of the formulation and negotiation of the Plan in order to present the anticipated impact of the Plan. No representation or warranty, express or implied, is provided in relation to the fairness, accuracy, correctness, completeness, or reliability of the information, opinions, or conclusions expressed herein.

- The Consolidated Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on June 30, 2020.

- The Consolidated Financial Projections assume that the Utility secures an investment grade rating from at least one rating agency on the secured debt of the Utility.

- The Consolidated Financial Projections assume the achievement of various efficiency initiatives, including, among other things, resource planning, contract management, monetization of excess renewable energy, and real estate optimizations. These efficiency initiatives reduce operating and capital expenditures by approximately $1 billion on average through 2024.

- The Consolidated Financial Projections also assume that: (1) there will be no material change in legislation or regulations, or the administration thereof, that would have an unexpected effect on the operations of the Debtors; and (2) there will be no change in generally accepted accounting principles in the United States that would have a material effect on the reported financial results of the Debtors.

### Assumptions Underlying Revenue Projections and Cost Recovery

*Base Revenue*

The Consolidated Financial Projections assume:

- Base revenues for electric distribution, natural gas distribution and electric generation operations are consistent with the Utility's proposed settlement agreement (the "2020 GRC Settlement") filed on December 20, 2019 with the California Public Utility Commission ("**CPUC**") in its 2020 General Rate Case ("**GRC**") for 2020-2022. Spending for wildfire-related programs included in the 2020 GRC Settlement associated with system hardening, vegetation management, public

safety power shutoffs and excess liability insurance, is anticipated to be well above amounts specified, and this incremental spending is recoverable through balancing accounts up to a two-year lag. Base revenue for the years 2023 and 2024 assumes an increase in authorized annual revenue requirement sufficient to cover the forecasted GRC costs and authorized rate of return.

- Formula rates for the recovery of costs for electric transmission facilities are determined by the Transmission Owner ("**TO**") rate cases with the Federal Energy Regulatory Commission ("**FERC**"). Under the formula rate mechanism, transmission revenues are updated to the actual cost of service annually. All prudently incurred transmission wildfire-related costs are assumed to be fully recoverable consistent with the formula rate mechanism.

- Base revenues for the Utility's natural gas transmission and storage services are consistent with the final decision issued in the Utility's 2019 gas transmission and storage ("**GT&S**") case, as approved by the CPUC on September 12, 2019 for 2019-2022. Base revenue for the years 2023 and 2024 assumes an increase in the authorized GT&S annual revenue requirement sufficient to cover forecasted expenses, except for amounts not recoverable. Aggregate GT&S capital expenditures of $576 million over the years 2011 through 2014 (the "**GT&S Expenditures**") that are currently subject to audit by the CPUC are assumed to be approved by the CPUC and restored to the Utility's rate base in 2020. Restoration of the GT&S Expenditures is subject to a subsequent CPUC proceeding following the audit. The CPUC has advised the Utility that litigation in respect of such proceeding will likely commence in the second half of 2020 with resolution occurring in 2021. The impact of this delay may result in a shift of the associated earnings available for common stock from 2020 to 2021 and a potential delay in associated cost recovery.

- Base operating and maintenance expenses excluding wildfire-related costs are forecast to be generally in line with the Utility's settlements and final decisions in its rate cases, including those described above.

### *Incremental Wildfire-Related and Other Costs*

The Consolidated Financial Projections assume full recovery of wildfire-related costs currently deferred as regulatory assets on the balance sheet and additional future spending beyond the programs included in the 2020 GRC Settlement:

- Full recovery over the Projection Period of approximately $2.5 billion of costs related to restoration, prevention, and insurance that are on the Utility's balance sheet as deferred costs as of December 31, 2019. Interim rate relief and accelerated will be granted by the CPUC allowing approximately $1.4 billion of these costs to be recovered in 2020 and 2021 on an accelerated basis.

- Consistent with the Utility's settlement agreement in the Order Instituting Investigation into the 2017 Northern California Wildfires and the 2018 Camp Fire (the "Wildfire OII") submitted to the CPUC on December 17, 2019, the Utility will receive no recovery of costs totaling approximately $1.675 billion contemplated by the Wildfires OII settlement relating to certain wildfire-related costs and shareholder-funded system enhancement initiatives. On February 27, 2020, a Presiding Officer's Decision (POD) was issued in the Wildfire OII proceeding which proposes modifications to the settlement agreement (as so modified, the "Revised Settlement") that would add $462 million of disallowances for wildfire mitigation ($198 million) and system enhancement initiatives ($64 million), and a payment to the state general fund ($200 million). The Revised Settlement, if accepted, is subject to Bankruptcy Court approval. Parties have 30 days to appeal the POD. PG&E is still evaluating its options, including appeal. The impact of the modifications to the settlement proposed by the POD is not reflected in the Consolidated Financial Projections. The impact of the modifications to the settlement proposed by the POD on the Consolidated

Financial Projections, if implemented, would be a decrease in earnings available for common stock and cashflow in 2020 as it relates to the payment to the general fund. Additionally, the proposed disallowed wildfire mitigation and system enhancement costs would impact earnings available for common stock primarily in 2020 and 2021, and cash flow impacts from the loss of anticipated revenue would be expected to impact future years. The modifications to the settlement proposed by the POD, if implemented, would also require any tax savings associated with the shareholder payments under the settlement agreement to be applied to wildfire mitigation expenses that would otherwise have been recovered from ratepayers when realized. The initial settlement of $1.675 billion and the additional $262 million established by the POD are assumed to be tax deductible and the resulting tax savings could be as much as $542 million based on the company's 28% effective net tax rate. The realization of these tax savings depend on many other variables and the timing of the savings is expected after 2024.

- For wildfire-related programs, including wildfire-related inspections and maintenance costs, that are in addition to programs requested in the 2020 GRC Settlement, recovery of costs will be allowed by the CPUC through memorandum accounts and collected on a three-year lag.
- Recovery of incremental capital expenditures in 2020 and 2021 related to implementing microgrid-enabling distributed generation, consistent with its proposal for cost recovery authorization submitted to the CPUC in connection with the CPUC's Order Instituting Rulemaking regarding microgrids.
- Pursuant to the requirements of Assembly Bill ("**AB**") 1054, approximately $3.2 billion of fire risk mitigation capital expenditures will be excluded from the Utility's equity rate base and will therefore not earn a return on equity. Such expenditures are assumed to be substantially incurred over the period from August 2019 through December 31, 2022 and are assumed to be funded with debt until securitization bond proceeds are received.

**Assumptions Underlying Regulatory and Policy Projections**

The Consolidated Financial Projections assume:

- The Utility's authorized Return on Equity will be 10.25% (as authorized through 2023 by the CPUC in its final decision issued December 19, 2019) throughout the Projection Period. The Consolidated Financial Projections also reflect a capital structure that is consistent with the terms of the Restructuring Support Agreement (the "**Noteholder RSA**") dated January 22, 2020, resulting in a weighted-average cost of debt of approximately 4.3%[2] upon PG&E Corporation's and the Utility's emergence from Chapter 11.
- Consistent with the terms of AB 1054, an initial contribution by the Utility to the Go-Forward Wildfire Fund established thereunder of $4.8 billion upon emergence, to be amortized over ten years and ongoing contributions by the Utility to the Go-Forward Wildfire Fund of $193 million per year over the Projection Period.
- The payment of various penalties by the Utility, including general fund payments, shareholder-paid initiatives, and agreements not to seek rate recovery for specified expenses pursuant to the following Orders Instituting Investigation ("**OIIs**"):
  - Locate & Mark OII: In February 2020, the presiding officer in this OII issued a decision modifying the settlement agreement between the Utility and the CPUC submitted on October 3, 2019. Consistent with the terms of the settlement agreement, as modified, the Consolidated Financial Projections assume payments and unrecovered expenses by the Utility in the amount of $110 million during 2020-2022.

---

[2] Inclusive of amortization of fees.

- Phase II Ex-Parte OII: On December 5th, 2019, the CPUC approved a settlement agreement between certain public entities and the Utility pursuant to which the Utility agreed to pay an incremental penalty of $10 million. The Consolidated Financial Projections assume that this penalty is paid in 2020.
- Wildfires OII: As described above, on December 17, 2019, the Utility submitted a settlement agreement to the CPUC in connection with the Wildfires OII in which it agreed not to seek cost recovery for $1.675 billion of wildfire-related expenditures. The Consolidated Financial Projections assume that these costs will not be recovered (See above for information related to the February 27, 2020 POD).

**Financing Considerations**

- The financing assumptions underlying the Consolidated Financial Projections are consistent with the Utility's testimony filed with the CPUC on January 31, 2020 in connection with the CPUC's Plan of Reorganization OII. The Consolidated Financial Projections assume total sources of funding and corresponding uses of approximately $59 billion ($57.65 billion upon emergence), as summarized in the following tables:

| *Expected Sources (in millions)* | |
| --- | --- |
| Equity issuance for cash | $9,000 |
| Equity issued into Fire Victim Trust (as defined below) | 6,750 |
| New PG&E Corporation Debt | 4,750 |
| Reinstated Utility Debt | 9,575 |
| New Utility Notes | 23,775 |
| Insurance Proceeds | 2,200 |
| Cash immediately prior to Emergence | 1,600 |
| Deferred Wildfire Claims Settlement | 1,350 |
| **Total Sources** | **$59,000** |

| *Expected Uses (in millions)* | |
| --- | --- |
| Payment to holders of wildfire-related claims | $24,150 |
| 2017/2018 Wildfire Claims Settlement (Deferred Payment) | 1,350 |
| Contributions to Go-Forward Wildfire Fund pursuant to AB 1054 | 5,000 |
| Repayment of Debtor-In-Possession Financing | 2,000 |
| Pre-petition Debt to be repaid or reinstated | 22,180 |
| Trade Claims and Other Costs | 2,300 |
| Accrued Interest | 1,270 |
| Cash immediately following Emergence | 750 |
| **Total Uses** | **$59,000** |

- The Consolidated Financial Projections assume, in connection with PG&E Corporation and the Utility's exit financing, that the CPUC will authorize the exclusion of $6 billion of temporary New Utility Notes from the Utility's capital structure. The Consolidated Financial Projections further assume that the CPUC will authorize the securitization of $7 billion of wildfire-related claims costs by March 31, 2021 that will be rate-neutral on a net present value basis to customers,

the proceeds of which will be used to retire the $6 billion of temporary New Utility Notes and to make payments as part of the $1.35 billion deferred settlement to the trust to be established under the Plan for the benefit of holders of wildfire-related claims ("**Fire Victim Trust**"). The authorization to securitize $7 billion of wildfire claims on an NPV neutral basis results in a $2.1 billion charge at inception as a result of an undiscounted regulatory liability associated with revenue credits funded by the NOL monetization. Securitization revenues, revenue credits, and interest expense on the $7 billion of securitized debt are fully offset by net amortization of the securitization regulatory asset and undiscounted regulatory liability.

- The securitization proposal reflected in the forecast includes revenue credits of $1.15 billion in 2021 and $397 million in 2022 that are not funded by NOL monetization. The timing and amounts of customer credits are still to be determined and are subject to material change and regulatory approval.

- The Consolidated Financial Projections assume that the equity commitment premium due under the equity backstop letters will equal 119 million shares of PG&E Corporation common stock, payable on the Effective Date. Assuming that the Debtors implement the capital structure described above by drawing on the equity backstop commitments and based on the Debtors' forecasted Normalized Estimated Net Income (as defined in the equity backstop commitment letters), the value of the equity commitment premium would be approximately $1.2 billion at the currently estimated Backstop Price (as defined in the equity backstop commitment letters). The value of the equity commitment premium could exceed this amount in the event that PG&E Corporation successfully consummates a marketed equity offering or rights offering in lieu of drawing on the equity backstop commitments or if the Debtors implement an alternative capital structure, under certain conditions.

- The Consolidated Financial Projections assume that the Debtors will face no incremental wildfire liabilities related to pre-petition wildfires beyond the $25.5 billion of wildfire-related claims that the Debtors have committed as of the date hereof to pay under the Plan pursuant to various settlement agreements with the holders of wildfire-related claims. The Consolidated Financial Projections further assume the Debtors will not face any liabilities related to postpetition wildfires that are not covered by insurance.

- Common dividends are assumed to be restored once Utility equity ratio achieves 52% on a regulatory basis and are moderated to allow PG&E Corporation debt reduction throughout the forecast period. This assumption does not reflect a commitment on the Board or management's part to a specific future dividend policy.

- The Consolidated Financial Projections assume that additional equity is raised in 2021. This financing need may either be met through equity issuance or maintaining Holding Company debt levels.

**PG&E Corporation Consolidated**
**CONDENSED CONSOLIDATED PROJECTED INCOME STATEMENTS**
**($ millions)**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **INCOME STATEMENT** | | | | | |
| | | | | | |
| **Net Operating Revenues** | 15,512 | 15,408 | 16,866 | 18,256 | 19,028 |
| *Memo: Total Cost of Energy* | *3,400* | *3,716* | *3,684* | *3,450* | *3,490* |
| | | | | | |
| **Operating Expenses** | | | | | |
| | | | | | |
| Operating and maintenance | (8,807) | (8,869) | (8,700) | (8,921) | (8,972) |
| Depreciation, amort. & decommissioning | (3,444) | (3,693) | (3,916) | (4,229) | (4,510) |
| Net securitization regulatory deferral | | (1,083) | 265 | (137) | (142) |
| **Total Operating Expenses** | (12,251) | (13,645) | (12,351) | (13,287) | (13,624) |
| | | | | | |
| **Operating Income** | 3,261 | 1,763 | 4,515 | 4,970 | 5,405 |
| | | | | | |
| **Total Interest Expense** | (1,296) | (1,759) | (1,843) | (1,918) | (1,969) |
| | | | | | |
| **State Wildfire Insurance Fund Contribution and Prepayment Amortization** | (672) | (672) | (672) | (672) | (672) |
| | | | | | |
| **Other Income/(Expense), net** | (1,479) | (166) | (166) | (180) | (193) |
| | | | | | |
| **Income Before Income Taxes** | (186) | (834) | 1,834 | 2,200 | 2,571 |
| | | | | | |
| Income tax provision | 232 | 793 | 24 | (73) | (187) |
| | | | | | |
| Preferred dividend requirement | (14) | (14) | (14) | (14) | (14) |
| | | | | | |
| **TOTAL EARNINGS AVAIL FOR COMMON STOCK** | 32 | (55) | 1,844 | 2,113 | 2,370 |
| | | | | | |
| **Non-GAAP Core Earnings Adjustments** | | | | | |
| Bankruptcy and Legal Costs | 1,487 | 28 | | | |
| Investigation Remedies and Delayed Cost Recovery | 110 | 42 | 48 | | |
| GT&S Capital Audit | (191) | | | | |
| Amortization of Wildfire Insurance Fund Contribution | 484 | 484 | 484 | 484 | 484 |
| Net Securitization Inception Charge | | 1,539 | | | |
| **NON-GAAP CORE EARNINGS** | 1,922 | 2,038 | 2,376 | 2,597 | 2,854 |

Forecasted 2021 Normalized Estimated Net Income ("NENI"), as defined in the Backstop Commitment Letter filed with the SEC on December 26, 2019, excludes the following items that are otherwise included in the presentation of forecasted 2021 Core Earnings: approximately $55 million related to unrecoverable Gas Transmission and Storage costs, approximately $45 million related to delayed capital recovery and approximately $20 million of earnings below authorized amounts. In addition to the adjustments referenced above, NENI includes the post-tax annual contribution to the Go-Forward Wildfire Fund, which is excluded from Core Earnings.

**PG&E Corporation Consolidated**
**CONDENSED CONSOLIDATED PROJECTED BALANCE SHEETS**
**($ millions)**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **Current Assets** | | | | | |
| Cash and Cash Equivalents | 757 | 1,096 | 752 | 677 | 647 |
| Accounts Receivable | 2,788 | 2,721 | 2,937 | 3,166 | 3,283 |
| Regulatory Balancing Accounts, net of Liabiltiies (1) | 747 | 1,619 | 1,677 | 1,040 | 743 |
| Prepaid Expenses, Inventories and Collateral | 1,742 | 1,836 | 1,920 | 1,993 | 2,057 |
| **Total Current Assets** | 6,035 | 7,272 | 7,286 | 6,876 | 6,730 |
| **Net Property, Plant and Equipment** | 66,340 | 71,347 | 75,809 | 80,991 | 85,277 |
| **Other Noncurrent Assets** | | | | | |
| Nuclear Decommissioning Assets | 3,291 | 3,409 | 3,527 | 3,645 | 3,763 |
| Wildfire Fund Contribution | 4,320 | 3,840 | 3,360 | 2,880 | 2,400 |
| Regulatory Assets and Other | 8,804 | 8,551 | 8,343 | 8,372 | 8,568 |
| **Total Other Noncurrent Assets** | 16,415 | 15,800 | 15,230 | 14,897 | 14,730 |
| **TOTAL ASSETS** | 88,790 | 94,418 | 98,325 | 102,764 | 106,738 |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | |
| **Current Liabilities** | | | | | |
| Accounts Payable | 2,152 | 2,140 | 2,063 | 2,005 | 1,986 |
| Short Term Borrowing | 1,720 | 2,000 | 2,000 | 2,000 | 2,000 |
| Other Current Liabilities | 1,648 | 1,853 | 1,631 | 1,421 | 1,350 |
| Accrued Wildfire Liability (Gross) | 1,350 | 0 | 0 | 0 | 0 |
| **Total Current Liabilities** | 6,870 | 5,992 | 5,694 | 5,426 | 5,336 |
| **Noncurrent Liabilities** | | | | | |
| Deferred Income Taxes | (320) | (1,112) | (1,148) | (1,084) | (909) |
| Long-term debt | 37,843 | 34,690 | 35,961 | 36,936 | 37,061 |
| *Memo: HoldCo Portion of Long Term Debt* | *4,750* | *3,500* | *3,100* | *2,900* | *2,250* |
| Securitized bonds | 0 | 7,676 | 8,287 | 8,864 | 9,403 |
| Regulatory Liabilities | 9,716 | 11,250 | 11,527 | 12,436 | 13,426 |
| Asset Retirement Obligations | 6,002 | 6,161 | 6,320 | 6,320 | 6,320 |
| Other | 6,099 | 6,086 | 6,328 | 6,673 | 7,005 |
| **Total Noncurrent Liabilities** | 59,340 | 64,752 | 67,276 | 70,144 | 72,306 |
| **Shareholders' Equity** | | | | | |
| Total Shareholders' Equity | 22,328 | 23,422 | 25,103 | 26,941 | 28,845 |
| Noncontrolling Interest - Preferred Stock of Subsidiary | 252 | 252 | 252 | 252 | 252 |
| **Total Shareholders' Equity** | 22,580 | 23,674 | 25,355 | 27,193 | 29,097 |
| **TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY** | 88,790 | 94,418 | 98,325 | 102,764 | 106,738 |

**PG&E Corporation Consolidated**
**CONDENSED CONSOLIDATED PROJECTED STATEMENTS OF CASH FLOWS**
**($ millions)**

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| **CASH FLOW STATEMENT** | | | | | |
| **Cash Flows From Operations:** | | | | | |
| Net Income | 46 | (42) | 1,858 | 2,127 | 2,384 |
| Depreciation and Amortization | 3,439 | 3,683 | 3,907 | 4,219 | 4,500 |
| Net Amortization of Securitization Regulatory Assets and Liabilities | | (1,054) | (265) | 137 | 142 |
| Share-Based Equity Backstop Commitment Premium | 1,222 | | | | |
| Wildfire Insurance Fund Amortization | 480 | 480 | 480 | 480 | 480 |
| Wildfire Insurance Fund Contribution | (4,800) | | | | |
| Change in Deferred Taxes | (232) | (793) | (36) | 64 | 175 |
| Changes in Operating Assets and Liabilities | 52 | 192 | (374) | (340) | (208) |
| Change in Balancing Accounts and Regulatory Assets | (221) | 1,452 | 125 | 815 | 479 |
| Other Noncurrent Assets and Liabilities | 110 | 42 | 39 | 55 | 25 |
| Change in Other Working Capital | 155 | 50 | 68 | (71) | (57) |
| Payment of Liabilities Subject to Compromise, net of Insurance Proceeds | (25,547) | (1,350) | | | |
| Net Cash from Operations | (25,295) | 2,661 | 5,802 | 7,485 | 7,921 |
| **Investing Activities:** | | | | | |
| Capital Expenditures | (8,086) | (8,140) | (7,730) | (8,702) | (8,015) |
| Net Change in Nuclear Decommissioning Funds | (118) | (118) | (118) | (118) | (118) |
| Proceeds from Asset Sales | 1,322 | 0 | 0 | 0 | 0 |
| Net Cash Used In Investing | (6,882) | (8,258) | (7,848) | (8,820) | (8,133) |
| **Financing Activities:** | | | | | |
| Holding Company Financing | 19,850 | (100) | (400) | (200) | (650) |
| Short and Long Term Utility Debt Issued (Matured/Repurchased) | 11,552 | (1,626) | 1,668 | 1,172 | 772 |
| Securitization Bonds Issued | 0 | 7,676 | 611 | 576 | 540 |
| Preferred Dividends Disbursed | (42) | (14) | (14) | (14) | (14) |
| Common dividends | 0 | 0 | (164) | (275) | (466) |
| Net Cash Provided by Financing | 31,360 | 5,936 | 1,701 | 1,259 | 182 |
| **NET CHANGE IN CASH** | **(817)** | **339** | **(344)** | **(75)** | **(30)** |

Case: 19-30088    Doc# 6322    Filed: 03/16/20    Entered: 03/16/20 16:17:34    Page 65 of 65