# Exhibit A



**FILED**
02/18/20
02:51 PM

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088. | Investigation 19-09-016 |

**ASSIGNED COMMISSIONER'S RULING AND PROPOSALS**

This ruling sets forth assigned Commissioner proposals (Proposals) for certain issues relating to the application of state law to the proposed plan of reorganization for Pacific Gas and Electric Company (PG&E) and, to the extent directly or indirectly implicated, its holding company PG&E Corporation.  This ruling is providing the Proposals to the parties at this time in order to encourage the development of the record on the issues identified herein.

## 1.  Background

This ruling soliciting party responses on certain issues is to inform the Commission's regulatory review under Assembly Bill (AB) 1054 regarding PG&E's reorganization plan and other documents resolving PG&E's insolvency proceeding.  Commission determinations on these (and other) issues are

Case: 19-30088    Doc# 6358-1    Filed: 03/18/20    Entered: 03/18/20 16:02:31    Page 2 of 22

necessary in order for PG&E to participate in the wildfire insurance fund established pursuant to Public Utilities (Pub. Util.) Code Section 3292.

## 2. Proposal for PG&E to Obtain Regulatory Approvals Under Pub. Util. Code Section 3292(b)(1)(C)

In order to participate in the wildfire insurance fund established pursuant to Section 3292(a), Pub. Util. Code Section 3292(b)(1)(C) requires PG&E to meet the following condition, among others, by June 30, 2020:

> The commission has approved the reorganization plan and other documents resolving the insolvency proceeding, including the electrical corporation's resulting governance structure as being acceptable in light of the electrical corporation's safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission.

The Scoping Ruling for this proceeding identified financial and non-financial issues upon which any plan of reorganization would be evaluated to determine reasonableness and consistency with AB 1054 requirements and other applicable state law.  As stated in the Scoping Ruling, the Commission's consideration will include financial and operational issues over both the short-term and the longer-term to ensure PG&E's customers receive safe and reliable service at reasonable rates consistent with achieving California's climate goals.  After review of the record to date, including PG&E's opening testimony, and in light of the limited schedule to meet the June 30, 2020 statutory deadline, this Assigned Commissioner's Ruling seeks parties' comments on the Proposals to inform the development of the record across the many important issues before us.  The Proposals are attached as Appendix A to this Ruling.

## 3. Responses to Proposals

Parties will have the opportunity to discuss the schedule for addressing the Proposals at the beginning of the evidentiary hearings starting on

February 25, 2020, at 10:00 a.m.  For discussion purposes the following schedule is proposed:

1) One round of concurrent testimony (on the Proposals only) to be served on a date to be determined between March 6, 2020 and March 13, 2020.

2) Evidentiary hearings (if necessary) would be held on March 18, 2020 through March 20, 2020.  (Please note that these hearing dates were previously calendared.)

3) One round of concurrent briefing on the Proposals would be filed and served on March 26, 2020.

4) Reply briefs (on all other issues) that are currently scheduled to be filed and served on March 20, 2020, would also become due on March 26, 2020.

**IT IS RULED** that the assigned Commissioner proposals are attached as Appendix A.

Dated February 18, 2020, at San Francisco, California.

/s/  MARYBEL BATJER
_____
Marybel Batjer
Assigned Commissioner

# Appendix A

# APPENDIX A

## ASSIGNED COMMISSIONER PROPOSALS

In this proceeding, the Commission must review Pacific Gas and Electric Company's (PG&E) Plan of Reorganization (Plan) and determine if it is compliant with California law, including Assembly Bill (AB) 1054. Specifically, AB 1054 directs the Commission to determine whether:

> the reorganization plan and other documents resolving the insolvency proceeding, including the electrical corporation's resulting governance structure [are] acceptable in light of the electrical corporation's safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission.

Public Utilities Code Section 3292(b)(1)(c). In making this determination, the Commission is guided by the imperative to ensure that PG&E is operationally and financially stable and can provide customers with safe, reliable, affordable and clean energy. Any proposals for governance and operational changes should create incentives for risk reduction and improved performance and facilitate the financial stability of the utility, which ultimately benefits ratepayers. We also recognize the critical need to ensure that the reorganized companies, both the utility and holding company, must be fundamentally changed after their restructuring and the governance and operational changes we may impose pursuant to our statutory authority under AB 1054.

After reviewing the record to date and the opening testimony of PG&E served on January 31, 2020, I request that parties (including PG&E) submit supplemental testimony on the proposals set forth below in order to ensure the development of a robust record on these concepts. Parties' supplemental testimony should address whether the Commission should condition its approval of PG&E's Plan and other documents resolving the insolvency proceeding on PG&E's implementation of any or all of these proposals for governance and operational reforms, as well as any substantive recommendations on the concepts. Throughout the proposals below, for periods after PG&E emerges from bankruptcy, the term "PG&E" and "PG&E Corporation" means the reorganized PG&E and reorganized PG&E Corporation.

These proposals address key elements of a reorganized PG&E but should not be interpreted as the totality of governance and operational reforms being considered and that may be established through the proceeding. As the Scoping Memo and Ruling points out, there are other financial and non-financial issues we must consider.  This ruling is not an indication that I view other issues beyond governance and operational reform (including the financial elements of the Plan) as less material to the resolution of this matter.

Implementation of proposals on governance and organization may also require additional actions, such as CPUC regulatory approvals, modifications to the Plan,

Case: 19-30088    Doc# 6358-1    Filed: 03/18/20    Entered: 03/18/20 16:02:31    Page 6 of 22

amendments to PG&E and PG&E Corporation's corporate organizational documents, or other actions to be undertaken by PG&E and PG&E Corporation. Further, I recognize that implementation steps may be required by certain dates that will be determined in this proceeding and may remain binding on PG&E and PG&E Corporation unless or until the Commission determines otherwise. Details on implementation are not fully addressed at this time and parties may comment in supplemental testimony and briefs on appropriate procedures for approvals, timelines, and other implementation considerations.

**Commissioner Proposals:**

1. Executive-Level Risk and Safety Officers
2. Independent Safety Advisor
3. Expanded SNO Committee Authority
4. Board of Directors
5. Approval of Senior Management
6. Regional Restructuring
7. Safety and Operational Metrics
8. Earnings Adjustment Mechanism
9. Executive Compensation
10. Enhanced Oversight and Enforcement Process

**1. Executive-Level Risk and Safety Officers**

PG&E proposed to establish one or more executive-level management positions responsible for risk assessment and public safety. PG&E proposed two new executive-level management positions, a Chief Risk Officer (CRO) and a Chief Safety Officer (CSO), and to split the risk assessment function and the public safety function between these two positions.

Chief Risk Officer. PG&E proposed a CRO that reports directly to the Chief Executive Officer (CEO) of PG&E Corporation and to the Safety and Nuclear Oversight Committee (the SNO Committees) and the Audit Committees (the Audit Committees) of PG&E and PG&E Corporation. PG&E sets forth a specific scope of responsibility for the CRO in the testimony of Andrew Vesey.

Chief Safety Officer. PG&E proposed a CSO that reports directly to the SNO Committees and the CEO of PG&E Corporation. Although PG&E proposed a CSO in its testimony, PG&E did not define the responsibilities of the CSO and the role appears focused on workplace safety, not the public safety aspect of the position.

**Commissioner Proposal for CRO and CSO:**

To elevate risk assessment and safety to the highest level of its organization, in addition to the enumerated scope of responsibilities PG&E proposed, the CRO and CSO should have a direct line of reporting from safety officers and regular contact with employees and contractors in the field within each region of PG&E's service territory.

The CRO should appear before the Commission or meet with Commission staff at least quarterly.

In addition to a focus on workplace safety, the roles and responsibilities of the CSO should also incorporate public safety as relevant in each component. Additionally, the CSO should provide semi-annual performance reports to the Commission staff on metrics relating to public safety, such as the Safety and Operational Metrics proposed in section 7 (including, where metrics are not met) and mitigation plans approved by the CSO and the Independent Safety Advisor (if any).

The initial CRO and CSO should be in place when PG&E and PG&E Corporation emerge from bankruptcy and the selection process for the initial appointments should provide for consultation with or approval by the State and CPUC staff. After the appointment of the initial CRO or CSO, any replacement should be acceptable to a majority of the members of the Safety Subcommittee. The CRO and CSO positions should remain in place unless the Commission determines they are no longer necessary based on safety and operational history.

## 2. Independent Safety Advisor

PG&E has a federally appointed monitor as part of its criminal probation resulting from the gas pipeline explosion in San Bruno. In Andrew Vesey's testimony PG&E proposed appointment of an Independent Safety Advisor upon termination of the existing federal court monitor. In that testimony, PG&E included certain qualifications and a scope of responsibilities for the post-monitor Independent Safety Advisor. PG&E also proposes that the Independent Safety Advisor position operate as an evolution of the Independent Safety Oversight Council.

**Commissioner Proposal for Independent Safety Advisor:**

PG&E should be required to appoint an Independent Safety Advisor after the termination of the federal monitor to provide ongoing external oversight during the post-bankruptcy and post-probation period. An Independent Safety Advisor should work with the CRO, the CSO, and PG&E's management team and board (including the Safety Subcommittee proposed in section 4) to develop recommendations to address compliance issues and enhance PG&E's safety performance. The Independent Safety Advisor will functionally serve in the same capacity as the federal monitor and shall have the authority to retain third-party advisors.

### 3. Expanded SNO Committee Authority

PG&E proposed certain expanded authority for the SNO Committees of the boards of directors in the testimony of Nora Brownell, but PG&E's testimony lacks details and appears duplicative in some places of other board and board committee functions.

**Commissioner Proposal for SNO Committees:**

To clarify responsibility for critical safety issues, PG&E should expand the authority for the SNO Committees to provide oversight of PG&E's wildfire mitigation plan, Public Safety Power Shutoff (PSPS) program, and related investments. In addition to its current responsibilities and the responsibilities listed in PG&E's testimony, the SNO Committees should have the following oversight responsibility:

- Compliance with the Safety and Operational Metrics proposed in section 7;
- Periodic reporting to PG&E and PG&E Corporation's boards of directors and the CPUC staff, including, when appropriate, detailed recommendations based on its review of PG&E's expenditures, protocols, and procedures with respect to the foregoing matters; and
- PG&E's response to the recommendations of an Independent Safety Advisor, if one is required as proposed in section 2.

The SNO Committees should also have the authority to hire third-party safety and utility operations experts to advise and provide analysis to assist them with their oversight obligations. The selection process should provide for consultation with or approval by the State and CPUC staff for the initial members of the SNO Committees. Any member appointed to an SNO Committee after emergence from bankruptcy should be acceptable to the Safety Subcommittee, if one is established as proposed in section 4.

### 4. Board of Directors

PG&E proposed continuation of much of its current governance structure. PG&E proposed that PG&E and PG&E Corporation retain one or more nationally recognized independent search firms to assist in refining its skills matrix. PG&E identified the importance of using a skills matrix in identifying qualified candidates for the boards of directors and the testimony of Nora Brownell lists certain criteria that would be included in a general skills matrix. PG&E also proposed that the independent search firms retained to assist in development of the skills matrix will also assist in identifying individuals meeting that skills matrix.

**Commissioner Proposal for the Boards of Directors:**

The board structure of PG&E and PG&E Corporation should be designed to ensure safety and reliability and continued progress toward climate goals. The directors of PG&E and

4

PG&E Corporation must be committed to achieving these goals. The Commission should consider establishing the following requirements:

Composition of the Boards of Directors.

- PG&E and PG&E Corporation's board of directors should be comprised of between 12 and 15 directors, one of whom shall be the CEO of PG&E Corporation.

- PG&E's board of directors should be comprised of the same directors as PG&E Corporation's board of directors plus one additional director who should be the CEO of PG&E.

- The terms for PG&E and PG&E Corporation's boards of directors should be initially structured as three-year terms with no term limits. This policy should be evaluated after five years.

- The directors, other than the two executive officers, should be independent directors as defined by the New York Stock Exchange and the Securities and Exchange Committee.

- At least 50 percent of the directors should be California residents at the time of their election.

- There should be the presumption that the reorganized PG&E and PG&E Corporation boards of directors will be comprised of individuals not currently serving on the boards.

- The selection process shall provide for consultation with or approval by the State and CPUC staff on any firm retained to identify new board candidates and to assist in refining the skills matrix. This requirement should apply only to the initial selection of PG&E and PG&E Corporation's boards of directors upon emergence from bankruptcy.

- In addition to meeting characteristics identified in PG&E's testimony for the skills matrix, candidates for the boards of directors should be evaluated on the following criteria:
    - The character of the candidates and their fit with the board culture such as self-awareness, integrity, ethical standards, judgment, interpersonal skills and relations, communication skills, and ability to work collaboratively with others.
    - Possible limitations on serial or "professional" directors, including a restriction on directors that have substantial relationships with investment funds and investors in PG&E or PG&E Corporation.
    - Important public policy objectives such as diversity, representation from regions PG&E serves, and commitment to California's climate change goals.

Safety Subcommittee. To ensure that PG&E has a mechanism to incorporate safety in decisions of the board of directors into the future it should constitute a "Safety Subcommittee" of the executive committee of the board of directors. The members of the

Safety Subcommittee should have enhanced safety expertise as defined by the following safety expertise criteria and may include additional limitations on serial or "professional" directors and a preference for California residency.

Safety Expertise Criteria. The skills matrix should include additional criteria that must be met by the Chair of the Board of PG&E, the Chair of the SNO Committees, and at least one other director. Directors who meet one or more of the safety expertise criteria would serve on the Safety Subcommittees. The safety expertise criteria should include the following:

- Specific substantial expertise related to wildfire safety, wildfire prevention, and/or wildfire mitigation.

- Specific substantial expertise related to the safe operation of a natural gas distribution company.

- Specific substantial expertise related to enterprise risk management, including cyber security, and/or experience with nuclear safety (prior to the cessation of production operations of Diablo Canyon Nuclear Power Plant in 2025).

Director Selection Process. The independent search firms retained by PG&E should vet all candidates for the boards of directors (other than the CEOs) and prepare a list of candidates that meet the skills matrix and are qualified to serve on PG&E and PG&E Corporation's boards of directors. The independent search firms, with input from the State, will develop the list of qualified director candidates for consideration to serve on the boards. PG&E's Plan should provide for consultation with and approval from the State on the directors for the initial boards before emergence from bankruptcy. After the selection of the initial boards, and after emergence, for a continuous period of seven years the Nominating and Governance Committees of PG&E Corporation should nominate director candidates, and these nominations shall be based on the list of directors that meet the skills matrix selected by the independent search firms. Going forward, PG&E Corporation shall use a skills matrix for selecting board of director candidates.

## 5. Approval of Senior Management

### Commissioner Proposal for Approving Senior Management:

It is imperative that the senior management of PG&E be approved by the Safety Subcommittee, if one is established, to ensure the Safety Subcommittee's safety expertise influences the approval of senior management. Therefore, the Safety Subcommittee should affirmatively vote to approve PG&E's executive officers in addition to any other board approvals that may be required.

### 6. Regional Restructuring

PG&E described a process to develop a regional restructuring plan in the testimony of Andrew Vesey, with a purpose to assure it is more responsive and accountable to the particular needs and circumstances of the customer base, improve customer service and safety at the local level, and include customer service focused metrics, such as interconnection, outage response and other localized safety issues.

**Commissioner Proposal for Regional Restructuring:**

Unless determined otherwise by the Commission, PG&E should create local operating regions to bring management closer to the customers they serve.

By June 30, 2020 PG&E shall file an application for approval of a proposed regional restructuring plan and take the following interim steps toward regional restructuring:

- Appoint regional officers to manage each region proposed in the application who are executive officer positions that report directly to the CEO and President of PG&E.
- Provide for each region to have its own risk officer and safety officer who report to the CRO and CSO respectively.

PG&E will maintain these interim measures in effect until the later date of a Commission decision approving PG&E's application for a proposed regional restructuring plan and recovery of associated costs, or a final non-appealable Commission decision denying PG&E's application.


### 7. Safety and Operational Metrics

In the testimony of William Johnson and Andrew Vesey PG&E proposed that it will develop and propose to the Commission certain safety and operational metrics against which it would be held accountable.

**Commissioner Proposal for Safety and Operational Metrics:**

In the appropriate Commission proceeding, PG&E should propose attainable Safety and Operational Metrics that, if achieved, would ensure that PG&E provides safe, reliable and affordable service consistent with California's clean energy goals ("Safety and Operational Metrics"). These metrics will be subject to Commission review, revision, and approval. The Safety and Operational Metrics should be consistent with state law and include metrics that measure progress over defined periods of time in order to ensure that the PG&E is meeting its obligations to the state of California. The Commission may use any approved metrics to measure PG&E's progress on critical safety issues. The metrics should consider, among other things, whether and the extent to which:

Case: 19-30088   Doc# 6358-1   Filed: 03/18/20   Entered: 03/18/20 16:02:31   Page 12 of 22

- PG&E has an approved wildfire mitigation plan.
- PG&E has a safety certificate.
- PG&E is in compliance with its regulatory reporting requirements, including reporting on each of its metrics required in the Enhanced Oversight and Enforcement Process as proposed in section 10, at the times required.
- PG&E has and is making the infrastructure investments, including investments in the grid, to support the transition to clean energy in an affordable and reliable manner.
- PG&E has complied with any of the metrics set forth in its approved wildfire mitigation plan, including PSPS protocols, vegetation management programs, reliability and hardening programs (both electrical infrastructure and microgrid implementation), risk analysis, and prioritization of implementation of mitigation measures.
- PG&E has complied with metrics resulting from its on-going safety culture assessment.
- PG&E has met the metrics related to other utility performance related to risk and safety.
- PG&E has timely achieved, or made sufficient progress toward, approved safety or risk-driven investments related to the gas business or the electric business.

## 8. Earnings Adjustment Mechanism

In the testimony of Robert Kenney PG&E asserts that it considered a potential earnings adjustment mechanism linked to safety performance, but declined to include one in its Plan.

**Commissioner Proposal for Earnings Adjustment Mechanism:**

The Commission should consider establishing a mechanism to adjust PG&E's earnings (revenue requirement) based on its achievement of a relevant and reasonably achievable subset of the Safety and Operational Metrics, on a sliding scale of 4 percent up or 4 percent down of earnings in a given year. If adopted, the earning adjustment mechanism should be evaluated after a period of time. Development of the relevant subset of Safety and Operational Metrics and implementation of this earnings adjustment mechanism may occur after June 30, 2020.

## 9. Executive Compensation

PG&E provided testimony on executive compensation structures through multiple witnesses, including John Lowe who acknowledged that AB 1054 requires the Commission to determine that PG&E's executive incentive compensation structure is

8

"designed to promote safety as a priority and ensure public safety and utility financial stability."

**Commissioner Proposal for Executive Compensation:**

The proposals included in PG&E's executive compensation structure should consider both safety incentives and the need to attract and retain highly qualified executives to achieve transformation.

PG&E's executive compensation plan should include at least the following components. Further, PG&E shall retain a nationally recognized independent consultant to help ensure its executive compensation plans meet the requirements of AB 1054.

- Publicly disclosed compensation arrangements for executives;

- Written compensation agreements for executives;

- Guaranteed cash compensation as a percentage of total compensation that does not exceed industry norms.

- Holding or deferring the majority or super-majority of incentive compensation, in form of equity awards, for at least 3 years.

- Basing a significant component of long-term incentive compensation on safety performance, as measured by a relevant subset of by the Safety and Operational Metrics to be developed, as well as customer satisfaction, engagement, and welfare. The remaining portion may be based on financial performance or other considerations.

- Annual review of awards by an independent consultant.

- Annual reporting of awards to the CPUC through a Tier 1 advice letter compliance filing.

- A presumption that a material portion of executive incentive compensation shall be withheld if the PG&E is the ignition source of a catastrophic wildfire, unless the Commission determines that it would be inappropriate based on the conduct of the utility.

- Executive officer compensation policies will include provisions that allow for restrictions, limitations, and cancellations of severance payments in the event of any felony criminal conviction related to public health and safety or financial misconduct by the reorganized PG&E, for executive officers serving at the time of the underlying conduct that led to the conviction. Implementation of this policy should take into account PG&E's need to attract and retain highly qualified executive officers.

9

## 10. Enhanced Oversight and Enforcement Process

In William Johnson's testimony PG&E proposes to work with the CPUC to construct a process for identifying shortcomings in its performance (based on safety and operational metrics) that may prompt implementation of corrective actions, and he acknowledges a potential for escalating Commission enforcement.

### Commissioner Proposal for Enhanced Oversight and Enforcement:

The Commission should establish an Enhanced Oversight and Enforcement Process (Process) designed to provide a clear roadmap for how the Commission will closely monitor PG&E's performance in delivering safe, reliable, affordable, clean energy.

The Process contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics. The Process includes enhanced reporting requirements and additional monitoring and oversight. The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria. If triggered, the Process would occur in coordination with the Commission's existing formal and informal reporting requirements and procedures and would not replace or limit the Commission's regulatory authority including the authority to impose fines and penalties.

If triggered, the Commission would place PG&E in the appropriate step upon the occurrence of a specified triggering event, with appropriate notification by the Commission's Executive Director, or as otherwise provided below. The Commission's Executive Director may move PG&E through the steps of the Process sequentially, or the Commission or its Executive Director may place PG&E in the appropriate step upon the occurrence of a specified triggering event.

### Enhanced Reporting

### STEP 1: Enhanced Reporting

A. Triggering Events

    i. PG&E fails to obtain an approved wildfire mitigation plan or fails in any material respect to comply with its regulatory reporting requirements.

    ii. PG&E fails to comply with, or has shown insufficient progress toward, any of the metrics (i) set forth in its approved wildfire mitigation plan including Public Safety Power Shutoffs (PSPS) protocols, (ii) resulting from its on-going safety culture assessment, or (iii) related to other specified safety performance goals.

    iii. PG&E demonstrates insufficient progress toward approved safety or risk-driven investments related to the electric and gas business.

    iv.    PG&E (or PG&E Corporation) fails in any material respect to comply with the Commission's requirements and conditions for approval of its emergence from bankruptcy.

B. Actions During Step 1

    i.    PG&E will submit a Corrective Action Plan within twenty days of the earlier of the date on which (a) PG&E reports to the Commission demonstrating that any Step 1 triggering event has occurred (which report shall be made no later than five business day after the date on which any member of senior management of PG&E becomes aware of the occurrence of a Step 1 triggering event) or (b) the Commission staff notifies PG&E in writing that any Step 1 triggering event has occurred and is continuing.

    ii.    The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 1 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation by the Chief Risk Officer.

    iii.    The Corrective Action Plan, including any timeframes set forth therein for the correction of the triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

    iv.    Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other things, existing or enhanced reporting.

    v.    The CRO, the Safety Subcommittee, and the boards of directors shall provide reporting to the Commission as directed.

C. Performance that Results in Exit from Step 1

    i.    PG&E's exit from Step 1 of the Process would be confirmed by the Commission's Executive Director upon meeting the conditions of its Corrective Action Plan within the required timeframe.

    ii.    The Commission's Executive Director will move PG&E to Step 2 if it fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe. PG&E may remain in Step 1 if it demonstrates sufficient progress toward meeting the conditions of its Corrective Action Plan and additional time appears needed to successfully address the triggering event(s).

## Step 2: Commission Oversight of Management and Operations

A. Triggering Events

    i.    The Commission's Executive Director makes a determination to move PG&E to Step 2, as provided in Step 1, Section C (ii) above.

ii. A gas or electric incident occurs that results in the destruction of 1,000 or more dwellings or commercial structures and appears to have resulted from PG&E's failure to follow Commission rules or orders or prudent management practices.

iii. PG&E fails to comply with electric reliability performance metrics, including standards to be developed for intentional de-energization events (i.e., PSPS).

iv. PG&E fails to report to the Commission a systemic electric or gas safety issue.

B. Actions During Step 2

i. PG&E will submit a Corrective Action Plan, or updated Corrective Action Plan, within twenty days of the earlier of the date on which (a) PG&E reports to the Commission demonstrating that any Step 2 triggering event has occurred (which report shall be made no later than five business day after the date on which any member of senior management of PG&E becomes aware of the occurrence of a Step 2 triggering event) or (b) the Commission staff notifies PG&E in writing that any Step 2 triggering event has occurred and is continuing.

ii. The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 2 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation by the Chief Risk Officer and the Safety Subcommittee.

iii. The Corrective Action Plan, including any timeframes set forth therein for the correction or prevention of the Step 2 triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

iv. Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other activities, increased inspections, quarterly reports, and, to the extent applicable, spot auditing of General Rate Case, Wildfire Expense Memorandum Account, Catastrophic Events Memorandum Account, or Pipeline Safety Enhancement Plans accounts in which approved investments in wildfire mitigation, electric or gas safety are auditable.

v. The Safety Subcommittee and the CRO shall appear quarterly before the Commission to report progress on the Corrective Action Plan and provide additional reporting as directed.

C. Performance that Results in Exit from Step 2

i. The Commission's Executive Director will confirm PG&E's exit from Step 2 of the Process when he/she determines the company has met the

12

conditions of its Step 2 Corrective Action Plan within the required timeframe. The Commission's Executive Director may determine that PG&E will move back to Step 1 of the Process rather than exit the process if the Executive Director determines that PG&E has made sufficient progress in meeting its Step 2 Corrective Action Plan but continued enhanced reporting is needed.

ii. The Commission's Executive Director will move PG&E to Step 3 if

    a. PG&E fails to adequately meet the conditions of its Corrective Action Plan, and

    b. the Executive Director determines that additional time in Step 2 is not likely to result in the effective implementation of its Corrective Action Plan.

## Enhanced Enforcement

Steps 3 through 6 of the Process implement increasing levels of operational oversight upon occurrence of certain triggering events.

## Step 3: Appointment of Independent Third-Party Monitor

B. Triggering Events

i. The Commission's Executive Director makes a determination to move PG&E to Step 3, as provided in Step 2, Section C (ii).

ii. PG&E fails to obtain or maintain its safety certificate as provided in AB 1054.

C. Actions During Step 3

i. The Commission's Executive Director may appoint an independent third-party monitor (Monitor) to oversee PG&E's operations and to work with senior management to develop and implement a Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.

ii. The Monitor will provide active, external oversight of PG&E's implementation of its Corrective Action Plan.

iii. The Monitor will have the authority to hire third-party safety and utility operations experts to assist it with its oversight obligations.

iv. Senior management must work jointly with the Monitor to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission). The Corrective Action Plan shall be certified by the Monitor.

v. PG&E may request the Monitor to modify the Corrective Action Plan but must otherwise implement the plan as approved by the Monitor.

13

vi. The Monitor will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.

vii. The CRO and Safety Subcommittee will provide reporting to the Commission as required during this Step.

D. Performance that Results in Exit from Step 3

i. PG&E's exit from Step 3 will be confirmed by the Commission's Executive Director if PG&E meets the conditions of its Step 3 Corrective Action Plan within the required timeframe. The Commission's Executive Director may determine that PG&E must remain in Step 1 or 2 for additional time after it confirms that PG&E has exited Step 3.

ii. The Commission's Executive Director will move PG&E to Step 4 if any of the following occurs:

a. PG&E fails to implement the Corrective Action Plan within the timeframes required by the Monitor or the Commission's Executive Director.

b. The Commission's Executive Director determines that additional enforcement is necessary because of PG&E's systemic non-compliance or poor performance with its Safety and Operational Metrics over an extended period.

**Step 4: Appointment of a Chief Restructuring Officer**

A. Triggering Events

i. The Commission's Executive Director makes a determination to move PG&E to Step 4, as provided in Step 3, Section C (ii).

ii. The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that PG&E repeatedly violated its regulatory requirements, committed gross negligence, or committed a serious violation of the law, such that these violations in the aggregate represent a threat to public health and safety.

iii. PG&E causes an electric or gas safety incident that results in the destruction of 1,000 or more dwellings or commercial structures and the Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that such event results from the willful misconduct or repeated and serious violations of Commission rules, orders or regulatory requirements.

iv. The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process that additional enforcement is necessary because the wildfire fund administrator has made

14

a determination following a covered wildfire that PG&E is ineligible for the cap on reimbursement because its actions or inactions that resulted in a covered wildfire constituted conscious or willful disregard of the rights and safety of others.

v. PG&E failed to obtain or maintain its safety certificate as provided in AB 1054 for a period of three consecutive years.

B. Actions During Step 4

i. The Commission will require that PG&E retain a chief restructuring officer from a list of qualified candidates identified by a third-party. The chief restructuring officer will have full management responsibility for developing and directing PG&E to implement the Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.

ii. The chief restructuring officer will have the authority of an executive officer of PG&E and will report to the Safety Subcommittee on all safety issues.

iii. PG&E's senior management must work jointly with the chief restructuring officer to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission).

iv. The chief restructuring officer will have all corporate authority that can be delegated to an officer under the California Corporate Code in order to ensure that PG&E can meet its Corrective Action Plan.

v. The Corrective Action Plan must be certified by the chief restructuring officer.

vi. PG&E must otherwise implement the Corrective Action Plan as certified by the chief restructuring officer.

vii. The chief restructuring officer will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.

viii. The Chief Restructuring Officer will remain in place during Steps 5 and 6, if triggered.

C. Performance that Results in Exit from Step 4

i. PG&E's exit from Step 4 would be confirmed by the Commission's Executive Director if it meets the conditions of its Step 4 Corrective Action Plan within the required timeframe. The Commission's Executive Director may determine that PG&E must remain in Steps 1, 2, or 3 for additional time after it confirms that PG&E has exited Step 4.

ii. The Commission through will move PG&E to Step 5 if the Commission finds, through an Order to Show Cause or Order Instituting Investigation, that

> PG&E failed to implement the Corrective Action Plan within the timeframes required by the chief restructuring officer or the Commission.

    iii.    PG&E may remain in Step 4 if after consultation with the chief restructuring officer the Commission or the Executive Director determine that additional time appears needed to successfully address the triggering event(s).

## Step 5: Appointment of a Receiver

A. Triggering Events

    i.    PG&E fails to implement its Step 4 Corrective Action Plan within the required timeframes, as provided in Step 4, Section C (ii).

B. Process

    i.    The Commission will pursue the receivership remedy subject to then applicable law of the state of California. If PG&E becomes the subject of a subsequent chapter 11 case, PG&E will agree not to oppose a motion for the appointment of a chapter 11 trustee if such a motion is filed by the Commission or the state of California in such case.

    ii.    The receiver, if appointed by the Superior Court, would be empowered to control and operate PG&E's business units in the public interest but not dispose of the operations, assets, business or PG&E stock.

C. Performance that Results in Exit from Step 5

    i.    If the Commission determines that PG&E has corrected all of the Step 5 triggering events and has remained in material compliance with Safety and Operational Metrics for a period of 18 months, the Commission may request termination of any receivership.

    ii.    At any time while the receiver is in place and to the extent permitted by then applicable law, the Commission can initiate a Step 6 enforcement action if a Step 6 triggering event has occurred.

    iii.    In the event that Commission seeks, but is not successful in obtaining a receiver, the Commission would determine whether PG&E shall remain in Step 4 or advance to Step 6.

## Step 6: Review of CPCN

A. Triggering Events

    i.    A receiver, or interim management (in the event that interim management is appointed or maintained because the appointment of a receiver has been denied) appointed as set forth above has determined that continuation of Receiver Oversight will not result in restoration of safe and reliable service;

     provided, that such receiver, or interim management shall have been a place for a period of at least nine (9) months before making such a determination.

ii.    A court of applicable jurisdiction has denied the Commission's request for a receiver made as set forth above.

iii.    PG&E fails adequately to address all of the Step 5 triggering events within 18 months of imposition of Step 5 and the Commission determines that additional time in Step 5 is unlikely to result in corrective action.

B. Process

i.    The Commission will undertake this process subject to then applicable law of the state of California.

ii.    The CPUC will issue an order to show cause or Order Instituting Investigation to initiate Step 6

iii.    As a result of the order to show cause, the CPUC may place conditions on PG&E's CPCN or revoke PG&E's CPCN.

*(End of Appendix A)*