**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Carol C. Villegas
David J. Goldsmith
Jeffrey A. Dubbin (SBN 287199)
Aram Boghosian
140 Broadway
New York, New York 10005

*Lead Counsel to Lead Plaintiff and the Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Bankruptcy Counsel to Lead Plaintiff and the Class*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin (*pro hac vice*)
Andrew Behlmann (*pro hac vice*)
Scott Cargill
Colleen Maker
One Lowenstein Drive
Roseland, New Jersey 07068

*Bankruptcy Counsel to Lead Plaintiff and the Class*

*(additional counsel on Exhibit A)*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☒ Affects Both Debtors<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company | Case No. 19-30088 (DM) (Lead Case)<br>Chapter 11<br>(Jointly Administered)<br><br>**SECURITIES PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING TO PROSECUTE CLAIMS OF THE DEBTORS' ESTATES**<br><br>Hearing<br>Date: April 7, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Before: Hon. Dennis Montali<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, California 94102 |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................6

BACKGROUND ...................................................................................................7

    A.    The Securities Litigation ......................................................................7

    B.    The Chapter 11 Cases ..........................................................................8

    C.    Consolidation With the *York County* Action .....................................9

    D.    The Third Amended Complaint ...........................................................9

        1.    Exchange Act Claims ...............................................................9

        2.    Securities Act Claims ..............................................................10

        3.    The Class ..................................................................................10

    E.    Motions to Dismiss the TAC ...............................................................11

    F.    Class Claims and Rule 7023 Motion ...................................................11

    G.    The Plan and RSA ...............................................................................12

    H.    The Motion ..........................................................................................12

ARGUMENT .....................................................................................................13

I.    THE MOTION IS, AT BEST, PREMATURE. .........................................13

II.    THE SECURITIES LITIGATION CLAIMS ARE DIRECT AND INDEPENDENT CLAIMS AGAINST THE DEBTORS AND THE NON-DEBTOR DEFENDANTS.........14

    A.    Legal standard for determining whether a claim is direct or derivative ....................15

    B.    The Securities Litigation Claims are direct claims. ...........................16

        1.    Shareholders suffered a direct injury .....................................16

        2.    The pled theory of loss causation in the Securities Litigation relies on exposure to fraud rather than the occurrence of the Fires....................18

        3.    The cases cited by the TCC are inapposite here. ...................20

    C.    The TCC's Additional Arguments Are Meritless. ...............................22

        1.    Loss of market capitalization directly injured Class members. ...........................22

2. The Class Period is defined by Debtors' fraudulent conduct. ...........................22

3. The TCC's argument about Misstatement No. 1 is incorrect and irrelevant. ...........................................................................................................23

D. Regardless of whether the Securities Litigation Claims are derivative claims, they are not "claims . . . relating to" the Fires and thus cannot be Assigned Rights and Causes of Action under the Plan and RSA. ................................23

E. The Plan Clarifies that the Securities Litigation Claims Are Not Assigned to the TCC. ........................................................................................................................24

III. THE TCC HAS NOT MET ITS BURDEN TO OBTAIN DERIVATIVE STANDING, DESPITE THE NEWLY MINTED STANDING STIPULATION. ...............25

CONCLUSION ...........................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*In re Amyris, Inc. S'holder Derivative Litig.*,
No. 17-04719, 2018 WL 1242075 (N.D. Cal. Mar. 9, 2018) ................................................23

*In re Godon, Inc.*,
275 B.R. 555 (Bankr. E.D. Cal. 2002).................................................................................26

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983).............................................................................................................17

*Jones v. H.F. Ahmanson & Co.*,
1 Cal. 3d 93 (1969) .......................................................................................................16, 17

*Klopstock v. Superior Court*
17 Cal.2d 13 (1941) .............................................................................................................16

*Lapidus v. Hecht*,
232 F.3d 679 (9th Cir. 2000) ...............................................................................................17

*New York City Emps.' Ret. Sys. v. Jobs*,
593 F.3d 1018 (9th Cir. 2010) ........................................................................................17, 18

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
730 F.3d 1111 (9th Cir. 2013) .............................................................................................20

*Oakland Raiders v. Nat'l Football League*,
131 Cal. App. 4th 621 (2005) ..............................................................................................16

*Pareto v. FDIC*,
139 F.3d 696 (9th Cir. 1998) .........................................................................................17, 24

*Sanguinetti v. Viewlogic Sys., Inc.*,
No. C 95 2286, 1996 WL 33967 (N.D. Cal. Jan. 24, 1996) .................................................17

*Schuster v. Gardner*,
127 Cal. App. 4th 305 (2005) ...........................................................................16, 21, 22, 23

*In re Semtech Corp. Sec. Litig.*,
No. 07-7114, 2008 U.S. Dist. LEXIS 126135 (C.D. Cal. Dec. 15, 2008)...................16, 17, 18

*In re Smith Barney Transfer Agent Litig.*,
765 F. Supp. 2d 391 (S.D.N.Y. 2011).............................................................................17, 19

*In re Spaulding Composites Co., Inc.*,
   207 B.R. 899 (9th Cir. BAP 1997)...................................................................26

*Stoyas v. Toshiba Corp.*,
   896 F.3d 933 (9th Cir. 2018) ......................................................................23

*In re Touch America Holdings, Inc.*,
   401 B.R. 107 (Bankr. D. Del. 2009) ....................................................21, 22, 24

**STATUTES**

11 U.S.C. § 362(a) .......................................................................................9

11 U.S.C. §  510(b) ................................................................................25, 26

15 U.S.C. § 77k(a) .....................................................................................17

28 U.S.C. § 1658(b) ...................................................................................23

Securities Litigation Uniform Standards Act of 1998 ..................................23

**RULES**

Fed. R. Bankr. P. 7023.................................................................................12

**OTHER AUTHORITIES**

Friedman, California Practice Guide: Corporations ¶ 6:598 ........................16

Public Employees Retirement Association of New Mexico ("**Lead Plaintiff**"), the court-appointed lead plaintiff in the securities class action captioned as *In re PG&E Corporation Securities Litigation*, Case No. 18-03509 (the "**Securities Litigation**") pending in the U.S. District Court for the Northern District of California (the "**District Court**"), on behalf of itself and the proposed class it represents in the Securities Litigation (the "**Class**"), together with York County on behalf of the County of York Retirement Fund, City of Warren Police and Fire Retirement System, and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund (collectively, "**Securities Act Plaintiffs**," and together with Lead Plaintiff, "**Securities Plaintiffs**"), hereby submit this objection (the "**Objection**") to the motion (the "**Motion**") [ECF No. 5972] of the Official Committee of Tort Claimants (the "**TCC**") appointed in the Chapter 11 bankruptcy cases (the "**Chapter 11 Cases**") of the above-captioned debtors in possession (the "**Debtors**") for an order granting the TCC standing to file an adversary proceeding on behalf of the Debtors' estates seeking a declaratory judgment that certain direct claims asserted in the Securities Litigation actually belong to the Debtors' estates.  In support of this Objection, Securities Plaintiffs respectfully state as follows:

## PRELIMINARY STATEMENT[1]

The Motion is a premature and baseless attempt to co-opt Securities Litigation Claims by unjustifiably mischaracterizing them as derivative claims belonging to the Debtors.  This assertion is contrived to support the TCC's implausible conclusion that the Securities Litigation Claims are among the claims that will be assigned to the Fire Victim Trust upon confirmation of the Plan and occurrence of the Effective Date.  The Securities Litigation Claims are, in fact, brought *against the Debtors* and others by defrauded investors seeking remedies for individualized losses caused by the Debtors' and Non-Debtor Defendants' fraudulent misstatements and omissions that artificially inflated the price of PG&E's securities and violated federal securities laws.  The essence of the Securities Litigation Claims attached when Class members purchased the Debtors' securities at artificially inflated prices, and the damages Class

---

[1] Capitalized terms in this Preliminary Statement but not yet defined have the meanings given thereto later in this Objection.

members suffered arise from the purchase of the security. Put differently, the TCC should not wish to inherit Debtors' only "interest" in the Securities Litigation Claims – namely, PG&E's *liability* for its own fraudulent conduct.

Nor are the Securities Litigation Claims "claims . . . relating to" or arising from the Fires under the terms of the assignment in the RSA and the Plan. Further, such assignment is yet to occur and contingent upon confirmation of the Plan and the occurrence of the Effective Date. The only connection between the Securities Litigation Claims and the Fires is that the Fires laid bare the safety risks the Debtors and Non-Debtor Defendants materially hid from investors. These concealed safety risks could, however, have been brought to light by other events, such as a whistleblower complaint or regulatory investigation. The direct and independent nature of the Securities Litigation Claims is further evidenced by the amended Plan filed after the Motion was filed. The amended Plan adds the Exchange Act Claims against the Debtors as a new class of claims *against the estates* based on the *purchase or sale* of common stock, recognizing that those claims are wholly separate and distinct from the fire-related derivative claims assigned to the Fire Victim Trust.[2]

The Securities Litigation Claims are claims *against* the estates (and others) for fraud— not fire-related derivative claims brought *for the benefit* of the estates. The Motion should be denied.

## BACKGROUND

### A.    The Securities Litigation

The initial complaint in the Securities Litigation was filed on June 12, 2018 [DC ECF No. 1]. On September 10, 2018, the District Court consolidated the Securities Litigation and appointed PERA as Lead Plaintiff and Labaton Sucharow LLP as lead counsel for the Class [DC ECF No. 62]. Pursuant to that order, Lead Plaintiff filed a second amended complaint [DC ECF No. 95] on December 14, 2018.

---

[2]    The discrete nature of other Securities Litigation Claims based upon the purchase of debt securities had already been recognized through the separate classification of those claims in class 9A.

### B.     The Chapter 11 Cases

On January 29, 2019, the Debtors filed these Chapter 11 Cases.  As a result, the Securities Litigation Claims against the Debtors remain automatically stayed pursuant to 11 U.S.C. § 362(a).  On February 15, 2019, the Debtors filed an adversary proceeding, Adv. Pro. No. 19-03006, seeking to enjoin continued prosecution of the Securities Litigation and other lawsuits against various Non-Debtor Defendants.  The Court entered an agreed order on May 1, 2019 (the "**Agreed Scheduling Order**") dismissing Lead Plaintiff from that adversary proceeding and establishing a timeline for the Debtors to file a new adversary proceeding solely against the Securities Plaintiffs and renew their request to enjoin the continued prosecution of the Securities Litigation against the Non-Debtor Defendants therein after Lead Plaintiff filed its Third Amended Complaint (the "**TAC**").

Pursuant to the Agreed Scheduling Order, Securities Plaintiffs filed the TAC, and the Debtors thereafter filed a new adversary proceeding seeking to enjoin continued prosecution of the Securities Litigation against the Non-Debtor Defendants, Adv. Pro. No. 19-03039.  Notably, neither the Debtors nor the TCC ever asserted in either adversary proceeding that the Securities Litigation Claims are derivative claims or otherwise are property of the estate.  If the Debtors or the TCC legitimately believed that to be the case, the argument would have been front and center in the preliminary injunction motions.  Having argued the contrary – namely, that continued prosecution of the Securities Litigation Claims *by the Securities Plaintiffs* would impact the Debtors' restructuring efforts and their estates *as liabilities* – the Debtors tacitly admitted that the Securities Litigation Claims are direct claims of the Securities Plaintiffs and Class members, an admission that should bind both the Debtors and the TCC.  Indeed, the Debtors later filed a motion in March 2019 seeking to enforce the automatic stay against a different plaintiff and his counsel in a shareholder derivative action asserting breach of fiduciary duty and other state law claims against certain of the Debtors' current and former directors and officers, on the basis that those claims belonged to the Debtors' estates.  *See* ECF No. 893.  Tellingly, neither the Debtors nor the TCC made any such assertions with respect to the Securities Litigation Claims until recently.

### C. Consolidation With the *York County* Action

On February 22, 2019, the Securities Act Plaintiffs filed a class action styled as *York County v. Rambo*, Case No. 19-994 (N.D. Cal.) (the "**York County Action**"), asserting claims under the Securities Act of 1933 (the "**Securities Act**") against certain of the Debtors' current and former directors and officers, as well as the underwriters of certain of the Debtors' notes offerings. On May 7, 2019, the District Court consolidated the York County Action with the Securities Litigation and authorized Lead Plaintiff to file the TAC [DC ECF No. 117].

### D. The Third Amended Complaint

On May 28, 2019, Lead Plaintiff, with the Securities Act Plaintiffs, filed the TAC [DC ECF No. 121]. The TAC asserts claims against eighteen of the Debtors' current and former directors and officers (the "**Individual Defendants**") and twenty-four investment banks that underwrote the Notes Offerings (the "**Underwriter Defendants**," and together with the Individual Defendants, the "**Non-Debtor Defendants**"). But for the imposition of the automatic stay in these Chapter 11 Cases, the Securities Litigation would proceed against the Debtors, alongside the Non-Debtor Defendants, with respect to both the Exchange Act Claims and the Securities Act Claims. The Class Claims are based solely on direct injuries to Securities Plaintiffs and Class Members as a result of the violations of the federal securities laws by the Debtors and the Non-Debtor Defendants, as alleged in the TAC.

#### 1. *Exchange Act Claims*

The TAC asserts claims under Section 10(b) of the Exchange Act, SEC Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act (the "**Exchange Act Claims**"). Among other things, the TAC alleges that from April 29, 2015 through November 15, 2018 (the "**Class Period**"), the Debtors and the Non-Debtor Defendants intentionally or recklessly misled investors about the Debtors' wildfire safety practices, including representations that the Debtors were in full legal compliance and continuing to invest in safety (as a prudent manager), notwithstanding their numerous and widespread violations of safety regulations and inadequate safety practices, thereby artificially inflating the prices of the Debtors' publicly traded securities. As information regarding the natural and probable consequences of the Debtors' long-

concealed deficient safety practices emerged between October 12, 2017 and November 15, 2018, investors were surprised, given their purchases of securities following Debtors' and Non-Debtor Defendants' numerous public statements during the Class Period touting the Debtors' compliance, safety measures, and intertwined financial health. As a direct result, the artificially inflated prices of the Debtors' securities dropped significantly. Thus, as a result of Class members' purchases of the Debtors' securities at prices impacted by misstatements and omissions of material fact set forth in detail in the TAC, the Securities Plaintiffs and other Class members have suffered significant damages. The claims asserted in the TAC arise from the purchase of the Debtors' securities by Class members; only the calculation of damages suffered by those purchasers was influenced by subsequent events. The Exchange Act Claims arise from purchases by certain stockholders following the misstatements and omissions of material fact that artificially inflated the prices of the Debtors' securities, *not* from breaches of any duties the Non-Debtor Defendants may have owed to the Debtors. The only relevance the Northern California wildfires of 2017 and 2018 (the "**Fires**") have to the Exchange Act Claims is that those Fires revealed the extent of the misstatements and omissions that form the basis for these claims.

### 2. *Securities Act Claims*

The TAC also asserts claims under Sections 11 and 15 of the Securities Act (the "**Securities Act Claims**" and, together with the Exchange Act Claims, the "**Securities Litigation Claims**"), arising from the Debtors' four public senior notes offerings on March 1, 2016; December 1, 2016; March 10, 2017; and April 2, 2018 (the "**Notes Offerings**"), in which the Debtors offered and sold approximately $4.35 billion of registered senior notes (the "**Senior Notes**"). The TAC alleges that the offering documents for the Notes Offerings contained thirty-four (34) materially false and misleading statements or omissions.

### 3. *The Class*

Investors who purchased PG&E's publicly traded securities after any of the aforementioned misstatements and omissions, and who held securities during any of the revelations regarding PG&E's imprudence and responsibility for the Fires, suffered significant,

direct, compensable losses under the federal securities laws. The Class is comprised of investors that acquired the Debtors' securities during the Class Period (regardless of whether they currently hold those securities) and suffered losses as a direct result of the Debtors' and the Non-Debtor Defendants' false statements and omissions that artificially inflated the price of the Debtors' securities. The Class is *not* defined as, or with any reference to, persons who were physically injured or whose property was damaged or destroyed by the Fires. Nor is the Class asserting claims based upon a breach of fiduciary duties, corporate waste, or any other claims based upon an injury to the Debtors. Indeed, the Debtors are defendants in the Securities Litigation.

## E. Motions to Dismiss the TAC

On October 4, 2019, after this Court denied the Debtors' motion to extend the automatic stay to the Non-Debtor Defendants [Adv. Pro. No. 19-03039, ECF No. 23], the Non-Debtor Defendants filed motions to dismiss the TAC (the "**Motions to Dismiss**") [DC ECF No. 148, 155]. On January 29, 2020, the District Court took the Motions to Dismiss under submission without oral argument [DC ECF No. 175]. The Motions to Dismiss are *sub judice* before the District Court. No defendant asserted in the Motions to Dismiss (or anywhere else) that the Securities Litigation Claims belong to the Debtors or that Securities Plaintiffs lack standing to sue. This is not surprising, because such an assertion would have been just as frivolous as the TCC's position in the Motion.

## F. Class Claims and Rule 7023 Motion

On October 21, 2019, Lead Plaintiff timely filed proofs of claim on behalf of itself and the Class (the "**Class Claims**"). Subsequently, on December 9, 2019 Lead Plaintiff filed a Motion to Apply Bankruptcy Rule 7023 to the Class Claims (the "**Rule 7023 Motion**"). The Court denied the Rule 7023 Motion and entered an order extending the bar date for Class members to April 16, 2020. Lead Plaintiff timely filed a notice of appeal from that order [ECF No. 6135].

### G.     The Plan and RSA

On December 9, 2019, the Debtors filed a Motion to approve a Restructuring Support Agreement (the "**RSA**") with the TCC, among others [ECF No. 5038].  On December 19, 2019, the Court entered an order [ECF No. 5174] authorizing the Debtors to enter into the RSA.  On September 9, 2019, the Debtors filed a Chapter 11 plan of reorganization, which has been amended from time to time.  Most recently, on March 16, 2020, the Debtors filed the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (the "**Plan**") [ECF No. 6320].  The Plan seeks, in part, to implement the agreements contained in the RSA such as assigning certain rights and causes of action to a Fire Victim Trust as discussed below.[3]

The Plan and RSA provide that upon the Effective Date, the Debtors will transfer certain "Assigned Rights and Causes of Action" to the Fire Victim Trust for the benefit of the Fire Victims.  The Plan defines the Assigned Rights and Causes of Action as:

> any and all *rights, claims, causes of action*, and defenses related thereto relating directly or indirectly to any of the Fires *that the Debtors may have against* vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management), former directors and officers of the Debtors solely to the extent of any directors and officers' Side B Insurance Coverage, and others as mutually agreed upon by the Plan Proponents and identified in the Schedule of Assigned Rights and Causes of Action.

Plan § 1.8 (emphases added).

### H.     The Motion

On February 28, 2020, the TCC filed the Motion.  The Motion asks this Court to grant the TCC standing to commence an adversary proceeding in this Court against Securities Plaintiffs seeking (a) a declaration that the Securities Litigation Claims and the Class Claims are derivative corporate claims rather than direct shareholder claims, and are property of the Debtors' estates (and thus, Assigned Rights and Causes of Action under the Plan), and (b) a preliminary and

---

[3]    Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Plan.

permanent judgment enjoining further prosecution of the Class Claims and the Securities Litigation.

On the evening of March 23, 2020, nearly a month after the Motion was filed and on the eve of the objection deadline, the Debtors filed a Stipulation between the TCC and the Debtors (the "**Standing Stipulation**") [ECF No. 6435], through which the Debtors, subject to Court approval, purport to confer standing upon the TCC to commence and prosecute the proposed Adversary Proceeding described in the Motion.[4] The Standing Stipulation provides no information concerning the Debtors' inexplicable reversal in position from their initial refusal to commence a declaratory judgment action. Nor does the Standing Stipulation explain how the prosecution of the Adversary Proceeding at this time is necessary or beneficial to the Debtors' estates where the Debtors have never before advanced these arguments despite having every opportunity and reason to do so, likely because the arguments have no merit.

## **ARGUMENT**

### I. THE MOTION IS, AT BEST, PREMATURE.

Putting aside its deficiencies on the merits, detailed below, the Motion is at best premature. Even if the Securities Litigation Claims were derivative claims related to the Fires, there still would be no legitimate reason for the TCC to seek standing to pursue a declaration to that effect at this time. Under the timeline recently ordered by the Court, confirmation of the Plan is approximately two months away. Right now, the "claims" the TCC wishes to assert derivatively (*i.e.*, the Debtors' supposed right to a declaratory judgment), as meritless as they are, belong to the Debtors' estates. If the Plan is confirmed and the Effective Date occurs, the Fire Victim Trust may then seek a declaration that the Securities Litigation Claims (including the Class Claims) belong to the Debtors pursuant to an actual assignment and thus constitute Assigned Rights and Causes of Action under the Plan. Simply waiting would obviate the need to litigate the Motion, making this superfluous Motion a waste of the estates' resources.

Much like the TCC's failed attempt to utilize the estates' resources to establish an

---

[4] For the avoidance of doubt, through this Objection, Securities Plaintiffs also object to approval of the Standing Stipulation for the same reasons the Motion should be denied.

extensive campaign seeking discovery from third parties,[5] the TCC now seeks to expend limited time and resources trying to obtain standing to litigate the scope of certain claims – an effort the Fire Victim Trust could accomplish without the preliminary step of a motion for derivative standing.

Simply put, there is no urgency that the relief requested by the Motion be decided now, especially in light of the significant number of pre-confirmation disputes that must be adjudicated prior to the legislatively mandated June 30, 2020 deadline. The parties' interests are much better served by focusing this Court's resources on Plan confirmation. The Motions to Dismiss remain pending before the District Court. Upon the Effective Date, under the current version of the Plan, a specific list of Assigned Rights and Causes of Action will be transferred to the Fire Victim Trust.[6] If the TCC actually believes the Securities Litigation Claims are derivative claims, the proper party to litigate the issue is the trustee of the Fire Victim Trust, after the Effective Date. Requiring all parties to engage in discovery and motion practice in the weeks leading to confirmation would be unnecessary, prejudicial, and burdensome to the Debtors' estates without any redeeming benefit.

## II. THE SECURITIES LITIGATION CLAIMS ARE DIRECT AND INDEPENDENT CLAIMS AGAINST THE DEBTORS AND THE NON-DEBTOR DEFENDANTS.

In an attempt to co-opt the Securities Litigation Claims, the TCC mischaracterizes them as seeking "to recover damages to the corporations: tens of billions of dollars in wildfire liabilities asserted against the Debtors, which resulted in an incidental drop in stock price." Motion at 11. In fact, Securities Plaintiffs and Class members were injured by fraudulent misstatements and omissions that inflated the price of the Debtors' securities, rather than the Fires. The *only* connection between the Securities Litigation Claims and the Fires is that the Fires laid bare the extent of the defendants' misstatements and omissions about safety. Crucially, if the Fires had occurred in the absence of any misstatements or omissions by the

---

[5] *See The Official Committee of Tort Claimants' Motion to Establish Procedures for Discovery Preceding Plan Confirmation* [ECF No. 5840].

[6] For the same reason, the TCC's proposed adversary proceeding lacks ripeness. Unless and until the Securities Litigation Claims are enumerated on the yet-undefined "Schedule of Assigned Rights and Causes of Action," the need for such a proceeding is purely speculative and cannot be adjudicated. *See* Plan § 1.8.

Debtors or the Non-Debtor Defendants, *the Securities Litigation Claims would not exist at all*, regardless of any negligence or breach of fiduciary duties by the Debtors' officers and directors.

The Securities Litigation Claims cannot be Assigned Rights and Causes of Action because (1) the Securities Litigation Claims are direct claims belonging exclusively to Securities Plaintiffs and Class members, rather than derivative claims belonging to the Debtors, and (2) regardless of whether they are derivative claims (which they are not), the Securities Litigation Claims against *current* directors and officers and underwriters do not fall within the plain terms of the Plan's assignment.

**A.    Legal standard for determining whether a claim is direct or derivative**

In determining whether a claim asserted against a corporation by a current or former investor is direct (belonging to the plaintiff itself) or derivative (belonging to and assertable by or on behalf of the corporation), "a court must ask two questions: '[w]ho suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy?'" *In re Semtech Corp. Sec. Litig.*, No. 07-7114, 2008 U.S. Dist. LEXIS 126135, at *16-17 (C.D. Cal. Dec. 15, 2008) (quotation omitted). The two types of actions are mutually exclusive: In a direct action, the right of action and recovery belongs to the investor, whereas in a derivative action, these belong to the corporation. *See Oakland Raiders v. Nat'l Football League*, 131 Cal. App. 4th 621, 650-51 (2005) (citing Friedman, California Practice Guide: Corporations ("Friedman") ¶ 6:598).

An action is derivative if "the gravamen of the complaint is injury to the corporation or to the whole body of its stock or property without any severance of distribution among individual holders, or if it seeks to recover assets for the corporation or to prevent the dissipation of assets." *Jones v. H.F. Ahmanson & Co.*, 1 Cal. 3d 93, 106-07 (1969). Shareholder plaintiffs generally bring derivative suits to recover damages for breaches of fiduciary duty that directors and officers owe *to the corporation*. *See Schuster v. Gardner*, 127 Cal. App. 4th 305, 312 (2005) (emphasis added) (citing Friedman ¶ 6.604). When the claim is derivative, the shareholder is merely a nominal plaintiff. Even though the corporation is joined as a nominal defendant in a derivative action, the corporation is the real party in interest to which any recovery generally

belongs. *Klopstock v. Superior Court* 17 Cal.2d 13, 16–21 (1941); *see also* Friedman ¶ 6.602.

A direct claim, in contrast, is maintained where the "the injury is *not incidental* to an injury to the corporation." *Jones*, 1 Cal. 3d at 107) (emphasis added). Thus, the plaintiff's claimed injury is *independent* of any injury to the corporation, and implicates a duty owed to the investor rather than the corporation. *New York City Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) *overruled on other grounds¸ Lacy v. Maricopa Cty.*, 693 F.3d 896 (9th Cir. 2012) (overruling *en banc* on unrelated issue of preservation of claims after amendment); *see also Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998) ("[T]he mere presence of an injury to the corporation does not necessarily negate the simultaneous presence of an individual injury.").[7] While separate, direct claims routinely co-exist with derivative claims. *See, e.g.*, *Semtech*, 2008 U.S. Dist. LEXIS 126135 at *22 ("The fact that [the corporation] also suffered injury is irrelevant to this case because plaintiff's claims are distinct and any injury to [the corporation] . . . is being addressed in the parallel derivative action.").

**B.     The Securities Litigation Claims are direct claims.**

**1.     Shareholders suffered a direct injury**

The Securities Litigation Claims do *not* allege that the Non-Debtor Defendants' conduct caused any harm to the Debtors themselves, much less seek to recover for any economic loss the Debtors incurred.[8]  Securities Plaintiffs do not allege that any Non-Debtor Defendants breached

---

[7]  Whether a claim is direct or derivative is generally governed by the law of the state of incorporation, and the Debtors are California companies. *Lapidus v. Hecht*, 232 F.3d 679, 682 (9th Cir. 2000). Some courts have also looked to federal law to evaluate standing questions under Section 10(b) of the Securities Exchange Act of 1934. *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011) (citing, *inter alia*, *Sanguinetti v. Viewlogic Sys., Inc.*, No. C 95 2286, 1996 WL 33967, at *7-8 (N.D. Cal. Jan. 24, 1996)). Federal decisions on the subject are relatively few, however, and the central inquiry is similar under both California and federal law, which asks "whether a plaintiff suffered an individual injury distinct from the injury to the corporation." *Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d at 398.

[8]  The analysis is even more straightforward for the Securities Act Claims. The Securities Act authorizes only *purchasers of securities* issued pursuant to a registration statement – such as Securities Plaintiffs and Class members – to sue. *See* 15 U.S.C. § 77k(a) (where a registration statement for a security contains a misstatement or omission of material fact, "any person acquiring such security" may sue). The Securities Act Claims are strict liability claims against the Debtors and essentially strict liability claims against the Non-Debtor Defendants, actionable even if the Fires never occurred at all. *See, e.g.*, *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

their fiduciary duties to the Debtors, depleted or misappropriated corporate assets, mismanaged the Debtors, or otherwise caused any harm whatsoever to the Debtors as entities. Rather, the Securities Plaintiffs seek damages under federal statutes for losses they and the Class incurred as a result of the fraudulent misstatements and omissions by the Debtors and the Non-Debtor Defendants, which artificially inflated the prices of the Debtors' securities. When those securities were purchased. Under the federal securities laws, the Debtors have no comparable cause of action, meaning the claims are not derivative, could never be brought by or on behalf of the Debtors, and thus *cannot* be property of the Debtors' estates – and, in turn, cannot be assigned to the Fire Victim Trust.

This logic is reflected in *Semtech*, where a class brought securities claims alleging a scheme by senior management to backdate corporate stock options. In rejecting defendants' argument that plaintiffs' Exchange Act claims were derivative, the district court, which concurrently presided over a derivative suit against the same corporation, held that the factual overlap was irrelevant:

> The Court concludes that plaintiff has properly alleged a direct claim against Semtech. Plaintiff is alleging a claim under Rule 10(b) and therefore federal law applies to determine whether plaintiff's claim is direct or derivative. *Here, plaintiff, and not Semtech, purchased securities at an allegedly inflated price and therefore suffered a direct injury.* Even if state law applies, the Court concludes that plaintiff's claim is direct. *Plaintiff's claim is for a distinct injury suffered by the shareholders—overpaying for artificially inflated Semtech stock. Therefore, any resulting damages from this claim belong to the shareholders who purchased stock during the class period and not Semtech. The fact that Semtech also suffered an injury is irrelevant* to this case because plaintiff's claims are distinct and any injury to Semtech from the backdating is being addressed in the parallel derivative action.

2008 U.S. Dist. LEXIS 126135, *22 (emphasis added; citation omitted); *see also Jobs*, 593 F.3d at 1022 (holding that a claim under Section 14(a) of the Exchange Act was direct, and not derivative, where it was independent of any injury to the corporation and implicated a duty of disclosure that was owed to shareholders), *overruled on other grd's¸ Lacy v. Maricopa County*, 693 F.3d 896 (9th Cir. 2012) (overruling *en banc* on unrelated issue of preservation of claims after amendment).

Here, there is a comparably distinct injury suffered by Class members alone—namely, direct economic loss caused by their purchases, at fraudulently inflated prices, of PG&E securities leading to decreases in value of those securities, or sales of those securities at a loss. Indeed, the Class *is not* defined as "all shareholders," but rather as only the subset of securities purchasers who (like PERA) made their purchases after one of the nineteen distinct false and misleading statements were made. *See* TAC ¶¶ 321, 477, Motion Ex. 1 [Dkt. 5973-1]. In contrast, the derivative plaintiffs claim damages predicated on separate injuries that PG&E's directors and officers caused to PG&E *itself*,[9] which is the hallmark of derivative actions—a fact the TCC cannot help but acknowledge even while misreading the derivative damages allegations. Class members suffered a direct harm independent of any harm to the corporation – namely, they were defrauded **by** the corporation and others, resulting in economic loss to their own assets. Other investors, who purchased securities before the false and misleading statements were made or who sold their securities before the first fraud-related decline in value, were *not* harmed and are *not* Class members. As such, the fraud did not harm the company or investors as a whole as the TCC nakedly asserts. *See* Motion at 7-9. Instead, the Securities Litigation concerns only victims of fraud that incurred economic losses directly to their own pocketbooks.

### 2. The pled theory of loss causation in the Securities Litigation relies on exposure to fraud rather than the occurrence of the Fires.

For the same reasons, the TCC is wrong when it contends that the Securities Litigation "ties every drop in stock price . . . to wildfire liabilities asserted against the Debtors." Motion at 12 (emphasis deleted). To the contrary, as detailed below, the price drops are tied to false statements Debtors and other the Non-Debtor Defendants made to the investing public. *See Smith Barney*, 765 F. Supp. 2d at 399 (section 10(b) plaintiffs "suffered a direct injury" where they "claim[ed] that they were fraudulently induced to purchase shares . . . based on material misrepresentations").[10]

---

[9] *See, e.g.*, Warren Compl., Motion Ex. 2 [Dkt. 5973-2], ¶¶ 2, 6, 12, 69 (alleging injuries and loss *to the Debtors* as a result of breaches of fiduciary duty, corporate waste, and unjust enrichment).

[10] The Securities Act Plaintiffs similarly plead damages caused by the declines in value of PG&E notes as PG&E's misconduct was further revealed to the market. TAC ¶¶ 504-505, 701.

The TAC explicitly pleads that the drops in the value of PG&E's publicly traded securities occurred as investors learned of PG&E's imprudence and hence inability to recoup under California's inverse condemnation law—rather than the mere fact of the Fires. The first decrease alleged in the Complaint occurred on October 12, 2017, days after the North Bay Fires began, when the public learned of a litigation hold letter from the CPUC indicating that PG&E likely bore responsibility for the North Bay Fires. It is alleged that this revealed numerous of Defendants' statements about safety were false, unconnected to the fires themselves. TAC ¶¶ 328-30. Similarly, the next alleged drop in PG&E's stock price, on October 13-16, 2017, occurred when PG&E issued an SEC filing that further led investors to believe that PG&E's imprudence would increase the extent to which the company would have to bear the financial impact of losses (as opposed to rate payers). *Id.* ¶¶ 335-338. And the decreases on May 25-29, 2018 (fourth alleged stock drop event) occurred when Cal Fire confirmed PG&E's violation of safety laws, revealing the falsity of PG&E's promises of compliance in many of the nineteen alleged false statements. *Id.* ¶¶ 346-51. The same was true of Cal Fire's further disclosures to the same effect on June 8, 2018 (the fifth alleged stock drop event). *Id.* ¶¶ 353-54. Similarly, the sixth through ninth alleged decreases were precipitated by Debtors' fraud because investors incurred losses on revelations that PG&E's imprudence – precisely what Defendants fraudulently concealed from investors – likely contributed to the Camp Fire. *Id.* ¶¶ 364-71.

Lead Plaintiff's damages theory is entirely consistent with the general discussion above concerning direct actions: the Debtors and Non-Debtor Defendants misrepresented or omitted the very facts that were a substantial factor in causing investors' economic loss. *See Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013) (holding that a Rule 10b-5 "plaintiff can satisfy loss causation by showing that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss.") (quotations and emphasis omitted). While the TAC sporadically references harm to PG&E (including its bankruptcy), *see, e.g.*, TAC ¶¶ 19, 33, 135, 177-179, that is not the basis of the asserted damages incurred by the Class. Rather, the damages to the Class were independently caused by nine distinct, fraud-related declines in value of PG&E securities. *Id.* ¶¶

321-390.  Accordingly, the Securities Litigation Claims are direct claims *against* the Debtors, not derivative claims belonging to the Debtors.

### 3. The cases cited by the TCC are inapposite here.

#### (a) *Schuster v. Gardner*

The TCC's heavy reliance on *Schuster v. Gardner*, an inapposite case, shows the error of the TCC's position.  The TCC misreads *Schuster* when asserting that the Securities Plaintiffs' "entire class action theory is precisely what was rejected in *Schuster*." Motion at 13. Far from asserting direct claims like the Securities Plaintiffs' *under the federal securities laws*, the plaintiff in *Schuster* brought an explicit "action for breach of fiduciary duty" and styled it as a class action. *See Schuster*, 127 Cal. App. 4th at 309 (first sentence of opinion)).  Indeed, the *Schuster* plaintiff even alleged this claim under an unusual theory (based on misrepresentations "to induce forbearance—to induce persons not to take action" *i.e.,* as a "holder action"), and attempted to argue that such a cause of action was a "direct claim[] under both California and Delaware law." *Id.* at 311-14.  Here, in contrast, there is no claim for breach of fiduciary duty in the TAC, but rather federal law securities claims based on the *purchase or sale* (not holding) of securities, much less any claim under Delaware or California law.  *See* TAC ¶321 ("As a result of their purchases of PG&E's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.")).[11] While it is true that *Schuster* held that the gravamen of plaintiff's breach of fiduciary duty claim "was harm to Peregrine," the corporation (*id.* at 313), that conclusion was driven by the fact that the plaintiff attempted to assert breach-of-duty claims on behalf of all shareholders *as holders*, none of which accurately describes allegations in the TAC.

#### (b) *In re Touch America Holdings, Inc.*

The TCC's assertion that the Chapter 11 case of *In re Touch America Holdings, Inc.*, 401

---

[11] The TCC wrongfully points to this "Loss Causation" section of the TAC in its Motion, but neglects this and other clear allegations which predicate the claims on the *purchase or sale* of securities at certain times – rather than the body of stock at a whole; the TCC opts instead to take the final alleged paragraph (¶390) of this section out of context in its Motion.  *See* Motion at 12 (quoting ¶390 and referencing "twenty pages," namely, the Loss Causation section).

B.R. 107 (Bankr. D. Del. 2009), is "an identical situation" to the present case, *see* Motion at 14, is yet another mischaracterization. *Touch America* arose in the context of a Chapter 11 bankruptcy case and involved a lawsuit brought by a group of shareholders – but the similarities end there. The central holding in *Touch America* was that "[a]though plaintiff characterizes the action as a deprivation of the individual shareholders' voting rights, in essence, plaintiff's claim is that the Individual Defendants *breached their fiduciary duty and did not act in the best interest of the corporation* when they sold the assets without shareholder approval." *Id*. at 123 (emphasis added). The *Touch America* plaintiff's allegations, and the court's holding, are not relevant to the Securities Litigation Claims. The Securities Plaintiffs do not allege that the Debtors or Non-Debtor Defendants deprived them of corporate governance rights of all securities holders *as holders* or acted in a manner that damaged the Debtors generally. Rather, the Securities Litigation Claims are premised on the defendants' violations of federal securities laws that specifically provide for redress that *only* securities purchasers, such as Securities Plaintiffs and the Class, can pursue *from*, not on behalf of, the Debtors.

The TCC also fails to mention that, concurrently with the derivative litigation in *Touch America*, a separate federal securities class action alleging violations of the federal securities laws, like the Securities Litigation here, was pending against the debtor's officers and directors. *See McGreevy et al. v. Montana Power Company*, Montana Second Judicial District Court, CV-03-01-DVM. The separate derivative action relating to *Touch America* alleged similar facts to those underlying the direct claims asserted in the securities litigation. *See id.*, Docket No. 2-4. The securities litigation went forward independently of the derivative action, without any attempt to improperly recharacterize the securities claims, and was ultimately settled for the benefit of the company's injured investors (as opposed to all shareholders).

Tellingly, neither *Schuster* nor *Touch America* decided that claims based on the purchases and sales of securities pursuant to Sections 10 and 20(a) of the Exchange Act or Sections 11 and 15 of the Securities Act – those asserted in the Securities Litigation here – are derivative claims. Indeed, the TCC does not cite *one case* with such a holding.

**C.    The TCC's Additional Arguments Are Meritless.**

**1.    Loss of market capitalization directly injured Class members.**

The TCC argues that the Securities Litigation actually alleges "damage to the corporation's overall market value, and incidental damages to shareholders."  Motion at 12 (citing TAC ¶ 390).  This is a purely semantic distinction:  Damage to PG&E's "overall market value" in this context simply means loss of market capitalization, which is a species of damages to Class members that is directly recoverable under federal securities laws.  *See, e.g.*, *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 937 n.1 (9th Cir. 2018) (observing that "Toshiba's stock price declined by more than 40 percent, a loss of $7.6 billion in market capitalization"); *cf. In re Amyris, Inc. S'holder Derivative Litig.*, No. 17-04719, 2018 WL 1242075, at *1 (N.D. Cal. Mar. 9, 2018) (dismissing complaint asserting breach of fiduciary duty for failure to disclose revenue shortfall, causing stock drop that "eras[ed] almost $614 million in market capitalization").

**2.    The Class Period is defined by Debtors' fraudulent conduct.**

The TCC questions the propriety of the Class Period alleged in the TAC, suggesting that the start and end dates were chosen to capture all of the Securities Plaintiffs' trades in PG&E securities, as opposed to the timing of the alleged false statements.  Motion at 13.  Even if the TCC were correct (and, as discussed below, it is not), the Class Period has nothing to do with the standard for whether claims are direct or derivative.  In *Schuster*, 127 Cal. App. 4th at 314, on which the TCC relies, the plaintiff argued that his complaint was based on "direct 'holder actions' for breach of fiduciary duty to shareholders."  Indeed, after an initial complaint was removed to federal court because the complaint was preempted by the Securities Litigation Uniform Standards Act of 1998, the *Schuster* plaintiff obtained a remand by modifying the purchaser class to a holder class.  *Id.* at 310.  The court concluded that regardless of the class definition, the underlying claims were derivative because the complaint alleged mismanagement and harm to the company.  *Id.* at 316.  Here, the Securities Litigation Claims are based on misstatements and omissions, not mismanagement or breaches of fiduciary duty, and are direct in nature regardless of the Class Period.

Moreover, the TCC is mistaken.  April 29, 2015 is the start date of the Class Period

because that is when the first materially false and misleading statement occurred. TAC ¶ 194; *see* 28 U.S.C. § 1658(b). PERA alleged the same start date in the now-superseded consolidated and second amended consolidated complaints, neither of which named City of Warren (or York County) as a plaintiff. The Class Period ends with the date of the final loss in share value caused by the removal of fraud-related inflation from the share price. TAC ¶ 386. The second amended consolidated complaint, which again did not name York County (or City of Warren) as a plaintiff, also alleged the same November 15, 2018 end date.

### 3. The TCC's argument about Misstatement No. 1 is incorrect and irrelevant.

Lead Plaintiff disputes the TCC's contention that the April 29, 2015 alleged false statement "is actually true" when taken in context. Motion at 14. First and foremost, that is an issue of fact for the District Court to decide in the Securities Litigation. But even if the District Court were to dismiss this one statement for lack of falsity, that would not transform the Securities Litigation Claims into derivative claims under the *Pareto* case, on which the TCC wrongly relies. *See id.* In *Pareto*, the court found that the claims were derivative because the case was about an unsuccessful bank merger, as opposed to a fraud on the market. The alleged misrepresentations by the bank's directors in *Pareto* did not turn otherwise direct claims into derivative claims. *See* 139 F.3d at 700. Conversely, the "loss of stock value" suffered by all investors resulting from a corporate restructuring that abrogated their voting and appraisal rights does not suggest that the Securities Litigation Claims are actually derivative claims. *See In re Touch Am. Holdings, Inc.*, 401 B.R. at 120-21; Motion at 14-15.

In sum, the Securities Litigation Claims – including the Class Claims asserted *against the Debtors* – are direct claims held by Class members for their own account, *not* derivative claims held by the Debtors and asserted for the benefit of the Debtors or their assignees.

### D. Regardless of whether the Securities Litigation Claims are derivative claims, they are not "claims . . . relating to" the Fires and thus cannot be Assigned Rights and Causes of Action under the Plan and RSA.

Pursuant to the Plan, if confirmed, only derivative "claims . . . relating directly or indirectly to any of the Fires," would be assigned to the Fire Victim Trust. Plan § 1.8. In an attempt to shoehorn the Securities Litigation Claims into the definition of Assigned Rights and

Causes of Action, the Motion further mischaracterizes the Securities Litigation Claims as being "claims . . . relating to" the Fires. While the Fires are relevant to the Securities Litigation Claims in the sense that the Fires laid bare the extent of the misrepresentations and omissions that form the basis of the Securities Litigation Claims, the Securities Litigation claims themselves are not *claims related to* the Fires.

As discussed above, the Securities Litigation Claims arose directly from misstatements and omissions by the Debtors and Non-Debtor Defendants that artificially inflated the price of the Debtors' securities. Thus, the Securities Litigation Claims existed well before the Fires, and would have been compensable regardless of any losses sustained by the Debtors as a result of the Fires. The *only* link between the Securities Litigation Claims and the Fires is that the Fires laid bare the extent of the Debtors' and Non-Debtor Defendants' misstatements and omissions. Any number of other events could have yielded the same result, such as a whistleblower complaint, a regulatory investigation, an internal investigation, a voluntary corrective disclosures, a violation of PG&E's criminal probation, or less-destructive wildfires occurring. In each case, PG&E's reputation as a prudent manager would have been undermined, and investors would have incurred losses as the market came to understand what PG&E's imprudence would mean for any kind of disaster it caused, causing the value of its securities to decline accordingly. The mere fact that the Fires revealed the extent of the Debtors' misstatements and omissions in violation of the federal securities laws does not make the statements and omissions "claims . . . related to" the Fires that occurred thereafter. As such, the Securities Litigation Claims are not "claims . . . related to" the Fires and clearly fall outside the scope of the Assigned Rights and Causes of Action under the Plan, irrespective of whether they are direct or derivative.

**E.      The Plan Clarifies that the Securities Litigation Claims Are Not Assigned to the TCC.**

The Plan, the current version of which was filed after the Motion, makes clear that the Securities Litigation Claims are claims *against* the estates and accordingly are not assigned to the TCC. In response to Securities Plaintiffs' objection to the proposed disclosure statement for the Plan, the updated Plan adds one class of claims against PG&E Corporation: Class 10A-II

"HoldCo Rescission or Damages Claims." Plan §§ 3.2., 4.14. HoldCo Rescission or Damages Claims are defined as "any Claim *against [PG&E Corporation]* subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising or related to the common stock of [PG&E Corporation]." *Id.* § 1.108 (emphasis added). The Exchange Act Claims, which are subordinated pursuant to section 510(b) of the Bankruptcy Code, are Class 10A-II HoldCo Rescission or Damages Claims – by definition, claims *against PG&E Corporation* that cannot be assigned to the Fire Victim Trust through the Plan.[12]

It therefore unquestionably follows that the Securities Litigation Claims are also direct claims against PG&E's *current* officers and directors: Julie M. Kane, Fred J. Fowler, and Eric D. Mullins.[13]

### III. THE TCC HAS NOT MET ITS BURDEN TO OBTAIN DERIVATIVE STANDING, DESPITE THE NEWLY MINTED STANDING STIPULATION.

The Ninth Circuit's "bankruptcy appellate panel has consistently held that a creditor obtains 'derivative standing' to exercise powers that are otherwise reserved to the trustee . . . when the court authorizes a creditor to do so *for the benefit of the estate*." *In re Godon, Inc.*, 275 B.R. 555, 565 (Bankr. E.D. Cal. 2002) (emphasis added). The Motion provides no explanation or evidence demonstrating that the adversary proceeding the TCC seeks to commence would benefit the Debtors' estates in any way – presumably because, for the reasons discussed above, the TCC cannot prevail in the declaratory judgment action it seeks standing to bring. This lack of support alone is fatal to the Motion, even where the Debtors have consented to a grant of derivative standing. *In re Spaulding Composites Co., Inc.*, 207 B.R. 899, 904 (9th Cir. BAP 1997) ("So long as the *bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial*, allowing a creditors' committee to represent the

---

[12] Furthermore, the Securities Litigation Claims include "Utility Subordinated Debt Claims," separately classified as Class 10B claims under the Plan. For the same reasons, this classification of additional Securities Litigation Claims as claims *against* PG&E prevents their assignment as derivative claims *owned by* PG&E.

[13] Were this Court to hold that a subset of the Securities Litigation Claims were derivative claims to be pursued by the Fire Victim Trust against *former* officers and directors (as the TCC has requested), while the Securities Plaintiffs continue to prosecute the same Securities Litigation Claims with the same statutory foundation against *current* officers and directors, chaos would ensue.

estate presents no undue concerns") (emphasis added). Accordingly, the Motion should be denied.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Securities Plaintiffs respectfully request that the Court deny the Motion and decline to approve the Standing Stipulation.

Dated: March 25, 2020          Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
**MICHELSON LAW GROUP**

By:    */s/ Randy Michelson*
Randy Michelson (SBN 114095)

*Bankruptcy Counsel to Lead Plaintiff and the Class*

- and -

**LABATON SUCHAROW LLP**

*Lead Counsel to Lead Plaintiff and the Class*

- and -

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**

*Liaison Counsel for the Class*

- and -

**ROBBINS GELLER RUDMAN & DOWD LLP**

*Counsel for the Securities Act Plaintiffs*

- and -

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT A**
**COUNSEL**

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin *(pro hac vice)*
Andrew Behlmann *(pro hac vice)*
Scott Cargill
Colleen Maker
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone   973-597-2500
Facsimile    973-597-2333
metkin@lowenstein.com
abehlmann@lowenstein.com
scargill@lowenstein.com
cmaker@lowenstein.com

**MICHELSON LAW GROUP**
Randy Michelson, Esq. (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone   415-512-8600
Facsimile    415-512-8601
randy.michelson@michelsonlawgroup.com

*Bankruptcy Counsel to Lead Plaintiff and the Class*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Carol C. Villegas
David J. Goldsmith
Jeffrey A. Dubbin (SBN 287199)
Aram Boghosian
140 Broadway
New York, New York 10005
Telephone   212-907-0700
tdubbs@labaton.com
cvillegas@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**
James M. Wagstaffe (SBN 95535)
Frank Busch (SBN 258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone   415-357-8900
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Liaison Counsel for the Class*

*Lead Counsel to Lead Plaintiff and the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Darren J. Robbins (SBN 168593)
Brian E. Cochran (SBN 286202)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone   619-231-1058
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (SBN 200089)
Kenneth J. Black (SBN 291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone   415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone   313-578-1200
tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act Plaintiffs*

# EXHIBIT B
## RESERVATION OF RIGHTS

This Objection, and any subsequent pleading, appearance, argument, claim, or suit made or filed by Lead Plaintiff, either individually or for the Class or any member thereof, do not, shall not, and shall not be deemed to:

    **a.**    constitute a submission by Lead Plaintiff, either individually or for the Class or any member thereof, to the jurisdiction of the Bankruptcy Court;

    **b.**    constitute consent by Lead Plaintiff, either individually or for the Class or any member thereof, to entry by the Bankruptcy Court of any final order or judgment, or any other order having the effect of a final order or judgment, in any non-core proceeding, which consent is hereby withheld unless, and solely to the extent, expressly granted in the future with respect to a specific matter or proceeding;

    **c.**    waive any substantive or procedural rights of Lead Plaintiff or the Class or any member thereof, including but not limited to (a) the right to challenge the constitutional authority of the Bankruptcy Court to enter a final order or judgment, or any other order having the effect of a final order or judgment, on any matter; (b) the right to have final orders and judgments, and any other order having the effect of a final order or judgment, in non-core matters entered only after de novo review by a United States District Court judge; (c) the right to trial by jury in any proceedings so triable herein, in the Chapter 11 Cases, including all adversary proceedings and other related cases and proceedings (collectively, "Related Proceedings"), in the Securities Litigation, or in any other case, controversy, or proceeding related to or arising from the Debtors, the Chapter 11 Cases, any Related Proceedings, or the Securities Litigation; (d) the right to seek withdrawal of the bankruptcy reference by a United States District Court in any matter subject to mandatory or discretionary withdrawal; or (e) all other rights, claims, actions, arguments, counterarguments, defenses, setoffs, or recoupments to which Lead Plaintiff or the Class or any member thereof are or may be entitled under agreements, at law, in equity, or otherwise, all of which rights, claims, actions, arguments, counterarguments, defenses, setoffs, and recoupments are expressly reserved.

For the avoidance of doubt, Lead Plaintiff, on behalf of itself and the Class, does not, and will not impliedly, consent to this Court's adjudication of the claims asserted against any Non-Debtor Defendants now or hereafter named in the Securities Litigation.