William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Claimant and*

*Party to California Public Utilities Commission Proceeding I.19-09-016 to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19- 30088.*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*


FILED
MAR 26 2020
UNITED STATES BANKRUPTCY COURT
SAN FRANCISCO, CA

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

In re:

PG&E CORPORATION,

-and-

PACIFIC GAS AND ELECTRIC COMPANY,
                Debtors.

☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company
☑ Affects both Debtors

\* *All papers shall be filed in the lead case, No. 19-30088 (DM)*

Bankr. Case No. 19-30088 (DM)
Chapter 11
(Lead Case)
(Jointly Administered)

**MOTION OF WILLIAM B. ABRAMS FOR RECONSIDERATION AND RELIEF FROM THE ORDERS PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND BANKRUPCTY RULE 9024 APPROVING PROPOSED DISCLOSURE STATEMENT FOR DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION [Dkt. 6340]**

1. William B. Abrams, Claimant and Sonoma County Resident ("Abrams"), hereby submits this motion for reconsideration and relief from "Order (I) Approving Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization; (II) Approving Form and Manner of Notice of Hearing on Proposed Disclosure Statement; (III) Establishing and Approving Plan Solicitation and Voting Procedures; (IV) Approving Forms of Ballots, Solicitation Packages, and Related Notices; and (V) Granting Related Relief (the "Disclosure Statement Order") [Dkt. 6340, 6396] given the nature of the recent Tort Claimant Committee resignations and the supplements to disclosure statements that were filed after the order was issued. These specific supplements include the "supplements to disclosure statements for debtors' and shareholder proponents' joint chapter 11 plan of reorganization" (the "Supplements") [Dkt. 6448] and the "Notice of Filing of Exhibit A (Updated Financial Projections) to [Proposed] Supplement to Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" ("the updated financial projections") [Dkt. 6480].

**Preliminary Statement**

2. The nature of the TCC resignations, the supplements to the disclosure statement and the updated financial projections that were provided by the Debtors leave the disclosure statement fatally flawed given that the order was based on an incomplete and misleading record. These issues if left unresolved through reconsideration and relief of the disclosure statement order will serve to force an unjust and ill-informed vote for victims. Moreover, the Debtors and the Tort Claimant Committee (TCC) have chosen to supplement the disclosure statement with imbalanced information to support a "yes" vote rather than resolve the trust agreement and registration rights agreement so that victim claimants can make an informed decision. The process and procedures outlined to (1) provide insubstantial and unsubstantiated disclosures and then (2) solicit votes from claimants followed by (3) resolution of trust agreement and registration rights agreement is manifestly unjust and will only serve to victimize the victims again through this process.

## Argument

3. **PLEASE TAKE NOTICE** that on March 10, 2020 on behalf of the Debtors, Mr. Karotkin stated *"In fact, some people put in amounts, I think... for liquidated amounts of something like 576 billion dollars"* and went further to state *"Obviously we have done our own internal analysis, as to what we believe the liability is"*.[1] So, given that this analysis exists why has it not been provided to victims so that they can understand the range of settlement and make an informed decision?

4. **PLEASE TAKE FURTHER NOTICE** that on March 10, 2020 Your Honor asked *"what is the definition of "full""* and in response Mr. Karotkin stated *"Payment of the claims ultimately allowed"*. Similarly, Mr. Johnson, Chief Executive Officer of PG&E Corporation testified on February 25, 2020 at the California Public Utilities Commission (CPUC) as to what he defined as "fully" and stated *"that the claims are paid according to what the bankruptcy court and all the committees and everybody else agrees is "full paid"*.[2]

5. **PLEASE TAKE FURTHER NOTICE** that in the hearing on March 24, 2020 it was disclosed that the Victim Trust Agreement and the Registration Rights Agreement has significant material matters that are not yet determined and still being negotiated. These issues were known by core parties at the time the disclosure statement was proposed but not introduced as part of the record. These still unresolved matters include how much and when victims will be compensated. Even general guidelines to how the victim trust will be managed and how the related stock will be managed on behalf of the victims is NOT being disclosed prior to vote solicitation.

---

[1] March 10, 2020 US Bankruptcy Court Hearing, 10am Transcript, Pg. 41-42
[2] California Public Utilities Commission, I.19-09-016, February 25, 2020, Mr. Johnson Testimony, pg. 133 (lines 3-6)

6. When will the initial funds be available through the trust? If not until 2021, will this be contingent on wildfire risks, company insolvency and prioritization of other settlements? If PG&E files for Chapter 7 will the provisions within the trust agreement still hold? How long will the trust be forced to hold the stock before it is sold "over time"? Is that one year, three years or ten years? Will victims be forced to hold the stock when other shareholders sell because of perceived stock devaluation and increased risk? How much will the company be able to dilute the stock and affect the value of the victim shares?

7. These are not far removed questions but expose material issues that go to the heart of what needs to be disclosed to victims given that no range of settlement has been provided as a basis for a vote. Keep in mind that these are very real and likely implications. Consider that Mr. Johnson testified on February 25, 2020 that his expectation was that *"Hedge funds… I would expect after we exit and refinance, that most of them would exit the stock"*.[3] PG&E's ability to attract new traditional investors is likely to be significantly impaired when these hedge funds leave as they will be looking for new investment at a time of increased risk and increasing liabilities for PG&E. If victims will be asked to hold stock while others sell, these risks need to be clearly defined in the disclosure statement. These intentions of PG&E executives were known by the Debtors and the TCC at the time of the disclosure statement hearing but not made part of the record and not incorporated into the disclosure statement.

8. Indeed, given this order, victims are being asked to vote FIRST and then try to negotiate what and when payments will be made as part of the settlement. Describing a claims resolution process without dates, dollars or a registration rights agreement is ineffectual and largely irrelevant. Did the bondholders, the insurance companies and/or other claimant classes leave these items to chance for after their vote? NO. These savvy investors would never agree to that imprudent course and understand that they would have ZERO leverage to negotiate terms after the vote. Only the victims are being asked to vote first and resolve material matters later. Asking the victims to do this can only be described as manifestly unjust.

---

[3] California Public Utilities Commission, I.19-09-026, February 26, 2020, Mr. Johnson Testimony, pg. 211 (lines 12-16)

9. Furthermore, it is clear from the TCC Restructuring Support Agreement (RSA) and recent resignations from the Tort Claimant Committee (TCC) that the attorneys representing victims are significantly impaired regarding their negotiations with the Debtors on behalf of their clients and significantly impaired from articulating the risks associated with this plan. These facts make it more of an imperative to ensure that the disclosure statement fully articulates the risks with complete resolution of the trust agreement and the registration rights agreement BEFRORE ballots are sent to victims asking them to vote on the plan. In a letter to the United States Trustee, Chief Kirk Trostle indicated that he was compelled to resign from the TCC because *"PG&E's reorganization plan is deeply flawed and very risky for all fire victims."* and went onto state that *"This resignation will allow me to remove the chains our TCC counsels' opinion has put me on so I can freely and publicly advocate in the fire victims' best interests"*.[4] The disclosure statement certainly did not describe any provisions of the plan as anything close to "deeply flawed" or "very risky". Clearly, these problems with the plan were known by members of the TCC at the time of the disclosure statement hearing but members were not free to express those views and those deep concerns for Your Honor to consider. In light of these and other recent revelations, the court should reconsider the disclosure statement order.

10. **PLEASE TAKE NOTICE** that on March 24, 2020 the Debtors filed the "supplement to disclosure statement for debtors' and shareholder proponents' joint Chapter 11 plan of reorganization" [Dkt. 6448]. This supplement did outline Governor Newsom's much appreciated and welcome position on the plan of reorganization. However, this Debtor supplement did NOT articulate the implications of the Governor's directives on the plan, the victim trust and related recourse. If PG&E is unable or unwilling to meet these commitments and obligations to the Governor and the State of California, where does this leave the victims and their trust agreement? How the victim trust will be prioritized if the Governor exercises the options he describes in his statement is left unaddressed in this supplement. The assumption is that this is yet another piece left to be negotiated AFTER victims are asked to vote on the plan. That should not be considered appropriate especially given the context and other issues described in this motion.

---

[4] See Attached Letter to Timothy S. Laffredi, Assistant United States Trustee from Chief Kirk Trostle, March 24, 2020

11. **PLEASE TAKE FURTHER NOTICE** that on March 24, 2020 the Debtors filed the "Notice of Filing of Exhibit A (Updated Financial Projections) to [Proposed] supplement to disclosure statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization" [Dkt. 6480]. This supplement describes added "securitization transactions" but does not discuss how securitization for other parties may or may not impact the victims' security relative to their trust. Additionally, this supplement describes other "fines", "penalties" and "commitments" which apparently will be paid out of the victim trust. However, this supplement does not describe the PG&E criminality associated with these fines and penalties. Namely, PG&E has agreed to plead guilty to 84 counts of manslaughter. The notion that victims of these crimes who are also claimants in this proceeding will not care that PG&E intends to have their fund cover the penalties associated with the criminal behavior that was perpetrated against them is outrageous. The fact that PG&E does not see the moral and ethical implications of this should be disconcerting to the court and the omission of the substance of the criminal plea alone should be a strong basis for reconsideration of the disclosure statement order.

12. Beyond these immediate ethical issues, the implications of this growing pattern of PG&E criminality and what it means to the viability and solvency of the company needs to also be considered by victims who are being asked to be shareholders through this vote. Through all of these unethical and criminal activities, it is important to note that the company code of ethics has not been revised since 2013 and the Chief Ethics and Compliance Officer for the Company will remain in her position upon exit from bankruptcy. These issues are not immaterial as they go to the heart of how the company will operate and whether or not it will operate in a prudent manner to protect the victim trust and associated investment.

### Conclusion

13. Clearly, there have been a number of new revelations that demonstrate the need for reconsideration and relief from the disclosure statement order. The nature of the TCC resignations, the incomplete/distorted supplements and the lack of description regarding the added criminal penalties are just some of these issues. It is important to understand that these and other material matters were largely known by core parties even if some were not completely resolved and should

have been discussed on the record during the disclosure statement hearing on March 10, 2020. Unfortunately, the Debtors and the TCC did not choose to present these material issues to the court on this date or when the supplements were considered on March 25, 2020 leaving the court without a satisfactory record and basis for the ruling. I respectfully request that Your Honor reconsider the disclosure statement order given the imprudent path it would set. Simply stated, asking victims to vote YES to the plan and then asking the TCC and the Debtors to negotiate material terms of the trust agreement is impractical and manifestly unjust.

Dated: March 26, 2020

Respectfully submitted,

/s/ William B. Abrams
William B. Abrams
Claimant