Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br>**PG&E CORPORATION**<br>-and-<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>      **Debtors.**<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>■ Affects both Debtors<br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**REPLY BRIEF OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN SUPPORT OF ITS MOTION FOR STANDING TO PROSECUTE CLAIMS OF THE DEBTORS' ESTATES**<br><br>**Hearing**<br>Date: April 7, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: Courtroom 17<br>   450 Golden Gate Ave., 16th Fl.<br>   San Francisco, CA 94102<br><br>**Objection Deadline: March 25, 2020**<br>**Reply Deadline: March 31, 2020** |

# **TABLE OF CONTENTS**

DISCUSSION .................................................................................................................................. 2

    A.    The TCC's Actions Are Not Merely Timely, They Are a Necessity ...................... 2

        1.    The Pending Mediation Threatens Insurance Coverage for Fire Victims ................................................................................................... 2

        2.    The Shareholder BK Claims Threaten the Debtors' Equity Backstop ........ 5

    B.    Why Does the TCC Say the Pending Action Is Not a Valid, Direct Securities Action? ................................................................................................................ 5

    C.    The Effort to Distinguish Touch America Is Mistaken .......................................... 10

    D.    The Positions of the Debtors and UCC Support the Requested Relief ................. 11

CONCLUSION ............................................................................................................................. 12

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Brockton Ret. Sys. v. Avon Prods.*,
  2014 U.S. Dist. LEXIS 137387, 2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014) ...................... 8

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
  412 F. Supp. 3d 206 (E.D.N.Y. 2019) ............................................................................... 9

*Continental Cas. Co. v. Wendt*,
  205 F.3d 1258 (11th Cir. 2000) ........................................................................................ 3

*Cottonwood P'ship, L.L.P. v. Kivisto (In re SemCrude L.P.)*,
  2012 U.S. Dist. LEXIS 163236 (D. Del. November 15, 2012) ........................................ 5

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2nd Cir. 2009) ....................................................................................... 8, 9

*Eureka Federal Sav. & Loan Asso. v. American Casualty Co.*,
  873 F.2d 229 (9th Cir. 1989) ........................................................................................... 4

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005) ............................................................................. 8

*La. World Exposition, Inc. v. Fed. Insurance Co. (In re La. World Exposition, Inc.)*,
  832 F.2d 1391 (5th Cir. 1987) ......................................................................................... 1

*Meglolia v. Maxwell*,
  293 B. R. 443 (N. D. Ill. 2003) ........................................................................................ 5

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) ...................................................................................... *passim*

*Williams v. McGreevey (In re Touch America Holdings, Inc.)*,
  401 B.R. 107 (Bankr. D. Del. 2009) ............................................................................. 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The TCC[1] hereby files this reply brief in support of its Motion for entry of an order granting the TCC standing to file a complaint in substantially the form attached to the Motion, and in response to the Opposition (the "Opposition") filed by PERA.

The standard that applies to the TCC's Motion is whether it has presented a colorable claim to protect the interests of Fire Victims, not whether it has proven by motion that the Shareholder Complaint fails to plead valid securities claims.[2] The latter issue will be presented in a future motion for summary judgment, and is summarized in the Motion, and below, to demonstrate the colorable nature of the TCC's proposed complaint. Where subordinated former securities holders are attempting to recover insurance proceeds that are intended by a debtor's plan to be available for payment to unsecured creditors, an injunction is appropriately issued. That colorable claim for injunctive relief, alone, is all that is necessary to demonstrate the appropriateness of standing. The Motion is timely, as there is an ongoing mediation ordered by this Court that threatens to dilute or destroy remaining insurance coverage for the benefit of Fire Victims.

The Opposition presents arguments that are neither relevant to this standard, nor applicable to the arguments of the TCC. The TCC is **not** arguing that a **properly** pleaded securities claim for damages to a discrete group of securities holders caused by actionable false statements that materially changed the information available to potential investors could be a derivative claim. Rather, the TCC is arguing that the Shareholder Complaint does not plead such claims. It does not properly plead valid securities claims because no reasonable investor could have ignored the reality of the Butte Fire and its causation by vegetation management failures, ignored the reality of statewide states of emergency pertaining to wildfire risks, ignored the North Bay Fires and their causation by vegetation management failures, ignored the billions in liabilities asserted against the Debtors arising from wildfires, and ignored the declining stock price, and relied instead on puffery in press releases to justify safe investments in PG&E securities, or that such puffery could have had the effect of "inflating" PG&E's stock value despite the impact of

---

[1] Capitalized terms not defined herein carry the meaning ascribed to them in the Motion.
[2] *La. World Exposition, Inc. v. Fed. Insurance Co. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987) (requiring showing "that the claim be colorable").

actual wildfires. Ongoing promises in press releases of regulatory compliance do not state securities claims when they are made in a real-world context that renders the statements nothing more than puffery and public relations. When those baseless allegations of "false statements" are disregarded under applicable federal securities law, the complaint that remains is a very detailed complaint alleging mismanagement that caused billions of dollars of damages—just like every other pending Self-Described Derivative Action.

The TCC's proposed injunctive relief claim is the claim that will protect Fire Victims, while the declaratory relief claim will inform this Court whether that injunctive relief should be temporary or permanent, as case law on injunctions against shareholder litigation splits along two lines: those that permanently enjoin an action because it asserts claims that, at their core, are derivative, and those that temporarily enjoin a direct securities action to give a post-confirmation trustee sufficient time to act to protect the claims of the trust against the same insurance policies.

Once the TCC has filed its complaint and files a motion for a preliminary injunction, it will request a preliminary injunction pending resolution of the declaratory relief claims, in order to permit this Court to properly determine the proper timing of the injunction.

The Debtors' agreement to stipulate to this standing is a recognition that the TCC has a valid claim to pursue, and valid grounds to protect the interests of Fire Victims. The Motion should be granted.

## DISCUSSION

**A.    The TCC's Actions Are Not Merely Timely, They Are a Necessity**

   **1.    The Pending Mediation Threatens Insurance Coverage for Fire Victims**

The TCC's Motion is timely. This Court has ordered mediation of the Former Shareholders' claims, which is ongoing. Any settlement of those claims could not only dilute insurance proceeds that must be preserved to compensate Fire Victims who enjoy a higher priority for recovery under the Bankruptcy Code, but any settlement also risks destroying any recovery by Fire Victims given the nature of the Shareholder Complaint's allegations.

Each of the Debtors' D&O policies contain a single "Wrongful Act" exclusion, which provides that any payout or settlement of the Pending Action—even a nuisance-value

2

Case: 19-30088    Doc# 6547    Filed: 03/31/20    Entered: 03/31/20 11:30:17    Page 5 of 15

settlement—could erase as much as a half billion dollars of policy limits, most of which should be paid to Fire Victims by judgments or settlement in the other pending derivative actions.

The Debtors' D&O insurance policies provide that if the insurers make any payment on account of a settlement or judgment in any lawsuit, then coverage is excluded for any other lawsuit that pleads the same "wrongful act" or any "wrongful act" that shares any "common nexus" with any wrongful acts pleaded in the settled or resolved action. The wording of the exclusion is exceedingly broad.

As addressed in the Motion, the Shareholder Complaint filed in the Pending Action, and every complaint filed in every pending self-described derivative shareholder action[3] (the "Self-Described Derivative Actions"), all plead the same allegations of mismanagement by the Debtors causing the North Bay and/or Camp Fires, and the billions of dollars in liabilities that arose from those fires. The Debtors' D&O insurers can be expected to argue that a settlement of any one of these actions—including the Pending Action—wipes out all insurance coverage for all of the remaining actions. The Shareholder Complaint pleads over a hundred pages of mismanagement allegations that are the same as the allegations pleaded in the Self-Described Derivative Actions. A settlement of the Shareholder Complaint would improperly provide subordinated shareholders with a recovery, while risking the deletion of an asset worth hundreds of millions of dollars that has been assigned to the Fire Victim Trust.

This isn't an unjustified concern. It is simple case law. *See, e.g., Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000) (holding that claims from different plaintiffs were interrelated for purposes of same "wrongful act" exclusion where they were based on "same course of conduct").

There are limits to this argument. For example, the insurers couldn't successfully argue that their settlement of the San Bruno gas pipeline explosion also settled the pending shareholder lawsuits simply because the Pending Action and Self-Described Derivative Actions all allege that the San Bruno explosion was an example of past mismanagement. Under Ninth Circuit law, there would have been intervening business judgment decisions that would confirm that the current

---

[3] The lawsuits listed as items (a) through (f) on Page 5 of the Motion.

shareholder actions concern different "wrongful acts." *Eureka Federal Sav. & Loan Asso. v. American Casualty Co.*, 873 F.2d 229, 235 (9th Cir. 1989) ("intervening business decisions" during period of common pattern of conduct separated lawsuits alleging different damages from wrongful act exclusion).

But any settlement of the Pending Action would be a settlement of a lawsuit in which the only properly pleaded wrongful acts are the same allegations of mismanagement causing fire-related damages as pleaded in all of the Self-Described Derivative Actions, and such a settlement could wipe out a half billion dollars of insurance coverage, no matter how small the settlement amount might be. It is for these reasons that the TCC has to take the Pending Action very seriously. Not because it is a valid lawsuit, but because it has pleaded the same mismanagement claims and then added a veneer of misrepresentation allegations that fail to satisfy the standard for proper direct securities claims.

This is the same position argued by some of the officers and directors in one of their Motions to Dismiss the Pending Action, currently pending before the District Court, who argue that the Shareholder Complaint is, at its core, another mismanagement complaint.[4]

The TCC's position is consistent with the defendants, except that is adds one element. The D&O defendants ask the District Court to dismiss the Pending Action because it is not a valid securities action. But dismissal is not relief that this Court may grant. And even if the District Court dismisses the Pending Action, it is likely to be dismissed with leave to amend while the mediation will continue to drive the action towards settlement. Therefore, the TCC asks this Court to address the relief that it may extend, in the form of declaratory relief and injunctive relief. Because the Pending Action is a mismanagement complaint facially disguised as a Securities Act complaint, it may be properly recognized as a derivative action that is no different from the same mismanagement claims pleaded in the pending Self-Described Derivative Actions. And, because its ongoing prosecution risks destroying a substantial recovery for creditors, it may be enjoined.

---

[4] *See* Case 5:18-cv-03509-EJD, Dkt. No. 155-1, pp. 14:1-10, 18:6-12.

### 2. The Shareholder BK Claims Threaten the Debtors' Equity Backstop

This Court has permitted shareholders who fall within the Pending Action's putative class to file individual proofs of claim, and has confirmed that those recoveries will be subordinated to the same level as equity, thereby diluting the recoveries of equityholders under the Plan. That dilution will also impact the equityholders and investors who are lined up to provide the Debtors with an equity backstop.

But a timely determination that the Pending Action is not a valid securities action, because the sole actionable allegations could only state derivative claims, would address this concern by wiping out any claims the Former Shareholders could assert in these Chapter 11 cases. The TCC's proposed Complaint is not merely timely, it is integral to a successful reorganization by these Debtors.

### B. Why Does the TCC Say the Pending Action Is Not a Valid, Direct Securities Action?

As noted above, the TCC's declaratory relief claim will inform this Court whether the requested injunctive relief should be permanent because the claims are derivative or invalid, or temporary in order to give the Fire Victim Trust time to protect the interests of Fire Victims. *Compare Cottonwood P'ship, L.L.P. v. Kivisto (In re SemCrude L.P.)*, 2012 U.S. Dist. LEXIS 163236 (D. Del. November 15, 2012) (affirming order enjoining derivative shareholder claims against debtor's accounting firm where injuries were to the corporation, and claims belonged to bankruptcy estate); *Meglolia v. Maxwell*, 293 B. R. 443, 449 (N. D. Ill. 2003) (enjoining securities litigation to permit trustee to first pursue derivative claims and recover from insurance policies).

The Opposition appears to suggest that the TCC is arguing that a properly pleaded direct securities action can be a derivative action. That is not the case. The TCC will demonstrate in a future motion for summary judgment that the Shareholder Complaint is not a properly pleaded direct securities action, but is more of a business model than a valid complaint—an effort to distinguish itself from the flood of Self-Described Derivative Action by adding a layer of alleged "false statements" to the same mismanagement allegations pleaded in every Self-Described Derivative Action, and thereby obtain a settlement advantage. But the allegations of "false

statements" cannot state valid securities claims under applicable standards, particularly in a setting where every reasonable investor—and every Court in Northern California—was fully aware that the Debtors were causing wildfires by failing to implement proper vegetation management practices.

In order to allege a false statement on which a valid securities claim may be based, that false statement must be one that significantly altered the "total mix" of information available to an investor. It must:

> in the view of a reasonable investor, have 'significantly altered the 'total mix' of information made available.' The statement must also be 'mislead[ing],' evaluated not only by 'literal truth,' but by 'context and manner of presentation.'

*Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (citations omitted).

An example of a statement that significantly alters the "total mix" of information available to an investor is the example provided in the Motion, whereby a pharmaceutical company announces a new cancer treatment. Such an announcement would materially alter how an investor would view an investment in that company.

The Shareholder Complaint does not contain a single allegation of a false statement that satisfies this standard. The allegations in the Shareholder Complaint that describe the Debtors' mismanagement and damages are separated into a different section of the complaint from the allegations of alleged false statements. But when they are all organized together into chronological order, it tells a very different story.

For example, the Shareholder Complaint alleges that the North Bay Fires ignited on October 8, 2017 (¶ 246). In response to the North Bay Fires, PG&E's stock dropped 6.7% on October 12, 2017, because "<u>the market began to understand</u> that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires," and "<u>Investors started to be concerned</u> regarding whether PG&E violated any regulations (e.g., failed to adequately trim trees) ..." (¶ 328-333) (emphasis added).

PG&E's stock dropped another 16.5% on October 13, 2017, because PG&E filed an 8-K stating that PG&E's "financial condition or results or operations could be materially affected,"

and "Investors understood" that the 8-K "signaled to the market that at least some of the North Bay Fires were caused by PG&E's negligence or worse." (¶ 335-337) (emphasis added).

Commensurate with all of this real world information that fed the knowledge and understanding of "concerned" investors, there were three press releases or other communications in a one-week period between October 31 and November 5, 2017, in which PG&E made its usual claims about following "all applicable federal and state vegetation clearance requirement" and told investors that two years earlier it had doubled its spending on vegetation management, all of which are alleged to have been false. (¶¶ 249, 258, 264, 271). Statements such as these are mere puffery under the standard in *Singh*, and the cases cited therein, and do not meet the necessary detail that is required for actionable compliance statements. *Singh v. Cigna Corp.*, 918 F.3d at 63 (describing the substantial detail required for a compliance statement to be actionable).

Despite the banality of these "false statements," and despite the ongoing reality of the North Bay Fires and what investors "understood" about the ongoing decline of PG&E's stock price, York made its **first** purchase of any of the Debtors' securities that same month, Warren acquired stock and bond debt at the same time, and Mid-Jersey acquired bonds. (Dkts. 121-2, 121-3 and 121-4). These aren't misled investors. They are speculators who fully "understood" that massive wildfires had caused PG&E's stock to begin plummeting in value, and made a conscious and informed decision to purchase securities based on real world information.

This sort of pleading is not permitted. It is understandable from a strategy perspective, as it allowed these Former Shareholders to plead a complaint that set it apart (facially) from all of the pending Self-Described Derivative Actions, provided them with relief from stay, and placed them into a position whereby they are now the sole D&O lawsuit that is negotiating a settlement with the Debtors. But this sort of business practice was recently savaged by the Second Circuit:

> This case presents us with a creative attempt to recast corporate mismanagement as securities fraud. The attempt relies on a simple equation: first, point to banal and vague corporate statements affirming the importance of regulatory compliance; next, point to significant regulatory violations; and voila, you have alleged a prima facie case of securities fraud! The problem with this equation, however, is that such generic statements do not invite reasonable reliance. They are not, therefore, materially misleading, and so cannot form the basis of a fraud case.

7

*Singh*, 918 F.3d at 59-60. To hold otherwise would "bring within the sweep of federal securities laws many routine representations made by [companies]." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2nd Cir. 2009).

In *Singh*, Cigna made a variety of statements concerning its purported compliance with applicable regulations, such as a 10-K stating that it had "established policies and procedures to comply with applicable requirements." The subsequent drop in stock price was not caused by an external event such as a wildfire, but because of a public audit letter demonstrating that the statements were false, and Cigna was not in compliance with applicable requirements. In other words, unlike the PG&E case, there was actually a direct connection between the false statement and the drop in stock price. And yet, this did not create a direct shareholder claim, as the Second Circuit found that the statements did not significantly alter the "total mix" of information available to investors. 918 F.3d at 63 (concluding that alleged misstatements are "textbook example of 'puffery'").

Similarly, in *ECA*, plaintiffs alleged that JP Morgan Chase had made false statements, such as its claim that its "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process." 553 F.3d at 205. The Court held that such statements were "puffery" that were "too general to cause a reasonable investor to rely upon them," and could not "amount to a guarantee that its choices would prevent failures in risk management practices." *Id*. at 206. *See also Singh*, 918 F.3d at 63 ("[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,' meaning that they are too general to cause a reasonable investor to rely upon them."); *City of Brockton Ret. Sys. v. Avon Prods.*, 2014 U.S. Dist. LEXIS 137387, 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) ("Such statements are not actionable as securities fraud because investors do not rely on 'generalizations regarding integrity, fiscal discipline and risk management.'") (*quoting In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632-33 (S.D.N.Y. 2005), and collecting other cases).

A general statement of compliance with regulations of laws, or promises of practices to ensure strong risk management processes, are insufficient to create a material, false statement for

purposes of pleading a federal securities claim. *Singh*, 918 F.3d at 63. Yet the Former Shareholders' entire case is a series of press releases and 8-K filings that made similar promises of puffery concerning regulatory and legal compliance, <u>after</u> the Butte Fire had been found to be caused by vegetation management failures, <u>while</u> the North Bay Fires were still smoldering and PG&E's vegetation management failures were found to be the cause, during two statewide states of emergency, and amidst a constant stream of information about a changing climate that is increasing the risks of wildfires. The entire Shareholder Complaint rests on finding that their putative class ignored what they already "understood" about fires, climate, and future risks, that was being reported every day in investment news, newspapers and elsewhere, and that they then invested in a self-imposed vacuum of information, relying on nothing but the puffery in PG&E's press releases and website information as guarantees that there would never be a wildfire that would cause a drop in stock price. That does not state a claim. It merely describes careless speculators who now seek to recover losses that reflect an intentional and knowing gamble, not actionable securities claims. The alleged false statements not only fail to satisfy the "total mix" standard of *Singh*, they aren't even connected to the alleged damages like the insufficient false statements in *Singh* and *ECA*.

These Shareholder Plaintiffs are no stranger to these arguments. In *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206 (E.D.N.Y. 2019), named Plaintiff Warren in this Pending Action was the lead plaintiff in *Foot Locker*, and had its complaint dismissed under *Singh* because, even "drawing all reasonable inferences," Warren's allegations of false statements failed to allege "an actionable statement or omission warranting 10(b) liability" under *Singh*. 412 F. Supp. 3d at 220.

It would be a travesty if these Former Shareholders were able to translate their baseless allegations of "misstatements" into a settlement (for any amount) that would have the effect of wiping out as much as a half-billion dollars of insurance coverage that should compensate Fire Victims for their losses while compensating speculative investors who purchased securities when they "understood" that an effect of the North Bay Fires was a plummeting stock price.

When these baseless allegations of false statements are stripped away, what is left is a well-pleaded Complaint that details more than a hundred pages of mismanagement by the Debtors causing massive wildfires, and billions of dollars in liabilities to Fire Victims. They are the same allegations pleaded in each of the complaints filed in the Self-Described Derivative Complaint, and derivative claims for breach of fiduciary and other such causes of action are the sole claims that they may properly support.

Thus, like the Second Circuit's ruling in *Singh*, the TCC seeks declaratory relief that recognizes the true nature of the Shareholder Complaint when the baseless allegations of misstatements are disregarded, and the remaining allegations of mismanagement are all that properly remain. *Singh*, 918 F.3d at 59 ("This case presents us with a creative attempt to recast corporate mismanagement as securities fraud.").

The TCC's future motion for summary judgment will demonstrate that, by its own admissions of what investors "understood" about the North Bay Fire and its impact on declining share prices, and by the baseless and "puffery" nature of alleged false statements that cannot erase the reality of wildfires caused by acknowledged failures in vegetation management practices, the Shareholder Complaint does not present valid, direct securities claims. What is left, at the core of the complaint, is mismanagement allegations that can only plead derivative claims.

The TCC has a colorable claim to have the Shareholder Complaint enjoined, either temporarily if the TCC does not prevail on its declaratory relief claim, or permanently if the TCC does prevail on its declaratory relief claim. Either way, the TCC has addressed the standard to obtain standing to file its proposed Complaint.

**C.     The Effort to Distinguish Touch America Is Mistaken**

The effort of the Former Shareholders to distinguish the case *Williams v. McGreevey (In re Touch America Holdings, Inc.)*, 401 B.R. 107 (Bankr. D. Del. 2009), misstates the case. The shareholder action in Touch America was settled at mediation in 2004, in a global mediation with the creditor Trust represented by the TCC's counsel in these instant cases, after which the parties engaged in five years of litigation over the settlement, leading to the published case. The Trust's motion for summary judgment only addressed the derivative nature of the shareholders' claim for

damages that sought recovery from the same insurance policies assigned to the Trust. The Trust did not challenge claims for declaratory relief, constructive trust, or against third parties, and those claims continued in litigation. The "second" action cited by the Former Shareholders is the same lawsuit, removed from state court to federal court. There was only one Montana Power shareholder lawsuit. The settlement was finally approved by the Bankruptcy Court in 2009, in conjunction with a larger settlement of all remaining claims in multiple actions. *See* Supplemental Declaration of David J. Richardson.

The case is directly on point for a variety of issues: (i) the appropriateness of standing first granted to the committee of unsecured creditors, then passed to the Trust; (ii) the appropriateness of resolving the derivative/direct issue by summary judgment in an adversary proceeding; and (iii) the standards that apply to such an analysis.

## D. The Positions of the Debtors and UCC Support the Requested Relief

The Debtors have stipulated to the relief requested in the Motion. That, alone, should permit entry of the proposed order granting the requested relief.

The Official Committee of Unsecured Creditors has filed a statement [Dkt. No. 6475] that "supports the TCC's request for standing" solely for the purposes described in the Motion, except for the requested finding in the proposed Complaint that any derivative claims stated in the Shareholder Complaint are among the "Assigned Claims" that are being assigned to the Fire Victim Trust under the Debtors' Plan. The TCC is not opposed to revising its Complaint in this manner, with a full reservation of all rights on such issues.

Indeed, the Former Shareholders' arguments in their Opposition that the derivative claims that are stated by their mismanagement allegations are not necessarily assigned to the Fire Victim Trust are red herrings. The Fire Victim Trust has many Self-Described Derivative Actions that it can take over and litigate for the benefit of Fire Victims. The primary issue with respect to this Pending Action is whether or not it should be enjoined temporarily (in a future motion) in order to ensure that subordinated shareholders do not deplete or destroy insurance coverage intended for the benefit of Fire Victims, or permanently if the allegations pleaded in the Shareholder Complaint can only state derivative mismanagement claims. That issue is for another day.

## **CONCLUSION**

WHEREFORE, for all the reasons explained herein and in the Motion, the TCC respectfully requests that the Court enter the Proposed Order, substantially in the form attached to the Motion, and such other and any further relief as the Court may deem just and proper.

Dated:  March 31, 2020

BAKER & HOSTETLER LLP

By: ___*/s/ David J. Richardson*___
    Robert A. Julian
    Cecily A. Dumas
    David J. Richardson

*Counsel to the Official Committee of Tort Claimants*