| | |
|---|---|
| Robert A. Julian (SBN 88469) | Elizabeth A. Green (*pro hac vice*) |
| Cecily A. Dumas (SBN 111449) | BAKER & HOSTETLER LLP |
| BAKER & HOSTETLER LLP | 200 South Orange Avenue, Suite 2300 |
| 600 Montgomery Street, Suite 3100 | Orlando, FL 32801 |
| San Francisco, CA 94111-2806 | Telephone: 407.649.4036 |
| Telephone: 415.659.2600 | Facsimile: 407.841.0168 |
| Facsimile: 415.659.2601 | Email: egreen@bakerlaw.com |
| Email: rjulian@bakerlaw.com | |
| Email: cdumas@bakerlaw.com | |

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| -and- | (Lead Case) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | (Jointly Administered) |
| Debtors. | **LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO THE DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019 FOR ENTRY OF AN ORDER (I) APPROVING CASE RESOLUTION CONTINGENCY PROCESS AND (II) GRANTING RELATED RELIEF [Dkt. No. 6398]** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | |
| | Date: April 7, 2020 |
| | Time: 10:00 a.m. (Pacific Time) |
| | Place: **Telephonic Appearances Only** United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco, CA 94102 |
| | **Objection Deadline: April 5, 2020** |

The Official Committee of Tort Claimants ("**TCC**") in the chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (the "**Debtors**" or "**PG&E**") hereby submits its limited objection to the Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Approving Case Resolution Contingency Process and (II) Granting Related Relief (the "**Contingency Process Motion**" regarding the **"Contingency Process"**) [Dkt. No. 6398], and respectfully states as follows:

## PRELIMINARY STATEMENT

1. The TCC agrees with the Governor on the concept of the off-ramp. The TCC writes separately to address issues that are consistent with the restructuring support agreement (the "**RSA**", attached as **Exhibit 1**) that the TCC entered into with the Debtors and certain shareholder proponents after extensive negotiations and court-ordered mediation. The RSA and the Amended Plan contain provisions designed to ensure prompt funding of the Fire Victim Trust before the 2020 fire season. If the "Effective Date of the Amended Plan does not occur prior to August 29, 2020[,]" (the **"Termination Deadline"**) absent consent of the TCC, the RSA will automatically terminate, and the Debtors' plan of reorganization (the **"Plan"**) [Dkt.No. 6320] will fail. RSA § 3(a)(ii)(E); Plan § 9.2(c) (effectiveness of the RSA is a condition precedent to the Effective Date). The RSA does not require the TCC to support any process for resolving the Debtors' obligations other than the Amended Plan, as defined therein, or any process inconsistent with their rights under the RSA. In fact, the RSA prohibits the Debtors and Shareholder Proponents from "encourag[ing], propos[ing], fil[ing], support[ing or], participat[ing] in the formulation of . . . any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtors other than the Amended Plan" during its term. RSA § 2(o)(ii).

2. Without consulting the TCC,[1] the Debtors have proposed a Contingency Process that anticipates that the Debtors and their shareholder proponents will breach the RSA by missing

---

[1] *See* RSA §§ 4 ("Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to, the pursuit, approval, implementation, and consummation of the transactions contemplated by this Agreement and the Amended Plan as well as the negotiation, drafting, execution, and delivery of the Definitive Documents."), 6 ("The Debtors shall use commercially reasonable efforts to provide counsel for the TCC . . . drafts of all motions . . . the Debtors intend to file with the Bankruptcy Court . . . that could reasonably be expected to affect implementation of the modifications in the Term Sheet[] at least three (3) calendar days before the date when

the Termination Deadline and proposes a process for a sale of assets or plan of reorganization to by managed by the Debtors and the Governor's office.  This is alarming.  If the Debtors and Shareholder Proponents' ability to fund the Plan by the Termination Deadline is in serious question, that fact needs to disclosed and dealt with now, not delayed for nearly five months to be dealt with in August 2020, on the eve of fire season.  Playing a game of bait and switch with the fire victims in this case would be absolutely unconscionable.

3. If the Plan is confirmed, the Contingency Process gives the Debtors a free pass to wait to make the Plan effective until December 2020.[2]  If the Debtors fail to confirm the Plan by June 30, 2020, or to make a confirmed Plan effective by the end of 2020, the Contingency Process empowers the Debtors to manage a sale process for as long as fifteen months, until September 2021.  This process will be managed on a day-to-day basis by the Debtors' Chief Restructuring Officer and special committees of the Debtors' boards approved by the Governor, but ultimately power resides in the Debtors' boards as a whole.

4. To the extent the Contingency Process modifies or supersedes the provisions of the Plan and RSA providing that the RSA terminates and the Plan fails if the Plan does not become effective prior to August 29, 2020, it is inconsistent with, and a repudiation of, the RSA.  Moreover, the Debtors' unilateral "participation in the formulation of" the Contingency Process for the sale of the Debtors' assets or a future plan does not appear to be consistent with their obligations under § 2(o)(ii) of the RSA.

5. The TCC assumes that the Contingency Process does not supersede the TCC's rights and the Debtors' obligations under the RSA and is intended instead to create additional deadlines the Debtors must meet.  This must be confirmed in the order approving the Contingency Process.  However, the Contingency Process still contains objectionable elements that must be fixed.

---

the Debtors intend to file such pleading"); RSA Term Sheet § Conditions to Effectiveness ("All definitive documents relating to the Plan, capitalization, equity and debt financing shall be in form and substance reasonably acceptable to" the Requisite Consenting Fire Claimant Professionals, including the TCC).

[2] The first deadline for the effective date is September 30, 2020, one month after the Termination Deadline, but the only consequence of such a failure is the appointment of the Governor's Operational Observer as Chief Transition Officer (the "**CTO**") to manage safety-related items.  Although the appointment of an outside expert to manage PG&E's safety processes may be laudable, the CTO's relatively limited role does not appear to be a major consequence.

6. The Contingency Plan would allow the Debtors' current management to run a sale or second plan process of up to fifteen months, doubling the length of this case and exposing creditors to the risks of the 2020 and 2021 fire seasons without the full protection of AB 1054. And it does so without securing the prompt, bargained-for treatment of fire victims, some of whom have been waiting for compensation since the 2015 Butte Fire, and many of whom still do not live in permanent homes. The Contingency Process merely requires the closing of a sale of the Debtors by September 2021, and if that is not managed through a plan of reorganization, it could very easily lead to fire victims being unpaid even into 2022.

7. Time is of the essence for fire victims. Many of them are in desperate straits because they have lost their homes or loved ones. This is compounded by the current circumstances related to COVID-19, and the impact it is having on the victims, many of whom live paycheck to paycheck, but also because an extended time period for marketing a second plan for PG&E carries with it extensive additional risks. Between major wildfires and the 2016 Ghost Ship Fire, PG&E has not had a single year that was free of major fires since 2014. And the proposed Contingency Plan exposes fire victims to the full risks of the 2020 and potentially 2021 wildfire seasons.

8. The TCC does not oppose having a sale process in place as a contingency. However, it does oppose locking these cases into a single-track lengthy sales process controlled solely by PG&E and the Governor. In the event that the Plan fails and PG&E is operating without the full protections of AB 1054, the Debtors must refocus their fiduciary obligations on protecting creditors, not equity. Given equity's control over PG&E, that focus must be enforced by permitting competition.

9. The Contingency Plan as drafted appears to contemplate that the Debtors might retain exclusivity. That should only occur if the Plan is confirmed and timely becomes effective. If the Plan is not confirmed, exclusivity would quickly, if not immediately, terminate by operation of law. In any event, even with a filed Plan, the maximum extension of the exclusivity period would be until September 2020 under § 1121(d)(2)(B). If the Plan is confirmed, but does not become effective by the Termination Date, the Contingency Plan must provide that exclusivity is finally terminated as to all parties. Other parties have expressed interest in potentially sponsoring a Plan

or acquiring some or all of the Debtors' assets, and if they can confirm a Plan with the consent of creditors before the Debtors can approve a sale, they should be permitted to do so. *See, e.g.,* Dkt. Nos. 6624, 6626.

10. Moreover, the Debtors and Governor should not have sole control of the sales process. The TCC should be permitted to participate throughout the anticipated sale process, including in the formulation of the bidding procedures and the selection of a prevailing bidder, by having the same rights as the Governor to ensure that a preferred bidder is permitted to bid, and to object to the sale process as may be appropriate.

## RELEVANT FACTUAL BACKGROUND

11. On or about December 6, 2019, the TCC, Debtors, law firms representing individuals holding approximately 70% in number of the prepetition fire claims filed against the Debtors (the "**Consenting Fire Claimant Professionals**"), and certain funds and accounts managed by Abrams Capital Management, LP and Knighthead Capital Management, LLP (the "**Shareholder Proponents**") entered into the RSA.

12. The RSA contains provisions that provide for the treatment of fire victims' claims, including the establishment of the Fire Victim Trust, which is to be funded with no less than $13.5 billion in cash and stock in the reorganized PG&E Corp. plus certain assigned rights and causes of action. The Trust is to be partially funded on the Effective Date so that fire claimants may begin receiving distributions on their claims as expeditiously as possible.

13. The RSA also places restrictions on the parties' activities. Section 2 of the RSA provides that the Debtors (and other parties) cannot:

> (ii) directly or indirectly solicit approval or acceptance of, encourage, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets, merger, workout, or plan of reorganization for the Debtors other than the Amended Plan, including, without limitation, the Alternative Plan or any other plan of reorganization proposed by the Ad Hoc Committee; (iii) otherwise take any action that would interfere with, delay, impede, or postpone (i) the solicitation of acceptances, consummation, or implementation of the Amended Plan, or (ii) the entry or effectiveness of the Approval Orders (other than as a result of the failure of the Consenting Fire Claimant Threshold to occur)

RSA at ¶ 2(o).

14. The RSA provides that the Effective Date of the Plan must occur before August 29, 2020 or the RSA is automatically terminated, unless the parties mutually agree to an extension of the deadline. RSA at ¶ 3(a)(ii). The RSA also contains discretionary termination provisions and states in part that the TCC and requisite Consenting Fire Claimant Professionals may terminate the RSA if the Debtors:

> (i) … breach … any of their obligations, representations, warranties, or covenants set forth in this [RSA]; (ii) the Debtors … at any time either (A) fail to prosecute the Amended Plan and seek entry of the Confirmation Order that contains the terms set forth in the Term Sheet, and are otherwise consistent with the terms hereof, or (B) propose, pursue, or support a Plan or Confirmation Order inconsistent with the Term Sheet or the Amended Plan; (iii) the Amended Plan is, or is modified to be, inconsistent with the Term Sheet or this [RSA].

RSA at ¶ 3(b).

15. In exchange for the consideration provided by the Debtors, the TCC and Consenting Fire Claimant Professionals provided consideration including the TCC's withdrawal as a proponent of a competing plan, the suspension of certain discovery and the Consenting Fire Claimant Professionals' agreement to recommend supporting the Plan to their clients.

16. On December 9, 2019, the Debtors filed the Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief [Dkt. No. 5038].

17. On December 19, 2019, the Court entered the Order Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 (I) Authorizing the Debtors and TCC to Enter into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents, and (II) Granting Related Relief [Dkt. No. 5174].

18. On March 16, 2020, the Debtors filed the Plan. [Dkt. No. 6320].

19. On March 20, 2020, the Debtors filed the Contingency Process Motion and the Governor filed a statement in support of the Contingency Process Motion (the "**Governor's Statement**") [Dkt. No. 6402]. The Contingency Process Motion envisions a multi-scenario

contingency process which could result in the sale of the Debtors or their assets if certain deadlines are not met.

20. Under the first scenario, if the confirmation order is not entered by June 30, 2020, the Debtors will appoint the CTO, who was selected by the Governor, and begin a sale process, managed by their Chief Restructuring Officer and sale committees of the Debtors' boards, but subject to control of the Debtors' boards. Contingency Process Motion at pps. 9, 14, 17, and 31-34.

21. Under the second scenario, if the Plan does not become effective by September 30, 2020 (more than a month after the required Effective Date under the RSA), the Debtors will appoint a CTO, and the deadline for the Effective Date to occur will be extended to December 31, 2020. *Id.* at pps. 9, 14-15 & 32-33.

22. Under the third scenario, if the Plan is confirmed by June 30, 2020 but does not become effective by December 31, 2020, the Debtors shall pursue the sale process as set forth above. *Id.* at pps. 9, 15 & 33. The Contingency Process contemplates the sale closing by September 30, 2021 but leaves open the possibility that the deadline may be extended by agreement with the Governor's office or order of the Court. *Id.* at pps. 16, 31 & 32.

## **OBJECTION**

**A. The Contingency Process Must Conform To The RSA And The Debtors Should Confirm Their Ability To Make The Plan Effective In A Timely Manner**

23. As discussed above, the Debtors and Shareholder Proponents are party to the RSA, which provides that if the "Effective Date of the Amended Plan does not occur prior to August 29, 2020[,]" absent consent of the TCC, the RSA will automatically terminate, and the Plan will fail. RSA § 3(a)(ii)(E); Plan § 9.2(c). To the extent that the Contingency Process anticipates that its provisions could modify or supersede the rights of the TCC under the RSA (i.e., the Plan could become effective on or after August 29, 2020), it is a repudiation of the RSA by the Debtors. Any order approving the Contingency Process must specifically protect the rights of the TCC under the RSA.

24. Moreover, the fact that a Contingency Plan was filed anticipating that the Termination Deadline might be satisfied months late, or not at all, is deeply troubling, particularly in the current environment. If this Contingency Plan is merely precautionary, the Debtors and their Shareholder Proponents should provide assurances that they are able to fully fund the Amended Plan (as defined in the RSA) before the Termination Deadline. If the Debtors and their shareholder proponents are in serious danger of breaching the RSA by missing the Termination Deadline that fact needs to disclosed and dealt with now, not delayed for nearly five months to be dealt with in August 2020, on the eve of fire season. The Debtors, felons soon to be convicted of 84 counts of involuntary manslaughter, should not play bait and switch with their victims.

**B. The Contingency Process Must Provide for a Competitive and Potentially Speedier Process**

25. Under the Contingency Process, if the Effective Date of the Plan does not occur on or before September 30, 2020, the only practical consequence is that the Operational Observer appointed by the Governor becomes the CTO and assumes management of certain safety-related functions. The purported deadline has no other effect. The effective deadline for the Plan to be consummated is December 31, 2020, a full six months after the statutory June 30, 2020 deadline for plan confirmation and over four months past the Termination Deadline. Thereafter, the Debtors and the Governor control a sale process for which the deadline for completion is September 30, 2021, and potentially later. Particularly since the sale process does not necessarily mean distributions to victims can begin immediately, this process is unacceptable to wildfire victims as structured.

26. The Debtors filed their chapter 11 petitions on January 29, 2019 *for the sole purpose of addressing and paying wildfire claims*. *See e.g.* Declaration of Jason P. Wells in Support of First Day Motions and Related Relief ("The chapter 11 filings were necessitated by a confluence of factors resulting from the catastrophic and tragic wildfires that occurred in Northern California in 2017 and 2018, and PG&E 's potential liabilities arising therefrom") [Dkt. No. 28]. Although it is laudable that the Governor achieved certain financial, governance and operational concessions from the Debtors through the Contingency Process, and the offramp he sought to impose, the victims

should not be locked in to a process that might not pay them anything until 2022. The Contingency Plan must permit other, potentially speedier avenues if the Plan fails.

27. Time is of the essence for fire victims. Many of them are in desperate straits because they have lost their homes or loved ones or have extensive medical bills. But also because an extended time period for marketing a second plan for PG&E carries with it extensive additional risks. Between major wildfires and the 2016 Ghost Ship Fire, PG&E has not had a single year that was free of major fires since 2014. And the proposed Contingency Plan exposes fire victims to the full risks of the 2020 and potentially 2021 wildfire seasons.

28. The Debtors will not have the full protection of AB 1054 during this time. Under Cal. Public Utilities Code section 3292(e), the Debtors only have the right to seek reimbursement from the state wildfire fund for 40% of the allowed amount of claims resulting from wildfires that occur between July 12, 2019 and the date on which the Debtors fund their initial contribution. Section 3292(e) provides in part that: "provided that the fund shall not pay more than 40 percent of the allowed amount of a claim arising between July 12, 2019, and the date the electrical corporation exits bankruptcy, with the balance of those claims being addressed through the insolvency proceeding." Therefore, during the post-confirmation pre-Effective Date period, the Debtors will be responsible for administering through the Cases 60% of all uninsured wildfire claims. Additionally, the 40% is subject to payback to the wildfire fund if the CPUC disallows payments in reviewing recovery from the wildfire fund.

29. The deadline for the Plan to become effective under the Contingency Process is December 31, 2020. Although the use of the term "exits bankruptcy," in the Public Utilities Code is ambiguous, the TCC believes that the Debtors contend that they are not obligated to fund their initial contribution until the Plan becomes effective. Stated a different way, the Debtors intend to pay their initial contribution from the Plan financing on the Effective Date, not before the financing has been consummated. The months between June and December 2020 are the wildfire season in the Debtors' service territory. The Debtors are placing the risk of additional claims upon their creditors by delaying full access to the wildfire fund. If under the Contingency Plan deadlines are moved forward to the end of 2021, the exposure is further exacerbated. None of the stakeholders

can afford to take the risk associated with another uncovered wildfire prior to the Effective Date, those who have already been victimized least of all.

30. These time-sensitive risks provide no assurance to any creditor group that creditors will be paid in accordance with their current treatment if the Plan doesn't become effective on or before December 31, 2020, or that they will be paid within a reasonable time.

31. The Contingency Process allows the equity sponsors of the Plan to retain control, with the Governor's participation, of a new sale process if the Plan is not confirmed or does not become effective. There is no reason to allow equity to control the only process after the Plan they sponsored has failed to become effective. These cases should not be locked in to a single-track lengthy sales process that would encourage equity to delay payments to fire victims in the hopes a stronger economy in the future will inure to their benefit. The TCC does not oppose having a contingency sale process, but if equity is unable or unwilling to fund its own Plan then the Debtors and equity must be opened to competition to focus them on the creditors in this case.

32. The Contingency Plan appears to contemplate that the Debtors might retain exclusivity during the Contingency Plan process. The Debtors are entitled to exclusivity if the Plan is confirmed and timely becomes effective. If the Plan is not timely confirmed, exclusivity would quickly, if not immediately, terminate by operation of law. In any event, even with a filed Plan, the maximum extension of the exclusivity period would be until September 2020 under § 1121(d)(2)(B). That date is growing close. If the Plan is confirmed, but does not become effective by the Termination Date (as it may be extended by the TCC and Consenting Fire Claimant Professionals), the Debtors are not entitled to any further time to insulate themselves from competition. In that circumstance, exclusivity should be terminated for all parties. The Debtors, Governor and equity are preparing for what happens if the Plan fails. The TCC must be permitted to do the same.

33. Moreover, the sales process must be opened to other constituencies, and not subject to the sole control of the Governor and Debtors. The order approving the Contingency Process must provide that the TCC shall be permitted to participate as a principal party throughout the anticipated sale process, including in the formulation of the bidding procedures and the selection

of a prevailing bidder, that the TCC shall have the same rights as the Governor to ensure that a preferred bidder is a qualified bidder, and to object to the sale process as may be appropriate.

## CONCLUSION

**WHEREFORE**, the TCC respectfully requests that this Court enter an order (a) conditioning approval of the Contingency Process Motion on (i) confirmation that the Contingency Process does not modify or in any way supersede the TCC's rights under the RSA, (ii) acknowledgement that the sale process contemplated by the Contingency Process Motion is not exclusive of other methods of resolving the Debtors' bankruptcy, including by terminating exclusivity for any party in the event that the Plan is not confirmed, or fails to become effective by the Termination Date (or such other date as may be permitted under the RSA), (iii) permitting the TCC to participate as an equal partner in the anticipated sale process, including in the formulation of the bidding procedures and the selection of a prevailing bidder, by having the same rights as the Governor to ensure that a preferred bidder is permitted to bid, and to object to the sale process as may be appropriate and (b) granting such other and further relief as is just and proper.

Dated: April 5, 2020

BAKER & HOSTETLER LLP

By: */s/ Elizabeth A. Green*
     Elizabeth A. Green

*Counsel for Official Committee of Tort Claimants*

Joseph M. Esmont (*pro hac vice*)
BAKER & HOSTETLER LLP
Key Tower, 127 Public Square
Suite 2000
Cleveland, OH 44114
Telephone: 216.861.7835
Facsimile: 216.696.0740
Email: jesmont@bakerlaw.com

Elyssa S. Kates (*pro hac vice*)
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4227
Facsimile: 212.589.4201
Email: ekates@bakerlaw.com