| | |
|---|---|
| **WEIL, GOTSHAL & MANGES LLP**<br>Stephen Karotkin (*pro hac vice*)<br>  (stephen.karotkin@weil.com)<br>Jessica Liou (*pro hac vice*)<br>  (jessica.liou@weil.com)<br>Matthew Goren (*pro hac vice*)<br>  (matthew.goren@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel:    (212) 310 8000<br>Fax:    (212) 310 8007<br><br>KELLER BENVENUTTI KIM LLP<br>Tobias S. Keller (SBN 151445)<br>  (tkeller@kbkllp.com)<br>Jane Kim (SBN 298192)<br>  (jkim@kbkllp.com)<br>650 California Street, Suite 1900<br>San Francisco, CA 94108<br>Tel:    (415) 496-6723<br>Fax:    (415) 636-9251 | **JONES DAY**<br>Bruce S. Bennett (SBN 105430)<br>  (bbennett@jonesday.com)<br>Joshua M. Mester (SBN 194783)<br>  (jmester@jonesday.com)<br>James O. Johnston (SBN 167330)<br>  (jjohnston@jonesday.com)<br>555 South Flower Street<br>Fiftieth Floor<br>Los Angeles, CA  90071-2300<br>Tel:    (213) 489-3939<br>Fax:    (213) 243-2539<br><br>*Attorneys for the Shareholder Proponents* |

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>     - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>                    Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS FOR ENTRY OF AN ORDER DIRECTING SUPPLEMENTAL DISCLOSURE IN THE FORM OF A LETTER FROM THE TCC**<br><br>Date: April 7, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 6636 |

PG&E Corporation ("PG&E") and Pacific Gas and Electric Company, as debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases, and certain funds and accounts managed or advised by Abrams Capital Management, LP, and certain funds and accounts managed or advised by Knighthead Capital Management, LLC (the "Shareholder Proponents"), each as Proponents of the Plan and parties to the Tort Claimants RSA, object to the *Motion For Entry Of An Order Directing Supplemental Disclosure In The Form Of A Letter From The TCC* [ECF 6636 (the "Motion")] filed by the Official Committee of Tort Claimants (the "TCC").[1]

By the Motion, the TCC asks the Court to authorize the dissemination of a Proposed Letter recommending that fire claimants withhold a vote on the Plan until the TCC disseminates a "supplemental report" on May 1, 2020 – just fifteen days before the voting deadline approved by the Court in connection with the Disclosure Statement and heavily negotiated solicitation procedures [ECF 6340]. The TCC's transparent intent is to renegotiate the settlement memorialized in the Court-approved Tort Claimants RSA, on which the Plan is based. Proposed Letter ¶ 13 (advising fire claimants not to vote until the Debtors "fix" allege problems with the Plan).

Setting aside its sheer impracticability,[2] the Court should disapprove this attempt to leverage a better deal. The TCC's proposed communication is riddled with false and misleading information and is the antithesis of "adequate information" within the meaning of section 1125 of the Bankruptcy Code. None of the TCC's alleged concerns are new, and all are more than adequately addressed in the Disclosure Statement approved by the Court. If the TCC truly

---

[1] Capitalized terms not defined here have the meanings given in the Motion and the *Debtors' And Shareholder Proponents' Joint Chapter 11 Plan Of Reorganization Dated March 16, 2020* [ECF 6320 (the "Plan")].

[2] The TCC would have fire claimants withhold votes until after dissemination of a "supplemental report" by the TCC on May 1, 2020 (for which the TCC also would seek the Court's approval). That report would need to be distributed by Prime Clerk, at the expense of the estate, to more than 80,000 fire claimants, who then would need to complete and return their ballots so that they are received by May 15 (earlier than that for claimants who are to return ballots to their attorneys for inclusion and submission as part of master ballots). This is utterly unrealistic and presents the risk that thousands of fire claimants will miss the voting deadline and not have their votes counted in connection with Plan confirmation.

- 1 -

believed that the Plan does not reflect the agreement struck in the Tort Claimants RSA or that disclosure otherwise is inadequate, it could and should have raised these issues at the time the Disclosure Statement was under consideration and before it was transmitted with ballots to tens of thousands of creditors. There have been no new developments and the appropriate time to debate the adequacy of disclosure regarding the Plan has long since passed.

## Stock Valuation

The premise of the Motion (and the Proposed Letter) is that the Plan no longer reflects "the original intent of the parties" to the Tort Claimants RSA, leaving the TCC free to renege and renegotiate the deal. Proposed Letter ¶ 9. In particular, the TCC alleges that the Tort Claimants RSA was intended to "guarantee" that the stock in reorganized PG&E to be delivered to the Fire Victim Trust will be worth $6.75 billion on the Plan's Effective Date and that, by refusing to provide a formal after-the-fact guarantee, the Debtors and Shareholder Proponents somehow have acted in bad faith or in derogation of their obligations under the Tort Claimants RSA. Proposed Letter ¶¶ 2, 3, 7, 9, 10.

This is demonstrably false. The Tort Claimants RSA clearly does not reflect an intention that the Trust be guaranteed stock with a "$6.75 billion valuation at issuance." Proposed Letter ¶ 10. The Debtors and the Shareholder Proponents never agreed that the stock to be deposited into the Trust would have a cash value or a market value of $6.75 billion on the Effective Date. To the contrary, under the watchful eye of Mediator Randall Newsome, the parties carefully and exhaustively negotiated a formula for determining the number of shares that would need to be issued to give the Trust $6.75 billion of stock at "Fire Victim Equity Value." Tort Claimants RSA, Ex. A (Plan Term Sheet) at 6. The parties agreed that Fire Victim Equity Value was "14.9 multiplied by the Normalized Estimated Net Income as of the date to be agreed upon." *Id.* at 3.[3]

---

[3] This was no mistake or typographical error. Just ten days after signing the Tort Claimants RSA, the TCC and the Consenting Fire Claimant Professionals asked to amend the definition of Aggregate Fire Victim Consideration to further clarify that the anti-dilution protection for the stock being deposited in the Trust would be "calculated using the treasury stock method (*using an Effective Date equity value equal to Fire Victim Equity Value*)." Tort Claimants RSA Amend. No. 1 [ECF 5143-1] at § 3 (emphasis added).

The valuation formula simply does not provide for or require that the market value of the stock at issuance be $6.75 billion. **The TCC frankly acknowledges this in the Proposed Letter**, which states that "[t]he RSA settlement contains a formula for calculating the value of stock. Under that formula, the value of the stock may change according to market conditions." Proposed Letter ¶ 3. The TCC recently admitted the same thing in a filing to Judge Donato, noting that "[t]he formula is susceptible to fluctuating market conditions, such as the unprecedented worldwide corona virus pandemic which is causing utility value to drop by a substantial percentage, and could provide Fire Victims with less than $6.75 billion in stock value. The amount is uncertain at this time." [Case No. 19-cv-05257-JD, ECF 295 at 4]

The Plan faithfully incorporates the bargain and provides for the deposit of $6.75 billion of PG&E common stock at Fire Victim Equity Value on the Effective Date. Plan §§ 1.6, 1.81, 4.26. It is entirely consistent and compliant with the Tort Claimants RSA, and it remains the exact same deal that the TCC and other fire victim attorneys party to the Tort Claimants RSA agreed was the best and most appropriate deal to get recoveries to fire victims in a fair and expeditious manner. *See* Transcript of hearing held on December 17, 2019, at 246:13-14 (MR. PITRE: "But there is no doubt in my mind, Your Honor, that on this deal, it is the best that it gets. This is not playing chicken. Chicken games are over. We got to the bottom line . . . .").

With this background, it is apparent that the TCC's Proposed Letter makes several false statements. First, the TCC claims that "PG&E's multiple bankruptcy motions and press statements" somehow promise an Effective Date market valuation of $6.75 billion. Proposed Letter ¶ 1. Conveniently, the TCC ignores the Court-approved disclosure materials approved for dissemination to creditors and shareholders in connection with the Plan, which expressly provide to the contrary. For example, the "Fire Victim Claim Plan Treatment Summary" – *which was drafted by the TCC* and specifically approved for dissemination to fire claimants – provides:

> **RISK**: The $6.75 billion value of the common stock of reorganized PG&E Corporation does not necessarily reflect the actual value of the stock to be held by the Fire Victim Trust on the Plan effective date and thereafter. The actual value of the stock on the Plan effective date and thereafter could be greater or less than $6.75 billion based on the future trading value of the common stock of reorganized PG&E Corporation.

Fire Victim Claim Plan Treatment Summary [ECF 6338-1] at 4 (emphasis in original).

Similarly, the Disclosure Statement provides the following in all caps and bolded text on the second page of the document:

> **THE $6.75 BILLION VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP. IS BASED ON A FORMULA SET FORTH IN THE TORT CLAIMANTS RSA AND INCORPORATED IN THE PLAN. THE $6.75 BILLION VALUE DOES NOT NECESSARILY REFLECT THE ACTUAL VALUE OF THE STOCK TO BE HELD BY THE FIRE VICTIM TRUST ON THE EFFECTIVE DATE AND THEREAFTER. THE ACTUAL VALUE OF THE STOCK ON THE EFFECTIVE DATE AND THEREAFTER COULD BE GREATER OR LESS THAN $6.75 BILLION BASED ON THE FUTURE TRADING VALUE OF THE COMMON STOCK OF REORGANIZED PG&E CORP.**

Disclosure Statement [ECF 6353] at 2 (emphasis in original). The Disclosure Statement makes this point crystal clear in several other places:

> While the cash and stock contributed to the Fire Victim Trust have an aggregate nominal value of approximately $13.5 billion, the market value of the New HoldCo Common Stock on the Effective Date could be greater or less than $6.75 billion based on the trading value of New HoldCo Common Stock on such date or any subsequent date.

Disclosure Statement at 26.

> ***Potential Change in Value of Common Stock of Reorganized PG&E Corp***. As set forth above, the Fire Victim Trust will be funded with approximately $6.75 billion in common stock of Reorganized PG&E Corp. valued in accordance with the terms of the Tort Claimants RSA. The market value of that common stock may fluctuate due to a variety of factors, including, but not limited to: (i) the risk of additional wildfires, (ii) general market and economic conditions and (iii) actual or anticipated changes in operating results. These factors could cause the market value of common stock in Reorganized PG&E Corp. to increase or decrease, and those changes in price could have a substantial effect (both positively or negatively) on the assets of the Fire Victim Trust.

Disclosure Statement at 27-28 (emphasis in original).

Ignoring the Disclosure Statement and the TCC's own summary specifically tailored to fire claimants, the TCC asserts that "PG&E's multiple bankruptcy motions and press statements" created the "expectation" that the stock would be worth $6.75 billion on the Effective Date. Proposed Letter ¶¶ 1, 7. This too is false. The Debtors' motion for approval of the Tort Claimants RSA, for example, precisely (and correctly) describes the stock component of

consideration to be delivered to the Fire Victim Trust: "**Stock**: $6.75 billion in Common Stock of reorganized PG&E Corp. (valued at 14.9x Normalized Estimated Net Income), which shall represent not less than 20.9% share ownership of the reorganized PG&E Corp., assuming the Utility's current allowed return on equity." [ECF 5038 at 12 (emphasis in original)] The Debtors' 8-k release describing the Tort Claimants RSA similarly and correctly explains that "[t]he Aggregate Fire Victim Consideration is to be funded into a trust (the "Fire Victim Trust") to be established pursuant to the Amended Plan for the benefit of holders of the Fire Victim Claims and will consist of . . . $6.75 billion in common stock of the reorganized PG&E Corporation valued at 14.9 times Normalized Estimated Net Income (as defined in the RSA), except that the Fire Victim Trust's share ownership of the reorganized PG&E Corporation will not be less than 20.9%, assuming the Utility's current allowed return on equity." PG&E Corporation, Form 8-K dated December 6, 2019, at 2.

Thus, the TCC's allegation that the Debtors promised, much less guaranteed, an Effective Date value of $6.75 billion is not credible. Indeed, the description of the Tort Claimants RSA *on the TCC's own website* states that "[t]he trust will be funded with cash (of $5.4 billion), stock (valued under the plan at $6.75 billion, *but subject to fluctuations in value*), and deferred payments (over two years of $1.35 billion), totaling $13.5 billion, plus certain other assets like insurance policies and litigation rights." https://dm.epiq11.com/case/pge2/info (last visited April 5, 2020).

That description is exactly right. The value of the stock to be transferred to the Trust is subject to fluctuations in value. On the Effective Date and thereafter, it may be less than $6.75 billion, but it also may be more than $6.75 billion. In this regard, it is notable that the negotiated formula used to determine the number of shares to be delivered to the Trust is based upon a price-to-earnings multiple that is substantially lower than that of other publicly traded utilities of a similar size and growth profile. Moreover, notwithstanding the current market disruptions associated with COVID-19, the current market price of PG&E common stock ($8.56) is almost ten percent (10%) *higher* than the average price in the two months preceding execution

- 5 -

of the Tort Claimants RSA ($7.80). The TCC's assertion that current market conditions "present an unforeseeable and significant risk" (Proposed Letter ¶ 4) is simply unfounded.

### Capital Structure

The TCC also alleges that, "since the TCC settled with PG&E, the TCC believes that PG&E changed the December 2019 plan" by reducing the amount of equity and increasing the amount of debt of reorganized PG&E, which it claims somehow justifies renegotiation of the Tort Claimants RSA. Proposed Letter ¶ 2. This too is wrong.

The Tort Claimants RSA says nothing about reorganized PG&E's anticipated capitalization. While the definition of Normalized Estimated Net Income used in the formula to calculate Fire Victim Equity Value does include an adjustment for certain changes in interest costs – a provision that (all other things being equal) would cause the number of shares to be issued to the Trust to increase if certain interest costs increase – the negotiated formula for determining the shares that the Debtors must distribute to the Trust is not based upon and does not refer to any specific amount of equity or debt of reorganized PG&E.

### Registration Rights

The TCC also asserts that fire claimants should not vote because a registration rights agreement for the Trust has not yet been negotiated. Proposed Letter ¶ 5. The Tort Claimants RSA provides that there will be "reasonable registration rights consistent with the recommendations of the Debtors' equity underwriter and tax rules and regulations." Tort Claimants RSA Amend. No. 1 [ECF 5143-1] at § 3. The Tort Claimants RSA, however, says nothing about an agreement on registration rights before confirmation. And the Disclosure Statement expressly advises fire claimants that, "[w]hile there are no limitations on the Fire Victim Trust selling its stock under the applicable corporate documents, the ability of the Fire Victim Trust to do so may be limited by applicable securities laws or contractual provisions, such as those that may be found in a registration rights agreement." Disclosure Statement at 28. This

clearly is not a subject that justifies a misleading communication recommending that fire claimants not vote on the Plan.[4]

### Effective Date

The TCC's Proposed Letter states that "[t]he RSA settlement requires PG&E to fund the cash and stock to the Fire Victim Trust before August 29, 2020, and the Plan requires PG&E to fund the cash and stock by December 31, 2020," and then purports to warn fire claimants that "PG&E's ability to fund the cash and stock before August 29, 2020 is uncertain." Proposed Letter ¶ 6. This is misleading in two ways. First, the Tort Claimants RSA does not "require" funding of the Trust by August 29; it provides for automatic termination if the Plan's Effective Date does not occur by August 29, but also authorizes the termination date to be extended by agreement of the Debtors, the Shareholder Proponents, the TCC and the Requisite Consenting Fire Claimant Professionals. Tort Claimants RSA § 3(a)(ii). Consistent with this flexibility, the TCC's own Fire Victim Claim Plan Treatment Summary – which already has been disseminated – informs fire claimants that "the effective date will not be determined until the beginning of June, and that the effective date may occur by late summer or early fall of 2020." Fire Victim Claim Plan Treatment Summary at 8.

Second, the TCC's bald assertion that "PG&E's ability to fund the cash and stock before August 29, 2020 is uncertain" is completely unsupported and therefore misleading.

### Proposed CPUC Penalty Decision

The TCC's Proposed Letter references the administrative law judge's proposed rejection of the Debtors' settlement with the CPUC's special enforcement division. Proposed Letter ¶ 11. The TCC's description is misleading and inaccurate.[5] More importantly for disclosure purposes,

---

[4] That said, the Debtors recently engaged equity underwriters and have encouraged the TCC to do the same. Because underwriters will drive many of the essential registration right terms (a fact reflected in the Tort Claimants RSA itself), it was impossible to reach an informed agreement on registration rights before now. Assuming that all parties act in good faith, there should be a registration rights agreement well before the hearing on Plan confirmation.

[5] For example, the TCC states that the proposed decision "included the imposition of a $200 million fine." Proposed Letter ¶ 11. The proposed decision did not "impose" a fine. It rejected the proposed settlement but indicated that a settlement including a $200 million fine (and other terms) would be approved.

the proposed decision and the Debtors' response to it is described fully in the Disclosure Statement the Court has already approved. *See* Disclosure Statement at 16-17. There is nothing about the proposed decision that warrants an additional communication from the TCC, much less one advising constituents not to vote.

### Alleged Breach Of The Tort Claimants RSA

Finally, the Proposed Letter suggests that Sections 20 and 23 of the Tort Claimants RSA require the Debtors and Shareholder Proponents to modify the Plan, or that Section 19 of the Tort Claimants RSA authorizes the TCC to disregard its obligation to support the Plan. Proposed Letter ¶¶ 9, 10. This too is obviously false.

Section 20 of the Tort Claimants RSA requires RSA parties to "take such action as may be reasonably necessary or reasonably requested by the other Party to carry out the purposes and intent of this Agreement." Tort Claimants RSA § 20. As explained above, the Plan is perfectly consistent with the "purposes and intent" of the Tort Claimants RSA.

Section 23 of the Tort Claimants RSA (entitled "Severability") requires the parties "to negotiate in good faith to modify the Agreement to effect the original intent of the parties," but only when "any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, *shall be held invalid or unenforceable* in whole or in part." Tort Claimants RSA § 23 (emphasis added). It is only "[u]pon any such determination of invalidity" that the parties must negotiate to modify the Agreement "to reflect the original intent of the Parties." *Id.* As the Court has not declared any part of the Tort Claimants RSA to be invalid or unenforceable, Section 23 is inapplicable. In any event, to repeat, the Tort Claimants RSA and the Plan reflect and effectuate the "original intent" of the parties. There is nothing in the Tort Claimants RSA that requires any party to renegotiate the deal at this point.

Finally, nothing in Section 19 of the Tort Claimants RSA authorizes the dissemination of misleading disclosure about the Plan or otherwise relieves the TCC of its obligations under the Tort Claimants RSA. Section 19 provides that "nothing in this Agreement, the Term Sheet or the Amended Plan shall require the TCC to take or refrain from taking any action that it determines in good faith would be inconsistent with its fiduciary duties under applicable law. Notwithstanding

- 8 -

the foregoing, the TCC acknowledges that its entry into this Agreement is consistent with its fiduciary duties." Tort Claimants RSA § 19. For all the reasons set forth above, the Plan fully adopts the agreement memorialized in the Tort Claimants RSA, and the Plan therefore "is consistent with [the TCC's] fiduciary duties."

Accordingly, it is the TCC that currently is in breach of its obligations under the Tort Claimants RSA, which requires the TCC, among other things,

- to "provide the Debtors a letter . . . from the TCC that the Debtors may distribute to holders of Fire Victim Claims along with the solicitation materials in respect of the Amended Plan in which the TCC advises and recommends holders of Fire Victim Claims to vote to accept the Amended Plan," § 2(k);
- not to "object to, delay, impede, or take any other action to interfere with acceptance, confirmation, or implementation of the Amended Plan" § 2(o)(i); and
- not to "otherwise take any action that would interfere with, delay, impede, or postpone . . . the solicitation of acceptances, consummation, or implementation of the Amended Plan," § 2(o)(iii).

The Motion and Proposed Letter violate all three of those covenants (as do other actions taken by the TCC to frustrate the Plan and renegotiate the Tort Claimants RSA).

## Applicable Caselaw Confirms That The Proposed Letter Is Inappropriate

The seminal decision regarding supplemental disclosures made by creditors or creditor representatives in the context of solicitation of votes on a plan of reorganization is *In re Adelphia Comms. Corp.*, 352 B.R. 592 (Bankr. S.D.N.Y. 2006). In *Adelphia*, the Court considered a set of proposed submissions by a number of creditors who sought judicial approval of statements they wished to make with respect to a proposed plan as to which a disclosure statement had been approved. Addressing what it believed to be a matter of first impression, the Court established the ground rules:

> When a bankruptcy judge is asked to approve supplemental solicitation material, . . . [t]he purpose of the exercise is to ensure that the affected creditors get accurate information upon which they can determine whether or not to accept a plan. *It's not too much to require that it be not misleading. That means that any facts presented be accurate, and that the*

> *disclosure not leave out facts necessary to ensure that whatever is said isn't misleading or deceptive. . . .*
>
> Where, as here, a court is asked to pass on supplemental solicitation material in advance, I think fairness and accuracy are legitimate concerns. And in connection with the latter, I think a court should protect creditors under standards similar to those under which our securities laws protect investors. I think *the court must decline to approve supplemental solicitation material to the extent that it knows or suspects that facts are false, or that the proposed disclosures omit facts necessary to make those that have been stated not misleading*.

*Id.* at 600-01 (emphasis added).

Due to its many inaccuracies and falsehoods, the Proposed Letter fails this standard. As a consequence, the Debtors and Shareholder Proponents object to the Proposed Letter and request that the Court deny the Motion by which the TCC seeks the Court's judicial imprimatur on it.

Dated: April 6, 2020
                                            WEIL, GOTSHAL & MANGES LLP
                                            KELLER BENVENUTTI KIM LLP

By: */s/ Stephen Karotkin*
       Stephen Karotkin

*Attorneys for the Debtors and Debtors in Possession*

JONES DAY

By: */s/ James O. Johnston*
       James O. Johnston

*Attorneys for the Shareholder Proponents*