# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA (SAN FRANCISCO DIVISION)**

| | |
|---|---|
| In re:<br>**PG&E CORPORATION,**<br>- and -<br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>Debtors. | **Bankruptcy Case**<br>No. 19-30088 (DM)<br><br>**Chapter 11**<br>**(Lead Case)**<br>**(Jointly Administered)** |

☑ Date Stamped Copy Returned
[ ] No Self-Addressed Stamped Envelope
[ ] No Copy Provided

# Proof of Claim (Fire Claim Related)

Read the instructions before filing this claim form. This form is for tort claimants who have a claim against the Debtors (i.e. PG&E Corporation and Pacific Gas and Electric Company) that arose prior to the Debtors filing for bankruptcy (i.e. prior to January 29, 2019) and that arose from, or relates to, a fire.

Do not use this form for non-fire claims. Non-fire tort claimants should use Form 410.

Do NOT file a fraudulent claim. A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Please type or print in the spaces below. Do NOT use red ink or pencil.

## Part 1: Identify the Claim

**1. Who is the current creditor?**

GER Hospitality, LLC, dba Aventine Glen Ellen, for itself and on behalf of all others similarly situated
Name of the current creditor (the person or entity to be paid for this claim)

**2. Has this claim been acquired from someone else?**

☑ No
[ ] Yes. From whom? _____

**3. Are you filing this claim on behalf of your family?**
A family is a group of two or more people related by birth, marriage, domestic partnership, or adoption and residing together. All such people are considered as members of one family.

☑ No
[ ] Yes

If you checked "Yes", please provide the full name of each family member that you are filing on behalf of:

_____ _____
_____ _____
_____ _____
_____ _____

**4. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Name Law Offices of Francis O. Scarpulla
Attorney Name (if applicable) Francis O. Scarpulla
Attorney Bar Number (if applicable) CA SB 41059
Street Address 456 Montgomery Street, 17th Floor
City San Francisco
State CA
Zip Code 94104
Phone Number 415-788-7210
Email Address fos@scarpullalaw.com

Where should payments to the creditor be sent? (if different)

Name _____
Attorney Name (if applicable) _____
Attorney Bar Number (if applicable) _____
Street Address _____
City _____
State _____
Zip Code _____
Phone Number _____
Email Address _____

**5. Does this claim amend one already filed?**

[ ] No
☑ Yes. Claim number on court claims registry (if known) Att. A

Filed on 01/29/2019
MM / DD / YYYY

**6. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
[ ] Yes. Who made the earlier filing? _____

Proof of Claim (Fire Related)

Page 1

193008880009701

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:13:05    Page 2
of 49

Claim Number: 59725

**Part 2:** Give Information About the Claim as of the Date this Claim Form is Filed

| | |
|---|---|
| 7. **What fire is the basis of your claim?**<br><br>Check all that apply. | ☐ Camp Fire (2018)<br>☑ North Bay Fires (2017)<br>☐ Ghost Ship Fire (2016)<br>☐ Butte Fire (2015)<br>☐ Other (please provide date and brief description of fire: _____<br><br>_____ |
| 8. **What are the loss location(s) where you and/or your family suffered harm? (e.g. home or business address, place of injury, place from which you were evacuated, if different.?** | Location(s):<br><br><div align="center"># 14301 Arnold Drive, #32, Glen Ellen, CA 95442</div> |
| 9. **How were you and/or your family harmed?**<br><br>Check all that apply | ☑ Property Damage (homes, structures, personal property, land, trees, landscaping, and all other property damage)<br>    ☐ Owner ☑ Renter ☐ Occupant ☐ Other (Please specify): _____<br>☐ Personal Injury<br>☐ Wrongful Death (if checked, please provide the name of the deceased) _____<br>☑ Business Loss/Interruption<br>☑ Lost wages and earning capacity<br>☑ Loss of community and essential services<br>☐ Agricultural loss<br>☑ Other (Please specify):   Loss of going-concern value of business; loss of income; loss of inventory, etc. |
| 10. **What damages are you and/or your family claiming/seeking?**<br><br>Check all that apply | ☑ Economic damages (including replacement cost of damaged property, diminution in value, loss of use, lost inventory, lost profits, and other economic damage)<br>☑ Non-economic damages (including loss of society and support, loss of consortium, pain and suffering, emotional distress, annoyance and discomfort, and other non-economic damage)<br>☑ Punitive, exemplary, and statutory damages<br>☑ Attorney's fees and litigation costs<br>☑ Interest<br>☑ Any and all other damages recoverable under California law<br>☑ Other (Please specify):   See Att. B |
| 11. **How much is the claim?** | ☐ $_____ (optional)<br>☑ Unknown / To be determined at a later date |

Proof of Claim (Fire Related)

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/17/2019     (mm/dd/yyyy)

/s/ Francis O. Scarpulla
     Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | Francis O. Scarpulla |
| | First name      Middle name      Last name |
| Title | Attorney |
| Company | Law Offices of Francis O. Scarpulla |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 456 Montgomery Street, 17th Floor |
| | Number      Street |
| | San Francisco      CA      94104 |
| | City      State      ZIP Code |
| Contact phone | 415-788-7210      Email      fos@scarpullalaw.com |

Attachment A to Second Amended Proof of Claim (Fire Claim Related)
Claimant: GER Hospitality, LLC, dba Aventine Glen Ellen, on behalf of itself and all others
similarly situated

PRIOR CLAIMS

**5. Does this claim amend one already filed? Yes.**

    a)     Proof of Claim, Official Form 410, filed with USBC, NDCA on 1/30/19, docket 4
                 in 19-30088; docket 6 in 19-30089.

    b)     Amended Proof of Claim, Official Form 410, filed with USBC, NDCA on
                 January 30, 2019; docket numbers unknown.

    c)     Proof of Claim numbers assigned by Prime Clerk on 1/29/19: **15.**

    d)     Proof of Claim numbers assigned by Prime Clerk on 1/30/19: **28, 29, 35, 90, 118.**

Attachment B to Proof of Claim (Fire Claim Related)
Claimant:  GER Hospitality, LLC, dba Aventine Glen Ellen, on behalf of itself and all others
similarly situated

**10.  What damages are you and/or your family claiming/seeking?**

Claimant's lawsuit against Debtors arising from destruction of Claimant's business at 14301
Arnold Drive, #32, Glen Ellen, CA:  *GER HOSPITALITY, LLC, for itself and on behalf of all
others similarly situated, v. PG&E Corporation, et al.*, Sonoma County Superior Court Action
No.SCV-261723, filed December 22, 2017, coordinated with *California North Bay Fire Cases*;
JCCP 4955.



1  FRANCIS O. SCARPULLA (SBN 41059)
   PATRICK B. CLAYTON (SBN 240191)
2  LAW OFFICES OF FRANCIS O. SCARPULLA
   456 Montgomery Street, 17th Floor
3  San Francisco, CA  94104
   Tel.: (415) 788-7210
4  Email: fos@scarpullalaw.com
          pbc@scarpullalaw.com
5
   TAD S. SHAPIRO (SBN 96179)
6  SHAPIRO, GALVIN, SHAPIRO & MORAN
   640 Third Street
7  Santa Rosa, CA 95404
   Tel.: (707) 544-4848
8  Email:  tad@shpirogalvinlaw.com

9  [Additional Attorneys Appear on Signature Page]

10 *Attorneys for Plaintiff*

11            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                **COUNTY OF SONOMA**  SCV261723

13 GER HOSPITALITY, LLC, for itself and on    [UNLIMITED CIVIL CASE]
   behalf of all others similarly situated,
14                                            **COMPLAINT FOR DAMAGES**
15              Plaintiff,
                                              **CLASS ACTION**
16        vs.
                                              1.  **NEGLIGENCE;**
17 PG&E CORPORATION, a California             2.  **INVERSE CONDEMNATION;**
   Corporation; PACIFIC GAS AND              3.  **PUBLIC NUISANCE;**
   ELECTRIC COMPANY, a California            4.  **PRIVATE NUISANCE;**
18 Corporation; and DOES 1-125, inclusive,   5.  **PREMISES LIABILITY;**
19                                            6.  **NEGLIGENCE *PER SE*;**
              Defendants.                     7.  **VIOLATION OF PUBLIC UTILITIES**
20                                                **CODE, SECTION 2106; and**
21                                            8.  **VIOLATION OF HEALTH & SAFETY**
                                                  **CODE, SECTION 13007;**
22                                            9.  **NEGLIGENT INTERFERENCE WITH**
                                                  **PROSPECTIVE ECONOMIC**
23                                                **ADVANTAGE**
24
25
26
27
28
                                    1
                         COMPLAINT FOR DAMAGES

Plaintiff, GER HOSPITALITY, LLC, for itself and on behalf of a class of business entities in Sonoma, Napa, Mendocino, Lake, and Solano Counties who suffered economic losses due to the wildfires that began on or about October 8, 2017, complains and alleges as follows:

## I
## JURISDICTION AND VENUE

1. This Court has jurisdiction over the claims alleged in this complaint pursuant to Sections 395.5 and 410.10, California Code of Civil Procedure, in that the defendants named herein are found and are doing business in Sonoma County and many of the unlawful acts that started the wildfires on October 8, 2017, which proximately caused plaintiff and the class members to suffer economic injuries, occurred in Sonoma County.

2. Venue is proper in Sonoma County pursuant to Section 395.5, California Code of Civil Procedure, because the unlawful acts of the defendants named herein which proximately caused injury and damages to plaintiff and to the members of the class occurred in Sonoma County.

## II
## THE PARTIES

### A.    The Plaintiff

3. The Plaintiff GER Hospitality, LLC, *dba* Aventine Glen Ellen (hereinafter "GER" or "Plaintiff"), a California limited liability corporation with its principal place of business in San Francisco, California, owns and operates a restaurant in Glen Ellen, California, which has suffered economic losses due to the wildfires which started on October 8, 2017.

### B.    The Defendants

4. Pacific Gas and Electric Company (hereinafter "PG&E Co."), a California Corporation, with its principal place of business in San Francisco, California, is hereby named a defendant herein. PG&E Co., which is authorized to transact business in California, owns, operates, controls and/or manages an electric plant for compensation within the State of California, including in Sonoma County. The electricity PG&E Co. generates is not solely for its own use and is

2

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 8 of 49

1   distributed for sale and transmission to others, including Plaintiff and other residents of Sonoma

2   County.  Therefore PG&E Co. is an "Electrical Corporation" as defined by Section 218(a) of the

3   California Public Utilities Code; as such, PG&E Co. performs a service for and/or delivers a

4   commodity to the public, including to plaintiff and other residents of Sonoma County.  PG&E Co.

5   receives payment for that service and/or delivery of that commodity.  Therefore, pursuant to

6   California Public Utilities Code, Section 216(a) and (b), PG&E Co. is a "Public Utility" subject to

7   the jurisdiction, control and regulation of the California Public Utilities Commission ("CPUC") and

8   the provisions of the California Public Utilities Code.

9          5.      PG&E Corporation (hereinafter "PG&E Corp."), a publicly traded company

10  organized and existing under the laws of the State of California with its principal place of business in

11  San Francisco, California, is hereby named a defendant herein.  PG&E Corp., which is authorized to

12  transact business in California, is the parent company of PG&E Co.  PG&E Corp. owns, operates,

13  controls and/or manages real estate, fixtures and personal property in connection with and or to

14  facilitate the production, generation, transmission, delivery and/or furnishing of electricity for light,

15  heat or power.  Further, PG&E Corp. owns, operates, controls and/or manages conduits, ducts, or

16  other devices, materials, apparatus, or property for containing, holding, or carrying conductors used

17  or to be used for the transmission of electricity for light, heat, or power.  Therefore, PG&E Corp. is

18  an "Electric Plant" as defined in Section 217 of the California Public Utilities Code.  PG&E Corp.

19  also is both an "Electrical Corporation" and a "Public Utility" as defined by Sections 218(a) and 216

20  (a) and (b), respectively, of the California Public Utilities Code.

21         6.      PG&E Co. and PG&E Corp. are referred to collectively as "PG&E" or "Defendant."

22     **C.     The DOE Defendants.**

23         7.      The true names of DOES 1-125, whether individual, corporate, associate, agency or

24  otherwise, are unknown to Plaintiff(s), who, under California Code of Civil Procedure, Section 474,

25  sue these Defendants under fictitious names. Each of the hereto unknown DOES is responsible in

26  some manner for the conduct alleged herein, including, without limitation, by way of conspiracy,

27  aiding, abetting, acting with actual or ostensible authority, furnishing the means and/or acting in

28

3

capacities that create agency, *respondeat superior*, and/or predecessor or successor-in-interest

relationships with PG&E. Some or all of the DOES may be residents or conduct business in the

State of California. Plaintiff will seek to amend this Complaint to allege the true names, capacities

and responsibility of these DOES once they are ascertained. Plaintiff makes all allegations contained

in this Complaint against all Defendants, including DOES 1-125.

8. PG&E Co., PG&E Corp., and the DOES are referred to collectively as "Defendants."

9. The Defendants herein, and each of them, were agents and/or employees each of the

other and in acting and/or failing to act as alleged herein, the Defendants, and each of them, were

acting in the course and scope of said agency and/or employment relationship.

**D.** **The Class**

10. Plaintiff brings this action pursuant to Section 382, California Code of Civil

Procedure, as a class action for itself and on behalf of the following class:

> All business entities located in Sonoma, Napa, Mendocino, Lake, and
> Solano Counties who suffered economic losses due to the wild fires
> that started on or shortly after October 8, 2017 (the "Class").
> Excluded from this Class is any such business entity owned or
> controlled, in whole or in part, by PG&E, its officers, executives,
> directors, and employees, as well as by any Judge (and that Judge's
> family members), court personnel, law clerks, or members of their
> families.

11. This action is brought and may properly be maintained as a class action on behalf of

the proposed Class defined above, pursuant to the applicable and appropriate provisions of

California Code of Civil Procedure, Section 382.

12. The members of the Class are so numerous that a joinder of all members would be

impracticable. Based on public information on the number of business entities damaged, destroyed,

interrupted, or otherwise affected, the Class of those with fire-related damages includes hundreds of

potential business-entity claimants.

13. The Class is ascertainable because business entities have state, county, or city permits

to operate so that their identities can be ascertained easily and thus they can be notified of this action

by direct-mail or by direct electronic means.

4

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 10
of 49

1       14.     A well-defined community of interest in questions of law or fact involving and

2   affecting all members of the Class exists, and common questions of law or fact are substantially

3   similar and predominate over questions that may affect only individual Class members. This action

4   is amenable to a class-wide calculation of damages, or the establishment of fair and equitable

5   formulae for determining and allocating damages, through expert testimony applicable to anyone in

6   the Class. The common questions of law or fact that will decide the outcome of this litigation are

7   questions common to the Class, or to definable categories or subclasses thereof, and can be answered

8   by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in

9   the litigation. The questions of law or fact common to the Plaintiff and Class members, include,

10  among others, the following:

11           a.    whether Defendants were negligent in their construction, maintenance, and

12                  operation of electrical infrastructure, high-voltage power lines, transformers,

13                  and/or other equipment;

14           b.    whether Defendants owed any duties to Class members;

15           c.    whether Defendants breached one or more duties to Class members;

16           d.    whether Defendants' actions or inactions were a substantial factor in causing

17                  harm to class members;

18           e.    whether the wildfires caused physical injury to Class members' properties;

19           f.    whether the wildfires interfered with or continue to interfere with the Class

20                  members' business entities;

21           g.    whether Defendants have created a public nuisance;

22           h.    whether the nuisance Defendants created is temporary or permanent;

23           i.    whether the Defendants have taken the property of Plaintiff and Class

24                  members;

25           j.    whether Defendants have provided just compensation for having taken the

26                  property of Plaintiff and Class members;

27

28

5

COMPLAINT FOR DAMAGES

|     |     |                                                                                                    |
| --- | --- | -------------------------------------------------------------------------------------------------- |
| 1   | k.  | whether Defendants violated any California statutes, including California                           |
| 2   |     | Civil Code, Sections 3479, 3480, Public Utilities Code, Section 2106, and                          |
| 3   |     | California Health & Safety Code, Section 13007;                                                     |
| 4   | l.  | the extent to which Class members have been harmed by the wildfires; and                           |
| 5   | m.  | what is the proper measure of total class-wide damages for the Class members                       |
| 6   |     | for their losses.                                                                                  |

7   15. Plaintiff's claims are typical of the members of the Class. The evidence and the legal

8   theories regarding Defendants' alleged wrongful conduct are substantially the same for Plaintiff and

9   all of the Class members.

10   16. Plaintiff will fairly and adequately protect the interests of the Class members.

11   Plaintiff has retained competent counsel experienced in class action litigation to ensure such

12   protection. Plaintiff and its counsel intend to prosecute the action vigorously.

13   17. The class action is superior to all other available methods for the fair and efficient

14   adjudication of this case or controversy. the class action device is preferable to individual litigation

15   because it provides the benefits of unitary and inclusive adjudication, economies of scale, and

16   comprehensive adjudication by a single court.

17   18. Prosecution of separate actions by individual business entities would create a risk of

18   inconsistent or varying adjudications with respect to individual Class members that would establish

19   incompatible standards of conduct for the party (or parties) opposing the Class, lead to the

20   underinclusive, inconsistent or otherwise inequitable allocation of Defendants' available assets and

21   insurance among similarly situated claimants, and would lead to repetitious trials of numerous

22   common questions of fact and/or law. Plaintiff knows of no difficulty that will be encountered in the

23   management of this litigation that would preclude its maintenance as a class action. As a result, a

24   class action is superior to other available methods for the fair and efficient adjudication of this

25   controversy.

26   ///

27   ///

28

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 12
of 49

## VIOLATIONS ALLEGED

19. Beginning on or about October 8, 2017 a series of severe wildfires (referred to collectively as the "Wine Country Fires") burned large areas in Sonoma, Napa, Mendocino, Lake, and Solano Counties (the "Wildfire Counties").

20. Plaintiff operates a restaurant in Glen Ellen, California and suffered damages because of the Wine Country Fires and seeks compensation for those damages.

21. The wildfire that damaged Plaintiff's business was a result of the negligence of PG&E in the design, engineering, construction, maintenance, use, repair and/or monitoring its electrical equipment and the areas around that equipment and the failure of such equipment.

22. As part of supplying electricity to members of the public, PG&E installed, constructed, maintained, and operated overhead power lines, together with supporting poles and appurtenances, for conducting electricity for delivery to members of the general public including residents of and businesses located in the Wildfire Counties.

23. PG&E is responsible for maintaining its electrical equipment and the areas around that equipment, including, but not limited to maintaining and/or clearing vegetation and other hazards in proximity to their electrical equipment in compliance with State and Federal Regulations, specifically including but not limited to California Public Resource Code, Section 4292, California Public Resource Code, Section 4293, CPUC General Order 95, and Public Utilities Commission, General Order 165.

24. At all times prior to October 8, 2017, PG&E had a non-transferable, non-delegable duty to apply a level of care commensurate with, and proportionate to, the danger of designing, engineering, constructing, operating, managing, maintaining, and repairing its electrical transmission and distribution systems. This duty includes the maintenance and clearance of vegetation from around such transmission and distribution systems. Additionally, PG&E has a non-delegable duty of vigilant oversight in the maintenance, use, operation, repair and inspection appropriate to the changing conditions and circumstances of its electrical transmission and distribution systems and the surrounding environment.

25. At all times relevant to this Complaint, PG&E has and had a non-delegable duty to properly maintain and repair their electrical transmission lines and other equipment, and to keep vegetation properly trimmed and maintained to prevent contact with power lines and other electrical equipment. This duty includes the obligation to comply with statutes, regulations, and standards, including, but not limited to, California Public Resources Code, Section 4292, California Public Resources Code, Section 4294 and CPUC General Order 95. Further, PG&E was aware that such standards and regulations constitute minimum standards and that PG&E had a duty to make its equipment safe under all foreseeable circumstances and conditions.

26. The operation of electrical infrastructure and the transmission of electricity through wires are dangerous and hazardous activities. Conducting such activities requires the exercise of an increased level of care commensurate with that danger and hazard so as to make the transmission of electricity safe under all prevailing circumstances, including, but not limited to surrounding vegetation, climate, weather and the risk of fire.

27. Defendants were aware of the danger from fires in the Wildfire Counties during periods of little or no precipitation when environmental conditions increase the danger of wildfires and the high temperatures, abundance of dry plant material, absence of moisture, and the prevalence of high wind make extinguishing a fire difficult.

28. In recent years, the increasing number of severe wildfires in California put PG&E on notice of the elevated level of care required to prevent their electrical equipment from causing wildfires during California's seasonal weather conditions. For many years, California suffered through a severe drought. Much of the vegetation, including trees, had died, and was very dry. The rains of the winter of 2016-2017 predictably produced an abundance of new growth of grasses and other plant material that foreseeably became highly-combustible during the Summer and into the Fall months. The low-humidity, tinder-like vegetation, and high wind are foreseeable conditions that occur often in the region of California where the Wine Country Wildfires occurred.

29. According to the California Department of Forestry and Fire Protection ("Cal Fire"), the explosive failure of power lines and other electrical equipment has regularly ranked among the

COMPLAINT FOR DAMAGES

top three singular sources of California wildfires for the last several years. In 2015, the last year of reported data, electrical power problems caused the burning of 149,241 acres – more than twice the amount from any other cause.

30.     As set forth in more detail below, the Wine Country Fires share a common cause: PG&E's willful and conscious disregard of public safety. PG&E's aging and improperly maintained electrical infrastructure sparked the Wine Country Fires by coming into contact with trees and vegetation that PG&E had allowed to grow too close to power lines and poles.

31.     PG&E was aware of these dangers and risks – it knew its infrastructure was aging and inadequately maintained; it knew trees and vegetation were too close to the poles and lines; it knew the current and seasonal weather, climate and fire-risk conditions in Northern California; it knew where and how fires had ignited before in these areas; and it knew its own failures had caused fires and the attendant destruction numerous times before. PG&E knew all this, but failed to act on this knowledge.

32.     The conditions and circumstances in existence when the Wine Country Fires began were foreseeable by a reasonably prudent person, and even more foreseeable to PG&E, which has special knowledge and expertise as a public utility company, and which has dealt with such conditions and circumstances for an extended period of time.

33.     PG&E did not protect against the danger caused by these foreseeable risks. As a result, residents of the Wildfire Counties were stricken by devastating fires, which were entirely preventable. These fires were caused by the intentional, negligent, and/or otherwise wrongful conduct of PG&E.

34.     PG&E failed in its duty to exercise care commensurate with, and proportionate to, the combined danger of an area susceptible to fire and the dangerous activity of wires carrying electricity and electrical infrastructure. PG&E's failure was the sole cause of the Wine Country Fires, as more fully set forth herein.

35.     The California Public Utilities Commission (hereinafter "CPUC") regulates privately owned electric, natural gas, and telecommunications companies. The role of CPUC is to protect

9

COMPLAINT FOR DAMAGES

1  consumers and ensure the provision of safe, reliable, utility service and infrastructure. In enacting
2  their regulations, CPUC is given the power to fine utilities they regulate for failure to comply with
3  such regulations.

4      36.    In 2013, a report that was produced at the direction of CPUC found that much of
5  PG&E's equipment was obsolete and highly susceptible to failure and that many of PG&E's old
6  power poles were not properly inspected and/or maintained. It was further found that a significant
7  portion of PG&E's electrical infrastructure was not able to be remotely turned off when a power line
8  was downed.

9      37.    Over the past 10 years, PG&E has been subject to numerous fines and penalties
10  because of their ongoing failure to abide by safety rules and regulations. A notable CPUC decision
11  date April 9, 2015 imposed on PG&E a record fine/penalty of $1.6 billion for safety violations that
12  resulted in deaths, injuries, and destroyed homes related to the San Bruno natural gas pipeline
13  explosion. One of the stated purposes of the CPUC in rendering such a record fine against PG&E
14  was to "ensure that nothing like this happens again."

15      38.    PG&E was also subjected to $8.3 million in fines and penalties by the CPUC for its
16  role in causing the Butte Fire. These fines were issued, in part, for PG&E's failure to maintain
17  overhead conductors safely and properly, and PG&E's failure to maintain the minimum required
18  clearance between its conductors and trees.

19      39.    PG&E's disregard for safety has resulted in federal criminal charges. The United
20  States Department of Justice has charged PG&E with various crimes based on PG&E's knowing and
21  willful violation of various minimum safety standards.

22      40.    Despite these penalties and fines, PG&E has failed and refused to modify its behavior
23  and continues to conduct its business with a conscious disregard for the safety of the public.

24      41.    As a result of the continued actions by PG&E, in conscious disregard for the safety of
25  others, the CPUC has ordered an investigation into the culture of ignoring safety at PG&E. The
26  CPUC President has recognized that PG&E has failed and refused to modify its conduct. Despite
27  penalties and fines, in July of 2015, the President of the CPUC, specifically stated:

28

> Despite major public attention, ongoing CPUC investigations (OIIs) and rulemakings (OIRs) into PG&E's actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, continued safety lapses at PG&E continue to occur.

42. In addition, the most recent 2015 audit of PG&E, found 3,527 maintenance and repair jobs that were not finished by their scheduled due dates. A 2013 audit of PG&E's North Bay division, which includes Marin and Napa counties, showed 9,520 repair or maintenance orders finished late and 3,270 still overdue at the time of the audit.

43. In the construction, inspection, repair, maintenance, management, ownership, and/or operation of its power lines and other electrical equipment, PG&E had an obligation to comply with a number of statues, regulations, and standards, as detailed below.

44. Pursuant to Public Utilities Code, Section 451, "[e]very public utility shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities ... as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

45. To meet this safety mandate, PG&E is required to comply with a number of design standards for its electrical equipment, as stated in CPUC General Order 95. In extreme fire areas, PG&E also must ensure that its power lines can withstand winds of up to 92 miles per hour. Further, PG&E also must follow several standards to protect the public from the consequences of vegetation and/or trees coming into contact with its power lines and other electrical equipment. Pursuant to Public Resources Code, Section 4292, PG&E is required to "maintain around and adjacent to any pole or tower which supports a switch, fuse, transformer, lightning arrester, line junction, or dead end or corner pole, a firebreak which consists of a clearing of not less than 10 feet in each direction from the outer circumference of such pole or tower." Also, Public Resources Code, Section 4293 mandates PG&E maintain clearances of four to ten feet for all of its power lines, depending of **[on]** their voltage. In addition, "[d]ead trees, old decadent or rotten trees, trees weakened by decay or disease and trees or portions thereof that are leaning toward the line which may contact the line from the side or may fall on the line shall be felled, cut, or trimmed so as to remove such hazard."

11

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 17 of 49

46.     Pursuant to CPUC General Order 165, PG&E is also required to inspect its distribution facilities to maintain a safe and reliable electric system. In particular, PG&E must conduct "detailed" inspections of all of its overhead transformers in urban areas at least every five years. Also, every ten years, PG&E is required to conduct "intrusive" inspections of its wooden poles that have not already been inspected and are over 15 years old.

47.     PG&E knew or should have known that such standards and regulations were minimum standards and that PG&E has a duty to identify vegetation which posed a foreseeable hazard to power lines and/or other electrical equipment, and to manage the growth of vegetation near its power lines and equipment so as to prevent the foreseeable danger of contact between vegetation and power lines starting a fire. Further, PG&E has a duty to manage, maintain, repair, and/or replace its aging infrastructure to protect public safety. These objectives could and should have been accomplished in a number of ways, including, but not limited to, putting electrical equipment underground in wildfire-prone areas, increasing inspections, developing and implementing protocols to shut down electrical operations in emergency situations, modernizing infrastructure, and/or obtaining an independent audit of its risk-management programs to ensure effectiveness.

48.     Defendants were specifically aware that they had a duty to maintain equipment and the surrounding vegetation in compliance with these regulations and that a failure to do so constituted negligence and would expose Plaintiff and Class members to a serious risk of property damage and economic losses caused by wildfires.

49.     At all times mentioned herein, PG&E was aware that the State of California had been in a period of drought, and that even though it received more rain this past winter, the extremely hot Summer months brought back drought-like conditions. The heavy rain this Winter followed by a hot Summer made California especially prone to wildfires: the rains caused a lot of plants and vegetation to grow, and the het then caused them to dry out. PG&E was aware that the drought conditions existed and were aware that fire danger was at an extraordinarily high level, particularly given the increased amount of dry vegetation.

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 18
COMPLAINT FOR DAMAGES    of 49

50.     PG&E also know that Northern California often experiences the "Diablo Winds," the hot, dry winds, which can make dangerous weather conditions highly conducive to the spread of wildfire. The Diablo Winds are not abnormal or unforeseeable, and all who live and work in California have to act reasonably under these conditions to prevent fires from starting or spreading.

51.     PG&E knew that if their power lines or other equipment came into contact with, or caused electricity to come into contact with, vegetation it was probable that a fire would result and that, given the dry conditions, such a fire would likely result in the loss of life, significant damage to real and personal property, and economic losses to members of the general public, including to this Plaintiff and Class members.

52.     In June 2014, the CPUC directed PG&E to take remedial measures to reduce the risk of fires by way of Resolution ESRB-4, after Governor Brown had declared a Drought State of Emergency in January. In November 2015, the Governor issued another drought-related Executive Order to call for additional actions to respond to the record dry conditions and assist recovery efforts for the victims of 2015's devastating wildfires. Although the Governor issued an Executive Order in April 2017 ending the drought State of Emergency in all counties except Fresno, Kings, Tulare, and Tuolumne, the declaration directed state agencies "to continue response activities that may be needed to manage the lingering drought impacts to people and wildlife."

53.     In October 2015, Governor Brown issued The California Tree Mortality State of Emergency regarding the unprecedented tree die-off in the state. The drought conditions exacerbated a bark beetle infestation that ultimately killed tens of millions of trees. The tree die-off significantly worsened the "risk in many areas of the state and presents life safety risks from falling trees to Californians living in rural, forested communities." Governor Brown sought additional resources to provide for the safe removal of dead and dying trees.

54.     In addition, the CPUC informed PG&E in Resolution ESRB-4 that it could seek recovery of incremental costs associated with these remedial measures outside of the standard funding process, *i.e.*, the CPUC was agreeing to provide additional funding on top of vegetation

13

1  management funding already authorized in order to make sure remedial measures would not go
2  unperformed due to lack of funding.
3      55.     According to PG&E's 2014 Annual Electric Distribution Reliability Report, sent to
4  the CPUC on February 27, 2015, weather conditions have accounted for many of the top ten PG&E
5  electrical outages each year since at least 2004 – proof that Defendants knew that these weather
6  conditions occur and that they can cause electrical problems.  For example, four of the "ten largest
7  2004 outage events" for PG&E occurred in the Santa Rosa and Sonoma areas, and winds were
8  documented at much higher levels than those of October 8, 2017.  The CPUC has not rescinded
9  ESRB-4 and the Tree Mortality State of Emergency remains in effect.
10     56.     Further, according to records maintained by Cal Fire, approximately 135 fires in
11 Sonoma and Napa Counties were caused by electrical equipment from 2011 through 2015.  In 2015,
12 the last year of reported data, electrical power problems sparked the burning of 149,241 acres across
13 California – more than twice the amount from any other cause.
14     57.      PG&E has long known that the biggest threat of a tree-caused electrical wildfire was
15 in the North Bay.  A document entitled "Summary and Analysis of Vegetation-Related Fire
16 Incidents on PG&E electric Powerlines," an internal PG&E document prepared by Charles Filmer in
17 February 2013 and reviewed by NBC Bay Area, shows that the North Bay counties to have nearly a
18 three percent (3%) risk of a power line sparking a wildfire.  The risk was listed as one percent (1%)
19 elsewhere in PG&E's territory.  Nevertheless, PG&E failed to take reasonable, preventative
20 measures.
21     58.     In May 2016, the CPUC adopted a so-called "Fire Map," which depicts areas of
22 California where there is an elevated hazard for the ignition and rapid spread of power line fires due
23 to strong winds, abundant dry vegetation, and other environmental conditions.  The CPUC adopted
24 the Fire Map in response to past devastating wildfires that were reportedly ignited by power lines.
25     59.     On the Fire Map, the area in and around the origin of the Wine Country Fires
26 indicates the highest level of elevated hazard for the ignition and rapid spread of power line fires due
27 to strong winds, abundant dry vegetation, and/or other environmental conditions.

28

14

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 20
of 49

60.     PG&E was put on direct notice of this map in May 2016, and therefore knew well in advance of the Wine Country Fires of the elevated fire risk for the region.

61.     After the fires, PGE initially attempted to shift blame away from itself by announcing that unusually powerful, "hurricane strength winds" were to blame for the severity of the fires. But local weather station readings found the winds were almost half that speed when Defendants' power lines started to come down.

62.     Contrary to Defendant's suggestion, Northern California did not experience highly unusual weather patterns the night he Wine Country Fires began. A review of readings at weather stations in the areas impacted by the Fires shows that winds were not at unexpected levels when PG&E's electrical equipment began to fail. For example, a weather station in Santa Rose in the vicinity of the Tubbs Fire recorded wind gusts of about 30 miles per hour at or around 9:30 p.m. on October 8, 2017. About an hour later, the same station recorded wind gusts of 41 miles per hour. These wind speeds were surpassed in other recent storms in the area on a number of occasions.

63.     On May 6, 2013, a report (the "2013 Liberty report") was sent to the Safety and Enforcement Division of the CPUC from the Liberty Consulting Group, which had been retained to conduct an independent review of capital and operations and maintenance expenditures proposed by PG&E. The 2013 Liberty Report concluded that: "several aspects of the PG&E [electrical] distribution system present significant safety issues."

64.     The report further stated, "addressing aging infrastructure and adding SCADA to the system comprise the major focuses of safety initiatives for the distribution system." The Report authors were so concerned about the state of PG&E's aging infrastructure that they advised in the Report: "[w]e also recommend that PG&E treat aging infrastructure as an enterprise-level risk."

65.     The Liberty Report concluded that "aging infrastructure is best addressed by having a strategic asset management program in place. These types of programs … force a detailed and thorough condition assessment survey of the major assets. These types of formal programs also take failure modes into consideration. Long term sustainable plans can then be prepared to address the

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 21 of 49
COMPLAINT FOR DAMAGES

asset conditions. A sustainable asset management plan will mitigate system safety risks from aging

infrastructure, which constituted a major portion of the safety items" for PG&E.

66.     PG&E has known for years that its miles of aging power lines pose a serious safety

risk of triggering wildfires.

67.     The 2013 Liberty Report found that PG&E's system had a large amount of obsolete,

unsafe, small-size wiring (*a.k.a.*, "conductors") still in use, which should have been replaced with

safer larger-size wires long ago. At the time, PG&E had 113,000 miles of wiring, and according to

the report, over 60 percent (60%) is of the small-size type that is highly susceptible to failure. The

small-size conductors are generally more susceptible to breaking than standard-size conductors. As

the conductor ages, it becomes even more susceptible to breaking. Weather conditions, such as

winds and lightning strikes, will also wear a small conductor more than larger ones. For these

reasons, "[t]his conductor [type] is now recognized as obsolete, due to its small size."

68.     The 2013 Liberty Report found that about one-fifth of PG&E's system was frail and

obsolete. Most concerning to the consultants was that three-quarters of the system was made of

three-wire lines. Three-wire lines lack modern in-line grounding technology that has been available

for at least the last four decades. Without a ground wire, PG&E could not always isolate a problem

remotely nor shut down a faulty wire quickly. Instead, the live wires remain on the ground when

they fall, posing a danger of injuries and fire.

69.     PG&E knew the majority of its system was obsolete and had unsafe wiring, yet

PG&E did nothing to update it.

70.     According to the 2017 CPUC Order Instituting Investigation into the Creation of a

Shared Database or Statewide Census of Utility Poles and Conduit:

> Poorly maintained poles and attachments have caused substantial
> property damage and repeated loss of life in this State. Unauthorized
> pole attachments are particularly problematic. A pole overloaded with
> unauthorized equipment collapsed during winding conditions and
> started the Malibu Canyon Fire of 2007, destroying and damaging
> luxury homes and burning over 4500 acres. Windstorms in 2011
> knocked down a large number of poles in Southern California, many
> of which were later found to be weakened by termites, dry rot, and
> fungal decay.

16

1    71.    In the June 29, 2017 CPUC press release for the Order, the CPUC President Michael
2    Picker stated, "[p]lain old wooden poles, along with their cousins, the underground conduits, are
3    work horses, carrying most of our power and telecommunications.  They sometimes get crowded and
4    fail, causing outages and fires because of all the equipment crammed onto them."  Further, "[n]ot
5    knowing where all the poles are and who owns them, how loaded they are, how safe they are, and
6    whether they can handle any additional infrastructure, is problematic to both the utilities and to the
7    CPUC.  Creating a database of utility poles could help owners track attachments on their poles and
8    manage necessary maintenance and rearrangements, and can help the CPUC in our oversight role."

9    72.    In addition, since prior to 1996, PG&E has known or should have known that its
10   choice of chemical treatments for its poles can also make its equipment unsafe.  For example, PG&E
11   uses and has used poles treated with pentachlorophenol in liquified petroleum gas by the Cellon®
12   process.  Those poles tend to experience surface decay below ground regardless of the type of wood
13   used for the poles.  As a result, digging inspections are required for poles treated by these processes
14   for all wood types.  However, Plaintiffs believes that PG&E has failed to conduct the proper
15   inspections, and when PG&E has been advised of necessary repairs to such poles, PG&E failed to
16   repair the poles in a timely manner.

17   73.    The 2013 Liberty Report found that on a daily basis, and in 36 percent (36%) of
18   cases, PG&E cannot remotely de-energize a downed line and must send someone to the scene to
19   manually turn-off the feed.  During that time, the downed line is a live wire and a fire hazard.

20   74.    PG&E has a long-standing practice of using devices called "reclosers" throughout its
21   system to automatically restart power after interruptions, even though it is well known to the
22   industry – including PG&E – that recloser devices can cause wildfires.

23   75.    Reclosers send pulses of electricity through power lines whenever an interruption
24   occurs on lines equipped with the devises.  According to experts, if power lines are in contact with
25   trees or vegetation, these pulses of electricity can start fires.

26   76.    PG&E knew that its reclosers posed a great risk of wildfire.  At a Congressional
27   hearing in 2015, PG&E's Senior Vice President of Electrical Operations, Patrick Hogan, stated that

28
                                                   17
Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 23
of 49

PG&E had the ability to reprogram its reclosers during fire season to not restart power. Patrick Hogan claimed that shutting down power means "you take the reliability hit, but you gain the wildfire benefit."

77. The dangers posed by reclosers are so significant that the other two major utilities in California, San Diego Gas & Electric Company and Southern California Edison, have reprogrammed their electrical systems during fire seasons to ensure that reclosers do not automatically restart electrical currents after a service interruption. In contrast, PG&E did not reprogram its reclosers.

78. Since PG&E did not reprogram all of its reclosers to keep electricity turned off after a disruption during fire season, the night the Wine Country Fires began, some of PG&E's devices were programmed to trying up to three times to restore power by sparking electricity.

79. NBC Bay Area has recently reported that PG&E's own auditors allow one out of 100 trees they check to violate state power line clearance standards. With about 55 million trees under its control, this means approximately 500,000 trees may not be in compliance with state law. Even more troubling, when PG&E found more than one tree in every 100 violated safety laws, the company merely expanded the number of trees it checked until it could meet its compliance rate.

80. On top of having aging infrastructure and no formal, organized system to track the condition of the infrastructure, PG&E failed to perform the necessary maintenance and inspections of its electrical equipment. A 2015 audit of PG&E's Sonoma Division revealed that there were over 3,500 unfilled PG&E repair and maintenance requests in the area of the Tubbs fire. This number is staggering in terms of the safety risk posed to the people and businesses in the Fire Area.

81. In a December 31, 2015 letter to PG&E regarding the audit, Fayi Daye, a supervising electric safety regulator with the CPUC, outlined the violations found in the review of records between 2010 and 2015 and a spot check of PG&E electrical distribution equipment. Fayi Daye's letter stated the following:

> PG&E's records indicated that from August 2010 to September 21, 2015, a total of 3,527 work orders were completed past their scheduled date of corrective action per PG&E's electric Notification Prioritization Standards. Late work orders included overhead and underground facilities.

18

COMPLAINT FOR DAMAGES

1    The letter concluded that these delays violated CPUC General Order No. 128, Rule 17.1,

2    which sets forth the CPUC's design, construction, and maintenance rules for electrical systems.

3         82.    The audit also reviewed PG&E's maps for its electrical distribution lines and found

4    that over 50 pieces of overhead equipment – including pole-mounted transformers and power lines –

5    had not been inspected every year as required by law.  This was a violation of CPUC General Order

6    No. 165, Section III-B, which sets forth standards for inspections.

7         83.    Although PG&E received the money for such inspections, PG&E failed to correct any

8    problems with its lines.

9         84.    PG&E's failure to use due care in maintaining its power lines and its disregard for the

10   requirements of vegetation management caused this foreseeable, preventable tragedy that has

11   harmed thousands of people and businesses.

12        85.    PG&E knew of the risks its system created before the Wine Country Fires because

13   PG&E has been called out and punished for this behavior before.

14        86.    PG&E has a long history of disregarding safety regulations in order to maximize

15   corporate profits.  In 1994, PG&E was found guilty of 739 counts of negligence and fined nearly $30

16   Million by the CPUC when its high-voltage wires caused a fire in Nevada County after coming into

17   contact with nearby trees.  Prosecutors uncovered that PG&E had diverted almost $80 Million from

18   its tree-cutting programs into profits.

19        87.    An audit by the CPUC showed that PG&E violated electricity-grid safety regulations

20   at least 11 times in the North Bay in the years prior to the Wine Country Fires.  CPUC also said that

21   PG&E had failed in thousands of instances over a five-year period to conduct timely inspections and

22   to complete work orders required by the state regulator.  During the same time period, PG&E took in

23   about $1 Billion in profits each year.

24        88.    PG&E also regularly fails to comply with safety rules set by regulators.  Regulators

25   who audit PG&E's work in the field cite the company for late repairs and maintenance jobs far more

26   frequently than any other electric utility in the state.

27

28

1    89.    Moreover, PG&E has actively fought against initiatives intended to prevent wildfires.

2    After electrical lines knocked down by wind sparked the catastrophic fired in San Diego in 2007, the

3    CPUC has attempted to adopt stricter regulations and create a map of the power lines that pose the

4    biggest fire risk.  Proponents asset that the initiative could have bolstered maintenance efforts and

5    forced PG&E to strengthen poles prior to the Fires.  But PG&E opposed these efforts, claiming such

6    mapping would be too expensive for rural areas.  This safety initiative was delayed five times,

7    including an additional delay granted on October 6, just two days before the Wine Country Fires

8    began.

9    90.    PG&E has also blocked implementation of the safety proposals related to wildfires.

10    In July 2017, PG&E asked again to slow down the effort and for more time to comply with new

11    wildfire regulations.  PG&E also argued against increasing the ability of the poles to sustain greater

12    winds, claiming there was no evidence that wildfires had been caused by poles not being able to

13    withstand high winds.

14    91.    PG&E has a well-documented history of implementing a "run to failure" approach

15    with its aging infrastructure, whereby it ignores necessary maintenance in order to line its own

16    pockets with excessive profits.  According to a filing by the CPUC in March 2013:

17            [T]he Overland Audit explains how PG&E systematically underfunded
                [Gas Transmission & Storage ("GT&S")] integrity management and
18            maintenance operations for the years 2008 through 2010.  PG&E
                engaged in a "run to failure" strategy whereby it deferred needed
19            maintenance projects and changed the assessment method for several
                pipelines from [In-line Inspection ('ILI')] to the less informative
20            [External Corrosion Direct Assessment ("ECDA")] approach – all to
                increase its profits even further beyond its already generous authorized
21            rate of return, which averaged 11.2% between 1996 and 2010.

22            Given PG&E's excessive profits over the period of the Overland
                Audit, there is no reason to believe that Overland's example regarding
23            GT&S operations between 2008 and 2010 was unique.  The
                [Integrated Resource Planning] Report supplements the Overland
24            Audit findings with additional examples of PG&E management's
                commitment to profits over safety.  Thus, it is evident that while the
25            example of G&&S underfunding between 2008 and 2010 might be
                extreme, it was not an isolated incident; rather, it represents the
26            culmination of PG&E management's long-standing policy to squeeze
                every nickel it could from PG&E gas operations and maintenance,
27            regardless of the long term "run to failure" impacts.  And PG&E has
                offered no evidence to the contrary.

28

20

92.     This same filing also cited to reports which revealed that "the multiple and recurring deficiencies in PG&E operation practices indicate a systemic problem …. [These problems] involve people at numerous levels within a company, and are characterized by a pervasive lack of proactive measures to ensure adoption and compliance with a safety culture." Additionally, the filing found that "[PG&E] did not include any goals for safety as part of its long-term aspirations. It did include an aspiration for financial performance, however."

93.     PG&E knew about the significant risk of wildfires from its ineffective vegetation management programs, unsafe equipment, and/or aging infrastructure for decades before the Wine Country Fires began, and has been repeatedly fined and/or convicted of crimes for failing to mitigate these risks.

        a.     In 1994, PG&E's failure to trim trees near its power lines caused the devastating "Trauner Fire" in Nevada County, California. In 1997, a jury found PG&E liable for 739 counts of criminal negligence for causing this fire. Subsequent to the trial, a report authored by the CPUC revealed that from 1987 through 1994, PG&E diverted $495 Million from its budgets for maintaining its systems, and instead, used this money to boost corporate profits.

        b.     In 2003, PG&E's apparent inability to lean from its past mistakes caused a fire at its Mission District Substation in San Francisco. In 2004, the CPUC investigated the fire and concluded that "it finds it quite troubling that PG&E did not implement its own recommendations" after a previous fire at the same substation.

        c.     In 2008, PG&E's inadequate repair job and infrastructure caused a deadly explosion in Rancho Cordova, California. In 2010, the CPUC fined PG&E $38 Million for causing and failing to prevent the explosion.

        d.     In 2010, PG&E's aging infrastructure caused the deadly gas explosion in San Bruno, California that killed eight people and destroyed dozens of homes. As

21

1    a result, the CPUC slapped PG&E with a $1.6 Billion fine, and PG&E was
2    later found guilty of six felony charges.
3    e.    In 2011, PG&E caused an explosion in Cupertino when it failed to replace a
4          plastic pipe that it knew was unsafe since at least 2002. PG&E ignored
5          warnings about the dangerous nature of the pipe, and instead chose to do
6          nothing.
7    f.    In 2014, PG&E's inadequate recordkeeping and disregard for public safety
8          caused an explosion in Carmel. As a result, PG&E was required to pay over
9          $36 Million in fines.
10   g.    Since 2014, PG&E has been fined $9.65 Million by the CPUC for incidents
11         solely related to their electrical distribution systems.
12   h.    Since 2015, PG&E was once again responsible for causing a massive wildfire
13         called the "Butte Fire," which destroyed hundreds of homes and killed two
14         people, due to its inadequate and unlawful vegetation management practices
15         and disregard for public safety. After the fire, in 2017, the CPUC fined
16         PG&E a total of $8.3 Million for violating multiple safety laws.
17   i.    The most recent fine/penalty imposed on PG&E for safety violations occurred
18         on April 9, 2015, when the CPU imposed a record $1.6 billion for safety
19         violations that resulted in deaths, injuries, and destroyed homes related to the
20         San Bruno fire. One of the stated purposes of the CPUC in rendering such a
21         record fine against PG&E was to "ensure that nothing like this happens
22         again."
23   94.    In addition, PG&E's disregard for safety has resulted in federal criminal charges for
24   its knowing and willful violation of various minimum safety standards. Despite these penalties and
25   fines, the PG&E Defendants have failed and refused to modify their behavior and they have
26   continued to conduct their business with a conscious disregard for the safety of the public.
27
28

22

95.     As a result of the continued actions by these Defendants, in conscious disregard for the safety of others, the CPUC has ordered an investigation into the culture of ignoring safety at PG&E. The CPUC President has recognized that Defendants have failed and refused to modify their conduct. Despite penalties and fines, in July of 2015, the President of the CPUC, specifically stated:

> Despite major public attention, ongoing CPUC investigations … and rule makings … into PG&E's actions and operations, including the investigations we voted on today, federal grand jury, and California Department of Justice investigation, continued safety lapses at PG&E continue to occur.

96.     All of these devastating events, and many more, resulted from PG&E's long history of choosing to divert funds from its public safety, vegetation management, and/or infrastructure maintenance programs to instead line its own corporate pockets.

97.     Rather than allocate adequate funds from the money it obtains from customers for infrastructure maintenance and safety, PG&E funnels funds to boost its own corporate profits and compensation. This pattern and practice of favoring profits over having a solid and well-maintained infrastructure that would be safe and dependable for years to come exposed the citizens of Northern California, such as Plaintiff and Class members, to an increased risk of a catastrophic event such as the Wine Country Fires.

98.     For example, according to documents released by The Utility Reform Network, PG&E supposedly planned to replace a segment of the San Bruno pipeline in 2007 that it identified as one of the riskiest pipelines in PG&E's system. PG&E collected $5 Million from its customers to complete the project by 2009, but instead deferred the project until it was too late and repurposed the money to other priorities. That same year, PG&E spent nearly $5 Million on bonuses for six of its top executives.

99.     Moreover, PG&E has implemented multiple programs that provide monetary incentives to its employees, agents, and/or contractors to not protect public safety. Prior to the Butte Fire, PG&E chose to provide a monetary incentive to its contractors to cut fewer trees, even though PG&E was required to have an inspection program in place that removed dangerous trees and reduced the risk of wildfires. Robert Urban, a regional officer for a PG&E contractor, stated that he

23

1   had a concern that the bonus system incentivized his employees to not do their job, but PG&E chose

2   to keep this program despite knowing this risk.

3       100.    Similarly, prior to the San Bruno explosion, PG&E had a program that provided

4   financial incentives to employees to not report or fix gas leaks and keep repair costs down. This

5   program resulted in the failure to detect a significant number of gas leaks, many of which were

6   considered serious leaks. According to Richard Kuprewicz, an independent pipeline safety expert,

7   PG&E's incentive system was "training and rewarding people to do the wrong thing," emblematic of

8   "a seriously broken process," and "explains many of the systemic problems in this operation that

9   contributed to the [San Bruno] tragedy."

10                                    **IV**
11              **INJURY TO PLAINTIFF AND THE CLASS**

12      101.    Plaintiff is informed and believes and herein alleges that PG&E knew or should have

    known of its failure to maintain its equipment to appropriate standards that resulted in the Wine
13
    Country Fires. Plaintiff is further informed and believes and herein alleges that PG&E knew or
14
    should have known of the dangerous conditions that eventually resulted in the Wine Country Fires,
15
    but recklessly and with careless and conscious disregard for human life and safety, decided to ignore
16
    the fire risk.
17
        102.    All of the Wine Country Fires shared a common cause – faulty electrical
18
    infrastructure owned, operated, and improperly maintained by PG&E.
19
        103.    Not only did PG&E's wires and transformer problems start the Wine Country Fires,
20
    but also the downed trees blocked firefighters and emergency responders from reaching the scene.
21
    Highway 128, in the center of the battle to contain the flames, was completely blocked by trees and
22
    branches, and Highway 101, which provided access through the heart of Santa Rosa, was shut down
23
    because of PG&E's downed wires.
24
        104.    The full extent of the damage has not yet been quantified, but as of this filing, the
25
    Wine Country Fires have devastated nearly 250,000 acres in Northern California, destroying homes,
26
    businesses, vineyards, farms, and lives.
27

28
                                        24
COMPLAINT FOR DAMAGES

105.     Over 14,700 structures were damaged or destroyed.  These included homes, farm buildings, and commercial structures, often along with everything inside them, as well as damaging pastures and vineyards.

106.     Because the Wine Country Fires spread so quickly, businesses entities often could not protect their properties or valuable inventories of products, crops, materials, and records.

107.     The fire damage and destruction also have negatively impacted the value of affected business property, including property used as pasture for livestock, vineyards, and other farming or ranching operations, and will continue to the resale value and development potential for such properties for an as-yet-unknown period of time.

108.     In addition to damage and destruction of real and personal property, the Wine Country Fires caused widespread economic losses to businesses throughout the region, and will continue to do so into the future.

109.     Business entities that were displaced have incurred and will continue to incur costs related to re-locating while displaced.

110.     Businesses have incurred and will continue to incur economic losses due to inability to operate their businesses, loss of access to their business locations, and inability of staff and employees to reach all such businesses.  These conditions are ongoing and will continue for an unknown time into the future.

111.     Many businesses in Wildfire Counties derive significant revenue from tourists and other out-of-region customers.  These businesses have suffered and will continue to suffer economic loss due to these tourists and out-of-region customers choosing not to visit the Wildfire Counties in the aftermath of the wildfires.

112.     Individual employees of affected businesses also have incurred and will continue to incur economic losses due to the inability of those businesses to operate, be accessed, or attract or service customers due to the wine Country Fires.

113.     Businesses have incurred and will continue to incur economic losses due to the chemical retardant that was used to put out the fires.  Cal Fire dumped several million gallons to try

to control the blazes. The chemical kills the plants it comes into contact with and also harms the soil. Organic businesses incurred and will continue to incur economic losses due to the foreseeable use of chemical retardant because the product contains fertilizer-type materials that will ruin an organic accreditation. These conditions are ongoing and will continue for an unknown time into the future.

114.    Northern California's Wine Country is internationally renowned for its wines and is the world's fourth largest wine producer. The region produces much of the most highly prized and highest-priced wine in California. Napa and Sonoma are America's equivalent to France's Bordeaux region. They are home to many premier vinicultural areas: locations where the climate, geology, and other natural factors are considered ideal for producing quality wine.

115.    Twenty-seven wineries in the region have reported damage thus far caused by the Wine Country Fires. Although the full extent of the damage caused to vineyards and wineries is not known, the grapes on the vines that survived the Wine Country Fires may suffer from "smoke taint" and be unusable for winemaking. Smoke may have permeated into the plant's leaves or the skin of the grapes, which will only reveal its damage during fermentation. This condition severely damages flavor and the "nose" of the wine. In bad cases, the wine can take on the taste of a "dirty ashtray" or smell "like a smoked fish."

116.    Many wineries lost power during the wildfires. Without power, the fermentation process may accelerate too quickly ruining the wines. Reserves of wines aging in barrels and bottles may also be lost to smoke and heat damage to the wines.

117.    The damage the wildfires caused to the soil may also impact the taste and quality of the wines grown in the region far into the future. Those who lost vineyards may have to wait as many as three to five years to return the soil to a place where they can produce a viable crop of grapes.

118.    There are more than 100,000 acres of vineyards in Napa Valley and Sonoma, but the full damage to the vines cannot be seen yet. It may take at least two years to really understand if each vine is still viable or how its growth patterns may have changed.

26

COMPLAINT FOR DAMAGES

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 32 of 49

119.    The viability of the vines depends on where they were burned.  The part of the vine which creates fruit is grafted onto different, hardier rootstock, so it has a better chance to grow and be resistance to disease.  Thus, even if the roots were undamaged, the rootstock does not produce grapes which are desirable for winemaking.  Whether the vine will remain fruitful is also dependent on the extent of the damage.  For example, scorched vine will not produce as much fruit.  The worst case is when the trunk of the plant is damaged.  If a substantial portion of the trunk is destroyed, there is no saving the vine.

120.    A vine does not actually have had to catch fire to be harmed; even just exposure to heat from adjacent burning material can cause damage.  Slightly damaged vines are also vulnerable to pathogens like fungi.

121.    Each of these lost vines represents many hours of human labor, skill, and artistry.  They cannot be easily replaced.  Each vine has been manipulated for decades to develop a particular taste or a quality such as the thickness of the grapes' skin.  Furthermore, it takes at least three years for a vine to produce usable fruit, and the higher quality grapes come from the more mature vines.  Many of the vines in Napa and Sonoma were thirty to forty years old.  Some of the vines may have been more than a century old and brought to America in the "baggage of a European immigrant."

122.    The Wine Country Fires also have caused a huge risk of erosion.  Individuals and businesses have and will incur damage to personal and real property, business losses, and other damages related to preparing for and preventing erosion, runoff, and debris flow for an as-yet unknown period of time.

123.    Beyond the damage to their properties, vines, and inventories, vines, and inventories, wineries are also worried about the impact the Wine Country Fires are having on tourism.  Last year, California wineries drew more than 23 million visits and earned more than $7.2 Billion in tourist-related income, most of which was spent in Napa and Sonoma Counties.  The wine industry in Napa County supports 46,000 jobs locally through the 700 grape growers and 475 wineries operating in the area and employees about 325,000 people statewide.  Many in the area depend on the wine industry for their livelihoods.

1    124.    Northern California receives most of its tourists around the fall wine-grape harvest

2    season, and October is typically among the busiest months for hotels and other tourism-related

3    industries in Northern California.

4    125.    Many hotels had to evacuate and close their properties because of the wildfires.  If

5    they reopened, they housed emergency responders, evacuees, and insurance groups at lower rates.

6    However, news of the wildfires is driving away visitors and leading them to choose other

7    destinations.

8                                                    V
                                        **CAUSES OF ACTION**

9
                                    **FIRST CAUSE OF ACTION**
10                                           **(Negligence)**

11    126.    Plaintiff hereby re-alleges and incorporates by reference every allegation contained

12    above as though the same were set forth herein in full.

13    127.    The Wine Country Fires were a direct and legal result of the negligence, recklessness,

14    and/or unlawfulness of PG&E.

15    128.    PG&E has a non-delegable duty to apply a level of care commensurate with and

16    proportionate to the dangers inherent in designing, engineering, constructing, operating and

17    maintaining electrical transmission and distribution systems.  This duty includes the obligation to

18    keep vegetation properly trimmed and maintained so as to prevent contact with power lines and

19    other electrical equipment, including utility poles.

20    129.    PG&E has a non-delegable duty to vigilantly perform and/or oversee the

21    maintenance, use, operation, repair and inspection of their electrical transmission and distribution

22    systems.  This oversight duty must be appropriate to the changing conditions and circumstances of

23    their electrical transmission and distribution systems and the surrounding environment.

24    130.    PG&E was aware that if its electrical transmission and distribution systems came in

25    contact with vegetation that a fire would likely result. PG&E also knew that, given the existing

26    climate and weather conditions, said fire was likely to pose a risk of serious injury and economic

27    damage to the general public, including to the Plaintiff and to Class members.

28

Case: 19-30088    Doc# 6675-2    Filed: 04/07/20    Entered: 04/07/20 09:53:05    Page 34
of 49

1      131.    Prior to the Wine Country Fires, PG&E hired, retained, contracted, allowed, and/or

2 otherwise collaborated with one or more of the DOE Defendants and/or other parties to perform

3 work on and maintain their network of electrical distribution lines, infrastructure, and nearby

4 vegetation. The work for which certain of the DOE Defendants were hired involved a risk of fire,

5 and protection against the risk of fire, that was peculiar to the nature of the agency relationship. A

6 reasonable property/easement owner and/or lessee in the position of PG&E, would have recognized,

7 the necessity of taking special precautions to protect against the risk of harm created by work

8 performed, work to be performed, work improperly performed and/or work not performed by certain

9 of the DOE Defendants.

10      132.    PG&E knew or should have known that the activities of some or all of the DOE

11 Defendants, and/or other parties, involved a risk that was peculiar to the operation of PG&E's

12 business as an electrical corporation, public utility and electric plant. That risk was foreseeable and

13 arose from the nature and/or location of the work. Notwithstanding the above, PG&E failed to take

14 reasonable precautions to protect against the foreseeable risk of harm created by the activities of

15 some or all of the DOE Defendants and other parties.

16      133.    PG&E has special knowledge and expertise far above that of a layperson that they

17 were required to apply to the design, engineering, construction, use, operation, inspection, repair and

18 maintenance of electrical lines, infrastructure, equipment, and vegetation to assure safety under all

19 the local conditions in their service area, including but not limited to, those conditions identified

20 herein.

21      134.    PG&E negligently breached those duties by, among other things:

22           a.  Failing to conduct reasonably prompt, proper and frequent inspections of the

23              electrical transmission lines, wires and associated equipment;

24           b.  Failing to design, construct, monitor, and maintain electrical transmission and

25              distribution lines and equipment and all appurtenances including power poles

26              to withstand foreseeable conditions to avoid igniting fires;

27

28

COMPLAINT FOR DAMAGES

c. Failing to maintain and monitor high-voltage transmission and distribution lines in fire-prone areas to avoid igniting fire and spreading fires;

d. Failing to install the equipment necessary, and/or to inspect and repair the equipment installed, to prevent electrical transmission and distribution lines from improperly sagging, swaying or otherwise making contact with other metal wires placed on its poles and igniting fires;

e. Failing to keep equipment in a safe condition at all times to prevent fires;

f. Failing to inspect fixtures and vegetation within proximity to energized transmission and distribution lines;

g. Failing to de-energize power lines during fire-prone conditions;

h. Failing to de-energize power lines after the fire's ignition;

i. Failing to properly train and supervise employees and agents responsible for maintenance and inspection of the distribution lines;

j. Failing to implement and follow regulations and reasonably prudent practices to avoid fire ignition;

k. Failing to properly investigate, monitor, and maintain vegetation and other hazards sufficient to mitigate the risk of fire.

l. Failing to comply with the applicable statutes, regulations and standards;

m. Failing to timely and properly maintain and inspect the subject electrical lines, infrastructure, equipment and adjacent vegetation and other hazards;

n. Failing to properly cut, trim, prune, and/or otherwise keep vegetation from contact with its line; and

o. Failing to make the overhead electrical lines infrastructure, equipment and vegetation safe under all the foreseeable exigencies created by the surrounding circumstances and conditions.

135. PG&E's negligent failure to comply with their duty of care proximately caused economic damages to Plaintiff and to the members of the Class.

COMPLAINT FOR DAMAGES

## SECOND CAUSE OF ACTION
### (Inverse Condemnation)

2      136.    Plaintiff hereby re-alleges and incorporates by reference every allegation contained

3  above as though the same were set forth herein in full.

4      137.    On or about October 8, 2017, Plaintiff was an owner of a business entity located

5  within the Wildfire Counties.

6      138.    At all times relevant to this Complaint, PG&E installed, owned, operated, used,

7  controlled, and/or maintained electrical lines, electrical infrastructure and other electric equipment in

8  the Wildfire Counties.  The installation, operation, use, control and maintenance are a public

9  improvement for a public use, and constitute an "Electrical Plant" pursuant to California Public

10  Utilities Code, Section 217.

11      139.    PG&E's electrical lines, infrastructure, equipment and other public improvements, as

12  knowingly and intentionally designed and constructed, present an inherent risk of fire to private

13  property.  During all times relevant to this Complaint, PG&E, acting in furtherance of the public

14  purpose of supplying electricity, took a conscious, considered risk that private property would be

15  damaged or destroyed by fire.

16      140.    On or about October 8, 2017, as a direct, necessary, and legal result of PG&E's

17  negligent installation, ownership, operation, use, control, and/or maintenance for a public use of their

18  power lines and electrical infrastructure and equipment, PG&E's electrical lines and/or equipment

19  caused wildfires which burned in excess of 220,000 acres, including property owned or occupied by

20  Plaintiff.  The fire caused Plaintiff to suffer economic losses resulting in the taking of Plaintiff's

21  private property.  Plaintiff has not received adequate compensation for the damages, and therefore

22  has suffered a taking or damaging of said property by PG&E without just compensation

23      141.    PG&E's conduct as described herein was the sole factor in causing damage to a

24  property interest protected by the Fifth Amendment to the United States Constitution and Article I,

25  Section 19, of the California Constitution, which entitles Plaintiff to just compensation to be

26  ascertained by a jury for all damages incurred.

27

28

1   142.   Pursuant to California Code of Civil Procedure, Section 1036, Plaintiff is entitled to
2   recover all costs, including reasonable attorney's fees.

### THIRD CAUSE OF ACTION
### (Public Nuisance)

5   143.   Plaintiff hereby re-alleges and incorporates by reference every allegation contained
6   above as though the same were set forth herein in full.

7   144.   At all times relevant to this Complaint, Plaintiff owned a business entity in the area
8   destroyed by the Wine Country Fires.  Plaintiff had the right, without the interference of PG&E, to
9   operate that business.

10  145.   PG&E, by acting and/or failing to act, created conditions that were harmful to the
11  public, including Plaintiff.  This condition was harmful to health, obstructed the free use of
12  Plaintiff's business so as to interfere with the use of that business and was a fire hazard to the
13  property of the public and to Plaintiff's business.

14  146.   An ordinary person would be reasonably annoyed and disturbed by the condition
15  created by PG&E.

16  147.   The seriousness of the harm caused by PG&E's acts and/or failing to act, including
17  the burning of over 200,000 acres, the displacement of an enormous number of people and the
18  destruction of over 8,000 structures, outweighs the social utility of the PG&E's conduct.

19  148.   Plaintiff did not consent to the PG&E's conduct.

20  149.   PG&E's acts and/or failure to act were the sole direct and legal cause of harm to
21  Plaintiff that was different from the type of harm suffered by the general public.  Such harm included
22  the loss of the use, benefit, and enjoyment of Plaintiff's business entity and lost profits from the
23  closure of Plaintiff's business, and incidental expenses, annoyance, disturbance, and inconvenience.

24  150.   The conduct of the PG&E, as set forth above, constitutes a public nuisance pursuant
25  to California Civil Code, Sections 3479 and 3480.  Further, the uncontrolled Wine Country Fires
26  which resulted from PG&E's conduct as set forth above constitutes a public nuisance pursuant to
27  California Public Resources Code, Sections 4104 and 4170.  Further, pursuant to California Civil

28

1    Code, Section 731, Plaintiff is entitled to enjoin and abate the nuisance as created by PG&E, in

2    addition to recovering damages.

<div align="center">

**FOURTH CAUSE OF ACTION**
**(Private Nuisance)**

</div>

5    151.    Plaintiff hereby re-alleges and incorporates by reference every allegation contained

6    above as though the same were set forth herein in full.

7    152.    PG&E's actions, conduct, omissions, negligence, trespass and failure to act resulted

8    in a fire hazard and a foreseeable obstruction to the free use of Plaintiff's business property, invaded

9    the right to use the Plaintiff's business property, and interfered with the enjoyment of Plaintiff's

10    business property, causing the Plaintiff unreasonable harm and substantial actual damages

11    constituting a nuisance, pursuant to California Civil Code, Section 3479.

12    153.    As a direct and proximate result of the conduct of PG&E, Plaintiff sustained loss and

13    damage, including but not limited to damage to lost profits from its restaurant, the amount of which

14    will be proven at trial.

<div align="center">

**FIFTH CAUSE OF ACTION**
**(Premises Liability)**

</div>

17    154.    Plaintiff hereby re-alleges and incorporates by reference every allegation contained

18    above as though the same were set forth herein in full.

19    155.    PG&E owned, occupied, controlled real property, and/or an easement to real property

20    at or near the location to the Wine Country Fires.

21    156.    PG&E was negligent in the use and/or maintenance of that property and/or of their

22    equipment installed on that property.

23    157.    PG&E's negligence was the sole factor in causing harm to Plaintiff and members of

24    the Class.

<div align="center">33</div>

COMPLAINT FOR DAMAGES

## SIXTH CAUSE OF ACTION
### (Negligence *Per Se*)

158.   Plaintiff hereby re-alleges and incorporates by reference every allegation contained above as though the same were set forth herein in full.

159.   PG&E at all times herein had a duty to properly design, construct, operate, maintain, inspect, and manage its electrical infrastructure, and to trim trees and vegetation near it electrical infrastructure, in compliance with all relevant provisions of applicable orders, decisions, directions, rules and statutes, including, but not limited to, CPUC General Order 95, including but not limited to Rules 31.2 and 38; CPUC General Order 165; and California Public Resources Code, Section 4435.

160.   California Public Resources Code, Section 4435 provides that if a fire originates from the operation or use of a device which may kindle a fire, the occurrence of a fire is *prima facie* evidence that the device was negligently maintained or used.

161.   The violation of a legislative enactment or administrative regulation which defines a minimum standard of conduct is unreasonable *per se*.

162.   PG&E violated the above legislation and regulations by, but not limited to:

a.   Failing to properly service, inspect or maintain electrical infrastructure, structures and vegetation affixed to and in close proximity to high voltage electrical lines;

b.   Failing to provide electrical supply systems of suitable design;

c.   Failing to construct and to maintain such systems for their intended use of safe transmission of electricity considering the known conditions of climate, weather and vegetation of the area;

d.   Failing to properly design, construct, operate, maintain, inspect and manage its electrical supply systems and the surrounding arid vegetation resulting in said vegetation igniting and accelerating the spread of the fire;

e.   Failing to properly safeguard against the ignition of fire during the course and scope of employee work on behalf of PG&E;

34

1                       f.    Failing to comply with the enumerated legislative enactments and

2                            administrative regulations.

3        163.    The violation of CPUC General Order 95, including, but not limited to, Rules 31.2,

4 and 38; CPUC General Order 165; and California Public Resources Code, Section 4435 by PG&E

5 proximately and substantially caused the destruction, damages and injuries to Plaintiff and members

6 of the Class.

7        164.    Plaintiff was and is an entity for whose protection CPUC General Order 95, including

8 but not limited to Rules 31.2, and 38; CPUC General Order 165; and California Public Resources

9 Code, Section 4435; were adopted.

10        165.    PG&E is liable to Plaintiff for all loss, damages and injury caused by and resulting

11 from Defendants' violation of CPUC General Order 95, including, but not limited to Rules 31.2, and

12 38; CPUC General Order 165; and California Public Resources Code, Section 4435 as alleged herein

13 according to proof.

14 <div align="center">**SEVENTH CAUSE OF ACTION**<br>**(Violation of Public Utilities Code, Section 2106)**</div>

15

16        166.    Plaintiff hereby re-alleges and incorporates by reference every allegation contained

17 above as though the same were set forth herein in full.

18        167.    As a Public Utility, PG&E is legally required to comply with the rules and orders

19 promulgated by the CPUC pursuant to California Public Utilities Code, Section 702.

20        168.    A utility that performs or fails to perform something required to be done by the

21 California Constitution, a law of the State, or a regulation or order of the Public Utilities

22 Commission, which leads to the loss or injury, is liable for that loss or injury, pursuant to California

23 Public Utilities Code, Section 2106.

24        169.    As a utility, PG&E is required to provide, maintain, and service equipment and

25 facilities in a manner adequate to maintain the safety, health and convenience of their customers and

26 the public, pursuant to California Public Utilities Code, Section 451.

27

28

<div align="center">35</div>

COMPLAINT FOR DAMAGES

1    170.   PG&E is required to design, engineer, construct, operate and maintain electrical

2    supply lines in a manner consonant with their use, taking into consideration local conditions and

3    other circumstances, so as to provide safe and adequate electric service, pursuant to CPUC General

4    Order 95 and General Order 165.

5    171.   Through its omissions, commissions, and conduct alleged herein, PG&E violated

6    California Public Utilities Code, Sections 702 and 451, and/or CPUC General Order 95, thereby

7    making them liable for losses, damages and injury sustained by Plaintiff pursuant to Public Utilities

8    Code, Section 2106.

9
                            **EIGHTH CAUSE OF ACTION**
                  **(Violation of Health & Safety Code, Section 13007)**
10

11    172.   Plaintiff hereby re-alleges and incorporates by reference every allegation contained

12    above as though the same were set forth herein in full.

13    173.   By engaging in the acts and omissions alleged in this Complaint, PG&E willfully,

14    negligently, and in violation of law, set fire to and/or allowed fire to be set to the property of another

15    in violation of California Health & Safety Code, Section 13007.

16    174.   As a legal result of PG&E's violation of California Health & Safety Code,

17    Section13007, Plaintiff suffered recoverable damages to property under California Health & Safety

18    Code, Section 13007.

19    175.   As a further legal result of the violation of California Health & Safety Code, Section

20    13007 by PG&E, Plaintiff suffered damages and are entitled to reasonable attorney's fees under

21    California Code of Civil Procedure, Section 1021.9 for the prosecution of this cause of action.

22
                            **NINTH CAUSE OF ACTION**
                  **(Negligent Interference with Prospective Economic Advantage)**
23

24    176.   Plaintiff hereby re-alleges and incorporates by reference every allegation contained

25    above as though the same were set forth herein in full.

26

27

28
                                    36
                            COMPLAINT FOR DAMAGES

177. Plaintiff and members of the Class have existing or prospective economic relationships with citizens of the region impacted by the Wine Country Fires, visitors to the region, and other individuals and organizations in and related to the region.

178. These relationships have a reasonably probable likelihood of resulting in future economic benefits or advantages to Plaintiff and members of the Class

179. PG&E knew or should have known of these existing and prospective economic relationships.

180. PG&E owed a duty to Plaintiff and to the members of the Class to avoid negligent or reckless conduct that would interfere with and adversely affect the existing and prospective economic relationships or Plaintiff and members of the Class

181. PG&E breached that duty to Plaintiff and the members of the Class by, among other things, failing to install and/or maintain reasonable safety equipment to prevent fires, failing to properly maintain their electrical infrastructure in a safe condition, and failing to manage the vegetation surrounding their equipment.

182. PG&E knew or should have known that, if it failed to act with reasonable care, the existing or prospective economic relationships of Plaintiffs and the members of the Class would be interfered with and disrupted.

183. PG&E was negligent and failed to act with reasonable care as set forth above.

184. PG&E engaged in wrongful acts and/or omissions as set forth above, including but not limited to their violations of laws that require it to operate its equipment in a manner that does not damage public health or safety.

185. As a direct and proximate result of PG&E's wrongful acts and/or omissions, it negligently and recklessly interfered with and disrupted the existing and prospective economic relationships of Plaintiff and the members of the Class.

## VI
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants PG&E Corp., PG&E, and Does 1-125, and each of them, as follows:

**For Negligence, Trespass, Private Nuisance, Premises Liability,
Violation of Public Utilities Code, Section 2106
and Violation of Health & Safety Code, Section 13007**

1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost property;

2. General and/or special damages for all damages to property according to proof;

3. Loss of the use, benefit, goodwill, and enjoyment of Plaintiff's property;

4. Loss of business profits or proceeds and/or any related displacement expenses;

5. Attorneys' fees, expert fees, consultant fees and litigation costs and expense, as allowed under California, Section 1021.9 and/or any other statute;

6. For punitive and exemplary damages against Defendants in an amount according to proof under California Public Utilities Code, Section 2106 and any and all other statutory or legal basis that may apply;

7. Costs of suit;

8. Prejudgment interest; and

9. Any and all other and further such relief as the Court shall deem proper, all according to proof.

**For Public Nuisance**

1. Repair, depreciation, and/or replacement of property;

2. General and/or special damages for all damages to property according to proof;

3. Loss of the use, benefit, goodwill, and enjoyment of Plaintiff's business property;

4. Loss of business profits or proceeds and/or any related expenses;

5. General damages for loss of quiet enjoyment of property;

6. A permanent injunction ordering that Defendants cease their violation of Public Resources Code, Sections 4292 and 4293 and CPUC General order 95. Plaintiff further

38

| | |
|---|---|
| 1 | seeks an order directing PG&E to abate the continuing public nuisance as set forth |
| 2 | above. |
| 3 | **For Inverse Condemnation** |
| 4 | 1. Repair, depreciation, and/or replacement of damaged, destroyed, and/or lost |
| 5 | business property; |
| 6 | 2. Loss of business profits and/or any related expenses; |
| 7 | 3. All costs of suit, including attorneys' fees, expert fees and related costs; |
| 8 | 4. Any and all relief, compensation, or measure of damages available to Plaintiff by |
| 9 | law based on the injuries and damages suffered by Plaintiff; |
| 10 | 5. Prejudgment interest according to proof; and |
| 11 | 6. For such other and further relief as the Court shall deem proper, all according to |
| 12 | proof. |
| 13 | /// |
| 14 | /// |
| 15 | /// |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

39

## VII
## JURY TRIAL DEMAND

Plaintiff herby demands a jury trial on all causes of action for which a jury is available under the law.

Dated: December 19, 2017

_____
Francis O. Scarpulla

FRANCIS O. SCARPULLA (SBN 41059)
PATRICK B. CLAYTON (SBN 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Tel: (415) 788-7210
Email: fos@scarpullalaw.com
          pbc@scarpullalaw.com

QUENTIN L. KOPP (SBN_25070)
FREDERICK P. FURTH (SBN 38438)
DANIEL S. MASON (SBN 54065)
THOMAS W. JACKSON (SBN 107608)
FURTH SALEM MASON & LI LLP
101 California Street, Suite 2710
San Francisco, CA 94111
Telephone: (415) 407-7796
Email: quentinlkopp@gmail.com
          fredpfurth@gmail.com
          dmason@fsmllaw.com
          tjackson@fsmllaw.com

TAD S. SHAPIRO (SBN 96179)
SHAPIRO, GALVIN, SHAPIRO & MORAN
640 Third Street
Santa Rosa, CA 95404
Tel: (707) 544-4848
Email: tad@shapirogalvinlaw.com

JEREMIAH F. HALLISEY (SBN 40001)
Hallisey and Johnson, PC
465 California Street, Suite 405
San Francisco, CA 94104-1812
Telephone: (415) 433-5300
Email: jfhallisey@gmail.com

///

///

///

COMPLAINT FOR DAMAGES

FRANKLIN D. AZAR (*pro hac vice*)
HUGH ZACHARY BALKIN (*pro hac vice*)
FRANKLIN D. AZAR & ASSOCIATES, P.C.
14426 East Evans Avenue
Aurora, CO  80014
Telephone:  (303) 575-3300
Email: azarf@dazar.com
        balkin@fdazar.com

*Attorneys for Plaintiff*

41

LAW OFFICES OF

# FRANCIS O. SCARPULLA
### ATTORNEY AT LAW
AND
### UNITED KINGDOM SOLICITOR
456 MONTGOMERY STREET, 17ᵀᴴ FLOOR
SAN FRANCISCO, CA 94104
(415) 788-7210
TELECOPIER: (415) 788-0706
CELLULAR: (415) 310-0607
EMAIL: fos@scarpullalaw.com

October 17, 2019

*VIA* FEDERAL EXPRESS

PG&E Corporation Claims Processing Center
c/o Prime Clerk, LLC
850 3ʳᵈ Avenue, Suite 412
Brooklyn, NY 11232

> Re:  *In re: PG&E Corporation, and Pacific Gas and Electric Company, Debtors*
>      USBC, NDCA No. 19-30088 (DM)
>      Proofs of Claim (Fire Claim Related)

Dear Sir or Madam:

Enclosed please find the original and one copy of six (6) amended Proofs of Claim (Fire Claim Related) on behalf of Mark Baker, June L. Stewart, Romana Bracco, Richard W. Carpeneti, Jeanette Smylie on behalf of herself and all other similarly situated, and GER Hospitality, LLC, dba Aventine Glen Ellen, for itself and on behalf of all others similarly situated to be filed in the above-referenced matter.

Also enclosed is an original and one copy of a first Proof of Claim (Fire Claim Related) on behalf of Adolfo Veronese to be filed in the above-referenced matter.

We enclose a self-addressed, postage-prepaid envelope in which to return the copies of each of these Proofs, stamped "received", to this office.

Thank you for your attention in this regard.

Very truly yours,

C.P. Cusick

C.P. Cusick, sec'y to
Francis O. Scarpulla

Enclosures

ORIGIN ID:APCA   (415) 788-7210
FRANCIS O. SCARPULLA

SHIP DATE: 17OCT19
ACTWGT: 1.00 LB
CAD: 108568126/INET4160

456 MONTGOMERY STREET
17TH FLOOR
SAN FRANCISCO, CA 94104
UNITED STATES US

BILL SENDER

TO   PG&E CORP. CLAIMS PROCESSING CENTER

**RECEIVED**

C/O PRIME CLERK, LLC
830 3RD AVENUE, SUITE 412
BROOKLYN NY 11232

OCT 18 2019

**PRIME CLERK LLC**

(999) 999-9999
INV:
PO:           REF: PGE BK
                  DEPT:

FedEx
Express

**E**

FRI - 18 OCT 10:30A

PRIORITY OVERNIGHT

TRK#
0201   7767 4945 3752

11232

**XA FBTA**     NY-US   EWR

**RECEIVED**

OCT 18 2019

**PRIME CLERK LLC**

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.