WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DEBTORS' MOTION PURSUANT TO 11 U.S.C. § 105(a) AND FED. R. BANKR. P. 9019 FOR AN ORDER (I) APPROVING SETTLEMENT AGREEMENT RESOLVING EX PARTE OII AND (II) GRANTING RELATED RELIEF ("EX PARTE OII SETTLEMENT MOTION")**<br><br>Date: April 29, 2020<br>Time: 10:00 am (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Judge: Hon. Dennis Montali<br>**Objection Deadline: April 22, 2020, 4:00 pm (PT)** |

PG&E Corporation ("**PG&E Corp**.") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to section 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for an order (i) approving the settlement agreement, dated June 28, 2019 (the "**Phase II Settlement Agreement**"), by and among the Utility, the City of San Bruno, the City of San Carlos, the Public Advocates Office, the Safety and Enforcement Division ("**SED**") of the California Public Utilities Commission ("**CPUC**"), and The Utility Reform Network ("**TURN**" and, collectively, the "**Parties**") resolving Phase II of the Ex Parte OII (as defined below), and (iii) granting related relief. The Phase II Settlement Agreement was submitted to the CPUC for approval on June 28, 2019 and was subsequently approved by the CPUC in Decision 19-12-013, dated December 5, 2019 (the "**CPUC Order**").

In support of the Motion, the Debtors submit the Declaration of Steven Frank (the "**Frank Declaration**"), filed contemporaneously herewith. A true and correct copy of the CPUC Order, along with a copy of the Phase II Settlement Agreement, is annexed to the Frank Declaration as **Annex 1**.

A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal. Feb. 22, 2016), and Rule 5011-1(a) of the Bankruptcy Local Rules. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**" and, together with the Creditors Committee, the "**Committees**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] (the "**Wells Declaration**").

## III. EX PARTE OII PROCEEDING AND ITS RESOLUTION

On November 23, 2015, the CPUC issued an Order Instituting Investigation 15-11-015, commencing a proceeding to determine whether the Utility should be sanctioned for violations of Article 8 of the CPUC's Rules of Practice and Procedure (C.C.R. Title 20, Div. 1, Ch.1, Sections 8.1 *et seq.*), Rule 1.1 of the Rules of Practice and Procedure, and Public Utilities Code (Pub. Util. Code) §§ 1701.2(c) and 1701.3(c) (collectively, the "**Ex Parte Rules**") governing ex parte communications between the

Utility and CPUC officials, including Administrative Law Judges, Commissioners, and Commissioners' advisors (the "**Ex Parte OII**").  The Ex Parte OII focused on communications reflected in emails sent or received by Utility officers and employees.

Resolution of the Ex Parte OII occurred in two phases.  Phase I of the Ex Parte OII ("**Phase I**") related to emails disclosed by the Utility in 2014 and 2015 and allegations of ex parte violations levied by the City of San Bruno in 2014.  In March of 2017, the Parties submitted a settlement of Phase I (the "**Phase I Settlement Agreement**"), which proposed, among other things:

(a) A total financial remedy of $86.5 million, allocated among:

  (i) $1 million paid by the Utility to the State of California's General Fund (the "**California General Fund**");

  (ii) A $63.5 million credit to ratepayers in the Utility's 2015 Gas Transmission and Storage rate case;

  (iii) A $10 million credit to ratepayers in the Utility's 2020 General Rate Case; and

  (iv) $6 million in compensatory payments each to the City of San Bruno and the City of San Carlos; and

(b) Non-financial remedies in which the Utility agreed to:

  (i) Provide notice to the Public Advocates Office, SED, and TURN (collectively, the "**Notice Parties**") of any tours of the Utility's facilities by a CPUC decisionmaker, from 2018- 2020;

  (ii) Provide notice to the Notice Parties any time the Utility sends a CPUC decisionmaker any credit rating agency or investor report or analysis, for a period of three years;

  (iii) Provide notice to the Notice Parties any time certain Utility officers attend certain planned meetings with a CPUC or Commissioner's advisor, for a period of two years; and

  (iv) Provide training to the Utility's Regulatory Affairs employees and Law Department attorneys on the CPUC's ex parte rules, for a period of three years.

On September 1, 2017, the Administrative Law Judge ("**ALJ**") assigned to oversee the Phase I proceeding issued a proposed decision (the "**Proposed Decision**") that modified the financial remedy contemplated by the Parties, increasing the amount to be paid to the California General Fund from $1 million to $12 million, resulting in a total financial remedy to be paid by the Utility for Phase I of $97.5 million.

On September 21, 2017, the Utility filed a motion agreeing to the ALJ's proposed

modifications in the Proposed Decision. Along with the motion, the Utility disclosed 16 additional emails from 2013 – 2014 (the "**September 2017 Disclosure**") that the Utility discovered while responding to an unrelated governmental inquiry that raised similar issues as the communications that were encompassed in the Phase I Settlement Agreement. Following several discussions, on November 1, 2017, the Parties, other than the Utility, submitted a joint filing accepting the Proposed Decision and requesting that the CPUC open a second phase (**"Phase II"**) of the Ex Parte OII to address the emails included in the Utility's September 2017 Disclosure. On May 3, 2018, the CPUC approved the Proposed Decision adopting the modified Phase I Settlement Agreement and commencing Phase II of the Ex Parte OII.

Following an initial meet and confer and discovery period, the CPUC held a prehearing conference on Phase II of the Ex Parte OII on March 9, 2019. During the latter half of 2018 and the first half of 2019 the Parties engaged in settlement discussions, which culminated in the Phase II Settlement Agreement, which resolves all remaining issues in the proceeding. The Parties filed a joint motion seeking CPUC approval of the Phase II Settlement Agreement on June 28, 2019, which was subsequently approved by the CPUC Order dated December 5, 2019.

### IV. MATERIAL TERMS OF THE PHASE II SETTLEMENT AGREEMENT

The Phase II Settlement Agreement fully resolves Phase II of the Ex Parte OII and any disputed claims, allegations or outstanding issues related thereto. The key terms and provisions of the Phase II Settlement Agreement, as approved by the CPUC Order, are summarized below.[1]

#### A. Financial Remedies

Pursuant to the Phase II Settlement Agreement, the Utility will pay financial remedies totaling $10 million (the "**Financial Remedies**"), none of which shall be borne by ratepayers. The Financial Remedies consist of the following: (i) $2 million to be contributed by the Utility to the California General Fund (the "**General Fund Claim**") pursuant to Section 2100 *et seq*. of the Public Utilities Code; (ii) the Utility forgoing a collection of $5 million in revenue requirements during the

---

[1] This summary is qualified in its entirety by reference to the provisions of the CPUC Order and of the Phase II Settlement Agreement. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the CPUC Order and Phase II Settlement Agreement, the CPUC Order and Phase II Settlement Agreement shall govern.

term of its 2019 Gas Transmission and Storage rate case (the "**Gas Transmission and Storage Ratemaking Remedy**"); (iii) the Utility foregoing a collection of $1 million in revenue requirements during the term of its 2020 General Rate Case (the "**General Rate Case Ratemaking Remedy**" and, together with the Gas Transmission and Storage Ratemaking Remedy, the "**Ratemaking Remedies**"); (iv) $1 million to be contributed by the Utility to the City of San Bruno General Fund (the "**San Bruno Fund Claim**"); and (v) $1 million to be contributed by the Utility to the City of San Carlos General Fund (the "**San Carlos Fund Claim**" and together with the General Fund Claim and San Bruno Fund Claim, the "**Financial Claims**").

**B. Non-Financial Remedies**

In addition to the non-financial remedies agreed to in Phase 1, the Utility agreed to additional non-financial remedies that are tailored to the issues raised in Phase II of the Ex Parte OII (collectively, the **"Non-Financial Remedies"**). The Non-Financial Remedies consist of the following:

(a) Through December 31, 2025, if the Utility gives a tour of its facilities to a CPUC decisionmaker it will provide notice within three days of the tour in an open General Rate Case, Gas Transmission and Storage rate case, or other relevant cost recovery case if the facility, technology, process, or information to be addressed during the tour is at issue in such a case, and will additionally invite a representative of each of the Public Advocates Office, the SED, and TURN to attend the tour. This is intended as an extension of the remedy agreed to by the Utility in the settlement of Phase I;

(b) Through December 31, 2025, if the Utility transmits via email a credit rating agency or investor report or analysis to a CPUC decisionmaker, the Utility simultaneously will provide a copy to designated representatives of the Public Advocates Office, the SED, TURN, and all parties in the Utility's most recent cost of capital, General Rate Case, and Gas Transmission and Storage proceedings. This is intended as an extension of the remedy agreed to by the Utility in the settlement of Phase I;

(c) Through December 31, 2025, if the Corporation's Chief Executive Officer, the Utility's President, the Corporation's Chief Financial Officer, or the Corporation's General Counsel, participates in a meeting arranged or accepted by the Utility to be attended only by the Utility and its agents and the CPUC Commissioner and/or the Commissioner's advisors, the Utility will provide notice within three days to designated representatives of the Public Advocates Office and of TURN. This is intended as an extension of the remedy agreed to by the Utility in the settlement of Phase I;

(d) The Utility will provide training on the CPUC's ex parte communication rules, and through December 31, 2025, the Utility will provide to the other Parties to the Phase II Settlement Agreement (i) a copy of the training materials used for this purpose, and (ii) an annual certificate of completion for the training of all officers, Regulatory Affairs (or its successor) employees and Law Department attorneys. This is intended as an extension of the remedy agreed to by the Utility in the settlement of Phase I;

(e) The Utility will not contract with outside parties for "Advocacy Work" before the CPUC through December 31, 2025. "Advocacy Work" means lobbying on behalf of the Utility directly before the CPUC, other than in a public hearing, workshop, or other public forum, which has been noticed to the official service list or on the record of a CPUC proceeding. Advocacy Work does not include (i) testimony or participation in a public hearing, workshop, or other public forum, which has been noticed to the official service list or on the record of a CPUC proceeding, (ii) the provision of technical, advisory, or expert services to support the Utility's advocacy before the CPUC, where the primary purpose of such services is the technical, advisory, or expert services, and not lobbying, or (iii) lobbying work before any governmental body other than the CPUC;

(f) Commencing in January 1, 2026 and continuing through December 31, 2030, the Utility shall include in all contracts with outside parties for "Advocacy Work," as defined above, before the CPUC a summary of the CPUC's ex parte communication rules, as then in effect, and contractually obligate the outside parties to adhere to these rules. The Utility shall provide the summary of the ex parte rules it intends to include in such contracts to the Public Advocates Office, the SED, and TURN before January 1, 2026; and

(g) The Utility will not oppose a request by any of the Parties for a rulemaking to consider a change to the CPUC's rules that would extend the ex parte rules set forth in Article 8 of the CPUC's Rules of Practice and Procedure to cover, as a "ratesetting proceeding," the advice letter process for those instances where the process could result in a CPUC resolution.

C. **Bankruptcy Court Approval and Timing of Payments**

Pursuant to the CPUC Order, the Utility is required to seek Bankruptcy Court approval of the Phase II Settlement Agreement. *See* CPUC Order at 26, ¶2.

With respect to the Financial Claims, the Debtors have agreed with the Parties that the Utility will satisfy such claims in accordance with the terms of a Bankruptcy Court order authorizing payment of the Financial Claims, in full or in part, pursuant to the terms of a confirmed chapter 11 plan of reorganization. *See* Phase II Settlement Agreement ¶3.8 ("Except as may be otherwise instructed by the [CPUC] and ordered by the Bankruptcy Court, PG&E shall satisfy the financial remedies set forth in [the Phase II Settlement Agreement], and shall treat and satisfy the claims relating to such remedies as general unsecured claims in accordance with the terms of a confirmed chapter 11 plan of reorganization."). This authority would be in the form of an order of the Bankruptcy Court approving a chapter 11 plan of reorganization that provides for the payment of general unsecured claims, including the general unsecured claims relating to the Financial Claims. The Phase II Settlement Agreement further provides that, if neither the confirmed chapter 11 plan of reorganization nor the CPUC specifies

a time by which PG&E shall satisfy the Financial Claims, payments to the City of San Bruno, the City of San Carlos, and the California General Fund shall be received no later than any confirmed chapter 11 plan of reorganization's effective date, or, if not reasonably practicable, no later than thirty (30) days after such effective date. *See* Phase II Settlement Agreement, § 3.8.[2] Section 3.8 of the Phase II Settlement Agreement also provides that, absent instruction by the CPUC or Bankruptcy Court otherwise, satisfaction of the Ratemaking Remedies shall occur no later than the first reasonable opportunity to do so following the effective date of any confirmed plan.

Further, the Phase II Settlement Agreement provides that within ten (10) days of the effective date of any confirmed plan, the Utility shall file a report in the Ex Parte OII proceeding that explains the treatment of the Financial Remedies under the plan and indicates when and how the Utility will satisfy the Financial Remedies. *See* Phase II Settlement Agreement, § 3.8. As currently proposed, under the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (as it may be amended, modified or supplemented, the "**Plan**"), allowed general unsecured claims, such as the claims contemplated to be allowed herein and in the Phase II Settlement Agreement, will be paid by the Debtors in full and in cash on the effective date of the Plan, or as soon as reasonably practicable thereafter. *See* Plan, Article IV.

## V. BASIS FOR RELIEF REQUESTED

### A. The Phase II Settlement Agreement is in the Best Interests of the Debtors' Estates and Should be Approved Pursuant to Bankruptcy Rule 9019.

The Debtors submit that the Phase II Settlement Agreement is in the best interests of the Debtors' estates and all stakeholders and should be approved under Bankruptcy Rule 9019. Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a). This rule empowers Bankruptcy Courts to approve settlements "if they are in the best interests of the estate." *In re Drexel Burnham Lambert Group*, *Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Myers v. Martin (In re Martin)*, 91

---

[2] The CPUC Order both approves the Phase II Settlement Agreement and orders PG&E to make payment to the State General Fund within 30 days of the Court's approval of this Motion, thus creating some ambiguity regarding timing of the satisfaction of the General Fund Claim, The Debtors submit that the CPUC Order should be interpreted to support the Parties' intention to satisfy the General Fund Claim within 30 days after a confirmed chapter 11 plan of reorganization becoming effective, as the settling parties intended for all of the Financial Claims, not within 30 days of the Court's approval of this Motion.

F.3d 389, 393 (3d Cir. 1996). Compromises and settlements are normal and welcomed occurrences in chapter 11 because they allow a debtor and its creditors to avoid the financial and other burdens associated with litigation over contentious issues and expedite the administration of the bankruptcy estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968) (hereafter, "*TMT Trailer Ferry*"); *Martin v. Kane (In re A&C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986). The decision to approve a particular compromise lies within the sound discretion of the Court. *See Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994); *Woodson v. Fireman's Fund Ins. Co. (In re Woodson),* 839 F.2d 610, 620 (9th Cir. 1988). A proposed compromise and settlement implicates the issue of whether it is "fair and equitable" and "in the best interest of the [debtor's] estate." *In re A&C Properties*, 784 F.2d at 1381. The court must apprise itself "of all relevant facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *TMT Trailer Ferry*, 390 U.S. at 424.

Courts in this jurisdiction typically consider the following factors in determining whether a settlement should be approved: (i) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (ii) the difficulties, if any, to be encountered in the matter of collecting any litigated judgment; (iii) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (iv) the paramount interest of the creditors and the proper deference to their reasonable views in the premises. *See In re Woodson,* 839 F.2d at 620 (quoting *A&C Props*., 784 F.2d at 1380). It is not necessary that the conclusions reached in the consideration of each of the above factors support the settlement, but taken as a whole, those conclusions must favor the approval of the settlement. *See In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004) (citing *In re WCI Cable, Inc*., 282 B.R. 457, 473-74 (Bankr. D. Or. 2002)).

The standard courts apply for approval of settlements under Bankruptcy Rule 9019 is deferential to the debtor's judgment and merely requires the Court to ensure that the settlement does not fall below the lowest point in the range of reasonableness in terms of potential benefits to the debtor. *See Allied Waste Serves. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness . . . If a trustee chooses to accept

a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference.") (*citing In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *Shugrue*, 165 B.R. at 123 (a court need not be aware of or decide the particulars of each individual claim resolved by the settlement or "assess the minutia of each and every claim"; rather, a court "need only canvass the issues and see whether the settlement falls 'below the lowest point in the range of reasonableness.'"); *see also, In re Pacific Gas and Elec. Co.*, 304 B.R. at 417; *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991) (same).

While a court must "evaluate . . . all . . . factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *Anderson*, 390 U.S. at 424-25, a court need not conduct a "mini-trial" of the merits of the claims being settled, *Port O'Call Invest. Co. v. Blair (In re Blair),* 538 F.2d 849, 851 (9th Cir. 1976), or conduct a full independent investigation. *Drexel Burnham Lambert Group*, 134 B.R. at 496. As one court explained in assessing a global settlement of claims, "[t]he appropriate inquiry is whether the Settlement Agreement *in its entirety* is appropriate for the . . . estate." *Air Line Pilots Ass'n, Int'l v. Am. Nat'l Bank & Trust Co. (In re Ionosphere Clubs, Inc.)*, 156 B.R. 414, 430 (S.D.N.Y. 1993), *aff'd* 17 F.3d 600 (2d Cir. 1993) (emphasis added).

Here, the terms of the Phase II Settlement Agreement are fair and reasonable and in the best interest of the Utility, its estate, creditors and other stakeholders, and should be approved. The Phase II Settlement Agreement is the result of extensive, good faith, and informed negotiations among parties with a thorough understanding of the underlying issues, and all parties supported or did not oppose the Phase II Settlement Agreement. The agreement fully resolves Phase II of the Ex Parte OII, eliminates the costs and uncertainties associated with further litigation, including the possible costs of rehearing, appeal, and additional penalties, and ultimately benefits the Utility's customers through the Ratemaking Remedies therein.

Following months of arms'-length negotiations with the Parties regarding Phase II of the Ex Parte OII beginning in May, 2018, the parties ultimately agreed to the terms of the Phase II Settlement Agreement. In entering into the Phase II Settlement Agreement, the Utility considered many factors, including the benefit to customers, the potential costs and risks associated with continued litigation of Phase II of the Ex Parte OII, and the potential penalties that could otherwise be levied. During this

process, all Parties were involved in, or had an opportunity to be involved in, the negotiations and the proceedings. Further, the Phase II Settlement Agreement clearly does not fall below the lowest point in the range of reasonableness. Indeed, the CPUC has already determined that the Phase II Settlement Agreement is "reasonable in light of the record, is consistent with law, and is in the public interest." CPUC Order at 5.

As set forth above, the Phase II Settlement Agreement contemplates both Financial Remedies and Non-Financial Remedies. The agreed $10 million in Financial Remedies ($6 million of which are Ratemaking Remedies, rather than cash contributions), although meaningful, caps the Utility's liability for Phase II of the Ex Parte OII and provides certainty that would not otherwise be available if the Ex Parte OII were to continue to be litigated.

In addition to the costs, further litigation presents the possibility that the CPUC would levy a higher penalty than what is contemplated in the Phase II Settlement Agreement. Here, the Utility has admitted that certain communications at issue in the Phase II Settlement Agreement violated the Ex Parte Rules and all the Parties agree that communications in the jointly-approved evidentiary record reflect serious misconduct, raise new issues not addressed in the Phase I Settlement Agreement, and warrant additional remedies beyond those approved in connection with resolution of Phase I. However, the Parties did not attempt to determine the specific number of violations at issue and, if the proceeding were to continue, the CPUC could determine that financial remedies in excess of the $10 million contemplated in the Phase II Settlement Agreement are warranted.

Further, the Financial Remedies were highly negotiated and tailored to these specific circumstances. The Financial Remedies take into account that the Utility has already paid substantial amounts ($97.5 million) in connection with the Phase I Settlement Agreement, which covered violations involving many of the same Utility employees and CPUC proceedings that are at issue in Phase II of the Ex Parte OII. The Non-Financial remedies are tailored to promote compliance with the Ex Parte Rules and provide greater transparency into the Utility's communications with the CPUC, to the benefit of the Utility, its estate, and its creditors and customers. Absent the Phase II Settlement Agreement, there is no guarantee that a final CPUC determination would take into account these circumstances and provide for similarly tailored remedies.

By entering into the Phase II Settlement Agreement, the Utility is capping its financial liability in connection with Phase II of the Ex Parte OII at $10 million (comprised of $4 million in allowed general unsecured claims relating to the Financial Claims and forgoing $6 million in Ratemaking Remedies), a result that is not certain absent settlement and, without which, the Utility could face potentially an even larger penalty. Further, both the Financial Remedies and Non-Financial Remedies are tailored to the circumstances and formulated to benefit the Utility's customers and those harmed by the actions at issue. In light of the above, the Debtors assert that the Phase II Settlement Agreement is fair and reasonable and should be approved.

**VI.  NOTICE**

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Safety and Enforcement Division; (ix) the City of San Bruno; (x) the City of San Carlos; (xi) the Public Advocates Office; (xii) The Utility Reform Network; (xiii) the Nuclear Regulatory Commission; (xiv) the Federal Energy Regulatory Commission; (xv) the Office of the United States Attorney for the Northern District of California; (xvi) counsel for the agent under the Debtors' debtor in possession financing facility; and (xvii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Utility's business judgment, appropriate under section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, and in the best interests of the Utility's estate, its creditors, shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: April 8, 2020

**WEIL, GOTSHAL & MANGES LLP**

**KELLER BENVENUTTI KIM LLP**

By: */s/ Jessica Liou*
      Jessica Liou

*Attorneys for Debtors
and Debtors in Possession*