WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and –<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                 **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas & Electric Company<br>☐ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DEBTORS' MOTION PURSUANT TO 11 U.S.C §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 9019 AND 6004 FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT RESOLVING LOCATE AND MARK OII**<br><br>Date: April 29, 2020<br>Time: 10:00 am (Pacific Time)<br>Place: United States Bankruptcy Court<br>       Courtroom 17, 16th Floor<br>       San Francisco, CA 94102<br>Judge: Hon. Dennis Montali<br>**Objection Deadline: April 22, 2020, 4:00 pm (PT)** |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**") as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to section 363(b) and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 9019 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order approving the Settlement Agreement, dated October 3, 2019 (the "**Settlement Agreement**"), by and among the Utility, the Safety and Enforcement Division ("**SED**") of the California Public Utilities Commission ("**CPUC**"), and the Coalition of California Utility Employees ("**CUE**") (collectively, the "**Settling Parties**") in the L&M OII (as defined below). The Settlement Agreement was submitted to the CPUC for approval on October 3, 2019. The Presiding Officer issued a Presiding Officer's Decision on January 17, 2020, proposing modifications to the Settlement Agreement. The Settling Parties accepted the modifications, and on February 20, 2020, the Presiding Officer's Decision became the decision of the CPUC.

In support of the Motion, the Debtors submit the Declaration of Alejandro Vallejo (the "**Vallejo Declaration**"), filed contemporaneously herewith. A true and correct copy of the decision of the CPUC, along with a copy of the Settlement Agreement, are attached to the Vallejo Declaration as **Annex 1**. A proposed order granting the relief requested herein is attached hereto as **Exhibit A** (the "**Proposed Order**").

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal. Feb. 22, 2016), and Rule 5011-1(a) of the Bankruptcy Local Rules. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On January 29, 2019 (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No chapter 11 trustee or examiner has been appointed in either of the Chapter 11 Cases. The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**"). On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263].

## III. THE LOCATE AND MARK OII AND ITS RESOLUTION

California law requires that owners of underground facilities, such as the Utility, take certain precautions to ensure that excavations do not damage their facilities. Pursuant to California law, excavators planning to dig must notify the Underground Service Alert ("**USA**") 811 system, which in turn notifies underground facility owners such as the Utility. When the Utility receives notice from the 811 system, California law gives it two working days to "locate and mark" the location of its underground facilities, unless the excavator specifies or agrees to a later deadline. To locate and mark a facility, a

Utility employee known as a locator travels to the excavation site, uses various techniques to locate the Utility's underground facilities, and physically marks the location of those facilities on the ground so the excavator can avoid them. The Utility tracks locate and mark ("**L&M**") jobs through electronic "tickets" that reflect when Utility locators perform the required work. The overall goal of the L&M process is to avoid potentially dangerous and disruptive incidents known as "dig-ins" where excavators hit underground facilities.

In 2018, following a lengthy informal investigation, the CPUC issued its Order Instituting Investigation 18-12-007 (the "**L&M OII**") to investigate whether the Utility's damage prevention and L&M programs and practices for its natural gas system were in violation of the California Public Utilities Code, California Government Code, CPUC general orders or decisions, and other laws, applicable rules or requirements. Thereafter, in May 2019, the CPUC determined that the proceeding would include the Utility's L&M practices related to its underground electric distribution infrastructure, in addition to its L&M practices for its gas facilities. *See* Assigned Commissioner's Scoping Memo and Ruling at 6 (May 7, 2019), attached to the Vallejo Declaration as **Annex 2** (hereinafter, the "**Scoping Memo**").[1]

In connection with opening the L&M OII, the SED conducted a lengthy investigation and issued a 177-page investigative report. In preparation for hearings on the merits, the Utility and SED both submitted witness testimony before the CPUC, as did intervenors The Utility Reform Network ("**TURN**"), the CPUC's Public Advocate's Office ("**Cal Advocates**") and the CPUC's Office of Safety Advocates ("**OSA**").[2]

---

[1] The Scoping Memo and Ruling provided that the L&M OII would be focused on four main issues: (1) whether the Utility's L&M procedures, practices and/or activities relating to its underground electric distribution and natural gas infrastructure violated any applicable statutes, rules, regulations or orders; (2) whether the Utility's L&M recordkeeping and reporting procedures, practices and/or activities violated any applicable statutes, rules, regulations or orders; (3) whether the Utility violated any applicable statutes, rules, regulations or orders relating to the use of Qualified Electrical Workers for locating and marking underground infrastructure; and (4) what should be the appropriate penalty or remedy for any violations. Scoping Memo at 6.

[2] A full listing of (and links to) the filings in this proceeding are available on the Docket Card for this proceeding on the CPUC's website at:
https://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:I1812007.

On October 3, 2019, the Settling Parties filed a joint motion with the CPUC for approval of a proposed settlement, attached to the Vallejo Declaration as **Annex 3**. The Settlement Agreement required, among other things, that the Utility make payments and incur a penalty that totaled $65 million, at shareholder expense. TURN, Cal Advocates, and the OSA submitted comments and the CPUC's Presiding Officer held a hearing on the proposed settlement.

Subsequently, on January 17, 2020, the Presiding Officer issued a Presiding Officer's Decision accepting the Settlement Agreement with modifications. As discussed in more detail below, the Presiding Officer indicated that the Settlement Agreement would not be approved as proposed, but would be approved if the Settling Parties agreed to increase the total payments and penalty from $65 million to $110 million and made certain changes to the Settlement Agreement's operational initiatives. Presiding Officer's Decision at 34. The Presiding Officer's Decision gave the Settling Parties twenty (20) days to accept the modifications or request other relief.

The Settling Parties filed a joint motion on February 6, 2020 accepting the Presiding Officer's Decision and proposing modifications to the changes required under the Presiding Officer's Decision. On February 14, 2020, the ALJ issued an order approving the settlement as modified in the Presiding Officer's Decision and rejecting the Settling Parties' proposed modifications. On February 20, 2020, the Presiding Officer's Decision became the decision of the CPUC.

The Settlement Agreement will become final and effective following approval from this Court. Settlement Agreement at 1, 34.

### IV. MATERIAL TERMS OF THE LOCATE AND MARK OII SETTLEMENT

The Settlement Agreement entered by the Settling Parties, and subsequently modified by the Presiding Officer, contains three primary components: stipulated facts, monetary penalties and payments, and system enhancement initiatives. These primary components, as well as certain other requirements, are summarized below.[3]

---

[3] This summary is qualified in its entirety by reference to the Presiding Officer's Decision and the Settlement Agreement. To the extent that any discrepancies exist between the summary described in this Declaration and the terms of the Presiding Officer's Decision and the Settlement Agreement, the Presiding Officer's Decision and the Settlement Agreement shall govern.

### A. Stipulated Facts

First, the Settlement Agreement includes numerous factual stipulations relating to the Utility's locate and mark program. As the Settlement Agreement recounts, for a period of time going back at least to 2012 and lasting into 2017 (the "**OII Period**"), the Utility significantly undercounted in its internal tracking system the number of instances in which it failed to respond in a timely manner to a portion of the approximately 4.6 million USA notifications that it received during that time. Settlement Agreement at 3. The undercounting was caused by a combination of factors, including (1) knowledge among the Utility's senior L&M management that there were late tickets that did not appear late, including in the Utility's late ticket reports; (2) steps taken, known among the Utility's senior L&M management, that had the effect of making some late tickets appear timely; (3) the Utility's L&M management failing to address concerns raised among numerous L&M supervisors, and also raised to L&M senior management by one L&M superintendent, about inaccurate notes, and potential entry of false notes on tickets; (4) despite learning of this problem, L&M management's continual placement of inappropriate pressures on locators and their supervisors; (5) L&M management providing unclear guidance for supervisors and locators to follow; and (6) L&M management expecting zero late tickets of staff while at times not providing sufficient staff to achieve that expectation. *Id.* The Utility provided the inaccurate information in its internal tracking system to SED. *Id.* at 4-5.

Additionally, the Settlement Agreement contains stipulations acknowledging that some L&M jobs require assistance from specially trained employees known as Qualified Electrical Workers ("**QEWs**"), and the Utility did not have sufficient QEWs for much of the OII period. When the Utility did not provide a needed QEW to complete a locate and mark, there were instances, due to a number of factors, in which Utility locators marked tickets as complete without the required assistance of a QEW and used techniques to locate the Utility's electric facilities that those employees were not permitted to use under Utility policies. Settlement Agreement at 9.

### B. Monetary Penalties And Payments

Under the Settlement Agreement as negotiated, the Utility was required to make payments and incur a penalty that totaled $65 million, $5 million of which was to be paid in cash to the State of

California's General Fund (the "**California General Fund**") and the remaining $60 million of which was to be devoted to investing in certain system enhancements aimed at improving L&M performance and compliance. The Presiding Officer's Decision, however, conditioned approval of the Settlement Agreement on increasing the total penalty amount to $110 million. Presiding Officer's Decision at 33. Of that amount, $44 million is to be paid to California General Fund (the "**General Fund Claim**"). *Id.* at 34. The remaining $66 million will be used to fund the Utility's System Enhancement Initiatives (the "**System Enhancement Investment**"). *Id.* These payments will be made at shareholder expense and will not be funded by ratepayers. *Id.* at 8; Settlement Agreement at 13. If the System Enhancement Initiatives cost less than $66 million, the remaining balance of that amount will be paid to the California General Fund. Presiding Officer's Decision at 34.

### C. System Enhancement Initiatives

The Settlement Agreement includes numerous required System Enhancement Initiatives designed to enhance, among other things, the Utility's L&M compliance and capabilities and the reliability of the ticket management information that the Utility maintains in the ordinary course of its business. These include:

- An independent compliance audit of L&M tickets, to be undertaken in consultation with SED, to determine whether the Utility's records that indicate a timely L&M activity are properly categorized as timely;

- An independent compliance audit using field reviews, to be undertaken in consultation with SED, to determine the Utility's L&M performance, procedure adherence, and compliance;

- The addition of 63 L&M personnel;

- Development of new ticket management software with better reporting capabilities;

- An update of electric facilities information in the Utility's system that locators use to identify the Utility's assets;

- An independent review, to be undertaken in consultation with SED, of certain Utility programs provided for employees to raise safety and other concerns;

- Improved L&M training; and

- Initiatives designed to promote the Utility's compliance culture—not just within its L&M division and not just aimed at line employees, but enterprise-wide and aimed at employees, managers, and the Utility's senior leadership.

Settlement Agreement at 14-21. As discussed *supra*, the Utility will pay for these System Enhancement Initiatives with the $66 million System Enhancement Investment it is required to contribute under the Settlement Agreement.[4]

**D. Additional Requirements**

In the Presiding Officer's Decision, the Presiding Officer proposed an additional requirement that the Utility board members and executives at or above the level of Senior Vice President go on L&M program site visits to both the field and to Utility L&M facilities at least once every three years. Presiding Officer's Decision at 34. Additionally, the Presiding Officer modified the Settlement Agreement to extend the time period of certain of the System Enhancement Initiatives, to require that certain reviews—which the Utility agreed to conduct as part of the System Enhancement Initiatives—be provided to the California Underground Facilities Safe Excavation Board, and to require that the Utility consult with the Board regarding additional methods to improve communications between the Utility and excavators. *Id.* These additional requirements were all accepted by the Settling Parties.

**E. Bankruptcy Court Approval and Timing of Payments**

The Settlement Agreement resolves and disposes of all claims, allegations, and liabilities within the scope of the L&M OII. Settlement Agreement at 1. Pursuant to the Presiding Officer's Decision, the Utility is required to seek Bankruptcy Court approval of the Settlement Agreement, as amended. *See* Presiding Officer's Decision at 2, 35. Upon this Court's approval of the Settlement Agreement, the L&M OII proceeding will be closed and the Settlement Agreement will be effective. Presiding Officer's Decision at 35; Settlement Agreement at 1.

The Settlement Agreement contemplates, and the Settling Parties agree, that the Utility will satisfy the General Fund Claim "pursuant to, and in accordance with, the time frame and other provisions governing distributions as set forth in a chapter 11 plan of reorganization for [the Utility] as confirmed by the Bankruptcy Court." Settlement Agreement at § III.A.2. As currently proposed, under the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (as it may

---

[4] If the cost of implementing the System Enhancement Initiatives exceeds the levels of shareholder funding identified in the Settlement Agreement, the Utility may request and obtain additional ratepayer funding through a general rate case. Presiding Officer's Decision at 34.

be amended, modified or supplemented, the "**Plan**"), allowed general unsecured claims, such as the General Fund Claim, will be paid by the Debtors in full and in cash on the effective date of the Plan, or as soon as reasonably practicable thereafter. *See* Plan, Article IV. With regard to the System Enhancement Investment, the Settlement Agreement contemplates that the System Enhancement Initiatives are to be implemented following Bankruptcy Court approval and the occurrence of the effective date of the Settlement Agreement. As such, the Utility is seeking Bankruptcy Court approval of the System Enhancement Investment necessary to implement the required initiatives.

## V. BASIS FOR RELIEF REQUESTED

The Debtors submit that the Settlement Agreement, as modified by the Presiding Officer, is in the best interests of the Debtors' estates and all stakeholders and should be approved under Bankruptcy Rule 9019. Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. R. 9019(a). Bankruptcy courts have "great latitude in approving compromise agreements," *Woodson v. Fireman's Fund Ins. Co.*, 839 F.2d 610, 620 (9th Cir. 1988) (citing *Martin v. Kane (In re A & G Properties)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986)), provided that the agreement is "fair and equitable," *id.* In assessing whether that standard is met, the Court considers: (1) the probability of success in the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *Id.* at 620. The Court considers these factors "as a whole to determine whether the settlement compares favorably with the expected rewards of litigation," *Western Funding Inc. v. Shapiro (In re Western Funding Inc.)*, 550 B.R. 841 (9th Cir. BAP 2016).

Importantly, to be approved, a settlement need not be the best possible settlement for the Debtor. Rather, the Court must "ensure that the trustee has exercised proper business judgment in making the decision to agree to the proposed agreement," and the settlement is within "the range of reasonableness.'" *In re Cresta Techs.*, No. 16-50808 MEH, 2018 WL 2422415, at *3 (N.D. Cal. Bankr. May 29, 2018) (quoting *In re Rake*, 363 B.R. 146 (Bankr. D. Idaho 2007)) (emphasis added); *see also Allied Waste*

*Serves. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011) (*citing In re Thompson*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *Shugrue*, 165 B.R. at 123; *see also In re Fox*, No. 03-60547 JPK, 2011 WL 10468085, at *8 (Bankr. N.D. Ind. Mar. 16, 2011) ("The test for reasonable equivalence is 'whether or not the terms of the proposed compromise fall within the reasonable range of litigation possibilities.'") (quoting *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968)).

The Settlement Agreement here, as modified by the Presiding Officer, should be approved.

### A. The Settlement Agreement, as Modified by the Presiding Officer's Decision, Should be Approved.

Entry into the Settlement Agreement, as modified by the Presiding Officer, is reasonable and in the best interests of the Utility. The Settlement Agreement is the result of months of extensive negotiations undertaken by sophisticated parties represented by counsel, and of modifications required by the administrative law judge presiding over the matter. Prior to reaching a settlement, the Utility engaged in extensive discovery, submitted testimony before the CPUC, and participated in a law-and-motion hearing, two pre-hearing conferences, and a status conference. *See* Presiding Officer's Decision at 6. The Utility obtained a comprehensive understanding of the allegations made against it, assessed the strength of its litigation positions, and then entered a Settlement Agreement with SED and CUE to resolve the OII. *Cf. In re Residential Capital, LLC*, 497 B.R. 720, 735 (Bankr. S.D.N.Y. 2013) (approving settlement, in part, because "[t]he parties who negotiated the Settlement were all represented by competent and experienced counsel" and were the product of "[a]rm's-[l]ength [n]egotiations").

Indeed, the Presiding Officer's Decision found that, based on the extensive record before it, the "proposed settlement as modified … is reasonable in light of the whole record" and in the public interest. As demonstrated by the record, the Utility engaged in good faith negotiations to settle its liabilities for $65 million in total payments, of which only $5 million would have gone to the California General Fund. *See* Settlement Agreement at 12-13. The Utility and the other Settling Parties defended the original settlement and advocated for the Presiding Officer to adopt it in full, but the Presiding Officer rejected the $65 million number and increased the total settlement amount to $110 million, of which $44 million

is due to the California General Fund. *See* Presiding Officer's Decision at 26-34 (noting that the CPUC "cannot find that the proposed settlement is reasonable" at $65 million). Had the Utility declined to accept the modifications, the dispute would not have settled and the Presiding Officer could have imposed even larger penalties following a contested hearing.

The Settlement Agreement also provides important benefits. Over half of the money paid by the Utility under the Settlement Agreement will be used to fund System Enhancement Initiatives to improve the Utility's L&M function to the benefit of its estate. Unlike contributions to the California General Fund, these contributions will directly improve the Utility's damage prevention program, safeguard customers, and reduce risk going forward. *See* Settlement Agreement at 13; Presiding Officer's Decision at 33.

The overall monetary amount is also reasonable in light of the claims it will resolve. The Settlement Agreement will resolve possible liability spanning a period of approximately six years (2012-2017) and involving potentially tens of thousands of false tickets. Settlement Agreement at 2, 4. The monetary payments required by the Settlement Agreement are reasonable given the potentially broad scope of the claims.

**B. The Settlement Agreement Allows the Utiltiy to Avoid Significant Litigation Risk and Expense.**

The Settlement Agreement also is advantageous because it obviates significant litigation risk and costs. Had the Utility not reached a Settlement Agreement to resolve the L&M OII, the Presiding Officer would have adjudicated the OII and, if the Presiding Officer found that the Utility was liable for violations, he would have assessed penalties against the Utility. Such an adjudication could have resulted in penalties significantly more severe than those imposed by the Settlement Agreement. The Presiding Officer reasoned that using low-end penalty figures for the number of inaccurate late tickets reported and certain other violations would result in a penalty range of $84.2 million to $134.4 million, and using maximum penalty figures for each of those violations would multiply possible penalties much higher. Presiding Officer's Decision at 18-21 (using $500 penalty per inaccurate ticket and range of $5,000 to $20,000 for other violations, when maximums ranged from $50,000 to $100,000 per violation).

Accordingly, the high end of the Utility's exposure in this matter could have been significantly above the $110 million result. *Id.* The Settlement Agreement allowed the Utility to avoid the risk of maximum-level penalties and therefore should be approved. *See In re Golden Mane Acquisitions, Inc.*, 221 B.R. 963, 966 (Bankr. N.D. Ala. 1997) (to obtain approval of a settlement under Rule 9019, "[a]ll that [a debtor] must do is establish . . . that, all things considered, it is prudent to eliminate the risks of litigation to achieve specific certainty though admittedly it might be considerably less (or more) than were the case fought to the bitter end." (quoting *Florida Trailer & Equip. Co. v. Deal*, 284 F.2d 567, 573 (5th Cir. 1960)).

Although the Utility believes that it would have had substantial arguments against imposition of the maximum penalties, the Presiding Officer, who concluded that "virtually all of the litigation risk was on [the Utility]," may not have agreed with the Utility's position. Presiding Officer's Decision at 21. Furthermore, if the case had been litigated, the Utility would not have been able to negotiate with SED to ensure that the required System Enhancement Initiatives were feasible to implement and likely to help the Utility improve. Instead, the Utility would have been forced to accept whatever remedial actions or penalties the CPUC would choose on its own to impose.

Finally, if this matter were not resolved by the Settlement Agreement, the Utility would have had no choice but to continue engaging in costly and time-consuming litigation. The Utility would have had to participate in an in-depth evidentiary hearing and present numerous witnesses, and it would have continued responding to discovery requests and propounding its own discovery on SED and other parties. The costs of continuing to litigate would have been substantial. The Settlement Agreement allows the Utility to avoid these costs.

**C. The System Enhancement Investment is a Sound Exercise of the Utility's Business Judgment and Should be Approved Pursuant to Sections 363(b) and 105(a) of the Bankruptcy Code.**

Finally, in addition to approving the Settlement Agreement pursuant to Bankruptcy Rule 9019, the Court should also authorize the Utility to use its funds to satisfy the System Enhancement Initiative requirements under the Settlement Agreement pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363(b) provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use,

sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). The Court generally should approve expenses proposed pursuant to these provisions if the debtor identifies a "sound business justification." *In re Walter*, 83 B.R. 14, 17 (9th Cir. B.A.P. 1988); *see also In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (use of assets outside the ordinary course of business permitted if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

In this case, there plainly is a sound business justification for the Utility's commitment to make the System Enhancement Investment to satisfy the obligations under the Settlement Agreement. The Settlement Agreement limits the Utility's liability, ends costly and time-consuming litigation, and, specifically, the System Enhancement Investment ensures that the System Enhancement Initiatives are feasible and likely to be helpful. The Settlement Agreement also will ensure that the Utility improves its L&M and damage prevention programs, leading to safer service for its customers and reducing the Utility's exposure to future liability. The Utility entered the Settlement Agreement only after engaging in substantial litigation and obtaining advice from counsel. Accordingly, the System Enhancement Investment, as contemplated by the Settlement Agreement, is a sound and prudent exercise of the Utility's business judgment and should be authorized.

**VI.    REQUEST FOR BANKRUPTCY RULE 6004(h) WAIVER**

The Utility requests a waiver of any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above, the Settlement Agreement contemplates the Utility making $66 million in System Enhancement Investments. This obligation arises upon the effective date of the Settlement Agreement, which occurs upon entry of an order from this Court approving the relief requested herein. To comply with the terms of the Settlement Agreement and Presiding Officer's Decision, and to avoid the immediate and irreparable harm to the Utility from failure to comply, the

| | |
|---|---|
| 1 | Utility requests a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent |
| 2 | such stay applies. |

**VII.    NOTICE**

Notice of this Application will be provided to (i) the Safety and Enforcement Division of the California Public Utilities Commission; (ii) the Coalition of California Utility Employees; (iii) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (iv) counsel to the Creditors Committee; (v) counsel to Tort Claimants Committee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) the Office of the California Attorney General; (ix) the Nuclear Regulatory Commission; (x) the Federal Energy Regulatory Commission; (xi) the Office of the United States Attorney for the Northern District of California; (xii) counsel for the agent under the Debtors' debtor in possession financing facility; and (xiii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002.  The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

***

WHEREFORE the Debtors respectfully request entry of an order granting (i) the relief requested herein as a sound exercise of the Utility's business judgment, appropriate under sections 363 and 105(a) of the Bankruptcy Code and Bankruptcy Rules 9019 and 6004, and in the best interests of the Utility's estate, its creditors, shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: April 8, 2020

        **WEIL, GOTSHAL & MANGES LLP**

        **KELLER BENVENUTTI KIM LLP**

        By: /s/ *Jessica Liou*
             Jessica Liou

        *Attorneys for Debtors and Debtors in Possession*