WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DECLARATION OF ALEJANDRO VALLEJO IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 363(b) AND 105(a) AND FED. R. BANKR. P. 9019 AND 6004 FOR ENTRY OF AN ORDER APPROVING SETTLEMENT AGREEMENT RESOLVING LOCATE AND MARK OII**<br><br>Date: April 29, 2020<br>Time: 10:00 am (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Judge: Hon. Dennis Montali<br>**Objection Deadline: April 22, 2020, 4:00 pm (PT)** |

I, Alejandro Vallejo, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

I am the Senior Director and Senior Special Counsel of Corporate Compliance and Government Oversight for Pacific Gas and Electric Company (the "**Utility**"), a role I have held since 2017. The Utility is a wholly-owned subsidiary of PG&E Corporation ("**PG&E Corp.**" and, together with the Utility, the "**Debtors**"). Prior to joining the Utility's Law Department in 2010, I practiced commercial litigation at Orrick, Herrington & Sutcliffe LLP. I have an undergraduate degree from the University of California, Riverside, and received my Juris Doctor degree from Harvard Law School.

I am authorized to submit this Declaration (the "**Declaration**") on behalf of the Debtors in support of the *Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 9019 and 6004 for Entry of an Order Approving Settlement Agreement Resolving Locate and Mark OII* (the "**Motion**"), filed contemporaneously herewith.[1] The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, or information provided to me by other members of my team working under my supervision and direction. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

As described in the Motion, the Utility has reached a settlement (the "**Settlement Agreement**") with the Safety and Enforcement Division ("**SED**") of the California Public Utilities Commission ("**CPUC**"), and the Coalition of California Utility Employees ("**CUE**") (collectively, the "**Settling Parties**") that resolves a proceeding commenced by the CPUC to determine whether the Utility's damage prevention and locate and mark programs and practices for its natural gas system were in violation of the California Public Utilities Code, California Government Code, CPUC general orders or decisions, and other laws, applicable rules or requirements (the "**L&M OII**").

**A. The L&M OII Proceeding and its Resolution**

California law requires that owners of underground facilities, such as the Utility, take certain precautions to ensure that excavations do not damage their facilities. Pursuant to California law,

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

excavators planning to dig must notify the Underground Service Alert ("**USA**") 811 system, which in turn notifies underground facility owners such as the Utility. When the Utility receives notice from the 811 system, California law gives it two working days to "locate and mark" the location of its underground facilities, unless the excavator specifies or agrees to a later deadline. To locate and mark a facility, a Utility employee known as a locator travels to the excavation site, uses various techniques to locate the Utility's underground facilities, and physically marks the location of those facilities on the ground so the excavator can avoid them. The Utility tracks locate and mark ("**L&M**") jobs through electronic "tickets" that reflect when Utility locators perform the required work. The overall goal of the L&M process is to avoid potentially dangerous and disruptive incidents known as "dig-ins" where excavators hit underground facilities.

In 2018, following a lengthy informal investigation, the CPUC issued its Order Instituting Investigation 18-12-007, commencing the L&M OII. Thereafter, in May 2019, the CPUC issued a Scoping Memo and Ruling (the "**Scoping Memo**") that determined that the proceeding would include the Utility's L&M practices related to its underground electric distribution infrastructure, in addition to its L&M practices for its gas facilities. A true and correct copy of the **Scoping Memo** is annexed hereto as **Annex 2**. In connection with opening the L&M OII, the SED conducted a lengthy investigation and issued a 177-page investigative report. In preparation for hearings on the merits, the Utility and SED both submitted witness testimony before the CPUC, as did intervenors The Utility Reform Network ("**TURN**"), the CPUC's Public Advocate's Office ("**Cal Advocates**") and the CPUC's Office of Safety Advocates ("**OSA**").

On October 3, 2019, the Settling Parties filed a joint motion with the CPUC for approval of a proposed settlement which required, among other things, that the Utility make payments and incur a penalty that totaled $65 million, at shareholder expense. A true and correct copy of the joint motion is annexed hereto as **Annex 3**. TURN, Cal Advocates, and the OSA submitted comments and the CPUC's Presiding Officer held a hearing on the proposed settlement.

Subsequently, on January 17, 2020, the Presiding Officer issued a Presiding Officer's Decision accepting the Settlement Agreement with modifications. A true and correct copy of the Presiding

Officer's Decision, along with a copy of the Settlement Agreement, is annexed hereto as **<u>Annex 1</u>**. As discussed in more detail below, the Presiding Officer indicated that the Settlement Agreement would not be approved as proposed, but would be approved if the Settling Parties agreed to increase the total payments and penalty from $65 million to $110 million and made certain changes to the Settlement Agreement's operational initiatives. Presiding Officer's Decision at 34. The Presiding Officer's Decision gave the Settling Parties twenty (20) days to accept the modifications or request other relief.

The Settling Parties filed a joint motion on February 6, 2020 accepting the Presiding Officer's Decision and proposing modifications to the changes required under the Presiding Officer's Decision. On February 14, 2020, the ALJ issued an order approving the settlement as modified in the Presiding Officer's Decision and rejecting the Settling Parties' proposed modifications. The Presiding Officer's Decision became the decision of the CPUC on February 20, 2020, and the Settlement Agreement will become final and effective following approval from this Court. The material terms of the Settlement Agreement, as modified by the Presiding Officer's Decision, are more fully described in the Motion.

**B. The Settlement Agreement, as Modified by the Presiding Officer's Decision, Should be Approved**

I actively participated in the negotiations with the Settling Parties, the subsequent discussions with the Utility's senior management in evaluating the potential benefits of the Settlement Agreement, and the Utility's decision to enter into the Settlement Agreement.

The Settlement Agreement, as modified by the Presiding Officer, is the product of months of extensive good faith, arm's-length negotiations undertaken by sophisticated parties represented by counsel, and of modifications required by the administrative law judge presiding over the matter. Prior to reaching a settlement, the Utility engaged in extensive discovery, submitted testimony before the CPUC, and participated in a law-and-motion hearing, two pre-hearing conferences, and a status conference. The Utility obtained a comprehensive understanding of the allegations made against it, assessed the strength of its litigation positions, and then entered a Settlement Agreement with SED and CUE to resolve the OII. The Utility's decisions to enter into the Settlement Agreement and to accept the terms as modified by the Presiding Officer reflected the Utility's business judgment as to what is in the best interest of the Utility. The Settlement Agreement fully resolves the L&M OII, eliminates the costs

and uncertainties associated with further litigation, including the possible costs of rehearing, appeal, and potential penalties that could otherwise be levied, and ultimately benefits the Utility's customers.

As demonstrated by the record, the Utility engaged in good faith negotiations to settle its liabilities for $65 million in total payments, of which only $5 million would have gone to the California General Fund. *See* Settlement Agreement at 12-13. The Utility and the other Settling Parties defended the original settlement and advocated for the Presiding Officer to adopt it in full, but the Presiding Officer rejected the $65 million number and increased the total settlement amount to $110 million, of which $44 million is due to the California General Fund. *See* Presiding Officer's Decision at 26-34. Had the Utility declined to accept the modifications, the dispute would not have settled and the Presiding Officer could have imposed even larger penalties following a contested hearing.

The Settlement Agreement also provides important benefits. Over half of the money paid by the Utility under the Settlement Agreement will be used to fund System Enhancement Initiatives to improve the Utility's L&M function to the benefit of its estate. Unlike contributions to the California General Fund, these contributions will directly improve the Utility's damage prevention program, safeguard customers, and reduce risk going forward. The overall monetary amount is also reasonable in light of the claims it will resolve. The Settlement Agreement will resolve possible liability spanning a period of approximately six years (2012-2017) and involving potentially tens of thousands of false tickets. Settlement Agreement at 2, 4. The monetary payments required by the Settlement Agreement are reasonable given the potentially broad scope of the claims.

The Settlement Agreement also is advantageous because it obviates significant litigation risk and costs. Had the Utility not reached a Settlement Agreement to resolve the L&M OII, the Presiding Officer would have adjudicated the OII and, if the Presiding Officer found that the Utility was liable for violations, he would have assessed penalties against the Utility. Such an adjudication could have resulted in penalties significantly more severe than those imposed by the Settlement Agreement. The Presiding Officer reasoned that using low-end penalty figures for the number of inaccurate late tickets reported and certain other violations would result in a penalty range of $84.2 million to $134.4 million, and using maximum penalty figures for each of those violations would multiply possible penalties much higher.

Accordingly, the high end of the Utility's exposure in this matter could have been significantly above the $110 million result.

Although the Utility believes that it would have had substantial arguments against imposition of the maximum penalties, the Presiding Officer, who concluded that "virtually all of the litigation risk was on [the Utility]," may not have agreed with the Utility's position. Presiding Officer's Decision at 21. Furthermore, if the case had been litigated, the Utility would not have been able to negotiate with SED to ensure that the required System Enhancement Initiatives were feasible to implement and likely to help the Utility improve. Instead, the Utility would have been forced to accept whatever remedial actions or penalties the CPUC would choose on its own to impose.

If this matter were not resolved by the Settlement Agreement, the Utility would have had no choice but to continue engaging in costly and time-consuming litigation. The Utility would have had to participate in an in-depth evidentiary hearing and present numerous witnesses, and it would have continued responding to discovery requests and propounding its own discovery on SED and other parties. The costs of continuing to litigate would have been substantial. The Settlement Agreement allows the Utility to avoid these costs.

Finally, the Utility's proposed use of its funds to satisfy the System Enhancement Initiative requirements under the Settlement Agreement is a sound exercise of the Utility's business judgment and should be authorized. Here, there is clearly a sound business justification for the Utility's commitment to make the System Enhancement Investment to satisfy the obligations under the Settlement Agreement. The Settlement Agreement limits the Utility's liability, ends costly and time-consuming litigation, and, specifically, the System Enhancement Investment ensures that the System Enhancement Initiatives are feasible and likely to be helpful. The Settlement Agreement also will ensure that the Utility improves its L&M and damage prevention programs, leading to safer service for its customers and reducing the Utility's exposure to future liability. The Utility entered the Settlement Agreement only after engaging in substantial litigation and obtaining advice from counsel. Accordingly, the System Enhancement Investment, as contemplated by the Settlement Agreement, is a sound and prudent exercise of the Utility's business judgment and should be authorized.

For the reasons above, I believe the Settlement Agreement is fair and reasonable and the Utility's decision to accept the Presiding Officer's modifications to the Settlement Agreement is supported by the record. Accordingly, the Settlement Agreement, as modified by the Presiding Officer's Decision, should be approved.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 8, 2020
San Francisco, California

_____
Alejandro Vallejo

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119