**<u>Annex 1</u>**

**Presiding Officer's Decision and Settlement Agreement**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## PUBLIC UTILITIES COMMISSION

505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

February 20, 2020

TO PARTIES OF RECORD IN INVESTIGATION 18-12-007, DECISION 20-02-036:

On January 17, 2020, a Presiding Officer's Decision in this proceeding was mailed to all parties.  Public Utilities Code Section 1701.2 and Rule 15.5(a) of the Commission's Rules of Practice and Procedure provide that the Presiding Officer's Decision becomes the decision of the Commission if no appeal or request for review has been filed within 30 days of the mailing of the Presiding Officer's Decision.

No timely appeals to the Commission or requests for review have been filed. Therefore, the Presiding Officer's Decision is now the decision of the Commission.

The decision number is shown above.

/s/  ANNE E. SIMON
Anne E. Simon
Chief Administrative Law Judge

AES:mph

Attachment

Decision 20-02-036  February 20, 2020

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. | Investigation 18-12-007 |
|---|---|

**PRESIDING OFFICER'S DECISION**

# TABLE OF CONTENTS

**Title**                                                                     **Page**

PRESIDING OFFICER'S DECISION ............................................................................... 1

Summary ..................................................................................................................... 2

1. Background ........................................................................................................... 2

    1.1. Inaccurate Tickets ...................................................................................... 3

    1.2. Qualified Electrical Workers ...................................................................... 5

    1.3. Procedural Background .............................................................................. 6

2. Proposed Settlement – Summary and Party Positions ....................................... 7

    2.1. Non-Settling Parties ................................................................................... 9

    2.2. Settling Parties ......................................................................................... 11

3. Proposed Settlement – Discussion and Analysis ............................................. 13

    3.1. Level of Penalties ..................................................................................... 14

    3.2. Other Remedies ........................................................................................ 24

    3.3. Modifications ............................................................................................ 26

4. Election to Accept Modifications ....................................................................... 32

5. Assignment of Proceeding ................................................................................. 32

Findings of Fact ....................................................................................................... 32

Conclusions of Law ................................................................................................. 33

ORDER ...................................................................................................................... 33

Appendix A

## PRESIDING OFFICER'S DECISION

### Summary

This decision approves with modifications a proposed settlement between Pacific Gas & Electric Company (PG&E), the Commission's Safety and Enforcement Division (SED), and the Coalition of California Utility Employees (CUE) relating to problems with PG&E's "Locate and Mark" program for identifying the location of underground gas and electric facilities.[1] Under the settlement as modified, PG&E shall be liable for a total penalty of $110 million, including the obligation to undertake specified initiatives at shareholder expense to address the problems with the Locate and Mark program. Upon approval by the Bankruptcy Court[2] of the Settlement Agreement as modified, this proceeding is closed.

### 1. Background

Owners of underground facilities such as PG&E are notified through the Underground Service Alert (USA) 811 system when an excavator reports that it plans to dig. Under state law, PG&E has two working days to locate and mark the location of its underground facilities, unless the excavator specifies or agrees to a later deadline. Each notification results in a "ticket," and PG&E keeps records for each ticket, including whether or not PG&E performed the required locate and mark work on time.

---

[1] The proposed settlement, titled: *Settlement Agreement Between Pacific Gas and Electric Company, the Coalition of California Utility Employees, and the Safety and Enforcement Division of the California Public Utilities Commission Resolving Order Instituting Investigation I. 18-12-007* (Settlement Agreement) is attached as Appendix A.

[2] United States Bankruptcy Court for the Northern District of California, Case No. 19-30088DM (Bankruptcy Court).

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 5 of 67

## 1.1.  Inaccurate Tickets

In 2010, a Pacific Gas & Electric Company (PG&E) Quality Assurance Audit identified a "glitch" in the software used for the recordkeeping of PG&E's Locate and Mark program.  The result of this glitch was that:

> [T]he time-clock feature of the software would be halted just by opening the record without performing the work or documenting an agreement with the excavator to postpone the work.  As a result, the reports for on-time performance generated using this software showed a 99 percent on-time response for 2010 that cannot be relied upon. (PG&E 90-Day Report at 32.)[3]

A 2012 PG&E Internal Audit stated that: "Interviews with employees in the damage prevention program confirmed that this deficiency has not yet been corrected." (*Id*. at 32-33.) PG&E does not explain why the problem was not addressed prior to 2012.  In response to the 2012 Internal Audit, PG&E then began to work to resolve this problem, and by the end of 2012, PG&E concluded that the glitch had been fixed and that the late-ticket issues identified in the 2010 and 2012 audits had been resolved.  (*Id*. at 33 and 43.) Unfortunately, only part of the problem had been resolved.

In April 2016, the Commission's Safety and Enforcement Division (SED) was notified by the federal Pipeline and Hazardous Material Safety Administration (PHMSA) that PG&E may have falsified many of its Locate and Mark records.  (SED Investigative Report at 161, PG&E 90-Day Report at 45.) SED submitted its first data request to PG&E on June 8, 2016, asking for information about late tickets between 2013 to 2016.

---

[3]  The full title is: *Pacific Gas and Electric Company's 90-Day Report and Response to Locate and Mark OII Directives 1 to 9, Volume 1 of 2.*

In May 2016, PG&E Quality Management informed PG&E senior leadership (above the Locate and Mark organization) that they had identified late tickets that had not been reported. (PG&E 90-Day Report at 80.) In response, Jesus Soto, Vice President of Gas Operations, directed John Higgins, PG&E's Vice President, Gas Transmission & Distribution Operations, to look into the problem. (*Id.* at 81.) Higgins took steps to investigate, but did not report back to Soto, and no action was taken in response. PG&E acknowledges that at this time there was: "a failure of follow through [that] allowed the issue to persist." (*Id.* at 82.)

On March 23, 2017, through a peer review conducted through the American Gas Association (AGA): "PG&E senior leadership became aware that problems with L&M's [Locate and Mark's] late ticket data had persisted through efforts over the years to fix them." (*Id.* at 82.) At a debriefing session toward the end of the peer review, the reviewers told Mr. Soto that according to PG&E employees they had talked to, "PG&E's actual performance on late tickets was being shielded, and employees knew it." (PG&E 90-Day Report at 48; Settlement Agreement at 9.) Subsequently, PG&E convened a "Special Attention Review" and hired outside consultants Guidepost and Bates White to help it understand and address the problem.

According to Bates White, PG&E could have had as many as 170,135 late tickets over the 2012 to February 2017 period, while PG&E's records (and reports to the Commission) only showed 34,998. This is a difference of up to 135,137 tickets. (Settlement Agreement at 4.) Bates White described its PG&E-approved methodology as conservative, and more likely to overcount rather than undercount the number of late tickets, but they could not quantify the scope of

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 7 of 67

that potential overcounting and did not attempt to do so. (Settlement Agreement at 4; Transcript, Vol. 3 at 256-257.)

Of the 135,137 potentially inaccurate tickets, it is not clear from the record which of those tickets were intentionally falsified, which were accurate but intended to take advantage of the software glitch, and which were accurate and good-faith entries with no intention of making a late ticket appear timely. (PG&E 90-Day Report at 105.) PG&E concedes that some tickets were intentionally falsified to avoid having a ticket show up as late. (*Id* at 105, 115.) Regardless of the motivation of the individual employee, up to 135,137 tickets that PG&E recorded and reported as on time were actually late.

Late tickets have potential safety consequences, including an increased risk of dig-ins. PG&E late responses to USA notifications were a contributing factor to 67 dig-ins by excavators on PG&E gas lines. (Settlement Agreement at 6.)

### 1.2. Qualified Electrical Workers

Under PG&E procedure for certain situations involving electrical facilities, completion of the locate-and-mark process required the assistance of a Qualified Electrical Worker (QEW). (Settlement Agreement at 9.) During the period at issue, PG&E failed to maintain sufficient QEW support for its locate and mark activities. (*Id.*) In some cases PG&E did not provide a QEW on a timely basis. This resulted in late tickets (some of which may have been inaccurately recorded as on time), tickets requiring a QEW that were marked complete without the assistance of a QEW, and non-QEW locators performing tasks that required a QEW. (*Id.* at 9-10.)

- 5 -

The consequences of inadequate QEW support could be serious:

> PG&E has identified five dig-ins during the OII Period in which the failure to use a QEW that was required by PG&E procedure to complete the locate and mark may have contributed to the dig-in. (*Id*. at 10.)

In November 2014, the lack of QEW assistance was a factor in a dig-in in San Jose that resulted in injuries to a City of San Jose employee. (Settlement Agreement at 10.) PG&E hired Exponent to conduct an independent root cause analysis of this dig-in. Around the end of March 2015, Exponent provided a copy of its final report to Joel Dickson, PG&E's Locate and Mark Director, who immediately sent an e-mail summarizing the report and its recommended corrective actions to Jesus Soto, Vice President of Gas Operations. (Ex. SED-10, Testimony of Charles Mee at 7.) SED also provided PG&E a notice of violation for this incident on March 30, 2015. (Settlement Agreement at 10.)

SED testimony states that PG&E management, in general, was aware of the QEW issues as early as 2013, and that Mr. Soto was informed of the Exponent Report on March 31, 2015. In 2019, PG&E is now taking steps to remedy the inadequate QEW support, including the hiring of additional QEWs and other measures. (*Id*. at 17-18.)

### 1.3. Procedural Background

SED issued its investigative report and the Commission opened this proceeding in December 2018. A number of motions, responses to motions and rulings have been filed in this proceeding on issues including confidentiality of information, scope of the proceeding, discovery, and scheduling; a law-and-motion hearing, two pre-hearing conferences and a status conference

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 9 of 67

were held.[4]  A Scoping Memo and Ruling was issued on May 7, 2019.  Testimony was served by SED, PG&E, The Utility Reform Network (TURN), the Commission's Public Advocate's Office (Cal Advocates) and the Commission's Office of Safety Advocates (OSA).[5]

On October 3, 2019, PG&E, the Coalition of California Utility Employees (CUE) and SED (Settling Parties) filed a joint motion for approval of a proposed settlement (Joint Motion).  Attached to the Joint Motion is the Settlement Agreement.  A hearing on the proposed settlement was held on October 21, 2019.  Comments on the proposed settlement were filed on November 4, 2019 by TURN, Cal Advocates and OSA, all of which criticized aspects of the settlement and opposed its adoption as proposed.  Reply comments expressing support for the comments of TURN, Cal Advocates and OSA were filed by the City and County of San Francisco (CCSF).  Reply comments reiterating support for the proposed settlement were filed jointly by SED, PG&E and CUE (Settling Parties).

## 2.  Proposed Settlement – Summary and Party Positions

In order for the Commission to approve a proposed settlement, the Commission must find that it is reasonable in light of the whole record, consistent with law, and in the public interest.  (Commission Rules of Practice and Procedure Rule 12.1(d).)

The proposed settlement sets forth a set of stipulated facts and violations, calls for PG&E to undertake 28 "System Enhancement Initiatives," make $60 million in payments toward certain System Enhancement Initiatives and pay

---

[4] A full listing of (and links to) the filings in this proceeding are available on the Docket Card for this proceeding on the Commission's website, at: https://apps.cpuc.ca.gov/apex/f?p=401:56:0::NO:RP,57,RIR:P5_PROCEEDING_SELECT:I1812 007

[5] As of January 1, 2020, OSA was absorbed back into SED.

$5 million to the state's General Fund. (Joint Motion at 6-8.)  After summarizing the stipulated facts and violations, the Joint Motion summarizes the proposed settlement as follows:

> **Second**, the Settlement requires PG&E to undertake 28 System Enhancement Initiatives.  Nine are focused on late ticket and late ticket data issues.  Five are focused on issues identified in the locating and marking of PG&E's electrical facilities, and in particular PG&E's failures to provide sufficient numbers of QEWs.  Seven more are aimed at addressing cultural issues both within PG&E's L&M division and enterprise-wide, focusing on training and the creation of environments in which employees are comfortable and empowered to speak up and identify, among other things, possible safety concerns and possible misconduct—including an independent review of PG&E's existing programs for raising and responding to issues.  The last seven provide for increased transparency into PG&E's L&M [Locate & Mark] operations, including Annual L&M Report requirements and a provision regarding root cause analyses and causal evaluations.  Several of these System Enhancement Initiatives are discussed in greater detail in Part II of this Motion, discussing how the Settlement addresses the "main issues" in this proceeding.
>
> **Third**, the Settlement requires PG&E to make payments and incur a penalty totaling $65 million.  These amounts shall be funded by PG&E shareholders and PG&E shall not seek to recover any of these costs in rates.  Of that $65 million, $5 million is to be paid as a fine to the General Fund.  The remaining $60 million is intended to be allocated among various System Enhancement Initiatives, as identified in Table 1, immediately below.

**Table 1**

**Duration and Funding Estimates for
PG&E Shareholder-Funded System Enhancement Initiatives**

| Paragraph | | Duration (years) | Funding ($ million) |
|---|---|---|---|
| III.B.1 and III.B.14 | Ticket compliance audit | 2 | $2.0 |
| III.B.2 | Compliance audit using field reviews | 2 | $6.0 |
| III.B.4 and III.B.10 | Additional L&M staff | Through 2022 | $41.3 |
| III.B.6 and III.B.13 | Digital ticket management system to replace IrthNet, and update electric facilities information in GIS | Through 2022 | $7.0 |
| III.B.21 | Review of Corrective Action Program ("CAP") and Compliance and Ethics Helpline program | 1 | $1.0 |
| III.B | Add'l L&M staffing, extensions of audits, and remaining items in Part III.B | as required or specified | $2.7 |
| TOTAL | | | $60.020 |

The full Settlement Agreement is attached as Appendix A to this decision.

## 2.1.  Non-Settling Parties

TURN strongly criticizes the proposed settlement, arguing that it is neither reasonable in light of the whole record nor in the public interest.  TURN argues that the settlement does not require PG&E "…to accept the true nature and full extent of the failures here as *failures in management*."  (TURN Comments at 2,

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 12 of 67

emphasis in original.) TURN calls for "…a clear acknowledgement of the responsibility of PG&E management for the conduct at issue and increasing the proposed penalty to account for mismanagement." (*Id*.)

In addition, TURN argues that the proposed settlement needs to be modified to ensure that it operates as intended and for ratepayer benefit. According to TURN, the proposed settlement lacks an adequate mechanism for tracking the costs of the shareholder funded enhancement initiatives and ensuring that they are actually funded by the shareholders. (*Id*. at 2-3)

TURN summarizes its arguments as follows:

The Proposed Settlement suffers from serious shortcomings. First, it lacks necessary accounting and ratemaking mechanisms to ensure that shareholders will in fact pay for the 28 System Enhancement Initiates required by the Settlement. Second, it fails to explicitly require PG&E to fund those enhancements in full, even if the costs exceed the $60 million specified in the Settlement. Third, it fails to hold PG&E sufficiently accountable for its 2017 data request response that PG&E knew or should have known was inaccurate. Last but not least, it fails to acknowledge and account for the nature and full extent of the managerial failures at PG&E. Unless these problems are remedied, the Commission cannot conclude that the proposed Settlement is consistent with the record and in the public interest. *(Id*. at 4.)

Cal Advocates also criticizes the proposed settlement, arguing that the proposed settlement is not reasonable in light of the entire record, consistent with the law, or in the public interest, because the proposed settlement:

• Does not include fines and financial remedies in an amount commensurate with Pacific Gas and Electric Company's (PG&E) failure to promptly rectify deficiencies in it locate and mark program that were identified as early as 2010;

• Does not include fines and financial remedies in an amount commensurate with the harm to the regulatory process caused

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 13
of 67

by PG&E's failure to accurately report late ticket information to the Commission's Safety and Enforcement Division (SED);

• Does not include fines and financial remedies in an amount commensurate with the harm to the regulatory process caused by PG&E's failure to disclose a root cause analysis of a November 7, 2014 dig-in for more than four years after the completion of the root cause analysis and report, despite SED's request for all reports related to the November 2014 dig-in;

• Does not include compliance audits of an adequate duration to evaluate whether PG&E's management is ensuring adherence to locate and mark procedures; and

• Does not ensure that the shareholder funds identified to maintain 63 locate and mark staff are not duplicative of funds that PG&E has requested in Application (A).18-12-009, its 2020 General Rate Case (GRC). (Cal Advocates Comments at 1-2, footnotes omitted.)

OSA similarly argues that the proposed settlement is not reasonable in light of the entire record and not in the public interest. According to OSA, the proposed settlement does not adequately address the enterprise-wide causes and failures in management oversight the led to the problems with the locate and mark program, and the remedies in the proposed settlement are insufficient to address deficiencies in PG&E's safety culture. (OSA Comments at 5-9.)

While TURN, Public Advocates and OSA offered criticisms of the ratemaking, penalty size, and scope of remedies of the proposed settlement, there was no significant party criticism of the specific System Enhancement Initiatives identified in the proposed settlement.

## 2.2. Settling Parties

In response, the Settling Parties clarify that PG&E's obligation to undertake the identified System Enhancement Initiatives (Initiatives) is separate from PG&E's obligation to spend $60 million of shareholder money on

Initiatives, including the ones identified in the Settlement Agreement. (Settling Parties Reply Comments at 3-6.)  In other words, PG&E must implement the identified Initiatives, which may cost more or less than $60 million, and it must spend $60 million of shareholder money on Initiatives (either the identified ones or other ones).

This partially addresses the criticisms of TURN and Cal Advocates. It clarifies that there cannot be "double dipping" – if PG&E gets ratepayer funding for certain Initiatives, such as hiring additional locate and mark staff, it cannot count the associated expenses towards the $60 million.  It also clarifies that the obligation of PG&E to implement the Initiatives does not end when PG&E's spending hits the $60 million level – even if PG&E has spent $60 million, the Initiatives would continue.

The Settling Parties also clarify that while the Settlement Agreement contains estimates of the costs of the various Initiatives that add up to $60 million, those are only non-binding estimates, however, and they could be wrong. (Settling Parties Reply Comments at 5, citing Settlement Agreement at 13-14.)  If the cost of the identified Initiatives is less than $60 million in shareholder funds, then PG&E and SED would work to reach agreement on how to expend the remaining funds. (*Id*. at 5.)  But at this time neither the parties nor this Commission know what those funds would be spent on.

Since the Initiatives would not end upon the expenditure of $60 million, if the cost of the identified Initiatives is more than $60 million, it appears that ratepayers would be asked to pay the difference:

> Nothing in this Settlement Agreement shall be read as requiring the expenditure by PG&E of additional shareholder-provided funding after the funding provided by

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 15 of 67

this Settlement Agreement has been exhausted.  (Settlement Agreement at 13.)

TURN and Cal Advocates argued that the dollar amount of the proposed settlement is too low; the Settling Parties respond to these arguments with four counter-arguments: 1) The benchmark precedents cited by the Settling Parties are appropriate, and TURN and Cal Advocates did not propose the use of other precedents; 2) TURN and Cal Advocates did not take into account the financial resources of PG&E as SED has done; 3) the Settling Parties had to account for their litigation risks; and 4) Cal Advocates' alternative methodology of calculating the proper penalty level is inapplicable and based on inaccurate information.  (Settling Parties Reply Comments at 7-9.)

Finally, the Settling Parties address the arguments that the proposed settlement does not adequately acknowledge or address PG&E management's role and responsibility, but do so by focusing on the remedies that would be implemented under the proposed settlement.  (Settling Parties Reply at 20.)

## 3.  Proposed Settlement – Discussion and Analysis

In general, there is no significant disagreement about the underlying facts. PG&E has largely admitted to the various violations identified by SED, including the existence of inaccurate tickets, inaccurate reporting to this Commission, lack or delay of management response, and inadequate QEW support for locate and mark duties.  The Settling Parties have stipulated to these facts in the proposed settlement, and the non-Settling Parties do not dispute them.

The dispute between the Settling Parties and the Non-Settling Parties focuses primarily on the level of penalties, the scope of remedial actions, and the allocation of costs between ratepayers and shareholders.  In the proposed settlement there is some overlap between the penalties and remedial actions. Typically, penalties are intended to punish wrongful acts, and by doing so they

- 13 -

seek to deter future wrongful acts. In theory, the entity that is punished will try to avoid being punished again in the future. Remedial actions, on the other hand, are intended to fix problems (and ideally fix the underlying causes of the problems), and are generally not intended to be punitive.

Here, the penalty and the remedial actions overlap, as the proposed settlement would have remedial actions undertaken by PG&E at shareholder expense, without PG&E being able to recover those costs from ratepayers. In essence, the idea is that the cost of the remedial actions would come out of PG&E's pocket, not recovered from ratepayers, similar to how a penalty paid to the state's General Fund would be paid. Nevertheless, because the underlying basis for penalties and remedial actions differs, and because the proposed settlement does establish some separation between the two, it is appropriate to look at them separately.

## 3.1. Level of Penalties

Based on the record before the Commission, there appear to be several problems with the penalty provision of the proposed settlement: 1) it is not clear how much PG&E would actually pay out-of-pocket; 2) the parties and the Commission cannot clearly determine what a substantial part of the money paid would be used for; and 3) the amount of the penalty appears to be too low for the number, duration and severity of the violations, including PG&E management's failure to correct the violations.

First, based on the record of the proceeding, it is not clear that PG&E shareholders will actually pay $65 million. While it is not certain, PG&E may be able to take a federal tax deduction for the $60 million that it would spend on its various Initiatives, which would result in a potential tax savings of

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 17 of 67

approximately $16 million. (Transcript, Vol. 3 at 123-126.)[6] If so, then PG&E's total penalty would not be $65 million, but approximately $49 million. The proposed settlement does not address tax issues, and there is no indication that it took into consideration the possible deductibility of $60 million of its total $65 million in penalties. While the $5 million fine paid to the General Fund is clear and not deductible, that is not true of the other $60 million. Accordingly, the Commission cannot determine if the actual total amount to be paid by PG&E is $65 million or approximately $49 million.

Second, TURN and Cal Advocates raise valid questions about the actual value or benefit to ratepayers of a key provision of the proposed settlement, as it appears to be duplicative of a request for ratepayer funding in PG&E's 2020 General Rate Case (GRC) application. Cal Advocates observes that the proposed settlement calls for PG&E to maintain an additional 63 locate and mark personnel, for a total of 319; but on October 1, 2019, PG&E had 324 locate and mark personnel, all funded by ratepayers. (Cal Advocates Comments at 8-9.) Cal Advocates argues that since PG&E already has more locate and mark staff than called for in the settlement, the proposed settlement does not result in the hiring of additional locate and mark staff, but would allow PG&E to take credit for activities that they have already done. (*Id*. at 9.)

TURN makes essentially the same argument:

> If staffing levels are already beyond the level required by the Settlement, and PG&E has requested ratepayer funding for the staffing it needs starting in 2020 in the GRC, it is unclear how ratepayers will benefit from shareholders funding additional employees. [...] If the division is already

---

[6] Based on the record in this proceeding, the current state of the tax law is unclear regarding the deductibility of those expenses. (*Id*.)

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 18 of 67

adequately staffed, ratepayers are currently paying for the implementation of one of the "enhancement initiatives" identified under the settlement. (TURN Comments at 6.)

TURN points out that the proposed settlement does not identify a mechanism for tracking the spending of any of the $60 million of shareholder funding, with $41.3 million of that earmarked for the additional 63 locate and mark personnel. (TURN Comments at 5.) Cal Advocates likewise notes that the proposed settlement does not analyze the overlap between the proposed settlement and PG&E's GRC, and PG&E's witness admitted that the parties had not done that yet. (Cal Advocates Comments at 10.)

The Settling Parties only partially address these criticisms, by clarifying that PG&E could not "take credit" for spending on Initiatives that have been funded by ratepayers. (Settling Parties Reply Comments at 4-6.) In other words, if the cost of the additional 63 locate and mark personnel is already being recovered in rates, that cost would not count towards the $60 million of shareholder funds that PG&E is obligated to spend. The hiring of the additional personnel apparently would, however, still count as achieving one of the identified Initiatives.

TURN and Cal Advocates raise valid concerns that the proposed settlement is unclear whether one of its main purported benefits is actually incremental to what PG&E is already doing, and accordingly it is unclear what benefit ratepayers would receive. An estimated $41.3 million of the $60 million to be spent on Initiatives is attributed to the hiring of additional locate and mark personnel. (Settlement Agreement at 13.) If PG&E is already spending ratepayer money on the additional locate and mark staff, then by the terms of the proposed settlement, PG&E must increase its spending on other Initiatives to reach the $60 million level. If the estimate in the proposed settlement is accurate, that

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 19 of 67

means that PG&E must spend $41.3 million on other Initiatives.  It is not clear if the $41.3 million would be added to amounts estimated to be spent on the other Initiatives identified in the proposed settlement, or if it would be spent on new, not-yet-identified Initiatives.  The only clarity is that PG&E and SED would seek to "reach agreement on the method of expending any remaining funds." (Settling Parties Reply Comments at 5, quoting Settlement Agreement at 14.)  As a result, neither the parties nor this Commission have a clear understanding of what roughly two-thirds of the $60 million would actually be spent on.

Third, the total amount of the penalty is low relative to the scale of PG&E's wrongdoing.  While the penalty amount is a negotiated "black box" settlement, the Settling Parties appear to rely heavily on two factors in their justification of the penalty level: prior Commission decisions that they describe as "benchmark precedents," and PG&E's financial condition. (Joint Motion at 28-33, Settling Parties Reply Comments at 7-8.)  While prior Commission decisions can be relevant in determining an appropriate penalty, they do not provide a particularly useful benchmark in a unique case like this one.[7]  Based on the information provided by the Settling Parties, the proposed settlement appears to be completely unmoored from the number of violations and the potential penalties that could be imposed for those violations.

Cal Advocates uses a different methodology, based on the number and severity of the violations and an associated penalty amount, to calculate a significantly higher penalty amount.  (Cal Advocates Comments at 5-7.)  The Settling Parties argue that this methodology is inapplicable because the Settling

---

[7]  In contexts where there are numerous cases with similar violations, there can be more standardization or "benchmarking" of penalty levels.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 20 of 67

Parties did not use that methodology (Settling Parties Reply Comments at 9), which is a rather circular argument.

The Settling Parties also argue that the calculations of Cal Advocates should not be used because they are based on the Bates White count of underreported late tickets, which the Settling Parties characterize as having "uncertainties," and accordingly cannot be considered the "correct" number, and Cal Advocates did not provide any evidence that 135,137[8] was the "definitive number" of unreported late tickets. (*Id*. at 9.)  Given that the "uncertainty" around the number of tickets was the fault of PG&E, and that neither PG&E nor SED can testify to a "definitive number" of unreported late tickets, this criticism is misdirected.

In fact, the general approach used by Cal Advocates is reasonable for evaluating the amount of the penalty, as it provides some correlation between the number and scope of violations and the penalty amount.  Starting with just the number of inaccurate tickets – 135,137 - each one of which is a violation, a penalty of $500 per ticket (the minimum penalty under section 2107) would support a penalty of $67.5 million.[9]

Even more serious, however, is that PG&E senior management was apparently unaware of the inaccurate ticket problem for years, and took no action to remedy it from the end of 2012 until March of 2017, when it was pointed out to them via an AGA peer review.  This means that there were at least

---

[8] The Settlement Agreement contained the number 135,145, which was later corrected to 135,137.

[9] A penalty of $500 per ticket is appropriate for inadvertently or unintentionally inaccurate tickets; tickets that were intentionally falsified would deserve a higher penalty.  Because the number of intentionally falsified tickets is unknown (but more than zero), a $500 per ticket penalty is on the low side.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 21 of 67

four full years (2013, 2014, 2015 and 2016) and two months in which the problem was ongoing and unaddressed.[10]  That minimum duration adds up to about 1,520 days.  Under section 2108, for a continuing violation, each day's continuance is a separate and distinct offense.  Accordingly, it would be appropriate to multiply a penalty amount by 1,520.  The question remains what the appropriate daily penalty level for this should be.

According to the Joint Motion: "SED believes that the threat of physical and economic harm associated with each of the violations makes them severe." (Joint Motion at 20, 22.) While PG&E downplays the severity of the violations, PG&E management's inability to even realize the existence of a problem that its own employees were aware of is deeply troubling.  It took PG&E senior management years to figure out that there was a problem, and when it learned of the problem in 2016 it failed to correct it and had to be reminded of it by an outside peer review in 2017.  This is clearly more than a minimum-level $500 per day violation.  While PG&E management's failure act may not deserve the maximum statutory penalty of $100,000 per day, even a penalty of $5,000 to $20,000 per day would result in a penalty of $7.6 million to $30.4 million.

PG&E management also failed to take action in response to the ongoing lack of availability of QEWs for locate and mark activities.  According to SED, PG&E management was aware of QEW issues in 2013. (Ex. SED-10 at 7.)  In response to a 2014 dig-in, PG&E hired Exponent to perform a root cause evaluation.  The report issued to PG&E by Exponent in 2015 identified a number of problems with PG&E's locate and mark program, including ineffective

---

[10]  This does not include the two years – from 2010 to 2012 – it took for PG&E to address and (partially) resolve the prior issue.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 22 of 67

communication between electric and gas lines of business, among other deficiencies, and recommended corrective actions. (*Id*. at 6.) PG&E's Vice President of Gas Operations Jesus Soto was made aware of the Exponent Report around March 31, 2015. (*Id*. at 7.)

The Settlement Agreement, dated October 3, 2019 sets forth QEW-focused proposals, but does not indicate what actions, if any, PG&E took prior to that date to address the QEW issues. SED's testimony identifies steps that PG&E says it took to implement recommendations from the Exponent Report, but also found PG&E's efforts to be deficient. (*Id*. at 9-11.)

Again, PG&E had a safety-related problem with its locate and mark program that was ongoing and unaddressed, with the difference that PG&E senior management was aware of the QEW problem since at least early 2015. Like the under-counted or inaccurate ticket problem, this is an ongoing violation of section 451 subject to a daily penalty under section 2108. Based on the record before the Commission, PG&E was in violation for a minimum of five years (2013 through 2017), and potentially as many as eight years (2012 through 2019). Using the five-year minimum of 1,825 days, a penalty of $5,000 to $20,000 per day would result in a total penalty of $9.1 million to $36.5 million for the failure to provide adequate QEWs.

Even without the violations related to the San Jose dig-in and Exponent analysis that PG&E has stipulated to, a back-of-the-envelope estimation of the low end of the potential penalty faced by PG&E is significantly higher than the $65 million maximum penalty that PG&E would pay under the proposed

settlement.[11]  Considering only the potential penalties for the inaccurate tickets, the missing QEWs, and PG&E's ongoing failure to address these problems, the sheer number of violations, the long-term failure of management to realize or understand that there were serious problems, and the safety risks directly presented by the problems would reasonably support imposition of a penalty of $84.2 million to $134.4 million or more.[12]  A $65 million penalty is oddly low under the circumstances.

The Settling Parties argue that it is important to consider that the Settling Parties had to account for their varying litigation risks in order to reach an agreement.  (Settling Parties Reply Comments at 8.)  As a general matter, this is a correct statement, and if SED faced significant litigation risk this would support a reduced penalty level from what would be sought in litigation.  Here, however, it is hard for this Commission to discern what significant litigation risks were faced by SED, as PG&E had already largely admitted to the alleged violations.[13]  The Settling Parties do not identify any specific litigation risks faced by the individual parties, but from the record before the Commission, virtually all of the litigation risk was on PG&E.  Accordingly, litigation risk does not provide a good basis for agreeing to a relatively low penalty.

The Settling Parties also identify the conduct of the utility as a relevant factor in determining the appropriate penalty level, and note that the

---

[11] As described above, because of the potential tax implications, it is difficult to tell if PG&E would pay $65 million, or if it would actually pay $49 million.

[12] This amount is reached by adding together the potential penalties described above of $67.5 million for the number of inaccurate tickets, $7.6 million to $30.4 million for the failure of PG&E management to fix the late ticket problem, and $9.1 million to $36.5 million for the failure to provide adequate QEWs.

[13] There appears to be even less litigation risk to CUE, but there is potential benefit in the settlement through PG&E's hiring of additional employees.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 24 of 67

Commission has previously considered the utility's conduct in: (1) preventing the violation; (2) detecting the violation, and (3) disclosing and rectifying the violation. (Joint Motion at 24, citing D.98-12-075.) Here, PG&E did not prevent multiple violations,[14] did not detect the violations,[15] and was at best questionable in disclosing and rectifying the violations. PG&E's conduct would support the imposition of a relatively high penalty.

It appears that for SED, PG&E's financial condition was more significant than the "benchmark" precedents cited by the Settling Parties. After citing to a number of cases, the Settling Parties go on to state:

> SED recognizes that past precedent is not completely instructive in determining the amount shareholders should pay in this case. Rather a combination of unique circumstances, such as those discussed in the "Financial Resources of the Utility" Section above provide a different calculus for determining the penalty that should be imposed.

> SED also carefully considered PG&E's ability to pay in this instance as best it could in agreeing to the sum total in the settlement. PG&E's pending bankruptcy is a factor to consider in assessing PG&E's ability to pay. SED respectfully requests that the factors identified here be considered when analyzing the consistency of this settlement with past precedent. (Joint Motion at 33.)

Language elsewhere in the Joint Motion confirms that PG&E's financial condition and resources was a major factor in determining the amount of the penalty:

> A unique combination of circumstances appear to affect the financial resources of PG&E at this point in time, including

---

[14] PG&E's protestations that the violations were inconsistent with company policy do not show that actual prevention occurred.

[15] When PG&E did detect violations, it failed to effectively address them.

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 25 of 67

PG&E's filing for reorganization under Chapter 11 of the Bankruptcy Code. SED contends that Assembly Bill 1054 adds to the unique combination of circumstances. SED has carefully considered PG&E's ability to pay in this instance. In light of this, SED made concessions with regards to shareholder penalties that it might not otherwise have made, and instead focused efforts to apply shareholder funding toward safety-related corrective actions.

The Settling Parties believe that the $65 million combination of penalty and funding of system enhancement initiatives here is sufficient in light of PG&E's financial condition. (Joint Motion at 29.)

This is the most clearly-stated basis provided by the Settling Parties in support of imposing a lower penalty than might otherwise be appropriate.[16]  At the same time, it provides no detail as to how the penalty level in this proceeding relates to the bankruptcy, nor does it explain the effect of Assembly Bill 1054.  It is not clear how the bankruptcy was factored in to the calculation of the penalty, or how the penalty level in this proceeding is affected by the scale or process of the bankruptcy, and there is little or no detail about PG&E's bankruptcy in the record of this proceeding.  While the Settling Parties are correct about the limited usefulness of precedent in determining the penalty in this proceeding, their heavy reliance upon the financial resources of PG&E as a basis for the settlement is misplaced.

The Commission understands that settlement negotiations are confidential, and that the penalty amount was the result of those confidential negotiations, but the Settling Parties have provided only the most general and superficial

---

[16]  PG&E has a clear interest in a low penalty; this language indicates that PG&E's financial condition, including its current Chapter 11 bankruptcy, influenced SED to agree to a lower penalty than it otherwise may have sought.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 26 of 67

explanation of the result that was reached, and do not explain how that result is reasonable in light of the whole record and in the public interest.

### 3.2.  Other Remedies

The Non-Settling Parties do not criticize the substance of the remedial actions set forth in the Settlement Agreement,[17] and OSA expressly supports them (OSA Comments at 9), but all of the Non-Settling Parties criticize their scope, with OSA making the most comprehensive argument that they do not go far enough. (OSA Comments at 8-14.)

OSA argues that: "PG&E has a collection of safety programs working independently of each other with no interconnection occurring or thoughtful analysis of potential issues."  (*Id.* at 9.)  Accordingly, while OSA supports the remedies and system enhancement initiatives in the proposed settlement, OSA goes on to state:

> However, the seven enterprise-wide remedies are narrow in focus and do not sufficiently address the foundational root issues that have sustained a poor safety culture at PG&E that in part led to the locate and mark program failures.  Most importantly, these proposed remedies do not provide for the type of structural change that will address the deficient safety culture at PG&E.  Specifically, the Proposed Settlement Agreement does not provide for an executive-level safety office, a comprehensive, company-wide safety management system, an accountability officer within PG&E, nor a safety advisory board to advise PG&E and help prevent future safety lapses such as occurred in the locate and mark program. Without a structural change to the organization, the public will remain at risk.  (*Id.*)

OSA and TURN criticize the proposed settlement as inadequately acknowledging and addressing the failures of PG&E management. OSA argues

---

[17] Attached as Appendix A.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 27 of 67

that: "The record demonstrates serious failures in management oversight of the locate and mark program and a deficient safety culture at PG&E." (OSA Comments at 6.)  TURN concurs, and argues that the proposed settlement is inadequate in part because: "PG&E has not accepted the gravity of its managerial failures." (TURN Comments at 15.)  According to TURN, "The Settlement does not assign any violations to the failures of upper level management and fails to implement meaningful management remedies." (*Id*.)

The Settling Parties respond that the proposed settlement specifically describes management's role, and that "PG&E management's knowledge of and role in the issues are acknowledged throughout the Settlement's stipulated facts." (Settling Parties Reply Comments at 11.)  As proof, the Settling Parties excerpt a paragraph from the Settlement Agreement and highlight in bold text each mention of PG&E management, of which there are ten. Nine of the ten mentions, however, refer specifically to PG&E's Locate and Mark management; only one refers to PG&E's higher-level Gas Operations management. If anything, this tends to prove the point of OSA and TURN. As TURN points out:

> A company that truly prioritizes its statutory obligation to provide safe service would admit that its behavior was decidedly unacceptable, and that responsibility for allowing such behavior rests at the top leadership levels.  (TURN Comments at 15, emphasis added.)

From the apparent willingness of the Settling Parties – PG&E, SED and CUE – to place the blame on PG&E middle management, it is not clear that there is a true commitment to implementation of company-wide measures "[D]esigned to foster safe environments where employees feel comfortable speaking up." (Settling Parties Reply Comments at 20.)

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 28 of 67

### 3.3.  Modifications

Given the uncertainty as to the amount of the effective penalty to be paid by PG&E, the uncertainty about what the $60 million remedial portion of the settlement would actually pay for, the uncertainty about what ratepayers will be asked to fund, the relatively low penalty amount, and the lack of acceptance of responsibility by PG&E's top management, this Commission cannot find that the proposed settlement is reasonable in light of the whole record and in the public interest.

At the same time, however, there is record support (and no opposition) to the implementation of the specific System Enhancement Initiatives set forth in the Settlement Agreement, and this Commission has no desire to delay or otherwise hinder their implementation.  The System Enhancement Initiatives identified in the Settlement Agreement are approved.

Cal Advocates argues that one of the System Enhancement Initiatives should be expanded:

> The Proposed Settlement Agreement establishes a two-year duration for compliance audits using field reviews to ensure adherence to locate and mark procedures, with the possibility of extensions that would be funded by ratepayers and subject to Commission approval.  In light of PG&E managements failure to rectify problems with its locate and mark program for over five years, two years is insufficient to evaluate whether PG&E management is exercising adequate oversight to ensure adherence to locate and mark procedures.  The Commission should not approve the Proposed Settlement unless it is revised to require four years of compliance audits using field reviews at shareholder expense.  The anticipated cost for each year of the compliance audits using field reviews is $3 million, so an additional $6 million of shareholder funding should be identified to fund the cost of two

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 29 of 67

additional years of the compliance audits. (Cal Advocates Comments at 8, footnote omitted)

Cal Advocates raises a valid point – given PG&E management's failure to recognize and address serious ongoing problems, it would be appropriate to extend the duration of the audits.  Accordingly, we modify the proposed settlement to require four years of compliance audits rather than two years.  The additional $6 million cost of these audits is added to the amount to be paid by shareholders, increasing the total shareholder funding to $66 million.

Other aspects of the proposed settlement, however, do not have the same level of consensus and support as the System Enhancement Initiatives, particularly the allocation and amount of the financial penalty.  TURN and Cal Advocates provide alternative proposals on this issue.

On the cost of adding additional locate and mark staff, TURN argues:

Given that the utility has met its staffing requirements under the Settlement, it is not clear how the Settling Parties intend for the utility to account for the proposed $41.3 million for additional L&M staff.  Rather than develop a complicated accounting mechanism, the simplest solution would be to provide ratepayers a credit of $41.3 million against GRC revenues authorized by the Commission for Gas Distribution O&M in 2020-2022.  (TURN Comments at 15-16.)

Assuming that TURN is correct that PG&E has already hired the additional staff, then under TURN's proposal the $41.3 million of the proposed settlement designated for that purpose would be returned to ratepayers, instead of PG&E and SED coming up with new initiatives on which to spend the money.

TURN also criticizes the proposed settlement for requiring ratepayers to fund the cost of the initiatives to the extent they exceed $60 million:

The language of the settlement suggests, however, that PG&E will only fund the shareholder initiatives up to a cap of

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 30 of 67

$60 million.  To the extent that the costs of these initiatives exceed $60 million, PG&E acknowledges that it will seek ratepayer funding for the remaining costs.  If SED's intent is that PG&E complete the identified initiatives as a remedy for the failures identified in its investigation, then the work should be completed solely at shareholder expense.

The language of the Settlement Agreement § III.A.3 should be changed to reflect that PG&E is required to finish the system enhancement initiatives using shareholder funding.  (TURN Comments at 17, footnote omitted.)

TURN also argues that the total amount of the financial penalty in the proposed settlement is significantly too low, and should be increased:

TURN recommends that the Commission increase the fine PG&E will pay to the General Fund from $5 million to at least $70 million, for a total package of fines and shareholder-funded remedies of at least $130 million, which is twice the amount in the proposed Settlement.  A total financial remedy of $130 million equates to approximately $962 for each of the 135,137 late tickets that PG&E failed to report to the Commission over 2012-2017.  (TURN Comments at 21.)

Cal Advocates has somewhat similar recommendations as TURN, but with some differences:

Rather than the $65 million in the Proposed Settlement Agreement, the Public Advocates Office recommends that the Commission require that the Settling Parties revise the Proposed Settlement Agreement to include fines and equitable financial remedies totaling $109.895 million.  This number is calculated by assessing $500 for each late ticket that PG&E failed to report to SED (Violation 1); $50,000 for each dig-in associated with a late ticket (Violation 2); $20,000 per day for PG&E management's failure to remedy the inaccurate calculation of late tickets (Violation 3); and $500 per day for PG&E management's failure to provide the Exponent Report (Violation 4).  This recommended financial remedy is conservative, because it uses the lowest amount permitted under Public Utilities Code Section 2107 for each late ticket

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 31 of 67

not timely reported to the Commission, and each day the Exponent report was not provided; a midrange number for each day that PG&E management failed to remedy the inaccurate calculation of the number of late tickets; and the highest number for dig-ins associated with a late ticket.

The Public Advocate[s] Office recommends that the Commission require the Settling Parties to allocate $5 million of total amount to the General Fund and to allocate the money identified for shareholder-funded system enhancement initiatives as provided in the Proposed Settlement Agreement with two exceptions. As discussed in Sections IV B and C below, the Proposed Settlement Agreement should include an additional $6 million in shareholder funding for compliance audits and should exclude the $41.3 million identified to maintain 63 locators until 2022. Given the Settling Parties' failure to demonstrate that the $41.3 million to maintain 63 locators is incremental to PG&E's locate and mark GRC request, the Commission should require the Settling Parties to revise the Proposed Settlement Agreement to credit ratepayers with the remaining $80.195 million as a credit to the Annual Gas True Up (AGT) over the next three years. (Cal Advocates Comments at 6-7, footnote omitted.)

Given the valid criticisms of the proposed settlement from the Non-Settling Parties combined with the lack of opposition to the actual initiatives proposed by the settlement, the best choice for the Commission is to modify the proposed settlement. Approving the proposed settlement as-is would not be consistent with the requirements that settlements are reasonable in light of the whole record and in the public interest. Rejecting the proposed settlement and requiring the parties to litigate would fail to take advantage of the unopposed Initiatives that they have agreed upon, and at this stage of the proceeding would not be an efficient use of time.

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 32 of 67

Accordingly, the proposed settlement is approved with the following modifications:

1) The identified System Enhancement Initiatives are approved, but with a longer compliance audit period of four years, as discussed above.

2) The total penalty amount is increased to $110 million. This is approximately the penalty level calculated by Cal Advocates, and lower than the penalty level recommended by TURN, both of whom used a more appropriate methodology for calculating the penalty level than the methodology used by the settling parties. As discussed in more detail above, this penalty level also falls in the lower mid-range of potential penalties that could reasonably have been imposed on PG&E.

   a. The amount of PG&E shareholder-paid initiatives that PG&E shall be liable for is increased from $60 million to $66 million to cover the cost of the longer compliance audit period.

   b. The penalty payment to the General Fund that PG&E shall be liable for is increased from $5 million to $44 million to cover the incremental difference between $66 million and $110 million.

3) In order to increase the specificity and certainty of the initiatives to be undertaken, only those initiatives specifically identified in the Settlement Agreement are approved.[18] PG&E and SED are not authorized to agree to the use of other initiatives for the purpose of expending any remaining shareholder funds. The amount of shareholder funding for each initiative that is counted towards the $66 million is capped at no more than 20% above the estimated funding level set forth in the

---

[18] While the identified initiatives may assist PG&E in its efforts to comply with applicable laws and regulations, they do not by themselves result in compliance with the law, such as would occur with activities like installing a piece of safety equipment or repairing substandard facilities.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 33 of 67

Settlement Agreement or as modified by this decision. If at the end of four years PG&E has not spent $66 million in shareholder funds on the specified initiatives, the remaining balance shall be paid to the General Fund. If the costs of implementing the specified initiatives exceed the level of shareholder funding ordered in this decision, any additional ratepayer funding must be requested and found to be reasonable and appropriate in a general rate case.

4) Given the duties of the California Underground Facilities Safe Excavation Board (Dig Safe Board), established pursuant to Government Code section 4612.12, the reviews prepared under Sections III(B)(2) and III(B)(17) of the Settlement Agreement shall be provided to the Dig Safe Board. PG&E and SED are to consult with the Dig Safe Board regarding additional methods to improve communications between PG&E and excavators.

5) All PG&E board members and executives at or above the level of Senior Vice President are required to go on locate and mark program site visits to both the field and to PG&E locate and mark facilities at least once every three years.

As modified, the proposed settlement will be referred to as the "Amended Settlement."

The larger-scale recommendations of OSA are more appropriately addressed in the PG&E Safety Culture Investigation (I.15-08-019) and may be considered in that proceeding and are not adopted here. All non-confidential material admitted to the record in this proceeding is incorporated by reference into the record of I.15-08-019 (including the recommendations of OSA), and parties may cite to it in that proceeding, as the detailed factual evidence presented here could provide a potentially informative case study for use in that proceeding.

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 34 of 67

## 4.  Election to Accept Modifications

Pursuant to Rule 12.4(c), the Commission may propose alternative terms to the parties to a settlement and allow the parties reasonable time to elect to accept such terms or request other relief.  The modifications to the proposed settlement set forth in this decision constitute such "alternative terms," and result in an Amended Settlement.  The Settling Parties have 20 days from the service of the Presiding Officer's Decision to file and serve a motion accepting the modifications to the proposed settlement or requesting other relief.

## 5.  Assignment of Proceeding

Clifford Rechtschaffen is the assigned Commissioner and Peter V. Allen is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1.  PG&E undercounted numerous late Locate and Mark tickets over a period of years.

2.  PG&E reported inaccurate counts of its late Locate and Mark tickets to the Commission.

3.  PG&E failed to provide adequate Qualified Electrical Worker support for Locate and Mark activities over a period of years.

4.  PG&E's top management was often unaware of problems with PG&E's Locate and Mark program, even though PG&E staff was aware of the problems.

5.  Even when it became aware of problems with its Locate and Mark program, PG&E's top management failed to resolve the problems.

6.  PG&E, SED and CUE have agreed to a proposed settlement with penalties totaling $65 million, with $5 million going to the General Fund and $60 million in shareholder-funded System Enhancement Initiatives.

7.  TURN, Cal Advocates and OSA oppose the proposed settlement, arguing for more significant penalties.

8.  The penalty level in the proposed settlement is too low for the number, nature and duration of PG&E's violations.

9.  The Amended Settlement modifies the proposed settlement.

10. Evidence and proposals in this proceeding are relevant to the PG&E Safety Culture proceeding (Investigation 15-08-019).

**Conclusions of Law**

1.  PG&E has violated Public Utilities Code section 451.

2.  PG&E has violated Commission Rule 1.1.

3.  The proposed settlement is not reasonable in light of the whole record.

4.  The proposed settlement is not in the public interest.

5.  The proposed settlement should be modified.

6.  The proposed settlement as modified in the Amended Settlement is reasonable in light of the whole record.

7.  The proposed settlement as modified in the Amended Settlement is in the public interest.

8.  Non-confidential material admitted to the record in this proceeding should be available to Investigation 15-08-019.

## O R D E R

**IT IS ORDERED** that:

1.  The proposed settlement in this proceeding is approved with the following modifications (Amended Settlement):

    1)  The identified System Enhancement Initiatives are approved, but with a longer compliance audit period of four years;

    2)  The total penalty amount is increased to $110 million;

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 36 of 67

    a. The amount of PG&E shareholder-paid initiatives that PG&E shall be liable for is increased from $60 million to $66 million;

    b. The penalty payment to the General Fund that PG&E shall be liable for is increased from $5 million to $44 million;

3) Only those initiatives specifically identified in the Settlement Agreement are approved. The amount of shareholder funding for each initiative that is counted is capped at no more than 20% above the estimated funding level set forth in the Settlement Agreement or as modified by this decision.

4) If at the end of four years PG&E has not spent $66 million in shareholder funds on the specified initiatives, the remaining balance shall be paid to the General Fund. If the costs of implementing the specified initiatives exceed the level of shareholder funding ordered in this decision, any additional ratepayer funding must be requested and found to be reasonable and appropriate in a general rate case.

5) The reviews prepared under Sections III(B)(2) and III(B)(17) of the Settlement Agreement shall be provided to the California Underground Facilities Safe Excavation Board (Dig Safe Board). PG&E and SED are to consult with the Dig Safe Board regarding additional methods to improve communications between PG&E and excavators.

6) All PG&E board members and executives at or above the level of Senior Vice President are required to go on locate and mark program site visits to both the field and to PG&E locate and mark facilities at least once every three years.

2. All non-confidential material admitted to the record in this proceeding is incorporated by reference into the record of Investigation 15-08-019.

3. The Settling Parties have 20 days from the service of the Presiding Officer's Decision to file and serve a motion accepting the modifications to the proposed settlement or requesting other relief.

Case: 19-30088   Doc# 6711-1   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 37 of 67

    4.  Upon Bankruptcy Court approval of the Amended Settlement in full, this proceeding is closed.

       This order is effective today.

       Dated February 20, 2020, at San Francisco, California.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 38 of 67

**APPENDIX A**

**SETTLEMENT AGREEMENT BETWEEN PACIFIC GAS AND ELECTRIC COMPANY, THE COALITION OF CALIFORNIA UTILITY EMPLOYEES, AND THE SAFETY AND ENFORCEMENT DIVISION OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION RESOLVING ORDER INSTITUTING INVESTIGATION I. 18-12-007**

# TABLE OF CONTENTS

**Page**

I.    PARTIES ................................................................................................................1

II.    RECITALS .............................................................................................................2

   A.    Stipulated Facts ............................................................................................2

       Background Relating to PG&E's Undercounting of Late Tickets ....................2

       SED's Investigation and PG&E's Inaccurate Late Ticket Counts ..................4

       Safety Consequences of Late Tickets and Underreporting .............................6

       PG&E Knowledge of Undercounting of Late Tickets ....................................7

       Inadequate Support from Qualified Electrical Workers ..................................9

   B.    Violations .......................................................................................................2

III.    AGREEMENT .......................................................................................................12

   A.    PG&E Settlement Payments and Costs to Be Incurred. ...............................12

   B.    System Enhancement Initiatives ..................................................................14

       L&M-Focused Proposals ...............................................................................14

       QEW-Focused Proposals ...............................................................................17

       Enterprise-Wide Proposals ............................................................................18

       Transparency and Visibility Measures ..........................................................20

IV.    OTHER MATTERS ..............................................................................................21

## SETTLEMENT AGREEMENT BETWEEN PACIFIC GAS AND ELECTRIC COMPANY, THE COALITION OF CALIFORNIA UTILITY EMPLOYEES, AND THE SAFETY AND ENFORCEMENT DIVISION OF THE CALIFORNIA PUBLIC UTILITIES COMMISSION RESOLVING ORDER INSTITUTING INVESTIGATION I. 18-12-007

Pacific Gas and Electric Company ("PG&E"), the Coalition of California Utility Employees ("CUE"), and the Safety and Enforcement Division ("SED") of the California Public Utilities Commission ("CPUC" or "Commission") are hereinafter collectively referred to as the Settling Parties. On the following terms and conditions, the Settling Parties hereby agree to settle, resolve and dispose of all claims, allegations, liabilities and defenses within the scope of Commission proceeding I. 18-12-007 entitled "*Order Instituting Investigation on the Commission's Own Motion Into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters* ("L&M OII" or "proceeding").

This Settlement Agreement shall become effective upon (1) approval by the Commission in a written decision and (2) following such approval by the Commission, approval of the United States Bankruptcy Court, Northern District of California, San Francisco Division ("Bankruptcy Court") in PG&E's bankruptcy proceeding, *In Re Pacific Gas and Electric Company*, Case No. 19-30088 (DM) ("Effective Date"). In order to move forward efficiently with all references to the Effective Date in this document, the Settling Parties also agree to seek expeditious approval of this Settlement Agreement and its terms, and PG&E agrees to use its reasonable best efforts to secure Bankruptcy Court approval of the same, without change, including by filing a joint motion seeking approval of this Settlement Agreement with the Commission and any other written filings, appearances, and other means as may be necessary to secure Bankruptcy Court approval.

This Settlement Agreement is entered into as a compromise of disputed claims and defenses in order to minimize the time, expense, and uncertainty of continued litigation. The Settling Parties agree to the following terms and conditions as a complete and final resolution of all claims made by SED and all defenses raised by PG&E in this proceeding. This Settlement Agreement constitutes the sole agreement between the Settling Parties concerning the subject matter of this proceeding. PG&E and CUE brought no claims in this proceeding.

I.     PARTIES

    A.     The parties to this Settlement Agreement are SED, PG&E, and CUE.

    B.     SED is a division of the Commission charged with enforcing compliance with the Public Utilities Code and other relevant utility laws and the Commission's rules, regulations,

orders, and decisions. SED is also responsible for investigations of utility incidents, including fires, and assisting the Commission in promoting public safety.

C.     PG&E is a public utility, as defined by the California Public Utilities Code. It serves a population of approximately 16 million in a 70,000-square-mile service area within Northern and Central California.

D.     CUE is a coalition of unions that represent approximately 34,000 people who work for investor-owned and publicly-owned utilities in California, and for contractors who perform work for utilities and project developers.

II.     RECITALS

The Settling Parties have stipulated to the following facts and violations for the purpose of this Settlement:

A.     Stipulated Facts

Background Relating to PG&E's Undercounting of Late Tickets

1.     For a period of time going back at least to 2012 and lasting into 2017, PG&E significantly undercounted in its internal tracking system the number of instances in which it failed to respond in a timely manner to a portion of the approximately 4.6 million Underground Service Alert ("USA") notifications that it received during that time. The undercounting was caused by a combination of factors, including (1) knowledge among PG&E's senior Locate and Mark ("L&M") management that there were late tickets that did not appear late, including in PG&E's late ticket reports; (2) steps taken, known among PG&E's senior L&M management, that had the effect of making some late tickets appear timely; (3) PG&E's L&M management failing to address concerns raised among numerous L&M supervisors, and also raised to L&M senior management by one L&M superintendent, about inaccurate notes,[1] and potential entry of false notes on tickets;[2] (4) despite learning of this problem, L&M management's continual placement of inappropriate pressures on locators and their supervisors; (5) L&M management providing unclear guidance for supervisors and locators to follow; and (6) L&M management expecting zero late tickets of staff while at times not providing sufficient staff to achieve that expectation. While certain individuals within PG&E had information that should have caused PG&E to investigate the issue further, PG&E's Gas Operations leadership and management did not adequately and timely identify, recognize, or address the undercounting problem. PG&E accepts responsibility for its failures, including for the inappropriate measures described in this paragraph.

2.     In the USA 811 system, owners of underground facilities like PG&E are notified when an excavator reports plans to dig at a particular location. State law then provides that, unless the timeline is extended by mutual agreement, facility owners like PG&E generally

---

[1] SED Investigative Report into the Operations and Practices of Pacific Gas & Electric Company's Damage Prevention and Locate & Mark Programs (December 6, 2018) ("Investigative Report") Attachment 56 at SED-01902, lines 6-18 (Mack).

[2] Tr. Yamashita, 23:25-24:6, 49:20-50:1; Tr. Mayfield 21:27-22:21, 38:13-39:4.

2

must mark their facilities within two working days, or before the excavator's start time if that time is more than two days away. The undercounting at issue here occurred within PG&E's L&M organization and, prior to a reorganization in 2014, L&M's predecessor entities that responded to these USA notifications.

3.     During the period of 2012 through 2017 (the "Order Instituting Investigation Period", or "OII Period"), PG&E experienced a significant increase in the volume of USA notifications that required a response.[3]  As the number of tickets grew, PG&E at times failed to maintain sufficient staffing for the increased volume and PG&E struggled to keep up with the demand.  At the same time, the L&M Director expected that L&M staff who visited excavation sites to locate and mark PG&E facilities, or locators, needed to have "zero late tickets," and employees were made to feel that their directive was that zero late tickets was the only acceptable outcome.[4]  While the expectation of reducing late tickets is consistent with the law, the message was delivered improperly and in an overly forceful manner.  As a result, L&M personnel, including both supervisors and locators, felt pressure to eliminate late tickets, which was exacerbated by inadequate staffing.[5]  One employee called L&M "an impossible task in an impossible time frame."[6]

4.     In part as a result of these directives, pressures, and expectations, insufficient resources, and inadequate and in some instances improper training, PG&E employees took a variety of steps that had the effect of making some late tickets appear timely, resulting in the undercounting of late tickets.  An L&M supervisor directed an employee in some number of instances to close tickets in ways that did not comply with procedures, and the employee did so, thinking that the notes he was instructed to enter were proper.[7]  In some instances, as a result of PG&E's failure to fully correct a problem in the internal ticket management system's reporting logic, the undercounting consisted of PG&E entering information that may have been accurate but that caused tickets to be falsely counted as on time when the tickets were in fact late.[8]  The internal ticket management system also extended the deadline for a USA ticket when PG&E L&M personnel entered that PG&E had left a "unilateral" voicemail for the excavator.   Although PG&E policy prohibited the use of a "unilateral" voicemail[9] without receiving the excavator's mutual agreement, and applicable law required mutual agreement in order to reschedule a deadline by which an L&M ticket had to be completed,[10] at times PG&E failed to provide consistent messages to its employees regarding

---

[3] *See, e.g.*, PG&E Reply Testimony of Jesus Soto at 1-9, lines 7-9 PG&E Reply Testimony of Mevinl Christopher at 2-6, lines 5-10.

[4] Investigative Report Attachment 33 at SED-00669, lines 14-28 (Dickson); *see generally* Investigative Report Attachment 33 at SED-00666 to SED-00668.

[5] Tr. Yamashita, 31:22-34:20.

[6] Investigative Report Attachment 3 at SED-00038.

[7] Tr. Villanueva, 53:6-54:17, 58:24-27, 60:26-61:23, 62:10-13, 66:2-10.

[8] SED Prepared Testimony of Wai-Yin Chan at 14, lines 7-9; PG&E Reply Testimony of Jason Klemm at 3-15, line 17 to 3-16, line 31; PG&E Reply Testimony of Travis Huston, Zac Scofield, and Ron Yamashita at 4-3, lines 12-20.

[9] Investigative Report Attachment 25 at SED-00421; Investigative Report Attachment 46 at SED-01553.

[10] Investigative Report Attachment 3 at SED-00017.

3

these requirements,[11] and as a result there were times when PG&E did not follow these requirements. Finally, in some instances, as a result of inadequate training and unclear guidance, PG&E improperly "phased" certain tickets, indicating that the ticket would be completed over time and thus incorrectly counted as timely in IrthNet, PG&E's internal ticket management system, even though phasing was expected to be reserved for breaking larger jobs into segments.[12] In one case, an L&M supervisor directed employees to phase tickets in ways that did not comply with procedures, and the employees refused to do so.[13] There were also concerns raised among numerous L&M supervisors about inaccurate notes and potential entry of false notes on tickets.[14]

5.      As a result of this conduct and of PG&E's failure to provide appropriate training and managerial directives in its L&M program, there were times when PG&E personnel responded to the directives, pressures, and expectations of L&M leadership by taking steps that had the effect of making some late tickets appear timely. There were also times when personnel took appropriate steps that as a result of PG&E's failures to fix the problems in its ticket management system caused late tickets to appear timely. As a result, the reports produced by the internal ticket management system undercounted the true number of times that PG&E did not respond to a USA notification by the statutory due time.

6.      The scope of PG&E's late ticket undercounting problem was significant. Over the OII Period, there were likely tens of thousands more late tickets than PG&E's internal late ticket reports demonstrated. PG&E retained an economic consulting firm to assess the scope of the problem. The consultant's report indicated that it used a methodology that the consultant said was designed to be conservative, and to count as late some tickets that may in fact be timely, but the consultant's report also accepted the information in the database as true and would not have accounted for false or inaccurate information that was input in the database and made late tickets appear on time.[15] According to the consultant's analysis, there may have been as many as 170,135 late tickets over the 2012 to February 2017 period,[16] when internal reports produced by PG&E's ticket management software inaccurately indicated only 34,990 late tickets during that period—a difference of potentially up to 135,145 tickets.[17]

SED's Investigation and PG&E's Inaccurate Late Ticket Counts

7.      In April 2016, the SED received information from the Pipeline and Hazardous Materials Safety Administration ("PHMSA") regarding PG&E's late ticket data. SED subsequently began a preliminary investigation into the issue. On June 8, 2016, and on subsequent occasions, SED requested that PG&E provide information regarding the number of

---

[11] PG&E Reply Testimony of Travis Huston, Zac Scofield, and Ron Yamashita at 4-3, lines 17-25.

[12] PG&E Reply Testimony of Travis Huston, Zac Scofield, and Ron Yamashita at 4-3, line 34 to 4-4, line 9.

[13] Tr. Scofield, 23:12 – 25:27.

[14] See PG&E Reply Testimony of Travis Huston, Zac Scofield, and Ron Yamashita at 4-5, lines 5-15; Tr. Yamashita, 27:28-28:16.

[15] SED Prepared Testimony of Wai-Yin Chan, Attachment 13 at CHAN-0548-64.

[16] SED Prepared Testimony of Wai-Yin Chan, Attachment 13 at CHAN-0548-64.

[17] Investigative Report Attachment 5 at SED-00014.

ticket responses that were completed late. PG&E responded to those requests by exporting information from its internal ticket management tracking system, often sending spreadsheets generated by that system directly to SED, and informed SED of the methodology used to generate the spreadsheets.[18]

        8.     In the course of an ongoing series of data requests and responses that began shortly after SED's first data request in June 2016, PG&E provided SED extensive information regarding its L&M operation and its late tickets in particular. For instance, in response to a request from SED, on April 19, 2017, PG&E provided SED with annual late ticket counts for locate and mark tickets related to its gas operations tickets. In responding to SED, PG&E referred back to its previous responses in which PG&E had informed SED that it was providing the late ticket data as it was reported in the internal ticket management system. Based on inaccurate information in the internal ticket management system, PG&E reported in response to SED's discovery request the following late ticket volumes between 2012 and February 2017:

- 2012: 4,623
- 2013: 13,547
- 2014: 13,391
- 2015: 3,385
- 2016: 44
- Jan.-Feb. 2017: 8[19]

     Total:     34,998 (2012-Feb. 2017)

        9.     In June 2017, during the course of data requests and meetings regarding PG&E's late tickets, for the first time, PG&E informed SED that PG&E had identified late tickets that were not included in its IrthNet data.[20] In November 2017, PG&E informed SED that PG&E had learned through discussions with L&M personnel about what appeared to be instances of conduct that knowingly caused the under-reporting of late tickets.[21] SED requested that PG&E provide SED with updated historical late ticket counts. In February 2018, PG&E provided interim estimates in response to SED's request, but informed SED that PG&E had retained a third-party consulting firm to assist with the issue and expected that its then-current estimates would be revised.[22]

        10.    On May 2, 2018, PG&E provided SED with the initial results of the third-party consultant's work. The updated late ticket count showed a significant increase in the volume of late tickets identified to be at issue in SED's investigation, but did not yet include

---

[18] *Pacific Gas and Electric Company's 90-Day Report and Response to Locate and Mark OII Directives 1 to 9,* filed March 14, 2019 ("PG&E 90-Day Report"), Exhibit ("Ex.") 33 at 1, 3.

[19] Investigative Report Attachment 5 at SED-00104.

[20] Investigative Report Attachment 2 at SED-00003.

[21] Investigative Report Attachment 59, Response at SED-02406.

[22] Investigative Report Attachment 17 at SED-00354.

certain categories of late tickets that would later be identified as within the scope of this proceeding.[23]

11.     On June 5, 2019, PG&E provided SED with an updated analysis from its third-party consultant.  The consultant advised that the updated analysis included refinements to the late ticket counting logic, corrected for certain anomalies in the data, and included certain categories of tickets that, prior to the May 7, 2019 Scoping Memo in this proceeding, were not identified as encompassed within this proceeding.  The revised late ticket count was as follows:

- 2012:  22,846
- 2013:  30,586
- 2014:  30,741
- 2015:  41,437
- 2016:  38,113
- Jan.-Feb. 2017:  6,412

Total:     170,135 (2012-Feb. 2017)

The consultant's report indicated that it used a methodology that the consultant said was designed to be conservative, and to count as late some tickets that may in fact be timely, but the consultant's report also accepted the information in the database as true and would not have accounted for false or inaccurate information that was input in the database and made late tickets appear on time.[24]

Safety Consequences of Late Tickets and Underreporting

12.     Each verified late ticket is a failure of PG&E to comply with California Government Code Section 4216.3(a)(1), unless the excavator and operator mutually agreed to a later start date and time or otherwise agreed to the sequence and timeframe in which the operator would locate and mark.  PG&E's undercounted late tickets means neither PG&E nor SED have an accurate count of the number of times PG&E did not meet the statutory deadline for completing locating and marking under California Government Code Section 4216 during the OII period.

13.     Late responses to USA notifications have potential safety consequences. Late responses increase the risk of dig-ins, which are events that result in a need to repair or replace an underground facility due to an excavation.[25]  Every dig-in creates a risk of harm to the public, to employees and contractors, and property.  During the period of 2012 to February 2017, PG&E late responses to USA notifications were a contributing factor to each of the 67 dig-ins by third-party excavators on PG&E gas lines, as detailed in the June 2019 Bates White Report.[26]

---

[23] Investigative Report Attachment 4 at SED-00099.

[24] SED Prepared Testimony of Wai-Yin Chan, Attachment 13 at CHAN-0548-64.

[25] There are other definitions of dig-ins beyond the scope of the Settlement Agreement.  For example, see aga.org/natural-gas/glossary/d/.

[26] SED Prepared Testimony of Wai-Yin Chan, Attachment 13 at CHAN-0559.

6

This does not include "near hits," in which an excavator may have begun digging and nearly missed striking, or made contact with but without causing a dig-in on, PG&E's facilities that were unmarked as a result of PG&E's failure to mark within the statutory timeline. While excavators are required by law to wait to begin digging until they have received responses from all known facility operators,[27] a facility owner's late response increases the risk of a dig-in.

14.    PG&E's undercounting of late tickets can also have safety consequences, and may have contributed to the number of dig-ins on PG&E facilities. Had PG&E maintained an accurate count of its late tickets, it would have had an increased awareness of the need to increase its L&M staffing and may have been prompted to take corrective actions similar to some of those identified in this Settlement.[28] With more appropriate staffing levels, PG&E might have avoided some or all of the 67 dig-ins during the OII period to which late tickets cannot be ruled out as a contributing factor.

15.    PG&E's underreporting of late tickets to SED and update of late ticket counts more than a year later also had potential safety consequences. PG&E's underreporting of late tickets delayed SED's safety-related investigation of PG&E's L&M practices, including the causes of the undercounting. The inaccurate late ticket counts that PG&E provided delayed SED's understanding of the full nature of the late ticket issues and SED's ability to more timely proceed with its pre-formal investigation.

PG&E Knowledge of Undercounting of Late Tickets

16.    PG&E identified potential issues in its L&M data regarding late responses as early as 2010 in connection with an internal audit. At that time, PG&E determined that if a user made certain entries in recording the user's activities on a particular ticket, PG&E's ticket management system would incorrectly categorize a late ticket as timely in its late ticket counts.[29] In 2012, PG&E changed the software's reporting logic so that certain actions would no longer cause a late ticket to appear timely, and concluded that the technological problem had been fully corrected.[30] However, that conclusion was incorrect, because there were still certain other actions that could still cause a late ticket to appear timely, and result in inaccurate late ticket numbers.[31]

17.    During the OII Period, PG&E possessed information that should have prompted PG&E to more thoroughly investigate and identify the late ticket undercounting. Beginning in 2011, PG&E's Gas Operations Quality Management team identified tickets that were in fact late but that did not appear in the ticket management system's late ticket reports, tickets that had not been negotiated properly because there had not been "positive contact" with the excavator, and tickets that had been improperly phased. A Quality Management Supervisor reported these findings to supervisors and locators in 2011, 2012, and 2013, and after L&M

---

[27] Cal. Gov. Code § 4216.2(g) (2019); Cal. Code Regs. § 1541(b)(1)(A) (2019).
[28] PG&E 90-Day Report at 63-64.
[29] PG&E 90-Day Report Ex. 14 at 1.
[30] Investigative Report Attachment 48 at SED-01538-39.
[31] PG&E 90-Day Report at 115-116; PG&E Reply Testimony of Jason Klemm at 3-15, line 17 to 3-16, line 31.

became a separate function, to the L&M Director in 2014 and 2015.  The L&M Director did not report those findings to his superiors or adequately address the late ticket undercounting issues.[32]

18.     In one case, a PG&E employee known within the company as its foremost expert on IrthNet data communicated to PG&E officials that IrthNet had zero late tickets even when he was told that field conditions suggested otherwise.[33]  Although the employee then reviewed the data contained in the IrthNet system and confirmed that pictures in the system in that instance in fact were consistent with other information in IrthNet, he did not directly observe the field conditions to corroborate the information in IrthNet.[34]  This communication regarding possible discrepancies between field conditions and IrthNet data did not prompt a broader review.

19.     L&M senior management also, at times, dismissed concerns raised by certain L&M employees regarding steps taken with respect to late ticket recordkeeping as described herein.[35]  This kind of response discouraged personnel from raising safety-related concerns and was a set-back in efforts to foster a culture of safety.  The L&M Director and Superintendent were relieved of their respective job duties on June 1, 2018 and are no longer employed by PG&E.

20.     Although information that should have been sufficient to cause PG&E to investigate the late ticket undercounting issues had been in PG&E's possession for several years, PG&E's Senior Vice President of Gas Operations, Jesus Soto, was not informed of the problem by L&M leadership and did not learn of the problem until 2016, when PG&E's Quality Management personnel raised concerns about late ticket data, and a supervisor raised a related concern directly to him.  Mr. Soto instructed PG&E's Vice President, Gas Transmission & Distribution Operations, John Higgins, to look into the issue.[36]  Mr. Higgins met with Quality Management personnel regarding their findings, but Mr. Higgins did not resolve the undercounting issue or return to Mr. Soto regarding the problem.[37]  Mr. Soto incorrectly assumed that when Mr. Higgins did not return, it meant that the concerns were unfounded or that Mr. Higgins could resolve the issue without Mr. Soto's assistance, and Mr. Soto failed to follow up with Mr. Higgins about his findings.[38]  As a result, the issue persisted.  Mr. Higgins was relieved of his job duties on June 1, 2018, and is no longer employed by PG&E.

21.     In March 2017, PG&E hosted a "peer review" of its Damage Prevention program.  Under the peer review process, under the auspices of the American Gas Association,

---

[32] Investigative Report Attachment 3 at SED-00039.
[33] Tr. Walker, 41:27-42:15.
[34] Tr. Walker, 44:2-45:4, 45:9-26, 46:5-12.
[35] Investigative Report Attachment 3 at SED-00043.
[36] PG&E Reply Testimony of Jesus Soto at 1-11, lines 7-14; Investigative Report Attachment 35 at SED-00898, lines 3-21 (Soto); Tr. Soto, 136:6-26; Investigative Report Attachment 52 at SED-01756, line 24 to SED-01757, line 4, SED-01758, line 22 to SED-01759, line 27.
[37] PG&E 90 Day Report at 81.
[38] PG&E 90-Day Report at 81.

8

utilities visited each other, shared best practices, and identified opportunities for improvement.[39]
Toward the end of this peer review, reviewers informed Mr. Soto that, according to personnel
they talked to, PG&E's actual performance on late tickets was being shielded, and employees
knew it.[40] PG&E then initiated a process to review and develop solutions for the late ticket
undercounting issue shortly after this discussion.[41]

Inadequate Support from Qualified Electrical Workers

22. Also during the OII Period, PG&E did not have consistently sufficient
levels of support of Qualified Electrical Workers ("QEWs") who were required, per PG&E
procedure, to be present when a locator must enter an enclosure above 600 volts in order to
locate an electric facility. This PG&E procedure is designed to effectuate California Code of
Regulations OSHA ("Cal OSHA") safety requirements that "work on energized conductors or
equipment connected to energized high-voltage systems" be conducted by a qualified electrical
worker.[42] Cal OSHA defines a QEW as "a qualified person who by reason of a minimum of two
years of training and experience with high-voltage circuits and equipment and who has
demonstrated by performance familiarity with the work to be performed and the hazards
involved."[43]

23. In some percentage of tickets requiring a locator to enter an enclosure
above 600 volts, despite PG&E's requirement that a QEW help complete the ticket, PG&E did
not provide one in a timely fashion. As a result of these shortages of QEWs, there were instances
in which PG&E's responses to USA notifications were late.[44] PG&E is not able to quantify the
number of instances in which PG&E procedure or Cal OSHA required, but PG&E did not
provide, a QEW to help complete the locate and mark on time—though these tickets are
subsumed within the analysis of the total number of late tickets described above.

24. When PG&E did not provide a needed QEW to complete a locate and
mark, there were instances due to understaffing of QEWs,[45] pressure to have zero late tickets[46],
and according to one superintendent and one locator, concerns about excavators digging before
facilities had been located and marked,[47] in which PG&E locators marked tickets as complete

---

[39] PG&E Reply Testimony of Jesus Soto at 1-8, lines 3-12.

[40] Reply Testimony of Jesus Soto at 1-11, lines 30-33; Tr. Soto, 126:12-127:15.

[41] Investigative Report Attachment 3 at SED-00045-46; PG&E Reply Testimony of Jesus Soto at 1-12, line 13 to 1-13, line 22; PG&E Reply Testimony of Melvin Christopher at 2-18, line 13 to 2-19, line 3.

[42] Cal. Code Regs. tit. 8, § 2940(c) (2019).

[43] Cal. Code Regs. tit. 8, § 2700 (2019).

[44] PG&E Reply Testimony of Jason Klemm at 3-8, lines 6-8.

[45] Tr. Mack, 92: 12-92: 22.

[46] Tr. Mack, 137:11 – 137: 19; Tr. Villanueva, 55, 58. No excavator was deposed or testified about digging prior to a locate and mark. In the case of 67 dig-ins, PG&E missed the statutorily required deadline and excavators dug before those facilities were located and marked.

[47] Tr. Mack, 63:7-21. The record has no evidence that excavators did or would have begun digging at a site before it was properly located and marked.

9

without the required assistance of a QEW and used techniques to locate PG&E's electric facilities that those employees were not permitted to use under PG&E policies.[48]

25.     PG&E has identified five dig-ins during the OII Period in which the failure to use a QEW that was required by PG&E procedure to complete the locate and mark may have contributed to the dig-in.[49] One of those five dig-ins occurred on November 7, 2014 in San Jose and resulted in an injury and burns to a City of San Jose employee. The locator who marked the facility in that incident was unaware that an unmarked electric line existed, and believed that all PG&E electric facilities were installed and located in the joint trench in the sidewalk area.[50] This belief was due to several factors, including the lack of assistance from a QEW and a lack of procedural information and training for locators on the use of electric plat maps.[51] The quality of the locate in this instance contributed to the dig-in, and the quality of the locate was affected by the lack of assistance from a QEW.[52] The locator also recorded on the ticket associated with this incident, "qew assist on electric locate," when in fact a QEW did not assist on the locate.[53]

26.     SED provided a Notice of Violation related to this dig-in on March 30, 2015. During its investigation of the incident, SED requested on November 13, 2014 that PG&E provide SED with "investigative reports related to this incident."[54] PG&E's responses to SED's requests did not disclose to SED that PG&E had engaged a third party, Exponent, to conduct a root cause analysis of the dig-in, and PG&E did not share with SED the final Exponent report, which was prepared for PG&E on April 1, 2015. In a December 12, 2014 response to an SED data request, PG&E informed SED that it was "conducting a thorough investigation," but did not specifically identify a root cause analysis.[55] PG&E's responses to SED's requests also did not explain that, notwithstanding the note on the ticket, a QEW had not actually assisted on the locate.[56] PG&E informed SED on June 26, 2019 of the Exponent Root Cause Analysis and the false statement on the ticket associated with the San Jose dig-in that there was a QEW assist.

27.     PG&E's L&M Director was aware that there was insufficient QEW support for locators, but PG&E's L&M Director continued to communicate his expectation that PG&E have zero late tickets.

---

[48] SED Prepared Testimony of Charles Mee at 15, lines 14-22; PG&E Reply Testimony of Jason Klemm at 3-9, lines 5-9.

[49] SED Prepared Testimony of Charles Mee at 18, lines 8-12.

[50] SED Prepared Testimony of Raymond Cho, Attachment 6 at RCHO-0033, Attachment 7 at RCHO-0056.

[51] SED Prepared Testimony of Raymond Cho, Attachment 6 at RCHO-0033; SED Prepared Testimony of Raymond Cho Attachment 7 at RCHO-0079.

[52] SED Prepared Testimony of Charles Mee at 5-6.

[53] SED Prepared Testimony of Raymond Cho Attachment 6 at RCHO-0033.

[54] SED Prepared Testimony of Raymond Cho Attachment 9 at RCHO-0126.

[55] SED Prepared Testimony of Raymond Cho Attachment 9 at RCHO-0127.

[56] SED Prepared Testimony of Raymond Cho at 3-4.

10

B.    <u>Violations</u>

1.    California Public Utilities Code Section 451 provides that utilities "shall furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities . . . as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees and the public."

    a.    The events and circumstances described in these stipulated facts are violations of the requirements provided under California Public Utilities Code Section 451 at various times during 2012 through 2017 (the time period within the scope of the OII) with respect to the following:

        i.    PG&E failing in some percentage of tickets (that PG&E cannot quantify) to provide and use QEWs to assist in the locating and marking of tickets where required by PG&E policies.

        ii.    PG&E taking steps to make a significant number of locate and mark tickets that were late in violation of California Government Code Section 4216.3(a)(1)(A) (effective January 1, 2017) and its predecessor statute appear timely.

        iii.    PG&E's L&M leadership and management failing to respond to L&M personnel and supervisor concerns regarding the undercounting of PG&E's late ticket data and related concerns that late tickets were being inaccurately made to appear timely.

        iv.    PG&E L&M management inappropriately communicating directives, pressures and expectations to supervisors and staff to achieve zero late tickets while providing inadequate staffing to achieve that expectation.

        v.    In the case of 67 dig-ins on PG&E's system, PG&E did not locate and mark by the statutorily required deadline, in violation of California Government Code Section 4216.3(a)(1)(A) (effective Jan. 1, 2017) or its predecessor statute, and such late tickets were a contributing factor to each dig-in.

    b.    The events and circumstances described in these stipulated facts are violations of the requirements provided under California Public Utilities Code Section 451 with respect to a dig-in in San Jose on November 7, 2014 that involved unsafe practices, including a false notation on the ticket associated with the dig-in that stated QEW assistance was received for the locate and mark when it was not.

11

2.      Commission Rule 1.1 provides that any person transacting business with the Commission shall "never [] mislead the Commission or its staff by an artifice or false statement of fact or law."  California courts have determined that a violation of Rule 1.1 does not require intent.  *Pacific Gas and Electric Company v. Public Utilities Comm'n*, 237 Cal.App.4th 812, 846 (2015).  SED contends, and PG&E does not dispute, that these failures to disclose were violations of Rule 1.1 as Rule 1.1 has been interpreted by the California Court of Appeal in *PG&E v. CPUC*.  PG&E contends that the violations were not intentional and there was no intent to mislead.  As described in these stipulated facts, PG&E violated Commission Rule 1.1 in the following ways:

      a.      PG&E underreported late ticket counts to SED on April 19, 2017. While some managers and certain other employees at PG&E knew that PG&E's late ticket counts were inaccurate, the employees involved in providing the data to SED did not know they were inaccurate.  PG&E accurately informed SED that PG&E was providing the late ticket data as it was reported in the Company's internal ticket management system.  SED does not contend that in providing this data PG&E intended to mislead SED.  On June 6, 2017, PG&E informed SED that PG&E had identified late tickets that were not included in its ticket management system data.

      b.      Although SED investigated the San Jose dig-in into PG&E facilities in November 2014, as described in the Parties' Stipulated Facts, PG&E did not disclose the following facts to SED during its investigation leading up to its March 30, 2015 notice of violation.

            i.      The locator who submitted the ticket related to the San Jose dig-in had falsely stated on the ticket associated with that dig-in that he had received a QEW assist.

            ii.      PG&E had contracted for a root cause analysis on the San Jose dig-in.

      PG&E informed SED of this information on June 26, 2019.

## III.   AGREEMENT

### A.   PG&E Settlement Payments and Costs to Be Incurred

1.      PG&E shall make payments and incur costs (as set forth below) totaling $65 million ($65,000,000.00) to settle this proceeding.

2.      As part of the $65 million referred to in Paragraph 1 above, PG&E shall pay a fine of $5 million to the General Fund of the State of California pursuant to, and in accordance with, the time frame and other provisions governing distributions as set forth in a chapter 11 plan of reorganization for PG&E as confirmed by the Bankruptcy Court.

12

3.    PG&E Shareholder-Funded System Enhancement Initiatives.  The remaining $60 million in shareholder-provided settlement funds shall be spent on the System Enhancement Initiatives identified in Part III.B below, which will be undertaken to enhance, among other things, PG&E's L&M compliance and capabilities and the reliability of the ticket management information that PG&E maintains in the ordinary course of its business.  Nothing in this Settlement Agreement shall be read as requiring the expenditure by PG&E of additional shareholder-provided funding after the funding provided by this Settlement Agreement has been exhausted.  PG&E shall not seek ratepayer recovery of the shareholder-provided settlement funds in its General Rate Case, in any other case, or by any other mechanism.  None of the costs previously incurred prior to the Effective Date qualify for the $60 million in shareholder-provided settlement funds, except that shareholder-provided funds incurred pursuant to Paragraphs III.B.4, 6, and 10 after the execution of the Settlement Agreement may be counted toward the $60 million in shareholder-provided settlement funds.  The remainder of items that require funding will not be funded from the $60 million in shareholder-provided settlement funds except for costs incurred on or after the Effective Date.

4.    Funding and Duration of PG&E Shareholder-Funded System Enhancement Initiatives.  The Settling Parties agree on the following estimates of duration and funding requirements for each of the System Enhancement Initiatives identified in Part III.B.  The actual duration and funding level for each of the System Enhancement Initiatives may be modified upon agreement by PG&E and SED, as long as shareholder-provided settlement funds for the System Enhancement Initiatives total at least $60 million.

Duration and Funding Estimates for
PG&E Shareholder-Funded System Enhancement Initiatives

| Paragraph | | Duration (years) | Funding ($ million) |
|---|---|---|---|
| III.B.1 and III.B.14 | Ticket compliance audit | 2 | $2.0 |
| III.B.2 | Compliance audit using field reviews | 2 | $6.0 |
| III.B.4 and III.B.10 | Additional L&M staff | Through 2022 | $41.3 |
| III.B.6 and III.B.13 | Digital ticket management system to replace IrthNet, and update electric facilities information in GIS | Through 2022 | $7.0 |
| III.B.21 | Review of Corrective Action Program ("CAP") and Compliance and Ethics Helpline program | 1 | $1.0 |

13

| III.B | Add'l L&M staffing, extensions of audits, and remaining items in Part III.B | as required or specified | $2.7 |
|---|---|---|---|
| | TOTAL | | $60.0 |

If shareholder settlement funds are not fully expended or expected to be expended in a manner consistent with this paragraph and the estimates above (within three years of the Effective Date), PG&E shall contact SED the earlier of either three years from the Effective Date or as soon as practicable after PG&E becomes aware that it will not fully expend shareholder settlement funds within three years. Subsequent to the aforementioned contact, PG&E and SED shall hold a meeting and make a good faith effort to reach agreement on the method of expending any remaining funds.

      B.   <u>System Enhancement Initiatives</u>. PG&E shall undertake the following System Enhancement Initiatives:

      L&M-Focused Proposals

      1.     PG&E will retain an independent consultant which will conduct a compliance audit of gas and electric L&M tickets that indicate a timely response for purposes of determining whether the ticket was properly categorized as timely. PG&E shall present SED with a proposal containing at least three reasonably qualified consultants to perform the work, whom SED may interview. SED shall select the final consultant after this presentation. Once SED selects the consultant, PG&E shall hire the consultant. The sample and methodology will be developed in accordance with the independent consultant's professional judgment and standard practices in similar contexts and in consultation with SED. Prior to the outset of the audit, the consultant shall present SED with the methodology and a description of the anticipated final product of the audit based upon the goals and objectives identified in this Settlement Agreement. Within the scope identified here, SED may consult with the consultant about the methodology and plans to achieve the goals identified herein. To the extent that the consultant determines that a ticket(s) processed during the 24 month period after the Effective Date that was indicated to be timely was not in fact timely, PG&E will perform a causal evaluation to identify factors that contributed to the mis-categorization. The consultant will provide the results of those audits and any causal evaluation to SED on a semi-annual basis for two years, as well as to PG&E, which will provide the results and causal evaluations to all PG&E managers and leaders with responsibility for the L&M organization. Upon request by SED, the consultant will meet with SED to discuss the consultant's latest or final findings and to receive further direction from SED consistent with this Paragraph. PG&E will not oppose requests by SED to continue this process beyond a two-year period at ratepayer expense, but approval of recovery from ratepayers is subject to Commission approval. The costs of this consultant are not to exceed $1 million per 12 month period, unless otherwise agreed to by SED and PG&E. PG&E shall grant SED's request to extend the audit period at shareholder expense if, after taking into account PG&E's remaining commitments under this Settlement Agreement, there is excess shareholder funding within the scope of this Settlement Agreement provided for corrective actions that remains available.

Case: 19-30088    Doc# 6711-1    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 55 of 67

2.      PG&E will retain an independent consultant which will perform a compliance audit using field reviews of a random sampling of gas and electric L&M tickets to determine L&M performance, procedure adherence, and compliance for a 24 month period after the Effective Date.  PG&E shall present SED with a proposal containing at least three reasonably qualified consultants to perform the work, whom SED may interview.  SED shall select the final consultant after this presentation.  Once SED selects the consultant, PG&E shall hire the consultant.  Prior to the outset of the review, the consultant shall present SED with the objectives, methodology, and a description of the final product of the review, and receive consultation from SED.  Within the scope identified here, SED may consult with the independent consultant about the methodology and plans to achieve the goals identified herein. The field reviews shall also determine whether all of the sampled PG&E gas and electric facilities are accurately and completely mapped within PG&E's mapping database, discrepancies are identified and corrected utilizing PG&E's map correction process, and corrections are tracked in PG&E's Corrective Action Program ("CAP").  Tracked corrections shall include the facility that has been corrected, the new accurately identified facility, the date of the discovery, and the date the correction was made.  The sample and methodology will be developed in accordance with the independent consultant's professional judgment and standard practices in similar contexts, and in consultation with SED.  If the independent consultant's reviews identify materially different findings from those identified in field reviews conducted by PG&E's Quality Assurance personnel, and those findings are not the result solely of different samples of tickets reviewed and may provide opportunities to improve PG&E's internal review procedures, PG&E will incorporate appropriate practices utilized by the independent consultant into PG&E's Quality Assurance field reviews in order to enhance PG&E's Quality Assurance capabilities.  The consultant will provide the results of these reviews and PG&E's conclusions regarding the findings to SED on a semi-annual basis for two years, as well as to PG&E, which will provide the results and PG&E's conclusions to all PG&E managers and leaders with responsibility for the L&M organization.  SED may also request separate meetings with the third-party consultant to discuss the consultant's findings.  PG&E will not oppose requests by SED to continue this process at ratepayer expense, but approval of recovery from ratepayers is subject to Commission approval.  The costs of these reviews are not to exceed $3 million per 12 month period, unless otherwise agreed to by SED and PG&E.  PG&E shall grant SED's request to extend the review period at shareholder expense if, after taking into account PG&E's remaining commitments under this Settlement Agreement, there is excess shareholder funding within the scope of this Settlement Agreement provided for corrective actions that remains available.

3.      PG&E shall take reasonable steps to validate late ticket data and information recorded on L&M tickets.  For a minimum of a 12-month period after the Effective Date and subject to extension and reassessment as provided below, such steps shall at least include the following:

        a.      PG&E's Gas Operations Quality Control Group will conduct a random sampling of renegotiated tickets by contacting the associated excavators to verify mutual agreement to the renegotiation.

b.    PG&E will conduct a "Voice of the Customer Survey" that is focused on soliciting feedback from excavators and identifying improvement opportunities related to the L&M Program.

c.    PG&E will review, per week, 200 randomly selected Facility Marked tickets across the territory to evaluate quality, compliance, and timeliness.

d.    At the conclusion of the 12 month period after the Effective Date, PG&E shall assess the steps taken pursuant to this paragraph and implement appropriate ongoing steps to validate late ticket data and information recorded on L&M tickets. PG&E shall report to SED the ongoing steps it intends to take to validate late ticket data and information recorded on L&M tickets at the end of the initial 12 month period, and shall meet and confer with SED regarding forward-looking steps at that time upon request.

4.    PG&E will use a work-resource model that takes into account forecasted and actual ticket volumes, as well as historical division-specific and system-wide data on ticket productivity, to establish staffing levels for L&M. Subject to the meet and confer process provided in this paragraph, through at least December 31, 2022, PG&E will maintain an additional 63 L&M personnel (contractors and employees) over its January 2017 baseline for L&M staffing levels. At that time, PG&E had 196 locator employees and 60 contractor locators for a total of 256 contracted or employee locators. The addition of 63 locators will bring the total of contracted or employed locators to 319. If, between 24 months after the Settlement Agreement is executed and December 31, 2022, the work-resource model indicates that a lower staffing level is appropriate, SED and PG&E shall meet and confer to establish a new staffing level consistent with the work-resource model through December 31, 2022. The provisions of this Paragraph III.B.4 shall impose immediate obligations on PG&E to hire locators and QEWs, as described in Paragraph III.B.10 upon the execution of this Settlement Agreement. Expenditures on staffing of locators and QEW's, as described in this Paragraph and Paragraph III.B.10 respectively, shall be tracked and applied to the shareholder-provided settlement funds in a manner consistent with Paragraph III.A.4. To the extent PG&E maintains L&M personnel in excess of 63 over its January 2017 baseline for any period, the costs associated with such staffing may also be applied to the shareholder-provided settlement funds, to the extent that the total amount of shareholder-provided settlement funds do not exceed the $60 million identified in Paragraph III.A.3. The obligations in this paragraph will cease if the Settlement Agreement is not approved.

5.    PG&E will make a written request to the executive directors of USA North 811 and Dig Alert South to provide additional information to operators regarding 811 notifications, including categorization of requests by homeowners, excavators, and farm or rural submissions. SED and PG&E expressly recognize and agree that the ultimate decision to collect and/or provide such data will be made by USA North 811 or Dig Alert South, not PG&E. SED and PG&E also expressly recognize that the views of other stakeholders in the Underground Service Alert system are important to the functioning of those systems and should be given full consideration.

16

6.     PG&E will develop, implement, and maintain a new ticket management system, which will replace IrthNet and be designed to provide, among other things, additional controls to promote program compliance and process adherence around phasing, negotiations, and late ticket reporting. PG&E will work with SED to test the effectiveness of the late ticket report functionality in the new ticket management system.

7.     PG&E will develop mechanisms that take into account the expected time to complete a ticket, including considerations of the linear feet of assets to be marked, where known, to better identify the potential time and work that a ticket represents, which will enable PG&E to more quickly and efficiently deploy the appropriate resources to different types of tickets. Information developed through these mechanisms will be provided in connection with the Annual L&M Report.

8.     In addition to requiring National Utility Locating Contractors Association ("NULCA") accreditation for PG&E L&M locators, PG&E will require that its contractor locators attend training that is accredited by NULCA, and shall maintain, consistent with reasonable record-keeping practices, records of individuals who receive such training.

9.     PG&E will perform a causal evaluation, designed to provide reasonable assurance that the cause of a problem is determined and will be corrected, for any dig-in that results in a release of gas or a damaged electrical cable. Also, PG&E will perform a root cause analysis, defined as a formal and rigorous investigation that uses industry-accepted analysis methods to determine the root cause(s) of a problem, for any dig-in that results in a release of gas or a damaged electrical cable, and a serious injury or fatality. This requirement is in addition to the requirement of Paragraph III.B.22.h.

QEW-Focused Proposals

10.     PG&E will add 14 additional QEW employees (bringing PG&E's total to 25 QEW employees) designated for locate and mark tasks, which are included in the 63 L&M personnel described in Paragraph III.B.4, to its Gas Operations L&M organization until, at a minimum, December 31, 2022. This proposal is already in progress. PG&E will use January 2017 as the baseline for QEW staffing levels. If, between 24 months after the Settlement Agreement is executed and December 31, 2022, work demands indicate that a lower staffing level is appropriate, SED and PG&E shall meet and confer to establish a new staffing level consistent with the work demands through December 31, 2022. The provisions of this Paragraph III.B.10 shall impose obligations on PG&E immediately upon the execution of this Settlement Agreement. The obligations in this paragraph will cease if the Settlement Agreement is not approved.

11.     Within a 6 month period after the Effective Date, PG&E will update and clarify procedure TD-5811P-1200 – Locating and Marking Subsurface (Underground Facilities), regarding electric locating requirements, including when employees and locators need to call a QEW to assist with a locate and mark, and a delineation of tasks that can and cannot be performed by personnel based on training and competency level, to clearly delineate and define roles and responsibilities. This proposal is already in progress. PG&E will provide appropriate training to relevant personnel.

17

12.     PG&E will develop additional training for locators to promote safe practices for all electric locating based on competency level and work performed.  Such training shall include, at a minimum, how to identify hazards present on or around electrical facilities, appropriate minimum approach distances, and the appropriate steps for safely accessing and connecting to electrical facilities.  PG&E shall maintain, consistent with reasonable record-keeping practices, records of individuals who receive formal training.

13.     PG&E will work with a third-party vendor to identify and store additional and updated electric asset information in GIS (the system that locators refer to in identifying the location of and relevant information regarding assets) that can be integrated into and accessible through PG&E's new ticket management system.  This information should make the deployment and utilization of QEWs (when needed) more efficient over time, for example, allowing PG&E to determine in some instances whether a QEW is needed before a locator arrives on location.

14.     The compliance audits using field reviews of L&M tickets described in Paragraph III.B.2 will assess compliance with QEW-related policies.

Enterprise-Wide Proposals

15.     PG&E will provide SED information on the Reach Every Employee ("REE") program and the steps PG&E is taking in response to lessons learned from that program.  The REE program is one way PG&E is working to create an emotionally safe environment where employees feel comfortable speaking up.  REE empowers employees to communicate with their supervisor about safety concerns or possible misconduct and their new ideas.  PG&E has developed a survey to provide feedback on employees' experience with their REE discussions.  The information that PG&E gathers through this survey will be shared with PG&E's leadership.

16.     PG&E will inform its employees through its Speak Up Now website and Speak Up Now App that, among other options for raising safety concerns such as the federal monitor hotline, the Compliance & Ethics hotline, CAP, and the Safety Department helpline, the employees may contact the CPUC pursuant to its whistleblower protections.

17.     With respect to employee cultural surveys conducted by PG&E after the Settlement is approved, PG&E will undertake an enhanced review of the results of such surveys, relying on both quantitative and qualitative information, to identify potential safety risks as well as potential issues related to falsification or improper record-keeping.  PG&E will provide the results of those reviews to SED.

18.     PG&E shall hold leaders and managers, including supervisors and officers, accountable for their compliance with the PG&E Code of Conduct, in a manner consistent with PG&E's policies and procedures, including through discipline or termination of their employment.

19.     PG&E's 2019 Code of Conduct training will have one module that defines fraud and provides an emphasis on the need to maintain accurate company records, and its 2019 Compliance and Ethics training, which focuses on ethical decision making, will address how the

18

pressure to meet metrics can drive unintended consequences.  This proposal is already in progress.

20.     Within 6 months after the Effective Date, PG&E will provide training to its leaders on creating a safe environment for employees to raise safety concerns, appropriate responses when employees raise safety concerns, and how the pressures to meet metrics can drive unintended consequences.  PG&E shall maintain, consistent with reasonable record-keeping practices, records of individuals who receive such training.

21.     PG&E will retain an independent consultant which will review PG&E's current Corrective Action Program ("CAP") and Compliance and Ethics Helpline programs.  The purpose of the review and the steps taken pursuant to it shall be to understand and make recommendations regarding the current CAP and Compliance and Ethics Helpline programs' effectiveness.  PG&E shall present SED with a proposal containing at least three reasonably qualified consultants, possessing expertise in effective whistleblower programs, to perform the work, whom SED may interview.  SED shall select the final reviewer after this presentation. Once SED selects the reviewer, P&E shall hire the reviewer.  Within the scope of the work identified here, SED may consult with the reviewer as it deems necessary about the methodology and plans to achieve the goals identified herein.  The purpose of the review will be to assess the effectiveness of these programs, including employee or contractor willingness to take advantage of the programs and the effectiveness of PG&E's response to issues raised through the programs, including but not limited to issues raised by whistleblowers.  The review shall include, but not be limited to, a review of how these programs are used by employees and contractors regarding locate and mark practices and how PG&E responds to employee and contractor issues raised under these programs.  The review shall also include a comparison of PG&E's programs with best practices for comparable programs and whistleblower programs more generally.  Review of the current CAP and Compliance and Ethics Helpline programs' effectiveness will necessitate understanding of the programs' structure and operations.  While the independent consultant's evaluation will consider the effectiveness of program initiatives over the past 12 months, the independent consultant will review the variety of types of submissions received over the 24 month period prior to the start of the audit as relevant, in the judgment of the consultant, to understanding the current programs' effectiveness.  The review shall commence within 120 days of the Effective Date, unless that date is extended by SED.  The review, including a report with findings regarding the effectiveness of the CAP and Compliance and Ethics Helpline programs and recommendations to improve the effectiveness of the programs, shall be completed within 12 months of its commencement, unless that date is extended by SED.  The report will be provided to SED and PG&E, which shall provide to the service list a notice of availability of the report. Within 90 days of the issuance of the report, PG&E will provide its response to SED (with a notice of availability to the service list) indicating whether or not it will implement the recommended improvements.  If PG&E declines to implement a recommendation, it will explain its decision in the response.  The costs of this review are not to exceed $1 million per 12 month period, unless otherwise agreed by SED and PG&E.  PG&E shall grant SED's request to extend the review period at shareholder expense if, after taking into account PG&E's remaining commitments under this Settlement Agreement, there is excess shareholder funding within the scope of this Settlement Agreement provided for corrective actions that remains available.

19

Transparency and Visibility Measures

22.     On an annual basis, PG&E will provide SED with a report that reflects, at a minimum, the following information regarding the L&M program ("Annual L&M Report"):

      a.    The L&M program's purpose, goals, and vision;

      b.    Significant recent activities, accomplishments, and challenges;

      c.    Plans for future performance;

      d.    Key metrics, which shall include the number of total tickets, number of late tickets, number of renegotiated tickets, data regarding the causes of dig-ins, or similar data in accordance with industry best practices;

      e.    L&M work plan, including relevant information regarding ticket forecasts and staffing levels;

      f.    A summary of Gas Operations Quality Control and Quality Assurance results related to L&M, including information regarding high findings (such as late tickets not appearing on late ticket reports);

      g.    A summary of the results of any survey taken of L&M employees, L&M contractors, or third-party excavators for the purpose of soliciting feedback and identifying improvement opportunities;

      h.    A list of third-party dig-ins by address, facility type involved, and cause using categories of potential causes commonly used in the industry;

      i.    The costs incurred associated with corrective actions required under the Settlement Agreement that are significant and reasonably segregable.

23.     The Annual L&M Report shall be required for a period of 4 years after the Effective Date, subject to extension upon request by SED. Extensions shall be for one year, subject to further one-year extensions, unless otherwise agreed by SED and PG&E. Upon requesting an extension of such report, SED shall consider in good faith any proposal from PG&E to modify the required contents.

24.     The Annual L&M Report shall be provided to the Board of Directors and all managers and leaders with responsibility for the L&M organization, including the Chief Executive Officer and Vice President (or Senior Vice President) of Gas Operations.

25.     PG&E shall cooperate with any SED request for a root cause analysis or causal evaluation of a dig-in.

20

26. Within 180 days after the Effective Date, PG&E shall provide SED with training materials developed pursuant to Paragraphs III.B.8, 11, 12, 19, and 20.

27. To the extent practicable, all reports and information required by this Settlement Agreement to be provided to SED shall be provided as part of one document.

28. The designated individuals within SED who will receive the documentation provided in compliance with this Settlement shall be the Program Manager of the Gas Safety and Reliability Branch and the Program Manager of the Electric Safety and Reliability Branch, or other staff as designated by the Director of the Safety and Enforcement Division.

IV. <u>OTHER MATTERS</u>

A. The Settling Parties agree to seek expeditious approval of this Settlement Agreement and the terms of the settlement, and to use their reasonable best efforts to secure Commission approval of it without change, including by filing a joint motion seeking approval of this Settlement Agreement and any other written filings, appearances, and other means as may be necessary to secure CPUC approval. The Settling Parties agree to actively and mutually defend this Settlement Agreement if its adoption is opposed by any other party in proceedings before the Commission. In accordance with Rule 12.6 of the Commission's Rules of Practice and Procedure, if this Settlement Agreement is not adopted by the Commission, its terms are inadmissible in any evidentiary hearing unless their admission is agreed to by the Settling Parties. In the event the Commission rejects or modifies the Settlement Agreement, Settling Parties reserve all rights set forth in Rule 12.4 of the Rules of Practice and Procedure. The provisions of this Paragraph IV.A shall impose obligations on the Settling Parties immediately upon the execution of this Settlement Agreement.

B. PG&E also agrees to seek expeditious approval of this Settlement Agreement and the terms of this Settlement Agreement and, upon approval by the Commission under Part IV.A, to use its reasonable best efforts to secure Bankruptcy Court approval of the Settlement Agreement and the terms of the Settlement Agreement without change, including by filing a motion seeking approval of this Settlement Agreement and any other written filings, appearances, and other means as may be necessary to secure Bankruptcy Court approval.

C. The Settling Parties have bargained in good faith to reach the agreement set forth herein. The Settling Parties intend the Settlement Agreement to be interpreted as a unified, interrelated agreement. The Settling Parties agree that no provision of this Settlement Agreement shall be construed against any of them because a particular party or its counsel drafted the provision. The representatives of the Settling Parties signing this Settlement Agreement are fully authorized to enter into this Settlement Agreement.

D. The rights conferred and obligations imposed on any of the Settling Parties by this Settlement Agreement shall inure to the benefit of or be binding on that Settling Party's

successors in interest or assignees as if such successor or assignee was itself a party to this Settlement Agreement.

      E.     Should any dispute arise between the Settling Parties regarding the manner in which this Settlement Agreement or any term shall be implemented, the Settling Parties agree, prior to initiation of any other remedy, to work in good faith to resolve such differences in a manner consistent with both the express language and the intent of the Settling Parties in entering into this Settlement Agreement.

      F.     This Settlement Agreement is not intended by the Settling Parties to be precedent for any other proceeding, whether pending or instituted in the future. The Settling Parties have assented to the terms of this Settlement Agreement only for the purpose of arriving at the settlement embodied in this Settlement Agreement. Each Settling Party expressly reserves its right to advocate, in other current and future proceedings, or in the event that the Settlement Agreement is rejected by the Commission, positions, principles, assumptions, arguments and methodologies which may be different than those underlying this Settlement Agreement, and the Settling Parties expressly declare that, as provided in Rule 12.5 of the Commission's Rules of Practice and Procedure, this Settlement Agreement should not be considered as a precedent for or against them.

      G.     The Settling Parties are prohibited from filing a petition for modification of a Commission decision approving this Settlement Agreement, in full or in part, regarding any issue resolved in this Settlement Agreement.

      H.     This Settlement Agreement may be executed in counterparts.

      I.     The Settling Parties hereby agree that this Settlement Agreement is entered into as a compromise of disputed claims and defenses in order to minimize the time, expense, and uncertainty of continued litigation in the L&M OII.

      J.     Nothing in this Settlement Agreement relieves PG&E from any safety responsibilities imposed on it by law or Commission rules, orders, or decisions.

      K.     In reaching this Settlement Agreement, the Settling Parties expect and intend that neither the fact of this settlement nor any of its specific contents will be admissible as evidence of fault or liability in any other proceeding before the Commission, any other administrative body, or any court. In this regard, the Settling Parties are relying on Evidence Code Section 1152(a) and Public Utilities Code Section 315. Furthermore, such use of this Settlement Agreement or any of its contents in any other proceeding before the Commission, any other

administrative body, or any court would frustrate and interfere with the Commission's stated policy preference for settlements rather than litigated outcomes.  See Pub. Util. Code § 1759(a).

IN WITNESS WHEREOF, the Settling Parties hereto have duly executed this Settlement Agreement.


[Signatures immediately follow this page]




[This space intentionally left blank.]

23

Dated: _10/3/19_                    Pacific Gas and Electric Co.

By: _____
Melvin Christopher
Senior Vice President, Gas Operations
Pacific Gas and Electric Company

[This space intentionally left blank.]

Dated: __10/3/19__

Safety and Enforcement Division California
Public Utilities Commission

By: _____

Leslie L. Palmer
Director, Safety and Enforcement
Division
California Public Utilities
Commission

[This space intentionally left blank.]

25

Dated:   October 3, 2019                    Coalition of California Utility Employees

By _____
          Rachael Koss
          Attorney for Coalition of California
          Utility Employees

[This space intentionally left blank.]

26