**Annex 3**

**Settling Parties' Joint Motion for Approval of Proposed Settlement Agreement**

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## BEFORE THE PUBLIC UTILITIES COMMISSION
## OF THE STATE OF CALIFORNIA

| | |
|---|---|
| Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. | Investigation 18-12-007 (Issued December 14, 2018) |

## JOINT MOTION OF PACIFIC GAS AND ELECTRIC COMPANY, THE COALITION OF CALIFORNIA UTILITY EMPLOYEES, AND SAFETY AND ENFORCEMENT DIVISION FOR APPROVAL OF SETTLEMENT

**DARRYL GRUEN**
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA 94102
Telephone: (415) 703-1973
Email: darryl.gruen@cpuc.ca.gov

Attorney for the
SAFETY AND ENFORCEMENT DIVISION

**ALEJANDRO VALLEJO**
**JONATHAN D. PENDLETON**
Pacific Gas and Electric Company
77 Beale Street, B30A
San Francisco, CA 94105
Telephone: (415) 973-2916
Facsimile: (415) 973-5520
Email: jonathan.pendleton@pge.com

**RACHAEL KOSS**
Adams Broadwell Joseph & Cardozo
601 Gateway Blvd., Suite 1000
South San Francisco, CA 94080
Telephone: (650) 589-1660
Facsimile: (650) 589-5062
Email: rkoss@adamsbroadwell.com

Attorneys for
COALITION OF CALIFORNIA UTILITY
EMPLOYEES

**BRIAN HAUCK**
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054
Telephone: (213) 239-2244
Facsimile: (213) 239-5199
Email: bhauck@jenner.com

Attorneys for
PACIFIC GAS AND ELECTRIC COMPANY

# TABLE OF CONTENTS

**Page**

I.  BACKGROUND AND SUMMARY OF SETTLEMENT ........................................................ 3

   A.  Procedural History and Background ................................................................ 3

   B.  Summary of the Settlement ............................................................................ 6

II.  RESOLUTION OF THE "MAIN ISSUES" IN THIS PROCEEDING ................................. 9

   A.  Locate and Mark Procedures ........................................................................ 10

      1.  Relevant Facts ....................................................................................... 11

      2.  Resolution ............................................................................................. 11

   B.  Locate and Mark Recordkeeping and Reporting ........................................ 12

      1.  Relevant Facts ....................................................................................... 13

      2.  Resolution ............................................................................................. 13

   C.  Qualified Electrical Workers ....................................................................... 15

      1.  Relevant Facts ....................................................................................... 16

      2.  Resolution ............................................................................................. 16

   D.  Appropriate Penalty or Remedy ................................................................. 17

III.  THE SETTLEMENT COMPLIES WITH DECISION D. 98-12-075 .............................. 19

   A.  Severity of the Offenses .............................................................................. 20

      1.  Physical and Economic Harm ............................................................... 20

      2.  Harm to the Regulatory Process .......................................................... 22

   B.  The Conduct of the Utility .......................................................................... 24

   C.  Financial Resources of the Utility .............................................................. 28

   D.  Totality of Circumstances in Furtherance of Public Interest ..................... 29

   E.  The Role of Precedent ................................................................................. 30

IV.  THE SETTLEMENT IS REASONABLE IN LIGHT OF THE WHOLE RECORD, CONSISTENT WITH LAW, AND IN THE PUBLIC INTEREST ..................................... 34

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 3 of 40

V.  CONCLUSION..................................................................................................... 36

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 4
of 40

**BEFORE THE PUBLIC UTILITIES COMMISSION**
**OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation and Order to Show Cause on the Commission's Own Motion into the Operations and Practices of Pacific Gas and Electric Company with Respect to Locate and Mark Practices and Related Matters. | Investigation 18-12-007 (Issued December 14, 2018) |

## JOINT MOTION OF PACIFIC GAS AND ELECTRIC COMPANY, THE COALITION OF CALIFORNIA UTILITY EMPLOYEES, AND SAFETY AND ENFORCEMENT DIVISION FOR APPROVAL OF SETTLEMENT

Pursuant to Rule 12.1 of the California Public Utilities Commission's ("CPUC" or "Commission") Rules of Practice and Procedure, the Safety and Enforcement Division ("SED") of the California Public Utilities Commission ("CPUC"), the Coalition of California Utility Employees ("CUE"), and Pacific Gas and Electric Company ("PG&E") (collectively, the "Settling Parties") respectfully request that the Commission approve the "Settlement Agreement Between Pacific Gas and Electric Company, the Coalition of California Utility Employees, and the Safety and Enforcement Division of the California Public Utilities Commission Resolving Order Instituting Investigation I. 18-12-007" ("Settlement" or "Settlement Agreement") attached hereto as Exhibit A.

The Commission issued its Order Instituting Investigation 18-12-007 (the "L&M OII") to investigate whether PG&E's damage prevention and locate and mark ("L&M") programs and

1

practices for its natural gas system have been unsafe and in violation of any provision or provisions of the California Public Utilities Code ("Public Utilities Code"), California Government Code ("Government Code"), Commission general orders or decisions, and other state or federal laws, applicable rules or requirements. The Commission subsequently issued a Scoping Memo and Ruling determining that an investigation into PG&E's L&M practices related to its underground electric distribution infrastructure was also within the scope of the L&M OII. The Assigned Commissioner's Scoping Memo and Ruling provides that the L&M OII is focused on four main issues: (1) whether PG&E's L&M procedures, practices and/or activities relating to its underground electric distribution and natural gas infrastructure violate any applicable statutes, rules, regulations or orders; (2) whether PG&E's L&M recordkeeping and reporting procedures, practices and/or activities violate any applicable statutes, rules, regulations or orders; (3) whether PG&E violated any applicable statutes, rules, regulations or orders relating to the use of Qualified Electrical Workers ("QEWs") for locating and marking underground infrastructure; and (4) what should be the appropriate penalty or remedy for any violations.[1]

The Settling Parties negotiated the Settlement under which PG&E shall make payments and incur a penalty that totals $65 million, at shareholder expense.[2] For the significant majority of this financial outcome, PG&E must undertake a series of System Enhancement Initiatives[3] designed to enhance, among other things, PG&E's L&M compliance and capabilities and the reliability of the ticket management information that PG&E maintains in the ordinary course of

---

[1] Assigned Commissioner's Scoping Memo and Ruling at 6 (May 7, 2019).

[2] PG&E agrees not to seek ratepayer recovery in a General Rate Case, other proceeding, or via another mechanism for these shareholder expenses.

[3] System Enhancement Initiatives are also refered to as "System Enhancements" elsewhere in this document.

its business.  These System Enhancement Initiatives include, but are not limited to, the

following:

- An independent compliance audit of L&M tickets,[4] to be undertaken in consultation with SED, to determine whether PG&E's records that indicate a timely L&M activity are properly categorized as timely;

- An independent compliance audit using field reviews, to be undertaken in consultation with SED, to determine PG&E's L&M performance, procedure adherence, and compliance;

- The addition of 63 L&M personnel;

- Development of new ticket management software with better reporting capabilities;

- An update of electric facilities information in PG&E's system that locators use to identify PG&E's assets;

- An independent review, to be undertaken in consultation with SED, of certain PG&E programs provided for employees to raise safety and other concerns;

- Improved L&M training; and

- Initiatives designed to promote PG&E's compliance culture—not just within its L&M division and not just aimed at line employees, but enterprise-wide and aimed at employees, managers, and PG&E's senior leadership.

## I.  BACKGROUND AND SUMMARY OF SETTLEMENT

### A.  Procedural History and Background

SED began a pre-formal investigation into PG&E's L&M practices in April 2016.  SED's

pre-formal investigation included hundreds of data requests and responses, productions of emails

and other documents, and examinations under oath of eight current and former employees of

PG&E.[5]  On September 15, 2017, PG&E engaged Guidepost Solutions, LLC ("Guidepost") to

conduct an independent investigation into the extent and nature of the issues identified in

---

[4] The term "Audit" as used in this document refers to a compliance audit, not a financial audit.

[5] See PG&E Reply Testimony of Melvin Christopher at 2-16, line 10 to 2-17, line 11; Pacific Gas and Electric Company's 90-Day Report and Response to Locate and Mark OII Directives 1 to 9, I. 18-12-007 at 9 (March 14, 2019) ("PG&E 90-Day Report").

PG&E's late ticket data.[6]  PG&E provided SED with Guidepost's investigative report, along with other materials, on May 2, 2018.

Based on its pre-formal investigation, including information provided by PG&E, SED issued its Investigative Report dated December 6, 2018.  In the Investigative Report, SED alleged that between 2012 and February 2017, PG&E falsely undercounted and underreported to SED tens of thousands of instances in which PG&E's L&M tickets were "late," defined as missing the deadline by which they were statutorily required to be completed.  SED's Investigative Report also alleged a number of related problems, including that: (1) PG&E's Quality Assurance Group found falsification of PG&E's L&M tickets dating back to 2009; (2) certain PG&E management knew of such falsification; (3) PG&E had a goal of zero late tickets and pressured employees to achieve that goal; and (4) in a number of instances PG&E did not follow its own procedures when it changed the statutory deadline of its L&M tickets without first getting mutual agreement from excavators.  SED also described a number of safety-related consequences associated with PG&E's alleged false undercounting and underreporting of late tickets, including that: (1) PG&E did not properly prevent all dig-ins or mitigate the risk of them; (2) PG&E's undercounting led to improper staffing of locators; and (3) PG&E underreported late ticket data to SED which delayed SED's pre-formal investigation.  SED's Investigative Report concluded that PG&E's L&M practices violated Government Code § 4216 and certain of PG&E's own L&M related procedures which PG&E is required to follow pursuant to 49 CFR § 192.605(a).[7]

---

[6] *See* SED Investigative Report into the Operations and Practices of Pacific Gas & Electric Company's Damage Prevention and Locate & Mark Programs (December 6, 2018) ("Investigative Report"), Attachment 3; PG&E Reply Testimony of Melvin Christopher at 2-19, lines 4-9.

[7] *See generally* Investigative Report.

4

On December 14, 2018, the Commission found that the SED presented a prima facie case and issued the L&M OII, instituting a formal investigation into the allegations and ordering PG&E to show cause why the Commission should not find violations in the matter and why the Commission should not impose penalties and/or any other forms of relief if any violations are found. The L&M OII ordered PG&E to file a report to identify all reasons of law and fact known to PG&E to support the possibility that the company committed no violation of law with respect to its L&M practices and to respond to nine directives.[8]

On March 14, 2019, PG&E submitted its "90-Day Report and Response to Locate and Mark OII Directives 1 to 9." In this report, PG&E acknowledged that the proceeding would address instances in which certain information that PG&E maintained relating to its L&M program was demonstrably inaccurate, but claimed that PG&E was taking corrective actions to address the issues raised.[9]

On March 22, 2019, SED filed a motion to include PG&E's electric distribution activities in the scope of the proceeding, which included additional facts that SED had learned since the opening of the OII as the basis for expanding the scope in this fashion. PG&E did not oppose that motion. On May 7, 2019, the Commission issued the Scoping Memo and Ruling determining that PG&E's L&M activities with respect to its electrical distribution systems were within the scope of the L&M OII.

The Commission set evidentiary hearings for October 21-25, 2019, with a schedule for the submission of written testimony in advance of those hearings. SED submitted testimony on July 24, 2019. The Public Advocates Office ("Cal Advocates"), the Office of the Safety

---

[8] Order Instituting Investigation and Order to Show Cause, I. 18-12-007 (December 14, 2018).
[9] PG&E 90-Day Report at 1-9.

Advocate ("OSA") and The Utility Reform Network ("TURN") submitted testimony on August 16, 2019. PG&E's reply testimony was submitted on September 18, 2019 and SED rebuttal testimony is due on October 4, 2019.

On April 24, 2019 and August 15, 2019, PG&E issued notices of settlement conference consistent with Rule 12.1(b). Beginning in May and lasting through the end of August, the parties engaged in eight settlement conferences.[10] PG&E and SED informed the Commission of their settlement in principle on September 13, 2019 and PG&E, SED, and CUE subsequently executed the Settlement Agreement.

**B.      Summary of the Settlement[11]**

The Settlement consists of three primary substantive components. ***First***, the Settling Parties have stipulated to a series of facts and violations.[12] The facts, many of which are incorporated below in discussion of how the Settlement addresses the main issues in this proceeding, cover several topics:

- Background and overview related to PG&E's undercounting of late tickets;[13]

- SED's investigation into PG&E's inaccurately low late ticket counts and the associated underreporting of the late ticket counts to SED;[14]

---

[10]  The parties include PG&E, SED, CUE, Cal Advocates, OSA, TURN, and the City and County of San Francisco.

[11] For the convenience of the Commission, this Motion summarizes a number of provisions of the Settlement. The Settling Parties have sought to summarize the provisions as accurately as possible. To the extent such summaries are in any way ambiguous or contradict the provisions of the Settlement, the language of the Settlement controls.

[12] *See* Settlement Part II.

[13] Settlement Paragraphs II.A.1-6.

[14] Settlement Paragraphs II.A.7-11.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 10 of 40

- The safety consequences associated with PG&E's late ticket counting and associated underreporting of those counts to SED;[15]

- The level of knowledge of PG&E Gas Operations employees, managers and supervisors, and leaders of the undercounting issues involved in this proceeding;[16] and

- The inadequate support that PG&E provided its L&M program with respect to QEWs, and associated consequences, and in particular a false note relating to a ticket associated with a November 7, 2014 dig-in in San Jose, California.[17]

The Settling Parties also agreed that the events and circumstances described in the stipulated facts violated both California Public Utilities Code Section 451 and Commission Rule 1.1.[18]

*Second*, the Settlement requires PG&E to undertake 28 System Enhancement Initiatives. Nine are focused on late ticket and late ticket data issues. Five are focused on issues identified in the locating and marking of PG&E's electrical facilities, and in particular PG&E's failures to provide sufficient numbers of QEWs. Seven more are aimed at addressing cultural issues both within PG&E's L&M division and enterprise-wide, focusing on training and the creation of environments in which employees are comfortable and empowered to speak up and identify, among other things, possible safety concerns and possible misconduct—including an independent review of PG&E's existing programs for raising and responding to issues. The last seven provide for increased transparency into PG&E's L&M operations, including Annual L&M Report requirements and a provision regarding root cause analyses and causal evaluations.

---

[15] Settlement Paragraphs II.A.12-15.
[16] Settlement Paragraphs II.A.16-21.
[17] Settlement Paragraphs II.A.22-27.
[18] Settlement Part II.B.

Several of these System Enhancement Initiatives are discussed in greater detail in Part II of this Motion, discussing how the Settlement addresses the "main issues" in this proceeding.[19]

*Third*, the Settlement requires PG&E to make payments and incur a penalty totaling $65 million. These amounts shall be funded by PG&E shareholders and PG&E shall not seek to recover any of these costs in rates. Of that $65 million, $5 million is to be paid as a fine to the General Fund. The remaining $60 million is intended to be allocated among various System Enhancement Initiatives, as identified in Table 1, immediately below.

**Table 1**

**Duration and Funding Estimates for**
**PG&E Shareholder-Funded System Enhancement Initiatives**

| Paragraph | | Duration (years) | Funding ($ million) |
|---|---|---|---|
| III.B.1 and III.B.14 | Ticket compliance audit | 2 | $2.0 |
| III.B.2 | Compliance audit using field reviews | 2 | $6.0 |
| III.B.4 and III.B.10 | Additional L&M staff | Through 2022 | $41.3 |
| III.B.6 and III.B.13 | Digital ticket management system to replace IrthNet, and update electric facilities information in GIS | Through 2022 | $7.0 |
| III.B.21 | Review of Corrective Action Program ("CAP") and Compliance and Ethics Helpline program | 1 | $1.0 |
| III.B | Add'l L&M staffing, extensions of audits, and remaining items in Part III.B | as required or specified | $2.7 |

---

[19] *See* Settlement Part III.B.

TOTAL                                                                    $60.0[20]

The Settlement also contains general settlement terms.  It states that the settlement is a

compromise of the Settling Parties' disputed claims and defenses and the Settling Parties agree

that the Settlement resolves and disposes of all disputed issues in the L&M OII.  In accordance

with Commission Rule 12.5, the Settling Parties agree that the Settlement does not constitute

precedent regarding any principle or issue in this proceeding or in any future proceeding.  The

Settling Parties jointly request Commission approval of the Settlement and agree to actively

support prompt approval of the Settlement.  The Settlement may be amended or changed only by

a written agreement signed by the Settling Parties and approved by the Commission.

Finally, the Settlement requires approval from the Commission and then the Bankruptcy

Court in PG&E's bankruptcy proceeding in final and non-appealable orders.  With limited

exceptions,[21] the Settlement provides that it will become effective on the latter date of

Commission or Bankruptcy Court approval; the Settling Parties expect that the Commission's

review will come first.  If the Commission rejects or modifies the Settlement, the Settling Parties

reserve all rights set forth in Rule 12.4 of the Commission's Rules of Practice and Procedure.

## II.    RESOLUTION OF THE "MAIN ISSUES" IN THIS PROCEEDING

The Assigned Commissioner's Scoping Memo identified four "main issues" in this

proceeding:

> 1.  Did PG&E's locate and mark procedures, practices, and / or activities
>     relating to its underground electric distribution and natural gas

---

[20] *See* Settlement Part III.A.

[21] See Settlement Paragraphs III.B.10 and III.B.4, which provides for PG&E to hire 63 L&M personnel, including 14 additional QEWs upon execution of the Settlement Agreement, and Paragraph III.B.6, which requires PG&E to implement a new ticket management system.  Settlement Part III.A describes the structure and timing of credit toward the shareholder-provided funds requirements.  See also Part IV.A. and Part IV.B, which provide certain global and other obligations related to the Settlement Agreement on the Settling Parties immediately upon execution of the Settlement Agreement.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 13 of 40

infrastructure violate any applicable statutes, rules, regulations or orders?

2.  Did PG&E's locate and mark recordkeeping and reporting procedures, practices and / or activities violate any applicable statutes, rules, regulations or orders? (PG&E has admitted that its recordkeeping and reporting contained inaccurate information, so that is not a contested issue.)

3.  Did PG&E violate any applicable statutes, rules, regulations or orders relating to the use of Qualified Electrical Workers for locating and marking underground infrastructure?

4.  What is the appropriate penalty or remedy for any violations?[22]

As discussed further herein, the Settling Parties believe that the Settlement appropriately addresses each of these, including stipulated facts and violations and extensive system enhancements. SED, PG&E and CUE have entered into the Settlement because the issues can be appropriately addressed through the Settlement and to avoid the uncertainties and costs of litigation.

The following sections describe how the Settlement addresses each of the four "main issues" identified by the Assigned Commissioner's Scoping Memo and Ruling.

### A.   Locate and Mark Procedures

The Settling Parties believe the Settlement appropriately addresses issues relating to the first "main issue," regarding PG&E's L&M procedures, practices, and / or activities relating to its underground electric distribution and natural gas infrastructure. Generally speaking, SED has alleged that PG&E failed to respond to requests for it to locate and mark its facilities in a timely manner.

---

[22] Assigned Commissioner's Scoping Memo and Ruling at 5-6 (May 7, 2019).

### 1. Relevant Facts

Among other facts, through the Settlement, the Settling Parties have stipulated to facts reflected in Paragraphs II.A.3-6, 12-13, 22-23, and 25 that are particularly relevant to the issue of PG&E's L&M procedures, practices, and / or activities.

### 2. Resolution

The Settling Parties have stipulated to violations related to these issues as reflected in Paragraphs II.B.1.a.iii, II.B.1.a.iv, and II.B.1.a.v.[23]

The Settlement requires PG&E to take a number of steps to address these issues. PG&E's failures to respond to tickets in a timely manner occurred, in large part, because "PG&E at times failed to maintain sufficient staffing for the increased volume" of USA tickets that it received.[24] Accordingly, the Settlement requires PG&E to increase its locator staffing by approximately 25% over 2017 levels—at a minimum—and to maintain at least that staffing level for three years.[25] As part of the locator staffing, the Settlement also requires PG&E to add 14 QEWs explicitly designated for L&M tasks.[26] The Settlement also requires PG&E to implement a "work-resource model" to forecast future staffing needs, taking into account both historical division-specific and system-wide data to anticipate future work volume so that it can maintain adequate staffing levels.[27] PG&E will also be required to develop mechanisms that better assess

---

[23] The identification of the enumerated violations as particularly associated with one of the "Main Issues" identified in the Order is not intended to suggest that the violations may not also be associated with others of the Main Issues, but is provided for the Commission's convenience in assessing the resolution of the Main Issues that it had identified.

[24] Settlement Paragraph II.A.3.

[25] Settlement Paragraph III.B.4. The Settlement notes that PG&E began increasing its staffing prior to the execution of the Settlement and provides a mechanism to modify staffing levels in the third year if work demands change.

[26] Settlement Paragraphs III.B.4, III.B.10.

[27] Settlement Paragraph III.B.4.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 15
of 40

the amount of time that individual tickets will take to mark, so that appropriate resources can be deployed to different types of tickets.[28] PG&E locators—whether employees or contractors—will be required to attend training that is accredited by the National Utility Locating Contractors Association.[29] The Settlement also emphasizes continuous improvement, so that PG&E is learning from the damages that arise in the Damage Prevention process: Any time that an excavation results in a dig-in to an electric or gas facility, whether the dig-in was caused by PG&E or by a failure by the excavator, PG&E will perform a causal evaluation or root cause analysis to better understand the factors that contributed to it so that PG&E can work to address them.[30] PG&E will also cooperate with SED requests that PG&E provide a root cause analysis or causal evaluation of a dig-in.[31] Several other Settlement requirements, including some discussed in Section II.B of this Motion regarding the reliability of PG&E's late ticket data, will also enhance PG&E's—and SED's—understanding of problems in PG&E's Damage Prevention process and facilitate corrective actions or improvement opportunities.[32]

### B. Locate and Mark Recordkeeping and Reporting

The Settling Parties believe the Settlement appropriately addresses issues relating to the second "main issue," regarding PG&E's L&M recordkeeping and reporting procedures, practices and / or activities. Generally speaking, SED has alleged significant undercounting in PG&E's late ticket data.

---

[28] Settlement Paragraph III.B.7.
[29] Settlement Paragraph III.B.8.
[30] Settlement Paragraph III.B.9.
[31] Settlement Paragraph III.B.25.
[32] *See*, *e.g.*, Settlement Paragraph III.B.1-2, 5-6.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 16 of 40

### 1. Relevant Facts

Among other facts, the Settling Parties have stipulated to the facts reflected in Paragraphs II.A.4-11 and 14-15 that are particularly relevant to this issue—including regarding the Bates White Report and the number of inaccurate L&M tickets and allegations and stipulations that PG&E employees knowingly created inaccurate or false records, all of which the Settling Parties understand are of particular interest to the Commission.[33]

The Settling Parties have also stipulated to the facts reflected in Paragraphs II.A.16-21 regarding PG&E's knowledge of the undercounting problems, including PG&E's management's knowledge of and response to the problems.[34]

### 2. Resolution

The Settling Parties have stipulated to violations related to these issues as reflected in Paragraphs II.B.1.a.ii, II.B.1.a.iii, II.B.1.b, II.B.2.a, and II.B.2.b.

The Settlement requires PG&E to take a number of steps to address this issue—both on the "front end," to facilitate the entry and maintenance of accurate data, and on the "back end," to validate that the data was in fact accurate. On the front end, PG&E's company-wide Code of Conduct training this year is emphasizing the need to maintain accurate company records like those at issue in this proceeding.[35] At a managerial level, the Settlement requires PG&E to train company leaders, not just in L&M but enterprise-wide, on how the pressures to meet metrics can drive unintended consequences—like how emphasizing "zero late tickets" in an inappropriate

---

[33] Administrative Law Judge's Ruling Identifying Issues To Be Addressed At Evidentiary Hearing at 1 (Aug. 23, 2019).
[34] Administrative Law Judge's Ruling Identifying Issues To Be Addressed At Evidentiary Hearing at 1 (Aug. 23, 2019).
[35] Settlement Paragraph III.B.19.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 17 of 40

manner, including without adequate staffing, could result in steps to avoid the *appearance* of late tickets.[36] The Settlement also requires PG&E to review the cultural surveys that it conducts of its employees, using an enhanced methodology, to identify potential safety risks and falsification or record-keeping issues, again not just in L&M but enterprise-wide.[37] From a technological perspective, the Settlement grants SED a role in testing the effectiveness of a new ticket management system that PG&E is implementing.[38] The Settlement provides that the new ticket management system is to be "designed to provide, among other things, additional controls to promote program compliance and process adherence around phasing, negotiations, and late ticket reporting."[39]

On the "back end," the Settlement requires PG&E to implement a number of controls to validate the accuracy of data being reflected on each ticket. PG&E's obligation to take steps to validate its late tickets under this Settlement has no expiration date. In the short-term, though, the Settlement requires a number of specific steps. First, given concerns that ticket due times were being "renegotiated" without the agreement of the excavator, the Settlement requires PG&E to contact a sampling of excavators to verify whether they had actually been contacted and had agreed to a new due time.[40] Second, PG&E is required to review 200 randomly selected tickets every week to evaluate whether they were properly handled.[41] Third, in addition to those validations of individual tickets, PG&E is required to undertake formal surveys that solicit feedback from excavators who seek locating and marking from PG&E, to identify areas of

---

[36] Settlement Paragraph III.B.20.
[37] Settlement Paragraph III.B.17.
[38] Settlement Paragraph III.B.6.
[39] Settlement Paragraph III.B.6.
[40] Settlement Paragraph III.B.3.a.
[41] Settlement Paragraph III.B.3.c.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 18 of 40

concern that are apparent to those who interact with PG&E's L&M division.[42] PG&E must also provide the results of these reviews to SED.[43]

The Settlement also provides for external validation, so that SED can assess whether these reforms are having their intended effect. There will be two significant compliance audits of PG&E L&M data. One will be a compliance audit of L&M tickets, to check whether tickets that are in fact late are properly categorized as late in L&M's late ticket reports; this compliance audit should identify whether the reporting logic in PG&E's ticket management system is accurately evaluating tickets.[44] The other compliance audit will go beyond the data reflected on each ticket. In this second compliance audit, an independent consultant will perform "field reviews" of work performed by PG&E locators. The reviews, which involve sending a reviewer to actual excavation sites to review recently performed work, will assess, among other things, whether the locating and marking was performed and recorded in compliance with L&M procedures.[45] SED will select the independent consultants who will conduct these two compliance audits. The compliance audits will be undertaken in consultation with SED and will be conducted over defined period of time, subject to extension if performance is not improving as required.

### C. Qualified Electrical Workers

The Settling Parties believe the Settlement appropriately addresses issues relating to the third "main issue," regarding the use of QEWs for locating and marking underground infrastructure. Generally speaking, SED has alleged that PG&E failed to provide sufficient

---

[42] Settlement Paragraph III.B.3.b.
[43] Settlement Paragraph III.B.22.f-g.
[44] Settlement Paragraph III.B.1.
[45] Settlement Paragraph III.B.2.

numbers of QEWs to assist in the locating and marking of underground electric infrastructure, and Settling Parties have agreed to knowledge of this fact by PG&E senior L&M management.

### 1. Relevant Facts

Among other facts, through the Settlement, the Settling Parties have stipulated to facts reflected in Paragraphs II.A.22-27 that are particularly relevant to this issue.[46]

### 2. Resolution

The Settling Parties have stipulated to violations related to these issues as reflected in Paragraphs II.B.1.a.i and II.B.1.b.

The Settlement requires PG&E to take a number of steps to address this issue. The late tickets and unsafe conduct related to QEW issues occurred, in large part, because "PG&E did not have consistently sufficient levels of support of [QEWs]."[47] The Settlement requires PG&E to add 14 additional QEWs, designated for L&M tasks, above its 2017 levels.[48] PG&E has advised that this additional level of QEWs will enable it to place a QEW designated for L&M tasks in every division in its service area, along with additional QEWs in divisions with greater QEW needs (such as San Francisco and Oakland).

The Settlement also requires PG&E to develop a system that the Settling Parties believe will enable PG&E to allocate its QEW resources more expeditiously. Historically, locators have not been able to know whether a particular job required a QEW until the locator was actually on site and could make that determination. This process increased the likelihood that a ticket

---

[46] These facts address the availability and use of QEWs for locate and mark activities, which the Commission's August 23, 2019 Ruling indicates is of particular interest to the Commission. Administrative Law Judge's Ruling Identifying Issues To Be Addressed At Evidentiary Hearing at 1 (Aug. 23, 2019).

[47] Settlement Paragraph II.A.22.

[48] Settlement Paragraph III.B.10.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 20 of 40

requiring a QEW would go late, because QEWs were not called until the locator had gotten to the site, at times shortly before the ticket's due time.  Under the Settlement, locators will begin tracking, in the ticket management system, locations that require QEWs.[49]  Over time, this process will build up the L&M knowledge base of sites that require QEWs, so that locators will more often be able to arrange for and schedule QEW assistance before they reach the site, allowing more time for the QEW process before tickets would go late and decreasing unnecessary pressure on locators.  The Settlement also requires PG&E to clarify its procedures and update its training for electric locating, so that locators have better guidance regarding the kinds of tasks that they can and cannot perform consistent with PG&E policies and the kinds of tasks that require a QEW.[50]

The Settlement also provides for SED to review PG&E performance on QEW-related issues.  The audit using field reviews discussed above, which involve sending a reviewer to actual excavation sites to review recently performed work, will assess compliance with QEW-related policies[51] and whether—related to the November 7, 2014 San Jose dig-in discussed above—relevant facilities are accurately and completely mapped in PG&E's mapping database, and that any discrepancies are identified, corrected, and tracked.[52]

### D.    Appropriate Penalty or Remedy

The foregoing sections describe a number of non-monetary remedies that the Settling Parties agree constitute an appropriate resolution.  The Settling Parties believe those non-monetary remedies address the issues identified in PG&E's L&M program and, combined with a

---

[49] Settlement Paragraph III.B.13.
[50] Settlement Paragraphs III.B.11-12.
[51] Settlement Paragraph III.B.14.
[52] Settlement Paragraph III.B.2.

series of remedies that focus on cultural, training, and management initiatives beyond L&M and enterprise wide, will make an important difference going forward.

The Settling Parties have also agreed that PG&E should make payments and incur costs of $65 million to resolve this proceeding. That includes a $5 million fine payable to the General Fund. It also includes $60 million in shareholder funds that must be dedicated to the Safety Enhancement Initiatives identified in Table 1.

These System Enhancements include, but are not limited to, the following:

- An independent compliance audit of L&M tickets, to be undertaken in consultation with SED, to determine whether PG&E's records that indicate a timely L&M activity were properly categorized as timely[53]
- An independent compliance audit using field reviews, to be undertaken in consultation with SED, to determine PG&E's L&M performance, procedure adherence, and compliance[54]
- The addition of sixty-three L&M personnel[55]
- Development of new ticket management software with better reporting capabilities,[56] including the incorporation of electric facilities information in the new system[57]
- An independent review, to be undertaken in consultation with SED, of certain PG&E programs provided for employees to raise safety and other concerns[58]

The Settling Parties believe that this structure is an appropriate resolution to address PG&E's conduct.

---

[53] Settlement Paragraphs III.B.1, 14.
[54] Settlement Paragraph III.B.2.
[55] Settlement Paragraph III.B.4 and III.B.10.
[56] Settlement Paragraph III.B.6.
[57] Settlement Paragraph III.B.13.
[58] Settlement Paragraph III.B.21.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 22 of 40

## III.    THE SETTLEMENT COMPLIES WITH DECISION D. 98-12-075

In D.98-12-075, the Commission adopted the following criteria for evaluating the reasonableness of settlements involving fines:  (1) severity of the offense;[59] (2) conduct of the utility;[60] (3) financial resources of the utility;[61] (4) totality of the circumstances in furtherance of the public interest;[62] and (5) the role of precedent.[63]  As part of the factor focusing on severity of the offense, the Commission included physical harm, economic harm, and harm to the regulatory process as considerations.[64]  The factor focusing on the conduct of the utility also considered the utility's conduct in preventing the violation, detecting the violation, and disclosing and rectifying the violation.[65]  Importantly, this decision provided that:

> Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the Commission in the matters specific in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or proper to secure compliance therewith by all of its officers, agents, and employees.

As discussed below, application of the foregoing criteria demonstrates that, on balance, the Settlement, including the $65 million in financial consequences and associated remedial actions, is reasonable in light of the record, consistent with the law, and in the public interest. Therefore, the Settlement should be approved.

---

[59] D.98-12-075, mimeo, Appendix A, at 10-11.

[60] D.98-12-075, mimeo, Appendix A, at 11-13.

[61] D.98-12-075, mimeo, Appendix A, at  13.

[62] D.98-12-075, mimeo, Appendix A, at  13.

[63] D.98-12-075, mimeo, Appendix A, at 13-14.

[64] D.98-12-075. mimeo, Appendix A, at 10.

[65] D.98-12-075 mimeo, Appendix A, at 11-13.  The Commission also found that "The public utility is responsible for the acts of all its officers, agents, and employees."  D.98-12-075 mimeo, at 37.

## A. Severity of the Offenses

The Commission has stated that the severity of the offense includes several considerations, including physical harm, economic harm, and harm to the regulatory process.[66]

### 1. Physical and Economic Harm

The Commission has described the Physical and Economic Harm criteria as follows:

> The severity of the offense includes several considerations. Economic harm reflects the amount of expense which was imposed upon the victims as well as any unlawful benefits gained by the public utility. Generally, the greater of these two amounts will be used in establishing the fine. In comparison, violations which caused actual physical harm to people or property are generally considered the most severe, with violations that threatened such harm closely following.[67]

Because of the relationship between "Physical Harm" and "Economic Harm," these two factors are discussed together below.

Over the six-year OII Period and out of approximately 4.6 million tickets,[68] the Settling Parties have identified 67 dig-ins in which PG&E's late response to a USA ticket request was a contributing factor,[69] and five additional dig-ins to which PG&E's failure to use a QEW may have contributed.[70] Every dig-in raises important safety concerns, and every time there is a late ticket, there is a risk of physical and economic harm, even where a dig-in does not occur. In this matter, of the 72 dig-ins identified, none resulted in fatalities, and one resulted in an injury.[71] SED believes that the threat of physical and economic harm associated with each of the violations makes them severe.

---

[66] D.98-12-075, Appendix A, at 10-11.

[67] D.98-12-075, mimeo, Appendix A, at 7.

[68] Settlement Paragraph II.A.1.

[69] Settlement Paragraph II.A.13; SED Prepared Testimony of Wai-Yin Chan at 34, line 16 to 35, line 6.

[70] Settlement Paragraph II.A.25; SED Prepared Testimony of Charles Mee at 18, line 6 to 19, line 1.

[71] Settlement Paragraph II.A.25; SED Prepared Testimony of Raymond Cho at 1, lines 1-12; SED Prepared Testimony of Charles Mee at 5, lines 16-25.

PG&E's undercounting and underreporting of late tickets also had safety consequences or potential safety consequences.[72] That said, PG&E contends that those consequences of undercounting and underreporting late tickets are less direct than the consequences of the late responses themselves; while a late response to a ticket can have a very direct safety consequence, the safety consequences of undercounting or underreporting late tickets are less direct.[73] PG&E also contends that late responses to USA requests are not a significant driver of dig-in risks.[74] SED contends that undercounting and underreporting of late tickets to SED has a direct safety consequence, delaying SED's understanding of the full nature of the late ticket issues, and SED's ability to more timely proceed with its pre-formal investigation.[75]

PG&E also contends that, with respect to the Commission's consideration of "any unlawful benefits gained by the public utility," PG&E did not gain any unlawful benefits as a result of the conduct at issue and that, to the contrary, the conduct was detrimental to the company's interests.[76] Without conceding PG&E's point regarding economic harm, SED notes that D.98-12-075 considers the greater of economic or physical harm (or threat of physical harm), a driving factor in this case.

The Settling Parties agree that the safety consequences of the conduct at issue in this proceeding are important, and that the violations in this instance have not resulted in the

---

[72] Settlement Paragraphs II.A.14-15.

[73] PG&E Reply Testimony of Melvin Christopher at 2-9, line 9 to 2-10, line 2; PG&E Reply Testimony of Jeff Wiese at 7-6, line17 to 7-7, line 27.

[74] PG&E's 90-Day Report at 23-25, 112-13; *see* PG&E Reply Testimony of Melvin Christopher at 2-8, lines 25-28; PG&E Reply Testimony of Jason Klemm at 3-35, lines 1-3; PG&E Reply Testimony of Jeff Wiese at 7-2, lines 12-19.

[75] Settlement Paragrah II.A.15.

[76] PG&E's 90-Day Report at 63-64; PG&E Reply Testimony of Melvin Christopher at 2-15, lines 14-20; PG&E Reply Testimony of Jesus Soto at 1-12, lines 8-12; *see also* PG&E Reply Testimony of Glenda Scarbrough at 5-3, line 5 to 5-5, line 17.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 25 of 40

catastrophic consequences experienced in certain other matters. SED believes that the potential safety consequences, including physical and economic harm, make these violations severe. PG&E believes that however the harms here are characterized, untimely responses to 811 calls are a relatively minor threat in causing dig-ins, and PG&E's damage prevention program became safer over this time period.[77] Nonetheless, the Settling Parties have identified 67 dig-ins in which PG&E's late response to USA notifications were a contributing factor.[78]

### 2. Harm to the Regulatory Process

As part of the severity of the offense factor, the Commission has described the "Harm to the Regulatory Process" criterion as follows:

> "Every public utility shall obey and comply with every order, decision, direction, or rule made or prescribed by the Commission in the matters specified in this part, or any other matter in any way relating to or affecting its business as a public utility, and shall do everything necessary or property to secure compliance therewith by all of its officers, agents, and employees." Public Utilities Code §702

> Such compliance is absolutely necessary to the proper functioning of the regulatory process. For this reason, disregarding a statutory or Commission directive, regardless of the effects on the public, will be accorded a high level of severity.[79]

PG&E has acknowledged violations of Commission Rule 1.1 relating both to its underreporting of late tickets[80] and its failure to produce certain information requested in a 2014-15 investigation of a dig-in in San Jose, including the false entry in the associated ticket that a QEW assist was received.[81] The Settling Parties have further agreed that the underreporting of late tickets "had potential safety consequences," "delayed SED's safety-related investigation"

---

[77] PG&E Reply Testimony of Jeff Wiese at 7-2, lines 12-26.
[78] Settlement Paragraph II.A.13.
[79] D.98-12-075, mimeo, Appendix A, at 7-8.
[80] Settlement Paragraph II.A.15; Settlement Paragraph II.B.2.a.
[81] Settlement Paragraph II.A.26; Settlement Paragraph II.B.2.b.i.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 26 of 40

and "delayed SED's understanding of the full nature of the late ticket issues and SED's ability to more timely proceed with its pre-formal investigation."[82]

PG&E contends that the Rule 1.1 violations did not involve an intent to mislead the Commission.[83] SED notes that a violation of Rule 1.1 does not require an intent to mislead.[84]

SED also contends that PG&E initially had claimed that the successful reductions of number of late tickets to 3,385 in 2015 and 44 in 2016 were attributed to PG&E's aggressive effort to reduce late tickets by establishing a zero late tickets goal and taking actions to achieve that goal.[85] The Settlement Agreement identifies that PG&E underreported late tickets to SED on April 19, 2017, and that PG&E later identified unaccounted for late tickets to SED in June of 2017.[86]

PG&E contends that it took several appropriate steps to remedy the problems beginning in 2017, including informing SED when it became aware of the late ticket data issues.[87] PG&E also notes that late ticket data is not information that is routinely requested by or reported to SED

---

[82] Settlement Paragraph II.A.15.

[83] Settlement Paragraph II.B.2; PG&E Reply Testimony of Melvin Christopher at 2-15, lines 5-13 and 2-16, line 10 to 2-18 line 11; PG&E Reply Testimony of Adeel Babar at 6-3, line 1 to 6-4 line 14.

[84] *Pacific Gas and Electric Company v. Public Utilities Comm'n*, 237 Cal. App. 4th 812, 846 (2015). ". . . it is not so much the plain language of Rule 1.1 that governs, but the language of section 2107 which, together with sections 701 and 1701, is the head source authority for Rule 1.1. (See fn. 15, *ante.*) The language of section 2107, by itself and when examined with other statutes, establishes that no intent element is 'mandated" by that language.' *See also,* D.09-04-009, mimeo, at 15, "[A utility] is subject to a penalty for its violation of Rule 1.1, even if the violation was inadvertent. . ." *See also,* D.01-08-019, mimeo, at 9. "In any event, the question of intent to deceive merely goes to the question of how much weight to assign to any penalty that may be assessed. The lack of direct intent to deceive does not necessarily, however, avoid a Rule 1 violation."

[85] Investigative Report Attachment 16 at SED-00352.

[86] Settlement Paragraph II.B.2.a.

[87] PG&E 90-Day Report at 82-102; SED Prepared Testimony of Wai-Yin Chan at 35, lines 15-18; *see also* PG&E Reply Testimony of Jesus Soto at 1-11, lines 18-27 and 1-12, line 20 to 1-13 line 22; *see generally* PG&E Reply Testimony of Melvin Christopher at 2-18, line 13 to 2-21 line 19; *see generally* PG&E Reply Testimony of Jason Klemm at 3-9, line 24 to 3-37 line 5; PG&E Reply Testimony of Ron Peterson at 9-6, lines 3-12.

or, to the Settling Parties' knowledge, to any other safety regulator.[88]  However, SED observes that it has asked PG&E about late ticket data in the past.

## B.    The Conduct of the Utility

In describing the Conduct of the Utility, the Commission has recognized the Utility's conduct in: (1) preventing the violation; (2) detecting the violation, and (3) disclosing and rectifying the violation.[89]  The Stipulated Facts and the discussion in Section II of this Motion provide important context to the violations overall.

SED contends that PG&E underreported the total number of late tickets it had from 2012 to February 2017 as 34,998 in response to SED data requests for late ticket counts,[90] a count which PG&E told SED was underreported in June of 2017.[91]  Also, SED contends that PG&E had initially claimed that the successful reductions of the number of late tickets to 3,385 in 2015 and to 44 in 2016 were attributed to PG&E's aggressive effort to reduce late tickets by establishing a zero late tickets goal and taking actions to achieve that goal, but that these levels were falsely low.[92]  SED contends that PG&E's initial claims were later refuted by further evidence of PG&E undercounting its late tickets and underreporting of them to SED on the order of an estimated 135,145 tickets during this approximate five-year period.[93]  SED contends that PG&E also acknowledged it failed to provide certain information relevant to an investigation in 2014-15 into the November 7, 2014 San Jose dig-in.[94]

---

[88] PG&E Reply Testimony of Jeff Wiese at 7-7, lines 12-16; PG&E Reply Testimony of Melvin Christopher Ex. 2E at 6-7.

[89] D.98-12-075, at 37-38.

[90] Settlement Paragraph II.A.8.

[91] Settlement Paragraph II.A.9.

[92] Investigative Report Attachment at SED-00352.

[93] Settlement Paragraph II.A.6.

[94] Settlement Paragraph II.A.26.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 28 of 40

While agreeing to the facts summarized in the Settlement Agreement in Paragraphs II.A, and accepting responsibility for the problems identified, PG&E contends that, among other things: the conduct at issue was contrary to the values, policies, and cultural change that PG&E was working to implement during this time period;[95] PG&E made important overall safety improvements during this period, including increasing public awareness of damage prevention and driving down the overall dig-in rate by over 50% from 2012-2017, and those safety improvements made it more difficult to identify the late ticket issues;[96] and PG&E took appropriate steps to address these issues beginning in March 2017, when it began developing an action plan to respond to information PG&E learned during an AGA Peer Review.[97] Among other things, PG&E notes that it retained a third-party investigative firm to better understand what happened, gave it unfettered access to prepare an independent report, and committed to providing that report to SED and others.[98] PG&E believes that its efforts to assess the scope of the problem, hold senior managers and leaders accountable, work transparently with SED and PG&E's federal Monitor, and—most importantly—develop a Compliance Plan to address the issues going-forward, merit consideration.

---

[95] *See generally*, PG&E Reply Testimony of Jesus Soto at 2, line 22 to 10, line 18; PG&E Reply Testimony of Jesus Soto at 11, line 22 to 12, line 15; PG&E Reply Testimony of Melvin Christopher at 10, line 9 to 12, line 4; PG&E Reply Testimony of Jason Klemm at 3, line 31 to 5, line 19; PG&E Reply Testimony of Jeff Wiese at 9, line 1 to 13, line 33.

[96] PG&E Reply Testimony of Jesus Soto at 1-9, lines 1-13; PG&E Reply Testimony of Bruce Paskett at 8-5, lines 15-20; PG&E Reply Testimony of Jeff Weise at 7-8, lines 27-30.

[97] *See generally* PG&E 90-Day Report Appendix B; PG&E Reply Testimony of Jesus Soto at 1-11, lines 18-27 and 1-12, line 20 to 1-13 line 22; *see generally* PG&E Reply Testimony of Melvin Christopher at 2-18, line 13 to 2-21 line 19; *see generally* PG&E Reply Testimony of Jason Klemm at 3-9, line 24 to 3-37 line 5; PG&E Reply Testimony of Ron Peterson at 9-6, lines 3-12.

[98] PG&E Reply Testimony of Melvin Christopher at 2-19, lines 4-24.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 29 of 40

SED recognizes PG&E's internal efforts, but this does not change the fact that PG&E underreported its late ticket counts to SED in April, 2017.[99] SED contends that the scope of the violations here is significant and is particularly concerning since the Commission had previously found that PG&E had failed to properly maintain its pipeline safety records, and PG&E had already promised to take steps to fix safety related deficiencies, including recordkeeping, deficiencies like these in D.15-04-024, the San Bruno Decision on Fines and Remedies. In the aftermath of that the San Bruno Decision on Fines and Remedies, the scope of PG&E's late ticket undercounting problem was significant. Over the OII Period, there were likely tens of thousands more late tickets than PG&E's internal late ticket reports demonstrated.[100] PG&E underreported late ticket counts to SED on April 19, 2017.[101] PG&E informed SED of the underreport on June 6, 2017.[102] PG&E L&M management inappropriately communicated directives, pressures and expectations to supervisors and staff to achieve zero late tickets while providing inadequate staffing to achieve that expectation.[103] Although information that should have been sufficient to cause PG&E to investigate the late ticket undercounting issues had been in PG&E's possession for several years, PG&E's Senior Vice President of Gas Operations ("Senior Vice President"), was not informed of the problem by L&M leadership and did not learn of the problem until 2016. The Senior Vice President then instructed PG&E's Vice President, Gas Transmission & Distribution Operations ("Vice President") to look into the issue. The Vice President met with Quality Management personnel regarding their findings, but the Vice President did not resolve the undercounting issue or return to the Senior Vice President

---

[99] Settlement, Section II.A.8.

[100] Settlement Paragraph II.A.6.

[101] Settlement Paragraph II.B.2.A.

[102] Settlement Paragraph II.B.2.A.

[103] Settlement Paragraph II.B.2.A.iv.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 30 of 40

regarding the problem.  The Senior Vice President incorrectly assumed that when the Vice President did not return, it meant that the concerns were unfounded or that the Senior Vice President could resolve the issue without the Senior Vice President's assistance, and the Senior Vice President failed to follow up with the Vice President about his findings.[104]

By focusing the majority of the financial consequences on remedial actions, SED has targeted areas that can help with PG&E's safety culture, if implemented and maintained properly.

Finally, with respect to the individual violations, the Settling Parties note the following additional context:

*QEW-related violations (Paragraph II.B.1.a.i):*  To the extent that a shortage of QEWs caused tickets to go late, the consequences of those late tickets are already reflected in the violations related to late responses to USA ticket requests.

*Late ticket undercounting (Paragraph II.B.1.a.ii-iv):*  The scope of PG&E's late ticket undercounting problem was significant, and there were likely tens of thousands more late tickets than PG&E's internal late ticket reports demonstrated.[105]  The Settling Parties have stipulated to certain facts regarding the knowledge and involvement of PG&E's leaders and senior managers.[106]  SED does not contend that PG&E leaders were aware of or involved in the late ticket undercounting issues other than as discussed in those facts.[107]

---

[104] Settlement Paragraph II.A.20.

[105] Settlement Paragraph II.A.6.

[106] Settlement Paragraphs II.A.20-21.

[107] SED Prepared Testimony of Wai-Yun Chan at 14, lines 16-2; *see generally* PG&E Reply Testimony of Melvin Christopher Ex. 2E at 14-17.

*Late tickets (Paragraph II.B.1.a.v):* The Settling Parties have identified 67 dig-ins in which PG&E's late response to USA notifications were a contributing factor,[108] and have agreed that those dig-ins reflect violations related to California Government Code Section 4216.3(a)(1)(A) or its predecessor statute. The Settling Parties are unaware of cases in which a late response to a ticket, without an associated dig-in or other harm or safety consequence, has resulted in a monetary penalty. PG&E contends that relying on aggregate late ticket numbers (even if they were known in this case) for a monetary penalty could be counter-productive; PG&E does not want its employees to believe that any time a ticket is recorded as late—which PG&E contends is inevitable at times in the gas industry—there will be a monetary penalty.[109] The Settling Parties have agreed PG&E's late response was a contributing factor to 67 dig-ins, and those are part of an appropriate basis for a penalty.

*Rule 1.1 violations (Paragraph II.B.2):* PG&E acknowledges that it failed to provide accurate information in response to SED data requests for late tickets and failed to provide certain information relevant to an investigation in 2014-15 into the November 7, 2014 San Jose dig-in. PG&E contends that the Rule 1.1 violations did not involve an intent to mislead the Commission,[110] and with respect to the data requests, that PG&E provided information as it was maintained in PG&E's ticket management system.

## C.    Financial Resources of the Utility

The Commission has described this criterion as follows:

Effective deterrence also requires that the Commission recognize the financial resources of the public utility in setting a fine which balances the need for

---

[108] Settlement Paragraph II.A.13.
[109] PG&E Reply Testimony of Jason Klemm at 3-13, lines 6-17; PG&E Reply Testimony of Melvin Christopher Ex. 2E at 6.
[110] Settlement Paragraph II.B.2.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 32 of 40

deterrence with the constitutional limitations on excessive fines. . .The Commission intends to adjust fine levels to achieve the objective of deterrence, without becoming excessive, based on each utility's financial resources.[111]

SED, PG&E, and CUE have worked closely to prescribe a set of corrective actions that are intended to address the problems that the facts in this proceeding show in PG&E's L&M activities.

A unique combination of circumstances appear to affect the financial resources of PG&E at this point in time, including PG&E's filing for reorganization under Chapter 11 of the Bankruptcy Code. SED contends that Assembly Bill 1054 adds to the unique combination of circumstances. SED has carefully considered PG&E's ability to pay in this instance. In light of this, SED made concessions with regards to shareholder penalties that it might not otherwise have made, and instead focused efforts to apply shareholder funding toward safety-related corrective actions.

The Settling Parties believe that the $65 million combination of penalty and funding of system enhancement initiatives here is sufficient in light of PG&E's financial condition.

### D. Totality of Circumstances in Furtherance of Public Interest

The Commission has described this criterion as follows:

Setting a fine at a level which effectively deters further unlawful conduct by the subject utility and others requires that the Commission specifically tailor the package of sanctions, including any fine, to the unique facts of the case. The Commission will review facts which tend to mitigate the degree of wrongdoing as well as any facts which exacerbate the wrongdoing. *In all cases, the harm will be evaluated from the perspective of the public interest.*[112]

The Settling Parties believe the public interest requires approval of this Settlement. First, the Settlement provides an appropriate resolution of the issues identified here. The $65 million

---

[111] D.98-12-075, mimeo, Appendix A, at 10.
[112] D.98-12-075, mimeo, Appendix A, at 10.

in penalty and shareholder-funded corrective actions is significant, and the System Enhancement Initiatives are appropriately targeted to address the problems identified. While the Settling Parties recognize that others may wish to impose more significant structural changes on PG&E in this proceeding, the Settling Parties contend that there are or will be other proceedings in which those proposals can be addressed more appropriately. And by reaching a settlement, the Settling Parties have implicitly agreed that total shareholder cost of $65 million is not constitutionally excessive.

Second, the Settling Parties believe—with an appropriate resolution having been reached—it is in the public interest to resolve this proceeding now. At an initial level, the Settling Parties see little benefit to hearings in this case, where the facts are well-known after years of investigations. The Settling Parties believe that approving this Settlement before evidentiary hearings is an appropriate use of Commission resources. Approval of the Settlement also promotes administrative efficiency so that the Commission and parties are not required to expend substantial time and resources on continued litigation.

To help achieve the intent to further the public's interest in the safety of PG&E's system, the vast majority of the funds are for corrective actions directly targeted to address the problems identified in this proceeding. These efforts, if properly implemented and maintained, should help prevent these types of violations occurring again in the future.

### E.    The Role of Precedent

The Commission has described the role of precedent as follows:

> The Commission adjudicates a wide range of cases which involve sanctions, many of which are cases of first impression. As such, the outcomes of cases are not usually directly comparable. In future decisions which impose sanctions, the parties and, in turn the Commission will be expected to explicitly address those

Case: 19-30088   Doc# 6711-3   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 34 of 40

> previously issued decisions which involved the most reasonably comparable factual circumstances and explain any substantial differences in outcome.[113]

The Settling Parties agree that the settlement is reasonable, but for different reasons and based upon different decisions.

PG&E contends that the Settlement is reasonable when compared to the outcomes in other, comparable SED settlements and outcomes in Commission investigations. PG&E believes that one instructive benchmark is PG&E's Gas Distribution Recordkeeping OII, which resulted in a $25.6 million fine.[114] PG&E notes that Gas Distribution Recordkeeping OII involved inaccuracies in safety records and, in the Commission's view, systemic violations over 30 years. PG&E also notes that the Gas Distribution Recordkeeping OII involved a catastrophic safety event. While acknowledging that this proceeding involves certain additional conduct that was not at issue in the Gas Distribution Recordkeeping OII, PG&E also believes that in many ways, the conduct at issue in this L&M proceeding is analogous to or less culpable than the conduct in that earlier proceeding.

SED contends that the facts in this proceeding are similar to those in the Commission's investigations into PG&E's Recordkeeping (I.11-02-016)[115] and Class Location (I.11-11-009)[116] practices regarding its gas transmission system. As with those investigations, this proceeding

---

[113] D.98-12-075, mimeo, Appendix A, at 10-11.

[114] I.14-11-008.

[115] See for example, D.15-04-021, *Modified Presiding Officer's Decision Regarding Allegations of Violations Regarding Pacific Gas and Electric Company's Operations and Practices with Respect to Facilities Records for Its Natural Gas Transmission System Pipelines*, mimeo, at 273, Findings of Facts 2-7, which focused on the National Transportation Safety Board and Safety Enforcement Division's concerns and reports regarding PG&E's recordkeeping deficiencies and practices.

[116] See for example, D.15-04-022, *Modified Presiding Officers Decision Regarding Allegations of Pacific Gas and Electric Company's Violation Regarding Operation of Its Natural Gas Transmission Pipeline System in Locations with Higher Population Density*, mimeo, at 60, Findings of Fact 3-9, identifying incorrect class location designations, and the need to have traceable, verifiable, and complete class location records on significant portions of PG&E's system.

addresses systemic failures in PG&E's locate and mark recordkeeping and related practices. In the Commission's Decision on Fines and Remedies that resulted from three San Bruno investigations, including the ones on PG&E's Recordkeeping and Class Location, the Commission prescribed approximately $50 million to implement remedies,[117] comparable to the $60 million shareholder-funded System Enhancement Initiatives agreed to by the Settling Parties in this instance.[118]

In SED's evaluation, it is appropriate that total shareholder costs in this proceeding should be higher than those in the Gas Distribution Recordkeeping OII (shareholder costs of $25.6 million paid as a fine to the General Fund), but lower than those provided regarding San Bruno in D.15-04-024.

Other OIIs provide a certain amount of context. In 2011, the Commission adopted shareholder costs in the form of a $38 million penalty following an explosion in Rancho Cordova.[119] In D.16-08-020, following a pipeline rupture in Carmel, the Commission imposed PG&E shareholder costs in the form of a fine of more than $25 million to the General Fund; in that decision, the Commission concluded that the most directly applicable precedent occurred where the Commission imposed a $16.76 million fine for poor recordkeeping leading to failures to leak survey nearly 14 miles of PG&E's natural gas distribution system facilities because there was limited actual harm but the serious potential for great harm.[120]

---

[117] D.15-04-024, *Decision on Fines and Remedies to Be Imposed on Pacific Gas and Electric Company for Specific Violations in Connection with the Operation and Practices of Its Natural Gas Transmission System Pipelines*, mimeo, at 1-2.

[118] *See* Settlement Paragraphs III.A.3 and III.A.4.

[119] D.11-11-001, mimeo, at 48-49, Ordering Paragraph 4.

[120] D.16-08-020, *Decision Regarding Investigation of Pacific Gas and Electric Company's Gas Distribution Facilities Records,* mimeo, at 62, Conclusion of Law 10.

The scope of this proceeding included issues related to electric distribution, thereby meriting consideration of other decisions related to that subject matter. In D.17-09-024, in response to a power outage in Long Beach, California that caused no fatalities or injuries, the Commission adopted a settlement with $15 million in financial consequences at shareholder expense, including $11 million in specified System Enhancement Projects,[121] and a $4 million penalty to the General Fund.[122]

SED recognizes that past precedent is not completely instructive in determining the amount shareholders should pay in this case. Rather a combination of unique circumstances, such as those discussed in the "Financial Resources of the Utility" Section above provide a different calculus for determining the penalty that should be imposed.

SED also carefully considered PG&E's ability to pay in this instance as best it could in agreeing to the sum total in the settlement. PG&E's pending bankruptcy is a factor to consider in assessing PG&E's ability to pay. SED respectfully requests that the factors identified here be considered when analyzing the consistency of this settlement with past precedent.

CUE agrees with PG&E that the Settlement is reasonable when compared to the outcome of comparable SED settlements and outcomes in Commission investigations, including, for example, PG&E's Gas Distribution Recordkeeping OII. CUE agrees with SED that, in this instance, there are a combination of unique circumstances, such as those discussed in the "Financial Resources of the Utility" Section above, that should be considered when determining the penalty that should be imposed.

---

[121] D.17-09-024, *Decision Adopting Settlement Agreement Between Southern California Edison Company and the Safety and Enforcement Division*, mimeo, at 22, Finding of Fact 6.
[122] D.17-09-024, mimeo, at 22, Finding of Fact 7.

Case: 19-30088    Doc# 6711-3    Filed: 04/08/20    Entered: 04/08/20 20:54:27    Page 37 of 40

## IV. THE SETTLEMENT IS REASONABLE IN LIGHT OF THE WHOLE RECORD, CONSISTENT WITH LAW, AND IN THE PUBLIC INTEREST

The Commission should approve this Settlement resolving the issues raised in the L&M OII because it is reasonable, consistent with law, and in the public interest. Most importantly, the Settlement imposes a number of System Enhancement Initiatives designed to enhance, among other things, PG&E's L&M compliance and capabilities and the reliability of the ticket management information that PG&E maintains in the ordinary course of its business. The Settlement also imposes System Enhancement Initiatives outside of the L&M program, aimed at addressing cultural issues enterprise-wide, focusing on training and the creation of environments in which employees are comfortable and empowered to speak up and identify, among other things, possible safety concerns and possible misconduct. One System Enhancement Initiative specifically requires PG&E to review the cultural surveys that it commissions for its employees, not limited to L&M, "to identify potential safety risks as well as potential issues related to falsification or improper record-keeping."[123] Nothing in the Settlement bars any more "structural" remedies from being raised in another proceeding with a broader mandate.

The Settlement also requires PG&E to make payments and incur costs of $65 million, including $60 million in shareholder funding as described in Table 1 of this motion. The amounts at issue fall within a range that fairly reflects the facts involved and the differing legal positions of the Settling Parties when evaluated against the possible statutory fines and the uncertainty of the results of a fully litigated outcome. While the Settling Parties were unable to determine precise numbers of violations in some instances, the System Enhancement Initiatives were taken into account in agreeing to the $65 million resolution. PG&E's payments to the

---

[123] Settlement Paragraph III.B.17.

General Fund, its admissions, and its shareholder funding of the projects described herein represent a reasonable compromise that is in the public interest.

The Settlement will also avoid litigation and conserve Commission and party resources. SED's investigation into these issues began in 2016. After an extensive pre-formal investigation, SED prepared an Investigative Report, continued discovery after the opening of the L&M OII, and negotiated the agreed-upon fine and other terms in the Settlement. Commission decisions approving settlement including negotiated penalty amounts emphasize that the public interest is served by settlements that reduce the expense of litigation, conserve scarce Commission resources, and allow parties to eliminate the risk of more unfavorable litigated outcomes. The Settlement achieves all of these public interest objectives.

While the Settling Parties believe that these amounts and structure are appropriate in light of the conduct, the Settling Parties are also mindful of additional circumstances here—as emphasized at the Prehearing Conference[124]—that warrant settlement. Assembly Bill 1054 provides that in order to access the Wildfire Fund that would pay eligible claims arising out of catastrophic wildfires, PG&E's Plan of Reorganization must be approved by June 30, 2020. Delaying a resolution here will complicate that process significantly. The Settling Parties also believe that the structure, with significant benefits going to ratepayers and with most of the financial consequences capable of being effectuated within the next few years rather than a longer period, is likely to facilitate an orderly resolution of PG&E's bankruptcy proceedings in the Bankruptcy Court.

---

[124] Tr. Vol. PHC at 21-24 and 44; Tr. Vol. PHC-2 at 63; Tr. Vol. 2 at 39, 51, and 55.

Case: 19-30088   Doc# 6711-3   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 39 of 40

## V. CONCLUSION

For the reasons stated above, the Settling Parties believe that the Settlement appropriately resolves the L&M OII. The Settlement is reasonable in light of the record, consistent with the law and precedent, and in the public interest. Therefore, the Settling Parties jointly request that the Commission approve the Settlement in the form presented.

Respectfully submitted,


By:  /s/
**DARRYL GRUEN**
Safety & Enforcement Division
California Public Utilities Commission
505 Van Ness Avenue
San Francisco, CA  94102
Telephone:  (415) 703-1973
Email:  darryl.gruen@cpuc.ca.gov

Attorney for
SAFETY & ENFORCEMENT DIVISION


By:  /s/
**JONATHAN D. PENDLETON**
ALEJANDRO VALLEJO
Pacific Gas and Electric Company
77 Beale Street, B30A
San Francisco, CA 94105
Telephone: (415) 973-2916
Facsimile:   (415) 973-5520
Email: jonathan.pendleton@pge.com

Attorneys for
PACIFIC GAS AND ELECTRIC COMPANY


By:  /s/
**RACHAEL KOSS**
Coalition of California Utility Employees
Adams Broadwell Joseph & Cardozo
601 Gateway Blvd., Suite 1000
South San Francisco, CA  94080
Telephone:  (650) 589-1660
Email:  rkoss@adamsbroadwell.com

Attorney for
COALITION OF CALIFORNIA UTILITY
EMPLOYEES


By:  /s/
**BRIAN HAUCK**
Jenner & Block LLP
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054
Telephone : (213) 239-2244
Facsimile:   (213) 239-5199
Email: bhauck@jenner.com

Attorney for
PACIFIC GAS AND ELECTRIC COMPANY


Dated:  October 3, 2019

Case: 19-30088   Doc# 6711-3   Filed: 04/08/20   Entered: 04/08/20 20:54:27   Page 40 of 40