**WEIL, GOTSHAL & MANGES LLP**
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Theodore Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
New York, NY 10153-0119
Tel: (212) 310-8000
Fax: (212) 310-8007

**KELLER BENVENUTTI KIM LLP**
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (415) 636-9251

*Attorneys for Debtors and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION**,<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors**.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>\* *All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DEBTORS' STATEMENT REGARDING THE OFFICIAL COMMITTEE OF TORT CLAIMANTS' MOTION FOR STANDING TO PROSECUTE CLAIMS OF THE DEBTORS' ESTATES**<br><br>[Relates to Dkt. Nos. 5972-73, 6435, 6449, 6475, 6482, 6547-48, 6600, 6684, 6697, 6704]<br><br>Regarding Motion Set for Hearing April 14, 2020 at 10:00 a.m. PDT |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**", and collectively with PG&E Corp., the "**Debtors**"), as debtors and debtors in possession in the above-captioned cases (the "**Chapter 11 Cases**"), hereby submit this statement (the "**Statement**") regarding *The Official Committee of Tort Claimants' Motion for Standing to Prosecute Claims* [Dkt. No. 5972] (the "**Motion**"),[1] in order to address certain issues raised by the *Securities Plaintiffs' Memorandum of Points and Authorities in Opposition to Official Committee of Tort Claimants' Motion for Standing to Prosecute Claims of the Debtors' Estates* [Dkt. No. 6482] (the "**Securities Plaintiffs Opposition**"), as well as by the *Reply Brief of the Official Committee of Tort Claimants in support of its Motion for Standing to Prosecute Claims of the Debtors' Estates* [Dkt. No. 6547] (the "**TCC Reply**"). The Debtors respectfully state as follows:

**STATEMENT**

There is no dispute that the Debtors "own" and have the right to bring any "derivative" claims. The TCC's Motion seeks to obtain standing to file a complaint (the "**Draft Complaint**") in these Chapter 11 Cases to commence an adversary proceeding (the "**Adversary Proceeding**") seeking a declaratory judgment that certain claims (the "**Claims**")[2] brought by current and former holders of securities of PG&E Corp. are, in fact, derivative claims belonging to the Debtors' estates, and to enjoin further prosecution of such Claims.[3]

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

[2] The Claims are currently pending in an action commenced by the Securities Plaintiffs, as that term is defined in the Securities Plaintiffs Opposition, in the United States District Court for the Northern District of California, San Francisco Division, styled *In re PG&E Corporation Securities Litigation*, Civil Action No. 3:18-cv-03509-EJD (the "**Securities Action**"), and are also set forth in proofs of claim filed, and to be filed, in these Chapter 11 Cases against the Debtors (the "**Securities POCs**").

[3] While the TCC frames the discussion around whether the Claims are "direct" or "derivative," the issue here is really whether the Claims (to the extent they exist) are property of the Debtors or their present and former securities holders.

In order to resolve the Motion, the Debtors and the TCC entered into the *Stipulation and Agreement for Order Resolving the Official Committee of Tort Claimants' Motion for Standing to Prosecute Claims of the Debtors' Estates* [Dkt. No. 6449] (the "**Stipulation**"), whereby the Debtors agreed to grant the TCC standing expressly for the *sole and limited* purpose of seeking the relief described in the Motion and Draft Complaint, *i.e.*, to determine whether the Claims are direct or derivative in nature. Specifically, the Debtors and the TCC agreed that the "TCC shall be deemed to have standing for the sole purpose of commencing and prosecuting the Adversary Proceeding substantially in the form of [the Draft Complaint]," and that such standing and prosecution "shall be *limited to the sole purpose of a determination as to whether the Claims are derivative claims* that belong to the Debtors' estate, and, if so, whether the Securities Action and pursuit of the Securities POCs should be enjoined." Stipulation ¶ 2 (emphasis added). To the extent the Claims are determined to be derivative, the Debtors expressly retained the right to settle or prosecute them until and unless the Debtors' plan is effective and the Claims become part of the Fire Victim Trust. *See id.* ¶ 3.

1. **The Securities Plaintiffs Opposition**

The Court should disregard the Securities Plaintiffs Opposition and the arguments set forth therein. On March 25, 2020, the Securities Plaintiffs filed their Opposition to the TCC's Motion, contending: (1) that the Court should deny the Motion and refuse to allow the TCC to commence the Adversary Proceeding, and (2) that the substantive argument that the TCC stated in its Motion that it intends to assert in the Adversary Proceeding, *i.e.*, that the Claims are, in fact, derivative claims belonging to the Debtors' estates, is incorrect.

The Securities Plaintiffs are the proposed defendants in the Adversary Proceeding and it is particularly inappropriate for them to seek to have any say as to whether that suit is brought by the Debtors or the TCC. The Securities Plaintiffs have no standing to choose their adversary. The Securities Plaintiffs should not have any input into whether, or by whom, they are sued. Given this incontrovertible conflict of interest, the Court should give no weight to the Securities Plaintiffs' arguments regarding whether the Court should grant the TCC the standing it requests.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The issue of who can prosecute the adversary proceeding is uniquely one between the Debtor and its creditor constituencies, including the TCC and the Official Committee of Unsecured Creditors (the "**UCC**"). In this regard and as already noted, the Debtors and the TCC have stipulated that the TCC may commence the Adversary Proceeding for the sole purpose of determining whether the Claims are direct or derivative, and the UCC has "welcome[d]" that agreement, stating: "[U]ntil a plan is confirmed in these cases, the [UCC] may well have an interest in the Claims equal to all other creditors. The TCC's efforts are thus an appropriate use of estate resources, as they may benefit the Debtors' estates as a whole, as opposed to primarily parochial interests."[4]

It is also inappropriate for the Securities Plaintiffs to raise the *merits* of the contemplated Adversary Proceeding on a motion limited to the question of who can bring that lawsuit. If the Court determines that the TCC can bring the Adversary Proceeding, the Securities Plaintiffs will have an opportunity to argue whether the Claims are direct or derivative. For now, consideration of those underlying issues on this Motion is not appropriate and, in any event, premature.

**2.     The TCC Reply**

a.     <u>The Stipulation</u>

In its Motion, the TCC stated that it is seeking standing to commence an Adversary Proceeding in order to request a determination that the Claims are property of the estate on the theory that "the [Securities] Action asserts derivative claims." Mot. at 2. In the Draft Complaint, the TCC set forth allegations and causes of action consistent with its stated theory that the Claims are derivative, not direct.[5] To resolve the Motion, the Debtors entered into the Stipulation with the TCC. *See supra* at 2.

---

[4] *See* Statement of Official Committee of Unsecured Creditors Regarding Motion of the Official Committee of Tort Claimants for Standing to Prosecute Claims of the Debtors' Estates [Dkt. No. 6475], at 2.

[5] *See, e.g.*, Motion, Ex. B ¶ 11 ("The TCC requests entry of a judgment declaring that the [Claims] are derivative claims belonging to the Debtors' chapter 11 estates"); ¶ 12 ("The TCC therefore requests entry of a judgment that confirms the derivative nature of the Shareholder Claims and Shareholder BK Claims . . . ."); ¶ 55 ("The Shareholder Claims pleaded by the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

In its Reply (and again in its opposition to the Securities Plaintiff's application to file a sur-reply), the TCC appears to pivot from its original arguments, now apparently intending to contend that the Securities Action "does not properly plead valid securities claims," and that if the Securities Plaintiffs' "baseless allegations of 'false statements' are disregarded under applicable federal securities law, the complaint that remains is a very detailed complaint alleging mismanagement that caused billions of dollars of damages—just like every other pending Self-Described Derivative Action." TCC Reply at 1-2. The TCC also contends that the Securities Action's "allegations of 'false statements' cannot state valid securities claims under applicable standards." *Id.* at 5-6. In addition, the TCC Reply asserts that the Securities Action "does not contain a single allegation of a false statement that satisfies" the purportedly relevant pleading standards, that the statements set forth in the Securities Action "do not meet the necessary detail that is required for actionable compliance statements," and that the allegations set forth in the Securities Action constitute the "sort of pleading [that] is not permitted." *Id.* at 6-7.

In short, the TCC in its Reply appears to suggest that it now intends to make motion to dismiss-type arguments as to the Claims alleged in the Securities Action. While the Debtors generally agree with those the arguments, the Debtors have not agreed to allow the TCC standing to litigate the merits of the underlying Claims—the Debtors have only agreed to allow the TCC to argue whether the Claims are direct or derivative, an issue which does not in any way turn on the merits of the underlying Claims. As discussed, the Stipulation expressly states that the Debtors grant of standing to the TCC is for the "sole purpose" of allowing the TCC to file and prosecute the Draft Complaint. *See* Stipulation ¶ 2. The Draft Complaint does not contain a

---

Former Shareholders in the Shareholder Complaint filed in the [Securities] Action are classic derivative claims . . . ."); ¶ 60 ("The Shareholder BK Claims, and any further individual proofs of claim asserting the same theory of damages, are derivative claims that are property of the Debtors' estates in these Chapter 11 Cases."); at 22 ("The TCC requests the Court enter . . . (a) Judgment declaring the Shareholder Claims are derivative corporate claims and not direct shareholder claims . . . (b) Judgment declaring that the Shareholder BK Claims filed in the Chapter 11 Cases are the same derivative claims pleaded against the Debtors by the Former Shareholders in the [Securities] Action . . . ."

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

single reference to whether the allegations set forth in the Securities Action are "properly" pled. *See* Motion, Ex. B.[6]

As set forth in the Stipulation, the Debtors do not object to the TCC commencing and prosecuting the Adversary Proceeding by filing the Draft Complaint and solely pursuing their theory that the Claims are derivative in nature. The Debtors do, however, object to any efforts by the TCC to litigate the merits of the Claims, including, but not limited to, the sufficiency of the allegations set forth in the Securities Action. The Debtors, therefore, request that any order be consistent with the language of the Stipulation and state that the TCC's standing "shall be *limited to the sole purpose of a determination as to whether the Claims are derivative claims*."[7] The Debtors reserve the right to object to any assertion of arguments by the TCC regarding the merits of the underlying Claims or the Securities Action—arguments that the TCC has no standing to make.

b. The Debtors' D&O Insurance Program

The TCC Reply also contains various statements about the Debtors' director and officer ("**D&O**") insurance program that misstate how the insurance works. The Court need not—and should not—address these significant insurance issues, which have no bearing on the TCC's Motion. Indeed, the TCC is not a party to any of the Debtors' insurance agreements, and does not speak for the Debtors or any party to those agreements. Nevertheless, because the TCC's misstatements, if accepted, could induce the Debtors' insurers to make arguments to diminish, perhaps significantly, the amount of insurance available to fund the liabilities of the Debtors' estates, the Debtors are compelled to provide a brief response.

The TCC's first major error is to suggest that the D&O policies include a "single

---

[6] The Motion similarly does not contain any such reference.

[7] The Stipulation's Recitals are also clear as to the scope of the contemplated standing to be transferred. *See* Stipulation ¶ B ("The TCC seeks standing to commence in these Chapter 11 Cases an adversary proceeding . . . seeking a declaratory judgment that certain claims . . . brought by current and former holders of securities of PG&E Corp. . . . are, in fact, derivative claims belonging to the Debtors' estates.").

'Wrongful Act' exclusion" and that this purported exclusion "provides that any payout or settlement of the Securities Action . . . could erase as much as a half billion dollars of policy limits . . . ." TCC Reply at 2-3. Specifically, the TCC contends that the "Debtors' D&O insurance policies provide that if the insurers make any payment on account of a settlement or judgment in any lawsuit, then coverage is excluded for any other lawsuit that pleads the same 'wrongful act' or any 'wrongful act' that shares any 'common nexus' with any wrongful acts pleaded in the settled or resolved action." *Id.* at 3.

The TCC's statement regarding the insurance policies is wholly incorrect. There is no provision in the D&O policies that states that the policies will respond only to the first alleged Wrongful Act that results in a covered claim, leaving all other claimants empty-handed. The D&O policies do not work that way, at all.

The relevant coverage grants of the D&O policies instead provide that the policies cover the "Ultimate Net Loss" (a term defined to include judgments, settlements, defense costs) that the insured parties must pay as a result of a claim first made against them during the policy period for a "Wrongful Act" that takes place during or before the policy period. The D&O policies define "Wrongful Act" as an "actual or alleged breach of duty, neglect, error, misstatement, misleading statement or omission actually or allegedly caused, committed, or attempted by" the insured.

The D&O policies expressly recognize that there could be multiple claims arising out of the same Wrongful Act, and they provide that in the event there are "Multiple Claims arising out of a single Wrongful Act," they "shall be deemed to be a single Claim." Accordingly, a potentially indefinite number of claims asserted by different parties arising out of the same Wrongful Act(s) could be covered under the D&O policies, provided that all of them would be treated as a single claim for purposes of the policies' self-insured retention and limits of liability.

The TCC appears to be focusing instead on the last sentence of the definition of Wrongful Act, which provides that "[a]ll breaches of duty, neglect, errors, misstatements, misleading statements or omissions . . . having as a common nexus any single or series of related

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

facts, circumstances, situations, events, transactions or causes shall be deemed to be a single WRONGFUL ACT." This is known as an "interrelated wrongful acts" provision. It does not, contrary to the TCC's statement, mean that in a multi-claimant scenario, only one claimant can recover. Instead, this provision defines the circumstances in which multiple Wrongful Acts will be combined together for various purposes under the D&O policies, including a determination of the applicable policy period, the pertinent self-insured retention, and the available limits of liability. The language does not do what the TCC mistakenly states: generate a race to the proceeds whereby once one claimant recovers anything, the rest are left in the cold.[8] Such a reading would be highly eccentric, and not, as the TCC asserts, "simple case law." TCC Reply at 3.

The second major error the TCC makes with respect to the Debtors' coverage is its assertion that "the Shareholder Complaint filed in the [Securities] Action, and every complaint filed in every pending self-described derivative shareholder action (the 'Self- Described Derivative Actions'), all plead the same allegations of mismanagement by the Debtors causing the North Bay and/or Camp Fires, and the billions of dollars in liabilities that arose from those fires." TCC Reply at 3. This contention blurs the distinction between the claims at issue in the securities and derivative cases, which involve different allegations of wrongful conduct that trigger two different sets of insurance limits. Blurring all of the allegations, as the TCC improperly does, risks providing the Debtors' insurers with arguments that would improperly

---

[8] "Interrelated wrongful acts" provisions have been the subject of California Supreme Court, California Court of Appeal, and Ninth Circuit decisions applying California law, holding that Wrongful Acts are interrelated only when they are logically and causally connected. *See, e.g.*, *Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 5 Cal. 4th 854, 855 (1993); *Fin. Mgmt. Advisors, LLC v. Am. Int'l Specialty Lines Ins. Co.*, 506 F.3d 922, 924 (9th Cir. 2007); *see also Feldman v. Illinois Union Ins. Co.*, 198 Cal. App. 4th 1495, 1504 (2011) (a single lawsuit can have some claims for relief that are interrelated with an earlier claim and some claims for relief that are not interrelated). The Florida case law that the TCC cites, *Continental Cas. Co. v. Wendt*, 205 F.3d 1258, 1264 (11th Cir. 2000), did not hold that once insurance had responded to a single claim, no further obligations were owed for interrelated claims. Instead, it held that an insurer was only obligated to pay one year's policy limits for related claims.

seek to limit their obligations under the policies.

The Debtors' D&O program falls into two different policy years—one running from May 2017 to May 2018, and one running from May 2018 to May 2020, and *each* affording more than $200 million in coverage.[9] Each set of policies applies on a "claims first made" basis, meaning that the insurers' obligations in each year are triggered by claims that are first asserted against the insured in that year.

There are multiple sets of claims that implicate the Debtors' D&O policies, including at least the following three: (1) Securities and derivative claims arising out of the 2017 North Bay Fires. These claims generally relate to allegations stemming from supposed failures by the Debtors and their directors and officers regarding vegetation management, which resulted in the downed trees that caused many of the 2017 North Bay Fires and, in turn, led to various losses and an associated stock drop. (2) New and different securities and derivative claims arising from the 2018 Camp Fire. These claims relate to an entirely different set of facts and allegations than the 2017 North Bay Fires. (3) Claims asserted in *Vataj v. Johnson* (Case No. 4:19-cv-06996-HSG), a securities action against four of the Debtors' executives, contains allegations concerning the Debtors' attempts to *avoid* forest fires in the Fall of 2019.

The distinction between the sets of claims is very important. Many of the Debtors' insurers have incorrectly asserted that the 2017 North Bay Fire claims, the 2018 Camp Fire claims, and *Vataj* share a "common nexus," which they assert to be a single course of mis-management. In so doing, the insurers seek to treat *all* of the sets of claims—no matter when they were made—as falling exclusively within the 2017 policy year, such that the insurers' obligations would be capped by the $200 million in limits of liabilities in that year. That is not correct, however, because, among other things, the fires (and efforts to avoid causing fires) do not share a common nexus of fact, and at least $200 million in 2018-2020 policy limits ought to be fully available to respond to the 2018 Camp Fire claims and *Vataj*. To the extent the TCC

---

[9] The Debtors extended their 2018-2019 D&O policies through May 20, 2020.

blurs together (presumably through a lack of clarity) the various events and allegations, the TCC is not just wrong, its imprecise and misleading language could be cited adversely (albeit improperly) to the interests of its constituents, the fire victims.

Ultimately, the Court of course does not need to address, for purposes of the Motion, whether the Claims fall into one or multiple policy years. That issue will be resolved separately between the insureds and their insurers. Additionally, any resolution of these insurance issues based on the TCC's arguments on this Motion would be both legally wrong and potentially prejudicial to the Debtors' efforts to ensure that the proper, maximum amount of D&O insurance coverage is available to address the various claims to which it responds. Again, none of those issues should be decided in the context of a motion relating purely to the TCC's standing.

Dated: April 10, 2020

WEIL, GOTSHAL & MANGES LLP
KELLER BENVENUTTI KIM LLP

/s/ *Richard W. Slack*
Richard W. Slack

*Attorneys for Debtors and Debtors in Possession*