William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Claimant and*

*Party to California Public Utilities Commission Proceeding I.19-09-016 to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19- 30088.*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>    -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>          Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*  All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(B) AND 1126(E) AND BANKRUPTCY RULE 2019**<br><br>**<u>Hearing:</u> Telephonic Appearances Only**<br>Date Request: April 21, 2020<br>Time: 10am PT<br>Place: Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA, 94102<br><br>Judge: Hon. Dennis Montali |

# **PRELIMINARY STATEMENT**

1.      I, William B. Abrams, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

2.      There is no doubt that votes are being solicited in direct violation of 11 U.S.C. §§ 1125(B) and 1126(E) and Bankruptcy Rule 2019 for the purposes of driving an early vote prior to disclosures and revelations coming out regarding the ongoing negotiations surrounding the trust agreement, registration rights agreement and other material matters for victim claimants.  These problems are being compounded by the undisclosed litigation financing and other conflicts of interest that exist and that are exacerbated by the Tort Claimant Committee (TCC) RSA provisions that are in direct violation of the law.  Indeed, gerrymandering, numerosity issues, bad-faith solicitation and many other issues are prevalent and have been thus far unreported to the court due to certain RSA clauses and other perverse financial incentives.  Respectfully, I ask the court to designate votes that have been improperly solicited and either restart the voting process free of these improper solicitations or issue a letter from the court asking victims to revote.  Anything short of these remedies would yield a tainted and unjust vote which the court could not rely upon to inform plan confirmation decisions.

## **ARGUMENT: Bankruptcy Rule 2019, Litigation Financing and Conflicts of Interest**

3.      **Bankruptcy Rule 2019** requires disclosures of conflicts and defines those broadly as "Disclosable Economic Interests" to include any economic interest that could affect the legal and strategic positions a stakeholder takes in a chapter 11 case beyond just claims and interests, including, among other things, short positions, credit default swaps, total return swaps, participations, and derivative instruments.  Given this, there are significant issues with the current voting process as these conflicts were not disclosed to the court or to victim claimants prior to the vote.  The Fire Claimant Professionals that are proponents of the plan have secured heavy litigation financing including what they have described as "lines of credit" with undisclosed terms and indications that there general conflicts of interest but without any real disclosure.  Alluding to conflicts of interest in a

public meeting is not the same as providing full disclosure of relevant conflicts in keeping with professional standards, bankruptcy rules or moral matters that need to be paramount to the court. As an example, I received a transcription of a meeting conducted by Mikal Watts of Watts Guerra LLP which I have independently verified with other sources as an accurate representation of a meeting held on December 8, 2019 at the Flamingo Hotel in Santa Rosa, CA.[1] This transcription describes a "line of credit" that is partially funded by investors on one or multiple sides of this deal. This transcript describes financial relationships with bondholders (Abrams Management, Apollo Management, Elliot Management, etc.) and equity stakeholders and others including Centerbridge LLP. This transcription describes Mikal Watts' meetings with these firms and key stakeholders in this case including attorneys representing the Official Tort Claimant Committee (TCC) and various Fire Claimant Professionals all signatories on the TCC RSA.

4. Now, what is not clear from this transcription is how much money is influencing at least some of these attorneys. If attorneys are making more money from these alternative sources to unduly influence or deliver a yes-vote this is directly in conflict with the interests of victims and the public at-large. Some of these attorneys may or may not have conflicts of interests. However, what is absolutely clear is that these types of muddied financial transactions to benefit victim attorneys have undermined the plan confirmation and voting processes. Did the decisions to switch from an all cash Bondholder plan to the Debtors plan have to do with the intermingling of funds from these sources? If this deal went the way of the Bondholders would Mr. Watts have to drop his 18,000 clients and remove himself from the case due to conflicts and therefore favored the equity backed deal? What other financial incentives or disincentives may have influenced this deal to the detriment of victim claimants? How much of this yes vote is influenced by Bruce Bennett who has equity interests in PG&E and was named in this transcription? Did these apparent conflicts and intermingling "lines of credit" have preconditions for attorneys to support a YES vote on the plan or to deliver a YES vote? I do not know the answers to any of these questions but what is clear from this transcription and from other sources is that the current plan of reorganization and the voting process has been irreparably harmed. At a minimum, the voting process should be redone and this court should seriously consider if the whole plan of reorganization should be abandoned and a new

---

[1] See Exhibit D, Email transcription of "Watts Town Hall" meeting, December 8, 2019, 6:30pm at Flamingo Hotel, Santa Rosa, CA

process defined free of conflicts so that PG&E victims and the public are not victimized yet again at the hands of PG&E and the parties that they influence.

## ARGUMENT: Clear Violations of 11 U.S.C. §§ 1125(B)

5.     **11 U.S.C. §§ 1125(B)** states "*An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.*"  Now, if you look at Exhibit A "Fire Settlement Facts" you can see that this was a full-page advertisement that ran on March 31, 2020 (see top right corner of ad) in the Press Democrat which reaches victims from the PG&E North Bay fires of 2017 and others.[2]  Given that this was the first day of the voting process and the vast majority of claimants had not received any disclosure statement, this is in direct violation of Section 1125(B) because claimants did not receive the disclosure statement until a later date.

6.     Even if the attorney sponsors and authors that launched this advertising campaign masquerading as a vote solicitation did send the disclosure statement electronically to their clients, this campaign clearly targets all victim claimants and not just those represented by the council listed on the very bottom of the advertisement.  I ask the court to verify the dates that electronic versions of disclosure statements were sent to clients to understand the extent to which these advertising campaigns violated Section 1125(B) .  Furthermore, the fact that the attorney sponsors of this ad placed their names in barely legible fine-print at the bottom of this advertisement demonstrates the degree to which they wanted to ensure that the broadest possible number of victims were targeted by this newspaper advertisement.  Please, consider that this is just one example of the many vote

---

[2] See Exhibit A: "Wildfire Settlement Facts", full page advertisement in Press Democrat, March 31, 2020 and accompanying text-to-vote solicitation example

solicitation documents with purely misleading characterizations of the plan sent by attorneys well prior to disclosure statements being received by victim claimants.

## **ARGUMENT: Clear Violations of 11 U.S.C. §§ 1126(E)**

7.    **11 U.S.C. §§ 1126(E)** states "*On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.*"  Please, refer to "Exhibit A" attached which shows one such bad-faith advertisement and then the text-by-phone voting process in "Exhibit B" to urge a yes-vote early in the process before the victim trust agreement and registration rights agreement are negotiated.  This is part of a very strategic well-funded campaign to undermine due process voting with things like multi-day robo-calls to badger victims until they vote.  These attorneys representing victims are pushing for this yes vote early to ensure the needed 2/3 vote is achieved before the debtors push back trust funding dates and before trust rules, stock dilution terms and other material issues are resolved.  This path to manipulate and cajole victims to vote before these material issues are resolved is an unjust process that will lead to a tainted vote if this court does not assure and cement this $13.5B settlement and associated terms and conditions.  Here is one such solicitation at a recent town hall event sponsored by Mikal Watts, Roy Miller and Joseph Earley who combined seem to represent over 50% of total victim claims:

**Mr. Roecker:** *Yes. Jake, he wants to know what the downsides to voting yes are.*  **Mr. Watts:** *So the downsides to voting yes is you won't be hearing from me until May 15th. I'm kidding. I got a lot of calls about too many calls to the house. And I apologize, guys. We're just trying to get you to vote. But those calls, every night I've got folks that tabulate. I've got a computer guy who's just brilliant named Matt Archer that counts all this stuff up, and then he takes you off the list for the next call. So as soon as we get ballots from everybody in that house, you'll stop getting calls from us about this, and we'll go back to communicating the way we have.*[3]

---

[3] See "Telephonic Town Hall" with a presentation of "Fire Settlement Facts", presented and sponsored by Joseph Earley, Roy Miller and Mikal Watts, April 4, 2020, Transcript page 79 (lines 13-25)

8.      Another example of solicitation in bad faith can be seen in "Exhibit C" which makes the bold claim to victims that "we alone have the power to decide whether to force PG&E to pay the $13.5 billion or to risk little or no payment at all."[4]  Is that anywhere close to factually correct?  Do victims really have the power to force PG&E to pay $13.5B?  Is this advertisement in keeping with the high ethical standards this court is to oversee?  This advertisement again is combined with text messaging voting to avoid those pesky disclosure statements and to push a YES vote early.  It is astonishing that attorneys avoid the disclosure statement when the debtors drove that content and the process to promote a yes-vote.  The TCC again was hindered from calling out risks and other material matters and stipulating those issues in the disclosure statement because of the RSA hush provisions.  How much money promoting these yes-vote campaigns (TV, radio, newspapers, online, etc.) is from outside sources and due to conflicts with PG&E shareholders, bondholders and others needs to be reported to the court.  Indeed, this is in direct violation of 11 U.S.C. §§ 1126(E) and compounded with many other ethical and legal issues due to attorneys not sharing "disclosable economic interests".   These disclosures and details about litigation financing should be promptly reported to the court.

9.      Some may say that there are other attorneys advising clients and disclosing these unresolved material issues associated with the victim settlement.  Unfortunately, this is largely not the case because of the provisions within the TCC Restructuring Support Agreement (RSA).  These hush and gag clauses within the RSA prevent otherwise fair-minded professional attorneys from providing a balanced view of the plan and keep them from disclosing attorney conflicts of interest.  This RSA was executed months prior to the Bondholder RSA which created significant financial problems for victims but certainly helped to support the realignment of interests between shareholders and bondholders as proponents of the plan and to ensure that some victim attorneys were onboard to promote their interests.  Indeed, the TCC negotiations are significantly impaired by the RSA regarding the remaining terms of the trust which seemingly cannot be overcome unless they break the RSA, resign from the TCC or reject the plan of reorganization.  Please, keep in mind that four attorneys did not sign the restructuring support agreement on moral grounds.  This dissent among TCC members should have raised red flags for the court but still the core parties pressed on

---

[4] See Exhibit C, "ParadisePost.com Ad to vote and Force PG&E to pay the $13.5B", Joseph Earley, received April 16, 2020

valuing expediency of plan approval over the efficacy of the process and just outcomes. The AB1054 June 30, 2020 deadline has been leveraged affectively as a scapegoat to justify these procedural tradeoff. The following clauses ensure that the disclosure statement, vote solicitation materials and other victim facing documents are one-sided and misleading to support a yes-vote for the plan:

- *(2.g) each Consenting Fire Claimant Professional **shall** use all reasonable efforts to advise and recommend to its existing and future clients' (who hold Fire Victim Claims) to (i) **support and vote to accept the Amended Plan**, and (ii) to opt-in to consensual releases under Section 10.9(b) of the Amended Plan;*

- *(2.k) **the TCC shall** provide the Debtors a letter, in form and substance agreed to by the Debtors, the Requisite Consenting Fire Claimant Professionals and the Shareholder Proponents, from the TCC that the Debtors may **distribute to holders of Fire Victim Claims** along with the solicitation **materials in respect of the Amended Plan in which the TCC advises and recommends holders of Fire Victim Claims to vote to accept the Amended Plan***

- *(2. o,i) **each Party shall not**: object to, **delay, impede, or take any other action to interfere with acceptance, confirmation, or implementation of the Amended Plan**, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization;*

10. Taken together, these clauses ensure that no balanced information or real description of the risks will make their way to victims. Indeed, the earlier described vote-solicitation tactics and statement by Mikal Watts' may seem out of bounds but in the context of these "shall" clauses may be in keeping with these unjust RSA terms. Regardless, these efforts are in direct violation of 11 U.S.C. §§ 1125(B), 1126(E) and bankruptcy rule 2019. Furthermore, the fact that these RSA clauses are in direct contradiction to rules of professional conduct did not get in the way of the majority of the TCC members signing this agreement. These rules of professional conduct include but are not limited to rules 1.2, 1.3 and 1.4. As an example, rule 1.4(b) states "*a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation*". Now, there is an exception called out in the following clause:

*1.2(b) "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, is not otherwise prohibited by law, **and the client gives informed consent**."*

It is important to keep in mind that no such client "informed consent" has been provided by victim claimants and thus their full and fair informed consent should have prohibited these clauses from making their way into the TCC RSA. These same rules of professional conduct should require attorneys with disclose their conflicts of interest to the court and to their clients but unfortunately this did not occur undermining this whole proceeding.

## <u>CONCLUSION</u>

11.     So, it is clear that the vote solicitation process was set up as a manifestly unjust process to rush a 2/3 YES vote before the trust agreement and registration rights agreement were finalized. If this vote process is not remedied it will ensure that victims will be short-changed and victimized again due to undisclosed financial conflicts which make the YES vote a more lucrative proposition for certain victim attorneys. All-cash settlements that would be in the best interest of victims were likely bypassed by some victim attorneys due to perverse financial incentives and cozy relationships with entrenched investors. This combined with bad-faith vote solicitations void of needed disclosures provided a voting environment full of fantasy but void of facts.

12.     Many wildfire survivors like me have joined together in good faith to help educate victims regarding the risks and benefits of the plan. These all-volunteer efforts through forums and websites provide a more balanced view of the plan because they are not bound by the RSA and not infected with financial conflicts. However, these grassroots efforts are no match for the comingled dollars of attorneys pushing the YES vote with empty promises of $13.5 billion. I strongly urge the court to designate improperly solicited votes, demand the disclosure of financial conflicts of interest and litigation financing so that victims can really understand the strange alliances working to subvert their just settlement and their due process rights.

Dated:  April 18, 2020

Respectfully submitted,

William B. Abrams

Claimant

## Exhibit B: "Text Voting"



**Exhibit C: Paradisepost.com Ad to Vote and "Force PG&E to Pay the $13.5B"**



**Wildfire Victims Should Vote to Accept
the PG&E Settlement**

**By Joe Earley**

Like my family, friends and neighbors, I lost everything I owned
when the Camp Fire destroyed our communities. PG&E has
agreed to pay $13.5 billion to com-pensate victims of this fire and
others caused by its equipment. While we lawyers negotiated this
proposed settlement, it is our vote as Fire Victims alone that
decides whether the settlement will happen. We alone have the
power to decide whether to force PG&E to pay the $13.5 billion or
to risk little or no payment at all. As one of the lawyers who
represents over 12,000 of my friends and neighbors from
Paradise, and surrounding communities, I write to address some
false information that has been circulating (especially on social
media) and to explain why I encourage you to join me in voting to
accept this settlement. The simple and irrefutable fact is that this
is a good settlement and there is no viable alternative available.

**Click here for more Information**



7:30 🔋 ◎ 🡇 🡇 ▣          ♀ ✕ ⊿ 74%▣

←          🔒 Paradisepost.com          •••

Individuals and families can purchase
groceries online using their EBT card at
Amazon and Walmart. If you receive
CalWORKs, you may also be able to use your
cash benefits to make purchases online at
Wal-Mart.

**Related Articles**

- Ban on freshwater fishing? California
  weighs options due to coronavirus
- Coronavirus: The six things that must
  happen before California reopens

◁          ○          ▢

III          ○          ‹