# EXHIBIT A

Proposed Decision

STATE OF CALIFORNIA GAVIN NEWSOM, *Governor*

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

April 20, 2020      Agenda ID #18340
Ratesetting

TO PARTIES OF RECORD IN INVESTIGATION 19-09-016:

This is the proposed decision of Administrative Law Judge Peter V. Allen. Until and unless the Commission hears the item and votes to approve it, the proposed decision has no legal effect. This item may be heard, at the earliest, at the Commission's May 21, 2020 Business Meeting. To confirm when the item will be heard, please see the Business Meeting agenda, which is posted on the Commission's website 10 days before each Business Meeting.

Parties of record may file comments on the proposed decision as provided in Rule 14.3 of the Commission's Rules of Practice and Procedure.

The Commission may hold a Ratesetting Deliberative Meeting to consider this item in closed session in advance of the Business Meeting at which the item will be heard. In such event, notice of the Ratesetting Deliberative Meeting will appear in the Daily Calendar, which is posted on the Commission's website. If a Ratesetting Deliberative Meeting is scheduled, ex parte communications are prohibited pursuant to Rule 8.2(c)(4)(B).


/s/ MICHELLE COOKE for

Anne E. Simon
Chief Administrative Law Judge


AES:avs
Attachment

333204578      - 1 -

Case: 19-30088    Doc# 6892-1    Filed: 04/22/20    Entered: 04/22/20 17:59:14    Page 2 of 11

Decision **PROPOSED DECISION OF ALJ ALLEN**  (Mailed 4/20/2020)

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088. | Investigation 19-09-016 |

**DECISION APPROVING REORGANIZATION PLAN**

proceeding, the Commission does not adopt an earnings adjustment mechanism here.[17]

### vi. Executive Compensation

Executive Compensation is addressed in both AB 1054 and ACR Proposal 9. Public Utilities Code Section 8389(e)(4) and (e)(6) state:

> (e) The executive director of the commission shall issue a safety certification to an electrical corporation if the electrical corporation provides documentation of the following:
>
> […]
>
> (4) The electrical corporation has established an executive incentive compensation structure approved by the division and structured to promote safety as a priority and to ensure public safety and utility financial stability with performance metrics, including incentive compensation based on meeting performance metrics that are measurable and enforceable, for all executive officers, as defined in Section 451.5.  This may include tying 100 percent of incentive compensation to safety performance and denying all incentive compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities.
>
> […]
>
> (6) (A) The electrical corporation has established a compensation structure for any new or amended contracts for executive officers, as defined in Section 451.5, that is based on the following principles:
>
> (i) (I) Strict limits on guaranteed cash compensation, with the primary portion of the executive officers' compensation based on achievement of objective performance metrics.

---

[17] The issue of a safety-based earnings adjustment mechanism remains within the scope of the PG&E Safety Culture Investigation (I.15-08-019).

  (II) No guaranteed monetary incentives in the compensation structure.

 (ii) It satisfies the compensation principles identified in paragraph (4).

 (iii) A long-term structure that provides a significant portion of compensation, which may take the form of grants of the electrical corporation's stock, based on the electrical corporation's long-term performance and value. This compensation shall be held or deferred for a period of at least three years.

 (iv) Minimization or elimination of indirect or ancillary compensation that is not aligned with shareholder and taxpayer interest in the electrical corporation.

(B) The division shall approve the compensation structure of an electrical corporation if it determines the structure meets the principles set forth in subparagraph (A) and paragraph (4).

(C) It is the intent of the Legislature, in enacting this paragraph and paragraph (4), that any approved bankruptcy reorganization plan of an electrical corporation should, in regards to compensation for executive officers of the electrical corporation, comply with the requirements of those paragraphs.

In addition, ACR Proposal 9 sets forth nine components that PG&E's executive compensation plan should include:

- Publicly disclosed compensation arrangements for executives;
- Written compensation agreements for executives;
- Guaranteed cash compensation as a percentage of total compensation that does not exceed industry norms.
- Holding or deferring the majority or super-majority of incentive compensation, in form of equity awards, for at least 3 years.

- Basing a significant component of long-term incentive compensation on safety performance, as measured by a relevant subset of by the Safety and Operational Metrics to be developed, as well as customer satisfaction, engagement, and welfare.  The remaining portion may be based on financial performance or other considerations.
- Annual review of awards by an independent consultant.
- Annual reporting of awards to the CPUC through a Tier 1 Advice Letter compliance filing.
- A presumption that a material portion of executive incentive compensation shall be withheld if the PG&E is the ignition source of a catastrophic wildfire, unless the Commission determines that it would be inappropriate based on the conduct of the utility.
- Executive officer compensation policies will include provisions that allow for restrictions, limitations, and cancellations of severance payments in the event of any felony criminal conviction related to public health and safety or financial misconduct by the reorganized PG&E, for executive officers serving at the time of the underlying conduct that led to the conviction.  Implementation of this policy should take into account PG&E's need to attract and retain highly qualified executive officers.

PG&E presented testimony on its executive compensation structure to show that it complied with the requirements of AB 1054.  (Ex. PG&E-1 at 7-1 through 7-23.)  A number of parties offered criticism of PG&E's executive compensation program, including TURN, Cal Advocates, SBUA, MCE, and TCC.  This section first discusses the statutory requirements, and then turns to ACR Proposal 9.

The requirements set forth in the statute for the structure of an executive compensation plan are detailed and complex.  Looking at some of the criticisms and concerns raised by TURN provides some perspective on how challenging a

Case: 19-30088    Doc# 6892-1    Filed: 04/22/20    Entered: 04/22/20 17:59:14    Page 6 of 11

task it will be to properly develop, implement and monitor an executive compensation plan that complies with state law and policy.  Among other things, TURN argues that PG&E has not provided enough information regarding the reasonableness of the numerical milestones that establish the threshold, target and maximum levels for each metric; that PG&E's two LTIP [Long-Term Incentive Plan] public safety and reliability 'metrics' are not metrics at all, but rather are what the Commission has called "Program Targets," in that they simply measure how much work PG&E has carried out to meet self-imposed targets, rather than whether that work has met desired safety goals (citing to D.19-05-036); PG&E's proposed STIP [Short-Term Incentive Plan] metrics need more detail and clarity to meet AB 1054's measurable and enforceable requirements; and PG&E has failed to provide criteria or metrics for reducing or eliminating incentive compensation in response to catastrophic events.  (TURN Brief at 68-79.)

> TURN would also add four more components to the ACR list:
>
> • Achievement milestones should be calibrated to incent improvement, not provide guaranteed compensation. […]
>
> • Incentive compensation should be based on outcome-based (performance) metrics, not program targets. […]
>
> • Metrics on which incentive compensation is based should be measurable, enforceable and objective and not subject to manipulation in ways that undermine the safety purpose of the metric. […]
>
> • Metrics that encourage reducing customer minutes of PSPS events are warranted to limit the harm to customers from PSPS, and should be balanced by metrics that encourage reducing the number of ignitions that occur in locations and weather conditions that have the highest risk of catastrophic wildfires. […]  (*Id.* at 82.)

Case: 19-30088    Doc# 6892-1    Filed: 04/22/20    Entered: 04/22/20 17:59:14    Page 7
of 11

The criticisms of PG&E's executive compensation plan raised by TURN and other parties may have merit, but given the schedule of this proceeding, the detail and complexity of the issues, and the need to address executive compensation thoroughly and carefully, we simply cannot adequately review, analyze and resolve in this decision the issues that have been presented.

The question then becomes how to more thoroughly address executive compensation issues. TURN and Cal Advocates recommend that the Commission address PG&E's executive compensation plan in further proceedings. TURN recommends:

> The decision in this proceeding should direct PG&E to submit a revised ECP [executive compensation plan]. […] The revised ECP should direct PG&E to provide workpapers and other supporting documents to show how PG&E derived the achievement milestones (threshold, target and maximum) for each metric and how achievement of different milestones affects the award of compensation. In addition, for each proposed metric, the Commission should require PG&E to provide complete definitions that prevent subjectivity and manipulation of the results. This revised ECP should be subject to further discovery and record development, perhaps in a workshop. Parties should then be given an opportunity to provide comments on the revised ECP, based on a schedule that allows sufficient time for the necessary detailed analysis and recommendations. (TURN Brief at 83.)

Cal Advocates has a similar, if less detailed, recommendation:

> To address PG&E's failure to provide detailed information to demonstrate an effective Executive Compensation program, the Public Advocates Office recommends that resolution of this proceeding include a Commission directive that the Commission keep the Safety Culture Proceeding (I.15-08-019) active and address unresolved ACR Executive Compensation concerns in that proceeding. (Cal Advocates Reply Brief at 6.)

For purposes of this decision, we find that PG&E's executive compensation plan minimally and conditionally satisfies the requirements of Public Utilities Code Section 8389(e)(6)(C), subject to further proceedings before this Commission. The plan will be further strengthened by the adoption of the components of the ACR Proposal 9.

Turning to ACR Proposal 9, parties who commented, including PG&E, TURN, SBUA, MCE, TCC, were largely if not completely supportive. No party opposed the proposal. PG&E agreed to all of the elements of the proposal, with two exceptions, noting that "most of those proposals track the structure PG&E has proposed." (PG&E Opening Brief at 163.) TURN gave qualified or full support for the proposals, further arguing that some of the provisions should be strengthened (for example arguing that the restrictions on severance payments in the event of a felony conviction of the company should be extended to include any violations of the conditions of PG&E's probation).

PG&E raised concerns with two provisions in the ACR Proposal 9. First, while PG&E supports the presumption that a material portion of executive incentive compensation be withheld if PG&E is the ignition source of a catastrophic wildfire, it argues that PG&E, not the Commission, should determine the applicability of this presumption and whether it should be overcome. PG&E contends that the company's boards will have greater access to information and be better positioned to make this decision. (PG&E Brief at 166-167.)

TCC responds that leaving this decision to PG&E "has not worked well in the past" and would be equivalent to "leaving the fox to guard the henhouse considering PG&E's long and less-than-stellar safety history." (TCC Reply Brief 30-31) TURN proposes a hybrid under which PG&E would make the initial

Case: 19-30088    Doc# 6892-1    Filed: 04/22/20    Entered: 04/22/20 17:59:14    Page 9 of 11

determination as to whether PG&E had caused a catastrophic event that warrants reduction or elimination of incentive compensation, but that this decision would be subject to Commission review and modification.  (TURN Reply Brief at 58-59.)

We agree with TURN and TCC. The Commission is in the best position to make an objective determination about whether the utility's conduct justifies a departure from this presumption.  It can best balance the interests of promoting safety and properly aligning executive incentives.

Second, PG&E objects to the requirement that its compensation policies include provisions that limit or cancel severance payments for executive officers in the event of certain felony criminal convictions by the company, on the grounds that these restrictions would apply whether or not an executive is personally liable for criminal misconduct, and would thus undermine its ability to recruit qualified leadership.  The provision, however, only applies to a narrow range of the most serious corporate wrongdoing -- felony convictions related to public health and safety or financial misconduct.  It also addresses PG&E's concern directly by providing flexibility in its implementation, noting that implementation of the policy should "take into account PG&E's need to attract and retain highly qualified executive officers."  TURN would eliminate this flexibility, arguing that "an executive officer who is worried about leading the company into another criminal conviction is one that should not be hired," (TURN Opening Brief at 82.)

MCE, while supporting the ACR, argues that the long-term incentive compensation provision should be changed so that it is based on PG&E's financial health, rather than its financial performance, and that the incentive structure should not use shareholder-focused metrics such as earnings per share.

(MCE Opening Brief at 51-52.) However, as PG&E notes, company earnings is a well-developed financial metric that is familiar to utility investors, and is also consistent with the AB 1054 requirement that the executive compensation structure be designed to promote "financial stability."[18] (PG&E Reply Brief 106-107)

As a whole, ACR Proposal 9 will promote public accountability, independent review, and incentives that further the purposes of AB 1054, and should be adopted. In addition to implementing the components of the ACR, PG&E shall provide additional information for the further refinement of its executive compensation plan in the proceeding for the development and implementation of safety and operational metrics described above, or other proceeding as directed by the Commission.

### c. Climate

AB 1054 requires the Commission to determine if the plan of reorganization and related documents are "consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state." (Public Utilities Code section 3292(b)(1)(D).

In its testimony, PG&E asserts that it has been in compliance with the state's climate goals, including the Renewables Portfolio Standard (RPS) and procurement requirements, and will continue to do so. More specifically, PG&E points out that its plan of reorganization provides that PG&E will assume all power purchase agreements, renewable energy power purchase agreements, and Community Choice Aggregation servicing agreements. (Ex. PG&E-1 at 9-20.)

---

[18] Public Utilities Code section 8389(e)(4).