# Exhibit 1

Case: 19-30088    Doc# 6981-1    Filed: 04/29/20    Entered: 04/29/20 11:35:08    Page 1 of 157

| Last Name | First Name |
|---|---|
| Abshire | Dylan (MINOR) |
| Abshire | Devan (MINOR) |
| Aderna | Matt |
| Aldrich | Debbie |
| Aldrich (Tonning) Jr | Ernest |
| Alva Jr. | Anthony |
| Anderson | Luke |
| Anderson (Part of Anderson family trust) | Brian |
| Anderson | Jessica |
| Anderson | Elijah |
| Anderson | Lucas *MINOR* |
| Anderson | Korra *MINOR* |
| Anderson | Tiffany |
| Anderson | Renee |
| Anderson | George |
| Anderson | David |
| Anderson | Michelle |

| | |
|---|---|
| Anderson | Carissa (MINOR) |
| Anguiano | Carolyn |
| Asada | Curtis |
| Asada | Diane |
| Autio | Kevin |
| Avram | Nancy |
| Avram | Trevor |
| Baker | Carol |
| Bankston | Larry |
| Baptist | Jo Ann |
| Baptist | Leon |
| Baptist | Leon Jr |
| Barkey | Robert |
| Barkowski | Sheryl |
| Bartos | Todd |
| Bascom | Dave |
| Bass | Wayne |
| Bassett | Brooklyn (minor to Ivan and Staci Bassett) |
| Bassett | Ivan |
| Bassett | Staci (*also has Zackary Lopez as minor son signed up) |
| Batson | Steven |
| Bayly | Richard |
| Belster | Nancy |
| Bennet | Velvet |
| Bilodeaux | Mike |
| Bilodeaux | Sierra |
| Bilodeaux | Travis |
| Bingham | David |
| Bitzan | Jayne |
| Black | Terry |
| Blocker | Bill |
| Blocker | Edith |
| Boch | Jeremy |

| Last Name | First Name |
|---|---|
| Boch (Minor) | Daisy |
| Bohan | Dylan |
| Bohannon | Janet |
| Bohannon | Curt |
| Borchers | Kuniko |
| Bowers | Marlon |
| Bravo | Donald |
| Britton | Jacob (MINOR) |
| Britton | Wendy |
| Brodehl | Corina |
| Brodehl (Hart) | Cassandra *MINOR* |
| Brodehl (Hart) | Blaina *MINOR* |
| Brooks | Jerry |
| Brooks | Jackie |
| Brower | Brooke |
| Brower | Gary |
| Brown | Chris (+MINOR Lacy Brown) |
| Brown | Nancy (+MINOR Lacy Brown) |
| Brown | Lacy Brown (MINOR TO CHRIS BROWN) |
| Brown | Renee |
| Brown | Joey |
| Brown | Brodee (MINOR) |
| Brown | Bailee (MINOR) |
| Brown | Owen (MINOR) |
| Bruns | Eugene |
| Bruns | Sueann |
| Buckingham | Lenore |
| Burdick | Roxanne |
| Burton | Travis |
| Cabral | Michael |

| Cabral | Melodie |
|--------|---------|
| Carlson | Janai |
| Carlson | Melissa |
| Carson | Brian |
| Carter (Nystrom) | Ambrosia *MINOR* |
| Carter (Nystrom) | Kameron *MINOR* |
| Cassing | Damon |
| Cassing | Tim |
| Cassing (Anderson-Cassing) | Laura |
| Cassing | Caitlin (MINOR) |
| Cassing | Gretchen |
| Cassing (Anderson-Cassing) | Cale |
| Caswell | Cindy |
| Caswell | Jeff |
| Caswell | Brittany |
| Chavera | Mario |
| Cibart | Connie |
| Clark | Jason (MINOR to Jennifer McCurdy) |

| | |
|---|---|
| Clark | Kinsey (MINOR TO Miranda Mize) |
| Cline | Larry |
| Cline | Kelvin |
| Coady | Carol |
| Coady | Erin |
| Coady | Genevive (*MINOR*) |
| Coady | John |
| Coady | Sarah |
| Coady (Carr) | Owen |
| Coady | William |
| Cole | Jackie |
| Collins | Michelle |
| Colvert | David |
| Colyer | Art |
| Colyer | Joan |
| Couchot | Leslie |
| Couchot | Maurice |
| Couchot | Justin (Father to Justin, Jaxton, and Jace) |
| Couchot | Jaxton Donald (MINOR TO JUSTIN COUCHOT) |
| Couchot | Jace Nunziato (MINOR TO JUSTIN COUCHOT) |
| Couchot | Justin Maurice (MINOR TO JUSTIN COUCHOT) |
| Courtney | Susan |
| Courtney | John |
| Courtney | William |
| Cousino | Jeremy |
| Cranney | Jeremy |
| Crawford | Travis |
| Critchfield | David |
| Crowley | Marc |

| Last | First |
|---|---|
| Croyro | Lisa |
| Croyro | Roger |
| Croyro | Dierdie *Deceased |
| Cruces | Joseph |
| Cruces | Linda |
| Csonka | Andrew |
| Csonka | Valerie |
| Daniels | Cody |
| Daniels | Desiree |
| Davina | Elizabeth |
| Davis | Kristina |
| Deady | David |
| Deady | Wanda |
| Dearing | Rebecca (and MINOR Keylonnie Pearson) |
| Diamond (with Rickson Dise | Klara Anna |
| Divine | Lavinia |
| Dodge | John |
| Dombrowski | Evelyn |
| Dutter | Debra |
| Earp | Leann |
| Edwards | Charlotte |
| Egelak | Chrystal |
| Eiselt | Sean |
| Eiselt | Richard |
| Ely | Doris |
| Emery | Paige Williams |
| English | Jerelyn |
| Eselin | Diana |
| Estes | Ryder (MINOR TO SHANNON EVANS) |



| Last Name | First Name |
|---|---|
| Evans | Andrew |
| Evans | Shannon (+ MINOR Ryder Evans) |
| Evans | Ryder (MINOR TO SHANNON EVANS) |
| Ewell | Robert |
| Ewing | Paula |
| Fair | Amber |
| Faircloth | Andy |
| Farley | Michael |
| Femino | Stephana |
| Fingarson | David |
| Fischer | Doug |
| Fischer | Edith |
| Fischer | Lupe |
| Fischer | Kevin |
| Fischer | Zachary |
| Fischer | Erica |
| Flaherty | Jamie |
| Flaherty | Michael |
| Fleming | Emily |
| Fleming | John |
| Fleming | Paulette |
| Foster | Gary |
| Foster | Gary Lynn |
| Fox | Winston |
| Freer | Aaron |
| Fuller | Annie |
| Funkhouser | Justin |
| Gallegos | Jason |
| Gallegos | Patricia |
| Gannon | Nicholas |
| Gannon | Vanity Earl *MINOR* |
| Garcia | Hannah |
| Genna | Nicholas |
| Giambroni | Joe |
| Gibaldi | Brian |
| Gibaldi | Mary |
| Giden | Malachi (MINOR TO TEELA GIDEN) |
| Giden | Sabarius (MINOR TO TEELA GIDEN) |
| Giden | Teela (+ 2 MINORS ABOVE) |
| Gilbert | Jennifer |
| Gilliland | Garret |
| Glass | Bonnie |
| Glass | Clifford Jr |
| Glass | Clifford Sr |
| Glass | Stuart |
| Glass | Vincent |
| (Golart) Brodehl | Gavin *MINOR* |
| Golart | Loren |
| Golden | Jacob |
| Gonzales | Gregg |

| Last Name | First Name |
|---|---|
| Gran | Anita |
| Green Jr | Charles Robert |
| Green | James |
| Gribble | Starling |
| Griffin | Virginia Patricia |
| Griffin | Thomas |
| Griffin | Sean |
| Grosse | Richard |
| Hall | Marilyn |
| Hans | Darin |
| Harris | Shawn |
| Harvest | Aeon |
| Harvey | Scott |
| Hegenbart | Dan |
| Hegenbart | Dana |
| Henderson | Mike |
| Henning | Kimberly Lois |
| Hess | Michelle |
| Hess (Minor) | Blake |
| Hildreth | Deanna (& MINOR Dustin Smith) |
| Hillis | Tim |
| Hinman | Delbert |
| Hittelman | Jeff |
| Hittelman | Yolanda |
| Hoffman | Douglas |
| Holleyman | Alan |
| Holleyman | Bonnie |
| Holmes | Susan |

| Last Name | First Name |
|---|---|
| Hopson | Bud (Bascom) |
| Howell | John |
| Howell | Patricia |
| Hubert | Dena |
| Hubert | Kenneth |
| Hudson (Wright) | Shelly |
| Hutton | Vincent |
| Hutton | Peggy |
| Iliff | Dianna |
| Ingeus | James |
| Jacques | Gina |
| Johnson | Casey |
| Johnson | Cynthia Louise |
| Johnson | Gina |
| Johnson | Jennifer |
| Johnson | Kai (MINOR to Christy Smith) |
| Joseph | Howard |
| Joseph | Lorna |
| Kakkonen | Birgit (PK) |
| Kakkonen | Jarmo |
| Kakkonen | Pertti (Pepe) |
| Kelly | Margaret |
| Kelly | Kevin |
| Kelley | Sharlene |
| Kemen | Terri |
| Kemen | Christopher |
| Kemper | Eric |
| Kidd | Anna |
| Kirchubel | Isaac *MINOR* |
| Klassen | Theresa |
| Klassen | Jeff (Theresa Klassen's |
| Klassen | Brandon (Theresa |
| Klassen | Ken (Theresa Klassen's |
| Klemn | Timothy |
| Knopf | Daniel |
| Knopf | Lisa |
| Knopf | Riley (MINOR CHILD to Daniel & Lisa) |
| Koski | Ashleigh |
| Koski | Tyler |
| Lane | James |

| Last Name | First Name |
|---|---|
| Lang | Ashley |
| Lang | Benjamin |
| Lang | Meeka *MINOR* |
| Lang | Memphis *MINOR* |
| Larson | Gregory |
| Larson | Christopher |
| Lee | Brandon |
| Lee | Brittani |
| Lively | Terry |
| Lopez | Deborah |
| Lopez | Cory |
| Lopez | Zackary (** MINOR to Staci Bassett) |
| Lougee | Richard |
| Lucas | Benjamin |
| Luke | Holly |
| Lynn | Taylor |
| Macomber | John (Woody) |
| Madea | Linda |
| Magneson | Heidi |
| Mallan | Dell |
| Manas | Bohumil |
| Mangham | Danny |
| Martin | Patricia |

| | |
|---|---|
| Massey | Lori |
| Mathews | Melissa |
| Mattingly | Hugh |
| Mattingly | Rachel |
| Mawer | Serina |
| Mawer | Tim |
| Mays | Steven |
| McCabe | Pamela |
| McCall | Richard |
| McCoy | Carol |
| McCurdy | Jennifer |
| McFarland | Sean JR. |
| McFarland | Sean SR. |
| McLaughlin | Adan |
| McLaughlin | Laura (Tim Caving has her Power of Attorney) |
| McMahon | Mike |
| Medeiros | Thomas |
| Meldrum | Karter |
| Metcalf | Sharron |
| Metcalf | Richard |

| Last Name | First Name |
|---|---|
| Miller | Brandy |
| Miller | John |
| Miller | Rita (with Aaron Freer) |
| Minsart | Dan |
| Minsart | Michele |
| Mirabal | Brianna (wife/mother) |
| Mirabal | Ella (MINOR) |
| Mirabal | Erik (husband/father) |
| Mirabal | Matthew (MINOR) |
| Mirabal | Ryan (MINOR) |
| Mize | Miranda (& MINOR Kinsey Clark) |
| Mize | Gary |
| Molina | |
| Montarbo | David |
| Moore | Trenton |
| Morales | Gloria |
| Moran | Guillermo Emmanuel (MINOR of Carmen Torres) |
| Moran | Guillermo |
| Moran | Isaac (MINOR of Carmen Torres) |
| Morse | Michael Ryan |
| Morse | Donald |
| Morelock | Georgina |
| Mott | Jeffrey |
| Mott | Patricia |
| Mullen | Gloria |
| Munger | Rev. Mike |
| Murray | Michelle |
| Nance | Jonathon |
| Nelson | Alison |
| Nelson | Molly *MINOR* |
| Nelson | Rylie *MINOR* |
| Nelson | Teegan *MINOR* |
| New | Diane |
| Nichols | Megan |

| | |
|---|---|
| Nichols | Nicholas |
| Nichols (Minor) | Nevaeh |
| Nickerson | Mark |
| Nix | Vicky |
| Nolan-Estrella | Leslie |
| Nott | Jessica |
| Nystrom | Victoria |
| O'Shaughnessy | Charles |
| O'Shaughnessy | Yvonne |
| Oliver | David Joe |
| Oliver | Karen |
| Osborn | Mike |
| Osborn | Judy |
| Otterson | Caroline Pituso |
| Otterson | Miles |
| Pacheco | Bailey (MINOR TO GABRIEL PACHECO) |
| Pacheco | Gabriel (+ MINOR) |
| Page | Gordon |
| Parsons | Gary |
| Parsons | Roxanne |
| Parsons | James |
| Pearson | Raylonnie (MINOR to Rebecca Dearing) |
| Perry | Dominic (MINOR TO BRAD PERRY, A WXRA CLIENT) |
| Perry | Penelope (MINOR TO BRAD PERRY, A WXRA CLIENT) |
| Petersen | Martin |
| Petersen | Sue |
| Pickard | Jessica |
| Pickett | Debbie |
| Pickett | Paul |
| Pilgram | Barbara |
| Pilgram | Andy |
| Pitt | David |
| Pitt | Elizabeth |

| | |
|---|---|
| Pope-Rix (Ed Pope Family Trust) | Jaime |
| Porter | Cassandra |
| Porter | Dustin |
| Porter | Jonathon |
| Quigley | Lori |
| Railey | Daniel |
| Railey | Leah |
| Reece | Beverly |
| Reece | Richard |
| Rickson | Paul |
| Rickson | Kandice |
| Rickson | Shawnee |
| Rickson | Trevor |
| Richards | Glenn |
| Richards | Carol |
| Robertson | Diane |
| Robertson | Ronald |
| Robinson | Shere L. |
| Robinson | Faith *MINOR* |
| Robinson | Sally |
| Rohrbacker | Keith |
| Rohrbacker | Becky |
| Rosales | Naomi |
| Rosales | Jeremy |
| Rosales | Eva MINOR |
| Rosales | Dane MINOR |
| Royal | Carol |
| Royal | David |
| Royal | Larry |
| | |
| Ruff | Joseph |
| Ruff | Victoria |
| Ruffino | Charles |
| Ruiz | Guadalupe (MINOR OF CARMEN TORRES) |
| Russo | Asiya **(MINOR TO ANGELA TREVINO)** |
| Russo | Caitlyn **(MINOR TO ANGELA TREVINO)** |

| | |
|---|---|
| Russo | Rollin (MINOR TO ANGELA TREVINO) |
| Ryan | Robert |
| Sacksteder | Carey |
| Sacksteder | Phil |
| Sandoval | Mary |
| Sandoval | Joseph |
| Saechao | Kao |
| Salazar | Catherine |
| Salazar | Frank |
| Salinas | Inez |
| Salerno | Randy |
| Saltalamacchia | Thomas |
| Saltalamacchia | Sierra |
| Santiago | Julio |
| Schnoor | Kalise *MINOR* |
| Schnoor | (Stacy) Kirk |
| Schnoor | Leana *MINOR* |
| Schnoor | Lisa |
| Schnoor | Shalee |
| Schnoor | Taleigha |
| Scott | Denise |
| Scott | Trishia |
| Scott | George |
| Seaman | Ken |
| Seefried | Amanda |
| Seefried | Conner *MINOR* |
| Seefried | Rowan *MINOR* |
| Severson | David |
| Severson | Valeri |
| Sherwood | Charlotte (MINOR OF MARIANEE WARNER) |
| Shreve | Tesla |
| Shreve | Ryan |
| Shreve | Declynn *MINOR* |
| Shreve (Hodgkin) | Ryleigh *MINOR* |
| Shute | Josh |
| Sikut | John |
| Silverman | Benjamin |
| Smith | Christy (has MINOR Kai Johnson) |
| Smith | Douglas |
| Smith | Dusti (MINOR TO Deanna Abbott) |
| Smith | Kenneth |
| Smith | Mary |

| Last Name | First Name |
|---|---|
| Smith | Robert |
| Smith | Jonah |
| Soto | Frederick |
| South | Bonie |
| South | Gary |
| Spinney | Sabrina |
| Spreen | Edward |
| Spreen | Roberta |
| Stanford | Patty |
| Stephens | Melody |
| Stephens | Vernon |
| Strang | Steve |
| Strang | Mary |
| Stegall | Maureen |
| Stevens | Albert |
| Sutter | Corine |
| Sutter (Glass) | Mason |
| Sutter (Glass) | Bonnie *MINOR* |
| Sutter (Glass) | Vivian *MINOR* |
| Swan | Isaac *MINOR* |
| Sykes | Kathy |
| Tashiro | Ken |
| Taylor | Eleanor Jane |
| Taylor | Devona |
| Taylor | Loreli *MINOR* |
| Taylor | Tom |
| Taylor | Kathy |
| Taylor | Monic |
| Taylor | Samantha |
| Teeter | Alyssa |
| Teeter | Tory |
| Thiessen | Lawrence |
| Thomas | Jeff |
| Thonfeldt | Colton |
| Tipton | Jaren (TIP WILMARTH) |
| Tominello | Jennifer |
| Torres | Carmen (with the Moran family, has 3 MINORS) |
| Torres | Angelgabriel (MINOR) |
| Torres | Brisa Noemi (MINOR) |
| Torres | Carlos Kristian (MINOR) |
| Torres | Dayanara Estrella (MINOR) |
| Torres, Jr. | Jose |
| Torres | Leonardo (MINOR) |
| Torres | Pureza |
| Towne | Austin |
| Towne | Kathy |
| Towne | Richard |
| Tovey | Rebecca |
| Trent | Sara |
| Trevino | Angela (+3 MINORS) |
| Trezek | Catherine |
| Turner | Stan |
| Uradzionek | Louis |
| Uradzionek | Barbara |
| Vance | Reginald |
| Vanderwerff | Erik |
| Vanderwerff | Lori |
| Vang | Po |

| | |
|---|---|
| VanHorn | Rosie |
| VanHorn | Thomas |
| Vega | John |
| Vega | Judy |
| Vega | Valarissa MINOR |
| Vega | Nathaniel MINOR |
| Viktord | Kathleen |
| Vollmer | Derek |
| Von Stockhausen | Nicole |
| Vinson | Katherine |
| Wagner | Amanda |
| Wagner | Ashton *MINOR* |
| Wagner (actually Coomes) | Keaton *MINOR* |
| Wagner (actually Coomes) | Shawn |
| Wagner (actually Coomes) | Zaden *MINOR* |
| Wagner | Craig |
| Wagner | Greg |
| Waldemar | Mary Susan |
| Walters | Perry |
| Ward | Kristina |
| Ward | Nancy |
| Warner | Marianne |
| Watters | Derrick |
| Watters | Terry |
| Watters (-Muscetta) | Anieka (Minor) |
| Watters | Christian (Minor) |
| Weston | Kathleen |
| Weston | Robert |
| Wharton | Nicole |
| White | Allegra |
| Williams | Corey |
| Williams (Strang) | Elisabeth |
| Williams | Norman |
| Wilkie | Joyhce |

| | |
|---|---|
| Wilmarth | Mary |
| Wilson | Alexandria |
| Wilson | Tramaine |
| Wilson | Laurie |
| Wimmer | Linda |
| Wimmer | Jerry |
| Wood | Mark |
| Worley "MINOR" | Coen |
| Wortham | Glenn |
| Wright | Russell |
| York | Richard |
| Young | Robert |
| Young | Gilberta |
| Young | Ryan |
| Zablockis | Aleksandr |
| Zinn | Patricia |

| Last | First |
| --- | --- |
| Akam | Theresia |
| Angel | Jessa |
| Austin | Shiloh |
| Baptist | Jared |
| Behm | Barry |
| Behm | Eric |
| Berry | Adam |
| Bieghler | Robert |
| Bishop | Karen |
| Bishop | Will |
| Boulom | Souvanny |
| Brown | Cyrena |
| Brown | Susan |
| Bunce | Alli *MINOR* |
| Carter | Jordan |
| Covert | Ronald |
| Cox | Steven |
| Cox | Pamela |
| Deckman | Rob |
| Deckman | Ava |
| Deckman | Justin |
| Deckman | Brianna |
| Deckman | Brittany |
| Doe | Robert |
| Donnelson | Troy A. |

| | |
|---|---|
| Ducommun | David |
| Ducommun | Neatia |
| Dunn | James |
| Farris | Keith |
| Finafrock | Erin |
| Franklyn | Dianna |
| Genna | Evan |
| Genna | Mike |
| Genna | Tonja |
| Gill | Jack |
| Glass | Genevieve |
| Gurule | Albert |
| Gurule-Gallegos | Monique |
| Hicks | Alfred |
| Holz | Sandra |
| Hutton | Jenny |
| Jenkins | Arthur |
| Jensen | Ruth |
| Jensen | Earl |
| Kern | James |
| Kern | JoAnn |
| Landelius | Karen |

| Lewis | Joyce |
|---|---|
| Lyons | Pamela |
| Marino | Victor |
| Mitchell | Deborah |
| Moore | Allene Lyn |
| Myers | Donald |
| Myers | Shawn |
| Nagy | Laura |
| Needham | Michael |
| Norton | Robert |
| Oneal | Adrianna |
| Oneal | Cindy |

| | |
|---|---|
| Palomares | Amanda |
| Perry | Alicia |
| Perry | Brad |
| Peters | David |
| Peters | Roxanne |
| Petersen | Carol |
| Pitt | Sharon |
| Pitt | Richard |
| Potts | Alice |
| Rica | Mike |
| Richison | Eric |
| Richison | Melanie |
| Rippee | Scott |
| Rivas | Refugio |
| Robinson | Jeanene |

| | |
|---|---|
| Robinson | Brandi |
| Robinson | David Dean SR. |
| Robinson | Dorene |
| Robinson | Raylene |
| Seaton | Tiara Brooke |
| Seldon | Justice |
| Sobrero | Kimberly Lois |
| Stein | Kevin |
| Sumrall | Tosha |
| Swan | Cynthia R. |
| Swan | Debbie |

| | |
|---|---|
| Swan | David |
| Swan | Gloria |
| Tassi | Scott |
| Trojanowski | Tammy |
| Van Dyke | Tambra |
| Vasquez Jr. | Nicholas |
| Vasquez-Oneal | Nicolas<br>*MINOR* |

| | |
|---|---|
| Vasquez-Oneal | Jessie *MINOR* |
| Wagner | Justin |
| Weagel | Marie |
| Wells | Gary |
| Wells | Katherine |

| | |
|---|---|
| White | Michael |
| Wright | Bonnie |
| Wright | Brenda |
| Yang | Doua |

Case: 19-30088    Doc# 6981-1    Filed: 04/29/20    Entered: 04/29/20 11:35:08    Page 27 of 157

**Exhibit 2**

William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Claimant and*

*Party to California Public Utilities Commission Proceeding I.19-09-016 to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19- 30088.*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>   -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>          Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br>**WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(B) AND 1126(E) AND BANKRUPTCY RULE 2019**<br><br>**Hearing:** Telephonic Appearances Only<br>Date Request: April 21, 2020<br>Time: 10am PT<br>Place: Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA, 94102<br><br>Judge: Hon. Dennis Montali |

# **PRELIMINARY STATEMENT**

1.      I, William B. Abrams, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

2.      There is no doubt that votes are being solicited in direct violation of 11 U.S.C. §§ 1125(B) and 1126(E) and Bankruptcy Rule 2019 for the purposes of driving an early vote prior to disclosures and revelations coming out regarding the ongoing negotiations surrounding the trust agreement, registration rights agreement and other material matters for victim claimants.  These problems are being compounded by the undisclosed litigation financing and other conflicts of interest that exist and that are exacerbated by the Tort Claimant Committee (TCC) RSA provisions that are in direct violation of the law.  Indeed, gerrymandering, numerosity issues, bad-faith solicitation and many other issues are prevalent and have been thus far unreported to the court due to certain RSA clauses and other perverse financial incentives.  Respectfully, I ask the court to designate votes that have been improperly solicited and either restart the voting process free of these improper solicitations or issue a letter from the court asking victims to revote.  Anything short of these remedies would yield a tainted and unjust vote which the court could not rely upon to inform plan confirmation decisions.

## **ARGUMENT: Bankruptcy Rule 2019, Litigation Financing and Conflicts of Interest**

3.      **Bankruptcy Rule 2019** requires disclosures of conflicts and defines those broadly as "Disclosable Economic Interests" to include any economic interest that could affect the legal and strategic positions a stakeholder takes in a chapter 11 case beyond just claims and interests, including, among other things, short positions, credit default swaps, total return swaps, participations, and derivative instruments.  Given this, there are significant issues with the current voting process as these conflicts were not disclosed to the court or to victim claimants prior to the vote.  The Fire Claimant Professionals that are proponents of the plan have secured heavy litigation financing including what they have described as "lines of credit" with undisclosed terms and indications that there general conflicts of interest but without any real disclosure.  Alluding to conflicts of interest in a

public meeting is not the same as providing full disclosure of relevant conflicts in keeping with professional standards, bankruptcy rules or moral matters that need to be paramount to the court. As an example, I received a transcription of a meeting conducted by Mikal Watts of Watts Guerra LLP which I have independently verified with other sources as an accurate representation of a meeting held on December 8, 2019 at the Flamingo Hotel in Santa Rosa, CA.[1] This transcription describes a "line of credit" that is partially funded by investors on one or multiple sides of this deal. This transcript describes financial relationships with bondholders (Abrams Management, Apollo Management, Elliot Management, etc.) and equity stakeholders and others including Centerbridge LLP. This transcription describes Mikal Watts' meetings with these firms and key stakeholders in this case including attorneys representing the Official Tort Claimant Committee (TCC) and various Fire Claimant Professionals all signatories on the TCC RSA.

4.     Now, what is not clear from this transcription is how much money is influencing at least some of these attorneys. If attorneys are making more money from these alternative sources to unduly influence or deliver a yes-vote this is directly in conflict with the interests of victims and the public at-large. Some of these attorneys may or may not have conflicts of interests. However, what is absolutely clear is that these types of muddied financial transactions to benefit victim attorneys have undermined the plan confirmation and voting processes. Did the decisions to switch from an all cash Bondholder plan to the Debtors plan have to do with the intermingling of funds from these sources? If this deal went the way of the Bondholders would Mr. Watts have to drop his 18,000 clients and remove himself from the case due to conflicts and therefore favored the equity backed deal? What other financial incentives or disincentives may have influenced this deal to the detriment of victim claimants? How much of this yes vote is influenced by Bruce Bennett who has equity interests in PG&E and was named in this transcription? Did these apparent conflicts and intermingling "lines of credit" have preconditions for attorneys to support a YES vote on the plan or to deliver a YES vote? I do not know the answers to any of these questions but what is clear from this transcription and from other sources is that the current plan of reorganization and the voting process has been irreparably harmed. At a minimum, the voting process should be redone and this court should seriously consider if the whole plan of reorganization should be abandoned and a new

---

[1] See Exhibit D, Email transcription of "Watts Town Hall" meeting, December 8, 2019, 6:30pm at Flamingo Hotel, Santa Rosa, CA

process defined free of conflicts so that PG&E victims and the public are not victimized yet again at the hands of PG&E and the parties that they influence.


## ARGUMENT: Clear Violations of 11 U.S.C. §§ 1125(B)


5.      **11 U.S.C. §§ 1125(B)** states "*An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.*" Now, if you look at Exhibit A "Fire Settlement Facts" you can see that this was a full-page advertisement that ran on March 31, 2020 (see top right corner of ad) in the Press Democrat which reaches victims from the PG&E North Bay fires of 2017 and others.[2] Given that this was the first day of the voting process and the vast majority of claimants had not received any disclosure statement, this is in direct violation of Section 1125(B) because claimants did not receive the disclosure statement until a later date.


6.      Even if the attorney sponsors and authors that launched this advertising campaign masquerading as a vote solicitation did send the disclosure statement electronically to their clients, this campaign clearly targets all victim claimants and not just those represented by the council listed on the very bottom of the advertisement. I ask the court to verify the dates that electronic versions of disclosure statements were sent to clients to understand the extent to which these advertising campaigns violated Section 1125(B) . Furthermore, the fact that the attorney sponsors of this ad placed their names in barely legible fine-print at the bottom of this advertisement demonstrates the degree to which they wanted to ensure that the broadest possible number of victims were targeted by this newspaper advertisement. Please, consider that this is just one example of the many vote

---

[2] See Exhibit A: "Wildfire Settlement Facts", full page advertisement in Press Democrat, March 31, 2020 and accompanying text-to-vote solicitation example

solicitation documents with purely misleading characterizations of the plan sent by attorneys well prior to disclosure statements being received by victim claimants.

## ARGUMENT: Clear Violations of 11 U.S.C. §§ 1126(E)

7. **11 U.S.C. §§ 1126(E)** states "*On request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.*" Please, refer to "Exhibit A" attached which shows one such bad-faith advertisement and then the text-by-phone voting process in "Exhibit B" to urge a yes-vote early in the process before the victim trust agreement and registration rights agreement are negotiated. This is part of a very strategic well-funded campaign to undermine due process voting with things like multi-day robo-calls to badger victims until they vote. These attorneys representing victims are pushing for this yes vote early to ensure the needed 2/3 vote is achieved before the debtors push back trust funding dates and before trust rules, stock dilution terms and other material issues are resolved. This path to manipulate and cajole victims to vote before these material issues are resolved is an unjust process that will lead to a tainted vote if this court does not assure and cement this $13.5B settlement and associated terms and conditions. Here is one such solicitation at a recent town hall event sponsored by Mikal Watts, Roy Miller and Joseph Earley who combined seem to represent over 50% of total victim claims:

**Mr. Roecker:** *Yes. Jake, he wants to know what the downsides to voting yes are.* **Mr. Watts:** *So the downsides to voting yes is you won't be hearing from me until May 15th. I'm kidding. I got a lot of calls about too many calls to the house. And I apologize, guys. We're just trying to get you to vote. But those calls, every night I've got folks that tabulate. I've got a computer guy who's just brilliant named Matt Archer that counts all this stuff up, and then he takes you off the list for the next call. So as soon as we get ballots from everybody in that house, you'll stop getting calls from us about this, and we'll go back to communicating the way we have.*[3]

---

[3] See "Telephonic Town Hall" with a presentation of "Fire Settlement Facts", presented and sponsored by Joseph Earley, Roy Miller and Mikal Watts, April 4, 2020, Transcript page 79 (lines 13-25)

8.      Another example of solicitation in bad faith can be seen in "Exhibit C" which makes the bold claim to victims that "we alone have the power to decide whether to force PG&E to pay the $13.5 billion or to risk little or no payment at all."[4]  Is that anywhere close to factually correct?  Do victims really have the power to force PG&E to pay $13.5B?  Is this advertisement in keeping with the high ethical standards this court is to oversee?  This advertisement again is combined with text messaging voting to avoid those pesky disclosure statements and to push a YES vote early.  It is astonishing that attorneys avoid the disclosure statement when the debtors drove that content and the process to promote a yes-vote.  The TCC again was hindered from calling out risks and other material matters and stipulating those issues in the disclosure statement because of the RSA hush provisions.  How much money promoting these yes-vote campaigns (TV, radio, newspapers, online, etc.) is from outside sources and due to conflicts with PG&E shareholders, bondholders and others needs to be reported to the court.  Indeed, this is in direct violation of 11 U.S.C. §§ 1126(E) and compounded with many other ethical and legal issues due to attorneys not sharing "disclosable economic interests".   These disclosures and details about litigation financing should be promptly reported to the court.

9.      Some may say that there are other attorneys advising clients and disclosing these unresolved material issues associated with the victim settlement.  Unfortunately, this is largely not the case because of the provisions within the TCC Restructuring Support Agreement (RSA).  These hush and gag clauses within the RSA prevent otherwise fair-minded professional attorneys from providing a balanced view of the plan and keep them from disclosing attorney conflicts of interest.  This RSA was executed months prior to the Bondholder RSA which created significant financial problems for victims but certainly helped to support the realignment of interests between shareholders and bondholders as proponents of the plan and to ensure that some victim attorneys were onboard to promote their interests.  Indeed, the TCC negotiations are significantly impaired by the RSA regarding the remaining terms of the trust which seemingly cannot be overcome unless they break the RSA, resign from the TCC or reject the plan of reorganization.  Please, keep in mind that four attorneys did not sign the restructuring support agreement on moral grounds.  This dissent among TCC members should have raised red flags for the court but still the core parties pressed on

---

[4] See Exhibit C, "ParadisePost.com Ad to vote and Force PG&E to pay the $13.5B", Joseph Earley, received April 16, 2020

valuing expediency of plan approval over the efficacy of the process and just outcomes.  The AB1054 June 30, 2020 deadline has been leveraged affectively as a scapegoat to justify these procedural tradeoff.  The following clauses ensure that the disclosure statement, vote solicitation materials and other victim facing documents are one-sided and misleading to support a yes-vote for the plan:

- *(2.g) each Consenting Fire Claimant Professional **shall** use all reasonable efforts to advise and recommend to its existing and future clients' (who hold Fire Victim Claims) to (i) **support and vote to accept the Amended Plan**, and (ii) to opt-in to consensual releases under Section 10.9(b) of the Amended Plan;*

- *(2.k) **the TCC shall** provide the Debtors a letter, in form and substance agreed to by the Debtors, the Requisite Consenting Fire Claimant Professionals and the Shareholder Proponents, from the TCC that the Debtors may **distribute to holders of Fire Victim Claims** along with the solicitation **materials in respect of the Amended Plan in which the TCC advises and recommends holders of Fire Victim Claims to vote to accept the Amended Plan***

- *(2. o,i) **each Party shall not**: object to, **delay, impede, or take any other action to interfere with acceptance, confirmation, or implementation of the Amended Plan**, including, without limitation, support any request to terminate the Debtors' exclusive periods to file or solicit a plan of reorganization;*

10.    Taken together, these clauses ensure that no balanced information or real description of the risks will make their way to victims.  Indeed, the earlier described vote-solicitation tactics and statement by Mikal Watts' may seem out of bounds but in the context of these "shall" clauses may be in keeping with these unjust RSA terms.  Regardless, these efforts are in direct violation of 11 U.S.C. §§ 1125(B), 1126(E) and bankruptcy rule 2019.   Furthermore, the fact that these RSA clauses are in direct contradiction to rules of professional conduct did not get in the way of the majority of the TCC members signing this agreement.  These rules of professional conduct include but are not limited to rules 1.2, 1.3 and 1.4.  As an example, rule 1.4(b) states "*a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation*".  Now, there is an exception called out in the following clause:

*1.2(b) "A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances, is not otherwise prohibited by law, **and the client gives informed consent**."*

It is important to keep in mind that no such client "informed consent" has been provided by victim claimants and thus their full and fair informed consent should have prohibited these clauses from making their way into the TCC RSA. These same rules of professional conduct should require attorneys with disclose their conflicts of interest to the court and to their clients but unfortunately this did not occur undermining this whole proceeding.

## **CONCLUSION**

11.     So, it is clear that the vote solicitation process was set up as a manifestly unjust process to rush a 2/3 YES vote before the trust agreement and registration rights agreement were finalized. If this vote process is not remedied it will ensure that victims will be short-changed and victimized again due to undisclosed financial conflicts which make the YES vote a more lucrative proposition for certain victim attorneys. All-cash settlements that would be in the best interest of victims were likely bypassed by some victim attorneys due to perverse financial incentives and cozy relationships with entrenched investors. This combined with bad-faith vote solicitations void of needed disclosures provided a voting environment full of fantasy but void of facts.

12.     Many wildfire survivors like me have joined together in good faith to help educate victims regarding the risks and benefits of the plan. These all-volunteer efforts through forums and websites provide a more balanced view of the plan because they are not bound by the RSA and not infected with financial conflicts. However, these grassroots efforts are no match for the comingled dollars of attorneys pushing the YES vote with empty promises of $13.5 billion. I strongly urge the court to designate improperly solicited votes, demand the disclosure of financial conflicts of interest and litigation financing so that victims can really understand the strange alliances working to subvert their just settlement and their due process rights.

Dated:  April 18, 2020

Respectfully submitted,

William B. Abrams

Claimant

**Exhibit A: "Fire Settlement Facts"**

**Exhibit B: "Text Voting"**



## Wildfire Victims Should Vote to Accept the PG&E Settlement

### By Joe Earley

Like my family, friends and neighbors, I lost everything I owned when the Camp Fire destroyed our communities. PG&E has agreed to pay $13.5 billion to com-pensate victims of this fire and others caused by its equipment. While we lawyers negotiated this proposed settlement, it is our vote as Fire Victims alone that decides whether the settlement will happen. We alone have the power to decide whether to force PG&E to pay the $13.5 billion or to risk little or no payment at all. As one of the lawyers who represents over 12,000 of my friends and neighbors from Paradise, and surrounding communities, I write to address some false information that has been circulating (especially on social media) and to explain why I encourage you to join me in voting to accept this settlement. The simple and irrefutable fact is that this is a good settlement and there is no viable alternative available.

### Click here for more information

7:30  ⬛ 📶 ⬇ ⬆ 🔋                    📍 🌐 ◢ 74% 🔋

←        🔒 Paradisepost.com        ⋯

Individuals and families can purchase groceries online using their EBT card at Amazon and Walmart. If you receive CalWORKs, you may also be able to use your cash benefits to make purchases online at Wal-Mart.



### Related Articles

- Ban on freshwater fishing? California weighs options due to coronavirus
- Coronavirus: The six things that must happen before California reopens

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Transcript
**Date:** April 17, 2020 at 7:51 PM
**To:** Will Abrams sonomarebuild@gmail.com

Here's my transcript from Watts town hall

You guys have become my friends. I wanna be your daddy for like 20 minutes if you'll let me. And what I mean by that is - I've been doing this a long time. I watched people get burned. I've watched people get paid and lose their money. Give me 20 mintues.

Number one, I want to disclose to you something. There are all sorts of conflicts of interest out there that in assessing what I tell you, you need to consider. One of the reasons I come over and over and over again and do these meetings and refuse to leave until the last question is asked is I want you to trust me. I have to earn that trust. Watch out for people with conflicts of interests. Over at Camp, there were all sorts of other lawyers, sign up, sign up. All sorts of craziness going on. All sorts of litigation funders?? going on.

1:24 I want to disclose to you something that happened to me over the last 90 days. Don't worry about it. But I want to tell you about it because it's a good example.

1:36. SLIDE (WHAT TO EXPECT AFTER THE DEADLINE. A. POSSIBLY, A PRE-10/21/19 SETTLEMENT OF THE ENTIRE BANKRUPTCY. (september 26, 2019 -- nice hotel photo - I think this is the Hyatt Park bar in New York or something like that) OK, when we were here on the 15th, I think I told you that things are looking good. I met with these two guys. I think this is the Hyatt Park bar in New York or something like that. I pointed there. I said 'Yeah yeah, I had drinks with these great guys from this outfit called Centerbridge.' I've got a practice where everytime I make a bunch of money, I put it in my kids trust, my wife... I get hungry again then I go to work.

I have an operating line of credit, used to be with something called Frost (?) Bank, then it was Community Bank. ...

"2:18 About September, a group called Stifel contacts me and says, we hear you've got a bunch of fire cases. "Yeah" We'd like to help you - dah dah dah dah dah. Next thing you know, I've got this huge line of operating credit with this group called Stifel, who I don't know who they are, but they're nice.

2:32 They take me to this bar, they introduce me to a couple of guys from an outfit called Centerbridge. Real nice guys. (SWITCHES SLIDES: OCTOBER 4, 2019 10amET - 591295 Valero PFAS Science Day - Oct 4, 2019 9AM to 11AM Honorable Richard M. Gergel, J Waties Waring Judicial Center, Charleston Courtroom, 83 Meeting St, Charleston, SC 29401)

The next day I think, I'm down in South Carolina on a different case that has nothing to do with you. One day, I cheated on you, a little water contamination case called PFAS, and in the morning, I get a call from one of these Centerbridge guys who I've never met. And his name is Gavin Bareia. He says hey, I'd like to meet with you about your PG&E case. I say ' great'. The next day, I send him an email.

(INSERT SLIDE)

Reads from email: I enjoyed our call yesterday. Thanks for the heads up about your participation about Wednesday's bidding in San Francisco. Says he wants to get together with Frank Petre (check sp), our (!!!) lawyer Cecily Dumas. We're all about XX San Francisco. Great!

(SWITCHES SLIDES: OCTOBER 5, 2019 - Reuters - PG&E says it has $34.45 billion in debt financing for reorganization)

3:20 The following day, there's some article, I think it's one of the last things I shared with you, that PG&E's rounded up $34B in funding. And I'm looking and I see JPMorgan Chase, Bank of America, Barclays, Citigroup, Goldman Sachs, a very impressive group but I notice that number 12 is this group called Centerbridge that just offered me (another line? 3:39)

3:40 So my little BS meter goes up so I say, ok, that's alright. So we meet with them. The following day, I realize this is a fight between equity and bonds. Equity and debt. There's a group called Apollo Management, Elliott Management that puts up $29.2 billion. I say, ok, Apollo, that's interesting.

(SLIDE - an email b/w Mikal Watts and Gavin Baiera: gbaiera@ccnterbridge.com - GB: Are you here listening to Judge Donato? Judge landed in Texas. Enjoyed our time together.)

4:02 So I meet with this Gavin guy. It's in the Ritz Carlton in San Francisco and he's there meeting with a guy, Steve Skikos. A guy named Khaldoun Baghdadi. He's just out there shmoozing, trying to impress the flesh on behalf of equity.

4:17 And then I see that there's some guys from Apollo there and I realize for the first time that part of my operational line of credit through Stifel has been in effect cordoned off -- some to Centerbridge, some to Apollo, some to so-and-so, some to so-and-so. So I say holy, moly. I see what's going on here. These guys are trying to play me, right? So we did this deal (SWITCHES SLIDES to email between Watts and Baiera: "I just …)

And I meet with them, I said, ok, that's fine. And then next thing you know, I get introduced to Bruce Bennett and Tom Wagner. Bruce Bennett was PG&E's equity's lawyer, Tom Wagner is one of the guys trying to sell the deal. And the other guys go away. I say, okay, that's good. So I meet Wagner. I make my own independent judgement when I start negotiating with him. I say look, I look forward to talking to you in discussions. So that was about 6 weeks ago. (SHOWS EMAIL WITH WATTS/BENNETT/WAGNER)

(SLIDE: PG&E SHAREHOLDERS AT SETTLEMENT MEETING AT JONES DAY - shows photos of Bennett, Tom Wagner/Knighthead, David Abrams, Michael Stern/Stonehill)

I think in my last meeting, I showed you about these meetings with Knighthead, Tom Wagner, Abrams - this is the guy that owns part of the Raiders, Stonehill. So I go back. Do any of these guys own part of my no (??NOTES??) - none of them. Which is good. So this is the guys I've been negotiating with.

(SWITCHES SLIDE: NOV 5 - HAKKASAN DINNER MEETING WITH MAJOR EQUITY OWNERS - bruce bennett/Jones Day, Tom Wagner/KH, John Matulsky/Stonehill, Edward Mule/Silverpoint)

5:26 I tell you about this dinner with all these billionaire types. Again, I go back and check, none of the guys I negotiated have anything do anything to do with my note.

(SWITCHES SLIDE: NOVEMBER 5, 2019 Email between Watts and Apollo - William Jones wjones@apollo.com & Chris Lahoud - clahoud@apollo.com - Would you have a few minutes this afternoon or tomorrow to catch up on PG&E with Chris (copied on this email) and I? William Jones Cell: 540-553-5112 Office 917-296-5918)

5:40 Then I get a call from Apollo, who does have something to do with one of my notes. Which bothered me. But he said, well, I want to introduce you to a guy named Chris Lahoud. I don't know who Chris Lahoud is, but I say fine. I get on the phone with Chris Lahoud, and asked him what he was restricted ??? starts calling up on the baseline. Bondholders to the guys. And I should go with the bondholders not the equity guys. And I'm like, man, I'm getting played here. (getting wooed)

6:10 I said, look, let me be blunt, your money is no less green than the other guys. All I care about is how much there is, how much is in cash, how much is guaranteed and how we do this. (??When I recommend to my clients??) I don't care who loaned me what. My bankers. Remember back in the financial crisis, You know these mortgages - you get a mortgage, you get a mortgage, you get a mortgage. It got bottled up and sold to someone else. Apparently that's what's happened here. So I tell them all look, no dice. The best deal wins.

(SWITCHES SLIDES: NOV 6 - FOUR SEASONS BREAKFAST MEETING WITH MAJOR DEBT OWNERS)

I'm eating with all the bond guys. You remember me telling you this the last time (PHOTOS OF MICHAEL STAMER/AKIN GUMP, PAUL SINGER/ELLIOTT, SCOTT STRIEGEL/PIMCO, ADAM GUBNER/PIMCO)

6:50 I meet with these fellas. (??) (Points at Singer) I'm a bit concerned about this fella's reputation. Paul Singer. Lots of bad articles about him. But the PIMCO guys were quite outstanding. (NOV 9 - MEETING WITH BONDHOLDERS AT UT-K-STATE-FOOTBALL GAME; PHOTO WATTS WITH KIDS) I host this guy JEFF Rosenbaum at my box at UT. Super nice guy before we get into where's your money? (??just telling you) So I'm analyzing all these guys. I meet with their lawyer. I meet with the Pimco guys. Where's your money? How you getting my folks the cash? So we're going back and forth.

(SWITCHES SLIDE: NOV 18 EMAIL)

7:25 I ask them point-blank 'so are you sending me an RSA that says $13.5B half-cash, half-stock? It never comes. This is from ??. "The TCC should be receiving an RSA tomorrow" This is on November 17. It says that. We never get it.

7:40 Lahoud calls me, and I said, did it come? This is before Thanksgiving. (SWITCHES SLIDE SUBJECT: TRANSCRIPT) He says, hey there's a hearing in front of the judge where the governor's lawyer says you shouldn't go with equity -- the governor is going to hate it. The judge realizes the flaw.

I'm here to tell you point blank that either the governor of the state of California hates the equity deal, or he hates the bondholders deal. Both of them are spinning.

8:17 So we get to a mediation in mid-November. I'm ready to get you guys paid. The gov's office says we need 3 weeks to analyze the finances of these two proposals. We'd like to get back with you on the week of December 2. I'm like - ugh (sighs) 'three more weeks? That's awful.' We wait the three weeks. We give them - in effect- a veto right and on we go. So that's why the deal as announced on December 6. It coulda been announced November 15.

**THE GOVERNOR HAD REVIEWED IT**

(SWITCHES SLIDES)

8:49 About two hours before the deadline, (points) and why is that the deadline? I had given a challenge to the equity that say look, a lot of people say you don't have the money ??? what's called financial backstops.

You promised us $5.4 billion in cash. Give me $5.4 billion in backstops from other financiers who would tell me Wall Street likes the deal and will commit to fund it.

9:17 So in two weeks, the equity goes and doesn't get me 5.4 B - they get me 11.6 like that. (like that) SEC rules say they can't even solicit - they can only answer the phone so that was impressive to me. I get a call on Friday from the equity guys, I say look, the fact that we're not at 12, we held the deal open for some people who want to see the deal. If that's a problem, let me know and I'll have the other 400M ready in five minutes. Alright. The fact of the matter is when we signed the deal, we had an amazing five minutes.

So Wall Street likes this deal with equity.


SLIDE:

THE BONDHOLDERS' UPDATED "OFFER" December 6 -

$13.5B; $7.75 CASH

UP TO $500M MORE IF WIN ESTIMATION

DOWNSIDES

DELAY - IF MISS A.B. 1054 DEADLINE, IT'S OVER

RISK - IF LOSE ESTIMATION

ELLIOTT CAPITAL MANAGEMENT - DESTROYER


9:53 About an hour before it goes down, everybody's leaky. Lots of rumors. The bond guy says, hey, we're doing all this stuff, the governor hates the deal, oh by the way, we've got an updated offer for you - 2 hours before the deadline. The updated offer is we'll go to $7.75 in cash; up to $500M if you win the estimation hearing, which means we could lose it, which means delay. Lots of downsides. Number 1 is delay. You could get all sorts of litigation. If you have this litigation, you have substantial risk of missing the AB 1054 exit bankruptcy - June 30.

NUMBER Three - pretty litigious guy. I DON'T WANT to get into details about why I feel this way. All I will tell you is, Google Elliott Capital Management and Paul Singer, and make your own judgement. I'm a gut guy. A character guy. "GOOGLE WHAT AGAIN?" Google - Elliott Capital Management. I'm not telling you what to do. I'm just telling you my thinking.

Sent via the Samsung Galaxy S8+, an AT&T 5G Evolution capable smartphone

---

Page 1

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:                    ) Bankruptcy Case
                          ) No. 19-30088-DM
PG&E CORPORATION,         )
and                       ) Chapter 11
                          )
                          ) Jointly Administered
PACIFIC GAS AND ELECTRIC      )
COMPANY,                  )
                          )
Debtors.                  )

**********************************************
TELEPHONIC town hall
APRIL 4, 2020
**********************************************

---

Page 2

1        MR. WATTS:  This is Mikal Watts, and I
2    want to thank you for participating in our live
3    telephonic town hall.  We've done approximately 24
4    in-person town hall meetings, but because of the
5    coronavirus, it's necessary for us to adapt a new
6    technology to be able to do these telephonically.  This
7    is the third such meeting we've had.  We had one last
8    Saturday.  We had one Wednesday night.  And today we'll
9    do our third one.  But you can count your calendars,
10   every Saturday after this until the vote is over, and
11   that would be April 11th, April 18, April 25, May 2,
12   May 9, and the last day of voting is May 15, we'll
13   have a town hall that day as well.  All of them will be
14   at noon Pacific Daylight Time.
15       So feel free to tell all your friends,
16   whether or not they are Watts Guerra clients or Joe
17   Earley clients or Roy Miller clients or just not
18   represented at all, that everybody in the public is
19   welcome in these town halls.  This is our effort to get
20   the information out with respect to this settlement so
21   that people can appropriately make their vote as to
22   whether they wish to participate.
23       Under the bankruptcy rules, two-thirds of
24   the votes cast need to be in favor of the plan for it to
25   proceed forward for confirmation.  The deadline is

---

Page 3

1    May 15 of 2020, so make sure you get your ballots in
2    prior to the deadline.
3        With me here today are two attorneys with
4    whom I've worked carefully.  One is Roy Miller in the
5    Santa Rosa area.  The other is Joe Earley in the
6    Paradise area.  And I'd like each of them to talk to you
7    first.
8        Roy, are you on the line?
9        MR. MILLER:  I am.
10       Good afternoon, everyone.  Probably a good
11   number of you are clients of mine.  Some of you are
12   Paradise clients of Joe.  And for the last two plus
13   years we've been trying to help you through not just the
14   PG&E claims process, but the insurance and rebuilding
15   process, if you're clients of mine.
16       I understand that this whole layered
17   bankruptcy thing on top of a very complex tort case has
18   been stressful for everybody.  There is a lot of
19   information.  And so what we're doing is our best to
20   organize that information to you and get it to you in as
21   efficient a way as possible and then answering any
22   questions that you have.  Mikal will be taking questions
23   after the call.  Clients of mine can always reach me via
24   phone and e-mail and make sure that all of your
25   questions get answered so you can make an informed

---

Page 4

1    decision.
2        Thank you.
3        MR. WATTS:  Thank you, Roy.
4        Joe, are you on the line?
5        MR. EARLEY:  I am.
6        MR. WATTS:  Joe, go ahead.
7        MR. EARLEY:  Yeah, I want to take a second
8    to lay out a little bit of background and put in context
9    where your part in this and your contribution to this
10   effort.  So I want to let people know that don't know
11   this, when I had lost everything in the fire, I mean, I
12   was in a horrible place, frustrated and angry,
13   devastated, just like probably most of the people on
14   this line were.  I felt like I needed to do something.
15       So when I was contacted by Watts Guerra
16   and Mauro Archer and them and asked to join the group,
17   because I happen to be a practicing lawyer as well, I
18   saw that you guys were doing a really good job with your
19   people in North Bay.  You had a very good reputation.
20   So we talked at length about these things, and I felt
21   really comfortable.  Your people were happy, and it just
22   seemed like I could really contribute something here,
23   that, you know, I made this one request and that's --
24   because I have lived in Paradise.  I'm going to live in
25   Paradise again.  I'm going to probably die in Paradise.

1 (Pages 1 to 4)

1  It's really important that I'm involved at every level.
2       And I've listened to the concerns of my
3  community or this -- because you're all a big firm and
4  you do a lot of big cases.  It's really important to me.
5       So, anyway, you guys agreed, and it's made
6  me very happy.  You've been true to your word, and I
7  really appreciate that.  I feel like you've really
8  listened to what I've had to say and you respect our
9  community.  I know it's a big project and not everything
10  goes perfect, but you guys are always trying to bust
11  your tails to resolve any issues that I've bring up.  I
12  really appreciate that, and I think that our clients
13  need to know this.
14       So, anyways, many issues have come up,
15  before and after the bankruptcy.  Mikal has
16  always stayed on top of things, and he's always had a
17  good idea about how to deal with the various issues and,
18  really, what was underlying the issue so they could be
19  solved.  So with FEMA and Cal OES, they wanted to
20  plunder our fund, you know, people were screaming, well,
21  I am not going to vote for this.  When PG&E said it
22  wanted to pay its criminal penalties from our funds,
23  people were screaming, I won't vote for this.
24       And Mikal would tell me, don't worry,
25  we're negotiating.  It's not going to be a problem.

1  Just trust me, we're on top of it.  And every single
2  time Mikal has been right.  He's always known what's
3  going on.  He's always been on top of it.  So it seems
4  like something comes up every week.
5       So this week, you know, it's the TCC
6  concerns that, you know, some people are up in arms
7  about.  And when Mikal tells me don't worry, not going
8  to be a problem, I know he knows what he's talking
9  about.  So by next week there will be something else,
10  and this will be over and there will be something else.
11  It's going to be all the rage.  We'll deal with that.
12  We'll deal with every issue as they come up.
13       So my plan, trust Mikal.  We're going to
14  move forward on this plan, in my mind.  We're going to
15  get ready to get our claims processed, I'm confident.
16       But there is one final thing I want to
17  talk about, and that's this people are accusing us of
18  rushing people to vote right away, like there's some
19  kind of sneaky motive or something.  The truth is that
20  we've been inundated, just absolutely slammed with
21  requests by our clients to get their voting in now.
22  This is really important, in their view.  It's been
23  overwhelming.  People can always wait, if they want.
24  We'll let anybody wait.  But so many people don't want
25  to wait.  They want this deal done now so they can move

1  forward and not wait around forever to get that going.
2  I've talked to these people.  Their lives are destroyed,
3  and we need to help them as soon as we can.  We've got
4  the plan to do it.
5       So, anyway, that's all I've got to say
6  about that.  And thank you, Mikal, very much.
7       MR. WATTS:  Thank you, Joe.
8       And thank you for everybody getting on on
9  a Saturday.  We've got thousands of people on the line.
10  And my job for the time that we're on the line is to
11  give you as much information as I can so that you can
12  make an appropriate decision.
13       One of the things that we've done is we've
14  created a website called firesettlementfacts.com and
15  we've put a lot of time and there's a lot of videos that
16  are already on there, a lot of information that we just
17  filmed that we'll continue to add.  And this will be a
18  process where we'll continue to add information, that
19  you can go to this website firesettlementfacts.com to
20  learn why it is that I'm recommending that you vote for
21  the plan.
22       So let me just kind of tell you generally
23  why it is that I recommend that the fire victims vote
24  for this plan.  Now, I want to be honest.  I was in the
25  negotiation rooms negotiating this deal with the equity

1  participants who are putting up the tens of billions of
2  dollars it takes to bring PG&E out of bankruptcy to pay
3  all of its debts, to pay all of the fire victims.  This
4  is a plan that I negotiated.  I stand by it.  I think
5  it's in the best interest of the fire victims.  I now
6  want to explain to you why.
7       First, $13 and a half billion will help
8  rebuild your communities now.  Whether it's our friends
9  and neighbors in Paradise or our friends and neighbors
10  in the North Bay and the surrounding communities, a lot
11  of you were uninsured or underinsured.  Everybody
12  learned about the fact that you thought you were going
13  to get enough insurance to rebuild your homes, and
14  you're learning about when thousands of homes are burned
15  down at once, because of supply and demand, the cost to
16  replace those homes is much higher than the value of
17  them the day before the fire.  Therefore, this lawsuit
18  against PG&E is the only way that we can rebuild our
19  homes and businesses, but you must act now.
20       In order for PG&E to participate in this
21  new 20.5-billion-dollar risk pool to pay for any future
22  wildfire liabilities, they've got to meet a deadline of
23  June 30, 2020.  It was set by the state legislature in
24  AB-1054.  If PG&E doesn't meet that deadline, then we
25  don't have a plan.  The legislature included this very

1 deadline to allow fire victims to put pressure on PG&E
2 during the bankruptcy. This was necessary because most
3 large corporate bankruptcies take many years of
4 litigation before victims are paid. Even then, they
5 only get a small percentage of what they're actually
6 owed.
7     Let me give you three examples. The Dow
8 Corning's bankruptcy took nine years before breast
9 implant victims were paid only a portion of their
10 claims. Victims of Enron fraud, once it took
11 bankruptcy, waited eight years before they were paid
12 less than ten percent of their losses. There are plenty
13 other examples in the asbestos context.
14     Bankruptcy court traditionally takes many,
15 many years. It's being accelerated here because of the
16 deadline that the California legislature put in on June
17 30th. That is the primary reason that we had the
18 leverage to force PG&E to offer to pay us $13 and a half
19 billion. But if victims reject this 13.5-million-dollar
20 settlement, we'll be in the same boat as the folks that
21 tried to recover from Dow or Enron. No payments were
22 made for years. You'll get very little compared to the
23 13 and a half that's been agreed to.
24     I want to emphasize that point very
25 clearly. There are all sorts of deals that have been

1 struck that have achieved value that's left to be
2 available for the fire victims. I want to give you just
3 several examples.
4     No. 1, the insurance companies that paid
5 to rebuild a lot of these homes have paid over $15 and a
6 half billion. There's about 3.7 billion they have still
7 to pay. They're saying that they paid out $20 billion,
8 and they want their $20 billion back. Through strenuous
9 negotiation with these subrogation carriers, they agreed
10 to take $11 billion. That achieved $9 billion of extra
11 value that was available for the fire victims.
12 Likewise, there is a billion-dollar settlement that was
13 negotiated with the local municipalities and counties,
14 including the counties that we're talking about here.
15 Those were settled for $1 billion. Those claims are
16 worth $3 billion. That settlement achieved $2 billion
17 in value that was available to fire victims.
18     There is also a tax treatment, it's called
19 NOLs, net operating losses. There is a particular issue
20 in the tax code that says, look, as long as the company
21 is, in effect, reformulated by the same entity, you can
22 take advantage of those NOLs. About $7 and a half
23 billion that has been contributed by PG&E into the
24 estate to help do the things that are necessary to pay
25 everybody.

1 If this deal doesn't go under, by
2 agreement with the Governor, PG&E is going to be sold
3 off to other people. Now, what we're going to get for
4 it is a wholly different question in the world of a
5 coronavirus recession. But regardless of the sales
6 price, of the sell-off of PG&E, that $7 and a half
7 billion in value is lost. So you take 9 billion in new
8 claims from the insurers, 2 billion in new claims from
9 the local cities and counties, and a loss of $7 and a
10 half billion. Any subsequent deal has got to find a
11 massive amount of money before we're even back to where
12 we are now, and I'm here to tell you, I don't see a way
13 that that's ever going to happen.
14     So we have the delay problem. We have the
15 idea that if this deal is voted down, you got to come up
16 with 12, 15, $16 billion in new value just to get back
17 to where we are; and that is while taking on the risk of
18 future wildfires, because we'll no longer have the
19 AB-1054 20.5-billion-dollar fund.
20     I don't believe that the people of
21 Paradise can wait for years to rebuild their houses. I
22 fear if they do, it will never happen. Accepting this
23 settlement is the only way to make certain that
24 rebuilding happens within a reasonable period of time.
25     Secondly, the reality is this is the only

1 option on the table. There is no Plan B. There is no
2 other viable alternative available. No matter what
3 you're hearing from others, there's simply no other
4 party out there that has the ability to put up the
5 money. Let me talk to you about the options.
6     At one time the Tort Claims Committee had
7 cut a tentative deal with the bondholders. They said
8 they were going to put up all this money. The bottom
9 line is is that they disappeared. It seems as if their
10 involvement in late 2019 was solely to apply leverage to
11 require PG&E to pay them a higher rate of interest on
12 their bonds. They've since pulled that offer. They've
13 gone on to other things. What's worse, they were given
14 the option to participate in the equity financing of the
15 present deal, but when they were invited to do so, they
16 just went away. They're not involved anymore. So
17 they're not a viable alternative.
18     The second option I hear about is, well,
19 if we reject this settlement, we could get paid by the
20 State of California when it takes over the company. But
21 that's not true, either. There is a bill by Senator
22 Wiener that was filed in the California Senate that
23 would have resulted in a State takeover. But, for
24 whatever reason, Governor Newsom declined to officially
25 support this bill that would call for a State takeover

Worldwide Court Reporters, Inc.
(800) 745-1101

1 of PG&E.  And, more recently, after using that as kind
2 of a negotiation lever to extract valuable financial
3 concessions from the company, he came out in support of
4 this amended plan, this 13.5-billion-dollar settlement
5 instead.
6          Are there any other investors?  After all,
7 if the deal doesn't go through, then the agreement with
8 the Governor says it's got to be sold off.  There are no
9 other investors that wish to buy PG&E now, in the midst
10 of the recent stock market crash caused by the COVID-19
11 pandemic.  Nobody's lined up.  So if we reject this
12 settlement, there is no Plan B out there that's ready to
13 provide the money it would take to pay the wildfire
14 victims.  Again, there is no other deal on the table.
15          And, finally, this is something that I
16 think California should be proud of.  The deal mandates
17 safety improvements by PG&E and is supported by
18 California's Governor.  Governor Newsom drove a hard
19 bargain.  He negotiated the deal with PG&E that requires
20 the replacement of most of the members of the board of
21 directors.  Almost everybody that was there during the
22 fire is not there anymore.  He mandated
23 multibillion-dollar investments in grid hardening to
24 prevent future wildfires.  And the amount of money that
25 PG&E was spending on grid hardening versus what it's

1 going to have to spend over the next few years is just a
2 massive difference, massive difference, because Governor
3 Newsom wants to make certain this doesn't happen again.
4          Part of the way that he's achieved that
5 through the negotiation the company agreed to, he's
6 objectively defined safety requirements that the company
7 must meet by date certain, or it risks losing its
8 license to deliver electricity in Northern California.
9 Moreover, in order to make those costs as rate neutral
10 as possible for the rate payers, the agreement prevents
11 PG&E from using money to pay dividends for the next
12 three years.  So I think the company that's going to
13 come out is going to be a very different company that
14 went into bankruptcy.  Old PG&E destroyed your
15 communities is now in the history books.  New PG&E is
16 statutorily required by the deal with the Governor to
17 put its focus on safety and put people before profits
18 while they're rebuilding your homes.
19          So those are the three primary reasons
20 that I'm suggesting that you vote for it, though I want
21 to address some of the information that's been put out
22 in the literature and on social media about why you
23 shouldn't.  As Joe mentioned, there was this question
24 about whether or not victims are going to have to pay
25 the fine that PG&E has to pay in order to, you know,

1 plead guilty to 84 counts of manslaughter.  I can tell
2 you that the Butte County District Attorney offered to
3 indict PG&E for the lesser crime of arson if it would
4 just pay Butte County $200 billion extra.  Because that
5 high fine would reduce the funds available to the
6 victims, PG&E agreed to plead guilty to the more serious
7 crime of involuntary manslaughter, which carried only a
8 maximum fine of $3.48 million.
9          Now, since that happened, there was a big
10 article, as Joe mentioned, oh, my gosh, PG&E's asking
11 the victims to pay its fine.  That's not true.  What
12 happened was is the lawyers that were not named Mikal
13 Watts negotiated a deal with the bondholders last
14 summer, and it called for all the fines and penalties to
15 go into the victims' fund.  And I'm not critical of
16 that.  They were trying to get the money as high as they
17 could, with the idea that we could beat down the fines
18 and penalties, like what just happened here.
19 $200 million became $3.48 million.  But $1 of victims
20 paying for PG&E's fine for burning down its homes there
21 in the Camp Fire is too much.  I worked with PG&E, the
22 equity participants, the subrogation people, and they
23 have reached an agreement that none of that fine, not
24 one penny of that fine will be paid from the $13 and a
25 half billion to be placed into the fire victims' trust.

1          Secondly, as Joe mentioned, the original
2 big criticism of this plan is, wait a minute, it's a
3 13-and-a-half-billion-dollar fund, but FEMA has made a
4 claim for $3.9 billion.  The California Office of
5 Emergency Services made a claim for $2.4 billion.  You
6 add that together, that's over $6.3 billion.  There is
7 several hundred million dollars in claims from other
8 state and federal agencies.  What did you do?  The
9 government is going to take all the money back.  Again,
10 we asked for your patience.
11          I've been in more mediations about this
12 issue over the last six months than I would care to
13 admit to.  But the bottom line is all of those claims
14 from FEMA have been subordinated, which means they're
15 not paid until every fire victim is fully paid.  We sat
16 in the room and we explained to them, this means you're
17 not likely to get paid at all, and they understood it.
18 And FEMA did the right thing.  That was after making a
19 ridiculous claim on our money, they agreed to get in the
20 back of the line to allow victims to be paid first.
21 That had the corollary benefit of taking $3.9 billion in
22 claims and pushing it off the table.  But it's also
23 under what's called the Stafford Act meant that the
24 California Office of Emergency Services no longer had to
25 claim its $2.4 billion.  And Cal OES waived its claim,

Case: 19-30088   Doc# 6789-1   Filed: 04/29/20   Entered: 04/29/20 10:35:08   Page 49
of 157

1  meaning it will not get one dime from the fire victims'
2  fund.
3         So these criticisms that we've got these
4  massive governmental claims are going to be pulled out
5  of the fund is just not true.  There have been other
6  settlements from other federal agencies where the
7  agencies have agreed to take it not from the
8  13.5-billion-dollar fund, but from interest and stock
9  appreciation or from lawsuits that we're going to bring
10 against third parties in the future.  So it's kind of a
11 contingent recovery, but it will not come from the
12 victims' 13.5-billion-dollar fund.
13        Lastly, the big criticism I hear is how
14 can you ever require me to take shares in the company
15 that burned down my house?  The answer is we're not
16 requiring you to do that.  Let me put it clearly.  No
17 victim is going to be required to take stock in PG&E,
18 but you will have the option.  Let me explain how
19 that works.  The $13.5 billion is paid one half in cash
20 and one half in stock.  $6.75 billion in cash.  There
21 are three payments, $5.4 billion on the effective date,
22 $700 million on January the 15th of 2021, and
23 650 million on January the 15th of 2022.  To ensure that
24 those future payments are going to be made regardless of
25 what happens to PG&E, we made them spread the risk.

1  suggest that this value of stock could rise
2  significantly.
3         I'm not going to sit here and tell you
4  that Mikal Watts is a genius on stock appreciation.  I'm
5  not.  But I've talked to a bunch of people that are.  We
6  hope that the trust one day will be worth more than
7  $13.5 billion.  It's interesting to me that
8  organizations, California state agencies have agreed to
9  wait on their payment and will only be paid if the stock
10 appreciates.  Why do you think they agreed to do that?
11 Because they think the stock will appreciate.  Now,
12 whether and how much the stock appreciates, we'll have
13 to wait for the future, but right now the answer is no
14 one is required to take stock in this company.
15        Now, what I'd like to do, and then I'm
16 going to open this up for questions, is address several
17 things that happened this week.  First, there was an
18 announcement with respect to this CPUC fine of
19 $200 million.  Again, folks that negotiated with the
20 bondholders long before I got involved put together a
21 deal, $13 and a half million stock, cash, out of which
22 fines and penalties come.  The company negotiated a fine
23 with the CPUC for about $1.68 billion that would be
24 funded not out of our trust, but out of future
25 investments, accelerated investments.  So that was good.

1         So they collected $12 billion in financial
2  backstop commitments from some of the largest financial
3  institutions across the United States of America.  We
4  required PG&E to obtain these backstops as sort of an
5  insurance policy to make certain that all of these cash
6  payments that are owed would, in fact, be made
7  regardless of what happens to PG&E's finances in the
8  future.  And that's important, because the company has
9  almost $60 billion in debt to take care of in this
10 bankruptcy, and they didn't have enough money.  So what
11 did we also do?
12        It's not like we chose to take stock
13 because we wanted it.  We took all the cash that was
14 available.  We didn't guess.  We hired sophisticated
15 financial analysts who consulted in both the Tort Claims
16 Committee and the lawyers representing all the people,
17 the so-called consenting fire claimant professionals.
18 But because they had all that debt, we required in
19 addition that the holders of PG&E stock give the fire
20 victims part of their ownership stake in PG&E.  As a
21 result, the fire victims' trust will receive at least
22 22.4 percent of the new PG&E equity, which will then be
23 liquidated or sold off to pay the fire victims in cash.
24 We talked to a bunch of sophisticated financial analysts
25 who agree that the company's future projected earnings

1         We got thrown a little curve ball about a
2  month ago when CPUC raised that by $462 million, which
3  included the 200-million-dollar fine, which technically
4  at the time said it should have come out of the fire
5  victims' trust.  Now, of course, I called folks at the
6  equity and said, that's never going to work, nobody is
7  going to vote for that.  And so what has happened since
8  then?
9         No. 1, PG&E, at our suggestion, filed an
10 appeal of this fine itself, arguing that the very
11 existence of the fine imperils the viability of the
12 bankruptcy exit plan, which was not CPUC's intent.
13 Secondly, the Tort Claims Committee has either filed
14 papers or is about to that joins in PG&E's position,
15 asking that the fine be rescinded or tabled.  And,
16 thirdly, we've already made substantial progress in that
17 regard.  CPUC Commissioner Clifford Rechtschaffen issued
18 a notice just days ago where he spent five pages making
19 the case to the other commissioners about why the CPUC
20 should, in effect, rescind the fine altogether, and so
21 that's very good news.
22        And, basically, part of what he said is I
23 want you to permanently suspend it, quote, this is
24 appropriate due to the unique situation of PG&E's
25 bankruptcy, its indebtedness to hundreds of wildfire

1    claimants for loss of life, property, and the current
2    upheaval in the financial markets.
3            Putting that in regular English, they
4    screwed up making this fine. They shouldn't have made
5    it. They thought it would be a good way to look tough
6    and it does, but the bottom line is because of the
7    agreements with the financial backstop partners, it
8    would have been a death knell to this deal. And now
9    they're backing off, appropriately, with help from the
10   State of California.
11           Now, the last issue. I've talked about
12   this Camp Fire fine, these 84 counts of involuntary
13   manslaughter, and I just want to revisit one thing. The
14   way that's going to be paid is not from the trust, even
15   though the trust says it should be paid from the trust.
16   We knew that would be a big deal, if one penny was paid
17   from the trust. So what happened is over the weekend
18   between March the 27th and March the 30th a bunch of
19   people put their heads together, and the subrogation
20   carriers that are to be paid $11 billion agreed to wait,
21   and the interest on that $11 billion during that period
22   of time generates enough cash to cover the $4 million in
23   fines and expenses associated with the plea agreement
24   with the Butte County District Attorney. And PG&E has
25   put out a promise in terms of a press release, and it's

1    been accepted by the District Attorney. It is that its
2    fine will not reduce the amount of funds available to
3    satisfy wildfire victims' funds. Instead, that
4    4 million will be funded to the trust and paid from
5    income earned on the distribution to be made to the
6    subrogation claimants under the plan. As a result,
7    there will be no reduction in the amount available for
8    wildfire victims.
9            One last issue, and then I'm going to open
10   it up for questions. If you have a question, you need
11   to type in star 3. And the technology is a little
12   different this week. Last week, when you typed in star
13   3, I could actually hear your voice. This week, because
14   we opened this up to a public forum, I called a bunch of
15   my clients, but other individuals are calling in to
16   participate. So I think what's going to happen is we
17   have a moderator named Sam Roeker who will read the
18   questions off to me, and then I will answer them to the
19   best of my ability. So star 3, if you have questions,
20   call in and make your questions; and then Mr. Roeker in
21   a minute will start feeding them to me, and we will stay
22   on this line for the next 90 minutes while I answer as
23   many questions as I can in the two hours that we've
24   purchased this technology for.
25           And anything we don't get to, I want you

1    to, in effect, e-mail us. If you're a client from the
2    Camp Fire, e-mail chico@wattsguerra.com. If you're a
3    client from the North Bay area, e-mail us at
4    santarosa@wattsguerra.com. And if you're not a client,
5    I want to divide it up into two ways. I'm happy to take
6    questions from unrepresented persons. If you're
7    represented by another lawyer, I'm not allowed under the
8    rules to talk to you. And you called into this, and
9    there is no way I can stop it and make it an open town
10   hall, I'm happy that you're listening, but I cannot
11   answer your question. You need to go to your own lawyer
12   and get your questions answered there.
13           But last issues about what happened last
14   week that Joe promised that I would address it. Why the
15   resignations from the TCC. There are three individuals
16   who have resigned: Adolfo Veronese, Kirk Trostle and
17   Karen Gowins. These are represented -- Mr. Veronese is
18   represented by a lawyer named Francis Scarpulla and
19   Jeremiah Hallisey. I have the utmost respect for these
20   two gentlemen, but it would be fair to say that they
21   prefer to deal with the bondholders as opposed to the
22   present deal.
23           Mr. Trostle is a fine individual. I've
24   met him. I respect him. He's represented by a fine
25   lawyer named Tom Tosdale, and I'm going to address why

1    he dropped out in a second.
2            And then most recently, Karen Gowins who
3    is represented by two dear friends of mine, Steve and
4    Bonnie Kane. Good lawyers.
5            So why did they resign? Well, let me
6    explain what happened. The TCC, or the Tort Claims
7    Committee, has a law firm known as BakerHostetler.
8    They're bankruptcy specialists. They got over a
9    thousand lawyers. And they're good. They've done a
10   good job. I have no criticism of the BakerHostetler
11   firm. But as I am told, the BakerHostetler firm
12   representing the members of the TCC wrote a letter to
13   the members of the TCC basically telling them they
14   couldn't talk, and so they resigned so that they could
15   talk.
16           Mr. Trostle's letter was addressed to the
17   Assistant United States Trustee Timothy Laffredi on
18   March the 24th of 2020. Some of what Mr. Trostle said
19   was as follows: First, I've been advised by TCC counsel
20   I am restrained from exercising my First Amendment right
21   as a Camp Fire victim. Second, their opinion is I as a
22   TCC member cannot encourage fire victims how to vote on
23   the plan without violating my fiduciary duties,
24   regardless of whether my comments were made as a private
25   individual. Third, as a result of the TCC counsel's

Worldwide Court Reporters, Inc.
(800) 745-1101

1  opinion of exercising my Constitutional right as a
2  private citizen and fire victim conflicts with my
3  membership on the TCC, I immediately withdraw from my
4  position on the official committee of tort claimants.
5  Fourth, this resignation will allow me to remove the
6  chains our TCC counsel's opinion has put on me so I can
7  freely and publicly advocate in the firm victims' best
8  interests.
9          So there was a letter written by the
10 lawyer to the client.  The client didn't like it.  They
11 wanted to be able to talk.  And I have no criticism with
12 respect to the folks that resigned so they can talk.
13 Frankly, their work is done.  We're in the midst of the
14 vote.  We still have eight of the 11 Tort Claim
15 Committee members, and all 13 of 13 consenting fire
16 claimants professionals, all of whom signed the
17 settlement agreement that we're talking about here,
18 those fire claimant professionals represent well over
19 two-thirds of the fire victims, and they're all still
20 working diligently, advocating for the passage of this
21 plan.
22          Now, you heard an article this week that
23 says some people are against the plan, some people are
24 for it.  Well, that's what democracy is about, and
25 democracy is no less alive and well in the bankruptcy

1  court.  Again, under the United States code, two-thirds
2  of the fire victims who vote have to vote to support the
3  plan for it to be confirmed.  And so I've told you there
4  is a couple of lawyers representing folks that preferred
5  the bond deal.  The bond deal is gone, and I don't know
6  what -- how more specifically we can describe to them
7  that the bond deal is in the ashes of history.
8          They're trying to resurrect it.  They're
9  trying to tell people, oh, my gosh, just vote no on
10 this.  There is going to be something else out there.
11 But I just don't buy it because the bond deal has been
12 gone for months.  There was a Wall Street Journal
13 article on April the 1st.  The title was "PG&E Fire
14 Victims Agitate Against Deal to Exit Bankruptcy."  I
15 read that title and I thought it was an April Fool's
16 joke because it quoted one person who was against it and
17 one lawyer who was for it, Mike Danko, representing
18 6,600 fire victims who was quoted that he expects most
19 of his clients will vote in support of the plan.
20          Mr. Danko was quoted in the Wall Street
21 Journal article, quote, A no vote sort of means
22 thermonuclear meltdown.  There is no Plan B, close
23 quote.
24          And Danko is right.  This is a choice
25 about whether or not a plan that pays $13.5 billion is

1  one that's going to rebuild homes, rebuild people's
2  lives in 2020 and '21, or whether we are going to resume
3  litigation that lasts for years, take on the liabilities
4  of maybe PG&E becomes defunct because of another fire
5  because there is no protection from AB-1054, and hope
6  that we can get something more later despite the fact
7  that the math shows that there's $9 billion of future
8  liabilities from subro, $2 billion or more liabilities
9  from local governments, a lost NOL of $7.5 billion.  And
10 that money, that 18-and-a-half-billion dollars has got
11 to be made up somewhere before fire victims get back to
12 where they are now.  I'm just telling you, I don't
13 believe it's there.
14          Two days later Bloomberg wrote an article,
15 and they basically wanted to know whether the lawyers
16 representing the fire victims actually support the plan
17 in light of these bombs that are being thrown off by
18 these TCC resignations.  And the bottom line is this
19 Scott Deveau in Bloomberg says PG&E's plan has broad
20 support from fire victims, their lawyers say.
21          They called me and they said, hey, how
22 many clients do you have?
23          I said, 18,000.
24          How many have voted?  This was several
25 days ago.

1          9,000.
2          How are they voting?
3          Nearly unanimously in favor of the plan.
4  Less than a hundred have voted no.
5          Now, that number is now approaching
6  11,000.  And I'm happy that my clients are voting
7  because I believe the plan is appropriate, but again,
8  I'm not telling anybody you got to vote now.  I think
9  you should, but if you want to wait till the last day
10 with the consequent risk of your vote not counting, do
11 it at your own peril.
12          The firm with the second largest number of
13 cases is the Singleton Law Firm.  They've got about
14 7,000 clients.  Bloomberg quoted Mr. Singleton as saying
15 the vast majority of his clients solidly back the plan.
16 Quote, So far the response has been overwhelming.  None
17 of the alternatives are close to what this is offering.
18 There is no reason to believe that they would get more
19 money if they reject the deal, says this lawyer that
20 represents 7,000 people.
21          Again, Mike Danko, who was quoted in the
22 Wall Street Journal, represents 6,000 people, said
23 he's anticipating most of his clients will support the
24 plan.
25          Jim Frantz, who represents over 5,000

Case: 19-30088   Doc# 6981-2   Filed: 04/29/20   Entered: 04/29/20 10:35:08   Page 52
of 157

1 victims, was quoted as saying almost all of his clients
2 support the deal.  This is not a perfect solution, but
3 this is as perfect as it's going to get.
4          And, finally, an attorney Richard
5 Bridgford represents 4,300 people in the plan, says he
6 believes his clients will vote overwhelmingly for the
7 plan.
8          Now, the last thing I want to address
9 before we open it up for questions is this:  The TCC
10 filed a paper earlier this week raising certain issues,
11 and I want to address those issues because I think it's
12 fine that they did that.  And, again, I have no
13 criticism of what the TCC is doing.  They're doing the
14 very best that they can.  The members are doing the very
15 best that they can.  But the bottom line is is that
16 everybody is trying to optimize this deal.  And so
17 there's all sorts of work going on.
18          The mediator who helped put this deal
19 together is very much still involved in trying to
20 optimize this deal to make it better.  All of the things
21 that happened with respect to these fines no longer
22 being part of the 13.5-billion-dollar fund have been
23 things that have been done in the last several weeks to
24 improve the deal.  This is stuff that didn't have to
25 happen.  It happened because both our lawyers for the

1 available.  I think that everybody on the TCC will tell
2 you that we had a very sophisticated group of financial
3 analysts from the Lincoln Group that we didn't just take
4 their word for it about what the debts were, what the
5 responsibilities were.  They had financial analysts.  We
6 had financial analysts.  Those guys would take all sorts
7 of meetings between themselves to make sure that they
8 agreed with respect to what the debts were.  So we took
9 all the money that was available, but it still wasn't
10 enough and we said it wasn't enough, so we want part of
11 your shares in the company.
12          Now, I'm getting asked a lot, if the stock
13 is being put into the victims' trust, worth suggest
14 $6.75 billion in value.  The truth is that the recent
15 stock market volatility has raised a number of questions
16 about the value of stock in any company.  But a
17 substantial margin of safety was built into the
18 agreement that we negotiated with PG&E.  First, the
19 amount of the stock that at least 22.4 percent is being
20 placed into the trust is based on a valuation that is
21 meaningfully below the fair value of other major
22 utilities.
23          Now, that's important because, as I
24 understand it, there is a -- there is a -- an index
25 called the utility index.  And before the last couple of

1 fire victims and lawyers for the other side are trying
2 to make this as palatable as they can so that people
3 will make the right decision.
4          So with all that said, what I'd like to do
5 is this:  Again, you can press star 3.  If you press
6 star 3, you're going to get the ability to type in a
7 question.  Sam is going to read that question off.  And
8 then we'll see where this goes from the standpoint of me
9 trying to get you answers to all the questions that you
10 have.
11          Sam, do you want to start with the
12 questions, please?
13          MR. ROECKER:  Yeah, of course.  Like Mikal
14 said, it's star 3, if you have a question you'd like to
15 ask.  We've got a lot of people listening either on
16 Facebook or the website, too.  So if you're on one of
17 those, feel free to type it in, and we'll get to as many
18 of these as we can on today's call.
19          I'm going to read our first one.  Ed asks,
20 why would we accept part of the 13.5-billion-dollar
21 settlement in stock which can fluctuate?  Why not all
22 cash?
23          MR. WATTS:  Ed, thank you for your
24 question.  I think I've partially answered it, but let
25 me try again.  No. 1, we took all the cash that was

1 months, the utility index trades at about 22 times
2 earnings.  For some reason, PG&E has always traded at a
3 discount, and that's because of California's unique
4 regulatory construct that creates more liabilities for
5 wildfires.  I can tell you that because of AB-1054,
6 that's going to substantially increase the earnings
7 multiple valuation for California utility generally.
8          Now, of course, you've got to get PG&E out
9 of bankruptcy, and that's going to mean that there is a
10 lot of depression in the trading value until this deal
11 gets voted on.  If the deal gets voted on and PG&E exits
12 bankruptcy, with a company with very predictable cash
13 flow, 17 million people sending in a check for 3-, $400
14 a month, the folks that are valuing these stocks are not
15 guessing.  This predictable earnings means that the
16 stock has meaningful room for increasing in value as
17 PG&E's earnings grow after bankruptcy, and all the
18 projections say that it's the fastest growing utility in
19 the country.
20          And third and perhaps most importantly, if
21 the stock had to be sold all at once, Ed, I would agree
22 with your concern.  But what's going to happen is that
23 stock is going to be acquired, and then people that are
24 a lot smarter than Mikal Watts known as investment
25 advisers are going to advise Justice Trotter, the

Worldwide Court Reporters, Inc.
(800) 745-1101

1    trustee, as to how to sell off the stock, and they'll
2    negotiate what's called shareholder rights agreements to
3    make sure that there's not dilution. We'll have to hold
4    that stock for a certain time.
5          So what the financial analysts told us to
6    do is get the 5.4 upfront, start paying off claims, hold
7    the stock for this five-, six-month period of time so
8    that you can sell it for a high value. And then you can
9    distribute it or you can sell it off to pay people in
10   cash. They'll advise us as to how frequently we should
11   sell the stock in order to keep the market from
12   punishing its price, and so that major U.S. investment
13   bank insuring the value of the shares to be maximized.
14        But I'll tell you this: As somebody that
15   doesn't personally trade in the stock market, a stock is
16   a stock is a stock. If we're right, the value of the
17   stock could go up significantly and the trust gains in
18   the rebirth of PG&E. In other words, I didn't want them
19   to have all the success of getting out of bankruptcy.
20   We can share in it. But if we choose to take that stock
21   and sell it off quickly, then we can, in effect,
22   liquidate it, and it'll be all cash. And so there's
23   been a lot of discussion about how to do that and when
24   to do that. Of course, people have concerns about,
25   well, I don't want to hold stock as we go through one of

1    these fire seasons.
2        And, of course, I'll tell you with respect
3    to that risk, and I'm very concerned about it, just
4    generally, but I think we saw last year through this
5    PSPS, these mandatory power shutdowns that I know
6    infuriated all of you guys, that it's a different world
7    than it was in 2017 and 2018. In fact, part of our
8    liability theories against PG&E in North Bay and, again,
9    in Camp, is you should have shut the power off. You
10   knew the winds were going to be high speed, and you knew
11   your grid was old and it was a problem. You should have
12   shut the power off. A year later they started doing
13   that, and, of course, everybody rightfully was critical
14   of them. But here's what we learned about those PSPSs
15   since then. No. 1, it's not PG&E's decision whether to
16   shut the power off. There is a representative from the
17   Governor's Office and a representative from the CPUC in
18   the control room making the judgment about whether the
19   power is going to be shut off.
20        The Judge, Judge Montali, just made the
21   decision that PG&E couldn't be sued for those shutoffs
22   because it was the government's decision whether to do
23   it. So, A, I think there is going to be a ton of
24   shutoffs anytime there is a risk of fire, which is
25   inconvenient, but it's going to prevent fires. And,

1    secondly, even if there is a fire, there is now going to
2    be a 20.5-billion-dollar risk pool fund that's already
3    been factored into the price of the stock. So holding
4    the stock for six months should be a good thing in terms
5    of augmenting or maximizing share value. And the only
6    risk, the fire season risk, is mitigated either by PSPSs
7    or by the fact that if there is a fire, it's covered
8    through AB-1054 in the 20.5-billion-dollar fund.
9        Sam, I know that was a long answer to your
10   question, so let me go on to the next question.
11       MR. ROECKER: Dave asked a question on
12   mobile homes. He wrote saying, quote, Mobile homes
13   can't be replaced or rebuilt on the value that it was
14   appraised before the fire. How are mobile homes
15   compensated in the settlement?
16       MR. WATTS: So, Dave, I think -- I'm glad
17   you asked that question. That's going to be a question
18   for the trustee that's writing the claims rules. I'm
19   going to have my people send that question in. But
20   here's what my gut says where I think it's going to end
21   up. A mobile home is just a structure on wheels. It
22   shouldn't be treated any differently than, you know, a
23   home or a structure. And so California law, in effect,
24   says if you have a present intent to rebuild the
25   structure on the premises, then you're entitled to the

1    higher kind of damages, which is the actual replacement
2    cost. Everybody that has an intent to rebuild that
3    hasn't started, you're going to have to show that
4    present intent.
5        So how do you do that? Get an estimate.
6    Try to get a construction loan from a banker. Try to
7    get contractors come out and give you estimates.
8    Document your file that you have an intent to rebuild,
9    because my analysis is it's about 35 percent more than
10   the value the home was the day before the fire. Same
11   thing with your mobile home. The value of that mobile
12   home has probably been heavily depreciated. There is no
13   way you can replace it for anything close to the value
14   of the home. So you have to, in effect, get quotes
15   about how much it costs to replace the same size mobile
16   home with a new one. Get those quotes. Get ready to
17   buy them. Show yourself shopping around in the mobile
18   home stores or however you want to do it, but show a
19   present intent to rebuild or reacquire, and then we'll
20   have to see what the trust does with respect to mobile
21   homes.
22       Next question.
23       MR. ROECKER: Lisa had a similar question,
24   asking what happens if you sell your lot; how does that
25   change the settlement?

Worldwide Court Reporters, Inc.
(800) 745-1101

1    MR. WATTS:  Okay.  So if you sell your
2  lot, Lisa -- obviously, I don't blame anybody that sold
3  their properties.  You know, it's going to be
4  challenging -- particularly in the Camp Fire area.  It's
5  going to be a challenging road to rebuild that community
6  of Paradise, and so some people just chose to sell their
7  lots.  I saw that happen in various neighborhoods in the
8  North Bay area inside of Santa Rosa.  If you sell your
9  lot, then the question is can you show a present intent
10  to rebuild and whether that's on the premises?  That's a
11  question of California law.  If I were you and I had
12  already sold my lot, I would show a present intent to
13  rebuild somewhere.  But if you just bought a house
14  somewhere else, acquired somebody's house, and you
15  haven't made any attempt to rebuild, then you're likely
16  going to get the value of the house as of the day of the
17  fire as opposed to the cost to rebuild it because you're
18  not rebuilding it.
19         Next question.
20         MR. ROECKER:  Looks like our next question
21  is Anna.  Anna wants to know if the vote goes through,
22  when will first payments to the victims begin, and are
23  those in one-month payment or separated out?
24         MR. WATTS:  Anna, thank you for that
25  question.  So what I think is going to happen is this:

1  If the vote goes through, and the vote ends again on
2  May 15, 2020, it'll take a little time for the votes to
3  be calculated.  That won't take that long because the
4  Judge has already set a confirmation hearing, I believe
5  it's on May 27th.  That's just 12 days after the vote.
6  So we're going to -- you know, we're going to look at
7  what the vote is.  We got to the two-thirds.  We'll
8  proceed towards confirmation.
9         What will happen then is the legal version
10  of what you're reading about now on Facebook or the
11  newspaper.  Anybody with a pen can write an objection.
12  Anybody with a social media account can slam this deal.
13  Everybody has a First Amendment right to say what they
14  want to say, and that's fine, for or against, that's
15  what we're doing here.  So there will be a whole bunch
16  of objections, you can count on it, okay.
17         Those objections will be heard by Judge
18  Montali, and that'll happen on the 27th.  If the
19  objections are heard on the 27th, I would anticipate
20  that shortly thereafter -- this Judge is very
21  diligent -- will rule on those objections, either order
22  the plan modified to meet the objections or to, you
23  know, just go with the plan that was voted because it
24  went through and approve it.  He might have some
25  appeals.  Those appeals, I do not believe, will keep

1  PG&E from exiting bankruptcy by June 30th, for the
2  simple reason that every appellate court Judge in the
3  state understands this company goes under if you don't
4  vote yes and if you don't have the 20.5-billion-dollar
5  fund.  So I think you get out of bankruptcy by June the
6  30th.
7         And then the question is what's the
8  effective date for the payments?  Now, there was some
9  requirements were negotiated with the Governor with
10  respect to this stairstep approach of this, then that,
11  that maybe the effective date potentially as far back as
12  December.  But we put a trap into the settlement
13  agreement that says, look, I don't care about all that
14  other stuff.  You've got to pay us by the end of August,
15  or we're going to walk away from the deal.  And -- and
16  I've worked really hard on this deal, and I dearly hope,
17  for your benefit, that it goes through.  But I've made
18  it very clear to the folks at PG&E's equity that if they
19  don't fund this thing by the end of August, I'll
20  personally lead the charge to blow up the deal, because
21  we need to get people paid.  That was the incentive.
22  But, you know, we need the flexibility as well as an
23  option on our part.  Let me tell you what I mean.
24         Pretend that the coronavirus, instead of
25  taking over the country in the second half of February

1  and the first part of March, took over the country in
2  the second half of July and the month of August, and the
3  stock market crashed, as it's done in the last month,
4  and, not that it's selling worth a darn, you wouldn't
5  want to take it out to the market to issue stock at that
6  point.  If that happened, I would be advocating let's
7  wait.
8         And so back when we were negotiating this
9  stuff, before the coronavirus, everybody was, hey, look,
10  we've got to, in effect, have this paid by August 30th.
11  Everybody agreed it was probably going to happen.  I can
12  tell you, from what I see, that the company had already
13  been out there, they've had a company called Lazard
14  choosing the underwriting partners.  There are major
15  U.S. investment banks that are going to do the stock
16  issuance, to, in effect, get all the money.  That's
17  already underway.  We're going to spend the next week
18  negotiating the shareholder rights agreement.
19         So I believe this is going to happen in
20  June or July, but the only reason it wouldn't is if, for
21  some reason, either the 2.2-trillion-dollar stimulus
22  doesn't help the economy or, for some reason, the
23  coronavirus continues to get a lot worse.  And what I
24  mean by that is that every morning I turn on MSNBC
25  and Fox News, and I see all these charts about how many

Worldwide Court Reporters, Inc.
(800) 745-1101

 1  coronavirus cases are there, how many deaths are there
 2  that day.  Right now it's still rising, and we're
 3  waiting for something called the apex.  The apex is that
 4  day when there are less deaths than yesterday, and then
 5  day after day, less deaths than the day before, and
 6  you start taking it down, as we are seeing already in
 7  China where this started.
 8        Most of the experts I've talked to says
 9  we're looking at an apex, you know, three, four weeks
10  from now.  The financial analysts that I've talked to
11  say that apex crests, the market will start to
12  recover.  So I think we're going to be in good shape.  I
13  think that we'll have a funding of this sometime in
14  June, perhaps July, depending upon that apex date, and I
15  think that the whole thing gets funded in August.
16        Now, as soon as that happens, I was on the
17  phone yesterday with the trustee, John Trotter, with the
18  claims administrator, Cathy Yanni, and they are working
19  around the clock to get the claims rules and the claims
20  forms, everything done before PG&E exits bankruptcy.
21  Why?  Because if we get all that work done in advance,
22  we can get the claims period started where people can
23  get in their claims form.  Cathy Yanni told me
24  point-blank, it's our goal to get a bunch of people paid
25  in calendar year 2020.

 1        And all I can tell you is they're working
 2  very hard.  PG&E has agreed to pay for that process, in
 3  part.  They're going to put in over $5 million to pay
 4  for Trotter and Yanni's staff and the BrownGreer people.
 5  That's not something they had to do.  It wasn't
 6  required.  But they did it because it's been convinced
 7  to them that the way to get people to vote for this plan
 8  is to ensure them that this isn't going to be some
 9  year-long mass -- or morass three years, four years
10  claims process.  And so we're pre-doing all the work.
11  PG&E, I think, is going to advance the money to pay for
12  that, and then, you know, we'll take it out of the fund
13  later.  But the bottom line is is that all that work's
14  done very quickly.  And so as soon as you can get in
15  your claims process, I think that the trust and the
16  third-party administrator hired or are hiring, like, 200
17  people, 33 neutrals.  We're hiring this army of people
18  so that we can process claims as quickly as possible.
19        So I don't know the exact date, to answer
20  your question, but I do know this:  I know that
21  everybody is working hard to make that date as early as
22  possible.
23        MR. ROECKER:  Mikal, we've got a few
24  people that have questions about voting, particularly if
25  it's a trust or there is multiple people in a household

 1  of claims.  How many ballots should they be receiving?
 2        MR. WATTS:  So the number of ballots you
 3  should receive depends on how many claims you file.  If
 4  you filed one claim for your entire house, you're going
 5  to get one ballot.  If you have five people in your
 6  house and you filed five separate claims, as I advised
 7  my clients to do, they're going to get five separate
 8  ballots.  So it's one ballot per claim.
 9        MR. ROECKER:  Great.  And, again, star 3,
10  if you have a question on the phone.  If you're on-line
11  listening, type it in, and we'll try to get to you
12  today.
13        If people want to take stock, Jean asked,
14  how does that process work?
15        MR. WATTS:  So this will be a process
16  that's set up by the trustee, but as it's written right
17  now, you're going to have the option to take it all in
18  cash; you can take it all in stock, I wouldn't do that;
19  or a mix of cash and stock.  There will be a certain,
20  you know, number of shares issued by the trust,
21  depending upon what the value of your claim was, and,
22  you know, it'll be transferred to your trading account
23  at some point.  Or if you don't want the stock, you say,
24  no, I want it in cash, and they'll sell stock to pay for
25  the cash distributions.

 1        And, of course, there's benefits.  You
 2  know, you hold stock more than a year and a day, you
 3  convert it from ordinary income to capital gains, which
 4  is a lower tax rate.  If the company appreciates in
 5  value as it puts this behind it, you could have a rise.
 6  But you also bring the risk of, you know, if you hold
 7  the stock after it's been issued to you, it could go
 8  down.  If that does, I mean, the stock market is not a
 9  guaranteed thing.  You make investments and you see
10  those investments rise, if you're correct.  So if you
11  want to take the stock, you'll be able to.  If you don't
12  want to take the stock, you don't have to.
13        MR. ROECKER:  Julie wrote in that her
14  parents have PTSD as a result of the Camp Fire.  How are
15  PTSD and emotional distress claims part of the
16  settlement?
17        MR. WATTS:  So they are.  There are seven
18  different categories of claims, and the mental anguish,
19  emotional distress type of categories are there.  The
20  bottom line is is that the Good Lord did not wire us to
21  be able to psychologically respond to running for our
22  life on two minutes' notice from a 50-foot wall of fire.
23  Everybody understands that.  California law calls for
24  the compensation of mental anguish claims.  The trust
25  will follow California law.

Worldwide Court Reporters, Inc.
(800) 745-1101

1    In terms of who gets what and how, I can
2  just tell you that you're going to have to prove that
3  you were in the zone of danger as opposed to, you know,
4  20 counties away or off on vacation in Hawaii or
5  something. You can do that through, I think, sworn
6  testimony, through videos from your iPhone as you're
7  escaping the fire, some of you were there. If you have
8  an iPhone and didn't take any video, it may be that the
9  trust is going to be able to use a principle called
10  geofencing that'll say where a phone was at a certain
11  time. So you'll have to demonstrate you were in the
12  fire area.
13    And then you got to demonstrate that you
14  had some sort of psychological distress. The definition
15  of psychological distress is being in the fire area and
16  having to escape it. So you'll get something for being
17  there. My belief is -- and I'm not writing these rules,
18  but my belief is if you sought counseling from a priest,
19  from a group, from a psychiatrist or a psychologist,
20  that you might be -- you know, have a strong argument
21  that you should be paid more. If you have a formal
22  diagnosis, as your parents do, of post-traumatic stress
23  disorder, I would think that would be more valuable than
24  somebody that doesn't. So these will all be in the
25  trust rules that will be distributed soon.

1  Go ahead, Sam.
2    MR. ROECKER: Kent wrote in, asking what
3  the ratio is right now to how many noes/yes votes we've
4  received?
5    MR. WATTS: Well, so I'm only tracking the
6  ones in my firm. I know there is more than 11,200
7  people that have voted to accept, and about 90 have
8  voted to reject, inside of my firm. I don't have that
9  data with respect to other law firms. But based on the
10  Bloomberg article, it appears that the folks with large
11  numbers of clients, the Singleton Law Firm says the vast
12  majority solidly bought the plan. Danko with 6,000
13  claimants says most of his victims support it. Frantz
14  with 5,000, almost all of his clients support the deal.
15  Bridgford believes his clients will vote overwhelmingly
16  for the plan.
17    But I won't know what other law firms'
18  clients have done, because what happens is you collect
19  the ballots into your firm, you keep documentary proof
20  of what you got, and then you submit a summary about I
21  got this many yeas and this many nays, and we'll submit
22  all of those to Prime Clerk. They'll add up the tallies
23  from all the law firms together with the individual
24  votes they got, and then they'll pronounce the results.
25    MR. ROECKER: Great. We have a couple

1  voting questions in a row. First is Linda. Linda wants
2  to know what the difference between voting now versus
3  waiting until May 15th is.
4    MR. WATTS: Well, Linda, that's a good
5  question. Let me tell you what my concerns are.
6  Obviously, this is a stressful time because of this
7  shelter in place that most of us are under. My strategy
8  has been I know where everybody is because everybody is
9  home, so I can communicate with everybody; whereas,
10  normally they would be off at work, working 40, 50 hours
11  a week, hard to get ahold of. So our strategy was
12  because we know everybody is functionally sheltered in
13  place, we don't know when that'll end, let's talk to
14  them early, get them all the information they need, and
15  collect the ballots. So we're going to continue to do
16  that on a daily basis.
17    But I want to be clear. I am not begging
18  people to vote now versus vote a week from now versus a
19  month from now. My preference would be you vote early
20  so that we can tabulate your vote, spend our resources
21  working on running down the folks that haven't voted,
22  and make sure that everybody gets a shot to vote.
23    But let me be clear. This is just like an
24  election. If you don't choose to vote, it's not that
25  you're not a claimant anymore. You don't lose all your

1  rights. It just your say doesn't matter because you
2  didn't exercise it. So the bankruptcy code says
3  two-thirds of the votes have to be in favor of the plan,
4  but it's not two-thirds of the claims. It's two-thirds
5  of those who choose to vote. So if you don't vote,
6  you're, in effect, transferring power over whether this
7  plan is going to be accepted to others.
8    And so that's one of the reasons that I am
9  working hard with my lawyers and my staff to communicate
10  early and often with my clients, so that my folks who
11  have done a ton of work that I've asked them to do been
12  very compliant clients, have showed up at 24 different
13  town hall meetings by the hundreds and asked questions.
14  And, literally, I answered every one of them except for
15  one time I had to catch a flight out of Oakland. But I
16  have a very proactive, energetic client base that writes
17  questions, we get them answered. They write e-mails, we
18  answer them. They show up at meetings and ask
19  questions, we answer them. So I know that my clients
20  are highly informed, and they know my recommendation.
21  It's a strong one, and that is is that I recommend that
22  you vote to accept this deal. But it's your right.
23  It's not Mikal Watts' vote. It's your vote and when you
24  do, it is also your choice.
25    My concern is this: Especially with

Worldwide Court Reporters, Inc.
(800) 745-1101

 1  respect to other law firms, there are a lot of law firms
 2  that chose, hey, you know what, I'm just going to have
 3  Prime Clerk send out the ballots and the disclosure
 4  statements and the solicitation materials and the like.
 5  When you add all that stuff up, it's several hundred
 6  pages.  And what I worry about, and I'm not here to pick
 7  on the United States mail service or whatever they're
 8  using, but imagine this:  I've had cases where it takes
 9  eight days to get a letter from one part of the country
10  to another.  Why it takes that long, I don't know, but
11  that's what the data shows me.
12          I have clients that are busy at home.
13  They've got a desk.  I've got a desk right now that's
14  got papers all over it.  Let's say I took that ballot
15  and put it on the desk, meaning to get to it tomorrow.
16  And then my wife comes in and puts a folder on top of
17  it, and then I don't see it again.  And then 25 days
18  from now I get around to cleaning off my desk and maybe
19  I get to it and maybe I don't.  There is only three days
20  left for the vote, to use my silly example and I put it
21  in the mail and it doesn't get there until after
22  May 15th.
23          So that concerns me.  I've done this in a
24  number of big cases.  Vote by mail is difficult because
25  paper is notoriously slow, whereas digital voting is

 1  fast.  So we have been texting our clients ballots and
 2  all the materials.  We've been e-mailing our clients
 3  ballots and all the materials.  And the folks that don't
 4  have a mobile phone and don't have an e-mail address
 5  that they've given us are getting it via paper, but
 6  they're going to get several hundred pages of stuff.  I
 7  just hope and pray it doesn't sit on their desk and they
 8  don't wait.  Because if you put this stuff in the mail
 9  after about May 5 or 6, I have substantial doubts as to
10  whether it gets in on time.  Now, whether a postmark
11  before May 15th is good enough, I, frankly, haven't
12  checked on it.  But I've just seen too many of these
13  things where nobody gets around to finally voting.
14          So I would prefer, to answer the question,
15  that you vote now, if you feel like you have the
16  information you need.  If you don't, then wait, but just
17  don't forget about it.
18          MR. ROECKER:  Great.  Gilberto wants to
19  know, he says he is wondering from some of the wording,
20  it sounds like all of the claims don't add up to
21  13.5 billion or if all the claims don't add up to
22  13.5 billion, what happens to the remainder of the
23  money?
24          MR. WATTS:  So if all the claims don't add
25  up to 13.5 billion, FEMA will step in line and take the

 1  next billion dollars.  But there is no scenario where
 2  PG&E gets any of the money back.  As a practical matter,
 3  the claims are going to add up to $13.5 billion.  The
 4  job of the trustee is to distribute the 13.5.  It's not
 5  to try to save nickels to give money back to PG&E.
 6  There is no provision where PG&E ever gets a dollar of
 7  this back.
 8          MR. ROECKER:  And Ruth wants to --
 9          MR. WATTS:  Hold on for a second.  Sam,
10  hold on.  Let me keep answering that question.
11          We have a lawyer for the Tort Claims
12  Committee named Bob Julian.  He's become my very dear
13  friend.  He's very diligent.  And he's got an army of
14  people that have fought really hard for the fire
15  victims, and I'm real proud to call him a colleague and
16  a friend.  Bob has been working the last four months on
17  a number of other things that can add value, and let me
18  tell you what I mean.  The settlement, when you look at
19  it, is not just 13.5 billion.  It's 13.5 billion plus an
20  assignment of all the claims that PG&E may have against
21  third party.
22          So Bob's firm, the BakerHostetler firm,
23  has done an outstanding job vetting, in the months of
24  January, February, March, and will continue in April,
25  the potential lawsuits that PG&E would have.  For

 1  example, PG&E does not employ its own tree trimmers, or
 2  at least it did not.  It uses third-party contractors.
 3  Some of these fires were caused by trees that fell into
 4  lines in high winds because they had not been trimmed.
 5  And if PG&E had a contract with somebody to trim all the
 6  trees to a certain specification to meet state law, and
 7  there is a state law about it, and the tree trimmers
 8  just didn't do it and they started some big fire that
 9  burned down a thousand houses, the tree trimmers should
10  be responsible.  And we've had that lawsuit assigned to
11  us.
12          Likewise, I don't want to wish any ill
13  will on a human being, but there are former directors
14  and officers of this company that, frankly, I would not
15  argue strenuously ought to have some criminal folks look
16  at them.  I just think that this company did not meet
17  the standard of good conduct, I'll put it politely,
18  and cause a lot of death and injury.  And those
19  individual officers and directors may have
20  responsibility for their individual lapses in judgment,
21  to put it politely.  The company buys several hundred
22  million dollars of what's called D&O coverage, directors
23  and officers liability coverage.  We got that assigned
24  to us, and Bob's team at BakerHostetler has been
25  carefully analyzing those cases.

Worldwide Court Reporters, Inc.
(800) 745-1101

And then the third thing that Bob has been working on is that on top of the directors and officers and on top of the tree trimmers case, these companies employ a lot of really, really, really large consultancy firms; and these firms are some of the biggest firms in the world that are supposed to give them safety systems analyses, safety systems projections about how to make things safe and this kind of -- and, frankly, those companies did a poor job. Those companies carry several hundred million dollars in insurance.

And so Bob Julian's team at BakerHostetler has been working with our team to kind of get all these lawsuits ready and we're pursuing them and we're going to file them and we're going to go try to collect every dollar on behalf of the fire victims. And we had to use some of those proceeds to, in effect, get some of the claims from the governmental entities settled without touching the 13.5, we've assigned some of that. But after those assignments, hopefully, there will be additional moneys available because of Bob Julian and BakerHostetler's work and other lawyers; and I plan to be involved as well, to add value on top of the 13.5 to the settlement pot so that we can make sure that people are fully paid as well.

Go ahead, Sam, next question.

MR. ROECKER: Yeah, Ruth wants to know if something should happen to her before the settlement is final, what happens to her claim?

MR. WATTS: So that's a question of California law. What generally happens is that there is probably going to be a procedure where you would file a -- well, you wouldn't file it because you would be passed away, and I hope it doesn't happen. But your loved ones would file a suggestion of death. Hopefully, you have a will saying where the assets of your estate would go. That would be submitted to the trust, and, hopefully, if it's done right, those proceeds would go to your beneficiaries of your will.

There is some states where, you know, plaintiff's claim dies with the plaintiff. I'm not familiar with what the law is in California inside of a trust, but I know that we can write stuff inside the trust once the 13.5 is there. And so I'll run that down for you, Ruth.

MR. ROECKER: There is a few people asking how else they can reach out, if they want to just verify that everything has been received and their vote is counted on our end?

MR. WATTS: Sure. If you are from the

Camp Fire area, e-mail us at chico@santarosa.com -- strike that, I'm sorry -- chico@wattsguerra.com. If you're from the North Bay area, e-mail us at santarosa@wattsguerra.com.

But, look, we got in about 11,000 ballots last week. It's not going to help the cause if we get 11,000 e-mails saying, did you get it? The fastest way to know, if you're a Watts Guerra client, that we don't have all your ballots, is most of you got auto-calls from me with my voice four times this week. If you got it four times, it's because you hadn't voted yet. Some of you had voted, but, remember, when I said that there may be five ballots inside of a house and somebody just returned one of them, I want those other four ballots back.

And so we'll continue to alert you. I'm not going to do it on a daily basis. I had some of my clients say, hey, man, this is getting too much, you're calling me too often. And I agree. And we'll do it on a less frequent basis, now that we're in Week 2, Week 3, Week 4. But I want to warn you, if you haven't voted, you know, pretty close to May 1 and I don't have a ballot for you, I'm going to start bugging you again, in large part, because I want all my clients to remember to vote.

MR. ROECKER: Helen has a question. She wants to know how the trust evaluate wrongful death cases when it comes to compensation.

MR. WATTS: So there are discussions underway. Let me kind of give you a backdrop about ethical rules for lawyers. Lawyers are allowed to represent multiple clients in litigation, but we're not allowed to pick between them in terms of robbing Peter to pay Paul, taking from plaintiff No. 1 so that plaintiff No. 2 gets more money, because that would breach a fiduciary duty to each of our clients. So the way that duty issue is handled is that an independent third party makes the adjudication of who gets what. My job is to get the biggest pot of money put together. Other people's job is to divide it.

So the way that division job is being handled is through the trustee and through Cathy Yanni, the claims administrator. And, frankly, and I've been in a lot of meetings with them, I didn't know either of them before this case; but every lawyer I talked to said, we need Trotter and Yanni, we need Trotter and Yanni, we need Trotter and Yanni. And now that I've gotten to know them, I understand why they were the unanimous choice of everybody. They're excellent. They're diligent. They're hard working. They

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 04:36:09   Page 59
of 157

1  understand speed and they're working hard. So they'll
2  create the claims rules, which are largely drafted and
3  being finalized, they will finalize them, and they will
4  publish them, and they will put out those rules and
5  those rules will set up how you decide which category of
6  damage gets what.
7         The death cases, obviously, on an
8  individual basis are the most serious. I mean, there is
9  just nothing worse than losing a loved one in a
10  wildfire. So those cases have, in my view, great value.
11  They're not all going to -- they're not all getting paid
12  the same amount. So then you'll have a question among
13  the 44 deaths in North Bay and 84 deaths in Camp, who
14  gets what among the death case pot. That's going to be
15  decided by somebody not named Mikal Watts. It will be a
16  third-party neutral that will come in, and they'll work
17  through all that. But the bottom line is that, you
18  know, if -- there is going to be a recommendation, and
19  if you take it, then fine. If you don't like that, you
20  we can appeal, and we go from there.
21         Now, my buddy Jerry Singleton, who
22  represents the second largest number of clients, texted
23  me to correct my answer about if a plaintiff dies. He
24  says, under California law, when a plaintiff dies, his
25  or her noneconomic claims will die, but all of the

1  economic claims will survive. So please take my last
2  answer, and let me defer to Jerry.
3         And thank you, Jerry, for that answer, and
4  I believe he's correct. I'm glad he took the time. Any
5  other lawyers that hear me say something wrong, feel
6  free to text me in the middle of this, and I'll
7  tell them. This is a team effort.
8         But the bottom line is under California
9  law, noneconomic claims will be lost on death before
10  trial, but there is no trial, so we're going to ask
11  Trotter to try to modify that so nobody loses their
12  claims. But he's got to follow California law. So
13  it'll be somewhere in between that, Ruth.
14         MR. ROECKER: Craig has got a question,
15  he's been listening on Facebook, asking about children
16  who were almost 18 before the fire. So now that they
17  are past 18, do they need to amend their claim form?
18         MR. WATTS: So I don't know the answer to
19  that, but I suspect you might see that in the claims
20  rules. Just so you know, what I do in these town hall
21  meetings is we record them all. We'll put a link up on
22  firesettlementfacts.com. I suspect the links from the
23  past ones are already up there or about to be. I also
24  hired a court reporter to type up a transcript of all
25  this, and the reason for that is when I distribute that

1  transcript not only to my clients but to the other
2  lawyers to make sure I didn't mess anything up. And so
3  if -- if there is anything that we need to find out
4  about, we will.
5         And then, secondly, what I like to do is
6  I'll submit this stuff to the trustee and to the claims
7  administrator so they can, you know, see what all the
8  questions are as they attempt to formulate the plan and
9  the claims rules. So we'll get this in front of Trotter
10  and Yanni and get them to consider what they want to do
11  on these issues.
12         You know, for example, an 18-year-old, it
13  depends on when they turned 18. At a certain point, as
14  I found out with my son this morning, they're adults,
15  and, like it or not, you got to let them go. So my
16  guess is is that there may be a requirement that that
17  individual who wasn't 18, but now is, certify that this
18  is their decision when they take the money or not.
19         MR. ROECKER: Okay. Michelle is seeing
20  some stuff online that says about the backstop insuring
21  all 13.5 billion which is also the same people saying
22  that only 5.4 billion is insured. What's the truth
23  here?
24         MR. WATTS: Okay. So Michelle -- I don't
25  know whether Michelle is saying that or whether she saw

1  that. But let me just kind of tell you as I understand
2  it. There are $12 billion in financial backstops that
3  were secured. The 5.4 billion is not really the
4  problem, because if they don't pay it -- and once they
5  pay it, we've got it. It doesn't need insurance. It's
6  in the house, in the trust fund. So the real issue is
7  are we going to get that 700 million and the 650 million
8  that are due on January the 15th of the next two years.
9  Those are insured by the backstop. So all the cash is
10  insured. The stock is going to be issued as part of the
11  exit. Once we own the stock in the trust, there is
12  nothing to insure. We have what lawyers call fee
13  simple. We own it. And then it's up to the investment
14  agents to figure out, you know, at what rate to sell it.
15         And so the idea that this is only
16  partially insured is just not correct. And one of the
17  reasons I know it is I was in the negotiations demanding
18  it, because, you know, what I couldn't get around was,
19  hey, yeah, I know you guys think it's great, that PG&E
20  has got to do better, but what if you don't? And if you
21  guys go under because you burn down another town in
22  2020, my clients are going to come straight after me.
23  So go get these backstops. And these backstops are
24  what's so important.
25         In order to get the backstop, the company

Worldwide Court Reporters, Inc.
(800) 745-1101

Case: 19-30088   Doc# 6989-2   Filed: 04/28/20   Entered: 04/28/20 09:36:08   Page 69
of 157

 1    has to represent it wouldn't take on more debt than X,
 2    which is the very thing that made the CPUC fine or the
 3    Butte County, even though it was only 3 and a half
 4    million, a problem, because it meant there was more
 5    liability than what they promised the backstop.  That's
 6    why I worked so diligently with the folks from the
 7    equity to get rid of this idea that a
 8    13-and-a-half-billion-dollar deal is going to get
 9    sidetracked by $3.48 million.
10            And kudos to whoever the lawyer was that
11    figured out, well, let's just delay the payment to the
12    insurance companies so we that don't kill the whole
13    thing over $3 and a half million.
14            But the answer to your question is the
15    payments are insured by the backstops.  As long as the
16    backstops are still here, then you have over 70 of the
17    most prominent financial institutions in the United
18    States that are contractually bound to make a payment.
19            MR. ROECKER:  It looks like Gary and a
20    couple other people had questions on attorneys' fees and
21    how those are factored into the settlement.
22            MR. WATTS:  I'm sorry, are they specific
23    questions, or do you want me to address attorneys' fees
24    generally?
25            MR. ROECKER:  Generally.  Just how --

 1            MR. WATTS:  Okay.  So attorneys' fees, by
 2    and large, in this case are calculated based on what's
 3    called a contingency fee.  Most individuals have signed
 4    a retention agreement with their lawyers that did not
 5    require any payment upfront.  It didn't require the
 6    payment of hourly fees as time was expended.  Instead,
 7    the fee is entirely contingent, and that's something
 8    that's owed when and only when a recovery is made and
 9    then as a percentage of the amount of the recovery.
10            The contingency fee arrangement is
11    traditionally justified because the great majority of
12    the public are poor or middle class, without the money
13    that it takes to fund these lawsuits, to hire lawyers,
14    to hire experts.  My firm all in, I think we spent,
15    gosh, it's coming on $20 million in the last two and a
16    half years.  That's not an amount of money available to
17    most fire victims to take on what was a 3-billion-dollar
18    behemoth corporation called PG&E.  It takes a lot of
19    financial wherewithal to take on these big companies,
20    and a lot of our clients don't have that.
21            So without the contingency fee, the
22    wrongdoer would escape responsibility because the
23    injured person would have no means to pursue a lawsuit
24    against such a big company.  So with the contingency fee
25    system, that client is able to get the best counsel they

 1    can find without having to make them pay upfront, which
 2    levels the playing field between your average guy on the
 3    street and a huge corporation with all the fire power of
 4    PG&E.  So you can go after the corporate wrongdoer.
 5            The contingency fee is considered to be
 6    not inequitable because of the contingent nature of it.
 7    That's what aligns the interest of the lawyer and his or
 8    her client.  The lawyer doesn't get paid unless the
 9    client does, and even then for only the value added.  So
10    the fee rises in direct proportion to the recovery to
11    ensure the lawyers stay focused on maximizing the
12    recovery of his or her client.
13            So let me give you an example.  If this
14    was an hourly fee, when they offered you $5.4 billion,
15    you may have had a different answer.  But we were
16    motivated to get every last cent that we could for our
17    clients.
18            Different lawyers have different
19    contracts.  My contract is a one-third contingency fee
20    rate.  We researched it heavily.  It's considered
21    reasonable and customary in our industry.  The American
22    Bar has put out some stuff about this.  It's the most
23    pervasive form of payment in litigation in the United
24    States.  The attorney receives a portion, often a third
25    of the recovery in the case if it's won, but nothing if

 1    it's lost.  There was a study that was put out by
 2    Harvard that showed 96 percent of plaintiffs in tort
 3    litigation chose the contingency fee as the preferred
 4    method of paying their attorneys in tort litigation.
 5            Obviously, this is a lot of money.  There
 6    is a lot of lawyers involved.  There is several hundred
 7    lawyers from over 85 law firms that banded together to
 8    work on this.  There were all sorts of things that made
 9    this perilous.
10            In the Camp Fire it was important to know
11    that PG&E took the position that it owed nothing because
12    it wasn't negligent.  It said it had legal arguments
13    that inverse condemnation didn't apply.  The lawyers
14    took that all the way to the California Supreme Court
15    and won.  They had a bunch of other legal defenses.
16            In the Tubbs Fire, there was an even
17    bigger problem, and that was that the agency with the
18    statutory responsibility to adjudicate the cause of
19    these fires, Cal Fire, initially issued a report saying
20    PG&E's equipment didn't cause the fire.  But the lawyers
21    went out and scoured the hill, interviewed all the
22    persons located within a mile, collected all the iPhone
23    videos, collected surveillance video shot from the
24    Bennett Lane Winery.  We used that to do a lighting test
25    on the two-year anniversary that showed that the light

1 did not come from the area where Cal Fire said the fire
2 started. They said it was way up the hill at
3 Mrs. Zenke's private line, and it was nonsense. So we
4 replicated the light to demonstrate it had to have been
5 down on the bottom where the tree fell into PG&E's line.
6 There were a bunch of lawyers that worked
7 really hard getting the Tubbs case ready for trial in
8 San Francisco, and eventually PG&E gave up.
9 I've gotten a lot of questions about that.
10 Hey, shouldn't the Camp Fire people be paid more because
11 Cal Fire said no? Well, originally, all day long,
12 except for Cal Fire was wrong.
13 And so it's up to the trustee to decide
14 issues of relative liability, but the way the trust is
15 written is clearly Camp Fire, all the other fires that
16 adjudicated to be PG&E's fault and, frankly, the facts
17 adjudicated the Tubbs fire to be PG&E's fault. That was
18 done by a bunch of lawyers working really hard.
19 The second thing that justifies the fee is
20 this labyrinth known as bankruptcy court. It's a zoo in
21 there. And I don't mean to pick on bankruptcy lawyers
22 that are on the line, but the bottom line is it
23 dramatically increased the difficulty of achieving a
24 fair settlement for our clients and, therefore, getting
25 any fee whatsoever. The Tort Claims Committee, the

1 lawyers, we have bankruptcy counsel, financial advisers,
2 mediators, consultants assisting us through this
3 treacherous minefield which is bankruptcy court.
4 Make no mistake about it. We're at the
5 end of it, and it is a great result, but this was a
6 viciously fault legal war against some of the highest
7 paid lawyers in the world that were fighting on behalf
8 of PG&E. As we fought that war successfully, they were
9 forced to raise their settlement offers.
10 Last summer a lawyer for PG&E took a
11 position in open court that all of the damages of all of
12 the victims and all of the fires was never going to
13 exceed $5.4 billion, so that's what we offered,
14 $5.4 billion. We turned it down, and we continued to
15 fight on your behalf. We turned down overtures of 6 and
16 a half, 7.4, little hints about, well, what about
17 9 billion, wouldn't that get it done, and ultimately
18 secured a settlement of $13 and a half billion. But the
19 work didn't stop there, because then we had to fight off
20 multibillion-dollar claims from FEMA, from Cal OES, from
21 federal and state agencies, local municipalities.
22 My wife jokes that I've spent more time
23 with Judge Randall Newsome, the mediator in this case,
24 than I have with her. It's probably true, actually.
25 But the bottom line is the difficulty of being in

1 bankruptcy court can't be overemphasized here.
2 And then lastly what I would say is
3 that the attorneys' fees are paid on an individual level
4 by individual plaintiffs pursuant to contracts that they
5 signed. They don't go to a single lawyer that's his or
6 her profit. They go to many lawyers as ordinary income
7 against which the firm's fixed and transactional costs
8 were applied.
9 Let me give you an example with respect to
10 me. Most of the contracts that I have have a bunch of
11 California lawyers also involved. Those lawyers have
12 been working for two and a half years in the North Bay
13 case with no money, being paid for almost a year and a
14 half, more than a year and a half now in the Camp Fire
15 case with no compensation upfront whatsoever. But
16 they're in the fight. Joe Earley hadn't made a dollar
17 yet. Roy Miller hadn't made a dollar yet. All the
18 costs that we put out. A lot of fees are going to go to
19 banks that we borrowed money from to front the expenses.
20 Finally, it doesn't go into somebody's
21 pocket as a profit. I mean, my firm has over a hundred
22 employees, most of whom have been working on this
23 litigation nonstop for over two years. During those two
24 years we paid their salaries, their benefits, the rent
25 on the space they consume. We opened up offices in

1 Chico and Santa Rosa so that we can personally meet with
2 our clients. And my commitment was and my commitment is
3 those offices will stay open until we're done, even
4 though right now nobody is coming to them because they
5 can't, under the law.
6 So bottom line, the fees are done on a
7 contingent basis. And then the expenses, people worry
8 about the expenses, so I want to address this. I get
9 asked a lot of, what are the expected expenses that
10 individual clients will have to repay? Actually, as to
11 my clients, the expenses on a per-person basis will not
12 be that significant. And I've explained this in live
13 meetings and on previous telephonic town halls, that one
14 of the benefits of our law firm and all of our joint
15 venture partners out there in California representing
16 18,000 claimants at once is the clients achieve
17 economies of scale.
18 A lot of you have heard me talk about
19 Michael Schultz, who I think is the world's best fire
20 cause and origin expert. He was out there doing that
21 light test that I told you about. If he spends a
22 million dollars on his work and you were my only client,
23 that expense would be enormous, and it would materially
24 eat into your recovery. On the other hand, if it's you
25 and your wife, you're only two of 18,000 clients, I

17 (Pages 65 to 68)

Case: 19-30088   Doc# 6901-2   Filed: 04/28/20   Entered: 04/28/20 09:36:08   Page 62
of 157

 1   could apportion that million dollars over 18,000 cases;
 2   and, on average, it would be a cost $55.55 apiece for
 3   one of the best experts in the world.
 4            So I can give you a lot of examples like
 5   that. But assuming the total expenses are
 6   $20 million -- and they're not all going to be
 7   reimbursed. I mean, I'm not saying that. But even if
 8   it was $20 million, that would yield an average general
 9   litigation expense of approximately $1,111 per case.
10   Now, there may be specific individual expenses, like, if
11   we hire a public adjuster or an arborist for your
12   specific case, those fees will be added to that general
13   litigation expense. But we've been very judicious as to
14   how we spend client money because we know those sums
15   have to be repaid out of our clients' recovery. But I
16   think we've done a good job of that. At least as to my
17   clients, I've explained on the phone, and I'll say it
18   again, I think you can expect expenses in that low 1 to
19   2 percent range of your recovery. So if you signed the
20   one-third fee contract, you can probably take it to the
21   bank that you're going to clear 65 cents on the dollar
22   of the gross recovery. So that's the best information I
23   can give you about fees and expenses right now.
24            MR. ROECKER: Matthew wants to know --
25   he's got a couple questions here. He wants to know, is

 1   there a limit to when they need to make additions to
 2   their claim by? He says him and his wife are still
 3   working on obtaining PTSD documentation. They want to
 4   know when the deadline for that is. And he's also
 5   curious about who's behind any negative comments about
 6   the settlement.
 7            MR. WATTS: Okay. So the first question
 8   about what's the deadline to make the claims, that'll
 9   come out when the trustee publishes his claims rule.
10   When Trotter and Yanni finalize, this won't be some Star
11   Chamber deal only a few of us know about it. It'll be
12   published to every one of you. It's my job to
13   communicate to my clients, hey, we've got this deadline.
14            And as you probably already noticed by the
15   energy with which we were asking you to take the first
16   week, we're not going to let grass grow around us. The
17   first day I know that deadline, you're going to get all
18   this stuff immediately, because I want you working on
19   it. I've asked clients for at least two years to work
20   on their contents of personal property, to send me
21   pictures, whatever you got in terms of outdoor personal
22   property, trees, and the like. We've had public
23   adjusters working on people's contents lists for years,
24   arborists working on trees. I've got kids that worked
25   for me all summer on Google Earth, taking pictures of

 1   your house or what was your house, so we can count up
 2   the number of trees and the size of them and get those
 3   tree loss claims documented up.
 4            But we need your help. We need you to
 5   supply us whatever you've given your insurance company.
 6   And if you just quit because there was an artificial
 7   level on your personal property, you know, work it
 8   through. Go to the contents college, which is this
 9   process where we put you through all the rooms in your
10   house to try to maximize that claim. Because, frankly,
11   what we get you for trees and what we get you for
12   personal property is what will allow you to rebuild the
13   house. So we want to do that very diligently.
14            But to answer your question directly,
15   there is no deadline yet. If you ask Mikal Watts, it's
16   tomorrow. Just get it in as fast as you can. If you're
17   in the Camp Fire, send it to chico@wattsguerra.com. If
18   you're in the North Bay fires, send it to
19   santarosa@wattsguerra.com. By the way, Watts Guerra,
20   W-a-t-t-s G-u-e-r-r-a dot com. So send us that stuff as
21   quick as you can. I don't know when the deadline is,
22   but when I get it, you will be the first to know, and I
23   will bother you significantly to make certain we get
24   everybody's claims in on time.
25            MR. ROECKER: Great. Looks like -- I

 1   think you mentioned this earlier in the call, but people
 2   joined late. Looks like --
 3            MR. WATTS: Hold on, Sam. Sam. Sam, hold
 4   on just a second. I didn't answer her second question.
 5   I apologize. Who's behind the negative comments about
 6   the deal? So let me address that, and I want to be
 7   politically correct here, because we live in a
 8   democracy. It's no secret that 45 percent of us vote
 9   one way and 45 percent of us vote the other. In every
10   presidential cycle, the 10 percent of the people in the
11   middle pick the President. It's not surprising to me
12   that in a situation involving 70,000 people who filed
13   claims that there is a difference in opinion. It's
14   certainly not surprising to me that there are a lot of
15   people really pissed off at PG&E. I don't blame you one
16   bit, one bit.
17            So what my job is to put the facts out as
18   frequently as I can so that people's emotions don't mask
19   their ability to look at the facts. And while it's okay
20   to be pissed off and never want to settle, what I can
21   tell you is there is nothing that I can do as a lawyer
22   to prevent what happened in North Bay in 2017, in Camp
23   in 2018. I can't rebuild your homes except with money,
24   that my job is to go get it for you.
25            And so while I hope that people that are

18  (Pages 69 to 72)

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 04:36:09   Page 63
of 157

1  just against the deal because they don't trust PG&E --
2  trust me, I don't trust them, either. We have verified
3  every single thing they tell us. We have our own
4  consultants, our own experts. We are making certain
5  that nobody is pulling the wool over our eyes. And then
6  my job is to get out the information as well as I can.
7  I'm not going to be critical of lawyers who hold a
8  different view. I can tell you that I think there is
9  only two or three of them that have come out publicly
10  against this. I don't think they represent a lot of
11  people. They may have a view that maybe they think the
12  bondholders are going to come back. I don't. I don't
13  share that. But I'm not going to call them out. I'm
14  not going to call them bad guys.
15        I've got folks that are against this deal
16  that I got to know and I have high opinions of. But I
17  don't think they've come up with what I would consider a
18  plan. There is a joke that shows up, hope is not a
19  plan. All we have to do is blow this up, and then we'll
20  get them back to the table, we'll do better. That's
21  hope. That's not a plan. A plan is looking at the data
22  as it is and responding to facts, not hope. And the
23  facts are that if we vote no and this plan doesn't get
24  through, we lose a 20.5-billion-dollar insurance policy
25  that is the only way that PG&E is going to be a viable

1  company. The facts are that if this plan doesn't go
2  through pursuant to its deal with the Governor, it's got
3  to be sold off in parts, which means somebody has
4  7.5-billion-dollar asset disappears. So somebody has
5  got to come up with an additional $7.5 billion.
6        The facts are the insurance companies are
7  going to be back, saying, okay, well, we want our 20,
8  not the 11 we agreed to take. City and County is going
9  to say, we want our 3, not the billion we agreed to
10  take. So it just adds an 18.5 billion-dollar bogey to
11  the cost of getting us back to where we are right now.
12        Not to mention on top of that the time
13  value of this. Do you want to rebuild Paradise sooner,
14  or do you want to rebuild it later? I don't criticize
15  anybody for wanting to just set this company's
16  headquarters on fire, but we have to deal with reality
17  and that is that in the last two years, the overwhelming
18  majority of the people that were in the board of
19  directors, the officers and directors of this company
20  have been shown the door. The Governor's agreement with
21  this company requires a major refreshing of the board of
22  directors that's much more emphasis on safety as opposed
23  to just profits.
24        The owners of the company, the people that
25  are putting up the money to bail this company out of

1  bankruptcy and to put the billions and the tens of
2  billions of dollars in to get out of bankruptcy,
3  they're not the same people that were the owners of this
4  company when they burned down your house. So even
5  though it's got the same title, I would have changed it,
6  but even though they're still called PG&E, the owners
7  are different, the people that are leading it are
8  different, and your Governor, in my view, did an
9  outstanding job of insisting that this company is going
10  to be different.
11        MR. ROECKER: Looks like Sam has a
12  question now. He says, what if we can't prove anything
13  except for the home itself? He says, photos and
14  receipts were all destroyed in the fire. What are the
15  options and likeliness of compensation?
16        MR. WATTS: So, Steve, obviously, I don't
17  need photographs to prove that your structure was burned
18  down. There is good third-party data in the form of tax
19  rolls. County of so-and-so has got the stuff. In
20  effect, our experts already have for every one of you
21  the approximate surface area, number of square feet of
22  your home. We also have experts that tell us in a given
23  neighborhood what's the cost per square foot on average
24  to rebuild it. So we've got good data in order to be
25  able to get the structure loss.

1        As to the stuff inside the home, that's
2  why we're trying to have the quick pay, the easy to
3  prove, versus you show up and prove every dollar thing.
4  The easy to proving would be, you know, in effect,
5  hey, on average, insurance statistics say that a certain
6  percentage of the cost of the home is what people should
7  traditionally have in terms of personal property, and so
8  that's going to be the default. But if you want more
9  than the default, show up with all your stuff, pictures,
10  surveys, E-Bay receipts, whatever, showing that what you
11  had in the home was more valuable.
12        There is some guy -- I can't believe a
13  lawyer did this -- that claimed somebody had a
14  354-million-dollar opal or emerald in their home. I
15  guess if they had a picture of the opal or the emerald,
16  it would be fine, but I find it weird that it was in a
17  120,000-dollar house with no insurance on it. But we'll
18  look through all that kind of stuff.
19        But the bottom line is we're trying to
20  create a scenario where we're going to assume you had a
21  certain amount of stuff in the house. You're entitled
22  to some reimbursement on that.
23        But let me make one other point on this
24  issue: I mentioned that the insurance companies have
25  paid out $15 and a half billion and have about another

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 64
of 157

1  3.8 billion in reserves. This was a very important
2  point to me. I know it's not popular that the insurance
3  companies took their money in cash and we've got cash
4  and stock; but the reason that happened is they took a
5  huge discount from 20 to 11, freeing up $9 billion in
6  value.
7        But, No. 2, I flew down to Los Angeles to
8  meet with their lawyers, and I said, look, I'm only
9  going to support this deal if the following happens, and
10  that is is that all that money that's reserved that you
11  haven't paid out yet, you haven't rebuilt the town of
12  Paradise yet, and I'm not agreeing to a deal that lets
13  you hold on to your settlement unless two things happen:
14  No. 1, you're not going to come after my clients for
15  reimbursement of moneys you paid them under some
16  contractual right. In other words, we keep our 13.5,
17  you keep your 11. And they said, you know what, I agree
18  with that. I said, because I can't have my clients
19  getting bills from their insurance companies for this or
20  that or overpayment or this and that. But, on the other
21  hand, I can't have my clients getting screwed around by
22  a bunch of insurance companies that don't want to give
23  them the money they need to.
24        California has excellent law with respect
25  to the duties that insurance companies have to fairly

1  administer claims that pay claims. If you violate that
2  duty, I must have the ability on behalf of my clients
3  for the clients to sue you for insurance bad faith.
4  That's the only way that I can look my clients in the
5  eye and say, we've still got the Sword of Damocles over
6  these insurance companies. They're going to have to
7  treat you right or they're going to be faced with bad
8  faith liability. And we've maintained that. So we've
9  got benefit they're not coming after us, but to the
10  extent that they're bad guys in claims administration,
11  we're going to come after them. So we want that
12  $3.8 billion paid to our people.
13        Now, I'm not taking a fee off of anybody's
14  payments from their insurance company. You did that.
15  You paid the premiums. You deserve the payments. You
16  don't need a lawyer to do that. But what I also don't
17  want to have happen is I don't want rich insurance
18  companies to hoist that $3 and a half billion into the
19  trust by just not paying, right. So we've got to insist
20  that it's got to be written into the claims rules that
21  before you can take from the fire victims' trust, you
22  had to have done your best to get the insurance company
23  to pay.
24        So one of the things you're going to see
25  out of me as soon as this vote is is a bunch of

1  recommendations of letters that I want you to write,
2  steps that I want you to take to make sure you've taken
3  all the steps that you can to get paid by the insurance
4  company. Every dollar you get paid by the insurance
5  company is a dollar you're not paying me a fee on.
6  You're just getting it, and that's good for you, okay.
7  But at the same time, the insurance companies are not
8  going to shed their responsibility off on this trust by
9  saying, well, you guys pay it; we don't want to. We're
10  not going to allow that to happen.
11        Sam, go on to the next question. Thank
12  you.
13        MR. ROECKER: Yes. Jake, he wants to know
14  what the downsides to voting yes are.
15        MR. WATTS: So the downsides to voting yes
16  is you won't be hearing from me until May 15th. I'm
17  kidding. I got a lot of calls about too many calls to
18  the house. And I apologize, guys. We're just trying to
19  get you to vote. But those calls, every night I've got
20  folks that tabulate. I've got a computer guy who's just
21  brilliant named Matt Archer that counts all this stuff
22  up, and then he takes you off the list for the next
23  call. So as soon as we get ballots from everybody in
24  that house, you'll stop getting calls from us about
25  this, and we'll go back to communicating the way we

1  have.
2        The -- in terms of downside, to be honest
3  with you, I don't see a lot of downside to voting yes
4  when you compare it with what we're looking at. There
5  is, in any situation, contingencies out there, and let
6  me just tell you what I think they are, just off the top
7  of my head. No. 1, I don't play in the stock market
8  because about 25 years ago I tried to, and I wasn't very
9  good at it. Stocks go up. Stocks go down. What I've
10  learned and the reason I don't participate in the stock
11  market is that every stock has a counterparty, somebody
12  you're trading with. They're buying or selling while
13  you're buying and selling, and usually that counterparty
14  is in New York City in some financial house that's got
15  hundreds of analysts that aren't guessing like we are.
16  They know exactly what they're doing. So what we tried
17  to do to mitigate the risk of guessing is we hired
18  really smart financial advisers to call PG&E's bluff
19  about this or that.
20        So we're taking $6.75 billion in stock
21  because it's the only way to get to 13.5, there is not
22  that amount of cash available. But the way you mitigate
23  that downside is hire somebody who is a very
24  well-regarded firm that is a financial investment
25  adviser about whether to sell the stock, when to sell

Worldwide Court Reporters, Inc.
(800) 745-1101

1  the stock, how to sell the stock, how not to get creamed
2  on commissions, all this other stuff, so we maintain as
3  much value as we can.
4          Downside, if you take a bunch of stock and
5  cross a fire season, if something goes wrong.
6  Hopefully, you've got AB-1054, which I have no reason to
7  believe you won't, so you'll have that fund that will
8  keep the stock price from going down if there is a fire.
9          I suppose there is a minor risk that
10  somehow a wildfire burns up the City of San Francisco,
11  but the last time I was there there is not enough trees
12  to keep it going, so I don't think that's a real risk.
13  But unless they burn down a massive city and the damages
14  are more than $20.5 billion, it shouldn't have a
15  material effect on the stock.  Obviously, Wall Street
16  doesn't like surprises.  We would prefer there be no
17  fires, which is why I think the PSPSs are going to
18  mitigate that risk.  So you have risk there.
19          The other downside is is that we're going
20  to require that you try to get it from the insurance
21  companies first.  So just follow the directions in terms
22  of establishing that so that you're not having trust
23  rules clip your ability to recover under the trust.
24          Now, that's not to say that if you didn't
25  carry insurance, that somehow you get paid less.  That's

1  just not true.  But if you did and insurance company
2  owes part of the bill, we're going to work with you to
3  try to make the insurance company pay the bill in a way
4  that doesn't create any fees for your lawyers, but it
5  does get you paid in a way that doesn't deplete the
6  trust.  So those are the two major downsides.
7          Third downside, possibly, you know,
8  everybody is a little shocked to the core about
9  coronavirus.  I used to tell the joke that, you know, in
10  2019 that financial crisis turned all of our 401(k)s
11  into a 201(k), and it feels like that's happening again.
12  What I can tell you is is that -- and I've written some
13  articles seeking alpha, you know, oh, my gosh, you know,
14  the whole company is not worth $5 billion; how is it
15  worth 6.75?  You don't value it based on the old
16  company.  You value it based on the issuance price to
17  the new company, and the way that gets valued is
18  multiples of future income.  And as long as we don't
19  sell a large part of the stock before January 2021, that
20  valuation will be based on 2022 earnings, which are
21  already in its financial statement.  We know it's going
22  to be about 2 and a quarter billion.  It's very
23  predictable.  Should be something you can count on, but,
24  you know, can bad things happen?  Sure.  Can the stock
25  go down?  Sure.  But you're not going to have Mikal

1  Watts advising how long to hold the stock.  We'll have
2  people that do this for a living that will minimize that
3  risk.  So that's what we're trying to do, is minimize
4  risk.
5          We've got about ten minutes left, so keep
6  pushing star 3 if you have any questions.  Again, if we
7  don't reach you, send your e-mails to
8  chico@wattsguerra.com, if you're from the Camp area,
9  Camp Fire area, and to santarosa@wattsguerra.com if
10  you're in North Bay.
11          MR. ROECKER:  Kim says that she's hearing
12  a lot of rebuilding.  But she wants to know, what about
13  the value of the home lots at market value, if they have
14  to relocate because of the fire?  And what about
15  relocation costs, can they be recovered?
16          MR. WATTS:  So the answer is it depends on
17  the trust rules whether relocation costs can be
18  recovered, but I've been in meetings where that very
19  issue has been discussed.  Any client of mine that has
20  relocation costs, we're going to put that in the claim
21  and try to get it for you.
22          And, by the way, as soon as those claims
23  rules are published, we're going to keep this
24  firesettlementfacts.com website up throughout the
25  duration.  We'll continue to add to it.  So I really do

1  encourage every one of you to go to
2  firesettlementfacts.com to get the information.  What
3  does it have on it?  It's got a bunch of your fellow
4  members of the community telling why they're voting yes.
5  It's got me trying to answer a whole bunch of questions.
6  I have filmed, I think, already about 12 pages of
7  answers.  This morning I filmed another 22 pages of
8  questions.  What I'm trying to do is get the information
9  out there in one site and answer every question that can
10  be asked, and we'll continue to add to that over the
11  next five or six weeks.  If you go to
12  firesettlementfacts.com, we'll continue to add
13  information.  That'll be the information clearinghouse.
14          And then, again, in addition to that,
15  we'll continue to do these telephonic town halls every
16  Saturday at noon Pacific time.  You'll get this call.
17  You know, frankly, if you've already listened to five of
18  them, you're going to hear similar things.  But those of
19  you that were on the last two, I'm trying to add new
20  content as opposed to saying the same thing over and
21  over again.  So I spent a lot of time talking about what
22  happened this week with the TCC.  I spent a lot of
23  time -- next week I hope to have some serious good news
24  in terms of stuff we're working on right now.
25          But that's where you go to get your

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 66
of 157

 1    information, firesettlementfacts.com.  You'll continue
 2    to get the weekly Joe Earley e-mails.  You'll get them
 3    from Roy Miller if you're in North Bay.  I'll continue
 4    writing you letters.  I might even start doing video
 5    messages to you and text it to you.  We've got that
 6    capacity now.  But go to firesettlementfacts.com and
 7    stay on it, and we'll continue to add information to it.
 8        So let's keep going.  We've got about nine
 9    minutes left.
10        MR. ROECKER:  Deanna says she owns her
11    primary property and then she has three rental
12    properties.  Does she need to vote for each property or
13    just one per person?
14        MR. WATTS:  It depends on how many claims
15    she filed.  We're now on a per-claim basis.  So if you
16    would e-mail us and we'll get the list of claims and
17    we'll tell you how many times to vote.  But as the plan
18    goes, I mean, a lot of you got a phone message from me
19    yesterday morning apologizing that this is the fourth
20    time I've called you this week.  You may think you've
21    already voted.  If you're getting this message today,
22    you may have voted for yourself, but you didn't vote for
23    the other three people in your house, and we need those
24    three votes cast.  So we'll continue on a per-claim
25    basis to try to get a vote for each of them, for that

 1    reason.
 2        MR. ROECKER:  Katherine has a question
 3    about mobile homes as well.  She says the mobile home
 4    park she was in was destroyed, and it's not determined
 5    whether it will be rebuilt or not.  What happens to
 6    replacement value of the home if there's no possibility
 7    of the park being open so she can rebuild?
 8        MR. WATTS:  Yeah, I think it'll be on a
 9    mobile home level.  So claim the lost mobile home, and
10    you may have to move until somebody reopens one.
11        MR. ROECKER:  And then Candice on the line
12    asked me about families who have family members that
13    have passed away since the fire, if they do not have a
14    will, how does that impact their claim?
15        MR. WATTS:  So if you don't have a will,
16    every state has what's called intestacy laws, that says
17    if you didn't have a will where you directed where it
18    goes, it's presumed that X percentage goes to a spouse,
19    this much goes to kids.  If there is no spouse or no
20    kids, it may go sideways to brothers and sisters or
21    upwards to parents.
22        If you would send me an e-mail, I'll get
23    somebody to pull the intestacy law for the state of
24    California so we can specifically answer your question.
25    Probably what I'll do is I'll wait on a text from Jerry

 1    Singleton.  What I think will happen is if you don't
 2    have a will, California has intestacy laws.  It's
 3    probably all on a single sheet of paper that we can send
 4    to you.  If you e-mail us at chico@wattsguerra.com, ask
 5    the question, we'll get it answered.  If you're in the
 6    North Bay, santarosa@wattsguerra.com, we'll get you the
 7    answers.  And we'll try to post the answer to that
 8    question on firesettlementfacts.com as well.
 9        Seven minutes.  Let's keep going, Sam.
10        MR. ROECKER:  We have a question asking
11    how the trust is going to weed out false claims?
12        MR. WATTS:  That's a good question and I
13    have a specific answer.  There is a lot of different
14    ways that we're doing that, but I can tell you, having
15    talked with John Trotter and Cathy Yanni, they both
16    value their reputations and they're so well regarded, I
17    understand why those reputations are dear to them.  I
18    know that it is a primary concern of the trustee and the
19    claims administrator to write claims rules that ensure
20    that only legitimate claims are being paid.
21        As I think I've mentioned, we've already
22    made substantial progress in eliminating duplicate
23    claims.  You've heard about 80,000 claims.  I think
24    there is over 10,000 of those that were already
25    identified as duplicates and removed from the system.

 1    There is a variety of reasons for that.  I'm not calling
 2    it fraud.  But one firm was afraid that the system would
 3    crash on the deadline, so they submitted all their
 4    claims on the computerized way to do it and also dumped
 5    all the paper copies down so somebody had to dedup all
 6    those.  That's fine.
 7        I've had other clients come in and say,
 8    oh, the system was getting stuck, Prime Clerk, and they
 9    just kept pushing "send" six or eight times.  Well, the
10    system counted six or eight times.  They just didn't
11    know how to get the notification.  So we had to dedup
12    those.
13        There are a lot of folks that have filed
14    claims, what I call evacuation only claims.  And that is
15    that their houses didn't burn down.  They were just, you
16    know, inconvenienced and forced to evacuate.  They do
17    have a claim, but I don't think the value of those
18    claims is going to sufficiently raid the trust such that
19    there's not enough money for people whose houses burned
20    down.
21        So all of that deduplication and
22    categorizing is going to be very transparent.  It's
23    going to be prepublished.  But the other way we do it is
24    through the requirement that you document what you're
25    claiming.

                22  (Pages 85 to 88)

Case: 19-30088   Doc# 6960-2   Filed: 04/28/20   Entered: 04/28/20 09:36:09   Page 67
of 157

 1        In order to sign up or, you know, the
 2  bankruptcy notice claims process, that's a lot like
 3  registering to vote.  You can do it pretty easily.
 4  Filing a claim with this trust, this
 5  13-and-a-half-billion-dollar fund, will be more like a
 6  loan application down at the bank.  You got to show up
 7  with your backup financial documents when you make a
 8  loan application.  Here when you're making a claim for
 9  payment by the trust, you'll have to show up with proof
10  about what you lost.  They're not just going to take
11  your word for it.
12        And then, finally, the trust has important
13  checks in place to ensure that it's only paying out
14  legitimate claims that were demonstrated by proof.
15  We've got the audits.  We've got third-party reviews,
16  we've got third-party neutrals.  We've got appellate
17  rights.  These are all techniques that are embedded into
18  the trust process, designed to mitigate against the
19  concern that somebody is going to get paid for a false
20  claim.
21        MR. ROECKER:  We have a couple questions
22  about the TCC.  I know you covered that at the
23  beginning, but can you just do a quick recap of the TCC
24  and the latest news there?
25        MR. WATTS:  Yeah, sure.  I can tell you

 1  that I was on a phone call for several hours yesterday
 2  working with my friends who represent members of the
 3  TCC.  I've been in a large number of negotiations with
 4  people and these people all gave their time for free and
 5  have done it for a long time and the folks who chose to
 6  resign so that they could exercise their First Amendment
 7  rights and say what they want, I have no criticism of
 8  them.  In fact, I know they're lawyers and consider them
 9  friends.
10        I can tell you that the TCC is meeting on
11  a frequent basis.  It's continuing to do its work.  Its
12  lawyers are working hard to optimize this deal, to make
13  it something that everybody can recommend to their
14  clients.  And, you know, a good deal is worth voting
15  for, and I think it's worth voting for, but, at the same
16  time we're doing the vote, we're all working to make it
17  better, and we'll continue to try to find holes in the
18  system, close them up to make it the best that it can
19  be.
20        And, you know, the bottom line is there is
21  a reason that, you know, 11,200 people that I represent
22  have said yes and 90 have said no.  There is a reason
23  that Jerry Singleton's 7,000 clients, he's seen an
24  overwhelming response, and that's because none of the
25  alternatives are close to what this is offering and that

 1  the facts as opposed to the emotions suggest that there
 2  is no reason to believe that these folks are going to
 3  get more money if you reject this deal.  There is a lot
 4  of reason to believe that it's going to delay it and it
 5  may not be there.
 6        There is a reason Mike Danko's 6,000
 7  clients, he's expecting them to support it.  There is a
 8  reason Jim Frantz has got almost all of his clients
 9  supporting the deal, and that Rich Bridgford says his
10  clients are going to vote overwhelmingly for the plan.
11  And the reason for that is that, to put it in Mike
12  Danko's words, if you vote it down, it's like
13  thermonuclear meltdown.  There is no Plan B.  But there
14  is nothing to be embarrassed about about Plan A.  This
15  is one of the largest torts in the history, one of the
16  largest settlements in the history of the American tort
17  system.  And the fact that it came out of bankruptcy
18  court is all the more important.
19        So, in conclusion, we've got a minute
20  left, I want to thank everybody again for being on for
21  the last two hours.  We've still got well over a
22  thousand people on the line.  I apologize for not
23  getting all the questions answered.  Go to
24  firesettlementfacts.com as often as you like.  There
25  will be new stuff added to it during the entire time

 1  period.  And then after the vote, we'll transfer it into
 2  an information receptacle about how to do the claims.
 3        So, again, this is Mikal Watts.  I'll see
 4  you next Saturday at 12:00 noon.  We'll be here to do it
 5  again and to give you next week's information.  If
 6  you're so inclined and think you're properly informed,
 7  we would appreciate you considering voting now.  My
 8  recommendation is is that you vote to accept the plan,
 9  and it's not even a close call, in my view.  It's a
10  whole-hearted recommendation.  I think it's in your best
11  interest.  I think it's the best way to rebuild your
12  communities as soon as we can.
13        So that's all we've got today, folks.
14  Thank you very much for participating.  Be safe.
15
16
17
18
19
20
21
22
23
24
25

```
1    I, PHYLLIS WALTZ, a Texas Certified Shorthand Reporter,
2    Texas Certified Realtime Reporter, Louisiana Certified
3    Court Reporter, Registered Merit Reporter, Certified
4    Realtime Reporter, and Certified Realtime Captioner in
5    and for the State of Texas, certify that the foregoing
6    is a correct transcription, to the best of my ability
7    from the audio recording of the proceedings in the
8    above-entitled matter.
9
10   I further certify that I am neither counsel for, related
11   to, not employed by any of the parties to the action in
12   which this deposition was taken, and further that I am
13   not financially or otherwise interested in the outcome
14   of the action.
15        Certified to by me this 4TH day of APRIL
16   2020.
17
18        _____
          PHYLLIS WALTZ, RMR, CRR, CRC
19        Expiration Date:  12/31/20
          TEXAS CSR, TCRR NO. 6813
20        Expiration Date:  12/31/21
          LOUISIANA CCR NO. 2011010
21        Expiration Date:  12/31/20
22
     Worldwide Court Reporters, Inc.
23   Firm Certification No. 223
     3000 Weslayan, Suite 235
24   Houston, Texas  77027
     (713) 572-2000
25
```

Worldwide Court Reporters, Inc.
(800) 745-1101

**A**

**AB-1054** 8:24
11:19 27:5
32:5 35:8 81:6
**ability** 12:4
22:19 30:6
72:19 78:2
81:23 93:6
**able** 2:6 25:11
44:11,21 45:9
62:25 75:25
**above-entitled**
93:8
**absolutely** 6:20
**accelerated** 9:15
19:25
**accept** 30:20
46:7 48:22
92:8
**accepted** 22:1
48:7
**Accepting** 11:22
**account** 38:12
43:22
**accusing** 6:17
**achieve** 68:16
**achieved** 10:1
10:10,16 14:4
**achieving** 65:23
**acquired** 32:23
37:14
**act** 8:19 16:23
**action** 93:11,14
**actual** 36:1
**adapt** 2:5
**add** 7:17,18 16:6
46:22 49:5
50:20,21,24
51:3,17 53:23
83:25 84:10,12
84:19 85:7
**added** 63:9
69:12 91:25
**addition** 18:19
84:14
**additional** 53:21

74:5
**additions** 70:1
**address** 14:21
19:16 23:14,25
29:8,11 50:4
61:23 68:8
72:6
**addressed** 24:16
**adds** 74:10
**adjudicate**
64:18
**adjudicated**
65:16,17
**adjudication**
56:13
**adjuster** 69:11
**adjusters** 70:23
**administer** 78:1
**Administered**
1:5
**administration**
78:10
**administrator**
41:18 42:16
56:18 59:7
87:19
**admit** 16:13
**Adolfo** 23:16
**adults** 59:14
**advance** 41:21
42:11
**advantage** 10:22
**advise** 32:25
33:10
**advised** 24:19
43:6
**adviser** 80:25
**advisers** 32:25
66:1 80:18
**advising** 83:1
**advocate** 25:7
**advocating**
25:20 40:6
**afraid** 88:2
**afternoon** 3:10
**agencies** 16:8
17:6,7 19:8

66:21
**agency** 64:17
**agents** 60:14
**Agitate** 26:14
**ago** 20:2,18
27:25 80:8
**agree** 18:25
32:21 55:19
77:17
**agreed** 5:5 9:23
10:9 14:5 15:6
16:19 17:7
19:8,10 21:20
31:8 40:11
42:2 74:8,9
**agreeing** 77:12
**agreement** 11:2
13:7 14:10
15:23 21:23
25:17 31:18
39:13 40:18
62:4 74:20
**agreements** 21:7
33:2
**ahead** 4:6 46:1
54:1
**ahold** 47:11
**alert** 55:16
**aligns** 63:7
**alive** 25:25
**allow** 9:1 16:20
25:5 71:12
79:10
**allowed** 23:7
56:6,8
**alpha** 82:13
**alternative** 12:2
12:17
**alternatives**
28:17 90:25
**altogether** 20:20
**amend** 58:17
**amended** 13:4
**Amendment**
24:20 38:13
90:6
**America** 18:3

**American** 63:21
91:16
**amount** 11:11
13:24 22:2,7
31:19 57:12
62:9,16 76:21
80:22
**analyses** 53:7
**analysis** 36:9
**analysts** 18:15
18:24 31:3,5,6
33:5 41:10
80:15
**analyzing** 52:25
**Angeles** 77:7
**angry** 4:12
**anguish** 44:18
44:24
**Anna** 37:21,21
37:24
**anniversary**
64:25
**announcement**
19:18
**answer** 17:15
19:13 22:18,22
23:11 35:9
42:19 48:18,19
50:14 57:23
58:2,3,18
61:14 63:15
71:14 72:4
83:16 84:5,9
86:24 87:7,13
**answered** 3:25
23:12 30:24
48:14,17 87:5
91:23
**answering** 3:21
51:10
**answers** 30:9
84:7 87:7
**anticipate** 38:19
**anticipating**
28:23
**anybody** 6:24
28:8 37:2

38:11,12 74:15
**anybody's** 78:13
**anymore** 12:16
13:22 47:25
**anytime** 34:24
**anyway** 5:5 7:5
**anyways** 5:14
**apex** 41:3,3,5,9
41:11,14
**apiece** 69:2
**apologize** 72:5
79:18 91:22
**apologizing**
85:19
**appeal** 20:10
57:20
**appeals** 38:25
38:25
**appears** 46:10
**appellate** 39:2
89:16
**application** 89:6
89:8
**applied** 67:8
**apply** 12:10
64:13
**apportion** 69:1
**appraised** 35:14
**appreciate** 5:7
5:12 19:11
92:7
**appreciates**
19:10,12 44:4
**appreciation**
17:9 19:4
**approach** 39:10
**approaching**
28:5
**appropriate**
7:12 20:24
28:7
**appropriately**
2:21 21:9
**approve** 38:24
**approximate**
75:21
**approximately**

Case: 19-30088 Doc# 6901-2 Filed: 04/20/20 Entered: 04/20/20 09:36:08 Page 70 of 157

2:3 69:9
**April** 1:9 2:11
2:11,11 26:13
26:15 51:24
93:15
**arborist** 69:11
**arborists** 70:24
**Archer** 4:16
79:21
**area** 3:5,6 23:3
37:4,8 45:12
45:15 55:1,3
65:1 75:21
83:8,9
**argue** 52:15
**arguing** 20:10
**argument** 45:20
**arguments**
64:12
**arms** 6:6
**army** 42:17
51:13
**arrangement**
62:10
**arson** 15:3
**article** 15:10
25:22 26:13,21
27:14 46:10
**articles** 82:13
**artificial** 71:6
**asbestos** 9:13
**ashes** 26:7
**asked** 4:16
16:10 31:12
35:11,17 43:13
48:11,13 68:9
70:19 84:10
86:12
**asking** 15:10
20:15 36:24
46:2 54:21
58:15 70:15
87:10
**asks** 30:19
**asset** 74:4
**assets** 54:11
**assigned** 52:10

52:23 53:19
**assignment**
51:20
**assignments**
53:20
**Assistant** 24:17
**assisting** 66:2
**associated** 21:23
**assume** 76:20
**assuming** 69:5
**attempt** 37:15
59:8
**attorney** 15:2
21:24 22:1
29:4 63:24
**attorneys** 3:3
64:4
**attorneys'** 61:20
61:23 62:1
67:3
**audio** 93:7
**audits** 89:15
**augmenting**
35:5
**August** 39:14,19
40:2,10 41:15
**auto-calls** 55:9
**available** 10:2
10:11,17 12:2
15:5 18:14
22:2,7 31:1,9
53:21 62:16
80:22
**average** 63:2
69:2,8 75:23
76:5

---

**B**

**B** 12:1 13:12
26:22 91:13
**back** 10:8 11:11
11:16 16:9,20
27:11 28:15
39:11 40:8
51:2,5,7 55:15
73:12,20 74:7
74:11 79:25

**backdrop** 56:5
**background** 4:8
**backing** 21:9
**backstop** 18:2
21:7 59:20
60:9,25 61:5
**backstops** 18:4
60:2,23,23
61:15,16
**backup** 89:7
**bad** 73:14 78:3,7
78:10 82:24
**bail** 74:25
**BakerHostetler**
24:7,10,11
51:22 52:24
53:12
**BakerHostetle...**
53:22
**ball** 20:1
**ballot** 43:5,8
49:14 55:23
**ballots** 3:1 43:1
43:2,8 46:19
47:15 49:3
50:1,3 55:5,9
55:13,14 79:23
**banded** 64:7
**bank** 33:13
69:21 89:6
**banker** 36:6
**bankruptcies**
9:3
**bankruptcy** 1:1
1:2 2:23 3:17
5:15 8:2 9:2,8
9:11,14 14:14
18:10 20:12,25
24:8 25:25
26:14 32:9,12
32:17 33:19
39:1,5 41:20
48:2 65:20,21
66:1,3 67:1
75:1,2 89:2
91:17
**banks** 40:15

67:19
**Bar** 63:22
**bargain** 13:19
**base** 48:16
**based** 31:20
46:9 62:2
82:15,16,20
**basically** 20:22
24:13 27:15
**basis** 47:16
55:17,20 57:8
68:7,11 85:15
85:25 90:11
**Bay** 4:19 8:10
23:3 34:8 37:8
55:3 57:13
67:12 71:18
72:22 83:10
85:3 87:6
**beat** 15:17
**begging** 47:17
**beginning** 89:23
**behalf** 53:16
66:7,15 78:2
**behemoth** 62:18
**belief** 45:17,18
**believe** 11:20
27:13 28:7,18
38:4,25 40:19
58:4 76:12
81:7 91:2,4
**believes** 29:6
46:15
**beneficiaries**
54:14
**benefit** 16:21
39:17 78:9
**benefits** 44:1
67:24 68:14
**Bennett** 64:24
**best** 3:19 8:5
22:19 25:7
29:14,15 62:25
68:19 69:3,22
78:22 90:18
92:10,11 93:6
**better** 29:20

60:20 73:20
90:17
**big** 5:3,4,9 15:9
16:2 17:13
21:16 49:24
52:8 62:19,24
**bigger** 64:17
**biggest** 53:6
56:14
**bill** 12:21,25
82:2,3
**billion** 8:7 9:19
10:6,6,7,8,10
10:10,15,16,16
10:23 11:7,7,8
11:10,16 15:4
15:25 16:4,5,6
16:21,25 17:19
17:20,21 18:1
18:9 19:7,23
21:20,21 26:25
27:7,8,9 31:14
50:21,22,25
51:1,3,19,19
59:21,22 60:2
60:3 63:14
66:13,14,17,18
74:5,9 76:25
77:1,5 78:12
78:18 80:20
81:14 82:14,22
**billion-dollar**
10:12 74:10
**billions** 8:1 75:1
75:2
**bills** 77:19
**bit** 4:8 72:16,16
**blame** 37:2
72:15
**Bloomberg**
27:14,19 28:14
46:10
**blow** 39:20
73:19
**bluff** 80:18
**board** 13:20
74:18,21

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 71
of 157

Bob 51:12,16
53:1,12,21
Bob's 51:22
52:24
bogey 74:10
bombs 27:17
bond 26:5,5,7,11
bondholders
12:7 15:13
19:20 23:21
73:12
bonds 12:12
Bonnie 24:4
books 14:15
borrowed 67:19
bother 71:23
bottom 12:8
16:13 21:6
27:18 29:15
42:13 44:20
57:17 58:8
65:5,22 66:25
68:6 76:19
90:20
bought 37:13
46:12
bound 61:18
breach 56:11
breast 9:8
Bridgford 29:5
46:15 91:9
brilliant 79:21
bring 5:11 8:2
17:9 44:6
broad 27:19
brothers 86:20
BrownGreer
42:4
buddy 57:21
bugging 55:23
built 31:17
bunch 18:24
19:5 21:18
22:14 38:15
41:24 64:15
65:6,18 67:10
77:22 78:25

81:4 84:3,5
burn 60:21
81:13 88:15
burned 8:14
17:15 52:9
75:4,17 88:19
burning 15:20
burns 81:10
businesses 8:19
bust 5:10
busy 49:12
Butte 15:2,4
21:24 61:3
buy 13:9 26:11
36:17
buying 80:12,13
buys 52:21

─── C ───
Cal 5:19 16:25
64:19 65:1,11
65:12 66:20
calculated 38:3
62:2
calendar 41:25
calendars 2:9
California 1:1
9:16 12:20,22
13:16 14:8
16:4,24 19:8
21:10 32:7
35:23 37:11
44:23,25 54:6
54:17 57:24
58:8,12 64:14
67:11 68:15
77:24 86:24
87:2
California's
13:18 32:3
call 3:23 12:25
22:20 30:18
51:15 60:12
72:1 73:13,14
79:23 80:18
84:16 88:14
90:1 92:9

called 7:14
10:18 15:14
16:23 20:5
22:14 23:8
27:21 31:25
33:2 40:13
41:3 45:9
52:22 62:3,18
75:6 85:20
86:16
calling 22:15
55:19 88:1
calls 44:23 79:17
79:17,19,24
Camp 15:21
21:12 23:2
24:21 34:9
37:4 44:14
55:1 57:13
64:10 65:10,15
67:14 71:17
72:22 83:8,9
Candice 86:11
capacity 85:6
capital 44:3
Captioner 93:4
care 16:12 18:9
39:13
carefully 3:4
52:25
carried 15:7
carriers 10:9
21:20
carry 53:10
81:25
case 1:2 3:17
20:19 53:3
56:20 57:14
62:2 63:25
65:7 66:23
67:13,15 69:9
69:12
cases 5:4 28:13
41:1 49:8,24
52:25 56:3
57:7,10 69:1
cash 17:19,20

18:5,13,23
19:21 21:22
30:22,25 32:12
33:10,22 43:18
43:19,24,25
60:9 77:3,3
80:22
cast 2:24 85:24
catch 48:15
categories 44:18
44:19
categorizing
88:22
category 57:5
Cathy 41:18,23
56:17 87:15
cause 52:18 55:6
64:18,20 68:20
caused 13:10
52:3
CCR 93:20
cent 63:16
cents 69:21
certain 11:23
14:3,7 18:5
29:10 33:4
43:19 45:10
52:6 59:13
71:23 73:4
76:5,21
certainly 72:14
Certification
93:23
Certified 93:1,2
93:2,3,4,15
certify 59:17
93:5,10
chains 25:6
challenging 37:4
37:5
Chamber 70:11
change 36:25
changed 75:5
Chapter 1:4
charge 39:20
charts 40:25
check 32:13

checked 50:12
checks 89:13
Chico 68:1
chico@santar...
55:1
chico@wattsg...
23:2 55:22
71:17 83:8
87:4
children 58:15
China 41:7
choice 26:24
48:24 56:24
choose 33:20
47:24 48:5
choosing 40:14
chose 18:12 37:6
49:2 64:3 90:5
cities 11:9
citizen 25:2
city 74:8 80:14
81:10,13
claim 16:4,5,19
16:25,25 25:14
43:4,8,21 54:4
54:16 58:17
70:2 71:10
83:20 86:9,14
88:17 89:4,8
89:20
claimant 18:17
25:18 47:25
claimants 21:1
22:6 25:4,16
46:13 68:16
claimed 76:13
claiming 88:25
claims 3:14 6:15
9:10 10:15
11:8,8 12:6
16:7,13,22
17:4 18:15
20:13 24:6
33:6 35:18
41:18,19,19,22
41:23 42:10,15
42:18 43:1,3,6

Case: 19-30088   Doc# 6981-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 72
of 157

44:15,18,24
48:4 50:20,21
50:24 51:3,11
51:20 53:18
56:18 57:2,25
58:1,9,12,19
59:6,9 65:25
66:20 70:8,9
71:3,24 72:13
78:1,1,10,20
83:22 85:14,16
87:11,19,19,20
87:23,23 88:4
88:14,14,18
89:2,14 92:2
**class** 62:12
**cleaning** 49:18
**clear** 39:18
47:17,23 69:21
**clearinghouse**
84:13
**clearly** 9:25
17:16 65:15
**Clerk** 46:22
49:3 88:8
**client** 23:1,3,4
25:10,10 48:16
55:8 62:25
63:8,9,12
68:22 69:14
83:19
**clients** 2:16,17
2:17 3:11,12
3:15,23 5:12
6:21 22:15
26:19 27:22
28:6,14,15,23
29:1,6 43:7
46:11,14,15,18
48:10,12,19
49:12 50:1,2
55:18,24 56:7
56:11 57:22
59:1 60:22
62:20 63:17
65:24 68:2,10
68:11,16,25

69:17 70:13,19
77:14,18,21
78:2,3,4 88:7
90:14,23 91:7
91:8,10
**clients'** 69:15
**Clifford** 20:17
**clip** 81:23
**clock** 41:19
**close** 26:22
28:17 36:13
55:22 90:18,25
92:9
**code** 10:20 26:1
48:2
**colleague** 51:15
**collect** 46:18
47:15 53:15
**collected** 18:1
64:22,23
**college** 71:8
**com** 71:20
**come** 5:14 6:12
11:15 14:13
17:11 19:22
20:4 36:7
57:16 60:22
65:1 70:9 73:9
73:12,17 74:5
77:14 78:11
88:7
**comes** 6:4 49:16
56:3
**comfortable**
4:21
**coming** 62:15
68:4 78:9
**comments** 24:24
70:5 72:5
**Commissioner**
20:17
**commissioners**
20:19
**commissions**
81:2
**commitment**
68:2,2

**commitments**
18:2
**committee** 12:6
18:16 20:13
24:7 25:4,15
51:12 65:25
**communicate**
47:9 48:9
70:13
**communicating**
79:25
**communities** 8:8
8:10 14:15
92:12
**community** 5:3
5:9 37:5 84:4
**companies** 10:4
53:4,9,10
61:12 62:19
74:6 76:24
77:3,19,22,25
78:6,18 79:7
81:21
**company** 1:6
10:20 12:20
13:3 14:5,6,12
14:13 17:14
18:8 19:14,22
31:11,16 32:12
39:3 40:12,13
44:4 52:14,16
52:21 60:25
62:24 71:5
74:1,19,21,24
74:25 75:4,9
78:14,22 79:4
79:5 82:1,3,14
82:16,17
**company's**
18:25 74:15
**compare** 80:4
**compared** 9:22
**compensated**
35:15
**compensation**
44:24 56:3
67:15 75:15

**complex** 3:17
**compliant** 48:12
**computer** 79:20
**computerized**
88:4
**concern** 32:22
48:25 87:18
89:19
**concerned** 34:3
**concerns** 5:2 6:6
33:24 47:5
49:23
**concessions** 13:3
**conclusion**
91:19
**condemnation**
64:13
**conduct** 52:17
**confident** 6:15
**confirmation**
2:25 38:4,8
**confirmed** 26:3
**conflicts** 25:2
**consenting**
18:17 25:15
**consequent**
28:10
**consider** 59:10
73:17 90:8
**considered** 63:5
63:20
**considering** 92:7
**Constitutional**
25:1
**construct** 32:4
**construction**
36:6
**consultancy**
53:5
**consultants** 66:2
73:4
**consulted** 18:15
**consume** 67:25
**contacted** 4:15
**content** 84:20
**contents** 70:20
70:23 71:8

**context** 4:8 9:13
**contingencies**
80:5
**contingency**
62:3,10,21,24
63:5,19 64:3
**contingent**
17:11 62:7
63:6 68:7
**continue** 7:17,18
47:15 51:24
55:16 83:25
84:10,12,15
85:1,3,7,24
90:17
**continued** 66:14
**continues** 40:23
**continuing**
90:11
**contract** 52:5
63:19 69:20
**contractors** 36:7
52:2
**contracts** 63:19
67:4,10
**contractual**
77:16
**contractually**
61:18
**contribute** 4:22
**contributed**
10:23
**contribution** 4:9
**control** 34:18
**convert** 44:3
**convinced** 42:6
**copies** 88:5
**core** 82:8
**Corning's** 9:8
**corollary** 16:21
**coronavirus** 2:5
11:5 39:24
40:9,23 41:1
82:9
**corporate** 9:3
63:4
**corporation** 1:3

Case: 19-30088   Doc# 6981-2   Filed: 04/29/20   Entered: 04/29/20 09:36:09   Page 73
of 157

62:18 63:3
**correct** 44:10
57:23 58:4
60:16 72:7
93:6
**cost** 8:15 36:2
37:17 69:2
74:11 75:23
76:6
**costs** 14:9 36:15
67:7,18 83:15
83:17,20
**counsel** 24:19
62:25 66:1
93:10
**counsel's** 24:25
25:6
**counseling**
45:18
**count** 2:9 38:16
71:1 82:23
**counted** 54:24
88:10
**counterparty**
80:11,13
**counties** 10:13
10:14 11:9
45:4
**counting** 28:10
**country** 32:19
39:25 40:1
49:9
**counts** 15:1
21:12 79:21
**County** 15:2,4
21:24 61:3
74:8 75:19
**couple** 26:4
31:25 46:25
61:20 69:25
89:21
**course** 20:5
30:13 32:8
33:24 34:2,13
44:1
**court** 1:1 9:14
26:1 39:2

58:24 64:14
65:20 66:3,11
67:1 91:18
93:3,22
**cover** 21:22
**coverage** 52:22
52:23
**covered** 35:7
89:22
**COVID-19**
13:10
**CPUC** 19:18,23
20:2,17,19
34:17 61:2
**CPUC's** 20:12
**Craig** 58:14
**crash** 13:10 88:3
**crashed** 40:3
**CRC** 93:18
**creamed** 81:1
**create** 57:2
76:20 82:4
**created** 7:14
**creates** 32:4
**crests** 41:11
**crime** 15:3,7
**criminal** 5:22
52:15
**crisis** 82:10
**critical** 15:15
34:13 73:7
**criticism** 16:2
17:13 24:10
25:11 29:13
90:7
**criticisms** 17:3
**criticize** 74:14
**cross** 81:5
**CRR** 93:18
**CSR** 93:19
**curious** 70:5
**current** 21:1
**curve** 20:1
**customary**
63:21
**cut** 12:7
**cycle** 72:10

**D**

**D&O** 52:22
**daily** 47:16
55:17
**damage** 57:6
**damages** 36:1
66:11 81:13
**Damocles** 78:5
**danger** 45:3
**Danko** 26:17,20
26:24 28:21
46:12
**Danko's** 91:6,12
**darn** 40:4
**data** 46:9 49:11
73:21 75:18,24
**date** 14:7 17:21
39:8,11 41:14
42:19,21 93:19
93:20,21
**Dave** 35:11,16
**day** 2:12,13 8:17
19:6 28:9
36:10 37:16
41:2,4,5,5 44:2
65:11 70:17
93:15
**Daylight** 2:14
**days** 20:18
27:14,25 38:5
49:9,17,19
**deadline** 2:25
3:2 8:22,24 9:1
9:16 70:4,8,13
70:17 71:15,21
88:3
**deal** 5:17 6:11
6:12,25 7:25
11:1,10,15
12:7,15 13:7
13:14,16,19
14:16 15:13
19:21 21:8,16
23:21,22 26:5
26:5,7,11,14
28:19 29:2,16

29:18,20,24
32:10,11 38:12
39:15,16,20
46:14 48:22
61:8 70:11
72:6 73:1,15
74:2,16 77:9
77:12 90:12,14
91:3,9
**deals** 9:25
**Deanna** 85:10
**dear** 24:3 51:12
87:17
**dearly** 39:16
**death** 21:8 52:18
54:10 56:2
57:7,14 58:9
**deaths** 41:1,4,5
57:13,13
**debt** 18:9,18
61:1
**Debtors** 1:7
**debts** 8:3 31:4,8
**December** 39:12
**decide** 57:5
65:13
**decided** 57:15
**decision** 4:1
7:12 30:3
34:15,21,22
59:18
**declined** 12:24
**dedup** 88:5,11
**deduplication**
88:21
**default** 76:8,9
**defenses** 64:15
**defer** 58:2
**defined** 14:6
**definition** 45:14
**defunct** 27:4
**delay** 11:14
61:11 91:4
**deliver** 14:8
**demand** 8:15
**demanding**
60:17

**democracy**
25:24,25 72:8
**demonstrate**
45:11,13 65:4
**demonstrated**
89:14
**depending**
41:14 43:21
**depends** 43:3
59:13 83:16
85:14
**deplete** 82:5
**deposition** 93:12
**depreciated**
36:12
**depression**
32:10
**describe** 26:6
**deserve** 78:15
**designed** 89:18
**desk** 49:13,13,15
49:18 50:7
**despite** 27:6
**destroyed** 7:2
14:14 75:14
86:4
**determined** 86:4
**devastated** 4:13
**Deveau** 27:19
**diagnosis** 45:22
**die** 4:25 57:25
**dies** 54:16 57:23
57:24
**difference** 14:2
14:2 47:2
72:13
**different** 11:4
14:13 22:12
34:6 44:18
48:12 63:15,18
63:18 73:8
75:7,8,10
87:13
**differently**
35:22
**difficult** 49:24
**difficulty** 65:23

Case: 19-30088   Doc# 6981-2   Filed: 04/20/20   Entered: 04/20/20 00:36:00   Page 74
of 157

66:25
**digital** 49:25
**diligent** 38:21
  51:13 56:25
**diligently** 25:20
  61:6 71:13
**dilution** 33:3
**dime** 17:1
**direct** 63:10
**directed** 86:17
**directions** 81:21
**directly** 71:14
**directors** 13:21
  52:13,19,22
  53:2 74:19,19
  74:22
**disappeared**
  12:9
**disappears** 74:4
**disclosure** 49:3
**discount** 32:3
  77:5
**discussed** 83:19
**discussion** 33:23
**discussions** 56:4
**disorder** 45:23
**distress** 44:15
  44:19 45:14,15
**distribute** 33:9
  51:4 58:25
**distributed**
  45:25
**distribution**
  22:5
**distributions**
  43:25
**District** 1:1 15:2
  21:24 22:1
**divide** 23:5
  56:15
**dividends** 14:11
**division** 56:16
**document** 36:8
  88:24
**documentary**
  46:19
**documentation**

70:3
**documented**
  71:3
**documents** 89:7
**doing** 3:19 4:18
  29:13,13,14
  34:12 38:15
  68:20 80:16
  85:4 87:14
  90:16
**dollar** 51:6
  53:16 67:16,17
  69:21 76:3
  79:4,5
**dollars** 8:2 16:7
  27:10 51:1
  52:22 53:10
  68:22 69:1
  75:2
**door** 74:20
**dot** 71:20
**doubts** 50:9
**Dow** 9:7,21
**downside** 80:2,3
  80:23 81:4,19
  82:7
**downsides** 79:14
  79:15 82:6
**drafted** 57:2
**dramatically**
  65:23
**dropped** 24:1
**drove** 13:18
**due** 20:24 60:8
**dumped** 88:4
**duplicate** 87:22
**duplicates** 87:25
**duration** 83:25
**duties** 24:23
  77:25
**duty** 56:11,12
  78:2

—— E ——
**E-Bay** 76:10
**e-mail** 3:24 23:1
  23:2,3 50:4

55:1,3 85:16
  86:22 87:4
**e-mailing** 50:2
**e-mails** 48:17
  55:7 83:7 85:2
**Earley** 2:17 3:5
  4:5,7 67:16
  85:2
**earlier** 29:10
  72:1
**early** 42:21
  47:14,19 48:10
**earned** 22:5
**earnings** 18:25
  32:2,6,15,17
  82:20
**Earth** 70:25
**easily** 89:3
**easy** 76:2,4
**eat** 68:24
**economic** 58:1
**economies** 68:17
**economy** 40:22
**Ed** 30:19,23
  32:21
**effect** 10:21
  20:20 23:1
  33:21 35:23
  36:14 40:10,16
  48:6 53:17
  75:20 76:4
  81:15
**effective** 17:21
  39:8,11
**efficient** 3:21
**effort** 2:19 4:10
  58:7
**eight** 9:11 25:14
  49:9 88:9,10
**either** 12:21
  20:13 30:15
  35:6 38:21
  40:21 56:19
  73:2
**election** 47:24
**ELECTRIC** 1:5
**electricity** 14:8

**eliminating**
  87:22
**embarrassed**
  91:14
**embedded** 89:17
**emerald** 76:14
  76:15
**Emergency** 16:5
  16:24
**emotional** 44:15
  44:19
**emotions** 72:18
  91:1
**emphasis** 74:22
**emphasize** 9:24
**employ** 52:1
  53:4
**employed** 93:11
**employees** 67:22
**encourage** 24:22
  84:1
**ends** 38:1
**energetic** 48:16
**energy** 70:15
**English** 21:3
**enormous** 68:23
**Enron** 9:10,21
**ensure** 17:23
  42:8 63:11
  87:19 89:13
**entire** 43:4
  91:25
**entirely** 62:7
**entities** 53:18
**entitled** 35:25
  76:21
**entity** 10:21
**equipment**
  64:20
**equity** 7:25
  12:14 15:22
  18:22 20:6
  39:18 61:7
**escape** 45:16
  62:22
**escaping** 45:7
**Especially** 48:25

**establishing**
  81:22
**estate** 10:24
  54:11
**estimate** 36:5
**estimates** 36:7
**ethical** 56:6
**evacuate** 88:16
**evacuation**
  88:14
**evaluate** 56:2
**eventually** 65:8
**everybody** 2:18
  3:18 7:8 8:11
  10:25 13:21
  29:16 31:1
  34:13 36:2
  38:13 40:9,11
  42:21 44:23
  47:8,8,9,12,22
  56:24 79:23
  82:8 90:13
  91:20
**everybody's**
  71:24
**exact** 42:19
**exactly** 80:16
**example** 49:20
  52:1 59:12
  63:13 67:9
**examples** 9:7,13
  10:3 69:4
**exceed** 66:13
**excellent** 56:24
  77:24
**exercise** 48:2
  90:6
**exercising** 24:20
  25:1
**existence** 20:11
**exit** 20:12 26:14
  60:11
**exiting** 39:1
**exits** 32:11
  41:20
**expect** 69:18
**expected** 68:9

Case: 19-30088   Doc# 6900-1   Filed: 04/20/20   Entered: 04/20/20 09:36:08   Page 35
of 147

expecting 91:7
expects 26:18
expended 62:6
expense 68:23
  69:9,13
expenses 21:23
  67:19 68:7,8,9
  68:11 69:5,10
  69:18,23
expert 68:20
experts 41:8
  62:14 69:3
  73:4 75:20,22
Expiration
  93:19,20,21
explain 8:6
  17:18 24:6
explained 16:16
  68:12 69:17
extent 78:10
extra 10:10 15:4
extract 13:2
eye 78:5
eyes 73:5

F

Facebook 30:16
  38:10 58:15
faced 78:7
fact 8:12 18:6
  27:6 34:7 35:7
  90:8 91:17
factored 35:3
  61:21
facts 65:16
  72:17,19 73:22
  73:23 74:1,6
  91:1
fair 23:20 31:21
  65:24
fairly 77:25
faith 78:3,8
false 87:11
  89:19
familiar 54:17
families 86:12
family 86:12

far 28:16 39:11
fast 50:1 71:16
fastest 32:18
  55:7
fault 65:16,17
  66:6
favor 2:24 28:3
  48:3
fear 11:22
February 39:25
  51:24
federal 16:8
  17:6 66:21
fee 60:12 62:3,7
  62:10,21,24
  63:5,10,14,19
  64:3 65:19,25
  69:20 78:13
  79:5
feeding 22:21
feel 2:15 5:7
  30:17 50:15
  58:5
feels 82:11
fees 61:20,23
  62:1,6 67:3,18
  68:6 69:12,23
  82:4
feet 75:21
fell 52:3 65:5
fellow 84:3
felt 4:14,20
FEMA 5:19
  16:3,14,18
  50:25 66:20
fiduciary 24:23
  56:11
field 63:2
fight 66:15,19
  67:16
fighting 66:7
figure 60:14
figured 61:11
file 36:8 43:3
  53:15 54:7,8
  54:10
filed 12:22 20:9

20:13 29:10
43:4,6 72:12
85:15 88:13
Filing 89:4
filmed 7:17 84:6
  84:7
final 6:16 54:4
finalize 57:3
  70:10
finalized 57:3
finally 13:15
  29:4 50:13
  67:20 89:12
finances 18:7
financial 13:2
  18:1,2,15,24
  21:2,7 31:2,5,6
  33:5 41:10
  60:2 61:17
  62:19 66:1
  80:14,18,24
  82:10,21 89:7
financially
  93:13
financing 12:14
find 11:10 59:3
  63:1 76:16
  90:17
fine 14:25 15:5,8
  15:11,20,23,24
  19:18,22 20:3
  20:10,11,15,20
  21:4,12 22:2
  23:23,24 29:12
  38:14 57:19
  61:2 76:16
  88:6
fines 15:14,17
  19:22 21:23
  29:21
fire 4:11 7:23
  8:3,5,17 9:1
  10:2,11,17
  13:22 15:21,25
  16:15 17:1
  18:17,19,21,23
  20:4 21:12

23:2 24:21,22
25:2,15,18,19
26:2,13,18
27:4,11,16,20
30:1 34:1,24
35:1,6,7,14
36:10 37:4,17
44:14,22 45:7
45:12,15 51:14
52:8 53:16
55:1 58:16
62:17 63:3
64:10,16,19,20
65:1,1,10,11
65:12,15,17
67:14 68:19
71:17 74:16
75:14 78:21
81:5,8 83:9,14
86:13
fires 34:25 52:3
  64:19 65:15
  66:12 71:18
  81:17
firesettlement...
  7:14,19 58:22
  83:24 84:2,12
  85:1,6 87:8
  91:24
firm 5:3 24:7,11
  24:11 25:7
  28:12,13 46:6
  46:8,11,19
  51:22,22 62:14
  67:21 68:14
  80:24 88:2
  93:23
firm's 67:7
firms 46:9,23
  49:1,1 53:5,5,6
  64:7
firms' 46:17
first 3:7 8:7
  16:20 19:17
  24:19,20 30:19
  31:18 37:22
  38:13 40:1

47:1 70:7,15
70:17 71:22
81:21 90:6
five 20:18 43:5,6
  43:7 55:13
  84:11,17
five- 33:7
fixed 67:7
flew 77:7
flexibility 39:22
flight 48:15
flow 32:13
fluctuate 30:21
focus 14:17
focused 63:11
folder 49:16
folks 9:20 19:19
  20:5 25:12
  26:4 32:14
  39:18 46:10
  47:21 48:10
  50:3 52:15
  61:6 73:15
  79:20 88:13
  90:5 91:2
  92:13
follow 44:25
  58:12 81:21
following 77:9
follows 24:19
Fool's 26:15
foot 75:23
force 9:18
forced 66:9
  88:16
foregoing 93:5
forever 7:1
forget 50:17
form 41:23
  58:17 63:23
  75:18
formal 45:21
former 52:13
forms 41:20
formulate 59:8
forum 22:14
forward 2:25

Case: 19-30088   Doc# 6900-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 76
of 157

6:14 7:1
**fought** 51:14
66:8
**found** 59:14
**four** 41:9 42:9
51:16 55:10,11
55:14
**fourth** 25:5
85:19
**Fox** 40:25
**Francis** 23:18
**Francisco** 65:8
81:10
**frankly** 25:13
50:11 52:14
53:9 56:18
65:16 71:10
84:17
**Frantz** 28:25
46:13 91:8
**fraud** 9:10 88:2
**free** 2:15 30:17
58:6 90:4
**freeing** 77:5
**freely** 25:7
**frequent** 55:20
90:11
**frequently** 33:10
72:18
**friend** 51:13,16
**friends** 2:15 8:8
8:9 24:3 90:2,9
**front** 59:9 67:19
**frustrated** 4:12
**fully** 16:15
53:25
**functionally**
47:12
**fund** 5:20 11:19
15:15 16:3
17:2,5,8,12
29:22 35:2,8
39:5,19 42:12
60:6 62:13
81:7 89:5
**funded** 19:24
22:4 41:15

**funding** 41:13
**funds** 5:22 15:5
22:2,3
**further** 93:10,12
**future** 8:21
11:18 13:24
17:10,24 18:8
18:25 19:13,24
27:7 82:18

_____

**G**

**G-u-e-r-r-a**
71:20
**gains** 33:17 44:3
**Gary** 61:19
**GAS** 1:5
**general** 69:8,12
**generally** 7:22
32:7 34:4 54:6
61:24,25
**generates** 21:22
**genius** 19:4
**gentlemen** 23:20
**geofencing**
45:10
**getting** 7:8
31:12 33:19
50:5 55:18
57:11 65:7,24
74:11 77:19,21
79:6,24 85:21
88:8 91:23
**Gilberto** 50:18
**give** 7:11 9:7
10:2 18:19
36:7 51:5 53:6
56:5 63:13
67:9 69:4,23
77:22 92:5
**given** 12:13 50:5
71:5 75:22
**glad** 35:16 58:4
**go** 4:6 7:19 11:1
13:7 15:15
23:11 33:17,25
35:10 38:23
44:7 46:1

53:15 54:1,12
54:13 57:20
59:15 60:21,23
63:4 67:5,6,18
67:20 71:8
72:24 74:1
79:11,25 80:9
80:9 82:25
84:1,11,25
85:6 86:20
91:23
**goal** 41:24
**goes** 5:10 30:8
37:21 38:1
39:3,17 81:5
85:18 86:18,18
86:19
**going** 4:24,25
5:21,25 6:3,7
6:11,13,14 7:1
8:12 11:2,3,13
12:8 14:1,12
14:13,24 16:9
17:4,9,17,24
19:3,16 20:6,7
21:14 22:9,16
23:25 26:10
27:1,2 29:3,17
30:6,7,19 32:6
32:9,22,23,25
34:10,19,23,25
35:1,17,19,20
36:3 37:3,5,16
37:25 38:6,6
39:15 40:11,15
40:17,19 41:12
42:3,8,11 43:4
43:7,17 45:2,9
47:15 48:7
49:2 50:6 51:3
53:14,15 54:7
55:6,17,23
57:11,14,18
58:10 60:7,10
60:22 61:8
66:12 67:18
69:6,21 70:16

70:17 73:7,12
73:13,14,25
74:7,8 75:9
76:8,20 77:9
77:14 78:6,7
78:11,24 79:8
79:10 81:8,12
81:17,19 82:2
82:21,25 83:20
83:23 84:18
85:8 87:9,11
88:18,22,23
89:10,19 91:2
91:4,10
**good** 3:10,10
4:18,19 5:17
19:25 20:21
21:5 24:4,9,10
35:4 41:12
44:20 47:4
50:11 52:17
69:16 75:18,24
79:6 80:9
84:23 87:12
90:14
**Google** 70:25
**gosh** 15:10 26:9
62:15 82:13
**gotten** 56:23
65:9
**government**
16:9
**government's**
34:22
**governmental**
17:4 53:18
**governments**
27:9
**Governor** 11:2
12:24 13:8,18
13:18 14:2,16
39:9 74:2 75:8
**Governor's**
34:17 74:20
**Gowins** 23:17
24:2
**grass** 70:16

**great** 43:9 46:25
50:18 57:10
60:19 62:11
66:5 71:25
**grid** 13:23,25
34:11
**gross** 69:22
**group** 4:16 31:2
31:3 45:19
**grow** 32:17
70:16
**growing** 32:18
**guaranteed** 44:9
**Guerra** 2:16
4:15 55:8
71:19
**guess** 18:14
59:16 76:15
**guessing** 32:15
80:15,17
**guilty** 15:1,6
**gut** 35:20
**guy** 63:2 76:12
79:20
**guys** 4:18 5:5,10
31:6 34:6
60:19,21 73:14
78:10 79:9,18

_____

**H**

**half** 8:7 9:18,23
10:6,22 11:6
11:10 15:25
17:19,20 19:21
39:25 40:2
61:3,13 62:16
66:16,18 67:12
67:14,14 76:25
78:18
**hall** 1:9 2:3,4,13
23:10 48:13
58:20
**Hallisey** 23:19
**halls** 2:19 68:13
84:15
**hand** 68:24
77:21

Case: 19-30088   Doc# 6900-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 77
of 157

**handled** 56:12
  56:17
**happen** 4:17
  11:13,22 14:3
  22:16 29:25
  32:22 37:7,25
  38:9,18 40:11
  40:19 54:3,9
  77:13 78:17
  79:10 82:24
  87:1
**happened** 15:9
  15:12,18 19:17
  20:7 21:17
  23:13 24:6
  29:21,25 40:6
  72:22 77:4
  84:22
**happening**
  82:11
**happens** 11:24
  17:25 18:7
  36:24 41:16
  46:18 50:22
  54:4,6 77:9
  86:5
**happy** 4:21 5:6
  23:5,10 28:6
**hard** 13:18
  39:16 42:2,21
  47:11 48:9
  51:14 56:25
  57:1 65:7,18
  90:12
**hardening** 13:23
  13:25
**Harvard** 64:2
**Hawaii** 45:4
**head** 80:7
**headquarters**
  74:16
**heads** 21:19
**hear** 12:18
  17:13 22:13
  58:5 84:18
**heard** 25:22
  38:17,19 68:18

  87:23
**hearing** 12:3
  38:4 79:16
  83:11
**heavily** 36:12
  63:20
**Helen** 56:1
**help** 3:13 7:3 8:7
  10:24 21:9
  40:22 55:6
  71:4
**helped** 29:18
**hey** 27:21 40:9
  49:2 55:18
  60:19 65:10
  70:13 76:5
**high** 15:5,16
  33:8 34:10
  52:4 73:16
**higher** 8:16
  12:11 36:1
**highest** 66:6
**highly** 48:20
**hill** 64:21 65:2
**hints** 66:16
**hire** 62:13,14
  69:11 80:23
**hired** 18:14
  42:16 58:24
  80:17
**hiring** 42:16,17
**history** 14:15
  26:7 91:15,16
**hoist** 78:18
**hold** 33:3,6,25
  44:2,6 51:9,10
  72:3,3 73:7
  77:13 83:1
**holders** 18:19
**holding** 35:3
**holes** 90:17
**home** 35:21,23
  36:10,11,12,14
  36:16,18 47:9
  49:12 75:13,22
  76:1,6,11,14
  83:13 86:3,6,9

  86:9
**homes** 8:13,14
  8:16,19 10:5
  14:18 15:20
  27:1 35:12,12
  35:14 36:21
  72:23 86:3
**honest** 7:24 80:2
**hope** 19:6 27:5
  39:16 50:7
  54:9 72:25
  73:18,21,22
  84:23
**hopefully** 53:20
  54:10,13 81:6
**horrible** 4:12
**hourly** 62:6
  63:14
**hours** 22:23
  47:10 90:1
  91:21
**house** 17:15
  37:13,14,16
  43:4,6 55:13
  60:6 71:1,1,10
  71:13 75:4
  76:17,21 79:18
  79:24 80:14
  85:23
**household** 42:25
**houses** 11:21
  52:9 88:15,19
**Houston** 93:24
**huge** 63:3 77:5
**human** 52:13
**hundred** 16:7
  28:4 49:5 50:6
  52:21 53:10
  64:6 67:21
**hundreds** 20:25
  48:13 80:15

---

**I**

**idea** 5:17 11:15
  15:17 60:15
  61:7
**identified** 87:25

**ill** 52:12
**imagine** 49:8
**immediately**
  25:3 70:18
**impact** 86:14
**imperils** 20:11
**implant** 9:9
**important** 5:1,4
  6:22 18:8
  31:23 60:24
  64:10 77:1
  89:12 91:18
**importantly**
  32:20
**improve** 29:24
**improvements**
  13:17
**in-person** 2:4
**incentive** 39:21
**inclined** 92:6
**included** 8:25
  20:3
**including** 10:14
**income** 22:5
  44:3 67:6
  82:18
**inconvenienced**
  88:16
**inconvenient**
  34:25
**increase** 32:6
**increased** 65:23
**increasing** 32:16
**indebtedness**
  20:25
**independent**
  56:12
**index** 31:24,25
  32:1
**indict** 15:3
**individual** 23:23
  24:25 46:23
  52:19,20 57:8
  59:17 67:3,4
  68:10 69:10
**individuals**
  22:15 23:15

  62:3
**industry** 63:21
**inequitable** 63:6
**information**
  2:20 3:19,20
  7:11,16,18
  14:21 47:14
  50:16 69:22
  73:6 84:2,8,13
  84:13 85:1,7
  92:2,5
**informed** 3:25
  48:20 92:6
**infuriated** 34:6
**initially** 64:19
**injured** 62:23
**injury** 52:18
**inside** 37:8 46:8
  54:17,18 55:13
  76:1
**insist** 78:19
**insisting** 75:9
**institutions** 18:3
  61:17
**insurance** 3:14
  8:13 10:4 18:5
  53:11 60:5
  61:12 71:5
  73:24 74:6
  76:5,17,24
  77:2,19,22,25
  78:3,6,14,17
  79:3,4,7
  81:20,25 82:1
  82:3
**insure** 60:12
**insured** 59:22
  60:9,10,16
  61:15
**insurers** 11:8
**insuring** 33:13
  59:20
**intent** 20:12
  35:24 36:2,4,8
  36:19 37:9,12
**interest** 8:5
  12:11 17:8

21:21 63:7
92:11
**interested** 93:13
**interesting** 19:7
**interests** 25:8
**interviewed**
64:21
**intestacy** 86:16
86:23 87:2
**inundated** 6:20
**inverse** 64:13
**investment**
32:24 33:12
40:15 60:13
80:24
**investments**
13:23 19:25,25
44:9,10
**investors** 13:6,9
**invited** 12:15
**involuntary**
15:7 21:12
**involved** 5:1
12:16 19:20
29:19 53:23
64:6 67:11
**involvement**
12:10
**involving** 72:12
**iPhone** 45:6,8
64:22
**issuance** 40:16
82:16
**issue** 5:18 6:12
10:19 16:12
21:11 22:9
40:5 56:12
60:6 76:24
83:19
**issued** 20:17
43:20 44:7
60:10 64:19
**issues** 5:11,14,17
23:13 29:10,11
59:11 65:19
**it'll** 33:22 38:2
43:22 58:13

70:11 86:8

**J**
**Jake** 79:13
**January** 17:22
17:23 51:24
60:8 82:19
**Jean** 43:13
**Jeremiah** 23:19
**Jerry** 57:21 58:2
58:3 86:25
90:23
**Jim** 28:25 91:8
**job** 4:18 7:10
24:10 51:4,23
53:9 56:14,15
56:16 69:16
70:12 72:17,24
73:6 75:9
**Joe** 2:16 3:5,12
4:4,6 7:7 14:23
15:10 16:1
23:14 67:16
85:2
**John** 41:17
87:15
**join** 4:16
**joined** 72:2
**joins** 20:14
**joint** 68:14
**Jointly** 1:5
**joke** 26:16 73:18
82:9 85:17
**jokes** 66:22
**Journal** 26:12
26:21 28:22
**Judge** 34:20,20
38:4,17,20
39:2 66:23
**judgment** 34:18
52:20
**judicious** 69:13
**Julian** 51:12
53:21
**Julian's** 53:12
**Julie** 44:13
**July** 40:2,20

41:14
**June** 8:23 9:16
39:1,5 40:20
41:14
**Justice** 32:25
**justified** 62:11
**justifies** 65:19

**K**
**Kane** 24:4
**Karen** 23:17
24:2
**Katherine** 86:2
**keep** 33:11
38:25 46:19
51:10 77:16,17
81:8,12 83:5
83:23 85:8
87:9
**Kent** 46:2
**kept** 88:9
**kidding** 79:17
**kids** 70:24 86:19
86:20
**kill** 61:12
**Kim** 83:11
**kind** 6:19 7:22
13:1 17:10
36:1 53:8,13
56:5 60:1
76:18
**Kirk** 23:16
**knell** 21:8
**knew** 21:16
34:10,10
**know** 4:10,10,23
5:9,13,20 6:5,6
6:8 14:25 26:5
27:15 34:5
35:9,22 37:3
37:21 38:6,23
39:22 41:9
42:12,19,20,20
43:20,22 44:2
44:6 45:3,20
46:6,17 47:2,8
47:12,13 48:19

48:20 49:2,10
50:19 54:2,15
54:18 55:8,22
56:2,19,23
57:18 58:18,20
59:7,12,25
60:14,17,18,19
64:10 69:14,24
69:25 70:4,11
70:17 71:7,21
71:22 73:16
76:4 77:2,17
79:13 80:16
82:7,9,13,13
82:21,24 83:12
84:17 87:18
88:11,16 89:1
89:22 90:8,14
90:20,21
**known** 6:2 24:7
32:24 65:20
**knows** 6:8
**kudos** 61:10

**L**
**labyrinth** 65:20
**Laffredi** 24:17
**Lane** 64:24
**lapses** 52:20
**large** 9:3 46:10
53:4 55:24
62:4 82:19
90:3
**largely** 57:2
**largest** 18:2
28:12 57:22
91:15,16
**lastly** 17:13 67:2
**lasts** 27:3
**late** 12:10 72:2
**latest** 89:24
**law** 24:7 28:13
35:23 37:11
44:23,25 46:9
46:11,17,23
49:1,1 52:6,7
54:6,17 57:24

58:9,12 64:7
68:5,14 77:24
86:23
**laws** 86:16 87:2
**lawsuit** 8:17
52:10 62:23
**lawsuits** 17:9
51:25 53:14
62:13
**lawyer** 4:17 23:7
23:11,18,25
25:10 26:17
28:19 51:11
56:20 61:10
63:7,8 66:10
67:5 72:21
76:13 78:16
**lawyers** 15:12
18:16 24:4,9
26:4 27:15,20
29:25 30:1
48:9 53:22
56:6,6 58:5
59:2 60:12
62:4,13 63:11
63:18 64:6,7
64:13,20 65:6
65:18,21 66:1
66:7 67:6,11
67:11 73:7
77:8 82:4 90:8
90:12
**lay** 4:8
**layered** 3:16
**Lazard** 40:13
**lead** 39:20
**leading** 75:7
**learn** 7:20
**learned** 8:12
34:14 80:10
**learning** 8:14
**left** 10:1 49:20
83:5 85:9
91:20
**legal** 38:9 64:12
64:15 66:6
**legislature** 8:23

Case: 19-30088   Doc# 6904-2   Filed: 04/20/20   Entered: 04/20/20 00:36:09   Page 79
of 157

8:25 9:16
**legitimate** 87:20
89:14
**length** 4:20
**lesser** 15:3
**let's** 40:6 47:13
49:14 61:11
85:8 87:9
**letter** 24:12,16
25:9 49:9
**letters** 79:1 85:4
**level** 5:1 67:3
71:7 86:9
**levels** 63:2
**lever** 13:2
**leverage** 9:18
12:10
**liabilities** 8:22
27:3,8,8 32:4
**liability** 34:8
52:23 61:5
65:14 78:8
**license** 14:8
**life** 21:1 44:22
**light** 27:17
64:25 65:4
68:21
**lighting** 64:24
**likeliness** 75:15
**Likewise** 10:12
52:12
**limit** 70:1
**Lincoln** 31:3
**Linda** 47:1,1,4
**line** 3:8 4:4,14
7:9,10 12:9
16:13,20 21:6
22:22 27:18
29:15 42:13
44:20 50:25
57:17 58:8
65:3,5,22,22
66:25 68:6
76:19 86:11
90:20 91:22
**lined** 13:11
**lines** 52:4

**link** 58:21
**links** 58:22
**liquidate** 33:22
**liquidated** 18:23
**Lisa** 36:23 37:2
**list** 79:22 85:16
**listened** 5:2,8
84:17
**listening** 23:10
30:15 43:11
58:15
**lists** 70:23
**literally** 48:14
**literature** 14:22
**litigation** 9:4
27:3 56:7
63:23 64:3,4
67:23 69:9,13
**little** 4:8 9:22
20:1 22:11
38:2 66:16
82:8
**live** 2:2 4:24
68:12 72:7
**lived** 4:24
**lives** 7:2 27:2
**living** 83:2
**loan** 36:6 89:6,8
**local** 10:13 11:9
27:9 66:21
**located** 64:22
**long** 10:20 19:20
35:9 38:3
49:10 61:15
65:11 82:18
83:1 90:5
**longer** 11:18
16:24 29:21
**look** 10:20 21:5
38:6 39:13
40:9 51:18
52:15 55:5
72:19 76:18
77:8 78:4
**looking** 41:9
73:21 80:4
**looks** 37:20

61:19 71:25
72:2 75:11
**Lord** 44:20
**Los** 77:7
**lose** 47:25 73:24
**loses** 58:11
**losing** 14:7 57:9
**loss** 11:9 21:1
71:3 75:25
**losses** 9:12 10:19
**lost** 4:11 11:7
27:9 58:9 64:1
86:9 89:10
**lot** 3:18 5:4 7:15
7:15,16 8:10
10:5 30:15
31:12 32:10,24
33:23 36:24
37:2,9,12
40:23 49:1
52:18 53:4
56:19 62:18,20
64:5,6 65:9
67:18 68:9,18
69:4 72:14
73:10 79:17
80:3 83:12
84:21,22 85:18
87:13 88:13
89:2 91:3
**lots** 37:7 83:13
**Louisiana** 93:2
93:20
**loved** 54:10 57:9
**low** 69:18
**lower** 44:4

———————
**M**
———————
**mail** 49:7,21,24
50:8
**maintain** 81:2
**maintained** 78:8
**major** 31:21
33:12 40:14
74:21 82:6
**majority** 28:15
46:12 62:11

74:18
**making** 16:18
20:18 21:4
34:18 73:4
89:8
**man** 55:18
**mandated** 13:22
**mandates** 13:16
**mandatory** 34:5
**manslaughter**
15:1,7 21:13
**March** 21:18,18
24:18 40:1
51:24
**margin** 31:17
**market** 13:10
31:15 33:11,15
40:3,5 41:11
44:8 80:7,11
83:13
**markets** 21:2
**mask** 72:18
**mass** 42:9
**massive** 11:11
14:2,2 17:4
81:13
**material** 81:15
**materially** 68:23
**materials** 49:4
50:2,3
**math** 27:7
**Matt** 79:21
**matter** 12:2 48:1
51:2 93:8
**Matthew** 69:24
**Mauro** 4:16
**maximize** 71:10
**maximized**
33:13
**maximizing**
35:5 63:11
**maximum** 15:8
**mean** 4:11 32:9
39:23 40:24
44:8 51:18
57:8 65:21
67:21 69:7

85:18
**meaning** 17:1
49:15
**meaningful**
32:16
**meaningfully**
31:21
**means** 16:14,16
26:21 32:15
62:23 74:3
**meant** 16:23
61:4
**media** 14:22
38:12
**mediations**
16:11
**mediator** 29:18
66:23
**mediators** 66:2
**meet** 8:22,24
14:7 38:22
52:6,16 68:1
77:8
**meeting** 2:7
90:10
**meetings** 2:4
31:7 48:13,18
56:19 58:21
68:13 83:18
**meltdown** 26:22
91:13
**member** 24:22
**members** 13:20
24:12,13 25:15
29:14 84:4
86:12 90:2
**membership**
25:3
**mental** 44:18,24
**mention** 74:12
**mentioned**
14:23 15:10
16:1 72:1
76:24 87:21
**Merit** 93:3
**mess** 59:2
**message** 85:18

85:21
**messages** 85:5
**met** 23:24
**method** 64:4
**Michael** 68:19
**Michelle** 59:19
59:24,25
**middle** 58:6
62:12 72:11
**midst** 13:9 25:13
**Mikal** 2:1 3:22
5:15,24 6:2,7
6:13 7:6 15:12
19:4 30:13
32:24 42:23
48:23 57:15
71:15 82:25
92:3
**Mike** 26:17
28:21 91:6,11
**mile** 64:22
**Miller** 2:17 3:4,9
67:17 85:3
**million** 15:8,19
15:19 16:7
17:22,23 19:19
19:21 20:2
21:22 22:4
32:13 42:3
52:22 53:10
60:7,7 61:4,9
61:13 62:15
68:22 69:1,6,8
**mind** 6:14
**mine** 3:11,15,23
24:3 83:19
**minefield** 66:3
**minimize** 83:2,3
**minor** 81:9
**minute** 16:2
22:21 91:19
**minutes** 22:22
83:5 85:9 87:9
**minutes'** 44:22
**mistake** 66:4
**mitigate** 80:17
80:22 81:18

89:18
**mitigated** 35:6
**mix** 43:19
**mobile** 35:12,12
35:14,21 36:11
36:11,15,17,20
50:4 86:3,3,9,9
**moderator**
22:17
**modified** 38:22
**modify** 58:11
**money** 11:11
12:5,8 13:13
13:24 14:11
15:16 16:9,19
18:10 27:10
28:19 31:9
40:16 42:11
50:23 51:2,5
56:10,14 59:18
62:12,16 64:5
67:13,19 69:14
72:23 74:25
77:3,10,23
88:19 91:3
**moneys** 53:21
77:15
**Montali** 34:20
38:18
**month** 20:2
32:14 40:2,3
47:19
**months** 16:12
26:12 32:1
35:4 51:16,23
**morass** 42:9
**morning** 40:24
59:14 84:7
85:19
**motivated** 63:16
**motive** 6:19
**move** 6:14,25
86:10
**MSNBC** 40:24
**multibillion-d...**
13:23 66:20
**multiple** 32:7

42:25 56:7
**multiples** 82:18
**municipalities**
10:13 66:21

### N

**named** 15:12
22:17 23:18,25
51:12 57:15
79:21
**nature** 63:6
**nays** 46:21
**Nearly** 28:3
**necessary** 2:5
9:2 10:24
**need** 2:24 5:13
7:3 22:10
23:11 39:21,22
47:14 50:16
56:21,21,22
58:17 59:3
60:5 70:1 71:4
71:4 75:17
77:23 78:16
85:12,23
**needed** 4:14
**negative** 70:5
72:5
**negligent** 64:12
**negotiate** 33:2
**negotiated** 8:4
10:13 13:19
15:13 19:19,22
31:18 39:9
**negotiating** 5:25
7:25 40:8,18
**negotiation** 7:25
10:9 13:2 14:5
**negotiations**
60:17 90:3
**neighborhood**
75:23
**neighborhoods**
37:7
**neighbors** 8:9,9
**neither** 93:10
**net** 10:19

**neutral** 14:9
57:16
**neutrals** 42:17
89:16
**never** 11:22 20:6
66:12 72:20
**new** 2:5 8:21
11:7,8,16
14:15 18:22
36:16 80:14
82:17 84:19
91:25
**news** 20:21
40:25 84:23
89:24
**Newsom** 12:24
13:18 14:3
**Newsome** 66:23
**newspaper**
38:11
**nickels** 51:5
**night** 2:8 79:19
**nine** 9:8 85:8
**Nobody's** 13:11
**noes/yes** 46:3
**NOL** 27:9
**NOLs** 10:19,22
**noneconomic**
57:25 58:9
**nonsense** 65:3
**nonstop** 67:23
**noon** 2:14 84:16
92:4
**normally** 47:10
**North** 4:19 8:10
23:3 34:8 37:8
55:3 57:13
67:12 71:18
72:22 83:10
85:3 87:6
**Northern** 1:1
14:8
**notice** 20:18
44:22 89:2
**noticed** 70:14
**notification**
88:11

**notoriously**
49:25
**number** 3:11
28:5,12 31:15
43:2,20 49:24
51:17 57:22
71:2 75:21
90:3
**numbers** 46:11

### O

**Oakland** 48:15
**objection** 38:11
**objections** 38:16
38:17,19,21,22
**objectively** 14:6
**obtain** 18:4
**obtaining** 70:3
**obviously** 37:2
47:6 57:7 64:5
75:16 81:15
**OES** 5:19 16:25
66:20
**offer** 9:18 12:12
**offered** 15:2
63:14 66:13
**offering** 28:17
90:25
**offers** 66:9
**Office** 16:4,24
34:17
**officers** 52:14,19
52:23 53:3
74:19
**offices** 67:25
68:3
**official** 25:4
**officially** 12:24
**oh** 15:10 26:9
82:13 88:8
**okay** 37:1 38:16
59:19,24 62:1
70:7 72:19
74:7 79:6
**old** 14:14 34:11
82:15
**on-line** 43:10

Case: 19-30088   Doc# 6984-2   Filed: 04/28/20   Entered: 04/28/20 09:36:08   Page 96
of 147

**once** 8:15 9:10
32:21 41:11
54:19 60:4,11
68:16
**one-month**
37:23
**one-third** 63:19
69:20
**ones** 46:6 54:10
58:23
**online** 59:20
**opal** 76:14,15
**open** 19:16 22:9
23:9 29:9
66:11 68:3
86:7
**opened** 22:14
67:25
**operating** 10:19
**opinion** 24:21
25:1,6 72:13
**opinions** 73:16
**opposed** 23:21
37:17 45:3
74:22 84:20
91:1
**optimize** 29:16
29:20 90:12
**option** 12:1,14
12:18 17:18
39:23 43:17
**options** 12:5
75:15
**order** 8:20 14:9
14:25 33:11
38:21 60:25
75:24 89:1
**ordinary** 44:3
67:6
**organizations**
19:8
**organize** 3:20
**origin** 68:20
**original** 16:1
**originally** 65:11
**ought** 52:15
**outcome** 93:13

**outdoor** 70:21
**outstanding**
51:23 75:9
**overemphasized**
67:1
**overpayment**
77:20
**overtures** 66:15
**overwhelming**
6:23 28:16
74:17 90:24
**overwhelmingly**
29:6 46:15
91:10
**owed** 9:6 18:6
62:8 64:11
**owes** 82:2
**owners** 74:24
75:3,6
**ownership**
18:20
**owns** 85:10

———————
**P**
**Pacific** 1:5 2:14
84:16
**pages** 20:18 49:6
50:6 84:6,7
**paid** 9:4,9,11
10:4,5,7 12:19
15:24 16:15,15
16:17,20 17:19
19:9 21:14,15
21:16,20 22:4
39:21 40:10
41:24 45:21
53:25 57:11
63:8 65:10
66:7 67:3,13
67:24 76:25
77:11,15 78:12
78:15 79:3,4
81:25 82:5
87:20 89:19
**palatable** 30:2
**pandemic** 13:11
**paper** 29:10

49:25 50:5
87:3 88:5
**papers** 20:14
49:14
**Paradise** 3:6,12
4:24,25,25 8:9
11:21 37:6
74:13 77:12
**parents** 44:14
45:22 86:21
**park** 86:4,7
**part** 4:9 14:4
18:20 20:22
29:22 30:20
31:10 34:7
39:23 40:1
42:3 44:15
49:9 55:24
60:10 82:2,19
**partially** 30:24
60:16
**participants** 8:1
15:22
**participate** 2:22
8:20 12:14
22:16 80:10
**participating**
2:2 92:14
**particular** 10:19
**particularly**
37:4 42:24
**parties** 17:10
93:11
**partners** 21:7
40:14 68:15
**parts** 74:3
**party** 12:4 51:21
56:13
**passage** 25:20
**passed** 54:9
86:13
**patience** 16:10
**Paul** 56:9
**pay** 5:22 8:2,3
8:21 9:18 10:7
10:24 12:11
13:13 14:11,24

14:25 15:4,11
18:23 33:9
39:14 42:2,3
42:11 43:24
56:9 60:4,5
63:1 76:2 78:1
78:23 79:9
82:3
**payers** 14:10
**paying** 15:20
33:6 64:4
78:19 79:5
89:13
**payment** 19:9
37:23 61:11,18
62:5,6 63:23
89:9
**payments** 9:21
17:21,24 18:6
37:22 39:8
61:15 78:14,15
**pays** 26:25
**pen** 38:11
**penalties** 5:22
15:14,18 19:22
**penny** 15:24
21:16
**people** 2:21 4:10
4:13,19,21
5:20,23 6:6,17
6:18,23,24 7:2
7:9 11:3,20
14:17 15:22
18:16 19:5
21:19 25:23,23
26:9 28:20,22
29:5 30:2,15
32:13,23 33:9
33:24 35:19
37:6 39:21
41:22,24 42:4
42:7,17,17,24
42:25 43:5,13
46:7 47:18
51:14 53:24
54:21 59:21
61:20 65:10

68:7 72:1,10
72:12,15,25
73:11 74:18,24
75:3,7 76:6
78:12 83:2
85:23 88:19
90:4,4,21
91:22
**people's** 27:1
56:15 70:23
72:18
**per-claim** 85:15
85:24
**per-person**
68:11
**percent** 9:12
18:22 31:19
36:9 64:2
69:19 72:8,9
72:10
**percentage** 9:5
62:9 76:6
86:18
**perfect** 5:10
29:2,3
**peril** 28:11
**perilous** 64:9
**period** 11:24
21:21 33:7
41:22 92:1
**permanently**
20:23
**person** 26:16
62:23 85:13
**personal** 70:20
70:21 71:7,12
76:7
**personally** 33:15
39:20 68:1
**persons** 23:6
64:22
**pervasive** 63:23
**Peter** 56:8
**PG&E** 1:3 3:14
5:21 8:2,18,20
8:24 9:1,18
10:23 11:2,6

Case: 19-30088   Doc# 6900-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 82
of 157

12:11 13:1,9
13:17,19,25
14:11,14,15,25
15:3,6,21
17:17,25 18:4
18:19,20,22
20:9 21:24
26:13 27:4
31:18 32:2,8
32:11 33:18
34:8,21 39:1
41:20 42:2,11
51:2,5,6,20,25
52:1,5 60:19
62:18 63:4
64:11 65:8
66:8,10 72:15
73:1,25 75:6
**PG&E's** 15:10
15:20 18:7
20:14,24 27:19
32:17 34:15
39:18 64:20
65:5,16,17
80:18
**phone** 3:24
41:17 43:10
45:10 50:4
69:17 85:18
90:1
**photographs**
75:17
**photos** 75:13
**PHYLLIS** 93:1
93:18
**pick** 49:6 56:8
65:21 72:11
**picture** 76:15
**pictures** 70:21
70:25 76:9
**pissed** 72:15,20
**place** 4:12 47:7
47:13 89:13
**placed** 15:25
31:20
**plaintiff** 54:16
56:9,10 57:23

57:24
**plaintiff's** 54:16
**plaintiffs** 64:2
67:4
**plan** 2:24 6:13
6:14 7:4,21,24
8:4,25 12:1
13:4,12 16:2
20:12 22:6
24:23 25:21,23
26:3,19,22,25
27:16,19 28:3
28:7,15,24
29:5,7 38:22
38:23 42:7
46:12,16 48:3
48:7 53:22
59:8 73:18,19
73:21,21,23
74:1 91:10,13
91:14 92:8
**play** 80:7
**playing** 63:2
**plea** 21:23
**plead** 15:1,6
**please** 30:12
58:1
**plenty** 9:12
**plunder** 5:20
**plus** 3:12 51:19
**pocket** 67:21
**point** 9:24 40:6
43:23 59:13
76:23 77:2
**point-blank**
41:24
**policy** 18:5
73:24
**politely** 52:17,21
**politically** 72:7
**pool** 8:21 35:2
**poor** 53:9 62:12
**popular** 77:2
**portion** 9:9
63:24
**position** 20:14
25:4 64:11

66:11
**possibility** 86:6
**possible** 3:21
14:10 42:18,22
**possibly** 82:7
**post** 87:7
**post-traumatic**
45:22
**postmark** 50:10
**pot** 53:24 56:14
57:14
**potential** 51:25
**potentially**
39:11
**power** 34:5,9,12
34:16,19 48:6
63:3
**practical** 51:2
**practicing** 4:17
**pray** 50:7
**pre-doing** 42:10
**predictable**
32:12,15 82:23
**prefer** 23:21
50:14 81:16
**preference**
47:19
**preferred** 26:4
64:3
**premises** 35:25
37:10
**premiums** 78:15
**prepublished**
88:23
**present** 12:15
23:22 35:24
36:4,19 37:9
37:12
**President** 72:11
**presidential**
72:10
**press** 21:25 30:5
30:5
**pressure** 9:1
**presumed** 86:18
**Pretend** 39:24
**pretty** 55:22

89:3
**prevent** 13:24
34:25 72:22
**prevents** 14:10
**previous** 68:13
**price** 11:6 33:12
35:3 81:8
82:16
**priest** 45:18
**primary** 9:17
14:19 85:11
87:18
**Prime** 46:22
49:3 88:8
**principle** 45:9
**prior** 3:2
**private** 24:24
25:2 65:3
**proactive** 48:16
**probably** 3:10
4:13,25 36:12
40:11 54:7
66:24 69:20
70:14 86:25
87:3
**problem** 5:25
6:8 11:14
34:11 60:4
61:4 64:17
**procedure** 54:7
**proceed** 2:25
38:8
**proceedings**
93:7
**proceeds** 53:17
54:13
**process** 3:14,15
7:18 42:2,10
42:15,18 43:14
43:15 71:9
89:2,18
**processed** 6:15
**professionals**
18:17 25:16,18
**profit** 67:6,21
**profits** 14:17
74:23

**progress** 20:16
87:22
**project** 5:9
**projected** 18:25
**projections**
32:18 53:7
**prominent**
61:17
**promise** 21:25
**promised** 23:14
61:5
**pronounce**
46:24
**proof** 46:19 89:9
89:14
**properly** 92:6
**properties** 37:3
85:12
**property** 21:1
70:20,22 71:7
71:12 76:7
85:11,12
**proportion**
63:10
**protection** 27:5
**proud** 13:16
51:15
**prove** 45:2
75:12,17 76:3
76:3,4
**provide** 13:13
**provision** 51:6
**PSPS** 34:5
**PSPSs** 34:14
35:6 81:17
**psychiatrist**
45:19
**psychological**
45:14,15
**psychologically**
44:21
**psychologist**
45:19
**PTSD** 44:14,15
70:3
**public** 2:18
22:14 62:12

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 04:36:09   Page 83
of 157

69:11 70:22
**publicly** 25:7
73:9
**publish** 57:4
**published** 70:12
83:23
**publishes** 70:9
**pull** 86:23
**pulled** 12:12
17:4
**pulling** 73:5
**punishing** 33:12
**purchased** 22:24
**pursuant** 67:4
74:2
**pursue** 62:23
**pursuing** 53:14
**pushing** 16:22
83:6 88:9
**put** 4:8 7:15 9:1
9:16 12:4,8
14:17,17,21
17:16 19:20
21:19,25 25:6
29:18 31:13
39:12 42:3
49:15,20 50:8
52:17,21 56:14
57:4 58:21
63:22 64:1
67:18 71:9
72:17 75:1
83:20 91:11
**puts** 44:5 49:16
**putting** 8:1 21:3
74:25

**Q**
**quarter** 82:22
**question** 11:4
14:23 22:10
23:11 30:7,7
30:14,24 35:10
35:10,11,17,17
35:19 36:22,23
37:9,11,19,20
37:25 39:7

42:20 43:10
47:5 50:14
51:10 54:1,5
56:1 57:12
58:14 61:14
70:7 71:14
72:4 75:12
79:11 84:9
86:2,24 87:5,8
87:10,12
**questions** 3:22
3:22,25 19:16
22:10,18,19,20
22:23 23:6,12
29:9 30:9,12
31:15 42:24
47:1 48:13,17
48:19 59:8
61:20,23 65:9
69:25 83:6
84:5,8 89:21
91:23
**quick** 71:21 76:2
89:23
**quickly** 33:21
42:14,18
**quit** 71:6
**quote** 20:23
26:21,23 28:16
35:12
**quoted** 26:16,18
26:20 28:14,21
29:1
**quotes** 36:14,16

**R**
**rage** 6:11
**raid** 88:18
**raise** 66:9
**raised** 20:2
31:15
**raising** 29:10
**Randall** 66:23
**range** 69:19
**rate** 12:11 14:9
14:10 44:4
60:14 63:20

**ratio** 46:3
**reach** 3:23 54:22
83:7
**reached** 15:23
**reacquire** 36:19
**read** 22:17
26:15 30:7,19
**reading** 38:10
**ready** 6:15
13:12 36:16
53:14 65:7
**real** 51:15 60:6
81:12
**reality** 11:25
74:16
**really** 4:18,21,22
5:1,4,7,7,12,18
6:22 39:16
51:14 53:4,4,4
60:3 65:7,18
72:15 80:18
83:25
**Realtime** 93:2,4
93:4
**reason** 9:17
12:24 28:18
32:2 39:2
40:20,21,22
58:25 77:4
80:10 81:6
86:1 90:21,22
91:2,4,6,8,11
**reasonable**
11:24 63:21
**reasons** 14:19
48:8 60:17
88:1
**rebirth** 33:18
**rebuild** 8:8,13
8:18 10:5
11:21 27:1,1
35:24 36:2,8
36:19 37:5,10
37:13,15,17
71:12 72:23
74:13,14 75:24
86:7 92:11

**rebuilding** 3:14
11:24 14:18
37:18 83:12
**rebuilt** 35:13
77:11 86:5
**recap** 89:23
**receipts** 75:14
76:10
**receive** 18:21
43:3
**received** 46:4
54:23
**receives** 63:24
**receiving** 43:1
**receptacle** 92:2
**recession** 11:5
**Rechtschaffen**
20:17
**recommend**
7:23 48:21
90:13
**recommendati...**
48:20 57:18
92:8,10
**recommendati...**
79:1
**recommending**
7:20
**record** 58:21
**recording** 93:7
**recover** 9:21
41:12 81:23
**recovered** 83:15
83:18
**recovery** 17:11
62:8,9 63:10
63:12,25 68:24
69:15,19,22
**reduce** 15:5 22:2
**reduction** 22:7
**reformulated**
10:21
**refreshing** 74:21
**regard** 20:17
**regarded** 87:16
**regardless** 11:5
17:24 18:7

24:24
**Registered** 93:3
**registering** 89:3
**regular** 21:3
**regulatory** 32:4
**reimbursed** 69:7
**reimbursement**
76:22 77:15
**reject** 9:19 12:19
13:11 28:19
46:8 91:3
**related** 93:10
**relative** 65:14
**release** 21:25
**relocate** 83:14
**relocation** 83:15
83:17,20
**remainder**
50:22
**remember** 55:12
55:24
**remove** 25:5
**removed** 87:25
**rent** 67:24
**rental** 85:11
**reopens** 86:10
**repaid** 69:15
**repay** 68:10
**replace** 8:16
36:13,15
**replaced** 35:13
**replacement**
13:20 36:1
86:6
**replicated** 65:4
**report** 64:19
**reporter** 58:24
93:1,2,3,3,4
**Reporters** 93:22
**represent** 25:18
56:7 61:1
73:10 90:2,21
**representative**
34:16,17
**represented**
2:18 23:7,17
23:18,24 24:3

**representing**
18:16 24:12
26:4,17 27:16
68:15
**represents** 28:20
28:22,25 29:5
57:22
**reputation** 4:19
**reputations**
87:16,17
**request** 4:23
**requests** 6:21
**require** 12:11
17:14 62:5,5
81:20
**required** 14:16
17:17 18:4,18
19:14 42:6
**requirement**
59:16 88:24
**requirements**
14:6 39:9
**requires** 13:19
74:21
**requiring** 17:16
**rescind** 20:20
**rescinded** 20:15
**researched**
63:20
**reserved** 77:10
**reserves** 77:1
**resign** 24:5 90:6
**resignation** 25:5
**resignations**
23:15 27:18
**resigned** 23:16
24:14 25:12
**resolve** 5:11
**resources** 47:20
**respect** 2:20 5:8
19:18 23:19,24
25:12 29:21
31:8 34:2
36:20 39:10
46:9 49:1 67:9
77:24
**respond** 44:21

**responding**
73:22
**response** 28:16
90:24
**responsibilities**
31:5
**responsibility**
52:20 62:22
64:18 79:8
**responsible**
52:10
**restrained** 24:20
**result** 18:21
22:6 24:25
44:14 66:5
**resulted** 12:23
**results** 46:24
**resume** 27:2
**resurrect** 26:8
**retention** 62:4
**returned** 55:14
**reviews** 89:15
**revisit** 21:13
**rich** 78:17 91:9
**Richard** 29:4
**rid** 61:7
**ridiculous** 16:19
**right** 6:2,18
16:18 19:13
24:20 25:1
26:24 30:3
33:16 38:13
41:2 43:16
46:3 48:22
49:13 54:13
58:6 68:4
69:23 74:11
77:16 78:7,19
84:24
**rightfully** 34:13
**rights** 33:2
40:18 48:1
89:17 90:7
**rise** 19:1 44:5,10
**rises** 63:10
**rising** 41:2
**risk** 8:21 11:17

17:25 28:10
34:3,24 35:2,6
35:6 44:6
80:17 81:9,12
81:18,18 83:3
83:4
**risks** 14:7
**RMR** 93:18
**road** 37:5
**robbing** 56:8
**ROECKER**
30:13 35:11
36:23 37:20
42:23 43:9
44:13 46:2,25
50:18 51:8
54:2,21 56:1
58:14 59:19
61:19,25 69:24
71:25 75:11
79:13 83:11
85:10 86:2,11
87:10 89:21
**Roeker** 22:17,20
**rolls** 75:19
**room** 16:16
32:16 34:18
**rooms** 7:25 71:9
**Rosa** 3:5 37:8
68:1
**row** 47:1
**Roy** 2:17 3:4,8
4:3 67:17 85:3
**rule** 38:21 70:9
**rules** 2:23 23:8
35:18 41:19
45:17,25 56:6
57:2,4,5 58:20
59:9 78:20
81:23 83:17,23
87:19
**run** 54:19
**running** 44:21
47:21
**rushing** 6:18
**Ruth** 51:8 54:2
54:20 58:13

**S**

**safe** 53:8 92:14
**safety** 13:17
14:6,17 31:17
53:7,7 74:22
**salaries** 67:24
**sales** 11:5
**Sam** 22:17 30:7
30:11 35:9
46:1 51:9 54:1
72:3,3,3 75:11
79:11 87:9
**San** 65:8 81:10
**Santa** 3:5 37:8
68:1
**santarosa@w...**
23:4 55:4
71:19 83:9
87:6
**sat** 16:15
**satisfy** 22:3
**Saturday** 2:8,10
7:9 84:16 92:4
**save** 51:5
**saw** 4:18 34:4
37:7 59:25
**saying** 10:7
28:14 29:1
35:12 54:11
55:7 59:21,25
64:19 69:7
74:7 79:9
84:20
**says** 10:20 13:8
21:15 25:23
27:19 28:19
29:5 35:20,24
39:13 41:8
46:11,13 48:2
50:19 57:24
59:20 70:2
75:12,13 83:11
85:10 86:3,16
91:9
**scale** 68:17
**Scarpulla** 23:18

**scenario** 51:1
76:20
**Schultz** 68:19
**Scott** 27:19
**scoured** 64:21
**screaming** 5:20
5:23
**screwed** 21:4
77:21
**season** 35:6 81:5
**seasons** 34:1
**second** 4:7 12:18
24:1,21 28:12
39:25 40:2
51:9 57:22
65:19 72:4,4
**secondly** 11:25
16:1 20:13
35:1 59:5
**secret** 72:8
**secured** 60:3
66:18
**see** 11:12 30:8
36:20 40:12,25
44:9 49:17
58:19 59:7
78:24 80:3
92:3
**seeing** 41:6
59:19
**seeking** 82:13
**seen** 50:12 90:23
**sell** 33:1,8,9,11
33:21 36:24
37:1,6,8 43:24
60:14 80:25,25
81:1 82:19
**sell-off** 11:6
**selling** 40:4
80:12,13
**Senate** 12:22
**Senator** 12:21
**send** 35:19 49:3
70:20 71:17,18
71:20 83:7
86:22 87:3
88:9

sending 32:13
separate 43:6,7
separated 37:23
serious 15:6
  57:8 84:23
service 49:7
Services 16:5,24
set 8:23 38:4
  43:16 57:5
  74:15
settle 72:20
settled 10:15
  53:18
settlement 2:20
  9:20 10:12,16
  11:23 12:19
  13:4,12 25:17
  30:21 35:15
  36:25 39:12
  44:16 51:18
  53:24 54:3
  61:21 65:24
  66:9,18 70:6
  77:13
settlements 17:6
  91:16
seven 44:17 87:9
shape 41:12
share 33:20 35:5
  73:13
shareholder
  33:2 40:18
shares 17:14
  31:11 33:13
  43:20
shed 79:8
sheet 87:3
shelter 47:7
sheltered 47:12
shocked 82:8
shopping 36:17
Shorthand 93:1
shortly 38:20
shot 47:22 64:23
show 36:3,17,18
  37:9,12 48:18
  76:3,9 89:6,9

showed 48:12
  64:2,25
showing 76:10
shown 74:20
shows 27:7
  49:11 73:18
shut 34:9,12,16
  34:19
shutdowns 34:5
shutoffs 34:21
  34:24
side 30:1
sidetracked 61:9
sideways 86:20
sign 89:1
signed 25:16
  62:3 67:5
  69:19
significant
  68:12
significantly
  19:2 33:17
  71:23
silly 49:20
similar 36:23
  84:18
simple 39:2
  60:13
simply 12:3
single 6:1 67:5
  73:3 87:3
Singleton 28:13
  28:14 46:11
  57:21 87:1
Singleton's
  90:23
sisters 86:20
sit 19:3 50:7
site 84:9
situation 20:24
  72:12 80:5
six 16:12 35:4
  84:11 88:9,10
six-month 33:7
size 36:15 71:2
slam 38:12
slammed 6:20

slow 49:25
small 9:5
smart 80:18
smarter 32:24
sneaky 6:19
so-and-so 75:19
so-called 18:17
social 14:22
  38:12
sold 11:2 13:8
  18:23 32:21
  37:2,12 74:3
solely 12:10
solicitation 49:4
solidly 28:15
  46:12
solution 29:2
solved 5:19
somebody 33:14
  45:24 52:5
  55:13 57:15
  74:4 76:13
  80:11,23 86:10
  86:23 88:5
  89:19
somebody's
  37:14 67:20
son 59:14
soon 7:3 41:16
  42:14 45:25
  78:25 79:23
  83:22 92:12
sooner 74:13
sophisticated
  18:14,24 31:2
sorry 55:2 61:22
sort 18:4 26:21
  45:14
sorts 9:25 29:17
  31:6 64:8
sought 45:18
sounds 50:20
space 67:25
specialists 24:8
specific 61:22
  69:10,12 87:13
specifically 26:6

  86:24
specification
  52:6
speed 34:10 57:1
spend 14:1
  40:17 47:20
  69:14
spending 13:25
spends 68:21
spent 20:18
  62:14 66:22
  84:21,22
spouse 86:18,19
spread 17:25
square 75:21,23
staff 42:4 48:9
Stafford 16:23
stairstep 39:10
stake 18:20
stand 8:4
standard 52:17
standpoint 30:8
star 22:11,12,19
  30:5,6,14 43:9
  70:10 83:6
start 22:21
  30:11 33:6
  41:6,11 55:23
  85:4
started 34:12
  36:3 41:7,22
  52:8 65:2
state 8:23 12:20
  12:23,25 16:8
  19:8 21:10
  39:3 52:6,7
  66:21 86:16,23
  93:5
statement 82:21
statements 49:4
states 1:1 18:3
  24:17 26:1
  49:7 54:15
  61:18 63:24
statistics 76:5
statutorily 14:16
statutory 64:18

stay 22:21 63:11
  68:3 85:7
stayed 5:16
step 50:25
steps 79:2,3
Steve 24:3 75:16
stimulus 40:21
stock 13:10 17:8
  17:17,20 18:12
  18:19 19:1,4,9
  19:11,12,14,21
  31:2 31:12,15
  31:16,19 32:16
  32:21,23 33:1
  33:4,7,11,15
  33:15,16,16,17
  33:20,25 35:3
  35:4 40:3,5,15
  43:13,18,19,23
  43:24 44:2,7,8
  44:11,12 60:10
  60:11 77:4
  80:7,10,11,20
  80:25 81:1,1,4
  81:8,15 82:19
  82:24 83:1
stocks 32:14
  80:9,9
stop 23:9 66:19
  79:24
stores 36:18
straight 60:22
strategy 47:7,11
street 26:12,20
  28:22 63:3
  81:15
strenuous 10:8
strenuously
  52:15
stress 45:22
stressful 3:18
  47:6
strike 55:2
strong 45:20
  48:21
struck 10:1
structure 35:21

Case: 19-30088   Doc# 6901-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 86
of 157

35:23,25 75:17
75:25
**stuck** 88:8
**study** 64:1
**stuff** 29:24
39:14 40:9
49:5 50:6,8
54:18 59:6,20
63:22 70:18
71:20 75:19
76:1,9,18,21
79:21 81:2
84:24 91:25
**submit** 46:20,21
59:6
**submitted** 54:12
88:3
**subordinated**
16:14
**subro** 27:8
**subrogation**
10:9 15:22
21:19 22:6
**subsequent**
11:10
**substantial**
20:16 31:17
50:9 87:22
**substantially**
32:6
**success** 33:19
**successfully**
66:8
**sue** 78:3
**sued** 34:21
**sufficiently**
88:18
**suggest** 19:1
31:13 91:1
**suggesting** 14:20
**suggestion** 20:9
54:10
**Suite** 93:23
**summary** 46:20
**summer** 15:14
66:10 70:25
**sums** 69:14

**supply** 8:15 71:5
**support** 12:25
13:3 26:2,19
27:16,20 28:23
29:2 46:13,14
77:9 91:7
**supported** 13:17
**supporting** 91:9
**suppose** 81:9
**supposed** 53:6
**Supreme** 64:14
**sure** 3:1,24 31:7
33:3 47:22
53:24 54:25
59:2 79:2
82:24,25 89:25
**surface** 75:21
**surprises** 81:16
**surprising** 72:11
72:14
**surrounding**
8:10
**surveillance**
64:23
**surveys** 76:10
**survive** 58:1
**suspect** 58:19,22
**suspend** 20:23
**Sword** 78:5
**sworn** 45:5
**system** 62:25
87:25 88:2,8
88:10 90:18
91:17
**systems** 53:7,7

**T**

**table** 12:1 13:14
16:22 73:20
**tabled** 20:15
**tabulate** 47:20
79:20
**tails** 5:11
**take** 4:7 9:3
10:10,22 11:7
13:13 16:9
17:7,14,17

18:9,12 19:14
23:5 27:3 31:3
31:6 33:20
38:2,3 40:5
42:12 43:13,17
43:18 44:11,12
45:8 50:25
57:19 58:1
59:18 61:1
62:17,19 69:20
74:8,10 78:21
79:2 81:4
89:10
**taken** 79:2 93:12
**takeover** 12:23
12:25
**takes** 8:2 9:14
12:20 49:8,10
62:13,18 79:22
**talk** 3:6 6:17
12:5 23:8
24:14,15 25:11
25:12 47:13
68:18
**talked** 4:20 7:2
18:24 19:5
21:11 41:8,10
56:20 87:15
**talking** 6:8
10:14 25:17
84:21
**tallies** 46:22
**tax** 10:18,20
44:4 75:18
**TCC** 6:5 23:15
24:6,12,13,19
24:22,25 25:3
25:6 27:18
29:9,13 31:1
84:22 89:22,23
90:3,10
**TCRR** 93:19
**team** 52:24
53:12,13 58:7
**technically** 20:3
**techniques**
89:17

**technology** 2:6
22:11,24
**telephonic** 1:9
2:3 68:13
84:15
**telephonically**
2:6
**tell** 2:15 5:24
7:22 11:12
15:1 19:3 26:9
31:1 32:5
33:14 34:2
39:23 40:12
42:1 45:2 47:5
51:18 58:7
60:1 72:21
73:3,8 75:22
80:6 82:9,12
85:17 87:14
89:25 90:10
**telling** 24:13
27:12 28:8
84:4
**tells** 6:7
**ten** 9:12 83:5
**tens** 8:1 75:1
**tentative** 12:7
**terms** 21:25 35:4
45:1 56:8
70:21 76:7
80:2 81:21
84:24
**test** 64:24 68:21
**testimony** 45:6
**Texas** 93:1,2,5
93:19,24
**text** 58:6 85:5
86:25
**texted** 57:22
**texting** 50:1
**thank** 2:2 4:2,3
7:6,7,8 30:23
37:24 58:3
79:11 91:20
92:14
**theories** 34:8
**thermonuclear**

26:22 91:13
**thing** 3:17 6:16
16:18 21:13
29:8 35:4
36:11 39:19
41:15 44:9
53:1 61:2,13
65:19 73:3
76:3,4 84:20
**things** 4:20 5:16
7:13 10:24
12:13 19:17
29:20,23 50:13
51:17 53:8
64:8 77:13
78:24 82:24
84:18
**think** 5:12 8:4
13:16 14:12
19:10,11 22:16
28:8 29:11
30:24 31:1
34:4,23 35:16
35:20 37:25
39:5 41:12,13
41:15 42:11,15
45:5,23 52:16
60:19 62:14
68:19 69:16,18
72:1 73:8,10
73:11,17 80:6
81:12,17 84:6
85:20 86:8
87:1,21,23
88:17 90:15
92:6,10,11
**third** 2:7,9 17:10
24:25 32:20
51:21 53:1
56:13 63:24
82:7
**third-party**
42:16 52:2
57:16 75:18
89:15,16
**thirdly** 20:16
**thought** 8:12

Case: 19-30088   Doc# 6984-1   Filed: 04/29/20   Entered: 04/29/20 11:36:09   Page 87
of 157

21:5 26:15
**thousand** 24:9
52:9 91:22
**thousands** 7:9
8:14
**three** 9:7 14:12
14:19 17:21
23:15 41:9
42:9 49:19
73:9 85:11,23
85:24
**thrown** 20:1
27:17
**till** 28:9
**time** 2:14 6:2
7:10,15 11:24
12:6 20:4
21:22 33:4,7
38:2 45:11
47:6 48:15
50:10 58:4
62:6 66:22
71:24 74:12
79:7 81:11
84:16,21,23
85:20 90:4,5
90:16 91:25
**times** 32:1 55:10
55:11 85:17
88:9,10
**Timothy** 24:17
**title** 26:13,15
75:5
**today** 2:8 3:3
43:12 85:21
92:13
**today's** 30:18
**told** 24:11 26:3
33:5 41:23
68:21
**Tom** 23:25
**tomorrow** 49:15
71:16
**ton** 34:23 48:11
**top** 3:17 5:16 6:1
6:3 49:16 53:2
53:3,23 74:12

80:6
**tort** 3:17 12:6
18:15 20:13
24:6 25:4,14
51:11 64:2,4
65:25 91:16
**torts** 91:15
**Tosdale** 23:25
**total** 69:5
**touching** 53:19
**tough** 21:5
**town** 1:9 2:3,4
2:13,19 23:9
48:13 58:20
60:21 68:13
77:11 84:15
**tracking** 46:5
**trade** 33:15
**traded** 32:2
**trades** 32:1
**trading** 32:10
43:22 80:12
**traditionally**
9:14 62:11
76:7
**transactional**
67:7
**transcript** 58:24
59:1
**transcription**
93:6
**transfer** 92:1
**transferred**
43:22
**transferring**
48:6
**transparent**
88:22
**trap** 39:12
**treacherous**
66:3
**treat** 78:7
**treated** 35:22
**treatment** 10:18
**tree** 52:1,7,9
53:3 65:5 71:3
**trees** 52:3,6

70:22,24 71:2
71:11 81:11
**trial** 58:10,10
65:7
**tried** 9:21 80:8
80:16
**trim** 52:5
**trimmed** 52:4
**trimmers** 52:1,7
52:9 53:3
**Trostle** 23:16,23
24:18
**Trostle's** 24:16
**Trotter** 32:25
41:17 42:4
56:21,21,22
58:11 59:9
70:10 87:15
**true** 5:6 12:21
15:11 17:5
66:24 82:1
**trust** 6:1,13
15:25 18:21
19:6,24 20:5
21:14,15,15,17
22:4 31:13,20
33:17 36:20
42:15,25 43:20
44:24 45:9,25
54:12,18,19
56:2 60:6,11
65:14 73:1,2,2
78:19,21 79:8
81:22,23 82:6
83:17 87:11
88:18 89:4,9
89:12,18
**trustee** 24:17
33:1 35:18
41:17 43:16
51:4 56:17
59:6 65:13
70:9 87:18
**truth** 6:19 31:14
59:22
**try** 30:25 36:6,6
43:11 51:5

53:15 58:11
71:10 81:20
82:3 83:21
85:25 87:7
90:17
**trying** 3:13 5:10
15:16 26:8,9
29:16,19 30:1
30:9 76:2,19
79:18 83:3
84:5,8,19
**Tubbs** 64:16
65:7,17
**turn** 40:24
**turned** 59:13
66:14,15 82:10
**two** 3:3,12 22:23
23:5,20 24:3
27:14 44:22
60:8 62:15
67:12,23,23
68:25 70:19
73:9 74:17
77:13 82:6
84:19 91:21
**two-thirds** 2:23
25:19 26:1
38:7 48:3,4,4
**two-year** 64:25
**type** 22:11 30:6
30:17 43:11
44:19 58:24
**typed** 22:12

**U**

**U.S** 33:12 40:15
**ultimately** 66:17
**unanimous**
56:24
**unanimously**
28:3
**underinsured**
8:11
**underlying** 5:18
**understand** 3:16
31:24 56:23
57:1 60:1

87:17
**understands**
39:3 44:23
**understood**
16:17
**underway** 40:17
56:5
**underwriting**
40:14
**uninsured** 8:11
**unique** 20:24
32:3
**United** 1:1 18:3
24:17 26:1
49:7 61:17
63:23
**unrepresented**
23:6
**upfront** 33:6
62:5 63:1
67:15
**upheaval** 21:2
**upwards** 86:21
**use** 45:9 49:20
53:16
**uses** 52:2
**usually** 80:13
**utilities** 31:22
**utility** 31:25
32:1,7,18
**utmost** 23:19

**V**

**vacation** 45:4
**valuable** 13:2
45:23 76:11
**valuation** 31:20
32:7 82:20
**value** 8:16 10:1
10:11,17 11:7
11:16 19:1
31:14,16,21
32:10,16 33:8
33:13,16 35:5
35:13 36:10,11
36:13 37:16
43:21 44:5

Case: 19-30088   Doc# 6980-2   Filed: 04/29/20   Entered: 04/29/20 09:36:09   Page 88
of 157

51:17 53:23
57:10 63:9
74:13 77:6
81:3 82:15,16
83:13,13 86:6
87:16 88:17
**valued** 82:17
**valuing** 32:14
**variety** 88:3
**various** 5:17
37:7
**vast** 28:15 46:11
**venture** 68:15
**verified** 73:2
**verify** 54:22
**Veronese** 23:16
23:17
**version** 38:9
**versus** 13:25
47:2,18,18
76:3
**vetting** 51:23
**viability** 20:11
**viable** 12:2,17
73:25
**viciously** 66:6
**victim** 16:15
17:17 24:21
25:2
**victims** 7:23 8:3
8:5 9:1,4,9,10
9:19 10:2,11
10:17 13:14
14:24 15:6,11
15:19 16:20
18:20,23 22:8
24:22 25:19
26:2,14,18
27:11,16,20
29:1 30:1
37:22 46:13
51:15 53:16
62:17 66:12
**victims'** 15:15
15:25 17:1,12
18:21 20:5
22:3 25:7

31:13 78:21
**video** 45:8 64:23
85:4
**videos** 7:15 45:6
64:23
**view** 6:22 57:10
73:8,11 75:8
92:9
**violate** 78:1
**violating** 24:23
**voice** 22:13
55:10
**volatility** 31:15
**vote** 2:10,21
5:21,23 6:18
7:20,23 14:20
20:7 24:22
25:14 26:2,2,9
26:19,21 28:8
28:10 29:6
37:21 38:1,1,5
38:7 39:4 42:7
46:15 47:18,18
47:19,20,22,24
48:5,5,22,23
48:23 49:20,24
50:15 54:23
55:25 70:15
72:8,9 73:23
78:25 79:19
85:12,17,22,25
89:3 90:16
91:10,12 92:1
92:8
**voted** 11:15
27:24 28:4
32:11,11 38:23
46:7,8 47:21
55:11,12,21
85:21,22
**votes** 2:24 38:2
46:3,24 48:3
85:24
**voting** 2:12 6:21
28:2,6 42:24
47:1,2 49:25
50:13 79:14,15

80:3 84:4
90:14,15 92:7

---

## W

**W-a-t-t-s** 71:20
**wait** 6:23,24,25
7:1 11:21 16:2
19:9,13 21:20
28:9 40:7 50:8
50:16 86:25
**waited** 9:11
**waiting** 41:3
47:3
**waived** 16:25
**walk** 39:15
**wall** 26:12,20
28:22 44:22
81:15
**WALTZ** 93:1
93:18
**want** 2:2 4:7,10
6:16,23,24,25
7:24 8:6 9:24
10:2,8 14:20
20:23 21:13
22:25 23:5
28:9 29:8,11
30:11 31:10
33:18,25 36:18
38:14 40:5
43:13,23,24
44:11,12 47:17
52:12 54:22
55:14,21,24
59:10 61:23
68:8 70:3,18
71:13 72:6,20
74:7,9,13,14
76:8 77:22
78:11,17,17
79:1,2,9 90:7
91:20
**wanted** 5:19,22
18:13 25:11
27:15
**wanting** 74:15
**wants** 14:3

37:21 47:1
50:18 51:8
54:2 56:2
69:24,25 79:13
83:12
**war** 66:6,8
**warn** 55:21
**wasn't** 31:9,10
42:5 59:17
64:12 80:8
**Watts** 2:1,1,16
4:3,6,15 7:7
15:13 19:4
30:23 32:24
35:16 37:1,24
43:2,15 44:17
46:5 47:4
50:24 51:9
54:5,25 55:8
56:4 57:15
58:18 59:24
61:22 62:1
70:7 71:15,19
72:3 75:16
79:15 83:1,16
85:14 86:8,15
87:12 89:25
92:3
**Watts'** 48:23
**way** 3:21 8:18
11:12,23 14:4
21:5,14 23:9
36:13 42:7
55:7 56:12,16
64:14 65:2,14
71:19 72:9
73:25 78:4
79:25 80:21,22
82:3,5,17
83:22 88:4,23
92:11
**ways** 23:5 87:14
**we'll** 2:8,12 6:11
6:12,24 7:17
7:18 9:20
11:18 19:12
30:8,17 33:3

36:19 38:7
41:13 42:12
43:11 46:21
55:16,19 58:21
59:9 73:19,20
76:17 79:25
83:1,25 84:10
84:12,15 85:7
85:16,17,24
87:5,6,7 90:17
92:1,4
**we're** 3:19 5:25
6:1,13,14 7:10
10:14 11:3,11
17:9,15 25:13
25:17 33:16
38:6,6,15
39:15 40:17
41:2,9,12
42:10,17 47:15
53:14,14,15
55:20 56:7
58:10 66:4
68:3 70:16
76:2,19,20
78:11 79:9,18
80:4,20 81:19
82:2 83:3,20
83:23 84:24
85:15 87:14
90:16,16
**we've** 2:3,7 3:13
6:20 7:3,9,13
7:13,15 17:3
20:16 22:23
30:15 40:10
42:23 46:3
50:2 52:10
53:19 60:5
69:13,16 70:13
70:22 75:24
77:3 78:5,8,8
78:19 83:5
85:5,8 87:21
89:15,15,16,16
91:19,21 92:13
**website** 7:14,19

Case: 19-30088   Doc# 6980-2   Filed: 04/20/20   Entered: 04/20/20 09:36:09   Page 84
of 147

30:16 83:24
**Wednesday** 2:8
**weed** 87:11
**week** 6:4,5,9
19:17 22:12,12
22:13 23:14
25:22 29:10
40:17 47:11,18
55:6,10,20,20
55:21 70:16
84:22,23 85:20
**week's** 92:5
**weekend** 21:17
**weekly** 85:2
**weeks** 29:23
41:9 84:11
**weird** 76:16
**welcome** 2:19
**well-regarded**
80:24
**went** 12:16
14:14 38:24
64:21
**Weslayan** 93:23
**whatsoever**
65:25 67:15
**wheels** 35:21
**wherewithal**
62:19
**whole-hearted**
92:10
**wholly** 11:4
**Wiener** 12:22
**wife** 49:16 66:22
68:25 70:2
**wildfire** 8:22
13:13 20:25
22:3,8 57:10
81:10
**wildfires** 11:18
13:24 32:5
**winds** 34:10
52:4
**Winery** 64:24
**wire** 44:20
**wish** 2:22 13:9
52:12

**withdraw** 25:3
**won** 63:25 64:15
**wondering**
50:19
**wool** 73:5
**word** 5:6 31:4
89:11
**wording** 50:19
**words** 33:18
77:16 91:12
**work** 20:6 25:13
29:17 41:21
42:10 43:14
47:10 48:11
53:22 57:16
64:8 66:19
68:22 70:19
71:7 82:2
90:11
**work's** 42:13
**worked** 3:4
15:21 39:16
61:6 65:6
70:24
**working** 25:20
41:18 42:1,21
47:10,21 48:9
51:16 53:2,13
56:25 57:1
65:18 67:12,22
70:3,18,23,24
84:24 90:2,12
90:16
**works** 17:19
**world** 11:4 34:6
53:6 66:7 69:3
**world's** 68:19
**Worldwide**
93:22
**worry** 5:24 6:7
49:6 68:7
**worse** 12:13
40:23 57:9
**worth** 10:16
19:6 31:13
40:4 82:14,15
90:14,15

**wouldn't** 40:4
40:20 43:18
54:8 61:1
66:17
**write** 38:11
48:17 54:18
79:1 87:19
**writes** 48:16
**writing** 35:18
45:17 85:4
**written** 25:9
43:16 65:15
78:20 82:12
**wrong** 58:5
65:12 81:5
**wrongdoer**
62:22 63:4
**wrongful** 56:2
**wrote** 24:12
27:14 35:12
44:13 46:2

**X**

**X** 61:1 86:18

**Y**

**Yanni** 41:18,23
56:17,21,22,22
59:10 70:10
87:15
**Yanni's** 42:4
**yeah** 4:7 30:13
54:2 60:19
86:8 89:25
**year** 34:4,12
41:25 44:2
67:13,14
**year-long** 42:9
**years** 3:13 9:3,8
9:11,15,22
11:21 14:1,12
27:3 42:9,9
60:8 62:16
67:12,23,24
70:19,23 74:17
80:8
**yeas** 46:21

**yesterday** 41:4
41:17 85:19
90:1
**yield** 69:8
**York** 80:14

**Z**

**Zenke's** 65:3
**zone** 45:3
**zoo** 65:20

**0**

**1**

**1** 10:4,15 15:19
20:9 30:25
34:15 55:22
56:9 69:18
77:14 80:7
**1,111** 69:9
**1.68** 19:23
**10** 72:10
**10,000** 87:24
**11** 1:4 10:10
21:20,21 25:14
74:8 77:5,17
**11,000** 28:6 55:5
55:7
**11,200** 46:6
90:21
**11th** 2:11
**12** 11:16 18:1
38:5 60:2 84:6
**12/31/20** 93:19
93:21
**12/31/21** 93:20
**12:00** 92:4
**120,000-dollar**
76:17
**13** 8:7 9:18,23
15:24 19:21
25:15,15 66:18
**13-and-a-half-...**
16:3 61:8 89:5
**13.5** 17:19 19:7
26:25 50:21,22
50:25 51:3,4

51:19,19 53:19
53:23 54:19
59:21 77:16
80:21
**13.5-billion-d...**
13:4 17:8,12
29:22 30:20
**13.5-million-d...**
9:19
**15** 2:12 3:1 10:5
11:16 38:2
76:25
**15th** 17:22,23
47:3 49:22
50:11 60:8
79:16
**16** 11:16
**17** 32:13
**18** 2:11 58:16,17
59:13,17
**18-and-a-half-...**
27:10
**18-year-old**
59:12
**18,000** 27:23
68:16,25 69:1
**18.5** 74:10
**19-30088-DM**
1:3
**1st** 26:13

**2**

**2** 2:11 10:16
11:8 27:8
55:20 56:10
69:19 77:7
82:22
**2.2-trillion-do...**
40:21
**2.4** 16:5,25
**20** 10:7,8 45:4
62:15 69:6,8
74:7 77:5
**20.5** 81:14
**20.5-billion-d...**
8:21 11:19
35:2,8 39:4

Case: 19-30088   Doc# 6980-2   Filed: 04/20/20   Entered: 04/20/20 04:36:09   Page 99
of 157

73:24
**200** 15:4,19
19:19 42:16
**200-million-d...**
20:3
**201(k)** 82:11
**2011010** 93:20
**2017** 34:7 72:22
**2018** 34:7 72:23
**2019** 12:10
82:10
**2020** 1:9 3:1
8:23 24:18
27:2 38:2
41:25 60:22
93:16
**2021** 17:22
82:19
**2022** 17:23
82:20
**21** 27:2
**22** 32:1 84:7
**22.4** 18:22 31:19
**223** 93:23
**235** 93:23
**24** 2:3 48:12
**24th** 24:18
**25** 2:11 49:17
80:8
**27th** 21:18 38:5
38:18,19

---

**3**

**3** 10:16 22:11,13
22:19 30:5,6
30:14 43:9
55:20 61:3,13
74:9 78:18
83:6
**3-** 32:13
**3-billion-dollar**
62:17
**3.48** 15:8,19
61:9
**3.7** 10:6
**3.8** 77:1 78:12
**3.9** 16:4,21

**30** 8:23
**3000** 93:23
**30th** 9:17 21:18
39:1,6 40:10
**33** 42:17
**35** 36:9
**354-million-d...**
76:14

---

**4**

**4** 1:9 21:22 22:4
55:21
**4,300** 29:5
**40** 47:10
**400** 32:13
**401(k)s** 82:10
**44** 57:13
**45** 72:8,9
**462** 20:2
**4TH** 93:15

---

**5**

**5** 42:3 50:9
82:14
**5,000** 28:25
46:14
**5.4** 17:21 33:6
59:22 60:3
63:14 66:13,14
**50** 47:10
**50-foot** 44:22
**55.55** 69:2
**572-2000** 93:24

---

**6**

**6** 50:9 66:15
**6,000** 28:22
46:12 91:6
**6,600** 26:18
**6.3** 16:6
**6.75** 17:20 31:14
80:20 82:15
**60** 18:9
**65** 69:21
**650** 17:23 60:7
**6813** 93:19

---

**7**

**7** 10:22 11:6,9
**7,000** 28:14,20
90:23
**7.4** 66:16
**7.5** 27:9 74:5
**7.5-billion-dol...**
74:4
**70** 61:16
**70,000** 72:12
**700** 17:22 60:7
**713** 93:24
**77027** 93:24

---

**8**

**80,000** 87:23
**84** 15:1 21:12
57:13
**85** 64:7

---

**9**

**9** 2:12 10:10
11:7 27:7
66:17 77:5
**9,000** 28:1
**90** 22:22 46:7
90:22
**96** 64:2

Case: 19-30088   Doc# 6981-2   Filed: 04/29/20   Entered: 04/29/20 09:36:09   Page 91
of 157

**Exhibit 3**

Steven S. Kane, Esq., SBN: 061670
Bonnie E. Kane, Esq., SBN: 167700
**THE KANE LAW FIRM**
402 W. Broadway, Suite 2500
San Diego, CA 92101
Telephone: (619) 236-8700
Facsimile: (619) 236-1370
E-mail: skane@thekanelawfirm.com
E-mail: bonnie@thekanelawfirm.com

Attorneys for KAREN GOWINS Creditor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re:* | ) |
| | ) **Case No. 19-30088 (DM)** |
| PG&E CORPORATION | ) Chapter 11 |
| | ) (Lead Case) |
| -and- | ) (Jointly Administered) |
| | ) |
| PACIFIC GAS AND ELECTRIC | ) **JOINDER ON BEHALF OF KAREN** |
| COMPANY | ) **GOWINS IN WILLIAM B. ABRAMS'** |
| Debtors. | ) **MOTION TO DESIGNATE** |
| | ) **IMPROPERLY SOLICITED VOTES** |
| ☐ Affects PG&E Corporation | ) **PURSUANT TO 11 U.S.C. §§ 1125(b) AND** |
| | ) **11226 (e) AND BANKRUPTCY RULE** |
| ☐ Affects Pacific Gas & Electric | ) **2019** |
| | ) |
| ◾ Affects Both Debtors | ) Docket Nos. 6799, 6798, 6801 |
| | ) |
| *All papers shall be filed in the Lead Case,* | ) Date: TBD |
| *No.19-30088 (DM)* | ) Time: TBD |
| | ) Place: United States Bankruptcy Court |
| | ) Courtroom 17, 16th Floor |
| | ) San Francisco, CA 94102 |

Undersigned Counsel submits this joinder in the Motion to Designate Improperly Solicited Votes Pursuant to 11 U.S.C. §§ 1125 (b) and 1126 (e) and Bankruptcy Rule 2019, on behalf of Camp Fire survivor and creditor, Karen Gowins.

## I. Introduction

Karen Gowins, a fire victim claimant in this Chapter 11 case, and, a former member of the Official Committee of Tort Claimants, hereby joins in the Motion of William B. Abrams To

---

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE
IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND11226(e) AND BANKRUPTCY
RULE 2019

1    Designate Improperly Solicited Votes Pursuant to 11 U.S.C §§ 1125(b) and 1126(e) and

2    Bankruptcy Rule 2019, and, moves the Court for an Order that Attorney Mikal Watts and

3    affiliated counsel representing fire victim claimants in this case, (1) pursuant to California Rule of

4    Professional Conduct 1.7, disclose in form and content approved in advance by the Court to each

5    and every such client in this case all real or potential conflicts of interest arising from litigation

6    financing obtained by their counsel to finance their claimant cases, and, (2) after such disclosure

7    request each client to execute a waiver of the designated conflict.  The litigation financing

8    obligations at issue have been assigned to Apollo Group, an entity providing $604,000,000 in

9    financing to the proposed Plan.

10         The conflict exists because Mr. Mikal Watts, and, potentially lawyers affiliated with him

11   have obtained litigation financing held by Apollo Group.  In short, Apollo Group is one of Mr.

12   Watts' litigation lenders and stands to reap great rewards if the proposed Plan is approved.

13   Exhibit 1, p.8, *Third Amended Verified Statement of the Ad Hoc Committee of  Senior Unsecured*

14   *Noteholders Pursuant to Bankruptcy Rule 2019* Dkt. 6747 (April 13, 2020)  to this Joinder

15   contains a detailed statement showing that Apollo holds interests in the proposed plan totaling

16   $604,000,000 in value.

17         Mr. Watts has not disclosed the amount that he and his affiliated counsel owe to Apollo

18   nor has he revealed the terms of the loan transaction.  However, he has admitted in his town hall

19   meeting on December 12, 2020 that Apollo holds his notes for his line of credit. *See* Exhibit D, p.

20   2, at 4:17, 4:30 to *William B. Abrams Mot. To Designate Improperly Solicited Votes,* Dkt

21   No.6799-1.   Further, Mr. Watts states in his Declaration that "Watts Guerra has disclosed to its

22   clients and to others its communications in this case with **assignees of portions of its credit**

23   **facility**, and its subsequent communications with principals of the Debt and the Equity."

2

*Declaration of Mikal Watts in Support of His Preliminary Opposition to William B. Abrams Motion to Designate Improperly Solicited Votes,* Dkt. No. 6801-1, 3:19-20 (*Watts Dec*). Although he recognizes the conflict sufficiently to disclose it, he does not do so in a manner which complies wit*h the California State Bar Rules.*

*Significantly*, Mr. Watts and his affiliated lawyers are conducting an extensive, intense, expensive and almost frantic campaign through multiple media to convince not only their own clients, but all other fire victims to vote for the Plan. *See* Exhs. A, B and C to *William B. Abrams Mot. To Designate Improperly Solicited Votes,* Dkt. 6799-1, examples of advertising.) The targets of this tidal wave of lawyer advertising include thousands of claimants who have not retained attorneys and thus cannot verify what they are being told by Mr. Watts and his affiliated lawyers by contacting their own counsel. To moving party's knowledge, none of the ads contain detailed disclaimers revealing the financial position of their litigation lender in the case or the conflict created by that situation.

In addition to complete disclosure of the admitted conflict, moving party requests a further Order of the Court that "Yes" votes in favor of the plan received from clients of Mr. Watts and his affiliated counsel should be designated as not obtained in good faith and not counted in the Plan vote unless the appropriate conflict waiver has been obtained from those voting claimants.

## II. Mr. Watts' Own Declaration in Opposition to Mr. Abrams' Motion Shows that a Conflict Exists between Watts and Affiliated Firms and their Clients Concerning Respondents' Advice to Their Clients and All Fire Claimants to Vote "Yes" in support of the Proposed Plan.

Significantly, Mr. Watts' Declaration shows that he fundamentally misconstrues the purpose and function of rules relating to attorney conflicts of interest. In almost his entire Declaration, Mr. Watts goes to great lengths to give detailed assurances that he has not committed deliberate misconduct by following the instructions or requests of his lender to campaign in favor of the

3

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND11226(e) AND BANKRUPTCY RULE 3018(e)

Case: 19-30088   Doc# 6801-1   Filed: 04/23/20   Entered: 04/23/20 11:35:08   Page 95 of 157

USBE/NDCA No. 19-30088 (DM)

proposed Plan.  However, he "protests too much," since he is not being accused here of such misconduct.   Indeed, no actual violation of the attorney client relationship is necessary in order to invoke the rules regarding conflicts or the procedures required to mitigate them.  Under California State Bar Rules and the Rules of this Court, the attorney faced with a real or potential conflict is required to take specified action to deal with those conflicts, which Mr. Watts has not done.

The clear and admitted conflict of Mr. Watts and his affiliated attorneys between themselves and major investors in the proposed Plan is concisely described and summarized in a news story dated April 25, 2020 written by Lily Jamali of KQED, San Francisco, the local KPBS outlet. (*See* Ex. 3).  The KQED article identifies and describes Mr. Watts' knowledge of the conflict he had arising from ownership of his litigation funding debt by plan investor Apollo, as well as plan investor Centerbridge.  His knowledge was admitted by him to be as early as November 5, 2019 nearly five months before the beginning of the plan voting process as shown by the transcript of his meeting with clients   (*See* Exhibit D, p. 2, at 4:17, 5:26, 5:40 to *William B. Abrams Mot. To Designate Improperly Solicited Votes,* Dkt No.6799-1.)

The purpose of this Motion is to secure compliance with conflict rules and protect the integrity of the Plan vote by assuring that Mr. Watts' clients casting an effective vote will have done so after waiving the conflict.

4

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND 11226(e) AND BANKRUPTCY RULE 3018
USBE/NDCA No. 19-30088 (DM)

Case: 19-30088   Doc# 6991-1   Filed: 04/29/20   Entered: 04/29/20 11:35:08   Page 96 of 157

### III. California Rule of Professional Conduct Rule 1.7(b) Requires Mr. Watts and his Affiliated Lawyers Resolve the Serious Conflict Created by Their Litigation Financing held by a Major Financial Participant in the Proposed Plan, But They Have Failed to Do So.

Rule 1.7(b) of the California State Bar Rules of Professional Conduct requires with respect to conflicts of interest that:

> "A lawyer shall not, without informed written consent from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests." Cal. Rules of Prof'l Conduct R.1.7(b) (2018)

Lawyers practicing in this Court are required to "Be familiar and comply with the standards of professional conduct required of members of the State Bar of California." (Rule 11-4 (1)(a)(1) Local Civil Rules of the U.S. District Court of the Northern District of California as incorporated by Rule 1001-2 (a) of the Bankruptcy Local Rules of the U.S. Bankruptcy Court for the Northern District of California)

Comment 4 to Rule 1.7 states that:

> "Even where there is no direct adversity, a conflict of interest requiring informed written consent under paragraph (b) exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal." Cal. Rules of Prof'l Conduct R. 1.7 com. 4 (2018)

Admittedly, Mr. Watts has a significant interest in his obligation to the Apollo Group which will certainly benefit from approval of the proposed Plan. However, he has also admitted that he has failed to comply with Rule 1.7 concerning the conflict arising from his litigation financing and he continues to advise his 16,000 clients, and, indeed all other fire victims whether they are represented by counsel or not, to vote for that proposed Plan. In this regard, Mr. Watts' interest

5

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND 11226(e) AND BANKRUPTCY

USBE/NDCA No. 19-30088 (DM)

aligns precisely with the interest of his lender, but not necessarily with that of his clients. Conflict rules were created to cure precisely this kind of situation.

Conflicts of interest between plaintiffs' counsel and their clients in mass tort cases have attracted more attention from judges and commentators as these cases have ballooned in numbers of plaintiffs and size of fees. In a case arising out of the World Trade Center attack on 9/11 the Court dealt with such issues in *In re World Trade Center Disaster Site Litigation,* 769 F.Supp.2d 650, 651 (S.D.N.Y 2011). The plaintiffs in *World Trade Center* were 10,500 individuals who were rescue and clean-up workers who "performed heroic service on the World Trade Center pile of smoldering debris." *Id*. at 657. Concerning conflicts involving plaintiffs' lawyers, Judge Hellerstein stated:

> Napoli Bern, in the expectation of a contingency fee, had advanced over 10,000 cases for nine years without compensation. As I learned later in the litigation, from a motion that Napoli Bern withdrew, the firm was deeply in debt, to the extent of millions of dollars, secured by personal guarantees of the principals of the firm, payable at high, compounding interest rates. Approval of the SPA would produce approximately $150 million for the firm in fees, plus expenses, and would allow the firm to liquidate its debt. *Id*. at 652.)

> Their need to finance their cases over several years of hard-fought and expensive litigation creates substantial financial debts, financed at high compound interest rates. Repayment of the loans tends to depend on settlements or recoveries of the lawsuits, the outcomes of which tend to be far from certain. These debts create powerful motivations that potentially can interfere with the lawyers' professional obligation to serve clients' interests first and foremost"[1] *Id* at 657.

In the present case the Court is faced with a conflict situation very similar to the one confronted by Judge Hellerstein in *World Trade Center, supra,* in which the lawyers' objectivity in rendering objective, unbiased advice and representation to a number of clients was made questionable due to the lawyers' high litigation expense debt. The Court solved the problem by

---

[1]  The subject of conflicts of interest of plaintiffs' lawyers in mass tort cases is explored further in Nancy J. Moore, *Ethical Issues in Mass Tort Plaintiffs' Representation: Beyond the Aggregate Settlement Rule*. 81 Fordham L. Rev. 3233 (2013).

6

appointing new, unconflicted counsel for those clients. [2]

It is easy to imagine parties who want to control the creditor vote in a mass tort Chapter 11 case purchasing obligations of plaintiffs' counsel to repay litigation cost loans in order to obtain undue and improper influence over those counsel regarding their advice to their clients on plan voting. There is no evidence that this has occurred in the present case, but compliance with conflict of interest rules has the salutary effect of preventing even the appearance of such a bad faith scheme which would undermine the integrity of the voting and plan confirmation processes.

Here, the Court can, and should resolve the conflict by requiring clients of Mr. Watts and his affiliated lawyers to give written waivers of the conflict after full disclosure in order for their votes in favor of the Plan to be counted.

**IV.   Mr. Watts' Declaration In Opposition to The Abrams' Motion Shows That He has Never Made a full Disclosure of the Conflict to his Clients, and, That He Has Failed to Obtain the Written Conflict Waivers Required by Rule 1.7.**

Mr. Watts' Declaration conclusively shows that he has failed to make the disclosures and obtain the client waivers required by Rule 1.7. In this regard, the pleadings filed by Mr. Watts in opposition to Mr. Abrams' Motion allege with regard to disclosure of the real or potential conflict with the litigation finance company that:

> "Watts Guerra has disclosed to its clients and to others its communications in this case with assignees of portions of its credit facility, and its subsequent communications with principals of the Debt and Equity. Specifically, Mikal Watts conducted an in-person town hall to WATTS-GUERRA'S clients in Chico on December 12, 2020, and in Santa Rosa later the same day. This town hall was filmed and all WATTS-GUERRA clients received an update email or letter shortly thereafter with a link to those town meeting…" (Ex. 3, Declaration of Mikal Watts in Support of His Preliminary To William B. Abrams' Motion

---

[2] Judge Hellerstein could not resolve the conflict in *World Trade Center* by requiring notice to the clients and waiver as can be done here because one of the conflicts in *World Trade Center* involved conflicting interests of two client groups both represented by plaintiffs' counsel. That situation required appointment of the Court of separate counsel for one group.

7

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND 1226(e) AND BANKRUPTCY RULE 2019

USBE/NDCA No. 19-30088 (DM)

Case: 19-30088   Doc# 6911-1   Filed: 04/23/20   Entered: 04/23/20 14:35:08   Page 99 of 157

to Designate Improperly Solicited Votes Pursuant to 11 U.S.C 6(e) and Bankruptcy Rule 2019.)

"Watts Guerra provided the disclosure statement and other materials required by this Court digitally early in the morning of March 31, 2020, before beginning its communications program during the voting period." (Dec. of Mikal Watts, 4:6-8.) [3]

Mr. Watts also indicated that he provided the conflict information on his website.

Despite these claims, Mr. Watts does not describe a complete disclosure of the existing conflict to his 16,000 clients. Rather, he refers to "town meetings" which were certainly not attended by all of his 16,000 clients with a "link" to clients who did not attend if they choose to utilize it. This is puzzling since a good-faith effort to disclose the conflict would have employed a letter or email message sent at the same time to all clients. Mr. Watts does not explain why he did not utilize these simple communications methods.

Mr. Watts does not allege that he ever made the required specific, detailed and complete disclosure of his conflict relationship with the Apollo Group in a letter to all of his clients including a form which could be returned by each client who chose to waive the conflict. Most significantly, Mr. Watts fails to explain why he did not comply with Bankruptcy Rule 2019 by filing the required disclosure of his business relationship with Plan investors with this Court.

---

[3]  Interestingly enough, Mr. Watts may have transferred to his own clients the Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization, the supplement thereto, the Fire Victim Plan Treatment Summary and related documents that were provided by Prime Clerk with the ballots, but he did not provide those to other fire victims prior to his affiliate counsel publishing a public ad soliciting affirmation of the plan on March 31, 2020, which was many days prior to all fire victims receiving the Disclosure Statement information by mail. This appears to be in violation of the solicitation rules under 11 U.S.C.S 1125(b). *See* Exh. A to *William B. Abrams Mot. To Designate Improperly Solicited Votes,* Dkt. No.6799-1 (Press Democrat ad placed by Watts affiliate with reference to website containing Watts videos, but no Disclosure Statements.).

8

Case: 19-30088   Doc# 6981-1   Filed: 04/29/20   Entered: 04/29/20 13:35:08   Page 9 of 100
USBE/NDCA No. 19-30088 (DM)

V.    **The Court has Authority Under Bankruptcy Rule 2019(b) to Require Full Disclosure of the Admitted Conflict By Attorney Watts and his Affiliated Counsel to All of Their Clients In This Case, and, to Require Proof of Waiver of that Conflict by all Clients Casting "Yes" Votes in Favor of the Plan.**

Clearly, the Court has authority to make the requested disclosure orders in this case.  In *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.* 321 B.R. 147 (D.N.J. 2005) the District Court upheld an order of the Bankruptcy Court requiring law firms who represented numerous asbestos tort claimants to file statements under Bankruptcy Rule 2019(b) disclosing the referral fee and fee-sharing arrangements among those firms.  Concerning its jurisdiction and authority to order the disclosures, the Court stated that: "Regulation of professional responsibility with respect to creditors' or debtors' counsel is squarely within the purview of the bankruptcy court regardless of whether third-party non-debtors are involved." *Id.* at 163.

In *In Re Washington Mutual* 442 B.R. 314, 326 (Bankr. D. Del. 2011)  The Court stated that "The Court takes seriously any allegation that professionals involved in case before it are conflicted or have acted reorganization *has not been proposed in good faith."* citing *In Re Coram Health Care Corp.*271 B.R. 228, 234-40 (Bankr. D. Del 2004). (Emphasis added.)

The admitted failure of Mr. Watts and his affiliated lawyers to make the required disclosure of a serious conflict and obtain waivers from his 16,000 clients as required by the California Rules of Professional Conduct fundamentally undermines the integrity of the plan voting process and will result in a Plan which has been proposed in bad faith.

Finally, the seriousness Mr. Watts' failure to fully disclose the conflict is made much more serious since he and his affiliates have conducted a massive advertising campaign directed to *all* fire claimants urging a "yes" vote on the proposed plan.  To Moving Party's knowledge, none of this advertising contains a disclaimer or disclosure of the admitted conflict of interest described in this Motion.  As a result, not only the "yes" votes of Mr. Watts' 16,000 clients are

9

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND11226(e) AND BANKRUPTCY
101 of157

USBE/NDCA No. 19-30088 (DM)

Case:19-30088   Doc#6981-1   Filed:04/29/20   Entered:04/29/20 13:35:08   Page of

tainted by his conflict, but, those of *all* fire claimants voting on the Plan.

## **ORDER REQUESTED**

Moving party, Karen Gowins, requests that the Court issue the following order with respect to the established conflict of interest with regard to Mr. Watts, the Watts Guerra law firm, his affiliates and their 18,000 clients who are tort claimants in this case:

1.  Within 5 days of the date of the order, Respondents shall present a factual and concise but complete disclosure of any and all conflicts of interest or potential conflict regarding litigation financing which Respondents have obtained with regard to representing clients in this case for approval by the Court;

2.  After approval, Respondents shall mail, send by U.S. mail or deliver each of their clients in this case by some other reliable method the approved disclosure along with a form by which clients may, at their discretion, waive the conflict in writing.

3.  Votes of Respondents' clients who have not executed the written waiver required by the Order shall be designated as not being in good faith and shall not be counted in the Plan vote tally.

Respectfully submitted.

Dated:  April 24, 2020.                                     **THE KANE LAW FIRM**


                                                           By:  /s/ *Steven S. Kane*_____

                                                           STEVEN S. KANE
                                                           *Attorneys for Creditor KAREN GOWINS*

10

JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE
IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b) AND11226(e) AND BANKRUPTCY
USBE/NDCA No. 19-30088 (DM)

Case: 19-30088    Doc# 6984-1    Filed: 04/28/20    Entered: 04/28/20 14:35:08    Page
102 of 157

1    Steven S. Kane, Esq., SBN: 061670
     Bonnie E. Kane, Esq., SBN: 167700
2    **THE KANE LAW FIRM**
     402 W. Broadway, Suite 2500
3    San Diego, CA 92101
     Telephone: (619) 236-8700
4    Facsimile: (619) 236-1370
     E-mail: skane@thekanelawfirm.com
5    E-mail: bonnie@thekanelawfirm.com

6    Attorneys for KAREN GOWINS, Creditor

7                   UNITED STATES BANKRUPTCY COURT

8                   NORTHERN DISTRICT OF CALIFORNIA

9                        SAN FRANCISCO DIVISION

10
     *In re:*                        )  Case No:      19-30088
11                                    )  Case No:      19-30089
     PG&E CORPORATION                 )
12                                    )  CHAPTER 11
     -and-                            )
13                                    )  **PROOF OF SERVICE**
     PACIFIC GAS AND ELECTRIC         )
14   COMPANY                          )
                   Debtors.          )
15                                    )
     ☐ Affects PG&E Corporation       )
16                                    )
     ☐ Affects Pacific Gas & Electric )
17                                    )
     ☐ Affects Both Debtors           )
18                                    )
     *All papers shall be filed in the Lead Case,*  )
19   *No.19-30088 (DM)*               )
                                      )
20
21
22
23
24
25
26
27                               1
28

──────────────────────────────────────────────
                    PROOF OF SERVICE
                                          USBC NDCA Case No 19-30088

**PROOF OF SERVICE**

I, Bonnie E. Kane, declare

I am a citizen of the United States and employed in San Diego County, California and Butte County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 402 W. Broadway, Suite 2500, San Diego, California 92101. On April 20, 2020 I served a copy of the within document:

1. **JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(B) AND 1126 (E) AND BANKRUPTCY RULE 2019;**

2. **DECLARATION OF STEVEN S. KANE IN SUPPORT OF JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(B) AND 1126 (E) AND BANKRUPTCY RULE 2019**

3. **EXHIBITS 1, 2, 3**

by transmitting electronically through the Court's CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on April 25, 2020, at San Diego, California.


_____/s/ Bonnie E. Kane_____
Bonnie E. Kane

2

1  Steven S. Kane, Esq., SBN: 061670
   Bonnie E. Kane, Esq., SBN: 167700
2  **THE KANE LAW FIRM**
   402 W. Broadway, Suite 2500
3  San Diego, CA 92101
   Telephone: (619) 236-8700
4  Facsimile: (619) 236-1370
   E-mail: skane@thekanelawfirm.com
5  E-mail: bonnie@thekanelawfirm.com

6  Attorneys for KAREN GOWINS Creditor

7

8                 **UNITED STATES BANKRUPTCY COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                     **SAN FRANCISCO DIVISION**

11

12  *In re:*                              )
                                          )  **Case No. 19-30088 (DM)**
13  PG&E CORPORATION                      )  Chapter 11
                                          )  (Lead Case)
14  -and-                                 )  (Jointly Administered)
                                          )
15  PACIFIC GAS AND ELECTRIC              )  **DECLARATION OF STEVEN S. KANE**
    COMPANY                               )  **IN SUPPORT OF JOINDER ON BEHALF**
16                        Debtors.        )  **OF KAREN GOWINS IN WILLIAM B.**
                                          )  **ABRAMS' MOTION TO DESIGNATE**
17  ☐ Affects PG&E Corporation            )  **IMPROPERLY SOLICITED VOTES**
                                          )  **PURSUANT TO 11 U.S.C. §§ 1125(b) AND**
18  ☐ Affects Pacific Gas & Electric      )  **11226 (e) AND BANKRUPTCY RULE**
                                          )  **2019**
19  ☑ Affects Both Debtors                )
                                          )  Docket Nos. 6799, 6798, 6801
20  *All papers shall be filed in the Lead Case,*  )
    *No.19-30088 (DM)*                    )  Date: TBD
21  _____      )  Time: TBD
                                          )  Place: United States Bankruptcy Court
22                                              Courtroom 17, 16th Floor
                                                San Francisco, CA 94102
23

24        I, Steven S. Kane, hereby declare under panlty of perjury that the following is true and

25  correct to the best of my knowledge, information and belief.

26     1.  I am a partner in the Kane Law Firm, counsel to Creditor Karen Gowins in the above

27

28  _____
    DECLARATION OF STEVEN S. KANE IN SUPPORT OF JOINDER ON BEHALF OF KAREN GOWINS IN
    WILLIAM B. ABRAMS' MOTION TO DESIGNATEIMPROPERLY SOLICITED VOTES PURSUANT TO 11
    U.S.C. §§ 1125(b) AND11226(e) AND BANKRUPTCY RULE 2019

referenced case.

2. Exhibit 1 to this Joinder is a true and correct copy of a document entitled "Third Amended Verified Statement of the Ad Hoc Committee of Senior Unsecured Note holders Pursuant to Bankruptcy Rule 2019," which I downloaded directly from the official docket of this case, using the Pacer system. It is docket No. 6747 on that system.

3. Exhibit 2 to this Joinder is a true and correct copy of a document entitled Declaration of Mikal Watts in Support of his Preliminary Opposition to William B. Abrams Motion to Designate Improperly Solicited Votes Pursuant to 11 U.S.C. §§ 1125 (b) and 1126(3) and Bankruptcy Rule 2019 which I downloaded directly from the official docket of this case, using the Pacer system. It is Docket No. 6801-1 on that system.

4. Exhibit 3 to this Joinder is a true and correct copy of a KQED news article of April 25, 2020 which I downloaded from the KQED website at

https://www.kqed.org/news/11813173/attorney-for-pge-fire-victims-funded-by-wall-street-firms-hes-negotiating-against?fbclid=IwAR27cMqjD7FB-AaEBnxI11tFulgOu7D8qPINAP55P4YPYPSIZXL4vzLEpww

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 25, 2020, at San Diego County, California.

_____/s/ Steven S. Kane_____
STEVEN S. KANE

2

---

DECLARATION OF STEVEN JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125(b)

# EXHIBIT 1

AKIN GUMP STRAUSS HAUER & FELD LLP

Michael S. Stamer (*pro hac vice*)
Ira S. Dizengoff (*pro hac vice*)
David H. Botter (*pro hac vice*)
Abid Qureshi (*pro hac vice*)
One Bryant Park
New York, New York 10036
Telephone:      (212) 872-1000
Facsimile:      (212) 872-1002
Email:          mstamer@akingump.com
                idizengoff@akingump.com
                dbotter@akingump.com
                aqureshi@akingump.com

Ashley Vinson Crawford (SBN 257246)
580 California Street
Suite 1500
San Francisco, California 94104
Telephone:      (415) 765-9500
Facsimile:      (415) 765-9501
Email:          avcrawford@akingump.com

*Counsel to the Ad Hoc Committee of Senior Unsecured*
*Noteholders of Pacific Gas and Electric Company*

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Case Nos.      19-30088 (DM) |
| **PG&E CORPORATION,** | 19-30089 (DM) |
| -and- | Chapter 11 |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **THIRD AMENDED VERIFIED STATEMENT OF THE AD HOC COMMITTEE OF SENIOR UNSECURED NOTEHOLDERS PURSUANT TO BANKRUPTCY RULE 2019** |
| **Debtors.** | |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

Pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (the "Ad Hoc Committee"), who hold senior unsecured notes issued by Pacific Gas and Electric Company (the "Utility") (and other indebtedness as more specifically detailed in Exhibit A attached hereto), by and through its undersigned counsel, hereby submit this verified statement (this "Statement"), and in support thereof, state as follows:

1. In or around February 2019, the Ad Hoc Committee engaged Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") to represent it in connection with the chapter 11 cases of the Utility and PG&E Corporation (collectively, the "Debtors"). On March 5, 2019, the Ad Hoc Committee filed the *Verified Statement of the Ad Hoc Committee of Senior Unsecured Noteholders Pursuant to Bankruptcy Rule 2019* [Docket No. 744] (the "Original Statement").

2. On July 18, 2019, the Ad Hoc Committee filed the *First Amended Verified Statement of the Ad Hoc Committee of Senior Unsecured Noteholders Pursuant to Bankruptcy Rule 2019* [Docket No. 3083] (the "First Amended Statement").

3. On October 21, 2019, the Ad Hoc Committee filed the *Second Amended Verified Statement of the Ad Hoc Committee of Senior Unsecured Noteholders Pursuant to Bankruptcy Rule 2019* [Docket No. 4369] (the "Second Amended Statement"). This Statement amends and replaces the Second Amended Statement.

4. As of the date of this Statement, Akin Gump represents only the Ad Hoc Committee. Akin Gump does not represent or purport to represent any other entities in connection with the Debtors' chapter 11 cases. Akin Gump does not represent the Ad Hoc Committee as a "committee" (as such term is employed in the Bankruptcy Code and Bankruptcy Rules) and does not undertake to represent the interests of, and are not fiduciaries for, any creditor, party in interest, or other entity that has not signed a retention agreement with Akin Gump. In addition, the Ad Hoc Committee does not represent or purport to represent any other entities in connection with the Debtors' chapter 11 cases.

5. The members of the Ad Hoc Committee either hold claims or manage accounts that hold claims against the Debtors' estates. In accordance with Bankruptcy Rule 2019, a list of the

names, addresses and the "nature and amount of all disclosable economic interests" held in relation to the Debtors as of April 1, 2020, by each member of the Ad Hoc Committee is attached hereto as Exhibit A.

6.     The information set forth in Exhibit A, which is based on information provided by the applicable members of the Ad Hoc Committee to Akin Gump, is intended only to comply with Bankruptcy Rule 2019 and is not intended for any other purpose. Akin Gump does not make any representation regarding the validity, amount, allowance, or priority of such claims and reserves all rights with respect thereto.

7.     Nothing contained in this Statement (or Exhibit A) should be construed as a limitation upon, or waiver of, any rights of any member of the Ad Hoc Committee to assert, file and/or amend their claims in accordance with applicable law and any orders entered in these chapter 11 cases.

8.     Akin Gump reserves the right to amend and/or supplement this Statement in accordance with the requirements set forth in Bankruptcy Rule 2019.

Dated: April 13, 2020                    **AKIN GUMP STRAUSS HAUER & FELD LLP**

                                         By */s/ Ashley Vinson Crawford*
                                         Ashley Vinson Crawford (SBN 257246)
                                         Michael S. Stamer (*pro hac vice*)
                                         Ira S. Dizengoff (*pro hac vice*)
                                         David H. Botter (*pro hac vice*)
                                         Abid Qureshi (*pro hac vice*)

                                         *Counsel to the Ad Hoc Committee of Senior Unsecured*
                                         *Noteholders of Pacific Gas and Electric Company*

1    **Exhibit A**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case: 19-30088   Doc# 6691-1   Filed: 04/29/20   Entered: 04/29/20 11:35:08   Page 5
of 157

| NAME | ADDRESS | NATURE AND AMOUNT OF DISCLOSABLE ECONOMIC INTEREST |
|---|---|---|
| Apollo Global Management LLC | 9 West 57th Street 43rd Floor New York, NY 10019 | $336,425,000 in Senior Utility Notes[1] $85,000,000 in Utility Revolver Loans[2] $83,000,000 in DIP Term Loans[3] $100,000,000 in Wildfire Subrogation Claims |

---

[1] "Senior Utility Notes" means the senior notes issued by Pacific Gas and Electric Company (the "Utility") under (a) that certain Indenture, dated as of April 22, 2005, between Utility and The Bank of New York Company, as trustee (in such capacity, the "Trustee"), which amends and restates that certain Indenture of Mortgage, dated as of March 11, 2004, relating to the issuance of certain notes which are no longer outstanding, other than $3,000M principal amount of 6.05% senior notes due March 1, 2034, and (i) 1st Supplemental Indenture, dated as of March 13, 2007, relating to $700M principal amount of 5.80% senior notes due March 1, 2037 (ii) 3rd Supplemental Indenture, dated as of March 3, 2008, relating to $400M principal amount of 6.35% senior notes due Feb 15, 2038, (iii) 6th Supplemental Indenture, dated as of March 6, 2009, relating to $550M principal amount of 6.25% senior notes due March 1, 2039, (iv) 8th Supplemental Indenture, dated as of November 18, 2009, relating to $550M principal amount of 5.40% senior notes due January 15, 2040, (v) 9th Supplemental Indenture, dated as of April 1, 2010, relating to $250M principal amount of 5.80% senior notes due March 1, 2037, (vi) 10th Supplemental Indenture, dated as of September 15, 2010, relating to $550M principal amount of October 1, 2020, (vii) 12th Supplemental Indenture, dated as of November 18, 2010, relating to $250M principal amount of 3.50% senior notes due October 1, 2020 and $250M principal amount of 5.40% senior notes due January 15, 2040, (viii) 13th Supplemental Indenture, dated as of May 13, 2011, relating to $300M principal amount of 4.25% senior notes due May 15, 2021, (ix) 14th Supplemental Indenture, dated as of September 12, 2011, relating to $250M principal amount of 3.25% senior notes due September 15, 2021, (x)16th Supplemental Indenture, dated as of December 1, 2011, relating to $250M principal amount of 4.50% senior notes due December 15, 2041, (xi) 17th Supplemental Indenture, dated as of April 16, 2012, relating to $400M principal amount of 4.45% senior notes due April 15, 2042, (xii) 18th Supplemental Indenture, dated as of August 16, 2012, relating to $400M principal amount of 2.45% senior notes due August 15, 2022 and $350M principal amount of 3.75% senior notes due August 15, 2042, (xiii) 19th Supplemental Indenture, dated as of June 14, 2013, relating to $375M principal amount of 3.25% senior notes due June 15, 2023 and $375M principal amount of 4.60% senior notes due June 15, 2043, (xiv) 20th Supplemental Indenture, dated as of November 12, 2013, relating to $300M principal amount of 3.85% senior notes due November 15, 2023 and $500M principal amount of 5.125% senior notes due November 15, 2043, (xv) 21st Supplemental Indenture, dated as of November 12, 2013, relating to $450M principal amount of 4.75% senior notes due February 15, 2024 and $450M principal amount of 4.75% senior notes due February 15, 2044, (xvi) 23rd Supplemental Indenture, dated as of August 18, 2014, relating to $350M principal amount of 3.40% senior notes due August 15, 2024 and $225M principal amount of 4.75% senior notes due February 15, 2044, (xvii) 24th Supplemental Indenture, dated as of November 6, 2014, relating to $500M principal amount of 4.30% senior notes due March 15, 2045, (xviii) 25th Supplemental Indenture, dated as of June 12, 2015, relating to $400M principal amount of 3.50% senior notes due June 15, 2025 and $100M principal amount of 4.30% senior notes due March 15, 2045, (xix) 26th Supplemental Indenture, dated as of November 5, 2015, relating to $200M principal amount of 3.50% senior notes due June 15, 2025 and $450M principal amount of 4.25% senior notes due March 15, 2046, (xx) 27th Supplemental Indenture, dated as of March 1, 2016, relating to $600M principal amount of 2.95% senior notes due March 1, 2026, (xxi) 28th Supplemental Indenture, dated as of December 1, 2016, relating to $400M principal amount of 4.00% senior notes due December 1, 2046, (xxii) 29th Supplemental Indenture, dated as of March 10, 2017, relating to $400M principal amount of 3.30% senior notes due March 15, 2027 and $200M principal amount of 4.00% senior notes due December 1, 2046, (b) that certain Indenture, dated as of March 10, 2017, between Utility and the Trustee, relating to $1,150M principal amount of 3.30% senior notes due December 1, 2027 and $850M principal amount of 3.95% of senior notes due 2047 and (c) that certain Indenture, dated as of August 6, 2018, between Utility and the Trustee, as supplemented by 1st Supplemental Indenture, dated as of August 6, 2018, relating to $500M principal amount of 4.25% senior notes due 2023 and $300M principal amount of 4.65% senior notes due 2028.

[2] "Utility Revolver Loans" means loans under that certain Second Amended and Restated Credit Agreement, dated as of April 27, 2015 by and between the Utility and Citibank, N.A. as administrative agent (in such capacity, the "Revolving Agent").

[3] "DIP Term Loans" means the term loans under that senior secured, superpriority debtor-in-possession new money credit, guaranty and security agreement (the "DIP Credit Agreement") in an aggregate principal amount of $1,500,000,000.

| | | |
|---|---|---|
| Aurelius Capital Management, LP | 535 Madison Avenue 31st Floor New York, NY 10022 | $89,902,000 in Senior Utility Notes |
| Canyon Capital Advisors LLC | 2000 Avenue of the Stars 11th Floor Los Angeles, CA 90067 | $600,044,000 in Senior Utility Notes $129,037,343.93 in Utility Revolver Loans $102,748,595.72 in Utility L/C Reimbursement $58,557,367.00 in HoldCo Revolver Loans[4] $45,000,000 in HoldCo Term Loans[5] |
| Capital Group | 333 South Hope Street 55th Floor Los Angeles, CA 90071 | $390,025,000 in Senior Utility Notes $37,985,000 in Utility L/C Reimbursement |
| CarVal Investors, LLC | 461 Fifth Avenue New York, NY 10017 | $82,727,000 in Senior Utility Notes $35,000,000 in Utility Revolver Loans $100,000,000 in Utility L/C Reimbursement |
| Castle Hook Partners LP | 250 West 55th Street New York, NY 10019 | $107,250,000 in Senior Utility Notes $10,000,000 in Utility Revolver Loans 3,333,841 shares of PG&E Stock |
| Citadel Advisors LLC | 520 Madison Avenue New York, NY 10022 | $741,190,000 in Senior Utility Notes $174,972,513.80 in Utility Revolver Loans 5,395,315 shares of PG&E Stock |
| Davidson Kempner Capital Management LP | 520 Madison Avenue 30th Floor New York, NY 10022 | $945,184,000 in Senior Utility Notes $327,931,000 in Utility Revolver Loans $25,000,000 in Utility L/C Reimbursement $2,666,000 in Trade Claims |
| Diameter Capital Partners LP | 24 West 40th Street 5th Floor New York, NY 10018 | $156,290,000 in Senior Utility Notes $104,541,717 in Utility Revolver Loans $17,000,000 in Bilateral Utility Loan $33,865,078 in Trade Claims |

---

[4] "HoldCo Revolver Loans" means loans under that certain Second Amended and Restated Credit Agreement, dated as of April 27, 2015 by and between PG&E and the Revolving Agent.

[5] "HoldCo Term Loans" means loans under that certain Term Loan Credit Agreement, dated as of April 16, 2018, by and between PG&E and Mizuho Bank, Ltd., as administrative agent.

| | | |
|---|---|---|
| Elliott Management Corporation | 40 West 57th Street New York, NY 10019 | $1,722,605,000 in Senior Utility Notes |
| Farallon Capital Management, L.L.C. | One Maritime Plaza Suite 2100 San Francisco, CA 94111 | $855,880,000 in Senior Utility Notes $260,120,000 in Utility Revolver Loans $28,000,000 in DIP Term Loans $86,340,000 in Trade Claims $1,140,000 in Wildfire Subrogation Claims |
| Fidelity Management & Research | 801 Boylston Street Boston, MA 02116 | $712,822,000 in Senior Utility Notes |
| Fir Tree Partners | 55 West 46th Street 29th Floor New York, NY 10036 | $89,800,000 in Senior Utility Notes |
| LMR Partners LLP | 363 Lafayette Street New York, NY 10012 | $76,409,000 in Senior Utility Notes |
| Marathon Asset Management LP | One Bryant Park 38th Floor New York, NY 10036 | $24,250,000 in Senior Utility Notes $22,698,939 in Utility Revolver Loans $41,724,692 in HoldCo Revolver Loans $39,023,409 in HoldCo Term Loans |
| Oak Hill Advisors, L.P. | 1114 6th Avenue 27th Floor New York, NY 10036 | $162,500,000 in Senior Utility Notes |
| Oaktree Capital Management, L.P. | 333 South Grand Avenue 28th Floor Los Angeles, CA 90071 | $167,223,000 in Senior Utility Notes $24,458,189 in Utility Revolver Loans $10,000,000 in Utility Term Loans[6] $3,750,000 in DIP Term Loans |
| Pacific Investment Management Company LLC | 650 Newport Center Drive Newport Beach, CA 92660 | $3,170,343,000 in Senior Utility Notes $230,000,000 in Utility Term Loans $1,065,340,000 in DIP Term Loans |

---

[6] "Utility Term Loans" means loans under that certain term loan agreement dated as of February 23, 2018 by and among the Utility, The Bank of Tokyo-Mitsubishi UFJ, Ltd. ("BTMU") and U.S. Bank National Association, as lenders, joint lead arranger and joint bookrunners and BTMU as administrative agent.

| | | |
|---|---|---|
| P. Schoenfeld Asset Management LP | 1350 Avenue of the Americas 21st Floor New York, NY 10019 | $153,471,000 in Senior Utility Notes |
| Sculptor Capital Management | 9 West 57th Street 39th Floor New York, NY 10019 | $493,120,670,000 in Senior Utility Notes $20,000,000 in DIP Term Loans $105,000,000 in Utility L/C Reimbursement 216,800 shares of PG&E Stock Short Positions in 2,168 Call Option Contracts on PG&E Stock 2,168 Put Option Contracts on PG&E Stock |
| Senator Investment Group LP | 510 Madison Avenue Suite 28 New York, NY 10022 | $88,286,000 in Senior Utility Notes $25,000,000 in Utility Revolver Loans |
| Silver Rock Financial LP | 12100 Wilshire Blvd. Suite 1000 Los Angeles, CA 90025 | $46,329,000 in Senior Utility Notes |
| Taconic Capital Advisors LP | 280 Park Avenue 5th Floor New York, NY 10017 | $133,810,000 in Senior Utility Notes $50,000,000 in Utility Revolver Loans $25,000,000 in Utility L/C Reimbursement |
| Third Point LLC | 390 Park Avenue New York, NY 10022 | $605,953,000 in Senior Utility Notes $10,000,000 in Utility Revolver Loans |
| Värde Partners, Inc. | 901 Marquette Avenue South Minneapolis, MN 55402 | $696,827,000 in Senior Utility Notes $372,285,106.67 in Utility Revolver Loans $5,000,000 in Utility L/C Reimbursement |

EXHIBIT 2

WATTS GUERRA LLP
Mikal C. Watts
70 Stony Point Road, Suite A
Santa Rosa, California 95401
Phone: (707) 241-4567
2561 California Park Drive, Suite 100
Chico, California 95928
Phone: (530) 240-6116
Email: mcwatts@wattsguerra.com

*Attorneys for Numerous Wild Fire Claimants*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors. | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF MIKAL WATTS IN SUPPORT OF HIS PRELIMINARY OPPOSITION TO WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §1125(B) AND 1126(E) AND BANKRUPTCY RULE 2019** |
| ☐Affects PG&E Corporation<br>☐Affects Pacific Gas and Electric Company<br>☒Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Date: April 27, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 6799 & 6798 |

## DECLARATION OF MIKAL WATTS

Mikal Watts declares the following pursuant to 28 U.S.C. § 1746:

1.    I am an attorney at the law firm of WATTS GUERRA LLP.

2.    My firm has twenty-five lawyers, a staff of approximately 100 employees, and eight offices in California and Texas.

3.    I have practiced law for over thirty (30) years, and have led my own firms for more than twenty-three (23) years.

4.    During all twenty-three of those years leading my own firm, my firms always have had access to traditional law firm credit facilities, which involve a banking institution providing operational and case investment capital to a law firm through a general credit line, with such credit being collateralized by the income produced by the law firm, and with such risk to the banking institution being spread out via assignment rights provided by the bank.

5.    Importantly, my lenders never have been, and are not now, granted control whatsoever over my firm's litigation decisions.

6.    In recent years, there also has been a proliferation of for-profit firms offering nonrecourse loans to plaintiffs in return for a share of any funds recovered. These rights to share in a percentage of funds recovered also can be assigned out by the litigation funder. This is *not* the kind of credit facility used by WATTS GUERRA.

7.    WATTS GUERRA's credit facility is not contingent upon the outcome of this litigation. Rather, it is a general credit facility collateralized by income to be received by the firm across all its various cases; a facility no different than any other facility provided by banking institutions across the United States.

8.    WATTS GUERRA's lenders have been given no right of control over the firm's decisions concerning this litigation.

9.    Together with other law firms, WATTS GUERRA LLP represents more than 16,000 individuals who timely filed Notices of Claims in this bankruptcy proceeding.

10.    To my knowledge, his Court has not entered an order requiring private counsel to make disclosures pursuant to Bankruptcy Rule 2019, and a reading of the rule suggests that it probably does not apply to private counsel representing individual fire survivors.

1    11.    WATTS GUERRA is not a group or committee.

2    12.    Each fire survivor's Notice of Claim filed by this Court's amended Bar Date of

3    December 31, 2019 sets forth the name of the law firm representing each such fire survivor.

4    13.    WATTS GUERRA has no disclosable economic interest held in relation to the

5    debtor, and no economic interest in it that is affected by the value, acquisition, or disposition of a

6    claim or interest.

7    14.    WATTS GUERRA is not a member of a group or committee that claims to represent

8    any entity; rather WATTS GUERRA represents its individual clients alone as single creditors, not

9    with some official committee.

10   15.    WATTS GUERRA is not a creditor or equity security holder represented by an

11   entity, group, or committee.

12   16.    If the Court believes that WATTS GUERRA and other private attorneys not serving

13   on the TCC, should provide a disclosure under Bankruptcy Rule 2019 WATTS GUERRA is happy

14   to voluntarily make such a disclosure upon order of this Court pursuant to Bankruptcy Rule

15   2019(e)(3).

16   17.    WATTS GUERRA has disclosed to its clients and to others its communications in

17   this case with assignees of portions of its credit facility, and its subsequent communications with

18   principals of the Debt and the Equity. Specifically, Mikal Watts conducted an in-person town hall

19   to WATTS GUERRA's clients in Chico on December 12, 2020, and in Santa Rosa later the same

20   day. This town hall was filmed, and all WATTS GUERRA clients received an update email or

21   letter shortly thereafter with a link to the video of those town hall meetings. A link to a Power

22   Point setting forth the nature of the disclosure made in Santa Rosa on December 12, 2019 is

23   provided herewith,[1] and specific reference is made to slides 53-80 therein. A link to a Power Point

24

25

26

27

28   ----

     [1] Click here to download the file

setting forth the nature of the disclosure made in Chicco on December 12, 2019 is provided herewith,[2] and specific reference is made to slides 53-80 therein.  Likewise, a second version of the same disclosure occurred most recently on April 18, 2020 on a telephonic town hall that was open to the public.  A transcript of that meeting is made available herewith as well.[3]

18.     WATTS GUERRA provided the disclosure statement and other materials required by this Court digitally on March 31, 2020, before beginning its communications program during the voting period.  The Restructuring Support Agreement specifically provided for "approval by the Bankruptcy Court of procedures to allow distribution of solicitation materials and casting of ballots for holders of Fire Victim Claims by digital means."  Doc. # 50380-1, p. 4, ¶2(a)(ii). WATTS GUERRA confirmed that the court-ordered disclosure statement and other materials would be available beginning March 31, 2020, prepared its digital disclosure plan, and executed on it early in the morning on March 31, 2020 for the very purpose of ensuring compliance with 11 U.S.C. §1125(b).

19.     WATTS GUERRA continues to provide information both to its clients with update letters and emails.  During the litigation, WATTS GUERRA conducted quarterly in-person town hall meetings and provided systematic written updates as well.  More recently, we have been providing weekly written updates to our clients.

20.     Additionally, WATTS GUERRA provides information on its website, www.firesettlementfacts.com.  As questions are presented by fire survivors, those questions are sent to Watts, who prepares an answer that is then recorded on video, and put up on the website for all to see.  A repeated disclosure of the information concerning credit facilities was made again

_____

[2] Click here to download the file

[3] Click here to download the file

during our April 18, 2020 telephonic town hall, and a Drop Box of that disclosure is available herewith. [4]    Likewise, that disclosure has been made available to all on www.firesettlementfacts.com.

21.    Since the COVID-19 "shelter in place" orders, WATTS GUERRA has and will continue to conduct ten (10) weekly telephonic town hall meetings where fire survivors can call in and listen to various lawyers discuss the issues relating to the plan, and to answer questions fire survivors may have.  Those telephonic town hall meetings have occurred on March 21, March 26, March 31, April 4 and April 11, and future telephonic town hall meetings scheduled for April 18, April 25, May 2, May 9 and May 15, 2020.

22.    In addition, at Abrams' invitation, fire survivor attorneys Mikal Watts and Gerald Singleton appeared on a two-hour long Facebook Live forum on April 14, 2020, where the pros and cons of the Amended Plan being voted on were debated with Mr. Abrams himself, as well as attorneys Bonnie Kane and Francis Scarpulla who represent former TCC members.

23.    On April 16, 2020, my law firm filed several lawsuits against Mike Bloomberg 2020, Inc., alleging that the Bloomberg campaign reneged on its promises to employ those persons agreeing to work on his presidential campaign through the November election, regardless of whether he won or lost the Democratic primary.  When he reneged, I filed a lawsuit on behalf of my first client, Jennifer Strobel, on March 27, Plaintiff's Original Petition in *Jennifer Strobel v. Mike Bloomberg 2020, Inc.*, Cause No. D-1-GN-20-001852, in the 201ˢᵗ Judicial District of Travis County, Texas.  On April 16, 2020 three additional pleadings on  behalf of twenty-three (23) employees of the Bloomberg campaign: (1) Plaintiffs' Original Petition in *Sarah Allen, et al. v. Mike Bloomberg 2020, Inc.*, Travis County, Texas; (2) Plaintiffs' Original Petition in *Tania Gonzalez-Ingram v. Mike Bloomberg 2020, Inc.*, Cause No. D-1-GN-20-002148, In the 200ᵗʰ

---

[4] https://www.dropbox.com/s/pvzk6o5jl92f9y8/20200418%20town%20hall%20v1,1%20clip%201_1.mp4?dl=0

Judicial District, Travis County, Texas; (3) Plaintiff's First Amended Petition, *Jennifer Strobel v. Mike Bloomberg 2020, Inc.*, Cause No. D-1-GN-20-001852, in the 201ˢᵗ Judicial District of Travis County, Texas.

24.     On Sunday evening, April 19, 2020, I received a phone call from *Bloomberg News* reporter Mark Chediak, stating that he was writing a story on Abrams' filing. I asked for the filing before giving comment, and was told that Abrams had specifically told Mark Chediak not to share the filing with me. A search of the Court's docket contained no such filing, but *Bloomberg News*' Mark Chediak confirmed to me that Abrams had already sent it to him. While Mark Chediak asked for comment on a Sunday night, he honorably agreed that perhaps it would not be fair to require comment from me on a filing pre-supplied to a national reporter, but withheld from its subject.

25.     I affirm that the facts set forth in this declaration are true and correct.

Dated April 20, 2020                    Respectfully submitted,


                                        /s/ Mikal C. Watts
                                        Mikal C. Watts
                                        WATTS GUERRA LLP
                                        70 Stony Point Road, Suite A
                                        Santa Rosa, California 95401
                                        Phone: (707) 241-4567
                                        2561 California Park Drive, Suite 100
                                        Chico, California 95928
                                        Phone: (530) 240-6116
                                        Email: mcwatts@wattsguerra.com

                                        *Attorney for Numerous Wild Fire Claimants*

# EXHIBIT 3

# Attorney for PG&E Fire Victims Funded by Wall Street Firms He's Negotiating Against

Lily Jamali

Apr 25

- Facebook
- Twitter
- Email
- Copy Link



About 70,000 wildfire survivors are waiting for PG&E to pay out claims. *(Amy Osborne/AFP/Getty Images)*

An attorney whose firm represents the largest single group of Northern California wildfire survivors in the PG&E bankruptcy is partially funded by some of the very Wall Street firms he's been negotiating against.

San Antonio, Texas-based lawyer Mikal Watts, of the firm Watts Guerra LLP, told KQED he's known that his credit line included financing from private equity heavyweight Apollo Global Management and investment firm Centerbridge Partners.

The firms represent competing groups that have sat across the bargaining table from each other, while also negotiating against wildfire survivors in the PG&E bankruptcy.

The PG&E wildfire cases are among the more recent mass tort cases Watts has mounted. That kind of complex litigation can take years and cost millions, which is where Centerbridge and Apollo came in.

Their financial dealings with Watts were unearthed by a fire survivor in a PG&E bankruptcy court filing this week. It quotes Watts telling clients at a December town hall in Santa Rosa that he came to "realize...that part of my operational line of credit... had been in effect cordoned off, some to Centerbridge, some to Apollo" among others.

Sponsored

In late 2019, Apollo and Centerbridge were competing against one another to strike a lucrative deal with Watts and other attorneys for wildfire survivors. The Watts group's client roster includes 16,000 of the estimated 70,000 PG&E fire survivors who have filed claims in the bankruptcy. Watts was heavily involved in negotiating the $13.5 billion compensation deal that lawyers for fire survivors brokered in early December, according to people involved in the case and Watts himself.

"I wanted to disclose to my clients that backdrop, of who I met, and give them the full color of why I thought one deal was superior to the other," Watts told KQED this week.

PG&E fire victims have been casting ballots on the bankruptcy deal since April 1, with voting continuing through May 15. The plan requires support from two-thirds of survivors who vote. Watts says nearly 13,000 of his clients have voted "yes" so far.

The company is aiming to exit bankruptcy by June 30 so it can tap a state insurance fund that would pay future fire survivors if the utility's equipment sparks future fires.

## RELATED COVERAGE

**PG&E CEO Bill Johnson to Step Down After a Tumultuous Year**


**Judge Rebukes PG&E for Bid to Pay $4M Criminal Fine From Fire Victims' Fund**


**Judge Refuses to Approve Fire Victims Letter Attacking PG&E**


Watts and others involved, including the <u>committee of survivors</u> in bankruptcy court, ultimately chose the deal presented by the group that included Centerbridge, which bought up PG&E stock as the price tanked after the 2018 Camp Fire. Centerbridge has also scooped up around $200 million in claims by insurance companies against PG&E, and is expected to reap a major financial windfall once the utility exits from Chapter 11.

Apollo, which is a major owner of PG&E's debt, had offered a competing deal, which was rejected by lawyers for survivors.

The line of credit was provided to Watts by St. Louis, MO-based investment firm Stifel. In the emerging area of litigation financing, brokers like Stifel act as a go-between for lawyers seeking to fund large cases and investors seeking part of the reward if a case ends in a payout. Stifel, Centerbridge, and Apollo did not respond to requests for comment.

"Stifel has the right to make assignments on percentages of the deal," Watts told KQED in a phone interview this week, "I have no right to know how they've assigned it. What I do know is I learned Centerbridge and Apollo had taken assignments on a percentage of my deal. Then, they introduced me to their respective corners in the equity versus debt fight."

Watts said Centerbridge's weight in the equity group of 1.6% of PG&E shares was overshadowed by Apollo's half a billion dollar holdings of PG&E bonds.

"If that had entered my thinking, I would have gone with the bonds. They were bigger players," Watts said.

**Exhibit 4**

1   QUENTIN L. KOPP (SBN _25070)          JEREMIAH F. HALLISEY (SBN 4001)
    DANIEL S. MASON (SBN 54065)           HALLISEY AND JOHNSON PC
2   THOMAS W. JACKSON (SBN 107608)        465 California St, Ste 405
    FURTH SALEM MASON & LI LLP            San Francisco, CA  94104
3   640 Third Street, 2nd Floor           Telephone: (415) 433—5300
    Santa Rosa, CA  95404-4445            Email:  jfhallisey@h-jlaw.com
4   Telephone: (707) 244-9422
    Email:  quentinlkopp@gmail.com
5           dmason@fsmllaw.com
            tjackson@fsmllaw.com
6
    FRANCIS O. SCARPULLA (SBN 41059)
7   PATRICK B. CLAYTON (SBN 240191)
    LAW OFFICES OF FRANCIS O.
8   SCARPULLA
    456 Montgomery Street, 17th Floor
9   San Francisco, CA  94104
    Tel: (415) 788-7210
10  Email:  fos@scarpullalaw.com
            pbc@scarpullalaw.com

11  *[Attorneys for clients as listed on signature page]*

12                  UNITED STATES BANKRUPTCY COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16  In re:                              | Bankruptcy Case No. 19-30088 (DM)

17  PG&E CORPORATION,                   | Chapter 11

18      - and -                         | (Lead Case)

19  PACIFIC GAS AND ELECTRIC            | (Jointly Administered)
    COMPANY,
20                                      | **JOINDER OF CERTAIN FIRE VICTIMS
                            Debtors.    | IN WILLIAM B. ABRAMS MOTION TO
21                                      | DESIGNATE IMPROPERLY SOLICITED
                                        | VOTES PURSUANT TO 11 U.S.C. §§
22                                      | 1125(B) AND 1126(E) AND BANKRUPTCY
                                        | RULE 2019**
23

24                            **I**

25                       **INTRODUCTION**

26          This Joinder is submitted by a substantial group of fire victims who suffered injuries and

27  were damaged by the PG&E fires in Sonoma, Napa, Mendocino and Butte Counties both for

28  themselves and as advocates for all fire victims injured by the 2015, 2017, and 2018 Northern

1  California wildfires who are considering the settlement offer by PG&E.

2  <center>II</center>

3  <center>**THE PG&E SETTLEMENT IS NOT GOOD FOR FIRE VICTIMS**</center>

4  The settlement proposed by PG&E, which was then negotiated by the Tort Claimants

5  Committee ("TCC"), allegedly as intended to pay fire victims $13.5 billion in consideration.  The

6  terms of that settlement are contained in a Restructuring Support Agreement ("RSA") purportedly

7  entered into on or about December 5, 2019, which provides for the $13.5 billion to be paid one-

8  half in cash and one-half in post-bankruptcy PG&E common stock.  Pursuant to the RSA, the

9  cash portion is to be paid into a new "Fire Victims' Trust Account" (the "Trust")  in three

10  installments -- $5.4 billion on August 29, 2020; $650 million by January 15, 2021 and $700

11  million by January 15, 2022.  The later two payments bear no interest and have questionable

12  security.[1] The stock portion likewise would be paid on August 29, 2020 into the Trust, and then

13  sold over a period of time.  At the time the the TCC signed the RSA with PG&E, the real value of

14  the $13.5 billion was less than that amount and has further decreased as the economy declined,

15  and financial markets have been disrupted.  It is now time to expose this settlement for what it is

16  – a terrible deal for the fire victims.

17  We agree with the TCC that PG&E has breached the RSA by making material changes to

18  that document, to which changes the TCC did not agree.  As the charts below show, the agreed-

19  upon value of $6.75 billion in PG&E stock does not have that value, so the fire victims are not

20  getting a total of $13.5 billion as promised.  See, Declaration of Eric Lowrey, CIRA, In Support

21  of Objection by Certain Fire Victims to Debtors' Motion Pursuant to 11 U.S.C. 105(A) and

22  502(C) to Establish Amount of Fire Victim Claims for all Purposes of the Chapter 11, I re PG&E

23  Corporation, Civil Case No. 19-05257 (JD), Doc. No. 307 (04/03/20), a copy of which is attached

24  hereto as Exhibit A.

25  PG&E unilaterally amended its capitalization by reducing equity by $3 billion and

26  increasing its debt-load by more than $3.7 billion than was agreed to with the TCC, thereby

27  _____

28  [1] The security hinges on a successful IRS ruling that net operating losses ("NOLs") will not be
lost if the amount of stock transferred upon exit from bankruptcy creates a change in ownership,
which usually places the NOLs in jeopardy.

1  lowering the value of the stock.  Neither the TCC nor any of the fire victims agreed to that

2  increase in debt.

3      Moreover, because of the recent dramatic downturn in the economy due to coronavirus,

4  the value of any post-petition PG&E stock will be greatly reduced.

5      Thus, it is obvious that the value of the consideration to be transferred to the Trust is

6  substantially less than the promised $13.5 billion, and current economic conditions puts the value

7  and timing of that consideration at risk of further reduction and threatens to delay  payment of the

8  cash portion of the settlement consideration.  Forty percent of the cash portion of the

9  consideration – *i.e.*, $5.4 billion – would be paid when PG&E exits bankruptcy which is supposed

10  to be by August 29, 2020.  However, that effective date is problematical due to the Contingency

11  Plan added to the Plan of Reorganization as part of the agreement between PG&E and Governor

12  Newsom's office, which now could extend the time of the first payment to December 31. 2020.

13      Additionally, 10% of the total cash consideration – *i.e.*, $1.35 billion – is deferred without

14  interest until January 15, 2021 ($650 million) and January 15, 2022 ($700 million)[2] and is based

15  on questionable security.  Such deferred "cash" is not cash set aside by PG&E and held for the

16  benefit of the fire victims, but rather this "cash" is yet to be earned by PG&E and is subject to

17  various uncertainties and risks related to PG&E's ability to realize cash benefits from tax

18  attributes as well as any traditional business and credit risks.

19      The other half of the $13.5 billion in consideration – *i.e.*, $6.75 billion – is in common

20  stock in the reorganized PG&E, which currently is worth substantially less than the touted $6.75

21  billion.  This stock will be liquidated in order to provide much-needed cash for the fire victims.

22  However, the sale of this stock will be subject to restrictions on timing of the liquidation by

23  PG&E alone, which restrictions have not been disclosed as yet.  In fact, PG&E has failed to

24  deliver the stock Registration Rights Agreement, that is an important part of the deal, and which

25  impacts the $6.75 billion stock value.  Moreover, because PG&E is not going to be able to pay

26  dividends for 3 years, the market price of this common stock will be negatively affected because

27

28  ---

[2] Because there is no interest on the two deferred payments, they would need to be discounted by about $45 million.

JOINDER OF FIRE VICTIMS IN ABRAMS
MOTION                                          - 3 -                     USBC/NDCA NO. 19-30088 (DM)

1   most institutional investors manage funds that are prohibited from acquiring a stock that pays no

2   dividends.

3         Eric Lowrey, a Certified Restructuring and Insolvency Advisor, has advised the U.S.

4   District Court that the true value of the PG&E stock is only $4.85 billion, not the $6.75 billion

5   PG&E and the proponents of that plan assert.  And Mr. Lowrey has further advised the Court that

6   there is substantial risk that PG&E will fail to raise the necessary financing to exit bankruptcy on

7   the timeline contemplated, *i.e.* August 2020.  See, Declaration of Eric Lowrey, CIRA, In Support

8   of Objection by Certain Fire Victims to Debtors' Motion Pursuant to 11 U.S.C. 105(A) and

9   502(C) to Establish Amount of Fire Victim Claims for all Purposes of the Chapter 11, I re PG&E

10  Corporation, Civil Case No. 19-05257 (JD), Doc. No. 307 (04/03/20), a copy of which is attached

11  hereto as Exhibit A.  Mr. Lowrey correctly points out that among the subrogation claimants,

12  unsecured noteholder claimants, and tort victims, everyone receives cash except the victims as

13  shown below:hereto as Exhibit A.  Mr. Lowrey correctly points out that among the subrogation

14  claimants, unsecured noteholder claimants, and tort victims, everyone receives cash except the

15  victims as shown on the next page.

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS
MOTION

- 4 -

USBC/NDCA NO. 19-30088 (DM)

### Individual Fire Victims the Only Claimant Group to Receive Deferred Cash & Equity

**While every other claimant group is to receive 100% cash or secured debt, 60% of the consideration to be transferred to the Victim Trust is exposed to the risk of diminution of value prior to receipt**

*$Millions*

| CLAIMANT GROUPS | TREATMENT OF CLAIMS | | | TOTAL |
|---|---|---|---|---|
| | Cash / New Debt | Deferred Cash | Equity | |
| Debtor-In-Possession Financing | 2,000 | 0 | 0 | 2,000 |
| Trade Claims and Other Costs | 2,300 | 0 | 0 | 2,300 |
| Prepetition Debt & Accrued Interest | 23,450 | 0 | 0 | 23,450 |
| Subrogated Wildfire Liability Claims | 11,000 | 0 | 0 | 11,000 |
| Public Entities Wildfire Liability Claims | 1,000 | 0 | 0 | 1,000 |
| **Individual Fire Victim Liability Claims** | 5,400 | 1,350 | 6,750 | 13,500 |
| | | | | 53,250 |

- **Individual victims** are the **only claimants to receive at-risk deferred cash and/or equity**
- The $1.35 billion of deferred cash and the Fire Victim Equity are exposed to significant risks
  - Fire Victim Equity to be contributed to the Victim Trust currently estimated to be worth approximately $4.85 billion, materially less than $6.75 billion, and it could decline further
  - Significant risk of negative impacts due to current economic downturn, including the potential for the Debtors' earnings forecast to be reduced and reduced liquidity due to customer non-payment
  - Cash tax benefits needed to fund $1.35 billion of deferred cash payments may not be realized
  - Potential future wildfire liability claims made against PG&E would be senior to Victim Equity

Source: Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization.
1) Based on uses of $59.0 billion in PG&E POR, including $1.35 billion in deferred cash for the Victim Trust. Not shown is the $5.0 billion wildfire fund contribution and $0.75 billion of B/S cash.
2) Comprised of $13.875 billion in cash and $9.575 billion in new secured debt. The $9.575 billion of new, secured debt to be senior in priority to deferred cash and equity yet to be contributed to Victim Trust upon PG&E's exit from bankruptcy. Secured debt will also be senior in priority to any future wildfire liability claims filed against PG&E (deferred cash and equity will not be).

It is woefully apparent that this PG&E "new deal" is a bad deal for fire victims, especially when one considers that all other creditors, along with Equity and the Noteholders, are getting all cash payments and stand to make billions of dollars upon PG&E's exit from this Chapter 11 proceeding. The only group of creditors who are at risk of getting less than they deserve are the fire victims – the very individuals who suffered the most from the PG&E-caused wide fires. The vast majority of fire victims, who were not members of any committee and therefore whose voices were not heard, but to whom the TCC nevertheless has a fiduciary obligation to maximize their recoveries, did not agree to take less than the $13.5 billion they were promised they would receive. That is why three members of the TCC have resigned because they cannot support the proposed settlement in such circumstances.

Meanwhile, the proponents of the PG&E settlement are broadcasting to fire victims that the only way to get paid promptly is to vote "Yes" on the PG&E plan. But that representation is

JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS MOTION - 5 -   USBC/NDCA NO. 19-30088 (DM)

inaccurate and misleading, because it will be years before any payments are made from the Trust to the fire victims.  Indeed, the statements by the proponents of the PG&E plan that a "No" vote will result in years of chaos and litigation and the possible breakup of the company is not correct because there is a viable back-up plan proposed by the Customer-Owned Utility ("C-OU") group, which would provide the fire victims with $13.5 billion all cash, meet the June 30, 2020 deadline for joining the wildfire insurance fund, and be paid into the Fire Victims Trust by September 30, 2020.  See Declaration of Francis O. Scarpulla In Support of Objection to Debtors' Motion, Case No.: 19-cv-05257-JD, Doc. No.: 306-1, attached hereto as Exhibit B.

### III

### HOW DID THIS HAPPEN TO FIRE VICTIMS?

It appears to an independent observer that a number of mistakes were made which materially affected the fire victims' settlement.  Initially, it appears that the subrogation claimants (many of whom are hedge funds who purchased such insurance subrogation claims at thirty cents on the dollar) abandoned any meaningful negotiations with the TCC and obtained an $11 billion all-cash deal with the PG&E equity group (also led by a group of hedge funds which would make billions of dollars upon exit from bankruptcy).  Once the subrogation claimants joined PG&E any negotiating strength of the TCC was greatly weakened.

Another mistake was not to engage with the noteholders (possessing trillions of dollars in assets) who apparently were ready, willing and able to offer an all-cash $13.5 billion deal for the fire victims.  While it is common knowledge that a mediation session took place, one wonders why the noteholders' settlement proposal was not accepted, which caused them to join with equity and effectively eliminate all competition for the fire victims' damages amount.[3]  Once that happened, all fire victims were at the mercy of PG&E and Equity, except that the TCC had an automatic RSA withdrawal provision if Governor Newsom rejected PG&E's proposal, as he eventually did.  However, rather than terminate the deal, the TCC agreed to revise the RSA by deleting such automatic withdrawal right. After that revision, the TCC could escape from the

---

[3] When two competitors enter into a contract to the injury of a party, that may be deemed to be a violation of Section 1 of the Sherman Act for which the combining parties can be liable for treble damages.

1   RSA only if its fiduciary obligations required it to withdraw from the PG&E RSA.

2         Now that it is obvious to anyone examining the PG&E "deal" objectively that it is not in

3   the interests of fire victims to approve it, the TCC still has not utilized the fiduciary-out provision

4   of the RSA.

5         We do not propose that this Court scrap the PG&E plan altogether, but rather that it

6   consider how to resolve all of the outstanding issues so that the fire victims receive $13.5 billion

7   as they were promised.

8         One way is for the subrogation claimants, who currently are to receive $11 billion in cash,

9   to contribute $3.7 billion in cash to the fire victims' Trust and take $3.7 billion in stock.  Thus,

10  the fire victims would receive $10.45 billion in cash and $3.05 billion in stock.

11        Then, there are the noteholders who originally offered the fire victims $13.5 billion in

12  cash.  These same noteholders could contribute $3.05 billion in cash to the fire victims and take

13  for themselves an additional $3.05 billion in stock, so that the victims would receive $13.5 billion

14  in cash.

15        Alternatively, or in addition, the noteholders could agree to convert some or all of their

16  debt to equity thereby reducing the debt-load on PG&E and presumably increasing the value of

17  the stock post-bankruptcy.

18        Additionally, there is now a back-up proposal from the C-OU group which would provide

19  the fire victims with an all-cash payment of $13.5 billion and permit PG&E to meet the June 30,

20  2020 wildfire insurance fund requirements of AB1054, with payment of the all-cash $13.5 billion

21  into the Fire Victims Trust by September 30, 2020.  See Declaration of Francis O. Scarpulla In

22  Support of Objection to Debtors' Motion, Case No.: 19-cv-05257-JD, Doc. No.: 306-1.

23  However, the fire victims have not been permitted to even consider that proposal.

24        While it is not known exactly why a group of 13 plaintiffs firms, who allege they

25  represent thousands of fire-victim claims, keep advocating for the obviously-flawed PG&E

26  settlement, one could guess it is because certain law firms may reap hundreds of millions in fees

27  while avoiding a trial of the Tubbs preference cases (which the TCC asked be sent to the San

28  Francisco Superior Court for a jury trial when Cal Fire did not find PG&E at fault for the Tubbs

JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS
MOTION                                              - 7 -                    USBC/NDCA NO. 19-30088 (DM)

1    Fire).  After those Tubbs preference cases were before a state-court judge for trials, PG&E and

2    certain lawyers who represented Tubbs preference clients, and who also had clients on the TCC,

3    entered into settlement agreements which are to be paid from the Trust – unlike the unliquidated

4    fire victims' claims which may take years to process and fully pay.  The amount of those

5    settlements, however, are <u>secret</u>.  As these settlement amounts are to be paid from the Trust,

6    PG&E could care less how much the Tubbs plaintiffs were paid in settlements, which are now

7    liquidated claims and can be paid immediately from the Trust once it is funded. The attorneys can

8    be expected to seek fees for those settlements.  Because of the settlement with PG&E, the Tubbs

9    claimants also were able to avoid any damages estimation trial, were the District Court Judge was

10   to rule on the total damages caused by PG&E.  As only PG&E could settle the Tubbs preference

11   lawsuits and avoid an estimation trial, the Tubbs claimants had no incentive to pursue other non-

12   PG&E settlements, even though at least two of them – the noteholders and, more recently, the

13   C-OU, both of whom offered fire victims $13.5 billion all cash.

14          The proponents of the PG&E plan are inundating their clients as well as all fire victims,

15   whether represented by them or not, with misinformation.  These proponents claim that rejecting

16   the PG&E plan will not lead to a better deal because PG&E cannot pay out more to the fire

17   victims and emerge from bankruptcy as a viable utility.  This is simply not true, because the

18   claims of individual wildfire victims are senior in priority to pre-petition equity claims, which

19   means fire victims will get paid in full before equity.  However, as the plan now stands, rather

20   than equity getting paid last – if at all – it will reap about $5.8 billion under the current plan of

21   reorganization.  So, rather than fight for the fire victims, the lawyers who were supposed to be

22   protecting fire victims left about $5.8 billion on the table.

23                                            **IV**

24                                      **CONCLUSION**

25          We respectfully submit that this Court should not confirm the PG&E plan, but rather now

26   order all interested parties to a mediation beginning as soon as possible with the two mediators

27   who almost had this complex litigation case settled – The Honorable Daniel Weinstein (Ret.) and

28   Robert Meyer – and allow the parties one week to resolve all outstanding issues and achieve a

JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS                - 8 -                USBC/NDCA NO. 19-30088 (DM)
MOTION

1  $13.5 billion all cash fund for the fire victims and a plan that can be confirmed.

2  Dated:  April 24, 2020                    By: /s/ Quentin L. Kopp
3                                                 Quentin L. Kopp

4                                            QUENTIN L. KOPP (SBN 25070)
                                             DANIEL S. MASON (SBN 54065)
                                             THOMAS W. JACKSON (SBN 107608)
5                                            FURTH SALEM MASON & LI LLP
                                             640 Third Street, 2nd Floor
6                                            Santa Rosa, CA  95404-4445
                                             Telephone: (707) 244-9422
7                                            Email:  quentinlkopp@gmail.com
                                                      dmason@fsmllaw.com
8                                                     tjackson@fsmllaw.com

9                                            Attorneys for Ken Born, Christine Born, Cathy
                                             Ference, William Ference, Allen Goldberg, Robert
10                                           Johnson, Patricia Goodberg, Paul Goodberg,
                                             Terence Redmond, Melissa Redmond, Sonoma
11                                           Court Shops, Inc., and Rita Godward

12                                           By: /s/ Jeremiah F. Hallisey
                                                  Jeremiah F. Hallisey
13
                                             JEREMIAH F. HALLISEY (SBN 40001)
14                                           Hallisey and Johnson, PC
                                             465 California Street, Suite 405
15                                           San Francisco, CA  94104-1812
                                             Telephone: (415) 433-5300
16                                           Email:  jfhallisey@gmail.com

17                                           Attorneys for William, Ming, and Fuguan O'Brien;
                                             Kye and Michael Heinstein; Clint Reilly; Karen
18                                           Roberds and Anita Freeman; and William N. Steel

19                                           By: /s/ Francis O. Scarpulla
                                                  Francis O. Scarpulla
20
                                             FRANCIS O. SCARPULLA (SBN 41059)
21                                           PATRICK B. CLAYTON (SBN 240191)
                                             LAW OFFICES OF FRANCIS O. SCARPULLA
22                                           456 Montgomery Street, 17th Floor
                                             San Francisco, CA  94104
23                                           Tel: (415) 788-7210
                                             Email:  fos@scarpullalaw.com
24                                                    pbc@scarpullalaw.com

25                                           Attorneys for GER HOSPITALITY, LLC and
                                             ADOLFO VERONESE FAMILY
26

27

28
     JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS          - 9 -              USBC/NDCA NO. 19-30088 (DM)
     MOTION

1

2                          <u>**CERTIFICATE OF SERVICE**</u>

3

4    I, Quentin L. Kopp, declare as follows:

5           I am a citizen of the United States and over the age of eighteen (18) years and not a party

6    to the within action.  My business address is 456 Montgomery Street, 17th Floor, San Francisco,

7    CA  94014.

8           On April 24, 2020, I served document(s) described as:

9                  **JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS**

10                 **MOTION**

11   on the interested parties in this action as follows:

12   [ ]    BY MAIL: Service was accomplished by placing the document(s) listed above in a sealed

13          envelope with postage thereon fully prepaid, in the United States mail at San Francisco,

14          addressed as set forth above.

15   [X]    BY E-MAIL/NEF:  Service was accomplished through the Notice of Electronic Filing

16          ("NEF") for all parties and counsel who are registered ECF Users and those identified

17          below:

18          I declare under penalty of perjury under the laws of the United States of America that the

19   above is true and correct.  This declaration was executed on April 24, 2020 at San Francisco,

20   California.

21                                          ___/s/ Quentin L. Kopp_____

22                                          Quentin L. Kopp

23

24

25

26

27

28
     JOINDER OF CERTAIN FIRE VICTIMS IN ABRAMS              - 10 -                USBC/NDCA NO. 19-30088 (DM)
     MOTION

# ATTACHMENT A

1  Jeremiah F. Hallisey, Esq. (SBN 40001)
   Karen J. Chedister, Esq. (SBN 99473)
2  HALLISEY & JOHNSON, P.C.
   465 California Street, Suite 405
3  San Francisco, CA 94104
   Tel:    (415) 433-5300
4  Fax:    (415) 230-5792

5  Richard A. Lapping (SBN 107496)
   TRODELLA & LAPPING, LLP
6  540 Pacific Avenue
   San Francisco, CA  94133-4608
7  Telephone: (415) 399-1015
   Email:  rich@trodellalapping.com
8

9  Co-Counsel for Creditors
   KAREN ROBERDS and ANITA FREEMAN,
10 for themselves and on behalf of all others similarly,
   situated, WILLIAM N. STEEL, for himself and on
11  behalf of all others similarly situated;
   WILLIAM O'BRIEN, MING O'BRIEN,
12 FUGUAN O'BRIEN; MICHAEL HEINSTEIN,
   KYE HEINSTEIN; CLINTON REILLY,
13 Class Claimant GER HOSPITALITY, LLC,
    and RICHARD CARPENETI
14

15              UNITED STATES DISTRICT COURT

16             NORTHERN DISTRICT OF CALIFORNIA

17                SAN FRANCISCO DIVISION

18 | In re:                              | Civil Case No. 19-05257 (JD)
19 |                                     |
   | PG&E CORPORATION                    | Bankruptcy Case No. 19-30088 (DM)
20 |                                     |
   |            -and-                    | **DECLARATION OF ERIC LOWREY,**
21 |                                     | **CIRA IN SUPPORT OF OBJECTION BY**
   | PACIFIC GAS AND ELECTRIC COMPANY,   | **CERTAIN FIRE VICTIMS TO**
22 |                                     | **DEBTORS' MOTION PURSUANT TO 11**
   |            Debtors.                 | **U.S.C. 105(A) AND 502(C) TO**
23 |                                     | **ESTABLISH AMOUNT OF FIRE**
   |                                     | **VICTIM CLAIMS FOR ALL PURPOSES**
24 |                                     | **OF THE CHAPTER 11 CASES**
   |                                     | Date:   May 21, 2020
25 |                                     | Time:  10:00 a.m.
   |                                     | Ctrm.:  11
26 |                                     | Judge:  Hon. James Donato
27

                                    1
28 .  DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO
      DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM
      CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

I, ERIC LOWREY, CIRA, declare as follows:

1. I am a restructuring professional with over 15 years of financial and strategic advisory experience, particularly to companies in the power and utilities industry, and am a Certified Restructuring and Insolvency Advisor (CIRA) by the Association of Insolvency & Restructuring Advisors. I have led the day-to-day work on engagements for Jefferies Financial Group, Miller Buckfire & Co., PwC Advisory Services, and New Harbor Incorporated and been a member of the investment banking groups at Deutsche Bank and Barclays. I have advised companies, creditors and other stakeholders on the negotiation and execution of in-court and out-of-court restructurings and issues related to capital structure, financing, liquidity, and valuation, and advised distressed companies, official creditor and equity committees, and investors on restructurings in the consumer, energy, healthcare, and metals and mining industries. Each restructuring engagement on which I advised involved the analysis of detailed financial data and projections, which I conducted and/or oversaw. I have a BA in Economics from Boston College (*Magna Cum Laude*) and an MBA from Columbia University.

2. This Declaration pertains to the Aggregate Fire Victim Consideration to be used to fund the Fire Victim Trust under the Plan, as defined below, for the benefit of all of the individual Fire Victim Claimants and is offered in support of the Objection by Certain Fire Victims to Debtors' Motion Pursuant t 11 U.S.C. 105(A) And 502(C) to Establish Amount of Fire Victim Claims for All Purposes of the Chapter 11 Case.

3. I was asked to review and analyze the Aggregate Fire Victim Consideration to be used to fund the Fire Victim Trust as described in the Disclosure Statement for the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated March 17, 2020 (the "Plan"). Pursuant to the Plan filed, the consideration to be used to fund the Fire Victim Trust includes $13.5 billion[1], consisting of $5.4 billion in cash, $1.35 billion in deferred cash, and $6.75 billion in common stock of Reorganized PG&E Corp. (the "Fire Victim Equity").

4. I have reviewed numerous documents which constitute or relate to the above-mentioned Plan of Reorganization and the Aggregate Fire Victim Consideration thereunder.

---

2

. DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO
DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM
CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

Documents reviewed include, but are not limited to:

- The Disclosure Statement for the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization

- The Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization

- The Supplement to the Disclosure Statement for the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization (the "Supplement")

- The Tort Claimants Restructuring Support Agreement (the "Tort Claimant RSA")

- Various news and research reports relating to PG&E Corporation, its bankruptcy proceedings, and the power and utilities industry

5.      As more fully set out in the paragraphs below, my analysis and conclusions are (1) the value of the consideration to be transferred to the Fire Victim Trust is now substantially less than $13.5 billion[(1)]; and (2) the current unprecedented economic conditions put the value and timing of the consideration to be transferred to the Fire Victim Trust at risk of reduction and/or payment delay.   Specifically,

- The funding for the five, primary creditor/claimant groups other than the individual Fire Victim Claimants is 100% cash (Please see **Exhibit A**, which I prepared and lists the respective claimant groups and their settlement amounts). The consideration[(1)] to be transferred to the Victim Trust to satisfy individual Fire Victim Claims is 40% cash, 10% deferred cash and 50% new common stock in the Reorganized PG&E Corp., which exposes the Fire Victim Claimants to significant risk of value reduction prior to receipt.

- The estimated value of the Victim Equity to be transferred to the Victim Trust has fluctuated downward since the Tort Claimants RSA was entered into in December 2019 (See **Exhibit B**, which I prepared and sets out a summary of the change in value). The amount of $6.75 billion as described in the TCC Claimants RSA is a component in a formula used to calculate the percentage of the common stock in Reorganized PG&E Corporation's equity to be contributed to the Fire Victim Trust, subject to a minimum of

3

. DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

20.9%. This formula contemplates valuing the common stock of Reorganized PG&E as a function of the Normalized Net Income for 2021, as defined in the Plan, multiplied by 14.9. Using the Debtors forecast of $2.04 billion for 2021 non-GAAP Core Earnings included in the Debtors' updated financial projections included (the "Supplement") would imply an equity value of $30.4 billion of which $6.75 billion would represent 22.2%. To estimate what this may be worth one could use Edison International (NYSE: EIX) as a proxy for how the equity market may value PG&E's common equity.

- Currently, EIX trades at 10.7 multiplied by the consensus 2021 earnings estimates for EIX[2]. Multiplying the 2021 non-GAAP Core Earnings of $2.04 billion by the same multiple of 10.7 would imply an equity market capitalization of approximately $21.8 billion for Reorganized PG&E, implying a value of approximately $4.85 billion for the Victim Equity to be contributed to the Fire Victim Trust. However, this value is still at significant risk of further decline in the wake of the COVID-19 pandemic as utility companies face the potential to underperform forecasts in the near-term and other potential financial challenges as a result, such as reduced liquidity due to "no disconnect" orders and/or agreements.

- Additionally, there are a number of PG&E-specific issues that may cause the market to value Reorganized PG&E at lower multiple than the one at which Edison International trades. One of the most notable of these issues is that PG&E has agreed not to pay dividends, an attribute typically sought by utility investors, for a minimum of three years.

- The $1.35 billion of deferred cash payments to the Fire Victim Trust (to be funded through an as of yet uncertain securitization and/or by the realization of cash tax benefits resulting from tax attributes of the Debtors) is exposed to several risks. Those risks include the potential for a change of control as part of the Debtors' equity financing ,which could limit the company's ability to use its NOLs to offset future taxes; the failure of Reorganized PG&E to generate earnings sufficient to realize the requisite cash tax benefits necessary to fund the deferred cash payments; and general business and credit risk due to among other things potential future wildfire liability claims that could be disallowed or not covered in a

4

DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

1    timely manner by the Go-Forward Wildfire Fund;

2        6.        The timing of contributions to the Fire Victim Trust is also uncertain. Expectations

3    for the timing of the initial cash and equity contributions have been based on the Debtors' Plan of

4    Reorganization becoming effective on or before August 29, 2020.  However, under the recently

5    announced as Case Resolution Contingency Process the date by which the Debtors emerge from

6    bankruptcy could be as late as December 31, 2020.

7        7.        PG&E's ability to successfully finance its exit from bankruptcy and fund the cash

8    transfer to the Fire Victim Trust was not 100% certain prior to the recent health and economic

9    crises. With the recent economic downturn and disruption in the financial markets caused by the

10   COVID-19 pandemic the risk that the Debtors will fail to raise the financing necessary to exit

11   bankruptcy on the timeline contemplated at the time the TCC Claimants RSA was entered into has

12   increased substantially.

13       8.        Should PG&E fail to emerge from bankruptcy by December 31, 2020 and be

14   required to initiate a sale process for the company, as agreed to and outlined in the Case Resolution

15   Contingency Process, the resulting sale could further delay and potentially negatively impact the

16   funding of the Fire Victim Trust. The potential for such a scenario creates additional risk and

17   uncertainty for the payments agreed under the TCC Claimants RSA as there is no guarantee that a

18   sale process would result in sale proceeds sufficient to meet the Debtors' commitments under the

19   TCC Claimant RSA.

20       I declare under penalty of perjury that the foregoing is true and correct. Executed on April

21   3, 2020 at New York, New York.

22                    _/s/ Eric Lowrey_____
                          ERIC LOWREY
23   Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in filing this document has been obtained
     from the signatory, Eric Lowrey.
24
                    __/s/ Jeremiah F. Hallisey_____
25                       Jeremiah F. Hallisey

26

27   (1) Exclusive of certain rights and causes of action to be transferred to Victim Trust under the Plan

28                                5
     .        DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO
              DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM
              CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

1   (2) The 10.7 multiple of earnings for Edison International (NYSE: EIX) is based on the consensus

2        2021 earnings estimates and closing stock price for EIX as of April 3, 2020 per CapIQ.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

6

DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES

**EXHIBIT A TO**

**DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY
CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A)
AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL
PURPOSES OF THE CHAPTER 11 CASES**

# Individual Fire Victims the Only Claimant Group to Receive Deferred Cash & Equity

**While every other claimant group is to receive 100% cash or secured debt, 60% of the consideration to be transferred to the Victim Trust is exposed to the risk of diminution of value prior to receipt**

*$Millions*

| CLAIMANT GROUPS | TREATMENT OF CLAIMS | | | TOTAL |
|---|---|---|---|---|
| | Cash / New Debt | Deferred Cash | Equity | |
| Debtor-In-Possession Financing | 2,000 | 0 | 0 | **2,000** |
| Trade Claims and Other Costs | 2,300 | 0 | 0 | **2,300** |
| Prepetition Debt & Accrued Interest | 23,450 | 0 | 0 | **23,450** |
| Subrogated Wildfire Liability Claims | 11,000 | 0 | 0 | **11,000** |
| Public Entities Wildfire Liability Claims | 1,000 | 0 | 0 | **1,000** |
| **Individual Fire Victim Liability Claims** | **5,400** | **1,350** | **6,750** | **13,500** |
| | | | | **$53,250** |

- **Individual victims** are the **only claimants to receive at-risk deferred cash and/or equity**

- The $1.35 billion of deferred cash and the Fire Victim Equity are exposed to significant risks

  – Fire Victim Equity to be contributed to the Victim Trust currently estimated to be worth approximately $4.85 billion, materially less than $6.75 billion, and it could decline further

  – Significant risk of negative impacts due to current economic downturn, including the potential for the Debtors' earnings forecast to be reduced and reduced liquidity due to customer non-payment

  – Cash tax benefits needed to fund $1.35 billion of deferred cash payments may not be realized

  – Potential future wildfire liability claims made against PG&E would be senior to Victim Equity

Source: Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization.
1) Based on uses of $59.0 billion in PG&E POR, including $1.35 billion in deferred cash for the Victim Trust. Not shown is the $5.0 billion wildfire fund contribution and $0.75 billion of B/S cash.
2) Comprised of $13.875 billion in cash and $9.575 billion in new secured debt. The $9.575 billion of new, secured debt to be senior in priority to deferred cash and equity yet to be contributed to Victim Trust upon PG&E's exit from bankruptcy. Secured debt will also be senior in priority to any future wildfire liability claims filed against PG&E (deferred cash and equity will not be).

**EXHIBIT B TO**

**DECLARATION OF ERIC LOWREY, CIRA IN SUPPORT OF OBJECTION BY CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(A) AND 502(C) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASES**

## Value of Equity Allocated to Individual Victims Estimated to be $4.85B, Not $6.75B[1]

As of early April 2020, the value of the equity in Reorganized PG&E Corp. to be contributed to the Victim Trust estimated at only $4.85 billion, 28% (or $1.9 billion) less than the headline amount of $6.75 billion



1) Value of Fire Victim Equity estimated using Edison International (NYSE: EIX) as a proxy, which trades at a multiple of 10.7x consensus 2021 earnings estimates as of April 3, 2020 per CapIQ.
2) Based on 2021 forecasted earnings of $2.04 billion per the Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization.
3) Based on 2021 forecasted earnings multiplied by 14.9 per the Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization.

# ATTACHMENT B

1 | Richard A. Lapping (SBN 107496)
   | TRODELLA & LAPPING, LLP
2 | 540 Pacific Avenue
   | San Francisco, CA 94133-4608
3 | Telephone: (415) 399-1015
   | Email: rich@trodellalapping.com
4 |
5 | Co-Counsel for Creditors
   | KAREN ROBERDS and ANITA FREEMAN,
6 | for themselves and on behalf of all others similarly,
   | situated
7 | [additional creditors and counsel
   | listed on signature page]
8 |
9 |
10 | UNITED STATES DISTRICT COURT
11 | NORTHERN DISTRICT OF CALIFORNIA
12 | SAN FRANCISCO DIVISION

| In re: | Case No. 19-cv-05257-JD |
| | |
| PG&E CORPORATION | Bankruptcy Case No.: 19-30088-DM |
| | |
| -and- | **OBJECTION BY CERTAIN FIRE VICTIMS TO DEBTORS' MOTION PURSUANT TO 11 U.S.C. 105(a) AND 502(c) TO ESTABLISH AMOUNT OF FIRE VICTIM CLAIMS FOR ALL PURPOSES OF THE CHAPTER 11 CASE; JOINDER IN RESPONSE OF TCC** |
| PACIFIC GAS AND ELECTRIC COMPANY, | |
| Debtors. | |
| | Date: May 21, 2020 |
| | Time: 10:00 a.m. |
| | Ctrm: 11 |
| | Judge: Hon. James Donato |

**I**

**INTRODUCTION**

The Debtors, PG&E Corporation and Pacific Gas & Electric ("Debtors" or "PG&E") have

moved this Court for an order establishing by estimation the total amount of all fire victims' claims

for all purposes in the Debtors' Chapter 11 bankruptcy cases. In essence, the Debtors propose

funding a trust for fire victims with $6.75 billion in cash and PG&E stock allegedly valued at $6.75

1

. CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
CLAIM FOR ALL CHAPTER 11 CASES                    USDC/NDCA Case No. 19-cv-05257-JD

1   billion and the assignment of certain rights and causes of action.  The Debtors define "fire victim"

2   as any tort claimant affected by any PG&E-caused wildfires in 2015, 2016 (Ghost Ship), 2017 and

3   2018 anywhere in Northern California, including not only individuals who lost loved-ones, or real

4   and personal property, but also business entities and public entities.

5          For two major reasons, this group of individual fire victims opposes that motion and joins in

6   the Response of the Official Committee of Tort Claimants ("TCC") filed herein at ECR No. 295

7   (Apr. 2, 2020).  First, Debtors' current Plan[1] classifies claims of creditors with substantially similar

8   legal claims against the Debtors, i.e., claims of fire victims in their own right and claims of their

9   insurers for losses paid due to fires, in different classes with profoundly different treatment, and

10  therefore cannot be confirmed under 11 U.S.C. §§ 1129(a)(1) and 1122.  Whereas fire victims and

11  their insurers each have legal claims for damages, the Plan pays the insurers in cash whereas the

12  fire victims trust, unlike all other creditors, must accept the highly speculative risk of holding

13  PG&E stock as half of their consideration, instead of cash.

14         Second, this unequal treatment is exacerbated by the massive changes in circumstances,

15  including the current economic downturn caused by COVID-19 and the recent criminal plea

16  entered by the Debtors for involuntary manslaughter in connection with the Camp Fire, raise

17  serious questions about the value of the PG&E stock proposed for fire victims in the Plan.

18  Therefore, any estimation of the capped amount of fire victims' claims must take into account that

19  the supposedly absolute value of $13.5 billion (to be paid half in cash and half in stock) is at least

20  partly illusory and not worth that amount anymore.

21                                              II

22                                         ARGUMENT

23  A.      All Similarly-Situated Creditors Must be Treated Equally

24         Under the provisions of 11 U.S.C. §§ 1129(a)(1), (a)(7), and 1122, all similar claims of

25  creditors must be treated equally or the plan cannot be confirmed.  Here, the fire victims (both

26  those individuals and entities that suffered damages from the 2015, 2017 and 2018 wildfires, as

27  _____

28  [1] *Debtors' Amended Plan of Reorganization*, Bankr. Dkt. No. 6320 (Mar. 16, 2020).

                                              2

.    CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
     CLAIM FOR ALL CHAPTER 11 CASES              USDC/NDCA Case No. 19-cv-05257-JD

well as the public entities and subrogation insurance entities) are all similarly situated in that their

losses were caused by fires attributable to the Debtors' equipment or operations. However, only

the individual fire victims, who lost loved-ones, homes, personal property, businesses, and other

damages, are at risk of receiving less than they were guaranteed under the proposed settlement

agreement with the Debtors. These fire victims are required to accept half of the $13.5 billion in

cash and half in stock in the new company exiting bankruptcy. On the other hand, the subrogation

insurance companies are receiving an all-cash payment amounting to $11 billion. The current

public entity settlements likewise are all cash. Only the individual fire victims are treated

differently and unfairly. Thus, this motion to finally fix the amount of the fire victims' claim

should not be granted unless and until this gross disparity is remedied and the fire victims are

guaranteed that they will actually receive the full value of the proposed estimated $13.5 billion as

the Debtors promised.

### B. Changed Circumstances Dictate Denial of the Motion

#### 1. The Economic Crash

The now-worldwide onset of the Coronavirus has caused a massive economic crash,

causing the U.S. economy to slide into what appears to be a deep recession, with all closely-

watched averages down to bear-market levels. Additionally, there is an historic number of

Americans filing for unemployment benefits -- over 6 million during the last week of March, 2020.

In short, most economic experts assert that the U.S. in this deep economic recession for a long

period of time. None of these factors existed when the Debtors proposed their half-cash/half-stock

$13.5 billion settlement with the fire victims. Based on the current economic circumstances, the

$13.5 billion is no longer worth $13.5 billion, a risk that fire victims should not shoulder on their

own, when other creditors with the same legal claims receive all cash.

A substantial portion of the $13.5 billion – $6.75 billion is to be paid in stock in the new

company exiting bankruptcy. But that stock is no longer worth $6.75 billion, but only $4.85 billion

– *i.e.*, about $1.9 billion less than promised. *See* accompanying Declaration of Eric Lowrey in

support of this objection ("Lowrey Decl.) para.. 5, second bullet point. This decline in stock value

could further deteriorate given several factors: PG&E's ongoing wildfire risks; its weak credit

3

.    CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
      CLAIM FOR ALL CHAPTER 11 CASES                          USDC/NDCA Case No. 19-cv-05257-JD

portfolio; the potential for its earnings forecast to be revised downward due to further economic downturns; and its inability to pay any dividends for a minimum of three years, something that is a key attribute that potential utility investors look for when deciding whether to purchase stock. *See* Lowrey Decl., ¶ 5.

Not only is there a very real risk that the stock going to the fire victims trust will be worth less than the promised $6.75 billion, but the $6.75 billion cash portion of the fire victims' settlement may also turn out to be less. The cash portion of the settlement calls for the payment of $5.4 billion on the effective date (assuming the Debtors are able to obtain financial commitments to come up with the capital to make that payment, which at this point is still unclear), with a deferred payment of $1.35 billion paid in two installments ($650 Million on January 15, 2021 and $700 Million on January 15, 2022), without interest and with questionable security. (*See*, Plan section 1.208). Because the deferred payments do not bear any interest, that amount needs to be discounted, which results in a deduction of $45 Million from the $1.35 billion. Additionally, the deferred payments means that the new PG&E will have to make it through two fire seasons while, at the same time, these deferred payments are generated by tax attributes that may never occur because if there is a mass sale of PG&E stock shortly after exit from bankruptcy, the IRS might consider that a change of control such that the net operating losses essentially disappear. Lowrey Decl. ¶ 5, 3rd bullet point. Moreover, upon exit, the new PG&E will have some $38 billion in debt, leaving little margin for error if it is to achieve enough money to pay the $1.35 billion in deferred payments. Finally, the current economic downturn is very likely to have a material negative impact on the Debtors' financial forecast over the next 12 to 18 months, which could put a significant portion of the deferred cash payments at substantial risk to the fire victims. Lowrey Decl. ¶ 7.

Therefore, these objecting fire victims respectfully suggest that this Court should not confirm the $13.5 billion to the tort claimants unless and until that full amount is certain to get to those claimants without any deductions whatsoever.

## 2. The Guilty Pleas

Recently, the Debtors pleaded guilty to 84 counts of felony involuntary manslaughter in violation of Cal. Penal Code § 192(b) and one count of unlawfully causing a fire in violation of Cal.

4

1  Penal Code § 452 bringing a fine of $4 Million[2] (which the Debtors initially stated was to paid out of the

2  fire victims' trust, but relented when faced with overwhelming objections from fire victims).  However,

3  because the Debtors are convicted felons for causing the Camp Fire, they are now subject to punitive

4  damages from those fire victims whose losses are attributable to that fire.  When the Debtors proposed the

5  $13.5 billion settlement there was no real threat of punitive damages, which there is now,  and which makes

6  the $13.5 billion inadequate to pay all fire victims' claims, as well as any substantial punitive damages to the

7  Camp Fire victims.  Therefore, the motion to establish the $13.5 billion should be denied unless and until the

8  Debtors prove to this Court that the fire victims will receive consideration actually worth $13.5 billion, plus

9  any additional amount to satisfy any punitive damages claims by the Camp Fire victims.

10                                                     **III**

11                              **RESOLUTION OF THE PROBLEM**

12             Providing $13.5 billion for the fire victims is achievable without dismantling the entire

13  settlement with the Debtors.  Either the Debtors can amend the settlement to provide for an all-cash

14  payment to the fire victims on the effective date, or if the Debtors are unable to accomplish that,

15  they should include a backup plan – *i.e.*, a backstop, if you will – that protects the $13.5 billion all-

16  cash amount, and there are at least two groups that can provide that backstop.  First there is the

17  Customer-Owned Utility proposal, which assures that fire victims will receive the $13.5 billion in

18  cash upon the effective date.  Declaration of Francis .O. Scarpulla in support of this objection

19  ("Scarpulla Decl."), Exhibit A, response no. 8.  In fact, the Customer-Owned Utility propose the

20  following, among other provisions: 1) to fully fund the fire victims' trust with $13.5 billion all cash

21  on or before September 30, 2020; 2) treat all other creditors exactly the same as in the current

22  Debtors' agreement, including the $11 billion cash to the subrogation insurance group; 3) pay the

23  settling public entities their $1 billion in cash; and 4) fully comply with all requirements of AB

24  1054.  Scarpulla Decl., Exhibit A.

25

26  _____

27  [2] Debtors' motion before the Bankruptcy Court to approve the plea agreement, and the plea

28  agreement are filed at Bankr. Dkt No. 6418 (Mar. 23, 2020).

                                                     5
.    CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
     CLAIM FOR ALL CHAPTER 11 CASES                    USDC/NDCA Case No. 19-cv-05257-JD

1   A second potential backstop could be from the Bondholders, who proposed a $13.5 billion

2   all cash payment to the fire victims, but who eventually joined the Equity group in the current

3   proposal.  In fact, there could be an amalgamation of both the Customer-Owned Utility group, with

4   the Bondholders and with the Equity group to resolve this bankruptcy case for the benefit of all

5   creditors.

6                                              **IV**

7                                        **CONCLUSION**

8   As the objecting fire victims have pointed out, this Court should not grant the Debtors'

9   motion without guaranteeing that the fire victims shall receive the full value of the promised

10  $13.5 billion payable into their trust fund for future distributions to the claimants.  If the Debtors

11  are not willing to so guarantee that the fire victims will receive the $13.5 billion, undiluted in any

12  way, then this Court could order all interested parties to a mediation with the previously-agreed to

13  mediators, Judge Daniel Weinstein (Ret.) and Robert Mayer, which would end with a unified

14  agreement on behalf of the fire victims.

15

16  Dated:  April 3, 2020                 TRODELLA & LAPPING, LLP

17

18                                        By ___/s/ Richard A. Lapping_____

19                                              Richard A. Lapping

20                                        Co-Counsel for Creditors Listed Below

21                                        Jeremiah F. Hallisey, Esq. (SBN 40001)
22                                        Karen J. Chedister, Esq. (SBN 99473)
                                          HALLISEY & JOHNSON, P.C.
23                                        465 California Street, Suite 405
                                          San Francisco, CA 94104
24                                        Tel:    (415) 433-5300
25                                        Fax:   (415) 230-5792

26                                        Attorneys for Creditors
27                                        KAREN ROBERDS and ANITA FREEMAN, for
                                          themselves and on behalf of all others similarly
28                                        situated; WILLIAM N. STEEL, for himself and on

---

6

.   CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
    CLAIM FOR ALL CHAPTER 11 CASES                    USDC/NDCA Case No. 19-cv-05257-JD

Case: 19-30088    Doc# 6981-1    Filed: 04/29/20    Entered: 04/29/20 11:35:08    Page
                                156 of 157

behalf of all others similarly situated; WILLIAM O'BRIEN, MING O'BRIEN, and FUGUAN O'BRIEN by her Guardian ad Litem, Ming O'Brien; MICHAEL HEINSTEIN, KYE HEINSTEIN; and CLINTON REILLY

Francis O. Scarpulla (SBN 41059)
Patrick Clayton (SBN 240191)
Law Offices of Francis O. Scarpulla
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Tel: 415.788.7210
Fax: 415.788.0706

Attorneys for Creditors
Class Claimant GER Hospitality, LLC and Richard Carpeneti

Pursuant to Local Rule 5-1(i)(3), I attest that concurrence in filing this document has been obtained from the signatories.

 /s/ Richard A. Lapping
Richard A. Lapping

.    CERTAIN FIRE VICTIMS' OBJECTION TO MOTION TO ESTABLISH AMOUNT OF FIRE VICTIMS'
CLAIM FOR ALL CHAPTER 11 CASES                               USDC/NDCA Case No. 19-cv-05257-JD