Klinedinst PC
501 West Broadway, Suite 600
San Diego, California 92101

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>PG&E CORPORATION and PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors. | Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>**DECLARATION OF HEATHER L. ROSING IN SUPPORT OF SUPPLEMENT TO JOINDER ON BEHALF OF KAREN GOWINS IN WILLIAM B. ABRAMS' MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §§ 1125 (b) AND 1126 (e) AND BANKRUPTCY RULE 2019**<br><br>Date: May 12, 2020<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>  Courtroom 17, 16th Floor<br>  San Francisco, CA 94102 |

I, Heather L. Rosing, have been requested to provide an expert opinion regarding the above-referenced matter, and I have agreed to do so. The following is my report, in the form of the declaration:

## I.

## BACKGROUND AND QUALIFICATIONS OF EXPERT

1. I am an attorney licensed to practice law in California since 1996. I currently serve as the Chairperson of the Professional Liability Department and the Ethics and Risk Management

Department at Klinedinst PC, a law firm with five offices in California and Washington, and more than sixty attorneys. I have also served as Klinedinst's Chief Financial Officer (a managing shareholder role) since 2006, and previously served as the firm's General Counsel.

2. In 2009, I was appointed to the American Bar Association's Standing Committee on Lawyers' Professional Liability and served a three-year term. In addition to chairing three National Legal Malpractice Conferences hosted by the Standing Committee, I have been a presenter at many of these conferences over the last 20 years. As a regular matter, I also speak, teach, and write on fee disputes, malpractice, risk management, and legal ethics on a pro bono basis across the country.

3. I am certified as a specialist in Legal Malpractice Law by the State Bar of California Board of Legal Specialization. I have represented lawyers, law firms, and other professionals in hundreds of cases and matters in State Court, Federal Court, State Bar Court, and arbitration proceedings, including conflicts of interest matters. I have also represented judges and commissioners in matters before the Commission on Judicial Performance and advised judicial officers on matters pertaining to judicial ethics.

4. I served as an appointed advisor to the Rules Revision Commission of the State Bar of California, which recommended wholesale revisions to the Rules of Professional Conduct (which were adopted in large part by the California Supreme Court and went into effect in November 1, 2018). In the course of that work, as well as my other ethics related work, I studied and was exposed to the intricacies of the ABA Model Rules of Professional Conduct, which serve as the basis for the ethics rules in many states. The ABA Model Rules oftentimes come into play in the Federal Court setting as well. I was also an appointed member of the Mandatory Insurance Working Group of the State Bar, which studied the issue of whether California should adopt mandatory malpractice insurance.

5. I served as the Inaugural President of the California Lawyers Association (CLA), which was formed January 1, 2018 as a result of the de-unification of the State Bar of California. CLA strives to promote professional advancement of attorneys practicing in California. I initiated the first Ethics Committee of CLA, which is designed to provide ethics-related resources to

attorneys throughout California.

6. After my approximate two-year tenure as CLA President concluded in 2019, I accepted the role as President of the California Lawyers Foundation, an entity within CLA that is dedicated to promoting civics education, diversity, and access to justice across California.

7. In terms of earlier service, I was the President of the Board of Directors of the California Bar Foundation (now ChangeLawyers), which works to improve access to justice for the underserved and under-represented in California. I served on the Board of Trustees of the State Bar of California for four years (including as treasurer and vice-president), and on the Board of Directors of the San Diego County Bar Association for six years, including one year as President. I was also heavily involved in the SDCBA's Legal Ethics Committee for a number of years, including service as the co-chair of the Committee.

8. I have been rated AV®-Preeminent™ by Martindale since 2000, and have been honored with numerous accolades for my work in ethics and professional liability defense. I was awarded the Daily Journal Top 100 Attorneys (2018 and 2019). Recently, I was named one of the Daily Transcript's Most Influential Women in San Diego. Among other honors, I have been awarded Top 25 Women San Diego Super Lawyers and Top 50 San Diego Super Lawyers by San Diego Super Lawyers®, Best Lawyers in America, the Witkin Award for Excellence in Public Service (2019), the Earl B. Gilliam Bar Foundation's Corporate Commitment to Diversity Award (2016), CFO of the Year by the San Diego Business Journal (2016), Lawyer of the Year by the San Diego Defense Lawyers (2015), the Exemplary Service Award by the San Diego Volunteer Lawyer Program (2014), and # 1 Attorney in San Diego County by Southern California Super Lawyers® (2014). I received my undergraduate degree from the University of Illinois and my law degree from Northwestern University School of Law.

## II.

## FACTUAL BACKGROUND

9. My opinions are based on the following facts, which have been presented to me through documents filed in this matter and news reports.

10. In December 2019, Pacific Gas & Electric and roughly 70,000 claimants who lost

homes or loved ones in fires caused by the utility company's equipment reached a $13.5 billion settlement in principle. Half of the settlement is to be paid in cash. The other half is proposed to be paid in PG&E stock. To date, the parties have not determined when a fire victims trust will be funded or when the trust can sell the stock that will be transferred to it. The hearing on confirmation of the plan is scheduled for May 27, 2020.

11. Mikal Watts of Watts Guerra LLP represents more than 22 percent of all claimants, more than 16,000 of the 70,000 fire victims.[1] This is a larger number of claimants than any other lawyer in the litigation represents.[2]

12. In September 2019, Watts Guerra borrowed money from Stifel, a loan facility.

13. Stifel then sold some of that debt to private equity firms Centerbridge Partners and Apollo Global Management. Centerbridge is a PG&E shareholder and has committed to buying new PG&E stock as part of the company's restructuring plan.[3] It owns more than 7.7 million shares of PG&E common stock valued at more than $84 million.[4] Apollo invested $336,425,000 in PG&E senior notes. It also has a combined $168 million in outstanding debt due from PG&E for outstanding utility revolver loans and DIP term loans. ECF no. 6747, Third Am. V.S. of the Ad Hoc Comm. of Senior Unsecured Noteholders Pursuant to Bankr. Rule 2019, Ex. A (April 13, 2020).

14. Both companies purchased insurance claims for wildfires caused by PG&E equipment. As of April 13, 2020, Apollo held $100 million of such claims; as of December 2019,

---

[1] Chediak and Blumberg, *Apollo, Centerbridge Backed PG&E, Funded a Loan to Firm Suing It*, BLOOMBERG (Ap.29, 2020 [rev. Apr 30, 2020]); *see also* ECF 6801-1, Decl. of Watts, ¶ 9.

[2] Morris, PG&E victims' lawyer scrutinized over Wall Street connections, SAN FRAN. CHRON. (May 2, 2020.

[3] Chediak and Blumberg, *supra* (stating "Centerbridge Partners LP is the among the 20 biggest shareholders in PG&E and has committed to buying as much as $325 million in the utility's shares when it emerges from Chapter 11.")

[4] Centerbridge Partners, L.P., SEC, Form 13F-HR for Calendar Year or Quarter Ending 12/31/19 (Feb. 14, 2020).

Centerbridge held $209 million of claims. ECF no. 6747, Third Am.V.S. of the Ad Hoc Comm. of Senior Unsecured Noteholders Pursuant to Bankr. Rule 2019, Ex. A (April 13, 2020). Watts has also had social interactions with Gavin Baiera, a Centerbridge senior managing director, regarding the PG&E lawsuit.

15. In February 2019, months before Watts Guerra took out the loan, Apollo and Centerbridge reported through Counsel for the Ad Hoc Committee of Senior Unsecured Noteholders their interests in PG&E funding and stock. ECF no. 744, V.S. of the Ad Hoc Comm. of Senior Unsecured Noteholders Pursuant to Bankr. Rule 2019, March 5, 2019.

16. In November 2019, Watts was asked by William Jones of Apollo to speak with Chris Lahoud. During that conversation, Lahoud requested that Watts side with the bondholders, rather than the equity holders. Representatives from Centerbridge and Apollo introduced Watts to the principal negotiators for the bondholders and shareholders, but did not participate in the negotiations.

17. In December 2019, Watts claims that he told some of his clients at a town hall meeting at the Flamingo Resort in Santa Rosa that he had been offered a line of credit by Stifel, an investment bank. In an interview, Watts stated the credit line was $100 million with an 18 percent interest rate over four years, and that Stifel could assign repayment obligations without his consent.[5] Watts states the interest rate is substantially lower than his firm had on previous loans with commercial banks.

18. Although Watts has opined that he does not have a conflict of interest, he states that he disclosed his financing from Centerbridge and Apollo to his clients at the December 2019 town hall meeting, and by sending links of that meeting to clients who did not attend. During that recording, Watts acknowledged, "these guys are trying to play me."

19. Neither Watts nor anybody else from Watts Guerra has produced any documentation pertaining to the loan by Stifel. As a result, the terms cannot be confirmed. Watts

---

[5] Penn and Evis, *PG&E's Settlement With Wildfire Victims Faces Crucial Vote*, NEW YORK TIMES (April 30, 2020).

Guerra has not produced a lending agreement, the covenants imposed by the lender, a note, security agreements, or documents reflecting the terms under which it can reassign the payment obligations, and the consideration for the same.Because the repayment terms and security terms have not been disclosed, is not possible to determine whether the loan is truly nonrecourse, as described by Watts Guerra. Whether a loan that finances litigation is recourse or nonrecourse is notable, since in nonrecourse situations the lender, and thus its assignees, have a direct interest in the outcome of the litigation.

20. It is also unknown what information this lender required from Watts Guerra about its pending cases, including the cases on behalf of its 16,000 clients against PG&E, before agreeing to extend the loan. It is likely that information was potentially required in order to extend a loan of $100 million. Because of the lack of information provided by Watts Guerra, it is unknown whether it provided confidential information to Stifel. There is no indication in the record that any client of Watts Guerra consented to Watts Guerra sharing confidential information with Stifel.

21. It is also unknown what information about the cases maintained by Watts Guerra's 16,000 clients was required by Centerbridge Partners and Apollo Global Management before the transfer of the debt. Because of the lack of information provided by Watts Guerra, it is unknown whether it or Stifel provided confidential information to Centerbridge Partners and Apollo Global Management. There is no indication in the record that any client of Watts Guerra consented to Watts Guerra sharing confidential information with Centerbridge Partners and Apollo Global Management.

22. In Watts Guerra's Reply to Doc. #6944 (Kane/Gowans) Regarding William B. Abrams Motion to Designate Improperly Solicited Votes Pursuant to 11 USC section 1125(B) and 1126(E) and Bankruptcy Rule 2019, it writes as follows: "So, WATTS GUERRA repeatedly has disclosed both orally and in writing to its entire client base detailed information concerning its credit facility in detail, the assignees thereof whom it met, and those with whom it negotiated whom were introduced to WATTS GUERRA by such assignees, and repeatedly has passed those disclosures along to all its clients in writing, and also made such disclosures publicly." (ECF No.

6973-1, Decl. of Watts, pp. 2-3, ¶ 5.) At least one former client, Geoffrey B. Reed, has attested that he was never provided with this information.

### III.

### ANALYSIS

23. Rules of Professional Conduct, rule 1.7, subparagraph (b), provides that a "lawyer shall not, without informed written consent from each affected client and compliance with paragraph (d), represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client, a former client or a third person, or by the lawyer's own interests."

24. Here, Watts Guerra has an outstanding debt of up to $100 million. Significant portions of that debt are held by Apollo and Centerbridge. Regardless of their legal ability to direct Watts to act in any particular way regarding the settlement of this litigation, Watts has admitted that they have "tried to play him," that they introduced him to principals involved in negotiations, and that they have requested that he recommend a particular resolution. Accordingly, this relationship represents a significant risk that Watts's loyalty to his clients could be limited.

25. Watts was on notice of this risk at least as early as November 2019 when Apollo introduced him to Lahoud so that Lahoud could attempt to influence Watts. By that time, Watts knew of Apollo's and Centerbridge's financing of both his firm and PG&E since the latter was reported in this action. At that time, he should have obtained informed written consent from his clients to continue as their counsel. There is no dispute that he failed to do so.

26. Rules of Professional Conduct, rule 1.7, subparagraph (c)(1), provides, "Even when a significant risk requiring a lawyer to comply with paragraph (b) is not present, a lawyer shall not represent a client without written disclosure of the relationship to the client and compliance with paragraph (d) where . . . the lawyer has, or knows that another lawyer in the lawyer's firm has, a legal, business, financial, professional, or personal relationship with or responsibility to a party or witness in the same matter."

27. Here, Watts has financial relationships with parties to the matter, in that Centerbridge and Apollo own interests in claims against PG&E, as well as interests involving

PG&E as shareholders and bondholders. Accordingly, the obligations to make disclosures pursuant to Rule 1.7(c) have been triggered.

28. Although Watts claims he has made disclosures to comply with his ethical obligations, Watts states that he did so at a town hall meeting and by sending a link of that town hall meeting to his clients not in attendance. I also find it highly unusual that a lawyer would make "disclosures" in an instance where the lawyer claims he has no conflict. That is, the conclusion that there is no conflict and the act of making disclosures are inconsistent with one another.

29. As a preliminary matter, such "disclosures" are insufficient to comply with the mandates of Rule 1.7. The rule expressly provides that disclosures must be made in writing. A writing requirement exists to ensure that lawyers fulfill their obligation to explain matters to the extent reasonably necessary to permit their clients to make informed decisions regarding the representation. *See* Rule Prof. Conduct, rule 1.4(b). For example, in a case like this where a lawyer has more than 16,000 clients, it is a virtual certainty that they have varied levels of sophistication and will need different levels of detail and explanation for the disclosure to be effective. Moreover, it is not clear whether all 16,000 of Watts's clients speak English as their primary language. To the extent they do not, there is no indication that they were provided this information in their primary language.

30. It is important to note that the number of clients does not excuse the duties that a lawyer owes to each and every client. In discussing competency, Rule of Professional Conduct 1.1, subparagraph (b), provides that competence includes not only having sufficient learning and skill, but also having the mental, emotional, and physical ability reasonably necessary for the performance of services. In other words, among other things, lawyers must consider their "bandwidth" when undertaking the representation of clients to ensure that they have the ability to represent them fully and completely, as the Rules of Professional Conduct and the State Bar Act mandate. Watts Guerra elected to accept 16,000 individual clients, all of which suffered very emotional personal losses. In taking on this number of clients, the firm was obligated to ensure that it could meet its ethical obligations to each and every one of them.

31. It is also important to note that the disclosures contemplated by the Rules of

Professional Conduct would have required an in depth discussion of the relevant circumstances and the material risks, including any actual and reasonably foreseeable adverse consequences of the proposed course of conduct. *See* Rule Prof. Conduct, rule 1.0.1(e) (which defines disclosure requirements for client decision-making). In other words, a proper disclosure, as contemplated by Watts's ethical responsibilities would have required him, upon learning of the facts and circumstances, to set them forth in writing, and provide his clients with an analysis of the potential risks for the interference with his independent judgment, regardless of whether he was impacted by pressure that his creditors placed on him to act in a particular way.

32. Of course, should the particular circumstances present a significant risk that a relationship falling under subparagraph (c) will materially limit the lawyer's representation of clients, informed written consent is required. Here, Centerbridge and Apollo interjected themselves into the negotiating process and tried to influence Watts. Regardless of whether he was actually influenced, this represents a significant risk given the entanglements created among the various financial relationships. Accordingly, this is a matter where informed written consent of each of the clients was necessary.

33. Moreover, it is axiomatic that a lawyer who violates obligations to a client, such as Watts Guerra did here by failing to provide a written disclosure or obtaining informed written consent when aware of a conflict must then obtain informed written consent to proceed in the matter. Otherwise, there is the peril that the lawyer may conduct the representation in a manner that is beneficial to the lawyer's interests, but antagonistic to the clients' interests. *See, e.g.*, San Diego County Bar Assn. 2017-1 (addressing conflicts when lawyers defend their own work). As Watts Guerra has claimed that it has met its obligations, it seems apparent that it has failed to meet this obligation as well.

34. The rationale for this is well-exhibited by the present situation. Rule of Professional Conduct 1.2 provides that a lawyer shall abide by a client's decisions concerning the objectives of the representation, including a decision whether to settle the matter pursuant to particular terms. A lawyer who fails to disclose a conflict such as the one described herein, and then who fails to obtain informed written consent, is in a position where the clients' decisions regarding resolution

are not properly informed. By depriving them of such information, Watts deprives his clients of the allocation of authority provided by Rule 1.2. Moreover, a lawyer in such a position, especially one who represents so many claimants in the matter, may use that position to influence the decisions of others, again without fully disclosing his conflicts or the risks involved with proceeding as he has directed.

35. On a final note, there is the possibility that other Rules of Professional Conduct are implicated, but Watts Guerra did not provide sufficient information about the nature of the financing to ascertain the same. For example Rule 1.6, Confidential Information of a Client, could require Watts Guerra to get the informed written consent of the clients before disclosing their confidential information related to the pending litigation to Stifel or the companies that purchased the debt, Apollo and Centerbridge. Given the involvement of Apollo and Centerbridge with a party adverse to the Watts Guerra clientele (PG&E), obtaining informed written consent before any confidential information was transmitted would be particularly important. While the common interest privilege could apply under certain circumstances, it is unclear whether any of those circumstances exist here, and, even with that in place, a nondisclosure agreement would be best practice. Also, while the terms of the loan with the primary credit facility, Stifel, are unknown, the terms of litigation funding – and nonrecourse litigation funding in particular – in general can raise a number of ethics related issues, including impermissible fee splitting with a nonlawyer, unacceptable levels of interest, and the funder's level of control over the litigation, among other issues. Some of these items may be addressed through written disclosures or the informed written consent of the clients (something we do not have here). Some courts even have required disclosure of litigation funding in order to ensure a transparent process.

36. As stated in a recent February 28, 2020 Report to the President by the New York City Bar Association Working Group on Litigation Funding, there are best practices guidelines for lawyers utilizing litigation funding that ensure that the lawyers acting within the parameters of the ethical rules:

> Depending on the lawyer's role, these guidelines require that the lawyer should (1) possess the required competence—understanding the varying structures of the agreement and other areas of law affecting the litigation funding agreements; (2) act with diligence and perform

the required inquiries to represent the client effectively—i.e., understanding the terms of the agreements; (3) communicate relevant information and alternatives to the client before and during the litigation and protect the client's confidence; and (4) as the fiduciary, act to protect the client's best interest and property. Following these steps will help ensure compliance with the lawyer's ethical and legal professional obligations and is the best way for participants to avoid or minimize undesirable surprises in litigation financing.[6]

37. There is no indication in the record provided to me that these steps were taken.

38. I declare under penalty of perjury under the laws of California and the United State of America that the foregoing is true and correct. Executed this 5th day of May 2020.

                                                /s/ *Heather L. Rosing*
                                                Heather L. Rosing

18406600.1

Pursuant to Local Civil Rule 5-1(i)(3) of the U.S. District Court for the Northern District of California as incorporated into the Local Bankruptcy Rules, I attest that concurrence in filing this document has been obtained from the signatory, Heather L. Rosing.

                                                /s/ *Bonnie E. Kane*
                                                Bonnie E. Kane

---

[6] http://documents.nycbar.org/files/Report_to_the_President_by_Litigation_Funding_Working_Group.pdf