# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | **Bankruptcy Case** |
| **PG&E CORPORATION,** | **No. 19-30088 (DM)** |
| - and - | |
| **PACIFIC GAS AND ELECTRIC** | **Chapter 11** |
| **COMPANY,** | **(Lead Case)** |
| **Debtors.** | **(Jointly Administered)** |

## SUPPLEMENTAL CERTIFICATE OF SERVICE

I, Andrew G. Vignali, do declare and state as follows:

1.      I am employed at Prime Clerk LLC ("***Prime Clerk***"), the claims and noticing agent for the debtors in the above-referenced chapter 11 bankruptcy cases.

2.      On May 4, 2020, at my direction and under my supervision, employees of Prime Clerk caused the following document to be served (1) by overnight mail on the Honorable Dennis Montali at an address that is being redacted due to privacy; and (2) by overnight mail on Danisha Brar at an address that is being redacted due to privacy:

- Exhibit C and D, specifically pages 1799 to 1932, of the Notice of Filing of Plan Supplement in Connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020 [Docket No. 7037], a copy of which is attached hereto as **Exhibit A**

3.      I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and that if called upon as a witness, I could and would competently testify thereto.

Executed this 7th day of May 2020, at New York, NY.

/s/ Andrew G. Vignali

Andrew G. Vignali

2

**Exhibit A**

1  **Exhibit C**

2  **Subrogation Wildfire Trust Agreement (with all Exhibits)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUBROGATION CLAIMS DECLARATION OF TRUST

This Subrogation Claims Declaration of Trust, dated as of [DATE] (as amended, supplemented, or otherwise modified from time to time, this "Agreement"), by and among (i) the undersigned members of the subrogation trust advisory board ("Trust Advisory Board," and each such member, a "Member") and (ii) Ankura Consulting Group, LLC, as trustee of the Subrogation Trust (in such capacity, the "Trustee"), creates and governs the subrogation trust ("Subrogation Trust") referenced in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated January 31, 2020* [Docket No. 5590][1] (as amended, supplemented, or otherwise modified from time to time, "Plan") and order approving such Plan ("Confirmation Order"). The Trust Advisory Board and Trustee are each referred to herein individually as a "Party" and, collectively, as the "Parties."

### RECITALS

**WHEREAS**, each of PG&E Corporation and Pacific Gas and Electric Company (collectively, "Debtors") filed a voluntary petition for relief (collectively, "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code ("Bankruptcy Code") on January 29, 2019 in the United States Bankruptcy Court for the Northern District of California ("Bankruptcy Court")[2];

**WHEREAS**, the Plan provides that holders of Subrogation Claims[3] shall have an allowed aggregate claim of $11,000,000,000.00, and that the distribution on account of such Subrogation Claims ("Aggregate Subrogation Recovery") shall be transferred to the Subrogation Trust on the effective date of the Plan ("Effective Date") for the benefit of holders of Subrogation Claims ("Subrogation Trust Beneficiaries");

**WHEREAS**, upon the occurrence of the Effective Date, this Agreement shall become effective and govern payments to Subrogation Trust Beneficiaries on account of Subrogation Claims which payments shall be made either (i) with respect to Subrogation Trust Beneficiaries who are parties to the Subrogation Wildfire Claim Allocation Agreement dated as of September 30, 2019, as may be amended and restated from time to time ("Allocation Agreement"), in accordance with the Allocation Agreement, or (ii) with respect to Subrogation Trust Beneficiaries who are not parties to the Allocation Agreement, in accordance with the terms hereof;

**WHEREAS**, the Subrogation Trust is intended to qualify as a "qualified settlement fund" within the meaning of Treasury Regulation section 1.468B-1 *et seq.* for all U.S. federal and

---

[1]     NTD: To be updated for title and docket number of final plan.

[2]     As used herein, the term "Bankruptcy Court" shall include the United State Bankruptcy Court for the Northern District of California or any court sitting in appellate jurisdiction thereof, and, in the event that the foregoing courts lack or decline to exercise jurisdiction, Courts of the State of California and the United States District Court of the Northern District of California or any other court of competent jurisdiction.

[3]     As used herein, the term "Subrogation Claim" means any Subrogation Wildfire Claim as defined in the Plan relating to the 2017 and 2018 wildfires that occurred in Northern California prior to January 29, 2019, as set forth on **Exhibit A** hereto (the "Wildfires").

applicable state and local income tax purposes, subject to the Debtors' right to make an election to treat the Subrogation Trust as a "grantor trust" for U.S. federal income tax purposes and, to the extent permitted under applicable law, for state and local income tax purposes;

**WHEREAS**, the Trustee shall have all powers necessary (a) to implement this Agreement, the Allocation Agreement and the provisions of the Plan, and Confirmation Order relating to Subrogation Claims, and (b) to administer the Subrogation Trust as provided herein; and

**WHEREAS**, the Trustee and Trust Advisory Board are familiar with the terms of the Allocation Agreement and are entering into (i) this Agreement to distribute the Aggregate Subrogation Recovery consistent with the terms of the Allocation Agreement to the parties thereto and (ii) to otherwise distribute the Aggregate Subrogation Recovery to Subrogation Trust Beneficiaries not party to the Allocation Agreement in accordance with the terms hereof.

**NOW**, **THEREFORE**, pursuant to the Plan and the Confirmation Order, in consideration of the mutual agreements of the Parties contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and affirmed, the Parties hereby agree as follows:

## ARTICLE I
## ESTABLISHMENT OF THE SUBROGATION TRUST

1.1     <u>Establishment and Purpose of the Subrogation Trust</u>.

(a)     <u>Establishment of Subrogation Trust</u>.  Pursuant to Sections 4.25(b) and 6.4 of the Plan, on the Effective Date, in full satisfaction of the Subrogation Claims, the Debtors shall irrevocably transfer, assign and deliver the Aggregate Subrogation Recovery to either (i) one or more accounts established by the Trustee with the consent of the Trust Advisory Board at  Bank of America Corporation, JPMorgan Chase & Co. and/or Citibank, N.A., or (ii) such other account(s) as agreed to by a majority of members of the Steering Committee of the Ad Hoc Subrogation Group, in each case for the purpose of receiving, holding, and distributing the Aggregate Subrogation Recovery for the benefit of all Subrogation Trust Beneficiaries.  The Aggregate Subrogation Recovery shall be transferred in any and all cases free and clear of all liens, encumbrances, Claims and Interests (legal, beneficial, or otherwise, as Claims and Interests are defined in the Plan) for the sole benefit of the Subrogation Trust Beneficiaries.  For the avoidance of doubt, upon the transfer of the Aggregate Subrogation Recovery, the Subrogation Trust shall succeed to all of the Debtors' rights, title, and interest in the Aggregate Subrogation Recovery, and the Debtors shall have no further right or interest in or with respect to the Aggregate Subrogation Recovery.

(b)     <u>Purpose of Subrogation Trust</u>.  The primary purposes of the Subrogation Trust are, in an expeditious and orderly manner, (i) to make timely Distributions (as defined in Section 6.1) in accordance with the Allocation Agreement and this Agreement to holders of Paid

Claims and (ii) to object to and/or resolve Non-Party Claims (as defined in Section 1.2(a)) and make Distributions thereon.[4]

(c)  Relationship.  This Agreement is intended to create a trust and a trust relationship and is to be governed and construed in all respects as a trust.  The Subrogation Trust is not intended to be, and shall not be deemed to be, or be treated as, a general partnership, limited partnership, joint venture, corporation, joint stock company, or association, nor shall the Trustee, the Trust Advisory Board (or any Member or Alternate Representative), or the Subrogation Trust Beneficiaries for any purpose be, or be deemed to be or treated in any way whatsoever to be, liable or responsible hereunder as partners or joint venturers.  The relationship of the Subrogation Trust Beneficiaries, on the one hand, to the Trustee and the Trust Advisory Board, on the other hand, shall be solely that of a beneficiary of a trust and shall not be deemed a principal and agency relationship, and the parties' rights shall be limited to those conferred upon them by the Plan, Confirmation Order, Allocation Agreement and this Agreement.

(d)  Financial and Status Reports.  The fiscal year of the Subrogation Trust shall be the calendar year.  During the term of the Subrogation Trust, within forty-five (45) days after the close of each calendar quarter and ninety (90) days after the end of each calendar year, and as soon as practicable upon termination of the Subrogation Trust, the Trustee shall upload to a password-protected data room (the "Data Room"), with credentials made available to the Subrogation Trust Beneficiaries, a written report (each, a "Financial and Status Report") which shall include:  (i) (x) for each calendar quarter, financial statements of the Subrogation Trust for such calendar quarter prepared in accordance with U.S. generally accepted accounting principles, and (y) for the end of a calendar year, financial statements for such calendar year prepared in accordance with U.S. generally accepted accounting principles, (ii) a summary description of any action taken by the Subrogation Trust that, in the judgment of the Trustee, materially affects the Subrogation Trust and of which notice has not previously been given to the Subrogation Trust Beneficiaries, (iii) details of aggregate funds distributed by the Trustee and the Aggregate Subrogation Recovery, if any, remaining, (iv) details of income earned on the Aggregate Subrogation Recovery, (v) details of the amount of any reserves, (vi) details of the Holdback Amount, (vii) the then in effect Implied Recovery Percentage and Adjustment Percentage (as defined in and calculated in accordance with Section 3(b) of the Allocation Agreement) and information necessary to show the Trustee's calculation of the Implied Recovery Percentage and Adjustment Percentage and (viii) a description of the progress of making Distributions to the Subrogation Trust Beneficiaries and any other material information relating to the Aggregate

---

[4]  As used herein, the terms "Paid Claims," and "Assignor Insurer" shall have the same meanings as they do in the Allocation Agreement.

Paid Claims means payments and legally recoverable expenses made to or on behalf of insureds in connection with the Wildfires and the insuring agreement between a Claimholder or Assignor Insurer and its insured, but not including payments of any personal injury or death claims, non-recoverable expenses (including deductibles voluntarily refunded), damages unrelated to the Wildfires and/or arising from the insurer's negligence or bad faith.  For the avoidance of doubt, Paid Claims shall also include payments and recoverable expenses made by a Claimholder to or for the benefit of insureds in connection with Wildfires required by California law as a result of an insurer's insolvency.

Assignor Insurer means an insurer from whom the holder of Subrogation Claims directly or indirectly acquired Subrogation Claims.

- 3 -

Subrogation Recovery and the administration of the Subrogation Trust, including Subrogation Trust Costs and Expenses incurred during such period and cumulative for the duration of the Subrogation Trust. To the extent practicable, the Trustee will promptly provide additional information related to the Subrogation Trust as requested from time to time by any Subrogation Trust Beneficiary, provided, that such information shall be uploaded to the Data Room. Each Financial and Status Report shall be delivered to the Trust Advisory Board upon being uploaded to the Data Room. The Trustee shall provide access to the Data Room to any third party that executes a customary confidentiality agreement, unless the Trustee demonstrates that there is a good reason to not do so to the satisfaction of a majority of Members of the Trust Advisory Board.

(e) Service without Bond. The Trustee and Members (and any Alternate Representative) shall serve without bond and shall have no obligation to file any accountings with any state or federal court.

1.2 Funding of the Subrogation Trust Costs and Expenses.

(a) Funding. On the Effective Date, $10,000,000.00 of the Aggregate Subrogation Recovery (the "Initial Trust Cost and Expense Funding") shall be reserved by the Trustee to administer the Subrogation Trust and deposited in a segregated account established and maintained by the Trustee (the "Expense Reserve") at a bank selected by the Trustee with the consent of the Trust Advisory Board. To the extent the professional fees and expenses incurred by the ad hoc group of subrogation claim holders ("Ad Hoc Subrogation Group") are not fully reimbursed by the Debtors on the Effective Date pursuant to the Plan, any unpaid amounts owed shall be paid by the Trustee from the Expense Reserve to the applicable Ad Hoc Subrogation Group professionals within ten (10) days upon written request. To the extent that any Subrogation Trust Beneficiary incurred or paid professional fees or expenses or indemnification obligations pursuant to sections 4, 5, and paragraph 6(c) of the related terms of business of that certain engagement letter between Ankura Consulting Group, LLC and certain Subrogation Trust Beneficiaries dated April 9, 2020, any such amounts shall be reimbursed by the Trustee from the Expense Reserve within ten (10) days of the applicable Subrogation Trust Beneficiary's written request to the Trustee; provided, the Expense Reserve shall also be reduced by any amount otherwise paid to Ankura Consulting Group, LLC pursuant to such engagement letter. To the extent that Trustee is owed professional fees and expenses in connection with its engagement prior to the Effective Date, such amounts will be reimbursed from the Expense Reserve following a written request from the Trustee and approval of the Trust Advisory Board. To the extent the reasonable fees, costs and expenses of administering the Subrogation Trust and the Aggregate Subrogation Recovery and the professional fees of the Ad Hoc Subrogation Group paid from the Expense Reserve at any time exceed the Initial Trust Cost and Expense Funding, the Trustee may, in consultation with the Trust Advisory Board, replenish the Expense Reserve in an amount not to exceed $2,000,000.00 in the aggregate from the funds in the Holdback Amount to pay such amounts as are reasonably expected to cover the reasonable fees, costs and expenses of administering the Subrogation Trust and Aggregate Subrogation Recovery, including any costs and expenses relating to objecting to and/or resolving any disputed Subrogation Claims not held by a party to the Allocation Agreement ("Non-Party Claims" and, individually a "Non-Party Claim"), notwithstanding that such replenishment may diminish the

- 4 -

Aggregate Subrogation Recovery. To the extent more than an additional $2,000,000.00, in the aggregate, is required beyond the original $10,000,000.00 in funding to cover the reasonable fees, costs and expenses of administering the Subrogation Trust and Aggregate Subrogation Recovery until the termination of the Subrogation Trust, the Trustee shall only replenish the Expense Reserve by more than $2,000,000.00 with the unanimous consent of the Trust Advisory Board.

        (b)    <u>Retention of Professionals</u>. The Trustee and Trust Advisory Board may, without further order of the Bankruptcy Court, employ professionals to assist them in fulfilling their respective obligations under the Plan and this Agreement. Professional service agreements entered into by the Trustee pursuant to this Section 1.2(b) shall be approved by the Trust Advisory Board, shall include reasonable and customary fee and expense provisions, and shall not be duplicative of other professional service engagements. Compensation of the Trustee reimbursable under this Agreement shall be governed by separate agreement by and between the Trustee and the Trust Advisory Board pursuant to Section 2.2 hereof and shall include reasonable and customary fee and expense provisions. Professional expenses of the Trust Advisory Board reimbursable under this Agreement shall be limited to fees and expenses paid to a single law firm representing the entire Trust Advisory Board (rather than some or all of its Members), shall include reasonable and customary fee and expense provisions, and shall not be duplicative of other professional service engagements. Any law firm retained by the Trustee shall not also represent the Trust Advisory Board or any Subrogation Trust Beneficiary in connection with any matter relating to the Subrogation Trust or the Debtors, and any law firm retained by the Trust Advisory Board shall not also represent the Trustee or any of the Subrogation Trust Beneficiaries in connection with any matter relating to the Subrogation Trust or the Debtors. For the avoidance of doubt, fees and expenses of professionals retained pursuant to this Section 1.2(b) shall be paid out of the Expense Reserve. At the direction and discretion of the Trust Advisory Board, the Trustee may hire an accounting firm to prepare financial statements and tax filings, as may be required to be made by the Subrogation Trust.

## ARTICLE II
## THE TRUSTEE

        2.1    <u>Appointment of Trustee</u>. The Trustee is hereby appointed trustee of the Subrogation Trust as of the Effective Date and agrees to accept and hold the Aggregate Subrogation Recovery, plus any accrued interest and earnings thereon, in trust for the Subrogation Trust Beneficiaries. Other than as provided in Section 2.8(a) hereof, the Trustee may not be a Member of the Trust Advisory Board.

        2.2    <u>Trustee's Compensation and Reimbursement</u>. The Trustee shall be compensated for its services and reimbursed for its expenses in accordance with, and pursuant to the terms of, a separate agreement to be negotiated and executed by the Trustee and the Trust Advisory Board, which agreement shall not be subject to any third-party notice or approval, <u>provided</u>, that, the Trustee shall not earn a management fee for the Trustee's management of the assets of the Subrogation Trust. Compensation and reimbursement under this Section 2.2 will be paid from the Expense Reserve.

- 5 -

2.3     Power and Responsibilities.  The Trustee, in consultation with the Trust Advisory Board, shall have all powers necessary to implement this Agreement and the provisions of the Plan relating to the Subrogation Trust, in accordance with the Plan, Confirmation Order, Allocation Agreement, this Agreement, and applicable law, including the power to execute any agreement or other document consistent with the terms thereof.  The Trustee shall, in a manner consistent with the terms of this Agreement:  (i) administer and make Distributions to Subrogation Trust Beneficiaries from the Aggregate Subrogation Recovery in accordance with this Agreement and the Allocation Agreement, (ii) dispute and/or resolve any Subrogation Claims held by parties to the Allocation Agreement in accordance with the terms of Articles IV and V hereof and the Allocation Agreement, and (iii) object to and/or resolve Non-Party Claims in accordance with the Objection Procedures set forth in **Exhibit B** hereto (the "Non-Party Objection Procedures"); provided that, if, after following the Non-Party Objection Procedures, the Trustee cannot resolve a disputed Non-Party Claim, the Trustee may resolve such disputed Non-Party Claim with the consent of the Trust Advisory Board.  The Trustee is expressly prohibited from engaging in the conduct of, or to further, any trade or business, including employing any persons or entities other than as provided herein.  In consultation with the Trust Advisory Board, the Trustee shall acquire insurance covering the actions of the Trustee and Trust Advisory Board.

2.4     Tenure.  The powers and responsibilities of the Trustee shall continue in full force and effect until the Subrogation Trust is terminated in accordance with Section 9.1 hereof.  The Trustee will serve until the earlier of (a) the termination of the Subrogation Trust or (b) the Trustee's earlier death, resignation or removal.

2.5     Resignation.  The Trustee may resign by giving not less than ninety (90) days' prior written notice to the Trust Advisory Board, and to the extent permitted by law, without judicial approval.  Such resignation shall become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor by the Trust Advisory Board, as provided in Section 2.8(a) hereof, and the acceptance by such successor of such appointment. Notwithstanding the foregoing, upon the Termination Date, the Trustee shall be deemed to have resigned.  The Trustee shall be deemed to have resigned upon the incapacity of the Trustee, which determination shall be made by, and in the sole discretion of, the Trust Advisory Board.

2.6     Removal.  The Trustee may be removed by the unanimous written consent of the Members with or without Cause (as defined in Section 3.8 hereof) immediately upon notice to the Trustee thereof.

2.7     Effect of Resignation or Removal.  The death, dissolution, bankruptcy, resignation, incompetency, incapacity, or removal of the Trustee, as applicable, shall not operate to terminate the Subrogation Trust created by this Agreement or to revoke any existing agency created pursuant to this Agreement or invalidate any action theretofore taken by the Trustee or any prior Trustee.  In the event of the resignation or removal of the Trustee, such Trustee will promptly (i) execute and deliver such documents, instruments, and other writings as may be reasonably requested by Trust Advisory Board or the successor Trustee (as appointed pursuant to Section 2.8 hereof) to effect the termination of such Trustee's capacity under this Agreement, (ii) deliver to the Trust Advisory Board and/or the successor Trustee (as appointed pursuant to

- 6 -

Section 2.8 hereof) all documents, instruments, records, and other writings related to the Subrogation Trust as may be in the possession of such Trustee (provided, however, that such Trustee may retain one copy of such documents for archival purposes or as required by law), and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Trustee.

2.8     Appointment of Successor Trustee.

(a)     Appointment Procedure.  In the event of the death (in the case of a Trustee that is a natural person), dissolution (in the case of a Trustee that is not a natural person), incompetency, or removal of the Trustee, the Member of the Trust Advisory Board selected in accordance with Section 5(b)(iii) of the Allocation Agreement shall immediately become the interim Trustee, solely for legal purposes, and whose powers as interim Trustee shall be limited solely to maintaining the legal existence of the Subrogation Trust and who shall stay all actions of the Subrogation Trust, including those in Article IV, V, and VI pending appointment of a successor Trustee.  The interim Trustee shall continue to be a Member of the Trust Advisory Board.  As soon as practicable thereafter, the Trust Advisory Board by a unanimous vote shall designate a successor Trustee, who, for the avoidance of doubt, may not be a Member of the Trust Advisory Board.  In the case of resignation of the Trustee (i) the Trust Advisory Board by a unanimous vote shall appoint a successor Trustee as soon as practicable thereafter, and (ii) if a successor Trustee is not appointed or does not accept its appointment within ninety (90) days following delivery of the notice of resignation, the Member of the Trust Advisory Board selected in accordance with Section 5(b)(iii) of the Allocation Agreement shall immediately become the interim Trustee and serve consistent with the limitations set forth in the preceding sentences of this section pending appointment of a successor Trustee.

(b)     Acknowledgment of Successor Trustee.  Every successor Trustee appointed hereunder shall execute, acknowledge, and deliver to the Trust Advisory Board an instrument accepting the appointment under this Agreement and agreeing to be bound as Trustee hereto.  Thereupon the successor Trustee, without any further act, deed or conveyance, shall become vested with all rights, powers, trusts, and duties of the retiring Trustee.  No successor Trustee shall be personally liable for any act or omission of a predecessor Trustee.

2.9     Confidentiality.  Notwithstanding anything to the contrary, including any agreement to which the Trustee is a party, the Trustee shall hold strictly confidential and not use for personal gain or for any purpose other than carrying out the duties of the Trustee any non-public information of or pertaining to any Subrogation Trust Beneficiary or their insureds to which any of the Aggregate Subrogation Recovery relates or of which the Trustee has become aware in the Trustee's capacity as Trustee, including, but not limited to, the contents of the Allocation Agreement, except as otherwise required by law, provided, that the Trustee may share non-public information with Subrogation Trust Beneficiaries in accordance with the terms of this Agreement.  This section shall survive termination of this Agreement and/or the Trustee's removal or resignation.

2.10     Investment of Cash. The Trustee shall have the right and power to invest all or a portion of the Aggregate Subrogation Recovery or any income earned by the Subrogation Trust

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 10 of 137

only in Cash and U.S. Federal Government securities with a term of one year or less, as defined in section 2(a)(16) of the Investment Company Act; provided, however, that (i) the scope of any such permissible investments shall be further limited to include only those investments that a "qualified settlement fund," within the meaning of Treasury Regulations section 1.468B-1 *et seq.*, may be permitted to invest in, pursuant to the Treasury Regulations, or any modification in Internal Revenue Service ("IRS") guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise, and (ii) the Trustee, with the consent of the Trust Advisory Board, may expend the assets of the Subrogation Trust (a) as reasonably necessary to meet contingent liabilities and maintain the value of the assets of the Subrogation Trust, (b) to pay reasonable administrative expenses (including any taxes imposed on the Subrogation Trust), and (c) to satisfy other liabilities incurred or assumed by the Subrogation Trust (or to which the assets are otherwise subject) in accordance with the Plan, Confirmation Order, Allocation Agreement, or this Agreement. For the avoidance of doubt, all income earned with respect to the Aggregate Subrogation Recovery shall be added to the assets in the Subrogation Trust, held as part thereof, and distributed in accordance with the Allocation Agreement including, without limitation, Section 3(b) and footnote 4 thereof. In consultation with the Trust Advisory Board, the Trustee shall administer the undistributed portion of the Aggregate Subrogation Recovery in a commercially reasonable manner, including procurement of a customary and reasonable fidelity bond to insure such undistributed funds (subject to cost considerations).

2.11    Limitations on Power and Authority of the Trustee. Notwithstanding anything in this Agreement to the contrary, the Trustee will not have the authority to do any of the following:

(a)    take any action in contravention of the Plan, Confirmation Order, Allocation Agreement, this Agreement, or applicable order of the Bankruptcy Court;

(b)    take any action that would make it impossible to carry on the activities of the Subrogation Trust;

(c)    possess property of the Subrogation Trust or assign the Subrogation Trust's rights in specific property for any purpose other than as provided herein;

(d)    cause or permit the Subrogation Trust to engage in any trade or business or employ any persons or entities other than as provided herein;

(e)    receive transfers of any listed stocks or securities or any readily marketable assets or any operating assets of a going business, other than Non-cash Recovery provided for under the Plan, or as is otherwise necessary or required under the Plan, the Confirmation Order, or this Agreement; provided, however, that in no event shall the Trustee receive any such investment that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 *et seq.*, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law);

(f)    exercise investment power beyond what is provided in Section 2.10 hereof;

(g)     receive or retain any operating assets of an operating business, a partnership interest in a partnership that holds operating assets or 50% or more of the stock of a corporation with operating assets, except as is necessary or required under the Plan, the Confirmation Order, or this Agreement; provided, however, that in no event shall the Trustee receive or retain any such asset or interest that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 *et seq.*, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law);

(h)     take any other action or engage in any investments or activities that would jeopardize treatment of the Subrogation Trust as a "qualified settlement fund" for federal income tax purposes under Treasury Regulation section 1.468B-1 *et seq.*, or any successor provision thereof (or corresponding or similar provisions of state, local, or foreign law); or

(i)     assign or delegate any of the Trustee's rights or obligations to any third party except as expressly provided herein.

**ARTICLE III**
**SUBROGATION TRUST ADVISORY BOARD**

3.1     <u>Appointment of Trust Advisory Board.</u>  The Trust Advisory Board shall consist of three (3) members initially appointed in accordance with the Allocation Agreement.  The initial Members of the Trust Advisory Board are [_____], [____], and [____]. Each Member, to the extent that it is an institution may, from time to time, designate an employee or other designee as its representative (each an "Alternate Representative") to attend meetings and participate in activities of the Trust Advisory Board.  Such designation may be revoked at any time by the designating Member.  The Alternate Representative shall not be entitled to compensation except as provided in Section 3.2 hereof.  In the event an Alternate Representative ceases to be employed by a Member (or ceases to act as its legal counsel), the Member shall designate a replacement Alternate Representative.

3.2     <u>Trust Advisory Board Compensation and Reimbursement</u>.  Starting on the Effective Date, the Members of the Trust Advisory Board appointed in accordance with Section 5(b)(i) and (ii) of the Allocation Agreement shall be compensated $[___] per month for their services, and the Member of the Trust Advisory Board appointed in accordance with Section 5(b)(iii) of the Allocation Agreement shall be compensated $[__] per month for his or her services.  Members of the Trust Advisory Board and any Alternate Representative shall be reimbursed for their reasonable and necessary expenses incurred in performance of obligations under this Agreement.  Members shall be compensated for their services on the first business day of every month, beginning with the first business day of the month following the Effective Date.  Compensation and reimbursement under this Section 3.2 will be paid from the Expense Reserve.

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:15:02   Page 13 of 137

3.3     Responsibilities.  The Trust Advisory Board shall monitor, consult with and advise the Trustee as to the administration and management of the Subrogation Trust in accordance with the Plan, the Confirmation Order, the Allocation Agreement and this Agreement.

3.4     Authority.  The Trust Advisory Board shall have the authority to perform its duties and obligations hereunder and to reasonably require the Trustee to provide information to the Trust Advisory Board.  The Trust Advisory Board shall have the authority to remove the Trustee in accordance with Section 2.6 hereof.

3.5     Meetings of the Trust Advisory Board.

(a)     Timing.  Meetings of the Trust Advisory Board are to be held not less often than quarterly.  Special meetings of the Trust Advisory Board may be held whenever and wherever called for by the Trustee or any Member; provided, however, that notice of any such meeting shall be duly given in writing to each Member and the Trustee no less than 48 hours prior to such meeting (such notice being subject to waiver by the Members), and attendance at a special meeting shall constitute waiver of such notice.  The Trust Advisory Board shall keep minutes of each meeting.  Unless the Trust Advisory Board decides otherwise, the Trustee and the Trustee's advisors may, but are not required to, attend meetings of the Trust Advisory Board, provided, however, the Trust Advisory Board may, at its discretion, meet without the Trustee or the Trustee's advisors.

(b)     Actions.  All meetings of the Trust Advisory Board shall consist of all Members.  Unless otherwise provided for in this Agreement, the majority vote of the Members at a duly called meeting at which all Members are present throughout shall be an act of the Trust Advisory Board.  The Trust Advisory Board may take action without a meeting by unanimous written consent as evidenced by one or more writings (including electronic mail) describing the action agreed to by all Members.  Notwithstanding the foregoing, if (a) a Member of the Trust Advisory Board, or any Alternate Representative of such Member, fails to attend three (3) consecutive, duly noticed meetings, including special meetings, of the Trust Advisory Board, and (b) if such Member, or any Alternate Representative for such Member, fails to attend the next duly noticed meeting, including special meetings, of the Trust Advisory Board, then, (x) the attendance of two (2) Members of the Trust Advisory Board or their Alternate Representatives at such next duly notice meeting (or special meeting) shall be deemed a proper meeting of the Trust Advisory Board in all respects (the "Two-Member Meeting"), and (y) the vote of two (2) Members of the Trust Advisory Board or their Alternate Representatives at the Two-Member Meeting shall be deemed the unanimous consent of the Trust Advisory Board in all respects at the Two-Member Meeting.  Thereafter, all meetings of the Trust Advisory Board shall consist of all Members or their Alternate Representatives, provided, that, if any Member of the Trust Advisory Board or their Alternate Representative subsequently fails to attend three (3) consecutive, duly noticed meetings, including special meetings, of the Trust Advisory Board, the preceding provisions with respect to a Two-Member Meeting shall apply.

(c)     Form of Participation.  Any or all of the Members may participate in a meeting by, or conduct the meeting through the use of, conference telephone or similar

- 10 -

communications equipment by means of which all Persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any Member participating in a meeting by these means is deemed to be present in person at the meeting.

3.6 <u>Tenure</u>. The authority of the Members continues in full force and effect until the Subrogation Trust is terminated in accordance with Section 9.1 hereof. Each Member will serve until the earlier of (a) the termination of the Subrogation Trust or (b) such Member's earlier death, resignation or removal.

3.7 <u>Resignation</u>. A Member may resign by giving not less than ninety (90) days' prior written notice thereof to the Trustee and the other Members, and to the extent permitted by law, without judicial approval, <u>provided</u>, that, the non-resigning Members may waive the ninety (90) days' notice. Such resignation shall become effective on the later to occur of (i) the day specified in such notice and (ii) the appointment of a successor in accordance with Section 3.9 hereof.

3.8 <u>Removal</u>. Two Members of the Trust Advisory Board may remove the other Member for Cause immediately upon notice thereof. "<u>Cause</u>" shall mean (i) a Person's willful failure to perform his material duties hereunder (including with respect to a Member, failing to regularly attend meetings of the Trust Advisory Board; it being understood that missing three (3) meetings in a row shall be deemed to constitute Cause) that is not remedied within fifteen (15) days' notice, if curable, (ii) a Person's commission of an act of fraud, theft, or embezzlement (iii) a Person's conviction of a felony (iv) a Person's gross negligence, bad faith, willful misconduct, or knowing violation of law in the performance of his duties hereunder, or (v) incapacity due to illness or other circumstances.

3.9 <u>Appointment of a Successor Member</u>. In the event of a vacancy on the Trust Advisory Board for any reason including, without limitation, resignation or removal of a Member, the vacant seat on the Trust Advisory Board shall be filled according to the method initially used to appoint such Member as provided in section 5(b) of the Allocation Agreement. The appointment of a successor Member will be evidenced in the reports provided by the Trustee to Subrogation Trust Beneficiaries pursuant to Section 1.1(d) hereof. Immediately upon the appointment of any successor Member, all rights, powers, duties, authority, and privileges of the predecessor Member hereunder will be vested in and undertaken by the successor Member without any further act, and such successor Member will not be liable personally for any act or omission of the predecessor Member. Every successor Member appointed hereunder shall execute, acknowledge and deliver to the Trustee and other Members an instrument accepting the appointment under this Agreement and agreeing to be bound hereto.

3.10 <u>Confidentiality</u>. Notwithstanding anything to the contrary, including any agreement to which a Member is a party, each Member shall hold strictly confidential and not use for personal gain any non-public information of or pertaining to any Subrogation Trust Beneficiary or their insureds to which any of the Aggregate Subrogation Recovery relates or of which the Member has become aware in its capacity as a Member, including, but not limited to, the contents of the Allocation Agreement, except as otherwise required by law, <u>provided</u>, that

- 11 -

each Member may share non-public information with Subrogation Trust Beneficiaries. This section shall survive termination of this Agreement and/or the Member's removal or resignation.

3.11    Common Legal Interest.  The Trustee and the Trust Advisory Board have a "common legal interest" relating to the Subrogation Claims, the Subrogation Trust, the Plan, Confirmation Order, Allocation Agreement and this Agreement (other than Section 2.6 and Section 2.7 hereof), including without limitation, (i) the formation of the Subrogation Trust, (ii) the retention and direction of professional advisors, (iii) the administration of the Subrogation Trust, (iv) making Distributions in accordance with this Agreement and the Allocation Agreement, (v) disputing and/or resolving any Subrogation Claims held by parties to the Allocation Agreement in accordance with the terms of Articles IV and V hereof, and (vi) objecting to and/or resolving any Non-Party Claims in accordance with the Non-Party Objection Procedures or as otherwise provided herein (the "Common Legal Interest Matters").  Any discussion, evaluation, or other communications and exchanges of information relating to the Common Legal Interest Matters shall at all times remain subject to all applicable privileges, immunities and protections from disclosure, including without limitation, the attorney-client privilege, work-product doctrine and common legal interest privilege.  It is the express intent of the Trustee and the Trust Advisory Board to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement or otherwise, in whole or in part, any and all privileges, protections and immunities.

## ARTICLE IV
## REPORTING, REVIEW, VERIFICATION AND TRANSFERS OF PAID CLAIMS

4.1    Beneficiary Reporting Requirements.

(a)    General Reporting Requirement.  The Trustee and Trust Advisory Board understand and acknowledge that Subrogation Trust Beneficiaries shall provide updated information to the Trustee regarding Paid Claims and Subrogation Claims reserved for but not paid ("Reserved Claims") in accordance with the terms of the Allocation Agreement and using a form substantially similar to the form attached hereto as **Exhibit C** (along with any attachments thereto, "Distribution Request").  In developing or modifying its procedures for submitting Subrogation Claims for payment, the Trustee shall evaluate whether the Subrogation Trust can provide claimants with the opportunity to utilize currently available technology, including filing claims and supporting documentation through web-based systems, the internet and/or electronic media.  The form of the Distribution Request may be changed and the foregoing alternative procedures for electronic claims submission may be adopted by the Subrogation Trust with the consent of the Trust Advisory Board.

(b)    Timing.  The deadlines by which Subrogation Trust Beneficiaries shall provide updated information to the Trustee regarding Paid Claims and Reserved Claims (each a "Reporting Deadline") is set forth in Section 2 of the Allocation Agreement.  The Trustee shall only make Distributions on account of Distribution Requests that are timely filed on or before each Reporting Deadline, in the manner set forth in the Allocation Agreement and according to the procedures set forth in **Exhibit D** hereto ("Subrogation Claims Review Protocol").

- 12 -

4.2     Review and Verification by Trustee.

(a)     Establishment of Wildfire Parameters.  Prior to the Effective Date, Berger Kahn ALC ("Berger Kahn"), in consultation with the steering committee of the Ad Hoc Subrogation Group established parameters regarding (i) affected areas for the Wildfires (each such area, an "Affected Zone"), and (ii) a range of dates within which the Subrogation Claims associated with such Wildfire are presumed to have been incurred (each, a "Date of Loss Range").  The final Affected Zones and Date of Loss Ranges are attached hereto as **Exhibit E**.

(b)     Retention of Claims Review Professionals.  As soon as practicable after the Effective Date, the Subrogation Trust shall retain Berger Kahn ALC, the law firms comprising the Subrogation Review Committee (as defined in the Subrogation Claims Review Protocol), and Ankura Consulting Group, LLC as the Third Party Reviewer, (collectively, the "Claims Review Professionals"), for the roles set forth in the Subrogation Claims Review Protocol.  The Subrogation Trust shall retain the Claims Review Professionals pursuant to engagement letters acceptable to the Trust Advisory Board which shall provide that the applicable Claims Review Professionals agrees to be bound by the applicable terms of this Agreement (including the Subrogation Claims Review Protocol).

(c)     Review and Verification Process.  The Subrogation Trust shall review Distribution Requests as set forth in the Subrogation Claims Review Protocol.  The Trustee may, with the consent of the Trust Advisory Board, adopt claims processing instructions or other materials to guide individual reviewers at any level of the review process in order to ensure compliance with the Subrogation Claims Review Protocol.

(d)     Subrogation Claims Review Reports.  Promptly following each level of review set forth in the Subrogation Claims Review Protocol, the Trustee shall notify each Subrogation Trust Beneficiary as to the results of such review level.

(e)     Distribution Notices to Subrogation Trust Beneficiaries.  In advance of each quarterly Distribution, the Trustee shall send a notice to each applicable Subrogation Trust Beneficiary detailing the amount such Subrogation Trust Beneficiary will be paid on the subsequent distribution date in accordance with the Allocation Agreement (a "Distribution Notice").  The Distribution Notice shall set forth the calculation of the subsequent Distribution to be made to the Subrogation Trust Beneficiary, including the then in effect Implied Recovery Percentage and Adjustment Percentage (as calculated in accordance with Section 3(b) of the Allocation Agreement) and information necessary to show the Trustee's calculation of the Implied Recovery Percentage and Adjustment Percentage.  Disputed Subrogation Claims (or portions thereof) identified in a Distribution Notice following a Level Four Review shall be referred to herein as a "Disputed Claim."

4.3     Replacement of Claims Review Professionals.  At any time during the term of this Agreement, (a) the Trustee, with the unanimous consent of the Trust Advisory Board, or the Trust Advisory Board (acting unanimously), may immediately terminate the services of any Claims Review Professional, and (b) if the services of any Claims Review Professional are

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 17 of 137

terminated, the Trustee shall retain a different firm to perform such duties in a substantially similar manner with the unanimous consent of the Trust Advisory Board.

4.4     Transfers of Paid Claims

(a)     Subject to the terms and conditions of this section 4.4, Subrogation Trust Beneficiaries shall be entitled to sell, assign, transfer, hypothecate, convey, or otherwise dispose, directly or indirectly any interest in Paid Claims in whole or in part (each, a "Transfer").  The Trustee shall work with the Subrogation Trust Beneficiaries to effectuate any Transfer and to ensure the correct Distributions are paid upon any transferred Paid Claim and shall provide cooperation to facilitate the Transfer.

(b)     Notwithstanding anything to the contrary herein, no Paid Claims may be transferred to any Person unless:  (i) such Person (x) is either a party to the Allocation Agreement, or (y) executes and delivers a joinder to the Allocation Agreement to the Trustee prior to the Transfer, (ii) such Person is either (x) already a Subrogation Trust Beneficiary prior to such Transfer or (y) an "accredited investor" as such term is defined under Regulation D of the Securities Act; (iii) the transferee is acquiring the Paid Claims for its own account and constitutes one person for purposes of Section 12(g)(1)(A) of the Exchange Act; (iv) the aggregate amount of Paid Claims transferred is not less than the lesser of $10,000,000.00 and 100% of the Paid Claims owned by such transferor; and (v) the Transfer is done in compliance with all applicable laws, and after giving effect to such Transfer, the Subrogation Trust would not be subject to the reporting requirements of Section 12(g) of the Exchange Act or any successor rule thereto.

(c)     In the event of any Transfer, the transferee and transferor will provide to the Subrogation Trust (i) prior notice, including the specific Subrogation Claims to which the Transfer relates and (ii) such representations, certifications, and information as reasonably requested by the Subrogation Trust to confirm that such Transfer is in compliance with this Agreement.

(d)     Any purported Transfer in violation of the terms of this Agreement shall be void *ab initio*.

**ARTICLE V**
**CLAIM DISPUTES**

5.1     Claim Disputes.

(a)     Disputed Claims.  In accordance with the Allocation Agreement, a Subrogation Trust Beneficiary that believes one or more of its submitted Subrogation Claims (or any portions thereof) was identified as a Disputed Claim in error shall notify the Trustee (an "Appeal Notice") within ten (10) business days after receipt of the applicable Distribution Notice (the "Appeal Period").  An Appeal Notice shall constitute a duly submitted Appeal Notice if it (i) identifies the Disputed Claim in reasonable detail, and (ii) states that the Subrogation Trust Beneficiary disputes the calculation of the Disputed Claim.  If a Subrogation Trust Beneficiary does not respond to a Distribution Notice by the end of the Appeal Period, the claim amounts set

- 14 -

forth by the Trustee in such Distribution Notice shall be binding on the Subrogation Trust Beneficiary. If a Subrogation Trust Beneficiary timely submits an Appeal Notice, the Trustee shall reserve for any Disputed Claim identified on such Appeal Notice pending resolution of the dispute in accordance with this Article V ("Claim Dispute") by treating the disputed portion of such claim as a Reserved Claim for all purposes with respect to the Allocation Agreement. Following receipt of an Appeal Notice, the Trustee and the applicable Subrogation Trust Beneficiary shall attempt in good faith to consensually resolve the Claim Dispute.

(b)     Mediation. If the Trustee, with the consent of the Trust Advisory Board, and the applicable Subrogation Trust Beneficiary, cannot consensually resolve the Claim Dispute, the applicable Subrogation Trust Beneficiary may request formal mediation, provided at least ten (10) business days have passed since the Trustee's receipt of the Appeal Notice, and the Trustee and the applicable Subrogation Trust Beneficiary shall attempt in good faith to promptly resolve the Claim Dispute through mediation. The mediation shall take place at the offices of counsel to the Trustee unless otherwise agreed to by the parties to such Claim Dispute and the mediator shall be mutually agreed upon by the Trustee and the applicable Subrogation Trust Beneficiary, provided, that, if the parties cannot mutually agree on a mediator, the Trust Advisory Board shall select one. Each party shall bear its own costs with respect to the mediation, and the cost of the mediator shall be split evenly between the parties. Except as explicitly set forth herein, the mediation shall be administered pursuant to the Commercial Arbitration Rules and Mediation Procedures of the American Arbitration Association. If the Trustee and the applicable Subrogation Trust Beneficiary have not consensually resolved the Claim Dispute and the applicable Subrogation Trust Beneficiary has not requested formal mediation within sixty (60) days of the Trustee's receipt of the Appeal Notice, the claim amounts set forth by the Trustee in the applicable Distribution Notice shall be binding on the Subrogation Trust Beneficiary and shall be deemed to resolve any Disputed Claims that were the subject of the Appeal Notice for the purposes of making Distributions hereunder.

(c)     Litigation. Only if the Trustee and the applicable Subrogation Trust Beneficiary cannot resolve the Claim Dispute through formal mediation within forty-five (45) days after the appointment of the mediator, the Subrogation Trust Beneficiary shall have the right to move in the Bankruptcy Court to have the Disputed Claim treated as a Paid Claim for all purposes hereunder and under the Allocation Agreement. If such Subrogation Trust Beneficiary has not filed a motion with the Bankruptcy Court within the earlier of (i) ninety (90) days after appointment of a mediator, and (ii) thirty (30) days after mediation concludes with no resolution of the Claim Dispute, the claim amounts set forth by the Trustee in the applicable Distribution Notice shall be binding on such Subrogation Trust Beneficiary and shall be deemed to resolve any Disputed Claims that were the subject of the Appeal Notice for the purposes of making Distributions hereunder. The Trustee shall have the right to object to such motion or to such Subrogation Trust Beneficiary's claim in the Bankruptcy Court (solely on the basis of a determination regarding the verification of its status as a Paid Claim in accordance with the terms of this Allocation Agreement), and such Claim Dispute shall be resolved by entry of a final order of the Bankruptcy Court unless the applicable Subrogation Trust Beneficiary and the Trustee (with the consent of the Trust Advisory Board) consensually resolve such Claim Dispute prior to the Bankruptcy Court's determination and the finality of its order. Any litigation pursuant to this Section 5.1(c) shall be governed by Section 17(b) and 17(c) of the Allocation

- 15 -

Agreement, unless the applicable Party and the Trustee (with the consent of the Trust Advisory Board) consensually resolve such Claim Dispute.

(d) _Miscellaneous_. The Trustee may consult with any Claims Review Professionals regarding any Disputed Claim at any time during the applicable Claim Dispute. The procedures set forth in this Article V shall apply only to Subrogation Trust Beneficiaries party to the Allocation Agreement, and the Trustee shall have the right to object in the Bankruptcy Court to Non-Party Claims in accordance with the Non-Party Objection Procedures.

## ARTICLE VI
## DISTRIBUTIONS

6.1 _Distributions Only on Account of Paid Claims_. Notwithstanding anything to the contrary herein the Trustee shall only make distributions ("_Distributions_") (a) with respect to Subrogation Claims asserted by parties to the Allocation Agreement, in accordance with this Agreement and the Allocation Agreement or (b) with respect to Non-Party Claims in accordance with the Non-Party Objection Procedures or as otherwise provided herein.

6.2 _Non-Cash Recovery_.

(a) _Subrogation Trust Beneficiary Election_. In the event the Plan is amended to accommodate an individual Subrogation Trust Beneficiary's election to have all or a portion of its Initial Distribution (defined below) paid in a Non-cash Recovery (as defined in the Plan), the Trustee shall work with the Debtors, and take such reasonable steps necessary, to effect the distribution of such Non-cash Recovery to such Subrogation Trust Beneficiary in connection with the Initial Distribution. A Subrogation Trust Beneficiary who elects to receive a Non-cash Recovery in connection with the Initial Distribution shall receive all other Distributions from the Subrogation Trust in the form of cash.

(b) _Value of Non-Cash Recovery_. The Trustee shall value all Non-cash Recovery, as of the Effective Date pursuant to the valuation metrics set forth in the Plan, or if no such value is set forth in the Plan, as otherwise ordered by the Bankruptcy Court.

6.3 _Payment of Distributions_

(a) _Dates of Distributions_. The Trustee shall make Distributions to Subrogation Trust Beneficiaries who are parties to the Allocation Agreement on account of Verified Paid Claims as set forth in the Allocation Agreement and the Subrogation Claims Review Protocol. The initial Distribution made by the Trustee under the Allocation Agreement shall be referred to herein as the "_Initial Distribution_." The final Distribution made by the Trustee under the Allocation Agreement shall be referred to herein as the "_Final Distribution_."

(b) _Distribution Formula_. Notwithstanding anything herein to the contrary, the Trustee shall calculate the amount to be distributed in each Distribution to each Subrogation Trust Beneficiary party to the Allocation Agreement in accordance with the Allocation Agreement and the Subrogation Claims Review Protocol.

- 16 -

(c)     Holdback Amount.  The Trustee shall hold back from each Distribution on Paid Claims, other than the Final Distribution, only those amounts required by the Allocation Agreement (the "Holdback Amount").

(d)     Distribution Agent.  The Trustee, with the consent of the Trust Advisory Board, shall have the authority to enter into agreements with one or more entities to make or facilitate Distributions required by the Plan, Confirmation Order, Allocation Agreement and this Agreement (the "Distribution Agent").  The Trustee shall pay to the Distribution Agent all reasonable and documented fees and expenses of the Distribution Agent in accordance with Section 1.2 hereof.

(e)     Destination of Payments.  The Trustee shall make Distributions either: (i) directly to each Subrogation Trust Beneficiary (or its designee) in accordance with the wire transfer instructions included on such Subrogation Trust Beneficiary's most recently submitted Distribution Request or (ii) to the Distribution Agent for further Distribution to Subrogation Trust Beneficiaries.

(f)     Payments Returned as Undeliverable.  In the event that any Distribution to any Subrogation Trust Beneficiary is returned as undeliverable, the Trustee shall not make a subsequent Distribution to such Subrogation Trust Beneficiary unless and until the Trustee has made reasonable efforts to determine the then-current address of such Subrogation Trust Beneficiary, at which time such Distribution shall be made to such Subrogation Trust Beneficiary without interest if such address can be identified; provided, however, that, if such address cannot be identified after reasonable efforts, an undeliverable Distribution shall be deemed unclaimed property at the expiration of one year after date of the attempted undeliverable payment (an "Initial Undeliverable Distribution") and such Subrogation Trust Beneficiary (the "Undeliverable Subrogation Trust Beneficiary") shall be deemed to forever relinquish the Initial Undeliverable Distribution, and any subsequent future Distributions to which such Subrogation Trust Beneficiary would otherwise be entitled (collectively, the "Undeliverable Distributions").  After such date, all Undeliverable Distributions shall be returned to the Aggregate Subrogation Recovery and distributed in accordance with the Allocation Agreement to other Subrogation Trust Beneficiaries (but, for the avoidance of doubt, an Undeliverable Subrogation Trust Beneficiary shall not receive the Final Distribution).

(g)     De Minimis Distributions.  Notwithstanding anything herein to the contrary, the Trustee shall not be required to make on account of a Paid Claim (i) payments of fractions of dollars, or (ii) a Distribution if the amount to be distributed is or has an economic value of less than $100.00.  Any funds so withheld and not distributed shall be held in reserve and distributed in subsequent Distributions.  Unless otherwise provided for in this Agreement, all funds in the Subrogation Recovery Reserve (as defined in the Allocation Agreement) shall be distributed in the Final Distribution.

(h)     Distributions Less than Zero.  The Trustee shall not make any Distributions less than or equal to $0.

- 17 -

6.4     Treatment of Non-Parties to the Allocation Agreement

(a)     Objections.  Pursuant to Section 1.54 of the Plan, Non-Party Claims shall be Disputed (as defined in the Plan) as of the Effective Date.  The Trustee shall be responsible for litigating and otherwise resolving all Non-Party Claims in accordance with the Non-Party Objection Procedures.

(b)     Reserves for Non-Parties.  The Trustee shall reserve funds in the Subrogation Recovery Reserve (as defined in the Allocation Agreement) for Non-Party Claims either (i) in an amount agreed upon by the holder of such Non-Party Claims and the Trustee (in consultation with the Trust Advisory Board) or (ii) if such amount cannot be agreed upon in accordance with subsection (i), in such amount as the Bankruptcy Court estimates is sufficient to reserve for Distributions on account of such Non-Party Claims.  Such reserves shall remain in the Subrogation Recovery Reserve until such Non-Party Claims are resolved in accordance with the Non-Party Objection Procedures.

(c)     Distributions to Non-Parties.  In the event (i) the Bankruptcy Court enters a final order pursuant to which a Non-Party Claim is resolved and all or part of such Non-Party Claim becomes Allowed (as defined in the Plan) or (ii) the Trustee and holder of such Non-Party Claims resolve the Non-Party Claims in accordance with the Non-Party Objection Procedures, then the Trustee shall make a Distribution to such holder in accordance with the Bankruptcy Court's order or terms of the consensual resolution.  Any excess reserves held by the Trustee on account of such Non-Party Claims shall be available for future Distributions pursuant to this Agreement and the Allocation Agreement.  For the avoidance of doubt, the Trustee shall not make a Distribution to any holder of a Non-Party Claim if such Non-Party Claim is Disputed and/or subject to an unresolved objection filed by the Trustee in the Bankruptcy Court.

## ARTICLE VII
## LIABILITY AND INDEMNIFICATION

7.1     No Further Liability.  Each of the Trustee, the Members, and any Alternate Representative, and their respective representatives shall have no liability for any actions or omissions in accordance with this Agreement or with respect to the Subrogation Trust to the extent permissible under New York law.  In no event shall the Trustee, the Trust Advisory Board, any Member, or any Alternate Representative be liable for indirect, punitive, special, incidental, or consequential damages or loss (including but not limited to lost profits) whatsoever, provided, however, that the provisions of this section shall not apply to the Trustee, the Members, any Alternate Representative and their respective representatives, to the extent such liability is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from the fraud, gross negligence, or willful misconduct of such party.  In performing its duties under this Agreement, the Trustee, the Members, any Alternate Representative and their respective representatives (as applicable) shall have no liability for any action taken by each such Person in accordance with the advice of counsel, accountants, appraisers, and/or other professionals retained by the Members, the Trustee, or their respective representatives, provided that such professionals have been selected with reasonable care. Without limiting the generality of the foregoing, the Trustee, the Members, any Alternate

- 18 -

Representative, and their respective representatives may rely without independent investigation on copies of orders of the Bankruptcy Court reasonably believed by such Person to be genuine and shall have no liability for actions taken in reliance thereon. Except as otherwise provided herein, none of the provisions of this Agreement shall require the Trustee, the Members, any Alternate Representative, or their respective representatives to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their rights and powers. Each of the Trustee, the Members, any Alternate Representative, and their respective representatives may rely without inquiry upon writings delivered to such Person pursuant to the Plan or the Confirmation Order that such Person reasonably believes to be genuine and to have been properly given. Any action taken or omitted to be taken in the case of the Trustee or the Trust Advisory Board with the express approval of the Bankruptcy Court will conclusively be deemed not to constitute fraud, self-dealing, intentional misrepresentation, willful misconduct, breach of fiduciary duty, or gross negligence. No termination of this Agreement or amendment, modification, or repeal of this Section 7.1 shall adversely affect any right or protection of the Trustee, the Members of the Trust Advisory Board, any Alternate Representative, or their respective designees, professional agents, or representatives that exist at the time of such amendment, modification, or repeal.

       7.2    <u>Indemnification of the Trustee and Trust Advisory Board</u>.

       (a)    <u>Scope of Indemnification</u>. Each of the Trustee, the Subrogation Trust, the Trust Advisory Board, any Alternate Representative, and each of their respective professionals and representatives (each, a "<u>Subrogation Trust Indemnified Party</u>" and collectively, the "<u>Subrogation Trust Indemnified Parties</u>") shall be, and hereby is, indemnified and held harmless by the Subrogation Trust, to the fullest extent permitted by applicable law, from and against any and all Claims, debts, dues, accounts, actions, suits, Causes of Action, bonds, covenants, judgments, damages, attorneys' fees, defense costs, and other assertions of liability arising out of any such Subrogation Trust Indemnified Party's exercise of what such Subrogation Trust Indemnified Party reasonably understands to be its powers or the discharge of what such Subrogation Trust Indemnified Party reasonably understands to be its duties conferred by the Plan, the Confirmation Order, the Allocation Agreement, or this Agreement, any order of the Bankruptcy Court entered pursuant to, or in furtherance of, the Plan, applicable law, or otherwise (except as prohibited by New York law), <u>provided</u>, <u>however</u>, that the indemnification provided in this Section to any Subrogation Trust Indemnified Party shall not apply to any such loss to the extent such loss is found in a final judgment by a court of competent jurisdiction (not subject to further appeal) to have resulted from the fraud, gross negligence, or willful misconduct of such Subrogation Trust Indemnified Party. The foregoing indemnification shall also extend to matters directly or indirectly in connection with, arising out of, based on, or in any way related to: (i) this Agreement, (ii) the services to be rendered pursuant to this Agreement, or (iii) any document or information, whether oral or written, referred to herein or supplied to the Trustee. To the extent reasonable, pursuant to the foregoing indemnification provision, the Trustee shall pay in advance or reimburse reasonable and documented out-of-pocket expenses (including advancing reasonable costs of defense) incurred by the Subrogation Trust Indemnified Party who is or is threatened to be named or made a defendant or a respondent in a proceeding concerning the business and affairs of the Subrogation Trust, solely out of the Expense Reserve; <u>provided</u>, <u>however</u>, that any Subrogation Trust Indemnified Party receiving any such advance shall execute

- 19 -

a written undertaking to repay such advance if a court of competent jurisdiction ultimately determines, by final order, that such Subrogation Trust Indemnified Party is not entitled to indemnification hereunder. In any matter covered by the first two sentences of this subsection, any party entitled to indemnification shall have the right to employ such party's own separate counsel, at the Subrogation Trust's expense, subject to the foregoing terms and conditions. In addition, the Trustee shall purchase, using funds from the Expense Reserve for the benefit of the Trustee and the Members, insurance coverage, including, without limitation, liability insurance covering the Trustee and the Members and any errors and omissions insurance with regard to any liabilities, losses, damages, claims, costs, and expenses the Trustee or the Members may incur, including, but not limited to, attorneys' fees, arising out of or due to its actions or omissions, or consequences of such actions or omissions with respect to the implementation and administration of the Plan or this Agreement. The indemnification provided under this Section 7.2 shall survive the death, dissolution, resignation, or removal, as may be applicable, of the Trustee, the Trust Advisory Board, any Member, or any other Subrogation Trust Indemnified Party and shall inure to the benefit of the Trustee's, each Member's, and each other Subrogation Trust Indemnified Party's respective heirs, successors, and assigns.

(b)     Term of Indemnification.  The foregoing indemnity in respect of any Subrogation Trust Indemnified Party shall survive the termination of such Subrogation Trust Indemnified Party from the capacity for which such party is indemnified. Termination or modification of this Agreement shall not affect any indemnification rights or obligations set forth herein.

(c)     Waiver of Indemnification Rights.  Any Subrogation Trust Indemnified Party may waive the benefits of indemnification under this Section 7.2, but only by an instrument in writing executed by such Subrogation Trust Indemnified Party and delivered to the Trustee.

(d)     Indemnification Rights Not Exclusive.  The rights to indemnification under this Section 7.2 are not exclusive of other rights which any Subrogation Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution. Nothing in this Section 7.2 will affect the rights or obligations of any Person (or the limitations on those rights or obligations) under any other agreement or instrument to which that Person is a party.

(e)     Indemnitor of First Resort.  The Subrogation Trust shall be the indemnitor of first resort for the Subrogation Trust Indemnified Parties (*i.e.*, the indemnification obligations of the Subrogation Trust to any Subrogation Trust Indemnified Party are primary and any obligation of any third-party to provide advancement or indemnification for the same indemnified expenses and liabilities (including all interest, assessment and other charges paid or payable in connection with or in respect of such indemnified expenses and liabilities) incurred by such Subrogation Trust Indemnified Party indemnitee, are secondary). If any third-party pays or causes to be paid on behalf of a Subrogation Trust Indemnified Party, for any reason, any amounts otherwise indemnifiable by the Subrogation Trust, then (i) such third-party shall be fully subrogated to all rights of the applicable Subrogation Trust Indemnified Party to

- 20 -

indemnification hereunder with respect to such payment, and (ii) the Subrogation Trust shall reimburse such third-party for the payments actually made.

7.3    Subrogation Trust Liabilities.  All liabilities of the Subrogation Trust, including indemnity obligations under Section 7.2 of this Agreement, will be liabilities of the Subrogation Trust as an entity and will be paid or satisfied solely from the Expense Reserve.  No liability of the Subrogation Trust will be payable in whole or in part by any Subrogation Trust Beneficiary individually or in the Subrogation Trust Beneficiary's capacity as a Subrogation Trust Beneficiary, by the Trustee individually or in the Trustee's capacity as Trustee, by any Member individually or in the Member's capacity as Member, or by any representative, member, partner, shareholder, director, officer, professional, employees, agent, affiliate, or advisor of any Subrogation Trust Beneficiary, any Member, the Trustee, or their respective affiliates.

7.4    Limitation of Liability.  None of the Subrogation Trust Indemnified Parties shall be liable for indirect, punitive, exemplary, consequential, special, or other damages for a breach of this Agreement under any circumstances.

7.5    Burden of Proof.  In making a determination with respect to entitlement to indemnification hereunder, the court, Person, or entity making such determination shall presume that any Subrogation Trust Indemnified Party is entitled to indemnification under this Agreement and any Person or entity seeking to overcome such presumption shall have the burden of proof to overcome that presumption.

## ARTICLE VIII
## TAX MATTERS

8.1    Transfer of Aggregate Subrogation Recovery.  The transfer of the Aggregate Subrogation Recovery to the Subrogation Trust shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use, or other similar tax, pursuant to Section 1146(a) of the Bankruptcy Code.  Pursuant to Section 6.19 of the Plan, the transfer of any equity interest as a component of the Aggregate Subrogation Recovery to the Subrogation Trust shall be exempt from registration requirements under applicable securities laws under Section 1145 of the Bankruptcy Code.

8.2    Tax Reporting.

(a)    The "taxable year" of the Subrogation Trust shall be the "calendar year" as such terms are defined in section 441 of the U.S. Internal Revenue Code of 1986, as amended ("IRC").  The Subrogation Trust shall use the accrual method of accounting as defined in IRC section 446(c).

(b)    The Trustee, acting for this purpose as the administrator (as defined in Treasury Regulations section 1.468B-2(k)) shall (i) obtain an employer identification number for the Subrogation Trust, and (ii) prepare and file, or cause to be prepared and filed, U.S. federal, state, local and foreign tax returns (as applicable) for the Subrogation Trust, consistent with Treasury Regulations section 1.468B-2(k) and corresponding or similar provisions of state and local law, and in accordance with this Section 8.2 and Article 6 of the Plan.

Case 19-30088   Doc# 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 25 of 137

(c)     The Trustee shall also file (or cause to be filed) any other statement, return, or disclosure relating to the Subrogation Trust that is required by any governmental unit, including but not limited to information reporting as described in Treasury Regulations section 1.468B-2(l) (or corresponding or similar provisions of state, local, or foreign law).

(d)     The Trustee shall obtain from the Debtors a statement required pursuant to Treasury Regulations section 1.468B-3(e) no later than February 15th of the year following each calendar year in which Debtors make a transfer to the Subrogation Trust.

(e)     The Trustee shall be responsible for payment, out of the Aggregate Subrogation Recovery, of any taxes imposed on the Subrogation Trust or the Aggregate Subrogation Recovery.

8.3     <u>Withholding of Taxes</u>.  The Trustee shall withhold and pay to the appropriate tax or governmental authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state, or local tax law with respect to any payment or Distribution to the Subrogation Trust Beneficiaries.  All such amounts withheld and paid to the appropriate Tax Authority shall be treated as amounts distributed to such Subrogation Trust Beneficiaries for all purposes of this Agreement.  The Trustee shall be authorized to collect such tax information from the Subrogation Trust Beneficiaries (including social security numbers or other tax identification numbers of such Subrogation Trust Beneficiary) as it, in its sole discretion, deems necessary to effectuate the Plan, the Confirmation Order, and this Agreement.  In order to receive Distributions under the Plan, all Subrogation Trust Beneficiaries will need to identify themselves to the Trustee and provide tax information and the specifics of their holdings, to the extent the Trustee deems appropriate, including a taxpayer identification number ("<u>TIN</u>") as assigned by the IRS or, in the case of Subrogation Trust Beneficiaries that are not United States persons for federal income tax purposes, a properly completed applicable IRS Form W-8 (with required attachments, if any).  This identification requirement may, in certain cases, extend to holders who hold their securities in street name.  The Trustee may refuse to make a Distribution to any Subrogation Trust Beneficiary that fails to furnish such information in a timely fashion, until such information is delivered; <u>provided</u>, <u>however</u>, that, upon the delivery of such information by a Subrogation Trust Beneficiary, the Trustee shall make such Distribution to which the Subrogation Trust Beneficiary is entitled, without interest.

8.4     <u>Expedited Determination of Taxes</u>.  The Trustee may request an expedited determination of taxes of the Subrogation Trust under Section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Subrogation Trust for all taxable periods through the termination of the Subrogation Trust.

8.5     <u>Foreign Tax Matters</u>.  The Trustee shall duly comply on a timely basis with all obligations, and satisfy all liabilities, imposed on the Trustee or the Subrogation Trust under non-United States law relating to taxes.

8.6     <u>Qualified Settlement Fund</u>.  The Parties, Subrogation Trust, and Subrogation Trust Beneficiaries intend that the Subrogation Trust be classified as a "qualified settlement fund" under Treasury Regulations section 1.468B-1 *et seq.* (and corresponding or similar

- 22 -

provisions of state, local, or foreign law, as applicable), and the Trustee may take any action that it determines is necessary to maintain the Subrogation Trust's status as such; provided, however, that the Debtors may elect to treat the Subrogation Trust as a "grantor trust" for U.S. federal income tax purposes, in which case the Parties, Subrogation Trust, and Subrogation Trust Beneficiaries shall be bound by such election notwithstanding anything in this Agreement to the contrary and, to the extent permitted under applicable law, the Subrogation Trust shall be treated consistently for state and local tax purposes.

## ARTICLE IX
## TERMINATION OF SUBROGATION TRUST

9.1     Termination.  The Trust Advisory Board and the Subrogation Trust shall be dissolved at such time as all of the Aggregate Subrogation Recovery including any investment income earned thereon, has been distributed pursuant to the Plan, Confirmation Order, Allocation Agreement, and this Agreement.  If at any time the Trustee determines, in consultation with the Trust Advisory Board and in reliance upon the recommendation of such professionals as the Trustee or Trust Advisory Board may retain, that the expense of administering the Subrogation Trust so as to make a Final Distribution to the Subrogation Trust Beneficiaries is likely to exceed the value of the assets remaining in the Subrogation Trust, the Trustee, with the unanimous consent of the Trust Advisory Board, may (i) reserve any amount necessary to dissolve the Subrogation Trust, (ii) donate any balance to a charitable organization (a) described in section 501(c)(3) of the IRC, (b) exempt from U.S. federal income tax under section 501(a) of the IRC, (c) not a "private foundation," as defined in section 509(a) of the IRC, and (d) that is unrelated to the Debtors, the Subrogation Trust, the Trustee and any insider of the Trustee, and the Members of the Trust Advisory Board, and (iii) dissolve the Subrogation Trust. Such date upon which the Subrogation Trust shall finally be dissolved shall be referred to herein as the "Termination Date."  The Aggregate Subrogation Recovery including any investment income earned thereon shall be distributed in accordance with the Allocation Agreement on or before the Termination Date.  In no event shall the Debtors have any right to refund or reversion with respect to the Aggregate Subrogation Recovery.  The Termination Date shall be no later than the date that is five and one-half years after the Effective Date, provided that the Termination Date may be extended for one year to the date that is six and one-half years after the Effective Date if the Trustee (with the consent of the Trust Advisory Board) determines that such an extension is warranted and such extension is approved by the Bankruptcy Court upon a finding that the extension is necessary to the liquidating purpose of the Subrogation Trust.  Any such extension must be approved by the Bankruptcy Court on or prior to the date on which the Subrogation Trust would otherwise terminate.

9.2     Continuance of Subrogation Trust for Winding Up.  After the termination of the Subrogation Trust and solely for the purpose of liquidating and winding up the affairs of the Subrogation Trust, the Trustee shall continue to act as such until its duties have been fully performed and shall continue to be entitled to receive the fees pursuant to Section 2.2 hereof for a period of time not to exceed three (3) months following the date of termination of the Subrogation Trust.  Upon Distribution of all the Aggregate Subrogation Recovery, the Trustee shall retain the books, records, and files that shall have been delivered or created by the Trustee. At the Trustee's discretion, all of such records and documents may be destroyed no earlier than

- 23 -

two years following the date of Final Distribution of Aggregate Subrogation Recovery as the Trustee deems appropriate (unless such records and documents are necessary to fulfill the Trustee's obligations hereunder). Except as otherwise specifically provided herein, upon the termination of the Subrogation Trust, the Trustee shall have no further duties or obligations hereunder.

# ARTICLE X
## AMENDMENT AND WAIVER

10.1 This Agreement shall be irrevocable; provided, that, the Trustee, with the prior unanimous consent of the Trust Advisory Board, may amend, supplement or waive any provision of this Agreement, in a writing signed by the Trustee, without notice to or the consent of the Subrogation Trust Beneficiaries, or the approval of the Bankruptcy Court; provided, further, no amendment, supplement or waiver of or to this Agreement shall (i) adversely affect the payments and/or Distributions to be made under the Plan, the Allocation Agreement, or this Agreement, or (ii) adversely affect the U.S. federal income tax status of the Subrogation Trust as a "qualified settlement fund". Notwithstanding anything to the contrary, if the Allocation Agreement is amended at any time in writing, this Agreement will be deemed to be amended automatically to incorporate any provisions of the Allocation Agreement that are referenced or incorporated by reference herein.

# ARTICLE XI
## MISCELLANEOUS PROVISIONS

11.1 <u>Limitations on Claim Interests for Securities Law Purposes</u>.

(a) The entitlements of the Subrogation Trust Beneficiaries will not be represented by certificates, securities, receipts or in any other form or manner whatsoever, except as maintained on the books and records of the Subrogation Trust by the Trustee as provided in Section 11.2 herein. The death, incapacity or bankruptcy of any Subrogation Trust Beneficiary during the term of the Subrogation Trust shall not (i) operate to terminate the Subrogation Trust, (ii) entitle the representatives or creditors of the deceased party to an accounting, (iii) entitle the representatives or creditors of the deceased party to take any action in the Bankruptcy Court or elsewhere for the distribution of the Subrogation Trust's assets or for a partition thereof or (iv) otherwise affect the rights and obligations of any of the Subrogation Trust Beneficiaries hereunder.

(b) It is intended that the entitlements of the Subrogation Trust Beneficiaries hereunder shall not constitute "securities." To the extent the entitlements of the Subrogation Trust Beneficiaries hereunder are deemed to be "securities," the issuance of any entitlements hereunder or under the Plan shall be exempt, pursuant to Section 1145 of the Bankruptcy Code, from registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>"), and any applicable state and local laws requiring registration of securities. If the Trustee determines, with the advice of counsel, that the Subrogation Trust is required to comply with registration and/or reporting requirements of the Securities Act, the Securities Exchange Act of 1934, as amended (the "<u>Exchange Act</u>"), the Trust Indenture Act of 1939, as amended (the "<u>Trust</u>

- 24 -

Indenture Act"), or the Investment Company Act of 1940, as amended (the "Investment Company Act"), then the Trustee shall, after consultation with the Trust Advisory Board, take any and all actions to comply with such registration and reporting requirements, if any, and file reports with the Securities and Exchange Commission (the "SEC") to the extent required by applicable law. Notwithstanding the foregoing procedure, nothing herein shall be deemed to preclude the Trust Advisory Board and Trustee from amending this Agreement to make such changes as are deemed necessary or appropriate by the Trustee, with the advice of counsel, to ensure that the Subrogation Trust is not subject to registration and/or reporting requirements of the Securities Act, the Exchange Act, the Trust Indenture Act or the Investment Company Act.

(c) Except as (i) permitted in this Agreement, including Section 4.4, or (ii) as consented to by the Trustee (such consent not to be unreasonably withheld), no transfer of any entitlement of a Subrogation Trust Beneficiary hereunder may be effected or made; provided, that entitlements of Subrogation Trust Beneficiary hereunder and/or under the Plan may be made by operation of law or by will or the laws of descent and distribution.

11.2 **Books and Records**.

(a) <u>Information Retention</u>. The Trustee shall receive, manage, analyze and protect all information provided to it by or on behalf of Subrogation Trust Beneficiaries regarding Subrogation Claims.

(b) <u>General Records</u>. The Trustee, and any professionals or advisors retained by or on behalf of the Trustee or the Subrogation Trust, shall maintain good and sufficient books and records of their work relating to the Subrogation Trust including without limitation, as applicable: (i) the Aggregate Subrogation Recovery and the management thereof; (ii) all transactions undertaken by the Trustee; (iii) all expenses incurred by or on behalf of the Trustee, the Trust Advisory Board, and/or the Subrogation Trust; and (iv) all Distributions to Subrogation Trust Beneficiaries contemplated or effectuated, in each case, in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and in accordance with New York law. Such books and records shall be maintained as reasonably necessary to facilitate compliance with the tax reporting requirements of the Subrogation Trust. Nothing in this Agreement requires the Trustee to file any accounting or seek approval of any court with respect to the administration of the Subrogation Trust or as a condition for making any payment or Distribution out of the Aggregate Subrogation Recovery.

(c) <u>Subrogation Claim Records</u>. The Trustee, and any professionals or advisors retained by or on behalf of the Trustee or the Subrogation Trust, shall maintain good and sufficient books and records as applicable relating to each Subrogation Claim reported to it or asserted against the Debtors pursuant to a proof of claim filed in the Chapter 11 Cases, including without limitation: (i) a copy of any proof of claim filed with respect to such Subrogation Claim, including the amount of any claim asserted thereunder, (ii) a copy of each Distribution Request related to such Subrogation Claim; (iii) the identity of the current owner of each Subrogation Claim, (iv) the identity of former owners of each Subrogation Claim, (v) the disposition of each individual Paid Claim, including whether such Subrogation Claim is a Verified Paid Claim, (vi) the amount and date of all Distributions made on account of each Paid

- 25 -

Claim, and confirmation of such Distributions (*e.g.* copies of checks), and (vii) any documentation submitted by or on or behalf of a Subrogation Trust Beneficiary with respect to such Subrogation Claim.

11.3 <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York (without reference to principles of conflicts of law thereof that would result in the application of law of another jurisdiction).

11.4 <u>Jurisdiction and Waiver of Trial by Jury</u>. The Parties agree that the Bankruptcy Court shall have continuing jurisdiction over any matters concerning or arising out of this Agreement and the Subrogation Claims, including exclusive jurisdiction over disputes arising out of this Agreement or otherwise in connection with the Aggregate Subrogation Recovery. Each Party hereby waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising out of or relating to this Agreement or the transactions contemplated hereby (whether based on contract, tort or any other theory).

11.5 <u>Severability</u>. In the event any provision of this Agreement or the application thereof to any person or circumstances shall be determined by final order to be invalid or unenforceable to any extent, the remainder of this Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

11.6 <u>Notices</u>.

(a) <u>Trustee or Members</u>. Any notice or other communication required or permitted to be made under this Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by facsimile, by electronic communication from a Party or its counsel, or by nationally recognized overnight delivery service or mailed by first-class mail. The date of receipt of such notice shall be the earliest of (i) the date of actual receipt by the receiving Party, (ii) the date of personal delivery (or refusal upon presentation for delivery), (iii) the date of the transmission confirmation, or (iv) three business days after service by first-class mail, to the receiving Party's below address(es):

(i) if to the Trustee, to:

Attn:
E-mail Address:
Address:

(ii) if to a Member of the Trust Advisory Board, to:

[_____]
Attn:

- 26 -

E-mail Address:
Address:

[_____]
Attn:
E-mail Address:
Address:

[_____]
Attn:
E-mail Address:
Address:

(b)     <u>Subrogation Trust Beneficiaries</u>.     Any notices or other communications required or permitted to be made to Subrogation Trust Beneficiaries shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by facsimile, by electronic communication or by nationally recognized overnight delivery service or mailed by first-class mail to the notice address identified on such Subrogation Trust Beneficiary's signature page to the Allocation Agreement or such notice address as may be provided or amended in conjunction with a Distribution Request made by such Subrogation Trust Beneficiary.

11.7     <u>Headings</u>.     The headings contained in this Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Agreement or of any term or provision hereof.

11.8     <u>Entire Agreement</u>.     This Agreement and the exhibits attached hereto contain, and the Allocation Agreement, the Plan, and the Confirmation Order, contain the entire agreement between the Parties and supersede all prior and contemporaneous agreements or understandings between the Parties with respect to the subject matter hereof, <u>provided</u>, <u>that</u>, the Allocation Agreement (as that agreement may be amended from time to time) is incorporated by reference into this Agreement.

11.9     <u>Meanings of Other Terms</u>.     Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa, and words importing persons shall include firms, associations, corporations, and other entities.     All references herein to Articles, Sections, and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the Bankruptcy Rules, or other law, statute, or regulation, refer to the corresponding Articles, Sections, and other subdivisions of this Agreement, and the words "herein," "hereof," or "herewith" and words of similar import refer to this Agreement as a whole and not to any particular Article, Section, or subdivision of this Agreement.     The term "including" shall mean "including, without limitation."

11.10     <u>Counterparts</u>.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute one

- 27 -

and the same instrument. A facsimile or electronic mail signature of any Party shall be considered to have the same binding legal effect as an original signature.

11.11 <u>Conflict</u>. In the event of any conflict between this Agreement and the Allocation Agreement, the Plan, or Confirmation Order, the Allocation Agreement (as that agreement may be amended from time to time) shall control and govern, <u>provided</u>, <u>that</u>, the provisions of Article V hereof shall supersede section 10(c) of the Allocation Agreement, and the provisions of Section 1.2(a) hereof shall supersede section 1(d) of the Allocation Agreement, to the extent of any conflicts.

*[remainder of page left intentionally blank]*

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement or caused this Agreement to be duly executed by their respective officers, representatives, or agents, effective as of the date first above written.

Trust Advisory Board Member[5]

By:_____
Name:
Title:

Trustee

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

---

[5]     All signatures must be notarized.

Case 19-30088   Doc# 7894   Filed 09/07/20   Entered 09/07/20 15:15:02   Page 132 of 137

Trust Advisory Board Member

By:_____
Name:
Title:

Trust Advisory Board Member

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Witness

By:_____
Name:
Title:

Case 19-30088 Doc# 7094 Filed 05/07/20 Entered 05/07/20 15:18:02 Page 149
of 203

Case 19-30088 Doc# 7094 Filed 05/07/20 Entered 05/07/20 06:15:57 Page 34
of 137

## EXHIBIT A TO THE SUBROGATION WILDFIRE TRUST AGREEMENT

1. 2017 North Bay Wildfires
   a. 37
   b. Atlas
   c. Blue
   d. Cascade/LaPorte Complex
   e. Cherokee
   f. Honey
   g. Lobo
   h. Maacama
   i. McCourtney
   j. Nuns Complex (including Adobe, Norrbom, Nuns, Partrick, Pressley, Pythian/ Oakmont)
   k. Pocket
   l. Point
   m. Redwood/Potter Valley Complex
   n. Sullivan
   o. Sulphur
   p. Tubbs

2. 2018 Camp Fire

## EXHIBIT B TO THE SUBROGATION WILDFIRE TRUST AGREEMENT

### Non-Party Objection Procedures

1. **Litigation of Disputed Subrogation Claims**. Any dispute over the amount of a Party's Paid Claims for the purposes of Distributions under the Allocation Agreement will be resolved by the Trustee, after consultation with the Subrogation Trust Advisory Board, in accordance with the terms of the Allocation Agreement and the Trust Agreement. Subrogation Claims held or asserted by Claimholders who are not Parties to the Allocation Agreement shall be Disputed (as defined in the Plan) as of the Effective Date. The Trustee shall be responsible for litigating and/or consensually resolving all Disputed Subrogation Claims of Claimholders who are not Parties to the Allocation Agreement. The Trustee shall not make any Distributions to such Claimholders on account of such Disputed Claims until and unless such Disputed Subrogation Claims become Allowed (as such terms are defined in the Plan).

2. **Settlement of Disputed Subrogation Claims**. The Trustee, after consultation with the Subrogation Trust Advisory Board, may enter into a settlement with any Claimholder to resolve its Disputed Subrogation Claim(s) (a "Settlement"); provided, that if a Claimholder is not a party to the Allocation Agreement as of the Effective Date, such settlement shall not provide for such Claimholder to receive any more than 90% of the aggregate Distributions it would have received on its Paid Claims under the terms of the Allocation Agreement had such Claimholder been a Party to the Allocation Agreement on the Effective Date and received Distributions on its Paid Claims in accordance with the terms of the Allocation Agreement.

3. **Funds Related to Disputed Claims**. The portion of the Aggregate Subrogation Recovery that is required to be reserved under Section 1(c) of the Allocation Agreement for a Claimholder who is not a Party to the Allocation Agreement shall remain in the Subrogation Recovery Reserve until and unless (i) such Disputed Subrogation Claim becomes Disallowed (in which event the reserved amount shall be distributed by the Trustee to the Parties in accordance with Sections 3(b) and 3(c) of the Allocation Agreement), (ii) such Disputed Subrogation Claim is settled as provided in Section 2 of these Objection Procedures (in which case the reserved amount will be distributed as provided in the Settlement); or (iii) the Bankruptcy Court enters a final order pursuant to which the Disputed Subrogation Claim is resolved and all or part of such Disputed Claim becomes Allowed (in which case, the Trustee shall distribute, out of the amount reserved for such Disputed Subrogation Claim, the amount of such Allowed Claim to the Claimholder, and the balance to Parties in accordance with Sections 3(b) and 3(c) of the Allocation Agreement). In the event the Aggregate Subrogation Recovery is lower than $11,000,000,000.00, the holder of a Disputed Subrogation Claim that becomes an Allowed Claim shall have its Distribution calculated by dividing (a) the Aggregate Subrogation Recovery by (b) $11,000,000,000.00, and multiplying such number by the Allowed Claim.

# EXHIBIT C TO THE SUBROGATION WILDFIRE TRUST AGREEMENT

## Form Distribution Request

## Subrogation Trust Beneficiary Distribution Request

In accordance with Section 4.1 of the Subrogation Claims Declaration of Trust, each Subrogation Trust Beneficiary must submit a completed and signed copy of this form prior to any Distribution, along with a completed distribution request attachment (in excel form) ("Distribution Request Attachment 1") together in a .zip file to the Sharefile submission site designated by the Trustee and administered and maintained by Berger Kahn.[6] Parties that have not received an excel copy of Distribution Request Attachment 1 or instructions regarding the Sharefile submission site should contact Sue Muncey at Berger Kahn by phone at (949) 748-4464 or by email at smuncey@bergerkahn.com.

I.    SUBROGATION TRUST BENEFICIARY DISTRIBUTION REQUEST

A. Date of submission: _____

B. Name of creditor: _____

C. Name of insurance carrier(s) (if different from creditor listed above): _____
   _____

D. Contact information regarding this submission:

   i.     Law Firm/Company (if applicable): _____

   ii.    Relationship to creditor listed above: _____

   iii.   Name: _____

   iv.    Email: _____

   v.     Telephone: _____

E. Total Paid Claims/Indemnity Payments Made that are being submitted for payment in this distribution request:[7] $_____

F. Total open reserves as of this distribution request:[8] $_____

G. Do any of the claims on the attached Distribution Request Attachment 1 arise from a contract providing payments to insurance carriers (*i.e.* reinsurance payments)?

---

[6]      Capitalized terms not otherwise defined shall have the meanings provided to such terms in the Subrogation Claims Declaration of Trust.

[7]      This figure should equal the sum of all entries in Column X on the Distribution Request Attachment.

[8]      This figure should equal the sum of all entries in Column Y on the Distribution Request Attachment.

Yes [ ]        No [ ]

 a. If you checked yes to Question G above, has the original underlying insurer that made payments to or on behalf of insureds directly or indirectly assigned the claims listed on the attached Distribution Request Attachment 1 to the creditor?

  Yes [ ]        No [ ]

 b. Please provide the name(s) of the original underlying insurers.[9] _____

 c. Please identify the individual claims for which you checked yes to Question G above. [10] _____

H. Date of last distribution request submission by this creditor: _____

## II. DISTRIBUTION REQUEST ATTACHMENT 1 INSTRUCTIONS

A. **Column A (Unique Tracker Number)**: The Trustee shall assign a unique tracker number for each Subrogation Claim submitted for payment to the Trustee.

B. **Column G (Responsible Fire)**: The Responsible Fire will reflect the Affected Zone in which the Loss Location Address maps in accordance with the Affected Zones set forth in Exhibit D to the Subrogation Claims Declaration of Trust.

C. **Column I (Cause of Loss)**: Response to this column may be a single word such as "Wildfire", "Fire", "Smoke" or "Evacuation"  If the Cause of Loss is not clearly identifiable as associated with a wildfire event (*e.g.,* "Other" or "Miscellaneous"), the Subrogation Trust Beneficiary shall be asked to submit additional information to confirm that the cause of loss is associated with a Wildfire.

D. **Columns L–O (collectively, "Loss Location Address")**: The Loss Location Address shall include the complete street address, city, state and zip code, if available.  If no street address is available, an alternate form of geolocation for the loss location can be provided so that the actual location of the loss can be ascertained (*e.g.* latitude and longitude, parcel number, or cross-streets).  If a claim involves more than one physical location, all relevant addresses related to the claim shall be provided.  Auto losses submitted without a full street address shall include alternate information such as city, date and cause of loss for confirmation.

E. **Column T (Indemnity Payment from Other Insurance Coverage)**: Indemnity payments provided for in this column must be different from the payments listed in Columns P—S and be made on account of the insurance policies described in Column U.

---

[9] Please provide a schedule of original underlying insurers.
[10] Please provide a schedule of underlying claims.

F. **Column U (Other Insurance Coverage Description)**: Response to this column should include the type of insurance policy under which the indemnity payment was paid (*e.g.*, mortgage insurance).

G. **Column V (Salvage Recovered)**: Provide answer of $0 if no salvage has been recovered with respect to indemnity payments. Provide answer of a *negative* number if salvage has been recovered. Answer can be provided on an aggregate basis and need not be broken down by associated coverage types.

H. **Column W** (Voluntarily Refunded Deductibles): Answer can be provided on an aggregate basis and need not be broken down by associated coverage types.

I. **Column X** (Total Paid Claim Submitted/Indemnity Paid): This column should equal the sum of the indemnity payments provided in a row (Columns P–T), *less* Salvage Recovered (Column V), *less* Voluntarily Refunded Deductibles (Column W).

*[continue to next page]*

III.    **WIRE INSTRUCTIONS FOR SUBROGATION TRUST BENEFICIARY DISTRIBUTIONS**

A.  Name of Recipient:    _____

B.  Name of Bank:    _____

C.  ABA:    _____

D.  Account Number:    _____

E.  Attention To:    _____

F.  Details:    _____


IV.    **VERIFICATION BY AUTHORIZED AGENT OF THE SUBROGATION TRUST BENEFICIARY**

By signing below and submitting the data in the attached Distribution Request Attachment 1, I verify to the best of my knowledge that the values set forth in Column X of the attached are "Paid Claims" as defined in the Subrogation Claims Declaration of Trust (copied below) and have been submitted following my review of the Subrogation Claims Review Protocol:

> "Paid Claims" shall mean payments and legally recoverable expenses made to or on behalf of insureds in connection with the Wildfires and the insuring agreement between a Claimholder (as defined in the Allocation Agreement) or Assignor Insurer and its insured, but not including payments of any personal injury or death claims, non-recoverable expenses (including deductibles voluntarily refunded), damages unrelated to the Wildfires and/or arising from the insurer's negligence or bad faith. For the avoidance of doubt, Paid Claims shall also include payments and recoverable expenses made by a holder of Subrogation Claims to or for the benefit of insureds in connection with Wildfires required by California law as a result of an insurer's insolvency.


Signed:    _____

Name Print:    _____

Relationship to the Creditor:    _____

**PG&E Subrogation Trust:  Distribution Request Attachment 1**

Carrier:

Carrier Tracker

POC #

**PG&E Subrogation Trust:  Distribution Request Attachment 1**

| Unique Tracker Number | Insurance Underwriting Company | Insurance Claim No. | Insurance Policy No. | Date of Loss | Line of Business (Auto, Commercial, Homeowners) | Responsible Fire |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Status (Open/Closed) | Cause of Loss | Last Name | LOSS LOCATION ADDRESS | | |
|---|---|---|---|---|---|
| | | | First Name | Loss Location Street | Loss Location City |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Loss Location State | Loss Location Zip Code | CATEGORIES OF INDEMNIT | | |
|---|---|---|---|---|
| | | Building / Appurtenant Structure / Debris Removal | Contents / Business Personal Property / Debris Removal | Added Living Expense / Business Interruption, Loss of Use/Rent |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

| Auto / Rental / Loss of Use / Tow / Storage | Indemnity Payment from Other Insurance Coverage | Other Insurance Coverage Description | Salvage Recovered | Voluntarily Refunded Deductibles | Total Paid Claim Submitted/ Indemnity Paid |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

| Unpaid Case Reserves (claim by claim using statutory accounting) | Additional Notes or Information by Submitting Party | INITIAL DATA RE | |
|---|---|---|---|
| | | Claim Approved for Recovery under Trust Agreement?  Yes / No / Partial | If Claim Not Approved, Short Explanation  [Date out of Range; Location not confirmed in Fire Zone; Incorrect Fire Designation; Other] |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| REVIEW RESPONSE AND PAYMENT CALCULATIONS | | |
|---|---|---|
| **Dollar Amount Subtracted from Recovery Per Allocation Agreement This Submission** | **Total Approved Recovery Per Claim** | **Additional Reviewer Comments** |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

<u>**EXHIBIT D TO THE SUBROGATION WILDFIRE TRUST AGREEMENT**</u>

**Subrogation Claims Review Protocol**

**Exhibit D to the Subrogation Claims Declaration of Trust ("Trust Agreement")**
**Subrogation Claim Review Protocol**

**A.  Submission of Required Data**

- In order to submit a distribution request for payment from the Subrogation Trust,[1] each Subrogation Trust Beneficiary shall submit its Subrogation Claims data in accordance with the Distribution Request Form attached to the Trust Agreement as Exhibit C ("**Distribution Request**").[2]
- A separate Distribution Request must be submitted for each insurer or each carrier group as applicable.[3]
- Each Subrogation Trust Beneficiary's Distribution Request shall provide the following data in the appropriate columns (as applicable) for each claim:

    1. Tracker number
    2. Insurance Company
    3. Insurance Claim Number
    4. Insurance Policy Number
    5. Date of Loss
    6. Line of Business (Auto, Commercial, Homeowners)
    7. Responsible Fire
    8. File Status (Open/Closed)
    9. Cause of Loss (Fire/Smoke/Evacuation)[4]
    10. Insured Last & First Name
    11. Loss Location Address
    12. Loss Location City
    13. Loss Location State
    14. Loss Location Zip Code
    15. Building/Appurtenant Structure/Debris Removal[5] Indemnity Payment
    16. Contents/ Business Personal Property/Debris Removal Indemnity Payment
    17. Additional Living Expense/Business Interruption/Loss of Use/Rent Indemnity Payment
    18. Auto/Rental/Loss of Use/Tow/Storage Indemnity Payment
    19. Other Indemnity Payment[6]
    20. Other Indemnity Payment Description

---

[1] Capitalized terms not otherwise defined shall have the meaning provided to them in the Trust Agreement.

[2] Any submitted Distribution Request will require the signature of an authorized agent of the Subrogation Trust Beneficiary.

[3] For the avoidance of doubt, any Subrogation Trust Beneficiary that has purchased interests in Subrogation Claims from multiple Assignor Insurers shall not be considered a single insurer or carrier group.

[4] Any Subrogation Trust Beneficiary submitting a Subrogation Claim for payment from the Subrogation Trust must take additional steps to check any causes of loss that are not clearly fire-related and to include in the column labeled "Additional Notes or Information by Submitting Party" how and why such Subrogation Claim falls under a covered wildfire and meets the definition of a "Paid Claim" according to the Allocation Agreement.

[5] Debris removal indemnity can be found in either building or contents coverage categories.  Berger Kahn will work with individual Subrogation Trust Beneficiaries to reconcile any questions Berger Kahn has with respect to the categorization of indemnity payments submitted.

[6] Any amounts listed in the "Other Indemnity Payment" column will require an explanation in the "Other Indemnity Payment Description" column as to what the "other" coverage is and the basis for that payment.

21. Salvage Recovered and Other Credits
22. Voluntarily Refunded Deductibles
23. Total Paid Claim Submitted/Indemnity Paid
24. Unpaid Case Reserves (using statutory accounting)
25. Additional Notes or Information by Submitting Party

- Categories 21 (Salvage Recovered and Other Credits) and 22 (Voluntarily Refunded Deductibles) can be reported on an aggregate basis and need not be broken down by associated coverage types. If Salvage Recovered and Voluntarily Refunded Deductibles are reported on an aggregate basis, then the figures provided in the coverage breakdown categories (Categories 15-19) may reflect amounts for Salvage Recovered and Voluntarily Refunded Deductibles but is required to be noted.
- The insurer or carrier group shall not include or otherwise report unallocated "bulk" reserves and provision for claims incurred but not reported (commonly referred to as pure IBNR) in its Distribution Request(s) and the Subrogation Trust will not hold back for such amounts. For the avoidance of doubt, any Subrogation Claims that are accounted for as IBNR or bulk reserves and thereafter mature into a Paid Claim may be submitted to the Subrogation Trust for payment in subsequent Distribution Requests.
- For the avoidance of doubt, Unpaid Case Reserves for known/reported Subrogation Claims in the latest Distribution Requests for each insurer or carrier group will be used for the purposes of determining Reserved Claims in the Allocation Agreement. Amounts reported for Unpaid Case Reserves will 1) be consistent with statutory accounting reporting, 2) exclude any reserves in relation to IBNR, and 3) exclude any unallocated "bulk" reserves.
- Initial Reviews, Level One Reviews, and Level Two Reviews (each as defined and described below) may all be completed in advance of the Effective Date for any Subrogation Trust Beneficiary that voluntarily elects to submit their Subrogation Claims for Initial Review by uploading its Distribution Request via file transfer protocol ("**FTP**") to Berger Kahn on or after April 1, 2020 and prior to May 15, 2020. In such case, the Distribution Request shall be submitted to the Trustee and the Trustee shall notify the Subrogation Trust Beneficiary of the Results of the Initial Review, and if applicable, the Level One Review and Level Two Review by promptly delivering a report to the such Subrogation Trust Beneficiary following the Trustee's receipt of the report.

**B. Initial Review of Spreadsheet Data Performed by Berger Kahn**

- Initial Distribution Requests shall be uploaded via FTP to Berger Kahn.
- Upon submission of the Distribution Request, Berger Kahn shall review all the data provided and notify the Subrogation Trust Beneficiary as quickly as practicable of any identified issues with the reported data ("**Initial Review**").
- The purpose of the Initial Review is to identify any problems on the face of the reported data, such as whether the Subrogation Claims submitted are associated with the correct Wildfire, Affected Zone and Date of Loss Range, including administrative mistakes (*i.e.* data entry typos/errors) and irregular, unexplained, or extraordinary development of Paid Claims over time on previously Reserved Claims.[7]

---

[7] For the avoidance of doubt, the omission of a response to various data fields in the Distribution Request will not be a *per se* reason for invalidating a Subrogation Claim.

- The Initial Review shall also identify and flag any claims that do not fit the Plan's definition of Subrogation Wildfire Claim, *i.e.* claims that do not arise in connection with payments made or to be made by the applicable insurer to insured tort victims, such as claims of any Governmental Unit (as defined in section 101(27) of the Bankruptcy Code, or any claim asserting direct personal injury, regardless of whether the claimant is an insured and has received or will receive a recovery from their insurer. Such claims shall be referred to the Trustee and Trust Advisory Board who will determine collectively how to contest such claims.
- The Trustee shall notify the Subrogation Trust Beneficiary of the results of the Initial Review by promptly delivering a report to such Subrogation Trust Beneficiary following the Initial Review.
- If any inaccuracies are identified, the Subrogation Trust Beneficiary shall have an opportunity to revise its Distribution Request before submitting to the Trustee.
- Once the revised Distribution Request is submitted to the Trustee, Berger Kahn shall advise the Trustee of any problematic Subrogation Claims identified in the Initial Review that have not been omitted or corrected ("**Flagged Initial Review Claims**"), and the revised Distribution Request shall move to a Level One Review detailed in Section C below.
- Following the Initial Review, and before the Distribution Request completes subsequent levels of review, the Trustee shall be authorized to distribute 75% of the distribution the Subrogation Trust Beneficiary would be entitled to under the Allocation Agreement on account of Subrogation Claims included in a Distribution Request that pass the Initial Review and are not Flagged Initial Review Claims (the "**Advance Distribution**"). The Trustee shall act as quickly as practicable to distribute the Advance Distribution, unless the Trustee determines that good cause exists to withhold all or any portion thereof. The Advance Distribution shall be made on the date of the Initial Distribution (as soon as reasonably practicable after the Effective Date) to any Subrogation Trust Beneficiary that voluntarily elects to submit its Subrogation Claims for Initial Review by uploading its Distribution Request via FTP to Berger Kahn prior to [May 15], 2020.
- The Trustee shall oversee the Initial Review process, including by working to resolve any disagreement between the Subrogation Trust Beneficiary and Berger Kahn regarding designation of a Flagged Initial Review Claim. To the extent necessary, the Trustee is authorized to retain additional professionals to review and provide recommendations regarding Berger Kahn's performance and work product.

C. **Level One Claims Files Review by SRC (30 days) -- ("Level One Review")**

*I. Level One Claims Selection and Review*

- The Level One Review shall be performed by the members of the subrogation review committee ("**Subrogation Review Committee**" or "**SRC**").
- The purpose of the Level One Review is to identify systemic issues resulting in payments that do not fall within the definition of "Paid Claims"[8] as defined by the Allocation Agreement.

---

[8] "Paid Claims," as such term is used herein, means payments and legally recoverable expenses made to or on behalf of insureds in connection with the Wildfires and the insuring agreement between a Claimholder or Assignor Insurer and its insured, but not including payments of any personal injury or death claims, non-recoverable expenses (including deductibles voluntarily refunded), damages unrelated to the Wildfires and/or arising from the insurer's negligence or bad faith. For the avoidance of doubt, Paid Claims shall also include payments and

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:18:02   Page 145
of 203

- The Level One Review shall include a review of 15 Subrogation Claims files[9] selected by the reviewing member of the SRC from the Distribution Request consisting of:
  - 5 claims files with indemnity payments equal to or exceeding $100,000 (or all such claims, if any, if the Distribution Request contains fewer than five such claims);
  - 2 auto claims files (or all such claims, if any, if the Distribution Request contains less than 2 such claims); and
  - 8-15 claims files of any type or size (depending on applicability of the two above categories).
- In addition to the 15 Subrogation Claims files described above, the Level One Review shall also include a review of (i) any Subrogation Claims files with indemnity payments exceeding $15,000,000 and (ii) any Flagged Initial Review Claims in the revised Distribution Request submitted to the Trustee.
- The Trustee shall notify the Subrogation Trust Beneficiary which Subrogation Claims have been selected for review, and the Subrogation Trust Beneficiary shall promptly collect the applicable files and deliver them to the Trust for Level One Review.
- Each Subrogation Trust Beneficiary's Level One Review shall be conducted by one of the following six law firms on the SRC, each of which shall commence Level One Reviews prior to the Effective Date and be retained by the Trustee following the Effective Date: (i) Berger Kahn, ALC, (ii) Grotefeld Hoffman, (iii) Cozen O'Connor P.C., (iv) Baumann Loewe Witt & Maxwell, PLLC, (v) Law Offices of Shawn Caine, A.P.C., and (vi) Schroeder Loscotoff Stevens LLP.[10]
  - For purposes of a Level One Review, no claim file will be reviewed by any member of the SRC who also represents the Subrogation Trust Beneficiary with respect to any Subrogation Claims.
  - To the extent each of the six above law firms represents the Subrogation Trust Beneficiary with respect to Subrogation Claims, then the Trustee may select one of the six firms or retain one or more additional law firms, as contemplated in Footnote 11, to conduct the Level One Review.
- The SRC will complete the Level One Review within 30 days of receipt of the claim files being delivered to the SRC member conducting the review.

_II. Satisfying Level One Review_

- To pass the Level One Review, the Subrogation Claims files reviewed must support the aggregate Paid Claims of the selected Subrogation Claims with an accuracy of 99% or higher,[11]

---

recoverable expenses made by a Claimholder to or for the benefit of insureds in connection with Wildfires required by California law as a result of an insurer's insolvency.

[9] To the extent a Subrogation Trust Beneficiary submits a Distribution Request of less than 25 Subrogation Claims, the Level One Review shall consist of 60% of all Subrogation Claims associated with such Distribution Request, and the Level Two Review shall review the remainder.

[10] The SRC law firms shall perform the Subrogation Claims files reviews contemplated hereunder at no charge to the Subrogation Trust; provided however, for each Subrogation Claims file reviewed by an SRC law firm in excess of 875 files, the SRC law firm shall be compensated from the Subrogation Trust in the amount of $200 per file reviewed. The Trustee may but is not required to retain additional law firms with experience in large property subrogation work to serve on the SRC and review Subrogation Claims files pursuant to this protocol, including the following firms: (i) Jang & Associates, LLP, (ii) Stutman Law, (iii) Butler, Weihmuller Katz Craig LLP, and (iv) such other firm(s) as may be identified by the Trustee in consultation with the Trust Advisory Board.

[11] The aggregate amount of all Paid Claims selected for review as reflected on a Distribution Request must be less than 101% of the aggregate Paid Claim amount as determined based on the review of the selected individual

and, after removal of any claims with Isolated Errors (defined below), none of the Subrogation Claims files reviewed may exhibit any of the potentially systemic issues identified below.

- The task of the SRC will be to specifically confirm that the following payments are not improperly submitted as a Paid Claim.

1. **Non-Wildfire Claims** – Claims made for insured losses that were not incurred as a result of one of the Wildfires enumerated on Exhibit A of the Trust Agreement and specified geographically on Exhibit E of the Trust Agreement.[12]

2. **Loss Adjustment Expenses ("LAE")** – Expenses incurred to adjust the claim. These are business expenses paid by the insurer that are related to the cost of doing business and adjusting the claim and not payments made to or on behalf of an insured as part of the indemnity owed by the insurer.

3. **Voluntary Deductible Refunds** – Partial or full refunds of deductibles to insureds which are improperly categorized as indemnity payments.  A refunded deductible is properly characterized as an indemnity payment (and therefore recoverable) if: (a) it is refunded (or "absorbed") because the loss exceeded applicable policy limits; or (b) it is refunded pursuant to a policy provision or endorsement.

4. **Extra-Contractual Payments** – Payments by any carrier made outside of its contractual obligations under the insurance policy to resolve allegations of negligence or bad faith on the part of the insurer.  These are payments that are not associated with any of the coverages owed under the underlying insurance policy, but are explicitly payments to resolve allegations regarding the actions of the insurer.[13]  "Extra-contractual" must be interpreted narrowly to cover exceptional payments to resolve bad faith claims, and specifically does not include ordinary course indemnity payment adjustments.

5. **Net Salvage Proceeds** – Salvage proceeds received by an insurer that were not appropriately accounted for by a reduction of the paid indemnity being claimed in the Distribution Request.

6. **Voluntary Payments Not Recoverable in Subrogation** – These are any other voluntary payments[14] to an insured or non-insured that do not present a colorable argument of coverage.[15]

---

Subrogation Claim files.  When reviewing the Paid Claim amount based on individual Subrogation Claim files reviewed, the SRC and Third-Party Reviewer (defined below) are instructed to perform their review in a commercially reasonable manner.

[12] These geographic areas were developed by the use of qualified fire behavior and spread consultants and approved by the Subrogation Ad Hoc Steering Committee.

[13] The existence of payments related to a settlement or litigation involving allegations of negligence or bad faith will not be deemed, ipso facto, to be extracontractual or voluntary unless the payments are not tethered to any of the coverages owed under the policy and, rather, additional payments for the sole purpose of satisfying a claim of negligence and/or bad faith on the part of the insurer.

[14] *See* footnote 13.

[15] It is not the intent of the reviewers to determine if a Subrogation Claim was overpaid or could have been reduced pursuant to the terms or interpretation of the policy, but rather generally subject to equitable subrogation.

7. **Confirmation of Paid Claims Submitted/Indemnity Paid** — Confirm that Total Paid Claims Submitted/Indemnity Paid provided in the Distribution Request reconciles with the payments reported in the reviewed Subrogation Claims files.

8. **Confirmation of Fire Classification** — Confirm that the "Responsible Fire" provided in the Distribution Request reconciles with the loss address in the claim file.

- For the avoidance of doubt, the SRC is not tasked with (i) confirming or assessing whether the correct amount of indemnity payments were made under the terms of an applicable insurance policy, or (ii) assessing the extent to which the Debtors could assert legal defenses against such Subrogation Claims (*e.g.* defenses under the anti-subrogation rule doctrine).
- When the reviewer identifies any of the potentially systemic errors enumerated above, the reviewer shall notify the applicable Subrogation Trust Beneficiary of the issue identified and the applicable Subrogation Trust Beneficiary shall have a reasonable time to respond and explain why the identified error does not indicate a systemic issue with its Distribution Request.  If the reviewer determines, in the reviewer's discretion, that the issue identified does not a indicate a systemic issue with the Distribution Request, the reviewer shall recommend to the Trustee that such Subrogation Claim be deemed an "**Isolated Error**."  Isolated Errors may include (but are not limited to):
  - o (a) administrative mistakes (*i.e.* data entry typos/errors), including with respect to the Responsible Fire and amount of the Paid Claim submitted;
  - o (b) insured losses arising from an electrical fire, toaster fire, auto accident, personal injury, or wind damage unrelated to the applicable Wildfire[16]; and
  - o (c) the inclusion of LAE, voluntary deductible refunds, salvage proceeds, extra-contractual payments and/or payments not recoverable in subrogation, in an isolated claim when the Subrogation Trust Beneficiary can explain (to the reviewer's and Trustee's satisfaction) why such inclusion was an isolated issue and does not indicate a systemic issue.
- The Trustee may (but is not required to) consult with the Trust Advisory Board in reviewing the referred Subrogation Claim to determine whether it constitutes an Isolated Error.  If the Trustee agrees that the referred Subrogation Claim is an Isolated Error, the Subrogation Trust Beneficiary shall have the option to remove such claim from its Distribution Request or fix the identified Isolated Error.  If the referred claim is removed (or if the reviewer determines that review of an additional claim will help confirm the issue identified is not systemic), the reviewer shall select another Subrogation Claim from the Distribution Request, and complete the review as if the removed Subrogation Claim was not part of the initial selection.  When selecting another Subrogation Claim from the Distribution Request, the reviewer may impose reasonable parameters on the replacement Subrogation Claim file to be reviewed.  This procedure shall be referred to herein as the "**Isolated Error Procedure**," and shall be available in the Level One Review, the 30-Claim Level One Review, the Level Two Review, and the Level Three Review.

*III. Next Steps Following Level One Review*

- The Trustee shall notify the Subrogation Trust Beneficiary of the results of the Level One Review by promptly delivering a report to such Subrogation Trust Beneficiary following the Level One Review.

---
[16] The list of examples is not intended to be exhaustive.

- If a Distribution Request passes a Level One Review, the Distribution Request shall move to a Level Two Review detailed in Section D below.
- If a Distribution Request fails to pass the Level One Review, the SRC representative that identified any issues shall notify the Subrogation Trust Beneficiary and explain the reasons for such failure.
- The Subrogation Trust Beneficiary shall have the option to address any such issues, and resubmit the Distribution Request for a second Level One Review; provided, such review shall include: (a) any Subrogation Claims identified by the SRC as problematic in the initial Level One Review, and (b) at least thirty (30) Subrogation Claims files selected by the reviewing member of the SRC independently from the initial Distribution Request (using the same selection criteria noted above multiplied by 2) (a "**30-Claim Level One Review**").[17]  The 30-Claim Level One Review Shall be completed within forty-five (45) days of submission.
- Re-submitted Distribution Requests that pass a 30-Claim Level One Review move to a Level Two Review detailed in Section D below.
- Re-submitted Distribution Requests that fail a 30-Claim Level One Review shall move to a Level Three Review detailed in Section E below.
- Before the Distribution Request proceeds to the subsequent review the Subrogation Trust Beneficiary may appeal the SRC's determinations to the Trustee and the Trust Advisory Board, sitting together, which shall have the right to overrule the SRC's determinations by unanimous consent.  If the Trustee and the Trust Advisory Board decline to overrule the SRC, the Distribution Request shall proceed to the subsequent review as set forth above.

## D.  Level Two Claims Files Review by Third-Party Reviewer (14 Days) – ("Level Two Review")

### I.  Level Two Claims Selection and Review

- The Level Two Review shall be performed by a third party claims reviewer ("**Third-Party Reviewer**").[18]  To facilitate Distributions being made to Subrogation Trust Beneficiaries as soon as reasonably practicable after the Effective Date, the Ad Hoc Subrogation Group (or counsel to the Ad Hoc Subrogation Group) may retain the Third-Party Claims Reviewer in advance of the Effective Date.  Following the Effective Date, the same Third-Party Claims Reviewer shall be retained by the Trustee.
- The purpose of the Level Two Review is to identify systemic issues resulting in payments that do not fall within the definition of "Paid Claims" as defined by the Allocation Agreement.
- The Third-Party Reviewer shall select and review the claims files of 10 Subrogation Claims listed in the Distribution Request, each of which shall be independently selected and shall not include those reviewed by the SRC in connection with the Level One Review and/or the 30-Claim Level One Review.[19]

---

[17] To the extent a Subrogation Trust Beneficiary elects a 30-Claim Level One Review and there are fewer than 30 Subrogation Claims remaining in the Distribution Request that were not reviewed during Level One Review, the 30-Claim Level One Review shall consist of 60% of all un-reviewed Subrogation Claims associated with such Distribution Request, and the Level Two Review shall review the remainder.

[18] The Trustee and Trust Advisory Board shall have the authority to monitor the performance and internal procedures of the Third-Party Reviewer including ensuring that the Subrogation Claims file reviews are efficient, completed in a timely fashion and limited to the parameters set forth in Section C.II hereof.

[19] To the extent the applicable Distribution Request contains fewer than 10 un-reviewed Subrogation Claims, the Level Two Review shall review each Subrogation Claim not previously reviewed.

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 54
of 137

- The Trustee shall notify the Subrogation Trust Beneficiary which Subrogation Claims have been selected for review, and the Subrogation Trust Beneficiary shall promptly collect the applicable files and deliver them to the Subrogation Trust for Level Two Review.
- The Third Party Reviewer will complete the Level Two Review within 14 days of receipt of the claim files being delivered to the Subrogation Trust.
- To pass the Level Two Review, the Subrogation Claims files reviewed must support the aggregate Paid Claims of the selected Subrogation Claims with an accuracy of 99% or higher, and none of the Subrogation Claims files reviewed may exhibit any of the systemic issues identified in Section C.II above.
- The Third-Party Reviewer will use the same criteria as the SRC pursuant to Section C.II to confirm that the payments are properly submitted as a Paid Claim, including the Isolated Error Procedure.

*II. Next Steps Following Level Two Review*

- The Trustee shall notify the Subrogation Trust Beneficiary of the results of the Level Two Review by promptly delivering a report to such Subrogation Trust Beneficiary following the Level Two Review.
- If a Distribution Request passes the Level Two Review, the submission will be referred to the Trustee for payment pursuant to the Allocation Agreement of the remaining amount not already paid pursuant to Section B.
- If a Distribution Request fails the Level Two Review, the Trustee shall notify the Subrogation Trust Beneficiary and explain the reasons for such failure.
    - o Distribution Requests failing the Level Two Review that never failed any other review shall have the option to address any identified issues, and resubmit the Distribution Request for a 30-Claim Level One Review.
    - o Distribution Requests failing the Level Two Review that previously failed any other review, shall move to a Level Three Review detailed in Section E below.
    - o Before the Distribution Request proceeds to the subsequent review the Subrogation Trust Beneficiary may appeal the Third-Party Claims Reviewer's determinations to the Trustee and the Trust Advisory Board, sitting together, which shall have the right to overrule the Third-Party Claims Reviewer's determinations by unanimous consent. If the Trustee and the Trust Advisory Board decline to overrule the Third Party Claims Reviewer, the Distribution Request shall proceed to the subsequent review as set forth above.

**E. Level Three Claims Files Review by Third-Party Reviewer (60 Days) – ("Level Three Review")**

*I. Level Three Claims Selection and Review*

- The Level Three Review shall be performed by the Third-Party Reviewer.
- The purpose of the Level Three Review is to identify systemic issues resulting in payments that do not fall within the definition of "Paid Claims" as defined by the Allocation Agreement.
- The Third-Party Reviewer shall (a) review the claims files for any Subrogation Claims identified by the SRC as problematic and not removed from the Distribution Request, and (b) select and review the claims files of 50 Subrogation Claims listed in the Distribution Request, each of which

Case 19-30088 Doc #7094 Filed 09/07/20 Entered 09/07/20 15:18:02 Page 55 of 137

shall be independently selected from the Distribution Request and shall not include those reviewed in any prior reviews.[20]

- The Trustee shall notify the Subrogation Trust Beneficiary which Subrogation Claims have been selected for review, and the Subrogation Trust Beneficiary shall promptly collect the applicable files and deliver them to the Subrogation Trust for Level Three Review.
- The Third Party Reviewer will complete the Level Three Review within 60 days of receipt of the claim files being delivered to the Subrogation Trust.
- To pass the Level Three Review, the Subrogation Claims files reviewed must support the aggregate Paid Claims of the selected Subrogation Claims with an accuracy of 99% or higher, and none of the Subrogation Claims files reviewed may exhibit any of the systemic issues identified in Section C.II above.
- The Third-Party Reviewer will use the same criteria as the SRC pursuant to Section C.II to confirm that the payments are properly submitted as a Paid Claim, including the Isolated Error Procedure.

*II. Next Steps Following Level Three Review*

- The Trustee shall notify the Subrogation Trust Beneficiary of the results of the Level Three Review by promptly delivering a report to such Subrogation Trust Beneficiary following the Level Three Review.
- If a Distribution Request passes a Level Three Review, the submission will be referred to the Trustee for payment pursuant to the Allocation Agreement of the remaining amount not already paid, pursuant to Section B.
- If a Distribution Request fails a Level Three Review, the Distribution Request shall move to a Level Four Review detailed in Section F below; provided, that if the Trustee believes a Subrogation Trust Beneficiary has reconciled or will reconcile a systemic error in advance of a Level Four Review, then in the Trustee's sole discretion, it may refer the Subrogation Trust Beneficiary to a 30-Claim Level One Review, or delay the start of the Level Four Review.
- Before the Distribution Request proceeds to the Level Four Review the Subrogation Trust Beneficiary may appeal the Third-Party Claims Reviewer's determinations to the Trustee and the Trust Advisory Board, sitting together, which shall have the right to overrule the Third-Party Claims Reviewer's determinations by unanimous consent. If the Trustee and the Trust Advisory Board decline to overrule the Third Party Claims Reviewer, the Distribution Request shall proceed to the Level Four Review.

## F. Level Four Claims Files Review – 100% Review by Third-Party Reviewer (3 Months) ("Level Four Review")

*I. Level Four Claims Review*

- The Level Four Review shall be performed by the Third-Party Reviewer.
- The purpose of the Level Four Review is to review the claim file of each Subrogation Claim submitted in the Distribution Request to identify (a) payments that do not fall within the definition of "Paid Claims" as defined by the Allocation Agreement, (b) administrative mistakes (*i.e.* data entry typos/errors), and (c) any other Isolated Errors.

---

[20] To the extent the applicable Distribution Request contains fewer than 50 un-reviewed Subrogation Claims, the Level Three Review shall review each Subrogation Claim not previously reviewed.

Case 19-30088 Doc #7094 Filed 09/07/20 Entered 09/07/20 15:15:02 Page 56 of 137

- The Third-Party Reviewer will use the same criteria as the SRC pursuant to Section C.II to confirm that the payments are properly submitted as a Paid Claim.
- The Subrogation Trust shall be authorized to charge any Subrogation Trust Beneficiary whose Subrogation Claims are subject to a Level Four Review [$200 per claim file reviewed].[21] The Subrogation Trust may recoup such costs by reducing Distributions to such Subrogation Trust Beneficiary.
- The Third-Party Reviewer shall have 3 months to review Subrogation Claims subject to the Level Four Review.

*II.  Next Steps Following Level Four Review*

- The Third-Party Reviewer shall make a recommendation to the Trustee that sets forth (a) which Subrogation Claims are Verified Paid Claims, and (b) to the extent a Subrogation Claim is deficient, the determination as to the corrected amount of such claim (which may be $0).
- The Trustee shall notify the Subrogation Trust Beneficiary of the results of the Level Four Review by promptly delivering a report to such Subrogation Trust Beneficiary following the Level Four Review ("Level Four Report").
- Upon receipt of the Level Four Report, the Subrogation Trust Beneficiary shall then have the right to dispute any Subrogation Claim determinations in accordance with the Disputed Claim Procedures set forth in Article V of the Trust Agreement.

**G.      Subsequently Submitted Claims/Miscellaneous**

- In advance of each quarterly Distribution, the Trustee shall send a Distribution Notice to the applicable Subrogation Trust Beneficiary detailing the amount such Subrogation Trust Beneficiary will be paid on the subsequent distribution date in accordance with the Allocation Agreement.
- To perform the calculations necessary to make any Distribution in accordance with the Allocation Agreement (including the Initial Distribution), the Trust shall use the Paid Claims and Reserved Claims data most recently submitted to the Trustee prior to the applicable Reporting Deadline, which may be data submitted with the proof of claim form for Subrogation Trust Beneficiaries that have yet to submit a Distribution Request to the Trust.
- If a Subrogation Trust Beneficiary who has submitted a Distribution Request on behalf of an individual insurer or carrier group (as applicable) which has satisfied either a Level Two Review or a Level Three Review, submits new Subrogation Claims to the Subrogation Trust for payment on behalf of the same insurer or carrier group, such Subrogation Claims shall be: (i) subject to only an Initial Review if the cumulative amount of new Subrogation Claims is less than 0.5% of the amount of Paid Claims previously approved, or (ii) otherwise subject to the standard review procedures under this Subrogation Claims Review Protocol.  If the initial review finds errors, then the claims shall be subject to the standard review under this Subrogation Claims Review Protocol.
- Subsequent payments made on account of Verified Paid Claims that have satisfied a Level Two Review, Level Three Review or Level Four Review can be submitted to the Subrogation Trust for payment.  Such additional payments will only be subject to an Initial Review prior to receiving a

---

[21] TBD based on cost guidance.

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:58:02   Page 152
of 303

distribution and will not need to undergo additional levels of review, unless subsequent payments on any single such claim exceed $15,000,000 per payment or on cumulative basis for a single Verified Paid Claim, in which case such claim shall be subject to review by a representative of the SRC.

- The Trustee will not personally perform any review of Subrogation Claims unless the Trustee determines, in consultation with the Trust Advisory Board, that good cause exists for such review. The Trustee will endeavor to make sure that any Distribution Request is verified pursuant to the terms of this Subrogation Claims Review Protocol.

- This Subrogation Claim Review Protocol is subject to periodic review by the SRC and the Trust Advisory Board to evaluate the efficiency and effectiveness of the Subrogation Claims review process. The Trust Advisory Board may amend these procedures at any time by unanimous consent to address any issues identified during such periodic review.

Case 19-30088 Doc# 7094 Filed 09/07/20 Entered 09/07/20 15:18:02 Page 158 of 207
Case 19-30088 Doc# 7094 Filed 09/07/20 Entered 09/07/20 15:15:57 Page 183 of 253

# EXHIBIT E TO THE SUBROGATION WILDFIRE TRUST AGREEMENT

## Affected Zones and Date of Loss Ranges

Date of Loss Ranges for all 2017 North Bay Fires

**October 8, 2017 - November 30, 2017**

Date of Loss Range for 2018 Camp Fire

**November 8, 2018 – November 30, 2018**

Affected Zones for North Bay Fires[11]



---

[11] Claims falling outside of the designated North Bay Fire Affected Zones may require Subrogation Trust Beneficiaries to submit additional detail to confirm that they are wildfire related losses.

Affected Zones for Camp Fire[12]



---

[12] The Camp Fire perimeter and nearby cities are shown. Camp Fire loss location addresses extending beyond the area depicted may require the submission of additional detail to confirm that they are wildfire related losses.

1

**Exhibit D**

2

**Fire Victim Trust Agreement (with all Exhibits, including the Fire Victim Claims Resolution Procedures)**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PG&E FIRE VICTIM TRUST AGREEMENT[1]**

**Dated as** of [●]**, 2020**

*Pursuant to the Debtors' and Shareholder Proponents'*
*Joint Chapter 11 Plan of Reorganization Dated March 16, 2020*

---

[1] The proposed draft Fire Victim Trust Agreement and proposed draft Fire Victim Claims Resolution Procedures, and all proposed draft exhibits attached thereto, remain subject to the review and consent of the Plan Proponents, and the Plan Proponents reserve all rights with respect thereto. Neither the filing of the proposed draft Fire Victim Trust Agreement and proposed draft Fire Victim Claims Resolution Procedures, nor anything contained therein, shall constitute or be deemed to constitute consent to the terms thereof, or an admission or waiver of any rights of the Plan Proponents thereto in any respect. The proposed draft Fire Victim Trust Agreement and proposed draft Fire Victim Claims Resolution Procedures, and all proposed draft exhibits attached thereto, also remain subject to final approval from the TCC and Consenting Fire Claimant Professional Group, as defined in the Tort Claimants RSA.

# PG&E FIRE VICTIM TRUST AGREEMENT

## TABLE OF CONTENTS

RECITALS ........................................................................................................................... 1
SECTION I. AGREEMENT OF TRUST ..................................................................... 2
1.1    Creation and Name ................................................................................................ 2
1.2    Purpose ...................................................................................................................... 2
1.3    Transfer of Assets ................................................................................................. 3
1.4    Acceptance of Assets and Assumption of Liabilities ................................ 4
1.5    Beneficial Owners ................................................................................................. 5
1.6    Jurisdiction .............................................................................................................. 6
SECTION II. POWERS AND TRUST ADMINISTRATION ............................... 6
2.1    Powers ....................................................................................................................... 6
2.2    General Administration ...................................................................................... 10
2.3    Claims Administration ........................................................................................ 13
2.4    Claim Approval and Denial ............................................................................... 14
2.5    Confidentiality ....................................................................................................... 15
2.6    Credits for Amounts Covered by Insurance .............................................. 15
2.7    Deduction for Payment Received from Wildfire Assistance Fund ........ 16
SECTION III. ACCOUNTS, INVESTMENTS, AND PAYMENTS ................... 17
3.1    Accounts ................................................................................................................. 17
3.2    Investment Guidelines ....................................................................................... 17
3.3    Payments ................................................................................................................ 18
SECTION IV. DISTRIBUTIONS .............................................................................. 19
4.1    Distributions .......................................................................................................... 19
4.2    Manner of Payment or Distribution ............................................................... 19
4.3    Delivery of distributions .................................................................................... 20
4.4    Cash distributions ............................................................................................... 20
4.5    No De Minimis Distribution .............................................................................. 20
4.6    Reimbursement and Reporting Obligations Under Medicare Secondary
        Payer Act ................................................................................................................ 21
SECTION V. TRUSTEE AND DELAWARE TRUSTEE ..................................... 22
5.1    Number ................................................................................................................... 22
5.2    Term of Service and Successor Trustee ..................................................... 22
5.3    Reliance; No Personal Obligation .................................................................. 22
5.4    Standard of Care; Exculpation ....................................................................... 23
5.5    Protective Provisions ......................................................................................... 24
5.6    Compensation and Expenses of the Trustee ............................................ 25
5.7    Indemnification ..................................................................................................... 25
5.8    Trustee's Employment of Professionals and Experts ............................. 26
5.9    Trustee's Independence ................................................................................... 27
5.10  Bond ........................................................................................................................ 27
5.11  Delaware Trustee ............................................................................................... 27
SECTION VI. TRUST OVERSIGHT COMMITTEE .............................................. 29
6.1    Members of the TOC .......................................................................................... 29
6.2    Duties of the Members of the TOC ................................................................ 29

| | | |
|---|---|---|
| 6.3 | Term of Office of the TOC Members. | 30 |
| 6.4 | Appointment of Successor Members of the TOC. | 30 |
| 6.5 | Compensation and Expenses of the TOC | 30 |
| 6.6 | Procedures for Consultation with and Obtaining the Consent of the TOC. | 30 |

**SECTION VII. NEUTRALS** ........................................................................... 32

| | | |
|---|---|---|
| 7.1 | Panel of Neutrals | 32 |
| 7.2 | Duties of the Neutrals | 32 |
| 7.3 | Random Assignment of Neutrals | 32 |
| 7.4 | Meetings with Neutrals | 32 |
| 7.5 | Indemnification | 32 |

**SECTION VIII. GENERAL PROVISIONS** ........................................................ 33

| | | |
|---|---|---|
| 8.1 | Irrevocability | 33 |
| 8.2 | Term; Termination. | 33 |
| 8.3 | Amendments | 34 |
| 8.4 | Meetings. | 34 |
| 8.5 | Severability | 34 |
| 8.6 | Notices. | 34 |
| 8.7 | Successors and Assigns | 35 |
| 8.8 | Limitation on Claim Interests for Securities Laws Purposes | 35 |
| 8.9 | Evidence of Beneficial Interests | 35 |
| 8.10 | Exemption from Registration | 35 |
| 8.11 | Transfer and Exchange | 36 |
| 8.12 | Change of Address | 36 |
| 8.13 | Entire Agreement; No Waiver | 36 |
| 8.14 | Headings. | 36 |
| 8.15 | Compliance with Laws | 36 |
| 8.16 | Governing Law | 36 |
| 8.17 | Settlors' Representative and Cooperation | 37 |
| 8.18 | Dispute Resolution | 37 |
| 8.19 | Enforcement and Administration | 38 |
| 8.20 | Joinder | 38 |
| 8.21 | Capitalized Terms | 38 |
| 8.22 | Effectiveness | 38 |
| 8.23 | Counterpart Signatures | 38 |

EXHIBIT 1
EXHIBIT 2
EXHIBIT 3
EXHIBIT 4
EXHIBIT 5
EXHIBIT 6

Case 19-30088 Doc# 7094 Filed 05/07/20 Entered 05/07/20 15:18:02 Page 64
of 137

# PG&E FIRE VICTIM TRUST AGREEMENT

This PG&E Fire Victim Trust Agreement (this "**Trust Agreement**"), dated as of [●], 2020 and effective as of the Effective Date, is in accordance with the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020 (as it may be amended, modified, or supplemented, the "**Plan**") and effectuates certain agreements made by PG&E Corporation ("**PG&E Corp**") and Pacific Gas and Electric Company (the "**Utility**") (collectively, the "**Debtors,**" "**PG&E,**" or the "**Settlors**"), the debtors and debtors-in-possession whose Chapter 11 cases are jointly administered under Case No. 19-30088 in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), with the approval of the Bankruptcy Court, the Trustee of the Fire Victim Trust (the "**Trustee**"), the Delaware Trustee pursuant to this Trust Agreement and any successor Delaware Trustee serving in such capacity (the "**Delaware Trustee**"), and the members of the Fire Victim Trust Oversight Committee (the "**TOC**") who are identified on the signature pages hereof.

## RECITALS

A.     The Debtors have reorganized under the provisions of Chapter 11 of the Bankruptcy Code in cases filed in the United States Bankruptcy Court for the Northern District of California known as *In re PG&E Corporation et al*, Debtors, Jointly Administered Case No. 19-30088 (collectively, the "**Bankruptcy Cases**").

B.     Requisite approval for the entry into this Trust Agreement in accordance with the Restructuring Support Agreement, dated December 6, 2019 (as amended on December 16, 2019), among the Debtors, the TCC, the Consenting Fire Claimants Professionals (as defined therein) has been sought and received.

C.     The Confirmation Order has been entered by the Bankruptcy Court and has become final and non-appealable, or such requirements have been waived in accordance with the Plan.

D.     As of the December 31, 2019 deadline for submission of claims against the Debtors relating to the wildfires in 2015, 2017, and 2018 listed on **Exhibit 1** attached hereto that were caused by Debtors' equipment and operations, tens of thousands of claims were filed by persons and entities damaged or who purport to have been damaged in various ways by those wildfires ("**Fire Victims**").

E.     The Plan provides, among other things, for the creation of the PG&E Fire Victim Trust (the "**Fire Victim Trust**" or the "**Trust**") to evaluate, administer, process, settle, expunge, and resolve all claims of Fire Victims against the Debtors ("**Fire Victim Claims**"), and, to the extent approved and liquidated pursuant to the Fire Victim Claims Resolution Procedures **(the "CRP") attached hereto as Exhibit 2** ("**Approved**"), satisfy and pay all Approved Fire Victim Claims in accordance with the Plan, the Confirmation Order, the Trust Agreement, the CRP and the Registration Rights Agreement, including all related exhibits (collectively, the "**Trust Documents**"), and to prosecute or settle the Assigned Rights and Causes of Action.

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 65 of 137

F.      The Plan provides that, on the Effective Date and continuing thereafter until fully funded by Debtors, the Aggregate Fire Victim Consideration shall be transferred to, vested in, and assumed by the Trustee.

G.      Pursuant to the Trust Documents, the Trustee is to use the Trust Assets to satisfy and pay, on a *pro rata basis,* Approved Fire Victim Claims against the Debtors.

H.      It is the intent of the Debtors, the Trustee and the TOC that the Trust be administered, maintained, and operated at all times through mechanisms that provide reasonable assurance that the Trust will evaluate, administer, process, settle, expunge, resolve, and, to the extent Approved, compensate Fire Victim Claims pursuant to the CRP in a fair, consistent, equitable manner, and *pro rata basis,* in compliance with the terms of this Trust Agreement and the CPR, and to the extent of available Trust Assets.

I.      Pursuant to the Plan, the Trust is intended to qualify as a "qualified settlement fund" within the meaning of section 1.468B-1 *et seq.* of the Treasury Regulations promulgated under section 468B of the Internal Revenue Code of 1986, as amended (the "**QSF Regulations**"), and, to the extent permitted under applicable law, for state and local income tax purposes.

J.      The Bankruptcy Court has determined that the Trust and the Plan satisfy all the prerequisites for an injunction pursuant to section 105(a) of the Bankruptcy Code with respect to any and all Fire Victim Claims against the Debtors, with such claims being channeled to the Fire Victim Trust, and such Channeling Injunction has been entered in connection with the Confirmation Order.

**NOW, THEREFORE**, it is hereby agreed as follows:

**SECTION I.**
**AGREEMENT OF TRUST**

**1.1      Creation and Name.**  The Debtors as Settlors hereby create a trust known as the "PG&E Fire Victim Trust," which is the Trust provided for and referred to in the Plan.  The Trustee may transact the business and affairs of the Trust in the name of the Trust, and references herein to the Trust shall include the Trustee acting on behalf of the Trust.  It is the intention of the parties hereto that the PG&E Fire Victim Trust created hereby constitutes a statutory trust under Chapter 38 of title 12 of the Delaware Code, 12 Del. C. Section 3801 *et seq.* (the "Act") and that this document, along with the other Trust Documents, constitute the governing instruments of the PG&E Fire Victim Trust.  The Trustee and the Delaware Trustee are hereby authorized and directed to execute and file a Certificate of Trust with the Delaware Secretary of State in the form attached hereto as Exhibit 3.

**1.2      Purpose.**  The purposes of the Trust are to (i) assume the liability for all Class 5A-III and Class 5B-III Claims against the Debtors, (ii) evaluate, administer, process, settle, defend, expunge, resolve, liquidate Fire Victim Claims, and satisfy and pay all Approved Fire Victim Claims and all Trust Expenses (as defined in Section 1.4(b) below) of the Trust from the Trust Assets (as defined in Section 1.3(a), below) in a fair, consistent, and equitable manner

Case: 19-30088    Doc# 7094    Filed: 05/07/20    Entered: 05/07/20 15:15:02    Page 66 of 137

without regard to the asserted amount of the claim (and in respect of Approved Fire Victim Claims, on a *pro rata* basis), , (iii) prosecute or settle all Assigned Rights and Causes of Action, (iv) preserve, hold, manage, monetize and maximize the Trust Assets for use in paying and satisfying Approved Fire Victim Claims on a *pro rata basis* and for use in paying all Trust Expenses, all in accordance with the terms of the Trust Documents, and (iv) otherwise comply in all respects with the Trust Documents.  In order to be able to effectuate these purposes, the Trustee, Delaware Trustee, Claims Administrator, Claims Processor, Neutrals, and their agents, shall have no interest in and at all times shall be independent of the Debtors, the Fire Victim Claimants, the TOC, and their agents. Pre-Effective Date appointments, retentions and/or applications of the Trustee, Claims Administrator or any Professional in the Bankruptcy Cases shall not prevent the Trustee, Claims Administrator or any Professional from being deemed independent.

      **1.3**    **Transfer of Assets.**

      (a)    Pursuant to, and in accordance with Section 6.7 of the Plan, beginning upon the Effective Date and continuing thereafter until fully funded by Debtors, the Trustee will receive the Aggregate Fire Victim Consideration to fund the Trust and use the Aggregate Fire Victim Consideration, any other assets transferred to the Fire Victim Trust pursuant to the Plan, and any income earned or proceeds derived from all such assets (collectively, the "**Trust Assets**") to resolve all Fire Victim Claims against the Debtors, satisfy the terms of any court-approved settlement agreements entered into pursuant to the Plan that provide for Trust payment obligations, if any, and pay all Trust Expenses.  The Trust Assets will be transferred free and clear of any liens, encumbrances, charges, claims, interests or other liabilities of any kind by the Debtors, any creditor, or other entity except as provided in the Plan and this Trust Agreement. To the extent certain assets comprising the Trust Assets, because of their nature or because such assets will accrue or become transferable subsequent to the Effective Date, and cannot be transferred to, vested in, and assumed by the Trust on such date, such assets shall be automatically, and without further act or deed, transferred to, vested in, or assumed by the Trust as soon as reasonably practicable after such date.  The Debtors shall execute and deliver such documents as the Trustee reasonably requests to transfer and assign any assets to fund the Trust and the Trustee on behalf of the Trust, is authorized, to the extent necessary, such documents. No monies, choses in action, and/or assets comprising the Trust Assets that have been transferred, granted, assigned, or otherwise delivered to the Trustee shall be used for any other purpose other than for the payment, defense, or administration of the Fire Victim Claims and the payment of Trust Expenses.

      (b)    In furtherance of, and without limiting, the foregoing:

      (i)    On the Effective Date, the Debtors shall irrevocably, grant, and assign to the Trust, and the Trust shall receive and accept, any and all of the rights in the 2015 Insurance Policies that constitute part of the Aggregate Fire Victim Consideration, including the right to enforce obligations of the insurance companies under the 2015 Insurance Policies (the "Insurance Companies") to pay any Fire Victim Claims or to reimburse the Debtors for such Fire Victim Claims (the "Insurance Rights Transfer").

3

(ii)     The Insurance Rights Transfer is made free and clear of all Claims, Liens, encumbrances, or Causes of Action of any nature whatsoever, except available limits of liability for coverage of certain types of Claims under one or more Insurance Policies that may have been reduced by certain prepetition payments made by an Insurance Company to, or on behalf of, one or more of the Debtors.

(iii)     The Trust shall become liable for and shall satisfy, solely from the Trust Assets and to the extent required under applicable law, any premiums, deductibles, self-insured retentions, and any other amounts arising in any way out of the receipt of any payment from an Insurance Company.

(iv)     The Insurance Rights Transfer is made to the maximum extent possible under applicable law.

(v)     The Insurance Rights Transfer is absolute and does not require any further action by the Debtors, the Reorganized Debtors, the Trust, the Bankruptcy Court, or any other Entity.

(vi)     The Parties hereto intend that the Insurance Rights Transfer shall be governed by, and construed in accordance with, the Bankruptcy Code and other applicable laws governing the Insurance Policies.

(c)     The income of the Trust (after payment of all taxes thereon) shall be added to the Trust Assets and used in accordance with the purposes of the Trust as set forth in Section 1.2 hereof.

**1.4     Acceptance of Assets and Assumption of Liabilities.**

(a)     In furtherance of the purposes of the Trust, the Trustee hereby expressly accepts the transfer to the Trust of the Trust Assets and any other transfers in the time and manner and subject to the terms contemplated in the Trust Documents.  For the avoidance of doubt, the Trust Assets shall include all claims and Causes of Action of the Debtors that were not waived, exculpated, or released in accordance with the provisions of the Plan, the Confirmation Order, or a Final Order of the Bankruptcy Court, and all of the Debtors' rights with respect to the Trust Assets, including attorney-client privilege and work product.  The Trustee shall succeed to all of the Debtors' respective right, title, and interest in the Trust Assets, including but not limited to standing to commence, pursue, abandon, or settle Causes of Action, and the Debtors will have no further equitable or legal interest in, or with respect to, the Trust Assets or the Trust.

(b)     In furtherance of the purposes of the Trust, and subject to the terms of the Trust Documents, the Trustee expressly assumes (i) all liabilities and responsibility for all Fire Victim Claims against the Debtors, and (ii) all reasonable fees and expenses incurred in pursuing the Trust Assets, administering the Trust, managing the Trust Assets, and making distributions in accordance with the Trust Documents, (the "**Trust Expenses**"), all of which items under clauses (i) and (ii) shall be paid from the Trust Assets, such that the Reorganized Debtors shall not have any further financial or other responsibility or liability therefor, except as otherwise expressly set forth in the Trust Documents.  Except as otherwise provided in the Trust Documents, the Trust

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:15:02   Page 168
of 137

shall have all defenses, cross-claims, offsets, and recoupments, as well as rights of insurance, indemnification, contribution, subrogation, and similar rights, regarding such claims that the Debtors or Reorganized Debtors have or would have had under applicable law.

(c)     The parties hereto intend that the Trust be classified as a "qualified settlement fund" under the QSF Regulations (and corresponding or similar provisions of state, local, or foreign law, as applicable).  No provision herein or in the CRP shall be construed or implemented in a manner that would cause the Trust to fail to qualify as a "qualified settlement fund" under the QSF Regulations, and, to the extent permitted under applicable law, the Trust shall be treated consistently for state and local tax purposes.

(d)     Nothing in this Trust Agreement shall be construed in any way to (i) limit the scope, enforceability, or effectiveness of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan or (ii) subject to the provisions of Section 1.4(b) above, limit the Trust's assumption of all liability for Fire Victim Claims against the Debtors.

(e)     **Claimant Release.** As further described in the CRP, the Trust shall require all holders of Approved Fire Victim Claims to execute a release in substantially the same form and content as either the Claimant Release and Indemnification in Connection With the Fire Victim Trust Awards or the Entity Claimant Release and Indemnification in Connection With the Fire Victim Trust Awards attached hereto as **Exhibit 4** (the "**Claimant Release**") as a precondition to receiving any payment on account of their Fire Victim Claims from the Trust.

(f)     **Made Whole Release**. Pursuant to and subject to Section 4.25(f)(ii) of the Plan and the Confirmation Order, and as further described in the CRP, and except with respect to any settlement or other agreement regarding the Fire Victim Claims asserted by Adventist Health System/West and Feather River Hospital d/b/a Adventist Health Feather River, the Trust shall require all Claimants who hold Approved Fire Victim Claims to execute a release in substantially the same form and content as and the Mutual Made Whole Release attached hereto as **Exhibit 5** (the "**Mutual Made Whole Release**") upon the Claimant's acceptance of the Claimant's Total Allocation Award.  A Claimant's acceptance of the Total Allocation Award does not establish that the Claimant has been fully compensated under California law for their compensable damages as a result of the fire to the extent those damages are covered by insurance, and the Claimant is not agreeing as a factual matter that the Claimant has been fully compensated for each and every category of their damages under California law.

**1.5     Beneficial Owners.**

(a)     To the extent required by the Act, the beneficial owners (within the meaning of the Act) of the PG&E Fire Victim Trust (the "**Beneficial Owners**") shall be the holders of the Class 5A-III and Class 5B-III Claims against the Debtors, provided that, (i) holders of such Class 5A-III and Class 5B-III Claims, as Beneficial Owners, shall have only such rights with respect to the Fire Victim Trust and its assets as are set forth in the Trust Documents, and (ii) no greater or other rights, including upon dissolution, liquidation or winding up of the Fire Victim Trust, shall be deemed to apply to the holders of such Class 5A-III and Class 5B-III Claims in their capacity as Beneficial Owners.

(b)     No Beneficial Owner shall be entitled to (i) hold any title in or to the Trust Assets (which title shall be vested in the Trust) or (ii) any right to call for a partition or division of the Trust Assets or to require an accounting. For the avoidance of doubt, Beneficial Owners shall not have rights comparable to shareholders of a corporation (other than limited liability, as provided in Section 3803(a) of the Act).

(c)     Subject to giving reasonable notice, a Beneficial Owner may request information and documents relating to their claim from the Claims Administrator, but shall have no right to request information relating to claims of other Beneficial Owners.

**1.6     Jurisdiction.**    The Bankruptcy Court shall have exclusive jurisdiction with respect to any action relating to or arising out of the Trust. Only in the event that the Bankruptcy Court does not have subject matter jurisdiction, then the Superior Court of California for the County of San Francisco shall have exclusive jurisdiction of all matters relating to or arising out of the Trust.  The court having exclusive jurisdiction pursuant to this Section 1.6 shall be referred to hereinafter as the "Court of Exclusive Jurisdiction."  For the avoidance of doubt, nothing in this Section 1.6 shall affect, impair, alter, modify or supersede the procedures contained in the CRP or the authority granted to the Trustee under the Trust Documents to, *inter alia*, evaluate, administer, process, settle, expunge, and resolve all Fire Victim Claims under the CRP in the manner and to the effect set forth therein.

## SECTION II.
## POWERS AND TRUST ADMINISTRATION

**2.1     Powers.**

(a)     The Trustee is and shall act as the fiduciary to the Trust in accordance with the provisions of this Trust Agreement.  The Trustee shall administer the Trust, the Trust Assets, and any other amounts to be received under the terms of the Trust Documents in accordance with the purposes set forth in Section 1.2 above and in the manner prescribed by the Trust Documents.  Subject to the limitations set forth in the Trust Documents, the Trustee shall have the power to take any and all actions that in the judgment of the Trustee are necessary or proper to fulfill the purposes of the Trust, including, without limitation, each power expressly granted in this Section 2.1, any power reasonably incidental thereto and any trust power now or hereafter permitted under the laws of the State of Delaware.  Nothing in this Trust Agreement, the Plan, any Trust Document or any related document shall require the Trustee to take any action if the Trustee reasonably believes that such action is contrary to law.  In addition to all powers enumerated in the Trust Documents, from and after the Effective Date, the Trust shall succeed to all of the rights and standing of the Debtors with respect to the Assigned Rights and Causes of Action in its capacity as a trust administering assets for the benefit of the Fire Victims. In the event of any ambiguity or conflict between the terms of this Trust Agreement and the Plan, any other Trust Document, or any related document required or provided for under the Trust Documents, the Trustee shall be permitted to act in accordance with his reasonable belief, with or without advice of counsel, as he determines in his sole discretion, as to what action (or inaction) is required or permitted pursuant to this Trust Agreement, <u>provided</u> that, for the avoidance of doubt, the Trustee shall be required to consult on, or obtain consent with respect to,

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 70 of 137

only those certain matters as expressly provided for in this Trust Agreement, the CRP and any other Trust Documents.

(b)     The Trustee will be appointed as the representative of each of the Debtors' estates pursuant to sections 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to this Trust Agreement) to, among other things, prosecute and settle all Assigned Rights and Causes of Action in his capacity as a trustee for the benefit of the Fire Victims.  As the representative of the Debtors' estates, and in his or her capacity as a trustee for the benefit of the Fire Victims, the Trustee will succeed to the standing and all of the rights and powers of the Debtors and their estates with respect to all Assigned Rights and Causes of Action assigned and transferred to the Trust whether or not such claims are pending in filed litigation.  The Trustee will be substituted for and will replace the Debtors, their estates, and/or any official committee appointed in any related action, and is authorized to appear before any court or tribunal in any proceeding that related to or affects to the Trust or Trust Assets.

(c)     Unless otherwise expressly provided for under the Plan or the Confirmation Order, on the Effective Date all Assigned Rights and Causes of Action will vest in the Trustee free and clear of all claims, liens, encumbrances, charges, and other interests, subject to the provisions of the Trust Documents.  On and after the Effective Date, the transfer of the Assigned Rights and Causes of Action to the Trust will be deemed final and irrevocable and distributions may be made from the Trust.

(d)     Except as required by applicable law or the Trust Documents, the Trustee need not obtain the order or approval of any court in the exercise of any power or discretion conferred hereunder.

(e)     Without limiting the generality of Section 2.1(a) above, and except as limited in this Trust Agreement and by applicable law, the Trustee shall have the power to:

(i)     receive and hold the Trust Assets and exercise all rights with respect thereto, including the right to sell any securities that are included in the Trust Assets and purchase securities and other assets that are to be included in the Trust Assets, all of which shall be subject to the limitations set forth in Sections 3.2 and 3.3 below;

(ii)     subject to the terms of any agreements entered into pursuant to the Plan that provide otherwise, exercise the right to vote given to owners of New HoldCo Common Stock that are included in the Trust Assets, except that in exercising the right to vote for the election of members of the Board of Directors of New HoldCo, to the extent applicable, the Trustee shall do so only after obtaining the consent of the TOC;

(iii)     invest the monies and other assets held from time to time by the Trust, subject to the limitations set forth in Sections 3.2 and 3.3 below;

(iv)     sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper in consultation with the Investment Advisor and consistent with the other terms of the Trust Documents;

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 136 of 137

(v)     enter into leasing and financing agreements with third parties to the extent such agreements are reasonably necessary to permit the Trust to operate;

(vi)     determine and pay liabilities and expenses created, incurred, or assumed by the Trust, except that the Claims Administrator (as defined in Section 2.3, below) shall have all rights, responsibilities, and powers related to the resolution of any Fire Victim Claims in accordance with the Trust Documents;

(vii)     prepare analyses and budget(s), both of which may be updated from time to time, of all Fire Victim Claims ("Claims Budget") in order to determine the fair and appropriate amount to be distributed on Approved Fire Victim Claims as such claims become Approved, which takes into account the existence of the Approved Fire Victim Claims that have not yet been paid and Fire Victim Claims that have not yet become Approved Fire Victim Claims, including by maintaining sufficient Trust Assets on hand as deemed by the Trustee, in his or her sole discretion (based on, among other things, the Claims Budget), to be necessary and prudent in carrying out the purposes of the Trust, including, but not limited to, to ensure that all Approved Fire Victim Claims receive a *pro rata* distribution or as close thereto as possible, regardless of when such claim is fully administered under the terms of the Trust and CRP such that it becomes an Approved Fire Victim Claim;

(viii)     establish such funds, reserves, and accounts within the Trust, as deemed by the Trustee, in his or her sole discretion, to be useful in carrying out the purposes of the Trust;

(ix)     assign Neutrals (as defined in Section 7.1 of this Trust Agreement), to serve on the Complex Panel (as defined in Section 7.1 of this Trust Agreement).  Neutrals shall be randomly assigned from the Panels to the specific tasks enumerated in the CRP;

(x)     appoint an independent appeals officer (the "**Appeals Officer**") to determine whether an appeal from a Determination of the Claims Administrator should be heard by a Neutral from the General Panel or by a Neutral from the Complex Panel;

(xi)     sue, be sued, and participate as a party or otherwise in any judicial, administrative, arbitrative, or other proceeding;

(xii)     supervise and administer the Trust in accordance with this Trust Agreement and the CRP;

(xiii)     appoint such officers and retain such employees, consultants, advisors, independent contractors, experts, and agents and engage in such legal, financial, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities as the business of the Trust requires, and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable or necessary in order to carry out the terms of this Trust Agreement;

(xiv)     subject to the Budget (as defined in Section 2.2(d)(i), below) and Sections 5.6(b) and 5.8 below, reimburse the Trustee and pay reasonable compensation to any

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 137 of 203

employees, consultants, advisors, independent contractors, experts, and agents for legal, financial, accounting, investment, auditing, forecasting, and alternative dispute resolution services and activities;

(xv)    subject to the Budget and Sections 2.3(c), 5.6(b), 5.7, 5.8, and 6.6 below, reimburse the Trustee, Delaware Trustee, Claims Administrator, TOC and other employees, consultants, advisors, independent contractors, experts, and agents for all reasonable out-of-pocket costs and expenses incurred by such persons in connection with the performance of their duties hereunder;

(xvi)    execute and deliver such instruments as the Trustee considers proper in administering the Trust;

(xvii)    enter into such other arrangements with third parties as are deemed by the Trustee to be useful in carrying out the purposes of the Trust, provided such arrangements do not conflict with any other provision of this Trust Agreement;

(xviii)    in accordance with Section 5.7 below, defend, indemnify, and hold harmless (and purchase insurance indemnifying) the Trust Indemnified Parties (as defined below) solely from the Trust Assets and to the fullest extent permitted by law, however, notwithstanding anything to the contrary herein, no party shall be indemnified or defended in any way for any liability, expense, claim, damage, or loss for which he or she is ultimately liable under Section 5.4 below;

(xix)    delegate any or all of the authority herein conferred with respect to the investment of all or any portion of the Trust Assets to any one or more reputable institutional investment advisors or investment managers without liability for any action taken or omission made because of any such delegation, except as provided in Section 5.4 below;

(xx)    consult with the TOC at such times and with respect to such issues relating to the conduct of the Trust as set forth herein;

(xxi)    make, pursue (by litigation or otherwise), abandon, collect, compromise, or settle for the benefit of the Trust any claim, right, action, or cause of action included in the Trust Assets, including, but not limited to, insurance recoveries and claims against third parties before any court of competent jurisdiction, which power shall, for the avoidance of doubt, be exercised in the Trustee's sole and absolute discretion;

(xxii)    purchase such insurance and performance bonds as the Trustee deems appropriate or as required under the Trust Documents, including with respect to any indemnification obligations of the Trust;

(xxiii)    take any and all actions required by the Trust Documents;

(xxiv)    require, in respect of any distribution of Trust Assets, the Trustee's timely receipt of properly executed documentation (including, without limitation, Form W-8BEN, Form W-8BEN-E, or Form W-9, as applicable) as the Trustee determines in his or her

9

sole discretion is necessary or appropriate to comply with United States federal, state, local or foreign tax laws then in effect;

(xxv) petition the Superior Court of California for the County of San Francisco to appoint a special master (the "**Special Master**") to approve any and all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP;

(xxvi) contract for the establishment of a website (the "**Trust Website**") as soon as reasonably practicable after the Effective Date to aid in communicating information to Fire Victims and in making the activities of the Trust as transparent as possible; and

(xxvii) engage in any transactions necessary or appropriate to the foregoing or to facilitate implementation of the Plan, including but not limited to, entering into, performing, and exercising rights under contracts and leases on behalf of the Trust.

(f) The Trustee shall not have the power to guarantee any debt of other persons

(g) The Trustee agrees to take the actions of the Trust required hereunder.

(h) The Trustee shall give the TOC prompt notice of any act proposed to be performed or that requires consultation with, or the consent of, the TOC, including but not limited to Sections 2.1(e)(ii), 2.2(a) 2.2(f), 2.3(d), 3.2(c), 6.5, and 6.6.

(i) Except as otherwise set forth in the Trust Documents, and subject to any retention of jurisdiction by the Bankruptcy Court as provided in the Plan, but without prior or further authorization, the Trustee may control and exercise authority over the Trust Assets and over the protection, conservation, and disposition thereof. No person dealing with the Trust shall be obligated to inquire into the authority of the Trustee in connection with the protection, conservation, or disposition of the Trust Assets. It is intended that a signed copy of this Agreement shall serve as adequate proof of the Trustee's authority to act if such proof is required for any reason by any third party.

2.2 **General Administration.** The Trustee shall act in accordance with this Trust Agreement.

(a) The timeframes and deadlines related to the administration of the Trust as set forth in this Trust Agreement and the CRP are subject to adjustment and extension by: (i) the Trustee, in his or her reasonable discretion; and (ii) upon request of the TOC, for good cause and in consultation with the Trustee. The Trustee, in consultation with the TOC, may promulgate and adopt trust bylaws that are consistent with the terms of the Trust Agreement ("**Trust Bylaws**"). In the event Trust Bylaws are adopted, then the Trust Bylaws, if any, shall govern the affairs of the Trust. In the event of any inconsistency between the Trust Bylaws (if any) and this Trust Agreement, this Trust Agreement shall govern.

(b)     The Trustee shall be the "administrator" of the Trust within the meaning of Treasury Regulations section 1.468B-2(k)(3) and, in such capacity, shall (i) timely file such income tax and other returns and statements required to be filed and shall timely pay all taxes required to be paid by the Trust out of the Trust Assets, which assets may be sold by the Trustee to the extent necessary to satisfy tax liabilities of the Trust and (ii) comply with all applicable reporting and withholding obligations.

(c)     The Trustee shall timely account to the Bankruptcy Court as follows:

(i)     The Trustee shall engage a firm of independent certified public accountants (the "Trust Accountants") selected by the Trustee, to audit, and the Trustee shall file with the Bankruptcy Court, within one hundred and twenty (120) days following the end of each fiscal year, an annual report (the "**Annual Report**") containing special-purpose financial statements of the Trust (including, without limitation, the assets and liabilities of the Trust as of the end of such fiscal year and the additions, deductions and cash flows for such fiscal year) audited by the Trust Accountants and accompanied by an opinion of such firm as to the fairness in all material respects of the special-purpose financial statements. The Trustee shall provide a copy of such Annual Report to the Claims Administrator and the TOC, and shall publish it on the Trust Website when such report is filed with the Bankruptcy Court.

(ii)     In connection with the filing of the Annual Report, the Trustee shall cause to be prepared and filed with the Bankruptcy Court a report containing a summary regarding the number and type of claims disposed of during the period covered by the financial statements (the "**Claims Report**").  The Trustee shall provide a copy of the Claims Report to the Claims Administrator and the TOC, and shall publish it on the Trust Website when such report is filed with the Bankruptcy Court.

(iii)     All materials filed with the Bankruptcy Court by this Section 2.2(c) need not be served on any parties in the Bankruptcy Cases but shall be available for inspection by the public in accordance with procedures established by the Bankruptcy Court.

(d)     The Budget

(i)     The Trustee shall cause to be prepared, as soon as practicable prior to the commencement of each fiscal year, a budget (the "**Budget**") covering the administrative costs and expenses of the Trust (including: (a) compensation for the Trustee and the Trustee's consultants, professionals, advisors, independent contractors, experts, and agents; (b) compensation for the Claims Administrator and the Claims Administrator's professionals; and (c) compensation for the Delaware Trustee) for such fiscal year and the succeeding four fiscal years. Prior to the Trustee preparing the Budget for each year, the TOC shall provide the Trustee with its reasonable estimates of necessary expenses to be incorporated into the Budget. The Trustee shall provide a copy of each Budget to the TOC.  The Trustee shall cause the initial Budget to be prepared promptly following the Effective Date.

(ii)     The Trustee shall undertake to manage the expenses of the Trust in accordance with the Budget, with the goal of not exceeding the aggregate amount of 120% of the Budget for any fiscal year, absent reasonably unforeseen circumstances.

11

(e)     The Trustee shall consult with the TOC (i) on matters not contemplated by this Trust Agreement regarding the general implementation and administration of the Trust, (ii) on matters not contemplated by this Trust Agreement regarding the general implementation and administration of the CRP and (iii) on such other matters as may be required under this Trust Agreement and the CRP.

(f)     The Trustee shall be required to obtain the consent by vote of a simple majority of the TOC pursuant to the notice and quorum requirements set forth in Section 6.6 herein to:

(i)     amend, supplement, modify, terminate or extend the term of the Trust in any respect;

(ii)     amend, supplement or modify the Trust Agreement in any respect;

(iii)     amend, supplement or modify the CRP in a manner that the Trustee determines, in his or her reasonable discretion, materially affects: (x) the process or processes for submitting Fire Victims Claims for evaluation under the CRP; or (y) the process or processes for evaluating and administering Fire Victims Claims under the CRP.  For the avoidance of doubt, and in no way expanding the limitations provided in the foregoing, the TOC shall have no consent right or rights over any amendment, supplement, or modification to the CRP in any other respect, including in respect of valuation, estimation, or budgeting under the CRP including any valuation, estimation, determination or budgeting of any Fire Victim Claim, group of Fire Victim Claims or category of Fire Victim Claims, *provided that* the Trustee may determine, in his or her sole discretion to consult the TOC on such and all other matters related to the CRP;

(iv)     change the form of the Claimant Release to be provided pursuant to the CRP or this Trust Agreement (for the avoidance of doubt, the form of Mutual Made Whole Release shall be in the form attached to the Plan, and shall not be amended absent an amendment to the Plan);

(v)     subject to the terms of any agreements entered into pursuant to the Plan that provide otherwise, exercise the right to vote for the election of members of the Board of Directors of New HoldCo, to the extent applicable;

(vi)     settle any litigation involving Trust Assets or rights relating to Trust Documents, except that the Trustee shall not be required to obtain the consent of the TOC to the extent that such settlements involve Trust Assets below a minimum threshold set by the Trustee in consultation with the TOC;

(vii)     make Trust expenditures in excess of 120% of the Budget;

(viii)     approve the Budget;

(ix)     sell, transfer, or exchange any or all of the Trust Assets at such prices and upon such terms as the Trustee may determine proper in consultation with the

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:15:02   Page 76
of 137

Investment Advisor and consistent with the other terms of this Trust Agreement, except that the Trustee shall not be required to obtain the consent of the TOC to the extent that such dispositions involve Trust Assets below a minimum threshold set by the Trustee in consultation with the TOC; or

(x)  adopt, upon the advice of an Investment Advisor (as defined in Section 3.3(c) below), a Sell-Down Plan (as defined in Section 3.3(b) below) for New HoldCo Common Stock held by the Trust as part of the Trust Assets;

(g)  **Trust Website.**  The Trustee shall publish information on the Trust Website as he deems prudent in his or her sole discretion.  The Trustee has no obligation to provide, and Beneficial Owners have no right to receive, information regarding the operation of the trust except as provided in Section 2.2(c) above.

**2.3**  **Claims Administration.**  Cathy Yanni shall serve as claims administrator whose role it is to assist the Trustee in the resolution of the Fire Victim Claims in accordance with the CRP and provide such information necessary for the Trustee to implement the CRP (the "Claims Administrator").  The Claims Administrator shall have reasonable discretion in the means and methods in carrying out the duty of resolving Fire Victim Claims consistently with the CRP.

(a)  The Claims Administrator shall serve from the date of retention until the termination of the Trust.  Prior to the termination of the Trust, the Claims Administrator shall be removable by agreement of the Trustee and the vote of at least two-thirds of the members (the "**Supermajority Vote**") of the TOC for cause, which shall be defined as the substantial, repeated, or prolonged failure to carry out the duties and obligations defined in Section 2.3(b) below. If a Claims Administrator is removed or if there is a vacancy for any other reason, the Trustee and a majority of members of the TOC shall appoint the successor Claims Administrator, provided however, that if the Trustee and a majority of the members of the TOC cannot agree on the successor Claims Administrator, the Bankruptcy Court shall make the appointment.

(b)  Without limiting the generality of Section 2.3 above, and except as limited below, the Claims Administrator, in conjunction with the Trustee, shall have the power and obligation to:

(i)  evaluate, disallow, resolve, settle, and approve any and all Fire Victim Claims in accordance with the CRP without the need to seek the approval of the Bankruptcy Court for any actions taken with respect to the determination of Fire Victim Claims;

(ii)  authorize payment of any and all Approved Fire Victim Claims in accordance with the CRP;

(iii)  propose changes to the CRP;

(iv)  hire such professionals, including: (i) professionals retained by the Trustee; and (ii) entities affiliated with the Claims Administrator and employees, officers, and directors of such entities as necessary to perform its duties hereunder to resolve the Fire Victim Claims subject to approval by the Trustee;

13

(v)     act as liaison between the Trustee and the Neutrals; and

(vi)    serve as chair of any joint meeting of the Neutrals.

(c)     The Claims Administrator will be compensated at the hourly rate of $1,250.00. The Trust will promptly reimburse the Claims Administrator for all reasonable out-of-pocket costs and expenses incurred by the Claims Administrator in connection with the performance of the duties set forth in the Trust Documents.

(d)     The Claims Administrator shall retain BrownGreer PLC, which shall assist the Claims Administrator in the calculation and processing of claims (the "**Claims Processor**") and such other professionals as the Claims Administrator determines is necessary and appropriate for the calculation and processing of claims.  The Claims Administrator shall have the power to replace the Claims Processor if at any time the Claims Administrator and Trustee determine, in consultation with the TOC, that the replacement of the Claims Processor is prudent and necessary to continue the efficient processing of claims pursuant to the CRP.

### 2.4     Claim Approval and Denial.

(a)     The CRP shall govern the process by which, each Fire Victim Claim shall be evaluated, administered, processed, settled, expunged, determined and resolved on a final basis. At all times, the Trustee, the Claims Administrator, Claims Processor, and/or one or more members of the Panel of Neutrals described herein shall act in accordance with and consistent with the CRP.  Only Approved Claims, which are approved in accordance with the CRP, shall be entitled to payments from the Trust, and any Fire Victim Claim determined to be ineligible on a final basis under the CRP shall have no entitlement to payments from the Trust and shall forever be denied, disallowed and expunged.  Any objections to Fire Victim Claims with respect to their eligibility or valuation shall be resolved consistently with the CRP.

(b)     In furtherance of, and consistent with, the purpose of the Trust Documents, the Claims Administrator, in conjunction with the Trustee, shall have the power and authority to determine the eligibility, amount, and allowance of Fire Victim Claims, at all times subject to the CRP (as may be amended, modified or supplemented), which was filed with the Plan Supplement and incorporated into the Confirmation Order. The Claims Administrator, in conjunction with the Trustee shall evaluate proofs of claim and other claims materials submitted by each holder of a Fire Victim Claim for determination of eligibility, amount, and allowance of such Claim in accordance with the procedures set forth in the CRP.

(c)     Notwithstanding anything herein, the Trustee reserves all powers expressly granted to him by the Trust Documents with respect to the administration of claims.

(d)     The Claims Administrator's determination, as confirmed by the Trustee, of eligibility, amount, and allowance of each Fire Victim Claim shall be final and binding, and shall not be subject to any challenge or review of any kind, by any court or other person or entity, except as set forth in the CRP.

14

**2.5** **Confidentiality.** All facts and documents submitted in support of any Fire Victim Claim will be used and disclosed only for the following purposes: (a) processing the Claim, (b) legitimate business uses associated with administering the Trust, including the prevention of fraud and/or the resolution of liens, and (c) other necessary legal and judicial requirements or processes. Otherwise, the information submitted by Fire Victims shall be kept confidential and shall only be disclosed to the Trustee, the Claims Administrator, Claims Processor, the Neutrals, and in respect of the preceding entities, their employees, agents, professionals and advisors, the Fire Victim, the Fire Victim's authorized agent, or to any court of competent jurisdiction, and, in the latter case, only then in a document filed with the court under seal. To the extent possible, any reference to the identity of any Fire Victim in a publicly available document shall be made by the use of a unique numerical identifier, and any information contained in such a document that could lead to the discovery of the claimant's identity such as property address, APN, telephone number, email address, and the like shall be redacted before such a document is filed or circulated to persons or entities other than the claimant, counsel for the claimant, or other persons or entities who are authorized by the claimant in writing to receive an unredacted copy of the specific document. Similarly, the amount of any Fire Victim Claim that is approved, accepted, or disallowed in whole or in part shall kept confidential and shall only be disclosed to the Trustee, the Claims Administrator, Claims Processor, the Neutrals, and in respect of the preceding entities, their employees, agents, professionals and advisors, the Fire Victim, the Fire Victim's authorized agent, or to any court of competent jurisdiction, and, in the latter case, only then in a document filed with the court under seal.

**2.6** **Credits for Amounts Covered by Insurance.** To the extent a Fire Victim Claim represents damages or losses covered, in full or in part, by a policy of insurance ("Covered Fire Victim Claim"), the amount in which such Covered Fire Victim Claim may be Approved pursuant to the CRP shall be reduced on a dollar-for-dollar basis by all insurance recoveries available to the Fire Victim on account of such damages or losses ("Available Insurance Recoveries"), whether or not the Fire Victim actually made a claim against a policy of insurance for such damages or losses. Available Insurance Recoveries shall include (i) any amount actually paid to the Fire Victim for damages or losses arising from or attributable to a Wildfire by an insurer under a policy of insurance, and (ii) any amount to be paid, payable, or otherwise owed to the Fire Victim for damages or losses arising from or attributable to a Wildfire by an insurer under a policy of insurance. For the avoidance of doubt, Available Insurance Recoveries shall not include any policy of insurance that cannot be reasonably construed to provide coverage for damages or losses arising from or attributable to a Wildfire. In determining the amount of Available Insurance Recoveries, the Trustee shall consider, as applicable, (i) the terms of any available policy of insurance and whether such policy or any other existing insurance policies can be reasonably interpreted to provide coverage, in full or in part, for the damages or losses that the holder of the Covered Fire Victim Claim seeks to recover from the Trust, (ii) the available policy limits of any available policy of insurance that can reasonably be construed to provide insurance coverage for each applicable category of damages that the holder of the Covered Fire Victim Claim seeks to recover from the Trust, (iii) whether the Fire Victim has exercised reasonable efforts to obtain all recoveries available under policies of insurance for damages or losses arising from or attributable to a Wildfire, and (iv) the amounts that could or should have been paid under a policy of insurance to the Fire Victim for damages or losses

Case: 19-30088 Doc# 7094 Filed: 09/07/20 Entered: 09/07/20 15:15:02 Page 79 of 137

arising from or attributable to a Wildfire had the Fire Victim taken reasonable efforts to obtain an insurance recovery for such damages or losses.

(c)     A Fire Victim shall be deemed to have exercised reasonable efforts with respect to a category of damages or losses arising from or attributable to a Wildfire that is covered by a policy of insurance if such Fire Victim receives payments from an insurer pursuant to such policy that are equivalent to or greater than (i) the full amount of such damages or losses or (ii) the available policy limits for claims made for such damages or losses.  If a Fire Victim is unsuccessful in obtaining payment of the available policy limits from an insurer after exercising reasonable efforts in making claims for damages or losses arising from or attributable to a Wildfire, the Trustee may, in his or her sole and absolute discretion, accept an assignment of his or her rights against the insurance company (the "Claimant Insurance Rights") to the Trustee, in which event the Fire Victim shall be deemed to have exercised reasonable efforts with respect to the recoveries available from such insurer for such damages or losses.  For the avoidance of doubt, nothing in this Section shall require the Trustee to accept any assignment of a Fire Victim's insurance rights.

(d)     The Trustee shall establish procedures to assist Claimants to recover the full amount due to the Claimant under the applicable insurance policy, where the Claimant requests this assistance.

(e)     The purpose of this provision is to (i) encourage all Fire Victims to fully pursue all rights and remedies available under their policies of insurance prior to asserting a claim against the Trust, and (ii) ensure that insurance companies do not pass their coverage obligations on to the Trust. Consistent with these policies, the Trustee may, in his or her sole and absolute discretion, grant exceptions to Section 2.6(a) for good cause.

(f)     Any amount that any holder of a Fire Victim Claim, its predecessor, successor, or assignee received or shall receive from any insurance company under and pursuant to the terms and coverage provisions of any insurance policy for losses resulting from a Wildfire and any funds received by any holder of a Fire Victim Claim, net of attorney's fees, shall satisfy, to the extent applicable, any amounts of restitution the Debtors or Reorganized Debtors might be subject to under California Penal Code § 1202.4.

**2.7     Deduction for Payment Received from Wildfire Assistance Fund.**  Pursuant to the Supplemental Order (A) Approving Appointment of Administrator and Establishing Guidelines for the Wildfire Assistance Program and (B) Granting Related Relief entered on June 5, 2019, to the extent a Fire Victim Claim has received a payment from the Wildfire Assistance Fund, the amount in which such Fire Victim Claim may be Approved pursuant to the CRP shall be reduced on a dollar-for-dollar basis by the amount of such payment received from the Wildfire Assistance Fund.

**2.8     Deduction for Payment Received From FEMA.** To the extent a Fire Victim Claim represents damages or losses for which the Fire Victim has received a payment from the Federal Emergency Management Agency ("**FEMA**"), the amount in which such Fire Victim Claim may be Approved pursuant to the CRP shall be reduced on a dollar-for-dollar basis by the amount of such payment received from FEMA on account of the same damages or losses.

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:15:02   Page 105 of 137

## SECTION III.
## ACCOUNTS, INVESTMENTS, AND PAYMENTS

### 3.1    Accounts.

(a)    The Trustee may, from time to time, create such accounts and reserves within the Trust estate as authorized in this Section 3.1 and as he may deem necessary, prudent, or useful in order to provide for the payment of expenses and payment of Fire Victim Claims, and may, with respect to any such account or reserve, restrict the use of money therein (the "**Trust Accounts**"). Any such reserve established by the Trustee shall be held as Trust Assets and shall not be subject to separate entity tax treatment as a "disputed claims reserve" or a "disputed ownership fund" within the meaning of the Internal Revenue Code or Treasury Regulations.  The Claims Administrator and TOC shall provide information as necessary for the Trustee to establish such accounts and reserves.

(b)    The Trustee shall include a reasonably detailed description of the creation of any account or reserve in accordance with this Section 3.1 and, with respect to any such Trust Account, the transfers made to such account, the proceeds of or earnings on the assets held in each such account and the payments from each such account in the accounts to be filed with the Bankruptcy Court and provided to the TOC pursuant to Section 2.2(c)(i) above.

(c)    The Trustee, on behalf of the Trust, may retain one or more depository institution(s) to serve as the Financial Institution of the Trust (the "**Financial Institution**"). Candidates for the position of Financial Institution shall fully disclose to the Trustee any interest in or relationship with the Debtors or the Reorganized Debtors. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting the Financial Institution.

(d)    The Trustee shall direct the disbursement of funds from Trust Accounts as set forth in this Trust Agreement and the CRP.

(e)    The Trustee may remove the Financial Institution at any time and may retain a successor Financial Institution.

(f)    The Trustee may retain additional financial services firms and/or banking or depository institution(s) as he or she reasonably determines appropriate or advisable in connection with the efficient operation and administration of the Trust.

### 3.2    Investment Guidelines.

(a)    The Trustee shall establish written Investment Guidelines, attached hereto as Exhibit 6, (the "**Investment Guidelines**") for the Trust Assets and may modify such Investment Guidelines in his or her discretion, consistent with the requirements of this Section 3. The Trustee shall provide copies of the Investment Guidelines to the TOC, shall review the Investment Guidelines with the TOC at least bi-annually, and shall promptly advise the TOC of modifications made thereto.

Case 19-30088   Doc# 7094   Filed 09/07/20   Entered 09/07/20 15:15:02   Page 81 of 137

(b)     Pursuant to the Debtors' Plan of Reorganization, the Trustee shall accept and hold $6.75 billion in New HoldCo Common Stock in trust for the Fire Victims, and shall hold that stock in the name of the PG&E Fire Victim Trust and not individually. The Trust shall continue to hold all such stock until such time as the Trustee determines, in consultation with an Investment Advisor (as defined below), that it is in the best interests of the beneficiaries of the Trust to liquidate some or all of the stock, consistent with the terms of the Registration Rights Agreement (the "**Sell-Down Plan**"). This provision is intended to modify the "prudent person" rule, "prudent investor" rule, or any other rule of law that would require the Trustee to diversify this stock portfolio. The Trustee shall execute the Sell-Down Plan from time to time in consultation with the TOC.

(c)     The Trust shall not acquire or hold any options other than options or other derivative securities (including, without limitation, any forward contract, equity swap, put or call, put or call equivalent position, collar, non-recourse loan, sale of an exchangeable security or similar transaction) acquired or held in connection with bona fide hedging transactions with respect to the New HoldCo Common Stock, and in connection therewith, notwithstanding any restriction to the contrary set forth herein, the Trust shall be permitted to assign, transfer, pledge, grant a lien, security interest or other encumbrance in such New HoldCo Common Stock.

(d)     After a reasonable investigation and after consultation with the TOC, the Trustee shall retain such professional advisors as he or she determined necessary and appropriate to act as investment and financial advisor (each an "**Investment Advisor**") who shall assist the Trustee in assessing acceptable levels of investment risks, making investment decisions based on budgetary considerations and market conditions, and taking reasonable steps to protect, and reinvest and dispose of Trust Assets in accordance with the purposes of the Trust as set forth in Section 1.2 above. Candidates for the position of Investment Advisor shall fully disclose to the Trustee any interest in or relationship with the Debtors or the Reorganized Debtors. Any such interest or relationship shall not be an automatic disqualification for the position, but the Trustee shall take any such interest or relationship into account in selecting the Investment Advisor.

(e)     Notwithstanding the foregoing, if the Trustee takes possession of property as part of the enforcement of any rights and such property is in a form other than cash, the Trustee may retain such property and shall take reasonable steps to monetize such property in accordance with the purposes of the Trust as set forth in Section 1.2 above. However, if the Trustee chooses to sell or exchange such property, any cash proceeds received in connection with such sale or exchange shall be invested and reinvested as outlined in Sections 3.3(b) and (c) above in accordance with the Investment Guidelines until necessary for the purposes of the Trust as set forth in Section 1.2 above.

**3.3     Payments.**

(a)     **Payment of Trust Expenses.** All Trust Expenses shall be, subject to the Budget, payable by the Trustee out of the Trust Assets. None of the Trustee, Delaware Trustee, Claims Administrator, Claims Processor, Neutrals, TOC, nor any of their officers, agents, advisors, professionals or employees shall be personally liable for the payment of any Trust Expense or any other liability of the Trust.

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 182 of 137

(b)     **Payment of Fire Victim Claims.**  The Trustee will pay Approved Fire Victim Claims against the Debtors and the Reorganized Debtors on a *pro rata* basis, from the Trust Assets up to the full amount of such Claims, in a fair, consistent, and equitable manner in accordance with this Trust Agreement and the CRP.

(c)     **Allocation of Insurance Proceeds.**  All proceeds recovered under any insurance policies providing coverage for Fire Victim Claims shall be received and held by the Trustee as assets of the Trust to be used for payment of Fire Victim Claims and Trust Expenses.

(d)     **Inclusion in Annual Report.**  The Trustee shall include a description of any payments made in accordance with this Section 3.3 in the Annual Report consistent with special-purpose financial statement reporting, as determined by the Trustee in consultation with the Trust's independent certified public accountants.  However, any names of any Fire Victim recipient of any such payment and any information that could lead to the discovery of any recipient's identity such as property address, APN, telephone number, email address, and the like shall not be disclosed in the Annual Report, but shall be kept confidential by the Trustee, Delaware Trustee, the Claims Administrator, Claims Processor, Neutrals, the TOC, and each of the preceding person's and entity's officers, agents, advisors, professionals, or employees.

## SECTION IV.
## DISTRIBUTIONS

**4.1     Distributions.** The Trustee shall distribute all Trust Assets on behalf of the Trust in accordance with the Trust Documents at such time or times as the Trustee may determine.

**4.2     Manner of Payment or Distribution.**

(a)     All distributions made by the Trustee on behalf of the Trust to Beneficial Owners (or by a disbursing agent (the "**Disbursing Agent**") retained by the Trust to make distributions on behalf of the Trust) shall be payable to the Beneficial Owner of record or to counsel for the Beneficial Owner as set forth at Section 4.3(a) below on the date scheduled for the distribution (the "**Distribution Date**"), unless such day is not a Business Day, then such date for the distribution shall be the following Business Day, but such distribution shall be deemed to have been completed as of the required date. The Trustee shall direct the Disbursing Agent to effect an orderly and efficient disbursement of funds with respect to Approved Claims, after the Trust has satisfied any release, tax information or tax reporting, and other documents or requirements (including without limitation tax withholding, if necessary), in accordance with the Trust Documents.

(b)     The Disbursing Agent may enter into arrangements with one or more banks with branch networks located in Northern California so as to expedite Beneficial Owner access to such funds.

(c)     All Trust Assets shall be distributed in accordance with the Trust Documents.

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:15:02   Page 83 of 137

**4.3    Delivery of distributions.**

(a)    All distributions under this Trust Agreement and CRP on behalf of the Trust to any Beneficial Owner shall be made to such Beneficial Owner's counsel, if any, as identified on the claims materials submitted to and maintained by the Claims Processor, including on any proof of claim, *provided however,* if the Beneficial Owner is not represented by counsel, then all distributions shall be made by check at the address of such Beneficial Owner as identified set forth in on the claims materials submitted to and maintained by the Claims Processor, including on any proof of claim, or by electronic transfer as directed by such Beneficial Owner as set forth in the claims materials submitted to and maintained by the Claims Processor, *provided further*, distributions shall be made in accordance with the above unless the Trustee has been notified pursuant to Section 8.12 below of a change of address, with such change of address provided at least twenty (20) days prior to such distribution Date, and *provided further*, that the Trustee, Claims Administrator, and Claims Processor, as applicable, shall have the authority, in their discretion, to seek further direction and information from Beneficial Owners or their counsel, if applicable, regarding the direction of distributions under this Trust Agreement and CRP.

(b)    In the event that any distribution to a Beneficial Owner is returned as undeliverable, no further distribution to such Beneficial Owner shall be made unless and until the Trustee has been notified of the then current address of such Beneficial Owner, at which time such distribution shall be made to such Beneficial Owner without interest; provided, however, that all distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date. After such date, all unclaimed property or interests in property (i) shall revert to the Trust (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), (ii) the Claim of any Beneficial Owner to such property or interest in property shall be released, settled, compromised, and forever barred, and (iii) such unclaimed property interests shall be distributed to other holders of Class 5A-III and Class 5B-III Claims in accordance with the Trust Documents, as if the Claim of such Beneficial Owner had been disallowed as of the date the undeliverable distribution was first made. The Trustee shall take reasonable efforts to obtain a current address for any Beneficial Owner with respect to which any distribution is returned as undeliverable.  In the event the Trust holds Cash after paying all Trust Expenses and all distributions contemplated under the Trust Documents, such remaining cash shall be distributed to a national recognized charitable organization of the Trustee's choice to the extent economically feasible. No Trust Asset or any unclaimed property shall escheat to any federal, state, or local government or any other entity.

**4.4    Cash distributions.**  Distributions of Cash shall be distributed as provided in the CRP, and the Trustee is entitled to setoff and recoupment to the extent permissible under the Plan.

**4.5    No De Minimis Distribution.** Notwithstanding any provision in the Trust Documents to the contrary, no payment shall be made to any Beneficial Owner on account of any Approved Claim if the Trustee determines that the cost of making such distribution is greater than the amount of the distribution to be made**.**

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:58:02   Page 84 of 137

**4.6    Reimbursement and Reporting Obligations Under Medicare Secondary Payer Act.**

(a)    In connection with the distribution of Trust Assets as provided in this Section IV, and except as provided below, the Trust shall be responsible for all reimbursement and reporting obligations imposed by the Medicare Secondary Payer Act, 42 USC §§ 1395y(b)(2),(8), for the repayment of any Fire Victim Claim-related conditional payments made under Medicare Parts A and B ("Conditional Payment"). Before disbursing any Trust Assets to any Beneficial Owner, the Trustee may enter into a global resolution with the Centers for Medicare & Medicaid Services ("CMS") to reimburse all Medicare Parts A and B Conditional Payments, and to resolve Medicare reporting obligations pursuant to 42 USC § 1395y(b)(8). The Trustee will address recovery obligations as to Medicare Part C and D Conditional Payments directly with those plans and separately from any global resolution that might be reached.

(b)    Pursuant to 42 USC § 1395y(b)(8), defined Responsible Reporting Entities ("RREs") must report claims to CMS in the manner and time established in accordance with the statute. If a global resolution with CMS cannot be reached, the Trustee is authorized to enter into a separate agreement with each RRE to report on their behalf and if a separate agreement with an RRE is not reached, the Trustee shall provide all of the information required for proper reporting under 42 USC § 1395y(b)(8) to the appropriate RRE(s) or their authorized agent before disbursing any funds to any Beneficial Owner. If a global resolution is not reached and the Trustee does not enter into an agency agreement with an appropriate RRE(s) before disbursing any funds to any Beneficial Owner (i) the Trustee will collect the Beneficial Owner's first name, last name, date of birth, gender, social security number and any other information required for proper reporting of the claim to CMS pursuant to 42 USC § 1395y(b)(8) and the Medicare Mandatory Insurer Reporting User Guide; and (ii) the Trustee will provide all of the required reporting information to the RREs within five (5) days of any Claims Determination (as that term is defined in the CRP) of any claim.

(c)    If a global resolution with CMS cannot be reached, before disbursing any funds to any Beneficial Owner, (i) the Trustee shall determine whether any Conditional Payment has been made to or on behalf of the Beneficial Owner to whom a distribution of Trust Assets will be made, and if any Conditional Payment has been made to or on behalf of such a Beneficial Owner, the Trustee shall, within the time period called for by the Medicare Act, (a) reimburse the Medicare Trust fund, or the appropriate Medicare plan or their authorized contractor for the appropriate amount and (b) submit the required information for the Beneficial Owner to CMS. Prior to the Trustee reimbursing any Medicare Part A or B plan requiring repayment, the Trustee shall provide notice of the existence of any Conditional Payment(s) to the Beneficial Owner and, if applicable, his or her attorney. The Beneficial Owner and/or his or her attorney may elect to negotiate the amount of the alleged Conditional Payments within 120 days of notice from the Trustee, but no later than any deadline imposed by Medicare Parts A and B. If the Beneficial Owner or his or her attorney elects not to negotiate the alleged Conditional Payment amounts, with the Beneficial Owner's consent, the Trustee may utilize a firm with experience in resolving liens to satisfy the Beneficial Owner's obligations represented by the Conditional Payment(s). Upon receiving confirmation of the final Medicare Part A or B amount(s) requiring repayment, the Trustee will reimburse the appropriate Medicare Part A or B plan or their authorized contractor. Any payments made to resolve such obligations of the Beneficial Owner shall be

deducted from the Beneficial Owner's distribution of the Trust Assets prior to disbursement of the balance to the Beneficial Owner or his or her counsel.

(d)     The Trustee also shall otherwise comply with any requirements (including, but not limited to, any reporting or payment requirements) of any other federal or state governmental health insurance programs and any state's Medicaid or Workers Compensation statute.  Prior to the Trustee reimbursing any other federal or state governmental health insurance program, including any state's Medicaid or Workers Compensation statute, the Trustee shall provide notice of the existence of such payments to the Beneficial Owner and, if applicable, his or her attorney.  Any payments made to resolve such obligations of the Beneficial Owner shall be deducted from the Beneficial Owner's distribution of the Trust Assets prior to disbursement of the balance to the Beneficial Owner or his or her counsel.

## SECTION V.
## TRUSTEE AND DELAWARE TRUSTEE

**5.1     Number.**  In addition to the Delaware Trustee appointed pursuant to Section 5.11 hereof, there shall be one (1) Trustee.  The initial Trustee shall be Hon. John K. Trotter (Ret.).  For the avoidance of doubt, there shall be at least one (1) Trustee serving at all times (in addition to the Delaware Trustee).

**5.2     Term of Service and Successor Trustee.**

(a)     Subject to the other provisions of this Section 4, the Trustee shall serve from the Effective Date until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 4.2(b) below, (iii) his or her removal pursuant to Section 4.2(c) below, or (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)     The Trustee may resign at any time before the end of his or her term by written notice to the TOC.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than ninety (90) days after the date such notice is given, where practicable.

(c)     The Trustee may be removed on application to the Court of Exclusive Jurisdiction, preceded by the Supermajority Vote of the TOC, in the event that the Trustee becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or for other good cause.  Such good cause shall mean fraud, self-dealing, intentional misrepresentation, or willful misconduct.

(d)     If for any reason John Trotter is unable to serve as Trustee, Cathy Yanni shall become the Successor Trustee.  If for any reason Cathy Yanni is unable to serve as trustee, the TOC shall promptly designate a new Successor Trustee by a Supermajority Vote, which Successor Trustee shall succeed to all of the rights, powers, and duties of the prior Trustee following confirmation by the Bankruptcy Court.  If the TOC cannot agree on the Successor Trustee by a Supermajority Vote, the Bankruptcy Court shall make the appointment.

**5.3     Reliance; No Personal Obligation.**

22

Except as otherwise provided herein:

(a)     The Trustee, Delaware Trustee, TOC and Claims Administrator may rely upon, and, except as otherwise provided in this Trust Agreement, shall be indemnified by the Trust in acting upon, any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, or other paper or document believed by the them to be genuine and to have been signed or presented by the proper party or parties.

(b)     Persons dealing with the Trustee, Delaware Trustee, Claims Administrator, Claims Processor, Neutrals and TOC shall look only to the Trust Assets to satisfy any liability incurred by the Trustee to such Person in carrying out the terms of this Trust Agreement, and neither the Trustee, Neutrals, Claims Administrator, Claims Processor, nor any member of the TOC or any professionals, advisors, officers, agents, consultants, lawyer shall have any personal obligation to satisfy any such liability.

**5.4     Standard of Care; Exculpation.**

(a)     None of the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master or their respective members, officers, employees, agents, consultants, lawyers, advisors, or professionals (collectively, the "**Trust Indemnified Parties**" with each being a "**Trust Indemnified Party**") shall be liable for any damages arising out of the creation, operation, administration, enforcement, or termination of the Trust, except in the case of such Trust Indemnified Party's willful misconduct, bad faith or fraud as established by a Final Order. To the fullest extent permitted by applicable law, the Trust Indemnified Parties shall have no liability for any action in performance of their duties under this Trust Agreement taken in good faith with or without the advice of counsel, accountants, appraisers, and other professionals retained by the Trust Indemnified Parties. None of the provisions of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own funds or otherwise incur personal financial liability in the performance of any of their duties hereunder or in the exercise of any of their respective rights and powers. Any Trust Indemnified Party may rely, without inquiry, upon writings delivered to it under any of the Trust Documents, which the Trust Indemnified Party reasonably believes to be genuine and to have been given by a proper person. Notwithstanding the foregoing, nothing in this Section 5.4 shall relieve the Trust Indemnified Parties from any liability for any actions or omissions arising out of the willful misconduct, bad faith or fraud as determined by a Final Order; provided that in no event will any such person be liable for punitive, exemplary, consequential, or special damages under any circumstances. Any action taken or omitted by the Trust Indemnified Parties with the approval of any of the Bankruptcy Court, the District Court, or the Superior Court of California for the County of San Francisco and, in the case of the Trustee, with the express approval of the TOC, will conclusively be deemed not to constitute willful misconduct, bad faith or fraud.

(b)     The Trust Indemnified Parties shall not be subject to any personal liability whatsoever, whether in tort, contract, or otherwise, to any person in connection with the affairs of the Trust or for any liabilities or obligations of the Trust except for its own willful misconduct, bad faith, or fraud, and all Persons claiming against the Trust Indemnified Parties, or otherwise asserting claims of any nature in connection with affairs of the Trust, shall look solely to the Trust Assets for satisfaction of any such claims.

Case 19-30088   Doc 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 87 of 137

(c)	To the extent that, at law or in equity, the Trust Indemnified Parties have duties (including fiduciary duties) or liability related thereto, to the Trust or the Beneficiaries, it is hereby understood an agreed by the parties hereto and the Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trust Indemnified Parties, *provided however*, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of the Trust Agreement, including but not limited to this Section 5.4 and its subparts.

(d)	The Trust Indemnified Parties shall be indemnified to the fullest extent permitted by law by the Trust against all liabilities arising out of the creation, operation, administration, enforcement, or termination of the Trust, including actions taken or omitted in fulfillment of their duties with respect to the Trust, except for those acts that those acts that are determined by Final Order to have arisen out of their own willful misconduct, bad faith or fraud.

(e)	The Trust will maintain appropriate insurance coverage for the protection of the Trust Indemnified Parties, as determined by the Trustee in his or her sole discretion.

**5.5	Protective Provisions.**

(a)	Every provision of this Trust Agreement relating to the conduct or affecting the liability of or affording protection to Trust Indemnified Parties shall be subject to the provisions of this Section 5.5.

(b)	In the event the Trustee and/or the Claims Administrator retains counsel (including, at the expense of the Trust), the Trustee and/or Claims Administrator, as applicable, shall be afforded the benefit of the attorney-client privilege with respect to all communications with such counsel, and in no event shall the Trustee and/or the Claims Administrator, as applicable, be deemed to have waived any right or privilege including, without limitation, the attorney-client privilege even if the communications with counsel had the effect of guiding the Trustee and/or the Claims Administrator in the performance of duties hereunder.  A successor to either of the Trustee or the Claims Administrator shall succeed to and hold the same respective rights and benefits of the predecessor for purposes of privilege, including the attorney-client privilege. No Beneficial Owner or other party may raise any exception to the attorney-client privilege discussed herein as any such exceptions are hereby waived by all parties.

(c)	To the extent that, at law or in equity, the Trustee has duties (including fiduciary duties) and liabilities relating hereto, to the Trust or to the Trust Beneficiaries, it is hereby understood and agreed by the Parties and the Trust Beneficiaries that such duties and liabilities are eliminated to the fullest extent permitted by applicable law, including Section 3806 of the Delaware Statutory Trust Act, and replaced by the duties and liabilities expressly set forth in this Trust Agreement with respect to the Trustee, *provided however*, that the duties of care and loyalty are not eliminated but are limited and subject to the terms of the Trust Agreement, including but not limited to Section 5.4 herein.

Case 19-30088 Doc# 7094 Filed 09/07/20 Entered 09/07/20 15:18:02 Page 88 of 137

(d)    No Trust Indemnified Party shall be personally liable under any circumstances, except for their own willful misconduct, bad faith or fraud as determined by a Final Order.

(e)    No provision of this Trust Agreement shall require the Trust Indemnified Parties to expend or risk their own personal funds or otherwise incur financial liability in the performance of their rights, duties, and powers hereunder.

(f)    In the exercise or administration of the Trust hereunder, the Trust Indemnified Parties (i) may act directly or through their respective agents or attorneys pursuant to agreements entered into with any of them, and the Trust Indemnified Parties shall not be liable for the default or misconduct of such agents or attorneys if such agents or attorneys have been selected by the Trust Indemnified Parties in good faith and with due care, and (ii) may consult with counsel, accountants, and other professions Persons to be selected by them in good faith and with due care and employed by them, and shall not be liable for anything done, suffered, or omitted in good faith by them in accordance with the advice or opinion of any such counsel, accountants, or other professionals.

**5.6    Compensation and Expenses of the Trustee.**

(a)    The Trustee will be compensated at the flat rate of $125,000 per month for the six months beginning on the Effective Date.  The Trustee will review with the TOC the work he has done against the flat rate at the conclusion of the initial six month period. The flat rate going forward will be adjusted accordingly, subject to the provisions of the Trust Documents. Following the initial six month review, the Trustee will review his compensation with the TOC as provided herein on an annual basis.

(b)    The Trust will promptly reimburse the Trustee for all reasonable out-of-pocket costs and expenses incurred by the Trustee in connection with the performance of the duties hereunder.

(c)    The Trustee shall include a description of the amounts paid under this Section 5.6 in the Annual Report.

**5.7    Indemnification.**

(a)    Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Trust Indemnified Parties in the performance of their duties hereunder to the fullest extent that a trust is entitled to indemnify, hold harmless, and defend such persons against any and all liabilities, expenses, claims, damages, or losses (including attorney's fees and costs) incurred by them in the performance of their duties hereunder or in connection with activities undertaken by them prior to or after the Effective Date in connection with the formation, establishment, funding, or operations of the Trust.

(b)    Reasonable expenses, costs and fees (including attorneys' fees and costs) incurred by or on behalf of the Trust Indemnified Parties in connection with any action, suit, or proceeding, whether civil, administrative, or arbitrative, from which they are indemnified by the

Case 19-30088 Doc# 7094 Filed 05/07/20 Entered 05/07/20 15:15:02 Page 89 of 137

Trust shall be paid by the Trustee in advance of the final disposition thereof upon receipt of an undertaking, by or on behalf of the Trust Indemnified Party, to repay such amount in the event that it shall be determined ultimately by final order of the Bankruptcy Court that the Trust Indemnified Party or any other potential indemnitee is not entitled to be indemnified by the Trust.

(c)     The Trustee shall purchase and maintain appropriate amounts and types of insurance on behalf of the Trust Indemnified Parties, as determined by the Trustee, which may include liability asserted against or incurred by such individual in that capacity or arising from his or her status as a Trust Indemnified Party, and/or as an employee, agent, lawyer, advisor, or consultant of any such person.

(d)     The indemnification provisions of this Trust Agreement with respect to any Trust Indemnified Party shall survive the termination of such Trust Indemnified Party from the capacity for which such Trust Indemnified Party is indemnified.  Termination or modification of the Trust Agreement shall not affect any indemnification rights or obligations in existence at such time.  In making a determination with respect to entitlement to indemnification of any Trust Indemnified Party hereunder, the person, persons, or entity making such determination shall presume that such Trust Indemnified Party is entitled to indemnification under the Trust Agreement, and any person seeking to overcome such presumption shall have the burden of proof to overcome the presumption.

(e)     The rights to indemnification hereunder are not exclusive of other rights which any Trust Indemnified Party may otherwise have at law or in equity, including common law rights to indemnification or contribution.

**5.8     Trustee's Employment of Professionals and Experts.**

(a)     The Trustee may, but shall not be required to, retain and/or consult with legal counsel, accountants, appraisers, auditors, forecasters, experts, financial and investment advisors, and such other parties deemed by the Trustee to be qualified as experts on relevant matters (the "**Trust Professionals**"), the cost of which shall be paid as a Trust Expense, and in the absence of willful misconduct, bad faith or fraud, the written opinion of or information provided by any such party deemed by the Trustee to be an expert on the particular matter submitted to such party shall be full and complete authorization and protection in respect of any action taken or not taken by the Trustee hereunder in good faith and in accordance with the written opinion of or information provided by any such party.

(b)     The Trustee may retain and reasonably compensate the Trust Professionals, the cost of which shall be paid as a Trust Expense, subject to the terms of this Trust Agreement, including the Budget. To the extent that any Trust Professionals provided services to the Trustee prior to the Effective Date and have not been compensated for such services, the Trustee is authorized to pay such fees and expenses.  All fees and expenses of the Trust Professionals incurred in connection with the foregoing shall be payable from the Trust Assets.

Case 19-30088   Doc# 7094   Filed 05/07/20   Entered 05/07/20 15:18:02   Page 105
of 137

**5.9    Trustee's Independence.**  Except as otherwise contemplated and disclosed in the Trust Documents or to the TOC after Effective Date of this Trust, the Trustee shall not, during the term of his or her service, hold a financial interest in, act as attorney or agent for, or serve as any other professional for any entity with a financial interest in the Trust, *provided that* any passive investment held by the Trustee shall not constitute a conflict of interest under this Section 5.9. Any violation of this Section 5.9 shall be cause for removal of the Trustee.  For the avoidance of doubt, this Section shall not be applicable to the Delaware Trustee.

**5.10    Bond.** The Trustee and the Delaware Trustee shall not be required to post any bond or other form of surety or security unless otherwise ordered by the Bankruptcy Court.

**5.11    Delaware Trustee.**

(a)    There shall at all times be a Delaware Trustee.  The Delaware Trustee shall either be (i) a natural person who is at least 21 years of age and a resident of the State of Delaware or (ii) a legal entity that has its principal place of business in the State of Delaware, otherwise meets the requirements of applicable Delaware law to be eligible to serve as the Delaware Trustee, and shall act through one or more persons authorized to bind such entity.  If at any time the Delaware Trustee shall cease to be eligible in accordance with the provisions of this Section 5.11, it shall resign immediately in the manner and with the effect hereinafter specified in Section 5.11(c) below.  For the avoidance of doubt, the Delaware Trustee will only have such rights, duties and obligations as expressly provided by reference to the Delaware Trustee hereunder.  The Trustee shall have no liability for the acts or omissions of any Delaware Trustee.

(b)    The Delaware Trustee shall not be entitled to exercise any powers, nor shall the Delaware Trustee have any of the duties and responsibilities of the Trustee set forth herein.  The Delaware Trustee shall be a trustee of the PG&E Fire Victim Trust for the sole and limited purpose of fulfilling the requirements of Section 3807(a) of the Act and for taking such actions as are required to be taken by a Delaware Trustee under the Act.  The duties (including fiduciary duties), liabilities, and obligations of the Delaware Trustee shall be limited to (i) accepting legal process served on the PG&E Fire Victim Trust in the State of Delaware and (ii) the execution of any certificates required to be filed with the Secretary of State of the State of Delaware that the Delaware Trustee is required to execute under Section 3811 of the Act.  There shall be no other duties (including fiduciary duties) or obligations, express or implied, at law or in equity, of the Delaware Trustee.  To the extent that, at law or in equity, the Delaware Trustee has duties (including fiduciary duties) and liabilities relating to the PG&E Fire Victim Trust or the Beneficial Owners, such duties and liabilities are replaced by the duties and liabilities of the Delaware Trustee expressly set forth in this Trust Agreement.  The Delaware Trustee shall have no liability for the acts or omissions of any Trustee.  Any permissive rights of the Delaware Trustee to do things enumerated in this Trust Agreement shall not be construed as a duty and, with respect to any such permissive rights the Delaware Trustee shall not be answerable for other than its willful misconduct, bad faith or fraud. The Delaware Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Trust Agreement at the request or direction of the Trustee or any other person pursuant to the provisions of this Trust Agreement unless the Trustee or such other person shall have offered to the Delaware Trustee security or indemnity (satisfactory to the Delaware Trustee in its sole discretion) against the costs, expenses and liabilities that may be incurred by it in compliance with such request or direction. The

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:15:02   Page 91 of 137

Delaware Trustee shall be entitled to request and receive written instructions from the Trustee and shall have no responsibility or liability for any losses or damages of any nature that may arise from any action taken or not taken by the Delaware Trustee in accordance with the written direction of the Trustee. The Delaware Trustee may, at the expense of the Trust, request, rely on and act in accordance with officer's certificates and/or opinions of counsel, and shall incur no liability and shall be fully protected in acting or refraining from acting in accordance with such officer's certificates and opinions of counsel.

(c)     The Delaware Trustee shall serve until such time as the Trustee removes the Delaware Trustee or the Delaware Trustee resigns and a successor Delaware Trustee is appointed by the Trustee in accordance with the terms of Section 5.11(d) below.  The Delaware Trustee may resign at any time upon the giving of at least sixty (60) days' advance written notice to the Trustee, provided that such resignation shall not become effective unless and until a successor Delaware Trustee shall have been appointed by the Trustee in accordance with Section 5.11(d) below, provided, further that if any amounts due and owing to the Delaware Trustee hereunder remain unpaid for more than ninety (90) days, the Delaware Trustee shall be entitled to resign immediately by giving written notice to the Trustee.  If the Trustee does not act within such 60-day period, the Delaware Trustee, at the expense of the PG&E Fire Victim Trust, may apply to the Court of Chancery of the State of Delaware or any other court of competent jurisdiction for the appointment of a successor Delaware Trustee.

(d)     Upon the resignation or removal of the Delaware Trustee, the Trustee shall appoint a successor Delaware Trustee by delivering a written instrument to the outgoing Delaware Trustee.  Any successor Delaware Trustee must satisfy the requirements of Section 3807 of the Act.  Any resignation or removal of the Delaware Trustee and appointment of a successor Delaware Trustee shall not become effective until a written acceptance of appointment is delivered by the successor Delaware Trustee to the outgoing Delaware Trustee and the Trustee, and any fees and expenses due to the outgoing Delaware Trustee are paid.  Following compliance with the preceding sentence, the successor Delaware Trustee shall become fully vested with all of the rights, powers, duties and obligations of the outgoing Delaware Trustee under this Trust Agreement, with like effect as if originally named as Delaware Trustee, and the outgoing Delaware Trustee shall be discharged of his or her duties and obligations under this Trust Agreement.  The successor Delaware Trustee shall make any related filings required under the Act, including filing a Certificate of Amendment to the Certificate of Trust of the PG&E Fire Victim Trust in accordance with Section 3810 of the Act.

(e)     Notwithstanding anything herein to the contrary, any business entity into which the Delaware Trustee may be merged or converted or with which it may be consolidated or any entity resulting from any merger, conversion or consolidation to which the Delaware Trustee shall be a party, or any entity succeeding to all or substantially all of the corporate trust business of the Delaware Trustee, shall be the successor of the Delaware Trustee hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto.

(f)     The Delaware Trustee shall be entitled to compensation for its services as agreed pursuant to a separate fee agreement between the Trust and the Delaware Trustee, which compensation shall be paid by the Trust. Such compensation is intended for the Delaware

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 192
of 1073

Trustee's services as contemplated by this Trust Agreement. The terms of this paragraph shall survive termination of this Trust Agreement and/or the earlier resignation or removal of the Delaware Trustee.

(g)     The Delaware Trustee shall neither be responsible for, nor chargeable with, knowledge of the terms and conditions of any other agreement, instrument, or document, other than this Trust Agreement, whether or not, an original or a. copy of such agreement has been provided to the Delaware Trustee. The Delaware Trustee shall have no duty to know or inquire as to the performance or nonperformance of any provision of any other agreement, instrument, or document, other than this Trust Agreement. Neither the Delaware Trustee nor any of its directors, officers, employees, agents or affiliates shall be responsible for nor have any duty to monitor the performance or any action of the Trust, the Trustee or any other person, or any of their directors, members, officers, agents, affiliates or employee, nor shall it. have any liability in connection with the malfeasance or nonfeasance by such party. The Delaware Trustee may assume performance by all such persons of their respective obligations. The Delaware Trustee shall have no enforcement or notification obligations relating to breaches of representations or warranties of any other person. The Delaware Trustee shall have no responsibilities (except as expressly set, forth herein) as to the validity, sufficiency, value, genuineness, ownership or transferability of any Trust Asset, written instructions, or any other documents in connection therewith, and will not, be regarded as making nor be required to make, any representations thereto.

(h)     The Delaware Trustee shall not, be responsible or liable for any failure or delay in the performance of its obligations under this Trust Agreement arising out, of or caused, directly or indirectly, by circumstances beyond its control, including without limitation, any act or provision of any present or future law or regulation or governmental authority: acts of God; earthquakes; fires; floods: wars; terrorism; civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communications service; accidents; labor disputes; acts of civil or military authority or governmental actions; or the unavailability of the Federal Reserve Bank wire or telex or other wire or communication facility.

## SECTION VI.
## TRUST OVERSIGHT COMMITTEE

**6.1     Members of the TOC.**  The TOC shall be comprised of [seven (7)] members who will represent the interests of holders of Fire Victim Claims in the administration of the Trust . The members of the TOC shall be appointed in accordance with the Plan.

**6.2     Duties of the Members of the TOC.**  The members of the TOC shall serve in a fiduciary capacity representing current holders of Fire Victim Claims in the administration of the Trust.  The TOC shall not have any fiduciary duties or responsibilities to any party other than holders of Fire Victim Claims, provided that the TOC shall be entitled to the protections and limitations of duties provided for herein even with respect to the holders of Fire Victim Claims. The Trustee must obtain the consent of the TOC on matters identified in Section 2.2(f) above and consult with the TOC in accordance with other provisions herein.  Where provided elsewhere in

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:15:02   Page 93 of 137

the Trust Agreement or in the CRP, certain other actions by the Trustee may also be subject to the consent of the TOC.

### 6.3 Term of Office of the TOC Members.

(a)     Members of the TOC shall serve until the earlier of (i) his or her death, (ii) his or her resignation pursuant to Section 6.3(b) below, (iii) his or her removal pursuant to Section 6.3(c) below, or (iv) the termination of the Trust pursuant to Section 8.2 below.

(b)     A member of the TOC may resign at any time by written notice to the other members of the TOC and the Trustee.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than thirty (30) days after the date such notice is given, where practicable.

(c)     A member of the TOC may be removed in the event that he or she becomes unable to discharge his or her duties hereunder due to accident, physical deterioration, mental incompetence, or a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, such as repeated non-attendance at scheduled meetings, or for other good cause.  Such removal shall be made at the recommendation of the majority of the remaining members of the TOC and with the approval of the Trustee.

### 6.4 Appointment of Successor Members of the TOC.

(a)     If member of the TOC dies, resigns pursuant to Section 6.3(b) above, or is removed pursuant to Section 6.3(c) above, the vacancy shall be filled with an individual selected by and agreed to by a majority of the remaining members of the TOC; provided however, that if such members cannot agree on the successor, the Bankruptcy Court shall make the appointment.

(b)     Each successor or replacement member of the TOC shall serve under the same terms and conditions as the original members of the TOC.

### 6.5 Compensation and Expenses of the TOC.  The members of the TOC shall not be entitled to compensation for their services but shall be reimbursed promptly for all reasonable out-of-pocket costs and expenses incurred in connection with the performance of their duties hereunder.  The TOC shall, in its discretion, be permitted to procure and maintain appropriate insurance coverage (as determined by the TOC with the consent of the Trustee) as a Trust Expense.  The Trustee shall include a description of the amounts paid under this Section 6.6 in the Annual Report to be filed with the Bankruptcy Court and provided to the TOC pursuant to Section 2.2(c)(i).

### 6.6 Procedures for Consultation with and Obtaining the Consent of the TOC.

(a)     **Quorum; Simple Majority for Consent.**  A quorum will be declared if at least [four (4)] of the [seven (7)] members of the TOC Members are present.  Except as provided elsewhere in this Trust Agreement, all votes or determinations will require an affirmative vote of a majority of those present.

(b)     **Consultation Process.**

(i)     In the event the Trustee is required to consult with the TOC pursuant to Section 2.2(e) above or on other matters as provided herein, the Trustee shall provide the TOC with written advance notice, which notice shall be deemed given if delivered by electronic mail, of the matter under consideration, and with all relevant information concerning the matter as is reasonably practicable under the circumstances. The Trustee shall also provide the TOC with such reasonable access to the Trust Professionals and other experts retained by the Trustee and the Claims Administrator as the TOC may reasonably request during the time that the Trustee is considering such matter, and shall also provide the TOC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with the Trustee and the Claims Administrator.

(ii)     In determining when to take definitive action on any matter subject to the consultation procedures set forth in Section 6.6, the Trustee shall take into consideration the time required for the TOC, if its members so wish, to engage and consult with its own independent advisors as to such matter. Except for the Emergency Consultation Matters and Emergency Consultation Procedures, the Trustee shall not take definitive action on any such matter until at least three (3) business days after providing the TOC with the initial written notice that such matter is under consideration by the Trustee, unless (a) such time period is waived in writing by the TOC or at a meeting where the TOC and Trustee are present, or (b) the Trustee believes that the matter must be considered on less than three (3) business days' notice. If the Trustee believes that the matter must be considered on less than three (3) business days' notice (an "**Emergency Consultation Matter**"), the Trustee shall so advise the TOC and provide a consultation deadline and information that is reasonable under the circumstances, after which the Trustee shall be deemed to have consulted with the TOC (the "**Emergency Consultation Procedures**").

(c)     **Consent Process**.

(i)     In the event the Trustee is required to obtain the consent of the TOC pursuant to any provision in the Trust Documents, the Trustee shall provide the TOC with a written notice stating that its consent is being sought, describing in detail the nature and scope of the action the Trustee proposes to take. The Trustee shall provide the TOC as much relevant additional information concerning the proposed action as is reasonably practicable under the circumstances. The Trustee shall also provide the TOC with such reasonable access to the Trust Professionals and other experts retained by the Trustee and the Claims Administrator as the TOC may reasonably request during the time that the Trustee is considering such action, and shall also provide the TOC the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such action with the Trustee.

(ii)     The TOC must consider in good faith and in a timely fashion any request for its consent by the Trustee, and must in any event advise the Trustee, in writing, of its consent or its objection to the proposed action within three (3) business days of receiving the original request for consent from the Trustee. The TOC may not withhold its consent unreasonably. If the TOC decides to withhold its consent, it must explain in detail its objections to the proposed action. If the TOC does not advise the Trustee, in writing, of its consent or its objections to the action within three (3) business days of receiving notice regarding such request, the TOC's consent to the proposed actions shall be deemed to have been affirmatively granted.

Case 19-30088 Doc 7094 Filed 05/07/20 Entered 05/07/20 15:18:02 Page 95 of 137

If, the TOC does not consent to the Trustee's proposed action, the Trustee and the TOC shall resolve their dispute pursuant to Section 8.18 below, however, in that event the TOC shall have the burden of proof to show the validity of the TOC's objection.

(iii)     If the Trustee believes that the matter must be considered on less than three (3) business days' notice (the "**Emergency Consent Matter**"), the Trustee shall so advise the TOC of the Trustee's proposed action and provide a response deadline and information that is reasonable under the circumstances.  The TOC shall be deemed to have consented if the TOC does not respond within the shortened response deadline.  If the TOC does not consent to the Emergency Consent Matter, the Trustee may immediately seek the Bankruptcy Court's intervention.

## SECTION VII.
## NEUTRALS

**7.1     Panel of Neutrals.**  The Trustee, Claims Administrator, Claims Processor, and TOC shall work with a neutrals experienced in resolution of wildfire claims and related matters in resolving issues relating to the liquidation and settlement of claims against the Trust .  Only those neutrals with the requisite experience who attend all training or other preparatory meetings held by the Trustee will be eligible for approval by the Trustee as a neutral (the "**Neutrals**"). The Trustee shall, in his or her sole and absolute discretion, designate certain Neutrals who he or she deems specially qualified to serve exclusively on a panel of Neutrals charged with considering with [large, complex and/or sensitive] Fire Victim Claims (the "**Complex Panel**"). All other Neutrals shall serve on a panel that shall consider all other Fire Victim Claims (the "**General Panel**," and, together with the Complex Panel, the "**Panels**").

**7.2     Duties of the Neutrals.**  The duties of the Neutrals shall be as enumerated in the CRP.

**7.3     Random Assignment of Neutrals.**  Neutrals shall be randomly assigned from the Panels to resolve Fire Victim Claims. Neither the Trustee nor the Claims Administrator shall have any power to assign any Neutral to consider any Fire Victim Claim.

**7.4     Meetings with Neutrals.**  The Trustee shall hold meetings with the Neutrals, Claims Administrator, Claims Processor and TOC on such schedule as the Trustee deems appropriate in his sole discretion (either in person or via conference call) to discuss, refine, or devise methods of liquidating Fire Victim Claims in a fair, consistent, and equitable manner. The Trustee shall meet with some or all of the Neutrals at various times. At all such meetings the Trustee and the Claims Administrator shall serve as co-chairs of the meeting.

**7.5     Indemnification.**  Without the need for further court approval, the Trust hereby indemnifies, holds harmless, and defends the Neutrals in the performance of their duties hereunder to the fullest extent that a trust is entitled to indemnify, hold harmless, and defend such persons against any and all liabilities, expenses, claims, damages, or losses (including attorney's fees and costs) incurred by them in the performance of their duties hereunder.

## SECTION VIII.
## GENERAL PROVISIONS

**8.1**     **Irrevocability.**   To the fullest extent permitted by applicable law, the Trust is irrevocable.

**8.2**     **Term; Termination.**

(a)     The term for which the Trust is to exist shall commence on the date of the filing of the Certificate of Trust and shall terminate pursuant to the following provisions.

(b)     The Trust shall automatically dissolve on the date (the "**Trust Termination Date**") ninety (90) days after the first to occur of the following events:

(i)     the date on which the Bankruptcy Court approves dissolution of the Trust because (1) all Claims duly filed with the Trust have been liquidated, approved or disallowed, accepted, and paid to the extent possible based upon funds available through the Plan and as provided in this Trust Agreement and the CRP or have been disallowed by a final non-appealable order, (2) all known claims against third parties have been pursued and all reasonably expected recoveries from those claims have been collected, and (3) a final accounting has been filed with and approved by the Bankruptcy Court; or

(ii)     to the extent that any rule against perpetuities shall be deemed applicable to the Trust, the date on which twenty-one (21) years less ninety-one (91) days pass after the death of the last survivor of all of the descendants of the late Joseph P. Kennedy, Sr., father of the late President John F. Kennedy, living on the date hereof.

(c)     On the Trust Termination Date or as soon as reasonably practicable thereafter, after the wind-up of the Trust's affairs by the Trustee and payment of all of the Trust's liabilities have been provided for as required by applicable law, all monies remaining in the Trust estate shall be distributed to the Fire Victims on a *pro rata* basis according to the percentage value of each Approved Claim relative to the total amount of Approved Claims, provided, however, that, notwithstanding any provision in the Trust Documents to the contrary, no payment in the aggregate of less than twenty-five dollars ($25.00) in Cash shall be made to any Beneficial Owner on account of any Approved Claim.

(d)     Following the dissolution and distribution of the assets of the Trust, the Trust shall terminate, and the Trustee (acting alone) shall perform all acts and duties necessary to complete the termination and winding up of the affairs of the Trust and shall execute and cause a Certificate of Cancellation of the Certificate of Trust of the PG&E Fire Victim Trust to be filed in accordance with the Act. Notwithstanding anything to the contrary contained in this Trust Agreement, the existence of the PG&E Fire Victim Trust as a separate legal entity shall continue until the filing of such Certificate of Cancellation. The Trustee shall provide to the Delaware Trustee a certified copy of the Certificate of Cancellation within a reasonable time after the filing of such Certificate of Cancellation. The Certificate of Cancellation need not be signed by the Delaware Trustee.

**8.3    Amendments.**  Any modification or amendment made pursuant to this Section 8.3 must be done in writing.  Notwithstanding anything contained in this Trust Agreement or the CRP to the contrary, neither this Trust Agreement, the CRP, nor any document annexed to the foregoing shall be modified or amended in any way that could jeopardize, impair, or modify (i) the applicability of section 105 of the Bankruptcy Code to the Plan and the Confirmation Order, (ii) the efficacy or enforceability of the Channeling Injunction or any other injunction or release issued or granted in connection with the Plan, (iii) the Trust's qualified settlement fund status under the QSF Regulations, or (iv) the rights, duties, liabilities and obligations of the Delaware Trustee without the written consent of the Delaware Trustee.  Further, without the written consent of the TOC there shall be no modification of (i) Section 5.7 hereof or any rights, benefits or protections provided to the Trust Indemnified Parties, or (ii) the terms of the Claimant Release or the obligation of the Trust to obtain a properly executed Claimant Release as a pre-condition to a claimant receiving a distribution from the Trust.

**8.4    Meetings.**

(a)    The Trustee and the Claims Administrator will hold regularly scheduled, periodic meetings with the TOC, either in person or via telephone or videoconference, which shall occur at least quarterly. The Delaware Trustee shall not be required nor permitted to attend such meetings.

(b)    The TOC shall meet as needed, either in person or via telephone or videoconference.  The Trustee may participate in such meeting as requested by the TOC. Minutes will be maintained at meetings of the TOC and the TOC shall provide such minutes to the Trustee within ten (10) days following such meeting.

**8.5    Severability.**  Should any provision in this Trust Agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this Trust Agreement.

**8.6    Notices.**

(a)    Notices to persons asserting claims shall be given by e-mail as provided on such person's claim form submitted to the Trust with respect to his or her Fire Victim Claim.

(b)    Any notices or other communications required or permitted hereunder to the following parties shall be in writing and delivered at the addresses designated below, or sent by email or facsimile pursuant to the instructions listed below, or mailed by first class mail, postage prepaid, addressed as follows, or to such other address or addresses as may hereafter be furnished in writing to each of the other parties listed below in compliance with the terms hereof.

To the Trustee:

[TBD]

To the Claims Administrator:

[TBD]

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 15:18:02   Page 98 of 137

To the Claims Processor:

[TBD]

To the TOC:

[TBD]

To the Delaware Trustee:

[TBD]

To the Debtors:

[TBD]

With a copy (which shall not constitute notice) to:

[TBD]

(c)　All such notices and communications shall be sent by First Class Mail, fax, or email.  If mailed, the notices shall be effective when physically delivered at the designated addresses.  If sent by fax or email, the notices shall be effective upon transmission.

**8.7　Successors and Assigns.**  The provisions of this Trust Agreement shall be binding upon and inure to the benefit of the Trust, the Trustee, the Delaware Trustee, the TOC, and their respective successors and assigns, except that none of such persons may assign or otherwise transfer any of its rights or obligations, if any, under this Trust Agreement except, in the case of the Trust and the Trustee, as contemplated by Section 2.1 above, and in the case of the Delaware Trustee, as contemplated by section 5.11.

**8.8　Limitation on Claim Interests for Securities Laws Purposes.**  Fire Victim Claims, and any interests therein (a) shall not be assigned, conveyed, hypothecated, pledged, or otherwise transferred, voluntarily or involuntarily, directly or indirectly, except by will or under the laws of descent and distribution; (b) shall not be evidenced by a certificate or other instrument; (c) shall not possess any voting rights; and (d) shall not be entitled to receive any dividends or interest.

**8.9　Evidence of Beneficial Interests.**  Ownership of a beneficial interest in the Trust Assets by the Beneficial Owners shall not be evidenced by any certificate, security or receipt or in any other form or manner whatsoever, except as maintained on the books and records of the Trust by the Trustee.

**8.10　Exemption from Registration.**  The Parties hereto intend that the rights of the Beneficial Owners arising under this Trust Agreement shall not be "securities" under applicable laws, but none of the Parties hereto represent or warrant that such rights shall not be securities or shall be entitled to exemption from registration under applicable securities laws. If it should be determined that any such interests constitute "securities," the Parties hereto intend that the

Case: 19-30088   Doc# 7094   Filed: 09/07/20   Entered: 09/07/20 15:18:02   Page 99
of 137

exemption provisions of section 1145 of the Bankruptcy Code will be satisfied and the offer and sale under the Plan of the beneficial interests in the Trust will be exempt from registration under the Securities Act, all rules and regulations promulgated thereunder, and all applicable state and local securities laws and regulations.

**8.11    Transfer and Exchange.**  The beneficial interests held by Beneficial Owners are not negotiable and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law, and shall be subject to certain other restrictions. Moreover, any and all Trust Interests shall not be listed for trading on any national securities exchange and the Trustee shall not take any action the purpose of which is, or which would be in support of, the establishment of an active trading market in the beneficial interests in the Trust. No voluntary transfer of a beneficial interest in the Trust shall be effective or binding upon the Trust or the Trustee for any purpose. In the case of a deceased individual Beneficial Owner, his or her executor or administrator shall provide written notice to the Trustee and deliver to the Trustee such documentation necessary to evidence the transfer by operation of law and identify the proper Person to succeed to such decedent's interests. The Trustee may fully rely on any such evidence provided by a purported executor or administrator and shall have no duty to investigate.

**8.12    Change of Address.**  A Beneficial Owner may, after the Effective Date, select an alternative distribution address or provide wire transfer instructions for any distribution by providing notice to the Trustee (or to another Person as directed by the Trustee) including such address or instructions. Such notification will be effective only upon receipt by the Trustee or other Person in accordance with this Section 8.12. Absent receipt of such notice, the Trustee shall not recognize any such change of distribution address.

**8.13    Entire Agreement; No Waiver.**  The entire agreement of the parties relating to the subject matter of this Trust Agreement is contained herein and in the documents referred to herein, and this Trust Agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.  No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any further exercise thereof or of any other right, power, or privilege.  The rights and remedies herein provided are cumulative and are not exclusive of rights under law or in equity.

**8.14    Headings.**  The headings used in this Trust Agreement are inserted for convenience only and do not in any manner affect the construction of the provisions of this Trust Agreement.

**8.15    Compliance with Laws.** Any and all distributions of Trust Assets shall be in compliance with applicable laws, including applicable federal and state tax and securities laws.

**8.16    Governing Law.**  The validity and construction of this Trust Agreement and all amendments hereto and thereto shall be governed by the laws of the State of Delaware, and the rights of all parties hereto and the effect of every provision hereof shall be subject to and construed according to the laws of the State of Delaware without regard to the conflicts of law provisions thereof which would purport to apply the law of any other jurisdiction; provided, however, that the laws of the State of California shall govern: (x) any issue of privilege between

Case: 19-30088    Doc# 7084    Filed: 05/07/20    Entered: 05/07/20 06:18:52    Page 100 of 137

any holder of a Fire Victim Claim and his or her counsel; and (y) any issue of privilege between the Trust, the Trustee, and their professionals; provided, further, and for the avoidance of doubt, that all Fire Victim Claims administered under the CRP and this Trust Agreement shall be evaluated under the laws of the State of California; provided, further, that the parties hereto intend that the provisions hereof shall control and there shall not be applicable to the Trust, the Trustee, the Delaware Trustee, the Claims Administrator, the TOC, or this Trust Agreement, any provision of the laws (statutory or common) of the State of Delaware pertaining to trusts that relate to or regulate in a manner inconsistent with the terms hereof: (a) the filing with any court or governmental body or agency of trustee accounts or schedules of trustee fees and charges, (b) affirmative requirements to post bonds for trustees, officers, agents, or employees of a trust, (c) the necessity for obtaining court or other governmental approval concerning the acquisition, holding, or disposition of real or personal property, (d) fees or other sums payable to trustees, officers, agents, or employees of a trust, (e) the allocation of receipts and expenditures to income or principal, (f) restrictions or limitations on the permissible nature, amount or concentration of trust investments or requirements relating to the titling, storage, or other manner of holding of trust assets, (g) the existence of rights or interests (beneficial or otherwise) in trust assets, (h) the ability of beneficial owners or other persons to terminate or dissolve a trust, or (i) the establishment of fiduciary or other standards or responsibilities or limitations on the acts or powers of trustees or beneficial owners that are inconsistent with the limitations on liability or authorities and powers of the Trustee, the Delaware Trustee, the Claims Administrator, or the TOC, as set forth or referenced in this Trust Agreement. Section 3540 of Title 12 of the Delaware Code shall not apply to the Trust.

**8.17    Settlors' Representative and Cooperation.**  The Debtors are hereby irrevocably designated as the Settlors and are hereby authorized to take any action required of the Settlors by the Trustee in connection with this Trust Agreement.   The Reorganized Debtors agree to cooperate in implementing the goals and objectives of this Trust Agreement.

**8.18    Dispute Resolution.**  Any disputes that arise under this Trust Agreement or under the CRP among the parties hereto shall be resolved by an alternative dispute resolution (the "**ADR**") process mutually agreeable to the parties involved. The parties involved agree to meet and confer in good faith in an effort to agree upon a mutually acceptable ADR process. Any party to the ADR process that is dissatisfied with the final outcome of the ADR process may apply to the Bankruptcy Court, and after the close of the Debtors' chapter 11 cases, the District Court, for a judicial determination of the matter, which shall be final. Any review conducted by the Bankruptcy Court (or District Court, as applicable) shall be de novo. In any case, if the dispute arose pursuant to the consent provision set forth in Section 6.7, the burden of proof shall be on the party or parties who withheld consent to show by a preponderance of the evidence that consent was not unreasonably withheld. If after thirty (30) days following notification to all involved parties that there is a matter in dispute, an ADR process has not been agreed upon by the parties or the dispute has not been resolved by an ADR process, the parties are relieved of the requirement to pursue ADR prior to application to the Bankruptcy Court (or District Court, as applicable).  If the Trustee determines that the matter in dispute is exigent and cannot await the completion of the ADR process, the Trustee shall have the discretion to elect out of the ADR process at any stage of the process and seek resolution of the dispute in the Court of Exclusive Jurisdiction.

**8.19    Enforcement and Administration.**  The provisions of this Trust Agreement, the CRP, and the other Trust Documents shall be enforced by the Court of Exclusive Jurisdiction. The parties also acknowledge and agree that the Court of Exclusive Jurisdiction (1) shall have exclusive continuing jurisdiction over the settlement of accounts of the Trustee, those matters set forth in Section 1.6 above, and the determination that the Trust is terminated pursuant to Section 8.2 above, and (2) shall have exclusive continuing jurisdiction over all other matters relating to the Trust and its administration.

**8.20    Joinder.**  The Trustee, the Delaware Trustee, the Claims Administrator, [the Special Master] and each member of the TOC shall execute this Trust Agreement (or a Joinder hereto, as applicable) thereby acknowledging their respective obligations and rights created by the Trust, and agreeing to perform the duties set forth in the Trust Agreement.

**8.21    Capitalized Terms.**  All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the Plan, and such definitions are incorporated herein by reference.  All capitalized terms not defined herein or defined in the Plan, but defined in the Bankruptcy Code or Rules, shall have the meanings ascribed to them by the Bankruptcy Code and Rules, and such definitions are incorporated herein by reference.

**8.22    Effectiveness.**  This Trust Agreement shall not become effective until it has been executed and delivered by all the parties hereto.

**8.23    Counterpart Signatures.**  This Trust Agreement may be executed in any number of counterparts, each of which shall constitute an original, but such counterparts shall together constitute but one and the same instrument.  Delivery of a counterpart hereof by facsimile or email transmission of a PDF file shall be effective as delivery of a manually executed counterpart hereof.

**[balance of page intentionally left blank]**

IN WITNESS WHEREOF, the parties have executed this Trust Agreement as of the date first set forth above to be effective as of the Effective Date.

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**[SIGNATORY NAME]**

By:_____

Title:_____

Date:_____

**EXHIBIT 1**

**2015, 2017, AND 2018 WILDFIRES**

The Trust is established to administer Claims related to the following Fires:

(a)     Butte Fire (2015)

(b)     North Bay Wildfires (2017)

        A.     37
        B.     Adobe
        C.     Atlas
        D.     Blue
        E.     Cascade
        F.     Cherokee
        G.     Honey
        H.     LaPorte
        I.     Lobo
        J.     Maacama/Youngs
        K.     McCourtney
        L.     Norrbom
        M.     Nuns
        N.     Partrick
        O.     Pocket
        P.     Point
        Q.     Pressley
        R.     Pythian/Oakmont
        S.     Redwood/Potter Valley
        T.     Sullivan
        U.     Sulphur
        V.     Tubbs

(c)     Camp Fire (2018)

# EXHIBIT 2

## FIRE VICTIM CLAIMS RESOLUTION PROCEDURES

## FIRE VICTIM CLAIMS RESOLUTION PROCEDURES

## PREAMBLE

The goal of the Fire Victim Trust[1] is to provide an efficient process to fairly compensate the holders of timely filed Fire Victim Claims (respectively, "Claimants" and "Claims") in an equitable manner and on a *pro rata* basis consistent with the terms of the Trust Agreement, Plan, and California and federal law. These Fire Victim Claims Resolution Procedures ("CRP") apply to all Claims. The Claims Administrator shall implement and administer the CRP in consultation with the Trustee, Claims Processor, Neutrals, and Trust Professionals with the goal of securing the just, speedy, and cost-efficient determination of every Claim. Those entrusted with the consideration and determination of Claims shall treat all Claimants with abiding respect and shall strive to balance the prudent stewardship of the Trust with care in its administration, allocation, and distribution.

The speed of any distribution in a program involving thousands of claimants relies on multiple variables impacting administrative expediency. To achieve maximum fairness and efficiency, the CRP is founded on the following principles:

1. Objective eligibility criteria;
2. Clear and reliable proof requirements;
3. Administrative transparency;
4. Rigorous review processes that generate consistent outcomes regardless of the asserted amount of the claim; and
5. Independence of the Trustee, Claims Administrator, Claims Processor, Neutrals, and Trust Professionals.

The Trustee and Claims Administrator will consult with the Claims Processor and other Trust Professionals to develop claims valuation processes that result in fair and reasonable compensation of eligible Claims in accordance with the Trust Agreement and CRP.

## I.   CLAIMANT ELIGIBILITY

To be eligible to receive compensation from the Trust, a Claimant must: (1) have a Claim related to an Included Fire; (2) have timely filed a Proof of Claim; and (3) submit supporting documentation outlined in Section II of this CRP or required by the Claims Administrator ("Supporting Documents"). Upon submission of the Supporting Documents, the Trust will review each Claim and consider all damages and costs recoverable under California law or, if applicable, other non-bankruptcy law.

**A.     Included Fires.** The Trust is established to administer Claims related to the fires identified in <u>Exhibit 1 (</u>each a "Fire" and collectively the "Fires"). Any Claims unrelated to the Fires are ineligible for payment by the Trust and, pursuant to the process described

---

[1]   All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the PG&E Fire Victim Trust Agreement (the "Trust Agreement") and the Debtors' Amended Joint Chapter 11 Plan of Reorganization dated March 16, 2020 (as it may be amended, modified, or supplemented, the "Plan").

Case: 19-30088    Doc# 7094    Filed: 05/07/20    Entered: 05/07/20 06:13:52    Page 1902
of 2073

herein, shall be held to be ineligible on a final basis. For the purposes of the CRP, all Fires set forth in Exhibit 1 are deemed to have been caused by PG&E's equipment and as a result of PG&E's negligence.

**B.     Proof of Claim.** All Claimants must have filed a Proof of Claim for their claims or those of their family in the Bankruptcy Cases on or before December 31, 2019, and as amended, which was the extended Bar Date for Fire Claimants. Claims that were not timely submitted to the Bankruptcy Cases are ineligible for payment by the Trust, unless the claimant obtains relief from the Bankruptcy Court to file a late Claim and submits the Claim to the Bankruptcy Cases and Trust within 30 days after the Bankruptcy Court order allowing such late filing. Claims that have been disallowed or that have been withdrawn from the official claims registry in the Bankruptcy Cases are ineligible for payment by the Trust.

**C.     Supporting Documents.** Section II sets forth each Claim Type the Trust will consider and the Supporting Documents that may be submitted for each. In addition to the Supporting Documents outlined in Section II, Claimants will be required to submit a Claims Questionnaire, as explained in Section V.

## II.     CLAIM TYPES AND SUPPORTING DOCUMENTS

The Trust will use all information that assists in objectively valuing Claims and alleviates the burden on Claimants. This includes, but is not limited to, data from a Claimant's (a) Bankruptcy Proof of Claim Form; (b) Wildfire Assistance Program Claim Form; (c) Damages Questionnaire established under Case Management Order 5 in the California North Bay Fire Cases (JCCP 4955); and (d) other reasonably ascertainable and reliable information. Claimants may be required to submit additional facts and documents to support their Claims for each of the following Claim Types:

**A.     Real Property.**

    **1.     *Description of Real Property Claim.*** Real Property Claims include claims for damage to structures on residential or commercial real property, landscaping, forestry, and other real property improvements (*e.g.*, hardscape, fencing, retaining walls, pools, and solar panels) as a result of the Fires. Real Property damages may be measured in one of two ways: (1) the loss in fair market value to the property ("Diminution in Value"); or (2) the reasonable costs to rebuild or repair the property ("Cost of Repair"). Whether Diminution in Value or Cost of Repair is awarded will depend on the facts of each Claim.

        (a)     *Diminution in Value.* Diminution in Value will be calculated by subtracting the fair market value of the property immediately after the Fire from the fair market value of the property immediately before the Fire.

(b) **Cost of Repair.** The reasonable costs to rebuild or repair the property will be determined based on: (1) the use of the structure(s) and other improvement(s); (2) the extent of damage to the structure(s) [*e.g.*, burn damage versus smoke and soot damage]; (3) the square footage of structure(s); (4) the geographic location of the property; (5) the size of the vegetation on the property immediately before the Fire; (6) the extent of damage to vegetation; (7) the type of vegetation damaged; and (8) the fair market value of the property immediately before the Fire. In addition, the Claimant may claim the value of trees lost.

(c) **Consequential Damages.** Claimants also may make a claim for other reasonably foreseeable economic losses directly caused by destruction of or damage to real property.

2. **Types of Supporting Documents.** Claimants may provide the following documents to support a Real Property Claim:

(a) Verification of ownership;
(b) Appraisals;
(c) Tax records;
(d) Purchase records;
(e) Mortgage or loan documentation showing the pre-Fire condition or value of the property;
(f) Pre-Fire and post-Fire photos or videos of the structures (interior or exterior) or other damaged areas of the property;
(g) Architectural or engineering drawings;
(h) Permits;
(i) Contractor rebuild or repair estimates or invoices;
(j) Arborist reports, timber surveys, or documents relating to landscaping; and
(k) Other supporting documents within the Claimant's possession.

B. **Personal Property.**

1. **Description of Personal Property Claim.** Personal Property Claims include claims for loss of or damages to personal property, such as household items (*e.g.*, clothes, furniture, or tools) and automobiles, as a result of the Fires.

2. **Types of Supporting Documents.** Claimants may provide the following documents to support a Personal Property Claim:

(a) List of items destroyed or damaged in the residency;
(b) Proofs of purchase;
(c) Pre-Fire and post-Fire photos;

(d)     Appraisals; and

(e)     Other supporting documents within the Claimant's possession.

## C.     Personal Income Loss.

1.     ***Description of Personal Income Loss Claim.*** Personal Income Loss Claims include claims of individuals who lost income because (a) they were displaced by the Fires; (b) their employer suffered Business Losses and reduced or stopped paying wages to the Claimant as a result of the Fires; or (c) the Fires or resulting injuries or conditions otherwise interfered with their ability to earn income.

2.     ***Loss of Rental Income.*** Personal Income Loss Claims also include loss of income from rental of a damaged or destroyed property.

3.     ***Types of Supporting Documents***. Claimants may provide the following documents to support a Personal Income Loss Claim:

(a)     Tax returns, including all schedules and attachments;

(b)     W-2 Forms;

(c)     1099 Forms;

(d)     Lease agreements or canceled rent checks;

(e)     Bank account statements identifying earnings;

(f)     Paycheck stubs or payroll records; and

(g)     Other supporting documents within the Claimant's possession.

## D.     Business Loss.

1.     ***Description of Business Loss Claim.*** Business Loss Claims include claims for economic losses suffered by a business as a result of the Fires, including loss of business property or inventory used to conduct business and lost profits or revenue.

2.     ***Types of Supporting Documents***. Claimants may provide the following documents to support a Business Loss Claim:

(a)     Description of the business, including its mission statement;

(b)     Tax returns, including all schedules or attachments;

(c)     Financial statements, including profit and loss statements;

(d)     Articles of Incorporation, bylaws, shareholder lists, or partnership or limited partnership agreements;

(e)     Leases, deeds, titles, or other documents identifying the property owned or occupied by the business;

(f)     Canceled contracts;

(g)     Photos, videos, or other documentary evidence of fire damage to the Claimant's home or business; and

        (h)      Other supporting documents within the Claimant's possession.

**E.**      **Other Out of Pocket Expenses.**

      **1.**      ***Description of Other Out of Pocket Loss Claim.*** Other Out of Pocket Loss Claims include claims for out of pocket expenses that are not considered in any other claim type. These may include additional living expenses, medical and counseling expenses, and other out of pocket expenses as a result of the Fires.

      **2.**      ***Types of Supporting Documents***. Claimants may provide the following documents to support an Other Out of Pocket Loss Claim:

          (a)      Documentation supporting a claim for additional living expenses;
          (b)      Medical bills;
          (c)      Counseling bills; and
          (d)      Other supporting documents within the Claimant's possession.

**F.**      **Wrongful Death and Serious Personal Injury.**

      **1.**      ***Description of Wrongful Death and Serious Personal Injury Claim.*** Wrongful Death and Serious Personal Injury Claims include claims relating to individuals who died or suffered serious personal injury as a result of the Fires. The Trustee and Claims Administrator will devise procedures ensuring a streamlined and sensitive process providing Claimants and their family members the dignity that is critical to successfully resolving Claims relating to these extraordinary losses.

      **2.**      ***Types of Supporting Documents.*** Claimants may provide medical records and other documents supporting a Wrongful Death or Serious Personal Injury Claim, as well as documents supporting a claim for loss of relationship, love, support, and companionship.

**G.**      **Emotional Distress.**

      **1.**      ***Description of Emotional Distress Claim.*** Emotional Distress Claims include claims arising from: (a) zone of danger evacuation from the Fires; (b) physical injury as a result of the Fires; and (c) substantial interference with the use and enjoyment of or invasion of property occupied by the Claimant, as well as the impact of the loss of the community.

      **2.**      ***Types of Supporting Documents***. Claimants may provide the following documents to support an Emotional Distress Claim:

<ol type="a" start="1">
<li>(a) A written narrative or an audio or video recording detailing the Claimant's evacuation and impact of the Fire on the Claimant and his or her family, including impact related to the loss of property and any sentimental items in the home;</li>
<li>(b) Texts, emails, or social media content the Claimant created during the evacuation;</li>
<li>(c) Photos or videos taken during the evacuation;</li>
<li>(d) Pre-Fire and post-Fire photos and videos of the Claimant's property;</li>
<li>(e) Records describing bodily injury or mental health counseling or treatment;</li>
<li>(f) Documentation of medical and counseling expenses; and</li>
<li>(g) Other supporting documents in the Claimant's possession.</li>
</ol>

## III.    OTHER DAMAGES

The Trustee and Claims Administrator will devise procedures to evaluate any additional categories of recoverable damages.

## IV.    CLAIMS SUBMISSION

The Claims Processor will maintain a secure, web-based portal (a "Portal") for Claimants to submit Claims Questionnaires, Supporting Documents, Releases, and any other relevant information or documents. After submitting a Claim, Claimants will be able to use the Portal check their Claim status, receive and respond to determination notices, submit supplementary materials, and update contact information and other demographic information, if necessary.

## V.    CLAIMS QUESTIONNAIRE

In addition to the Claim-specific Supporting Documents identified in Section II, the Claims Administrator will require Claimants to complete a Claims Questionnaire that provides sufficient information to: (1) verify the Claimant's identity; (2) identify and support the claimed damages; and (3) demonstrate the Claimant's authority to assert the Claims.

Individual Claimants may submit Claims Questionnaires by household. The Claims Processor will pre-populate Claims Questionnaires with information already in its possession, including but not limited to data from a Claimant's (a) Bankruptcy Claim Proof of Claim Form; (b) Wildfire Assistance Program Claim Form; (c) Damages Questionnaire established under Case Management Order 5 in the California North Bay Fire Cases (JCCP 4955); and (d) information that is otherwise reasonably ascertainable and reliable.

The Trustee will use reasonable efforts to obtain insurance claim files directly from a Claimant's insurance carrier but may require certain insurance information directly from the Claimant in support of their Claim. The Claim Questionnaire may include a consent by the Claimant to the Trust obtaining any and all information related to the Claim from Claimant's

insurer. The Plan does not absolve the insurance carriers of their duty to fulfill their coverage obligations under their policies of insurance with a Claimant.

## VI. <u>RELEASE</u>

Before receiving payment from the Trust, Claimants must submit signed releases in substantially the same form and content as the Claimant Release and Mutual Made Whole Release, attached to the Trust Agreement as Exhibits 4 and 5, respectively.

By signing the Claimant Release, the Claimant will agree to release Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator and Special Master (the "Released Parties") from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that an applicant had, have, or may have in the future ("Released Claims") arising from, relating to, resulting from or in any way connected to, in whole or in part, the discharge of the Released Parties' duties and responsibilities under the Retention Order, the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the CRP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the CRP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities.

The Release will also require the Claimant to (i) acknowledge and agree that the Claimant remains solely responsible for resolving all open Government Payors[2] and Non-Government Payors' liens, rights of reimbursement, and other claims (collectively, "Liens"); (ii) use best efforts to resolve all known Liens; (iii) agree to indemnify and hold harmless the Trust in connection with all known Liens and any future Liens; (iv) agree that the Trust will not be liable for any act, or failure to act, of the lien resolution administrator retained in connection with the Fire Victim Trust; and (v) assign the Trust the right to pursue the 2015 Insurance Rights, if any, and the Claimant Insurance Rights (as defined in the Trust Agreement), if applicable, for the full value of the Fire Victim Claim.

## VII. <u>NOTICE OF CLAIMS DETERMINATION</u>

The CRP will govern the process by which each Claim is reviewed, including whether the Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment

---

[2] "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

("Claims Determination"). After the Trust has fully evaluated a Claim, the Claims Processor will issue a notice to the Claimant explaining the review result ("Determination Notice"). If the Claim has been approved and is eligible for payment ("Approved Claim"), the notice will include the specific amount that the Trust has approved for payment ("Approved Claim Amount") and the stages in which payment may occur. If the Claim is missing documents or information required for the Trust to fully evaluate the Claim ("Deficient Claim"), the notice will explain what is required and provide a timeline within which the Claimant may resolve the deficiencies. If the Claim is ineligible for payment from the Trust pursuant to the CRP ("Disallowed Claim"), the notice will explain the reason(s) that the Claim is ineligible.

## VIII.  DISPUTE RESOLUTION

Claimants dissatisfied with their Claims Determination will have the opportunity to dispute the determination and to provide supplemental information or documents to support their dispute. The Trust will implement the following three-tiered process:

1. ***Reconsideration.*** If a Claimant contests a Claims Determination, the Claims Administrator and Claims Processor will review the Claim again and will consider any newly submitted information and documents and all previously submitted information. Afterwards, the Claims Processor will issue a Reconsideration Determination. The Claimant may accept the Reconsideration Determination or may appeal to a Neutral.

2. ***Appeal.*** If a Claimant appeals a Reconsideration Determination, the Claimant shall submit a Notice of Appeal to the Claims Administrator. The Claims Administrator shall submit the Claim to the Appeals Officer[3] for further consideration de novo in accordance with the procedure set forth herein.

    (a)    The Claims Administrator shall submit the following:

      (i)    The Notice of Appeal;

      (ii)    The record from the Claims Administrator and Claims Processor resulting in the Claims Determination;

      (iii)    The record from the Claims Administrator and Claims Processor resulting in the Reconsideration Determination;

    (b)    Claimant may submit the following:

      (i)    Any additional information and/or documents not included in the record from either the Claims or Reconsideration Determination;

---

[3] The Appeals Officer shall be an individual appointed for the sole purpose of determining whether an appeal from a Determination of the Claims Administrator should be heard by a Neutral from the General Panel or by a Neutral from the Complex Panel. Such determination shall be at the sole and exclusive discretion of the Appeals Officer, who shall at all times remain independent of the Trustee and the Claims Administrator.

        (ii)     A brief not to exceed twenty (20) pages setting forth the issues on appeal and the basis for appeal as to each such issue.

(c)    Claimant shall designate the type of review sought:

        (i)     Document review only;

        (ii)     Document review followed by telephonic hearing;

        (iii)    Document review followed by virtual hearing

        (iv)    Document review followed by in-person hearing.

(d)    The Appeals Officer shall determine whether the appeal shall be considered by a Neutral from the Complex Panel. The Claimant may request that the appeal be considered by a Neutral from the Complex Panel, subject to a determination by the Appeals Officer.

        (i)     The determination of whether an appeal should be considered by a Neutral from the Complex Panel shall be made by the Appeals Officer in his sole discretion.

        (ii)     The Appeals Officer may consider the type, amount and complexity of a Claim and the type of review requested when determining whether an appeal should be considered by a Neutral from the Complex Panel the Claim

        (iii)    The Appeals Officer's determination of whether an appeal should be considered by a Neutral from the Complex Panel shall be final, binding and non-appealable and is not subject to review by any Court.

(e)    A Neutral shall be chosen at random from the General Panel or from the Complex Panel, as determined by the Appeals Officer, to consider the Claim de novo in accordance with the type of review requested by Claimant;

(f)    The Neutral shall consider the appeal based on all items submitted by Claimant through the close of the review and/or hearing.

(g)    Within thirty (30) days of the close of the hearing, the Neutral shall issue an Appeals Determination, increasing, decreasing, or confirming the Reconsideration Determination.

**3.**    ***Trustee Determination.*** The Neutral shall submit to the Trustee the Appeals Determination, increasing, decreasing, or confirming the Reconsideration Determination. The Trustee may accept, reject, or revise the Appeals Determination and then will issue a Trustee Determination to the Claimant. The Trustee Determination is the final Claims

Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 06:13:02   Page 115
Case: 19-30088   Doc# 7094   Filed: 05/07/20   Entered: 05/07/20 05:13:52   Page 115
of 137

Determination regarding both eligibility and payment amount, if any. The Trustee Determination will be final, binding, and non-appealable and is not subject to review by any Court, **including right to trial by jury**.[4]

## IX.     HOLD-BACK FOR ATTORNEY LIENS

Prior to receiving any award in respect of any Claim Determination, any Claimant who was represented by an attorney ("**Claimant Attorney**") at the time of filing its Proof of Claim in the Chapter 11 Cases or at any time thereafter, shall: (1) agree to receive their award through their Claimant Attorney; or (2) provide evidence to the satisfaction of the Claims Administrator and Trustee that there is no lien or potential lien on their Claims Determination asserted or assertable by a Claimant Attorney (an "**Attorney Lien**"), including by providing written confirmation from such Claimant Attorney that no Attorney Lien exists.  If an Attorney Lien exists, is asserted or assertable, then only the undisputed portion of the award shall be provided to the Claimant.  The disputed portion shall be held back until the Claims Administrator receives satisfactory notice in his or her sole determination, that such dispute and Attorney Lien has been resolved. The payment of attorney's fees incurred by Claimant and the satisfaction of any Attorney Lien is the sole obligation of Claimant. Neither the Trustee nor the Trust is responsible for the payment of any attorney's fees or the resolution of any Attorney Lien incurred in connection with a Claim.

## X.     CREDITS AND DEDUCTIONS

**A.     Credits for Amounts Covered By Insurance.**  In determining all award amounts, the Trustee will take into account all insurance recoveries available to the Claimant as provided in the Trust Agreement.

**B.     Deduction for Payment Received from Wildfire Assistance Fund.**  In determining all award amounts, the Trustee will take into account any payment Claimant has received from the Wildfire Assistance Fund as provided in the Trust Agreement.

**C.     Deduction for Payment Received from FEMA.**  In determining all award amounts, the Trustee will take into account any payment Claimant has received from the Federal Emergency Management Agency ("FEMA") on account of the same damages or losses, as provided in the Trust Agreement.

**D.     Medical Liens.**  In determining all award amounts, the Trustee will take into account all known outstanding governmental medical liens, if any, currently owed by the Claimant. Claimants shall be responsible for the payment of all medical or other applicable liens. The Claimant will undertake to resolve such liens, and if not done, the Trustee will take over the process, solely with respect to governmental liens. The Trustee will retain the services of a Lien Resolution Administrator to identify, resolve, and satisfy, in accordance with applicable law, certain Claimant governmental repayment obligations, including, but not limited to, Medicare (Parts A and B), Medicaid, and other governmental liens.

---

[4]     As of the Effective Date, all Fire Victim Claims against PG&E are discharged and channeled into this Trust. Any trial would be against the Trust and against the interests of fellow Fire Victims, not against PG&E. As such, the procedures in this Trust are set up to protect Fire Victims' due process rights and create fair, just, and expedient results.

**E.** **Taxes.** In connection with their duties hereunder, the Trustee and Claims Administrator will make every effort to ensure that the Trust complies with all applicable laws, including without limitation all tax return filings and information reporting requirements set forth in applicable laws.

## XI. CONFIDENTIALITY OF CLAIMS INFORMATION

All personal information, facts, and documents submitted to the Trust by or regarding any Claimant or Claim shall be kept confidential and shall only be disclosed: (1) to the Trustee, Claims Administrator, Claims Processor, Neutrals, and Trust Professionals to the extent necessary to process and pay Claims; or (2) as may be required by applicable law, ethical requirements, or legitimate business uses associated with administering the Trust.

63737092 v7

# EXHIBIT 3

## FORM OF CERTIFICATE OF TRUST
## OF THE
## PG&E FIRE VICTIM TRUST

This Certificate of Trust of the **PG&E FIRE VICTIM TRUST** (the "*Trust*") is being duly executed and filed by the undersigned trustees of the Trust, to form a statutory trust under the Delaware Statutory Trust Act (12 Del. Code § 3801 *et seq.*) (the "*Act*").

1. **Name.**  The name of the statutory trust formed hereby is:

    **PG&E Fire Victim Trust**

2. **Delaware Trustee.**  The name and business address of the Delaware Trustee of the Trust in the State of Delaware is:

    [                                                                    ]

3. **Effective Date.**  This Certificate of Trust shall be effective upon filing.

**IN WITNESS WHEREOF,** the undersigned, being all of the trustees of the Trust, have duly executed this Certificate of Trust in accordance with Section 3811(a) of the Act.

| TRUSTEE: | DELAWARE TRUSTEE: |
|---|---|
| _____<br>Hon. John K. Trotter (Ret.), in his capacity as Trustee and not individually | By: _____<br>Name:<br>Title: |

**EXHIBIT 4**

<u>**CLAIMANT RELEASE AND INDEMNIFICATION
IN CONNECTION WITH THE FIRE VICTIM TRUST AWARDS**</u>


<u>**ENTITY CLAIMANT RELEASE AND INDEMNIFICATION
IN CONNECTION WITH THE FIRE VICTIM TRUST AWARDS**</u>

**DRAFT – SUBJECT TO REVISION AS CLAIMS ARE REVIEWED**

## CLAIMANT RELEASE AND INDEMNIFICATION
## IN CONNECTION WITH THE FIRE VICTIM TRUST AWARDS

To receive payment of an Award (as defined below) from the PG&E Fire Victim Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). **This Release must be signed by the Claimant or the Claimant's Legal Representative (as defined below). A signature by an attorney for the Claimant or by an attorney for the Claimant's Legal Representative is not sufficient.**

If you need assistance, please contact the Claims Administrator by email at _____@\_\_\_\_.com or by phone toll-free at (\_\_\_) \_\_\_-\_\_\_\_. You may also visit the Fire Victim Trust Website for additional information.

### DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**2015 Insurance Policies**" means any insurance policy issued to any of the Debtors or under which the Debtors have sought or may seek coverage for the 2015 policy year.
.

"**2015 Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to resolve any claims related to Fires under the 2015 Insurance Policies, other than the rights of the Debtors to be reimbursed for claims submitted to and paid by the Debtors prior to January 29, 2019.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Fire Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California San Francisco Division, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**Channeling Injunction**" means the permanent injunction provided for in Section 10.7 of the Chapter 11 Plan with respect to Fire Victim Claims that was issued pursuant to, and included in, the order confirming the Chapter 11 Plan.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently

styled *In re PG&E Corporation and Pacific Gas and Electric Company*, Bankruptcy Case No. 19-30088 (DM) (Lead Case) (Jointly Administered).

"**Chapter 11 Plan**" means the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020, filed in the Chapter 11 Cases and confirmed by the Bankruptcy Court.

"**Claim**" or "**Claims**" has the meaning set forth in section A of this Release.

"**Claimant**" means a Fire Victim who (i) has timely filed a proof of claim in the Chapter 11 Cases, (ii) has had his or her Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction; and (iii) who is signing and executing this Release (or on whose behalf this Release is being signed and executed by a Legal Representative).

"**Claimant Insurance Company**" means any insurance company that issued or allegedly issued a Claimant Insurance Policy.

"**Claimant Insurance Policy**" means any insurance policy that was issued or allegedly issued that does or may afford the Claimant rights, benefits, indemnity, or insurance coverage with respect to any claims and that has been assigned to the Trustee by Claimant and accepted by the Trustee pursuant to Section 2.6(c) of the Trust Agreement.

"**Claimant Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Claimant to any proceeds, payments, benefits, causes of action, choses in action, defense or indemnity arising under or attributable to any and all Claimant Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

"**Claims Questionnaire**" means the claims questionnaire and supporting documents required by the CRP in support of Fire Victim Claims.

"**CRP**" means the Fire Victim Claims Resolution Procedures for the resolution, liquidation, and payment of Fire Victim Claims by the Trust, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020 and as may be amended and supplemented thereafter from time to time.

"**Debtors**" means PG&E Corporation and Pacific Gas and Electric Company, the debtors and debtors-in-possession in the Chapter 11 cases.

"**District Court**" means the United States District Court for the Northern District of California, having jurisdiction in the Chapter 11 Cases.

"**Fires**" means the Butte Fire (2015), the North Bay Fires (2017) (consisting of the following fires: LaPorte, McCourtney, Lobo, Honey, Redwood/Potter Valley, Sulphur, Cherokee, 37, Blue, Pocket, Atlas, Cascade, Nuns, Adobe, Norrbom, Pressley, Partrick, Pythian/Oakmont, Maacama, Tubbs, Point, and Sullivan) and the Camp Fire (2018).

"**Fire Victim**" means a person or entity damaged, or who purports to have been damaged, in various ways by the Fires.

"**Fire Victim Claim**" means any claim against the Debtors in any way arising out of the Fires that was channeled to the Trust by the Channeling Injunction and the Plan.

"**Governmental Payor**" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

"**Legal Representative**" means a personal representative, guardian, conservator, parent (on behalf of a minor), executor of an estate or a similar representative who has been appointed by a court (including the Special Master) or has other legal authorization to file a proof of claim and/or a Fire Victim Claim on behalf of the Claimant.

"**Lien**" or "**Liens**" means (i) any statutory lien of a Governmental Payor or Medicare Part C or Part D Program sponsor, or (ii) any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any Other Payer or Provider, where there is a legal obligation to withhold payment of an Award, or some portion thereof, to a Claimant under applicable federal or state law or for the Claimant to reimburse the Government Payor, Other Payer or Provider for amounts paid on the Claimant's behalf in connection with the Claimant's Fire Victim Claims.

"**Lien Resolution Administrator**" means that person or entity, retained by the Trustee to resolve Medicare Program Part A and B liens, Medicaid Program liens, and Medicare Part C Program liens, using the information provided by the Claimant in the Claims Questionnaire.

"**Medicaid Program**" means the federal program administered by the states under which certain medical items, services, and/or prescription drugs are furnished to Medicaid beneficiaries under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1, *et seq.*

"**Medicare Part C or Part D Program**" means the program(s) under which Medicare Advantage, Medicare cost, and Medicare health care prepayment plan benefits and Medicare Part D prescription drug plan benefits are administered by private entities that contract with Centers For Medicare & Medicaid Services ("**CMS**").

"**Medicare Program**" means the Medicare Parts A and B federal program administered by CMS under which certain medical items, services, and/or prescription drugs are furnished to Medicare beneficiaries under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*

"**Released Parties**" means the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, agents, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator or Special Master.

"**Retention Orders**" means the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Hon. John K. Trotter (Ret.) as Trustee *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6760] and the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Cathy Yanni as Claims Administrator *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6759], entered by the Bankruptcy Court on April 14, 2020 in the Chapter 11 Cases.

"**Special Master**" means the special master appointed by the Superior Court of California for the County of San Francisco to approve any and all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP.

"**TOC**" means the members of Trust Oversight Committee appointed by the Consenting Fire Claimant Professionals and the Tort Claimants Committee to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trust Agreement**" means the PG&E Fire Victim Trust Agreement dated as of [●], 2020, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020.

"**Trustee**" means Hon. John K. Trotter (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.    In consideration of the benefit of an Award from the Trust, I, on my own behalf and on behalf of my respective predecessors, successors, assigns, assignors, representatives, attorneys, agents, trustees, insurers, heirs, next of kin, estates, beneficiaries, executors, administrators, and any natural, legal, or juridical person or entity to the extent he, she, or it is entitled to assert any claim on my behalf, including, but not limited to, a Legal Representative, (hereafter "I", "My" or "Me"), do hereby voluntarily, intentionally, knowingly, absolutely,

unconditionally and irrevocably waive, release, remit, acquit, forever discharge, covenant not to sue, and hold harmless the Released Parties from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment of performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, the discharge of the Released Parties' duties and responsibilities under the Retention Order, the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the CRP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the CRP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities.  I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Released Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

B.      I hereby acknowledge that pursuant to the Chapter 11 Plan, the Channeling Injunction and the order confirming the Chapter 11 Plan, the Debtors have been fully and completely discharged and released and their respective property and successors and assigns from any and all liability arising from or related to any Fire Victim Claim asserted.

C.      I hereby acknowledge that I am solely and ultimately responsible for the satisfaction and discharge of all Liens.  I shall use best efforts to resolve all known Liens.

D.      Notwithstanding my responsibilities to resolve all known Liens, I hereby authorize the Lien Resolution Administrator to resolve any and all Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens, as set forth in the definition of Lien Resolution Administrator above.  The Lien Resolution Administrator shall use best efforts to resolve the Medicare Program liens, Medicaid Program liens, and Medicare Part C Program liens on my behalf.

E.      In further consideration of the benefit of an Award, I do hereby release, forever discharge, hold harmless, and covenant not to sue the Released Parties from any and all Claims arising from, relating to, resulting from or in any way connected t, in whole or in part, any act, or failure to act, of the Lien Resolution Administrator. I covenant and agree that I will honor the release as set forth in the preceding sentence and, further, that I will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Claim released hereby, (ii) participate,

assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

F.      I hereby acknowledge and agree that to the extent my information is incorrect or incomplete to any substantial degree, after reasonable diligence by the Lien Resolution Administrator, which results in the Lien Resolution Administrator being unable to properly verify coverage or identify Liens for which the Lien Resolution Administrator is responsible, then the Lien Resolution Administrator shall have no further responsibility for such unknown/unresolved Liens.

G.      In further consideration of the benefit of an Award, I shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including the costs of defense and attorneys' fees of, the Released Parties against any and all Claims.

H.      I, as assignor, hereby irrevocably and  unconditionally transfer and assign to the Trust, as assignee, any and all rights to pursue and release 2015 Insurance Rights for my Claim for the full amount of the liability that either of the Debtors may have or have had for my Claim.

I.      [I, as assignor, hereby irrevocably and unconditionally transfer and assign to the Trust, as assignee, any and all rights to pursue and release Claimant Insurance Rights for my Fire Victim Claim for the full amount of the liability any Claimant Insurance Company may have or has had for my Fire Victim Claim and has not previously paid.][1]

J.      I acknowledge that the Trust is not providing any tax advice with regard to the receipt of the Award or any component thereof, and I understand and agree that I shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

K.      [If I am awarded compensation for any loss of consortium or bystander claims, I acknowledge and agree that all beneficiaries of such claims (each, a "Beneficiary") must execute and be bound by this Release.  Each Beneficiary waives all rights and interests in those indirect or third-party claims and is barred from the assertion of those indirect or third-party claims in the tort system or otherwise.]

---

[1] This provision will be included only if an assignment pursuant to Trust Agreement Section 2.6(c) is contemplated.

**DRAFT – SUBJECT TO REVISION AS CLAIMS ARE REVIEWED**

Claimant or Legal Representative Printed Name: _____

Claimant or Legal Representative Signature: _____

Date: _____

Beneficiary Printed Name (if applicable): _____

Beneficiary Signature (if applicable): _____

Date: _____

## ENTITY CLAIMANT RELEASE AND INDEMNIFICATION
## IN CONNECTION WITH THE FIRE VICTIM TRUST AWARDS

To receive payment of an Award (as defined below) from the PG&E Fire Victim Trust (the "**Trust**"), an eligible Claimant must execute and submit to the Trustee (as defined below) this Release and Indemnification (the "**Release**"). **This Release must be signed by an authorized signatory of the Claimant. A signature by an attorney for the Claimant, unless such attorney is an authorized signatory of the Claimant, is not sufficient.**

If you need assistance, please contact the Claims Administrator by email at _____@____.com or by phone toll-free at (___) ___-____. You may also visit the Fire Victim Trust Website for additional information.

## DEFINITIONS

The definitions set forth above for the terms "**Trust**" and "**Release**" are specifically incorporated herein by reference as if fully set forth in this section.

All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Chapter 11 Plan (as defined below).

"**2015 Insurance Policies**" means any insurance policy issued to any of the Debtors or under which the Debtors have sought or may seek coverage for the 2015 policy year.
.
"**2015 Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Debtors to resolve any claims related to Fires under the 2015 Insurance Policies, other than the rights of the Debtors to be reimbursed for claims submitted to and paid by the Debtors prior to January 29, 2019.

"**Award**" means the compensation a Claimant receives on behalf of the Claimant's Fire Claim.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Northern District of California San Francisco Division, having subject matter jurisdiction over the Chapter 11 Cases and, to the extent of any reference withdrawal made under section 157(d) of title 28 of the United States Code, the District Court.

"**Channeling Injunction**" means the permanent injunction provided for in Section 10.7 of the Chapter 11 Plan with respect to Fire Victim Claims that was issued pursuant to, and included in, the order confirming the Chapter 11 Plan.

"**Chapter 11 Cases**" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court and currently

styled *In re PG&E Corporation and Pacific Gas and Electric Company*, Bankruptcy Case No. 19-30088 (DM) (Lead Case) (Jointly Administered).

"**Chapter 11 Plan**" means the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020, filed in the Chapter 11 Cases and confirmed by the Bankruptcy Court.

"**Claim**" or "**Claims**" has the meaning set forth in section A of this Release.

"**Claimant**" means a Fire Victim that (i) has timely filed a proof of claim in the Chapter 11 Cases, (ii) has had its Claim channeled to the Trust for evaluation, resolution, and payment pursuant to the Plan and the Channeling Injunction; and (iii) on whose behalf this Release is being signed and executed by an authorized signatory. The term Claimant includes all predecessors, successors, assigns, assignors, representatives, members, officers, agents, affiliates, general partners, limited partners, members, managers, direct and indirect equity holders in their capacity as equity holders, subsidiaries, managed accounts or funds, controlling persons, employees, fund advisors, agents, and other representatives.

"**Claimant Insurance Company**" means any insurance company that issued or allegedly issued a Claimant Insurance Policy.

"**Claimant Insurance Policy**" means any insurance policy that was issued or allegedly issued that does or may afford the Claimant rights, benefits, indemnity, or insurance coverage with respect to any claims and that has been assigned to the Trustee by Claimant and accepted by the Trustee pursuant to Section 2.6(c) of the Trust Agreement.

"**Claimant Insurance Rights**" means any and all rights, titles, privileges, interests, claims, demands, or entitlements of the Claimant to any proceeds, payments, benefits, causes of action, choses in action, defense or indemnity arising under or attributable to any and all Claimant Insurance Policies, now existing or hereafter arising, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, disputed or undisputed, fixed or contingent.

"**Claims Questionnaire**" means the claims questionnaire and supporting documents required by the CRP in support of Fire Victim Claims.

"**CRP**" means the Fire Victim Claims Resolution Procedures for the resolution, liquidation, and payment of Fire Victim Claims by the Trust, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020 and as may be amended and supplemented thereafter from time to time.

"**Debtors**" means PG&E Corporation and Pacific Gas and Electric Company, the debtors and debtors-in-possession in the Chapter 11 cases.

"**District Court**" means the United States District Court for the Northern District of California, having jurisdiction in the Chapter 11 Cases.

"**Fires**" means the Butte Fire (2015), the North Bay Fires (2017) (consisting of the following fires: LaPorte, McCourtney, Lobo, Honey, Redwood/Potter Valley, Sulphur, Cherokee, 37, Blue, Pocket, Atlas, Cascade, Nuns, Adobe, Norrbom, Pressley, Partrick, Pythian/Oakmont, Maacama, Tubbs, Point, and Sullivan) and the Camp Fire (2018).

"**Fire Victim**" means a person or entity damaged, or who purports to have been damaged, in various ways by the Fires.

"**Fire Victim Claim**" means any claim against the Debtors in any way arising out of the Fires that was channeled to the Trust by the Channeling Injunction and the Plan.

"**Lien**" or "**Liens**" means (i) any statutory lien of a Governmental Payor or Medicare Part C or Part D Program sponsor, or (ii) any mortgage, lien, pledge, charge, security interest, or legal encumbrance, of any nature whatsoever, held by any Other Payer or Provider, where there is a legal obligation to withhold payment of an Award, or some portion thereof, to a Claimant under applicable federal or state law or for the Claimant to reimburse the Government Payor, Other Payer or Provider for amounts paid on the Claimant's behalf in connection with the Claimant's Fire Victim Claims.

"**Released Parties**" means the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator, Special Master and each of their respective predecessors, successors, assigns, assignors, representatives, members, officers, employees, agents, consultants, lawyers, advisors, professionals, agents, trustees, insurers, beneficiaries, administrators, and any natural, legal, or juridical person or entity acting on behalf of or having liability in respect of the Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator or Special Master.

"**Retention Orders**" means the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Hon. John K. Trotter (Ret.) as Trustee *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6760] and the Order Granting Application of The Official Committee of Tort Claimants Pursuant to 11 U.S.C. §§ 1103 and 363 and Fed. R. Bankr. P. 2014 and 5002 to Retain and Employ Cathy Yanni as Claims Administrator *Nunc Pro Tunc* to January 13, 2020 [Docket No. 6759], entered by the Bankruptcy Court on April 14, 2020 in the Chapter 11 Cases.

"**Special Master**" means the special master appointed by the Superior Court of California for the County of San Francisco to approve any and all minors' compromises in conjunction with the evaluation, disallowance, resolution, settlement, and approval of any and all Fire Victim Claims in accordance with the CRP.

"**TOC**" means the members of Trust Oversight Committee appointed by the Consenting Fire Claimant Professionals and the Tort Claimants Committee to oversee the Trust in accordance with the Chapter 11 Plan and the Trust Agreement.

"**Trust Agreement**" means the PG&E Fire Victim Trust Agreement dated as of [●], 2020, substantially in the form included in the Plan Supplement filed in the Chapter 11 Cases on May 1, 2020.

"**Trustee**" means Hon. John K. Trotter (Ret.) or any other person appointed to serve as trustee under and in accordance with the Trust Agreement.

## RELEASE AND INDEMNIFICATION

A.  In consideration of the benefit of an Award from the Trust, Claimant, on its own behalf and on behalf of its predecessors, successors, assigns, assignors, representatives, members, officers, agents, affiliates, general partners, limited partners, members, managers, direct and indirect equity holders in their capacity as equity holders, subsidiaries, managed accounts or funds, controlling persons, employees, fund advisors, agents, and other representatives, trustees, insurers, estates, beneficiaries, executors, administrators, does hereby voluntarily, intentionally, knowingly, absolutely, unconditionally and irrevocably waive, release, remit, acquit, forever discharge, covenant not to sue, and hold harmless the Released Parties from and with respect to any and all claims, including, but not limited to, all claims as defined in section 101(5) of the Bankruptcy Code, charges, complaints, demands, obligations, causes of action, losses, expenses, suits, awards, promises, agreements, rights to payment, right to any equitable remedy, rights of any contribution, indemnification, reimbursement, subrogation or similar rights, demands, debts, liabilities, express or implied contracts, obligations of payment of performances, rights of offset or recoupment, costs, expenses, attorneys' and other professional fees and expenses, compensation or other relief, and liabilities of any nature whatsoever whether present or future, known or unknown, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, absolute or contingent, direct or derivative and whether based on contract, tort, statutory, or other legal or equitable theory of recovery (collectively, "**Released Claims**") arising from, relating to, resulting from or in any way connected to, in whole or in part, the discharge of the Released Parties' duties and responsibilities under the Retention Order, the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the CRP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the CRP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities.  Claimant covenants and agree that it will honor the release as set forth in the preceding sentence and, further, that it will not (i) institute a lawsuit or other action based upon, arising out of, or relating to any Released Claim released hereby, (ii) participate, assist, or cooperate in any such action, or (iii) encourage, assist and/or solicit any third party to institute any such action.

B.  Claimant hereby acknowledges that pursuant to the Chapter 11 Plan, the Channeling Injunction and the order confirming the Chapter 11 Plan, the Debtors have been fully and completely discharged and released and their respective property and successors and assigns from any and all liability arising from or related to any Fire Victim Claim asserted.

C.      Claimant hereby acknowledges that it is solely and ultimately responsible for the satisfaction and discharge of all Liens.  Claimant shall use best efforts to resolve all known Liens.

D.      In further consideration of the benefit of an Award, Claimant shall indemnify and forever hold harmless, and pay all final judgments, damages, costs, expenses, fines, penalties, interest, multipliers, or liabilities in whatsoever nature, including the costs of defense and attorneys' fees of, the Released Parties against any and all Claims.

E.      Claimant, as assignor, hereby irrevocably and unconditionally transfers and assigns to the Trust, as assignee, any and all rights to pursue and release 2015 Insurance Rights for it Claim for the full amount of the liability that either of the Debtors may have or have had for its Claim.

F.      [Claimant, as assignor, hereby irrevocably and unconditionally transfers and assigns to the Trust, as assignee, any and all rights to pursue and release Claimant Insurance Rights for its Fire Victim Claim for the full amount of the liability any Claimant Insurance Company may have or has had for its Fire Victim Claim and has not previously paid.][1]

G.      Claimant acknowledges that the Trust is not providing any tax advice with regard to the receipt of the Award or any component thereof, and understands and agrees that it shall be solely responsible for compliance with all tax laws with respect to the Award, to the extent applicable.

Claimant Name: _____

By: _____

Authorized Signature: _____

Title: _____

Date: _____

---

[1] This provision will be included only if an assignment pursuant to Trust Agreement Section 2.6(c) is contemplated.

**EXHIBIT 5**

**MUTUAL MADE WHOLE RELEASE**

The terms "Claimant" and "Insurer," are defined in Paragraph G. below.

_____, Trustee of the Fire Victim Trust, the undersigned party or personal representative (referred to herein as "Claimant"), individually and on behalf of the estate of the Claimant, and the Insurer (collectively, the "Parties" or "Releasees") agree as follows:

A.        Whereas, the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated _____ (the "Plan"), was confirmed by an order of the United States Bankruptcy Court for the Northern District of California entered on _____, 2020, and the Plan became effective on _____, 2020.

B.        Whereas the Plan provides for the treatment of all allowed Fire Victim Claims (as defined in the Plan) against the Debtors through the Fire Victim Trust (as defined in the Plan) and for the discharge of the Debtors from any further or other liability on account of all Fire Victim Claims.

C.        Whereas the Plan provides for the treatment of all allowed Subrogation Wildfire Claims (as defined in the Plan) against the Debtors through the Subrogation Wildfire Trust (as defined in the Plan) and for the discharge of the Debtors from any further or other liability on account of all Subrogation Wildfire Claims.

D.        Whereas, the Plan provides that the Fire Victim Claims are administered by a Fire Victim Trust and a Fire Victim Trustee who operates independent from the Debtors, holders of the Fire Subrogation Claims, and the Insurer.  Neither the Debtors, holders of the Fire Subrogation Claims, nor the Insurer shall have any right to participate in the administration of the Fire Victim Trust, review any allocation or distribution decision of the Trustee or Trust Oversight Committee, including that of the Claimant, or make any claim for money against the Trust or the Trustee in any way or at any time.

E.        Whereas, the Trustee and Fire Victim Trust Oversight Committee have reviewed and advised the Claimant of (a) the total amount paid into the Fire Victim Trust available for compensation to the Fire Victims, (b) the total number of claims made against the Fire Victim Trust, (c) the process by which trust funds will be allocated and distributed, and (d) the total allocated amount from the Fire Victim Trust to the Claimant ("Total Allocation Award").

F.        Whereas, the Claimant has reviewed the Total Allocation Award.

G.        Whereas, the Plan provides the Claimant and the Insurer execute a mutual limited release after the Claimant has reviewed the Total Allocation Award wherein the Claimant agrees to release only their claim against the Insurer under the Made Whole Doctrine (see Paragraph 1) and no other claim, cause of action, defense or remedy against the Insurer, and the Insurer agrees to release the Claimant as described herein in Paragraph 3.  For the purpose of this Release, "Claimant" includes the Claimant's heirs, legal representatives, successor or assigns and

Case: 19-30088    Doc# 7094    Filed: 05/01/20    Entered: 05/01/20 06:13:02    Page 132
of 137

"Insurer" includes the Claimants' insurance carriers, their past and present holders of insurance subrogation claims against the Debtors (and their direct and indirect assignors or assignees), and each of their directors, officers, agents, consultants, financial advisers, employees, attorneys, predecessors, successors and assigns.

       H.      Whereas, nothing in this Release is an affirmation, representation, or an acknowledgment that the Claimant has in fact been fully compensated for their damages covered by the contract of insurance between the Insurer and the Claimant. The parties agree that Court's approval of the Plan and the Claimants' acceptance of the Total Allocation Award does not establish that the Claimant has been fully compensated under California law for their compensable damages as a result of the fire to the extent those damages are covered by insurance.

       I.      Whereas, the Insurer has agreed to the terms, provisions, and agreements of this Mutual Release in a separate agreement dated _____, 20__, affirming, adopting, and attaching a copy of this Mutual Release ("Insurer Adoption Agreement"). This Mutual Release is conditioned upon the Insurer, or the Insurer's successor on behalf of the Insurer, filing in the Chapter 11 case the Insurer Adoption Agreement, which states the Insurer releases, as to the Made Whole Doctrine only, each Claimant who signs and agrees to the terms of this Mutual Release. The terms, provisions, and agreements of the Insurer Adoption Agreement are incorporated herein by reference. Insurer's consent and agreement to the terms, provisions, and agreements of this Mutual Release shall be effective upon the signature of the Claimant.

       J.      Whereas, this release is not required for the Trustee to allocate and distribute preliminary awards to individuals on a case by case basis for humanitarian or urgent needs.

       NOW, THEREFORE, in consideration for the agreements described in this Release and other good and valuable consideration, the Claimant and the Insurer agree as follows:

       1.      By accepting the Total Allocation Award, the Claimant hereby waives and releases their rights, known or unknown, to assert the Made Whole Doctrine against the Insurer. Claimant is not waiving or releasing any other claim, cause of action, defense, or remedy against Insurer. Also, by signing this agreement, the Claimant is not agreeing as a factual matter that the Claimant has been fully compensated for each and every category of their damages under California law.

       2.      The Claimant is not releasing any claims the Claimant may have against the Insurer other than the Claimant's foregoing waiver set forth in Paragraph 1. The Parties to this Release further agree and acknowledge that the Claimant is not releasing any claims, except and only to the extent set forth above, they might have against the Insurer, including but not limited to those claims or causes of action related to: (1) the policy of insurance and what is still owed or to be paid under the policy terms and conditions; (2) the right to pursue claims already made or to make new or continued claims under the policy; (3) claims handling issues; (4) delay in paying claims under the policy; (5) inadequate or untimely communication relating to the claim; (6) unreasonable positions taken relating to coverage, payment of the claim, acknowledging coverage, or day-today claims decisions; (7) actions or inactions of insurance agents or brokers in underwriting, securing, adjusting, calculating or recommending coverage; (8) coverage issues

Case: 19-30088   Doc# 7084   Filed: 05/07/20   Entered: 05/07/20 06:18:02   Page 132
of 137
Case: 19-30088   Doc# 7084   Filed: 05/07/20   Entered: 05/07/20 06:18:02   Page 133
of 2073

over policy language; (9) any action for bad faith or breach of the covenant of good faith and fair dealing; (10) any claims to reform or modify the terms of any policy; (12) any rights to recover damages for breach of contract or tort (including punitive damages), penalties or equitable relief; (13) any claims of violations of statutory or regulatory obligations; or (14) any claim for unfair business acts or practices.

3.     The Insurer agrees to release and waive any right to make claim for any amount paid to the Claimant pursuant to the Fire Victim Trust or to assert as a defense, offset or reduction, the money paid to the Claimant from the Fire Victim Trust, which belongs solely to the Claimant. The Claimant agrees to make no claim on the money paid to the Insurer from the Subrogation Wildfire Trust. In agreeing to this limited release, Insurer is not releasing any claim, cause of action, defense, or remedy it may have against the Claimant other than Claimant's foregoing release of any Made Whole Doctrine claim.

4.     The Insurer is not releasing any claims the Insurer may have against Claimant other than the Insurer's foregoing waiver set forth in Paragraph 3.  The Parties to this Release further agree and acknowledge that the Insurer is not releasing any claims, except and only to the extent set forth above, it might have against the Claimant, including but not limited to those claims related to:  (1) the policy of insurance and what is still owed or to be paid under the policy terms and conditions; (2) defenses to garden variety claims handling issues unrelated to the Made Whole Doctrine; (3) defenses related to delay in paying claims under the policy; (4) defenses to alleged inadequate or untimely communication relating to the claim; (5) defenses to alleged unreasonable positions taken relating to coverage, payment of the claim, acknowledging coverage, or day-today claims decisions;  (6) defenses to actions or inactions of insurance agents or brokers in securing coverage; (7) coverage issues over policy language unrelated to Made Whole Doctrine; or (8) defenses to any common law action for bad faith unrelated to Made Whole Doctrine.

5.     The Insurer further agrees that the Total Allocation Award shall not be the subject of discovery or mentioned in any pleadings in any state or federal court action or admissible in evidence in any state or federal court action for any of the causes of action or claims for relief identified in Paragraphs 2 or 4.  Claimant agrees that the amount paid to Insurer from the Subrogation Wildfire Trust shall not be the subject of discovery or mentioned in any pleadings in any state or federal court action or admissible in evidence in any state or federal court action.

6.     To the extent that the Claimant brings a claim for breach of contract, wrongful denial of coverage and/or bad faith against the Insurer, the Insurer shall not assert in any way or at any time that the Claimant should have or could have pursued that claim against the Debtors, the Fire Victim Trust, or any other party.  The Insurer agrees that that it will not assert in any action or proceeding covered under Paragraph 2 or 4 that the Claimant has been compensated as a result of the Claimant's settlement with the Debtors.

7.     Both the Claimant and the Insurer agree that this Release gives the parties released the status of third-party beneficiary of the Release, and such Releasees may enforce this Release and any rights or remedies set forth herein.

8.      This Release contains the entire agreement between the parties as to the subject matter hereof and is effective immediately upon signing.  Likewise, the release in Paragraph 1 is effective immediately upon signing.  If there is a conflict between this Release and any other prior or contemporaneous agreement between the parties concerning the subject matter of the Release, the Release controls.

9.      The law of the State of California shall govern the interpretation of this Release. The Bankruptcy Court has jurisdiction to resolve any disputes under this agreement.

10.     Each Releasor states that he, she, or it is of legal age, with no mental disability of any kind, is fully and completely competent, and is duly authorized to execute this Release on Releasor's own behalf.  Releasor further states that this Release has been explained to Releasor and that Releasor knows the contents as well as the effect thereof.   Releasor further acknowledges that Releasor executed this Release after consulting with Releasor's attorney or the opportunity to consult with an attorney.

11.     For avoidance of doubt, the Made Whole Doctrine is described herein. Subrogation is a doctrine that permits an insurance company, or its assignees, to assert the rights and remedies of an insured against a third-party tortfeasor.  The Made Whole Doctrine is a common law exception to insurer's right of subrogation.  The Made Whole Doctrine, under certain circumstances, could preclude an insurer from recovering any third-party funds unless and until the insured has been made whole for the loss.  Both the Claimant and Insurer agree that this Release does not modify, abrogate or affect any prior release or waiver between the Parties arising from the Fire.

12.     Consistent with the foregoing, it is expressly understood and agreed by claimant that claimant is waiving and releasing all known or unknown claims under the Made Whole Doctrine. It is expressly understood and agreed by insurer that insurer is waiving and releasing all known or unknown claims under the Made Whole Doctrine as to claimant.

Executed on this [●] day of [●], 20[●].

**BY CLAIMANT [Add Name]:**

_____
Signature of Claimant or Representative

_____
Printed Name of Signatory

_____
Capacity of Signatory

## EXHIBIT 6

### PG&E FIRE VICTIM TRUST AGREEMENT INVESTMENT GUIDELINES

**In General**. As set forth in Section 3.2 of the PG&E Fire Victim Trust Agreement (the "Trust Agreement"), the following written Investment Guidelines shall apply unless and until modified in writing in accordance with the terms of the Trust Agreement. Only the following investments will be permitted, provided that maturities on the following securities do not exceed thirty six (36) months, all investments are U.S. dollar denominated, and all rating requirements are satisfied at the time of purchase:

(i) marketable securities issued by the U.S. Government and supported by the full faith and credit of the U.S. Treasury, either by statute or an opinion of the Attorney General of the United States;

(ii) marketable debt securities, rated AAA by Moody's and/or AAA by S&P (to be reconfirmed on a quarterly basis) and issued by U.S. Government-sponsored enterprises, U.S. federal agencies, U.S. federal financial banks, or international institutions whose capital stock has been subscribed for by the United States; and

(iii) certificates of deposit, time deposits, and bankers acceptances of any bank or trust company incorporated under the laws of the United States or any state, provided that, at the date of acquisition, such investment and/or the commercial paper or other short term debt obligation of such bank or trust company has a short-term credit rating or ratings from Moody's and/or S&P, each at least P-1 or A-1.

Except as may be determined by the Trustee in consultation with the Trust's Investment Advisors with respect to New HoldCo Common Stock, as set forth herein, the borrowing of funds or securities for the purpose of purchasing and the lending of any investments held in the Trust is prohibited.

Notwithstanding the foregoing, it is acknowledged and agreed that the Trustee may liquidate investments and deposit and maintain funds in or with banks, trust companies, savings and loan associations, money market organizations and other depositories or issuers of depository-type accounts at such times as the Trustee determines to be necessary or appropriate to have cash available to satisfy payment obligations and other cash requirements of the Trust.

**New HoldCo Common Stock**. The foregoing Investment Guidelines shall not apply to the New HoldCo Common Stock transferred to the Trust. The Trustee, as he or she determines to be in the best interest of the Trust and its Beneficial Owners in consultation with the Trust's Investment Advisors, and to the extent permitted by applicable laws, may:

(i) implement the Sell-Down Plan;

(ii) enter into contracts constituting options or other derivative securities (including without limitation any forward contract, equity swap, put or call, put or call equivalent position, collar, non-recourse loan, sale of an exchangeable security or similar transaction) in

connection with bona fide hedging transactions with respect to the New HoldCo Common Stock;

(iii)     form one or more holding entities (corporation, limited liability company, subsidiary trust or other entity) to hold the New HoldCo Common Stock; and

(iv)     assign, transfer, pledge, grant a lien, security interest or other encumbrance in New HoldCo Common Stock, any interest in any  holding entity formed by the Trust to hold New HoldCo Common Stock or any interest in any direct or indirect parent (other than the Trust) of any such holding entity.