# EXHIBIT 9

WATTS GUERRA LLP Mikal C. Watts
Paige Boldt, SBN 308772
70 Stony Point Road, Suite A
Santa Rosa, California 95401
Phone: (707) 241-4567
2561 California Park Drive, Suite 100
Chico, California 95928
Phone: (530) 240-6116
Email: mcwatts@wattsguerra.com
       pboldt@wattsguerra.com

*Attorney for Numerous Wild Fire Claimants*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF CAROL LANGFORD REGARDING WILLIAM B. ABRAMS MOTION TO DESIGNATE IMPROPERLY SOLICITED VOTES PURSUANT TO 11 U.S.C. §1125(B) AND 1126(E) AND BANKRUPTCY RULE 2019**<br><br>Date: May 12, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Re: Docket No. 6799, 6939, 6964, 6963, 6944, 6946, 6983, 7004, 7069, 7073 |

I, Carol Langford, declare as follows:

1. I am an attorney admitted to practice in the State of California and Washington, D.C. I serve as a national expert witness in the ethics area, giving advice on legal ethics and discipline to attorneys, judges, law firms and corporations, and in representing lawyers and law students before the California State Bar in disciplinary and admissions matters. My private law practice is in Benicia, California, and I have taught ethics as an adjunct professor at the University of San Francisco School of Law since 1992, and as a lecturer at the University of California Berkeley, Boalt Hall School of Law and at U.C. Hastings College of the Law. I was formerly an associate at Pillsbury, Madison & Sutro and later partner in the Walnut Creek office of the law firm of Carroll, Burdick & McDonough, where I was ethics advisor to the firm and a member of the New Business Committee. I have devoted a considerable amount of time to teaching students and serving on MCLE panels about issues involving ethics and law practice management and have also co-written two books: a nationally adopted textbook entitled *Legal Ethics in the Practice of Law*, 4th Edition (Lexis Law Publishing, 2014) and *The Moral Compass of the American Lawyer, Truth, Justice, Power and Greed* (Ballantine,1999).

2. In addition to my practice, I served as a member of the California Commission for the Revision of the Rules of Professional Conduct, and in that role I drafted and assisted in the drafting of the New Rules of Professional Conduct. Those Rules were approved in 2018. I was an ethics consultant to the Judicial Council of California on a project, and am a member of the Mandatory Fee Arbitration Committee of the State Bar of California. I was appointed by the Bar Board of Governors to the Disciplinary Standards Task Force where I assisted in re-drafting the disciplinary standards that now govern California lawyers. I was Chair of the Ethics Committee of the American Bar Association Intellectual Property Section and was elected Chair of the Law Practice Management & Technology Committee of the State Bar of California and Chair of the Council of Section Chairs. I also served as the Chair and Special Advisor to the California State Bar Committee on Professional Responsibility and Conduct. In 2014, I was the Chair of the Drafting Subcommittee of the Disciplinary Standards Task Force. Since 2000, I have been a member of the Association of Professional Responsibility Lawyers. Since 2006, I have been a

1

member of the Association of Discipline Defense Counsel. A true and correct copy of my curriculum vitae is attached hereto as **Exhibit A**.

3. I was contacted by Therese Cannata and Karl Olson of the law firm Cannata, O'Toole, Fickes & Olson LLP, who I am informed are consulting with the Watts Guerra LLP firm in this matter. I was retained by her firm to analyze and provide a declaration on an ethics issue arising in the above-entitled PG&E bankruptcy matter. We discussed the facts at length. In conducting my review of this matter and in formulating my opinions, I reviewed a brief filed by the Kane Law Firm on behalf of Karen Gowins, including a declaration of Heather Rosing; a newspaper article in the San Francisco Chronicle and an article in Bloomberg News about the issues discussed below; a brief filed by the Watts Guerra Law Firm and accompanying Declaration of Mikal Watts related to the issues discussed below.

4. In addition to the documents reviewed, I have also relied upon my background, training, education and experience as listed above and in providing advice and counsel on attorney ethics matters. I have been asked to evaluate the contentions made in Docket Nos. 6799, 6939, 6964, 6963, 6944, 6946, 6983, 7004, 7069, 7073 filed in *In re*: PG&E CORPORATION - and -PACIFIC GAS AND ELECTRIC COMPANY, Bankruptcy Case No. 19-30088 (DM), In the United States Bankruptcy Court, Northern District of California – San Francisco Division. Specifically, I have been asked to evaluate whether a certain credit facility for WATTS GUERRA, and subsequent assignments of portions thereof to Centerbridge, an owner of PG&E stock, and Apollo, a holder of PG&E debt, created a conflict Under Rule 1.7 of the California Rules of Professional Conduct.

5. The facts as I understand them to be are as follows. The Watts Guerra LLP firm first took on the representation of clients in the PG&E wildfire matter in October 2017. There were two major fires; the "North Bay fires" primarily in Sonoma and Napa Counties in October of 2017 and the "Camp fire" in Butte County in November of 2018. The firm, along with many other plaintiff's law firms, have worked on these cases intensively throughout late 2017, 2018, 2019 and into 2020.

6. WATTS GUERRA had an existing credit facility in 2019 with a commercial

lender. In the fall of 2019 the firm was approached by representatives of Stifel with an offer to refinance its existing credit facility at a lower interest rate. Thereafter, the firm entered into a new credit facility in September of 2019 with an $100 million dollar maximum with W.G. FUNDING LLC. W.G. FUNDING LLC was formed for the sole purpose of this credit refinance facility. It was a normal bank refinance of a facility that the firm and the firm's predecessors had enjoyed for 23 years. The note has a typical four-year term. It has flat, non-usurious interest – in fact – a lower interest with the refinance. Its debt compounds annually like a normal bank loan, is not secured by personal guarantees by the principals of the firm, and the amount of the credit facility is less than 25% of the expected fees from cases WATTS GUERRA is expected to earn, as calculated by an agreed formula used to calculate the firm's borrowing base.

7. The credit facility provided that it could be assigned to other financial entities without the knowledge or prior consent of WATTS GUERRA. This is typical of a line of credit. Consider, for example, a home equity line of credit wherein your bank provides a credit facility and then sells the loan to another entity. At the time the credit facility was approved, there were no specific financial entities listed or disclosed to any of the principals at WATTS GUERRA. This too is typical of a credit facility to a law firm. It is not a "litigation financing" vehicle whereby an investor funds a case and earns a percentage of the fees in that case. Rather, it is a facility from which WATTS GUERRA runs eight offices in multiple states and makes large investments in many mass torts cases at once, across the United States. This includes tens of thousands of Syngenta corn clients, 3M earplug clients, and thousands of Valsartan, Zantac, and Juul plaintiffs seeking compensation for their respective injuries and damages. It also helps fund the firm's Opioid litigation and its COVID 19 business interruption litigation. I understand that this credit facility was for the general use of the firm and the lender obtained no control over how the firm would use it for its business operations.

8. I also understand that the borrower had no direct contractual relationship with assignees or syndicators and that the assignees at issue here were not mentioned in the original credit facility. As with any credit facility, it was in the best interests of WATTS GUERRA and its clients to recover as much money as possible from the PG&E litigation. And it was in the best

interests of the bank, that provided the credit facility, for the firm to recover as much as possible to pay their facility. Everyone was on the same side. There were and are no differing goals as far as the credit facility was concerned.

9. Thereafter, it is my understanding that Mikal Watts (a capital partner at WATTS GUERRA) was informed that Apollo and Centerbridge had become assignees of the credit facility. I understand this was on or about the fall of 2019 after the signing of credit facility papers. Mr. Watts at that time was contacted first by Mr. Gavin Baiera of CENTERBRIDGE, and later by Mr. William Jones of APOLLO. These representatives said that they were employees of two current assignees of the refinanced credit facility. It is my understanding that Mr. Watts was not asked at that time to "side with the equity holders," nor to "side with the bond holders." He was only introduced to principals of equity holders and then to bond holders from businesses other than CENTERBRIDGE and APOLLO. At this time the Firm's credit facility had already been approved, Mr. Watts knew there was no reason to revoke it, and that these representatives had no power to control how Mr. Watts handled any case. Introductions such as this are common in a settlement process, especially in litigation as complex as this. While it is possible that a representative of an assignee may have given Mr. Watts the name of a debt holder or equity holder in PG&E, there is no evidence that this introduction harmed the settlement process, and in fact Mr. Watts has stated that he was able to use the conflict between the debt and equity holders of PG&E to the advantage of the fire victim clients by improving the settlement by getting contributions from both.

10. A client of Steven Kane, Karen Gowins has highlighted a statement purportedly made by Mikal Watts at a Town Hall meeting of firm victims to the effect that either Apollo or Centerbridge "tried to play me." The only available evidence, however, is that they did not succeed in "playing" Mr. Watts but rather that the settlement got considerably better after his initial meeting with the representatives of Apollo and Centerbridge. I understand that Mr. Watts has publicly stated that he obtained more favorable financial terms after his discussions began. It is significant to note that all the mediations were attended by many plaintiff's law firms (who may have had credit lines themselves). All thirteen law firms representing large numbers of

4

wildfire survivors, the so-called "Consenting Fire Clamant Professional," chose to side with the Plan of Reorganization put forth by the equity holders, and all eleven members of the Official Committee of Tort Claimants (the "TCC") voted to side with the equity holders, and the parties signed a Restructure Support Agreement ("RSA") with the equity holders on December 6, 2019. Those firms contractually agreed to support the Equity Plan in the RSA. Thereafter, many of them strongly recommended the settlement to their clients, and according to court filing thus far, around 98% of the clients have voted in favor of the settlement. That high level of approval applies to not just WATTS GUERRA clients, but to all other litigants.

11. At any mass tort settlement there will be lawyers and parties to the settlement that have different views on the merits of settlement value and composition. That is true of all settlements. However, that does not implicate a conflict of interest that must be waived because a third party has a point of view on the settlement. In this case, I understand that Apollo and Centerbridge have taken a position on the settlement, filed pleadings in the matter, and identify themselves as interested parties for the competing equity holders and bondholders.

12. Apollo and Centerbridge are private equity funds. Both companies are playing all sides – that is what many hedge funds or private equity funds do. Any conflict which might arise is between *them* and *their* clients. They may have varying positions – they own debt, equity, insurance claims, and interest in a line of credit – in other words, they have a role in various pieces of the PG&E bankruptcy litigation. This is public knowledge. They have never denied that. A lawyer cannot control a private equity fund or a bank, but there is no evidence here that either the private equity funds at issue or the lenders (bank) had any control over Watts Guerra either as it pertained to the PG&E litigation. From an ethics perspective, the issue is control, and here there is no evidence that the Watts Guerra lawyers' independent judgment, competence and fiduciary duty to their clients were compromised.

13. I understand that on December 12, 2019 in Chico, California at 2:00 p.m., and again in Santa Rosa, California at 6:30 p.m., Mr. Watts orally disclosed his understanding of Apollo's and Centerbridge's role in the PG&E bankruptcy, in which he explained the credit facility and the assignments. He recorded this disclosure and sent links to all his clients in

5

1    December of 2019. He did not attempt to hide anything. He also explained this at a telephonic

2    Town Hall meeting held on April 18, 2020.  He recorded this too.  He also did this again on

3    April 20, 2020.  He also filed with the bankruptcy court Document #6801 that set forth

4    everything he had told his clients with links to the Power Point presentations.

5           14.     On April 25, 2020 Mr. Watts made the disclosure again, recorded and transcribed

6    it, and set it forth in a May 1, 2020 email to all his clients.  The clients voted on the settlements

7    at various times between March 31, 2020 and thereafter, but not prior to December 12, 2019.

8           15.     Based on these facts, my opinions are as follows. First, Rule 1.7 (a), does not

9    apply, and there appears to be no dispute on this point.  Attached hereto as **Exhibit B** is a true and

10   correct copy of Rule 1.7 of the California Rules of Professional Conduct.

11          16.     Section (b) of Rule 1.7 also does not apply. That section requires informed written

12   consent where there is a significant risk the lawyer's *representation* of the client **will** be

13   ***materially*** *limited* by the lawyer's responsibilities to or relationships with another client, former

14   client or third person, or by the lawyer's own interests. [1] Here, there was no significant risk that

15   any alleged pressure by Apollo representatives or Centerbridge representatives – which he denies

16   ever even occurred - would force Mr. Watts' hand in tipping the settlement in a way that harmed

17   his clients. That is because, no matter what those representatives allegedly said to Watts (and Mr.

18   Watts says that nothing they said to him in fact pressured him), his clients would benefit by the

19   highest possible settlement. Further, the notion that Mr. Watts would sacrifice his own interests as

20   a contingency fee lawyer in obtaining the best possible settlement because of an assignee's

21   desires, is not logical.  There was no benefit to Mr. Watts to sacrifice the benefit of his clients in

22   obtaining a good settlement and moreover, given the involvement of around a dozen other law

23   firms in the settlement process, the possibility that any alleged influence of Apollo or

24   Centerbridge could actually materialize is extremely insignificant.  The fact that a portion of the

---

[1] In addition, I believe that the Kane firm is really looking at the old Rule 3-310 and its language that discussed disclosure to entities that would reasonably be affected substantially by resolution of the matter. But, and this is important, when the Rules were revised in 2018, we on the Commission voted to take that language out.  In fact, in comment 4, the very paragraph they cite to, we specifically pointed out that the mere possibility of harm does not itself require informed written consent or even disclosure.

settlement consists of PG&E stock does not change my opinion. In my experience, settlement terms may include, along with cash proceeds, other non-cash components, including, *inter alia*, licensing rights, option agreements, deferred compensation, partnership interests, real property, assignment of notes and deeds of trust, stock and other non-cash components. It does surprise me or change my opinion that, in this bankruptcy proceeding, a settlement includes a non-cash component.

17. Section (c) of Rule 1.7 is the only subsection of the rule that is even arguably implicated. The Kane Law Firm on behalf of Karen Gowins, is claiming that written disclosure was necessary because Mr. Watts had a financial relationship with a party to the PG&E bankruptcy. However, it is undisputed that there was a three-step disclosure process: first, the lawyer made oral disclosures (which were recorded) and written disclosures were thereafter made. I understand as well that the Watts Guerra firm took steps to ensure that this information was properly disseminated to their clients.

18. I believe as well that under the particular facts of this case, there are competing public policy concerns. First, Apollo and Centerbridge were not direct parties; the plaintiffs, victims of the fire, were suing PG&E. The assignees of a credit facility have an attenuated role in that lawsuit. Second, I believe it is contrary to public policy to view a law firm with a generalized credit facility with an assignee selected by their lender after approval and funding of the loan as automatically having disclosure duties under subdivision (c). This casts too wide a net on the definition of "party" and in my view is not consistent with the intent of the rule. Third, even if this were viewed as litigation funding – and this credit facility was not "litigation funding" per se in the sense of a lender obtaining interest in a particular case's outcome – in *PG&E vs. Bear Stearns*, 50 Cal. 3rd 1118, 1136-37 (1990), the California Supreme Court definitively ruled that funders are allowed and that efforts to impede them would create a "pernicious barrier to free access to the courts." More recently, in *Sosa v. DirecTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), the United States Court of Appeals for the Ninth Circuit issued a ruling consistent with the Bear Stearns ruling via the *Noerr-Pennington* doctrine. This informs me that the California courts strive to protect funding as a form of assistance to plaintiffs with meritorious litigation. Without it

these plaintiffs would be deprived of access to the courts. The alleged conflict here was even more attenuated than the one alleged in the above cases, and as here, we are addressing assignees and not even the direct lender.

19. To allow this kind of argument would mean that any lawyer obtaining a generalized credit facility would have a constant duty to monitor what the bank does with their loan. It would also mean that any settlement in this court, at any time, could be upended by a bank or lender assigning their loan, which is an act that cannot be controlled by this court, the parties, or their counsel. There is no way that they can do that, for many reasons, one of which is that may be a bank secret. A bank may not know who they will syndicate to, at the time of the loan. It creates an onerous burden on plaintiff's lawyers that cannot be met.

20. As noted, I do not believe that disclosure of Apollo and Centerbridge's role was required. But even if disclosure was required, disclosure consistent with Rule 1.7(c) was made. I note that the Kane firm asserts that because, in an abundance of caution, Mr. Watts made disclosures about Apollo and Centerbridge he was admitting it was required. But what if he had said nothing? He wanted to be completely open about everything. What is important to the clients is that their settlement amounts are fair and reasonable under Rule 1.5. It is significant that not just the Watts firm but about a dozen other plaintiff's law firm, some quite prominent, all have reviewed, and endorsed the settlement. The overwhelming majority of the plaintiffs have voted in favor of it. The state of California is also heavily involved in the process. And, most important, the settlement at issue here is subject to the approval of the Bankruptcy Court.

21. It is my opinion that there has been no violation of Rule of Professional Conduct 1.7 here, nor of any other Rule of Professional Conduct.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of May 2020 at Benicia, California.

CAROL LANGFORD