# EXHIBIT F

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA

In re:                                ) Bankruptcy Case
                                      ) No. 19-30088-DM
PG&E CORPORATION,        )
                                      ) Chapter 11
      and                         )
                                      ) Jointly Administered
PACIFIC GAS AND ELECTRIC        )
      COMPANY,                )
                                      )
      Debtors.                    )

*********************************************
TELEPHONIC TOWN HALL
MAY 2, 2020
*********************************************

 1         MR. WATTS:  Hi, folks, this is Mikal
 2 Watts.  I apologize for our late entry.  We had a little
 3 bit of technical difficulty.
 4         So on the phone today, we have a number of
 5 lawyers, and we also have Erin Brockovich and Senator
 6 Noreen Evans.  Both of them have been pivotal in our
 7 effort to communicate the project against PG&E.  And
 8 then, in addition, we have Robert Bryson from the Robins
 9 firm.  We have Richard Bridgford and Jim Frantz from the
10 Frantz Bridgford Group.  We have Jerry Singleton, and
11 then we have Joe Earley and Roy Miller from the group
12 that I'm with.
13         So what we'd like to do is start off.  Our
14 goal is to answer your questions.  So if you have
15 questions, press star 3.  But, in the meantime, what
16 we're going to do is we're going to start off with just
17 everybody making a brief statement.
18         As opposed to me starting off making a
19 statement, what I'd like to do is invite our headliner,
20 Erin Brockovich.  Erin, can you make some comments?
21         MS. BROCKOVICH:  Yes, I can.  I don't know
22 how long I have to speak, and I don't want to take much
23 time, because I know everybody always has many, many
24 questions.  But I want to say hello to everyone.  I am
25 happy to be on the call.  I hope everyone is doing well.

 1 And I think for me today, I have a couple of things that
 2 I'm thankful that I'm going to have an opportunity to
 3 share.  And to do that, I'm going to back up just a
 4 moment.
 5         So do I -- do I have, you know, five
 6 minutes to say something, Mikal?
 7         MR. WATTS:  Go ahead.  Go ahead.
 8         MS. BROCKOVICH:  Okay.  It's always a deep
 9 breath for me, even looking back, as we all watched the
10 horrific fire situation in 2017 and 2018.  I became
11 involved early on up in Santa Rosa through Doug Boxer.
12 I was introduced to this amazing team that is on the
13 phone, working with Gary Morrow and Noreen Evans and
14 Spencer Zach and countless staff members, who I saw
15 mobilize very quickly and were already out on the ground
16 to try to help people.  They were so organized in how
17 they were getting information to those in need and
18 working to set up information to be shared through
19 e-mails, through town hall meetings, having a location
20 for people to get to, and handling it all so swiftly as
21 a solid presence in and for the community to help those
22 that have lost so much and to help them find information
23 and a possible path forward.
24         One of the first things that we fought
25 back at that time, knowing down the road it could be

 1 very harmful to all fire victims of the future, and that
 2 was working to stop the strict liability and inverse
 3 condemnation situation happening in the legislation.
 4 Noreen Evans was completely an amazing, amazing asset,
 5 working with the team to stay on top of this situation,
 6 making sure that it didn't happen.  And we ended up
 7 being successful.  Any such litigation like that could
 8 have resulted in no form of justice for fire victims in
 9 the future.  It was too much to bear at the time that we
10 turned to another disastrous fire, and that was in
11 Paradise, California.
12         I really feel compelled to say it's been
13 such a privilege to continue to be working with this
14 team that I have watched mobilize quickly into Paradise
15 and to start working with local counsel, Joe Earley, and
16 taking action to help those that have been harmed.
17         And I really want to say something very
18 personal today for all of the fire victims, and I -- I
19 feel I need to say it to you.  I think of you all the
20 time, and I think of everyone I've met from Paradise and
21 up in Northern California.  And to see us here today in
22 this conversation, in this moment everyone has worked so
23 hard for, brings so much to my mind.
24         I have -- over the past couple of months,
25 all of you have been so much in my thoughts, as we're

Case: 19-30088    Doc# 7129-28    Filed: 05/08/20    Entered: 05/08/20 15:06:44    Page 2 of 41

1 living out COVID-19. There have been personal days for
2 me where I just wanted to crawl under the covers. I
3 felt dazed and confused, and I'm not sure what has
4 happened. And then I truly begin to think of you.
5        I have watched the courage that you have
6 exhibited during a disastrous time, where you showed up
7 to meetings, many of you had no homes, living in your
8 cars, the fears or concerns, your loss. Yet I watched
9 you rise up and come to those meetings. You listened.
10 You learned. You were involved. And I want you to know
11 from me that I am in awe of that. I always believed in
12 the power of we the people. And you are such living
13 proof how during the worst of circumstances that we can
14 stand up and we can find our way forward, and you have
15 exhibited a strength, a courage, and a determination
16 that is inspiring to many of us.
17        I truly know you don't need to hear this
18 from me, but I want to say it: I am so proud of you and
19 I am so inspired by your courage and, more often than
20 not, I think of that and I see you and I find myself
21 saying in a crisis that we're, once again, all
22 experiencing together, that, yes, I can face the day and
23 I can move forward. I know it's been a long road
24 getting to where you all are today.
25        This team of attorneys have worked hard on

1 your behalf to reach an agreement and settlement that's
2 been approved by the bankruptcy court, and it brings me
3 back to the time in Hinkley where the first agreement
4 came down to the people's vote. It was the same process
5 as you're experiencing today. There were so many
6 questions, yes, and not everyone always agreed. But it
7 was their vote and their decision. And this is your
8 vote and your decision. It happened to them and it
9 happened to you. They came together as you've come
10 together. They had meeting after meeting and they
11 listened to all the information and they made an
12 informed decision of their vote, just as you are. I
13 trusted and I believed in those people, as I do in you
14 to make the decision of your vote, and I stand with you.
15        I want you to remember this is your vote.
16 We are here to answer questions, any and all questions,
17 on the eighth town hall that the team has come together
18 and will do endlessly for you and town halls, but
19 ultimately it is up to you. And I am the same today as
20 I was back then. It's your courage, your determination
21 that's brought you to where you are. And now it's your
22 turn. It's your vote to see your justice so that you
23 can move forward as whole as possible into your new
24 life.
25        I'm aware of everything that goes on. I'm

1 always here, constantly running around in the
2 background. And in my gut, this settlement has been
3 reached fairly. Everybody was involved at the table,
4 reaching this settlement, and it can help make you as
5 whole as we possibly can. Yes, I want you to know I
6 understand it is PG&E, and I get the lack of trust that
7 people have. But I do have trust in this team of
8 attorneys. I do have trust in the bankruptcy court and
9 the Judges' decisions that will hold and keep this
10 company accountable in this settlement. I have
11 absolutely no reason to believe that there is any other
12 deal somewhere out there that somebody is not aware of,
13 because I'm certainly not aware of any such situation.
14        The time is here. It's been a long
15 journey, and now it's up to you, the people, those that
16 were harmed. This was your loss, your life and your
17 future, to vote on how you wish to move forward so that
18 you can have that moment in your life of justice and you
19 can see a better path moving forward.
20        That is what I wanted to share with all of
21 you today and I do appreciate you taking the time and
22 listening and I wish everyone safety and wellness not
23 only during some of the most unusual circumstances I
24 think we've all ever lived through, but yet you've been
25 through there and you've lived through it. Stay safe,

1 strong, and courageous every single day of your life.
2        MR. WATTS: Thank you, Erin.
3        So I asked Erin to get on because there
4 were a couple questions last week about what Erin's
5 present position is. I think that that'll tell you what
6 it is. And Erin has been a champion of this effort
7 from -- I mean, she was in Santa Rosa days after the
8 North Bay Fire and Chico shortly after those fires.
9 Nobody deserves more credit in their attack and their
10 effort against PG&E than Erin Brockovich. I'm proud to
11 have her on our team. I hope that today gives you an
12 indication of what she feels.
13        And so what I'd like to do right now is
14 switch to Noreen Evans, who is a state senator or was a
15 state senator in Santa Rosa, a community leader, has
16 been involved in this for upwards of two and a half
17 years. Noreen, can you help us?
18        MS. EVANS: Yes, absolutely. Thanks,
19 Mikal, for the introduction.
20        And thanks, Erin.
21        Can you hear me?
22        MR. WATTS: Yeah, go.
23        MS. BROCKOVICH: I can hear you, Noreen.
24        MS. EVANS: Okay. Thank you, Mikal, for
25 the introduction and thank you, Erin, for all of your

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 3 of 41

1  comments.
2        My -- in addition to being a former state
3  senator, I'm a long-time attorney.  And in this
4  litigation I've had a front-row seat to some of the best
5  lawyering I've ever seen, and I want to thank all the
6  lawyers and all of their support staff who have worked
7  so hard and gone toe to toe with PG&E.  And I want to
8  thank all of you for sticking with us.  As Erin said,
9  it's been a long, rough road.  And it's been that the
10  wheels of justice grind slowly, and nobody knows that
11  now better than you do.
12        I remember back when we were holding town
13  hall meetings two years ago now, and one of the things
14  we talked about is how one of the few tools we have to
15  change corporate behavior is through lawsuits like this
16  one.  It's one of the -- the reasons why we urged you to
17  take action against PG&E, not only to make sure that
18  you're made whole, but also to change the corporation's
19  behavior, because for years they've been blowing up and
20  burning down so many of our communities.  And because
21  all of you stepped up, we finally are seeing some great
22  changes in process.  From the bankruptcy court to the
23  Governor's Office and the State capitol and the criminal
24  court, PG&E is finally, slowly, but inevitably being
25  held accountable for the first time for all the damage

1  that they've done to us for so many years.  It is not
2  the same company today as it was two years ago, and two
3  years from now, we will see even more changes, and all
4  of that is thanks to you who stuck with this process.
5        So my message to you is we have two things
6  to celebrate:  One, of course, first and foremost, is
7  getting you paid, getting you made whole; but, second,
8  is changing PG&E's corporate culture to protect the
9  future of our community.  And I realize we're not done
10  yet.  Many people are still voting on the proposed
11  settlement.  And disbursing the settlement funds is
12  going to take some more time.  But the silver lining in
13  that is until everything is paid and ramped up, the
14  spotlight will remain on PG&E's bad behavior -- bad
15  behavior, and our need for PG&E to change.  And now is
16  not the time to let up on PG&E or to lose our momentum.
17        And I'm just going to leave you with one
18  last thought.  Again, going back a couple of long years
19  here.  When many of you sat in my office still
20  traumatized and grieving from the fires, I promised that
21  in two years we'd be on the road to a better future, and
22  we are.  Nobody knew, though, that we'd be facing yet
23  another calamity with the COVID virus.  But one of the
24  things I've learned in my life is that life is full of
25  calamities.  It's how we meet those challenges that is

1  important and it makes us who we are.  And I want to
2  thank you for meeting this one head on, being part of
3  the movement to hold PG&E accountable and bringing
4  yourselves, your families, and our communities to a
5  better and safer tomorrow.  And I truly appreciate all
6  of the trust and the faith that you've had in all of us
7  here that have been handling the litigation.  Again,
8  thank you to everybody that's been a part of this.
9        MR. WATTS:  Thank you, Noreen.
10        So the folks that we've got on the line
11  are some of the lawyers with the most "cases" in the
12  case.  The Watts Guerra group, which includes Roy Miller
13  and Joe Earley, has 16,095 clients, unique individuals
14  with timely filed notices of claims.  I can tell you as
15  of last Tuesday, 13,329 had voted to accept, 148 had
16  voted to reject.  That's an acceptance rate of
17  98.9 percent.  So we feel like our clients are
18  overwhelmingly in favor of the deal.  Of course, it's
19  everybody's individual vote.
20        But what I'd like to do is talk to a
21  couple of my partners in our thing.  Roy Miller, can you
22  tell us what you're seeing over in Santa Rosa with
23  respect to how people are voting and what their concerns
24  are?
25        MR. MILLER:  Thanks, Mikal.

1        People here in Santa Rosa that I've talked
2  to -- I've answered quite a few questions about the
3  process.  I've answered quite a few questions about the
4  stock portion of this deal, which is a concern to
5  people, but I think they understand that with a claimant
6  group this large and a settlement as large as it is, the
7  third largest, that there was going to be a stock
8  component; but people understand and are real about this
9  and they want to move forward, and that's why my client
10  group, which is part of Watts Guerra, has been
11  overwhelmingly in favor of it.
12        I'm living in the middle of a construction
13  zone.  Four homes around me are in the framing stages.
14  So we're rebuilding.  The rest of Santa Rosa is
15  rebuilding.  People need the money that is available
16  through this settlement to complete that process, and
17  they want to move forward.  And we're going to do
18  everything we can to help them reach that goal and
19  answer any questions you have along the way.
20        Thank you, Mikal.
21        MR. WATTS:  Joe Earley in the Paradise
22  Camp Fire area.
23        MR. EARLEY:  Thank you, Mikal.  I want to
24  thank my clients that are the victims of the Camp Fire
25  for their absolutely overwhelming support and their

Case: 19-30088    Doc# 7129-28    Filed: 05/08/20    Entered: 05/08/20 15:06:44    Page 4
of 41

1  understanding that we're truly in this together.  We're
2  going through the same process.  I appreciate that
3  people appreciate that.  It means a lot to me.
4       Look, I feel very confident, given the
5  numbers that Mikal was giving us, that we're, in a
6  sense, going to be over the hump real quick here and
7  moving towards the real work, which is getting your
8  claims processed and resolved, and that's where the
9  rubber hits the road.
10      Right now it is important to me that
11 everyone, to the extent they can, understand that this
12 really is a good settlement that we should be voting
13 for.  You know, every week we ask to be shown a viable
14 alternative plan to our 13.5-billion-dollar settlement,
15 and that's not just what people hope and wish for, like,
16 a, "boy, wouldn't it be great if" plan, but a real plan,
17 a solid plan that's actually got support to it,
18 financial support and backing.
19      And, you know, another week passes and,
20 still, we got nothing, we hear nothing.  If there was
21 something, we would look at it and we would -- we would
22 support it, if there was actually something that
23 would -- that is better than what we have.  So that's
24 something that's really important that people
25 understand.  We only have two weeks to go now, right,

1  for voting.  We're getting at the end, and now is the
2  time to do it.  Putting it off, waiting, as a lot of
3  people were advocating for, well, we've waited and
4  there's nothing there.  So let's get the votes in and
5  get this done with.  I truly believe that the more
6  support we show for the plan, the faster the process is
7  going to unfold and the sooner we're going to get our
8  recoveries.
9       So I'm going to say please vote
10 electronically.  The U.S. Mail has been just horrific.
11 People we sent out physical ballots to, you know, weeks
12 ago, and they still haven't got them yet.  And this is
13 very frightening, because everyone should have their
14 opportunity to vote, and I fear that two weeks is
15 cutting it just way too close for sending out paper
16 ballots.
17      So, please, for my clients, if you haven't
18 voted, contact me directly.  You've got my phone number.
19 You've got my e-mail.  I'm -- I'm easily accessible.  I
20 will make sure that you get a formal ballot.  You can't
21 just vote with me.  You can't just say, hey, Joe, I want
22 to vote yes.  A lot of people have tried to do that.
23 But we have to go through a formal process.  I will
24 forward you on to the right people to get a formal
25 ballot so you can do that.  Please do that.  Otherwise,

1  our e-mail is chico@wattsguerra.com is always available,
2  and we'll take care of you.  For other people who are
3  not my clients, who have not voted, please just contact
4  your lawyer as soon as you can, and let's just get
5  moving forward.
6       So, anyway, thank you, everyone, for the
7  support.  I really want to thank my friend Erin
8  Brockovich for her understanding of what we're going
9  through, what she -- she really has been along on this
10 ride.  It's been my honor to work side by side with her.
11 She gets what we're going through.  And there is a
12 reason why she's supporting this plan.  She knows that
13 that's the only way for us to go.
14      And, finally, I really -- I got to say
15 thank you to Mikal Watts.  He has been fantastic in
16 this.  He has worked his tail off.  And, really, it
17 bothers me deeply how he's become this target that
18 people are attacking this man who is going to bat for
19 us, and I know that because I work with him on a daily
20 basis.  I know he's there for us.  I appreciate that.
21 I'm just sorry you have to go through this, Mikal,
22 people bringing up stuff that has nothing at all to do
23 with this settlement.  No one has said there's anything
24 wrong with the settlement, and that's just not the way
25 it should be.  If you're going to attack something,

1  attack it on the merits and don't play those kind of
2  games.  So I thank you, Mikal.  I just want you to know
3  that.
4       MR. WATTS:  Well, I appreciate that, Joe.
5  And, you know, Watts Guerra has about 98.9 percent of
6  its clients, about 13,329 vote to accept, 148 have voted
7  to reject.  It's everybody's decision, but it's
8  basically, 98.9 percent of our clients.  So one of the
9  concerns that we have is, obviously, I'm under attack by
10 the three or four people that don't want this to happen.
11 There is an article in the New York Times.  There is an
12 article in The Wall Street Journal.  There is an article
13 in the Bloomberg News.  There is an article in the
14 San Francisco Chronicle.  But that's not really a
15 concern to me.  I mean, I've got thick skin.  What I
16 wanted to know is some of our other compatriots who are
17 also doing the best they can for the fire survivors,
18 what are they seeing with their client base.
19      So Jerry Singleton has the second largest
20 number of clients after our group.  I think, Jerry,
21 you've got over 7,000 clients.  What do you see in terms
22 of your clients' decision whether to accept or reject
23 this plan?
24      MR. SINGLETON:  We're seeing pretty
25 remarkably similar numbers to what you're seeing.  We've

4 (Pages 13 to 16)

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 5
of 41

1  had about half of our clients vote. Initially, there
2  was an issue with Prime Clerk, and so we had to figure
3  out how we were going to address that in terms of smart
4  phones. And I do, again, want to apologize to everyone
5  because I know that you've been receiving a lot of texts
6  and calls. Again, the reason for that was there was an
7  issue with Prime Clerk and the smart phones. So Watts
8  Guerra was able to assist us with some of the
9  technology. We all worked with Prime Clerk, and we were
10  able to get that phone issue resolved. But we've seen
11  over 98 percent of our clients support the plan.
12        And, again, I know Mikal and everybody on
13  the call share this, it is absolutely up to the
14  individual. If you do not believe this plan is in your
15  best interests, you absolutely should vote against it.
16  We represent you. We'll do whatever you want. But I
17  think it is heartening to see that so many people are
18  supporting it. And I think, following up on what was
19  said earlier, the reason for that is very
20  straightforward. There just is not any other viable
21  option. If this plan is not approved, then it will
22  result in the contingency plan that has been approved by
23  the Court being put into place. PG&E will be sold off
24  in pieces over a period of, likely, two to three years;
25  and then at the end of that, people will get paid out of

1  the proceeds there.
2        Unfortunately, because bankruptcy deals
3  generally result in a significant discount, in all
4  likelihood, people are going to get 50 to 75 cents on
5  the dollar, and, obviously, that's not something that
6  anybody wants. So I think, at least in my experience,
7  when we've been able to explain that to people, they
8  have been very supportive.
9        One thing that I would really encourage
10  everyone to do, whoever you are represented by, whether
11  it's our group, whether it's Mikal, Joe, and Roy's
12  groups, whether it's Robert Bryson at Robins Cloud, go
13  to your counsel, and if you have any questions, they can
14  answer them and they can give you the documents.
15  Because one thing that is very clear when you read the
16  documents is that there is no other available plan and
17  that this is the only way forward for us to get out of
18  the situation we're in now. So just wanted to stress
19  that.
20        Also, this is something we're going to
21  touch on during the remainder of the call. But on
22  Friday, yesterday, the trustee released the trust and
23  the claims resolution procedures, and I know a lot of
24  people had been waiting on those. They're on our
25  website, I know they're on the Watts Guerra website, and

1  I'm sure they're on several other websites. So if you
2  are interested in those, please ask your attorneys for
3  them.
4        And then, lastly, before I get off, I just
5  wanted to thank Erin and Noreen for being on this call.
6  And, also, this is something that really has not been
7  given enough publicity because of all the things that
8  have been going on. But as Erin said, in 2018 PG&E and
9  the other utilities spent tens of millions of dollars to
10  try to get rid of inverse condemnation to limit their
11  liability. And Erin, Noreen, and a number of people
12  were very influential in defeating that, and so I wanted
13  to thank them for doing so.
14        MR. WATTS: Yeah, I remember even before
15  the Camp Fire, I mean, Erin and Noreen and all sorts of
16  people were advocating in Sacramento with the group Up
17  From the Ashes to stop the abrogation of inverse
18  condemnation. Thank God that happened because six weeks
19  later we had the Camp Fire, where 14,000 of you were
20  burned out of house and home. You have a right of cause
21  of action because of people like Noreen Evans and Erin
22  Brockovich.
23        So, just to be clear. So Roy Miller, Joe
24  Earley, and I collectively represent about 16,000 people
25  who are voting for the plan at a rate of 98.9 percent.

1  I think Jerry Singleton represents another 7,000 people
2  who are voting for the plan at about 98.81 percent.
3        So -- so two other people we've got on the
4  line is my friend Jim Frantz and Richard Bridgford.
5  They're working together. I think collectively, they
6  work -- they represent 4300 people.
7        Jim, tell me what your -- what your client
8  base look like. Are they for this, against this? Are
9  they having a similar experience that Jerry and I are
10  having? What are you seeing?
11        MR. FRANTZ: I would say it's almost
12  identical. We have over 4300 clients, and so far we
13  have 2,083 that have voted to accept and just a mere 26
14  voted against the plan. And, you know, so we're doing
15  great. Our clients understand how important this
16  resolution is and the fact that there is absolutely no
17  other plan out there. And without this going through,
18  it's going to be a really huge problem for everybody
19  getting any indemnification on this case. But, so it's
20  great success in the voting right now.
21        But I want to thank all the lawyers on the
22  call with me. I'm proud to work alongside of you-all.
23  You've been working tirelessly on this case. And I want
24  to thank Erin Brockovich for the kind comments that she
25  made to us and to -- especially the victims, and the

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 6 of 41

1  victims are the ones we're all here for.
2      I want to acknowledge Todd Vector, John
3  Dixon, and Ray Montega that are working tirelessly with
4  our group, our group, Rich Bridgford, Pat McNicholas,
5  and my law firm, Frantz Law Group. And I know the
6  clients that they work with are very proud to be with
7  our firm and have worked through them.
8      We have clients in the North Bay Fire,
9  Redwood Valley, Napa, Atlas Peak, that entire area, and
10  they have been waiting since 2017 to get indemnity on
11  this case to get back with their lives. It's been a
12  long time. And the horrible Paradise Fire, there is --
13  our hearts go out to all the folks there, all the lives
14  that were lost.
15      So we -- we really, really have no option
16  other than to accept this plan. I think it's a really
17  great plan. It provides what we believe to be close to
18  a hundred percent indemnity for everyone. It's not
19  going to bring back any lives that were lost. As far as
20  all the property damage itself, we think it pretty much
21  covers the gamut of what's required and necessary.
22  Singleton stated, if this is not approved, then we go
23  back into another process with the Court, which would
24  take several years and probably significantly less
25  return to the victims. So the key is return to victims

1  here will be almost a hundred percent made whole versus
2  something else that will happen, which is not good, if
3  they don't vote for the plan.
4      Although as Jerry and others have said,
5  you have the right to vote your conscience. I don't
6  disrespect any of the 26 of the 2,083 clients that we
7  have that voted against the plan. I just think that
8  maybe they have a different view of it, which, you know,
9  you can vote your conscience, but I think going with the
10  plan is the only way to go here.
11      Thank you.
12      MR. WATTS: Okay. Thanks, Jim.
13      So, you know, the Watts Guerra group,
14  which is Roy Miller and Joe Earley and myself, has about
15  98.9 percent of their clients voted for the plan; the
16  Jerry Singleton group, 7,000 people voted, about
17  98.81 percent; and the Frantz group is about
18  98.77 percent. One of Jim Frantz's partners is Rich
19  Bridgford. He has been very helpful in terms of
20  allowing us to assess the stock and all.
21      Rich, what -- what are your -- what are
22  your clients telling you about what they think about
23  this deal?
24      Hey, Rich, you're on mute, buddy.
25      MR. BRIDGFORD: Mikal, sorry about that.

1      MR. WATTS: There you go.
2      MR. BRIDGFORD: Yeah, I'm -- my name's
3  Rich Bridgford, and I'm working with the McNicholas firm
4  and Jim Frantz in a three-firm JPA. And I just want to
5  say I'm honored and privileged to be working with the
6  other firms here towards getting this plan approved.
7  And, you know, folks, they say the arc in history is
8  long, but it bends towards justice. I'm going to go out
9  on a limb and predict we are going to get this plan
10  approved and that we are close to obtaining justice.
11      And two principal things that we seek
12  through this plan, first of all, to make you whole to
13  the greatest extent possible; and, second of all, to
14  change the corporate behavior at PG&E and to make the --
15  make the states safer for all of you. I want you to
16  know that I -- I go to bed thinking about this case and
17  I wake up thinking about this case. And along with my
18  good friend Jim and the McNicholas Firm, working seven
19  days a week and, you know, we're getting to the point
20  now where we got to start focusing on getting you
21  compensated. And, as Jim said, that's not going to
22  bring anybody back. We can't do that.
23      But we now have the outline of how the
24  claims resolution procedure is going to work, how we're
25  going to get you compensated for your real property,

1  lost structures, trees, your personal property, your
2  personal income loss, your business income loss, your
3  emotional distress, living expenses, a whole host of
4  different categories that we're going to be seeking
5  compensation on your behalf. And I'm sure the other
6  attorneys on this call share in this sentiment with me,
7  and that is please, you know, respond to the e-mails
8  that you receive and get us the materials that we need
9  so that we can go about maximizing your potential
10  recovery.
11      As Jerry mentioned, we hope that there
12  will be enough money here to make all of you whole, and
13  that is -- that is the goal. And it's been an honor
14  representing you. We're going to continue to work as
15  hard as we can going forward on this case to change
16  their culture and to put the money in your pocket to
17  make up for your loss.
18      Thank you.
19      MR. WATTS: Thanks.
20      And then last week -- you know, I've been
21  working with Jerry Singleton and Jim Frantz and Rich
22  Bridgford. I just wanted to make sure that our data was
23  not anomalous, that what we were seeing was unusual. So
24  we called our friend Bill Robins, frankly, way back a
25  decade ago with some friends of mine from Texas, and

6 (Pages 21 to 24)

1  he's got Robert Bryson, who is kind of the managing
2  partner of his firm working on it. They've got over
3  2,088 cases.
4        Robert, what are you seeing in terms of
5  what your clients are thinking about, how they're voting
6  on this deal?
7        MR. BRYSON: Well, first, let me thank you
8  again, Mikal, for this opportunity and all the folks
9  that are on the phone that many of you of whom I
10  personally met, both from the '17 and the '18 fires. So
11  what we're seeing from those folks, you're right, we
12  have just over a couple thousand folks that joined with
13  our firm, gave us the honor of representing them, we're
14  seeing just shy of 98 percent approval of the plan. And
15  a few folks voted their conscience and voted against it,
16  somewhere around 20. So we're seeing a very consistent
17  voting pattern, I think, across all firms that represent
18  a very large number of fire victims.
19        And I think this sentiment was echoed by
20  Erin and many of the lawyers on this call. I,
21  unfortunately, and I want to emphasize the word
22  "unfortunately," have been involved with fire losses for
23  almost 20 years from San Diego to Los Angeles to
24  Northern California. And it's heartbreaking to see the
25  same blank stare on everyone's face after they suffer

1  such a catastrophe.
2        And so what -- what this bankruptcy plan
3  offers is -- is closure for people, and it's the best
4  possible closure that everyone on this call and an army
5  of other plaintiff fire claimant victim attorneys have
6  been fighting for. And I also want to echo the comment
7  of some of the other folks on the line that it is your
8  right to vote. We as your attorneys, we make
9  recommendations based upon studying information and our
10  knowledge of the overall of this case, but ultimately
11  it's your -- your decision whether to vote yes or no.
12  And we, my firm and all the other attorneys on this
13  line, support you in your decision, whether it's to
14  approve or disapprove.
15        But I think if you take the time and look
16  at it closely, you'll see for a variety of reasons that
17  this plan is the best possible opportunity for you to
18  finally be compensated. And when I say "compensated,"
19  and the word has been thrown around a maypole, it's
20  important to recognize that you have suffered a tragic
21  loss, whether it's the loss of a loved one, some -- we
22  have a very kind lady that suffered third -degree burns
23  on 30 percent of her body or people that have lost their
24  homes and everything, their cherished possessions, that
25  you're -- what you're seeking, we can't replace those

1  loved ones, obviously, we can't replace those cherished
2  items, and we can't restore your body. All we can do is
3  to, quote, unquote, make you whole, which is to provide
4  you with monetary compensation so you can restart your
5  life and have an opportunity to hopefully live a better
6  life. So we're trying to restore you to what you were,
7  in a rather crude fashion. But it's important to
8  recognize that with -- in my opinion, without this plan,
9  that restoration will take an untold number of years,
10  and there is a lot of question to what that compensation
11  would look like, as opposed to what we're voting on
12  right now.
13        And so all of my clients, I've made clear,
14  whether I spoke to on the phone, spoke to in person,
15  responded to your e-mails, responded to your texts, is
16  that our firm has studied this, and we recommend it
17  because we believe it provides you the best possible
18  opportunity to be compensated in a timely fashion.
19        And, also, as most of the lawyers on this
20  call have noted is to finally force PG&E to become a
21  corporately responsible partner in the community as
22  opposed to the opposite, which I personally would -- if
23  I never had to respond to another fire loss, that would
24  definitely be a plus in my career for the past 30 years.
25  So to everyone on the phone, I thank you for your hard

1  work and it's been a privilege to work along side you
2  and we will continue to do so.
3        And, Mikal, thank you again for having me
4  today.
5        MR. WATTS: Yeah, of course.
6        Hey, so I'd just like to say something
7  before we start with the questions and answers. You
8  know, it seems like, between the folks on the line and
9  some other folks with whom we discussed the
10  situation, as of Tuesday you had lawyers representing
11  31,388 cases, about 20,229 who voted to accept and 272
12  had voted to reject. So at least as far as lawyers
13  could tell, it's about a 98.67 percent acceptance rate.
14        But I want to be clear. There are four
15  people who I have had the opportunity to get to know.
16  Tom Tosdal representing Kirk Trostle. Rocky Baldesian
17  representing a former member of the TCC. Fran
18  Scarpulla, who represents, I think, eight clients who,
19  you know, a gentleman burned down -- had a restaurant
20  burned down. Will Abrams, who is an individual who is a
21  fire victim. Steve and Bonnie Kane represents Karen
22  Gowins. They're lobbing all sorts of missiles against
23  me, and that's okay. You know, they feel very strongly,
24  and I respect their view. I've been on Facebook Live.
25  I've debated this with them. There is all sorts of

7 (Pages 25 to 28)

Worldwide Court Reporters, Inc.
(800) 745-1101
Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 8
of 41

1   filings about Mikal Watts did X and Mikal Watts did Y.
2          Look, I think that instead of engaging in
3   a back and forth about, you know, what's going on, you
4   can look at five, six different law firms representing
5   over 30,000 people and see that 98.67 percent of all the
6   claimants who voted that we're familiar with have voted
7   yes. So the fact that you have three or four people,
8   you know, screaming and yelling on the front of the
9   New York Times, The Wall Street Journal, Bloomberg,
10  San Francisco Chronicle, trying to castigate whatever
11  they allege that I'm doing, I'm not real worried about
12  that.
13         What I am worried about is I want to make
14  sure that everybody has a chance to vote. We have
15  sought diligently to give people the information they
16  need to vote, and that's why we're doing this town hall
17  meeting. So we want you to be able to vote. We want
18  you to have the information that you need to -- to vote
19  intelligently. We think the plan is going to be
20  confirmed, and we think you should vote for it. That
21  being said, we want you to be informed.
22         So here's our thoughts from hereon out:
23  The bottom line is that we think that this is the plan
24  that is the best plan available. We think that this is
25  a plan that gets you $13 and a half billion as quickly

1   as possible, and we'll go from there.
2          So one of the things that happened is that
3   yesterday the trustee of the trust Honorable John H.
4   Trotter, the claims administrator Cathy Yanni, filed a
5   document, it's Document No. 7037, it's entitled, "Notice
6   Regarding Filing of Plan Supplement in Connection With
7   Debtors' and Shareholder Proponents' Joint Chapter 11
8   Plan of Reorganization." So what I'd like to do is kind
9   of take you guys through that.
10         And, Roy, let's start with you. What are
11  the general rules that apply to the claims process
12  according to this new document and do they apply equally
13  to the Tubbs Fire versus the other fire?
14         MR. MILLER: Okay. This is part of a
15  2,000-page filing that got dropped on the bankruptcy
16  case yesterday. So Alicia O'Neill and Jon Givens, among
17  others at our group did some breakdown, and these are
18  some of the general rules. Keep in mind, this is
19  subject to being approved by the Judge later, and you're
20  going to be able to see it in writing for yourself,
21  because there is a lot to it. Like everything else in
22  this case, it's complicated.
23         But here are some of the general rules:
24  To be eligible for compensation, you must have a claim
25  related to an included fire. So there is a list of

1   fires that is covered by this PG&E case. You have to be
2   one of them. That you have timely filed a proof of
3   claim and you've submitted supporting documentation,
4   which is outlined in the rules. And upon submission of
5   those documents, the trust will review each claim and
6   consider the damages and costs recoverable. And they'll
7   apply California law or other nonbankruptcy law, if they
8   need to.
9          All the fires that are listed in the
10  document, in the trust rules, is assume that PG&E caused
11  the fire and is responsible, so we're not dealing with a
12  question of whether or not they did it. The proof of
13  claim must have been on file on or before December 31st,
14  2019, which was the extended claims date. If there were
15  claims that were not filed during that time period,
16  they're not eligible for payment unless the claimant
17  obtains relief from the bankruptcy court to file a late
18  claim and then files it within 30 days after being
19  allowed to do so.
20         The type of categories that are involved
21  and the supporting documents, the trust will use
22  information that assists it in evaluating your claim and
23  doing all they can to relieve you guys the burden. So
24  what they will do is they will look at the proof of
25  bankruptcy claim form and the Wildfire Assistance

1   Program claim form, if you participated in that. This
2   is what we call in our group the CMO 5. It was a Case
3   Management Order No. 5, which I'm sure most if not all
4   of the groups filled out, and any other reasonably
5   ascertainable and reliable information. So, for
6   example, your insurance documentation, your declaration
7   page, proof of what your insurance company paid you,
8   photographs, and things like that. And that's -- those
9   are the basic outlines, in general.
10         Thanks, Mikal.
11         MR. WATTS: Great.
12         Okay. So those are the general rules.
13  What I'd like to do is ask Robert Bryson. There is
14  different categories, one of them is what I call real
15  property losses. Robert, explain for the folks on the
16  line what real property losses can be claimed.
17         MR. BRYSON: Thanks again, Mikal, I'll be
18  happy to do so.
19         This is an important loss that persons
20  have suffered. And, just to be clear, when we're
21  talking about real property, maybe people take this for
22  granted, but this is folks that owned the property,
23  whether that's a homeowner or a business owner that owns
24  the land, for example.
25         So what does a real property claim

Worldwide Court Reporters, Inc.
(800) 745-1101

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 9 of 41

1  include? And I -- it's going to include your home that
2  you lost or your commercial real estate structure that
3  you lost and then everything associated with it, for
4  example, landscaping, trees, other improvements that you
5  made to the property down to, say, if you had a very
6  nice mailbox at the entrance of your driveway and it was
7  a nice brick structure and that got destroyed in the
8  fire, then the value to replace that is something that
9  will be included as well, along with other types of
10 hardscape. If your walkways are damaged, your fencing,
11 retaining walls, pools, solar panels, anything and
12 everything you can think of that you spent probably a
13 considerable amount of time and energy to improve your
14 property is something that would be included.
15      And then how -- once you identify what it
16 is that you can claim, the things you lost, it's then
17 how is that -- lawyers call it a damage. That's just a
18 fancy word for your loss. How is that measured? How do
19 you figure out that value?
20      And there is two ways in California. The
21 first is the loss and the fair market value of your
22 property. So if your property was worth X immediately
23 before the fire and then it's now worth less, which is
24 Y, immediately after the fire, the difference between
25 the two is called, another fancy lawyer phrase,

1  diminution in value. It's, basically, the difference in
2  the value of the loss and the value of your property.
3  The second way is what's referred to as the reasonable
4  cost to rebuild or repair your property, and I think
5  everyone understands what that means.
6       So then the next question comes, well,
7  which one is it? How do I know whether it's the reduced
8  value of my property that's my damage or the cost to
9  repair? Well, as everyone on this line knows, the
10 lawyers, there is a specific jury instruction that
11 provides guidance. Now, granted, we're not in a trial
12 setting anymore, but at least it provides what
13 California says and, in short order, it says that
14 ordinarily you can only recover the fair market value
15 loss. However, let's say, for example, a homeowner had
16 a desire, for a personal reason, to rebuild their home,
17 because the view, because they love their neighborhood,
18 whatever the reason may be, even if that cost to
19 repair is more than the fair market value loss, you can
20 recover your cost to repair.
21      And I'm confident that all the lawyers on
22 this line here are going to be fighting for the maximum
23 amount of money that each of you would be entitled to
24 recover for the loss of your home or your commercial
25 property.

1       So what -- what you look to next is how --
2  how is diminution in value calculated? And I kind of
3  hinted at that. It's -- it's the value of your property
4  immediately before the fire versus immediately after the
5  fire. So, unfortunately, the property value is going to
6  dip after a fire, as many of you have seen, if you put
7  your lot up for sale -- which that's another important
8  note. Remember, at the beginning of this I said it's
9  important to maintain your ownership and that that's
10 critical, because if you sell your lot -- and you may
11 have a legitimate reason for doing so, and we all
12 understand that. We're not -- we're not questioning
13 that. It's just that there is a -- a consequence to
14 that which can be that you would be limited to fair
15 market value in -- in your damage for the loss that you
16 suffered versus your cost to repair because you don't
17 own the property anymore.
18      So then we turn to the next item, which
19 is, all right, how do we calculate the cost of repair.
20 So when you're looking at the reasonable cost to rebuild
21 your property as opposed to fair market value, there is
22 a number of items that you're going to be -- we're going
23 to be wanting to obtain from you and/or obtaining
24 independent in order to be able to prove up your claim
25 to maximize your recovery, should this plan be approved.

1  And I'll -- I'll just highlight some of the examples.
2  You're going to have -- you're going to be looking to
3  the use of those structures, the extent of damaged. If
4  it was -- it was a total burn-down, smoke, or some type
5  of heat damage, we're going to look to the square
6  footage of your structure, the geographic location of
7  your property. Where your property was situated can be
8  very important. Also, the -- the vegetation, meaning
9  your trees, your shrubs, and things located on the
10 property. And then, of course, you're going to look at
11 the fair market value before the property and then after
12 the property.
13      And in addition to that, all those
14 factors, the trees have a separate and independent value
15 from, say, for example, your home. In other words, we
16 can recover separately for that and that's a different
17 calculus and all of us on this line and your lawyers are
18 looking to arborists to help us make those calculations.
19      So then this is a big factor, and it kind
20 of melted into what I was talking about before, which is
21 I just talked about how you calculate it, but now we
22 want to look to what do we need to prove it. And let's
23 start with an obvious. If you're a homeowner, you're
24 going to have a grant deed. Now, my firm has been
25 pulling that from both the tax assessor's office and

Worldwide Court Reporters, Inc.
(800) 745-1101

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
10 of 41

also working with our clients to obtain that. And then
we also if you've got appraisals, your -- your mortgage
loan documentation will be helpful.

Any -- this is significant -- photographs
that maybe you could get from friends and family or if
you had them on the -- in the cloud somewhere or on your
phone, if you were fortunate enough to save your phone.
Photographs before the loss, and then we compare those
against photographs after. We know that the loss -- the
photographs after are going to show. It's going to show
near or complete devastation. But the pre-photos were
able to show maybe some of those cherished items that
you lost or the home -- what your home looked like, the
trees, et cetera. So those are very important.

And another critical aspect is the plan.
Now, sometimes that can be difficult to obtain. We had
a couple folks that were preference folks or older
people that were not in the best of health. We were
going to go to trial. We were going to go to trial for
them in San Francisco Superior Court. And I -- I had to
track down the plans. I had to actually go and meet
with the architect to get my two clients' plans. Why
those are so important, I think everyone understands.
With the plans, we can give those to a general
contractor or a similar type of expert who can then

basically calculate what it would cost to replace the
home that you had in conjunction with your description
of, let's say, some of the finishes of your home. And
with that information, we've got a really, really good
idea of what it would cost to rebuild your home.

And then, finally, one of the other things
I mentioned a moment ago is arborists. We hire these
very smart folks to help us value trees, which is a
unique industry, and they have different methodologies
to do that or ways to do it. And there is two different
deals. You'll have ornamental trees. Those are trees
around your house. They're going to have a different
way to value those as opposed to someone that might have
a large swath of land that is timber and they had sold
it in the past. So we use arborists to help us in that
calculation.

There is also a final damage that is
available to you, and that was -- we'd have to spend a
lot of time talking about it. It's called consequential
damages. Those are recoverable as well, but we don't
have the time, nor the place for that.

If you have questions on any of this and
you're a Robins Cloud client, and, as I mentioned last
time, you can call 310-929-4200 or all of our e-mails
are available. And my cell phone, which I'm not going

to give out right now, but I've received many, many
calls from folks that have been concerned. So please
feel free to reach out to us if you have questions about
whether you've provided this information.

And then I urge everyone else on the line
to contact your lawyers as well to make sure that you've
provided them with the information that I just outlined
in a quick format so that we have the best opportunity
to prove up what you lost relative to your real
property.

So thank you, Mikal.

MR. WATTS: You bet.

Hey, so, Rich Bridgford, let me ask you
this: My friend Fran Scarpulla, I think he's got eight
clients in this case and his signature client is a
restaurant that did not burn down, but, you know, they
lost economic damages and like that. What type of
business losses or other out-of-pocket expenses are
recoverable for somebody like Fran's client who their
property didn't burn down, but their business shut down?

MR. BRIDGFORD: Thank you, Mikal.

So the question is what types of business
claims qualify? And under the claims resolution
procedures, business loss claims include claims for
economic losses suffered by a business that were caused

by the fire, the result of the fire. And that includes
the loss of business property or inventory used to
conduct the business as well as lost profits or revenue.

Now, a moment ago Mr. Bryson referenced,
you know, the word "prove." And we're not in a court of
law here, but the claims administer -- administrator,
trustees are going to be looking for certain backup
information in order to document these types of claims.
Particularly in regard to the lost profits and revenue,
a track record of your business is going to be
important.

So what types of documents will be
required? The claimants may provide the following
document to support a business loss claim. First, a
description of the business is important, including its
mission statement. Second, tax returns, including the
schedules and attachments will be important in
establishing the profits, the revenues, and the activity
of the business. Third, financial statements, including
profit and loss statements, also important in
establishing what the loss of the business was. Fourth,
Articles of Incorporation, bylaws, shareholders lists or
partnership or limited partnership agreements, those are
important in substantiating the business. Fifth, lease,
leases, deeds, titles, or other documents identifying

Case: 19-30088    Doc# 7129-28    Filed: 05/08/20    Entered: 05/08/20 15:06:44    Page
11 of 41

1 the property owned or occupied by the business, whether
2 you owned the property or rented it. Sixth, cancelled
3 contracts. Seven, photos, videos, other documentary
4 evidence of the fire damage to the claimant's home or
5 business and other supporting documents within the
6 claimant's possession. All of these will be important
7 in documenting your claim.
8 And I'm sure the other attorneys are doing
9 this as well. Respond to the staff questionnaires and
10 things that we send out and get us that information so
11 that we can recover for you.
12 Related to the foregoing is the question,
13 are there other out-of-pocket expenses that are
14 recoverable? The answer to that is yes. Other
15 out-of-pocket loss claims include claims for
16 out-of-pocket expenses that are not considered in any
17 other type of claim under the claims resolution
18 procedures. These could include additional living
19 expenses, medical and counseling expenses, and other
20 out-of-pocket expenses which you incurred specifically
21 as a result of the fire. The types of supporting
22 documents that the trustee and claims administrators
23 will look for include documentation supporting a claim
24 for additional living expenses, medical bills,
25 counseling bills, and other supporting documents within

1 claimant's possession.
2 Thank you.
3 MR. WATTS: Awesome.
4 Noreen, let me ask you a question. What
5 personal property losses can be claimed? I mean, tell
6 us about personal property income loss.
7 MS. EVANS: Sure, Mikal, happy to do that.
8 You can think about your personal property
9 loss as everything that's not attached to your house or
10 your landscaping and everything that is part of your
11 business. So that would include everything in your home
12 and your garage, outside, in your car, it includes
13 your -- all motor vehicles, your car, your boat, your
14 motorcycle, all of your appliances in your house. Go
15 through your house room by room and remember what you
16 had in there. It's everything down to the teaspoons.
17 It's all your furniture, and clothing, all your
18 equipment that you had in the garage, music, books,
19 artwork, jewelry, everything that you had. That's --
20 you're going to have to make a list. That's the dreaded
21 inventory that we all talked about a couple of years
22 ago. You have got to prepare that list. You have to be
23 able to prove everything you owned that you lost in the
24 fire.
25 So how do you do that? First of all, I

1 mentioned the list of items that you had. You can also
2 do that by showing proof of purchase; receipts, if
3 you're able to obtain those; photographs, photographs
4 that are on your phone that may show what you had on the
5 walls in the background of the photo, might show the
6 artwork that you had. You might even have a photograph
7 of a particularly nice piece of jewelry, that sort of
8 thing. Photographs are very helpful. If you had an
9 appraisal of something, sending a copy of that appraisal
10 would help. Any kind of photographic or paper evidence
11 you can show that you owned the property, what the
12 property was, and what its value is.
13 The other question was whether personal
14 income loss can be claimed, and the answer to that is
15 yes. Personal income loss claims include claims of
16 individuals who lost income because either you were
17 displaced by the fire and couldn't work or your employer
18 was harmed by the fire and either reduced your income or
19 stopped paying you or had to let you go or you sustained
20 some kind of injury in the fire that interfered with
21 your ability to earn income. So that would be your
22 income loss claim.
23 You will have to be able to prove what you
24 lost, and you can do that through a variety of ways,
25 including your tax returns that show the income you had

1 prior to the fire versus what you earned after the fire,
2 W-2 forms, 1099 forms. And if you lost income as a
3 result of losing a rental home or something like that,
4 you can also prove that income loss by a copy of the
5 lease agreement or canceled checks that you had received
6 in the past. You can also look at your bank account
7 statements that will be able to show what you earned
8 prior to the fire versus what you were able to deposit
9 after the fire. Paycheck stubs from your employer and
10 other documentary evidence such as that. And, yes, you
11 can claim any income you lost from renting your home or
12 other rental property. So that's also your -- part of
13 your claim as well.
14 MR. WATTS: Very good. Thank you, Noreen.
15 I appreciate it.
16 Hey, let's go to a different issue. Joe
17 Earley, tell us about the wrongful death cases.
18 What's -- what's the status of those?
19 MR. EARLEY: So we represent -- we
20 represent several families of people who tragically died
21 during -- in the fire, directly in the fire and
22 that's -- that's a rough one. That's a rough one, ever,
23 just to think about. We also represent several families
24 of people who died subsequent to the fire and as a
25 result of the fire, because of the increased stress or

11 (Pages 41 to 44)

1 circumstances. A lot of people didn't have their
2 medications, for instance, that they were dependent upon
3 and they couldn't get them because they evacuated so
4 quickly and frantically. There is a number of reasons.
5 But we represent several of those families. That's --
6 that's a tough -- that's a tougher job, because people
7 die regularly for many reasons that are not related to
8 the fire.
9 But in this case, we have to prove that it
10 was related, so we have to have a physician look at all
11 the records and come to that conclusion that there
12 really was a -- that there was causation between the
13 fire and the -- and the death. So that's something that
14 takes awhile. It's a bit of -- it's a bit of work. But
15 we've been successful in obtaining, you know, very good,
16 strong medical opinions about -- about that, and I think
17 we're going to not have any problem at all demonstrating
18 to the -- you know, the process that they were
19 "deservant" a recovery for the loss of their loved ones.
20 And then the -- the claim for -- the kind
21 of general claim, nonspecific, noneconomic claims,
22 they're -- they're going to be the hardest, in order to
23 quantify, of all of this types of damages. There is no
24 tables to look up what's the value of a relationship or
25 the value of pain, the value of losing, you know,

1 sentimental items that your family has had forever and
2 now they're gone. This is all very, very subject to --
3 to someone's opinion. And that happens all the time in
4 the courtroom. People have to decide what's the value
5 of the loss of a life and you, know, pain and so on. In
6 this case we're going to have to leave it up to a
7 referee as part of the claims resolution process, and we
8 have to trust that they will be fair and deal with the
9 individual's losses properly.
10 In the many, many community forums and
11 client forums that we have put on I always believe,
12 almost without exception, would discuss something in my
13 life that I had lost that was never -- could never be
14 replaced. It has a value, a deep, deep, deep
15 sentimental value to me, but has really no economic
16 value. And I -- I did that to make it clear to my
17 clients that we understand, that I understand the depths
18 of that, the depth of that loss and that they'll never
19 be -- you can never really be made whole, you can never
20 really get that back. So I know that no matter what we
21 do, we will never walk away thinking, gosh, I'm back
22 where I was. That's never going to happen. You can
23 have the nicest home, you can have your vehicle back,
24 but you'll never, you'll never get that loss, that part
25 of your soul that was ripped out and burned.

1 So, that being said, all we can do is the
2 best we can do. So they set up rules, and these rules
3 they set up, they're intentionally vague. They kind of
4 have to be. I think that gives the people making the
5 determinations, it gives them some flexibility to do the
6 right thing. And they're going through a process, and,
7 certainly, that's -- that's why lawyers are there, too,
8 to make sure that these rules are followed.
9 But if you like, Mikal, I can read through
10 the rules that they need to follow. Would that be
11 helpful?
12 MR. WATTS: Sure.
13 MR. EARLEY: So, first, qualifying just --
14 what was just provided by the Court, that the -- in the
15 claims resolution process that the others fellows were
16 talking about. Wrongful death and serious personal
17 injuries include claims, related individuals who died or
18 suffered serious personal injury as a result of the
19 fires. The trustee and claims administrator will devise
20 procedures ensuring a streamlined and sensitive process,
21 providing claimants and their family members the dignity
22 that is critical to successfully resolving claims
23 relating to these extraordinary losses. So you can see
24 that's intentionally kind of generic. That's probably
25 good, because that allows them more flexibility to what

1 they really need because there are such individualized
2 losses.
3 What types of supporting documents can be
4 submitted? Well, again, you know, the claimants may
5 provide medical records or other documents supporting a
6 wrongful death or serious personal injury claim, as well
7 as documents supporting the claim for loss of
8 relationship, love, support, and companionship. That's
9 something that your lawyers should be working with you
10 with, if you're in that category. That's not
11 necessarily needed to prove, but we do the best that we
12 can.
13 So what types of claims and proof can be
14 provided for emotional distress and PTSD? So emotional
15 distress claims include claims arising from -- this is
16 important, these categories -- the zone of danger
17 evacuation from the fire. That's the circumstances
18 under which we left the fire. Some of us were fortunate
19 enough to be ahead of the flames, then some of us were
20 unfortunate enough to be stuck with the flames all
21 around. That's called the zone of danger claim,
22 emotional distress claim and those claims need to be
23 supported in some way, whatever you've got, and it can
24 be your testimony, because you're -- we're all entitled
25 to give our under oath testimony, you know, under

Worldwide Court Reporters, Inc.
(800) 745-1101

1 penalty of perjury and all that. So we have to be
2 honest, but whatever that is, that type of claim.
3        Then physical injury, that's a little more
4 easy to show because there will be some kind of medical
5 record probably showing the physical injury.
6        Then -- then the more difficult one is one
7 that they refer to as a substantial interference with
8 the use and enjoyment of or invasion of the property
9 occupied by the claimant as well as the impact of the
10 loss of community. I mean, those are very, very general
11 terms, but those of us who lost our cherished stuff and
12 our cherished lives and our cherished community
13 understand how real that is and it's deep. But how do
14 you -- how do you put a price on that? I don't know.
15 That's -- that's going to be up to the trustee. We will
16 try to put forth the best argument that we can.
17        Another section related to what types of
18 supporting documents can be provided for that, and they
19 list several. They can provide a written narrative or
20 an audio or a video narrative recording the details of
21 the evacuation, and that will -- you know, that will
22 depend on the circumstances how best to do that. So
23 that's part of your lawyer's job, is to come up with the
24 best way to convey the reality of what you went through
25 to get out.

1 anything. They're keeping it very, very general, and
2 that's -- and that's good.
3        Documentation of medical, counseling, and
4 expenses. Other -- just to show you how open they are
5 to looking at the whole picture. Other supporting
6 documents in the claimant's possession. So that's a
7 wide door. So we just have to work with your lawyers
8 and see what there is to substantiate, and, you know,
9 we'll put the best foot forward on that claim.
10        And there's -- here's another -- another
11 example of how wide the door is for these kind of
12 claims. The question is, are there other damages that
13 may be recoverable. And the trustee and claims
14 administrator will devise procedures to evaluate any
15 additional category of recoverable damages. So it's a
16 matter of just expressing what the -- what the damages
17 are, you make the claim for it. We hope that the -- the
18 administrators can understand exactly what -- what --
19 what that translates to on a -- on a personal level.
20 And, hopefully, there will be a recovery that at least
21 you can feel like -- like somebody cared and -- and
22 maybe do something to enhance your life to try to make
23 up for those losses. But it's going to be a tough one.
24 On the other hand, I'm also looking forward to making
25 sure that's done fairly for my clients.

1        Texts, e-mails, social media posts, and so
2 on, those can be very, very helpful in laying that out;
3 and, presumably, a lot of that has already been
4 collected and submitted to your lawyers. Photos and
5 videos, of course, taken during the evacuation are
6 critical, or can be critical, but not necessary, because
7 some of us were worried about just getting out and not
8 about recording the event, but a lot of people did, and
9 thank goodness for that because that's going to be an
10 important factor in determining the values.
11        Prefire, post fire photos and videos of
12 the property showing the stuff that you lost that's
13 meaningful to you, and then, of course, an explanation
14 as to why they were meaningful. This was a lot of work.
15 We understand that.
16        The records describing bodily injury and
17 mental health counseling or treatment. If possible,
18 everyone should be getting some kind of treatment, even
19 aside from the lawsuit itself, just for their own
20 survival, because it really wreaked havoc on our -- our
21 brain functioning and our relationships and so on. So
22 any records of such treatments or diagnoses can be
23 really critical. Again, they're very vague. They're
24 not saying that a psychiatrist has to provide a
25 declaration or anything. They're not specifying

1        Thank you for that, Mikal.
2        MR. WATTS: Yeah, awesome.
3        Hey, so I know that we've got several of
4 the folks from, you know, North Bay Fires, Noreen Evans,
5 Roy Miller. One of our partners over there is Michael
6 Fiumara, and his husband, Gordon Larsen, passed away
7 recently. Michael is one of my big-time buddies for two
8 and a half years. And he's -- he's part of our team as
9 well. So I didn't want to leave that waiting.
10        Hey, Jim Frantz, let's see whether we can
11 go -- how will these claims be submitted? Tell me about
12 how we're going to submit all this information and will
13 there be a form to fill out.
14        MR. FRANTZ: Yeah, Mikal, yeah, there is.
15 The claims processer will maintain a secure web-based
16 portal and -- and that's for the claimants to submit
17 their claims questionnaires, supporting documents,
18 releases and any other relevant information or
19 documents. And after submitting their claim, the
20 claimants will be able to use the portal to check their
21 claim status and receive and respond to determination
22 notices, submit supplement material, update the contact
23 gap information that they have or any demographic
24 information, if necessary. And there will be a form to
25 fill out.

13 (Pages 49 to 52)

Worldwide Court Reporters, Inc.
(800) 745-1101

1    So in addition to the claim specific
2  supporting documents, the claims administrator will
3  require the claimant to complete a claims questionnaire
4  that provides sufficient information to, No. 1, verify
5  the claimant's identity; identify and support the claim
6  damages in the case; No. 3, demonstrate the claimant's
7  authority to assert the claims, in other words, like,
8  for your house, a copy of the deed, for example.
9  Individual claimants may submit claims questionnaires by
10  household.  What does that mean?  Well, if you have a
11  household, a husband, wife, and three kids, the head of
12  the household may submit claims questionnaires by the
13  household, including all the information for each
14  individual that was in the house.
15    The claims processer will pre-populate
16  claims questionnaires with information already in its
17  possession, including, but not limited to, the data from
18  the claimant's bankruptcy claim proof of claim form, the
19  one that you've already filed; the Wildfire Assistance
20  Program claim form; and damages questionnaire
21  established under the CMO No. 5 in the California North
22  Bay Fire cases and information that is otherwise
23  reasonably ascertainable and reliable.
24    And, as a practical matter, we have
25  submitted questionnaires to all of our clients, and the

1  That goes to a claims administrator, who's going to look
2  at it and then issue a written determination notice.
3  That determination notice lets you know what portion of
4  your claim has been approved.  So it may be that the
5  claims administrator approves your entire claim.  It may
6  be that he or she approves a certain percentage of it.
7  And that amount is the approved claim amount.
8    Once you get that approved claim amount,
9  then you have the opportunity to object to it and to ask
10  for more.  And, for example, you can provide additional
11  information.  If, for example, the claims administrator
12  says I was not able to award a hundred percent on this
13  aspect of the claim because you were missing X, Y, and
14  Z, then you can provide that to the claims
15  administrator.
16    Ultimately, you are going to go back and
17  forth, and you are going to reach the final amount that
18  that claims administrator is willing to pay.  If at that
19  point you don't believe that it was reasonable, then you
20  have the opportunity to appeal, and what you do is you
21  file a request with the trustee and ask that all or part
22  of your claim be appealed.  And by "a part," what I mean
23  is it could be, for example, that you were happy with
24  the real property, the personal property and the loss of
25  income -- or the loss of income, but you didn't like the

1  questionnaires asked for all of the damage information
2  that's available during this wildfire as to the claims
3  that we're making.  And so we would really encourage all
4  clients and our clients to answer the questionnaires as
5  completely as possible so we have all the information we
6  need to evaluate, assess, and come up with a damage
7  allocation on your case. It's very, very important that
8  we get cooperation from you and get the questionnaires
9  filled out completely and accurately.  And, as with all
10  the other law firms on this call, everyone has staff
11  standing by to assist, to the extent necessary, if you
12  have a problem filling out questionnaires.
13    MR. WATTS:  All right, excellent.  Thanks,
14  Jim.
15    Hey, Jerry, once a proof of claim form is
16  submitted, what happens?  I mean, how is the money
17  decided?  Is it appealable?  Give the folks some thought
18  about that.
19    MR. SINGLETON:  Sure thing.  So this has
20  been clarified a great deal by the documents that were
21  filed yesterday.  But, essentially, what happens, as Jim
22  said, you submit a proof of claim.  That proof of claim
23  is supported by all the documentation, Rich touched on
24  this as well, that your attorney gathers, and we do
25  everything we can to maximize the value of that claim.

1  noneconomic amount or something like that.  You notify
2  the trustee of what your appeal is going to cover, and
3  you also say whether or not you want the document review
4  only, whether you want a telephonic hearing, whether you
5  want a document review followed by a telephonic hearing,
6  or if you would like an actual full-blown hearing in
7  front of a new hearing officer.
8    If you request that, then a new
9  individual, a new claims administrator will be appointed
10  and the entire process is done again over, de novo,
11  meaning from scratch. So if, for example, the award was
12  200,000, the claims administrator who hears the appeal
13  would have the right to award less or more, and the
14  final decision must be made within 30 days of that
15  hearing.
16    Once that final decision is made, if
17  you're still unhappy, then you can make a final appeal
18  directly to the trustee, which is Justice Trotter, and
19  you can submit the same information again.
20  Justice Trotter will review it, and then his decision
21  will be final.
22    MR. WATTS:  Okay, awesome.
23    MR. SINGLETON:  Go ahead.
24    MR. WATTS:  We've taken the basic
25  questions we've got.  Let's take the questions that

Worldwide Court Reporters, Inc.
(800) 745-1101

Case: 19-30088    Doc# 7129-28    Filed: 05/08/20    Entered: 05/08/20 15:06:44    Page
15 of 41

1  people are typing in. Press star 3. Press star 3, and
2  we'll answer your questions.
3  MR. ROECKER: Okay. Let's take our first
4  question. Somebody asked if there were -- if there were
5  only 25,000 structures burned, why are there 75,000
6  claimants?
7  MR. WATTS: Jerry, do you want to take
8  that?
9  MR. SINGLETON: Sure, I'd be happy to.
10  That happens for a number of reasons, and,
11  basically, the simple answer is that it's not just the
12  loss of the structure that is compensable. For example,
13  if you were living in a town and there was damage done
14  to your property, but your home survived, for example,
15  the trees on your lot were burned down, any number of
16  things could happen, then you can make a claim for that.
17  It's not just the structure.
18  In addition, though, many homes were
19  rented. And so when you have the destruction of a
20  rental home, that gives rise to two separate claims.
21  The renter is entitled to recover for their personal
22  property and for their emotional distress, but at the
23  same time, the owner is entitled to recover for the
24  damage to personal property.
25  And then, finally, you have another

1  category which is purely the emotional distress, and
2  this is particularly prominent in someplace like
3  Paradise. You know, we all have heard about just how
4  horrific it was getting out there. It was -- I mean,
5  the descriptions literally defy the imagination in terms
6  of just how bad it was at the end there. And so if you
7  were someone who did not lose a structure, but you were
8  fleeing the area and were placed in fear for your life,
9  then you're certainly entitled to make a claim for that
10  emotional distress, although you're not, obviously,
11  going to have a claim for real property if your
12  structure survived and wasn't damaged.
13  So that, in a nutshell, is how it works,
14  is it's not just the destruction of the property; it's
15  the destruction of any type of real property, personal
16  property, or emotional distress. And then the other
17  thing to remember is that 77,000 claims, that's 77,000
18  individuals. So while you may have had X number of
19  structures destroyed, if there were two people living
20  there, then now, all of a sudden, that would get
21  doubled. So that's how it all works out.
22  MR. WATTS: All right.
23  MR. ROECKER: Mikal, the next one is from
24  one of your clients in Santa Rosa. Deborah wants to
25  know if people are available to help fill out the forms

1  dealing with her emotional distress claims and her loss
2  of income claim. And then her second question is, with
3  more fires going on, are they part of the current
4  lawsuit?
5  MR. WATTS: So, Deborah, let me answer
6  that. The first is for the forms, yes. We're waiting
7  on the final forms from Justice Trotter and claims
8  administrator Cathy Yanni. Expect those imminently. I
9  am in the process of hiring between 35 and 50 law
10  students to help us help you fill out the claims. We've
11  got all sorts of people. I've got 111 people working
12  for me that are going to help us with that. So, yes,
13  you're going to have help. As soon as we get the final
14  claims, we'll start that process.
15  And then, Sam, what was the second
16  question? I lost track. I'm sorry.
17  MR. ROECKER: The second one -- let me
18  find it here.
19  UNIDENTIFIED SPEAKER: It was about the
20  current fires.
21  MR. WATTS: Oh, yeah. So the current
22  fires, I'm going to use Kincade as an example. Any fire
23  after the filing of bankruptcy is called a post filing
24  administrative claim. Kincade is that. It will not be
25  out of the $13.5 billion. Kincade is the one fire that,

1  you know, will have to be dealt with by the company.
2  And, of course, if there is another fire this fall, we
3  got AB-1054 that should cover the majority of that. At
4  the same time, you know, if there is -- if there is
5  another issue, it will be handled administratively, not
6  out of our 13.5 billion.
7  MR. ROECKER: Great. The next question,
8  looks like it's from Nasi, and he says he had 2 acres of
9  oak trees that burned down. How can he evaluate the
10  cost of removing and the price of the trees?
11  MR. WATTS: Sure, Jerry, you want to
12  handle that?
13  MR. SINGLETON: Sure. That's -- I think
14  Rich touched on this a little bit earlier, but that's
15  where the arborist comes in. So what will happen in
16  that situation is your attorney will hire an arborist.
17  The arborist will come in, and they'll look at a couple
18  of different categories. No. 1 will be what it will
19  cost to remove all of the dead trees and make it safe.
20  The next thing will be how do you replant. Obviously,
21  you cannot replace like for like. If you had a mature
22  oak tree, it's not possible to move one that large in.
23  So what they'll do is they'll come up with a program for
24  planting trees, and that will likely require irrigation
25  and things like that. And the final thing they'll do is

Worldwide Court Reporters, Inc.
(800) 745-1101

1  they'll look at the loss of esthetic value, because it's
2  going to be a number of years, unfortunately, before the
3  trees that they plant come anywhere near approaching
4  what it was that you lost.
5      So they take all of those damages
6  together, they add it up, and then that's the value of
7  the loss. They put that in their report. And then your
8  attorney will submit that along with the rest of your
9  package.
10     MR. WATTS: Okay. Who's next? We got
11  about 28 minutes. Let's keep going.
12     MR. ROECKER: Next question is from Ann.
13  She wants to know, as far as the nonsalvageable list, is
14  there a deadline for getting that turned in? And do you
15  need the list that she has made up or the list that
16  insurance will give her -- give her showing
17  depreciation.
18     MR. WATTS: Roy Miller, do you want to
19  answer that?
20     MR. MILLER: Sure.
21     The short answer is we want everything.
22  If the insurance company has already given you back a
23  list of your items reflecting depreciation, we want
24  that. If you have additional items that you recall
25  having lost, we would like that as well. The more

1  detail that you're able to provide your lawyer, the
2  better and the more information the trustee
3  administrator will have to be able to compensate you for
4  the loss.
5      In terms of the deadline, obviously, we
6  want it sooner rather than later. The Watts Guerra
7  group is going to try to get the process started in
8  June. All the groups are probably going to be doing
9  something similar. So whenever you can get that to us
10  would be great.
11     Thanks.
12     MR. WATTS: All right. What's next?
13     MR. ROECKER: Great. Faith says that she
14  wanted to rebuild in Paradise, but it looks like it was
15  going to be cost prohibitive and also no guarantee of a
16  water supply, so she ended up moving, but still owns the
17  lot. They're wondering about the time frame of the
18  settlement and the pay-out.
19     MR. WATTS: So, Faith, on the time frame,
20  I think that the goal of the trustee and the special --
21  I mean, and the claims administrator is to get a lot of
22  the money out towards the end of this year, first
23  quarter of next year. I think they're going to try for
24  a quick play that gets rid of about 65, 70 percent of
25  the 13.5 billion. And the people who want to appeal to

1  a third-party neutral or an arbitration panel after that
2  will be delayed. But I think the goal is to get most of
3  the money out this year or early next.
4      MR. ROECKER: Great. Madelyn wants to
5  know if she needs to be getting her own estimates for
6  replacement of out-structures and then also property not
7  associated with the house, like lawns, retaining walls,
8  shop buildings, or RV shelters.
9      MR. WATTS: Yeah, well, the main thing is
10  we need you to get that information to us so we know
11  what it is. We have people that will help assess that.
12  But if you've got your own estimates, we'd like that as
13  well.
14     MR. ROECKER: And then Kim wants to know
15  how renters are -- are dealt with in the settlement.
16  She keeps hearing a lot about homeowners, but wants to
17  know specifically about renters who did not have
18  insurance.
19     MR. WATTS: Sure. Jim Frantz, do you want
20  to handle rentals?
21     MR. FRANTZ: Renters are treated similarly
22  to other real estate property owners. They will value
23  the claim for the losses of rental, but they will file a
24  claim for all their personal possessions. And to the
25  extent they have emotional distress, annoyance, and

1  discomfort damages, they will have those available to
2  them as well as far as the evacuation and the ordeal
3  after finding a new rental and all the experiences that
4  they had after the fire that were difficult for them.
5      Any loss of earnings, that's another issue
6  that they'll be able to make a claim for to the extent
7  that they can prove that up.
8      Okay.
9      MR. WATTS: Okay.
10     MR. ROECKER: Chris is wondering what
11  order the claims will be processed. Is it
12  alphabetically, smallest to largest, or how is that
13  dealt with?
14     MR. WATTS: I think it will be based on
15  when the claims come in. I mean, I don't think it's
16  alphabetical. I don't think it's, you know, date of the
17  fire. I think it's going to be more like who gets their
18  stuff in and out.
19     MR. ROECKER: Jerry on-line wants to know,
20  what if you owned an item and you don't have a record of
21  it.
22     MR. WATTS: Rich Bridgford, do you want to
23  handle that?
24     MR. BRIDGFORD: The question is what if
25  you owned personal items, is that the question?

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
17 of 41

1     MR. ROECKER:  Yeah, what if you owned an
2  item, but you don't have a record of it?
3     MR. BRIDGFORD:  I believe you still make a
4  claim.  We are -- we're using adjusters that have
5  checklists that have been compiled over a period of 20
6  years.  My partner Jim Frantz in these cases, has been
7  doing these fires for quite a bit.  And the bottom line
8  is the purpose of that inventory that we provide our
9  client is to trigger things that they may have even
10  forgotten about.  And the fact that you don't have
11  records of it does not mean that you shouldn't --
12  shouldn't claim it.  Of course, you shouldn't invent
13  anything that you don't have.
14     But I would be surprised if most of the
15  victims have records of everything that they ever owned,
16  unless they kept all their receipts in a box and they --
17  they taped everything they had in their house.
18     MR. WATTS:  Okay.  Sam, what's next?
19     MR. ROECKER:  Mark wants to know if there
20  is a dollar amount estimate of the claims combined and,
21  also, will the administrator use a standard percentage
22  of replacement value to establish fair market value?
23     MR. WATTS:  Bryson, do you want to take a
24  shot at that?
25     MR. BRYSON:  Yeah.  I'm sorry, what were

1  the two questions again?  Just to make sure I got it
2  straight.
3     MR. ROECKER:  The first one is is there an
4  estimate of the total amount of all the claims combined?
5  And will the administrator use a standard percentage of
6  replacement value to establish fair market value?
7     MR. BRYSON:  Okay.  So in response to the
8  question, that's a simple no.  It's unknown at the
9  moment.  What we do know is the pot of potential money
10  to recover, which is 13.5 billion.
11     As to the second question, I think many of
12  the lawyers on the phone spoke to that.  There is going
13  to be uniformity in the way claims are addressed, but
14  claims vary from claim to claim, property to property.
15  For example, let's say you had a home in Paradise than
16  you lost and then someone else had a home that they lost
17  in Sonoma County.  Those are different counties,
18  different geographies, different property values,
19  different costs to rebuild.  So all those differences
20  will factor into valuing the cost to replace potentially
21  your home versus someone else's home.
22     So while there will be a standard in a
23  sense that everyone will be treated fairly, applying the
24  same rules, the fact that the form -- the proof of your
25  claim or the basis for your claim that your lawyers want

1  to establish for you will vary, and that will create
2  uniqueness for each home.
3     MR. WATTS:  Okay.
4     MR. ROECKER:  Darren wants to know if they
5  have already rebuilt, landscaping, hardscaping, fencing,
6  et cetera, do they need to go through all of it to
7  estimate reasonable cost to rebuild?
8     MR. WATTS:  Jerry.
9     MR. SINGLETON:  Sure.  The answer to that
10  question is that it depends and the answer -- and the
11  reason for that is because what you're entitled to
12  recover is not necessarily what you rebuilt; it's what
13  you lost at the time.  So, certainly, the costs that you
14  actually expended are very relevant, but in order for it
15  to be apples to apples, you would have had to have
16  rebuilt substantially the same house.  So if you rebuilt
17  the same house, the same basic floor plan with a few
18  minor adjustments, that you're not going to have to
19  really do much else.  As long as you have the costs of
20  actually building it, then you're fine.
21     On the other hand, if you did what a lot
22  of my clients do and decide to make some changes, which
23  is perfectly appropriate, then you probably are going to
24  have to get an estimate from a contractor because
25  they're going to have to opine as to what it would have

1  cost to build the exact same home you had at that time.
2     MR. WATTS:  Okay.  We've got about 18
3  minutes left.  What else do we have?
4     MR. ROECKER:  Yeah, Stephanie would like
5  to know if the loss of a pet is recoverable in the
6  settlement.
7     MR. WATTS:  Yeah.  Robert Bryson, tell us
8  about California law and the loss of pets.
9     MR. BRYSON:  Well, I don't mean to be the
10  bearer of bad news, because I -- I have some dogs and
11  I've had pets my entire life.  Unfortunately, although
12  pets, many of us probably on the line, generally,
13  especially in California, often treat them as family
14  members.  The current state of the law, which I'll say
15  personally I do not agree with, is that pets are treated
16  as akin to personal property.  So you can recover for
17  the loss of a pet, but you're not going to be able to
18  recover for the emotional loss associated with that pet.
19  It's going to be a very cold calculation as to what your
20  turtle, your German Shepherd, your cat may have been
21  worth in order to replace that particular -- like, for
22  example, you might have had a German Shepherd that was
23  highly trained and not only your children enjoyed, but
24  served as security for your home, and you paid a pretty
25  penny for that -- that particular dog and the training.

Worldwide Court Reporters, Inc.
(800) 745-1101

1  That would be factored in as something you could seek to
2  recover. However, you wouldn't be able to recover the
3  loss that the children and you suffered from the loss of
4  that family member.
5        MR. WATTS: Okay. What's next?
6        MR. ROECKER: Peter would like to know,
7  what's the best contact info for all the law firms for
8  clients to get in contact with, phone numbers and
9  e-mails.
10       MR. WATTS: I think for Watts Guerra, I
11  mean, in the Camp Fire area, it would be
12  chico@wattsguerra.com,
13  c-h-i-c-o@w-a-t-t-s-g-u-e-r-r-a.com. If you're in North
14  Bay, it would be santarosa@wattsguerra.com.
15       And the other guys, go ahead.
16       MR. SINGLETON: Hi, this is Jerry.
17  Go ahead, Jim.
18       MR. FRANTZ: I was going to say for
19  Bridgford, Artinian, McNicholas and McNicholas and
20  Frantz Law Group, it's wildfires@frantzlawgroup.com.
21  And the phone number that is utilized by all the clients
22  for all three of our firms that are joined together is
23  855-735-5945.
24       MR. SINGLETON: Oh, this is Jerry -- oh,
25  I'm sorry, go ahead.

1       UNIDENTIFIED SPEAKER: Go ahead. Go
2  ahead, Jerry.
3       MR. SINGLETON: Sure, this is Jerry
4  Singleton. For us, you can either talk with anyone
5  you've been talking to or e-mail me directly anytime you
6  have any issues. My e-mail is Gerald, G-e-r-a-l-d,
7  @slffirm.com. Our number is 619-771-3473.
8       MR. WATTS: And -- and Robert Bryson.
9       MR. BRYSON: Yes, for Robins Cloud
10  clients, I mentioned before, our number is 3 -- we have
11  different numbers. I'm going to give you the primary
12  number. 310-929-4200. 310-929-4200. And then I would
13  echo what Jerry mentioned, that there is a number of
14  folks that many of our clients have been in contact
15  with, some very hard-working team members. You probably
16  have their e-mails. And you can reach us, of course,
17  through our website at robinslaw.com. And my e-mail
18  address is on my business card, and it's not hidden from
19  view, is rbryson@robinscloud.com would be the best way.
20       MR. WATTS: All right. Who do we have
21  next?
22       MR. ROECKER: Next is Frank. Frank wants
23  to know about the proof of claim papers. Are they going
24  to be mailed out to the clients, or do they need to pick
25  them up?

1       MR. WATTS: I think -- I think I speak for
2  everybody. I mean, we're going to -- we're going to
3  send them digitally, we're going to mail them, we're
4  going to, you know, push you guys pretty hard to get
5  them done. I think we're going to have a, you know,
6  computerized fill-in claim form, where we're filling in
7  data and having you submitted it, something like that.
8  We don't have that yet, but I know that Jerry has been
9  working with, you know, Justice Trotter and Cathy Yanni.
10  I think that's imminent. I don't think they want to
11  send out the claim forms before the vote because they
12  don't want to seem presumptuous. It's your call. But
13  we have rough drafts of that. We have a pretty good
14  idea what's going to happen. I would not expect a lot
15  of delay from the time of confirmation until the time
16  that these claim forms are sent out. And we'll
17  certainly get them to you immediately.
18       Jerry, you got a thought?
19       MR. SINGLETON: Yeah, I think that's
20  right. We are working on it. The final procedures are
21  supposed to be approved and have everything up and
22  running by July 1st. So I think the next two months
23  we're going to be finalizing them. And once the vote is
24  approved, I think we'll have -- we'll be in a much
25  better position. So hopefully we can get people drafts

1  by the end of the month, early next month, and start
2  getting things submitted in July.
3       MR. WATTS: Yeah, I think that's right.
4       What else we got?
5       MR. ROECKER: Yeah, Jennifer has a loss of
6  income question. Her husband worked at a hospital and
7  then when they moved, his guaranteed salary was less
8  afterwards. Is that something that they can claim?
9       MR. WATTS: Yeah, Rich, you want to -- you
10  want to answer that one?
11       MR. BRIDGFORD: Yes. The issue here is
12  causation. I believe that they -- they can, if they can
13  prove that they were dispossessed of their property by
14  the fire. They can claim what I would call the delta
15  and any consequential damages as well.
16       MR. WATTS: Okay. All right. What else
17  we got?
18       MR. ROECKER: Yeah, Jennifer has another
19  question about submitting a claim. If they have
20  submitted everything to the attorney, will the attorney
21  then submit the claim to the processer, or do they just
22  resubmit everything on their own?
23       MR. WATTS: No, no, we'll submit it for
24  you.
25       MR. ROECKER: And then we've got John.

Worldwide Court Reporters, Inc.
(800) 745-1101

1 John says he made his insurance payment and received a
2 pay-out on the losses incurred. In terms of coverage,
3 is the fact that they received payment from the
4 insurance, does that matter?
5 MR. WATTS: You're not going to get to
6 recover twice. So whatever you recover from the
7 insurance will be an offset against whatever your
8 damages are going to be. So we want you to get every
9 dollar you can from the insurance company because you
10 don't have to pay us a fee, which is good. We're here
11 to get you over and above what the insurance companies
12 have paid you.
13 MR. ROECKER: I've got Michelle. Michelle
14 is a Tubbs Fire renter. We did not have rental
15 insurance. She had to take out an SBA loan for money to
16 replace everything. Will the loan be something that
17 they can get reimbursed for?
18 MR. WATTS: Robert Bryson, what's your
19 thoughts on that?
20 MR. BRYSON: Well, just to be clear, what
21 we would do as your lawyers is we would make sure that
22 you give us a complete list of all the personal property
23 that you lost and help you value that property along
24 with, unfortunately, depreciation. You can't get the
25 replacement cost. You get the value based upon the

1 condition, et cetera. So we would work hard to get you
2 the maximum amount that we can recover for all of your
3 lost keepsakes, personal property, et cetera.
4 But if you had to take out an SBA loan to
5 help you to be able to replace them in the interim, we
6 couldn't then seek that as an additional damage and you
7 would still be responsible, of course, under the terms
8 of that loan to repay it, unless that loan is forgiven.
9 That might be something you want to look into.
10 MR. WATTS: All right, sounds good.
11 Sam, what else you got?
12 MR. ROECKER: Marilyn -- yeah, Marilyn
13 wants to know if she were to pass away before the
14 settlement, would her portion still be hers and how
15 would they know to give it to her kids?
16 MR. WATTS: Joe Earley.
17 MR. EARLEY: Yeah, and that'll depend on
18 what -- what aspects of the claim. There are certain --
19 certain of our damages that will not survive our death.
20 Emotional distress would be the most obvious. But,
21 otherwise, that's really just part of an estate. Like,
22 whatever -- whatever your estate plan says happens to
23 your estate, those would be -- and your claim is an
24 asset in your estate. So however that says it should
25 go. Should that happen during the -- during this

1 process, obviously, you'd want to talk to a lawyer about
2 what you would need to do in order to effectuate that --
3 that change in the ownership of those -- of those assets
4 or your claim. So it all depends on what's going on
5 within the trust or, you know, a will or nothing at all.
6 So that's something that you're going to need legal
7 advice on, should that unfortunate event occur. Let's
8 hope it -- let's hope it doesn't.
9 MR. WATTS: All right. So, excellent.
10 We've got about nine minutes left. Let's take two or
11 three more questions.
12 Sam, what do we have?
13 MR. ROECKER: Yes, Doug wants to know if
14 he's allowed to sell his lot.
15 MR. WATTS: Robert, what are your
16 thoughts?
17 MR. BRYSON: Well, all of us that are fire
18 victims -- I mean, let me rephrase that. All of you
19 that are fire victims and you're confronted with a
20 myriad of different reasons why you might need to sell
21 your lot. We as your lawyers to understand that. But,
22 as I had mentioned at the beginning of this discussion,
23 it can dramatically impact our ability to recover moneys
24 for you. The easiest way to understand it is that if
25 you sell your lot and you have to move, of course, you

1 lost your home in the fire, whichever fire that was, we
2 couldn't seek the cost to repair your home because you
3 don't own the lot. What we could recover is that fancy
4 lawyer word, diminution in value. So that's the
5 difference between what your property was worth before
6 the fire versus after the fire. And, generally,
7 although not always, that's a lower value.
8 So on behalf of Robins Cloud clients and
9 all the other lawyers on this phone, I'm sure they would
10 echo my sentiment that if you can do it financially, we
11 would strongly urge you to maintain ownership of that
12 lot so that we then can go after the cost to repair
13 everything that you lost on that property, because that
14 generally is a very significant loss.
15 MR. WATTS: Okay.
16 MR. ROECKER: And then John was reading
17 about the stock. He just wants to know how PG&E stock
18 is affected by the recent market downturn.
19 MR. WATTS: Rich, do you want to take that
20 one?
21 MR. BRIDGFORD: Sure. The simple answer
22 is that PG&E stock, I think -- I didn't check it last
23 week, but I think it's doing as well or better than it
24 was before the fires. I think I learned that from you,
25 Mikal. I didn't actually -- I actually hadn't charted

Worldwide Court Reporters, Inc.
(800) 745-1101

1  it, but I believe that's the case.
2         And in relation to the stock sort of --
3  sort of -- that question is sort of pregnant with the
4  following, and that is how is the stock going to work.
5  And, just briefly, I think it's very important to know
6  that the stock that the victims' trust fund will receive
7  and that the trustee will appoint financial experts,
8  Houlihan & Lokey being one of them, Canadian bank for
9  the TCC, to manage the stock.  Okay.  It will be stock
10 in the new PG&E.
11        So what happens in bankruptcy is if this
12 plan gets voted in favor of and the Judge approves it,
13 you issue stock in the new PG&E, which is what attorneys
14 know as post discharge.  So that stock will no -- will
15 be in a new company that will not be saddled with all of
16 these claims that we're making here.  Those all go into
17 the victims' trust fund that's funded, and PG&E no
18 longer has responsibility for those claims.  All of the
19 FEMA, California claims, insurance subro claims, all
20 that stuff falls by the wayside, and you, basically,
21 emerge with a PG&E that hopefully has the money from
22 1054 to remediate future fires, harden the grid, and is,
23 basically, collecting every month utility rates from
24 17 million different customers.
25        Now, apart from the fires, this is a very

1  sound economic model.  So we're very hopeful that stock
2  will do just fine.
3         MR. WATTS:  Who else has got a question?
4  We've got about four minutes left.
5         MR. ROECKER:  Phil is a 73-year-old Camp
6  Fire client who does not really know much about
7  computers.  He wants to know if he'll be able to just go
8  into the office and deal with all of this in person
9  rather than on-line.
10        MR. WATTS:  Yeah, Phil, right now you
11 can't because we're sheltered in place, but my
12 expectation is -- in Texas we just opened up a little
13 bit.  I think by June 1 you'll be able to open up.
14        And just so that everybody knows, over the
15 course of the next several weeks we're going to be
16 sending you a text designed to get you lined up with a
17 schedule of an appointment to allow you to get your
18 claim done.  We're going to make you a full disclosure
19 about all this stuff you've been reading in the New York
20 Times, The Wall Street Journal, and the San Francisco
21 Chronicle tomorrow and get you to waive any conflict
22 that you see.  I don't see it.  But the bottom line is
23 the main goal is we want you to sign up and schedule
24 yourself.  We'll have 50 people working on this around
25 the clock, making sure that your claim forms are ready

1  to go.  So watch out for that.
2         Within the next two weeks we'll be sending
3  you a text, a voice mail, whatever, telling you, hey, we
4  got 50 people working on this to set up times, because,
5  you know, it looks like -- I've been criticized for
6  pushing the vote too hard.  I mean, I don't think we
7  have.  I want you to vote when you're ready to vote and
8  not before then, but at the same time, we got a lot of
9  work to do.  Same thing on the claim form.
10        Just because the claims administrator may
11 give you six months to do it, we want to be in the front
12 of the line because you get paid first.  So really be
13 putting together your contents information, your
14 structural valuations, evidence you were in the fire
15 zone, mental anguish type stuff.  And then we'll get you
16 started.  We're not -- we're not going to start until
17 June 1, not because we want to wait until then.  It's
18 just that's the best evidence I've got as to when we'll
19 be able to have people physically in the office out
20 there in Santa Rosa and Chico.
21        Sam, we got about three minutes.  What
22 else?
23        MR. ROECKER:  Yeah, Rita wants to know if
24 she has to include photographic evidence with her claim.
25 She doesn't have a lot of photographic evidence.  She

1  just wants to make sure she's not going to lose out.
2         MR. WATTS:  Yeah, Rita, my answer is is
3  include whatever you've got.  I mean, obviously, your
4  claim is stronger based on proof, but I can't make you
5  re-create something that doesn't exist.  So whatever you
6  can find, send to us.  If you can't find it, tell them.
7  And I think we should be okay.
8         MR. ROECKER:  Then Lori wants to know if
9  she's able to file a claim for the amount of time spent
10 working on rebuilding, researching, cleaning up,
11 et cetera.
12        MR. WATTS:  Yeah, it's what's called a
13 consequential damage.  I don't have any problem with you
14 submitting that.  I'm not saying you'll get it, but it
15 can't hurt.
16        MR. ROECKER:  Great.  And then Doug wants
17 to know, is it one person voting per household, or how
18 many votes should they be having?
19        MR. WATTS:  You should be having as many
20 different "claims" as there were.
21        MR. ROECKER:  And then Gloria, she had a
22 question about personal property loss and emotional
23 distress.  She had to relocate out of state and hasn't
24 submitted anything, documentation to her lawyer yet.
25 Should she now or just wait until the claims portal is

Worldwide Court Reporters, Inc.
(800) 745-1101

1  open?
2         MR. WATTS:  You know, I think she ought to
3  get it ready.  I think she ought to get it to her
4  lawyer.  But I don't think she ought to be killing
5  herself until the claims portal is open because it's
6  almost done.
7         So we've got about two minutes.  Any other
8  questions?
9         MR. ROECKER:  Judith wants to know, she
10 had two -- two homes.  She wants to know if she can
11 combine the square footage and just file one claim.
12        MR. WATTS:  Well, if you made two claims,
13 you should file two separate claims.  If you made one
14 claim, file one claim.  My gut is we want to keep it
15 simple, but, more important than simple, we want to keep
16 it consistent with whatever the claim form was.
17        So, guys, it's about 3:59.  We're going to
18 shut it down for the week.  Please feel free to e-mail
19 us your questions.  If you're a Watts Guerra client,
20 e-mail us at santarosa@wattsguerra.com.  If you're in
21 the North Bay Fires, then chico@santarosa.com [sic].  If
22 you're in the Paradise fire or the Camp Fire.  If you
23 got any other questions for any of the other lawyers,
24 e-mail it to them.  We're coordinating on a daily basis.
25        Our goal is next Saturday, May 9th, we

1  want to answer every question you got.  The voting ends
2  on May 15.  So please plan to attend May 9th.  We have a
3  lot of people that were saying, hey, wait to vote until
4  May the 1st.  News flash, it's May the 2nd.  It's time
5  to float -- time to vote.  So get your vote in.  We want
6  to make sure that everybody's word is heard.  But at the
7  same time, if you have any other questions, get on with
8  us next Saturday on the 9th.  Then the following Friday,
9  the voting deadline on the 15th.  We'll be happy to
10 answer any questions you have.
11        Sam, thank you for hosting this.  And
12 thank you for the thousands of people that were on this
13 call today.  We'll be in touch soon.  Thank you.
14        MR. ROECKER:  Thanks, everyone.

1  I, PHYLLIS WALTZ, a Texas Certified Shorthand Reporter,
2  Texas Certified Realtime Reporter, Louisiana Certified
3  Court Reporter, Registered Merit Reporter, Certified
4  Realtime Reporter, and Certified Realtime Captioner in
5  and for the State of Texas, certify that the foregoing
6  is a correct transcription, to the best of my ability
7  from the audio recording of the proceedings in the
8  above-entitled matter.
9
10 I further certify that I am neither counsel for, related
11 to, not employed by any of the parties to the action in
12 which this deposition was taken, and further that I am
13 not financially or otherwise interested in the outcome
14 of the action.
15        Certified to by me this 3RD day of MAY,
16 2020.
17
18
         PHYLLIS WALTZ, RMR, CRR, CRC
19       Expiration Date:  12/31/20
         TEXAS CSR, TCRR NO. 6813
20       Expiration Date:  12/31/21
         LOUISIANA CCR NO. 2011010
21       Expiration Date:  12/31/20
22
Worldwide Court Reporters, Inc.
23 Firm Certification No. 223
   3000 Weslayan, Suite 235
24 Houston, Texas  77027
   (713) 572-2000
25

**A**

**AB-1054** 60:3
**ability** 43:21
75:23 83:6
**able** 17:8,10
18:7 29:17
30:20 35:24
37:12 42:23
43:3,23 44:7,8
52:20 55:12
62:1,3 64:6
68:17 69:2
74:5 78:7,13
79:19 80:9
**above-entitled**
83:8
**Abrams** 28:20
**abrogation**
19:17
**absolutely** 7:11
8:18 12:25
17:13,15 20:16
**accept** 11:15
16:6,22 20:13
21:16 28:11
**acceptance**
11:16 28:13
**accessible** 14:19
**account** 44:6
**accountable**
7:10 9:25 11:3
**accurately** 54:9
**acknowledge**
21:2
**acres** 60:8
**action** 4:16 9:17
19:21 83:11,14
**activity** 40:18
**actual** 56:6
**add** 61:6
**addition** 2:8 9:2
36:13 53:1
57:18
**additional** 41:18
41:24 51:15
55:10 61:24

74:6
**address** 17:3
70:18
**addressed** 66:13
**adjusters** 65:4
**adjustments**
67:18
**administer** 40:6
**Administered**
1:5
**administrative**
59:24
**administrativ...**
60:5
**administrator**
30:4 40:6
47:19 51:14
53:2 55:1,5,11
55:15,18 56:9
56:12 59:8
62:3,21 65:21
66:5 79:10
**administrators**
41:22 51:18
**advice** 75:7
**advocating** 14:3
19:16
**ago** 9:13 10:2
14:12 24:25
38:7 40:4
42:22
**agree** 68:15
**agreed** 6:6
**agreement** 6:1,3
44:5
**agreements**
40:23
**ahead** 3:7,7
48:19 56:23
69:15,17,25
70:1,2
**akin** 68:16
**Alicia** 30:16
**allege** 29:11
**allocation** 54:7
**allow** 78:17
**allowed** 31:19

75:14
**allowing** 22:20
**allows** 47:25
**alongside** 20:22
**alphabetical**
64:16
**alphabetically**
64:12
**alternative**
13:14
**amazing** 3:12
4:4,4
**amount** 33:13
34:23 55:7,8
55:17 56:1
65:20 66:4
74:2 80:9
**and/or** 35:23
**Angeles** 25:23
**anguish** 79:15
**Ann** 61:12
**annoyance**
63:25
**anomalous**
24:23
**answer** 2:14
6:16 12:19
18:14 41:14
43:14 54:4
57:2,11 59:5
61:19,21 67:9
67:10 72:10
76:21 80:2
82:1,10
**answered** 12:2,3
**answers** 28:7
**anybody** 18:6
23:22
**anymore** 34:12
35:17
**anytime** 70:5
**anyway** 15:6
**apart** 77:25
**apologize** 2:2
17:4
**appeal** 55:20
56:2,12,17

62:25
**appealable**
54:17
**appealed** 55:22
**apples** 67:15,15
**appliances**
42:14
**apply** 30:11,12
31:7
**applying** 66:23
**appoint** 77:7
**appointed** 56:9
**appointment**
78:17
**appraisal** 43:9,9
**appraisals** 37:2
**appreciate** 7:21
11:5 13:2,3
15:20 16:4
44:15
**approaching**
61:3
**appropriate**
67:23
**approval** 25:14
**approve** 26:14
**approved** 6:2
17:21,22 21:22
23:6,10 30:19
35:25 55:4,7,8
71:21,24
**approves** 55:5,6
77:12
**arbitration** 63:1
**arborist** 60:15
60:16,17
**arborists** 36:18
38:7,15
**arc** 23:7
**architect** 37:22
**area** 12:22 21:9
58:8 69:11
**argument** 49:16
**arising** 48:15
**army** 26:4
**article** 16:11,12
16:12,13

**Articles** 40:22
**Artinian** 69:19
**artwork** 42:19
43:6
**ascertainable**
32:5 53:23
**Ashes** 19:17
**aside** 50:19
**asked** 8:3 54:1
57:4
**aspect** 37:15
55:13
**aspects** 74:18
**assert** 53:7
**assess** 22:20
54:3 63:11
**assessor's** 36:25
**asset** 4:4 74:24
**assets** 75:3
**assist** 17:8 54:11
**Assistance** 31:25
53:19
**assists** 31:22
**associated** 33:3
63:7 68:18
**assume** 31:10
**Atlas** 21:9
**attached** 42:9
**attachments**
40:17
**attack** 8:9 15:25
16:1,9
**attacking** 15:18
**attend** 82:2
**attorney** 9:3
54:24 60:16
61:8 72:20,20
**attorneys** 5:25
7:8 19:2 24:6
26:5,8,12 41:8
77:13
**audio** 49:20 83:7
**authority** 53:7
**available** 12:15
15:1 18:16
29:24 38:18,25
54:2 58:25

Case: 19-30088    Doc# 7129-28    Filed: 05/08/20    Entered: 05/08/20 15:06:44    Page
23 of 41

64:1
**award** 55:12
56:11,13
**aware** 6:25 7:12
7:13
**awe** 5:11
**awesome** 42:3
52:2 56:22
**awhile** 45:14

_____

**B**

**back** 3:3,9,25
6:3,20 9:12
10:18 21:11,19
21:23 23:22
24:24 29:3
46:20,21,23
55:16 61:22
**background** 7:2
43:5
**backing** 13:18
**backup** 40:7
**bad** 10:14,14
58:6 68:10
**Baldesian** 28:16
**ballot** 14:20,25
**ballots** 14:11,16
**bank** 44:6 77:8
**bankruptcy** 1:1
1:2 6:2 7:8
9:22 18:2 26:2
30:15 31:17,25
53:18 59:23
77:11
**base** 16:18 20:8
**based** 26:9
64:14 73:25
80:4
**basic** 32:9 56:24
67:17
**basically** 16:8
34:1 38:1
57:11 77:20,23
**basis** 15:20
66:25 81:24
**bat** 15:18
**Bay** 8:8 21:8

52:4 53:22
69:14 81:21
**bear** 4:9
**bearer** 68:10
**bed** 23:16
**beginning** 35:8
75:22
**behalf** 6:1 24:5
76:8
**behavior** 9:15
9:19 10:14,15
23:14
**believe** 7:11
14:5 17:14
21:17 27:17
46:11 55:19
65:3 72:12
77:1
**believed** 5:11
6:13
**bends** 23:8
**best** 9:4 16:17
17:15 26:3,17
27:17 29:24
37:18 39:8
47:2 48:11
49:16,22,24
51:9 69:7
70:19 79:18
83:6
**bet** 39:12
**better** 7:19 9:11
10:21 11:5
13:23 27:5
62:7 71:25
76:23
**big** 36:19
**big-time** 52:7
**Bill** 24:24
**billion** 29:25
59:25 60:6
62:25 66:10
**bills** 41:24,25
**bit** 2:3 45:14,14
60:14 65:7
78:13
**blank** 25:25

**Bloomberg**
16:13 29:9
**blowing** 9:19
**boat** 42:13
**bodily** 50:16
**body** 26:23 27:2
**Bonnie** 28:21
**books** 42:18
**bothers** 15:17
**bottom** 29:23
65:7 78:22
**box** 65:16
**Boxer** 3:11
**boy** 13:16
**brain** 50:21
**breakdown**
30:17
**breath** 3:9
**brick** 33:7
**Bridgford** 2:9
2:10 20:4 21:4
22:19,25 23:2
23:3 24:22
39:13,21 64:22
64:24 65:3
69:19 72:11
76:21
**brief** 2:17
**briefly** 77:5
**bring** 21:19
23:22
**bringing** 11:3
15:22
**brings** 4:23 6:2
**Brockovich** 2:5
2:20,21 3:8
8:10,23 15:8
19:22 20:24
**brought** 6:21
**Bryson** 2:8
18:12 25:1,7
32:13,17 40:4
65:23,25 66:7
68:7,9 70:8,9
73:18,20 75:17
**buddies** 52:7
**buddy** 22:24

**build** 68:1
**building** 67:20
**buildings** 63:8
**burden** 31:23
**burn** 39:16,20
**burn-down** 36:4
**burned** 19:20
28:19,20 46:25
57:5,15 60:9
**burning** 9:20
**burns** 26:22
**business** 24:2
32:23 39:18,20
39:22,24,25
40:2,3,10,14
40:15,19,21,24
41:1,5 42:11
70:18
**bylaws** 40:22

_____

**C**

**c-h-i-c-o@w-a...**
69:13
**calamities** 10:25
**calamity** 10:23
**calculate** 35:19
36:21 38:1
**calculated** 35:2
**calculation**
38:16 68:19
**calculations**
36:18
**calculus** 36:17
**California** 1:1
4:11,21 25:24
31:7 33:20
34:13 53:21
68:8,13 77:19
**call** 2:25 17:13
18:21 19:5
20:22 24:6
25:20 26:4
27:20 32:2,14
33:17 38:24
54:10 71:12
72:14 82:13
**called** 24:24

33:25 38:19
48:21 59:23
80:12
**calls** 17:6 39:2
**Camp** 12:22,24
19:15,19 69:11
78:5 81:22
**Canadian** 77:8
**canceled** 44:5
**cancelled** 41:2
**capitol** 9:23
**Captioner** 83:4
**car** 42:12,13
**card** 70:18
**care** 15:2
**cared** 51:21
**career** 27:24
**cars** 5:8
**case** 1:2 11:12
20:19,23 21:11
23:16,17 24:15
26:10 30:16,22
31:1 32:2
39:15 45:9
46:6 53:6 54:7
77:1
**cases** 11:11 25:3
28:11 44:17
53:22 65:6
**castigate** 29:10
**cat** 68:20
**catastrophe**
26:1
**categories** 24:4
31:20 32:14
48:16 60:18
**category** 48:10
51:15 58:1
**Cathy** 30:4 59:8
71:9
**causation** 45:12
72:12
**cause** 19:20
**caused** 31:10
39:25
**CCR** 83:20
**celebrate** 10:6

**cell** 38:25
**cents** 18:4
**certain** 40:7
  55:6 74:18,19
**certainly** 7:13
  47:7 58:9
  67:13 71:17
**Certification**
  83:23
**Certified** 83:1,2
  83:2,3,4,15
**certify** 83:5,10
**cetera** 37:14
  67:6 74:1,3
  80:11
**challenges** 10:25
**champion** 8:6
**chance** 29:14
**change** 9:15,18
  10:15 23:14
  24:15 75:3
**changes** 9:22
  10:3 67:22
**changing** 10:8
**Chapter** 1:4
  30:7
**charted** 76:25
**check** 52:20
  76:22
**checklists** 65:5
**checks** 44:5
**cherished** 26:24
  27:1 37:12
  49:11,12,12
**Chico** 8:8 79:20
**chico@santar...**
  81:21
**chico@wattsg...**
  15:1 69:12
**children** 68:23
  69:3
**Chris** 64:10
**Chronicle** 16:14
  29:10 78:21
**circumstances**
  5:13 7:23 45:1
  48:17 49:22

**claim** 30:24 31:3
  31:5,13,18,22
  31:25 32:1,25
  33:16 35:24
  40:14 41:7,17
  41:23 43:22
  44:11,13 45:20
  45:21 48:6,7
  48:21,22 49:2
  51:9,17 52:19
  52:21 53:1,5
  53:18,18,20
  54:15,22,22,25
  55:4,5,7,8,13
  55:22 57:16
  58:9,11 59:2
  59:24 63:23,24
  64:6 65:4,12
  66:14,14,25,25
  70:23 71:6,11
  71:16 72:8,14
  72:19,21 74:18
  74:23 75:4
  78:18,25 79:9
  79:24 80:4,9
  81:11,14,14,16
**claimant** 12:5
  26:5 31:16
  49:9 53:3
**claimant's** 41:4
  41:6 42:1 51:6
  53:5,6,18
**claimants** 29:6
  40:13 47:21
  48:4 52:16,20
  53:9 57:6
**claimed** 32:16
  42:5 43:14
**claims** 11:14
  13:8 18:23
  23:24 30:4,11
  31:14,15 39:23
  39:23,24,24
  40:6,8 41:15
  41:15,17,22
  43:15,15 45:21
  46:7 47:15,17

  47:19,22 48:13
  48:15,15,22
  51:12,13 52:11
  52:15,17 53:2
  53:3,7,9,12,15
  53:16 54:2
  55:1,5,11,14
  55:18 56:9,12
  57:20 58:17
  59:1,7,10,14
  62:21 64:11,15
  65:20 66:4,13
  66:14 77:16,18
  77:19,19 79:10
  80:20,25 81:5
  81:12,13
**clarified** 54:20
**cleaning** 80:10
**clear** 18:15
  19:23 27:13
  28:14 32:20
  46:16 73:20
**Clerk** 17:2,7,9
**client** 12:9 16:18
  20:7 38:23
  39:15,19 46:11
  65:9 78:6
  81:19
**clients** 11:13,17
  12:24 14:17
  15:3 16:6,8,20
  16:21 17:1,11
  20:12,15 21:6
  21:8 22:6,15
  22:22 25:5
  27:13 28:18
  37:1 39:15
  46:17 51:25
  53:25 54:4,4
  58:24 67:22
  69:8,21 70:10
  70:14,24 76:8
**clients'** 16:22
  37:22
**clock** 78:25
**close** 14:15
  21:17 23:10

**closely** 26:16
**closure** 26:3,4
**clothing** 42:17
**cloud** 18:12 37:6
  38:23 70:9
  76:8
**CMO** 32:2
  53:21
**cold** 68:19
**collected** 50:4
**collecting** 77:23
**collectively**
  19:24 20:5
**combine** 81:11
**combined** 65:20
  66:4
**come** 5:9 6:9,17
  45:11 49:23
  54:6 60:17,23
  61:3 64:15
**comes** 34:6
  60:15
**comment** 26:6
**comments** 2:20
  9:1 20:24
**commercial**
  33:2 34:24
**communicate**
  2:7
**communities**
  9:20 11:4
**community** 3:21
  8:15 10:9
  27:21 46:10
  49:10,12
**companies**
  73:11
**companionship**
  48:8
**company** 1:6
  7:10 10:2 32:7
  60:1 61:22
  73:9 77:15
**compare** 37:8
**compatriots**
  16:16
**compelled** 4:12

**compensable**
  57:12
**compensate**
  62:3
**compensated**
  23:21,25 26:18
  26:18 27:18
**compensation**
  24:5 27:4,10
  30:24
**compiled** 65:5
**complete** 12:16
  37:11 53:3
  73:22
**completely** 4:4
  54:5,9
**complicated**
  30:22
**component** 12:8
**computerized**
  71:6
**computers** 78:7
**concern** 12:4
  16:15
**concerned** 39:2
**concerns** 5:8
  11:23 16:9
**conclusion**
  45:11
**condemnation**
  4:3 19:10,18
**condition** 74:1
**conduct** 40:3
**confident** 13:4
  34:21
**confirmation**
  71:15
**confirmed** 29:20
**conflict** 78:21
**confronted**
  75:19
**confused** 5:3
**conjunction**
  38:2
**Connection** 30:6
**conscience** 22:5
  22:9 25:15

consequence 35:13
consequential 38:19 72:15 80:13
consider 31:6
considerable 33:13
considered 41:16
consistent 25:16 81:16
constantly 7:1
construction 12:12
contact 14:18 15:3 39:6 52:22 69:7,8 70:14
contents 79:13
contingency 17:22
continue 4:13 24:14 28:2
contractor 37:25 67:24
contracts 41:3
conversation 4:22
convey 49:24
cooperation 54:8
coordinating 81:24
copy 43:9 44:4 53:8
corporate 9:15 10:8 23:14
corporately 27:21
CORPORATI... 1:3
corporation's 9:18
correct 83:6
cost 34:4,8,18,20 35:16,19,20

38:1,5 60:10 60:19 62:15 66:20 67:7 68:1 73:25 76:2,12
costs 31:6 66:19 67:13,19
counsel 4:15 18:13 83:10
counseling 41:19,25 50:17 51:3
counties 66:17
countless 3:14
County 66:17
couple 3:1 4:24 8:4 10:18 11:21 25:12 37:17 42:21 60:17
courage 5:5,15 5:19 6:20
courageous 8:1
course 10:6 11:18 28:5 36:10 50:5,13 60:2 65:12 70:16 74:7 75:25 78:15
court 1:1 6:2 7:8 9:22,24 17:23 21:23 31:17 37:20 40:5 47:14 83:3,22
courtroom 46:4
cover 56:2 60:3
coverage 73:2
covered 31:1
covers 5:2 21:21
COVID 10:23
COVID-19 5:1
crawl 5:2
CRC 83:18
create 67:1
credit 8:9
criminal 9:23
crisis 5:21

critical 35:10 37:15 47:22 50:6,6,23
criticized 79:5
CRR 83:18
crude 27:7
CSR 83:19
culture 10:8 24:16
current 59:3,20 59:21 68:14
customers 77:24
cutting 14:15

**D**

daily 15:19 81:24
damage 9:25 21:20 33:17 34:8 35:15 36:5 38:17 41:4 54:1,6 57:13,24 74:6 80:13
damaged 33:10 36:3 58:12
damages 31:6 38:20 39:17 45:23 51:12,15 51:16 53:6,20 61:5 64:1 72:15 73:8 74:19
danger 48:16,21
Darren 67:4
data 24:22 53:17 71:7
date 31:14 64:16 83:19,20,21
day 5:22 8:1 83:15
days 5:1 8:7 23:19 31:18 56:14
dazed 5:3
de 56:10
dead 60:19

deadline 61:14 62:5 82:9
deal 7:12 11:18 12:4 22:23 25:6 46:8 54:20 78:8
dealing 31:11 59:1
deals 18:2 38:11
dealt 60:1 63:15 64:13
death 44:17 45:13 47:16 48:6 74:19
debated 28:25
Deborah 58:24 59:5
Debtors 1:7
Debtors' 30:7
decade 24:25
December 31:13
decide 46:4 67:22
decided 54:17
decision 6:7,8,12 6:14 16:7,22 26:11,13 56:14 56:16,20
decisions 7:9
declaration 32:6 50:25
deed 36:24 53:8
deeds 40:25
deep 3:8 46:14 46:14,14 49:13
deeply 15:17
defeating 19:12
definitely 27:24
defy 58:5
degree 26:22
delay 71:15
delayed 63:2
delta 72:14
demographic 52:23
demonstrate 53:6

demonstrating 45:17
depend 49:22 74:17
dependent 45:2
depends 67:10 75:4
deposit 44:8
deposition 83:12
depreciation 61:17,23 73:24
depth 46:18
depths 46:17
describing 50:16
description 38:2 40:15
descriptions 58:5
deservant 45:19
deserves 8:9
designed 78:16
desire 34:16
destroyed 33:7 58:19
destruction 57:19 58:14,15
detail 62:1
details 49:20
determination 5:15 6:20 52:21 55:2,3
determinations 47:5
determining 50:10
devastation 37:11
devise 47:19 51:14
diagnoses 50:22
die 45:7
died 44:20,24 47:17
Diego 25:23
difference 33:24 34:1 76:5
differences

66:19
**different** 22:8
24:4 29:4
32:14 36:16
38:9,10,12
44:16 60:18
66:17,18,18,19
70:11 75:20
77:24 80:20
**difficult** 37:16
49:6 64:4
**difficulty** 2:3
**digitally** 71:3
**dignity** 47:21
**diligently** 29:15
**diminution** 34:1
35:2 76:4
**dip** 35:6
**directly** 14:18
44:21 56:18
70:5
**disapprove**
26:14
**disastrous** 4:10
5:6
**disbursing**
10:11
**discharge** 77:14
**disclosure** 78:18
**discomfort** 64:1
**discount** 18:3
**discuss** 46:12
**discussed** 28:9
**discussion** 75:22
**displaced** 43:17
**dispossessed**
72:13
**disrespect** 22:6
**distress** 24:3
48:14,15,22
57:22 58:1,10
58:16 59:1
63:25 74:20
80:23
**DISTRICT** 1:1
**Dixon** 21:3
**document** 30:5

30:5,12 31:10
40:8,14 56:3,5
**documentary**
41:3 44:10
**documentation**
31:3 32:6 37:3
41:23 51:3
54:23 80:24
**documenting**
41:7
**documents**
18:14,16 31:5
31:21 40:12,25
41:5,22,25
48:3,5,7 49:18
51:6 52:17,19
53:2 54:20
**dog** 68:25
**dogs** 68:10
**doing** 2:25 16:17
19:13 20:14
29:11,16 31:23
35:11 41:8
62:8 65:7
76:23
**dollar** 18:5
65:20 73:9
**dollars** 19:9
**door** 51:7,11
**doubled** 58:21
**Doug** 3:11 75:13
80:16
**downturn** 76:18
**drafts** 71:13,25
**dramatically**
75:23
**dreaded** 42:20
**driveway** 33:6
**dropped** 30:15

---

**E**

**e-mail** 14:19
15:1 70:5,6,17
81:18,20,24
**e-mails** 3:19
24:7 27:15
38:24 50:1

69:9 70:16
**Earley** 2:11 4:15
11:13 12:21,23
19:24 22:14
44:17,19 47:13
74:16,17
**earlier** 17:19
60:14
**early** 3:11 63:3
72:1
**earn** 43:21
**earned** 44:1,7
**earnings** 64:5
**easiest** 75:24
**easily** 14:19
**easy** 49:4
**echo** 26:6 70:13
76:10
**echoed** 25:19
**economic** 39:17
39:25 46:15
78:1
**effectuate** 75:2
**effort** 2:7 8:6,10
**eight** 28:18
39:14
**eighth** 6:17
**either** 43:16,18
70:4
**ELECTRIC** 1:5
**electronically**
14:10
**eligible** 30:24
31:16
**else's** 66:21
**emerge** 77:21
**emotional** 24:3
48:14,14,22
57:22 58:1,10
58:16 59:1
63:25 68:18
74:20 80:22
**emphasize** 25:21
**employed** 83:11
**employer** 43:17
44:9
**encourage** 18:9

54:3
**ended** 4:6 62:16
**endlessly** 6:18
**ends** 82:1
**energy** 33:13
**engaging** 29:2
**enhance** 51:22
**enjoyed** 68:23
**enjoyment** 49:8
**ensuring** 47:20
**entire** 21:9 55:5
56:10 68:11
**entitled** 30:5
34:23 48:24
57:21,23 58:9
67:11
**entrance** 33:6
**entry** 2:2
**equally** 30:12
**equipment**
42:18
**Erin** 2:5,20,20
8:2,3,6,10,20
8:25 9:8 15:7
19:5,8,11,15
19:21 20:24
25:20
**Erin's** 8:4
**especially** 20:25
68:13
**essentially** 54:21
**establish** 65:22
66:6 67:1
**established**
53:21
**establishing**
40:18,21
**estate** 33:2
63:22 74:21,22
74:23,24
**esthetic** 61:1
**estimate** 65:20
66:4 67:7,24
**estimates** 63:5
63:12
**et** 37:14 67:6
74:1,3 80:11

**evacuated** 45:3
**evacuation**
48:17 49:21
50:5 64:2
**evaluate** 51:14
54:6 60:9
**evaluating** 31:22
**Evans** 2:6 3:13
4:4 8:14,18,24
19:21 42:7
52:4
**event** 50:8 75:7
**everybody** 2:17
2:23 7:3 11:8
17:12 20:18
29:14 71:2
78:14
**everybody's**
11:19 16:7
82:6
**everyone's**
25:25
**evidence** 41:4
43:10 44:10
79:14,18,24,25
**exact** 68:1
**exactly** 51:18
**example** 32:6,24
33:4 34:15
36:15 51:11
53:8 55:10,11
55:23 56:11
57:12,14 59:22
66:15 68:22
**examples** 36:1
**excellent** 54:13
75:9
**exception** 46:12
**exhibited** 5:6,15
**exist** 80:5
**expect** 59:8
71:14
**expectation**
78:12
**expended** 67:14
**expenses** 24:3
39:18 41:13,16

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
27 of 41

51:4
**experience** 18:6
20:9
**experiences** 64:3
**experiencing**
5:22 6:5
**expert** 37:25
**experts** 77:7
**Expiration**
83:19,20,21
**explain** 18:7
32:15
**explanation**
50:13
**expressing**
51:16
**extended** 31:14
**extent** 13:11
23:13 36:3
54:11 63:25
64:6
**extraordinary**
47:23

**F**

**face** 5:22 25:25
**Facebook** 28:24
**facing** 10:22
**fact** 20:16 29:7
65:10 66:24
73:3
**factor** 36:19
50:10 66:20
**factored** 69:1
**factors** 36:14
**fair** 33:21 34:14
34:19 35:14,21
36:11 46:8
65:22 66:6
**fairly** 7:3 51:25
66:23
**faith** 11:6 62:13
62:19
**fall** 60:2
**falls** 77:20
**familiar** 29:6
**families** 11:4

**44**:20,23 45:5
**family** 37:5 46:1
47:21 68:13
69:4
**fancy** 33:18,25
76:3
**fantastic** 15:15
**far** 20:12 21:19
28:12 61:13
64:2
**fashion** 27:7,18
**faster** 14:6
**favor** 11:18
12:11 77:12
**fear** 14:14 58:8
**fears** 5:8
**fee** 73:10
**feel** 4:12,19
11:17 13:4
28:23 39:3
51:21 81:18
**feels** 8:12
**fellows** 47:15
**felt** 5:3
**FEMA** 77:19
**fencing** 33:10
67:5
**Fifth** 40:24
**fighting** 26:6
34:22
**figure** 17:2
33:19
**file** 31:13,17
55:21 63:23
80:9 81:11,13
81:14
**filed** 11:14 30:4
31:2,15 53:19
54:21
**files** 31:18
**filing** 30:6,15
59:23,23
**filings** 29:1
**fill** 52:13,25
58:25 59:10
**fill-in** 71:6
**filled** 32:4 54:9

**filling** 54:12
71:6
**final** 6:3 38:17
55:17 56:14,16
56:17,21 59:7
59:13 60:25
71:20
**finalizing** 71:23
**finally** 9:21,24
15:14 26:18
27:20 38:6
57:25
**financial** 13:18
40:19 77:7
**financially**
76:10 83:13
**find** 3:22 5:14
5:20 59:18
80:6,6
**finding** 64:3
**fine** 67:20 78:2
**finishes** 38:3
**fire** 3:10 4:1,8
4:10,18 8:8
12:22,24 16:17
19:15,19 21:8
21:12 25:18,22
26:5 27:23
28:21 30:13,13
30:25 31:11
33:8,23,24
35:4,5,6 40:1,1
41:4,21 42:24
43:17,18,20
44:1,1,8,9,21
44:21,24,25
45:8,13 48:17
48:18 50:11
53:22 59:22,25
60:2 64:4,17
69:11 72:14
73:14 75:17,19
76:1,1,6,6 78:6
79:14 81:22,22
**fires** 8:8 10:20
25:10 31:1,9
47:19 52:4

59:3,20,22
65:7 76:24
77:22,25 81:21
**firm** 2:9 21:5,7
23:3,18 25:2
25:13 26:12
27:16 36:24
83:23
**firms** 23:6 25:17
29:4 54:10
69:7,22
**first** 3:24 9:25
10:6 23:12
25:7 33:21
40:14 42:25
47:13 57:3
59:6 62:22
66:3 79:12
**Fiumara** 52:6
**five** 3:5 29:4
**flames** 48:19,20
**flash** 82:4
**fleeing** 58:8
**flexibility** 47:5
47:25
**float** 82:5
**floor** 67:17
**focusing** 23:20
**folks** 2:1 11:10
21:13 23:7
25:8,11,12,15
26:7 28:8,9
32:15,22 37:17
37:17 38:8
39:2 52:4
54:17 70:14
**follow** 47:10
**followed** 47:8
56:5
**following** 17:18
40:13 77:4
82:8
**foot** 51:9
**footage** 36:6
81:11
**force** 27:20
**foregoing** 41:12

83:5
**foremost** 10:6
**forever** 46:1
**forgiven** 74:8
**forgotten** 65:10
**form** 4:8 31:25
32:1 52:13,24
53:18,20 54:15
66:24 71:6
79:9 81:16
**formal** 14:20,23
14:24
**format** 39:8
**former** 9:2
28:17
**forms** 44:2,2
58:25 59:6,7
71:11,16 78:25
**forth** 29:3 49:16
55:17
**fortunate** 37:7
48:18
**forums** 46:10,11
**forward** 3:23
5:14,23 6:23
7:17,19 12:9
12:17 14:24
15:5 18:17
24:15 51:9,24
**fought** 3:24
**four** 12:13 16:10
28:14 29:7
78:4
**Fourth** 40:21
**frame** 62:17,19
**framing** 12:13
**Fran** 28:17
39:14
**Fran's** 39:19
**Francisco** 16:14
29:10 37:20
78:20
**Frank** 70:22,22
**frankly** 24:24
**frantically** 45:4
**Frantz** 2:9,10
20:4,11 21:5

22:17 23:4 24:21 52:10,14 63:19,21 65:6 69:18,20
**Frantz's** 22:18
**free** 39:3 81:18
**Friday** 18:22 82:8
**friend** 15:7 20:4 23:18 24:24 39:14
**friends** 24:25 37:5
**frightening** 14:13
**front** 29:8 56:7 79:11
**front-row** 9:4
**full** 10:24 78:18
**full-blown** 56:6
**functioning** 50:21
**fund** 77:6,17
**funded** 77:17
**funds** 10:11
**furniture** 42:17
**further** 83:10,12
**future** 4:1,9 7:17 10:9,21 77:22

**G**
**G-e-r-a-l-d** 70:6
**games** 16:2
**gamut** 21:21
**gap** 52:23
**garage** 42:12,18
**Gary** 3:13
**GAS** 1:5
**gathers** 54:24
**general** 30:11,18 30:23 32:9,12 37:24 45:21 49:10 51:1
**generally** 18:3 68:12 76:6,14
**generic** 47:24
**gentleman** 28:19

**geographic** 36:6
**geographies** 66:18
**Gerald** 70:6
**German** 68:20 68:22
**getting** 3:17 5:24 10:7,7 13:7 14:1 20:19 23:6,19 23:20 50:7,18 58:4 61:14 63:5 72:2
**give** 18:14 29:15 37:24 39:1 48:25 54:17 61:16,16 70:11 73:22 74:15 79:11
**given** 13:4 19:7 61:22
**Givens** 30:16
**gives** 8:11 47:4,5 57:20
**giving** 13:5
**Gloria** 80:21
**go** 3:7,7 8:22 13:25 14:23 15:13,21 18:12 21:13,22 22:10 23:1,8,16 24:9 30:1 37:19,19 37:21 42:14 43:19 44:16 52:11 55:16 56:23 67:6 69:15,17,25 70:1,1 74:25 76:12 77:16 78:7 79:1
**goal** 2:14 12:18 24:13 62:20 63:2 78:23 81:25
**God** 19:18
**goes** 6:25 55:1
**going** 2:16,16

3:2,3 10:12,17 10:18 12:7,17 13:2,6 14:7,7,9 15:8,11,18,25 17:3 18:4,20 19:8 20:17,18 21:19 22:9 23:8,9,21,24 23:25 24:4,14 24:15 29:3,19 30:20 33:1 34:22 35:5,22 35:22 36:2,2,5 36:10,24 37:10 37:10,19,19 38:12,25 40:7 40:10 42:20 45:17,22 46:6 46:22 47:6 49:15 50:9 51:23 52:12 55:1,16,17 56:2 58:11 59:3,12,13,22 61:2,11 62:7,8 62:15,23 64:17 66:12 67:18,23 67:25 68:17,19 69:18 70:11,23 71:2,2,3,4,5,14 71:23 73:5,8 75:4,6 77:4 78:15,18 79:16 80:1 81:17
**good** 13:12 22:2 23:18 38:4 44:14 45:15 47:25 51:2 71:13 73:10 74:10
**goodness** 50:9
**Gordon** 52:6
**gosh** 46:21
**Governor's** 9:23
**Gowins** 28:22
**grant** 36:24
**granted** 32:22

34:11
**great** 9:21 13:16 20:15,20 21:17 32:11 54:20 60:7 62:10,13 63:4 80:16
**greatest** 23:13
**grid** 77:22
**grieving** 10:20
**grind** 9:10
**ground** 3:15
**group** 2:10,11 11:12 12:6,10 16:20 18:11 19:16 21:4,4,5 22:13,16,17 28:12 30:17 32:2 62:7 69:20
**groups** 18:12 32:4 62:8
**guarantee** 62:15
**guaranteed** 72:7
**Guerra** 11:12 12:10 16:5 17:8 18:25 22:13 62:6 69:10 81:19
**guidance** 34:11
**gut** 7:2 81:14
**guys** 30:9 31:23 69:15 71:4 81:17

**H**
**half** 8:16 17:1 29:25 52:8
**hall** 1:9 3:19 6:17 9:13 29:16
**halls** 6:18
**hand** 51:24 67:21
**handle** 60:12 63:20 64:23
**handled** 60:5
**handling** 3:20

11:7
**happen** 4:6 16:10 22:2 46:22 57:16 60:15 71:14 74:25
**happened** 5:4 6:8,9 19:18 30:2
**happening** 4:3
**happens** 46:3 54:16,21 57:10 74:22 77:11
**happy** 2:25 32:18 42:7 55:23 57:9 82:9
**hard** 4:23 5:25 9:7 24:15 27:25 71:4 74:1 79:6
**hard-working** 70:15
**harden** 77:22
**hardest** 45:22
**hardscape** 33:10
**hardscaping** 67:5
**harmed** 4:16 7:16 43:18
**harmful** 4:1
**hat** 35:3
**havoc** 50:20
**he'll** 78:7
**head** 11:2 53:11
**headliner** 2:19
**health** 37:18 50:17
**hear** 5:17 8:21 8:23 13:20
**heard** 58:3 82:6
**hearing** 56:4,5,6 56:7,15 63:16
**hears** 56:12
**heartbreaking** 25:24
**heartening**

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page 29 of 41

17:17
**hearts** 21:13
**heat** 36:5
**held** 9:25
**hello** 2:24
**help** 3:16,21,22
4:16 7:4 8:17
12:18 36:18
38:8,15 43:10
58:25 59:10,10
59:12,13 63:11
73:23 74:5
**helpful** 22:19
37:3 43:8
47:11 50:2
**hereon** 29:22
**hey** 14:21 22:24
28:6 39:13
44:16 52:3,10
54:15 79:3
82:3
**Hi** 2:1 69:16
**hidden** 70:18
**highlight** 36:1
**highly** 68:23
**Hinkley** 6:3
**hinted** 35:3
**hire** 38:7 60:16
**hiring** 59:9
**history** 23:7
**hits** 13:9
**hold** 7:9 11:3
**holding** 9:12
**home** 19:20 33:1
34:16,24 36:15
37:13,13 38:2
38:3,5 41:4
42:11 44:3,11
46:23 57:14,20
66:15,16,21,21
67:2 68:1,24
76:1,2
**homeowner**
32:23 34:15
36:23
**homeowners**
63:16

**homes** 5:7 12:13
26:24 57:18
81:10
**honest** 49:2
**honor** 15:10
24:13 25:13
**Honorable** 30:3
**honored** 23:5
**hope** 2:25 8:11
13:15 24:11
51:17 75:8,8
**hopeful** 78:1
**hopefully** 27:5
51:20 71:25
77:21
**horrible** 21:12
**horrific** 3:10
14:10 58:4
**hospital** 72:6
**host** 24:3
**hosting** 82:11
**Houlihan** 77:8
**house** 19:20
38:12 42:9,14
42:15 53:8,14
63:7 65:17
67:16,17
**household** 53:10
53:11,12,13
80:17
**Houston** 83:24
**huge** 20:18
**hump** 13:6
**hundred** 21:18
22:1 55:12
**hurt** 80:15
**husband** 52:6
53:11 72:6

— I —
**idea** 38:5 71:14
**identical** 20:12
**identify** 33:15
53:5
**identifying**
40:25
**identity** 53:5

**imagination**
58:5
**immediately**
33:22,24 35:4
35:4 71:17
**imminent** 71:10
**imminently** 59:8
**impact** 49:9
75:23
**important** 11:1
13:10,24 20:15
26:20 27:7
32:19 35:7,9
36:8 37:14,23
40:11,15,17,20
40:24 41:6
48:16 50:10
54:7 77:5
81:15
**improve** 33:13
**improvements**
33:4
**include** 33:1,1
39:24 41:15,18
41:23 42:11
43:15 47:17
48:15 79:24
80:3
**included** 30:25
33:9,14
**includes** 11:12
40:1 42:12
**including** 40:15
40:16,19 43:25
53:13,17
**income** 24:2,2
42:6 43:14,15
43:16,18,21,22
43:25 44:2,4
44:11 55:25,25
59:2 72:6
**Incorporation**
40:22
**increased** 44:25
**incurred** 41:20
73:2
**indemnification**

20:19
**indemnity** 21:10
21:18
**independent**
35:24 36:14
**indication** 8:12
**individual** 11:19
17:14 28:20
53:9,14 56:9
**individual's**
46:9
**individualized**
48:1
**individuals**
11:13 43:16
47:17 58:18
**industry** 38:9
**inevitably** 9:24
**influential** 19:12
**info** 69:7
**information**
3:17,18,22
6:11 26:9
29:15,18 31:22
32:5 38:4 39:4
39:7 40:8
41:10 52:12,18
52:23,24 53:4
53:13,16,22
54:1,5 55:11
56:19 62:2
63:10 79:13
**informed** 6:12
29:21
**Initially** 17:1
**injuries** 47:17
**injury** 43:20
47:18 48:6
49:3,5 50:16
**inspired** 5:19
**inspiring** 5:16
**instance** 45:2
**instruction**
34:10
**insurance** 32:6,7
61:16,22 63:18
73:1,4,7,9,11

73:15 77:19
**intelligently**
29:19
**intentionally**
47:3,24
**interested** 19:2
83:13
**interests** 17:15
**interfered** 43:20
**interference**
49:7
**interim** 74:5
**introduced** 3:12
**introduction**
8:19,25
**invasion** 49:8
**invent** 65:12
**inventory** 40:2
42:21 65:8
**inverse** 4:2
19:10,17
**invite** 2:19
**involved** 3:11
5:10 7:3 8:16
25:22 31:20
**irrigation** 60:24
**issue** 17:2,7,10
44:16 55:2
60:5 64:5
72:11 77:13
**issues** 70:6
**item** 35:18 64:20
65:2
**items** 27:2 35:22
37:12 43:1
46:1 61:23,24
64:25

— J —
**Jennifer** 72:5,18
**Jerry** 2:10 16:19
16:20 20:1,9
22:4,16 24:11
24:21 54:15
57:7 60:11
64:19 67:8
69:16,24 70:2

70:3,13 71:8 71:18
**jewelry** 42:19 43:7
**Jim** 2:9 20:4,7 22:12,18 23:4 23:18,21 24:21 52:10 54:14,21 63:19 65:6 69:17
**job** 45:6 49:23
**Joe** 2:11 4:15 11:13 12:21 14:21 16:4 18:11 19:23 22:14 44:16 74:16
**John** 21:2 30:3 72:25 73:1 76:16
**joined** 25:12 69:22
**Joint** 30:7
**Jointly** 1:5
**Jon** 30:16
**Journal** 16:12 29:9 78:20
**journey** 7:15
**JPA** 23:4
**Judge** 30:19 77:12
**Judges'** 7:9
**Judith** 81:9
**July** 71:22 72:2
**June** 62:8 78:13 79:17
**jury** 34:10
**justice** 4:8 6:22 7:18 9:10 23:8 23:10 56:18,20 59:7 71:9

**K**

**Kane** 28:21
**Karen** 28:21
**keep** 7:9 30:18 61:11 81:14,15

**keeping** 51:1
**keeps** 63:16
**keepsakes** 74:3
**kept** 65:16
**key** 21:25
**kids** 53:11 74:15
**killing** 81:4
**Kim** 63:14
**Kincade** 59:22 59:24,25
**kind** 16:1 20:24 25:1 26:22 30:8 35:2 36:19 43:10,20 45:20 47:3,24 49:4 50:18 51:11
**Kirk** 28:16
**knew** 10:22
**know** 2:21,23 3:5 5:10,17,23 7:5 13:13,19 14:11 15:19,20 16:2,5,16 17:5 17:12 18:23,25 20:14 21:5 22:8,13 23:7 23:16,19 24:7 24:20 28:8,15 28:19,23 29:3 29:8 34:7 37:9 39:16 40:5 45:15,18,25 46:5,20 48:4 48:25 49:14,21 51:8 52:3,4 55:3 58:3,25 60:1,4 61:13 63:5,10,14,17 64:16,19 65:19 66:9 67:4 68:5 69:6 70:23 71:4,5,8,9 74:13,15 75:5 75:13 76:17 77:5,14 78:6,7 79:5,23 80:8

80:17 81:2,9 81:10
**knowing** 3:25
**knowledge** 26:10
**knows** 9:10 15:12 34:9 78:14

**L**

**lack** 7:6
**lady** 26:22
**land** 32:24 38:14
**landscaping** 33:4 42:10 67:5
**large** 12:6,6 25:18 38:14 60:22
**largest** 12:7 16:19 64:12
**Larsen** 52:6
**lastly** 19:4
**late** 2:2 31:17
**law** 21:5,5 29:4 31:7,7 40:6 54:10 59:9 68:8,14 69:7 69:20
**lawns** 63:7
**lawsuit** 50:19 59:4
**lawsuits** 9:15
**lawyer** 15:4 33:25 62:1 75:1 76:4 80:24 81:4
**lawyer's** 49:23
**lawyering** 9:5
**lawyers** 2:5 9:6 11:11 20:21 25:20 27:19 28:10 33:17 34:10,21 36:17 39:6 47:7 48:9 50:4 51:7 66:12,25 73:21

75:21 76:9 81:23
**laying** 50:2
**leader** 8:15
**learned** 5:10 10:24 76:24
**lease** 40:24 44:5
**leases** 40:25
**leave** 10:17 46:6 52:9
**left** 48:18 68:3 75:10 78:4
**legal** 75:6
**legislation** 4:3
**legitimate** 35:11
**let's** 14:4 15:4 30:10 34:15 36:22 38:3 44:16 52:10 56:25 57:3 61:11 66:15 75:7,8,10
**level** 51:19
**liability** 4:2 19:11
**life** 6:24 7:16,18 8:1 10:24,24 27:5,6 46:5,13 51:22 58:8 68:11
**likelihood** 18:4
**limb** 23:9
**limit** 19:10
**limited** 35:14 40:23 53:17
**line** 11:10 20:4 26:7,13 28:8 29:23 32:16 34:9,22 36:17 39:5 65:7 68:12 78:22 79:12
**lined** 78:16
**lining** 10:12
**list** 30:25 42:20 42:22 43:1 49:19 61:13,15

61:15,23 73:22
**listed** 31:9
**listened** 5:9 6:11
**listening** 7:22
**lists** 40:22
**literally** 58:5
**litigation** 4:7 9:4 11:7
**little** 2:2 49:3 60:14 78:12
**live** 27:5 28:24
**lived** 7:24,25
**lives** 21:11,13,19 49:12
**living** 5:1,7,12 12:12 24:3 41:18,24 57:13 58:19
**loan** 37:3 73:15 73:16 74:4,8,8
**lobbing** 28:22
**local** 4:15
**located** 36:9
**location** 3:19 36:6
**Lokey** 77:8
**long** 2:22 5:23 7:14 9:9 10:18 21:12 23:8 67:19
**long-time** 9:3
**longer** 77:18
**look** 13:4,21 20:8 26:15 27:11 29:2,4 31:24 35:1 36:5,10,22 41:23 44:6 45:10,24 55:1 60:17 61:1 74:9
**looked** 37:13
**looking** 3:9 35:20 36:2,18 40:7 51:5,24
**looks** 60:8 62:14 79:5

**Lori** 80:8
**Los** 25:23
**lose** 10:16 58:7
80:1
**losing** 44:3
45:25
**loss** 5:8 7:16
24:2,2,17
26:21,21 27:23
32:19 33:18,21
34:2,15,19,24
35:15 37:8,9
39:24 40:2,14
40:20,21 41:15
42:6,9 43:14
43:15,22 44:4
45:19 46:5,18
46:24 48:7
49:10 55:24,25
57:12 59:1
61:1,7 62:4
64:5 68:5,8,17
68:18 69:3,3
72:5 76:14
80:22
**losses** 25:22
32:15,16 39:18
39:25 42:5
46:9 47:23
48:2 51:23
63:23 73:2
**lost** 3:22 21:14
21:19 24:1
26:23 33:2,3
33:16 37:13
39:9,17 40:3,9
42:23 43:16,24
44:2,11 46:13
49:11 50:12
59:16 61:4,25
66:16,16 67:13
73:23 74:3
76:1,13
**lot** 13:3 14:2,22
17:5 18:23
27:10 30:21
35:7,10 38:19

45:1 50:3,8,14
57:15 62:17,21
63:16 67:21
71:14 75:14,21
75:25 76:3,12
79:8,25 82:3
**Louisiana** 83:2
83:20
**love** 34:17 48:8
**loved** 26:21 27:1
45:19
**lower** 76:7

--- **M** ---

**Madelyn** 63:4
**mail** 14:10 71:3
79:3
**mailbox** 33:6
**mailed** 70:24
**main** 63:9 78:23
**maintain** 35:9
52:15 76:11
**majority** 60:3
**making** 2:17,18
4:6 47:4 51:24
54:3 77:16
78:25
**man** 15:18
**manage** 77:9
**Management**
32:3
**managing** 25:1
**Marilyn** 74:12
74:12
**Mark** 65:19
**market** 33:21
34:14,19 35:15
35:21 36:11
65:22 66:6
76:18
**material** 52:22
**materials** 24:8
**matter** 46:20
51:16 53:24
73:4 83:8
**mature** 60:21
**maximize** 35:25

54:25
**maximizing**
24:9
**maximum** 34:22
74:2
**maypole** 26:19
**McNicholas**
21:4 23:3,18
69:19,19
**mean** 8:7 16:15
19:15 42:5
49:10 53:10
54:16 55:22
58:4 62:21
64:15 65:11
68:9 69:11
71:2 75:18
79:6 80:3
**meaning** 36:8
56:11
**meaningful**
50:13,14
**means** 13:3 34:5
**measured** 33:18
**media** 50:1
**medical** 41:19
41:24 45:16
48:5 49:4 51:3
**medications**
45:2
**meet** 10:25
37:21
**meeting** 6:10,10
11:2 29:17
**meetings** 3:19
5:7,9 9:13
**melted** 36:20
**member** 28:17
69:4
**members** 3:14
47:21 68:14
70:15
**mental** 50:17
79:15
**mentioned**
24:11 38:7,23
43:1 70:10,13

75:22
**mere** 20:13
**Merit** 83:3
**merits** 16:1
**message** 10:5
**met** 4:20 25:10
**methodologies**
38:9
**Michael** 52:5,7
**Michelle** 73:13
73:13
**middle** 12:12
**Mikal** 2:1 3:6
8:19,24 11:25
12:20,23 13:5
15:15,21 16:2
17:12 18:11
22:25 25:8
28:3 29:1,1
32:10,17 39:11
39:21 42:7
47:9 52:1,14
58:23 76:25
**Miller** 2:11
11:12,21,25
19:23 22:14
30:14 52:5
61:18,20
**million** 77:24
**millions** 19:9
**mind** 4:23 30:18
**mine** 24:25
**minor** 67:18
**minutes** 3:6
61:11 68:3
75:10 78:4
79:21 81:7
**missiles** 28:22
**missing** 55:13
**mission** 40:16
**mobilize** 3:15
4:14
**model** 78:1
**moment** 3:4
4:22 7:18 38:7
40:4 66:9
**momentum**

10:16
**monetary** 27:4
**money** 12:15
24:12,16 34:23
54:16 62:22
63:3 66:9
73:15 77:21
**moneys** 75:23
**Montega** 21:3
**month** 72:1,1
77:23
**months** 4:24
71:22 79:11
**Morrow** 3:13
**mortgage** 37:2
**motor** 42:13
**motorcycle**
42:14
**move** 5:23 6:23
7:17 12:9,17
60:22 75:25
**moved** 72:7
**movement** 11:3
**moving** 7:19
13:7 15:5
62:16
**music** 42:18
**mute** 22:24
**myriad** 75:20

--- **N** ---

**name's** 23:2
**Napa** 21:9
**narrative** 49:19
49:20
**Nasi** 60:8
**near** 37:11 61:3
**necessarily**
48:11 67:12
**necessary** 21:21
50:6 52:24
54:11
**need** 3:17 4:19
5:17 10:15
12:15 24:8
29:16,18 31:8
36:22 47:10

48:1,22 54:6
61:15 63:10
67:6 70:24
75:2,6,20
**needed** 48:11
**needs** 63:5
**neighborhood**
34:17
**neither** 83:10
**neutral** 63:1
**never** 27:23
46:13,13,18,19
46:19,21,22,24
46:24
**new** 6:23 16:11
29:9 30:12
56:7,8,9 64:3
77:10,13,15
78:19
**news** 16:13
68:10 82:4
**nice** 33:6,7 43:7
**nicest** 46:23
**nine** 75:10
**nonbankruptcy**
31:7
**noneconomic**
45:21 56:1
**nonsalvageable**
61:13
**nonspecific**
45:21
**Noreen** 2:6 3:13
4:4 8:14,17,23
11:9 19:5,11
19:15,21 42:4
44:14 52:4
**North** 8:8 21:8
52:4 53:21
69:13 81:21
**Northern** 1:1
4:21 25:24
**note** 35:8
**noted** 27:20
**notice** 30:5 55:2
55:3
**notices** 11:14

52:22
**notify** 56:1
**novo** 56:10
**number** 2:4
14:18 16:20
19:11 25:18
27:9 35:22
45:4 57:10,15
58:18 61:2
69:21 70:7,10
70:12,13
**numbers** 13:5
16:25 69:8
70:11
**nutshell** 58:13

---
**O**

**O'Neill** 30:16
**oak** 60:9,22
**oath** 48:25
**object** 55:9
**obtain** 35:23
37:1,16 43:3
**obtaining** 23:10
35:23 45:15
**obtains** 31:17
**obvious** 36:23
74:20
**obviously** 16:9
18:5 27:1
58:10 60:20
62:5 75:1 80:3
**occupied** 41:1
49:9
**occur** 75:7
**offers** 26:3
**office** 9:23 10:19
36:25 78:8
79:19
**officer** 56:7
**offset** 73:7
**oh** 59:21 69:24
69:24
**okay** 3:8 8:24
22:12 28:23
30:14 32:12
56:22 57:3

61:10 64:8,9
65:18 66:7
67:3 68:2 69:5
72:16 76:15
77:9 80:7
**older** 37:17
**on-line** 64:19
78:9
**once** 5:21 33:15
54:15 55:8
56:16 71:23
**ones** 21:1 27:1
45:19
**open** 51:4 78:13
81:1,5
**opened** 78:12
**opine** 67:25
**opinion** 27:8
46:3
**opinions** 45:16
**opportunity** 3:2
14:14 25:8
26:17 27:5,18
28:15 39:8
55:9,20
**opposed** 2:18
27:11,22 35:21
38:13
**opposite** 27:22
**option** 17:21
21:15
**ordeal** 64:2
**order** 32:3 34:13
35:24 40:8
45:22 64:11
67:14 68:21
75:2
**ordinarily** 34:14
**organized** 3:16
**ornamental**
38:11
**ought** 81:2,3,4
**out-of-pocket**
39:18 41:13,15
41:16,20
**out-structures**
63:6

**outcome** 83:13
**outline** 23:23
**outlined** 31:4
39:7
**outlines** 32:9
**outside** 42:12
**overall** 26:10
**overwhelming**
12:25
**overwhelmingly**
11:18 12:11
**owned** 32:22
41:1,2 42:23
43:11 64:20,25
65:1,15
**owner** 32:23
57:23
**owners** 63:22
**ownership** 35:9
75:3 76:11
**owns** 32:23
62:16

---
**P**

**PACIFIC** 1:5
**package** 61:9
**page** 32:7
**paid** 10:7,13
17:25 32:7
68:24 73:12
79:12
**pain** 45:25 46:5
**panel** 63:1
**panels** 33:11
**paper** 14:15
43:10
**papers** 70:23
**Paradise** 4:11
4:14,20 12:21
21:12 58:3
62:14 66:15
81:22
**part** 11:2,8
12:10 30:14
42:10 44:12
46:7,24 49:23
52:8 55:21,22

59:3 74:21
**participated**
32:1
**particular** 68:21
68:25
**particularly**
40:9 43:7 58:2
**parties** 83:11
**partner** 25:2
27:21 65:6
**partners** 11:21
22:18 52:5
**partnership**
40:23,23
**pass** 74:13
**passed** 52:6
**passes** 13:19
**Pat** 21:4
**path** 3:23 7:19
**pattern** 25:17
**pay** 55:18 73:10
**pay-out** 62:18
73:2
**Paycheck** 44:9
**paying** 43:19
**payment** 31:16
73:1,3
**Peak** 21:9
**penalty** 49:1
**penny** 68:25
**people** 3:16,20
5:12 6:13 7:7
7:15 10:10
11:23 12:1,5,8
12:15 13:3,15
13:24 14:3,11
14:22,24 15:2
15:18,22 16:10
17:17,25 18:4
18:7,24 19:11
19:16,21,24
20:1,3,6 22:16
26:3,23 28:15
29:5,7,15
32:21 37:18
44:20,24 45:1
45:6 46:4 47:4

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
33 of 41

50:8 57:1
58:19,25 59:11
59:11 62:25
63:11 71:25
78:24 79:4,19
82:3,12
**people's** 6:4
**percent** 11:17
16:5,8 17:11
19:25 20:2
21:18 22:1,15
22:17,18 25:14
26:23 28:13
29:5 55:12
62:24
**percentage** 55:6
65:21 66:5
**perfectly** 67:23
**period** 17:24
31:15 65:5
**perjury** 49:1
**person** 27:14
78:8 80:17
**personal** 4:18
5:1 24:1,2
34:16 42:5,6,8
43:13,15 47:16
47:18 48:6
51:19 55:24
57:21,24 58:15
63:24 64:25
68:16 73:22
74:3 80:22
**personally** 25:10
27:22 68:15
**persons** 32:19
**pet** 68:5,17,18
**Peter** 69:6
**pets** 68:8,11,12
68:15
**PG&E** 1:3 2:7
7:6 8:10 9:7,17
9:24 10:15,16
11:3 17:23
19:8 23:14
27:20 31:1,10
76:17,22 77:10

77:13,17,21
**PG&E's** 10:8,14
**Phil** 78:5,10
**phone** 2:4 3:13
14:18 17:10
25:9 27:14,25
37:7,7 38:25
43:4 66:12
69:8,21 76:9
**phones** 17:4,7
**photo** 43:5
**photograph**
43:6
**photographic**
43:10 79:24,25
**photographs**
32:8 37:4,8,9
37:10 43:3,3,8
**photos** 41:3 50:4
50:11
**phrase** 33:25
**PHYLLIS** 83:1
83:18
**physical** 14:11
49:3,5
**physically** 79:19
**physician** 45:10
**pick** 70:24
**picture** 51:5
**piece** 43:7
**pieces** 17:24
**pivotal** 2:6
**place** 17:23
38:21 78:11
**placed** 58:8
**plaintiff** 26:5
**plan** 13:14,16,16
13:17 14:6
15:12 16:23
17:11,14,21,22
18:16 19:25
20:2,14,17
21:16,17 22:3
22:7,10,15
23:6,9,12
25:14 26:2,17
27:8 29:19,23

29:24,25 30:6
30:8 35:25
37:15 67:17
74:22 77:12
82:2
**plans** 37:21,22
37:24
**plant** 61:3
**planting** 60:24
**play** 16:1 62:24
**please** 14:9,17
14:25 15:3
19:2 24:7 39:2
81:18 82:2
**plus** 27:24
**pocket** 24:16
**point** 23:19
55:19
**pools** 33:11
**portal** 52:16,20
80:25 81:5
**portion** 12:4
55:3 74:14
**position** 8:5
71:25
**possession** 41:6
42:1 51:6
53:17
**possessions**
26:24 63:24
**possible** 3:23
6:23 23:13
26:4,17 27:17
30:1 50:17
54:5 60:22
**possibly** 7:5
**post** 50:11 59:23
77:14
**posts** 50:1
**pot** 66:9
**potential** 24:9
66:9
**potentially**
66:20
**power** 5:12
**practical** 53:24
**pre-photos**

37:11
**pre-populate**
53:15
**predict** 23:9
**preference**
37:17
**Prefire** 50:11
**pregnant** 77:3
**prepare** 42:22
**presence** 3:21
**present** 8:5
**press** 2:15 57:1
57:1
**presumably**
50:3
**presumptuous**
71:12
**pretty** 16:24
21:20 68:24
71:4,13
**price** 49:14
60:10
**primary** 70:11
**Prime** 17:2,7,9
**principal** 23:11
**prior** 44:1,8
**privilege** 4:13
28:1
**privileged** 23:5
**probably** 21:24
33:12 47:24
49:5 62:8
67:23 68:12
70:15
**problem** 20:18
45:17 54:12
80:13
**procedure** 23:24
**procedures**
18:23 39:24
41:18 47:20
51:14 71:20
**proceedings**
83:7
**proceeds** 18:1
**process** 6:4 9:22
10:4 12:3,16

13:2 14:6,23
21:23 30:11
45:18 46:7
47:6,15,20
56:10 59:9,14
62:7 75:1
**processed** 13:8
64:11
**processer** 52:15
53:15 72:21
**profit** 40:20
**profits** 40:3,9,18
**program** 32:1
53:20 60:23
**prohibitive**
62:15
**project** 2:7
**prominent** 58:2
**promised** 10:20
**proof** 5:13 31:2
31:12,24 32:7
43:2 48:13
53:18 54:15,22
54:22 66:24
70:23 80:4
**properly** 46:9
**property** 21:20
23:25 24:1
32:15,16,21,22
32:25 33:5,14
33:22,22 34:2
34:4,8,25 35:3
35:5,17,21
36:7,7,10,11
36:12 39:10,20
40:2 41:1,2
42:5,6,8 43:11
43:12 44:12
49:8 50:12
55:24,24 57:14
57:22,24 58:11
58:14,15,16
63:6,22 66:14
66:14,18 68:16
72:13 73:22,23
74:3 76:5,13
80:22

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
34 of 41

**Proponents'** 30:7
**proposed** 10:10
**protect** 10:8
**proud** 5:18 8:10 20:22 21:6
**prove** 35:24 36:22 39:9 40:5 42:23 43:23 44:4 45:9 48:11 64:7 72:13
**provide** 27:3 40:13 48:5 49:19 50:24 55:10,14 62:1 65:8
**provided** 39:4,7 47:14 48:14 49:18
**provides** 21:17 27:17 34:11,12 53:4
**providing** 47:21
**psychiatrist** 50:24
**PTSD** 48:14
**publicity** 19:7
**pulling** 36:25
**purchase** 43:2
**purely** 58:1
**purpose** 65:8
**push** 71:4
**pushing** 79:6
**put** 17:23 24:16 35:6 46:11 49:14,16 51:9 61:7
**putting** 14:2 79:13

**Q**

**qualify** 39:23
**qualifying** 47:13
**quantify** 45:23
**quarter** 62:23
**question** 27:10

31:12 34:6 39:22 41:12 42:4 43:13 51:12 57:4 59:2,16 60:7 61:12 64:24,25 66:8,11 67:10 72:6,19 77:3 78:3 80:22 82:1
**questioning** 35:12
**questionnaire** 53:3,20
**questionnaires** 41:9 52:17 53:9,12,16,25 54:1,4,8,12
**questions** 2:14 2:15,24 6:6,16 6:16 8:4 12:2,3 12:19 18:13 28:7 38:22 39:3 56:25,25 57:2 66:1 75:11 81:8,19 81:23 82:7,10
**quick** 13:6 39:8 62:24
**quickly** 3:15 4:14 29:25 45:4
**quite** 12:2,3 65:7
**quote** 27:3

**R**

**ramped** 10:13
**rate** 11:16 19:25 28:13
**rates** 77:23
**Ray** 21:3
**rbryson@robi...** 70:19
**re-create** 80:5
**reach** 6:1 12:18 39:3 55:17 70:16

**reached** 7:3
**reaching** 7:4
**read** 18:15 47:9
**reading** 76:16 78:19
**ready** 78:25 79:7 81:3
**real** 12:8 13:6,7 13:16 23:25 29:11 32:14,16 32:21,25 33:2 39:9 49:13 55:24 58:11,15 63:22
**reality** 49:24
**realize** 10:9
**really** 4:12,17 13:12,24 15:7 15:9,14,16 16:14 18:9 19:6 20:18 21:15,15,16 38:4,4 45:12 46:15,19,20 48:1 50:20,23 54:3 67:19 74:21 78:6 79:12
**Realtime** 83:2,4 83:4
**reason** 7:11 15:12 17:6,19 34:16,18 35:11 67:11
**reasonable** 34:3 35:20 55:19 67:7
**reasonably** 32:4 53:23
**reasons** 9:16 26:16 45:4,7 57:10 75:20
**rebuild** 34:4,16 35:20 38:5 62:14 66:19 67:7
**rebuilding**

12:14,15 80:10
**rebuilt** 67:5,12 67:16,16
**recall** 61:24
**receipts** 43:2 65:16
**receive** 24:8 52:21 77:6
**received** 39:1 44:5 73:1,3
**receiving** 17:5
**recognize** 26:20 27:8
**recommend** 27:16
**recommendati...** 26:9
**record** 40:10 49:5 64:20 65:2
**recording** 49:20 50:8 83:7
**records** 45:11 48:5 50:16,22 65:11,15
**recover** 34:14,20 34:24 36:16 41:11 57:21,23 66:10 67:12 68:16,18 69:2 69:2 73:6,6 74:2 75:23 76:3
**recoverable** 31:6 38:20 39:19 41:14 51:13,15 68:5
**recoveries** 14:8
**recovery** 24:10 35:25 45:19 51:20
**reduced** 34:7 43:18
**Redwood** 21:9
**refer** 49:7
**referee** 46:7
**referenced** 40:4

**referred** 34:3
**reflecting** 61:23
**regard** 40:9
**Regarding** 30:6
**Registered** 83:3
**regularly** 45:7
**reimbursed** 73:17
**reject** 11:16 16:7 16:22 28:12
**related** 30:25 41:12 45:7,10 47:17 49:17 83:10
**relating** 47:23
**relation** 77:2
**relationship** 45:24 48:8
**relationships** 50:21
**relative** 39:9
**released** 18:22
**releases** 52:18
**relevant** 52:18 67:14
**reliable** 32:5 53:23
**relief** 31:17
**relieve** 31:23
**relocate** 80:23
**remain** 10:14
**remainder** 18:21
**remarkably** 16:25
**remediate** 77:22
**remember** 6:15 9:12 19:14 35:8 42:15 58:17
**remove** 60:19
**removing** 60:10
**rental** 44:3,12 57:20 63:23 64:3 73:14
**rentals** 63:20
**rented** 41:2

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
35 of 41

57:19
renter 57:21
73:14
renters 63:15,17
63:21
renting 44:11
Reorganization
30:8
repair 34:4,9,19
34:20 35:16,19
76:2,12
repay 74:8
rephrase 75:18
replace 26:25
27:1 33:8 38:1
60:21 66:20
68:21 73:16
74:5
replaced 46:14
replacement
63:6 65:22
66:6 73:25
replant 60:20
report 61:7
Reporter 83:1,2
83:3,3,4
Reporters 83:22
represent 17:16
19:24 20:6
25:17 44:19,20
44:23 45:5
represented
18:10
representing
24:14 25:13
28:10,16,17
29:4
represents 20:1
28:18,21
request 55:21
56:8
require 53:3
60:24
required 21:21
40:13
researching
80:10

resolution 18:23
20:16 23:24
39:23 41:17
46:7 47:15
resolved 13:8
17:10
resolving 47:22
respect 11:23
28:24
respond 24:7
27:23 41:9
52:21
responded 27:15
27:15
response 66:7
responsibility
77:18
responsible
27:21 31:11
74:7
rest 12:14 61:8
restart 27:4
restaurant
28:19 39:16
restoration 27:9
restore 27:2,6
resubmit 72:22
result 17:22
18:3 40:1
41:21 44:3,25
47:18
resulted 4:8
retaining 33:11
63:7
return 21:25,25
returns 40:16
43:25
revenue 40:3,9
revenues 40:18
review 31:5 56:3
56:5,20
Rich 21:4 22:18
22:21,24 23:3
24:21 39:13
54:23 60:14
64:22 72:9
76:19

Richard 2:9
20:4
rid 19:10 62:24
ride 15:10
right 8:13 13:10
13:25 14:24
19:20 20:20
22:5 25:11
26:8 27:12
35:19 39:1
47:6 54:13
56:13 58:22
62:12 70:20
71:20 72:3,16
74:10 75:9
78:10
ripped 46:25
rise 5:9 57:20
Rita 79:23 80:2
RMR 83:18
road 3:25 5:23
9:9 10:21 13:9
Robert 2:8
18:12 25:1,4
32:13,15 68:7
70:8 73:18
75:15
Robins 2:8
18:12 24:24
38:23 70:9
76:8
robinslaw.com
70:17
Rocky 28:16
ROECKER
57:3 58:23
59:17 60:7
61:12 62:13
63:4,14 64:10
64:19 65:1,19
66:3 67:4 68:4
69:6 70:22
72:5,18,25
73:13 74:12
75:13 76:16
78:5 79:23
80:8,16,21

81:9 82:14
room 42:15,15
Rosa 3:11 8:7,15
11:22 12:1,14
58:24 79:20
rough 9:9 44:22
44:22 71:13
Roy 2:11 11:12
11:21 19:23
22:14 30:10
52:5 61:18
Roy's 18:11
rubber 13:9
rules 30:11,18
30:23 31:4,10
32:12 47:2,2,8
47:10 66:24
running 7:1
71:22
RV 63:8

_____
S
_____
Sacramento
19:16
saddled 77:15
safe 7:25 60:19
safer 11:5 23:15
safety 7:22
salary 72:7
sale 35:7
Sam 59:15 65:18
74:11 75:12
79:21 82:11
San 16:14 25:23
29:10 37:20
78:20
Santa 3:11 8:7
8:15 11:22
12:1,14 58:24
79:20
santarosa@w...
69:14 81:20
sat 10:19
Saturday 81:25
82:8
save 37:7
saw 3:14

saying 5:21
50:24 80:14
82:3
says 34:13,13
55:12 60:8
62:13 73:1
74:22,24
SBA 73:15 74:4
Scarpulla 28:18
39:14
schedule 78:17
78:23
schedules 40:17
scratch 56:11
screaming 29:8
seat 9:4
second 10:7
16:19 23:13
34:3 40:16
59:2,15,17
66:11
section 49:17
secure 52:15
security 68:24
see 4:21 5:20
6:22 7:19 10:3
16:21 17:17
25:24 26:16
29:5 30:20
47:23 51:8
52:10 78:22,22
seeing 9:21
11:22 16:18,24
16:25 20:10
24:23 25:4,11
25:14,16
seek 23:11 69:1
74:6 76:2
seeking 24:4
26:25
seen 9:5 17:10
35:6
sell 35:10 75:14
75:20,25
senator 2:5 8:14
8:15 9:3
send 41:10 71:3

71:11 80:6
**sending** 14:15
43:9 78:16
79:2
**sense** 13:6 66:23
**sensitive** 47:20
**sent** 14:11 71:16
**sentiment** 24:6
25:19 76:10
**sentimental** 46:1
46:15
**separate** 36:14
57:20 81:13
**separately** 36:16
**serious** 47:16,18
48:6
**served** 68:24
**set** 3:18 47:2,3
79:4
**setting** 34:12
**settlement** 6:1
7:2,4,10 10:11
10:11 12:6,16
13:12,14 15:23
15:24 62:18
63:15 68:6
74:14
**seven** 23:18 41:3
**share** 3:3 7:20
17:13 24:6
**shared** 3:18
**Shareholder**
30:7
**shareholders**
40:22
**sheltered** 78:11
**shelters** 63:8
**Shepherd** 68:20
68:22
**shop** 63:8
**short** 34:13
61:21
**Shorthand** 83:1
**shortly** 8:8
**shot** 65:24
**show** 14:6 37:10
37:10,12 43:4

43:5,11,25
44:7 49:4 51:4
**showed** 5:6
**showing** 43:2
49:5 50:12
61:16
**shown** 13:13
**shrubs** 36:9
**shut** 39:20 81:18
**shy** 25:14
**sic** 81:21
**side** 15:10,10
28:1
**sign** 78:23
**signature** 39:15
**significant** 18:3
37:4 76:14
**significantly**
21:24
**silver** 10:12
**similar** 16:25
20:9 37:25
62:9
**similarly** 63:21
**simple** 57:11
66:8 76:21
81:15,15
**single** 8:1
**Singleton** 2:10
16:19,24 20:1
21:22 22:16
24:21 54:19
56:23 57:9
60:13 67:9
69:16,24 70:3
70:4 71:19
**situated** 36:7
**situation** 3:10
4:3,5 7:13
18:18 28:10
60:16
**six** 19:18 29:4
79:11
**Sixth** 41:2
**skin** 16:15
**slffirm.com** 70:7
**slowly** 9:10,24

**smallest** 64:12
**smart** 17:3,7
38:8
**smoke** 36:4
**social** 50:1
**solar** 33:11
**sold** 17:23 38:14
**solid** 3:21 13:17
**somebody** 7:12
39:19 51:21
57:4
**someone's** 46:3
**someplace** 58:2
**Sonoma** 66:17
**soon** 15:4 59:13
82:13
**sooner** 14:7 62:6
**sorry** 15:21
22:25 59:16
65:25 69:25
**sort** 43:7 77:2,3
77:3
**sorts** 19:15
28:22,25 59:11
**sought** 29:15
**soul** 46:25
**sound** 78:1
**sounds** 74:10
**speak** 2:22 71:1
**SPEAKER**
59:19 70:1
**special** 62:20
**specific** 34:10
53:1
**specifically**
41:20 63:17
**specifying** 50:25
**Spencer** 3:14
**spend** 38:18
**spent** 19:9 33:12
80:9
**spoke** 27:14,14
66:12
**spotlight** 10:14
**square** 36:5
81:11
**staff** 3:14 9:6

41:9 54:10
**stages** 12:13
**stand** 5:14 6:14
**standard** 65:21
66:5,22
**standing** 54:11
**star** 2:15 57:1,1
**stare** 25:25
**start** 2:13,16
4:15 23:20
28:7 30:10
36:23 59:14
72:1 79:16
**started** 62:7
79:16
**starting** 2:18
**state** 8:14,15 9:2
9:23 68:14
80:23 83:5
**stated** 21:22
**statement** 2:17
2:19 40:16
**statements**
40:19,20 44:7
**states** 1:1 23:15
**status** 44:18
52:21
**stay** 4:5 7:25
**Stephanie** 68:4
**stepped** 9:21
**Steve** 28:21
**sticking** 9:8
**stock** 12:4,7
22:20 76:17,17
76:22 77:2,4,6
77:9,9,13,14
78:1
**stop** 4:2 19:17
**stopped** 43:19
**straight** 66:2
**straightforward**
17:20
**streamlined**
47:20
**Street** 16:12
29:9 78:20
**strength** 5:15

**stress** 18:18
44:25
**strict** 4:2
**strong** 8:1 45:16
**stronger** 80:4
**strongly** 28:23
76:11
**structural** 79:14
**structure** 33:2,7
36:6 57:12,17
58:7,12
**structures** 24:1
36:3 57:5
58:19
**stubs** 44:9
**stuck** 10:4 48:20
**students** 59:10
**studied** 27:16
**studying** 26:9
**stuff** 15:22
49:11 50:12
64:18 77:20
78:19 79:15
**subject** 30:19
46:2
**submission** 31:4
**submit** 52:12,16
52:22 53:9,12
54:22 56:19
61:8 72:21,23
**submitted** 31:3
48:4 50:4
52:11 53:25
54:16 71:7
72:2,20 80:24
**submitting**
52:19 72:19
80:14
**subro** 77:19
**subsequent**
44:24
**substantial** 49:7
**substantially**
67:16
**substantiate**
51:8
**substantiating**

40:24
**success** 20:20
**successful** 4:7
47:15
**successfully**
47:22
**sudden** 58:20
**suffer** 25:25
**suffered** 26:20
26:22 32:20
35:16 39:25
47:18 69:3
**sufficient** 53:4
**Suite** 83:23
**Superior** 37:20
**supplement** 30:6
52:22
**supply** 62:16
**support** 9:6
12:25 13:17,18
13:22 14:6
15:7 17:11
26:13 40:14
48:8 53:5
**supported** 48:23
54:23
**supporting**
15:12 17:18
31:3,21 41:5
41:21,23,25
48:3,5,7 49:18
51:5 52:17
53:2
**supportive** 18:8
**supposed** 71:21
**sure** 4:6 5:3 9:17
14:20 19:1
24:5,22 29:14
32:3 39:6 41:8
42:7 47:8,12
51:25 54:19
57:9 60:11,13
61:20 63:19
66:1 67:9 70:3
73:21 76:9,21
78:25 80:1
82:6

**surprised** 65:14
**survival** 50:20
**survive** 74:19
**survived** 57:14
58:12
**survivors** 16:17
**sustained** 43:19
**swath** 38:14
**swiftly** 3:20
**switch** 8:14

**T**

**table** 7:3
**tables** 45:24
**tail** 15:16
**take** 2:22 9:17
10:12 15:2
21:24 26:15
27:9 30:9
32:21 56:25
57:3,7 61:5
65:23 73:15
74:4 75:10
76:19
**taken** 50:5 56:24
83:12
**takes** 45:14
**talk** 11:20 70:4
75:1
**talked** 9:14 12:1
36:21 42:21
**talking** 32:21
36:20 38:19
47:16 70:5
**taped** 65:17
**target** 15:17
**tax** 36:25 40:16
43:25
**TCC** 28:17 77:9
**TCRR** 83:19
**team** 3:12 4:5,14
5:25 6:17 7:7
8:11 52:8
70:15
**teaspoons** 42:16
**technical** 2:3
**technology** 17:9

**telephonic** 1:9
56:4,5
**tell** 8:5 11:14,22
20:7 28:13
42:5 44:17
52:11 68:7
80:6
**telling** 22:22
79:3
**tens** 19:9
**terms** 16:21 17:3
22:19 25:4
49:11 58:5
62:5 73:2 74:7
**testimony** 48:24
48:25
**Texas** 24:25
78:12 83:1,2,5
83:19,24
**text** 78:16 79:3
**texts** 17:5 27:15
50:1
**thank** 8:2,24,25
9:5,8 11:2,8,9
12:20,23,24
15:6,7,15 16:2
19:5,13,18
20:21,24 22:11
24:18 25:7
27:25 28:3
39:11,21 42:2
44:14 50:9
52:1 82:11,12
82:13
**thankful** 3:2
**thanks** 8:18,20
10:4 11:25
22:12 24:19
32:10,17 54:13
62:11 82:14
**thick** 16:15
**thing** 11:21 18:9
18:15 43:8
47:6 54:19
58:17 60:20,25
63:9 79:9
**things** 3:1,24

9:13 10:5,24
19:7 23:11
30:2 32:8
33:16 36:9
38:6 41:10
57:16 60:25
65:9 72:2
**think** 3:1 4:19
4:20 5:4,20
7:24 8:5 12:5
16:20 17:17,18
18:6 20:1,5
21:16,20 22:7
22:9,22 25:17
25:19 26:15
28:18 29:2,19
29:20,23,24
33:12 34:4
37:23 39:14
42:8 44:23
45:16 47:4
60:13 62:20,23
63:2 64:14,15
64:16,17 66:11
69:10 71:1,1,5
71:10,10,19,22
71:24 72:3
76:22,23,24
77:5 78:13
79:6 80:7 81:2
81:3,4
**thinking** 23:16
23:17 25:5
46:21
**third** 12:7 26:22
40:19
**third-party** 63:1
**thought** 10:18
54:17 71:18
**thoughts** 4:25
29:22 73:19
75:16
**thousand** 25:12
**thousands** 82:12
**three** 16:10
17:24 29:7
53:11 69:22

75:11 79:21
**three-firm** 23:4
**thrown** 26:19
**timber** 38:14
**time** 2:23 3:25
4:9,20 5:6 6:3
7:14,21 9:25
10:12,16 14:2
21:12 26:15
31:15 33:13
38:19,21,24
46:3 57:23
60:4 62:17,19
67:13 68:1
71:15,15 79:8
80:9 82:4,5,7
**timely** 11:14
27:18 31:2
**times** 16:11 29:9
78:20 79:4
**tirelessly** 20:23
21:3
**titles** 40:25
**today** 2:4 3:1
4:18,21 5:24
6:5,19 7:21
8:11 10:2 28:4
82:13
**Todd** 21:2
**toe** 9:7,7
**Tom** 28:16
**tomorrow** 11:5
78:21
**tools** 9:14
**top** 4:5
**Tosdal** 28:16
**total** 36:4 66:4
**touch** 18:21
82:13
**touched** 54:23
60:14
**tough** 45:6
51:23
**tougher** 45:6
**town** 1:9 3:19
6:17,18 9:12
29:16 57:13

**track** 37:21 40:10 59:16
**tragic** 26:20
**tragically** 44:20
**trained** 68:23
**training** 68:25
**transcription** 83:6
**translates** 51:19
**traumatized** 10:20
**treat** 68:13
**treated** 63:21 66:23 68:15
**treatment** 50:17 50:18
**treatments** 50:22
**tree** 60:22
**trees** 24:1 33:4 36:9,14 37:14 38:8,11,11 57:15 60:9,10 60:19,24 61:3
**trial** 34:11 37:19 37:19
**tried** 14:22
**trigger** 65:9
**Trostle** 28:16
**Trotter** 30:4 56:18,20 59:7 71:9
**truly** 5:4,17 11:5 13:1 14:5
**trust** 7:6,7,8 11:6 18:22 30:3 31:5,10 31:21 46:8 75:5 77:6,17
**trusted** 6:13
**trustee** 18:22 30:3 41:22 47:19 49:15 51:13 55:21 56:2,18 62:2 62:20 77:7
**trustees** 40:7

**U**

**U.S** 14:10
**ultimately** 6:19 26:10 55:16
**understand** 7:6 12:5,8 13:11 13:25 20:15 35:12 46:17,17 49:13 50:15 51:18 75:21,24
**understanding** 13:1 15:8

**try** 3:16 19:10 49:16 51:22 62:7,23
**trying** 27:6 29:10
**Tubbs** 30:13 73:14
**Tuesday** 11:15 28:10
**turn** 6:22 35:18
**turned** 4:10 61:14
**turtle** 68:20
**twice** 73:6
**two** 8:16 9:13 10:2,2,5,21 13:25 14:14 17:24 20:3 23:11 33:20,25 37:22 38:10 52:7 57:20 58:19 66:1 71:22 75:10 79:2 81:7,10 81:10,12,13
**type** 31:20 36:4 37:25 39:17 41:17 49:2 58:15 79:15
**types** 33:9 39:22 40:8,12 41:21 45:23 48:3,13
**typing** 57:1

**V**

**vague** 47:3 50:23
**Valley** 21:9
**valuations** 79:14
**value** 33:8,19,21 34:1,2,2,8,14 34:19 35:2,3,5 35:15,21 36:11 36:14 38:8,13 43:12 45:24,25 45:25 46:4,14

**understands** 34:5 37:23
**unfold** 14:7
**unfortunate** 48:20 75:7
**unfortunately** 18:2 25:21,22 35:5 61:2 68:11 73:24
**unhappy** 56:17
**UNIDENTIFI...** 59:19 70:1
**uniformity** 66:13
**unique** 11:13 38:9
**uniqueness** 67:2
**UNITED** 1:1
**unknown** 66:8
**unquote** 27:3
**untold** 27:9
**unusual** 7:23 24:23
**update** 52:22
**upwards** 8:16
**urge** 39:5 76:11
**urged** 9:16
**use** 31:21 36:3 38:15 49:8 52:20 59:22 65:21 66:5
**utilities** 19:9
**utility** 77:23
**utilized** 69:21

46:15,16 54:25 61:1,6 63:22 65:22,22 66:6 66:6 73:23,25 76:4,7
**values** 50:10 66:18
**valuing** 66:20
**variety** 26:16 43:24
**vary** 66:14 67:1
**Vector** 21:2
**vegetation** 36:8
**vehicle** 46:23
**vehicles** 42:13
**verify** 53:4
**versus** 22:1 30:13 35:4,16 44:1,8 66:21 76:6
**viable** 13:13 17:20
**victim** 26:5 28:21
**victims** 4:1,8,18 12:24 20:25 21:1,25,25 25:18 65:15 75:18,19
**victims'** 77:6,17
**video** 49:20
**videos** 41:3 50:5 50:11
**view** 22:8 28:24 34:17 70:19
**virus** 10:23
**voice** 79:3
**vote** 6:4,7,8,12 6:14,15,22 7:17 11:19 14:9,14,21,22 16:6 17:1,15 22:3,5,9 26:8 26:11 29:14,16 29:17,18,20 71:11,23 79:6 79:7,7 82:3,5,5

**voted** 11:15,16 14:18 15:3 16:6 20:13,14 22:7,15,16 25:15,15 28:11 28:12 29:6,6 77:12
**votes** 14:4 80:18
**voting** 10:10 11:23 13:12 14:1 19:25 20:2,20 25:5 25:17 27:11 80:17 82:1,9

**W**

**W** 30:3
**W-2** 44:2
**wait** 79:17 80:25 82:3
**waited** 14:3
**waiting** 14:2 18:24 21:10 52:9 59:6
**waive** 78:21
**wake** 23:17
**walk** 46:21
**walkways** 33:10
**Wall** 16:12 29:9 78:20
**walls** 33:11 43:5 63:7
**WALTZ** 83:1 83:18
**want** 2:22,24 4:17 5:10,18 6:15 7:5 9:5,7 11:1 12:9,17 12:23 14:21 15:7 16:2,10 17:4,16 20:21 20:23 21:2 23:4,15 25:21 26:6 28:14 29:13,17,17,21 36:22 52:9 56:3,4,5 57:7

60:11 61:18,21
61:23 62:6,25
63:19 64:22
65:23 66:25
71:10,12 72:9
72:10 73:8
74:9 75:1
76:19 78:23
79:7,11,17
81:14,15 82:1
82:5
**wanted** 5:2 7:20
  16:16 18:18
  19:5,12 24:22
  62:14
**wanting** 35:23
**wants** 18:6
  58:24 61:13
  63:4,14,16
  64:19 65:19
  67:4 70:22
  74:13 75:13
  76:17 78:7
  79:23 80:1,8
  80:16 81:9,10
**wasn't** 58:12
**watch** 79:1
**watched** 3:9
  4:14 5:5,8
**water** 62:16
**Watts** 2:1,2 3:7
  8:2,22 11:9,12
  12:10,21 15:15
  16:4,5 17:7
  18:25 19:14
  22:12,13 23:1
  24:19 28:5
  29:1,1 32:11
  39:12 42:3
  44:14 47:12
  52:2 54:13
  56:22,24 57:7
  58:22 59:5,21
  60:11 61:10,18
  62:6,12,19
  63:9,19 64:9
  64:14,22 65:18

65:23 67:3,8
68:2,7 69:5,10
69:10 70:8,20
71:1 72:3,9,16
72:23 73:5,18
74:10,16 75:9
75:15 76:15,19
78:3,10 80:2
80:12,19 81:2
81:12,19
**way** 5:14 12:19
  14:15 15:13,24
  18:17 22:10
  24:24 34:3
  38:13 48:23
  49:24 66:13
  70:19 75:24
**ways** 33:20
  38:10 43:24
**wayside** 77:20
**we'll** 15:2 17:16
  30:1 51:9 57:2
  59:14 71:16,24
  71:24 72:23
  78:24 79:2,15
  79:18 82:9,13
**we're** 2:16,16
  4:25 5:21 10:9
  12:14,17 13:1
  13:1,5 14:1,7
  15:8,11 16:24
  18:18,20 20:14
  21:1 23:19,24
  24:4,14 25:11
  25:13,16 27:6
  27:11 29:6,16
  31:11 32:20
  34:11 35:12,12
  35:22 36:5
  40:5 45:17
  46:6 48:24
  52:12 54:3
  59:6 65:4 71:2
  71:2,3,3,5,6,23
  73:10 77:16
  78:1,11,15,18
  79:16,16 81:17

81:24
**we've** 7:24 11:10
  14:3 16:25
  17:10 18:7
  20:3 38:4
  45:15 52:3
  56:24,25 59:10
  68:2 72:25
  75:10 78:4
  81:7
**web-based**
  52:15
**website** 18:25,25
  70:17
**websites** 19:1
**week** 8:4 13:13
  13:19 23:19
  24:20 76:23
  81:18
**weeks** 13:25
  14:11,14 19:18
  78:15 79:2
**wellness** 7:22
**went** 49:24
**Weslayan** 83:23
**wheels** 9:10
**whichever** 76:1
**wide** 51:7,11
**wife** 53:11
**wildfire** 31:25
  53:19 54:2
**wildfires@fra...**
  69:20
**willing** 55:18
**wish** 7:17,22
  13:15
**wondering**
  62:17 64:10
**word** 25:21
  26:19 33:18
  40:5 76:4 82:6
**words** 36:15
  53:7
**work** 13:7 15:10
  15:19 20:6,22
  21:6 23:24
  24:14 28:1,1

43:17 45:14
50:14 51:7
74:1 77:4 79:9
**worked** 4:22
  5:25 9:6 15:16
  17:9 21:7 72:6
**working** 3:13,18
  4:2,5,13,15
  20:5,23 21:3
  23:3,5,18
  24:21 25:2
  37:1 48:9
  59:11 71:9,20
  78:24 79:4
  80:10
**works** 58:13,21
**Worldwide**
  83:22
**worried** 29:11
  29:13 50:7
**worst** 5:13
**worth** 33:22,23
  68:21 76:5
**wouldn't** 13:16
  69:2
**wreaked** 50:20
**writing** 30:20
**written** 49:19
  55:2
**wrong** 15:24
**wrongful** 44:17
  47:16 48:6

 
**X**
 
**X** 29:1 33:22
  55:13 58:18

 
**Y**
 
**Y** 29:1 33:24
  55:13
**Yanni** 30:4 59:8
  71:9
**yeah** 8:22 19:14
  23:2 28:5 52:2
  52:14,14 59:21
  63:9 65:1,25
  68:4,7 71:19

72:3,5,9,18
74:12,17 78:10
79:23 80:2,12
**year** 62:22,23
  63:3
**years** 8:17 9:13
  9:19 10:1,2,3
  10:18,21 17:24
  21:24 25:23
  27:9,24 42:21
  52:8 61:2 65:6
**yelling** 29:8
**yesterday** 18:22
  30:3,16 54:21
**York** 16:11 29:9
  78:19
**you-all** 20:22

 
**Z**
 
**Z** 55:14
**Zach** 3:14
**zone** 12:13
  48:16,21 79:15

 
**0**
 

 
**1**
 
**1** 53:4 60:18
  78:13 79:17
**1054** 77:22
**1099** 44:2
**11** 1:4 30:7
**111** 59:11
**12/31/20** 83:19
  83:21
**12/31/21** 83:20
**13** 29:25
**13,329** 11:15
  16:6
**13.5** 59:25 60:6
  62:25 66:10
**13.5-billion-d...**
  13:14
**14,000** 19:19
**148** 11:15 16:6
**15** 82:2
**15th** 82:9

Case: 19-30088   Doc# 7129-28   Filed: 05/08/20   Entered: 05/08/20 15:06:44   Page
40 of 41

| 1 | |
|---|---|
| **16,000** 19:24 | |
| **16,095** 11:13 | |
| **17** 25:10 77:24 | |
| **18** 25:10 68:2 | |
| **19-30088-DM** | |
| 1:3 | |
| **1st** 71:22 82:4 | |

**2**

**2** 1:9 60:8
**2,000-page**
  30:15
**2,083** 20:13 22:6
**2,088** 25:3
**20** 25:16,23 65:5
**20,229** 28:11
**200,000** 56:12
**2011010** 83:20
**2017** 3:10 21:10
**2018** 3:10 19:8
**2019** 31:14
**2020** 1:9 83:16
**223** 83:23
**235** 83:23
**25,000** 57:5
**26** 20:13 22:6
**272** 28:11
**28** 61:11
**2nd** 82:4

**3**

**3** 2:15 53:6 57:1
  57:1 70:10
**3:59** 81:17
**30** 26:23 27:24
  31:18 56:14
**30,000** 29:5
**3000** 83:23
**31,388** 28:11
**310-929-4200**
  38:24 70:12,12
**31st** 31:13
**35** 59:9
**3RD** 83:15

**4**

**4300** 20:6,12

**5**

**5** 32:2,3 53:21
**50** 18:4 59:9
  78:24 79:4
**572-2000** 83:24

**6**

**619-771-3473**
  70:7
**65** 62:24
**6813** 83:19

**7**

**7,000** 16:21 20:1
  22:16
**70** 62:24
**7037** 30:5
**713** 83:24
**73-year-old** 78:5
**75** 18:4
**75,000** 57:5
**77,000** 58:17,17
**77027** 83:24

**8**

**855-735-5945**
  69:23

**9**

**98** 17:11 25:14
**98.67** 28:13 29:5
**98.77** 22:18
**98.81** 20:2 22:17
**98.9** 11:17 16:5
  16:8 19:25
  22:15
**9th** 81:25 82:2,8