John H. MacConaghy (SBN 83684)
MacConaghy & Barnier, PLC
645 First St. West, Suite D
Sonoma, CA 95476
Telephone:    707.935.3205
Facsimile:    707.935.7051
Email:  macclaw@macbarlaw.com

*Proposed Special Counsel for Official Committee of Tort Claimants*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION** | |
| **-and-** | Chapter 11 (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** **Debtors.** | **RESPONSE OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO OBJECTION OF ADVENTIST HEALTH, AT&T, PARADISE ENTITIES AND COMCAST TO TRUST DOCUMENTS** |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ■ Affects both Debtors | Date:    May 15, 2020 Time:    10:00 a.m. (Pacific Time) Place:    United States Bankruptcy Court Courtroom 17, 16th Floor San Francisco, CA 94102 |
| *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Relates to Dkt. Nos. 7072 & 7121 |

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

**TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  ARGUMENT ................................................................................................. 2

    A.  The Plan Does Not Impermissibly Deprive Fire Victims of Judicial Review ........ 3

        1.  The Trust Agreement and the Claims Resolution Procedures ................... 3

        2.  Bankruptcy Binds Dissenting Impaired Creditors ...................................... 6

        3.  The Code Does Not Require the Court to Adjudicate 80,000 Tort
            Claims ......................................................................................... 9

        4.  The Trust Agreement and CRP Are Consistent with Other Mass Tort
            Cases ......................................................................................... 11

    B.  The Insurance Offset Is Reasonable and Consistent with Applicable Law ......... 13

        1.  The Insurance Offset Is Required Under California Law ....................... 15

        2.  The Insurance Offset Does Not Violate the Collateral Source Rule ......... 18

        3.  The Insurance Offset Complies with Section 1123(a)(4) ....................... 21

        4.  Alteration of the Insurance Offset Could Require a Re-Vote ................. 22

    C.  The Trustee Does Not Have the Unfettered Right to Modify Trust Documents .. 24

    D.  The Trust Documents Do Not Permit the Trustee to Hold Adverse Interests ...... 27

    E.  Setoff and Recoupment Rights Do Not Need to Be Clarified ............................ 27

    F.  The Claimant Release Does Not Need to Be Temporally Limited ...................... 28

    G.  The Objectants Mischaracterize the Provisions on Attorney Liens .................... 28

    H.  The Trust Documents Establish Proper Standards for Resolving Claims ............ 29

III. CONCLUSION ............................................................................................. 30

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

ii

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Acequia, Inc.*,
787 F.2d 1352 (9th Cir. 1986) ........................................................................ 7, 21

*Allstate Ins. Co. v. Mel Rapton, Inc.*,
77 Cal. App. 4th 901, 92 Cal. Rptr. 2d 151 (Cal. Ct. App. 2000) ...................... 16

*Am. Int'l Specialty Lines Ins. Co. v. U.S.*,
No. 09-01734, 2009 WL 10672384 (C.D. Cal. Dec. 14, 2009) ........................... 19

*In re Am. Solar King Corp.*,
90 B.R. 808 (Bankr. W.D. Tex. 1988) ............................................................ 22, 23

*In re American Capital Equip., Inc.*,
405 B.R. 415 (Bankr. W.D. Pa. 2009) ................................................................. 10

*In re Bellucci*,
119 B.R. 763 (Bankr. E.D. Cal. 1990) ................................................................... 9

*In re Biovance Techs., Inc.*,
Nos. 10-82441 & 10-82442, 2014 WL 2861003 (Bankr. D. Neb. 2014) .............. 17

*In re BMW Grp. I, Ltd.*,
168 B.R. 731 (Bankr. W.D. Okla. 1994) ................................................................ 8

*In re Breitburn Energy Partners LP*,
582 B.R. 321 (Bankr. S.D.N.Y. 2018) .............................................................. 6, 21

*In re Butcher*,
459 B.R. 115 (Bankr. D. Colo. 2011) ................................................................... 10

*Butner v. United States*,
440 U.S. 48 (1979) ........................................................................................ 15, 18

*In re Castlerock Props.*,
781 F.2d 159 (9th Cir. 1986) ................................................................................. 9

*In re Cent. Med. Ctr., Inc.*,
122 B.R. 568 (Bankr. E.D. Mo. 1990) .................................................................... 7

*In re Cinematronics, Inc.*,
916 F.2d 1444 (9th Cir. 1990) ............................................................................... 3

*In re Del Biaggio*,
496 B.R. 600 (Bankr. N.D. Cal. 2012) ................................................................. 17

iii

MacCONAGHY & BARNIER, PLC
ATTORNEYS AT LAW
SONOMA, CALIFORNIA

*In re Dow Corning Corp.*,
　255 B.R. 445 (E.D. Mich. 2000) ............................................................................ 7

*Downtown Inv. Club III v. Coopersmith (In re Downtown Inv. Club III)*,
　89 B.R. 59 (B.A.P. 9th Cir. 1988) ........................................................................ 23

*Elder v. Uecker (In re Elder)*,
　325 B.R. 292 (N.D. Cal. 2005) ...................................................................... 10, 11

*Enron Corp. v. The New Power Co. (In re The New Power Co.)*,
　438 F.3d 1113 (11th Cir. 2006) .......................................................................... 23

*In re Equity Funding Corp. of Am. Sec. Litig.*,
　603 F.2d 1353 (9th Cir. 1979) ...................................................................... 18, 19

*Ferraro v. S. Cal. Gas Co.*,
　102 Cal. App. 3d 33, 162 Cal. Rptr. 238 (Cal Ct. App. 1980) ........................... 15, 16, 17, 20

*In re Filex, Inc.*,
　116 B.R. 37 (Bankr. S.D.N.Y. 1990) ................................................................... 10

*In re Frontier Airlines, Inc.*,
　93 B.R. 1014 (Bankr. D. Colo. 1988) .................................................................. 23

*In re G-I Holdings, Inc.*,
　323 B.R. 583 (Bankr. D.N.J. 2005) ..................................................................... 10

*In re G-I Holdings, Inc.*,
　No. 01-30135 (RG) (Bankr. D. N.J. Nov. 12, 2009) .......................................... 11

*Garbell v. Conejo Hardwoods, Inc.*,
　122 Cal. Rptr. 3d 856 (Cal. Ct. App. 2011) ................................................ *passim*

*In re Garlock Sealing Techs. LLC*,
　No. 17-cv-00275 (GCM) (W.D.N.C. June 12, 2017) .......................................... 11

*Goodman v. Lozano*,
　47 Cal. 4th 1327, 104 Cal. Rptr. 3d 219, 223 P.3d 77 (Cal. 2010) ....................... 15

*Helfend v. S. Cal. Rapid Transit Dist.*,
　2 Cal. 3d 1, 84 Cal. Rptr. 173, 465 P.2d 61 (Cal. 1970) ................................ 16, 18

*Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*,
　295 U.S. 243 (1935) .......................................................................................... 17

*In re Joint E. & S. Dist. Asbestos Litig.*,
　982 F.2d 721 (2d Cir. 1992) ............................................................................... 7

*In re Journal Register Co.*,
　407 B.R. 520 (Bankr. S.D.N.Y. 2009) ................................................................ 18

iv

*In re Kaiser Aluminum Corp.*,
  No. 01-10429 (JKF) (Bankr. D. Del. Aug. 3, 2006) ................................... 11

*In re Nat'l Energy & Gas Transmission, Inc.*,
  492 F.3d 297 (4th Cir. 2007) ................................................................. 18

*Nikko Materials USA, Inc. v. NavCom Defense Elecs., Inc.*,
  No. 05-4158, 2011 WL 13143723 (C.D. Cal. Aug. 29, 2011) ....................... 19

*Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. Withum Smith
  Brown, P.C.*,
  692 F.3d 283 (3d Cir. 2012) ................................................................. 17

*In re Pac. Gas. & Elec. Co.*,
  279 B.R. 561 (Bankr. N.D. Cal. 2002) ................................................. 9, 10

*Pac. Gas & Elec. Co. v. Superior Court*,
  28 Cal. App. 4th 174, 33 Cal. Rptr. 2d 522 (Cal Ct. App. 1994) ................... 16

*In re Plant Insulation Co.*,
  No. 09-31347 (HLB) (Bankr. N.D. Cal. Mar. 3, 2014) ............................... 11

*In re PRS Ins. Grp., Inc.*,
  335 B.R. 77 (Bankr. D. Del. 2005) ......................................................... 10

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1988) ................................................................... 8

*R.F.C. v. Denver & R.G.W.R. Co.*,
  328 U.S. 495 (1946) ........................................................................... 17

*S.E.C. v. Capital Consultants, LLC*,
  397 F.3d 733 (9th Cir. 2005) ....................................................... 18, 19, 20

*In re TK Holdings Inc.*,
  No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) ..................... 11, 12, 13, 24

*Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*,
  549 U.S. 443 (2007) ............................................................ 10, 15, 16, 18

*In re Tucson Estates, Inc.*,
  912 F.2d 1162 (9th Cir. 1990) ................................................................. 9

*In re Twins, Inc.*,
  318 B.R. 90 (Bankr. D.S.C. 2004) ........................................................... 6

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012) ............................................................... 7, 21

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

v

*Wedges/Ledges of Cal. v. City of Phoenix, Ariz.*,
  24 F.3d 56 (9th Cir. 1994) ............................................................................ 2

*White v. Jubitz Corp.*,
  219 P.3d 566 (Or. 2009) .............................................................................. 18

*In re Yelverton*,
  No. 09-00414, 2015 WL 3637440 (Bankr. D.D.C. June 10, 2015) ..................... 17

**Statutes**

11 U.S.C. § 105(5)(A) .................................................................................... 15

11 U.S.C. § 362(d) .......................................................................................... 9

11 U.S.C. § 501(a) .......................................................................................... 9

11 U.S.C. § 502(a) .......................................................................................... 9

11 U.S.C. § 502(b) .......................................................................................... 9

11 U.S.C. § 1123(a)(4) ............................................................................ 6, 7, 21

11 U.S.C. § 1123(b)(1) ..................................................................................... 6

11 U.S.C. § 1124(1) ......................................................................... 6, 8, 10, 21

11 U.S.C. § 1126(c) .......................................................................................... 8

11 U.S.C. § 1127(d) ....................................................................................... 22

28 U.S.C. § 157(b) ......................................................................................... 10

28 U.S.C. § 157(b)(2)(B) .................................................................................. 9

28 U.S.C. § 157(b)(5) ................................................................................... 2, 4

28 U.S.C. § 1334(b) .................................................................................... 9, 17

28 U.S.C. § 1334(c) .......................................................................................... 9

28 U.S.C. § 1411(a) .......................................................................................... 2

**Rules**

Fed. R. Bankr. P. 3019(a) ............................................................................... 22

Fed. R. Civ. P. 23(b)(1) .................................................................................... 8

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

Case: 19-30088    Doc# 7159    Filed: 05/12/20    Entered: 05/12/20 13:50:49    Page 6 of
37

**Other Authorities**

2 Cal. Affirmative Def. § 36:3 (2d ed. 2019) ........................................................ 19

7 Collier on Bankruptcy ¶ 1123.01[4] (16th ed. 2020) ......................................... 7

8 Collier on Bankruptcy ¶ 3019.03 (15th ed. 1987) .............................................. 23

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

Case: 19-30088    Doc# 7159    Filed: 05/12/20    Entered: 05/12/20 13:50:49    Page 7 of
37

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

The Official Committee of Tort Claimants ("**TCC**"), for its Response in Opposition to the Objection of Adventist Health, AT&T, Paradise Entities and Comcast to Trust Documents (Dkt. Nos. 7072 & 7121) (the "**Objection**"), respectfully states as follows:

## I.    **INTRODUCTION**

The Objection, while styled as an objection to the Trust Documents, is principally an objection to the confirmation of the Chapter 11 Plan of Reorganization dated March 16, 2020 (Dkt. No. 6320) (the "**Plan**").[1]  There are over 80,000 Fire Victim Claims filed in this case.  Many of these claims are held by individuals and families who suffered catastrophic personal injuries, lost loved ones, and had their homes or businesses destroyed.  These people need to be compensated quickly, fairly and efficiently.  The TCC, the Consenting Fire Claimant Professionals and the Debtors have crafted a means to do this which is consistent with the practice in many mass tort bankruptcy cases over the past 30 years.  The self-proclaimed "Objectants" seek to stand in the way to leverage a special advantage for themselves.

The compromises reached by the TCC, the Consenting Fire Claimant Professionals and the Debtors are predicated on the creation of a trust that pays fire victims in a fair, equitable, cost-effective and timely manner.  The use of a trust not only shortens the time for over 80,000 fire victims to have their claims administered and receive their awards, but it also facilitates the Debtors' swift emergence from bankruptcy.  The four Objectants argue for the Bankruptcy Court's review of 80,000 Fire Victim Claims in lieu of the proposed trust structure.  Such a result would defeat the purpose of the Plan.  A process under which this Court must adjudicate over 80,000 Fire Victim Claims would be substantially more expensive (forcing the Fire Victim Trust to incur vast amounts of additional administrative costs to litigate claims in Bankruptcy Court, thereby reducing the funds available to compensate victims), overwhelm this Court's docket, and delay payments to desperate victims by years.

The Objection also seeks to undermine various key settlements that are built into the Plan and imperil the Fire Victim Trust's financial ability to satisfy Fire Victim Claims.  Under the Plan,

---

[1]  Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Plan.

fire losses get paid once. The $13.5 billion Fire Victim Trust (sometimes referred to herein as the "**Trust**") will pay Fire Victim Claims to the extent not covered by insurance. The $11 billion Subrogation Wildfire Trust will pay Subrogation Wildfire Claims of insurers. Under the Objectants' flawed legal theory, damages that are already included in Subrogation Wildfire Claims would also be included in Fire Victim Claims. The Objectants' arguments are defeated by Ninth Circuit precedent and multiple decisions by the California Court of Appeals that are directly on point and are not cited anywhere in the Objection.

The Objection is also filled with factually inaccurate statements regarding the proposed claims resolution process and incorrectly presumes that the Fire Victim Trustee (the "**Trustee**") will act arbitrarily. The proposed procedures, grounded on objective eligibility criteria, clear and reliable proof requirements, administrative transparency and oversight, a rigorous review process, and independence of the Trustee and other trust professionals, have been carefully designed and approved by the TCC, the Consenting Fire Claimant Professionals and other parties. These procedures are in harmony with the claims resolution process in numerous other mass tort cases. The Objection reflects an attempt by four well-financed entities to obtain special treatment at the expense of thousands of other deserving victims and should be overruled.

## II.  ARGUMENT

The Objectants are corporations and public entities that have asserted claims for property damage, business losses and interruptions, and lost wages and earning capacity. Between them, the Objectants assert damages in the total amount of $1.55 billion—$1 billion by Adventist (Claim Nos. 59459, 59996), $283 million by AT&T (Claim No. 86127), $93 million by Comcast (Claim Nos. 96971, 57791, 57788), and $171 million by the Paradise Entities (Claim Nos. 58500, 96955, 97724, 97725). Many of the Objectants have insurance that covers their losses.

The Objectants are not individuals with personal injury or wrongful death tort claims. The Objectants lack standing to invoke the jury trial rights set forth in 28 U.S.C. § 1411(a) and 28 U.S.C. § 157(b)(5).[2] The issues raised by the Objectants are: (A) whether the Plan impermissibly deprives

---

[2]  *See, e.g.*, *Wedges/Ledges of Cal. v. City of Phoenix, Ariz.*, 24 F.3d 56, 61 (9th Cir. 1994) ("The prudential limitations [on standing] include a requirement that the plaintiff assert his own rights,

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

fire victims of their alleged right to have their claims adjudicated by the Court (Objection at ¶¶ 9-23); (B) whether the Trust Documents' proposed treatment of insurance is legal (*Id.* at ¶¶ 24-46); (C) whether the Objectants' proposed material changes to the Trust Documents should be approved (*Id.* at ¶¶ 47-49); (D) whether the Trust Documents allow the Trustee to hold financial interests and act as a professional for fire victims (*Id.* at ¶¶ 50-51); (E) whether setoff and recoupment rights must be clarified (*Id.* at ¶ 52); (F) whether the release contained in the Trust Documents must be temporally limited (*Id.* at ¶¶ 53-54); (G) whether fire victims with property damage claims are entitled to reimbursement of their attorneys' fees (*Id.* at ¶ 55); and (H) whether the Trust Documents establish adequate standards to resolve claims (*Id.* at ¶ 56).

This Response addresses each of these objections in turn.

**A.    The Plan Does Not Impermissibly Deprive Fire Victims of Judicial Review**

80,000 fire victims do not have an absolute right to have their claims heard by this Court. The problem presented by this case and other mass tort bankruptcies is the number of claims for damages that must be reviewed and ultimately paid.  Here, the claim form the Court approved for fire victims succeeded in increasing the number of victims filing claims to more than 80,000.  This claim form, by design, did not require victims to provide supporting documentation or a claim amount.  The task ahead is to ensure that tens of thousands of claims, the vast majority of which do not state a claim amount, are substantiated, reviewed, and paid in accordance with procedures that treat fire victims fairly and equitably and are consistent with applicable law.

1.    The Trust Agreement and the Claims Resolution Procedures

The TCC, the Consenting Fire Claimant Professionals and other parties have spent months working on the Fire Victim Trust Agreement (Dkt. No. 7037, pp. 1857-99 (the "**Trust Agreement**") and the Fire Victim Claims Resolution Procedures (Dkt. No. 7037, pp. 1902-12

---

rather than rely on the rights or interests of a third party . . . .") (internal quotation marks and citation omitted); *In re Cinematronics, Inc.*, 916 F.2d 1444, 1448 (9th Cir. 1990) (appellant lacked standing to assert its co-appellant's right to a jury trial as a basis for appealing the denial of withdrawal of the reference to the district court).

3

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

(the "**CRP**").[3] These agreements represent a thoughtful balance of complex procedures necessary to efficiently and objectively liquidate and pay the fire victims' claims in an even-handed and cost-effective manner against the Debtors' need to swiftly emerge from bankruptcy.

To request compensation from the Trust, a claimant must have a claim related to a specified fire, have filed a proof of claim in the bankruptcy cases, and must submit supporting information and documentation in accordance with the CRP. CRP at § I. To further promote efficiency in resolving the thousands of claims at issue, the CRP provides that the fires are deemed to have been caused by the Debtors' equipment and as a result of the Debtors' negligence. *Id.* at § I(A).

The CRP provides a detailed outline of the claim types and damages the Trust will compensate and the supporting documentation required for each claim type: (1) real property claims may be supported by appraisals, tax records, or permits; (2) personal property claims may be supported by lists of items lost, photographs, or appraisals; (3) personal income loss claims may be supported by tax forms, lease agreements, or account statements; (4) business loss claims may be supported by tax returns, financial statements, or canceled contracts; (5) other out-of-pocket expense claims may be supported by medical bills or counselling bills; (6) wrongful death and serious personal injury claims may be supported by medical records or other documents supporting claims for loss of relationship or support; and (7) emotional distress claims may be supported by written narratives detailing the impact of the fire on the victim or photographs taken during the victim's evacuation. *Id.* at § II(A)-(G).

Supporting documentation can be submitted through a web-based portal. *Id.* at § IV. A claims questionnaire will be completed by claimants to verify identities, support claimed damages, and demonstrate a claimant's authority to assert those claims. *Id.* at § V. To facilitate this process and ensure that all claims are evaluated with as much supporting information as possible, the claims questionnaire will be pre-populated with information already in the Claims Processor's records, including a claimant's (a) Bankruptcy Proof of Claim Form, (b) Wildfire Assistance Program Claim Form, (c) Damages Questionnaire established under Case Management

---

[3] For the Court's convenience, the Trust Agreement and CRP are attached hereto as **Exhibit A**.

4

Order No. 5 in the California North Bay Fires Cases (JCCP 4955), and (d) information that is otherwise reasonably ascertainable and reliable. *Id.* Further, processes will be developed to evaluate additional categories of damages. *Id.* at § III. The CRP also explains that certain credits and deductions will be made when determining claim amounts, including amounts covered by insurance, payments received from the Wildfire Assistance Fund, payments received from the Federal Emergency Management Agency, and medical liens. *Id.* at § X.

Once a claim is asserted, the CRP explains how a claim will be processed ("**Claims Determination**"). *Id.* at § VII. After the claim is evaluated, the Claims Processor will issue a notice that explains the result of the review ("**Determination Notice**"). *Id.* If the claim is approved, the Determination Notice will include the amount to be paid, including the stages in which that payment may occur. *Id.* If the claim is missing documents or other information necessary to evaluate the claim, the Determination Notice will explain what is needed to complete a full review. *Id.* If the claim is ineligible for payment, the Determination Notice will explain why. *Id.*

If a claimant is dissatisfied with the Claims Determination, the claimant may dispute the Claims Determination and provide supplemental information to support the claim. *Id.* at § VIII. There is a detailed, three-tiered process by which a claimant may obtain review of the initial Claims Determination. *Id.* First, a claimant may request reconsideration requiring a second review of the claim including any newly submitted information. *Id.* at § VIII(1). If the claimant is dissatisfied with the reconsideration decision, the claimant may then appeal the second review. *Id.* at § VIII(2). On appeal, if the claimant chooses, the claimant may submit even more additional information that was not included in the earlier review and a legal brief in support. *Id.* at § VIII(2)(b). The claimant may also obtain a hearing. *Id.* at § VIII(2)(c). A neutral will then be chosen at random to review the claim *de novo*. *Id.* at § VIII(2)(d)-(g). Finally, the decision on appeal will be submitted to the Trustee, who will make the final determination on the claim's eligibility and amount. *Id.* at § VIII.

Under the Tort Claimants RSA, the procedures that govern the administration of the Trust and the settlement and payment of Fire Victim Claims must be determined by the holders of Fire Victim Claims. *See* Dkt. No. 5038-1, Ex. A. Fire Victim Claims must be administered by the Fire Victim Trust and a settlement oversight committee that is independent of the Debtors. *Id.* The

5

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

1  TCC, the Consenting Fire Claimant Professionals and other parties representing the varied interests

2  of both individual and business fire victims participated in the creation of, and have approved, the

3  Trust Agreement and the CRP.

4      These are heavily negotiated agreements that pave the way for a process intended to fairly

5  and quickly compensate fire victims.  The Trustee and other trust professionals have worked

6  diligently for months in setting up the complicated machinery of the trust administration to ensure

7  the fair, equitable and swift administration of the multitude of Fire Victim Claims.  The Objectants

8  take issue with these agreements and contend that the Plan, the Trust Agreement and the CRP

9  deprive fire victims of their alleged right to have their claims individually adjudicated by this Court.

10         2.    Bankruptcy Binds Dissenting Impaired Creditors

11     The benefits fire victims gain by the Plan, the Trust Agreement and the CRP are the

12  elimination of the need to prove that the fires were caused by the Debtors' equipment and as a result

13  of the Debtors' negligence.  The right the fire victims lose due to the Debtors' bankruptcy and the

14  proposed Plan is the right to have their claims determined by a state court.  Instead, Fire Victim

15  Claims are channeled to the Trust and will be resolved under the Trust Agreement and the CRP.

16     11 U.S.C. § 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of

17  claims."  11 U.S.C. § 1124(1) does not limit "impairment" to economic issues.  Rather, it defines

18  impairment as the alteration to "legal, equitable, and contractual rights."  11 U.S.C. § 1124(1); *see*

19  *In re Twins, Inc.*, 318 B.R. 90, 95 (Bankr. D.S.C. 2004) (through a confirmed plan, "a debtor may

20  generally adjust or alter preexisting rights, or may eliminate them altogether …").  Here, the Plan

21  alters the "legal" and "equitable" rights of Fire Victim Claims by substituting the streamlined CRP

22  for costly and time-consuming litigation in state court.

23     Because the class of Fire Victim Claims is impaired, fire victims have the right to vote.  If

24  this class votes in favor of confirmation, the vote binds the Objectants to the process as long as the

25  Plan meets the "best interest" test under section 1129(a)(7) and the Plan provides "the same

26  treatment of each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).

27     Section 1123(a)(4) "requires equality of treatment, not equality of result."  *In re Breitburn*

28  *Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018).  The requirement of equal

6

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

treatment is satisfied if all claimants are subject to the same claim determination process, even if that process yields differing financial results for certain claimants. *See In re Acequia, Inc.*, 787 F.2d 1352, 1363 (9th Cir. 1986).[4] To offend section 1123(a)(4), the plan would have to "single out specific claimants within a class for disparate treatment." *In re W.R. Grace & Co.*, 475 B.R. 34, 125 (D. Del. 2012). The Trust Agreement and the CRP do not do so.

The Ninth Circuit's decision in *Acequia* is illustrative. 787 F.2d 1352. In *Acequia*, a shareholder objected to plan confirmation and argued that restrictions placed on his voting rights violated section 1123(a)(4). *Id.* at 1363. The plan prohibited the shareholder from exercising his right to elect or remove directors or otherwise alter the composition of the board of directors. *Id.* There was no question that the shareholder's rights were impaired, but such impairment did not offend section 1123(a)(4) because all shareholders were impaired in the same manner.

The court in *Dow Corning* reached a similar conclusion. 255 B.R. 445. In *Dow*, the holder of a prepetition judgment objected to the confirmation of a plan in a mass tort case that gave claimants the opportunity to litigate their claim against a litigation facility or accept a settlement. *Id.* at 501. The objecting claimants argued that they should be treated differently based on their rights as judgment creditors. *Id.* In rejecting this argument, the court held that the "requirement under § 1123(a)(4) that all claims be treated equally is satisfied when the class members are subject 'to the same process for claim satisfaction.'" *Id.* (quoting *Cent. Med. Ctr.*, 122 B.R. at 575).

Implied in both *Acequia* and *Dow* is that plan treatment need not afford a claimant the same legal rights that exist under non-bankruptcy law. This is what it means to be impaired.

---

[4] *Accord In re Cent. Med. Ctr., Inc.*, 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990) (finding "same treatment" under section 1123(a)(4) because even though the plan resulted in "differing financial results," that was "merely … the consequences of the process"); *In re Joint E. & S. Dist. Asbestos Litig.*, 982 F.2d 721, 749 (2d Cir. 1992), *opinion modified on rehearing*, 993 F.2d 7 (2d Cir. 1993) ("[w]ithout question, the 'same treatment' standard of section 1123(a)(4) does not require that all claimants within a class receive the same amount of money"); *In re Dow Corning Corp.*, 255 B.R. 445, 501 (E.D. Mich. 2000); 7 Collier on Bankruptcy ¶ 1123.01[4] (16th ed. 2020) ("Furthermore, section 1123(a)(4) is not violated when class members are subject to the same process of claim determination and satisfaction even if the resulting recovery is different").

7

*See* 11 U.S.C. § 1124(1). Here, the Plan does not provide fire victims with the same legal rights that exist under non-bankruptcy law. But all fire victims are treated the same—they are all foregoing the right to have their claims adjudicated in state court and to litigate with the Debtors, in exchange for receiving distributions under the Trust's streamlined, fair and expeditious process.

Nearly all fire victims appreciate this compromise because they will not have to wait years and engage in costly litigation to finally obtain the compensation that they desperately need and deserve. Allowing *de novo* bankruptcy court review from the claim determinations made pursuant to the Fire Victim CRP would substantially impact distributions for all fire victims because it would require the use of Trust assets to fund the defense of claim determinations, thereby materially diminishing the funds that would otherwise be available to compensate victims, and would significantly extend the time before the Trustee would be able to make final distributions to fire victims.

The Objectants' true complaint is that they were not able to foist a claims resolution process on the other 80,000 claimants that is tailored to their individual wants. But, a chapter 11 plan that is confirmed by the consent of all impaired classes is equally binding on dissenting claimants as it is on claimants that vote to accept the plan. *See* 11 U.S.C. § 1126(c); *In re BMW Grp. I, Ltd.*, 168 B.R. 731, 749 (Bankr. W.D. Okla. 1994) ("Unsecured creditors may vote their pro rata debt, but if the class as a whole accepts the plan by one-half in number and two-thirds in amount of debt, the plan is deemed accepted by the whole class—dissenters and all."). The process that is being followed—plan voting by all impaired fire victims—and the procedures that have been proposed to resolve Fire Victim Claims are fully consistent with the Bankruptcy Code.[5]

---

[5] The mandatory claims process set forth in the Trust Agreement and the CRP is consistent with processes approved in so-called "non-opt-out" class actions certified under Fed. R. Civ. P. 23(b)(1) or (2). In such cases, once the process of class certification and approval of a class settlement are consummated, dissenting class members have no right to judicial review of their individual claims. *See*, *e.g.*, *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 295-96 (3d Cir. 1988). The showing which must be made by the class representatives in these "non-opt-out" class actions is similar to the showing required to bind dissenters in a chapter 11 plan.

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

### 3.   The Code Does Not Require the Court to Adjudicate 80,000 Tort Claims

The Objectants argue that this Court is statutorily mandated to be the exclusive arbiter of the 80,000 Fire Victim Claims. This is incorrect. Section 501(a) permits a creditor to "file a proof of claim." 11 U.S.C. § 501(a). Section 502(a) provides that a claim "proof of which is filed under section 501 of [title 11] is deemed allowed, unless a party in interest … objects." 11 U.S.C. § 502(a). And, section 502(b) provides that "if such objection is made, the court, after notice and a hearing, shall determine the amount of such claim …." 11 U.S.C. § 502(b). A core proceeding includes the "allowance or disallowance of claims against the estate." 28 U.S.C. § 157(b)(2)(B).

The Court has "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). But the Court is not required to hear every proceeding arising under title 11. A bankruptcy court can grant relief from the automatic stay on a request of a party in interest or *sua sponte* to permit claims to be liquidated in state court. *See* 11 U.S.C. § 362(d); *In re Castlerock Properties*, 781 F.2d 159, 163 (9th Cir. 1986); *In re Pac. Gas. & Elec. Co.*, 279 B.R. 561, 572 (Bankr. N.D. Cal. 2002); *In re Bellucci*, 119 B.R. 763, 777-78 (Bankr. E.D. Cal. 1990). And, a bankruptcy court may abstain from hearing proceedings arising under title 11, including proceedings "based on a State law claim or State law cause of action." 28 U.S.C. § 1334(c).

The factors courts consider in deciding whether to abstain include the effect "thereof on the efficient administration of the estate," "the extent to which state law issues predominate over bankruptcy issues," "the feasibility of severing state law claims from core bankruptcy matters to allow judgements to be entered in state court with enforcement left to the bankruptcy court," "the burden on the bankruptcy court's docket," and "the existence of a right to a jury trial." *In re Tucson Estates, Inc.*, 912 F.2d 1162, 1167 (9th Cir. 1990). This Court considered these same factors when it decided to abstain from hearing 1,250 personal injury claims in PG&E's first bankruptcy. *See Pac. Gas. & Elec.*, 279 B.R. at 570-71.

Here, the losses suffered by each fire victim could include as many as 25 different damage categories, involving the application of dozens of California Code provisions and Judicial Council of California Civil Jury Instructions sections, as well as a vast body of California case law

9

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

addressing the validity and valuation of each category. As in the first *PG&E* bankruptcy, state law issues clearly predominate over bankruptcy issues. 279 B.R. at 570. The sheer volume of Fire Victim Claims—over 80,000—would place an undue burden on this Court's docket. This Court can decline to hear Fire Victim Claims.

Since this Court can decline to hear Fire Victim Claims, it follows as a matter of law and logic that fire victims do not have the absolute right to have their claims heard by this Court. While this Court can abstain or grant relief from stay, a state court cannot. The right the fire victims lose due to the Debtors' bankruptcy and the proposed Plan is the right to have their claims determined by a state court. Such modifications plainly constitute impairment under section 1124(1) of the Bankruptcy Code, which is why the fire victims are entitled to vote. If the class of Fire Victim Claims votes in favor of confirmation, the Objectants will be bound by the Plan. None of the cases cited by the Objectants in Section I.A of their Objection support their arguments for judicial review of their claims or refute the TCC's analysis on this issue.[6]

---

[6] For example, the language quoted from *Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co.*, 549 U.S. 443, 449-50 (2007), was in the context of the Court's consideration of whether to allow a claim for attorney's fees authorized by a prepetition contract and incurred in postpetition litigation. Similarly, the court in *In re PRS Insurance Group, Inc.*, 335 B.R. 77, 81-83 (Bankr. D. Del. 2005), was not considering whether the bankruptcy court had exclusive power to determine whether a claim is allowed or disallowed, but was determining whether a claimant's filing of a proof of claim constituted a waiver of the claimant's objection to the bankruptcy court's jurisdiction to decide whether to allow the claim as filed. The plan in *In re American Capital Equipment, Inc.*, 405 B.R. 415 (Bankr. W.D. Pa. 2009), was unconfirmable because it embodied a settlement with asbestos claimants that was forbidden by Pennsylvania law and because it deprived personal injury claims of the right to a jury trial in contravention of 28 U.S.C. § 157(b), not because it altered the claims allowance process. Neither *In re Filex, Inc.*, 116 B.R. 37, 40 (Bankr. S.D.N.Y. 1990), where plan solicitation was attempted under the auspices of the automatic stay without any court approval, nor *In re Butcher*, 459 B.R. 115, 130 (Bankr. D. Colo. 2011), where the plan impermissibly "cut off" the time for filing claims and shifted the burden of objections on creditors, are on point. Neither *In re G-I Holdings, Inc.*, 323 B.R. 583 (Bankr. D.N.J. 2005), nor *Elder v. Uecker (In re Elder)*, 325 B.R. 292 (N.D. Cal. 2005), supports the Objectants' assertion that claim adjudication must be subject to court review. *G-I Holdings* dealt with personal injury and wrongful death claims that have different review requirements than property damage claims like those held

10

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

4.     The Trust Agreement and CRP Are Consistent with Other Mass Tort Cases

The TCC and the Consenting Fire Claimant Professionals obviously did not write on a clean slate. As the Objectants acknowledge, the difficulty in adjudicating thousands of tort claims in bankruptcy cases has led to the creation of mechanisms for resolving claims. It is common in mass tort bankruptcies for courts to approve streamlined procedures to resolve tort claims under a trust established by a plan. *See, e.g.*, *In re Garlock Sealing Techs. LLC,* No. 17-cv-00275 (GCM) (W.D.N.C. June 12, 2017) (Dkt No. 6261); *In re TK Holdings Inc.*, No. 17-11375 (BLS) (Bankr. D. Del. Feb. 21, 2018) (Dkt No. 2120) ("**Takata**"); *In re Plant Insulation Co.*, No. 09-31347 (HLB) (Bankr. N.D. Cal. Mar. 3, 2014) (Dkt No. 2722); *In re G-I Holdings, Inc.*, No. 01-30135 (RG) (Bankr. D. N.J. Nov. 12, 2009) (Dkt No. 9787); *In re Kaiser Aluminum Corp.*, No. 01-10429 (JKF) (Bankr. D. Del. Aug. 3, 2006) (Dkt No. 8225).

Such claims procedures establish an orderly, alternative mechanism to verify, evaluate, and resolve tort claims, which predominantly involve state law issues, without overwhelming the court. To litigate thousands of claims in bankruptcy court would take years, if not decades, and would result in uncertainty and delay the distribution of compensation to victims. The Trust would be expending considerable resources litigating the claims in bankruptcy court thereby diminishing the ultimate recoveries of the fire victims. The Trust is already being funded in a capped amount that must be used to pay Fire Victim Claims and would see its expenses increase in connection with such litigation. The Trust procedures avoid this outcome by permitting claims to be resolved in an effective, fair and cost-efficient manner, and maximize the overall distribution to victims.

The claims resolution procedures established by the Trust are consistent with the procedures approved in other mass tort bankruptcies. In *Takata*, the court approved a multi-step, out-of-court process to resolve over $1 billion of personal injury and wrongful death claims asserted against the debtors. *See* Notice of Filing of Fourth Plan Supplement Pursuant to the Fifth Amended Joint

---

by the Objectants. The court in *Elder* did not hold that section 502 prohibits a bankruptcy court from delegating claims administration to a trust without judicial review, it merely noted that the plan in that case allowed claimants dissatisfied with a trust's claims determination to seek review from the bankruptcy court.

Chapter 11 Plan of Reorganization of TK Holdings Inc. and Its Affiliated Debtors at Ex. N, *TK Holdings*, No. 17-11375 (BLS) (Bankr. D. Del. Mar. 26, 2018) (Dkt No. 2505).

To apply for compensation, *Takata* claimants are required to submit a claim form and supporting documentation to the trust established under the debtors' plan to compensate individuals injured by the debtors' faulty airbags. *Id.* at 12-14 (Section 3.1). The trustee reviews the submitted materials to determine a claimant's eligibility for compensation. *Id.* at 18-19 (Section 4.1). If a claimant establishes his or her eligibility and provides the necessary documentation, the trustee determines if the claim satisfies the criteria for compensation based on a valuation schedule. *Id.* at 19-23 (Section 4.2). Under this schedule, the trustee assigns a value to the claim based on the nature and severity of the claimant's injuries. *Id.* at 24 (Section 5.2), 28 (Section 6.2), Exs. A-B. The trustee then issues a determination to the claimant that becomes binding unless the claimant initiates an appeal under the trust's appellate procedures. *Id.* at 30-36 (Sections 5.4, 6.2(d), 6.3).

Under the *Takata* claims procedures, depending on the type of claim asserted, claimants are afforded multiple opportunities to appeal the trustee's determination, and each stage of appeal is subject to *de novo* review. For a claimant's personal injury or wrongful death claims against the debtors ("**TD Claim**"),[7] appeals over eligibility and value are addressed by the Future Claims Representative under a "Supplemental Review Process." *Id.* at 25 (Section 5.4). For personal injury or wrongful death claims asserted against the debtors that involve a vehicle manufactured by a participating original equipment manufacturer ("**P-OEM Claims**"), the first appeal is conducted by a single reviewer from a twelve-person appeals panel composed of neutral individuals. *Id.* at 32-35 (Section 6.3(c)). If dissatisfied with the results of the first appeal, the claimant could bring a second appeal, which would be conducted by the initial reviewer and two additional reviewers from the panel. *Id.* If still dissatisfied, the claimant could initiate a third appeal, which would take the form of a conference with the future claims' representative appointed by the trust. *Id.* at 35-36 (Section 6.3(d)). Significantly, neither the claim determination nor the appellate process involved the bankruptcy court. As discussed above, the Fire Victim CRP sets forth a similar review process.

---

[7] Claimants that have TD Claims may also have a claim against the participating original equipment manufacturer channeled to the trust and resolved by the trust.

Case: 19-30088    Doc# 7159    Filed: 05/12/20    Entered: 05/12/20 13:50:49    Page 19 of 37

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

MacCONAGHY & BARNER, PLC
ATTORNEYS AT LAW
SONOMA, CALIFORNIA

After exhausting the extensive evaluation and appeal procedures, the *Takata* claims resolution procedures allows personal injury and wrongful death claimants to opt out and challenge the trust's valuation of the claim via a jury trial, but only on the limited issue of damages and only in respect of P-OEM Claims. *See id.* at 36-38 (Section 6.4(a)), Ex. C. Trials in the tort system are limited to the cause of the claimant's injuries and damages. *Id*. at 36-39 (Section 6.4(a)). If the claimant succeeds at trial or settles with the trust, the trust is required to pay the judgment or settlement over two successive years. *Id*. at 39-41 (Section 6.4(b)). Notably, only personal injury and wrongful death claims against non-debtor third-party original equipment manufacturers can opt out. *Id.* (Section 6.4) (titled "Litigation in Tort System of P-OEM Claims"). All claims against the debtors have no opt-out to the courts and are resolved fully in the trust in accordance with the trust procedures. Again, the Objectants here do not hold personal injury or wrongful death claims.

### B.  The Insurance Offset Is Reasonable and Consistent with Applicable Law

The Objectants' analysis of the treatment of insurance is flawed. The Objectants fail to cite binding precedent that defeats their arguments. The insurance offset is not only fair and reasonable but is essential to maximize the recoveries of all fire victims in this case.

Through their Plan, the Debtors seek to resolve billions in liabilities arising from the Wildfires. In their motion to approve the Subrogation Claims RSA, the Debtors purported to settle $20 billion of Subrogation Wildfire Claims—*i.e.*, claims arising from amounts paid and to be paid by insurers to fire victims under an insurance policy—for $11 billion. *See* Dkt. No. 3992 at 7. And, in their motion to approve the Tort Claimants RSA, the Debtors purported to settle their liabilities to fire victims for approximately $13.5 billion. *See* Dkt. No. 5038 at 8.

Both RSAs lead to the funding of trusts—the Fire Victim Trust to pay Fire Victim Claims and the Subrogation Wildfire Trust to pay Subrogation Wildfire Claims. *See* Plan at §§ 6.4 & 6.7. The Court's bar date orders required fire victims and subrogation claimants to file proofs of claim by the applicable bar dates. *See* Dkt. Nos. 2806 & 4672. And, under the Plan, all Fire Victim Claims and all Subrogation Wildfire Claims are being fully resolved and satisfied through the funding of the trusts. *See* Plan at §§ 6.4 & 6.7.

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

Under the Trust Agreement and the Plan, the approved amount of all Fire Victim Claims is reduced on a dollar-for-dollar basis by available insurance recoveries. *See* Trust Agreement at § 2.6 ("the Approved Amount of the Fire Victim Claim shall be reduced on a dollar-for-dollar basis by all available insurance recoveries available to the Fire Victim whose loss gives rise to such Fire Victim Claim"); Plan at § 6.7(a) ("To the extent, if any, a holder of a Fire Victim Claim asserts damages against the Debtors or the Fire Victim Trust for amounts covered by a policy of insurance, the Fire Victim Trust may receive a credit against the Fire Victim Claim of any such holder, its predecessor, successor, or assignee, for insurance coverage amounts as provided in the Fire Victim Trust Agreement.").[8]

This reflects two policies. The first is that victims must pursue their insurers before seeking compensation from the trust so that all fire victims obtain the total maximum recovery available to them. Trust Agreement at § 2.6(e)(i). The second, and most important, is to ensure that insurers do not pass their coverage obligations on to the Fire Victim Trust. *Id.* at § 2.6(e)(ii). Given that the Subrogation Wildfire Claims include approximately $5.7 billion in reserves or amounts to be paid to victims, the danger to the Fire Victim Trust is obvious. If fire victims do not maximize their insurance recoveries, the insurers could transfer substantial liabilities into the Fire Victim Trust to the detriment of all fire victims.

The solution, as set forth in Section 2.6 of the Trust Agreement, is a formula under which all Fire Victim Claims are reduced on a dollar-for-dollar basis by available insurance recoveries. This reduction will not reduce the Debtors' liability, nor will it result in the Debtors paying less to fund the Fire Victim Trust or even the Subrogation Wildfire Trust. This is an allocation issue among fire victims that is consistent with federal bankruptcy law and California law.

---

[8] *Accord* Disclosure Statement at 25 ("Distributions for business losses will take into consideration amounts received or potentially recoverable from applicable insurance policies."); *Id.* at 27 ("To the extent any Allowed Fire Victim Claim is covered by insurance, the insurance coverage amounts may be credited to the Fire Victim Trust in accordance with the Fire Victim Trust Agreement.").

14

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

1.     The Insurance Offset Is Required Under California Law

The Objectants argue to the contrary.  First, the Objectants argue at length that "long-standing federal bankruptcy law" permits fire victims to assert "the full amount of their claim notwithstanding their recoveries from other sources."  Objection at ¶¶ 30-34.  The Objectants, however, assert that they are willing to agree to have their recoveries reduced by amounts paid by their insurers.  *Id.* at ¶ 41 fn. 8.  Notably absent from the Objection is any discussion of what amounts fire victims are entitled to recover under California law.

"[W]hen the Bankruptcy Code uses the word 'claim'—which the Code itself defines as a 'right to payment,' 11 U.S.C. § 105(5)(A)—it is usually referring to a right to payment recognized under state law."  *Travelers Cas. & Sur. Co.*, 549 U.S. at 451.  Under basic bankruptcy principles, claims and property rights are not "analyzed differently simply because an interested party is involved in a bankruptcy proceeding."  *Id.* (quoting *Butner v. United States*, 440 U.S. 48, 55 (1979)).  Here, the Fires occurred in California.  The threshold question, which the Objectants fail to consider, is what right to payment does a fire victim have from a tortfeasor when the fire victim has recovered from an insurer under California law.

Two published decisions by the California Court of Appeals, which have been widely followed, speak to this issue.  *See Garbell v. Conejo Hardwoods, Inc.*, 122 Cal. Rptr. 3d 856, 864 (Cal. Ct. App. 2011) (insurance proceeds properly deducted from fire victim's recovery from tortfeasor under California law); *Ferraro v. S. Cal. Gas Co.*, 102 Cal. App. 3d 33, 47, 162 Cal. Rptr. 238, 246 (Cal Ct. App. 1980) (same), disapproved on other grounds as stated in *Goodman v. Lozano*, 47 Cal. 4th 1327, 1330, 1336-37, 104 Cal. Rptr. 3d 219, 223 P.3d 77 (Cal. 2010).

In *Garbell*, individuals suffered a property loss due to a fire and asserted claims against their insurer and the tortfeasor who caused the fire.  122 Cal. Rptr. 3d at 861.  The insurer paid the policy limit of $424,050 of the total loss of $822,483.  *Id.*  The victims then sought to recover their "uninsured loss" from the alleged tortfeasor.  *Id.*  The fire victims prevailed, but the jury found that the tortfeasor was only 55% at fault, resulting in a judgment for $452,365.  *Id.*  The court deducted the insurance payment from the judgment, leaving a "net recovery" of $28,315.  *Id.*  The court held that the fire victims' recovery from the tortfeasor was net of the victims' policy limit.  *Id.*

15

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

The fire victims appealed and argued that the court miscalculated their damages under California law by deducting the insurance payment. In rejecting this argument, the Court of Appeals found that upon paying the victims $424,050, the insurer became "subrogated in that amount" and "stepped into the shoes" of the victims "to the extent of the insurance payment." *Id.* at 863 (quoting *Allstate Ins. Co. v. Mel Rapton, Inc.*, 77 Cal. App. 4th 901, 908, 92 Cal. Rptr. 2d 151 (Cal. Ct. App. 2000) and citing *Ferraro*, 102 Cal. App. 3d at 41). The Court found that "[w]hen the insured is only partially compensated by the insurer for a loss, as was the case here, the subrogation doctrine results in two or more parties having a right of action for recovery of damages based upon the underlying negligence." *Id.*; *accord Ferraro*, 102 Cal. App. 3d at 41.

The first party—the insurer—has a "subrogation right" to recover the insurance payments, since payment by an insurer to a tort victim under an insurance policy gives the insurer a subrogation right with respect to the claim against the tortfeasor. *Id.* The second party—the fire victim—has "a right to recover their uninsured loss." *Garbell*, 122 Cal. Rptr. 3d at 863. The amount of damages that the fire victims could recover from the tortfeasor is properly reduced by the amount of the insurance coverage when the insurer has a right of subrogation. A contrary holding would require "a tortfeasor to pay double for his or her wrong," which is contrary to California law. *Id.* at 864 (citing *Helfend v. S. Cal. Rapid Transit Dist.*, 2 Cal. 3d 1, 9-11, 84 Cal. Rptr. 173, 465 P.2d 61 (Cal. 1970)). The California Court of Appeals held that the fire victims were entitled to a "net recovery" that accounted for their insurance policy. *Id.*[9]

Following *Garbell*, the starting point is the subrogation rights reflected in the Subrogation Wildfire Claims. The Court has found that the subrogation right in this case includes all payments made or to be made to fire victims under an insurance policy. The bar date order permitted insurers

_____

[9] Although not cited in the Objection, the California Court of Appeals' decision in *Pacific Gas & Electric Co. v. Superior Court*, 28 Cal. App. 4th 174, 33 Cal. Rptr. 2d 522 (Cal Ct. App. 1994) is inapposite because it did not involve subrogation rights. The issue in *Pacific Gas & Electric*, as in *Helfend*, was whether the benefit of insurance payments should inure to the tortfeasor or the insured. *Pacific Gas & Electric* and *Helfend* both support the notion that the assertion of subrogation rights renders the collateral source rule inapplicable because the insured and the insurer share recovery from a third-party tortfeasor, which, in turn, prevents double recovery.

16

to assert subrogation claims based on "amounts paid or reserved for damages or losses resulting from a wildfire." Dkt. No. 2806 at A-3. Under the Plan, Subrogation Wildfire Claims, which are defined to include any Fire Claim that arises from subrogation "in connection with payments made or to be made by the applicable insurer to insured tort victims," are being settled and discharged through the funding of the Subrogation Wildfire Trust. Plan at §§ 1.201, 4.6(a) & 4.25(d).

It follows that all Fire Victim Claims must be reduced by amounts that have been paid or will be paid under insurance policies that cover those same damages. Section 2.6(a) of the Trust Agreement mirrors the definition of Subrogation Wildfire Claim in the Plan and requires a reduction for any amounts "actually paid," "to be paid, payable, or otherwise owed to the Fire Victim" by an insurer. Under the Objectants' theory, the same loss would be payable from the Subrogation Wildfire Trust and the Fire Victim Trust—*i.e.*, the same double recovery that led the *Garbell* Court to hold that fire victims in this context are only entitled to a "net recovery" from a tortfeasor under California law.

The Objectants fail to cite *Garbell* or *Ferraro*. The Objectants cite *Ivanhoe* and its progeny and argue that tort claims include insurance recoveries under "long-standing federal bankruptcy law" even though such claims are "net" of such recoveries under state law. The cases the Objectants cite in Section II.A of their Objection do not involve subrogation rights and tort claims and are completely inapposite.[10] The Objectants' federal law argument requires the Court to analyze Fire

_____

[10] The courts in *Ivanhoe Building & Loan Association of Newark, N.J. v. Orr*, 295 U.S. 243, 246-47 (1935) and *R.F.C. v. Denver & R.G.W.R. Co.*, 328 U.S. 495, 529 (1946) found that a creditor whose claim is secured by property owned by a third party need not deduct the value of that collateral in proving its claim against the debtor unless the creditor would recover from all sources more than the amount owed. The court in *In re Del Biaggio*, 496 B.R. 600 (Bankr. N.D. Cal. 2012), followed *Ivanhoe* and found that creditors seeking to collect the full balance of notes evidencing debt owed by the debtor are not required to reduce their claims by amounts recovered from co-obligors unless the dividend paid in the bankruptcy case would result in more than full recovery on the notes. The courts in *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. Withum Smith Brown, P.C.*, 692 F.3d 283 (3d Cir. 2012), and *In re Yelverton*, No. 09-00414, 2015 WL 3637440, at *8 (Bankr. D.D.C. June 10, 2015), discussed *Ivanhoe* in addressing whether a proceeding was "related to" a chapter 11 proceeding under 28 U.S.C. § 1334(b). The court in *In re Biovance Technologies,*

17

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

Victim Claims "differently" simply because PG&E is in bankruptcy in contravention of the Supreme Court's rulings in *Travelers* and *Butner*.

## 2. The Insurance Offset Does Not Violate the Collateral Source Rule

Next, the Objectants erroneously argue that the insurance provisions in the Trust Agreement and the CRP violate the collateral source rule. Objection at ¶¶ 35-41. This argument is also flawed.

First, the Objectants' argument ignores Ninth Circuit precedent holding that the collateral source rule does not apply where the offsets do not relieve tortfeasors of their conduct, but only affect the allocation of limited settlement funds among claimants. *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 743 (9th Cir. 2005); *see In re Equity Funding Corp. of Am. Sec. Litig.*, 603 F.2d 1353, 1364 (9th Cir. 1979). In *Capital Consultants*, the district court placed an investment management company into receivership. 397 F.3d at 736. A group of investors challenged the distribution plan because it provided for an offset to their distributions for monies recovered by those investors from third parties, including insurers. *Id.* at 737-38.

The investors argued that the offsets violated the collateral source rule under state common law. *Id.* at 743.[11] In approving the offset, the Ninth Circuit summarily dismissed the investors' argument that the collateral source rule applied because the offsets only affected how receivership

_____

*Inc.*, Nos. 10-82441 & 10-82442, 2014 WL 2861003, at *4 (Bankr. D. Neb. 2014) found that a lessor was not required to reduce its claim against a guarantor based on amounts recovered through a third party settlement until the lessor received payment in full from all available sources. The court in *In re National Energy & Gas Transmission, Inc.*, 492 F.3d 297, 301 (4th Cir. 2007), found that a debtor's debt to a creditor was not reduced by the amount the creditor received from a non-debtor guarantor. The court in *In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009), found that potential recoveries that members of an unsecured creditors class may have against joint obligors, sureties and guarantors does not create a classification problem under § 1123(a). And, the court in *Waddell Jenmar Securities, Inc.*, 126 B.R. 935, 947 n. 12 (Bankr. E.D.N.C. 1991), found that a creditor's claim against a debtor did not have to be reduced by a recovery obtained from a bank where there was no risk that the creditor would be overly compensated.

[11] *Capital Consultants* involved Oregon common law, which, like California common law, applies the collateral source rule. *Compare White v. Jubitz Corp.*, 219 P.3d 566, 220-21 (Or. 2009) *with Helfend*, 2 Cal. 3d at 9-11.

18

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

assets would be "distributed among the innocent claimants" and would not give the tortfeasors a "windfall" or relieve them "of the consequences of their conduct." *Capital Consultants*, 397 F.3d at 743. The Ninth Circuit reached the same conclusion in *Equity Funding*. 603 F.2d at 1364 (approving offset provision that did not benefit any "tortfeasor," but was used instead "for the purpose of allocating the available settlement funds among the various claimants.").[12]

As in *Capital Consultants*, the proposed insurance offset only affects how the Trustee will distribute trust assets "among the innocent claimants." 397 F.3d at 743. It does not impact the Debtors. If an insured with $200 million in coverage settled with its insurer for $10 million and was permitted to assert a claim for $190 million against the Trust, every dollar paid on such claim would take money away from other victims. Like the offset in *Capital Consultants*, the insurance offset will not relieve the Debtors of liability—it does not change the amount that the Debtors are contributing to the Fire Victim Trust or the Subrogation Wildfire Trust under the Plan. Since this is an allocation issue, the collateral source rule does not apply under common law. *See id.*

Second, the Objectants ignore basic hornbook law that "[w]hen the insurance carrier becomes subrogated to the claim of an insured against a third-party tortfeasor, a payment of insurance proceeds is no longer a collateral source." 1 CALIFORNIA INS. LAW DICTIONARY & DESK REF. § C40 (2019 ed.); *see* 2 CAL. AFFIRMATIVE DEF. § 36:3 (2d ed. 2019) ("When the plaintiff's insurer pays plaintiff for all or part of the loss and becomes subrogated to the claim against the tortfeasor, the collateral source rule is altered to that extent. The rule does not require the tortfeasor

---

[12] *Capital Consultants* is also consistent with cases involving CERCLA actions where courts have refused to apply the collateral source rule if doing so would be inconsistent with the rule's purpose. *See Nikko Materials USA, Inc. v. NavCom Defense Elecs., Inc.*, No. 05-4158, 2011 WL 13143723, at *3 (C.D. Cal. Aug. 29, 2011) (since the purpose of a CERCLA action "is to determine an equitable allocation between responsible parties" and "not innocent parties" the "collateral source rule does not apply."); *Am. Int'l Specialty Lines Ins. Co. v. U.S.*, No. 09-01734, 2009 WL 10672384, at *1 (C.D. Cal. Dec. 14, 2009) (finding collateral source rule inapplicable in CERCLA action because "the policy underlying the collateral source rule … is simply not advanced in such cases.").

19

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

to pay the injured plaintiff and to repay the plaintiff's insurer, paying double."). The analysis supporting this rule is set forth in *Garbell* and *Ferraro*.[13]

The Objectants also assert that the Trustee can "disregard the plain meaning" of insurance policies and "disregard the fact that an insurer has denied or otherwise disputed coverage." Objection at ¶ 40. But Section 2.6 of the Trust Agreement states nearly the opposite: "A Fire Victim Claim shall not be reduced, in full or in part, to the extent that the terms of a policy of insurance cannot be reasonably construed to provide coverage for damages or losses arising from or attributable to a Wildfire."

The Objectants then claim that the Trustee's ability to consider whether a fire victim that fails to receive payments equal to policy limits exercised "reasonable efforts" is improper and that the Trustee will act arbitrarily. Not so. The purpose of Section 2.6(a) is to deduct insurance payments that have been received and will be received—*i.e.*, what is available to insureds. Such payments are not a collateral source under California law. The reasonableness requirement provides an important check to ensure insureds do not enter into agreements with insurers that settle claims for amounts that are outside the range of reasonableness. This is essential here because such agreements would harm other fire claimants, which is why *Capital Consultants* is directly on point.

Victims that exercise reasonable efforts to exhaust insurance recoveries will have the same net claim against the Trust as they would have against the Debtors outside of bankruptcy. The Objectants' assertion that the Trustee has "unfettered authority and discretion" to reduce claims by amounts that could never be paid is simply inaccurate. Objection at ¶ 41. If any Objectant exercises reasonable efforts to recover from its insurers, it will be a beneficiary of the Trust's offset formula. The fact that the Objectants oppose the offset formula, while the TCC and law firms representing tens of thousands of fire victims require it, speaks for itself.

---

[13] *Garbell*, 122 Cal. Rptr. 3d at 864 ("When the insurance carrier becomes subrogated to the claim of an insured against a third party tortfeasor, the payment of insurance proceeds is no longer a 'collateral source.'"); *Ferraro*, 102 Cal. App. 3d at 47 ("[W]hen an insurance carrier becomes subrogated to the claim of an insured against a third party tortfeasor, the payment of insurance proceeds is no longer a 'collateral source.'").

20

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

3.    The Insurance Offset Complies with Section 1123(a)(4)

Finally, the Objectants invoke section 1123(a)(4) of the Bankruptcy Code and allege disparate treatment.  Objection at ¶¶ 42-46.  What the Objectants oppose is the fact that they will be treated the same as every other fire victim.

Again, Fire Victim Claims are impaired.  The fire victims' legal and equitable rights are being modified.  Fire Victim Claims are channeled to the Trust, which is entitled to deduct insurance coverage.  Such modifications constitute impairment under section 1124(1) of the Bankruptcy Code.  The Plan affords the holders of Fire Victim Claims the right to vote.  If this class votes in favor of confirmation, an issue will be whether the plan provides "the same treatment of each claim or interest of a particular class."  11 U.S.C. § 1123(a)(4).

As explained above, case law applying this section makes it clear that section 1123(a)(4) "requires equality of treatment, not equality of result."  *Breitburn Energy*, 582 B.R. at 358.  The requirement of equal treatment is satisfied if all claimants are subject to the same claim determination process, even if that process yields differing financial results for certain claimants. *See Acequia*, 787 F.2d at 1363.  To offend section 1123(a)(4), the plan would have to "single out specific claimants within a class for disparate treatment."  *W.R. Grace*, 475 B.R. at 125.

Here, the process is the same.  All Fire Victim Claims—large or small, whether asserted by individuals or businesses—are subject to the same formula.  The deduction is based on what is available to the insured.  This ensures that victims who have yet to receive insurance payments are not paid more than victims that have been paid.  The goal is to treat everyone the same, which is what section 1123(a)(4) requires.  The Objectants may prefer a different formula, but this does not mean that the Plan and Trust Agreement violate section 1123(a)(4).

The Objectants wrongly assert that claimants without insurance are treated worse.  But this assertion is based on the Objectants' erroneous interpretation of the collateral source rule.[14]  The

---

[14]  The Objectants assert that "[a] claimant that received some insurance money and went to trial in state court and recovered $100,000 from a jury would be entitled to the same amount ($100,000) from the tortfeasor as a claimant without insurance that also recovered $100,000 from a state court jury."  Objection at ¶ 44.  But this issue was addressed in *Garbell* were the Court of Appeals held

21

Objectants also wrongly assert that the Trustee's ability to accept an assignment of an insurance claim gives rise to disparate treatment. Such an assignment would not alter a fire victim's recovery on account of his or her claim but is intended to offer victims facing an undue hardship a mechanism to resolve their claims while protecting the Trust from attempts to shift coverage obligations into the Trust. Likewise, the "reasonable efforts" requirement does not result in disparate treatment but ensures that all fire victims will exercise reasonable efforts to exhaust available insurance recoveries.

### 4. Alteration of the Insurance Offset Could Require a Re-Vote

As set forth above, the Objectants' arguments against the treatment of insurance are wrong. The Objectants' demands have far-reaching downside implications for the vast majority of the other fire victims. The elimination of the insurance offset, or changes thereto that impact fire victims' incentive to pursue insurance recoveries, could reduce fire victims' recovery by over 22% and necessitate a re-vote on the Plan.

Voting is in process. Bankruptcy Rule 3019(a), which implements section 1127(d) of the Bankruptcy Code, provides that if a plan is modified after votes are cast but prior to confirmation, the Court must consider whether the modifications "adversely change the treatment" of the claims held by creditors who previously voted to accept the plan. Fed. R. Bankr. P. 3019(a). Courts have found that a modification is material if "it so affects a creditor … who accepted the plan that such entity, if it knew of the modification, would be likely to reconsider its acceptance." *In re Am. Solar*

that the jury award was properly reduced by the insurance recovery. A victim with insurance is likely to recover more than a victim without insurance. A victim that suffers a loss of $100,000 that has $50,000 of insurance coverage is likely to receive $50,000 from his or her insurer and a percentage of the remaining $50,000 from the Fire Victim Trust. If the Fire Victim Trust pays 90% of the allowed claims, the victim would recover $95,000 in total. A fire victim without insurance could recover $90,000 from the Fire Victim Trust after the Trust is fully administered. This is consistent with notions of equal treatment because the fire victim that has insurance only has a net claim against the Debtors under California law. It is difficult to imagine why any fire victim would prefer to not have insurance in this context. But the Objectants' example illustrates an important point. If the Objectants, all of which have insurance coverage, are successful, the result would be that victims with insurance will dilute the recovery of victims that lack insurance.

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

*King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (quoting 8 Collier on Bankruptcy ¶ 3019.03, p. 3019-3 (15th ed. 1987)).

"The severity of the modification need not be such as would motivate a claimant to change their vote—only that they would be apt to *reconsider* acceptance." *Id.* at 824. If the modification materially changes the way a claim is treated, the court must order a re-solicitation of votes.[15] The changes the Objectants demand would have a material adverse impact on fire victims.

The Debtors assert $20 billion in potential liabilities to insurers, of which $15 billion is based on claims paid and $5 billion is based on reserves for future payments. $11 billion in cash will be paid to the Subrogation Wildfire Trust. If the insurers pay 100% of their reserves, their distribution will be roughly 55% ($11 billion / $20 billion). But, if the insurers pay little to none of their reserves, their distribution would be 73% ($11 billion / $15 billion). The $11 billion paid to the trust is not tied to the portion of the reserves that is paid to victims. The numerator is fixed. Anything that reduces the denominator—*e.g.*, not paying insured claims—benefits the insurers.

Insurers avoiding their coverage obligations harms fire victims. If the total "net" liabilities to fire victims is $15 billion and total amount allocated to the Fire Victim Trust is $13.5 billion, the distribution to fire victims would be 90% ($13.5 billion / $15 billion). But, if the insurers' coverage obligations are unjustly shifted to the Fire Victim Trust because insureds are not required or incentivized to pursue available recoveries, the distribution could go down to 67.5% ($13.5 billion / $20 billion). The numerator is fixed but the denominator increases to the extent the insurers' coverage obligations are passed to the Fire Victim Trust.

---

[15] *See Enron Corp. v. The New Power Co. (In re The New Power Co.)*, 438 F.3d 1113, 1117-18 (11th Cir. 2006) (if a "modification materially and adversely changes the way that a claim or interest holder is treated," then "the claim or interest holder is entitled to a new disclosure statement and another vote"); *Downtown Inv. Club III v. Coopersmith (In re Downtown Inv. Club III)*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) (modifications that had the effect of permitting the debtor's general partner to be paid in full, exhausting all assets of the estate, and leaving nothing for unsecured creditors were material and required formal disclosure); *In re Frontier Airlines, Inc.,* 93 B.R. 1014, 1023 (Bankr. D. Colo. 1988) (if the modification adversely affects a creditor in "more than a purely ministerial, de minimis manner," the creditor must have the opportunity to change his or her vote).

23

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

As shown above, if the Trust Agreement is modified to appease the Objectants, the fire victims' recovery from the Fire Victim Trust could be reduced by 22.5% (90% vs. 67.5%), while the insurers' recovery could be increased by 18% (73% vs. 55%). While the Objectants may champion this result, the Plan and Trust Agreement on which fire victims are currently voting forbid it. If the protections set forth in Section 2.6 of the Trust Agreement are removed or altered in a manner that causes a material reduction in fire victim recoveries, a re-vote may be required.

### C.    The Trustee Does Not Have the Unfettered Right to Modify Trust Documents

The Objectants' allegations that the Trust Documents grant the Trustee unfettered discretion are unfounded. Objection at ¶ 48. The Trustee is appointed as the representative of the Debtors' estates, and the Plan empowers the Trustee to make distributions to holders of Fire Victim Claims in accordance with the terms of the Trust. To administer the Trust, the fire victims selected, and this Court approved, uniquely qualified and highly respected professionals to respectively serve as the Trustee and Claims Administrator of the Trust.

Justice Trotter and Ms. Yanni have settled thousands of cases and facilitated the distribution of billions of dollars in settlement funds to claimants. Justice Trotter has been appointed as a Special Master in numerous complex mass tort cases, including *Zyprexa I* and *Zyprexa II MDL*, *Baycol MDL*, *Rezulin MDL*, *Vioxx MDL*, *In re DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation* and *Toyota MDL*, and has served as the Appeal Referee for the MII Mediation Trust in connection with the Metabolife chapter 11 case and as the Claims Resolution Facility Referee for the TL Ephedra Personal Injury Trust in connection with the Twin Labs chapter 11 case. Justice Trotter also formulated the resolution program for the 2007 San Diego fire cases and supervised the resolution of all the victims' claims. Ms. Yanni, who served as the Administrator of the Wildfire Assistance Program, has been appointed as an Appeal Panelist, Administrator, Special Master, or Mediator in numerous cases, including: *In re TK Holdings Inc.*, *In re: National Prescription Opiate Litigation*, *Abilify MDL*, *Medtronic Infuse*, *In re: DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, *Gadolinium Contrast Dyes Product Liability Litigation*, *St. Jude Riata Lead Wire Medical Device Litigation*, *Kelly v. Xoft*,

24

One would think that whatever other issues the Objectants have with the Trust Agreement, they would be delighted with the appointment of Justice Trotter and Ms. Yanni. But no. Using very untoward and regrettable hyperbole, the Objectants go so far as to assert that "without the judicial oversight of this Bankruptcy Court . . . the Fire Victim Claimants [would be] vulnerable to potential mischief" by, for example the Trustee "amend[ing] the Trust Agreement to exclude Claimants over a certain age or based on their political affiliation." Objection at ¶ 48. These and other aspersions against a reputable Justice, who has overseen many large victim trusts and who was selected by the fire victims with the approval of this Court, have no place here.

In addition to these unfounded, *ad hominem* speculations, the Objectants ignore the express checks and balances built into the Trust Agreement and CRP. Oversight of the Trust is provided by a board of directors—the Fire Victim Trust Oversight Committee ("**Trust Oversight Committee**"), drawn from its beneficiaries and other constituents. Trust Agreement at § 6.1. The Plan provides that the members of the Trust Oversight Committee shall be selected and appointed by the Consenting Fire Claimant Professionals and the TCC, both of which represent business and individual Fire Victim Claimants. Plan at § 6.8(e). While the Plan empowers the Trustee to make distributions to holders of Fire Victim Claims and carry out the provisions of the Plan relating thereto, no key decisions could be made exclusively by the Trustee without the consent of the Trust Oversight Committee.[16]

---

[16] Specifically, pursuant to Sections 2.2(f) and 6.2 of the Trust Agreement, the Trustee must obtain the consent of the Trust Oversight Committee in connection with:

    (i)    amending, supplementing, modifying, terminating or extending the term of the Trust in any respect;

    (ii)    amending, supplementing or modifying the Trust Agreement in any respect;

    (iii)    amending, supplementing or modifying the CRP in a manner that materially affects the process or processes for submitting Fire Victim Claims for evaluation under the CRP;

    (iv)    changing the form of the Claimant Release;

25

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

The Objectants express confusion as to whether the Trustee could unilaterally modify the terms of the Trust Agreement. He cannot. The Trust Agreement could not be clearer that the Trust Oversight Committee's consent is required in this regard. The Trustee must also consult with the Trust Oversight Committee regarding the general implementation and administration of the Fire Victim Trust, the CRP and other matters, as may be required from time to time. *See* Trust Agreement at § 2.2(e). Not only is the Fire Victim Trust being administered by highly respected and experienced professionals, but the oversight mechanism of the Fire Victim Trust comprised of the very beneficiaries of the trust assets provides another layer of protection and confirmation of a fair and equitable distribution process.

The Trust Agreement and the CRP are designed to ensure that every fire victim gets the same fair and equitable evaluation of their claims based on available evidence and applicable law. The Trust Agreement grants the Trustee discretion only so far as is necessary to ensure that operation of the Fire Victim Trust is as even-handed and efficient as possible and that key decisions are subject to oversight. The special treatment sought by the Objectants in the form of *de novo* review with unlimited upside and huge transaction costs would disturb the currently designed efficient and unbiased operation of the Fire Victim Trust. Such an open-ended "second chance" at obtaining a larger distribution based on different considerations at the expense of other Fire Victim Claims would destroy the Trust's ability to economically model hold-backs and distributions and would delay the ability of the Trust to make fair distributions to thousands of other deserving fire victims, including hundreds of similarly-situated businesses.

---

(v)     exercising the right to vote for the election of members of the Board of Directors of New Holdco;

(vi)     settling any litigation involving Trust Assets or rights relating to Trust Documents;

(vii)     making Trust expenditures in excess of 120% of the Budget;

(viii)     approving the Trust Budget;

(ix)     determining, in consultation with an Investment Advisor (selected after consultation with the Trust Oversight Committee), whether it is proper to sell, transfer, or exchange Trust Assets.

26

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

1

### D.      The Trust Documents Do Not Permit the Trustee to Hold Adverse Interests

2

    Despite the language of the Trust Agreement, the Objectants contend that the Trustee would

3 be allowed to hold a substantial, non-passive financial interest in, or act as attorney, agent or

4 professional for, one or more of the Fire Victim Claimants. Objection at ¶ 50. The Trust Agreement

5 provides the opposite. Section 5.9 of the Trust Agreement prohibits the Trustee from (i) holding a

6 financial interest in any entity with a financial interest in the Fire Victim Trust; (ii) acting as an

7 attorney or agent for any entity with a financial interest in the Fire Victim Trust; or (iii) serving as

8 any other professional for any entity with a financial interest in the Fire Victim Trust.

9

    The "except" lead-in language to Section 5.9 that the Objectants seek to strike is meant to

10 ensure that to the extent any such conflicts arise, they must be disclosed, including to the Trust

11 Oversight Committee. This section explains that a passive investment held by the Trustee which

12 the Trustee may not even know about (*e.g.*, through an investment in a mutual fund managed by a

13 third-party investment advisor) does not constitute a conflict of interest. To underscore the

14 Trustee's independence, the last sentence of this section makes clear that any violation of this

15 provision is cause for removal of the Trustee. The Objectants' proposed modification to Section 5.9

16 would actually strip the disclosure requirement of potential conflicts of interest by the Trustee.

17

### E.      Setoff and Recoupment Rights Do Not Need to Be Clarified

18

    The Objectants argue that there is an inconsistency in the Plan and the Trust Documents as

19 to who may claim a right to set off and recoup against Fire Victim Claims. Objection at ¶ 52. This

20 argument fails to consider the definition of "Trust Documents" in the Trust Agreement, which

21 includes the Plan. Section 1.4(b) of the Trust Agreement provides "[e]xcept as otherwise provided

22 in the Trust Documents [—*i.e.*, the Plan—], the Trust shall have all defenses, cross-claims, offsets,

23 and recoupments, as well as rights of insurance, indemnification, contribution, subrogation, and

24 similar rights, regarding such claims that the Debtors or Reorganized Debtors have or would have

25 had under applicable law." Section 4.4 of the Trust Agreement provides "the Trustee is entitled to

26 setoff and recoupment to the extent permissible under the Plan." There is no conflict between

27 Sections 1.4(b) and 4.4 of the Trust Agreement and the Plan.

28

Case: 19-30088   Doc# 7159   Filed: 05/12/20   Entered: 05/12/20 13:50:49   Page 34 of 37

**F.**     **The Claimant Release Does Not Need to Be Temporally Limited**

The Objectants further complain that the Claimant Release is too broad. Objection at ¶ 53. Section 1.4(e) of the Trust Agreement provides that holders of Approved Fire Victim Claims will be required to execute a release prior to receiving any distribution from the Fire Victim Trust. The proposed release is substantially similar in form to releases used in other bankruptcy cases involving victim trusts.

The Objectants do not oppose the scope of the release other than as to timing, and the checks and balances provided in the Trust Agreement, including the requirement of Trust Oversight Committee consent with respect to many of the actions taken by the Trustee, safeguards against any released party taking "fundamentally improper actions that adversely affect the Fire Victim Trust and the consideration held for the benefit of the Fire Victim Claimants."

As the Objectants acknowledge, it is likely that more than one distribution will be made to holders of Approved Fire Victim Claims. If the language proposed by the Objectants is added to the release, the Trust would need to have a new release executed every time a distribution is made. This proposition is entirely impractical given the tens of thousands of unique holders of claims within the Fire Victim Trust. The proposed releases are necessary and proper, and the Objectants offer no basis for requiring that the Trustee and other released parties receive a release only with respect to their service to the Fire Victim Trust prior to the initial distribution.

**G.**     **The Objectants Mischaracterize the Provisions on Attorney Liens**

The Objectants claim that the "CRP impermissibly deny Fire Victim Claimants with property damage losses the right to seek reimbursement of their attorneys' fees." Objection at ¶ 55. They cite to the last part of Article IX of the CRP, which states that "[t]he payment of attorney's fees incurred by Claimant . . . is the sole obligation of Claimant. Neither the Trustee nor the Trust is responsible for the payment of any attorney's fees . . . incurred in connection with a Claim." *Id.*

This statement acknowledges only that it is the responsibility of the fire victim to pay any fees due to counsel on account of counsel's representation of a fire victim in connection with a Fire Victim Claim. The Objectants fail to understand that the provision to which they cite was added to ensure that any distribution that is subject to an attorney's lien will be subject to a holdback in

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

the amount of the lien until the Fire Victim Trust receives confirmation that the lien has been satisfied. To the extent that the Objectants mean to complain that the Fire Victim Trust is not taking attorney's fees into account in the determination of the amount in which a Fire Victim Claim is approved, there has not yet been a final determination on that issue.

**H.** **The Trust Documents Establish Proper Standards for Resolving Claims**

Finally, the Objectants argue that the CRP merely obligates the Trustee, the Claims Administrator and the Neutrals to consider, but not follow, applicable law in the process of determining claims. Objection at ¶ 56. The Objectants claim that this is "not due process." *Id.* The Objectants' criticisms reflect a failure to understand the Trust Documents, which do establish standards for adjudicating claims and afford multiple layers of review. *See* CRP at § VII.

The CRP provides that a claimant may seek reconsideration of his or her claim and may submit additional information or documentation in support thereof. *Id.* If the claimant is still not satisfied, he or she may request *de novo* review by a Neutral. *Id.* The *de novo* review process allows a claimant to once again submit additional information or documentation. *Id.* All claim determinations are subject to a final review by the Trustee, who is charged with ensuring that all Fire Victim Claims are treated equally. *Id.* The Trustee has the power to ensure that one Neutral's claim determination is not significantly different than another Neutral's determination of a substantially similar claim. *Id.* With the notable exception of these dissenting creditors, the Trust Agreement and the CRP enjoy widespread support among fire victims because they are fair, equitable, comply with applicable law, and are consistent with procedures adopted in other mass tort bankruptcies.

The Trustee, Claims Administrator and Neutrals plainly have an ethical duty to follow all applicable law in carrying out this process. Justice Trotter has been charged with his level of discretion in similar positions for several other trusts. For example, he served as CRF Appeal Referee for the MII Mediation Trust in connection with the Metabolife chapter 11 case (Case No. 05-06041-PB11, Bankr. S.D. Cal.). And, he similarly served as Claims Resolution Facility Referee in connection with the Twin Labs chapter 11 case and the TL Ephedra Personal Injury

MacConaghy & Barner, PLC
Attorneys at Law
Sonoma, California

29

MacConaghy & Barnier, PLC
Attorneys at Law
Sonoma, California

1  Trust Agreement (Case No. 1:04-md-01598-JSR Bankr. SDNY).  His ability and integrity in

2  executing such duties have never been called into question.

3  **III.**    <u>**CONCLUSION**</u>

4         The Plan and Trust Agreement now under attack create a limited trust which must

5  adequately compensate over 80,000 fire victims.  There is no legal or factual basis to allow the

6  Objectants to dilute the Fire Victim Trust by securing enhanced recoveries for themselves and

7  logarithmically increasing the costs and delays of administration for all concerned.  For the reasons

8  set forth herein, the Objection should be overruled in its entirety.

9   Dated:  May 12, 2020                                    Respectfully submitted,

10                                                                    MacConaghy & Barnier, PLC

11                                                                    By:  _/s/ John H. MacConaghy_
                                                                            John H. MacConaghy

12
                                                                    *Proposed Special Counsel for The Official*
13                                                                 *Committee of Tort Claimants*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30