Steven J. Skikos (SBN 148110)
Gregory T. Skikos (SBN 176531)
Matthew J. Skikos (SBN 269765)
Tarik J. Naber (SBN 255665)
Uzair Saleem (SBN 302620)
**SKIKOS, CRAWFORD, SKIKOS & JOSEPH**

One Sansome Street, Suite 2830
San Francisco, CA 94104
Telephone: 415-546-7300
Facsimile: 415-546-7301
sskikos@skikos.com

701A Fourth Street #209
Santa Rosa, CA 95404
Telephone: 707-757-7610
Facsimile: 415-546-7301

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** <br> **PG&E CORPORATION** <br> -and- <br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br> **Debtors.** <br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ■ Affects both Debtors <br> *All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM) <br><br> Chapter 11 <br> (Lead Case) <br> (Jointly Administered) <br><br> **JOINDER TO THE RESPONSE OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO OBJECTION OF ADVENTIST HEALTH, AT&T, PARADISE ENTITIES AND COMCAST TO TRUST DOCUMENTS** <br><br> Date: May 14, 2020 <br> Time: 10:00 a.m. (Pacific Time) <br> Place: United States Bankruptcy Court <br> Courtroom 17, 16th Floor <br> San Francisco, CA 94102 <br><br> Relates to Dkt. Nos. 7072, 7159 |

Skikos, Crawford, Skikos & Joseph (**"Skikos"**), on behalf of its fire victim claimants, as counsel for a member of the Tort Claimants Committee (**"TCC"**), member of the Consenting Fire Claimant Professionals (**"CFCP"**) and co-liaison in the PG&E state court proceeding, hereby join

the RESPONSE OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO OBJECTION OF ADVENTIST HEALTH, AT&T, PARADISE ENTITIES and COMCAST TO TRUST DOCUMENTS, Dkt. No. 7159, filed on May 12, 2020 and reserve rights to be heard.

## I. RESPONSE

This firm represents over 5,000 individual and business fire victims. We seek the fair resolution and expeditious adjudication of all fire victims' claims, including those of the objectors. We further seek the full restoration of homes, apartments, businesses, and essential services to all the impacted communities as well as fair compensation to all individual fire victims. The Fire Victim Trust Claims Allowance Process (**"Process"**), to which the Objectors address concern, is central to the Debtors' Chapter 11 Plan of Reorganization, dated March 16, 2020 (Dkt. No. 6320) (the **"Plan"**),[1] as it constitutes the agreement reached after months of extensive negotiations among the TCC, the CFCP, the Debtors, the shareholders, the insurers, and the state and federal government. The Process draws from the experiences of the proposed Trustee and Claims Administrator in working with Federal and State Court Judges in resolving national Multi-District Litigations (**"MDL's"**) and California complex panel (**"JCCP"**) cases. The proposed Trustee and Claims Administrator have decades of experience working collaboratively with the Courts to oversee complex mass tort resolutions as well as settlements involving previous wildfires, previous mass tort bankruptcy cases and cases involving PG&E. The Plan here is premised on these collaborative efforts.

The Objections, if sustained, will unravel the efforts among all the parties in this bankruptcy, cause undue delay to the victims and force the Trust to expend unnecessary resources. The Objectors are essentially seeking to have the claims administration allocation done twice, once by the Trustee and then by the Court. Duplicating this process would make budgeting and consistency of results, which are already difficult because of the uncertainties associated with the value of the stock being granted to this settlement, almost impossible. Every claim that the Court grants de novo review could potentially alter the allocation budget for each damage claim category,

---

[1] Capitalized terms used herein but not otherwise defined shall have the meanings given to them in the Plan.

and every claim in that category would have to be re-reviewed to be consistent with appellate decision. The Court would be making these appellate decisions without adequate information and certainly without a complete understanding of the integrated planning work done to ensure that the system is just for all participants. Also, the exit from the Fire Victim Trust (**"FVT"**) to the Bankruptcy Court would require enormous additional administrative costs by the FVT. In turn, the FVT would be forced to litigate these claims and defend the Trustee's award determinations in the Bankruptcy Court. The FVT monies used for these purposes would otherwise be used to compensate victims.

With mediation efforts still ongoing to address specific issues, the Fire Claimants face significant uncertainty regarding how this case will conclude and when settlement distributions will be made. Adding uncertainty and delay to the Process is not the answer. Neither is unraveling the months of negotiations which resulted in an integrated agreement among the Debtors, the subrogation interests, the state and federal governments and the TCC with respect to the Plan and the insurance issues.

## II.  LEGAL ARGUMENTS

The creation of the FVT and the Process are essential elements of the Plan, the agreements with the state and federal governments, and the agreements among the Fire Victims, the insurers, the Debtors, and the shareholders. In each agreement and in the Plan, the parties appropriately delegated the management of the FVT and Claims Administration to the Trustee and Claims Administrator. The allocation and administration of approximately 75,000 individual and business claims appropriately belongs in the FVT.

### A.  The Plan Provides for Trustee Independence Over Allocation and Claims Administration.

The Process constitutes a culmination of many concessions and resolved disputes between the parties in this case. Section 6.7(d) of the Plan titled "The Fire Victim Trust," states: "No parties other than holders of Fire Victim Claims shall have a right, or involvement in, the Fire Victim Claims Resolution Procedures, the Fire Victim Trust Agreement, the administration of the Fire Victims Trust, the selection of a Fire Victim Trustee, settlement fund administrator, claims

administrator, or the Fire Victims Trust Oversight Committee." Section 6.7(d) provides for certain additional important provisions consistent with established practices in MDL and JCCP mass tort cases. Specifically, the Plan provides for a fully integrated and independent system:

- The Fire Victim Claims shall be administered by an FVT and the Fire Victims Trust Oversight Committee independent of the Debtors.

- The Fire Victim Claims shall be administered, allocated and distributed in accordance with applicable ethical rules and subject to adequate informed consent procedures.

- The Fire Victim Trustee shall receive settlement allocations consistent with Rule 1.8(g) of the Model Rules of Professional Conduct. The rules and procedures governing the administration and allocation of the funds from the FVT shall be objectively applied and transparent.

- No party other than holders of Fire Victim Claims, including but not limited to the Debtors, the Reorganized Debtors, and any holders of Claims or Interests other than holders of Fire Victim Claims, shall have any rights to any of the proceeds in the Fire Victim Trust, or any claw back or reversionary interest of any of the consideration (whether Cash or otherwise) allocated to any of the holders of Fire Victim Claims generally or in the total amount funded to the FVT.

**B. The Agreements with the State and Federal Governments.**

The Plan and trust administration procedures are consistent with the settlement agreements with the federal and state government Agencies (**"Agencies"**). The Agencies entered agreements with the Debtors, TCC and CFCP which were documented before this Court (Dkt. No. 6940-1). The Agencies have claims against the FVT as set forth in the agreements. Paragraph 2(g) of the FEMA agreement and 2(e) of the state agreement are substantially identical. Specifically, the Agencies consented to the appointment of the Trustee and the Claims Administrator to the FVT and recognized the importance of the Trust remaining independent from the Court throughout the allocation and claims determination process.

Trust Administration: The agencies "shall have no role in the Fire Victim Trust administration, including, without limitation, the investment or monetization of any assets of the Fire Victim Trust **or any decision relating to the individual and/or aggregate amount of the Fire Claims and punitive and exemplary damages thereon, if any, all of which is under the sole determination of the**

> **Trustee and Claims Administrator, as provided in the Fire Victim Trust Agreement**." (Section 2(g) and 2(e) of FEMA and State agreements, respectively).

There are provisions within the FVT that protect the due process rights of all of the claimants. The Agencies agreed that their rights are the same as the fire victim rights except with respect to their separate consideration under 2.2 (a) and (b).

### C. The Agreement Between the Debtors, Shareholders, TCC, CFCP and Subrogation Interests

Honoring the clear delineation that the Plan has made between Fire Victim Claims and subrogation claims is an essential element of the agreement between the parties. That important distinction was also highlighted in the procedures created for filing individual Proofs of Claim, with fire victims being given a different Proof of Claim (**"POC"**) form from subrogation insurers. By creating separate channels of POC forms, the parties have recognized the need to ensure the two different classes of claims are channeled into their respective funds. In order to exit this bankruptcy proceeding, the Debtors negotiated separate settlement agreements, first with the subrogation claim holders (insurance carriers) and months later with the TCC and CFCP. Those settlements have been outlined separately in the TCC Restructuring Support Agreement (**"TCC RSA"**) and the Subrogation Restructuring Support Agreement (**"Subrogation RSA"**).

Upon the signing of the TCC RSA, one issue remained involving the scope of the release between the fire victims and the insurers, and the integrity of the two independent settlements. The provisions in the Mutual Made Whole Release mirrors the agreement in Section 6.7 of the Plan under subsection (d). These provisions emphasize the protections given to the Trustee in the administration of the FVT, clarifying the autonomous nature of the Process. The administration of the FVT will operate independently from all other parties, including the Debtors and Subrogation Claim Holders. The Debtors and Subrogation Claim Holders have acknowledged this distinction, and that memorialization is a central aspect of the Plan as set forth in paragraph (D) of the agreed Made Whole Release.

> (D). Whereas, the Plan provides that the Fire Victim Claims are administered by a Fire Victim Trust and a Fire Victim Trustee who operates independent from the Debtors, holders of the Fire Subrogation Claims, and the Insurer. Neither the

> Debtors, holders of the Fire Subrogation Claims, nor the Insurer shall have any right to participate in the administration of the Fire Victim Trust, review any allocation or distribution decision of the Trustee or Trust Oversight Committee, including that of the Claimant, or make any claim for money against the Trust or the Trustee in any way or at any time. (Exhibit C to the Plan).

There are two pots from which to make a claim for a loss. The Plan contemplates compensating Fire Victim Claims separately from subrogation claims. These distinctions have been emphasized to prevent any conflation between the two funds available to satisfy the different claims. As such, the plan provides the policy that the insurance companies cannot pass their coverage obligations into the FVT as set forth in section 2.6 of the Trust Agreement.

Provided that the FVT is being compensated partially in PG&E stock, which carries more value risk than cash, it is especially important that the FVT assets are preserved for Fire Victim Claims. The Parties recognized important Provisions of the Made Whole Release that speak to these concerns.

The concern that the liquidation of Fire Victim Claims will completely exhaust the aggregate FVT is set forth in the Made Whole Release at Section H: "Whereas, nothing in this Release is an affirmation, representation, or an acknowledgment that the Claimant has in fact been fully compensated for their damages covered by the contract of insurance between the Insurer and the Claimant. The parties agree that Court's approval of the Plan and the Claimants' acceptance of the Total Allocation Award does not establish that the Claimant has been fully compensated under California law for their compensable damages as a result of the fire to the extent those damages are covered by insurance."

The Made Whole Release ultimately agreed to by the parties addressed insurance coverage issues extracted from the original Subrogation RSA, entered with the Court on September 24, 2019. Page 13 of the original Subrogation RSA contained a section detailing the "Affirmative Covenants of the Debtors." These covenants had to be enforced by PG&E to avoid breach of the Subrogation RSA. Thee affirmative covenants included language that conditioned payments from PG&E to fire victims upon the execution of waivers that could potentially release insurance companies from honoring their coverage obligations to those same fire victims ("Settlement Payment Condition"). The waivers were outlined as follows, "Subject to the terms and conditions

of the RSA, the Debtors shall:

> (iii) upon entry into any settlement with any holder or holders of IP Claims that fixes the amount or terms for satisfaction of an IP Claim, including with respect to rights against a post-Plan Effective Date trust established for the resolution and payment of such Claims, require, **as a condition to payment or other distribution to or for the benefit of such holder pursuant to such settlement or other agreement, that the holder of the IP Claim contemporaneously execute and deliver a release and waiver of any and all claims to the fullest extent permitted by law against all parties in interest in the Chapter 11 Cases, including any potential made-whole claims against present and former holders of Subrogation Claims**, which release shall be in form and substance reasonably acceptable to the Debtors and Requisite Consenting Creditors (as defined below) (the "**Settlement Payment Condition**") (emphasis added)."

This provision states that (1) the Debtors shall require a condition upon fire victims in exchange for any payment or settlement of their claims, and (2) that condition is the fire victim must contemporaneously execute a release and waiver of "any and all claims against all parties in interest…including potential made whole claims against present and former holders of Subrogation claims." The phrase "any and all claims" was specifically addressed in the resolution of the Made Whole Release to not include coverage and claims for bad faith. Section J, paragraph 2 of the Made Whole Release highlights the importance to the FVT that the fire victims preserve all of their coverage and bad faith claims against the insurers.[2]

**D.  De Novo Review**

The Plan presents the best solution to the logistical difficulty of expeditiously adjudicating approximately 75,000 fire claims while providing fair and equitable treatment for all claimants. As set forth above, none of the agreements made between the parties contemplates de novo review of claims in the bankruptcy court. Yet, after months of meet and confers, these

---

[2] The Claimant is not releasing any claims the Claimant may have against the Insurer other than the Claimant's foregoing waiver set forth in Paragraph 1. The Parties to this Releases further agree and acknowledge that the Claimant is not releasing any claims, except and only to the extent set forth above, they might have against the Insurer, including but not limited to those claims or causes of action related to: (1) the policy of insurance and what is still owed or to be paid under the policy terms and conditions; (2) the right to pursue claims already made or to make new or continued claims under the policy; (3) claims handling issues; (4) delay in paying claims under the policy; (5) inadequate or untimely communication relating to the claim; (6) unreasonable positions taken relating to coverage, payment of the claim, acknowledging coverage, or day-today claims decisions; (7) actions or inactions of insurance agents or brokers in underwriting, securing, adjusting, calculating or recommending coverage; (8) coverage issues over policy language; (9) any action for bad faith or breach of the covenant of good faith and fair dealing; (10) any claims to reform or modify the terms of any policy; (12) any rights to recover damages for breach of contract or tort (including punitive damages), penalties or equitable relief; (13) any claims of violations of statutory or regulatory obligations; or (14) any claim for unfair business acts or practices.

Objectors are essentially asking to have the claims administration allocation done twice: once by the Trustee and then again by the bankruptcy Court. Every claim that the Court grants de novo review could potentially alter the allocation budget for each damage claim category, diminishing the monies in the Trust that are available to compensate victims. Additionally, every claim in that category would have to be re-reviewed to be consistent with appellate decision. The court would be making these appellate decisions in an information vacuum, without understanding the integrated planning work done to ensure that the system is just for all participants, not just one group. Adventist, AT&T and Comcast are not the only claims in this case.

The amount of attention paid in this bankruptcy case to the single claim of Adventist has been arguably greater than the specific claims of each of the other 75,000 claimants combined. This is precisely the outcome that the Plan seeks to avoid. Furthermore, an alternative process under which this Court would adjudicate approximately 75,000 Fire Victim Claims would be more expensive, tax the Bankruptcy Court's judicial resources, and ultimately diminish and delay payments to fire victims by many years.

**E.  Trustee Leadership and Oversight Are the Proper and Equitable Solution for the Administration of Approximately 75,000 Unique Claims.**

*1.  Analysis of the Fire Related Proof of Claims—Scope of the Allocation Project*

The North Bay Fires, comprised of 22 major fires across six Northern California counties, commenced on October 8, 2017 and were contained by October 31, 2017. The fires burned 245,000 acres, destroyed 9,000 homes, apartments, businesses, farms, and wineries, and killed 45 people. By October 15, 2017, over 50,000 people had been evacuated or were under evacuation orders in the affected areas. Approximately 28,000 POC forms have been filed by North Bay Fire claimants, and each will require individual evaluation.

Butte County's Camp Fire commenced on November 8, 2018 and was contained on November 25, 2018. The fire burned 153,336 acres, destroyed 18,793 homes, apartments, businesses, and farms, and killed 85 people.[3] Within hours of the fire's ignition, the communities of Paradise and Magalia were nearly destroyed. The Camp Fire resulted in long term

---

[3] *Camp Fire*, California Department of Forestry & Fire Prevention, (Sept. 18, 2019), https://www.fire.ca.gov/incidents/2018/11/8/camp-fire/.

displacement of tens of thousands of people and the complete destruction of hundreds of essential businesses and entities. Approximately 50,000 POC forms have been filed by Camp Fire claimants, and each will require individual evaluation.

The Claims Resolution Procedures (**"Procedures"**) incorporated into the Trust administration procedures were developed to resolve approximately 75,000 Fire Victim Claims relating to fires caused by PG&E's negligence. The Fire Victim Claims include approximately 13,000 commercial claims, of which thousands are for pure commercial loss such a lost profits, lost inventory and commercial property damage, like the claims asserted by the Objectors. Each fire claim could include as many as 25 different economic and non-economic damage categories, implicating dozens of California Code provisions and Judicial Council of California Civil Jury Instructions sections, as well as a vast body of California case law addressing the validity and valuation of each damage category. The Procedures reflect an analysis of California statutory and case law. They also take into account input from dozens of professionals who in the past have evaluated wildfire related damage claims, analyzed significant commercial damage claims, or who have successfully implemented mass tort settlements, both in and out of the bankruptcy context.

The Procedures are intended to provide a uniform and equitable method to compensate individual and commercial fire victims and to enable the Trustee to create and adhere to budgets that will ensure all victims are compensated as expeditiously as possible. To do as the Objectors suggest and create a secondary method for evaluating certain Fire Victim Claims would not only invite further requests for exceptions, it would also inject a level of uncertainty into the Process that could potentially render it unworkable.

Balance must be given throughout this process to the consideration of the emotional and financial stress the fire victims have and continue to live with. This consideration must be connected to a settlement administration process that is objective, transparent, independent, consistent, rigorous, open, inclusive, and fair.

Consistent with other mass tort cases, the Plan provides for the FVT procedures process that resolves claims in a fair and cost-effective manner, without overwhelming the Bankruptcy Court post confirmation.

Case: 19-30088   Doc# 7167   Filed: 05/13/20   Entered: 05/13/20 10:47:52   Page 9 of 11

- 9 -

### 2. The Trust and Claims Administration Procedures for this Case Were Developed to Be Consistent with Successful Mass Tort Precedent and Experience, Including Mass Tort Bankruptcies, and Previous Wild-Fire Settlement Allocations.

Mass tort cases usually involve thousands of claimants who have a shared tort claim against one or more defendants. If an aggregate settlement is achieved in the mass tort context, the appointment of qualified trustees or special masters and the building of an extensive and neutral claims resolution facility is paramount to that settlement. The volume and serious nature of the claims, coupled with the need for a principled claim evaluation process, justify the employment of experienced experts to establish a process of claims resolution.

Justice John Trotter and Cathy Yanni, Esq. were officially appointed by the bankruptcy court on April 14, 2020, to fill the roles of Trustee and Claims Administrator to the FVT. Justice Trotter joined JAMS in 1987 after retiring from the California Court of Appeal. In his tenure at JAMS, Justice Trotter served as a Special Master in several MDL Pharmaceutical matters, including Zyprexa I, Zyprexa II, Baycol, Rezulin, Vioxx, the Toyota Sudden Acceleration case, among many other complex cases venued in Federal and State court. Germane to the PG&E FVT appointment, Justice Trotter oversaw the resolution of claims related to the 2007 San Diego fire cases and the PG&E Hinkley ground water contamination case. Justice Trotter has now retired from JAMS.

Cathy Yanni has served as a Special Master and/or mediator in several mass tort cases, including the National Prescription Opiate Litigation, Abilify, Medtronic InFuse, Depuy ASR Hip Implant Products, Gadolinium Contrast Dyes Products, PPA, Baycol, and Zyprexa I and II. Ms. Yanni specializes in claims resolution and administration. Most recently, she was appointed by the bankruptcy court to oversee the Wildfire Assistance Program. Through this appointment, she has directed the administration and distribution of nearly $100 million in emergency cash funds based on over 18,000 claims. The processing of payments was achieved in 8 months. Neither Justice Trotter nor Cathy Yanni have been the subject of a judicial review, despite being involved in the resolution and administration of tens of thousands of claims.

To compliment and support Justice Trotter and Cathy Yanni's leadership overseeing the Trust and Claims Administration process, BrownGreer has also been appointed as the Claims Processor that will build out the claims resolution facility and assist the neutrals in the processing of thousands of anticipated claims. BrownGreer is qualified to oversee this process, having administered dozens of mass tort cases, including Chinese Drywall, Vioxx, Deep Water Horizon, and the NFL Concussion settlements.

### F. Material Alteration of the Plan

The changes proposed by these Objectors go far beyond a superficial modification that would result in a creditor to being "likely to reconsider" acceptance of the Plan. The creation of the FVT and the Process are essential elements of the Plan. Fundamental to the many complicated and intricate features of the agreements between the TCC and the other parties in this case is the process by which 75,000 Fire Victim Creditor Claims will be allocated within the FVT.

### III. CONCLUSION

For the reasons set forth above, the objection should be overruled in its entirety.

Dated: May 13, 2020

By: /s/ Steven J. Skikos
Steven J. Skikos (SBN 148110)
Skikos, Crawford, Skikos & Joseph, LLP
1 Sansome Street, Suite 2830
San Francisco, California 94104
Tel: 415.546.7300
Fax: 415.546-7301