1  MARK GORTON (SBN 99312)
   **BOUTIN JONES INC.**
2  555 Capitol Mall, Fifteenth Floor
   Sacramento, CA 95814
3  Telephone: (916) 321-4444
   Email: mgorton@boutinjones.com
4

5  LISA S. GAST *(pro hac vice)*
   **DUNCAN, WEINBERG, GENZER & PEMBROKE, P.C.**
6  1667 K Street NW, Suite 700
   Washington, DC 20006
7  Telephone: (202) 791-3601
   Email: lsg@dwgp.com
8

9  BRIAN DOYLE (SBN 112923)
   City Attorney
10 **CITY OF SANTA CLARA**
   1500 Warburton Avenue
11 Santa Clara, CA  95050
   (508) 615-2234
12 BDoyle@SantaClaraCA.gov
13

14 *Attorney for Creditor and Party-in-Interest*
   *CITY OF SANTA CLARA dba SILICON VALLEY POWER*

15            UNITED STATES BANKRUPTCY COURT

16            NORTHERN DISTRICT OF CALIFORNIA

17               SAN FRANCISCO DIVISION

18 | In re | ) | Case Nos. 19-30088 DM (Lead Case) |
   |       | ) |             19-30089 DM |
19 | PG&E CORPORATION | ) | |
   | -and- | ) | Chapter 11 |
20 | PACIFIC GAS AND ELECTRIC | ) | Jointly Administered |
   | COMPANY, | ) | |
21 |                         Debtors. | ) | **OBJECTION TO CURE AMOUNT AND** |
   |       | ) | **REQUEST FOR ADEQUATE ASSURANCE** |
22 | ☐ Affects PG&E Corporation | ) | **OF FUTURE PERFORMANCE BY** |
   |       | ) | **COUNTERPARTY CITY OF SANTA** |
23 | ☐ Affects Pacific Gas and Electric Company | ) | **CLARA DBA SILICON VALLEY POWER** |
   |       | ) | |
24 | ☒ Affects both Debtors. | ) | Date:        May 27, 2020 |
   |       | ) | Time:        10:00 a.m. |
25 | * All papers shall be filed in the Lead Case | ) | Courtroom:   17 |
   | No. 19-30088 DM | ) | Place:       450 Golden Gate Ave., 16th Floor |
26 |       | ) |                San Francisco, CA 94102 |
   |       | ) | Judge:       Hon. Dennis Montali |
27

28

# TABLE OF CONTENTS

**Page**

I.      Summary of Argument and Impact on Claims .......................................................... 1

II.     Procedural Posture ................................................................................................ 3

III.    The Subject of Santa Clara's Objection to Cure Notice:   The GDMSA ................... 4

IV.     PG&E Recklessly Caused the Camp Fire ................................................................. 6

V.      PG&E Having Recklessly Caused the Camp Fire, and the Resultant De-Energization of the Caribou-Palermo Line, Renders PG&E Unable to Fulfill Its Obligations Under the GDMSA ............................................................................................................. 8

VI.     PG&E's Breach of the GDMSA and Resultant Default ............................................. 8

VII.    Santa Clara's Damages Resulting from PG&E's Breach and Default of the GDMSA .......... 10

VIII.   PG&E Should Be Required to Cure the Actual Known Damage ........................................ 16

IX.     PG&E Should Be Required to Provide Adequate Assurance of Future Performance for the Forecasted Future Damages and the Cost of Re-establishing an Interconnection to the Electric Grid ................................................................................................. 16

X.      No Unilateral Modification as Condition of Assumption ..................................................... 16

XI.     Request for Relief .................................................................................................. 21

# TABLE OF AUTHORITIES

**Page**

**Cases**

*City of Covington v. Covington Landing Ltd. P'ship*,
   71 F.3d 1221 (6th Cir. 1995) ................................................................................... 17

*In re Airlift Int'l*,
   761 F.2d 1503 (11th Cir. 1985) ................................................................................ 17

*In re Castellino Villas*,
   836 F.3d 1028 (9th Cir. 2016) ..................................................................................... 8

*In re Castellino Villas, A. K. F. LLC*,
   836 F.3d 1028 (9th Cir. 2016) ........................................................................... 18, 19

*In re David Orgell, Inc.*,
   117 B.R. 574 (Bankr. C.D. Cal. 1990) ..................................................................... 17

*In re De Laurentiis Ent. Group, Inc.*,
   963 F.2d 1269 (9th Cir. 1992) .................................................................................. 19

*In re Frontier Properties*,
   979 F.2d 1358 (9th Cir. 1992) .................................................................................. 17

*In re Gould*,
   401 B.R. 415 (B.A.P. 9th Cir. 2009), aff'd, 603 F.3d 1100 (9th Cir. 2010) ............. 19

*In re Jensen*,
   995 F.2d 925 (9th Cir. 1993) ............................................................................. 18, 19

*In re Luongo*,
   259 F.3d 323 (5th Cir. 2001) .................................................................................... 19

*In re Nat'l Gypsum Co.*,
   208 F.3d 498 (5th Cir. 2000) .................................................................................... 17

*In re Plitt Amusement Co. of Washington, Inc.*,
   233 B.R. 837 (Bankr. C.D. Cal. 1999) ..................................................................... 17

*In re SCCC Assocs. II Ltd. Partnership*,
   158 B.R. 1004 (Bankr. N.D. Cal. 1993) ................................................................... 17

*In re Stonewall F.*,
   208 Cal.App.3d 1054 (1989) ...................................................................................... 7

*In re Trigg*,
   630 F.2d 1370 (10th Cir. 1980) ................................................................................ 17

*Matter of Steelship Corp.,*
   576 F.2d 128 (8th Cir. 1978) ......................................................................................... 17

*N.L.R.B. v. Bildisco & Bildisco,*
   465 U.S. 513 (1984)......................................................................................................... 17

*Oasis West Realty, LLC v. Goldman,*
   51 Cal.4th 811, 821 (2011) citing *Reichert v. General Ins. Co.*, 68 Cal.2d 822 (1968)................... 9

*See In re Conseco, Inc.,*
   301 B.R. 525 (Bankr. N.D. Ill. 2003) ........................................................................... 19

**Statutes**

11 U.S.C.
   Section 365(b)(1) ....................................................................................................... 8, 17
   Section 365(b)(1)(A) ...................................................................................................... 16
   Section 365(b)(1)(C) ...................................................................................................... 16
   Section 1129(a)(1) .......................................................................................................... 20
   Section 1141(d)(1)(A) ............................................................................................... 18, 19
   Sections 101 et seq......................................................................................................... 3

California Penal Code
   Section 450(f) ................................................................................................................. 6
   Section 452 ..................................................................................................................... 6

The City of Santa Clara dba Silicon Valley Power ("Santa Clara")[1] hereby objects to the cure amount set forth in the *Schedule of Executory Contracts etc. and Proposed Cure Amounts* (the "Cure Notice," Dkt. 7037) and seeks adequate assurance of future performance ("Cure Objection") with regard to the Grizzly Development and Mokelumne Settlement Agreement ("GDMSA"). This Cure Objection is supported by the Declaration of Steve Hance ("Hance Dec."), the Request for Judicial Notice ("RJN") and the Exhibits, all submitted herewith, and the pleadings, filings and documents in the Debtors' cases. The undersigned may be contacted concerning resolution of this Cure Objection. In support of its Cure Objection, Santa Clara respectfully represents as follows:

## I.    SUMMARY OF ARGUMENT AND IMPACT ON CLAIMS

1.    This Cure Objection relates to PG&E's proposed assumption of the GDMSA. Under the GDMSA, Santa Clara financed and owns the Grizzly Hydroelectric Project ("Grizzly") which generates electric power for delivery to Santa Clara. The GDMSA provides for all electric power generated by Grizzly ("Grizzly output") to be delivered by Santa Clara to PG&E's electric system at the interconnection between Grizzly and PG&E's electric system, and for PG&E in turn to deliver an equivalent amount of energy to the Santa Clara's receiving stations for Santa Clara's use in serving its customers. The interconnection between Grizzly and PG&E's electric system is on the Caribou-Palermo Line, the very line that sparked the Camp Fire on November 8, 2018, which PG&E has permanently de-energized. PG&E admits it recklessly caused the Camp Fire. As a result, Grizzly output is undeliverable by PG&E to the electric transmission grid for transmission to, and use by, Santa Clara and its customers, in breach and default of the GDMSA by PG&E.

2.    Santa Clara submits that as conditions of assumption,

      a.    Santa Clara's *actual* known loss of the economic value of Grizzly output arising from PG&E's breach of the GDMSA must be cured. That amount from November 8, 2018 through April 28, 2020 is $9,817,169.77, which should be paid by the Debtors;

      b.    Santa Clara's *future (projected)* loss of the economic value of Grizzly output

---

[1] Silicon Valley Power is a municipal electric utility, operated as a department of the City of Santa Clara, California.

arising from PG&E's breach of the GDMSA must also be compensated and provided for as adequate assurance of future performance. The forecasted future loss of economic value of Grizzly output, from April 28, 2020 until the date PG&E is able to resume delivering Grizzly energy to Santa Clara, curing the breach and default of the GDMSA (assuming that the re-establishment of an interconnection of Grizzly to the electric transmission grid is completed at the end of December 2021) is $10,232,162.88, which should be paid subject to a true-up adjustment as actual amounts, and the date deliveries of Grizzly energy can resume and the breach cured, are known;

c. The re-establishment of an interconnection of Grizzly to the electric transmission grid, enabling PG&E to resume delivering Grizzly output to Santa Clara, curing the breach and default of the GDMSA, must also be provided for as adequate assurance of future performance. The forecasted cost of re-establishing an interconnection of Grizzly to the electric transmission grid is $5,000,000.00, and either (x) PG&E should be required to pay the forecasted cost subject to true-up adjustment as actual amounts are known; or (y) PG&E should formally commit to assuming the cost responsibility for the re-establishment of an interconnection and energization of Grizzly to the electric transmission grid; and

d. The GDMSA must be assumed in full without unilateral modification by PG&E in the Plan (defined in paragraph 5, *infra*), the Cure Notice or otherwise.

3. The GDMSA is included in Santa Clara's general unsecured claim (Claim No. 64691). Santa Clara also filed a Fire Claim (Claim No. 60676) but the Fire Claim will be withdrawn if the GDMSA is assumed and the foregoing conditions satisfied.[2]

---

[2] Santa Clara filed the Fire Claim out of an abundance of caution due to the expansive description of such claims—"any claim . . . related to or in any way arising from the fires that occurred in Northern California prior to the Petition Date . . . ." (*See Order Establishing Deadline for Filing Proofs of Claim*, Dkt. 2806, p. 4 n. 2.)

Santa Clara has no interest in diminishing the proceeds of the Fire Trust available to the fire victims who had no contractual relationship with PG&E (other than as customers) but the City believed it had to assert the Fire Claim to protect its rights. The cure and assurance of Santa Clara's loss of

## II.    PROCEDURAL POSTURE

4.    PG&E Corporation ("PG&E Corp.") and Pacific Gas and Electric Company ("PG&E") (collectively, "Debtors") filed voluntary petitions for reorganization under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in this court (the "Court") on January 29, 2019 (the "Petition Date").

5.    In connection with the confirmation proceedings concerning the proposed Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization (Dkt. 6320, together all exhibits, schedules and supplements, the "Plan"), the Court issued a scheduling order (Dkt. Nos. 5732), setting May 1, 2020 as the deadline for Debtors to file their Plan Supplement, which includes the Cure Notice. The deadline for Objections to the Cure Notice is May 15, 2020.

6.    The Debtors filed and served their Cure Notice on May 1, 2020 (Dkt. 7037), which identified the GDMSA as an executory contract that the Debtors are assuming, but identified no cure amount due to the City. (*See* Cure Notice, Dkt. 7037 at pp. 335.)

7.    Santa Clara objects and disputes that no cure amount is required by Debtors to assume the GDMSA.[3] As explained below, PG&E is in breach and default of the GDMSA and, as a result: (a) Santa Clara has suffered an *actual* loss of Grizzly output from PG&E's inability to deliver that must be cured, (b) Santa Clara will suffer a *future* loss of Grizzly output until PG&E can resume delivery, which must be cured, and for which PG&E must provide adequate assurance of future performance, and (c) the interconnection of Grizzly to the electric transmission grid must be re-established so that PG&E can resume delivery of the Grizzly output, the costs of which must be cured and for which PG&E must provide adequate assurance of future performance. Finally, PG&E

Grizzly output by PG&E in connection with assumption of the GDMSA will result in withdrawal of the City's Fire Claim. This position is specifically set forth in the City's amendments to its general unsecured claim and its Fire Claim, filed April 30, 2020.

[3] Santa Clara notes that PG&E's decision to assume the GDMSA is prudent, despite the magnitude of the cure and adequate assurance obligations, because rejection of the GDMSA would result in a much larger general unsecured claim that would include not only the GDMSA cure and performance assurance obligations, but would also cause Grizzly to revert to PG&E, triggering the "Reverter Reimbursement," currently estimated to be in excess of $60 million. (*See* GDMSA Section 12.4, which describes the "intent of the Parties that Santa Clara be made whole and reimbursed by PG&E for the fair market value of Grizzly upon . . . the reversion of Grizzly to PG&E.")

must assume the GDMSA without unilateral modification by PG&E in the Plan.

### III.  THE SUBJECT OF SANTA CLARA'S OBJECTION TO CURE NOTICE: THE GDMSA

8.  The GDMSA is an executory contract, listed as being assumed by the Debtors, between Pacific Gas and Electric Company and the City of Santa Clara, entered into on March 8, 1990, and most recently filed by PG&E at the Federal Energy Regulatory Commission ("FERC") as a stand-alone agreement in FERC Docket No. ER17-1752-000, effective August 1, 2017.[4] (Hance Dec. para. 9, RJN **Exhibit 1**.)

9.  Under the terms of the GDMSA, Santa Clara is the owner[5] of the hydroelectric facility known as Grizzly, located in Plumas County, California, and which is a part of the Bucks Creek Project, FERC No. 619. (*See* GDMSA Sections 2.1 and 1.1.33.) Grizzly includes, but is not limited to, the Grizzly (hydroelectric) powerhouse, the powerhouse's electric switchyard and a short 115 kV generation tie-line ("Grizzly Transmission Line"). (*See* GDMSA Sections 1.1.33(d) and (f).)

10.  The GDMSA provides that during the Ownership Period, Santa Clara will own and receive all energy generated by Grizzly, less transmission losses. (*See* GDMSA Section 2.4.2.; Hance Dec. para. 14.)

11.  Critical to this Cure Objection, the GDMSA also provides that the energy generated by Grizzly is delivered to Santa Clara by PG&E, and describes the contractual transfer of the energy

---

[4] The GDMSA was entered into by PG&E and Santa Clara as a settlement of certain issues between the two, pursuant to which Santa Clara would become a joint licensee in an existing hydroelectric license (the "Bucks Creek Project," FERC Project No. 619), which had been amended by FERC to give PG&E permission to construct and operate a facility to be known as the Grizzly Powerhouse Development; under the GDMSA, Santa Clara would finance and own the Grizzly Powerhouse Development in conjunction with the Bucks Creek Project. (*See* GDMSA Recitals C-E; Hance Dec. paras. 9-10.)

[5] Under the GDMSA, Santa Clara owns 100% of the Grizzly Hydroelectric Project during the "Ownership Period." (*See* GDMSA Section 2.1) The Ownership Period is defined as ending upon the first of (1) the occurrence of the Reverter Date; (2) development of Grizzly is terminated; or (3) abandonment of the project by Santa Clara or condemnation. (*See* GDMSA at 1.1.47; Hance Dec. para. 11.) The Reverter Date is the date on which Santa Clara's interest in Grizzly terminates and reverts to PG&E. (See GDMSA at Section 1.1.59; Hance Dec. paras. 11-12.) The Reversion Dates are very complicated, but the first possible Reverter Date is November 18, 2027. (*See* GDMSA at 12.3 and *Public Utilities With Existing Contracts in the California Independent System Operator Corporation Region*, 112 FERC ¶61,007 at paras. 52-53 (2005), RJN **Exhibit 3**.)

generated by Grizzly to PG&E's transmission system at what is now known as the Caribou-Palermo Line. Specifically, the GDMSA provides that Santa Clara delivers (using the Grizzly Transmission Line) "all electric power generated at Grizzly" to PG&E at the "interconnection of the PG&E-owned span of the Grizzly Transmission Line at the disconnect switch located on the Grizzly transmission line end structure near PG&E's Caribou-Sycamore Creek transmission line" (which is now known as the Caribou-Palermo Line). (*See* GDMSA Section 9.1.2; Hance Dec. para. 15; *see also* PG&E/Santa Clara Final License Application for Bucks Creek Hydroelectric Project, FERC Project No. 619, at Volume I, Exhibit A, Pages A-19, A-20 (filed Dec. 12, 2016), which can be found at http://www.bucksrelicensing.com/Public/default.aspx., RJN **Exhibit 2**.) Importantly, the GDMSA then provides that PG&E delivers the energy and capacity to Santa Clara at certain Santa Clara Receiving Stations or other Points of Delivery specified by Santa Clara. (*See* GDMSA Section 9.1.1, Hance Dec. para. 15.) The Receiving Stations and Points of Delivery include the points of interconnection between PG&E and Santa Clara, where Santa Clara receives power for its retail customers. (*See* GDMSA Sections 1.1.58 and 1.1.51.) The Caribou-Palermo Line is the sole interconnection of the Grizzly Transmission Line to PG&E's transmission system, and without it, energy produced by Grizzly cannot be scheduled and delivered to Santa Clara,[6] and renders Grizzly inoperable by Santa Clara.[7] (Hance Dec. para. 20.)

12. The GDMSA also obligates PG&E to "endeavor to maintain continuity of service to Santa Clara and to take all reasonable steps to schedule and deliver [Grizzly energy] to Santa Clara under this Agreement." (*See* GDMSA Section 9.3.1., Hance Dec. para. 16.)

---

[6] Grizzly was designed and constructed to deliver power (using the Grizzly Transmission Line) to the electric transmission grid at 115 kV. While there are PG&E 230 kV transmission lines in the immediate geographic vicinity of Grizzly, an interconnection to any of these lines would require planning, engineering, permitting, construction and, at a minimum, a 115 kV to 230 kV step-up transformer and associated facilities to be installed by PG&E. (Hance Dec. para. 22.)

[7] Grizzly is minimally operable for PG&E's benefit. PG&E has the right, under GDMSA Section 8.2.1, to use Grizzly for reactive power, which allows Grizzly to serve as a synchronous condenser for PG&E's use. Specifically, by using Grizzly for reactive power, Grizzly is capable of supporting voltage in Grizzly's immediate geographic vicinity through a low-voltage station service connection, lowering transmission and distribution system losses and providing reliability to PG&E's customers. Such use of Grizzly by PG&E does not in any way serve to reduce Santa Clara's monetary damages, and this low-voltage station service connection is not a means by which PG&E can deliver energy produced by Grizzly to Santa Clara. (Hance Dec. para. 24.)

## IV. PG&E RECKLESSLY CAUSED THE CAMP FIRE

13. On November 8, 2018, PG&E's Caribou-Palermo Line, the transmission line necessary to transmit the energy generated by Grizzly to the electric transmission grid, sparked the Camp Fire in Butte County, the deadliest wildfire in California history, burning a total of 153,336 acres, destroying 18,804 structures and resulting in 85 fatalities. (*See* Cal Fire News Release, "Cal Fire Investigators Determine Cause of Camp Fire," May 15, 2019 (determining cause of Camp Fire to be PG&E transmission facility), RJN **Exhibit 4**; PG&E December 11, 2018 Supplement to the CPUC regarding Electric Incident Report Nos. EI181108A and EI181108B (clarifying that the PG&E transmission line CAL FIRE identified as the cause of the fire was the Caribou-Palermo Line), RJN **Exhibit 5**; PG&E Response to Request for Information, Response to Paragraph 12, pp. 14:13-17, *United States of America v. Pacific Gas and Electric Company*, Case 3:14-cr-00175-WHA, Docket 1078 (N.D.Cal., filed July 31, 2019), RJN **Exhibit 6**.)

14. PG&E's role in the Camp Fire was not merely as the owner of the equipment that caused the fire—PG&E has been indicted and will plead guilty to one count of Unlawfully Causing a Fire (along with 84 counts of involuntary manslaughter) with respect to its role in the Camp Fire. In the plea agreement, PG&E acknowledges there exists a sufficient factual basis for the Butte County Superior Court to accept the guilty plea to the charges. (*See Butte County Agreement Motion*, Dkt. 6413 at p. 12:21-24.) The settlement represented by the plea agreement has been approved by the Bankruptcy Court. (*See Order etc. Approving Debtors' Agreement and Settlement with People of the State of California*, Dkt. 6785.) PG&E's agreement that sufficient factual basis exists to support the guilty plea to unlawfully causing a fire, is an admission that PG&E recklessly caused the 2018 Camp Fire based upon applicable California law.

    a. California Penal Code Section 452 states: "A person is guilty of unlawfully causing a fire when he *recklessly* sets fire to or burns or causes to be burned, any structure, forest land or property." Emphasis added.

    b. California Penal Code Section 450(f) states: "'Recklessly' means a person is aware of and consciously disregards a substantial and unjustifiable risk that his or her act will set fire to, burn, or cause to burn a structure, forest land, or property.

The risk shall be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation. A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts recklessly with respect thereto."

    c.  The CALCRIM jury instruction (CALCRIM is the official Judicial Council of California approved criminal jury instructions) for "recklessly" states: "A person acts recklessly when (1) he or she is aware that his or her actions present a substantial and unjustifiable risk of causing a fire; (2) he or she ignores that risk; and (3) ignoring the risk is a gross deviation from what a reasonable person would have done in the same situation." CALCRIM No. 1532; *In re Stonewall F.*, 208 Cal.App.3d 1054 (1989).

It logically follows that PG&E is admitting that its actions were reckless by pleading guilty to Unlawfully Causing a Fire with respect to its Caribou-Palermo Line causing the Camp Fire, and by acknowledging the existence of facts to support the plea.[8]

/ / /

/ / /

---

[8] PG&E's record of equipment maintenance failure is well established. The extent of PG&E's safety failures have been recently summarized by District Judge William Alsup:

> A fundamental concern in this criminal probation remains the fact that Pacific Gas & Electric Company, though the single largest privately-owned utility in America, *cannot safely deliver power to California. This failure is upon us because for years, in order to enlarge dividends, bonuses, and political contributions, PG&E cheated on maintenance of its grid* — to the point that the grid became unsafe to operate during our annual high winds, so unsafe that the grid itself failed and ignited many catastrophic wildfires. In the past three years alone, PG&E wildfires killed at least 108 and burned 22,049 structures. It will take years, now, for PG&E to catch up on maintenance so that the grid can safely supply power at all times. The conditions of probation herein have been aimed at requiring PG&E to do so. It's evident, however, that more is necessary.

Order Modifying Conditions of Probation, p. 1, *United States of America v. Pacific Gas and Electric Company*, Case 3:14-cr-00175-WHA, Docket 1186 (N.D.Cal., filed April 29, 2020) (emphasis added), RJN **Exhibit 7**.

## V. PG&E HAVING RECKLESSLY CAUSED THE CAMP FIRE, AND THE RESULTANT DE-ENERGIZATION OF THE CARIBOU-PALERMO LINE, RENDERS PG&E UNABLE TO FULFILL ITS OBLIGATIONS UNDER THE GDMSA

15.     As explained above, the GDMSA provides that energy generated by Grizzly is delivered to PG&E by Santa Clara (using the Grizzly Transmission Line) at the interconnection of the Grizzly Transmission Line and the Caribou-Palermo Line, and then PG&E is obligated to deliver the energy to Santa Clara at Santa Clara's Receiving Stations or other Points of Delivery. (GDMSA at Sections 9.1.2, 9.1.1, 1.1.58 and 1.1.51.)

16.     The de-energization of the Caribou-Palermo Line (resulting from PG&E having recklessly caused the Camp Fire) renders Grizzly output undeliverable to the electric transmission grid, and PG&E unable to fulfill its obligation to deliver Grizzly energy to Santa Clara pursuant to the GDMSA Section 9. (Hance Dec. para. 21.) This de-energization of the Caribou-Palermo Line is now permanent, as unilaterally decided by PG&E. (*See* PG&E Response to Request for Information, Response to Paragraph 17, pp. 17:10-21, *United States of America v. Pacific Gas and Electric Company*, Case 3:14-cr-00175-WHA, Docket 1078 (N.D.Cal., filed July 31, 2019).) Since the Caribou-Palermo Line was the sole means of transmitting energy generated by Grizzly for use by Santa Clara, its de-energization (first by PG&E recklessly causing the Camp Fire, and then permanently by the unilateral decision of PG&E) renders PG&E unable to fulfill its obligation under the GDMSA to deliver Grizzly energy to Santa Clara (*See* GDMSA Sections 9.1.1 and 9.3.1), until a new means of re-establishing the interconnection can be planned, constructed and energized. (Hance Dec. para 22.)

## VI.     PG&E'S BREACH OF THE GDMSA AND RESULTANT DEFAULT

17.     Section 365 of the Bankruptcy Code provides that a trustee (or debtor in possession pursuant to Section 1107) may assume an executory contract in default provided the default is cured, the counterparty is compensated for actual pecuniary loss and adequate assurance of future performance is provided. *See* 11 U.S.C. § 365(b)(1).

18.     Traditional common law and statutory and regulatory theories determine the existence of a right to payment in bankruptcy cases. *See In re Castellino Villas*, 836 F.3d 1028, 1034 (9th Cir. 2016). The GDMSA provides for the parties to be governed by the laws of the State of California or

the United States, as applicable. (*See* GDMSA Section 21.4.) A claim for breach of contract under California law requires proof of the following elements: (1) the existence of a contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff. *See Oasis West Realty, LLC v. Goldman,* 51 Cal.4th 811, 821 (2011) citing *Reichert v. General Ins. Co.*, 68 Cal.2d 822, 830 (1968).

19.    The elements required to prove a claim for breach of contract have been met by Santa Clara.

  a.    *Contract*. The GDMSA is a contract. As noted above, the GDMSA is identified as item 2.7347 in PG&E's Schedule G Executory Contracts and Unexpired Leases filed March 14, 2019 as Dkt. 907-1.

  b.    *Performance by Santa Clara*. Santa Clara has performed its obligations under the GDMSA; there has been no claim by PG&E to the contrary.

  c.    *Breach by PG&E*. PG&E has breached the GDMSA. As explained above, pursuant to GDMSA Sections 9.1 and 9.3, PG&E is required to deliver the energy and capacity produced by Grizzly to Santa Clara at Santa Clara's Receiving Stations or other Points of Delivery. PG&E failed (and continues to fail) to deliver the energy capable of being produced by Grizzly, contrary to GDMSA Sections 9.1 and 9.3. PG&E is unable to fulfill this material provision of the GDMSA, to deliver the energy capable of being produced by Grizzly to Santa Clara, because the sole interconnection of Grizzly to PG&E's transmission system, the Caribou-Palermo Line, was destroyed in the Camp Fire recklessly caused by PG&E's failure to comply with Prudent Utility Practice in maintaining it, and PG&E's affirmative decision to permanently de-energize the line. Section 9.3 of the GDMSA also requires PG&E to endeavor to maintain continuity of service and take all reasonable steps to schedule and deliver Grizzly Power to Santa Clara. PG&E has failed to do so, and continues to fail, by not developing and implementing an alternative solution. PG&E's failure to deliver the capacity and energy capable of being produced by Grizzly to Santa

Clara constitutes a failure of a material obligation of the GDMSA. The GDMSA provides that "Default" means "the failure of any Party to make payment or perform any material obligation in the time and manner provided by [the GDMSA]" (GDMSA Section 17), which renders the failure to deliver a Default under the GDMSA and a breach of the GDMSA contract.

    d. *Damages.* Santa Clara's damages arising from PG&E's breach of the GDMSA are detailed below.

20. The GDMSA does not excuse PG&E's failure to deliver the capacity and energy capable of being produced by Grizzly to Santa Clara. The GDMSA does permit PG&E to: "temporarily interrupt or reduce any service under [the GDMSA], if PG&E determines that it would be prevented from delivering at the Points of Delivery" under certain conditions, including "when the operation of PG&E's electric system is suspended, interrupted or interfered with as a result of forces or circumstances over which PG&E has no reasonable control, including, but not limited to, those identified in Section 20.2 [Force Majeure]." (GDMSA Section 9.3.3(d).) However, the failure to deliver and the interruption of service arose from circumstances over which PG&E absolutely had control. (Hance Dec. para. 27.)

21. PG&E has effectively conceded the point by its plea agreement to plead guilty to unlawfully causing the Camp Fire and to acknowledge that a sufficient factual basis exists to support the guilty plea. *See* paras. 13-14, *supra*.

22. PG&E's inability to perform its obligation to deliver Grizzly energy to Santa Clara because it recklessly caused the Camp Fire is certainly not excused under Section 9.3.3(d) of the GDMSA. The excuse of Section 9.3.3(d) only applies to relieve PG&E of this obligation when the suspension or interruption of service results from circumstances *not* under PG&E's control.

## VII.   SANTA CLARA'S DAMAGES RESULTING FROM PG&E'S BREACH AND DEFAULT OF THE GDMSA

23. PG&E's inability (and resultant failure) to deliver Grizzly energy to Santa Clara, combined with its admission that it unlawfully and recklessly caused the Camp Fire and its unilateral decision to permanently de-energize its Caribou-Palermo Line, have resulted in PG&E's breach of

the GDMSA.

24.     PG&E's failure to perform this material obligation of the GDMSA—specifically its obligation to deliver energy generated by Grizzly to Santa Clara pursuant to Sections 9.1 and 9.3 of the GDMSA—constitutes a Default of the GDMSA (*See* GDMSA Section 17) for which Santa Clara should be compensated, because Santa Clara lost the benefit of the bargain: Santa Clara paid for but did not receive the energy and other services proved in the GDMSA. PG&E's GDMSA Default has caused and continues to cause, monetary damages for Santa Clara that must be cured.

25.     There are three parts to Santa Clara's claim for monetary damages associated with PG&E's breach of the GDMSA. *First*, Santa Clara's claim for monetary damages includes the loss by Santa Clara of the value of Grizzly from November 8, 2018 through April 28, 2020 associated with Santa Clara's inability to utilize Grizzly for the commodities a typical hydroelectric facility produces: energy, ancillary services (spinning reserves), renewable energy credits, and capacity. Additionally, Santa Clara has lost the value of the avoided transmission costs provided by the delivery component (transmission) provided in the GDMSA for that period, so that is also included in Santa Clara's claim.  This monetary loss is calculated to be $9,817,169.77. *Second*, Santa Clara's claim for monetary damages associated with the PG&E's breach of contract includes the projected loss of value for those same commodities—energy, ancillary services (spinning reserves), renewable energy credits, capacity, and avoided transmission costs—from April 28, 2020 until a new interconnection is energized and PG&E can resume delivery of energy from Grizzly to Santa Clara pursuant to GDMSA Section 9.  This monetary loss is projected to be $10,232,162.88 based on current estimates for the new interconnection to be in-service of end-of-year 2021, but will need to be updated as better information becomes available. *Third*, as PG&E has not yet committed to pay for the new interconnection needed for PG&E to resume delivery of energy from Grizzly to Santa Clara pursuant to GDMSA Section 9, Santa Clara's claim for monetary damages associated with PG&E's breach of contract includes the estimated cost for such interconnection, $5,000,000.00, as a placeholder in the event that PG&E does not commit to pay for the new interconnection. (Hance Dec. para. 28.)

26.     With regard to the first and second parts of Santa Clara's claim associated with

PG&E's breach of contract (the loss of value associated with Santa Clara's inability to use Grizzly for energy, ancillary services (spinning reserves), renewable energy credits and capacity from November 8, 2018 until a new interconnection is energized such that PG&E can resume delivering energy from Grizzly to Santa Clara), Santa Clara's claim estimates the loss of value associated with these various commodities using a methodology developed by Steve Hance, set forth in the Declaration of Steve Hance (Hance Dec. paras. 29-41) and explained below.

27. With regard to calculating the value associated with the loss of Grizzly energy, the methodology first approximated the generation that would take place in an average year by producing a simple average based on the average production stated for Grizzly in the Bucks Creek Hydroelectric Project Final License Application, which is 43,908.52 MWh/year. (*See* PG&E/Santa Clara Final License Application for Bucks Creek Hydroelectric Project, FERC Project No. 619, at Volume I, Exhibit A, Page A-15 (filed Dec. 12, 2016), which can be found at http://www.bucksrelicensing.com/Public/default.aspx.) For the first part of Santa Clara's claim for monetary damages associated with PG&E's breach of the GDMSA, from November 2018 through April 28, 2020, the precipitation and water year type was known, and Grizzly's estimated energy production would have been slightly more than 139% of an average year, or 61,113.65 MWh. For the second part of Santa Clara's claim for monetary damages associated with PG&E's breach of the GDMSA, the methodology used the simple average based on the last 30 years of production, 43,908.52 MWh/year, since there is no way of knowing or estimating what type of precipitation the remainder of 2020 and 2021 will produce. Since energy values fluctuate on an hourly basis throughout the year, and can significantly deviate by season, the methodology included apportioning the annual energy quantities determined above to monthly quantities based on historical observation of how Grizzly has operated in the past. The calculation then used the actual CAISO Locational Marginal Price (LMP) for the Santa Clara Custom Load Aggregation Point (CLAP) for the lost value of Grizzly energy from November 8, 2018 through April 28, 2020, and produced a forecast of future hourly market energy values using historical CAISO published LMP for the Santa Clara CLAP as a proxy for future lost value of Grizzly energy for the calculation from April 28, 2020 through the end of 2021. The methodology then assumed GDMSA energy would be delivered by PG&E to Santa

Clara, as it has in the past, during the highest value hours in any month, limited by the contractual 17.66 MW of delivered hourly capacity (*See* GDMSA Appendix F, Section 2.3.2.), until the monthly quantity of energy was reached. The loss of value associated with Santa Clara's inability to use Grizzly for energy was then determined by multiplying the forecasted hourly quantity of energy by the forecasted hourly $/MWh price and summing the results during the claim period—first for the period November 8, 2018 through April 28, 2020, and then from the April 28, 2020 through the end of 2021. (Hance Dec. paras. 30-34.)

28. Additionally, when Grizzly is not producing energy, it is capable of producing spinning reserves, which is another commodity Grizzly, as a hydroelectric generator, can provide that has a market value. The methodology used to calculate the loss to Santa Clara of the ability to use Grizzly for spinning reserves used historical CAISO published prices over the last 3 years to produce a forecast of future hourly Spinning Reserve values. (*See* http://oasis.caiso.com/mrioasis/logon.do, then "Prices"/ "A/S Clearing Prices") Specifically, for every hour of both claim periods (November 8, 2018 through April 28, 2020, and April 28 through December 31, 2021), the methodology assumed Grizzly would be available to either produce energy *or* spinning reserves. Since the hourly delivery of energy was determined with respect to the lost value of Grizzly energy (see above), the Spinning Reserve methodology subtracted any forecasted hourly energy from 17.66 MWs of available capacity (*See* GDMSA Appendix F, Section 2.3.2) to determine the hourly quantity of spinning reserves that would have been produced, and multiplied this hourly quantity of spinning reserves to the forecasted hourly value of CAISO spinning reserve market values. (Hance Dec. paras. 35-37.)

29. Third, since Grizzly's nameplate capacity is less than 30 MW, it counts as an eligible renewable energy facility under California's Renewable Portfolio Standard ("RPS"). As such, when it is capable of producing power, the electricity output would be tracked and used toward meeting the compliance obligations of California's RPS program. There is a market value associated with those RECs, so Santa Clara's claim for the loss of value associated with PG&E's breach includes the loss of the market value of those RECs. When Santa Clara filed its Proof of Claim, Portfolio Content Category 1 ("PCC1") RECs were valued at $19 per REC. (Grizzly is a PCC1 unit, according to the

California Energy Commission's RPS Eligibility Guidebook, *see* https://www.energy.ca.gov/programs-and-topics/programs/renewables-portfolio-standard/renewables-portfolio-standard-0) One MWh of generation equates to 1 REC eligible to be used towards California RPS compliance. (Hance Dec. para. 38.)

30. Fourth, the GDMSA provides that not only must PG&E deliver the energy generated by Grizzly, but PG&E must also deliver Grizzly capacity. (*See* GDMSA at 9.1.1.) This capacity also has an associated monetary value. As a result of the California Public Utility Commission's Decision in D.04-01-050 on January 22, 2004 (*See* http://docs.cpuc.ca.gov/Published/REPORT/65960.htm), all Load Serving Entities ("LSEs") within the CAISO balancing authority area must make an annual and monthly showing of the generation resources with which they intend to serve their customers, to demonstrate that they have sufficient capacity reserves (as of the 2004 Decision, called a "Resource Adequacy" determination). The quantity that must be demonstrated in this showing is determined by an LSE's contribution to the entire CAISO's monthly coincident peak demand times 115%, and is called "Resource Adequacy Capacity" or "RA Capacity". When a generation project is on a forced outage, it is not capable of being submitted as a source of RA capacity in a supply plan. The value of the loss of this RA Capacity was calculated by multiplying the contractually available quantity of capacity (*See* GDMSA Appendix F, Section 2.3.2.) of 17.66 MW x $5.00/MW month for the period of November 2018-December 2019, and 17.66 MW x $212/MW day x days/month for the period of January 2020-December 2021. $5.00/MW month during the early period represents the approximate market value observed during that period, and the $212/MW day represents the alternative contractual price for capacity provided for in GDMSA Section 8.6, "Maintenance Power". This alternative price was used since the market price for RA Capacity in 2020 has exceeded the contractual price associated with Maintenance Power capacity set forth in GDMSA Section 8.6. (Hance Dec. paras. 39-40.)

31. In addition to the four commodities set forth above, the GDMSA provides (at Section 9) that the energy produced by Grizzly is delivered to Santa Clara. Therefore, there is value associated with the fact that Santa Clara does not need to separately pay the CAISO for use of the CAISO transmission grid to deliver the energy produced by Grizzly to Santa Clara. An estimate of

the value of this *avoided transmission service cost* was calculated from the date of the Camp Fire to April 28, 2020 using the actual CAISO High Voltage (HV) and Low Voltage (LV) Transmission Access Charge (TAC) rates applicable to the PG&E region during the applicable time period from the date of the Camp Fire to April 28, 2020 (see http://www.caiso.com/participate/Pages/Transmission/Default.aspx), multiplied by the forecasted amount of generation Grizzly would have produced during that period. The value of the avoided transmission service cost from April 28, 2020 through December 31, 2020 was estimated by assuming the TAC rates would remain at their currently-effective rate, and the period January 1, 2021 through the end of 2021 was estimated by assuming a 5% escalation in the CAISO HV and LV TAC rates, multiplied by the forecasted amount of generation Grizzly would have produced during the applicable periods. (Hance Dec. para. 41.)

32. In addition to the loss of the value of Grizzly energy, ancillary services (spinning reserves) renewable energy credits, capacity and avoided transmission costs, Santa Clara includes in its claim for monetary damages associated with PG&E's breach of the GDMSA the estimate for reconnecting Grizzly from the existing 115 kV Grizzly Transmission Line to a nearby PG&E 230 kV transmission line. The estimates Santa Clara has received indicate that this re-connection, including planning, permitting, engineering, construction and testing will cost approximately **$5,000,000**. While Santa Clara expects that costs of re-establishing an interconnection such that PG&E can resume delivering energy from Grizzly to Santa Clara will be borne by PG&E, Santa Clara has not received any notification, formal or otherwise, that PG&E accepts this obligation of cost responsibility. (Hance Dec. para. 42.)

33. The total damages as actually known and estimated to date are summarized as follows:

Lost Value (Revenue) from Grizzly Hydroelectric Project:

Actual - November 2018 through April 2020: $ 9,817,169.77

Forecast - May 2020 through December 2021: $ 10,232,162.88

Lost Revenue Total: $ 20,049,332.65

Estimated Construction Costs to Reconnect: $ 5,000,000.00

TOTAL:              **$ 25,049,332.65**

(Hance Dec. para. 43.)

### VIII. PG&E SHOULD BE REQUIRED TO CURE THE ACTUAL KNOWN DAMAGE

34. Pursuant to Section 365(b)(1)(A), PG&E should be required to cure Santa Clara's actual known damages from the date of the Camp Fire, November 8, 2018, to April 28, 2020, in the amount of $9,817,169.77, which should be paid as a condition of assumption of the GDMSA.

### IX. PG&E SHOULD BE REQUIRED TO PROVIDE ADEQUATE ASSURANCE OF FUTURE PERFORMANCE FOR THE FORECASTED FUTURE DAMAGES AND THE COST OF RE-ESTABLISHING AN INTERCONNECTION TO THE ELECTRIC GRID

35. Pursuant to Section 365(b)(1)(C), PG&E should be required to compensate and provide adequate assurance of future performance for Santa Clara's future loss of Grizzly output from April 28, 2020 through the date PG&E is able to resume delivering Grizzly energy to Santa Clara, as a condition of assumption of the GDMSA. The forecasted future loss, assuming the re-establishment of an interconnection of Grizzly to the electric transmission grid can be energized, and PG&E can resume delivering Grizzly energy to Santa Clara by December 31, 2021, is $10,232,162.88 which should be paid subject a true-up adjustment as actual amounts and the date PG&E can resume delivery are known, as a condition of assumption of the GDMSA;

36. Pursuant to Section 365(b)(1)(C), the re-establishment of an interconnection of Grizzly to the electric transmission grid must be provided for as adequate assurance of future performance as a condition of assumption of the GDMSA. The forecasted cost of re-establishing an interconnection is $5,000,000.00 and either (x) PG&E should be required to pay the forecasted cost subject to true-up adjustment as actual amounts are known or (y) PG&E should formally commit to assuming the cost responsibility for the reconnection and energization.

### X. NO UNILATERAL MODIFICATION AS CONDITION OF ASSUMPTION

37. As an additional condition of assumption, the GDMSA and all other executory contracts of Santa Clara that are to be assumed by PG&E must be assumed in full without unilateral modification by PG&E in the Plan, the Cure Notice or otherwise.

38. The Plan proposes to assume virtually all executory contracts, subject to the occurrence of the Plan Effective Date and payment of any Cure Amount. *See* Plan 8.1(b). Each

assumed contract will be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, *except as modified by the Plan*, the order approving assumption or applicable law. *See* Plan 8.1(c).

39. "Except as modified by the Plan" is the qualification of concern to Santa Clara. Under applicable bankruptcy law, when a contract is assumed, the debtor must perform in full, just as if the bankruptcy had not intervened. *See In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992); *In re Airlift Int'l*, 761 F.2d 1503, 1508 (11th Cir. 1985); *In re Trigg*, 630 F.2d 1370, 1375 (10th Cir. 1980); *Matter of Steelship Corp.*, 576 F.2d 128, 132 (8th Cir. 1978). An executory contract or unexpired lease must be assumed or rejected as a whole. The debtor cannot retain (assume) beneficial provisions of an agreement while rejecting its burdens. *See N.L.R.B. v. Bildisco & Bildisco,* 465 U.S. 513, 531–32 (1984) ("Should the debtor-in-possession elect to assume the executory contract, however, it assumes the contract cum onere. . . .); *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, cum onere—the debtor accepts both the obligations and the benefits of the executory contract."); *In re Plitt Amusement Co. of Washington, Inc.*, 233 B.R. 837, 840 (Bankr. C.D. Cal. 1999); *In re David Orgell, Inc.*, 117 B.R. 574, 576 (Bankr. C.D. Cal. 1990).

40. Section 365(b)(1) is a shield for non-debtors and not a sword for debtors. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 509 (5th Cir. 2000). It "provides a guarantee to the non-debtor party, who may be forced to continue a relationship it would rather terminate, that as condition to the forced continuation of the contractual relationship, any losses or defaults existing at the time will be satisfied either through a timely cure or through reasonable assurances of future payment." *Id.*

41. A debtor does not get to modify the contract unilaterally and assume it. *City of Covington v. Covington Landing Ltd. P'ship*, 71 F.3d 1221, 1227 (6th Cir. 1995) (allowing assumption of contract as modified by the parties); *see also In re SCCC Assocs. II Ltd. Partnership*, 158 B.R. 1004, 1015 (Bankr. N.D. Cal. 1993) (debtor-tenant may not seek court's aid to rewrite terms of unexpired lease to allow assumption). To allow a debtor to unilaterally modify the terms of a contract assumed in a plan would be inconsistent with Section 365. PG&E in its Plan is seeking to do just that.

42.     The Plan provides for the release of all pre-assumption claims concerning the assumed contract. In that regard, PG&E's proposed plan at Section 8.2(e) states in part the "assumption . . . of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims *and Causes of Action* against any Debtor or defaults by any Debtor arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease, whether monetary or nonmonetary . . . ." (emphasis added.)

43.     The overbroad definition of "Cause of Action"[9] in Section 1.21 of the Plan is the culprit. The scope of the release for assumed executory contracts would be a defense for PG&E against any claim arising out of an executory contract, even those that were unknown, unforeseen or unsuspected at the time of assumption and through the Effective Date. *See* 11 U.S.C. Section 1141(d)(1)(A) (discharge is through confirmation, not effective date); *In re Jensen*, 995 F.2d 925 (9th Cir. 1993) and *In re Castellino Villas, A. K. F. LLC*, 836 F.3d 1028, 1034 (9th Cir. 2016) (claims must be in "fair contemplation"). PG&E could also use the release offensively by contending that any defense to any affirmative claim it brought against the counterparty under the contract is released. These released defenses include rights of setoff and recoupment. These provisions that effectively change the contract without the counterparty's express consent are contrary to what a plan and executory contract assumption are authorized to do under applicable bankruptcy law.

44.     These provisions that unilaterally modify the GDMSA and other assumed executory contracts are inconsistent with current law:

_____

[9] *Cause of Action* means, without limitation, any and all actions, class actions, proceedings, causes of action, controversies, liabilities, obligations, rights, *rights of setoff, recoupment rights*, suits, damages, judgments, accounts, *defenses*, offsets, powers, privileges, licenses, franchises, Claims, Avoidance Actions, counterclaims, cross-claims, *affirmative defenses*, third-party claims, Liens, indemnity, contribution, guaranty, and demands of any kind or character whatsoever, whether known or *unknown*, asserted or unasserted, reduced to judgment or otherwise, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, suspected or *unsuspected*, foreseen or *unforeseen*, direct or indirect, choate or inchoate, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring on or prior to the Petition Date or during the course of the Chapter 11 Cases, *including through the Effective Date* . . . . (emphasis added.)

a. An unknown claim – one that is not in "fair contemplation" – is not subject to discharge, *See In re Jensen*, 995 F.2d 925 (9th Cir. 1993); *In re Castellino Villas, A. K. F. LLC*, 836 F.3d 1028, 1034 (9th Cir. 2016).

b. Setoff and recoupment rights are not subject to discharge, *See In re De Laurentiis Ent. Group, Inc.*, 963 F.2d 1269, 1277 (9th Cir. 1992); *In re Gould*, 401 B.R. 415, 431 (B.A.P. 9th Cir. 2009), aff'd, 603 F.3d 1100 (9th Cir. 2010) (allowing IRS setoff after confirmation); *see also In re Luongo*, 259 F.3d 323, 333 (5th Cir. 2001) (collecting cases) ("We agree with the vast majority of courts considering the relationship between § 524(a) and § 553 that a debtor's discharge in bankruptcy does not bar a creditor from asserting its right to setoff.").

c. The discharge does not extend beyond confirmation to the effective date, 11 U.S.C. § 1141(d)(1)(A).

d. Accepting distribution is not consent. *See In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003).

45. PG&E also attempts to use the Cure Notice to unilaterally modify the contractual rights of the counterparties. Provisions of the Cure Notice,[10] like the Plan, seeks to "deem" the

---

[10] The Cure Notice at para. 8 states in relevant part:

**Any counterparty to an Agreement that fails to timely file and serve an Objection as proscribed herein will be deemed to have assented to such assumption, assumption and assignment, and Cure Amount. Except as otherwise set forth in the Plan or the Confirmation Order, the assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims and Causes of Action against any Debtor or defaults by any Debtor arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease, whether monetary or nonmonetary . . . . On the Effective Date of the Plan, any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed, or assumed and assigned, under the Plan shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

(bold in original.) The Cure Notice at para. 13 states:

failure to object to be consent, including to the full release and satisfaction of any Claims *and Causes of Action* against the Debtor *or defaults* by any Debtor arising under any assumed executory contract at any time *before the date of assumption* (including pre-petition contingent contractual indemnity obligations owed by the Debtors) and disallowance and expungement of proofs of claim.

46. Here again the "Cause of Action" definition problem described in paragraphs 38-40 is found.

47. These provisions of the Cure Notice and the Plan are not authorized by Sections 365, 1123, 1141 or any other provision of the Bankruptcy Code and violate Section 1129(a)(1). There is also an unfair asymmetry in deeming the counterparties to have released *unknown* contingent indemnity rights against the Debtors (who are most likely to know whether such a claim even exists) while the Debtors reserve those very rights against the counterparties and all others. *See* Plan, Section 10.11.

48. Therefore, in addition to the cure and performance assurance, as a further condition to assumption, PG&E should be required to assume the GDMSA and all other executory contracts to be assumed without unilateral modification by PG&E in the Plan, the Cure Notice or otherwise. In that regard, Plan should be modified or the confirmation order should provide that neither confirmation nor consummation of the Plan shall affect in any way the assumed GDMSA (or any other executory contract or unexpired lease that is assumed) and no term, obligation, right, privilege, representation, warranty, recital, covenant, condition, benefit or burden of the assumed GDMSA (or any other executory contract or unexpired lease that is assumed) shall be discharged, waived or released.

---

Except as set forth in Section 8.4 of the Plan with respect to the D&O Indemnity Obligations, the assumption by the Debtors or Reorganized Debtors, as applicable, of all other executory contracts or unexpired leases pursuant to the Plan shall result in the full release and satisfaction of any and all contingent pre-petition indemnification obligations arising under the terms of any such agreements and any proof of Claim premised on a pre-petition contractual indemnification obligation alleged to be owed by the Debtors or Reorganized Debtors shall be deemed disallowed and discharged on the Effective Date, without further notice to or action, order, or approval of the Bankruptcy Court.

# XI.    REQUEST FOR RELIEF

49.    On the basis of the foregoing, Santa Clara respectfully requests the court authorize PG&E to assume the GDMSA on the following conditions:

    a.  Santa Clara's *actual* known loss of the economic value of Grizzly output arising from PG&E's breach of the GDMSA must be cured. That amount from November 8, 2018 through April 28, 2020 is $9,817,169.77, which should be paid by the Debtors;

    b.  Santa Clara's *future (projected)* loss of the economic value of Grizzly output arising from PG&E's breach of the GDMSA must also be compensated and provided for as adequate assurance of future performance. The forecasted future loss of economic value of Grizzly output, from April 28, 2020 until the date PG&E is able to resume delivering Grizzly energy to Santa Clara, curing the breach and default of the GDMSA (assuming that the re-establishment of an interconnection of Grizzly to the electric transmission grid is completed at the end of December 2021) is $10,232,162.88, which should be paid subject to a true-up adjustment as actual amounts, and the date deliveries of Grizzly energy can resume and the breach cured, are known;

    c.  The re-establishment of an interconnection of Grizzly to the electric transmission grid, enabling PG&E to resume delivering Grizzly output to Santa Clara, curing the breach and default of the GDMSA, must also be provided for as adequate assurance of future performance. The forecasted cost of re-establishing an interconnection of Grizzly to the electric transmission grid is $5,000,000.00, and either (x) PG&E should be required to pay the forecasted cost subject to true-up adjustment as actual amounts are known; or (y) PG&E should formally commit to assuming the cost responsibility for the re-establishment of an interconnection and energization of Grizzly to the electric transmission grid;

    d.  The GDMSA must be assumed in full without unilateral modification by PG&E in the Plan, the Cure Notice or otherwise; and

1         e.    Such other and further conditions or relief as the court deems appropriate.

2   DATED: May 15, 2020.            RESPECTFULLY SUBMITTED,

3                                        BOUTIN JONES INC.

4                                        By: _____ */s/ Mark Gorton* _____
                                                     Mark Gorton

5                                        -and-

6

7                                        Lisa S. Gast
                                        DUNCAN, WEINBERG, GENZER & PEMBROKE,

8                                        P.C.

9                                        -and-

10                                     Brian Doyle
                                      City Attorney

11                                     CITY OF SANTA CLARA

12                                     Attorneys *for Creditor and Party-in-Interest,*

13                                     *CITY OF SANTA CLARA dba SILICON VALLEY*
                                     *POWER*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28