# EXHIBIT 3

UNITED STATES OF AMERICA112 FERC ¶61,007
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners:  Pat Wood, III, Chairman;
                            Nora Mead Brownell, and Joseph T. Kelliher.

| | |
|---|---|
| Public Utilities With Existing Contracts in the California Independent System Operator Corporation Region | Docket No. ER04-928-000 |
| California Independent System Operator Corporation | Docket Nos.  ER02-1656-021 ER02-1656-023 |

ORDER ON SCOPE AND STANDARD OF REVIEW OF EXISTING
TRANSMISSION CONTRACTS

(Issued July 1, 2005)

1.      This order is a follow-up to the Commission's order issued on February 10, 2005,[1] in which we approved in principle certain elements of the California Independent System Operator Corporation's (CAISO's) conceptual proposal for honoring existing transmission contracts (ETCs)[2] under the CAISO's Market Redesign and Technology Upgrade (Market Redesign) proposal.[3]  In the February Order, the Commission accepted

---

[1] *California Independent System Operator Corporation*, 110 FERC ¶ 61,113 (2005) (February Order).

[2] An ETC is a contractual obligation of a CAISO Participating Transmission Owner (PTO), established prior to the start-up of the CAISO, to provide transmission service to another party in accordance with terms and conditions specified in the contract, utilizing transmission facilities owned by the PTO that have been turned over to CAISO operational control pursuant to the Transmission Control Agreement.

[3] Formerly referred to as the CAISO's Comprehensive Market Design 2002 (MD02).  *See* generally California Independent System Operator Corporation, 105 FERC ¶ 61,140 (2003) (*Guidance Order*); California Independent System Operator Corporation, 107 FERC ¶ 61,274, *order on reh'g*, 108 FERC ¶ 61,254 (2004), *order on reh'g*, 110 FERC ¶ 61,041 (2005) (June 17 Order).

Docket No. ER04-928-000, *et al.*                                                                      2

the CAISO's proposal to honor scheduling rights for all contracts in which the CAISO's proposal does not diminish rights and for which parties agree that rights are not diminished. The Commission further stated that the CAISO's proposal will honor scheduling rights for all ETCs, not just those subject to a *Mobile-Sierra* public interest standard of review.[4] Because, however, we believed it necessary for CAISO to have an accurate accounting of ETCs and for disputes raised to be resolved, we stated our intent to issue a subsequent order on the contract characterization issues.

2.      In this order, we define the universe of ETCs which will be in place upon implementation of the CAISO's Market Redesign and address the applicable standard of review for the contracts in question. We do so, even though our approval of the CAISO's proposal obviated any need to consider contract modification at this time, to ensure that the CAISO has the information necessary to implement its conceptual proposal and to ensure a complete and accurate record.

3.      This order benefits customers by ensuring that ETC rights holders and other market participants are subject to fair and reasonable terms and conditions upon implementation of the CAISO's Market Redesign.

## Background

4.      In the June 17 Order, the Commission directed public utility parties providing service under ETCs (and non-jurisdictional parties on a voluntary basis) to submit to the Commission the following information: (1) the name of the entity responsible under the contract for scheduling the contract; (2) the type of agreement, *e.g.*, point-to-point, system integration; (3) the source point(s) applicable to the ETC; (4) the sink point(s) applicable to the ETC; (5) the maximum number of megawatts transmitted pursuant to the ETC for each set of source and sink points; (6) whether any modification to the ETC is subject to a just and reasonable standard of review or a *Mobile-Sierra* public interest standard of review; (7) the contract termination date; and (8) the FERC designation for the contract, if applicable. The Commission explained that this information would be used to form the basis of further proceedings[5].

5.      On July 23, 2004, pursuant to the directive in the June 17 Order, Pacific Gas and Electric Company (PG&E), Southern California Edison Company (SCE), San Diego Gas and Electric Company (SDG&E) and other participating transmission owners with ETCs filed with the Commission summaries of their ETCs. These filings were submitted in Docket No. ER04-928-000. In addition, certain parties receiving service under existing

---

[4] *United Gas Pipe Line Co. v. Mobile Gas Serv. Corp.*, 350 U.S. 332 (1956); *FPC v. Sierra Pacific Power*, 350 U.S. 348 (1956).

[5] *See* June 17 Order at P 161-64.

contracts voluntarily filed summaries to provide their own representation of the information requested by the Commission.[6] On August 30, 2004, SCE filed revised ETC templates for three of its ETCs.

6.    On December 8, 2004, after extensive market participant meetings on ETC-related issues, the CAISO submitted a conceptual proposal for honoring ETCs under the CAISO's Market Redesign proposal.[7] The CAISO's ETC proposal contained three main elements: (1) scheduling the use of ETC rights in the CAISO markets; (2) validating that ETC schedules submitted to the CAISO are consistent with the ETC holders' contractual rights; and (3) settlement and allocation of CAISO charges associated with ETC schedules and schedule changes. In its filing, the CAISO also indicated that it reviewed the July 23, 2004 submissions to the Commission regarding the terms of ETCs in question and summarized the results in Attachment D.

7.    Subsequently, the Commission issued the February Order, in which the Commission approved in principle certain elements of the CAISO's ETC proposal, provided guidance and sought additional information regarding settlement and allocation of congestion related costs associated with ETC schedules.[8] The Commission did not rule on the disputed contract characterization issues raised by parties because the challenge to contract interpretation did not directly impact the Commission's determination on the CAISO's ETC proposal. Notwithstanding, the Commission indicated that the CAISO must have an accurate accounting of both the number of relevant ETCs and the standard of review associated with each ETC. Accordingly, the Commission stated that a subsequent order would be issued setting forth the universe of relevant ETCs and a resolution of arguments raised by various parties regarding the appropriate standard of review for individual ETCs.

8.    In addition, SMUD filed a request for rehearing of the February Order alleging that in that order the Commission mischaracterized its ETCs. Because the issue raised by SMUD is directly related to the issue of contract characterization, we will address SMUD's rehearing request in this order.

---

[6] These parties are the Los Angeles Department of Water and Power (LADWP), M-S-R Public Power Agency (M-S-R), Modesto Irrigation District (Modesto), Metropolitan Water District of Southern California Metropolitan, the City of Santa Clara (SVP), Transmission Agency of Northern California (TANC), and the Sacramento Municipal Utility District (SMUD).

[7] *See* Docket No. ER02-1656-021.

[8] *See* February Order at P 1.

**Notice, Interventions, Responsive Pleadings, and Request for Rehearing**

9.     Notice prescribing a template for submitting the ETC summaries and establishing a deadline for making such submissions in Docket No. EL04-928-000 was published in the *Federal Register*, 69 Fed. Reg. 43,975 (2004).  Following the July 23, 2004 ETC template submissions, the Northern California Power Agency (NCPA), SMUD, TANC, SVP, LADWP, Turlock Irrigation District (Turlock), the State Water Project of the California Department of Water Resources (SWP), Arizona Public Service Company, Imperial Irrigation District, the City and County of San Francisco, California, M-S-R, Metropolitan, SDG&E, PG&E, and SCE filed motions to intervene in this proceeding.  Motions to intervene are hereby granted pursuant to Rule 214 of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.214 (2004).

10.     Certain interveners also submitted comments and reply pleadings.  Rule 213(a) of the Commission's Rules of Practice and Procedure, 18 C.F.R. § 385.213(a) (2004), prohibits answers to protests and answers unless otherwise permitted by the decisional authority.  We accept all reply pleadings because they have assisted in our decision-making.

11.     PG&E and SCE argue that the information provided in the ETC templates cannot adequately or completely describe all of the contracting parties' rights and obligations because of the limited space and options in the summary template.  As a result, PG&E and SCE contend that the summary information should not be construed as an interpretation of the relevant ETC provisions and, if any ETC provisions appear inconsistent with the information provided in the template, the terms of the ETC will govern the contracting parties' rights and obligations.

12.     Parties that filed comments to the ETC summaries submitted by PG&E and SCE argue that many of the ETC templates inaccurately reflect the terms and conditions of the contracts.  These parties request that the templates be modified to correct errors so as to ensure that the Commission is working with the proper set of facts.  Specifically, these parties argue that the templates do not accurately state:  the type of service (*i.e.*, point-to-point, network service, *etc.*), the contractual source to sink, the associated MWs, the termination language in the contract, and the contract modification rights.

13.     In its request for rehearing of the February Order, SMUD alleges that the Commission erred in its characterization of SMUD's ETCs with PG&E.  Specifically, the Commission stated that these contracts are subject to the just and reasonable standard of review, while SMUD argues that the public interest standard of review applies to its ETCs.

Docket No. ER04-928-000, *et al.* 5

## Discussion

14.     Based on the information submitted pursuant to our directive in the June 17 Order, we find that there are approximately 64 contractual obligations that were established prior to the start-up of the CAISO's operation date.  Of the 64 contracts submitted, 54 contracts will be in place upon implementation of the Market Redesign in February 2007, and 10 contracts terminate prior to implementation.[9]  Of these 54 contracts, 24 contracts have been characterized as having the just and reasonable standard of review, 8 contracts have been characterized as having the *Mobile-Sierra* public interest standard of review, and 22 are characterized as "mixed."  "Mixed" contracts contain provisions providing for both the public interest standard of review and the just reasonable standard of review, depending on which of the parties initiates a contractual modification, or depending on which of the contractual provisions is being challenged.

15.     The identified ETCs are predominately point-to-point transmission contracts, but a few are described as agreements providing for system integration, network service, emergency sharing, interconnection or interchange service.  The latter contracts represent approximately 19,000 megawatts (MWs) on the CAISO transmission system or as much as 42 percent of the CAISO's 2004 peak load of 45,000 MWs.

16.     We note that many of the issues raised by the parties in regard to PG&E and SCE's ETC summaries have been resolved by PG&E's and SCE's subsequent filings clarifying and correcting their July 23, 2004 submissions, as well as through reply comments.[10]  In this order, we will address any outstanding issues which have not been resolved.  Specifically, this order will address the issue of the applicable standard of review for the contracts identified in PG&E's and SCE's ETC templates.  We will also address three additional issues:  (1) ETCs which were not initially included in ETC summaries; (2) termination dates for the ETCs in question; and (3) type of service provided under the identified ETCs.

### A.  Applicable Standard of Review

17.     As noted above, our review of the ETC templates indicates that 24 contracts were characterized by parties as having unilateral modification rights subject to the just and

---

[9] Of the 54 contracts, 17 have specific termination dates and 37 contracts have no termination date and can terminate upon notice by one of the parties.

[10] *See* PG&E's comments and supplemental comments filed on September 17 and October 12, 2004, respectively.  *Also see* SCE's revised ETC templates filed on August 30, 2004.

reasonable standard.[11]  A number of parties raised objections to this characterization.  Several parties contend that neither PG&E nor SCE's ETC templates accurately reflect the contractual bars to making unilateral modifications to their contracts.

18.    Of the 54 contracts that will be in place upon implementation of Market Redesign, approximately 22 contracts were characterized by filing parties as "mixed", *i.e.*, providing for both the *Mobile-Sierra* public interest standard of review and the just and reasonable standard.[12]

## 1. <u>SMUD and PG&E's ETCs</u>

19.    SMUD contends that PG&E incorrectly stated in its ETC template that the following ETCs under which PG&E provides transmission service to SMUD are subject to the just and reasonable standard of review:  (1) Rate Schedule No. 88 - Slab Powerhouse Interconnection and Transmission Agreement (the Slab Creek Agreement), (2) Rate Schedule No. 91 - Camp Far West Interconnection and Transmission Agreement (Camp Far West Agreement), and (3) the Interconnection Agreement (the IA – Rate Schedule No. 136).  The alleged mischaracterization of three of the ETCs identified above is also a subject matter of SMUD's request for rehearing of the February Order.  SMUD urges the Commission to rely, in its determination of the applicable standard of review, on the information provided by SMUD in its ETC templates submitted on August 17, 2004.

20.    Specifically, SMUD argues that the terms and conditions of each agreement are protected against unilateral modification under the *Mobile-Sierra* doctrine.  SMUD acknowledges that each of these agreements contains a provision which reserves PG&E's right to unilaterally file changes with the Commission in rates and rate methodologies under section 205 of the Federal Power Act (FPA).[13]  However, in SMUD's opinion, these contractual provisions do not apply to proposed changes to terms and conditions of the ETCs in question. SMUD further argues that PG&E erroneously concludes that silence on the issue of the applicable standard of review for unilateral modifications of the terms and conditions of the ETCs in question, means that the just and reasonable standard of review applies.  In SMUD's opinion, unilateral modifications of the terms

---

[11] The 24 contracts that are apart of this discussion include: (1) PG&E's Rate Schedule Nos. 1 and 2 (superseded by 72), 20, 42, 77, 85, 88, 91, 114, 116, 136, 139, 140, 143, 147, and 213; (2) SCE's Rate Schedule Nos. 113, 131, 207, 268, 272, 292, 342, 348 and 360.

[12] SCE identified the following Rate Schedules as "mixed":  55, 203, 219, 339, 361, 362, 363, 364, 365, 372, 373, 374, 375, 376, 378, 379, 380, 381, 390, 391, 392, and 393.

[13] 16 U.S.C. § 824e (2000).  SMUD cites to section 10.23 of the IA, section 14(c) of the Camp Far West Agreement, and section 14(c) of the Slab Creek Agreement.

Docket No. ER04-928-000, *et al.*                                      7

and conditions of the ETCs in questions are subject to the *Mobile-Sierra* public interest standard.

21.     PG&E responds that under the IA, Camp Far West Agreement and the Slab Creek Agreement, it has unqualified section 205 rights to change these three ETCs pursuant to Administrative Law Judge (ALJ) Birchman's Initial Decision in Docket No. ER00-2360-000,[14] which was subsequently affirmed by the Commission.[15]

22.     SMUD and TANC also challenge PG&E's characterization of the South of Tesla Principles Agreement (the SOTP – Rate Schedule No. 143).[16] Specifically, SMUD and TANC argue that it should be identified as "mixed." According to TANC, the public interest standard applies to proposed changes to pre-specified mitigation charges pursuant to section 5.4 of the SOTP Agreement, and the just and reasonable standard applies to proposed changes to all other provisions. TANC further states that the Commission found that the public interest standard applies to section 5.4.3 of the SOTP Agreement when it affirmed the ALJ's finding that "there is no substantive basis for amending Section 5.4 of the SOTP."[17] As with other ETCs, SMUD argues that while the just and reasonable standard of review applies to proposed changes to rates under the SOTP Agreement, the public interest standard should be applied to changes to non-rate terms and conditions because the SOTP Agreement is silent on the applicable standard of review for provisions other than rate terms.

23.     PG&E does not agree with TANC's assertion that the SOTP Agreement should have been identified as "mixed." In particular, PG&E states that section 5.1 of the SOTP provides that after December 31, 1999 "rates for subsequent periods shall be as mutually agreed or as may be unilaterally filed by PG&E with the FERC under [s]ection 205 of the [FPA]." PG&E, however, acknowledges that there are some limited exceptions to these broad section 205 rights, such as section 5.4.3 of the SOTP Agreement referred to by TANC. However, PG&E further argues that the section 5.4.3 language does not expressly provide for the *Mobile-Sierra* public interest standard of review. PG&E therefore concludes that because the SOTP Agreement allows for unilateral modifications

---

[14] *See Pacific Gas and Electric Company*, 95 FERC ¶ 63,022 (2001) (*Initial Decision*).

[15] PG&E cites to *Pacific Gas and Electric Company*, 100 FERC ¶ 61,160 at P 10 (2002) (*Order on Initial Decision*).

[16] The SOTP agreement is a contractual arrangement between PG&E, SMUD, TANC, Modesto, Turlock, and NCPA.

[17] *See Initial Decision* at 65,211; *Order on Initial Decision* at Ordering Paragraph (A).

Docket No. ER04-928-000, *et al.*                                                    8

and does not expressly refer to the *Mobile-Sierra* public interest standard, the appropriate standard of review is the just and reasonable standard.

### Commission Determination

24.     With respect to the Slab Creek Agreement, the Camp Far West Agreement, and IA, we reaffirm our earlier finding that modifications to these contracts should be reviewed under the just and reasonable standard.[18] Accordingly, we find that the ETCs in question were correctly characterized as having the just and reasonable standard of review, and deny SMUD's rehearing of the February Order.

25.     In regard to the SOTP Agreement, we find that this ETC has a "mixed" standard of review. Section 5.1 of the SOTP Agreement provides that "rates… shall be as mutually agreed or as may be unilaterally filed by PG&E with the FERC under [s]ection 205 of the [FPA]".

26.     We agree with SMUD that the just and reasonable standard of review will only apply to proposed changes to rates under the SOTP Agreement and changes to non-rate terms and conditions of the SOTP Agreement will be examined under the public interest standard of review. The fact that the parties chose to exclude changes to non-rate terms from section 5.1 demonstrates that parties intended the public interest standard to apply to amendments to terms and conditions other than rates. Accordingly, we find that the SOTP Agreement should be characterized as an ETC with the "mixed" standard of review.

27.     In addition, we note that while pursuant to section 5.4 of the SOTP Agreement changes to pre-specified mitigation charges proposed before January 1, 2005 would have been subject to the public interest standard, as established by the ALJ in the *Initial Decision*, the effective date of that provision has already expired.

### 2. SVP and PG&E's ETC

28.     SVP argues that PG&E mistakenly identified the Grizzly Agreement[19] as being subject to the just and reasonable standard of review. In SVP's opinion, the public interest standard of review applies to the Grizzly Agreement pursuant to section 21.7 of the agreement.

---

[19] Service Agreement No. 20 to PG&E's Electric Tariff Sixth Revised, Volume No. 5 (formerly Rate Schedule No. 85). *See Pacific Gas and Electric Company*, 100 FERC ¶ 61,233 (2002).

29.     PG&E agrees that section 21.7 of the Grizzly Agreement limits amendments to written agreements between the parties and does not provide PG&E with any section 205 rights. However, in PG&E's opinion, because the Grizzly Agreement does not expressly refer to the *Mobile-Sierra* public interest standard, the appropriate standard of review for the Grizzly Agreement should be "mixed."

30.     Section 21.7 of the Grizzly Agreement[20] mentioned by the parties does not address the parties' rights to unilaterally seek changes to the agreement. We disagree with PG&E's contention that the appropriate standard of review should be "mixed." We found no language in the Grizzly Agreement that would suggest that different standards of review should be applied to different terms and conditions of the agreement, nor does PG&E cite any facts that would support its contention. In addition, the parties have not presented any facts that would demonstrate their intent on the issue of the applicable standard of review at the time the contract was concluded. Without this signal to indicate the parties' intent regarding the applicable standard of review, we must rely on the controlling court precedent in *Texaco Inc. v. FERC*, 148 F.3d 1091 at 1096 (D.C. Cir. 1998). In this decision, the United States Court of Appeals for the District of Columbia Circuit held that "[t]he law is quite clear: absent contractual language 'susceptible to the construction that the rate may be altered while the contract[] subsists,' the Mobile-Sierra doctrine applies" (citing *Appalachian Power Co. v. FPC*, 529 F.2d 342, 348 (D.C. Cir. 1976)). Accordingly, we agree with SVP's characterization of the Grizzly Agreement and find that the law requires that silence concerning the applicable standard of review dictates that this agreement must be identified as an ETC subject to the public interest standard of review.

### 3. **Modesto and PG&E's ETC**

31.     Modesto contends that PG&E inaccurately represents the modification rights of its Interconnection Agreement with PG&E (Rate Schedule No. 116). Modesto argues that the agreement is not fully subject to the just and reasonable standard of review. Modesto notes that section 10.26 of the Interconnection Agreement grants PG&E section 205 rights with respect to rates and rate methodologies. However, Modesto notes that with respect to the terms and conditions, the Interconnection Agreement is silent, and, thus, the public interest standard applies.

32.     Section 10.26 states in pertinent part "nothing contained herein shall be construed as affecting in any way PG&E's right to unilaterally file changes with FERC in rate and rate methodology under [s]ection 205 of the [FPA]." Similarly to the Slab Creek Agreement and the Camp Far West Agreement, section 10.26 of the Modesto/PG&E

---

[20] Section 21.7 of the Grizzly Agreement states: "This Agreement may be amended only by a written instrument duly executed by the Parties, subject to any required regulatory approval."

Docket No. ER04-928-000, *et al.*                                        10

Interconnection Agreement defines the term "rates" as "a statement of electric services under [the respective ETC], rates and charges for or in connection with those services, and classifications, practices, rules, regulations, or contracts…, which in any manner affect or relate to such services." Section 10.26 also provides that "[a] change in rates may include, but not limited to, not only changes in rates and charges but also in the underlying methodology by which such rates and charges are developed."

33.    Consistent with our ruling on the Slab Creek Agreement and the Camp Far West Agreement, we find that the quoted contractual language explicitly provides for the application of the just and reasonable standard of review to all proposed changes to the ETCs in question. Accordingly, the Interconnection Agreement should be characterized as a contract providing for the just and reasonable standard of review.

### 4. **M-S-R and SCE's ETCs**

34.    M-S-R challenges SCE's contention that the just and reasonable standard applies to its Firm Transmission Service (FTS) Agreement (Rate Schedule No. 339). M-S-R states that SCE has failed to reflect that sections 9.2.5 and 14.2 of the agreement provide for the application of the public interest standard of review to any changes to these sections. As a result, M-S-R requests that the Commission require SCE to reflect that the public interest standard of review applies to changes to sections 9.2.5 and 14.2 of the FTS Agreement.

35.    In response, SCE argues that the just and reasonable standard applies. SCE states that the Commission has previously rejected M-S-R's claim that sections 9.2.5 and 14.2 barred SCE's application for a rate change.[21]

36.    Our ruling concerning sections 9.2.5 and 14.2 in the *SCE Order* was fact specific and therefore not relevant to the issues in this proceeding. In the *SCE Order*, the Commission made a determination on the applicability of section 14.2 to a specific charge; however, it never ruled on the applicable standard(s) of review for the FTS Agreement. We have reviewed the contractual language in the FTS Agreement *de novo* and conclude that the applicable standard of review is the just and reasonable standard.

37.    Section 14.3 of the FTS Agreement explicitly provides for the just and reasonable standard of review. Specifically, it states in pertinent part:

---

[21] SCE cites to *Southern California Edison Company*, 100 FERC ¶ 61,191 at P 11-14 (2002) (*SCE Order*).

> Except as provided in [s]ection 14.2, nothing contained herein shall be construed as affecting in any way: (1) the right of [SCE] unilaterally to make application to the [Commission] for a change in rates, losses…, charges, classification, or service, or any rule, regulation, or contract relating thereto, under [s]ection 205 of the[FPA]…

Section 14.2 referred to in section 14.3 establishes a procedure for redetermination of the rate of service under the FTS Agreement in the event that the state commission modifies the rate of return used to determine the rate of service under this ETC. Section 14.2, however, does not address parties' rights to unilaterally seek redetermination of the contract rate. Section 9.2.5 cited by SCE provides that M-S-R shall not oppose SCE's section 205 application to the Commission for changes to scheduling and dispatching charges. Contrary to M-S-R's assertion, section 9.2.5 does no provide for application of the public interest standard, it only restricts M-S-R' rights to protest a section 205 filing submitted by SCE with respect to certain types of charges under the FTS Agreement. For these reasons, we find that the applicable standard of review for the FTS Agreement is the just and reasonable standard.

### 5. Turlock and PG&E's ETC

38.     Turlock in its comments informs the Commission that the issue of whether modification of the non-rate terms and conditions of Turlock's Interconnection Agreement with PG&E (Rate Schedule No. 213) is subject to the public interest standard or the just and reasonable standard of review is currently being litigated in Docket No. ER00-565.

39.     We note here that the proceeding mentioned by Turlock has ended. The ALJ in that proceeding found that PG&E's section 205 rights did not need to be addressed.[22] The Commission subsequently affirmed this ALJ finding.[23] Accordingly, we have examined the contractual language in question and conclude that the Interconnection Agreement is subject to the just and reasonable standard of review.

40.     Section 10.27 of the Interconnection Agreement at issue states in pertinent part:

> …nothing contained herein shall be construed as affecting in any way PG&E's right unilaterally to file changes with FERC in rate and rate methodology under [s]ection 205 of the [FPA]…

---

[22] *See Pacific Gas and Electric Company*, 107 FERC ¶ 63,030 at P 128 (2004).

[23] *See Pacific Gas and Electric Company*, 109 FERC ¶ 61,093 at P 54 (2004).

Docket No. ER04-928-000, *et al.* 12

 Similarly to other PG&E ETCs addressed in this order, the Interconnection Agreement in question defines the term "rates" as "a statement of electric services under [the respective ETC], rates and charges for or in connection with those services, and classifications, practices, rules, regulations, or contracts…, which in any manner affect or relate to such services." Section 10.27 of the Interconnection Agreement also provides that "[a] change in rates may include, but not limited to, not only changes in rates and charges but also in the underlying methodology by which such rates and charges are developed." Consistent with our findings above, we conclude that the Interconnection Agreement should be characterized as an ETC providing for the just and reasonable standard of review.

### 6. **Metropolitan and SCE's ETC**

41.    Metropolitan takes issue with SCE's identification of the standard of review for the Service and Interchange Agreement (Rate Schedule No. 203). Metropolitan argues that the applicable standard of review should be the public interest standard, not "mixed," as suggested by SCE. Metropolitan alleges that during contract negotiations, Metropolitan stated its expressed interest in avoiding any future modification of the contract under section 205 or 206 of the FPA. Metropolitan therefore contends that the public interest standard of review should apply.

42.    In response, SCE contends that while the Service and Interchange Agreement does not expressly provide for section 205 or section 206 rights, it also does not state that the public interest standard applies. As a result, SCE stands by its representation in the initial ETC submission that the agreement in question should be characterized as "mixed."

43.    SCE has provided no explanation for its characterization of the Service and Interchange Agreement as "mixed." The agreement in question is silent on the applicable standard of review. Although Metropolitan asserts that during contract negotiations Metropolitan expressed interest in avoiding the application of sections 205 or 206 to future contract amendments, it provides no further evidence demonstrating that the parties intended the applicable standard of review to apply to their contract at the time the contract was concluded. For this reason, we rely on the court precedent[24] holding that absent contractual language susceptible to the construction that the rate may be altered, the public interest standard applies. Accordingly, we find that the Service and Interchange Agreement should be characterized as an ETC subject to the public interest standard of review.

### 7. **LADWP and SCE's ETC**

44.    LADWP challenges SCE's identification of the appropriate standard of review for its Exchange Agreement (Rate Schedule No. 219). SCE's identified the applicable

---

[24] *See*, *e.g.*, *Texaco Inc. v. FERC*, 148 F.3d 1091, 1096  (D.C. Cir. 1998)

standard of review as "mixed." LADWP argues that the public interest standard applies to the Exchange Agreement. LADWP states that each template submitted by SCE that cites section 6.15 of the Exchange Agreement as supplemental information is incorrect in two respects. First, according to LADWP, SCE appears to believe that section 6.15 of the Exchange Agreement sets the rate for each transmission service described in its templates. In LADWP's opinion, section 6.15 pertains only to the rate that SCE may charge LADWP beginning June 1, 2012 for the 368 MW of firm bi-directional transmission service between Devers and Sylmar described in section 6.1 of the Exchange Agreement.[25] LADWP contends that nothing in the Exchange Agreement expressly gives SCE the unilateral right to amend the agreement or unilaterally change the rate for service under sections 6.1 or 6.3 to a rate other than the rate specified in section 6.15. As a result, LADWP concludes any proposed changes to section 6 of the Exchange Agreement should be subject to the public interest standard of review.[26]

45.    SCE states that it accurately represented the contract language that describes SCE's right to change rates. Moreover, SCE contends that the Exchange Agreement does not expressly provide that the public interest standard applies.

46.    In its ETC template submission, SCE characterized the Exchange Agreement as "mixed" on the basis of section 6.15, which, in SCE's opinion, gives SCE the section 205 rights with respect to transmission service provided pursuant to section 6.1. Contrary to SCE's contention, we find that section 6.15 does not address parties' rights to unilaterally change any term or provision of the Exchange Agreement. Section 6.15 of the Exchange Agreement establishes rates for the transmission service provided under this ETC is silent on the applicable standard of review.[27] In addition, the parties have not presented any

---

[25] LADWP explains that section 6.14 states the rates for transmission service under sections 6.1 and 6.3 until June 1, 2012. Section 7.12 states the rate for the 320 MW of firm bi-directional transmission service between COB and Midway and between Midway and Sylmar that SCE is obligated to provide under sections 7.2 and 7.6. LADWP further explains that sections 8.7.6. and 8.7.7 state the rate for the 368 MW of firm bi-directional transmission service between Palo Verde and Devers that SCE is obligated to provide under section 8.7.

[26] LADWP also argues that nothing in the Exchange Agreement expressly authorizes SCE unilaterally to amend sections 7 and 8 of the Exchange Agreement. Therefore, modifications of these sections are also subject to the public interest standard of review.

[27] Section 6.15 of the Exchange Agreement states: "For the transmission service made available by Edison pursuant to section 6.1, beginning June 1, 2012, Los Angeles shall pay Edison (i) at a rate to be determined in accordance with Edison's then-current methodology for determining such transmission service rate for transmission service between Devers and Sylmar and (ii) for all fees associated with such service."

facts that would demonstrate their intent on the issue of the applicable standard of review at the time the contract was concluded. For this reason, we rely on court precedent[28] holding that absent contractual language susceptible to the construction that the rate may be altered, the public interest standard applies. Accordingly, we find that any proposed changes to the Exchange Agreement are subject to the public interest standard.

## B. Contracts Omitted from SCE's ETC Template

47. LADWP argues that SCE failed to identify all ETCs under which SCE provides transmission service. LADWP's July 23 submission identified four contracts that they believe should be included as ETCs in SCE's template: (1) Victorville-Lugo Interconnection Agreement (Rate Schedule No. 51); (2) Navajo Transmission Agreement (Rate Schedule No. 264); and (3) Amended and Restated Eldorado System Conveyance and Co-Tenancy Agreement (Rates Schedule Nos. 424 and 425). LADWP believes that the above listed should have been identified as ETCs for the following reasons. First, LADWP argues, the above mentioned contracts meet the definition of an ETC under the CAISO tariff, which states that ETCs are contracts which grant transmission service rights in existence on the CAISO operation date as may be amended in accordance with their terms or agreement between the parties thereto from time to time.[29] LADWP further contends that because these contracts were in existence on the date of the CAISO inception, these contracts fall within the definition of existing contracts under the CAISO tariff. Second, LADWP argues that the Transmission Control Agreement between the CAISO and SCE established operating protocols for transmission lines under the operational control of the CAISO.[30] LADWP contends that the transmission facilities that SCE conveyed to the CAISO's operational control were encumbered by LADWP's preexisting transmission rights under the above listed contracts.[31] LADWP therefore concludes that these contracts should be identified as ETCs.

48. In response, SCE states that LADWP erroneously has identified these contracts as ETCs because even though LADWP is a joint owner under those agreements, it is not provided transmission service under those contracts.

---

[28] *See*, *e.g.*, *Texaco Inc. v. FERC*, 148 F.3d 1091, 1096 (D.C. Cir. 1998).

[29] LADWP refers to the CAISO's Tariff Schedule Sheet No. 315.

[30] LADWP also states that the Transmission Control Agreement sets forth "Protocols for Encumbered Facilities," which specify the operating obligations of interconnections, integration, exchange, operating, joint ownership agreement between SCE and other transmission owners and market participants that the CAISO must follow when operating the grid.

[31] *See* Appendix B of the Transmission Control Agreement.

Docket No. ER04-928-000, *et al.* 15

### Commission Determination

49.     With respect to Rate Schedule Nos. 51 and 264, we find that these contracts should have been identified as ETCs.  We disagree with SCE's contention that these contracts are not ETCs.  The Responsible Participating PTO Agreement between SCE and the CAISO defines "existing contracts" as contracts between the Responsible PTO (*i.e.*, SCE) and the existing right holder (*i.e.*, LAWDP) which "have been in place prior to the ISO [o]perations [d]ate and the operating arrangements included in the [e]xisting [c]ontracts have been proven to be consistent with reliable Control Area operation."[32] Two of the contracts identified by LAWDP (Rate Schedule Nos. 51 and 264) are included in Appendix A to the CAISO's Transmission Control Agreement, which lists SCE's existing contracts that were in place on the ISO operations date.  Moreover contrary to SCE's contention that LADWP, as only a joint owner, is not provided transmission service under these contracts, we find that these ETCs provide LADWP with transmission rights to have an amount of power delivered on transmission lines owned by SCE.[33]  We find that the contracts identified as Rate Schedules 51 and 264 should have been included in the SCE's ETC submission.

50.     As for the contracts identified as Rate Schedules Nos. 424 and 425, we find that these contracts were correctly omitted from the ETC template.  These contracts are not identified among the existing contracts listed in Appendix A to the Transmission Control Agreement, and they also do not fall within the Commission definition of an ETC.  We have defined an ETC as a contractual obligation of a CAISO PTO, established prior to the start-up of the CAISO, to provide transmission service to another party in accordance with terms and conditions specified in the contract, utilizing transmission facilities owned by the PTO that have been turned over to CAISO operational control pursuant to the Transmission Control Agreement.[34]  Although, both ETCs in question were executed prior to the inception of the CAISO, they provide for an entitlement to an amount of power through each component of the Eldorado System,[35] which is not under the CAISO's control.  For this reason, we find that Rate Schedules No. 424 and 425 should not be included in SCE's ETC template.

---

[32] *See* section A and 1.2 of the Responsible PTO Agreement.

[33] *E.g.*, s*ee* section 10 of the ZLADWP-SCE Victorville-Lugo Interconnection Agreement Rate Schedule No. 51.

[34] *See* February Order at n.1.

[35] Section 8 of Rate Schedule No. 424 and section 7 of Rate Schedule No. 425.

Docket No. ER04-928-000, *et al.*                                                16

### C.  Contract Termination Dates

51.     SVP argues that PG&E's template incorrectly states that the termination date for the Grizzly Agreement between PG&E and SVP is November 18, 2022.  SVP claims that the Grizzly Agreement is to expire on January 1, 2034.

52.     In response, PG&E explains that the contract contains multiple options for termination[36] and that SVP listed the latest possible Reverter Date, while PG&E listed the earliest possible date, which it later recognized was incorrect.  PG&E states that the first Reverter Date was adjusted by five years as a result of Amendment No. 1 to the Grizzly Agreement, so the first available termination date according to PG&E is November 18, 2027.

53.     In an answer to PG&E comments, SVP agreed with the first available termination date as November 18, 2027.  However, SVP states that the Grizzly Agreement does not automatically terminate on that date, which is why SVP listed the termination date as January 1, 2034.  SVP further argues that upon further review of the contract, it now believes that the Grizzly Agreement could potentially go on beyond January 1, 2034.  SVP argues that Amendment No. 1 to the Grizzly Agreement provides that the fourth possible Reverter Date may occur on or after the later of January 1, 2034 or the third possible Reverter Date.

54.     PG&E's ETC submission states that its Extra High Voltage Transmission and Exchange Contract  with SMUD (EHV Agreement)[37] has a termination date of December 31, 2004.  SMUD argues that PG&E should modify its ETC template to reflect that termination is currently being contested and that certain provisions of the contract create a contingent termination date.

55.     PG&E states that the ETC template contains a footnote stating that termination of this contract is currently pending at the Commission.

### Commission Determination

56.     The Grizzly Agreement provides for several alternative termination dates, *i.e*., Reverter Dates.[38]  The original provision on the Reverter Dates was amended to provide that the latest possible Reverter Date may occur on or after the later of January 1, 2034 or the third possible Reverter Date.[39]  The third possible Reverter Date is to occur on the

---

[36] Optional termination dates are defined as Reverter Dates.

[37] Rate Schedule No. 37.

[38] *See* section 12.3.1 of the Grizzly Agreement.

[39] See section 2 of Amendment No. 1 of the Grizzly Development and Mokelomne Settlement Agreement between SVP and PG&E.

twenty-fifth anniversary of the Commercial Operation Date.[40]   Pursuant to section 1.1.3, the Commercial Operation Date shall be "0000 hours on the day following the completion" of the construction process and follow-up procedures, as defined in the Grizzly Agreement.   Section 1.1.3 also states that the Commercial Operation Date under the Grizzly Agreement may not necessarily coincide with the completion date, as approved by the Commission.  Absent the information about the Commercial Operation Date, we can make no determination on the latest possible termination date of the Grizzly Agreement.  For this reason, we direct PG&E to provide us with the information on the Commercial Operation Date under the Grizzly Agreement at the time when it makes a compliance filing directed in this order.  PG&E must also submit supporting documentation to substantiate its position.  In addition, we also note that the revised ETC template must reflect both the earliest and the latest possible termination dates.

57.    With respect to the EHV Agreement, on December 3, 2004, the Commission issued an order accepting PG&E's notice of cancellation of the EHV Agreement.[41] Accordingly, we find that the EHV Agreement should no longer be included in PG&E's ETC template.

### D.  Type of Services Provided under Existing Contracts

58.    Turlock argues that the ETC template submitted by PG&E for the Interconnection Agreement between Turlock and PG&E (Rate Schedule No. 213) does not fully represent the type of service provided under the agreement.  Turlock notes that PG&E accurately identified much of the Reserved Transmission Service provided under the agreement as "point-to-point."  However, Turlock states that PG&E provides approximately 10 MW of firm, bi-directional Reserved Transmission Service that Turlock can use for access to or from NCPA and/or SVP.  As a result, Turlock contends that the service has characteristics of limited network or flexible point-to-point service and therefore should be reflected in the ETC template submitted by PG&E.

59.    In response, PG&E contends that because the service under the Turlock Interconnection Agreement involves delivery from and to specific receipt and delivery points, the "point-to-point" identification is appropriate for this agreement.

60.    SVP also objects to PG&E's characterization of the type of service provided under the Grizzly Agreement between PG&E and SVP.[42]  PG&E identified the transmission service as "point-to-point," while SVP's ETC template identified the service as both "point-to-point" and integration service.  SVP states that it is not clear why PG&E would

---

[40] *See supra* n. 40.

[41] *See Pacific Gas and Electric Company*, 109 FERC ¶ 61,255 at P 70 (2004).

[42] Service Agreement No. 20 to PG&E's Electric. Tariff Sixth Revised Volume No. 5.

characterize the transmission service as only point-to-point service because the agreement relies on various source and sink points on PG&E's system.[43] SVP requests that the Commission review the actual contract and require PG&E to be more specific on the exact source and sink points.

61.     PG&E states that there is a netting arrangement under the agreement in which PG&E can meet SVP's load from sources other than the Grizzly power plant. However, PG&E states, the transmission provided under the Grizzly Agreement relies on the exact source and sink points listed by PG&E in its ETC template, which can only be characterized as point-to-point. PG&E also argues that the Grizzly plant and Santa Clara receiving stations relate to energy deliveries under the contract, but do not change the transmission service provided under the Grizzly Agreement.

**Commission Determination**

62.     Our review of the Grizzly Agreement indicates that the appropriate characterization of this agreement should be "point-to-point" and "system integration." Section 7 of the Grizzly Agreement states that the transfer of electric power shall only occur at the point(s) of interconnection identified in the agreement. We note that Appendix A of the Grizzly Agreement provides for multiple source and sink points to assist in the delivery of capacity and energy under this agreement. We also note that sections 9.1.1 and 9.1.2 of the Grizzly Agreement state that capacity will be delivered to PG&E "at *receiving stations* or *other points of delivery*, if necessary." As a result, we find that the Grizzly Agreement provides parties with various options to transfer electric power over the interconnected systems and should, therefore, be characterized as both "point-to-point" and system integration.

63.     As for Turlock Interconnection Agreement, we believe that the appropriate characterization of the type of service provided under this ETC should be both "point-to-point" and system integration. Section 5.1 explicitly states that transmission service is to be provided only between Turlock and specified transaction points on PG&E's system. However, pursuant to sections 5.1 through 5.1.4, the list of specified transactions points includes multiple source and sink points on PG&E's system. For this reason, we find that the type of transmission service provided under the Turlock Interconnection Agreement is both "point-to-point" and system integration.

The Commission orders:

        (A)  Guidance and clarification on the scope and characterization of the ETCs are hereby provided, as discussed in the body of this order.

---

[43] SVP refers to sections 9.1.1 and 9.1.2 of the Grizzly Agreement to demonstrate its entitlement. SVP claims there are various source points (including the Grizzly plant) and the sink points are the Santa Clara Receiving Stations or "other Points of Delivery."

Case: 19-30088   Doc# 7209-3   Filed: 05/15/20   Entered: 05/15/20 08:16:05   Page 19 of 20

Docket No. ER04-928-000, *et al.*                                        19

   (B)  PG&E and SCE are hereby directed to submit, within 30 days of the date of issuance of this order, a compliance filing revising the previously submitted ETC templates to reflect the Commission's findings in the body of this order.

   (C)  SMUD's request for rehearing is hereby denied, as discussed in the body of this order.

By the Commission. Commissioner Kelly not participating.

( S E A L )

Magalie R. Salas,
Secretary.