Kenneth N. Klee (State Bar No. 63372)
David M. Stern (State Bar No. 67697)
Samuel M. Kidder (State Bar No. 284015)
KTBS LAW LLP, *f/k/a* KLEE, TUCHIN, BOGDANOFF & STERN LLP
1999 Avenue of the Stars, Thirty-Ninth Floor
Los Angeles, California 90067
Telephone: 310-407-4000
Facsimile: 310-407-9090
Email: kklee@ktbslaw.com
dstern@ktbslaw.com
skidder@ktbslaw.com

*Attorneys for Trans Bay Cable LLC*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF TRANS BAY CABLE LLC TO PROPOSED CURE AMOUNT IN CONNECTION WITH SPECIAL AGREEMENT FOR UNMETERED ELECTRICAL SERVICE**<br><br>[*Declarations of Michael Blunt and Lenneal Gardner Filed Concurrently Herewith*]<br><br>[Hearing Date TBD] |

Pursuant to Bankruptcy Code section 365(b)(1), Section 8.2(b) of the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* [Docket No. 6320] (as amended, modified, or supplemented, the "Plan"), and Paragraph 7 of the *Schedule of Executory Contracts and Unexpired Leases to be Assumed Pursuant to the Plan and Proposed Cure Amounts* [Docket No. 7037] (the "Cure Notice"), Trans Bay Cable LLC ("TBC") hereby objects to the assumption of that certain *Special Agreement for Unmetered Electrical Service –*

*Limited Exception*, dated August 7, 2017 (together with that certain amendment thereto executed on or about August 21, 2017, the "Special Agreement"),[1] by and between TBC and Pacific Gas and Electric Company ("PG&E" and, together with TBC, the "Parties"), absent payment of the $270,760.76 cure amount owed to TBC thereunder. In support of this objection, TBC relies on the Declaration of Michael Blunt ("Blunt Declaration") and the Declaration of Lenneal Gardner ("Gardner Declaration") filed concurrently herewith.

## I.  BACKGROUND

### A. The Special Agreement

TBC constructed, owns, and operates a 53-mile direct current electrical transmission cable (the "Transmission Line") buried in the San Francisco Bay. The Transmission Line extends from a converter station in the city of Pittsburg, CA to a similar converter station in San Francisco, CA. It provides up to approximately 40% of the peak electrical power needs of the city of San Francisco. Blunt Decl. ¶ 3. TBC has two converter stations, one of which is located in Pittsburg, CA (the "Pittsburg Converter Station") and is connected to PG&E's electric system at 230kV and the other of which is located in San Francisco, CA (the "Potrero Converter Station" and, together with the Pittsburg Converter Station, the "Converter Stations") and is connected to PG&E's electric system at 115kV. *See* Special Agreement, Recitals.

TBC's Converter Stations require electric energy to: (i) support the converter equipment at the Converter Stations ("non-retail power"), and (ii) provide the power needs of the supporting buildings and other non-transmission equipment ("retail power"). *Id.*[2] When the Transmission Line is energized, retail power is drawn from PG&E's distribution system. *Id.* When the Transmission Line is not energized, TBC draws retail power from TBC's on-site diesel generators.

---

[1] A true and correct copy of the Special Agreement is attached as Exhibit 1 to the Gardner Declaration. A true and correct copy of that certain *Amendment to Special Agreement for Unmetered Electrical Service – Limited Exception*, executed on or about August 21, 2017, is attached as Exhibit 2 to the Gardner Declaration.

[2] TBC has two retail accounts with PG&E, one for the Pittsburg Converter Station, serviced under PG&E account number 6490430917, and one for the Potrero Converter Station, serviced under PG&E account number 1592848224. *Id.*

KTBS LAW LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

*Id.* There is no metering to separately measure the retail energy used at either Converter Station when the Transmission Line is energized (*i.e.*, the existing retail meters at the converter stations do not capture the retail portion of the load). *Id.*

Accordingly, the Parties entered into the Special Agreement to set forth a methodology to determine the amounts payable to PG&E in respect of un-metered retail energy consumed by the Converter Stations and other buildings and related equipment that support the Transmission Line. *Id.* The Special Agreement provides, *inter alia*, that each monthly electric bill from PG&E for each Converter Station will include an additional amount for the estimated unmetered usage (the "<u>Monthly Retail Adder</u>") as calculated in Section 4 of the Special Agreement. *See* Special Agreement §§ 2, 4.

To determine the Monthly Retail Adder, the Parties made certain assumptions about TBC's estimated retail energy use (the "<u>Estimated Retail Demand</u>"), as set forth in detail in Attachment A to the Special Agreement. The Estimated Retail Demand was based on technical drawings and other assumptions about the unmetered retail energy consumption at the Converter Station, including assumptions based on the energy ratings put out by the manufacturers of the equipment that draws retail power at the Converter Stations (*e.g.*, air conditioners). *See id.* §§ 3, 4 & Attachment A.

The Special Agreement provides for certain adjustments to be made to the Estimated Retail Demand, ultimately resulting in a "Modified Monthly Energy Usage" estimate for each Converter Station. *Id.* § 4. TBC's monthly bill for unmetered retail energy (*i.e.*, the Monthly Retail Adder) is calculated my multiplying the "Modified Monthly Energy Usage" by the appropriate current PG&E retail rate, as published in PG&E's tariffed rate schedule. *Id.* § 4(c). In other words, the Special Agreement provides that the amount TBC owes PG&E for unmetered retail energy is based entirely on estimates of TBC's retail energy consumption (which estimates do not vary from month to month). The monthly bill is not tied to TBC's *actual* consumption of retail power.

Although the Special Agreement provides an initial estimate of TBC's retail usage, it expressly contemplates that "[t]he Estimated Retail Demand numbers may change from time to time if there are changes to the unmetered retail loads at either converter station." *Id.* § 3. Under

such circumstances, TBC is to "notify PG&E in writing within thirty (30) days of becoming aware of any material modification to the retail loads at either converter substation." *Id.* Within 60 days of such notice, the "Parties shall review and agree in writing to updates to the calculation of the Estimated Retail Demand for each or either converter station. This review may require TBC and PG&E to perform a physical review of either converter station, a review of past TBC retail bills, and other appropriate inspections." *Id.*

**B.     TBC's Installation of Meters and Discovery of Overpayments**

In or about July 2018, TBC installed four brand new metering units to meter the consumption of the circuits that draw retail energy. Blunt Decl. ¶ 5. TBC was thereby able to directly measure the retail energy consumed by each Converter Station. *Id.* TBC collected a three-month sample of meter readings to ensure accuracy and consistency. *Id.* The meters showed that the Estimated Retail Demand assumed in the Special Agreement significantly overstated TBC's actual retail energy consumption. *Id.* ¶ 6. Specifically, the meters showed the following actual retail loads for the months of July, August, and September 2018:

| Converter Station | Jul-18 | Aug-18 | Sep-18 | Monthly Average |
|---|---|---|---|---|
| Pittsburg | 40,210.50 kWh | 38,770.10 kWh | 36,260.40 kWh | 38,413.67 kWh |
| Potrero | 18,440.20 kWh | 18,053.30 kWh | 18,273.80 kWh | 18,255.77 kWh |

*See* Blunt Decl. Ex 4. A table setting forth TBC's actual metered retail consumption for each month from July 2018 through April 2020 is attached as Exhibit 4 to the Blunt Declaration.

By contrast, the "Modified Monthly Energy Usage" estimates in the Special Agreement are 65,474 kWhs for the Pittsburg Converter Station (approximately 70% greater than the average actual monthly meter reading for the three-month period) and 62,681 kWhs for the Potrero Converter Station (approximately 243% greater than the average actual monthly meter reading for the same period). Special Agreement § 4(d).

On November 28, 2018, TBC's Director of Operations, Michael Blunt, emailed a PG&E representative to discuss TBC's retail load. Blunt Decl. ¶ 9 & Ex. 5. On or about November 29, 2018, Mr. Blunt had a phone call with Andrew D'Amico, PG&E's account representative for the

TBC accounts, regarding TBC's "request to review the unmetered load agreement for our facility." *Id.* ¶ 10 & Ex. 5. Mr. Blunt explained on that call that TBC's meter data demonstrated that TBC was being substantially overcharged for retail energy. *Id.* ¶ 10. On December 14, 2018, Mr. Blunt had a call with Mr. D'Amico and Dylan Savidge of PG&E, during which Mr. Blunt again explained the issue and requested that PG&E review and revise the estimates of retail demand under the Special Agreement. *Id.*

On January 25, 2019, TBC's in-house counsel, Mr. Gardner, notified PG&E in writing "that TBC is aware of material modification to the retail loads at both its converter stations as a result of new information regarding the retail load demands. TBC has installed meters at both its facilities to track previously unmetered retail load and compared those outputs with those utilized in Attachment A to the Special Agreement. Based on TBC's calculation, from March 2018 to current, TBC has overpaid the Monthly Retail Adder by an estimated total sum of $154,000 and formally requests a refund of the overpayment." Gardner Decl. Ex. 3. TBC further stated that it was "open to any review and other inspections as required by the Special Agreement for the verification of its findings." *Id.*

In an email exchange spanning the period from December 2018 to February of 2019, Mr. Blunt sent to PG&E representatives certain line drawings and technical information regarding the meters installed by TBC. Blunt Decl. ¶ 11 & Ex. 6. Mr. Savidge of PG&E responded: "I just spoke with our metering engineer. He has reviewed the metering information and single lines and feels that we can work with this. He would like to visit both sites and it looks like he's available the week of February 25." *Id.*

On April 9, 2019, Messrs. D'Amico and Savidge of PG&E visited the Pittsburg Converter Station to inspect and verify the meter installed by TBC. *See id*. ¶ 12. After discussing the matter with Mr. Blunt and reviewing the meters installed by TBC, Messrs. D'Amico and Savidge acknowledged that the Estimated Retail Demand figures in the Special Agreement overstated TBC's actual retail energy consumption. *Id.* They stated, however, that due to technical incompatibilities between PG&E's technology and TBC's meters, PG&E would not be able to draw usage data from TBC's meters for purposes of calculating retail load. *Id.* Mr. Blunt

KTBS LAW LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

discussed potential workarounds with them, including installation by PG&E of its own meters at the Converter Stations. *Id.* The PG&E representatives informed Mr. Blunt that they would look into such solutions. *Id.* On September 13, 2019, Mr. Blunt followed up with another email to Messrs. D'Amico and Savidge, asking "how your meter department is doing with regards to our meter solution, and if they are able to integrate with out [*sic*] meters?" *Id.* ¶ 13 & Ex. 7. PG&E never responded. *Id.* ¶ 13.

Thus, notwithstanding its acknowledgment that the Estimated Retail Demand in the Special Agreement materially overstates TBC's retail usage, PG&E continues to bill TBC (and TBC continues to pay such bills) based on the inflated estimate of retail consumption set forth in the Special Agreement. *See* Blunt Decl. ¶ 8 & Ex. 4. Nor has PG&E agreed to refund TBC for overpayments made pursuant to the outdated methodology set forth in the Special Agreement, despite TBC's formal request for a refund.

Exhibit 4 to the Blunt Declaration displays (i) the amount invoiced by PG&E (and paid by TBC) for each month from July 2018 to April 2020; and (ii) the estimated amount that TBC should have been charged for retail energy based on its actual metered usage for each of the same months. Overall, Exhibit 4 shows that TBC has overpaid PG&E by an estimated total of $270,760.76 during the period from July 2018 to April 2020.[3]

**C.    The Cure Notice**

On May 1, 2020, PG&E filed the Cure Notice. Although the Special Agreement is not listed on the Cure Notice,[4] Section 8.1 of the Plan provides that "[a]s of, and subject to, the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases of the Reorganized Debtors shall be deemed assumed" (subject to certain exceptions not applicable here). Plan § 8.1(a). Accordingly, it is TBC's understanding

---

[3] TBC does not yet have billing or metering data available for the month of May 2020. Any overpayments made in May 2020 and subsequent months must also be refunded in connection with assumption of the Special Agreement.

[4] Two other contracts for which TBC is listed as the counterparty are listed on the Cure Schedule (a "Special Facilities Agreement" and an "Interconnection Agreement," each dated June 1, 2007). This cure objection does not pertain to those two contracts.

KTBS LAW LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000

that PG&E proposes to assume the Special Agreement as of the Effective Date with no cure payment.[5]

## II. ARGUMENT

Bankruptcy Code section 365(b)(1) provides, in pertinent part, that "[i]f there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee … cures, or provides adequate assurance that the trustee will promptly cure, such default" and "compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default …." 11 U.S.C. § 365(b)(1).

Here, PG&E is in default under the Special Agreement. By its letter of January 25, 2019, TBC notified PG&E of a "material modification to the retail loads at [both] converter station[s]." *See* Special Agreement § 3; Gardner Decl. Ex. 3. The Special Agreement provides that upon receipt of such notification, the Parties "***shall*** review and agree in writing to updates to the calculation of the Estimated Retail Demand for each or either converter station." Special Agreement § 3 (emphasis added). Following its visit to the Pittsburg Converter Station, PG&E did not dispute the existence of a "material modification" to the retail load. Indeed, PG&E acknowledged that TBC is being substantially overcharged based on the Estimated Retail Demand set forth in the contract. Nevertheless, PG&E has been non-responsive to TBC's repeated efforts to reach agreement on "updates to the calculation of the Estimated Retail Demand." Special Agreement § 3.

As a result of PG&E's failure to comply with the Special Agreement, PG&E has overcharged TBC by an estimated $270,760.76. Blunt Decl. Ex. 4. PG&E cannot assume the Special Agreement unless it (i) agrees to update the calculation of Estimated Retail Demand under the Special Agreement for all purposes going forward, and (ii) compensates TBC for the

---

[5] Counsel for TBC contacted counsel for PG&E on May 8, 2020 to discuss a potential consensual resolution of this dispute. PG&E's counsel did not provide a substantive response, thus necessitating this objection.

$270,760.76 pecuniary loss (plus any overcharging that occurs in May 2020 or subsequent months) it has suffered as a result of PG&E's failure to comply with the Special Agreement. 11 U.S.C. § 365(b)(1).

### III. CONCLUSION

WHEREFORE, TBC respectfully requests that the Court condition assumption of the Special Agreement on PG&E's cure payment of $270,760.76 to TBC.

DATED: May 15, 2020  /s/ Samuel M. Kidder
Kenneth N. Klee
David M. Stern
Samuel M. Kidder
KTBS LAW LLP, *f/k/a* KLEE, TUCHIN, BOGDANOFF & STERN LLP

*Attorneys for Trans Bay Cable LLC*

KTBS LAW LLP
1999 AVENUE OF THE STARS, THIRTY-NINTH FLOOR
LOS ANGELES, CALIFORNIA 90067
TELEPHONE: 310-407-4000