William B. Abrams
end2endconsulting@gmail.com
1519 Branch Owl Place
Santa Rosa, CA, 95409
Tel: 707 397 5727

*Pro Se Claimant and*

*Party to California Public Utilities Commission Proceeding I.19-09-016 to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19- 30088.*

*Party to California Public Utilities Commission Proceeding I.15-08-019 to Determine whether Pacific Gas and Electric Company and PG&E's Corporation's Organizational Culture and Governance Prioritizes Safety*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>    -and-<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>               Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>**\*  *All papers shall be filed in the lead case, No. 19-30088 (DM)*** | Bankr. Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administrated)<br><br>**WILLIAM B. ABRAMS OBJECTION TO DEBTORS PLAN OF REORGANZIATION PURSUANT TO 11 U.S.C. §§ 1129(A) [DKT. 6320]**<br><br>**<u>Hearing:</u> Telephonic Appearances Only**<br>Date: May 27, 2020<br>Time: 10am PT<br>Place: Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA, 94102<br><br>Judge: Hon. Dennis Montali |

## PRELIMINARY STATEMENT AND INTRODUCTION

1.      I, William B. Abrams, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information and belief:

2.      **The proposed plan of reorganization is in direct violation of § 1129(a)(3) and § 1129(a)11** given that it is has not been proposed in good faith and has been leveraged for the primary purposes of investor short-term payouts at the detriment of plan integrity.  The Restructuring Support Agreements ("**RSAs**") that served as foundational documents for the direction of this proceeding were in violation of law as demonstrated in the *"Objection to Debtors' Motion Pursuant to 11 U.S.C. §§363(b) and §§105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter Into Restructuring Support Agreement with the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents and (II) Granting Related Relief"* [Dkt. 5139] and in the "William B. Abrams *Objection to Debtors' Motion Pursuant to 11 U.S.C. §§363(b) and §§105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Approving and Authorizing the Debtors to Enter Into a Restructuring Support Agreement with Consenting Noteholders and Shareholder Proponents and (II) Granting Related Relief"* [Dkt. 5576] and through various other objections that myself and other parties put forward to the court through the course of this proceeding.  These objections were designed to promote and improve the plan of reorganization in "good faith" but were consistently circumvented throughout this proceeding until the *"William B. Abrams Motion to Designate Improperly Solicited Votes Pursuant to §§1125(B) and §§1126(E) and Bankruptcy Rule 2019"* [Dkt. 6799] and subsequent joinders pointed to clear evidence and left no doubt regarding the fundamental and structural integrity issues associated with this case.  The fact that these actions and inaction to undermine the integrity of the plan largely occurred outside the hearing room does not make the plan any less flawed.  The fact that these efforts have also undermined the safety and security of current and future PG&E wildfire victims should also be critical for the court to consider.

# ARGUMENT: Clear Violations of 11 U.S.C. §§ 1129(a)(3)

3.    **Section 1129(a)(3)** requires the plan to have been "proposed in good faith and not by any means forbidden by law"[1] While "good faith" is not defined within the Code, it is generally interpreted in the context of section 1129(a)(3) to mean that there is a "reasonable likelihood that the plan will achieve a result consistent with the objectives and the purposes of the Bankruptcy Code."[2] We must keep in mind that a plan is proposed in good faith "only if it has a legitimate and honest purpose to reorganize the debtor."[3]  However, this plan was developed and devised to provide short-term payouts for investors to the determinant of the Debtors and cloaked in a seemingly honest plan to settle with victims and reorganize the company.

4.    Indeed, Section 1129(a)(3) "speaks more to the process of the plan development than to the content of the plan."[4]  Given this, we must consider how the plan development process inside and outside the courtroom was leveraged to ensure short-term payouts for parties to this proceeding rather than for the overall health of the Debtors as will be described in later sections of this objection. This was stated very pointedly by Skikos, Crawford, Skikos and Joseph, counsel in a April 23, 2020 townhall and in a subsequent letter obtained and publicly posted by the Watts Guerra and co-counsel "Fire Settlement Facts" website stating "**Unfortunately, the hedge funds that have hijacked these bankruptcy proceedings (all to their significant financial benefit), did not care about your concerns BEFORE the coronavirus pandemic, nor do they care about them now.**"[5]  I greatly appreciate the Skikos Law Firm for rightly calling out these injustices and they should be commended for their advocacy and this truthful representation to their clients.  However, just because these views were vehemently and consistently expressed by many parties only outside the courtroom, it should not preclude them from being considered within this plan confirmation decision.  In consideration of these violations, the court should consider the totality of the circumstances with a

---

[1] 11 U.S.C. § 1129(a)(3).

[2] See In re Chemtura Corp., 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010) (Gerber, J.); see also In re Breitburn Energy Partners LP, 582 B.R. 321, 352 (Bankr. S.D.N.Y. 2018) (Bernstein, J.); Matter of Madison Hotel Assocs., 749 F.2d 410, 424-26 (7th Cir. 1984).

[3] Chemtura Corp., 439 B.R. at 608 (internal quotation omitted); see 20 Bayard Views, 445 B.R. at 95-96.

[4] See Breitburn Energy Partners, 582 B.R. at 352 (quoting Chemtura Corp., 439 B.R. at 608).

[5] See Watts Guerra, Hansen and Miller Law and the Law Office of Joseph Earley "Fire Settlement Facts" website https://firesettlementfacts.com/ as "Skikos, Crawford, Skikos & Joseph Email"

"fact-intensive, case-by-case inquiry."[6]  However, when these issues were brought to light by TCC resignations, news reports and in the hearing on May 12, 2020 there was no call by parties for transparency or disclosure related to these issues.  The integrity of the plan process has been compromised and therefore the integrity of the plan of reorganization itself has been compromised in direct violation of Section 1129(a)(3).

5.      Moreover, in consideration of Section 1129(a)(3) the court should also take a close look at the vote solicitation process and not necessarily on the substantive plan provisions.[7]  As the court takes a "good faith inquiry" of the voting process relative to plan confirmation it should consider the "*William B. Abrams Motion to Designate Improperly Solicited Votes Pursuant to §§1125(B) and §§1126(E) and Bankruptcy Rule 2019*" [Dkt. 6799], as well as the "*Notice of Plan Voting Procedure Irregularities*" [Dkt. 7069] and the "*Second Notice of Voting Procedure Irregularities*" [Dkt. 7186].  After a look at the pervasive bad-faith solicitation practices documented in these papers and the manner in which this case has been "hijacked" as a vehicle to ensure short-term benefits for investors rather than to restore the health of the company, the court must conclude significant violations of Section 1129(a)(3).

## ARGUMENT: Clear Violations of 11 U.S.C. §§ 1129(a)(11)

6.      **Section 1129(a)(11) provides, "The court shall confirm a plan only if all of the following requirements are met:  Confirmation of the plan is not likely to be followed by the liquidation, or the need for further reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."[8]**  It is clear from an analysis of the plan and the risk profile of the company that near-term liquidation is highly likely and there is no mention of this path anywhere in the proposed plan of reorganization.  Indeed, the plan is patently unconfirmable due to a lack of financial viability as a plan for reorganization and

---

[6] Solow v. PPI Enters. (U.S.), Inc. (In re PPI Enters. (U.S.), Inc.), 324 F.3d 197, 211-12 (3d Cir. 2003); see Chemtura Corp., 439 B.R. at 608 ("The bankruptcy judge is in the best position to assess the good faith of the parties' proposals.") (internal quotation omitted).
[7] 20 Bayard Views, 445 B.R. at 95-96.
[8] Id. § 1129(a)(11).

unconfirmable on its face given its complete failure to address feasibility standards required by Section 1129(a)(11).

7.      The misuse and abuse of the victim trust and registration rights agreement to withhold key information from victims (trust funding dates, stock dilution terms, stock-sale prioritization, etc.) and then asking victims to vote on a plan without clear dates or dollars is manifestly unjust. It allows the short-term interests of entrenched shareholders and bondholders to supersede the interests of victims to achieve a fair settlement. More importantly and relevant to Section 1129(a)(11) is that the plan of reorganization with these provisions gives investors securitization and exit strategies to abandon the Debtors when risks from PG&E wildfires and/or further PG&E unlawful activities drive the Debtors into insolvency within months after an exit from bankruptcy. Indeed, cementing the exit strategy for entrenched company investors is the primary goal of this plan and NOT the health of the Debtors.

8.      Mr. Johnson, CEO of Pacific Gas and Electric Corporation ("**PG&E**") stated under cross examination at the California Public Utilities Commission on February 25, 2020 that his expectation was that hedge funds would exit the stock and that "What we are trying to do is set up a situation where we have traditional, usual way utility investors come back into the stock…"[9] Later that week on February 28, 2020 Mr. Wells, CFO of PG&E stated under cross examination that his expectation was that after bankruptcy exit "the issuer rating will be as phrased here sub-investment grade or junk."[10] This notion that PG&E will be able to attract "traditional utility investors" with the predicted exponentially higher risk or wildfires, COVID and a company with a junk rating is a fantasy at best and at worst an investor ploy to provide cover for a company sell-off this summer. Victims with their 21% shareholder stake will be forced to hold the stock during these highly risky times to enable a clear pathway for other majority shareholders to sell. Given this "Plan A" for the equity investors, the previously financially-exposed "Senior Unsecured Noteholders" successfully negotiated securitization and asset liens for their investments before they dropped their competing plan. Simply stated, this win-win short-term exit strategy for equity and debt is a lose-lose strategy

---

[9] California Public Utilities Commission, I19-09-016 Evidentiary Hearing Transcript, February 25, 2020, page 99 (lines 27-28) http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M327/K740/327740877.PDF
[10] California Public Utilities Commission, I.19-09-016 Evidentiary Hearing Transcript, February 28, 2020, page 604 (lines 21-22) http://docs.cpuc.ca.gov/PublishedDocs/Efile/G000/M328/K691/328691064.PDF

for victims, the Debtors and the public. More importantly for this proposed plan of reorganization is that this strategy embedded in the plan is in direct violation of Section 1129(a)(11).

9.      Specifically, in order "to demonstrate feasibility, the plan proponent must establish that there will be sufficient cash flow to fund the plan and maintain operations according to the plan."[11] There is absolutely no way that the Debtors will have sufficient cash flow this summer as investors exit the stock and they are unable to increase rates due to AB1054 "ratepayer neutral" provisions. This situation will not only lead the company into insolvency but it will serve to revictimize PG&E victims and the public. There are some unrealistic calculations that because of COVID it is better to deal with these insolvency issues this summer but I do not support that path and it is not in keeping with Section 1129(a)(11). The Eleventh Circuit has recently explained that for a plan to satisfy the feasibility test, a court must determine that the plan is not likely to "be followed by Chapter 7 liquidation, a Chapter 11 liquidation, or a Chapter 11 classic reorganization."[12] There is NO reasonable or rational look at the strategic moves of investors during this bankruptcy proceeding, the risk profile of PG&E and the external risks posed by COVID and this wildfire season and come to the conclusion that this feasibility test is satisfied.

10.      The purpose of the feasibility test is to "ensure that a bankruptcy court confirms a plan only if it finds that the plan creates a 'reasonable assurance of commercial viability.'"[13] Additionally, "the feasibility standard requires a court to consider whether the plan offers a reasonable probability of success."[14] When the savvy equity investors, bondholders and others evaluate the risks and position themselves to exit the stock and sell off should the court take the diametrically opposite position and reasonably predict success? The court should not take that position and expose victims and the public to these short-term eventualities. This would be an imprudent path for the court and not in keeping with bankruptcy law. More importantly to this claimant, it will endanger the lives and the livelihoods of my family and our communities and thus will impair future victim claimants.

---

[11] Barbara J. Houser et al., Disclosure Statements: Confirmation and Cramdown of Chapter 11 Plans, ST005 A.L.I.-A.B.A. 2177, 2205 (2011).
[12] United Mine Works of Am. Combined Benefit Fund v. Toffel (In re Walter Energy, Inc.), 911 F.3d 1121, 1155 (11th Cir. 2018).
[13] Id.
[14] Two Streets., 597 B.R. at 317. (Bankr. S.D. Miss. 2019)

## **CONCLUSION**

11.     The proposed plan of reorganization is manifestly unjust for victims, based upon bad-faith negotiations and vote solicitation processes and flatly unconfirmable based on Section 1129. This is the basis of my objection.  However, it is the detrimental effects of this plan on victims and the public that has compelled me to take this position and object to the plan.  Myself and certain other parties like those that resigned from the TCC have been working to improve the plan at each and every stage of this proceeding for victims, the public and the Debtors.  These three courageous members of TCC understood that the bankruptcy process had been compromised irreparably which is why they resigned on moral ground.  Likewise, I cannot support a plan that victimizes current and future PG&E wildfire survivors and exposes the company and California to unacceptable risks at the hands of investors and parties to this proceeding who see the risks but would prefer to cash out rather than work collaboratively in good-faith work towards just ends.  I implore the court to consider these implications and deny this plan from promoting a dire reality for the company, victims and the public.


Dated:  May 15, 2020



                                                    Respectfully submitted,

                                                    William B. Abrams
                                                    Pro Se Claimant