DOWNEY BRAND LLP
R. DALE GINTER (Bar No. 100784)
dginter@downeybrand.com
JAMIE P. DREHER (Bar No. 209380)
jdreher@downeybrand.com
621 Capitol Mall, 18th Floor
Sacramento, California 95814
Telephone:    916.444.1000
Facsimile:    916.444.2100

Attorneys for Emmerson Investments, Inc.

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In re | Case No. 19-30088-DM |
| PG&E Corporation | Chapter 11 |
| and | **EMMERSON INVESTMENT, INC.'S OBJECTION TO THE PROPOSED CURE AMOUNT** |
| PACIFIC GAS AND ELECTRIC COMPANY. | |
| | Date:       May 27, 2020 |
| | Time:       10:00 a.m. |
| Debtors. | Place:      Courtroom 17 |
| | 450 Golden Date Avenue |
| [ ] Affects PG&E Corporation | San Francisco, CA 94102 |
| [ ] Affects Pacific Gas and Electric Company | Judge:     Hon. Dennis Montali |
| [x] Affects Both Debtors, | |
| *All papers shall be filed in the Lead Case No. 19-30088-DM | |

Claimant, Emmerson Investments, Inc. ("EII") operates a "small power production

facility" as defined in 18 CFR §§292.203(c) and 292.204.  Said facility is called the Grasshopper

Flat Hydroelectric Project ("Project") and is located at 647 Nelson Creek Road, Big Bend, Ca.

96001.  The Project provides Pacific Gas and Electric Company ("PG&E") with electricity that is

a renewable resource pursuant to a Renewable Market Adjusting Tariff Power Purchase

Agreement executed by PG&E on January 31, 2017 (the "Power Purchase Agreement").

EII has filed 2 proofs of claim.  The first of these claims, attached as Exhibit A, is a

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 1 of 70

1635814v1

DOWNEY BRAND LLP

Section 503(b)(9) priority claim in the amount of $17,195.72 and is designated as Claim Number 2395. EII's second proof of claim, attached as Exhibit B, is a non-priority claim in the amount of $1,582.72 and is designated as Claim Number 30847. Both of EII's proof of claims arise from amounts owing under the Power Purchase Agreement.

On May 1, 2020 PG&E filed its Notice of Filing of Plan Supplement In Connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020 [Docket # 7037] ("Notice"). Exhibit B to the Notice is the Schedule of Executory Contracts and Unexpired Leases To Be Assumed Pursuant to the Plan and Proposed Cure Amounts (the "Assumption Schedule").

EII's Power Purchase Agreement with PG&E is listed on Page 458 of 1778 (or page 478 of 2063 on Docket # 7037) with a proposed cure amount of $17,195.72. EII has no objection to the assumption of the Power Purchase Agreement but does object to the cure amount because it does not include the $1,582.72 as set forth in Claim Number 30847. The correct cure amount is $18,778.44.

Additionally, the Assumption Schedule reflects an address for EII of 30 Federal St., 5th Floor, Boston, Ma. 02108. EII has never had an address in Boston. Its correct address is c/o Sierra Pacific Industries, P. O. Box 496028, Redding, Ca. 96049, Attn: Michael Dalglish.

Bankruptcy Code Section 365(b)(1)(A) makes the curing or providing adequate assurance of a prompt cure a prerequisite to the assumption of the Power Purchase Agreement.

Wherefore, EII respectfully requests the Court to authorize assumption but with a cure amount of $18,778.44.

DATED: May 15, 2020                    DOWNEY BRAND LLP


                                       By: _____/s/ R. Dale Ginter_____
                                              R. DALE GINTER
                                       Attorneys for Emmerson Investments, Inc.

# EXHIBIT A

# United States Bankruptcy Court, Northern District of California

**Fill in this information to identify the case (Select only one Debtor per claim form):**

- [ ] PG&E Corporation (19-30088)
- [x] Pacific Gas and Electric Company (19-30089)

# Proof of 503(b)(9) Claim

**Read the instructions before filling out this form.** This form is for asserting claims entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) against one of the above Debtors arising on or after January 9, 2019 through and including January 28, 2019. Do not use this form to assert any other pre-petition claim(s). Assert such claims on Form 410.

**11 U.S.C. § 503(b)(9)** applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Emmerson Investments, Inc. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |

**2. Has this claim been acquired from someone else?**
- [x] No
- [ ] Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

R. Dale Ginter - Downey Brand LLP
621 Capitol Mall, 18th Floor
Sacramento, CA 95817

Contact phone 916-520-5353
Contact email dginter@downeybrand.com

Where should payments to the creditor be sent? (if different)

Sierra Pacific Industries
c/o Mike Dalglish
P.O. Box 496028
Redding, CA 96049

Contact phone 530-378-8275
Contact email mdalglish@spi-ind.com

**4. Does this claim amend one already filed?**
- [x] No
- [ ] Yes. Claim number on court claims registry (if known) _____  Filed on ____/____/____  MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**
- [x] No
- [ ] Yes. Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. On what date (or dates) were the goods delivered? (if known)**

01/09/2019 _____ (mm/dd/yyyy)

**7. How much is the claim?**

$ 17,195.72 _____

Note: 11 U.S.C. § 503(b)(9) applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Do not include in the above amount the value of goods received by the Debtor outside of that period, or the value of any other services performed. Assert such claims on Form 410.

**8. What is the description of the goods provided in the claim?**

Electricity

| Part 3: | Sign Below |
|---|---|

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☑ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

**Signature:** *R. Dale Ginter*
R. Dale Ginter (Apr 17, 2019)

**Email:** mfrazier@downeybrand.com

Signature

Print the name of the person who is completing and signing this claim:

| Name | R. Dale Ginter | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Lawyer | | |
| Company | Downey Brand LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 621 Capitol Mall, 18th Floor | | |
| | Number      Street | | |
| | Sacramento | CA | 95814 |
| | City | State | ZIP Code |
| Contact phone | 916-520-5353 | Email | dginter@downeybrand.com |

**Attach Supporting Documentation** (limited to a single PDF attachment that is less than 5 megabytes in size and under 100 pages):

☒ I have supporting documentation.
   (attach below)

☐ I do not have supporting documentation.

 Attachment

PLEASE REVIEW YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTS AND REDACT ACCORDINGLY PRIOR TO UPLOADING THEM. PROOFS OF CLAIM AND ATTACHMENTS ARE PUBLIC DOCUMENTS THAT WILL BE AVAILABLE FOR ANYONE TO VIEW ONLINE.

IMPORTANT NOTE REGARDING REDACTING YOUR PROOF OF CLAIM AND SUPPORTING DOCUMENTATION When you submit a proof of claim and any supporting documentation you must show only the last four digits of any social-security, individual's tax-identification, or financial-account number, only the initials of a minor's name, and only the year of any person's date of birth. If the claim is based on the delivery of health care goods or services, limit the disclosure of the goods or services so as to avoid embarrassment or the disclosure of confidential health care information.

A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. The responsibility for redacting personal data identifiers (as defined in Federal Rule of Bankruptcy Procedure 9037) rests solely with the party submitting the documentation and their counsel. Prime Clerk and the Clerk of the Court will not review any document for redaction or compliance with this Rule and you hereby release and agree to hold harmless Prime Clerk and the Clerk of the Court from the disclosure of any personal data identifiers included in your submission. In the event Prime Clerk or the Clerk of the Court discover that personal identifier data or information concerning a minor individual has been included in a pleading, Prime Clerk and the Clerk of the Court are authorized, in their sole discretion, to redact all such information from the text of the filing and make an entry indicating the correction.

**United States Bankruptcy Court, Northern District of California**

Fill in this information to identify the case (Select only one Debtor per claim form):

☐ PG&E Corporation (19-30088)

☑ Pacific Gas and Electric Company (19-30089)

# Proof of 503(b)(9) Claim

**Read the instructions before filling out this form. This form is for asserting claims entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9) against one of the above Debtors arising on or after January 9, 2019 through and including January 28, 2019. Do not use this form to assert any other pre-petition claim(s). Assert such claims on Form 410.**

**11 U.S.C. § 503(b)(9) applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.**

**Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.**

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | **Emmerson Investments, Inc.** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |

2. **Has this claim been acquired from someone else?**
☒ No
☐ Yes. From whom? _____

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| R. Dale Ginter - DOWNEY BRAND, LLP | Sierra Pacific Industries |
| Name | Name c/o Mike Dalglish |
| 621 Capitol Mall, 18th Floor | P.O. Box 496028 |
| Number        Street | Number        Street |
| Sacramento, CA 95814 | Redding, CA 96049 |
| City                State         ZIP Code | City                State         ZIP Code |
| Contact phone  916-520-5353 | Contact phone  530-378-8275 |
| Contact email  dginter@downeybrand.com | Contact email  mdalglish@spi-ind.com |

4. **Does this claim amend one already filed?**
☒ No
☐ Yes.  Claim number on court claims registry (if known)_____      Filed on ___/___/_____ (MM / DD / YYYY)

5. **Do you know if anyone else has filed a proof of claim for this claim?**
☒ No
☐ Yes. Who made the earlier filing? _____

| | | |
|---|---|---|
| 6. | **On what date (or dates) were the goods delivered? (if known)** | 1-9-2019 through 1-28-2019 _____ (mm/dd/yyyy) |

7. **How much is the claim?**

$ \_\_17,195.72_____

Note: 11 U.S.C. § 503(b)(9) applies only to claims arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Do not include in the above amount the value of goods received by the Debtor outside of that period, or the value of any other services performed. Assert such claims on Form 410.

8. **What is the description of the goods provided in the claim?**

Electricity

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

- ☐ I am the creditor.
- ☒ I am the creditor's attorney or authorized agent.
- ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
- ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/17/2019 _____ (mm/dd/yyyy)

    /s/ R. Dale Ginter _____
    Signature

Print the name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | R. Dale Ginter | |
| | First name      Middle name      Last name | |
| Title | Lawyer | |
| Company | Downey Brand LLP | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | 621 Capitol Mall, 18th Floor | |
| | Number     Street | |
| | Sacramento, CA 95814 | |
| | City      State      ZIP Code | |
| Contact phone | 916-520-5353 | Email   dginter@downeybrand.com |

**ATTACHMENT TO EMMERSON INVESTMENTS, INC.'S
SECTION 503(b)(9) PROOF OF CLAIM IN PACIFIC GAS AND ELECTRIC
COMPANY'S CHAPTER 11 CASE NUMBER 19-30089
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

Claimant, Emmerson Investments, Inc. ("EII") operates a "small power production facility" as defined in 18 CFR §§292.203(c) and 292.204. Said facility is called the Grasshopper Flat Hydroelectric Project ("Project") and is located at 647 Nelson Creek Road, Big Bend, Ca. 96001. The Project provides Pacific Gas and Electric Company ("PG&E") with electricity that is a renewable resource.

Attached as Exhibit A is a copy of the Renewable Market Adjusting Tariff Power Purchase Agreement dated January 31, 2017, exclusive of appendices, between EII and PG&E.

Attached as Exhibit B is a copy of EII's invoice to PG&E for electricity delivered from the Project in January 2019 in the amount of $19,571.71. PG&E paid for the power delivered Post-petition (1/29/19 to 1/31/19) in the amount of $2,375.99, leaving $17,195.72 unpaid. All of this unpaid amount is for electricity delivered in the 20 days preceding the petition date (1/29/19). Hence EII has a Section 503(b)(9) claim for $17,195.72. Due to a lack of water at the Project no electricity was generated between 1/1/19 and 1/8/19.

# EXHIBIT A



# RENEWABLE MARKET ADJUSTING TARIFF
## POWER PURCHASE AGREEMENT

[This contract has been approved by the California Public Utilities Commission in Decision 13-05-034. Modification of the terms and conditions of this contract will result in the need to obtain additional Commission approval of the contract.]

[The contract approved by Decision 13-05-034 includes terms and conditions that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by Decision 11-01-025, and these terms and conditions are shown in shaded text.]

RENEWABLE MARKET ADJUSTING TARIFF
POWER PURCHASE AGREEMENT
BETWEEN
PACIFIC GAS AND ELECTRIC COMPANY AND
EMMERSON INVESTMENTS, INC.

Automated Document – Preliminary Statement Part A

Page 1 of 99
Form No. 79-1150
Advice 4781-E
January 2015

191-8_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA



# RENEWABLE MARKET ADJUSTING TARIFF
## POWER PURCHASE AGREEMENT

## TABLE OF CONTENT

1.     DOCUMENTS INCLUDED ........................................................... 3
2.     SELLER'S FACILITY AND COMMERCIAL OPERATION DATE ............................. 4
3.     CONTRACT CAPACITY AND QUANTITY; TERM; CONTRACT PRICE; BILLING ..... 7
4.     GREEN ATTRIBUTES; RESOURCE ADEQUACY BENEFITS; EIRP REQUIREMENTS; ERR REQUIREMENTS; QUALIFYING FACILITY STATUS ................................. 13
5.     REPRESENTATION AND WARRANTIES; COVENANTS .................................. 18
6.     GENERAL CONDITIONS ........................................................... 21
7.     INDEMNITY ..................................................................... 28
8.     LIMITATION OF DAMAGES ....................................................... 28
9.     NOTICES ....................................................................... 29
10.    INSURANCE ..................................................................... 29
11.    FORCE MAJEURE ................................................................ 32
12.    GUARANTEED ENERGY PRODUCTION ............................................... 33
13.    CREDIT AND COLLATERAL REQUIREMENTS .......................................... 34
14.    EVENTS OF DEFAULT AND TERMINATION ........................................... 37
15.    SCHEDULING COORDINATOR; FORECASTING PENALTIES; CAISO CHARGES; GOVERNMENTAL CHARGES ...................................................... 42
16.    RELEASE OF INFORMATION AND RECORDING CONVERSATION ..................... 43
17.    ASSIGNMENT .................................................................... 44
18.    GOVERNING LAW ................................................................ 45
19.    DISPUTE RESOLUTION .......................................................... 45
20.    MISCELLANEOUS ................................................................ 47

## APPENDIXES

APPENDIX A -   DEFINITIONS ................................................................ 50
APPENDIX B -   COMMERCIAL OPERATION DATE CONFIRMATION LETTER .................... 66
APPENDIX C -   TIME OF DELIVERY PERIODS AND PAYMENT ALLOCATION FACTORS ......... 67
APPENDIX D -   FORECASTING AND OUTAGE NOTIFICATION REQUIREMENTS ............... 68
APPENDIX E -   DESCRIPTION OF THE FACILITY ............................................. 72
APPENDIX F -   TELEMETRY REQUIREMENTS ................................................. 73
APPENDIX G -   GUARANTEED ENERGY PRODUCTION DAMANGES .............................. 76
APPENDIX H -   FORM OF LETTER OF CREDIT ............................................... 77
APPENDIX I -   SELLER'S MILESTONE SCHEDULE ............................................ 81
APPENDIX J -   NOTICES LIST ............................................................. 82
APPENDIX K -   FORM OF GENERAL CONSENT TO ASSIGNMENT ............................. 84
APPENDIX L -   FORM OF FINANCING CONSENT TO ASSIGNMENT ........................... 89
APPENDIX M -   PROCEDURE FOR DEMONSTRATION OF CONTRACT CAPACITY ................ 96
APPENDIX N-1 - QF EFFICIENCY MONITORING PROGRAM – COGENERATION DATA REPORTING FORM .................................................................. 98
APPENDIX N-2 - FUEL USE STANDARDS – SMALL POWER PRODUCER DATA REPORTING FORM ..................................................................... 99

Automated Document – Preliminary Statement Part A

Page 2 of 99
Form No. 79-1150
Advice 4781-E
January 2016

Case: 19-30088   Doc# 7362   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 12 of 70

191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA



*Pacific Gas and Electric Company*, a California corporation ("Buyer" or "PG&E"), and <u>Emmerson Investments, Inc.</u> ("Seller"), a <u>California Corporation</u>, hereby enter into this Power Purchase Agreement ("Agreement") made and effective as of the Execution Date. Seller and Buyer are sometimes referred to in this Agreement jointly as "Parties" or individually as "Party." In consideration of the mutual promises and obligations stated in this Agreement and its appendices, the Parties agree as follows:

## 1. DOCUMENTS INCLUDED

This Agreement includes the following appendices, which are specifically incorporated herein and made a part of this Agreement:

| | |
|---|---|
| Appendix A | Definitions |
| Appendix B | Commercial Operation Date Confirmation Letter |
| Appendix C | Time of Delivery Periods and Payment Allocation Factors |
| Appendix D | Forecasting and Outage Notification Requirements |
| Appendix E | Description of the Facility |
| Appendix F | Telemetry Requirements |
| Appendix G | Guaranteed Energy Production Damages |
| Appendix H | Form of Letter of Credit |
| Appendix I | Seller's Milestone Schedule |
| Appendix J | Notices List |
| Appendix K | Form of General Consent to Assignment |
| Appendix L | Form of Financing Consent to Assignment |
| Appendix M | Procedure for Demonstration of Contract Capacity |
| Appendix N-1 | QF Efficiency Monitoring Program – Cogeneration Data Reporting Form |
| Appendix N-2 | Fuel Use Standards – Small Power Producer Data Reporting Form |

191-3_Emmerson Investments Inc_Grasshopper Final_ReMAT PPA



**2. SELLER'S FACILITY AND COMMERCIAL OPERATION DATE**

This Agreement governs Buyer's purchase of the Product from the electrical generating facility (hereinafter referred to as the "Facility" or "Project") as described in this Section.

2.1. <u>Facility Location</u>.  The Facility is physically located at:

647 Nelson Creek Road

Big Bend, California 96011

41.02890°, -121.89235°

2.2. <u>Facility Name.</u>  The Facility is named **Grasshopper Flat Hydroelectric Project** .

2.3. <u>Type of Facility.</u>

2.3.1. The Facility is a(n) (check one):

☐ Baseload Facility

☒ As-Available Facility

2.3.2. The Facility's renewable resource is **Hydroelectric** .  [e.g., biogas, hydro, etc.]

2.3.3. The Facility is a (check all applicable):

☒ "small power production facility," as described in 18 CFR §§292.203(a), 292.203(c) and 292.204

☐ "topping-cycle cogeneration facility," as defined in 18 CFR §292.202(d)

☐ "bottoming-cycle cogeneration facility," as defined in 18 CFR §292.202(e)

2.4. <u>Interconnection Queue Position</u>.  The Project's interconnection queue position is  **N/A** .  The Project's interconnection queue position may only be used for the sole benefit of the Project.

2.5. <u>Interconnection Point</u>.  The Facility is connected to PG&E electric system at **PG&E's 12kV Pit5 1101 feeder** at a service voltage of  **12**  kV.

2.6. Delivery Point.  The Delivery Point is at the point of interconnection with the CAISO Grid, **Pit #5 - Round Mountain 230 kV transmission lines #1 and #2 at Pit #5 Powerhouse Substation**.

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 14
191-1_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA
of 70


2.7. <u>Facility Description</u>. A description of the Facility, including a summary of its significant components, a drawing showing the general arrangements of the Facility, and a single line diagram illustrating the interconnection of the Facility and loads with Buyer's electric distribution system, is attached and incorporated herein as Appendix E.

2.8. <u>Expected Commercial Operation Date; Guaranteed Commercial Operation Date.</u>

2.8.1. If not already capable of delivering Product on the Execution Date, the Facility's expected Commercial Operation Date is **12/19/2018**, which may, subject to the terms of the Agreement, be modified by Seller from time to time after the Execution Date. Seller shall provide Notice to Buyer of the latest expected Commercial Operation Date of the Facility no later than sixty (60) days before such date.

2.8.2. Seller shall have demonstrated Commercial Operation by the "Guaranteed Commercial Operation Date," which date shall be no later than the date that is twenty-four (24) months (720 days) after the Execution Date; provided that, subject to Section 2.8.4, the Guaranteed Commercial Operation Date may be extended for the following reasons ("Permitted Extensions"):

2.8.2.1. Subject to Section 2.8.5, if Seller has taken all commercially reasonable actions (including but not limited to Seller's timely filing of required documents and payment of all applicable fees) to obtain permits necessary for the construction and operation of the Project, but is unable to obtain such permits due to delays beyond Seller's reasonable control ("Permitting Delay"), then the Guaranteed Commercial Operation Date shall be extended six (6) months;

2.8.2.2. Subject to Section 2.8.5, if Seller has taken all commercially reasonable actions (including but not limited to Seller's timely filing of required documents and payment of all applicable fees, and completion of all Electric System Upgrades needed, if any) to have the Project physically interconnected to the Transmission/Distribution Owner's distribution system, but fails to secure any necessary commitments from CAISO or the Transmission/Distribution Owner for such interconnection and upgrades due to delays beyond Seller's reasonable control ("Transmission Delay"), then the Guaranteed Commercial Operation Date shall be extended six (6) months;

2.8.2.3. In the event of Force Majeure ("Force Majeure Delay") without regard to Transmission Delay or Permitting Delay, the

Case: 18-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 15
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA   of 70


Guaranteed Commercial Operation Date shall be extended on a day-to-day basis for a cumulative period of not more than six (6) months; provided that Seller complies with Section 11; or

2.8.2.4. If Seller pays to Buyer damages in an amount equal to two percent (2%) of the Collateral Requirement per day for each day (or portion thereof) the Guaranteed Commercial Operation Date is extended ("Daily Delay Liquidated Damages"), then the Guaranteed Commercial Operation Date shall be extended on a day-to-day basis corresponding to the number of days for which Seller has paid Daily Delay Liquidated Damages for a cumulative period of not more than six (6) months. Daily Delay Liquidated Damages payments applicable to days included in any Guaranteed Commercial Operation Date extension are nonrefundable and are in addition to, and not a part of, the Collateral Requirement; provided that Seller will be entitled to a refund (without interest) of any estimated Daily Delay Liquidated Damages payments paid by Seller to Buyer which exceed the amount required to cover the number of days by which the Guaranteed Commercial Operation Date was actually extended.

2.8.3. All Permitted Extensions taken shall be concurrent, rather than cumulative, during any overlapping days.

2.8.4. Notwithstanding anything in this Agreement, the Guaranteed Commercial Operation Date shall be no later than the date that is thirty (30) months after the Execution Date.

2.8.5. Upon request from Buyer, Seller shall provide documentation demonstrating to Buyer's reasonable satisfaction that the Permitted Extensions described in Section 2.8.2.1 or 2.8.2.2 (as applicable), did not result from Seller's action or failure to take action as described in Section 2.8.2.1 or 2.8.2.2 (as applicable)

2.9. Notice of Permitted Extension.

2.9.1. In order to request a Permitting Delay or Transmission Delay (individually and collectively, "Delay"), Seller shall provide Buyer with Notice of the requested Delay by the later of (a) the date that is twenty-two (22) months (660 days) after the Execution Date and (b) within three (3) Business Days of the date that Seller becomes aware of, or reasonably should have become aware of, the circumstances giving rise for the applicable Delay, which Notice must clearly identify the Delay being requested and include information necessary for Buyer to verify the qualification of the Delay. Buyer shall use reasonable discretion to grant or deny the requested extension, and

Case: 19-30088 Doc# 7262 Filed: 05/15/20 Entered: 05/15/20 14:17:39 Page 16 of 70
191-8_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA


shall provide Seller Notice of its decision within ten (10) Business Days of Notice from Seller.

2.9.2. In the case of a Force Majeure Delay, Seller shall provide Notice as specified in Section 11.2.

2.9.3. In the case of an extension of the Guaranteed Commercial Operation Date by the payment of Daily Delay Liquidated Damages, Seller must, at the earliest possible time, but no later than five (5) Business Days before the commencement of the proposed Guaranteed Commercial Operation Date extension, provide Buyer with Notice of its election to extend the Guaranteed Commercial Operation Date along with Seller's estimate of the duration of the extension and its payment of Daily Delay Liquidated Damages for the full estimated Guaranteed Commercial Operation Date extension period.

2.9.4. Notwithstanding anything to the contrary herein, Seller shall provide Notice to Buyer of the latest expected Commercial Operation Date of the Facility no later than sixty (60) days before the Commercial Operation Date.

## 3. CONTRACT CAPACITY AND QUANTITY; TERM; CONTRACT PRICE; BILLING

3.1. <u>Contract Capacity</u>. The Contract Capacity is **1,100** kW. The Contract Capacity shall not exceed 3,000 kW. The Contract Capacity is subject to adjustment based on the Demonstrated Contract Capacity and the definition of "Contract Capacity."

3.2. <u>Contract Quantity</u>. The "Contract Quantity" during each Contract Year is the amount set forth in the applicable Contract Year in the "Delivery Term Contract Quantity Schedule," set forth below, which amount is net of Station Use, and, for excess sale arrangements, Site Host Load. Seller shall have the option to update the Delivery Term Contract Quantity Schedule one (1) time to the extent such a change is necessary based upon any adjustment to the Contract Capacity based on the Demonstrated Contract Capacity and the definition of "Contract Capacity," within ten (10) Business Days of Buyer's Notice of such adjustment to the Contract Capacity or the date of the Engineer Report, as applicable, which adjusted amounts shall thereafter be the applicable "Contract Quantity."

| Delivery Term Contract Quantity Schedule ||
| Contract Year | Contract Quantity (kWh/Yr) |
| --- | --- |
| 1 | 4,700,000 |
| 2 | 4,700,000 |
| 3 | 4,700,000 |
| 4 | 4,700,000 |

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 17
191-A_Emmerson Investments, Inc_Grasshopper Flat_ReMAT PPA    of 70


| Delivery Term Contract Quantity Schedule | |
|---|---|
| **Contract Year** | **Contract Quantity (kWh/Yr)** |
| 5 | 4,700,000 |
| 6 | 4,700,000 |
| 7 | 4,700,000 |
| 8 | 4,700,000 |
| 9 | 4,700,000 |
| 10 | 4,700,000 |
| 11 | 4,700,000 |
| 12 | 4,700,000 |
| 13 | 4,700,000 |
| 14 | 4,700,000 |
| 15 | 4,700,000 |
| 16 | 4,700,000 |
| 17 | 4,700,000 |
| 18 | 4,700,000 |
| 19 | 4,700,000 |
| 20 | 4,700,000 |

3.3.   <u>Transaction.</u>  During the Delivery Term, Seller shall sell and deliver, or cause to be delivered, and Buyer shall purchase, the Product from the Facility at the Delivery Point, pursuant to Seller's election of a(n) (check one):

☒ full buy/sell; or

☐ excess sale arrangement.

In no event shall Seller have the right to procure the Product from sources other than the Facility for sale or delivery to Buyer under this Agreement or substitute such Product.  Buyer shall have no obligation to receive or purchase the Product from Seller prior to the Commercial Operation Date or after the end of the Delivery Term.

3.4.   <u>Term of Agreement; Survival of Rights and Obligations.</u>

3.4.1. The term shall commence upon the Execution Date of this Agreement and shall remain in effect until the conclusion of the Delivery Term unless terminated sooner pursuant to Sections 11.4 or 14 of this Agreement (the "Term").

3.4.2. Notwithstanding anything to the contrary in this Agreement, the rights and obligations that are intended to survive a termination of this Agreement are all of those rights and obligations that this Agreement expressly provides survive any such termination and those that arise

---

Case: 19-30088   Doc# 7362   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 18
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA   of 70


from Seller's or Buyer's covenants, agreements, representations, and warranties applicable to, or to be performed, at or during any time before or as a result of the termination of this Agreement, including: (a) all obligations to pay in full amounts due, including under Sections 3.6, 12, 13.3, 14 and 15, (b) all obligations to post, maintain, return and release the Collateral Requirement under Section 13, (c) Seller's obligations under Sections 4.1, 4.2, 4.3 and 6.11, (d) all rights and obligations under Sections 6.4, 7, 10.2.7, and 14.8.4, and any other indemnity rights, (e) the limitations on liability set forth in Section 8, (f) all rights and obligations under Section 16, (g) all rights and obligations under Section 14.8, (h) the governing law set forth in Section 18, and (i) the dispute resolution provisions set forth in Section 19.

3.5.   Delivery Term. The Seller shall deliver the Product from the Facility to Buyer for a period of (check one) ☐ ten (10), ☐ fifteen (15), or ☒ twenty (20) Contract Years ("Delivery Term"), which shall commence on the Commercial Operation Date under this Agreement and continue until the end of the last Contract Year unless terminated by the terms of this Agreement.  The Commercial Operation Date shall occur only when all of the following conditions have been satisfied:

3.5.1. the Facility's status as an Eligible Renewable Energy Resource is demonstrated by Seller's receipt of pre-certification from the CEC;

3.5.2. if required pursuant to Section 4.8, the Facility's status as a Qualifying Facility is demonstrated by Seller's receipt of a docket number assigned to Seller's filing of FERC Form 556;

3.5.3. as evidence of the Commercial Operation Date, the Parties shall execute and exchange the "Commercial Operation Date Confirmation Letter" attached as Appendix B;

3.5.4. Seller has provided to Buyer the Collateral Requirement specified in Section 13;

3.5.5. Seller has satisfied all of the CAISO agreement, interconnection agreement, and metering requirements in Sections 6.1 and 6.2 and has enabled Buyer to schedule the Facility with the CAISO;

3.5.6. Seller has furnished to Buyer all insurance documents required under Section 10;

3.5.7. Seller has delivered to Buyer the first report required under Section 6.12.4;

Case: 19-30088   Doc# 7362   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 19
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA   of 70


3.5.8. Seller has satisfied all of the telemetry requirements required to be satisfied by the Commercial Operation Date under Section 6.10 and Appendix F;

3.5.9. the Demonstrated Contract Capacity has been determined in accordance with Appendix M;

3.5.10. Seller has provided sixty (60) days Notice prior to the Commercial Operation Date as required under Section 2.8.1;

3.5.11. Seller has delivered to Buyer the report required under Section 6.16, if any; and

3.5.12. Seller has delivered to Buyer any currently operative filings at FERC, including any rulings, orders or other pleadings or papers filed by FERC, concerning the qualification of the Facility as a Qualifying Facility.

3.6. <u>Contract Price</u>.

3.6.1. The price for Delivered Energy (the "Contract Price") is <u>zero point zero eight nine two three</u> dollars (**$ 0.08923**) per kWh. *[Contract Price to be determined by Re-MAT pricing methodology.]*

3.6.2. In no event shall Buyer be obligated to receive or pay for, in any hour, any Delivered Energy that exceeds one hundred and ten percent (110%) of Contract Capacity, and the Contract Price for such Delivered Energy in excess of such one hundred and ten percent (110%) of Contract Capacity shall be adjusted to be Zero dollars ($0) per kWh.

3.6.3. In any Contract Year, if the amount of Delivered Energy exceeds one hundred twenty percent (120%) of the annual Contract Quantity amount, the Contract Price for such Delivered Energy in excess of such one hundred twenty percent (120%) shall be adjusted to be seventy-five percent (75%) of the applicable Contract Price.

3.7. <u>Billing</u>.

3.7.1. The amount of Product purchased by Buyer from Seller under this Agreement at the Delivery Point is determined by the meter specified in Section 6.2.1 or Check Meter, as applicable. Throughout the Delivery Term and subject to and in accordance with the terms of this Agreement, Buyer shall pay the Contract Price to Seller for the Product; provided that Buyer has no obligation to purchase from Seller any Product that is not or cannot be delivered to the Delivery Point as a result of any circumstance, including: (a) an outage of the Facility; (b) a Force Majeure under Section 11; or (c) a reduction or

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 20 of 70
191-1_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA


curtailment of deliveries in accordance with Sections 6.8.1(a) or (b). Buyer will not be obligated to pay Seller for any Product that Seller delivers in violation of Section 6.8, including any Product Seller delivers in excess of the amount specified in any Curtailment Order.

3.7.2. For the purpose of calculating monthly payments under this Agreement, the amount recorded by the meter specified in Section 6.2.1 or Check Meter, as applicable, will be time-differentiated according to the time period and season of the receipt of the Product by Buyer from Seller, as set forth in Appendix C, and the pricing will be weighted by the Payment Allocation Factors.

3.7.3. The monthly payment will equal the sum of (a) the sum of the monthly TOD Period payments for all TOD Periods in the month and (b) the Curtailed Product Payment for the month. Each monthly TOD Period payment will be calculated pursuant to the following formula, where "n" is the TOD Period being calculated:

$$\text{TOD PERIOD}_n \text{ PAYMENT} = A \times B \times (C - D)$$

Where:

A = Contract Price, in $/kWh.
B = The Payment Allocation Factor for the TOD Period being calculated.
C = The sum of Energy recorded by the meter specified in Section 6.2.1 or Check Meter, as applicable, in all hours for the TOD Period being calculated, in kWh.
D = Any Energy produced by the Facility for which Buyer is not obligated to pay Seller as set forth in Section 3.7.1.

3.7.4. On or before the last Business Day of the month immediately following each calendar month, Seller shall determine the amount of Product received by Buyer pursuant to this Agreement for each monthly period and issue an invoice showing the calculation of the payment. Seller shall also provide to Buyer: (a) records of metered data, including CAISO metering and transaction data sufficient to document and verify the generation of Product by the Facility for any CAISO settlement time interval during the preceding months; (b) access to any records, including invoices or settlement data from the CAISO; and (c) an invoice, in the format specified by Buyer.

3.7.5. Buyer shall make payment of each invoice, adjusted by any amounts owed by or to Seller under this Agreement, on or before the later of

19-1-0_Commerson_Investment LLC_Grasshopper Trade_RMAT3-45/20 Entered: 05/15/20 14:17:39 Page 21 of 70


the last Business Day of the month in which Buyer receives an invoice from Seller, or the tenth (10th) Business Day after receipt of the invoice; provided that Buyer shall have the right, but is not obligated, to apply any amounts due to Buyer from Seller for any charges incurred under this Agreement, for past due bills for electric service or for Buyer services, towards any amount owed to Seller under this Agreement. In the event Buyer applies any amounts due to Buyer from Seller towards an invoice issued by Seller, Buyer shall provide an explanation of the amounts Buyer has applied towards Seller's invoice.

3.7.6. In the event an invoice or portion thereof or any other claim or adjustment arising hereunder, is disputed, payment of the undisputed portion of the invoice shall be required to be made when due, with Notice of the objection given to the other Party. Any invoice dispute or invoice adjustment shall be in writing and shall state the basis for the dispute or adjustment. Payment of the disputed amount shall not be required until the dispute is resolved. In the event adjustments to payments are required as a result of inaccurate meter(s), Buyer shall determine the correct amount of Product received under this Agreement during any period of inaccuracy and recompute the amount due from Buyer to Seller for the Product delivered during the period of inaccuracy. The Parties agree to use good faith efforts to resolve the dispute or identify the adjustment as soon as possible. Upon resolution of the dispute or calculation of the adjustment, any required payment shall be made within thirty (30) days of such resolution along with simple interest accrued at the Interest Rate from and including the due date, but excluding the date paid. Inadvertent overpayments shall be returned upon request or deducted by the Party receiving such overpayment from subsequent payments, with simple interest accrued at the Interest Rate from and including the date of such overpayment, but excluding the date repaid or deducted by the Party receiving such overpayment. Any dispute with respect to an invoice is waived unless the other Party is notified in accordance with this Section 3.7.6 within twelve (12) months after the invoice is rendered or any specific adjustment to the invoice is made [,except for invoice disputes under Section 4.3 which are waived unless the other Party is notified in accordance with this Section 3.7.6 within twenty-four (24) months after the invoice is rendered or any specific adjustment to the invoice is made] [bracketed provision for Facilities (1) 500 kW or greater and (2) eligible for a CAISO revenue meter.] If an invoice is not rendered by Seller within twelve (12) months after the close of the month during which performance occurred, the right to payment for such performance is waived.

3.7.7. Notwithstanding anything to the contrary in Section 3.7.5, Buyer may issue an invoice to Seller for any amount due under this Agreement.

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 22
191-1_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


Unless explicitly stated otherwise, payment of such invoice shall be made within thirty (30) days of receipt of such invoice.

3.7.8. Unless otherwise agreed to in writing by the Parties, any payment due under this Agreement will be satisfied by issuance of a check, via Automated Clearing House transfer or via wire transfer. Notwithstanding anything to the contrary set forth in this Agreement, neither Party is obligated to make payment on any invoice until the cumulative amount due exceeds fifty dollars ($50.00), except that both Parties shall pay all amounts due pursuant to this Agreement at least once per calendar year no later than thirty (30) days after the end of the calendar year.

3.7.9. All interest paid or payable under this Agreement shall be computed as simple interest using the Interest Rate and, unless specified otherwise in this Agreement, shall be paid concurrently with the payment or refund of the underlying amount on which such interest is payable.

3.8. <u>Title and Risk of Loss</u>. Title to and risk of loss related to the Product from the Facility shall transfer from Seller to Buyer from the Delivery Point. Seller warrants that it will deliver to Buyer the Product from the Facility free and clear of all liens, security interests, claims and encumbrances or any interest therein or thereto by any person arising prior to the Delivery Point.

## 4. GREEN ATTRIBUTES; RESOURCE ADEQUACY BENEFITS; EIRP REQUIREMENTS; ERR REQUIREMENTS; QUALIFYING FACILITY STATUS

4.1. <u>Green Attributes.</u> Seller hereby provides and conveys all Green Attributes associated with all electricity generation from the Project to Buyer as part of the Product being delivered. Seller represents and warrants that Seller holds the rights to all Green Attributes from the Project, and Seller agrees to convey and hereby conveys all such Green Attributes to Buyer as included in the delivery of the Product from the Project. [Standard term and condition that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028, and Decision 10-03-021, as modified by Decision 11-01-025]

4.2. <u>Conveyance of Product</u>. Throughout the Delivery Term, Seller shall provide and convey the Product to Buyer in accordance with the terms of this Agreement, and Buyer shall have the exclusive right to the Product. Seller shall, at its own cost, take all actions and execute all documents or instruments that are reasonable and necessary to effectuate the use of the Green Attributes, Resource Adequacy Benefits, if any, and Capacity Attributes, if any, for Buyer's benefit throughout the Delivery Term.

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 23
191-1_Emmerson Investments-Inc_Grasshopper Flat_ReMAT PPA    of 70


4.3. <u>WREGIS</u>.  *[WREGIS Requirements for Facilities  (1)500 kW or greater; and (2) eligible for a CAISO revenue meter]* [Seller shall, at its sole expense take all actions and execute all documents or instruments necessary to ensure that all WREGIS Certificates associated with all Renewable Energy Credits corresponding to all Energy produced by the Facility are issued and tracked for purposes of satisfying the requirements of the California Renewables Portfolio Standard and transferred in a timely manner to Buyer for Buyer's sole benefit.  Seller shall comply with all Laws, including, without limitation, the WREGIS Operating Rules, regarding the certification and transfer of such WREGIS Certificates to Buyer and Buyer shall be given sole title to all such WREGIS Certificates.  Seller shall be deemed to have satisfied the warranty in Section 4.3.9; provided that Seller fulfills its obligations under Sections 4.3.1 through 4.3.7 below.

4.3.1. Within thirty (30) days of the Commercial Operation Date, Seller shall register the Project with WREGIS and establish an account with WREGIS ("Seller's WREGIS Account"), which Seller shall maintain until the end of the Delivery Term.  Seller shall transfer the WREGIS Certificates using "Forward Certificate Transfers" (as described in the WREGIS Operating Rules) from Seller's WREGIS Account to the WREGIS account(s) of Buyer or the account(s) of a designee that Buyer identifies by Notice to Seller ("Buyer's WREGIS Account").  Seller shall be responsible for all expenses associated with registering the Project with WREGIS, establishing and maintaining Seller's WREGIS Account, paying WREGIS Certificate issuance and transfer fees, and transferring WREGIS Certificates from Seller's WREGIS Account to Buyer's WREGIS Account.

4.3.2. Seller shall cause Forward Certificate Transfers to occur on a monthly basis in accordance with the certification procedure established by the WREGIS Operating Rules.  Since WREGIS Certificates will only be created for whole MWh amounts of Energy generated, any fractional MWh amounts (i.e., kWh) will be carried forward until sufficient generation is accumulated for the creation of a WREGIS Certificate.

4.3.3. Seller shall, at its sole expense, ensure that the WREGIS Certificates for a given calendar month correspond with the Delivered Energy for such calendar month as evidenced by the Project's metered data.

4.3.4. Due to the ninety (90) day delay in the creation of WREGIS Certificates relative to the timing of invoice payment under Section 3.7, Buyer shall pay an invoice payment for a given month in accordance Section 3.7 before the WREGIS Certificates for such month are formally transferred to Buyer in accordance with the WREGIS Operating Rules and this Section 4.3.  Notwithstanding this

Case: 12-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 24
191-R_Emmerson Investments-RC_Grasshopper Flat_ReMAT PPA    of 70


delay, Buyer shall have all right and title to all such WREGIS Certificates upon payment to Seller in accordance with Section 3.7.

4.3.5. A "WREGIS Certificate Deficit" means any deficit or shortfall in WREGIS Certificates delivered to Buyer for a calendar month as compared to the Delivered Energy for the same calendar month ("Deficient Month"). If any WREGIS Certificate Deficit is caused, or the result of any action or inaction, by Seller, then the amount of Delivered Energy in the Deficient Month shall be reduced by the amount of the WREGIS Certificate Deficit for the purposes of calculating Buyer's payment(s) to Seller under Section 3.7 and the Guaranteed Energy Production for the applicable Performance Measurement Period. Any amount owed by Seller to Buyer because of a WREGIS Certificate Deficit shall be made as an adjustment to Seller's invoice to Buyer in accordance with Section 3.7, and Buyer shall net such amount against Buyer's subsequent payment(s) to Seller.

4.3.6. Without limiting Seller's obligations under this Section 4.3, if a WREGIS Certificate Deficit is caused solely by an error or omission of WREGIS, the Parties shall cooperate in good faith to cause WREGIS to correct its error or omission.

4.3.7. If WREGIS changes the WREGIS Operating Rules after the Execution Date or applies the WREGIS Operating Rules in a manner inconsistent with this Section 4.3 after the Execution Date, the Parties promptly shall modify this Section 4.3 as reasonably required to cause and enable Seller to transfer to Buyer's WREGIS Account a quantity of WREGIS Certificates for each given calendar month that corresponds to the Delivered Energy in the same calendar month.

4.3.8. Buyer, at its sole discretion, shall have the right to direct Seller to cause and allow Buyer to be the "Qualified Reporting Entity" and "Account Holder" (as such terms are defined by WREGIS) for the Facility.

4.3.9. Seller warrants that all necessary steps to allow the Renewable Energy Credits transferred to Buyer to be tracked in the Western Renewable Energy Generation Information System will be taken prior to the first delivery under the contract. [Standard term and condition that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by Decision 11-01-025]

4.3 **WREGIS**. *[WREGIS Requirements for Facilities that are (1) less than 1 MW and (2) ineligible for a CAISO revenue meter.]* With respect to WREGIS, Seller shall cause and allow Buyer to be the "Qualified Reporting Entity" and "Account Holder"

Case: 19-30088 Doc# 7362 Filed: 05/15/20 Entered: 05/15/20 14:17:39 Page 25
191-A_Emmerson Investments Inc_Grasshopper Final_ReMAT PPA of 70


(as such terms are defined by WREGIS) for the Facility within thirty (30) days after the Commercial Operation Date.

4.4. <u>Resource Adequacy Benefits.</u>

    4.4.1. During the Delivery Term, Seller grants, pledges, assigns and otherwise commits to Buyer all of the Contract Capacity, including Capacity Attributes, if any, from the Project to enable Buyer to meet its Resource Adequacy or successor program requirements, as the CPUC, CAISO or other regional entity may prescribe ("Resource Adequacy Requirements").

    4.4.2. If providing any Resource Adequacy, Seller shall comply with the Resource Adequacy requirements set forth in the CAISO Tariff, including Section 40 thereof, as may be changed from time to time.

    4.4.3. Seller shall have the option but not the obligation to pursue Full Capacity Deliverability Status for the Project. If the Project achieves Full Capacity Deliverability Status, Seller, at its option, may make a one-time, irrevocable election to utilize the full capacity deliverability payment allocation factors set forth in Appendix C by providing Notice to Buyer of such election within sixty (60) days of achieving Full Capacity Deliverability Status (the "Full Capacity Option Notice"), which election shall be effective as specified in the definition of "Payment Allocation Factors."

    4.4.4. Seller shall cooperate in good faith with, and comply with unburdensome requests of, Buyer and the CAISO to enable Buyer and/or the CAISO to assign Capacity Attributes and Resource Adequacy Benefits to the Facility.

4.5. <u>Eligible Renewable Resource.</u> Seller shall take all actions necessary to achieve and maintain status as an Eligible Renewable Energy Resource or ERR. Within thirty (30) days after the Commercial Operation Date, Seller shall file an application or other appropriate request with the CEC for CEC Certification for the Facility. Seller shall expeditiously seek CEC Certification, including promptly responding to any requests for information from the requesting authority.

4.6. <u>Compliance Expenditure Cap.</u> If Seller establishes to Buyer's reasonable satisfaction that a change in Laws occurring after the Execution Date has increased Seller's cost above the cost that could reasonably have been contemplated as of the Execution Date to take all actions to comply with Seller's obligations under the Agreement with respect to obtaining and maintaining CEC Pre-Certification, CEC Certification or CEC Verification, then Seller's required out-of-pocket expenses are limited to Twenty-Five Thousand dollars ($25,000.00) in the aggregate each year of the Term

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 26
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


("Compliance Expenditure Cap") between the Execution Date and the last day of the Term.

4.6.1. Any actions required for Seller to comply with its obligations set forth in Section 4.6, the cost of which will be included in the Compliance Expenditure Cap, shall be referred to collectively as the "Compliance Actions."

4.6.2. If Seller reasonably anticipates the need to incur out-of-pocket expenses in excess of the Compliance Expenditure Cap in order to take any Compliance Action, Seller shall promptly provide Notice to Buyer and documentation to demonstrate the expenses incurred up to the Compliance Expenditure Cap and such anticipated out-of-pocket expenses.

4.6.3. Buyer will have ninety (90) days to evaluate such Notice and documentation (during which time period Seller is not obligated to take any Compliance Actions described in the Notice) and shall, within such time, either (a) agree to reimburse Seller for all or some portion of the costs that exceed the Compliance Expenditure Cap (such Buyer-agreed upon costs, the "Accepted Compliance Costs"), or (b) waive Seller's obligation to take such Compliance Actions, or any part thereof for which Buyer has not agreed to reimburse Seller. Notwithstanding the foregoing, if Buyer, in its sole discretion, elects to seek CPUC approval before Buyer agrees to reimburse anticipated out-of-pocket expenses that exceed the Compliance Expenditure Cap or waive Seller's obligation to take such Compliance Actions, Buyer may seek CPUC approval, during which time period Seller is not obligated to take any Compliance Actions described in the Notice.

4.6.4. If Buyer agrees to reimburse Seller for the Accepted Compliance Costs, then Seller shall take such Compliance Actions covered by the Accepted Compliance Costs as agreed upon by the Parties and Buyer shall reimburse Seller for Seller's actual costs to effect the Compliance Actions, not to exceed the Accepted Compliance Costs.

4.7.   <u>Eligible Intermittent Resources Protocol Requirements</u>.  If at any time during the Term the Facility is eligible for EIRP, Seller shall provide Buyer with a copy of the notice from CAISO certifying the Facility as a Participating Intermittent Resource as soon as practicable after Seller's receipt of such notice of certification.  Following such certification: (a) Seller, at its sole cost, shall participate in and comply with EIRP and all additional protocols issued by the CAISO for a Participating Intermittent Resource (if directed by Buyer, in its sole discretion, to participate in such program) or, if the EIRP is no longer available by the CAISO, then all protocols, rules or regulations issued by the CAISO for generating facilities providing energy on an intermittent basis; and (b) Buyer in its limited capacity as Seller's


Scheduling Coordinator shall facilitate communication with the CAISO and provide other administrative materials to the CAISO as necessary to satisfy Seller's obligations and to the extent such actions are at de minimis cost to Buyer.

4.8. <u>FERC Qualifying Facility Status.</u> Seller shall take all actions, including making or supporting timely filings with the FERC necessary to obtain or maintain the Qualifying Facility status of the Facility throughout the Term; provided, however, that this obligation does not apply to the extent Seller is unable to maintain Qualifying Facility status using commercially reasonable efforts because of (a) a change in PURPA or in regulations of the FERC implementing PURPA occurring after the Execution Date, or (b) a change in Laws directly impacting the Qualifying Facility status of the Facility occurring after the Execution Date; and provided further that Seller shall not be obligated under this Section 4.8 to take any actions or make any filings to the extent that no action or filing is required by FERC to obtain, or maintain the Qualifying Facility status of the Facility.

## 5. REPRESENTATION AND WARRANTIES; COVENANTS

5.1. <u>Representations and Warranties.</u> On the Execution Date, each Party represents and warrants to the other Party that:

5.1.1. it is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation;

5.1.2. the execution, delivery and performance of this Agreement are within its powers, have been duly authorized by all necessary action and do not violate any of the terms and conditions in its governing documents, any contracts to which it is a party or any Laws;

5.1.3. this Agreement and each other document executed and delivered in accordance with this Agreement constitutes a legally valid and binding obligation enforceable against it in accordance with its terms;

5.1.4. it is not Bankrupt and there are no proceedings pending or being contemplated by it or, to its knowledge, threatened against it which would result in it being or becoming Bankrupt; and

5.1.5. there is not pending or, to its knowledge, threatened against it or any of its Affiliates any legal proceedings that could materially adversely affect its ability to perform its obligations under this Agreement.

5.2. <u>General Covenants.</u> Each Party covenants that throughout the Term of this Agreement:

5.2.1. it shall continue to be duly organized, validly existing and in good standing under the Laws of the jurisdiction of its formation;

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 28 of 70

191-0_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA


5.2.2. it shall maintain (or obtain from time to time as required, including through renewal, as applicable) all regulatory authorizations necessary for it to legally perform its obligations under this Agreement; and

5.2.3. it shall perform its obligations under this Agreement in a manner that does not violate any of the terms and conditions in its governing documents, any contracts to which it is a party, or any Law.

5.3. <u>Seller's Representations, Warranties and Covenants</u>. In addition to the representations, warranties and covenants specified in Sections 5.1 and 5.2, Seller makes the following additional representations, warranties and covenants to Buyer, as of the Execution Date:

5.3.1. Seller has not participated in the Self-Generation Incentive Program (as defined in CPUC Decision 01-03-073), the California Solar Initiative (as defined in CPUC Decision 06-01-024), and/or other similar California ratepayer subsidized program relating to energy production or rebated capacity costs with respect to the Facility or ten (10) years have elapsed from the date Seller first received an incentive or benefit under any such program with respect to the Facility;

5.3.2. Seller's execution of this Agreement will not violate Public Utilities Code Section 2821(d)(1), if applicable;

5.3.3. Seller, and, if applicable, its successors, represents and warrants that throughout the Delivery Term of this Agreement that: (i) the Project qualifies and is certified by the CEC as an Eligible Renewable Energy Resource ("ERR") as such term is defined in Public Utilities Code Section 399.12 or Section 399.16; and (ii) the Project's output delivered to Buyer qualifies under the requirements of the California Renewables Portfolio Standard. To the extent a change in law occurs after execution of this Agreement that causes this representation and warranty to be materially false or misleading, it shall not be an Event of Default if Seller has used commercially reasonable efforts to comply with such change in law; [Standard term and condition that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by Decision 11-01-025]

5.3.4. Seller and, if applicable, its successors, represents and warrants that throughout the Delivery Term of this Agreement the Renewable Energy Credits transferred to Buyer conform to the definition and attributes required for compliance with the California Renewables Portfolio Standard, as set forth in California Public Utilities Commission Decision 08-08-028, and as may be modified by


subsequent decision of the California Public Utilities Commission or by subsequent legislation. To the extent a change in law occurs after execution of this Agreement that causes this representation and warranty to be materially false or misleading, it shall not be an Event of Default if Seller has used commercially reasonable efforts to comply with such change in law; [Standard term and condition that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by Decision 11-01-025]

5.3.5. The term "commercially reasonable efforts" as used in Section 5.3.3 and 5.3.4 means efforts consistent with and subject to Section 4.6;

5.3.6. Subject to Section 4.8, throughout the Term of this Agreement, the Facility shall qualify as a Qualifying Facility.

5.3.7. Throughout the Term, Seller shall: (a) own and operate the Facility; (b) deliver the Product to Buyer to the Delivery Point free and clear of all liens, security interests, claims and encumbrances or any interest therein or thereto by any individual or entity; and (c) hold the rights to all of the Product;

5.3.8. Seller is acting for its own account, has made its own independent decision to enter into this Agreement and as to whether this Agreement is appropriate or proper for it based upon its own judgment, is not relying upon the advice or recommendations of the Buyer in so doing, and is capable of assessing the merits of, and understands and accepts, the terms, conditions and risks of this Agreement;

5.3.9. Throughout the Delivery Term: (a) Seller will not convey, transfer, allocate, designate, award, report or otherwise provide any or all of the Product, or any portion thereof, or any benefits derived therefrom, to any party other than Buyer; and (b) Seller will not start-up or operate the Facility per instruction of or for the benefit of any third party, except as required by other Laws or, in the case of excess sale arrangements, to serve any Site Host Load;

5.3.10. Seller has not relied on any promises, representations, statements or information of any kind that are not contained in this Agreement in deciding to enter into this Agreement;

5.3.11. The construction of the Facility shall comply with all Laws, including applicable state and local laws, building standards, and interconnection requirements;

Automated Document – Preliminary Statement Part A

Page **20** of 99
Form No. 79-1150
Advice 4781-E
January 2016

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 30
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA                          of 70


5.3.12. No other person or entity, including any other generating facility has any rights in connection with Seller's interconnection agreement or Seller's Interconnection Facilities and no other persons or entities shall have any such rights during the Term; and

5.3.13. During the Term, Seller shall not allow any other person or entity, including any other generating facility, to use Seller's Interconnection Facilities.

## 6. GENERAL CONDITIONS

6.1. <u>CAISO Agreements; Interconnection Agreements; Scheduling.</u> During the Delivery Term, Seller shall operate the Facility in compliance with the Transmission/Distribution Owner tariffs, the CAISO Tariff, and all Laws. Seller shall secure and maintain in full force all of the CAISO agreements, certifications and approvals required in order for the Facility to comply with the CAISO Tariff, including executing and maintaining, as applicable, a Participating Generator Agreement, Meter Service Agreement, interconnection agreement, and/or any other agreement necessary to deliver the Product to Buyer. Seller shall also comply with any modifications, amendments or additions to the applicable tariffs, protocols and Laws; provided that Seller shall be required to enter into a Participating Generator Agreement with the CAISO only if the Facility's net capacity is 500 kW or greater or if the CAISO Tariff requires or provides Seller the option to enter into such an agreement. Seller shall arrange and pay independently for any and all necessary costs under a Participating Generator Agreement, Meter Service Agreement, interconnection agreement, and/or any other agreement necessary to deliver the Product to Buyer. Ninety (90) days prior to the Commercial Operation Date, Seller must provide Buyer with all operating information, consistent with manufacturers specifications, needed for the Buyer to register the Facility with the CAISO and for Buyer to serve as Scheduling Coordinator.

6.2. <u>Metering Requirements</u>.

6.2.1. All output from the Project must be delivered through a single CAISO revenue meter and that meter must be dedicated exclusively to the Project; provided that if the CAISO does not permit a revenue meter for the Facility, the Buyer shall specify a revenue quality meter for the Facility. All Product purchased under this Agreement must be measured by the Project's CAISO revenue meter(s), or the revenue quality meter specified by Buyer, to be eligible for payment under this Agreement. Seller shall bear all costs relating to all metering equipment installed to accommodate the Project.

6.2.2. Buyer may, at its sole cost, furnish and install one Check Meter at the interconnection associated with the Facility at a location provided by

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 31
191-3_Emmerson Investments Inc_Grasshopper File_ReMAT PPA    of 70


Seller that is compliant with Buyer's electric service requirements. The Check Meter must be interconnected with Buyer's communication network to permit (a) periodic, remote collection of revenue quality meter data, and (b) back-up real time transmission of operating-quality meter data through the telemetering system. In the event that Buyer elects to install a Check Meter, Buyer may compare the Check Meter data to the CAISO meter data. If the deviation between the CAISO meter data and the Check Meter data for any comparison is greater than 0.3%, Buyer may provide Notice to Seller of such deviation and the Parties shall mutually arrange for a meter check or recertification of the Check Meter or CAISO meter, as applicable. Each Party shall bear its own costs for any meter check or recertification. Testing procedures and standards for the Check Meter will be the same as for a comparable Buyer-owned meter. Seller shall have the right to have representatives present during all such tests. The Check Meter, if Buyer elects to install a Check Meter, is intended to be used for back-up purposes in the event of a failure or other malfunction of the CAISO meter, and Check Meter data shall only be used to validate the CAISO meter data and, in the event of a failure or other malfunction of the CAISO meter, in place of the CAISO meter until such time that the CAISO meter is recertified.

6.2.3. In the case of excess sales arrangements, Buyer may, at its sole cost, furnish and install a net generation output meter at a location provided by Seller that is compliant with Buyer's electric service requirements. Such meter must be interconnected with Buyer's communication network to permit (a) periodic, remote collection of revenue quality meter data, and (b) back-up real time transmission of operating-quality meter data through the telemetering system.

6.3. <u>Meter Data</u>. Seller hereby agrees to provide all meter data to Buyer in a form acceptable to Buyer, and consents to Buyer obtaining from the CAISO the CAISO meter data applicable to the Project and all inspection, testing and calibration data and reports. Seller shall grant Buyer the right to retrieve the meter readings from the CAISO Operational Meter Analysis and Reporting website and directly from the meter(s) at the Site.

6.4. <u>Standard of Care</u>. Seller shall: (a) maintain and operate the Facility and Interconnection Facilities, except facilities installed by Buyer, in conformance with all Laws and in accordance with Prudent Electrical Practices; (b) obtain any governmental authorizations and permits required for the construction and operation thereof; and (c) generate, schedule and perform transmission services in compliance with all applicable operating policies, criteria, rules, guidelines and tariffs and Prudent Electrical Practices. Seller shall reimburse Buyer for any and all losses, damages, claims, penalties, or liability Buyer incurs as a result of Seller's failure to obtain or maintain any governmental authorizations and permits required for


construction and operation of the Facility throughout the Term of this Agreement.

6.5. <u>Access Rights</u>.

    6.5.1. <u>Operations Logs</u>. Seller shall maintain a complete and accurate log of all material operations and maintenance information on a daily basis. Such log shall include, but not be limited to, information on power production, fuel consumption (if applicable), efficiency, availability, maintenance performed, outages, results of inspections, manufacturer recommended services, replacements, electrical characteristics of the generators, control settings or adjustments of equipment and protective devices. Seller shall provide this information electronically to Buyer within twenty (20) days of Buyer's request.

    6.5.2. <u>Access Rights</u>. Buyer, its authorized agents, employees and inspectors may, on reasonable advance notice under the circumstances, visit the Project during normal business hours for purposes reasonably connected with this Agreement or the exercise of any and all rights secured to Buyer by Law, its tariff schedules, and rules on file with the CPUC. Buyer, its authorized agents, employees and inspectors must (a) at all times adhere to all safety and security procedures as may be required by Seller; and (b) not interfere with the operation of the Project. Buyer shall make reasonable efforts to coordinate its emergency activities with the Safety and Security Departments, if any, of the Project operator. Seller shall keep Buyer advised of current procedures for contacting the Project operator's Safety and Security Departments.

6.6. <u>Protection of Property</u>. Each Party shall be responsible for protecting its own facilities from possible damage resulting from electrical disturbances or faults caused by the operation, faulty operation, or non-operation of the other Party's facilities and such other Party shall not be liable for any such damages so caused; provided that nothing in this Section 6.6 shall modify any other agreement between the Parties.

6.7. <u>Performance Excuses</u>.

    6.7.1. <u>Seller Excuses</u>. Seller shall be excused from achieving the Guaranteed Energy Production during Seller Excuse Hours, as provided in Section 12.1.

    6.7.2. <u>Buyer Excuses</u>. The obligation of Buyer to receive and/or pay for the Product shall be excused only (a) during periods of Force Majeure, (b) by Seller's failure to perform, or (c) as provided with respect to curtailment in Section 6.8.

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 33 of 70

191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA


6.8. <u>Seller Curtailment</u>.

6.8.1. Seller shall curtail the production of the Facility in accordance with the applicable Notice after receipt of: (a) Notice from Buyer that Buyer has been instructed by the CAISO or the Transmission/Distribution Owner to curtail Energy deliveries; (b) Notice that Seller has been given a curtailment order or similar instruction in order to respond to an Emergency; (c) Notice of a Curtailment Order issued by Buyer.

6.8.2. Buyer shall have no obligation to pay Seller for any Product delivered in violation of Section 6.8 or for any Product that Seller would have been able to deliver but for the fact of a curtailment pursuant to Section 6.8.1(a) or (b). Seller shall assume all liability and reimburse Buyer for any and all costs and charges incurred by Buyer, including but not limited to CAISO Penalties, as a result of Seller delivering Energy in violation of Section 6.8.

6.8.3. Buyer shall have the right, but not the obligation, to issue to Seller a Curtailment Order. Buyer shall pay Seller the Contract Price for the Product Seller would have been able to deliver but for the fact that Buyer issued a Curtailment Order ("Paid Curtailed Product").

6.8.4. Buyer shall estimate the amount of Product the Facility would have been able to deliver under Sections 6.8.3. Buyer shall apply accepted industry standards in making such an estimate and take into consideration past performance of the Facility, meteorological data, solar irradiance data, and any other relevant information. Seller shall cooperate with Buyer's requests for information associated with any estimate made hereunder. Buyer's estimates under this Section 6.8.4 for the amount of Product that the Facility would have been able to deliver but for Buyer's issuance of a Curtailment Order will be determined in Buyer's reasonable discretion.

6.9. <u>Forecasting and Outage Notifications</u>. Seller shall comply with the forecasting and outage notifications in Appendix D.

6.10. <u>Telemetry Requirements</u>. Seller shall comply with the telemetry requirements in Appendix F.

6.11. <u>Greenhouse Gas Emissions</u>. Seller acknowledges that a Governmental Authority may require Buyer to take certain actions with respect to greenhouse gas emissions attributable to the generation of Energy, including, but not limited to, reporting, registering, tracking, allocating for or accounting for such emissions. Promptly following Buyer's written request, Seller agrees to take all commercially reasonable actions and execute or provide any and all documents, information or instruments with respect to

---

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 34
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA   of 70


generation by the Facility reasonably necessary to permit Buyer to comply with such requirements, if any.

6.12. Reporting and Record Retention.

6.12.1. Seller shall use commercially reasonable efforts to meet the Milestone Schedule set forth in Appendix I and avoid or minimize any delays in meeting such schedule. Seller shall provide Project development status reports in a format and a frequency, which shall not exceed one (1) report per month, specified by the Buyer. The report shall describe Seller's progress relative to the development, construction, and startup of the Facility, as well as a Notice of any anticipated change to the Commercial Operation Date and whether Seller is on schedule to meet the Guaranteed Commercial Operation Date.

6.12.2. Seller shall within ten (10) Business Days of receipt thereof provide to Buyer copies of any Interconnection Study or the interconnection agreement tendered to Seller by the CAISO or the Transmission/Distribution Owner and all other material reports, studies and analyses furnished by the CAISO or any Transmission/Distribution Owner, and any correspondence with the CAISO or Transmission/Distribution Owner related thereto, concerning the interconnection of the Facility to the Transmission/Distribution Owner's electric system or the transmission of Energy on the Transmission/Distribution Owners' electric system. Concurrently with the provision of any Interconnection Study or the interconnection agreement tendered to Seller by the CAISO or the Transmission/Distribution Owner that may give rise to a termination right of Buyer under Section 14.9.1, Seller shall provide Buyer a Notice of its irrevocable election to exercise or not exercise its rights under Section 14.9.2, with a failure to provide such an election deemed to be an election not to exercise such rights.

6.12.3. No later than twenty (20) days after each semi-annual period ending on June 30th or December 31st, Seller shall provide a report listing all WMDVBEs that supplied goods or services to Seller during such period, including any certifications or other documentation of such WMDVBEs' status as such and the aggregate amount paid to WMDVBEs during such period.

6.12.4. Seller shall provide to Buyer on the Commercial Operation Date, and within thirty (30) days after the completion of each Contract Year thereafter during the Delivery Term, an inspection and maintenance report regarding the Facility. Buyer shall provide to the Seller a form inspection and maintenance report before the Commercial Operation Date and Seller shall complete the form inspection and maintenance

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 35
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


report. Buyer, at its sole discretion, may modify the form inspection and maintenance report to be used in subsequent Contract Years during the Delivery Term.

6.12.5. Seller shall keep all operating records required of a Qualifying Facility by any applicable CPUC order as well as any additional information that may be required of a Qualifying Facility in order to demonstrate compliance with all applicable standards which have been adopted by the CPUC.

6.12.6. If the Facility is a "qualifying cogeneration facility" as contemplated in 18 CFR Section 292.205, then within thirty (30) days following the end of each calendar year, and within thirty (30) days following the end of the Delivery Term, Seller shall provide to Buyer:

6.12.6.1. A copy of a FERC order waiving for the Facility, the applicable operating and efficiency standards for qualifying cogeneration facilities for the applicable year; or

6.12.6.2. A completed copy of Buyer's "QF Efficiency Monitoring Program – Cogeneration Data Reporting Form," substantially in the form of Appendix N-1, with calculations and verifiable supporting data, which demonstrates the compliance of the Facility with cogeneration Qualifying Facility operating and efficiency standards set forth in 18 CFR Section 292.205 "Criteria for Qualifying Cogeneration Facilities," for the applicable year.

6.12.7. If the Facility is a "qualifying small power production facility" as contemplated in 18 CFR Section Sections 292.203(a), 292.203(c) and 292.204, then within thirty (30) days following the end of each year, and within thirty (30) days following the end of the Delivery Term, Seller shall provide to Buyer:

6.12.7.1. A copy of a FERC order waiving for the Facility, the applicable operating and fuel use standards for qualifying small power production facilities for the applicable year; or

6.12.7.2. A completed copy of Buyer's "Fuel Use Standards – Small Power Producer Data Reporting Form," substantially in the form of Appendix N-2, with calculations and verifiable supporting data, which demonstrates the compliance of the Facility with small power producer Qualifying Facility fuel use standards set forth in 18 CFR Section 292.204 "Criteria for Qualifying Small Power Production Facilities," for the applicable year.

Case: 19-30088   Doc: 7362   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 36
191-A_Emmerson Investments Inc_Grasshopper Final_ConfRMR PPA   of 70


6.13. <u>Tax Withholding Documentation</u>. Upon Buyer's request, Seller shall promptly provide to Buyer Internal Revenue Service tax Form W-9 and California tax Form 590 (or their equivalent), completed with Seller's information, and any other documentation necessary for Buyer to comply with its tax reporting or withholding obligations with respect to Seller.

6.14. <u>Modifications to Facility</u>. During the Delivery Term, Seller shall not repower or materially modify or alter the Facility without the written consent of Buyer, which written consent is at Buyer's sole discretion. Material modifications or alterations include, but are not limited to, (a) movement of the Site, (b) changes that may increase or decrease the expected output of the Facility (other than a one (1) time decrease based upon any adjustment to the Contract Capacity based on the Demonstrated Contract Capacity), (c) changes that may affect the generation profile of the Facility, (d) changes that may affect the ability to accurately measure the output of Product from the Facility and (e) changes that conflict with elections, information or requirements specified elsewhere in this Agreement (other than, to the extent not covered by clauses (a) through (d), as specified in Appendix E). Material modifications or alterations do not include maintenance and repairs performed in accordance with Prudent Electrical Practices. Seller shall provide to Buyer Notice not less than ninety (90) days before any proposed repowering, modification or alteration occurs describing the repowering, modification or alteration to Buyer's reasonable satisfaction and, if subject to Buyer's consent pursuant to this Section 6.14, seeking Buyer's written consent.

6.15. <u>No Additional Incentives</u>. Seller agrees that during the Term of this Agreement it shall not seek additional compensation or other benefits pursuant to the Self-Generation Incentive Program, as defined in CPUC Decision 01-03-073, the California Solar Initiative, as defined in CPUC Decision 06-01-024, Buyer's net energy metering tariff, or other similar California ratepayer subsidized program relating to energy production with respect to the Facility.

6.16. <u>Small Hydro/Private Energy Producer</u>. Seller agrees to provide to Buyer copies of each of the documents identified in California Public Utilities Code Section 2821(d)(1), if applicable, as may be amended from time to time, as evidence of Seller's compliance with such Public Utilities Code section prior to the Commercial Operation Date and, after the Commercial Operation Date, within thirty (30) days of Seller's receipt of written request.

6.17. <u>Site Control</u>. Seller shall have Site Control as of the earlier of: (a) the Commercial Operation Date; or (b) any date before the Commercial Operation Date to the extent necessary for the Seller to perform its obligations under this Agreement and, in each case, Seller shall maintain Site Control throughout the Delivery Term. Seller shall promptly provide

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 37
191-R_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA                                    of 70


Buyer with Notice if there is any change in the status of Seller's Site Control.

7. **INDEMNITY**

7.1. Each Party as indemnitor shall defend, save harmless and indemnify the other Party and the directors, officers, and employees of such other Party against and from any and all loss and liability (including reasonable attorneys' fees) for injuries to persons, including employees of either Party, and physical damage to property, including property of either Party, resulting from or arising out of: (a) the engineering, design, construction, maintenance, or operation of the indemnitor's facilities; (b) the installation of replacements, additions, or betterments to the indemnitor's facilities; or (c) the negligence or willful misconduct of the indemnitor relating to its obligation under this Agreement. This indemnity and save harmless provision shall apply notwithstanding the active or passive negligence of the indemnitee. Neither Party shall be indemnified for liability or loss, resulting from its sole negligence or willful misconduct. The indemnitor shall, on the other Party's request, defend any suit asserting a claim covered by this indemnity and shall pay all costs, including reasonable attorneys' fees that may be incurred by the other Party in enforcing this indemnity.

7.2. Each Party shall defend, save harmless and indemnify the other Party, its directors, officers, employees, and agents, assigns, and successors in interest, for and against any penalty imposed upon the Party to the extent caused by the other Party's failure to fulfill its obligations under this Agreement.

7.3. Each Party releases and shall defend, save harmless and indemnify the other Party from any and all loss and liability (including reasonable attorneys' fees) in connection with any breach made by the indemnifying Party of its representations, warranties and covenants in this Agreement.

8. **LIMITATION OF DAMAGES**

EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT THERE IS NO WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND ANY AND ALL IMPLIED WARRANTIES ARE DISCLAIMED. LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY, SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED UNLESS EXPRESSLY HEREIN PROVIDED. NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. UNLESS EXPRESSLY HEREIN PROVIDED, AND SUBJECT TO THE

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 38
191-3_Emmerson Investments Inc Grasshopper Fac_ReMAT PPA   of 70


PROVISIONS OF SECTION 7 (INDEMNITY), IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

## 9. NOTICES

Notices (other than forecasts, scheduling requests and curtailment (or equivalent) instructions) shall, unless otherwise specified herein, be in writing and may be delivered by hand delivery, United States mail, overnight courier service, facsimile or electronic messaging (e-mail). Notices of curtailment (or equivalent orders) may be oral or written and must be made in accordance with accepted industry practices for such notices. A notice sent by facsimile transmission or e-mail will be recognized and shall be deemed received on the Business Day on which such notice was transmitted if received before 5 p.m. Pacific prevailing time (and if received after 5 p.m., on the next Business Day) and a notice by overnight mail or courier shall be deemed to have been received on the next Business Day after such Notice is sent or such earlier time as is confirmed by the receiving Party unless it confirms a prior oral communication, in which case any such notice shall be deemed received on the day sent. A Party may change its addresses by providing notice of same in accordance with this provision. All Notices, requests, invoices, statements or payments for this Facility must reference this Agreements identification number. Notices shall be provided as indicated in Appendix J.

## 10. INSURANCE

10.1. <u>Insurance Coverage</u>. Seller shall, at its own expense, starting on the Execution Date and until the end of the Term, and for such additional periods as may be specified below, provide and maintain in effect the following insurance policies and minimum limits of coverage as specified below, and such additional coverage as may be required by Law, with insurance companies authorized to do business in the state in which the services are to be performed, with an A.M. Best's Insurance Rating of not less than A-:VII.

    10.1.1. Commercial general liability insurance, written on an occurrence, not claims-made basis, covering all operations by or on behalf of Seller arising out of or connected with this Agreement, including coverage for bodily injury, broad form property damage, personal and advertising injury, products/completed operations, contractual liability, premises-operations, owners and contractors protective, hazard, explosion, collapse and underground. Such insurance must bear a combined single limit per occurrence and annual aggregate of not less than one million dollars ($1,000,000.00), exclusive of defense costs, for all coverages. Such insurance must contain standard

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 39
191-R_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA                                    of 70


cross-liability and severability of interest provisions. If Seller elects, with Buyer's written concurrence, to use a "claims made" form of commercial general liability insurance, then the following additional requirements apply: (a) the retroactive date of the policy must be prior to the Execution Date; and (b) either the coverage must be maintained for a period of not less than four (4) years after this Agreement terminates, or the policy must provide for a supplemental extended reporting period of not less than four (4) years after this Agreement terminates. Governmental agencies which have an established record of self-insurance may provide the required coverage through self-insurance.

10.1.2. Workers' compensation insurance with statutory limits, as required by the state having jurisdiction over Seller's employees, and employer's liability insurance with limits of not less than: (a) bodily injury by accident - one million dollars ($1,000,000.00) each accident; (b) bodily injury by disease - one million dollars ($1,000,000.00) policy limit; and (c) bodily injury by disease - one million dollars ($1,000,000.00) each employee.

10.1.3. Commercial automobile liability insurance covering bodily injury and property damage with a combined single limit of not less than one million dollars ($1,000,000.00)per occurrence. Such insurance must cover liability arising out of Seller's use of all owned, non-owned and hired automobiles in the performance of the Agreement.

10.1.4. Umbrella/excess liability insurance, written on an occurrence, not claims-made basis, providing coverage excess of the underlying employer's liability, commercial general liability, and commercial automobile liability insurance, on terms at least as broad as the underlying coverage, with limits of not less than four million dollars ($4,000,000.00) per occurrence and in the annual aggregate.

10.2. <u>Additional Insurance Provisions</u>.

10.2.1. On or before the later of (a) sixty (60) days after the Execution Date and (b) the date immediately preceding commencement of construction of the Facility, and again within a reasonable time after coverage is renewed or replaced, Seller shall furnish to Buyer certificates of insurance evidencing the coverage required above, written on forms and with deductibles reasonably acceptable to Buyer. Notwithstanding the foregoing sentence, Seller shall in no event furnish Buyer certificates of insurance evidencing required coverage later than the Commercial Operation Date. All deductibles, co-insurance and self-insured retentions applicable to the insurance above must be paid by Seller. All certificates of insurance must note that the insurers issuing coverage must endeavor to provide Buyer

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 40
191-A_Emmerson Investments Inc_Grasshopper Filial_ReMAT PPA    of 70


with at least thirty (30) days' prior written notice in the event of cancellation of coverage. Buyer's receipt of certificates that do not comply with the requirements stated in this Section 10.2.1, or Seller's failure to provide such certificates, do not limit or relieve Seller of the duties and responsibility of maintaining insurance in compliance with the requirements in this Section 10 and do not constitute a waiver of any of the requirements of Section 10.

10.2.2. Insurance coverage described above in Section 10.1 shall provide for thirty (30) days written Notice to Buyer prior to cancellation, termination, alteration, or material change of such insurance.

10.2.3. Evidence of coverage described above in Section 10.1 shall state that coverage provided in primary and is not excess to or contributing with any insurance or self-insurance maintained by Buyer.

10.2.4. Buyer shall have the right to inspect or obtain a copy of the original policy(ies) of insurance.

10.2.5. All insurance certificates, endorsements, cancellations, terminations, alterations, and material changes of such insurance must be issued, clearly labeled with this Agreement's identification number and submitted in accordance with Section 9 and Appendix J.

10.2.6. The insurance requirements set forth in Section 10.1 will apply as primary insurance to, without a right of contribution from, any other insurance maintained by or afforded to Buyer, its subsidiaries and Affiliates, and their respective officers, directors, shareholders, agents, and employees, regardless of any conflicting provision in Seller's policies to the contrary. To the extent permitted by Law, Seller and its insurers shall be required to waive all rights of recovery from or subrogation against Buyer, its subsidiaries and Affiliates, and their respective officers, directors, shareholders, agents, employees and insurers. The commercial general liability insurance required in Section 10.1.1 and the umbrella/excess liability insurance required in Section 10.1.4 must name Buyer, its subsidiaries and Affiliates, and their respective officers, directors, shareholders, agents and employees, as additional insureds for liability arising out of Seller's construction, use or ownership of the Facility.

10.2.7. Seller shall remain liable for all acts, omissions or default of any subcontractor or subsupplier and shall indemnify, defend and hold harmless Buyer for any and all loss or damages, as well as all costs, charges and expenses which Buyer may suffer, incur, or bear as a result of any acts, omissions or default by or on behalf of any subcontractor or subsupplier.

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 41
191-R_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70



10.2.8. If Seller fails to comply with any of the provisions of this Section 10, Seller, among other things and without restricting Buyer's remedies under Law or otherwise, shall, at its own cost, act as an insurer and provide insurance in accordance with the terms and conditions of this Section 10. With respect to the required commercial general liability insurance set forth in Section 10.1.1, umbrella/excess liability insurance set forth in Section 10.1.4, and commercial automobile liability insurance set forth in Section 10.1.3, Seller shall provide a current, full and complete defense to Buyer, its subsidiaries and Affiliates, and their respective officers, directors, shareholders, agents, employees, assigns, and successors in interest, in response to a third party claim in the same manner that an insurer with an A.M. Best's Insurance Rating of A-:VII would have, had the insurance been maintained in accordance with the terms and conditions set forth in this Section 10 and given the required additional insured wording in the commercial general liability insurance and umbrella/excess liability insurance, and standard "Who is an Insured" provision in commercial automobile liability form.

## 11. FORCE MAJEURE

11.1. <u>No Default for Force Majeure.</u>  Neither Party shall be in default in the performance of any of its obligations set forth in this Agreement, except for obligations to pay money, when and to the extent failure of performance is caused by Force Majeure. Nothing in this Section 11 shall relieve the Seller of the obligation to achieve Commercial Operation on or before the Guaranteed Commercial Operation Date, as may be extended pursuant to Section 2.8.

11.2. <u>Requirements Applicable to Claiming Party</u>.  If a Party, because of Force Majeure, is rendered wholly or partly unable to perform its obligations when due under this Agreement, such Party (the "Claiming Party") shall be excused from whatever performance is affected by the Force Majeure to the extent so affected. In order to be excused from its performance obligations under this Agreement by reason of Force Majeure:

11.2.1. The Claiming Party, on or before the fourteenth (14th) day after the initial occurrence of the claimed Force Majeure, must give the other Party Notice describing the particulars of the occurrence; and

11.2.2. The Claiming Party must provide timely evidence reasonably sufficient to establish that the occurrence constitutes Force Majeure as defined in this Agreement.

11.3. <u>Limitations</u>.  The suspension of the Claiming Party's performance due to Force Majeure may not be greater in scope or longer in duration than is required by such Force Majeure. In addition, the Claiming Party shall use

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 42
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA
of 70



diligent efforts to remedy its inability to perform. When the Claiming Party is able to resume performance of its obligations under this Agreement, the Claiming Party shall give the other Party prompt Notice to that effect.

11.4. <u>Termination.</u> Either Party may terminate this Agreement on at least five (5) Business Days' prior Notice, in the event of Force Majeure which materially interferes with such Party's ability to perform its obligations under this Agreement and which (a) extends for more than 365 consecutive days, (b) extends for more than a total of 365 days in any consecutive 540-day period, or (c) causes the Commercial Operation Date to fail to be demonstrated by the Guaranteed Commercial Operation Date.

## 12. GUARANTEED ENERGY PRODUCTION

12.1. <u>General.</u> Throughout the Delivery Term, Seller shall be required to deliver to Buyer no less than the Guaranteed Energy Production over two (2) consecutive Contract Years during the Delivery Term ("Performance Measurement Period"). "Guaranteed Energy Production" means an amount of Delivered Energy, as measured in kWh, equal to the product of (x) and (y), where (x) is:

> [one hundred forty percent (140%)] *[for wind As-Available technology]*

> [one hundred seventy percent (170%)] *[for all other As-Available technologies]*

> [one hundred eighty percent (180%)] *[for Baseload technologies]*

> [**thirteen** percent (**13**%)] *[for hydro a threshold reasonably acceptable to Buyer based on Facility characteristics to be proposed by hydro Seller]*

of the average of the Contract Quantity over the Performance Measurement Period and (y) is the difference between (I) and (II), with the resulting difference divided by (I), where (I) is the number of hours in the applicable Performance Measurement Period and (II) is the aggregate number of Seller Excuse Hours in the applicable Performance Measurement Period. Guaranteed Energy Production is described by the following formula:

> *Guaranteed Energy Production = (**13** % \* average of the Contract Quantity over the Performance Measurement Period in kWh) \* [(Hrs in Performance Measurement Period - Seller Excuse Hrs) / Hrs in Performance Measurement Period]*

12.2. <u>GEP Failures.</u> If Seller has a GEP Failure, then within ninety (90) days after the last day of the last month of such Performance Measurement

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 63
191-3_Emmerson Investments Inc_Grasshopper Flat_RMAT PPA
of 70


Period, Buyer shall notify Seller of such failure. Seller shall cure the GEP Failure by delivering to Buyer GEP Damages, calculated pursuant to Appendix G, within thirty (30) days of receipt of the Notice.

12.3. <u>GEP Damages.</u> The Parties agree that the damages sustained by Buyer associated with Seller's failure to achieve the Guaranteed Energy Production requirement would be difficult or impossible to determine, or that obtaining an adequate remedy would be unreasonably time consuming or expensive and therefore agree that Seller shall pay the GEP Damages to Buyer as liquidated damages. In no event shall Buyer be obligated to pay GEP Damages.

## 13. CREDIT AND COLLATERAL REQUIREMENTS

13.1. <u>Collateral Requirement.</u> On or before the thirtieth (30th) day following the Execution Date, Seller shall post and thereafter maintain a collateral requirement (the "Collateral Requirement") equal to twenty dollars ($20.00) for each kilowatt of the Contract Capacity. The Collateral Requirement will be held by Buyer and must be in the form of either a cash deposit or Letter of Credit.

13.2. <u>Maintenance of Collateral Requirement.</u> The Collateral Requirement shall be posted to Buyer and maintained at all times from the thirtieth (30th) day following the Execution Date through the end of the Term and thereafter until such time as Seller has satisfied all monetary obligations which survive any termination of this Agreement, not to exceed one year following the end of the Term. In the event that Buyer draws on the Collateral Requirement pursuant to this Agreement, Seller shall promptly replenish such Collateral Requirement to the amount specified in Section 13.1, as may be adjusted pursuant to Section 13.3.

13.3. <u>Forfeiture Based on Capacity.</u> If, on the earlier of the Commercial Operation Date or the Guaranteed Commercial Operation Date, Seller:

13.3.1. is not capable of delivering any of the Contract Capacity to the Delivery Point, as determined by Buyer in its reasonable discretion, Seller shall forfeit, and Buyer shall be entitled to, the entire Collateral Requirement and Buyer may terminate this Agreement; or

13.3.2. is only capable of delivering a portion of the Contract Capacity to the Delivery Point, based on the Demonstrated Contract Capacity, Seller shall forfeit, and Buyer shall have the right to retain, a portion of the Collateral Requirement equal to the product of (a) twenty dollars ($20.00), multiplied by (b) the Contract Capacity set forth in Section 3.1 less the Demonstrated Contract Capacity.

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 44
of 70

1911_Emmerson Investments Inc_Grasshopper Flat_ReMATPPA


13.4. <u>Grant of Security Interest/Remedies</u>.  To secure its obligations under this Agreement and to the extent Seller delivers the Collateral Requirement, as applicable, hereunder, Seller hereby grants to Buyer, as the secured party, a first priority security interest in, and lien on (and right of setoff against), and assignment of, all such Collateral Requirement posted with Buyer in the form of cash or Letter of Credit and any and all proceeds resulting therefrom or the liquidation thereof, whether now or hereafter held by, on behalf of, or for the benefit of, Buyer.  Within thirty (30) days of the delivery of the Collateral Requirement, Seller agrees to take such action as Buyer reasonably requires in order to perfect a first-priority security interest in, and lien on (and right of setoff against), such Collateral Requirement and any and all proceeds resulting therefrom or from the liquidation thereof.  Upon or any time after the occurrence of an Event of Default, an Early Termination Date or an occasion provided for in this Agreement where Buyer is authorized to retain all or a portion of the Collateral Requirement, Buyer may do any one or more of the following:  (a) exercise any of the rights and remedies of a secured party with respect to the Collateral Requirement, as applicable, including any such rights and remedies under Law then in effect; (b) exercise its rights of setoff against any and all property of Seller in the possession of the Buyer or Buyer's agent; (c) draw on any outstanding Letter of Credit issued for its benefit or retain any cash deposit; and (d) liquidate the Collateral Requirement then held by or for the benefit of Buyer free from any claim or right of any nature whatsoever of Seller, including any equity or right of purchase or redemption by Seller.  Buyer shall apply the proceeds of the collateral realized upon the exercise of any such rights or remedies to reduce Seller's obligations under the Agreement (Seller remaining liable for any amounts owing to Buyer after such application), subject to the Buyer's obligation to return any surplus proceeds remaining after such obligations are satisfied in full.

13.5. <u>Use of Collateral Requirement</u>.  Buyer shall be entitled draw upon the Collateral Requirement for any damages arising upon Buyer's declaration of an Early Termination Date or as set forth in Section 13.3.1 and 13.3.2.  If Buyer terminates this Agreement and is entitled to draw upon the Collateral Requirement, any amount of Collateral Requirement that Seller has not yet posted with Buyer will be immediately due and payable by Seller to Buyer.

13.5.1. <u>Return of Collateral Requirement</u>.  Buyer shall return the unused portion of the Collateral Requirement, including the payment of any interest due thereon to Seller promptly after the following has occurred: (a) the Term of the Agreement has ended, or an Early Termination Date has occurred, as applicable; and (b) all payment obligations of the Seller arising under this Agreement, including but not limited to payments pursuant to the Settlement Amount, indemnification payments, or other damages are paid in full (whether directly or indirectly such as through set-off or netting).

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 45
191-1_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA
of 70


13.5.2. <u>Full Return of Collateral Requirement</u>. Notwithstanding the foregoing, the full Collateral Requirement will be returned to Seller if this Agreement is terminated in accordance with Section 11.4 or 14.10; provided that a termination under Section 11.4 only entitles Seller to a return of the full Collateral Requirement if the termination is based on a Force Majeure that prevents the Commercial Operation Date from occurring on or before the Guaranteed Commercial Date or prevents Seller from demonstrating full Contract Capacity in accordance with Appendix M.

13.5.3. <u>Payment of Interest</u>. Buyer shall pay simple interest on cash held to satisfy the Collateral Requirements at the rate and in the manner set forth in Section 3.7.9.

13.6. <u>Letter of Credit</u>.

13.6.1. If Seller has provided a Letter of Credit to satisfy the Collateral Requirement, then Seller shall renew or cause the renewal of each outstanding Letter of Credit on a timely basis as provided in the relevant Letter of Credit and in accordance with this Agreement. In the event the issuer of such Letter of Credit (a) fails to maintain a Credit Rating of at least (i) an A3 by Moody's with a stable designation and at least an A- by S&P with a stable designation, if the issuer is rated by both Moody's and S&P, or (ii) an A3 by Moody's with a stable designation or an A- by S&P with a stable designation, if the issuer is rated by either Moody's or S&P but not both, (b) indicates its intent not to renew such Letter of Credit or has not renewed such Letter of Credit at least twenty-five (25) Business Days prior to its expiration, or (c) fails to honor Buyer's properly documented request to draw on an outstanding Letter of Credit by such issuer, Seller shall cure such default by complying with either Section 13.6.1.1 or 13.6.1.2 below in an amount equal to the Collateral Requirement, and by completing the action within three (3) Business Days of the applicable event (all of which is considered the "Cure"):

13.6.1.1. providing a substitute Letter of Credit that is issued by a qualified bank acceptable to Buyer, other than the bank failing to honor the outstanding Letter of Credit, or

13.6.1.2. posting cash.

If Seller fails to Cure or if such Letter of Credit expires or terminates without a full draw thereon by Buyer, or fails or ceases to be in full force and effect at any time that such Letter of Credit is required pursuant to the terms of this Agreement, then Seller shall have failed to meet the Collateral Requirements of Section 13. If a Letter of

Automated Document – Preliminary Statement Part A

Page 36 of 99
Form No. 79-1150
Advice 4781-E
January 2016

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 46
191-A_Emmerson Investments Inc_Grasshopper Final_ReMAT PPA    of 70


Credit has not been renewed at least twenty (20) Business Days prior to its scheduled expiration, Buyer may draw on the Letter of Credit for the full amount of the Collateral Requirement.

13.6.2.  In all cases, the costs and expenses of establishing, renewing, substituting, canceling, increasing, reducing, or otherwise administering the Letter of Credit shall be borne by Seller.

## 14.  EVENTS OF DEFAULT AND TERMINATION

14.1.  Termination.  Unless terminated earlier pursuant to Section 11.4 or this Section 14, this Agreement automatically terminates immediately following the last day of the Delivery Term.

14.2.  <u>Events of Default</u>.  An "Event of Default" means, with respect to a Party, the occurrence of any of the following:

14.2.1.  With respect to either Party:

14.2.1.1. A Party becomes Bankrupt;

14.2.1.2. Except for an obligation to make payment when due, if there is a failure of a Party to perform any material covenant or obligation set forth in this Agreement (except to the extent such failure provides a separate termination right for the non-breaching Party or to the extent excused by Force Majeure), if such failure is not remedied within thirty (30) days after Notice thereof from the non-breaching Party to the breaching Party;

14.2.1.3. A Party fails to make any payment due and owing under this Agreement, if such failure is not cured within five (5) Business Days after Notice from the non-breaching Party to the breaching Party; or

14.2.1.4. Any representation or warranty made by a Party (a) is false or misleading in any material respect when made or (b) becomes false or misleading in any material respect during the Term; provided that the representations and warranties made by Seller in Sections 5.3.3 or 5.3.4 shall be subject to Section 5.3.5.

14.2.2.  With respect to Seller:

14.2.2.1. Seller fails to take all corrective actions specified in any Buyer Notice, within the time frame set forth in such Notice, that the Facility is out of compliance with any term of this Agreement; provided that if such corrective action falls under a

---

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 47
of 70
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA


specific termination right under Section 14.2.2, then the time frame, if any, set forth for such right shall apply;

14.2.2.2. The Facility has not achieved Commercial Operation by the Guaranteed Commercial Operation Date;

14.2.2.3. Subject to Section 11, Seller has not sold or delivered Product greater than 10% of the applicable Contract Quantity from the Facility to Buyer for a period of twelve (12) consecutive months;

14.2.2.4. Subject to Section 4.6, Seller fails to maintain its status as an ERR as set forth in Section 4.5 of the Agreement;

14.2.2.5. Subject to Section 4.8, the Facility fails to maintain its status as a Qualifying Facility;

14.2.2.6. Seller fails to post and maintain the Collateral Requirements pursuant to Section 13 and such failure is not cured within any applicable cure period;

14.2.2.7. Seller abandons the Facility;

14.2.2.8. Seller installs generating equipment at the Facility that exceeds the Contract Capacity and such excess generating capacity is not removed within five (5) Business Days after Notice from Buyer;

14.2.2.9. Seller delivers or attempts to deliver to the Delivery Point for sale under this Agreement Product that was not generated by the Facility;

14.2.2.10. Seller fails to install any of the equipment or devices necessary for the Facility to satisfy the Contract Capacity of the Facility, as set forth in Section 13.3.1;

14.2.2.11. An unauthorized assignment of the Agreement, as set forth in Section 17;

14.2.2.12. Seller fails to reimburse Buyer any amounts due under this Agreement; or

14.2.2.13. Seller breaches the requirements in Section 6.15 regarding incentives.

14.3. <u>Declaration of an Event of Default</u>. If an Event of Default has occurred, the non-defaulting Party shall have the right to: (a) send Notice, designating a day, no earlier than five (5) days after such Notice and no later than twenty

Automated Document – Preliminary Statement Part A

Page **38** of 99
Form No. 79-1150
Advice 4781-E
January 2018

191-0_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 48 of 70



(20) days after such Notice, as an early termination date of this Agreement ("Early Termination Date"); (b) accelerate all amounts owing between the Parties; (c) terminate this Agreement and end the Delivery Term effective as of the Early Termination Date; (d) collect any Settlement Amount under Section 14.5; and (e) if the defaulting party is the Seller and Buyer terminates the Agreement prior to the start of the Commercial Operation Date, Buyer shall have the right to retain (or if the Collateral Requirement has not been provided, collect) the entire Collateral Requirement.

14.4. <u>Release of Liability for Termination</u>.

    14.4.1. Upon termination of this Agreement, neither Party shall be under any further obligation or subject to liability hereunder, except as provided in Section 3.4.2.

    14.4.2. If an Event of Default shall have occurred, the non-defaulting Party has the right to immediately suspend performance under this Agreement and pursue all remedies available at Law or in equity against the defaulting Party (including monetary damages), except to the extent that such remedies are limited by the terms of this Agreement.

14.5. <u>Calculation of Settlement Amount</u>.

    14.5.1. If either Party exercises a termination right under Section 14 after the Commercial Operation Date, the non-defaulting Party shall calculate a settlement amount ("Settlement Amount") equal to the amount of the non-defaulting Party's aggregate Losses and Costs less any Gains, determined as of the Early Termination Date. Prior to the Commercial Operation Date, the Settlement Amount shall be Zero dollars ($0).

    14.5.2. If the non-defaulting Party's aggregate Gains exceed its aggregate Losses and Costs, if any, determined as of the Early Termination Date, the Settlement Amount shall be Zero dollars ($0).

    14.5.3. The Buyer shall not have to enter into replacement transactions to establish a Settlement Amount.

14.6. <u>Rights and Remedies Are Cumulative</u>. The rights and remedies of the Parties pursuant to this Section 14 shall be cumulative and in addition to the rights of the Parties otherwise provided in this Agreement.

14.7. <u>Duty to Mitigate</u>. Buyer and Seller shall each have a duty to mitigate damages pursuant to this Agreement, and each shall use reasonable efforts to minimize any damages it may incur as a result of the other Party's non-

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 49
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA
of 70


performance of this Agreement, including with respect to termination of this Agreement.

14.8. <u>Right of First Refusal</u>.

14.8.1. If Seller terminates this Agreement, as provided in Sections 14.10 or 11.4 (based on a Force Majeure as to which Seller is the Claiming Party), or if Buyer terminates this Agreement as provided in Sections 14.2.2.2 and 13.3.1, or due to an Event of Default of Seller prior to the Guaranteed Commercial Operation Date, neither Seller nor Seller's Affiliates may sell, or enter into a contract to sell, Energy, Green Attributes, Capacity Attributes, or Resource Adequacy Benefits, generated by, associated with or attributable to a generating facility installed at the Site to a party other than Buyer for a period of two (2) years following the effective date of such termination ("Restricted Period").

14.8.2. This prohibition on contracting and sale will not apply if, before entering into such contract or making a sale to a party other than Buyer, Seller or Seller's Affiliate provides Buyer with a written offer to sell the Energy, Green Attributes, Capacity Attributes and Resource Adequacy Benefits to Buyer at the Contract Price and on other terms and conditions materially similar to the terms and conditions contained in this Agreement and Buyer fails to accept such offer within forty-five (45) days after Buyer's receipt thereof.

14.8.3. Neither Seller nor Seller's Affiliates may sell or transfer the Facility, or any part thereof, or land rights or interests in the Site of the proposed Facility (including the interconnection queue position identified in Section 2.4) during the Restricted Period so long as the limitations contained in this Section 14.8 apply, unless the transferee agrees to be bound by the terms set forth in this Section 14.8 pursuant to a written agreement reasonably approved by Buyer.

14.8.4. Seller shall indemnify and hold Buyer harmless from all benefits lost and other damages sustained by Buyer as a result of any breach of the covenants contained within this Section 14.8.

14.9. <u>Transmission Costs Termination Right</u>.

14.9.1. Subject to Section 14.9.2, Buyer has the right to terminate this Agreement on Notice, which will be effective five (5) Business Days after such Notice is given to Seller, on or before the date that is sixty (60) days after Seller provides to Buyer the results of any Interconnection Study or the interconnection agreement tendered to Seller by the CAISO or the Transmission/Distribution Owner if:


14.9.1.1. Such study or agreement as of the date of the termination Notice estimates, includes, indicates, specifies or reflects that the maximum total cost of transmission upgrades or new transmission facilities to any Transmission/Distribution Owner, including costs reimbursed by any Transmission/Distribution Owner to Seller ("Aggregate Network Upgrade Costs"), may in the aggregate exceed Three Hundred Thousand dollars ($300,000.00) ("Network Upgrades Cap"), irrespective of any subsequent amendment of such study or agreement or any contingencies or assumptions upon which such study or agreement is based; or

14.9.1.2. Buyer must procure transmission service from any other Transmission/Distribution Owner to allow Buyer to Schedule Energy from the Facility and the cost of such transmission service is not reimbursed or paid by Seller.

14.9.2. Notwithstanding Section 14.9.1, Buyer shall have no right to terminate this Agreement under Section 14.9.1, if Seller (a) concurrently with its provision of the relevant Interconnection Study or interconnection agreement pursuant to Section 6.12.2, irrevocably agrees, as applicable, to pay to Buyer (i) the amount which Aggregate Network Upgrade Costs exceed the Network Upgrades Cap ("Excess Network Upgrade Costs"), such payment to be made, at Buyer's election, either directly to the Transmission/Distribution Owner on behalf of Seller or to Buyer for transfer to the Transmission/Distribution Owner at the time due, and (ii) any costs for transmission services specified in Section 14.9.1.2, and (b) enters into an interconnection agreement that contains language requiring Seller to pay, without reimbursement from Buyer or any other Transmission/Distribution Owner, all Excess Network Upgrade Costs; provided that Buyer shall have a separate right to terminate this Agreement on Notice, which will be effective five (5) Business Days after such Notice is given to Seller, on or before the date that is ninety (90) days after FERC, CAISO, or any Transmission/Distribution Owner, as applicable, rejects Seller's interconnection agreement, in whole or in part, or modifies Seller's interconnection agreement, in any such case, in a manner that would make Seller unable to comply with the terms of Section 14.9.2(b). If Seller elects to pay, without reimbursement, for any Excess Network Upgrade Costs pursuant to this Section 14.9.2, in no event shall Seller have any interest in or rights or title to any Network Upgrades or Congestion Revenue Rights (as defined in the CAISO Tariff) in connection with the development of the Facility or the delivery of Product to Buyer pursuant to this Agreement.


14.10. <u>Permit Termination Right.</u> Either Party has the right to terminate this Agreement on Notice, which will be effective five (5) Business Days after such Notice is given, if Seller has not obtained permits necessary for the construction and operation of the Project within twenty-two (22) months after the Execution Date and a Notice of termination is given on or before the end of the twenty-third (23rd) month after the Execution Date; provided that prior to any termination by Seller under this Section 14.10, Seller must have taken all commercially reasonable actions (including but not limited to Seller's timely filing of required documents and payment of all applicable fees) to obtain such permits.

15. **SCHEDULING COORDINATOR; FORECASTING PENALTIES; CAISO CHARGES; GOVERNMENTAL CHARGES**

15.1. <u>Scheduling Coordinator.</u> Buyer shall be Seller's designated Scheduling Coordinator (as defined by CAISO Tariff). Seller shall comply with all forecasting and outage notification requirements in Appendix D. Buyer shall be responsible for all costs and charges assessed by the CAISO with respect to Scheduling and imbalances except as provided in Sections 6.8.2, 15.2 and 15.3. Throughout the Delivery Term, Buyer shall be entitled to all CAISO revenues and credits associated with the Project.

15.2. <u>Forecasting Penalties and CAISO Penalties</u>. Seller is liable for Forecasting Penalties and CAISO Penalties under the following circumstances:

15.2.1. <u>Determining Seller's Liability for Forecasting Penalties.</u> If in any hour of any month in the Delivery Term Seller fails to comply with the requirements in Appendix D of this Agreement with respect to Seller's Available Capacity forecasting, and the sum of Energy Deviations for each of the six Settlement Intervals in that hour exceed the Performance Tolerance Band described in Section 15.2.2, then Seller is liable for a forecasting penalty ("Forecasting Penalty") equal to one hundred fifty percent (150%) of the Contract Price for each kWh of electric Energy Deviation, or any portion thereof, in that hour.

15.2.2. <u>Performance Tolerance Band.</u> The "Performance Tolerance Band," in kWh, is equal to: (a) three percent (3%) times; (b) forecasted Available Capacity times; (c) one (1) hour.

15.2.3. <u>Seller's Liability for CAISO Penalties.</u> Seller shall assume all liability and reimburse Buyer for any and all CAISO Penalties incurred by Buyer because of Seller's failure to adhere to its obligations under the CAISO Tariff or any CAISO directive or to perform any covenant or obligation set forth in this Agreement.

15.3. <u>Availability Charges.</u> If the Facility is subject to the terms of the Availability Standards, Non-Availability Charges, and Availability Incentive Payments

Case: 19-30088   Doc# 7362   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page 52
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA   of 70


as contemplated under Section 40.9 of the CAISO Tariff, any Availability Incentive Payments will be for the benefit of Seller and for Seller's account and any Non-Availability Charges will be the responsibility of Seller and for Seller's account.

15.4. <u>Governmental Charges</u>.  Seller shall pay or cause to be paid all taxes imposed by any Governmental Authority ("Governmental Charges") on or with respect to the Product or the Transaction arising at the Delivery Point, including, but not limited to, ad valorem taxes and other taxes attributable to the Project, land, land rights or interests in land for the Project.  Buyer shall pay or cause to be paid all Governmental Charges on or with respect to the Product or the Transaction from the Delivery Point.  In the event Seller is required by Law or regulation to remit or pay Governmental Charges which are Buyer's responsibility hereunder, Buyer shall reimburse Seller for such Governmental Charges within thirty (30) days of Notice by Seller.  If Buyer is required by Law or regulation to remit or pay Governmental Charges which are Seller's responsibility hereunder, Buyer may deduct such amounts from payments to Seller with respect to payments under the Agreement; if Buyer elects not to deduct such amounts from Seller's payments, Seller shall reimburse Buyer for such amounts within thirty (30) days of Notice from Buyer.  Nothing shall obligate or cause a Party to pay or be liable to pay any Governmental Charges for which it is exempt under the Law.  A Party that is exempt at any time and for any reason from one or more Governmental Charges bears the risk that such exemption shall be lost or the benefit of such exemption reduced; and thus, in the event a Party's exemption is lost or reduced, each Party's responsibility with respect to such Governmental Charge shall be in accordance with the first four sentences of this Section.

## 16. RELEASE OF INFORMATION AND RECORDING CONVERSATION

16.1. <u>Release of Information.</u>  Seller authorizes Buyer to release to the FERC, CEC, the CPUC and/or other Governmental Authority information regarding the Facility, including the Seller's name and location, and the size, location and operational characteristics of the Facility, the Term, the ERR type, the Commercial Operation Date, greenhouse gas emissions data and the net power rating of the Facility, as requested from time to time pursuant to the CEC's, CPUC's or applicable Governmental Authority's rules and regulations.

16.2. <u>Recording.</u>  Unless a Party expressly objects to a recording at the beginning of a telephone conversation, each Party consents to the creation of a tape or electronic recording of all telephone conversations between Buyer's employees or representatives performing a Scheduling Coordinator function as provided in Section 15.1 and any representative of Seller.  The Parties agree that any such recordings will be retained in confidence, secured from improper access, and may be submitted in evidence in any

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 63
191-1_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


proceeding or action relating to this Agreement. Each Party waives any further notice of such monitoring or recording, and agrees to notify its officers and employees of such monitoring or recording and to obtain any necessary consent of such officers and employees.

## 17. ASSIGNMENT

17.1. <u>General Assignment.</u> Except as provided in Sections 17.2 and 17.3, neither Party shall assign this Agreement or its rights hereunder without the prior written consent of the other Party, which consent shall not be unreasonably withheld so long as among other things (a) the assignee assumes the transferring Party's payment and performance obligations under this Agreement, (b) the assignee agrees in writing to be bound by the terms and conditions hereof, (c) the transferring Party delivers evidence satisfactory to the non-transferring Party of the proposed assignee's technical and financial capability to meet or exceed such characteristics in the assigning Party's obligations hereunder and (d) the transferring Party delivers such tax and enforceability assurance as the other Party may reasonably request. Notwithstanding the foregoing and except as provided in Section 17.2, consent shall not be required for an assignment of this Agreement where the assigning Party remains subject to liability or obligation under this Agreement; provided that (i) the assignee assumes the assigning Party's payment and performance obligations under this Agreement, (ii) the assignee agrees in writing to be bound by the terms and conditions hereof, and (iii) the assigning Party provides the other Party with at least thirty (30) days' prior written Notice of the assignment. Appendix K is the General Consent to Assignment form that shall be used for this Section 17.1.

17.2. <u>Assignment to Financing Providers.</u> Seller shall be permitted to assign this Agreement as collateral for any financing or refinancing of the Project (including any tax equity or lease financing) with the prior written consent of the Buyer, which consent shall not be unreasonably withheld or delayed. The Parties agree that, the consent provided to Buyer in accordance with this Section 17.2 shall be in a form substantially similar to the Form of Financing Consent attached hereto as Appendix L; provided that (a) Buyer shall not be required to consent to any additional terms or conditions beyond those contained in Appendix L, including extension of any cure periods or additional remedies for financing providers, and (b) Seller shall be responsible at Buyer's request for Buyer's reasonable costs and attorneys' fees associated with the review, negotiation, execution and delivery of documents in connection with such assignment.

17.3. <u>Notice of Change in Control.</u> Except in connection with public market transactions of the equity interests or capital stock of Seller or Seller's Affiliates, Seller shall provide Buyer notice of any direct change of control of Seller (whether voluntary or by operation of Law).

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 54
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


## 18. GOVERNING LAW

This agreement and the rights and duties of the parties hereunder shall be governed by and construed, enforced and performed in accordance with the laws of the state of California, without regard to principles of conflicts of law. To the extent enforceable at such time, each party waives its respective right to any jury trial with respect to any litigation arising under or in connection with this agreement. [Standard term and condition that "may not be modified" pursuant to prior Commission decisions, including Decision 07-11-025, Decision 08-08-028 and Decision 10-03-021, as modified by Decision 11-01-025]

## 19. DISPUTE RESOLUTION

19.1. <u>Intent of the Parties.</u> The sole procedure to resolve any claim arising out of or relating to this Agreement is the dispute resolution procedure set forth in this Section 19, except that either Party may seek an injunction in Superior Court in San Francisco, California if such action is necessary to prevent irreparable harm, in which case both Parties nonetheless will continue to pursue resolution of all other aspects of the dispute by means of this procedure.

19.2. <u>Management Negotiations.</u>

19.2.1. The Parties will attempt in good faith to resolve any controversy or claim arising out of or relating to this Agreement by prompt negotiations between each Party's authorized representative, or such other person designated in writing as a representative of the Party (each a "Manager"). Either Manager may request a meeting to, be held in person or telephonically, to initiate negotiations to be held within ten (10) Business Days of the other Party's receipt of such request, at a mutually agreed time and place.

19.2.2. All communication and writing exchanged between the Parties in connection with these negotiations shall be deemed confidential and shall be inadmissible as evidence such that it cannot be used or referred to in any subsequent judicial or arbitration process between the Parties, whether with respect to this dispute or any other.

19.2.3. If the matter is not resolved within forty-five (45) days of commencement of negotiations under Section 19.2.1, or if the Party receiving the written request to meet refuses or does not meet within the ten (10) Business Day period specified in Section 19.2.1, either Party may initiate arbitration of the controversy or claim according to the terms of Section 19.3.

19.3. <u>Arbitration Initiation.</u> If the dispute cannot be resolved by negotiation as set forth in Section 19.2 above, then the Parties shall resolve such controversy

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 55
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA    of 70


through arbitration ("Arbitration"). The Arbitration shall be adjudicated by one retired judge or justice from the JAMS panel. The Arbitration shall take place in San Francisco, California, and shall be administered by and in accordance with JAMS' Commercial Arbitration Rules. If the Parties cannot mutually agree on the arbitrator who will adjudicate the dispute, then JAMS shall provide the Parties with an arbitrator pursuant to its then-applicable Commercial Arbitration Rules. The arbitrator shall have no affiliation with, financial or other interest in, or prior employment with either Party and shall be knowledgeable in the field of the dispute. Either Party may initiate Arbitration by filing with the JAMS a notice of intent to arbitrate at any time following the unsuccessful conclusion of the management negotiations provided for in Section 19.2.

19.4. <u>Arbitration Process</u>. The arbitrator shall have the discretion to order depositions of witnesses to the extent the arbitrator deems such discovery relevant and appropriate. Depositions shall be limited to a maximum of three (3) per Party and shall be held within thirty (30) days of the making of a request for depositions. Additional depositions may be scheduled only with the permission of the arbitrator, and for good cause shown. Each deposition shall be limited to a maximum of six (6) hours duration unless otherwise permitted by the arbitrator for good cause shown. All objections are reserved for the Arbitration hearing except for objections based on privilege and proprietary and confidential information. The arbitrator shall also have discretion to order the Parties to exchange relevant documents. The arbitrator shall also have discretion to order the Parties to answer interrogatories, upon good cause shown.

19.4.1. Each of the Parties shall submit to the arbitrator, in accordance with a schedule set by the arbitrator, offers in the form of the award it considers the arbitrator should make. If the arbitrator requires the Parties to submit more than one such offer, the arbitrator shall designate a deadline by which time the Parties shall submit their last and best offer. In such proceedings the arbitrator shall be limited to awarding only one of the two "last and best" offers submitted, and shall not determine an alternative or compromise remedy.

19.4.2. The arbitrator shall have no authority to award punitive or exemplary damages or any other damages other than direct and actual damages and the other remedies contemplated by this Agreement.

19.4.3. The arbitrator's award shall be made within nine (9) months of the notice of intention to arbitrate and the arbitrator shall agree to comply with this schedule before accepting appointment. However, this time limit may be extended by agreement of the Parties or by the arbitrator, if necessary. At the conclusion of the Arbitration, the arbitrator shall prepare in writing and provide to each Party a decision

Case: 19-30088   Doc# 7262   Filed: 05/15/20   Entered: 05/15/20 14:17:39   Page
191-3_Emmerson Investments Inc_Grasshopper Final_ReMAT PPA
of 70
56


setting forth factual findings, legal analysis, and the reasons on which the arbitrator's decision is based.

19.4.4. The arbitrator shall not have the power to commit errors of law or fact, or to commit any abuse of discretion, that would constitute reversible error had the decision been rendered by a California superior court. The arbitrator's decision may be vacated or corrected on appeal to a California court of competent jurisdiction for such error.

19.4.5. The California Superior Court of the City and County of San Francisco may enter judgment upon any award rendered by the arbitrator. The Parties are aware of the decision in Advanced Micro Devices, Inc. v. Intel Corp., 9 Cal. 4th 362 (1994) and, except as modified by this Agreement, intend to limit the power of the arbitrator to that of a Superior Court judge enforcing California Law.

19.4.6. The prevailing Party in this dispute resolution process is entitled to recover its costs and reasonable attorneys' fees.

19.4.7. The arbitrator shall have the authority to grant dispositive motions prior to the commencement of or following the completion of discovery if the arbitrator concludes that there is no material issue of fact pending before him or her.

19.4.8. Unless otherwise agreed to by the Parties, all proceedings before the arbitrator shall be reported and transcribed by a certified court reporter, with each Party bearing one-half of the court reporter's fees.

19.4.9. Except as may be required by Law, neither a Party nor an arbitrator may disclose the existence, content, or results of any Arbitration hereunder without the prior written consent of both Parties.

## 20. MISCELLANEOUS

20.1. <u>Severability.</u> If any provision in this Agreement is determined to be invalid, void or unenforceable by the CPUC or any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Agreement. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

20.2. <u>Counterparts.</u> This Agreement may be executed in one or more counterparts each of which shall be deemed an original and all of which shall be deemed one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or PDF transmission will be deemed as effective as delivery of an originally executed counterpart. Each

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 57
191-a_Emmerson Investments Inc_Grasshopper Field_RMR PPA
of 70


Party delivering an executed counterpart of this Agreement by facsimile or PDF transmission will also deliver an originally executed counterpart, but the failure of any Party to deliver an originally executed counterpart of this Agreement will not affect the validity or effectiveness of this Agreement.

20.3. <u>General</u>. This Agreement has been approved by the CPUC and modification of the terms and conditions of this Agreement, other than administrative amendments that do not impact the CPUC approved standard terms and conditions of this Agreement, will result in the need to obtain additional CPUC approval of the amended Agreement. In addition to the foregoing, no amendment to or modification of this Agreement shall be enforceable unless reduced to writing and executed by both Parties. This Agreement shall not impart any rights enforceable by any third party other than a permitted successor or assignee bound to this Agreement. Waiver by a Party of any default by the other Party shall not be construed as a waiver of any other default. The term "including" when used in this Agreement shall be by way of example only and shall not be considered in any way to be in limitation. The headings used herein are for convenience and reference purposes only.

20.4. <u>Interpretation</u>. Whenever this Agreement specifically refers to any Law, tariff, Governmental Authority, regional reliability council, Transmission/Distribution Owner, or credit rating agency, the Parties hereby agree that the references also refers to any successor to such Law, tariff or organization.

20.5. <u>Construction</u>. The Parties acknowledge and agree that this Agreement has been approved by the CPUC and that the Agreement will not be construed against any Party as a result of the preparation, substitution, or other event of negotiation, drafting or execution thereof.

Case: 19-30088    Doc# 7362    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 58
of 70
191-A_Emmerson Investments Inc_Grasshopper Flat_ReMAT PPA



# RENEWABLE MARKET ADJUSTING TARIFF
## POWER PURCHASE AGREEMENT

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed by its authorized representative as of the date of last signature provided below.

| Emmerson Investments, Inc. | **PACIFIC GAS AND ELECTRIC COMPANY** |
|---|---|
| (Seller) | (Buyer) |
| Mark D. Emmerson | |
| (Signature) | (Signature) |
| (Type/Print Name) | (Type/Print Name) |
| Vice President & Financial Officer | |
| (Title) | (Title) |
| January 27, 2017 | |
| (Date) | (Date) |

Automated Document – Preliminary Statement Part A

191-1_Emmerson Investments Inc_Grasshopper Flat_ReMATPPA

Page 49 of 99
Form No. 79-1150
Advice 4781-E
January 2016

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 59 of 70



# RENEWABLE MARKET ADJUSTING TARIFF
# POWER PURCHASE AGREEMENT

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed by its authorized representative as of the date of last signature provided below.

Emmerson Investments, Inc.

_____
(Seller)

_____
(Signature)

_____
(Type/Print Name)

_____
(Title)

_____
(Date)

**PACIFIC GAS AND ELECTRIC COMPANY**

_____
(Buyer)

*Donald P Howerton*

_____
(Signature)

*Donald Howerton*

_____
(Type/Print Name)

*Director, Renewable Transactions*

_____
(Title)

*1/31/2017*

_____
(Date)

Automated Document – Preliminary Statement Part A

191-1_Emmerson Investments Inc_Grasshopper Flat_ReMATPPA

Page 49 of 99
Form No. 79-1150
Advice 4781-E
January 2016

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 60 of 70



# RENEWABLE MARKET ADJUSTING TARIFF
# POWER PURCHASE AGREEMENT

IN WITNESS WHEREOF, each Party has caused this Agreement to be duly executed by its authorized representative as of the date of last signature provided below.

| Emmerson Investments, Inc. | **PACIFIC GAS AND ELECTRIC COMPANY** |
|---|---|
| (Seller) | (Buyer) |
| (Signature) | (Signature) |
| (Type/Print Name) | (Type/Print Name) |
| (Title) | (Title) |
| (Date) | (Date) |

# EXHIBIT B

**Remit electronic payment w/invoice reference to:**
ABA/Routing: 121000248 (Wells Fargo, Sacramento)
Account #: 4124907098
Account Name: Emmerson Investments, Inc.
Prior to sending pmt., please e-mail to:
E-mail: RPerez@spi-ind.com

Sold
To:    Pacific Gas & Electric Company
       77 Beale Street, Mail Code N12E
       San Francisco, CA 94105-1702

| Invoice Number | Invoice Date | Due Date | Delivery Month | Page |
|---|---|---|---|---|
| E29-012019 | 2/10/2018 | 2/25/2019 | Jan-19 | 1 |

**Summary Of Payment**

Power Delivered (MWh): 204.87

| | | |
|---|---|---|
| Power Sales: | $ | 19,571.71 |
| True Up: | $ | - |
| Amount Due: | $ | 19,571.71 |

# Pacific Gas & Electric Company Invoice

*Emmerson Investments, Inc.    PO Box 496028    Redding, CA 96049    (530) 378-8000*

# Electronic Proof of Claim

Final Audit Report                                              2019-04-17

| | |
|---|---|
| Created: | 2019-04-17 |
| By: | Prime Clerk E-Filing (efiling@primeclerk.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhaCeUKU5hOPmaS2ctMzXvYIHnM6NLY5p |

## "Electronic Proof of Claim" History

Widget created by Prime Clerk E-Filing (efiling@primeclerk.com)
2019-04-17 - 10:09:45 PM GMT

R. Dale Ginter (mfrazier@downeybrand.com) uploaded the following supporting documents:
Attachment
2019-04-17 - 10:24:13 PM GMT

Widget filled in by R. Dale Ginter (mfrazier@downeybrand.com)
2019-04-17 - 10:24:13 PM GMT- IP address: 12.233.206.12

(User email address provided through API User-Agent: Mozilla/5.0 (Windows NT 6.1; WOW64; Trident/7.0; rv:11.0) like Gecko)
2019-04-17 - 10:24:15 PM GMT- IP address: 12.233.206.12

Signed document emailed to R. Dale Ginter (mfrazier@downeybrand.com) and Prime Clerk E-Filing (efiling@primeclerk.com)
2019-04-17 - 10:24:15 PM GMT

# EXHIBIT B

**United States Bankruptcy Court, Northern District of California**

Fill in this information to identify the case (Select only one Debtor per claim form):

☐ PG&E Corporation (19-30088)

☒ Pacific Gas and Electric Company (19-30089)

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

Unless an exception in the Bar Date Order applies to you, you should not use this form to submit a claim that arises out of or relates to the fires that occurred in Northern California prior to January 29, 2019.

---

**Part 1:** Identify the Claim

| | | |
|---|---|---|
| 1. **Who is the current creditor?** | Emmerson Investments Inc., dba Nelson Creek Power | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |
| 2. **Has this claim been acquired from someone else?** | ☑ No | |
| | ☐ Yes. From whom? _____ | |
| 3. **Where should notices and payments to the creditor be sent?** Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| | R. Dale Ginter<br>Downey Brand LLP<br>621 Capitol Mall, 18th Floor<br>Sacramento, Ca. 95814 | |
| | Contact phone 916 520 5353 | Contact phone _____ |
| | Contact email dginter@downeybrand.com | Contact email _____ |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____<br>MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ _____ _____ _____

**7. How much is the claim?** $ 1,582.72 . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

### Electric Power Sold to the Debtor from the Nelson Creek Project

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Official Form 410                    Proof of Claim                    page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).     $_____

☐ Up to $2,850 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).     $_____

☐ Wages, salaries, or commissions (up to $12,850) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).     $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).     $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).     $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_____) that applies.     $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3: Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   10/08/2019   (mm/dd/yyyy)

/s/ R. Dale Ginter
_____
Signature

Print the name of the person who is completing and signing this claim:

Name    R. Dale Ginter
     First name     Middle name     Last name

Title    Attorney

Company    Downey Brand LLP
     Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    621 Capitol Mall, 18th Floor
     Number     Street
     Sacramento      Ca      95814
     City      State      ZIP Code

Contact phone    916 520 5353      Email    dginter@downeybrand.com

**Confidential:** Documents submitted under D.06-06-066 and/or PU Code §454.5(g), and PU Code §583

| | | |
|---|---|---|
| **Pacific Gas and Electric Company®**<br><br>Purchase / Sales Invoice<br>Invoice Number: 136299 | **From:**<br>Pacific Gas and Electric Company<br>77 Beale Street<br>San Francisco, CA 94105 | **To:**<br>NELSON CREEK POWER EMMERSON INVESTMENTS INC<br>P. O. Box 496028<br>Redding, CA 96049 |
| Delivery Period Start:12/01/2018<br>Delivery Period End: 12/18/2018<br>Invoice Date: 01/17/2019<br>Due Date: 01/25/2019 | Contract Manager: Paul Krebs<br>Phone: 415-973-9632<br>Email: RPKA@pge.com | Project Name: NELSON CREEK POWER<br>Payment Method: CHECK<br>Vendor Number: 1032527 |
| Log Number: 13H042<br>Account Code: 2320900<br>Meter Channel: FF60YC<br>Contract Start: 12/19/1988 | Settlement Analyst: Marshall<br>Hutzelman<br>Phone: 415-973-8032<br>Fax: 415-973-9505<br>Email: MKHi@pge.com | Contact: Stephanie Donham<br>Phone: 530-378-8269<br>Fax: 530-378-8232<br>Email: sdonham@spi-ind.com |

| Payment Name | Quantity | Unit | Amount |
|---|---|---|---|
| Energy Payment 12/01/2018 – 12/18/2018 | 17.752 | MWh | $-1,316.03 |
| As-Delivered Capacity Payment | 16.264 | MWh | $-266.69 |
| | | Net Total | $-1,582.72 |

| | |
|---|---|
| **Total Amount Due to NELSON CREEK POWER EMMERSON INVESTMENTS INC on Due Date:**<br>**01/25/2019** | USD $ 1,582.72 |

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 69 of 70

Confidential:  Documents submitted under D.06-06-066 and/or PU Code §454.5(g), and PU Code §583

## Payment Calculation For As-Delivered Capacity

**Winter Period Payment**

| Date Period | TOD[1] | MW Level | MWh | Rate Name[2] | Rate ($/MWy) | Rate % | CLAF[3] | Allocation Factor | Amount Due |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/18 to 12/18/18 | PP | 0.0 to 1.1 | 12.348 | FLAT | 188,000.00 | 100 | 0.870 | 0.0001318 | $266.239 |
| 12/01/18 to 12/18/18 | OP | 0.0 to 1.1 | 3.917 | FLAT | 188,000.00 | 100 | 0.870 | 0.0000007 | $0.449 |
| 12/01/18 to 12/18/18 | SO | 0.0 to 1.1 | 1.793 | FLAT | 188,000.00 | 100 | 0.870 | 0.0000000 | $0.000 |
| **FLAT Subtotal for level 0.0 to 1.1:** | | | 16.264 | | | | | | |
| | | | | | | | | | $266.69 |

| Date Period | TOD[1] | MW Level | MWh | Rate Name[2] | Rate ($/MWy) | Rate % | CLAF[3] | Allocation Factor | Amount Due |
|---|---|---|---|---|---|---|---|---|---|
| 12/01/18 to 12/18/18 | PP | 1.101 to Total | 0.000 | NONE | 0.00 | 100 | 0.870 | 0.0001318 | $0.000 |
| 12/01/18 to 12/18/18 | OP | 1.101 to Total | 0.000 | NONE | 0.00 | 100 | 0.870 | 0.0000007 | $0.000 |
| 12/01/18 to 12/18/18 | SO | 1.101 to Total | 0.000 | NONE | 0.00 | 100 | 0.870 | 0.0000000 | $0.000 |
| **NONE Subtotal for level 1.101 to Total:** | | | 0.000 | | | | | | |
| | | | | | | | | | $0.00 |
| **Winter Period Subtotal:** | | | | | | | | | $266.69 |
| **As-Delivered Capacity Total:** | | | | | | | | | $266.69 |

TOD[1] = Time Of Deliveries, PK = Peak, PP = Partial Peak, OP = Off Peak, SO = Super Off Peak
Rate Name[2] =
- FSC = Forecasted Shortage Cost
- CSC = Current Shortage Cost
CLAF[3] = Capacity Loss Adjustment Factor

Case: 19-30088    Doc# 7262    Filed: 05/15/20    Entered: 05/15/20 14:17:39    Page 70 of 70