Paul R. Glassman (SBN 76536)
STRADLING YOCCA CARLSON & RAUTH, P.C.
10100 Santa Monica Boulevard, Suite 1400
Los Angeles, CA 90401
Telephone: (424) 214-7000
Facsimile: (424) 214-7010
Email:     pglassman@sycr.com

Mia S. Brown (SBN 242268)
General Counsel
SOUTH SAN JOAQUIN IRRIGATION DISTRICT
11011 E. Highway 120
Manteca, CA 95336
Telephone: (209) 249-4600
Facsimile: (209) 249-4692
Email:     mbrown@ssjid.com

Attorneys for Creditor and Party-In-Interest
SOUTH SAN JOAQUIN IRRIGATION DISTRICT

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In Re:** | Bankruptcy Case No. 19 - 30088 (DM) |
| **PG&E CORPORATION** | Chapter 11 |
| **- and -** | Lead Case |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | Jointly Administered |
| **Debtors.** | **SOUTH SAN JOAQUIN IRRIGATION DISTRICT'S (A) OBJECTION TO DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED MARCH 16, 2020 AS AMENDED (DOCKET NO. 6320) AND (B) OBJECTION TO CURE AMOUNTS AND OTHER MATTERS PERTAINING TO ASSUMPTION PURSUANT TO SECTION 365(B)(1) OF THE BANKRUPTCY CODE (DOCKET NO. 7037)** |
| ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☒ Affects both Debtors <br><br> *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Judge:   Hon. Dennis Montali <br><br> Date:    May 27, 2020 <br> Time     10:00 a.m. <br> Place:   United States Bankruptcy Court <br>         450 Golden Gate Ave., 16th Flr, Crt. 17 <br>         San Francisco, CA 94102 <br> **Reply Deadline**: May 22, 2020 at 4:00 p.m. (PT) |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ..................................................................................................2

    A.    Proceedings involving the District and PG&E .........................................3

        1.    The SJ LAFCo Proceeding .............................................................3

        2.    The LAFCo Action ........................................................................4

        3.    The Eminent Domain Action ..........................................................5

    B.    Contracts of PG&E and the District...........................................................7

    C.    Objectionable Plan Provisions ...................................................................8

III.  SUMMARY OF ARGUMENT .............................................................................9

IV.   ARGUMENT .......................................................................................................10

    A.    The District is Required to Object to the Plan Because a Confirmed Plan is Binding on all Parties, Even if it Contains Improper or Illegal Provisions ..........10

    B.    The Plan Illegally Expands the Discharge Provided by the Bankruptcy Code Beyond Liabilities on Claims and Can be Read to Include the Eminent Domain Action and LAFCO Action. .......................................................11

        1.    The Eminent Domain Action Cannot be Affected by a Plan of Reorganization. ...........................................................................14

        2.    The LAFCo Action Cannot be Affected by a Plan of Reorganization. ...........................................................................16

        3.    The Plan Cannot Affect Any Matter that Arises after the Confirmation Date. ........................................................................17

    C.    The Plan Cannot "Settle" any Claims, Causes of Action, Rights or Liabilities of the District. .........................................................................18

    D.    The Plan Improperly Provides for Full Release and Satisfaction of Claims and Causes of Action Arising from Assumed Executory Contracts, Which Must "Ride Through" the Bankruptcy. ....................................................20

    E.    Section 10.13 Special Provisions for Governmental Units...........................24

V.    CONCLUSION...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re Allen*,
135 B.R. 856 (Bankr. N.D. Iowa 1992) ...................................................................22

*In re Amigoni*,
109 B.R. 341 (Bankr. N.D. Ill. 1989) ....................................................................10

*Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of City of New Hampton, Iowa*,
738 F.2d 209 (7th Cir. 1984) .........................................................................14, 15

*Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of the State of Wisconsin, Dep't of Trans.*,
739 F.2d 1169 (7th Cir. 1984) .............................................................................15

*Commonwealth v. Bartlett*,
384 F.2d 819 (1st Cir. 1967) ..........................................................................15, 16

*In re Conseco, Inc.*,
301 B.R. 525 (Bankr. N.D. Ill. 2003) ....................................................................19

*County of San Mateo, et al. v. Peabody Energy Corporation (In re Peabody Energy Corporation)*,
--- F.3d ----, 2020 WL 2176028 (8th Cir. May 6, 2020).......................................24

*In re FFS Data, Inc.*,
776 F.3d 1299 (11th Cir. 2015) ...........................................................................10

*In re Frontier Properties*,
979 F.2d 1358 (9th Cir. 1992) ............................................................................22

*Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*,
239 B.R. 564 (N.D. Cal. 1999) ......................................................................12, 20

*Maryland v. Amoruso (In re Quality Supplier Gen. Partnership)*,
176 B.R. 135 (Bankr. D. Md. 1994) ............................................................14, 15, 16

*Mission Prod. Holdings v. Tempnology, LLC*,
587 U.S. __, 139 S. Ct. 1652, 203 L. Ed. 2d 876 (2019)........................................22

*In re Multech Corp.*
47 Bankr. 747 (Bankr. N.D. Iowa 1985).................................................................22

*N.L.R.B. v. Bildisco & Bildisco*,
465 U.S. 513 (1984).............................................................................................22

-ii-

*In re Rossi,*
    86 B.R. 220 (9th Cir. B.A.P. 1988)................................................................16

*In re SCCC Assocs. II Ltd. Partnership,*
    158 B.R. 1004 (Bankr. N.D. Cal. 1993) .....................................................23

*In re Storage Technology Corp.,*
    53 B.R. 471 (Bankr. D.Colo 1985) .............................................................23

*Travelers Indem. Co. v. Bailey,*
    557 U.S. 137 (2009)......................................................................................10

*In re U.S. Metalsource Corp.,*
    163 B.R. 260 (Bankr. W.D. Pa. 1993) ........................................................22

*United Student Aid Funds, Inc. v. Espinoza,*
    559 U.S. 260, 130 S.Ct. 1367, 176 L.Ed.2d 158 (2010) .............................10

*In re Washington Capital Aviation & Leasing,*
    156 B.R. 167 (Bankr. E.D. Va. 1993) .........................................................22

*In re WCI Cable, Inc.,*
    282 B.R. 457 (Bankr. D. Or. 2002).............................................................19

*In re Welcome Hospitality, LLC,*
    2012 Bankr. LEXIS 6223 (Bankr. M.D.Fla. 2012) .....................................16

**State Cases**

*City of Oakland v. Oakland Raiders,*
    32 Cal. 3d 60 (1982) ...................................................................................14

**Federal Statutes**

11 U.S.C. § 101(5) ...............................................................................14, 16, 17

11 U.S.C. § 101(10) ...................................................................................16, 17

11 U.S.C. § 101(12) ...........................................................................................11

11 U.S.C. § 365 ...............................................................................10, 22, 23

11 U.S.C. § 365(b)(1) ...................................................................................1, 23

11 U.S.C. § 524(a)(2) and (3) ...........................................................................14

11 U.S.C. § 1141(a) ...........................................................................................10

11 U.S.C. § 1141(d)(1) .........................................................................10, 11, 17

-iii-

**State Statutes**

California Civil Code § 1542 .......................................................................................20

California Code of Civil Procedure § 877.6 ..............................................................18

California Code of Civil Procedure § 1240.020 ...........................................................5

California Code of Civil Procedure § 1240.030 ...........................................................6

California Code of Civil Procedure § 1245.230 ...........................................................5

California Environmental Quality Act (Pub. Res. Code § 21000 et seq.) ....................4

California Government Code § 56000 et seq. ..........................................................4, 17

California Water Code § 22115 .........................................................................4, 5, 17

California Water Code § 22456 ....................................................................................5

California Water Code Division 11 ..............................................................................2

**Other Authorities**

Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding
  "Rejection", 59 Colo. L. Rev. 845, 847 (1988) ..................................................22

-iv-

South San Joaquin Irrigation District (the "District") hereby files this (A) Objection to *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (Docket No. 6320) (as amended, the "Plan") filed by Pacific Gas and Electric Company ("PG&E") and PG&E Corporation (together with PG&E, the "Debtors")[1] and (B) Objection to Cure Amounts and Other Matters Pertaining to Assumption of Executory Contracts Pursuant to Section 365(b)(1) of the Bankruptcy Code (the "Objection"),[2] and respectfully states as follows:

# I.    INTRODUCTION

The District is an irrigation district, which provides irrigation water and, among other things, owns hydroelectric generating facilities and has a long standing relationship with PG&E. In that connection, the District has numerous contracts with PG&E as well as disputes about how to provide retail electric utility service in the District's area. For years prior to the bankruptcy, the District has sought to acquire retail distribution assets within its service area from PG&E through an eminent domain lawsuit and a related Local Agency Formation Commission proceeding, which was challenged by PG&E in a separate lawsuit for declaratory relief. These are now on appeal. After the District brought a motion for relief from stay, PG&E agreed to stipulate to an order[3] lifting the stay. Those appeals are now proceeding in the California appellate courts.

The Debtors have filed and now seek confirmation of the Plan. The Debtors' consistent mantra has been that the purpose of the bankruptcy filings is to address fire victim claims while allowing the Debtors to continue day to day operations on a "business as usual" basis, and

---

[1] The Plan defines "Reorganized Debtors" as including, among others, the Debtors. References herein to Debtors are intended to include both the Debtors and the Reorganized Debtors. Capitalized terms that are not defined herein have the meanings provided in the Plan.

[2] This Objection is supported by the concurrently filed Request for Judicial Notice ("ORJN"), Declaration of Mia S. Brown ("Brown Decl."), Appendix of Plan Excerpts, and the District's Amended Proof Of Claim No. 98548, the Declaration of Peter Rietkerk (Docket No. 6081) ("Rietkerk Decl."), the Declaration of Peggy O'Laughlin (Docket No. 6082) ("O'Laughlin Decl."), and the Request for Judicial Notice ("RJN"), which were filed in support of the District's motion for relief from stay (Docket No. 6078) ("MRAS") and are attached as Exhibits to the ORJN, the records and files in this case and all related proceedings, and such other and further matters as this Court may consider at or before any hearing on the Plan.

[3] The Court's order (Docket No. 6390) lifted the stay of those actions.

general unsecured claims, including those of Governmental Units, are touted as being unimpaired. However, other provisions in the Plan are far less benign. The Plan's immensely broad discharge, injunctions, releases, settlements, and waivers go far beyond the scope of discharge permitted under the Bankruptcy Code.

The Plan's discharge-related provisions cover an extraordinarily broad array of matters including virtually every type of action, proceeding, power or right relating to the Debtors. The wide scope appears to include the pending eminent domain litigation and related proceedings for the District to acquire the assets from PG&E to provide retail electric service in the District's service area. These provisions would also cherry pick for PG&E the best parts of its contracts with the District while cutting off important rights of the District under those agreements. This Objection describes these objections to the Plan and the supplement to the Plan on contract assumption in detail and suggests changes to the Plan and supplement to address these concerns.

The District joins in the objections to the Plan of Valley Clean Energy Alliance and the City and County of San Francisco, which objections are incorporated herein by this reference and reserve the right to join objections of others.

Accordingly, the District respectfully requests that the Court deny confirmation of the Plan, or in the alternative, require modifications of the Plan that are set forth below.

## II.  BACKGROUND

The District is an irrigation district organized and existing under Division 11 of the Water Code of the State of California. It was established over a hundred years ago in 1909. It provides agricultural irrigation water to about 56,000 acres and wholesale drinking water to more than 193,000 residents. Rietkerk Decl. at ¶ 2. It has developed its own diversion works, dams, storage reservoirs and hydroelectric generating facilities and holds rights to 72.5 mega-watts of electric generation capacity. *Id.* at ¶ 2.

In 1948, the District and the Oakdale Irrigation District ("OID") formed a partnership known as the Tri-Dam Power Authority ("Tri-Dam"). Brown Decl. at ¶ 4. Together, they

developed, operate and maintain the Beardsley, Donnells and Tulloch projects (together, the "Tri-Dam Project"). *Id*. The District is asserting this Objection on behalf of Tri-Dam as well. *Id*.

PG&E provides electric service in the District using PG&E's electrical distribution system that is within the District's service area (the "Property").[4] Since 2004, the District has pursued a project to take over providing that electric service, so the District can provide safe and reliable retail electric service in a transparent, responsible and accountable manner at a 15% cost savings over PG&E to the approximately 40,000 electrical customers (about 100,000 persons) in and around the communities of Manteca, Escalon, and Ripon. Rietkerk Decl. at ¶ 3; Exhibit 4 to the RJN (Judgment in LAFCo Action) at p. 3. To pursue this project, the District sought to acquire the Property, either through a consensual transaction or by exercise of the District's power in eminent domain. Prior to commencing any action seeking the Property, the District offered PG&E approximately $116 million as "just compensation" for the Property, and PG&E refused.[5] The District then took the steps needed to pursue the Property that PG&E opposed, which led to the parties being party to two proceedings, which are described below.

### A.   Proceedings involving the District and PG&E

#### 1.   The SJ LAFCo Proceeding

In 2004, the District commenced a proceeding ("SJ LAFCo Proceeding") before the San Joaquin Local Agency Formation Commission ("SJ LAFCo") to obtain a change of organization to expand its services to include retail electric distribution services. Rietkerk Decl. ¶ 3. In December 2014 the District obtained the approval (the "SJ LAFCo Approval") of the San Joaquin Local Agency Formation Commission to a change of organization to provide retail electric service within its service territory after a lengthy and extensive application process, lasting almost 10, years. Rietkerk Decl. at ¶ 4.

---

[4] True and accurate descriptions of the properties, which together make up the "Property," are set forth in exhibit A the Resolution of Necessity, which is Exhibit 9 to the RJN (which is attached to the ORJN as Exhibit D), but that exhibit does not include the property description given it is close to 200 pages in length.

[5] The District renewed its offer after the bankruptcy filing, and PG&E rejected that offer as well.

Among other things, SJ LAFCo found that the District's retail electric project would provide "a reduction in retail electrical energy rates, more disposable income for local residents to spend with local merchants, the enhanced attractiveness of the area to new employment generating businesses due to lower electrical rates, a more diversified local tax base due to new business generation and improved local control over electrical rates and service." Staff Report at p. 18. To ensure that the District's proposal would remain "revenue neutral" to the local governments in San Joaquin County, SJ LAFCo conditioned its approval on the District's payment of 2.5% of its gross retail electric revenue to the County of San Joaquin and other public entities ("Condition 2") to make up for property taxes and fees that PG&E currently pays. *See* Exhibit 4 to the RJN (Judgment in LAFCo Action) at pp. 1-2.

## 2. The LAFCo Action

After the SJ LAFCo Approval was obtained, PG&E commenced a proceeding (the "LAFCo Action") on February 13, 2015, against the District in the San Joaquin County Superior Court (the "Superior Court") styled *Pacific Gas & Electric v. San Joaquin Local Agency Formation Commission; South San Joaquin Irrigation District et al.*, Case No. STK-CV-UJR-2015-000-1266, which is on appeal in the California Court of Appeal of the State of California, Third Appellate District ("Court of Appeal"), Case No. C086008 (the "LAFCo Appeal"). Exhibit 1 to RJN. The lawsuit sought a declaratory judgment as to the legality and constitutionality of SJ LAFCo's conditions of approval and a writ of mandate on various procedural and substantive grounds under the LAFCo Act (California Govt. Code section 56000 et seq.), the California Constitution and the California Environmental Quality Act (Pub. Res. Code Section 21000 et seq.). The District is vested with authority to provide retail electric power pursuant to California Water Code section 22115.

In the LAFCo Action, PG&E moved for summary adjudication on a number of bases, including that (i) SJ LAFCo failed to determine that the District had sufficient revenue to provide retail electric service to the customers in its territory at a 15% discount from PG&E's rates for thirty years and (ii) Condition 2 constituted an unconstitutional tax on the District in violation of

the California State Constitution. Exhibits 2 and 3 to RJN. On March 7, 2016, the trial court denied PG&E summary adjudication on both points. However, on October 31, 2017, the trial court entered a judgment (the "SJ LAFCo Judgment") in favor of PG&E invalidating Condition 2 as an improper tax on the District in violation of the California State Constitution. Exhibit 4 to the RJN. On November 21, 2017, in the LAFCo Action, the District filed its notice of appeal of the LAFCo Judgment in the Superior Court, and it was lodged with the Court of Appeal on November 29, 2017, creating the LAFCo Appeal. *See* O'Laughlin Decl. at ¶ 2; Exhibit 5 to the RJN (LAFCo Appeal docket). On November 29, 2017, PG&E filed its cross appeal challenging the Superior Court's rulings in the District's favor. O'Laughlin Decl. at ¶ 2. After Debtors filed their bankruptcy petitions, the LAFCo Action was stayed, and the stay was lifted by the Bankruptcy Court's *Order Approving Stipulation Between Debtors and South San Joaquin Irrigation District for Relief from the Automatic Stay* (Docket No. 6390) ("Lift Stay Order"), which approved a stipulation between the District and PG&E to lift the stay (Docket No. 6783). The Eminent Domain Appeal is continuing in the California appellate court. Brown Decl. at ¶ 7.

### 3.     The Eminent Domain Action

On July 7, 2016, the District pursued the Property by filing an eminent domain proceeding (the "Eminent Domain Action") in the Superior Court styled *South San Joaquin Irrigation District v. Pacific Gas And Electric Company et al.,* Case No. STK-CV-UED-2016-0006638, which is on appeal in the Court of Appeal, Case No. C086319 (the "Eminent Domain Appeal"). In the Eminent Domain Action, the District is seeking to condemn the Property, which is located within the District's service territory. Exhibit 6 to RJN. The District is vested with authority to exercise the power of eminent domain pursuant to California Water Code sections 22456 and 22115 and California Code of Civil Procedure section 1240.020.

Prior to commencing the Eminent Domain Action, the District offered PG&E approximately $116 million as "just compensation" for the Property. *See* Resolution No. 16-05-E ("Resolution of Necessity"), a true and correct copy of which is attached as Exhibit 9 to the RJN. PG&E refused the offer.

Also prior to commencing the Eminent Domain Action, pursuant to California Code of Civil Procedure sections 1245.230 and 1240.030, the District was required to, and did, hold a public hearing and adopt a resolution of necessity. *See* Resolution of Necessity at p.3; Rietkerk Decl. at ¶ 5. In order to adopt the resolution of necessity, the District's Board must make required statutory and state constitutional findings. *Id*. The Legislative Committee Comments to section 1240.030 explain that "public interest and necessity include all aspects of the public good, including but not limited to social, economic, environmental and aesthetic considerations."

For the Resolution of Necessity, the Board's findings of the public benefits and necessity of its retail project were supported by the evidence and the extensive Staff Report, which addressed the public good and benefits resulting from the electric project. Staff Report (Exhibit 10 to RJN) at pp. 7-10; Rietkerk Decl. at ¶ 6. The benefits are wide ranging, including local control and accountability to customers through a nonprofit, locally elected board, transparency of operation and practices, reduced electric rates projected to be a discount of 15% from PG&E's rates, and improving and stimulating the local economy through reduced rates. Staff Report at pp. 7-10. The Staff Report also supported the Board's finding of the public benefit by having a local, public entity responsible for the safety and reliability of the electric distribution system. *Id*. at 7. The Staff Report set forth the District's serious concerns in 2016 about PG&E's safety and maintenance records and practices as a utility. *Id*. at p. 66.[6]

After the SJ LAFCo Judgment was entered for PG&E in the LAFCo Action in October 2017, PG&E moved to dismiss the Eminent Domain Action based on the entry of SJ LAFCo Judgment invalidating Condition 2. On January 4, 2018, the Superior Court granted PG&E's motion to dismiss the Eminent Domain Action ("Eminent Domain Judgment"). Exhibit 7 to RJN. The District filed its notice of appeal of the Eminent Domain Judgment with the Superior Court,

---

[6] Since 2016, these concerns over PG&E's ability and commitment to ensure the safety of its electric system have only increased. As the Court is aware, in 2017, PG&E was convicted of crimes for willfully failing to address known record keeping deficiencies, willfully failing to identify and address threats to its gas pipeline and failure to take corrective action linked to the deadly San Bruno explosion. Presently, PG&E is facing billions of dollars in lawsuits and other liabilities from the devastating wildfires in Northern California.

Case: 19-30088   Doc# 7265   Filed: 05/15/20   Entered: 05/15/20 14:25:21   Page 11 of 30

and the Eminent Domain Appeal was created. O'Laughlin Decl. at ¶ 5; Exhibit 8 to the RJN. After the Debtors filed their petitions, the Eminent Domain Action was stayed, and then the stay was lifted by the Lift Stay Order. The Eminent Domain Appeal is continuing in the California appellate court. Brown Decl. at ¶ 7.

## B. Contracts of PG&E and the District.

PG&E, the District, and Tri-Dam are, and have been, party to numerous agreements over decades. These agreements that have not expired or terminated include the Coordinated Operations Agreement (Contract ID POWGEN_00122) (the "2005 COA") and an amendment to it, which applied to the purchase of electric service by PG&E for the Sand Bar Diversion Fish Screen and Intake facilities ("Sand Bar Amendment"), interconnection agreements, master encroachment agreements, easements, permits, and other contracts (together and with all amendments thereto, the "District's Contracts") that, among other things, allow the District and PG&E to work together to provide power to their customers.[7] Brown Decl. at ¶ 5. The District's Contracts have long terms – some last decades – and are complex. *Id*. Many of the District's Contracts include indemnification, contribution, and other obligations of PG&E and the District. *Id*. The District filed a proof of claim (Claim No. 70439) and an amendment thereof (Claim No. 98548) in the Pacific Gas and Electric Company chapter 11 case, reserving its rights regarding its executory contracts, the Eminent Domain Action, the LAFCo Action, and any other executory contracts and any claims it may discover.

On May 1, 2020, the Debtors filed their *Notice of Filing of Plan Supplement in Connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (Docket No. 7037, "EC Supplement").[8] Despite its non-specific title, the EC Supplement includes schedules listing executory contracts and unexpired leases that the Debtors list as being rejected (Exhibit A) or assumed or assumed and assigned (Exhibit B). None of the District's Contracts appear to be listed as rejected contracts in Exhibit

---

[7] *See* the District's Amended Proof of Claim, which is Claim No. 98548 (Exhibit A to ORJN).

[8] The EC Supplement says the "Debtors and Shareholder Proponents reserve the right to amend the documents contained in the Plan Supplement before the Effective Date," *Id*. at p. 3, ll. 15-16.

A, twenty seven of the District's Contracts appear to be listed as assumed in Exhibit B with no cure for any of them, and the District believes that others of the District's Contracts are executory contracts and are not in either exhibit to the EC Supplement. Brown Decl. at ¶ 6.

Under the Plan, an executory contract that is not specifically listed as being rejected in Exhibit A of the EC Supplement (and has not otherwise been rejected) will be assumed, even if it is not listed in Exhibit B. *See* Section 8.1(a) of the Plan. Because the Debtors have not rejected any of the District's Contracts, the Debtors are assuming all of the District's Contracts pursuant to the Plan. In the EC Supplement, PG&E states that no Cure Amounts are due under the District's Contracts. The District became aware of certain specific amounts owed to the District by PG&E as of the Petition Date from information received from PG&E. Brown Decl. at ¶ 6. PG&E did not pay the full amount of PG&E Headwater Benefit Payment due under the 2005 COA or a portion of the fee due under the Sand Bar Amendment, for the period of January 1, 2019 through the Petition Date. As a result, as of the Petition Date, the cure amount owed under the 2005 COA was $27,354.98 and the cure amount under the Sand Bar Amendment was $720.51. *Id.* Other than these amounts, the District is not aware of any defaults under the District's Contracts. *Id.*

Thus, the District is a party to numerous executory contracts with PG&E, holds claims against the Debtors, and is a party to litigation involving PG&E in the Eminent Domain and LAFCo Actions.

### C.    Objectionable Plan Provisions

The objectionable provisions of the Plan[9] include the following:

- Section 1.21 defining "Cause of Action"
- Section 5.9 entitled "Satisfaction of Claims"
- Section 6.1 entitled "General Settlement of Claims and Interests"
- Section 8.1(c), which is in Section 8.1 entitled "General Treatment"

---

[9] Prior to this Objection, the District requested clarification as to the scope and effect of the discharge, release and injunction provisions of the Plan and the Special Provisions for Governmental Units in Section 10.13. *See*, *e.g.*, the District's Joinder to Valley Clean Energy Alliance Status Conference Statement Regarding Preconfirmation Legal Issues [Dkt. No. 5442] (Dkt. No. 5446); the District's motion for relief from stay (Dkt. 6078), which was resolved by the Lift Stay Order.

- Section 8.2(e), which is in Section 8.2 entitled "Determination of Cure Disputes and Deemed Consent"
- Section 10.3 entitled "Release and Discharge of Debtors"
- Section 10.6 entitled "Injunction"
- Section 10.8 entitled "Exculpation"
- Section 10.9(b) entitled "Releases by Holders of Claims and Interests"
- Section 10.9(e) entitled "Waiver of Statutory Limitations on Releases"
- Section 10.9(f) entitled "Injunction Related to Releases and Exculpation"
- Section 10.13 entitled "Special Provisions for Governmental Units"
- Paragraphs 8 and 13 of the Schedule of Executory Contracts and Unexpired Leases to be Assumed Pursuant to the Plan and Proposed Cure Amounts, which is Exhibit B to the EC Supplement ("Cure Notice").

Copies of the pages of the Plan and Cure Notice that include these provisions are attached to the Appendix of Plan Excerpts, which is being filed concurrently herewith.

## III. SUMMARY OF ARGUMENT

The District must file this Objection to the Plan because a confirmed plan is binding on all parties, even if the plan contains improper or illegal provisions.

The Plan illegally expands the discharge in two ways. First, the Plan applies the discharge to rights, liabilities, and "Causes of Action," which the Plan defines very broadly to include practically every action, right, and power under the sun and even unknown and unsuspected Claims. This can be read to include the Eminent Domain Action, the LAFCo Action, and all related powers and authority of the District, and other powers and rights that are not Claims (together, "Non-Plan Matters") (see Sections 1.21, 10.3, 10.9(b), and 10.9(f)). The Eminent Domain and LAFCO Actions and other Non-Plan Matters are not claims and cannot be discharged under a plan, whether couched as discharge, release, waiver, settlement or otherwise.

Second, the Plan seeks to indirectly expand the discharge by providing for settlements, compromises, waivers, releases, and other bars of the Eminent Domain Action, the LAFCo Action, and other Non-Plan Matters (see Sections 1.21, 6.1, 10.3, 10.9(b), 10.9(e) and 10.9(f)). The Debtors cannot "settle" all Non-Plan Matters, including the Eminent Domain Action and LAFCO Action, because there is no consent, and therefore no true settlement.

In addition, the Plan improperly provides a full release and satisfaction of Claims and Causes of Action under assumed executory contracts, including the District's Contracts, instead of providing that assumed contracts essentially ride through and provide all parties with the

benefits and burdens of those contracts (Sections 1.21 and 8.2(e)). This is not permitted in a Plan and would unilaterally modify the District's Contracts to strip out important obligations of the Debtors, such as indemnity and contribution obligations, and eviscerate the District's rights under Section 365.

Finally, the Plan provides exceptions to the Plan discharge provisions in Section 10.13 (Special Provisions for Governmental Units). However, these do not adequately cover matters involving Governmental Units that cannot be affected by a plan, such as the Eminent Domain Action, the LAFCo Action, and the District's Contracts. The District proposes modifications to the Plan to address the matters raised in the Objection.

## IV. ARGUMENT

### A. The District is Required to Object to the Plan Because a Confirmed Plan is Binding on all Parties, Even if it Contains Improper or Illegal Provisions

If a plan of reorganization is confirmed, the plan can be binding on the debtor, creditors, shareholders and other parties in interest, no matter what provisions the plan includes. 11 U.S.C. § 1141(a); 11 U.S.C. § 1141(d)(1) ("Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—(A) discharges the debtor from any debt that arose before the date of such confirmation."). An order confirming a plan has the force of a final judgment with preclusive effect. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152 (2009); *In re FFS Data, Inc.*, 776 F.3d 1299, 1306 (11th Cir. 2015). As a result, if a plan has improper or impermissible provisions and is confirmed, the entire plan is binding on all parties, who received actual notice and failed to object, and those provisions cannot be collaterally attacked. *See United Student Aid Funds, Inc. v. Espinoza*, 559 U.S. 260, 275-276, 278, 130 S.Ct. 1367, 1380, 176 L.Ed.2d 158, 172-173 (2010) (Court held a confirmed chapter 13 plan that improperly included illegal discharge of student loan was binding on all parties and not subject to collateral attack).

Of course, if a party does timely object to an impermissible or improper provision in a plan, the provision must be excluded or the plan cannot be confirmed. *In re Amigoni*, 109 B.R.

341, 345 (Bankr. N.D. Ill. 1989) (Debtors' plans were not confirmed because they would curb rights that could not be affected by a plan).

Here, the plan's illegal provisions would improperly discharge the Eminent Domain Action and the LAFCo Action and release claims and actions of the District under the District's Contracts even though those contracts are to be assumed. The District sought to resolve its concerns about the Plan with PG&E consensually, but no resolution was reached. Accordingly, the District objects to the Plan on the grounds set forth herein.

**B. The Plan Illegally Expands the Discharge Provided by the Bankruptcy Code Beyond Liabilities on Claims and Can be Read to Include the Eminent Domain Action and LAFCO Action.**

As explained above, Bankruptcy Code Section 1141(d)(1) sets out the discharge that a debtor can obtain. Because "debt" means "liability on a claim," the Bankruptcy Code only discharges a debtor from liability on a claim, which arose before confirmation. 11 U.S.C. § 101(12) (defining debt).

Instead of only discharging the Debtors from liabilities on Claims, which are subject to the Plan, the Plan would discharge the Debtors from matters, which cannot be affected by a plan, which appear to include the Eminent Domain Action, the LAFCo Action. The Plan impermissibly expands the discharge to liability for all Claims, rights, liabilities, and actions of every sort because of the Plan's extremely broad definition of Causes of Action and the discharges provided by Sections 10.3[10] and 10.9(b). Section 10.9(b) is entitled "Releases by Holders of Claims and Interests" and greatly expands the discharge to every possible "action" that a party could take and liabilities of every Released Party[11] (including the Debtors) as follows:

---

[10] Section 10.3 is entitled "Release and Discharge of Debtors" and purports to discharge the Debtors from all Claims, rights, and liabilities that are subject to the Plan.

[11] The District, other creditors, and every party in interest are the "Releasing Parties," *see* Section 1.180; the "Released Parties" include the Debtors, the Reorganized Debtors, and practically every person or entity involved in developing or implementing the Plan. *See* Section 1.179. Section 10.9(c) indicates only consensual non-debtor releases are enforceable. To the extent Sections 10.8 (exculpation) and 10.9(b) attempt to release or exculpate parties other than the

*Releases by Holders of Claims and Interests.* . . . [T]he Released Parties, are deemed forever released and discharged, to the maximum extent permitted by law and unless barred by law, by the Releasing Parties [including the District] from any and all claims . . ., <u>rights</u>, <u>Causes of Action</u>, <u>losses</u>, <u>remedies</u>, and <u>liabilities</u> whatsoever . . . . based on or <u>relating to . . . the Debtors</u>, . . . the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party . . . or any other act or omission, transaction, agreement, event, or other occurrence. . . ."

Section 10.9(b) (emphasis added).[12] Because all of these matters merely have to "relate to" the Debtors or any "occurrence," it is difficult to imagine anything that is not supposedly discharged by Section 10.9(b). This is particularly the case because the definition of "Cause of Action" is so very broad:

**1.21 Cause of Action** means . . . all <u>actions</u>, class actions, <u>proceedings</u>, causes of action, <u>controversies</u>, <u>liabilities</u>, <u>obligations</u>, <u>rights</u>, <u>rights of setoff</u>, <u>recoupment rights</u>, suits, damages, judgments, accounts, defenses, offsets, <u>powers</u>, privileges, <u>licenses</u>, franchises, <u>Claims</u>, Avoidance Actions, counterclaims, cross-claims, affirmative <u>defenses</u>, third-party claims, Liens, <u>indemnity</u>, <u>contribution</u>, guaranty, and <u>demands</u> of any kind or character whatsoever, whether known or <u>unknown</u>,[13] . . . <u>unsuspected</u>, foreseen or <u>unforeseen</u>, direct or indirect, choate or <u>inchoate</u>[14] . . . assertable directly or derivatively, existing or hereafter arising, in contract or in tort, in law, in equity, or otherwise, whether arising under the Bankruptcy Code or any applicable nonbankruptcy law, based in whole or in part upon any act or omission or other event occurring on or prior to . . . the Effective Date. . . .[15]

Section 1.21 of the Plan (emphasis added). The many broad terms nested within "Cause of Action" rope in every proceeding or action, such as the Eminent Domain and LAFCo Actions; actions to petition for relief before regulators, such as SJ LAFCO, the California Public Utilities Commission, or the Federal Energy Regulatory Commission; every power, such as the power of eminent domain and power to operate electric service; and indemnification, contribution, and

---

Debtors as set forth in the Plan provisions on discharge, release, settlement, waiver, or similar improper matters identified in this Objection, Sections 10.8 and 10.9(b) are objectionable for the reasons set forth herein.

[12] Another problem and source of confusion is that the Plan in a number of provisions outside of the definition of "Cause of Action" uses words, such as rights, liabilities, and controversies, which are also in the definition of Cause of Action.

[13] Unknown, unsuspected, unforeseen and similar ("unknown") claims cannot be discharged, as discussed further below in the section on releases. *See Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*, 239 B.R. 564, 570 (N.D. Cal. 1999).

[14] Certain inchoate rights or interests cannot be discharged (see discussion of eminent domain in the next section).

[15] The discharge in any event should only apply, if at all, to claims arising prior to confirmation as explained below.

other claims under contracts, such as the District's Contracts. Section 10.9(b) can be read as seeking to extend the discharge to all such matters.

In addition, Section 10.3 and 10.9(b) say they also discharge "rights" and "liabilities,"[16] and Section 10.9(b) adds "losses" and "remedies" to the discharge stew. The problem, though, is that these words are not defined, and nothing limits those terms at all. As a result, "rights" can be read to include the District's rights in the Eminent Domain Action and the LAFCo Action; liabilities can be read to include every liability of any kind of the Debtors, including their liabilities in the Eminent Domain Action and the LAFCo Action and other litigation that does not involve a Claim; "losses" could arguably mean loss of property, such as the Property that the District seeks in the Eminent Domain Action; and "remedies" could mean the remedies sought in any action, such as the Eminent Domain Action and the LAFCo Action. So, the Plan also would discharge all of the District's rights, whether the rights were related to a Claim or not, and would discharge all of the Debtors' liabilities of every kind, not just liabilities for Claims. This lack of definition and precision is compounded by Article I of the Plan that would give the Debtors the sole power to interpret "effectuating provisions."[17] So, the provisions mean whatever the Debtors say they mean. If the Debtors interpret "rights" of the District being discharged to include all rights (such as rights in the Eminent Domain Action and LAFCo Action), the Debtors could argue that the District has no recourse.

These attempts to expand the discharge[18] are illegal. In particular, the Plan cannot discharge or otherwise impact the Eminent Domain Action, the LAFCo Action, or other rights of the District that are not "rights to payment."

---

[16] Rights and liabilities are also in the laundry list of items in the definition of Cause of Action, so adding them in Section 10.9(b) along with Cause of Action adds nothing there.

[17] Article I of the Plan states in relevant part:

> INTERPRETATION. . . . (j) any effectuating provisions may be interpreted by the Reorganized Debtors . . . without further notice to or action, order, or approval of the court or any other entity, and such interpretation shall control in all respects. . . .

Article I. So, having spun a web of broad and undefined terms, the Debtors seek to profit from the confusion they have created by nominating themselves as the sole arbiter of the meaning of these provisions, thereby usurping the power of this Court to interpret the Plan.

[18] Because Sections 10.3 and 10.9(b) purport to both discharge and release the Eminent Domain Action and LAFCo Action, and similar matters, Section 10.9(f) would improperly pile on to

### 1. The Eminent Domain Action Cannot be Affected by a Plan of Reorganization.

The Bankruptcy Code provides for discharge of a debtor from liability on a Claim, which is a "right to payment" from a debtor or its estate:[19]

> The term "claim" means—
> (A)    right to payment, whether or not such right is reduced to judgment, liquidated, . . . legal, equitable, secured, or unsecured; or
> (B)    right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. . . .

11 U.S.C. § 101(5); Section 1.21 ("Claim" is a "claim" under the Bankruptcy Code). However, there is no claim when a party such as the District exercises a power or other right that is not a right to payment. Thus, the Eminent Domain Action is not a Claim and cannot be impacted by any plan of reorganization in bankruptcy because, by its nature, "[t]he power of eminent domain is an inherent attribute of sovereignty" and is "'universally' recognized and 'necessary to the very existence of government.'" *City of Oakland v. Oakland Raiders*, 32 Cal. 3d 60, 64 (1982). Courts have held that eminent domain is to be given special deference in bankruptcy. *See Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of City of New Hampton, Iowa*, 738 F.2d 209, 211-213 (7th Cir. 1984). The *Chicago* court stated "the guiding principle should be to permit the exercise of the power of eminent domain to the greatest extent consistent with the purposes of the reorganization proceeding." *Id.* at 214; *Maryland v. Amoruso (In re Quality Supplier Gen. Partnership)*, 176 B.R. 135, 140-141 (Bankr. D. Md. 1994) (citing *Chicago*).

---

enjoin the Eminent Domain Action, the LAFCo Action, and other matters as follows:

> The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity . . . of any Claims, . . . debts, rights, Causes of Action, losses, or liabilities released pursuant to this Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in this Plan."

Section 10.9(f). This Section also bars actions against anyone concerning any release provided in the Plan. Since many provisions impose settlements that include releases, this injunction can be construed to be even broader than the Section 10.6 injunction. Sections 10.6 and 10.9(f) improperly expand the injunction allowed in 11 U.S.C. § 524(a)(2) and (3) and therefore suffer from the same defects as Sections 10.3 and 10.9(b) and should not be allowed.

[19] The District's motion for relief from stay (Docket No. 6078) discussed why the Eminent Domain and the LAFCo Actions cannot be discharged.

"It is obvious, at the outset, that the state is not here in the position of a creditor. It is not seeking to enforce an existing mortgage, tax lien . . . or other interest that would qualify as a 'claim' against the debtor's property under section 77(B), and therefore [it cannot] be subject to alteration or modification in the course of approving a plan under that section." *Commonwealth v. Bartlett*, 384 F.2d 819, 822 (1st Cir. 1967). An eminent domain action could only be, at most, postponed. *Id*. This is because the governmental unit pursuing an eminent domain action:

> possesses a special inchoate interest or right, which is paramount to any interest of the debtor in the property. This is nothing the debtor ever had, or that it, or the court, could convey, qualify, or subordinate to any other claim or interest. There is . . . not even a bankruptcy function to determine fair compensation. In sum, with respect to the state's prescriptive rights the court could effect none of the alterations or take any of the actions ordinarily contemplated in a reorganization proceeding.

*Id*.; *Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of the State of Wisconsin, Dep't of Trans.*, 739 F.2d 1169, 1173-1174 (7th Cir. 1984) (citing *Bartlett* with approval; allowed state to acquire railroad property by condemnation); *Maryland v. Amoruso (In re Quality Supplier Gen. Partnership)*, 176 B.R. 135, 140-141 (Bankr. D. Md. 1994) (citing *Bartlett* with approval); *Matter of Chicago, Milwaukee, St. Paul & P.R. Co., Appeal of City of New Hampton, Iowa*, 738 F.2d 209, 212-214 (7th Cir. 1984) (City could pursue condemnation after the completion of the bankruptcy).

Thus, the power of eminent domain and related rights are so strong that a debtor never has any rights to property that are different from the rights the debtor had the moment before the bankruptcy was filed, and the entity seeking the property through eminent domain keeps its powers and rights at all times. *Maryland v. Amoruso (In re Quality Supplier Gen. Partnership)*, *supra*, 176 B.R. at 140-141. The *Maryland* court reasoned:

> Debtors may not, however, permanently bar the State from exercising its power of eminent domain over their property through the expedient of a confirmed reorganization plan. Assuming the debtors were successful in having a reorganization plan confirmed, the federal interest of the bankruptcy court in protecting debtors opportunity to reorganize would fade upon confirmation. . . . When a bankruptcy estate's property is revested in a debtor after confirmation of a reorganization plan, the debtor's property interests stand in the same

relationship to the State's sovereign powers of eminent domain as they did before bankruptcy, and in the same relationship as the ownership rights of other property owners. Debtors never possessed rights in Lot 25 that were superior to the eminent domain powers of the State. Debtors do not have, and they never had, the power to convey property free of the State's eminent domain powers, nor do debtors have the power to subordinate the State's sovereign rights.

*Id*. at 140.[20] In *Maryland*, debtors owned real property ("Lot 25") improved by a three story factory building in which debtors conducted businesses that included paper converting and recycling and trucking. Maryland sought to condemn the property as part of a much larger tract for the construction of a penal institution, and the bankruptcy court found the State's power and rights were not affected by the bankruptcy. *Maryland v. Amoruso*, 176 B.R. at 142-143.

Similarly, in *In re Rossi*, 86 B.R. 220 (9th Cir. B.A.P. 1988) debtors owned five lots of real property with a one-story brick building on two of the lots and a parking lot on the other three parcels in a city; the city filed a condemnation action seeking the parking lot, and the bankruptcy court lifted the stay to allow the action to proceed. *Id*. at 221 (Decided by the Bankruptcy Appellate Panel for the Ninth Circuit on other grounds); *see In re Welcome Hospitality, LLC*, 2012 Bankr. LEXIS 6223, *11 (Bankr. M.D.Fla. 2012) (Eminent domain action proceeded even after bankruptcy case was closed).

Therefore, the eminent domain power is not a right to payment, so it is not a Claim, *see* 11 U.S.C. § 101(5), there is no debtor-creditor relationship between the District and PG&E with respect to the Eminent Domain Action, *see* 11 U.S.C. § 101(10) (defining "creditor"), and the Eminent Domain Action and other eminent domain actions cannot be affected by a plan of reorganization in bankruptcy.

### 2. The LAFCo Action Cannot be Affected by a Plan of Reorganization.

In the LAFCo Action, PG&E is seeking declaratory relief as to the validity of certain of the necessary findings in the SJ LAFCo proceeding that, if overturned, would invalidate SJ

---

[20] If a bankruptcy court were to conclude that a "proposed exercise of eminent domain would cripple the reorganization, the lethal blow may be diverted from the egg, but it will fall upon the day-old chick at the state's pleasure." *Maryland v. Amoruso*, 176 B.R. at 140 quoting *Commonwealth v. Bartlett*, 384 F.2d 819, 822 (1st Cir. 1967).

Case: 19-30088    Doc# 7265    Filed: 05/15/20    Entered: 05/15/20 14:25:21    Page 21 of 30

LAFCo's conditional approval of the District's change of organization request to provide retail electric service in its service territory, and the District is opposing PG&E's efforts to obtain declaratory relief to invalidate the District's regulatory approval from SJ LAFCo, a regulatory agency governed by the Cortese/Knox/Hertzberg Local Government Reorganization Act of 2000 (California Government Code Section 56000, et seq.).

The District not only has the power of eminent domain but also has the power to provide retail electric service. *See* California Water Code section 22115 (Irrigation district may provide for the generation, transmission, distribution, sale, and lease of electric power). Thus, the District's pursuit of that power is not assertion of "right to payment" from – so it is not asserting a Claim against – a Debtor or property of a Debtor's estate, 11 U.S.C. § 101(5), there is no debtor-creditor relationship between the parties with respect to the LAFCo Action, *see* 11 U.S.C. § 101(10), and the LAFCo Action and similar actions cannot be affected by a plan of reorganization in bankruptcy.

### 3. The Plan Cannot Affect Any Matter that Arises after the Confirmation Date.

Section 1141 is clear that the discharge should only apply to Claims that arose prior to confirmation. 11 U.S.C. § 1141(d)(1). Instead, the Plan seeks to discharge Claims – and other improperly included matters – that arose prior to the Effective Date of the Plan. However, the Effective Date will certainly occur after confirmation when numerous conditions are met. *See* Sections 1.59 and 9.2. As a result, the Effective Date could be many months after the Confirmation Date. This violates Section 1141, so the Plan must be revised so that it only discharges liability on Claims arising prior to the Confirmation Date.

Therefore, Sections 10.3 and 10.9(b) (and similar provisions) should be revised to only discharge the Debtors from liability on any Claim, which arose prior to the Confirmation Date; and Cause of Action should exclude the Eminent Domain Action, the LAFCo Action, and all other matters, which cannot be impacted by a plan.

Case: 19-30088    Doc# 7265    Filed: 05/15/20    Entered: 05/15/20 14:25:21    Page 22 of 30

### C. The Plan Cannot "Settle" any Claims, Causes of Action, Rights or Liabilities of the District.

The Plan also improperly attempts to do indirectly – with fictional settlements, releases and similar bars – what it cannot do directly with its overly broad discharge and even seeks to expand the relief sought. This is because the Plan also improperly purports to settle, compromise, waive, release, or similarly bar (together, "Settle") the Non-Plan Matters as well as Claims. *See* Sections 6.1, 10.3, 10.9(b), and 10.9(e). Specifically, Section 10.3 speaks of "waiver and release" and Section 10.9(b) says "release" of Causes of Action (as discussed above).

In addition to these expansive releases and waivers, Section 6.1 of the Plan purports to construct a good-faith[21] compromise and settlement of every Claim, Cause of Action (which as explained above includes every possible action), and controversy between the Debtors and the holder of a Claim:

> **6.1 General Settlement of Claims and Interests.** The Plan shall be deemed a motion to approve a good-faith compromise and settlement pursuant to which the Debtors and the holders of Claims against . . . the Debtors settle all Claims . . . and Causes of Action . . ., and . . . the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims . . . and controversies resolved pursuant to the Plan.

Thus, Sections 6.1 and 10.9(b) would apply these settlements and releases to Causes of Action, which include to the Eminent Domain Action and the LAFCo Action, Section 10.3's releases also apply to the District's rights in those actions, and Section 10.9(e) even attempts to release unknown and unsuspected claims.

The Plan also would deem acceptance of a distribution to be consent to settlement of the related Claim[22] and to being bound by all of the other improper provisions of the Plan, "including, the injunctions set forth in this Section." Section 10.6(b). In addition, PG&E could use the Plan's releases to assert that a creditor's defenses, including rights of setoff and

---

[21] To the extent the Debtors intend to come within the protections for good faith settlements under California Code of Civil Procedure Section 877.6, they have not met the requirements of that section.

[22] *See* Section 5.9 ("[A]ny distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.").

Case: 19-30088    Doc# 7265    Filed: 05/15/20    Entered: 05/15/20 14:25:21    Page 23 of 30

recoupment, to an affirmative claim brought against the creditor are released.

All of the Plan's provisions, which seek to create a compromise, settlement, release, waiver, satisfaction, or similar bar (together, "Settlement"), are improper because (a) the other supposed "parties" to these Settlements have not given consent to these Settlements (or releases, waivers, etc.) and have not received any consideration and (b) a plan can only Settle claims of a debtor and its estate (not other parties, such as the District).

In bankruptcy, a settlement is a proposed agreement that is negotiated and actually agreed upon by two parties, such as PG&E and the District, so there needs to be consent by both parties.[23] So, a unilateral proclamation in a plan is not a "settlement" just because the Debtors call it a "settlement."

Also, a plan cannot construct "consent" to a release by merely saying that a party that accepts a distribution under a plan consents to the plan. This is because a party would receive its distribution on its claim under a plan whether or not the plan said the party also gave a release, so the party does not receive any additional consideration in exchange for the release. *See In re Conseco, Inc*., 301 B.R. 525, 527–28 (Bankr. N.D. Ill. 2003) (Provisions in a plan providing for a release "violated the best interests of creditors test because they forced creditors to accept the release or to give up the distribution to which they were entitled" and "a creditor's mere acceptance of a distribution under the plan cannot be construed as a voluntary consent to the release.").[24]

---

[23] Even if the District did consent, a real settlement would only become effective if the Court granted a motion under Rule 9019 of the Federal Rules of Bankruptcy Procedure to approve the written, signed settlement. Fed. R. Bankr. P. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement. Notice shall be given to creditors. . . .").

[24] Further, Section 1123(b)(3)(a) only allows a plan to "provide for the settlement or adjustment of any claim or interest <u>belonging to the debtor or to the estate</u>" (emphasis added); *see In re WCI Cable, Inc.,* 282 B.R. 457, 468-469 (Bankr. D. Or. 2002) (Debtors could release their own claims). Section 1123 does not address, and therefore cannot allow, a plan to provide unilaterally for the settlement or adjustment of any claim or interest of a party other than the debtor or the estate. Thus, the Debtors may Settle their own claims, but they may not purport to Settle claims against them or any other party (such as the many Releasing Parties).

In addition, Section 10.9(e) attempts to foist a general release of unknown and unsuspected claims by referencing California Civil Code section 1542, which only would apply if there were truly an agreement between consenting parties:

> "10.9(e) Waiver of Statutory Limitations on Releases. Each . . . releasing party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the released party, including the provisions of California Civil Code section 1542. The releases contained in this Article X of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

Unknown and unsuspected claims should not be released because they cannot be discharged. *See Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*, 239 B.R. 564, 570 (N.D. Cal. 1999) (Bankruptcy Code "does not suggest that a creditor's claim is to be discharged if the parties could not reasonably contemplate the existence of that claim prior to the reorganization."); *U.S. v. Union Scrap Iron & Metal*, 123 Bankr. 831, 834-837 (D. Minn. 1990) (No discharge of environmental claims arising post-bankruptcy even though debtor's actions occurred prior to confirmation.). Since unknown and unsuspected claims cannot be discharged, it would be unfair to indirectly discharge them through the guise of a settlement.

The Plan is fundamentally unfair to the counterparty, who has not agreed and is being forced to settle and/or release claims for no consideration, while the Debtors take the benefits but not all of the burdens of their bargain. Therefore, the Plan cannot create any Settlement (or release, waiver, etc.) merely by saying it is so, and these provisions should not be allowed.

### D. The Plan Improperly Provides for Full Release and Satisfaction of Claims and Causes of Action Arising from Assumed Executory Contracts, Which Must "Ride Through" the Bankruptcy.

All of the District's Contracts are being "assumed" according to the Plan, but the Plan does not meet the requirements for assumption under the Bankruptcy Code. The Debtors want to cut off all Claims and Causes of Action – and cut out all indemnification and contribution rights – of counterparties to their assumed contracts. Section 8.1 provides that "upon payment of the

applicable Cure Amount, all executory contracts . . . shall be deemed assumed, unless such executory contract . . . is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts." Section 8.3 says an assumed executory contract will "be fully enforceable by, the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of this Plan. . . ." This suggests those contracts are modified elsewhere in the Plan; as discussed below, they cannot be. Section 8.2(e) says:

> assumption . . . of any executory contract . . . shall result in the full release and satisfaction of any Claims and Causes of Action against any Debtor or defaults by any Debtor arising under any assumed executory contract . . . at any time before the date that the Debtors assume . . . such executory contract. . . .

Section 8.2(e). Further, the Cure Notice[25] greatly expands these releases by saying that assumption of an executory contract also:

> shall result in the <u>full release and satisfaction of any and all contingent pre-petition indemnification obligations</u> arising under the terms of any such agreements[,] and any proof of Claim premised on a pre-petition contractual indemnification obligation . . . shall be deemed disallowed and discharged on the Effective Date. . . .

Paragraph 13 of the Cure Notice (emphasis added). These provisions can be read to not only release Claims and Causes of Action pursuant to a Debtor's indemnity obligations but also to entirely strip out all of the Debtors' indemnification obligations from all assumed executory contracts, which were entered prior to the Petition Date. Those excised obligations would presumably include indemnification obligations for the Debtor's actions (or failures) that cause damage to customers that PG&E serves and property, so this would remove another obstacle to PG&E operating with impunity. This is obviously extremely unfair to counterparties and the people, who may be harmed by PG&E's unfettered actions, but it is especially so where the Plan also provides that the Debtors' indemnification obligations to their officers and agents are "executory contracts that are assumed by the Debtors under this Plan" and those "shall continue as obligations of the Reorganized Debtors." *See* Section 8.4 of the Plan.

---

[25] The Cure Notice in the EC Supplement modifies the Plan. Surprisingly, the title of the EC Supplement does not even refer to executory contracts even though it impacts them greatly.

The Debtors' attempt to cherry pick the benefits of contracts and leave behind potentially huge liabilities is entirely inconsistent with the requirements for and results of assumption of an executory contract under the Bankruptcy Code. Section 365 provides that a debtor may assume an executory contract if the debtor cures any defaults and provides adequate assurance of future performance. 11 U.S.C. § 365. Assumption of an executory contract allows the contract to continue "as is" and does not change the obligations of the debtor or the counterparty to the contract, as long as the debtor complies with the requirements for assumption in the Bankruptcy Code. *See Mission Prod. Holdings v. Tempnology, LLC*, 587 U.S. __, 139 S. Ct. 1652, 1658, 203 L. Ed. 2d 876, 883 (2019) ("Section 365(a) enables the debtor . . ., upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance."); *In re Washington Capital Aviation & Leasing*, 156 B.R. 167, 173 (Bankr. E.D. Va. 1993); *In re Allen*, 135 B.R. 856, 864 (Bankr. N.D. Iowa 1992) (assuming a contract under § 365 only allows the debtor to "carry on with the contract according to its terms"); Michael T. Andrew, Executory Contracts in Bankruptcy: Understanding "Rejection", 59 Colo. L. Rev. 845, 847 (1988) ("Assumption permits the estate to obtain the benefits of continued performance by the nondebtor party to the contract, as would assumption by an ordinary contract assignee.").

Thus, after assumption of a contract, the debtor must perform "in full just as if bankruptcy had not intervened." *In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992) quoting *In re Multech Corp., 47 Bankr*. 747, 752 (Bankr. N.D. Iowa 1985); *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531-532 (1984) (If a debtor assumes "the executory contract, however, it assumes the contract *cum onere*. . . .").

Further, assumption of an executory contract results in all obligations of the debtor under the contract being treated as administrative expenses, regardless of whether the expenses arose prepetition or postpetition. *In re U.S. Metalsource Corp*., 163 B.R. 260, 269 (Bankr. W.D. Pa. 1993); *Bildisco*, *supra*, 465 U.S. at 532. Thus, an assumed contract essentially "rides through"

the bankruptcy, and the debtor and counterparty go forward with all of their rights and obligations.

The Debtors list the District's Contracts as having no Cure Amount in the Cure Notice. Thus, PG&E must not be aware of any defaults under the District's Contracts. First, the District objects to these Cure Amounts for the 2005 COA and the Amendment to the 2005 COA; the Cure Amount owed under the 2005 COA should be $27,354.98 and the Cure Amount under the Sand Bar Amendment is $720.51. Second, other than the Cure Amounts for the 2005 COA and the Amendment to the 2005 COA (which total $28,075.49), the District is also unaware of any default under the District's Contracts. Brown Decl. at ¶ 6. Because both parties are not aware of any other defaults under the District's Contracts, under Section 365, the District's Contracts will be assumed and must ride through with all of the parties' rights and obligations.

The Debtors' attempt to cut off all Claims and actions – and strip out all indemnification obligations – under the District's Contracts would therefore constitute impermissible unilateral modifications of the District's Contracts by the Plan and would eviscerate the District's rights under Section 365 upon assumption.[26] *In re SCCC Assocs. II Ltd. Partnership*, 158 B.R. 1004, 1015 (Bankr. N.D. Cal. 1993) ("Section 365 does not give debtors the ability to rewrite the terms of an unexpired lease"); *In re Storage Technology Corp.*, 53 B.R. 471, 476 (Bankr. D.Colo 1985) (Debtor cannot unilaterally rewrite contract and must obtain party's consent to modification).

Because of the foregoing, the District objects to these provisions of the Plan and the matters pertaining to assumption pursuant to Section 365(b)(1) of the Bankruptcy Code, as set forth in the Cure Notice. The Plan must be revised to be consistent with Section 365, including deleting the first sentence of Section 8.2(e) and Paragraph 13 and the last two sentences of Paragraph 8 of the Cure Notice.

---

[26] Further, for the reasons discussed above, unknown and unsuspected claims and rights to setoff and recoupment cannot be discharged, and a counterparty's failure to object to modifications of assumed contracts in the Plan should not be deemed consent. *See* EC Supplement at p. 17, lines 6-7 ("Any counterparty to an Agreement that fails to timely file and serve an Objection . . . will be deemed to have assented to such assumption. . . .").

Finally, the second sentence of Section 8.2(e) states "[a]ny proofs of Claim filed with respect to an executory contract . . . that has been assumed . . . shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court." To the extent the Debtors intend to extract any release or discharge of a Claim, which is asserted by a proof of claim filed with respect to an assumed executory contract, this provision fails for the same reasons as the first sentence of Section 8.2(e).

E.       **Section 10.13 Special Provisions for Governmental Units.**

Section 10.13 entitled Special Provisions for Governmental Units provides some exceptions to the Plan's provisions for Governmental Units such as the District. However, Section 10.13 does not clearly except the Eminent Domain Action, the LAFCo Action, or executory contracts with a Governmental Unit from the Plan's many problematic provisions.[27] For the reasons discussed in detail above on why the Eminent Domain Action, the LAFCo Action, and the District's Contracts cannot be subject to the objectionable provisions of the Plan, Section 10.13 should be revised as follows:

> **10.13   Special Provisions for Governmental Units.** Solely with respect to Governmental Units, nothing ~~herein shall limit or~~in the Plan, the Confirmation Order, or the Cure Notice including, without limitation, Sections 1.21 (Causes of Action), 5.9 (Satisfaction of Claims), 6.1 (General Settlement of Claims and Interests), 8.1(c) (Executory Contract General Treatment), 8.2(e)  (Executory Contracts Determination of Cure and Deemed Consent), 10.3 (Release and Discharge of Debtors), 10.6 (Injunction), 10.8 (Exculpation) and 10.9 (Releases) of the Plan and Paragraphs 8 and 13 of the Cure Notice (collectively, the "Settlement Provisions"), shall expand the scope of any discharge, cure, waiver, release, ~~or~~exculpation, injunction, or other bar expressly provided to ~~which~~the Debtors ~~or~~, the Reorganized Debtors ~~are entitled under the Bankruptcy Code. Further, nothing herein~~, or any other party by Bankruptcy Code Sections 524 and 1141, without their references to possible exceptions in the Plan, the Confirmation Order, or the Cure Notice. Further, nothing in the Plan, the Confirmation Order, or the Cure Notice, including ~~Section 10.8 and 10.9 hereof~~the Settlement Provisions, shall discharge, cure, waive, release, enjoin, or act as an injunction of, settle, compromise, satisfy, otherwise bar or affect (a) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit, including indemnification and contribution obligations, (1) arising on or after the ~~Confirmation Date~~confirmation date with respect to events occurring on or after the ~~Confirmation Date, (b) any liability to~~confirmation date, (2) arising at any time under or related to any executory contract or unexpired lease that was assumed, or assumed and assigned, pursuant to the Plan, the Confirmation

---

[27] It is important that the carve-out language involving Governmental Units be as explicit as possible. *See, e.g.*, *County of San Mateo, et al. v. Peabody Energy Corporation (In re Peabody Energy Corporation)*, --- F.3d ---, 2020 WL 2176028 (8th Cir. May 6, 2020).

Order or otherwise, or (3) arising at any time if the liability of a Debtor to the Governmental Unit (i) was unknown, unsuspected, or otherwise unforeseen prior to the confirmation date or (ii) is an indemnification or contribution obligation; (b) any liability to or power, authority, or right of a Governmental Unit that (1) is not a Claim, or (2) allows the Governmental Unit to seek an equitable remedy, even if the equitable remedy would give rise to a right to payment; (c) any valid right of setoff or recoupment of a Governmental Unit, (d) any police or regulatory action by a Governmental Unit, including nuisance abatement; (e) any action to exercise any power of a Governmental Unit, including the power of eminent domain and any related or ancillary power or authority of a Governmental Unit that is necessary or desirable in order for it to exercise its power of eminent domain to acquire any assets or property of the Debtors, their estates, or the Reorganized Debtors and the power to provide electric service to the Governmental Unit's area; (f) any environmental liability, including any liability on an Environmental Claim, to a Governmental Unit that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Effective Date, at any time; or (fg) any liability to a Governmental Unit on the part of any Persons or Entities other than the Debtors or the Reorganized Debtors, provided, that nothing in this Section 10.13 shall affect the Debtors' releases of any party in Section 10.9 hereof, nor shall anything herein enjoin in the Plan, the Confirmation Order, or the Cure Notice, including the Settlement Provisions, discharge, cure, waive, release, enjoin or act as an injunction of, settle, compromise, satisfy, or otherwise bar or limit any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any of the matters described in clauses (a) through (f) above g) of this Section 10.13. Even if any matters described in clauses (a) through (g) of this Section 10.13 allow a Governmental Unit to obtain, directly or indirectly, any right of payment, such matters will not be treated as a Claim, which is subject to discharge or otherwise impacted by the Plan or the Confirmation Order.

# V. CONCLUSION

For the reasons discussed above, the District respectfully requests that this Court (a) deny confirmation of the Plan or, in the alternative, require modification of the Plan as set forth herein, (b) the District's objections to the Cure Amounts and other matters pertaining to assumption of executory contracts as set forth herein,[28] and (c) grant such other and further relief as is just and proper under the circumstances.

DATED: May 15, 2020

STRADLING YOCCA CARLSON & RAUTH
A PROFESSIONAL CORPORATION

By: */s/ Paul R. Glassman*
Paul R. Glassman
Attorneys for Party-in-Interest,
South San Joaquin Irrigation District

---

[28] The name and contact information of the person authorized to resolve such objection is Paul Glassman, whose contact information is on the caption page.