| | |
|---|---|
| **LABATON SUCHAROW LLP** | **LOWENSTEIN SANDLER LLP** |
| Thomas A. Dubbs | Michael S. Etkin (*pro hac vice*) |
| Carol C. Villegas | Andrew Behlmann (*pro hac vice*) |
| Jeffrey A. Dubbin (SBN 287199) | Scott Cargill |
| Aram Boghosian | Colleen Maker |
| 140 Broadway | One Lowenstein Drive |
| New York, New York 10005 | Roseland, New Jersey 07068 |

*Lead Counsel to Lead Plaintiff and the Class*    *Bankruptcy Counsel to Lead Plaintiff and the Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Bankruptcy Counsel to Lead Plaintiff and the Class*    *(additional counsel on Exhibit A)*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>             Debtors.<br><br>☒ Affects Both Debtors<br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company | Case No. 19-30088 (DM) (Lead Case)<br><br>Chapter 11<br><br>(Jointly Administered)<br><br>**SECURITIES LEAD PLAINTIFF'S OBJECTION TO CONFIRMATION OF DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED MARCH 16, 2020 [ECF NO. 6320]**<br><br>Hearing<br>Date:      May 27, 2020<br>Time:     10:00 a.m. (Pacific Time)<br>Before:   Hon. Dennis Montali<br>           United States Bankruptcy Court<br>           Courtroom 17, 16th Floor<br>           450 Golden Gate Avenue<br>           San Francisco, California 94102<br><br>Objection Deadline<br>Date:      May 15, 2020<br>Time:     4:00 p.m. (Pacific Time) |

Public Employees Retirement Association of New Mexico ("**Lead Plaintiff**"), the court-appointed lead plaintiff in the securities class action captioned as *In re PG&E Corporation Securities Litigation*, Case No. 18-03509 (the "**Securities Litigation**") pending in the United States District Court for the Northern District of California (the "**District Court**"), on behalf of itself and the class that it seeks to represent in the Securities Litigation (the "**Class**"),[1] together with York County on behalf of the County of York Retirement Fund, City of Warren Police and Retirement System, and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund (collectively with Lead Plaintiff the "**Securities Plaintiffs**")[2] hereby submit this objection (the "**Objection**") to confirmation of the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* [ECF No. 6320] (the "**Plan**") of the debtors in possession (the "**Debtors**") in the above-captioned chapter 11 bankruptcy cases (the "**Chapter 11 Cases**"), and respectfully state as follows:

## PRELIMINARY STATEMENT[3]

As discussed more fully below, Securities Plaintiffs object to confirmation of the Plan for the following reasons:

- The Plan Injunction appears to be a veiled attempt to effect a nonconsensual third-party release that is impermissible as a matter of law;

---

[1] On February 27, 2019, the Court entered an order denying Securities Plaintiffs' motion to apply Bankruptcy Rule 7023 to the claims Lead Plaintiff filed on behalf of the Class. Securities Plaintiffs timely appealed from that order and their appeal remains pending in the District Court. Nevertheless, the issues raised in this Objection apply equally to Securities Plaintiffs individually, who also timely filed individual proofs of claim in these Chapter 11 Cases and to the members of the Class. In addition, as the court-appointed lead plaintiff in the Securities Litigation, Lead Plaintiff remains a fiduciary for Class members. *See, e.g.*, *Eubank v. Pella Corp.*, 753 F.3d 718, 723-24 (7th Cir. 2014) ("Class representatives are . . . fiduciaries of the class members. . . ."); *Schick v. Berg*, 2004 WL 856298, *4 (S.D.N.Y. Apr. 20, 2004) ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint."); *cf. In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").

[2] York County on behalf of the County of York Retirement Fund, City of Warren Police and Retirement System, and Mid-Jersey Trucking Industry & Local No. 701 Pension Fund join in this Objection solely as to issues impacting claims arising under the Securities Act of 1933.

[3] Capitalized terms used in this Preliminary Statement but not previously defined have the meanings given thereto below.

- The Distribution Formula for Equity Rescission or Damage Claims violates federal law and equitable principles by:

  o using an improper market capitalization for HoldCo in an effort to artificially dilute distributions to holders of Equity Rescission or Damage Claims,

  o improperly deducting insurance proceeds that holders of Equity Rescission or Damage Claims receive from the relevant D&O policies in calculating their distributions, even proceeds received *on account of claims against the Individual Defendants*, and

  o failing to account for the fact that Securities Plaintiffs and Class members hold separate Equity Rescission or Damage Claims against each of the Debtors; and

- If Class 10A-II votes to reject the Plan, the Debtors cannot satisfy the cramdown requirements under section 1129 of the Bankruptcy Code.

The Court should not confirm the Plan unless each of the foregoing issues is appropriately remedied through modifications to the Plan or the confirmation order.

## BACKGROUND

### A.     The Securities Litigation

The Securities Litigation is a securities class action that asserts claims against the Debtors, eighteen of the Debtors' current and former directors and officers (the "**Individual Defendants**"), and twenty-four investment banks that underwrote the Notes Offerings (the "**Underwriter Defendants**" and together with the Individual Defendants, the "**Non-Debtor Defendants**") on behalf of a proposed class (the "**Class**") of investors who acquired the Debtors' publicly traded securities from April 29, 2015 through November 15, 2018 (the "**Class Period**") and suffered losses as a result of the Debtors' and the Non-Debtor Defendants' alleged false and misleading statements and omissions that inflated the price of the Debtors' securities, as alleged in the Third Amended Complaint (the "**TAC**") filed in the Securities Litigation on May 28, 2019.[4]

The TAC alleges, among other things, that the Debtors and the Non-Debtor Defendants intentionally or recklessly misled investors about the Debtors' wildfire safety practices, including misrepresentations that the Debtors were in full legal compliance and increasing their

---

[4] References to the TAC in this Objection are for summary purposes only and are qualified in their entirety by the contents of the TAC itself. Securities Plaintiffs reserve all rights with respect to the Securities Litigation.

investments in safety, notwithstanding their numerous and widespread violations of safety regulations and cover-up of inadequate safety practices. However, as the true nature and extent of PG&E's responsibility for the Northern California wildfires materialized, Class members who purchased PG&E's publicly traded securities at inflated prices during the Class Period suffered significant compensable losses under the federal securities laws. Through the Securities Litigation, the Securities Plaintiffs seek to recover on behalf of tens or hundreds of thousands of Class members who collectively lost billions of dollars as a result of the Debtors' and Non-Debtor Defendants' conduct.

**B.     The Rescission or Damage Claims**

The Securities Plaintiffs timely filed individual and class proofs of claim against each of the Debtors on October 21, 2019, asserting claims based upon the allegations in the TAC (collectively, the "**Rescission or Damage Claims**"). The proofs of claim assert two types of Rescission or Damage Claims against the Debtors:

- claims arising from purchases of the Debtors' bonds during the Class Period (the "**Debt Rescission or Damage Claims**"), and

- claims arising from purchases of the Debtors' common stock during the Class Period (the "**Equity Rescission or Damage Claims**").

The Rescission or Damage Claims are subordinated pursuant to section 510(b) of title 11 of the United States Code (the "**Bankruptcy Code**") with the level of such subordination being distinct for Debt Rescission or Damage Claims and Equity Rescission or Damage Claims.

On February 27, 2020, the Court entered an Order extending the bar date to April 16, 2020 solely for holders of Rescission or Damage Claims to file individual proofs of claim (the "**Extended Bar Date**"). As of the date of this Objection, the Debtors' claims agent has processed at least 5,982[5] proofs of claim asserting Rescission or Damage Claims, exceeding $6.5 billion.[6] However, those figures are likely significantly understated because (a) several authorized agents filed bulk proofs of claim consolidating the claims of numerous individual clients (adding hundreds, possibly thousands, of claims to the 5,982), and (b) numerous

---

[5]   Prime Clerk appears to still be receiving and processing new Rescission or Damage Claims, as this figure continues to increase on a daily basis.

[6]   *See* https://restructuring.primeclerk.com/pge/Home-ClaimInfo?RescissionorDamage=MTY=

claimants, including large institutional investors, submitted unliquidated proofs of claim (not included in the $6.5 billion). Also, numerous Class members were provided late notice of the Extended Bar Date, or no notice whatsoever, in violation of their Due Process rights. *See* Letter dated April 29, 2020 [ECF No. 6982]; Rule 7023 Memo. Decision [ECF No. 5887].

### C. The Plan and Disclosure Statement

The Debtors filed their initial Chapter 11 Plan of Reorganization on September 9, 2019 [ECF No. 3841], which they subsequently amended from time to time. On March 16, 2020, the Debtors filed the most current version of the Plan [ECF No. 6320] and the accompanying disclosure statement (the "**Disclosure Statement**") [ECF No. 6353].

The Debtors anticipate that the transactions contemplated by the Plan will be funded in part through various debt and equity financings. Disclosure Statement at 34-36. The contemplated equity financing may take place through one or more of the following: (a) a market offering, if the offering price per share corresponds to an implied price-to-earnings ratio, based on the Debtors' estimated net income for 2021, of at least 13.5; (b) a rights offering to existing holders of PG&E Corporation common stock (the "**Rights Offering**"), if the offering price corresponds to an implied price-to-earnings ratio of 12.0, based on a net income metric set forth in the Equity Backstop Commitment Letters (as defined in the Disclosure Statement) [ECF No. 4446 Ex. C]; and (c) to the extent the Debtors do not raise sufficient equity capital through the market offering and the rights offering, by drawing on the commitments provided through the Equity Backstop Commitment Letters. *See* Disclosure Statement at 34.

The Debtors have not yet indicated which of these methods (or combination thereof) they intend to use to raise equity capital sufficient to satisfy all obligations in connection with the Plan. However, in the event the Debtors undertake a Rights Offering, the Plan provides that "New HoldCo Common Stock shall be issued to each **Eligible Offeree** that exercises its respective subscription rights pursuant to the Rights Offering Procedures and the Plan…" Plan, § 6.18 (emphasis added). Section 1.60 of the Plan defines an "Eligible Offeree" as having the meaning set forth in the "Rights Offering Procedures" to be approved by the Court. To date, the Rights Offering Procedures have not been filed with or approved by the Court. However, the

treatment of existing common stock under the Plan provides for holders to "receive a pro rata distribution of any subscription rights to be distributed to holders of HoldCo Common Interests in connection with a Rights Offering."  Plan, § 4.13(a).

### 1. Classification and Treatment of Rescission or Damage Claims Under the Plan

Under the Plan, Equity Rescission or Damage Claims are classified in Class 10A-II, consisting of "any Claim against HoldCo subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to the common stock of HoldCo."  Plan, § 1.108. Class 10A-II will "receive a number of shares of New HoldCo Common Stock equal to such holder's HoldCo Rescission or Damage Claim Share of the outstanding number of common stock of HoldCo as of the Petition Date (526,118,408)."  Plan § 4.14.  Class 10A-II includes only Equity Rescission or Damage Claims against PG&E Corporation ("**HoldCo**").  Equity Rescission or Damage Claims against Pacific Gas and Electric Company (the "**Utility**") are not classified or provided any treatment under the Plan.

Section 1.109 of the Plan, in turn, defines "**HoldCo Rescission or Damage Claim Share**" as "a percentage equal to (a) the dollar amount of a holder's Allowed HoldCo Rescission or Damage Claim *less* any cash payments received from an Insurance Policy, *divided by* (b) $35,905,153,932." (emphasis in original).   The denominator of the HoldCo Rescission or Damage Claim Share, $35,905,153,932, represents "HoldCo's market capitalization calculated using the market opening price on October 12, 2017, the day of the first disclosure alleged by PERA, and the fully diluted shares outstanding on or around such date."  Disclosure Statement at IV.B.  Class 10A-II is impaired and entitled to vote on the Plan.

Debt Rescission or Damage Claims are classified in Class 9A and 10B, which are both unimpaired and deemed to accept the Plan.

### 2. Third-Party Release and Injunction

Section 10.9 of the Plan contains a release (the "**Third-Party Release**") of certain claims and causes of action of a number of categories of non-Debtor releasors (the "**Releasing Parties**"), against the Debtors and various categories of non-Debtors (the "**Released Parties**").

The Released Parties include, among a myriad of others, the Debtors and their current and former officers, directors, and investment bankers. *See* Plan, § 1.179.

The definition of "**Releasing Parties**" includes, among many others, "any holder of a Claim or Interest that is solicited and voluntarily indicates on a duly completed Ballot submitted on or before the Voting Deadline that such holder opts into granting the releases set forth in Section 10.9(b) of the Plan." *See* Plan § 1.180. The Plan recognizes that under Ninth Circuit law (as discussed more fully below), the Debtors *cannot* foist the Third-Party Release on any non-Debtor who does not expressly consent to it, providing that

> **for the avoidance of doubt, and notwithstanding any other provision of this Plan, nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a holder of a Claim in favor of a party that is not a Debtor, it being acknowledged that such holder shall be deemed to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-in release procedures set forth herein or in any applicable Ballot.**

Plan, § 10.9.

Notwithstanding the Debtors' acknowledgment in the Third-Party Release that the Plan *cannot* release claims of any non-Debtors against other non-Debtors without the Releasing Parties' affirmative consent, the injunction set forth in section 10.6 of the Plan (the "**Plan Injunction**") appears to attempt (albeit indirectly) precisely that. The Plan Injunction provides in pertinent part:

> **Except as otherwise provided in this Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all persons who have held, hold, or may hold claims or Interests are, with respect to any such Claim or Interest, *permanently enjoined after the entry of the Confirmation Order from*: (i) *commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind . . . against or affecting, directly or indirectly*, a Debtor, a Reorganized Debtor, or an estate or the *property of any of the foregoing . . .* [Furthermore, b]y accepting distributions pursuant to this Plan, each holder of an Allowed Claim will be *deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in this Section*.**

Plan, § 10.6 (italicized emphasis added).

# ARGUMENT

**I.**   **THE PLAN INJUNCTION, TO THE EXTENT IT IS INTENDED TO APPLY TO THE SECURITIES LITIGATION AGAINST THE NON-DEBTOR DEFENDANTS, IS PROHIBITED BY NINTH CIRCUIT LAW.**

**A.**   **Nonconsensual third-party releases are impermissible as a matter of law.**

Nonconsensual third-party releases – releases of claims and causes of action of one non-debtor party against another without the knowing affirmative consent of the releasing party – in chapter 11 plans are categorically prohibited as a matter of law in this Circuit. *See, e.g.*, *Resorts Int'l v. Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995) ("This Court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *In re American Hardwoods*, 885 F.2d 621, 625-26 (9th Cir. 1989) (holding that Bankruptcy Courts are "powerless to discharge" liabilities of non-debtors); *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 77 (B.A.P. 9th Cir. 1994) (plans that propose to release non-debtors from obligations to creditors of a debtor "violate § 524(e) and are not confirmable").

The Third-Party Release is constructed as an "opt-in" release, presumably to avoid the Ninth Circuit's categorical prohibition of nonconsensual third-party releases. *See* Plan, § 1.180(c). The Plan further provides that

> for the avoidance of doubt, and ***notwithstanding any other provision of this Plan, nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a holder of a Claim in favor of a party that is not a Debtor***, it being acknowledged that such holder shall be deemed to release a party that is not a Debtor under the Plan solely to the extent that such holder consensually elects to provide such Plan release in accordance with the opt-in release procedures set forth herein . . . .

Plan, § 10.9(c) (emphasis added). While the Third-Party Release is merely a trap for the unwary[7] and should be removed from the Plan, it nevertheless expressly requires that creditors affirmatively consent to be bound by it, in an effort to be consistent with Ninth Circuit law.

---

[7]   That any creditor would ever voluntarily grant the Third-Party Release where doing so carries only downside – and where there is no penalty for declining to opt in – defies reason. The opt-in mechanism serves only to create confusion and generate some nominal level of inadvertent "consent" through obfuscation and mistake. Particularly where a substantial portion of the creditor body consists of individual claimants, it would be far more fair and appropriate to simply strike the Third-Party Release in its entirety.

Thus, it gives Class 10A-II claimants a confusing and inaccurate impression about how their claims against third parties will be treated under the Plan, including the *de facto* release via the Plan Injunction (as detailed in the following section), despite the appearance of a choice to opt out of the Third-Party Release.

### B. The Plan Injunction appears to attempt an end-run around the prohibition against nonconsensual third-party releases.

The Plan Injunction, in turn, purports to enjoin *all* creditors and interest holders from "**continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind . . . *affecting, directly or indirectly,* a Debtor, a Reorganized Debtor, or an estate or the *property of any of the foregoing*.**" Plan, § 10.6 (italicized emphasis added). In stark contrast to the clear acknowledgment in Section 10.9(c) of the Plan that only parties who affirmatively opt in will be bound by the Third-Party Release, the Plan Injunction provides that anyone who accepts a distribution under the Plan "will be ***deemed to have affirmatively and specifically consented to be bound*** by this Plan, including, the [Plan Injunction]." Plan, § 10.6(b) (emphasis added). In essence, it appears that the Debtors are attempting to alter the opt-*in* Third-Party Release (which no reasonable creditor would ever grant) with an indirect opt-*out* release through the Plan Injunction, from which creditors can only opt out by forfeiting all distributions under the Plan. That is the polar opposite of affirmative consent, and flies in the face of the Ninth Circuit's prohibition of nonconsensual third-party releases.

In light of the Debtors' assumption of their indemnification obligations to the Individual Defendants through the Plan, *see* Plan, §§ 1.127, 8.4, it is not difficult to imagine the reorganized Debtors and/or the Non-Debtor Defendants asserting in the future that the Securities Litigation "violates" the Plan Injunction because it somehow could affect the reorganized Debtors and their property. Indeed, the Debtors suggested that result at the Disclosure Statement approval hearing.[8] In that respect, the Plan Injunction attempts to indirectly accomplish what the Third-Party Release cannot.[9]

---

[8] "Mr. Bennett: Your Honor, it's a complex subject and the best way to do it is to spell it out unfortunately in precise and carefully drafted language. But I think here is the essence of the

The plan in *American Hardwoods* attempted a similar end-run around the Ninth Circuit's prohibition of nonconsensual third-party releases. 885 F.2d at 626. There, the debtor argued that it was not seeking a discharge or release of certain non-debtor individual guarantors' liability to the debtor's creditors, but instead, sought "only" a permanent injunction against enforcing a judgment against the guarantors on account of that liability – an injunction even less onerous than the potential scope of the Plan Injunction here. *See id.* The Ninth Circuit "f[ound] American's semantic distinction between a permanent injunction and a discharge unpersuasive" and held that such an injunction "falls squarely within the definition of a discharge under section 524(a)(2)" and thus was outside of the Bankruptcy Court's equitable powers. *See id.* ("We therefore conclude that the specific provisions of section 524 displace the court's equitable powers under section 105 to order the permanent relief sought by American."); *see also In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610 (B.A.P. 9th Cir. 1990) (holding that a plan that attempted to enjoin creditors from proceeding against non-debtor co-obligors "challenges a basic tenet of the Code that Chapter 11 cases generally are for the protection of the debtor only and not to protect the debtor's principals or co-[obligors]").

Just as in *American Hardwoods* and *Rohnert Park*, the Plan Injunction goes too far. While an injunction against pursuing claims that are released or discharged under the Plan might be confirmable, an injunction against pursuing direct, independent claims against non-Debtor third parties such as the Non-Debtor Defendants, which are specifically preserved and unaffected absent an affirmative opt in to the Third Party Release, clearly is not. Unless the Plan Injunction is revised to make clear that it does not enjoin or otherwise prejudice the continued prosecution of the Securities Litigation against the Non-Debtor Defendants in any way, the Plan cannot be confirmed.

---

problem. The securities plaintiffs contend that this release is too broad, and we contend that it's appropriate." Mar. 10, 2020 Hearing Transcript, 169:11-16.

9   On May 4, 2020, Securities Plaintiffs served limited document requests on the Debtors seeking documents concerning the applicability or potential applicability of the Plan Injunction to the Securities Litigation. On the evening of May 14, 2020, the Debtors responded that they have no non-privileged documents responsive to Securities Plaintiffs' requests.

## II. THE TREATMENT OF EQUITY RESCISSION OR DAMAGE CLAIMS UNDER THE PLAN IS INAPPROPRIATE.

The Plan entitles holders of allowed Equity Rescission or Damage Claims to receive distributions of new common stock in the reorganized Debtors, calculated pursuant to the following formula (the "**Distribution Formula**"):

$$Distribution = \frac{(Allowed\ Claim\ Amount - Insurance\ Recoveries)}{\$35,905,153,932}\ x\ 526,118,408\ shares$$

*See* Plan, §§ 1.109, 4.14.  Section 510(b) of the Bankruptcy Code mandates *pari passu* treatment between common stock in PG&E Corporation in Class 10A-I, denominated in shares, and Equity Rescission or Damage Claims in Class 10A-II, denominated in dollars.  The Distribution Formula is evidently the Debtors' attempt at approximating such treatment.  In essence, the Distribution Formula calculates the proportion that the amount of a particular Equity Rescission or Damage Claim bears to the Debtors' market capitalization on a particular date, then multiplies that proportion by the number of shares outstanding on a completely different date – the Petition Date – to yield a distribution denominated in shares.

Although the goal of reconciling distributions between *pari passu* classes denominated in shares (Class 10A-I) and dollars (Class 10A-II) is appropriate, three fatal flaws render the Distribution Formula unfair and inequitable to holders of allowed Equity Rescission or Damage Claims:[10]

- the denominator of the fraction in the Distribution Formula, the Debtors' market capitalization on an arbitrarily chosen date instead of the Petition Date, has no legal or factual basis and artificially dilutes distributions to holders of allowed Equity Rescission or Damage Claims;

- there is no legal or factual basis for deducting insurance recoveries in calculating the HoldCo Rescission or Damage Claim Share where such claims are impaired and not being paid in full and the deduction conflicts with federal law; and

---

[10]  On May 4, 2020, Securities Plaintiffs served limited document requests on the Debtors seeking documents concerning the Debtors' manner for determining the HoldCo Rescission or Damage Claim Share, including but not limited to, the Distribution Formula, inputs for the Distribution Formula, the date of Proposed Market Capitalization (October 17, 2020), and other formulas or inputs considered.  On the evening of May 14, 2020, the Debtors responded that they have no non-privileged documents responsive to Securities Plaintiffs' requests.

- the Distribution Formula fails to account for the fact that Securities Plaintiffs and Class members have claims against each of the Debtors, not just HoldCo.

The Plan cannot be confirmed unless each of these issues is appropriately remedied.

### A. The market capitalization used to calculate the HoldCo Rescission or Damage Claim Share is inappropriate.

The denominator of the fraction in the Distribution Formula, $35,905,153,932, represents "HoldCo's market capitalization calculated using the market opening price on October 12, 2017, the day of the first disclosure alleged by PERA, and the fully diluted shares outstanding on or around such date." Disclosure Statement at IV.B. While that explanation appears to bear some facial connection to the Securities Litigation, it is in fact utterly baseless.

Beyond the cursory explanation of *what* the $35.9 billion denominator represents, the Debtors have provided no explanation in the Plan, the Disclosure Statement, or anywhere else of *why* they chose that figure – because the reference to the corrective disclosures alleged in the TAC is a red herring. The Debtors' stock price at any point during the Class Period is relevant only to the damages suffered by holders of Equity Rescission or Damage Claims (already accounted for in the numerator of the Distribution Formula), and has no further bearing on the value of those claims being equated into shares of HoldCo common stock as of the Petition Date for purposes of their *pari passu* treatment with HoldCo common stock.

The likely reason the Debtors chose the October 12, 2017 market opening price as the baseline is that their stock price was near its Class Period zenith on that date. A higher market capitalization equals a larger denominator in the Distribution Formula, which in turn equals smaller distributions to holders of Equity Rescission or Damage Claims. However, that higher market capitalization bears no relation whatsoever to the value of the Equity Rescission or Damage Claims and is inconsistent with *pari passu* treatment with existing HoldCo common stock, who do not face a similarly arbitrary reduction in their treatment under the Plan.

The Equity Rescission or Damage Claims are entirely prepetition claims. It is axiomatic that the amount of a prepetition claim is determined *as of the filing of the petition*. *See, e.g.*, *In re Orange County Nursery, Inc.*, 479 B.R. 863, 871 (Bankr. C.D. Cal. 2012) ("Bankruptcy Code § 502(b) is crystal clear that the amount of unsecured claims should be determined 'as of the date

of the filing of the petition.'"); *see also In re Paigah*, 2010 Bankr. LEXIS 3903, at *5 (Bankr. S.D. Cal. Nov. 4, 2010) (noting that the petition date is "the watershed date of a bankruptcy proceeding" and that creditors' rights are fixed as much as possible as of that date). In light of that fundamental legal principle, there is no legitimate reason why the amount of an Equity Rescission or Damage Claim *as of the Petition Date* should be divided by the Debtors' inflated market capitalization *as of fifteen months earlier* (near its inflated, all-time highest value) to calculate the distribution on account of that prepetition claim. Common stock in Class 10A-I and holders of Equity Rescission or Damage Claims in Class 10A-II have equal priority under section 510(b) of the Bankruptcy Code. Using an arbitrary market capitalization from over a year before the Petition Date, instead of the Debtors' market capitalization *on* the Petition Date (*i.e.*, immediately before filing) will not result in equal treatment as of the Petition Date – it will result in artificial dilution of Equity Rescission or Damage Claims compared to their *pari passu* Class 10A-I counterparts. There is no legal or factual basis for such dilution.

The Debtors' arbitrary selection of an inflated market capitalization in the Distribution Formula would materially dilute recoveries by holders of Equity Rescission and Damage Claims. By way of example, a holder of an Equity Rescission or Damage Claim in the amount of $1,000,000 would receive 14,653 common shares of reorganized PG&E Corporation under the existing Distribution Formula.[11] In reality, using the correct market capitalization of $6,318,682,080 (the Debtors' approximate market capitalization immediately prior to the Petition Date), the same holder would be entitled to approximately 83,264 shares.[12] Accordingly, the Debtors' arbitrary (but calculated) choice of the October 12, 2017 date dilutes recoveries on account of Rescission or Damage Claims by *more than a factor of 5*.

### B. There is no factual or legal basis to deduct insurance recoveries in the calculation of the HoldCo Rescission or Damage Claim Share.

The Plan deducts "any cash payments received from an Insurance Policy" from the amount of an Equity Rescission or Damage Claim when calculating the HoldCo Rescission or Damage Claim Share applicable to such claim (the "**Insurance Offset**"), thereby reducing the

---

[11] ($1,000,000 / $35,905,153,932) x 526,118,408 = 14,653 shares
[12] ($1,000,000 / $6,318,682,080)  x 526,118,408 = 83,264 shares

number of shares the holder thereof will receive under the Plan. Plan, § 1.109(a). The Plan's definition of "Insurance Policy" includes the D&O liability insurance policies that cover the non-Debtor Individual Defendants in connection with the Securities Litigation. *Id.* §§ 1.41, 1.128; *Decl. of Elizabeth Collier* [Adv. Pro. No. 19-03039 ECF. No. 3], ¶ 7.

The Insurance Offset appears to treat any and all payments received under the relevant D&O liability insurance policies – including payments made by insurers on behalf of the non-Debtor Individual Defendants – as partial payments **by the Debtors**, which they obviously are not. Rather, they are payments from insurance on behalf of PG&E's non-Debtor directors and officers to cover their own roles in defrauding investors. Those Insurance Policies include $50 million (2017) and $100 million (2018) of Side A difference-in-conditions coverage that the Debtors admit is "D&O-dedicated insurance." *Decl. of Janaize Markland* [ECF No. 2472], ¶¶ 6, 8. Thus, the Insurance Offset inappropriately treats proceeds of the applicable D&O liability insurance policies, which exist first and foremost to pay defense costs and liability of the Individual Defendants (and some of which exist *solely* for the benefit of the Individual Defendants), as property of the Debtors' estate being distributed through the Plan to satisfy claims against the Debtors – even where such proceeds are paid on account of direct, independent claims against the Individual Defendants. Therefore, like the Distribution Formula, the Insurance Offset serves no purpose other than to dilute recoveries by Securities Plaintiffs and the Class.

The Insurance Offset violates the well-settled rule that a creditor is entitled to assert the full amount of its claim against a debtor, without reduction for amounts received from other, non-debtor sources. *Ivanhoe Bldg. & Loan Ass'n of Newark, N.J. v. Orr*, 295 U.S. 243, 245-46 (1935); *see also In re Del Biaggio*, 496 B.R. 600, 605 (Bankr. N.D. Cal. 2012) (holding that "*Ivanhoe* states a rule of federal bankruptcy law that must prevail over any contrary state law"); *In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009) ("We start with the proposition that members of an unsecured creditors class may have rights to payment from third parties, such as joint obligors, sureties and guarantors, and these rights may entitle them to a disproportionate recovery compared to other creditors of the same class (up to a full recovery).")

(citing *Ivanhoe*). The only limitation that applies where a creditor receives recovery from estate and non-estate sources is that the creditor's *aggregate* recovery cannot exceed 100%. *See Del Biaggio*, 496 B.R. at 603-04 ("*Ivanhoe* decides that the amount [of] the creditor's claim in the bankruptcy case is not affected by third-party payments, except to the extent payment from the debtor would produce a double recovery."). No facts or law support a conclusion here that the Insurance Offset is necessary to prevent an *aggregate* recovery over 100% (an issue already addressed by Section 5.12 of the Plan).

Further, the Insurance Offset is inconsistent with the federal statute that dictates how securities fraud liabilities must be apportioned between joint tortfeasors. Under the 1995 Private Securities Litigation Reform Act ("**PSLRA**"), a defendant's liability must be based "solely" on "the portion of the judgment that corresponds to [their] percentage of responsibility." 15 U.S.C. § 78u-4(f)(2)(B).[13] In contrast, the Insurance Offset makes unproven and inaccurate assumptions about the Debtors', officers', and directors' proportions of liability as well as how such liability may be resolved at a later date – inviting inconsistent judgments with future litigation. Further, by arbitrarily reducing the Debtors' liability, the Insurance Offset runs counter to Congress's judgment that fault be determined as a "percentage . . . of all persons who caused or contributed to the loss incurred by the plaintiff." 15 U.S.C. § 78u-4(f)(3)(A)(ii). The PSLRA allows a securities fraud defendant to offset its liability by an external source of recovery in *only one* instance: where one defendant "enters into a settlement with the plaintiff" after which the others reach "final verdict or judgment"—a circumstance that has *not* occurred here, and indeed, may not occur before distributions occur under the Plan (or ever). Congress's care in crafting the PSLRA to avoid allowing a tortfeasor to be responsible for *less than* its proportional fault reflects one of the many "policy concerns" Congress has already "considered" in crafting the statute, and the Supreme Court gives deference to these policy considerations in interpreting the PSLRA. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276–77 (2014).

---

[13] This provision applies "in general" and unless a "trier of fact specifically determines that" a defendant "knowingly committed a violation of the securities laws," in which case that defendant "shall be liable for damages jointly and severally." 15 U.S.C. § 78u-4(f)(2)(A).

Because the Insurance Offset has no factual or legal basis and violates substantive federal law, it renders the Plan unconfirmable.

### C. The Plan fails to account for the fact that Securities Plaintiffs and the Class hold Equity Rescission or Damage Claims against both of the Debtors.

Securities Plaintiffs (and thousands of Class members who filed individual proofs of claim) assert Equity Rescission or Damage Claims against each of the Debtors arising from purchases of HoldCo common stock. However, the Plan contains only a single class for Equity Rescission or Damage Claims, Class 10A-II, which consists solely of Equity Rescission or Damage Claims against HoldCo. The Plan does not provide any classification or treatment for Equity Rescission or Damage Claims against the Utility, which are separate from the Equity Rescission or Damage Claims against HoldCo. *See, e.g.*, TAC ¶¶ 43, 194-196, 208-210, 471-480 (allegations of the Utility's distinct role in the fraud). The Plan is also not premised upon the substantive consolidation of the Debtors' estates.

Securities Plaintiffs acknowledge that Ninth Circuit law treats claims against one debtor arising from purchases of the common stock of an affiliated debtor as *pari passu* with the common stock to which they relate (here, HoldCo common stock) and not with the common stock of the entity against which the claims are asserted (here, the Utility). *See In re Del Biaggio*, 834 F.3d 1003, 1014-15 (9th Cir. 2016) (adopting Second Circuit's superimposed capital structure analysis of subordinated claims arising from purchases of securities of an affiliate). Nevertheless, Equity Rescission or Damage Claims against the Utility must be classified and treated under the Plan. *See* 11 U.S.C. §§ 1122(a); 1123(a)(1), (3). Completely ignoring the existence of separate Equity Rescission or Damage Claims against the Utility, as the Plan presently does, obviously will not satisfy that requirement. The Plan should not be confirmed unless it is modified to classify and provide appropriate treatment for Equity Rescission or Damage Claims against the Utility.

### III.   THE PLAN DOES NOT MEET THE CRAMDOWN REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE WITH RESPECT TO EQUITY RESCISSION OR DAMAGE CLAIMS.

Because the deadline to vote on the Plan is contemporaneous with the deadline for filing objections to confirmation, Securities Plaintiffs do not yet know whether Class 10A-II will vote to accept the Plan. However, assuming Class 10A-II votes to reject the Plan, the Plan does not satisfy the cramdown requirements under the Bankruptcy Code.

Section 1129(b) of the Bankruptcy Code sets forth two requirements that must be met for a chapter 11 plan to be confirmed over the rejection of the plan by a class of impaired claims: the plan must (a) not discriminate unfairly against the rejecting class and (b) be fair and equitable to the rejecting class. 11 U.S.C. § 1129(b)(1). In its current form, the Plan unfairly discriminates against the Securities Plaintiffs and Class 10A-II, and therefore cannot be confirmed over its rejection by the Class.

The Equity Rescission or Damage Claims against HoldCo (in Class 10A-II) and the Utility (not presently classified or treated) are equal in priority to HoldCo common stock in Class 10A-I. *See* 11 U.S.C. § 510(b). The Plan provides that holders of interests in Class 10A-II will "retain such Interest subject to dilution from any New HoldCo Common Stock, or securities linked to New HoldCo Common Stock, issued pursuant to the Plan ***and***, if applicable, shall receive a pro rata distribution of any subscription rights to be distributed to holders of HoldCo Common Interests in connection with a Rights Offering." Plan § 4.13 (emphasis added).

The Plan discriminates against Equity Rescission or Damage Claims (in Class 10A-II) compared to its treatment of *pari passu* HoldCo Common Interests (in Class 10A-I), in at least three ways.

First, as discussed above, through the use of a massively inflated market capitalization in calculating the HoldCo Rescission or Damage Claim Share, the Distribution Formula in the Plan more severely (and arbitrarily) dilutes recoveries by holders of Equity Rescission or Damage Claims. In contrast, holders of common stock in Class 10A-I are retaining their interests – which do not appear, based on current market activity, likely to suffer much, if any, monetary dilution through the Plan. Artificially diluting Equity HoldCo Rescission or Damage Claims by a factor

greater than 5 through the inflated market capitalization in the denominator of the Distribution Formula is the antithesis of *pari passu* treatment with HoldCo common stock.

Second, the Insurance Offset arbitrarily and improperly deducts recoveries from a non-Debtor source in calculating the HoldCo Rescission or Damage Claim Share, further diluting recoveries by holders of Equity Rescission or Damage Claims. Holders of HoldCo common stock face no comparable dilution (arbitrary or otherwise).

Third, the Plan potentially entitles current holders of common stock in Class 10A-1 to purchase additional shares in the reorganized Debtors through the Rights Offering, an option that may provide those holders with significant incremental value. The Plan discriminates against holders of Equity Rescission or Damage Claims by failing to provide them with any value comparable to the Rights Offering rights.

Accordingly, the Plan does not satisfy the cramdown requirements under section 1129(b) of the Bankruptcy Code.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Court should not confirm the Plan unless the issues set forth in this Objection are appropriately remedied through revisions to the Plan or through the Confirmation Order.

*[ signature page follows ]*

Dated: May 15, 2020

Respectfully submitted,

**LOWENSTEIN SANDLER LLP**
**MICHELSON LAW GROUP**

By:   _/s/ Randy Michelson_
Randy Michelson (SBN 114095)

*Bankruptcy Counsel to Lead Plaintiff and the Class*

- and -

**LABATON SUCHAROW LLP**

*Lead Counsel to Lead Plaintiff and the Class*

- and -

**WAGSTAFFE, VON LOEWENFELDT, BUSCH & RADWICK, LLP**

*Liaison Counsel for the Class*

- and -

**ROBBINS GELLER RUDMAN & DOWD LLP**

*Counsel for the Securities Act Plaintiffs*

- and -

**VANOVERBEKE, MICHAUD & TIMMONY, P.C.**

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT A**
**COUNSEL**

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin *(pro hac vice)*
Andrew Behlmann *(pro hac vice)*
Scott Cargill
Nicole Fulfree
Colleen Maker
One Lowenstein Drive
Roseland, New Jersey 07068
Telephone   973-597-2500
Facsimile    973-597-2333
metkin@lowenstein.com
abehlmann@lowenstein.com

**MICHELSON LAW GROUP**
Randy Michelson, Esq. (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, CA 94104
Telephone   415-512-8600
Facsimile    415-512-8601
randy.michelson@michelsonlawgroup.com

*Bankruptcy Counsel to Lead Plaintiff and the Class*

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Carol C. Villegas
Jeffrey A. Dubbin (SBN 287199)
Aram Boghosian
140 Broadway
New York, New York 10005
Telephone   212-907-0700
tdubbs@labaton.com
cvillegas@labaton.com
jdubbin@labaton.com
aboghosian@labaton.com

**WAGSTAFFE, VON LOEWENFELDT,
BUSCH & RADWICK, LLP**
James M. Wagstaffe (SBN 95535)
Frank Busch (SBN 258288)
100 Pine Street, Suite 725
San Francisco, California 94111
Telephone   415-357-8900
wagstaffe@wvbrlaw.com
busch@wvbrlaw.com

*Lead Counsel to Lead Plaintiff and the Class*

*Liaison Counsel for the Class*

**ROBBINS GELLER RUDMAN & DOWD LLP**
Darren J. Robbins (SBN 168593)
Brian E. Cochran (SBN 286202)
655 West Broadway, Suite 1900
San Diego, California 92101
Telephone   619-231-1058
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

**ROBBINS GELLER RUDMAN & DOWD LLP**
Willow E. Radcliffe (SBN 200089)
Kenneth J. Black (SBN 291871)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, California 94104
Telephone   415-288-4545
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

**VANOVERBEKE, MICHAUD &
TIMMONY, P.C.**
Thomas C. Michaud
79 Alfred Street
Detroit, Michigan 48201
Telephone   313-578-1200
tmichaud@vmtlaw.com

*Additional Counsel for the Securities Act Plaintiffs*

**EXHIBIT B**
**RESERVATION OF RIGHTS**

This Objection and any subsequent pleading, appearance, argument, claim, or suit made or filed by Securities Plaintiffs, either individually or for the Class or any member thereof, do not, shall not, and shall not be deemed to:

a.  constitute a submission by Securities Plaintiffs, either individually or for the Class or any member thereof, to the jurisdiction of the Bankruptcy Court;

b.  constitute consent by Securities Plaintiffs, either individually or for the Class or any member thereof, to entry by the Bankruptcy Court of any final order or judgment, or any other order having the effect of a final order or judgment, in any non-core proceeding, which consent is hereby withheld unless, and solely to the extent, expressly granted in the future with respect to a specific matter or proceeding;

c.  waive any substantive or procedural rights of Securities Plaintiffs or the Class or any member thereof, including but not limited to (a) the right to challenge the constitutional authority of the Bankruptcy Court to enter a final order or judgment, or any other order having the effect of a final order or judgment, on any matter; (b) the right to have final orders and judgments, and any other order having the effect of a final order or judgment, in non-core matters entered only after de novo review by a United States District Court judge; (c) the right to trial by jury in any proceedings so triable herein, in the Chapter 11 Cases, including all adversary proceedings and other related cases and proceedings (collectively, "Related Proceedings"), in the Securities Litigation, or in any other case, controversy, or proceeding related to or arising from the Debtors, the Chapter 11 Cases, any Related Proceedings, or the Securities Litigation; (d) the right to seek withdrawal of the bankruptcy reference by a United States District Court in any matter subject to mandatory or discretionary withdrawal; or (e) all other rights, claims, actions, arguments, counterarguments, defenses, setoffs, or recoupments to which Securities Plaintiffs or the Class or any member thereof are or may be entitled under agreements, at law, in equity, or otherwise, all of which rights, claims, actions, arguments, counterarguments, defenses, setoffs, and recoupments are expressly reserved.

For the avoidance of doubt, Securities Plaintiffs, on behalf of themselves and the Class, do not, and will not impliedly, consent to this Court's adjudication of any claims now or hereafter asserted against any non-Debtor party now or hereafter named in the Securities Litigation.