Dennis F. Dunne (admitted *pro hac vice*)
Samuel A. Khalil (admitted *pro hac vice*)
MILBANK LLP
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

and

Gregory A. Bray (SBN 115367)
Thomas R. Kreller (SBN 161922)
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Counsel for the Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:** <br><br> **PG&E CORPORATION** <br><br> - and - <br><br> **PACIFIC GAS AND ELECTRIC COMPANY,** <br><br> Debtors. <br><br> ☐ Affects PG&E Corporation <br> ☐ Affects Pacific Gas and Electric Company <br> ☑ Affects both Debtors <br><br> * *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM) <br><br> Chapter 11 <br><br> (Lead Case) <br><br> (Jointly Administered) <br><br> **LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PLAN CONFIRMATION** <br><br> Date: May 27, 2020 <br> Time: 10:00 a.m. (Pacific Time) <br> Place: United States Bankruptcy Court <br> Courtroom 17, 16th Floor <br> 450 Golden Gate Avenue <br> San Francisco, CA 94102 <br><br> Re: Docket No. 6320 |

The Official Committee of Unsecured Creditors appointed in these cases (the "UCC") hereby submits this limited objection (the "Objection") to confirmation of the *Debtors' and*

*Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated March 16, 2020* [Docket No. 6320] (the "Plan")[1] and respectfully states as follows:

## PRELIMINARY STATEMENT

1. In the months prior to the deadline for filing objections to confirmation of the Plan, the UCC raised with the Debtors a number of concerns regarding the Plan. Progress has been made, with the Debtors informally agreeing to make several Plan modifications in response to the UCC's concerns. While the UCC expects that the agreed-upon modifications will be made, without a modified Plan yet on file, the UCC must raise its concerns here as preservative measure.

2. Moreover, several of the UCC's most important concerns remain unresolved, and the Debtors have advised the UCC that the Plan will not be revised to address those concerns. These concerns fall into two categories. First, the Plan designates General Unsecured Claims as unimpaired, but nonetheless alters the rights of holders of such Claims in potentially significant ways. If the Debtors wish to treat General Unsecured Claims as unimpaired, the Plan must explicitly state that ***all*** rights of the holders of these Claims survive confirmation and ride through unaffected.

3. Second, the Plan improperly compromises certain rights and entitlements of unsecured creditors, including the timing of payments, the use of estimation and the appropriate rate of postpetition interest payable on General Unsecured Claims and the preservation of appellate rights in connection therewith.

4. In addition, the Debtors have not yet filed their evidentiary support for confirmation pursuant to section 1129. The UCC reserves all of its rights to be heard by the Court in respect of such materials after they have been filed and the UCC has had sufficient time to review.

---

[1] Capitalized terms not defined herein have the meanings ascribed to them in the Plan.

# OBJECTION

## I. The Plan Improperly Impairs General Unsecured Claims.

### A. Section 10.3 of the Plan Improperly Expands the Section 1141 Discharge to Include An Affirmative, Non-Consensual Release By All Creditors.

5. Section 1141(d)(1) of the Bankruptcy Code states that "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan – (A) discharges the debtor from any debt that arose before the date of such confirmation …." 11 U.S.C. § 1141(d)(1). This section does not include a general creditor release.

6. Yet, Section 10.3 of the Plan expands the scope of section 1141 by including an affirmative, non-consensual waiver and release of the Debtors by all creditors, notwithstanding the fact that section 1141 contains no such language. Specifically, Section 10.3 provides that, in consideration of the Plan distributions, each holder of a Claim, including all holders of General Unsecured Claims, upon the Effective Date, will ***waive, release*** and ***discharge*** the Debtors "of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date" (the "Section 10.3 Release").[2] The Debtors attempt to thrust non-consensual releases upon creditors, including holders of supposedly unimpaired Claims, under the guise of discharge should not be permitted.

7. The Debtors no doubt will point to the "to the fullest extent permitted by section 1141" qualifier included in Section 10.3, but section 1141 only refers to discharge, not to a "waiver" or "release." Those two concepts do not even arise under section 1141. As such, the

---

[2] Section 10.3 states, in pertinent part:

Upon the Effective Date … each holder … of a Claim or Interest … shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date ….

Section 10.3 Release should be removed, and Section 10.3 should be modified to simply provide a discharge to the fullest extent available under section 1141.

**B. As Drafted, Section 10.3 of the Plan Would Force General Unsecured Creditors to Grant the Debtors a Full Release, Which Necessarily Renders the General Unsecured Creditor Class Impaired.**

8. As noted above, Section 10.3 of the Plan would force creditors to "waive, release and discharge" all "Claims, Interests, rights, and liabilities" against the Debtors that arose prior to the Effective Date.

9. The Plan Supplement puts a finer point on the alteration of creditors' rights, in that its "Other Indemnification Obligations" provision declares that:

> the assumption by the Debtors or Reorganized Debtors, as applicable of all other executory contracts or unexpired leases pursuant to the Plan ***shall result in the full release and satisfaction of any and all contingent pre-petition indemnification obligations arising under the terms of any such agreements and any proof of Claim premised on a pre-petition contractual indemnification obligation alleged to be owed by the Debtor or Reorganized Debtors shall be deemed disallowed and discharged on the Effective Date***.

Plan Supplement [Docket No. 7037] at ¶ 13 (emphasis added).

10. This evisceration of contingent pre-petition rights, even those expressly preserved by proof of claim, comes with no carveout—even for General Unsecured Claims deemed unimpaired under the Plan.[3]

11. It is black letter law that a party assuming an agreement assumes both the benefits and burdens of the agreement and cannot assume only those parts that are beneficial to it. *N.L.R.B. v. Bildisco & Bildisco*, 465 U.S. 513, 531-32 (1984). Moreover, this non-consensual waiver and

---

[3] We note that this provision was put in the Plan Supplement that is approximately 2,000 pages in length. To the extent any similar provisions have been layered into the Plan Supplement, our objection is equally applicable.

release is inconsistent with the proposed treatment of General Unsecured Claims under the Plan as unimpaired.

12. Section 1124(1) of the Bankruptcy Code provides that a class of claims is "impaired" unless the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." This provision is construed broadly. *See In re L & J Anaheim Assocs.*, 995 F.2d 940, 942-43 (9th Cir. 1993) ("It is well established that, with this language, **Congress defined impairment in the broadest possible terms**.") (emphasis added).

13. Indeed, courts have held that ***any*** alteration of a creditor's rights or privileges constitutes impairment for purposes of section 1124(1)—regardless of the type or degree of the alteration. *See, e.g., id.* at 943 ("The plain language of section 1124 says that a creditor's claim is 'impaired' unless its rights are left 'unaltered' by the Plan."); *see also* 7 COLLIER ON BANKRUPTCY ¶ 1124.03 (2020) (Under 1124(1), "***[a]ny alteration of [legal, equitable, or contractual] rights constitutes impairment***, even if the value of the rights is enhanced. There is no suggestion that only alterations of a particular kind or degree can constitute impairment.") (emphasis added).

14. In *L & J Anaheim Associates*, the Ninth Circuit found that, pursuant to the applicable agreements, the creditor had the right "to exercise 'all rights and remedies' available to a secured party under the California Uniform Commercial Code once [the debtor] defaulted on its repayment obligations." 995 F.2d at 943. By requiring that the creditor's collateral be sold at public auction under procedures mandated by federal bankruptcy law, the proposed plan "did away with this right—it left [the creditor] no opportunity to invoke the substantive remedies or procedural mechanisms available to it at state law." The Ninth Circuit concluded that the plan therefore "altered [the creditor's] prepetition contract rights, leaving it impaired within the meaning of the [Bankruptcy] Code." *Id*.

15. Similarly, in *In re Evans*, 584 B.R. 917, 920-21 (Bankr. D. Or. 2018), the court addressed an objection to a plan that proposed to pay unsecured claims in full but allowed the debtors up to three years to do so, "proposing no payments in the interim." The debtor argued that the claims were not impaired because their holders would "receive full payment including the judgment rate of interest at closing." *Id*. However, the court found that, despite the proposed payment in full, the "proposed plan treatment curtail[ed] the creditors' rights to execute and foreclose on the liens for a three-year period." *Id*. Thus, this was "an impairment, plain and simple." *Id*.

16. Courts outside of the Ninth Circuit have construed section 1124(1) equally broadly, finding that "payment in full" is a necessary but not a sufficient requirement to render creditors unimpaired. *See, e.g.*, *In re Texas Rangers Baseball Partners*, 434 B.R. 393, 410 (Bankr. N.D. Tex. 2010) (finding lenders would be impaired by proposed plan that provided for payment of claim in full but denied lenders certain veto rights contained in prepetition loan documents). As particularly relevant here, in *In re Applied Safety, Inc.*, 200 B.R. 576, 588 (Bankr. E.D. Penn. 1996), the debtor proposed a plan that provided for payment of a creditor's claim in accordance with the parties' prepetition agreement "regardless of any valid defenses or causes of action which [the creditor had] to invalidate that Agreement." The court noted that "[p]ursuant to 11 U.S.C. § 1124, a claim is impaired unless the plan leaves intact the creditor's full '**legal, equitable** and contractual rights.'" *Id*. (emphasis in original). Thus, even though the creditor's right to payment was left intact, "other rights [the creditor] may possess against the Debtor, such as a legal and/or equitable right to have the [applicable] Agreement rescinded, would be eliminated under the Plan," thus leaving the creditor impaired. *Id*.

17. In this instance, the Plan provides that the General Unsecured Claims in classes 4A and 4B are unimpaired, thereby disenfranchising both classes. *See* Plan §§ 4.4 and 4.23. It is

antithetical to designate a class of Claims as being unimpaired, while at the same time forcing the creditors holding Claims in that class to provide a release and waiver of any rights whatsoever.

18. The Debtors may point to Section 10.3's "except as otherwise expressly provided herein" qualifier to mean that the unimpairment of General Unsecured Creditors under sections 4.4 and 4.23 of the Plan effectively trumps Section 10.3. But if that is what the Debtors mean, that is what the Plan should say. In other words, Section 10.3 should expressly carve out the General Unsecured Claims in Classes 4A and 4B from the reach of the Section 10.3 Release.

### C. The Improper Release and Waiver Provisions of Section 10.3 of the Plan and Paragraph 13 of the Plan Supplement Are Particularly Prejudicial to Those Vendors and Other Creditors That May Be Targets of the Assigned Claims and Causes of Action Being Assigned to the Fire Victims Trust.

19. The Section 10.3 Release as well as Paragraph 13 of the Plan Supplement will have an outsized impact upon the Debtors' vendors. Section 6.7 of the Plan provides that the Debtors will, as partial consideration for the settlement of the Fire Claims, assign their rights, Interests and Claims (the "Assigned Rights and Causes of Action") against their "vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management)" (collectively, the "Vendors") to the Fire Victim Trust that is expected to "prosecute or settle all Assigned Rights and Causes of Action."[4] And the TCC has made clear that it intends for those Claims to be aggressively pursued. Other unsecured creditors, such as non-fire tort claimants, will also be stripped of similar rights.

20. By stripping Vendors and other unsecured creditors of "any and all Claims, Interests, rights and liabilities that arose prior to the Effective Date" via the improper Section 10.3 Release, as well all pre-petition rights to indemnification against the Debtors, whether preserved

---

[4] See also, Schedule of Assigned Rights and Causes of Actions, which is Exhibit E to the Plan Supplement.

by proof of claim or not, the Plan will place the Vendors at a distinct disadvantage when faced with the Fire Victim Trust's prosecution of the Debtors' Claims. That the Section 10.3 Release deprives the Vendors and other unsecured creditors of any rights of contractual and/or equitable indemnification, contribution, offsets, and other defenses they held on a prepetition basis and would otherwise retain in the absence of the Section 10.3 Release is confirmed by the language of Paragraph 13 of the Plan Supplement.

21. Moreover, the channeling injunction included in Section 10.7 provides a prohibition on actions against the Debtors arising from Fire Claims, and the definition of Fire Claims includes "other litigation costs stemming from the Fires." Plan § 1.78(m). Similarly, the injunction contained in Section 10.6 precludes:

> all Persons who have held, hold, or may hold Claims or Interests are ... permanently enjoined from: ... (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing.

It is possible that such prohibitions could also bar any claims for indemnification or contribution against the Debtors whether arising from an action by the Fire Victims Trust or third-parties. At a minimum, the Plan should clarify that, notwithstanding anything to the contrary in the Plan, any and all unsecured creditors' rights are not impaired and may be asserted against the Debtors or, with respect to action brought against a Vendor by the Fire Victims Trust, against the Fire Victims Trust as defenses.

22. The inequity of the Vendors losing their ability to assert pre-existing rights and defenses against the onslaught of litigation to come from the Fire Victims Trust, purely because those Vendors are receiving distributions under the Plan, cannot be overstated. To remain unimpaired, all General Unsecured Creditors must retain all of the rights that they currently possess against the Debtors' estates and third-parties.

23. As drafted, however, the Section 10.3 Release and Paragraph 13 of the Plan Supplement will together, by their express terms, destroy these rights and absolve the Debtors and Reorganized Debtors from any liability.[5]  In addition, the Vendors also stand to lose certain other legal rights.  Specifically, under California Code of Civil Procedure § 877.6(c), where a joint tortfeasor reaches a "good faith" settlement with an injured party, such settlement "bar[s] any other joint tortfeasor . . . from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity."  CAL. CODE CIV. PROC. § 877.6(c).  To the extent the Court approves the Debtors' settlement with the TCC incorporated into the Plan without expressly preserving the Vendors' indemnification and contribution rights, this settlement may trigger California Code of Civil Procedure § 877.6(c), further depriving the Vendors of their rights notwithstanding their purported unimpairment.

24. Given that Claims against the Vendors will be transferred to the Fire Victims Trust and there is a clear expectation that at least some of these Claims will be pursued by the Fire Victim Trustee, the Vendors may find themselves liable for millions of dollars in damages—and for what reason: because they waited well over a year to receive payment to which they were always entitled on their Claims against a solvent debtor, all while being disenfranchised under the Plan.  It is inequitable for the Debtors to expose the Vendors and other unsecured creditors to this liability

---

[5] In addition to the explicit Section 10.3 Release, Section 5.13 of the Plan provides the Debtors with the ability to automatically set off or recoup amounts from Allowed Claims, without any stated right of creditors to challenge such setoff or recoupment.  Moreover, Article VIII of the Plan is not explicit that counterparties' indemnification and contribution rights are being assumed or that Claims for indemnification and contribution may be included in a creditors' rejection damages Claim.  The UCC requested that the Plan be clarified that creditors retain their rights to dispute any setoff or recoupment and that contractual indemnification obligations be discussed in connection with the assumption/rejection of executory contracts and unexpired leases.  The Debtors refused, arguing that all such rights to challenge setoff and recoupment were retained, and that applicable law required all rights and obligations to be assumed if an executory contract is assumed.  At a minimum, to avoid any ambiguity, the Debtors should state on the record that this remains their understanding.

while stripping them of valuable rights and defenses without at least giving them the right to vote on the Plan that harms them in this way.

25. It is of the utmost importance to the Reorganized Debtors' future that the Vendors be treated fairly, and their relationship with the Debtors is not compromised. Many of the Vendors are tree trimmers and other contract parties involved in vegetation management. Judge Alsup of the United States District Court for the Northern District of California has noted that "PG&E has repeatedly blamed the lack of contract crews for its shortfalls in vegetation compliance." *See Order to Show Cause*, dated January 16, 2020 [Docket 1133]. As a condition of PG&E's criminal probation, Judge Alsup has ordered that the Debtors comply with the California Public Resources Code and its wildfire mitigation plan.[6] However, to the extent that these Vendors are forced to pay substantial damages to the Fire Victims Trust without the ability to assert indemnification and/or contribution rights, they may be either put out of business or unwilling to work again for the Reorganized Debtors. This will cause the Reorganized Debtors to fall further behind in meeting their vegetation management requirements – an outcome that should be troubling to all constituents.

26. The Debtors may also argue that the Section 10.3 Release, in compliance with section 1141 of the Bankruptcy Code, only discharges those indemnification/contribution rights that were preserved in the timely filed proofs of claim. But, as noted, that argument is belied

---

[6] In his recent *Order Modifying Conditions of Probation*, dated April 29, 2020, Judge Alsup wrote that "[a]fter the disasters of 2017 and 2018, PG&E ramped up its outsourcing. It now has under contract over 1,000 "pre-inspectors" to flag trees that violate clearance requirements, and roughly 5,000 tree-trimmers to follow behind to remove hazard trees and limbs. This large uptick in effort has only made a small dent in the backlog of hazard trees and non-compliant vegetation management. Even if this effort had been perfectly executed, it will still take close to a decade to come into compliance with California law. But this effort is *not* being perfectly executed - far from it." As such, Judge Alsup ordered that the Debtors "shall ensure that sufficient resources, financial and personnel, including contractors and employees, are allocated to achieve the foregoing. If PG&E cannot find enough contractors, then PG&E must hire and train its own crews to trim and remove trees. To ensure that sufficient financial resources are available for this purpose, PG&E may not issue any dividends until it is in compliance with all applicable vegetation management."

by Paragraph 13 of the Plan Supplement. In any event, a claim only "arises" for bankruptcy purposes and thus may be discharged when the claimant has a fair basis for contemplating that it might have a claim against the debtor prior to the discharge. *See Picerne Constr. Corp. v. Castellino Villas (In re Castellino Villas, A. K. F. LLC)*, 836 F.3d 1028, 1034 (9th Cir. 2016) (citing *Cal. Dep't of Health Servs. v. Jensen (In re Jensen),* 995 F.2d 925, 931 (9th Cir.1993)). It would be "error for the bankruptcy court to discharge [an] indemnity claim . . . without first determining that the parties could fairly contemplate the claim prior to the termination of the bankruptcy proceedings." *Hexcel Corp. v. Stepan Co. (In re Hexcel Corp.)*, 239 B.R. 564, 570 (N.D. Cal. 1999). It is difficult to imagine that most unsecured creditors in these cases, often unsophisticated small businesses, could have reasonably contemplated prior to the bar date that causes of action against them would be assigned to a third-party while their indemnification and contribution rights would be cut-off.[7]

27. It is true that some courts, in the context of third-party releases, have adopted the view that unimpaired creditors have no standing to object to the Plan and should be deemed to have consented to all Plan provisions, including any releases contained therein. *See, e.g.*, *In re Indianapolis Downs, LLC*, 486 B.R. 286, 306 (Bankr. D. Del. 2013) ("[T]he third party releases in question bind certain unimpaired creditors who are deemed to accept the Plan: these creditors are being paid in full and have therefore received consideration for the releases."). Other courts, however, have rejected this view and found that creditors subject to non-consensual third-party releases cannot be unimpaired. *See, e.g.*, *In re Chassix Holdings*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) ("[I]t is difficult to understand" how a creditor can be described as unimpaired if, in exchange for full satisfaction of its claim, that creditor "must release a claim against a third party under a plan."); *In re Genco Shipping & Trading Ltd.,* 513 B.R. 233, 270 (Bankr. S.D.N.Y. 2014) ("The Court agrees that simply classifying a party as unimpaired does not mean that they should

---

[7] The bar date was October 21, 2019, and the Restructuring Support Agreement with the TCC was filed on December 9, 2019 [Docket No. 5038] and approved on December 19, 2019 [Docket No. 5174].

be somehow automatically deemed to grant a release.").[8]  This latter line of cases is more persuasive and should be applied by analogy to the Section 10.3 Release.

28.　Based on the foregoing, it is both against the law and fundamentally inequitable for the Plan to designate General Unsecured Claims as unimpaired, thereby disenfranchising them, while eviscerating their valuable prepetition contractual, legal and equitable rights.  As a result, the Section 10.3 Release should be removed from the Plan.

## II.　Remaining Plan Issues.

### A.　Holders of General Unsecured Claims Should Be Treated the Same As Other Creditors Regarding the Timing of Plan Distributions.

29.　The Plan provides for the payment of Allowed General Unsecured Claims (Classes 4A and 4B) on the Effective Date "*or as soon as reasonably practical thereafter.*"  [Plan §§ 4.3, 4.4, 4.22, 4.23, 5.4] (emphasis added).  At the same time, the Utility Public Entities Wildfire Claims (Class 5B-I) will be paid "on the Effective Date, or as soon as reasonably practicable thereafter, *but in no event later than thirty (30) days after the Effective Date.*"  [Plan § 4.24] (emphasis added).  If the Debtors can commit to pay some Allowed Claims no later than 30 days after the Effective Date, there is no reason for the Plan not to put a 30-day outside boundary on what is "reasonably practical" for the payment of General Unsecured Claims as well.  Holders of General Unsecured Claims should not be treated any different than other unsecured creditors, and the payment of their Claims should be uniform.

### B.　The UCC Should Have the Right to Review and Respond to Plan Modifications Affecting General Unsecured Creditors.

30.　The Plan provides that it may be "amended, modified, or supplemented … so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests hereunder."  Plan §12.6.  The Plan further provides that:

> [p]rior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the

---

[8] Furthermore, even those courts that presume the consent of unimpaired creditors view the lack of an objection as a key factor in approving such releases. *See, e.g.*, *In re Spansion, Inc.*, 426 B.R. 114, 144 (Bankr. D. Del. 2010) (overruling U.S. Trustee's objection to deemed consent by unimpaired creditors where "no creditor . . . whose rights are affected by the 'deemed' acceptance language has objected to the Plan," and stating that "the silence of the unimpaired classes on this issue is persuasive").

> Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests.

*Id*. In both instances, what is "material" or "adversely affects" unsecured creditors is left entirely in the Plan Proponents' discretion. As the Court is aware, statutory committees have a responsibility, as well as the right, to participate fully in the plan process. *See, e.g.*, *In re Mortgage & Realty Trust*, 212 B.R. 649, 652 (Bankr. C.D. Cal. 1997) (creditors' committees provide "needed checks and balances in the reorganization process").

31. The UCC has previously requested that it be given the right to review any proposed Plan amendment that may be reasonably expected to impact the rights of the Debtors' General Unsecured Creditors and a reasonable amount of time to object to any such proposed amendment, if warranted. The Debtors have denied this request. As such, the UCC requests that the Court require the Debtors to amend the Plan accordingly.

### C. The Plan Must Provide for Payment of Indenture Trustees' Fees and Expenses.

32. The various Funded Debt Documents to which the Debtors are parties compel the payment of the applicable trustees' fees and expenses, costs, and other disbursements (the "<u>Trustee Fees</u>"). They also provide these trustees with indemnification rights. Notwithstanding these continuing rights and obligations, the Debtors have resisted including language in the Plan to confirm these rights for the trustees of notes in impaired classes, arguing that the Noteholder RSA excluded these rights and that the relevant trustees should pursue their rights through their charging liens.[9] However, the trustees were not parties to the Noteholder RSA, and the noteholders that were parties (which is only a subset of all noteholders) did not have the right to waive the trustees'

---

[9] For example, Section 5.6 states that "Distributions in respect of Allowed Funded Debt Claims and Allowed Utility Senior Notes Claims shall be subject in all respects to the right of the applicable Funded Debt Trustee to assert its Charging Lien, if any, against such distributions."

rights. Moreover, the Noteholder RSA did not alter the payment rights of the trustees or the Debtors' payment obligations to them.

33. The Trustee Fees constitute direct Claims of the trustees against the Debtors. Regardless of whether these Claims have administrative or general unsecured status, the Plan provides for payment in full of both categories of Claims on the Effective Date. *See* Plan §§ 2.1, 4.4, 4.23. And yet, the Plan attempts to carve out the Trustee Fess from such categories without explanation or justification. The Debtors may not simply ignore their obligations to pay these Claims.

34. If the Trustee Fees are deemed Administrative Claims, as provided in the applicable Funded Debt Documents and section 503(b) of the Bankruptcy Code, pursuant to section 1129(a)(9) of the Bankruptcy Code, the Plan cannot be confirmed until such Claims are paid in full. Alternatively, if the Trustee Fees are deemed General Unsecured Claims, then without direct payment in full from the Debtors, the trustees will be impaired, as their payment rights will be altered. As discussed above, the Plan may not alter the rights of unsecured creditors without impairing them, and granting them a right to vote on the Plan. In other words, the Plan as presently structured requires that the Claims for Trustee Fees be paid in full.

35. Rather than pay such Claims, the Debtors are forcing trustees to assert Charging Liens against distributions under the Plan, even while the Debtors are requesting that the various trustees make distributions to holders under the Plan. While this may result in payment to the trustees, there is no guarantee that all Claims, such as indemnity Claims, which may arise after distribution, will be paid in full. The Debtors have also selectively determined which trustees to pay and which not to pay, which will result in disparate and discriminatory treatment of the trustees and holders. The Debtors' forced invocation of the Charging Lien as to certain trustees and holders will also dilute and reduce the distributions to holders and make the distribution process more

cumbersome with likely unnecessary delays. As a solvent debtor, there is no reason or basis for the Debtors to force certain trustees to seek alternative payment from other non-Debtor parties.

### D. The Debtors Must Pay Postpetition Interest at the Rate Ultimately Determined Appropriate.

36. The Plan provides that unsecured creditors will be paid postpetition interest at the Federal Judgment Rate. As the Court is aware, various parties, including the UCC, participated in briefing and argument regarding the appropriate rate of postpetition interest in solvent-debtor cases. This Court ultimately ruled that the rate should be the federal judgment rate. *See Interlocutory Order Regarding Postpetition Interest*, entered Feb. 6, 2020 [Docket No. 5669]. This ruling has been the subject of an appeal to the District Court. *See Ad Hoc Committee of Holders of Trade Claims, et al. v. PG&E Corp. et al.*, Case No. 20-cv-01493 (N.D. Cal. 2020).

37. That appeal was denied as interlocutory, with the District Court stating that "the true litigation here is the plan confirmation process, of which the postpetition interest issue is just one piece of the puzzle." *Order Denying Motion for Leave to Appeal*, Case No. 20-cv-01493 [Docket No. 62] at 14 (internal quotation omitted). The District Court also noted that "the Debtors are on record that 'if we lose . . . , we will amend the plan to unimpair [the affected creditors] by paying the postpetition interest rate to which those creditors are entitled." *Id.* at 10 (citing Sept. 24, 2019 Hr'g Tr. at 28:13-15).

38. The UCC continues to believe that the Federal Judgment Rate is not the correct rate of interest in a solvent debtor case, and as such, renews its objection to confirmation of the Plan on each of the grounds set forth in the *Consolidated Opening Brief of the Official Committee of Unsecured Creditors and Other Creditor Groups and Representatives Regarding the Appropriate Postpetition Interest Rate Payable on Unsecured Claims in a Solvent Debtor Case* [Docket No. 4634]. The UCC will not repeat its arguments here, but asserts its objection to preserve this issue for any subsequent appeal.

### E. Cure Amounts Must Include Contract Rate or Applicable State Law Interest Amounts.

39. The Plan provides that all parties to assumed executory contracts and unexpired leases will be paid their applicable Cure Amount. Plan §8.1(a). "Cure Amount" is defined to include:

> the payment of Cash or the distribution of other property (as the parties may agree or the Bankruptcy Court may order) as necessary to (a) cure a monetary default, as required by section 365(a) of the Bankruptcy Code by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors, and (b) permit the Debtors to assume or assume and assign such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

Plan, § 1.40.

40. The UCC believes that this language should be supplemented to make clear that, pursuant to sections 365 and 1123(d) of the Bankruptcy Code, all Cure Amounts will be calculated in accordance with applicable state law, including the contract rate of interest or, in the absence of contract rate, any other applicable state law entitlement. *See In re Westside Print Works, Inc.*, 180 B.R. 557, 560 (B.A.P. 9th Cir. 1995) (applicable state law governs cure amounts under section 365(b) of the Bankruptcy Code); *In re New Investments, Inc.*, 840 F.3d 1137, 1142 (9th Cir. 2016) (finding that a creditor was entitled to receive payment of interest at the post-default contract rate pursuant to section 1123(d)).

### F. General Unsecured Claims Should Not be Subject to Estimation.

41. Section 7.6 of the Plan grants the Debtors broad powers to estimate and cap Claims. Section 502(c) of the Bankruptcy Code mandates the estimation of a contingent or unliquidated Claim for the purpose of its allowance when the fixing or liquidation of the Claim "would unduly delay the administration of the case." 11 U.S.C. § 502(c)(1). As such, there is no need for estimation *unless* awaiting final resolution of a particular Claim would impede the Debtors' ability to confirm the Plan. *See Swift v. Bellucci (In re Bellucci)*, 119 B.R. 763, 778 (Bankr. E.D. Cal. 1990) (declining to estimate under section 502(c)(1) where assets were ample to fund a "full

payment" of a claim and the "uncertain status" of that claim was not an impediment to administration of the case); *Frito-Lay, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir. 1993) (finding no reason to estimate the claim under section 502(c)(1) where the plan at issue was substantially consummated); *In re Avaya Inc.*, 602 B.R. 445, 464 (S.D.N.Y. 2019) (affirming bankruptcy court's decision to decline to estimate a claim "given the size of [that] [c]laim compared to the size of the bankruptcy cases," reasoning that "reserving for the amount asserted by [the creditor would] not unduly delay the administration of the bankruptcy cases") (internal quotation marks and citation omitted).

42. Here, given that the holders of General Unsecured Claims do not have the right to vote on the Plan and that the universe of contingent and unliquidated General Unsecured Claims is not of the size that would impact the Plan's feasibility, resolution of these Claims through a standard claims reconciliation process would not "unduly delay the administration of the case." Accordingly, the UCC has requested that General Unsecured Claims be excluded from the estimation provision. The Debtors rejected this request.

43. The UCC requests that this provision be modified so as to exclude General Unsecured Claims.

### G. The Debtors Must Pay Postpetition Interest on Disputed Claims that Become Allowed Claims.

44. Section 5.3 of the Plan provides that a holder of a Disputed Claim will not receive any postpetition interest unless and until its Claim becomes an Allowed Claim, and then only for the period after such Claim becomes Allowed.[10] Denying parties the right to postpetition interest pending allowance creates a perverse incentive for the Debtors; it incentivizes them to prolong disputes while also granting the Debtors undue leverage in negotiations regarding Disputed

---

[10] Section 5.3 states that "Except as otherwise provided in the Plan, to the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the holder of such Claim shall not be entitled to any interest that accrued thereon from and after the Effective Date."

Claims. To the extent that the Debtors choose to dispute Claims, and such claims ultimately become Allowed, the Debtors must pay postpetition interest on such Claims for the entire period.

45. The Debtors previously informed the UCC that the Plan will be revised to provide that interest will be paid on any Claim that eventually becomes Allowed for the entire period. The UCC requests that the Debtors confirm that understanding on the record and in any amended Plan.

**H.    The UCC Cannot Be Compelled to Grant a Release.**

46. The Plan excludes the UCC from the definition of "Released Parties", but includes the UCC in the definition of "Releasing Parties". Plan § 1.180. The Plan contains no explanation as to why the Debtors believe it may be appropriate to force any party, let alone a statutory committee, to grant a non-consensual and non-mutual release. In fact, granting a non-consensual release is not appropriate. *See In re Hotel Mt. Lassen, Inc.*, 207 B.R. 935, 941 (Bankr. E.D. Cal. 1997) ("In the Ninth Circuit and other jurisdictions that prohibit compelled third-party releases, any third-party release associated with a plan of reorganization draws its vitality from its status as a voluntary contractual agreement between the releasing and the released parties, rather than by virtue of the court's order confirming the plan."). In a typical chapter 11 plan, a creditors' committee, together with its members and professionals, are granted a release in return for giving a release.

47. To the extent the Debtors refuse to provide this customary release to the UCC and its related parties, the UCC should be excluded from the definition of "Releasing Parties."

48. The Debtors previously informed the UCC that the Plan would be revised to remove the UCC from the definition of "Releasing Parties". The UCC requests that the Debtors confirm this understanding on the record and in any amended Plan.

## CONCLUSION

The UCC believes that the modifications requested herein are necessary to fully preserve and protect the rights of the Debtors' General Unsecured Creditors. Given that the Debtors did not seek the votes of these parties, it is imperative that the Plan not negatively affect their rights. Thus, the UCC requests that the Court require the Debtors to make the changes to the Plan set forth herein.

Dated: May 15, 2020

**MILBANK LLP**

*/s/ Gregory A. Bray*
DENNIS F. DUNNE
SAMUEL A. KHALIL
GREGORY A. BRAY
THOMAS R. KRELLER

*Counsel for the Official Committee of Unsecured Creditors*