**MACDONALD | FERNANDEZ LLP**
Iain A. Macdonald (SBN 051073)
Alexander K. Lee (SBN 293724)
221 Sansome Street, Third Floor
San Francisco, CA 94104-2323
Telephone: (415) 362-0449
Facsimile: (415) 394-5544

Attorneys for Creditor,
U.S. TelePacific Corp. dba TPx Communications

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | Case No. 19-30088-DM |
| **PG&E CORPORATION,** | Chapter 11 |
| -and- | (Lead Case) (Jointly Administered) |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **DECLARATION OF JEFFREY NEAL IN SUPPORT OF U.S. TELEPACIFIC CORP. DBA TPX COMMUNICATIONS' OBJECTION TO PLAN SUPPLEMENT IN CONNECTION WITH DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED MARCH 16, 2020** |
| **Debtors.** | |
| ☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors | Date: May 27, 2020<br>Time: 10:00 a.m.<br>Place: 450 Golden Gate Ave.,<br>Crtrm 17, 16th Flr.<br>San Francisco, CA |
| | Honorable Dennis Montali |

I, Jeffrey Neal, declare:

1. I am over the age of 18 years. I am the Senior Manager, Customer Financial Services, of U.S. TelePacific Corp. doing business as TPx Communications (hereinafter "U.S. TelePacific"). The following facts are true and correct of my own personal knowledge. If called upon as a witness, I could and would competently testify as stated in this declaration.

1

2. Each of the documents attached hereto were created in the regular course of U.S. TelePacific business at or near the time of the act, condition or event. As part of my job responsibilities for U.S. TelePacific, I am familiar with the types of records maintained in connection with the account that is the subject of assumption by the debtors and the procedures for creating those types of records. I have access to and have reviewed the books, records and files of U.S. TelePacific that pertain to the agreements with the debtors.

3. U.S. TelePacific provides telecommunications and internet services to PG&E Corporation and Pacific Gas and Electric Company under one billing account ending xxx669.

4. On or about March 11, 2015, U.S TelePacific entered into a Master Service Agreement (the "MSA") and an Addendum to Master Service Agreement ("Addendum") with Pacific Gas and Electric Company doing business as PG&E Corporation to provide high quality and extensive IDM, internet and related services. A true and correct copy of the MSA, Addendum, and current Terms and Conditions are attached hereto as **Exhibit 1.**

5. U.S. TelePacific's billing cycle is thirty days. Pursuant to the MSA, as modified by the Addendum, bills are due and payable not later than sixty days from the invoice.

6. On or about August 17, 2018, U.S. TelePacific and PG&E Corporation, acting on PG&E Corporation's behalf and on behalf of Pacific Gas and Electric Corporation (the original customer), entered into an Addendum to the Telecommunications Account Agreement – Multi-Location Renewal (the "Renewal"). Under the Renewal, U.S. TelePacific agreed to continue to provide high quality and extensive IDM, internet and related services to multiple service locations of PG&E Corporation and Pacific Gas and Electric Corporation for a period of three years. A true and correct copy of the Renewal is attached hereto as **Exhibit 2**.

7. On October 17, 2019, U.S. TelePacific filed a proof of claim in this bankruptcy for $75,627.86 against Pacific Gas and Electric Company (the operating customer).

8. On this account, average monthly charges are approximately $53,000.00 with the highest charge being $57,000.00. Shortly prior to bankruptcy, the $51,711.00 payment for the December 31, 2018 invoice was dishonored. The January 31, 2019 invoice showing the balance due ($108,749.87) is attached hereto as **Exhibit 3**.

Case: 19-30088   Doc# 7301-1   Filed: 05/15/20   Entered: 05/15/20 15:34:17   Page 2 of 36

9.      U.S. TelePacific is demanding that PG&E Corporation and Pacific Gas and Electric Corporation cure all pre-petition and post-petition obligations as a condition of assumption of its executory contract. The total cure amount as of May 15, 2020 is $172,402.21, which is comprised of the $75,627.86 pre-petition claim, $42,774.35 for the April 2020 invoice, and accrued but unbilled amounts that will be shown on the not-yet-issued May 29 invoice that is estimated at $54,000.

10.     U.S. TelePacific is also demanding adequate assurance of future performance. First, U.S. TelePacific is requesting that PG&E Corporation and Pacific Gas and Electric Corporation acknowledge that they are both responsible for payment of U.S. TelePacific's post-confirmation invoices.  Second, because of the time required for billing and payment, and because of the political and operational issues facing the post-confirmation debtors, U.S. TelePacific is demanding a security deposit ($114,000.00 -- about two months of estimated charges) to secure post-confirmation invoices. Like the debtors, U.S. TelePacific is a utility. U.S. TelePacific currently holds $57,000.00 to secure payment of post-bankruptcy administrative utility charges; after confirmation of the debtors' chapter 11 plan, U.S. TelePacific Corp. proposes to credit this $57,000.00 toward the $114,000.00 post-confirmation deposit (so that PG&E Corporation and Pacific Gas and Electric Corporation will only be required to pay an additional $57,000.00 to fund the post-confirmation security deposit).

I declare under penalty of perjury according to the laws of the United States of America that the foregoing is true and correct.  Executed on May 15, 2020, at Las Vegas, Nevada.


/s/ Jeffrey Neal
_____
JEFFREY NEAL

# EXHIBIT 1

# Master Service Agreement

This Master Service Agreement (referred to as "Agreement" or "MSA") is made by and between U.S. TelePacific Corp. and/or its affiliated companies, ("TelePacific", also referred to as "our, us, we"), having its principal place of business at 515 S. Flower Street, 47th Floor, Los Angeles, CA 90071-2201 and the Customer described below ("Customer" also referred to as "you, I"), pursuant to the TelePacific Terms and Conditions which are included in summary.

## Section 1 Customer Information

Company Legal Name (Individual if Sole Proprietorship) Pacific Gas and Electric Company

Doing Business As (DBA) PG&E

Legal Composition: X Corporation ☐ Sole Proprietorship ☐ General Partnership ☐ LLP ☐ LLC   State Organized: CA

Officer/Owner Name & Title

Officer/Owner Name & Title

Main Service Address: 77 Beale Street

| City: San Francisco | State: CA | ZIP Code: 94105 |
|---|---|---|

Billing Address (if different):

| City: | State: | ZIP Code: |
|---|---|---|

Customer's E-mail Address:

## Section 2 Terms and Conditions

### 1. General

These Terms and Conditions are part of the Telecommunications Account Agreement (referred to as "Agreement") between Customer (referred to as "you" and "your") and U.S. TelePacific Corp. and/or its affiliated companies (collectively referred to as "we", "us" and "our"). Services are offered to you by us either under Tariffs (documents which list services, prices and other terms and conditions) filed with the Federal Communications Commission (FCC) and state regulatory agencies having jurisdiction over the Services ("Tariffed Services"), or on a non-Tariffed basis. Tariffs are available online at www.telepacific.com. The rates, terms and conditions of Tariffed Services may change, subject to the approval of the applicable regulatory agency. If the Tariffs for any Services are cancelled as a result of regulatory action during the term of this Agreement, we will publish a Price List and related terms and conditions on our website (www.telepacific.com) which will become part of this Agreement.

### 2. Term, Billing, and Payment

(a) Effective Date. This Agreement is effective when it has been signed by both parties. Upon execution, we will begin as soon as practicable and in accordance with mutually agreed upon implementation schedule and approval by you, the installation, connection and testing of the lines and/or equipment necessary to provide the Services. If you have renewed Services ("Service Renewal") for a new term, ("Renewal Term"), the Effective Date of the Renewal Term is the date of the first invoice after the Service Renewal is entered into our billing system.

(b) Term. The initial term of this Agreement ("Initial Term") will begin the date we provide notice to you that the Services are available for your use which will occur after all services have been installed, tested, and approved in writing This Agreement will continue in effect for the entire Term chosen on the Service Agreement and for any subsequent Renewal Term. The chosen term will automatically renew for successive Renewal Terms of one (1) year each thereafter for up to two additional renewal term periods, unless terminated as provided in Section 4 of this Agreement. However, you may renew Services for a Renewal Term prior to the completion of the Initial Term. You may order additional services at the existing service location, subject to our acceptance, under this Agreement. Services for additional Service Locations may also be ordered, subject to our acceptance, under this Agreement. The initial term for additional Services ordered for additional Service Locations will begin the date we provide notice to you that the services are available for your use, which will occur after all services have been installed, tested and approved in writing and will continue in effect for the entire Term specified on the Service Agreement for the additional Services and shall automatically renew for successive periods of one (1) year each after the end of the Initial Term of the additional Services (each successive period being a Renewal Term for those additional Services), unless terminated as provided in Section 4 of this Agreement. The Terms and Conditions of this Agreement shall extend automatically, following termination, to cover the remaining

Term of any additional Services provided. See Section 4 of this Agreement for additional terms and conditions applicable to terminations and Renewal Terms, including the rates during Renewal Terms.

(c) Billing. We will begin invoicing you for the Services after giving you notice that the Services are available for your use and you have accepted in writing and will continue invoicing you on a monthly basis until the Agreement is terminated. We will bill monthly recurring charges in advance and usage charges after the usage occurs. You are responsible for all sales, gross receipts, use, excise, and other federal, state and local taxes, charges and assessments based on your use of the Services, which will be separately listed on each invoice along with any fees or surcharges applicable to the Services.

(d) Payment. Invoices are due and payable net sixty (60) days from receipt of the bill. You reserve the right to discount payment(s) to us by two percent (2%) of the invoice total amount for payment(s) made to us within fifteen (15) days of the Pay By Date printed on the invoice. If you have a bona fide dispute with any of the amounts on the invoice ("Disputed Amount"), you shall pay all amounts not in dispute by the Pay By Date and provide us with a written request for a billing adjustment, together with all supporting documentation, within 180days after the Pay By Date. If we agree to adjust all or a portion of the Disputed Amount, you will not be obligated to pay a late payment charge on the adjusted amount. If you fail to pay all non-Disputed charges on our invoice by the Pay By Date, we may impose a late payment charge of one percent (1%) per month or the maximum rate allowed by law, whichever is less, on the unpaid balance until the amount is paid.

### 3. Your Obligations

(a) Our Property. Any equipment installed at your premises by us or shipped to you by TelePacific or our authorized third party vendor remains our personal property, and nothing contained in this Agreement shall give or convey to you any right, title or interest in such equipment. You agree not to interfere with or damage the equipment and you agree to reimburse us for any loss or damage that is caused by your intentional or negligent acts or by the intentional or negligent acts of your agents, employees, authorized users or representatives. You will allow us to promptly remove the equipment from your premises or you will promptly return the equipment to us upon termination of the Services for which the equipment was used.

(b) Building Access. You shall obtain all necessary approvals, applicable permits and/or use fees to be attained, if any, for full access by us prior to installation of Service and while Service is provided.

(c) Responsibility for Message Content. You are solely responsible for all content that you make available on or through our Services. You guarantee that all such content will not infringe on, or contain any content that infringes on, or otherwise violates any copyright, patent or any other right held by a third party and that all such content will not violate any applicable law, rule, regulation or industry standard.

(d) Use of Services. You will not use the Services for any illegal, unlawful, abusive or fraudulent purpose and will use the Services in such a manner as to prevent damage to our network. Your proper use of the Services includes conforming to all Acceptable Use Policies ("AUP") that are available on request and are displayed at our web site at www.telepacific.com. The AUP may be amended from time to time.

(e) Third-Party Obligations. You are responsible to pay any third-party vendor charges and to arrange for disconnection and payment of charges related to the disconnection of any related services with your current carrier(s).

(f) Network Security. You acknowledge that it is your responsibility to take whatever actions you deem necessary to make your computer and voice network and circuits adequately secure from unauthorized access. You further acknowledge that we only provide telecommunications services and certain equipment to you and that we are not responsible for the security of your network and circuits from third parties, or for any damages that may result from any unauthorized access to your network. We urge you to seek independent advice with respect to products, equipment (including configurations), and services available to make your computer network and circuits more secure from third parties.
YOU FURTHER ACKNOWLEDGE THAT NONE OF OUR EMPLOYEES, AGENTS, REPRESENTATIVES OR SUBCONTRACTORS HAS MADE, AND THEY DO NOT HAVE THE AUTHORITY TO MAKE, ANY REPRESENTATIONS CONCERNING THE SECURITY OF YOUR NETWORK OR THE SERVICES WE PROVIDE THAT ARE INCONSISTENT WITH THE STATEMENTS CONTAINED IN THIS SECTION 3(e).

## 4. Automatic Renewals; Terminations; Rights and Remedies

(a) This Agreement and any orders for Services submitted under it shall remain in effect until terminated as stated in this Section 4. After the Initial Term, this Agreement will automatically renew for successive periods of one year each and may renew for up to two renewal terms, at our rates then in effect for your Services unless either party notifies the other in writing within the last sixty (60) days of the then-current Term of the intent not to allow this Agreement to renew for a successive Term. However, even after termination of this Agreement for Services ordered for the original location(s) covered by this Agreement, the Terms and Conditions of this Agreement will automatically extend to cover any remaining Terms or Service Agreements for any additional Services to additional Service Locations which have not expired. The Term of any such additional Service Agreements shall be subject to the same automatic renewal and termination notice provisions as are contained in this Agreement. If either party gives the other party the required notice of a decision not to allow the Agreement or the Term of any additional Services to additional Service Locations to renew at the expiration of a Term, actual termination of Services will not occur until the later of the end of the then current Term or thirty (30) days after receipt of that notification. If you elect to terminate the Agreement or any orders for Services before the installation of the Services, you must do so in writing, and you shall pay to TelePacific as a termination charge an amount equal to: (1) the incurred non-recurring charges applicable to the Services, even if initially waived, unless those charges have already been paid,

(b) Either party may terminate this Agreement upon 60 days written notice if the other party materially breaches the terms and conditions of this Agreement and the other party fails to cure the default within the 30-day period, including, but not limited to, your failure to pay our invoices for the Services by the Pay By Date. If you terminate this Agreement after our material breach, then you will be responsible only for charges for the period before the date of termination. If you terminate this Agreement or any Services provided to you for any reason other than our material breach, you shall provide us with written notice 30 days in advance, and the effective date of the termination will be the end of that 30 day notice period for purposes of determining the remaining time over which the termination charge will be calculated. If you do not give us that notice, then the effective date of termination shall be the date we terminate this Agreement. For partial months, remaining monthly recurring charges will be determined on a prorated basis.

(c) The prevailing party in a litigated dispute shall be entitled to recover its reasonable attorneys' fees and court costs.

## 5. Warranty Disclaimer, Limitation of Liability and Indemnity

(a) WARRANTY DISCLAIMER. WITHOUT LIMITING ANY EXPRESS FINANCIAL OR LIABILITY PROVISIONS PROVIDED FOR IN THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY INDIRECT, CONSEQUENTIAL, EXEMPLARY, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES (INCLUDING, WITHOUT LIMITATION, LOST BUSINESS, REVENUE, PROFITS, OR GOODWILL) ARISING IN CONNECTION WITH THIS AGREEMENT OR THE PROVISION OF SERVICES UNDER THIS AGREEMENT (INCLUDING ANY SERVICE IMPLEMENTATION DELAYS/FAILURES), UNDER ANY THEORY INCLUDING WITHOUT LIMITATION TORT, CONTRACT, WARRANTY, STATUTE, STRICT LIABILITY OR NEGLIGENCE, EVEN IF THE PARTY HAS BEEN ADVISED, KNEW OR SHOULD HAVE KNOWN OF THE POSSIBILITY OF SUCH DAMAGES. WE MAKE NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY SERVICE PROVISIONED. WE SPECIFICALLY DISCLAIM ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

(b) Credit Allowances for Interruption of Service. If an interruption or failure of Service is caused solely by us and not by you or any third party or other causes beyond our reasonable control, you may be entitled to a credit allowance not to exceed an amount equivalent to the proportionate charge to you for the affected Service for the time period during which the interruption occurred. The steps you must take to apply for credits are available on our website at www.telepacific.com. We shall not be liable for any act or omission of any other entity furnishing you with facilities or equipment used with the Services, nor shall we be liable for any damages or losses due in whole or in part to your fault or negligence or due in whole or in part to the failure of equipment or facilities that you provide.

(c) LIMITATION OF LIABILITY. NOTWITHSTANDING THE PROVISIONS OF SUB-SECTION (a) OF THIS SECTION 5, NEITHER PARTY'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL EXCEED THE LESSER OF (1) PROVEN DIRECT DAMAGES, (2) THE AMOUNTS YOU PAID TO US FOR THE SERVICES DURING THE PERIOD IN WHICH ANY SERVICE-RELATED PROBLEMS WERE EXPERIENCED (OR (3) THE CREDITS AVAILABLE TO YOU UNDER OUR TARIFFED LIMITATION OF LIABILITY. THE FOREGOING LIMITATIONS APPLY TO ALL CAUSES OF ACTION AND CLAIMS, INCLUDING WITHOUT LIMITATION BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS.

## 6. Miscellaneous Provisions

(a) Assignment and Succession. You may not assign or transfer this Agreement without our prior written consent, which shall not be unreasonably withheld. Any unauthorized assignment or transfer shall be null and void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, legal representatives, successor and authorized assigns.

(b) Governing Law. This Agreement shall be deemed to have been made in the State of California, and shall be construed pursuant to the laws of the State of California without regard to the conflicts of law provisions thereof.

(c) Force Majeure. We shall not be liable for any failure of performance of the Services due to causes beyond our control, including, but not limited to, fire, flood, electric power interruptions, national emergencies, civil disorder, acts of terrorists, riots, strikes, lockouts, work stoppages, Acts of God, or any law, regulation, directive, or order of the United States government, or any other governmental agency, including state and local governments having jurisdiction over us or the Services provided hereunder.

(d) Dispute Resolution.
(i) EXECUTIVE NEGOTIATIONS: The Parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiations between a vice president of PG&E or his or her designated representative and an executive of similar authority of TelePacific Corp. Either Party may give the other Party written notice of any dispute which has not been resolved at a working level. Within 20 days after delivery of such notice, the executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary to exchange information and to attempt to resolve the dispute.
(ii) MEDIATION: If the matter has not been resolved within 30 days of the first meeting of the executives, either Party may at any time thereafter request mediation by written notice to the other Party. The mediation shall be conducted by a mutually-agreeable mediator with experience mediating complex commercial disputes. If the matter has not been resolved with 60 days after the request for mediation, then either Party may initiate litigation.
(iii) Except as otherwise expressly provided in this Agreement, each Party shall continue to perform its obligations under this Agreement pending final resolution of any dispute arising out of or relating to this Agreement.
(iv) CONFIDENTIALITY OF DISPUTE RESOLUTION PROCESS: All negotiations and any mediation conducted pursuant to this provision are confidential and shall be treated as compromise and settlement negotiations, to which Section 1119 of the California Evidence Code shall apply, and Section 1119 is incorporated herein by reference.
(v) PRELIMINARY INJUNCTION: Notwithstanding the foregoing provisions, a Party may seek a preliminary injunction or other provisional judicial remedy if in its judgment such action is necessary to avoid irreparable damage or to preserve the status quo.

(e) Entire Agreement and Modifications. This Agreement and all other documents specifically referred to in this Agreement constitute the entire and final agreement and understanding between you and us with respect to the subject matter of this Agreement and supersede all prior agreements relating to such subject matter, which are of no further force or effect. Any and all exhibits referred to in this Agreement are integral parts of this Agreement and are made a part of this Agreement. This Agreement may only be modified or supplemented by an instrument in writing executed by both your and our duly authorized representatives.

(f) Severability. If any provision of this Agreement is held to be invalid or unenforceable by a court or administrative agency with jurisdiction over the Services, such provision shall be deemed amended to the minimum extent necessary to render it enforceable.

(g) Headings. The headings used in this Agreement are for convenience only and do not in any way limit or otherwise affect the meaning of any of the terms.

(h) Waiver. Under no circumstances shall our failure to enforce any provision of this Agreement in any particular instance be construed as a waiver of that provision.

(i) Notices. (1) All notices from you to us must be in writing and delivered by either email to our designated representative or by certified mail, return receipt requested or by Federal Express or other similar expedited delivery service to: U.S. TelePacific Corp., Attn. General Counsel, 515 S. Flower Street, 47th Floor, Los Angeles, CA 90071-2201. If you are notifying us that you do not wish to renew Services, your written notice may also be by a letter delivered in that manner or by an email to: retention@telepacific.com .

(2)  All notices from us to you must be in writing and delivered by either email to your designated representative, as bill insert with your monthly invoice, by certified mail, return receipt requested or by Federal Express or other similar expedited delivery service to your address listed on the Agreement.

**7. Service Guarantee**
Notwithstanding anything to the contrary contained in this Agreement, you may terminate this Agreement without any further obligation if the Services we provide are not substantially performing up to industry standards during the first 90 days the Services are available for your use. If you elect to terminate the Agreement pursuant to this guarantee, we will reimburse you for all reasonable costs you incurred to reestablish service with your previous service provider not to exceed the amount that you paid to us for installation of the Services. This Service Guarantee only applies if: (a) the cause of the Service deficiency was within our reasonable control; (b) you ordered at least the amount of Services that we recommended to meet your traffic volumes; (c) you give us written notice of the deficiency within the first 90 days after we notified you the Services are available for your use, and (d) we fail to correct the Service deficiency within 15 days after receiving written notice from you of the deficiency.

---

### Section 3 Acceptance

*Initial*  BY PLACING YOUR INITIALS IN THE SPACE PROVIDED, YOU ACKNOWLEDGE THAT YOU HAVE REVIEWED AND AGREED TO THE FULL TERMS AND CONDITIONS SET FORTH ABOVE ON THE DATE ENTERED BY YOU BELOW.

*Initial*  BY PLACING YOUR INITIALS IN THE SPACE PROVIDED, YOU ACKNOWLEDGE THAT YOU HAVE REVIEWED AND AGREED TO THE GENERAL SERVICE LEVEL AGREEMENT (SLA) SET FORTH AT www.insidetelepacific.com (click on SERVICE LEVEL AGREEMENTS at the bottom of the page) ON THE DATE ENTERED BY YOU BELOW

*Initial*  BY PLACING YOUR INITIALS IN THE SPACE PROVIDED, YOU CONSENT TO RECEIVING ELECTRONIC COMMUNICATIONS FROM TELEPACIFIC VIA THE EMAIL ADDRESS PROVIDED IN SECTION 1

By signing below, the person signing on behalf of Customer personally represents and warrants to TelePacific that he or she has the authority and power to sign on behalf of Customer and bind Customer to this Agreement. TelePacific agrees to provide, and the Customer agrees to receive and pay for, those services at locations set forth on the Service Agreements (attached), including any services on subsequent Service Agreements and subsequent changes as long as those changes meet TelePacific's minimum requirements.  This Agreement shall become a binding contract upon execution by Customer and acceptance by TelePacific.

X _____                                   3·11·15
Agreed by: Customer Signature                                       Date

Christopher Hogan                                                   Portfolio Manager
Customer Name (Print)                                              Title

Sales Representative Name                                          Phone

X _____                                   3/11/15
Agreed by: Sales Manager Signature                                 Date

# ADDENDUM TO
# MASTER SERVICE AGREEMENT

This Addendum to Master Service Agreement ("Addendum") is made as of the 4th day of March 2015, by and between **U.S. TelePacific Corp.**, a California corporation, d/b/a TelePacific Communications, 515 S. Flower Street, 47th Floor, Los Angeles, CA 90071-2201 ("TelePacific") and **Pacific Gas and Electric Company**, a California corporation, headquartered at 245 Market Street, N5D, San Francisco, CA 94105 ("Customer").

This Addendum amends and modifies that certain Master Service Agreement between TelePacific and Customer signed by Customer on the ___ day of _____, 20__, ("Agreement") for Services at various locations as follows:

1.      Based on the volume of Services renewed and additional Services purchased by Customer and the competitive conditions in the marketplace for telecommunications services, TelePacific hereby agrees to provide (a) SmartVoice PRI Services to Customer for twelve (12) Service Locations and (b) Internet Services to two (2) call center Service Locations for a three (3) year Term subject to the Terms and Conditions as modified by this Addendum as set forth below. The twelve (12) SmartVoice PRI Service Locations and two (2) call center Service Locations with related Services and pricing are listed in Exhibit A attached hereto and incorporated herein by this reference.

2.      Said Exhibit A is in lieu of fourteen (14) separate Service Agreements and by signing this Addendum, Customer is agreeing, as if signing fourteen (14) separate Service Agreements, to purchase the Services listed in Exhibit A for the Term under the Terms and Conditions of the Agreement.

3.      As of completion of the Initial Term which shall be the third (3rd) anniversary of the date that Services are available for Customer's use at the final installed Service Location, if Customer's total Monthly Recurring Charges ("MRCs") paid at all Service Locations during the Initial Term ("Total MRCs Paid") are less than sixty-five percent (65%) of the total MRCs for Services at all Service Locations for which Customer contracted at the commencement of this Agreement for the Initial Term ("Total Term Commitment"), Customer shall pay the shortfall between the Total Term Commitment and the Total MRCs Paid.

4.      TelePacific shall provide Customer with two (2) Flex Checks in the amount of $1,000.00 each for a total of a $2,000.00 credit which shall be credited to Customer's account by applying a monthly credit of $500.00 on each Customer invoice over a period of four (4) consecutive months.

5.      Customer may purchase Services listed in Exhibit B at additional locations at the same Monthly Recurring Charges.

6.      TelePacific shall provide Customer with 3Mbps of data bandwidth and up to 48 SmartVoice SIP call paths ("Trial Service") at no cost to Customer for a period of ninety (90) days, which shall begin when the Trial Service is installed and ready for use by

1

Customer. Customer shall either transition to 2000 SIP Call Path ("Permanent Service") at the end of the ninety (90) day period or provide TelePacific with specific limitations of interoperability for industry standard SIP trunking between TelePacific's SmartVoice SIP service and Customer's phone system. Should Customer require Trial Service beyond ninety (90) days, TelePacific shall invoice and Customer shall pay a monthly recurring charge of $775.00 for said service.

7.      All of the other provisions of the Agreement shall remain in full force and effect.

U.S. TelePacific Corp.,                    Pacific Gas and Electric Company,
a California corporation                   a California corporation

By: _Claude Teusley_                      By: _____

Name: _Claude Teusley_                    Name: _Christopher Haymn_

Title: _AGENT MANAGER_                    Title: _Portfolio Manager_

2



IMPORTANT:  SECTION 8 OF THESE TERMS AND CONDITIONS INCLUDES A PROVISION REGARDING BINDING ARBITRATION AND A WAIVER OF CUSTOMER'S RIGHT TO JURY TRIALS AND CLASS ACTIONS.

## 1.  General

(a)  <u>Incorporation of TAA or MSA</u>.  These Terms and Conditions (these "Terms and Conditions") to the Telecommunications Account Agreement ("TAA") or Master Service Agreement ("MSA") (referred to herein, as so amended and modified, as the "Agreement") are part of the Agreement between Customer and U.S. TelePacific Corp.  All capitalized terms used but not defined herein will have the meanings given to such terms in the TAA or MSA (as applicable).  "TPx" as used in the Agreement means the TPx entity executing the TAA or MSA and/or its Affiliates.

(b)  <u>Services</u>.  Services are offered to Customer by TPx either under tariffs (i.e., documents which list services, prices and other terms and conditions, referred to herein as "Tariffs") filed with the Federal Communications Commission and state regulatory agencies having jurisdiction over the Services ("Tariffed Services"), or on a non-Tariffed basis ("Non-Tariffed Services").  Tariffs are available online at www.tpx.com/tariffs.  All services provided under the Agreement are collectively referred to as the "Services."  In the event that the rates and terms in the Agreement conflict at any time with those set forth in TPx's federal and/or state Tariffs applicable to the Services, the rates and terms of the Tariffs will control.  The rates and terms of Tariffed Services may change, subject to the approval of the applicable regulatory agency.  If the Tariffs for any Services are cancelled as a result of regulatory action during the term of this Agreement, TPx will publish a revised price list and related terms and conditions for such Services on its website (www.tpx.com/rates) which will become part of the Agreement. In the event that any agreement between the parties is terminated and Tariffed Services are still provided by TPx, applicable Tariff rates and terms will apply to the Tariffed Services provided to Customer.

(c)  <u>Pass Through of Price Increases</u>.  TPx may increase the rates for non-Tariffed Services to pass through any price increases imposed on it or its Affiliate by the providers of the underlying facilities used to provide the Services or, in the case of long distance services, by wholesale providers of such services.  "Affiliate" means any entity that, directly or indirectly through one or more intermediaries, controls or is controlled by or under common control with a party, and where the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting securities, by contract or otherwise.

(d)  <u>Revisions</u>.  TPx may change the rates and terms applicable to Non-Tariffed Services ("Revisions") by giving Customer at least thirty (30) days prior written notice.  Customer will receive notice of the Revisions at least thirty (30) days prior to the effective date of any change.  Such notice will generally be provided in Customer's monthly invoice.

(i)  With regard to any such Revisions that are changes to the terms and conditions, Customer will then have thirty (30) days from the date of the invoice to provide TPx with written notice that the Revisions to the changed terms or conditions will have a material adverse effect on Customer's use of the Service(s).  If TPx is able to verify such adverse effect and eliminate the adverse effect, TPx will provide Customer with a written addendum to the Agreement to confirm Customer's assent to the elimination of the adverse effect on the Services(s).  However, if TPx is unable, after making a commercially reasonable effort, to eliminate the Revision's impact on such Service(s), TPx will notify Customer and Customer may terminate the impacted Service(s) without further obligation to TPx beyond the termination date, including termination charges, if any.  If Customer does not notify TPx in writing of Customer's election to terminate the affected Service(s) for changed terms or conditions within five (5) business days after receipt of written notice of TPx's inability to eliminate the Revision's impact, Customer will be deemed to have consented to the Revisions and to a continuation of the Service(s), subject to the Revisions.

(ii)  With regard to any such Revisions that materially increase the rates applicable to any of the Non-tariffed Services, except for pass-through rate increases, Customer may terminate the affected Service(s)

Case: 19-30088   Doc# 7301-1   Filed: 05/15/20   Entered: 05/15/20 15:34:17   Page 12 of 36


without further obligation beyond the termination date, including termination charges, if any, provided Customer notifies TPx in writing of its election to so terminate the affected Service(s) for such rate increase at least five (5) business days before the effective date of the rate increase. If Customer does not notify TPx in writing of Customer's election to terminate the affected Service(s) for increase in rates prior at least five (5) business days prior to the effective date of the rate increase, Customer will be deemed to have consented to the Revisions and to a continuation of the Service(s) subject to the Revisions.

(iii)     If Customer terminates Services pursuant to this Section 1(d), Customer exercising such termination right will be its sole and exclusive remedy for TPx's failure to provide the terminated Services.

(e)     <u>Expedite Fee</u>. Under certain conditions, Customer may request that installation of Services be expedited by agreeing to pay a fee (the "Expedite Fee"). No projected date for expedited installation is guaranteed. Payment of the Expedite Fee only earns an advanced priority for installation process and installation is not entirely in TPx's control. No credit or refund of the Expedite Fee will be made for delay of the installation date beyond the projected or requested date. A list of Expedite Fees is available at: [www.tpx.com/rates](http://www.tpx.com/rates).

(f)     <u>Additional Increase in Charges</u>. In addition to rate increases associated with Revisions as set forth above, a change in the manner in which TPx delivers Services to Customer may result in an increase in rates for those Services. Also, if a portion of the Services requires third party construction or other infrastructure, additional third party charges may apply. If TPx cannot deliver Services to Customer at the rates it has agreed to pay because of the cost of the technology used or additional third party costs required to deliver the Services, including an acceptable profit margin, TPx will notify Customer in writing before any change in the technology is used and seek Customer's consent to a change in the rates or additional charge of the affected Service. TPx may delay the installation of any change in technology until Customer has responded to the increased rate or additional charge. If Customer does not notify TPx in writing of Customer's refusal to consent to the increased rate within five (5) business days after receipt of notice from TPx of such increase, Customer will be deemed to have consented to the increase in rate or additional charge. If Customer objects to such increase or charge within five (5) business days, either party may terminate the affected Service on written notice without further obligation beyond the date of termination, including for termination charges. Customer's right to terminate will be its sole and exclusive remedy for TPx's failure to provide the terminated Services.

**2.     Term, Billing, and Payment**

(a)     <u>Agreement Effective Date</u>. The Agreement is effective when the TSA or MSA has been signed by Customer and accepted by TPx (the "Agreement Effective Date"), either by execution on behalf of TPx or by TPx commencing the Services delivery process. Thereafter, TPx will begin as soon as practicable the installation, connection and testing of the circuits and/or equipment necessary to provide the initial Services.

(b)     <u>Agreement Term</u>. The Agreement including these Terms and Conditions will expire immediately upon the expiration or termination of the last Service Agreement pursuant to which Services are provided under this Agreement; provided, however, that any amounts due under any related equipment addendum (each, an "Equipment Addendum") shall remain due and payable by Customer irrespective of any such expiration or termination.

(c)     <u>Service Term</u>. The initial term of the Services (the "Initial Service Term") provided under each Service Agreement thereunder (each, a "Service Agreement") will begin the date TPx provides notice to Customer that the Services are available for its use, unless otherwise provided in the Service Agreement. After the Initial Service Term, unless otherwise set forth in a Service Agreement, the applicable Service Agreement will automatically renew for successive periods of one year each at the rates then in effect for Customer's Services unless either party notifies the other in writing of non-renewal within the last sixty (60) days of the then-current Service Term of non-renewal (each a "Service Renewal Term" and together with the Initial Service Term, the "Service Term"). However, the termination of Services will not occur until the later of the end of the then-current Service Term or thirty (30) days after receipt of that notification. If Customer continues to use Service(s) after such date, it will receive and pay for Service(s) under the applicable Service Agreement on a month-to-month basis.

v082319

Case: 19-30088     Doc# 7301-1     Filed: 05/15/20     Entered: 05/15/20 15:34:17     Page 13
of 36


(d)  Non-Automatic Renewal Term.  Customer may renew Services under a Service Agreement for a Service Renewal Term prior to the completion of the Initial Service Term (a "Non-Automatic Renewal Term").  The beginning of this Non-Automatic Renewal Term is the date of the first invoice after the renewal of the Service for the Non-Automatic Renewal Term is entered into TPx's billing system.  Customer may order additional Services at Customer's existing service location(s) under the applicable Service Agreement.  The additional Service(s) will have a Service Term coterminous with the Service Term or Renewal Term of the existing Service(s) at said service location, subject to TPx's acceptance.  Services for additional service locations may also be ordered, subject to TPx's acceptance, under the applicable Service Agreement.  The Service Term for additional Services ordered for additional service locations will begin the date TPx provides notice to Customer that the Services are available for Customer's use, will continue in effect for the entire Service Term specified in the Service Agreement for the additional Services and will automatically renew for successive periods of one (1) year each after the end of the Service Term of the additional Services (each successive period being a Renewal Term for those additional Services), unless terminated as provided in these Terms and Conditions.

(e)  Billing.

(i) TPx will begin invoicing Customer for the Services and other charges after TPx gives Customer notice that the Services are installed and available for Customer's use and will continue invoicing on a monthly basis until the applicable Services are no longer provided.  TPx will bill monthly recurring charges in advance and usage charges after the usage occurs.  Customer is responsible for all other charges and government fees and taxes which will be separately listed on each invoice.  Notwithstanding the foregoing, each party will be responsible for its own income taxes and employment taxes.  The parties will cooperate in good faith to minimize taxes to the extent legally permissible.  Each party will provide to the other party any resale exemption, multiple points of use certificates, treaty certification and other exemption information reasonably requested by the other party.  TPx may require, in its discretion, that Customer provide a deposit or other assurance of payment before the Services are provided and/or thereafter.  Any required deposit will not bear interest unless required by law.  If Customer delays acceptance of the Services after receiving notice that Services are available, TPx may, in its sole discretion, begin invoicing Customer for the ordered Services.  If Customer continues to delay acceptance of the Services for more than sixty (60) days after the date the Services are available, Customer will have materially breached this Agreement, and TPx will be entitled to terminate this Agreement without further notice and to pursue the remedies in Section 4 of these Terms and Conditions.

(ii) TPx will invoice Customer for any equipment purchased or rented by TPx, whether by installment purchase option or otherwise, pursuant to the terms of the related Equipment Addendum. Payments for equipment are separate and independent of any payments owing by Customer for Services.

(f)  Back-billing.  TPx will endeavor to bill Customer for charges on a timely basis.  However, unless proscribed by state regulation, Customer will nevertheless be liable for all charges irrespective of any delay in billing, whether due to error, lack of necessary data, negligence or any other reason.  No such delay will constitute a basis for a claim of waiver, estoppel or other excuse of Customer's obligation to pay TPx's charges, irrespective of the length of the delay.  Nothing herein will toll the running of any statute of limitations applicable to such obligations.

(g)  Payment.  Invoices are due and payable upon presentation, and become past due after the Pay By Date printed on the invoice.  If Customer has a bona fide dispute with any of the amounts on the invoice ("Disputed Amount"), it will pay all amounts not in dispute by the Pay By Date and provide TPx with a written request for a billing adjustment, together with all supporting documentation, within forty-five (45) days after Customer's receipt of the invoice or Customer's right to any billing adjustment will be waived.  If TPx agrees to adjust all or a portion of the Disputed Amount, Customer will not be obligated to pay a late payment charge on the adjusted amount.  If Customer fails to pay all non-Disputed Amounts on an invoice by the Pay By Date, TPx may impose a late payment charge of 1.5% per month or the maximum rate allowed by law, whichever is less, on the unpaid balance until the amount is paid.  TPx may also suspend Customer's services until all delinquent amounts, including late payment charges, are paid in full.  An additional charge will apply to each returned check.  Payment must be made in U.S. Dollars.

v082319



(h)  Match Period.  If the Service Term for the Services initially to be provided under an applicable Service Agreement when it is first entered into by the parties is for sixty (60) months or more and the initial Services have been installed for at least twenty-four (24) months, Customer may provide TPx at retention@tpx.com with a bona fide, written quote of a lower monthly charge for a term at least equivalent to the remaining months in the Service Term from a competitive carrier for substantially the same initial Services with the same terms as provided pursuant to the Agreement and all Addenda, and TPx will have thirty (30) days (the "Match Period") after receipt of the bona fide written quote to match or beat the competitive provider's offer.  If TPx fails to provide the initial Services at the lower rate, Customer may terminate the initial Services without liability for early termination in a notice provided to TPx not less than thirty (30) days after the expiration of the Match Period.  Notwithstanding the foregoing, Customer may provide only one such quote under the Agreement.  For this Section 2(h) to apply, the quote from the competitive carrier must be for the same service location as initially set forth in the applicable Service Agreement and for the same initial configuration of Services.

## 3.  Customer's Obligations

(a)  Building Access.  Customer will obtain all necessary approvals, applicable permits and/or use fees to be attained, if any, for full access by TPx and its subcontractors prior to installation of the Service(s) and while the Service(s) is (are) provided.

(b)  Responsibility for Message Content.  Customer is solely responsible for all content that it makes available on or through the Services.  Customer represents and warrants that all such content will not infringe on, or contain any content that infringes on, or otherwise violates any copyright, patent or any other right held by a third-party and that all such content will not violate any applicable law, rule, regulation or industry standard.

(c)  Use of Services.  Customer will not use the Services for any illegal, unlawful, abusive or fraudulent purpose and will use the Services in such a manner as to prevent damage to TPx's network.  Customer's proper use of the Services includes conforming to all Acceptable Use Policies ("AUP") that are available on request and are displayed at TPx's web site at www.tpx.com/acceptable-use-policy.  The AUP may be amended from time to time.  If TPx materially changes the AUP, it will provide the same right to notification and cancellation as provided in Section 1(d) of these Terms and Conditions. Resale and distribution of all or any portion of the Services is prohibited.

(d)  Third-Party Obligations.  Customer is responsible to pay any third-party vendor charges for third party vendors retained by Customer, such as retaining a vendor for installation of necessary inside wiring.  Also, Customer is responsible to arrange for disconnection and payment of charges related to the disconnection of any related services with Customer's current provder(s).  Disconnection of such services may not be delegated to TPx.

(e)  Customer Local Area Network Responsibilities. Customer agrees to comply with TPx-provided Local Area Network (LAN) guidelines posted at www.tpx.com/support/ and acknowledges that all network configurations as well as hardware and software located at Customer's physical location(s) conforms to the specifications outlined by TPx based on the contracted TPx services.

(f)  Network Security.  Customer is responsible for taking whatever actions it deems necessary to make Customer's computer and voice network and circuits adequately secure from unauthorized access.  Customer acknowledges that TPx only provides telecommunications services and certain equipment to Customer and that TPx is not responsible for the security of Customer's network and circuits from third parties, or for any damages that may result from any unauthorized access to Customer's network.  Customer will follow the Fraud Guidelines provided at www.tpx.com/fraud-guidelines.  Failure to follow the steps provided may result in a greater likelihood that Customer's network will be exposed to fraud.  Customer acknowledges that TPx has recommended that Customer seek independent advice with respect to products, equipment (including configurations) and services available to make Customer's computer network and circuits more secure from third parties.

CUSTOMER FURTHER ACKNOWLEDGES THAT NONE OF TPx'S EMPLOYEES, AGENTS, REPRESENTATIVES OR SUBCONTRACTORS HAS MADE, AND THEY DO NOT HAVE THE AUTHORITY TO MAKE, ANY REPRESENTATIONS CONCERNING THE SECURITY OF CUSTOMER'S NETWORK OR THE


SERVICES, INCLUDING ANY REPRESENTATIONS THAT ARE INCONSISTENT WITH THE STATEMENTS CONTAINED IN THIS SECTION 3(f).

(g) <u>Access to Customer Premises, Systems and Data</u>. As required for the performance of the Services, Customer will provide a secure space, network, wiring, electrical power, and environmental conditions suitable for and compatible with TPx's provision of Service(s). Customer agrees to provide TPx reasonable access (on-site and remote) to existing systems such that monitoring agents and other management tools can be installed as part of the Service(s). Customer will assume insurance responsibility for the cost of its repair or replacement should the equipment be damaged due to negligence, misuse, external forces, power surges, or servicing by non-TPx designated service personnel. Customer consents to TPX accessing and processing all data provided by or on behalf of Customer in connection with the Agreement (including data from customers of Customer) and represents that it has obtained any consents required for such access and processing.

(h) <u>Customer's Compliance with Laws</u>. Customer is responsible for the compliance with all laws and regulations applicable to the business of Customer and its Affiliates. Customer will be responsible for (1) identifying such laws and regulations and notifying TPx of any associated impact on TPx or the delivery of the Services; (2) obtaining the consent or approval of any governmental entity required for the parties' compliance with any such laws and regulations; and (3) obtaining the consent of any individual required for the parties' compliance with any such laws and regulations, including any required consent related to the transfer, processing and storage of such individual's personal data under laws applicable to such individual or the personal data. If requested by Customer, TPx will work in good faith with the Customer to enter into an amendment to this Agreement or modify the provision of the Services to Customer as required to comply with such laws and regulations, in each case at the expense of Customer. In no event will TPx be required to provide Services in violation of any applicable law or regulation.

(i) <u>Receipt of Services</u>. Customer will defend, indemnify and hold TPx harmless (including TPx's officers, directors, employees, agents, and contractors) from any claims, liabilities, losses, damages and expenses (including reasonable attorneys' fees and costs) arising out of or relating to Customer's receipt or use of the Services. This indemnity will not be available if the damage or loss is due to TPx's willful or reckless acts or omissions.

**4. Termination Rights and Remedies**

(a) <u>Termination by Customer Before Installation</u>. If Customer elects to terminate the Agreement or any orders for Services before Services are installed and available for Customer's use, it must do so in writing, and will pay to TPx as a pre-installation charge an amount equal to: (1) the non-recurring charges applicable to the Services, even if initially waived, unless those charges have already been paid, (2) such amount that, if the Services require a third party that TPx contracts with to provide some or all of the underlying services, a charge from the third party, which as a result of Customer's cancellation, TPx becomes obligated to pay, and (3) if the Agreement is for a Term of one year, an amount equal to three times the one month recurring charges, or, if the Agreement is for a Term of more than one year, an amount equal to six times the one month recurring charges. Customer agrees that such a termination charge is not a penalty and is a reasonable amount because, among other reasons, it would be difficult or impossible to calculate the exact amount of damages suffered by TPx if Customer terminates the Agreement or any orders for Services.

(b) <u>Termination for Cause</u>. Either party may terminate the Agreement upon thirty (30) days notice if the other party materially breaches the terms and conditions of the Agreement and the other party fails to cure the default within the 30-day period, including, but not limited to, Customer's failure to pay TPx's invoices for the Services when due. If Customer terminates the Agreement after TPx's material breach, then Customer will be responsible for (i) charges for the period before the date of termination and (ii) all remaining installment payments for the equipment that Customer purchased from TPx via an installment payment purchase as provided in the related Equipment Addendum.

(c) <u>Early Termination Fee</u>. If TPx terminates the Agreement or any Service as a result of Customer's material breach, or Customer terminates the Agreement or any Services for any reason other than TPx's material breach, Customer will pay to TPx an early termination fee as set forth in this Section 4(c) (the "ETF"). The ETF shall include a charge determined in accordance with <u>Table 1</u> below (an "MRC ETF") based on:


(i)    the number of months of the Initial Term provided in the Service Agreement if the termination occurs during the Initial Term or the number of months of the Renewal Term if the termination occurs during a Renewal Term (as applicable, the "Applicable Term");

(ii)    the month of the Applicable Term during which the termination occurs (the "Termination Month");

(iii)   the number of months remaining in the Applicable Term after the Termination Month (the "ETF Calculation Period"); and

(iv)   the monthly recurring charge for the terminated Service as set forth in the Service Agreement or otherwise agreed by the parties (the "MRC").

The MRC ETF is the sum of the calculations within the MRC ETF Calculation Period as set forth on <u>Table 1</u> for the Applicable Term.

<u>Table 1</u>

| Applicable Term | MRC ETF Calculation Period (based on when termination occurs) | | | | |
|---|---|---|---|---|---|
| | 1-12 Months ("1st Service Year") | 13-24 Months ("2nd Service Year") | 25-36 Months ("3rd Service Year") | 37-48 Months ("4th Service Year") | 49-60 Months ("5th Contract Year") |
| 12 Months | 50% of MRC x Months remaining in term | N/A | N/A | N/A | N/A |
| 24 Months | 100% of MRC x Months remaining in term | 50% of MRC x Months remaining in term | N/A | N/A | N/A |
| 36 Months | 100% of MRC x Months remaining in term | 75% of MRC x Months remaining in term | 50% of MRC x Months remaining in term | N/A | N/A |
| 48 Months | 100% of MRC x Months remaining in term | 80% of MRC x Months remaining in term | 75% of MRC x Months remaining in term | 50%  of MRC x Months remaining in term | N/A |
| 60 Months | 100% of MRC x Months remaining in term | 80% of MRC x Months remaining in term | 75% of MRC x Months remaining in term | 50% of MRC x Months remaining in term | 25% x Months remaining in term |

In addition to the MRC ETF, Customer will pay TPx as part of the ETF: (1) the non-recurring charges for the terminated Services, even if those charges had been initially waived; (2) any promotional credits provided to Customer; and (3) if some or all of the terminated Services were provided by a third party, an amount equal to any charge from the third party that TPx becomes obligated to pay as a result of the termination, including any charges TPx may incur from third party providers of any underlying services as a result of the early termination of the Agreement or any Service.

For end user-oriented services (e.g., work stations/endpoints, end user subscriptions/licenses), Customer may downsize the quantity of such services by no more than ten percent (10%) of Customer's current quantity of end-user-oriented services, without incurring an ETF.

The ETF is due and payable immediately on the effective date of termination, and is in addition to any monthly recurring charges, usage charges and other charges due as of effective date of termination and any liability of Customer for breach of the Agreement.  Customer agrees that each of the above termination charges is a reasonable amount to compensate TPx for lost monthly recurring charges and usage charges following termination

6



because, among other reasons, it would be difficult or impossible to calculate the exact amount of such damages suffered by TPx if Customer terminates the Agreement or any orders for Services.

(d)  Effective Date of Termination by Customer.  If Customer terminates the Agreement or any Services provided to it for any reason other than TPx's material breach, Customer will provide TPx with written notice to retention@tpx.com thirty (30) days in advance, and the effective date of the termination will be the end of that thirty (30) day notice period for purposes of determining the remaining time over which the termination charge will be calculated.  If Customer does not give TPx that notice, then the effective date of termination will be the date TPx terminates the Agreement.  For partial months, remaining monthly recurring charges will be determined on a prorated basis based on the number of days in such month during which Services were to be provided.

(e)  Move Charge.  If Customer requests that TPx move the Services from Customer's current service location to a different service location, Customer may incur a non-recurring charge ("Move Charge").  The Move Charge may include (i) a termination charge which, as a result of Customer's termination, TPx becomes obligated to pay to a third party provider of the underlying facilities, and (ii) installation charge at the new service location.  Also, a new Term may apply to any Services moved to a new service location.

(f)  Delinquent Account.  In addition to any other recoveries TPx is entitled to receive, TPx will be entitled to recover from Customer for payment delinquencies all of the costs TPx incurs (including court costs and reasonable attorneys' fees) to collect any delinquent charges owed by Customer along with all other damages TPx incurs as a result of Customer's breach or other termination of the Agreement, including termination charges, past due recurring and usage charges, any damage to TPx's equipment, any promotional credits provided to Customer and any amounts TPx has to pay to third parties because of violations by Customer of TPx's AUP.

(g)  Notwithstanding the foregoing, Customer may terminate the applicable Service Agreement without any further obligation with respect to Services (but subject to Customer's obligation to pay amounts owing for equipment purchased from TPx under an installment payment option pursuant to the terms of an Equipment Addendum, without offset or recoupment) if the Services TPx provides thereunder are not provided substantially in accordance with the requirements of such Service Agreement during the first ninety (90) days the Services are available for Customer's use.  If Customer elects to terminate the Agreement pursuant to this Section 4(g), TPx will reimburse Customer for the reasonable costs Customer incurred to re-establish service with another service provider not to exceed the amount that Customer paid to TPx for installation of the Services.  This Section 4(g) only applies if: (i) the cause of the Service deficiency was within TPx's reasonable control; (ii) Customer ordered at least the amount of Services that TPx recommended to meet Customer's traffic volumes; (iii) Customer gives TPx written notice of the deficiency within the first ninety (90) days after TPx notified Customer the Services are available for Customer's use, and (iv) TPx fails to correct the Service deficiency within fifteen (15) days after receiving written notice from Customer of the deficiency.

**5.  Credit Allowance, Warranty Disclaimer, Limitation of Liability and Indemnity**

(a)  Credit Allowances for Interruption of Service.  If an interruption or failure of Service is caused solely by TPx and not by Customer or any third party agent, carrier, vendor, employee, or representative of Customer or other causes beyond TPx's reasonable control, Customer may be entitled to a credit allowance not to exceed an amount equivalent to the proportionate charge to Customer for the affected Service for the time period from the time of Customer's report to TPx of the Service interruption to the time Service is restored, not to exceed in any month, the total monthly recurring charge owed by Customer for the affected Service in that month.  The specific service levels, related credits and steps Customer must take to apply for credits are available on TPx's website at www.tpx.com/sla. TPx will not be liable for any act or omission of any other entity furnishing Customer with facilities or equipment used with the Services, nor will TPx be liable for any damages or losses due in whole or in part to Customer's fault or negligence or due in whole or in part to the failure of equipment or facilities that Customer provides.  For the avoidance of doubt, any credit allowances or adjustments permitted under the Agreement shall only relate to payments for Services and shall not be applied as an offset, credit, adjustment or recoupment against any payments owing by Customer for equipment purchased from TPx pursuant to an Equipment Addendum.



(b) <u>WARRANTY DISCLAIMER</u>. EXCEPT AS EXPRESSLY SET FORTH IN THE "WARRANTY" SECTION OF A SERVICE ADDENDUM, TPx MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY SERVICE OR DELIVERABLES. TPx SPECIFICALLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR TITLE OR NON-INFRINGEMENT OF THIRD PARTY RIGHTS.

(c) <u>EXCLUSIONS</u>. TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER CUSTOMER NOR TPX WILL BE ENTITLED TO RECEIVE PUNITIVE, INCIDENTAL, EXEMPLARY, INDIRECT, CONSEQUENTIAL, RELIANCE OR SPECIAL DAMAGES (INCLUDING DAMAGES FOR LOST BUSINESS, REVENUE, PROFITS OR GOODWILL) IN AN ACTION OR CLAIM OF ANY KIND OR NATURE, INCLUDING BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS.

(d) <u>LIMITATION OF LIABILITY</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, TPX'S TOTAL LIABILITY FOR ALL CLAIMS IN ANY MANNER ARISING OUT OF THE AGREEMENT WILL IN NO EVENT EXCEED THE LESSER OF (1) CUSTOMER'S PROVEN DIRECT DAMAGES, (2) THE AMOUNTS CUSTOMER PAID TO TPX FOR THE SERVICES GIVING RISE TO LIABILITY UNDER THE APPLICABLE SERVICE AGREEMENT DURING THE SIX (6) MONTH PERIOD IN WHICH ANY SERVICE-RELATED PROBLEMS WERE EXPERIENCED, OR (3) THE CREDITS AVAILABLE TO CUSTOMER UNDER TPX'S TARIFFED LIMITATION OF LIABILITY. FOR CLARITY, THE FOREGOING LIMITATIONS APPLY TO ALL DISPUTES, CAUSES OF ACTION AND CLAIMS OF ANY KIND OR NATURE, INCLUDING BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, STRICT LIABILITY, MISREPRESENTATION AND OTHER TORTS.

(e) <u>Indemnification</u>.

(i) <u>TPx Infringement Indemnity and Remedy</u>.

(A) <u>TPx Infringement Indemnity</u>. If a third party that is not an Affiliate of Customer asserts a claim against Customer asserting that TPx's proprietary materials used or provided with the Services infringes a U.S. patent existing as of the effective date of the Service Agreement pursuant to which the Service is provided or a trade secret or copyright owned by that third party (a "TPx Infringement Claim"), then TPx will, at its own expense defend or settle the TPx Infringement Claim; and pay the damages finally awarded against Customer. However, TPx shall have no obligation for any such claim or other obligation for infringement to the extent resulting or alleged to result from: (1) modifications made other than by TPx, (2) use of the Services or any work product of TPx in combination with any equipment, software or materials not provided by TPx, (3) compliance with the instructions, designs or specifications provided by or on behalf of Customer, or (4) Customer's continuing any allegedly infringing activity after being notified thereof or after being informed and provided with modifications that would have avoided the alleged infringement.

(B) <u>Infringement Remedy</u>. If an injunction or order is obtained against TPx performing the Services for Customer by reason of the allegations of infringement of TPx's proprietary materials, or if in TPx's opinion such proprietary materials used or provided with the Services may violate a third party's proprietary rights, then TPx will, at its expense and option: (1) procure for Customer the right to continue to receive the Services; (2) modify the allegedly infringing item to make it non-infringing without substantially reducing functionally or procure a non-infringing replacement; or (3) if neither (1) nor (2) are commercially practical, terminate the Service Agreement and release Customer from its obligation to make future payments for the Services.

(C) <u>Exclusive Remedy</u>. This Section 5(e)(i) contains Customer's exclusive remedies and TPx sole liability for claims of infringement.

(ii) <u>Customer Indemnity</u>. If a third party that is not an Affiliate of TPx asserts a claim against TPx that materials provided by or on behalf of Customer to TPx in connection with the Services infringes a U.S. patent existing as of the effective date of the Service Agreement pursuant to which the Service is provided or a trade secret or copyright owned by that third party (a "Customer Infringement Claim"), then the Customer will, at its own expense defend or

8

Case: 19-30088   Doc# 7301-1   Filed: 05/15/20   Entered: 05/15/20 15:34:17   Page 19 of 36



settle the Customer Infringement Claim and indemnify TPx for any damages finally awarded against TPx. However, Customer shall have no obligation for any such claim or other obligation for infringement to the extent resulting or alleged to result from: (1) modifications made by TPx, (2) compliance with the instructions, designs or specifications provided by or on behalf of TPx, or (3) TPx's continuing any allegedly infringing activity after being notified thereof or after being informed and provided with modifications that would have avoided the alleged infringement.

(iii)     Indemnification Procedures.  Upon the commencement of any claim, action, suit or proceeding for which a party wishes to seek indemnification under this Section 5(e) (each, a "Third Party Claim"), the party seeking indemnification (the "Indemnified Party") will provide prompt notice to the other party (the "Indemnifying Party") so that the Indemnifying Party has reasonably sufficient time to file, answer and defend such Third Party Claim, provided however, that no delay on the part of the Indemnified Party in providing such notice will relieve the Indemnifying Party from its indemnification obligations except to the extent the Indemnifying Party is prejudiced by such delay.  After receiving such notice, the Indemnifying Party will immediately take control of the defense, settlement and investigation of the Third Party Claim, and employ and engage attorneys reasonably acceptable to the Indemnified Party to handle and defend the same, at the Indemnifying Party's sole cost and expense.  The Indemnified Party will, at the expense of the Indemnifying Party, reasonably cooperate with the Indemnifying Party and its attorneys in the investigation, trial and defense of the Third Party Claim and any appeal arising therefrom.  The Indemnifying Party may settle a Third Party Claim without the prior consent of the Indemnified Party only if the Third Party Claim involves only the payment of money by the Indemnifying Party without any admission of guilt or fault and a full and complete release from continuing and further obligation or liability on the part of the Indemnified Parties is executed by Parties involved in the settlement and delivered to the Indemnified Party.  If the Indemnifying Party does not assume full control over the defense of a Third Party Claim subject to such defense as provided in this Section 5(e), the Indemnified Party will have the right to defend the Third Party Claim in such manner as it may deem appropriate, at the cost and expense of the Indemnifying Party.

## 6.     Confidentiality

(a)     Mutual Confidentiality.  This Section sets out the terms for identification of information which is considered confidential and proprietary by a party (the "Discloser"), and restrictions against use and disclosure of such Confidential Information after disclosure to the other party (the "Recipient").

(b)     Definition of Confidential Information.  "Confidential Information" as used in the Agreement means all proprietary or confidential information that is disclosed to the Recipient by the Discloser, and includes:  (i) any and all information relating to products or services provided by a Discloser, its customer-related and financial information, source and executable code, flow charts, drawings, techniques, specifications, development and marketing plans, strategies, forecasts, and sales and marketing materials; (ii) any products or services made available by a party; and (iii) the terms of this Agreement.  Confidential Information does not include information that Recipient can show: (A) was rightfully in Recipient's possession without any obligation of confidentiality before receipt from the Discloser; (B) is or becomes a matter of public knowledge through no fault of Recipient; (C) is rightfully received by Recipient from a third party without violation of a duty of confidentiality; or (D) is or was independently developed by or for Recipient.

(c)     Obligations of Confidentiality.

(i)     As necessary to accomplish the purposes and objectives of this Agreement, Recipient may disclose Discloser's Confidential Information to any Recipient employee, officer, director, subcontractor, agent or representative who has a legitimate need to know the information for the purposes of this Agreement and who is bound to Recipient to protect the confidentiality of the information in a manner at least as stringent as that required of Recipient under this Agreement.  Recipient may also disclose Discloser's Confidential Information to Recipient's attorneys if they are made aware of Recipient's obligations of confidentiality under this Agreement.

(ii)     Recipient will not use or reproduce Discloser's Confidential Information except as reasonably required to accomplish the purposes and objectives of this Agreement or as specifically permitted by this Agreement or approved in writing by Discloser.  Recipient will protect Discloser's Confidential Information from unauthorized use

Case: 19-30088     Doc# 7301-1     Filed: 05/15/20     Entered: 05/15/20 15:34:17     Page 20 of 36


or disclosure by using at least the same degree of care as Recipient employs to avoid unauthorized use or disclosure of its own Confidential Information of a similar nature, but in no event less than reasonable care.

(iii)  Recipient will promptly notify Discloser if Recipient becomes aware of any material unauthorized use, disclosure, loss of, or inability to account for any Confidential Information of Discloser.  If such use, disclosure, loss or inability to account resulted from Recipient's breach of this Agreement then, without limiting Discloser's remedies for such breach, Recipient will cooperate with Discloser and, at Discloser's request, undertake commercially reasonable efforts to assist Discloser in investigating and preventing a reoccurrence thereof.

(iv)  Recipient shall be responsible for any breach of the confidentiality provisions of this Agreement by any party to whom it discloses or makes available Discloser's Confidential Information as if such party were bound by the terms hereof and as if such breach were committed by Recipient.

(d)  <u>No Implied Rights</u>.  As between Discloser and Recipient, Discloser's Confidential Information will remain the property of Discloser.  Nothing contained in the Agreement will be construed as obligating a Party to disclose its Confidential Information to the other Party, or as granting to or conferring on a Party, expressly or by implication, any rights or licenses to the Confidential Information of the other Party.  Any such obligation or grant will only be as provided pursuant to other provisions of the Agreement.

(e)  <u>Compelled Disclosure</u>.  If Recipient becomes legally compelled to disclose any Confidential Information of Discloser in a manner not otherwise permitted by this Agreement, Recipient will provide Discloser with prompt written notice of the request (unless legally precluded from doing so) so that Discloser may seek a protective order or other appropriate remedy.  Recipient will reasonably cooperate with such efforts by Discloser.  If a protective order or similar order is not obtained by the date by which Recipient must comply with the request, Recipient may furnish that portion of the Confidential Information it is legally required to furnish provided that it (i) discloses only such Confidential Information as is legally required, and (ii) uses commercially reasonable efforts to obtain confidential treatment for any Confidential Information so disclosed.

(f)  <u>Return or Destruction</u>.

(i)  As requested by Discloser during the Term, Recipient will return, destroy, or provide Discloser a copy of any designated Confidential Information of Discloser, provided that TPx will not be liable for any failure or delay in its performance of Services to the extent resulting from its obligation to return, erase, or destroy Confidential Information of Customer in its possession prior to the completion of the Services.  Upon expiration or termination of this Agreement, Recipient will return or destroy all materials in any medium that contain Confidential Information of Discloser.  At Discloser's request, Recipient will certify in writing that it has returned or destroyed all copies of Discloser's Confidential Information in the possession or control of Recipient, any of Recipient's Affiliates or subcontractors, or any other party to whom any of them provided or permitted access to Confidential Information of Discloser.

(ii)  Recipient shall have no obligation to return or destroy any Confidential Information of Discloser that is subject to a claim, dispute, lawsuit, or subpoena or in any other circumstances in which Recipient reasonably believes that destruction would be unethical or unlawful.

(iii)  Any Confidential Information of Discloser retained by Recipient under this Section 6(f) shall remain subject to the confidentiality obligations under this Section 6.

(g)  <u>Proprietary Legends</u>.  Recipient may not remove, obscure, or alter any proprietary legend relating to the Discloser's rights on or from any form of Confidential Information of the Discloser, without the prior written consent of the Discloser, except as expressly authorized in an Agreement.

(h)  <u>Survival</u>.  This Section 6 shall survive any termination or expiration of this Agreement.

v082319

Case: 19-30088    Doc# 7301-1    Filed: 05/15/20    Entered: 05/15/20 15:34:17    Page 21 of 36


7. **Mutual Non-Solicitation**. During the term of this Agreement, and for a period of six (6) months thereafter, neither party will, directly or indirectly, solicit, negotiate, engage, employ, or offer employment to, the personnel or contractor of the other party involved with providing Services hereunder.

8. **Resolution of Disputes: Binding Arbitration (Jury Trial Waiver), No Class or Representative Actions or Arbitrations**

(a) <u>Binding Arbitration of Any and All Disputes</u>. By entering into the Agreement, Customer and TPx waive any right to a jury trial, or the right to have any Dispute resolved in any court, and instead accept the use of binding arbitration. "Dispute" as used in this Section 8 means any cause of action, claim, case, and/or controversy of any kind arising out of or in any way related to the Agreement (including any amendments, addendums or attachments to the Agreement or documents incorporated by reference into the Agreement), and/or the subject matter of the Agreement.

(b) <u>No Class or Representative Actions or Arbitrations</u>. **Customer and TPx expressly agree that any Dispute is personal to such parties, and any such Dispute will only be resolved by an individual arbitration and Customer will not bring or be a member in a class arbitration, a class action, or any other representative arbitration or judicial proceeding unless such agreement is prohibited by law.**

(c) <u>The Federal Arbitration Act Applies</u>. The Agreement affects interstate commerce and the enforceability of this Section 8 will be governed by, construed, and enforced, both procedurally and substantively, by the Federal Arbitration Act ("FAA") to the maximum extent permitted by applicable law.

(d) <u>Confidentiality</u>. Except as may be required by law or otherwise agreed by the parties, the arbitrator, AAA (defined below), and the parties will maintain the confidentiality of any proceedings, including the existence of the proceedings and any and all information gathered, prepared, and presented for purposes of the arbitration or related to the Dispute(s) therein. The arbitrator will have the authority to make appropriate rulings to safeguard that confidentiality, unless the law provides to the contrary.

(e) <u>Arbitration Procedures</u>. If Customer and TPx cannot resolve between themselves any Dispute, Customer and TPx will promptly submit the Dispute to binding arbitration at the office of the American Arbitration Association ("AAA") located in Los Angeles County, California. Either party may initiate arbitration by providing written demand for arbitration (with a copy to the other party), a copy of the Agreement and the administrative fee required by the commercial arbitration rules of the AAA ("AAA Rules") to the AAA. Any party paying the administrative fee may recover the fee if awarded by the arbitrator. The arbitration will be held in accordance with the AAA Rules as modified by this Agreement. The AAA Rules, and other information about the AAA and arbitration, are readily available at www.adr.org, by calling 1-800-778-7879, or by mail at 120 Broadway, Floor 21, New York, NY 10271. By entering into the Agreement, Customer either (1) acknowledges that it has read and understands the AAA Rules or (2) waives reading the AAA Rules and waives any claim that the current AAA Rules are unfair in any way. Customer and TPx agree that the AAA Rules will be subject to the terms of the Agreement, changes in procedures that the AAA may make from time to time in its AAA Rules or successor rules to its AAA Rules, and the following modifications:

(i) As limited by the FAA, the terms of the Agreement, and the applicable AAA Rules, the arbitrator will have the exclusive power and jurisdiction to make all procedural and substantive decisions concerning the Dispute; provided, however, that this power will not include: (a) the power to determine the question of arbitrability, which power Customer and TPx agree will be vested solely in a court of competent jurisdiction; or (b) the power to conduct a class or representative action or arbitration, which is prohibited by the terms of the Agreement as stated above (Section 8(b)).

(ii) To the maximum extent permitted by applicable law, each party will bear the cost of preparing and presenting its case in an arbitration unless the arbitration award provides otherwise. Notwithstanding the foregoing, the prevailing party shall be entitled to recover reasonable attorney's fees and court costs.


(iii) One arbitrator will be appointed in accordance with the AAA rules within 30 calendar days of the submission of the demand for arbitration. The arbitrator will designate the time and place for hearings as soon as practicable after the arbitrator is appointed.

(iv) The arbitrator's authority to grant relief will be subject to the provisions of the Agreement, TPx's applicable tariffs, if any, and any other applicable law. The arbitration award will state the reasons upon which it is based and will be in writing. Any award rendered by the arbitrator will be final, binding and non-appealable. Judgement on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In making any award, the arbitrator will be restricted by the Limitation of Liability provisions in this Agreement (Section 5(d)), and will not be entitled to award, nor will either party be entitled to receive, punitive, incidental, exemplary, consequential, reliance or special damages, including damages for lost profits; provided, however, that if the enforceability of any of these restrictions is limited by the applicable substantive law, that restriction will only be enforced to the extent permitted by such law.

(v) Notwithstanding the foregoing, each party retains the right to apply to any court of competent jurisdiction for interim or provisional relief in aid of arbitration, including injunctive relief in aid of arbitration, and any such request will not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. However, once the arbitrator is appointed, he or she will have exclusive jurisdiction to hear applications for such relief. Any interim measures or provisional relief ordered by the arbitrator may be immediately and specifically enforced by a court of competent jurisdiction. Nothing herein will preclude a party from seeking emergency measures of protection under the provisions of the AAA Rules.

**9. Enhanced 911 ("E911") for Customers with Voice over Internet Protocol ("VOIP") Based Services Notice**

(a) If the Services offered to Customer hereunder utilize VoIP technology to provide 911 and E911, this notice provides information about 911 and E911 capabilities and limitations on such voice services. The FCC requires that all telecommunications service providers utilizing VoIP notify their subscribers of the differences between the 911 and E911 access capability provided using VoIP technology and the 911 and E911 access capability using traditional telephone service. Further details about the FCC's requirements can be found at www.fcc.gov/cgb/consumerfacts/voip911.pdf.

(b) <u>Differences in VOIP 911 Capabilities</u>. 911/E911 access capabilities that use VoIP technology differ from 911/E911 access capabilities using traditional telephone service. The following list outlines some of the key differences, along with steps that Customer can take to mitigate those differences.

(i) <u>Service Location Information</u>. Customer must provide TPx with the correct service address of the location where Services will be used. If Customer does not provide correct service address information, or if Customer move Customer's VoIP access device (including an integrated access device, IP phone, or analog terminal adapter) to another location without updating service location information, calls to 911 will route to emergency personnel who may not be able to assist Customer, or may cause delays in receiving emergency services.

(ii) <u>Power Outage</u>. A power outage will render Customer's VoIP access devices unable to make or receive any calls, including calls to 911. Providing backup electrical power to VoIP access devices will mitigate this limitation.

(iii) <u>Broadband Service Disruption</u>. Disruptions to Customer's broadband service will prevent calls to 911 from completing. A failover connection to the public Internet over a broadband connection will reduce the likelihood of a service disruption.

(iv) <u>Service Suspension</u>. If Customer's service is terminated or suspended for any reason, 911 will not be available.

(c) <u>Geolocation Registration</u>. For calls to 911, TPx overrides any outbound calling line identification telephone number sent by the customer's phone system with a telephone number that is registered for the specific physical location of the service, also known as a geolocation. This enables 911 calls to route to the correct Public Safety Answering Point (PSAP), and that emergency personnel are sent to the correct location. Customer must provide

Case: 19-30088    Doc# 7301-1    Filed: 05/15/20    Entered: 05/15/20 15:34:17    Page 23 of 36



accurate and timely information about Customer's geolocation. There is a $125 charge per 911 call from telephone numbers with either incorrect or missing geolocation information.

(d)  Alternate Means of Contacting 911.  Customer should maintain alternate means of contacting 911, such as analog phone lines. Customer is also responsible for notifying users of these alternate means of contacting 911. **UCx clients on a mobile phone will route 911 calls through the mobile network provider by default.**

(e)  Notification of Users.  Customer is responsible for notifying any users, including staff, residents, guests, or other persons who may be present at any location where Customer utilizes TPx VoIP service about the limitations of 911 dialing on VoIP as compared with 911 dialing on traditional voice services. Customer will receive stickers concerning the limitations of 911 dialing on Customer's TPx VoIP service. It is Customer's responsibility to place the 911 sticker on or near each device that Customer uses with the Services. If Customer did not receive a 911 sticker with Customer's device, or Customer requires additional 911 stickers, please call 877-344-7441.

## 10.  Miscellaneous Provisions

(a)  FUSF Exemption.  Telecommunication carriers that provide interstate telecommunications services must file FCC Form 499-A with the Federal Communications Commission ("FCC"). Customer must provide TPx a copy of the first page of the Universal Service Worksheet (FCC Form 499-A, with Filer 499 ID Number). If Customer is not required to file Form 499-A under applicable laws and regulations, Certificate B must be completed and returned to TPx. TPx assesses its customers the Federal Universal Service Fund ("FUSF") fee based on end user revenues. TPx exempts from this charge certain customers who contribute directly to the Universal Service Fund ("USF"). In such case, TPx has established a Certificate of Exemption from TPx's FUSF assessment. To be exempt from FUSF charges, Customer must certify the following:

(i)  Customer is an interstate provider of telecommunications services and has a Filer 499 ID Number;

(ii)  Customer will purchase Services under the applicable Service Agreement exclusively for purposes of reselling those services to end users; and,

(iii)  Customer (or its end users) is directly contributing to the FUSF on all services provided by TPx.

To claim an exemption from TPx's assessment of FUSF charges, Customer must return certificate with the first page of the Universal Service Worksheet (FCC Form 499-A, with Filer 499 ID Number).

(b)  Independent Contractors.  The parties hereto are acting as independent contractors and under no circumstances will any of the employees of one party be deemed the employees of the other as a result of the Agreement for any purpose.  All of the Services performed by TPx will be performed as an independent contractor. TPx will perform such Services under the general direction of Customer, but TPx will have sole discretion to determine the manner, method and means of performing such Services subject to the provisions of this Agreement, including selecting the software and other technology and any subcontractors utilized by TPx in the performance of the Services.  Neither party will have any authority to make any contract in the name of or otherwise to bind the other party.  TPx will be responsible for and will pay all unemployment, social security and other payroll taxes, and all worker's compensation claims, worker's compensation insurance premiums and other insurance premiums, with respect to TPx and TPx's employees.  This Agreement does not create a partnership or joint venture between the parties.

(c)  Insurance.  TPx will provide and maintain during its rendition of the Services, but only for losses arising out of TPx independent contractor work for Customer: (a) Worker's Compensation and related insurance as prescribed by the law of the state applicable to the employees performing such Services; (b) employer's liability insurance with limits of at least one million dollars ($1,000,000) for each occurrence; (c) comprehensive/commercial general liability insurance including products liability with one million dollars ($1,000,000) per occurrence combined single limit and two million dollars ($2,000,000) general aggregate, including coverage for the use of subcontractors, products liability and completed operations, and not containing an exclusion for explosion, collapse and underground coverage; (d) comprehensive motor vehicle liability insurance, including coverage for owned, hired, leased, rented

Case: 19-30088    Doc# 7301-1    Filed: 05/15/20    Entered: 05/15/20 15:34:17    Page 24
of 36



and non-owned vehicles of at least one million dollars ($1,000,000) for combined single limit for bodily injury, including death, and/or property damage; and (e) professional liability insurance covering the effects of errors and omissions in the performance of professional duties in the amount of one million dollars ($1,000,000) for each occurrence and in the aggregate associated with Services.

(d)  Export Controls.  Customer will cooperate with TPx as reasonably necessary to permit TPx to comply with the laws and regulations of the United States and all other relevant countries, relating to the control of exports ("Export Laws").  Customer may not import, nor export or re-export directly or indirectly, including via remote access, any part of the Services into or to any country for which a validated license is required for such import, export or re-export under applicable Export Laws, without first obtaining such a validated license.

(e)  Assignment and Succession.  Customer may not assign or transfer the Agreement without TPx's prior written consent, which will not be unreasonably withheld.  Any unauthorized assignment or transfer by Customer will be null and void.  Subject to the foregoing, the Agreement will be binding upon and inure to the benefit of the parties and their respective heirs, executors, administrators, legal representatives, successor and authorized assigns.  The right to payments under any Equipment Addendum are assignable by TPx without consent as provided in such Equipment Addendum.

(f)  Governing Law.  With the exception that the enforceability of Section 8 is governed both procedurally and substantively by the FAA (as stated above), the Agreement will be construed pursuant to the laws of the State of California without regard to the conflicts of law provisions thereof.

(g)  Force Majeure.  TPx will not be liable for any failure of performance of the Services due to causes beyond TPx's control, including fire, flood, electric power interruptions, national emergencies, civil disorder, acts of terrorists, network attacks, riots, strikes, lockouts, work stoppages, Acts of God, or any law, regulation, directive, or order of the United States government, any other governmental agency, including state and local governments having jurisdiction over TPx or the Services provided hereunder, or the actions and failures to act of Customer or any third party.

(h)  Entire Agreement and Modifications.  The Agreement and all other documents specifically referred to in the Agreement (including each applicable Equipment Addendum) constitute the entire and final agreement and understanding between Customer and TPx with respect to the subject matter of the Agreement and supersede all prior agreements relating to such subject matter, which are of no further force or effect.  Any and all exhibits referred to in the Agreement are integral parts of the Agreement and are made a part of the Agreement.  The Agreement, including each applicable Equipment Addendum, may only be modified or supplemented by an instrument in writing executed by both Customer's and TPx's duly authorized representatives or by a written notice of change pursuant to Section 1(d) hereof.  Each Equipment Addendum relating to the Agreement is considered a separate and independent obligation of Customer to pay TPx for equipment purchased thereunder and the Agreement, as it relates to the equipment and amounts payable in connection with any installment purchase option, is subject to the terms of such Equipment Addendum.

(i)  Severability. If any provision of the Agreement is held to be invalid or unenforceable by a court or administrative agency with jurisdiction over the Services, such provision will be deemed amended to the minimum extent necessary to render it enforceable.

(j)  Order of Precedence.  If there is any conflict within the Agreement between the TAA or MSA (as applicable), these Terms and Conditions and a Service Agreement and any document incorporated by reference into a Service Agreement or an Addenda, the parties will attempt to read any such conflicting provisions consistently; however, in the event such a consistent reading cannot be accomplished, the order of precedence will be as follows (i) with regard to Tariffed Services, Section 1(b) of these Terms and Conditions; (ii) amendments to the Agreement entered into following the effective date of the Agreement; (iii) the TAA or MSA (as applicable); (iv) these Terms and Conditions, except to the extent that a Service Agreement expressly references a provision of these Terms and Conditions and then, only with respect to such Service Agreement, the Service Agreement will control with regard to the referenced provision; (v) the Service Agreement; and (vi) other documents incorporated by reference into a Service Agreement.

v082319



# Terms and Conditions to the Agreement

(k) <u>Referencing</u>. Customer agrees that TPx may refer to Customer as a customer of TPx, both internally and in externally published media. Customer also agrees to instruct appropriate personnel within its organization that Customer has agreed to receive and participate in calls, from time to time, with potential customers of TPx who wish to evaluate the technical specifications of the Services.

(l) <u>Interpretation of Agreement</u>. The word "including" will be construed to mean "including, without limitation". The word "or" will mean "and/or" unless the context requires otherwise. The words "day," "month," and "year" mean, respectively, calendar day, calendar month and calendar year. The Agreement will be fairly interpreted in accordance with its terms and without strict construction in favor of or against either party based on the identity of the drafter of the Agreement or any term or provision thereof.

(m) <u>No Third Party Beneficiaries</u>. Notwithstanding anything to the contrary, the Agreement is intended for the sole and exclusive benefit of the signatories and is not intended to benefit any third party or deemed to provide third parties with any remedy, claim, right of action, or other right.

(n) <u>Survival</u>. Sections 4 - 9 and Section 11 of the Agreement, inclusive of sub-sections, will survive any termination or expiration of the Agreement and will continue in full force and effect until they are satisfied in full or by their nature expire.

(o) <u>Headings</u>. The headings used in the Agreement are for convenience only and do not in any way limit or otherwise affect the meaning of any of the terms.

(p) <u>Waiver</u>. Under no circumstances will either party's failure to enforce any provision of the Agreement in any particular instance be construed as a waiver of that provision.

(q) <u>Notices</u>. All notices from Customer to TPx must be in writing and delivered by certified mail, return receipt requested or by Federal Express or other similar expedited delivery service to: U.S. TelePacific Corp., Attn. General Counsel, 515 S. Flower Street, 45th Floor, Los Angeles, CA 90071-2201. If Customer notifies TPx that it does not wish to renew Services, Customer's written notice may be by a letter delivered in that manner or by an email to: retention@tpx.com.

(r) <u>Limitation on Actions</u>. Any legal action (including but not limited to arbitration) arising in connection with this Agreement must be commenced within two (2) years after the cause of action arises.

## 11. Service Guarantee

Notwithstanding anything to the contrary contained in this Agreement, you may terminate this Agreement without any further obligation if the Services we provide are not substantially performing up to industry standards during the first ninety (90) days the Services are available for your use. If you elect to terminate the Agreement pursuant to this guarantee, we will reimburse you for all reasonable costs you incurred to re-establish service with another service provider not to exceed the amount that you paid to us for installation of the Services. This Service Guarantee only applies if: (a) the cause of the Service deficiency was within our reasonable control; (b) you ordered at least the amount of Services that we recommended to meet your traffic volumes; (c) you give us written notice of the deficiency within the first ninety (90) days after we notified you the Services are available for your use, and (d) we fail to correct the Service deficiency within fifteen (15) days after receiving written notice from you of the deficiency.

# EXHIBIT 2

## Addendum to the Telecommunications Account Agreement
## Multi-Location Renewal



This Addendum to the Telecommunications Account Agreement ("Addendum") is by and between **U.S. TelePacific Corp.,** a California corporation, d/b/a, TelePacific Communications, 515 S. Flower Street, 47th Floor, Los Angeles, CA 90071-2201 ("TelePacific") and Customer described below ("Customer").

| Company Information | | |
|---|---|---|
| PG&E Corporation | | |
| Company Legal Name (Customer) | Business Type | |
| | | |
| Doing Business As (DBA) | State of Organization | |
| PO BOX 2457 | Secaucus, NJ | 07096 |
| Billing Address: Street | City | State   Zip |

This Addendum amends and modifies the Telecommunications Account Agreement between TelePacific and Customer signed by Customer on the _____ day of _____, 20__, ("Agreement"), as follows:

1.  Based on the volume of Services purchased by the Customer and the competitive conditions in the marketplace for telecommunications services, TelePacific hereby agrees to renew Services to Customer for a three(3) year term ("Renewal Term") for four (4) Service Locations subject to the Terms and Conditions as modified by this Addendum as set forth below. The four (4) Service Locations with related Services and pricing are listed in Exhibit A attached hereto and incorporated herein by this reference.

2.  Said Exhibit A is in lieu of four (4) separate Service Agreements and by signing this Addendum, Customer is agreeing, as if signing four (4) separate Service Agreements, to renew the Services at the Service Locations and at the monthly recurring charges listed in Exhibit A for the Renewal Term under the Terms and Conditions of the Agreement.

3.  In the event of a conflict between the Terms and Conditions of the Agreement and the contents of this Addendum, the contents of this Addendum shall control.

| Agreement | |
|---|---|
| US TelePacific Corp., a California corporation | PG&E Corporation |
| Company Legal Name (Customer) | Customer Name a State Entity |
| **X** | x *Toni Tran* |
| Signature | Signature   Toni Tran |
| Name | Name |
| General Manager (signature required) | IT Portfolio Manager |
| Title | Title |
| | August 10, 2018 |
| Date | Date |

l

Case: 19-30088    Doc# 7301-1    Filed: 05/15/20    Entered: 05/15/20 15:34:17    Page 28 of 36

PG&E Corporation
Account 669
3 Year Term

| Services and Locations | Qty | Current MRC | New MRC | Savings |
|---|---|---|---|---|
| **Account Level** | | | | |
| OneCentral | 1 | $0.00 | $0.00 | $0.00 |
| World Pac Regions | 1 | $0.00 | $0.00 | $0.00 |
| | | | | |
| **3530 E California Ave., Fresno** | | | | |
| SmartVoice SIP Internet | 1 | $9,616.00 | $9,500.00 | $116.00 |
| Access - 200 MBPS | 1 | | | |
| DID Numbers, Block of 20 | 5 | | | |
| INOC Basic | 1 | | | |
| IP Address, Block of 4 | 1 | | | |
| Internet | 1 | | | |
| LDAC | 1000 | | | |
| Port - 200 MBPS | 1 | | | |
| SmartVoice Call Paths | 1000 | | | |
| | | | | |
| **3065 Gold Camp Dr., Rancho Cordova** | | | | |
| SmartVoice SIP Internet | 1 | $10,366.90 | $10,130.00 | $236.90 |
| Access - 200 MBPS | 1 | | | |
| DID Numbers, Block of 20 | 4 | | | |
| INOC Basic | 1 | | | |
| IP Address, Block of 4 | 1 | | | |
| Internet | 1 | | | |
| LDAC | 1000 | | | |
| OORC Number (SV) - Block of 100 - 2-Way | 3 | | | |
| Port - 200 MBPS | 1 | | | |
| SmartVoice Call Paths | 1000 | | | |
| Tier 5 Router Non -Standard Request | 1 | | | |
| SmartVoice SIP Voice Only | | $3,128.06 | $2,267.49 | $860.57 |
| DID Numbers, Block of 100 | 16 | | | |
| DID Numbers, Block of 20 | 3 | | | |
| OORC Number (SV) - 2-Way | 88 | | | |
| OORC Number (SV) - Block of 100 - 2-Way | 18 | | | |
| SmartVoice Traffic Study Reports | 1 | | | |
| | | | | |
| **3301 Crow Canyon Rd., San Ramon** | | | | |
| SmartVoice SIP Voice Only | 1 | $807.40 | $775.00 | $32.40 |
| Access - 1.5 MBPS | 2 | | | |
| Caller ID | 2 | | | |
| Caller ID Name | 2 | | | |
| DID Numbers, Block of 20 | 2 | | | |
| Enterprise Trunking | 2 | | | |

| | | | | |
|---|---|---|---|---|
| Equipment - Tier B: 3yr | 2 | | | |
| LDAC | 40 | | | |
| Port - 1.5 MBPS | 2 | | | |
| SmartVoice Call Paths | 40 | | | |
| Toll Free Number Charge | 2 | | | |
| Trunk Group Call Forwarding to PSTN | 2 | | | |
| Waive Admin Fee | | $2,500.00 | $0.00 | $2,500.00 |
| Total for Account ▮▮669 | | $26,418.36 | $22,672.49 | $3,745.87 |



## Envelope Data

| | |
|---|---|
| Subject: | signature |
| Documents: | PGE Corporation Addendum 081618.pdf |
| Document Hash: | 11075182 |
| Envelope ID: | ENV63586101-1753-EDAC-8050-EDEE |
| Sender: | Trina Gurrobat |
| Sent: | 8/17/2018 3:08:49 AM UTC |
| Status: | Completed |
| Status Date: | 8/17/2018 3:18:07 AM UTC |

### Recipients / Roles

| Name / Role | Address | Type |
|---|---|---|
| Trina Gurrobat | tgurrobat@tpx.com | Sender |
| Michael McMorrow | mmcmorrow@tpx.com | Signer |
| Trina Gurrobat | tgurrobat@tpx.com | Signer |

### Document Events

| Name / Roles | Email | IP Address | Date | Event |
|---|---|---|---|---|
| Trina Gurrobat | tgurrobat@tpx.com | ███████ | 8/17/2018 3:08:49 AM UTC | Created |
| Michael McMorrow | mmcmorrow@tpx.com | ███████ | 8/17/2018 3:16:38 AM UTC | Signed |
| Trina Gurrobat | tgurrobat@tpx.com | ███████ | 8/17/2018 3:18:09 AM UTC | Signed |
| | | | 8/17/2018 3:18:07 AM UTC | **Status - Completed** |

### Signer Signatures

| Signer Name / Roles | Signature |
|---|---|
| Michael McMorrow | *Michael McMorrow* |
| Trina Gurrobat | *Trina Gurrobat* |

# EXHIBIT 3

 **COMMUNICATIONS**

*Address Service Requested*

515 S. Flower St., 45th Floor
Los Angeles, CA 90071-2201

### Remittance Section

| | |
|---|---|
| Account Number | ███669 |
| Invoice Number | 113003047-0 |
| Statement Date | 01/31/19 |
| Amount Due | $108,749.87 |
| Pay By | 02/19/19 |
| Amount Paid | $ |

Please make checks payable to *TPx Communications*

PAY ONLINE AT www.OneCentralPortal.TPx.com
OR SEND PAYMENT TO THE ADDRESS BELOW

TPx Communications
P.O. Box 509013
San Diego, CA 92150-9013

Call (877) 487-8722 for a change of address.

PG&E CORPORATION
C/O TANGOE
PO BOX 2457
SECAUCUS NJ 07096-2457

███669 0113003047 00010874987 5

---

Please detach and return above portion with your payment

 **COMMUNICATIONS**

# Service Invoice

PG&E CORPORATION
C/O TANGOE
PO BOX 2457
SECAUCUS NJ 07096-2457

| | |
|---|---|
| Account Number | ███669 |
| Invoice Number | 113003047-0 |
| Statement Date | 01/31/19 |
| Amount Due | $108,749.87 |
| Pay By | 02/19/19 |

| Previous Bill Amount | Payments | Adjustments | Balance Forward | Current Charges | Total Due By 02/19/19 |
|---|---|---|---|---|---|
| $42,153.52 | $9,557.58 | $0.00 | $51,711.10 | $57,038.77 | $108,749.87 |

Total Charges are due by 02/19/19 after which a 1.5% per month late payment may apply.

---

## How to contact us



TPx Service
515 South Flower Street, 45th Floor
Los Angeles, CA 90071
www.tpx.com



Call us Toll Free
Customer Service and Billing: (877) 487-8722
Repair: (877) 487-8349 (24 Hours)
Sales: (877) 487-8722 (M-F 8am-6pm)

---

## Important Messages

Thank you for choosing TPx Communications

## Invoice Name Changes

TPx Communications is changing many service description names on your invoices.  Review the customer notice and change list at  **https://www.tpx.com/legal/notices/**

**Moving?**
Coordinating a customer move may take up to 30-days. Call us today at 877-487-8722, option 4 to schedule your move.

## Official Messages

### Telemarketing
Business customers who engage in telemarketing must comply with the FCC's Telemarketing Sales Rules and the National Do Not Call regulations. Under these rules, telemarketers may not block the Caller ID display of their name/number and are required to search the Do Not Call registry at least once every 31 days and drop from their call lists the phone numbers of consumers who have registered. Register your organization at https://telemarketing.donotcall.gov.

### Explanation of Deniable/Non-Deniable Charges
The total amount of your invoice may include both basic telephone service charges and non-basic charges. Failure to pay basic charges may result in disconnection of your telephone service for nonpayment. Non-basic charges are those charges which are indicated by an asterisk (*) on your invoice. Failure to pay non-basic charges appearing on your invoice will not result in disconnection of your telephone service but may result in collection action. You are responsible for payment of all charges on your invoice.

### California Complaint Resolution
If you believe there is an error on your bill or have a question about your service, please call **TPx Communications** customer support at **(877) 487-8722.**

If you are not satisfied with **TPx Communications'** response, submit a complaint to the California Public Utilities Commission (CPUC) by visiting: http://www.cpuc.ca.gov/complaints/. Billing and service complaints are handled by the CPUC's Consumer Affairs Branch (CAB), which can be reached by the following means if you prefer not to submit your complaint online.

Telephone: 1-800-649-7570 (8:30 AM to 4:30 PM, Monday through Friday)
Mail: California Public Utilities Commission, Consumer Affairs Branch,
505 Van Ness Avenue, Room 2003, San Francisco, CA 94102

If you have limitations hearing or speaking, dial 711 to reach the California Relay Service, which is for those needing direct assistance relaying telephone conversations, as well their friends, family and business contact. If you prefer having your calls immediately answered in your mode of communication, dial one of the toll-free language-specific numbers below to be routed to the California Relay Service provider.

| Type of Call | Language | Toll-Free 800 Number |
|---|---|---|
| TTY/VCO/HCO to Voice | English | 1-800-735-2929 |
| | Spanish | 1-800-855-3000 |
| Voice to TTY/VCO/HCO | English | 1-800-735-2922 |
| | Spanish | 1-800-855-3000 |
| From or to Speech-to-Speech | English & Spanish | 1-800-854-7784 |

To avoid having service turned off while you wait for an outcome of a complaint to the CPUC **specifically regarding the accuracy of your bill**, please contact CAB for assistance. If your case meets the eligibility criteria, CAB will provide you with instructions on how to mail a check or money order to be impounded pending resolution of your case. You must continue to pay your current charges while your complaint is under review to keep your service turned on.

### Nevada Complaint Resolution
This bill is now due and payable; it becomes subject to a late payment charge if not paid by the "Pay By" date shown on your bill.

If you believe you have been billed incorrectly, please contact TPx. The Company will investigate the matter and report the results of its investigation to you. You may request a written report.

### Service Provided By
Your service is provided under your contract with U.S. TelePacific Corp., dba, TPx Communications and/or its affiliated companies.

**Previous Bill Amount** (From Invoice 111909310-0)          **$42,153.52**

## Payments

| Date | Type | Amount |
|---|---|---|
| 01/25/19 | Reversal - Payment | $9,557.58 |
| 01/28/19 | Payment | ($51,711.10) |
| 01/31/19 | Dishonored Check Reversal | $51,711.10 |
| **Total Payments** | | **$9,557.58** |

## Adjustments

| Date | Type | Amount |
|---|---|---|
| **Total Adjustments** | | **$0.00** |

**Balance Forward**          **$51,711.10**

## Current Charges

### Non-Recurring Charges

| Date | Type | Amount |
|---|---|---|
| 01/30/19 | Insufficients Funds Fee | $25.00 |
| **Total Non-Recurring Charges** | | **$25.00** |

### Monthly Recurring Charges

| Service | From | To | Qty | Amount |
|---|---|---|---|---|
| OneNet | 02/01/19 | 02/28/19 | 1 | $2,407.87 |
| Access - 500 Mbps | | | 1 | |
| Best Effort CoSP | | | 1 | |
| EPL-Ethernet Private Line | | | 1 | |
| Equipment - No Router | | | 1 | |
| INOC - Basic | | | 1 | |
| Port - 500 Mbps | | | 1 | |
| SmartVoice PRI Voice Only | 02/01/19 | 02/28/19 | 3 | $66.30 |
| OORC Number (SV) - 2-Way | | | 10 | |
| OORC Number (SV) - Block of 100 - 2-Way | | | 2 | |
| SmartVoice SIP Internet | 02/01/19 | 02/28/19 | 9 | $19,629.68 |
| Access - 200 Mbps | | | 2 | |
| DID Numbers, Block of 20 | | | 9 | |
| INOC - Basic | | | 2 | |
| IP Address, Block of 4 | | | 2 | |
| Internet | | | 2 | |
| Long Distance Access Charge | | | 2000 | |
| OORC Number (SV) - Block of 100 - 2-Way | | | 3 | |
| Port - 200 Mbps | | | 2 | |
| SmartVoice Call Path | | | 2000 | |
| Tier 5 Router Non-Standard Request | | | 1 | |
| SmartVoice SIP OneNet Internet | 02/01/19 | 02/28/19 | 2 | $3.63 |
| OORC Number (SV) - 2-Way | | | 11 | |
| SmartVoice SIP Voice Only | 02/01/19 | 02/28/19 | 73 | $3,184.93 |
| Access - 01.5 Mbps | | | 2 | |
| Caller ID | | | 2 | |
| Caller ID Name | | | 2 | |
| DID Numbers, Block of 100 | | | 20 | |
| DID Numbers, Block of 20 | | | 7 | |
| Enterprise Trunking | | | 2 | |
| Equipment - Tier B: 3 Year | | | 2 | |
| Long Distance Access Charge | | | 40 | |
| OORC Number (SV) - 2-Way | | | 67 | |
| OORC Number (SV) - Block of 100 - 2-Way | | | 16 | |
| Port - 01.5 Mbps | | | 2 | |
| SmartVoice Call Path | | | 40 | |
| SmartVoice Portal | | | 1 | |
| SmartVoice Traffic Study Reports | | | 1 | |
| OneCentral Portal | 02/01/19 | 02/28/19 | 1 | $0.00 |
| Toll Free Number Charge | 02/01/19 | 02/28/19 | 2 | $0.00 |
| Trunk Group Call Forwarding to PSTN | 02/01/19 | 02/28/19 | 2 | $0.00 |
| WorldPac Regions | 02/01/19 | 02/28/19 | 1 | $0.00 |

**Total Recurring Charges**          **$25,292.41**

### Usage Charges

#### Domestic

| Description | Calls | Minutes | Amount |
|---|---|---|---|
| Zones 1&2 | 145,888 | 394,821.9 | $25,363.51 |
| Rating Discount | | | ($25,363.51) |
| Zone 3 | 23,208 | 60,669.5 | $3,931.56 |
| Rating Discount | | | ($3,931.56) |
| Intra-LATA | 129,623 | 336,156.4 | $20,398.33 |
| Rating Discount | | | ($20,398.33) |
| Intra-State/Inter-LATA | 638,311 | 1,756,796.6 | $18,699.34 |
| Inter-State/Inter-LATA | 38,695 | 244,264.3 | $2,378.00 |
| Alaska | 131 | 445.9 | $49.62 |
| Canada | 316 | 1,675.9 | $152.32 |
| Rating Discount | | | ($84.62) |
| Hawaii | 708 | 2,576.5 | $257.65 |
| US Virgin Islands | 17 | 21.6 | $3.76 |
| Puerto Rico | 29 | 80.2 | $11.34 |
| **Total** | **976,926** | **2,797,508.8** | **$21,467.41** |

#### International

| Description | Calls | Minutes | Amount |
|---|---|---|---|
| Australia | 1 | 0.5 | $0.08 |
| United Kingdom | 1 | 51.6 | $4.65 |
| **Total** | **2** | **52.1** | **$4.73** |

#### Toll Free Inbound

| Description | Calls | Minutes | Amount |
|---|---|---|---|
| Inter-State/Inter-LATA | 2 | 1.0 | $0.06 |
| **Total** | **2** | **1.0** | **$0.06** |

#### Directory Assistance

| Description | Calls | Amount |
|---|---|---|
| Long Distance Dir Asst | 6 | $7.50 |
| **Total** | **6** | **$7.50** |

**Total Usage Charges**          **$21,479.70**

### Other Charges

| Description | From | To | Qty | Amount |
|---|---|---|---|---|
| End User Common Line Charge (EUCL) | 02/01/19 | 02/28/19 | 2040 | $0.00 |
| End User Connection Charge (EUCC) | 02/01/19 | 02/28/19 | 2040 | $4,834.80 |
| Carrier Cost Recovery Fee | | | 1 | $585.69 |
| Federal Universal Service Fund Fee | | | | $554.56 |
| State Universal Service Fund Fee | | | | $1,829.55 |

**Total Other Charges**          **$7,804.60**

Government Fees and Taxes

| Type | Amount |
|---|---|
| 911 Tax | $249.50 |
| California Advanced Service Fund | $211.72 |
| California High Cost Fund A Surcharge | $129.92 |
| California Teleconnect Fund Surcharge | $295.52 |
| Federal Excise Tax | $678.94 |
| P.U.C. Tax (Fees) | $125.97 |
| Relay Service Communications Device Fund (DEAF) Surcharge | $106.23 |
| Sales Tax | $38.80 |
| Utility Users Tax | $600.46 |

| | |
|---|---|
| Total Government Fees and Taxes | $2,437.06 |
| Late Payment Charge | $0.00 |
| **Total Current Charges** | **$57,038.77** |
| **Total Due** | **$108,749.87** |