1 | Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
2 | BAKER & HOSTETLER LLP
Transamerica Pyramid Center
3 | 600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
4 | Telephone:    415.659.2600
Facsimile:    415.659.2601
5 | Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com
6 |
Eric E. Sagerman (SBN 155496)
7 | David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
8 | BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
9 | Los Angeles, CA 90025-0509
Telephone:    310.820.8800
10 | Facsimile:    310.820.8859
Email: esagerman@bakerlaw.com
11 | Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

Elizabeth A. Green (*pro hac vice*)
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
Telephone:    407.649.4036
Facsimile:    407.841.0168
Email: egreen@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>    **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>          **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**OBJECTION OF THE OFFICIAL COMMITTEE OF TORT CLAIMANTS TO CONFIRMATION OF DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED MARCH 16, 2020**<br><br>Date:    May 27, 2020<br>Time:    10:00 a.m. (Pacific Time)<br>Place:    **Telephonic Appearances Only**<br>        United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102 |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ................................................................................................ 1

II. FACTUAL BACKGROUND ............................................................................... 3

III. ISSUES OF LAW ............................................................................................... 6

A. The Plan Does Not Comply with Applicable Law under Section 1129(a)(3) if the Fire Victim Trust Does Not Receive the Full Value of the Settlement ............ 6

B. The Plan Violates the Good Faith Requirement of Section 1129(a)(3) Unless it is Modified to Conform to the Settlement, as Described Herein ........................ 10

IV. THE PLAN MUST BE MODIFIED TO PAY FIRE VICTIMS THE FULL VALUE OF THEIR SETTLEMENT ....................................................................... 11

A. The Plan Must Provide the Fire Victim Trust with the Full Scope of Assigned Rights and Causes of Action Provided in the Settlement ..................................... 11

1. The Debtors' Schedule of Assigned Claims Violates the Settlement by Erasing Hundreds of Millions of Dollars of Assigned Claims ................. 11

2. The Assigned Claims as Defined by the Settlement Are Substantial ....... 13

3. The Debtors' Schedule of Retained Claims Violates the Settlement ........ 16

B. The Fire Victim Trust Must Receive Stock that Holds a Value of $6.75 Billion . 17

1. The Fire Victim Trust Must Receive Treatment Under a Registration Rights Agreement No Less Favorable than Equity Backstop Parties ....... 17

2. The Debtors' Normalized Estimated Net Income Has Not Been Finalized and Should Be a Condition to Plan Confirmation .................... 20

C. The Plan's Definition of "Subrogation Wildfire Claim" Must Be Restored to Its Definition as of the Date of the Settlement, Unless the Trust Agreement's Insurance Setoff Language Is Approved ............................................................ 25

V. RESERVATION OF RIGHTS PERTAINING TO POST-CONFIRMATION MATTERS ......................................................................................................... 28

1. Go Forward Wildfire Fund ........................................................................ 28

2. The Tax Benefits Payment Agreement ..................................................... 29

3. Organizational Documents ........................................................................ 30

4. Automatic Termination of the RSA on August 29, 2020 ......................... 30

VI. CONCLUSION .................................................................................................. 30

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankruptcy Court (In re Chateaugay Corp.),*
   89 F.3d 942 (2d Cir. 1996)....................................................................................... 8, 9

*In re Alaska Fur Gallery, Inc.,*
   2011 Bankr. LEXIS 5787, 2011 WL 4904425 (Bankr. D. Ak. April 29, 2011)................. 6

*American Contractors Indemn. Co. v. Saladino,*
   115 Cal.App.4th 1262 (2004)................................................................................... 8, 9

*In re Applause, LLC,*
   2006 Bankr. LEXIS 2341 (Bankr. C.D. Cal. April 3, 2006)................................. 7, 8, 9

*Barnes v. Independent Automobile Dealers Ass'n of California Health & Welfare Plan,*
   64 F.3d 1389 (9th Cir. 1995)........................................................................................ 7

*In re Bashas' Inc.,*
   437 B.R. 874 (Bankr. D. Az. 2010) ........................................................................... 10

*In re Bethlehem Steel Corp.,*
   2004 Bankr. LEXIS 517, 2004 WL 601656 (Bankr. S.D.N.Y. 2004) ............................ 8

*In re Chateaugay Corp.,*
   94 F.3d 772 (2d Cir. 1996)........................................................................................... 8

*Computer Task Group, Inc. v. Brotby (In re Brotby),*
   303 B.R. 177 (9th Cir. BAP 2003) ............................................................................... 6

*Hamilton v. State Farm Fire & Cas. Co.,*
   270 F.3d 778 (9th Cir. 2001)...................................................................................... 15

*In re Lenox,*
   902 F.2d 737 (9th Cir.1990)........................................................................................ 6

*Pac. Gas & Elec. Co. v. Cal. ex. rel. Cal. Dep't of Toxic Substances Control,*
   350 F.3d 932 (9th Cir. 2003)........................................................................................ 6

*In re Pacific Gas and Elec. Co.,*
   304 B.R. 395 (Bankr. N.D. Ca. 2004).................................................................... 6, 9

*Platinum Capital, Inc. v. Sylmar Plaza L.P. (In re Sylmar Plaza, L.P.),*
   314 F.3d 1070 (9th Cir. 2002)................................................................................... 10

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- ii -

*Progressive West Ins. Co. v. Yolo County Superior Court*,
   135 Cal.App.4th 263 (2005)..............................................................................7

*Sapiano v. Williamsburg Nat. Ins. Co.*,
   28 Cal.App.4th 533 (1994)................................................................................7

*SEC v. Capital Consultants, LLC*,
   397 F.3d 733 (9th Cir. 2005)...........................................................................27

*Settling States v. Carolina Tobacco Co. (In re Carolina Tobacco Co.)*,
   360 B.R. 702 (D. Or. 2007)...............................................................................6

*In re Silberkraus*,
   253 B.R. 890 (Bankr. C.D. Cal. 2000)............................................................10

*Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*,
   84 B.R. 167 (B.A.P. 9th Cir. 1988)..........................................................10, 19

*Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard)*,
   729 F.3d 1279 (9th Cir. 2013)..........................................................................28

**Statutes**

11 U.S.C. § 509(a)..................................................................................................9

11 U.S.C. § 509(c)..................................................................................................8

11 U.S.C. § 1129(a)................................................................................................6

11 U.S.C. § 1129(a)(3)....................................................................................*passim*

Pub. Util. Code § 3292(b)..............................................................................28, 29

Pub. Util. Code § 3292(b)(1)...............................................................................29

Pub. Util. Code § 3292(e).....................................................................................29

**Rules**

Fed. R. Bankr. P. 9019(a).......................................................................................3

Fed. R. Civ. P. 60(b).............................................................................................6

Case: 19-30088   Doc# 7306   Filed: 05/15/20   Entered: 05/15/20 15:39:10   Page 4 of
35

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

The Official Committee of Tort Claimants (the "**TCC**") hereby files this Objection to confirmation of the Joint Chapter 11 Plan of Reorganization dated March 16, 2020, or any subsequently amended version thereof (the "**Plan**") proposed by PG&E Corp. and Pacific Gas and Electric Company (collectively, the "**Debtors**" or "**PG&E**") and the shareholders defined therein as the Shareholder Proponents (the "**Shareholder Proponents**"), as follows.

## I. INTRODUCTION

On December 6, 2019, the Debtors, the TCC, certain law firms representing individuals holding approximately 70% in number of the prepetition fire claims (the "**Consenting Fire Claimant Professionals**"), and the Shareholder Proponents, entered into a Restructuring Support Agreement (the "**RSA**") that established the terms for a settlement of the payment amount and plan treatment for Fire Victims' claims in an attached Term Sheet (the "**Settlement**").

That Settlement is often briefly described as a "$13.5 billion" settlement. But there is much more to the Settlement than the specified cash and stock to be contributed to the Fire Victim Trust. Among other terms, the Settlement confirms that a broad spectrum of claims will be assigned to the Fire Victim Trust; it protects the value of the $6.75 billion in stock that was negotiated for the Fire Victim Trust by ensuring fair and equitable access to the market and protecting against the risk of widespread sell-offs by other shareholders; it ensures that the Plan's financing will not be changed in any manner that impairs the financial interests of Fire Victims; and it requires funding of the Fire Victim Trust on an effective date that precedes the 2020 fire season.

By this Objection brief, the TCC requests that this Court enforce that Court-approved Settlement, because the Plan—unless modified as set forth herein—fails to provide Fire Victims with the treatment and value that was agreed to in the Settlement. Instead, the Plan has whittled away various aspects of the Settlement and could harm Fire Victims in amounts that are in the billions of dollars. For example, the Debtors have taken actions to limit the claims assigned to the Fire Victim Trust either by changing the scope of the claims or providing misleading notice. The Debtors have failed to provide the TCC with the required "reasonable" Registration Rights Agreement, which would provide Fire Victim Trust with the same registration and lock-up terms

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

as the insider Equity Backstop Parties. The Debtors' financing for the Plan has changed since the date of the RSA in a manner that reduces the value of the stock assigned to the Fire Victim Trust. The definition of "Subrogation Wildfire Claim" has been substantively amended, without the Fire Victims' required consent, in an apparent effort to push billions of dollars in claims from the Subrogation Trust where they belong and into the Fire Victim Trust. And thousands of newly filed subordinated debt claims filed by securities holders add undetermined billions of dollars in cash requirements for Plan effectiveness, further altering the leveraged nature of the Debtors' financial structure and further weakening the value of the stock assigned to the Fire Victim Trust.

A Plan that does not provide Fire Victims with the treatment that was approved by this Court in the Settlement is a plan that is not confirmable under Section 1129(a)(3). In order to ensure that the Plan provides Fire Victims with payment "in full" under the Settlement, and comply with applicable laws, the Plan must be modified as follows to restore the treatment of Fire Victim claims to the value provided under the Settlement (capitalized terms defined below):

- this Court should confirm that the Settlement's and Plan's definition of "Assigned Rights and Causes of Action" is controlling, should strike the Debtors' misleading schedule from its Plan Supplement, and should confirm that the TCC's Schedule of Assigned Claims (Exhibit 1 hereto) provides proper notice of the scope of such Assigned Claims. Alternatively, the Debtors must compensate the Fire Victim Trust for the value of all Assigned Claims that are compromised by the Debtors' actions, or else the Plan cannot be confirmed pursuant to Section 1129(a)(3);

- this Court should confirm that the Settlement's and Plan's definition of "Assigned Rights and Causes of Action," as illustrated in the TCC's Schedule of Assigned Claims, overrides any conflicting terms in the Debtors' Retained Schedule;

- it should be a condition to Plan confirmation that a reasonable Registration Rights Agreement have been executed by the Debtors and TCC on terms no less favorable than those given to the Equity Backstop Parties. Alternatively, this Court should retain jurisdiction to resolve this issue prior to the Effective Date;

- it should be a condition to Plan confirmation that the Debtors and the TCC confirm Normalized Estimated Net Income for 2021, and the corresponding amount of PG&E common stock for the Fire Victim Trust, in order to ensure that the Fire Victim Trust is paid the "full" value of the Settlement. Alternatively, if this issue cannot be resolved, the Court should send it to arbitration before Mr. Robert Meyer, and should reserve jurisdiction to order a future true-up proceeding; and

- if, for any reason, this Court does not approve the insurance set-off language in the Fire Victim Trust Agreement as filed, then this Court must restore the definition of "Subrogation Wildfire Claim" that existed when the RSA was approved. Further, the Court should confirm that nothing in the Plan or RSA releases any insurer from any contractual or equitable obligations to its Fire Victim insureds.

1    Attached to this brief as Exhibit 2 is a chart that lists each of these issues required for

2 confirmation.  In order for the Debtors' Plan to be confirmable, it must be amended as set forth

3 herein to restore the full value of the Settlement accorded to Fire Victims.  Anything less renders

4 the Plan unconfirmable for numerous reasons, including that it violates applicable California and

5 federal common law, and is not proposed in good faith.

6 **II.    FACTUAL BACKGROUND**

7    On December 9, 2019, the Debtors filed their motion for approval of the Settlement

8 pursuant to Fed. R. Bankr. P. 9019(a) [Dkt. No. 5038] (the "**Settlement Motion**").  *See* Exhibit A

9 to Declaration of David J. Richardson, filed herewith (the "**Richardson Decl.**"), attaching Dkt.

10 5038-1 (the "**RSA**"), and pp. 40-52 thereto (the "**Settlement**").  In their Settlement Motion, the

11 Debtors informed this Court that by entering into the Settlement, "the parties have resolved,

12 among other things, the **treatment** and discharge **of individual fire claims under the Debtors'**

13 **chapter 11 plan** in compliance with AB 1054."  *Id*. at p. 8:14-22 (emphasis added).

14    The parties to the RSA filed an amendment to the RSA/Settlement on December 16, 2019

15 [Dkt. No. 5143] (Exhibit B to Richardson Decl.), which included an amended definition of the

16 Aggregate Fire Victim Consideration for the Plan, which is the consideration that must be paid to

17 the Fire Victim Trust under the Settlement (the "**RSA/Settlement Amendment**").  This Court

18 approved the RSA and Settlement "in their entirety" in an Order entered December 19, 2019

19 [Dkt. No. 5174] (the "**9019 Order**") (Exhibit C to Richardson Decl.).

20    To ensure that the settled Plan treatment for Fire Victims is protected, the Settlement bars

21 amendments to the Plan that impact Fire Victims' financial interests unless the TCC consents.

22 The RSA specifically defines the "Plan" as the "Debtors' Joint Chapter 11 Plan of Reorganization

23 dated November 4, 2019" (*see* RSA, page 1) (the "**November Plan**") (Exhibit L to Richardson

24 Decl.) and permits incorporation of the Settlement's Terms into the November Plan to create an

25 Amended Plan.  *Id*. (agreeing "to amend the Plan as provided for in the Term Sheet (the

26 "Amended Plan") to include the terms and conditions set forth in this Agreement and with the

27 modifications set forth in the Term Sheet") (the "**Amended Plan**").

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 3 -

Based upon this undertaking, the TCC agreed to "support the **Amended Plan** as it would be revised **not inconsistent with the Term Sheet**." *Id.*, p. 2 (emphasis added). The concept that the Amended Plan would incorporate the terms of the Settlement, but then would only be revised in any manner "not inconsistent with the Term Sheet" is repeated multiple times in the RSA, as it is a critical protection for Fire Victims. *Id.*, pp. 1-2, recitals.

The Settlement plainly provides that the terms of the RSA and its Settlement "may not be waived, modified, amended, or supplemented except in a writing signed by the Debtors, the Shareholder Proponents, and the Requisite Fire Victim Professionals …" *Id.*, Section 7. The term "Requisite Consenting Fire Claimant Professional" includes the TCC. *Id.*, Section 1(m).

The terms that prevent the Debtors from making any amendments to the Amended Debtors that harm the interests of Fire Victims, without the consent of the TCC or the counsel to those Fire Victims, are unambiguous:

> **[A]ny waiver, change, modification, or amendment to this Agreement or the Amended Plan that adversely affects the economic recoveries or treatment of the holders of Fire Victim Claims** compared to the economic recoveries or treatment set forth in the Term Sheet attached hereto **may not be made without the written consent** of the Consenting Fire Claimant Professional representing such holder.

*Id.*, Section 7 (emphasis added). The Debtors have never obtained such written consent.

The RSA/Settlement further provides that the Debtors may only amend the Plan without TCC consent for non-material changes, as they may:

> **amend, modify, or supplement the Amended Plan** from time to time **without the consent of the TCC** or any Consenting Fire Claimant Professional **to cure any ambiguity**, defect (including any technical defect), or inconsistency, **provided**, that any such amendments, modifications, or supplements **do not materially adversely affect the rights, interests, or treatment of the TCC or Consenting Fire Claimant Professional under the Amended Plan**.

*Id.* (emphasis added). The TCC has never given such consent.

If the Debtors breach these terms of the Settlement, the RSA provides that the TCC may obtain specific performance to remedy the breach. *Id.* at Section 9 ("each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach").

- 4 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1    Admittedly, the TCC is not without obligations of its own under the RSA.  The RSA

2    contemplates that the TCC will support the "Amended Plan" as that term is defined in the RSA.

3    *Id.*, Section 2(k).  But as soon as the Debtors had the TCC's signature on the RSA and Settlement,

4    they began to further amend their Amended Plan without the TCC's consent in ways that

5    materially impact Fire Victims' financial interests beyond the intent of the Settlement, starting

6    with changes to the Debtors' capitalization and financial structure that impair the value of the

7    stock to be transferred to the Fire Victim Trust (discussed below).  And at no time have the

8    Debtors sent a notice of breach as required by the RSA, Section 3(c).  Thus, the Plan that is now

9    before this Court is not the "Amended Plan" that the TCC agreed to support, and the TCC has

10   repeatedly demanded a return to the agreed upon terms so that there is an Amended Plan that the

11   TCC can properly support.  That must happen for the Plan to be confirmable.

12   Virtually every appearance the TCC has made in this Court since the RSA and Settlement

13   were approved by the 9019 Order has been to protect the terms and value of the Settlement, and

14   ensure that the Plan that proceeds to confirmation provides Fire Victims with the full value of that

15   Settlement.  These appearances have included efforts to protect D&O insurance policies, limit the

16   impact of securities claims on the value of stock, protect the assets of the Fire Victim Trust from

17   diverted subrogation claims, protect assigned claims, and other such matters discussed below.

18   The Debtors will insist that because the TCC did not provide a letter of support for a

19   materially changed Plan that impairs the rights and interests of Fire Victims, they can keep

20   whittling down the value of the Settlement without any recourse by the TCC.  Stated simply, the

21   "Plan" is not the "Amended Plan" that the TCC agreed to support.  The changes were made in

22   violation of the Settlement, and were made in violation of the Debtors' duties under the

23   Settlement, and their duties to Fire Victims in general.  This is not an issue of "who breached

24   first," it is an issue of compliance with the RSA and Settlement, and with the requirements of

25   Section 1129(a)(3).  Unless and until the Plan is modified as set forth herein to provide for the full

26   value and complete terms of the Settlement, as approved by this Court, Fire Victims are not being

27   "paid in full" as a matter of California and federal common law, and the Plan therefore cannot

28   satisfy Section 1129(a)(3).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

III. **ISSUES OF LAW**

A.     **The Plan Does Not Comply with Applicable Law under Section 1129(a)(3) if the Fire Victim Trust Does Not Receive the Full Value of the Settlement**

Section 1129(a)(3) provides that a debtor's plan must comply with applicable state and federal law, unless otherwise preempted by the Bankruptcy Code. *In re Pacific Gas and Elec. Co.*, 304 B.R. 395, 399 (Bankr. N.D. Ca. 2004) ("This court's duty, derived from section 1129(a)(3), is to be certain that the Settlement Agreement and the Plan's implementation of it comply with applicable law"); *Settling States v. Carolina Tobacco Co. (In re Carolina Tobacco Co.)*, 360 B.R. 702, 711 (D. Or. 2007) ("Unless preempted by the Bankruptcy Code, state laws remain in place and a debtor must be able to comply with those state laws for a plan to be confirmed"); *In re Alaska Fur Gallery, Inc.*, 2011 Bankr. LEXIS 5787, *21, 2011 WL 4904425 (Bankr. D. Ak. April 29, 2011) (a "plan must comply with state law unless it has been preempted by the Bankruptcy Code").

Preemption is a very limited concept. The Ninth Circuit held in *Pac. Gas & Elec. Co. v. Cal. ex. rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932 (9th Cir. 2003) that the "notwithstanding" clause of Section 1129(a) only permits preemption of state law "relating to financial condition" of the debtor. *Id*. at 947-48. Thus, in order to satisfy Section 1129(a)(3), the Plan must comply with state and federal laws other than certain of those pertaining to the Debtors' "financial condition." *Id*.

As a general matter, a plan must conform to court-approved settlements and stipulations that specifically settle plan treatment, unless the settlement order is vacated under Fed. R. Civ. P. 60(b). *See, e.g., In re Lenox,* 902 F.2d 737 (9th Cir.1990) (reversing confirmation of plan where plan did not incorporate payment schedule from stipulation that specifically provided for plan treatment); *Computer Task Group, Inc. v. Brotby (In re Brotby)*, 303 B.R. 177, 186 (9th Cir. BAP 2003) (reversing confirmation of plan where creditor's stipulated treatment was changed in the filed plan and given differing classification). This Court's 9019 Order establishes the treatment that the Plan must provide for Fire Victim Claims, and the Plan must provide that treatment for the Plan to be confirmable.

Case: 19-30088    Doc# 7306    Filed: 05/15/20    Entered: 05/15/20 15:39:10    Page 10 of 35

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Similarly, the Debtors' Plan complies with Section 1129(a)(3) if—and only if—the consideration that will flow to the Fire Victim Trust is equal to the consideration agreed to under the Settlement. Anything less will violate Section 1129(a)(3) because if the Plan allows payments to subordinated or subrogated classes when Fire Victims have not been paid their Settlement value "in full," the Plan will violate California law and federal common law. *See Progressive West Ins. Co. v. Yolo County Superior Court*, 135 Cal.App.4th 263, 274 (2005) ("It is a general equitable principle of insurance law that, absent an agreement to the contrary, an insurance company may not enforce a right to subrogation until the insured has been fully compensated for [his or] her injuries, that is, has been made whole."); *Sapiano v. Williamsburg Nat. Ins. Co.*, 28 Cal.App.4th 533, 536 (1994) ("[T]he entire debt must be paid. Until the creditor has been made whole for its loss, the subrogee may not enforce its claim based on its rights of subrogation"); *Barnes v. Independent Automobile Dealers Ass'n of California Health & Welfare Plan*, 64 F.3d 1389, 1395 (9th Cir. 1995) (adopting as "federal common law the rule that, in the absence of a clear contract provision to the contrary, an insured must be made whole before an insurer can enforce its right to subrogation.").

This is not the same issue that the TCC argued when the Subrogation Claimholders settled with the Debtors, before there was a settlement of Fire Victim Claims. There are now settlements of all Fire Claims in these cases—Fire Victims, Subrogation, and Public Entities—and both the Subrogation claimants and the Public Entities are being paid in full, on the Effective Date. Fire Victims must also be paid "in full" on the Effective Date for the Plan to be confirmable; not whatever amount the Debtors are willing to pay, but the full value of the TCC Settlement. This is not simply a matter of equity or fairness, but compliance with Section 1129(a)(3).

Where the amount of a creditor's claim is resolved by settlement, the settlement value must be paid "in full" before an insurer or surety holding a subrogation claim arising from the same claim may be paid anything under a debtor's plan. The case of *In re Applause, LLC*, 2006 Bankr. LEXIS 2341 (Bankr. C.D. Cal. April 3, 2006) is instructive. In *In re Applause*, the court addressed the claim of an unsecured creditor, and the related subrogation claim of the issuer of a letter of credit who had partially paid the unsecured claim. The creditor had settled the total

amount of its claim for $800,000, but the Debtor did not have the funds to pay the $800,000

settlement value "in full." Relying on California and Ninth Circuit case law on subrogation

principles, the court held that because the creditor would not be paid "in full" under the

settlement, and regardless of the theory of subrogation on which the surety's claim was

asserted—California contract law, equitable subrogation, of Section 509(c)—the subrogation

claim was "in effect subordinated and of no value." *Id.* at *9-14. *See also American Contractors*

*Indemn. Co. v. Saladino*, 115 Cal.App.4th 1262, 1271-72 (2004) (until the value of a settlement

was paid in "total satisfaction of the underlying debt," the surety had no rights to recover their

portion of the settlement payment by subrogation).

     The court in *Applause* analyzed the Second Circuit's opinion in *In re Chateaugay Corp.*,

94 F.3d 772, 779-80 (2d Cir. 1996), where full payment of a settlement permitted payment of

associated subrogation claims, and held that:

> *Chateaugay* must mean that a claim is paid in full if there is a
> settlement between a primary obligor and a debtor and that the
> amount of the settlement is, in fact, paid. To the extent that
> *Chateaugay* holds otherwise, this Court declines to follow. The fact
> that AMB has not been and will not be paid the full $800,000
> because the estate has insufficient funds to pay unsecured creditors
> in full is the distinguishing factor. Because AMB has not been and
> will not be paid in full, Section 509(c) must apply, and WCL's
> claim must be subordinated.

*In re Applause, LLC*, 2006 Bankr. LEXIS 2341 at *14 (emphasis in original); *see also Id.* at *9-

10 (same holding if claim arises under contractual subrogation); *Id.* at *10 (same holding if

subrogation claim arises under equitable subrogation). *See also In re Bethlehem Steel Corp.*,

2004 Bankr. LEXIS 517, *16-17, 2004 WL 601656 (Bankr. S.D.N.Y. 2004) (where debtor paid

the full settlement amount of $10,000,000 to creditor under a settlement that compromised the

value of the claim, the creditor was "paid in full" and the related subrogation claim would not be

subordinated).

     The Second Circuit's decision in *Aetna Cas. & Sur. Co. v. Clerk, United States*

*Bankruptcy Court (In re Chateaugay Corp.)*, 89 F.3d 942 (2d Cir. 1996) is also instructive. In

that case, Aetna, acting as a surety, paid the claims of some, but not all, of the debtor's

employees. Aetna sought to have its subrogation claims treated with the same priority as the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

unpaid workers on the theory that its claims arose from the same category and priority of claims. The Second Circuit disagreed, applying "the general rule of subrogation set forth in § 509(a)" to hold that Aetna was "subordinate to the rights of unpaid employees until all employees are paid in full." *Id*. at 947-48. For the same reasons, unless and until this Court can find that all Fire Victims—insured or uninsured—will be paid the "full" amount of their Settlement by the consideration that flows to the Fire Victim Trust, a Plan that pays subordinated and subrogated claims cannot be confirmed.

The Plan's release provisions also violate California and federal common law unless and until the Fire Victim Trust receives the full value of the Settlement. The Settlement provides that the claims of Fire Victims will be satisfied by payment of the "Aggregate Fire Victim Consideration" to the Fire Victim Trust, and that each Fire Victim upon receiving a settlement payment of their claim will be required to sign a release confirming that they have been "made whole" under California law. *See* Plan, Section 4.25(f)(ii), and Exhibit C thereto. But if the Fire Victim Trust receives something less than the full value of the Settlement, Fire Victims will not have been paid "in full," and any requirement that they sign a release stating that they have been "made whole" would violate California and federal common law. *Applause*, 2006 Bankr. LEXIS 2341 at *9-14; *Saladino*, 115 Cal.App.4th at 1271-72. In other words, they would not have received the full "benefit of [their] bargain." *In re PG&E*, 304 B.R. at 415 (finding that the Debtors' plan did not violate Section 1129(a)(3) because the Debtors' settlement in that plan "will not change state law, but it will assure that PG&E gets the benefit of its bargain").

The Settlement specifically states the treatment of Fire Victim claims specified in the Settlement is required for there to be "full and final satisfaction, release, and discharge of all Utility Fire Victim Claims. Settlement, p. 46. The term Aggregate Fire Victim Consideration establishes that treatment. RSA/Settlement Amendment, p. 2. The Plan no longer provides that treatment, and cannot be deemed to be payment of the Settlement "in full."

To be clear, the TCC is not asking this Court to alter the payment rights of Subrogation Claimholders, or any other class that is being paid in full, in cash. The TCC is only asking that its Settlement be enforced, and its consideration paid in full. But because the Plan pays Subrogation

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Claimholders and others in full, in cash, the Plan cannot be confirmed unless Fire Victims are paid the "full" value of the Settlement, as anything less would violate Sections 1129(a)(3).

**B.** **The Plan Violates the Good Faith Requirement of Section 1129(a)(3) Unless it is Modified to Conform to the Settlement, as Described Herein**

Section 1129(a)(3) of the Bankruptcy Code provides that a plan must be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).

A plan proponent bears the burden of proving good faith under § 1129(a)(3). *In re Silberkraus*, 253 B.R. 890, 902 (Bankr. C.D. Cal. 2000). The term "good faith" is not defined in the Bankruptcy Code; however, "'[a] plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the [Bankruptcy] Code.'" *Platinum Capital, Inc. v. Sylmar Plaza L.P. (In re Sylmar Plaza, L.P.)*, 314 F.3d 1070, 1074 (9th Cir. 2002). It also requires a "fundamental fairness in dealing with one's creditors." *Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988). Good faith determinations are factual, based on the bankruptcy court's review of the totality of the circumstances, and made on a case-by-case basis. *In re Sylmar Plaza, L.P.*, 314 F.3d at 1074 (*citing In re Stolrow's, Inc.*, 84 B.R. at 172; *In re Bashas' Inc.*, 437 B.R. 874, 910 (Bankr. D. Az. 2010) ("In order to determine good faith, a court must inquire into the totality of circumstances surrounding the plan, the application of the principal [sic] of fundamental fairness in dealing with creditors, and whether the plan itself will fairly achieve a result consistent with the objectives and purposes of the Code.").

In these cases, unless and until the Plan is modified to address the TCC's objections set forth in this Objection and to conform to the Settlement, the Plan cannot be confirmed because it does not satisfy Section 1129(a)(3)'s mandate that the Plan be proposed in good faith. Since execution of the Tort Claimant RSA, the Debtors have taken substantial and unjustified steps that have had the effect of undermining the value conveyed to the Fire Victims, while insisting that they have the right to do so because the TCC has not issued a letter of support for this materially modified plan. Unless properly mitigated as set forth herein, these efforts establish the Debtors' lack of good faith in proposing the modified Plan and demonstrate a lack of fundamental fairness in dealing with one's creditors.

As addressed more fully, below, the Debtors' changes to the "Amended Plan" without TCC consent are in breach of multiple provisions of the RSA, including RSA Sections 4 (definitive documents), 6 (cooperation), 7 (amendments to the plan), and 20 (good- faith cooperation), and the Settlement's conditions to effectiveness, which require that "all definitive documents relating to the Plan, capitalization, equity and debt financing, shall be in form and substance reasonably acceptable to the Plan Proponent and the Requisite Consenting Fire Claimant Professionals…" *See* Settlement, at p. 48. Unless the Plan is modified as set forth herein to address these impermissible changes to the Settlement, the Plan has not been proposed in good faith, and cannot be confirmed.

## IV. THE PLAN MUST BE MODIFIED TO PAY FIRE VICTIMS THE FULL VALUE OF THEIR SETTLEMENT

### A. The Plan Must Provide the Fire Victim Trust with the Full Scope of Assigned Rights and Causes of Action Provided in the Settlement

#### 1. The Debtors' Schedule of Assigned Claims Violates the Settlement by Erasing Hundreds of Millions of Dollars of Assigned Claims

**Issue**: The Settlement and the Plan contain the identical definition of claims being assigned to the Trust, and the Plan requires that a schedule be filed that conforms to this definition. Despite this, the Debtors filed a Schedule of Assigned Claims over the TCC's objections that purports to erase a very material portion of the assigned claims, either by unilaterally amending the Settlement and Plan, or by ensuring that the Plan provides misleading notice in violation of the Debtors' duties.

**Means for Resolution**: This Court should confirm that the Settlement language defining "Assigned Rights and Causes of Action," which is also Section 1.8 of the Plan (the "**Assigned Claims**"), is the language that defines the scope of Assigned Claims, should strike the Debtors' misleading schedule, and should confirm that the TCC's Schedule of Assigned Claims (Exhibit 1 hereto) (the "**TCC Schedule**") provides proper notice to potential defendants of the scope of such Assigned Claims. Alternatively, if this Court is willing to permit the Debtors to unilaterally rewrite the terms of the Settlement to erase most of the Assigned Claims expressly or by

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

misleading notice, the Debtors must compensate the Fire Victim Trust for the substantial value of all omitted claims to ensure that the Fire Victim Trust receives payment "in full" of the value of the Settlement, or else the Plan cannot be confirmed pursuant to Section 1129(a)(3).

**Discussion**:  Article I of the Settlement's Term Sheet, as amended by the First Amendment to the RSA [Dkt. 5143-1] (*See* Exhibit B to Richardson Decl.) defines the term "Aggregate Fire Victim Consideration" to include, among other terms, "the assignment by the Debtors and Reorganized Debtors to the Fire Victim Trust of the Assigned Rights and Causes of Action."  *See* Dkt. 5143-1, at Article 1.6.  In turn, "Assigned Rights and Causes of Action" is defined in the Settlement as:

> any and all rights, claims, causes of action, and defenses related thereto relating directly or indirectly to any of the Fires that the Debtors may have against vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management), former directors and officers of the Debtors solely to the extent of any directors and officers Side B insurance coverage, and others as mutually agreed upon by the Plan Proponents and identified in the Schedule of Assigned Rights and Causes of Action.

*See* RSA/Settlement Amendment, Article I (the "**Assigned Claims**").  This identical term is Section 1.8 of the Plan, demonstrating the Debtors' original intent to comply with the Settlement.  As is clear from this definition, the Schedule of Assigned Rights and Causes of Action (the "**Schedule of Assigned Claims**"), must include certain Assigned Claims ("any and all rights, claims, causes of action, and defenses related thereto relating directly or indirectly to any of the Fires that the Debtors may have against…") and may include additional Assigned Claims (", and others as mutually agreed …"), but it cannot otherwise alter or reduce the scope of the Assigned Claims or amend either the Settlement or the Plan's inclusion of Settlement terms.  Consistent with the Settlement, the Plan defines the Schedule of Assigned Claims as "the schedule to be included in the Plan Supplement that is consistent in all respects with the definition of Assigned Rights and Causes of Action."  Plan at Section 1.189 (emphasis added).

But on May 1, 2020, the Debtors filed their Plan Supplement, including their version of the Schedule of Assigned Claims [Dkt. No. 7037, pp. 1933-1937] (the "**Debtors' Schedule**").  The Debtors' Schedule was filed without the TCC's agreement, in violation of every provision of

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 12 -

the RSA that obligates the Debtors to obtain TCC consent for such supplement or other definitive documents. *See* RSA at §§ 4, 6, 7 and 20. Whether by attempting to rewrite the Settlement, or by providing misleading notice of the scope of claims, the Debtors' Schedule risks mischief that could cost Fire Victims hundreds of millions of dollars, and render the Plan unconfirmable. The Debtors' Schedule effectively rewrites the Settlement's language on Assigned Claims, such that it would be amended as follows:

> any and all rights, claims, causes of action, and defenses related thereto, and that arose prior to the Petition Date, relating directly or indirectly to the cause of any of the Fires that the Debtors may have against vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management), subject only to recoveries under the defendants' insurance, and subject only to the extent that the claims pertain to a failure to provide contracted services in the manner required by the applicable contract, former directors and officers of the Debtors solely to the extent of any directors and officers Side B insurance coverage, and others as mutually agreed upon by the Plan Proponents and identified in the Schedule of Assigned Rights and Causes of Action.

The impact of these changes could be massive, and creates the risk that a court could find that the Debtors have successfully wiped out many Assigned Claims, whether by misleading notice, or by unilaterally amending the Settlement and Plan. The TCC filed a reservation of rights objecting to the Debtors' Schedule on May 4, 2020. *See* Exhibit J to Richardson Decl.

### 2. The Assigned Claims as Defined by the Settlement Are Substantial

The Settlement's and Plan's broad definition of Assigned Claims provides that the Trust will be assigned "any and all rights, claims, causes of action, and defenses related thereto" against the listed categories of entities "relating directly or indirectly to any of the Fires that the Debtors may have." Although former directors and officers fall within the category of potential defendants, the Debtors' Schedule does not appear to attempt to alter those rights. But with respect to contractors, vendors, consultants, etc. (collectively, "**Third Parties**"), the Debtors' changes are substantial and material.

The TCC believes that the claims against Third Parties that fall under the Settlement/Plan's agreed definition include:

- 13 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- Claims against third party contractors (including but not limited to vegetation management contractors, utility management contractors, and business consultants) based on breach of contract (such as failure to indemnify, failure to fulfill other contractual duties, failure to obtain additional insured rights, failure to give notice, and other potential claims), aiding and abetting the wrongful acts of Directors and Officers, property damage, professional negligence, and other claims sounding in tort; and

- Claims against insurance companies and other similar vendors, many of which arise from the Debtors' contracted right to be an "additional insured" in Third Parties' insurance policies.

In order to protect the Assigned Claims against any Plan confirmation challenge, confirm possible statute of limitations deadlines, confirm insurance notification requirements, and otherwise take actions to preserve the value of the Assigned Claims, the TCC has been attempting to take discovery relating to the Assigned Claims, first by reviewing and analyzing documents produced by the Debtors during these Cases, and then by discovery served directly on certain of the Third Parties. However, the records that have been produced by the Debtors, including those produced in response to specific requests for documents pertaining to the Assigned Claims, have been incomplete, and demonstrate that the Debtors do not appear to have sufficient recordkeeping that would permit a full and complete production of relevant documents. At the same time, cooperation by Third Parties has varied widely, with some Third Parties refusing to provide any relevant documents that pertain to Assigned Claims.

By unilaterally changing the Settlement terms, the Debtors have unconscionably attempted to deprive the Fire Victim Trust of substantial claims and recoveries, whether by actual amendment or by misleading notice, such that it is possible that:

- the Trust would be limited solely to insurance recoveries;
- claims for fraud, negligence or other common law counts that cannot be described as "a failure to provide contracted services in the manner required by the applicable contract" would be lost to the Trust;

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- all contractual indemnity claims not already asserted by the Debtors would be lost to the Trust;

- claims for property damage caused by Fires would be lost to the Trust;

- all claims that pertain "indirectly" to the Fires would be lost to the Trust; and

- all claims that do not arise from "causation" of the Fires would be lost to the Trust.

If this were the Debtors' negotiating position during Settlement discussions, it would have ended the discussions. As a unilateral change to the Settlement, it is impermissible.

Though the Plan is consistent with the Settlement, a schedule of Assigned Claims that provides misleading notice of the actual scope of claims could be deemed a waiver of claims. *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783 (9th Cir. 2001) ("In the bankruptcy context, a party is judicially estopped from asserting a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's schedules or disclosure statements"). Thus, even if this Court confirms that the actual scope of the Assigned Claims is determined by the Settlement's definition, the Debtors' Schedule could have the effect of destroying hundreds of millions of dollars in court-approved Settlement value if it isn't stricken from the Plan. If the Fire Victim Trust does not receive the full scope and value of Assigned Claims agreed to in the Settlement, with consistent notice provided by the Plan, then Fire Victims have not been paid "in full," and the Plan cannot be confirmed because it does not comply with Section 1129(a)(3).

For these reasons, the TCC requests that this Court: (i) confirm that the Settlement's definition of Assigned Claims as incorporated into Section 1.8 of the Plan is the controlling language; (ii) strike the Debtors' Schedule from the Plan for failing to comply with the Settlement and Plan; and (iii) find that the TCC Schedule is the operative Schedule of Assigned Rights and Causes of Action for purposes of providing notice by Plan confirmation of the nature and scope of Assigned Claims.

Alternatively, if this Court finds that the Debtors may unilaterally amend the scope of Assigned Claims under the Settlement, or finds that the misleading Debtors' Schedule may serve as notice of the scope of Assigned Claims, the Court must ensure that the Fire Victim Trust receives the value of all lost or waived Assigned Claims, by replacement cash or stock, to ensure

that the Fire Victim Trust is paid "in full" the value of the Settlement already approved by this Court. Anything less would violate Section 1129(a)(3) and render the Plan unconfirmable.[1]

### 3. The Debtors' Schedule of Retained Claims Violates the Settlement

**Issue**: The Debtors filed a Schedule of Retained Claims and Causes of Action as Exhibit F to their Plan Supplement (the "**Retained Schedule**") that appears to retain claims that fall within the scope of the Settlement's definition of Assigned Claims.

**Means for Resolution**: This Court should confirm that the scope of Assigned Claims is defined by the Settlement's definition and Plan Section 1.8, as illustrated by the TCC Schedule, and controls wherever there are conflicting terms in the Retained Schedule.

**Discussion**: The Plan does not provide for the filing of a schedule of retained claims. Nevertheless, the Debtors have filed their Retained Schedule, including terms that conflict with the Settlement and Plan.

The Settlement has assigned to the Trust all claims "against vendors, suppliers, third party contractors and consultants (including those who provided services regarding the Debtors' electrical system, system equipment, inspection and maintenance of the system, and vegetation management)." *See* Settlement, Article I. Yet the Retained Schedule lists contract claims pertaining to at least two of the Debtors' contractors who provided vegetation management services: (i) Chriso's Tree Trimming, Inc. and (ii) Mountain F. Enterprises. *See* Dkt. 7037, pp. 1946 and 1952. There may be additional contractors listed in the Retained Schedule whose names are not familiar to the TCC. The Retained Schedule also appears to retain claims for fire-related damage to property, which plainly fall within the broad language of the Settlement terms. There may be additional claims listed in the Retained Schedule that, by their vague terms, cannot be identified at this time as Assigned Claims, but may in fact be Assigned Claims.

The Retained Schedule does not limit these retained claims to post-petition claims, nor to claims other than those that are related to any of the prepetition Fires. Rather, it appears to

---

[1] The TCC anticipates that an objection to the assignment of the Assigned Claims may be filed by the Official Committee of Unsecured Creditors (the "**UCC**"), or by potential defendants. While this same argument applies to any such objection, and the Fire Victim Trust would have to receive replacement value for any claims stricken from the Settlement's definition of Assigned Claims, the TCC reserves all rights and arguments on this issue for its response to any such objection filed by the UCC or other parties.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"reserve" for the Debtors various claims that have been expressly assigned to the Fire Victim Trust under the Settlement.

In order to ensure that the Debtors have not further amended the Settlement without TCC consent simply by filing their Retained Schedule, the Confirmation Order should confirm that the Settlement's definition of Assigned Claims, as incorporated into Section 1.8 of the Plan, and as illustrated by the TCC Schedule, control the scope of Assigned Claims, and that the terms of the Settlement and TCC Schedule shall control any conflict with the terms of the Retained Schedule.

### B.   The Fire Victim Trust Must Receive Stock that Holds a Value of $6.75 Billion

#### 1.   The Fire Victim Trust Must Receive Treatment Under a Registration Rights Agreement No Less Favorable than Equity Backstop Parties

**Issue**: The Settlement and the Equity Backstop Letters each provide that the Debtors and the TCC/Equity Backstop Parties will negotiate a registration rights agreement which, among other things, will govern the terms under which the Fire Victim Trust and each Equity Backstop Party can liquidate its stock interests. Under commercial standards, a reasonable registration rights agreement would apply equal terms to both Fire Victims and the Equity Backstop Parties, and would subject both equally to any lock-up requirements. The Debtors have not provided the TCC with such a reasonable agreement. Locking up the Fire Victim Trust, but not Equity Backstop Parties, would risk the value of the common stock being transferred to the Fire Victim Trust, and would improperly delay payments to Fire Victims, while Equity Backstop Parties would be able to turn a quick profit, in addition to the approx. $1 billion fee they will receive.

**Means for Resolution**: It should be a condition to confirmation of the Plan that a reasonable Registration Rights Agreement have been finalized and executed by the Debtors and the TCC, on terms no less favorable than those given to the Equity Backstop Parties. Alternatively, this Court should retain jurisdiction to resolve this issue prior to the Effective Date.

**Discussion**:  The RSA provides that the PG&E common stock to be transferred to the Fire Victim Trust will be subject to "reasonable registration rights consistent with the recommendations of the Debtors' equity underwriter and tax rules and regulations." *See* RSA/Settlement Amendment, at § 3. The Backstop Commitment Letters also provide that a

- 17 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  registration rights agreement will be negotiated between the Debtors and the Equity Backstop

2  Parties. *See* Exhibit H to Richardson Decl., Exhibit C thereto, Dkt. 6013-1, p. 6, at § 2(d)(1).

3       When stock is acquired in a private offering or acquisition, it requires registration rights

4  for expeditious subsequent resale, and therefore investors typically seek out such rights in any

5  private offering or acquisition. But registration rights agreements also typically contain lock-up

6  provisions so that the stock is not immediately resold, in order to protect the stock value. The

7  TCC has collected and surveyed the publicly available registration rights agreements from all

8  public companies that emerged from chapter 11 within the past seven (7) years whose market

9  capitalization exceeded $1 billion at the time trading began following the effective date, and they

10  show on their face that it is market practice that any lock-up provisions are applied on equal terms

11  to all shareholders who are getting registration rights. Not one of the agreements shows differing

12  lock-up treatment for one group of such shareholders versus another. *See* Declaration of Brent

13  Williams (the "**Williams Decl.**"), at ¶¶ 15-16.

14       Since this Court approved the RSA and Settlement, the TCC and the Debtors have been

15  unable to negotiate an equitable and reasonable registration rights agreement. While the TCC

16  stands by the RSA and its Settlement, it is important to remember that the Fire Victims'

17  representatives agreed that the Fire Victim Trust would accept PG&E stock in partial funding of

18  the trust as a necessary evil to assist the Debtors with their exit, because equity insiders had

19  already settled away the rest of the Debtors' cash for all other creditor groups. Stock was the only

20  remaining currency to provide Fire Victims with compensation in these cases. For purposes of

21  registration rights, the $6.75 billion involuntary currency provided by Fire Victims to facilitate

22  the Debtors' restructuring is no different than the $9 billion provided by the Equity Backstop

23  Parties. What is different is that, as shown by public filings such as Rule 2019 statements, the

24  vast majority of the Equity Backstop commitments by value are from current equityholders. If

25  the Debtors are unable to raise sufficient capital in the market and need to rely on the Equity

26  Backstop, then those current equityholders must fund the backstop in order to ensure that a plan

27  will be confirmed that allows them to retain their equity. If their help is needed, and they do not

28  step forward, the Plan will fail and they will lose their existing equity. It is self-interest. And it is

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

very profitable self-interest, as the Equity Backstop Parties are being granted the privilege of participating in the Equity Backstop at a massive discount price, with more than a billion dollars in fees to compensate them for agreeing to take that privilege in order to protect their current equity. As the Debtors' 8-K filings and the Ad Hoc Subrogation Group's Rule 2019 filings demonstrate, Equity Backstop Parties who are equityholders have also purchased Subrogation Claims—as many as $9 billion at face value—but purchased as a substantial discount, creating yet another profit center for equityholders. Fire Victims, meanwhile, are being told that they must accept stock with its uncertain value while all other creditors get cash on the Effective Date, and accept a registration rights agreement that will force them to wait longer than any other party before their stock can be liquidated into cash, while equity insiders can profit from their sweetheart deals almost immediately. Under the Debtors' scenario, Fire Victims whose homes were destroyed three years ago will have to sit and wait even longer before the stock can lead to cash payments, while equityholders have a brand-new investment opportunity that can turn a quick profit. That is the state of the Debtors' Plan. Equity over Fire Victims. Inequity in registration rights and lock-up provisions will further tilt the balance of this case in favor of insider equity, at the further expense of Fire Victims.

Publicly available registration rights agreements demonstrate on their face that it would be outside of the range of reasonableness for the Fire Victim Trust to be subject to lock-up provisions while insider equityholders are free to trade all of their stock of the Reorganized PG&E. The Debtors' determination to disadvantage the Fire Victims Trust's stock for the benefit of the insider Equity Backstop Parties' stock does not satisfy the Settlement's requirement for a "reasonable" agreement on registration rights, and undermines rather than ensures that the Fire Victim Trust will receive stock with the promised value.

Refusing to negotiate with similarly situated parties on a level playing field with respect to substantially similar agreements is fundamentally unfair to the Fire Victims and should not be permitted. *See e.g. Stolrow v. Stolrow's, Inc. (In re Stolrow's, Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988) (stating that Section 1129(a)(3)'s confirmation requirement that a plan be proposed in good faith requires "fundamental fairness in dealing with one's creditors.").

It should be a condition to confirmation of the Plan that the Debtors and TCC have entered into a registration rights agreements that provides the Fire Victim Trust with terms that are no less favorable than those given to the insider Equity Backstop Parties. Alternatively, this Court should retain jurisdiction to ensure that such an agreement is executed prior to the Effective Date.

## 2. The Debtors' Normalized Estimated Net Income Has Not Been Finalized and Should Be a Condition to Plan Confirmation

**Issue**: The amount of the Reorganized Debtors' common stock to be transferred to the Fire Victim Trust is to be determined by a calculation involving the Debtors' "Normalized Estimated Net Income" ("**NNI**") for 2021. But because of Plan changes, changes to the Debtors' capitalization and financing after approval of the RSA and Settlement, changes to the economy, and substantial new securities claims in the billions of dollars, the parties have not determined NNI for 2021, and therefore have not determined the amount of stock to be transferred to the Fire Victim Trust. The fact that the Debtors' plan and capitalization structure was not established when the RSA was negotiated was the specific reason the TCC required a consent right to material modifications to the plan.

**Means for Resolution**: Confirmation of the Plan or passage of the Effective Date should be conditioned on the Debtors and the TCC successfully arbitrating NNI for 2021, and the resulting amount of common stock for the Fire Victim Trust. Alternatively, if this issue cannot be resolved, the Court should send it to arbitration before Mr. Robert Meyer, and should reserve the jurisdiction to order a future true-up proceeding, by this Court or by arbitration, to ensure that there is a resolution of this issue.

**Discussion**: When the parties to the Settlement agreed that the amount of stock to be transferred to the Fire Victim Trust would be determined by NNI for 2021, they could not have anticipated the financial downturn that has affected the economy, driven by the Covid 19 pandemic. Nor could the TCC or Fire Victims have anticipated the massive capitalization and financing changes that the Debtors would make to their Plan that would affect the NNI calculation. The "indubitable equivalent" nature of the Debtors' stock rather than cash is

questionable under current circumstances. And until there is resolution to determine the proper calculation of NNI given outstanding issues, it will remain unclear how much PG&E common stock must be transferred to the Fire Victim Trust, whether the Debtors will provide the Fire Victim Trust with such stock, and therefore whether Fire Victims can be deemed to be paid "in full" under the Settlement.

The term "Normalized Estimated Net Income" is a complex term as demonstrated by its definition in the Settlement. *See* Settlement at pp. 43-44. But calculation of NNI is further complicated by issues pertaining to the Debtors' Plan that have changed or remain uncertain or unresolved, particularly given the dramatic changes that the economy has undergone, and is likely to continue to undergo during the Covid 19 pandemic. Three examples are discussed as follows:

**a.     The Debtors' Plan Financing Has Changed, and Remains Uncertain**

The Settlement provides that a "Condition to Effectiveness" of the Amended Plan is that:

> All definitive documents relating to the Plan, **capitalization, equity and debt financing** shall be in form and substance reasonably **acceptable** to the Plan Proponents and the Requisite Consenting Fire Claimant Professionals;

Settlement Term Sheet, p. 8, Conditions to Effectiveness (emphasis added). The term "Requisite Consenting Fire Claimant Professionals" is defined to include the TCC. RSA, § 1(m).

The "substance" of the Amended Plan's "capitalization, equity and debt financing" has materially changed since the RSA was negotiated and executed, without the requisite "reasonably acceptable" consent from the TCC. On January 3, 2020, the Debtors filed their Amended Financing Motion, detailing financing consistent with when the RSA was signed. *See* Exhibit H to Richardson Decl. But on January 31, 2020, the Debtors filed testimony in the CPUC's OII proceeding showing that the Debtors only intended to utilize $9 billion of the $12 billion equity backstop (the "**Equity Backstop**"), would increase debt by a total of $3.7 billion, and would add a new short-term $6 billion debt facility that would be securitized in 2021. *See* Declaration of Jerry R. Bloom, at ¶ 5. The TCC attempted to inquire about these changes at the OII hearing, but the Debtors objected, claiming that the RSA bars the TCC from inquiring into changes in plan

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

financing. *Id.* at ¶ 6. These financing changes are still a live issue before the CPUC. *Id.*, at ¶ 7. The shift of $3 billion from equity to debt increases the leveraged nature of the Debtors' balance sheet and affects the value of the common stock that the Fire Victim Trust will receive. The value of the stock will have a direct impact on the payments to Fire Victims, and therefore the leveraged nature of the Debtors' balance sheet is of material concern to the TCC.

In addition, when the Settlement was negotiated, the November Plan on file at that time included provisions to pay Holdco Class 9A – Holdco Subordinated Debt Claims, and Utility Class 10B – Utility Subordinated Debt Claims (the "**Subordinated Debt Classes**"), in full, in cash, on the Effective Date. At the time, those two classes were minimal. Since then, securities holders have been given the opportunity to file late, individual claims against the Debtors (the "**Securities Claims**"). Thousands of Securities Claims have been filed, seeking billions of additional dollars in damages. In connection with this Court's hearing held on May 6, 2020, this Court was informed that there are at least 4,400 Securities Claims asserting at least $6.0 billion in damages, although the "actual dollar amount is significantly higher" because of those who filed their claims in an unliquidated amount, and that approximately 1,600 of those claims fall into the Subordinated Debt Classes. *See* <u>Exhibits O</u> to Richardson Decl., at p. 2 and fn. 1; <u>Exhibit P</u> at p. 3; and <u>Exhibit Q</u>, at p. 4, lines 6-9.[2] The financing that may be required to address these claims—if allowed—could have a substantial impact on the calculation of NNI, the leveraged nature of the Debtors' balance sheet, and the value of the common stock transferred to the Fire Victim Trust. *See* Williams Decl., at ¶ 12.

It would be particularly troubling if the Debtors were to raise additional debt to satisfy these Subordinated Debt Claims in cash, in a manner that may depress the stock value, while Fire Victims continue to be paid with $6.75 billion of stock solely because the Debtors had claimed at the time of the RSA an inability to further fund their reorganization with cash.

---

[2] The payment of these Subordinated Debt Classes in cash, in full, is yet another violation of Section 1129(a)(3) if the Fire Victim Trust does not receive the full value of the Settlement as contemplated at the time the Settlement was negotiated and approved by this Court. The potential value of these Subordinated Debt Classes, and the impact they might have on the value of the common stock being transferred to the Fire Victim Trust is <u>not</u> an issue that was disclosed to Fire Victims in the Debtors' Disclosure Statement. Moreover, payment of these claims— if they are allowed—cannot be permitted to dilute the value of the Fire Victim Trust's common stock.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1       Further, the Debtors have proposed that Securities Claims may be partially paid by

2  insurance.  While this sounds like a solution, it suggests that the Debtors will drain D&O

3  insurance policies for the benefit of subordinated equityholders, which would decimate the value

4  of the Fire Victim Trust's Assigned Claims against directors and officers—in other words, this

5  solution would take money out of the pockets of Fire Victims, and hand it to equityholders.

6       This Court has previously stated on the record that resolution of Securities Claims will not

7  dilute or devalue the Trust's stock position.  But the requirement to pay the Subordinated Debt

8  Classes in cash, in full, or the use of D&O policy proceeds, may have that effect unless it can be

9  confirmed that calculation of the NNI, and the amount of stock to be transferred to the Fire

10  Victim Trust will address these outstanding issues to the Debtors' financing and capitalization.

### b. The Debtors' Proposals to Address Penalties and Fines Could Affect the NNI Calculation

13       On May 8, 2020, the California Public Utilities Commission ("**CPUC**") issued Decision

14  20-05-019, in its Order Instituting Investigation 19-06-015, which amended the Debtors'

15  settlement with other settling parties by increasing the agreed upon $1.675 billion in fines and

16  penalties against the Debtors for their roles in the 2017 and 2018 wildfires by $462 million, for a

17  total of $2.137 billion, consisting of:

- $1.823 billion in disallowances for wildfire-related expenditures (an increase of $198 million from the proposed settlement agreement);

- $114 million in System Enhancement Initiatives and corrective actions (an increase of $64 million from the proposed settlement agreement); and

- a $200 million fine payable to the General Fund, which shall be permanently suspended.

24  *See* Exhibit R to Richardson Decl. at p. 2.  As the CPUC explained in a companion press release

25  issued on May 7, 2020, "PG&E shareholders will pay the cost of expenditures that it would

26  otherwise seek to recover from customers."  *See* Exhibit S to Richardson Decl. at p. 2.

27       The $462 million increase in the fines and penalties includes a $200 million fine payable

28  to the State's General Fund that would be permanently suspended to ensure that the fine would

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 23 -

not adversely impact PG&E's ability to finance its Plan.  Exhibit R to Richardson Decl. at pp. 49-50.  The CPUC also found that it would be inappropriate for the $200 million fine to be paid out of the Fire Victims Trust, as had been proposed by PG&E in response to the imposition of the fine, because the fine is dissimilar in nature to the claims of wildfire victims and should not compete with such claims.  *Id.*

The CPUC's decision imposes an additional $262 million of shareholder liability beyond that originally anticipated in the Plan.  It presently remains unclear whether the additional fines and penalties will have any impact on the value of the Debtors' common stock, and how it will affect a proper calculation of NNI.  While there may be some clarity to these questions when the Debtors file their schedules and other papers in support of confirmation, it presently leaves doubt as to the proper calculation for NNI, and the means to ensure that the Fire Victim Trust receives stock that has the value of $6.75 billion as required under the Settlement.  Williams Decl. at ¶ 11.

### c. Outstanding Resolution of the Debtors' Securitization Proposal Will Affect the NNI Calculation

When the Debtors filed their amended motion for approval of financing for the Plan on March 2, 2020 [Dkt. 6013] (the "**Amended Financing Motion**"), the Debtors disclosed an intention to obtain approx. $6.0 billion in short-term debt that it anticipates replacing with an "Included Securitization Transaction."  *See* Exhibit H to Richardson Decl., at pp. 30-33.

This new provision creates uncertainty in the calculation of NNI, as the securitization of the short-term debt is not expected to close until early 2021 or later.  If the transaction does not close by March 31, 2021, the Debtors may be required to carry a substantial interest expense, which would impact the NNI calculation.  Williams Decl. at ¶ 13.

While some of these issues pertaining to financing, securitization and the payment of penalties involve outstanding uncertainty, calculation of NNI and determination of the amount of common stock to be transferred to the Fire Victim Trust are issues that require certainty.  For these reasons, the TCC contends that it should be a condition to confirmation of the Plan that the Debtors and the TCC reach agreement on NNI for 2021, and the corresponding amount of PG&E common stock for the Fire Victim Trust, in order to ensure that the Fire Victim Trust is paid the

- 24 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

"full" value of the Settlement. Alternatively, this Court should reserve the jurisdiction to conduct a true-up proceeding to ensure that there is a resolution of this issue.

### C.  The Plan's Definition of "Subrogation Wildfire Claim" Must Be Restored to Its Definition as of the Date of the Settlement, Unless the Trust Agreement's Insurance Setoff Language Is Approved

**Issue**: The Debtors have amended the Plan's definition of "Subrogation Wildfire Claim" in a manner that could shift billions of dollars of insured claims to the Fire Victim Trust.

**Means for Resolution**: If, for any reason, this Court does not approve the Fire Victim Trust Agreement as filed, as it relates to the Fire Victim Trust's right to set off insurance coverage, then this Court must restore the definition of "Subrogation Wildfire Claim" that existed in the November Plan and Amended Plan when the RSA was approved in order to prevent a shift of billions of dollars of subrogation claims into the Fire Victim Trust. Further, the Court should confirm that nothing in the Plan or RSA releases any insurer from any contractual or equitable obligations to its Fire Victim insureds.

**Discussion**: The RSA and the Subrogation Claimants' Restructuring Support Agreement (the "**Subrogation RSA**") are not simply two settlement agreements incorporated into the same Plan. They are two integrated agreements that, together, resolve the entirety of each non-Public Entity Fire Claim—the insured portions that are addressed as Subrogation Wildfire Claims, and the damages in excess of insurance, or entirely uninsured, that are addressed as Fire Victim Claims. Any amount that is asserted as a claim against the Debtors' estate that arises from Fire-related damages to an individual's or non-Public Entity's property falls into one of these two buckets. If a homeowner filed a valid claim in these cases describing $1 million in damages, and $500,000 in insurance coverage, they should have a claim against the funds of the Fire Victim Trust for the $500,000 in under-insured damages, while the applicable Insurer must satisfy its obligations under their policy, and only then can file a $500,000 subrogation claim. The releases that are built into the Plan confirm this scenario, as the homeowner receiving $500,000 from the Fire Victim Trust would be required to sign a release in which the homeowner releases any made-

Case: 19-30088    Doc# 7306    Filed: 05/15/20    Entered: 05/15/20 15:39:10    Page 29 of 35

whole claim (but not any remaining policy rights), and the Insurer releases any subrogation rights against the homeowner. Both get paid. Both get releases.

It was a division that was easily understood until March 16, 2020, when the Debtors filed their amended Plan containing a revised definition of the term "Subrogation Wildfire Claim," a revision that threatens to shift billions of dollars in insured damages to the Fire Victim Trust. The Plan's definition of "Subrogation Wildfire Claim" has been changed to add a new exception, stating that a Subrogation Wildfire Claim does not include:

> **(b) any Fire Claim asserting direct injury to a fire victim, regardless of whether the claimant is an insured and has received or will receive a recovery from their insurer, and any such claims are not the subject of, or compromised under, the Subrogation Claims RSA**.

*See* Plan at Section 1.201 (emphasis added).

This extremely vague language was added to the Plan to address the TCC's objection to the proofs of claim filed by Adventist Health System/West and Feather River Hospital d/b/a Adventist Health Feather River [Dkt. No. 5760] (collectively, the "**Adventist POC Objection**"). The TCC filed its Adventist POC Objection to address a $1 billion proof of claim asserting fully insured damages, which the TCC believes may have been filed by the victim rather than the insurer to obtain a higher recovery from the Fire Victim Trust than the insurer would receive from the Subrogation Trust. Such a claim would improperly shift as much as a billion dollars in insured claim value from the Subrogation Trust to the Fire Victim Trust.

Neither the Plan nor the Subrogation RSA have any impact on the ongoing legal obligations of Insurers to their Insureds. The Subrogation RSA expressly provides for payment by the Debtors of insured claims that the Insurers have reserved for payment but have not yet paid. *See* Plan at Section 1.201 ("For the avoidance of doubt, Subrogation Wildfire Claims shall include both "Paid" and "Reserved" claims"). More than $5.7 billion of such reserves and IBNR (insured by not reserved) were acknowledged in the Debtors' motion for approval of the Subrogation RSA. *See* Exhibit E to Richardson Decl., at p. 22, lines 7-9. Those amounts, plus all subsequently arising reserves, remain the legal obligation of the Insurers, to be compensated in turn by the Debtors through the Subrogation Trust.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 26 -

The respective RSAs, and the required releases, only work if Insurers abide by their contractual obligations to their Insureds, and pursue their own recoveries from the Subrogation Trust. If any Insurer can cause their Insured to seek a recovery of insured damages from the Fire Victim Trust, the entire structure of dual trusts and complementary releases will unravel, all to the detriment of Fire Victims. But under the Debtors' revised definition for "Subrogation Wildfire Claim," an Insurer and its Insured could divert that liability to the Fire Victim Trust by having the Fire Victim file the claim.

Despite the improper changes to the definition of "Subrogation Wildfire Claim," the Fire Victim Trust has a form of protection, in that a term in the Trust Agreement and its attached Fire Victim Claims Resolution Procedures provides that the Trust will hold setoff rights against any Fire Victim's claim in the amount of insurance benefits that have not been paid. *See* Exhibit T to Richardson Decl., at p. 1874, Section 2.6; and p. 1911, Section X.A. Such offsets against insurance recoveries and other third-party claims to obtain a more equitable distribution scheme have been approved by the Ninth Circuit in receivership and mass tort cases. *See SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738-41 (9th Cir. 2005) (discussing other Ninth Circuit cases, and finding offset plan as allowing "for more equal compensation to innocent CCL clients").

The benefit of this language is that, if a Fire Victim files a claim that is fully or partially insured, but the Insurer has not provided benefits in the hope that the Fire Victim will receive full payment from the Fire Victim Trust, the liability will properly remain with the Insurer rather than be converted from a proper Subrogation Claim to an improper insured Fire Victim Claim.

The Trust Agreement's language is necessary to protect Fire Victims, particularly as the new definition of Subrogation Wildfire Claim creates an incentive for Insurers to abandon their contractual obligations to Insureds in the hope that the Insureds will seek their full damages from the Fire Victim Trust. If the Plan's revised definition is permitted to divert insured claims into the Fire Victim Trust, it will dilute the recoveries for all Fire Victims, such that no Fire Victim will be paid the "full" value of the Settlement.

In order to ensure that the insurance claims are not improperly diverted into the Fire Victim Trust, the TCC requests that this Court:

i. (a) approve the Fire Victim Trust Agreement as filed as it relates to the Fire Victim Trust's right to set off potential insurance recoveries, or (b) restore the definition of "Subrogation Wildfire Claim" that existed in the November Plan when the RSA was approved; and

ii. Confirm that nothing in the Plan or Subrogation RSA releases any insurer from its ongoing contractual or equitable obligations to any Fire Victim under their policy.

## V. RESERVATION OF RIGHTS PERTAINING TO POST-CONFIRMATION MATTERS

The TCC raises the following reservations of rights to address matters that may not arise prior to confirmation of the Plan but may be live issues as the Debtors approach the "prior to August 29, 2020" deadline for effectiveness of the Plan that is established in the RSA. The TCC requests that this Court specifically reserve post-confirmation jurisdiction in the Confirmation Order, to the fullest extent available under applicable law, to address fully any issues that may arise pertaining to PG&E's participation in the Go Forward Wildfire Fund and the automatic termination of the RSA, in the event that it appears the Debtors will be unable to make their Plan effective prior to August 29, 2020, or that interim events present the risk of substantial wildfire liability. *See Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1289-90 (9th Cir. 2013) (describing post-confirmation "close nexus" test for related to jurisdiction, and post-confirmation ancillary jurisdiction over plan and incorporated settlement).

### 1. Go Forward Wildfire Fund

As to PG&E, to participate in the Go Forward Wildfire Fund, Section 3292(b) requires that, by no later than June 30, 2020:

1) PG&E's insolvency proceeding has been resolved pursuant to a plan not subject to a stay;

2) The bankruptcy court has determined that the resolution provides for satisfying any prepetition wildfire claims; and

3) The CPUC has (a) approved the reorganization plan and other documents as acceptable in light of PG&E's safety history, criminal probation, recent financial

Case: 19-30088    Doc# 7306    Filed: 05/15/20    Entered: 05/15/20 15:39:10    Page 32 of 35

condition; ( b) determined the reorganization plan and other documents as
consistent with the (i) state's climate goals and (ii) neutral, on average to
ratepayers, and (c) determined the reorganization plan and other documents
recognize the contributions of ratepayers.

Pub. Util. Code § 3292(b)(1).

PG&E elected to participate in the fund on July 25, 2019, and received this Court's approval on August 26, 2019, for its determination to pay the initial contribution and annual contributions as they became due. PG&E's contributions to the fund are not due until the date that PG&E exits this proceeding. Pub. Util. Code § 3292(e).

Having obtained approval to participate in the Go Forward Wildfire Fund from this Court, PG&E's participation in the fund became effective as of the effective date of the code section and it applies to covered wildfires. Currently, there are two limitations on PG&E's participation in the fund. One, PG&E's participation in the fund is limited to forty percent (40%) of the allowed amount of a claim. Two, PG&E may not seek payments from the fund until: (1) it has met the subsection 3292(b) conditions, and (2) it has funded its initial contributions.

Provided that: (1) the Section 3292(b) conditions set forth above are met by June 30, 2020, and (2) the Effective Date and funding under the Debtor's Plan occurs prior to August 29, 2020, including the funding of the Go Forward Wildfire Fund contributions, PG&E will be able to obtain one-hundred percent (100%) participation in the Go Forward Wildfire Fund prior to commencement of the 2020 wildfire season. If, however, pursuant to the Case Resolution Process Order and Confirmation Order, the Effective Date and funding do not occur prior to August 29, 2020, or if interim events present the risk of substantial wildfire liability, issues regarding the risks associated with PG&E's less than full participation in the Go Forward Wildfire Fund for the 2020 wildfire season will arise and may need to be addressed by the Court.

## 2. The Tax Benefits Payment Agreement

The Settlement provides that the Fire Victim Trust will be protected by a Tax Benefits Payment Agreement which specifically includes stipulated judgments and letters of credit that will address the delayed cash payments totaling $1.35 billion. As of the date of this brief, that

agreement and its related documents have not been finalized. The TCC reserves all rights, and requests that this Court reserve all necessary jurisdiction, to ensure that an appropriate Tax Benefits Payment Agreement, and related documents, be finalized before the Effective Date, if not finalized before confirmation.

### 3. Organizational Documents

The Debtors also filed amended articles of incorporation and bylaws which have been amended in connection with these chapter 11 cases. *See* Plan Supplement, Exhibits I and J. The TCC has provided comments to these documents to the Plan Proponents that relate to the Fire Victim Trust's ability to monetize the shares being provided to it under the Plan. The TCC reserves all rights, and requests that this Court reserve all necessary jurisdiction, to ensure that these documents be finalized before the Effective Date, if not finalized before confirmation.

### 4. Automatic Termination of the RSA on August 29, 2020

The RSA provides that it will automatically terminate if the Plan is not made effective, including the funding of the Fire Victim Trust, before August 29, 2020. *See* RSA, at § 3(a)ii. The Plan, in turn, requires that the RSA be "in full force and effect" as an express condition precedent to confirmation of the Plan. *See* Plan at §§ 9.1(e) and 9.2(c). Neither of these terms can be waived without TCC consent. *Id*. at § 9.4.

The TCC reserves all rights, including the standing to address these matters, if the Plan is not made effective before August 29, 2020.

## VI. <u>CONCLUSION</u>

For the reasons argued herein, the TCC respectfully contends that the Debtors' Plan may not be confirmed under Section 1129(a)(3) unless the Plan is modified to restore the value and terms of the Settlement that was approved by this Court for the treatment of Fire Victim claims in any plan of reorganization. Specifically, the following terms must be restored or addressed:

- this Court should confirm that the Settlement's and Plan's definition of "Assigned Rights and Causes of Action" is controlling, should strike the Debtors' misleading schedule from its Plan Supplement, and should confirm that the TCC's Schedule of Assigned Claims (Exhibit 1 hereto) provides proper notice of the scope of such

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Assigned Claims. Alternatively, the Debtors must compensate the Fire Victim Trust for the value of all Assigned Claims that are compromised by the Debtors' actions, or else the Plan cannot be confirmed pursuant to Section 1129(a)(3);

- this Court should confirm that the Settlement's and Plan's definition of "Assigned Rights and Causes of Action," as illustrated in the TCC's Schedule of Assigned Claims, overrides any conflicting terms in the Debtors' Retained Schedule;

- it should be a condition to Plan confirmation that a reasonable Registration Rights Agreement have been executed by the Debtors and TCC on terms no less favorable than those given to the Equity Backstop Parties. Alternatively, this Court should retain jurisdiction to resolve this issue prior to the Effective Date;

- it should be a condition to Plan confirmation that the Debtors and the TCC confirm Normalized Estimated Net Income for 2021, and the corresponding amount of PG&E common stock for the Fire Victim Trust, in order to ensure that the Fire Victim Trust is paid the "full" value of the Settlement. Alternatively, if this issue cannot be resolved, the Court should send it to arbitration before Mr. Robert Meyer, and should reserve jurisdiction to order a future true-up proceeding; and

- if, for any reason, this Court does not approve the insurance set-off language in the Fire Victim Trust Agreement as filed, then this Court must restore the definition of "Subrogation Wildfire Claim" that existed when the RSA was approved. Further, the Court should confirm that nothing in the Plan or RSA releases any insurer from any contractual or equitable obligations to its Fire Victim insureds.

Dated: May 15, 2020

BAKER & HOSTETLER LLP

By: _/s/Robert A. Julian_
Robert A. Julian

Authors: Robert A. Julian
Elizabeth A. Green
David J. Richardson
*Counsel to the Official Committee of Tort Claimants*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 31 -