**EXHIBIT H**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  WEIL, GOTSHAL & MANGES LLP
   Stephen Karotkin (*pro hac vice*)
2  (stephen.karotkin@weil.com)
   Ray C. Schrock, P.C. (*pro hac vice*)
3  (ray.schrock@weil.com)
   Jessica Liou (*pro hac vice*)
4  (jessica.liou@weil.com)
   Matthew Goren (*pro hac vice*)
5  (matthew.goren@weil.com)
   767 Fifth Avenue
6  New York, NY 10153-0119
   Tel: 212 310 8000
7  Fax: 212 310 8007

   CRAVATH, SWAINE & MOORE LLP
   Paul H. Zumbro (*pro hac vice*)
   (pzumbro@cravath.com)
   Kevin J. Orsini (*pro hac vice*)
   (korsini@cravath.com)
   Omid H. Nasab (*pro hac vice*)
   (onasab@cravath.com)
   825 Eighth Avenue
   New York, NY 10019
   Tel: 212 474 1000
   Fax: 212 474 3700

8  KELLER BENVENUTTI KIM LLP
   Tobias S. Keller (#151445)
9  (tkeller@kellerbenvenutti.com)
   Jane Kim (#298192)
10 (jkim@kellerbenvenutti.com)
   650 California Street, Suite 1900
11 San Francisco, CA 94108
   Tel: 415 496 6723
12 Fax: 650 636 9251

13 *Attorneys for Debtors and Debtors in Possession*

14         **UNITED STATES BANKRUPTCY COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
15              **SAN FRANCISCO DIVISION**

16                                      Bankruptcy Case No. 19-30088 (DM)
17                                      Chapter 11 (Lead Case) (Jointly Administered)
   **In re:**
18                                      **DEBTORS' SECOND AMENDED MOTION**
                                        **FOR ENTRY OF ORDERS (I) APPROVING**
19                                      **TERMS OF, AND DEBTORS' ENTRY INTO**
                                        **AND PERFORMANCE UNDER, EQUITY**
20 **PG&E CORPORATION,**                **BACKSTOP COMMITMENT LETTERS,**
                                        **(II) APPROVING TERMS OF, AND**
       **- and -**                      **DEBTORS' ENTRY INTO AND**
21                                      **PERFORMANCE UNDER, DEBT**
   **PACIFIC GAS AND ELECTRIC**         **FINANCING COMMITMENT LETTERS**
22 **COMPANY,**                         **AND (III) AUTHORIZING INCURRENCE,**
                                        **PAYMENT AND ALLOWANCE OF**
23                        **Debtors.**  **RELATED FEES AND/OR PREMIUMS,**
                                        **INDEMNITIES, COSTS AND EXPENSES AS**
24 ☐ Affects PG&E Corporation          **ADMINISTRATIVE EXPENSE CLAIMS**
                                        **[Related to Docket Nos. 4446, 5267]**
25 ☐ Affects Pacific Gas and Electric   Date:  March 16, 2020
   Company                              Time:  10:00 a.m. (Pacific Time)
26                                      Place: United States Bankruptcy Court
   ☒ Affects both Debtors                      Courtroom 17, 16th Floor
27                                             San Francisco, CA 94102
   *All papers shall be filed in the Lead*     Objection Deadline: March 12, 2020
28 *Case, No. 19-30088 (DM).*

Case: 19-30088   Doc# 6013   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 1 of 48
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 2 of 175

**Purpose of the Amendment**

On January 3, 2020, the Debtors (as defined below) filed the *Debtors' Amended Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Equity Backstop Commitment Letters, (ii) Approving Terms of, and Debtors' Entry into and Performance Under, Debt Financing Commitment Letters and (iii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* (the "**Motion**") [Docket No. 5267] seeking approval of the Exit Financing Commitment Letters (as defined below). Subsequently, in light of the Noteholder RSA (as defined below) and the related filing of the Debtors' Plan (as defined below) on January 31, 2020, the Debtors entered into amended Exit Financing Commitment Letters.[1] Accordingly, the Debtors amend[2] the Motion as set forth below.

**The Second Amended Motion**

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this amended motion (the "**Second Amended Motion**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of orders (i) approving the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters (as defined below), (ii) approving the terms of, and the Debtors' entry into and performance under, the Debt Financing Commitment Letters (as defined below, and together with the Equity Backstop Commitment Letters, the "**Exit Financing Commitment Letters**") and (iii) authorizing the

---

[1] The Debtors have entered into amended Debt Financing Commitment Letters and are in the process of obtaining consents to amendments to the Equity Backstop Commitment Letters, which process the Debtors expect to complete prior to the hearing on the Second Amended Motion.

[2] The Debtors file this Second Amended Motion in an abundance of caution and do not concede that every present or future amendment to the Exit Financing Commitment Letters requires an amended motion.

Case: 19-30088    Doc# 6013    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 2 of
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 3
of 175

incurrence, payment and allowance of all related fees and/or premiums, indemnities, costs and expenses (the "**Exit Financing Obligations**") as administrative expense claims.

In support of the Second Amended Motion, the Debtors respectfully submit the Second Amended Declaration of Kenneth S. Ziman (the "**Ziman Declaration**"), filed contemporaneously herewith. Proposed forms of orders granting the relief requested herein with respect to the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters are attached to this Second Amended Motion as **Exhibit A** and **Exhibit B**, respectively (collectively, the "**Proposed Orders**").

Case: 19-30088    Doc# 6013    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 3 of 18
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 4 of 175

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ v

I.     PRELIMINARY STATEMENT ......................................................................... 1

II.    JURISDICTION ............................................................................................... 10

III.   BACKGROUND ................................................................................................ 10

     A.     The Debtors' Plan ............................................................................ 10

     B.     The Equity Backstop Commitment Letters.................................... 12

     C.     The Debt Financing Commitment Letters ..................................... 15

     D.     Certain Key Terms and Provisions of the Exit Financing Commitment Letters and the Proposed Orders ......................................................... 17

IV.   BASIS FOR RELIEF REQUESTED ............................................................... 33

     A.     Entry into the Exit Financing Commitment Letters is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates. ................. 33

     B.     Payment and Allowance of the Exit Financing Obligations as Administrative Expense Claims Should Be Approved Because They are Fair, Reasonable and Essential Terms of the Exit Financing Commitment Letters....................................... 36

V.     WAIVER OF BANKRUPTCY RULE 6004(h) ............................................... 40

VI.   NOTICE ............................................................................................................ 40

iv

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re AbitibiBowater Inc.*,
418 B.R. 815 (Bankr. D. Del. 2009) ............................................................35

*In re Adelphia Commc'ns Corp.*,
No. 02-41729 (REG), 2004 WL 1634538 (Bankr. S.D.N.Y. June 22, 2004)..............................4, 7

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*,
60 B.R. 612 (Bankr. S.D.N.Y. 1986) ...........................................................35

*Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*,
293 B.R. 455 (B.A.P. 8th Cir. 2003) ...........................................................35

*In re Excel Innovations, Inc.*,
502 F.3d 1086 (9th Cir. 2007) ....................................................................35

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
107 F.3d 558 (8th Cir. 1997) ......................................................................35

*In re Hexion Holdings LLC*,
No. 19-10684 (KG), (Bankr. D. Del. May 15, 2019) .................................35, 36, 40, 41

*In re Integrated Resources, Inc.*,
147 B.R. 650 (Bankr. S.D.N.Y. 1992) .....................................................34, 35

*In re Montgomery Ward Holding Corp.*,
242 B.R. 147 (D. Del. 1999) .......................................................................35

*In re Robles*,
No. 14-51812 (ASW), 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ...........................35

*Smith v. Van Gorkom*,
488 A.2d 858 (Del. 1985) ............................................................................35

*In re Station Casinos, Inc.*,
No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447 (Bankr. D. Nev. Feb. 2, 2010) ..................................................................................................34

*In re Ultra Petroleum Corp.*,
No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) ..............................4, 7

*In re Utah 7000, L.L.C.*,
No. 08-21869 (JB), 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) .........................4

v

**Statutes & Rules**

11 U.S.C. § 105 ...........................................................................................34, 36

11 U.S.C. § 105(a) ...............................................................................................35

11 U.S.C. § 362 ...................................................................................................34

11 U.S.C. § 363 ............................................................................................34, 36

11 U.S.C. § 363(b) ...............................................................................................35

11 U.S.C. § 363(b)(1) .........................................................................................34

11 U.S.C. § 364 ...................................................................................................34

11 U.S.C. § 503 ...................................................................................................34

11 U.S.C. § 503(b) ...............................................................................................41

11 U.S.C. § 507 ...................................................................................................34

11 U.S.C. § 507(a)(2) ...........................................................................................38

28 U.S.C. § 157 ...................................................................................................10

28 U.S.C. § 157(b) ...............................................................................................10

28 U.S.C. § 1334 .................................................................................................10

28 U.S.C. § 1408 .................................................................................................10

28 U.S.C. § 1409 .................................................................................................10

Fed. R. Bankr. P. 2002 ...................................................................................34, 42

Fed. R. Bankr. P. 4001 .........................................................................................34

Fed. R. Bankr. P. 6004 .........................................................................................34

Fed. R. Bankr. P. 6004(h) .....................................................................................41

Fed. R. Bankr. P. 9014 .........................................................................................34

Internal Revenue Code Section 382 .....................................................................19

Rule 5011-1(a) .....................................................................................................10

Rule 5110 .............................................................................................................32

Case: 19-30088   Doc# 6013   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 6 of
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 7
of 175

**Other Authorities**

California Assembly Bill 1054 ................................................................................ passim

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General
    Order 24 (N.D. Cal.) ....................................................................................10

United States Constitution Article III ................................................................10

Case: 19-30088   Doc# 6013   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 7 of
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 8
of 175

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.     PRELIMINARY STATEMENT**

On September 9, 2019, the Debtors filed their initial Joint Chapter 11 Plan of Reorganization [Docket No. 3841]. The Plan, which was subsequently amended to reflect an $11 billion settlement with holders of subrogation claims [Docket No. 3966], a $13.5 billion settlement with wildfire tort claimants [Docket No. 5101] and a settlement with a majority of the holders of the Utility's senior unsecured debt [Docket No. 5590] (as so amended, and as may be further amended or supplemented, the "**Debtors' Plan**"), will (a) satisfy all prepetition wildfire claims in full compliance with California Assembly Bill 1054 ("**AB 1054**"), (b) achieve a rate-neutral solution, on average, for customers, (c) meet the June 30, 2020 deadline for Plan confirmation established by AB 1054, (d) facilitate all necessary regulatory approvals, (e) support California's clean energy goals and (f) ensure that the reorganized Debtors have sufficient liquidity and other resources upon emergence to continue providing safe, clean and reliable electricity and natural gas to California residents.

Notably, the Debtors' Plan has the support of the Official Committee of Tort Claimants (the "**TCC**"), the attorneys representing individuals holding approximately 70% in number of prepetition wildfire claims filed against the Debtors, the Ad Hoc Committee of Subrogation Claimants, the Ad Hoc Committee of Senior Unsecured Noteholders (the "**Ad Hoc Noteholder Committee**") and the public entities that also have resolved their claims as provided in the Debtors' Plan. Indeed, the Debtors' Plan embodies a comprehensive resolution of these Chapter 11 Cases, with all of the impaired classes of claims supporting the Debtors' Plan, and the Debtors' Plan provides a clear and expeditious path for the Debtors' successful confirmation of the Debtors' Plan before the June 30, 2020 deadline established by AB 1054 and emergence from chapter 11 reasonably promptly thereafter.

In order to satisfy the objectives of the Debtors' Plan, the Debtors must have sufficient financing to consummate the Debtors' Plan. The Debtors' Plan contemplates multiple sources of funding, the foundations of which are the issuance of up to $12 billion[3] in reorganized PG&E Corp.

---

[3]     The current expectation is that $9 billion of new money equity will be raised pursuant to the OII Capital Structure (as defined below); however, the OII Capital Structure has not yet been approved by the California Public Utilities Commission (the "**CPUC**").

common stock ("**New PG&E Corp. Common Stock**"), to be used to fund payments under the Debtors' Plan to trusts that will make payments to wildfire tort claimants and insurance subrogation claimants, and the incurrence of up to $10.825 billion in senior debt obligations (the "**New Debt**"),[4] to, among other things, satisfy all prepetition obligations not being exchanged or reinstated under the terms of the Debtors' Plan, and to fund the Debtors' initial contribution to the Go-Forward Wildfire Fund (as defined below) and the payment in full, in cash, of the Debtors' obligations under their debtor-in-possession financing facilities and other administrative expenses.

The Debtors anticipate effectuating the equity and debt issuances contemplated by the Debtors' Plan through market transactions in order to obtain the most favorable pricing and other terms. However, the Debtors have obtained "backstop" commitments to ensure that sufficient funds at an acceptable price will be available on the effective date of the Debtors' Plan (the "**Effective Date**") even if market conditions deteriorate and the contemplated exit financing cannot be obtained on more favorable terms. The need for backstops is particularly important because of recent market volatility as a result of the coronavirus, the Debtors' exit financing-related requirements under certain RSAs and the need to demonstrate capital commitment as the Debtors navigate their way through the regulatory process.

Specifically, in the exercise of their business judgment, the Debtors have obtained debt financing commitments and expect to obtain amended equity financing commitments to provide assurances that the New PG&E Corp. Common Stock and New Debt will be fully financed on the Effective Date, guaranteeing the Debtors access to sufficient capital to consummate the Debtors' Plan. Under the equity commitment letters to be executed by PG&E Corp. (each in substantially the form

---

[4]     In addition, the Debtors' Plan contemplates the incurrence of up to $6 billion in short-term temporary debt (the "**Temporary Utility Debt**"), which is expected to be repaid post-emergence from the proceeds of a securitization financing transaction that is expected to be rate-neutral, on a net present value basis, to customers. The Temporary Utility Debt is not committed. Subject to obtaining confirmation by the AB 1054 deadline, Lazard is confident that the Debtors will be able to raise the Temporary Utility Debt at emergence. (Ziman Decl. ¶ 18.)

2

attached to this Second Amended Motion as **Exhibit C**,[5] and collectively, the "**Equity Backstop Commitment Letters**"), certain parties (collectively, the "**Equity Backstop Parties**") are expected to severally commit to purchase up to $12 billion in New PG&E Corp. Common Stock (collectively, the "**Equity Backstop Commitments**") on the Effective Date, on the terms and subject to the conditions set forth in the Equity Backstop Commitment Letters. Under the backstop debt commitment letters entered into by PG&E Corp. and the Utility on October 11, 2019, as supplemented on October 28, 2019 and December 2, 2019 and as amended on November 18, 2019, December 20, 2019, January 30, 2020, February 14, 2020 and February 28, 2020 (collectively, the "**Debt Commitment Letters**")[6], certain money-center banks have agreed to backstop the New Debt incurrences[7] contemplated by the Debtors' Plan (collectively, the "**Debt Commitments**" and, together with the Equity Backstop Commitments, the "**Exit Financing Commitments**"), on the terms and subject to the conditions set forth in the Debt Commitment Letters.

By this Second Amended Motion, the Debtors seek approval of the terms of, and their entry into and performance under, these Exit Financing Commitments, including the payment of all fees and expenses provided for in the Exit Financing Commitments. Under the Bankruptcy Code, the decision of a debtor-in-possession to obtain financing commitments is entitled to deference under the business judgment rule. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126); *In re Utah 7000, L.L.C.*, No. 08-21869 (JB), 2008

---

[5]     A copy of which was filed in an 8-K prior to market open on March 2, 2020.

[6]     Conformed copies of the Debt Commitment Letters entered into by PG&E Corp. and the Utility reflecting all amendments made through February 28, 2020 are attached to this Second Amended Motion as **Exhibit D** and **Exhibit E**, respectively.

[7]     Prior to January 31, 2020, the Debtors' Plan contemplated up to $34.35 billion of new debt financing. However, under the terms of the Debtors' Plan (as amended to incorporate the provisions of the Noteholder RSA) up to $21.425 billion of the Utility's prepetition notes and other funded debt will be exchanged or reinstated, reducing the new debt financing needed under the current Debtors' Plan. In addition, ongoing discussions regarding the treatment of $100 million of prepetition pollution control bonds may result in the exchange (rather than refinancing) of those pollution control bonds.

3

WL 2654919, at *2–3 (Bankr. D. Utah July 3, 2008). The soundness of the Debtors' business judgment is amply demonstrated here, where the Exit Financing Commitments have been obtained on favorable terms and, together with the Temporary Utility Debt, in amounts sufficient to allow the Debtors to successfully emerge from chapter 11 in the event market financing on better terms is unavailable. Given the critical importance of meeting the June 30, 2020 deadline to allow the reorganized Debtors to participate in the state wildfire insurance fund (the "**Go-Forward Wildfire Fund**") established by AB 1054, the Debtors have determined that obtaining backstop debt and equity financing commitments now and on the terms provided in the Exit Financing Commitments is in the best interests of all stakeholders.

**The Equity Backstop Commitment Letters.** The terms of the Equity Backstop Commitment Letters afford the Debtors significant flexibility in financing their emergence from the Chapter 11 Cases. (Ziman Decl. ¶¶ 18–19.) Although equity backstop commitment letters often require a debtor to consummate a particular type of equity offering—typically, a rights offering—the Equity Backstop Commitments here provide the Debtors with the flexibility to raise market-priced equity from other providers in the public and private markets while still ensuring that the needed capital will be available if those offerings are not consummated in time for the Debtors to emerge from their Chapter 11 Cases reasonably promptly after the Debtors' Plan is confirmed. Specifically:

- At equity valuations above a 13.5x implied price-to-earnings multiple (subject to adjustment based on changes in utility market indices), the Debtors are afforded discretion as to the type of primary equity offering that is consummated.
- Even at certain lower valuations, the Debtors may raise up to 20% of the equity proceeds in a widely-syndicated equity offering or, subject to certain consent rights, a private offering, with the remainder raised through a rights offering.

Importantly, the Equity Backstop Commitment Letters (and the contemplated equity issuances and rights offerings) are structured in a manner that permits the Debtors to preserve and utilize their significant net operating loss carryforwards ("**NOLs**") and other tax attributes, which is important to maximizing the value of the Debtors' estates. (*Id*. ¶ 18.) Specifically, the proposed amended Equity

4

Backstop Commitment Letters permit the Debtors to use these tax attributes to pursue a post-emergence securitization financing of $7 billion based on shareholder NOLs. Certain of these NOLs are assets of the shareholders[8] because the Debtors, contingent on obtaining approval for the securitization transaction, have decided not to seek recovery from customers of the corresponding $25.5 billion of payments related to prepetition wildfire claims. The proceeds from the securitization will be used to retire the $6 billion Temporary Utility Debt and to accelerate certain deferred payments to the Fire Victim Trust (as defined below) under the Debtors' Plan.

The Debtors also negotiated for significant flexibility as to the length of the Equity Backstop Commitments. Subject to the terms of the Equity Backstop Commitment Letters, the commitments extend through August 29, 2020—over 240 days from original signing and more than five months post-approval, in either case an unprecedented duration. Given the length of the commitments, the Equity Backstop Parties required certain termination rights and conditions precedent to their funding obligations, principally regarding (i) changes to the Debtors' Plan that have not been approved by the Equity Backstop Parties (including changes to the post-Effective Date capital structure), (ii) unexpected material adverse events such as adverse regulatory determinations, significant post-petition wildfires, material non-ordinary course asserted administrative expense claims and the insolvency of the Debtors, (iii) the monetization of the tax position of the Debtors and (iv) any amendment to the Debtors' Plan that incorporates a process for the transfer of the license and operating assets of the Utility to the State of California or a third party that is not supported by at least 66-2/3% of the Equity Backstop Commitments. With that in mind, the Debtors negotiated for reductions[9] to the commitment premiums in the event that the Equity Backstop Parties exercise any

---

[8]     Under California regulatory law, shareholders are entitled to retain the benefits of NOLs that are generated by shareholder paid costs.

[9]     These reductions are referred to as "clawbacks" in the Equity Backstop Commitment Letters. Although no commitment premiums are paid until the Effective Date, the full amount of the premium is "earned" by the Equity Backstop Parties upon Court approval of the Equity Backstop Commitment Letters. However, in the event an Equity Backstop Party terminates its commitment, a portion of this

5

termination rights. This reduction mechanism is intended to incentivize the Equity Backstop Parties to remain in the backstop even if a potential termination event (for example, by negotiating a waiver or amendment to address the potential termination event) arises. (*Id*. ¶ 20.) If an Equity Backstop Party nevertheless terminates its Equity Backstop Commitment Letter prior to specific dates, the Debtors will retain the applicable specified portion of the commitment premium that was subject to reduction, which the Debtors can then use to attract a replacement Equity Backstop Party (including by asking existing Equity Backstop Parties to upsize their commitments). Subject to the occurrence of the Effective Date and except in the limited circumstances discussed below, the commitment premiums will be paid in New PG&E Corp. Common Stock.

**The Debt Financing Commitment Letters.** In addition to the Equity Backstop Commitments, PG&E Corp. and the Utility have executed the Debt Commitment Letters with certain money-center banks, which provide that, in the event that the New Debt is not issued on or prior to the Effective Date for any reason (including market disruptions that would make the pricing on the New Debt too expensive), such banks will fund investment grade 364-day[10] "bridge" loan facilities (the "**Backstop Debt Facilities**") in aggregate amounts of up to $5.0 billion for PG&E Corp. and $5.825 billion for the Utility. In addition, the Debtors have executed fee letters (as amended, the "**Backstop Debt Fee Letters**"), which provide for, among other things, the payment of certain fees associated with the Backstop Debt Facilities, and engagement letters (the "**Debt Financing**

---

commitment premium is forfeited or "clawed back" and will not be paid to the Equity Backstop Party on the Effective Date.

[10] The 364-day period begins with the funding of the Backstop Debt Facilities. As noted above, the Debtors do not expect to draw upon the Backstop Debt Facilities, but instead expect to avail themselves of market financing that will be funded on the Effective Date. (Ziman Decl. ¶ 26.) Even if the Backstop Debt Facilities were to be funded, they are expected to be refinanced well in advance of their 364-day maturity. (*Id.*) Courts in other large, complex chapter 11 cases have approved debtors' entry into bridge facilities to enable debtors to emerge from chapter 11. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, 2004 WL 1634538, at *7 (Bankr. S.D.N.Y. June 22, 2004) (approving commitment letters providing for a bridge facility with a one year maturity); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126) (same).

6

**Engagement Letters**")[11], which engage the same banks to arrange (*i.e.*, market) the New Debt.[12]  The Debtors do not currently anticipate drawing on the Backstop Debt Facilities, but instead expect to issue new long-term bonds and incur new credit facilities on market terms to fund their emergence.  (*Id.* ¶ 26.)  Nevertheless, the Backstop Debt Facilities provide assurance that, together with the Temporary Utility Debt, sufficient funds at an acceptable price will be available if the New Debt financings cannot be consummated—effectively an insurance policy for market pricing and timing risk, which is necessitated here by the requirement to obtain confirmation of the Debtors' Plan on a specific timeline under AB 1054.  (*Id.* ¶¶ 26, 31.)

The Debt Financing Commitment Letters, like the Equity Backstop Commitment Letters, afford the Debtors significant flexibility in structuring the New Debt.  The Debtors, in their business judgment, may incur debt securities and bank credit facilities at any time on or prior to the Effective Date, allowing the Debtors to avail themselves of attractive market conditions that may arise during the pendency of these cases.  The Debt Commitments will be reduced on a dollar-for-dollar basis by the net cash proceeds of any such incurrences, subject to exceptions for certain indebtedness, including up to $6 billion of additional indebtedness incurred at the Utility (*i.e.*, the Temporary Utility Debt).  The Debt Financing Commitment Letters also permit the Debtors to incur the revolving credit

---

[11]    The Debt Financing Engagement Letters, the Debt Commitment Letters and the Backstop Debt Fee Letters are collectively referred to in this Motion as the "**Debt Financing Commitment Letters**".

[12]    Pursuant to the Court's order of October 28, 2019 [Docket No. 4501] (the "**Sealing Order**"), redacted copies of the Debt Financing Engagement Letters were previously filed as Docket No. 4446-7 (the "**Bank Financing Engagement Letter**") and Docket No. 4446-8 (the "**Securities Engagement Letter**"), while unredacted copies of the Bank Financing Engagement Letter [Docket No. 4453] and the Securities Financing Engagement Letter [Docket No. 4454] along with the sealed Backstop Debt Fee Letters [Docket No. 4452] were submitted to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis.  Pursuant to the Sealing Order, the Debtors will submit the amended Backstop Debt Fee Letters under seal to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis concurrently with the filing of the Second Amended Motion.

7

facilities contemplated by the Debtors' Plan to ensure adequate liquidity at emergence, without any corresponding reduction to the Debt Commitments.

The Debt Commitments extend through August 29, 2020, on terms that are consistent with (or better than) market. (*Id*. ¶¶ 31, 33.) The significant duration of the Debt Commitments comes with conditionality and termination rights, which broadly align with those under the Equity Backstop Commitment Letters and are otherwise limited to customary backstop debt financing conditions. (*Id*. ¶ 33.)

**The Exit Financing Obligations.** As discussed further below, the aggregate fees payable by the Debtors pursuant to the Debt Financing Commitment Letters and Equity Backstop Commitment Letters will depend on a variety of factors. However, both the aggregate fees payable under the Backstop Debt Fee Letters and the Equity Commitment Premium (as defined below) that would be owing under the OII Capital Structure are fair and reasonable under the circumstances and in the best interests of the Debtors' estates and their constituents. (*Id*. ¶¶ 20, 31, 33.) If the full $10.825 billion of Debt Commitments are maintained until June 30, 2020 (*i.e.*, no New Debt is incurred prior to the statutory deadline), the aggregate fees payable by the Debtors would be approximately $72 million payable in cash to the Backstop Debt Commitment Parties. (*Id.* ¶ 31.)

Pursuant to recent negotiations between the Debtors and certain Equity Backstop Parties, the Equity Backstop Commitment Letters now provide that the aggregate Equity Commitment Premium is a fixed 119 million shares of New PG&E Corp. Common Stock.[13] (*Id.* ¶ 17.) In the event the market value of those 119 million shares would be less than $764 million based on trading prices for the 20 business days immediately following the Effective Date, the Equity Backstop Parties will receive additional shares so that they receive at least $764 million of aggregate value, up to an

---

[13] The Equity Commitment Premium is generally payable in stock; however, in the following limited circumstances each Equity Backstop Party may elect to be paid in stock or cash: (i) PG&E Corp. exercises its fiduciary out to terminate the Equity Backstop Commitment Letters in order to enter into a transaction for the sale of the company or (ii) a plan of reorganization other than the Debtors' Plan is confirmed. If paid in cash, the Equity Commitment Premium would be approximately $764 million (6.364% of the full $12 billion commitment).

8

aggregate cap of approximately 139 million shares. The value of the Equity Commitment Premium on the Effective Date will depend on the market value of PG&E Corp.'s common stock and the number of shares of New PG&E Corp. Common Stock issued on the Effective Date pursuant to the Debtors' Plan. (*Id.*) However, assuming that the Debtors implement the OII Capital Structure by drawing on the Equity Backstop Commitments and based on the Debtors' forecasted Normalized Estimated Net Income (as defined below), the value of the Equity Commitment Premium would be approximately $1.2 billion at the currently estimated Equity Backstop Price (as defined below). (*Id.*) The value of the Equity Commitment Premium could exceed this amount in the event that PG&E Corp successfully consummates a marketed equity offering or rights offering in lieu of drawing on the Equity Backstop Commitments or if the Debtors implement a more leveraged capital structure. (*Id.*) Based on the closing price of PG&E Corp. common stock on February 28, 2020, the value of the Equity Commitment Premium would be approximately $1.8 billion. (*Id.*)

The Debt Financing Commitment Letters provide for certain additional fees in the event that (i) the Backstop Debt Facilities are funded or (ii) the New Debt financings are consummated. The Equity Backstop Commitment Letters provide that in certain circumstances where the Debtors do not consummate the OII Capital Structure, a portion of the economic value of Debtors' wildfire-related tax benefits may be held in trust for the benefit of the Equity Backstop Parties. Both the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters provide for the reimbursement and advancement of professional fees and expenses (in the case of the Equity Backstop Parties, subject to a cap of $34 million in the case of counsel, and $19 million in the case of the financial advisor). The Exit Financing Obligations are necessary, fair and reasonable compensation for the Equity Backstop Parties and Backstop Debt Commitment Parties. (*Id.* ¶¶ 20, 22, 31, 33.)

The Equity Backstop Commitment Letters and the Debt Financing Commitment Letters benefit the estates and all stakeholders by providing assurances of the Debtors' ability to fund the distributions contemplated by the Debtors' Plan that are necessary for Debtors' timely emergence from chapter 11. For all the above reasons and as discussed further below, the Debtors have

9

determined, in their business judgment, that the Equity Backstop Commitment Letters and the Debt Financing Commitment Letters are in the best interests of their estates, creditors, shareholders and all parties in interest. The Debtors respectfully request the Court's approval of the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters and Debt Financing Commitment Letters, and authority to incur and pay the obligations set forth therein.

## II. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that the Court may enter the Proposed Orders as final orders consistent with Article III of the United States Constitution.

## III. BACKGROUND

### A. The Debtors' Plan

On September 9, 2019, the Debtors filed their original chapter 11 Plan [Docket No. 3841], and concurrently filed a Summary of the Key Elements of the Debtors' Plan [Docket No. 3844].

On September 13, 2019, the Debtors announced an agreement in principle with entities holding approximately 85% of insurance subrogation claims to resolve all insurance subrogation claims arising out of the 2017 and 2018 wildfires for $11 billion pursuant to the Debtors' Plan (the "**Subrogation Settlement**"). On September 22, 2019, the Debtors executed a Restructuring Support Agreement (as amended, the "**Subrogation RSA**") with those entities, reflecting the Subrogation Settlement. The Subrogation Settlement followed the Debtors' June 18, 2019 settlement with certain local public entities (the "**Public Entities Settlement**"), which provides for an aggregate of $1 billion to be paid under the Debtors' Plan to such public entities in full satisfaction of their claims against the Debtors' estates. The Subrogation Settlement was incorporated into an amended chapter 11 Plan filed

10

by the Debtors on September 23, 2019 [Docket No. 3966] and further amended on November 4, 2019 [Docket No. 4563].

On December 6, 2019, the Debtors announced an agreement with the TCC and attorneys representing a substantial portion of the wildfire tort claimants to resolve all those claimants' prepetition fire claims pursuant to the Debtors' Plan. On December 9, 2019, the Debtors, certain shareholders, the TCC and such attorneys executed a Restructuring Support Agreement (the "**Tort Claimants RSA**") reflecting a $13.5 billion settlement of their claims (the "**Tort Claimants Settlement**"). The Tort Claimants RSA was incorporated into the Debtors' Plan filed by the Debtors on December 12, 2019 [Docket No. 5101]. On December 17, 2019, the Court approved both the Subrogation RSA and the Tort Claimants RSA.

On January 22, 2020, the Debtors announced an agreement with key members of the Ad Hoc Noteholder Committee to resolve all issues relating to the treatment of the Utility's prepetition funded debt under the Debtors' Plan. On the same day, the Debtors, certain shareholders and key members of the Ad Hoc Noteholder Committee executed a Restructuring Support Agreement (the "**Noteholder RSA**") reflecting a settlement of their claims (the "**Noteholder Settlement**"). The terms and conditions of the Noteholder RSA (including the Noteholder Settlement) were incorporated into the Debtors' Plan filed by the Debtors on January 31, 2020 [Docket No. 5590], which provides that $21.425 billion of prepetition notes and other funded debt will be exchanged or reinstated. On February 5, 2020, the Court entered an order approving the Noteholder RSA [Docket No. 5637].

In addition to the Subrogation Settlement, the Public Entities Settlement, the Tort Claimants Settlement and the Noteholder Settlement, the Debtors' Plan, as amended, provides for (i) payment in full, with interest at the legal rate, of all prepetition funded debt obligations, all prepetition trade claims and employee-related claims, (ii) assumption of all power purchase agreements and community choice aggregation servicing agreements, (iii) assumption of all pension obligations, other employee obligations and collective bargaining agreements with labor, (iv) future participation in the Go-Forward Wildfire Fund and (v) satisfaction of the legislative requirements of

11

AB 1054. As stated, the Debtors' Plan has the support of all impaired classes and constitutes a comprehensive global resolution that will expedite the successful and timely conclusion of these cases.

The Debtors' Plan contemplates various sources of funding, including (a) new equity issuances, (b) the issuance or incurrence of new debt at both the PG&E Corp. and Utility levels, (c) a securitization financing transaction that is rate-neutral, on a net present value basis, to customers (based on the monetization of certain shareholder tax benefits) and (d) cash on hand.

### B.    The Equity Backstop Commitment Letters

In August 2019, the Debtors began a dialogue with two current PG&E Corp. shareholders, Knighthead Capital Management, LLC ("**Knighthead**") and Abrams Capital Management, L.P. ("**Abrams**" and, together with Knighthead, "**Shareholder Proponents**"), who had publicly expressed interest in providing equity backstop commitments to allow the Debtors to fund their Debtors' Plan. (Ziman Decl. ¶ 8.) Subsequently, the Debtors received substantially similar equity capital commitments from more than 35 investors, representing equity backstop commitments in excess of $14 billion in the aggregate. (*Id*.)

The Debtors also engaged in discussions with certain money-center banks to determine whether such banks would be willing to provide equity backstop commitments on the same or better terms as those proposed by the shareholders. The Debtors found that such banks might be willing to guarantee the necessary equity proceeds to the Debtors (*i.e.*, a volume underwriting), but were unable to agree to a floor price at which such equity would be raised. (*Id.* ¶ 7.) The arrangement proposed by these banks would present a significant risk that PG&E Corp. would be required to issue a substantially greater percentage of its common shares for the same aggregate proceeds received by the Debtors under the Equity Backstop Commitment Letters. (*Id.*) Accordingly, in consultation with their financial advisors, the Debtors determined the backstop commitments offered by Knighthead and Abrams, which offered both a guarantee of necessary equity proceeds *and* a floor price (with *no* "market" out), were the better course for the Debtors and their stakeholders. (*Id.* ¶¶ 7–9.)

Over the course of extensive negotiations with Knighthead, Abrams and their advisors, the Debtors improved upon many of the terms initially proposed, including structure, conditionality,

12

Case: 19-30088    Doc# 6013    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 19
of 48
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 20
of 175

length of commitment and flexibility to pursue a variety of equity financing options. (*Id.* ¶ 9.) On September 9, 2019, PG&E Corp. executed the equity backstop commitment letters with Knighthead and Abrams as initial Equity Backstop Parties (the "**September Equity Backstop Commitment Letters**"). (*Id.*) The September Equity Backstop Commitment Letters were subsequently amended and restated on September 13, 2019 to, among other things, take into account the terms of the Subrogation Settlement. (*Id.* ¶ 10.)

After September 13, 2019, the Debtors engaged with other parties, including other current shareholders, bondholders and parties not invested in the Debtors' equity or debt securities, to obtain commitments from such parties as well. By September 20, 2019 the Debtors had received more than the $14 billion in Equity Backstop Commitments. (*Id.* ¶¶ 11–12.)

On November 16, 2019, the September Equity Backstop Commitment Letters were superseded and replaced as the Debtors entered into new equity backstop commitment letters with Knighthead, Abrams and additional Equity Backstop Parties that contemplated reduced total commitments of $12 billion (the "**November Equity Backstop Commitment Letters**"). (*Id.* ¶ 13.) This reduced commitment amount reflected that a portion of the consideration to be transferred to the trust that will satisfy claims held by the wildfire victims (the "**Fire Victim Trust**") would be funded in stock. The November Equity Backstop Commitment Letters also permitted a higher overall amount of compensation to be paid to the Fire Victim Trust. On December 6, 2019, the Debtors announced they had reached the commitment objective of $12 billion under the November Equity Backstop Commitment Letters. (*Id.*)

On December 13, 2019, and in view of the Tort Claimants RSA, the Debtors announced they were seeking an extension of the deadline for Court approval of the equity backstop commitment letters. In connection with this extension, on December 23, 2019, the Debtors entered into amended equity backstop commitment letters with the Equity Backstop Parties that superseded and replaced the November Equity Backstop Commitment Letters (the "**December Equity Backstop Commitment Letters**"). (*Id.* ¶ 14.)

13

1    On January 27, 2020, in light of the Noteholder RSA, holders of substantially all of the

2 backstop commitments consented and agreed to (a) the filing of the Debtors' Plan of January 31, 2020

3 that incorporated the terms and conditions of the Noteholder RSA and (b) an extension of the deadline

4 for Court approval of the Equity Backstop Commitment Letters from January 31, 2020 to February 28,

5 2020. (*Id.* ¶ 15.) Most recently, to align the equity commitments with the OII Capital Structure, the

6 Debtors negotiated the form of the Equity Backstop Commitment Letters with the Equity Backstop

7 Parties that will supersede and replace the December Equity Backstop Commitment Letters. (*Id.* ¶ 16.)

8 The Equity Backstop Commitment Letters extend the deadline for Court approval of the Equity

9 Backstop Commitment Letters from February 28, 2020 to March 15, 2020, and accommodate the OII

10 Capital Structure including the expected incurrence of the Temporary Utility Debt and the post-

11 emergence securitization transaction based on shareholder tax attributes. (*Id.* ¶ 16.) On March 1,

12 2020, the Debtors entered into Equity Backstop Commitment Letters with Knighthead and Abrams

13 representing commitments of $700 million in total. (*Id.*) The Debtors expect to obtain consents to the

14 modifications from the other Equity Backstop Parties to their Equity Backstop Commitment Letters

15 by the hearing on the Second Amended Motion. (*Id.*)

16    The Equity Backstop Commitment Letters require the Equity Backstop Parties to

17 purchase up to $12 billion in New PG&E Corp. Common Stock, on the terms and subject to the

18 conditions thereof, at a price per share that would imply a price-to-earnings multiple of 10x (subject

19 to certain adjustments) based on Normalized Estimated Net Income for 2021. *See* Equity Backstop

20 Commitment Letters § 1(a)(iv). The Debtors are not obligated under all circumstances to issue such

21 shares to the Equity Backstop Parties, but instead are permitted, at higher implied price-to-earnings

22 multiples, to consummate other equity offerings (including primary equity offerings and rights

23 offerings with existing shareholders). *See id.* at §§ 1(a)(i), (ii). In the event that such other equity

24 offerings (together with other permitted capital sources) do not raise $12 billion of proceeds in the

25 aggregate, the Debtors must draw on the Equity Backstop Commitments, subject to the satisfaction or

26 waiver of the conditions in the Equity Backstop Commitment Letters. *See id.* at § 1(a)(iv).

27

28                                                                                    14

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized in Section III.D below.

**C.    The Debt Financing Commitment Letters**

Since the second quarter of 2019, the Debtors and their financial advisors have maintained a dialogue with several prominent money-center banks regarding debt financing alternatives for the Debtors' emergence from chapter 11.  (Ziman Decl. ¶ 25.)  These conversations culminated in several banks providing illustrative financing structures and terms in the third quarter of 2019.  Incorporating the feedback received from these banks and in light of the Noteholder RSA, the Debtors developed an exit financing strategy that they believe maximizes the value of their estates for the benefit of all stakeholders—including savings of over $1 billion through the previously announced Noteholder Settlement.  (*Id.* ¶ 24.)

On September 25 and 26, 2019 the Debtors and their financial advisors contacted several money-center banks requesting initial proposals for backstop debt financing commitments to provide certainty that sufficient funds at an acceptable price will be available on the Effective Date if market financing is either more expensive or unavailable at that time.  (Ziman Decl. ¶¶ 27.)  All the banks contacted delivered proposals by October 1.  (*Id.*)  The Debtors, in consultation with their legal and financial advisors, evaluated these proposals based on a number of metrics, including the proposed terms and fees, the cost and certainty of the commitments, the experience and reputations of the parties and the ability of such banks to work collaboratively with the Debtors.  (*Id.* ¶ 28.)  The Debtors developed and shared a counterproposal with all the banks.  After discussions with the banks, the Debtors selected JPMorgan Chase Bank, N.A. ("**JPMorgan**"), Bank of America, N.A. ("**BANA**"), BofA Securities, Inc. ("**BofA**" and, together with BANA, "**Bank of America**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. ("**Citi**"), Goldman Sachs Bank USA ("**GS Bank**") and Goldman Sachs Lending Partners LLC (together with GS Bank, "**Goldman Sachs**"; JPMorgan, Bank of America, Barclays, Citi and Goldman Sachs, collectively, the "**Initial Backstop Debt**

15

**Commitment Parties**"[14]) to act as initial commitment parties with respect to the contemplated backstop debt facilities.  (*Id*.)

Following extensive negotiations during the week of September 30, 2019 with the Initial Backstop Debt Commitment Parties, which negotiations improved on many of the terms initially proposed by such banks (including pricing, fees, flexibility, conditionality and "alternate transaction" provisions), the Initial Backstop Debt Commitment Parties delivered signed Debt Financing Commitment Letters on October 4, 2019 in the aggregate amount of $34.35 billion.  [Docket No. 4119-2.]  On October 11, 2019, following deliberations, the Boards of Directors of each of PG&E Corp. and the Utility approved the Debtors' entry into the Debt Financing Commitment Letters, which were executed by the Debtors on the same day.  (Ziman Decl. ¶ 28.)  The Debt Financing Commitment Letters executed on October 11, 2019 contemplated obtaining Court approval by November 20, 2019.

On October 28, 2019, the Debtors joined BNP Paribas ("**BNP**"), Credit Suisse AG, Cayman Islands Branch ("**Credit Suisse**"), Morgan Stanley Bank, N.A. ("**Morgan Stanley**"), MUFG Union Bank, N.A. ("**MUFG**") and Wells Fargo Bank, National Association ("**Wells Fargo**"), as additional Commitment Parties to the Debt Commitment Letters.  (*Id.* ¶ 29.)  On November 18, 2019, the Debtors amended the Debt Commitment Letters to extend the deadline for obtaining Court approval from November 20, 2019 to December 20, 2019.  On December 2, 2019, the Debtors joined Mizuho Bank, Ltd. ("**Mizuho**") as an additional Commitment Party to the Debt Commitment Letters. (*Id.*)  On December 20, 2019, the Debtors further amended the Debt Commitment Letters to, among other things, extend the deadline for obtaining Court approval from December 20, 2019 to January 31, 2020.  (*Id.*)

In light of the Noteholder RSA, on January 30, 2020, the Debtors amended the Backstop Debt Fee Letters and the Debt Commitment Letters to (a) extend the deadline for obtaining

---

[14]    The Initial Backstop Debt Commitment Parties, together with any other parties that become party to the Debt Commitment Letters as additional "**Commitment Parties**", are collectively referred to as the "**Backstop Debt Commitment Parties**", and the Backstop Debt Commitment Parties and the Equity Backstop Parties are collectively referred to as the "**Exit Commitment Parties**".

16

Court approval of the Debt Commitment Letters from January 31, 2020 to February 28, 2020, (b) reduce the aggregate Debt Commitments from $27.35 billion to $5.825 billion for the Utility and from $7 billion to $5 billion for PG&E Corp. and (c) add termination events including, among others, termination events relating to the approval of the Noteholder RSA, summarized below. (*Id.* ¶ 30.) To align the Debt Commitments with the OII Capital Structure, the Debtors further amended the Debt Commitment Letters on February 14, 2020 to account for the OII Capital Structure including the expected incurrence of the Temporary Utility Debt and the post-emergence securitization transaction based on shareholder tax attributes. (*Id.*) On February 28, 2020, the Debtors further amended the Debt Commitment Letters to extend the deadline for obtaining Court approval of the Debt Commitment Letters from February 28, 2020 to March 31, 2020. (*Id.*)

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized in Section III.D below.

### D. Certain Key Terms and Provisions of the Exit Financing Commitment Letters and the Proposed Orders

Certain key terms and provisions of the Equity Backstop Commitment Letters are summarized as follows:[15]

| | |
|---|---|
| **Equity Backstop Commitments** *See* Equity Backstop Commitment Letters § 2(a); Exhibit A to Equity Backstop Commitment Letters. | In the aggregate, the Equity Backstop Parties have severally committed to fund up to $12 billion to PG&E Corp. on the Effective Date to finance the payments to wildfire victims contemplated by the Debtors' Plan, in consideration of the issuance of New PG&E Corp. Common Stock to the Equity Backstop Parties on the Effective Date, subject to the terms and conditions set forth in each Equity Backstop Commitment Letter. The price at which any such new shares would be issued to the Equity Backstop Parties (the "**Equity Backstop Price**") would equal (a) 10 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple), *times* (b) PG&E Corp.'s consolidated Normalized Estimated Net Income, *divided by* (c) the number of fully diluted shares of PG&E Corp. that will be |

---

[15] This summary is qualified in its entirety by reference to the provisions of the Equity Backstop Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Equity Backstop Commitment Letters, the Equity Backstop Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Equity Backstop Commitment Letters.

17

| | | |
|---|---|---|
| | | outstanding on the Effective Date (assuming the Equity Backstop Commitments are fully drawn). |
| | | "**Normalized Estimated Net Income**" means, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (*e.g.*, distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, times (ii) the equity percentage of the Utility's authorized capital structure, times (iii) the Utility's authorized rate of return on equity for such component, less (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, less (c) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund. |
| **Equity Offerings** *See* Equity Backstop Commitment Letters § 1(a). | | Permitted Equity Offering. Subject to an aggregate cap of $12 billion of net cash proceeds, PG&E Corp. will be permitted to conduct any primary offering of its common stock (including public offerings and private placements) in order to finance the Debtors' Plan, as long as the Implied P/E Multiple for such offering equals or exceeds 13.5 (subject to upward adjustment based on changes in the Applicable Utility Index Multiple, the "**Permitted Equity Offering Threshold**"). |
| | | Rights Offering. If PG&E Corp. conducts an equity offering with an Implied P/E Multiple of at least 12 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple, the "**Rights Offering Minimum Multiple**") but less than the Permitted Equity Offering Threshold, then PG&E Corp. must structure such equity offering so that at least 80% of the aggregate cash proceeds are raised through a rights offering to holders of shares of common stock of PG&E Corp. (the "**Rights Offering**"). Rights issued to PG&E Corp. shareholders in a Rights Offering would have an exercise price equal to the per share price implied by the Rights Offering Minimum Multiple. If PG&E Corp. conducts a Rights Offering, it would also be permitted to raise up to 20% of the aggregate cash proceeds through another form of primary equity offering, subject to the approval of a majority of the holders of Equity Backstop Commitments as to the identity of the purchaser in such other equity offering if it is not a broadly syndicated underwritten public offering. |
| | | Equity Backstop Funding. If PG&E Corp. is unable to conduct an equity offering with an Implied P/E Multiple at least equal to the Rights Offering Minimum Multiple, then PG&E Corp. would be required to draw upon the Equity Backstop Commitments. |
| **Net Operating Losses** *See* Equity Backstop Commitment Letters § 1. | | Any Permitted Equity Offering or Rights Offering, and the organizational documents of reorganized PG&E Corp., may include such terms and conditions as are reasonably advisable in order to avoid an "ownership change" within the meaning of Section 382 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes. |

18

| | | |
|---|---|---|
| **Reduction of Commitments** *See* Equity Backstop Commitment Letters §§ 1(b), 7. | In the event that the Debtors (a) receive binding commitments providing for funding from any Additional Capital Sources that satisfy the criteria set forth in the Equity Backstop Commitment Letters or (b) actually obtain funding from any Additional Capital Sources, the aggregate amount of Equity Backstop Commitments will be reduced by the amount of such Additional Capital Sources. "**Additional Capital Sources**" means, generally, (i) the principal amount of debt that is issued by PG&E Corp. in excess of $7 billion in connection with the Debtors' Plan; (ii) the proceeds of any preferred stock issued by the Utility; (iii) the proceeds of any third-party transactions based upon or related to the utilization or monetization of (x) any net operating loss carryforwards or other tax attributes or (y) tax deductions, in each case arising from the payment of prepetition wildfire-related claims that are not otherwise utilized in the Debtors' Plan (a "**Tax Benefits Monetization Transaction**") in excess of $3 billion; and (iv) the principal amount of any other debt that is issued or reinstated by the Utility and its subsidiaries in excess of $27.35 billion in connection with the Debtors' Plan. During the term of the Equity Backstop Commitment Letters, PG&E Corp. may not issue any senior equity securities. Notwithstanding the foregoing, if the Debtors consummate the OII Capital Structure, then (i) the amount of the Equity Offering shall be $9 billion, (ii) the Temporary Utility Debt will constitute a $6 billion Tax Benefits Monetization Transaction and (iii) there will be deemed to be $3 billion of Additional Capital Sources (reducing the Equity Backstop Commitment to $9 billion). | |
| **Tax Benefits Monetization Transaction** *See* Equity Backstop Commitment Letters §§ 1, 2; Exhibit A to Equity Backstop Commitment Letters. | If the Equity Backstop Commitment is drawn and a Tax Benefits Monetization Transaction is not expected to occur on the Effective Date, each Equity Backstop Party will receive, for no additional consideration (other than payment of the Backstop Price), a pro rata share of interests in a trust to be established by the Utility to monetize the Debtors' wildfire-related tax benefits in excess of $1.35 billion for the benefit of the Equity Backstop Parties. If the capital structure adopted by the Debtors in the Debtors' Plan is consistent with the capital structure described on pages 2-15 through 2-18 in Volume 1 of PG&E Corp.'s Plan of Reorganization OII 2019 Prepared Testimony filed in Investigation 10-09-016 on January 31, 2020 (the "**OII Capital Structure**"), and consummated on the Effective Date, the Temporary Utility Debt will constitute a Tax Benefits Monetization Transaction. | |
| **Equity Commitment Premiums and Expense Reimbursement** *See* Equity Backstop Commitment Letters §§ 2(c), 6, 11; Exhibit A | Except in the limited circumstances described below, the Equity Commitment Premium for the Equity Backstop Commitments is a fixed 119 million shares of New PG&E Corp. Common Stock. In the event the market value of those 119 million shares would be less than $764 million based on the mean volume weighted average share price for the 20 business days immediately following the Effective Date, the Equity Backstop Parties will receive additional shares so that they receive at least $764 million of value, up to an aggregate cap of approximately 139 million shares. The Equity Commitment Premium is earned in full upon entry by the Court of an order approving the Equity | |

19

| | | |
|---|---|---|
| | to Equity Backstop Commitment Letters. | Backstop Commitment Letters, subject to reduction under certain circumstances set forth in the Equity Backstop Commitment Letters.

If the Debtors terminate the Equity Backstop Commitment Letters in connection with certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock, the Equity Backstop Party may elect to have its Equity Commitment Premium paid in shares on the Effective Date or cash within three business days of the termination of the Equity Backstop Commitment Letter. Additionally, in the event that a plan of reorganization other than the Debtors' Plan is confirmed, then the Equity Commitment Premium shall be paid in cash if elected by the applicable Equity Backstop Party. If paid in cash, the Equity Commitment Premium would be approximately $764 million (6.364% of the full $12 billion commitment). Except as described in the immediately preceding sentences, all Equity Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, as described above.

Additionally, the Debtors agreed to reimburse and advance on a regular basis the Equity Backstop Parties for the reasonable fees and expenses of Jones Day, Orrick Harrington & Sutcliffe LLP and a financial advisor incurred prior to the termination of the Equity Backstop Commitment Letters, subject to overall caps on reimbursement of $31 million in the case of Jones Day, $3 million in the case of Orrick Harrington & Sutcliffe LLP and $19 million in the case of the financial advisor. |
| | **Reduction of Equity Commitment Premiums** *See* Equity Backstop Commitment Letters §§ 2(c), 11; Exhibit A to Equity Backstop Commitment Letters. | If (i) (except as described below) an Equity Backstop Party terminates its commitments or (ii) PG&E Corp. terminates the Equity Backstop Commitment Letter either (x) in the event of a breach of a representation or warranty by an Equity Backstop Party or (y) in the event that an Equity Backstop Party repudiates the Equity Backstop Commitment Letter and invalidly terminates it, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by (1) 85% if the commitments are terminated on or prior to January 20, 2020, (2) 60% if the commitments are terminated after January 20, 2020 and on or prior to April 30, 2020 and (3) 10% if the commitments are terminated after April 30, 2020 and prior to the Effective Date.

If an Equity Backstop Party terminates its commitments pursuant to the termination right that would be triggered if at any time after the first day of the confirmation hearing, either asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding all ordinary course administrative expense claims, all professional fee claims, all disallowed administrative expense claims and the portion of an administrative expense claim that is covered by insurance (collectively, the "**Excluded Administrative Expense Claims**"), or the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by 75%.

If an Equity Backstop Party terminates its commitments in connection with PG&E Corp.'s receipt of written waivers or specified amendments from |

20

| | | |
|---|---|---|
| | | entities holding 60% or more of the Equity Backstop Commitments to permit the aggregate amount of Additional Capital Sources *plus* the aggregate amount of proceeds of any Equity Offering *plus* the aggregate amount of proceeds funded under the Equity Backstop Commitments to exceed $12 billion, then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by (1) 75% if the commitments are terminated on or prior to April 30, 2020, (2) 50% if the commitments are terminated after April 30, 2020 and on or prior to May 31, 2020 and (3) 25% if the commitments are terminated after May 31, 2020.<br><br>If an Equity Backstop Party terminates its commitments pursuant to the Transfer Termination Right (as defined below), then the relevant Equity Backstop Party's Equity Commitment Premium will be reduced by 75%. |
| | **Conditions to the Obligations of the Equity Backstop Parties**<br>*See* Equity Backstop Commitment Letters § 4. | The Equity Backstop Parties' funding obligations under the Equity Backstop Commitment Letters are subject to the satisfaction or waiver of specified conditions, including (i) approval of the Equity Backstop Commitment Letters by the Court; (ii) satisfaction or waiver of all conditions precedent to the Effective Date set forth in the Debtors' Plan; (iii) entry by the Court of an order (the "**Confirmation Order**") confirming the Debtors' Plan, with amendments, modifications, changes and consents to the Debtors' Plan as approved by parties holding a majority of the Equity Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), which Confirmation Order shall be unstayed and in full force and effect; (iv) the weighted average earning rate base of the Debtors for estimated 2021 being no less than 95% of $48 billion (*i.e.*, $45.6 billion); and (v) absence of a Material Adverse Effect. |
| | **Termination Events**<br>*See* Equity Backstop Commitment Letters §§ 5–6. | Equity Backstop Parties. The Equity Backstop Parties may terminate the Equity Backstop Commitment Letters if, among other things: (i) the Debtors' Plan (including as may be amended, modified or otherwise changed) filed by the Debtors does not include Knighthead and Abrams as plan proponents and is not in a form acceptable to each of Knighthead and Abrams, or does not provide for substantially the same classification and treatment, including releases, of all Claims (other than Holdco Fire Victim Claims and Utility Fire Victim Claims and Utility PC Bond (2008 F and 2010 E) Claims, as long as such Utility PC Bond (2008 F and 2010 E) Claims are paid in Cash or debt securities) as provided in the Debtors' Joint Chapter 11 Plan of Reorganization filed with the Bankruptcy Court on January 31, 2020; (ii) the Court has not entered an order approving the Equity Backstop Commitment Letters on or before March 15, 2020; (iii) the Debtors' Plan is amended, modified or changed without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed), or any plan supplement or other plan document is filed or finalized without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed); (iv) the Confirmation Order has not been entered by the Court on or before June 30, 2020; (v) the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order; (vi) the Debtors have failed to perform any of their obligations in the Equity Backstop Commitment Letters, which failure to perform would give rise to the failure of certain conditions |

21

precedent; (vii) wildfires occur in the Utility's service area in 2019 that damage or destroy in excess of 500 dwellings or commercial structures ("**Structures**") in the aggregate that are asserted to arise out of the Debtors' activities; (viii) wildfires occur in the Utility's service area in 2020 that damage or destroy in excess of 500 Structures in the aggregate at a time when the portion of the Utility's system at the location of such wildfire was not successfully de-energized; (ix) the Debtors' aggregate liability with respect to prepetition wildfire-related claims is determined to exceed $25.5 billion; (x) the CPUC fails to issue all necessary approvals prior to June 30, 2020; (xi) there is in effect an order or law permanently prohibiting the consummation of the Debtors' Plan; (xii) at any time after the first day of the confirmation hearing, either asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding the Excluded Administrative Expense Claims, or the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims; (xiii) the Utility does not participate in the Go-Forward Wildfire Fund; (xiv) the Court at any time determines that the Debtors are insolvent; (xv) the Debtors or any of their subsidiaries enter into any Tax Benefits Monetization Transaction, and the net cash proceeds thereof to the Debtors (or such subsidiary) are less than $3 billion (excluding $1.35 billion of tax benefits utilized in the Debtors' Plan); or (xvi) the Debtors' Plan, any plan supplement or any plan document has been amended, modified or changed, in each case without the consent of the entities holding at least 66 2/3% of the Aggregate Equity Backstop Commitments to include a process for transferring the license and operating assets of the Utility to the State of California or a third party (a "**Transfer**") or PG&E effects a Transfer other than pursuant to the Debtors' Plan (such termination right, the "**Transfer Termination Right**").

<u>PG&E Corp.</u>  Among other circumstances, PG&E Corp. may terminate an Equity Backstop Commitment Letter in the event (i) the applicable Equity Backstop Party repudiates, invalidly purports to terminate or fails to fund its Equity Backstop Commitment when required; (ii) of certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock; and (iii) the aggregate amount of commitments falls below $12 billion provided that the PG&E shall use commercially reasonable efforts to obtain replacement commitments within 14 days of the termination.

| | |
|---|---|
| **Plan Support**<br>*See* Equity Backstop Commitment Letters §§ 14, 18. | Until the termination of the Equity Backstop Commitment Letters, subject to certain limitations, the Equity Backstop Parties must (i) use all reasonable efforts to support the Debtors' Plan with respect to the treatment of their PG&E Corp. common shares and to act in good faith with respect to any permitted equity offering, (ii) vote all of their PG&E Corp. common shares and claims to accept the Debtors' Plan, and (iii) vote their PG&E Corp. common shares and claims to reject any plan of reorganization other than the Debtors' Plan.  If the Debtors provide another creditor holding a funded debt claim a more favorable treatment than provided to an Equity Backstop Party with a similar funded debt claim, the Debtors shall take all actions so that the more favorable treatment applies to such Equity Backstop Party's similar funded debt claim.<br><br>Nothing in the Equity Backstop Commitment Letters prohibits any party from appearing as a party-in-interest in the Chapter 11 Cases, so long as such |

22

Case: 19-30088   Doc# 6013   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 29
of 58
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 30
of 175

<table>
<tr><td colspan="3">appearance and the positions advocated are consistent with the Equity Backstop Commitment Letters and the Debtors' Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Debtors' Plan.</td></tr>
</table>

Certain key terms and provisions of the Debt Financing Commitment Letters are summarized as follows (subject, in the case of the Backstop Debt Facilities, to the "market flex" terms contained in the Backstop Debt Fee Letters):[16]

| | Debt Commitment Letters | |
|---|---|---|
| | **PG&E Corp. Backstop Debt Facility** | **Utility Backstop Debt Facility** |
| **Borrower** | PG&E Corp. | Utility |
| **Backstop Debt Facility** | Up to $5,000 million 364-day senior unsecured "bridge" term loan credit facility | Up to $5,825 million 364-day senior secured "bridge" term loan credit facility |
| **Roles**<br>*See* Debt Commitment Letters, § 1; Schedule I to Debt Commitment Letters. | JPMorgan will act as administrative agent and, solely for the Utility Backstop Debt Facility, as collateral agent. JPMorgan, BofA, Barclays, Citi and GS Bank will act as joint bookrunners and, along with BNP, Credit Suisse, Morgan Stanley, MUFG, Wells Fargo and Mizuho (or, in each case, its designated affiliate), joint lead arrangers and co-documentation agents. | |
| **Interest Rate**<br>*See* Debt Commitment Letters, Annex A-I. | At the option of PG&E Corp. or the Utility, as applicable, (a) the Adjusted LIBO Rate plus the Applicable Margin set forth below or (b) ABR plus the Applicable Margin set forth below minus 1.00% (but not less than 0.00%). | |

---

[16] This summary is qualified in its entirety by reference to the provisions of the Debt Financing Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Debt Financing Commitment Letters, the Debt Financing Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Debt Financing Commitment Letters.

23

| | | |
|---|---|---|
| | Applicable Margin: 1.75% - 3.00% | Applicable Margin: 1.125% - 2.50% |

| Public debt rating | Rate |
|---|---|
| BB+ / Ba1 | 1.75% |
| BB / Ba2 | 2.00% |
| BB- / Ba3 | 2.125% |
| B+ / B1 or worse | 2.25% |

Each of the foregoing increases by 0.25% each 90 day period after the Closing Date.

| Public debt rating | Rate |
|---|---|
| BBB+ / Baa1 | 1.125% |
| BBB / Baa2 | 1.375% |
| BBB- / Baa3 | 1.50% |
| BB+ / Ba1 or worse | 1.75% |

Each of the foregoing increases by 0.25% each 90 day period after the Closing Date.

---

**Security**
*See* Debt Commitment Letters, Annex A.

Unsecured

Secured by a first-priority security interest in substantially all Utility assets (subject to permitted liens and other customary exceptions and limitations on perfection steps and thresholds to be agreed).

---

**Facility Fees and "Alternate Transaction"**
*See* Debt Commitment Letters, Annex A-1; Backstop Debt Fee Letters.

<u>Ticking Fees</u>. 0.30% per annum times the actual daily undrawn commitments accruing during the period commencing on January 9, 2020 and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of each lender, payable quarterly in arrears and on certain other specified dates.

<u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans

<u>Ticking Fees</u>. 0.175% per annum times the actual daily undrawn commitments accruing during the period commencing on January 9, 2020 and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments, for the account of each lender, payable quarterly in arrears and on certain other specified dates.

<u>Duration Fees</u>. For the ratable benefit of the lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans outstanding on the 90th day after the Closing Date; (ii) 0.75% of the aggregate principal amount of the loans

24

| | | |
|---|---|---|
| | outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date.<br><br>Other Fees / "Alternate Transaction". Set forth in the Backstop Debt Fee Letter, unredacted copies of which are to be provided under seal to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. | outstanding on the 180th day after the Closing Date; and (iii) 1.00% of the aggregate principal amount of the loans outstanding on the 270th day after the Closing Date.<br><br>Other Fees / "Alternate Transaction". Set forth in the Backstop Debt Fee Letter, unredacted copies of which are to be provided under seal to the Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| **Mandatory Prepayments and Commitment Reductions**<br>*See* Debt Commitment Letters, Annex A. | The aggregate commitments in respect of the applicable Backstop Debt Facility shall be automatically and permanently reduced, and after the Closing Date, the aggregate principal amount of loans under the applicable Backstop Debt Facility shall be prepaid, in each case without penalty or premium and on a dollar-for-dollar basis, by:<br><br>a) 100% of the Net Cash Proceeds of all non-ordinary course asset sales or dispositions or any insurance or condemnation proceeds (subject to certain exceptions set forth in the Debt Commitment Letters);<br>b) 100% of the Net Cash Proceeds received from (i) incurrences of debt securities or other debt (including pursuant to any bank or other credit facility) (other than Excluded Debt and amounts referred to in clause (c) below) and (ii) issuances of equity securities (including shares of common stock or preferred equity or equity-linked securities) (other than Excluded Equity Offerings); and<br>c) 100% of the committed amount under Qualifying Bank Financings (subject to certain exceptions);<br><br>*provided*, *however*, that until such time as the Equity Backstop Commitments have been reduced to $0, except as provided in the Debt Commitment Letters, the Debt Commitments are not reduced by any cash proceeds from any Additional Capital Source (as defined in the Equity Backstop Commitment Letters) to the extent that such cash proceeds also reduce the Equity Backstop Commitments.<br><br>The obligations of the Backstop Debt Commitment Parties to fund on the Closing Date shall be automatically and permanently reduced, without penalty or premium and on a dollar-for-dollar | |

25

basis, by the aggregate principal amount of any roll-over, "take-back" or reinstated debt of PG&E Corp. or the Utility, as applicable, other than New Utility Funded Debt Exchange Notes, the New Utility Long-Term Notes, the New Utility Short-Term Notes and the debt in respect of the Utility Reinstated Senior Note Claims (each as defined in the Noteholder RSA).

In addition, the Debt Commitment Letters require that the proceeds of any "**Included Securitization Transaction**" (defined as any securitization transaction of PG&E Corp., the Utility or their subsidiaries other than any non-recourse pass-through securitization transaction contemplated by AB 1054, but including, for the avoidance of doubt, any securitization that includes credits or rebates to customers) be applied, on or prior to the closing date of the Backstop Debt Facilities, as follows: (i) *first*, in lieu of the requirement for Designated Permitted Financing (as defined below), up to $6.0 billion to finance a portion of the transactions described in the Backstop Debt Commitment Letters, (ii) second, to finance the Fire Victim Trust as contemplated by the Plan, up to $1.35 billion, (iii) *third*, to reduce commitments under the PG&E Corp. Backstop Debt Facility, up to $2.0 billion, (iv) *fourth*, to be deposited as cash on the balance sheet of the Debtors, up to $650 million, and (v) *thereafter*, as the Debtors may otherwise direct (but without reduction to the minimum equity requirement under the Backstop Debt Facilities).

| | |
|---|---|
| **Expense Reimbursement**<br>*See* Debt Commitment Letters, § 5. | The Backstop Debt Commitment Parties and their respective affiliates will be reimbursed for out-of-pocket expenses incurred in connection with the Backstop Debt Facilities and any related documentation or the administration, amendment, modification or waiver thereof. |
| **Indemnification**<br>*See* Debt Commitment Letters, § 5. | Subject to certain exceptions set forth in the Debt Commitment Letters, the Backstop Debt Commitment Parties and their related parties will be indemnified from any losses, claims, damages, liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with the Debt Commitment Letters, the Backstop Debt Facilities, the use of the proceeds thereof or any related transaction or any Proceeding, and will be reimbursed for reasonable, documented and invoiced out-of-pocket legal expenses (subject to the Counsel Limitation) or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigation or defense. |
| **Conditions Precedent**<br>*See* Debt Commitment Letters, Annex B. | The obligations of the lenders to lend under the Backstop Debt Facilities are subject to satisfaction or waiver of certain condition precedents (or the absence of certain termination rights) substantially similar to those described above with respect to the Equity Backstop Commitment Letters and certain other conditions, |

26

including: (i) entry by the Court of (a) the Approval Order (as defined below), (b) the Noteholder RSA Approval Order and (c) a confirmation order confirming the Debtors' Plan in form and substance reasonably satisfactory to the Required Commitment Parties by no later than June 30, 2020, with each order in full force and effect, final and non-appealable and not subject to a stay; (ii) none of the Debtors' Plan, the Confirmation Order or the Approval Order shall have been amended or modified or any condition therein waived without the consent of the Required Commitment Parties (not to be unreasonably withheld, conditioned or delayed); (iii) compliance in all material respects with the Confirmation Order; (iv) all documents necessary to implement the Debtors' Plan and the financings and distributions contemplated thereunder shall have been executed (each of which shall either (a) not be adverse to the interests of the Backstop Debt Commitment Parties or (b) be in form and substance reasonably acceptable to the Required Commitment Parties); (v) delivery of specified historical and pro forma financial information; (vi) accuracy of representations and warranties and lack of default or event of default; (vii) execution of definitive documentation for the Backstop Debt Facilities; (viii) delivery of customary legal opinions, corporate organizational documents and solvency certificates and payment of all fees; (ix) delivery of documents and information under applicable "know your customer" and anti-money laundering rules; (x) solely with respect to the Utility Backstop Debt Facility, execution and delivery of all documents and instruments required to perfect the security interests in the Collateral and completion of flood insurance due diligence; (xi) receipt by the Utility of investment grade senior secured debt ratings with a stable or better outlook; (xii) absence of a Material Adverse Effect since June 30, 2019; (xiii) receipt by PG&E Corp. of at least $9,000 million of proceeds from the issuance of equity ; (xiv) receipt by Utility of at least $6.00 billion of proceeds from Designated Permitted Financing (defined as  any issuance of debt securities or other debt for borrowed money or any issuance of equity securities (on terms acceptable to each Backstop Debt Commitment Party)), provided that if such Designated Permitted Financing is an Included Securitization Transaction it shall be applied as set out above; (xv) the economic benefit of the net operating loss carryforwards of PG&E Corp or its subsidiaries shall not have been transferred except on terms that could not reasonably be expected to negatively impact the cash flow of PG&E Corp or its subsidiaries; (xvi) ownership by PG&E Corp. of 100% of the Utility common stock; and (xvii) delivery by the Utility of a financial model satisfactory to the Arrangers reflecting sources and uses and capital structure, together with a certification by the Utility that such financial model demonstrates compliance with all regulatory requirements (including all CPUC approvals).

27

| | |
|---|---|
| **Termination Rights**<br>*See* Debt Commitment Letters, § 11. | The Backstop Debt Commitment Parties' commitments and agreements with respect to the Backstop Debt Facilities are subject to termination rights, including (i) certain termination rights that are substantially similar to termination rights described above with respect to the Equity Backstop Commitment Letters or conditions precedent described above with respect to the Equity Backstop Commitment Letters or the Debt Commitment Letters, (ii) the occurrence of the Effective Date without using the applicable Backstop Debt Facility; (iii) the dismissal or conversion of the Chapter 11 Cases or the appointment of a trustee or examiner with enlarged powers; (iv) if the Court shall not have entered an order approving the Debt Financing Commitment Letters (the "**Approval Order**"), in form and substance reasonably satisfactory to the Backstop Debt Commitment Parties, on or before March 31, 2020; (v) if the Court shall not have entered an order approving the Noteholder RSA, in form and substance reasonably satisfactory to the Backstop Debt Commitment Parties (the "**Noteholder RSA Approval Order**"), on or before February 28, 2020; (vi) the necessary consents from the Backstop Parties in order to permit the Debtors' Plan to be amended to incorporate the terms of the Noteholder RSA are not obtained on or before February 28, 2020; and (vii) the CPUC revokes or terminates the Utility's Certificate of Public Convenience and Necessity. |
| | **Bank Financing Engagement Letter** |
| **Bank Engagement**<br>*See* Bank Financing Engagement Letter, § 1. | JPMorgan, BofA, Barclays, Citi and GS Bank (or their designated affiliates) are engaged to act as joint lead arrangers and joint bookrunners for (a) a $500 million PG&E Corp. revolving credit facility, (b) a $3,500 million Utility revolving credit facility, (c) a senior secured PG&E Corp. term loan facility and (d) any other bank loan or credit facility (other than a securitization facility) (clauses (a)-(d), collectively, the "**Bank Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Debtors' Plan, the refinancing or replacement of the Backstop Debt Facilities or other interim debt financing for the transactions and distributions contemplated by the Debtors' Plan, or any permanent revolving or term credit facility or other financing entered into in connection with the Debtors' Plan (collectively, the "**Exit Financing**"). |
| **Cooperation**<br>*See* Bank Financing Engagement Letter, § 2. | PG&E Corp. and the Utility have agreed to actively assist the Arrangers in achieving a mutually satisfactory syndication of any syndicated Bank Financing. |
| **Termination** | The engagement may be terminated by any Arranger (as to itself) at any time on written notice. PG&E Corp. and the Utility may |

| | |
|---|---|
| *See* Bank Financing Engagement Letter, § 3. | terminate the engagement on the earliest of (a) twelve months after the date of the Bank Financing Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Backstop Debt Facilities or other interim exit financing were not used and if any Bank Financing consummated prior to or concurrently with the Effective Date complied with the Bank Financing Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Backstop Debt Facilities or any other interim Exit Financing from the incurrence of Bank Financing in a transaction in which each Arranger acts in its titled capacity and receives its Requisite Economics (as defined below), if the Bank Financing is consummated after the Effective Date. |
| **Indemnification / Expense Reimbursement** *See* Bank Financing Engagement Letter, § 4. | Set forth in the Bank Financing Engagement Letter. |
| **Alternate Financing** *See* Bank Financing Engagement Letter, § 5(b). | If during the period commencing on the date of the Bank Financing Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Debtors' Plan (any such financing, an "**Alternate Financing**") without an Arranger acting in its titled capacity in connection therewith and without receiving at least the percentage of minimum economics of such financing under the Bank Financing Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Arranger an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Backstop Debt Facility, 100%) of the fees that would have been payable to such Arranger if such Arranger acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Arranger that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Debtors' Plan). |
| **Minimum Economics/Fees** | Set forth in the Bank Financing Engagement Letter, unredacted copies of which were previously provided to the Court [Docket No. 4453], the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |
| | **Securities Engagement Letter** |

29

| | | |
|---|---|---|
| | **Securities Engagement**<br>*See* Securities Engagement Letter, § 1. | J.P. Morgan Securities LLC, BofA, Barclays Capital Inc., Citi and Goldman Sachs & Co. LLC (or their designated affiliates) (collectively, the "**Securities Engagement Parties**") are engaged to act as joint bookrunning managers and joint lead underwriters, joint lead placement agents or joint lead initial purchasers, as applicable, in respect of any offering (each, an "**Offering**") by PG&E Corp., the Utility or any of their respective affiliates of debt securities (other than (x) any convertible debt, (y) any commercial paper programs and (z) any securitization) (the "**Securities**"), whether completed prior to, on or after the Effective Date, including the contemplated issuance of (a) at least $7,000 million aggregate principal amount of PG&E Corp. senior notes and (b) at least $27,350 million aggregate principal amount of Utility senior notes (clause (a) and (b) collectively, the "**Proposed Financing**"), in each case in connection with the financing of the transactions and distributions contemplated by the Debtors' Plan, and the refinancing or replacement of the Backstop Debt Facilities or other interim debt financing for the transactions and distributions contemplated by the Debtors' Plan (collectively, the "**Exit Financing**"). |
| | **Matters Relating to Securities Engagement**<br>*See* Securities Engagement Letter, § 2. | PG&E Corp. and the Utility will not initiate, solicit or enter into any discussions or negotiations for the issuance, offering or sale of Securities to any third parties, except through the Securities Engagement Parties. If PG&E Corp. or the Utility receive any inquiry concerning the Securities, PG&E Corp. and the Utility will promptly inform the Securities Engagement Parties. In addition, PG&E Corp. and the Utility have agreed that, during the term of the Securities Engagement Letter, they will not offer, sell, contract to sell or otherwise dispose of any securities substantially similar to the Securities without the prior written consent of the Securities Engagement Parties.<br><br>PG&E Corp. and the Utility shall not (except through the Securities Engagement Parties or as otherwise consented to by the Securities Engagement Parties) sell or offer to sell any Securities (or any substantially similar securities) during the term of the Securities Engagement Letter, and shall not offer or sell any security that would be integrated with the sale of any Securities that are not being offered or sold in a registered Offering in a manner that would require such Securities to be registered under the Act. |
| | **Termination**<br>*See* Securities Engagement Letter, § 3. | The engagement may be terminated by any Securities Engagement Party (as to itself) on written notice. PG&E Corp. and the Utility may terminate the engagement on the earliest of (a) twelve months after the date of the Securities Engagement Letter, if the Effective Date has not occurred, (b) the Effective Date, if the Backstop Debt Facilities or other interim exit financing were not used and if any Offering consummated prior to or concurrently with the Effective |

30

| | |
|---|---|
| | Date complied with the Securities Engagement Letter, (c) the first anniversary of the Effective Date and (d) the date of receipt by PG&E Corp. and the Utility of aggregate cash proceeds equal to outstanding obligations under the Backstop Debt Facilities or any other interim Exit Financing from the sale of Securities in a transaction in which each Securities Engagement Party acts in a titled capacity and receives its Requisite Economics, if such transaction is consummated after the Effective Date. Additionally, PG&E Corp. and the Utility may terminate the Securities Engagement Letter "for cause" with respect to any Rule 5110 Offering. |
| **Indemnification / Expense Reimbursement** *See* Securities Engagement Letter, § 4 and Annex A. | Set forth in the Securities Engagement Letter. |
| **Alternate Financing** *See* Securities Engagement Letter, § 5(c). | If during the period commencing on the date of the Securities Engagement Letter and ending 12 months following its termination, PG&E Corp., the Utility or any of their respective affiliates obtain Exit Financing or any other exit financing in connection with a plan of reorganization other than the Debtors' Plan (other than bank or syndicated credit financing) (any such financing, an "**Alternate Financing**") without a Securities Engagement Party acting in its titled capacity under the Securities Engagement Letter in connection therewith and without receiving at least the percentage of minimum economics of such financing under the Securities Engagement Letter (the "**Requisite Economics**"), then PG&E Corp. and the Utility have agreed to pay to such Securities Engagement Party an amount equal to 50% (or, if such Alternate Financing refinances or replaces any outstanding Backstop Debt Facility, 100%) of the fees that would have been payable to such Securities Engagement Party if such Securities Engagement Party acted in its titled capacity with the Requisite Economics for such Alternate Financing; *provided* that no fee is payable to any Securities Engagement Party that has been offered the opportunity to act in a titled capacity with the Requisite Economics and has elected not to do so (unless in connection with an Alternate Financing in connection with a plan other than the Debtors' Plan). |
| **Disclosure** *See* Securities Engagement Letter, § 6. | PG&E Corp. and the Utility shall furnish the Securities Engagement Parties with all financial and other information concerning the Debtors, the Debtors' Plan, the financing thereof and related matters that the Securities Engagement Parties may reasonably request for inclusion in any Offering Document or otherwise. |
| **Minimum Economics/Fees** | Set forth in the Securities Engagement Letter, unredacted copies of which were previously provided to the Court [Docket No. 4454], |

Case: 19-30088   Doc# 6013   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 38 of 58

Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 39 of 175

| | |
|---|---|
| | the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors and Official Committee of Tort Claimants on a confidential and professionals' eyes only basis. |

Certain additional provisions of the Proposed Orders are summarized as follows:[17]

| | |
|---|---|
| **Nature of Exit Financing Obligations**<br>*See* Proposed Orders, ¶ 4. | The Exit Financing Obligations shall be treated as allowed administrative expenses of the Debtors whether or not the Exit Financing Commitments are funded, and none of such amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Exit Financing Commitment Letters. |
| **Amendments**<br>*See* Proposed Orders, ¶ 7. | The Proposed Orders provide that the Debtors and the Exit Commitment Parties may enter into any nonmaterial amendment, modification or supplement of any provision of the Exit Financing Commitment Letters without further notice, hearing or order of the Court. In the case of any material amendment, modification or supplement to the Exit Financing Commitment Letters that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice to the Notice Parties (as defined below), each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to the Debtors and the applicable Exit Commitment Parties to such Material Amendment. If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material Amendment, the Debtors are authorized to execute such Material Amendment. If a Notice Party timely objects and such objection is not resolved prior to the date upon which such objection is scheduled to be heard by the Court, approval of the Court (which may be sought on an expedited basis) will be necessary to execute a Material Amendment.<br><br>This provision is substantially similar to paragraph 26 of that certain *Final Order Pursuant to 11 U.S.C. §§ 105, 362, 363, 364, 503 and 507 and Fed. R. Bankr. P. 2002, 4001, 6004 and 9014 (i) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (ii) Granting Liens and Superpriority Claims, (iii) Modifying the Automatic Stay, and (iv) Granting Related Relief* [Docket No. 1091]. |

---

[17]     This summary is qualified in its entirety by reference to the Proposed Orders. To the extent that any discrepancies exist between the summary described in this Motion and the Proposed Orders, the Proposed Orders shall govern.

32

| **No Imposition of Liability**<br>*See* Proposed Orders, ¶ 8. | Nothing in the Proposed Orders, the Exit Financing Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Exit Commitment Party of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts. |
|---|---|
| **Automatic Stay**<br>*See* Proposed Orders, ¶ 13. | The Proposed Orders provide for the modification of the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to enable the Exit Commitment Parties to perform under the Exit Financing Commitment Letters and to exercise any and all of their contractual rights thereunder. |

## IV.   BASIS FOR RELIEF REQUESTED

### A.   Entry into the Exit Financing Commitment Letters is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. § 363(b)(1). "Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Station Casinos, Inc.*, No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447, at *7 (Bankr. D. Nev. Feb. 2, 2010) (quoting *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate". *Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (emphasis in original, alterations and internal quotation marks omitted) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (stating the business judgment standard is "not a difficult standard to satisfy"). Once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and with

33

the belief that the decision was in the best interests of the debtor's estate.  *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

Section 105(a) of the Bankruptcy Code further supports entry of an order approving the Exit Financing Commitment Letters by providing that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]".  11 U.S.C. § 105(a); *see also In re Excel Innovations, Inc*., 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812 (ASW), 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014).  Together, sections 363(b) and 105(a) of the Bankruptcy Code give the Court sufficient authority to grant the relief requested herein.  *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (stating courts should permit use of assets outside the ordinary course of business if "sound business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

Courts have routinely relied on such sections of the Bankruptcy Code when approving relief similar to that sought herein.  *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4 (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The Equity Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 4 (Bankr. D. Del. May 15, 2019) (ECF No. 368) ("The Debt Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code.").

As noted above, the Debtors have reached a major milestone in these Chapter 11 Cases.  With the assistance of the Court-appointed mediator, the Debtors have achieved a comprehensive global consensus that has been embodied in the Debtors' Plan.  The Debtors' Plan has the support of all classes of wildfire constituencies and a majority of the holders of the Utility's senior unsecured debt, and will enable the confirmation of the Debtors' Plan, well within the June 30, 2020 timeframe

34

and perhaps, most importantly, expedite distributions to wildfire claimants—the Debtors' primary goal when seeking relief under chapter 11. The recent market turmoil driven by the coronavirus combined with the Debtors' exit financing-related requirements under certain RSAs and the need to demonstrate capital commitment as the Debtors navigate their way through the regulatory process demonstrate the Debtors' critical need for the Exit Financing Commitments. The Exit Financing Commitments Letters provide for the financial commitments (on fair and reasonable terms) needed to ensure that this comprehensive consensus will be timely implemented and that these cases are brought to a successful conclusion. Notably, over the past six months the Debtors have marketed the equity backstop on three separate occasions—in no instance was the equity backstop materially oversubscribed. (*Id.* ¶ 21.) Under these circumstances the relief requested in this Second Amended Motion plainly constitutes a valid exercise of the Debtors' business judgment.

The equity financings backstopped by the Equity Backstop Commitment Letters are an important component of the Debtors' successful emergence from chapter 11, since they will allow the Debtors to fund payments to the Fire Victim Trust. Given the possibility that the price of PG&E Corp. shares may decrease or that market conditions could deteriorate between now and confirmation of the Debtors' Plan, it is important to the Debtors to lock in a reasonable baseline share price that can be improved if the Debtors' market value and market conditions permit. (*See* Ziman Decl. ¶ 18.)

Similarly, the new long-term debt backstopped by the Debt Commitment Letters will help allow the Debtors to, among other things, satisfy certain prepetition obligations, and to fund the Debtors' initial contribution to the Go-Forward Wildfire Fund and the payment in full, in cash, of the Debtors' obligations under their debtor-in-possession financing facilities and other administrative expenses. As with the Equity Backstop Commitment Letters, the Debt Financing Commitment Letters provide assurances that, together with the Temporary Utility Debt, sufficient funds will be available at an acceptable price on the Effective Date in the event that market financings cannot be consummated at that time. (*Id.* ¶ 26.)

Recognizing, however, that the Debtors may be able to consummate financings on more attractive terms than those contemplated by the Exit Financing Commitment Letters as they near

35

emergence, the Debtors negotiated for flexibility around structure and timing of exit financings. This flexibility allows the Debtors to pursue exit financings that maximize the value of their estates for the benefit of all stakeholders.

Moreover, the Exit Financing Commitment Letters align the incentives of the Debtors with those of leading financial institutions and investors toward the ultimate success of the Debtors' Plan. (*Id.* ¶ 34.) These financial institutions and investors have committed significant capital to ensure the viability of the Debtors' Plan and therefore have an interest in seeing it through to completion. (*Id.*) These commitments also enhance the confidence of claimants, financial creditors, equityholders, ratepayers and other stakeholders that the Debtors will be able to fund the contemplated payments on the Effective Date and emerge from chapter 11 as a financially sound utility. (*Id.*)

For all the above reasons, the Debtors have concluded that the Exit Financing Commitment Letters are best designed to maximize the value of their estates and the likelihood of their successful emergence from the Chapter 11 Cases in accordance with the terms of the Debtors' Plan. Accordingly, the Second Amended Motion should be approved.

**B.** **Payment and Allowance of the Exit Financing Obligations as Administrative Expense Claims Should Be Approved Because They are Fair, Reasonable and Essential Terms of the Exit Financing Commitment Letters.**

The Exit Financing Obligations are essential components of the Exit Financing Commitment Letters. These fees, premiums, indemnities, costs and expenses are necessary, fair and reasonable compensation for the substantial undertakings of the Exit Commitment Parties. (*See id.* ¶¶ 20, 22, 31, 33.) The Equity Backstop Commitments have already provided significant value to the Debtors by preserving market value, which has facilitating settlements with both the TCC and prepetition noteholders. (*Id.* ¶ 21.) The Debtors are seeking the Court's approval of the Equity Backstop Commitment Letters so that their estates can continue to benefit from this baseline support for the next several months. Absent the Debtors' agreement to pay the Exit Financing Obligations, the Exit Commitment Parties would not have been willing to provide the Exit Financing Commitments. (*Id.* ¶¶ 21, 31.) Without the Exit Financing Commitments, the Debtors have no

36

assurances that they will have access to the financing proceeds required to fund the payments contemplated by the Debtors' Plan, including the satisfaction in full of wildfire claims and pre- and post-petition funded debt obligations. (*Id.* ¶¶ 18, 26.)

For these reasons, the Debtors determined, in their business judgment and in consultation with their advisors, that their agreements to pay the Exit Financing Obligations were essential and an appropriate means to obtain the Exit Financing Commitments. Compared to the substantial value provided by the Exit Financing Commitment Letters, and the significant duration of the Exit Financing Commitments, the Exit Financing Obligations are a reasonable use of estate resources and should be accorded administrative expense priority under section 507(a)(2) of the Bankruptcy Code. The Exit Financing Obligations are actual and necessary costs, not only for preserving the Debtors' estates, but also for maximizing their value and enhancing overall stakeholder recoveries.

The commitment premiums (the "**Equity Commitment Premiums**") under the Equity Backstop Commitment Letters (consisting of a fixed 119 million shares of New PG&E Corp. Common Stock and, in the circumstances described above, additional shares up to an aggregate cap of approximately 139 million shares, except in certain limited circumstances where such premium is payable in cash)[18] and the Debtors' agreement to pay reasonable fees and expenses of counsel and a financial advisor to the Equity Backstop Parties, subject to caps of $34 million and $19 million, respectively, are fair and reasonable under the circumstances and reflect market feedback. (*Id.* ¶¶ 20, 22.) Further, subject to the occurrence of the Effective Date, the Equity Commitment Premiums are payable in shares of New PG&E Corp. Common Stock, which minimizes the cash outflow on the Effective Date.[19]

---

[18]     Assuming the Debtors implement the OII Capital Structure by drawing on the Equity Backstop Commitments and based on the Debtors' forecasted Normalized Estimated Net Income, 119 million shares represents a fee of 10.2% of the Equity Backstop Commitments.

[19]     In the unlikely event—especially so in light of the approved Noteholder RSA and the withdrawal of the alternative plan—that the Court confirms a plan of reorganization that is not the

37

Moreover, as described above, the Equity Commitment Premiums have been structured so that the premiums may be reduced by significant percentages in the event an Equity Backstop Party terminates its commitment. For instance, termination between January 20, 2020 and April 30, 2020, will result in a 60% reduction. Termination between April 30, 2020 and June 30, 2020, which coincides with the confirmation date required by AB 1054 (and the associated Equity Backstop Commitment Letter termination right in favor of the Equity Backstop Parties), will result in a 10% reduction. The step-downs in the clawback amount were specifically designed to accommodate the administration of these Chapter 11 Cases—as the potential for termination events diminishes, and as uncertainty related to the Equity Backstop Commitment conditions is resolved. However, even if the Equity Backstop Commitments are maintained through August 29, 2020, the maximum Equity Commitment Premium that would be owing is still fair and reasonable under the circumstances in light of the extended duration that the commitments have been, and will continue to be, outstanding. (*Id.* ¶¶ 20, 21.)

The fees, expense reimbursements and indemnities owing by the Debtors under the Backstop Debt Fee Letters and the Debt Financing Engagement Letters are also reasonable under the circumstances, are the product of arms'-length negotiations and are comparable to, or better than, market. (*Id.* ¶¶ 31, 33.) The Debtors and their advisors negotiated the fees down relative to the initial proposals. (*Id.* ¶ 33.) Moreover, the Backstop Debt Facilities are intended to serve only as a backstop for lower-cost "take-out" financing. As and when such lower-cost financing is incurred, the Debt Commitments are reduced dollar-for-dollar. If the entire $10.825 billion in Debt Commitments remain outstanding until June 30, 2020 (*i.e.*, the statutory confirmation deadline), the aggregate fees payable by the Debtors with respect to such Debt Commitments would be approximately $72 million.[20] (*Id.*

---

Debtors' Plan, then the Equity Commitment Premium will be payable in cash in the aggregate amount of approximately $764 million or shares of New PG&E Corp. Common Stock, at the election of each Equity Backstop Party.

[20] In addition to such commitment fees, the Debt Commitment Letters and Backstop Debt Fee Letters provide for the payment of fees if the Backstop Debt Facilities are funded and on certain

Case: 19-30088    Doc# 6013    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 45
of 58
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 46
of 175

¶ 31.) Based on analyses conducted by the Debtors' financial advisors, this quantum of commitment fees is comparable to, or less than, those charged in other large complex "bridge" financing transactions over the last five years. (*Id.* ¶¶ 31, 33.)

Treatment of the Exit Financing Obligations as administrative expenses of the estate is also well within market parameters and is a customary term in exit financing commitment letters. *See, e.g.*, *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The . . . expenses provided for or permitted by the Equity Backstop Agreement (including . . . the Equity Expense Reimbursement . . . ) are hereby approved as reasonable, [and] shall constitute allowed administrative expense claims pursuant to section 503(b) of the Bankruptcy Code . . . ."); *In re Hexion Holdings LLC*, No. 19-10684 (KG), at 5 (Bankr. D. Del. May 15, 2019) (ECF No. 368) ("The fees, premiums, and . . . expenses provided for or permitted by the Debt Backstop Agreement (including . . . the Debt Backstop Commitment Premium, the Additional Premium, the Debt Expense Reimbursement, and the Debt Backstop Indemnity Obligations) are hereby approved as reasonable, [and] shall constitute allowed administrative expense claims pursuant to section 503(b) of the Bankruptcy Code . . . .").

In exchange for the Debtors' agreement to pay the Exit Financing Obligations, the Debtors will receive substantial benefits. The Exit Financing Obligations are necessary and appropriate inducements for the Exit Commitment Parties to enter into the Exit Financing Commitment Letters and are fair and reasonable under the circumstances. (Ziman Decl. ¶¶ 20, 22, 31, 33.) Given the magnitude of the commitments of the Exit Commitment Parties, the Debtors have

---

specified dates thereafter depending on the amount of the Backstop Debt Facilities outstanding as of such dates. As described above, the Backstop Debt Commitment Parties have also been engaged to arrange permanent bank and debt securities exit financings, which, if consummated, would result in the payment by the Debtors of certain additional fees. In the event the Debtors fail to use the Backstop Debt Commitment Parties in connection with the financings for which they have been engaged, the Backstop Debt Commitment Parties would be entitled to customary alternate transaction fees. The aggregate fees payable by the Debtors pursuant to the Debt Financing Commitment Letters will depend on a variety of factors, including the length of time the Debt Commitments and/or Backstop Debt Facilities remain outstanding, the amount of the Backstop Debt Facilities funded and the type and size of the applicable exit financing or alternate transaction.

39

determined, in their business judgment, to incur the Exit Financing Obligations to provide assurances of their ability to consummate their Debtors' Plan on the Effective Date.

For the foregoing reasons, the Debtors respectfully submit that approval of the Exit Financing Commitment Letters is in the best interest of their estates and an appropriate exercise of their business judgment.

## V. WAIVER OF BANKRUPTCY RULE 6004(h)

To implement the foregoing, the Debtors respectfully request the waiver of the 14-day stay under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise". Fed. R. Bankr. P. 6004(h). For the reasons described above, the relief requested herein allows the Debtors to achieve greater certainty around the financing of their Debtors' Plan.

## VI. NOTICE

Notice of this Second Amended Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to the Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor-in-possession financing facilities; (xii) counsel for the Equity Backstop Parties; (xiii) counsel for the Initial Backstop Debt Commitment Parties; and (xiv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein, other than as set forth in the original and amended Motion, has been made by the Debtors.

40

1    WHEREFORE the Debtors respectfully request entry of the proposed orders granting

2    (i) the relief requested herein and (ii) such other and further relief as the Court may deem just and

3    appropriate.

4

5    Dated:  March 2, 2020

6                                    **WEIL, GOTSHAL & MANGES LLP**
                                     **CRAVATH, SWAINE & MOORE LLP**
7                                    **KELLER BENVENUTTI KIM LLP**

8

9                                      /s/ *Paul H. Zumbro*
                                     Paul H. Zumbro
10

11

12                                   *Attorneys for Debtors and Debtors in Possession*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                                                                      41
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**
**[Proposed] Order – Equity Backstop Commitment Letters**

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>               **Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**[PROPOSED] ORDER (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, EQUITY BACKSTOP COMMITMENT LETTERS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED PREMIUMS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS** |

Upon the Second Amended Motion, dated March 2, 2020 (the "**Motion**")[1], of PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order (i) approving the terms of, and the Debtors' entry into and performance under, the Equity Backstop Commitment Letters with the Equity Backstop Parties and (ii) authorizing the incurrence, payment and allowance of all related commitment premiums and expenses (the "**Equity Backstop Obligations**") as administrative expense claims, all as more fully provided in the Equity Backstop Commitment Letters and as set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.) and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found and determined that notice of the Motion is reasonable and sufficient under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and the Ziman Declaration; and a hearing to consider the Motion having been held before this Court on March 16, 2020 (the "**Hearing**"); and this Court having found that the Equity Backstop Commitment Letters have been negotiated in good faith and at arms'-length between the Debtors and the other parties to such agreements; and this Court having determined that the legal and factual bases set forth in the Motion

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Case: 19-30088   Doc# 6013-1   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 3
of 66
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 52
of 175

and the Ziman Declaration and at the Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, shareholders, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. The Motion is granted as set forth herein. Any and all objections with respect to the Motion, to the extent not withdrawn, are hereby overruled in all respects on the merits.

2. The Equity Backstop Commitment Letters, each in substantially the form attached to the Motion as **<u>Exhibit C</u>** with the Equity Backstop Parties, are hereby approved in their entirety. The Equity Backstop Commitment Letters are valid, binding and enforceable against the Debtors.

3. The Debtors' entry into the Equity Backstop Commitment Letters constitutes a reasonable exercise of the Debtors' business judgment and is hereby approved. The Debtors are authorized to perform under and implement the terms of the Equity Backstop Commitment Letters and the exhibits thereto (including delivery of extension notices as provided therein), and to negotiate, prepare, execute and deliver all documents, and to take any and all actions necessary and appropriate to implement the terms of the Equity Backstop Commitment Letters and to perform all obligations thereunder on the terms and conditions set forth therein, without further notice, hearing or order of this Court.

4. The Equity Backstop Obligations are actual and necessary costs and expenses of preserving the Debtors' estates and as such shall be treated as allowed administrative expenses of the Debtors pursuant to section 503(b) of the Bankruptcy Code with the priority set forth in section 507(a)(2) of the Bankruptcy Code, whether or not the Equity Backstop Commitments are funded, and none of the amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Equity Backstop Commitment Letters.

5. The Debtors are authorized to reimburse or advance the Equity Backstop Parties for their expenses and pay and incur the premiums and all other Equity Backstop Obligations in

accordance with the terms of the Equity Backstop Commitment Letters, whether incurred prior to, on, or after the date of this Order, in each case pursuant to the terms and conditions set forth in the applicable Equity Backstop Commitment Letter, without further notice, hearing, or order of this Court, as, when, and to the extent they become due and payable under the terms of the applicable Equity Backstop Commitment Letter, which Equity Backstop Obligations shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

6.      The terms and provisions of this Order shall be binding in all respects upon all parties in these chapter 11 cases, the Debtors, their estates, and all successors and assigns thereof, including any chapter 7 trustee or chapter 11 trustee appointed in any of these cases or after conversion of any of these cases to cases under chapter 7 of the Bankruptcy Code; *provided*, that the Equity Backstop Parties shall be under no obligation to extend any financing to any chapter 7 trustee or chapter 11 trustee.

7.      Subject to the terms and conditions of the Equity Backstop Commitment Letters, the Debtors and the Equity Backstop Parties may enter into any nonmaterial amendment, modification or supplement of any provision of the Equity Backstop Commitment Letters, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver (and to pay any premiums and expenses, amounts, costs and other obligations in connection therewith), without further notice, hearing or order of this Court.  In the case of any material amendment, modification or supplement to the Equity Backstop Commitment Letters that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via electronic mail or other electronic means) to the Notice Parties, each of whom shall have five (5) calendar days from the date of receipt of such notice to object in writing to the Debtors and the Equity Backstop Parties to such Material Amendment.  If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material Amendment, the Debtors are authorized to

execute such Material Amendment, which shall become effective and enforceable against the Debtors and their estates immediately upon execution. If a Notice Party timely objects and such objection is not resolved prior to the date upon which such objection is scheduled to be heard by this Court, approval of this Court (which may be sought on an expedited basis) will be necessary to execute a Material Amendment.

8. Nothing in this Order, the Equity Backstop Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Equity Backstop Party of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.

9. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

10. Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

11. Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted pursuant to this Order in accordance with this Order and the Motion.

13. The automatic stay under section 362 of the Bankruptcy Code is hereby modified to the extent necessary to enable the Equity Backstop Parties to perform under the Equity Backstop Commitment Letters and to exercise any and all of their contractual rights thereunder.

14. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**\*\* END OF ORDER \*\***

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT B**
**[Proposed] Order – Debt Financing Commitment Letters**

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Ray C. Schrock, P.C. (*pro hac vice*)
(ray.schrock@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP                  CRAVATH, SWAINE & MOORE LLP
Tobias S. Keller (#151445)                 Paul H. Zumbro (*pro hac vice*)
(tkeller@kellerbenvenutti.com)             (pzumbro@cravath.com)
Jane Kim (#298192)                         Kevin J. Orsini (*pro hac vice*)
(jkim@kellerbenvenutti.com)                (korsini@cravath.com)
650 California Street, Suite 1900          Omid H. Nasab (*pro hac vice*)
San Francisco, CA 94108                    (onasab@cravath.com)
Tel: 415 496 6723                          825 Eighth Avenue
Fax: 650 636 9251                          New York, NY 10019
                                           Tel: 212 474 1000
                                           Fax: 212 474 3700

*Attorneys for Debtors and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:** | Bankruptcy Case No. 19-30088 (DM) |
| **PG&E CORPORATION,** | Chapter 11 (Lead Case) (Jointly Administered) |
| - and - | |
| **PACIFIC GAS AND ELECTRIC COMPANY,** | **[PROPOSED] ORDER (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, DEBT FINANCING COMMITMENT LETTERS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED FEES, INDEMNITIES, COSTS AND EXPENSES AS ADMINISTRATIVE EXPENSE CLAIMS** |
| **Debtors.** | |
| ☐ Affects PG&E Corporation | |
| ☐ Affects Pacific Gas and Electric Company | |
| ☒ Affects both Debtors | |
| *\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | |

Upon the Second Amended Motion, dated March 2, 2020 (the "**Motion**")[1], of PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for entry of an order (i) approving the terms of, and the Debtors' entry into and performance under, the Debt Financing Commitment Letters and (ii) authorizing the incurrence, payment and allowance of all related fees, indemnities, costs and expenses (the "**Debt Commitment Obligations**") as administrative expense claims, all as more fully provided in the Debt Financing Commitment Letters and as set forth in the Motion; and this Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.) and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"); and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found and determined that notice of the Motion is reasonable and sufficient under the circumstances, and it appearing that no other or further notice need be provided; and this Court having reviewed the Motion and the Ziman Declaration; and a hearing to consider the Motion having been held before this Court on March 16, 2020 (the "**Hearing**"); and this Court having found that the Debt Financing Commitment Letters have been negotiated in good faith and at arms'-length between the Debtors and the other parties to such agreements; and this Court having determined that the legal and factual bases set forth in the Motion and the Ziman Declaration and at the Hearing

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, shareholders, and all parties in interest; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.  Any and all objections with respect to the Motion, to the extent not withdrawn, are hereby overruled in all respects on the merits.

2.      The Debt Commitment Letters, conformed copies reflecting all amendments made through February 28, 2020 of which are attached to the Motion as **Exhibit D** and **Exhibit E**, are hereby approved in their entirety.  The Debt Financing Engagement Letters, in the forms filed with this Court on an unredacted basis, are hereby approved in their entirety.  The Backstop Debt Fee Letters, in the forms filed with this Court under seal, are hereby approved in their entirety.  The Debt Financing Commitment Letters are valid, binding and enforceable against the Debtors.

3.      The Debtors' entry into the Debt Financing Commitment Letters constitutes a reasonable exercise of the Debtors' business judgment and is hereby approved.  The Debtors are authorized to perform under and implement the terms of the Debt Financing Commitment Letters and all exhibits thereto, and to negotiate, prepare, execute and deliver all documents, and to take any and all actions necessary and appropriate to implement the terms of the Debt Financing Commitment Letters and to perform all obligations thereunder on the terms and conditions set forth therein, without further notice, hearing or order of this Court.

4.      The Debt Commitment Obligations are actual and necessary costs and expenses of preserving the Debtors' estates and as such shall be treated as allowed administrative expenses of the Debtors pursuant to section 503(b) of the Bankruptcy Code with the priority set forth in section 507(a)(2) of the Bankruptcy Code, whether or not the Backstop Debt Facilities are entered into or funded, and none of the amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Debt Financing Commitment Letters.

5.     The Debtors are authorized to reimburse the Backstop Debt Commitment Parties for their fees and expenses, indemnify the Backstop Debt Commitment Parties and their representatives and affiliates, and pay and incur the fees and all other Debt Commitment Obligations in accordance with the terms of the Debt Financing Commitment Letters, whether incurred prior to, on, or after the date of this Order, in each case pursuant to the terms and conditions set forth in the applicable Debt Financing Commitment Letter, without further notice, hearing, or order of this Court, as, when, and to the extent they become due and payable under the terms of the applicable Debt Financing Commitment Letter, which Debt Commitment Obligations shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.

6.     The terms and provisions of this Order shall be binding in all respects upon all parties in these chapter 11 cases, the Debtors, their estates, and all successors and assigns thereof, including any chapter 7 trustee or chapter 11 trustee appointed in any of these cases or after conversion of any of these cases to cases under chapter 7 of the Bankruptcy Code; *provided*, that the Backstop Debt Commitment Parties shall be under no obligation to extend any financing to any chapter 7 trustee or chapter 11 trustee.

7.     Subject to the terms and conditions of the Debt Financing Commitment Letters, the Debtors and the Backstop Debt Commitment Parties may enter into any nonmaterial amendment, modification or supplement of any provision of the Debt Financing Commitment Letters, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver (and to pay any fees and other expenses, amounts, costs, indemnities and other obligations in connection therewith), without further notice, hearing or order of this Court.  In the case of any material amendment, modification or supplement to the Debt Financing Commitment Letters that is adverse to the Debtors (a "**Material Amendment**"), the Debtors shall provide notice (which may be provided via electronic mail or other electronic means) to the Notice Parties, each of whom shall have five (5)

calendar days from the date of receipt of such notice to object in writing to the Debtors and the Backstop Debt Commitment Parties to such Material Amendment. If no objections are timely received (or if the Notice Parties indicate via electronic mail that they have no objection) to a Material Amendment, the Debtors are authorized to execute such Material Amendment, which shall become effective and enforceable against the Debtors and their estates immediately upon execution. If a Notice Party timely objects and such objection is not resolved prior to the date upon which such objection is scheduled to be heard by this Court, approval of this Court (which may be sought on an expedited basis) will be necessary to execute a Material Amendment.

8. Nothing in this Order, the Debt Financing Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Backstop Debt Commitment Party of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.

9. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

10. Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

11. Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

12. The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted pursuant to this Order in accordance with this Order and the Motion.

13. The automatic stay under section 362 of the Bankruptcy Code is hereby modified to the extent necessary to enable the Backstop Debt Commitment Parties to perform under the Debt Financing Commitment Letters and to exercise any and all of their contractual rights thereunder.

1    14.    The Court retains exclusive jurisdiction with respect to all matters arising from or
2    related to the implementation of this Order.

3

4                                    ** END OF ORDER **

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT C**
**Form of Equity Backstop Commitment Letter**

March 1, 2020

PG&E Corporation
77 Beale Street
P.O. Box 770000
San Francisco, California 94177

> Re: Amended and Restated Chapter 11 Plan Backstop Commitment Letter

Ladies and Gentlemen:

Reference is hereby made to the chapter 11 bankruptcy cases, lead case no. 19-30088 (the "***Chapter 11 Cases***"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "***Bankruptcy Court***"), in which PG&E Corporation ("***PG&E***" or the "***Company***") and Pacific Gas and Electric Company (the "***Utility***" and together with PG&E, the "***Debtors***") are debtors in possession. Reference is further made to the Chapter 11 plan of reorganization that includes Abrams Capital Management, L.P. (or certain funds and accounts it manages) ("***Abrams***" or a "***Shareholder Proponent***") and Knighthead Capital Management, LLC (or certain funds and accounts it manages) ("***Knighthead***" or a "***Shareholder Proponent***") as plan proponents with the Debtors, filed on January 31, 2020 at Dkt. No. 5590, that is in a form acceptable to each of Knighthead, Abrams, and the Debtors (as may be amended, modified or otherwise changed in accordance with this Backstop Commitment Letter, the "***Plan***") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used in this amended and restated backstop commitment letter (this "***Backstop Commitment Letter***") or in the exhibits hereto but not otherwise defined shall have the meanings ascribed to them in the Plan. The word "including" means "including, without limitation".

In order to facilitate the Debtors' emergence from Chapter 11, pursuant to this Backstop Commitment Letter, and subject to the terms, conditions and limitations set forth herein and in consideration for the Backstop Commitment Premium, the undersigned Backstop Party (the "***Backstop Party***") is willing to purchase, on the Effective Date, an amount of New HoldCo Common Stock and Backstop TBM Trust Interests (as defined herein) up to its Backstop Commitment Amount (as defined herein) at the Backstop Price (as defined herein).

In addition, PG&E has separately solicited and negotiated and expects to enter into substantially similar backstop commitment letters ("***Other Backstop Commitment Letters***") with other funding sources ("***Other Backstop Parties***") pursuant to which such Other Backstop Parties will commit to purchase New HoldCo Common Stock and Backstop TBM Trust Interests on the Effective Date (such commitments, "***Other Backstop Commitments,***" and together with this Backstop Commitment, the "***Aggregate Backstop Commitments***").

    1.    <u>Equity Offerings</u>.

        a.    <u>Structure</u>. The Plan, among other things, shall provide that, on the Effective Date, Reorganized HoldCo shall issue shares of New HoldCo Common Stock for up to $12 billion of aggregate net cash proceeds to Reorganized Holdco (the "***Equity Offering Cap***"). PG&E shall structure the offering of any such shares of New HoldCo Common Stock (or rights pursuant to which any such shares may be issued or other securities convertible into any such shares) (the "***Equity Offering***") in accordance with the terms of this Section 1, including the following parameters:

            (i)    if the Implied P/E Multiple with respect to such Equity Offering equals or exceeds the greater of (A) 13.5 and (B) 13.5 *times* one *plus* any percentage change of the Applicable Utility Index Multiple (as defined herein) as measured on November 1, 2019 and the Determination Date (as defined herein), then PG&E shall be permitted to conduct the Equity Offering in any form of primary equity offering (including any public offering, regular way

offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, rights offering, private placement, "PIPE" sale or other registered or unregistered transaction) upon such terms and conditions as may be determined by the Board (a "***Permitted Equity Offering***"), including such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their net operating loss carryforwards and other tax attributes (collectively, the "***NOLs***");

        (ii)      if the Implied P/E Multiple with respect to the Equity Offering is less than the Implied P/E Multiple required for a Permitted Equity Offering in Section 1(a)(i) above, but equals or exceeds the lesser of (A) 12 and (B) 12 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on November 1, 2019 and the Determination Date (the "***Rights Offering Threshold Multiple***"), then PG&E shall structure the Equity Offering such that (Y) at least 80%, determined assuming the exercise in full of all of the Rights, of the aggregate cash proceeds of the Equity Offering is to be raised through the exercise of purchase rights (the "***Rights***") distributed to holders of PG&E common stock ("***Existing Shareholders***") as of a record date to be determined by the Board (the "***Record Date***") to purchase shares of New HoldCo Common Stock for cash at a price set forth below (the "***Rights Offering***") and (Z) the balance of the aggregate cash proceeds of the Equity Offering is to be raised through any other form of primary equity offering (including any public offering, regular way offering, at-the-market equity offering, block trade, modified Dutch auction or other auction pricing mechanism, private placement, "PIPE" sale or other registered or unregistered transaction), <u>provided</u>, that entities holding a majority of the Aggregate Backstop Commitments have not objected to the identity of the purchasers and ultimate purchasers, as applicable, in such Equity Offering, to the extent such Equity Offering is not a broadly syndicated underwritten public offering, within three business days of receipt of notice from PG&E;

        (iii)      in both of paragraphs (i) and (ii) above, Reorganized Holdco may also raise equity capital (subject to the Equity Offering Cap) by calling on the Backstop Commitments (after giving effect to any reduction of the Backstop Commitments in connection with a Permitted Equity Offering or a Rights Offering, as applicable); and

        (iv)      if the Implied P/E Multiple with respect to the Equity Offering would be less than the Rights Offering Threshold Multiple or if for any other reason Reorganized Holdco is unable to execute an Equity Offering, then Reorganized Holdco shall not utilize either a Permitted Equity Offering or a Rights Offering and shall issue shares at the Backstop Price pursuant to the Backstop Commitments up to the amount of the Equity Offering Cap *less* the proceeds of any Additional Capital Sources.

"***Implied P/E Multiple***" means, with respect to any Equity Offering, (A) the price per share at which shares of New Holdco Common Stock are offered to be sold in such Equity Offering (which price (x) in the case of an Equity Offering of rights, shall be the exercise price to acquire a share of New HoldCo Common Stock pursuant to such rights or (y) in the case of an Equity Offering of a security convertible into or exchangeable for shares of New HoldCo Common Stock, shall be the per share price implied by the conversion ratio used to convert the principal amount, liquidation preference or other face amount of such security into a number of shares of New HoldCo Common Stock) (the "***Per Share Price***"), *times* (B) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming such Equity Offering and all other equity transactions contemplated by the Plan are consummated and settled on the Effective Date), *divided by* (C) the Normalized Estimated Net Income as of the Determination Date.

Case: 19-30088   Doc# 6013-3   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 3 of 33
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 65 of 175

b. <u>Additional Capital Sources</u>. PG&E shall conduct the Equity Offering in accordance with the Plan. The net cash proceeds to PG&E of the Equity Offering shall not exceed the Equity Offering Cap, *less* the sum of (i) the principal amount of debt that is issued by PG&E in excess of $7 billion in connection with the Plan; (ii) the proceeds of any preferred stock issued by the Utility (excluding any Utility Preferred Interests that are Reinstated pursuant to the Plan); (iii) the proceeds of any third-party transactions based upon or related to the utilization or monetization of any (x) NOLs or (y) tax deductions, in each case arising from the payment of Fire Claims, that are not otherwise utilized in the Plan (a "*Tax Benefits Monetization Transaction*") in excess of $3 billion; and (iv) the principal amount of any other debt that is issued or reinstated by the Utility and its subsidiaries, excluding any Tax Benefits Monetization Transaction, in connection with the Plan in excess of $27.35 billion (the "*Additional Capital Sources*"). During the term of the Backstop Commitment Letter, PG&E shall not issue any senior equity securities. Notwithstanding the foregoing, if the capital structure adopted by the Debtors in the Plan is consistent with the capital structure described on pages 2-15 through 2-18 in Volume 1 of PG&E's Plan of Reorganization OII 2019 Prepared Testimony filed in Investigation 10-09-016 on January 31, 2020 (the "*Specified OII Testimony*"), then the Equity Offering shall be $9 billion and there shall be deemed to be $3 billion in Additional Capital Sources. It is agreed that the capital structure described in the Specified OII Testimony incorporates a $6 billion Tax Benefits Monetization Transaction.

c. <u>Rights Offering</u>. With respect to the Rights Offering:

(i) the Rights will have a fixed exercise price equal to (a) the Rights Offering Threshold Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming all equity is raised by the exercise of all Rights);

(ii) the Rights shall be transferable;

(iii) the Board shall provide that holders of Rights who fully exercise their Rights will have over-subscription privileges to subscribe for additional shares of New HoldCo Common Stock to the extent other Rights are not exercised, with over-subscription procedures (including pro-ration rules) determined by the Board;

(iv) the Board may provide that the Rights or Rights Offering include such terms and conditions that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs, including limitations on the amount of Rights that are exercisable by holders who, together with persons who have a formal or informal understanding with such holders to make a coordinated acquisition of stock within the meaning of Treasury Regulations 1.382-3(a) (an "*Entity*"), beneficially own in excess of a specified percentage (e.g., 4.75%) of the outstanding shares of PG&E common stock, subject to exceptions to be determined by the Board; <u>provided</u>, <u>however</u>, that such terms and conditions shall not restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; and

(v) the Rights will have such other terms and conditions as may be determined by the Board, as long as such other terms and conditions are consistent with the Plan and with every other provision of this Backstop Commitment Letter.

Case: 19-30088   Doc# 6013-3   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 4 of 33
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 66 of 175

d. _Subordinated Claims_. To the extent provided in the Plan, the Debtors may issue Rights or New HoldCo Common Stock to holders of Claims against a Debtor that are subject to subordination pursuant to section 510(b) of the Bankruptcy Code and that arise from or are related to any equity security of such Debtor.

e. _Documentation_. The definitive documentation for any Permitted Equity Offering or any Rights Offering shall be consistent with the Plan. For the avoidance of doubt, the organizational documents of the Reorganized HoldCo (including its charter) may include limitations and other terms that are reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; _provided_, _however_, that the organizational documents shall not be modified or amended in a manner that would restrict existing holders of PG&E common stock (including any Entity) from acquiring shares that do not increase their aggregate beneficial ownership to more than 4.75% of the outstanding shares of PG&E common stock immediately after the completion of the Rights Offering; _provided further_, _however_, that if the Backstop Commitments will be drawn and as a result the Backstop Party's and its affiliates' aggregate beneficial ownership of shares of PG&E common stock would exceed 4.75% of the outstanding shares of PG&E common stock, then (i) the Debtors may reduce the amount of the Backstop Party's Backstop Commitment in order to eliminate such excess and (ii) if the Debtors do not make such reduction, the Debtors may not impose any restriction on the transfer of any shares held by the Backstop Party or its affiliates (determined as of the date the transactions contemplated by this Backstop Commitment Letter and the Plan are consummated) pursuant to the terms of PG&E's organizational documents. At least 30 days prior to the filing of the Plan Supplement, PG&E shall give the Backstop Party drafts of the subscription form and any other documentation to be completed by the Backstop Party in connection with funding the Backstop Commitment for its review and comment. The Plan filed by the Debtors shall include Abrams and Knighthead as plan proponents with the Debtors and be in a form reasonably acceptable to Abrams, Knighthead, and the Debtors and shall incorporate the modifications provided for in the Tort Claimants RSA, and such Plan shall otherwise provide for substantially the same classification and treatment, including releases, of all Claims (other than Utility PC Bond (2008 F and 2010 E) Claims as long as such Claims are paid in Cash or debt securities) as provided in the Debtors' Joint Chapter 11 Plan of Reorganization filed with the Bankruptcy Court on January 31, 2020.

f. _Use of Proceeds_. The Debtors shall only use the proceeds of an Equity Offering to fund obligations to holders of Fire Claims under the Plan.

g. _Notices_. Promptly, and in any event, within two days of the Board's determination of final pricing of any Equity Offering, PG&E shall publicly disclose the form, structure, amount and terms of such Equity Offering, including the Implied P/E Multiple for such Equity Offering. PG&E shall give the Backstop Party, as soon as reasonably practicable, but in no event later than five business days prior to the Effective Date, (i) written notification setting forth (A) the amount to be funded pursuant to the Backstop Commitment, (B) an estimate of the Backstop Price and (C) the targeted Effective Date and (ii) a subscription form to be completed by the Backstop Party, or other instructions, to facilitate the Backstop Party's subscription for the New HoldCo Common Stock.

h. _Cooperation_. As reasonably requested by the Debtors, the Backstop Party shall reasonably cooperate with the Debtors with respect to providing information relevant to the preservation of the Debtors' tax attributes, including information regarding (i) the number of shares of PG&E common stock owned by such party (on a holder-by-holder basis) prior to the Rights Offering, (ii) the amount of Rights exercised and shares of New HoldCo Common Stock purchased pursuant to the Backstop Commitment by such persons, and (iii) the amount of Backstop Party's Shares (as defined below) at any time prior to the Allocation Date upon at least three business days' notice to the Backstop Party.

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 5
of 33
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 67
of 175

2. <u>Backstop</u>.

a. Subject to the terms and conditions set forth herein and to the payment and provision of premium to the Backstop Party as provided in Section 2(c), the Backstop Party, solely on behalf of itself, hereby commits to purchase on the Effective Date at the Backstop Price (the "***Backstop Commitment***") and up to the dollar amounts set forth on <u>Exhibit A</u> hereto as may be adjusted pursuant to the terms of this Agreement (the "***Backstop Commitment Amount***"), (i) an amount of shares of New HoldCo Common Stock and (ii) if the Backstop Commitment is drawn and a Tax Benefits Monetization Transaction is not expected to occur on the Effective Date, a pro rata share (calculated as a percentage equal to the Backstop Commitment Amount *divided by* the Aggregate Backstop Commitments) of Backstop TBM Trust Interests (as defined herein), <u>provided</u>, <u>however</u>, that the Backstop Commitment Amount shall be reduced as necessary to ensure that the aggregate beneficial ownership of the Backstop Party does not exceed 8.99% of the outstanding voting shares of PG&E immediately after the completion of the Rights Offering. For the avoidance of doubt, in the event the Backstop Commitment is drawn and a Tax Benefits Monetization Transaction is not expected to occur on the Effective Date, the Backstop TBM Trust Interests shall be issued to the Backstop Party as provided in the foregoing clause (ii) for no additional consideration (other than payment of the Backstop Price).

b. PG&E and the Backstop Party shall cooperate in good faith to prepare and deliver a subscription agreement and any other documentation necessary to effect the private placement of New HoldCo Common Stock to the Backstop Party in accordance with the terms of this Backstop Commitment Letter, which documentation shall be consistent with this Backstop Commitment Letter and the Plan.

c. The Debtors agree to pay the Backstop Party the Backstop Commitment Premium to the extent provided on <u>Exhibit A</u> and to reimburse or advance on a regular basis the Backstop Party for the reasonable fees and expenses of Jones Day, Orrick Harrington & Sutcliffe LLP, and a financial advisor incurred after the commencement of the Chapter 11 Cases and prior to termination of this Backstop Commitment Letter in connection with the Plan, the Backstop Commitment Letter, the Chapter 11 Cases, and the transactions contemplated herein, provided that such reimbursement shall not exceed $31 million for Jones Day in the aggregate, $3 million for Orrick Harrington & Sutcliffe LLP in the aggregate, and $19 million for the financial advisor in the aggregate. The provisions for the payment of the Backstop Commitment Premium and the other provisions provided herein are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these provisions the Backstop Party would not have entered into this Backstop Commitment Letter, and the Backstop Commitment Premium shall, pursuant to an order of the Bankruptcy Court approving this Backstop Commitment Letter, constitute allowed administrative expenses of the Debtors' estates under sections 503(b) and 507 of the Bankruptcy Code.

d. (1) Reorganized Holdco will enter into a registration rights agreement with the Backstop Party in respect of the shares of New HoldCo Common Stock that the Backstop Party may acquire in accordance with the Plan and this Backstop Commitment Letter ("***Registrable Shares***"), which registration rights agreement shall (i) provide for the filing by Reorganized Holdco of a shelf registration statement (whether on Form S-3 or on Form S-1) with the Securities and Exchange Commission (the "***SEC***") covering the resale of Registrable Shares as soon following the Effective Date as is permissible under applicable rules and regulations of the SEC, and provide for the requirements to (x) use reasonable best efforts to cause such shelf registration statement to become effective on the earliest date practicable and (y) cause such registration statement to become effective in all events not later than 20 calendar days after the Effective Date, (ii) provide that PG&E's obligation to maintain an effective shelf registration statement under the registration rights agreement will terminate no earlier than the time that Registrable Shares issued to the Backstop Party may be sold by the Backstop Party in a single transaction without limitation under Rule 144 of the Securities Act (as defined below), (iii) treat the Backstop Party no less favorably than the Other Backstop Parties with respect to its Registrable Shares and (iv) otherwise be in

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 6
of 23
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 68
of 175

form and substance reasonably acceptable to the holders of a majority of the Aggregate Backstop Commitments.

(2) Upon the written request of the Backstop Party following the Effective Date, the Company shall use commercially reasonable efforts to obtain a Rule 144A CUSIP for the Backstop TBM Trust Interests. Upon the written request of Backstop Parties holding a majority of the Backstop TBM Trust Interests following the Effective Date, the Company shall use commercially reasonable efforts to (a) file a shelf registration statement (whether on Form S-3 or on Form S-1) with the SEC covering the resale of Backstop TBM Trust Interests as soon as practicable following such request and (b) cause such registration statement to be declared effective by the SEC.

e. To the extent that a Tax Benefits Monetization Transaction is not expected to occur on the Effective Date, if the Backstop Commitment is drawn, no later than five (5) business days prior to the Effective Date, the Debtors shall form the Backstop TBM Trust (as defined herein) pursuant to the Backstop TBM Trust Agreement (as defined herein). The Backstop TBM Trust shall enter into the Tax Receivables Agreement (as defined herein) with the Utility.

f. To the extent that PG&E agrees to terms that are more favorable to an Other Backstop Party in an Other Backstop Commitment Letter (excluding terms that apply proportionately relative to the size of such Other Backstop Party's backstop commitment), PG&E shall provide notice of such terms to the Backstop Party no later than 10 days after the Allocation Date and, absent a written objection from the Backstop Party no later than 10 days after the date of such notice, such terms shall be deemed without further action to be incorporated into this Backstop Commitment Letter.

3. <u>Backstop Party Representations</u>. The Backstop Party hereby represents and warrants, solely as to itself, that (a) it has all limited partnership, corporate or other power and authority necessary to execute, deliver and perform this Backstop Commitment Letter, (b) the execution, delivery and performance of this Backstop Commitment Letter by it has been duly and validly authorized and approved by all necessary limited partnership, corporate or other organizational action by it, (c) this Backstop Commitment Letter has been duly and validly executed and delivered by it and, assuming due execution and delivery by the other parties hereto, constitutes a valid and legally binding obligation of it, enforceable against it in accordance with the terms of this Backstop Commitment Letter, (d) the execution, delivery and performance by the Backstop Party of this Backstop Commitment Letter do not (i) violate the organizational documents of the Backstop Party or (ii) violate any applicable law or judgment applicable to it, (e) as of the date of this Backstop Commitment Letter, its Backstop Commitment is, and as of the date of commencement of any Rights Offering and as of the Effective Date its Backstop Commitment will be, less than the maximum amount that it is permitted to invest in any one portfolio investment pursuant to the terms of its constituent documents or otherwise, (f) it has, as of the date of this Backstop Commitment Letter, and will have, as of the Effective Date, in the aggregate available undrawn commitments and liquid assets at least in the sum of its Backstop Commitment Amount hereunder, and (g) as of November 1, 2019, it and its affiliates (excluding any affiliate that is an Other Backstop Party) beneficially owned, directly or indirectly, [____] shares of PG&E common stock and had a "put equivalent position" (as defined in Rule 16a-1 under the Securities Exchange Act of 1934, as amended) of [____] shares of PG&E common stock (the number of shares beneficially owned less the number of shares in the put equivalent position, as of a date determined by PG&E, but no more than two business days prior to the Allocation Date, being the "***Backstop Party's Shares***").

In addition, the Backstop Party hereby represents and warrants, solely as to itself, as of the date of this Backstop Commitment Letter and as of the Effective Date, that the Backstop Party (i) is acquiring the shares of New HoldCo Common Stock for its own account, solely for investment and not with a view toward, or for sale in connection with, any distribution thereof in violation of any foreign, federal, state or local securities or "blue sky" laws, or with any present intention of distributing or selling such shares in violation of any such laws, (ii) has such knowledge and experience in financial and business matters and in investments of this type that it is capable of evaluating the merits and risks of its investment in the shares

6

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 7 of 33
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 69 of 175

of New HoldCo Common Stock and of making an informed investment decision, and (iii) is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act of 1933, as amended (the "***Securities Act***"). The Backstop Party understands that Reorganized HoldCo will be relying on the statements contained herein to establish an exemption from registration under the Securities Act and under foreign, federal, state and local securities laws and acknowledges that the shares of New HoldCo Common Stock will not be registered under the Securities Act or any other applicable law and that such shares may not be transferred except pursuant to the registration provisions of the Securities Act (and in compliance with any other applicable law) or pursuant to an applicable exemption therefrom.

4. <u>Conditions to Backstop Party Commitment</u>. The obligations of the Backstop Party to fund its Backstop Commitment to PG&E in accordance with this Backstop Commitment Letter are further expressly conditioned upon and subject to the satisfaction or written waiver by the Backstop Party, in its sole discretion, at or prior to the Effective Date of each of the following conditions, which PG&E acknowledges are an integral part of the transactions contemplated by this Backstop Commitment Letter and without these conditions the Backstop Party would not have entered into this Backstop Commitment Letter.

a. by December 24, 2019, the Debtors shall have received valid and enforceable Other Backstop Commitments on substantially the same terms and conditions as set forth in this Backstop Commitment Letter that in the aggregate with this Backstop Commitment result in Aggregate Backstop Commitments of no less than the Equity Offering Cap;

b. other than the consummation of any Permitted Equity Offering or the Rights Offering, the satisfaction of all of the other conditions to the Effective Date provided for in the Plan or the waiver of any such conditions by the Debtors in accordance with the Plan (to the extent the Plan expressly provides for the possibility of such a waiver);

c. the Bankruptcy Court shall have entered the Confirmation Order, which shall confirm the Plan with such amendments, modifications, changes and consents as are approved by those entities having no less than a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), and such Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect;

d. this Backstop Commitment Letter shall have been approved by an order of the Bankruptcy Court and such order shall be in full force and effect, and no stay thereof shall be in effect;

e. the transactions contemplated herein shall have been authorized by an order of the Bankruptcy Court (which may be the Confirmation Order) such order shall be in full force and effect, and no stay thereof shall be in effect;

f. total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 shall be no less than 95% of $48 billion; and

g. no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Backstop Commitment Letter or the Plan or perform their obligations hereunder or thereunder (each a "***Material Adverse Effect***") shall have occurred; <u>provided</u>, <u>however</u>, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the

Case: 19-30088   Doc# 6013-3   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 8
of 23
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 70
of 175

filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy, (B) results, occurrences, facts, changes, events, effects, violations, inaccuracies, or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 dwellings or commercial structures ("**Structures**") in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect and (II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized).

5.    Termination by the Backstop Party.  Subject to the penultimate paragraph of this Section 5, the Backstop Party may terminate this Backstop Commitment Letter, solely as to itself, by written notice (which shall describe the basis for such termination), on or after the occurrence of any of the following (each a "**Backstop Party Termination Event**"):

a.    the Plan (including as may be amended, modified or otherwise changed) filed by the Debtors (i) does not include Knighthead and Abrams as plan proponents and is not in a form acceptable to each of Knighthead and Abrams or (ii) does not provide for substantially the same classification and treatment, including releases, of all Claims (other than Holdco Fire Victim Claims and Utility Fire Victim Claims and Utility PC Bond (2008 F and 2010 E) Claims, as long as such Utility PC Bond (2008 F and 2010 E) Claims are paid in Cash or debt securities) as provided in the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization filed with the Bankruptcy Court on January 31, 2020;

b.    the condition set forth in Section 4(a) is not satisfied as of December 24, 2019;

c.    the Bankruptcy Court has not entered an order approving this Backstop Commitment Letter (the "**Backstop Approval Order**") on or before March 15, 2020;

d.    subject to Section 11, (i) the Plan has been amended, modified or changed, in each case without the consent of the entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed) or (ii) any Plan Supplement or any Plan Document shall have been filed or finalized without the consent of entities holding a majority of the Aggregate Backstop Commitments (such consent not to be unreasonably withheld, conditioned or delayed);

e.    the Confirmation Order has not been entered by the Bankruptcy Court on or before June 30, 2020 (the "**Outside Date**");

f.    the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order;

g.    the Debtors have failed to perform any of their obligations set forth in this Backstop Commitment Letter, which failure to perform (i) would give rise to the failure of a condition set forth in Section 4(b) or 4(c) and (ii) is incapable of being cured or, if capable of being cured by the Outside Date, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(g) and the basis for such termination;

8

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 9
of 23
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 71
of 175

h.     the occurrence of a Material Adverse Effect;

i.     the occurrence of one or more wildfires in the Debtors' service territory after the Petition Date and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 Structures; provided, however, that any notice of termination under this clause (i) must be given on or before the entry of the Backstop Approval Order;

j.     the Debtors' aggregate liability with respect to Fire Claims is determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Fire Claims, or (iii) through a combination thereof) to exceed $25.5 billion;

k.     the CPUC fails to issue all necessary approvals, authorizations and final orders to implement the Plan prior to the Outside Date, and to participate in the Go-Forward Wildfire Fund, including: (i) provisions satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed) pertaining to authorized return on equity and regulated capital structure (it being agreed that the provisions included in (A) the CPUC's final decision dated December 19, 2019 in the 2020 Cost of Capital Proceeding and (B) the Utility's application dated October 1, 2018, as modified by the application dated May 9, 2019, as updated by the annual update filing dated November 27, 2019, in the Transmission Owner Rate Case for 2019 are satisfactory to the Backstop Party), (ii) a disposition, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (iii) a resolution, satisfactory to entities holding a majority of the Aggregate Backstop Commitments (such approval not to be unreasonably withheld, conditioned or delayed), of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date (it being agreed that (A) the settlement agreement dated October 3, 2019, as modified by the decision dated January 17, 2020, with respect to the Order Instituting Investigation to assess the Utility's locate and mark practices (Investigation 18-12-007) and (B) the settlement agreements approved by the CPUC on April 26, 2018 and December 5, 2019 in the Order Instituting Investigation regarding violations of the ex parte communications rules (Investigation 15-08-019) are satisfactory to the Backstop Party), and (iv) approval (or exemption from approval) of the financing structure and securities to be issued under the Plan;

l.     if at any time after the first day of the Confirmation Hearing, either (i) asserted Administrative Expense Claims exceed $250 million, excluding (A) all ordinary course Administrative Expense Claims, (B) all Professional Fee Claims, (C) all Disallowed Administrative Expense Claims; and (D) the portion of an Administrative Expense Claim that is covered by insurance (the Administrative Expense Claims in clauses (A) through (D) shall be referred to collectively as "***Excluded Administrative Expense Claims***"), or (ii) the Debtors have reserved for and/or paid more than $250 million in the aggregate for Administrative Expense Claims, excluding the Excluded Administrative Expense Claims;

m.     (i) there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or (ii) any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited;

n.     the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized;

o.     if as of the Effective Date, the Utility has not both (i) elected, and received Bankruptcy Court approval, to participate in the Go-Forward Wildfire Fund and (ii) satisfied the other conditions to participation in the Go-Forward Wildfire Fund set forth in the Wildfire Legislation;

p.     the Debtors breach the provisions of Section 14(b) and either (i) such breach is incapable of being cured or (ii) if capable of being cured by the Outside Date, the Debtors have not cured

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 10
of 23
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 72
of 175

within 5 business days following receipt by the Debtors of written notice of such breach from the Backstop Party stating the Backstop Party's intention to terminate this Backstop Commitment Letter pursuant to this Section 5(p);

q.     if at any time the Bankruptcy Court determines that the Debtors are insolvent;

r.     if the Company and/or any of its subsidiaries shall enter into any Tax Benefit Monetization Transaction, and the net cash proceeds thereof to the Company (or such subsidiary) attributable to NOLS and tax deductions arising, in each case, from the payment of Fire Claims shall be less than $3 billion (excluding, for the avoidance of doubt, $1.35 billion of Tax Benefits utilized in the Plan); or

s.     the Plan, any Plan Supplement or any Plan Document has been amended, modified or changed, in each case without the consent of the entities holding at least 66 2/3% of the Aggregate Backstop Commitments to include a process for transferring the license and operating assets of the Utility to the State of California or a third party (a "***Transfer***") or PG&E effects a Transfer other than pursuant to the Plan.

PG&E shall promptly, but in no event later than two business days after the relevant occurrence, provide notice to the Backstop Party of (i) the occurrence of any fact, event, or omission that is not publicly disclosed that gives rise or reasonably can be expected to give rise to a termination right under this Section 5 and (ii) the receipt of any termination notice from any Other Backstop Party, including the asserted basis for such termination, whether or not PG&E concurs therewith.

Upon valid termination of this Backstop Commitment Letter by the Backstop Party (such terminating Backstop Party, a "***Terminating Backstop Party***") pursuant to any of Section 5(a) through (s), this Backstop Commitment Letter shall be void and of no further force or effect solely with respect to such Terminating Backstop Party is obligated herein, such Terminating Backstop Party shall be released from its Backstop Commitments, undertakings and agreements under or related to this Backstop Commitment Letter, including its Backstop Commitment, except as explicitly provided herein and there shall be no liability or obligation on the part of such Terminating Backstop Party hereunder, except as expressly provided herein. Notwithstanding any termination by a Terminating Backstop Party, PG&E shall remain liable for the payment of all Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

The Backstop Party's obligations under this Backstop Commitment Letter shall automatically terminate in the event that PG&E has not returned a counter-signed copy of this Backstop Commitment Letter agreeing to its terms on or before the date that is two weeks from the day the Backstop Party furnished a signed copy of this Backstop Commitment Letter to PG&E.

The Backstop Party may not seek to (i) assert the failure of any condition precedent to any of its obligations or agreements under this Backstop Commitment Letter or (ii) terminate this Backstop Commitment Letter (including pursuit of any other remedies), in each case unless the Backstop Party has given written notice to PG&E of such assertion or termination.

Notwithstanding anything in this Backstop Commitment Letter to the contrary, any notice of termination under clauses (d), (g), (h), (k), (l) and (m)(ii) shall not be effective unless PG&E has received notices of termination from entities constituting a majority of the outstanding Aggregate Backstop Commitments with respect to the event or circumstance that is the basis for such notice of termination. PG&E shall provide the Backstop Party with a notice of such effective termination within two business days of the effectiveness of the termination.

In the event that any fact or circumstance would give the Backstop Party the right to terminate under more than one clause in this Section 5, the exercise of a termination right under any one clause shall not prejudice the Backstop Party from exercising a termination right under any other clause based on the same event or circumstance.

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 11
of 23
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 73
of 175

6.     Termination by PG&E; Defaulting Backstop Party; Extension Options.  PG&E may terminate this Backstop Commitment Letter (including all Backstop Commitments hereunder) (a) at any time prior to countersigning such Backstop Commitment Letter; (b) if, on any date after December 24, 2019, the condition set forth in Section 4(a) would not be satisfied if tested on such date; (c) in the event of a material breach of a representation or warranty of the Backstop Party set forth in Section 3; (d) in the event that the Backstop Party repudiates this Backstop Commitment Letter, purports to terminate this Backstop Commitment Letter if such purported termination is not a valid termination of this Backstop Commitment Letter as determined in a final order of a court with jurisdiction or fails to fund its Backstop Commitment when required to do so in accordance with this Backstop Commitment Letter; (e) if the Backstop Commitment Amount has been reduced to zero in accordance with Section 7; (f) if the Backstop Party has the right to terminate this Backstop Commitment Letter under clause (h), (i), (m) or (q) of Section 5; or (g) if (i) a third party makes a binding proposal to acquire at least 50% of the outstanding PG&E common stock (including by means of a merger, joint venture, partnership, consolidation, dissolution, liquidation, tender offer, recapitalization, reorganization, share exchange, business combination or similar transaction), (ii) either (x) the implementation of such proposal would require the approval of holders of a majority of the PG&E common stock or (y) the price contemplated by such proposal would exceed 160% of the Equity Offering Cap, and (iii) the Board determines in good faith, after consultation with PG&E's outside legal counsel, that the failure to terminate this Backstop Commitment Letter in response to such proposal would be inconsistent with the exercise of its fiduciary duties to the stockholders of PG&E under applicable law.  In the event of a breach, repudiation, purported termination or failure to fund contemplated by the foregoing clause (c) or (d), the Backstop Party shall be deemed to be a "*Defaulting Backstop Party*".  In the event that the Backstop Party becomes a Defaulting Backstop Party, then PG&E may, upon notice to such Defaulting Backstop Party, require the Backstop Party to assign and delegate, without recourse, all its interests, rights (other than any Backstop Commitment Premiums earned prior to the date of such assignment and delegation) and obligations under this Backstop Commitment Letter to a third party that shall assume such obligations (which assignee may be an Other Backstop Party, if an Other Backstop Party accepts such assignment and delegation).  PG&E shall not exercise a termination right under Section 6(b) unless it has used commercially reasonable efforts to replace the Other Backstop Commitment Letter giving rise to the termination right within fourteen (14) calendar days of the termination of the applicable Other Backstop Commitment Letter and the condition in Section 4(a) is still not satisfied at the expiration of that fourteen (14) calendar day period.  Notwithstanding any termination by PG&E under Sections 6(b), (e), (f) or (g), PG&E shall remain liable for the payment of all earned Backstop Commitment Premiums and expense reimbursement obligations in this Backstop Commitment Letter.

In the event that any fact or circumstance would give PG&E the right to terminate under more than one clause in this Section 6, the exercise of a termination right under any one clause shall not prejudice PG&E from exercising a termination right under any other clause based on the same event or circumstance.

7.     Reduction of Commitments by PG&E.

a.     In the event that on or prior to December 24, 2019 (the "*Commitment Deadline*"), PG&E receives Aggregate Backstop Commitments that exceed the Equity Offering Cap (such excess, the "*Overallotment Amount*"), then, on the earlier of (x) five business days thereafter and (y) December 27, 2019 (the "*Allocation Date*"), the Backstop Commitment Amount shall (i) if the Backstop Party was a Backstop Party under a Prior Commitment Letter (an "*Incumbent Backstop Party*"), be unchanged, unless the Backstop Party otherwise agrees (provided that if the Aggregate Backstop Commitments of the Incumbent Backstop Parties exceed the Equity Offering Cap (such excess, the "*Incumbent Overallotment Amount*"), then the Backstop Commitment Amount of each Incumbent Backstop Party shall be reduced by an amount equal to the Incumbent Backstop Party's pro rata share of the Incumbent Overallotment Amount, which shall be calculated as a percentage equal to the Backstop Commitment Amount *divided by* the Aggregate Backstop Commitments of the Incumbent Backstop Parties), or (ii) if the Backstop Party was not a Backstop Party under a Prior Commitment Letter, be equal to the Backstop Party's pro rata share of the difference (which may be zero) between the Equity Offering Cap and the Aggregate Backstop

Case: 19-30088     Doc# 6013-3     Filed: 03/02/20     Entered: 03/03/20 00:15:25     Page 12 of 33
Case: 19-30088     Doc# 7322-8     Filed: 05/15/20     Entered: 05/15/20 15:58:31     Page 74 of 175

Commitments of the Incumbent Backstop Parties after giving effect to the foregoing clause (a)(i), which shall be calculated as a percentage equal to the Backstop Commitment Amount *divided by* the Aggregate Backstop Commitments from any party to this Backstop Commitment Letter or Other Backstop Commitment Letter that is not an Incumbent Backstop Party. Notwithstanding the foregoing, on the Allocation Date, in the event there is an Overallotment Amount and for the purpose of curing such Overallotment Amount, PG&E may reduce the Backstop Commitment Amount as to any Backstop Party to the extent such reduction is reasonably advisable (based on the advice of the Debtors' tax advisors after consultation with Jones Day) in order to avoid an "ownership change" within the meaning of Section 382 and the Treasury Regulations promulgated thereunder or to otherwise preserve the ability of the Debtors to utilize their NOLs; provided that such reduction may not be below the amount of Backstop Commitments at which such Backstop Party would maintain its existing percentage ownership of the total outstanding shares of PG&E common stock. Within three business days of the Allocation Date, PG&E shall provide the Backstop Party with a notice of any adjustment to its Backstop Commitment Amount under this Section 7(a).

   b.  In the event that, after the Commitment Deadline, the Debtors (i) receive binding commitments providing for funding from any Additional Capital Sources that (A) have conditions to funding and commitment termination rights that are no less favorable to PG&E than those in this Backstop Commitment Letter and (B) are approved by an order of the Bankruptcy Court, or (ii) actually obtain funding from any Additional Capital Sources, then (x) in the case of clause (i), PG&E may reduce the Backstop Commitment Amount, and (y) in the case of clause (ii), the Backstop Commitment Amount shall be automatically reduced (if not already reduced pursuant to clause (i)), in each case by an amount equal to (A) the amount of such funding, times (B) a fraction, (1) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (2) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction. Any reduction in the Backstop Commitment pursuant to this Section 7(b) shall not reduce any Backstop Commitment Premium.

   c.  In the event that the Debtors consummate any Permitted Equity Offering or Rights Offering, the Backstop Commitment Amount shall be automatically reduced by an amount equal to (i) the net cash proceeds of such Permitted Equity Offering or such Rights Offering, as applicable, *times* (ii) a fraction, (A) the numerator of which is the Backstop Commitment Amount immediately prior to such reduction and (B) the denominator of which is the Aggregate Backstop Commitments as of immediately prior to such reduction.

   d.  The Debtors shall provide notice to the Backstop Party in the event that the Backstop Commitment Amount is reduced as provided above. References herein to "Backstop Commitment Amount" or "Backstop Commitment" mean such amounts as adjusted in accordance with the terms of this Backstop Commitment Letter. Any Backstop Commitments that have been terminated or reduced shall be terminated or reduced, as applicable, permanently.

   8.  <u>Assignment</u>. This Backstop Commitment Letter (a) is not assignable by the Backstop Party, and any purported assignment shall be null and void *ab initio*; provided, however, Backstop Party may assign its Backstop Commitment, in whole or in part, to (i) an Other Backstop Party, (ii) an affiliate of the Backstop Party, or (iii) an investment fund or separately managed account the primary investment advisor or sub advisor to which is a Backstop Party or an affiliate thereof, to the extent such assignee Backstop Party agrees in writing to assume all obligations hereunder of such Backstop Party in connection with such Backstop Commitment, and any assignment under this proviso shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter, and (b) is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person or entity other than the parties hereto. Notwithstanding the foregoing, a Backstop Party may assign all or any portion of its rights and obligations hereunder to a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933, as amended), without the consent of any party, provided, however, that (i) absent the prior written consent of PG&E, such assignee (including any Entity)

12

Case: 19-30088  Doc# 6013-3  Filed: 03/02/20  Entered: 03/03/20 00:15:25  Page 13 of 33

Case: 19-30088  Doc# 7322-8  Filed: 05/15/20  Entered: 05/15/20 15:58:31  Page 75 of 175

does not, and as a result of such assignment will not, beneficially own more than 4.75% of the Aggregate Backstop Commitments and (ii) any assignment under this sentence shall not relieve the Backstop Party from its obligations under this Backstop Commitment Letter.

9.    <u>Entire Agreement</u>.    This Backstop Commitment Letter, including all exhibits hereto, constitutes the entire understanding among the parties hereto with respect to the subject matter hereof and replaces and supersedes all prior agreements and understandings, both written and oral, between the parties hereto (or any of their respective affiliates) with respect to the subject matter hereof (including the Chapter 11 Plan Backstop Commitment Letter dated as of September 9, 2019, September 13, 2019, October 20, 2019, November 16, 2019, or December 6, 2019, if applicable) and, subject to the terms hereof, shall become effective and binding upon the mutual exchange of fully executed counterparts by each of the parties hereto.

10.    <u>Governing Law; Consent to Jurisdiction; Waiver of Jury Trial</u>.    This Backstop Commitment Letter shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Backstop Commitment Letter or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought only in the Bankruptcy Court.  By execution and delivery of this Backstop Commitment Letter, each of the parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court with respect to any such action, suit or proceeding.  EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

11.    <u>Amendment; Waiver; Counterparts</u>.

a.    This Backstop Commitment Letter may not be amended or waived by or on behalf of the Backstop Party, and no consent may be given hereunder by or on behalf of the Backstop Party (including to an amendment or waiver of any provision of the Plan), except in writing signed by the holders of a majority of the Aggregate Backstop Commitments (whether or not the Backstop Party signs such amendment or waiver), and confirmed in writing by the Company; <u>provided</u>, <u>however</u>, that (i) without the prior written consent of the Backstop Party, this Backstop Commitment Letter may not be amended to (A) increase the amount of the Backstop Commitment Amount or Backstop Commitment; (B) decrease the Backstop Commitment Premium, change the time at which the Backstop Commitment Premium shall be fully earned, or change the definition of "Applicable Premium Reduction Percentage", "Premium Clawback Event" or "Special Premium Clawback Event" in a manner adverse to the Backstop Party; (C) extend the Backstop Commitment beyond August 29, 2020; (D) amend the definition of "Backstop Price", "Backstop Commitment Share Premium," "Backstop Commitment Cash Premium," or any component thereof; (E) amend, modify, or waive the conditions in clauses (d), (e) or (f) of Section 4; (F) increase the amount of the Equity Offering Cap; (G) amend, modify or waive Section 2(e) or 2(f); (H) amend, modify or waive clause (a), (b), (c), (e), (f), (i), (j), (m)(i), (n), (o), (p), (q), (r) or (s) of Section 5, the first sentence of the penultimate paragraph of Section 5, this proviso to Section 11(a), Section 11(b), Section 11(c), Section 11(d) or Section 14(b); (I) amend, modify or waive the third sentence of Section 1(b); (J) amend, modify or waive Section 2(d); (K) amend, modify or waive the second sentence of Section 1(e); or (L) amend, modify or waive Section 2(f); and (ii) except as set forth in Section 1(b) with respect to the capital structure described in the Specified OII Testimony, without the prior written consent of holders of more than sixty percent (60%) of the Aggregate Backstop Commitments, this Backstop Commitment Letter may not be amended to amend, modify or waive any provision of this Agreement so as to permit the aggregate amount of Additional Capital Sources <u>plus</u> the aggregate amount of proceeds of any Equity Offering <u>plus</u> the aggregate amount of proceeds funded under the Backstop Commitments to exceed the Equity Offering Cap. This Backstop Commitment Letter may be executed in any number of counterparts, each of which will be

an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of this Backstop Commitment Letter by e-mail or portable document format (PDF) will be effective as delivery of a manually executed counterpart of this Backstop Commitment Letter.

b.       In the event that (i) PG&E seeks a waiver of a Backstop Party Termination Event (any such waiver, a "*Waiver*") (ii) PG&E obtains written Waivers from the holders of a majority of the Aggregate Backstop Commitments (the "*Waiver Threshold*"), then PG&E shall provide the Backstop Party, to the extent it has not delivered a Waiver (a "*Non-Waiving Backstop Party*"), a notice of the occurrence of the specific Backstop Party Termination Event, including the facts giving rise to the specific Backstop Party Termination Event (the "*Specified Backstop Termination Event*"), and that PG&E has met the Waiver Threshold. The Non-Waiving Backstop Party shall have five (5) business days from the date such notice is issued to exercise its right to terminate this Backstop Commitment Letter pursuant to Section 5 based on the Specified Backstop Termination Event; and the failure to exercise a termination right referred in the foregoing clause within this time period shall be deemed a waiver of the Specified Backstop Termination Event (but not any other Backstop Party Termination Event).

c.       In the event that PG&E seeks an amendment, modification or waiver contemplated by Section 11(a)(ii) (any such amendment, modification or waiver, a "*Specified Amendment*"), and PG&E obtains written Waivers or Specified Amendments from the holders of more than 60% of the Aggregate Backstop Commitments (the "*Specified Amendment Threshold*") then PG&E shall provide the Backstop Party, to the extent it has not delivered a Specified Amendment (a "*Non-Amending Backstop Party*"), or request for the Specified Amendment, including the specific terms of the request for the Specified Amendment, and that PG&E has met the Specified Amendment Threshold. The Non-Amending Backstop Party shall have five (5) business days from the date such notice is issued to terminate this Backstop Commitment Letter solely as to itself by written notice under this Section 11(c); and the failure to exercise a termination right and the failure to exercise a termination right referred to in this Section 11(c) shall be deemed to be a consent to the Specified Amendment.

d.       Any deemed waiver of a Specified Backstop Termination Event under Section 11(b) and any deemed consent to the Specified Amendment under Section 11(c) are subject to the condition that PG&E has provided the Backstop Party with notice of the request for the Waiver, in the case of Section 11(b), or the request for the Specified Amendment, in the case of Section 11(c), no later than the time that such request is given to holders of no more than 25% of the Aggregate Backstop Commitments.

12.     Notices. All notices required or permitted to be given under this Backstop Commitment Letter, unless otherwise stated herein, shall be given by overnight courier at the addresses specified below, or at such other address or addresses as a party may designate for itself in writing, or by email (if confirmed) at the email addresses specified below:

If to the Backstop Party, to the name, address and email address located on the Backstop Party's signature page to this Backstop Commitment Letter.

If to the Debtors:

> PG&E Corporation
> 77 Beale Street
> P.O. Box 770000
> San Francisco, California 94177
> Attention: Janet Loduca, Senior Vice President and General Counsel
> Email: J1Lc@pge.com
>
> with a copy to:
>
> Cravath, Swaine & Moore LLP

14

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 15

Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 77
of 175

825 Eighth Avenue
New York, New York 10019
Attention:  Richard Hall; Paul Zumbro
Email:  RHall@cravath.com; PZumbro@cravath.com

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:  Stephen Karotkin
Email:  Stephen.karotkin@weil.com

13.   No Liability.  Notwithstanding anything that may be expressed or implied in this Backstop Commitment Letter, each party hereto acknowledges and agrees that no person other than the Backstop Party (and it permitted assigns) shall have any obligation hereunder (subject to the limitations provided herein) or in connection with the transactions contemplated hereby and that (a) notwithstanding that any Backstop Party may be a partnership, limited partnership or limited liability company, no recourse (whether at law, in equity, in contract, in tort or otherwise) hereunder or under any document or instrument delivered in connection herewith, or in respect of any oral representations made or alleged to be made in connection herewith or therewith, shall be had against any former, current or future direct or indirect equity holder, controlling person, general or limited partner, shareholder, member, investment manager or adviser, manager, director, officer, employee, agent, affiliate, assignee, representative or financing source of any of the foregoing) (any such person or entity, other than such Backstop Party, a "***Related Party***") or any Related Party of any such Related Party, including, without limitation, any liabilities arising under, or in connection with, the Plan or this Backstop Commitment Letter and the transactions contemplated thereby and hereby, or in respect of any oral representations made or alleged to be made in connection therewith or herewith), whether by the enforcement of any judgment or assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law and (b) no personal liability whatsoever will attach to, be imposed on or otherwise be incurred by any Related Party of the Backstop Party or any Related Party of any such Related Party under this Backstop Commitment Letter or any document or instrument delivered in connection herewith or with the Plan Supplement or the Plan (or in respect of any oral representation made or alleged to be made in connection herewith or therewith) or for any action (whether at law, in equity, in contract, in tort or otherwise) based on, in respect of, or by reason of such obligations hereunder or by their creation.

14.   Plan Support.

a.    For as long as this Backstop Letter Agreement is in effect, the Backstop Party shall (i) use all reasonable efforts to support the Plan with respect to the treatment of HoldCo Common Interests and to act in good faith to consummate the Plan with respect to any Equity Offering and the Backstop Commitments, (ii) to the extent the Backstop Party is entitled to vote on the Plan and, with respect to Claims, controls the votes, timely vote (or cause to be voted) all of its HoldCo Common Interests and Claims to accept the Plan (and not to change or withdraw any such vote), and (iii) timely vote (or cause to be voted) its HoldCo Common Interests and Claims to reject any plan of reorganization other than the Plan; <u>provided</u>, <u>however</u>, that unless the Claims held by the Backstop Party receive no less favorable treatment than other similarly situated Claims under the Plan, then the obligations of the Backstop Party under clauses (i), (ii) and (iii) shall not apply to the Backstop Party's Claims.  This Section 14 shall apply solely to the Backstop Party and not to any of its subsidiaries or other affiliates.

b.    To the extent that the Debtors provide, directly or indirectly, another creditor holding a Funded Debt Claim with more favorable treatment to such creditor's Funded Debt Claim than provided to the Backstop Party holding a similarly situated Funded Debt Claim (it being understood that

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 16
of 33
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 78
of 175

Funded Debt Claims are not similarly situated unless they have substantially the same interest rate and tenor and the same obligor), the Debtors shall take all actions so that such more favorable treatment shall apply to the Backstop Party's similarly situated Funded Debt Claim, including by amending the Plan to provide for the application of such more favorable treatment to the Backstop Party's Claims.

c.      The rights of the Backstop Party under Section 5(p), Section 11 (with respect to Section 5(p) or Section 14(b)) and Section 14(b) are personal to the Backstop Party and may not be assigned to any person (it being agreed that the Backstop Party may assign its other rights under this Backstop Commitment Letter in accordance with Section 8).

15.      The Backstop Party shall not be required, pursuant to the terms of this Backstop Commitment Letter, to acquire or purchase any securities or indebtedness in connection with any Equity Offering that, pursuant to the terms of a Backstop Commitment Letter or other agreement, are to be acquired or subscribed for by any other party, nor shall the Backstop Party be required, pursuant to the terms of this Backstop Commitment Letter, to pay any money or other consideration, or exchange any claims whatsoever, which are owing from, or to be transferred from or by, any other party pursuant to the terms of another Backstop Commitment Letter or other agreement. Nothing in this Backstop Commitment Letter shall be deemed to constitute an agreement or a joint venture or partnership with or between any other person or entity nor constitute any party as the agent of any other person or entity for any purpose. For the avoidance of doubt, no Backstop Party shall, nor shall any action taken by a Backstop Party hereunder, be deemed to be acting in concert with any other person or entity with respect to the Backstop Commitment or any other matter nor shall the Backstop Commitments hereunder create a presumption that the Backstop Party is in any way acting in concert or as a group with any other person or entity whether as a result of this commitment or otherwise.

16.      Each party hereto confirms that it has made its own decision to execute this Backstop Commitment Letter based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

17.      Except as expressly provided in this Backstop Commitment Letter, (a) nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each party hereto to protect and preserve its rights, remedies and interests, including, without limitation, any claims against or interests in any of the Debtors or other parties, or its full participation in any bankruptcy proceeding, and (b) the parties hereto each fully preserve any and all of their respective rights, remedies, claims and interests as of the date hereof and upon a termination of this Backstop Commitment Letter. Further, nothing in this Backstop Commitment Letter shall be construed to prohibit any party hereto from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are consistent with this Backstop Commitment Letter and the Plan, and are not for the purpose of, and could not reasonably be expected to have the effect of, hindering, delaying or preventing the consummation of the transactions contemplated by the Plan.

18.      <u>Tax Treatment of Backstop Commitment Premium</u>. Except as otherwise required by a final determination by an applicable taxing authority (including with respect to an Other Backstop Commitment Letter) or change in applicable law:  (A) the Backstop Party and the Debtors hereto agree to treat, for U.S. federal income tax purposes, the entering into of the Backstop Commitment pursuant to this Backstop Commitment Letter as the sale of a put option by the Backstop Party to the Debtors and the Backstop Commitment Premium as the sale price for such put option; and (B) the Backstop Party and the Debtors shall not take any position on any tax return or otherwise take any action related to taxes inconsistent with such treatment (which, for the avoidance of doubt, in the case of the Debtors, shall include any position or action with respect to the Other Backstop Commitment Letters).

19.      <u>Press Releases</u>. The Debtors shall not issue any press release or otherwise make any public statement that identifies the Backstop Party without the Backstop Party's prior written consent; <u>provided</u>

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 17
of 33
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 79
of 175

that the Debtors shall be permitted to identify the Backstop Party in any filing required to be made with the SEC but only to the extent that the identification of the Backstop Party is expressly required.

[signature page follows]

Sincerely,

Backstop Party:

By: _____
Name:
Title:

Notice Information:

18

Accepted and agreed this _____ day of _____, 2020, by:

PG&E CORPORATION

By: _____
Name: [●]
Title: [●]

**Exhibit A**
**Backstop Terms**

| Backstop Party | Backstop Commitment Amount<br>(rounded to the nearest cent) |
|---|---|
| [Backstop Party] | $ |

**Payments**

The Backstop Commitment Premium shall be earned in full upon entry of the Backstop Approval Order.

If PG&E terminates this Backstop Commitment Letter pursuant to Section 6(g), the Backstop Party may elect to receive either (a) the Backstop Commitment Share Premium on the effective date of a plan of reorganization (plus any Shortfall Shares due as part of the Backstop Commitment Share Premium on the 21st business day after such effective date) or (b) the Backstop Commitment Cash Premium three business days after the date, and PG&E shall pay the applicable Backstop Commitment Premium to the Backstop Party on the date specified in clause (a) or (b), as applicable. In the event that a plan of reorganization for the Debtors that is not the Plan is confirmed by the Bankruptcy Court, then the Backstop Party may elect to receive either (y) the Backstop Commitment Share Premium on the effective date of such plan of reorganization (plus any Shortfall Shares due as part of the Backstop Commitment Share Premium on the 21st business day after such effective date) or (z) the Backstop Commitment Cash Premium on the effective date of such plan of reorganization.

Except as provided in the immediately preceding paragraph, PG&E shall pay the Backstop Commitment Share Premium to the Backstop Party on the Effective Date (plus any Shortfall Shares due as part of the Backstop Commitment Share Premium on the 21st business day after the Effective Date).

**Certain Defined Terms**

"*Applicable Premium Reduction Percentage*" shall mean an amount equal to (a) 85% of the Backstop Commitment Premium if there is a Premium Clawback Event on or prior to January 20, 2020; (b) 60% of the Backstop Commitment Premium if there is a Premium Clawback Event after January 20, 2020 and on or before April 30, 2020; and (c) 10% of the Backstop Commitment Premium if there is a Premium Clawback Event after April 30, 2020 and on or prior to the Effective Date. Notwithstanding the foregoing, (i) in the case of a Special Premium Clawback Event pursuant to Section 5(l) or Section 5(s), the "Applicable Premium Reduction Percentage" shall mean an amount equal to 75% of the Backstop Commitment Premium; and (ii) in the case of a Special Premium Clawback Event pursuant to Section 11(c), the "Applicable Premium Reduction Percentage" shall mean an amount equal to (x) 75% of the Backstop Commitment Premium if there is a Special Premium Clawback Event pursuant to Section 11(c) on or prior to April 30, 2020; (y) 50% of the Backstop Commitment Premium if there is a Special Premium Clawback Event pursuant to Section 11(c) after April 30, 2020 and on or prior to May 31, 2020; and (z) 25% of the Backstop Commitment Premium if there is a Special Premium Clawback Event pursuant to Section 11(c) after May 31, 2020.

"*Applicable Utility Index Multiple*" shall mean the average normalized 2021 estimated price-to-earnings ratio of the U.S. regulated utilities in the S&P 500 Utilities (Sector) Index (after excluding AES, AWK, EXC, NRG, PEG, and PPL) over the 20-day trading period before the applicable measurement date per Capital IQ Consensus Estimates.

"***Backstop Commitment Cash Premium***" shall mean an amount payable in cash equal to 636.4 basis points on the Backstop Commitment Amount immediately after the Allocation Date, provided, that in the event of a Premium Clawback Event or a Special Premium Clawback Event, the Applicable Premium Reduction Percentage of the Backstop Commitment Cash Premium shall be retained by PG&E and not paid to the Backstop Party.

"***Backstop Commitment Premium***" shall mean either the Backstop Commitment Cash Premium or the Backstop Commitment Share Premium, as the case may be.

"***Backstop Commitment Share Premium***" shall mean a number of shares of New HoldCo Common Stock (rounded to the nearest whole share) equal to the Backstop Party's pro rata share, based on the Backstop Commitment Amount immediately after the Allocation Date divided by $12 billion, of (a) 119,000,000 shares of New HoldCo Common Stock, plus (b) if the value of 119,000,000 shares of New HoldCo Common Stock based on the Trading Price is less than $764,000,000 as of the 21st business day following the Effective Date (such difference, the "***Shortfall Amount***"), a number of additional shares of New HoldCo Common Stock having a value based on the Trading Price equal to the Shortfall Amount not to exceed 19,909,091 shares in the aggregate (the "***Shortfall Shares***"), provided, that in the event of a Premium Clawback Event or a Special Premium Clawback Event, the Applicable Premium Reduction Percentage of the Backstop Commitment Share Premium shall be retained by PG&E and not paid to the Backstop Party.

"***Backstop Multiple***" shall mean the lesser of (a) 10 and (b) 10 *times* one *plus* the percentage change of the Applicable Utility Index Multiple as measured on November 1, 2019 and the fifth business day prior to the Effective Date. For the avoidance of doubt, the Backstop Multiple shall never exceed 10.

"***Backstop Price***" means (a) the Backstop Multiple *times* (b) the Normalized Estimated Net Income as of the Determination Date, *divided by* (c) the number of fully diluted shares of PG&E (calculated using the treasury stock method) that will be outstanding as of the Effective Date (assuming the entirety of the Equity Offering is purchased pursuant to this Backstop Commitment Letter and all Other Backstop Commitment Letters).

"***Backstop TBM Trust***" means a trust established by the Utility to monetize Tax Benefits for the benefit of the Backstop Party and the Other Backstop Parties.

"***Backstop TBM Trust Agreement***" means a trust agreement by and between the Reorganized Utility, the Backstop TBM Trust, and the Backstop TBM Trustee, in a form reasonable acceptable to the holders of a majority of the Aggregate Backstop Commitments, which shall provide for the periodic distribution of assets of the Backstop TBM Trust to the holders of Backstop TBM Trust Interests.

"***Backstop TBM Trust Interests***" means interests in the Backstop TBM Trust.

"***Backstop TBM Trustee***" means an individual approved by a majority of the holders of the Aggregate Backstop Commitments to serve as trustee of the Backstop TBM Trust, and any successor thereto appointed pursuant to the Backstop TBM Trust Agreement.

"***Board***" means the Board of Directors of PG&E. With respect to any matter, references to the Board include a committee of the Board that is duly authorized to act with respect to such matter.

"***Code***" means the Internal Revenue Code of 1986, as amended.

Case: 19-30088   Doc# 6013-3   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 22 of 23
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 84 of 175

"**Determination Date**" shall mean the earlier of (a) the first day of the Confirmation Hearing and (b) if (i) the Per Share Price for a Permitted Equity Offering is to be finally determined prior to such first day, the date of such determination or (ii) if the exercise price of the Rights is finally determined prior to such first day, the date of such determination.

"**Normalized Estimated Net Income**" shall mean, in each case with respect to the estimated year 2021, (a) on a component-by-component basis (e.g., distribution, generation, gas transmission and storage, and electrical transmission), the sum of (i) the Utility's estimated earning rate base for such component, *times* (ii) the equity percentage of the Utility's authorized capital structure, *times* (iii) the Utility's authorized rate of return on equity for such component, *less* (b) the projected post-tax difference in interest expense or preferred dividends for the entire company and the authorized interest expense or preferred dividends expected to be collected in rates, *less* (c) the amount of the Utility's post-tax annual contribution to the Go-Forward Wildfire Fund.

"**Premium Clawback Event**" shall mean (i) the date that the Backstop Party terminates this Backstop Commitment Letter, or (ii) the date that PG&E terminates the Backstop Commitment Letter pursuant to Section 6(c) or 6(d) of the Backstop Commitment Letter.  Notwithstanding the foregoing, a Special Premium Clawback Event shall not constitute a "Premium Clawback Event".

"**Prior Commitment Letter**" means any equity backstop commitment letter executed by the Company on either November 16, 2019 or December 6, 2019.

"**Section 382**" means Section 382 of the Code, or any successor provision or replacement provision.

"**Special Premium Clawback Event**" means the date that the Backstop Party terminates this Backstop Commitment Letter pursuant to either Section 5(l), Section 5(s) or Section 11(c).

"**Tax Benefits**" means the difference between (a) the income taxes actually paid by the Reorganized Utility and (b) the income taxes that the Reorganized Utility would have paid to the taxing authorities for such taxable year if the net operating losses of the Utility and any deductions arising from the payment of Fire Claims and Subrogation Claims were not available.

"**Tax Receivable Agreement**" means an agreement between the Reorganized Utility and the Backstop TBM Trust pursuant to which the Reorganized Utility agrees to deposit cash into the Backstop TBM Trust in an amount equal to all Tax Benefits arising after the first $1.350 billion of Tax Benefits starting with fiscal year 2020.

"**Tort Claimants RSA**" means that Restructuring Support Agreement dated as of December 6, 2019 among the Debtors, the Shareholder Proponents, the Official Committee of Tort Claimants, and the law firms representing holders of fire victim claims that are signatories thereto.

"**Trading Price**" means the mean volume weighted average price per share of New HoldCo Common Stock for the 20 consecutive business days commencing on the business day immediately after the Effective Date.

"**Treasury Regulations**" means final, temporary and proposed tax regulations promulgated under the Code, as amended.

Case: 19-30088    Doc# 6013-3    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 23 of 33
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 85 of 175

1

**EXHIBIT D**
**Conformed Copy of PG&E Corp. Debt Commitment Letter**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JPMORGAN CHASE BANK, N.A.**
383 Madison Avenue
New York, New York 10179

**BANK OF AMERICA, N.A.**
**BofA SECURITIES, INC.**
One Bryant Park
New York, NY 10036

**BARCLAYS**
745 Seventh Avenue
New York, NY 10019

**CITIGROUP GLOBAL MARKETS INC.**
388 Greenwich Street
New York, NY 10013

**GOLDMAN SACHS BANK USA**
**GOLDMAN SACHS LENDING PARTNERS LLC**
200 West Street
New York, NY 10282

**PERSONAL AND CONFIDENTIAL**

October 4, 2019

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
P.O. Box 77000
San Francisco, California 94177
Attention:      Nicholas M. Bijur

**PG&E Corporation**

**Commitment Letter**

Ladies and Gentlemen:

Reference is hereby made to (i) the Chapter 11 bankruptcy cases, jointly administered under lead case number 19-30088 (the "**Chapter 11 Cases**"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), in which PG&E Corporation, a California corporation (or any domestic entity formed to hold all of the assets of PG&E upon emergence from bankruptcy, the "**Borrower**") and Pacific Gas and Electric Company, a California corporation (the "**Utility**") (together with any domestic entity formed to hold all of the assets of Pacific Gas and Electric Company upon emergence from bankruptcy, the "**Utility**" and together with PG&E, the "**Debtors**" or "**you**"), are debtors and debtors in possession and (ii) the joint Chapter 11 plan of reorganization filed by the Debtors and the shareholder proponents with the Bankruptcy Court on December 12, 2019 at ECF No. 5101 (as may be further amended, modified or otherwise changed in accordance with this Commitment Letter, the "**Plan**") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used and not defined in this letter (together with Annexes A and B hereto, this "**Commitment Letter**") have the meanings assigned to them in Annexes A and B hereto as the context may require. JPMorgan, Bank of America, N.A. ("**BANA**"), BofA Securities, Inc. (or any of its designated affiliates, "**BofA**", and together with BANA, "**Bank of America**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. on behalf of Citi (as defined below), Goldman Sachs Bank

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 2
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 87
of 175

USA ("**GS Bank**"), Goldman Sachs Lending Partners LLC ("**GSLP**", and together with GS Bank, "**Goldman Sachs**") and any other Lenders that become parties to this Commitment Letter as additional "Commitment Parties" as provided in Section 3 hereof (including those entities listed in Schedule I attached hereto) are referred to herein, collectively, as the "**Commitment Parties**," "**we**" or "**us**."

You have informed us that, in connection with the consummation of the transactions contemplated by the Plan, the Borrower intends to (a) enter into a new revolving credit facility in an aggregate committed amount of $500 million (the "**Revolving Credit Facility**") and (b)(i) issue senior secured notes pursuant to a registered public offering or Rule 144A or other private placement (the "**Notes**"), (ii) incur term loans under a senior secured term loan facility (the "**Term Loan Facility**" and the loans thereunder, the "**Term Loans**" and, together with the Notes, collectively, the "**Permanent Financing**") or (iii) issue or incur a combination of the foregoing. In connection therewith, the Borrower desires to enter into a $5,000 million senior unsecured bridge loan facility (the "**Facility**") having the terms and subject to the conditions set forth herein and in the Annexes hereto, to be available in the event that the Permanent Financing is not issued and/or incurred on or prior to the Closing Date (as defined in Annex A) for any reason.

The transactions described in the preceding paragraphs are collectively referred to herein as the "**Transactions**."

For purposes of this Commitment Letter, "Citi" shall mean Citigroup Global Markets Inc., Citibank N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as any of them shall determine to be appropriate to provide the services contemplated herein.

1.    **Commitments; Titles and Roles**.

(a) (i) Each of JPMorgan, BofA, Barclays, Citi and GS Bank is pleased to confirm its agreement to act, and you hereby appoint each of JPMorgan, BofA, Barclays, Citi and GS Bank to act, as a joint lead arranger and joint bookrunner (in such capacities, the "**Arrangers**") and, except in the case of JPMorgan, co-syndication agent in connection with the Facility and (ii) each other Commitment Party accepts, on its own behalf or on behalf of its designated affiliate, the title(s) agreed to by the Borrower in writing and set forth adjacent to its name on Schedule I attached hereto under the heading "Title(s)"; (b) JPMorgan is pleased to confirm its agreement to act, and you hereby appoint JPMorgan to act, as administrative agent (the "**Administrative Agent**") for the Facility; and (c) each of JPMorgan, BANA, Barclays, Citi, GS Bank and GSLP (in such capacity, the "**Initial Lenders**") and each other Commitment Party is pleased to commit, and hereby commits, on a several and not joint basis, to provide the Borrower a portion of the aggregate principal amount of the Facility equal to the principal amount set forth adjacent to its name on Schedule II attached hereto under the heading "Commitment" on the terms contained in this Commitment Letter and subject to the conditions expressly set forth in Annex B hereto; *provided* that the amount of the Facility shall be automatically reduced as provided under "Mandatory Prepayments and Commitment Reductions" in Annex A hereto with any such reduction to be applied pro rata among the Initial Lenders. It is further agreed that JPMorgan will appear on the top left (and the Arrangers, other than JPMorgan, will appear in alphabetical order immediately to the right thereof) of the cover page of any marketing materials for the Facility and will hold the roles and responsibilities conventionally understood to be associated with such name placement. Our fees for our commitment and for services related to the Facility are set forth in a separate fee letter (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "**Fee Letter**") entered into by you and the Commitment Parties on the date hereof.  It is agreed that no other agents, co-agents, arrangers, co-arrangers or bookrunners will be appointed and no other titles will be awarded in connection with the Facility, and no compensation will be paid in order to obtain such person's commitment to participate in the Facility (other than the compensation expressly contemplated by this Commitment Letter and the Fee Letter) in connection with the Facility, unless the Arrangers and you shall so agree; provided, however, that you may award agent

2

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 3
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 88
of 175

(other than administrative agent and co-syndication agent) and similar titles to any additional Commitment Party that becomes a Commitment Party hereunder in accordance with the second paragraph of Section 3 hereof; provided, further, for the avoidance of doubt, no additional Commitment Party shall receive a bookrunner title.

You agree that JPMorgan may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC.

2.      **Conditions Precedent**.

Notwithstanding anything to the contrary in this Commitment Letter, the Fee Letter or any other agreement or other undertaking concerning the financing of the Transactions, (a) the Commitment Parties' commitments and agreements hereunder with respect to the Facility are subject solely to the satisfaction or waiver of the conditions expressly set forth in Annex B hereto and (b) the terms of the Facility Documentation shall be in a form such that they do not impair the availability of the Facility on the Closing Date if the conditions described in the immediately preceding clause (a) are satisfied.

3.      **Syndication**.

The Arrangers reserve the right, in accordance with the provisions of this Section 3, prior to or after the Closing Date, to syndicate the Facility to the Lenders (as defined in Annex A). The syndication of the Facility, including determinations as to the timing of offers to prospective Lenders, the selection of Lenders, the acceptance and final allocation of commitments, the awarding of titles or roles to any Lenders and the amounts offered and the compensation provided to each Lender from the amounts to be paid to the Arrangers pursuant to the terms of this Commitment Letter and the Fee Letter, will be conducted by the Arrangers in consultation with the Borrower.  Notwithstanding the foregoing, during the period commencing on the date hereof and ending November 20, 2019 (the "**Initial Syndication Period**"), the Facility will be syndicated only to those financial institutions approved by you in writing prior to the date hereof or other financial institutions as may be approved by you in your sole discretion (such financial institutions, collectively, the "**Approved Lenders**"). Following the Initial Syndication Period, if and for so long as a Successful Syndication (as defined in the Fee Letter) has not been achieved, the syndication of the Facility shall be conducted by the Arrangers in consultation with the Borrower. Following the achievement of a Successful Syndication of the Facility, further assignments and commitments shall be in accordance with the section captioned "Assignments and Participations" in the Term Sheet attached hereto as Annex A.

The aggregate commitments of the Commitment Parties with respect to the Facility shall be reduced dollar-for-dollar (and on a pro rata basis) by the amount of each commitment for the Facility received from additional Lenders selected in accordance with the preceding paragraph to the extent such Lender becomes (a) party to this Commitment Letter as an additional "Commitment Party" pursuant to a customary joinder agreement or other documentation reasonably satisfactory to the Arrangers and you (each, a "**Joinder Agreement**") or (b) party to the Facility Documentation as a Lender; *provided* that any reduction of Goldman Sachs's commitments under the Facility in accordance with the previous sentence or as a result of a reduction of the overall commitments of GSLP and GS Bank, each in its capacity as an Initial Lender, pursuant to the terms of this Commitment Letter shall be allocated between GSLP's and GS Bank's respective commitments as determined by GSLP and GS Bank in their sole discretion. Notwithstanding the Arrangers' right to syndicate the Facility and receive commitments with respect thereto, and except as provided in the immediately preceding sentence, (i) no Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the Facility on the Closing Date) in connection with any syndication, assignment or participation of the Facility, including its commitment in respect thereof, until after the initial funding of the Facility on the Closing

3

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 4 of 45

Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 89 of 175

Date has occurred, (ii) no assignment or novation shall become effective with respect to all or any portion of the Commitment Parties' commitments in respect of the Facility until the initial funding of the Facility on the Closing Date and (iii) unless you otherwise agree in writing, each Commitment Party shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Facility, including all rights with respect to consents, modifications, supplements, waivers and amendments, until the initial funding of the Facility on the Closing Date has occurred.

To facilitate an orderly and successful syndication of the Facility, you agree that, until the earlier of (a) the achievement of a Successful Syndication (as defined in the Fee Letter) and (b) 60 days following the Closing Date (such earlier date, the "**Syndication Date**"), the Utility and the Borrower will not syndicate or issue, attempt to syndicate or issue or announce the syndication or issuance of any competing debt facility or any debt or equity security (other than common equity) of the Utility, the Borrower or any of their respective subsidiaries that would reasonably be expected to materially impair the primary syndication of the Facility, in each case without the prior written consent of the Arrangers (such consent not to be unreasonably withheld, delayed or conditioned), other than (i) the Facility, (ii) the Permanent Financing, (iii) the Revolving Credit Facility, (iv) incremental facilities under the Utility's current debtor-in-possession credit agreement or any new debtor-in-possession facilities, in either case that are to be paid in full in cash at emergence from the Chapter 11 Cases, (v) securitization securities or facilities contemplated by the Plan, (vi) ordinary-course purchase money indebtedness, facility and equipment financings, other debt incurred in the ordinary course of business for capital expenditures and working capital purposes, financial leases or capital lease obligations, overdraft protection, ordinary course letter of credit facilities, hedging and cash management, and similar obligations, (vii) roll-over, "take-back" or reinstated debt contemplated by the Plan and (viii) common and preferred equity issued in accordance with the Plan in satisfaction of claims.

Without limiting your obligations to assist with the syndication efforts as set forth herein, it is understood that the Commitment Parties' commitments hereunder are not conditioned upon the syndication of, or receipt of commitments in respect of, the Facility and in no event shall the commencement or successful completion of syndication of the Facility constitute a condition to the availability of the Facility on the Closing Date.

Until the Syndication Date, you agree to actively assist the Arrangers in achieving a syndication satisfactory to you and us.  Such assistance shall include (a) your use of commercially reasonable efforts to ensure that the Arrangers' syndication efforts benefit from your and your affiliates' existing lending relationships, (b) your using commercially reasonable efforts to assist in the preparation of one or more information packages for the Facility in form and substance customary for transactions of this type regarding the business, operations, financial projections and prospects of the Borrower (after giving effect to the Transactions) (collectively, the "**Confidential Information Memorandum**"), (c) your using commercially reasonable efforts to obtain, as promptly as practicable prior to the launch of the syndication of the Facility, a Public Debt Rating for the Borrower from each of Moody's Investor Services, Inc. ("**Moody's**") and Standard & Poor's Financial Services LLC ("**S&P**"), in each case giving effect to the Transactions, (d) your executing and delivering one or more Joinder Agreements delivered to you in respect of prospective Lenders which are selected in accordance with the provisions of this Section 3, as soon as reasonably practicable following commencement of syndication of the Facility, (e) the presentation of one or more customary information packages for the Facility in format and content reasonably satisfactory to the Arrangers (collectively, the "**Lender Presentation**") in a reasonable number of meetings at reasonable times and locations mutually agreed upon and (f) arranging for direct contact between senior management and representatives, with appropriate seniority and expertise, of the Borrower with prospective Lenders and participation of such persons in a reasonable number of meetings at reasonable times and locations mutually agreed upon.  In connection with the Arrangers' syndication efforts, you shall not be required to provide information the disclosure of which would violate any (i)

4

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 5 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 90 of 175

attorney-client privilege (and you shall not be required to waive any such privilege), (ii) law, rule or regulation applicable to the Borrower or its affiliates or (iii) obligation of confidentiality from a third party binding on you or your affiliates (so long as (x) such confidentiality obligation was not entered into in contemplation of the Transactions, (y) you use commercially reasonable efforts to obtain a waiver of such confidentiality obligation (but not attorney-client privilege) and to otherwise provide such information that does not violate such confidentiality obligations and (z) you provide the Commitment Parties notice that information is being withheld due to the existence of such confidentiality obligation or attorney-client privilege); *provided* that none of the foregoing shall be construed to limit any of your representations and warranties set forth in Section 4 of this Commitment Letter (and any corresponding representation in the Confidential Information Memorandum or the Facility Documentation, as applicable). The Borrower will be solely responsible for the contents of any such Confidential Information Memorandum and Lender Presentation (other than, in each case, any information contained therein that has been provided for inclusion by the Commitment Parties about the Commitment Parties) and all other written information, documentation or materials delivered to the Commitment Parties by or on behalf of the Borrower in connection therewith (collectively, the "**Information**") and the Borrower acknowledges that the Commitment Parties will be using and relying upon the Information without independent verification thereof. The Borrower agrees that Information (including, without limitation, draft and execution versions of the Facility Documentation, the Confidential Information Memorandum, the Lender Presentation and publicly filed financial statements) may be disseminated to potential Lenders through one or more internet sites (including an IntraLinks, SyndTrak or other similar electronic workspace (the "**Platform**")) created for purposes of syndicating the Facility or otherwise, in accordance with each Arranger's standard syndication practices, and you acknowledge that no Commitment Party nor any of their respective affiliates will be responsible or liable to you or any other person or entity for damages arising from the use by others of any Information or other materials obtained on the Platform, except to the extent such damages have resulted from the willful misconduct, bad faith or gross negligence of such Commitment Party or its affiliates (as determined by a court of competent jurisdiction in a final and non-appealable judgment). You hereby authorize the Commitment Parties to download copies of the Borrower's trademark logos from its website and post copies thereof and any Information to any Platform established by the Arrangers to syndicate the Facility, and to use the Borrower's trademark logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the syndication of the Facility or in any advertisements (to which you consent, such consent not to be unreasonably withheld) that we may place after the closing of the Facility in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at our own expense describing our services to the Borrower hereunder; provided that such consent shall not be required with respect to tombstone, case study or similar advertisement incorporated into promotional material and not otherwise publicly disseminated.

The Borrower acknowledges that certain of the Lenders may be "public side" Lenders (i.e., Lenders that do not wish to receive Private-Side Information (as defined below)) (each, a "**Public Lender**"; and Lenders who are not Public Lenders being referred to herein as "**Private Lenders**"). At the request of the Arrangers, the Borrower agrees to prepare an additional version of the Confidential Information Memorandum and the Lender Presentation to be used by Public Lenders containing a representation that such Confidential Information Memorandum does not contain Private-Side Information. "**Private-Side Information**" means material non-public information (for purposes of United States federal, state or other applicable securities laws) concerning the Borrower and its affiliates or any of their respective securities; and "**Public-Side Information**" means any information that is not Private-Side Information. It is understood that in connection with your assistance described above, you will provide a customary authorization letter to the Arrangers (a) authorizing the distribution of the Information to prospective Private Lenders and the distribution of the Public Side Information to prospective Public Lenders and (b) containing a customary "10b-5" representation and a representation to the Commitment Parties, in the

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

case of the public-side version, that such Information does not include material non-public information about the Borrower, its affiliates or their respective securities. The Public-Side Information will contain customary language exculpating the Arrangers, you and the respective affiliates of each of the foregoing with respect to any liability related to the use of the contents of the Public-Side Information. In addition, the Borrower will clearly designate as such all Information provided to any Commitment Party by or on behalf of it which contains exclusively Public-Side Information. The Borrower acknowledges and agrees that the following documents may be distributed to all Lenders (including Public Lenders) (unless the Borrower promptly notifies the Arrangers in writing (including by email) within a reasonable time prior to their intended distribution (after you have been given a reasonable opportunity to review such documents) that any such document should only be distributed to prospective Private Lenders): (a) drafts and final versions of the Facility Documentation; (b) term sheets and notification of changes in the terms of the Facility and (c) administrative materials prepared by the Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda). If you advise us that any of the foregoing items should be distributed only to Private Lenders, then we will not distribute such materials to Public Lenders without further discussions with you.

4.  **Information**.

The Borrower represents and covenants that (i) all written Information (other than projections, estimates and other forward-looking materials and information of a general economic or industry specific nature) provided by or on behalf of the Borrower to the Commitment Parties or the Lenders in connection with the Transactions is and will be when furnished, when taken as a whole, complete and correct in all material respects and does not and will not contain when furnished, when taken as a whole, any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates provided thereto); and (ii) the written financial projections and other written forward-looking information (the "**Projections**") that have been or will be made available to the Commitment Parties or the Lenders by or on behalf of the Borrower in connection with the Transactions have been and will be prepared in good faith based upon assumptions that are believed by the Borrower to be reasonable at the time such Projections are furnished to the Commitment Parties or the Lenders, it being understood and agreed that Projections are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are out of the Borrower's control, that no assurance can be given that any particular Projections will be realized and that actual results during the period or periods covered by such Projections may differ significantly from the projected results and such differences may be material.

You agree that if at any time prior to the later of (i) the Closing Date and (ii) the Syndication Date you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct in all material respects in light of the circumstances under which such statements are made. We have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of you or any other party.

5.  **Indemnification and Related Matters**.

Subject to the approval of this Commitment Letter by the Bankruptcy Court, you agree, jointly and severally, (a) to indemnify and hold harmless the Commitment Parties and their respective affiliates and their respective officers, directors, employees, advisors, and agents (each, an "**indemnified person**") from and against any and all losses, claims, damages, liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the

6

Facility, the use of the proceeds thereof or any related transaction or any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "**Proceeding**"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for reasonable, documented and invoiced out-of-pocket legal expenses of one primary firm of counsel, one regulatory counsel and one special bankruptcy counsel for all such indemnified persons, taken as a whole, and, if necessary, of a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for all such indemnified persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where the indemnified person affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected indemnified person and, if necessary, of one regulatory counsel, one special bankruptcy counsel and a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for such affected indemnified person) (the foregoing, the "**Counsel Limitation**") or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; <u>provided</u> that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to (i) have arisen or resulted from the willful misconduct, bad faith or gross negligence of such indemnified person, (ii) have resulted from a claim brought by you or any of your subsidiaries against such indemnified person for material breach of such indemnified person's obligations hereunder or (iii) have not resulted from an act or omission by you or any of your affiliates and have been brought by an indemnified person against any other indemnified person (other than any claims against any Commitment Party in its capacity or in fulfilling its role as an arranger or agent or any similar role hereunder, except to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such indemnified party in such capacity), and (b) to reimburse the Commitment Parties and their respective affiliates on demand for all out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the Facility and any related documentation (including this Commitment Letter, the Fee Letter and the definitive documentation relating to the Facility) or the administration, amendment, modification or waiver thereof. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto. None of the indemnified persons or you shall have any liability for any special, indirect, consequential or punitive damages in connection with activities related to the Facility or the Transactions; <u>provided</u> that nothing contained in this sentence shall limit your indemnity and reimbursement obligations to the extent set forth in this paragraph.

No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Platform or otherwise via the internet, and you agree, to the extent permitted by applicable law, to not assert any claims against any indemnified person with respect to the foregoing.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (a) includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault,

7

#92905522v3
[[DMS:5282254v2:02/27/2020–06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 8 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 93 of 175

culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to the Commitment Parties and the other indemnified persons. You shall not be liable for any settlement of any Proceeding if the amount of such settlement was effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent or if there is a judgment by a court of competent jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each indemnified person from and against any and all losses, claims, damages, penalties, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this paragraph.

You agree that the fees, expenses and indemnities payable hereunder and incurred pursuant hereto, and as set forth in, this Commitment Letter and the Fee Letter (a) are reasonable, (b) are actual and necessary costs and expenses of preserving the Debtors' estates and (c) subject to the approval of this Commitment Letter by the Bankruptcy Court, constitute allowed Administrative Claims against the Debtors on a joint and several basis under the Plan.

6.    **Assignments**.

This Commitment Letter may not be assigned by you without the prior written consent of the Commitment Parties, nor, except as expressly contemplated by Section 3 above, by any Commitment Party without your prior written consent (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the Commitment Parties and the other parties hereto and, except as set forth in Section 5 above, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Any Commitment Party may, in consultation with the Borrower, assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates; for the avoidance of doubt, GS Bank may assign its commitments and agreements hereunder, in whole or in part, to GSLP and vice versa, and any such assignment will relieve such assignor of its obligations hereunder dollar-for-dollar by the amount of such assigned commitments (and the applicable assignee's commitments will be increased dollar-for-dollar by the amount of such assigned commitments)..

7.    **Confidentiality**.

This Commitment Letter, the Fee Letter and the contents hereof and thereof are confidential and may not be disclosed by you to any other person (other than any Commitment Party) without our prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), except pursuant to a subpoena or order issued by a court or administrative agency or by a judicial, administrative or legislative body or committee (in which case you agree to inform us promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation); *provided* that we hereby consent to your disclosure of (i) this Commitment Letter and the Fee Letter to your affiliates and your and your affiliates' respective officers, directors, employees, agents and advisors (including legal counsel, independent auditors and other experts, professional advisors or agents) who are involved in the consideration of the Transactions (including in connection with providing accounting and tax advice to the Borrower and its affiliates) on a confidential basis, (ii) this Commitment Letter and the Fee Letter as required by applicable law or compulsory legal process or, to the extent requested or required by governmental and/or regulatory authorities (in which case you agree (except with respect to any audit or examination conducted by bank examiners or any governmental bank regulatory authority exercising examination or regulatory authority) to inform us promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (iii) following your acceptance of the provisions hereof and return of an executed counterpart of this Commitment Letter to the Commitment Parties as provided below, this Commitment Letter (but not the Fee Letter other than the existence thereof) in any public record in which you are required by law

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 9
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 94
of 175

or regulation to file it (including the Bankruptcy Court to obtain its approval) or with the Securities and Exchange Commission ("**SEC**") and other applicable regulatory authorities and stock exchanges to the extent required to be in compliance therewith, (iv) the aggregate fee amounts contained in the Fee Letter in financial statements or as part of projections, pro forma information or a generic disclosure of aggregate sources and uses related to aggregate compensation amounts related to the Transactions to the extent customary or required in offering and marketing materials for the Facility, the Permanent Financing or in any public filing relating to the Transactions, in each case in a manner which does not disclose the fees payable pursuant to the Fee Letter (except in the aggregate), (v) this Commitment Letter and the information contained herein and the Fee Letter in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter, Fee Letter or the transactions contemplated thereby or enforcement thereof or hereof, (vi) the information contained in Annexes A and B in any prospectus or other offering memorandum or in any syndication or other marketing materials relating to the Facility or the Permanent Financing, (vii) any information set forth herein (including in the Annexes hereto) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by you or your affiliates or your or their respective officers, directors, employees or advisors, (viii) the existence of this Commitment Letter and the information contained in Annex A to any rating agency; *provided* that such information is supplied to any such rating agency only on a confidential basis and (ix) following your acceptance hereof and the return of an executed counterpart of this Commitment Letter to the Commitment Parties, as provided below, in consultation with us and on a confidential basis, this Commitment Letter to any potential or prospective Commitment Party or any potential or prospective Lender. The obligations under this paragraph with respect to this Commitment Letter (but not the Fee Letter) shall terminate automatically after the earlier of the date (x) of any public filing permitted hereunder and (y) the Facility Documentation shall have been executed and delivered by the parties thereto. To the extent not earlier terminated, the provisions of this paragraph with respect to this Commitment Letter (but not the Fee Letter) shall automatically terminate on the second anniversary hereof.

Notwithstanding anything to the contrary herein, any disclosure of the Fee Letter to obtain Bankruptcy Court approval shall only be made via a filing under seal and, to the extent required, by providing an unredacted copy thereof directly to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors, the Official Committee of Tort Claimants and any other official committee established pursuant to Section 1102 of the Bankruptcy Code on a confidential and professionals' eyes only basis; *provided*, *however*, that you shall be permitted to publicly disclose the fees payable under the Fee Letter, solely on an aggregate basis combined with all other fees payable by you in connection with the financing for which you are seeking the approval of the Bankruptcy Court.

Each Commitment Party shall use all non-public information provided to it by or on behalf of the Borrower or any of your subsidiaries or affiliates solely for the purpose of providing the services which are the subject of this Commitment Letter and otherwise in connection with the Transactions, and shall treat confidentially all such information and shall not disclose such information to any third party or circulate or refer publicly to such information; *provided*, *however*, that nothing herein will prevent each Commitment Party from disclosing any such information (a) pursuant to the order of any court or administrative agency, or otherwise as required by applicable law or compulsory legal process (in which case such person agrees to inform you promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (b) upon the request or demand of any regulatory authority having jurisdiction over such person or any of its affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank examiners or any governmental bank regulatory authority exercising examination or regulatory authority) to inform you promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (c) to the extent that such information is publicly

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

available or becomes publicly available other than by reason of disclosure by such person or any of such person's affiliates or its or their respective officers, directors, employees or advisors in violation of this Commitment Letter, (d) to such person's affiliates and to such person's and such affiliates' respective officers, directors, partners, members, employees, legal counsel, independent auditors, service providers and other experts or agents who need to know such information in connection with the Transactions and who have been informed of the confidential nature of such information and are instructed to keep such information confidential in accordance with the provisions of this Section 7, it being understood that the disclosing Commitment Party shall be responsible for any violation of the provisions of this Section 7 by any such person, (e) to potential and prospective Lenders, participants and any direct or indirect contractual counterparties to any swap or derivative transaction relating to the Borrower or its obligations under the Facility, in each case, who have agreed to keep such information confidential on terms not less favorable than the provisions hereof in accordance with the standard syndication processes of the Arrangers or customary market standards for the dissemination of such type of information, (f) to Moody's and S&P and other rating agencies; *provided* that such information is limited to Annex A and is supplied only on a confidential basis, (g) to market data collectors, similar service providers to the lending industry, and service providers to the Arrangers in connection with the administration and management of the Facility; *provided* that such information is limited to the existence of this Commitment Letter and information of a type routinely provided regarding the closing date, size, type, purpose of, and parties to, the Facility, (h) received by such person from a source (other than you or any of your affiliates, advisors, members, directors, employees, agents or other representatives) not known by such person to be prohibited from disclosing such information to such person by a legal, contractual or fiduciary obligation, (i) to the extent that such information was already in the Commitment Parties' possession on a non-confidential basis or is independently developed by the Commitment Parties, (j) for purposes of establishing a "due diligence" defense or (k) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby or enforcement thereof or hereof. The Commitment Parties' obligation under this provision shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the execution and delivery of the Facility Documentation by the parties thereto, at which time any confidentiality undertaking in the Facility Documentation shall supersede the provisions in this paragraph.

8. **Absence of Fiduciary Relationship; Affiliates; Etc**.

As you know, each Commitment Party (together with its affiliates, the "**Commitment Entities**") is a full service financial institution engaged, either directly or through its affiliates, in a broad array of activities, including commercial and investment banking, financial advisory, market making and trading, investment management (both public and private investing), investment research, principal investment, financial planning, benefits counseling, risk management, hedging, financing, brokerage and other financial and non-financial activities and services globally. In the ordinary course of their various business activities, the Commitment Entities and funds or other entities in which the Commitment Entities invest or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers. In addition, the Commitment Entities may at any time communicate independent recommendations and/or publish or express independent research views in respect of such assets, securities or instruments. Any of the aforementioned activities may involve or relate to assets, securities and/or instruments of the Borrower and/or other entities and persons which may (i) be involved in transactions arising from or relating to the arrangement contemplated by this Commitment Letter or (ii) have other relationships with the Borrower or its affiliates. In addition, the Commitment Entities may provide investment banking, commercial banking, underwriting and financial advisory services to such other entities and persons. Although the Commitment Entities in the course of such other activities and relationships may acquire information

10

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 11
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 96
of 175

about the transactions contemplated by this Commitment Letter or other entities and persons which may be the subject of the financing contemplated by this Commitment Letter, the Commitment Entities shall have no obligation to disclose such information, or the fact that the Commitment Entities are in possession of such information, to the Borrower or to use such information on the Borrower's behalf.

Consistent with the Commitment Entities' policies to hold in confidence the affairs of their customers, the Commitment Entities will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter to any of their other customers and will treat confidential information relating to the Borrower and its affiliates with the same degree of care as they treat their own confidential information and in accordance with Section 7 hereof. Furthermore, you acknowledge that neither the Commitment Entities nor any of their respective affiliates has an obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

Each of the Commitment Entities may have economic interests that conflict with those of the Borrower, its equity holders and/or its affiliates. You agree that each Commitment Entity will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or the Fee Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Entities and the Borrower, its equity holders or its affiliates. You acknowledge and agree that the transactions contemplated by this Commitment Letter and the Fee Letter (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Commitment Entities, on the one hand, and the Borrower, on the other, and in connection therewith and with the process leading thereto, (i) the Commitment Entities have not assumed (A) an advisory responsibility in favor of the Borrower, its equity holders or its affiliates with respect to the financing transactions contemplated hereby or (B) a fiduciary responsibility in favor of the Borrower, its equity holders or its affiliates with respect to the transactions contemplated hereby, or in each case, the exercise of rights or remedies with respect thereto or the process leading thereto (irrespective of whether the Commitment Entities have advised, are currently advising or will advise the Borrower, its equity holders or its affiliates on other matters) or any other obligation to the Borrower except the obligations expressly set forth in this Commitment Letter and the Fee Letter and (ii) the Commitment Entities are acting solely as principals and not as the agents or fiduciaries of the Borrower, its management, equity holders, affiliates, creditors or any other person. The Borrower acknowledges and agrees that it has consulted its own legal, tax, investment, accounting and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. To the fullest extent permitted by law, the Borrower agrees that it will not bring any claim that the Commitment Entities have breached any fiduciary or similar duty to the Borrower with respect to the financing transactions contemplated hereby or owe a fiduciary or similar duty to the Borrower, in connection with such financing transactions or the process leading thereto. In addition, each Commitment Party may employ the services of its affiliates in providing services and/or performing its or their obligations hereunder and may, subject to Section 7, exchange with such affiliates information concerning the Borrower and other companies that may be the subject of this arrangement, and such affiliates will be entitled to the benefits afforded to such Commitment Party hereunder (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential). Notwithstanding the foregoing, nothing herein shall affect the Borrower's rights in respect of any separate engagement of any Commitment Party, including as financial advisor, in connection with the Transactions or any other matter.

You further acknowledge that certain of the Commitment Parties and/or their affiliates currently are acting as lenders and as the administrative agent under certain of the Borrower's credit agreements, and your and your affiliates' rights and obligations under any other agreement with any Commitment Party or

11

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 12 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 97 of 175

any of its affiliates (including the Funded Debt Documents and the DIP Facility Credit Agreement (each as defined in the Plan)) that currently exist or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Commitment Letter, and none of such rights and obligations under such other agreements shall be affected by any Commitment Party's performance or lack of performance of services hereunder. You hereby agree that each Commitment Party may render its services under this Commitment Letter notwithstanding any actual or potential conflict of interest presented by the foregoing, and you agree that you will not claim any conflict of interest relating to the relationship among such Commitment Party and you and your affiliates in connection with the commitments and services contemplated hereby, on the one hand, and the exercise by any Commitment Party or any of its affiliates of any of their rights and duties under any credit agreement or other agreement (including the Funded Debt Documents and the DIP Facility Credit Agreement) on the other hand.

In addition, please note that the Commitment Entities do not provide accounting, tax or legal advice.

9.      **Miscellaneous**.

Neither this Commitment Letter nor the Fee Letter may be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto or thereto, as applicable, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto or thereto.

The provisions set forth under Sections 3, 4, 5, 7 and 8 hereof (in each case other than any provision therein that expressly terminates upon execution of the Facility Documentation), this Section 9 and the provisions of the Fee Letter will remain in full force and effect regardless of whether the Facility Documentation is executed and delivered, except that the provisions of Sections 3 and 4 shall not survive if the commitments and undertakings of the Commitment Parties are terminated prior to the effectiveness of the Facility; *provided* that (x) the foregoing provisions in this paragraph (other than with respect to the provisions set forth in the Fee Letter and under Sections 7, 8 and this Section 9 hereof, which will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Commitment Parties' respective commitments and agreements hereunder) shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the Facility Documentation upon execution thereof and thereafter shall have no further force and effect and (y) the provisions of Sections 3 and 4 shall terminate on the Syndication Date (or, in the case of the second paragraph of Section 4, the Closing Date if later).

**Each of the parties hereto (for itself and its affiliates) agrees that any suit or proceeding arising in respect of this Commitment Letter or the Commitment Parties' commitments or agreements hereunder or the Fee Letter will be tried exclusively in (i) subject to clause (ii)(B), until the Effective Date (as defined in the Plan) of the Plan, the Bankruptcy Court and (ii)(A) thereafter or (B) if the Bankruptcy Court refuses to accept, or the Bankruptcy Court or any appellate court from the Bankruptcy Court determines in a final, non-appealable order that the Bankruptcy Court does not have, jurisdiction, any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each party hereby submits to the exclusive jurisdiction of, and to venue in, such court. Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either the Commitment Parties' commitments or agreements or any matter referred to in this Commitment Letter or the Fee Letter is hereby waived by the parties hereto (to the fullest extent permitted by applicable law). Each of the parties hereto (for itself and its affiliates) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other**

12

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 13
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 98
of 175

**manner provided by law.** Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court. This Commitment Letter and the Fee Letter and any claim, controversy or dispute arising hereunder or thereunder will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

10.    **PATRIOT Act Notification**.

The Commitment Parties hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") and the requirements of 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**") the Commitment Parties and each Lender may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Commitment Parties and each Lender to identify the Borrower in accordance with the Patriot Act and the Beneficial Ownership Regulation.  This notice is given in accordance with the requirements of the Patriot Act and is effective for the Commitment Parties and each Lender.

11.    **Acceptance and Termination**.

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to subject matter contained herein, including an agreement to negotiate in good faith the Facility Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the commitments provided hereunder by the Commitment Parties are subject to the conditions expressly set forth in Annex B hereto.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement.  Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or other electronic transmission (e.g., "pdf" or "tif") will be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter and the Fee Letter are the only agreements that have been entered into among the parties hereto with respect to the Facility and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the Facility.

The Commitment Parties' commitments and agreements hereunder will terminate upon the first to occur of (i) the execution and delivery of the Facility Documentation by each of the parties thereto, (ii) the Effective Date of the Plan without using the loans under the Facility, (iii) 11:59 p.m., New York City time, on (A) June 30, 2020, if the Confirmation Order has not been entered prior to such time or (B) August 29, 2020, if the Closing Date has not occurred prior to such time, (iv)(A) the Plan, the Noteholder RSA (as defined below) or the Approval Order is amended or modified or any condition contained therein waived, in a manner that is adverse to the Commitment Parties in their capacities as such, in either case without the consent of the Administrative Agent and the Commitment Parties holding 66 2/3% of the commitments hereunder in respect of the Facility (the "**Required Commitment Parties**") (such consent not to be unreasonably withheld, conditioned or delayed; provided that modifications to the Plan solely as a result of an increase in roll-over, "take-back" or reinstatement of any existing debt of the Debtors shall be deemed not to be adverse to the Commitment Parties for the purposes of this clause (A)), (B) any Plan Supplement or any Plan Document (each as defined in the Plan) that is adverse to the interests of the Commitment Parties in their capacities as such is filed or finalized without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), (v) the Chapter 11 Case with respect to any Debtor is dismissed or converted to a proceeding under chapter 7 of

13

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 14
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 99
of 175

the Bankruptcy Code, (vi) a trustee or examiner with enlarged powers (having powers beyond those set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) is appointed with respect to any of the Debtors, (vii) there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited; (viii) the Bankruptcy Court shall not have entered an order approving the relief requested in the motion filed with the Bankruptcy Court authorizing the Borrower's entry into and performance under this Commitment Letter, the Fee Letter and any related engagement letter (the "**Approval Order**"), in form and substance reasonably satisfactory to the Commitment Parties, on or before March 31, 2020; (ix) the Debtors' aggregate liability with respect to Fire Claims (as defined in the Plan) is determined (whether (A) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (B) pursuant to an agreement between the Debtors and the holders of Fire Claims that is subject to an order of the Bankruptcy Court approving such agreement, or (C) through a combination thereof) to exceed $25.5 billion (the "**Fire Claims Cap**"); (x) (A) the occurrence of one or more wildfires within PG&E's service area after the Petition Date (as defined in the Plan) and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 dwellings or commercial structures ("**Structures**"); *provided*, *however*, that any notice of termination under this clause (x)(A) must be given on or before the entry of the Approval Order, or (B) the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized; (xi) the Debtors shall not have received at least $12,000 million of equity commitments by December 24, 2019 on terms reasonably satisfactory to the Commitment Parties, (xii) since June 30, 2019, a Material Adverse Effect shall have occurred; (xiii) the Debtors have failed to perform any of their obligations set forth in this Commitment Letter, which failure to perform (A) would give rise to the failure of the condition set forth in paragraph 1(a) or 1(d) on Annex B hereto and (B) is incapable of being cured or, if capable of being cured by June 30, 2020, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Commitment Parties holding a majority of the commitments in respect of the Facility, (xiv) if at any time after the first day of the Confirmation Hearing (as defined in the Plan), either (A) asserted Administrative Expense Claims (as defined in the Plan) exceed $250 million (excluding all ordinary course Administrative Expense Claims, Professional Fee Claims, Disallowed Administrative Expense Claims and the portion of an Administrative Expense Claim that is covered by insurance (in each case, as defined in the Plan) and including for the avoidance of doubt, any such expenses or claims with respect to the Facility (collectively, the "**Excluded Administrative Expense Claims**")) or (B) the Debtors have reserved for and/or paid more than $250 million in the aggregate for Administrative Expense Claims, excluding the Excluded Administrative Expense Claims, (xv) on or prior to June 30, 2020, the Borrower shall not have received from the California Public Utilities Commission (the "**CPUC**") all necessary approvals, authorizations and final orders to implement the Plan, and to participate in the Go-Forward Wildfire Fund (as defined in the Plan), including (A) provisions pertaining to authorized return on equity and regulated capital structure, (B) a disposition of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (C) resolution of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date and (D) approval (or exemption from approval) of the financing structure and the securities to be issued under the Plan, (xvi) if at any time the Bankruptcy Court determines that the Debtors are insolvent, (xvii) the Bankruptcy Court has entered a final and non-appealable order to authorize, or the Plan, any Plan Supplement or any Plan Document is amended, modified or changed to include, in each case without the consent of the Required Commitment Parties, a process for transferring the license and/or operating assets of the Utility to the State of California or a third party (a "**Transfer**") or PG&E effects a Transfer other than pursuant to the Plan, (xviii) the CPUC

14

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 15
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
100 of 175

has revoked or terminated the Utility's Certificate of Public Convenience and Necessity, (xix) the issuance of a preliminary or permanent injunction by a court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed) declaring the Plan or any material portion thereof (in each case, to the extent it relates to the terms hereof) to be unenforceable or otherwise restricting the consummation of any such material portion of the Plan, and such ruling, judgment, or order has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance, (xx) the Bankruptcy Court shall not have entered an order (the "**Noteholder RSA Approval Order**") approving the Borrower's entry into and performance under the Restructuring Support Agreement, dated as of January 22, 2020 (the "**Noteholder RSA**"), among the Debtors, the Consenting Noteholders and the Shareholder Proponents (each as defined therein), in form and substance reasonably satisfactory to the Commitment Parties, on or before February 28, 2020; and (xxi) the necessary consents from the Backstop Parties (as defined in the BCLs) in order to permit the Plan to be amended to incorporate the terms of the Noteholder RSA are not obtained on or before February 28, 2020 (the earliest date in clauses (ii) through (xxi) being the "**Commitment Termination Date**"); *provided* that the termination of any commitment pursuant to this sentence does not prejudice your rights and remedies in respect of any breach of this Commitment Letter. You will have the right to terminate this Commitment Letter in the event that the Debtor's exclusive periods to file and solicit acceptances of a plan of reorganization are terminated or modified.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to JPMorgan an executed copy of this Commitment Letter, together, if not previously executed and delivered, with an executed copy of the Fee Letter, on or before 11:59 p.m., New York City time, on October 11, 2019, whereupon this Commitment Letter and the Fee Letter will become binding agreements between us. This offer will terminate on such date if this Commitment Letter and the Fee Letter have not been signed and returned as described in the preceding sentence. We look forward to working with you on this transaction.

[Remainder of page intentionally left blank]

15

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 16
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
101 of 175

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

By: _____

    Name:

    Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**BofA SECURITIES, INC.**


By: _____
    Name:
    Title:


**BANK OF AMERICA, N.A.**


By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**BARCLAYS BANK PLC**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**CITIGROUP GLOBAL MARKETS INC.**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**GOLDMAN SACHS BANK USA**

By: _____
    Name:
    Title:


**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**ACCEPTED AND AGREED AS OF**
**THE DATE FIRST WRITTEN ABOVE:**

**PG&E CORPORATION**

By: _____
Name:
Title:

**PACIFIC GAS AND ELECTRIC COMPANY**

By: _____
Name:
Title:

*[Signature Page to Commitment Letter (HoldCo)]*

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 22
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
107 of 175

Titles

| Commitment Party (or its designated affiliate) | Title(s) |
|---|---|
| BNP Paribas | Joint Lead Arranger and Co-Documentation Agent |
| Credit Suisse AG, Cayman Islands Branch | Joint Lead Arranger and Co-Documentation Agent |
| Morgan Stanley Bank, N.A. | Joint Lead Arranger and Co-Documentation Agent |
| MUFG Union Bank, N.A. | Joint Lead Arranger and Co-Documentation Agent |
| Wells Fargo Bank, National Association | Joint Lead Arranger and Co-Documentation Agent |
| Mizuho Bank, Ltd. | Joint Lead Arranger and Co-Documentation Agent |

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 23
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
108 of 175

Commitments

| Commitment Party | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $1,047,297,280.00 |
| Bank of America, N.A. | $785,472,970.00 |
| Barclays Bank PLC | $785,472,970.00 |
| Citi | $785,472,970.00 |
| Goldman Sachs Bank USA | $750,000,000.00 |
| Goldman Sachs Lending Partners LLC | $35,472,970.00 |
| BNP Paribas | $135,135,140.00 |
| Credit Suisse AG, Cayman Islands Branch | $135,135,140.00 |
| Morgan Stanley Bank, N.A. | $135,135,140.00 |
| MUFG Union Bank, N.A. | $135,135,140.00 |
| Wells Fargo Bank, National Association | $135,135,140.00 |

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 24
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
109 of 175

| | |
|---|---|
| Mizuho Bank, Ltd. | $135,135,140.00 |
| **Total:** | **$5,000,000,000.00** |

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

**PG&E Corporation**
**$5,000 Million Senior Unsecured 364-Day Facility**
**Summary of Principal Terms**[1]

| | |
|---|---|
| Borrower: | PG&E Corporation, a California corporation (the "**PG&E**"), or any domestic entity formed to hold all of the assets of PG&E upon emergence from bankruptcy (the "**Borrower**"). |
| Guarantors: | None. |
| Security: | None. |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("**JPMorgan**") will act as sole administrative agent (collectively, in such capacity, the "**Administrative Agent**") for a syndicate of banks, financial institutions and other institutional lenders approved in accordance with the Commitment Letter (together with JPMorgan, the "**Lenders**"), and will perform the duties customarily associated with such role. |
| Joint Bookrunners and Joint Lead Arrangers: | JPMorgan, BofA, Barclays, Citi and GS Bank will act as joint bookrunners and joint lead arrangers for the Facility described below (in such capacities, the "**Arrangers**"), and will perform the duties customarily associated with such roles. |
| Co-Syndication Agents: | BofA, Barclays, Citi and GS Bank will act as co-syndication agents for the Facility and will perform the duties customarily associated with such roles. |
| Facility: | A senior unsecured bridge term loan credit facility in an aggregate principal amount of $5,000 million (the "**Facility**"). |
| Purpose: | The proceeds of the Facility will be used by the Borrower in accordance with the Plan to finance a portion of the Transactions, including to repay existing indebtedness of the Borrower and its affiliates, and to pay related fees and expenses. |
| Availability: | One drawing may be made under the Facility on the closing date of the Facility upon satisfaction of the conditions to funding described in Annex B to this Commitment Letter (the "**Closing Date**"). |
| | Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed. |
| Interest Rates and Fees: | As set forth in Annex A-I hereto. |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Annex A is attached, including Annex B thereto, unless otherwise specified.

| | |
|---|---|
| Final Maturity and Amortization: | The Facility will mature on the day that is 364 days after the Closing Date (the "**Maturity Date**"). There will be no scheduled amortization payments. |

Mandatory Prepayments and Commitment Reductions:

On or prior to the Closing Date, the aggregate commitments in respect of the Facility under the Commitment Letter or under the Facility Documentation (as applicable) shall be automatically and permanently reduced, and after the Closing Date, the aggregate principal amount of loans under the Facility shall be prepaid, in each case without penalty or premium and on a dollar-for-dollar basis, by the following amounts (without duplication):

(a) 100% of the Net Cash Proceeds (as defined below) of all asset sales or other dispositions of property by the Borrower, the Utility and their respective subsidiaries and any insurance and condemnation proceeds, other than (i) sales or other dispositions of assets in the ordinary course of business, (ii) sales or other dispositions of obsolete or worn-out property and property no longer used or useful in the business, (iii) intercompany transfers among the Utility, the Borrower and their respective subsidiaries, (iv) sales or other dispositions of assets the Net Cash Proceeds of which do not exceed $10,000,000 in any single transaction or series of related transactions, (v) other sales or other dispositions of assets the Net Cash Proceeds of which do not exceed an aggregate amount of $100,000,000, and (vi) Net Cash Proceeds of any casualty or condemnation event that are reinvested or committed to be reinvested to replace or repair the affected assets within twelve months after the receipt of such proceeds;

(b) 100% of the Net Cash Proceeds received by the Borrower, the Utility or any of their respective subsidiaries from (i) any issuance of debt securities (including the Notes) or other debt for borrowed money (including pursuant to any bank or other credit facility and including the Net Cash Proceeds of any securitization securities or facilities) (other than Excluded Debt (as defined below) and amounts referred to in clause (c) below) (collectively, "**Specified Debt**") and (ii) any issuance of equity securities (including shares of its common stock or preferred equity or equity-linked securities) (other than Excluded Equity Offerings (as defined below)); and

(c) 100% of the committed amount under any Qualifying Bank Financing (as defined below), excluding up to $5,825 million under any Qualifying Bank Financing of the Utility;

*provided*, *however*, that until such time as the Backstop Commitments (as defined in those certain Chapter 11 Plan Backstop Commitment Letters (the "**BCLs**"), as in effect on December 23, 2019) have been reduced to $0, except as contemplated by the proviso to the Excluded Debt definition below, the commitments in respect of the Facility shall not be reduced by any cash proceeds from any Additional Capital Source (as defined in the BCLs, as in

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 27 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 112 of 175

effect on December 23, 2019) to the extent that such cash proceeds also reduce the Backstop Commitments.

Mandatory prepayments or reductions under clause (a) and (b) above, or the proviso to the Excluded Debt definition below, may be applied, at the option of the Borrower, either to prepay loans or reduce commitments under the Facility and that certain senior secured bridge facility of the Utility described in the commitment letter dated as of the date hereof among the Borrower, the Utility, JPMorgan and the other "Commitment Parties" party thereto (such facility, the "**Utility Facility**"), provided that (i) the Borrower may not prepay loans or reduce commitments under the Utility Facility without prepaying or reducing the Facility on a pro rata basis and (ii) Net Cash Proceeds of any Permanent Financing issued and/or incurred by the Borrower shall be applied to prepay loans or reduce commitments under the Facility before being applied to prepay or reduce the Utility Facility. The application of Net Cash Proceeds received by the Utility to prepay or reduce the Facility shall be subject to requisite regulatory approvals (and such Net Cash Proceeds shall be applied to prepay or reduce the Utility Facility to the extent not permitted to be applied to prepay or reduce the Facility). For the avoidance of doubt, each dollar from a mandatory prepayment or reduction event described under this heading shall be applied to reduce either (but not both) of the commitments under the Facility or the commitments under the Utility Facility, or to prepay either (but not both) the loans under the Facility or the loans under the Utility Facility, in each case in accordance with the terms described under this heading.

Furthermore, the obligations of the Commitment Parties to fund on the Closing Date in respect of the Facility under the Commitment Letter or under the Facility Documentation (as applicable) shall be automatically and permanently reduced, without penalty or premium and on a dollar-for-dollar basis, by (without duplication of any of the clauses above) the aggregate principal amount of any roll-over, "take-back" or reinstated debt (the "**Surviving Debt**") of the Borrower, other than the New Utility Funded Debt Exchange Notes, the New Utility Long-Term Notes, the New Utility Short-Term Notes and the debt in respect of the Utility Reinstated Senior Note Claims (each as defined in the Noteholder RSA).

"**Net Cash Proceeds**" shall mean:

(a) with respect to a sale or other disposition of any assets of the Utility, the Borrower or any of their respective subsidiaries, the excess, if any, of (i) the cash actually received in connection therewith (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) payments made to retire any debt that is secured by such asset or that is required to be repaid in connection with the sale thereof (other than

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 28
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
113 of 175

loans under the Facility), (B) the fees and expenses incurred by the Utility, the Borrower or any of their respective subsidiaries in connection therewith, (C) taxes paid or reasonably estimated to be payable in connection with such transaction, (D) the amount of any rebates or credits required to be applied to benefit ratepayers as a result of a reduction in the rate base as a result of the sale or disposition of the 77 Beale Street, San Francisco property or any hydroelectric generation assets; provided that the Facility will provide that not more than $750 million of hydroelectric generation assets may be disposed of, and (E) the amount of reserves established by the Utility, the Borrower or any of their respective subsidiaries in good faith and pursuant to commercially reasonable practices for adjustment in respect of the sale price of such asset or assets in accordance with applicable generally accepted accounting principles; *provided* that if the amount of such reserves exceeds the amounts charged against such reserve, then such excess, upon determination thereof, shall then constitute Net Cash Proceeds;

(b)  with respect to the incurrence, issuance, offering or placement of debt securities or other debt for borrowed money, the excess, if any, of (i) cash actually received by the Utility, the Borrower and their respective subsidiaries in connection with such incurrence, issuance, offering or placement over (ii) the underwriting discounts and commissions and other fees and expenses incurred by the Utility, the Borrower and their respective subsidiaries in connection with such incurrence, issuance, offering or placement; and

(c)  with respect to the issuances of equity interests, the excess of (i) the cash actually received by the Utility, the Borrower and their respective subsidiaries in connection with such issuance over (ii) the underwriting discounts and commissions and other fees and expenses incurred by the Utility, the Borrower or any of their respective subsidiaries in connection with such issuance.

"**Excluded Debt**" shall mean (i) intercompany indebtedness of the Utility, the Borrower or any of their respective subsidiaries, (ii) ordinary-course purchase money indebtedness, facility and equipment financings, other debt incurred in the ordinary course of business for capital expenditures and working capital purposes, financial leases or capital lease obligations, overdraft protection, ordinary course letter of credit facilities, hedging and cash management, and similar obligations, (iii) borrowings under the Revolving Credit Facility up to an aggregate amount not to exceed $500 million, (iv) revolving borrowings under the DIP Facility Credit Agreement (as defined in the Plan) (or refinancings thereof) up to an aggregate amount not to exceed the amount of the revolving commitments in effect thereunder on the date of the Commitment Letter, (v) incremental facilities under the DIP Facility Credit Agreement (or refinancings thereof) or any new debtor-in-possession facilities, in either case that are to be paid in full in cash at emergence from the Chapter 11 Cases, (vi) securitization

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 29 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 114 of 175

securities or facilities and any Designated Permitted Financing, and (vii) issuances of debt by the Utility or its subsidiaries in a principal amount not to exceed $5,825 million and debt or unfunded commitments under a revolving credit facility to be entered into by the Utility in an amount not to exceed $3,500 million, in each case as contemplated by the Plan; *provided* that, notwithstanding the foregoing, if (A) the aggregate principal amount of Specified Debt issued or incurred by the Borrower plus the aggregate principal amount of Excluded Debt issued or incurred by the Borrower pursuant to clause (vi) plus the principal amount of Surviving Debt of the Borrower exceeds $5,000 million, or (B) the aggregate principal amount of Specified Debt issued or incurred by Utility or its subsidiaries plus the aggregate principal amount of Excluded Debt issued or incurred by the Utility or its subsidiaries pursuant to clause (iv), (v), (vi) or (vii), plus the principal amount of Surviving Debt of the Utility or its subsidiaries exceeds $33,350 million, then in either case the commitments with respect to the Facility shall be reduced, or the loans under the Facility shall be prepaid, by an equivalent amount (for the avoidance of doubt, until such commitments or the aggregate principal amount of such loans, in either case, equal zero).

"**Excluded Equity Offerings**" shall mean (i) issuances pursuant to employee compensation plans, employee benefit plans, employee based incentive plans or arrangements, employee stock purchase plans, dividend reinvestment plans and retirement plans or issued as compensation to officers and/or non-employee directors or upon conversion or exercise of outstanding options or other equity awards, (ii) issuances of directors' qualifying shares and/or other nominal amounts required to be held by persons other than PG&E, the Borrower and their respective subsidiaries under applicable law, (iii) issuances to or by a subsidiary of the Borrower to the Borrower or any other subsidiary of the Borrower (including in connection with existing joint venture arrangements), (iv) any equity issued pursuant to the Plan in an aggregate amount not to exceed $9,000 million, (v) any Designated Permitted Financing and (vi) additional exceptions to be agreed.

"**Qualifying Bank Financing**" shall mean a committed but unfunded bank or other credit facility for the incurrence of debt for borrowed money by the Borrower or the Utility that has become effective for the purposes of financing the Transactions (excluding, for the avoidance of doubt, the Facility), subject to conditions to funding that are, in the written determination of the Borrower, no less favorable to the Borrower than the conditions to the funding of the Facility set forth herein.

In addition, with respect to any Included Securitization Transactions, (x) if the proceeds of such Included Securitization Transaction are received, or commitments with respect thereto are entered into, on or prior to the Closing Date, such proceeds or

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 30 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 115 of 175

committed amounts shall be applied as set forth under "Closing Date Securitization Waterfall" below and (y) if the proceeds of such Included Securitization Transaction are received after the Closing Date, then, without duplication of any reduction pursuant to clause (x) above, such proceeds shall be applied to prepay the Facility to the maximum extent permitted by applicable law and regulatory approvals and thereafter shall be applied to prepay the Utility Facility

"**Included Securitization Transaction**" shall mean any securitization transaction of the Borrower, the Utility or its Subsidiaries other than any non-recourse pass-through securitization transaction contemplated by A.B. 1054, 2019 Assemb. (Cal. 2019) (for the avoidance of doubt, non-recourse pass-through securitization transactions shall not include any securitization all or a portion of which is, directly or indirectly, credited, rebated or otherwise paid to customers).

"**Fire Victim Trust Securitization**" shall mean a tax benefits securitization all or a portion of the proceeds of which will be utilized to finance the Fire Victim Trust contemplated by (and as defined in) the Plan.

In addition, the aggregate commitments in respect of the Facility shall be permanently reduced to zero on the Commitment Termination Date.

The Borrower shall provide the Administrative Agent with prompt written notice of any mandatory prepayment or commitment reduction being required hereunder.

Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed.

<u>Closing Date Securitization Waterfall:</u>

On or prior to the Closing Date, the proceeds of all Included Securitization Transactions shall be applied as follows (the "**Closing Date Securitization Waterfall**"):

>*First*, at the Borrower's election, in lieu of (and to reduce) the requirement for Designated Permitted Financing (and the intended use of proceeds thereof) as specified in clause 14 of Annex B, up to $6,000 million to finance a portion of the Transactions*;*

>*Second*, to the extent constituting proceeds of a Fire Victim Trust Securitization, to finance the Fire Victim Trust as contemplated by the Plan, up to $1,350 million;

>*Third*, to reduce commitments under the Facility on a dollar-for-dollar basis in accordance with the Mandatory Prepayments and Commitment Reductions section above, up to $2,000 million;

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 31
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
116 of 175

*Fourth*, to be deposited as cash on the balance sheet of the Borrower, the Utility or its Subsidiaries on the Closing Date, up to $650 million;

*Thereafter*, as the Borrower shall direct (but, for the avoidance of doubt, with no reduction to the minimum equity requirement, as specified in clause 13 of Annex B).

Voluntary Prepayments and Reductions in Commitments:

Prepayments of borrowings under the Facility will be permitted at any time, in whole or in part and in minimum principal amounts to be agreed upon, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. The Borrower may voluntarily reduce unutilized portions of the commitments under the Facility at any time without penalty.

Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed.

Documentation:

The making of the loans under the Facility will be governed by definitive loan and related agreements and documentation (collectively, the "**Facility Documentation**" and the principles set forth in this paragraph, the "**Documentation Principles**") to be negotiated in good faith, which will be based on the Borrower's Second Amended and Restated Credit Agreement, dated as of April 27, 2015, among the Borrower, the financial institutions from time to time party thereto and Bank of America, N.A., as administrative agent (as amended from time to time prior to the date hereof, the "**Pre-Petition Credit Agreement**"). The Facility Documentation will contain only those representations and warranties, affirmative and negative covenants, mandatory prepayments and commitment reductions, and events of default expressly set forth in the Commitment Letter (including this Annex A). The Facility Documentation shall include modifications to the Pre-Petition Credit Agreement (a) as are necessary to reflect the terms set forth in the Commitment Letter (including this Annex A) and the Fee Letter, (b) to reflect any changes in law or accounting standards since the date of the Pre-Petition Credit Agreement, (c) to reflect the operational or administrative requirements of the Administrative Agent and operational requirements of the Borrower and its subsidiaries, (d) to reflect the nature of the Facility as a bridge facility, (e) to reflect the Borrower's pro forma capital structure, (f) to reflect certain provisions in the DIP Facility Credit Agreement to be agreed and (g) to reflect the terms of the Plan.

Representations and Warranties:

The Facility Documentation will contain only the following representations and warranties, which shall be made on the effectiveness of the Facility Documentation (the "**Facility**

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 32 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 117 of 175

**Documentation Effective Date**") and on the Closing Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): financial condition, no change, existence; compliance with law; power; authorization; enforceable obligations; no legal bar; litigation; no default; taxes; federal regulations; ERISA; investment company act and other regulations; use of proceeds; environmental matters; no EEA financial institution; regulatory matters; solvency (after giving effect to the Transactions, with "solvency" to be defined consistent with the solvency certificate attached hereto as Annex B-1); full disclosure; beneficial ownership certification; anti-corruption and sanctions; ownership of property; subsidiaries; and intellectual property.

<u>Conditions to Borrowing on the Closing Date</u>:

The borrowing under the Facility on the Closing Date will be subject to the conditions expressly set forth in Annex B to the Commitment Letter (the "**Funding Conditions**").

<u>Affirmative Covenants</u>:

The Facility Documentation will contain only the following affirmative covenants, which shall become effective on the Facility Documentation Effective Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): financial statements, certificates and other information, payment of taxes, maintenance of existence, compliance, maintenance of property, insurance, inspection of property, books and records, discussions, notices, maintenance of licenses, and maintenance of ratings (but, for the avoidance of doubt, not any particular rating).

<u>Negative Covenants</u>:

The Facility Documentation will contain only the following negative covenants, which shall become effective on the Facility Documentation Effective Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): liens (which shall permit a lien on the stock of the Utility securing the Permanent Financing to the extent the Facility is secured on an equal and ratable basis with the Permanent Financing), fundamental changes, debt (with exceptions to be agreed, including debt for borrowed money of the Borrower (including the Facility and the Permanent Financing) not to exceed $5,000 million and the Revolving Credit Facility and debt for borrowed money of the Utility and its subsidiaries not to exceed $33,350 million and a revolving credit facility in an amount not to exceed $3,500 million); ownership of 100% of the common stock of the Utility; no limitations on dividends or payment from the Utility to the Borrower; change in the nature of business; investments; restricted payments; affiliate transactions; prepayments or modifications of junior debt, modifications of organizational documents, sale leaseback transactions, swap agreements, and change of fiscal year.

<u>Financial Covenants</u>:

Subject to the Documentation Principles, maintenance of a

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 33
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
118 of 175

maximum Consolidated Capitalization Ratio of less than or equal to 0.70 to 1.00, calculated in accordance with (and capitalized terms to have the meaning set forth in) the Pre-Petition Credit Agreement.

Events of Default:

The Facility Documentation will contain only the following events of default, which shall be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): nonpayment of principal when due; nonpayment of interest or other amounts after a grace period of five business days; material inaccuracy of representations and warranties; Facility Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period of 30 days); cross-default with respect to material indebtedness (including, for the avoidance of doubt, material indebtedness of the Utility); bankruptcy events (from and after the Closing Date); certain ERISA events; material judgments; and a change of control (to be defined in a manner to be agreed).

Voting:

Subject to the Documentation Principles and based on the Pre-Petition Credit Agreement.

Cost and Yield Protection:

Usual and customary for facilities and transactions of this type, including customary tax gross-up provisions (including but not limited to provisions relating to Dodd-Frank and Basel III), but subject to the Documentation Principles and based on the Pre-Petition Credit Agreement.

Assignments and Participations:

Subject to the Documentation Principles and based on the Pre-Petition Credit Agreement as follows:

Prior to the Closing Date, the Lenders will not be permitted to assign commitments under the Facility to any Person except in accordance with the terms of the syndication provisions in the Commitment Letter.

From and after the Closing Date, the Lenders will be permitted to assign loans under the Facility to eligible assignees subject to the consent of the Borrower (not to be unreasonably withheld or delayed); *provided* that no such consent shall be required with respect to any assignment (x) to a Lender, an affiliate of a Lender or an approved fund, (y) to an Approved Lender or (z) if a payment or bankruptcy (from and after the Closing Date) event of default shall have occurred and be continuing; *provided*, *further*, that such consent shall be deemed to have been given if the Borrower shall not have responded to a written request for consent within 10 business days. All assignments shall require the consent of the Administrative Agent (not to be unreasonably withheld or delayed). Each assignment shall be accompanied by the payment of a $3,500 assignment processing fee to the Administrative Agent (which fee may be waived by the Administrative Agent in its sole discretion).

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 34
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
119 of 175

Lenders may sell participations without the consent of any person, so long as any such participation does not create rights in participants to approve amendments or waivers, except in respect of certain customary matters consistent with the Pre-Petition Credit Agreement.

Defaulting Lenders:

The Facility Documentation will contain customary "defaulting Lender" provisions, including the suspension of voting rights and rights to receive certain fees, and the termination or assignment of commitments or loans of defaulting Lenders; *provided* that such provisions shall be subject to the Documentation Principles and be based on the Pre-Petition Credit Agreement.

Expenses and Indemnification:

Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrower shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Arrangers associated with the syndication of the Facility and the preparation, execution, delivery and administration of the Facility Documentation and any amendment or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel, one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel, subject to the Counsel Limitations) in connection with the enforcement of the Facility Documentation.

The Administrative Agent, the Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence, bad faith or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Facility Documentation or (z) disputes among Lenders not arising from the Company's breach of its obligations under the Facility Documentation (other than a dispute involving a claim against an indemnified party for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Facility, except, with respect to this clause (z), to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such indemnified party in such capacity)).

| | |
|---|---|
| <u>Governing Law and Forum</u>: | New York. |
| <u>Arranger's and Administrative Agent's Counsel</u>: | Davis Polk & Wardwell LLP. |
| <u>Miscellaneous</u>: | The Facility Documentation will contain customary European Union "bail-in" provisions and customary provisions pertaining to division of limited liability companies and the QFC stay rules.  The Lenders will provide customary representations as to their fiduciary status under ERISA. |

Interest Rates:                    The interest rates under the Facility will be, at the option
                                   of the Borrower, (a) Adjusted LIBO Rate plus the
                                   Applicable Adjusted LIBO Rate Margin (each as defined
                                   below) or (b) ABR (as defined below) plus the
                                   Applicable Adjusted LIBO Rate Margin minus 1.00%
                                   (but in any event not less than 0.00%).

                                   The Borrower may elect interest periods of 1, 2, 3 or 6
                                   months for Adjusted LIBO Rate borrowings. Calculation
                                   of interest shall be on the basis of the actual number of
                                   days elapsed in a year of 360 days (or 365 or 366 days, as
                                   the case may be, in the case of ABR loans based on the
                                   prime rate) and interest shall be paid in arrears (i) at the
                                   end of each interest period and no less frequently than
                                   quarterly, in the case of Adjusted LIBO Rate advances,
                                   and (ii) quarterly, in the case of ABR advances.

                                   "**ABR**" is the Alternate Base Rate, which is the greatest
                                   of (i) the Prime Rate, (ii) the NYFRB Rate from time to
                                   time plus 0.5% and (iii) the Adjusted LIBO Rate for a
                                   one month interest period on the applicable date plus 1%.

                                   "**Adjusted LIBO Rate**" means the LIBO Rate, as
                                   adjusted for statutory reserve requirements for
                                   eurocurrency liabilities.

                                   "**Interpolated Rate**" means, at any time, for any interest
                                   period, the rate *per annum* (rounded to the same number
                                   of decimal places as the LIBO Screen Rate) determined
                                   by the Administrative Agent (which determination shall
                                   be conclusive and binding absent manifest error) to be
                                   equal to the rate that results from interpolating on a linear
                                   basis between: (a) the LIBO Screen Rate for the longest
                                   period (for which the LIBO Screen Rate is available) that
                                   is shorter than the Impacted Interest Period; and (b) the
                                   LIBO Screen Rate for the shortest period (for which that
                                   LIBO Screen Rate is available) that exceeds the Impacted
                                   Interest Period, in each case, at such time; *provided* that
                                   if any Interpolated Rate as so determined would be less
                                   than zero, such rate shall be deemed to be zero for the
                                   purposes of the Facility Documentation.

                                   "**LIBO Rate**" means, with respect to any Eurodollar
                                   borrowing and for any interest period, the LIBO Screen
                                   Rate at approximately 11:00 a.m., London time, two
                                   business days prior to the commencement of such interest
                                   period; *provided* that if the LIBO Screen Rate shall not be
                                   available at such time for such interest period (an
                                   "**Impacted Interest Period**") then the LIBO Rate shall
                                   be the Interpolated Rate.

                                   "**LIBO Screen Rate**" means, for any day and time, with

#92905522v3
[[DMS:5282254v2:02/27/2020–06:07 PM]]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 37
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
122 of 175

respect to any Eurodollar borrowing for any interest period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal in length to such interest period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); *provided* that if the LIBO Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"**NYFRB**" means the Federal Reserve Bank of New York.

"**NYFRB Rate**" means, for any day, the greater of (i) the Federal Funds Effective Rate in effect on such day and (ii) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a business day, for the immediately preceding business day); *provided* that if none of such rates are published for any day that is a business day, the term "NYFRB Rate" means the rate quoted for such day for a federal funds transaction at 11:00 a.m., New York City time, on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; *provided*, *further*, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of the Facility Documentation.

"**Overnight Bank Funding Rate**" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as an overnight bank funding rate.

"**Prime Rate**" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 38
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
123 of 175

quoted therein, any similar rate quoted therein (as determined reasonably and in good faith by the Administrative Agent) or in any similar release by the Federal Reserve Board (as determined reasonably and in good faith by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

LIBO Rate Replacement:

The Facility Documentation shall contain customary provisions for the replacement of the LIBO Rate.

Applicable Adjusted LIBO Rate Margin:

| **Public Debt Rating**[2] | BB+/Ba1 | BB/Ba2 | BB-/Ba3 | B+/B1 **or worse** |
|---|---|---|---|---|
| Closing Date until 89 days following the Closing Date | 1.75% | 2.00% | 2.125% | 2.25% |
| 90th day following the Closing Date until 179th day following the Closing Date | 2.00% | 2.25% | 2.375% | 2.50% |
| 180th day following the Closing Date until 269th day following the Closing Date | 2.25% | 2.50% | 2.625% | 2.75% |
| From the 270th day following the Closing Date | 2.50% | 2.75% | 2.875% | 3.00% |

Default Rate:

At any time when the Borrower is in default in the payment of any amount of principal due under the Facility, the overdue amount shall bear interest at 2% above the rate otherwise applicable thereto. Overdue interest, fees and

---

[2]Based on public ratings from S&P and Moody's for senior unsecured, long-term indebtedness for borrowed money of the Borrower that is not guaranteed by any other person or subsidiary and not supported by any other credit enhancement (the "Public Debt Rating"). Split ratings to be handled consistently with the Pre-Petition Credit Agreement except that if the rating differential is 2 levels or more, the rating level that would apply at the rating one level below the higher rating shall apply.

other amounts shall bear interest at 2% above the rate applicable to ABR loans.

Ticking Fees:

Ticking fees ("**Ticking Fee**") equal to 0.30% per annum times the actual daily undrawn commitments under the Facility (as such amounts shall be adjusted to give effect to any voluntary or mandatory reductions of the commitments in accordance with the terms hereof) will accrue during the period commencing on the date that is the later of the Facility Documentation Effective Date and January 9, 2020 and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments under the Facility, for the account of each Lender in arrears quarterly and on the earlier of the Closing Date and the date of termination of the commitments under the Facility.

Duration Fees:

The Borrower will pay a fee (the "**Duration Fee**"), for the ratable benefit of the Lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans under the Facility outstanding on the date which is 90 days after the Closing Date, due and payable in cash on such 90th day (or if such day is not a business day, the next business day); (ii) 0.75% of the aggregate principal amount of the loans under the Facility outstanding on the date which is 180 days after the Closing Date, due and payable in cash on such 180th day (or if such day is not a business day, the next business day); and (iii) 1.00% of the aggregate principal amount of the loans under the Facility outstanding on the date which is 270 days after the Closing Date, due and payable in cash on such 270th day (or if such day is not a business day, the next business day).

**$5,000 Million Senior Unsecured 364-Day Facility**
**Conditions**[3]

The borrowing under the Facility shall be subject to the satisfaction or waiver by the Commitment Parties of the following conditions:

1.      (a) The Bankruptcy Court shall have entered (x) the Approval Order, (y) the Noteholder RSA Approval Order and (z) a confirmation order confirming the Plan with respect to the Debtors in form and substance reasonably satisfactory to the Required Commitment Parties (the "**Confirmation Order**") by no later than June 30, 2020, each of which shall (i) not be stayed, (ii) be in full force and effect, (iii) be final and non-appealable, and (iv) not have been reversed, vacated, amended, supplemented, or otherwise modified in a manner adverse to the interests of the Commitment Parties without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed; *provided* modifications to the Plan solely as a result of an increase in roll-over, "take-back" or reinstatement of any existing debt of the Debtors shall be deemed not to be adverse to the Commitment Parties for the purposes of this clause (iv)), (b) none of the Plan, the Confirmation Order or the Approval Order shall have been amended or modified or any condition contained therein waived, in either case without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), (c) the Plan shall have become effective in accordance with its terms no later than 60 days after the entry of the Confirmation Order, and all conditions precedent to the effectiveness of the Plan shall have been, or substantially contemporaneously with the closing under the Facility, will be, satisfied or waived (to the extent adverse to their interests, with the prior consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed)), (d) the transactions as described and defined in the Plan to occur upon the Effective Date of the Plan shall have been consummated, or substantially concurrently with the closing of the Facility will be consummated, on the Closing Date, (e) the Debtors shall be in compliance in all material respects with the Confirmation Order and (f) all documents necessary to implement the Plan and the financings and distributions contemplated thereunder shall have been executed (each of which shall either (x) not be adverse to the interests of the Commitment Parties or (y) be in form and substance reasonably acceptable to the Required Commitment Parties).

2.      (x) The Arrangers shall have received (a) U.S. GAAP audited consolidated balance sheets and related consolidated statements of income and comprehensive income, of shareholders' equity and of cash flows of the Borrower and its subsidiaries for the three most recent fiscal years ended at least 60 days prior to the Closing Date and (b) U.S. GAAP unaudited consolidated balance sheets and related consolidated statements of income and comprehensive income, of shareholders' equity and of cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter ended at least 40 days before the Closing Date (other than the last fiscal quarter of any fiscal year); *provided* that in each case the financial statements required to be delivered by this paragraph 2(x) shall meet the requirements of Regulation S-X under the Securities Act, and all other accounting rules and regulations of the SEC promulgated thereunder applicable to a registration statement on Form S-1, in all material respects. The Arrangers hereby acknowledge receipt of the financial statements of PG&E in the foregoing clause (a) for the fiscal years ended December 31, 2018, December 31, 2017 and December 31, 2016, and in the foregoing clause (b) for the fiscal quarters ended June 30, 2019 and March 31, 2019. The Borrower's filing of any required audited financial statements with respect to the Borrower on Form 10-K or required unaudited

---

[3] All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Annex B is attached, including Annex A thereto.

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 41 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 126 of 175

financial statements with respect to the Borrower on Form 10-Q, in each case, will satisfy the requirements under clauses (a) or (b), as applicable, of this paragraph.

(y) The Arrangers shall have received a pro forma consolidated balance sheet and a related pro forma consolidated statement of income of the Borrower and its subsidiaries (based on the financial statements referred to in paragraph above) as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 40 days before the Closing Date, or, if the most recently completed fiscal period is the end of a fiscal year, ended at least 60 days before the Closing Date (regardless of when such pro forma financial statements may be required to be filed with the SEC), prepared after giving effect to the Transactions (including, to the extent required by applicable accounting standards, the application of fresh start accounting) as if they had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such other statement of income) which shall meet the requirements of Regulation S-X under the Securities Act and all other accounting rules and regulations of the SEC promulgated thereunder applicable to a registration statement on Form S-1, in all material respects; *provided*, *however*, to the extent such pro forma financial statements are filed by the Borrower with the SEC, the condition set forth in this paragraph (y) shall be deemed satisfied.

3.     The representations and warranties in the Facility Documentation shall be true and correct in all material respects (provided, that any such representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be accurate in all respects and that any such representation or warranty that specifically refers to an earlier date shall be true and correct in all material respects (or in all respects, as the case may be) as of such earlier date) and no default or event of default shall be in existence at the time of, or after giving effect to the making of, the making of loans to the Borrower on the Closing Date.

4.     The execution and delivery by the Borrower of the Facility Documentation consistent with the terms set forth or referred to in this Commitment Letter (but taking into account the market flex provisions set forth in the Fee Letter) shall have occurred.

5.     The Administrative Agent shall have received customary legal opinions of counsel to the Borrower, corporate organizational documents of the Borrower, a good standing certificate of the Borrower from the jurisdiction of organization of the Borrower, resolutions and a customary closing certificate of the Borrower, and a customary borrowing notice, in each case as are customary for transactions of this type (collectively, the "**Closing Deliverables**").

6.     The Administrative Agent shall have received a solvency certificate from the chief financial officer of the Borrower in substantially the form of Annex B-I hereto.

7.     The Arrangers and the Lenders shall have received all fees and, to the extent invoiced at least three business days prior to the Closing Date, expenses required to be paid on or prior to the Closing Date pursuant to the Fee Letter or the Facility Documentation.

8.     The Commitment Parties shall have received, at least three business days prior to the Closing Date (to the extent requested in writing at least ten business days prior to the Closing Date), all documentation and other information with respect to the Borrower that the Commitment Parties reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and, to the extent applicable, the Beneficial Ownership Regulation.

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 42
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
127 of 175

9.     The Utility shall have received investment grade senior secured debt ratings of (i) in the case of Moody's, Baa3 or better and (ii) in the case of S&P, BBB- or better and in each case, with a stable or better outlook.

10.     Total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 as approved by the CPUC shall be no less than 95% of $48 billion.

11.     Since June 30, 2019, no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Commitment Letter or the Plan or perform their obligations hereunder or thereunder, including their obligations under the Facility or the Utility Facility (each a "**_Material Adverse Effect_**") shall have occurred; _provided_, _however_, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur: (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy, (B) results, occurrences, facts, changes, events, violations, inaccuracies or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 Structures in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect, and (II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized.

12.     The Debtors' aggregate liability with respect to Fire Claims shall be determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Fire Claims, or (iii) through a combination thereof) not to exceed the Fire Claims Cap.

13.     PG&E shall have received at least $9,000 million of proceeds from the issuance of equity, on terms acceptable to each Commitment Party in its sole discretion. The economic benefit of the net operating loss carryforwards and other tax attributes of the Borrower, the Utility or its subsidiaries shall not have been transferred (pursuant to a tax monetization transaction or otherwise) except on terms that could not reasonably be expected to negatively impact the cash flows of the Borrower, the Utility or its subsidiaries as determined by the Arrangers in their sole discretion.

#92905522v3
[[DMS:5282254v2:02/27/2020--06:07 PM]]

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 43
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
128 of 175

14. The Utility shall have received at least $6,000 million of proceeds from any issuance of debt securities or other debt for borrowed money (including pursuant to any bank or other credit facility and any securitization securities or facilities) or any issuance of equity securities (including shares of its common stock or preferred equity or equity-linked securities), in any case on terms acceptable to each Commitment Party in its sole discretion (the "Designated Permitted Financing"), provided that if such Designated Permitted Financing is an Included Securitization Transaction, it is applied in lieu of (and to reduce) the requirement under this paragraph in compliance with the Closing Date Securitization Waterfall set forth in Annex A.

15. The Utility has both (i) elected, and received Bankruptcy Court approval, to participate in the Go-Forward Wildfire Fund (as defined in the Plan) and (ii) satisfied the other conditions to participation in the Go-Forward Wildfire Fund set forth in the Wildfire Legislation (as defined in the Plan).

16. PG&E shall own directly 100% of the common stock of the Utility.

17. No order of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation or funding of any transactions contemplated by the Plan shall have been received by the Debtors, and no law, statute, rule, regulation or ordinance shall have been adopted that makes the consummation or funding of any transactions contemplated by the Plan illegal or otherwise prohibited. The Utility shall have delivered to the Arrangers a financial model satisfactory to the Arrangers reflecting sources and uses and capital structure, together with a certification by the Utility that such financial model demonstrates compliance with all regulatory requirements (including all CPUC approvals).

18. One or more investment banks reasonably satisfactory to the Commitment Parties shall have been engaged to publicly sell or privately place the Notes for the purpose of reducing, replacing or refinancing the Facility.

Case: 19-30088    Doc# 6013-4    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 44
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
129 of 175

**Form of Solvency Certificate**

[DATE]

This Solvency Certificate ("**Certificate**") of [_____] ("**the Borrower**"), and its Subsidiaries is delivered pursuant to Section [__] of the $[_____] Senior Unsecured Term Loan Credit Agreement, dated as of [_____] (the "**Credit Agreement**"), by and among the Borrower, the Lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent. Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

I, [_____], the duly elected, qualified and acting [Chief Financial Officer] of the Borrower and its Subsidiaries, DO HEREBY CERTIFY that I have reviewed the Credit Agreement and the other Loan Documents referred to therein and have made such investigation as I have deemed necessary to enable me to express a reasonably informed opinion as to the matters referred to herein.

I HEREBY FURTHER CERTIFY, in my capacity as [Chief Financial Officer] and not in my individual capacity, that as of the date hereof, immediately after giving effect to the Transactions:

1.      The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise.

2.      The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business.

3.      The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business.

4.      The Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the date hereof, would reasonably be expected to become an actual and matured liability.

For the purpose of the foregoing, I have assumed there is no default under the Credit Agreement on the date hereof and will be no default under the Credit Agreement after giving effect to the funding under the Credit Agreement.

[Remainder of page intentionally left blank]

Case: 19-30088   Doc# 6013-4   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 45 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 130 of 175

**EXHIBIT E**
**Conformed Copy of Utility Debt Commitment Letter**

**JPMORGAN CHASE BANK, N.A.**
383 Madison Avenue
New York, New York 10179

**BANK OF AMERICA, N.A.**
**BofA SECURITIES, INC.**
One Bryant Park
New York, NY 10036

**BARCLAYS**
745 Seventh Avenue
New York, NY 10019

**CITIGROUP GLOBAL MARKETS INC.**
388 Greenwich Street
New York, NY 10013

**GOLDMAN SACHS BANK USA**
**GOLDMAN SACHS LENDING PARTNERS LLC**
200 West Street
New York, NY 10282

<u>**PERSONAL AND CONFIDENTIAL**</u>

October 4, 2019

PG&E Corporation
Pacific Gas and Electric Company
77 Beale Street
P.O. Box 77000
San Francisco, California 94177
Attention:     Nicholas M. Bijur

**Pacific Gas and Electric Company**
<u>**Commitment Letter**</u>

Ladies and Gentlemen:

Reference is hereby made to (i) the Chapter 11 bankruptcy cases, jointly administered under lead case number 19-30088 (the "**Chapter 11 Cases**"), currently pending before the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), in which PG&E Corporation, a California corporation (or any domestic entity formed to hold all of the assets of PG&E upon emergence from bankruptcy) ("**PG&E**"), and Pacific Gas and Electric Company, a California corporation (the "**Utility**") (together with any domestic entity formed to hold all of the assets of the Utility upon emergence from bankruptcy, the "**Borrower**" and together with PG&E, the "**Debtors**" or "**you**"), are debtors and debtors in possession and (ii) the joint Chapter 11 plan of reorganization filed by the Debtors and the shareholder proponents with the Bankruptcy Court on December 12, 2019 at ECF No. 5101 (as may be further amended, modified or otherwise changed in accordance with this Commitment Letter, the "**Plan**") to implement the terms and conditions of the reorganization of the Debtors as provided therein. Capitalized terms used and not defined in this letter (together with Annexes A and B hereto, this "**Commitment Letter**") have the meanings assigned to them in Annexes A and B hereto as the context may require.  JPMorgan, Bank of America, N.A. ("**BANA**"), BofA Securities, Inc. (or any of its designated affiliates, "**BofA**", and together with BANA, "**Bank of America**"), Barclays Bank PLC ("**Barclays**"), Citigroup Global Markets Inc. on behalf of Citi (as defined below), Goldman Sachs Bank USA ("**GS Bank**"), Goldman Sachs Lending Partners LLC ("**GSLP**", and together with GS Bank, "**Goldman Sachs**") and any other Lenders that become parties to this Commitment Letter as additional

"Commitment Parties" as provided in Section 3 hereof (including those entities listed in Schedule I attached hereto) are referred to herein, collectively, as the "**Commitment Parties**," "**we**" or "**us**."

You have informed us that, in connection with the consummation of the transactions contemplated by the Plan, the Borrower intends to (a) enter into a new revolving credit facility in an aggregate committed amount of $3,500 million (the "**Revolving Credit Facility**") and (b) issue senior secured notes pursuant to a registered public offering or Rule 144A or other private placement (the "**Notes**"). In connection therewith, the Borrower desires to enter into a $5,825 million senior secured bridge loan facility (the "**Facility**") having the terms and subject to the conditions set forth herein and in the Annexes hereto, to be available in the event that the Notes are not issued on or prior to the Closing Date (as defined in Annex A) for any reason.

The transactions described in the preceding paragraphs are collectively referred to herein as the "**Transactions**."

For purposes of this Commitment Letter, "**Citi**" shall mean Citigroup Global Markets Inc., Citibank N.A., Citicorp USA, Inc., Citicorp North America, Inc. and/or any of their affiliates as any of them shall determine to be appropriate to provide the services contemplated herein.

1.    **Commitments; Titles and Roles**.

(a) (i) Each of JPMorgan, BofA, Barclays, Citi and GS Bank is pleased to confirm its agreement to act, and you hereby appoint each of JPMorgan, BofA, Barclays, Citi and GS Bank to act, as a joint lead arranger and joint bookrunner (in such capacities, the "**Arrangers**") and, except in the case of JPMorgan, co-syndication agent in connection with the Facility and (ii) each other Commitment Party accepts, on its own behalf or on behalf of its designated affiliate, the title(s) agreed to by the Borrower in writing and set forth adjacent to its name on Schedule I attached hereto under the heading "Title(s)"; (b) JPMorgan is pleased to confirm its agreement to act, and you hereby appoint JPMorgan to act, as administrative agent and collateral agent (the "**Administrative Agent**") for the Facility; and (c) each of JPMorgan, BANA, Barclays, Citi, GSLP and GS Bank (in such capacity, the "**Initial Lenders**") and each other Commitment Party is pleased to commit, and hereby commits, on a several and not joint basis, to provide the Borrower a portion of the aggregate principal amount of the Facility equal to the principal amount set forth adjacent to its name on Schedule II attached hereto under the heading "Commitment" on the terms contained in this Commitment Letter and subject to the conditions expressly set forth in Annex B hereto; *provided* that the amount of the Facility shall be automatically reduced as provided under "Mandatory Prepayments and Commitment Reductions" in Annex A hereto with any such reduction to be applied pro rata among the Initial Lenders.   It is further agreed that JPMorgan will appear on the top left (and the Arrangers, other than JPMorgan, will appear in alphabetical order immediately to the right thereof) of the cover page of any marketing materials for the Facility and will hold the roles and responsibilities conventionally understood to be associated with such name placement. Our fees for our commitment and for services related to the Facility are set forth in a separate fee letter (as amended, restated or otherwise modified from time to time in accordance with the terms thereof, the "**Fee Letter**") entered into by you and the Commitment Parties on the date hereof.   It is agreed that no other agents, co-agents, arrangers, co-arrangers or bookrunners will be appointed and no other titles will be awarded in connection with the Facility, and no compensation will be paid in order to obtain such person's commitment to participate in the Facility (other than the compensation expressly contemplated by this Commitment Letter and the Fee Letter) in connection with the Facility, unless the Arrangers and you shall so agree; provided, however, that you may award agent (other than administrative agent and co-syndication agent) and similar titles to any additional Commitment Party that becomes a Commitment Party hereunder in accordance with the second paragraph of Section 3 hereof; provided, further, for the avoidance of doubt, no additional Commitment Party shall receive a bookrunner title.

2

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 3 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 133 of 175

You agree that JPMorgan may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC.

2. **Conditions Precedent**.

Notwithstanding anything to the contrary in this Commitment Letter, the Fee Letter or any other agreement or other undertaking concerning the financing of the Transactions, (a) the Commitment Parties' commitments and agreements hereunder with respect to the Facility are subject solely to the satisfaction or waiver of the conditions expressly set forth in Annex B hereto and (b) the terms of the Facility Documentation shall be in a form such that they do not impair the availability of the Facility on the Closing Date if the conditions described in the immediately preceding clause (a) are satisfied.

3. **Syndication**.

The Arrangers reserve the right, in accordance with the provisions of this Section 3, prior to or after the Closing Date, to syndicate the Facility to the Lenders (as defined in Annex A). The syndication of the Facility, including determinations as to the timing of offers to prospective Lenders, the selection of Lenders, the acceptance and final allocation of commitments, the awarding of titles or roles to any Lenders and the amounts offered and the compensation provided to each Lender from the amounts to be paid to the Arrangers pursuant to the terms of this Commitment Letter and the Fee Letter, will be conducted by the Arrangers in consultation with the Borrower. Notwithstanding the foregoing, during the period commencing on the date hereof and ending November 20, 2019 (the "**Initial Syndication Period**"), the Facility will be syndicated only to those financial institutions approved by you in writing prior to the date hereof or other financial institutions as may be approved by you in your sole discretion (such financial institutions, collectively, the "**Approved Lenders**"). Following the Initial Syndication Period, if and for so long as a Successful Syndication (as defined in the Fee Letter) has not been achieved, the syndication of the Facility shall be conducted by the Arrangers in consultation with the Borrower. Following the achievement of a Successful Syndication of the Facility, further assignments and commitments shall be in accordance with the section captioned "Assignments and Participations" in the Term Sheet attached hereto as Annex A.

The aggregate commitments of the Commitment Parties with respect to the Facility shall be reduced dollar-for-dollar (and on a pro rata basis) by the amount of each commitment for the Facility received from additional Lenders selected in accordance with the preceding paragraph to the extent such Lender becomes (a) party to this Commitment Letter as an additional "Commitment Party" pursuant to a customary joinder agreement or other documentation reasonably satisfactory to the Arrangers and you (each, a "**Joinder Agreement**") or (b) party to the Facility Documentation as a Lender; *provided* that any reduction of Goldman Sachs's commitments under the Facility in accordance with the previous sentence or as a result of a reduction of the overall commitments of GSLP and GS Bank, each in its capacity as an Initial Lender, pursuant to the terms of this Commitment Letter shall be allocated between GSLP's and GS Bank's respective commitments as determined by GSLP and GS Bank in their sole discretion. Notwithstanding the Arrangers' right to syndicate the Facility and receive commitments with respect thereto, and except as provided in the immediately preceding sentence, (i) no Commitment Party shall be relieved, released or novated from its obligations hereunder (including its obligation to fund the Facility on the Closing Date) in connection with any syndication, assignment or participation of the Facility, including its commitment in respect thereof, until after the initial funding of the Facility on the Closing Date has occurred, (ii) no assignment or novation shall become effective with respect to all or any portion of the Commitment Parties' commitments in respect of the Facility until the initial funding of the Facility on the Closing Date and (iii) unless you otherwise agree in writing, each Commitment Party shall retain exclusive control over all rights and obligations with respect to its commitments in respect of the Facility,

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 4 of 45

Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 134 of 175

including all rights with respect to consents, modifications, supplements, waivers and amendments, until the initial funding of the Facility on the Closing Date has occurred.

To facilitate an orderly and successful syndication of the Facility, you agree that, until the earlier of (a) the achievement of a Successful Syndication (as defined in the Fee Letter) and (b) 60 days following the Closing Date (such earlier date, the "**Syndication Date**"), PG&E and the Borrower will not syndicate or issue, attempt to syndicate or issue or announce the syndication or issuance of any competing debt facility or any debt or equity security (other than common equity) of PG&E, the Borrower or any of their respective subsidiaries that would reasonably be expected to materially impair the primary syndication of the Facility, in each case without the prior written consent of the Arrangers (such consent not to be unreasonably withheld, delayed or conditioned), other than (i) the Facility, (ii) the Notes, (iii) the Revolving Credit Facility, (iv) incremental facilities under the Borrower's current debtor-in-possession credit agreement or any new debtor-in-possession facilities, in either case that are to be paid in full in cash at emergence from the Chapter 11 Cases, (v) securitization securities or facilities contemplated by the Plan, (vi) ordinary-course purchase money indebtedness, facility and equipment financings, other debt incurred in the ordinary course of business for capital expenditures and working capital purposes, financial leases or capital lease obligations, overdraft protection, ordinary course letter of credit facilities, hedging and cash management, and similar obligations, (vii) roll-over, "take-back" or reinstated debt contemplated by the Plan and (viii) common and preferred equity issued in accordance with the Plan in satisfaction of claims.

Without limiting your obligations to assist with the syndication efforts as set forth herein, it is understood that the Commitment Parties' commitments hereunder are not conditioned upon the syndication of, or receipt of commitments in respect of, the Facility and in no event shall the commencement or successful completion of syndication of the Facility constitute a condition to the availability of the Facility on the Closing Date.

Until the Syndication Date, you agree to actively assist the Arrangers in achieving a syndication satisfactory to you and us. Such assistance shall include (a) your use of commercially reasonable efforts to ensure that the Arrangers' syndication efforts benefit from your and your affiliates' existing lending relationships, (b) your using commercially reasonable efforts to assist in the preparation of one or more information packages for the Facility in form and substance customary for transactions of this type regarding the business, operations, financial projections and prospects of the Borrower (after giving effect to the Transactions) (collectively, the "**Confidential Information Memorandum**"), (c) your using commercially reasonable efforts to obtain, as promptly as practicable prior to the launch of the syndication of the Facility, a Public Debt Rating for the Borrower from each of Moody's Investor Services, Inc. ("**Moody's**") and Standard & Poor's Financial Services LLC ("**S&P**"), in each case giving effect to the Transactions, (d) your executing and delivering one or more Joinder Agreements delivered to you in respect of prospective Lenders which are selected in accordance with the provisions of this Section 3, as soon as reasonably practicable following commencement of syndication of the Facility, (e) the presentation of one or more customary information packages for the Facility in format and content reasonably satisfactory to the Arrangers (collectively, the "**Lender Presentation**") in a reasonable number of meetings at reasonable times and locations mutually agreed upon and (f) arranging for direct contact between senior management and representatives, with appropriate seniority and expertise, of the Borrower with prospective Lenders and participation of such persons in a reasonable number of meetings at reasonable times and locations mutually agreed upon. In connection with the Arrangers' syndication efforts, you shall not be required to provide information the disclosure of which would violate any (i) attorney-client privilege (and you shall not be required to waive any such privilege), (ii) law, rule or regulation applicable to the Borrower or its affiliates or (iii) obligation of confidentiality from a third party binding on you or your affiliates (so long as (x) such confidentiality obligation was not entered into in contemplation of the Transactions, (y) you use commercially reasonable efforts to obtain a waiver of

[[5287441v.1]]

such confidentiality obligation (but not attorney-client privilege) and to otherwise provide such information that does not violate such confidentiality obligations and (z) you provide the Commitment Parties notice that information is being withheld due to the existence of such confidentiality obligation or attorney-client privilege); *provided* that none of the foregoing shall be construed to limit any of your representations and warranties set forth in Section 4 of this Commitment Letter (and any corresponding representation in the Confidential Information Memorandum or the Facility Documentation, as applicable). The Borrower will be solely responsible for the contents of any such Confidential Information Memorandum and Lender Presentation (other than, in each case, any information contained therein that has been provided for inclusion by the Commitment Parties about the Commitment Parties) and all other written information, documentation or materials delivered to the Commitment Parties by or on behalf of the Borrower in connection therewith (collectively, the "**Information**") and the Borrower acknowledges that the Commitment Parties will be using and relying upon the Information without independent verification thereof. The Borrower agrees that Information (including, without limitation, draft and execution versions of the Facility Documentation, the Confidential Information Memorandum, the Lender Presentation and publicly filed financial statements) may be disseminated to potential Lenders through one or more internet sites (including an IntraLinks, SyndTrak or other similar electronic workspace (the "**Platform**")) created for purposes of syndicating the Facility or otherwise, in accordance with each Arranger's standard syndication practices, and you acknowledge that no Commitment Party nor any of their respective affiliates will be responsible or liable to you or any other person or entity for damages arising from the use by others of any Information or other materials obtained on the Platform, except to the extent such damages have resulted from the willful misconduct, bad faith or gross negligence of such Commitment Party or its affiliates (as determined by a court of competent jurisdiction in a final and non-appealable judgment). You hereby authorize the Commitment Parties to download copies of the Borrower's trademark logos from its website and post copies thereof and any Information to any Platform established by the Arrangers to syndicate the Facility, and to use the Borrower's trademark logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the syndication of the Facility or in any advertisements (to which you consent, such consent not to be unreasonably withheld) that we may place after the closing of the Facility in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at our own expense describing our services to the Borrower hereunder; provided that such consent shall not be required with respect to tombstone, case study or similar advertisement incorporated into promotional material and not otherwise publicly disseminated.

The Borrower acknowledges that certain of the Lenders may be "public side" Lenders (i.e., Lenders that do not wish to receive Private-Side Information (as defined below)) (each, a "**Public Lender**"; and Lenders who are not Public Lenders being referred to herein as "**Private Lenders**"). At the request of the Arrangers, the Borrower agrees to prepare an additional version of the Confidential Information Memorandum and the Lender Presentation to be used by Public Lenders containing a representation that such Confidential Information Memorandum does not contain Private-Side Information. "**Private-Side Information**" means material non-public information (for purposes of United States federal, state or other applicable securities laws) concerning the Borrower and its affiliates or any of their respective securities; and "**Public-Side Information**" means any information that is not Private-Side Information. It is understood that in connection with your assistance described above, you will provide a customary authorization letter to the Arrangers (a) authorizing the distribution of the Information to prospective Private Lenders and the distribution of the Public Side Information to prospective Public Lenders and (b) containing a customary "10b-5" representation and a representation to the Commitment Parties, in the case of the public-side version, that such Information does not include material non-public information about the Borrower, its affiliates or their respective securities. The Public-Side Information will contain customary language exculpating the Arrangers, you and the respective affiliates of each of the foregoing with respect to any liability related to the use of the contents of the Public-Side Information. In addition, the Borrower will clearly designate as such all Information provided to any Commitment Party by or on

5

[[5287441v.1]]

behalf of it which contains exclusively Public-Side Information. The Borrower acknowledges and agrees that the following documents may be distributed to all Lenders (including Public Lenders) (unless the Borrower promptly notifies the Arrangers in writing (including by email) within a reasonable time prior to their intended distribution (after you have been given a reasonable opportunity to review such documents) that any such document should only be distributed to prospective Private Lenders): (a) drafts and final versions of the Facility Documentation; (b) term sheets and notification of changes in the terms of the Facility and (c) administrative materials prepared by the Arrangers for prospective Lenders (such as a lender meeting invitation, allocations and funding and closing memoranda). If you advise us that any of the foregoing items should be distributed only to Private Lenders, then we will not distribute such materials to Public Lenders without further discussions with you.

4.  **Information**.

The Borrower represents and covenants that (i) all written Information (other than projections, estimates and other forward-looking materials and information of a general economic or industry specific nature) provided by or on behalf of the Borrower to the Commitment Parties or the Lenders in connection with the Transactions is and will be when furnished, when taken as a whole, complete and correct in all material respects and does not and will not contain when furnished, when taken as a whole, any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements and updates provided thereto); and (ii) the written financial projections and other written forward-looking information (the "**Projections**") that have been or will be made available to the Commitment Parties or the Lenders by or on behalf of the Borrower in connection with the Transactions have been and will be prepared in good faith based upon assumptions that are believed by the Borrower to be reasonable at the time such Projections are furnished to the Commitment Parties or the Lenders, it being understood and agreed that Projections are as to future events and are not to be viewed as facts, are subject to significant uncertainties and contingencies, many of which are out of the Borrower's control, that no assurance can be given that any particular Projections will be realized and that actual results during the period or periods covered by such Projections may differ significantly from the projected results and such differences may be material.

You agree that if at any time prior to the later of (i) the Closing Date and (ii) the Syndication Date you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information and Projections were being furnished, and such representations were being made, at such time, then you will promptly supplement, or cause to be supplemented, the Information and Projections so that such representations will be correct in all material respects in light of the circumstances under which such statements are made. We have no obligation to conduct any independent evaluation or appraisal of the assets or liabilities of you or any other party.

5.  **Indemnification and Related Matters**.

Subject to the approval of this Commitment Letter by the Bankruptcy Court, you agree, jointly and severally, (a) to indemnify and hold harmless the Commitment Parties and their respective affiliates and their respective officers, directors, employees, advisors, and agents (each, an "**indemnified person**") from and against any and all losses, claims, damages, liabilities and related expenses to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Facility, the use of the proceeds thereof or any related transaction or any actual or prospective claim, litigation, investigation, arbitration or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "**Proceeding**"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon demand for

6

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 7
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
137 of 175

reasonable, documented and invoiced out-of-pocket legal expenses of one primary firm of counsel, one regulatory counsel and one special bankruptcy counsel for all such indemnified persons, taken as a whole, and, if necessary, of a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for all such indemnified persons, taken as a whole (and, in the case of an actual or perceived conflict of interest where the indemnified person affected by such conflict informs you of such conflict and thereafter retains its own counsel, of another firm of counsel for such affected indemnified person and, if necessary, of one regulatory counsel, one special bankruptcy counsel and a single firm of local counsel in each appropriate jurisdiction (which may include a single firm of special counsel acting in multiple jurisdictions) for such affected indemnified person) (the foregoing, the "**Counsel Limitation**") or other reasonable, documented and invoiced out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing; provided that the foregoing indemnity will not, as to any indemnified person, apply to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to (i) have arisen or resulted from the willful misconduct, bad faith or gross negligence of such indemnified person, (ii) have resulted from a claim brought by you or any of your subsidiaries against such indemnified person for material breach of such indemnified person's obligations hereunder or (iii) have not resulted from an act or omission by you or any of your affiliates and have been brought by an indemnified person against any other indemnified person (other than any claims against any Commitment Party in its capacity or in fulfilling its role as an arranger or agent or any similar role hereunder, except to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such indemnified party in such capacity), and (b) to reimburse the Commitment Parties and their respective affiliates on demand for all out-of-pocket expenses (including due diligence expenses, syndication expenses, travel expenses, and reasonable fees, charges and disbursements of counsel) incurred in connection with the Facility and any related documentation (including this Commitment Letter, the Fee Letter and the definitive documentation relating to the Facility) or the administration, amendment, modification or waiver thereof. You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from any of such counsel based on the fees such counsel may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto. None of the indemnified persons or you shall have any liability for any special, indirect, consequential or punitive damages in connection with activities related to the Facility or the Transactions; provided that nothing contained in this sentence shall limit your indemnity and reimbursement obligations to the extent set forth in this paragraph.

No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Platform or otherwise via the internet, and you agree, to the extent permitted by applicable law, to not assert any claims against any indemnified person with respect to the foregoing.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless such settlement (a) includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to the Commitment Parties and the other indemnified persons. You shall not be liable for any settlement of any Proceeding if the amount of such settlement was effected without your consent (which consent shall not be unreasonably withheld, conditioned or delayed), but if settled with your written consent or if there is a judgment by a court of competent

[[5287441v.1]]

jurisdiction in any such Proceeding, you agree to indemnify and hold harmless each indemnified person from and against any and all losses, claims, damages, penalties, liabilities and expenses by reason of such settlement or judgment in accordance with the other provisions of this paragraph.

You agree that the fees, expenses and indemnities payable hereunder and incurred pursuant hereto, and as set forth in, this Commitment Letter and the Fee Letter (a) are reasonable, (b) are actual and necessary costs and expenses of preserving the Debtors' estates and (c) subject to the approval of this Commitment Letter by the Bankruptcy Court, constitute allowed Administrative Claims against the Debtors on a joint and several basis under the Plan.


6. **Assignments**.

This Commitment Letter may not be assigned by you without the prior written consent of the Commitment Parties, nor, except as expressly contemplated by Section 3 above, by any Commitment Party without your prior written consent (and any purported assignment without such consent will be null and void), is intended to be solely for the benefit of the Commitment Parties and the other parties hereto and, except as set forth in Section 5 above, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. Any Commitment Party may, in consultation with the Borrower, assign its commitments and agreements hereunder, in whole or in part, to any of its affiliates; for the avoidance of doubt, GS Bank may assign its commitments and agreements hereunder, in whole or in part, to GSLP and vice versa, and any such assignment will relieve such assignor of its obligations hereunder dollar-for-dollar by the amount of such assigned commitments (and the applicable assignee's commitments will be increased dollar-for-dollar by the amount of such assigned commitments).

7. **Confidentiality**.

This Commitment Letter, the Fee Letter and the contents hereof and thereof are confidential and may not be disclosed by you to any other person (other than any Commitment Party) without our prior written consent (such consent not to be unreasonably withheld, conditioned or delayed), except pursuant to a subpoena or order issued by a court or administrative agency or by a judicial, administrative or legislative body or committee (in which case you agree to inform us promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation); *provided* that we hereby consent to your disclosure of (i) this Commitment Letter and the Fee Letter to your affiliates and your and your affiliates' respective officers, directors, employees, agents and advisors (including legal counsel, independent auditors and other experts, professional advisors or agents) who are involved in the consideration of the Transactions (including in connection with providing accounting and tax advice to the Borrower and its affiliates) on a confidential basis, (ii) this Commitment Letter and the Fee Letter as required by applicable law or compulsory legal process or, to the extent requested or required by governmental and/or regulatory authorities (in which case you agree (except with respect to any audit or examination conducted by bank examiners or any governmental bank regulatory authority exercising examination or regulatory authority) to inform us promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (iii) following your acceptance of the provisions hereof and return of an executed counterpart of this Commitment Letter to the Commitment Parties as provided below, this Commitment Letter (but not the Fee Letter other than the existence thereof) in any public record in which you are required by law or regulation to file it (including the Bankruptcy Court to obtain its approval) or with the Securities and Exchange Commission ("**SEC**") and other applicable regulatory authorities and stock exchanges to the extent required to be in compliance therewith, (iv) the aggregate fee amounts contained in the Fee Letter in financial statements or as part of projections, pro forma information or a generic disclosure of

8

Case: 19-30088   Doc# 6013-5   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 9
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
139 of 175

aggregate sources and uses related to aggregate compensation amounts related to the Transactions to the extent customary or required in offering and marketing materials for the Facility, the Notes or in any public filing relating to the Transactions, in each case in a manner which does not disclose the fees payable pursuant to the Fee Letter (except in the aggregate), (v) this Commitment Letter and the information contained herein and the Fee Letter in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter, Fee Letter or the transactions contemplated thereby or enforcement thereof or hereof, (vi) the information contained in Annexes A and B in any prospectus or other offering memorandum or in any syndication or other marketing materials relating to the Facility or the Notes, (vii) any information set forth herein (including in the Annexes hereto) to the extent that such information becomes publicly available other than by reason of disclosure in violation of this agreement by you or your affiliates or your or their respective officers, directors, employees or advisors, (viii) the existence of this Commitment Letter and the information contained in Annex A to any rating agency; *provided* that such information is supplied to any such rating agency only on a confidential basis and (ix) following your acceptance hereof and the return of an executed counterpart of this Commitment Letter to the Commitment Parties, as provided below, in consultation with us and on a confidential basis, this Commitment Letter to any potential or prospective Commitment Party or any potential or prospective Lender.  The obligations under this paragraph with respect to this Commitment Letter (but not the Fee Letter) shall terminate automatically after the earlier of the date (x) of any public filing permitted hereunder and (y) the Facility Documentation shall have been executed and delivered by the parties thereto. To the extent not earlier terminated, the provisions of this paragraph with respect to this Commitment Letter (but not the Fee Letter) shall automatically terminate on the second anniversary hereof.

Notwithstanding anything to the contrary herein, any disclosure of the Fee Letter to obtain Bankruptcy Court approval shall only be made via a filing under seal and, to the extent required, by providing an unredacted copy thereof directly to the Bankruptcy Court, the Office of the United States Trustee and advisors to the Official Committee of Unsecured Creditors, the Official Committee of Tort Claimants and any other official committee established pursuant to Section 1102 of the Bankruptcy Code on a confidential and professionals' eyes only basis; *provided*, *however*, that you shall be permitted to publicly disclose the fees payable under the Fee Letter, solely on an aggregate basis combined with all other fees payable by you in connection with the financing for which you are seeking the approval of the Bankruptcy Court.

Each Commitment Party shall use all non-public information provided to it by or on behalf of the Borrower or any of your subsidiaries or affiliates solely for the purpose of providing the services which are the subject of this Commitment Letter and otherwise in connection with the Transactions, and shall treat confidentially all such information and shall not disclose such information to any third party or circulate or refer publicly to such information; *provided*, *however*, that nothing herein will prevent each Commitment Party from disclosing any such information (a) pursuant to the order of any court or administrative agency, or otherwise as required by applicable law or compulsory legal process (in which case such person agrees to inform you promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (b) upon the request or demand of any regulatory authority having jurisdiction over such person or any of its affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank examiners or any governmental bank regulatory authority exercising examination or regulatory authority) to inform you promptly thereof to the extent practicable and not prohibited by applicable law, rule or regulation), (c) to the extent that such information is publicly available or becomes publicly available other than by reason of disclosure by such person or any of such person's affiliates or its or their respective officers, directors, employees or advisors in violation of this Commitment Letter, (d) to such person's affiliates and to such person's and such affiliates' respective officers, directors, partners, members, employees, legal counsel, independent auditors, service providers and other experts or agents who need to know such information in connection with the Transactions and

9

[[5287441v.1]]

who have been informed of the confidential nature of such information and are instructed to keep such information confidential in accordance with the provisions of this Section 7, it being understood that the disclosing Commitment Party shall be responsible for any violation of the provisions of this Section 7 by any such person, (e) to potential and prospective Lenders, participants and any direct or indirect contractual counterparties to any swap or derivative transaction relating to the Borrower or its obligations under the Facility, in each case, who have agreed to keep such information confidential on terms not less favorable than the provisions hereof in accordance with the standard syndication processes of the Arrangers or customary market standards for the dissemination of such type of information, (f) to Moody's and S&P and other rating agencies; *provided* that such information is limited to Annex A and is supplied only on a confidential basis, (g) to market data collectors, similar service providers to the lending industry, and service providers to the Arrangers in connection with the administration and management of the Facility; *provided* that such information is limited to the existence of this Commitment Letter and information of a type routinely provided regarding the closing date, size, type, purpose of, and parties to, the Facility, (h) received by such person from a source (other than you or any of your affiliates, advisors, members, directors, employees, agents or other representatives) not known by such person to be prohibited from disclosing such information to such person by a legal, contractual or fiduciary obligation, (i) to the extent that such information was already in the Commitment Parties' possession on a non-confidential basis or is independently developed by the Commitment Parties, (j) for purposes of establishing a "due diligence" defense or (k) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter, the Fee Letter or the transactions contemplated hereby or thereby or enforcement thereof or hereof. The Commitment Parties' obligation under this provision shall remain in effect until the earlier of (i) two years from the date hereof and (ii) the execution and delivery of the Facility Documentation by the parties thereto, at which time any confidentiality undertaking in the Facility Documentation shall supersede the provisions in this paragraph.

8. **Absence of Fiduciary Relationship; Affiliates; Etc**.

As you know, each Commitment Party (together with its affiliates, the "**Commitment Entities**") is a full service financial institution engaged, either directly or through its affiliates, in a broad array of activities, including commercial and investment banking, financial advisory, market making and trading, investment management (both public and private investing), investment research, principal investment, financial planning, benefits counseling, risk management, hedging, financing, brokerage and other financial and non-financial activities and services globally. In the ordinary course of their various business activities, the Commitment Entities and funds or other entities in which the Commitment Entities invest or with which they co-invest, may at any time purchase, sell, hold or vote long or short positions and investments in securities, derivatives, loans, commodities, currencies, credit default swaps and other financial instruments for their own account and for the accounts of their customers. In addition, the Commitment Entities may at any time communicate independent recommendations and/or publish or express independent research views in respect of such assets, securities or instruments. Any of the aforementioned activities may involve or relate to assets, securities and/or instruments of the Borrower and/or other entities and persons which may (i) be involved in transactions arising from or relating to the arrangement contemplated by this Commitment Letter or (ii) have other relationships with the Borrower or its affiliates. In addition, the Commitment Entities may provide investment banking, commercial banking, underwriting and financial advisory services to such other entities and persons. Although the Commitment Entities in the course of such other activities and relationships may acquire information about the transactions contemplated by this Commitment Letter or other entities and persons which may be the subject of the financing contemplated by this Commitment Letter, the Commitment Entities shall have no obligation to disclose such information, or the fact that the Commitment Entities are in possession of such information, to the Borrower or to use such information on the Borrower's behalf.

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 11
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
141 of 175

Consistent with the Commitment Entities' policies to hold in confidence the affairs of their customers, the Commitment Entities will not furnish confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter to any of their other customers and will treat confidential information relating to the Borrower and its affiliates with the same degree of care as they treat their own confidential information and in accordance with Section 7 hereof. Furthermore, you acknowledge that neither the Commitment Entities nor any of their respective affiliates has an obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained or that may be obtained by them from any other person.

Each of the Commitment Entities may have economic interests that conflict with those of the Borrower, its equity holders and/or its affiliates. You agree that each Commitment Entity will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter or the Fee Letter or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Entities and the Borrower, its equity holders or its affiliates. You acknowledge and agree that the transactions contemplated by this Commitment Letter and the Fee Letter (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Commitment Entities, on the one hand, and the Borrower, on the other, and in connection therewith and with the process leading thereto, (i) the Commitment Entities have not assumed (A) an advisory responsibility in favor of the Borrower, its equity holders or its affiliates with respect to the financing transactions contemplated hereby or (B) a fiduciary responsibility in favor of the Borrower, its equity holders or its affiliates with respect to the transactions contemplated hereby, or in each case, the exercise of rights or remedies with respect thereto or the process leading thereto (irrespective of whether the Commitment Entities have advised, are currently advising or will advise the Borrower, its equity holders or its affiliates on other matters) or any other obligation to the Borrower except the obligations expressly set forth in this Commitment Letter and the Fee Letter and (ii) the Commitment Entities are acting solely as principals and not as the agents or fiduciaries of the Borrower, its management, equity holders, affiliates, creditors or any other person. The Borrower acknowledges and agrees that it has consulted its own legal, tax, investment, accounting and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. To the fullest extent permitted by law, the Borrower agrees that it will not bring any claim that the Commitment Entities have breached any fiduciary or similar duty to the Borrower with respect to the financing transactions contemplated hereby or owe a fiduciary or similar duty to the Borrower, in connection with such financing transactions or the process leading thereto. In addition, each Commitment Party may employ the services of its affiliates in providing services and/or performing its or their obligations hereunder and may, subject to Section 7, exchange with such affiliates information concerning the Borrower and other companies that may be the subject of this arrangement, and such affiliates will be entitled to the benefits afforded to such Commitment Party hereunder (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential). Notwithstanding the foregoing, nothing herein shall affect the Borrower's rights in respect of any separate engagement of any Commitment Party, including as financial advisor, in connection with the Transactions or any other matter.

You further acknowledge that certain of the Commitment Parties and/or their affiliates currently are acting as lenders and as the administrative agent under certain of the Borrower's credit agreements, and your and your affiliates' rights and obligations under any other agreement with any Commitment Party or any of its affiliates (including the Funded Debt Documents and the DIP Facility Credit Agreement (each as defined in the Plan)) that currently exist or hereafter may exist are, and shall be, separate and distinct from the rights and obligations of the parties pursuant to this Commitment Letter, and none of such rights and obligations under such other agreements shall be affected by any Commitment Party's performance or lack of performance of services hereunder. You hereby agree that each Commitment Party may render

11

[[5287441v.1]]

its services under this Commitment Letter notwithstanding any actual or potential conflict of interest presented by the foregoing, and you agree that you will not claim any conflict of interest relating to the relationship among such Commitment Party and you and your affiliates in connection with the commitments and services contemplated hereby, on the one hand, and the exercise by any Commitment Party or any of its affiliates of any of their rights and duties under any credit agreement or other agreement (including the Funded Debt Documents and the DIP Facility Credit Agreement) on the other hand.

In addition, please note that the Commitment Entities do not provide accounting, tax or legal advice.

9.  **Miscellaneous**.

Neither this Commitment Letter nor the Fee Letter may be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto or thereto, as applicable, and any term or provision hereof or thereof may be amended or waived only by a written agreement executed and delivered by all parties hereto or thereto.

The provisions set forth under Sections 3, 4, 5, 7 and 8 hereof (in each case other than any provision therein that expressly terminates upon execution of the Facility Documentation), this Section 9 and the provisions of the Fee Letter will remain in full force and effect regardless of whether the Facility Documentation is executed and delivered, except that the provisions of Sections 3 and 4 shall not survive if the commitments and undertakings of the Commitment Parties are terminated prior to the effectiveness of the Facility; *provided* that (x) the foregoing provisions in this paragraph (other than with respect to the provisions set forth in the Fee Letter and under Sections 7, 8 and this Section 9 hereof, which will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Commitment Parties' respective commitments and agreements hereunder) shall be superseded in each case, to the extent covered thereby, by the applicable provisions contained in the Facility Documentation upon execution thereof and thereafter shall have no further force and effect and (y) the provisions of Sections 3 and 4 shall terminate on the Syndication Date (or, in the case of the second paragraph of Section 4, the Closing Date if later).

**Each of the parties hereto (for itself and its affiliates) agrees that any suit or proceeding arising in respect of this Commitment Letter or the Commitment Parties' commitments or agreements hereunder or the Fee Letter will be tried exclusively in (i) subject to clause (ii)(B), until the Effective Date (as defined in the Plan) of the Plan, the Bankruptcy Court and (ii)(A) thereafter or (B) if the Bankruptcy Court refuses to accept, or the Bankruptcy Court or any appellate court from the Bankruptcy Court determines in a final, non-appealable order that the Bankruptcy Court does not have, jurisdiction, any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each party hereby submits to the exclusive jurisdiction of, and to venue in, such court. Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of either the Commitment Parties' commitments or agreements or any matter referred to in this Commitment Letter or the Fee Letter is hereby waived by the parties hereto (to the fullest extent permitted by applicable law). Each of the parties hereto (for itself and its affiliates) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court. This Commitment Letter and the Fee Letter and any claim, controversy or dispute arising**

12

[[5287441v.1]]

hereunder or thereunder will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.

10. **PATRIOT Act Notification**.

The Commitment Parties hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**") and the requirements of 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**") the Commitment Parties and each Lender may be required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Commitment Parties and each Lender to identify the Borrower in accordance with the Patriot Act and the Beneficial Ownership Regulation. This notice is given in accordance with the requirements of the Patriot Act and is effective for the Commitment Parties and each Lender.

11. **Acceptance and Termination**.

Each of the parties hereto agrees that this Commitment Letter is a binding and enforceable agreement with respect to subject matter contained herein, including an agreement to negotiate in good faith the Facility Documentation by the parties hereto in a manner consistent with this Commitment Letter, it being acknowledged and agreed that the commitments provided hereunder by the Commitment Parties are subject to the conditions expressly set forth in Annex B hereto.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or other electronic transmission (e.g., "pdf" or "tif") will be effective as delivery of a manually executed counterpart hereof. This Commitment Letter and the Fee Letter are the only agreements that have been entered into among the parties hereto with respect to the Facility and set forth the entire understanding of the parties with respect thereto and supersede any prior written or oral agreements among the parties hereto with respect to the Facility.

The Commitment Parties' commitments and agreements hereunder will terminate upon the first to occur of (i) the execution and delivery of the Facility Documentation by each of the parties thereto, (ii) the Effective Date of the Plan without using the loans under the Facility, (iii) 11:59 p.m., New York City time, on (A) June 30, 2020, if the Confirmation Order has not been entered prior to such time or (B) August 29, 2020, if the Closing Date has not occurred prior to such time, (iv)(A) the Plan, the Noteholder RSA (as defined below) or the Approval Order is amended or modified or any condition contained therein waived, in a manner that is adverse to the Commitment Parties in their capacities as such, in either case without the consent of the Administrative Agent and the Commitment Parties holding 66 2/3% of the commitments hereunder in respect of the Facility (the "**Required Commitment Parties**") (such consent not to be unreasonably withheld, conditioned or delayed; *provided* that modifications to the Plan solely as a result of an increase in roll-over, "take-back" or reinstatement of any existing debt of the Debtors shall be deemed not to be adverse to the Commitment Parties for the purposes of this clause (A)), (B) any Plan Supplement or any Plan Document (each as defined in the Plan) that is adverse to the interests of the Commitment Parties in their capacities as such is filed or finalized without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), (v) the Chapter 11 Case with respect to any Debtor is dismissed or converted to a proceeding under chapter 7 of the Bankruptcy Code, (vi) a trustee or examiner with enlarged powers (having powers beyond those set forth in section 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) is appointed with respect to any of the Debtors, (vii) there is in effect an order of a governmental authority of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of any of the transactions

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 14
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
144 of 175

contemplated by the Plan, or any law, statute, rule, regulation or ordinance is adopted that makes consummation of the transactions contemplated by the Plan illegal or otherwise prohibited; (viii) the Bankruptcy Court shall not have entered an order approving the relief requested in the motion filed with the Bankruptcy Court authorizing the Borrower's entry into and performance under this Commitment Letter, the Fee Letter and any related engagement letter (the "**Approval Order**"), in form and substance reasonably satisfactory to the Commitment Parties, on or before March 31, 2020; (ix) the Debtors' aggregate liability with respect to Fire Claims (as defined in the Plan) is determined (whether (A) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (B) pursuant to an agreement between the Debtors and the holders of Fire Claims that is subject to an order of the Bankruptcy Court approving such agreement, or (C) through a combination thereof) to exceed $25.5 billion (the "**Fire Claims Cap**"); (x) (A) the occurrence of one or more wildfires within PG&E's service area after the Petition Date (as defined in the Plan) and prior to January 1, 2020 that is asserted by any person to arise out of the Debtors' activities and that destroys or damages more than 500 dwellings or commercial structures ("**Structures**"); *provided*, *however*, that any notice of termination under this clause (x)(A) must be given on or before the entry of the Approval Order, or (B) the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized; (xi) the Debtors shall not have received at least $12,000 million of equity commitments by December 24, 2019 on terms reasonably satisfactory to the Commitment Parties; (xii) since June 30, 2019, a Material Adverse Effect shall have occurred; (xiii) the Debtors have failed to perform any of their obligations set forth in this Commitment Letter, which failure to perform (A) would give rise to the failure of the condition set forth in paragraph 1(a) or 1(d) on Annex B hereto and (B) is incapable of being cured or, if capable of being cured by June 30, 2020, the Debtors have not cured within 10 calendar days following receipt by the Debtors of written notice of such failure to perform from the Commitment Parties holding a majority of the commitments in respect of the Facility, (xiv) if at any time after the first day of the Confirmation Hearing (as defined in the Plan), either (A) asserted Administrative Expense Claims (as defined in the Plan) exceed $250 million (excluding all ordinary course Administrative Expense Claims, Professional Fee Claims, Disallowed Administrative Expense Claims and the portion of an Administrative Expense Claim that is covered by insurance (in each case, as defined in the Plan) and including for the avoidance of doubt, any such expenses or claims with respect to the Facility (collectively, the "**Excluded Administrative Expense Claims**")) or (B) the Debtors have reserved for and/or paid more than $250 million in the aggregate for Administrative Expense Claims, excluding the Excluded Administrative Expense Claims, (xv) on or prior to June 30, 2020, the Borrower shall not have received from the California Public Utilities Commission (the "**CPUC**") all necessary approvals, authorizations and final orders to implement the Plan, and to participate in the Go-Forward Wildfire Fund (as defined in the Plan), including (A) provisions pertaining to authorized return on equity and regulated capital structure, (B) a disposition of proposals for certain potential changes to PG&E's corporate structure and authorizations for the Utility to operate as a utility, (C) resolution of claims for monetary fines or penalties under the California Public Utilities Code for conduct prior to the Petition Date and (D) approval (or exemption from approval) of the financing structure and the securities to be issued under the Plan, (xvi) if at any time the Bankruptcy Court determines that the Debtors are insolvent, (xvii) the Bankruptcy Court has entered a final and non-appealable order to authorize, or the Plan, any Plan Supplement or any Plan Document is amended, modified or changed to include, in each case without the consent of the Required Commitment Parties, a process for transferring the license and/or operating assets of the Utility to the State of California or a third party (a "Transfer") or PG&E effects a Transfer other than pursuant to the Plan, (xviii) the CPUC has revoked or terminated the Utility's Certificate of Public Convenience and Necessity, (xix) the issuance of a preliminary or permanent injunction by a court of competent jurisdiction (including, without limitation, an order of the Bankruptcy Court which has not been stayed) declaring the Plan or any material portion thereof (in each case, to the extent it relates to the terms hereof) to be unenforceable or otherwise restricting the consummation of any such material portion of the Plan, and such ruling, judgment, or order

14

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 15
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
145 of 175

has not been stayed, reversed, or vacated, within fifteen (15) calendar days after issuance; (xx) the Bankruptcy Court shall not have entered an order (the "**Noteholder RSA Approval Order**") approving the Borrower's entry into and performance under the Restructuring Support Agreement, dated as of January 22, 2020 (the "**Noteholder RSA**"), among the Debtors, the Consenting Noteholders and the Shareholder Proponents (each as defined therein), in form and substance reasonably satisfactory to the Commitment Parties, on or before February 28, 2020; and (xxi) the necessary consents from the Backstop Parties (as defined in the BCLs) in order to permit the Plan to be amended to incorporate the terms of the Noteholder RSA are not obtained on or before February 28, 2020 (the earliest date in clauses (ii) through (xxi) being the "**Commitment Termination Date**"); *provided* that the termination of any commitment pursuant to this sentence does not prejudice your rights and remedies in respect of any breach of this Commitment Letter. You will have the right to terminate this Commitment Letter in the event that the Debtor's exclusive periods to file and solicit acceptances of a plan of reorganization are terminated or modified.

Please confirm that the foregoing is in accordance with your understanding by signing and returning to JPMorgan an executed copy of this Commitment Letter, together, if not previously executed and delivered, with an executed copy of the Fee Letter, on or before 11:59 p.m., New York City time, on October 11, 2019, whereupon this Commitment Letter and the Fee Letter will become binding agreements between us. This offer will terminate on such date if this Commitment Letter and the Fee Letter have not been signed and returned as described in the preceding sentence. We look forward to working with you on this transaction.

[Remainder of page intentionally left blank]

15

Very truly yours,

**JPMORGAN CHASE BANK, N.A.**

By: _____

    Name:

    Title:

*[Signature Page to Commitment Letter (Utility)]*

**BofA SECURITIES, INC.**

By: _____
    Name:
    Title:


**BANK OF AMERICA, N.A.**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (Utility)]*

[[5287441v.1]]

**BARCLAYS BANK PLC**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (Utility)]*

[[5287441v.1]]

**CITIGROUP GLOBAL MARKETS INC.**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (Utility)]*

[[5287441v.1]]

**GOLDMAN SACHS BANK USA**

By: _____
    Name:
    Title:


**GOLDMAN SACHS LENDING PARTNERS LLC**

By: _____
    Name:
    Title:

*[Signature Page to Commitment Letter (Utility)]*

[[5287441v.1]]

**ACCEPTED AND AGREED AS OF**
**THE DATE FIRST WRITTEN ABOVE:**

**PG&E CORPORATION**

By: _____
Name:
Title:

**PACIFIC GAS AND ELECTRIC COMPANY**

By: _____
Name:
Title:

*[Signature Page to Commitment Letter (Utility)]*

[[5287441v.1]]

Titles

| Commitment Party (or its designated affiliate) | Title(s) |
|---|---|
| BNP Paribas | Joint Lead Arranger and Co-Documentation Agent |
| Credit Suisse AG, Cayman Islands Branch | Joint Lead Arranger and Co-Documentation Agent |
| Morgan Stanley Bank, N.A. | Joint Lead Arranger and Co-Documentation Agent |
| MUFG Union Bank, N.A. | Joint Lead Arranger and Co-Documentation Agent |
| Wells Fargo Bank, National Association | Joint Lead Arranger and Co-Documentation Agent |
| Mizuho Bank, Ltd. | Joint Lead Arranger and Co-Documentation Agent |

Commitments

| Commitment Party | Commitment |
|---|---|
| JPMorgan Chase Bank, N.A. | $976,081,100.00 |
| Bank of America, N.A. | $976,081,080.00 |
| Barclays Bank PLC | $976,081,080.00 |
| Citi | $976,081,080.00 |
| Goldman Sachs Lending Partners LLC | $454,280,350.00 |
| Goldman Sachs Bank USA | $521,800,730.00 |
| BNP Paribas | $157,432,430.00 |
| Credit Suisse AG, Cayman Islands Branch | $157,432,430.00 |
| Morgan Stanley Bank, N.A. | $157,432,430.00 |
| MUFG Union Bank, N.A. | $157,432,430.00 |
| Wells Fargo Bank, National Association | $157,432,430.00 |

[[5287441v.1]]

Case: 19-30088   Doc# 6013-5   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 24
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
154 of 175

| | |
|---|---|
| Mizuho Bank, Ltd. | $157,432,430.00 |
| **Total:** | **$5,825,000,000.00** |

**Pacific Gas and Electric Company**
**$5,825 Million Senior Secured 364-Day Facility**
**Summary of Principal Terms**[1]

| | |
|---|---|
| Borrower: | Pacific Gas and Electric Company, a California corporation (the "**Utility**"), or any domestic entity formed to hold all of the assets of the Utility upon emergence from bankruptcy (the "**Borrower**"). |
| Guarantors: | None. |
| Security: | The Borrower's obligations under the Facility and under any cash management, interest protection or other hedging arrangements entered into by the Borrower with a Lender, an affiliate of a Lender or any person that was a Lender or an affiliate of a Lender at the time such arrangements were entered into (each, a "**Counterparty**") will be secured, from and after the Closing Date, either directly or indirectly through a first mortgage bond on terms and conditions reasonably satisfactory to the Administrative Agent, by a first-priority security interest in substantially all of the present and after-acquired assets of the Borrower (subject to permitted liens and other customary exceptions and limitations on perfection steps and thresholds to be agreed, the "**Collateral**"). |
| Administrative Agent: | JPMorgan Chase Bank, N.A. ("**JPMorgan**") will act as sole administrative agent and collateral agent (collectively, in such capacity, the "**Administrative Agent**") for a syndicate of banks, financial institutions and other institutional lenders approved in accordance with the Commitment Letter (together with JPMorgan, the "**Lenders**", and together with the Administrative Agent, the Arrangers and the Counterparties, the "**Secured Parties**"), and will perform the duties customarily associated with such role. |
| Joint Bookrunners and Joint Lead Arrangers: | JPMorgan, BofA, Barclays, Citi and GS Bank will act as joint bookrunners and joint lead arrangers for the Facility described below (in such capacities, the "**Arrangers**"), and will perform the duties customarily associated with such roles. |
| Co-Syndication Agents: | BofA, Barclays, Citi and GS Bank will act as co-syndication agents for the Facility and will perform the duties customarily associated with such roles. |
| Facility: | A senior secured bridge term loan credit facility in an aggregate principal amount of $5,825 million (the "**Facility**"). |
| Purpose: | The proceeds of the Facility will be used by the Borrower in accordance with the Plan to finance a portion of the Transactions, including to repay existing indebtedness of the Borrower and its affiliates, and to pay related fees and expenses. |

---

[1] All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Annex A is attached, including Annex B thereto, unless otherwise specified.

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 26
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
156 of 175

Availability:

One drawing may be made under the Facility on the closing date of the Facility upon satisfaction of the conditions to funding described in Annex B to this Commitment Letter (the "**Closing Date**").

Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed.

Interest Rates and Fees:

As set forth in Annex A-I hereto.

Final Maturity and Amortization:

The Facility will mature on the day that is 364 days after the Closing Date (the "**Maturity Date**"). There will be no scheduled amortization payments.

Mandatory Prepayments and Commitment Reductions:

On or prior to the Closing Date, the aggregate commitments in respect of the Facility under the Commitment Letter or under the Facility Documentation (as applicable) shall be automatically and permanently reduced, and after the Closing Date, the aggregate principal amount of loans under the Facility shall be prepaid, in each case without penalty or premium and on a dollar-for-dollar basis, by the following amounts (without duplication):

(a) 100% of the Net Cash Proceeds (as defined below) of all asset sales or other dispositions of property by PG&E, the Borrower and their respective subsidiaries and any insurance and condemnation proceeds, other than (i) sales or other dispositions of assets in the ordinary course of business, (ii) sales or other dispositions of obsolete or worn-out property and property no longer used or useful in the business, (iii) intercompany transfers among PG&E, the Borrower and their respective subsidiaries, (iv) sales or other dispositions of assets the Net Cash Proceeds of which do not exceed $10,000,000 in any single transaction or series of related transactions, (v) other sales or other dispositions of assets the Net Cash Proceeds of which do not exceed an aggregate amount of $100,000,000, and (vi) Net Cash Proceeds of any casualty or condemnation event that are reinvested or committed to be reinvested to replace or repair the affected assets within twelve months after the receipt of such proceeds;

(b) 100% of the Net Cash Proceeds received by PG&E, the Borrower or any of their respective subsidiaries from (i) any issuance of debt securities (including the Notes) or other debt for borrowed money (including pursuant to any bank or other credit facility and including the Net Cash Proceeds of any securitization securities or facilities) (other than Excluded Debt (as defined below) and amounts referred to in clause (c) below) (collectively, "**Specified Debt**") and (ii) any issuance of equity securities (including shares of its common stock or preferred equity or equity-linked securities) (other than Excluded Equity Offerings (as defined below)); and

(c) 100% of the committed amount under any Qualifying Bank Financing (as defined below), excluding up to $5,000 million under

any Qualifying Bank Financing of PG&E;

*provided*, *however*, that until such time as the Backstop Commitments (as defined in those certain Chapter 11 Plan Backstop Commitment Letters (the "**BCLs**"), as in effect on December 23, 2019) have been reduced to $0, except as contemplated by the proviso to the Excluded Debt definition below, the commitments in respect of the Facility shall not be reduced by any cash proceeds from any Additional Capital Source (as defined in the BCLs, as in effect on December 23, 2019) to the extent that such cash proceeds also reduce the Backstop Commitments.

Mandatory prepayments or reductions under clause (a) and (b) above, or the proviso to the Excluded Debt definition below, may be applied, at the option of the Borrower, either to prepay loans or reduce commitments under the Facility and that certain senior unsecured bridge facility of PG&E described in the commitment letter dated as of the date hereof among PG&E, the Borrower, JPMorgan and the other "Commitment Parties" party thereto (such facility, the "**PG&E Facility**"), provided that (i) the Borrower may not prepay loans or reduce commitments under the Facility without prepaying or reducing the PG&E Facility on a pro rata basis and (ii) Net Cash Proceeds of any Notes issued by the Borrower shall be applied to prepay loans or reduce commitments under the Facility before being applied to prepay or reduce the PG&E Facility. The application of Net Cash Proceeds received by the Utility to prepay or reduce the PG&E Facility shall be subject to requisite regulatory approvals (and such Net Cash Proceeds shall be applied to prepay or reduce the Facility to the extent not permitted to be applied to prepay or reduce the PG&E Facility). For the avoidance of doubt, each dollar from a mandatory prepayment or reduction event described under this heading shall be applied to reduce either (but not both) of the commitments under the Facility or the commitments under the PG&E Facility, or to prepay either (but not both) the loans under the Facility or the loans under the PG&E Facility, in each case in accordance with the terms described under this heading.

Furthermore, the obligations of the Commitment Parties to fund on the Closing Date in respect of the Facility under the Commitment Letter or under the Facility Documentation (as applicable) shall be automatically and permanently reduced, without penalty or premium and on a dollar-for-dollar basis, by (without duplication of any of the clauses above) the aggregate principal amount of any roll-over, "take-back" or reinstated debt (the "**Surviving Debt**") of the Borrower or its subsidiaries, other than the New Utility Funded Debt Exchange Notes, the New Utility Long-Term Notes, the New Utility Short-Term Notes and the debt in respect of the Utility Reinstated Senior Note Claims (each as defined in the Noteholder RSA).

"**Net Cash Proceeds**" shall mean:

[[5287441v.1]]

Case: 19-30088  Doc# 6013-5  Filed: 03/02/20  Entered: 03/03/20 00:15:25  Page 28 of 45
Case: 19-30088  Doc# 7322-8  Filed: 05/15/20  Entered: 05/15/20 15:58:31  Page 158 of 175

(a) with respect to a sale or other disposition of any assets of the Borrower, PG&E or any of their respective subsidiaries, the excess, if any, of (i) the cash actually received in connection therewith (including any cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (ii) the sum of (A) payments made to retire any debt that is secured by such asset or that is required to be repaid in connection with the sale thereof (other than loans under the Facility), (B) the fees and expenses incurred by the Borrower, PG&E or any of their respective subsidiaries in connection therewith, (C) taxes paid or reasonably estimated to be payable in connection with such transaction, (D) the amount of any rebates or credits required to be applied to benefit ratepayers as a result of a reduction in the rate base as a result of the sale or disposition of the 77 Beale Street, San Francisco property or any hydroelectric generation assets; provided that the Facility will provide that not more than $750 million of hydroelectric generation assets may be disposed of, and (E) the amount of reserves established by the Borrower, PG&E or any of their respective subsidiaries in good faith and pursuant to commercially reasonable practices for adjustment in respect of the sale price of such asset or assets in accordance with applicable generally accepted accounting principles; *provided* that if the amount of such reserves exceeds the amounts charged against such reserve, then such excess, upon determination thereof, shall then constitute Net Cash Proceeds;

(b) with respect to the incurrence, issuance, offering or placement of debt securities or other debt for borrowed money, the excess, if any, of (i) cash actually received by the Borrower, PG&E and their respective subsidiaries in connection with such incurrence, issuance, offering or placement over (ii) the underwriting discounts and commissions and other fees and expenses incurred by the Borrower, PG&E and their respective subsidiaries in connection with such incurrence, issuance, offering or placement; and

(c) with respect to the issuances of equity interests, the excess of (i) the cash actually received by the Borrower, PG&E and their respective subsidiaries in connection with such issuance over (ii) the underwriting discounts and commissions and other fees and expenses incurred by the Borrower, PG&E or any of their respective subsidiaries in connection with such issuance.

"**Excluded Debt**" shall mean (i) intercompany indebtedness of the Borrower, PG&E or any of their respective subsidiaries, (ii) ordinary-course purchase money indebtedness, facility and equipment financings, other debt incurred in the ordinary course of business for capital expenditures and working capital purposes, financial leases or capital lease obligations, overdraft protection, ordinary course letter of credit facilities, hedging and cash management, and similar obligations, (iii) borrowings under the Revolving Credit Facility up to an aggregate amount not to exceed

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 29 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 159 of 175

$3,500 million, (iv) revolving borrowings under the DIP Facility Credit Agreement (as defined in the Plan) (or refinancings thereof) up to an aggregate amount not to exceed the amount of the revolving commitments in effect thereunder on the date of the Commitment Letter, (v) incremental facilities under the DIP Facility Credit Agreement (or refinancings thereof) or any new debtor-in-possession facilities, in either case that are to be paid in full in cash at emergence from the Chapter 11 Cases, (vi) securitization securities or facilities and any Designated Permitted Financing, and (vii) issuances of debt by PG&E in a principal amount not to exceed $5,000 million and debt or unfunded commitments under a revolving credit facility to be entered into by PG&E in an amount not to exceed $500 million, in each case as contemplated by the Plan; *provided* that, notwithstanding the foregoing, if (A) the aggregate principal amount of Specified Debt issued or incurred by the Borrower or its subsidiaries plus the aggregate principal amount of Excluded Debt issued or incurred by the Borrower or its subsidiaries pursuant to clause (iv), (v) or (vi) plus the principal amount of Surviving Debt of the Borrower or its subsidiaries exceeds $33,350 million, or (B) the aggregate principal amount of Specified Debt issued or incurred by PG&E plus the aggregate principal amount of Excluded Debt issued or incurred by PG&E pursuant to clause (vi) or (vii) plus the principal amount of Surviving Debt of PG&E exceeds $5,000 million, then in either case the commitments with respect to the Facility shall be reduced, or the loans under the Facility shall be prepaid, by an equivalent amount (for the avoidance of doubt, until such commitments or the aggregate principal amount of such loans, in either case, equal zero).

"**Excluded Equity Offerings**" shall mean (i) issuances pursuant to employee compensation plans, employee benefit plans, employee based incentive plans or arrangements, employee stock purchase plans, dividend reinvestment plans and retirement plans or issued as compensation to officers and/or non-employee directors or upon conversion or exercise of outstanding options or other equity awards, (ii) issuances of directors' qualifying shares and/or other nominal amounts required to be held by persons other than PG&E, the Borrower and their respective subsidiaries under applicable law, (iii) issuances to or by the Borrower or any subsidiary of the Borrower to PG&E, the Borrower or any other subsidiary of the Borrower (including in connection with existing joint venture arrangements), (iv) any equity issued pursuant to the Plan in an aggregate amount not to exceed $9,000 million, (v) any Designated Permitted Financing and (vi) additional exceptions to be agreed.

"**Qualifying Bank Financing**" shall mean a committed but unfunded bank or other credit facility for the incurrence of debt for borrowed money by PG&E or the Borrower that has become effective for the purposes of financing the Transactions (excluding, for the avoidance of doubt, the Facility), subject to conditions to funding that are, in the written determination of the Borrower, no

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 30 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 160 of 175

less favorable to the Borrower than the conditions to the funding of the Facility set forth herein.

In addition, with respect to any Included Securitization Transaction, (x) if the proceeds of such Included Securitization Transaction are received, or commitments with respect thereto are entered into, on or prior to the Closing Date, such proceeds or committed amounts shall be applied as set forth under "Closing Date Securitization Waterfall" below and (y) if the proceeds of such Included Securitization Transaction are received after the Closing Date, then, without duplication of any reduction pursuant to clause (x) above, such proceeds shall be applied to prepay the PG&E Facility to the maximum extent permitted by applicable law and regulatory approvals and thereafter shall be applied to prepay the Facility.

"**Included Securitization Transaction**" shall mean any securitization transaction of PG&E, the Borrower or its Subsidiaries other than any non-recourse pass-through securitization transaction contemplated by A.B. 1054, 2019 Assemb. (Cal. 2019) (for the avoidance of doubt, non-recourse pass-through securitization transactions shall not include any securitization all or a portion of which is, directly or indirectly, credited, rebated or otherwise paid to customers).

"**Fire Victim Trust Securitization**" shall mean a tax benefits securitization all or a portion of the proceeds of which will be utilized to finance the Fire Victim Trust contemplated by (and as defined in) the Plan.

In addition, the aggregate commitments in respect of the Facility shall be permanently reduced to zero on the Commitment Termination Date.

The Borrower shall provide the Administrative Agent with prompt written notice of any mandatory prepayment or commitment reduction being required hereunder.

Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed.

Closing Date Securitization Waterfall:

On or prior to the Closing Date, the proceeds of all Included Securitization Transactions shall be applied as follows (the "**Closing Date Securitization Waterfall**"):

*First*, at the Borrower's election, in lieu of (and to reduce) the requirement for Designated Permitted Financing (and the intended use of proceeds thereof) as specified in clause 15 of Annex B, up to $6,000 million to finance a portion of the Transactions;

*Second*, to the extent constituting proceeds of a Fire Victim Trust Securitization, to finance the Fire Victim Trust as

contemplated by the Plan, up to $1,350 million;

*Third*, to reduce commitments under the PG&E Facility on a dollar-for-dollar basis in accordance with the Mandatory Prepayments and Commitment Reductions section above, up to $2,000 million;

*Fourth*, to be deposited as cash on the balance sheet of PG&E, the Borrower or its Subsidiaries on the Closing Date, up to $650 million;

*Thereafter*, as the Borrower shall direct (but, for the avoidance of doubt, with no reduction to the minimum equity requirement, as specified in clause 14 of Annex B).

<u>Voluntary Prepayments and Reductions in Commitments</u>:

Prepayments of borrowings under the Facility will be permitted at any time, in whole or in part and in minimum principal amounts to be agreed upon, without premium or penalty, subject to reimbursement of the Lenders' redeployment costs in the case of a prepayment of Adjusted LIBOR borrowings other than on the last day of the relevant interest period. The Borrower may voluntarily reduce unutilized portions of the commitments under the Facility at any time without penalty.

Amounts borrowed under the Facility that are repaid or prepaid may not be reborrowed.

<u>Documentation</u>:

The making of the loans under the Facility will be governed by definitive loan and related agreements and documentation (collectively, the "**Facility Documentation**" and the principles set forth in this paragraph, the "**Documentation Principles**") to be negotiated in good faith, which will be based on the Borrower's Second Amended and Restated Credit Agreement, dated as of April 27, 2015, among the Borrower, the financial institutions from time to time party thereto and Citibank, N.A., as administrative agent (as amended from time to time prior to the date hereof, the "**Pre-Petition Credit Agreement**"). The Facility Documentation will contain only those representations and warranties, affirmative and negative covenants, mandatory prepayments and commitment reductions, and events of default expressly set forth in the Commitment Letter (including this Annex A). The Facility Documentation shall include modifications to the Pre-Petition Credit Agreement (a) as are necessary to reflect the terms set forth in the Commitment Letter (including this Annex A) and the Fee Letter, (b) to reflect any changes in law or accounting standards since the date of the Pre-Petition Credit Agreement, (c) to reflect the operational or administrative requirements of the Administrative Agent and operational requirements of the Borrower and its subsidiaries, (d) to reflect the nature of the Facility as a bridge facility, (e) to reflect the Borrower's pro forma capital structure, (f) to reflect certain

provisions in the DIP Facility Credit Agreement to be agreed and (g) to reflect the terms of the Plan.

| | |
|---|---|
| Representations and Warranties: | The Facility Documentation will contain only the following representations and warranties, which shall be made on the effectiveness of the Facility Documentation (the "**Facility Documentation Effective Date**") and on the Closing Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): financial condition, no change, existence; compliance with law; power; authorization; enforceable obligations; no legal bar; litigation; no default; taxes; federal regulations; ERISA; investment company act and other regulations; use of proceeds; environmental matters; no EEA financial institution; regulatory matters; solvency (after giving effect to the Transactions, with "solvency" to be defined consistent with the solvency certificate attached hereto as Annex B-1); validity of security interests; full disclosure; beneficial ownership certification; anti-corruption and sanctions; ownership of property; subsidiaries; and intellectual property. |
| Conditions to Borrowing on the Closing Date: | The borrowing under the Facility on the Closing Date will be subject to the conditions expressly set forth in Annex B to the Commitment Letter (the "**Funding Conditions**"). |
| Affirmative Covenants: | The Facility Documentation will contain only the following affirmative covenants, which shall become effective on the Facility Documentation Effective Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): financial statements, certificates and other information, payment of taxes, maintenance of existence, compliance, maintenance of property, insurance, inspection of property, books and records, discussions, notices, maintenance of licenses, further assurances with respect to collateral, and maintenance of ratings (but, for the avoidance of doubt, not any particular rating). |
| Negative Covenants: | The Facility Documentation will contain only the following negative covenants, which shall become effective on the Facility Documentation Effective Date, and be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): liens (modified to reflect stand-alone exceptions to be agreed, including the Facility and the Notes), fundamental changes, debt (with exceptions to be agreed, including debt for borrowed money (including the Facility and the Notes) not to exceed $33,350 million and the Revolving Credit Facility), modifications of organizational documents, sale leaseback transactions, swap agreements, and change of fiscal year. |
| Financial Covenants: | Subject to the Documentation Principles, maintenance of a maximum Consolidated Capitalization Ratio of less than or equal to 0.65 to 1.00, calculated in accordance with (and capitalized terms to |

have the meaning set forth in) the Pre-Petition Credit Agreement.

| | |
|---|---|
| Events of Default: | The Facility Documentation will contain only the following events of default, which shall be based on those in the Pre-Petition Credit Agreement (subject to the Documentation Principles): nonpayment of principal when due; nonpayment of interest or other amounts after a grace period of five business days; material inaccuracy of representations and warranties; Facility Documentation ceasing to be in full force and effect or any Borrower party thereto so asserting; violation of covenants (subject, in the case of certain affirmative covenants, to a grace period of 30 days); cross-default with respect to material indebtedness; bankruptcy events (from and after the Closing Date); certain ERISA events; material judgments; actual or asserted invalidity of security documents representing a material portion of the collateral; and a change of control (to be defined in a manner to be agreed). |
| Voting: | Subject to the Documentation Principles and based on the Pre-Petition Credit Agreement, including all lender vote for the release of all or substantially all of the Collateral. |
| Cost and Yield Protection: | Usual and customary for facilities and transactions of this type, including customary tax gross-up provisions (including but not limited to provisions relating to Dodd-Frank and Basel III), but subject to the Documentation Principles and based on the Pre-Petition Credit Agreement. |
| Assignments and Participations: | Subject to the Documentation Principles and based on the Pre-Petition Credit Agreement as follows: |

Prior to the Closing Date, the Lenders will not be permitted to assign commitments under the Facility to any Person except in accordance with the terms of the syndication provisions in the Commitment Letter.

From and after the Closing Date, the Lenders will be permitted to assign loans under the Facility to eligible assignees subject to the consent of the Borrower (not to be unreasonably withheld or delayed); *provided* that no such consent shall be required with respect to any assignment (x) to a Lender, an affiliate of a Lender or an approved fund, (y) to an Approved Lender or (z) if a payment or bankruptcy (from and after the Closing Date) event of default shall have occurred and be continuing; *provided*, *further*, that such consent shall be deemed to have been given if the Borrower shall not have responded to a written request for consent within 10 business days. All assignments shall require the consent of the Administrative Agent (not to be unreasonably withheld or delayed). Each assignment shall be accompanied by the payment of a $3,500 assignment processing fee to the Administrative Agent (which fee may be waived by the Administrative Agent in its sole discretion).

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 34
of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
164 of 175

<table>
<tr><td>Defaulting Lenders:</td><td>Lenders may sell participations without the consent of any person, so long as any such participation does not create rights in participants to approve amendments or waivers, except in respect of certain customary matters consistent with the Pre-Petition Credit Agreement.</td></tr>
</table>

Lenders may sell participations without the consent of any person, so long as any such participation does not create rights in participants to approve amendments or waivers, except in respect of certain customary matters consistent with the Pre-Petition Credit Agreement.

Defaulting Lenders:

The Facility Documentation will contain customary "defaulting Lender" provisions, including the suspension of voting rights and rights to receive certain fees, and the termination or assignment of commitments or loans of defaulting Lenders; *provided* that such provisions shall be subject to the Documentation Principles and be based on the Pre-Petition Credit Agreement.

Expenses and Indemnification:

Subject to the limitations set forth in Section 5 of the Commitment Letter, the Borrower shall pay (a) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Arrangers associated with the syndication of the Facility and the preparation, execution, delivery and administration of the Facility Documentation and any amendment or waiver with respect thereto (including the reasonable, documented and invoiced fees, disbursements and other charges of one primary counsel, one regulatory counsel, one special bankruptcy counsel and one additional local counsel in each applicable jurisdiction) and (b) all reasonable, documented and invoiced out-of-pocket expenses of the Administrative Agent and the Lenders (including the reasonable, documented and invoiced fees, disbursements and other charges of counsel referred to in clause (a) above and additional conflicts counsel, subject to the Counsel Limitations) in connection with the enforcement of the Facility Documentation.

The Administrative Agent, the Arrangers and the Lenders (and their affiliates and their respective officers, directors, employees, advisors and agents) will have no liability for, and will be indemnified and held harmless against, any loss, liability, cost or expense incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof (except to the extent determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from (x) the gross negligence, bad faith or willful misconduct of the indemnified party or any of its affiliates, (y) such party's or any of its affiliates' material breach of the Facility Documentation or (z) disputes among Lenders not arising from the Company's breach of its obligations under the Facility Documentation (other than a dispute involving a claim against an indemnified party for its acts or omissions in its capacity as an arranger, bookrunner, agent or similar role in respect of the Facility, except, with respect to this clause (z), to the extent such acts or omissions are determined by a court of competent jurisdiction by a final and non-appealable judgment to have constituted the gross negligence, bad faith or willful misconduct of such indemnified party in such capacity)).

| | |
|---|---|
| <u>Governing Law and Forum</u>: | New York. |
| <u>Arranger's and Administrative Agent's Counsel</u>: | Davis Polk & Wardwell LLP. |
| <u>Miscellaneous</u>: | The Facility Documentation will contain customary European Union "bail-in" provisions and customary provisions pertaining to division of limited liability companies and the QFC stay rules. The Lenders will provide customary representations as to their fiduciary status under ERISA. |

Interest Rates:

The interest rates under the Facility will be, at the option of the Borrower, (a) Adjusted LIBO Rate plus the Applicable Adjusted LIBO Rate Margin (each as defined below) or (b) ABR (as defined below) plus the Applicable Adjusted LIBO Rate Margin minus 1.00% (but in any event not less than 0.00%).

The Borrower may elect interest periods of 1, 2, 3 or 6 months for Adjusted LIBO Rate borrowings. Calculation of interest shall be on the basis of the actual number of days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans based on the prime rate) and interest shall be paid in arrears (i) at the end of each interest period and no less frequently than quarterly, in the case of Adjusted LIBO Rate advances, and (ii) quarterly, in the case of ABR advances.

"**ABR**" is the Alternate Base Rate, which is the greatest of (i) the Prime Rate, (ii) the NYFRB Rate from time to time plus 0.5% and (iii) the Adjusted LIBO Rate for a one month interest period on the applicable date plus 1%.

"**Adjusted LIBO Rate**" means the LIBO Rate, as adjusted for statutory reserve requirements for eurocurrency liabilities.

"**Interpolated Rate**" means, at any time, for any interest period, the rate *per annum* (rounded to the same number of decimal places as the LIBO Screen Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Screen Rate for the longest period (for which the LIBO Screen Rate is available) that is shorter than the Impacted Interest Period; and (b) the LIBO Screen Rate for the shortest period (for which that LIBO Screen Rate is available) that exceeds the Impacted Interest Period, in each case, at such time; *provided* that if any Interpolated Rate as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of the Facility Documentation.

"**LIBO Rate**" means, with respect to any Eurodollar borrowing and for any interest period, the LIBO Screen Rate at approximately 11:00 a.m., London time, two business days prior to the commencement of such interest period; *provided* that if the LIBO Screen Rate shall not be available at such time for such interest period (an "**Impacted Interest Period**") then the LIBO Rate shall be the Interpolated Rate.

"**LIBO Screen Rate**" means, for any day and time, with

respect to any Eurodollar borrowing for any interest period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) for a period equal in length to such interest period as displayed on such day and time on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion); *provided* that if the LIBO Screen Rate as so determined would be less than zero, such rate shall be deemed to zero for the purposes of calculating such rate.

"**NYFRB**" means the Federal Reserve Bank of New York.

"**NYFRB Rate**" means, for any day, the greater of (i) the Federal Funds Effective Rate in effect on such day and (ii) the Overnight Bank Funding Rate in effect on such day (or for any day that is not a business day, for the immediately preceding business day); *provided* that if none of such rates are published for any day that is a business day, the term "NYFRB Rate" means the rate quoted for such day for a federal funds transaction at 11:00 a.m., New York City time, on such day received by the Administrative Agent from a federal funds broker of recognized standing selected by it; *provided*, *further*, that if any of the aforesaid rates as so determined would be less than zero, such rate shall be deemed to be zero for purposes of the Facility Documentation.

"**Overnight Bank Funding Rate**" means, for any day, the rate comprised of both overnight federal funds and overnight eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as an overnight bank funding rate.

"**Prime Rate**" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer

quoted therein, any similar rate quoted therein (as determined reasonably and in good faith by the Administrative Agent) or in any similar release by the Federal Reserve Board (as determined reasonably and in good faith by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

LIBO Rate Replacement:     The Facility Documentation shall contain customary provisions for the replacement of the LIBO Rate.

Applicable Adjusted LIBO Rate Margin:

| Public Debt Rating[2] | BBB+/Baa1 | BBB/Baa2 | BBB-/Baa3 | BB+/Ba1 or worse |
|---|---|---|---|---|
| Closing Date until 89 days following the Closing Date | 1.125% | 1.375% | 1.50% | 1.75% |
| 90th day following the Closing Date until 179th day following the Closing Date | 1.375% | 1.625% | 1.75% | 2.00% |
| 180th day following the Closing Date until 269th day following the Closing Date | 1.625% | 1.875% | 2.00% | 2.25% |
| From the 270th day following the Closing Date | 1.875% | 2.125% | 2.25% | 2.50% |

Default Rate:     At any time when the Borrower is in default in the payment of any amount of principal due under the Facility, the overdue amount shall bear interest at 2% above the rate otherwise applicable thereto. Overdue interest, fees and other amounts shall bear interest at 2% above the rate

---

[2] Based on public ratings from S&P and Moody's for senior secured, long-term indebtedness for borrowed money of the Borrower that is not guaranteed by any other person or subsidiary and not supported by any other credit enhancement (the "Public Debt Rating"). Split ratings to be handled consistently with the Pre-Petition Credit Agreement except that if the rating differential is 2 levels or more, the rating level that would apply at the rating one level below the higher rating shall apply.

[[5287441v.1]]

Case: 19-30088   Doc# 6013-5   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 39 of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 169 of 175

applicable to ABR loans.

| | |
|---|---|
| Ticking Fees: | Ticking fees ("**Ticking Fee**") equal to 0.175% per annum times the actual daily undrawn commitments under the Facility (as such amounts shall be adjusted to give effect to any voluntary or mandatory reductions of the commitments in accordance with the terms hereof) will accrue during the period commencing on the date that is the later of the Facility Documentation Effective Date and January 9, 2020 and ending on and including the earlier of (x) the Closing Date and (y) the date of termination of the commitments under the Facility, for the account of each Lender in arrears quarterly and on the earlier of the Closing Date and the date of termination of the commitments under the Facility. |
| Duration Fees: | The Borrower will pay a fee (the "**Duration Fee**"), for the ratable benefit of the Lenders, in an amount equal to (i) 0.50% of the aggregate principal amount of the loans under the Facility outstanding on the date which is 90 days after the Closing Date, due and payable in cash on such 90th day (or if such day is not a business day, the next business day); (ii) 0.75% of aggregate principal amount of the loans under the Facility outstanding on the date which is 180 days after the Closing Date, due and payable in cash on such 180th day (or if such day is not a business day, the next business day); and (iii) 1.00% of the aggregate principal amount of the loans under the Facility outstanding on the date which is 270 days after the Closing Date, due and payable in cash on such 270th day (or if such day is not a business day, the next business day). |

[[5287441v.1]]

Case: 19-30088   Doc# 6013-5   Filed: 03/02/20   Entered: 03/03/20 00:15:25   Page 40
of 45
Case: 19-30088   Doc# 7322-8   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
170 of 175

**$5,825 Million Senior Secured 364-Day Facility**
**Conditions**[3]

The borrowing under the Facility shall be subject to the satisfaction or waiver by the Commitment Parties of the following conditions:

1.        (a) The Bankruptcy Court shall have entered (x) the Approval Order, (y) the Noteholder RSA Approval Order and (z) a confirmation order confirming the Plan with respect to the Debtors in form and substance reasonably satisfactory to the Required Commitment Parties (the "**Confirmation Order**") by no later than June 30, 2020, each of which shall (i) not be stayed, (ii) be in full force and effect, (iii) be final and non-appealable, and (iv) not have been reversed, vacated, amended, supplemented, or otherwise modified in a manner adverse to the interests of the Commitment Parties without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed; *provided* modifications to the Plan solely as a result of an increase in roll-over, "take-back" or reinstatement of any existing debt of the Debtors shall be deemed not to be adverse to the Commitment Parties for the purposes of this clause (iv)), (b) none of the Plan, the Confirmation Order or the Approval Order shall have been amended or modified or any condition contained therein waived, in either case without the consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed), (c) the Plan shall have become effective in accordance with its terms no later than 60 days after the entry of the Confirmation Order, and all conditions precedent to the effectiveness of the Plan shall have been, or substantially contemporaneously with the closing under the Facility, will be, satisfied or waived (to the extent adverse to their interests, with the prior consent of the Required Commitment Parties (such consent not to be unreasonably withheld, conditioned or delayed)), (d) the transactions as described and defined in the Plan to occur upon the Effective Date of the Plan shall have been consummated, or substantially concurrently with the closing of the Facility will be consummated, on the Closing Date, (e) the Debtors shall be in compliance in all material respects with the Confirmation Order and (f) all documents necessary to implement the Plan and the financings and distributions contemplated thereunder shall have been executed (each of which shall either (x) not be adverse to the interests of the Commitment Parties or (y) be in form and substance reasonably acceptable to the Required Commitment Parties).

2.        (x) The Arrangers shall have received (a) U.S. GAAP audited consolidated balance sheets and related consolidated statements of income and comprehensive income, of shareholders' equity and of cash flows of the Borrower and its subsidiaries for the three most recent fiscal years ended at least 60 days prior to the Closing Date and (b) U.S. GAAP unaudited consolidated balance sheets and related consolidated statements of income and comprehensive income, of shareholders' equity and of cash flows of the Borrower and its subsidiaries for each subsequent fiscal quarter ended at least 40 days before the Closing Date (other than the last fiscal quarter of any fiscal year); *provided* that in each case the financial statements required to be delivered by this paragraph 2(x) shall meet the requirements of Regulation S-X under the Securities Act, and all other accounting rules and regulations of the SEC promulgated thereunder applicable to a registration statement on Form S-1, in all material respects.  The Arrangers hereby acknowledge receipt of the financial statements of the Utility in the foregoing clause (a) for the fiscal years ended December 31, 2018, December 31, 2017 and December 31, 2016, and in the foregoing clause (b) for the fiscal quarters ended June 30, 2019 and March 31, 2019.  The Borrower's filing of any required audited financial statements with respect to the Borrower on Form 10-K or required unaudited financial statements with respect to the Borrower on Form 10-Q, in each case, will satisfy the requirements under clauses (a) or (b), as applicable, of this paragraph.

---

[3] All capitalized terms used but not defined herein have the meanings given to them in the Commitment Letter to which this Annex B is attached, including Annex A thereto.

(y) The Arrangers shall have received a pro forma consolidated balance sheet and a related pro forma consolidated statement of income of the Borrower and its subsidiaries (based on the financial statements referred to in paragraph above) as of and for the twelve-month period ending on the last day of the most recently completed four-fiscal quarter period ended at least 40 days before the Closing Date, or, if the most recently completed fiscal period is the end of a fiscal year, ended at least 60 days before the Closing Date (regardless of when such pro forma financial statements may be required to be filed with the SEC), prepared after giving effect to the Transactions (including, to the extent required by applicable accounting standards, the application of fresh start accounting) as if they had occurred as of such date (in the case of such balance sheet) or at the beginning of such period (in the case of such other statement of income) which shall meet the requirements of Regulation S-X under the Securities Act and all other accounting rules and regulations of the SEC promulgated thereunder applicable to a registration statement on Form S-1, in all material respects; *provided*, *however*, to the extent such pro forma financial statements are filed by the Borrower with the SEC, the condition set forth in this paragraph (y) shall be deemed satisfied.

3.     The representations and warranties in the Facility Documentation shall be true and correct in all material respects (provided, that any such representation or warranty that is qualified as to "materiality" or "Material Adverse Effect" shall be accurate in all respects and that any such representation or warranty that specifically refers to an earlier date shall be true and correct in all material respects (or in all respects, as the case may be) as of such earlier date) and no default or event of default shall be in existence at the time of, or after giving effect to the making of, the making of loans to the Borrower on the Closing Date.

4.     The execution and delivery by the Borrower of the Facility Documentation consistent with the terms set forth or referred to in this Commitment Letter (but taking into account the market flex provisions set forth in the Fee Letter) shall have occurred.

5.     The Administrative Agent shall have received customary legal opinions of counsel to the Borrower, corporate organizational documents of the Borrower, a good standing certificate of the Borrower from the jurisdiction of organization of the Borrower, resolutions and a customary closing certificate of the Borrower, and a customary borrowing notice, in each case as are customary for transactions of this type (collectively, the "**Closing Deliverables**").

6.     The Administrative Agent shall have received a solvency certificate from the chief financial officer of the Borrower in substantially the form of Annex B-I hereto.

7.     The Arrangers and the Lenders shall have received all fees and, to the extent invoiced at least three business days prior to the Closing Date, expenses required to be paid on or prior to the Closing Date pursuant to the Fee Letter or the Facility Documentation.

8.     The Commitment Parties shall have received, at least three business days prior to the Closing Date (to the extent requested in writing at least ten business days prior to the Closing Date), all documentation and other information with respect to the Borrower that the Commitment Parties reasonably determines is required by United States regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Patriot Act and, to the extent applicable, the Beneficial Ownership Regulation.

9.     All documents and instruments required to perfect the Administrative Agent's security interests in the Collateral securing the Facility (including any pledged first mortgage bonds) shall have been executed and delivered by the Borrower and if applicable, be in proper form for filing and, with

[[5287441v.1]]

Case: 19-30088    Doc# 6013-5    Filed: 03/02/20    Entered: 03/03/20 00:15:25    Page 42 of 45
Case: 19-30088    Doc# 7322-8    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 172 of 175

respect to any real property that constitutes Collateral, the Commitment Parties shall be satisfied that flood insurance due diligence and flood insurance compliance has been completed.

10.     The Borrower shall have received investment grade senior secured debt ratings of (i) in the case of Moody's, Baa3 or better and (ii) in the case of S&P, BBB- or better and in each case, with a stable or better outlook.

11.     Total PG&E weighted average earning rate base (including electric generation, electric transmission, electric distribution, gas distribution, gas transmission and storage) for estimated 2021 as approved by the CPUC shall be no less than 95% of $48 billion.

12.     Since June 30, 2019, no result, occurrence, fact, change, event, effect, violation, penalty, inaccuracy or circumstance (whether or not constituting a breach of a representation, warranty or covenant set forth in the Plan) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies, or circumstances, (i) would have or would reasonably be expected to have a material adverse effect on the business, operations, assets, liabilities, capitalization, financial performance, financial condition or results of operations, in each case, of the Debtors, taken as a whole, or (ii) would reasonably be expected to prevent or materially delay the ability of the Debtors to consummate the transactions contemplated by this Commitment Letter or the Plan or perform their obligations hereunder or thereunder, including their obligations under the Facility or the PG&E Facility (each a "***Material Adverse Effect***") shall have occurred; *provided*, *however*, that none of the following results, occurrences, facts, changes, events, effects, violations, penalties, inaccuracies or circumstances shall constitute or be taken into account in determining whether a Material Adverse Effect has occurred, is continuing or would reasonably be expected to occur:  (A) the filing of the Chapter 11 Cases, and the fact that the Debtors are operating in bankruptcy, (B) results, occurrences, facts, changes, events, violations, inaccuracies or circumstances affecting (1) the electric or gas utility businesses in the United States generally or (2) the economy, credit, financial, capital or commodity markets, in the United States or elsewhere in the world, including changes in interest rates, monetary policy or inflation, (C) changes or prospective changes in law (other than any law or regulation of California or the United States that is applicable to any electrical utility) or in GAAP or accounting standards, or any changes or prospective changes in the interpretation or enforcement of any of the foregoing, (D) any decline in the market price, or change in trading volume, of any securities of the Debtors, (E) any failure to meet any internal or public projections, forecasts, guidance, estimates, milestones, credit ratings, budgets or internal or published financial or operating predictions of revenue, earnings, cash flow or cash position, (F) any wildfire occurring after the Petition Date and prior to January 1, 2020, and (G) one or more wildfires, occurring on or after January 1, 2020, that destroys or damages fewer than 500 Structures in the aggregate (it being understood that (I) the exceptions in clauses (D) and (E) shall not prevent or otherwise affect a determination that the underlying cause of any such change, decline or failure referred to therein is a Material Adverse Effect, and (II) a Material Adverse Effect shall include the occurrence of one or more wildfires on or after January 1, 2020 destroying or damaging at least 500 Structures within PG&E's service area at a time when the portion of PG&E's system at the location of such wildfire was not successfully de-energized.

13.     The Debtors' aggregate liability with respect to Fire Claims shall be determined (whether (i) by the Bankruptcy Court (or the District Court to which the reference has been partially withdrawn for estimation purposes), (ii) pursuant to an agreement between the Debtors and the holders of Fire Claims, or (iii) through a combination thereof) not to exceed the Fire Claims Cap.

14.     PG&E shall have received at least $9,000 million of proceeds from the issuance of equity, on terms acceptable to each Commitment Party in its sole discretion. The economic benefit of the net operating loss carryforwards and other tax attributes of PG&E, the Borrower or its subsidiaries shall

not have been transferred (pursuant to a tax monetization transaction or otherwise) except on terms that could not reasonably be expected to negatively impact the cash flows of PG&E, the Borrower or its subsidiaries as determined by the Arrangers in their sole discretion.

15.     The Utility shall have received at least $6,000 million of proceeds from any issuance of debt securities or other debt for borrowed money (including pursuant to any bank or other credit facility and any securitization securities or facilities) or any issuance of equity securities (including shares of its common stock or preferred equity or equity-linked securities), in any case on terms acceptable to each Commitment Party in its sole discretion (the "*Designated Permitted Financing*"), provided that if such Designated Permitted Financing is an Included Securitization Transaction, it is applied in lieu of (and to reduce) the requirement under this paragraph in compliance with the Closing Date Securitization Waterfall set forth in Annex A.

16.     The Utility has both (i) elected, and received Bankruptcy Court approval, to participate in the Go-Forward Wildfire Fund (as defined in the Plan) and (ii) satisfied the other conditions to participation in the Go-Forward Wildfire Fund set forth in the Wildfire Legislation (as defined in the Plan).

17.     PG&E shall own directly 100% of the common stock of the Borrower.

18.     No order of a governmental authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation or funding of any transactions contemplated by the Plan shall have been received by the Debtors, and no law, statute, rule, regulation or ordinance shall have been adopted that makes the consummation or funding of any transactions contemplated by the Plan illegal or otherwise prohibited. The Borrower shall have delivered to the Arrangers a financial model satisfactory to the Arrangers reflecting sources and uses and capital structure, together with a certification by the Borrower that such financial model demonstrates compliance with all regulatory requirements (including all CPUC approvals).

19.     One or more investment banks reasonably satisfactory to the Commitment Parties shall have been engaged to publicly sell or privately place the Notes for the purpose of reducing, replacing or refinancing the Facility.

[[5287441v.1]]

Case: 19-30088     Doc# 6013-5     Filed: 03/02/20     Entered: 03/03/20 00:15:25     Page 44
of 45
Case: 19-30088     Doc# 7322-8     Filed: 05/15/20     Entered: 05/15/20 15:58:31     Page
174 of 175

**Form of Solvency Certificate**

[DATE]

This Solvency Certificate ("**Certificate**") of [_____] ("**the Borrower**"), and its Subsidiaries is delivered pursuant to Section [__] of the $[_____] Senior Secured Term Loan Credit Agreement, dated as of [_____] (the "**Credit Agreement**"), by and among the Borrower, the Lenders from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent.  Unless otherwise defined herein, capitalized terms used in this Certificate shall have the meanings set forth in the Credit Agreement.

I, [_____], the duly elected, qualified and acting [Chief Financial Officer] of the Borrower and its Subsidiaries, DO HEREBY CERTIFY that I have reviewed the Credit Agreement and the other Loan Documents referred to therein and have made such investigation as I have deemed necessary to enable me to express a reasonably informed opinion as to the matters referred to herein.

I HEREBY FURTHER CERTIFY, in my capacity as [Chief Financial Officer] and not in my individual capacity, that as of the date hereof, immediately after giving effect to the Transactions:

1.     The fair value of the assets of the Borrower and its Subsidiaries, on a consolidated basis, at a fair valuation on a going concern basis, exceeds, on a consolidated basis, their debts and liabilities, subordinated, contingent or otherwise.

2.     The present fair saleable value of the property of the Borrower and its Subsidiaries, on a consolidated and going concern basis, is greater than the amount that will be required to pay the probable liability, on a consolidated basis, of their debts and other liabilities, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured in the ordinary course of business.

3.     The Borrower and its Subsidiaries, on a consolidated basis, are able to pay their debts and liabilities, subordinated, contingent or otherwise, as such liabilities become absolute and matured in the ordinary course of business.

4.     The Borrower and its Subsidiaries are not engaged in businesses, and are not about to engage in businesses for which they have unreasonably small capital.

For purposes of this Certificate, the amount of any contingent liability at any time shall be computed as the amount that, in light of all the facts and circumstances existing as of the date hereof, would reasonably be expected to become an actual and matured liability.

For the purpose of the foregoing, I have assumed there is no default under the Credit Agreement on the date hereof and will be no default under the Credit Agreement after giving effect to the funding under the Credit Agreement.

[Remainder of page intentionally left blank]