**EXHIBIT R**

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Decision 20-05-019  May 7, 2020

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017. | Investigation 19-06-015 |

**DECISION APPROVING PROPOSED SETTLEMENT AGREEMENT
WITH MODIFICATIONS**

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 2 of 89

# TABLE OF CONTENTS

**Title**                                                                         **Page**

DECISION APPROVING PROPOSED SETTLEMENT AGREEMENT WITH MODIFICATIONS ................................................................................. 1

Summary ........................................................................................................ 2

1. Factual Background .............................................................................. 3

2. Procedural Background ........................................................................ 4

3. Violations Found by SED ..................................................................... 8

4. PG&E Position on Violations ............................................................. 13

5. Summary of Proposed Settlement .................................................... 14

6. Party Positions on Proposed Settlement ......................................... 15

7. Standard of Review ............................................................................. 18

8. Discussion ............................................................................................ 19

   8.1. Penalty Factors ............................................................................ 19

      8.1.1 Severity of the Offense ..................................................... 20

      8.1.2 Conduct of the Utility ....................................................... 22

      8.1.3 Financial Resources of the Utility .................................. 25

      8.1.4 Totality of Circumstances in Furtherance of Public Interest .............. 26

      8.1.5 Consistency with Precedent ............................................ 28

   8.2. Amount and Structure of Penalty ............................................ 31

   8.3. Disallowances ............................................................................. 35

   8.4. Anticipated Tax Benefits .......................................................... 40

   8.5. Imposition of Fine ..................................................................... 47

   8.6. System Enhancement Initiatives ............................................. 51

      8.6.1 Funding of Initiatives ....................................................... 51

      8.6.2 Root Cause Analyses ......................................................... 52

      8.6.3 Format and Availability of Reports and Data ............... 56

      8.6.4 Timing of Wildfire Safety Audit ..................................... 58

   8.7. Tubbs Fire .................................................................................... 59

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 3 of 89

8.8. Future Review of Costs Associated with 2017 and 2018 Wildfires........... 62

8.9. Further Consideration of Systemic Issues ..................................................... 64

8.10. Approval of Proposed Settlement with Modifications ............................... 66

9. Rulings on Motions ...................................................................................................... 70

10. Motion Requesting Other Relief, Appeals, and Request for Review .............. 71

11. Comments on Decision Different ......................................................................... 74

12. Assignment of Proceeding ...................................................................................... 75

Findings of Fact .............................................................................................................. 75

Conclusions of Law ....................................................................................................... 80

ORDER .............................................................................................................................. 81

**Appendix A –** Settlement Agreement

### DECISION APPROVING PROPOSED SETTLEMENT AGREEMENT
### WITH MODIFICATIONS

## Summary

This decision approves with modifications a settlement proposed by Pacific Gas & Electric Company (PG&E), the Commission's Safety and Enforcement Division, the Commission's Office of the Safety Advocate, and the Coalition of California Utility Employees, which resolves all issues in this investigation concerning the penalties and other remedies that should be imposed on PG&E for the role its electrical facilities played in igniting wildfires in its service territory in 2017 and 2018.

With the modifications to the settlement agreement, this decision imposes penalties totaling $2.137 billion, which consist of:

- $1.823 billion in disallowances for wildfire-related expenditures (an increase of $198 million from the proposed settlement agreement);

- $114 million in System Enhancement Initiatives and corrective actions (an increase of $64 million from the proposed settlement agreement); and

- a $200 million fine payable to the General Fund, which shall be permanently suspended.

In addition, this decision requires any tax savings associated with the shareholder obligations for operating expenses under the settlement agreement, as modified by this decision, to be returned to the benefit of ratepayers.

These modifications to the settlement agreement are appropriate given the widespread harm resulting from the 2017 and 2018 fires at issue in this investigation;  the uncertainty that PG&E would otherwise recover from ratepayers a substantial portion of the costs identified in the settlement agreement;  the anticipated tax savings for PG&E associated with its shareholder

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 5
of 89

obligations;  and the importance of fines to punish and deter future misconduct and in light of Commission precedent.

Upon approval by the Bankruptcy Court[1] of the settlement agreement as modified, this proceeding is closed.

## 1.  Factual Background

In October 2017 and November 2018, multiple wildfires started burning across Pacific Gas and Electric Company (PG&E)'s service territory in Northern California.  These wildfires were unprecedented in size, scope, and destruction.

The "October 2017 Fire Siege" started on the evening of October 8, 2017 into the morning of October 9, 2017.  At the peak of the 2017 wildfires, there were 21 major wildfires that, in total, burned 245,000 acres.  Eleven thousand firefighters battled the fires that, at one time, forced 100,000 people to evacuate, destroyed an estimated 8,900 structures (as of October 30, 2017) and took the lives of 44 people:[2] the Atlas Fire (Napa, 6 fatalities), the Cascade Fire (Yuba, 4 fatalities), the Nuns Fire (Napa/Sonoma, 3 fatalities), the Redwood Valley Fire (Mendocino, 9 fatalities), and the Tubbs Fire (Sonoma, 22 fatalities).[3]

In the early morning hours of November 8, 2018, a fire ignited near Camp Creek Road near the community of Pulga in Butte County.  The resulting Camp Fire burned approximately 153,336 acres, destroyed 18,804 structures, and resulted in 85 fatalities.

---

[1] United States Bankruptcy Court for the Northern District of California, Case No. 19-30088DM (Bankruptcy Court).

[2] Of the 44 fatalities, 22 are attributed to fires started by PG&E facilities.

[3] Report on October 2017 Fire Siege by the Commission's Safety and Enforcement Division dated June 13, 2019 (SED Fire Report) at 1.  The SED Fire Report and attached individual incident investigation reports were designated as Appendix A to the order instituting this investigation.

## 2. Procedural Background

On June 27, 2019, the Commission issued this Order Instituting Investigation (OII) into the maintenance, operations, and practices of PG&E with respect to its electric facilities and ordered PG&E to show cause why the Commission should not impose penalties or other remedies for the role PG&E's electrical facilities had in igniting wildfires in its service territory in 2017.

The Commission initiated the investigation in response to investigative reports on the 2017 wildfires prepared by the Commission's Safety and Enforcement Division (SED), which found that PG&E had violated Commission General Orders (GOs) and Resolution E-4148 and failed to follow industry best practices. The OII addressed 15 of the 17 fire incidents that occurred in 2017 investigated by SED.[4] The California Department of Forestry and Fire Protection (CAL FIRE) had determined that PG&E's electrical facilities ignited all but one of these 15 fires.

The OII also ordered PG&E to provide a report on systemic issues as specified in Attachment B of the OII; to take immediate corrective actions to come into compliance with Commission requirements; and to file an application within 30 days of the issuance of the OII to develop an open source, publicly available mobile app that allows a Geographic Information System-equipped phone to send pictures of utility infrastructure (*e.g.,* pole) to an asset management system/database maintained by PG&E.

On July 29, 2019, PG&E filed its initial response to the OII/Order to Show Cause (OSC) (PG&E Initial Response) and also filed the mobile app application

---

[4] The OII did not include two of the fire incidents, the Lobo and McCourtney Fires, because information regarding those fires remained confidential at the time the Commission issued the OII.

(Application 19-07-019).  The Public Advocates Office at the Public Utilities Commission (Cal Advocates) and the Coalition of California Utility Employees (CUE) also filed responses to the OII on July 29, 2019.

On August 5, 2019, PG&E submitted its Report in Response to Attachment B of the OII/OSC (Attachment B Report), which included PG&E's responses to all Attachment B requirements with the exception of Requirements III.B.1, 2 and 7.[5]  On August 14, 2019, PG&E submitted an Amendment to Exhibit 4 of its Attachment B Report.  On August 23, 2019, PG&E submitted its Supplemental Response to Attachment B of the OII, which included additional responses to Attachment B Requirements III.B.1, 2 and 7 and Section VI.B. of its Attachment B Report.

A prehearing conference (PHC) was held on August 13, 2019, to discuss the service list, scope of issues, and schedule for the proceeding.  The Assigned Commissioner's Scoping Memo and Ruling (Scoping Memo) was issued on August 23, 2019 setting forth the category, issues to be addressed, and schedule of the proceeding.  The Scoping Memo ruled that the scope of this proceeding would include issues concerning the 15 fires addressed in the OII.[6]  The Scoping Memo also noted that SED intended to file a motion requesting to expand the scope of the proceeding to include alleged violations concerning the 2017 Lobo and McCourtney Fires and some or all of the 2018 Camp Fire.[7]  The Scoping Memo directed PG&E and SED to meet at least once a week to address the

---

[5]  At a status conference held on July 29, 2019, the assigned Administrative Law Judge (ALJ) authorized an extension of time to respond to certain Attachment B requirements.

[6]  Scoping Memo at 4-5.

[7]  Scoping Memo at 5.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 8 of 89

potential for settlement and also to meet with other parties regarding settlement and stipulated issues.

On September 6, 2019, the assigned Administrative Law Judge (ALJ) issued a ruling directing parties to brief various pre-evidentiary hearing legal issues.  PG&E, SED, Cal Advocates, the Office of the Safety Advocate (OSA), The Utility Reform Network (TURN), and Thomas Del Monte (Del Monte) and Wild Tree Foundation (Wild Tree) (jointly) filed opening pre-evidentiary hearing briefs addressing disputed legal issues on October 14, 2019.  PG&E, SED, Cal Advocates, TURN, and Del Monte/Wild Tree filed reply briefs on October 28, 2019.

SED subsequently released its reports for the Lobo and McCourtney Fires and on October 17, 2019 filed a motion to amend the scope of the proceeding to include these fires.  On October 28, 2019, an Amended Scoping Memo and Ruling (Amended Scoping Memo) was issued amending the scope of the proceeding to include issues concerning the Lobo and McCourtney Fires.

OSA and Del Monte served testimony on November 8, 2019.  PG&E served reply testimony for all its fact and expert witnesses with the exception of one witness on November 18, 2019.

On November 15, 2019, SED filed its Reply to PG&E's Report in Response to Attachment B.

On November 26, 2019, SED filed a motion to expand the scope of the proceeding to include the Camp Fire.  The motion included, as an attachment, a copy of SED's investigative report on the Camp Fire.  On December 5, 2019, a Second Amended Scoping Memo and Ruling (Second Amended Scoping Memo)

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 9 of 89

was issued amending the scope of the proceeding to include issues concerning the Camp Fire.[8]

Since the PHC, the parties have met bilaterally or multilaterally over thirty times and have filed weekly or bi-weekly joint status reports regarding settlement efforts. On November 18, 2019, PG&E issued a notice of settlement conference pursuant to Rule 12.1(b) of the Commission's Rules of Practice and Procedure. On December 17, 2019, PG&E, SED, OSA, and CUE (collectively, Settling Parties) filed a joint motion for approval of a settlement agreement, which would resolve all issues in this investigation (Joint Motion). The settlement was not joined by all parties to this investigation.

On December 30, 2019, the assigned ALJ issued a ruling directing PG&E to provide additional information regarding the proposed settlement agreement. PG&E timely filed a response to the ruling on January 10, 2020.

On January 16, 2020, Cal Advocates, TURN,[9] Del Monte and Wild Tree (jointly), and the City and County of San Francisco (CCSF) filed comments on the

---

[8] Contrary to assertions by Del Monte, Wild Tree, and Cal Advocates, the Second Amended Scoping Memo did not establish a schedule for issues related to the Camp Fire, and consequently, there was no discovery cut-off established for the Camp Fire. The discovery cut-off established in rulings issued prior to the Second Amended Scoping Memo applied to issues identified in the Scoping Memo and Amended Scoping Memo, which did not include issues related to the Camp Fire. (*See* Seconded Amended Scoping Memo at 4 (affirming schedule for issues identified in the Scoping Memo and Amended Scoping Memo).) Furthermore, pursuant to Rules 10.1 and 12.3 of the Commission's Rules of Practice and Procedure, parties were not precluded from conducting discovery regarding the settlement agreement.

[9] On January 17, 2020, TURN submitted a revised version of its comments, which added a table of contents, corrected page number formatting errors, and modified the new language proposed by TURN to address tax benefits from the settlement. All references in this decision to TURN's comments on the settlement agreement are to TURN's comments as amended on January 17, 2020.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 10 of 89

proposed settlement agreement. PG&E and CUE (jointly), SED, Cal Advocates, and TURN filed reply comments on January 31, 2020.[10]

On February 12, 2020, Cal Advocates filed a motion requesting a hearing on the contested settlement.

On February 25, 2020, Del Monte and Wild Tree filed a motion requesting evidentiary hearings on the settlement and to reopen the discovery period.

On February 27, 2020, the presiding officer issued the Presiding Officer's Decision Approving Proposed Settlement Agreement with Modifications (POD) to resolve the issues in this investigation. As described in Section 10, below, a motion requesting other relief, appeals, and a request for review were filed in response to the POD.

On April 20, 2020, the Decision Different of Commissioner Rechtschaffen Approving Proposed Settlement Agreement with Modifications (Decision Different) was issued. Parties filed comments on the Decision Different as described in Section 11, below.

## 3. Violations Found by SED

SED found violations for 15 of the 18 fires included in this investigation. Most but not all of the alleged violations are related to an ignition of a fire. Alleged violations not directly related to the ignition of a fire include violations related to recordkeeping practices, late work orders, and evidence disposal. With respect to the 2017 wildfires, SED found a total of 33 violations of GO 95 and Resolution E-4184. GO 95 establishes requirements for the design, construction, and maintenance of overhead electric lines to ensure adequate

---

[10] Unless otherwise specified, all references to a party's comments or reply comments are to the party's comments and reply comments on the proposed settlement agreement.

Case: 19-30088  Doc# 7322-18  Filed: 05/15/20  Entered: 05/15/20 15:58:31  Page 11 of 89

service and safety.  Resolution E-4184 sets forth procedures for reporting electric and gas emergencies to Commission Staff.

With respect to the 2018 Camp Fire, SED found 12 violations of GOs 95 and 165, Resolution E-4184, and Public Utilities Code § 451.  GO 165 establishes requirements for inspections of electric distribution and transmission facilities (excluding those facilities contained in a substation) in order to ensure safe and high-quality electrical service.  Pub. Util. Code § 451 requires every public utility "to furnish and maintain such adequate, efficient, just, and reasonable service, instrumentalities, equipment, and facilities … as are necessary to promote the safety, health, comfort, and convenience of its patrons, employees, and the public."

The following table summarizes the violations SED found for each fire:[11]

| No. | Incident | Violations Found |
|---|---|---|
| 1 | Adobe Fire | GO 95, Rule 31.1 – Hazardous tree not identified and abated |
| | | GO 95, Rule 31.1 – Records of 2015 CEMA inspection not retained |
| | | GO 95, Rule 31.1 – Work order completed late |
| 2 | Atlas Fire | GO 95, Rule 31.1 – Failure to identify and abate hazardous Black Oak tree at Atlas 1 site |
| | | GO 95, Rule 31.1 – Failure to identify and perform correctional prune of hazardous Valley Oak codominant branch at Atlas 2 site |
| | | GO 95, Rule 35 – Vegetation clearance not maintained at Atlas 1 site |
| | | GO 95, Rule 35 – Vegetation clearance not maintained at Atlas 2 site |

---

[11]  SED Fire Report at 12-14; SED Lobo Fire Report at 2; SED McCourtney Fire Report at 2; SED Camp Fire Report at 2-3.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 12 of 89

| No. | Incident | Violations Found |
|---|---|---|
|  |  | GO 95, Rule 31.1 – Work order completed late |
| 3 | Cascade Fire | GO 95, Rule 38 – Conductor clearance not maintained |
| 4 | Cherokee Fire | No violations identified |
| 5 | La Porte Fire | No violations identified |
| 6 | Norrbom Fire | GO 95, Rule 31.1 – Hazardous tree not identified and abated |
|  |  | GO 95, Rule 35 – Vegetation clearance not maintained |
| 7 | Nuns Fire | GO 95, Rule 35 - Improper prioritization and delay in abating vegetation strain on secondary conductor |
| 8 | Oakmont/Pythian Fire | GO 95, Rule 31.1 – Incomplete patrol prior to re-energizing circuit |
|  |  | GO 95, Rule 31.1 – Failed to complete work order and reinforce a pole |
|  |  | GO 95, Rule 31.1 – Completed a work order late |
| 9 | Partrick Fire | GO 95, Rule 31.1 – Hazardous tree not identified and abated |
|  |  | GO 95, Rule 35 – Vegetation clearance not maintained |
| 10 | Pocket Fire | GO 95, Rule 31.1 – Hazardous tree not identified and abated |
|  |  | GO 95, Rule 35 – Vegetation clearance not maintained |
| 11 | Point Fire | GO 95, Rule 19 – Evidence disposal |
| 12 | Potter/Redwood Fire | Resolution E-4184 – Second fire located at 9100 Main St., Potter Valley not reported |
|  |  | GO 95, Rule 31.1 – Repair records not maintained |
|  |  | GO 95, Rule 31.1 – Records of 2016 CEMA inspection not maintained |
| 13 | Sulphur Fire | GO 95, Rule 19 – Evidence disposal |
|  |  | GO 95, Rule 31.1 – Records of 2016 CEMA inspection not maintained |
| 14 | Tubbs Fire | No violations identified |

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 13 of 89

| No. | Incident | Violations Found |
|-----|----------|------------------|
| 15 | Youngs Fire | GO 95, Rule 31.1 – Hazardous tree not identified and abated |
| | | GO 95, Rule 35 – Vegetation clearance not maintained |
| 16 | Lobo Fire | GO 95, Rule 31.1 – Hazardous tree with open cavity not identified and abated |
| | | GO 95, Rule 31.1 – Failure to identify unsafe condition that left the subject tree exposed to high winds |
| | | GO 95, Rule 31.1 – Records of 2014 CEMA inspection not maintained |
| | | GO 95, Rule 35 – Vegetation clearance not maintained |
| 17 | McCourtney Fire | GO 95, Rule 31.1 – Failure to identify and remove a hazardous tree |
| | | GO 95, Rule 35 – Vegetation clearance not maintained |
| 18 | Camp Fire | GO 95, Rule 44.3 – Failure to replace or reinforce the C-hook on Tower :27/222 (Incident Tower) before its safety factor was reduced to less than two-thirds of the safety factor specified in Rule 44.1, Table 4, which is a violation of Rule 44.3. |
| | | GO 95, Rule 31.1 – Failure to maintain the C-hook supporting the transposition jumper on the Incident Tower :27/222 for its intended use and regard being given to the conditions under which it was to be operated. |
| | | GO 95, Rule 31.2 – Failure to inspect Incident Tower thoroughly and failure to detect an immediate Safety Hazard or Priority A condition on the incident C-hook. |
| | | GO 165, Section IV – PG&E failed to follow its procedures by failing to document the factors and reasons that led to the delay in the repair work on the Incident Tower. |

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
14 of 89

| No. | Incident | Violations Found |
|-----|----------|------------------|
|  |  | GO 165, Section IV – Failure to conduct detailed climbing inspections when conditions to trigger climbing inspections were evident as specified by internal procedures.  Wear on the original working eyes that remained on the Incident Tower is an indication of a known condition with potential to recur on the added hanger plates with working eyes, which should have triggered detailed climbing inspection to examine the added hanger plates. |
|  |  | GO 95, Rule 31.1 –The condition of the C-hook (material loss > 50%) supporting the transposition jumper on Tower :24/199 demonstrates that PG&E did not maintain the tower for its intended use. |
|  |  | GO 95, Rule 31.2 – Failure to inspect Tower :24/199 thoroughly and failure to detect an immediate Safety Hazard or Priority A Condition on the C-hook. |
|  |  | GO 165, Section IV – C-hook on Tower :24/199 had material loss of over 50%. PG&E failed to detect and correct the Priority A condition as specified in PG&E's procedures. |
|  |  | GO 95, Rule 18 – PG&E assigned an incorrect priority for an immediate Safety Hazard (disconnected insulator hold-down anchor on Tower :27/221). |
|  |  | GO 165, Section IV – PG&E failed to follow its procedures by using an outdated inspection form during the detailed climbing inspections that PG&E conducted from September 19 to November 5, 2018. |
|  |  | Decision (D.) 06-04-055, as amended by Resolution E-4184 – PG&E failed to report the reportable incident on the Big Bend 1101 12kV Distribution Circuit in a timely manner. |

| No. | Incident | Violations Found |
|---|---|---|
|  |  | CA Pub. Util. Code § 451 – Failure to maintain an effective inspection and maintenance program to identify and correct hazardous conditions on its transmission lines in order to furnish and maintain service and facilities, as are necessary to promote the safety and health of its patrons and the public. |

## 4.  PG&E Position on Violations

In PG&E's Initial Response, PG&E acknowledged that, with regard to the operation and maintenance of its electric facilities, there were some areas in which it could have performed better to mitigate risks.  However, PG&E disagreed with many of the findings in SED's Fire Reports and contested that there were violations of GO 95 and other Commission rules.  PG&E argued that SED erred in its interpretation and application of Rules 31.1, 35, and 38 of GO 95, and that SED misapplied GO 95, Rule 19 and Resolution E-4184.[12]

In PG&E's Initial Response, PG&E did not contest nine of SED's alleged violations but asserted that its decision not to contest these violations was not an admission of any wrongdoing, unlawful conduct, or liability.[13]  PG&E argues that of these nine violations, only one (Violation of GO 95, Rule 31.1 for an incomplete patrol prior to re-energizing a line for the Oakmont/Pythian Fire) was found to be related to the ignition of a fire.  The remainder of the uncontested violations related to late completion of work orders, failure to maintain records, and evidence disposal.

The Lobo, McCourtney, and Camp Fires were added to the scope of this investigation after PG&E's Initial Response was filed, and therefore, were not

---

[12]  PG&E Initial Response at 23.

[13]  PG&E Initial Response at 42.

addressed in the Initial Response.  The settlement agreement sets forth PG&E's positions on the allegations for all of the fires within the scope of this investigation.  PG&E disputes all but four of the allegations for the newly added fires.[14]  The uncontested allegations relate to failure to maintain records for the Lobo Fire, and failure to document reasons for repair work, use of outdated inspection form, and failure to report a reportable incident in a timely manner for the Camp Fire.

## 5.  Summary of Proposed Settlement

The proposed settlement would resolve all issues in this investigation and consists of three primary substantive components.

First, the Settling Parties have stipulated to a series of facts and violations.[15]  PG&E does not dispute that its electric facilities played a role in the ignition of all fifteen fires for which SED found violations.[16]  Other facts the Settling Parties have stipulated to include:

- the conditions of the subject trees identified in SED's investigative reports;

- instances of missing repair records;

- instances of repair work completed after the original due date;

- circumstances surrounding disposal of evidence;

- the conditions of equipment relevant to the 2018 Camp Fire investigation and alleged violations; and

- the inspection and maintenance history relevant to the 2018 Camp Fire investigation and alleged violations.

---

[14] Settlement Agreement, Exhibit B.

[15] Settlement Agreement, Exhibits A and B.

[16] *See* Settlement Agreement, Exhibit A, Stipulated Facts 10, 16, 22, 27, 33, 39, 42, 45, 50, 54, 58, 61, 67, 72, 132, and 133.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 17 of 89

Although PG&E stipulates to various facts, as discussed above, except for a few allegations largely unrelated to the ignition of these fires, PG&E continues to dispute that it violated applicable laws, rules, and regulations.

Second, the settlement agreement requires PG&E to bear $1.675 billion in financial obligations. PG&E agrees that it will not seek rate recovery of certain wildfire-related expenses and expenditures in future applications, which will total $1.625 billion. In addition, PG&E will spend $50 million, funded by shareholders, on 20 specified System Enhancement Initiatives.

Third, the settlement agreement requires PG&E to undertake 20 System Enhancement Initiatives. These initiatives include vegetation management and electric operations-focused initiatives, system wide analyses, community engagement-focused initiatives, and transparency and accountability-focused initiatives.

The full settlement agreement is attached as Appendix A to this decision.

## 6. Party Positions on Proposed Settlement

Cal Advocates, TURN, and Del Monte/Wild Tree (collectively, "Opposing Parties") filed comments opposing the proposed settlement agreement. These parties argue that the proposed settlement is not reasonable in light of the record, consistent with the law, or in the public interest.

Cal Advocates opposes the proposed settlement agreement on the following grounds: (1) the terms of the settlement agreement are not commensurate with the magnitude of PG&E's violations or the harm PG&E caused; (2) it does not bar PG&E from seeking recovery of costs related to fires that were caused by PG&E's failure to operate its electric facilities according to the law; (3) it fails to identify a process for considering and implementing corrections to lessen the likelihood of future catastrophic wildfires caused by

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 18 of 89

PG&E's electric facilities; and (4) the proposed settlement needlessly constrains the Commission's ability to evaluate the October 2017 Tubbs Fire, even if new information changes CAL FIRE's current conclusion that PG&E facilities did not ignite the Tubbs Fire.

Cal Advocates recommends that the Commission deny the settlement agreement unless it is revised to: (1) bar PG&E from seeking recovery of costs associated with fires for which SED found violations, and (2) allow SED to consider violations or enforcement proceedings regarding the Tubbs Fire in the event that CAL FIRE or another state, federal, or local entity determines that PG&E's infrastructure was the cause of the Tubbs Fire. Cal Advocates also recommends that the Commission leave this proceeding open to consider and implement corrections to lessen the likelihood of future catastrophic wildfires caused by PG&E's electric facilities.

TURN also opposes the proposed settlement as neither consistent with the whole record nor in the public interest. TURN argues that the proposed settlement suffers from the following significant deficiencies: (1) the proposed penalty does not include purely incremental disallowances, and is therefore, insufficient in light of PG&E's conduct; (2) ratepayers are at risk of funding projects that would not have occurred but for PG&E's role in these wildfires; and (3) the settlement does not address how PG&E will use any tax benefit received as a function of the settlement.

Although TURN opposes the settlement, TURN recognizes the condensed timeframe for review and the necessity of addressing prepetition claims before PG&E exits bankruptcy. Rather than outright rejection of the settlement agreement, TURN recommends the following modifications to the settlement to strengthen the proposed penalty: (1) ensure that the penalty is sufficient to

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 19 of 89

reflect the gravity of the violations by requiring PG&E to forego rate recovery of costs that are likely recoverable from ratepayers;  (2) require PG&E shareholders to fully fund the System Enhancement Initiatives, even if the costs exceed the $50 million provided in the settlement;  and (3) clarify that any tax benefits that are realized as a result of the structure of the penalty in this case must serve to benefit ratepayers.  TURN recommends that the Commission reject the settlement if the Settling Parties do not accept these alternative terms as provided for in Rule 12.4(c) of the Commission's Rules of Practice and Procedure.  TURN also recommends that this proceeding remain open for a second phase to consider the root cause analyses completed for the different wildfires in order to ensure that the underlying causes are adequately identified and mitigated.

Del Monte and Wild Tree also oppose the proposed settlement agreement. They argue that the settlement agreement is not in the public interest because: (1) it does not include a fine, which is an integral part of Commission enforcement actions in order to effectively deter future violations by the perpetrator and others;  (2) the financial obligations agreed to in the settlement are de minimis given that PG&E likely would not have received ratepayer recovery for a substantial amount of the costs and given the tax benefits associated with the financial obligations;  (3) the settlement agreement does not necessarily prohibit use of previously authorized debtor-in-possession (DIP) financing for the $1.625 billion in financial obligations;  and (4) in stark contrast to previous utility enforcement actions, it is "a no-fine settlement reached in just a matter of months with scant record evidence."

Del Monte and Wild Tree also argue that the settlement agreement is contrary to law because:  (1) the settlement does not adequately weigh and

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 20 of 89

consider PG&E's conduct as required by law;  and (2) SED's conclusions regarding PG&E's financial situation are contrary to law.

Del Monte and Wild Tree further argue that the settlement agreement is not reasonable in light of the whole record because it does not take into account any violations for PG&E's role in the Tubbs Fire.

Del Monte and Wild Tree request that the Commission deny the Joint Motion and move forward with evidentiary hearings.  Should the Commission adopt the settlement agreement with modifications, Del Monte and Wild Tree request that any reference to the Tubbs Fire be removed from the settlement agreement because they contend that the facts and violations associated with the Tubbs Fire were excluded from discovery and not adequately considered in this investigation.

CCSF filed comments proposing limited modifications to the settlement agreement to ensure transparency on important issues of public safety but did not take a position on other aspects of the settlement agreement.  Specifically, CCSF recommends that the settlement agreement be modified to make the quarterly electric maintenance reports and documentation of "near hit" potential fire incidents available to local governments and the general public.  CCSF also states that the location information for both the quarterly electric maintenance reports and "near hits" should be presented in a manner that is understandable by local government officials and the general public.

## 7.  Standard of Review

In order for the Commission to approve a proposed settlement, the Commission must find that it is reasonable in light of the whole record,

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 21 of 89

consistent with law, and in the public interest.[17]  In general, the Commission does not consider if a settlement reaches the optimal outcome on every issue. Rather, the Commission determines if the settlement as a whole is reasonable.

The Commission's policy is that contested settlements should be subject to more scrutiny compared to an all-party settlement.  As explained in D.02-01-041:

> In judging the reasonableness of a proposed settlement, we have sometimes inclined to find reasonable a settlement that has the unanimous support of all active parties in the proceeding. In contrast, a contested settlement is not entitled to any greater weight or deference merely by virtue of its label as a settlement; it is merely the joint position of the sponsoring parties, and its reasonableness must be thoroughly demonstrated by the record.[18]

## 8.  Discussion

### 8.1.  Penalty Factors

The financial obligations imposed by the settlement agreement are to resolve an enforcement action alleging violations of law by a public utility, and therefore, the Commission considers the financial obligations to be a settlement of the penalties to be imposed in this case.[19]  In evaluating the reasonableness of a settlement involving a penalty, the Commission considers the following criteria adopted in D.98-12-075:[20]

---

[17]  Commission's Rules of Practice and Procedure, Rule 12.1(d).

[18]  D.02-01-041 at 13.

[19]  Consistent with past Commission decisions, this decision uses the term "fines" to refer to monies imposed under Pub. Util. Code § 2107 and paid to the General Fund and the term "penalties" to refer to the combination of fines, disallowances, and remedies. (*See* D.15-04-024 at 27.)

Although the Settling Parties do not use the term "penalty" to describe the financial obligations to be imposed on PG&E, the Settling Parties analyze the settlement agreement in light of the penalty factors set forth in D.98-12-075.  (Joint Motion at 34.)

[20]  D.98-12-075 at 35-39.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 22 of 89

(1) Severity of the offense;

(2) The conduct of the utility;

(3) The financial resources of the utility;

(4) The totality of the circumstances in furtherance of the public interest; and

(5) The amount of the fine in relationship to prior Commission decisions.

Given that a settlement agreement was reached before this proceeding was fully adjudicated and several legal and factual issues remain in dispute, the Commission evaluates the reasonableness of the Settling Parties' proposed outcome based on the record to date and in light of the potential range of outcomes that could result if this proceeding was fully adjudicated and the litigation risk facing the parties.

### 8.1.1  Severity of the Offense

The Commission considers several factors in evaluating the severity of the offense, including physical harm, economic harm, and harm to the regulatory process, as well as the number and scope of violations.  The most severe violations are those that caused actual physical harm to people or property, with violations that threatened such harm closely following."[21]  A high level of severity is also accorded to the disregard of a statutory or Commission directive, regardless of the effect on the public, since such compliance is absolutely necessary to the proper functioning of the regulatory process.[22]

There is no question that the physical and economic harm resulting from the 2017 and 2018 wildfires is unprecedented.  The 2017 and 2018 wildfires resulted in over 100 deaths, the destruction of over 25,000 structures, and the

---

[21] D.98-12-075 at 36.

[22] D.98-12-075 at 36.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 23 of 89

burning of hundreds of thousands of acres. There is also no dispute that PG&E equipment played a role in igniting the 15 fires for which SED found violations. While PG&E accepts that its equipment played a role in igniting certain fires, PG&E continues to dispute SED's assertions that it violated applicable laws, rules, and regulations.[23]

The Settling Parties state that harm to the regulatory process was not deemed a significant factor for purposes of the settlement agreement because there were no allegations of Rule 1.1 violations, ethical violations, or any deliberate misconduct associated with the wildfires covered by this OII.[24] However, as noted by Cal Advocates, SED alleged several violations of rules regarding the preservation of evidence and the reporting of incidents, which directly relate to harm to the regulatory process.[25] Moreover, harm to the regulatory process can result from a failure to follow Commission requirements.

Given the unprecedented nature of the physical and economic harm, the detailed nature of SED's violations, as well as the fact that there are allegations regarding harm to the regulatory process, which are also accorded a high level of severity, the litigation risk to PG&E is very high. In the event that the Commission were to find that PG&E committed all or even some of the violations as alleged by SED, these violations would be considered the most severe and the severity of the offense factor would weigh in favor of a very significant penalty.

---

[23] PG&E Reply Comments at 7.

[24] Joint Motion at 36.

[25] Cal Advocates Reply Comments at 4-5.

### 8.1.2  Conduct of the Utility

In considering the conduct of the utility, the Commission examines the utility's conduct in:  (1) preventing the violation, (2) detecting the violation, and (3) disclosing and rectifying the violation.[26]  Utilities are expected to take reasonable steps to ensure compliance with applicable laws and regulations.  In evaluating a utility's actions to prevent a violation, "the Commission will consider the utility's past record of compliance with Commission directives."[27]

SED contends that PG&E's conduct prior to the 2017 and 2018 wildfires led to its inability to prevent, detect, and rectify the violations of GO 95, GO 165, and Pub. Util. Code § 451 identified in SED's investigative reports.  SED considered PG&E's failure to detect and prevent the violations prior to the events a significant factor for purposes of the settlement agreement, especially since many of the violations alleged by SED span decades.[28]

On the other hand, PG&E continues to contend that it followed the requirements of GO 95 when inspecting its electric facilities and performing vegetation management prior to the 2017 and 2018 wildfires.[29]  PG&E also states that it embarked on numerous improvements to its electric facility operations and maintenance in response to the 2017 and 2018 wildfires.[30]  The Settling Parties state that they have taken into consideration PG&E's efforts to proactively address the issues raised in the OII and have worked to prescribe a set of

---

[26] D.98-12-075 at 37-38.

[27] D.98-12-075 at 37.

[28] Joint Motion at 37.

[29] Joint Motion at 37.

[30] Joint Motion at 37.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 25 of 89

corrective actions intended to further enhance PG&E's efforts to minimize the risk of catastrophic wildfire in the future.[31]

The Opposing Parties argue that PG&E's conduct and inadequate efforts to prevent, detect, disclose, and rectify violations weigh in favor of significant penalties and that the penalties set forth in the settlement agreement are inadequate.[32]  Although PG&E states that it has made numerous improvements in response to the 2017 and 2018 wildfires,[33] parties note that PG&E's vegetation management program in 2019 has produced questionable results as measured by the Federal Monitor's Report.[34]

TURN also observes that the 2017 and 2018 wildfires are the latest in a series of disastrous safety lapses for the utility, which include:[35]

- a natural gas line rupture in San Bruno on September 9, 2010, which resulted in the Commission imposing $1.6 billion in penalties and the utility being found guilty of criminal conduct by a federal jury and being put on criminal probation;

- the fatality of a PG&E subcontractor at PG&E's decommissioned Kern Power Plant on June 19, 2012, which resulted in the Commission imposing $5.6 million in penalties;

- the Commission imposed $25.6 million in penalties in response to six incidents from 2010 and 2014 that called into question the safety of PG&E's natural gas distribution system;

---

[31] Joint Motion at 37-38.

[32] *See, e.g.,* Del Monte/Wild Tree Comments at 33; TURN Comments at 16; Cal Advocates Reply Comments at 5.

[33] Joint Motion at 37.

[34] TURN Comments at 14; Cal Advocates Reply Comments at 5.

[35] TURN Comments at 2-3.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 26 of 89

- the Butte Fire, which began on September 9, 2015 and destroyed approximately 70,000 acres of land, destroyed 921 structures, and left two civilians dead and resulted in SED issuing PG&E a citation for $8 million; and

- the Commission imposed $110 million in penalties in response to numerous violations for PG&E's implementation of its locate and mark program for identifying the location of underground gas and electric facilities prior to construction activities.

There are serious questions regarding PG&E's efforts to prevent, detect, and rectify the violations that are at issue in this proceeding.  Some of SED's allegations span decades.  Furthermore, PG&E has a demonstrated record of failing to comply with Commission directives, including those related to vegetation management.  In SED's citation for the Butte Fire issued on April 25, 2017, SED stated that it found PG&E in violation of GO 95, Rule 31.1, 37 times since 1999.[36]

It is clear from the record that PG&E failed to take any meaningful steps to prevent or detect this significant number of violations.  In fact, PG&E continues to dispute that most of the violations alleged by SED occurred.  These potential violations only came to light after the ignition of deadly and catastrophic fires, not as a result of any PG&E- initiated actions.  Moreover, although the Settling Parties assert that PG&E has made proactive efforts to address the issues raised in the OII, there are ongoing questions regarding whether PG&E has rectified its practices to avoid such incidents in the future.

---

[36] Citation No.: D.16-09-055 E.17-04-001 at 4.

### 8.1.3 Financial Resources of the Utility

In setting the level of a fine or penalty, the Commission must balance "the need for deterrence with the constitutional limitations on excessive fines."[37] The Commission, therefore, must "adjust fine levels to achieve the objective of deterrence, without becoming excessive, based on each utility's financial resources."[38]

The Settling Parties state that PG&E is currently in Chapter 11 bankruptcy proceedings and contend that this is a unique circumstance that affects PG&E's ability to pay any monetary penalty, particularly one that would require a cash payment to the General Fund. PG&E states that its ability to raise capital as part of its plan of reorganization is limited and depends in large part on the amount of capital it will require to resolve other claims.[39] In reaching a settlement, the Settling Parties took into account the fact that PG&E has total financial obligations of $25.5 billion to settle all claims related to the 2017 and 2018 wildfires as part of its proposed reorganization plan and will need an additional $4.8 billion for an initial contribution to the Wildfire Fund established pursuant to Assembly Bill (AB) 1054 (Stats. 2019), which is intended to help the state's electric utilities pay for future wildfire damages.[40]

Cal Advocates comments that PG&E is one of the largest combined natural gas and electric energy companies in the United States.[41] Cal Advocates argues that while the Commission may decide that PG&E's current financial resources

---

[37] D.98-12-075 at 38.

[38] D.98-12-075 at 39.

[39] PG&E/CUE Reply Comments at 8.

[40] Joint Motion at 38-39.

[41] Cal Advocates Reply Comments at 5-6.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 28 of 89

weigh in favor of a lower penalty than it would ordinarily impose on a utility of PG&E's size, the Commission should not approve a settlement with financial remedies too low to effectuate deterrence.

The fact that PG&E is currently in bankruptcy proceedings is a factor the Commission must consider in assessing the financial resources of the utility that may weigh in favor of a lower penalty than ordinarily would be warranted. However, the Settling Parties do not provide sufficient information regarding the bankruptcy or PG&E's plan of reorganization that would enable the Commission to assess whether the amount and structure of the financial obligations imposed by the settlement agreement are the limit of a reasonable penalty for punishing and deterring the conduct at issue without being excessive in light of PG&E's financial resources. Information regarding the bankruptcy plan of reorganization is provided in only very general terms and the extent of PG&E's ability to pay a larger penalty is not clear from the record.

### 8.1.4  Totality of Circumstances in Furtherance of Public Interest

The totality of the circumstances in furtherance of the public interest factor requires the Commission to:

> specifically tailor the package of sanctions, including any fine, to the unique facts of the case. The Commission will review facts which tend to mitigate the degree of wrongdoing as well as any facts which exacerbate the wrongdoing. In all cases, the harm will be evaluated from the perspective of the public interest.[42]

The Settling Parties argue that approval of the settlement agreement is in the public interest for reasons including: (1) it is consistent with the

---

[42]  D.98-12-075 at 39.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 29 of 89

Commission's policy in support of settlement, which promotes administrative efficiency so that the Commission and parties are not required to expend substantial time and resources on continued litigation; (2) the settled outcome reflects a reasonable compromise of the parties' positions and falls within a range of possible litigated outcomes; (3) timely resolution of this proceeding will help ensure that PG&E is able to conclude its Chapter 11 proceedings by June 30, 2020 to meet the AB 1054 deadline in order for PG&E to be able to participate in the Wildfire Fund, which will enable PG&E to be adequately capitalized to continue the necessary work set forth in its Wildfire Safety Plan; and (4) the settled costs relate to PG&E's efforts to mitigate future wildfire risks and show PG&E's intent to operate and maintain its electric facilities in accordance with law.[43]

The Opposing Parties argue that the settlement agreement is not in the public interest because the proposed penalty is not commensurate with the magnitude of the violations and the harm caused. TURN, Del Monte, and Wild Tree argue that the financial obligations set forth in the settlement agreement are not sufficient as a penalty because they do not consist of purely incremental financial obligations being imposed on PG&E and because PG&E may continue to receive tax savings from these expenses. Del Monte and Wild Tree also argue that the settlement agreement is not in the public interest because it does not include a fine payable to the General Fund. Del Monte, Wild Tree, and Cal Advocates also argue that the accelerated schedule for the proceeding has resulted in an inadequate record.

The Commission recognizes that the package of sanctions must be tailored to the unique facts of this case. As discussed further below, the Commission

---

[43] Joint Motion at 33-34, 40.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 30 of 89

takes into account and balances all of these considerations in evaluating the reasonableness of the penalties proposed in the settlement agreement.

### 8.1.5  Consistency with Precedent

In looking at the role of precedent, the Commission considers the proposed outcome with "previously issued decisions which involve the most reasonably comparable factual circumstances and explain[s] any substantial differences in outcome."[44]

The Settling Parties argue that that there is a wide range of outcomes in enforcement decisions involving electric operations safety issues and that the settlement agreement is reasonable when compared to the outcomes in other Commission proceedings.[45]  The Settling Parties argue that the settlement amount far exceeds the combined total of prior fire-related precedents and represents a significant amount even for a company of PG&E's size.[46]

Del Monte and Wild Tree argue that the settlement is inconsistent with long-standing well-reasoned precedent.  Del Monte and Wild Tree argue that it is difficult to adequately compare this proceeding to other enforcement actions and settlement precedent given the scope of harm and destruction that is at issue.[47]  Cal Advocates also comments that the damage and destruction at issue in this case are unprecedented.[48]

---

[44] D.98-12-075 at 39.

[45] Joint Motion at 41.

[46] Joint Motion at 45.

[47] Del Monte/Wild Tree Comments at 25-27.

[48] Cal Advocates Reply Comments at 6.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 31 of 89

In reviewing the Commission precedent presented by the Settling Parties,[49] the Commission does not find any previously issued decision that presents "reasonably comparable factual circumstances."  The loss of life, physical and economic harm, and destruction that are at issue in this proceeding are unprecedented and not comparable to the factual circumstances of prior enforcement proceedings.  For example, the Settling Parties cite to some prior incidents that involved no reported fatalities or injuries.[50]  Other prior incidents involved one or two fatalities.[51]  In comparison, the incidents at issue in this case for which SED found violations involves 107 fatalities.[52]

Furthermore, the violations alleged in this proceeding involve 15 separate fires.  There may be individual fires in this proceeding that are reasonably comparable to prior incidents.  However, there are others, such as the Camp Fire, for which the factual circumstances are not reasonably comparable to any prior incident.  In any event, there is no prior Commission decision that addresses factual circumstances on the scale of all 15 of these fires.

Del Monte and Wild Tree argue that the most comparable proceeding is the San Bruno OII, which was fully investigated and litigated and resulted in the Commission imposing penalties in the form of fines totaling $300 million, penalties of $850 million for infrastructure improvements, a $400 million bill

---

[49]  Joint Motion 41-45.

[50]  Long Beach Power Outages OII Decision (D.17-09-024) and Malibu Canyon Fire OII Decisions (D.12-09-019, D.13-09-026, and D.13-09-028).

[51]  Huntington Beach Underground Vault OII Decision (D.17-06-028), Kern Power Plant OII Decision (D.15-07-014), and Witch/Rice and Guejito Fire Settlements (D.10-04-047).

[52]  This is the number of fatalities reported in SED's Fire Reports.  Cal Advocates contends that the fatalities may exceed this number.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 32 of 89

credit, and $50 million in other remedies for a mix of penalties totaling
$1.6 billion.[53]

The Settling Parties argue that there are significant differences between the
record in this proceeding and the San Bruno proceedings,[54] including:  (1) the fact
that San Bruno involved three separate fully litigated investigations, and
(2) PG&E's financial resources are far more constrained today than they were at
the time of the San Bruno explosion.[55]

Although San Bruno involved fully litigated investigations, such precedent
may still be useful for assessing the potential range of outcomes that could result
if this proceeding was fully adjudicated.  However, there are factual differences
between this proceeding and the San Bruno proceedings.  The scope and severity
of the physical and economic harm at issue in this proceeding are on a scale
much greater than the physical and economic harm at issue in the San Bruno
proceedings, which would weigh in favor of higher penalties.  On the other
hand, PG&E's financial condition is much different than during the San Bruno
proceedings, which must be considered.

There is one aspect of the settlement agreement that departs from
Commission precedent.  The Settling Parties note that almost all of the precedent
they reference include a mix of fines, shareholder funding of programs, and/or
remedial action plans.[56]  Notably, all of these prior Commission decisions
included a fine payable to the General Fund.  The proposed settlement
agreement, however, does not include any fines.

---

[53]  Del Monte/Wild Tree Comments at 27.

[54]  I.11-02-016, I.11-11-009, I.12-01-007.

[55]  Joint Motion at 45-46, fn. 60; PG&E/CUE Reply Comments at 15-17.

[56]  Joint Motion at 45.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
33 of 89

## 8.2. Amount and Structure of Penalty

Under the terms of the proposed settlement agreement, PG&E's shareholders will bear $1.675 billion in financial obligations, which consists of $1.625 billion in disallowances of wildfire-related expenses and capital expenditures that PG&E incurred or will incur, as well as $50 million in System Enhancement Initiatives. The Settling Parties contend that their proposed outcome is reasonable in light of the whole record, consistent with the law, in the public interest, and meets the criteria set forth in D.98-12-075.

The Opposing Parties argue that PG&E should be penalized, and that the penalty must be commensurate with the magnitude of the alleged violations, the harm caused by the fires, and the utility's safety record. They argue that the terms of the settlement agreement do not provide for an adequate level of penalty in light of these considerations, and therefore, are not reasonable in light of the whole record or in the public interest.

While all of the Opposing Parties have recommendations for strengthening the penalty, Cal Advocates is the only party that offers an estimate of the amount of potential penalties in this investigation. Cal Advocates calculates potential penalties of approximately $943.8 million for the October 2017 wildfires and approximately $1.5 billion for the 2018 Camp Fire.[57] PG&E and CUE respond that Cal Advocates' estimates are based on unproven alleged violations, speculative estimates as to the longevity of the alleged violations, and the statutory maximum level for setting a fine without taking into account the financial resources of the utility.[58] TURN, on the other hand, argues that

---

[57] Cal Advocates Comments at Attachment B and Attachment E.

[58] PG&E/CUE Reply Comments at 14-15.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 34 of 89

Cal Advocates' calculations may actually underestimate the potential penalties, particularly with respect to the allegations related to the Camp Fire.[59]

The Settling Parties agree that "the settlement should be commensurate with the scale of the 2017 and 2018 wildfires."[60]  The Settling Parties represent that the settlement agreement "requires PG&E to bear an additional $1.675 billion in financial obligations to resolve this proceeding."[61]  By implication, the Settling Parties believe that the settled amount of $1.675 billion in financial obligations is commensurate.[62]  However, the Commission does not find that the effective value of the settled penalty is $1.675 billion as represented by the Settling Parties.

Based on review of the record in this proceeding, the Commission finds that the provision for penalties set forth in the proposed settlement agreement is inadequate for the following reasons:  (1) the proposed penalty is not commensurate with the magnitude of the allegations and conduct that are at issue;  (2) the effective value of the financial obligations imposed on PG&E is less than the asserted amount of $1.675 billion given that PG&E may not otherwise have received ratepayer recovery for a substantial amount of the costs identified in the settlement agreement and that PG&E can be expected to receive significant tax savings associated with the financial obligations;  and (3) the proposed

---

[59] TURN Reply Comments at 8-9.

[60] Joint Motion at 35.

[61] Joint Motion at 39.

[62] It is unknown why the Settling Parties settled on an amount of $1.675 billion.  The settlement agreement is a negotiated compromise and a "black box" settlement.  The Settling Parties did not assign a specific dollar amount to each alleged violation or explain the basis for the settled amount.  (PG&E/CUE Reply Comments at 15.)

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 35 of 89

settlement agreement is not in the public interest or consistent with Commission precedent because it does not impose any fines on PG&E.

Although this proceeding has not been fully adjudicated and there are questions of law and fact that remain in dispute, the Commission cannot find that a settlement is reasonable or in the public interest unless it reflects the magnitude of the allegations and conduct that are at issue.  In reviewing the penalty factors, the litigation risk to PG&E is very high and the only factor that may weigh against a much higher penalty is the financial resources of the utility.  However, as noted above, there is insufficient information in the record regarding the extent of PG&E's ability to pay a higher penalty.

As all parties acknowledge, the wildfires of 2017 and 2018 resulted in an unprecedented level of destruction, loss of life, and damage to property.  The Settling Parties represent that a penalty amount of $1.675 billion is commensurate with the scale of the harm caused by the 2017 and 2018 wildfires.  The Opposing Parties argue that the potential penalties, were the case fully litigated, may be greater than the settled amount by as much as $750 million or more.  Because the Commission finds that the proposed penalty is too low relative to the harm and that the effective value is likely substantially less than the proposed $1.675 billion, the Commission finds that the settlement agreement is not reasonable in light of the whole record or in the public interest.

The Commission finds that the settlement agreement should be modified to: (1) increase the financial obligations to be imposed on PG&E by an additional $462 million of which $198 million shall go toward future wildfire mitigation expenses that would have otherwise been recovered from ratepayers but for this decision, $64 million shall go toward expanding the System Enhancement Initiatives, and $200 million shall be in the form of a fine payable to the General

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 36 of 89

Fund, which shall be permanently suspended; and (2) require that any tax savings (*i.e.*, financial benefits) associated with shareholder obligations for operating expenses in the settlement agreement, as modified by this decision, be returned for the benefit of ratepayers once PG&E has realized the savings. The justification for these modifications is discussed further below.

In comments filed after the issuance of the Decision Different, the Settling Parties accept these modifications to the settlement agreement.[63]  In its appeal of the POD, PG&E did argue that a fine and additional disallowances are inappropriate because the violations against it were never proven and that SED would have faced considerable litigation risk if the violations had proceeded to hearing.[64]  PG&E's argument is belied by the scope and extent of the violations set forth in SED's Fire Reports, as noted above.  Also notable, as an independent matter, is PG&E's recent agreement with the Butte County District Attorney to plead guilty to 84 counts of involuntary manslaughter in connection with the Camp Fire.[65]  PG&E wrongly attempted to minimize the seriousness of the violations it faced.  For the reasons discussed above, the penalties imposed here are justified, and but for PG&E's financial condition, even higher penalties might have been warranted.

PG&E's objections in its appeal that the modifications to the settlement agreement undermine the Commission policy favoring settlement and the larger regulatory compact are also misplaced.[66]  As noted above, the Commission

---

[63]  PG&E Comments on Decision Different at 2; CUE Comments on Decision Different at 1; SED Comments on Decision Different at 2.

[64]  PG&E Appeal at 29-31, 35-36.

[65]  TURN Response to PG&E Motion Requesting Other Relief at 2-3, 16-17; Cal Advocates Response to Appeals and Request for Review at 10.

[66]  PG&E Appeal at 27-29.

affords considerably less deference to settlements that do not include all the parties, and here the settlement was vigorously contested by the non-settling intervenors.  The Commission retains the responsibility to independently review, and if appropriate modify, settlements to ensure that they are in the public interest.

### 8.3.  Disallowances

The Commission has explained that: "The purpose of a fine is to go beyond restitution to the victim and to effectively deter further violations by this perpetrator or others. … Deterrence is particularly important against violations which could result in public harm, and particularly against those where severe consequences could result."[67]  The Commission has the authority to impose fines pursuant to Pub. Util. Code §§ 2107 and 2108.  In addition to statutory fines, the Commission has the authority to fashion other equitable remedies pursuant to Pub. Util. Code § 701 and other statutes.

In past enforcement actions, the Commission has used a mix of penalties, including fines to the General Fund, disallowances, and other remedies, to penalize a utility for violations and to deter similar behavior and violations in the future.[68]  Although the Commission has in the past used disallowances as a penalty in enforcement proceedings, such disallowances can only be effective as a penalty where shareholders are required to absorb costs that would otherwise be paid by ratepayers.  To disallow ratepayer funding of costs that would not have been recoverable from ratepayers even in the absence of the enforcement action has little or no value as a penalty.

---

[67]  D.98-12-075 at 35.

[68]  D.15-04-024 at 1-2; *see* Joint Motion at 41-45.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 38 of 89

The proposed settlement agreement provides for $1.625 billion in disallowances for wildfire-related costs that PG&E has incurred or will incur. These wildfire-related costs are identified as follows:[69]

| Description | Expense | Capital | Estimated Amount |
|---|---|---|---|
| Distribution Safety Inspections Expense (excludes repairs) (FRMMA/WMPMA)[70] | $157,000,000 | | $157,000,000 |
| Distribution Safety Repairs Expense (FRMMA/WMPMA) | $79,000,000 | | $79,000,000 |
| Transmission Safety Inspections Expense (excludes repairs) (recovered at FERC)[71] | $225,000,000 | | $225,000,000 |
| Transmission Safety Repairs Expense (recovered at FERC) | $209,000,000 | | $209,000,000 |
| AWRR Base Camp and Admin Expense (FHPMA)[72] | $36,000,000 | | $36,000,000 |
| 2017 Northern California Wildfires CEMA[73] Expense and Capital (for amounts associated with fires for which SED or CAL FIRE have alleged violations) (CEMA) | $82,000,000 | $66,000,000 | $152,000,000 |
| 2018 Camp Fire | $435,000,000 | | $435,000,000 |

---

[69] Settlement Agreement at 2-3, as modified by PG&E January 10, 2020 Response at 3-4.

[70] FRMMA is the Fire Risk Mitigation Memorandum Account.  WMPMA is the Wildfire Mitigation Plan Memorandum Account.

[71] FERC is the Federal Energy Regulatory Commission.

[72] FHPMA is the Fire Hazard Prevention Memorandum Account.

[73] CEMA is the Catastrophic Event Memorandum Account.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 39 of 89

| Description | Expense | Capital | Estimated Amount |
|---|---|---|---|
| CEMA Expense (CEMA) | | | |
| 2018 Camp Fire CEMA Capital for Restoration (CEMA) | | $253,000,000 | $253,000,000 |
| 2018 Camp CEMA Capital for Temporary Facilities | | $84,000,000 | $84,000,000 |
| **Total** | **$1,222,000,000** | **$403,000,000** | **$1,625,000,000** |

The Opposing Parties argue that it is uncertain whether these costs would have been recoverable from ratepayers.  Pursuant to Pub. Util. Code § 451, the Commission must ensure that all charges demanded or received by any public utility are just and reasonable.  A utility cannot recover costs from ratepayers absent Commission review of the costs for reasonableness and approval to recover in rates.  There has been no finding by the Commission that the costs identified in the settlement agreement are reasonable.  Even in the absence of the settlement agreement, it is possible that the Commission may have disallowed some of the costs set forth in the settlement agreement in the ordinary course of its reasonableness review of these costs pursuant to Pub. Util. Code § 451.

In particular, TURN, Del Monte, and Wild Tree argue that it is highly uncertain that the Commission would have authorized rate recovery of the CEMA costs identified in the settlement agreement.  CEMA is used to record unexpected costs incurred as a result of significant events declared to be disasters by the state of California or federal authorities.[74]  These costs are recoverable in

---

[74] A utility may record costs for the following in CEMA:  (1) safely restoring utility services to customers during declared natural disasters, (2) repairing, replacing or restoring damaged utility facilities, or (3) complying with governmental agency orders. (Pub. Util. Code, § 454.9(a).)

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 40 of 89

rates following a request by the affected utility, a Commission finding of their reasonableness, and approval by the Commission.[75]

The CEMA costs included in the settlement agreement relate to the 2017 and 2018 wildfires for which SED has alleged violations and CAL FIRE has made determinations that PG&E's electrical facilities ignited. PG&E does not dispute that its equipment played a role in igniting in these fires. TURN, Del Monte, and Wild Tree argue that PG&E is not likely to be able to demonstrate the reasonableness of CEMA costs associated with catastrophes that it was responsible for causing.[76]

Due to the risk of non-recovery of the CEMA costs identified in the settlement, TURN recommends that the identified CEMA costs totaling $924 million not count towards the $1.625 billion in disallowances. As a substitute for those CEMA costs, TURN proposes that PG&E forego recovery of $930.9 million in other CEMA costs included in two pending PG&E CEMA applications (Application (A.) 18-03-015 and A.19-09-012), which do not involve costs associated with wildfires caused by PG&E.[77] Although TURN's proposed substitute costs are approximately $7 million higher than the settled costs, TURN contends that the small increase is reasonable given the uncertainty as to whether the Commission would have authorized these costs for recovery and to help ensure that more of the amount identified as a penalty is indeed a penalty.[78]

Upon review of the costs identified in the settlement, the Commission agrees with the Opposing Parties that argue that PG&E's ability to recover all of

---

[75] Pub. Util. Code, § 454.9(b); *see also* Pub. Util. Code, § 451.

[76] TURN Comments at 13-14; Del Monte/Wild Tree Comments at 21-22.

[77] TURN Comments at 21-23.

[78] TURN Comments at 23.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 41 of 89

the CEMA costs identified in the settlement is questionable.  TURN observes that PG&E has not yet sought recovery of these costs.  Moreover, in the past, the Commission has disallowed ratepayer recovery for costs related to fires caused by utility equipment where the Commission found that the utility did not reasonably manage and operate its facilities prior to the fires.[79]  On the other hand, as noted above, PG&E contests many of the violations related to the 2017 and 2018 fires.

Given the substantial uncertainty regarding the recoverability of the settled CEMA costs, the effective value of these disallowances as a penalty is likely much lower than the stated $924 million.  It is unclear whether the Settling Parties took into account the likelihood of recoverability of these costs.[80]  However, the Commission finds that this uncertainty must be taken into account when assessing whether the penalty is adequate.

To account for this uncertainty and to ensure the penalty is commensurate with the scale of the 2017 and 2018 fires, the Commission finds that the settled penalty amount should be increased.  The Commission finds that an appropriate modification is to adopt all of the disallowances in the settlement, and also increase the penalty amount by $462 million, which is half the value of the disputed CEMA costs included in the settlement.  This modification will help to ensure that the effective value of the penalty more closely approximates the amount proposed by the Settling Parties.

---

[79]  *See e.g.,* D.17-11-033.

[80]  PG&E and CUE state that the Settling Parties never suggested or made any prediction as to whether the Commission would view these costs as reasonable in a reasonableness review. (PG&E/CUE Reply Comments at 12.)

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 42 of 89

Of this $462 million, the Commission finds it reasonable to require that $198 million shall go toward future wildfire mitigation expenses that would otherwise have been recovered from ratepayers but for this decision; $200 million shall be in the form of a fine payable to the General Fund, which shall be permanently suspended; and $64 million shall go toward the System Enhancement Initiatives and corrective actions identified below.  The $198 million shall be applied to wildfire mitigation expenses recorded in the FRMMA or WMPMA within 4 years of the effective date of the settlement.

The Commission recognizes that the settlement agreement is a negotiated compromise, and contrary to arguments presented by some of the Opposing Parties, does not find that the CEMA disallowances identified in the settlement have no value as a penalty.  Although there are questions regarding whether the Commission would have allowed ratepayer recovery for these costs, it is not certain that the Commission would have disallowed all of these costs.  The Commission also notes that forgoing what is likely to be extensive litigation regarding the reasonableness of these costs saves resources for the Commission, PG&E's ratepayers, and other parties.

### 8.4.   Anticipated Tax Benefits

PG&E estimates that all $1.625 billion of the wildfire-related expenditures identified in the settlement agreement will be deductible for federal tax purposes and that it is possible but not certain that the additional $50 million invested in System Enhancement Initiatives will also be deductible for federal tax purposes.[81]  PG&E estimates that the full $1.675 billion in financial obligations

---

[81]  PG&E Jan. 10, 2020 Response at 10.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 43 of 89

will be tax deductible for California state tax purposes.[82]  Assuming that the full $1.675 billion is tax deductible, and depending on many other variables such as PG&E's taxable income, net operating loss position, future changes in the tax laws, and the timing of expenditures, PG&E estimates that its anticipated tax savings are as follows:[83]

| Tax Category | Statutory Tax Rate | Total Amount Deductible & Depreciable | Anticipated Tax Savings |
| --- | --- | --- | --- |
| Federal | 21 percent | $1,675,000,000 | $351,750,000 |
| State | 8.84 percent | $1,675,000,000 | $148,070,000 |
| State Impact on Federal Tax | 21 percent | ($148,070,000) | ($31,094,700) |
| Total | n/a | n/a | $468,725,300 |

TURN, Del Monte, and Wild Tree argue that any tax benefits that result from the structure of the penalty would reduce the net impact and deterrent value of the adopted penalty.[84]  TURN recommends that the settlement agreement be modified to include language that would require any tax benefit to be used to support the business in a manner that directly benefits ratepayers, such as through investment in operations that would otherwise be funded through rate revenues, or where appropriate, support for the utility's credit ratings.[85]

---

[82] PG&E Jan. 10, 2020 Response at 10-11.

[83] PG&E Jan. 10, 2020 Response at 14.

[84] TURN Comments at 25; Del Monte/Wild Tree Comments at 20-21.

[85] TURN Comments at 25.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 44 of 89

Generally, the federal tax treatment of fines, penalties, and other amounts associated with government enforcement action is governed by Section 162(f) of the Internal Revenue Code of 1986, as amended by the Tax Cuts and Jobs Act of 2017 (TCJA).  Under 26 U.S.C. § 162(f), a federal income tax deduction is not allowed "for any amount paid or incurred (whether by suit, agreement, or otherwise) to, or at the direction of, a government or governmental entity in relation to the violation of any law or the investigation or inquiry by such government or entity into the potential violation of any law."  26 U.S.C. § 162(f)(2)(A)(i) provides for two exceptions where deductions for such amounts are not disallowed:  (1) amounts paid as restitution,  and (2) amounts paid to come into compliance with "any law which was violated or otherwise involved in the investigation or inquiry."  For either of the exceptions to apply, the amounts must be "identified as restitution or as an amount paid to come into compliance with such law, as the case may be, in the court order or settlement agreement."[86]

The Settling Parties characterize the $1.625 billion in wildfire-related expenditures as costs that PG&E has incurred or will incur to comply with its legal obligations to provide safe and reliable service.[87]  The Settling Parties also state that the $1.625 billion in financial obligations are costs that "were, or will be, incurred by PG&E, not at the direction of SED or the Commission in the OII."[88]  Based on these characterizations, Section 162 does not bar PG&E from

---

[86] 26 U.S.C. § 162(f)(2)(A)(ii).

[87] Joint Motion at 13.

[88] Joint Motion at 13.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 45 of 89

deducting these costs from its federal taxes.[89]  In fact, PG&E states that it has already reported some of the incurred costs as current deductions or capital asset depreciation deductions in its tax return and financial statements and expects to report future costs in the same manner when they are incurred.[90]

There is less certainty regarding whether the shareholder funded System Enhancement Initiatives would fall under one of the exceptions under Section 162, and therefore, be deductible under federal law.[91]

California continues to follow the pre-TCJA Section 162(f), which prohibited deductions "for any fine or similar penalty paid to a government for the violation of any law."[92]  Therefore, under California law, both the disallowances and costs of the System Enhancement Initiatives would likely be deductible.

In comparison, a fine payable to the General Fund is not deductible under Section 162 or California law since it is a payment to a government for a violation of law or investigation or inquiry into a potential violation of law.

The POD modified the settlement agreement to require that ratepayers, rather than shareholders, receive the benefit of any tax savings associated with the financial obligations to be imposed on PG&E in this proceeding ("tax benefit provision").  PG&E and CUE object to the tax benefit provision and argue that the Commission should eliminate the provision because it is contrary to Commission precedent, invites PG&E to violate Internal Revenue Service (IRS)

---

[89] The additional disallowances adopted by this decision appear to be deductible for the same reasons.

[90] PG&E Jan. 10, 2020 Response at 13.

[91] PG&E Jan. 10, 2020 Response at 11-12.

[92] PG&E Jan. 10, 2020 Response at 12 citing 26 U.S.C. § 162(f) (Effective: December 19, 2014 to December 21, 2017).

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 46 of 89

normalization rules, and because it is unclear whether the POD considered the impact of a potential $518 million increase in penalties that may result.[93]

The argument that the tax benefit provision is contrary to Commission precedent is not persuasive.  PG&E argues that the Commission's general rule is "that when deductions were not part of utility cost of service, but were generated with shareholder funds, the deductions are the property of shareholders and not ratepayers.  This include[s] deductions derived from disallowed costs incurred in excess of those included in rates."[94]  Although this general rule may apply in rate cases such as those cited by PG&E, it does not necessarily apply to penalties. Penalties are intended to punish and deter unlawful conduct.  Therefore, the Commission may find that it is not appropriate for disallowances or expenditures intended as penalties to be treated as they would ordinarily be treated for ratemaking purposes.[95]

There is some merit to the assertion that the tax benefit provision may implicate IRS normalization rules, at least with respect to the capital expenditures for which PG&E has taken accelerated depreciation.  Pursuant to IRS normalization rules, a utility receives accelerated tax benefits in the early years of an asset's regulatory life, "but passes that benefit through to ratepayers ratably over the regulatory useful life of the asset in the form of reduced rates."[96] The POD directed PG&E to return the tax benefits to ratepayers "once PG&E has realized the savings."[97]  The POD also directed that "[t]he tax savings shall be

---

[93]  PG&E Appeal at 3 and 44-46; CUE Appeal at 5-6.

[94]  PG&E Appeal at 44 quoting D.14-08-032 at 584.

[95]  *See., e.g.,* D.16-12-010 at 30-31.

[96]  PG&E Appeal at 45.

[97]  POD at 72, Ordering Paragraph 1.b.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 47 of 89

applied in accordance with any applicable Internal Revenue Service normalization rules."[98]  However, PG&E argues that the normalization rules necessarily conflict with the tax benefit provision and that it is unclear how PG&E is to resolve this conflict.[99]

As set forth in Commissioner Rechtschaffen's request for review, applying the tax benefit provision only to the tax savings associated with operating expenses and not to any tax savings associated with capital expenditures would eliminate any potential legal conflict with IRS normalization rules.[100]  Although acknowledging that the modified tax benefit provision would eliminate any potential violation of IRS normalization rules, PG&E and CUE initially objected to the modified tax benefit provision arguing that it would still add an additional $425.5 million to the dollar value of the settlement and jeopardize PG&E's timely emergence from Chapter 11 bankruptcy proceedings.[101]  However, the Commission rejects this argument because the dollar value of the tax benefits is speculative, and PG&E has not met its burden of demonstrating that returning the tax benefits to ratepayers (when they are realized) would jeopardize PG&E's timely emergence from bankruptcy.

The financial obligations adopted in this decision are intended as penalties for the purpose of punishment and deterrence, and therefore, it is not appropriate for these expenditures to be treated as they would be treated during

---

[98]  POD at 44, n. 94.

[99]  PG&E Appeal at 46.

[100]  Commissioner Rechtschaffen's Request for Review at 4-5.

[101]  PG&E Response to Request for Review at 11; CUE Response to Request for Review at 2. PG&E and CUE subsequently accepted the modified tax benefit provision in their respective comments on the Decision Different.  (PG&E Comments on Decision Different at 2; CUE Comments on Decision Different at 1.)

the course of ordinary business. In order for the financial obligations adopted in this decision to have the appropriate punitive and deterrent impact, the Commission finds that ratepayers, rather than shareholders, should receive the benefit of any tax savings associated with these financial obligations. The Commission notes that if a fine were adopted for the same amount as the disallowances, the value of the penalty would be certain[102] and there would be no associated tax savings. To avoid any violation of IRS normalization rules, only the tax savings associated with operating expenses and not capital expenditures shall be returned to ratepayers.

PG&E argues that the Settling Parties took into account the deductibility of these expenditures in assessing PG&E's overall financial condition for purposes of reaching an agreement as to the financial obligations that should be imposed on PG&E.[103] However, the Settling Parties have not provided any information regarding how the deductibility of these expenditures impacts PG&E's overall financial condition or its ability to exit from bankruptcy now. The return of tax benefits to ratepayers will not occur until those tax benefits are realized by the company, which may occur many years in the future. There is no mention in the Joint Motion or the settlement agreement regarding these anticipated tax savings. Moreover, it is unclear that any tax savings were factored into assessing PG&E's overall financial condition given PG&E's arguments that the calculation of these tax benefits is uncertain.[104]

---

[102] As discussed above, the effective value of the settled disallowances as a penalty is uncertain because it is uncertain whether PG&E would have otherwise been able to recover these costs from ratepayers.

[103] PG&E. Jan. 10, 2020 Response at 14-15.

[104] *See* PG&E Jan. 10, 2020 Response at 12-13.

Therefore, as PG&E realizes any tax savings associated with the shareholder obligations for operating expenses set forth in the settlement agreement, as modified by this decision, PG&E is directed to report these tax savings, with accompanying supporting testimony and underlying calculations, in its next General Rate Case (GRC) filing immediately following the realization of the savings. The amount of the tax savings shall be applied to wildfire mitigation expenses recorded in the WMPMA or FRMMA that would otherwise have been recovered from ratepayers but for this decision.[105] This will ensure that ratepayers, not PG&E shareholders, benefit from the tax savings associated with treating the penalty as an ordinary business expense.

## 8.5. Imposition of Fine

Although the proposed settlement agreement imposes $1.675 billion in financial obligations on PG&E, it does not require PG&E to pay any fine to the General Fund. The Settling Parties contend that PG&E's bankruptcy affects its ability to pay a cash fine.[106]

Del Monte and Wild Tree argue that a fine of $0 is not in the public interest or in compliance with the law.[107] Del Monte and Wild Tree argue that the Settling Parties have put forth no evidence on PG&E's ability to pay a fine and have not shown that PG&E is unable to pay a fine.[108]

---

[105] In the event that all of the reported tax savings cannot be applied to FRMMA or WMPMA expenses in the GRC in which PG&E reports the tax savings, the reported savings or portion thereof shall be applied to the subsequent GRC or stand-alone application in which PG&E seeks recovery of FRMMA or WMPMA expenses. In the event that neither the FRMMA or WMPMA are open at the time the tax savings are to be applied, the Commission will designate substitute recorded wildfire mitigation or resiliency-related expenses that would otherwise have been recovered from ratepayers to which these savings should be applied.

[106] Joint Motion at 38.

[107] Del Monte/Wild Tree Comments at 23.

[108] Del Monte/Wild Tree Comments at 23.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 50 of 89

Upon review of the facts of this case, the Commission finds that it is neither consistent with Commission precedent nor in the public interest for this investigation to conclude without the assessment of a fine.  There is no question that PG&E's electric facilities played a role in the 2017 and 2018 fires.  PG&E faces a total of 45 alleged violations concerning these fires and does not contest 14 of these violations.[109]  Given the severity of the allegations, the assessment of no fine is not within a reasonable range of potentially litigated outcomes.

Of the settled penalty amount of $1.675 billion, $1.625 billion are in the form of disallowances.  However, as discussed above, disallowances are not the same as a fine.  Fines convey the strongest societal opprobrium for wrongdoing and are thus the most potent tool for purposes of penalizing and deterring unlawful conduct.

Notably, all of the prior Commission decisions cited as precedent by the Settling Parties included a fine payable to the General Fund.[110]  In D.15-04-024, the Commission imposed a mix of fines, penalties, and other remedies in connection with the San Bruno proceedings.  On its decision to impose a fine, the Commission explained: "we recognize both the statutory tool for penalties (*i.e.,* fines to the state General Fund) and the Commission's long-standing policy and practice of imposing fines on [utilities] as a means of penalizing and deterring, and therefore require PG&E to pay $300 million of the total penalties and remedies in the form of a fine to the state General Fund."[111]

The Commission has explained that "[s]ome California utilities are among the largest corporations in the United States and others are extremely modest,

---

[109]  Settlement Agreement, Exhibit B.

[110]  Joint Motion at 45.

[111]  D.15-04-024 at 3.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 51 of 89

one-person operations.  What is accounting rounding error to one company is annual revenue to another.  The Commission intends to adjust fine levels to achieve the objective of deterrence, without becoming excessive, based on each utility's financial resources."[112]  As noted by Cal Advocates, PG&E is one of the largest combined natural gas and electric energy companies in the United States.[113]  PG&E's last authorized total revenue requirement for 2019 was $18.184 billion.[114]

With the modifications adopted by this decision, the total penalties to be imposed on PG&E is $2.137 billion.[115]  In recognition of the number and severity of the allegations that are at issue in this investigation, the lives lost and homes destroyed, PG&E's size, and the Commission's long-standing policy and practice of imposing fines on utilities as a means of penalizing and deterring future misconduct, the Commission finds that, of the $2.137 billion in penalties, it is reasonable to impose a fine of $200 million.

The POD would have imposed a requirement that the fine be paid from funds that would not otherwise be available to satisfy the claims of wildfire victims.[116]  PG&E objects to this requirement arguing that such a requirement would jeopardize confirmation of its Plan of Reorganization (PoR) in its pending bankruptcy case.  In the event that the Commission imposes any fine, PG&E requests that the Commission order that the fine is a Fire Victim Claim under

---

[112] D.98-12-075 at 38-39.

[113] Cal Advocates Reply Comments at 5-6.

[114] Application 18-12-009, filed December 13, 2018 at 7, Table 4.

[115] This amount excludes PG&E's anticipated tax savings associated with these financial obligations that will be credited to ratepayers, rather than shareholders.

[116] POD at 72, Ordering Paragraph 1.a.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page
52 of 89

PG&E's PoR, will be paid out of the Fire Victims Trust, and will be subordinated to the Trust's payments to fire victims.[117]

The Commission does not find it appropriate for this fine to be included in the Fire Victims Trust because the fine is dissimilar in nature to the claims of the wildfire victims and should not compete with such claims.  Commissioner Rechtschaffen's request for review proposed that the Commission impose the $200 million fine without any restriction as to the source of funds but permanently suspend the fine due to: "the unique situation of PG&E's bankruptcy, its indebtedness to hundreds of wildfire claimants for loss of life and property, and the current upheaval in the financial markets."[118]  The Settling Parties have indicated that they do not oppose this modification to the POD.[119]

Despite its size, PG&E's ability to raise capital as part of its PoR is not unlimited.  The record reflects that PG&E already has wildfire-related liabilities totaling $25.5 billion.[120]  Moreover, the company is required to resolve its bankruptcy proceeding at a time when there is a great deal of uncertainty with respect to the financial markets.  Although the Commission finds that a fine should be imposed for the reasons discussed above, the Commission finds that permanent suspension of the fine is warranted in light of these unique and unprecedented circumstances and to ensure that payment of the fine does not reduce the funds available to satisfy the claims of wildfire victims.

---

[117]  PG&E Motion Requesting Other Relief at 47; PG&E Appeal at 52.

[118]  Commissioner Rechtschaffen's Request for Review at 2-3.

[119]  PG&E Response to Request for Review at 3; SED Response to Request for Review at 2; CUE Response to Request for Review at 2.

[120]  Joint Motion at 38-39.

### 8.6.    System Enhancement Initiatives
#### 8.6.1  Funding of Initiatives

The settlement agreement sets forth estimates of duration and funding requirements for 20 different System Enhancement Initiatives.[121]  The Settling Parties agree that the duration and funding level for each of the System Enhancement Initiatives may be modified upon agreement by PG&E and SED, as long as the shareholder provided settlement funds for the initiatives total $50 million.  The Settling Parties also agree that if PG&E becomes aware that it will not fully expend the shareholder settlement funds estimated for an initiative, it shall inform SED, and PG&E and SED shall make a good faith effort to reach agreement on the method of expending any remaining funds.

TURN argues that the settlement agreement should be modified to reflect that PG&E is required to finish the System Enhancement Initiatives using shareholder funding and will not seek ratepayer recovery for the costs of the initiatives.[122]

PG&E objects to TURN's proposed modification, arguing that the Settling Parties have made a good faith estimate that the initiatives will require $50 million in shareholder funds to complete and do not anticipate exceeding that amount.[123]

The Commission has not authorized ratepayer funding for the System Enhancement Initiatives.  If the costs of implementing the specified initiatives exceed the level of shareholder funding ordered in this decision, PG&E is not barred from seeking ratepayer recovery of these costs.  However, any request for

---

[121]  Settlement Agreement, Section III.B.

[122]  TURN Comments at 24.

[123]  PG&E/CUE Reply Comments at 18.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
54 of 89

ratepayer funding must be found to be reasonable and appropriate in a general rate case or other application.

It is also possible that PG&E may not expend all of the budgeted shareholder funds.  The longest estimated duration for any of the System Enhancement Initiatives is within five years of the effective date of the settlement agreement.  With the exception of shareholder funds to be spent on the root cause analyses and corrective actions, discussed further below, if PG&E has not spent the budgeted shareholder funds on the specified initiatives within five years of the effective date of the settlement agreement, the remaining balance shall be paid to the General Fund.

### 8.6.2  Root Cause Analyses

The settlement agreement provides that PG&E shareholders will pay for an independent root cause analysis (RCA) company to conduct an RCA for each of the wildfires included in this OII that were reportable incidents to the Commission and for which CAL FIRE determined that the ignition involved PG&E facilities.[124]  The RCAs for the applicable 2017 wildfires will be initiated within three months of the bankruptcy court's approval of the settlement agreement and will be completed no later than one year after the date of commencement.  The RCA for the Camp Fire will commence after the Butte County District Attorney finishes its investigation and CAL FIRE makes evidence from the Camp Fire available.  The total budget set forth in the settlement agreement for the RCAs is $3 million over a one-year period.

The settlement agreement states: "The purpose of the RCA will be to analyze the factors that contributed to the ignition of the fires and make

---

[124] Settlement Agreement, Exhibit C, Section B.7.

recommendations as appropriate so that the learnings can be implemented on a go-forward basis to mitigate the risk of similarly caused fires in the future. Analyzing all of these fires will maximize lessons learned not only for PG&E, but also for the Commission."[125] The settlement agreement clarifies that "the RCA will consider all potential root causes, and will not be restricted to violations of GO 95."[126] The settlement agreement further states that the RCA may "identify systemic, programmatic, management, and structural matters that may need to be addressed to reduce such incidents in the future."[127]

The proposed settlement agreement provides that the RCA final report(s) will be provided to the Director of SED and served on the service list for Investigation (I.) 19-06-015. Within 30 days after each RCA final report is completed, PG&E will submit a response to the Director of SED and the service list for I.19-06-015 addressing whether and how it will work to incorporate lessons based on the RCA report and its recommendations into its operations or provide an explanation as to why it is declining to incorporate any lessons. PG&E also agrees to make a good faith effort to initiate incorporation of the lessons learned within 12 months after the RCA final report is delivered to PG&E.

Cal Advocates and TURN recommend that the proceeding remain open to evaluate the results of the RCAs of the fires that will be undertaken pursuant to the settlement agreement, among other issues.[128] TURN also argues that the process for review of the RCAs set forth in the settlement agreement is

---

[125] Settlement Agreement, Exhibit C, Section B.

[126] Settlement Agreement, Exhibit C, Section B.7.

[127] Settlement Agreement, Exhibit C Section B.7.

[128] Cal Advocates Comments at 22; TURN Comments at 26-27.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 56 of 89

insufficient because it leaves full discretion for the implementation of mitigation actions with PG&E.[129]

The Commission agrees that the RCAs are a worthy initiative that will potentially yield valuable information and lessons that can aid in efforts to reduce the risk of future catastrophic wildfires.  However, the Commission finds that modifications to this initiative are warranted to ensure that the RCAs are scoped with sufficient depth and breadth, and to dedicate resources to implementing corrective actions that may be identified from the RCAs.

First, the Commission finds that a budget of $3 million for all 17 RCAs may be inadequate to conduct RCAs of sufficient depth and breadth and finds that the total budget to be funded by shareholders should be increased by $14 million for a total budget of $17 million.  This amount accommodates a budget of up to $1 million per RCA, and funds can be shifted between the analyses depending on the complexity of each.  If the RCAs are conducted for less than $17 million, any remaining funds shall be used to implement corrective actions.

Second, PG&E shall spend $50 million of shareholder funds, plus any amount remaining from the budget for conducting the RCAs, to implement corrective actions stemming from the RCAs that would otherwise have been funded by ratepayers but for this decision, as described further below.

Third, the settlement agreement provides that SED and OSA will select the consultant for the RCAs and that the consultant shall confer with and work under the direction of SED and OSA.[130]  However, the OSA is no longer an office

---

[129] TURN Comments at 27.

[130] Settlement Agreement, Exhibit C, Section B.7.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
57 of 89

within the Commission effective January 1, 2020 due to the sunset of Pub. Util. Code § 309.8, which established the OSA.  The Commission has established a new division, the Safety Policy Division (SPD), which will carry on many of the activities of OSA in an advisory capacity within the Commission.  While SPD will not become a formal party to proceedings, it has a safety policy and advisory role within the Commission and is well positioned to work with SED to manage the consultant selected to perform the RCAs.  Therefore, OSA's role with respect to the RCAs shall be replaced by SPD.

Fourth, the Commission addresses the intended scope of the RCAs in order to set expectations.  The settlement agreement states that the RCAs will analyze the events and may identify "systemic, programmatic, management, and structural matters that may need to be addressed to reduce such incidents in the future."[131]  It is the Commission's expectation that the analyses will not be limited to technical causes of the fires and will be scoped with sufficient depth and breadth to ensure that any physical, procedural, operational, management, and organizational elements that may have contributed to the fires' ignition come to the surface.  The Commission also expects the RCAs to be conducted in a manner that will enable the Commission, PG&E, and stakeholders to understand similarities, differences, and trends across the different events.

Fifth, the Commission finds that there must be a more robust process after the completion of the RCAs in order to ensure that appropriate corrective actions are identified and undertaken.  The settlement agreement provides that upon completion of the RCA reports (which may be staggered because of the evidence related to the Camp Fire), the reports will be served on the service list as well as

---

[131] Settlement Agreement, Exhibit C, Section B.7.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 58 of 89

on the Director of SED.  PG&E will then submit a response within 30 days after each RCA report is completed.  The Commission directs PG&E to also serve the RCA reports and PG&E's responses on the Director of SPD and the Director of the Wildfire Safety Division (WSD), which is now responsible for reviewing utilities' annual wildfire mitigation plans required pursuant to Senate Bill (SB) 901 (Stats. 2018).

Within 60 days after PG&E has served its last response addressing the RCA report(s) for the 2017 wildfires, or as soon as practicable, SED and SPD will hold a workshop regarding the 2017 wildfire RCAs, with notification to the service list of I.19-06-015.  Within 60 days after PG&E has served its response addressing the RCA report for the Camp Fire, or as soon as practicable, SED and SPD will hold a workshop regarding the Camp Fire RCA, which may also address the RCAs for the 2017 wildfires, with notification to the service list of I.19-06-015.

Following each workshop, SED and SPD will make recommendations to the Commission concerning:  (1) any recommended corrective actions based on the RCAs, and (2) a vehicle, such as a proceeding, working group, or series of reports and workshops (or any combination thereof), that can serve as a means for the Commission, PG&E, and stakeholders to further consider the corrective actions that may be needed and to monitor the implementation of any corrective actions.  The budget for the corrective actions shall be $50 million of PG&E shareholder funds, in addition to any funds remaining from the budget for conducting the RCAs.

### 8.6.3  Format and Availability of Reports and Data

Under the proposed settlement agreement, PG&E will submit quarterly reports on electric maintenance work to SED and provide data on "near hit"

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 59 of 89

potential fire incidents on a quarterly basis to SED and other Settling Parties that request in writing to receive the data.[132]

CCSF recommends that the settlement agreement be modified to make the quarterly electric maintenance reports and "near hit" data available to local governments and the general public. CCSF also states that the location information for both the quarterly electric maintenance reports and "near hits" should be presented in a manner that is understandable by local government officials and the general public.

PG&E and CUE respond that the Settling Parties are opposed to amending the settlement to include CCSF's recommendations due to the need for expedited review and approval of the settlement. However, PG&E states that it is willing to meet with CCSF and further discuss enhanced information sharing.[133]

To the extent possible, the Commission intends for this information to be made available to local governments and the public in order to promote greater transparency on important issues of public safety. However, there is a lack of specificity in the settlement agreement regarding the format and content of these reports, and therefore, it is unclear how and to what extent this information should be made more widely available.

The Commission directs PG&E to consult with SED and SPD within 30 days of the effective date of the settlement agreement regarding the appropriate format, content, and treatment (including availability to local governments and the public) of the quarterly electric maintenance reports and "near hit" data. Upon request of SED or SPD, PG&E shall also consult with the

---

[132] Settlement Agreement, Exhibit C, Sections B.16 and B.19.

[133] PG&E/CUE Reply Comments at 21.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 60 of 89

Divisions regarding the appropriate format, content, and treatment of other reporting and data sharing requirements set forth in the settlement agreement. As part of consulting with SED and SPD, PG&E shall provide those Divisions with proposed report and data sharing templates for their comment and consideration.  PG&E shall file a Tier 1 advice letter with SED within 60 days of the effective date of the settlement agreement to memorialize the format, content, and treatment of the reports and data set forth in the settlement agreement.

### 8.6.4  Timing of Wildfire Safety Audit

Under the proposed settlement agreement, PG&E shall retain Safety Evaluator(s) who will perform independent audits and reviews of PG&E policies, procedures, practices, compliance with shareholder-funded System Enhancement Initiatives, and financial data related to PG&E's Wildfire Safety Plans.[134]

Cal Advocates recommends that the Safety Evaluator's audit of PG&E's overhead distribution and transmission maintenance program be revised so that the audit starts within one month of the settlement agreement's effective date rather than within one year as currently drafted.[135]  Cal Advocates argues that there is no reason to delay the audit for a year given the serious violations SED alleges related to the Camp Fire.

PG&E disagrees that the audit should start within one month of the effective date of the settlement but initially did not provide any reason why the audit could not commence sooner.[136]  PG&E subsequently explains that "[t]he Settlement's provision providing that this particular audit shall begin within one

---

[134]  Settlement Agreement, Exhibit C, Section B.14.

[135]  Cal Advocates Comments at 4.

[136]  PG&E/CUE Reply Comments at 18, fn. 69.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 61 of 89

year of the effective date of the Settlement is reasonable in light of the threshold steps that must take place (with extensive input from SED) prior to commencement of the first audit."[137]  PG&E further explains that a single Safety Evaluator may be retained to conduct multiple aspects of the Independent Wildfire Safety Audits and that changing the timeframe for one of the audits may impact other audits or increase costs by requiring one of the audits to be on an accelerated timeline.[138]

Based on the explanation provided by PG&E, the Commission finds it reasonable for the Safety Evaluator's audit of PG&E's overhead distribution and transmission maintenance program to start within one year of the effective date of the settlement as proposed in the settlement.

### 8.7.  Tubbs Fire

Del Monte and Wild Tree argue that the proposed settlement is not reasonable in light of the whole record because it does not include any violations related to the Tubbs Fire.  Del Monte and Wild Tree contend that the cause of the Tubbs Fire and related violations of law are in dispute in this proceeding.[139]  Del Monte and Wild Tree request that any reference to the Tubbs Fire be removed from the settlement agreement because they contend that the facts and violations

---

[137]  PG&E Motion Requesting Other Relief at 46.

[138]  PG&E Motion Requesting Other Relief at 46-47.

[139]  Del Monte/Wild Tree Comments at 34-56.

On November 8, 2019, Del Monte served a copy of the Prepared Direct Testimony of Kenneth E. Buske on behalf of Party Thomas Del Monte (Buske Testimony"), which primarily addressed the origin and cause of the Tubbs Fire.  On November 20, 2019, PG&E filed a motion to strike the Buske Testimony to which Del Monte filed a response on December 11, 2019.  As discussed below, this testimony has not been admitted into the evidentiary record of this proceeding.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 62 of 89

associated with the Tubbs Fire were excluded from discovery and not adequately considered in this investigation.[140]

Cal Advocates argues that the proposed settlement improperly constrains consideration of any new information concerning the Tubbs Fire. Cal Advocates recommends that the proposed settlement be revised to allow SED to consider violations or enforcement proceedings regarding the Tubbs Fire in the event that CAL FIRE or another state, federal, or local entity determines that PG&E's infrastructure was the cause of the Tubbs Fire.[141]

TURN agrees with Del Monte, Wild Tree, and Cal Advocates that treatment of the Tubbs Fire by the settlement agreement is inappropriate and recommends that the Commission modify the settlement agreement to remove the Tubbs Fire from its scope.[142]

In wildfire-related investigations, SED relies on CAL FIRE as the agency qualified to determine the source of the ignition.[143] As SED explains, it does not make a determination as to the ignition source of the fire, rather it conducts an investigation and reviews relevant evidence to determine whether there were violations of law. SED conducted its own investigation and reviewed the

---

[140] Del Monte/Wild Tree Comments at 57-58. On December 12, 2019, the assigned ALJ issued a ruling granting in part, and denying in part, a motion to compel discovery filed by Del Monte on November 15, 2019. The ruling denied Del Monte's request to compel certain discovery because Del Monte failed to adequately justify his request. Del Monte sought to compel responses to discovery requests that were contingent upon several other data requests but failed to explain why the information requested in the underlying data requests was relevant to matters that are within the scope of this proceeding, and admissible in evidence or reasonably calculated to lead to the discovery of admissible evidence. (December 12, 2019 ALJ Ruling at 3-4.)

[141] Cal Advocates Comments at 25.

[142] TURN Reply Comments at 4.

[143] SED Reply Comments at 3. This Commission does not enforce the forest and fire laws set forth in the Public Resources Code. Rather, it is CAL FIRE that enforces these laws. (*See* Pub. Res. Code, §§ 713, 714, 4119, and 4137.)

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
63 of 89

evidence provided by CAL FIRE and found no violations with respect to the Tubbs Fire.[144]  No alleged violations with respect to the Tubbs Fire were identified in the OII or in the scoping memos issued in this proceeding.[145] Therefore, the settlement's exclusion of any violations with respect to the Tubbs Fire does not render it unreasonable.

The proposed settlement agreement states that the Settling Parties "agree to settle, resolve, and dispose of all claims, allegations, liabilities and defenses," including those related to the Tubbs Fire.[146]  Under Section IV.D. of the settlement agreement, SED agrees to "release and refrain from instituting, directing, or maintaining any violations or enforcement proceedings against PG&E related to the 2017 Northern California Wildfires and 2018 Camp Fire" based on information that was "known, or that could have been known" to SED at the time SED executed the settlement agreement or substantially similar to the facts alleged in the SED Fire Reports.

The Commission rejects the Opposing Parties' assertions that the settlement agreement improperly constrains consideration of any new information concerning the Tubbs Fire.  The Settling Parties have confirmed that the settlement agreement preserves SED's authority to investigate and enforce Commission requirements in the event that new evidence, of which SED was not and could not have been aware, were to come to light.[147]  Therefore, the

---

[144]  SED Reply Comments at 3.

[145]  Pursuant to Pub. Util. Code § 1701.1 and Rule 7.3 of the Commission's Rules of Practice and Procedure, the assigned Commissioner is required to issue a scoping memo that sets forth the issues that are to be addressed in a proceeding.

[146]  Settlement Agreement at 1.

[147]  SED Reply Comments at 3-4; PG&E/CUE Reply Comments at 21.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 64 of 89

Commission does not find it necessary to remove the Tubbs Fire from the settlement agreement.

### 8.8. Future Review of Costs Associated with 2017 and 2018 Wildfires

Cal Advocates argues that the proposed settlement agreement inappropriately allows PG&E to seek recovery of costs related to fires that were caused by PG&E's failure to operate its electric facilities according to the law. Therefore, Cal Advocates recommends that the settlement agreement be revised to bar PG&E from seeking recovery of costs associated with fires for which SED found violations.[148]

PG&E and CUE argue that adoption of Cal Advocates' recommendation would violate PG&E's due process rights and the Public Utilities Code because it would deny PG&E a reasonableness review of these costs, which is required pursuant to Pub. Util. Code § 454.9.[149]

With the exception of costs included in the settlement agreement, as modified by this decision, the Commission does not find it reasonable to bar PG&E from seeking future recovery of costs associated with fires for which SED found violations in this proceeding.  SED's allegations have not been fully adjudicated and the Commission has not made findings that there were violations.  Even if the Commission had found violations, such findings would not automatically result in a disallowance of related costs unless stated as such. Instead, those costs would be subject to a reasonableness review.  The costs for which Cal Advocates seeks to bar recovery have not been identified and have not been subject to a reasonableness review.  In addition, the Commission finds the

---

[148]  Cal Advocates Comments at 17.

[149]  PG&E/CUE Reply Comments at 11.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 65 of 89

level of penalties adopted in this decision (with the modifications to the settlement discussed above) to be reasonable in light of the record of this proceeding and does not find that additional disallowances should be imposed as a penalty.

When and if PG&E seeks recovery of costs associated with fires for which SED found violations, the Commission will conduct the reasonableness review required pursuant to Pub. Util. Code §§ 451, 454.9, and any other applicable law. Section IV.C of the settlement agreement states that: "the non-PG&E Settling Parties shall not assert that any violations or conduct underlying the violations alleged or identified by SED in this proceeding are the basis for future disallowances, violations, or penalties…."  TURN seeks clarification regarding how this provision impacts the Commission's potential review of these costs.[150] To be clear, this provision of the settlement agreement cannot and does not bar the Commission from undertaking the necessary reasonableness review required by law for any costs for which PG&E seeks ratepayer recovery in the future.

The Settling Parties also cannot agree to provisions that would impose restrictions on non-settling parties.  By its own terms, Section IV.C of the settlement agreement applies to "non-PG&E Settling Parties," and therefore, does not impose any restrictions on the assertions that can be made by non-settling parties.  However, Section B.7 of Exhibit C of the settlement agreement provides that "non-PG&E parties to this proceeding shall not use the results of the RCA to assert that the Commission should impose any additional financial penalties upon PG&E nor to argue for any additional disallowance."

---

[150]  TURN Comments at 22-23 quoting Settlement Agreement § IV.C. at 6.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 66 of 89

The Commission finds that this statement should be modified to substitute "non-PG&E Settling Parties" for "non-PG&E parties."

### 8.9. Further Consideration of Systemic Issues

Cal Advocates and TURN both argue that the schedule for the proceeding has prevented the Commission from undertaking a thorough investigation of the 2017 and 2018 wildfires, which is necessary to ensure that the underlying causes are well understood in order to reduce the risk of future catastrophic wildfires.[151] Therefore, Cal Advocates and TURN recommend that the proceeding remain open to evaluate the results of the RCAs of the fires that will be undertaken pursuant to the settlement agreement, and to review the systemic issues that may have contributed to the fires such as vegetation management issues, transmission inspection issues, and recordkeeping issues.[152]  Cal Advocates states that the purpose of this new phase would not be to levy additional fines but to evaluate the systemic issues that contributed to the fires and PG&E's progress in resolving those issues.[153]

Both SED and PG&E oppose leaving this proceeding open for a second phase.  PG&E argues that the settlement agreement includes sufficient processes to address longer-term topics following the closure of this proceeding and that the Commission oversees the safe operation of public utility facilities through many other avenues.  SED points out that to the extent the root cause analyses result in identification of broader wildfire risk mitigation policies, these issues would be more appropriately considered in a rulemaking applicable to electric utilities statewide.  SED also argues that the benefits of leaving the OII open for a

---

[151]  Cal Advocates Comments at 18-19; TURN Comments at 25-27.

[152]  Cal Advocates Comments at 20-24.

[153]  Cal Advocates Comments at 18.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 67 of 89

second phase must be weighed against the costs in resources to all parties concerned.

Given the continued wildfire risks facing the state, the Commission recognizes the importance of understanding the causes and circumstances of these fires and incorporating any learnings into utility operations and wildfire policies so as to mitigate the risk of similarly caused fires in the future. However, there are already a number of different venues and proceedings in which the Commission is reviewing wildfire risk mitigation policies. Furthermore, as discussed above, this decision establishes a more robust process for review and consideration of the results of the RCAs. Therefore, the Commission does not find it necessary for this investigation to remain open for a second phase. The Commission emphasizes that the closure of this investigation does not mean that the Commission will cease to examine the root causes and systemic issues related to the role PG&E's electric facilities had in igniting these wildfires.

PG&E's wildfire mitigation efforts are currently subject to oversight through the Commission's review of its annual wildfire mitigation plan (WMP) required pursuant to SB 901 and independent audits required pursuant to SB 247 (Stats. 2019), SB 901, and AB 1054. Pub. Util. Code § 8386 requires all California electric utilities to prepare and submit wildfire mitigation plans that describe the utilities' plans to prevent, combat, and respond to wildfires affecting their service territories. The elements that must be included in the plan include systemic issues that have been raised in this proceeding, such as: inspection and maintenance of electric infrastructure (Sections 8386(a) and (c)(9)); protocols for disabling reclosers and de-energization (Sections 8386(c)(6) and (7)); and vegetation management (Section 8386(c)(8)). The annual WMP process includes

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 68 of 89

reporting, monitoring, evaluation, and updating to ensure the electrical corporations are targeting the greatest risk with effective programs.

To the extent that the results of the RCAs or other information identify areas of PG&E's wildfire risk mitigation efforts that may be deficient, parties may raise these issues as part of the annual WMP review process.[154] To the extent that the RCAs or other information more broadly identify deficiencies in PG&E's operational practices (*e.g.*, recordkeeping practices), these issues may be further considered as part of the Commission's Investigation into PG&E's safety culture (I.15-08-019). As discussed above, the Commission will also receive and review these reports and PG&E's responses to these reports, hold workshops, and assess what further action may be necessary in order to ensure the safe operation of PG&E's electric facilities.[155] If the RCA reports identify broader wildfire risk mitigation policies that should be examined, including potential changes to GO 95, it may be more appropriate for the Commission to consider these issues in a rulemaking applicable to electric utilities statewide.

### 8.10. Approval of Proposed Settlement with Modifications

The Commission finds that the provision for penalties set forth in the proposed settlement agreement is inadequate and not commensurate with the scale of the harm caused by the 2017 and 2018 fires. As discussed above, the proposed settlement is inadequate for the following reasons: (1) the effective value of the penalties is uncertain due to the structure of the penalties and the

---

[154] The 2020 WMPs and comments on the 2020 WMPs will be served on the service list for Rulemaking (R.) 18-10-007. (Resolution WSD-001 at 3.) Persons not already on the service list of R.18-10-007 may contact the Commission's Process Office to request addition to the service list as "Information Only."

[155] The purpose of any further action would not be to levy any additional monetary penalties on PG&E for its role in the 2017 and 2018 wildfires.

fact that the vast majority of the penalties is in the form of disallowances;  (2) PG&E anticipates receiving tax savings associated with the penalties;  and (3) the settlement agreement does not include any fines.  Therefore, the Commission finds that the proposed settlement agreement as submitted is not reasonable in light of the whole record or in the public interest.

The Commission cannot approve the settlement agreement as submitted.  However, the Commission finds that the settlement agreement should be approved with modifications rather than rejected outright.  The Commission recognizes the parties' extensive settlement efforts and the Commission's policy favoring settlement.  Approval of the settlement agreement with modifications would resolve all issues in this proceeding and minimize the time, expense, and uncertainty of protracted litigation.

Furthermore, there are some meritorious aspects of the settlement agreement for enhancing safety.  The settlement agreement requires PG&E to undertake various System Enhancement Initiatives, which include: enhancements to PG&E's vegetation management program and inspection and maintenance program; root cause analyses and audits to help better understand the cause of the fires and to monitor the effectiveness of PG&E's operations in mitigating wildfire risks; and remedies that focus on transparency and community and customer engagement.  Although some parties questioned the funding and mechanics of some of the initiatives, no party opposed the substance of the initiatives.

There is also the unique circumstance of PG&E's pending bankruptcy proceeding to consider.  The plan to be confirmed in the bankruptcy proceeding will address and provide for the resolution and satisfaction of all pre-petition claims, such as those arising from the 2017 and 2018 wildfires.  Untimely

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 70 of 89

resolution of the issues in this proceeding would create uncertainty and prolong the resolution of the bankruptcy proceeding.  Under AB 1054, PG&E's bankruptcy must be resolved by June 30, 2020 in order for PG&E to participate in the wildfire fund created pursuant to that statute.  Given these considerations, it is in the public interest to timely resolve issues regarding the monetary penalties to be imposed on PG&E in this investigation.

The Commission finds that the settlement agreement is acceptable if modified to strengthen the effective value of the penalty and to provide a more robust process for review of the root cause analyses of the fires for which SED found violations.  Accordingly, the proposed settlement is approved with the modifications set forth in Ordering Paragraph 1, below.

The Commission finds that that the settlement agreement, as modified by this decision, is reasonable in light of the whole record, consistent with the law, and in the public interest.  The Commission finds that the outcome adopted by this decision falls within a reasonable range of litigated outcomes.  All of the parties face litigation risk.  It is possible that the Commission may determine that all of the violations as alleged by SED did not occur, which could result in lower penalties.  On the other hand, the Commission may determine that PG&E did commit some or all of the violations as alleged by SED, which would call for significant penalties given the unprecedented harm caused by the fires and PG&E's safety record.  These penalties could also be more punitive in structure by requiring that a higher portion be paid in the form of a fine and would be unlikely to include the wildfire-related expenditures agreed to by the Settling Parties in the settlement agreement.

Cal Advocates questions whether it is reasonable to adopt the proposed settlement when the full extent of PG&E's culpability and damage that resulted

from the fires may be unknown.  A fully adjudicated investigation would provide certainty regarding the number and days of violations.  However, it would not necessarily result in a material increase in the penalties that the Commission would impose on PG&E.  For one thing, it is possible that not all of SED's alleged violations may be proven.

Furthermore, the penalties imposed by this decision are substantial and the Commission's ability to impose monetary penalties is not unlimited.  The severity of the offense or conduct of the utility are not the only factors that are examined in determining an appropriate penalty.  The financial resources of the utility must also be taken into account.  For example, in the San Bruno proceedings, based on the number of days that PG&E was found to be in violation, the Commission calculated that the range of potential fines that could be imposed based on Pub. Util. Code § 2107 was from $9.2 billion to $254.3 billion.[156]  But the Commission recognized that the amount of the penalty to be imposed must be significantly decreased from that potential level in consideration of PG&E's financial resources and ultimately imposed a fine and other penalties and remedies totaling $1.6 billion.[157]

Given these considerations, the Commission finds that the provision for penalties set forth in the settlement agreement, as modified by this decision, is within a reasonable range of potentially litigated outcomes and in the public interest.  Rather than continued litigation regarding the amount of monetary penalties to be imposed on PG&E, the Commission finds that the public interest

---

[156] D.15-04-024 at 79.

[157] D.15-04-024 at 79.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 72 of 89

is best served by focusing efforts on appropriate corrective actions to help reduce the risk of such catastrophic wildfires in the future.

## 9.  Rulings on Motions

On December 17, 2019, PG&E filed a motion to file under seal supporting documents to the Joint Motion.  PG&E requests confidential treatment of customer-identifying information and certain employee-identifying information.  Consistent with the ALJ ruling issued on December 20, 2019, PG&E's unopposed motion is granted.

On March 10, 2020, subsequent to the issuance of the Presiding Officer's Decision, Del Monte filed a Motion to Reopen the Record and Accept into Evidence Previously Filed and Timely Served Testimonial Evidence.  The motion seeks to reopen the record to have the following documents admitted into evidence: (1) the Prepared Direct Testimony of Ken Buske, and (2) the Deposition of CAL FIRE Lead Investigator, John Martinez, Vols. 1 and 2.  These documents were previously attached to Del Monte and Wild Tree's comments on the proposed settlement agreement as Attachments C and B, respectively.  An ALJ ruling issued on January 28, 2020 accepted the comments and attachments for filing but clarified that these documents were not admitted into the evidentiary record of this proceeding.

PG&E filed a response on March 24, 2020 opposing the motion.  Cal Advocates filed a response on March 25, 2020 supporting the admission of Del Monte's documents and also arguing that all other testimony and documents appended to parties' comments on the proposed settlement agreement should be accepted into the evidentiary record.

Rule 13.8(c) of the Commission's Rules of Practice and Procedure states: "Prepared testimony and accompanying exhibits may be offered and received

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
73 of 89

into evidence without direct or cross examination absent objection by any party." In this case, evidentiary hearings have not been held and PG&E has raised objections as to the receipt of these documents into evidence. Therefore, Del Monte's motion to have these documents admitted into the evidentiary record is denied.

The Commission clarifies that all documents filed in the proceeding are part of the proceeding record. The Commission has reviewed and considered these documents in assessing whether the settlement agreement is reasonable in light of the whole record, consistent with the law, and in the public interest. To the extent that these documents have not been accepted into the evidentiary record, they are not relied upon to make an evidentiary finding (i.e., to prove or disprove any disputed issue of material fact).

All outstanding motions filed in the proceeding that have not been addressed in a prior ruling or in this decision are denied.

## 10. Motion Requesting Other Relief, Appeals, and Request for Review

Pursuant to Rule 12.4(c) of the Commission's Rules of Practice and Procedure, the Commission may propose alternative terms to the parties to a settlement and allow the parties reasonable time to elect to accept such terms or request other relief. The POD was issued on February 27, 2020 setting forth proposed alternative terms to the Settling Parties. The Settling Parties were provided 20 days from the service of the POD to file and serve a motion accepting the modifications to the proposed settlement or requesting other relief.

On March 18, 2020, PG&E filed a Motion Requesting Other Relief Regarding Presiding Officer's Decision Approving Settlement Agreement with Modifications. PG&E concurrently filed an appeal raising the same issues set forth in its motion requesting other relief. PG&E requests that the Commission

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 74 of 89

issue a decision approving the settlement agreement proposed by the Settling Parties.  Alternatively, PG&E requests that the POD be modified to: (1) eliminate the tax benefit provision, and (2) order that any fine payable to the General Fund, including the proposed $200 million fine, is a Fire Victim Claim under PG&E's PoR, will be paid out of the Fire Victim Trust, and will be subordinated to the Trust's payments to fire victims.

On March 19, 2020, CUE filed an appeal of the POD requesting the same relief set forth in PG&E's motion requesting other relief and appeal.  CUE concurrently filed a response supporting PG&E's motion requesting other relief.

On March 19, 2020, SED filed a motion in response to the POD.  SED continues to support the settlement agreement as being reasonable in light of the record, consistent with the law, and in the public interest.  However, SED neither opposes the modifications to the settlement agreement, nor suggests further modifications.

On March 19, 2020, SED filed a response to PG&E's motion requesting other relief stating that it does not oppose PG&E's proposed modifications to the settlement agreement set forth in the motion.

On March 27, 2020 Del Monte and Wild Tree filed a joint appeal of the POD.  The appeal argues that the ratepayer advocates were denied a fair hearing, that the POD fails to apply the appropriate legal standard in considering contested settlements, and that approval of the proposed settlement agreement or the POD would result in the Commission failing to comply with its legal duties to investigate accidents and prosecute violations of the law by public utilities.

On March 27, 2020 Commissioner Rechtschaffen filed a request for review of the POD in order to consider the following issues: (1) whether the $200 million

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 75 of 89

cash fine should be imposed without any restriction as to the source of funds but expressly state that the obligation to pay the fine is permanently suspended, and (2) whether the tax benefit provision should be limited to apply to tax savings associated with operating expenses only and not apply to any tax savings associated with capital expenditures.

Responses to the motion requesting other relief, appeals, and/or the request for review were filed on March 25, 2020 by the Official Committee of Tort Claimants of PG&E (TCC); on April 2, 2020 by Cal Advocates, TURN, and Del Monte/Wild Tree; on April 9, 2020 by PG&E, SED, CUE, Cal Advocates, TURN, Del Monte/Wild Tree, TCC, and CCSF; and on April 10, 2020 by Alex Canarra and Gene Nelson.[158]

The POD has been revised in response to the appeals and request for review as follows:

- The POD has been revised to require PG&E to return only the tax savings (i.e., financial benefits) associated with shareholder obligations for operating expenses in the settlement agreement, as modified by this decision, for the benefit of ratepayers once PG&E has realized the savings. The tax benefit provision shall not apply to tax savings associated with shareholder obligations for capital expenditures.

- The Commission finds that the $200 million fine should be imposed for the reasons set forth in the POD.  However, in view of the unique circumstances of PG&E's pending bankruptcy, the POD has been revised to permanently suspend the fine.

---

[158] An ALJ ruling issued on March 30, 2020 required responses to the appeals and request for review to be filed by April 9, 2020.  The assigned ALJ authorized the Docket Office to accept Canarra and Nelson's response, which had been served on April 9, 2020, for filing on April 10, 2020.

- The POD has been revised to approve the settlement agreement's provision for the Safety Evaluator's audit of PG&E's overhead distribution and transmission maintenance program to commence within one year of the effective date of the settlement.

In all other respects, the motion requesting other relief and appeals are denied.

## 11. Comments on Decision Different

The Decision Different was issued on April 20, 2020 and parties were provided 10 days from the service of the Decision Different to file concurrent comments.  Because parties already had an opportunity to file appeals of the POD, and respond to other parties' appeals, comments were limited to differences between the POD and the proposed Decision Different.  To the extent that any comments exceed that scope, they were not considered.

Comments were filed on April 30, 2020 by PG&E, SED, Cal Advocates, TURN, Del Monte/Wild Tree, and TCC and on May 1, 2020 by CUE.[159]

Pursuant to Rule 12.4(c) of the Commission's Rules of Practice and Procedure, the Settling Parties in their comments on the Decision Different indicated that they accept the modifications to the settlement agreement set forth in Ordering Paragraph 1, below.[160]

The Commission has carefully reviewed the comments and finds that, with the exception of edits to reflect the Settling Parties' acceptance of the

---

[159] An ALJ ruling issued on May 4, 2020 granted CUE's motion to file their comments one day late.

[160] PG&E Comments on Decision Different at 2; CUE Comments on Decision Different at 1; SED Comments on Decision Different at 2.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 77 of 89

modifications to the settlement agreement, no changes to the Decision Different are warranted.

## 12. Assignment of Proceeding

Clifford Rechtschaffen is the assigned Commissioner and Sophia J. Park is the assigned Administrative Law Judge in this proceeding.

## Findings of Fact

1. SED investigated 17 of the fire incidents that occurred in PG&E's service territory in 2017 and the Camp Fire, which occurred in 2018.

2. CAL FIRE determined that PG&E's electrical facilities ignited all but one of the 18 fire incidents investigated by SED that occurred in 2017 and 2018.

3. With respect to the 2017 wildfires, SED found a total of 33 violations of GO 95 and Resolution E-4184.

4. With respect to the 2018 Camp Fire, SED found 12 violations of GOs 95 and 165, Resolution E-4184, and Public Utilities Code § 451.

5. PG&E disagreed with many of the findings in SED's Fire Reports and contested that there were violations of GO 95 and other Commission rules.

6. PG&E does not contest 14 of the violations found by SED.

7. The 2017 and 2018 wildfires resulted in an unprecedented level of physical and economic harm.

8. There are serious questions regarding PG&E's efforts to prevent, detect, and rectify the violations that are at issue in this proceeding.

9. PG&E has a demonstrated record of failing to comply with Commission directives, including those related to vegetation management.

10. The fact that PG&E is currently in bankruptcy proceedings is a factor to consider in assessing the financial resources of the utility.

11.   The extent of PG&E's ability to pay a larger penalty is unknown based on the record.

12.   The significant loss of life, physical and economic harm, and destruction that are at issue in this proceeding are not comparable to the factual circumstances of prior enforcement proceedings.

13.   Under the terms of the settlement agreement, PG&E's shareholders will bear $1.675 billion in financial obligations, which consists of $1.625 billion in disallowances of wildfire-related expenses and capital expenditures that PG&E incurred or will incur, as well as $50 million in System Enhancement Initiatives.

14.   Cal Advocates calculates potential penalties of approximately $943.8 million for the October 2017 wildfires and approximately $1.5 billion for the 2018 Camp Fire.

15.   The provision for penalties set forth in the settlement agreement is inadequate and not commensurate with the magnitude of the allegations and conduct that are at issue.

16.   The effective value of the financial obligations imposed on PG&E by the settlement agreement is less than the asserted amount of $1.675 billion.

17.   PG&E may not have otherwise received ratepayer recovery for $924 million in CEMA costs identified in the settlement agreement, which relate to the 2017 and 2018 wildfires for which SED has alleged violations.

18.   Disallowances are only effective as a penalty where shareholders are required to absorb costs that would otherwise be paid by ratepayers.

19.   There has been no finding by the Commission that the wildfire-related expenditures identified in the settlement agreement are reasonable.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 79 of 89

20.  The significant uncertainty regarding the recoverability of the settled CEMA costs must be taken into account when assessing whether the penalty is adequate.

21.  The settled penalty amount should be increased to account for the uncertainty of the recoverability of the settled CEMA costs and to ensure that the penalty is commensurate with the scale of the 2017 and 2018 fires.

22.  It is reasonable to increase the settled penalty amount by $462 million, which is half the value of the disputed CEMA costs included in the settlement, in order to ensure that the effective value of the penalty more closely approximates the amount proposed by the Settling Parties.

23.  PG&E estimates that all $1.625 billion of the wildfire-related expenditures identified in the settlement agreement will be deductible for federal tax purposes and that it is possible but not certain that the additional $50 million invested in System Enhancement Initiatives will also be deductible for federal tax purposes.

24.  PG&E estimates that the full $1.675 billion in financial obligations identified in the settlement agreement will be tax deductible for California state tax purposes.

25.  Assuming that the full $1.675 billion is tax deductible, and depending on many other variables, PG&E estimates tax savings of approximately $469 million.

26.  With this decision's modifications to the settlement agreement, PG&E shareholders will incur additional financial obligations of approximately $262 million that PG&E may seek to deduct as ordinary business expenses, which would result in tax savings beyond the estimated $469 million.

27.  In order for the penalties adopted in this decision to have the appropriate punitive and deterrent impact, ratepayers, rather than shareholders, should

Case: 19-30088     Doc# 7322-18     Filed: 05/15/20     Entered: 05/15/20 15:58:31     Page 80 of 89

receive the benefit of any tax savings associated with these financial obligations, consistent with IRS rules.

28.  The assessment of no fine is not within a reasonable range of potentially litigated outcomes in this case.

29.  PG&E is one of the largest combined natural gas and electric energy companies in the United States.

30.  Despite its size, PG&E's ability to raise capital as part of its PoR is not unlimited.

31.  In light of the unique and unprecedented circumstances of PG&E's bankruptcy, a permanent suspension of the fine is warranted.

32.  The Commission has not authorized ratepayer funding for the System Enhancement Initiatives.

33.  The RCAs are a worthy initiative that will potentially yield valuable information and lessons that can aid in efforts to reduce the risk of future catastrophic wildfires.

34.  Modifications to the RCA initiative are warranted to ensure that the RCAs are scoped with sufficient depth and breadth, and to dedicate resources to implement corrective actions that may be identified from the RCAs.

35.  A budget of $3 million for all 17 RCAs may be inadequate to conduct RCAs of sufficient depth and breadth.

36.  There must be a more robust process after the completion of the RCAs in order to ensure that appropriate corrective actions are identified and undertaken.

37.  To the extent possible, information on electric maintenance work and "near hits" should be made available to local governments and the public in order to promote greater transparency on important issues of public safety.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
81 of 89

38. There is a lack of specificity in the settlement agreement regarding the format and content of the reports on electric maintenance work and "near hit" data, and therefore, it is unclear how and to what extent this information should be made more widely available.

39. It is reasonable for the Safety Evaluator's review of the overhead distribution and transmission preventative maintenance program and procedures to commence within one year of the effective date of the settlement agreement.

40. No alleged violations with respect to the Tubbs Fire were identified in the OII or in the scoping memos issued in this proceeding.

41. The settlement agreement does not improperly constrain consideration of any new information concerning the Tubbs Fire.

42. The exclusion of any violations with respect to the Tubbs Fire in the settlement agreement is reasonable.

43. With the exception of costs included in the settlement agreement, as modified by this decision, it is not reasonable to bar PG&E from seeking future recovery of costs associated with fires for which SED found violations in this proceeding.

44. Any request for future recovery of costs would be subject to a reasonableness review.

45. There are already a number of different venues and proceedings in which the Commission is reviewing wildfire risk mitigation policies.

46. It is not necessary for this proceeding to remain open for a second phase.

47. It is in the public interest to timely resolve issues regarding the monetary penalties to be imposed on PG&E in this investigation.

Case: 19-30088   Doc# 7322-18   Filed: 05/15/20   Entered: 05/15/20 15:58:31   Page 82 of 89

48.   The outcome adopted by this decision falls within a reasonable range of litigated outcomes.

49.   The Commission's ability to impose monetary penalties is not unlimited and the financial resources of the utility must be taken into account.

**Conclusions of Law**

1.   Pursuant to Pub. Util. Code § 451, a public utility cannot recover costs from ratepayers absent Commission review of the costs for reasonableness and approval to recover in rates.

2.   A fine payable to the General Fund is not deductible under Section 162 of the Internal Revenue Code or California law since it is a payment to a government for a violation of law or investigation or inquiry into a potential violation of law.

3.   Pursuant to IRS normalization rules, a utility receives accelerated tax benefits in the early years of an asset's regulatory life but passes that benefit through to ratepayers ratably over the regulatory useful life of the asset in the form of reduced rates.

4.   Requiring PG&E to return only the tax savings (i.e., financial benefits) associated with shareholder obligations for operating expenses in the settlement agreement, as modified by this decision, for the benefit of ratepayers once PG&E has realized the savings would not result in a violation of IRS normalization rules.

5.   It is neither consistent with Commission precedent nor in the public interest for this investigation to conclude without the assessment of a fine.

6.   The settlement agreement cannot bar the Commission from undertaking the necessary reasonableness review required by law for any costs for which PG&E seeks ratepayer recovery in the future.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 83 of 89

7.  The Settling Parties cannot agree to provisions that would impose restrictions on non-settling parties.

8.  The proposed settlement is not reasonable in light of the whole record.

9.  The proposed settlement is not in the public interest.

10.  The proposed settlement should be approved with modifications.

11.  The proposed settlement, as modified by this decision, is reasonable in light of the whole record.

12.  The proposed settlement, as modified by this decision, is consistent with the law.

13.  The proposed settlement, as modified by this decision, is in the public interest.

14.  Rule 12.4(c) of the Commission's Rules of Practice and Procedure requires the Settling Parties to be given the opportunity to accept the modifications to the settlement agreement or to seek other relief.

# O R D E R

**IT IS ORDERED** that:

1.  The proposed settlement in this proceeding is approved with the following modifications:

   (a)  The financial obligations to be imposed on Pacific Gas and Electric Company (PG&E) is increased by an additional $462 million of which: (i) $198 million shall go toward future wildfire mitigation expenses that would have otherwise been recovered from ratepayers but for this decision, (ii) $64 million shall go toward expanding the System Enhancement Initiatives, and (iii) $200 million shall be in the form of a fine payable to the General Fund, which shall be permanently suspended.  The $198 million shall be applied to wildfire mitigation expenses recorded in the Fire Risk Mitigation Memorandum Account or the Wildfire

Mitigation Plan Memorandum Account within four years of the effective date of the settlement agreement.

(b) Any tax savings (i.e., financial benefits) associated with the financial obligations for operating expenses in the settlement agreement, as modified by this decision, shall be returned for the benefit of ratepayers once PG&E has realized the savings. Once PG&E realizes any such tax savings, PG&E shall report the tax savings, with accompanying supporting testimony and underlying calculations, in its next General Rate Case filing immediately following the realization of the savings. The amount of the tax savings shall be applied to wildfire mitigation expenses recorded in the Fire Risk Mitigation Memorandum Account or the Wildfire Mitigation Plan Memorandum Account that would otherwise have been recovered from ratepayers but for this decision.

(c) With the exception of shareholder funds to be spent on the root cause analyses (RCAs) and associated corrective actions, if PG&E has not spent the budgeted shareholder funds on the specified System Enhancement Initiatives within five years of the effective date of the settlement agreement, the remaining balance shall be paid to the General Fund.

(d) The total budget for the RCAs to be funded by shareholders pursuant to Section B.7 of Exhibit C of the settlement agreement is increased by $14 million for a total budget of $17 million. The funds may be shifted between the analyses depending on the complexity of each. If the RCAs are conducted for less than $17 million, any remaining funds shall be used to implement corrective actions stemming from the RCAs.

(e) PG&E shall spend $50 million of shareholder funds, plus any amount remaining from the budget for conducting the RCAs, to implement corrective actions stemming from the RCAs that would otherwise have been funded by ratepayers but for this decision.

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page
85 of 89

(f) The Office of the Safety Advocate's role with respect to the RCAs shall be replaced by the Safety Policy Division (SPD).

(g) PG&E shall also serve the RCA reports and PG&E's responses to the reports on the Directors of SPD and the Wildfire Safety Division.

(h) PG&E shall consult with the Safety and Enforcement Division (SED) and SPD within 30 days of the effective date of the settlement agreement regarding the appropriate format, content, and treatment (including availability to local governments and the public) of the quarterly electric maintenance reports and "near hit" data required pursuant to Sections B.16 and B.19, respectively, of Exhibit C of the settlement agreement. Upon request of SED or SPD, PG&E shall also consult with the Divisions regarding the appropriate format, content, and treatment of other reporting and data sharing requirements set forth in the settlement agreement. As part of consulting with SED and SPD, PG&E shall provide those Divisions with proposed report and data sharing templates for their comment and consideration. PG&E shall file a Tier 1 advice letter with SED within 60 days of the effective date of the settlement agreement to memorialize the format, content, and treatment of the reports and data set forth in the settlement agreement.

(i) The statement in Section B.7 of Exhibit C of the settlement agreement that "non-PG&E parties to this proceeding shall not use the results of the RCA to assert that the Commission should impose any additional financial penalties upon PG&E nor to argue for any additional disallowance" is modified to substitute "non-PG&E Settling Parties" for "non-PG&E parties."

2. Pacific Gas and Electric Company's Motion for Leave to File Under Seal Supporting Documents to Joint Motion of Pacific Gas and Electric Company, the Safety and Enforcement Division of the California Public Utilities Commission, Coalition of California Utility Employees, and the Office of the Safety Advocate

for Approval of Settlement Agreement filed on December 17, 2019 is granted. The confidential version of Exhibit A of the settlement agreement shall remain under seal and shall not be made accessible or disclosed to anyone other than the Commission staff except on further order or ruling of the Commission, the Assigned Commissioner, the Assigned Administrative Law Judge (ALJ), or the ALJ then designated as the Law and Motion Judge.

3. Thomas Del Monte's Motion to Reopen the Record and Accept into Evidence Previously Filed and Timely Served Testimonial Evidence filed on March 10, 2020 is denied.

4. Pacific Gas and Electric Company (PG&E)'s request that the wildfire safety audit of PG&E's overhead distribution and transmission maintenance program pursuant to Section B.14(b) of Exhibit C of the settlement agreement commence within one year of the effective date of the settlement is granted. In all other respects, PG&E's Motion Requesting Other Relief Regarding Presiding Officer's Decision Approving Settlement Agreement with Modifications filed on March 18, 2020 and the appeals of the Presiding Officer's Decision are denied.

5. All motions not previously addressed are denied.

6.  Upon Bankruptcy Court approval of the settlement agreement, as modified by this decision, this proceeding is closed.

This order is effective today.

Dated May 7, 2020, at San Francisco, California.

MARYBEL BATJER
                    President
LIANE M. RANDOLPH
MARTHA GUZMAN ACEVES
CLIFFORD RECHTSCHAFFEN
GENEVIEVE SHIROMA
                    Commissioners

Case: 19-30088    Doc# 7322-18    Filed: 05/15/20    Entered: 05/15/20 15:58:31    Page 88 of 89

# APPENDIX A