1
2
3
4
**<u>EXHIBIT A</u>**
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Investigation: <u>19-09-016</u>
(U 39 M)
Date: <u>January 31, 2020</u>
Witness(es): Various

---

# PACIFIC GAS AND ELECTRIC COMPANY

# PLAN OF REORGANIZATION OII 2019

# PREPARED TESTIMONY

# VOLUME 1

---



# PACIFIC GAS AND ELECTRIC COMPANY
## PLAN OF REORGANIZATION OII 2019
## PREPARED TESTIMONY

## TABLE OF CONTENTS

**VOLUME 1**                    **TESTIMONY**

| Chapter | Title | Witness |
|---------|-------|---------|
| 1 | INTRODUCTION | William D. Johnson |
| 2 | PG&E'S PLAN AND FINANCING | Jason P. Wells |
| 3 | ABILITY TO RAISE CAPITAL POST-EMERGENCE | John Plaster |
| 4 | BOARD-LEVELGOVERNANCE | Nora M. Brownell |
| 5 | UTILITY SAFETY AND GOVERNANCE | Andrew M. Vesey<br>Stephen J. Cairns<br>Amit Gupta<br>Megan Hertzler |
| 6 | WILDFIRE SAFETY | Deborah Powell<br>Matt T. Pender<br>Tracy Maratukulam |
| 7 | EXECUTIVE COMPENSATION | John Lowe |
| 8 | GOVERNANCE:  PROBATION | Julie Kane |
| 9 | CLIMATE | Jessica Hogle<br>Martin K. Wyspianski |
| 10 | RATES AND RATE NEUTRALITY | Robert S. Kenney |
| 11 | FINES AND PENALTIES | Robert S. Kenney |
| 12 | SECTION 854 CONSIDERATIONS | Robert S. Kenney |

PACIFIC GAS AND ELECTRIC COMPANY
PLAN OF REORGANIZATION OII 2019
PREPARED TESTIMONY

TABLE OF CONTENTS
(CONTINUED)

**VOLUME 2**          **EXHIBITS SUPPORTING TESTIMONY**

| Chapter 2 Exhibits: | Title | Witness |
|---|---|---|
| 2.1 | FINANCIAL STATEMENT | Jason P. Wells |
| 2.2 | DESCRIPTION OF PROPERTY | Jason P. Wells |
| 2.3 | PREVIOUS DEBT AUTHORIZATIONS | Jason P. Wells |
| 2.4 | SHORT-TERM DEBT IN EXCESS OF § 823(C) | Jason P. Wells |
| 2.5 | NOTEHOLDER RSA | Jason P. Wells |

**VOLUME 3**          **EXHIBITS SUPPORTING TESTIMONY**

| Chapter 2 Exhibits: | Title | Witness |
|---|---|---|
| 2.6 | NOTEHOLDER RSA – REFERENCE MEDIUM-TERM SENIOR NOTE DOCUMENTS | Jason P. Wells |

**VOLUME 4**          **EXHIBITS SUPPORTING TESTIMONY**

| Chapter 2 Exhibits: | Title | Witness |
|---|---|---|
| 2.7 | NOTEHOLDER RSA – REFERENCE LONG-TERM SENIOR NOTE DOCUMENTS | Jason P. Wells |
| 2.8 | BRIDGE COMMITMENT LETTER | Jason P. Wells |
| 2.9 | FEE COMPUTATION | Jason P. Wells |

| Chapter 4 Exhibits: | Title | Witness |
|---|---|---|
| 1 | COMPLIANCE FILING IN SAFETY CULTURE OII (JULY 3, 2019) | Nora M. Brownell |

PACIFIC GAS AND ELECTRIC COMPANY
PLAN OF REORGANIZATION OII 2019
PREPARED TESTIMONY

TABLE OF CONTENTS
(CONTINUED)

**VOLUME 5**          **EXHIBITS SUPPORTING TESTIMONY**

| Chapter 4 Exhibits: | Title | Witness |
|---|---|---|
| 2 | NYSE: CORPORATE GOVERNANCE GUIDE (2014) | Nora M. Brownell |
| 3 | CALPERS' GOVERNANCE & SUSTAINABILITY PRINCIPLES (SEPTEMBER 2019) | Nora M. Brownell |
| 4 | CALSTRS CORPORATE GOVERNANCE PRINCIPLES (NOVEMBER 2018) | Nora M. Brownell |
| 5 | VANGUARD INVESTMENT STEWARDSHIP - SEMIANNUAL ENGAGEMENT UPDATE (2019) | Nora M. Brownell |
| 6 | BLACKROCK PROXY VOTING GUIDELINES FOR U.S. SECURITIES  (JANUARY 2019) | Nora M. Brownell |
| 7 | DELOITTE CENTER FOR CORPORATE GOVERNANCE, WOMEN IN THE BOARDROOM:  A GLOBAL PERSPECTIVE (6TH ED. 2019) | Nora M. Brownell |

PACIFIC GAS AND ELECTRIC COMPANY
PLAN OF REORGANIZATION OII 2019
PREPARED TESTIMONY

TABLE OF CONTENTS
(CONTINUED)

**VOLUME 6**          **EXHIBITS SUPPORTING TESTIMONY**

| Chapter 4 Exhibits: | Title | Witness |
|---|---|---|
| 8 | DELOITTE, 2016 BOARD PRACTICES REPORT: A TRANSPARENT LOOK AT THE WORK OF THE BOARD (10TH ED. 2017) | Nora M. Brownell |
| 9 | FINANCIAL REPORTING COUNCIL, UK CORPORATE GOVERNANCE CODE (2018) | Nora M. Brownell |
| 10 | DELOITTE FRAMING THE FUTURE OF CORPORATE GOVERNANCE | Nora M. Brownell |
| 11 | GLASS LEWIS GUIDELINES AN OVERVIEW OF THE GLASS LEWIS APPROACH TO PROXY ADVICE UNITED STATES | Nora M. Brownell |
| 12 | ISS UNITED STATES PROXY VOTING GUIDELINES BENCHMARK POLICY RECOMMENDATIONS | Nora M. Brownell |
| 13-22 | PG&E CORPORATION AUDIT COMMITTEE RESOLUTION OF THE BOARD OF DIRECTORS OF PG&E CORPORATION DATED SEPTEMBER 19, 2017 | Nora M. Brownell |
| 23 | TABLE OF CERTAIN REGULATORY, FINANCIAL AND OTHER COMMITMENTS | Nora M. Brownell |

| Chapter 7 Exhibits: | Title | Witness |
|---|---|---|
| 1 | STIP METRICS | John Lowe |
| 2 | LTIP METRICS | John Lowe |

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 1**

**INTRODUCTION TO TESTIMONY**

**(SCOPING MEMO – ALL SECTIONS)**

43816932.1

TABLE OF CONTENTS

A.  Executive Summary.............................................................................................. 1-1

B.  Introduction........................................................................................................... 1-3

C.  Backdrop to PG&E's Plan of Reorganization.................................................... 1-4

D.  Overview of PG&E's Plan of Reorganization and Supporting Testimony ........ 1-5

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 1**
**INTRODUCTION TO TESTIMONY**
**(SCOPING MEMO – ALL SECTIONS)**

**A. Executive Summary**

This Chapter 1 provides an introduction to Pacific Gas and Electric Company's (PG&E, the Company or the Utility) Plan of Reorganization (PG&E Plan or Plan) and its goals. The important goals accomplished by the PG&E's Plan include:

1. Fair and expeditious compensation to wildfire victims;

2. Accelerated wildfire risk reduction, while keeping customer rates affordable; and

3. A governance system that emphasizes safe and reliable service, and will keep PG&E financially and operationally healthy for the long term.

As described in the accompanying chapters, PG&E is in the process of making, and is dedicated to, transformative change to ensure that we prioritize safety and our customers' welfare, and PG&E commits to continue these efforts as it emerges from Chapter 11 under its Plan. PG&E's Plan complies with Assembly Bill (AB) 1054, addresses the concerns raised by California's Governor, and should be approved by the California Public Utilities Commission (CPUC or Commission).

PG&E needs to be a changed company. Through substantial reforms already in progress and continued hard work, PG&E is rapidly evolving. The company that emerges from bankruptcy will be a changed company with an enhanced focus on safety, improvement, customer welfare and operational excellence.

We need to improve the way we guard against catastrophic wildfires. So we've changed the way we're organized to prioritize and integrate wildfire mitigation. We've implemented aggressive measures to reduce the risk of wildfires, including through enhanced vegetation management, increased safety inspections, system hardening and, as a transitional strategy, the PSPS program. We understand that our implementation of PSPS was unacceptable. So we've improved our ability to provide potential outage information to

Case: 19-30088    Doc# 7331-1    Filed: 05/15/20    Entered: 05/15/20 16:15:55    Page 9 of 276
4/3816932:1

1    customers, changed the way we communicate and coordinate with OES, CalFire
2    and impacted local communities, and we are aggressively taking action to
3    reduce the number of impacted customers and duration of PSPS events.  We're
4    installing sectionalizing devices that can help limit the geographical impact of
5    de-energization and accelerate restoration.  We're upgrading our ability to
6    enable remote operation of line reclosers in high fire threat areas.  We're
7    installing hundreds of new weather stations and cameras to more accurately
8    pinpoint specific regions forecast to experience PSPS conditions.

9        We need to improve the way we run our operations, from asset condition to
10   operational planning and decision making.  So we are improving our asset
11   management, data collection and integration and record keeping.  We will be an
12   industry leader in the prudent management of our assets and will build on the
13   success of Gas Operations in obtaining ISO 55000 Certification by having the
14   electric and power generation lines of business achieve equivalent certifications
15   as well.

16       We need to improve our understanding of our risks, our identification and
17   monitoring of the main risk drivers, and improve our oversight and execution of
18   our strategies to mitigate these risks.  We understand that climate change will
19   bring new challenges to our operations, not even imagined today.  So we are
20   expanding our Enterprise and Risk Management program, working closely in
21   these efforts with the Commission.

22       We need to change quickly and efficiently.  So we're enhancing our
23   management of change, especially when it comes to safety and risk.  We have a
24   new management team in place and we are empowering leadership in the areas
25   of risk, safety, compliance and customer care.  We are adding a new Chief Risk
26   Officer and Chief Safety Officer.  We're also embracing entirely new governance
27   actions, including independent oversight through an Independent Safety Advisor
28   and Independent Safety Oversight Committee.

29       We moved too far from our customers.  We recognize the cornerstone of
30   future success requires focusing on protecting and advancing customer and
31   workforce welfare and improving overall the service our customers receive.  So
32   we are increasing reliability, including reducing the number of customers
33   affected by and the frequency and duration of PSPS events.  We're submitting a
34   plan to create local operating regions that place leadership and operations

43816932.1

1  closer to our customers.  Each region will be led by an officer of the Utility who
2  will be charged with understanding and addressing local customer service,
3  reliability and safety needs, and each region will have its own safety officer
4  focused on public and workforce safety.

5      Our blueprint for emerging from bankruptcy changed for the better is
6  described in the accompanying chapters of testimony, particularly Chapter 5 and
7  Chapter 6.

8  **B. Introduction**

9      My name is William D. Johnson.  I joined PG&E Corporation in May 2019,
10  when I became its Chief Executive Officer (CEO) and President.  I am a member
11  of the PG&E Corporation Board as well as the Board of its utility subsidiary,
12  Pacific Gas and Electric Company (the "Utility," and collectively with PG&E
13  Corporation, "PG&E").

14      Prior to joining PG&E, I served as President and CEO of the Tennessee
15  Valley Authority (TVA) from January 2013 to May 2019.  Prior to my tenure at
16  TVA, I held executive positions at Progress Energy during 1995-2012, including
17  serving as its President and CEO during 2007-2012.

18      During my 6-year tenure at TVA, the nation's largest public utility, the
19  organization achieved the best safety records in its 85-year history, and TVA
20  was a perennial top decile safety performer in the utility industry.  In that same
21  period, we retired more than half of TVA's coal generation, resulting in a
22  reduction of TVA's carbon omissions by about 50 percent over the last decade.
23  I was responsible for leading TVA to generate more than 50 percent of its
24  energy from non-greenhouse gas emitting sources.  I also oversaw TVA's
25  expansion into utility scale solar in recent years, with the addition of
26  approximately 1,000 megawatts (MW), and pursued the modernization of its
27  hydro assets to increase the overall amount of renewable resources.  TVA's
28  renewable portfolio includes almost 2,400 MWs of wind and solar and
29  5,800 MWs of hydro capacity.

30      I have joined PG&E at a time of extraordinary challenges, recognizing that
31  PG&E needs to compensate wildfire victims as quickly as possible, and that it
32  requires fundamental change and sustained performance over time to regain the
33  public trust.  We have now entered into settlements with all major groups of
34  wildfire victims and have received Bankruptcy Court approval of two of those

1  agreements.  And, as described in the accompanying testimony, PG&E is in the

2  process of implementing structural changes across the Company to improve

3  safety and operational performance for the long term.  These improvements lay

4  the groundwork for a reorganized PG&E that is positioned to lead California's

5  clean energy future while providing safe, reliable, and affordable energy to

6  customers every day.  I look forward to leading PG&E as it navigates its

7  Chapter 11 proceedings, achieves confirmation of its Plan, and continues the

8  enterprise-wide changes that are described further in the accompanying

9  testimony.

10  **C.  Backdrop to PG&E's Plan of Reorganization**

11  The Utility is a regulated public utility that provides electricity, natural gas,

12  and related services, to approximately 16 million customers in northern

13  and central California.  The Utility owns approximately 18,000 circuit miles of

14  interconnected electric transmission lines, and approximately 107,000 circuit

15  miles of electric distribution lines, and it delivered almost 80,000 gigawatt-hours

16  (GWh) of electricity to customers in 2018.  The Utility's bundled natural gas

17  sales in 2018 exceeded 208,000 Million Cubic Feet.

18  PG&E employs approximately 24,000 regular employees, over 99 percent of

19  them at the Utility.  Approximately 15,000 PG&E employees are covered by

20  collective bargaining agreements with local chapters of three labor unions:

21  (i) the International Brotherhood of Electrical Workers (IBEW); (ii) the Engineers

22  and Scientists of California (ESC); and (iii) the Service Employees International

23  Union (SEIU).

24  PG&E has been a major contributor to California's clean energy and climate

25  efforts.  During 2018, 38.9 percent of PG&E's energy deliveries, slightly over

26  19,000 GWh, were from renewable energy sources, exceeding the annual

27  Renewable Portfolio Standards target of 29 percent and reaching California's

28  2020 renewable energy goal ahead of schedule.  PG&E has led the way in

29  helping California achieve its ambitious clean energy and climate goals, and it is

30  committed to continuing this clean energy leadership.  PG&E's Plan is designed

31  to allow us to continue to do so.

32  However, PG&E also has fallen short in recent years, at times with grave

33  consequences.  These shortcomings are well-known, in particular the 2010

34  San Bruno explosion and the catastrophic wildfires of 2017 and 2018.  These

events undermined customers' and other stakeholders' trust and confidence in PG&E and its governance.

PG&E has embarked on significant structural improvements across the entire enterprise to revamp the organization around a culture of customer welfare, including public and occupational safety. As described in the accompanying testimony, PG&E is implementing and upgrading a variety of important management, organizational and reporting structures, accompanied by an executive compensation structure and performance metrics that heavily incentivize customer welfare and safety.

PG&E has refreshed its Board membership, replacing over 80 percent of the Board members since it filed for Chapter 11. The new Boards have extensive expertise in utility operations and regulation, safety, renewable energy, finance and technology, and have taken action to impose additional rigor and accountability around risk reporting. PG&E also has refreshed its officer corps, with nearly 70 percent of its officers, including over 75 percent of its senior and executive officers, having been replaced since September 2017.

PG&E is dedicated to emerging from Chapter 11 as a utility that safely and reliably delivers affordable and clean energy to our customers and communities. PG&E's proposed POR is built around enabling and enhancing that mission. PG&E's Plan is focused on fairly resolving wildfire claims, exiting the Chapter 11 process as quickly as possible, protecting customer rates, and putting PG&E on a path to be the safe energy company our customers expect and deserve.

## D. Overview of PG&E's Plan of Reorganization and Supporting Testimony

On December 12, 2019, PG&E submitted to the bankruptcy court a plan of reorganization which incorporated the settlement reached with the Tort Claimants Committee, representatives of individuals holding over 70 percent in number of fire victim claims, and various other parties.[1] Based on a Restructuring Support Agreement reached last week with the Ad Hoc Bondholders group (Bondholder RSA), PG&E is filing today a further amended

---

[1] Debtors' and Shareholder Proponents' Joint Ch. 11 Plan of Reorg., Dated December 12, 2019, *In re: PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. December 12, 2019).

1 plan of reorganization (PG&E's Plan or Amended Plan).[2]  The key terms of that

2 Amended Plan are also referenced in this and the accompanying testimony.

3 However, to the extent this testimony does not fully reflect the Amended Plan or

4 revisions thereto, PG&E will supplement this testimony accordingly.

5      In addition, PG&E has carefully considered views expressed by California's

6 Governor regarding its prior Plan, and PG&E's accompanying testimony

7 includes a number of additional commitments designed to address the

8 Governor's concerns and to ensure that PG&E's Plan satisfies AB 1054.

9      The following summarizes some of the key features of PG&E's Plan,

10 including the payment of Fire Claims, the Utility's participation in the Wildfire

11 Fund established by AB 1054, assumption of existing agreements, and

12 provisions that contemplate the resolution of other proceedings before

13 the Commission.[3]

14 <u>Payment of Wildfire Claims</u>

15      It is PG&E's intent to fully and fairly compensate all eligible wildfire victims.

16 To that end, PG&E has now entered into settlements (as embodied in the

17 corresponding restructuring support agreements) with all major groups of wildfire

18 victims.  Based on those settlements, PG&E's Plan provides for the payment of

19 claims related to the fires that occurred in Northern California in 2015, 2017, and

20 2018, in the agreed amounts totaling $25.5 billion.  PG&E has also reached a

21 settlement with the CPUC Safety and Enforcement Division, the Office of the

22 Safety Advocate, the Public Advocates Office at the California Public Utilities

23 Commission, and the Coalition of California Utility Employees related to 2017

24 and 2018 wildfires, to resolve claims in the Wildfire Order Instituting Investigation

25 (OII), which settlement provides for, among other things, $50 million in

26 shareholder-funded system enhancements and agreement not to seek rate

27 recovery for certain wildfire-related costs in the amount of $1.625 billion.

---

**2** Debtors' and Shareholder Proponents' Joint Ch. 11 Plan of Reorg. Dated January 31, 2020, *In re: PG&E Corp.*, No. 19-30088 (Bankr. N.D. Cal. January 31, 2020).

**3** *Id.* § 1.75 ("Fire Claim means any claim against the Debtors in any way arising out of the Fires… ."); *id.* § 1.83 and Ex. A (defining the Fires to which Fire Claims relate).

43816932.1

6

1    <u>Participation in the Wildfire Fund</u>

2    AB 1054 establishes a Wildfire Fund to pay certain claims arising from

3    wildfires.[4] PG&E's Plan provides that, on the Effective Date, the Utility will make

4    its required initial contribution (approximately $4.8 billion) and first annual

5    contribution (approximately $193 million) in order to meet the requirements for

6    participation in the Wildfire Fund under AB 1054.[5]

7    <u>Funded Debt Restructuring</u>

8    Under the terms of the Bondholder RSA, PG&E will refinance portions of its

9    long-term debt which bear relatively higher interest rates, with new debt that is

10   anticipated to bear lower interest rates.  PG&E also will pay a lower post-filing

11   interest rate than had been sought by the bondholders.  As discussed by Jason

12   Wells in the accompanying Chapter 2, this agreement will yield significant cost

13   savings for PG&E, for the benefit of its customers, as well as reducing execution

14   financing risk.

15   <u>Assumption of Agreements</u>

16   PG&E's Plan provides that, upon its emergence from Chapter 11, the

17   Utility will leave all trade claims unimpaired and will assume various existing

18   agreements, including the following.  First, PG&E's Plan provides that, upon the

19   plan's Effective Date, all power purchase agreements, renewable energy power

20   purchase agreements, and Community Choice Aggregation (CCA) servicing

21   agreements of the Debtors shall be deemed assumed.[6]  Assuming these

22   agreements will continue PG&E's commitment to providing energy from

23   renewable sources, in furtherance of achieving the state's climate goals and in

24   accordance with the choices of local communities.

25   Second, PG&E's Plan also provides that agreements related to its

26   employees will be assumed.  On the Effective Date, all Employee Benefit Plans

27   will be assumed.[7]  In addition, on or prior to the Effective Date (provided

---

[4]   Pub. Util. Code §§ 3280-3297.

[5]   *See id.* § 3292(e).

[6]   PG&E's Plan § 8.1(a).

[7]   *Id.* § 8.5.

the Effective Date occurs), PG&E will assume its Collective Bargaining Agreements.[8]  These Collective Bargaining Agreements include:

- Two agreements currently in place between the Utility and Local Union No. 1245 of the IBEW:  (i) the IBEW Physical Agreement, and (ii) the IBEW Clerical Agreement;

- The Collective Bargaining Agreement currently in place between the Utility and the ESC Local 20, of the International Federation of Professional and Technical Engineers; and

- The Collective Bargaining Agreement currently in place between the Utility and the SEIU.[9]

In addition, PG&E and the IBEW have agreed that the above-referenced IBEW agreements will be extended until December 31, 2025 and have agreed to a number of significant enhancements for the benefit of IBEW members.[10]  The assumption of these agreements, and related extensions and enhancements, will ensure that employees continue to benefit from those agreements and thus are treated fairly after PG&E's emergence from Chapter 11 under the PG&E Plan.

Third, under PG&E's Plan, all allowed prepetition environmental obligations, allowed prepetition obligations related to the Diablo Canyon project, and all allowed prepetition state tax obligations will be paid in full, and PG&E will pay currently due state tax obligations promptly.

Commission Approvals

A condition precedent to the Confirmation of PG&E's Plan is that "[t]he debtors have received CPUC Approval."[11]  Similarly, a condition precedent to the Effective Date of PG&E's Plan is that "[t]he CPUC Approval remains in full

---

**8**  *Id.* § 8.6.

**9**  *Id.* §§ 1.29, 1.118.

**10**  Among other things, Health Reimbursement Accounts deductibles, out-of-pocket maximums, co-payments, and employee premium contributions will remain at the 2020 amounts through 2025, there will be a General Wage Increase of 3.75 percent for each of 2022, 2023, 2024 and 2025, there will be no involuntary lay-offs of IBEW represented employees (except for cause) unless agreed to by IBEW, and PG&E management and IBEW leadership will focus their attention and skills on working together to improve safety and safety culture at PG&E.

**11**  *Id.* § 9.1(c).

force and effect."**12** PG&E's Plan defines CPUC Approval to mean "all necessary approvals, authorizations and final orders from the CPUC to implement the Plan, and to participate in the Go-Forward Wildfire Fund."**13**

The Plan further defines CPUC Approval to encompass the resolution of specified issues, including issues within the scope of ongoing CPUC proceedings. Those issues include "satisfactory resolution of claims for monetary fines or penalties under the California Public Utilities Code for prepetition conduct."**14** The Utility has now reached settlements, that are pending CPUC approval, of claims for fines and penalties in the Wildfire OII, Locate and Mark OII, and Ex Parte OII, which will satisfy the CPUC Approval condition with respect to those matters. The CPUC Approval issues also include "satisfactory provisions pertaining to authorized return on equity and regulated capital structure," and "approval (or exemption from approval) of the financing structure and securities to be issued under Article VI of the Plan, including one or more financing orders approving the Wildfire Victim Recovery Bonds."**15** The Commission has authorized a return on equity of 10.25 percent and an authorized capital structure of 52 percent common equity, 47.5 percent long-term debt, and 0.5 percent preferred equity. PG&E is willing to accept this resolution as satisfactory for the purpose of effectiveness of PG&E's Plan, which will satisfy the CPUC Approval condition with respect to that issue.

CPUC Approval is also defined to encompass "a disposition of proposals for certain potential changes to the Utility's corporate structure and authorizations to operate as a utility."**16** An OII into PG&E's Safety Culture, No. Investigation (I.) 15-08-019 (Safety Culture OII), addresses PG&E's corporate governance, structure, and operations. In that proceeding, the Commission may review alternatives to PG&E's current management and operational structures, including proposals to separate the Utility into separate gas and electric utilities or sell its gas assets; establish periodic review of the Utility's Certificate of Public

---

**12** *Id.* § 9.2(m).

**13** *Id.* § 1.37.

**14** *Id.* § 1.37(c).

**15** *Id.* § 1.37(a), (d).

**16** *Id.* § 1.37(b).

43816932.1

1  Convenience and Necessity; modify or eliminate PG&E's holding company
2  structure; and link the Utility's rate of return or return on equity to safety
3  performance metrics.[17]  For reasons discussed in the Safety Culture OII filings,
4  the foregoing proposals are unwise.  PG&E proposes that the potential
5  restructuring focus at this time should be on the proposed Regional
6  Restructuring Plan (see Mr. Vesey's testimony), and assuming that the CPUC
7  gives its approval to that restructuring, the CPUC should put a moratorium on
8  considering those other structural alternatives for at least the proposed initial
9  time period for the Regional Restructuring Plan.

10  <u>Safety Governance and Boards of Directors</u>

11  As discussed in detail in the accompanying chapters of testimony, PG&E is
12  in the process of very substantial upgrades to its safety and reliability-related
13  operations, and related governance, including extraordinary efforts to address
14  wildfire issues.  PG&E's Plan will put it on sound footing to continue those safety
15  and reliability enhancements.

16  In addition, in 2019, PG&E's Boards underwent a refreshment process that
17  brought to PG&E fresh perspectives and a range of diverse backgrounds,
18  experiences, skills, and expertise, including in the areas of safety, utility
19  operations, utility regulation, finance, restructuring, accounting, and government.
20  Following the refreshment process, the Boards have engaged in initiatives to
21  enhance oversight of safety, risk, and compliance.[18]

22  Under PG&E's Plan, the members of the Boards may continue to serve as
23  directors after the Effective Date.[19]  PG&E expects some of those directors to
24  continue with reorganized PG&E but PG&E also expects some of the current
25  directors will not continue to serve post-emergence.  PG&E's Plan will allow the
26  Boards to carry forward the initiatives described by Ms. Brownell in her
27  accompanying testimony, including further enhancements prompted by the

---

**17** Joint Assigned Commissioner's and Administrative Law Judge's Ruling on Proposals to Improve the Safety Culture of PG&E and PG&E Corp., I.15-08-019 (June 18, 2019), at 1.

**18** These developments are detailed in the accompanying testimony of Ms. Nora Mead Brownell.

**19** PG&E's Plan § 6.11(c).

1 Governor's comments and public letter to me ("Governor's letter"),[20] and to

2 continue PG&E's efforts to improve the safety and reliability of its service to

3 customers.

4 Overview of Accompanying Testimony Establishing AB 1054 Compliance

5 The accompanying testimony presents substantial detail regarding PG&E's

6 enhanced governance, with particular focus on elements relating to safety and

7 other factors pertinent to the CPUC's analyses under AB 1054, particularly

8 Public Utilities Code (Pub. Util. Code) Section 3292, which was enacted as part

9 of AB 1054. Those governance elements reflect what PG&E intends and

10 anticipates will be the governance of reorganized PG&E upon its emergence

11 from Chapter 11 under PG&E's Plan, and are responsive to various concerns

12 raised in the Governor's letter regarding satisfaction of AB 1054. PG&E will

13 incorporate into its Plan or related documents the direction the Commission

14 provides in its decision with regard to the governance matters addressed in the

15 accompanying testimony.

16 The remainder of PG&E's opening testimony consists of the following

17 chapters:

18 • Chapter 2 – PG&E's Plan and Financing (Jason Wells) [SM[21] 4.3-4.7]

19 • Chapter 3 – PG&E Access to Capital Post-Emergence (John Plaster)

20 [4.3, 4.6]

21 • Chapter 4 – Board Governance (Nora Mead Brownell) [SM 3.1]

22 • Chapter 5 – Utility Safety and Governance (Andrew M. Vesey) [SM 3.1]

23 Including sub-sections sponsored by other witnesses:

24 – Data, Metrics and Risk Management (Stephen Cairns)

25 – ISO 55000 (Amit Gupta)

26 – Enterprise Records and Information Management (Megan Hertzler)

27 • Chapter 6 – Wildfire Safety (Deborah Powell) [SM 3.1]

28 Including sub-sections sponsored by other witnesses:

29 – Wildfire Safety Programs (Matt Pender)

30 – Public Safety Power Shutoff Program (Tracy Maratukulam)

---

20 *See* Letter from Governor Gavin Newsom to William D. Johnson (Dec. 13, 2019).

21 For each chapter, PG&E provides cross-references to the issue sections set forth in the Assigned Commissioner's Scoping Memo and Ruling, dated November 14, 2019, at pp. 4-7 ("SM").

- Chapter 7 – Governance:  Executive Compensation (John Lowe) [SM 3.1, 4.3]
- Chapter 8 – Governance:  Probation/Compliance (Julie Kane) [SM 3.2]
- Chapter 9 – Climate (Jessica Hogle; Martin Wyspianski) [SM 3.3]
- Chapter 10 – Rates and Rate Neutrality (Robert Kenney) [SM 4.1, 4.4, 4.5]
- Chapter 11 – Fines and Penalties (Robert Kenney) [SM 4.2]
- Chapter 12 – Section 854 Considerations (Robert Kenney) [SM 3.4, 4.6]

As demonstrated by the opening testimony as a whole, PG&E's Plan meets all the requirements of AB 1054 including the Section 3292 requirements therein.  The criteria established by AB 1054 (including those elements of the statute identified in the Governor's Letter), and some of the key elements satisfying those elements, are outlined in the following table and summarized further below.

| **Governance** [Pub. Util. Code § 3292(b)(1)(C); Governor's Letter at 3] |
| --- |
| Safety Management |
| • Enhanced roles of Chief Risk Officer and Chief Safety Officer <br> • Additional safety oversight by Independent Safety Oversight Council, led by Independent Safety Advisor <br> • Expanded Enterprise and Risk Management Program <br> • Improved asset management, data collection, and record keeping <br> • Improved system reliability, including decreasing the effects of Public Safety Power Shutoff (PSPS) events <br> • Development of clearly defined safety and operational metrics and corrective action process <br> • Enhanced vegetation management, safety inspections, and system hardening |
| Board-level Governance |
| • Refined skills matrix for qualifications of Board members, including extensive safety qualifications <br> • Refreshed Board membership upon emergence, including substantial presence of California residents <br> • Expanded responsibility of Safety and Nuclear Oversight Committee regarding wildfire mitigation and PSPS <br> • Increased Board oversight of risk management and PSPS events <br> • Board approval of senior management |
| Restructuring |
| • Regional restructuring plan to get closer to customers |
| Probation |
| • Extensive compliance efforts, reviews and overall ethics & compliance training |

43816932.1   12

| | |
|---|---|
| **Executive Compensation Structured to Promote Safety** [Pub. Util. Code § 8389(e)(4)&(e)(6)] |
| • Majority of executive compensation will be at risk and based on achievement of objective performance metrics |
| • The performance metrics will be heavily weighted toward customer and workforce welfare, and within that category, primarily wildfire safety and other public and employee safety metrics |
| • A significant portion of executive compensation will consist of equity awards that will satisfy AB 1054's three-year holding requirement |
| **Satisfaction of Wildfire Claims** [Pub. Util. Code § 3292(b)(1)(B)] |
| • $25.5 billion for wildfire claimants |
| • Plan satisfies claims in amounts agreed upon in settlements |
| **Neutral to Ratepayers** [Pub. Util. Code § 3292(b)(1)(D)(ii), (E)] |
| • Plan does not cause any rate increase |
| • Plan saves interest expense for benefit of ratepayers |
| • Plan does not call for contribution from ratepayers |
| **Financial Condition** [Pub. Util. Code § 3292(b)(1)(C); Governor's Letter at 4] |
| • PG&E has sufficient funding to emerge from Chapter 11 |
| • PG&E will be financially healthy upon emergence with access to debt and equity capital, including to fund wildfire prevention and other infrastructure investments |
| **State Climate Goals** [Pub. Util. Code § 3292(b)(1)(D)(i)] |
| • PG&E reaffirms renewables purchase agreements |
| • PG&E highly supportive of State's climate initiatives |

*First*, Section 3292(b)(1)(A) requires that PG&E's insolvency "has been resolved [by June 30, 2020] pursuant to a plan or similar document not subject to a stay." PG&E is expeditiously pursuing confirmation of PG&E's Plan in the Bankruptcy Court and expects that the Bankruptcy Court will be able to confirm PG&E's Plan in advance of June 30, 2020.

*Second*, Section 3292(b)(1)(B) requires "[t]he bankruptcy court ... [to] determine[] that the resolution of the insolvency proceeding ... provides for satisfying any prepetition wildfire claims asserted against [PG&E] in the insolvency proceeding in the amounts agreed upon" in settlement agreements or otherwise allowed by the court. PG&E has now entered into settlements with all major groups of wildfire claimants. As described in the testimony of Mr. Jason Wells in Chapter 2, PG&E's Plan provides for the payment of $25.5 billion to satisfy Fire Claims, which are defined as any past, present, or future claims related to specified wildfires that occurred in Northern California in 2015-2018, in the amounts agreed upon in the settlements with wildfire claimants.

213

1   *Third*, under Section 3292(b)(1)(C), the Commission must "ha[ve] approved
2   the reorganization plan and other documents resolving the insolvency
3   proceeding, including [PG&E]'s resulting governance structure as being
4   acceptable in light of [PG&E]'s safety history, criminal probation, recent financial
5   condition, and other factors deemed relevant by the commission." PG&E is
6   implementing structural changes across the Company, including changes to
7   governance structure at the level of management and PG&E's Boards of
8   Directors, to improve safety and operational performance for the long term.
9   Based on that robust, safety-oriented governance structure, PG&E respectfully
10  submits that the Commission should approve PG&E's Plan, and its associated
11  governance structure, as acceptable in light of PG&E's recent history, financial
12  condition and probation.
13      The testimony of Ms. Nora Mead Brownell in Chapter 4 reflects the Board-
14  level governance structure that PG&E intends upon emergence from Chapter 11
15  under PG&E's Plan. This structure is the product of recent and ongoing reforms
16  that are designed to enhance oversight of the companies' efforts to improve
17  safety culture and performance; to reduce risk; to ensure compliance with
18  applicable laws, regulations, and policies; and to reduce the incidence and
19  impacts of Public Safety Power Shutoff (PSPS) events. Similarly, the testimony
20  of Mr. Andrew Vesey in Chapter 5 describes the improved governance structure
21  of the Utility, including the qualifications and responsibilities of senior leadership
22  and the empowerment of safety leaders. His testimony describes the ongoing
23  efforts to reorient the Utility around the goals of improving safety culture and
24  performance and to enhance the customer experience, including through
25  increased system reliability.
26      Also relevant to the Commission's consideration of PG&E's governance
27  structure is PG&E's criminal probation resulting from the San Bruno tragedy,
28  which is discussed in the testimony of Ms. Julie Kane in Chapter 8. PG&E has
29  undertaken extensive efforts to comply with all aspects of the judgment that
30  imposed the probation term, and has sought to cooperate fully with the Federal
31  Monitor appointed by the sentencing court.
32      Finally, PG&E's emergence from Chapter 11 pursuant to PG&E's Plan will
33  markedly improve PG&E's financial condition. As described in Mr. Wells'
34  testimony, as well as the testimony of Mr. John Plaster in Chapter 3, PG&E's

Plan will reduce its cost of financed debt, for the benefit of its customers, and it positions the Utility and PG&E Corporation to be financially healthy upon emergence, with improving credit ratings and access to equity and debt markets.

For these reasons and the other reasons provided in PG&E's testimony, the Commission's approval of PG&E's Plan is warranted, and in particular PG&E's governance structure is acceptable to facilitate PG&E's continuing efforts to provide safe, reliable, and affordable service.

*Fourth*, Section 3292(b)(1)(D) requires the Commission to "determine[] that the reorganization plan and other documents resolving the insolvency proceeding are ... consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state." As described in Chapter 9, in the testimony of Ms. Jessica Hogle and Mr. Martin Wyspianski, PG&E is committed to continuing its strong track record of sustainability and leadership in meeting the challenges of a changing climate following its emergence from Chapter 11, and will continue to meet the Renewables Portfolio Standard and other procurement requirements. In addition, PG&E's Plan provides that the Utility will assume all power purchase agreements, renewable energy power purchase agreements, and CCA servicing agreements, further supporting the development of renewable energy sources in California.

*Fifth*, Section 3292(b)(1)(D) and (E), respectively, require the Commission to "determine[] that the reorganization plan and other documents resolving the insolvency proceeding are ... neutral, on average, to the ratepayers of the electrical corporation" and "recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the commission, which may include sharing of value appreciation." As described in the testimony of Mr. Robert Kenney in Chapter 10, PG&E's Plan is "neutral, on average, to the ratepayers" because it does not cause customers to pay more on average than they would in the absence of PG&E's reorganization under that plan, and, indeed, PG&E's Plan will generate cost savings that will benefit ratepayers. For similar reasons, PG&E's Plan also meets the requirement of Section 3292(b)(1)(E) because it does not require any contributions from ratepayers beyond the baseline of what would have been required absent Chapter 11.

PG&E's Plan and the associated commitments expressed in PG&E's accompanying testimony not only satisfy AB 1054 but are designed to address the concerns raised in the Governor's December 13, 2019 letter regarding those requirements. The Governor's letter stated that the plan "should include stringent governance and management requirements [and] enforcement mechanisms,"[22] which would include "[s]trict, clearly defined operational and safety metrics to which the reorganized company will be held accountable," and an "escalating enforcement process that provides for greater oversight … if [PG&E] fails to meet the defined operational and safety metrics."[23] The accompanying testimony shows that PG&E is going to great lengths to establish governance systems that embody such safety orientation, oversight and accountability.

As described in Mr. Vesey's testimony, PG&E is committing to numerous concrete steps to improve its safety and reliability, and to elevate those issues in its governance structures, as it emerges from Chapter 11. In addition, PG&E will develop a regional restructuring plan designed to place leadership and operations closer to their customers, which PG&E will implement subject to appropriate Commission approvals.

Moreover, PG&E will propose safety and operational metrics to the Commission. PG&E recognizes that the Commission may intervene if PG&E falls shorts of those metrics, and PG&E will seek to work with the Commission to construct a process for early identification of shortcomings and prompt implementation of corrective actions, which will serve as an early stage of potentially escalating Commission enforcement.

In addition, as described in the testimony of Mr. John Lowe in Chapter 7, PG&E will implement an incentive compensation program that puts a majority of senior executives' incentive compensation at risk, based on objective, verifiable, and auditable outcome-based performance metrics weighted predominantly to customer and workforce welfare, and especially to safety.

The Governor's letter also refers to "[c]hanges that will result in a more qualified and independent board of directors," whose members would be

---

[22] Letter from Governor Gavin Newsom to William D. Johnson (Dec. 13, 2019), at 2.
[23] *Id.* at 3.

1  "selected based on a pre-determined set of qualifications, include members with
2  extensive safety experience, and be comprised of a majority of Californians."[24]
3  As described in Ms. Brownell's testimony, there will be changes to PG&E's
4  Boards upon PG&E's emergence from Chapter 11 that will ensure that Boards
5  are independent and possess the necessary safety expertise, and other critical
6  expertise to oversee PG&E.

7      PG&E expects that, upon emergence, the Boards will be refreshed.  PG&E
8  is developing a revised "director skills matrix" that will set forth the experience,
9  skills, characteristics, and expertise that PG&E desires its Board members
10  collectively to possess; all of the identified attributes are germane to PG&E's
11  needs, including its safety environment, going forward.  In addition, PG&E
12  intends that at least 25 percent of the directors will be California residents at the
13  time of their election, and PG&E will use best efforts to achieve a target of at
14  least 50 percent California resident directors upon emergence.  Finally, PG&E
15  will expand the purview of the Boards' Safety and Nuclear Oversight Committee
16  to include oversight of PG&E's Wildfire Mitigation Plan, wildfire and disaster
17  mitigation activities, initiation and execution of PSPS events, and responses to
18  recommendations of the Independent Safety Advisor, thereby centralizing safety
19  oversight in the committee.

20      In sum, PG&E has taken to heart the Governor's concerns, and the PG&E
21  Plan and accompanying testimony commitments embody the Governor's
22  principles and more than satisfy the requirements of AB 1054.

---

**24**  *Id.* at 3.

43816932.1

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 2**

**OPENING TESTIMONY TO**

**DESCRIPTION OF PG&E'S PLAN AND PLAN FUNDING**

**SCOPING MEMO ISSUES: 4.1 (RATEMAKING); 4.3**

**(GOVERNANCE STRUCTURE AND FINANCIAL CONDITION);**

**AND 4.7 (OTHER FINANCIAL ISSUES)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 2
OPENING TESTIMONY TO
DESCRIPTION OF PG&E'S PLAN AND PLAN FUNDING SCOPING MEMO
ISSUES: 4.1 (RATEMAKING); 4.3 (GOVERNANCE STRUCTURE AND FINANCIAL
CONDITION); AND 4.7 (OTHER FINANCIAL ISSUES)

TABLE OF CONTENTS

A.  Executive Summary................................................................. 2-1

    1.  Summary of Plan of Reorganization..................................... 2-1

    2.  Summary of Plan Funding and Associated Uses ...................... 2-1

    3.  Summary of Financial Position at Emergence ......................... 2-3

    4.  Summary of Requested Financing Authorizations ................... 2-3

B.  Introduction......................................................................... 2-3

C.  PG&E's Plan of Reorganization............................................... 2-5

    1.  Wildfire Claims ............................................................... 2-5

    2.  Other Claims .................................................................. 2-8

    3.  Participation in the Wildfire Fund ...................................... 2-12

    4.  Assumption of Agreements ............................................... 2-12

    5.  Management Incentive Plan................................................ 2-13

    6.  Conditions Precedent to Plan Confirmation and Effectiveness ................ 2-14

D.  Plan Funding and Sources and Uses ....................................... 2-15

    1.  Net Operating Losses ...................................................... 2-17

    2.  Temporary Utility Debt .................................................... 2-17

    3.  Settlement Agreement With Members of the Ad Hoc Committee of
        Senior Unsecured Noteholders and Resulting Interest Cost Savings ...... 2-18

        a.  The Noteholder RSA Yields Significant Interest Rate Cost
            Savings.................................................................. 2-19

        b.  The Noteholder RSA Constitutes a Reasonable Resolution of the
            Disputes Between PG&E and the Ad Hoc Committee....................... 2-20

    4.  Capital Structure ........................................................... 2-21

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 2
OPENING TESTIMONY TO
DESCRIPTION OF PG&E'S PLAN AND PLAN FUNDING SCOPING MEMO
ISSUES: 4.1 (RATEMAKING); 4.3 (GOVERNANCE STRUCTURE AND FINANCIAL
CONDITION); AND 4.7 (OTHER FINANCIAL ISSUES)

TABLE OF CONTENTS
(CONTINUED)

E.  Raising the Plan Funding for Emergence ........................................................ 2-22

F.  Financing Authorizations for Exit and Post-Emergence .................................. 2-25

    1.  Description of the $11.85 Billion in Long-Term Debt Securities
        Contemplated by the Noteholder RSA ................................................. 2-27

        a.  New Utility Funded Debt Exchange Notes ....................................... 2-28

        b.  New Utility Long-Term Notes ............................................................ 2-28

        c.  New Utility Medium-Term Notes ....................................................... 2-29

    2.  Description of Long-Term Debt Securities for the Issuance of up to
        $11.925 Billion in Long-Term Debt for Exit ......................................... 2-29

        a.  Secured Debt Securities .................................................................. 2-29

        b.  Unsecured Debt Securities .............................................................. 2-30

        c.  Direct Loans .................................................................................... 2-31

        d.  Accounts Receivable Financing ....................................................... 2-31

    3.  Proposed Uses of Long-Term Debt Proceeds ........................................ 2-31

    4.  Description of Short-Term Debt Securities for Exit and Post-
        Emergence ............................................................................................ 2-32

        a.  Direct Loans .................................................................................... 2-34

        b.  Revolving Credit and Letter of Credit Facilities ............................... 2-34

        c.  Accounts Receivable Financing ....................................................... 2-34

        d.  Commercial Paper and Extendible Commercial Notes ..................... 2-34

        e.  Bridge Facility .................................................................................. 2-35

    5.  Section 851 Authorization For Secured Debt ......................................... 2-36

    6.  Features to Enhance Debt Securities .................................................... 2-37

        a.  Credit Enhancements ...................................................................... 2-37

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 2
OPENING TESTIMONY TO
DESCRIPTION OF PG&E'S PLAN AND PLAN FUNDING SCOPING MEMO
ISSUES: 4.1 (RATEMAKING); 4.3 (GOVERNANCE STRUCTURE AND FINANCIAL
CONDITION); AND 4.7 (OTHER FINANCIAL ISSUES)

TABLE OF CONTENTS
(CONTINUED)

b.   Redemption Provisions ...................................................................... 2-37

Case: 19-30088   Doc# 7331-1   Filed: 05/15/20   Entered: 05/15/20 16:15:55   Page 29
of 276

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 2**
**OPENING TESTIMONY TO**
**DESCRIPTION OF PG&E'S PLAN AND PLAN FUNDING SCOPING**
**MEMO ISSUES: 4.1 (RATEMAKING); 4.3 (GOVERNANCE**
**STRUCTURE AND FINANCIAL CONDITION); AND 4.7 (OTHER**
**FINANCIAL ISSUES)**

**A. Executive Summary**

**1. Summary of Plan of Reorganization**

Pacific Gas & Electric Company's (PG&E or the Company or the Utility) Chapter 11 Proposed Plan of Reorganization (PG&E's Plan) will successfully resolve the Chapter 11 cases in a manner that:

- Provides $25.5 billion for the expeditious and fair compensation to wildfire victims and other wildfire claimants without a lengthy trial process on individual claims, all in accordance with Assembly Bill (AB) 1054;
- Refinances certain high-coupon prepetition debt of the Utility, thereby yielding approximately $1 billion in interest rate savings for the benefit of customers;
- Complies with AB 1054, enabling the Utility to participate in and providing nearly $5 billion in funding for AB 1054's Wildfire Fund;
- Is fair to Utility employees by assuming employee benefit plans and collective bargaining agreements and allowing workers' compensation claims to ride through;
- Addresses the critical prepetition liabilities that precipitated PG&E's Chapter 11 filings;
- Does not increase customer rates; and
- Positions the Utility and PG&E Corporation to be financially healthy upon emergence.

**2. Summary of Plan Funding and Associated Uses**

The following table summarizes plan funding sources and associated uses:

**TABLE 2.1: SOURCES & USES**

| SOURCES | | USES | |
|---|---|---|---|
| **New Equity in PG&E Corporation** | $15.75 billion | **Fire Claims** | $24.15 billion [1] |
| New money equity raise | $9 billion | **Contribution to Wildfire Fund** | **$5 billion** |
| Equity issued to Fire Victim Trust | $6.75 billion | **Debtor-In-Possession Financing** | **$2 billion** |
| **New PG&E Corporation Debt** | **$4.75 billion** | **Prepetition Debt** | **$22.18 billion** |
| **Reinstated Utility Debt** | **$9.575 billion** | **Trade Claims and Other Costs** | **$2.3 billion** |
| **New Utility Debt** | **$23.775 billion** | **Accrued Interest** | **$1.27 billion** |
| Refinancing of Pollution Control Bonds | $0.1 billion | **Cash** | **$0.75 billion** |
| Noteholder RSA debt | $11.85 billion | **Total Uses** | **$57.65 billion** |
| New debt | $5.825 billion | | |
| Temporary Utility Debt | $6 billion | | |
| **Insurance Proceeds** | **$2.2 billion** | | |
| **Cash at Emergence** | **$1.6 billion** | | |
| **Total Sources** | **$57.65 billion** | | |

PG&E will also pursue a securitization financing that is rate-neutral, on average, for $7 billion of wildfire claims costs in a separate application. The proceeds from the securitization will be used to retire $6 billion in temporary Utility debt and to accelerate the remaining deferred payment to the Fire Victim Trust. PG&E will use the proceeds from the realization of certain shareholder tax benefits, including Net Operating Losses (NOLs), and other credits to provide rate reductions so customers, on average, will not pay the associated cost of the securitization charges.

While the plan is not dependent on the approval of the post emergence securitization, the approval of such securitization will improve the Utility's credit metrics, which will reduce the cost of financing over time for the benefit of all customers, and will provide for the acceleration of the deferred payment to the Fire Victim Trust for the benefit of individual wildfire victims and the other beneficiaries of that trust.

---

**1**   Does not included $1.35 billion deferred payment to the Fire Victim Trust.

### 3. Summary of Financial Position at Emergence

PG&E anticipates the Utility will emerge from bankruptcy with a balanced capital structure that complies with its current authorized regulatory capital structure (see D.19-12-056) provided that the Commission approves the adjustments regarding the wildfire fund contribution and temporary debt requested herein.

PG&E Corporation and the Utility have secured financing commitments for the $9 billion of equity funding, $4.75 billion of PG&E Corporation debt and $5.825 billion of Utility debt from financial institutions to backstop the funding of the proposed plan. Additionally, the Utility has settled or re-instated $21.435 billion of debt needed to comply with its capital structure requirements.

The Utility expects to achieve investment grade ratings for secured debt upon emergence. The Utility also expects to have investment-grade credit metrics at emergence and will have a clear path towards improving its credit metrics over time.  Given this profile, PG&E is confident it will maintain ongoing access to the financial markets post emergence, absent material adverse events.

### 4. Summary of Requested Financing Authorizations

To consummate the exit financing, the Utility  requests authorization (1) to issue approximately $11.85 billion in long-term debt as contemplated by the Noteholder RSA and according to the terms described therein; (2) up to $11.925 billion in additional long-term debt to finance PG&E's Plan and subsequent exit from Chapter 11;[2] (3) up to $6 billion in short-term debt authority for the Utility's working capital and short-term debt needs for exit from bankruptcy and on-going working capital and short-term needs and contingencies after exit; and (4) authorization of up to $11.925 billion in short-term debt to temporarily finance PG&E's exit from bankruptcy which would be refinanced with the long-term debt described in (2) and/or in connection with PG&E's anticipated request for a securitization transaction.

### B. Introduction

My name is Jason P. Wells.  I am Executive Vice President and Chief Financial Officer for PG&E Corporation (together with its subsidiary Pacific Gas

---

[2] This amount also includes $100 million for the refinancing of Pollution Control Bonds.

1  and Electric Company (the Utility), PG&E or the Debtors).  My responsibilities
2  include overseeing the financial activities of the enterprise, including accounting,
3  treasury, tax, risk, business and financial planning, and investor relations.  I have
4  been with PG&E since 2007, holding various positions at the Utility and PG&E
5  Corporation, including Director of Technical Accounting; Senior Director of
6  Corporate Accounting and Assistant Controller; Vice President, Finance; Vice
7  President, Business Finance; and Senior Vice President and Chief Financial
8  Officer.  I have served as Chief Financial Officer of PG&E Corporation since
9  January 2016 and in my current position at PG&E Corporation since June 2019.
10  Before joining PG&E, I was a senior manager at PricewaterhouseCoopers LLP.
11  I hold Bachelor of Science and Master of Science degrees in accounting from
12  the University of Florida and I am a certified public accountant in the state of
13  Florida.  I also have completed the Reactor Technology Course for Utility
14  Executives at the Massachusetts Institute of Technology.

15      I understand that AB 1054, as codified in Public Utilities Code (Pub. Util.
16  Code) § 3292,[3] imposes certain requirements for a reorganization plan resolving
17  the Utility's Chapter 11 case in order for the Utility to participate in the Wildfire
18  Fund upon emergence from Chapter 11.  I believe our testimony meets those
19  requirements and is fully compliant with AB 1054. Post emergence, PG&E and
20  the Utility will be financially stable company positioned to continue prioritizing
21  safe operations and customer focus while meeting California's energy needs
22  and clean energy goals in a changed climate.

23      My testimony below has four parts.  First, I summarize the key provisions of
24  PG&E's Plan, including the expeditious and fair compensation provided to
25  wildfire victims.  Second, I describe at a high level the contemplated Plan
26  funding that would allow PG&E's exit from Chapter 11.  Third, I describe how
27  PG&E anticipates that its Plan would position the Utility and PG&E Corporation
28  to be financially healthy and to maintain access to debt and equity markets post-
29  emergence.  Fourth, I summarize PG&E's request for long-term and short-term
30  debt authorization from the Commission for the Plan funding.  These
31  authorizations are necessary for the Utility to consummate the anticipated exit

---

**3**  All further statutory references are to the Pub. Util. Code.

| | |
|---|---|
| 1 | financing.  My testimony is designed to assist the Commission as it evaluates |
| 2 | PG&E's Plan as prescribed by AB 1054. |

**C. PG&E's Plan of Reorganization**

PG&E announced its intent to commence reorganization cases under Chapter 11 of the U.S. Bankruptcy Code ("Chapter 11") on January 14, 2019 in light of the extraordinary challenges PG&E faced relating to the catastrophic wildfires of 2017 and 2018 in Northern California.  Since commencing the Chapter 11 cases on January 29, 2019, PG&E and its advisors have worked, and continue to work, diligently and constructively with all relevant stakeholders, including wildfire claimants, PG&E's other creditors and shareholders, the Commission and the State to satisfactorily address the claims asserted against PG&E and to resolve the bankruptcy proceedings, while also ensuring PG&E can fulfill its mission of safely and reliably delivering affordable clean energy to its customers and restoring PG&E to financial health.

The following discussion briefly summarizes key terms of PG&E's Plan,[4]  as filed in the bankruptcy court and in this proceeding.  PG&E continues to engage in ongoing discussions with certain critical stakeholders, discussions that may lead to changes or amendments to PG&E's Plan.  PG&E will update and revise this testimony as necessary to reflect any such changes but expects that much of the following discussion would, in broad strokes, remain applicable.

**1. Wildfire Claims**

PG&E's Plan provides for the payment of $25.5 billion in settlement of Fire Claims, which are defined as any past, present, or future claims related to specified wildfires that occurred in Northern California in 2015 through 2018.[5]  This includes four different classes of Fire Claims:

- Fire Victim Claims
- Public Entities Wildfire Claims
- Subrogation Wildfire Claims
- Subrogation Butte Fire Claims

---

**4** All references to PG&E's Plan refer to the version filed in the bankruptcy court on January 31, 2020 (U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088, ECF __) and filed in this proceeding on January 31, 2020.

**5** See PG&E's Plan §§ 1.75, 1.83 & Ex. A.

1)  Fire Victim Claims.  Fire Victim Claims include those Fire Claims against the Debtors that do not fall within the definitions of Public Entities Wildfire Claims, Subrogation Wildfire Claims, or Subrogation Butte Fire Claims, as described further below.[6]  This includes claims by individual wildfire victims as well as others, such as claims held by certain other government entities, including fire suppression cost claims asserted by Cal OES (the California Governor's Office of Emergency Services) and disaster assistance claims asserted by FEMA (the Federal Emergency Management Agency).

To compensate holders of Fire Victim Claims, PG&E's Plan provides for the establishment of the Fire Victim Trust, funded with a total of $13.5 billion, consisting of (a) $5.4 billion in cash on the plan effective date; (b) another $1.35 billion in cash in two installments in 2021 and 2022 pursuant to the Tax Benefits Payment Agreement with the Fire Victim Trust; and (c) $6.75 billion in (and not less than 20.9 percent of) Reorganized PG&E Corporation Common Stock.[7]  In addition, the Debtors will assign certain rights and causes of action to the Fire Victim Trust.

The Fire Victim Trust will administer, process, settle, resolve, liquidate, satisfy, and pay, in full and final satisfaction, all Fire Victim Claims and all Fire Victim Claims will be subject to an injunction permanently channeling them to the Fire Victim Trust.[8]  Pursuant to the channeling injunction, the Fire Victim Claims will be asserted exclusively against the Fire Victim Trust with no recourse to the Debtors, Reorganized Debtors, or their assets and properties.  The Fire Victim Trust will be administered by the Fire Victim Trustee, whose appointment is selected by the Consenting Fire Claimant Professionals and the Tort Claimants Committee, subject to the approval of the

---

**6**  See PG&E's Plan § 1.76.

**7**  See PG&E's Plan §§ 1.6, 1.79, 1.202, 4.7, 4.24, 6.7.

**8**  See PG&E's Plan § 6.7.

1      bankruptcy court, and overseen by the Fire Victim Trustee Oversight
2      Committee.[9]

3     2)  Public Entities Wildfire Claims. Public Entities Wildfire Claims are
4         Fire Claims against the Debtors held by Public Entities—which
5         includes (a) the North Bay Public Entities (comprising 14 cities and
6         counties); (b) the Town of Paradise; (c) the County of Butte; (d) the
7         Paradise Park and Recreation District; (e) the County of Yuba; and
8         (f) the Calaveras County Water District.[10] As already noted, claims
9         by other government entities beyond those specifically defined as
10        Public Entities are compensated through the Fire Victim Trust.
11        PG&E's Plan provides that the Public Entities will receive $1 billion
12        in full and final satisfaction of their wildfire claims against the
13        Debtors, to be distributed in accordance with the Public Entities Plan
14        Support Agreements.[11] The Public Entities also will benefit from a
15        $10 million Public Entities Segregated Defense Fund, established
16        for the benefit of the Public Entities to reimburse legal fees and
17        costs associated with third party claims against the Public Entities
18        related to the specified fires.[12]

19     3)  Subrogation Wildfire Claims. Subrogation Wildfire Claims include
20         any Fire Claim (other than a Fire Claim arising from the Butte Fire in
21         2015) that arises from subrogation or assignment (whether
22         contractual, equitable, or statutory) or otherwise in connection with
23         payments by an insurer to insured tort victims.[13] Consistent with
24         the settlement reached between the Debtors and holders of
25         Subrogation Wildfire Claims, PG&E's Plan provides for the
26         establishment of the Subrogation Wildfire Trust, which will be funded
27         with a total of $11 billion in cash.[14]

---

[9]  See PG&E's Plan §§ 1.81, 1.82, 6.8.

[10]  See PG&E's Plan §§ 1.138, 1.160.

[11]  See PG&E's Plan §§ 1.162, 1.166, 1.168, 4.5, 4.22.

[12]  See PG&E's Plan §§ 1.164, 1.167, 6.9.

[13]  PG&E's Plan § 1.195.

[14]  See PG&E's Plan §§ 1.193, 1.195, 1.197, 4.23, 6.4.

The Subrogation Wildfire Trust will administer, process, settle, resolve, liquidate, satisfy, and pay, in full and final satisfaction, all Subrogation Wildfire Claims and all Subrogation Wildfire Claims will be subject to an injunction permanently channeling them to the Subrogation Wildfire Trust.[15] Pursuant to the channeling injunction, the Subrogation Wildfire Claims will be asserted exclusively against the Subrogation Wildfire Trust with no recourse to the Debtors, Reorganized Debtors, or their assets and properties. The Subrogation Wildfire Trust will be administered by the Subrogation Wildfire Trustee, who will be selected by holders of Subrogation Wildfire Claims, and overseen by the Subrogation Wildfire Trust Advisory Board.[16]

4) Subrogation Butte Fire Claims. Subrogation Butte Fire Claims include any Fire Claim arising from the Butte Fire (2015) that arises from subrogation or assignment (whether contractual, equitable, or statutory), or otherwise in connection with payments made by the insurer to insured tort victims.[17] Any claims related to settlements relating to Subrogation Butte Fire Claims are treated as General Unsecured Claims, discussed below.[18]

**2. Other Claims**

PG&E's Plan also resolves other prepetition claims against PG&E in the following manner:

a) PG&E's Plan reflects the Noteholder Restructuring Support Agreement (RSA) entered into with members of the Ad Hoc Committee of Senior Unsecured Noteholders of the Utility regarding the treatment of claims related to prepetition funded debt. Specifically:

Utility Impaired Senior Note Claims. Utility Impaired Senior Note Claims relate to certain prepetition high-coupon senior notes of the Utility.[19]

PG&E's Plan provides that Utility Impaired Senior Note Claims receive cash

---

[15] See PG&E's Plan §§ 4.6, 4.23, 6.4.

[16] See PG&E's Plan §§ 1.200, 1.198, 6.5, 6.6.

[17] See PG&E's Plan § 1.192.

[18] See PG&E's Plan § 1.187.

[19] See PG&E's Plan §§ 1.218, 1.219, 1.220, 1.221.

1  for prepetition interest calculated at the non-default contract rate and
2  postpetition interest calculated at the Federal Judgment Rate (28 U.S.C.
3  § 1961(a)) as well as equal amounts of each issue of the New Utility Long-
4  Term Notes[20] in an aggregate amount equal to the principal on such
5  holder's Utility Impaired Senior Note Claim.[21]

6    Utility Reinstated Senior Note Claims.  Utility Reinstated Senior Note
7  Claims relate to certain prepetition low-coupon senior notes of the Utility.[22]
8  PG&E's Plan provides that Utility Reinstated Senior Note Claims will be
9  reinstated.[23]

10    Utility Short-Term Senior Note Claims.  Utility Short-Term Senior Note
11  Claims relate to certain prepetition senior notes of the Utility with near-term
12  maturities.[24]  PG&E's Plan provides that Utility Short-Term Senior Note
13  Claims receive cash for prepetition interest calculated at the non-default
14  contract rate and postpetition interest calculated at the Federal Judgment
15  Rate as well as equal amounts of each issue of the New Utility Short-Term
16  Notes[25] in an aggregate amount equal to the principal on such holder's
17  Utility Short-Term Senior Note Claim.[26]

18    Utility Funded Debt Claims.  Utility Funded Debt Claims relate to certain
19  prepetition debt, namely the Utility's prepetition revolver, term loan, and
20  certain pollution control bonds.[27]  PG&E's Plan provides that Utility Funded
21  Debt Claims receive cash for prepetition interest at the non-default contract
22  rate, certain other fees and expenses, and postpetition interest calculated at
23  the Federal Judgment Rate as well as equal amounts of each issue of the

---

**20**  See Section F.1.b.

**21**  PG&E's Plan § 4.16.

**22**  See PG&E's Plan §§ 1.229, 1.230.

**23**  PG&E's Plan § 4.17.

**24**  See PG&E's Plan §§ 1.240, 1.241, 1.242, 1.243.

**25**  See Section F.1.c. (referred to as New Utility Medium-Term Notes).

**26**  PG&E's Plan § 4.18.

**27**  See PG&E's Plan §§ 1.212, 1.213. 1.214, 1.215.

New Utility Funded Debt Exchange Notes[28] in an aggregate amount equal to the principal on such holder's Utility Funded Debt Claim.[29]

<u>Utility PC Bond (2008 F and 2010 E) Claims and HoldCo Funded Debt Claims</u>. Utility PC Bond (2008 F and 2010 E) Claims relate to certain prepetition pollution control bonds of the Utility and HoldCo Funded Debt Claims relate to certain prepetition debt of PG&E Corporation.[30] PG&E's Plan provides that Utility PC Bond (2008 F and 2010 E) Claims and HoldCo Funded Debt Claims will receive in cash the principal amount of the claim as of the petition date (January 29, 2019), all accrued and unpaid interest owed as of that date, and interest accrued from the petition date through the date when PG&E's Plan becomes effective at the Federal Judgment Rate.[31]

b) Employee-related claims. PG&E's Plan provides that workers' compensation claims will ride through. In other words, holders of workers' compensation claims will be entitled to pursue those claims against PG&E post emergence as if the Chapter 11 cases had not been commenced.[32]

c) General Unsecured Claims. PG&E's Plan provides that General Unsecured Claims[33] will be paid in full. In other words, each holder of a General Unsecured Claim will receive in cash an amount equal to the

---

[28] See Section F.1.a.

[29] PG&E's Plan § 4.19.

[30] See PG&E's Plan §§ 1.95, 1.143, 1.225.

[31] PG&E's Plan §§ 4.3, 4.20.

[32] See PG&E's Plan §§ 4.9, 4.26.

[33] See PG&E Plan § 1.87 (defining General Unsecured Claim as "any Claim, other than a DIP Facility Claim, Administrative Expense Claim, Professional Fee Claim, Priority Tax Claim, Other Secured Claim, Priority Non-Tax Claim, Funded Debt Claim, Workers' Compensation Claim, 2001 Utility Exchange Claim, Fire Claim, Ghost Ship Fire Claim, Intercompany Claim, Utility Senior Note Claim, Utility PC Bond (2008 F and 2010 E) Claim, or Subordinated Debt Claim, that is not entitled to priority under the Bankruptcy Code or any Final Order. General Unsecured Claims shall include any (a) Prepetition Executed Settlement Claim, including but not limited to settlements relating to Subrogation Butte Fire Claims; and (b) Claim for damages resulting from or otherwise based on the Debtors' rejection of an executory contract or unexpired lease"); *see also* PG&E Plan §§ 1.96, 1.216.

1     holder's claim, including all interest accrued from the Petition Date

2     through the Effective Date at the Federal Judgment Rate.[34]

3   d)   Ghost Ship Fire claims. Claims related to the Ghost Ship Fire, which

4     occurred in Oakland, California on December 2, 2016, may be pursued

5     in state court against PG&E but any recovery would be limited solely to

6     the total tower of PG&E's applicable insurance policies, as available, for

7     2016.[35]

8   e)   Priority Tax and Priority Non-Tax Claims. PG&E's Plan provides that

9     Priority Tax Claims and other priority claims (i.e., Priority Non-Tax

10     Claims) will be paid in full. That is, each holder of a Priority Tax Claim

11     or Priority Non-Tax Claim will receive cash in an amount equal to the

12     claim, including through the date PG&E's Plan becomes effective at the

13     Federal Judgment Rate.[36] For Priority Tax Claims, PG&E can elect

14     whether to pay (a) in full "on the Effective Date or as soon as reasonably

15     practicable thereafter, or (b) … in equal semi-annual installments and

16     continuing over a period not exceeding five (5) years from and after the

17     Petition Date, together with interest accrued thereon at the applicable

18     nonbankruptcy rate … ."[37] However, any Priority Tax Claim not due

19     and payable on or before the Effective Date will be paid in the ordinary

20     course as such obligations becomes due. *Id.* Consistent with this

21     provision, all allowed prepetition state tax obligations will be paid in full

22     and PG&E will pay currently due state tax obligations promptly.

23   f)   Subordinated Debt Claims. PG&E's Plan provides that Subordinated

24     Debt Claims will be paid in full. That is, each holder of a subordinated

25     debt claim will receive cash in the amount of the claim.[38]

26   g)   Common Interests. PG&E's Plan provides that each holder of PG&E

27     Corporation common stock will retain that interest in Reorganized PG&E

28     Corporation subject to dilution from new equity investments and shares

---

[34] See PG&E's Plan §§ 4.4, 4.21.

[35] See PG&E's Plan §§ 1.88, 1.89, 4.8, 4.25; U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088, ECF 5280.

[36] See PG&E's Plan §§ 1.45, 1.46, 2.4, 4.2, 4.15.

[37] PG&E's Plan § 2.4.

[38] See PG&E's Plan §§ 1.109, 1.191, 1.244, 4.11, 4.29.

distributed to the Fire Victim Trust, and receive a pro rata right to participate in any rights offering.[39] Utility Common Interests will be reinstated.[40]

h) Administrative Expense Claims. PG&E's Plan provides that Administrative Expense Claims will be paid in full. That is, each holder of an Administrative Expense Claim will be paid in the ordinary course and receive cash in the allowed amount of the claim.[41]

### 3. Participation in the Wildfire Fund

PG&E's Plan will enable the Utility to participate in the statewide Wildfire Fund upon emergence. Specifically, and as discussed in more detail in other chapters, PG&E's Plan complies with AB 1054's requirements and provides that on the date it becomes effective the Utility will make its initial contribution of approximately $4.8 billion and its first annual contribution of approximately $193 million to the Wildfire Fund established pursuant to AB 1054. See PG&E's Plan § 6.10. As described in more detail below, a portion of the Utility's contribution will come from long-term debt and, consistent with AB 1054, the Utility's contributions will not be recovered from customers. See § 3292(b)(3), (c).

The Utility's participation in the Wildfire Fund also is critical to PG&E's financial health post emergence as well as for the Wildfire Fund itself and the State. AB 1054 and the Wildfire Fund, together with the Commission's implementation of this new statutory and regulatory regime, are important for potential investors as well as for PG&E's credit ratings and access to debt and equity markets. Equally, given the size of PG&E and its service territory, the Utility's participation also is critical for the Wildfire Fund and the State, as PG&E is set to provide over 60 percent of the portion of the fund's resources that come from California utility shareholders. See § 3280(n).

### 4. Assumption of Agreements

PG&E's Plan provides for the assumption of various agreements upon emergence, once PG&E's Plan becomes effective. First, all power purchase

---

[39] See PG&E's Plan §§ 1.93, 1.180, 4.12.

[40] See PG&E's Plan §§ 1.210, 4.31.

[41] See PG&E's Plan §§ 1.4, 2.1.

agreements, renewable energy power purchase agreements, and Community Choice Aggregation servicing agreements will be deemed assumed.  See PG&E's Plan § 8.1; see also Ch. 9 (describing PG&E's ability to promote California's climate and energy policy goals).

Second, all Employee Benefit Plans and Collective Bargaining Agreements will be assumed.  See PG&E's Plan §§ 1.29, 1.60, 8.5, 8.6.  On the latter point, PG&E will assume (1) the two agreements currently in place between the Utility and IBEW Local 1245 ((i) the IBEW Physical Agreement, and (ii) the IBEW Clerical Agreement, as such agreements will be further amended, supplemented or modified in a manner consistent with the IBEW Agreement, attached to PG&E's Plan); (2) the Collective Bargaining Agreement currently in place between the Utility and the Engineers and Scientists of California Local 20, IFPTE; and (3) the Collective Bargaining Agreement currently in place between the Utility and the Service Employees International Union.  See PG&E's Plan §§ 1.29, 1.117, 1.118.  PG&E will make all outstanding payments which are accrued and unpaid as of the Effective Date pursuant to the Employee Benefit Plans promptly.  In addition, the assumption of the Employee Benefit Plans will result in a full release of any claims arising under the Employee Benefit Plans at any time before the Effective Date.

### 5. Management Incentive Plan

PG&E's Plan also enables PG&E to comply with the requirements of AB 1054 with respect to executive compensation.  Specifically, PG&E's Plan provides that the boards of the reorganized Utility and PG&E Corporation may establish and implement a management incentive plan that complies with the requirements of AB 1054.  As discussed in more detail in other chapters, see Chapter 7 (describing PG&E's executive compensation program), PG&E will incorporate into its Plan or related documents any direction the Commission provides in its decision in this proceeding with regard to executive compensation in order to ensure compliance with the relevant provisions of AB 1054.

**6. Conditions Precedent to Plan Confirmation and Effectiveness**

There are a number of conditions precedent to confirmation of PG&E's Plan and to the occurrence of the Effective Date under PG&E's Plan after confirmation. For instance, both the confirmation and effectiveness of PG&E's Plan are conditioned on, inter alia, certain restructuring support agreements and backstop commitments being in full force and effect and PG&E receiving various approvals from the CPUC. See PG&E's Plan §§ 9.1, 9.2.

CPUC approval is defined as "all necessary approvals, authorizations and final orders from the CPUC to implement the Plan, and to participate in the Go-Forward Wildfire Fund." PG&E's Plan § 1.37. This includes:

a) "[S]atisfactory provisions pertaining to authorized return on equity and regulated capital structure." PG&E's Plan § 1.37(a). While PG&E continues to believe that the rate of return on equity authorized in D.19-12-056 is too low, PG&E is willing to accept it as satisfactory for purpose of the Plan. The Utility's Application for a Waiver of the Capital Structure Condition (A.19-02-016) remains pending. PG&E anticipates that the Utility will emerge from bankruptcy with a balanced capital structure that complies with the regulatory capital structure authorized in D.19-12-056 provided the Commission authorizes certain adjustments described in more detail below.

b) "[A] disposition of proposals for certain potential changes to the Utility's corporate structure and authorizations to operate as a utility." PG&E's Plan § 1.37(b). PG&E requests that the Commission rule in I.15-08-019 that PG&E will not be forced to sell the gas business, to eliminate the holding company, or to municipalize and that the Commission will not institute a review of or make modifications to the Utility's certificate of public convenience and necessity.

c) "[S]atisfactory resolution of claims for monetary fines or penalties under the California Pub. Util. Code for prepetition conduct." PG&E's Plan § 1.37(c). As described further in Ch. 11, there are various proceedings before the Commission that address potential monetary fines or penalties under the California Public Utilities Code associated with the Utility's prepetition conduct. In I.19-06-015, I.18-12-007, I.15-11-015,

1  and I.18-07-008, the Commission either has approved or is currently
2  considering settlement agreements entered into by PG&E and various
3  parties.  Commission approval of any settlements not yet approved
4  would be satisfactory for purposes of this provision of PG&E's Plan.
5  PG&E's ability to raise capital for its emergence from Chapter 11, and
6  for its post-exit needs, assumes the Commission approves the Wildfire
7  OII settlement currently under consideration in I.19-06-015.  Other
8  material adverse events may also impair PG&E's ability to raise capital
9  for its emergence.

10  **D.  Plan Funding and Sources and Uses**

11  The funding for PG&E's Plan will consist of new and reinstated debt and
12  equity for both the Utility and PG&E Corporation as well as other sources of
13  funding anticipated to total approximately $57.65 billion to enable PG&E to
14  emerge from its Chapter 11 cases.  See PG&E's Plan §§ 1.63, 1.151, 5.2, 6.15,
15  6.16.  As already noted, PG&E remains in ongoing discussions with
16  stakeholders and may supplement and/or amend any of the following as
17  necessary.

18  Under PG&E's Plan, $6 billion of Temporary Utility debt will be used to pay
19  wildfire claims at exit and therefore will be the financial responsibility of
20  shareholders, not customers.  PG&E will also pursue a securitization that is rate-
21  neutral, on average, for $7 billion of wildfire claims costs in a separate
22  application. The proceeds from the securitization will be used to retire $6 billion
23  in Temporary Utility debt and to accelerate the remaining deferred payment to
24  the Fire Victim Trust. PG&E will use the proceeds from the realization of the
25  shareholder certain tax benefits, including Net Operating Losses (NOLs), and
26  other credits to provide rate reductions so customers, on average, will not pay
27  the associated cost of the securitization charges.

28  While the plan is not dependent on the approval of the post emergence
29  securitization, the approval of such securitization will improve the Utility's credit
30  metrics, which will reduce the cost of financing over time for the benefit of all
31  customers, and will provide for the acceleration of the deferred payment to the
32  Fire Victim Trust for the benefit of individual wildfire victims and the other
33  beneficiaries of that trust.

**TABLE 2.2: SOURCES**

| | |
|---|---|
| **New Equity in PG&E Corporation** | **$15.75 billion** |
| New money equity raise | $9 billion |
| Equity issued to Fire Victim Trust | $6.75 billion |
| **New PG&E Corporation Debt** | **$4.75 billion** |
| **Reinstated Utility Debt** | **$9.575 billion** |
| **New Utility Debt** | **$23.775 billion** |
| Refinancing of Pollution Control Bonds | $0.1 billion |
| Noteholder RSA debt | $11.85 billion |
| New debt | $5.825 billion |
| Temporary Utility Debt[42] | $6 billion |
| **Insurance Proceeds** | **$2.2 billion** |
| **Cash at Emergence** | **$1.6 billion** |
| **Total Sources** | **$57.65 billion** |

**TABLE 2.3: USES**

| | |
|---|---|
| **Fire Claims** | **$24.15 billion[43]** |
| **Contribution to Wildfire Fund** | **$5 billion** |
| **Debtor-In-Possession Financing** | **$2 billion** |
| **Prepetition Debt** | **$22.18 billion** |
| **Trade Claims and Other Costs** | **$2.3 billion** |
| **Accrued Interest** | **$1.27 billion** |
| **Cash** | **$0.75 billion** |
| **Total Uses** | **$57.65 billion** |

1       Particularly with respect to the up to $23.775 billion in new Utility long-

2    term debt and the associated request for authorization for the Utility to issue

3    and incur that indebtedness described below, PG&E anticipates the

4    following uses of the long-term debt:

---

**42**   Temporary Utility Debt will be retired either in connection with the post-emergence securitization transaction or realization of shareholder NOLs. This may be short-term or long-term debt, as described in Section F.

**43**   Does not include $1.35 billion deferred payment to the Fire Victim Trust.

**TABLE 2.4: USES OF UP TO $23.775 BILLION IN UTILITY LONG-TERM DEBT**

| | |
|---|---|
| **Prepetition Utility Debt (Noteholder RSA Debt)** | **$11.85 billion** |
| Prepetition Short-Term Debt Exchanged for Long-Term Debt | $3.183 billion |
| **Refinancing of Pollution Control Bonds** | **$0.1 billion** |
| **Refinancing of Debtor-In-Possession Facility** | **$2 billion** |
| **Contribution to Wildfire Fund** | **$2.5 billion** |
| **Fire Claims** | **$6 billion** |
| **Accrued Interest, Trade Claims & Other** | **$1.325 billion** |
| **Total** | **$23.775 billion** |

## 1. Net Operating Losses

PG&E will obtain certain tax benefits, including Net Operating Losses (NOL), by deducting wildfire claims costs as business expenses on its income tax returns. Shareholders retain the benefit of NOLs that are generated by shareholder-paid costs;[44] here, because the costs of the wildfire claims will be borne by PG&E Corporation's shareholders, the NOLs arising from payment of wildfire claims costs will make available cash flows to shareholders that would have otherwise been used to pay income taxes.

## 2. Temporary Utility Debt

As described above, PG&E anticipates that $6 billion in Temporary Utility debt would be used to pay wildfire claims. This portion of the Utility's debt would be paid off, if approved by the Commission, from the proceeds of a post-emergence rate-neutral $7 billion securitization transaction. Alternatively, the $6 billion would be retired with proceeds from

---

[44] See, *e.g.*, D.84-05-036 (1984) ("Tax losses are assets that belong to the shareholders who are responsible for the expenses which created the tax loss, and thus are entitled to the related tax benefit"); D.14-08-032 (2014) ("[W]hen deductions are not part of utility cost of service but derive from shareholder funds, the deductions are the property of shareholders").

1  shareholders.  PG&E plans to use cash flows from NOLs to support the $6
2  billion of Utility debt used to fund wildfire claims.**45**

3  **3.   Settlement Agreement With Members of the Ad Hoc Committee of**
4  **Senior Unsecured Noteholders and Resulting Interest Cost Savings**

5        On January 22, 2020 PG&E entered into a Restructuring Support
6  Agreement (the Noteholder RSA) with members of the Ad Hoc Committee of
7  Senior Unsecured Noteholders of the Utility that provides for certain
8  modifications to PG&E's Plan regarding the treatment of claims related to
9  Utility prepetition debt, and resolves a number of disputes between PG&E
10  and the members of the Ad Hoc Committee.  See Exhibit 2.5.  PG&E also
11  simultaneously entered into a related letter-agreement with certain
12  consenting members of the Ad Hoc Committee which sets forth certain
13  sensitive and confidential non-economic terms with respect to the parties'
14  commitments regarding public and private communications about PG&E's
15  Plan and the alternate plan of reorganization proposed by the Ad Hoc
16  Committee.  The changes resulting from the Noteholder RSA are reflected in
17  the amended Plan PG&E filed in the Bankruptcy Court and in this
18  proceeding on January 31, 2020.   As a result of the Noteholder RSA, the
19  Ad Hoc Committee has moved to withdraw its pleadings, including its
20  competing plan of reorganization, and will cease participating in this
21  proceeding before the Commission.  Once the Noteholder RSA is approved
22  by the Bankruptcy Court, the Ad Hoc Committee will formally withdraw its
23  proposed plan of reorganization before the Bankruptcy Court.

24        Pursuant to the Noteholder RSA and as now contemplated by PG&E's
25  Plan, the Utility will satisfy certain prepetition debt, namely high-coupon,
26  long-dated senior notes, senior notes with near-term maturities, and funded
27  bank debt (including revolving loans, term loans, and the pollution control
28  bonds) with new lower-coupon Utility notes, with payment of prepetition
29  interest at the contract rate and postpetition interest at the Federal

---

**45**  PG&E anticipates that the same would be true in the event the Commission approves a
securitization transaction insofar as the incremental cash flow resulting from the wildfire-
related NOLs would be available to support the securitization debt (without requiring an
overall increase in customer rates).  This monetization of the NOLs satisfies certain
conditions under the equity backstop commitment letters.

1    Judgment Rate in cash.  This satisfaction of prepetition Utility debt for newly

2    issued debt totals approximately $11.85 billion on terms defined in the

3    agreement.**46**  Other prepetition Utility long-term debt totaling approximately

4    $9.575 billion will be reinstated; this includes relatively low-coupon

5    prepetition long-term debt for which refinancing would not have been cost-

6    effective.  The Utility will pay customary debt placement fees and

7    reimbursements, including an underwriting fee for the newly issued debt.

8    **a.  The Noteholder RSA Yields Significant Interest Rate Cost Savings**

9    The Noteholder RSA results in significant benefits for the Utility and

10   its customers.  By exchanging high-coupon prepetition long-term debt

11   and reinstating relatively low-coupon prepetition long-term debt, PG&E

12   anticipates that its Plan will yield significant savings associated with

13   lower interest expenses for the Utility.  Comparing the interest rates on

14   the high-coupon prepetition long-term debt to the corresponding interest

15   rates giving effect to the Noteholder RSA reduces the cost of the Utility's

16   long-term debt by approximately $1 billion.  Additionally, the Noteholder

17   RSA refinances prepetition short-term debt and near-term maturities that

18   otherwise would have been financed with new debt.  As a result, the

19   Utility avoids underwriting fees on those amounts, resulting in

20   approximately $40 million in savings.

21   The projected annual savings in interest expense for the Utility

22   associated with the Noteholder RSA benefit customers through the

23   Utility's cost of debt and authorized capital structure.  In A.19-04-015,

24   the Utility "propose[d] to update its cost of debt for cost of capital

25   purposes, for the period beginning after it emerges from bankruptcy to

26   incorporate the costs of its exit financing, and the appropriate

27   forward-looking forecast of debt costs for the remaining forecast period."

28   D.19-12-056 at 13-14.  Accordingly, any interest rate cost savings

29   achieved as part of PG&E's Plan would be reflected in the Utility's

30   authorized cost of long-term debt in conjunction with that update.

---

**46**  *See* U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088,
ECF 5519, n.7.  The Noteholder RSA as executed (Exhibit 2.6) shows a total of
approximately $11.95 billion.  The correct amount, as reflected in PG&E's Plan, is
$11.85 billion.

### b. The Noteholder RSA Constitutes a Reasonable Resolution of the Disputes Between PG&E and the Ad Hoc Committee

The Noteholder RSA is the product of substantial arms-length, good faith negotiations among sophisticated and well-represented parties. It encompasses a comprehensive settlement that resolves all disputes between PG&E and certain members of the Ad Hoc Committee (including the treatment of over $21 billion in prepetition Utility debt and disputed claims of over $5 billion for postpetition interest and make-whole premiums), while reducing the Utility's cost of long-term borrowing by over $1 billion on a net present value basis. Prior to the agreement, the treatment of the Utility's prepetition notes was a major point of contention between PG&E and the Ad Hoc Committee before the Bankruptcy Court. PG&E's earlier Plan, as filed in the Bankruptcy Court and in this proceeding in December 2019, contemplated repaying the prepetition notes in full without a make-whole premium and, consistent with the Bankruptcy Court's recent decision, postpetition interest would accrue and be paid at the Federal Judgment Rate, not the contract rate. The Ad Hoc Committee argued that postpetition interest is payable at the contract rate, not the Federal Judgment Rate, and that make-whole or similar amounts would be due. These were hotly contested issues before the Bankruptcy Court and presented significant litigation risk for PG&E. Although the Bankruptcy Court decided the applicable postpetition interest rate in PG&E's favor, that decision is subject to appeal. If the Bankruptcy Court were to find in favor of the Ad Hoc Committee on the latter issue and that decision were upheld on appeal, PG&E would be forced either to reinstate the relevant prepetition debt or to pay substantial make-whole premiums associated with those claims, amounting to over $5 billion in disputed claims. The agreement therefore constitutes a fair and reasonable resolution of those disputes in light of the litigation risk to PG&E.

In addition, the Noteholder RSA removes significant uncertainty and risks associated with PG&E's exit financing. First, the agreement provides for the reinstatement of $9.575 billion in prepetition long-term debt and the issuance of an additional $11.85 billion in new debt on

terms defined in the agreement in order to refinance the Utility's remaining prepetition long-term and short-term debt.  As a result, PG&E will be required to raise significantly less new Utility debt in the market for emergence.  Second, the Noteholder RSA defines the terms of $11.85 billion in new Utility debt and provides for the reinstatement of $9.575 billion, locking in interest rates for a substantial portion of the Utility's long-term debt—$21.525 billion—well below the Utility's current authorized cost of debt.  This removes any interest rate risk associated with that debt and, accordingly, the Utility recently moved to amend its request for interest rate hedging authorization in A.19-11-002.

Thus, the Noteholder RSA resolves the disputes between PG&E and certain members of the Ad Hoc Committee in a manner that eliminates the associated litigation risk to PG&E.  The Noteholder RSA provides valuable certainty to PG&E and its customers with respect to exit financing, including by reducing market and interest-rate risk for a large portion of the Utility's long-term debt.

### 4.  Capital Structure

PG&E anticipates that the Utility will emerge from bankruptcy with a balanced capital structure that complies with the regulatory capital structure authorized in D.19-12-056 provided certain adjustments described below.[47] The Utility's most recent cost of capital Decision—19-12-056—set the authorized ratemaking capital structure as consisting of 52 percent common equity, 47.5 percent long-term debt, and 0.5 percent preferred equity.  The Utility currently has less than 52 percent equity on its financial books, primarily because the liabilities associated with the 2017 and 2018 wildfires resulted in non-cash charges to equity on the Utility's balance sheet, although it is deemed in compliance while its application for a waiver of the capital structure condition is pending (A.19-02-016).

---

[47] The adjustments described herein apply equally with respect to the ratemaking capital for purposes of the holding company conditions (see D.96-11-017 and D.19-12-056) as well as the affiliate transaction rules (see D.06-12-029 (Rule IX.B.)), including in connection with any dividends.  Alternatively, the Commission could issue a waiver from compliance with the authorized capital structure as contemplated in A.19-02-016 for these same purposes.

221

To the extent claims are initially paid from cash proceeds of debt rather than shareholder equity, absent the adjustments described below the common equity ratio would not be fully restored until PG&E finally pays off that debt with cash from equity. Adjustments must also be made to reflect Wildfire Fund contributions. Thus, the Utility anticipates complying with the authorized capital structure upon emergence provided the following:

First, any debt used to finance the initial and annual contributions to the Wildfire Fund is to be excluded from measurement of the authorized capital structure. This debt is not used to finance assets in the Utility's rate base and should be excluded from the calculation of the capital structure. PG&E's Plan funding contemplates that the Utility would issue $2.5 billion in long-term debt to fund its contributions to the Wildfire Fund. Accordingly, per § 3292(g) that amount will be excluded from the calculation of the regulatory capital structure. Also, any after-tax charges to earnings reflecting the amortization of the initial or ongoing contributions to the Wildfire Fund that are not financed with equity must be added back to the common equity balance.

Second, PG&E anticipates issuing Temporary Utility debt of $6 billion to pay wildfire claims. This debt would also not be used to finance assets in the Utility's rate base and would be excluded from the calculation of the capital structure. PG&E is not requesting that the wildfire claims be recovered from customers, and those amounts would ultimately be paid by shareholders, even if initially financed with debt in whole or in part. Accordingly, debt issued to pay claims should be excluded from the calculation of the debt portion of the capital structure. Also, the amount of the book value of equity must be increased by the after-tax amount of the claims paid that are not financed with equity, which is also equal to the after-tax amount of the debt issued to pay the claims.

### E. Raising the Plan Funding for Emergence

When PG&E commenced the Chapter 11 reorganization proceedings, PG&E was facing extraordinary challenges resulting from the catastrophic wildfires of 2017 and 2018 in Northern California. By satisfactorily and expeditiously compensating wildfire victims and ensuring compliance with AB 1054 so that the Utility can participate in the Wildfire Fund upon emergence,

PG&E's Plan resolves the wildfire liabilities that resulted in PG&E's Chapter 11 cases and thereby positions the Utility as financeable and financially healthy. Accordingly, PG&E is confident it will be able to raise the various components— both equity and debt—of the funding necessary for PG&E's Plan to become effective and to implement the Plan.  However, my opinion assumes the Commission approves the Wildfire OII settlement currently under consideration in I.19-06-015.  Other material adverse events may also impair PG&E's ability to raise capital for its emergence.

Under PG&E's Plan, the Utility expects to achieve investment grade ratings for secured debt upon emergence.  The Utility also expects to have a clear path towards further improving its credit ratings over time.  Such continued improvement will depend not only on PG&E's future operational and financial performance but also on constructive implementation of the new statutory and regulatory regime, including AB 1054, by the Commission, and the Utility's participation in the Wildfire Fund.  Commission approval of the proposed $7 billion post-emergence, rate-neutral securitization transaction would further improve the Utility's credit metrics.  PG&E's Plan positions the Utility as financeable and financially healthy upon emergence.  PG&E is confident that it will be able to attract the capital, both debt and equity, needed to fund PG&E's Plan and to maintain ready access to capital markets after emergence.

First, with regards to debt, the Noteholder RSA provides significant certainty, and committed financing on reasonable terms and conditions, for the vast majority of the Utility's long-term debt included in the Plan funding.  The agreement provides for reinstatement of approximately $9.575 billion of prepetition Utility long-term debt and approximately $11.85 billion in newly issued Utility long-term debt.  Thus, PG&E would need to raise only $11.925 billion of the Utility debt component of the anticipated Plan funding for emergence.  In addition, as described in Section F.4., PG&E also requests authorization from the Commission for up to $11.925 billion in short-term authority, to the extent needed, for PG&E's exit financing, which includes authorization for the temporary Utility debt, the Bridge Facility and provides additional certainty that PG&E will be able to raise the debt required for emergence.

1    Second, PG&E is confident that it will be able to raise the equity
2    components of the Plan funding.  PG&E has obtained "backstop" commitments
3    to ensure that sufficient funds at an acceptable price will be available when the
4    Plan becomes effective, even if market conditions deteriorate.  The equity
5    "backstop" commitments demonstrate robust interest by investors to invest
6    equity in PG&E Corporation and provide certainty that PG&E will have sufficient
7    equity to consummate PG&E's Plan for emergence.  However, PG&E
8    anticipates effectuating the equity issuance contemplated by PG&E's Plan
9    through market transactions in order to obtain the most favorable pricing and
10   other terms.
11       A large number of parties have entered into Equity Backstop Commitment
12   Letters, setting forth the terms and conditions to purchase up to $12 billion in
13   common stock of reorganized PG&E Corporation upon PG&E's Plan becoming
14   effective.[48]  The terms of the Equity Backstop Commitment Letters afford PG&E
15   significant flexibility.  Although equity backstop commitment letters often require
16   a debtor to consummate a particular type of equity offering—typically, a rights
17   offering—the Equity Backstop Commitment Letters here provide PG&E with the
18   flexibility to raise market-priced equity from other providers in the public and
19   private markets while still ensuring that the capital will be available if those
20   offerings are not consummated timely.  Accordingly, PG&E is confident that it
21   will be able to secure the equity components of the Plan funding for emergence,
22   whether through an offering in the market or under the Equity Backstop
23   Commitment Letters.
24       PG&E also is confident that it will maintain ongoing access to equity markets
25   post-emergence.  As described further in Ch. 3 and as evidenced by the Equity
26   Backstop Commitment Letters, there is substantial investor demand for equity in
27   utility companies generally and in PG&E Corporation in particular.  PG&E also
28   anticipates an investment-grade credit profile and a path to improving its credit
29   ratings post-emergence.

---

**48** U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088, ECF
5267.

## F. Financing Authorizations for Exit and Post-Emergence

In order for PG&E to consummate the exit financing and fund its Plan, the Utility needs authorization from the Commission pursuant to, *inter alia*, Pub. Util. Code §§ 818, 823 and 851 to issue the contemplated long-term and short-term debt. Specifically, PG&E requests authorization (1) to issue approximately $11.85 billion in long-term debt as contemplated by the Noteholder RSA and according to the terms described therein; (2) up to $11.925 billion[49] in additional long-term debt to finance PG&E's Plan and subsequent exit from Chapter 11, (3) up to $6 billion in short-term debt authority for the Utility's working capital and short-term debt needs for exit from Chapter 11 and on-going working capital and short-term needs and contingencies after exit; and (4) authorization of up to $11.925 billion in short-term debt to temporarily finance PG&E's exit from Chapter 11 which would be refinanced with the long-term debt already described in (2) and/or in connection with PG&E's anticipated request for a securitization transaction.

PG&E requests long-term and short-term debt authorization in this proceeding as opposed to a separate application given the direction in Administrative Law Judge Allen's December 27, 2019 Ruling Modifying Schedule. The December 27, 2019 Ruling stated that, "[b]ased on the understanding that the long-term debt at issue is integral to the plan of reorganization being considered in this proceeding, complies with all other requirements for issuance of debt, and does not require a separate financing order, PG&E should request approval of the long-term debt in this proceeding." December 27, 2019 Ruling at 4-5. While this direction pertained most immediately to long-term debt, as discussed further below, short-term debt authorization is equally critical to PG&E's exit financing and successful emergence from Chapter 11.

Requests (1), (2), and (4) described above relate directly to the contemplated exit financing for PG&E's Plan funding, amounting to up to $23.775 billion in new debt by the Utility (apart from the approximately

---

[49] $11.925 billion is PG&E's current estimate and, to the extent this estimate changes based on any subsequent modifications to PG&E's Plan or other developments, PG&E may update or amend this request. This amount also includes $100 million for the refinancing of Pollution Control Bonds.

1  $9.575 billion in prepetition Utility debt that PG&E anticipates reinstating).**50**
2  The anticipated uses of that long-term debt as part of PG&E's exit financing are
3  reflected in Table 2.4 and discussed further below.

4      In addition to the request for PG&E's exit financing, PG&E also requests
5  authorization for the Utility to incur up to $6 billion in short-term debt to fund
6  increased short-term capital requirements and general working capital
7  requirements, and in connection with potential contingencies.  This represents a
8  $2 billion increase to the Utility's $4 billion short-term debt authorization that was
9  in place prior to its Chapter 11 filing.  See D.09-05-002.  PG&E anticipates
10  exercising a portion of this authorization for the placement of short-term working
11  capital facilities immediately upon the effectiveness of PG&E's Plan.  First, a
12  credit facility for general working capital, when PG&E emerges and no longer
13  has access to the debtor-in-possession financing, is a critical factor for PG&E's
14  credit ratings.

15      Second, PG&E's $6 billion short-term request would be available for
16  potential post-emergence needs.  Such needs and contingencies include:

17      • Finance under-collections in balancing accounts
18      • Delays in recovery of certain incurred costs
19      • Collateral posting requirements associated with the Utility's business
20        and energy procurement activities
21      • Cyclical fluctuations in seasonal cash flows, or
22      • Other unexpected events.

23      Specifically, memorandum accounts typically allow cost recovery only after
24  costs have been incurred and recorded into the accounts, and then
25  subsequently approved by the Commission through an application.  There can
26  be a substantial period between when costs are incurred, and when those costs
27  ultimately are recovered in rates.  Such unrecovered balances are usually
28  financed with short-term debt.  In recent years the total amount of unrecovered
29  balances in PG&E's memorandum accounts, the net under-collections in various
30  balancing accounts, and the time delay between when costs are incurred and

---

**50** While PG&E's request in this proceeding concerns financing authorizations to enable
PG&E to exit from Chapter 11 and to meet its short-term working capital needs and
contingencies immediately upon emergence, PG&E also anticipates filing a separate
request for long-term financing authorization to address PG&E's post-emergence
long-term financing needs.

recorded and subsequently recovered in rates (if approved) have increased substantially, increasing PG&E's need for short-term debt authorization. Additionally, PG&E anticipates higher collateral posting requirements associated with PG&E's business and energy procurement activities when compared to pre-Chapter 11 filing.

Prior to PG&E's Chapter 11 filing, through D.04-10-037, as modified by D.05-04-023, D.06-11-006 and D.09-05-002, the Commission authorized PG&E to incur up to $4.0 billion of short-term debt[51] for working capital fluctuations and energy procurement-related purposes (including, without limitation, collateral posting requirements). In this proceeding, PG&E requests a total short-term debt authorization of up to $6 billion that would supersede its prior short-term debt authorizations. See D.04-10-037, *as modified by* D.05-04-023, D.06-11-006 and D.09-05-002. This total amount also is consistent with the total amount PG&E requested in A.18-10-003, which was filed on October 9, 2018 before PG&E filed for Chapter 11,[52] and is similar to the $2 billion increase for a total of $4 billion in short-term debt authorization recently granted to Southern California Edison. See D.19-09-008. Since PG&E's short-term debt request in this proceeding would supersede its prior authorizations, PG&E proposes to pay Commission fees on only the net difference in total authorization, i.e., $2 billion. See Exhibit 2.3 (showing prior authorizations) and 2.9 (calculating fees).

1. **Description of the $11.85 Billion in Long-Term Debt Securities Contemplated by the Noteholder RSA**

PG&E requests authorization for the Utility to issue, sell and deliver or otherwise incur approximately $11.85 billion in long-term debt consistent with the terms of the Noteholder RSA, as shown in Exhibits 2.5-2.7.[53] In particular, PG&E requests authorization for the following types of long-term

---

[51] Historically, the Commission has expressed PG&E's authorized short-term debt as an authorized amount including amounts allowed by Public Utilities Code § 823(c) (i.e., 5 percent of the par value of PG&E's outstanding long-term securities).

[52] In a decision dated January 28, 2019 and issued January 30, 2019 in that proceeding, the Commission exempted PG&E's Debtor-In-Possession financing from Commission approval and closed that proceeding. See D.19-01-025; see *also* D.19-01-026.

[53] *See* U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088, ECF 5519, n.7. The Noteholder RSA as executed (Exhibit 2.6) shows a total of approximately $11.95 billion. The correct amount, as reflected in PG&E's Plan, is $11.85 billion.

1   debt securities described below and on the terms described below

2   (collectively, and together with the other long-term and short-term debt

3   securities described below, "Debt Securities").

4   **a.   New Utility Funded Debt Exchange Notes**

5          The Utility may issue, collectively, (1) $1,949 million in new senior

6   secured notes bearing interest at the rate of 3.15 percent, maturing on

7   the 66 month anniversary of the Effective Date of PG&E's Plan, and

8   otherwise having the same terms and conditions as the Reference

9   Medium-Term Senior Note Documents[54] shown in Exhibit 2.6; and

10  (2) $1,949 million in new senior secured notes bearing interest at the

11  rate of 4.50 percent, maturing on the anniversary of the Effective Date of

12  PG&E's Plan in 2040, and otherwise having the same terms and

13  conditions as the Reference Long-Term Senior Note Documents shown

14  in Exhibit 2.7.[55]

15  **b.   New Utility Long-Term Notes**

16         The Utility may issue, collectively, (i) $3.1 billion in new senior

17  secured notes bearing interest at the rate of 4.55 percent, maturing on

18  the anniversary of the Effective Date of PG&E's Plan in 2030, and

19  otherwise having the same terms and conditions as the Reference

20  Long-Term Senior Note Documents shown in Exhibit 2.7; and (ii)

21  $3.1 billion in new senior secured notes bearing interest at the rate of

22  4.95 percent, maturing on the anniversary of the Effective Date of

23  PG&E's Plan in 2050, and otherwise having the same terms and

24  conditions as the Reference Long-Term Senior Note Documents shown

25  in Exhibit 2.7.

---

[54] These reference documents are described in the Noteholder RSA as the "Reference Short-Term Senior Note Documents." They are referred to as Reference Medium-Term Senior Note Documents herein to minimize confusion since the term of the New Utility Funded Debt Exchange Notes is longer than one year, meaning they are considered long-term debt not short-term debt for purposes of the Public Utilities Code.

[55] *See* U.S. Bankruptcy Court for the Northern District of California, Case No. 19-30088, ECF 5519, n.7. The Noteholder RSA as executed (Exhibit 2.6) shows $1,999 million as the amounts for the New Utility Funded Debt Exchange Notes. PG&E's Plan shows the correct amount of $1,949 million.

## c. New Utility Medium-Term Notes[56]

The Utility may issue, collectively, (i) $875 million in new senior secured notes bearing interest at the rate of 3.45 percent, maturing on the anniversary of the Effective Date of PG&E's Plan in 2025, and otherwise having the same terms and conditions as the Reference Medium-Term Senior Note Documents shown in Exhibit 2.6; and (ii) $875 million in new senior secured notes bearing interest at the rate of 3.75 percent, maturing on the anniversary of the Effective Date of PG&E's Plan in 2028 and otherwise having substantially similar terms and conditions as the Reference Medium-Term Senior Note Documents shown in Exhibit 2.6.

## 2. Description of Long-Term Debt Securities for the Issuance of up to $11.925 Billion in Long-Term Debt for Exit

PG&E additionally requests authorization to issue, sell and deliver or otherwise incur up to $11.925 billion in long-term debt to finance PG&E's Plan and subsequent exit from Chapter 11. In connection with this request, PG&E seeks authorization to issue the various types of long-term debt securities described below (collectively, and together with the short-term debt securities described below, "Debt Securities").

## a. Secured Debt Securities

PG&E and/or an affiliate may issue secured Debt Securities, which generally are expected to be first and refunding mortgage bonds under a mortgage trust indenture ("Trust Indenture"), but may include other forms of secured debt securities (collectively, "Secured Debt Securities"). Secured Debt Securities may be sold in one or more public offerings or in one or more private placements.[57] Secured Debt Securities may be sold to underwriters which in turn will offer the Secured Debt Securities to investors, or may be sold directly to

---

**56** These notes are described in the agreement with the Noteholder RSA as "New Utility Short-Term Notes." They are referred to as Medium-Term Notes herein to minimize confusion since their term is longer than one year, meaning they are considered long-term debt, not short-term debt, for purposes of the Public Utilities Code.

**57** Bonds sold in private placements may contain provisions for subsequent public registration.

| | |
|---|---|
| 1 | investors either with or without the assistance of a placement agent. |
| 2 | Secured Debt Securities may also be delivered in connection with the |
| 3 | issuance of other debt instruments as described in Section F.6.  The |
| 4 | offering of Secured Debt Securities may be registered with the |
| 5 | Securities and Exchange Commission (SEC), depending on the method |
| 6 | of offering and sale, and the Secured Debt Securities may be listed on a |
| 7 | stock exchange.  Because any such Secured Debt Securities would be |
| 8 | an encumbrance on the Utility's utility properties under a Trust |
| 9 | Indenture, as described further in Section F.5., PG&E requests |
| 10 | authorization under Pub. Util. Code § 851 to mortgage and encumber |
| 11 | utility property. |

**b. Unsecured Debt Securities**

| | |
|---|---|
| 13 | PG&E and/or an affiliate may issue unsecured Debt Securities as |
| 14 | bonds, debentures, notes, trust preferred securities, or other evidences |
| 15 | of indebtedness in one or more public offerings or in one or more private |
| 16 | placements.[58]  Unsecured Debt Securities (consistent with financial |
| 17 | marketplace terminology, collectively referred to herein as "notes") |
| 18 | would not be secured by specific properties of PG&E, but may be issued |
| 19 | under trust indentures.  Notes may be sold to underwriters which in turn |
| 20 | will offer the unsecured Debt Securities to investors, or may be sold |
| 21 | directly to investors either with or without the assistance of a placement |
| 22 | agent.  PG&E may also issue debentures or other unsecured Debt |
| 23 | Securities directly or as part of an issuance of trust preferred securities. |
| 24 | In such an issuance, PG&E may create a subsidiary in the form of a |
| 25 | trust that would issue preferred securities to the public.  The preferred |
| 26 | securities would represent an interest in the debentures issued by |
| 27 | PG&E to the trust and would also be guaranteed by PG&E.  The offering |
| 28 | of notes may be registered with the SEC, depending on the method of |
| 29 | offering and sale, and the notes may be listed on a stock exchange. |

---

**58** Bonds sold in private placements may contain provisions for subsequent public
registration.

### c. Direct Loans

PG&E anticipates that from time to time it may be advantageous to borrow directly from financial institutions such as banks, insurance companies, or other financial lenders. PG&E and/or an affiliate generally would enter into such loans when the loans were designed to result in an overall cost of money lower than that available through the issuance of other forms of Debt Securities or when necessary as an interim arrangement or for other reasons. Such loans could be either secured (including through a first mortgage bond structure) or unsecured.

### d. Accounts Receivable Financing

PG&E may obtain financing through the issuance of Debt Securities secured by a pledge, sale, or assignment of its accounts receivable. See Section VI.C. below for a discussion of accounts receivable financing in connection with PG&E's request for authority pursuant to Pub. Util. Code § 851.

## 3. Proposed Uses of Long-Term Debt Proceeds

Pub. Util. Code § 817 authorizes the issuance of long-term debt for specific purposes, including, *inter alia*, "(d) [f]or the discharge or lawful refunding of its obligations;" "(f) [f]or the reorganization or readjustment of its indebtedness or capitalization upon a merger, consolidation, or other reorganization;" "(g) [f]or the retirement of or in exchange for one or more outstanding stocks or stock certificates or other evidence of interest or ownership of such public utility, or bonds, notes, or other evidence of indebtedness of such public utility, with or without the payment of cash;" and "(h) [f]or the reimbursement of moneys actually expended from income or from any other money in the treasury of the public utility not secured by or obtained from the issue of stocks or stock certificates or other evidence of interest or ownership, or bonds, notes, or other evidences of indebtedness of the public utility, for any of the aforesaid purposes … ." Pub. Util. Code § 817(d), (f)-(h); see, *e.g.*, D.02-11-030 at 5-6.

As already detailed in Table 2.4, PG&E proposes to use the proceeds from the Utility's issuance of the long-term debt authorized in this

1    proceeding for the aforementioned purposes permitted by § 817 and any
2    others, other than for payment of accrued interest, if any, and after payment
3    or discharge of obligations incurred for expenses incident to their issue and
4    sale.  In connection with these proposed uses, PG&E also requests
5    authorization pursuant to Pub. Util. Code § 823(d) to use a portion of the
6    long-term debt requested herein to refund pre-petition short-term debt (as
7    reflected in Table 2.4) and, if applicable, to refund the additional $11.925
8    billion short-term debt request described below in Section F.4.

9    **4.    Description of Short-Term Debt Securities for Exit and Post-Emergence**
10         PG&E requests two different short-term debt authorizations.[59]  First,
11    PG&E requests authority to issue, sell and deliver or otherwise incur up to
12    $6 billion in short-term debt authority for the Utility's working capital and
13    short-term debt needs for exit from Chapter 11 and on-going working capital
14    and short-term needs and contingencies after exit.  Consistent with PG&E's
15    prior short-term debt authorizations, see D.04-10-037, *as modified by*
16    D.05-04-023, D.06-11-006 and D.09-05-002, and as described in greater
17    detail below, PG&E requests authorization to issue various types of short-
18    term debt securities, including direct loans, revolving credit facilities, term
19    loan facilities and letter of credit facilities, accounts receivable financing,
20    commercial paper, and extendible commercial notes.  Credit facilities for
21    these purposes may be established through several types of structures, the
22    most typical being bank revolving loan (including Letters of Credit (LOC))
23    and term loan facilities, and customer accounts receivable financing.  There
24    are a variety of structures involving customer accounts receivable financing,
25    including structures in which the receivables are the collateral against which
26    borrowings or LOCs can be drawn, or the receivables are sold to a third
27    party that then uses the receivables as collateral for borrowings and LOCs.
28    In this latter structure, the transaction is structured as a true sale for
29    bankruptcy purposes and debt for financial reporting and tax purposes.
30    Credit facilities typically involve multi-year agreements.  Since borrowings
31    under these facilities are intended to manage variations in short-term cash

---

**59**  See Exhibit 2.3 (showing the requested short-term debt authorization in excess of the
amount allowed pursuant to Public Utilities Code § 823(c)).

flow, and not as a permanent source of financing for long-term assets such as rate base, consistent with past practice[60] PG&E proposes to treat all such borrowings as short-term debt for ratemaking purposes, which will be excluded from PG&E's ratemaking capital structure.

PG&E expects to implement one or more of the structures described in order to optimize the terms and amount of credit facilities and to ensure adequate short-term liquidity. Any such credit facilities could be secured or unsecured.

Second, to provide flexibility for the Utility's exit financing, PG&E requests authority for the Utility to issue, sell and deliver or otherwise incur up to $11.925 billion in short-term debt to temporarily finance PG&E's exit from Chapter 11 which, in the event this authorization is used, would be subsequently refinanced with the long-term debt already described in Section VI.B. or in connection with the rate-neutral securitization transaction.[61] Indeed, since PG&E will file a separate application seeking authorization for a rate-neutral, post-emergence securitization transaction, the proceeds of which would be used to refinance $6 billion of Utility debt used to pay wildfire claims and accelerate payment under the Plan of $1.35 billion owed to victims in 2021 and 2022, it may make sense for the Utility to initially use $6 billion in short-term, not long-term, debt for this purpose. Similarly, PG&E could use short-term as opposed to long-term debt should capital market conditions require the issuance of the former. Thus, approving this authorization for up to $11.925 billion in short-term debt in connection with PG&E's exit financing will provide helpful flexibility to adapt to the circumstances at exit.

To be clear, this short-term request for up to $11.925 billion would serve as a temporary replacement for the requested authorization of up to $11.925 billion in long-term debt (or the securitization transaction), such that the aggregate amount of debt under both authorizations requested herein (short-term and long-term) would not exceed $11.925 billion. PG&E further

---

[60] E.g., D.04-10-037 at 12.

[61] As with PG&E's long-term debt request, this short-term debt authorization request may be updated or amended based on subsequent modifications to PG&E's Plan or other developments.

recognizes that, after funding its Plan and emerging, any portion of this $11.925 billion short-term request not used for its exit financing would lapse.

### a. Direct Loans

PG&E anticipates that from time to time it may be advantageous to borrow directly from financial institutions such as banks, insurance companies, or other financial lenders.  PG&E generally would enter into such loans only when the loans were designed to result in an overall cost of money lower than that available through the issuance of other forms of Debt Securities or when necessary to as an interim arrangement or for other reasons.  Such loans could be either secured (including through a first mortgage bond structure) or unsecured.

### b. Revolving Credit and Letter of Credit Facilities

PG&E may enter into revolving credit facilities and letter of credit facilities with financial institutions such as banks or other financial lenders.  These facilities may be used to for direct borrowings, letter of credit issuance, or as a backstop for commercial paper, among other uses.  Any such revolving credit and letter of credit facilities could be secured (including through a first mortgage bond structure) or unsecured.

### c. Accounts Receivable Financing

PG&E may obtain financing through the issuance of Debt Securities secured by a pledge, sale, or assignment of its accounts receivable.  See Section F.5. below for a discussion of accounts receivable financing in connection with PG&E's request for authority pursuant to Pub. Util. Code § 851.

### d. Commercial Paper and Extendible Commercial Notes

If PG&E's credit rating sufficiently improves such that it can re-enter the commercial paper market, PG&E may issue Short-Term Debt Securities as commercial paper, including the refunding or rolling over of previously issued commercial paper.  The commercial paper may be sold privately or publicly in the domestic or foreign capital markets.  The commercial paper may be sold through placement agents which market commercial paper on a reasonable efforts basis or may be sold directly

1  to investors.  Although it may issue commercial paper without separate
2  liquidity support if possible and cost-effective to do so, PG&E anticipates
3  it or an affiliate (acting at PG&E's direction) will arrange a credit
4  agreement with banks or other financial institutions to provide liquidity
5  support for the commercial paper indebtedness.  PG&E or its affiliate
6  may from time to time make modifications to the credit agreement terms
7  and conditions.  In addition, one or more new financial institutions may
8  be added to or substituted for institutions initially participating in the
9  credit agreement, and one or more of these institutions may be removed
10  or have their respective percentage participation adjusted.  At the
11  expiration of the credit agreement, PG&E or its affiliate may renew or
12  replace it.  To the extent that commercial paper is backed by a credit
13  facility, to avoid double counting the commercial paper and contingent
14  support facilities associated with such paper, the commercial paper
15  issued would be counted against available short-term debt authorization,
16  and any supporting credit facility would not be counted against the
17  authorization requested hereunder.  The cost of commercial paper will
18  include the effective yield plus any expenses associated with issuing
19  commercial paper.  These expenses include, but are not limited to,
20  dealer commissions, issuing and paying agent fees, and credit
21  agreement fees.  PG&E may also issue extendible commercial notes,
22  which are very similar to commercial paper but do not necessarily
23  require the support of a credit agreement.  Generally, the notes would
24  be issued with a maturity of less than 364 days, but at maturity they may
25  be extended for a period in excess of one year if not paid or remarketed.
26  Nonetheless, and consistent with D.09-05-002, D.04-10-037 and
27  D.00-04-057, extendible commercial notes would be treated for all
28  purposes as short-term debt.

29  **e.  Bridge Facility**

30     PG&E requests approval of its Bridge Facility in connection with its
31  second short-term debt request described above.  On October 11, 2019,
32  PG&E entered into commitment letters with various banks, including
33  JPMorgan Chase Bank, N.A., Bank of America, N.A., BofA Securities,
34  Inc., Barclays Bank PLC, Citigroup Global Markets Inc., Goldman Sachs

Bank USA, and Goldman Sachs Lending Partners LLC, to provide a $27.35 billion senior secured bridge loan facility (the "Bridge Facility") to PG&E.[62] The Bridge Facility would be secured by substantially all of PG&E's assets and would mature 364 days after any funding of the facility. PG&E's obligations under the commitment letters remain contingent on Bankruptcy Court approval and, of course, any funding of the Bridge Facility would require authorization from the Commission as requested herein. In light of the subsequent amendments to PG&E's Plan in the intervening months and, in particular, the Noteholder RSA, PG&E has entered into a reduced Bridge Facility in the amount of $5.825 billion on comparable terms.[63] The Bridge Facility is committed financing, which funding provides significant certainty to PG&E even if debt market conditions deteriorate.

5. **Section 851 Authorization For Secured Debt**

PG&E requests authority under Pub. Util. Code § 851 to encumber utility property in connection with the short- and long-term debt securities already described. Specifically, PG&E requests authority to secure the aforementioned debt securities by (1) a mortgage on the Utility's property, including by issuing collateral mortgage bonds or first mortgage bonds; (2) a pledge of the Utility's accounts receivable, including related collateral pledged under accounts receivable facilities, such as (a) security interests securing payment of such accounts receivable, (b) guarantees, LOCs, LOC rights, supporting obligations, insurance and other agreements or arrangements supporting the payment of such accounts receivable, (c) service contracts and other agreements associated with such accounts receivable, (d) records related to such accounts receivable, and/or (e) proceeds of any of the foregoing; and/or (3) a lien on the Utility's property or another credit enhancement arrangement. With respect to accounts receivable financing, debt securities are secured by a pledge, sale, or assignment of the Utility's customer accounts receivable. PG&E anticipates

---

[62] See PG&E and PG&E Corporation, 8-K (Oct. 15, 2019).

[63] See Exhibit 2.8. Depending on the circumstances, PG&E also could seek to increase the amount of the Bridge Facility up to the full amount of the $11.925 billion in requested short-term authorization.

1  that the transactions comprising an accounts receivable financing would be
2  structured to be a true sale for bankruptcy purposes and debt for financial
3  reporting and tax purposes, although other structures may be developed
4  using accounts receivable as security or collateral.  Should any such
5  transaction be structured whereby the Utility does not act as servicer of the
6  accounts receivable facility, PG&E may be required to enter a performance
7  guaranty to serve as guarantor of the performance of the obligations of the
8  servicer and hereby requests authorization to do so.  The Utility also seeks
9  authorization to execute and deliver one or more indentures or supplemental
10 indentures, mortgages, security agreements, pledge agreements and such
11 other collateral documents or instruments to secure the Debt Securities
12 authorized by the Commission in this proceeding.

13 **6.  Features to Enhance Debt Securities**

14     PG&E hereby requests authorization to include at its discretion one or a
15 combination of the following additional features in PG&E or affiliate Debt
16 Securities.  Such features will be used as appropriate to improve the terms
17 and conditions of the Debt Securities and to lower PG&E's overall cost of
18 financing for the benefit of customers.

19     **a.  Credit Enhancements**

20         PG&E may obtain credit enhancements for Debt Securities, such as
21     LOCs, standby bond purchase agreements, surety bonds or insurance
22     policies, or other credit support arrangements.  Such credit
23     enhancements may be included to reduce interest costs or improve
24     other credit terms, and the cost of such credit enhancements would be
25     included in the cost of the Debt Securities.  PG&E may also provide
26     mortgage security as a form of credit enhancement for Debt Securities.
27     Debt used as credit enhancement would not count against the amount
28     of debt authorized under this proceeding as long as there was no
29     possibility that such credit enhancements would ever increase the
30     amount of PG&E's debt obligations (see D.08-10-013).

31     **b.  Redemption Provisions**

32         Each issue of Debt Securities may contain a provision allowing it to
33     be redeemed or repaid prior to maturity.  An early redemption provision

1        may allow the Debt Securities to be redeemed or repaid at any time, or it

2        may allow the Debt Securities to be redeemed or repaid only after a

3        certain period.  In either case, the Debt Securities would be redeemable

4        at par, at a premium over par, or at a stated price.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 3**

**ABILITY TO RAISE CAPITAL POST-EMERGENCE**

**(SCOPING MEMO ISSUES 4.3, 4.6, 4.7)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 3
ABILITY TO RAISE CAPITAL POST-EMERGENCE
(SCOPING MEMO ISSUES 4.3, 4.6, 4.7)

TABLE OF CONTENTS

A.  Executive Summary ........................................................................................... 3-1

B.  Witness Introduction ........................................................................................ 3-1

C.  Reorganized PG&E Will Be Able to Access the Investment Grade Debt
    Market ............................................................................................................... 3-2

    1.  Credit Ratings for Utility Debt ................................................................... 3-2

    2.  Credit Ratings for California Utilities ........................................................ 3-5

        a.  Impact of Assembly Bill 1054 ............................................................ 3-5

        b.  Expected Debt Ratings for PG&E Upon Emergence. .......................... 3-7

    3.  Investment Grade Bond Market ................................................................ 3-8

D.  Equity Financing for Utilities ........................................................................... 3-15

    1.  Overview .................................................................................................... 3-15

    2.  Equity Market Access for Utilities ............................................................ 3-15

        a.  Utility Equity Performance and Valuations ........................................ 3-15

        b.  Depth of Utility Equity Market ........................................................... 3-17

    3.  Expected Equity Market Access for PG&E Upon Emergence ................. 3-20

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 3**
**ABILITY TO RAISE CAPITAL POST-EMERGENCE**
**(SCOPING MEMO ISSUES 4.3, 4.6, 4.7)**

## A. Executive Summary

This chapter describes Pacific Gas and Electric Company's (PG&E or the Company) credit position and access to capital after emergence under PG&E's Plan of Reorganization (PG&E Plan or Plan). In sum, reorganized PG&E will have the ability to raise adequate capital post-emergence.

Specifically, reorganized PG&E will be able to access the investment grade debt market. Based on the combination of PG&E's utility business risk profile, investment grade credit ratios and first mortgage bond structure, I expect the Company to achieve investment grade bond ratings on a secured basis.

Reorganized PG&E also will be able to access the equity capital markets. The equity needed for PG&E's Plan is provided by the backstop. But after emergence from Bankruptcy (BK), assuming constructive regulatory application of Assembly Bill (AB) 1054, I believe PG&E should have ongoing access to equity markets.

PG&E's improved wildfire risk position with the passage of AB 1054, and the Company's ongoing safety and system hardening initiatives will be attractive to both debt and equity investors. Additionally, the Company's improving credit profile, strong growth and favorable regulatory framework are important positive factors that will attract debt and equity capital to the Company.[1]

## B. Witness Introduction

My name is John Plaster. I am a Managing Director and Head of Power and Utilities, Americas at Barclays. I was previously a Managing Director at Lehman Brothers. I have over 20 years of investment banking experience working extensively with regulated utilities, Independent Power Producers, and renewable energy companies across a wide spectrum of disciplines, including financial advisory, equity and equity-linked finance, high grade and high yield

---

**1** My opinion regarding the Company's ability to raise capital for its emergence from Chapter 11, and for its post-exit needs, assumes the absence of material adverse events.

debt finance, structured finance, restructuring and commodities.  I have a Juris
Doctorate degree from Vanderbilt University Law School, Order of the Coif, and
Bachelor of Arts in Economics, cum laude, from Wabash College.

Barclays is one of the lead lenders for the debtor-in-possession (DIP) facility
that PG&E put in place during its Chapter 11 process.  Additionally, Barclays is
one of the lead underwriters of PG&E's committed exit financing.  We reviewed
and analyzed PG&E's financial model, including a review of the key assumptions
underlying the model.  Our decision to participate in the DIP financing and
underwrite the exit financing reflects the fact that we were satisfied with the
quality of PG&E's modeling.  In addition, in connection with this testimony, I
have also reviewed PG&E's more current financial model, and I have reviewed
preliminary and confidential estimated credit metrics for PG&E post-emergence
from BK.  I am familiar with a substantial body of the publicly available
information about the pertinent equity and debt markets discussed in
this testimony.

## C.  Reorganized PG&E Will Be Able to Access the Investment Grade Debt Market

### 1.  Credit Ratings for Utility Debt

An important factor in a company's ability to access debt markets
is its credit rating.  Credit rating agencies assign a corporate credit
rating to a utility based on numerous factors, primarily business risk and
financial leverage.

*Business Risk.*  The rating agencies take slightly different approaches
but particularly consider the underlying stability of the business's cash flows.
Utilities generally measure well in this regard:  They have stable cash flows
generated by revenues from monopoly franchises for the generation,
storage, transmission and distribution of electricity, heat and/or gas from
facilities that they own or operate.

The rating agencies also give significant weight to the regulatory
environment in determining a company's business risk.  For utilities, the
regulatory framework has a significant bearing on a utility's financial
performance.  As such, rating agencies consider the transparency,
predictability, and consistency of the regulatory framework; the recoverability

of costs; timeliness of cost recovery; flexibility to allow for recovery of unexpected costs; and attractiveness of the framework to attract long-term capital, among other factors.[2]  Accordingly, in determining a utility's competitive position, Standard & Poor's Global Ratings (S&P) weighs "regulatory advantage" at 60 percent.[3]  Moody's Investors Service (Moody's) bases 25 percent of its rating on an evaluation of the regulatory framework and another 25 percent on the ability to recover costs and earn returns.[4]

*Financial Leverage.*  A company's ability to repay debt depends in part on its expected future cash flows from operations, which is usually characterized as funds from operations (FFO) for the utility sector.  Rating agencies look to certain leverage metrics—in particular, the relationship between FFO and a company's total debt and debt-equivalents (*e.g.*, FFO-to-debt ratio),[5] and significantly weigh this ratio in determining the financial risk profile of a utility.[6]

Rating methodologies consider the combination of business risk and financial leverage.  A weaker business risk profile will allow for lower leverage, whereas a stronger business risk profile will permit higher leverage, at the same credit rating.

---

[2]  S&P Global Ratings, *Key Credit Factors for the Regulated Utilities Industry ("S&P Key Credit Factors")*, p. 6–7 (January 22, 2016).

[3]  S&P *Key Credit Factors*, p. 6.

[4]  Moody's, *Regulated Electric and Gas Utilities* (June 23, 2017), at p. 4.  Regarding regulatory framework, Moody's explains that 12.5 percent of a utility's rating is based on "Legislative and Judicial Underpinnings" and 12.5 percent is based on "Consistency and Predictability of Regulation."  Regarding ability to recover costs and earn returns, Moody's states that 12.5 percent of a utility's rating is based on "Timeliness of Recovery of Operating and Capital Costs" and 12.5 percent is based on "Sufficiency of Rates and Returns." *Ibid.*

[5]  S&P Global Ratings, *Corporate Methodology* (November 19, 2013), at p. 68.  S&P defines "Funds from operations (FFO)" as "a hybrid cash flow measure that estimates a company's inherent ability to generate recurring cash flow from its operations independent of working capital fluctuations"; *see also* Moody's, *Regulated Electric and Gas Utilities* (June 23, 2017), at p. 20.  Similarly, Moody's defines "CFO pre-WC / Debt" as "an indicator for a utility's ability to cover the costs of its borrowed capital." Further, "CFO pre-WC" is defined as "Cash Flow from Operations Before Changes in Working Capital […] because, unlike Funds from Operations (FFO), it captures the changes in long-term regulatory assets and liabilities."

[6]  Moody's*, Regulated Electric and Gas Utilities* (June 23, 2017), p. 4.  Regarding financial credit metrics, Moody's explains that 40 percent of a utility's rating is based on "Financial Strength, Key Financial Metrics."

*Secured Debt.* An issuer may obtain a higher credit rating for its debt by issuing secured debt. Secured debt is debt backed or secured by collateral to reduce the associated recovery risk for investors in a default scenario.

It is common for utilities to issue secured debt in a mortgage bond structure. A mortgage bond is secured by a mortgage or pool of mortgages that are typically backed by all the property, plant and equipment of the utility. In the event of default, mortgage bondholders have a priority claim over the assets of the Company. The rating agencies generally view mortgage bonds as having a very high recovery rate due to the critical infrastructure nature of the assets. Mortgage bonds are typically rated 2 notches higher than a utility's corporate credit rating.[7]

*Securitization.* Securitization has been used by utilities as a cost-efficient means to finance various types of expenditures, such as stranded costs and significant storm costs, among others. The securitization structure isolates a discrete revenue stream that is dedicated to debt service for the securitized debt and requires enabling legislation from the state.[8] The rating agencies treatment of securitization differs. S&P typically deconsolidates securitization debt and makes certain other adjustments when calculating its credit metrics, assuming the securitization structure meets S&P's protective criteria.[9] Moody's views securitization as on-credit debt and does not remove securitized debt from the balance sheet for calculating its credit metrics. However, Moody's ratings methodology notes that where securitization debt is on balance sheet, they will also consider credit ratios that exclude securitization debt and related revenues.[10]

---

[7] *Ibid.,* p. 44; *see also* S&P, *Collateral Coverage and Issue Notching Rules For '1+' And '1' Recovery Ratings On Senior Bonds Secured By Utility Real Property* (January 22, 2016), p. 3. S&P also notes the possibility of a 3 notch upgrade for a Speculative-grade ICR - [W]e apply more notching uplift on the secured utility bonds of speculative-grade ('BB+' and below) issuers, as the likelihood of an actual default is higher and recovery is a more meaningful consideration., p. 4 and p. 5.

[8] Moody's Regulated Electric and Gas Utilities (June 23, 2017), p. 44.

[9] S&P Global Ratings, Ratings Direct: Key Credit Factors For The Regulated Utilities Industry (January 22, 2016), p. 16.

[10] Moody's, Regulated Electric and Gas Utilities (June 23, 2017), p. 44 and p. 45.

## 2. Credit Ratings for California Utilities

In light of the points above, California utilities typically score highly on business fundamentals evaluated by the rating agencies. In general, California utilities have stable cash flows, a monopoly franchise, and a predictable regulatory environment.

Recently, however, rating agencies have recognized the significant financial exposure to wildfires for California utilities, which has significantly elevated the business risk profile of California utilities. The inverse condemnation doctrine has been identified as a source of significant risk for California utilities by both S&P and Moody's: "California's interpretation of the legal doctrine of inverse condemnation effectively makes California's electric utilities the state's reinsurer, which creates new risks that were never envisioned when investor-owned utilities (IOU) were established. We don't believe that an electric utility is large enough, sufficiently diversified, or adequately capitalized to be a reinsurer."[11] The risk under inverse condemnation that utilities will face financial liabilities following a wildfire is pronounced for IOUs because cost recovery is uncertain and because of the topography and size of their service territories.[12]

### a. Impact of Assembly Bill 1054

The credit rating agencies have also explained, however, that AB 1054 stands to mitigate utility exposure to wildfire risk, although credit outlook remains contingent on constructive regulatory implementation of the legislation. Moody's stated: "The new law establishes a strong framework to manage wildfire risk and the ensuing financial threats to utilities but there is more work to be done. Effective implementation of the wildfire mitigation plans required under the law will

---

[11] *Credit FAQ: Will California Still Have An Investment-Grade Investor-Owned Electric Utility?* (February 19, 2019), p. 2.

[12] *FAQ: California public power utilities are not immune to wildfire risks* (April 9, 2019), p. 1.

1    be critically important in reducing the wildfire-related risks facing the
2    state's utilities."[13]

3    Even as the rating agencies monitor the implementation of
4    AB 1054, the legislation has resulted in a more stable outlook overall
5    for California's IOUs, based in particular on improved assessments of
6    business risk and regulatory framework.  That approach is reflected
7    in recent rating agency analyses of Southern California Edison (SCE)
8    and San Diego Gas & Electric (SDG&E).  For example, in August 2019,
9    Moody's recognized that "[t]he passage of AB 1054 and the subsequent
10    establishment of the insurance fund has had a strong stabilizing effect
11    on SCE's credit profile," but "SCE's credit profile could still evolve, to a
12    stronger position or a weaker position, depending on the implementation
13    of the wildfire legislation ... ."[14]  Moody's described its improved
14    assessment of the regulatory framework affecting SCE based on its
15    belief "that AB 1054 has substantially offset the negative credit effects of
16    the inverse condemnation law."[15]  At the end of 2019, S&P also revised
17    its outlook on SCE to stable based on its expectation that the utility will
18    benefit from credit-supportive measures within AB 1054.[16]

19    Similarly, Moody's updated its outlook for SDG&E to positive in the
20    wake of AB 1054, noting:  "[R]ecently enacted legislation in California,
21    particularly [AB] 1054, combined with SDG&E's track record of effective
22    wildfire mitigation, have reduced the utility's catastrophic wildfire risk
23    exposure," but "[f]ailure to successfully implement the provisions of
24    AB 1054 associated with the insurance fund in a consistent and credit

---

**13**  *FAQ on the credit implications of California's new wildfire law* (Aug. 6, 2019), p. 3; *see also* S&P, *Industry Top Trends 2020:  North America Regulated Utilities* (November 7, 2019), p. 1 ("While wildfires remain operationally challenging for California's utilities, we expect that the passage of [AB] 1054 into law adds sufficient financial credit enhancements to protect the utility's credit quality over the next several years, absent near-term catastrophic wildfires.").

**14**  *Southern California Edison Company: Update following the passage of AB 1054* (August 2, 2019), p. 2; *ibid.*  (listing "[e]xecution risk in the CPUC's implementation of new prudency standards" as a credit challenge)

**15**  *Ibid.*, p. 7.

**16**  S&P Global Ratings, Ratings Direct: Southern California Edison Co. (December 26, 2019)

36

supportive manner would likely trigger negative momentum on the rating."[17]  Moody's also strengthened its assessment of SDG&E's regulatory framework because of AB 1054.[18]  S&P likewise revised its outlook for SDG&E to stable from negative and characterized the company's business risk as strong; S&P emphasized that AB 1054 was "designed to minimize the impact of a catastrophic wildfire and to reduce the associated financial impact to an investor-owned electric utility," and therefore "supports the regulatory construct and reduces business risk for SDG&E over the medium term."[19]

### b. Expected Debt Ratings for PG&E Upon Emergence.

Rating agencies are likely to be quite conservative in assessing PG&E's business risk because of ongoing wildfire risk and uncertainty regarding the regulators implementation of AB 1054.  PG&E has greater exposure to wildfire risk compared with SCE and SDG&E because of the size and character of its service territory.  Additionally, the fact that PG&E was forced to seek protection under the BK laws, creates additional public scrutiny leading to enhanced political and regulatory risk.

Given PG&E's business risk will likely be viewed as being higher than its California utility peers, PG&E would likely be assigned lower a corporate credit rating than SCE and SDG&E even if PG&E achieved a comparable financial risk profile.

For SCE, Moody's provides a leverage outlook of CFO Pre-WC/Debt of 16 percent to 18 percent and S&P provides a FFO/Debt outlook of 15 percent to 18 percent.  Moody's rates SCE senior unsecured debt at Baa2 and its first mortgage bonds two notches higher at A3.  S&P rates SCE senior unsecured debt BBB and its first mortgage bonds two notches higher at A-.

---

[17] Moody's, *San Diego Gas & Electric Company: Update following outlook change to positive* (Aug. 2, 2019), pp. 1, 3.

[18] *Id.*

[19] S&P Global Ratings, *San Diego Gas & Electric Co. Ratings Affirmed, Outlook Revised to Stable From Negative* (July 30, 2019), p. 1.

For SDG&E, Moody's provides a leverage outlook of CFO Pre-WC/Debt of 22 percent to 25 percent and S&P provides a FFO/Debt outlook of approximately 20 percent. Moody's rates SDG&E senior unsecured debt at Baa1 and its first mortgage bonds two notches higher at A2. S&P rates SDG&E senior unsecured debt at BBB+ and its first mortgage bonds two notches higher at A.

I have reviewed PG&E's preliminary and confidential financial projections under the Plan and reviewed the company's leverage profile under the Moody's and S&P methodology. Under the contemplated PG&E Plan, PG&E's leverage profile falls within the investment grade category for the broad regulated utility sector.

Comparing PG&E to its closest comparable, SCE, based on an expectation of a weaker business risk profile, slightly weaker leverage outlook, and in the context of a BK exit, it seems likely that PG&E's ratings will be lower than SCE's ratings. With the same secured notching treatment the rating agencies use for SCE and SDG&E, I believe PG&E should achieve an investment grade rating on its first mortgage bonds.[20][21]

Additionally, the Company's ratings will be positioned to improve over time with the implementation of system hardening and additional safety enhancements to reduce wildfire risk. Consistent with the foregoing descriptions of rating agency analyses of SCE and SDG&E, rating agencies' view of PG&E's business risk would benefit from constructive regulatory implementation of AB 1054.

### 3. Investment Grade Bond Market

The United States investment grade bond market is extremely deep and liquid. As of December 31, 2019, the United States Investment Grade Index

---

[20] "[I]n most cases we have two notches between the first mortgage bonds and senior debt of regulated electric and gas utilities in the U.S. Wider notching differentials between debt classes may also be appropriate in the speculative grade." Moody's, Regulated Electric and Gas Utilities (June 23, 2017), p. 44. I have not evaluated notching under Moody's LGD methodology for speculative grade companies, as I believe it is not likely to be applied for a regulated utility.

[21] S&P, *Collateral Coverage and Issue Notching Rules For '1+' And '1' Recovery Ratings On Senior Bonds Secured By Utility Real Property* (January 22, 2016).

1       was comprised of $6.23 trillion of supply across 6,822 securities.[22]  Debt

2       capital markets supply has averaged $1.10 trillion annually from 2009 to

3       2019, with supply totaling as much as $1.35 trillion in 2017.

**FIGURE 3-1**



4       Single offerings in the investment grade bond market have been as

5       large as $49 billion.  As an example, in November 2019, AbbVie, Inc. issued

6       $30 billion of bonds in the investment grade bond market.

---

**22**   Bloomberg L.P. "United States Investment Grade Index" data as of December 31, 2018.
Retrieved from Bloomberg database.

**FIGURE 3-2**

| Rank | Date | Issuer | Total Deal Size |
|------|------|--------|-----------------|
| **Largest IG Bond Market Offerings (2009 – Present)** | | | |
| 1 | 9/11/2013 | Verizon Communications Inc. | $49,000,000,000 |
| 2 | 1/13/2016 | Anheuser-Busch InBev Finance Inc. | $46,000,000,000 |
| 3 | 3/6/2018 | CVS Health Corporation | $40,000,000,000 |
| 4 | 11/12/2019 | AbbVie Inc. | $30,000,000,000 |
| 5 | 10/2/2018 | Comcast Corporation | $27,000,000,000 |
| 6 | 7/27/2017 | AT&T Inc. | $22,500,000,000 |
| 7 | 3/3/2015 | Actavis PLC | $21,000,000,000 |
| 8 | 5/17/2016 | Dell International LLC / EMC Corp | $20,000,000,000 |
| 8 | 9/6/2018 | Halfmoon Parent, Inc. (Cigna Corporation) | $20,000,000,000 |
| 8 | 5/8/2019 | International Business Machines Corporation | $20,000,000,000 |

*Source: Bloomberg, publicly available company filings.*

The Investment Grade United States (U.S.) Credit Index is near the lowest level it has been over the last 10 years. The average risk premium, or credit spread over U.S. Treasuries, is currently just 90 basis points (bps). Meanwhile, the all-in yield is currently 2.79 percent compared to the 10-year average of 3.29 percent. The average tenor of the Investment Grade U.S. Credit Index is 11.2 years. Indeed, as shown in the charts below, the current cost of investment grade debt is very attractive on a historical basis.

**FIGURE 3-3**



The utility sector is quite active in issuing investment grade debt. Utility bond supply has averaged $50.5 billion annually from 2009 to 2019, reaching a high of $72.2 billion pricing in 2019.

**FIGURE 3-4**



1    As shown in the charts below, the risk premium (or credit spread) of the
2    Investment Grade U.S. Utility Index is currently 97 bps and the yield is
3    currently 3.02 percent.  Utility index credit spreads and yields are currently
4    just approximately 20 bps higher than the lowest levels achieved in the last
5    10 years.  Utility companies are typically able to borrow at lower rates
6    compared to non-utility companies with the same rating.

**FIGURE 3-5**



7    The risk premium for utility companies with BBB ratings is also very
8    favorable relative to utility companies with higher credit ratings in the current
9    market.  The risk premium differential for utility companies with BBB ratings
10   compared to utility companies with A ratings is currently 32 bps, lower than
11   the average of approximately 50 bps over the past 10 years.

**FIGURE 3-6**



Source: Bloomberg Barclays U.S. Credit Utility Index.
Left chart: OAS in basis points (bps) from 12/31/09 – 12/31/19.
Right Chart: Fitted Par Spread to Treasury (bps) from 12/31/09 – 12/31/19.

1        Historically, on average, utility unsecured operating company debt has
2        had a higher premium (or credit spread) compared to secured operating
3        company debt.  This reflects investors' perception that secured utility debt
4        has a very low probability of capital loss.  In periods of distress, the risk
5        premium differential between unsecured and secured utility debt has
6        been over 75 bps.  Currently, secured utility operating company debt has
7        an approximately 20 bp lower risk premium than unsecured operating
8        company debt.

9        Accordingly, utilities commonly issue first mortgage bonds instead of
10      unsecured bonds to lower their cost of debt capital.

**FIGURE 3-7**



Source: Bloomberg Barclays Credit Index.
Note: 30-year 'A' Secured includes secured bonds from Duke Energy Carolinas, Florida Power & Light and Public Service Electric & Gas. 30-year 'A' Unsecured includes unsecured bonds from Alabama Power Company, Consolidated Edison Company of New York, Virginia Electric & Power, Georgia Power Company and Wisconsin Electric Power. Spread shown represents historical OAS data as per the eligible bonds from the respective issuers in the Bloomberg Barclays Index with years to maturity ranging from 25 to 32 years. Differential represents 30-year 'A' Unsecured Opco OAS - 30-year 'A' Secured Opco OAS.

1    *PG&E Will Be Able to Issue Investment-Grade Debt.*  Based on my
2    assessment of PG&E's anticipated credit profile and the debt market, I
3    believe that PG&E will be able to issue investment-grade mortgage bonds to
4    fund its Plan.  Specifically, in my opinion PG&E will be able to issue
5    investment grade rated first mortgage bonds that will attract more than
6    enough capital from institutional investors to fund PG&E's Plan and its
7    capital needs upon emergence.

8        High grade debt investors will be attracted to PG&E's potential for credit
9    improvement.  Continued progress by the Company and the state to lower
10   wildfire risk and a constructive track record by the regulator of implementing
11   AB 1054 would lead to a lower business risk and a potential credit upgrade
12   at expected leverage levels.  Additionally, PG&E's financial profile is
13   expected to improve, with leverage declining.  High grade investors also
14   generally strongly favor first mortgage bonds which will be another positive
15   factor for investor demand and will help the Company achieve a lower cost
16   of funding.

17       I also believe the Company's access to the investment grade bond
18   market should continue to improve over time, consistent with the above view
19   that the Company's credit profile will improve based on improved financial
20   ratios and constructive regulatory implementation of AB 1054.

**D.  Equity Financing for Utilities**

**1.  Overview**

In connection with its exit from Chapter 11, PG&E has access to new equity funding through its equity backstop commitment letters.  In addition, in my opinion, over the medium and longer term, PG&E should be able to access the public equity market for additional capital.

**2.  Equity Market Access for Utilities**

Equity investor sentiment for the utility sector is currently very strong.  This is exemplified by the magnitude of the sector and its positive performance and high valuations.  Utility equities attract significant capital from a large number of sophisticated institutional investors.

**a.  Utility Equity Performance and Valuations**

The performance of equities in the utilities sector has been strong in recent history.  In particular, the sector has experienced the following positive performance in the recent one and 5-year periods:

FIGURE 3-8



**FIGURE 3-9**



**Recent Utility Price Performance**

Source: FactSet as of 12/31/2019.
1. Market cap-weighted average of peers: AEE, AEP, CMS, DUK, ED, EIX, ES, ETR, SO, WEC, XEL.

**FIGURE 3-10**



**Total Return Analysis**

| | AEE | AEP | CMS | DUK | ED | EIX | ES | ETR | SO | WEC | XEL | Peer Mean[2] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FY1 P/E | 22.3x | 21.5x | 23.5x | 17.7x | 20.0x | 16.5x | 23.3x | 21.4x | 20.1x | 24.7x | 22.8x | 20.7x |
| FY2 P/E | 20.2x | 20.2x | 21.9x | 17.0x | 19.1x | 16.3x | 22.0x | 20.1x | 19.3x | 23.1x | 21.5x | 19.7x |
| FY2 P/E / TR | 2.4x | 2.4x | 2.5x | 1.9x | 2.6x | 2.1x | 2.7x | 2.2x | 2.3x | 2.7x | 2.7x | 2.5x |
| FY2 Payout Ratio | 57.4% | 61.0% | 57.3% | 73.5% | 65.3% | 53.6% | 58.5% | 66.4% | 78.2% | 63.1% | 58.2% | 65.6% |
| Market Cap (mm) | $18,895 | $46,683 | $17,837 | $66,495 | $30,075 | $27,042 | $27,542 | $23,852 | $66,804 | $29,093 | $33,293 | $35,237 |

1    A further reflection of the attractiveness of utilities equity to
2    investors is the strong valuations across this sector.  In particular, the
3    price-to-earnings ratios in the sector are close to historic highs, as
4    shown in the following:

**FIGURE 3-11**



5    **b.  Depth of Utility Equity Market**
6        Utility equities are held by a strong and broad investor base, and
7    these investments have been favored by large institutional investors.
8    Many of the biggest and best-known institutional investors have very
9    substantial holdings in the utilities sector.
10        The following are the top 30 Shareholders of U.S. Utilities:

**FIGURE 3-12**

| Holder Name | Market Value Held ($mm)[1] | Holdings Style | Investor Type |
|---|---|---|---|
| The Vanguard Group, Inc. | $36,999 | Index | Mutual Fund Manager |
| BlackRock Fund Advisors | $23,447 | Index | Investment Adviser |
| SSgA Funds Management, Inc. | $21,199 | Index | Mutual Fund Manager |
| T. Rowe Price Associates, Inc. (Investment Management) | $8,640 | Growth | Mutual Fund Manager |
| Geode Capital Management LLC | $5,852 | Index | Investment Adviser |
| JPMorgan Investment Management, Inc. | $5,694 | Growth | Mutual Fund Manager |
| Franklin Advisers, Inc. | $5,497 | Growth | Mutual Fund Manager |
| Massachusetts Financial Services Co. | $5,213 | Growth | Mutual Fund Manager |
| Northern Trust Investments, Inc.(Investment Management) | $5,004 | Index | Investment Adviser |
| Renaissance Technologies LLC | $4,231 | Growth | Hedge Fund Manager |
| Magellan Asset Management Ltd. | $3,716 | Growth | Investment Adviser |
| Wellington Management Co. LLP | $3,228 | Growth | Mutual Fund Manager |
| Invesco Capital Management LLC | $3,043 | Growth | Investment Adviser |
| The California Public Employees Retirement System | $2,926 | Growth | Pension Fund Manager |
| Capital Research & Management Co. (Global Investors) | $2,768 | Growth | Investment Adviser |
| Pictet Asset Management SA | $2,755 | Growth | Investment Adviser |
| Legal & General Investment Management Ltd. | $2,754 | Index | Investment Adviser |
| Invesco Advisers, Inc. | $2,589 | Growth | Investment Adviser |
| BlackRock Investment Management (UK) Ltd. | $2,570 | Growth | Investment Adviser |
| Fidelity Management & Research Co. | $2,460 | Growth | Investment Adviser |
| Columbia Management Investment Advisers LLC | $2,406 | Growth | Mutual Fund Manager |
| Wells Fargo Clearing Services LLC | $2,290 | Growth | Private Banking/Wealth Mgmt |
| Managed Account Advisors LLC | $2,169 | Growth | Investment Adviser |
| Mellon Investments Corp. | $1,960 | Value | Investment Adviser |
| BlackRock Advisors (UK) Ltd. | $1,928 | Index | Investment Adviser |
| Goldman Sachs & Co. LLC (Private Banking) | $1,868 | Growth | Private Banking/Wealth Mgmt |
| Schweizerische Nationalbank (Investment Portfolio) | $1,806 | Growth | Bank Investment Division |
| Charles Schwab Investment Management, Inc. | $1,741 | Growth | Investment Adviser |
| Norges Bank Investment Management | $1,625 | Growth | Sovereign Wealth Manager |
| Nikko Asset Management Co., Ltd. | $1,623 | Value | Investment Adviser |
| **Total** | **$170,003** | | |

Source: FactSet. Holdings as of Q3 2019 or most recent filings. Market value based on stock price as of 12/31/19.
1.   Market value held across utility peers. Peers include AEE, AEP, CMS, DUK, ED, EIX, ES, ETR, SO, WEC, XEL

1    Accordingly, the new issue market for utilities is very deep, with
2    utilities able to access large amounts of equity capital at very efficient
3    pricing levels.
4        In particular, there has been a large amount of new equity issued in
5    the utilities sector over the past couple years.  This is reflected in the
6    following charts of new issuance volumes:

FIGURE 3-13



This very substantial amount of new utility equity has been well-received by the market.  This receptiveness is reflected by the tight discounts on these equity issuances, as shown above, which highlight the strong investor demand for new utility equity.

In sum, substantial new utility equity is readily absorbed by the market.

This strong receptiveness to new utility equity is also true specifically for California utilities.  Of particular significance, in July 2019, Edison International (EIX), had ready access to the equity markets, raising $2.2 billion at a 2.52 percent discount to last sale.  In addition to being recent and involving a close peer, the EIX transaction is particularly relevant because it was the first equity offering by a California utility subsequent to AB 1054.  It thus highlights AB 1054's importance in the eyes of equity investors, as a mitigating factor to the wildfire risks facing California utilities.

1    In addition, in 2018, the other major California IOU, Sempra, issued
2    new equity.  That issuance, of $4.6 billion, also was well received by
3    institutional investors.

4    **3.  Expected Equity Market Access for PG&E Upon Emergence**

5    The equity needed to finance PG&E's Plan is provided by the already-
6    existing equity backstop commitments.  After its emergence from BK, I
7    expect PG&E to have ongoing access to the equity markets to raise
8    additional capital.  This conclusion is based on the following features.

9    First, there is strong investor demand for utility equity broadly, as I
10   discuss above.  As noted, this includes demand for California utilities equity
11   post the passage of AB 1054.

12   Second, California's adoption of AB 1054 will, if constructively
13   implemented by regulators, mitigate the wildfire risk faced by California's
14   utilities.  Constructive regulatory implementation of AB 1054 stands to
15   improve both PG&E debt ratings and the discount that the equity market
16   might otherwise demand to account for wildfire risk over time, resulting in a
17   stronger PG&E equity valuation.  This will improve the terms on which
18   PG&E can access the equity markets in the medium and longer terms.

19   Third, as PG&E continues to deploy substantial capital to harden its
20   system and improve its infrastructure, it stands to lower its overall wildfire
21   risk.  This ongoing reduction in risk also should have a positive effect on
22   PG&E's valuation and access to the equity markets.

23   Fourth, PG&E has a path to improve its credit ratings in the coming
24   years, particularly as the rating agencies gain comfort with the consistent
25   regulatory implementation of AB 1054 and system hardening and safety
26   initiatives prove effective.

27   Fifth, the anticipated strong rate base growth, likely followed by income
28   growth, should put PG&E on a path to renewing its dividend pay-outs.  That
29   in turn will further expand its access to equity capital in the medium term, as
30   more income focused investors will increasingly be interested in owning
31   PG&E stock.

32   For all of these reasons, in my opinion PG&E is likely to have substantial
33   access to additional equity capital following its emergence under the PG&E
34   Plan, to help fund PG&E's substantial capital expenditure program.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 4**

**BOARD GOVERNANCE (SCOPING MEMO SECTION 3.1)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 4
BOARD GOVERNANCE (SCOPING MEMO SECTION 3.1)

TABLE OF CONTENTS

A.  Executive Summary............................................................................. 4-1

B.  Introduction...................................................................................... 4-2

C.  The Role of a Board of Directors, and Best Practices for Board
    Governance...................................................................................... 4-4

D.  The Composition, Committee Structure, and Practices of the PG&E
    Boards ............................................................................................ 4-10

    1.  PG&E's Nominating Criteria and Process for Board Members ............... 4-10

    2.  The Composition of the Current Boards................................... 4-12

    3.  The Boards' Committee Structure ........................................... 4-15

    4.  Governance-Related Practices of the Boards ........................... 4-17

E.  The Boards' Oversight of Safety, Risk, Compliance, and PSPS ................... 4-23

    1.  The Boards' Oversight of Safety, Risk, and Compliance.......................... 4-23

    2.  The Boards' Oversight of PSPS Issues.................................... 4-32

F.  The Boards' Commitment to Transparency ...................................... 4-33

Case: 19-30088   Doc# 7331-1   Filed: 05/15/20   Entered: 05/15/20 16:15:55   Page 91
of 276

# PACIFIC GAS AND ELECTRIC COMPANY
# CHAPTER 4
# BOARD GOVERNANCE (SCOPING MEMO SECTION 3.1)

## A. Executive Summary

- A board of directors' responsibility is to oversee the business and affairs of the company by establishing an appropriate "tone from the top," setting corporate policies and goals, working with executive management as management implements those policies and pursues those goals on a day-to-day basis, and holding management accountable for results. This requires directors who are independent, who have diverse skills, and who participate actively in the board and its committees.

- In 2019, PG&E Corporation and Pacific Gas and Electric Company (the Utility, and together with PG&E Corporation, PG&E) undertook a Board refreshment that added independent directors who have substantial restructuring and financial expertise, as well as experience in public safety, gas pipeline safety, utility operations, regulatory policy, and other matters. In 2020, PG&E will undertake a further Board refreshment that will focus on the director skills necessary to lead the companies following emergence from Chapter 11 in a manner that is beneficial for PG&E's customers and other stakeholders—with customer and workforce safety being PG&E's first and highest priority.

- PG&E is in the process of implementing a number of significant Board-level reforms, such as reevaluating PG&E's director skills matrix, strengthening director independence requirements, working to increase the number of California residents on the Boards, and enhancing Board committee oversight of safety and risk.

- PG&E's Boards utilize a well defined committee structure with clearly assigned roles. The PG&E Corporation and/or Utility Board committees include: (i) a Nominating and Governance Committee, which defines the mix of skills PG&E desires for the Boards, vets candidates, and reviews Board and committee performance; (ii) Safety and Nuclear Oversight (SNO) Committees, which generally oversee safety; (iii) a Compliance and Public Policy Committee, which coordinates the compliance oversight of the

various Board committees; (iv) a Compensation Committee, which oversees matters relating to compensation and benefits; (v) a Finance Committee, which oversees matters relating to financial and investment planning, policies, and risks; and (vi) Audit Committees, which oversee the allocation of risk management, among other things. Each of these committees is comprised exclusively of independent directors.

- The Boards recently have implemented a number of structural and other changes at PG&E to improve oversight in the related areas of safety, risk, and compliance. The Boards have been particularly focused on improving PG&E's Enterprise and Operational Risk Management (EORM) program.

- Board members also have been broadly focused on wildfire risk mitigation, including overseeing ways to mitigate the incidence and customer impacts of Public Safety Power Shutoffs (PSPS).

- Institutional Shareholder Services Inc. gives PG&E Corporation its highest score for board-level governance.

## B. Introduction

My name is Nora Mead Brownell. I am the independent, non-executive Chair of the Board of Directors of PG&E Corporation and a member of the Board of Directors of the Utility. I joined the PG&E Boards in April 2019 at a time of great upheaval for the companies. The Utility was and is on criminal probation as a result of the San Bruno tragedy in 2010, and PG&E was and is addressing multitudes of issues arising from the devastating 2017 and 2018 wildfires. Relatedly, PG&E had filed for Chapter 11 bankruptcy protection, and many stakeholders, including the Governor of the State of California, had called for a change in leadership. PG&E Corporation's Chief Executive Officer (CEO) and President and numerous other senior leaders had departed, and in connection with the Board refreshment, PG&E underwent a change in the membership of 80 percent of its Boards.

I and my fellow directors joined (or in the case of two directors, remained on) the Boards intending to chart a positive course forward. The Boards' first and highest priority is keeping customers and workers safe as PG&E provides reliable, affordable, and clean energy to its customers while returning to financial stability and health. The Boards that were seated in 2019 have devoted enormous time and energy to overseeing PG&E's efforts to rise to this

challenge. I detail below some of the structural and other changes we have implemented, and others we are in the process of implementing, in an effort to set PG&E on a successful long-term path that benefits PG&E's customers, shareholders, and other stakeholders.

I understand that Assembly Bill (AB) 1054, as codified in Public Utilities Code § 3292(b)(1)(C), requires the California Public Utilities Commission (CPUC or Commission) to consider "the reorganization plan and other documents resolving [the Utility's] insolvency proceeding, including [whether the Utility's] resulting governance structure [is] acceptable in light of the [Utility's] safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission." My testimony primarily concerns PG&E's governance at the Board level, and reflects what PG&E intends and anticipates will be its Board-level governance structure upon emergence from Chapter 11 under PG&E's proposed Plan of Reorganization.[1] My testimony is designed to assist the Commission as it evaluates the governance structure considerations prescribed under AB 1054, consistent with New York Stock Exchange (NYSE) rules as approved by the Securities and Exchange Commission. To ensure compliance with AB 1054 and public company governance rules, PG&E will incorporate into its Plan of Reorganization or related documents the direction the Commission provides in its decision in this proceeding with regard to Board-level governance.

My testimony below has four parts. First, I describe certain matters concerning boards of directors in general, such as the proper role of a board and best practices for board governance as set forth in various publications. Second, I describe the PG&E Boards following their refreshment in 2019, their committee structure, certain of their general governance practices, and certain Board-level reforms the Boards are making. Third, I discuss structural and other changes the new Boards have implemented to enhance oversight of the companies' efforts to improve safety culture and performance; to reduce risk; to ensure compliance with applicable laws, regulations, and policies; and to reduce

---

[1] My testimony largely does not differentiate between Board-level governance at PG&E Corporation and at the Utility because the governance structures of the two companies are substantively similar, the compositions of the two Boards are nearly identical, and the companies are submitting a joint Plan of Reorganization.

1     the incidence and impacts of PSPS events.  Fourth, I discuss the Boards'

2     commitment to transparency with the Commission, shareholders, customers,

3     and other stakeholders.

4 **C.  The Role of a Board of Directors, and Best Practices for Board Governance**

5        A board of directors' role, broadly stated, is to oversee the business and

6     affairs of the corporation.[2]  A board fulfills this role in a variety of ways,

7     including:

8       •   Setting an appropriate "tone from the top" to actively cultivate a

9           corporate culture that gives priority to integrity, ethical standards, full

10           compliance with legal requirements, professionalism, fair dealing, and

11           socially responsible pursuit of the company's business objectives;

12       •   Establishing and periodically reviewing the company's long-term vision,

13           strategy, policies, and goals, and management's plans for achieving

14           those goals;

15       •   Maintaining a close relationship with the CEO and other senior members

16           of management, and working with them to provide advice and insights

17           as they implement the company's policies and pursue its objectives on a

18           day-to-day basis; and

19       •   Holding the CEO and management accountable for results.[3]

20     Although the board oversees the company, it does not operate it on a daily

21     basis; that is the function of management.[4]

22        An effective board of directors—especially for an enterprise as complex and

23     multi-faceted as a gas and electric utility serving millions of customers—must

24     "have ... directors with a wide range of talents, expertise, and occupational and

---

**2**   See Corp. Code § 300(a) ("[T]he business and affairs of the corporation shall be managed, and all corporate powers shall be exercised by or under the direction of the board.").

**3**   See *NYSE Corporate Governance Guide*, at iii-iv (2014) (Exh. 2 hereto).

**4**   See Corp. Code § 300(a) ("The board may delegate the management of the day-to-day operation of the business of the corporation to a management company or other person provided that the business and affairs of the corporation shall be managed, and all corporate powers shall be exercised under the ultimate direction of the board.").

404

personal backgrounds."[5]  The board of a public utility serves a unique role in that it oversees the utility's provision of safe and reliable service for the well-being of its customers, while supporting economic development and environmental leadership in a time of dramatic impacts from climate change.  A board of a public utility thus needs, for example, several members with experience and expertise in the safe, reliable, and affordable delivery of electricity and gas services in dynamic operating environments.  A board of a public utility also needs members with experience and expertise in areas common to corporations more generally, such as accounting, finance, executive compensation, and corporate governance, among other things.[6]  A board's precise needs will be dictated by the nature of the company's business, the changing business and regulatory environment, changing customer expectations, emerging technologies, and other factors.

---

[5] National Association of Corporate Directors (NACD), *Board Evaluation:  Improving Director Effectiveness*, at 4 (2010); see *also* California Public Employees' Retirement System (CalPERS), *Governance and Sustainability Principles*, at 16 (Sept. 2019) (Exh. 3 hereto) ("Board attributes should include a range of skills and experience which provide a diverse and dynamic team to oversee business strategy, risk mitigation and senior management performance."); California State Teachers' Retirement System (CalSTRS), *Corporate Governance Principles*, at 5 (Nov. 2018) (Exh. 4 hereto) ("The board should be composed of diverse individuals with the skills, education, experiences, expertise and personal qualities that are appropriate to the company's current and long-term business needs."); Vanguard, *Semiannual Engagement Update*, at 2 (2019) (Exh. 5 hereto) ("An effective board should . . . reflect . . . diversity of skill, experience, and opinion."); *id.* at 4 ("Vanguard views diversity of thought, experience, and personal characteristics as an important governance matter and a fundamental trait of an effective board.").  The NACD publications cited herein are not publicly available, are made available only to NACD members, and therefore are not attached as exhibits.

[6] See NACD, *Board Evaluation:  Improving Director Effectiveness*, *supra*, at 5 ("An effective board will strive to become diverse professionally.  General management, manufacturing, engineering, marketing, law, accounting, research and development, human resources, finance, and the public sector may all be part of a virtually limitless mix of professional callings."); CalPERS, *supra*, at 16 ("Collectively director attributes should include expertise in accounting or finance, international markets, business, human capital management, industry knowledge, governance, customer-base experience or perspective, crisis response, leadership, strategic planning, and competence managing multifaceted risk—including expertise and experience in climate change and other environmental risk management strategies, where material to business model or operations."); CalSTRS, *supra*, at 5 ("The skills and experience needed include, but are not limited to, financial and/or accounting, industry expertise, business management, governance, customer service, leadership, risk management, including climate risk management and cyber-risk management, and strategic planning.").

A board also can benefit from demographic diversity.[7]  In fact, California law requires any public company with its principal executive offices in California to have at least one female director by the end of 2019, and between one and three female directors (depending on the size of the board) by the end of 2021.[8]

A board functions as a collective body and needs diversity among its members in part because "no single person can be expected to bring all relevant skill sets to a board."[9]  No one individual, for example, is likely to have experience with gas operations, and electric operations, and safety culture, and public safety, and occupational safety, and accounting, and finance strategy, and executive compensation, and financial restructuring, and cyber-security, and regulatory policy.  And even if one person did have all the requisite experience, diverse board members still would be necessary to facilitate the robust

---

[7]  See NACD, *The Diverse Board:  Moving from Interest to Action*, at 8 (2012) ("A comprehensive definition of diversity must include both ... identity and skills.  Given the nature of the business world today, neither aspect can be excluded from the other."); BlackRock, *Proxy Voting Guidelines for U.S. Securities*, at 4 (Jan. 2019) (Exh. 6 hereto) ("In identifying potential candidates, boards should take into consideration the full breadth of diversity including personal factors, such as gender, ethnicity, and age ... . In addition to other elements of diversity, we encourage companies to have at least two women directors on their board."); CalPERS, *supra*, at 16 ("Board diversity should be thought of in terms of skill sets, gender, age, nationality, race, sexual orientation, gender identity, and historically under-represented groups.  Consideration should go beyond the traditional notion of diversity to include a more broad range of experience, thoughts, perspectives, and competencies to help enable effective board leadership."); CalSTRS, *supra*, at 6 (similar); Deloitte Center for Corporate Governance, *Women in the Boardroom:  A Global Perspective*, at 6-7 (6th ed. 2019) (Exh. 7 hereto) ("We expect to see a growing consensus that women and other underrepresented groups are critical contributors to a well-composed board. ... Increased gender diversity at all levels leads to smarter decision-making, contributes to an organization's bottom line, powers innovation, and protects against blind spots, among other benefits."); Deloitte, *2016 Board Practices Report:  A Transparent Look at the Work of the Board*, at 6 (10th ed. 2017) (Exh. 8 hereto) (noting that board diversity includes "gender, race, ethnicity, generation/age and thought").

[8]  See Corp. Code § 301.3(a), (b).

[9]  See BlackRock, *supra*, at 4.

exchange of thoughts, ideas, and perspectives that lead to sound decision-making.[10]

A nominating and governance committee of the board typically makes recommendations to the full board regarding the range of skills, expertise, and experience that should be represented on the board in light of the company's evolving needs.[11] That same committee commonly vets Board member candidates, and then makes recommendations to the full board for who should be nominated for election at the annual shareholder meeting (or appointed by the board in the case of a vacancy between meetings).[12] The nominating and governance committee typically also reviews board and committee performance on a periodic basis.[13]

---

[10] See NACD, *The Diverse Board*, *supra*, at 8 ("[I]ncreasing the representation of ... diverse candidates will necessarily result in more diverse opinions, perspectives, and skills in the boardroom."); BlackRock, *supra*, at 4 ("[W]e expect boards to be comprised of a diverse selection of individuals who bring their personal and professional experiences to bear in order to create a constructive debate of competing views and opinions in the boardroom."); Vanguard, *supra*, at 2 ("We believe that diverse boards make better decisions, which can set in motion a virtuous circle that allows a company to innovate, seek out new customers, or enter new markets. If a company's board is capable, diverse, and experienced, good results are more likely to follow."); *id.* at 4 ("Studies have shown that diverse groups can make better decisions, and we believe that better decision-making can lead to better results over the long term.").

[11] See NACD, *Board Evaluation: Improving Director Effectiveness*, *supra*, at 8 ("[I]t is desirable to have an independent committee that is responsible for board excellence in both board composition and board operations. ... [T]he nominating or governance committee is an ideal vehicle for this effort."); NACD, *Building the Strategic-Asset Board*, at 23 (2016) ("Nominating and governance committees should develop a 'clean-sheet' assessment of the board's needs in terms of director skill sets and experience at least every two to three years, and use it as an input in continuous-improvement efforts ... ."); CalPERS, *supra*, at 19 ("The main role and responsibilities of the nomination committee should ... include[] ... [d]eveloping a skills matrix, by preparing a description of the desired roles, experience and capabilities for each appointment, and then evaluating the composition of the board."); Deloitte, *2016 Board Practices Report*, *supra*, at 15 (reporting that 61 percent of large cap companies surveyed "use a board skills matrix or similar tool").

[12] See CalPERS, *supra*, at 19 ("The main role and responsibilities of the nomination committee should ... include[] ... [l]eading the process for board appointments and putting forward recommendations to shareowners on directors to be elected and re-elected."); Financial Reporting Council, *UK Corporate Governance Code* ("UK Code"), at 8 (2018) (Exh. 9 hereto) ("The board should establish a nomination committee to lead the process for appointments.").

[13] BlackRock, *supra*, at 4 ("[R]egular performance reviews and skills assessments should be conducted by the nominating / governance committee.").

47

Other board committees also are essential to good governance.  The full board—particularly one with many members—cannot feasibly address every issue and make every decision that may come up in the process of overseeing the business and affairs of the company.  Rather, a well-run board uses a committee structure, with committees comprised of at least some members with experience in the areas assigned to the committee.[14]  Board committees can be empowered to require reports from management, can make reports and recommendations to the full board for board action, and also can have delegated authority to take certain actions and make certain decisions within defined limits.

Independence, like diversity, is also an important requirement when it comes to board and board committee composition, in that it is "widely recognized that independent boards are essential to a sound governance structure" and that "[i]ndependence is a cornerstone of accountability."[15]  Broadly speaking, an independent director, as defined by NYSE guidelines, is one who "has no material relationship with the ... company (either directly or as a partner, shareholder or officer of an organization that has a relationship with the company)."[16]  Independent directors should comprise at least a majority of a

---

[14] See, e.g., Deloitte Center for Board Effectiveness, *Framing the Future of Corporate Governance*, at 6 (2016) (Exh. 10 hereto) (observing that "board committees [have] become increasingly critical to the operations of the board," and that a board should "inventory[] the critical responsibilities of each governance element ... and then identify[] those that are appropriate for a board committee and those best addressed by the full board").

[15] CalPERS, *supra*, at 11.

[16] NYSE Listed Company Manual § 303A.02(a).

48

1   public company board and of its committees (with NYSE guidelines requiring
2   certain committees to be fully independent).[17]

3       Director independence from outside political or other influences also is
4   important.  Directors owe fiduciary duties to shareholders and generally are
5   required to act in the shareholders' best interests (subject to exceptions or
6   qualifications in certain contexts, such as insolvency when directors can be
7   required to act in the best interests of creditors).[18]  The directors of PG&E, in
8   my experience, have taken into account impacts on customers and other
9   stakeholders as we have discharged these fiduciary duties.  Directors must be
10  free to consider and balance all such considerations in an unbiased fashion, and
11  must avoid conflicts of interest that could impair their ability to do so (or if a
12  director is conflicted on a particular matter, he or she ordinarily would abstain
13  from voting or exerting influence on the matter).[19]  If a director is inherently
14  beholden to an outside political or other constituency, then the director can be

---

[17] See NACD, *Board Evaluation:  Improving Director Effectiveness*, *supra*, at 4 ("A board with the right people will have a substantial majority of independent directors ... ."); BlackRock, *supra*, at 2 ("We expect a majority of the directors on the board to be independent.  In addition, all members of key committees, including audit, compensation, and nominating / governance committees, should be independent."); CalPERS, *supra*, at 11 ("Nearly all corporate governance commentators agree that boards should be comprised of at least a majority of 'independent directors.'"); *id.* at 11 ("Committees who perform audit, director nomination and executive compensation functions should consist entirely of independent directors."); CalSTRS, *supra*, at 5 ("The board should be comprised of at least two-thirds of independent directors who do not have a material or affiliated relationship with the company, its chairperson, CEO or any other executive officers."); *id.* at 6 ("Companies should have audit, nominating and compensation committees.  Those committees should be composed of at least three independent directors."); UK Code, *supra*, at 7 ("At least half the board, excluding the chair, should be non-executive directors whom the board considers to be independent.").

[18] See Corp. Code § 309(a) ("A director shall perform the duties of a director ... in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances."); CalPERS, *supra*, at 10 ("As a fiduciary, a director owes a duty of loyalty to the corporation and its shareowners and must exercise reasonable care in relation to his or her duties as a director."); CalSTRS, *supra*, at 7 ("The ultimate responsibility of the board is to serve the interests of its shareholders.").

[19] See Corp. Code § 310; CalPERS, *supra*, at 12 ("If a director has an interest in a matter under consideration by the board, then the director should promptly declare such an interest and be precluded from voting on the subject or exerting influence.").

1  compromised in fulfilling his or her duties, leading to distorted and suboptimal
2  decision-making.

3      PG&E's Boards fulfill all of the best practices described above, as discussed
4  in detail below.

5  **D. The Composition, Committee Structure, and Practices of the PG&E Boards**

6      In this section of my testimony, I discuss (i) PG&E's nominating criteria and
7  process for Board members; (ii) the composition of the current Boards; (iii) the
8  current Boards' committee structures; and (iv) various governance-related
9  structures and practices of the Boards, as well as Board-level reforms currently
10  being undertaken.

11      **1. PG&E's Nominating Criteria and Process for Board Members**

12      PG&E as a matter of policy seeks to ensure that its Boards are
13  comprised of dedicated, ethical, and highly regarded individuals who
14  collectively have experience relevant to PG&E's multifaceted operations,
15  who understand the complexities of its business environment, and who
16  possess the capabilities necessary to provide valuable insight, judgment,
17  and oversight. PG&E historically has had and continues to have a robust
18  process for identifying and seeking out such a diverse range of individuals.

19      Specifically, the PG&E Corporation Nominating and Governance
20  Committee, which is comprised entirely of independent directors, annually
21  reviews with each Board, and submits for each Board's approval, its
22  recommendations for the appropriate skills and characteristics required of
23  directors in the context of the current composition of each Board. When the
24  Committee conducts this assessment, it considers intellectual and
25  demographic diversity, skills, career experience, and other factors as it
26  deems appropriate given the current needs of each Board and of each
27  company. The Committee's recommendations are then accepted, rejected,
28  or modified by each Board, as appropriate.

29      The product of this process is what PG&E calls its "director skills
30  matrix"—a list of the range of backgrounds, experience, skills, and expertise
31  that PG&E desires to balance on its Boards so that each Board is well
32  positioned as a collective body to oversee a business as vast and complex
33  as PG&E's. Though I was not on the Boards at the time, I understand that

in December 2017, the Nominating and Governance Committee recommended adding safety to the director skills matrix consistent with a recommendation from NorthStar Consulting Group (NorthStar).[20]  I also understand that the full Boards explicitly added safety to the matrix in February 2018, and reapproved its inclusion in the skills matrix for 2019. I understand that PG&E had sought safety experience for its Boards prior to December 2017, but wanted to make this explicit in the matrix.

PG&E currently is undertaking its annual process of reevaluating the matrix, and plans to retain a nationally recognized independent search firm to assist.  PG&E intends that its new matrix will include criteria to encourage the election of directors who collectively reflect some or all of the following attributes, expertise, or experience, all of which are germane to PG&E's needs and business and safety environment going forward:

- Wildfire safety, preparedness, prevention, mitigation, response, and/or recovery;
- Workforce safety and/or public safety;
- Technology and cybersecurity;
- Nuclear generation safety;
- Natural gas transmission, distribution, operation, and safety;
- Public policy (legal, regulatory, or government);
- Leadership in the energy or utility industry;
- Utility operation or related engineering experience;
- Innovation and technology in the clean energy or utility industry;
- Risk management (including enterprise risk management);
- Climate change mitigation or climate resilience;
- Renewable energy and related engineering experience;
- Financial performance and planning;
- Financial literacy;

---

[20] See NorthStar Consulting Group, *Final Report:  Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture*, at I-12 (May 8, 2017) (NorthStar Report) (recommending that PG&E "[a]dd safety to the list of qualifications used in selecting Independent Directors to the Board(s) of PG&E Corp. and PG&E").  NorthStar subsequently reported that "[t]his recommendation has been implemented."  NorthStar Consulting Group, *First Update to Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture*, at III-55 (Mar. 29, 2019) (NorthStar First Update).

- Audit;
- Management incentives;
- Labor relations;
- Large scale customer experience;
- Public company board experience; and
- Community leadership.

PG&E intends to require that, to be eligible for nomination by the Boards for election as a director, an individual must satisfy a minimum number of qualifications identified on the skills matrix (as further defined in consultation with the independent search firm), consistent with the goal of establishing Boards that collectively reflect the range of attributes set forth in the matrix.

The Nominating and Governance Committee not only leads the process of developing the director skills matrix, but also receives and makes recommendations for which individuals should be nominated or selected to serve as new directors and for re-nominating existing directors. The Committee receives recommendations from a variety of sources, including shareholders, management, Board members, and independent search firms. The Committee intends that the independent search firm that will assist with the current reevaluation of the matrix also will assist with the nomination process, including by identifying Board member candidates, vetting all candidates (other than the companies' respective CEOs), and preparing a list of candidates fulfilling the matrix criteria and otherwise qualified to serve.

After the Committee makes its recommendations to the full Boards, each Board as a whole decides whom to nominate or re-nominate for election at the annual meeting of shareholders. Notwithstanding Committee or Board recommendations, under California statutory law, shareholders are the ones who ultimately choose whom to elect.[21] Shareholders also can nominate their own candidates, including by availing themselves of PG&E Corporation's proxy access bylaw provisions (discussed below).

## 2. The Composition of the Current Boards

Following the devastating Northern California wildfires in 2017 and the Camp Fire in 2018, PG&E made the decision to file for Chapter 11

---

[21] See Corp. Code § 301.

1  bankruptcy protection, and also received calls from many quarters, including
2  the Governor of California, to change its leadership.  In January 2019,
3  PG&E announced that it would undertake a Board refreshment.  PG&E
4  sought new directors with the skills and experience necessary to lead the
5  companies through Chapter 11, and sought to implement NorthStar's
6  recommendation to "[a]dd Independent Directors to the Board who have
7  experience with safety."[22]  In April 2019, the Boards voted in favor of
8  appointing numerous new Board members, and eight of 10 incumbent
9  directors voluntarily resigned.

10         The Board refreshment, which continued through October 2019,
11  substantially revamped the Boards; only two incumbent directors remain,
12  and the number of current directors on the Boards has increased to 14 for
13  PG&E Corporation and 15 for the Utility.  The Board refreshment brought to
14  PG&E fresh perspectives, and a range of diverse backgrounds,
15  experiences, skills, and expertise.  Notably, the new Boards include
16  (i) William D. Johnson, the new PG&E Corporation CEO and President
17  who sits on the Boards of both PG&E Corporation and the Utility; and
18  (ii) Andrew M. Vesey, the new Utility CEO and President who sits on the
19  Board of the Utility.

20         On July 3, 2019, PG&E submitted a Compliance Filing (Exhibit 1 hereto)
21  in the Safety Culture Order Instituting Investigation (OII) (I.5-08-019) that
22  describes, among other things, each director's safety-specific education and
23  training; direct, supervisorial, or management level safety-specific work
24  experience; and safety-specific board of directors' experience.  I will not
25  repeat that lengthy material here, but rather attach it hereto and incorporate
26  it by reference.[23]  I nevertheless describe the backgrounds of three
27  directors who were not included in the Compliance Filing because they
28  joined the Boards subsequent to that filing: (i) Mr. Vesey, who joined the
29  Utility's Board in August 2019; (ii) William L. Smith, who joined both Boards
30  in October 2019; and (iii) John M. Woolard, who also joined both Boards in
31  October 2019.

---

[22]  NorthStar Report at I-12.

[23]  Since the Compliance Filing, Kenneth Liang and Frederick Buckman resigned from the
Boards.

1  Mr. Vesey brings more than 35 years of diverse utility industry
2  experience, including several roles as CEO at major energy companies.
3  Before he joined the Utility as its new CEO and President and as a Board
4  member, he served as the Managing Director and CEO of Sydney-based
5  AGL Energy Limited, an integrated Australian energy company serving
6  about 3.7 million electric and natural gas customers and operating
7  20 percent of the country's power generation capacity.  Mr. Vesey
8  committed as AGL's top leader to closing all of the company's coal-fired
9  generation.  Before Mr. Vesey was with AGL, he served in a number of
10  successively greater leadership roles at energy companies such as AES
11  Corporation, where he was the Chief Operating Officer, and Entergy
12  Corporation and Niagara Mohawk Power Corporation, where he served as a
13  senior leader.  Mr. Vesey also spent a number of years as an energy
14  industry consultant and leader at firms that included FTI Consulting and
15  Ernst & Young LLP.  He also served as Managing Director and CEO of
16  Melbourne-based CitiPower.
17  Mr. Smith is the retired President of AT&T Technology Operations at
18  AT&T Services, Inc., where he spent 37 years with the telecommunications
19  service provider and its predecessor companies.  He held a number of
20  senior officer positions at AT&T, including President of Network Operations
21  where he oversaw data center and information technology operations;
22  DIRECTV field operations; and planning, engineering, construction,
23  provisioning, and maintenance for the company's wireless and wireline
24  networks.  He also served as Executive Vice President of Shared Services
25  for AT&T and Chief Technology Officer for BellSouth Corporation.  Mr. Smith
26  brings to PG&E a comprehensive focus on large-scale integration and
27  modernization of vast infrastructure networks, an ability to identify and
28  leverage new technologies to meet future business needs, and a track
29  record of delivering on commitments to public and employee safety.
30  Mr. Woolard is CEO of Meridian Energy (an energy consulting and asset
31  acquisition company) and a Senior Operating Partner at San Francisco-
32  based Activate Capital.  He has more than 20 years of experience as an
33  executive in the energy technology sector.  Mr. Woolard previously served
34  as the President and CEO of BrightSource Energy, where he led the

1    development, construction, and commissioning of the Ivanpah Solar Electric

2    Generating System in the Mojave Desert.  He also served as CEO of Silicon

3    Energy Corp., was Vice President of Energy at Google, and headed the

4    Energy Management Solutions Group at Itron Inc.  Mr. Woolard has

5    extensive experience in developing world-class clean energy projects,

6    brings to PG&E a technological background and understanding of software

7    and grid modernization solutions, and is well versed in California's

8    regulatory and policy goals.  He is a long-time California resident.

9    **3.  The Boards' Committee Structure**

10    As discussed above, effective Board governance requires a well-defined

11    committee structure with clearly assigned responsibilities.  PG&E's standing

12    Board committees, their current membership, and their basic responsibilities

13    are set forth in the following chart (and their respective charters are attached

14    as Exhibits 13 to 22 hereto):

| Committee | Membership | Description |
|---|---|---|
| Audit (PG&E Corporation and the Utility) | Dominique Mielle (Chair)<br><br>Richard R. Barrera<br><br>Eric D. Mullins | Oversee and monitor:<br>• Integrity of the company financial statements, and financial and accounting practices;<br>• Internal controls over financial reporting, and external and internal auditing programs;<br>• Selection and oversight of the companies' independent auditor;<br>• Compliance with legal and regulatory requirements, in concert with other Board committees;<br>• Related party transactions; and<br>• Risk management and assessment with the assistance of other Board committees. |
| Compensation (PG&E Corporation) | Meridee A. Moore (Chair)<br><br>William L. Smith<br><br>Alejandro D. Wolff | Oversees matters relating to compensation and benefits, including:<br>• Development, selection, and compensation of policy-making officers;<br>Employment, compensation, and benefits policies and practices;<br>• Potential risks arising from compensation policies and practices; and<br>• Retention and oversight of the Committee's independent compensation consultants, legal counsel, or other advisors. |
| Compliance and Public Policy (PG&E Corporation) | Kristine M. Schmidt (Chair) | Coordinates the compliance-related oversight of the various committees of the Boards, including: |

| Committee | Membership | Description |
|---|---|---|
| | Jeffrey L. Bleich<br><br>Cheryl F. Campbell<br><br>Michael J. Leffell<br><br>Alejandro D. Wolff<br><br>John M. Woolard | • The companies' compliance and ethics program;<br>• Compliance with laws, regulations, and internal policies and standards; and<br>• Internal or external compliance reviews or audits.<br><br>Oversees public policy, sustainability, and corporate responsibility issues that could affect customers, shareholders, or employees, including:<br>• Energy policy positions;<br>• Environmental protection, quality, and compliance;<br>• Community relations programs, activities, and contributions;<br>• Political contributions and political activities; and<br>• Diversity and inclusion.<br><br>Oversees the progress of the Wildfire Safety Program, and regularly reports on such progress to the full Board (although this responsibility will be transitioned to the SNO Committees). |
| Executive (PG&E Corporation and the Utility) | Nora Mead Brownell (Chair of the PG&E Corporation Executive Committee)<br><br>Jeffrey L. Bleich (Chair of the Utility Executive Committee)<br><br>Richard R. Barrera<br><br>Cheryl F. Campbell<br><br>William D. Johnson<br><br>Michael J. Leffell<br><br>Dominique Mielle<br><br>Meridee A. Moore<br><br>Kristine M. Schmidt<br><br>Andrew M. Vesey (Utility Executive Committee only) | Exercise powers and perform duties of the applicable Board subject to limits imposed by state law. |
| Finance (PG&E Corporation) | Richard R. Barrera (Chair)<br><br>Cheryl F. Campbell<br><br>Fred J. Fowler<br><br>Meridee A. Moore<br><br>William L. Smith | Oversees matters relating to financial and investment planning, policies, and risks, including:<br>• Strategic plans and initiatives;<br>• Financial and investment plans and strategies; and<br>• Dividend policy. |

| Committee | Membership | Description |
|---|---|---|
| Nominating and Governance (PG&E Corporation) | Michael J. Leffell (Chair)<br><br>Meridee A. Moore<br><br>Kristine M. Schmidt<br><br>John M. Woolard | Oversees matters relating to selection of directors and corporate governance, including:<br>• Recommending Board candidates, including reviewing skills and characteristics required of Board members;<br>• Selection of the chairmanship and membership of Board committees, and the nomination of a lead director of each company's Board, if necessary;<br>• Corporate governance matters, including the companies' governance principles and practices, and the review of shareholder proposals; and<br>• Evaluation of the Boards' performance and effectiveness. |
| Safety and Nuclear Oversight (PG&E Corporation and the Utility) | Cheryl F. Campbell (Chair)<br><br>Jeffrey L. Bleich<br><br>Nora Mead Brownell<br><br>Fred J. Fowler<br><br>Eric D. Mullins<br><br>Kristine M. Schmidt<br><br>William L. Smith | Oversee matters relating to safety, operational performance, and compliance issues related to the Utility's nuclear, generation, gas and electric transmission, and gas and electric distribution operations and facilities ("Operations and Facilities"), including:<br>• Principal risks arising out of the Operations and Facilities, the process used by management to analyze and identify those risks, and the effectiveness of programs to manage or mitigate those risks;<br>• The Utility's goals, programs, policies, and practices with respect to promoting a strong safety culture; and<br>• Periodically visiting the Utility's nuclear and other operating facilities.<br><br>The SNO Committees also will oversee the progress of the Wildfire Safety Program, and regularly report on such progress to the full Boards (a responsibility being transitioned from the Compliance and Public Policy Committee). |

1       PG&E's Corporate Governance Guidelines ensure that the governance
2  and committee structure is dynamic and agile.  The various Board
3  committees also work together, coordinating on matters that cut
4  across the purviews of different committees, including holding joint
5  committee meetings.

6  **4.  Governance-Related Practices of the Boards**
7       PG&E as a matter of policy adheres to robust Board-level governance
8  best practices in numerous additional respects, including:

- PG&E's current Corporate Governance Guidelines require at least
  75 percent of the directors to be independent, consistent with the best
  practices described above. At present, however, *all* directors are
  independent except for Mr. Johnson who sits on both Boards and
  Mr. Vesey who sits on the Utility's Board. PG&E intends that, going
  forward, all directors will be independent except for the companies'
  CEOs.

- Both the PG&E Corporation and Utility Board Chairs are independent
  directors. This is consistent with best practices.[24]

- All committee Chairs are independent directors, as are all committee
  members (except that Mr. Johnson is a member of the Boards'
  respective Executive Committees, and Mr. Vesey is a member of the
  Utility Board's Executive Committee). Again, this is consistent with the
  best practices described above.

- Board members have one-year terms, thereby maximizing their
  accountability to shareholders and other stakeholders.[25] PG&E
  considered and decided against classified Boards whose members
  would stand for reelection on a staggered basis less frequently than

---

[24] See CalPERS, *supra*, at 11 ("The board should be chaired by an independent director."); CalSTRS, *supra*, at 5 (same).

[25] See, e.g., BlackRock, *supra*, at 5 ("[D]irectors should be re-elected annually … ."); CalPERS, *supra*, at 10 ("Every director should be elected annually. Accountability mechanisms may require directors to stand for election on an annual basis … ."); CalSTRS, *supra*, at 6 ("CalSTRS supports annual election of all directors and believes directors should be accountable to the shareholders they represent and therefore should stand for election every year."); UK Code at 8 ("All directors should be subject to annual re-election.").

| 1 | annually, because classified boards generally are thought to reduce |
| 2 | accountability and therefore to be inconsistent with best practices.[26] |

3 • The Boards currently exceed the gender diversity requirement of
4 Corporations Code § 301.3, in that five directors are women. The
5 Boards also are racially diverse. This is consistent with the best
6 practices described above.

7 • Thirty-six percent of the current Board of PG&E Corporation, and 40% of
8 the current Board of the Utility, are California residents. PG&E intends to
9 use its best efforts to achieve a target of at least 50 percent California
10 resident directors at Chapter 11 emergence.

11 • As noted, Board and committee performance is evaluated periodically in
12 a process led by the Nominating and Governance Committee. This
13 process typically includes one-on-one interviews with each director about
14 the performance of the Boards and of the committees. This is consistent
15 with the best practices described above.

16 • Board and/or committee meetings are regularly attended by senior
17 management, including the PG&E Corporation and Utility CEOs, the
18 Chief Ethics and Compliance Officer, the Chief Safety Officer, and the
19 Chief Risk Officer. The Boards and certain of their committees also
20 receive regular reports from these officers concerning establishment of
21 and performance on safety, compliance, ethics, and risk metrics
22 (including, in some cases and as appropriate, reports on any significant
23 delays or lack of cooperation by managers in obtaining information
24 necessary for the preparation of the reports).

---

[26] See, e.g., BlackRock, *supra*, at 5 ("[C]lassification of the board dilutes shareholders' right to promptly evaluate a board's performance and limits shareholder selection of directors."); CalSTRS, *supra*, at 6 ("The board is expected to be declassified and not have staggered terms."); Glass Lewis, *An Overview of the Glass Lewis Approach to Proxy Advice*, at 15 (2020) (Exh. 11 hereto) ("[W]e may recommend that shareholders vote against the chair of the governance committee, or the entire committee, where the board has amended the company's governing documents to reduce or remove shareholder rights … . Examples … include … the adoption of a classified board structure … ."); Institutional Shareholder Services Inc., *United States Proxy Voting Guidelines Benchmark Policy Recommendations*, at 12-13 (Nov. 2019) (Exh. 12 hereto) (describing as "[p]roblematic" "[a] classified board structure" or if "[t]he company has opted into, or failed to opt out of, state laws requiring a classified board structure").

- As described more fully below, the Boards' respective Audit Committees annually review enterprise risks (with oversight of specific risk categories allocated to various Board committees in accordance with their specific charters—an allocation that is reviewed annually). The Audit Committees, the SNO Committees, and the Compliance and Public Policy Committee hold semi-annual joint meetings so as to coordinate activities, learning, and oversight.

- New Board members receive information and training on subjects that will assist them in discharging their duties. For example, in April 2019, the Boards had a two-day on-boarding session and Board meeting during which newly added directors and the continuing directors met with PG&E officers to, among other things, discuss the overall context for PG&E's current situation, share key information, establish the Boards' governance framework, and discuss areas of focus. More recently, Messrs. Smith and Woolard had a similar onboarding session that included a visit to PG&E's Emergency Operations Center used during the recent PSPS events. The Boards also receive recurring safety training apart from the onboarding process, including information on applicable safety and regulatory standards. This is all consistent with best practices.[27]

- The PG&E Corporation Board has adopted proxy access bylaw provisions that permit shareholders owning at least 3 percent of the outstanding common stock for at least three years to nominate the greater of two directors or 20 percent of the PG&E Corporation Board,

---

[27] See, e.g., *NACD, Building the Strategic-Asset Board*, at 16 (2016) ("Onboarding processes help support continuous improvement on the board by enabling new directors to quickly engage and become active contributors to boardroom deliberations.").

1  and to include such nominees in the PG&E Corporation proxy materials.
2  This is consistent with best practices.[28]

3  • PG&E's Corporate Governance Guidelines prescribe specific rules
4  regarding service on other boards, consistent with best practices.[29]
5  Directors who are considering service on the board of a public company
6  other than PG&E Corporation and its subsidiaries (including the Utility)
7  must notify the Chair of the Nominating and Governance Committee and
8  the Chair of each Board before accepting membership on any such
9  outside board.  Also, unless otherwise approved by PG&E Corporation's
10  Board of Directors and/or the Utility's Board of Directors (as applicable),
11  (i) a director may not serve on more than three public company boards in
12  addition to the Boards of PG&E Corporation and its subsidiaries
13  (including the Utility); and (ii) a director who is the principal executive
14  officer of a public company (including PG&E Corporation and the Utility)
15  may not serve on more than two public company boards in addition to
16  the board of his or her employer.[30]

17   Notably, in the ongoing Safety Culture OII and other venues, the
18  Commission, parties, and commentators have suggested that PG&E adopt,
19  or urged it to adopt, certain corporate governance measures that PG&E
20  already had adopted.  For example, the Scoping Memo in the Safety Culture
21  OII asked whether PG&E should "form an independent nominating
22  committee to identify and select candidates for the Board of Directors," and
23  whether PG&E should "identify specific criteria for potential Board of

[28]  See BlackRock, *supra*, at 16 ("We believe that long-term shareholders should have the opportunity, when necessary and under reasonable conditions, to nominate directors on the company's proxy card."); CalSTRS, *supra*, at 14 ("Companies should allow shareholder access to the director nomination process and to the company's proxy statement.  Generally, CalSTRS believes that a long-term investor or group of investors owning in aggregate at least three percent of the company's voting stock for three years should be able to nominate the lessor of 2 directors or 25 percent of the number of directors outlined in the company's current proxy statement for the annual election of directors.").

[29]  See BlackRock, *supra*, at 3 (stating that "a director [should not] serve[] on an excess number of boards, [because this] may limit his/her capacity to focus on each board's requirements"); UK Code at 7 ("Additional external appointments should not be undertaken without prior approval of the board ... .").

[30]  For purposes of this policy, the Boards of PG&E Corporation and its subsidiaries (including the Utility) are considered one board.

Directors members."[31]  As noted above, PG&E Corporation's independent
Nominating and Governance Committee fills this role, including development
and ongoing evaluation of the director skills matrix.  The Scoping Memo also
asked whether PG&E should "form an audit committee constituted of
independent directors possessing safety and financial expertise ... to
evaluate the Board of Directors' discharge of their duties and make
recommendations for qualifications of future members of PG&E's Board of
Directors."[32]  As noted, PG&E Corporation's Nominating and Governance
Committee performs these functions.  Also, the SNO Committees, whose
members possess deep safety expertise, are involved in safety matters.
The Audit Committees also are involved with safety issues, including the
allocation of risk oversight across committees and ensuring appropriate
coordination among committees.

PG&E Corporation's scores on a standardized global assessment of
sound governance confirm the quality of its Board-level governance.
Institutional Shareholder Services Inc., a leading provider of corporate
governance research, assigns "QualityScores" to companies' governance.
With scores ranging from 1 to 10, a score in the higher deciles (with "1"
being the highest) indicates relatively higher quality governance practices
and relatively lower governance risk.  As of January 9, 2020, PG&E
Corporation has a "1" for its overall QualityScore across various metrics,
including a subscore of "1" for board structure—the highest scores possible.
By contrast, as of the same date, the average publicly reported scores for
14 peer utility companies were much worse:  3.57 overall and 5.29 for
board structure.

The Boards recognize that as circumstances change, the companies'
needs change.  Accordingly, the Boards expect that as the companies
emerge from Chapter 11, a number of the current directors will depart and
be replaced, consistent with the companies' bylaws.  In accordance
with the requirements under the Bankruptcy Code for confirmation of a
Chapter 11 plan, PG&E will disclose prior to a Chapter 11 plan confirmation

---

[31] Assigned Commissioner's Scoping Memo and Ruling, I.15-08-019, at 10 (Dec. 21, 2018).

[32] *Id.*

1  hearing the identity and affiliations of any individual it proposes to serve as a
2  director of the post-emergence reorganized Utility.

3  **E. The Boards' Oversight of Safety, Risk, Compliance, and PSPS**

4  My testimony above primarily concerns the Boards' structures, polices, and
5  practices in general.  My testimony below focuses specifically on actions the
6  new Boards have undertaken and changes they have implemented with respect
7  to oversight of the related areas of safety, risk, compliance, and PSPS.

8  **1.  The Boards' Oversight of Safety, Risk, and Compliance**

9  The Boards view customer and workforce safety as PG&E's first and
10  highest imperative.  The Boards firmly believe that safety is job one because
11  safety is the right thing to do, period.

12  Safety also is critical to PG&E's long-term financial stability as it
13  emerges from Chapter 11.  Safety and financial performance go hand in
14  hand at PG&E.  Strong safety performance is vital for solid financial
15  performance, and conversely, strong financial performance is necessary to
16  fund safety improvements such as system hardening.  For example, a
17  catastrophic public safety event can have a devastating effect on the
18  companies' financial performance, as demonstrated by the current
19  Chapter 11 proceedings and the substantial decline in PG&E Corporation's
20  stock price since the 2017 and 2018 wildfires.  Conversely, poor financial
21  performance can, at a minimum, increase the costs of the capital needed to
22  fund safety investments—increased costs that are passed on to customers.
23  Extended poor financial performance also can lead to an inability to raise
24  capital or fund programs, a loss of talent, and a need to increase rates.

25  The following summarizes some of the structural and other reforms the
26  Boards implemented in 2019 to enhance oversight of safety, risk, and
27  compliance:

28  Oversight of the EORM Program:  The Boards have taken steps to
29  enhance PG&E's EORM program, which identifies, analyzes, evaluates,
30  monitors, and mitigates risks that might prevent PG&E from achieving its
31  fundamental objective of delivering safe, reliable, affordable, and clean
32  energy to its customers.  Under the EORM program, improved data and
33  advances in quantitative risk assessment not only have benefited

management in carrying out its day-to-day risk management activities, but also have given the Boards a clearer view of the risks and empowered them to provide better oversight.  As the EORM program improves, the full Boards receive periodic updates that include progress made, challenges being addressed, and next steps.

The new Boards developed a broad understanding of PG&E's top risks and the elements of the EORM program.  They requested additional information about the history and trajectory of the risk program and discussed the program during formal Board meetings and multiple in-person and telephonic meetings with senior management.  After the new Boards obtained an understanding of the EORM program, they took specific steps to improve it.  For example, after the Boards received descriptions of the primary challenges the EORM team was facing, the Boards identified certain themes, such as challenges with data collection, and helped the EORM team think through potential strategies to address each topic systematically. The Boards then established targets for those areas and followed up with the EORM team to track progress.

Below are additional examples of changes the Boards recently have implemented to improve risk management:

- The Boards have imposed additional rigor around risk reporting, endorsing the use of the Bowtie Analysis[33] as a standard way of quantitatively evaluating risk and communicating the key drivers of risk, the performance of critical controls, and the effectiveness of risk reduction activities.  The Boards have made clear that they expect risk presentations to include, at a minimum:  (i) a deep dive view of the risk or risk topic centered on a Bowtie Analysis; (ii) metrics that illustrate progress and effectiveness of mitigations over time; and (iii) descriptions of any associated open high-risk audit items.

- The Boards have imposed additional accountability for risk matters. They have required that each "enterprise risk" on PG&E's "risk register"

---

[33] A Bowtie Analysis is a recognized method of risk analysis that has developed over the course of several decades in the oil, gas, and other industries. It uses the historical frequency of known risk drivers to determine the probability of risk event occurrence and to understand the potential consequences of such occurrence.

1   have an identified "risk owner" who provides a progress update at least
2   once every 12 months. (An "enterprise risk" is a risk that could prevent
3   PG&E from fulfilling its mission of safely and reliably delivering affordable
4   service, and the "risk register" is currently a list of 36 such risks identified
5   through the EORM program.)

6   • The Boards have directed management to focus on developing the right
7     data sources to better inform decision-making and to make clear when
8     risk mitigation decisions are data-driven or based on subject-matter
9     expertise. If decisions are data-driven, the Boards have asked
10    management to communicate the level of confidence in the data used for
11    the decision and how management is working to improve it, as
12    necessary.

13  • The Boards have requested a view of spend by risk and, to the extent
14    possible with current modeling techniques, the risk reduction value of
15    that spend. This information will be useful in optimizing spend across all
16    risks on PG&E's risk register.

17  • The Boards have encouraged management to seek alternative
18    perspectives on how risk management is organizationally structured,
19    how the EORM program compares to out-of-industry best practices such
20    as the practices of airlines and other non-utility entities, and the quality of
21    the staff performing risk management functions.

22  • The Boards have set targets for management to address and close high-
23    risk audit items more quickly. The status of improvement activities is
24    now tracked at the senior leader level, and performance is presented at
25    the Board level.

26   Creation of the ISOC: The Boards have supported the creation of the
27   Independent Safety Oversight Council (ISOC), which is described in detail in
28   Mr. Vesey's testimony submitted herewith. In brief, the ISOC is modeled on
29   independent safety oversight committees that have been established and
30   used with success in the areas of nuclear power and dam operations. It will
31   provide independent oversight and review of the Utility's operations,
32   including safety and regulatory compliance, safety leadership, and
33   operational performance. ISOC members will conduct field visits,
34   interviews, and observations as necessary to evaluate areas of

responsibility, as well as reviews of documentation relating to safety performance. It will meet regularly and prepare reports highlighting performance for particular periods, including an annual performance evaluation. The ISOC began its work in December 2019 and initially focused on electric operations wildfire safety. It will scale throughout 2020 such that every area of the business is covered by a safety assurance function.

The ISOC is chaired by Christopher Hart, the immediate past chair of the National Transportation Safety Board, and is comprised of members with deep technical safety expertise in a diverse range of relevant areas such as wildfire safety. Such members currently include Mr. Randy Lyle (former Battalion Chief with the California Department of Forestry and Fire Protection, and wildfire mitigation program manager with San Diego Gas & Electric Company), Ms. Lynn Walter (veteran of multiple safety review boards across the utility industry), Mr. Frank Gallaher (former chief operating officer of Entergy with over 40 years of utility experience), and Mr. Gus Ponce (senior director at Exelon with more than 40 years of experience in electric transmission and distribution operations). All of the ISOC's members besides Mr. Hart are external to PG&E.

The ISOC's reports and recommendations, and any responses from the lines of business, will be provided to the SNO Committees and the full Boards. The ISOC will be a useful independent resource to management and the Boards going forward.

Effective Interactions With Management: NorthStar emphasized the importance of the Boards engaging with and challenging management.[34] The new Boards have sought to more effectively implement this. For example, the new Boards have established guidance that presentations to the Boards should address the key takeaways up front and take no more than 50 percent of the allotted time to leave time for dialogue and questions. The new Boards also have taken a proactive, probing approach—for example, asking management how confident it is in risk-related data, asking management how it is working to improve data quality, and asking

---

[34] See, e.g., NorthStar First Update at III-58.

management to seek out alternative perspectives on a variety of safety- and risk-related matters. The Boards also are working with management to identify ways to ensure that the companies achieve greater operational efficiency and financial discipline to enhance value to customers while continuing to advance the State's climate and other policy goals.

Consultations With the Federal Monitor: The Boards have met with the Utility's Federal Monitor to obtain his perspectives on safety, risk, and compliance issues, and Board meetings frequently have been attended by the Monitor or his delegates. Topics discussed include safety culture, the process of evaluating the Wildfire Safety Program, data collection and reporting relating thereto, and the overall process of the Monitor's review and provision of feedback to the Boards. The independent directors as a group, as well as individual Board members (Ms. Campbell and Ms. Schmidt), have met with the Monitor and his team in executive session without management present.

Creation of the Independent Safety Advisor: The Boards have supported the addition of an Independent Safety Advisor following the earlier of (i) expiration of the Utility's current criminal probation arising from the San Bruno tragedy; and (ii) termination of the Federal Monitorship. The Independent Safety Advisor will have proven expertise and experience in natural gas storage distribution and transmission safety, wildfire safety and mitigation, utility vegetation management and electric system infrastructure, electric system emergency procedure and operations, and public and workforce safety.[35] The Independent Safety Advisor will review PG&E's compliance and progress with respect to natural gas operations safety, and wildfire and other disaster mitigation activities, including vegetation management programs, reliability and hardening programs (both electrical infrastructure and microgrid implementation), risk analysis, implementation of mitigation measures (including the use of and effectiveness of PG&E's Emergency Operations Center and PSPS), public and workforce safety, and programs to assure compliance with safety and operational metrics. The

---

[35] The Independent Safety Advisor could be more than one person as necessary to ensure the requisite expertise.

Independent Safety Advisor will provide quarterly (or more frequent) reports to the SNO Committees (as well as the Chief Risk Officer and Chief Safety Officer) regarding findings concerning PG&E's operations and compliance with safety and operational metrics, and the status of remedial actions to address any deficiencies previously identified.[36]

Oversight of Compliance: The Boards regularly receive reports regarding compliance issues, including reports from the Chief Ethics and Compliance Officer regarding the Utility's probation and interactions with the Federal Monitor. The Boards receive and address compliance reports both with and without executives present. The Boards also review ethics complaints.

Generally speaking, the Boards undertake the activities described above through or in conjunction with the Boards' committees, which are integral to the Boards' oversight of safety, risk, and compliance. The Audit Committees, the SNO Committees, and the Compliance and Public Policy Committee are the principal committees that work together to help ensure proper oversight in these areas. These committees meet jointly at least twice a year to coordinate their efforts and to ensure that significant issues are being reviewed appropriately. They also frequently meet with the Federal Monitor or his delegates. The committees' written charters (included in Exhibits 13 through 22 hereto) ensure that the committees have the appropriate authority and funding to carry out their respective responsibilities, and the charters also formalize requirements for regular reports and communications from senior management.

Below is a summary of some of the activities of the Audit, SNO, and Compliance and Public Policy Committees in these areas:

The Audit Committees: The Audit Committees receive periodic updates from the EORM team and review the updates in committee meetings and pre-meetings. The Audit Committees receive regular reports from the Chief

---

[36] After the federal Monitorship ends, PG&E will evaluate the ISOC's effectiveness and consider whether changes are appropriate. PG&E may evaluate, for example, whether the Independent Safety Advisor should be an evolution from the ISOC or instead be structured as a more external role akin to the Monitor model. Such evaluation could result in modifications to the precise functions of the Independent Safety Advisor as described herein.

Risk Officer, who upon emergence from Chapter 11 will report to the Audit and SNO Committees (as well as the PG&E Corporation CEO).  The Audit Committees' chair and internal auditors set aside dedicated time at each Audit Committee meeting to review and discuss any high-risk issues one-by-one, as well as the number of open high-risk issues and their respective tenures.  The Audit Committees also review the guidelines and policies that govern PG&E's risk management activities.

Each Audit Committee regularly reports to its respective Board on its deliberations and actions taken.  The Audit Committees also annually receive and review a report summarizing the primary categories of risk management activities and allocate oversight for specific enterprise risks and "enterprise risk topics" (cross-cutting risk drivers or controls associated with one or more enterprise risks) among various Board committees.  This allocation generally has assigned oversight of safety risks to the SNO Committees.

The SNO Committees:  The SNO Committees exercise general Board-level oversight of safety matters.  Their members have deep safety and utility operating experience to allow them to fulfill this role effectively.  In fact, SNO Committee members' expertise was recognized by the Executive Director of the Commission when she recently issued an initial safety certification to the Utility pursuant to AB 1054, finding that the Utility "has met all the relevant requirements of PU Code § 8389, regarding its Initial Safety Certification,"[37] including documentation that the Utility has "established a safety committee of its board of directors composed of members with relevant safety experience."[38]

The SNO Committees generally centralize oversight of all safety issues, consistent with NorthStar's recommendation to move to greater integration of safety functions given that safety is an enterprise-wide issue.  For example, the SNO Committees' purview includes oversight of wildfire safety,

---

[37]  Aug. 23, 2019 Ltr. from CPUC Executive Director Alice Stebbins.

[38]  Pub. Util. Code § 8389(e)(3).  The Executive Director also found that the Utility had complied with all other requirements for an initial safety certification, including documentation that the Utility has "agreed to implement the findings of its most recent safety culture assessment" and "established board-of-director-level reporting to the commission on safety issues."  *Id.* § 8389(e)(2), (e)(5).

gas safety, nuclear safety, and workforce safety, rather than dividing these distinct but related areas across different committees. The SNO Committees also have oversight responsibility for risks related to climate change, cyber-security, emergency response, and records management.

PG&E intends to ensure even greater centralization of safety oversight going forward by ensuring that the SNO Committees' purviews include the following:

- PG&E's development, implementation, and compliance with its wildfire mitigation plan and associated expenditures (a responsibility currently residing in part with the Compliance and Public Policy Committee);
- PG&E's wildfire and other natural disaster mitigation activities, including vegetation management programs, reliability and hardening programs (both electrical infrastructure and microgrid implementation), risk analysis, and prioritization of implementation of mitigation measures (including the use of and effectiveness of the Emergency Operations Center and PSPS);
- PG&E's commitment to narrow the scope of PSPS events, including through the deployment and utilization of additional sectionalizing devices, additional weather stations, and microgrids;
- PG&E's commitment to improve its execution of any necessary PSPS, including the commitments summarized in Part E.2 below; and
- PG&E's response to the recommendations of the Independent Safety Advisor.

Senior management regularly provides reports to the SNO Committees concerning comprehensive safety plans and other matters. Both the Chief Risk Officer and the Chief Safety Officer, who will report to the PG&E Corporation CEO, also will report to the SNO Committees (and in the case of the Chief Risk Officer, the Audit Committees). The Chief Safety Officer will provide to the SNO Committees, among other things: (i) monthly reports regarding key performance metrics relating to workforce safety; (ii) recommendations for changes to work practices to improve safety performance; and (iii) annual presentations regarding the overall workforce safety plan; the processes, procedures and budgets for achieving desired workforce safety metrics; and a plan for monitoring performance and

<ol start="1">
<li>enabling interim actions to modify the plan to improve safety performance as</li>
<li>necessary.  Also, once the Independent Safety Advisor structure is</li>
<li>implemented, the Advisor will provide safety-related reports to the SNO</li>
<li>Committees on at least a quarterly basis.</li>
<li>The SNO Committees also have robust additional tools to carry out their</li>
<li>functions.  They have authority, for example, to request additional reports</li>
<li>from any other member of senior management and are entitled to any</li>
<li>reasonable funds to carry out their functions.  They also have authority to</li>
<li>hire third-party safety and utility operations experts.  The Committees also</li>
<li>are empowered to act independently of other Board committees, subject to</li>
<li>applicable legal restrictions and stock exchange standards.  The SNO</li>
<li>Committees have used the foregoing tools by, for example, increasing their</li>
<li>understanding of key safety risk drivers through requesting, reviewing, and</li>
<li>discussing additional information related to injuries during extended work</li>
<li>hours, frequently injured employees and leaders, and other items of safety</li>
<li>trend information.  The SNO Committees also have requested, reviewed,</li>
<li>and discussed information regarding the location of gas pipelines in high</li>
<li>wildfire threat areas, inline inspections of such lines, and risks associated</li>
<li>with such lines.</li>
<li>The Compliance and Public Policy Committee: The Compliance and</li>
<li>Public Policy Committee coordinates the compliance-related oversight of the</li>
<li>various committees of the Boards, including with respect to PG&E's</li>
<li>compliance and ethics programs; its compliance with laws, regulations, and</li>
<li>internal policies and standards; and internal or external compliance reviews</li>
<li>or audits.[39]  The Compliance and Public Policy Committee works with</li>
<li>management (including the Chief Ethics and Compliance Officer, who</li>
<li>functionally reports to the Committee) to regularly review and discuss</li>
<li>compliance and ethics issues, including reported compliance violations and</li>
<li>employee misconduct.  The Committee facilitates the Boards' regular receipt</li>
<li>of appropriate reports and materials from management.  The Committee</li>
<li>also oversees public policy, sustainability, and corporate responsibility</li>
</ol>

---

[39] The SNO Committees oversee matters relating to compliance with respect to the Utility's nuclear, generation, gas and electric transmission, and gas and electric distribution operations and facilities.

issues that could affect customers, shareholders, or employees.  The
Committee regularly reports to the full Boards regarding its deliberations and
actions taken, and provides periodic reports to the Audit Committees
regarding compliance oversight and related matters.

The Compliance and Public Policy Committee, the SNO Committees,
and the new Boards as a whole recognize that compliance and safety are
related but not synonymous.  The committees and the Boards repeatedly
have stressed to management that, in many areas, compliance is not
enough—i.e., that PG&E often must go beyond minimum legal, regulatory,
or operating standards to keep customers, communities, and workers safe.
The committees and the Boards intend to continue to make this an important
part of driving improvements to PG&E's safety culture and performance.

### 2. The Boards' Oversight of PSPS Issues

The Boards recognize that although PSPS events can be necessary to
prevent catastrophic wildfires—thereby preserving life and property—they
are highly disruptive for customers such that it is important to reduce their
incidence and impacts while keeping customers and communities safe.  The
Boards are pleased that when the Utility coordinated the massive
undertaking of multiple PSPS events in October 2019, it did so without any
major workforce injuries in connection with such events.  The Boards
acknowledge that the Utility's execution of those PSPS, though imperfect,
improved during the short timeframe over which they occurred, including
with respect to customer accessibility and better coordination with state and
local authorities.

The Boards are regularly informed of when a PSPS is planned or
contemplated and receive reports after a PSPS on what occurred.
Numerous Board members spent time in the Utility's Emergency Operations
Center, including during the 2019 PSPS events.  Ms. Schmidt and I also
attended meetings with representatives of state and local officials (including
the Governor's Office of Emergency Services and the California Department
of Forestry and Fire Protection) to discuss what occurred, what worked well,
and what can be done better in the future.  Ms. Schmidt and I also met with
the Sonoma County Farm Bureau, and tribal representatives in Sonoma and
Humboldt Counties, in November 2019 to get their post-event feedback.

The Boards' principal focus at this time in connection with PSPS is on overseeing investment in tools, equipment, training, system modifications, and personnel to improve safety and reliability of the system. The Boards also intend to oversee the Utility's fulfillment of the commitments it made following the October 2019 PSPS events, including:

- Narrowing the scope of PSPS events through measures such as additional sectionalizing devices (which allow areas unaffected by adverse weather to remain energized) and additional weather stations to provide more precise local data;
- Promoting microgrids;
- Reinforcing the website and call centers to handle a much higher volume during PSPS events;
- Improving the quality and accessibility of outage maps;
- Strengthening coordination with government agencies, including the Commission, the Governor's Office of Emergency Services, the California Department of Forestry and Fire Protection, cities and counties, and tribal governments; and
- Promoting customer options and improving outreach to vulnerable customers.

**F. The Boards' Commitment to Transparency**

The Boards are committed to being open and transparent with the Commission, and with shareholders, customers, and other stakeholders. The Boards have taken a number of actions in recent months that underscore this commitment. For example, as discussed above, the Boards, committees, and individual Board members have met frequently with the Federal Monitor or his delegates. The PG&E Corporation Board's then-current Chair also accepted the Commission's invitation to attend the April 15, 2019 public workshop in the Safety Culture OII to discuss the Board nomination process, the Board refreshment process, the qualifications of PG&E's new Board members, and related matters. As noted, PG&E also submitted a detailed Compliance Filing on July 3, 2019 that sets out each director's (i) safety-specific education and training; (ii) direct, supervisory, or management-level safety-specific work experience; (iii) safety-specific board of directors' experience; (iv) other previous and current board positions; and (v) other professional commitments. PG&E

1 also will be submitting non-confidential portions of Board and SNO Committee

2 minutes to the Commission's Safety and Enforcement Division on a going-

3 forward basis. Additionally, non-privileged portions of Board and Board

4 committee meetings will be open to the Independent Safety Advisor once the

5 Independent Safety Advisor is installed following termination of the Utility's

6 probation or Federal Monitorship.

7 The Utility and its operations also are subject to extraordinary levels of

8 oversight from a myriad of state agencies at significant cost to customers. In

9 2019 alone, at least 18 bills were signed into law that directly or indirectly place

10 additional regulatory requirements and/or oversight on various companies

11 including PG&E (or authorize agencies to impose such additional

12 requirements).**40** Such agencies include the Commission (including the newly

13 created Wildfire Safety Division); the Attorney General; the Air Resources Board;

14 the Division of Oil, Gas and Geothermal Resources; the Energy Resources and

15 Conservation Development Commission; the State Fire Marshall; and the

16 Department of Forestry and Fire Protection. Topics covered include, among

17 others, security around natural gas storage wells, leaks from such wells,

18 plugging and abandonment of wells, website accessibility, data privacy,

19 construction and design specifications, residential rate tariffs and programs,

20 commercial motor vehicle emissions, undergrounding in connection with wildfire

21 mitigation plans, PSPS, and vegetation management.

22 PG&E also has, at substantial cost, undertaken a number of very significant

23 regulatory commitments and resolved a number of recent regulatory

24 proceedings, some of which are summarized in Exhibit 23 hereto. PG&E

25 provides a more complete description of commitments and obligations arising

26 from regulatory and criminal proceedings in the testimony of Julie Kane filed

27 herewith. As described in my testimony above, PG&E's new Boards and senior

28 management have made and are making numerous reforms to strengthen and

29 drive continual improvements to PG&E's safety culture and performance.

30 The Boards also are open to additional proposals for further increasing

31 appropriate transparency and contact between Board members and other

---

**40** These bills include AB 25, AB 1026, AB 1054, AB 1057, AB 1083, AB 1166, AB 1362, Senate Bill (SB) 44, SB 49, SB 70, SB 155, SB 167, SB 190, SB 247, SB 463, SB 551, SB 560, and SB 676.

1    stakeholders.  The Boards are willing, for example, to hold regular meetings with

2    stakeholders, including customers.  The Boards are open to other constructive

3    suggestions as well.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 5**

**UTILITY SAFETY AND GOVERNANCE [SM 3.1, 3.4]**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 5
UTILITY SAFETY AND GOVERNANCE [SM 3.1, 3.4]

TABLE OF CONTENTS

A.  Executive Summary (*A. Vesey*) ........................................................... 5-1

B.  Introduction (*A. Vesey*) .................................................................. 5-3

C.  Empowering Leadership in the Areas of Safety, Risk, Compliance, and
    Customer Care (*A. Vesey*) ............................................................ 5-5

D.  Reorienting the Utility Around Customer and Workforce Welfare and
    Safety, and Overall Customer Experience (*A. Vesey*) ..................................... 5-11

    1.  Improving Safety Culture and Performance (*A. Vesey*) ........................... 5-11

        a.  Improving Data, Metrics, and Risk Management (*A. Vesey*) ............. 5-11

            1)  Detailed Summary:  Improving Data, Metrics, and Risk
                Management (*S. Cairns*) ............................................. 5-12

        b.  Improving Wildfire Safety (*A. Vesey*) ................................. 5-18

        c.  Enterprise Safety Management System (*A. Vesey*) ....................... 5-18

        d.  Working Toward Recognized International Standards (*A. Vesey*) ..... 5-20

            1)  Detailed Summary:  ISO 55000 (*A. Gupta*) ................................. 5-21

        e.  Enhancing PG&E's Management of Change, Including Horizon
            Scanning and Scenario Planning (*A. Vesey*) ..................................... 5-22

        f.  Embracing Existing Independent Oversight of Safety and Risk (*A.
            Vesey*) .................................................................................. 5-23

            1)  The Independent Safety Advisor and the Independent Safety
                Oversight Committee (*A. Vesey*) .................................... 5-23

            2)  NorthStar Consulting Group (*A. Vesey*) ...................................... 5-25

            3)  Independent Court-Appointed Monitor (*A. Vesey*) ...................... 5-26

            4)  Post-Monitor Independent Safety Advisor (*A. Vesey*) ................ 5-28

            5)  Independent Wildfire Safety Auditor (*A. Vesey*) .......................... 5-30

            6)  Safety and Operational Metrics (*A. Vesey*) .................................. 5-30

        g.  Enhancing PG&E's Compliance Program (*A. Vesey*) ........................ 5-30

h.  Enhancing PG&E's Enterprise Records and Information
    Management Program (*M. Hertzler*) ................................................... 5-31

i.  Incentivizing Safety Through the Employee Incentive
    Compensation Plan (*A. Vesey*)............................................................ 5-33

j.  Verifying the Utility's Safety-Related Filings (*A. Vesey*)..................... 5-33

2.  Improving the Customer Experience Through Increased System
    Reliability (*A. Vesey*) ............................................................................. 5-34

3.  Improving Customer Experience Through Regionalization (*A. Vesey*) .... 5-35

# PACIFIC GAS AND ELECTRIC COMPANY
# CHAPTER 5
# UTILITY SAFETY AND GOVERNANCE [SM 3.1, 3.4]

## A. Executive Summary (*A. Vesey*)

Pacific Gas and Electric Company (the Company or the Utility) is rededicating itself to customer welfare under the leadership of a new executive team, which I lead along with William D. Johnson, the Chief Executive Officer (CEO) of PG&E Corporation. PG&E is empowering its senior leadership team, most of whom joined PG&E in the recent past, to drive improvements to safety culture and performance, including the Chief Risk Officer (CRO), the Chief Safety Officer (CSO), and the Chief Ethics and Compliance Officer. PG&E believes that it currently has a strong team in place to lead the enterprise out of Chapter 11 and into a future that is more successful for customers, employees, and other stakeholders.

PG&E's future success depends on a pervasive, day-to-day, and intense focus on protecting and advancing customer and workforce welfare—including through improvements to safety culture and performance—and improving overall customer experience. PG&E's mission is to safely and reliably deliver affordable clean energy to its customers every single day, while building the energy network of tomorrow. To accomplish this mission, PG&E needs to put customers first across all these dimensions. PG&E is actively working to do so through multiple initiatives, including:

1) Enhancing PG&E's Enterprise and Operational Risk Management (EORM) program, which quantitatively and systematically identifies key risk drivers and facilitates the mitigation of risk across the enterprise.

2) Increasing wildfire safety through various initiatives, such as enhanced vegetation management, increased inspections, and system hardening.

3) Developing PG&E's Enterprise Safety Management System (ESMS), which when fully implemented will comprehensively cover how PG&E manages the business of safety and drive continuous learning and continual improvements in safety culture and performance.

4) Building on the success of Gas Operations in obtaining International Organization for Standardization (ISO) 55000 certification in 2014 and again

1   in 2017, by having the electric line of business (LOB) work toward such
2   certification as well.  (ISO 55000 is an internationally recognized benchmark
3   for the prudent management of assets developed by the ISO.)  The power
4   generation LOB likewise is making progress in achieving the ISO 55000
5   standard in conjunction with its efforts to satisfy an international standard
6   specifically tailored to dam safety.

7   5)  Enhancing PG&E's management of change, especially when it comes to
8       safety and risk.

9   6)  Using "horizon scanning" to identify and guard against future risks and
10      "black swan" events.

11  7)  Bolstering independent oversight in the areas of safety and risk,
12      including by:
13      i)   hiring an Independent Safety Advisor (Christopher Hart, the immediate
14           past chair of the National Transportation Safety Board (NTSB));
15      ii)  creating an Independent Safety Oversight Council (ISOC) chaired by
16           Mr. Hart and staffed by members with recognized safety expertise
17           across a range of areas relevant to utility operations;
18      iii) fully embracing and monitoring implementation of all recommendations
19           of NorthStar Consulting Group ("NorthStar"); and
20      iv)  working closely with the Federal Monitor and his staff.

21  8)  Enhancing PG&E's compliance program, including through high-level
22      reporting, training, and oversight responsibilities for PG&E's Chief Ethics
23      and Compliance Officer.

24  9)  Enhancing PG&E's safety focus by implementing elevated responsibilities
25      and reporting for the CRO.

26  10) Refining PG&E's Enterprise Records and Information Management (ERIM)
27      program to deploy consistent, integrated processes that better support
28      records management associated with operational safety, regulatory
29      compliance, and knowledge management.

30  11) Committing to submit verifications to the California Public Utilities
31      Commission (CPUC or Commission) for the Utility's safety-related filings,
32      signed by specified senior personnel, to ensure additional accountability
33      among senior-level personnel as well as transparency and the public's
34      confidence in PG&E's commitment to safety and reliability.

1      12) Using an incentive compensation program that incentivizes customer
2            welfare, especially public safety.

3      13) Supporting a regional restructuring initiative, to be implemented in
4            consultation with the Commission, to bring our operational management
5            closer to our customers.

6          PG&E also is committed to increasing system reliability, including by
7     reducing the number of customers impacted by, and the frequency and duration
8     of, Public Safety Power Shutoff (PSPS) events. PG&E recognizes that, although
9     PSPS events can be necessary to prevent catastrophic wildfires, they are
10    extraordinarily disruptive to customers. PG&E also is committed to improving its
11    execution of any necessary PSPS events going forward.

12         In short, PG&E recognizes that it has a lot of work yet to do, it has a strong
13    team in place to do it, and it is making significant strides as it works to protect
14    and advance customer and workforce welfare and safety. PG&E looks forward
15    to additional progress as it works to continually improve itself in delivering safe,
16    reliable, affordable, and clean energy to its customers.

17  **B.  Introduction (*A. Vesey*)**

18         My name is Andrew M. Vesey. I am the CEO and President of the Utility,
19    roles which became effective August 19, 2019. I report to the Utility's Board of
20    Directors and have responsibility for all aspects of the Utility's operations,
21    including safety, electric operations, gas operations, generation, and customer
22    care. I work closely with Mr. Johnson, who in April 2019 was formally appointed
23    as CEO and President of PG&E Corporation, effective May 1, 2019.

24         My background includes more than 35 years of diverse utility experience,
25    most recently as the Managing Director and CEO of Sydney-based AGL Energy
26    Limited, an integrated Australian energy company serving some 3.7 million
27    electric and natural gas customers and operating 20 percent of the country's
28    power generation capacity. In that role, I implemented AGL's Greenhouse Gas
29    Policy, which included a commitment to close AGL's existing coal-fired power
30    stations within a specified number of years. In addition, I made a strategic
31    decision at that time to exit AGL's coal seam gas business. During my time as
32    CEO of AGL, there was a strong improvement in various areas of safety
33    performance. Through a digital transformation program which I implemented to
34    upgrade the entire customer experience, we boosted the company's Net

1  Promoter Score by 35+ points.  Before leading AGL, I served in a number of
2  successively greater leadership roles at energy companies such as AES
3  Corporation, where I was the Chief Operating Officer and Executive Vice
4  President (EVP), and Entergy Corporation and Niagara Mohawk Power
5  Corporation, both where I served as a senior leader.  I have also worked as an
6  energy industry consultant at Ernst & Young LLP, where I was a partner in the
7  Energy, Chemicals and Utilities Practice, and at FTI Consulting, where I was
8  Managing Director of the Utility Finance and Regulatory Advisory Practice.
9  I began my career as a system planning engineer at Consolidated Edison in my
10  native New York, after earning a Master's degree in Applied Science from
11  New York University and a Bachelor of Science degree in Mechanical
12  Engineering and a Bachelor of Arts degree in Economics from Union College.
13      I have come to the Utility intent on steering it in new and positive directions
14  centered around customer and workforce welfare.  The Utility obviously has had
15  a multitude of grave problems in recent years, including the 2010 explosion in
16  San Bruno, an ensuing federal criminal conviction and probation, the devastating
17  2017 and 2018 wildfires, and the Chapter 11 filing.  I recognize, as do a range of
18  stakeholder constituencies, that there needs to be change.  I believe strongly
19  that, as described more fully below, the Utility's future success depends on
20  focusing on customer and workforce welfare in all its dimensions—including,
21  most critically, safety culture and performance, but also in related areas such as
22  reliability and affordability.
23      I understand that Assembly Bill (AB) 1054, as codified in Public Utilities
24  Code § 3292(b)(1)(C), requires the Commission to consider "the reorganization
25  plan and other documents resolving [the Utility's] insolvency proceeding,
26  including [whether the Utility's] resulting governance structure [is] acceptable in
27  light of the [Utility's] safety history, criminal probation, recent financial condition,
28  and other factors deemed relevant by the commission."  My testimony concerns
29  the governance and operational structure of the Utility, and is designed to assist
30  the Commission as it evaluates that structure as prescribed by AB 1054.  To
31  ensure compliance with the provisions of AB 1054 referenced above, PG&E will
32  incorporate into its Plan of Reorganization or related documents the direction the
33  Commission provides in its decision in this proceeding with regard to Utility
34  governance.

1    My testimony below is divided into three parts.  The first part, above,
2    provided an executive summary of the substance of my testimony.  The second
3    part discusses key members of senior management at PG&E (including at the
4    Utility), including recent changes thereto, and PG&E's focus on empowering
5    leadership in the areas of safety, compliance, and customer care.  The third part
6    surveys the actions taken to reorient the Utility around the mutually supportive
7    goals of improving safety culture and performance, and improving the customer
8    experience including through increased system reliability.

## C. Empowering Leadership in the Areas of Safety, Risk, Compliance, and Customer Care (*A. Vesey*)

11   Following devastating 2017 and 2018 wildfires, many stakeholders called for
12   substantial changes to PG&E's leadership.  PG&E has implemented numerous
13   such changes to its Boards of Directors and senior management.  For example,
14   as I mentioned, Mr. Johnson and I assumed our respective roles as CEO and
15   President of PG&E Corporation and the Utility in April and August 2019,
16   respectively.  Of the 13 officers comprising the Utility's C-suite and senior
17   leadership team, over half are new to the team since late 2017.  These
18   leadership changes have brought a wealth of outside experience and expertise
19   to the Utility.  Highlights of my own experience are described in the introduction
20   to this chapter.  Mr. Johnson's proven track record of leadership on safe utility
21   operations is highlighted in his testimony in Chapter 1.  Ms. Nora Mead
22   Brownell, the independent non-executive Chair of the Board of PG&E
23   Corporation whose testimony appears in Chapter 4, is a former Commissioner of
24   the Federal Energy Regulatory Commission (FERC) and the Pennsylvania
25   Public Utility Commission, and deeply understands that safety is the most
26   important job for utility leaders.

27   One of the Utility's actions to improve existing governance of safety culture
28   is to further empower safety leadership, including the CRO, the CSO, and the
29   Chief Ethics and Compliance Officer.  Achieving a high level of customer
30   satisfaction, including through the maintenance of reliable service, is the focus of
31   the Chief Customer Officer and the Senior Vice President (SVP), Electric
32   Operations.  These key leadership roles are described below.

33   In addition, given the importance of the CRO functions to PG&E's overall
34   efforts to enhance safety, PG&E will give that position even greater visibility and

reporting responsibilities as part of its reorganization, as described below.  This
enhanced role will be formally established by resolution of the Boards prior to
the effective date of PG&E's Plan, which will remain in effect for at least
five years unless the CPUC determines otherwise.  PG&E will consult with the
Governor's office and CPUC regarding the identity of the initial post-emergence
CRO.  All executive officers upon emergence, including the CRO, will be
approved by affirmative votes of the Boards.  Subsequent appointees to the
CRO role will be appointed by the Executive Committee of the Boards.

**Chief Risk Officer – Stephen Cairns.**  Stephen Cairns is Vice President
(VP), Internal Audit and CRO for both the Utility and PG&E Corporation.  In this
role, Mr. Cairns oversees the following organizations:  Internal Auditing,[1]  Market
and Credit Risk Management, Third-Party Risk Management, Sarbanes-Oxley
Act compliance, the EORM program (discussed below), and Insurance.  The
CRO currently reports directly to the Chief Financial Officer of PG&E
Corporation and also functionally reports to the Audit Committees with respect to
internal audit matters, provides regular reports to the Audit Committees on other
matters, and has executive sessions with the Audit Committee without
management present.  The CRO also currently reports the results of all
operational audits to the Safety and Nuclear Oversight (SNO) Committees.  He
submits regular written reports to the Boards, and frequently attends Board and
Board committee meetings where he provides further reports and answers
questions from Board and committee members.  Post-emergence, the CRO will
have a direct reporting relationship with the CEO of PG&E Corporation.

Mr. Cairns has many years of experience in internal audit and risk
management in the utility field.  He is a chartered accountant (the equivalent of a
Certified Public Accountant in the United Kingdom) and holds a degree in
Business and Finance from the University of Brighton in England.  He began his
career at Ernst & Young in its external audit practice and moved through other
practices including computer audit, internal audit, and business risk consulting,
focusing predominantly on the utility sector.  Mr. Cairns then joined
ScottishPower, a United Kingdom-based energy holding company that owned

---

[1] Internal Auditing focuses its audit plan on assessing the effectiveness of processes and controls to manage the most impactful risks inherent to Utility operations, including safety and compliance risks.

utilities in the United Kingdom and United States.  There he oversaw all aspects of internal audit and risk management in both the United Kingdom and United States.  Mr. Cairns joined the Utility in 2006 as Senior Director, Internal Auditing, and thereafter served as VP and Controller, and VP, Internal Audit and Compliance.

In addition, as noted above, PG&E is elevating the visibility and responsibilities of the CRO role.  The CRO will become an executive-level management position, reporting directly to the CEO of PG&E Corporation and to the SNO Committees of the Boards.  The CRO will also report directly to the Audit Committees of the Boards.  The CRO will be the enterprise risk officer for PG&E with oversight of risk assessment and mitigation. The CRO will have oversight of risks associated with PG&E's operations and the environment related to public safety. This will include but not be limited to nuclear risk, wildfire risk, and risks of other natural disasters as well as new strategic risks confronting utilities (including but not limited to business interruption from cyber-attack, storms, and other catastrophic events).  The CRO will have responsibility for evaluating the risks to public safety associated with PSPS and the risk of both implementation or non-implementation of PSPS and other operational decisions in catastrophic events. The CRO will also:

- Oversee an ongoing risk assessment and mitigation process that encompasses both the electrical and natural gas portions of PG&E's business;
- Be consulted and participate in strategic discussions related to threats and risks;
- Be afforded opportunities to identify, understand, and quantify threats and risk;
- Work with risk owners to implement risk management strategies;
- Identify threats to PG&E's business;
- Work with the CPUC and other California utilities to create a framework to assess the organization's level of risk appetite and tolerance;
- Assist in integrating risk management into the overall business strategy;
- Have responsibility for addressing the recommendations of the Independent Advisor (defined below) with respect to risk; and

1     •    Provide quarterly in-person reports to CPUC staff in conjunction with the
2         Independent Advisor (if applicable), on all findings and remedial actions.

3     **Chief Safety Officer (Interim) – Jan Nimick.**  Jon Franke, former CSO and
4 VP of Safety and Health, Enterprise Corrective Action Program and DOT
5 (SHED) for both PG&E Corporation and the Utility, departed PG&E on June 3,
6 2019, and Jan Nimick has been leading the SHED organization on an interim
7 basis.[2]  Mr. Nimick was most recently Senior Director at Diablo Canyon Power
8 Plant, which enables him to bring the rigor and best practices from the nuclear
9 industry's safety culture to the SHED organization; he also served a 4-month
10 rotational role in the Utility's wildfire inspection program prior to assuming his
11 role in SHED.  The Boards' SNO Committees, as part of their role in reviewing
12 and overseeing the corporate safety function, are engaged in reviewing the
13 retention of PG&E's CSO, consistent with the recommendations of NorthStar
14 regarding qualifications and training for such a position.[3]

15     The CSO currently partners with the lines of business to develop and
16 monitor the enterprise-wide safety program.  The CSO currently reports directly
17 to me, and also provides regular reports to the SNO Committees concerning
18 establishment of and performance on safety, including reports on any significant
19 delays or lack of cooperation by managers in obtaining information necessary for
20 the preparation of the reports.  Post-emergence, the CSO will have a direct
21 reporting relationship with the CEO of PG&E Corporation.

22     **Chief Ethics and Compliance Officer – Julie Kane.**  Julie Kane is SVP,
23 Chief Ethics and Compliance Officer and Deputy General Counsel for both
24 PG&E Corporation and the Utility.  As Chief Ethics and Compliance Officer, in
25 partnership with the lines of business, Ms. Kane has day-to-day responsibility for
26 overseeing and monitoring the enterprise-wide compliance and ethics program
27 (discussed below).  She also leads ethics and compliance training and culture-
28 building efforts, and oversees matters relating to the Utility's criminal convictions
29 arising from the San Bruno gas pipeline explosion.  The Chief Ethics and
30 Compliance Officer reports directly to the CEO and President of PG&E

---

**2**   Mr. Nimick is a Senior Director at the Utility.

**3**   *See* NorthStar Consulting Group, *Final Report: Assessment of Pacific Gas and Electric Corporation and Pacific Gas and Electric Company's Safety Culture*, at IV-24 (May 8, 2017).  PG&E expects to fill this position on a permanent basis imminently.

Corporation, and functionally reports to the Compliance and Public Policy
Committee of the PG&E Corporation Board on compliance and ethics matters
related to PG&E.  Ms. Kane also provides regular reports to the SNO
Committees of the Boards of Directors regarding compliance and ethics metrics
related to PG&E's operations and facilities.  Ms. Kane is the key management
liaison to the Compliance and Public Policy Committee and meets regularly with
that committee in executive session without other management present.
Ms. Kane also provides annual reports to the Boards regarding the matters
under her purview.

Ms. Kane has deep experience in ethics, compliance, and corporate
citizenship programs across several industries.  Before joining PG&E in 2015,
Ms. Kane served as VP, General Counsel and Compliance Officer of Avon North
America.  She had previously held a number of senior roles at Novartis
Corporation, including VP, Ethics and Compliance and Corporate Citizenship;
VP, Health, Safety and Environment and Chief Environmental Counsel; and VP,
Ethics and Compliance.  Ms. Kane earned her undergraduate degree in Political
Science from Williams College and a Law degree from the University of
San Francisco School of Law, and she is a member of the California State Bar.

**Chief Customer Officer – Laurie Giammona.**  Laurie Giammona is the
SVP and Chief Customer Officer for the Utility.  As Chief Customer Officer,
Ms. Giammona leads all aspects of the Utility's Customer Care organization,
which oversees service to 16 million people throughout northern and central
California and is dedicated to improving customers' experience.  She oversees
billing, metering, revenue, call centers, local offices, account services, low-
income offerings, customer programs (including energy efficiency, solar, electric
vehicle and demand response portfolios), and corporate security.

Ms. Giammona joined PG&E in 2012 as VP, Customer Service of the Utility,
a role in which she oversaw initiatives to improve customer experience and
satisfaction.  Before joining PG&E, she developed extensive experience in
customer care.  She served as Regional VP of Customer Care at Comcast,
where she led customer sales, service, and experience for 5 million households
in California, and also held executive positions at United Airlines, leading teams
in customer service, business and airport operations, sales, and training and
development.

1     **Senior Vice President, Electric Operations – Michael Lewis.** Michael
2 Lewis was named the Utility's SVP, Electric Operations in January 2019
3 (replacing Patrick Hogan, who retired that month). Mr. Lewis oversees all
4 electric transmission and distribution grid operations in the Utility's
5 70,000-square-mile service area, as well as the Utility's wildfire prevention and
6 response efforts, longer-term grid resiliency initiatives, system-wide vegetation
7 management, and emergency preparedness and response efforts.
8     Mr. Lewis has worked in the energy industry for more than three decades,
9 during which time he has gained experience leading large-scale safety and
10 operations improvement programs. Before he assumed his current role,
11 Mr. Lewis served as the Utility's VP, Electric Distribution Operations. Mr. Lewis
12 previously served as the SVP of Energy Delivery for Progress Energy in Florida.
13 After Progress Energy merged with Duke Energy, Mr. Lewis occupied
14 increasingly senior roles at Duke Energy, including Chief Transmission Officer
15 and culminating in his role as SVP and Chief Distribution Officer. Mr. Lewis
16 holds a Bachelor's degree in Electrical Engineering from the University of Florida
17 and a Master's of Business Administration from Nova Southeastern University.
18 He was recently named to the Governor's Earthquake Advisory Commission and
19 is a member of the Association of Edison Illuminating Companies.
20     **Interim Lead, Gas Operations– Jane Yura.** Following the October 2019
21 departure of Melvin Christopher (former VP, Gas Operations), the Utility has
22 rehired Jane Yura to lead its Gas Operations organization on a temporary basis.
23 She reports directly to me. Ms. Yura retired from a 35-year career with PG&E in
24 2014. She got her start here as an Engineer in Gas Design and Distribution,
25 and was promoted to Division Manager in the Gas Distribution and Customer
26 Services organizations.
27     From there, Ms. Yura moved into Finance, a path that led to her being
28 named VP of Regulation and Rates. She returned to Gas Operations at the
29 request of former PG&E President Nick Stavropoulos, becoming VP, Gas
30 Operations Standards and Policies, and ultimately VP, Gas Operations Asset
31 and Risk Management. Ms. Yura will remain in her new position as Interim
32 Lead, Gas Operations until PG&E emerges from Chapter 11, or until a
33 permanent replacement is named.

**D. Reorienting the Utility Around Customer and Workforce Welfare and Safety, and Overall Customer Experience (*A. Vesey*)**

The new leadership of the Utility, including myself, believes that the Utility's future success requires focusing on protecting and advancing customer and workforce welfare—including through improvements to safety culture and performance—and improving overall customer experience. Excellence in public safety performance is critical to customer welfare and satisfaction, and to restoring customer trust and goodwill. Excellence in occupational safety is critical to workforce welfare. The Utility's ability to drive positive outcomes for our customers also depends on properly managing change and transition in safety and other areas. Improving customer satisfaction also necessarily entails increasing the reliability of service, including reducing the number of customers impacted by PSPS events, and reducing the frequency and duration of PSPS events, which—while currently necessary to prevent catastrophic wildfires and preserve life and property—are highly disruptive for customers. The discussion below first addresses the Utility's efforts to improve customer and workforce welfare through improvements to safety culture and performance, and then turns to its efforts to increase customer satisfaction and reliability of service.

**1. Improving Safety Culture and Performance (*A. Vesey*)**

PG&E has taken and is taking numerous proactive steps to improve its safety culture and performance, including building on and enhancing existing governance structures, increasing transparency, and engaging stakeholders to improve long-term trust. PG&E also is embracing entirely new governance actions, including independent oversight such as institution of an Independent Safety Advisor and an ISOC, which will report to Mr. Johnson and also provide reports to the Boards' SNO Committees. Many of these initiatives and steps directly impact Utility safety culture and performance. I describe some of these measures below.

**a. Improving Data, Metrics, and Risk Management (*A. Vesey*)**

Another of the Utility's actions to improve existing governance of safety culture and performance is to improve data, metrics, and risk management through PG&E's EORM program and through the Safety Model Assessment Proceeding (SMAP) and the Risk Assessment and

Mitigation Phase (RAMP) proceeding. PG&E's EORM program is critical to effective, efficient management and reduction of the risks inherent in delivering gas and electric service to customers. Aligned with key input from the Commission and stakeholders, PG&E has made important changes to the EORM program, and PG&E plans to continue to make additional refinements, including implementing any future guidance from the Commission and stakeholders through the SMAP and RAMP processes. Through application of the EORM framework and continual improvements thereto, PG&E is set up to comprehensively identify risks that could lead to significant safety consequences, implement the actions that have the best potential and are most cost effective to reduce risk, and effectively and transparently monitor and report results.

1) **Detailed Summary: Improving Data, Metrics, and Risk Management (*S. Cairns*[4])**

At the most basic level, PG&E's public utility functions of delivering gas and electric service to customers have considerable and inherent risks, some of which simply cannot be eliminated; PG&E's EORM program is about reducing those inherent business risks. Specifically, the EORM program is designed to systematically identify, analyze, evaluate, and monitor all the risks that could potentially prevent PG&E from achieving its objective of delivering safe, reliable, affordable, and clean energy to customers. The EORM program then also identifies, evaluates, and monitors mitigations for addressing those risks. Particularly with its shift to a more quantitative approach to risk management and its goal of data-driven decision making that results in measurable risk reduction across the portfolio of enterprise and operational risks, the EORM program has proven essential to improving PG&E's risk identification and mitigation efforts.

---

[4] Stephen Cairns is VP, Internal Audit and CRO for both the Utility and PG&E Corporation. His background and responsibilities are further described above in the testimony of Andrew Vesey.

1    PG&E's EORM program was established in 2011 in response to
2    the Report of the Independent Review Panel issued by the
3    Commission recommending a more granular assessment of
4    operational risks following the San Bruno pipeline explosion.[5]  It
5    replaced PG&E's earlier Enterprise Risk Management program and,
6    in the time since, it has seen significant developments and
7    improvements.  Most importantly, this has included alignment with
8    the enterprise risk management regulatory processes established by
9    the Commission in the SMAP and RAMP proceedings[6] as well as
10   best practices contained in international risk management
11   standards.  PG&E's EORM program is based on the foundational
12   principles of ISO 31000, a family of standards relating to enterprise
13   risk management codified by the International Organization for
14   Standardization.  These principles include four basic and iterative
15   steps:  identify, evaluate, respond, and monitor.  At its inception, the
16   EORM program largely relied on a qualitative approach to assessing
17   and evaluating risks.  Over time, however, particularly with the
18   significant developments as part of SMAP and RAMP, PG&E's
19   EORM program has become increasingly data-driven and
20   quantitative at all stages of this iterative process.
21       Using the EORM process, PG&E's risks are:  (i) identified
22   across the entire enterprise, including individual lines of business;
23   (ii) evaluated using a multi-attribute value function (MAVF);
24   (iii) addressed through an analysis of mitigation alternatives to
25   determine the risk reduction value of particular approaches; and
26   (iv) once a risk mitigation approach is selected, monitored by risk
27   owners, by senior management, and in some cases directly by the

---

[5]  *See* Report of the Independent Review Panel San Bruno Explosion (June 8, 2011, revised June 24, 2011), *available at* https://www.cpuc.ca.gov/uploadedFiles/CPUC_Public_Website/Content/Safety/Natural_Gas_Pipeline/News/Final%20Report.pdf.

[6]  *See* D.14-12-025.

1    Boards of Directors[7] to determine if the risk mitigation activities are
2    achieving measurable risk reduction.  The Utility's Safety
3    Department likewise is responsible for applying the same process to
4    evaluate risk events where an employee, contractor, or member of
5    the public is seriously injured or killed due to:  (a) an interaction with
6    PG&E facilities either by working on or around them; (b) an
7    interaction with intact, properly functioning assets; or (c) a motor
8    vehicle incident.

9         PG&E's EORM program reflects important recent changes and
10   refinements, informed and driven by the Commission's SMAP
11   decision regarding risk measurement[8] as well as feedback from the
12   Commission and intervenors in connection with the Utility's
13   RAMP filing.[9]

14        First, PG&E has transitioned to an enterprise-wide event-based
15   risk register,[10] rather than viewing risk from the perspective of
16   individual departments or lines of business.  As part of this
17   transition, departments from across the enterprise collectively
18   identified the key risk events for PG&E and consolidated a list of
19   over 200 individual risks and risk drivers into what is currently a list
20   of 35 event-based risks, 15 of which are characterized as
21   "enterprise risks" (risks that could significantly disrupt PG&E's
22   mission of providing safe, reliable, and affordable utility service to
23   customers), and 8 "enterprise risk topics" (cross-cutting risk drivers
24   or controls associated with one or more enterprise risks).  Some of
25   the 200 individual risks previously identified were recharacterized as
26   drivers to, or controls for, risk events.  For example, "emergency

---

[7]  As discussed further in Chapter 4, the Boards and Board Committees have active
oversight responsibilities for all of PG&E's enterprise risk events and enterprise risk
topics.  Yet for some risks, Board oversight is even more direct and involved.

[8]  *See* D.18-12-014.

[9]  *See* D.19-10-007.

[10] *See* D.18-12-014 at 18 (defining "risk event" as:  "An occurrence or change of a
particular set of circumstances that may have potentially adverse consequences and
may require action to address.  In particular, the occurrence of a Risk Event changes
the levels of some or all of the Attributes of a risky situation.").

preparedness and response risk," i.e., the risk resulting from failing to appropriately prepare for and respond to emergent situations, is now primarily viewed as a control for reducing the impact of specific risk events, such as a "wildfire" or "loss of containment – transmission pipeline rupture." Likewise, the risk of a "cyber attack" is now viewed as a driver for several risk events, including a "system-wide electrical disturbance (blackout)" and a "data loss event."

Second, consistent with the outcomes of SMAP and the Utility's first RAMP,[11] PG&E is implementing a new way to measure and communicate risk using a MAVF for each risk event together with a bowtie analysis. A MAVF is "[a] tool for combining all potential consequences of the occurrence of a risk event, and [it] creates a single measurement of value."[12] A bowtie analysis is "[a] tool that consists of the Risk Event in the center, a listing of drivers on the left side that potentially lead to the Risk Event occurring, and a listing of Consequences on the right side that show the potential outcomes if the Risk Event occurs."[13] In Decision (D.) 18-12-014, the Commission found using a MAVF to be "a big improvement" that "dramatically advances [a] utility's ability to assess and prioritize risks,"[14] and the bowtie analysis helps facilitate the calculation of a risk score, which reflects the probability of a risk event occurrence given the historical frequency of key risk drivers and the potential consequences of the risk event. Using a MAVF, risk consequences

---

[11] *See* D.18-12-014; D.19-10-007.

[12] D.18-12-014 at 17.

[13] D.18-12-014 at 16. As a tool for quantitative risk assessment, the bowtie analysis enables a more targeted approach to mitigations as high frequency risk drivers can be addressed directly and in areas where the most significant consequences could occur. One recent example is the Utility's approach to mitigating wildfire risk. The bowtie analysis showed that the two largest drivers of risk are equipment failure and vegetation, and that the most catastrophic fires occur when there are populations living within or near High Fire Threat Districts. This has guided the Utility's approach to hardening its system and increasing vegetation management beyond traditionally allowed clearances.

[14] D.18-12-014 at 44.

are measured in terms of potential impacts to safety (public, employee, or contractor), gas or electric reliability, and the company's financials. The Commission determined that potential safety consequences of a risk event should be assigned "a minimum . . . weight of 40% to ensure that the safety attribute is weighted most heavily,"[15] and PG&E has decided to assign more than a 40 percent weighting for safety consequences in its risk scoring methodology.[16] The risk score then serves as a baseline from which to assess the need for further risk reducing actions and to assess the effectiveness of those actions over time.

Third, a significant focus area for quantitative risk assessment as part of PG&E's EORM program is improving data collection and use, particularly for the most impactful areas of risk. For instance, PG&E's bowtie analysis now relies not just on failure data for modeling the frequency of risk events but also on root cause analysis and data feedback loops, making the analysis even more robust. In addition, PG&E has refined the metrics used to measure the effectiveness of risk reduction mitigations. And complementary work is underway to ensure that the appropriate governance forums across the enterprise receive straightforward information on risk reduction performance with the appropriate transparency to ensure that the results are well understood and appropriate actions are taken. The performance of these metrics also will be included in the Utility's Risk Mitigation Accountability Reports, as part of the SMAP and RAMP process.[17] Also guided by the bowtie analysis, PG&E is conducting sensitivity analyses to further identify particularly valuable information for collection and measurement. Metrics, derived from components of the bowtie analysis, that show a cause-and-effect relationship between mitigation actions and risk reduction are currently being developed and championed through the SMAP

---

[15] D.18-12-014 at 45.

[16] Reliability consequences are weighted at 25 percent, and financial consequences at 25 percent.

[17] See D.14-12-025; D.19-04-020.

Working Group on metrics development. These metrics will be
helpful in demonstrating risk reduction and will help management
and the Board to better gauge the effectiveness of the company's
risk mitigation actions.

Fourth, after transitioning to an enterprise-wide event-based risk
register, PG&E also is better defining how cross-cutting issues play
a role in the overall risk management framework of the EORM
program. PG&E has found that an event-based view of risk means
that for certain risk events, the risk drivers, controls, and/or
mitigations may be managed by someone other than the risk owner.
Therefore, a critical component for the success of the EORM
program is for risk owners to coordinate all the risk management
activities across the enterprise to effectively control, mitigate, and
track performance.

PG&E seeks to continually improve its EORM program in
addition to these recent advances. PG&E's current focus for further
refinements to the EORM program includes progress in the following
areas:

- Developing quantitative risk models using a bowtie analysis for
  each risk on PG&E's risk register;
- Identifying data gaps, completing sensitivity analyses to identify
  the greatest opportunities for improved data collection, and
  presenting data improvement plans for those areas of most
  value;
- Developing risk mitigation plans selected based on an
  alternatives analysis that incorporates risk-spend efficiency and
  executability, including a differentiation between segments of
  risk exposure to identify highest value risk reduction
  opportunities;
- Identifying key effectiveness metrics derived from the bowtie
  analysis, and beginning tracking and reporting;
- Establishing rigorous standards for data quality and model
  integrity; and

1      • Conducting risk benchmarking with non-utilities to identify
2         transferable best practices.

3   **b. Improving Wildfire Safety (*A. Vesey*)**
4         The Utility is committed to continuing to strengthen its programs and
5      infrastructure to significantly improve public safety and mitigate wildfire
6      risk.  After the 2017 and 2018 wildfires, the Utility aggressively
7      expanded vegetation management around its assets.  In addition to the
8      Utility's regular ongoing vegetation work, in 2018, the Utility began
9      implementing its risk-based Enhanced Vegetation Management
10     Program to further mitigate fire risk associated with the Utility's electric
11     distribution lines in High Fire Threat District areas.  The Utility also has
12     developed and implemented an ambitious Wildfire Safety Inspection
13     Program to further mitigate fire risk associated with electric equipment
14     and infrastructure.  The Utility also is working to harden its electric
15     system for the future, including targeted use of undergrounding,
16     insulated conductors, and more durable and flame-resistant power
17     poles.
18        The Utility's extensive, ongoing wildfire safety efforts are described
19     in detail in Chapter 6:  Wildfire Safety.  On top of these extraordinary
20     efforts, the Utility is committed to continuing self-evaluation to identify
21     and exploit opportunities for continued improvement to help mitigate
22     California's escalating wildfire threat.

23  **c. Enterprise Safety Management System (*A. Vesey*)**
24        The Utility is committed to protecting the welfare of its customers, its
25     workforce, and the environment.  The Utility has been developing its
26     ESMS, which it expects will be a key enabler of continual improvements
27     in safety culture and performance.  The Utility initially developed and
28     implemented a safety management system for the design, construction,
29     maintenance, and operation of its natural gas system after the San
30     Bruno tragedy; the enterprise-wide ESMS will extend the system to the
31     remaining elements of the enterprise.  This ESMS will comprehensively
32     cover how the Utility manages the business of safety, and will address

gaps in the sufficiency of its safety management system as identified by
an independent third-party assessment by NorthStar.

At a session on the scope of the ESMS in August 2019, senior
operational leadership arrived at numerous design principles to achieve
the ESMS's mission of proactively safeguarding customers, our
workforce, and the environment by effectively collaborating as one team,
enhancing safety in all aspects and throughout all areas of the
companies, managing change in diverse and dynamic safety
environments, and continuous improvement.  The Utility's most recent
quarterly reports to the Safety and Enforcement Division (SED),
submitted on July 30 and October 31, 2019, detail PG&E's progress in
implementing NorthStar's recommendations.  I will not repeat those
lengthy discussions here, but rather respectfully refer the Commission to
those reports.  The reports cover the Utility's implementation and
refining of the One PG&E Occupational Health and Safety Plan, which
addresses employee and contractor safety efforts.  The Utility
acknowledges that it needs to improve its performance in this area and
is committed to doing so through, among other things, the Occupational
Health and Safety Plan, which is designed to improve safety and health
performance and culture by using data analytics to drive targeted
improvements in its systems, processes, and communications.

Following my arrival at the Utility in August 2019, I established my
commitment to the ESMS, and my office gathered a group of safety
leaders from across the enterprise to develop the foundational
standards that outline the ESMS requirements.  While the business of
safety is never complete, the ESMS has a target implementation date of
late 2021.

Related to the ESMS, as part of the recently announced Wildfire
Order Instituting Investigation (OII) settlement, PG&E will document
"near hit" potential fire incidents, such as arcing or sparking, that could
have ignited a wildfire but did not.  Data will include all momentary and
sustained outage data as well as information from customer calls
regarding such "near hit" incidents, and will be provided on a monthly
basis to the SED, among others.  This will provide additional

transparency and inform the continuous learning that will be an important component of the ESMS.

### d. Working Toward Recognized International Standards (*A. Vesey*)

One of the pillars of the Utility's safety management system is adopting and implementing internationally recognized asset management standards, in particular, Publicly Available Specification (PAS) 55 and ISO 55000. These standards cover end to end lifecycle aspects of a business' asset management system, and provide a common framework for the Utility to take a comprehensive view of how it manages assets in an effective and sustainable manner and to implement continuous improvement. The Utility believes that a collaborative, uniform approach to asset management throughout the enterprise will yield sustained benefits for its customers. To that end, the Utility's gas and electric lines of business have been working towards achieving and maintaining PAS 55 and ISO 55000 asset management standards. The Utility's power generation LOB is likewise working towards implementing principles of the ISO 55000 standard as it addresses the safety risks posed by high- and significant- hazard potential (FERC Hazard Classification System) dams by utilizing the Dam Safety Maturity Matrices developed by the Centre for Energy Advancement through Technological Innovation (CEATI). CEATI's safety maturity matrices are built on similar principles to the ISO 55000 standard, but are specifically tailored to asset management and safety issues posed by dams. Power Generation is already using the CEATI Maturity Matrix and is committed to utilizing CEATI to coordinate a peer evaluation of Power Generations maturity level in 2020. As the power generation LOB makes continued progress in implementing the CEATI framework, it is making progress towards implementing the principles of the ISO 55000 standard in tandem with the objective of ISO certification for Power Generation assets in the following years. The Utility's embracing the ISO, PAS, and CEATI standards reflects its dedication to a philosophy of continual improvement in the areas of safety, reliability, and cost performance across the enterprise as a whole.

1      **1)**    **Detailed Summary: ISO 55000 (*A. Gupta*[18])**

2          ISO 55000 was originally issued in 2014 after 10 years of

3 development, and is largely based on the PAS 55 standard from the

4 United Kingdom. The ISO standard, as an internationally

5 recognized benchmark for prudent asset management, consists of

6 three components: ISO 55000 (provides an overview of the subject

7 of asset management, and governing definitions and terminology);

8 ISO 55001 (issued in 2014, specifies the requirements for an

9 integrated, effective management system for asset management);

10 and ISO 55002 (issued in 2018, provides guidance for the

11 application of ISO 55001 in implementing such an asset

12 management system). The standard was most recently updated in

13 2019 with the publication of a Technical Specification

14 (ISO/TS 55010). The standard covers a range of topics, including

15 asset management strategy, objectives, and plans; asset

16 management organizational structure; training, awareness, and

17 competence; risk management; management of change;

18 performance and condition monitoring; evaluation of compliance;

19 and a host of other topics relevant to safe asset management.

20          The Utility is committed to the safe, reliable, affordable, and

21 sustainable management of its assets, including through the

22 implementation of recognized standards to achieve a consistent and

23 integrated application of asset management practices by employees

24 and contractors. In 2014, the Utility was one of the first utilities in

25 the world to attain for its gas operations both the ISO 55001 and

26 PAS 55-1 certifications. The Utility's gas operations LOB achieved

27 recertification under both of the standards in 2017. The

28 certifications and recertifications under both standards were

---

**18** Amit Gupta is the Utility's Manager of the Electric Asset Excellence program, which is responsible for adopting and achieving PAS 55 and ISO 55000 asset management certification for Electric Operations. He initially joined PG&E in 2013 to manage the Gas Safety Excellence program responsible for PAS 55 and ISO 55000 certification in the Utility's Gas Operations. Mr. Gupta holds a Master's in International Business from Leeds Metropolitan University, Leeds UK and a Master's of Science in Accounting & Taxation from University of Hartford, Connecticut.

awarded by the independent, internationally recognized auditor,
Lloyd's Register.  For instance, in May 2017, Lloyd's Register
travelled throughout the Utility's natural gas service area reviewing
safety practices, information and risk management policies,
employee qualifications, emergency response protocols, and critical
areas of asset management relating to the Utility's gas operations.
The certification process also involved a series of rigorous,
independent audits and interviews of more than 100 PG&E
members of management, field employees, and contractors.  In
addition to the certification and the recertification audits, the auditors
also conducted regular six-month surveillance visits over the
preceding three years to ensure the Utility was following the
requirements of the certifications for its gas operations.  The Utility is
in the process of seeking to attain PAS 55-1 and ISO 55001
certification for its electric operations, and has succeeded in
reducing the gaps as Lloyd's Register continues to conduct their
assessment of the Utility's Electric Operations.

**e.  Enhancing PG&E's Management of Change, Including Horizon**
   **Scanning and Scenario Planning (*A. Vesey*)**

PG&E is studying ways to ensure that it adequately plans for the
future in an ever-changing world, including as to safety and risk.  The
EORM program is critical to this, as it ties into PG&E's budgeting and
thus helps to ensure that risk assessments and mitigations are
incorporated into day-to-day operations.  The ESMS also is important in
this area, in that management of change is part of the ESMS; when fully
operational, it will provide methods for managing the safety risks
associated with changes to business processes and organizational
assets, to technical information and assets, and to the diverse and
dynamic risk environments in which PG&E operates.  Additionally,
PG&E has incorporated the concept of "Horizon Scanning" into its risk
management governance forums, and is exploring other mechanisms to
introduce horizon scanning into its planning efforts.  In addition, PG&E
will be using scenario planning as a strategic planning method so that

the company can be responsive and effective in dealing with various scenarios in the future which may affect the business.

Horizon scanning aims to identify, in a systematic manner, potential future developments, whether these are emerging risks not accounted for by current planning or potential "black swan" events that challenge past assumptions. Horizon scanning is intended to collect and synthesize observations that may be pertinent to future developments and allow for the examination of the implications and better preparedness or potential mitigation efforts. Employment of horizon scanning in discussions of risk and compliance matters is intended to encourage employees to raise concerns and bring potential issues to the table for discussion. Issues could include experiences others in the industry have encountered where similar conditions could be present at PG&E (e.g., the recent NiSource gas explosion), and issues that have come up at conferences or through networking and benchmarking with peers inside and outside the industry. In addition, the EORM team benchmarks top risks across the industry and reaches out to others in similar functions at companies much different from PG&E (e.g., airlines, financial services companies, etc.).

**f.    Embracing Existing Independent Oversight of Safety and Risk (*A. Vesey*)**

As discussed, PG&E has embraced the views of outside experts regarding improvements to its safety culture and performance.

**1)    The Independent Safety Advisor and the Independent Safety Oversight Committee (*A. Vesey*)**

PG&E has created the role of an Independent Safety Advisor, who reports directly to PG&E Corporation's CEO and President, and who will serve as the Chair of the recently formed ISOC. In April 2019, PG&E announced that it would engage Christopher Hart to serve as this Independent Safety Advisor, providing advice to PG&E Corporation and its subsidiaries, including the Utility. Mr. Hart was officially hired in August 2019, and the ISOC held its first meeting the week of December 9-16, 2019. Mr. Hart brings to

this role extensive administrative experience overseeing complex, hazardous industries to ensure they operate safely.  Mr. Hart is the immediate past Chair of the NTSB, the federal agency that investigates accidents in all modes of transportation (including the gas pipeline explosion in San Bruno in 2010), determines what caused them, and makes recommendations to prevent recurrences. Mr. Hart first became a member of the NTSB in 1990 and served until 1993.  From 1993 until 1995, he was Deputy Administrator of the National Highway Traffic Safety Administration, then he went on to serve as Federal Aviation Administration (FAA) Assistant Administrator for System Safety and FAA Deputy Director for Air Traffic Safety Oversight before returning to the NTSB in 2009. Mr. Hart holds a law degree from Harvard University and Master's and Bachelor's degrees in Aerospace Engineering from Princeton University.  In 2018, following Mr. Hart's resignation from the NTSB, he was engaged in connection with the natural gas distribution line explosions in Boston to advise on a statewide assessment of the physical integrity of the gas distribution system, as well as the operational management policies and practices of the distribution companies.

The ISOC is comprised of members with relevant and diverse safety and operational expertise, who are compensated for their time.  In addition to Mr. Hart, all of the other committee members are independent and external to PG&E, although certain Utility employees will assist individual committee members in performing their duties.

The ISOC is modeled on independent safety oversight committees that have been established with respect to nuclear power and dam operations.  Among other things, it will provide independent oversight and review of the Utility's operations, including safety and regulatory compliance, safety leadership, and operational performance.  For instance, the ISOC will enable the Utility to better:  (i) verify processes and safeguards through business unit, functional, and corporate assurance programs and

audits; (ii) analyze safeguard performance data identified through assurance activities; and (iii) apply learning from assurance analyses to improve risk assessment quality and support risk-based decision making.

While the ISOC's initial focus will be on wildfire safety, it will scale throughout 2020 such that every area of the business is covered with an independent safety assurance function.

Beginning in December 2019, ISOC members conducted field visits, interviews, and observations of meetings as necessary to evaluate areas of responsibility, as well as reviews of documentation relating to safety performance. The ISOC's initial site visit was during the week of December 9-16, 2019, during which the ISOC assessed processes and programs associated with wildfire safety risks. ISOC members who took part in this visit included, in addition to Mr. Hart, Mr. Frank Gallaher (former COO of Entergy with over 40 years of utility experience), Mr. Gus Ponce (senior director at Exelon with more than 40 years of experience in electric transmission and distribution operations and contract management), Ms. Lynn Walter (veteran of multiple safety review boards across the utility industry), and Mr. Randy Lyle (former Battalion Chief with the California Department of Forestry and Fire Protection (CAL FIRE) and wildfire mitigation program manager with San Diego Gas & Electric Company). PG&E looks forward to incorporating ISOC's feedback from this and future reviews, and is committed to a culture of continuous safety improvement.

The ISOC will meet regularly, assess safety issues, and prepare reports highlighting performance for the respective periods, including an annual performance evaluation for Utility management. The ISOC's report findings and the responses from the relevant lines of business will be disseminated to senior Utility leaders and reviewed with the Boards of Directors or relevant Board committees.

2) **NorthStar Consulting Group (*A. Vesey*)**

In D.18-11-050, the Commission directed the Utility to implement the recommendations of the Commission's SED, as set

forth in a report prepared by NorthStar, and to serve quarterly reports on the status of its implementation. The Utility has embraced every single recommendation in the NorthStar report and has diligently focused on fully implementing them. The Utility submits quarterly reports to the SED on the status of its progress on these recommendations. The Utility actively monitors the execution and sustainability of each NorthStar recommendation that has a sustainability component and is ongoing in nature. Also, in compliance with D.19-06-008, adopted by the Commission on June 13, 2019, the Utility provides details of the safety-specific training given to the Utility's and Corporation's Boards of Directors.

NorthStar's review of the Utility's safety culture and performance is ongoing, as NorthStar continues to monitor the Utility's progress in implementing its recommendations. NorthStar submitted a First Update Report on the Utility's progress to the Commission in March 2019. In the First Update Report, NorthStar highlighted as an ongoing area of concern its recommendations involving increasing the time spent by frontline supervisors in the field. The Utility has been redesigning work procedures and adding support to reduce the administrative burden on frontline leaders in order to allow them to spend at least half their time in the field with crews. This increasingly will allow them to model and support safe behaviors and practices via regular open dialogue, and lead to improved safety, quality, and productivity. In the Utility's most recently submitted quarterly report to the SED, submitted October 31, 2019, the Utility provided updates on the Supervisor in the Field initiative. The report also provided updates on, among other things, enhancements to the Utility's safety observation tool which helps sharing of best practices across the enterprise, its Safety Observation Dashboard, and the utilization of Field Safety Specialists.

**3) Independent Court-Appointed Monitor (*A. Vesey*)**

Since April 2017, the Utility has had a court-appointed independent monitor in connection with its federal sentencing

following the 2010 San Bruno pipeline explosion.  The independent
monitor—the Honorable Mark R. Filip (ret.) of Kirkland & Ellis LLP—
was appointed for a maximum term of five years and has robust
oversight authority to help ensure that the Utility takes reasonable
and appropriate steps to maintain the safety of its gas and electric
operations and maintains effective ethics, compliance, and safety-
related incentive programs across the enterprise.  The Monitor's
15 areas of focus relate to gas operations (including pipeline
integrity management), and policies and procedures "relating to the
handling of safety citations and timely reporting of self-identified
potential violations."  The Monitor is supported by dozens of other
lawyers from his firm and by over a dozen subject-matter experts in
integrity management, gas transmission, utility operations, risk
evaluation, compliance and ethics, and safety.  The Monitor or his
representatives frequently attend Utility management and
operational meetings, and also Utility Board and Board committee
meetings.  PG&E has facilitated the Monitor's extensive oversight
activities.  For example, the Monitor and his team:  (i) have
conducted field interviews and meetings with hundreds of
employees across PG&E's service territory, many of whom have
been interviewed more than once; (ii) have conducted over
one thousand meetings and site visits; (iii) have visited operational
facilities including compressor and processing stations, storage
fields, training facilities, crew yards, and customer service centers;
(iv) have conducted panel discussions with dozens of employees,
which have focused primarily on PG&E's enterprise compliance and
ethics, safety, and culture, as well as the effects of the Company's
bankruptcy in those areas; (v) have maintained regular
communications with PG&E, including participating in standing
weekly calls to discuss emerging issues and general updates;
(vi) have generated thousands of requests for information; and
(vii) established a Monitor Helpline for PG&E employees to raise
concerns directly to the Monitor team, which PG&E continuously
promotes to its workforce. In May 2019, the federal court expanded

the Monitor's role, such that the Utility will report to the Monitor on its vegetation management status and wildfire mitigation work. PG&E has received helpful feedback from and maintained a constructive relationship with the federal monitor, and PG&E expects that this will continue.

4) **Post-Monitor Independent Safety Advisor (*A. Vesey*)**

As part of its embrace of independent safety oversight, PG&E is willing to work with the CPUC to establish an ongoing Independent Safety Advisor position ("Independent Advisor") effective upon the termination of PG&E's criminal probation or of the related Federal Monitor. When the Federal Monitor position is nearing an end, PG&E will evaluate its experience with the ISOC (described above), and decide whether the Independent Advisor position should be an evolution from the ISOC or whether the Independent Advisor should be structured as a more external role akin to the Monitor model.

The Independent Advisor would be an expert who would review PG&E's compliance and progress with respect to natural gas operations safety and wildfire and other disaster mitigation activities, including: vegetation management programs; reliability and hardening programs (both electrical infrastructure and microgrid implementation); risk analysis; implementation of mitigation measures (including the use of and effectiveness of the Emergency Operations Center and PSPS); public and workforce safety; and programs to assure compliance with the safety and operational metrics (to be established as discussed below).

Among other things, the Independent Advisor would provide reports to the SNO Committee, the CRO, the CSO and the CPUC, as set forth below. In addition, the Independent Advisor would work with the CRO, the CSO, and PG&E's management team to develop recommendations to address compliance issues and to enhance PG&E's safety performance. The Independent Advisor would have the authority to observe relevant meetings of the boards of directors (including committee meetings) and management meetings (excluding privileged discussions) to evaluate performance and

safety issues, conduct field visits, interviews and inspections, review documentation related to safety performance, and undertake any other tasks reasonably required in furtherance of the Independent Advisor's duties.

The Independent Advisor's duties would include:

- Monitoring PG&E's progress and performance related to the safety of the natural gas storage, distribution and transmission system;

- Monitoring PG&E's progress with respect to vegetation management programs, reliability and hardening programs (both electrical infrastructure and microgrid implementation), risk analysis, and prioritization of implementation of mitigation measures (including the use of and effectiveness of the Emergency Operations Center and PSPS);

- Monitoring PG&E's progress toward and compliance with its Safety and Operational Metrics;

- Providing periodic (and no less than quarterly) reporting to the SNO Committees, the CRO, the CSO, and the CPUC on its findings regarding PG&E's operations and compliance with its Safety and Operational Metrics;

- Providing periodic (and no less than quarterly) reporting to the SNO Committees, the CRO, the CSO, and the CPUC on the status of any remedial actions to address any deficiencies previously identified by the Independent Advisor or by PG&E, the CPUC, or any other court or regulatory body of competent jurisdiction; and

- Providing quarterly in person reports to CPUC staff, in conjunction with the CRO and/or CSO as appropriate, on all findings and remedial actions.

The Independent Advisor would have expertise and experience in natural gas storage distribution and transmission safety, wildfire safety and mitigation, utility vegetation management and electric system infrastructure, electric system emergency procedure and operations, and public and workforce safety (except to the extent

that the CPUC approves an appointee to this role who may not satisfy all of these criteria.  The Independent Advisor would have the authority to retain third-party experts to advise and provide analysis to assist the Independent Advisor in their duties.  The Independent Advisor position would exist through 2025, and any Independent Advisor would have to be acceptable to the CPUC (through the CPUC Executive Director) and the SNO Committee (or other Board-level committee with pertinent oversight).

### 5) Independent Wildfire Safety Auditor (*A. Vesey*)

As part of the recently announced settlement of the Wildfire OII, PG&E has agreed to retain one or more independent consultants to perform audits and reviews of, among other things, specified matters related to PG&E's enhanced vegetation management efforts and overhead distribution and transmission preventive maintenance. The audits will be conducted annually for a three-year period, subject to various provisos as set out in the publicly available settlement documentation.  PG&E Corporation shareholders shall pay the costs for the safety evaluator up to a total of $4 million over the three-year period.

### 6) Safety and Operational Metrics (*A. Vesey*)

In addition, PG&E will work with the CPUC to design and implement a program for regular CPUC oversight of PG&E's safety and operational performance.  PG&E will propose to the CPUC, prior to its emergence from Chapter 11, a set of proposed safety and operational metrics for the CPUC's review and approval, and a system for regular evaluation of those metrics for early identification of shortcomings and corrective actions.

### g. Enhancing PG&E's Compliance Program (*A. Vesey*)

In 2015, PG&E created a new position of Chief Ethics and Compliance Officer to build a best-in-class ethics and compliance program and oversee its implementation.  We strive to ensure that every business decision is guided by our commitment to operate with high ethical standards, and is—at a minimum—in compliance with all

applicable laws and regulations and internal policies and procedures. Julie Kane serves as each company's Chief Ethics and Compliance Officer, and she is submitting testimony herewith that provides greater detail about PG&E's ongoing and active efforts in this critical area.

### h. Enhancing PG&E's Enterprise Records and Information Management Program (*M. Hertzler*[19])

Another action to improve existing governance of safety culture is the enhancement of PG&E's ERIM Program. The risk of not having an effective records and information management program may result in the failure to properly construct, operate, and maintain a safe system—potentially leading to property damage or even loss of life. A lack of records availability may have additional negative consequences after the occurrence of a catastrophic event, such as the inability to locate records necessary to support an investigation or to understand the incident's root cause. Thus, an event involving unavailable or inaccurate records or information is likely to have an impact on asset and operational safety risks. By contrast, a mature records management program mitigates against the risk that records are not maintained in a manner that allows the timely, efficient, and accurate retrieval of information to support informed decision making.

PG&E established the ERIM Department in May 2014 to continue and expand the work of PG&E's former Information Management Compliance organization. The ERIM Department was established as a centralized function providing enterprise level strategy and support for maturing Records and Information Management (RIM). In 2015, PG&E brought together the RIM team within each LOB under the new ERIM Program, which standardized record management practices across the

---

[19] Megan Hertzler is PG&E's Director of Enterprise Information Governance. She has over twenty years of legal and compliance experience specializing in the creation and management of information governance programs designed to achieve the responsible management of information assets throughout the lifecycle, including promoting compliance, managing risk and enabling effective business process. She holds a Juris Doctor degree from Mitchell Hamline College of Law, and maintains both a license to practice law in the State of Minnesota and a Certified Information Privacy Professional – US (CIPP-US) certification through the International Association of Privacy Professionals (IAPP).

enterprise. The ERIM Program focuses on the deployment of consistent, integrated processes that support records management associated with operational safety, regulatory compliance, and knowledge management. ERIM is responsible for assessing and inventorying physical and electronic records, establishing specialized plans for vital records to ensure availability in the event of an emergency or interruption of service, and monitoring the process controls for protecting and storing records. The ERIM team coordinates and works with the Legal Department, Internal Audit, Regulatory Relations, Information Technology and other lines of business to manage risk, support compliance, and drive continuous improvement in PG&E's operations.

The ERIM Program has generated several initiatives focused on maturing records management processes at PG&E. Examples of recently completed initiatives include: (i) promulgating ERIM policy and uniform standards to build awareness of requirements, roles, and responsibilities for governing the identification, control, management, retrieval, retention, and disposition of records and non-records; (ii) developing a risk mitigation five-year roadmap; (iii) piloting and testing retention and disposition processes for physical and electronic records; (iv) reviewing controls and testing for over 6,000 legal and regulatory requirements mapped to lines of business; (v) developing an Enterprise Records Retention Schedule and documenting and certifying associated records inventories for PG&E's various lines of business; (vi) developing records process maps for identified Gas Operations departments; (vii) assessing and monitoring compliance with ERIM policy and standards; (viii) sunsetting 200 terabytes of personal e-mail personal folders and automating retention in Outlook, to improve compliance with the California Consumer Privacy Act and to improve our ability to manage and retrieve records; (ix) launching multi-faceted awareness campaigns and extensive field- based awareness training; and (x) providing recommendations on ERIM best practices.

The ERIM program also consults, educates, and partners with the lines of business to support and implement Program requirements and

| | |
|---|---|
| 1 | mature the lines of business's records management practices.  This |
| 2 | involves providing training and resources to all PG&E employees, |
| 3 | including those in the field.  The LOB Support Team provides quarterly |
| 4 | training to RIM Ambassadors and supports them as they coach field |
| 5 | office employees about how to meet PG&E's record management |
| 6 | requirements.  The ERIM Coordinator network also provides Program |
| 7 | awareness and training support in each PG&E division supporting all |
| 8 | lines of businesses and all territories throughout PG&E. |

**i.  Incentivizing Safety Through the Employee Incentive Compensation Plan (*A. Vesey*)**

PG&E has an incentive compensation program called the Short-Term Incentive Plan (STIP) that provides for cash incentive compensation to approximately 10,000 employees.  PG&E's STIP is described in the testimony of John Lowe (who focuses on the STIP in the context of executive compensation).  As described in his testimony, the STIP uses performance metrics for executives that are weighted 75 percent to customer welfare, and within those metrics, is predominantly weighted to public safety.  This represents industry leadership:  Based on our benchmarking analysis of 19 peer utilities, only 20 percent of those other companies use customer/public safety metrics.

**j.  Verifying the Utility's Safety-Related Filings (*A. Vesey*)**

As part of the recently announced settlement of the Wildfire OII, the Utility will provide to the Commission verification of safety-related filings by senior PG&E personnel, as specified in the settlement documentation.  For each such filing, the designated officer or manager will be tasked with verifying that the filing is accurate and complete.  Verification requirements will be designed to enhance accountability among senior-level personnel at PG&E as well as transparency and the public's confidence in PG&E's commitment to safety and reliability.

## 2. Improving the Customer Experience Through Increased System Reliability (*A. Vesey*)

As noted, the Utility's new leadership strongly believes that the key to future success is restoring customer trust and increasing customer satisfaction. Safety—especially public safety—is critical to this, as is increasing efficiency, particularly given that customers bear expenses associated with investments in operations.

Building a close relationship with the customer also is imperative, and PG&E is pursuing ways to improve in this area. One approach under examination is bringing a more local focus to operations, including potential regionalization of its operations. Additionally, as part of the recently announced Wildfire OII settlement, PG&E will provide reports to local governments in advance of certain planned vegetation management or system hardening work, upon request and under specified conditions. The guiding principle is to establish greater partnerships with local jurisdictions, and to bring the voice of the customer into every decision.

Finally, the importance of system reliability to achieving customer satisfaction cannot be overstated. In this regard, PG&E is intensely focused on reducing the number of customers affected by PSPS events, and reducing the frequency and duration of PSPS events. The sole purpose of undertaking a PSPS is to prevent the Utility's equipment from sparking a catastrophic wildfire, and thereby to preserve lives and avoid widespread property damage. The weather events prompting recent shutoffs were historic, both in scope and severity. Humidity levels dropped to the single digits. Weather stations recorded wind gusts topping 70-100 miles per hour in some areas. The warm, sustained winds further dried out brush and trees, creating dangerous fuels on the ground. Inspections showed hundreds of instances of damage and hazards, many of which could have led to a wildfire ignition, had the lines been energized. Thus, the PSPS events achieved their singular purpose: preventing catastrophic wildfires. De-energizing and then restoring millions of customers across distinct PSPS events is a monumental task, requiring coordination, communication and safe actions, and PG&E is proud to have accomplished this work without significant workforce injuries. As the Utility stated at a recent Commission

hearing, the need for PSPS events are likely to continue for a period of time, but the Utility understands that PSPS are highly disruptive to its customers and therefore is taking active steps to reduce the number of customers affected by PSPS events, and reducing the frequency and duration of PSPS, through system hardening and other actions.  Our goal is to render PSPS unnecessary as we further adapt our system, tools and practices for the realities of increasing wildfire risk.

The Utility recognizes that it did not execute the recent PSPS events flawlessly, though execution improved substantially between PSPS events in a short timeframe, especially with respect to customer accessibility and coordination with state and local authorities.  The Utility recognizes, moreover, that even a perfectly executed PSPS event presents hardships for millions of people.  The Utility intends to focus on a number of improvements to reduce the number of customers affected by PSPS events, and reducing the duration and frequency of PSPS going forward, including:

- Narrowing the scope of PSPS through measures such as additional sectionalizing devices, which allow areas unaffected by adverse weather to remain on, and additional weather stations to provide more precise local data;
- Promoting distributed generation enabled microgrids;
- Reinforcing our website and call centers to handle a much higher volume during these events;
- Improving the quality and accessibility of our outage maps;
- Strengthening coordination with government agencies, including the Governor's Office of Emergency Services, CAL FIRE, the CPUC, counties and cities, and tribal governments in our service area;
- Promoting customer options; and
- Improving outreach to vulnerable customers.

**3. Improving Customer Experience Through Regionalization (*A. Vesey*)**

PG&E will improve responsiveness to and services for its customers through increased regionalization of its operations.  Accordingly, PG&E will develop a reorganization plan ("Regional Restructuring Plan") for its business lines to create local operating regions that place leadership and operations closer to their customers. Each region shall be led by an officer

1  of the Utility who reports directly to the Utility CEO.  Each region will have its
2  own safety officer who reports to the CSO.  The purpose of the Regional
3  Restructuring Plan is to assure that PG&E is more responsive and
4  accountable to the particular needs and circumstances of the customer
5  base, improve customer service and safety at the local level, and include
6  customer service focused metrics, such as interconnection, outage
7  response and other localized safety issues.

8      PG&E will develop this Regional Restructuring Plan and metrics for
9  implementation of such plan, and following consultation with the Governor's
10  office will submit the proposed plan to the CPUC.  The Regional
11  Restructuring Plan will be subject to the approval of the CPUC.[20]  PG&E will
12  maintain a Regional Restructuring Plan in effect for at least five years
13  following the PG&E Plan Effective Date.

---

**20**  PG&E will implement the Regional Restructuring Plan if the CPUC approves it,
including approval of the recovery of the costs of implementation.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 6**

**WILDFIRE SAFETY (SCOPING MEMO SECTION 3.1)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 6
WILDFIRE SAFETY (SCOPING MEMO SECTION 3.1)

TABLE OF CONTENTS

A. Introduction (*D. Powell*) ................................................................. 6-1

B. Executive Summary (*D. Powell*) ....................................................... 6-2

C. Organizational Structure and Governance (*D. Powell*) .................................... 6-2

    1. Electric Operations Organization ............................................... 6-2

    2. Oversight ................................................................. 6-3

D. The Utility's Extensive Wildfire Safety Efforts (*M. Pender*) .............................. 6-4

    1. Enhanced Vegetation Management Program ........................................... 6-4

    2. Wildfire Safety Inspection Program ................................................ 6-6

    3. System Hardening ............................................................ 6-7

    4. Public Safety Power Shutoff Program .............................................. 6-7

    5. Situational Awareness Technologies ............................................... 6-7

    6. Wildfire Safety Operations Center ................................................ 6-8

    7. System Operations ........................................................... 6-8

    8. Alternative Technologies ....................................................... 6-8

    9. Additional System Enhancements .................................................. 6-9

E. Public Safety Power Shutoff Program (*T. Maratukulam*) ................................... 6-10

    1. Decision-Making Process ....................................................... 6-10

    2. Program Strategies ........................................................... 6-11

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 6**
**WILDFIRE SAFETY (SCOPING MEMO SECTION 3.1)**

A.  **Introduction (*D. Powell*)**

My name is Deborah Powell.  I am Vice President, Asset & Risk Management, Community Wildfire Safety Program (CWSP) at Pacific Gas and Electric Company (the Utility).  In that role, my responsibilities include overseeing many of the Utility's extensive wildfire safety measures.  I report directly to the Utility's Senior Vice President, Electric Operations, Michael Lewis.

I have nearly 30 years of corporate, energy industry, and military experience.  Since joining the Utility in 2010, I have served in several senior leadership roles in the Utility's Electric Operations and Power Generation organizations, including Vice President, Power Generation.  Prior to joining the Utility, I led the Lower Colorado River Authority's 425 MW Thomas C. Ferguson Power Plant as Plant Manager.  I began my career in the United States Navy, serving in a variety of leadership and engineering roles on several combatant ships.  I retired from the United States Navy Reserves in 2012.  I earned a Bachelor of Science degree in General Science from the United States Naval Academy and am a 2011 graduate of Leadership California.

I understand that Assembly Bill 1054, as codified in Public Utilities Code § 3292(b)(1)(C), requires the California Public Utilities Commission (Commission) to consider "the reorganization plan and other documents resolving [the Utility's] insolvency proceeding, including [whether the Utility's] resulting governance structure [is] acceptable in light of the [Utility's] safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission."  Chapter 5 discusses in detail the Utility's governance and operational structure, including its leadership and programs in the areas of safety, risk, compliance, and customer care.  The testimony in this chapter discusses the Utility's programs and management related to wildfire safety in particular.

The testimony in this chapter has three parts.  First, the testimony provides an overview of the Utility's organizational structure and management with respect to wildfire safety.  Second, the testimony describes the Utility's extensive

1  efforts to mitigate wildfire risk.  Third, the testimony discusses the Utility's

2  strategies to further enhance its Public Safety Power Shutoff (PSPS) Program.

3  **B.  Executive Summary (*D. Powell*)**

4  California faces a continued and growing threat of extreme weather and

5  wildfires.  The Utility is focused on the critical role it plays in preventing

6  electrically-caused wildfires.  As an additional precautionary measure following

7  the 2017 and 2018 wildfires, the Utility has enhanced and expanded its CWSP

8  to further reduce wildfire risks and keep its customers safe.  As part of these

9  extensive efforts, the Utility has:

10  1.  Refined its organizational structure to effectively integrate and prioritize

11  wildfire mitigation.

12  2.  Implemented aggressive measures to reduce the risk of wildfires, including

13  through enhanced vegetation management, increased safety inspections,

14  system hardening, and its PSPS Program.

15  3.  Taken numerous steps to further enhance communication and coordination

16  with respect to its PSPS Program, and to reduce the impact and scope of

17  PSPS events.  PG&E has consistently affirmed its commitment to learn and

18  improve with each PSPS event that occurs, as the company understands

19  that these events, although at times necessary to reduce the risk of

20  catastrophic wildfires, create significant disruptions and hardships for its

21  customers.

22  **C.  Organizational Structure and Governance (*D. Powell*)**

23  **1.  Electric Operations Organization**

24  Mitigating the increasing wildfire risk is an enormous, complex

25  challenge that requires extensive resources and coordination across various

26  functions within the Electric Operations organization, including engineering,

27  vegetation management, inspections and maintenance, distribution and

28  transmission operations, and effective stakeholder engagement.  The

29  Utility's Electric Operations organization recognizes wildfire as its greatest

30  risk and top priority, and its various groups work together to effectively and

31  efficiently mitigate the risk of wildfire and promote safety.

32  Wildfire safety is embedded and integrated into processes and activities

33  throughout the Electric Operations organization.  The Utility's Asset, Risk

Management, and CWSP team is primarily responsible for engineering, fire prevention and mitigation, vegetation management,[1] fire response, fire forecasting, stakeholder engagement, communications, and fire safety research and development. But other teams within the Electric Operations organization play a critical role in those efforts. For example, the Major Projects and Programs team is responsible for performing wildfire risk mitigation activities such as system hardening and PSPS mitigation. The Regulatory Compliance and Quality Assurance team provides quality oversight and expertise for the Enhanced Vegetation Management (EVM) Program described below. And the Distribution Operations and Transmission Operations field teams perform ongoing maintenance and repairs of facilities in High Fire Threat Districts (HFTD).

The Utility utilizes a risk-based approach to identify and address the assets most at risk of wildfire ignition and in areas with greatest potential fire spread. The Asset, Risk Management, and CWSP organization balances expenditures and uses location- and asset-based tools to help define budgeting priorities. The Utility recently updated its risk prioritization methodology and has been incorporating the feedback and learnings from the 2019 wildfire season into its planning for 2020 and beyond.[2] To ensure best practices with respect to wildfire safety, the Utility has benchmarked extensively with other California utilities, with utilities in Australia, and with other peers through the Edison Electric Institute.

**2. Oversight**

The CWSP team is highly visible and accountable within the Utility. For example, the team meets every two weeks with an officer-level steering committee to discuss and coordinate wildfire safety-related efforts and strategy. The steering committee is cross-functional and includes officers from stakeholders such as risk management, land and environmental affairs, customer relations, sourcing, and regulatory affairs. In addition, the CWSP

---

[1] In 2020, the Vegetation Management Program will transition to the Major Projects and Programs team within Electric Operations.

[2] The Utility will submit its 2020-2022 Wildfire Mitigation Plan with the Commission on February 7, 2020.

1  team reports regularly to the Boards of the Utility and PG&E Corporation

2  regarding the Utility's progress with respect to its Wildfire Safety Plan goals.

3  **D. The Utility's Extensive Wildfire Safety Efforts (*M. Pender*[3])**

4  In response to the unprecedented wildfires in 2017 and 2018, the Utility

5  implemented numerous measures to mitigate the risk of wildfires and to promote

6  safety, as was reflected in its 2019 Wildfire Safety Plan.[4]  The Utility is

7  committed to continuous learning and improvement in this area, and it engages

8  in efforts to monitor and evaluate its work so that it can address any potential

9  shortcomings and improve.  The Utility is in the process of finalizing its

10  2020-2022 Wildfire Mitigation Plan, to be submitted to the Commission on

11  February 7, 2020, and can provide further detail at that time regarding continuing

12  improvements for 2020 and beyond.  The Utility continues to make significant

13  enhancements to its programs and infrastructure to maximize safety and

14  mitigate wildfire risk moving forward.

15  **1.  Enhanced Vegetation Management Program**

16  Because vegetation contact with power lines is a leading cause of

17  electrically-caused fire ignitions in HFTD areas, the Utility has aggressively

18  expanded vegetation management efforts around its assets to further

19  mitigate wildfire risk.  In 2018, the Utility began implementing risk-based

20  enhanced vegetation management activities.  The Utility's EVM Program

21  targets vegetation with the potential to impact power lines in HFTD areas

22  and includes the following activities:  (i) removal of vegetation to establish

---

**3**  Matthew Pender is the Director of Electric Regulatory Strategy and the Program Management Office for the Utility's CWSP, focused on enabling the successful implementation of the full suite of efforts the Utility is undertaking to further reduce the risk of wildfires.  Since joining the Utility in 2006 as a Gas Engineer, Mr. Pender has held leadership positions in Gas Operations, Electric Operations, Land Management, and Vegetation Management.

**4**  *See* The Utility's Amended 2019 Wildfire Safety Plan (February 6, 2019), *available at* https://www.pge.com/pge_global/common/pdfs/safety/emergency-preparedness/natural-disaster/wildfires/Wildfire-Safety-Plan.pdf.  The Utility's Wildfire Safety Plan is its submission pursuant to statutory requirements and direction provided by the Commission in its *Order Instituting Rulemaking to Implement Electric Utility Wildfire Mitigation Plans Pursuant to Senate Bill 901 (2018)*, Rulemaking (R.) 18-10-007.

12 feet of radial clearance around conductors;[5] (ii) removal or pruning of overhanging branches and limbs to maintain conductor-to-sky clearance within a zone extending 4 feet on either side of the conductors; (iii) targeted removal of trees that are determined to pose a high risk of striking power lines under the Utility's risk-informed tree analysis; and (iv) performance of "ground to conductor" vegetative fuel reduction work to create fire defense zones under and adjacent to power lines in select locations. This program goes well beyond what is required by applicable state and federal regulations and is performed in addition to the Utility's regular ongoing vegetation work.

To ensure that its EVM Program is effective, the Utility performs post-work verification—a separate check by a certified arborist or experienced vegetation management professional—on 100 percent of the circuit miles within the Program's scope to identify and address any incomplete work or missed trees. As an additional quality check, the Utility also has deployed a quality assurance team to review a sample of randomly-selected circuit segments after the post-work verification is complete.

To PG&E's knowledge, the Utility's EVM Program is unprecedented in terms of its scope, scale, and pace of implementation. Notably, the Utility exceeded its aggressive goal of performing EVM work on approximately 2,450 circuit miles in HFTDs by the end of 2019, completing EVM work on a total of approximately 2,500 line miles and working approximately 65,000 trees along those line miles. In addition, as discussed in Chapter 8, the Utility has implemented several measures to improve the quality of its vegetation management work and records management in response to feedback from the Federal Monitor and the Utility's own internal findings.[6] These measures include enhanced training, added layers of quality review,

---

**5** State vegetation and fire safety standards only require radial clearances of 4 feet around power lines in HFTD areas. *See* General Order 95, Rule 35; Pub. Resources Code § 4293. The guidelines to Rule 35 recommend minimum clearances of 12 feet or more at the time of pruning to ensure compliance year-round, and the EVM Program is intended to adhere to this recommendation.

**6** *See* Ch. 8 at 18-20.

additional personnel, steps to improve the accuracy of its mapping, and improvements related to the applications used for records management.

## 2. Wildfire Safety Inspection Program

To further reduce the risk of wildfire from equipment failure—another leading cause of electrically-caused fire ignitions—the Utility developed and implemented its ambitious Wildfire Safety Inspection Program (WSIP). WSIP provided for accelerated safety inspections of electric infrastructure in HFTD areas as additional precautionary measures following the 2017 and 2018 wildfires. The Utility used enhanced criteria for the inspections based on identification of individual electric system components that can create a risk of potential wildfire ignition. As part of this Program, more than 2,000 Utility employees and contractors conducted enhanced safety inspections, in addition to the Utility's ongoing routine inspections and maintenance programs.

The Utility has completed 100 percent of its enhanced safety inspections on approximately 700,000 distribution structures, approximately 50,000 transmission structures, and 222 substations, although the inspections were completed after the Utility's original May 2019 target due to a combination of factors,[7] and the Utility continues to engage in ongoing quality assessment efforts. These enhanced inspections included ground inspections of electric poles, ground or climbing visual inspections of transmission structures, and drone and helicopter inspections of all transmission, and select distribution, facilities. Throughout the inspection process, the Utility has taken immediate action to address issues identified as an imminent risk to public or workforce safety and has completed other high-priority repairs on an accelerated basis.

---

[7] The Utility completed these goals after May 2019 due to factors such as inclement weather; limited availability of equipment, materials, and qualified personnel; and legal and regulatory challenges (including objections from property owners or governmental agencies and environmental permitting requirements). The Utility has provided the Commission with periodic status updates on its WSIP commitments, including the status of inspections and high-priority corrective actions, beginning in May 2019.

### 3. System Hardening

In 2018, the Utility initiated its long-term System Hardening Program, which reduces potential fire risk by strengthening its overhead electric distribution system, replacing aging assets, and reducing ignition potential from external factors, such as animals or vegetation contacting lines. The Utility's system hardening measures include replacing bare overhead conductor with covered conductor, select undergrounding where appropriate, replacing equipment with equipment identified by the California Department of Forestry and Fire Protection (CAL FIRE) as lower fire risk, and installing more resilient poles to increase pole strength and fire resistance.

The Utility exceeded its goal of hardening its 150 highest-risk miles in 2019 and has completed approximately 189 miles to date. The Utility is in the process of upgrading its electric system over a period of approximately 12 to 14 years by installing approximately 7,100 miles of stronger poles and covered power lines in HFTD areas that it has identified through ignition modeling and field analysis as the highest threat.

### 4. Public Safety Power Shutoff Program

In 2018, the Utility implemented its PSPS Program to proactively de-energize lines under extreme fire risk conditions. PG&E's most important responsibility is safety, and in certain conditions, public safety is best served by implementing a PSPS event to reduce the risk of catastrophic wildfires. PG&E recognizes the seriousness of each PSPS event, however, and has been actively taking steps to reduce the duration, frequency, and impact of PSPS events, as explained in detail in Section E below.

### 5. Situational Awareness Technologies

The Utility has been increasing its knowledge of real-time local weather and environmental conditions on a more granular level by installing new weather stations and high-definition cameras. The Utility has installed more than 600 weather stations and 130 high-definition cameras to date, and plans to have installed approximately 1,300 weather stations and 600 cameras by 2022. Relatedly, the Utility has also been enhancing its situational awareness toolset by increasing the granularity of weather

forecasting, modeling how weather events impact the Utility's facilities, and modeling potential fire spread.

**6. Wildfire Safety Operations Center**

In 2018, the Utility opened its Wildfire Safety Operations Center (WSOC) to monitor conditions in real-time, 24/7 during wildfire season and to coordinate prevention and response efforts. The Center is a physical facility that serves as the central hub for wildfire-related information.

**7. System Operations**

Reclosing devices such as circuit breakers and reclosers are used to quickly and safely de-energize lines when a problem is detected and re-energize lines when the problem is cleared. The Utility makes informed decisions on when to disable reclosers during elevated fire conditions in Tier 2 and Tier 3 HFTD areas. When reclosers are disabled, all identified faults are removed from the electric grid, which reduces the risk of potential ignitions. Following the 2017 wildfires, the Utility implemented the Wildfire Reclosing Disable program to disable automated reclosing during elevated wildfire conditions in Tier 2 and Tier 3 HFTD areas for distribution and transmission lines 115 kilovolts and below. In 2019, the program included more than 2,700 reclosing devices on distribution lines and reclosing devices on nearly 400 transmission lines. In 2020, the Utility intends to disable reclosers for the duration of the wildfire season. The Utility has upgraded the vast majority of its reclosing-capable devices with Supervisory Control and Data Acquisition (SCADA) capability to enable remote operation in Tier 2 and Tier 3 HFTD areas.

**8. Alternative Technologies**

The Utility has been exploring and testing various cutting-edge system protection technologies. For example, the Utility has been testing Rapid Earth Fault Current Limiter and distribution fault anticipation. The Utility also has enabled single-phase SmartMeters™ to send real-time alarms to the Distribution Management System under partial voltage conditions (25-75 percent of nominal voltage). This enhanced situational awareness can help detect and locate downed distribution lines more quickly to enable faster response.

The Utility also partners with outside researchers to test new technologies. For example, the Utility is partnering with the Department of Energy and national labs to test line sensing technologies with the goal of capturing grid signatures that can be used as early indicators of arcing to identify and mitigate fire risk.

### 9. Additional System Enhancements

Under the recently announced 2017/2018 Wildfire Order Instituting Investigation (OII) settlement, the Utility has committed to not seek rate recovery of $1.625 billion in wildfire-related expenditures and to spend $50 million in shareholder-provided funds to undertake 20 System Enhancement Initiatives.[8] The System Enhancement Initiatives build on the system modifications the Utility has already undertaken and encompass initiatives related to vegetation management, electric operations, evidence preservation and reporting obligations, community engagement, transparency and accountability, and information gathering.

For example, the Utility has committed to establish a tree crew training and certificate program to increase the availability of qualified tree crew workers to assist the Utility's vegetation management-related wildfire risk mitigation efforts. In addition, the Utility has committed to submit quarterly reports to the Commission's Safety and Enforcement Division (SED) summarizing the status of transmission and distribution maintenance work generated by the Utility's WSIP to assist SED in its ongoing oversight. Further, the Utility has committed to hold multiple, region-specific meetings with local government planning, public works, emergency services, and fire leadership at least every 6 months to exchange feedback and information regarding ongoing wildfire safety activities.

---

[8] *See* Joint Motion for Approval of Settlement Agreement, *Order Instituting Investigation on the Commission's Own Motion into the Maintenance, Operations and Practices of Pacific Gas and Electric Company (U39E) with Respect to its Electric Facilities; and Order to Show Cause Why the Commission Should not Impose Penalties and/or Other Remedies for the Role PG&E's Electrical Facilities had in Igniting Fires in its Service Territory in 2017*, Investigation (I.) 19-06-015, at 15-31 and Ex. C (December 17, 2019).

## E. Public Safety Power Shutoff Program (*T. Maratukulam*[9])

### 1. Decision-Making Process

PG&E does not take the decision to de-energize lightly. PG&E recognizes that even a perfectly executed PSPS event will impose hardships on individuals and communities, and particularly those in vulnerable circumstances.

The following video provides an overview of the science and decision-making around PSPS events:

https://players.brightcove.net/3339141204001/default_default/index.html?videoId=6117130015001.

As discussed in the video, when determining if power must be turned off for safety, the Utility carefully reviews and evaluates a combination of factors, including the following:

- A Red Flag Warning declared by the National Weather Service;
- Low humidity levels, generally 20 percent and below;
- Forecasted sustained winds generally above 25 miles per hour (mph) and wind gusts in excess of approximately 45 mph, depending on location and site-specific conditions such as temperature, terrain, and local climate;
- Condition of dry fuel on the ground and live vegetation (moisture content); and
- On-the-ground, real-time wildfire related information from the Utility's WSOC and field observations from field crews.

When the Utility's Meteorology team forecasts elevated PSPS potential, the Utility first initiates a Readiness Posture. During the Readiness Posture, the Utility engages in various activities to prepare for potential PSPS events, including with respect to refining the scope of any PSPS, preparing tools and communications for external outreach, ensuring system readiness, and preparing operations to restore service as quickly as possible in a safe manner.

---

**9** Tracy Maratukulam is the Director of the Utility's PSPS Program, focused on building and enabling successful execution of PSPS events. Since joining the Utility in 2002 as a Telecommunications Engineer, Ms. Maratukulam has held leadership positions in Information Technology and Electric Operations.

When there is a reasonable chance of executing PSPS to reduce public safety risk in a given geographic zone due to a combination of adverse weather and dry fuel conditions, the Emergency Operations Center (EOC) is activated, with a designated Officer in Charge.  The Officer in Charge is responsible for key decisions throughout the PSPS process, including activation of the EOC; notification to potentially affected customers; approval of event scope, including transmission assets; the decision to de-energize; and the determination as to when conditions are safe to begin restoration. The Officer in Charge is the Senior Vice President of Electric Operations, or his or her delegate.  The Utility's Planning and Intelligence, Operations, and other Incident Command Structure teams continually monitor the latest weather forecasts and local conditions and continuously update the Officer in Charge on the real-time status.  The Officer in Charge evaluates whether to implement a PSPS based on these inputs.  As the meteorological data becomes more certain, the Utility then discusses adjustments to the scope of the de-energization.

## 2. Program Strategies

The Utility has undertaken significant efforts to further enhance its PSPS Program.[10]  For example, the Utility has implemented measures to limit the number of customers potentially impacted by a PSPS event, including the following:

- The Utility has installed sectionalizing devices that can help limit the geographical impact of de-energization and accelerate the restoration process;
- The Utility has upgraded its devices with SCADA capability to enable remote operation of 100 percent of all line reclosers in Tiers 2 and 3 HFTD areas; and
- The Utility has installed new weather stations that provide more granular weather data to more accurately model and pinpoint specific regions

---

[10] *See generally* The Utility's Response to OII I.19-11-013, *Order Instituting Investigation on the Commission's Own Motion on the Late 2019 Public Safety Power Shutoff Events*, I.19-11-013 (December 13, 2019) (discussing the Utility's efforts in greater detail).

forecast to experience PSPS conditions and high-definition cameras that enhance real-time weather awareness during PSPS events.

In addition, the Utility has taken numerous steps to promote coordination with its external partners in connection with PSPS events, including the following:

- Team members from the California Governor's Office of Emergency Services (OES) and the CAL FIRE were embedded in the Utility's EOC while it was activated for late 2019 PSPS events so that they had up-to-date information and were highly engaged (the Utility had team members embedded at OES as well);

- The Utility provided Utility liaison representatives in certain local EOCs who could share information with the counties and work to resolve unique, local issues;

- The Utility developed a cloud-based solution to share key event information with counties while maintaining use of the PSPS portal;

- The Utility created a dedicated helpline, monitored 24/7, for special requests from counties and tribes;

- The Utility offered each county access to a Geographic Information System mapping specialist who could provide additional real-time information and technical support; and

- The Utility has established single points of contacts to interface with the counties to form stronger working relationships with them and to obtain a more comprehensive understanding of their individual needs.

The Utility also has implemented measures to mitigate the impact of PSPS events on its customers, especially vulnerable populations, including the following:

- The Utility notifies potentially impacted customers of a PSPS event through several channels, as possible, as early as approximately 48 hours before electricity is turned off, approximately 24 hours before electricity is turned off, just before electricity is turned off, during the public safety outage, and once power has been restored.

- The Utility has reinforced and improved its website and call center resources to increase their capacity.

- The Utility has provided strategic temporary microgrids and temporary generation support to support public safety and societal continuity concerns, such as water treatment and pumping, medical centers, and tunnels, during PSPS events.
- The Utility has implemented repeatable, formalized processes to reach customers enrolled in its Medical Baseline Program, including emails, texts, and calls to such customers with a request for acknowledgement, followed by repeat calls and texts until contact is successfully made. If acknowledgment of notification is not received, a Utility representative is sent to notify the customer in person, or leave an informational door hanger, if needed.
- The Utility has mobilized collaborative Community Resource Center operations across more than 80 sites. The Utility has worked with local officials and public safety partners to identify potential site locations and local needs.

PG&E has been incorporating learnings from 2019 to focus on minimizing the frequency, scope, and duration of PSPS events moving forward. After each PSPS event, the Utility conducts an After Action Review to consider internal and external feedback about the event. The Utility also addresses "Lessons Learned" in the reports that it files with the Commission following each PSPS event. The Utility is continuing efforts to improve PSPS implementation in light of these evaluations.

For the 2020 wildfire season, as a result of leveraging more granular data and deploying additional sectionalizing devices, field team pre-positioning, microgrids, and other activities, the Utility is targeting to reduce the number of customers affected by individual PSPS events by nearly one-third[11] and to cut restoration time in half after the PSPS-inducing weather has cleared.

Further, although the Utility's execution of its PSPS Program accomplished its objectives of preventing ignition of catastrophic wildfires while minimizing public safety impact, PG&E recognizes there are

---

[11] As compared to the number of customers who would have been impacted if these additional mitigations were not in place, using the 2019 PSPS events as a benchmark.

1    opportunities to reduce the required scope of future events and the
2    associated customer impact through its System Hardening Program (which
3    itself reduces the overall wildfire risk from PG&E assets).  For example,
4    over the next several months to years, PG&E plans to monitor and collect
5    information on the operating performance of its hardened distribution
6    facilities with the goal of being able to adjust its PSPS criteria for its
7    hardened distribution facilities on a location by location basis.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 7**

**EXECUTIVE COMPENSATION (SCOPING MEMO SECTION 3.1)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 7
EXECUTIVE COMPENSATION (SCOPING MEMO SECTION 3.1)

TABLE OF CONTENTS

A.   Executive Summary .............................................................................. 7-1

B.   Introduction ......................................................................................... 7-2

C.   Overview of Executive Compensation Principles ............................... 7-3

D.   The Utility's Executive Compensation Structure ............................... 7-7

     1.   Foundational Compensation ...................................................... 7-8

     2.   The Short-Term Incentive Plan .................................................. 7-9

     3.   The Long-Term Incentive Plan ................................................... 7-15

E.   The Ways in Which the Utility's Executive Compensation Structure
     Addresses AB 1054's Requirements ................................................. 7-19

     1.   The Criteria of § 8389(e)(4) ...................................................... 7-20

     2.   The Criteria of § 8389(e)(6) ...................................................... 7-22

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 7**
**EXECUTIVE COMPENSATION (SCOPING MEMO SECTION 3.1)**

**A. Executive Summary**

- Consistent with best practices and Assembly Bill (AB) 1054, a majority of the compensation for senior executives of Pacific Gas and Electric Company (the Utility, and together with PG&E Corporation, PG&E) will, upon emergence from Chapter 11, be at risk.

- PG&E's Short-Term Incentive Plan (STIP) will use objective, verifiable, and auditable performance metrics weighted predominantly to customer and workforce welfare, and within that category, primarily to wildfire safety and other public and employee safety metrics. This executive compensation design will lead the industry in its focus on safety.

- PG&E's Long-Term Incentive Plan (LTIP) upon emergence also will use objective, verifiable, and auditable performance metrics tied to customer welfare, and within that category, primarily wildfire safety and Public Safety Power Shutoff (PSPS) related safety. LTIP awards will consist of equity-based long-term compensation, which will meet the three-year holding requirement of AB 1054.

- For both the STIP and the LTIP, risk-related performance metrics will be informed by PG&E's Enterprise and Operational Risk Management (EORM) program, which in turn is informed by the California Public Utilities Commission's (Commission) Safety Model Assessment Proceeding (SMAP) and Risk Assessment Mitigation Phase proceeding (RAMP).

- The LTIP's PSPS-related metrics will be informed by the Utility Wildfire Mitigation Maturity Model the Commission is developing in Rulemaking (R.) 18-10-007.

- PG&E's executive compensation structure applicable upon emergence from Chapter 11 will comply with AB 1054, including by:
  - Promoting safety as a priority;
  - Promoting financial stability;
  - Using objective, measurable, and enforceable performance metrics;

7-1

1       –     Preserving the discretion of the Utility's Board of Directors and the
2            Compensation Committee of PG&E Corporation's Board of Directors to
3            reduce or eliminate incentive compensation awards;
4       –     Basing the majority of executive compensation on objective
5            performance metrics via the STIP and LTIP, at target levels; and
6       –     Requiring that a significant portion of compensation be equity-based and
7            held for at least three years.

## B. Introduction

My name is John Lowe.  I am Senior Director, Total Rewards for PG&E.
I lead the Compensation and Benefits functions, which are responsible for
design and implementation of PG&E's compensation and benefits programs and
practices, including PG&E's executive compensation programs.  I joined PG&E
in 2012 as Director of Executive Compensation before accepting my current
position in June 2016.  I have worked in the field of Human Resources for more
than 35 years, 25 of which have been specifically focused in the area of
compensation.  Prior to joining PG&E, I was the Manager of Compensation for
Michigan-based energy provider DTE Energy Company, Director of
Compensation and Benefits at Holly Automotive Division, Coltec Industries, and
spent years consulting on compensation and benefits strategies with The
UL Group, Ltd. consulting firm.  I hold a Bachelor of Science in Human
Resources Management from Oakland University and a Master of Arts in
Industrial Relations from Wayne State University.

I understand that AB 1054, as codified in Public Utilities Code
§ 3292(b)(1)(C), requires the Commission to consider "the reorganization plan
and other documents resolving [the Utility's] insolvency proceeding, including
[whether the Utility's] resulting governance structure [is] acceptable in light of the
[Utility's] safety history, criminal probation, recent financial condition, and other
factors deemed relevant by the commission."[1]  I further understand that
AB 1054, as codified in § 8389(e)(6)(C), provides that "any approved bankruptcy
reorganization plan of an electrical corporation should, in regards to
compensation for executive officers of the electrical corporation, comply with the
requirements of [§ 8389(e)(4) and (e)(6)]."  I believe, and I understand that the

---

[1]    All further statutory references are to the Public Utilities Code.

PG&E Corporation Compensation Committee believes, that the executive compensation structure described below, which the Utility intends to have in place upon emergence from Chapter 11, not only meets but exceeds AB 1054's requirements. The Utility hereby formally requests that the Commission approve this executive compensation structure pursuant to §§ 3292(b)(1)(C) and 8389(e).

My testimony below has three parts. First, I provide an overview of key executive compensation principles, including how a well-designed compensation program can align with achievement of a company's goals and objectives (which in PG&E's case include, as the top priority, promoting customer welfare, especially in the area of safety). Second, I describe the background and parameters of the executive compensation structure that the Utility plans to have in place upon its emergence from Chapter 11, focusing in particular on performance-based compensation awardable under PG&E's STIP and LTIP. As I discuss below, these programs will heavily incentivize customer welfare and safety—far more than the compensation programs of utilities historically have—consistent with PG&E's safety priorities. Third and finally, I discuss the ways in which the Utility's overall executive compensation structure that will apply upon emergence will address the requirements of § 8389(e)(4) and (e)(6).

## C. Overview of Executive Compensation Principles

Executive compensation is an important element of attracting and retaining talented leaders, and aligning their compensation with achievement of an organization's objectives. In PG&E's case, this includes safeguarding and improving customer welfare by compensating outcomes that are specifically related to safety culture and performance.

Executive compensation divides into two broad categories: (i) foundational compensation; and (ii) performance-based or incentive compensation (sometimes called "at risk" compensation). The two together are necessary to provide a market-competitive level of compensation.

Foundational compensation provides an executive with a stable foundation of income and other benefits. It includes base salary and certain other items such as health and pension benefits. Performance-based compensation, by contrast, is not guaranteed and serves different purposes. As its name implies, it is designed primarily to align compensation with various kinds of performance or conduct, and thus is contingent on such performance or conduct.

Performance-based compensation can be contingent in one or more of several ways.  First, it may be paid only if specified criteria are met.  An example would be cash that is paid only if the executive satisfies certain individual performance goals, if the business unit the executive leads achieves stated objectives, or if the company as a whole meets certain milestones.  Second, performance-based compensation might be paid without meeting certain performance metrics, but nevertheless remain contingent on performance because its value depends on the performance of the company as a whole.  An example would be restricted stock units that vest based on length of service; although such units vest based solely on the passage of time (and thus serve a retention purpose), their value depends on the company's stock price, which in turn depends on the company's performance across a variety of areas (e.g., avoiding catastrophic public safety incidents, operating efficiently, or earning the company's allowed rate of return).  Third, performance-based compensation can be contingent for both reasons, i.e., it might be paid only if performance metrics are met, and its value further may depend on performance.  An example would be performance shares that are settled/paid only upon achievement of performance metrics, with their value dependent on the stock price and thus dependent on overall company performance.

In April 2017, Willis Towers Watson, an international advisory firm that PG&E uses as a consultant, published a study entitled *Principles and Elements of Effective Executive Compensation Design*.[2]  It took into account, among other things, "the views of hundreds of board members across various organizations and industries" and the views expressed during "a series of in-depth workshops to distill the insights and experience of more than 100 … senior EC [executive compensation] consultants."[3]  Willis Towers Watson reported that "[w]hile there is little consensus on the specific principles that should guide EC decisions, …

---

[2] According to Willis Towers Watson:  "[It] is a leading global advisory, broking and solutions company that helps clients around the world turn risk into a path for growth.  With roots dating to 1828, Willis Towers Watson has 40,000 employees serving more than 140 countries.  [It] design[s] and deliver[s] solutions that manage risk, optimize benefits, cultivate talent, and expand the power of capital to protect and strengthen institutions and individuals."  Willis Towers Watson, *Principles and Elements of Effective Executive Compensation Design*, at 51 (Apr. 2017).

[3] *Id.* at 1.

the views of diverse stakeholders have coalesced around a loosely shared point of view on what's right and wrong with pay at the top of the house in major organizations today."[4]  Willis Towers Watson's report contains some guideposts for best practices in designing executive compensation programs, including the following:[5]

First, "EC programs should incent and reward the behaviors and processes that reinforce the activities organizations undertake to create sustainable long-term value for multiple stakeholders" (in PG&E's case, customer welfare and safety as the highest priorities).[6]  Executive compensation should incentivize management to achieve positive outcomes for shareholders *and other* stakeholders (e.g., in the context of a regulated utility, customers and the public). As Willis Towers Watson explains, "While the creation of value for an organization's shareholders is the overriding imperative for public companies, the creation of value for other stakeholders is an important means to this end."[7]

Second, "[f]or senior executives, a majority of [overall compensation] should be in the form of incentive compensation; [and] a majority of incentive compensation should be in the form of LTIs [long-term incentives]."[8]  A well-designed executive compensation structure nevertheless should recognize that "the creation of value needs to be viewed … over multiple time frames in light of short- and long-term outcomes."[9]

Third, "[o]rganizations should carefully evaluate and define the objectives associated with their incentive plans and should align plan features (e.g., vehicle and performance measures) with these objectives."[10]  In other words, a

---

**4**   *Id.* at 2.

**5**   I do not discuss all the principles articulated in the Willis Towers Watson report, but only certain principles that the Commission may find most relevant to whether the Utility's executive compensation structure fulfills the criteria of AB 1054.

**6**   *Id.* at 8.

**7**   *Id.* at 9.

**8**   *Id.* at 15.

**9**   *Id.* at 8.

**10**  *Id.* at 16; see *also id.* ("[O]rganizations should put great[] emphasis on establishing well-conceived objectives and considering their short-term and LTI plans in totality as part of an overall portfolio."); *id.* at 17 ("Performance measures … should be selected in light of the organization's long-term strategy.").

company should have a clear idea of what it wants to incentivize, and should design its compensation vehicles and performance metrics accordingly (while guarding against and mitigating any unintended adverse incentives).

Fourth, a performance-based compensation "strategy should address … the desired targeted reward positioning at varying levels of performance."[11]  In other words, a performance-based compensation program should clearly define applicable performance metrics and achievement of those metrics, and specify the financial benefits of achieving them to varying degrees.  Implicit in this is the principle that targets must be realistically achievable; if they are perceived as out of reach, they will not have their desired incentive effect.  To illustrate, a well-designed incentive program might include:  (i) minimum or "threshold" metrics that must be met before any incentive payment is made;[12] (ii) "target" metrics that are more challenging but still reasonably achievable, and that result in higher payouts necessary to provide a market-competitive level of compensation; and (iii) "maximum" metrics that are even more ambitious but still within the realm of possibility, and that result in even higher payouts to provide even greater incentives to achieve desired outcomes.

Fifth, "[d]iscretion is a critical tool," whether used positively or negatively.[13] For example, situations can arise in which performance metrics are met and incentive payments are payable, but the compensation committee or board of directors determines that such payments nevertheless are inappropriate for some reason (e.g., because of a catastrophic public safety incident). Empowering the board or its compensation committee to reduce, eliminate, suspend, or defer incentive programs or payments thereunder (subject to legal restrictions) can be important for ensuring that incentive payments are not made inappropriately under the totality of the circumstances.  After the devastating wildfires in 2018, the prior Compensation Committee of the PG&E Corporation

---

[11] *Id.* at 10; see *also id.* at 20 ("The thoughtful determination of the incentive plan's targets as well as its performance and payout ranges are critical for the plan's effectiveness."); *id.* at 17 ("The[] measures should be transparent, and plan participants should understand how they can directly influence the outcomes with regard to the measures.").

[12] See *id.* at 20 ("[O]rganizations should establish a reasonable floor or minimum standard below which incentives will not be paid to senior executives … .").

[13] *Id.* at 21.

1  Board eliminated all 2018 STIP payments that otherwise would have been
2  earned by senior executives.

3  **D.  The Utility's Executive Compensation Structure**

4      PG&E uses the same compensation structure for the executives of both
5  PG&E Corporation and the Utility.  PG&E's executive compensation structure
6  that will apply upon emergence from Chapter 11 will differ substantially from the
7  structure PG&E has used in the past.  PG&E's revised structure will strongly
8  align compensation with safety *outcomes*—much more than PG&E and other
9  utilities historically have.  This is consistent with customer and workforce welfare
10  and safety being PG&E's highest priorities and the foundations of its future
11  success.

12      PG&E has developed its new executive compensation design through a
13  robust process.  Briefly, its executive compensation professionals, including
14  myself and others, developed recommended program features, such as the
15  overall mix of compensation (including foundational versus performance-based
16  compensation, and within performance-based, different types of awards such as
17  cash incentive payments and performance shares).  We worked with senior
18  leaders and the operating units to identify the applicable categories of
19  performance metrics, relative weightings of the metrics in calculating awards,
20  how achievement of the metrics will be evaluated and measured, and so forth.
21  We also worked with Willis Towers Watson, which as noted above is a
22  recognized leader in executive compensation design.

23      The PG&E Corporation Compensation Committee played an integral role in
24  the process.  The Committee currently is comprised of independent directors
25  Meridee A. Moore (the Chair), William L. Smith, and Alejandro D. Wolff, all of
26  whom joined the PG&E Boards in 2019 with significant operating, compensation,
27  and board experience.  The Committee worked closely with PG&E's senior
28  management, internal executive compensation professionals, and independent
29  consultants through an iterative process to formulate the executive
30  compensation structure that PG&E proposes to apply upon Chapter 11
31  emergence.  This process required the Utility's Chief Executive Officer (CEO)
32  and other senior operating leaders to develop metrics that would push PGE
33  toward its most important safety, reliability, and affordability goals.  The
34  Compensation Committee also worked with Pay Governance, the independent

compensation consultant to the Board. Pay Governance is a recognized leader in executive compensation design and governance, utilizing nearly 60 professionals across the United States to work with nearly 400 companies annually. Pay Governance provided overall advice, market data, market insights, and other guidance.

As a result of the foregoing process, PG&E has revamped its short-term and long-term executive compensation incentive programs (the STIP and the LTIP). The process has produced an executive compensation design that PG&E believes will incentivize behaviors that will produce outcomes that will not only meet AB 1054's requirements, but chart a new compensation design path for the industry. PG&E's revised STIP and LTIP largely consist of outcome-based, objectively measurable, risk reduction measures that promote customer and workforce welfare (especially public and employee safety) and financial stability. PG&E's revised STIP and LTIP use metrics that are informed by the risk drivers associated with PG&E's top risks as identified through its EORM program—a quantitative-based risk-reduction program that incorporates learning from the Commission's SMAP and RAMP. To PG&E's knowledge, this approach to executive compensation is unique in the industry.

The following describes the overall executive compensation structure (including foundational compensation, the STIP, and the LTIP) that will apply upon Chapter 11 emergence, as approved by the Compensation Committee and subject to the direction the Commission may provide in its decision in this matter.

### 1. Foundational Compensation

Foundational compensation for executives will consist of base salaries plus a handful of standard items such as health insurance benefits. Certain limited corporate perquisites such as parking and health club memberships, as described in PG&E's 2019 joint proxy statement, also will be provided. Such perquisites are typical in the industry, and align with shareholder and other stakeholder interests by serving a recruiting and retention purpose.

Foundational compensation is expected to comprise only about 36 percent of overall executive compensation at target incentive compensation levels (ranging from 24 percent to 44 percent depending on the individual). Thus, a significant majority of overall compensation will be performance-

based compensation awarded through the STIP and the LTIP.  This is consistent with best practices as described above.

## 2. The Short-Term Incentive Plan

The STIP will further the Utility's business objectives—especially customer and workforce welfare and safety—by promoting positive outcomes in line with those objectives, and making corresponding cash payments, on an annual basis (in contrast to the LTIP's longer-term focus). The STIP and the LTIP together are consistent with the best practice described above of using multiple timeframes for payment of incentive compensation.  The STIP is expected to comprise about 21 percent of overall executive compensation at target levels (ranging from 18 percent to 21 percent depending on the individual).

The STIP's performance metrics will be weighted 75 percent to customer and workforce welfare, and within that category, predominantly public and employee safety.  The STIP's remaining metric will be weighted to financial stability (which depends in significant part on strong safety performance).  The STIP's metrics will be almost entirely outcome-based as opposed to activity- or effort-based.  The STIP's emphasis on customer and workforce welfare (especially public safety) tied to outcome-based metrics represents industry leadership:  Based on our analysis of 19 other utilities, only 20 percent use customer/public safety metrics, and only one uses such a metric that is outcome-based.

PG&E firmly believes that safety is the most important element of its mission of delivering safe, reliable, affordable, and clean electricity and gas services to its customers.  PG&E also believes that a focus on customer welfare across all aspects of its business complements its safety culture. For example, with an overly narrow or exclusive focus on safety, PSPS could be routinely implemented—and although that might ensure wildfire safety, it could cause hardships to PG&E's customers, especially its most vulnerable customers.  PG&E's mission is and must be to provide service both reliably and safely.  As such, PG&E's performance-based compensation structure aligns with customer welfare overall—including safety as its most critical element—but the structure does so without sacrificing reliability and affordability.  PG&E's compensation structure, for

1   example, promotes reducing the incidence and impacts of PSPS, and

2   increasing operational efficiency.**14**

3       The chart below sets forth the specific metrics applicable under the

4   STIP, their respective weightings, and the extent to which the metrics are

5   outcome-based as opposed to activity- or effort-based.  Exhibit 1 hereto sets

6   forth the "threshold," "target," and "maximum" metric achievement

7   milestones for each of these metrics.

| Category | Metric | Outcome-Based |
|---|---|---|
| **Customer Welfare (prioritizing public and employee safety)** <br> **75%** | Electric Operations (25%) <br> • Reportable Fire Ignitions (10%) <br> • Electric Asset Failure (10%) <br> • Distribution Circuit Sectionalization (5%) | <br> Y <br> Y |
| | Gas Operations (15%) <br> • Large Overpressure Events (7.5%) <br> • Gas Dig-In Reduction (7.5%) | <br> Y <br> Y |
| | Generation (10%) <br> • Safe Dam Operating Capacity (5%) <br> • DCPP Reliability and Safety Indicator (5%) | <br> Y <br> Y |
| | Workforce Safety (15%) <br> • Days Away, Restricted and Transferred Rate | <br> Y |
| | Additional Public Safety and Reliability (10%) <br> • Gas Operations Customer Response (3.33%) <br> • 911 Emergency Response (3.33%) <br> • Customers Experiencing Multiple Interruptions (3.33%) | <br> <br> Y |
| **Financial Stability** <br> **25%** | Core Earnings Per Share (25%) | Y |

8       The following provides further information about these metrics:

---

**14** On January 24, 2020, the federal court in the criminal case arising from the San Bruno pipeline explosion issued an order directing the Utility to "show cause at a hearing on February 19 at 8 a.m. why it should not, going forward, restrict all bonuses and other incentives for supervisors and above *exclusively* to achieving the PG&E Wildfire Mitigation Plan and other safety goals."  (Further Order to Show Cause (re Bonuses) in *United States v. Pac. Gas. & Elec. Co.*, No. CR-14-00175-WHA, at 2 (N.D. Cal. Jan. 24, 2020) (emphasis added).)  The foregoing portion of my testimony summarizes some of the reasons the Utility does not believe this would be appropriate.

Reportable Fire Ignitions:  This public safety-related metric is designed to measure the results of PG&E's mitigation of wildfire risk, one of PG&E's key enterprise risks as identified through its EORM program (discussed above).  The metric measures powerline-involved incidents that are annually reportable to the Commission pursuant to Decision 14-02-015 and that are within the Utility's High Fire Threat Districts.  Specifically, the metric measures reportable fire incidents where: (i) ignition is associated with the Utility's transmission and/or distribution powerlines; (ii) something other than PG&E facilities burned; and (iii) the fire traveled more than one meter from the ignition point.  The metric measures outcomes, not efforts.  The metric's achievement milestones can be reviewed against data from several prior years and benchmarked against data reported to the Commission by the other California utilities.

Electric Asset Failure:  This public safety- and reliability-related metric is designed to measure the results of PG&E's mitigation of the risks of wildfires and system failures.  It measures the number of failure incidents (regardless of cause) of electric distribution, transmission, and substation underground and overhead assets.  Specifically, the metric measures distribution asset or distribution substation asset failures in High Fire Threat Districts, and transmission asset or transmission substation asset failures system-wide, that result in sustained unplanned outages.  The metric measures outcomes, not efforts.  The metric's achievement milestones can be reviewed against historical company performance and benchmarked against external industry data.

Distribution Circuit Sectionalization:  This public safety- and reliability-related metric will measure PG&E's mitigation of the scope and impacts of, and risks associated with, PSPS events.  The metric pertains to the time it will take to complete planned installation/automation and operationalization of sectionalization devices, which reduce the scope and impacts of PSPS events by allowing power to remain on in areas where weather conditions do not warrant a PSPS but that nevertheless could experience an outage on account of system configurations.  The metric's milestones for completing the planned work will be time-based, with a "target" completion date of

September 1, 2020—before the traditional height of the California wildfire season.

Large Overpressure Events:  This public safety-related metric is designed to measure the results of PG&E's mitigation of the risk of a loss of gas containment, various types of which are among PG&E's key enterprise risks as identified through its EORM program.  The metric tracks the number of large overpressure events (which occur when gas pressure exceeds the maximum allowable operating pressure) leading to loss of containment, damages to facilities, and/or reduced pipeline capacity or availability.  The metric measures outcomes, not efforts.  The metric's achievement milestones can be reviewed against PG&E's historical operating data.

Gas Dig-In Reduction:  This public safety-related metric is designed to measure the results of PG&E's mitigation of the risk of a loss of containment from the Utility's underground gas transmission and distribution facilities.  The Utility participates in a one-call "811" public service program administered by Underground Service Alert (USA).  The Utility receives "tickets" from USA notifying the Utility of activities that could damage the Utility's underground pipelines.  The metric tracks the number of gas dig-ins per 1000 USA tickets received for gas operations (subject to certain exclusions).  The metric measures outcomes, not efforts.  The metric's achievement milestones can be reviewed against PG&E's historical data and benchmarked against American Gas Association data.

Safe Dam Operating Capacity:  This public safety-related metric is designed to measure the results of PG&E's mitigation of the risk of a large uncontrolled water release, which is one of PG&E's key enterprise risks as identified through its EORM program.  The metric measures the operating capacity of the mechanical equipment that is used as the main control to reduce the risk of such a release.  The metric measures outcomes, not efforts.  The metric is, to PG&E's knowledge, a first-of-its-kind metric for the hydro industry.  The metric's achievement milestones can be reviewed against historical operating data.

DCPP Reliability and Safety Indicator:  This public safety-related metric is designed to measure the results of PG&E's reduction of the risk of a nuclear core damaging event with the potential for a radiological release at

the Diablo Canyon Power Plant, which is one of PG&E's key enterprise risks as identified through its EORM program. The metric represents a composite of 11 performance indicators for nuclear power generation developed by the nuclear industry and applied to all U.S. nuclear power plants. The metric measures outcomes, not efforts. Its achievement milestones can be benchmarked against others in the industry.

Days Away, Restricted, and Transferred Rate: This employee safety-related metric is designed to measure the results of PG&E's reduction of the risk of workforce injuries, and to promote improved performance in this key area. It measures the number of Occupational Safety and Health Administration (OSHA) recordable cases in the current year for employees that meet OSHA's recordkeeping requirements (excluding fatalities) and that have resulted in at least one lost workday or one day of job restriction or transfer. The metric measures outcomes, not efforts. Its achievement milestones can be benchmarked against data from other utilities.

Gas Operations Customer Response: This metric is designed to measure the results of PG&E's mitigation of public safety risks and its efforts to increase reliability of service, by promoting prompt responses to customer calls or notifications reporting a gas odor or gas emergency. It measures the number of minutes from the time the Utility is notified to the time Utility personnel or another qualified first responder arrives onsite to the location (subject to certain exclusions, such as multiple calls for the same event, or calls relating to a planned gas release). The metric is an industry standard, and achievement milestones can be benchmarked against other utilities.

911 Emergency Response: This public safety-related metric measures the percentage of time that PG&E personnel arrive onsite within 60 minutes after receiving a 911 call (with onsite defined as arriving at the premises where the 911 agency personnel are waiting). The metric is designed to promote prompt response times so as to accomplish two things: reducing public safety risks associated with a confirmed hazard, and freeing public agency resources to respond to other emergency situations. The metric is an industry standard, and achievement milestones can be benchmarked against other utilities.

1      <u>Customers Experiencing Multiple Interruptions</u>:  This reliability-related
2    metric is designed to measure the results of PG&E's efforts to promote
3    system reliability.  It measures the number of customers who experience five
4    or more sustained service interruptions, whether planned or unplanned.  The
5    metric measures outcomes, not activities.  The metric is an industry
6    standard, and external benchmarks are available in connection with setting
7    its achievement milestones.

8      <u>Core Earnings Per Share</u>:  This metric promotes financial stability,
9    consistent with AB 1054's imperative that executive compensation be
10    structured not only "to promote safety as a priority and to ensure public
11    safety," but also to "promote … utility financial stability."[15]  This metric also
12    promotes safety, moreover, in that strong public safety performance is
13    essential to financial stability (as evidenced by the current Chapter 11
14    proceedings and the substantial decline in the price of PG&E Corporation
15    common stock since the 2017 and 2018 wildfires).  The metric also
16    promotes customer affordability, in that it aligns with cost efficiency.
17    A metric tied to financial performance and stability is customary in the
18    industry, and in my experience, expected by institutional shareholders.[16]
19    The metric's milestones will be set after equity issuances in connection with
20    Chapter 11 emergence are determined.

21            *   *   *

22      Two qualifying principles will overlay payment of STIP awards as
23    calculated based on achievement of "threshold," "target," or "maximum"

---

[15]  Pub. Util. Code § 8389(e)(4).

[16]  See, e.g., California Public Employees' Retirement System, *Governance and Sustainability Principles*, at 23 (Sept. 2019) ("Compensation programs should symmetrically align the interests of the companies' executives and employees with the providers of capital, that is, both sides should participate in good and bad times. Incentive pay should be tied to shareowner experience."); California State Teachers' Retirement System, *Corporate Governance Principles*, at 9-10 (Nov. 2018) ("The [compensation] philosophy should promote an alignment of interests between management and shareholders.  The company's compensation philosophy should intend to create long-term value … .").

milestones on the foregoing metrics.[17]  First, there will be an individual modifier for each executive that can result in adjustment of the executive's payout depending on how the executive performs relative to individually conveyed annual performance goals.  The individual modifier could result in an executive's award being reduced to as low as 75 percent or increased to as high as 125 percent of the amount otherwise payable.

Second, the PG&E Corporation Compensation Committee and the Utility's Board of Directors at all times will retain complete discretion to reduce or eliminate STIP awards for any particular executive or more broadly if, in the totality of the circumstances, the Committee or the Board sees fit to do so.  Such circumstances could include, for example, a catastrophic wildfire, loss of gas containment, or generating or nuclear event, or a failure of the Utility to maintain its safety certification pursuant to § 8389(e).  The Committee and the Board exercised their discretion to reduce 2018 STIP payouts to zero in light of the devastating 2018 Camp Fire, the hardships incurred by communities, and the Utility's financial circumstances including the need to seek relief under Chapter 11.

### 3. The Long-Term Incentive Plan

The LTIP is designed to further PG&E's long-term objectives— especially customer welfare and safety—by aligning compensation with those objectives and making corresponding payouts over the longer term. LTIP awards are all equity-based, and therefore inherently align compensation with strong company performance.  LTIP awards for 2020 post-emergence will consist entirely of performance shares that will be awarded only upon achievement of the objective performance metrics described below, with a proviso that such awards must be held for at least three years from the grant date.[18]  Thus, LTIP performance share awards will be paid based on performance, and in addition, their value over time will depend on PG&E's stock performance at least three years into the future.

---

**17**  PG&E ensures and will continue to ensure that the underlying data used to evaluate achievement of incentive compensation milestones is reliable.  PG&E historically has used its internal audit unit to confirm such reliability.  PG&E is reviewing external verification solutions to buttress the internal audit verification process.

**18**  The CEO's compensation structure currently also includes stock options.

LTIP awards will not include restricted stock units that vest based on length of service, notwithstanding the retention purpose such awards can serve; PG&E has elected to focus all of its long term compensation on achievement of safety and other important objectives. LTIP awards are expected to constitute about 44 percent of overall executive compensation at target levels (ranging from 36 percent to 55 percent depending on the individual).

The chart below sets forth the specific metrics that will apply upon Chapter 11 emergence, their respective weightings, and the extent to which the metrics are outcome-based as opposed to activity- or effort-based. Exhibit 2 hereto sets forth the "threshold," "target," and "maximum" metric achievement milestones for each of these metrics.

| Category | Metric | Outcome-Based |
|---|---|---|
| **Public Safety and Reliability** **50%** | **System Hardening (25%)** | |
| | **Substation Enablement (25%)** | |
| **Customer Experience** **50%** | **Customer Experience Index**<br>• Customer Satisfaction Score (25%)<br>• PSPS Notification Accuracy (25%) | Y<br>Y |

To take into account the long term financial health and stability of PG&E, the LTIP score determined by the metrics above will be multiplied by a Total Shareholder Return (TSR) modifier, which will increase or reduce the total payout to LTIP participants based on the relative performance of PG&E Corporation stock over time (described in more detail below).

The following provides further information about the metrics:

System Hardening: This public safety- and reliability-related metric aligns with mitigation of the risk of catastrophic wildfires. The metric measures rebuilding of overhead circuitry to current hardening design standards, targeted undergrounding, or elimination of overhead circuitry, in High Fire Threat Districts. The metric's achievement milestones, which will

1 be measured in completed circuit miles, can be benchmarked against data
2 from other California utilities.**19**

3      PG&E's risk analysis indicates that, while the risk of wildfires is inherent
4 in delivery of electricity in California and can never be entirely eliminated,
5 completing just 20 percent of PG&E's planned system hardening can reduce
6 the risk of a catastrophic wildfire by up to 90 percent. PG&E therefore
7 believes it is important to align compensation with progress toward
8 completion of this critical work.

9      <u>Substation Enablement</u>: This public safety- and reliability-related metric
10 promotes efforts to reduce the scope and customer impacts of PSPS. It
11 relates to a list of 64 substations that were identified following the October
12 2019 PSPS events as able to reduce the number of customers impacted by
13 a transmission-level PSPS event. The metric measures the number of such
14 substations that are successfully rendered energizable during such events,
15 whether through microgrid temporary or permanent solutions, or other to-be-
16 identified solutions.

17      <u>Customer Experience Index</u>: This customer satisfaction-related metric
18 aligns with strong customer service, especially in connection with PSPS
19 events. Its two equally weighted components will measure progress toward
20 two objectives. First, the "customer satisfaction score" will measure
21 improvement in customer satisfaction in 2022 over current satisfaction levels
22 based on a quarterly survey conducted by a third party that asks customers
23 a single overall question: "How would you rate the products and/or services
24 offered by PG&E?" Second, the "PSPS notification accuracy" component
25 will measure the percentage of PSPS-affected customers who receive
26 notifications at least 12 hours prior to a PSPS outage. The "PSPS
27 notification accuracy" component derives from the Commission's proposed
28 Utility Wildfire Mitigation Maturity Model in R.18-10-007, and at "threshold,"
29 "target," and "maximum" metric achievement milestones will correspond to

---

**19** Certain ongoing system hardening work in Butte County will not count toward
achievement of the metrics.

Maturity Levels 1, 2, and 3, respectively, in such model.[20]  Both components of the "customer experience" metric measure outcomes, not efforts.  Both components can be compared against historical data.

* * *

Two principles will overlay payment of LTIP awards as calculated based on achievement of "threshold," "target," or "maximum" milestones on the foregoing metrics.

First, the TSR modifier will result in an adjustment of LTIP payments by multiplying the LTIP score by a low of 75 percent to a high of 125 percent depending on PG&E's relative TSR.  Relative TSR is a measure of total share performance (price appreciation or depreciation, plus dividends received, if any), relative to the same measure for a comparator group of peer companies (a comparator group that the Compensation Committee reviews annually to ensure its appropriateness).  TSR is commonly used as a metric in long-term compensation plans—including at peer utilities in California and elsewhere—and is typically heavily weighted in such plans.  Also, TSR or a comparable financial performance metric is, in my experience, expected by institutional shareholders in order to help align executive incentives with long-term shareholder welfare.

Because the LTIP will use TSR only as a *modifier* after LTIP awards are initially calculated, TSR will receive less emphasis in the calculation of final awards than it would if, as is common at other companies, it were a metric in its own right with a significant weighting.  For example, under the LTIP, if "threshold" milestones for the Public Safety and Reliability metrics and the Customer Experience metric are not met, executives will not be entitled to an LTIP payout even if PG&E Corporation's stock performs well compared to the stock of peer companies.  If, however, the LTIP used TSR as an independent metric, then executives could be entitled to an LTIP payout notwithstanding that the Utility failed to meet public safety, reliability, and customer welfare goals.  Because the LTIP uses TSR only as a modifier, the sole effect of TSR will be to increase or decrease the LTIP score that is

---

[20] See Attachment 2 (Utility Wildfire Mitigation Maturity Model) to ALJ's Ruling on Wildfire Mitigation Plan Templates and Related Material and Allowing Comment, at 38, R.18-10-007 (Dec. 16, 2019).

otherwise calculated, thereby keeping the executive's compensation primarily tied to public safety, reliability, and customer welfare.

Second, the Board of Directors or the Compensation Committee may at any time suspend, terminate, modify, or amend the LTIP in any respect, and may cancel or annul any grant of an award provided that such cancellation or annulment does not, without the employee's consent, adversely affect the employee's rights under incentive awards previously granted. The Board and the Compensation Committee thus retain considerable discretion to reduce or eliminate LTIP awards if doing so is warranted in the totality of the circumstances.

**E. The Ways in Which the Utility's Executive Compensation Structure Addresses AB 1054's Requirements**

AB 1054, as codified in § 8389(e), contains two pertinent subsections containing two sets of requirements. First, subsection (e)(4) requires a utility to show that it has "established an executive compensation structure" meeting various criteria. Specifically:

> The electrical corporation [must show that it] has established an executive incentive compensation structure approved by the division and structured to promote safety as a priority and to ensure public safety and utility financial stability with performance metrics, including incentive compensation based on meeting performance metrics that are measurable and enforceable, for all executive officers, as defined in Section 451.5. This may include tying 100 percent of incentive compensation to safety performance and denying all incentive compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities.

Second, subsection (e)(6) requires the utility to show that it has "established a compensation structure for any new or amended contracts for executive officers" that is based on certain principles. Specifically:

> The electrical corporation [must show that it] has established a compensation structure for any new or amended contracts for executive officers, as defined in Section 451.5, that is based on the following principles:
>
> (i)     (I) Strict limits on guaranteed cash compensation, with the primary portion of the executive officers' compensation based on achievement of objective performance metrics[; and] (II) [n]o guaranteed monetary incentives in the compensation structure.
>
> (ii)    It satisfies the compensation principles identified in paragraph (4).

1  (iii)  A long-term structure that provides a significant portion of
2        compensation, which may take the form of grants of the electrical
3        corporation's stock, based on the electrical corporation's long-term
4        performance and value.  This compensation shall be held or deferred
5        for a period of at least three years.

6  (iv)  Minimization or elimination of indirect or ancillary compensation that
7        is not aligned with shareholder and taxpayer interest in the electrical
8        corporation.

9  I discuss below how these statutory requirements are addressed by the

10  Utility's post-emergence executive compensation structure.

### 1. The Criteria of § 8389(e)(4)

12  Covered Officers:  Section 8389(e)(4) requires the requisite

13  compensation structure to apply to "all executive officers, as defined in

14  Section 451.5."  The definition of "officers" applied by PG&E is based in part

15  on a functional analysis of individual duties, which may change over time.

16  As of the time of this testimony, the structure described above will apply to

17  all of the Utility's officers who qualify as "executive officers" under

18  17 C.F.R. 240.3b-7 (plus two officers listed in § 451.5 who are not listed in

19  § 240.3b-7, namely, the Secretary and Treasurer).[21]

20  Safety Incentives:  Section 8389(e)(4) requires the compensation to be

21  "structured to promote safety as a priority and to ensure public safety."  Both

22  the STIP and the LTIP will do this.  The STIP's metrics will be heavily

23  weighted toward customer and workforce welfare, placing a priority on public

24  safety.  The LTIP's metrics similarly will be weighted primarily to promote

25  wildfire- and PSPS-related safety.

26  Additionally, *all* LTIP awards incentivize customer and workforce welfare

27  over the long term because their value will depend over time on how PG&E

28  Corporation common stock performs.  The stock's relative performance

29  depends primarily on PG&E's performance, and PG&E's performance

30  depends heavily on public safety performance.  If safety performance is

31  poor—for example, if there is a catastrophic public safety incident—the

32  effect on the stock can be devastating, as evidenced by the stock losing

---

[21]  I understand that the Commission has construed the term "officer" as used in Pub. Util.
Code § 706 to mean the officers encompassed by 17 C.F.R. 240.3b-7.  See
Resolution E-4963 at 8 (Dec. 13, 2018).

significant value since the 2017 northern California wildfires. Inasmuch as performance-based LTIP awards must be held for at least three years after grant, all such awards necessarily promote safety over the long term.

Financial Stability Incentives: Section 8389(e)(4) also requires the compensation to be "structured to promote … utility financial stability." The STIP and the LTIP will do this. As noted, the STIP and the LTIP collectively will promote customer, public, and workforce safety, and thus contribute to financial stability. In addition, the STIP will promote financial stability directly via the core earnings per share metric, and the LTIP's TSR modifier likewise will promote financial stability.

Objective Performance Metrics: Section 8389(e)(4) requires the compensation structure to use "performance metrics[] [and to] includ[e] incentive compensation based on meeting performance metrics that are measurable and enforceable." As described above and in the exhibits hereto, both the STIP and the LTIP will use performance metrics that are objectively defined, measurable, enforceable, and auditable. The metrics will be almost entirely outcome-based.

Tying 100 percent of Incentive Compensation to Safety Performance: Section 8389(e)(4) provides in permissive, not mandatory, language that the compensation structure "may include tying 100 percent of incentive compensation to safety performance and denying all incentive compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities." As discussed above, PG&E believes that tying 100 percent of incentive compensation to safety metrics would not adequately align with PG&E's *overall* mission of providing safe, reliable, affordable, and clean energy to its customers. Though PG&E unequivocally views safety as the most important aspect of its mission, the other aspects also are important and should be promoted.

That said, as noted, the Board of Directors and the Compensation Committee have discretion to reduce or eliminate STIP awards for any reason (e.g., in the event of a catastrophic public safety event), and they did so for 2018. Similarly, the Board and the Compensation Committee may at any time suspend, terminate, modify, or amend the LTIP in any respect, and may cancel or annul any grant of LTIP awards provided that

1  such cancellation or annulment does not, without the employee's
2  consent, adversely affect the employee's rights under incentive awards
3  previously granted.

4  **2.  The Criteria of § 8389(e)(6)**

5      Section 8389(e)(6) requires the "compensation structure [applicable to]
6  any new or amended contracts for executive officers" to meet certain
7  criteria.  I understand that there is a legal question over whether this applies
8  to general compensation programs such as the Utility's programs described
9  above, or instead only applies to written employment contracts that set out
10  all the material terms and conditions of employment—which the Utility
11  generally does not have with its executives.**22**  Assuming for present
12  purposes only that subsection (e)(6) applies to the Utility's compensation
13  structure described above, I make the following points.

14      Cash/Incentive Compensation Mix:  Section 8389(e)(6)(i)(I) provides
15  that the compensation structure must place "[s]trict limits on guaranteed
16  cash compensation, with the primary portion of the executive officers'
17  compensation based on achievement of objective performance metrics."
18  The compensation structure applicable upon Chapter 11 emergence will do
19  this.  The only guaranteed cash compensation will be base salary (plus a
20  modest cash stipend in lieu of broader perquisites), which is and will remain
21  a minority of total compensation.  Also, STIP and LTIP incentive
22  compensation that is based on objective performance metrics will comprise
23  greater than 50 percent of total executive compensation at target levels.

24      No Guaranteed Monetary Incentives:  Section 8389(e)(6)(i)(I) provides
25  that there must be "[n]o guaranteed monetary incentives in the
26  compensation structure."  STIP and LTIP awards are entirely "at risk," and
27  thus, executives' only guaranteed monetary payments will be their
28  foundational compensation.  Further, PG&E generally does not have formal
29  employment contracts with its executives, and thus, for example, there is no
30  contractual entitlement to continued employment, to a salary for a particular

---

**22** LTIP awards are made through written award contracts, but such contracts do not set
out all material terms and conditions of employment.

1    term following termination of employment, or to a pay raise from one year to
2    the next.
3        Compliance With § 8389(e):  Section 8389(e)(6)(ii) provides that the
4    compensation structure should "satisf[y] the compensation principles
5    identified in paragraph (4)."  The compensation structure applicable upon
6    Chapter 11 emergence will do this, as outlined above.
7        Equity Awards:  Section 8389(e)(6)(iii) provides that the compensation
8    structure should include "[a] long-term structure that provides a significant
9    portion of compensation, which may take the form of grants of the electrical
10   corporation's stock, based on the electrical corporation's long-term
11   performance and value," with such "compensation … held or deferred for a
12   period of at least three years."  The LTIP will accomplish this because:  (i) all
13   of its awards will consist of equity awards; (ii) the Utility intends to ensure
14   that these equity awards comprise about 44 percent of total executive
15   compensation at target levels (ranging from 36 percent to 55 percent
16   depending on the individual); and (iii) the Utility will require that
17   performance-based equity awards be held for at least three years from
18   grant.
19       Minimization of Ancillary Compensation:  Section 8389(e)(6)(iv) requires
20   "[m]inimization or elimination of indirect or ancillary compensation that is not
21   aligned with shareholder and taxpayer interest in the electrical corporation."
22   As noted, although executives receive corporate perquisites such as parking
23   and health club memberships, these are de minimis, are typical in the
24   industry, and are aligned with shareholder and other stakeholder interests
25   by serving a recruiting and retention purpose.
26       In sum, I believe, and I understand that the Compensation Committee
27   believes, that the Utility's post-emergence executive compensation structure
28   meets the requirements of AB 1054.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 8**

**GOVERNANCE STRUCTURE:  CRIMINAL PROBATION**

**(SCOPING MEMO SECTION 3.2)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 8
GOVERNANCE STRUCTURE:  CRIMINAL PROBATION (SCOPING MEMO
SECTION 3.2)

TABLE OF CONTENTS

A.   Introduction ........................................................................................... 8-1

B.   Executive Summary ............................................................................... 8-1

C.   Witness Background .............................................................................. 8-2

D.   Overview of Probation and Monitorship ............................................... 8-3

     1.   Judgment ....................................................................................... 8-3

     2.   Order Establishing Independent Monitorship ............................... 8-6

     3.   Additions and Amendments to Conditions of Probation ............. 8-7

E.   The Utility's Compliance with Probation and Monitorship ................... 8-9

     1.   Independent Monitorship .............................................................. 8-9

     2.   General Probation Conditions .................................................... 8-10

     3.   Effective Compliance and Ethics Program ................................ 8-12

     4.   Oversight of Wildfire Safety ....................................................... 8-17

          a.   Monitor Oversight ............................................................... 8-18

          b.   Court Oversight .................................................................. 8-20

F.   Potential Impact of Plan and PG&E Governance ........................... 8-21

# PACIFIC GAS AND ELECTRIC COMPANY
## CHAPTER 8
## GOVERNANCE STRUCTURE:  CRIMINAL PROBATION (SCOPING MEMO SECTION 3.2)

### A.  Introduction

My name is Julie Kane.  I am Senior Vice President (SVP), Chief Ethics and Compliance Officer, and Deputy General Counsel for PG&E Corporation and Pacific Gas and Electric Company (the Company or the Utility).

I understand that Assembly Bill (AB) 1054, as codified in Public Utilities Code § 3292(b)(1)(C), requires the California Public Utilities Commission (CPUC or Commission) to consider "the reorganization plan and other documents resolving [the Utility's] insolvency proceeding, including [whether the Utility's] resulting governance structure [is] acceptable" in light of, among other factors, the Utility's "criminal probation."  The Assigned Commissioner's Scoping Memo in Investigation (I.) 19-09-016 directs the parties to "address this issue, including how the criminal probation may relate to or impact the resolution of other issues."[1]  My testimony is designed to assist the Commission as it considers these issues.

My testimony below has three parts.  First, I provide an overview of the conditions of probation and the structure of the independent third-party monitorship implemented in connection with that probation.  Second, I describe the extensive actions the Utility has taken to comply with the probation and to cooperate with the monitorship.  Third, I discuss how the probation and monitorship may relate to or impact the resolution of issues in this proceeding.

### B.  Executive Summary

My testimony addresses the following key points:

1) In 2017, the Utility was sentenced to pay monetary penalties and to a 5-year criminal probation, which includes implementation of an independent monitorship.

---

[1]  Assigned Commissioner's Scoping Memo and Ruling, I.19-09-016, at 5 (Nov. 14, 2019).

2) The Utility has undertaken extensive efforts to fully comply with all aspects of the Court's Judgment, and those efforts are integrated with the Utility's governance at senior levels.

3) For example, the Utility has paid its monetary penalties, has satisfied its community service obligations, has reorganized and rebuilt its companywide Compliance and Ethics Program, and has fully cooperated with the Monitor's numerous oversight activities, which have included more than 1,000 meetings and site visits and thousands of requests for information.

4) PG&E's governance structure is and will remain consistent and harmonious with the terms of its probation. PG&E's proposed Plan of Reorganization does not entail changes to its corporate governance or structure of a sort that could implicate the probation, and PG&E anticipates that the reorganized Utility will continue with its extensive probation compliance efforts.

5) To ensure compliance with the above-referenced provisions of AB 1054, PG&E will incorporate into its Plan of Reorganization or related documents any direction the Commission provides in its decision in this proceeding with regard to PG&E's governance as it relates to the Utility's criminal probation. If the Commission directs PG&E to make significant changes to its corporate governance or structure, such changes could potentially impact certain conditions of probation.

## C. Witness Background

I joined PG&E in May 2015 as part of its commitment to achieving a best-in-class ethics and compliance program. As Chief Ethics and Compliance Officer, I oversee and monitor the companywide Compliance and Ethics Program and lead ethics and compliance training and culture-building efforts. I also support PG&E's efforts with respect to the federal monitorship and probation.

I report directly to the Chief Executive Officer (CEO) and President of PG&E Corporation, and also functionally report to the Compliance and Public Policy Committee of the PG&E Corporation Board. I submit formal annual reports to the full Boards, including regarding the Utility's probation and the Monitor. I also regularly attend and report at Board and Board committee meetings on a variety of matters.

Before joining PG&E, I worked at Avon Products, Inc., as Vice President (VP) and General Counsel of Avon North America and Corporate Legal Functions. Prior to my role with Avon, I held a number of senior roles with Novartis Corporation and its affiliates over a 25-year period, including VP, Ethics and Compliance for Novartis Corporation; VP, Ethics and Compliance and Corporate Citizenship for Novartis Pharmaceuticals Corporation; and VP, Health, Safety and Environment and Chief Environmental Counsel for Novartis Corporation.

I earned an undergraduate degree in political science from Williams College and a J.D. from the University of San Francisco School of Law. I am a member of the State Bar of California.

## D. Overview of Probation and Monitorship

### 1. Judgment

The 2010 San Bruno pipeline explosion was a terrible tragedy. Immediately afterwards, PG&E accepted responsibility for what happened and took significant action to help those impacted and to make its pipeline system safer. For example, the Utility stipulated to liability in the civil cases and granted millions of dollars to the San Bruno community with no conditions. PG&E also undertook a massive program to update one of the largest pipeline systems in the country. Between 2010 and January 2017, the Utility spent more than $2.1 billion on gas pipeline safety improvements. Through its Pipeline Safety Enhancement Plan, the Utility strength tested or verified the pipeline strength of hundreds of miles of pipeline, replaced or upgraded hundreds of other miles to accommodate in-line inspection tools, and reviewed, scanned, and uploaded more than 3.8 million paper documents into electronic form.

In 2016, a jury found the Utility guilty of five federal felony counts of violating United States (U.S.) Pipeline Safety Act regulations related to integrity management and one federal felony count of obstructing an agency proceeding. In January 2017, the Utility was sentenced by the federal court

to pay monetary penalties consisting of a $3,000,000 fine and a $2,400 assessment, and to a 5-year term of probation.[2]

The Court's Judgment orders seven standard conditions of probation, summarized below:

1) Within 30 days of the date of the Judgment, the Utility must designate an official to act as its representative and primary contact with the probation officer;

2) The Utility must answer the probation officer's inquiries truthfully and must follow the probation officer's instructions;

3) The Utility must notify the probation officer 10 days before making any change to its principle business or mailing address;

4) The Utility must permit the probation officer to visit the Utility at any of its operating business sites;

5) The Utility must notify the probation officer within 72 hours of any criminal prosecution, major civil litigation, or administrative proceeding against the Utility;

6) The Utility must "not dissolve, change its name, or change the name under which it does business unless this judgment and all criminal monetary penalties imposed by this court are either fully satisfied or are equally enforceable against the defendant's successors or assignees"; and

7) The Utility must "not waste, nor without permission of the probation officer, sell, assign, or transfer its assets."[3]

The Judgment also orders nine special conditions of probation, summarized below:

1) The Utility must not commit another federal, state, or local crime while on probation;

2) The Utility must comply with the separately entered order concerning a third-party monitor, as described in more detail below;

3) The Utility must develop and submit to the Court an effective compliance and ethics program consistent with § 8B2.1 of the U.S. Sentencing

---

[2] *See United States v. Pacific Gas & Electric Co.*, No. 3:14-CR-00175, Dkt. No. 922, Judgment in a Criminal Case (N.D. Cal. Jan. 31, 2017).

[3] *Id.* at 2.

Guidelines, including a schedule for implementation, within 6 months of the date of the Judgment, and must revise the program and file updates with the Court whenever deemed appropriate by the monitor;

4) Within 60 days of the date of the Judgment, the Utility must place a full-page advertisement in the Wall Street Journal and San Francisco Chronicle publicizing the nature of the offenses, the convictions, the nature of the sentence, and the steps that will be taken to prevent the recurrence of similar offenses;

5) For 3 months, and to the greatest extent possible replicating the same channels and air times that the Utility used before and/or during trial in 2016, the Utility must air television commercials that publicize the nature of the offenses, the convictions, the nature of the sentence, and the steps that will be taken to prevent the recurrence of similar offenses, in accordance with the Court's instructions;

6) The Utility must submit to "(A) a reasonable number of regular or unannounced examinations of its books and records at appropriate business premises by the probation officer or experts engaged by the Court," and "(B) interrogation of knowledgeable individuals within the organization," and must pay compensation to and costs of any experts engaged by the Court;

7) The Utility must perform 10,000 hours of preapproved community service with a focus on the San Bruno area, 2,000 of which must be completed by high-level personnel;

8) The Utility must "notify the probation officer and monitor immediately upon learning of: (A) any material adverse change in its business or financial condition or prospects; or (B) the commencement of any bankruptcy proceeding, major civil litigation, criminal prosecution, or administrative proceeding against the organization, or any investigation or formal inquiry by governmental authorities regarding the organization"; and

9)  The Utility must pay the $3,000,000 fine and $2,400 assessment in a lump sum within 60 days of the date of the Judgment and must not pass the cost on to its customers.[4]

### 2. Order Establishing Independent Monitorship

The Court entered a separate order on January 26, 2017 establishing the third-party monitorship.[5]  The monitorship's stated purpose is "to help ensure PG&E takes reasonable and appropriate steps to maintain the safety of the gas transmission pipeline system, performs appropriate assessment testing on gas transmission pipelines, and maintains an effective ethics and compliance program and safety related incentive program."[6]  In recognition of the Commission's primary jurisdiction over the Utility, the Order specifically provides that the Monitor does not have authority to supplant the Commission's authority over gas transmission operations or pipeline safety, and does not have authority to require the Utility to take action contrary to the directives of its regulators.[7]

The Order also enumerates fifteen areas of focus for the Monitor's review, including fourteen areas relating to gas operations (including pipeline integrity management) and one area on policies and procedures "relating to the handling of safety citations and timely reporting of self-identified potential violations."[8]  The scope of the monitorship also covers review of any gas transmission pipeline safety issues that may arise during the monitorship.[9]

The monitorship has a term of five years unless it is terminated early under the provisions of the Order, and the Utility is responsible for paying the reasonable compensation and expenses of the Monitor and his team.[10] The Monitor has robust powers to carry out his duties, including to request

---

[4]  *Id.* at 3.

[5]  *Id.* at 6-18.

[6]  *Id.* at 6.

[7]  *Id.* at 7.

[8]  *Id.* at 7-9.

[9]  *Id.* at 9.

[10]  *Id.* at 10-11.

access to non-privileged information, documents, records, facilities and/or employees, and to take any other reasonable steps the Monitor may deem necessary to be fully informed.[11]

The Monitor is required to issue periodic reports setting forth his ongoing assessment and recommendations and to report any potential violations of criminal law to the Probation Office, the U.S. Attorney's Office, and the Utility.[12]  The Monitor also is required to report any non-compliances with the gas transmission pipeline safety regulations to PG&E's SVP, Gas Operations, and to me.[13]

The Order establishing the monitorship includes a successorship provision, which provides that "[i]n the event of a sale of the gas pipeline transmission system, assignment or transfer of all of PG&E's stock or assets to an unaffiliated third party pursuant to an arm's-length transaction, the terms of this Order shall continue to apply to PG&E and to any successor of PG&E."[14]

### 3. Additions and Amendments to Conditions of Probation

Following the October 2017 North Bay wildfires, the Monitor, the U.S. Attorney's Office, and the Utility agreed that the Monitor team also would evaluate certain aspects of the Utility's electric distribution operations, including vegetation management, electric pole and equipment maintenance and inspection, and emergency response and restoration.  In April 2019, the Court imposed the following additional conditions of probation in light of the 2017 and 2018 wildfires:

1) The Utility must fully comply with all applicable vegetation management and clearance-related laws;

2) The Utility must fully comply with the targets and metrics set forth in the Utility's CPUC-approved 2019 Wildfire Safety Plan (also known as "Wildfire Mitigation Plan" or "Wildfire Safety Improvement Plan"), including with respect to enhanced vegetation management;

---

[11] *Id.* at 11-12.

[12] *Id.*

[13] *Id.* at 16-17.

[14] *Id.* at 17.

3) The Monitor will assess the Utility's wildfire mitigation and safety work, including through regular vegetation management and equipment inspections and field interviews;

4) The Utility must maintain traceable, verifiable, accurate, and complete vegetation management records, must report monthly to the Monitor on its vegetation management status and progress, and must make all related records available for inspection at the Monitor's request; and

5) The Utility must allocate sufficient resources, financial and personnel, including contractors and employees, to achieve wildfire mitigation, and may not issue any dividends until it is in compliance with all applicable vegetation management requirements.[15]

On January 30, 2019, the Court found that the Utility violated the probation by failing to notify the Probation Office of a settlement that PG&E had entered into with the Butte County District Attorney's Office in connection with the 2017 Honey Fire. In response, PG&E took several actions to address the Probation Office's concerns and ensure ongoing compliance, including meeting with the Probation Officer in person to discuss her expectations, inviting the Probation Officer to join PG&E's weekly phone calls with the Monitor, and increasing email communications with the Probation Office. In May 2019, the Court held a sentencing hearing regarding the probation violation and imposed the following additional conditions of probation:

1. By no later than July 15, 2019, the Utility's Board and senior leaders, the Monitor, and the Probation Office must tour the Paradise and San Bruno communities and speak with victims and other stakeholders; and

2. A PG&E Board committee must assume responsibility for tracking progress against the Utility's CPUC-approved Wildfire Safety Plan and the new terms of probation imposed in April 2019, and must report to the Board at least quarterly on progress and how the Utility will address any shortfalls.[16]

The Utility has been complying with these conditions, as discussed below.

---

[15] *Id.*, Dkt. No. 1040, Order Adopting New Conditions of Probation (April 3, 2019).

[16] *Id.*, Dkt. No. 1071, Order Adopting New Conditions of Probation (May 14, 2019).

On November 27, 2019, the Court issued an order amending special condition of probation Number 7 relating to community service.  Specifically, the Court granted the city of San Bruno's request that PG&E, subject to the necessary approvals related to its bankruptcy, contribute $3,000,000 in funding toward a wildfire mitigation project in San Bruno in lieu of completing the remaining required hours of community service.**17**  The Order provides that once the funding has been provided, special condition Number 7 will be deemed complete and removed as a condition of probation.**18**

As discussed below, the Court has scheduled a hearing on February 19, 2020 to consider whether further conditions, relating to hiring and training tree trimming crews and incentive compensation, should be imposed.

**E. The Utility's Compliance with Probation and Monitorship**

PG&E is deeply committed to continually improving its performance and culture with respect to safety, ethics, and compliance.  In 2017, PG&E expanded the scope of its Compliance and Ethics Department to create a new corporate compliance function to lead and manage full and timely compliance with the terms of probation and the monitorship.  As explained below, PG&E has been fully and extensively cooperating with the monitorship and has been working to comply with all the conditions of probation.  In addition, as discussed in Chapters 5 and 6, PG&E has taken numerous steps beyond its explicit legal requirements to improve its safety operations and culture.

**1. Independent Monitorship**

The Court appointed Mark Filip as the Utility's independent Monitor in 2017.  Mr. Filip is a former U.S. Deputy Attorney General and former acting U.S. Attorney General, a retired federal judge, and currently a partner at the law firm of Kirkland and Ellis LLP.  Mr. Filip is supported by dozens of other attorneys from his law firm and more than a dozen subject matter experts in varied areas such as gas operations, safety, compliance and ethics, electric operations, and finance.

The Monitor has been heavily engaged since the beginning of the monitorship, and PG&E has facilitated the Monitor's extensive oversight

---

**17** *Id.*, Dkt. No. 1118, Order Adopting Amending Conditions of Probation (Nov. 27, 2019).

**18** *Id.*

activities.  For example, the Monitor and his team:  (i) have conducted field interviews and meetings with hundreds of employees across PG&E's service territory, many of whom have been interviewed more than once; (ii) have conducted over one thousand meetings and site visits; (iii) have visited operational facilities including compressor and processing stations, storage fields, training facilities, crew yards, and customer service centers; (iv) have conducted panel discussions with dozens of employees, which have focused primarily on PG&E's enterprise compliance and ethics, safety, and culture, as well as the effects of the Company's bankruptcy in those areas; (v) have maintained regular communications with PG&E, including participating in standing weekly calls to discuss emerging issues and general updates; (vi) have generated thousands of requests for information; and (vii) established a Monitor Helpline for PG&E employees to raise concerns directly to the Monitor team, which PG&E continuously promotes to its workforce.  PG&E has given the Monitor full access to non-privileged information, documents, records, facilities and/or employees as needed to fulfill his duties.

PG&E has worked closely and constructively with the Monitor.  The Monitor or his representatives frequently attend Utility management and operational meetings.  They also frequently meet with the full Boards, Board committees, and individual Board members (including in executive session without management present).  The Monitor has acknowledged that PG&E has cooperated and engaged with the Monitor at all levels of the company.**19**

## 2.  General Probation Conditions

The Utility timely paid its $3,000,000 fine and $2,400 assessment on February 1, 2017 and did not pass the cost along to ratepayers, as required by special condition of probation Number 9.  The Company also timely completed the requirements of special conditions Numbers 4 and 5 related to publicizing the conviction through an advertising campaign.

---

**19**  *See, e.g.*, *id.*, Dkt. No. 972, Transcript of Nov. 6, 2018 Proceedings, at 2-7 (Jan. 18, 2019).

Before the Court amended special condition Number 7 on November 27, 2019, the Utility had made substantial progress on its community service obligations and was on track to complete the requirements ahead of schedule. In developing a community service plan, the Utility met with the Probation Officer, San Bruno City Manager, San Bruno Director of Community Services, San Bruno Mayor, other city officials, and local community non-profits to understand San Bruno's service needs and priorities. The Utility's overall service strategy was focused on revitalizing schools and neighborhoods, including through San Bruno school transformation projects, local revitalization efforts, and skills-based tutoring and professional mentorship. As of December 1, 2019, the Utility had completed 7,478.25 (74.8 percent) of its 10,000 required total hours of community service, and 2,339.75 (117 percent) of its 2,000 required hours of community service by high-level personnel.

The Utility has contributed $3,000,000 in funding toward the city of San Bruno's wildfire mitigation project in compliance with the Court's November 27, 2019 Order, which completes special condition Number 7 under that Order. The Utility expects to continue performing community service in and around San Bruno as part of the Company's commitment to the communities it serves.

In addition, the Utility has been complying with the additional conditions of probation that were adopted in the Court's May 2019 Order.[20] PG&E assigned the Corporation Board's Compliance and Public Policy Committee the responsibility of tracking progress against the Utility's CPUC-approved Wildfire Safety Plan. In compliance with the Court's Order, the Committee's charter requires it to report to the Board both orally and in writing at least quarterly on the Utility's progress in meeting the terms of the Wildfire Safety Plan and the terms of probation that were adopted in April 2019 and, to the extent there are shortfalls, how the Utility will address the shortfalls. Also in compliance with the Court's Order, Board members and senior leaders visited Paradise on June 7, 2019 and San Bruno on July 16, 2019.

---

[20] *See* Order Adopting New Conditions of Probation, *infra*, n.16.

### 3. Effective Compliance and Ethics Program

On July 26, 2017, the Utility made a submission to the Probation Office to fulfill its obligation to develop and submit an effective compliance and ethics program under special condition Number 3. PG&E also cooperates extensively with the Monitor's ongoing oversight of the Utility's compliance and ethics program.

Since 2010, PG&E has taken significant steps to improve and revamp its companywide Compliance and Ethics Program and to promote a culture of safety, ethics, and compliance. As summarized below, the program complies with § 8B2.1 of the Sentencing Guidelines, in accordance with the conditions of probation.

*First*, the Sentencing Guidelines recommend that the organization's governing authorities have knowledge and oversight of the content and implementation of the compliance and ethics program, that high-level personnel of the organization ensure its effectiveness, and that specific individuals are delegated day-to-day responsibilities for its operation.[21] Consistent with these recommendations, PG&E has substantially increased senior management-level and Board-level oversight of its Compliance and Ethics Program and has significantly expanded its compliance and ethics team.

In March 2015, PG&E created the executive-level position of Chief Ethics and Compliance Officer to oversee the Compliance and Ethics Program. I joined PG&E as the Chief Ethics and Compliance Officer in May 2015. As Chief Ethics and Compliance Officer, I report directly to PG&E's President and CEO, as well as the Boards and their relevant committees. In 2015, the PG&E Corporation Board reconstituted its Public Policy Committee into the Compliance and Public Policy Committee to help ensure comprehensive and coordinated oversight of the Compliance and Ethics Program.

At the most senior level of management, PG&E developed a broad-based officer-level Compliance and Ethics Committee, which meets regularly to discuss critical compliance and ethics matters. At the next level

---

[21] *See* U.S.S.G. § 8B2.1(b)(2).

of management is the director-level Compliance and Ethics Leadership Team, which is responsible for developing and implementing strategies and policies related to Compliance and Ethics across PG&E.  I lead the officer-level Compliance and Ethics Committee, and the Compliance and Ethics Leadership Team reports directly to me.

Each Compliance and Ethics Leadership Team member is supported by a manager-level Compliance and Ethics Liaison from his or her line of business (LOB).  The Compliance and Ethics Liaisons are responsible for the day-to-day implementation of compliance and ethics programs for each LOB.  Each LOB also has its own risk and compliance committee, which regularly reviews that business's most significant risks and compliance requirements, including the status of associated mitigation measures.

PG&E's Compliance and Ethics Department has significantly expanded since the beginning of 2016 from 12 to approximately 28 full-time staff members.  The Department is responsible for building and implementing PG&E's Compliance and Ethics Program, and it provides subject-matter expertise, tools, resources, and guidance on compliance and ethics matters to leaders and employees (including coordination and sharing of best practices).

*Second*, the Sentencing Guidelines recommend that the organization assess and evaluate the effectiveness of the compliance and ethics program.[22]  PG&E has a 5-year, integrated strategic planning process with an annual cycle.  Every spring, we hold a day-long meeting with the Company's CEO and President, and senior executives from each LOB, referred to as "Session D," to review and assess the companies' risk and compliance issues.  During Session D, we discuss top operational risks (including safety and compliance risks), review the LOBs' management of those risks and any challenges, and discuss mitigation plans to address the risks.  This meeting represents the culmination of several months of preparation by the LOBs.

During 2019's Session D, PG&E's Compliance and Ethics Department introduced cultural challenges as a risk.  Specifically, the Department

---

**22**  *See id.* §§ 8B2.1(b)(5)(B), (c).

worked with multiple stakeholders to review how accountability gaps could lead to noncompliance and how undue pressure to meet metrics could prevent employees from speaking up.  The Department led an interactive brainstorming discussion with the leadership team to develop actionable next steps to address these challenges, including developing a campaign to promote listening up and following up for safety and compliance.  The Department has already begun implementing this campaign by integrating these topics into the two enterprise-wide trainings it leads and by developing a podcast designed to help employees better understand these topics.

In addition, in 2016, PG&E developed and implemented a standardized framework called the Compliance and Ethics Maturity Model to assess the effectiveness of each LOB's compliance program.  The Maturity Model scores each program on eight different elements derived from the U.S. Federal Sentencing Guidelines.  The Compliance and Ethics Department regularly reports to senior management and the Board on the progress toward achieving compliance maturity.  In addition, the department facilitates the sharing of best practices across LOBs.  In 2019, PG&E also initiated a parallel program to promote coordinated compliance management of several cross-functional, shared compliance programs.

*Third*, the Sentencing Guidelines recommend that the organization have established standards and procedures for compliance and ethics.[23]  In February 2018, PG&E released an updated Employee Code of Conduct that integrates PG&E's new Mission, Vision, and Culture statements and focuses on the importance of speaking up about safety issues, misconduct, and new ideas.  That Code sets forth PG&E's conduct standards and policies, explains how employees can report compliance and ethics issues, and describes PG&E's strong non-retaliation policy.  In summer 2018, PG&E updated the Boards' Code of Conduct and the Supplier Code of Conduct to align with the refreshed Employee Code of Conduct and the Company's Mission, Vision, and Culture statements.

---

[23]  *See id.* § 8B2.1(b)(1).

*Fourth*, the Sentencing Guidelines recommend that the organization communicate its standards and train its personnel.[24] PG&E's Compliance and Ethics Department leads two annual enterprise-wide trainings: a live, leader-led compliance and ethics training and a web-based Code of Conduct training. Both trainings emphasize the importance of speaking up and non-retaliation. In 2019, the Department led the annual compliance and ethics training at the Company's Officers and Directors meeting in June, which enabled approximately 200 officers and directors to discuss compliance and ethics together at one live session, including through a lively and interactive "town hall" style Q&A session. The training emphasized how leaders can impact the Speak Up, Listen Up, Follow Up ("Speak Up") culture, the importance of speaking up in difficult situations, and the critical importance of PG&E's strict non-retaliation policy. In addition to these enterprise-wide trainings, PG&E provides many other trainings related to compliance and ethics, including through its LOBs.

PG&E makes numerous strategic communications regarding compliance and ethics. One of PG&E's flagship communication efforts is its annual all-employee Compliance and Ethics Week ("C&E Week"), which in 2017 was extended to a full week of trainings, activities, and guest presentations. During the 2017 C&E Week, PG&E established an annual Speak Up Award Program, at which senior leaders honor employees who speak up about an issue or concern to highlight that PG&E encourages people to speak up to promote safety and compliance. The 2018 C&E Week also included PG&E hosting a two-day meeting of the National Energy Compliance Forum, an association of energy company compliance and ethics leaders, at which the twenty-four attending energy companies shared best practices in implementing compliance and ethics.

PG&E's 2019 C&E Week focused on personal accountability in managing data and records, highlighting the theme, "*I'm accountable: my work, my records, my integrity.*" At the third annual Speak Up Award program, we recognized approximately seventy nominated employees and honored nine selected awardees who exhibited the courage to speak up

---

[24] *See id.* § 8B2.1(b)(4)(A)-(B).

about an issue or concern to promote safety or compliance.  The 2019 C&E Week also included a panel conversation that I moderated with the CEO and President of the Utility and the CEO and President of PG&E Corporation regarding the importance of accountability in managing data and records in our day-to-day work.

In addition to the annual C&E Week, PG&E holds other trainings and events to promote compliance and ethics.  For example, in 2018, PG&E elicited a series of executive-level stories from senior leaders that highlighted speak-up behaviors, including taking accountability for their mistakes, and underscoring the importance of a speak-up culture.  Further, PG&E's Compliance and Ethics Department publishes a monthly newsletter promoting the importance of compliance and ethics and providing updates on critical initiatives.

*Fifth*, the Sentencing Guidelines recommend that the organization provide the opportunity for employees to report or seek guidance on compliance and ethics issues.[25]  As noted above, a top priority of PG&E's Compliance and Ethics Program is encouraging people to speak up regarding safety issues, misconduct, and new ideas.  In 2018, PG&E's Compliance and Ethics Department established a systematic approach to continue to improve its Speak Up culture through governance, behavioral tools, training, and communications.

In 2019, PG&E's Compliance and Ethics Department assumed responsibility for the Company's Reach Every Employee (REE) Program, which is designed to promote regular, meaningful conversations between supervisors and their employees, consistent with the existing Speak Up effort.  PG&E expanded the REE Program this year from exclusively safety-specific conversations to discussions on a broader array of concerns, including safety, potential misconduct, and employees' new ideas.  PG&E also enhanced the program by asking leaders to demonstrate accountability with their teams by following up after the conversations.

PG&E has several mechanisms for people to report or seek guidance on compliance and ethics issues.  PG&E has a 24-hour Compliance and Ethics

---

[25]  *See id.* § 8B2.1(b)(5)(C).

Helpline that is available to all employees, contractors, consultants, and suppliers and can be accessed by web, email, or a toll-free number. The helpline is administered by a leading third-party provider, Navex Global, and people have the option to submit reports anonymously. Employees also can seek guidance or report concerns through PG&E's Corrective Action Program or the independent Monitor Helpline, noted above.

In addition, to promote a culture of speaking up, senior leaders continuously encourage employees to raise issues directly to them. Such issues are promptly addressed through PG&E's Corrective Action Program or Compliance and Ethics Department, as appropriate. Further, PG&E established the PG&E Ethics Council, which includes representatives from all levels across the Company, to facilitate open dialogue between management and front-line employees regarding ethical issues. The Council meets several times each year and asks its members to bring the discussions back to their LOBs.

*Finally*, the Sentencing Guidelines have various recommendations to ensure that the organization promotes the consistency and accountability of its program.[26] In 2016, PG&E's Compliance and Ethics Department partnered with a third-party expert and key internal stakeholders to redesign its investigations and reporting processes based on the Sentencing Guidelines recommendations. The redesigned processes promote thorough and timely investigations, standardize discipline across the enterprise, provide for centralized oversight and records management, and improve tracking and reporting on trends and lessons learned. For example, PG&E tracks the Compliance and Ethics Helpline calls to identify recurring issues and trends. The Company also conducts internal audits to evaluate the effectiveness of its compliance processes and controls. As part of my regular reporting to Board committees and to senior management, I provide updates regarding any significant misconduct issues and/or trends.

**4. Oversight of Wildfire Safety**

PG&E's wildfire safety programs and measures are discussed in detail in Chapter 6. As discussed in that chapter, the Utility has timely completed

---

[26] *See id.* §§ 8B2.1(b)(3), (b)(5)(A), (b)(6), (b)(7).

its goals of performing enhanced vegetation management work on approximately 2,450 circuit miles in High Fire Threat Districts and hardening its 150 highest-risk miles through its System Hardening Program.

### a. Monitor Oversight

PG&E has fully cooperated with the Monitor's oversight of its electric operations and wildfire safety pursuant to the Court's April 2019 Order and has given his team extensive access to PG&E's employees, contractors, records, and facilities to enable his review. The Monitor team has undertaken numerous activities focused on electric operations, including inspecting lines and equipment in the field. For example, through November 22, 2019, the Monitor team had inspected over 450 circuit miles. The Monitor team sends the Utility periodic reports on their findings, as well as any escalated identifications of specific potential issues, and the Utility promptly addresses them. The Monitor team also is in the early stages of validating the infrastructure inspection work performed under the Utility's Wildfire Safety Inspection Program.

In addition to performing inspections, the Monitor has participated in operational meetings regarding the Utility's Public Safety Power Shutoff (PSPS) Program and was embedded full-time in the Utility's Emergency Operations Center during each PSPS event in 2019. The Utility also provides the Monitor with real-time emergency response and operational updates during and following wildfires.

In August 2019, the Utility received a copy of a letter report from the Monitor to the Court on his team's vegetation management field inspections, in which the Monitor preliminarily observed that the Utility's contractors had missed some trees that should have been identified and worked under the Utility's Enhanced Vegetation Management Program, and that the systems for tracking and assigning such work may have contributed to the missed work. Notably, the vast majority of the potential missed trees were missed only in the sense that they arose under the aggressive standards that the Utility voluntarily chose to adopt in its Program, and that went beyond the minimum requirements imposed by law; such misses do not indicate violations of state or

federal regulations.[27]  Nevertheless, the Utility is committed to meeting its elevated safety standards and, based on the Monitor's letter report and the Utility's own findings, the Utility has implemented several measures to address the concerns and recommendations.

Below are examples of the measures that the Utility has implemented to reduce the number of potential missed trees:

- The Utility implemented a new training program for all new pre-inspectors performing enhanced vegetation management work and all contractors assigned to the post-work verification teams;

- The Utility began requiring its pre-inspectors to pass a competency test, which is designed to assess their preparedness to accurately identify the enhanced vegetation management work that should be prescribed in the field;

- The Utility incorporated additional layers of controls within its enhanced vegetation management process, including by adding a second layer of review by pre-inspectors and by adding a quality assurance group to randomly review circuit segments after the post-work verification team has completed its assessment;

- The Utility has been conducting bi-weekly meetings with contractors to keep them apprised of any updates or new requirements, to discuss any personnel issues, and to solicit feedback on potential process improvements, among other things;

- The Utility has created enhanced written training materials for its pre-inspectors; and

- The Utility has brought on additional personnel to provide further oversight of the execution of the Enhanced Vegetation Management Program, including a VP, 2 Directors, 22 Execution Staff, and 15 Support Staff.

Below are examples of the measures that the Utility has instituted to improve its records management:

---

[27] Also, the identified difficulties partly arose from changes in scope arising mid-stream as a result of the Commission's May 30, 2019 Order prohibiting the removal of healthy trees without tree-specific arborist determinations, and more fundamentally from the unprecedented speed and scale of roll-out of this new program.

- The Utility has taken steps to standardize contractors' use of Arc Collector—a recently introduced mobile application that pre-inspectors use to record work;

- The Utility is surveying and capturing all of its overhead power lines in Tier 2 and Tier 3 High Fire Threat Districts using Light Detection and Ranging (LiDAR) technology to address potentially inaccurate line depictions in Arc Collector;

- The Utility's new training program for pre-inspectors discussed above includes detailed training on the proper use of Arc Collector;

- The Utility has developed enhanced reference materials on Arc Collector for use in the field;

- The Utility has implemented certain controls within the Arc Collector application to ensure that the necessary information is recorded and that certain data cannot later be revised or overwritten; and

- The Utility now requires that pre-inspectors, tree crews, and post-work verifications crews use a partner application—Survey 123—to certify that work is complete.

PG&E is dedicated to mitigating the risk of wildfires and continues to assess its wildfire safety practices to determine whether additional improvements would be beneficial.

**b. Court Oversight**

The Court also has been engaged in overseeing the Utility's ongoing wildfire prevention efforts, and the Utility has been complying with the Court's requests for information. On December 20, 2019, the Court requested that the Utility file a statement regarding its compliance with two of the conditions of probation relating to vegetation management and the Utility's Wildfire Safety Plan.[28]

In the Utility's response on January 15, 2020, the Utility explained that it "is unable to certify that it is in perfect compliance with all applicable regulations at any specific point in time" due to "the size of its service territory, the dynamic environment that PG&E power lines run

---

[28] *See United States v. Pacific Gas & Electric Co.*, No. 3:14-CR-00175, Dkt. No. 1129, Questions Re Probation Conditions (Dec. 20, 2019).

through and other legal and practical limitations,“ but that it "has made significant progress in enhancing its readiness and responsiveness to the increased threat of potential wildfires across its service territory" and "is taking a comprehensive, multi-pronged approach that aims to achieve as close to the standard of perfect compliance as feasible."[29] In addition, the Utility stated that it "made it a top priority in 2019 to meet the specific targets and metrics set forth in [its Wildfire Safety Plan]," and that it has met or exceeded 46 of the 53 commitments set forth in the plan.[30] The Utility explained why it was unable to meet 7 of the commitments and the steps it has been taking to address those commitments.[31]

Because the Utility has identified a lack of qualified personnel as one of the challenges it has faced, on January 16, 2020, the Court ordered the Utility to show cause why a further condition of probation should not be imposed requiring the Utility to hire and train sufficient crews and equipment as part of its own workforce to come into full compliance with the California Public Resources Code and PG&E's Wildfire Safety Plan.[32] On January 24, 2020, the Court ordered the Utility to also show cause why a further condition of probation should not be imposed "restrict[ing] all bonuses and other incentives for supervisors and above *exclusively* to achieving the PG&E Wildfire Mitigation Plan and other safety goals."[33] A hearing on these issues is set for February 19, 2020.[34]

## F. Potential Impact of Plan and PG&E Governance

The Utility has been working diligently to comply with all of the conditions of probation and intends to comply with the conditions moving forward, including

---

**29** *Id.*, Dkt. No. 1132, Response to Request for Information Regarding Probation Conditions, at 2-3 (Jan. 15, 2020).

**30** *Id.* at 9.

**31** *Id.* at 9-13.

**32** *Id.*, Dkt. No. 1133, Order to Show Cause (Jan. 16, 2020).

**33** *Id.*, Dkt. No. 1134, Further Order to Show Cause (Re Bonuses) (Jan. 24, 2020) (emphasis in original).

**34** *Id.*, Dkt. Nos. 1133 & 1134, *infra*, nn.32 & 33.

1    upon emergence from bankruptcy under PG&E's proposed Plan of
2    Reorganization ("Plan"). PG&E anticipates and intends that as reorganized
3    under its Plan, the Utility will continue with the extensive probation compliance
4    efforts described above, including the related governance enhancements
5    focused generally on safety, ethics and compliance matters. In addition,
6    PG&E's proposed Plan does not propose any structural changes to its corporate
7    governance or structure that could implicate the Utility's probation, and the
8    reorganized Utility will remain fully subject to the probation under the Court's
9    Judgment.[35]

10    However, the Commission's rulings in this proceeding or in related
11    proceedings could potentially impact certain conditions of probation. PG&E's
12    Plan provides that "CPUC Approval" is a condition precedent to the Plan taking
13    effect.[36] The Plan defines CPUC Approval to mean "all necessary approvals,
14    authorizations and final orders from the CPUC to implement the Plan, and to
15    participate in the Go-Forward Wildfire Fund."[37] CPUC Approval is further
16    defined to encompass the resolution of specified issues, including "proposals for
17    certain potential changes to the Utility's corporate structure and authorizations to
18    operate as a utility."[38] If CPUC Approval were to include significant structural
19    changes, certain conditions of probation could be implicated, such as the
20    following terms:
21    •    The Utility must "not dissolve, change its name, or change the name under
22         which it does business unless this judgment and all criminal monetary
23         penalties imposed by this court are either fully satisfied or are equally
24         enforceable against the defendant's successors or assignees";
25    •    The Utility must "not waste, nor without permission of the probation officer,
26         sell, assign, or transfer its assets"; and

---

[35]  *See* Judgment, *infra* n.2, at 17 ("In the event of a sale of the gas pipeline transmission
      system, assignment or transfer of all of PG&E's stock or assets to an unaffiliated third
      party pursuant to an arm's-length transaction, the terms of this Order shall continue to
      apply to PG&E and to any successor of PG&E.").

[36]  *See* Debtors' Joint Ch. 11 Plan of Reorg. Dated Jan. 31, 2020, *In re: PG&E Corp.*,
      No. 19-30088, §§ 9.1(c), 9.2(m) (Bankr. N.D. Cal. Jan. 31, 2020).

[37]  *Id.* § 1.37.

[38]  *Id.* § 1.37(b).

The Utility must "notify the probation officer and monitor immediately upon learning of: (A) any material adverse change in its business or financial condition or prospects; or (B) the commencement of any bankruptcy proceeding, major civil litigation, criminal prosecution, or administrative proceeding against the organization, or any investigation or formal inquiry by governmental authorities regarding the organization."[39]

---

[39] *See* Judgment, *infra* n.2, at 2-3.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 9**

**CLIMATE (SCOPING MEMO ISSUE 3.3)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 9
CLIMATE (SCOPING MEMO ISSUE 3.3)

TABLE OF CONTENTS

A.  EXECUTIVE SUMMARY ................................................................. 9-1

B.  INTRODUCTION ......................................................................... 9-1

    1.  Witness Introduction (J. Hogle) ............................................ 9-1

    2.  Witness Introduction (M. Wyspianski) ................................. 9-2

    3.  Introduction to Testimony ................................................... 9-3

C.  PG&E VALUES ITS CLEAN ENERGY PARTNERSHIP WITH THE
    STATE OF CALIFORNIA (J. HOGLE) .......................................... 9-3

    1.  PG&E's Mission and Vision Places Sustainability at Its Center ................ 9-3

    2.  PG&E Advocates for Public Policies That Promote Climate Solutions
        and Clean Energy .......................................................... 9-4

    3.  PG&E Invests in Climate-Related Initiatives ............................ 9-8

        a.  Million Ton Challenge .......................................... 9-9

        b.  Gas Operations .................................................. 9-9

        c.  Modernizing the Electric Grid ................................ 9-10

    4.  PG&E's Clean Energy Programs Support Customers and Aim to
        Leave No Customers Behind ............................................ 9-10

        a.  Energy Efficiency Initiatives ................................ 9-11

        b.  Clean Transportation .......................................... 9-12

        c.  Other Customer Programs ..................................... 9-13

        d.  Supporting Communities ...................................... 9-14

    5.  PG&E Prioritizes Climate Resilience and Environmental Stewardship .... 9-15

D.  PG&E WILL MEET CALIFORNIA'S CLIMATE GOALS AND COMPLY
    WITH APPLICABLE PROCUREMENT REQUIREMENTS (M.
    WYSPIANSKI) .......................................................................... 9-16

    1.  RPS Goals ................................................................... 9-16

    2.  Clean Energy Power Mix .................................................. 9-17

3. Other Procurement Requirements ............................................................. 9-18

4. RPS Sales ................................................................................................. 9-19

5. The Plan of Reorganization Is Consistent With the State's RPS and
   Procurement Objectives ........................................................................... 9-20

# PACIFIC GAS AND ELECTRIC COMPANY
# CHAPTER 9
# CLIMATE (SCOPING MEMO ISSUE 3.3)

## A. EXECUTIVE SUMMARY

Pacific Gas and Electric Company (the Company or the Utility) has a well-established track record in its commitment to sustainability and meeting the challenge of climate change that is central to the Company's Vision and Mission. That commitment includes alignment of our resources and business strategy with the state's clean energy goals, and advocacy for policies and programs that enable safe, reliable, affordable and clean electricity and gas service for our customers. In particular, we are dedicated to providing clean energy programs, including energy efficiency (EE) initiatives and electric vehicle (EV) programs, which support our customers and communities.

PG&E has met and will meet applicable procurement and other standards pursuant to the state's overall climate goals. We proactively engage with the State, regulators, and stakeholders on climate, Renewable Portfolio Standards (RPS), and procurement issues. A reorganized PG&E will continue in this stead and will comply with any future climate or procurement mandates issued by the California Public Utilities Commission (CPUC or Commission) or by the Legislature. We have a track record of partnership with the Commission and the State on climate and procurement mandates. Historically, the Utility has satisfied and even surpassed applicable RPS mandates, and it is on track to meet the 60 percent by 2030 RPS procurement goal. The Utility also has achieved a high percentage of deliveries from clean energy sources, including nearly 80 percent of its electric power mix from greenhouse gas (GHG) free sources in 2018.

## B. INTRODUCTION

### 1. Witness Introduction (J. Hogle)

My name is Jessica Hogle. I am the Vice President of Federal Affairs and Corporate Sustainability for PG&E Corporation, the parent company of the Utility. I manage and direct the team responsible for PG&E's sustainability efforts and engagement, and advise corporate leadership on

1  how best to integrate and align PG&E's sustainability strategy with its
2  business strategy.
3      I am also responsible for leading activities to shape public affairs
4  policies and develop, implement, and manage federal affairs strategies to
5  advance national energy and economic policies and initiatives in support of
6  PG&E's sustainability strategy, business operations, employees, and
7  customers.  In my dual role as chief federal lobbyist and overseer of
8  corporate sustainability, I am responsible for building relationships at the
9  national level with non-governmental organizations, trade associations,
10  advocacy organizations, and other key stakeholders.
11     Prior to joining PG&E in 2008, I was the Director of Political and
12  Legislative Affairs for the Portland Cement Association, after working on
13  Democratic Senate campaigns in the 2004 and 2006 election cycles.  I
14  received my Bachelor of Arts in Religion at the University of the South,
15  Sewanee, Tennessee.

16  **2.  Witness Introduction (M. Wyspianski)**
17     My name is Martin Wyspianski.  As the Senior Director for Energy
18  Portfolio Procurement and Policy at the Utility, I am responsible for
19  developing policy positions and managing commercial transactions related
20  to the Utility's energy portfolio.  I also manage the requests for offers and
21  negotiations of power purchase agreements related to renewable energy,
22  energy storage, Distributed Energy Resources, and other wholesale
23  market activities.
24     I joined PG&E in 2006 and have served in a variety of roles across the
25  Company, including as Senior Director of Market and Credit Risk
26  Management, Director of Enterprise Risk Management and Insurance,
27  Manager of Strategic Renewable Investment and Principal in Corporate
28  Strategy and Development.  I hold a Bachelor of Science degree in
29  Chemical Engineering from Brown University and a Master of Business
30  Administration from the Haas School of the University of California
31  at Berkeley.

### 3. Introduction to Testimony

Assembly Bill (AB) 1054, as codified in Public Utilities Code (Pub. Util. Code)§ 3292(b)(1)(D), requires the Commission to "determin[e] that the reorganization plan and other documents resolving the insolvency proceeding are … consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state."

In Section C of this chapter, Ms. Hogle describes PG&E's longstanding dedication to the shared values of sustainability and its role as a partner in implementing California's broader clean energy and climate vision. PG&E Corporation and the Utility will continue to honor and meet our commitments to California's clean energy and climate goals—both throughout the bankruptcy process and beyond. We are resolved to mitigate carbon emissions and adapt our operations to a changing climate, to run our business sustainably, and to help our communities build resilience against climate threats. Our strong track record on sustainability demonstrates the strength of our ongoing commitment to these issues.

In Section D of this chapter, Mr. Wyspianski describes how PG&E's Plan of Reorganization (the Plan or PG&E's Plan) is consistent with California's climate goals and related California procurement obligations. PG&E recognizes its important role in supporting the State's clean and renewable energy goals and throughout the Chapter 11 process, PG&E has remained committed to helping California achieve those goals. PG&E will continue to support the State's clean and renewable energy goals after emergence and remains well-positioned to meet its clean and renewable energy obligations going forward.

## C. PG&E VALUES ITS CLEAN ENERGY PARTNERSHIP WITH THE STATE OF CALIFORNIA (J. HOGLE)

### 1. PG&E's Mission and Vision Places Sustainability at Its Center

Corporate sustainability is integral to PG&E's business strategy. We define sustainability as meeting the needs of today in a way that creates a better tomorrow for our customers, communities, employees, and the planet. We take an approach that considers our operations through the lens of

preparing for the future and providing ongoing, long-term value to our many
stakeholders.  Doing so is what customers, investors, policymakers,
regulators, environmental and social justice advocates and many others
expect and deserve from PG&E.

PG&E's Mission and Vision framework places a sustainable energy
future at the center, and helps guide our decisions.

- Our Mission:  To safely and reliably deliver affordable and clean energy
  to our customers and communities every single day, while building the
  energy network of tomorrow; and
- Our Vision:  With a sustainable energy future as our North Star, we will
  meet the challenge of climate change while providing affordable energy
  for all customers.

## 2. PG&E Advocates for Public Policies That Promote Climate Solutions and Clean Energy

PG&E advocates for public policies consistent with our Vision and
Mission, and that further its commitment to environmental leadership.  Our
public policy advocacy is funded by shareholders:  PG&E's political
contributions comply with the law and with PG&E's Political Contributions
Policy and Procedures.  PG&E's public policy activities are overseen by the
Compliance and Public Policy Committee of the PG&E Corporation Board of
Directors, and an annual report is prepared each year which details political
contributions made by PG&E.

In 2006, PG&E developed a Climate Change Policy Framework to
establish our principles for programs and policies to address global climate
change, and to guide our activities to ensure consistency in our advocacy of
public policy.  In the intervening years, we have updated the Framework to
incorporate new objectives and reflect how we and the State have
implemented aspects of the Framework.  The principles outlined in the
Framework support advocacy for policies that include verifiable emission
reductions; are cost-effective, affordable, and foster innovation; establish an
economywide, market-based price on carbon; promote GHG reductions
beyond California; and support resilience and adaptation.  The policy, by
design and consistent with our Vision, states that we will work to reduce

GHG emissions and environmental impacts from our operations, and act as a valuable partner to do so in California and beyond.

Examples of our advocacy efforts consistent with the Climate Change Policy Framework include:

- Reducing GHG emissions and pricing carbon:
    – PG&E was the first investor-owned utility to support AB 32 (2006), which established the state's first economywide GHG emissions target (the 2020 target) and authorized the state's cap-and-trade program. We also supported Senate Bill (SB) 32 (2016), which established the state's 2030 economywide GHG emissions target. We also supported AB 398 (2017) which authorized the California Air Resources Board (CARB) to strengthen and extend California's cap-and-trade program through 2030, helping ensure the state can meet its SB 32 target to reduce GHG emissions 40 percent below 1990 levels by 2030. We have advocated at CARB in support of a well-designed cap-and-trade program in CARB's many cap-and-trade rulemakings over the past decade, including most recently concerning the implementation of AB 398.
    – PG&E supported significant RPS legislation in California, including SB 350 (2015) which increased the state's RPS objective to 50 percent by 2030, doubled state EE goals, and seeks to accelerate widespread transportation electrification.
    – PG&E also supports and is an active participant in CARB's Low Carbon Fuel Standard (LCFS). Through this program, PG&E is the steward of credits generated by EV charging on its electric system. PG&E provides a majority of the revenues generated by these credits to a forthcoming statewide point-of-sale incentive to EV buyers. This incentive program is in addition to existing state and federal tax credits and rebate programs, and will help place EVs on a competitive footing with internal-combustion-engine vehicles. PG&E uses the remainder of revenues generated by LCFS credit sales to accelerate transportation electrification within its service area.

- <u>Supporting customer affordability and equity:</u>
  - In 2017, California took an important step to address air pollution in the most heavily burdened communities through the passage of AB 617, which directs CARB to develop community air monitoring and community emissions reduction programs and to deploy them in the highest priority communities. PG&E strongly supports a comprehensive, statewide air protection program and was actively engaged in the development and passage of AB 617. We are working with CARB and other stakeholders through the AB 617 implementation process to ensure that the community air protection programs are successful and effective at reducing emissions in disadvantaged communities.
  - PG&E collaborated with community stakeholders to manage the retirement of the Diablo Canyon Power Plant (Diablo Canyon). In 2016, PG&E, labor unions, environmental groups, and community organizations sought Commission approval for a Joint Proposal to retire the nuclear facility at the end of its current operating licenses, in 2024 and 2025. Underpinning the agreement was the recognition that California's new energy policies will significantly reduce the need for Diablo Canyon's electricity output. PG&E has worked with the Commission and stakeholders to ensure that the Integrated Resource Planning process avoids any increase in emissions of GHGs as a result of the retirement of Diablo Canyon in 2024 and 2025, as required by SB 1090 (2018).
- <u>Promoting GHG reductions beyond California and positioning the State as a leader and innovator:</u>
  - PG&E has long advocated for a national program to reduce GHG emissions consistent with the Framework. This has included active support for federal cap-and-trade legislation and the United States (U.S.) EPA's Clean Power Program, which proposed new carbon dioxide regulations for new and existing power plants under Section 111 of the Clean Air Act. PG&E is participating in various ongoing litigation activities in support of federal GHG

Case: 19-30088   Doc# 7331-1   Filed: 05/15/20   Entered: 05/15/20 16:15:55   Page 240 of 276

1  emission reduction strategies as well as coalitions supporting the
2  U.S. participation in the Paris Agreement.
3  –  PG&E also supports California's stringent GHG tailpipe emissions
4  standards, as well as advancing EV adoption by providing tax
5  incentives and support for charging infrastructure.  In 2019, as part
6  of its membership in the National Coalition for Advanced
7  Transportation, PG&E joined California and several other states in a
8  lawsuit against revising the EPA's existing GHG emission
9  standards.
10  •  Working with coalitions to amplify our efforts:
11  –  PG&E works with broad industry and non-governmental entity
12  coalitions to advocate for a federal price on carbon to reduce GHG
13  emissions, and amplify our experience in California as proof positive
14  that it is possible to grow the economy and reduce GHG emissions
15  at the same time.
16  –  In June 2019, Bill Johnson, PG&E Corporation's Chief Executive
17  Officer (CEO) and President, participated in a meeting of the U.S.
18  Senate Democrats' Special Committee on the Climate Crisis.
19  During his remarks, Johnson discussed California's ambitious
20  renewable electricity and carbon reduction goals and PG&E's
21  progress; considerations for federal renewable or clean energy
22  standards; and the need for climate adaptation in any federal policy,
23  noting the impacts of climate change California is experiencing,
24  including wildfires and PG&E's Wildfire Safety Plan.  Johnson also
25  described his participation in the CEO Climate Dialogue, in which
26  the CEOs of 13 Fortune 500 companies and four environmental
27  groups collaborate regarding how best to address climate change at
28  the federal level at the lowest possible cost.  PG&E also has
29  provided written comments and responses to the U.S. House
30  Committee on Energy and Commerce and the U.S. House Select
31  Committee on the Climate Crisis, regarding ways to adapt to and
32  mitigate climate change that support California's programs and
33  customer affordability.

- <u>Ensuring transparency and clarity in our advocacy efforts:</u>
    – PG&E's sustainability efforts also encompass clear communication around our strategy, goals, and progress. In fact, holding ourselves accountable and reporting on the Company's progress, performance and challenges with transparency has been a hallmark of our approach for many years. PG&E Corporation produces an annual Corporate Responsibility and Sustainability Report to share progress and responds to various environmental, social and governance disclosure requests, including the CDP questionnaire on risks and opportunities associated with climate change. On a voluntary basis, we also report a comprehensive GHG emissions inventory to The Climate Registry, a nonprofit organization. We also publicly disclosed a Climate Change Vulnerability Assessment that assessed climate-driven risks to the Utility's assets and infrastructure; and publicly disclosed the results of a sustainability materiality assessment, which used a structured process to better understand the perspectives of external stakeholders on the issues most important to them.
    – Additionally, PG&E's external Sustainability Advisory Council provides guidance and feedback to PG&E on clean energy-related issues including energy affordability and social equity. The group, made up of community and environmental leaders, policy experts and business entrepreneurs, meets regularly with PG&E leaders to share feedback, identify new areas of opportunity and inspire collaboration with new partners.

Going forward, we are committed to meeting California's vision for a sustainable energy future, including implementation of SB 100, and carbon neutrality by 2045, in a reliable and cost-effective manner for customers.

3. **PG&E Invests in Climate-Related Initiatives**

PG&E invests in climate-related initiatives for its operations, which demonstrate its commitment to addressing the challenge of climate change. PG&E's sustainability commitment is shaped by California's regulatory and public policy priorities.

### a. Million Ton Challenge

PG&E launched the Million Ton Challenge, a voluntary 5-year carbon reduction goal for PG&E's operations. Our goal is to avoid one million tons of cumulative GHG emissions from our operations from 2018 through 2022, compared to a 2016 baseline. To achieve the goal, we are reducing methane emissions from our natural gas operations, reducing sulfur hexaflouride ($SF_6$) emissions from electric substation equipment, saving energy in our facilities, and deploying a smarter, cleaner fleet of company vehicles.

### b. Gas Operations

PG&E has invested in sustainability-oriented efforts to maintain and operate the gas system safely and reliably. We joined the U.S. EPA's Natural Gas Methane Challenge in 2016 as a founding partner, a voluntary program aimed at reducing emissions beyond regulatory requirements. We have participated in EPA's Natural Gas STAR program since 2008. Also, in 2016, we partnered with the Environmental Defense Fund in its Methane Detectors Challenge, a partnership aimed to raise awareness and increase gas pipeline methane leak detection and repairs. We were the first company to pilot innovative methane detection laser technology from Acutect, Inc., a San Francisco based startup company, at a natural gas storage facility.

We also have invested in enhanced leak response and repair. We use a diverse array of state-of-the-art tools to survey and inspect our gas infrastructure by air, land and water. We use the Picarro Surveyor™ as a detection vehicle, which is one of the most sensitive methane-detection technologies available, measuring methane in parts per billion. Since 2014, our Picarro gas leak survey vehicles have enabled us to more quickly identify leaks and prioritize them for repair, and to reduce the backlog of minor non-hazardous workable leaks.

We also welcome the opportunity to avoid investments in new gas assets that may later prove underutilized as local governments and the state work together to meet long term decarbonization objectives. We have supported several local ordinances to ban the use of natural gas in new buildings.

### c. Modernizing the Electric Grid

We recognize that integration of renewable energy and distributed generation requires investment in grid modernization technologies and creation of an integrated platform for grid connectivity. We invest in efforts to modernize the grid, including deployment of Smart Grid technologies. The Smart Grid is a modernized electric system that takes advantage of advanced communications and controls.

We engage in research and development into clean energy, including to explore and expand on Commission policies and programs. In one such project, funded by the Electric Program Investment Charge, PG&E explored the potential of smart inverters to prevent our customers' solar systems from contributing to voltage fluctuations and adverse impacts on protection systems due to reverse power flow. As another example, PG&E worked in collaboration with several partners to demonstrate how a Distributed Energy Resource Management System can enhance the stability and power quality of the grid and optimize power-flow management, increasingly important as more customers adopt solar and storage.

We also are working to reduce emissions of $SF_6$, which is commonly used by PG&E and other energy companies as an electrical insulating material in high-voltage circuit breakers and gas-insulated switchgear; however, if it escapes to the atmosphere, it contributes to global warming. We have established a multi-pronged approach to address $SF_6$, which includes repairing the highest leaking circuit breakers, implementing $SF_6$ best management practices, phasing in $SF_6$-free equipment, and engaging with CARB on regulatory amendments to phase-out $SF_6$ over the long term.

### 4. PG&E's Clean Energy Programs Support Customers and Aim to Leave No Customers Behind

We partner with our customers to help keep customer energy bills affordable, promote clean transportation, and invest in local communities.

### a. Energy Efficiency Initiatives

PG&E engages with customers to help reduce their energy use through programs that help keep customer energy bills affordable, reduce load on the grid, and meet California's clean energy goals. Our EE initiatives include:

- Working to reduce financial barriers to EE upgrades for residential, commercial and government customers. Our EE financing program provides commercial customers and government agencies with loans for EE upgrades with no out-of-pocket costs and zero interest.

- Giving customers access to their data to support smart energy planning. The Home Energy Checkup program offers a customizable energy assessment tool to help residential customers find out which appliances are using energy in their homes and offers personalized suggestions on how to make improvements that will save energy and costs.

- Collaborating with retailers, distributors and others to increase the availability and uptake of high-efficiency products.

- Advocating for stronger building codes and appliance standards in collaboration with entities such as the California Energy Commission (CEC), while continuing to serve as California's statewide coordinator for utility initiatives and analyses on standards.

- Advancing Zero Net Energy (ZNE) design and technology, and supporting California's goal for all newly constructed residential buildings to be ZNE by 2020.

- Maintaining our longstanding leadership role in the nation's first interdisciplinary EE institute at the University of California Davis and in the "best practices" clearinghouse for EE and demand response at the Consortium for Energy Efficiency.

PG&E's portfolio is designed to maximize customer uptake and impact by using a variety of channels, from self-service software tools to PG&E's business customer account representatives. We also partner with state and local governments, community partners and third-party EE specialists. We operate two Energy Centers and support a Food

Service Training Center, which offer EE education and training programs for building professionals.

**b. Clean Transportation**

PG&E is dedicated to providing clean transportation programs and incentives that are affordable and easy to use.  We support the state's goals of five million zero emission vehicles on the road by 2030, supported by 250,000 charging stations, including 10,000 fast chargers, and 200 hydrogen fueling stations statewide by 2025.  The Utility's service area also leads the nation in EV adoption, allowing increasingly clean electricity to be used to help address pollution from California's largest source of emissions, the transportation sector.  To further accelerate transportation electrification, the Utility is investing in programs that increase access to charging infrastructure needed to help its customers charge electric cars, trucks, and buses.  In addition, the Utility offers (or is in the process of implementing) residential and commercial electric rates for charging EVs to ensure that the cost of electric fuel is cheaper than the fossil fuel alternative, especially when charged during off-peak periods.  Electrifying the transportation sector can put downward pressure on electric rates to the benefit of all utility customers by spreading the costs of maintaining and hardening the electric grid over more sales of electricity, reducing the price per kilowatt-hour. An independent study estimated that electric vehicle customers in PG&E's service territory have already contributed $350 million in excess of associated costs, reducing rates and bills for other customers.[1]

PG&E's clean transportation programs are designed to increase adoption of clean vehicles in California and help the state meet its climate, air quality and clean transportation goals.  Specifically:

- PG&E provides electric rates for charging at residential and commercial locations.  These EV rates are designed to make

---

[1] Synapse Energy Economics, Electric Vehicles Are Driving Rates Down, June 2019, available at:  https://www.synapse-energy.com/sites/default/files/EV-Impacts-June-2019-18-122.pdf.

charging affordable and enable significant overall savings for EV drivers compared to gasoline.

- PG&E's 3-year EV Charge Network program calls for installing up to 7,500 Level 2 charging ports throughout our service area at multi-unit dwellings and workplaces. PG&E pays for the infrastructure to supply electricity to each EV parking space, and for a portion of the charging equipment. At least 15 percent of the units will be located in disadvantaged communities.

- PG&E's EV Fleet Program was created to expand PG&E's charging infrastructure programs to medium- and heavy-duty fleets. Our goal is to convert 700 sites to electric fleet vehicles by 2023 to support the adoption of 6,500 medium- and heavy-duty EVs. PG&E will dedicate 25 percent of the program budget to investments in disadvantaged communities.

- PG&E's EV Fast Charge Program aims to support the development of 50 public fast charging sites, with PG&E paying for and building the infrastructure from the electric grid to the charging equipment for public fast chargers, complementing state and privately funded initiatives. One quarter of the fast chargers will be located in disadvantaged communities.

- PG&E's Clean Fuel Rebate Program provides an $800 rebate for EV owners, which will be converted to a statewide point-of-sale rebate in 2020, and provides on-bill credits for drivers of compressed natural gas vehicles.

- PG&E's Empower EV program targets outreach and EV education and provides rebates for EV chargers and installation for income-qualified residential customers.

**c. Other Customer Programs**

We also offer other customer programs to support clean energy and sustainability.

Our demand response programs enable customers to reduce energy use during periods of peak demand, so they can save or even earn money by adjusting their usage. By giving customers incentives to

curtail usage, demand response programs provide grid stability, reduce costs for customers and achieve GHG emissions reductions.

In addition to the support PG&E provides to its customers to install private rooftop solar capacity, we offer the Solar Choice and Regional Renewable Choice programs. These programs give customers the option to purchase 100 percent of their electricity from a universal solar program, without the need to install private rooftop solar panels.

### d. Supporting Communities

PG&E is working to assist customers facing financial challenges, who live in disadvantaged communities or who face issues of environmental and social justice. For example, our aforementioned clean transportation efforts include specific benchmarks for investment in disadvantaged communities. We also are implementing electrification pilot programs in disadvantaged communities in the San Joaquin Valley. These programs are designed to replace propane and wood burning appliances with electric appliances or natural gas line extensions, and test an outreach and engagement strategy that utilizes local residents and community-based organizations.

PG&E's EE services also include a focus on low-income customers. For example, our Energy Savings Assistance Program offers energy-efficient home improvements at no cost to reduce energy bills and increase health, comfort and safety for income-qualified customers.

PG&E also offers a Disadvantaged Communities component of the Green Tariff Shared Renewables Program, which enables income-qualified residential customers residing in disadvantaged communities to benefit from utility scale clean energy and receive a 20 percent bill discount.

We also work to integrate environmental justice priorities into PG&E's business operations, guided by our Environmental Justice Policy (first adopted in 2001). A dedicated Tribal Liaison and Environmental and Social Justice Manager coordinate PG&E's efforts in this area.

PG&E also supports communities through the Better Together Giving Program, which provides contributions to charitable organizations

funded entirely by shareholders.  Our charitable giving is designed to enrich educational opportunities, preserve the environment, promote emergency preparedness and support economic vitality.  These community investments are focused on providing assistance to underserved communities, such as low-income individuals, communities of color, the long-term unemployed, women and girls, veterans, senior citizens, people with disabilities and members of the lesbian, gay, bisexual, transgender and queer community.

### 5. PG&E Prioritizes Climate Resilience and Environmental Stewardship

PG&E strives to serve as responsible stewards of the areas where the Company operates and to support climate resilience in our operations and in the communities we serve.  We define climate resilience as the actions to be taken related to PG&E's assets, infrastructure, operations, employees and customers to mitigate against potential consequences and adapt to a changing climate and associated weather patterns.

We are working to design, influence and implement climate resilience programs and policies.  For example, we are working to integrate the best available climate science into our asset planning and management.  This includes developing tools for climate data visualization, performing research into different climate risks, and investing in mitigation of potential risks.

Additionally, we are partnering with utility peers and policymakers to advance energy sector climate resilience.  We participate in the Governor's Office of Planning and Research's Integrated Climate Adaptation and Resilience Program and the Corporate Climate Resilience Council.  We provide input into CEC climate resilience research priorities, and are an active participant in Commission efforts to establish guidance for utilities regarding adapting to climate change, such as the Commission's Climate Adaptation Order Instituting Rulemaking.

We also collaborate with customers and communities to enhance climate resilience in California.  In 2019, we offered our third round of grants for the Better Together Resilient Communities grant program, a shareholder-funded initiative to support local climate resilience planning efforts.

1        I understand that the Community Wildfire Safety Program is discussed
in more detail elsewhere in this testimony,[2] but the Program also is an
example of PG&E's immediate implementation of strategies to further
reduce wildfire risks and keep our customers and the communities we serve
safe.  The Program includes real-time monitoring and intelligence, enhanced
safety measures, and system hardening and resilience.

Finally, as a land owner in California, PG&E takes special care to
protect threatened and endangered species and their habitats.  As part of
our Land Conservation Commitment, we are permanently protecting more
than 140,000 acres through the donations of fee title and conservation
easements on watershed lands to public agencies and qualified
conservation organizations.

## D. PG&E WILL MEET CALIFORNIA'S CLIMATE GOALS AND COMPLY WITH APPLICABLE PROCUREMENT REQUIREMENTS (M. WYSPIANSKI)

In addition to PG&E's environmental leadership described above, we also
have supported and will support implementation of California's ambitious climate
policy framework, through full compliance with applicable statutory and
regulatory requirements.

### 1. RPS Goals

California's RPS Program is a central component of the State's climate-
related objectives.  The program was established in 2002 by SB 1078 with
the initial requirement that investor-owned utilities meet 20 percent of their
retail sales with eligible renewable resources by 2017.  Four years later, in
2006, SB 107 accelerated the RPS mandate to 20 percent by 2010; and in
2011, SB X1-2 established an additional RPS target of 33 percent by 2020.
In 2015, the program was further accelerated by SB 350 which mandated a
50 percent RPS by 2030.  SB 350 includes interim annual RPS targets with
3-year compliance periods and requires 65 percent of RPS procurement to
be derived from long-term contracts of ten or more years starting in 2021.  In
2018, SB 100 was signed into law, which further increased RPS objectives
to 60 percent by 2030 and requires all of the State's electricity sales to come
from carbon-free resources by 2045.

---

**2**   See Ch. 6, Wildfire Safety.

The Utility is on track to meet its 60 percent by 2030 RPS procurement mandate.  In 2018, all electricity retail sellers had an annual target to serve at least 29 percent of their electric load with RPS-eligible resources.  In 2018, we surpassed that target, delivering 38.9 percent of the Utility's bundled load from RPS-eligible resources (substantially exceeding the annual target of 29 percent).

The Utility has a long history of RPS compliance and has worked actively and successfully with the Commission to implement RPS requirements.  We have filed and obtained Commission approval for annual RPS plans and have filed annual RPS Compliance Reports, which demonstrate our ample progress towards meeting RPS requirements.  Our historic compliance with RPS standards for past compliance periods is reflected in the table below.

**TABLE 9-1**
**COMPLIANCE WITH RPS STANDARDS**

| Line No. | Year | Annual RPS Percentage | PG&E's RPS Percentage | Compliance Period | Compliance Period RPS Requirement | PG&E's Compliance Period RPS |
|---|---|---|---|---|---|---|
| 1 | 2011 | 20% | 19.6% | Compliance Period 1 (2011 – 2013) | 20% | 20.3% |
| 2 | 2012 | 20% | 19.0% | | | |
| 3 | 2013 | 20% | 22.5% | | | |
| 4 | 2014 | 21.7% | 27.0% | Compliance Period 2 (2014 – 2016) | 23.3% | 29.7% |
| 5 | 2015 | 23.3% | 29.5% | | | |
| 6 | 2016 | 25% | 32.8% | | | |
| 7 | 2017 | 27% | 33.0% | Compliance Period 3 (2017 – 2020) | 30% | – |
| 8 | 2018 | 29% | 38.9% | | | |
| 9 | 2019 | 31% | – | | | |
| 10 | 2020 | 33% | – | | | |

### 2. Clean Energy Power Mix

The Utility also has achieved a high percentage of deliveries from clean energy sources.  In 2018, nearly 80 percent of the Utility's total electric power mix was from GHG-free sources including nuclear, large hydroelectric, and renewable sources of energy.  The power mix delivered in 2018 included 34 percent non-emitting nuclear generation, 13 percent large

hydroelectric facilities, and 39 percent eligible renewable resources, such as wind, geothermal, biomass, solar, and small hydroelectric facilities.

Our commitment to clean power is shaped by California's public policy. Looking ahead, SB 100, which includes increased RPS objectives and clean energy goals, is still being implemented by the Commission, CEC, and CARB.  PG&E plans to meet any mandates that result from the implementation of the 100 percent clean energy target for 2045 per SB 100. Additionally, Executive Order B-55-18 sets a statewide goal to achieve carbon neutrality by 2045.  We anticipate that we will be an active participant in future efforts in the Legislature to codify the carbon neutrality goal and in proceedings at the Commission, the CEC, and the CARB to determine how to achieve carbon neutrality.  We plan to meet any mandates that implement the State's plan for carbon neutrality.

### 3.  Other Procurement Requirements

*Integrated Resource Planning.*  SB 350, passed by the Legislature in 2015 and codified as Pub. Util. Code §§ 454.51 and 454.52, established 2030 targets for EE and RPS.  SB 350 also required the Commission to establish an IRP process to ensure that load serving entities in the State shape their future energy portfolios to meet California's clean energy goals in a reliable and cost-effective manner.  We are actively working with the Commission to implement the IRP requirements to meet the State's GHG reduction targets.  As of PG&E's approved 2018 IRP, PG&E can meet its 2030 GHG planning target with its existing GHG-free resource portfolio and resources added to comply with existing mandates. We also will comply with incremental procurement requirements that are set forth in the IRP proceedings.

*Other Procurement Requirements.*  We administer a variety of other climate-related procurement requirements authorized by statute and by Commission decisions and resolutions, as illustrated in the following examples:

- Bioenergy Market Adjusting Tariff:  We comply with requirements to procure from bioenergy facilities in three categories:  biogas from wastewater, municipal waste, food processing, or codigestion; biomass

or biogas from dairy or agriculture; and biogas or biomass using sustainable forest management;

- Bioenergy Renewable Auction Mechanism:  We comply with requirements to procure from bioenergy facilities, including those using High Hazard Zone fuel;

- Green Tariff Shared Renewables (GTSR):  We procure energy consistent with the requirements under the GTSR program, which gives customers the option to meet their electrical needs with generation from renewable energy resources; and

- Solar Generation in Disadvantaged Communities:  We will procure solar resources consistent with the requirements under these programs, which are designed to increase access to and adoption of renewable generation in disadvantaged communities.

*Collaboration on Procurement Issues.*  In general, we actively and productively engage with the State, regulators, and stakeholders on procurement issues.  We have actively participated in proceedings to implement the procurement-related initiatives outlined above.  As a further example, PG&E regularly presents information regarding its procurement activities to the Procurement Review Group (PRG).  The PRG consists of representatives from the Commission's Energy Division and the Public Advocates Office; the Coalition of California Utility Employees; Coast Economic Consulting; The Utility Reform Network (TURN); the Union of Concerned Scientists; and Woodruff Expert Services (representing TURN). Generally, PG&E staff presents a quarterly update to the PRG on its RPS and GHG positions, and presents information to the PRG regarding solicitations and other procurement-related updates.

**4.  RPS Sales**

The Utility has a surplus of renewable energy and associated RECs. Accordingly, and consistent with past practice, the Utility is selling surplus renewable energy and credits in a manner that is consistent with meeting its own requirements and providing benefits to customers.

Since 2013, the Utility has sold volumes of bundled RPS energy and RECs on a short-term (five years or less) basis through solicitations that are consistent with our annual RPS Plan Sales Framework approved by the

1  Commission.  Beginning in November 2019, the Utility issued a solicitation
2  to also sell long-term (ten year) surplus RPS volumes.

3  **5.  The Plan of Reorganization Is Consistent With the State's RPS and**
4  **Procurement Objectives**

5  We have a strong track record of compliance and partnership with the
6  Commission and the State on climate and procurement mandates.  A
7  reorganized PG&E will continue in this stead and will comply with any future
8  climate or procurement mandates issued by the Commission or by the
9  Legislature.  Through the Chapter 11 process, PG&E continues to support
10  California's clean energy leadership, consistent with our long history of
11  helping California pursue ambitious climate goals.  The Plan puts PG&E on
12  track to emerge from bankruptcy as a financially sound enterprise, so that
13  PG&E will be in a position to continue to support California's clean energy
14  future.

15  PG&E's Plan also provides that the Utility will assume all power
16  purchase agreements, renewable energy power purchase agreements, and
17  Community Choice Aggregation servicing agreements.  Although these
18  power purchase agreements were entered into at market prices available at
19  that time, many of the early contracts are at rates well-above currently
20  available renewable resources.  The Utility entered into these contracts in
21  order to meet State renewable energy procurement requirements, and in
22  doing so, facilitated the growth of the renewable industry and a subsequent
23  drop in prices of renewable energy that has benefited the State as a whole.
24  The Utility's power purchase agreements include substantial commitments
25  to clean energy development well into the future.  Accordingly, PG&E's
26  assumption of all power purchase agreements will continue our long-term
27  commitment to providing energy from renewable sources, in furtherance of
28  achieving the State's climate goals.

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 10**

**RATES AND RATE NEUTRALITY**

**(SCOPING MEMO ISSUES 4.1, 4.4, 4.5)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 10
# RATES AND RATE NEUTRALITY
## (SCOPING MEMO ISSUES 4.1, 4.4, 4.5)

### TABLE OF CONTENTS

A.  Executive Summary.............................................................................................. 10-1

B.  Introduction......................................................................................................... 10-1

C.  Rate Impacts ...................................................................................................... 10-2

D.  Rate Neutrality.................................................................................................... 10-3

E.  Customer Contributions...................................................................................... 10-3

F.  Earnings Adjustment Mechanism ...................................................................... 10-4

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 10**
**RATES AND RATE NEUTRALITY**
**(SCOPING MEMO ISSUES 4.1, 4.4, 4.5)**

A. **Executive Summary**

The purpose of this chapter is to discuss the rate impacts of PG&E's Plan of Reorganization (the "PG&E Plan" or "PG&E's Plan"). In particular, this chapter addresses rate impacts, compliance with the neutrality requirement of Assembly Bill 1054 ("AB 1054"), and compliance with the customer contributions requirement of AB 1054.

The PG&E Plan complies with the AB 1054 requirement that a plan of reorganization be "neutral, on average, to the ratepayers," because the PG&E Plan does not cause customers to pay more on average than they would in the absence of PG&E's reorganization under the Plan. Indeed, the PG&E Plan generates cost savings that will benefit ratepayers.

B. **Introduction**

My name is Robert S. Kenney. I am Vice President, State and Regulatory Affairs for Pacific Gas and Electric Company (the Utility). In this role, I am responsible for executive management and strategic guidance of PG&E's California External Affairs, including state and local governmental affairs and community relations, including overseeing the PG&E Foundation and PG&E's charitable and political giving. I am also responsible for executive management and strategic guidance of all aspects of PG&E's interactions with the California Public Utilities Commission (Commission), the Federal Energy Regulatory Commission, the California Energy Commission, and other state agencies, including all regulatory filings and proceedings. I have been with PG&E since 2015 and have held roles with increasing levels of responsibility and leadership.

Prior to joining PG&E, I was Chairman of the Missouri Public Service Commission, where I presided over proceedings deciding, among other things, rate increases, mergers and acquisitions, transmission siting, resource adequacy, and implementation of Missouri's Renewable Energy Standard and Energy Efficiency Investment Act. I also served on the Board of Directors of the National Association of Regulatory Utility Commissioners. I hold a bachelor's

1  degree in political science from Hampton University and a law degree from Saint
2  Louis University School of Law.

## C. Rate Impacts

4      The PG&E Plan will result in a reduction in customer rates, relative to the
5  rates that would have been in effect absent PG&E's reorganization under the
6  PG&E Plan, because its provisions will result in a substantial reduction in the
7  cost of debt.  In accordance with the restructuring support agreement between
8  PG&E and holders of senior unsecured debt issued by PG&E, PG&E will
9  refinance a portion of its prepetition debt, at lower interest rates, and the Plan
10 therefore will yield approximately $1 billion in savings associated with lower
11 interest expenses on long-term debt, as discussed in the testimony of Mr. Jason
12 Wells in Chapter 2.

13     In addition, PG&E has committed not to recover certain wildfire-related costs
14 as provided in the 2017/2018 Wildfire Order Instituting Investigation (OII)
15 settlement.  As background, on June 27, 2019, the Commission issued an OII to
16 determine whether the Utility violated any provisions of the Public Utilities Code,
17 Commission General Orders, or decisions, or other applicable rules or
18 requirements pertaining to the maintenance and operation of its electric facilities
19 that were involved in igniting fires in its service territory in 2017.  The proceeding
20 was subsequently expanded to include the 2018 Camp Fire.  PG&E, the Safety
21 and Enforcement Division of the Commission, the Office of the Safety Advocate,
22 and the Coalition of California Utility Employees eventually reached a settlement
23 and filed a motion for approval of a settlement of the OII on December 17, 2019,
24 which is pending.  As part of the settlement, PG&E agrees not to seek recovery
25 of $1.625 billion of wildfire-related costs and to spend $50 million in shareholder-
26 provided funds to undertake 20 System Enhancement Initiatives.[1]  If the
27 Commission approves the settlement, that provision of the settlement will be
28 incorporated into PG&E's Plan.

---

[1] See Joint Motion of Pacific Gas & Electric Company, SED, OSA, and CUE for Approval
of Settlement Agreement (Dec. 17, 2019), Exh. 1, Settlement Agreement Between
PG&E, SED, CCUE, and Office of the Safety Advocate Resolving OII I.19-06-015, p. 3.

**D. Rate Neutrality**

AB 1054 sets the following condition for PG&E participation in the wildfire fund: "The commission has determined that the reorganization plan and other documents resolving the insolvency proceeding are . . . neutral, on average, to the ratepayers of the electrical corporation." Pub. Util. Code § 3292(d)(1)(D). The Plan of Reorganization is neutral, on average, to ratepayers, if the Plan by its terms does not require ratepayers on average to pay more in rates than they would in the absence of PG&E's reorganization under the terms of PG&E's Plan. For example, changes in rates that result from costs that PG&E would have had to incur to improve the safety of its system, regardless of whether or not PG&E emerged from Chapter 11 pursuant to PG&E's Plan, are independent of the Plan; such costs do not prevent the plan from being neutral to customers, because PG&E would have had to incur those costs regardless of Chapter 11. Moreover, changes in rates that occur as a result of Commission decisions in proceedings such as the cost of capital and General Rate Cases (GRC) are not relevant to Section 3292(d)(1)(D) because they are not rate changes resulting from the Plan. Likewise, changes in rates that occur as a result of other Commission decisions after PG&E's emergence from bankruptcy, and independent of the Plan, including prudence review, are not relevant to Section 3292(d)(1)(D) because they are not rate changes resulting from the Plan.

PG&E's Plan meets the neutrality requirement. The costs recovered from customers that result from activities described in the Plan are not a departure from the baseline absent Chapter 11. PG&E would have had to incur these costs to operate and in some cases to improve the safety of its system regardless of Chapter 11. In fact, PG&E's Plan substantially reduces the costs potentially borne by ratepayers, through cost savings obtained through the refinancing of debt at lower interest rates under the terms of the PG&E Plan, as noted above and as described in detail in Mr. Wells' testimony in Chapter 2.

**E. Customer Contributions**

AB 1054 also sets the following condition: "The commission has determined that the reorganization plan and other documents resolving the insolvency proceeding recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the commission, which may

1    include sharing of value appreciation." Pub. Util. Code § 3292(d)(1)(E).  The
2    Plan of Reorganization meets this requirement if the Plan does not require
3    contributions from customers beyond the baseline of what would have been
4    required absent Chapter 11, or if any contributions from customers are
5    compensated or offset appropriately.
6        PG&E's Plan meets the "customer contribution" requirement.  As described
7    above, the Plan is neutral because it does not require contributions from
8    ratepayers beyond the baseline of what would have been required absent
9    Chapter 11.  Accordingly, there are no "contributions of ratepayers" that fall
10   within the scope of subparagraph 3292(d)(1)(E); therefore, no compensation is
11   needed.

12   **F.  Earnings Adjustment Mechanism**

13       PG&E has considered implementing with the Commission a potential
14   earnings adjustment mechanism linked to safety performance, but determined
15   that it would be unwise to include such a mechanism in PG&E's Plan.  PG&E
16   proposed a safety-based earnings adjustment mechanism in its testimony in
17   PG&E's 2020 GRC.[2]  However, such a mechanism has the potential to increase
18   financial risk, to the long-term detriment of ratepayers and the company, and
19   could be destabilizing at precisely the time when the company is under the most
20   stress (i.e., when it experiences a catastrophic event).  Thus, there is substantial
21   potential for unintended consequences and any such mechanism needs to be
22   carefully evaluated and calibrated.  In addition, a management incentive
23   compensation structure with significant safety metrics is a more direct approach
24   to incentivizing safety efforts, without as much downside risk.  PG&E recognizes
25   that the Commission can continue to evaluate potential safety-based earnings
26   adjustment mechanisms post-emergence, but such a mechanism should not be
27   built into PG&E's Plan.

---

[2]  See Test Year 2020 General Rate Case Application of Pacific Gas and Electric
Company (U 39 M), A.18-12-009, Ex. 12, Ch. 14 (Dec. 13, 2018).

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 11**

**FINES AND PENALTIES (SCOPING MEMO 4.2)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 11
FINES AND PENALTIES (SCOPING MEMO 4.2)

TABLE OF CONTENTS

A.   Executive Summary............................................................................................. 11-1

B.   Introduction......................................................................................................... 11-1

C.   PG&E's Plan Provides For Resolution of Claims............................................ 11-1

D.   Resolution of Fines and Penalties For Prepetition Conduct ............................ 11-2

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 11**
**FINES AND PENALTIES (SCOPING MEMO 4.2)**

## A. Executive Summary

The Commission has directed the parties to address whether a proposed plan of reorganization provides satisfactory resolution of claims for monetary fines or penalties for Pacific Gas and Electric Company's (PG&E) prepetition conduct.

Settlements in other Commission proceedings, some of which are currently pending Commission approval, satisfactorily resolve the claims for monetary fines or penalties for prepetition conduct.

PG&E's reorganization includes Bankruptcy Court[1] approval of PG&E's entry into those settlements, and those settlements will satisfy the related PG&E Plan conditions for emergence.

## B. Introduction

My name is Robert S. Kenney. I am Vice President, State and Regulatory Affairs for PG&E. My industry experience is summarized in my testimony in Chapter 10.

My testimony in this chapter describes the PG&E Plan provisions relating to claims for fines and penalties for PG&E pre-petition conduct, and the anticipated resolution of those claims through settlements approved or to be approved by the Commission and the Bankruptcy Court. As a result of those PG&E Plan provisions and the anticipated approvals, the PG&E Plan will satisfactorily resolve those claims.

## C. PG&E's Plan Provides For Resolution of Claims

PG&E's proposed plan of reorganization (PG&E Plan or PG&E's Plan) contains a "CPUC Approval" condition precedent to PG&E's Plan taking effect.[2] The Plan defines CPUC Approval to mean "all necessary approvals,

---

[1] The "Bankruptcy Court" refers to the court presiding over the bankruptcy of PG&E Corporation and PG&E, in *In re: PG&E Corp.*, United States District Court, N.D.Ca., No. 19-30088.

[2] See Debtors' and Shareholder Proponents' Joint Ch. 11 Plan of Reorg. Dated Jan. 31, 2020, *In re: PG&E Corp.*, No. 19-30088, (Jan. 31, 2020).

authorizations and final orders from the CPUC to implement the Plan, and to participate in the Go-Forward Wildfire Fund," including, among other things, "satisfactory resolution of claims for monetary fines or penalties under the California Public Utilities Code (Pub. Util. Code) for prepetition conduct."**3**

Except as otherwise expressly provided, confirmation of the PG&E Plan would discharge PG&E's pre-petition obligations pursuant to Section 1141 of the Bankruptcy Code.**4**

Potential claims under the California Pub. Util. Code for monetary fines or penalties for prepetition conduct are encompassed within several other CPUC proceedings:  Disconnection Order Instituting Investigation (OII) (I.18-07-008), the Ex Parte OII (I.15-11-015), the Locate and Mark (L&M) OII (I.18-12-007), and the 2017-2018 Wildfire OII (I.19-06-015).  As discussed below, the CPUC has adopted settlement agreements in I.18-07-008 and I.15-11-015, and the CPUC currently is considering motions to approve settlement agreements in I.18-12-007 and I.19-06-015, which would resolve the claims for potential monetary fines or penalties for prepetition conduct.  In conjunction with or prior to Bankruptcy Court approval of PG&E's Plan, PG&E will seek Bankruptcy Court approval of its entry into those settlements.

**D. Resolution of Fines and Penalties For Prepetition Conduct**

PG&E's Plan provides satisfactory resolution of claims for monetary fines or penalties for PG&E's pre-petition conduct, because:  (1) PG&E has reached settlement agreements that the Commission either has found, or it is anticipated will find, to fairly resolve such claims, (2) those settlements will satisfy the CPUC Approval condition in PG&E's Plan regarding fines and penalties; and (3) the Bankruptcy Court will approve those settlements prior to or in connection with confirmation of PG&E's Plan.

<u>2017/2018 Wildfire OII (I.19-06-015)</u>

The CPUC issued this OII to investigate the role of PG&E's electric facilities in the ignition of fires in its service territory in 2017 and 2018.  The CPUC currently is considering a motion for approval of a comprehensive settlement agreement between PG&E, the Safety and Enforcement Division (SED) of the

---

**3** *Id.* § 1.37(c).

**4** *Id.* § 10.3.

1  CPUC, the Coalition of California Utility Employees, and the Office of the Safety

2  Advocate.[5]

3  Under the settlement, in resolution of the potential claims, PG&E agrees to

4  not seek rate recovery of $1.625 billion in wildfire-related expenditures and to

5  spend $50 million in shareholder-provided settlement funds on 20 specified

6  System Enhancement Initiatives relating to the company's electric transmission

7  and distribution system.

8  For the reasons discussed in PG&E's joint motion for approval of the

9  settlement in I.19-06-015, the settlement fairly and reasonably resolves the

10  claims, and if the Commission grants the motion for approval, the Commission

11  will have found the settlement to fairly and reasonably resolve the claims.  That

12  settlement will constitute a satisfactory resolution of those claims within the

13  meaning of the CPUC Approval provision of PG&E's Plan.  Following

14  Commission approval of the settlement, PG&E will file a motion with the

15  Bankruptcy Court seeking Bankruptcy Court approval of the settlement.

16  <u>Locate and Mark Practices OII (I.18-12-007)</u>

17  The CPUC issued this OII to investigate whether PG&E's damage

18  prevention and L&M programs and practices for its natural gas system were

19  unsafe and in violation of any provision of the Public Utilities Code, Government

20  Code, Commission general orders or decisions, and other state or federal laws,

21  applicable rules or requirements.

22  PG&E, the SED of the CPUC, and the Coalition of California Utility

23  Employees reached a resolution of the OII and jointly moved for the CPUC to

24  approve the proposed settlement agreement.[6]  Under the settlement, in

25  resolution of the potential claims, PG&E agrees to make payments and incur a

26  penalty at shareholder expense.  For the significant majority of this financial

27  outcome, PG&E must undertake a series of System Enhancement Initiatives

28  designed to enhance, among other things, PG&E's L&M compliance and

---

[5] I.19-06-015, *Joint Motion of Pacific Gas and Electric Company (U 39 E), the Safety and Enforcement Division of the California Public Utilities Commission, Coalition of California Utility Employees, and the Office of the Safety Advocate for Approval of Settlement Agreement*, filed December 17, 2019.

[6] I.18-12-007, *Joint Motion of Pacific Gas and Electric Company (U 39 E), the Coalition of California Utility Employees, and Safety and Enforcement Division for Approval of Settlement Agreement*, filed October 3, 2019.

1  capabilities and the reliability of the ticket management information that PG&E
2  maintains in the ordinary course of its business.

3      For the reasons discussed in PG&E's joint motion for approval of the
4  settlement in I.18-12-007, the settlement is a fair and reasonable resolution of
5  the claims, and if the Commission approves the settlement, the Commission will
6  have found the settlement to fairly and reasonably resolve the claims.  That
7  settlement will constitute a satisfactory resolution of those claims within the
8  meaning of the CPUC Approval provision of PG&E's Plan.  Following
9  Commission approval of the settlement, PG&E will file a motion with the
10  Bankruptcy Court seeking Bankruptcy Court approval of the settlement.

11      On January 17, 2020, Administrative Law Judge Allen issued a Presiding
12  Officer's Decision approving and modifying the settlement.  The decision, if
13  adopted by the Commission, would approve the settlement, which remains
14  subject to bankruptcy court approval, but would increase the financial penalty
15  paid by PG&E from $65 million to $110 million.

16  Ex Parte OII (I.15-11-015)

17      The CPUC issued this OII to investigate eight proceedings in which PG&E
18  failed to timely report *ex parte* communications and engaged in improper *ex*
19  *parte* communications.

20      On May 3, 2018, the CPUC adopted (as modified) a settlement agreement
21  between PG&E, the City of San Bruno, the City of San Carlos, the Public
22  Advocates Office at the California Public Utilities Commission (Cal Advocates),
23  the SED of the CPUC, and The Utility Reform Network (TURN) that resolved
24  Phase I of the OII.[7]  Under the settlement, PG&E agreed to penalties and
25  forbearances totaling $97.5 million, as well as certain non-financial penalties,
26  such as providing training on the Commission's *ex parte* rules and providing
27  notice to the Cal Advocates, SED, and TURN of certain communications.

28      In Phase II, on June 28, 2019, the CPUC adopted a settlement agreement
29  between PG&E, the City of San Bruno, the City of San Carlos, the
30  Cal Advocates, the SED, and TURN that resolved Phase II of the OII.[8]  Under

---

[7]  Decision (D.) 18-04-014.

[8]  D.19-12-013, at 26 (approving settlement and finding the "Phase II Settlement
Agreement is reasonable in light of the record, is consistent with law, and is in the public
interest").

the settlement, PG&E agreed to a total financial penalty of $10 million, to an extension of the time period for the applicability of the non-financial remedies agreed to in Phase I, and to new non-financial remedies, such as a prohibition on contracting outside parties for Advocacy Work before the Commission through 2025.

Thus, the Commission has found the settlement fairly and reasonably resolves the claims.[9] That settlement constitutes a satisfactory resolution of those claims within the meaning of the CPUC Approval provision of PG&E's Plan. Prior to or in conjunction with seeking Bankruptcy Court approval of the PG&E Plan, PG&E will file a motion with the Bankruptcy Court seeking Bankruptcy Court approval of these settlements.

Disconnection OII (I.18-07-008)

The CPUC scoped this OII to investigate PG&E's self-reported violations in connection with its inadvertent failure to provide the 24-hour notice required in its Electric Rule No.8 A.2 Tariff prior to residential service disconnections between July 1, 2016 and July 18, 2016 and its disconnection, in error, of certain customers on October 20, 2018.

On September 18, 2019, the CPUC adopted a settlement agreement between PG&E and the Consumer Protection and Enforcement Division of the CPUC.[10]

Under the settlement, in resolution of the potential claims, PG&E agreed to provide a bill credit of $100 to each of the 6,371 affected customer accounts that had not already received such a credit (totaling $637,100) and to contribute $637,100 to the Relief for Energy Assistance through Community Help Program, each at shareholder expense.

Thus, the Commission has found the settlement fairly and reasonably resolves the claims.[11] That settlement constitutes a satisfactory resolution of those claims within the meaning of the CPUC Approval provision of PG&E's

---

[9] *Id.*

[10] D.19-09-037.

[11] *Id.*

Plan.  On December 5, 2019, the Bankruptcy Court granted PG&E's motion for approval of these settlements.[12]

Conclusion

PG&E hereby affirms that Commission approval of the above-referenced settlements as submitted satisfies the CPUC Approval condition of the PG&E Plan relating to satisfactory resolution of prepetition claims for monetary fines and penalties.

---

[12] *Order*, *In re: PG&E Corp.*, No. 19-30088, Dkt. No. 5002 (Dec. 5, 2019).

**PACIFIC GAS AND ELECTRIC COMPANY**

**CHAPTER 12**

**SECTION 854**

**(SCOPING MEMO ISSUES 3.4, 4.6)**

PACIFIC GAS AND ELECTRIC COMPANY
CHAPTER 12
SECTION 854
(SCOPING MEMO ISSUES 3.4, 4.6)

TABLE OF CONTENTS

A.  Introduction ................................................................................................ 12-1

B.  Financial Condition of the Utility ................................................................ 12-1

C.  Quality of Service to Ratepayers ............................................................... 12-2

D.  Quality of Management .............................................................................. 12-3

E.  Fairness to Employees .............................................................................. 12-4

F.  Benefits to State and Local Economies and Local Communities ................... 12-5

**PACIFIC GAS AND ELECTRIC COMPANY**
**CHAPTER 12**
**SECTION 854**
**(SCOPING MEMO ISSUES 3.4, 4.6)**

### A. Introduction

My name is Robert S. Kenney.  I am Vice President, State and Regulatory Affairs for Pacific Gas and Electric Company (the Utility, and, together with PG&E Corporation, PG&E).  My industry experience is summarized in my testimony in Chapter 10.

I understand that the Administrative Law Judge's Ruling on Public Utilities Code (Pub. Util. Code) Section 854, dated November 27, 2019, ruled that the California Public Utilities Commission (Commission) will review PG&E's Plan of Reorganization (PG&E's Plan) with reference to, among other things, certain criteria from Pub. Util. Code Section 854.  These criteria are whether the plan will:  "maintain or improve the financial condition of the resulting public utility doing business in the state"; "maintain or improve the quality of service to public utility ratepayers in the state"; "maintain or improve the quality of management of the resulting public utility doing business in the state"; "be fair and reasonable to affected public utility employees, including both union and nonunion employees"; and "be beneficial on an overall basis to state and local economies, and to the communities in the area served by the resulting public utility."  My testimony in this chapter is designed to assist the Commission as it evaluates PG&E's Plan in light of those criteria.

The testimony that follows references several other witnesses' testimony relating to these issues.  For clarity and to avoid duplication, my testimony in this chapter refers briefly to the portions of those witnesses' testimony related to each of the issues above.

### B. Financial Condition of the Utility

- Given that PG&E is currently in Chapter 11 proceedings, its successful emergence from Chapter 11 pursuant to a Plan that will need to have its financial feasibility approved by the Bankruptcy Court will undoubtedly improve PG&E's financial condition.

- As described in the testimony of Mr. Jason Wells in Chapter 2, PG&E will be able to raise the necessary debt and equity to exit Chapter 11. In accordance with a settlement agreement with holders of senior unsecured notes issued by the Utility (the "Noteholders"), the Utility will reinstate certain bonds held by the Noteholders and refinance certain higher coupon bonds at agreed rates. PG&E's Plan also contemplates the issuance of new long-term debt by the Utility. In addition, PG&E's Plan contemplates an equity issuance. PG&E has already secured substantial "backstop" commitments for equity in the reorganized company, which provide certainty that sufficient equity will be available for emergence.

- Moreover, as described in Mr. Wells' testimony and the testimony of Mr. John Plaster in Chapter 3, PG&E's Plan positions the Utility and PG&E Corporation to be financially healthy upon emergence, including because:
  - The Utility expects to achieve investment grade credit ratings for secured debt upon emergence, and continue to improve its credit ratings over time through its constructive implementation of the Assembly Bill (AB) 1054 regulatory environment and its participation in the Wildfire Fund; and
  - PG&E should have ongoing access to equity markets following emergence, particularly in light of substantial investor demand for equity in utilities, improvements to PG&E's credit rating following emergence, greater certainty regarding the AB 1054 regulatory environment, and PG&E's eventual re-establishment of a dividend.

## C. Quality of Service to Ratepayers

The Utility's ongoing efforts to improve its ability to provide safe and reliable service at affordable rates will continue upon emergence from Chapter 11, improving service to ratepayers.

- As described in the testimony of Mr. Andrew Vesey in Chapter 5, the Utility has recently made great strides toward improving the safety and reliability of its service to ratepayers, which will continue upon its emergence from Chapter 11:
  - The Utility has undertaken numerous ongoing initiatives to improve the safety of its service deliveries;

1     –     The Utility has further empowered its safety leadership, including its
2           Chief Risk Officer and Chief Safety Officer;
3     –     The Utility is focused on increasing the reliability of its service, in part
4           by decreasing the incidence of Public Safety Power Shutoffs;
5     –     The Utility, and particularly its Chief Customer Officer, is also
6           focused on enhancing the voice of its customers and increasing
7           customer satisfaction; and
8     –     The Utility is actively exploring ways to develop a regional focus in its
9           operations, which will better address the specific concerns and needs of
10          local communities and is designed to improve the safety and reliability of
11          service within each region.

12    •     These improvements to PG&E's service to its customers will inure to the
13          benefit of PG&E's valued small business customers.  PG&E's current
14          management has experience providing quality service to small businesses.
15          Upon its emergence from Chapter 11, PG&E intends to maintain its Small
16          and Medium Business class of programs and continue its outreach to small
17          businesses.

18    •     As described in the testimony of Mr. Wells in Chapter 2, PG&E will emerge
19          from Chapter 11 as a financially healthy utility, which will, in turn, enhance
20          its ability to raise capital at lower rates for the benefit of its customers, and
21          allow the Utility to continue and augment the ongoing substantial efforts to
22          improve the safety and reliability of its services.

23    •     As noted above with reference to Mr. Wells' testimony, PG&E's Plan
24          involves refinancing a portion of the Utility's existing debt; this refinancing
25          will result in lower interest rates for that debt, generating savings for the
26          benefit of ratepayers.  Thus, PG&E's Plan will enable the Utility to provide
27          ratepayers with improved quality of service at more affordable rates.

28    **D. Quality of Management**

29          The Utility's substantial changes to its senior management team and
30    enhancement of its governance will lead to an improved quality of management.

31    •     As described in Mr. Vesey's testimony, PG&E has recently made a number
32          of key changes in its senior executives and management, which have
33          brought a wealth of outside experience and expertise to the Utility and have
34          focused particularly on empowering leaders in safety.

- As described in the testimony of Ms. Nora Mead Brownell in Chapter 4,
  PG&E's refreshed Boards engage in robust oversight of and regular
  interaction with management, particularly with regard to safety, risk, and
  compliance, which ensures that PG&E's management is accountable for
  maintaining and enhancing the Utility's safety performance and service
  to ratepayers.

## E. Fairness to Employees

PG&E's reaffirmance of its existing commitments to its employees, its
continuing efforts to improve occupational safety, and its compliance with
applicable worker protections will ensure that its employees are treated fairly
upon PG&E's emergence from Chapter 11.

- As described in the testimony of Mr. William Johnson in Chapter 1, PG&E's
  Plan expressly provides that the Utility will assume various existing
  agreements with union and non-union employees, including collective
  bargaining agreements and the employee benefit plans governing
  employees. In addition, as Mr. Johnson notes, PG&E has agreed with the
  International Brotherhood of Electrical Workers (IBEW) to extend and
  enhance the IBEW collective bargaining agreements for the benefit of those
  employees, as well as the overall enterprise.
- As described in Mr. Vesey's testimony, the Utility continues to implement
  and refine its One PG&E Occupational Health and Safety 5-Year Plan,
  which is designed to improve occupational safety and health performance
  and culture by using data analytics to drive targeted improvements in the
  Utility's systems, processes, and communications.
- I understand that Pub. Util. Code Section 854.2 establishes worker
  protections that apply during a 180-day transition period following PG&E's
  bankruptcy filing and the three years thereafter; these protections ensure
  that workers' wages and hours are maintained, as is the total number of
  qualified employees, consistent with collective bargaining agreements and
  the Commission's orders. PG&E will fully comply with the requirements of
  this section.

## F. Benefits to State and Local Economies and Local Communities

The Utility's emergence from Chapter 11 as a financially healthy utility committed to continued improvements to the safety, reliability, and affordability of its service will benefit the communities it serves and the state as a whole.

- As described in Mr. Vesey's testimony, the Utility is intensely focused on improving the reliability of its service, which will substantially benefit the state and local economies that rely on access to energy.

- The savings from the refinancing of debt in PG&E's Plan, discussed above and in Mr. Wells' testimony, will also benefit state and local economies in the form of lower rates for PG&E's customers.

- As also discussed in Mr. Wells' testimony, PG&E will emerge from Chapter 11 as a financially healthy utility under PG&E's Plan, which will enable it to be a strong partner to the state in confronting the challenges of climate change and the increasing threat of wildfires.

- PG&E's extensive efforts to improve its safety performance, as described in the testimony of Mr. Vesey, and its particular focus on wildfire safety, as described in the testimony in Chapter 6, will increase the safety of the communities within the area that the Utility serves, including those communities that have suffered from devastating wildfires in recent years.

- PG&E's reaffirmance of its commitments to its employees—who are also members of the communities that the Utility serves—will help minimize disruption to communities as PG&E emerges from Chapter 11.

- PG&E contributes significant amounts in the form of property taxes and franchise fees to the counties and cities where PG&E owns and operates gas and electric infrastructure. For example, in 2019, PG&E paid more than $388 million to 50 counties and 247 cities; this total was $21 million greater than payments in the prior year, an increase that was driven by PG&E's substantial investments in infrastructure to promote safety and reliability. PG&E's Plan, under which PG&E will be able to emerge from Chapter 11 and to continue to make such investments, will therefore facilitate this important contribution to cities and counties, which drives local economies and supports essential services.

- PG&E and the PG&E Corporation Foundation make charitable contributions, funded entirely by shareholders, which benefit the communities that PG&E

serves, with a particular focus on underserved communities.  In 2018, PG&E and the PG&E Corporation Foundation supported $27.8 million in contributions to charitable organizations.  Of that total amount, 31% was directed toward the area of economic and community vitality, which includes investments in job creation and career training opportunities, support for local businesses, and energy assistance to low-income families to improve quality of life.

- PG&E also supports community development by prioritizing the inclusion of diverse business enterprises – small businesses and businesses owned by women, minorities, service-disabled veterans and LGBTQ individuals – in its supply chain.  PG&E offers workshops, trainings, technical assistance, and educational scholarships to suppliers; collaborates with community organizations; and encourages its major suppliers to further diversity in subcontracting.  These efforts have delivered results: in 2018, PG&E spent $2.98 billion with diverse suppliers, representing 41.43 percent of its total procurement expenditures. This was the 13th consecutive year that the Utility exceeded the Commission's goal of 21.5 percent.