1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

<u>**Exhibit C**</u>

**JH Kelly Complaint Against AECOM**

**FILED**

JAN 29 2019

CLERK OF THE SUPERIOR COURT
BY: S. MURILLO, DEPUTY CLERK

1  MARIO R. NICHOLAS (SB #273122)
   mario.nicholas@stoel.com
2  STOEL RIVES LLP
   760 SW Ninth Avenue, Suite 3000
3  Portland, OR  97205
   Telephone:  503.224.3380
4  Facsimile:  503.220.2480

5  Attorneys for Plaintiff
   JH Kelly, LLC

6

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SHASTA

10  JH KELLY, LLC, a Washington limited        CASE NO.  **19CV0172**
    liability company,
11                                             **COMPLAINT FOR:**
                    Plaintiff,
12                                             1. Breach of Contract;
          v.                                   2. Breach of Contract/Total Cost or
13                                                Modified Total Cost;
    AECOM TECHNICAL SERVICES, INC., a          3. Breach of Implied Warranty (Adequacy
14  purported California corporation; and         of Plans and Specifications);
    DOES 1 through 10, inclusive,              4. Breach of the Implied Covenant of
15                                                Good Faith and Fair Dealing;
                    Defendants.                5. *Quantum Meruit*/Abandonment;
16                                             6. Violation of Prompt Payment Laws;
                                                  and
17                                             7. *Quantum Meruit*/Reasonable Value

18                                             Unlimited Jurisdiction

19

20

21        For its Complaint, Plaintiff JH Kelly, LLC ("JH Kelly") alleges as follows:

22                              **THE PARTIES**

23        1.       Plaintiff JH Kelly is a Washington limited liability company.  JH Kelly is duly

24  qualified to do business in the State of California as a contractor under Contractors State License

25  Board License No. 991732.

26        2.       On information and belief, defendant AECOM Technical Services, Inc.

27  ("AECOM") is now, and all relevant times was, a California corporation headquartered in Los

28  Angeles, California.  On information and belief, defendant AECOM is a subsidiary of AECOM, a

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-1-

COMPLAINT

99892670.8 8034592-00012

1   Delaware corporation, which has 77 offices in the State of California, and domestic main offices

2   in Los Angeles, California and New York, New York, and international main offices in London,

3   England; Moscow, Russia; Hong Kong Sha Tin, China; Abu Dhabi, United Arab Emirates; and

4   Brisbane, Australia.

5        3.    JH Kelly is ignorant of the true names and capacities of defendants sued herein as

6   Does 1 through 10, inclusive, and therefore sues these defendants by such fictitious names.  JH

7   Kelly will amend this Complaint to allege true names and capacities when ascertained.  JH Kelly

8   is informed and believes and therefore alleges that each of the fictitiously named defendants are

9   responsible in some manner for the occurrences herein alleged and for JH Kelly's damages.

10        4.    At all times mentioned herein, defendants, and each of them, were the agents,

11   servants, and employees of each of the remaining defendants and were, in doing the things

12   complained of, acting within the scope of their agency and/or employment, and acting with the

13   full knowledge or subsequent ratification of their principals or employers.

14   **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

15        5.    This lawsuit arises out of the pervasive design, procurement, permitting,

16   construction management, construction administration, and related performance errors and

17   contract breaches committed by AECOM and Does 1-10 (the "AECOM Defendants").  The

18   AECOM Defendants are the prime contractor on a private construction project generally known

19   as the Burney K2 Replacement Project, owned by Pacific Gas and Electric Company ("PG&E"),

20   and located near the City of Burney, Shasta County, California (the "Project").  As set forth in

21   more detail below, the AECOM Defendants' egregious mismanagement and maladministration of

22   the Project, and unconscionable treatment of JH Kelly, a subcontractor, is underscored by the

23   following nonexhaustive list of facts:

24        a.    JH Kelly's work on the Project doubled in duration from an eight-month

25             construction schedule, with a break for winter, to a 16-month construction

26             schedule, working through wet and cold winter conditions;

27        b.    JH Kelly's scope of work on the Project doubled from $14,341,281 to

28             $27,871,284 (excluding schedule and productivity impact delays);

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-2-

COMPLAINT

99802670.8 0034592- 00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 3
of 40

    c.  JH Kelly experienced a 238% increase in Project costs;

    d.  JH Kelly planned to work zero overtime hours, and ended up working 35,039 overtime hours;

    e.  After terminating its own onsite Project team, the AECOM Defendants brought in a mostly new, modified Project team that directed JH Kelly to accelerate its schedule and failed and refused to pay JH Kelly for its additional costs;

    f.  The AECOM Defendants' new Project team unilaterally ceased payment under the contractual payment schedule agreed to in the Subcontract (defined below);

    g.  JH Kelly began work in or around October 2016, and demobilized from the site on or about June 28, 2018, but has not received any payment for 197 days (since on or about July 5, 2018);

    h.  JH Kelly has not been paid for any work performed after March 25, 2018 (the AECOM Defendants last made payment to JH Kelly on or about July 5, 2018 for work performed through March 25, 2018);

    i.  The AECOM Defendants failed to process 143 pending change order requests ("CORs" or, if singular, "COR") totaling $9,562,782, the oldest of which was submitted on or about April 28, 2017;

    j.  JH Kelly has been paid only 62% of the base contract and approved change order amounts;

    k.  JH Kelly has been paid only 34% of its total costs incurred; and

    l.  Notwithstanding the foregoing, (i) JH Kelly paid all of its subcontractors, employees, and vendors, (ii) no subcontractors or vendors filed liens against the Project, (iii) no employees filed payment claims regarding the Project, (iv) JH Kelly finished the job with zero recordable injuries; and (v) despite lack of payment, JH Kelly continued to diligently and successfully execute the work until completion in June 2018—which is consistent with JH Kelly's history of never abandoning a project.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-3-

COMPLAINT

99802670.8 0034592- 00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 4 of 40

6. On or about July 14, 2015, the AECOM Defendants first contacted JH Kelly to inquire regarding its availability to work on the Project.

7. The Project generally involved the replacement of a natural gas compressor unit at the Burney Compressor Station in Burney, California; the performance of various upgrades to the Burney Compressor Station; and the limited demolition of existing equipment and facilities at the Project site. The Burney Compressor Station is a facility located along PG&E's natural gas pipelines that compresses gas to a specified pressure, thereby allowing it to continue traveling along the pipelines from the State of Oregon to its intended recipients in the State of California. It supplies natural gas to the City of Burney and its neighboring communities, and is a part of PG&E's natural gas distribution system that provides service to around 4.2 million customers from Bakersfield, California to the southern border of the State of Oregon.

8. On or about August 12, 2015, the AECOM Defendants provided JH Kelly with a request for proposal from PG&E for the Project.

9. On or about August 25, 2015, JH Kelly attended a pre-bid job walk at the Project site in Burney, California.

10. On or about August 26, 2015, Steven R. Petto, Associate Vice President of Power & Industrial for the AECOM Defendants ("Mr. Petto"), represented to JH Kelly that the AECOM Defendants had rebuilt the Gerber Compressor Station (the "Gerber Project") about 50 miles south of Burney, California; that the Gerber Project was "very similar to what we have now at Burney"; and that the AECOM Defendants had "rebuilt the [Gerber Project] site in 5 months."

11. On or about October 7, 2015, JH Kelly submitted a bid package, JH Kelly Proposal No. 15000.77.505 ("Proposal"), to the AECOM Defendants to perform certain civil, structural, mechanical, electrical, and related construction work on the Project for a lump-sum price of $14,341,281.

12. In preparing its Proposal, including its scope of work and draft schedule narrative, JH Kelly reviewed and relied upon the bid documents provided by the AECOM Defendants, including, but not limited to, the plans, details, material quantities, drawings, specifications, information regarding the Gerber Project, and other information provided by the AECOM

-4-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT
99802670.8 0034592- 00012

Case: 19-30088   Doc# 7447-3   Filed: 05/15/20   Entered: 05/21/20 08:15:22   Page 5 of 40

Defendants.  Included among the documents relied upon by JH Kelly was a batch of roughly 270 pages of emails and material take off ("MTO") information, which JH Kelly relied upon, and which AECOM directed JH Kelly to rely upon, to generate its pricing for the assumed fixed quantities of materials and equipment necessary for JH Kelly's scope of work (these emails and MTO information were ultimately attached to the Subcontract (defined below) as Exhibit B2A). JH Kelly expressly reserved the right to seek additional compensation for changes to the quantities of material and equipment included in its Proposal through change orders.  JH Kelly's pricing also excluded winter work and overtime work.

13.     JH Kelly's Proposal included a draft schedule narrative for the Project ("JH Kelly's Proposed Construction Schedule"), which JH Kelly prepared based on its pre-bid planning with the AECOM Defendants and review of the Project documents.  JH Kelly's Proposed Construction Schedule contemplated JH Kelly's scope of work being complete in one year, with no onsite work during the winter months, and provided, among other things, as follows:

    a.  Mobilization to begin in October 2016;

    b.  Demobilization would occur in November 2016 to leave the Project for the winter period, which was November 2016 through February 2017 (the "2016-2017 Winter Period");

    c.  JH Kelly would perform detailing and fabrication of electrical and piping materials offsite during the 2016-2017 Winter Period;

    d.  Re-mobilization and construction work at the Project would occur from March 2017 through September 2017; and

    e.  Final demobilization for JH Kelly would occur in October 2017.

14.     JH Kelly's plan to demobilize during the 2016-2017 Winter Period was consistent with the Project documents provided by the AECOM Defendants, which provided that "[d]ue to the relatively harsh winters, construction [is] recommended to be scheduled from April to October."

15.     On or about February 11, 2016, on information and belief, the AECOM Defendants entered into an Engineering, Procurement, and Construction of Natural Gas & Electric Transmission and Distribution Facilities Agreement (the "EPC Agreement") with PG&E for the Project, with the contract price $40,510,262 under which the AECOM Defendants agreed to act as the design-builder and prime contractor for the Project.

16.     Under the EPC Agreement, the AECOM Defendants were responsible for designing the Project, procurement of all large and long-lead materials for the Project, building the Project, and construction management and administration of the Project. The AECOM Defendants were also responsible for, among other things, developing, maintaining, updating, and achieving the Project schedule per the deadlines in the EPC Agreement, and timely obtaining all building permits.

17.     On or about October 12, 2016, the AECOM Defendants requested that JH Kelly provide a detailed construction schedule for the Project in order for the AECOM Defendants to incorporate into the overall Project schedule. JH Kelly sent the AECOM Defendants the requested detailed construction schedule on or about October 14, 2016.

18.     On or about October 19, 2016, the AECOM Defendants issued an overall Project schedule (the "Project Schedule"). Consistent with JH Kelly's Proposed Construction Schedule, the Project Schedule provided, among other things, as follows:

    a.  Mobilization to begin in October 2016 to early November 2017, along with clearing, grubbing, and other site preparation work;

    b.  Winter demobilization would occur during the 2016-2017 Winter Period (except for the commencement of some limited work in late February 2017);

    c.  The AECOM Defendants would complete all permitting work by October 4, 2016 (which would allow the immediate commencement of construction after the 2016-2017 Winter Period);

    d.  The AECOM Defendants would complete the Issued for Construction ("IFC") drawings by December 1, 2016 (which would allow JH Kelly to perform

detailing and fabrication of the necessary piping and electrical materials during the 2016-2017 Winter Period);

    e. Re-mobilization and construction work would occur from March 2017 through September 2017; and

    f. JH Kelly would complete its scope of work in October 2017.

    19. On or about October 14, 2016, Mr. Petto, on behalf of the AECOM Defendants, represented that JH Kelly would be entitled to addition compensation for changes to the quantities of materials and equipment set forth in JH Kelly's Proposal as follows:

> "In hindsight if we weren't scrambling so hard to get everything included before Power Advocate shut the window on proposal entries we might have had a more formal transmittal process to better track the latest quantities; a lessons learned for the next proposal, but for now this is what we've got. If later we find material quantity changes I missed, AECOM will negotiate in good faith to resolve any discrepancies."

    20. JH Kelly believed and relied upon Mr. Petto's representation that "AECOM will negotiate in good faith to resolve any discrepancies" regarding the quantities of materials and equipment in entering into the Subcontract (defined below) with the AECOM Defendants.

    21. On or about October 21, 2016, the AECOM Defendants and JH Kelly entered into the Agreement Between Design-Builder and Subcontractor (Where Subcontractor Does Not Provide Design Services), Subcontract No. 60482831-SC-001 (the "Subcontract"), with a contract price of $14,341,281—the same amount included in JH Kelly's Proposal. A copy of the Subcontract, excluding exhibits (which consist of approximately 2,218 pages), is attached hereto as **Exhibit A** and incorporated herein.

    22. The Subcontract incorporated as Exhibit H the JH Kelly Construction Schedule (the "Subcontract Ex. H Schedule"), which, consistent with JH Kelly's Proposed Construction Schedule and the Project Schedule, provided that:

    a. Mobilization to begin in October and November 2016;

    b. Winter demobilization would occur in November 2016 for the 2016-2017 Winter Period;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-7-

COMPLAINT

99802670.8 0034592- 00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 8 of 40

1        c.  JH Kelly would perform off-site detailing and fabrication of the necessary

2            piping and electrical materials during the 2016-2017 Winter Period;

3        d.  Re-mobilization and construction work would occur from March 2017 through

4            September 2017; and

5        e.  Final demobilization for JH Kelly would occur in October 2017.

6        23.    The Subcontract incorporated as Exhibit A2 a modified major milestone schedule,

7    provided by AECOM, which, consistent with JH Kelly's Proposed Construction Schedule, the

8    Project Schedule, and the Subcontract Ex. H Schedule, provided, among other things, as follows:

9        a.  Mobilization to begin on October 17, 2016;

10       b.  Winter demobilization would occur in November 2016 for the 2016-2017

11           Winter Period;

12       c.  The AECOM Defendants would complete all IFC drawings by December 1,

13           2016 (which, as set forth above, would allow JH Kelly to perform its detailing

14           and fabrication for the necessary piping and electrical materials during the

15           2016-2017 Winter Period);

16       d.  The AECOM Defendants would complete all engineering by January 16, 2016

17           (which would allow JH Kelly to commence construction immediately after the

18           2016-2017 Winter Period);

19       e.  Re-mobilization and construction work would occur from March 2017 through

20           November 2017;

21       f.  Substantial completion of the overall Project would occur on November 17,

22           2017; and

23       g.  Project final completion and demobilization would occur on December 1,

24           2017.

25       24.    As set forth above, at the time JH Kelly entered into the Subcontract, JH Kelly

26   planned (i) to work on the Project in two phases, commencing in or around October 2016, (ii) to

27   not work onsite during the 2016-2017 Winter Period, during which time JH Kelly planned to

28   perform off-site detailing, fabrication, and related work to prepare for the start of construction in

-8-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592- 00012

1  or around March 2017, (iii) to follow a standard sequence of construction, and (iv) to complete its

2  work in or around October 2017.

3       25.    From the outset, for reasons unknown to JH Kelly and not the fault of JH Kelly,

4  the AECOM Defendants fell behind on their engineering, procurement, and permitting

5  obligations.

6       26.    After executing the Subcontract, the AECOM Defendants advised JH Kelly that

7  they would not meet the December 1, 2016 deadline to issue the IFC electrical drawings (the

8  "IFC Electrical"), and that JH Kelly should expect to receive the unstamped IFC Electrical by

9  December 15, 2016, and the stamped IFC Electrical shortly thereafter.

10       27.    On or about January 4, 2017, having not received the IFC Electrical by the

11  December 15, 2016 deadline, JH Kelly contacted the AECOM Defendants to request an update

12  on the status of the IFC Electrical. That same day, the AECOM Defendants responded that the

13  IFC Electrical would not be released until February 24, 2017. JH Kelly further learned the IFC

14  Electrical was going to include electrical re-design and added electrical scope.

15       28.    The AECOM Defendants' message on January 4, 2017 was the first time that the

16  AECOM Defendants notified JH Kelly that the IFC Electrical would not be issued until February

17  24, 2017—nearly three months later than planned. This delay significantly concerned JH Kelly

18  because material procurement and off-site detailing and fabrication, among other services, could

19  not begin without the IFC Electrical. JH Kelly had arranged a team of electrical detailers to start

20  work on December 1, 2016 based on the previously scheduled issue date for the IFC Electrical.

21  JH Kelly later moved its start date to December 15, 2016 upon learning of AECOM's delay in

22  providing the IFC Electrical. JH Kelly would now need to move the detailing and fabrication

23  work out further based on the AECOM Defendants' notice of delay to February 24, 2017.

24       29.    On or about January 4, 2017, JH Kelly notified the AECOM Defendants that it

25  requested an adjustment under the Subcontract to account for the schedule compression,

26  additional work, loss of productivity, and other issues that flowed from the late issuance of the

27  IFC Electrical, the electrical re-design, added electrical scope, and the AECOM Defendants'

28  failure to manage the sequencing and flow of work. The AECOM Defendants expressly

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-9-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 10
of 40

1   acknowledged receipt of JH Kelly's January 4, 2017 request for adjustment and relief under the

2   Subcontract.

3          30.    On or about January 24, 2017, JH Kelly again advised the AECOM Defendants of

4   the substantial impact on the construction schedule and Project costs as a result of the late

5   issuance of the IFC Electrical and added electrical scope. That same day the AECOM

6   Defendants expressly acknowledged that the late issuance of the IFC Electrical impacted the

7   Project Schedule.

8          31.    The AECOM Defendants did not issue the stamped IFC Electrical on February 24,

9   2017 as they represented they would.

10         32.    Over the course of the following nine months, in a disjointed and disorganized

11   manner, the AECOM Defendants modified, corrected, and updated the IFC Electrical.

12         33.    The AECOM Defendants issued the final update to the IFC Electrical on or about

13   November 15, 2017, over 11 months later than planned.

14         34.    The AECOM Defendants' 11-month delay in issuing the IFC Electrical, and the

15   extensive changes to the IFC Electrical, fundamentally changed the timing, sequencing, and scope

16   of JH Kelly's work on the Project.

17         35.    On or about September 12, 2017, JH Kelly submitted COR #70 for compensation

18   for the myriad of changes caused by the IFC Electrical.

19         36.    On or about September 12, 2017—the same day that JH Kelly formally submitted

20   COR #70—the AECOM Defendants requested that JH Kelly implement an accelerated schedule

21   (the "Accelerated Schedule") to compensate for the delays to the Project. The Accelerated

22   Schedule contemplated a revised substantial completion date of February 28, 2018 by making the

23   following primary changes to JH Kelly's work on the Project:

24               a.    The initiation of overtime for all labor by shifting from a "4-10s" schedule

25                   (four consecutive days at 10 hours per day) to a "6-10s" schedule (six

26                   consecutive days at 10 hours per day);

27               b.    The requirement that JH Kelly to work through the cold and wet winter period

28                   from November 2017 through February 2018; and

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-10-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088     Doc# 7447-3     Filed: 05/15/20     Entered: 05/21/20 08:15:22     Page 11
of 40

c.   The addition of nightshifts for electricians.

37.   On or about November 9, 2017, the AECOM Defendants directed JH Kelly to implement the Accelerated Schedule.  JH Kelly implemented the Accelerated Schedule at the specific instance and request of the AECOM Defendants, and based on the understanding that it would be compensated for its additional costs.

38.   In addition to the delayed delivery of the IFC Electrical, and other IFC drawings, the substantial changes in the IFC Electrical, and other IFC drawings, and the implementation of the Accelerated Schedule, JH Kelly's work on the Project was severely impacted as a result of, without limitation, the following issues (for which numerous notices were provided to the AECOM Defendants):

a.   Late and Incomplete Permits: The AECOM Defendants failed to timely procure building permits prior to the start of construction, which directly impacted the progress, sequence, and cost of construction on the Project.  The final building permit was applied for on or about August 28, 2017, which was six months after the start of construction and nearly three months prior to the planned substantial completion date of November 17, 2017.  JH Kelly was significantly limited from commencing work without the permits, and nearly all aspects of the Project experienced a material permitting delay;

b.   Late Procurement: The AECOM Defendants were responsible for the majority of procurement for the Project, including, without limitation, procurement of all large and long-lead materials, including all two-inch and larger piping materials, and they failed to timely procure the materials, which directly impacted the progress, sequence, and cost of construction;

c.   Defective Coating Procurement: The AECOM Defendants procured piping that did not meet the coating standard defined in the EPC Agreement, and that failed the "jeep" tests in the field, requiring removal of the defective coating and reapplication of the coating to the proper standard in the field, which directly impacted the progress, sequence, and cost of construction;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-11-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 12 of 40

d. <u>Delayed and/or Defective Mechanical Material</u>: Mechanical materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

e. <u>Delayed and/or Defective Steel Building Material</u>: Steel materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

f. <u>Delayed and/or Defective Shop Fabrication Material</u>: Materials furnished by the AECOM Defendants and/or third parties under their control were delivered late, were missing item(s), and contained errors in fabrication, which directly impacted the progress, sequence, and cost of construction;

g. <u>Contract Maladministration</u>: During the AECOM Defendants' management and administration of the Project, the AECOM Defendants failed to coordinate and manage the sequencing and flow of work, resulting in extensive delays, work stoppages, and inefficiencies, which forced JH Kelly to perform additional work to resolve the conflicts and changed conditions;

h. <u>Differing Site Conditions</u>: The presence of large rocks and boulders disrupted JH Kelly's foundation work and progress on JH Kelly's underground work at the compressor building, in addition to its underground piping and electrical site utility work, which directly impacted the progress, sequence, and cost of construction;

i. <u>Hydro Vacuum Requirements</u>: Contrary to the AECOM Defendants' instructions at the time JH Kelly submitted its Proposal, JH Kelly was directed to use hydro vacuum excavation in place of mechanical excavation, which directly impacted the progress, sequence, and cost of construction;

j. <u>Base and Corner Trim and Flashing Fabrication Errors</u>: The AECOM Defendants and/or third parties under their control defectively fabricated the

-12-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

99802670.8 0034592-00012

base permitted flashing at several buildings, which directly impacted the

progress, sequence, and cost of construction;

k. <u>Missing Fire Coating/Fireproofing to Materials</u>: The AECOM Defendants

and/or third parties under their control did not provide the required fire coating

on the building steel of Valve Houses 1 and 2, which directly impacted the

progress and cost of construction;

l. <u>Door and Frame Location Conflicts</u>: The AECOM Defendants did not properly

specify all door and frame locations at the Project, which directly impacted the

progress and cost of construction;

m. <u>Late Delivery of the Generator</u>: The AECOM Defendants delivered and set a

generator and associated components on or about September 12, 2017, six

months later than the planned date of March 8, 2017, which directly impacted

the progress and cost of construction;

n. <u>Removal of Security and Communications Conduit</u>: JH Kelly encountered

several instances where existing security or communication conduits had to be

removed, which directly impacted the progress and cost of construction;

o. <u>Delayed Water Tank Installation</u>: The AECOM Defendants and/or third parties

under their control were late in delivering a water tank for installation at the

fire water pump building, which directly impacted the progress and cost of

construction;

p. <u>Delayed Design for Rebar and Anchor Bolt Procurement</u>: The AECOM

Defendants and/or third parties under their control were late in delivering rebar

and anchor bolt design for installation at the fire water pump building, which

directly impacted the progress and cost of construction; and

q. <u>Disjointed Construction Management</u>: The AECOM Defendants switched

construction managers midstream, on or about July 30, 2017, and replaced

their entire Project team throughout the course of the Project, which resulted in

JH Kelly being forced to re-answer the same questions, re-submit the same

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-13-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 14
of 40

1  documentation, and adjust to a new team and new approach, all of which

2  impacted the progress and cost of construction, and largely stopped the

3  approval of pending change orders.

4   39. As a result of the AECOM Defendants' delayed and fragmented issuance of the

5 IFC Electrical and other IFC drawings, mismanagement and maladministration of the Project,

6 lack of transparency, late and incomplete procurement of permits, late procurement of materials,

7 and procurement of defective materials, and the multitude of other issues with the Project, as set

8 forth herein, JH Kelly was forced to perform massive additional work over a far longer period

9 than planned, and incurred substantial damages.

10   40. JH Kelly timely submitted CORs for all of the foregoing additional work, changed

11 work, and resulting damages. JH Kelly also prepared, at the direction of the AECOM

12 Defendants, Time Impact Analysis ("TIA") reports to support many of its claims, including TIA

13 reports regarding (i) the IFC Electrical, (ii) the AECOM Defendants' late permitting, (iii) the

14 AECOM Defendants' late and defective procurement of piping, valves, and fittings, (iv) the

15 AECOM Defendants' defective coating procurement, (v) the directive that JH Kelly use hydro

16 vacuum excavation, and (vi) JH Kelly's additional electrical excavation. Despite repeated

17 requests, the AECOM Defendants have failed and refused to compensate JH Kelly for its work on

18 the Project, including original contract amounts owed, CORs, retention, schedule, and

19 productivity impacts.

20   41. The AECOM Defendants are also wrongfully withholding contract funds from JH

21 Kelly's December 2017 and January 2018 invoices, and seeking offsets through bogus

22 backcharges with funds that are lawfully due and owing to JH Kelly on the Project. Specifically,

23 the AECOM Defendants are wrongfully withholding (i) $750,000 from JH Kelly based on

24 PG&E's assessment of $1,500,000 in liquidated damages against the AECOM Defendants for the

25 AECOM Defendants' failure to meet the Project substantial completion deadline, (ii) $1,414,500

26 from JH Kelly based on delay damages allegedly attributable to JH Kelly, (iii) $813,259 from JH

27 Kelly based on the "Valve Strike" event for which a third party is wholly responsible, and (iv)

28 $300,000 for extra work performed by JH Kelly to paint existing aboveground piping and

-14-

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088 Doc# 7447-3 Filed: 05/15/20 Entered: 05/21/20 08:15:22 Page 15
of 40

buildings. The AECOM Defendants' withholdings are improper because, among other things, the delays at issue are entirely attributable to the AECOM Defendants, the withholding contradicts their prior admissions that JH Kelly is not responsible for the delays to the Project Schedule, and the AECOM Defendants did not provide adequate evidence or other information to support the basis for the withholdings.

42. At all times, JH Kelly proactively, diligently, and in good faith did everything reasonably within its power to work with the AECOM Defendants to resolve the myriad of design issues and changes, the late and improper procurement, and the late permits, and to keep the Project moving towards completion. The AECOM Defendants, by contrast, did not act in good faith, failed and refused to promptly respond to CORs, declined to accept responsibility for the delays and cost increases, declined to agree to payment for the indisputably changed work and massive extra work, and ignored JH Kelly's multiple requests for approval of the extra work.

43. In light of the foregoing, including many months of non-payment, JH Kelly would have been justified in suspending work and/or terminating the Subcontract for cause. However, because JH Kelly has never abandoned a project or had a claim made against its performance bond, and because JH Kelly wanted to complete its scope of work, JH Kelly continued to work towards completing the Project, including the full payment of all subcontractors, vendors and employees, to the significant benefit of the AECOM Defendants. JH Kelly is currently owed approximately $26,402,479.89 (plus interest, costs, attorneys' fees, and penalties), as follows:

    a. The AECOM Defendants owe JH Kelly $6,839,697.89 for invoiced contract amounts, including amounts wrongfully withheld, as follows:

        i. JH Kelly Invoice No. MD 200101 in the amount of $1,587,483.56;

        ii. JH Kelly Invoice No. MD 202353 in the amount of $1,690,275.55;

        iii. JH Kelly Invoice No. MD 204418 in the amount of $2,053,311.95;

        iv. JH Kelly Invoice No. MD 205983 in the amount of $506,321.50;

        v. JH Kelly Invoice No. MD 208892 in the amount of $86,880.35;

        vi. Release of retention withheld in the amount of $915,424.98;

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-15-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088   Doc# 7447-3   Filed: 05/15/20   Entered: 05/21/20 08:15:22   Page 16 of 40

b. The AECOM Defendants owe JH Kelly $9,562,782 for pending CORs, as set forth in more detail in **Exhibit B**; and

c. The AECOM Defendants owe JH Kelly an amount currently estimated at $10,000,000, to be proven at trial, for schedule and productivity impacts on the Project.

44.     On or about June 28, 2018, JH Kelly demobilized from the Project site after successfully completing its scope of work on the Project.

## FIRST CAUSE OF ACTION

### (Breach of Contract)

45.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 44 above.

46.     JH Kelly has performed all conditions, covenants, and promises required on its part to be performed in accordance with the terms and conditions of the Subcontract.

47.     The AECOM Defendants failed to pay their obligations under the Subcontract.

48.     The AECOM Defendants are in breach of the Subcontract and have caused damages to JH Kelly in the amounts set forth in paragraph 43 above, or an amount to be proven at the time of trial, plus interest, penalties, and attorneys' fees and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## SECOND CAUSE OF ACTION

### (Breach of Contract/Total Cost or Modified Total Cost Recovery)

49.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 48 above.

50.     JH Kelly's scope of work under the Subcontract has been altered by the AECOM Defendants' changes so significantly that the final Project was significantly different from the original Project.

51. As a result of the AECOM Defendants' changes to the Project, it is not practical to prove the actual additional costs caused by each individual change demanded by the AECOM Defendants.

52. JH Kelly's original Proposal that was accepted by the AECOM Defendants was reasonable.

53. JH Kelly's actual costs on the Project were reasonable.

54. JH Kelly was not responsible for incurring the additional costs on the Project without compensation from the AECOM Defendants.

55. As a result of the substantial changes to JH Kelly's scope of work on the Project, JH Kelly is entitled to recover its total costs or modified total costs for its performance of work on the Project, minus Subcontract amounts paid, in the amounts set forth in paragraph 43 above, or an amount to be proven at the time of trial, plus interest, penalties, and attorneys' fees and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## THIRD CAUSE OF ACTION

### (Breach of Implied Warranty (Adequacy of Plans and Specifications))

56. JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 55 above.

57. Under the Subcontract, the AECOM Defendants were solely responsible for design and engineering activities, and JH Kelly had no responsibility for design. As a matter of law, the AECOM Defendants had the obligation to provide plans and specifications that were timely, adequate, complete, and sufficient to allow JH Kelly to construct the Project as intended when the Project was bid and the Subcontract was executed. At the time the AECOM Defendants accepted JH Kelly's Proposal and awarded the Subcontract to JH Kelly, the AECOM Defendants impliedly warranted the adequacy, sufficiency, and completeness of the plans and specifications for purposes of bidding and performing construction of the Project.

58. The plans, specifications, drawings, and other design and Project documents upon which JH Kelly bid were, in fact, late, inadequate, inaccurate, and incomplete. Moreover, the

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-17-

COMPLAINT

99802670.8 0034592-00012

Case: 19-30088     Doc# 7447-3     Filed: 05/15/20     Entered: 05/21/20 08:15:22     Page 18 of 40

1   AECOM Defendants failed to timely remedy the defective plans and specifications and failed to

2   timely deliver the corrected IFC drawings, all of which constitute material and substantial

3   breaches of the implied warranty of the adequacy of plans and specifications.

4          59.    As a direct, proximate, and foreseeable result of the AECOM Defendants' breach

5   of the implied warranty of the adequacy of the plans and specifications, JH Kelly incurred

6   significant extra and unanticipated costs and damages, including, but not limited to, disruption

7   and delay in completion of its work.  JH Kelly has been damaged in an amount to be proven at the

8   time of trial, which is a portion of the amounts set forth in paragraph 43 above, plus interest,

9   penalties, and attorneys' fees and costs to the extent allowable by law.

10         Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

11                              **FOURTH CAUSE OF ACTION**

12            **(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

13         60.    JH Kelly realleges and incorporates by this reference, as if set forth in full herein,

14  the allegations in paragraphs 1 through 59 above.

15         61.    Implied in the Subcontract is a covenant of good faith and fair dealing to which the

16  AECOM Defendants are bound.  The covenant requires the AECOM Defendants to refrain from

17  any action that would impair the benefits that JH Kelly has a right to expect from the Subcontract.

18         62.    As alleged herein, the AECOM Defendants breached the covenant of good faith

19  and fair dealing by, among other things, their failure and refusal to timely and properly manage

20  and administer the Project; their failure to address and respond to design issues; their refusal to

21  properly and timely respond to CORs; their refusal to pay JH Kelly for both its original and extra

22  work that was directed by the AECOM Defendants; their refusal to provide JH Kelly with timely

23  updates regarding changes to the Project Schedule, including, but not limited to, changes to the

24  delivery dates for the IFC drawings, and the delivery dates for materials; their failure to pay even

25  undisputed amounts owing to JH Kelly in an effort to financially burden JH Kelly and in an

26  attempt to interfere with JH Kelly's relationships with its subcontractors; and their general failure

27  and refusal to negotiate or deal in good faith with JH Kelly.

28

63.     As a proximate result of the AECOM Defendants' breaches, JH Kelly has been damaged in an amount to be proven at the time of trial, which is a portion of the amounts set forth in paragraph 43 above,, plus interest, penalties, and attorneys' fees and costs to the extent allowable by statute.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## FIFTH CAUSE OF ACTION

### (*Quantum Meruit*/Abandonment of Contract)

64.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 63 above.

65.     The AECOM Defendants imposed upon JH Kelly an excessive number of changes such that it can fairly be said that JH Kelly's scope of work under the Subcontract was drastically and cardinally altered.

66.     The changes imposed upon JH Kelly materially increased JH Kelly's costs and caused performance of the work on the Project to be done under disadvantageous circumstances.

67.     The scope of work undertaken by JH Kelly greatly exceeded that called for under the Subcontract, and the final Project was materially different from the contracted work.

68.     As a result of the substantial changes to JH Kelly's scope of work on the Project, the AECOM Defendants have abandoned the Subcontract, and JH Kelly is entitled to recover the reasonable value of the labor, services, and materials supplied on the Project, in an amount to be proven at the time of trial, but estimated at $26,000,000, plus interest, penalties, and costs to the extent allowable by law.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## SIXTH CAUSE OF ACTION

### (Violation of Prompt Payment Laws [Business and Professions Code § 7108.5 and/or Other Applicable Code Section(s)])

69.     JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 68 above.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-19-

COMPLAINT

70. JH Kelly performed all obligations under the Subcontract and duly completed its obligations under the Subcontract, except for those excused by the AECOM Defendants' failures to perform. As of the date of completion, the amount remaining as unpaid contract funds was the sum of $16,402,479.89, or an amount to be proven at the time of trial. That amount has exceeded seven days overdue. No good-faith dispute existed or now exists about the unpaid contract funds.

71. The AECOM Defendants wrongfully withheld payments due and owing to JH Kelly. No good-faith dispute exists or has existed regarding the payments that have been withheld.

72. The conduct of the AECOM Defendants as alleged in this Complaint violates Business and Professions Code section 7108.5, and/or other applicable code section(s).

73. Pursuant to those code sections, JH Kelly is entitled to its attorneys' fees (among other statutory bases) should the Court find in its favor.

74. In addition, JH Kelly is entitled to penalties at a rate of 2% per month.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

## SEVENTH CAUSE OF ACTION

### (*Quantum Meruit*/Reasonable Value)

75. JH Kelly realleges and incorporates by this reference, as if set forth in full herein, the allegations in paragraphs 1 through 74 above.

76. JH Kelly furnished labor, services, and materials to the AECOM Defendants at their special insistence and request in connection with the Project, for which the AECOM Defendants then and there agreed to pay to JH Kelly the reasonable value of such labor, services, and materials.

77. The reasonable value of such labor, services, and materials, and related costs, was, and is an amount to be proven at time of trial, but estimated at $26,000,000, which remains due, owing, and unpaid by the AECOM Defendants, together with interest at the prevailing legal rate from the time such payments became due.

Wherefore, JH Kelly seeks relief as set forth in the Prayer for Relief.

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-20-

COMPLAINT

99802670.8 0034592- 00012

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 21 of 40

## RESERVATION OF RIGHTS

78.     JH Kelly hereby expressly reserves the right to amend its Complaint and assert additional damages and causes of action, including, but not limited to, causes of action for negligent misrepresentation, fraudulent misrepresentation, fraudulent inducement of contract, and related causes of action, based on facts pled and facts learned through discovery.

## PRAYER FOR DAMAGES

*On the First, Second, Third, and Fourth Causes of Action (against AECOM and Does 1-10, and each of them)*:

1.     For principal damages of approximately $26,402,479.89, plus contractual fees, or an amount to be proven at the time of trial,

2.     For interest at the contractual rate of 18% per annum, or the prevailing legal rate, whichever is higher;

*On the Fifth and Seventh Causes of Action (against AECOM and Does 1-10, and each of them)*:

3.     For principal damages in an amount to be proven at the time of trial, but approximately $26,000,000;

4.     For interest at the prevailing legal rate;

*On the Sixth Cause of Action (against AECOM and Does 1-10, and each of them)*:

5.     For principal damages of not less than $16,402,479.89, or an amount to be proven at the time of trial;

6.     For interest at the contractual rate of 18% per annum, or the prevailing legal rate, whichever is higher;

7.     For the statutory penalty of 2% per month pursuant to California Business and Professions Code § 7108.5, and/or other applicable code section(s);

8.     For attorneys' fees as provided in California Business and Professions Code § 7108.5, and/or other applicable code section(s ), or as otherwise provided by law;

*Against all defendants on all causes of action*:

9.     For costs of the suit herein incurred; and

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

-21-

COMPLAINT

99802670.8 0034592-00012

10.    For such other relief as the Court may deem just and proper.

## **JURY DEMAND**

JH Kelly demands a jury trial.


DATED:  January 29, 2019                    STOEL RIVES LLP


By:

MARIO R. NICHOLAS
Attorneys for Plaintiff
JH Kelly, LLC

-22-

COMPLAINT

STOEL RIVES LLP
ATTORNEYS AT LAW
PORTLAND

# EXHIBIT A

# AECOM Technical Services, Inc.

### SUBCONTRACT # 60482831-SC-001...........

| Client / Prime Contract / Task Order | AECOM Numbers: |
|---|---|
| Client: PG&E.................... Prime contract #:2501335149...................... / Task Order #:n/a....... Prime contract (task order) pricing structure: lump sum | Project #: 60482831.............. Vendor #: .TBD...................... |

| Subcontractor: | Issued By: |
|---|---|
| Sub Name:   JH Kelly, LLC Address:       821 3rd Avenue City, State, ZIP   Longview, WA 98632 Attn:  Steve Lennon Phone: (360) 905-1372 Fax:...n/a................... | AECOM Technical Services, Inc. 300 Lakeside Drive, Suite 400.................... Oakland, CA 94612.................... Attn:  Ocie Williams....................., Subcontract Administrator Phone:...(510) 874-3169............... E-Mail:ocie.williams@aecom.com Fax:.......n/a............... |

| Period of Performance: | Price or Not-To-Exceed Ceiling Price: | Payment Terms |
|---|---|---|
| 07/01/2016 through 02/28/2018 | $14,341,281 | NET 30 days |

This agreement ("Subcontract") between the parties, when referenced herein shall be deemed to include the documents referenced in the Table of Contents below:

## *TABLE OF CONTENTS*

Signature Form (this page)
Standard Terms and Conditions [Agreement Between Design-Builder And Subcontractor (Where Subcontractor Does Not Provide Design Services)]
EXH A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]
EXH A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]
EXH A2 Modified Flow Down Conditions_FINAL_2016-10-12
EXH B Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]
EXH B1 15000.77.505 PGE Burney Station Proposal 10-7-2015
EXH B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission
EXH B2A Material Quantities
EXH B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1
EXH B4 Unit Pricing for Boulder Removal
EXH C1 CA Conditional Waiver And Release On Progress Payment
EXH C2 CA Unconditional Waiver And Release On Progress Payment
EXH D1 CA Conditional Waiver And Release On Final Payment
EXH D2 CA Unconditional Waiver And Release On Final Payment
EXH E Not Used
EXH F Performance & Payment Bonds (to be provided by JH Kelly)
EXH G Not Used
EXH H JH Kelly Construction Schedule
EXH I1 JHK Time and Material Rates – Labor
EXH I2 JHK Time and Material Rates – Equipment
EXH J JHK Proposed Invoicing Schedule

The effective date of this Subcontract is the date of the last signature below.

Exhibit A
Page 1 of 41

The parties acknowledge that there has been an opportunity to negotiate the terms and conditions of this Subcontract and agree to be bound accordingly.

| SUBCONTRACTOR | AECOM Technical Services, INC. |
|---|---|
| _Paul Furth_  10/21/16 | _Shawn_  10/21/16 |
| Signature                    Date | Signature                    Date |
| Paul Furth | SHAWN KELLY |
| Printed Name | Printed Name |
| CFO VP | Vice President |
| Printed Title | Printed Title |

Page 2

Exhibit A
Page 2 of 41

# AGREEMENT BETWEEN DESIGN-BUILDER AND SUBCONTRACTOR (WHERE SUBCONTRACTOR DOES NOT PROVIDE DESIGN SERVICES)

Exhibit A
Page 3 of 41

Case: 19-30088   Doc# 7447-3   Filed: 05/15/20   Entered: 05/21/20 08:15:22   Page 28
of 40

# TABLE OF CONTENTS

| Article | Name | Page |
|---|---|---|
| Article 1 | General | 2 |
| Article 2 | Subcontractor's Services and Responsibilities | 6 |
| Article 3 | Design-Builder's Services and Responsibilities | 11 |
| Article 4 | Ownership of Work Product | 13 |
| Article 5 | Time of Performance | 14 |
| Article 6 | Contract Price | 15 |
| Article 7 | Procedure for Payment | 16 |
| Article 8 | Stop Work and Termination | 20 |
| Article 9 | Representatives of the Parties | 22 |
| Article 10 | Insurance and Bonds | 24 |
| Article 11 | Indemnification | 25 |
| Article 12 | Changes to the Contract Price and Time | 26 |
| Article 13 | Contract Adjustments and Disputes | 29 |
| Article 14 | Miscellaneous | 31 |
| Article 15 | Electronic Data | 33 |
| Article 16 | Confidential Information | 34 |
| Article 17 | Other Provisions | 35 |

AECOM Technical Services, Inc.
300 Lakeside Drive, Suite 400
Oakland, CA 94612

# Agreement Between
# Design-Builder and Subcontractor
# (Where Subcontractor Does Not Provide Design
# Services)

This **AGREEMENT** is made as of the _____ 21st _____ day of _____ October _____
in the year of 2016, by and between the following parties, for services in connection with the Project
identified below:

**DESIGN-BUILDER:**
*(Name and address)*
*AECOM Technical Services, Inc.*
*300 Lakeside Drive, Suite 400*
*Oakland, CA 94612*

**SUBCONTRACTOR:**
*(Name and address)*
*JH Kelly, LLC*
*821 3rd Avenue*
*Longview, WA 98632*

**PROJECT:**
*(Include Project name and location as it will appear in the Contract Documents)*
*Burney K2 Replacement Project*
*37667 Highway 299*
*Burney, CA 96013*

**OWNER:**
*(Name and address)*
*Pacific Gas and Electric Company*
*77 Beale Street*
*San Francisco, California 94105*

In consideration of the mutual covenants and obligations contained herein, Design-Builder and
Subcontractor ( the "Parties") agree as set forth herein.

Page **1**

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 6 of 41

## Article 1

### General

**1.1    Basic Purpose.**

**1.1.1**    Design-Builder has contracted with Owner to provide the services necessary for the design and construction of the Project as set forth in the Engineer, Procure, Construct Agreement ("EPC Agreement"). Subcontractor, through itself, and Sub-Subcontractors, agrees to provide all construction and other aspects of the Work consistent with the Contract Documents. Design-Builder and Subcontractor agree that to the extent applicable to the performance of the Work hereunder, Subcontractor shall have the same responsibilities and obligations as to Design-Builder as Design-Builder by the EPC Agreement has against and to Owner, except as may be modified herein. Subcontractor will include in each lower-tier subcontract the appropriate flow-down clauses as required by the EPC Agreement. Any inconsistency, conflict or ambiguity between terms and conditions of this Agreement and the terms and conditions of the EPC Agreement will be resolved by applying the more stringent of the conflicting provisions.

**1.2    Basic Definitions.**

**1.2.1**    Terms used in this Agreement shall have the meanings set forth in the EPC Agreement between Owner and Design-Builder unless otherwise provided herein, with the following specific terms defined as follows:

**1.2.1.1**    *Agreement* refers to this executed contract between Design-Builder and Subcontractor.

**1.2.1.2**    *Construction Documents* are the documents consisting of Drawings and Specifications, prepared or assembled by Design-Builder in accordance with the EPC Agreement.

**1.2.1.3**    *Day* or *Days* shall mean calendar days unless otherwise specifically noted in the Contract Documents.

**1.2.1.4**    *EPC Agreement* refers to the contract between Design-Builder and Owner for the design and construction of the Project and all exhibits, attachments, and other Contract Documents enumerated and incorporated therein.

**1.2.1.5**    *Design Consultant* is a qualified, licensed design professional who is not an employee of Design-Builder, but is retained by Design-Builder, or employed or retained by anyone under contract with Design-Builder, to furnish design services required under the EPC Agreement.

**1.2.1.6**    *Final Completion* is the date on which all Work is complete in accordance with the Contract Documents, including but not limited to any items identified in the punch list prepared under the EPC Agreement and the submission of all documents set forth in Section 7.5.2.

**1.2.1.7**    *Force Majeure Events* are those events that are beyond the control of Subcontractor, Design-Builder and Owner, including the events of war, floods, labor disputes, earthquakes, epidemics, adverse weather conditions not reasonably anticipated, and other acts of God.

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 7 of 41

**1.2.1.8** *Hazardous Conditions* are any materials, wastes, substances and chemicals deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which are regulated by applicable Legal Requirements.

**1.2.1.9** *Legal Requirements* are all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any government or quasi-government entity having jurisdiction over the parties, the Project or Site, the practices involved in the Project or Site, or any Work.

**1.2.1.10** *Owner's Project Criteria* are developed by or for Owner to describe Owner's program requirements and objectives for the Project, including use, space, price, time, site and expandability requirements, as well as submittal requirements and other requirements governing Design-Builder's performance of the Work. Owner's Project Criteria may include conceptual documents, design criteria, design performance specifications, design specifications, and LEED® or other sustainable design criteria and other Project-specific technical materials and requirements.

**1.2.1.11** *Project Schedule* refers to the schedule setting forth the dates by which the various stages of both the design and construction, commissioning, substantial completion and completion of the Project that must be attained to satisfy Design-Builder's obligations to Owner.

**1.2.1.12** *Site* is the land or premises on which the Project is located. For purposes of the contract "Burney" shall mean the site.

**1.2.1.13** *Sub-Subcontractor* is any person or entity retained by Subcontractor as an independent contractor to perform a portion of the Subcontractor's Work and shall include materialmen, suppliers, and subcontractors of any tier which will accept certain flow down provisions from the EPC Agreement to the extent required in this Agreement.

**1.2.1.14** *Substantial Completion or Substantially Complete* is the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete in accordance with the Contract Documents so that Owner can occupy and commercially use the Work for its intended purpose.

**1.2.1.15** *Work* is comprised of all Subcontractor's construction and other services required by the Contract Documents, including procuring and furnishing all supervision, labor, inspection, testing and start-up support labor, materials, tools, equipment, machinery, transportation, temporary utilities, temporary facilities, 12 X 60' Trailer connected to site facilities for Design Builder including Parking and porch/steps ready for use, including same items of furniture and appliances Subcontractor supplies for its own trailer(s), and all other items and services specified  in this Agreement and the other Contract Documents necessary to complete the portion of the Project described in **Exhibit B**.

**1.3    Contract Documents.**

**1.3.1**    The Contract Documents are comprised of the following:

**1.3.1.1** All written modifications, amendments, minor changes and Change Orders to this Agreement;

**1.3.1.2** This Agreement, including the following exhibits: (*list for example, performance standard requirements, performance incentive arrangements, markup exhibits, allowances, unit prices, or exhibit detailing offsite reimbursable personnel*);

Page **3**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 8 of 41

Case: 19-30088      Doc# 7447-3      Filed: 05/15/20      Entered: 05/21/20 08:15:22      Page 32
of 40

Exhibit A Flow Down General Conditions [Attachment 2 GC AECOM 2501335149 01062016 Final fpd3]
Exhibit A1 Flow Down Specific Conditions [Attachment 3 SC AECOM 2501335149 01152016 Final fpd3]
Exhibit A2 Modified Flow Down Conditions_FINAL_2016-10-12
Exhibit B: Scope of Work [Attachment 1 PSI AECOM 2501335149 01152016 Final fpd3]
Exhibit B1_15000.77.505 PGE Burney Station Proposal 10-7-2015
Exhibit B2 PG&E Burney pricing workbook JHK 10-7-2015 (POST CONFERENCE CALL) REV1Submission
EXH B2A Material Quantities
Exhibit B3 15000.77.505 PG&E Burney Alt Add for Comp Bldg - Slab Removal REV 1
Exhibit B4 Unit Pricing for Boulder Removal
Exhibit C1 CA Conditional Waiver And Release On Progress Payment
Exhibit C2 CA Unconditional Waiver And Release On Progress Payment
Exhibit D1 CA Conditional Waiver And Release On Final Payment
Exhibit D2 CA Unconditional Waiver And Release On Final Payment
Exhibit E: Not Used
Exhibit F: Performance & Payment Bonds (to be provided by JH Kelly)
Exhibit G: Not Used
Exhibit H: JH Kelly Construction Schedule
Exhibit I1: JHK Time and Material Rates – Labor
Exhibit I2: JHK Time and Material Rates – Equipment (to be provided by JH Kelly)
Exhibit J: JHK Proposed Invoicing Schedule

**1.3.1.3** The Construction Documents; and

**1.3.1.4** The EPC Agreement, but only to the extent the EPC Agreement relates to the Work and the terms and conditions under which the Work shall be performed, as mutually agreed and modified by the parties on the attached Exhibit A2.

**1.4     Interpretation and Intent.**

**1.4.1**     Design-Builder and Subcontractor, prior to execution of the Agreement, shall carefully review all the Contract Documents for any conflicts or ambiguities. Design-Builder and Subcontractor will discuss and resolve any identified conflicts or ambiguities prior to execution of the Agreement.

**1.4.2**     The Contract Documents are intended to be complementary and interpreted in harmony so as to avoid conflict, with words and phrases interpreted consistent with construction and design industry standards. In the event of any inconsistency, conflict, or ambiguity between or among the Contract Documents, the more stringent provision of this Agreement will apply as it relates to Subcontractor's scope of Work, determined by a standard of good faith and reasonableness.

**1.5     Mutual Obligations and Acknowledgments.**

**1.5.1**     Design-Builder and Subcontractor commit at all times to cooperate fully with each other, and proceed on the basis of trust and good faith, to permit each party to realize the benefits afforded under the Contract Documents. Design-Builder and Subcontractor shall perform their respective responsibilities, obligations and services in a timely manner to facilitate the other's timely and efficient performance and so as not to unreasonably delay or interfere with the other's performance of its obligations under the Contract Documents.

**1.5.2**     Subcontractor acknowledges that it has reviewed the EPC Agreement, and has met with Design-Builder to review, discuss, and familiarize itself with the EPC Agreement, as well as all

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

documents incorporated therein and attached thereto. Subcontractor will include in each lower-tier subcontract (if any) the appropriate flow-down clauses as required by the EPC Agreement.

**1.6    Entire Agreement.**

**1.6.1**    The Contract Documents, as modified and mutually agreed to by the Design-Builder and Subcontractor, all of which are incorporated by reference into this Agreement, and any modifications thereto, are attached to this Agreement, form the entire agreement between Design-Builder and Subcontractor and are as fully binding on the parties as if repeated herein. No oral representations or other agreements have been made by the parties except as specifically stated in the Contract Documents.

Page **5**

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 10 of 41

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 34
of 40

## Article 2

### Subcontractor's Services and Responsibilities

**2.1** **General.**

**2.1.1** Within seven (7) days after execution of this Agreement, Design-Builder and Subcontractor will meet to discuss issues affecting the administration and schedule of the Work, and implement the necessary procedures, including but not limited to those relating to schedule updates, submittals, and payment, to facilitate the ability of the parties to perform their obligations under this Agreement.

**2.1.2** Subcontractor's Representative shall be reasonably available to Design-Builder and shall have the necessary expertise and experience required to supervise the Work. Subcontractor's Representative shall communicate regularly with Design-Builder and shall be vested with the authority to act on behalf of Subcontractor. Subcontractor shall replace its Representative upon the reasonable request of Design-Builder.

**2.1.3** Subcontractor shall only communicate with Owner, Design-Builder's Design Consultant or separate contractors of Design-Builder or Owner through Design-Builder.

**2.2** **Review of Site and Contract Documents.**

**2.2.1** Subcontractor represents that it has examined the Site and the Contract Documents prior to executing this Agreement so as to reasonably ascertain the nature of the Work and the various conditions affecting the Work.

**2.2.2** Subcontractor shall promptly report to Design-Builder any errors, inconsistencies, omissions, or violations of Legal Requirements that Subcontractor discovers. Subcontractor shall be liable to Design-Builder for any damages resulting from any such errors, inconsistencies, omissions, or violations of Legal Requirements which Subcontractor discovers and fails to report to Design-Builder. Nothing in this Agreement shall be deemed to transfer any design liability from Design-Builder to Subcontractor, unless Subcontractor's scope of Work includes design-assist services or Subcontractor must perform any incidental design in order to satisfy the requirements of this Agreement.

**2.2.3** Subcontractor disclaims any and all liability with respect to latent structural, soil and subsurface conditions and pre-existing contamination of the jobsite.

**2.3** **Construction Services Generally.**

**2.3.1** Subcontractor shall perform all construction services efficiently and with the requisite expertise, skill and competence to satisfy the requirements of the Contract Documents and the Project Schedule.

**2.3.2** At the request of Design-Builder, Subcontractor shall attend meetings with Design-Builder, Owner, and/or separate design professionals or contractors of Design-Builder or Owner to discuss design and/or construction issues regarding the Subcontractor's Work as listed in Exhibit B which may arise during the Project.

**2.4** **Submittals and Substitutions.**

**2.4.1** In accordance with the Contract Documents and the Project Schedule, Subcontractor shall submit for Design-Builder's review and approval submittals, including shop drawings,

product data and samples. Design-Builder shall advise Subcontractor on or before the meeting required by Section 2.1.1 hereof of the submittal requirements for the Project. Any variances with the Construction Documents shall be specifically identified in Subcontractor's submittals or included in Exhibit B. Design-Builder's review and approval shall not relieve Subcontractor of its responsibilities to perform the Work in accordance with the Construction Documents unless Design-Builder expressly approves in writing any such variance in its response to Subcontractor's submittals. Subcontractor shall make any necessary revisions to the submittals requested by Design-Builder.

**2.4.2**   Subcontractor shall not make any substitutions in the Work or procedures or methods specified by Owner, Design-Builder or the Construction Documents for performing the Work unless it first receives written approval for such substitution from Design-Builder.

**2.5      Sub-Subcontractors.**

**2.5.1**   Subcontractor shall employ only Sub-Subcontractors who are duly licensed and qualified to perform the Work consistent with the Contract Documents. Subcontractor agrees that each Sub-Subcontractor shall be fully bound to Subcontractor in the same manner as Subcontractor is bound to Design-Builder for all the requirements of the Contract Documents to the extent applicable to the Sub-Subcontractor's scope of Work.

**2.5.2**   Subcontractor assumes responsibility to Design-Builder for the proper performance of the Work of Sub-Subcontractors and any acts and omissions in connection with such performance. Subcontractor shall coordinate the activities of all Sub-Subcontractors. Nothing in this Agreement is intended or deemed to relieve Subcontractor from responsibility for the work performed by its Sub-Subcontractors, or create any legal or contractual relationship between Owner or Design-Builder and any Sub-Subcontractor, including but not limited to any third-party beneficiary rights.

**2.6      Work of Others.**

**2.6.1**   Subcontractor agrees to reasonably cooperate with, and coordinate its activities so as not to interfere with, those parties performing work at the Site, including Owner's and Design-Builder's separate contractors, so that the Project can be completed in an orderly and coordinated manner without unreasonable disruption.

**2.6.2**   If any part of the Work depends upon other work performed by Design-Builder, or Design-Builder's or Owner's separate contractors, Subcontractor shall, prior to proceeding with that part of the Work, inspect such other work and promptly notify Design-Builder of any discovered discrepancies or defects that would render it unacceptable for the proper performance of the Work. Subcontractor shall not proceed with such part of the Work without further direction from Design-Builder. Design-Builder shall promptly correct or cause to be corrected any such discrepancy or defect in the other work. Any delay in the performance of the Work caused by the Owner, or for which the Owner is responsible, will be resolved by the application of Section 5.4.1. Except to the extent such discrepancies or defects in such other work are latent, Subcontractor shall be liable for appropriate losses or damages incurred due to any discrepancies or defects in such other work not reported to Design-Builder by Subcontractor.

**2.7      Site Cleanup.**

**2.7.1**   Subcontractor shall keep the Site reasonably free from debris, trash and construction wastes resulting from the performance of the Work. Upon Substantial Completion of the Work, or a portion of the Work, Subcontractor shall remove all debris, trash, construction wastes, materials, equipment, machinery and tools arising from the Work or applicable portions thereof to permit Owner to occupy the Project or a portion of the Project for its intended use.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

Exhibit A
Page 12 of 41

**2.8      Inspection.**

**2.8.1**    At all reasonable times, Subcontractor shall provide sufficient facilities for inspection of the Work by Design-Builder at the Site and at all locations where portions of the Work are in progress or various stages of completion. When appropriate portions of the Work are ready for inspection, Subcontractor shall notify Design-Builder.

**2.8.2**    When Subcontractor considers that the Work, or a portion thereof that Owner or Design-Builder agrees to accept separately, is Substantially Complete, Subcontractor will notify Design-Builder in writing, and Subcontractor and Design-Builder will jointly inspect all of the Work or a portion thereof performed by Subcontractor. After the inspection, Subcontractor will prepare and submit to Design-Builder in writing a comprehensive punch list of items to be completed or corrected prior to Final Completion. Design-Builder will have ten (10) days from receipt of the punch list to accept, reject, or add items to such punch list. Failure to include an item on such punch list does not alter the responsibility of Subcontractor to complete all Work in accordance with the Contract Documents.

**2.9      Patents and Copyrights.**

**2.9.1**    Subcontractor shall pay all license fees and royalties due for items, materials, methods, systems or processes applicable to the Work which are subject to copyrights or patent rights and which are selected by Subcontractor.

**2.10     Legal Requirements.**

**2.10.1**   Subcontractor shall perform the Work in accordance with all applicable Legal Requirements.

**2.10.2**   The Contract Price and/or the times for completion of the Work shall be adjusted to compensate Subcontractor for the effects, if any, of any changes in the Legal Requirements enacted after the date of the Agreement affecting the performance of the Work, but only to the extent Design-Builder receives a corresponding adjustment from Owner.

**2.11     Government Approvals and Permits.**

**2.11.1**   Subcontractor shall obtain and pay for the permits, licenses, and government charges included in Exhibit B required for the prosecution of the Work.

**2.11.2**   Subcontractor shall provide reasonable assistance to Design-Builder in obtaining those permits, inspections, approvals and licenses, if any, that are the responsibility of Owner or Design-Builder and related to the Work.

**2.12     Project Safety and Security.**

**2.12.1**   Subcontractor recognizes the importance of performing the Work in a safe manner so as to prevent damage, injury or loss to (i) all individuals at the Site, whether working or visiting, (ii) the Work, including materials and equipment incorporated into the Work or stored on-Site or off-Site, (iii) the work of others on the Project, and (iv) all other property at the Site or adjacent thereto. Subcontractor assumes responsibility for implementing and monitoring all safety precautions and programs related to the performance of the Work.

**2.12.2**   Subcontractor and Sub-Subcontractors shall comply with all Legal Requirements relating to safety, as well as any Owner-specific and/or Design-Builder-specific safety requirements set forth in the Contract Documents or established for the Project, provided that such Owner-specific and/or Design-Builder-specific requirements do not violate any applicable Legal Requirement.

Subcontractor will immediately report in writing any safety-related injury, loss, damage or accident arising from the Work to Design-Builder's Representative and, to the extent mandated by Legal Requirements, to all government or quasi-government authorities having jurisdiction over safety-related matters involving the Project or the Work.

**2.12.3** Subcontractor shall cooperate with Design-Builder on all security matters and shall promptly comply with any Project security requirements established by Design-Builder. Subcontractor shall at all times conduct all operations under this Agreement in a manner to avoid the risk of loss, theft, or damage by vandalism, sabotage, or other means to any property.

**2.12.4** Subcontractor shall furnish its employees and its Sub-Subcontractors' employees identification badges, approved by Design-Builder, showing Subcontractor's name and employee number. Each employee shall be required to wear his badge in plain sight at all times whenever he is on the Site. Subcontractor, its Sub-Subcontractors, and their employees shall observe all procedures for admission to the Site required by Design-Builder.

**2.12.5** Prior to the start of the Work at the Site, Subcontractor and its Sub-Subcontractors shall submit to Design-Builder a list of all employees to be employed at the Site in connection with the Work under this Agreement. Such list shall include employee's name, and shall be kept current during the course of the Work.

## 2.13 Warranty.

**2.13.1** Subcontractor warrants to Design-Builder that the Work, including all materials and equipment furnished as part of the Work, shall be new unless otherwise specified in the Contract Documents, of good quality, in conformance with the Contract Documents and free of defects in materials and workmanship. Nothing in this warranty is intended to limit any manufacturer's warranty which provides Owner and/or Design-Builder with greater warranty rights than set forth in this Section 2.13 or the Contract Documents. Subcontractor will provide and, if requested, assign to Design-Builder all manufacturers' warranties upon Substantial Completion.

## 2.14 Correction of Defective Work.

**2.14.1** Subcontractor agrees to correct any of the Work that is found not to be in conformance with the Contract Documents, including that part of the Work subject to Section 2.13 hereof, within a period of one (1) year from the date of Substantial Completion of the Work or any portion of the Work, or within such longer period to the extent required by any specific warranty included in the Contract Documents. Where defective Work (and damage to other work resulting therefrom) has been corrected or removed and replaced under this Section 2.14.1, the correction period hereunder with respect to such Work will be extended for an additional period of one (1) year after such correction or removal and replacement has been satisfactorily completed.

**2.14.2** Subcontractor shall, within seven (7) days of receipt of written notice from Design-Builder that the Work is not in conformance with the Contract Documents, take meaningful steps to commence correction of such nonconforming Work, including the correction, removal or replacement of the nonconforming Work and any damage caused to other parts of the Work or the Project affected by the nonconforming Work. If Subcontractor fails to commence the necessary steps within such seven (7) day period, Design-Builder, in addition to any other remedies provided under the Contract Documents, may provide Subcontractor with written notice that Design-Builder will commence correction of such nonconforming Work with its own forces. If Design-Builder does perform such corrective Work, Subcontractor shall be responsible for all reasonable costs incurred by Design-Builder in performing such correction. If the nonconforming Work creates an emergency requiring an immediate response, the seven (7) day period identified herein shall be deemed inapplicable.

**Agreement Between Design-Builder and Subcontractor**
**(Where Subcontractor Does Not Provide Design Services)**

**2.14.3** The one (1) year period referenced in Section 2.14.1 above applies only to Subcontractor's obligation to correct nonconforming Work and is not intended to constitute a period of limitations for any other rights or remedies Design-Builder may have regarding Subcontractor's obligations under the Contract Documents.

### 2.15    Start-Up and Training.

**2.15.1** If required as part of Subcontractor's Work, Subcontractor shall be responsible for the start-up, testing, and commissioning of the Work, and shall train Owner's personnel with respect to the operation and maintenance of the Work.

### 2.16    Hazardous Conditions.

**2.16.1** Subcontractor is responsible for Hazardous Conditions introduced to the Site by itself, Sub-Subcontractors or anyone for whose acts they may be liable. Subcontractor must notify Design-Builder immediately upon the discovery of the presence of any Hazardous Conditions on, or the release of Hazardous Conditions from, the Site. Subcontractor will be responsible for the handling, storage, remediation, or disposal of such Hazardous Conditions (including, but not limited to, any conditions resulting from the presence thereof) in compliance with all applicable Legal Requirements and as directed by Design-Builder.

**2.16.2** Subcontractor shall indemnify, defend and hold harmless Owner, Design-Builder, Design Consultants, and their officers, directors, employees and agents from and against all claims, losses, damages, liabilities, and expenses, including attorneys' fees and expenses, arising out of or resulting from those Hazardous Conditions for which Subcontractor, Sub-Subcontractors or anyone for whose acts they may be liable are responsible under this Agreement.

**2.16.3** Subcontractor and its Sub-Subcontractors will, at their expense, provide suitable facilities to prevent the introduction of any substances or materials into any stream, river, lake or other body of water which may pollute the water or constitute substances or materials deleterious to fish and wildlife.

**2.16.4** Subcontractor and its Sub-Subcontractors will so perform the Work as not to discharge into the atmosphere from any source whatsoever smoke, dust, or other air contaminants in violation of the laws, rules, and regulations of the governmental entities having jurisdiction.

**2.16.5** Nothing furnished by Subcontractor in the performance of the Work or for incorporation into the Work will contain asbestos (i.e. must be "asbestos-free"). Subcontractor must execute and submit a certificate of conformance with this Section in such form as may be required by Design-Builder.

### 2.17    Omissions and Misdescriptions

**2.17.1  In the event Subcontractor discovers** omissions from the drawings or specifications or the misdescription of details of Work which are manifestly necessary to carry out the intent of the Construction Documents, or which are customarily performed, Subcontractor shall immediately bring to the attention of Design-Builder the omission via a Request for Information (RFI) prior to commencement of any work, but shall not relieve the Subcontractor from performing such omitted or misdescribed details of the Work and the Work shall be performed as if fully and correctly set forth and described in the Construction Documents. Variations in quantities from as-bid shall be brought to the attention of Design-Builder via a Request For Information (RFI) prior to any purchase of materials.

### 2.18    Underground Installations

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 15 of 41

**2.18.1** Existing underground installations are indicated on the Construction Documents only to the extent such information was discovered by Owner or Design-Builder in preparing the Construction Documents. There is no guarantee as to the accuracy or completeness of such information, and all responsibility for the accuracy and completeness thereof is expressly disclaimed. Subcontractor shall be responsible for discovery of existing underground installations, in advance of excavating or trenching, by contacting all local utilities and by prospecting. Subcontractor's responsibility for locating underground installations is limited to one initial underground verification as noted in Exhibit B. Subcontractor disclaims any and all liability with respect to soil and subsurface conditions, including undocumented or inaccurate location services provided by others.

**2.19    Publicity**

**2.19.1** Subcontractor shall not engage in any advertising, publicity, or other promotional activities which in any way directly or indirectly mentions or refers to this Agreement, the relationship between the parties created thereby or the services and material furnished thereunder, without obtaining the prior written consent of Design-Builder. Subcontractor shall not display any signs, posters, or other advertising matter in or on any part of the Work or around the Site thereof without specific written approval of Design-Builder. The taking of photographs, videotapes, or other visual images of the Site will not be permitted without the prior written approval of Design-Builder.

**2.20    Labor Requirements**

**2.20.1** All employee taxes, wages, and employer contributions imposed by any Union Affiliations, Federal or State laws shall be paid by Subcontractor or its Sub-subcontractors, including all interest and penalties payable under said laws as a result of any noncompliance therewith. Subcontractor shall also indemnify, defend and hold harmless Design-Builder from and against any and all claims, liabilities, and expenses with respect to the foregoing.

# Article 3

## Design-Builder's Services and Responsibilities

**3.1    Timely Reviews and Approvals.**

**3.1.1**    Design-Builder shall provide timely reviews and approvals of all submittals within ten (10) Working Days (consistent with the turnaround times set forth in the Project Schedule), or as agreed to by the parties at the meeting required under Section 2.1.1 hereof.

**3.2    Design-Builder's Representative.**

**3.2.1**    Design-Builder's Representative shall be responsible for providing Design-Builder-supplied information and approvals in a timely manner to permit Subcontractor to fulfill its obligations under the Contract Documents.

**3.3    Furnishing of Services and Information.**

**3.3.1**    Unless expressly stated to the contrary in the Contract Documents, and to the extent Design-Builder has received such items from Owner, Design-Builder shall provide for Subcontractor's information the items listed below. Design-Builder does not warrant the accuracy

Page **11**

Agreement Between Design-Builder and Subcontractor
(Where Subcontractor Does Not Provide Design Services)

Exhibit A
Page 16 of 41

Case: 19-30088    Doc# 7447-3    Filed: 05/15/20    Entered: 05/21/20 08:15:22    Page 40
of 40