MICHAEL A. KELLY (State Bar #71460)
mkelly@walkuplawoffice.com
KHALDOUN A. BAGHDADI (State Bar #190111)
kbaghdadi@walkuplawoffice.com
DORIS CHENG (State Bar #197731)
dcheng@walkuplawoffice.com
ANDREW P. McDEVITT (State Bar #271371)
amcdevitt@walkuplawoffice.com
**WALKUP, MELODIA, KELLY & SCHOENBERGER**
650 California Street, 26th Floor
San Francisco, CA 94108
Telephone: (415) 981-7210  Facsimile: (415) 391-6965

FRANK PITRE (State Bar #100077)
fpitre@cpmlegal.com
ALISON CORDOVA (State Bar #284942)
acordova@cpmlegal.com
**COTCHETT, PITRE & McCARTHY. LLP**
840 Malcolm Road, Suite 200
Burlingame, CA 94010
**TELEPHONE: (650) 697-6000**

**On Behalf of Direct/Individual Plaintiffs**

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**10/17/2019**
**Clerk of the Court**
BY: JUDITH NUNEZ
Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN FRANCISCO

| | |
|---|---|
| Coordination Proceeding<br>Special Title (Rule 3.550)<br><br>CALIFORNIA NORTH BAY FIRE CASES | JCCP No. 4955<br><br>**DECLARATION OF STEVEN CAMPORA IN SUPPORT OF OPPOSITION TO PG&E's MOTION FOR A PROTECTIVE GAG ORDER AGAINST PUBLICITY**<br><br>Date: October 30, 2019<br>Time: 2:30pm<br>Dept.: 613<br><br>**Assigned for All Purposes to**<br>**The Honorable Teri L. Jackson**<br>**Department 613** |

/ / / /

/ / / /

/ / / /

/ / / /

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 13:35:00    Page 1
of 109

I, STEVEN M. CAMPORA, declare:

1.     I am an attorney licensed to practice law before all courts in the State of California and I am a partner with Dreyer Babich Buccola Wood Campora LLP, co-counsel for individual plaintiffs this action. I have personal knowledge of the foregoing facts, and would be able to competently testify before the court if called upon to do so.

2.     Based upon information published on PG&E's website on January 24, 2019, PG&E cited to the Cal Fire report released that day in support of PG&E's statement that the company's equipment did not cause the 2017 Tubbs Fire. A true and correct copy of this statement taken from:

https://www.pge.com/en/about/newsroom/newsdetails/index.page?title=20190124_cal_fire_concl udes_that_pge_equipment_did_not_cause_2017_tubbs_wildfire is attached to this declaration as "Exhibit 1."

3.     The Sacramento Bee ran a front-page story on Friday, January 25, 2019 stating that Cal Fire had found PG&E was not responsible for the Tubbs Fire and contained a reference to, "PG&E attorneys previously said their review of evidence at the Tubbs Fire showed that the failed equipment that sparked the inferno did not belong to PG&E, but was on private property." A true and correct photocopy of this story is attached to this declaration as "Exhibit 2." A story on the Santa Rosa Press Democrat on January 24, 2019 also confirmed PG&E was not at fault for the Tubbs Fire based upon the conclusions of the Cal Fire report and "PG&E noted it had been cleared by state investigators . . ." A true and correct copy of this story taken from:

https://www.pressdemocrat.com/news/9207814-181/cal-fire-says-tubbs-fire is attached to this declaration as "Exhibit 3." An online story posted by CNBC.com on January 24, 2019 confirms "CAL FIRE clears PG&E for deadly Tubbs Fire…" and also contains PG&E's statement relying on the Cal Fire report to exonerate it from responsibility on the Tubbs Fire. A true and correct copy of this story taken from: https://www.cnbc.com/2019/01/24/cal-fire-private-equipment-not-pge-at-fault-for-deadly-tubbs-fire.html is attached to this declaration as "Exhibit 4." A news story published by the New York Times on that same date also confirms PG&E was found to not be liable for the Tubbs Fire, and a true and correct copy of this story taken from:

DECLARATION OF STEVEN CAMPORA IN SUPPORT OF OPPOSITION TO PG&E'S MOTION FOR A
PROTECTIVE ORDER AGAINST PUBLICITY

Case: 19-30088    Doc# 7500    Filed: 05/22/20    Entered: 05/22/20 13:35:00    Page 2
of 105

1    https://www.nytimes.com/2019/01/24/business/energy-environment/pge-tubbs-fire.html is

2    attached to this declaration as "Exhibit 5."

3         4.      I am personally aware the Tubbs Fire report issued by Cal Fire has been publicly

4    available for review or download online since its release in January of 2019. The 80 page

5    document contains summaries of witness interviews, summaries of evidence collected, diagrams,

6    and the ultimate conclusion determining the Tubbs Fire was started due to an electrical caused fire

7    originating from an "unknown event" affecting privately owned electrical equipment, as opposed

8    to the PG&E lines hanging only a few feet from those private lines, on the Zink property located at

9    1128 Bennett Lane in Calistoga, CA on the night of October 8, 2017.

10        5.      A news story reporting on the dismay of Tubbs Fire victims upon learning of Cal

11    Fire's determination PG&E was not responsible for the Tubbs Fire appeared in the Santa Rosa

12    Press democrat on January 24, 2019, detailing the impression of many fire victims that their

13    recoveries would be denied because of Cal Fire's conclusions. A true and correct copy of this

14    story taken from: https://www.pressdemocrat.com/news/9207945-181/tubbs-fire-report-a-blow is

15    attached to this declaration as "Exhibit 6."

16        6.      Only five days after the Cal Fire report was first made public, PG&E nonetheless

17    declared bankruptcy, thus halting all litigation in the underlying PG&E cases, including the Tubbs

18    Fire case. The Tubbs Fire litigation was then removed from the bankruptcy action on August 16,

19    2019 for the purpose of conducting a civil trial on liability and damages in January of 2020,

20    prompting PG&E to immediately speak with the press, stating *Regardless of the next legal steps,*

21    *Cal Fire has already determined that the cause of the 2017 Tubbs Fire was not related to PG&E*

22    *equipment.*" A true and correct copy of this statement taken from a story published by the

23    Mercury News published at: https://www.mercurynews.com/2019/08/16/pge-must-face-tubbs-

24    wildfire-victims-in-state-court-bankruptcy-ruling/ is attached to this declaration as "Exhibit 7."

25    This same statement was quoted in a story published in the Santa Rosa Press Democrat that same

26    day, and a true and correct copy of the story obtained from:

27    https://www.pressdemocrat.com/news/9911377-181/bankruptcy-judge-clears-way-for is attached

28    to this declaration as "Exhibit 8."

1     7.    As recently as September of 2019, PG&E's own CEO, Bill Johnson, was quoted

2  after a federal court hearing saying Cal Fire's report about the Tubbs Fire is correct. "There were

3  21 fires. Cal Fire said PG&E caused 20 of them, and didn't cause the other one, and I think we

4  should have a little confidence in their ability to determine things." This statement, of which there

5  is also video evidence of Mr. Johnson making outside of the courthouse, was quoted in a story

6  published NBC Bay Area on September 26, 2019, and a true and correct copy of the story

7  obtained from: https://www.nbcbayarea.com/investigations/Photos-Show-PGE-Lines-Sparked-

8  Tubbs-Fire-Expert-561487651.html is attached to this declaration as "Exhibit 9."

9     8.    PG&E has used the press and its own public statements repeatedly since these

10  wildfires initially occurred in 2017 to attempt to avoid liability. In an August 13, 2018 article with

11  the Insurance Journal, PG&E's then CEO Geisha Williams blamed climate change for the recent

12  fires in an attempt to both shield PG&E from perceived liability while also lobbying for a change

13  to the rules regarding inverse condemnation in California. A true and correct copy of this story

14  was obtained from: https://www.insurancejournal.com/news/west/2018/08/13/497820.htm and is

15  attached to this declaration as "Exhibit 10."

16     9.    After the 2017 wildfires, PG&E even took the step of creating its own public action

17  coalition, "BRITE" (standing for Building Resilient Infrastructure for Tomorrow's Economy), and

18  then running television and social media ads lobbying for public support to change the laws

19  regarding inverse condemnation as they apply to utilities like PG&E. A true and correct copy of

20  this story was obtained from the San Francisco Chronicle and was obtained at:

21  https://www.insurancejournal.com/news/west/2018/08/13/497820.htm and is attached to this

22  declaration as "Exhibit 11."

23     10.    PG&E has also utilized public servants such as Menlo Park Fire Chief Harold

24  Schapelhouman in advertisements which vouch for PG&E and the company's important

25  partnership with first responders in these advertisements. A true and correct copy of this story was

26  obtained from the Palo Alto Daily Post and was obtained at:

27  https://padailypost.com/2018/02/06/some-question-if-fire-chief-should-have-done-pge-

28  commercial/ and is attached to this declaration as "Exhibit 12."

4

Case: 19-30088  Doc# 7500-1  Filed: 05/22/20  Entered: 05/22/20 13:35:00  Page 4
of 109

11.     This type of press is all a concerted effort by PG&E, as is evidenced by the company's own 2014 marketing strategy presentation, wherein the need to improve the company's reputation and perceived lack of integrity would be addressed by advertising about PG&E's involvement in the community and the company's commitment to safety. Advertisements are constantly playing touting PG&E's dedication to safety in terms of inspecting equipment and vegetation management to this day.  These materials were obtained from the internet and a true and correct copy of this publicly available marketing presentation is attached to this declaration as "Exhibit 13."

12.     The information available to the public regarding the cause of the Tubbs Fire has been shaped by PG&E to form public opinion regarding the cause of the Tubbs Fire and to dissuade Tubbs Fire victims from filing claims in the bankruptcy proceeding ahead of the October 21, 2019 deadline.  A news story expressing fire victims' hesitation to file a claim against PG&E appeared in the New York Times on October 6, 2019, and a true and correct copy of that publication was obtained from: https://www.nytimes.com/2019/10/06/business/energy-environment/pge-wildfire-victims.html and is attached to this declaration as "Exhibit 14."

13.     I personally attended the deposition of Jim Nolt, the electrical expert hired by Cal Fire to assist with the Tubbs Fire investigation, and questioned him for a portion of his deposition. He testified that no person from PG&E advised him of the blown fuses at PG&E pole 773 near Bennett Lane.  He was never provided with a copy of the video showing the "flash" at 9:20 p.m., despite asking for a copy of the video from the lead Cal Fire investigator, John Martinez.  Nolt concluded the timing of the fuses blowing at 9:20 p.m. coinciding with the timing of the "flash" in the Bennett Lane winery video was unlikely a coincidence.  He testified that at the time of his work on the Tubbs Fire, he was unaware of evidence of arcing on the PG&E power lines going up to the 1128 Bennett Lane residence.  Finally he testified working with PG&E to get information in the Tubbs Fire investigation was agonizing and a "miserable experience."  True and correct excerpts from his deposition supporting this testimony have been attached to the declaration as "Exhibit 15."

14.     I personally attended the deposition of Jeremy Monroe, a Cal Fire Deputy Chief

5

Case: 19-30088    Doc# 7500    Filed: 05/22/20    Entered: 05/22/20 13:35:00    Page 9 of 109

who testified he was assigned to perform a peer review of the Origin and Cause analysis for the Tubbs Fire. He testified never saw the flash on the video prior to his deposition on September 30, 2019, and no one from Cal Fire had told him there was a flash visible in the video at 9:20 p.m. Further, Mr. Monroe was never told the fuses on a PG&E pole 773 has also blown at 9:20 p.m. He testified he would have liked to know all of this information when performing his peer review of the Origin and Cause analysis for the Tubbs Fire. True and correct excerpts from Mr. Monroe's deposition supporting this testimony have been attached to the declaration as "Exhibit 16."

15. I have searched the internet to identify articles and commercials which have been published by PG&E and which are currently available concerning PG&E and public safety, cooperation with first responders and/or vegetation management. Examples of these items can be seen at the following websites:

a. https://www.youtube.com/watch?v=BgqUU-p3Z8k

b. https://www.youtube.com/watch?v=PZ8JHGYjZts

c. https://www.youtube.com/watch?v=4kzeoFCP-bo

d. https://www.youtube.com/watch?v=W0rzvgn3uRw

e. https://www.youtube.com/watch?v=5q6F_9gNuYY

16. I am one of the Liaison Counsel for the Butte Fire JCCP in Sacramento, California. Immediately after a trial date was set in that case, PG&E began airing commercials, in the Sacramento area, touting its vegetation management program and public safety. The Butte Fire was a fire caused by a tree into a power line and the quality and performance of PG&E's vegetation management program was an issue in that case.

17. The deposition of the John Martinez, the Cal Fire Battalion Chief who served as lead investigator in the Tubbs Fire investigation and signed off on the Cal Fire report, is currently set to begin on October 21, 2019. To my knowledge, no Cal Fire investigator involved in the Tubbs Fire investigation has testified about having any knowledge of the evidence of arcing on the PG&E power lines going up to 1128 Bennett Lane at the time the Tubbs Fire report was prepared.

////

////

DECLARATION OF STEVEN CAMPORA IN SUPPORT OF OPPOSITION TO PG&E'S MOTION FOR A PROTECTIVE ORDER AGAINST PUBLICITY

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 13:38:00   Page 6 of 109

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 17th day of October, 2019, at Sacramento, California.

_____
STEVEN CAMPORA, Declarant

7

Case: 19-30088    Doc# 7500    Filed: 05/22/20    Entered: 05/22/20 23:35:00    Page 7 of 109

# EXHIBIT 1

For My Home | About | Contact Us | Safety | English    Search    Go    **Log in**

**Company Info**        **Newsroom**        **Environment**        **Community**        **Careers**

News Releases

RSS

## News Releases

View News Releases by Topic ▼    View All News Releases

CAL FIRE Concludes that PG&E Equipment Did Not
Cause 2017 Tubbs Wildfire

**Release Date:** January 24, 2019
**Contact:** PG&E External Communications (415) 973-5930

**SAN FRANCISCO, Calif.** — Pacific Gas and Electric Company (PG&E) today issued the following statement in response to the release of information by the California Department of Forestry and Fire Protection (CAL FIRE) regarding the October 2017 Tubbs wildfire:

Without question, the loss of life, homes and businesses during these devastating wildfires is heartbreaking, and we remain focused on helping affected communities recover and rebuild. The safety of our customers and the communities we serve is our most important responsibility, and we are committed to assessing our infrastructure to further enhance safety and help protect all of the customers we serve from the ever-increasing threat of wildfires.

CAL FIRE has completed its investigation of the 2017 Tubbs Fire and concluded that PG&E facilities did not cause the fire.

The devastating and unprecedented wildfires of 2017 and 2018 have had a profound impact on our customers, employees and communities. Regardless of today's announcement, PG&E still faces extensive litigation, significant potential liabilities and a deteriorating financial situation, which was further impaired by the recent credit agency downgrades to below investment grade. Resolving the legal liabilities and financial challenges stemming from the 2017 and 2018 wildfires will be enormously complex and will require us to address multiple stakeholder interests, including thousands of wildfire victims and others who have already made claims and likely thousands of others we expect to make claims.

**Background Information**

Given the continued and growing threat of extreme weather and wildfires, and as an additional precautionary measure, PG&E is enhancing and expanding its Community Wildfire Safety Program to further reduce wildfire risks and help keep its customers and the communities it serves safe. PG&E's ongoing and expanded safety actions include:

**Real-Time Monitoring and Intelligence**

Coordinating prevention and response efforts by monitoring wildfire risk in real-time from its Wildfire Safety Operations Center.

Expanding its network of weather stations to enhance weather forecasting and modeling. By 2022, PG&E will add approximately 1,300 new weather stations in high fire-risk areas.

Installing nearly 600 new high-definition cameras in high fire-threat areas, increasing coverage across these areas to more than 90 percent.

**New and Enhanced Safety Measures**

### Media Contact Info

For Media Inquiries Only:
**(415) 973-5930**
Media Inquiry Form

Customer Service Questions :
**1-800-743-5000**

### Winter Storm Kit

Company Profile (PDF, 245 KB)

Carbon Monoxide Safety (PDF, 133 KB)

Customer Safety (PDF, 221 KB)

Media Safety (PDF, 242 KB)

Storm and Outage Safety (PDF, 244 KB)

Notification of Power Outages (PDF, 242 KB)

Call 811 Before Digging (PDF, 220 KB)

### About PG&E

Pacific Gas and Electric Company, a subsidiary of PG&E Corporation (NYSE:PCG), is one of the largest combined natural gas and electric utilities in the United States.

Company Profile

Officers

Investor Relations

Corporate Responsibility and Sustainability Report

Electric Power Mix

PG&E Currents News Site

### Energy Facts

By going solar, you can offset more than a pound of $CO_2$ each solar kilowatt hour.

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 9

Further enhancing vegetation management efforts with an increased focus on vegetation that poses a higher potential for wildfire risk, such as overhanging branches and limbs directly above and around power lines, and tree species at an increased risk of falling into power lines, as well as dead and dying trees.

Conducting accelerated safety inspections of electric infrastructure in high fire-threat areas, in addition to routine inspections and maintenance. This includes ground or climbing inspections, as well as aerial imagery captured by drones and in some cases, helicopter, to further complement and enhance visual inspections.

Taking action right away to address any immediate risk to public safety found during accelerated inspections.

Disabling of automatic reclosing of circuit breakers and reclosers in high fire-risk areas during wildfire season.

Proactively turning off electric power for safety, only as a last resort, when extreme fire danger conditions are forecasted, and helping customers prepare by providing early warning notification when and where possible.

## System Hardening and Resiliency

Installing stronger and more resilient poles and covered power lines across 7,100 miles of highest fire-risk areas over the course of the next 10 years.

Replacing equipment to further reduce risk to its system and tailoring upgrades based on terrain and weather conditions using more granular analysis of fire-prone regions.

Piloting new resilience zones to provide electricity to central community resources serving local customers during a Public Safety Power Shutoff event.

## Wildfire Risk is Growing

California faces an ever-increasing threat from catastrophic wildfires, extreme weather and higher temperatures. Recent state and federal climate assessments warn the threat is only growing. California's Fourth Climate Change Assessment found the average area burned statewide would increase 77 percent if greenhouse gas emissions continue to rise. The Assessment also said prolonged drought and higher temperatures will triple the frequency of wildfires.

Multiple factors contribute to wildfire risk across PG&E's service area. These include vast tree mortality following a historic five-year drought. Fire season is now extended due to prolonged periods of high temperatures, extreme dryness, tinder-dry grass and record-high winds increasing the number of wildfires and making them more dangerous. More than half of PG&E's service area is now considered to be in extreme or high fire-risk areas as designated by the CPUC's Fire-Threat Map.

## About PG&E

Pacific Gas and Electric Company, a subsidiary of PG&E Corporation (NYSE:PCG), is one of the largest combined natural gas and electric energy companies in the United States. Based in San Francisco, with more than 20,000 employees, the company delivers some of the nation's cleanest energy to nearly 16 million people in Northern and Central California. For more information, visit www.pge.com/ and pge.com/news.

## Cautionary Statement Concerning Forward-Looking Statements

This news release includes forward-looking statements that are not historical facts, including statements about the beliefs, expectations, estimates, future plans and strategies of PG&E Corporation and Pacific Gas and Electric Company. These statements are based on current expectations and assumptions which management believes are

reasonable, and on information currently available to management, but are necessarily subject to various risks and uncertainties. In addition to the risk that these assumptions prove to be inaccurate, factors that could cause actual results to differ materially from those contemplated by the forward-looking statements include the timing and outcome of the investigations into the Camp Fire and other factors disclosed in PG&E Corporation and Pacific Gas and Electric Company's annual report on Form 10-K for the year ended December 31, 2017, their most recent quarterly report on Form 10-Q for the quarter ended September 30, 2018, and their subsequent reports filed with the Securities and Exchange Commission. PG&E Corporation and Pacific Gas and Electric Company undertake no obligation to publicly update or revise any forward-looking statements, whether due to new information, future events or otherwise.

"PG&E" refers to Pacific Gas and Electric Company, a subsidiary of PG&E Corporation. © 2019 Pacific Gas and Electric Company. All rights reserved

EXHIBIT 2

REGISTERED 1857
VOL 242 NO. 25

FACEBOOK.COM/SACRAMENTOBEE
TWITTER.COM/SACBEE_NEWS

NATIONAL DAY
2019 MAY

FRIDAY JANUARY 25, 2019

Mostly sunny
63/40 See 6A

# THE SACRAMENTO BEE

SACBEE.COM

# Tubbs Fire blamed on private electrical system, not PG&E



PHOTO [STAFF] J.B. Sacramento Bee file

BY MICHAEL McGOUGH,
TONY BIZJAK, DALE KASLER,
RYAN SABALOW
AND SOPHIA BOLLAG

mmcgough@sacbee.com

For more than a year, lawyers representing wildfire survivors have been suing PG&E over the Tubbs Fire — at the time the deadliest in California history.

On Thursday, Pacific Gas and Electric Co. was exonerated, a rare victory for a utility facing bankruptcy over a staggering number of wildfire lawsuits.

California fire investigators concluded the Tubbs Fire, which swept through Sonoma and Napa counties in October 2017, was caused by an electrical problem on private property. After more than a year of investigation, Cal Fire said investigators did not find any violations of state law.

PG&E stock, which had plummeted since the November Camp Fire, shot up within minutes of the announcement, and closed at $13.95 a share, nearly doubling Thursday. PG&E has said it plans to file for bankruptcy at the end of the month as it faced "billions of dollars in wildfire survivor claims.

Following the Cal Fire report, PG&E declined to say whether it still plans to file for bankruptcy, but said the investigators' conclusion doesn't erase the company's troubles. "Regardless of today's announcement, PG&E still faces extensive litigation, significant potential liabilities and a deteriorating financial situation."

Gov. Gavin Newsom, speaking to reporters at the Capitol,

SEE PG&E, 2A

The Tubbs Fire left the Rincon Ridge area of Santa Rosa in ruins, killing 22 people and destroying more than 5,600 structures.

said a PG&E bankruptcy remain "an open-ended question and that's a question for them." He added that he and many others had "maybe fairly" assumed PG&E had caused the Tubbs Fire, and that the Cal Fire report will likely make it more difficult for victims to recover damages.

"After a thorough, systematic investigation, taking into account witness statements, opinions of experts, physical evidence, collected electronic data and fire direction indicators, the specific origin area of the Tubbs Fire is near the primary residential structure and immediate area surround-

California history.

Until Thursday, the Tubbs Fire was the only [...] investigation, [...] 2017 Northern California wildfire in which a [...] eliminated all other [...] causes for the Tubbs Fire, with exception of an electrical-caused fire originating.

In its much anticipated report, Cal Fire said its inspectors isolated the ignition point to a private [...] that affecting privately owned electrical equipment."

Cal Fire said earlier this year that investigators conducted [...]

PG&E attorneys previously said their review of evidence at the Tubbs Fire showed that the failed equipment that sparked the inferno did not belong to PG&E, but was on private property in a federal court filing in late December, the company said it believed the fire began on a Calistoga property owned by a woman named Ann Zink.

ing the structure," Cal Fire's investigator wrote. "During my investigation, I eliminated all other [...] that PG&E cited. Zink could not be reached for comment.

In the report, Cal Fire Battalion Chief John Martinez explicitly ruled out PG&E's lines and poles that supplied power to the Calistoga property as the fire's ignition source. However, he said investigators couldn't pinpoint an exact point of origin in the private electrical wiring that supplied a pool and pump station on the private land because the fire burned up most of the evidence.

Two lawyers suing PG&E on behalf of Tubbs survivors, Steve Campora and Dario de Ghetaldi, said they couldn't comment on Cal Fire's findings or how it would affect their cases because they had not seen the report.

Cal Fire didn't name her in the report but listed the same address in Calistoga destroyed the home and other structures on the Calistoga property, making it hard to determine a precise cause.

"Looking at the burn patterns, it was determined it went back so that specific property," he said.

"If [the cause] is undeterminable due to the heat of that fire. The house and structures on that property were destroyed.

Because there was no determination of criminal[...], Cal Fire will not forward the investigative report to the district attorneys in Napa and Sonoma counties.

PG&E has told the [...] rules and Exchange Commission that it could face liabilities of as much as $30 billion over the 2017 and 2018 wildfires — including $10 billion from

Cal Fire spokesman Scott McLean said the fire offered a breakdown on the potential costs from the Tubbs Fire.

BlueMountain Capital Management, a PG&E Corp. shareholder that's been pressuring the utility's bankruptcy plans, said Cal Fire's conclusion "is another example of why the company shouldn't be rushing to file for bankruptcy, which would be totally unnecessary and bad for all stakeholders."

It is The Bee's policy to acknowledge errors promptly. Mistakes should be called to the attention of Managing Editor Scott Lebar, 916-321-1783, slebar@sacbee.com.

CDF-TUBBS 0035056

# EXHIBIT 3

# Cal Fire says Tubbs fire caused by private electrical system, not PG&E



**SLIDE 1 OF 80**

Cal Fire found that the Tubbs fire started adjacent to a home at 1128 Bennett Lane in Calistoga. A privately owned wooden pole distributed power throughout the rural property, not PG&E equipment. Some Tubbs fire survivors and families of victims have sued to challenge that finding. (Christopher Chung/ The Press Democrat)

f 𝕐 👍 © + 🗖

**JULIE JOHNSON AND MARY CALLAHAN**
THE PRESS DEMOCRAT January 24, 2019
 Follow this story

A private electrical system next to a Napa County home, not PG&E power equipment, ignited the deadly Tubbs fire that devastated Santa Rosa in 2017, the state's fire service announced Thursday in a determination that upended widely held suspicions about the fire's cause and reverberated from Wall Street to the West Coast.

Cal Fire's long-awaited conclusion indicates the Tubbs fire was the lone major wildfire among 18 that broke out during the 2017 Northern California firestorm that wasn't caused by PG&E's electrical grid, according to the state.

The finding represents a significant blow to thousands of fire survivors and local governments in the North Bay that sued PG&E hoping to recoup billions of dollars in losses.

The devastating Oct. 8, 2017 blaze erupted near Calistoga and swept across the Mayacamas Mountains into Santa Rosa, burning 36,807 acres, destroying 5,636 structures and killing 22 people. It was the most destructive blaze in state history at the time, surpassed now only by the deadly Camp fire last year in Butte County.

Cal Fire's report is the result of a 16-month investigation that looked as much at what didn't cause the fire as what did. Investigators noted in the state's report that the Tubbs fire destroyed key pieces of electrical equipment at the fire's origin on a 10-acre property off

Bennett Lane north of Calistoga. Examining burn patterns, witness statements and other evidence, the lead investigator determined it "unlikely PG&E equipment is responsible for causing the Tubbs fire."

The fire started with a weakened telephone pole adjacent to the main house, according to the report. A caretaker for the property told investigators the pole had been "wood-peckered so damn bad" and was slated to be replaced in the spring.

Cal Fire spokesman Michael Mohler said the investigation was one of Cal Fire's most extensive, requiring "several thousand hours" of work, with an origin area heavily scorched by fire.

"From our investigator's opinion it came from a private system. It did not come from a public system," said Mohler.

Neither Ann Zink, the landowner, who now lives in Riverside, or Michael Andrews, the caretaker for the property, could not be immediately reached Thursday. Zink said previously the property was unoccupied at the time of the fire.

The state had previously found PG&E at fault in at least 17 other major fires that ignited that night in October 2017 in a firestorm stretching from Sonoma County to Yuba County in the Sierra Nevada foothills. Many had expected a similar conclusion for the Tubbs fire.

PG&E stock soared nearly 75 percent Thursday as investors speculated the Cal Fire report would improve the utility's dire financial condition. Before Thursday, PG&E had estimated it was exposed to over $30 billion in potential liability for its role in wildfires in 2017 and 2018. The Tubbs fire alone accounted for as much as $17 billion of those potential costs, Gov. Gavin Newsom estimated Thursday.

Newsom, responding to the report in a press conference outside his office, called the investigative teams leading the most closely watched report on the 2017 fires "competent" and "apolitical."

"From the victims' perspective, there are a lot of open-ended questions," Newsom said. "My focus is now not on PG&E, it is on ... a safe, reliable and affordable service and to make sure we have the backs of those victims, for those who have lost family members and personal possessions and things they hold dear."

See special coverage of the first anniversary of the October firestorm here

—

Read Cal Fire's report here

**MOST POPULAR**

Map: Where PG&E shutoffs could happen in the North Bay

PG&E turning off power to about 262,000 Sonoma County residents

Prolonged PG&E outages could affect more than 250,000 across North Bay

What you need to know on PG&E's planned shutoffs: Several school districts will be closed

From getting gas to buying ice, here's how to prepare for a PG&E outage

'We're doing everything possible to over-staff': Local firefighters prepare for fire risk

The report validates a defense PG&E has mounted in court and regulatory filings. It represents a stunning setback, albeit one with uncertain repercussions, for the survivors who filed suit against PG&E. It is also a blow to governments, including the city of Santa Rosa and Sonoma County, which have sought tens of millions of dollars in aid from state and federal agencies to cover mounting fire costs.

In a statement that referenced first the loss of life and property from the Tubbs fire, PG&E noted it had been cleared by state investigators but said the company's many challenges remained significant.

In 11 of the wildfires that sparked in 2017, PG&E could be held criminally negligent because the utility hadn't followed state safety laws, according to Cal Fire. In the Tubbs fire, however, investigators found no violations of state law.

"Without question, the loss of life, homes and businesses during these devastating wildfires is heartbreaking, and we remain focused on helping affected communities recover and rebuild," the utility's statement said. "The safety of our customers and the communities we serve is our most important responsibility, and we are committed to assessing our infrastructure to further enhance safety and help protect all of the customers we serve from the ever-increasing threat of wildfires."

The San Francisco-based utility, California's largest, has announced plans to seek protection from creditors by filing bankruptcy, in large part because of the liability related to its ties to destructive fires. The Cal Fire finding does not change the situation, it noted.

## RELATED STORIES



"Regardless of today's announcement, PG&E still faces extensive litigation, significant potential liabilities and a deteriorating financial situation, which was further impaired by the recent credit agency downgrades to below investment grade," the company stated. "Resolving the legal liabilities and financial challenges stemming from the 2017 and 2018 wildfires will be enormously complex and

will require us to address multiple stakeholder interests, including thousands of wildfire victims and others who have already made claims and likely thousands of others we expect to make claims."

For some people who lost their homes and worldly possessions in the Tubbs fire, Cal Fire's conclusion didn't dislodge a conviction that PG&E remains responsible because of its failure to institute safety measures like power shutdowns credited with preventing fires for years in Southern California.

"You're expecting to hear a certain sound, and you get a clang," said Santa Rosa-based attorney Roy Miller, whose home in Wikiup burned to the ground in the Tubbs fire. "It doesn't square with what we went through that night."

Miller leads one of the legal teams suing PG&E on behalf of displaced residents, and he challenged Cal Fire's findings, noting they diverged from those reached by private fire investigators hired for the 1,200 plaintiffs represented by his firm.

Cal Fire's redacted 80-page investigative report outlined the step-by-step process a series of investigators took in their analyses of the Bennett Lane property.

Investigators said the fire ignited with power lines and equipment adjacent to the main house, but found no state law violations related to the cause of the fire.

Witness reports and burn patterns led investigators up a long driveway onto the property and eventually to a PG&E power pole and line drop to private electrical equipment serving electricity to a main residence, water pumps and other structures.

Cal Fire investigators analyzed what equipment remained — much was destroyed — and burn patterns in a complex analysis that ruled out PG&E equipment as the cause, leaving private power equipment failure as the prevailing theory.

The report noted that the conductor on one of the private power poles "did not appear professionally installed," but did not directly implicate that wiring for sparking the fire. It also mentioned that a 2015 inspection at the property for fire safety resulted in two violations for overgrown vegetation.

"I eliminated all other causes for the Tubbs fire, with the exception of an electrical caused fire originating from an unknown event affecting privately owned conductor or equipment," wrote the lead investigator, Battalion Chief John Martinez.

Regardless of Cal Fire's findings, Miller, the Santa Rosa attorney, said PG&E failed to utilize basic safety measures in October 2017 — when forecasters gave several days notice about high fire danger, including hot, dry weather and strong winds.

"I'm the one writing six-figure checks to my contractor to rebuild my home that burned down and almost us with it," Miller said. "This isn't over. I'm disappointed in the conclusion and I don't think it's correct."

Noreen Evans, a Santa Rosa attorney with Watts Guerra, said her firm represents more than 2,000 individuals suing PG&E related to the 2017 firestorm, including several hundred who lost property in the Tubbs fire. While she said Thursday's development was disappointing, it was a possibility for which they planned.

"Their report's not conclusive as a matter of law," Evans said of Cal Fire's investigation. "Nothing has changed. We would have of course preferred Cal Fire determine that PG&E equipment caused the Tubbs fire, but we always knew it was a possibility that they wouldn't, which is why we conducted our investigation from the outset."

David Rabbitt, chairman of the Sonoma County Board of Supervisors, also said Cal Fire's investigative report would not be the end for governments seeking to recoup costs stemming from the fires and a long recovery.

"What does it mean and how do we go forward? It's too early to tell," he said. "At the end of the day, as much as I respect Cal Fire and the work they've done, it's not a definitive cause. It still needs to be determined in court. There are lots of people that will have other opinions and want to talk about other evidence."

Former Santa Rosa Mayor Chris Coursey, who led the city during the fires and through the first year of recovery, said Cal Fire's conclusion took him by surprise and will take some time to set in.

"What it reminds us is that we all have to figure out a better way to live with our need for electricity," Coursey said. "Whether it's a private property or a public utility, the impacts can be the same."

PG&E officials admitted to regulators in late 2017 that at least some of the damaged equipment found near the origin of the Tubbs fire, as well as two other fires that ravaged Sonoma and Napa counties, was theirs.

Yet PG&E concluded the Tubbs fire was triggered by privately owned and maintained equipment branching off its own power pole to a rural residential property on Bennett Lane north of Calistoga, according to a utility court filing earlier this month.

"The evidence supports the conclusion that this equipment, located beyond PG&E's service delivery point, was planned, designed, installed, maintained and operated by third parties, not PG&E," the utility stated in its report. "After the service delivery point, and therefore after the point at which PG&E had legal responsibility for operation … Ms. Zink owned and maintained private electrical equipment."

Andrews, who PG&E and Cal Fire identified as the property's caretaker, was responsible for maintenance of power equipment on the property but had no electrical training and was not licensed for the work, according to the utility's court filing.

In February 2017, he authorized repair work on a utility pole on the property that was completed by a Kelseyville-based general engineering contractor who also lacked an electrical license from the state, according to the court filing.

"Based on the evidence that PG&E has reviewed to date, we believe that customer-owned equipment may have been the cause of the Tubbs fire," the company said in a statement earlier this month.

State Sen. Bill Dodd, D-Napa, whose district includes parts of the Tubbs burn area, said the Cal Fire finding was "obviously good news for PG&E," noting there remain "so many other areas where PG&E has been found at fault."

Dodd said PG&E still must make major corporate changes, but added that the finding could allow the company to avoid bankruptcy.

"I do not believe it alters my call to PG&E to create new leadership and board members to create a culture of safety," Dodd said.

Staff writers Kevin Fixler, Guy Kovner, Hannah Beausang and Alexandria Bordas contributed to this report. You can reach Staff Writer Julie Johnson at 707-521-5220 or julie.johnson@pressdemocrat.com. On Twitter @jjpressdem. You can reach Staff Writer Mary Callahan at 707-521-5249 or mary.callahan@pressdemocrat.com. On Twitter @MaryCallahanB.

# EXHIBIT 4

https://www.cnbc.com/2019/01/24/cal-fire-private-equipment-not-pge-at-fault-for-deadly-tubbs-fire.html

# Cal Fire clears PG&E for deadly Tubbs Fire, but utility still faces uncertainty over other large blazes

PUBLISHED THU, JAN 24 2019•7:25 PM EST•UPDATED FRI, JAN 25 2019•9:16 AM EST

Jeff Daniels @JEFFDANIELSCA

## KEY POINTS

- Cal Fire said Thursday its investigators concluded that "a private electrical system" was to blame for the Tubbs Fire in 2017 that killed 22 people in Northern California's Sonoma County, not PG&E.

- The state agency previously pinned blame on PG&E for 17 other blazes in 2017, including two fires that resulted in a total of 13 fatalities.

- Also, PG&E still faces uncertainty over last year's deadly Camp Fire that destroyed most of the town of Paradise and killed 86 people.



**A search and rescue team searches for bodies in Santa Rosa, California on October 12, 2017 after the Tubbs Fire caused devastation.**

*Josh Edelson | AFP | Getty Images*

LOS ANGELES — Cal Fire said a 15-month probe into the Tubbs Fire that killed 22 people in California's Sonoma County has concluded that "a private electrical system" was to blame, not PG&E.

The Tubbs Fire destroyed 5,636 structures in Northern California and was the deadliest of a series of wine country wildfires in October 2017. However, Pacific Gas & Electric still faces uncertainty and billions of dollars in potential liability over the Camp Fire in November 2018 that killed 86 people and destroyed nearly 14,000 homes in Butte County.

On Thursday's news, PG&E stock soared more than 74 percent in trading on the New York Stock Exchange.

Cal Fire previously found PG&E at fault for 17 other fires in 2017, including the Redwood Fire, which resulted in nine fatalities. The state agency also found PG&E responsible for the Cascade Fire that killed four in Yuba County in October 2017.

Earlier this month, the San Francisco-based utility disclosed that it [plans to file for Chapter 11](#) bankruptcy on or about Jan. 29, saying it "faces extensive litigation and significant potential liabilities" in connection with Northern California wildfires in 2017 and 2018." The company estimated its liability for the wildfires ["could exceed $30 billion,"](#) according to an SEC 8-K filing from Jan. 13.

Gov. Gavin Newsom said his office estimates that $17 billion of that $30 billion figure is from the Tubbs Fire in the wine country. The new governor said the figure raises questions about whether PG&E would file for bankruptcy.

"They [PG&E] will make that determination," Newsom said. "The state of California cannot make that determination for them. They have the right to make that determination, and we will respond accordingly."

The governor said his goal is to make sure victims are made whole, that the state has "safe, reliable and affordable service," and that ratepayers "are not paying the price of the neglect" by PG&E established in past wildfires.

Utilities in California face liability under what's known as inverse condemnation as well as for negligence claims for wildfire and other damaging incidents caused by such things as power lines or other utility equipment. There are state regulations requiring strict vegetation management practices by utilities, and they include standards for keeping vegetation clear of power lines.

The Camp Fire — the deadliest wildfire in state history — remains under investigation, although PG&E has previously acknowledged it had electrical equipment problems the day the Northern California fire started. The fire destroyed most of the town of Paradise and led to a flood of lawsuits against the utility.

"Cal Fire has completed its investigation of the 2017 Tubbs Fire and concluded that PG&E facilities did not cause the fire," PG&E said in a statement Thursday. "Regardless of today's announcement, PG&E still faces extensive litigation, significant potential liabilities and a deteriorating financial situation, which was further impaired by the recent credit agency downgrades to below investment grade."

The utility added, "Resolving the legal liabilities and financial challenges stemming from the 2017 and 2018 wildfires will be enormously complex and will require us to address multiple stakeholder interests, including thousands

of wildfire victims and others who have already made claims and likely thousands of others we expect to make claims."

The Tubbs Fire burned a total of 36,807 acres and caused destruction to entire neighborhoods in the city of Santa Rosa. The city and hundreds of residents have sued PG&E in connection with the disaster.

In all, the October 2017 fires in Northern California involved more than 170 blazes and charred at least 245,000 acres. Nearly 11,000 firefighters were involved in battling the blazes, and help came from more than a dozen other states as well as Australia.

Back in June 2018, Cal Fire said its investigators determined a dozen wildfires in the wine country in October 2017 were caused by equipment operated by PG&E, including electric power and distribution lines, conductors and the failure of power poles. A month earlier, the state agency said four Northern California fires from the 2017 fire siege were caused by trees coming into contact with PG&E power lines.

Also, Cal Fire disclosed last October that PG&E power lines caused Northern California's Cascade Fire, which burned nearly 10,000 acres and destroyed 264 structures. Besides four civilian fatalities, the fire resulted in one firefighter injury.

"The exoneration of Tubbs is not a major input to our liquidity analysis, but it does significantly reduce the risk of the 'extraordinary' financial events that we considered," Guggenheim analyst Shahrior Pourreza wrote in a research note Thursday.

The Guggenheim note also said PG&E "should remain solvent despite the reiterated intent to file bankruptcy on Jan. 29. With our estimates of total wildfire liabilities of $17 billion, we do not view bankruptcy as warranted at this time."

*- The Associated Press contributed to this story.*

# EXHIBIT 5

## The New York Times

# *PG&E Is Cleared in Deadly*
# *Tubbs Fire of 2017*

**By Ivan Penn and Peter Eavis**

Jan. 24, 2019

**The Times reports from 160+ countries.**                                                    ×
When a story starts with a city, it means we were there to report it.

Don't show me messages like this

LOS ANGELES — Pacific Gas and Electric Company, with billions of dollars of potential wildfire liabilities pushing it toward bankruptcy, has been cleared of responsibility for one giant 2017 fire in Northern California, brightening its financial outlook.

The California Department of Forestry and Fire Protection said on Thursday that private electrical equipment at a home was responsible for starting the Tubbs Fire in Sonoma County in October 2017. The exact cause could not be determined, however, because much of the equipment was destroyed in the fire, which eventually killed 22 people and destroyed over 5,600 buildings.

After the department made the announcement, PG&E's stock soared, closing up 75 percent on Thursday at $13.95. Even so, the shares remain much lower than where they were before last November, when a new wave of devastating fires swept through the utility's vast service territory.

PG&E, facing an estimated $30 billion of liability for fires in 2017 and 2018, said last week that it planned to seek bankruptcy protection by the end of the month. California officials say the company's equipment caused at least 17 of 21 major 2017 wildfires in the state.

Investors and government officials have cast doubt on the company's rationale for a bankruptcy filing. PG&E has enough money on hand to meet day-to-day expenses and its wildfire liability has not been definitively established, these people have said.

Financial analysts scrambled on Thursday to figure out the change in PG&E's liability as a result of the state's determination about the Tubbs Fire. That overall liability could now be about $8 billion lower, according to one financial research firm, CreditSights.

**Subscribe to The Times**

Yet it was not clear whether the news changed the company's bankruptcy calculations.

Gov. Gavin Newsom said that he was surprised by the findings of the state's fire investigators and that he had spoken to PG&E officials about them. But he said he was not sure whether the news would prompt the company to shift gears.

"This obviously begs the question, now what?" Mr. Newsom said. "Do we anticipate that PG&E will move forward as they have previewed? That is an open-ended question. That is a question for PG&E."

For its part, PG&E said it still faced untold financial exposure without making clear whether it would still file for bankruptcy.

"The devastating and unprecedented wildfires of 2017 and 2018 have had a profound impact on our customers, employees and communities," the utility said. "Regardless of today's announcement, PG&E still faces extensive litigation, significant potential liabilities and a deteriorating financial situation, which was further impaired by the recent credit agency downgrades to below investment grade."

At least one of the company's investors, the New York-based hedge fund BlueMountain Capital, said PG&E ought to reconsider a bankruptcy filing in light of the state's conclusions about the Tubbs Fire. The hedge fund said earlier on Thursday that it would seek to replace PG&E's board, which it accused of failing the company's shareholders, customers and employees.

"The news from CalFire that PG&E did not cause the devastating 2017 Tubbs Fire is yet another example of why the company shouldn't be rushing to file for bankruptcy, which would be totally unnecessary and bad for all stakeholders," Omar Vaishnavi, head of fundamental credit at BlueMountain Capital, said in a statement.

Investors and analysts who are skeptical that the company needs bankruptcy argue that PG&E has access to plenty of assets it could borrow against or sell to meet its wildfire liabilities, including its headquarters building in San Francisco and its gas business. Selling such assets would still leave the company as the primary electricity utility to much of Northern and Central California.

Case: 19-30088     Doc# 7500-1     Filed: 05/22/20     Entered: 05/22/20 15:35:00     Page 29
of 105

Stocks of companies that are on the verge of filing for bankruptcy often trade for pennies because investors believe that shareholders will get wiped out in a court-ordered reorganization. The Thursday rally in PG&E's stock could further undermine the case for a bankruptcy. The company's stock outstanding was worth more than $7 billion at Thursday's closing price.

But PG&E's board might still decide to seek bankruptcy because it could conclude that is the most expedient way to resolve the thousands of wildfire claims against the utility. A filing could also protect the company in case its liabilities turn out to be much higher than current estimates.

California officials have not yet determined the cause of the November 2018 Camp Fire, the state's most devastating. That wildfire killed at least 86 people and destroyed the town of Paradise. It could be months more before investigators reach a conclusion about its cause. Mr. Newsom said the state expected to determine the cause of the Camp Fire within the first half of the year.

Some legal experts said the Tubbs Fire decision probably would not stop the company from filing for bankruptcy.

"This should not change much," G. Marcus Cole, a law professor at Stanford, wrote in an email. "If PG&E files for bankruptcy, it is not because of the crushing weight of liability. Instead, it will be for administrative efficiency reasons. They still face hundreds of claims from hundreds of plaintiffs."

Investors also have to consider the possibility that PG&E still faces large, hard-to-quantify liabilities. Measures to reduce the risks of wildfires, like trimming trees around power lines and installing insulated wiring, could end up costing the company billions.

"PG&E's numerous regulatory, legislative and credit challenges are largely unchanged and we still expect them to file for Chapter 11 bankruptcy protection in the next few days," Jeff Cassella, a vice president and senior credit officer at Moody's, said in a statement.

For wildfire victims, PG&E's bankruptcy plans could cut both ways. Legal experts say newer claims against the utility could be processed more quickly through one bankruptcy court than through several state courts. But claims related to 2017 fires that are further along in the legal process, especially those that are set to go to trial in September, could be delayed by a bankruptcy filing.

Ivan Penn reported from Los Angeles and Peter Eavis reported from New York.

A version of this article appears in print on Jan. 25, 2019, Section B, Page 1 of the New York edition with the headline: PG&E Stock Climbs 75% Once Cleared In 2017 Fire

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 30 of 105

# EXHIBIT 6

News    Obits    Sports    Business    Opinion    Food & Wine    Lifestyle    A&E    Events

# Tubbs fire report a blow to plaintiffs suing PG&E



**SLIDE 1 OF 73**

Fire survivor Will Abrams poses for a portrait holding part of a clay drum that he salvaged from the ashes of his Hidden Hills home that burned down in the Tubbs Fire, at the house he now rents with his family, in Santa Rosa, California, on Tuesday, October 2, 2018. (Alvin Jornada / The Press Democrat)



**MARY CALLAHAN**

THE PRESS DEMOCRAT | January 24, 2019

  **Follow this story**

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 32 of 105

Thousands of people who lost their homes and much of what made up their lives to the Tubbs fire withstood another blow Thursday when they learned that Cal Fire has cleared PG&E of responsibility for the catastrophic blaze.

Tubbs fire victims were strongly represented among those suing the utility giant in the wake of the October 2017 firestorm, at least 18 major fires swept across Northern California, scorching 137 square miles of Sonoma County.

All those fires have since been attributed by the state to PG&E power equipment save one — the Tubbs, the most devastating and deadly. Investigators have pointed in that case to private electrical equipment on a Calistoga-area property owned by a 91-year-old Riverside woman and looked after by a local caretaker.

Many plaintiffs fear the new report puts millions of dollars in potential legal awards out of reach. Even more, they worry PG&E will not be pressed to make the investments necessary to ensure that no such wildfire can result from their utility equipment.

"My motivation is not to have a few extra dollars in a year," said Will Abrams, whose family survived a harrowing escape from their Riebli Road home after the flames had arrived. "My motivation is to know that we're in a safe place — to know that we're not going to have to go through that again."

From its start in Napa County, the Tubbs fire, the worst on record at the time in California, raced across the Mayacamas Mountains into Santa Rosa, killing 22 people and destroying 4,651 homes.

Attorneys representing some of the estimated 6,000 or more plaintiffs who sued PG&E said Cal Fire may not have the final word on liability. Most legal firms have their own fire investigators, and some lawyers on Thursday appeared prepared to challenge the agency's findings.

They include Santa Rosa resident Roy Miller, whose home was destroyed by the Tubbs fire and whose firm represents about 1,200 people displaced by the blaze.

His investigators disagreed with the report's conclusions. PG&E failed to utilize basic safety measures at the time, like powering down the grid during extreme wind and weather conditions, a step that might have prevented the destructive firestorm, he said.

"I've done everything I could to counsel every client of mine to not count on anything specific from PG&E," Miller said.

Chris Diaz, who is in the midst of rebuilding at the north end of Coffey Park, is one of many fire survivors who had sued PG&E in hopes of closing some of the gap between his insurance payout and the cost of his new home.

The dismay in his voice was clear Thursday.

## RELATED STORIES

North Bay fire victims remembered

Cal Fire: Private equipment, not PG&E, caused Tubbs fire

Santa Rosa, Sonoma County ponder next steps against PG&E after fire report

"We have taken out loans, and we're talking about loans in the hundreds of thousands, so we were counting on something from the Tubbs fire (litigation)," he said. "Ten minutes ago it would have been 'We are.' Now it's 'We were.' I don't know how these things work, but it's usually not a good sign if Cal Fire says it was not caused by PG&E."

Larkfield resident Brad Sherwood said any settlement would certainly help with the expense of rebuilding for any of the plaintiffs. But a key concern, he said, is arriving at certainty on a cause to ensure history doesn't repeat itself.

"I just hope this doesn't discourage people from rebuilding and staying in the community," he said. "That's my fear."

Barry Hirsch, who already has rebuilt his home on Michele Way off Mark West Springs Road, said he and his wife were not interested in joining the suit, but said everyone else he knows from the fire zone did.

"One of my neighbors was promised a seven figure settlement," Hirsch said. "That's a lot of money. A million!"

Another of his neighbors, Gary Bayless, said he's still hopeful attorneys fighting for those who lost property in the fires will successfully dispute Cal Fire's findings.

But he suspects he and the other plaintiffs will be hard-pressed to get much from PG&E, given its stated plans to file for bankruptcy.

"I know all the attorneys out there that have put together these cases aren't going to roll over and say, 'OK, that's what Cal Fire decided,'" Diaz said.

"The bottom line is we were counting on hopefully having an opportunity to get some money for a loss that we've incurred, and 10 minutes ago hopefully PG&E was on that list," he said. "If they're not on that list, there aren't many options for us."

You can reach Staff Writer Mary Callahan at 707-521-5249 or mary.callahan@pressdemocrat.com. On Twitter @MaryCallahanB.

## MOST POPULAR

1

Sleeping woman killed by suspected DUI driver in Santa Rosa ID'd

2

Police: Santa Rosa DUI driver who killed woman, dog was going 90 mph through neighborhood

3

1 sent to hospital in Santa Rosa wreck

4

Northern California man brings body to police, says he killed family

5

Santa Rosa High grad joins NBA dance team

6

How likely are more aftershocks after last night's Bay Area quake?

Sponsored Content on Press Democrat



### Hilarious Neighbors Finally Get Their Revenge 🗗

*By Buzzworthy*

You don't need an elaborate trap to catch a bad neighbor, just a camera. A little public shaming takes care of the rest.

## Show Reader Comments



EXHIBIT 7

News > **Accidents and Fires** • News

# PG&E must face Tubbs wildfire victims in state court: bankruptcy ruling



### Victims of lethal Wine Country fire in Sonoma County will get day in court against PG&E



Karl Mondon/Bay Area News Group

A wildfire burns in Sonoma County, October 2017. PG&E must face in a state court — and potentially in front of a jury — victims of a lethal inferno that scorched portions of Sonoma County and Napa County in October 2017, a judge ruled on Friday as part of the disgraced utility's bankruptcy case.

By **GEORGE AVALOS** | gavalos@bayareanewsgroup.com | Bay Area News Group
PUBLISHED: August 16, 2019 at 5:13 pm | UPDATED: August 18, 2019 at 7:50 pm

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 38

PG&E must face in a state court — and potentially in front of a jury — victims of a lethal inferno that scorched portions of Sonoma County and Napa County in October 2017, a judge ruled on Friday as part of the utility's bankruptcy case.

Judge Dennis Montali, who is supervising PG&E's $51.69 billion federal bankruptcy filing, ruled that a state court is the correct venue to determine PG&E's potentially liability in connection with a deadly blaze known as the Tubbs Fire.

PG&E had wanted Montali to make an official determination, as part of the bankruptcy proceeding, of what PG&E's potential liability should be in connection with the Tubbs wildfire.

The decision to move the Tubbs liability proceeding out of the bankruptcy court and into the venue of a full-blown trial meets, in Montali's view, a key goal of all the parties involved.

"A just resolution of the claims of victims of the wildfires that have ravaged Northern California in recent years" is how Montali described those crucial goals in his court ruling Friday.

A jury trial on the Tubbs fire liability, accompanied by a legal review of the causes of the inferno and any possible liability for PG&E, is the appropriate way to proceed, the bankruptcy judge determined.

In January, state fire investigators announced the Tubbs Fire was caused by a malfunction of private equipment at a residence in the Napa County town of Calistoga. The fire eventually engulfed part of Sonoma County, roared through Santa Rosa and killed 22 people.

However, attorneys for Tubbs Fire victims believe they can present evidence that shows the power was out at the residence prior to the start of the blaze at that location. That evidence could shift the blame back to PG&E.

San Francisco-based PG&E has noted that the Cal Fire official written report regarding the Tubbs Fire concluded that PG&E facilities didn't cause the inferno.

"Regardless of the next legal steps, Cal Fire has already determined that the cause of the 2017 Tubbs Fire was not related to PG&E equipment," PG&E spokeswoman Lynsey Paulo said. "We intend to cooperate with the state court in order to help achieve the June 30, 2020 deadline to participate in the

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 39
                                        of 105

PG&E, which is already a convicted felon for crimes it committed before and after a fatal gas explosion in San Bruno in 2010 that killed eight, filed for bankruptcy in January, hoping to reorganize its shattered finances that buckled beneath the pressure of a mounting array of liabilities, debts, and wildfire-linked claims.

"The debtors (PG&E and Pacific Gas and Electric) are correct when they state that resolution of the Tubbs fire proceedings is central to this (bankruptcy) case," Montali stated in his ruling. "However, commencement of this (Tubbs fire) litigation, while connected to the bankruptcy, will not interfere with the bankruptcy case. The state court trial may proceed on a parallel track to the proceedings in this court."

In a separate ruling Friday, Motali allowed PG&E to retain the exclusive right to craft a detailed plan for the reorganization of its finances and to sketch its path out of insolvency.

PG&E expects to file its plan of reorganization with the bankruptcy court by Sept. 9.

"Most important to the court, the parties, the fire victims, and all other concerned citizens of Northern California, is to find a clear path to reach the goal of compensation for the fire victims who are involuntary creditors of PG&E and Pacific Gas and Electric, as well as for the contractual claims of their voluntary creditors," the judge ruled in his decision regarding the PG&E reorganization plan.

Report an error
Policies and Standards
Contact Us

 **The Trust Project**



SPONSORED CONTENT

**Cancer and Clinical Trials—What You Should Know.**

By Sutter Health

When you or someone you love is diagnosed

# EXHIBIT 8

News    Obits    Sports    Business    Opinion    Food & Wine    Lifestyle    A&E    Events

# Bankruptcy judge clears way for trial against PG&E on Tubbs fire



**SLIDE 1 OF 4**

Crime scene tape on Bennett Lane north of Calistoga, Tuesday Oct. 24, 2017, marks off an area of interest to fire investigators looking in to the cause of the Tubbs fire. (Kent Porter / Press Democrat) 2017



**JULIE JOHNSON**

THE PRESS DEMOCRAT | August 16, 2019

 Follow this story 

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 42
of 105

Widely held questions over whether PG&E is responsible for damages caused by the 2017 Tubbs fire that devastated Santa Rosa can be tried in civil court and decided by a California jury, a bankruptcy judge ruled Friday.

The decision marks a key juncture in PG&E's bankruptcy case, which had stalled all lawsuits against the investor-owned utility facing an estimated $30 billion liability for wildfires started by its power equipment in 2017 and 2018.

Now, a group of plaintiffs suing PG&E can ask a jury to hear their case alleging Cal Fire got it wrong when the agency concluded the Tubbs fire — the second-most destructive wildland blaze in state history — was sparked by private power equipment and not PG&E.

Allowing a civil trial on the Tubbs fire would "advance these cases towards the necessary and stated goals of all the parties: a just resolution of the claims of victims of the wildfires that have ravaged Northern California in recent years," U.S. Bankruptcy Judge Dennis Montali said in his five-page written order issued Friday afternoon.

If PG&E does not appeal the decision, a fast-tracked civil trial on the Tubbs fire will begin in San Francisco Superior Court. The trial will be brought on behalf of a select group of elderly plaintiffs in poor health who are entitled to a fast-tracked trial in state court because of their conditions.

Because preparations for a civil trial such as evidence gathering and witness depositions were well underway last year before the utility filed for bankruptcy in late January, lawyers handling the case said they can pick up where they left off. The plaintiffs' attorneys told Montali they could be prepared for a trial to begin sometime in late 2019 or early 2020 — a timeline PG&E contested.

On Wednesday during a key day of arguments over the issue, a lawyer for the company warned Montali that a civil trial could imperil the company's ability to meet a state deadline to participate in a $10.5 billion wildfire insurance fund created to help utilities pay for victims' claims from future fires not caused by their power equipment.

PG&E has consistently defended Cal Fire's conclusion that private power equipment started the Tubbs fire. Cal Fire has also disputed claims that its investigation was incomplete and defended the work of its investigators.

"Regardless of the next legal steps, Cal Fire has already determined that the cause of the 2017 Tubbs fire was not related to PG&E equipment," a spokeswoman said in an email. "We intend to cooperate with the state court in order to help achieve the June 30, 2020 deadline to participate in the new state Wildfire Fund established by Assembly Bill 1054."

Attorney Robert Julian, who led arguments Wednesday in federal bankruptcy court in San Francisco in support of a civil trial, said it was "courageous" of Montali to allow a California jury to help make crucial decisions affecting thousands of people, businesses and local governments with losses from the Tubbs fire.

"This case sends a message to the parties in the bankruptcy court and to the bondholders and the security traders on Wall Street who are trading and trying to make profits off of this case," Julian said. "They are going to have to deal with the thousands of victims in Northern California who are trying to obtain just compensation."

## MOST POPULAR

1

2

3

'It was terrible': Santa Rosa crash that killed woman, dog shakes quiet neighborhood

Sonoma County airport plans to add flights, here's where

DNA leads police to suspect in 2002 rape of Santa Rosa teen

4

5

6

From dogs to pot: 20 things that annoy locals about their neighbors

2 years after losing home in Tubbs fire, Sebastopol educator named a state teacher of the year

Family ends search for missing CEO after a body is found in San Jose

The number of Tubbs fire victims are in the tens of thousands and includes households, businesses, local governments, insurance companies, people with family members killed in the fire and others.

There is no complete tally of damages caused by the Tubbs fire, which ignited near Calistoga and burned west across 12 miles into Santa Rosa, killing 22 people and destroying 5,636 structures, most of them homes. Insured losses hit an estimated $9.5 billion, according to the industry trade group Insurance Information Institute.

In bankruptcy proceedings, creditors' claims against the debtor are settled through negotiations and estimation hearings overseen by a judge, which take into account what a jury might award creditors.

Lawyers representing wildfire victims in the bankruptcy case argued that questions about PG&E's liability for Tubbs fire damages were too complex for the bankruptcy estimation process.

Their case involves advancing an alternative theory about how the Tubbs fire started and showing that PG&E was negligent in its duty to prevent electricity-sparked wildfires. These

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 45

questions are better suited for a 12-person jury, they said in a July motion filed in the bankruptcy case.

**RELATED STORIES**

Tubbs fire victims request fast-track civil trial against PG&E

Billions of dollars could rest with Tubbs fire case tied to this power pole

An attorney representing PG&E warned that a civil trial could be far too time consuming to be an effective means of making that decision and could imperil the utility's ability to take part in a critical state insurance fund created to cover damages from future wildfire.

But Montali agreed with arguments that the bankruptcy proceedings can continue "on a parallel track" while the Tubbs case is tried in civil court because of the large volume of matters to be decided.

In his order, Montali urged PG&E to "work collaboratively with plaintiffs' counsel to expedite rather than delay the pre-trial process to get to a jury trial promptly," he wrote in a footnote. The judge suggested that it would be in the company's interest to help the process move forward expeditiously in the civil trial if the company wants the same cooperation during bankruptcy sessions for estimating all of the claims by the company's creditors.

"The shoe might be on the other foot when it is time to schedule the final estimation hearings," Montali wrote.

Roy Miller, a Santa Rosa lawyer whose home was destroyed in the fire, said the bankruptcy estimation process overseen by one judge was not suitable to handle the complex question better suited to a jury of 12 people. Miller in July moved into the home he and his wife rebuilt in Larkfield, which remains a construction zone.

"All we want is to have a determination about the Tubbs fire. Period. End of story," Miller said. "And the way that it's done is by a jury of your peers."

You can reach Staff Writer Julie Johnson at 707-521-5220 or julie.johnson@pressdemocrat.com. On Twitter @jjpressdem.

Sponsored Content on Press Democrat



### Hilarious Neighbors Finally Get Their Revenge 

*By Buzzworthy*

You don't need an elaborate trap to catch a bad neighbor, just a camera. A little public shaming takes care of the rest.

## Show Reader Comments

# EXHIBIT 9



East Bay|North Bay|Peninsula|San Francisco|South Bay

# Photos Show PG&E Lines Sparked Tubbs Fire: Expert

## By Jaxon Van Derbeken

Published Sep 26, 2019 at 7:19 PM | Updated at 10:50 AM PDT on Sep 27, 2019

New photographic evidence indicates tree contact with two PG&E power lines – not the private hilltop electrical system state investigators have blamed – caused the devastating Tubbs fire, according to an expert with four decades of experience investigating electrical fires. Investigative Reporter Jaxon Van Derbeken reports.

(Published Thursday, Sept. 26, 2019)

New photographic evidence indicates tree contact with two PG&E power lines – not the private hilltop electrical system state investigators have blamed – caused the devastating Tubbs fire, according to an expert with four decades of experience investigating electrical fires.

Until now, the second most destructive fire in state history stands as the only one of a two-year string of Northern California wildfires Cal Fire has not blamed on PG&E equipment. Cal Fire says in its report this year that the fire that started on October 8, 2017, was sparked somewhere along an unpermitted, substandard electrical system on a hilltop property along Bennett Lane in Calistoga.

But photos of two PG&E lines – recently obtained by NBC Bay Area's Investigative unit – show telltale marks of arcing far from that home, says veteran electrical engineer Ken Buske, who has examined the cause of 1,000 fires over four decades.

Arcing is the burst of energy, akin to lightning, often associated with high voltage lines slapping against each other in high winds or contact with vegetation.

- **Investigative** **Lawmaker Wants Tubbs Fire Probe Reopened, Citing New Video**

The photos are of two adjacent PG&E wires that had fed the hilltop property, after PG&E replaced them earlier this year as part of what it says was system hardening efforts against wildfire.

The photos show boil-like marks on what had been two adjacent 12,000 volt copper lines. Those wires, PG&E says, are now being preserved.

"This is where the fire started," Buske said, pointing to the photos and the location of the marks on the top of the wires as strong evidence of tree contact at a location that sources say is about 30 feet from Bennett Lane. That spot is some 100 yards from the area of origin identified in Cal Fire's report.

- **Northern California Fire Victims Can File Claims With PG&E**

Based on the marks, Buske offered a much different scenario than Cal Fire's report.

"There's a bright flash, an electric flow -- like lightning between the portion of the wire, the top wire and some vegetation, and there's a similar event with the other wire," Buske said.

He says a surveillance video that NBC Bay Area previously broadcast is additional evidence. The recording shows that at 9:20 p.m., well before the fire became visible, there was a bright flash of light to the right of the image, not far from where the arc marks were found. Buske says the intensity of the light is strong evidence of arcing.

- **PG&E Reaches $11B Deal With California Wildfire Insurers**

The timing of the flash also corresponds to the exact moment fuses and a power outage that cut power to the private hilltop property Cal Fire blames for the fire.

Given the report doesn't account for even the potential that arcing sparked the fire, Buske offered a blunt assessment of Cal Fire's findings.

"The fire report is wrong," he said.

- **Judge Sets Trial for Tubbs Fire Victims' Claims Against PG&E**

Cal Fire has not responded to questions about potential new evidence of arcing, instead standing by its findings that clear PG&E.

PG&E's CEO, Bill Johnson, says Cal Fire got it right.

"There were 21 fires," Johnson said after a federal court status hearing earlier this month on PG&E wildfire prevention efforts. "Cal Fire said PG&E caused 20 of them, and didn't cause the other one, and I think we should have a little confidence in their ability to determine things."

But State Sen. Jerry Hill isn't so sure, especially since Cal Fire has so far seemed unwilling to look at any evidence that casts doubt on its findings.

"It's outrageous," he said, "that they've kind of dug in their heels and said we're not going to do that."

Hill says state investigators should think twice when they point the finger and then refuse to reconsider.

"We're going to really force this -- because when you don't blame the right people, you don't hold the right people responsible for this. That's not justice…"

Buske says based on the evidence he has reviewed, Cal Fire needs to start the Tubbs fire probe from scratch.

"There's a big problem," he said. "The Tubbs fire isn't somebody's burnt chicken coop. A lot of people suffered a lot in the fire and they deserved a good fire report."

Whatever Cal Fire does now, a San Francisco jury is set to decide in January what role, if any, PG&E played in the fire.

Get the latest from NBC Bay Area anywhere, anytime



## Download the App

Available for [IOS](#) and [Android](#)

- **Follow NBC Bay Area**

**Find this article at:**
https://www.nbcbayarea.com/investigations/Photos-Show-PGE-Lines-Sparked-Tubbs-Fire-Expert-561487651.html

☐ Check the box to include the list of links referenced in the article.

© NBC Universal, Inc. | All Rights Reserved.

# EXHIBIT 10

We Added a Super Cool New Feature
And we made this ad to tell you about it. You can now
contact multiple markets simultaneously. ( Try it now. )

*The New*


My New Markets
POWERED BY INSURANCE JOURNAL



View this article online: https://www.insurancejournal.com/news/west/2018/08/13/497820.htm

# Facing $17B in Fire Damages, PG&E CEO Blames Climate Change

It was California's biggest fire yet. In late July and August, wildfires devastated an area north of San Francisco far bigger than New York City, destroying more than 100 homes and injuring two fire fighters. It's just one in a rash of fast-spreading blazes that have killed at least 56 people this year and last in the Golden State.

Authorities don't yet know the cause of some of the fires, but the region's giant utility, PG&E Corp., see a culprit at work — climate change. The blazes in recent years, it said, are the latest example of how global warming has produced unusually hot, dry conditions that spawn more frequent and intense fires. "Climate change is no longer coming, it's here," Geisha Williams, chief executive officer of PG&E, said in an email. "And we are living with it every day."

Scientists tend to agree with that assessment. But California's biggest utility has an especially compelling reason to link the fires to the environment. State investigators have tied PG&E equipment, such as trees hitting power lines, to some of the blazes in October that in total destroyed nearly 9,000 structures and killed 44 people. It faces damage liabilities totaling as much as $17 billion, and possible financial ruin — its stock is down about 37 percent since the fires — unless Williams can convince California lawmakers that the company's problem is, in fact, a climate change problem.

**Green Mantle**

Invoking the environment is a clever strategy in a state that's taken on the green mantle in the face of a skeptical Trump administration. (Indeed, President Donald Trump offered his own reason for the fires last week, blaming a lack of water and bad environmental laws. It was roundly dismissed.) Williams's battle cry — don't blame us, blame climate change — is catching on. PG&E's neighboring utilities, Edison International and Sempra Energy, are echoing the defense, and it may well serve as a blueprint for utilities worldwide as global warming produces extreme weather events such as hurricanes that have slammed Texas and Puerto Rico.

Williams is deploying the argument in a lobbying campaign she's waging to shield PG&E from liability. California law holds that property owners can collect compensation from utilities linked to fires — even if they weren't negligent. She argues that because of the increasing frequency of fires, utilities shouldn't be held responsible each time a tree branch falls on a power line during a storm if it followed all safety rules. Instead, the test should be whether the utility acted "reasonably" in trying to prevent fires, things like trimming trees and brush around lines, she contends. In that case, insurance or government agencies would pick up the damages.

"No one is suggesting the utilities should get a free pass if they were negligent," Williams said. But the current legal policy of unlimited, strict-liability has the potential to financially cripple companies, she said.

Some California lawmakers insist PG&E hasn't even met the reasonable standard, pointing to signs that in some cases PG&E allegedly violated fire safety rules, according to reports by the California Department of Forestry and Fire Protection, or Cal Fire. "Climate change and the so-called new normal do not ignite fires," said California State Senator Jerry Hill, a frequent PG&E critic. "The Cal Fire findings show that suspected negligence by PG&E did."

PG&E says it believes it has met the state's high safety standards.

The utility hasn't been blamed for any of this year's fires, but it's got plenty of financial worries dealing with the ones from 2017. On a recent investor call, Williams raised the stakes by saying PG&E has brought up the prospect of bankruptcy with lawmakers unless the state changes the law. It's already taken a $2.5 billion charge stemming from the October fires. PG&E has shown that it won't shy away from court protection. It entered bankruptcy in 2001 after incurring $9 billion in debt by buying power for more than it could charge customers. It emerged three years later.

**Suspended Dividend**

The $17 billion in potential liabilities today, as estimated by JPMorgan Chase, are significant, representing about 75 percent of its market capitalization of $22 billion. PG&E suspended its dividend in December as it tries to assess damage costs. Some consumer advocates are skeptical of the bankruptcy warnings. (Creditors seem to agree. While prices have dropped since last year's fires, they are nowhere near distressed levels.)

Williams is winning some adherents, including California Governor Jerry Brown. He's proposed a bill that would lesson utilities' exposure to damages from fires, citing climate change. Brown echoes Williams in contending the utility needs to be financially healthy in order to invest in renewable energy and help the state meet its climate goals.

The daughter of Cuban political refugees, the 57-year-old Williams is the nation's first Latina CEO of a Fortune 500 company. After first working at Florida Power & Light, she joined PG&E in 2007 and became CEO in March last year — just seven months before the big wildfires in October.

Now, as she deals with the existential threat posed by the fires, she's bolstering PG&E's wildfire prevention activities, including stepping up aerial patrols of its power lines, setting up a new wildfire operations center that works round the clock and expanding a network of weather monitoring stations. Still, Williams understands that the Holy Grail is a change in the liability law. At a recent energy conference in Houston, she said — jokingly — that if she fails to do that, "I won't be here in two years."

**More from Insurance Journal**

Today's Insurance Headlines | Most Popular | West News

# EXHIBIT 11

# TV's New Wildfire Commercials Quietly Brought To You By PG&E

**TV's New Wildfire Commercials Quietly Brought To You By PG&E**

**By David R. Baker, SAN FRANCISCO CHRONICLE**

**August 14, 2018**

https://www.sfchronicle.com/business/article/Those-new-wildfire-TV-ads-...

California's electric utilities have taken their fight to change wildfire liability rules to the television screen, backing ads throughout the state.

That the companies back the ads, however, isn't obvious from the commercials themselves.

Instead, the ads urge viewers to support the BRITE Coalition, a group pushing to reform the state's liability rules concerning fires triggered by utility equipment. All three of the state's large investor-owned utilities — Pacific Gas and Electric Co., Southern California Edison and San Diego Gas & Electric Co. — are members.

So are various chambers of commerce, a wind-energy association, a climate-change education group and the main union representing PG&E employees.

The utilities have spent months lobbying Sacramento legislators to change a system known as inverse condemnation, which holds them liable for wildfire damage tied to their equipment even in cases where the company did nothing wrong.

California fire investigators have blamed PG&E's equipment for starting 16 of the wind-driven wildfires that tore across Northern California last fall. In 11 of those fires, investigators with the California Department of Forestry and Fire Protection, known as Cal Fire, found evidence that PG&E violated safety laws. Estimates of the company's potential liability range as high as $17 billion. Cal Fire has not yet announced the cause of the most destructive wildfire last fall, the Tubbs Fire in the Wine Country, which tore through neighborhoods in Santa Rosa.

Gov. Jerry Brown has proposed ending the system of automatically holding utilities financially liable for wildfire damage linked to their power lines, although his proposal would not apply to last year's fires.

The issue has touched off a pitched battle of lobbyists and groups representing people and companies with a stake in the outcome.

Some of the lawyers and homeowners suing PG&E have their own advocacy group, Up from the Ashes, trying to thwart the utilities in the state Capitol. Insurance companies have another, bluntly titled Stop the Utility Bailout.

The BRITE Coalition (the acronym stands for Building Resilient Infrastructure for Tomorrow's Economy) is ramping up its efforts as the end of the legislative session nears. With three weeks left, the group held a press conference Tuesday in Sacramento, and its smoothly produced television ads — also popping up on social media — started running early this month.

"If a tree falls in a forest and hits a power line through no fault of anyone's, the utilities are now the insurers of all that fire loss, and that's not fair," said Rob Fong, a former Sacramento city councilman, at the BRITE press conference. "And more importantly, it's not healthy for the financial stability of this state."

To its opponents, BRITE is nothing more than an "astroturf" group, a campaign backed by corporations but designed to look like a grass-roots effort.

"It's nothing more than a name to put on the end of a television commercial other than PG&E," said Jamie Court, president of the Consumer Watchdog advocacy group. "It's as phony as they come."

The coalition may have a hard time persuading lawmakers to tackle such a sensitive and complicated issue in the session's waning days. Tuesday afternoon, two of the state Senate's top Republicans called for delaying any action on inverse condemnation, saying the Legislature should focus on fire prevention instead.

"We believe it is in the best interest of the public for the Legislature to defer discussion of inverse condemnation to a later time," wrote Republican leader Patricia Bates of Laguna Niguel (Orange County) and Jim Nielsen of Gerber (Tehama County), chairman of the Senate Republican Caucus, in a press release. "The Legislature should instead focus on more immediate issues that we can realistically address by the end of this month, such as improving the safety of electricity delivery systems, and reducing the risks of wildfires by fixing laws and regulations that have led to a proliferation of unmanaged forests and unprecedented levels of fuel."

PG&E touts BRITE as a broad-based effort. The utility, California's largest, views the wildfire liability fight as part of a much larger issue: how the state will pay for the damage wrought by climate change. Massive wildfires, the company argues, have become more common in recent years because global warming and the recent drought have killed an estimated 130 million trees in the state.

"We believe this is frankly the most critical issue facing California today, and we believe it's really important that voices are heard on this," said Steven Malnight, PG&E's senior vice president of strategy and policy, speaking of the BRITE Coalition. "It's a substantial group. That's why we're proud to be a part of it."

Malnight, speaking Tuesday with Chronicle editors and reporters, declined to say how much PG&E has donated to the group. A search of the state website that tracks campaign financing and lobbying expenses turned up no records with the group's name.

A form PG&E filed with the state detailing its lobbying expenses for this year's second quarter listed $1.14 million spent on "grassroots and other advocacy" related to state wildfire legislation.

The Bay Area Council, a business-backed public policy group, has also joined BRITE. Geisha Williams, the CEO of PG&E Corp., sits on the group's executive committee.

But Jim Wunderman, the council's president, said that regardless of that personal connection, the group does not want to see the current liability system bankrupt PG&E. The utility filed for bankruptcy once before, during the state's electricity crisis of 2000-01.

"We do not want to end up with a bankrupt PG&E," he said Tuesday. "We've seen that before, and it wasn't pretty. Our residents require a functional utility."

The same fear also motivates the International Brotherhood of Electrical Workers, another BRITE member. The union often backs PG&E on issues it considers a threat to the company or the utility industry.

"We learned this from our experience with PG&E going bankrupt during the energy crisis — the bankruptcy court has the latitude to cancel our labor agreement, has the latitude to remove the pension fund and use it to make payments to creditors," said Hunter Stern, business representative for IBEW Local 1245, speaking with reporters Tuesday after the Sacramento press conference.

*San Francisco Chronicle staff writer Melody Gutierrez contributed to this report.*

*David R. Baker is a San Francisco Chronicle staff writer.*
*Email: dbaker@sfchronicle.com Twitter: @DavidBakerSF*

# EXHIBIT 12

# Some question if fire chief should have done PG&E commercial

February 6, 2018 9:02 pm



CHIEF HAROLD SCHAPELHOUMAN

**Menlo Park Fire Chief Harold Schapelhouman in a PG&E commercial.**

BY **EMILY MIBACH**
Daily Post Staff Writer

You might not expect to turn on your TV and see your fire chief featured in a **PG&E commercial**. But residents of East Palo Alto, Atherton, Menlo Park and North Fair Oaks have been watching their fire chief, Harold Schapelhouman, in a one-minute commercial for the utility company.

And about a dozen people have complained to the Menlo Park Fire Protection District about Schapelhouman's appearance in the commercial because of PG&E's role in the San Bruno disaster and its possible involvement in last October's fires in Wine Country.

PG&E has paid more than $2.1 billion in fines and civil penalties over the 2009 San Bruno explosion that killed eight people. The utility company is under investigation in connection with the fires in Sonoma and Napa counties that killed 31 people.

"How can the head of this (fire agency) say he is partners with PG&E and trust them when it has been proven that they caused the terrible fires that have happened," wrote John Kolski to the Menlo Park City Council, even though the fire district is separate from the city government.

But Schapelhouman said he sees the commercial more like a public service announcement.

"In regards to the utility being held accountable and their potential culpability in recent fire disasters if rumors of their guilt are substantiated, I don't deal with their corporate leadership, but I'm sure that they will need to answer many difficult questions and perhaps serious legal challenges, if those rumors are true," Schapelhouman said in a statement about the ad.

### PG&E didn't pay chief or fire district

Neither the fire chief nor the district was paid for the commercial, Schapelhouman said.

"Some people are saying that I'm a shill for PG&E or I have a job lined up with them after I retire," Schapelhouman said. "I did it because they are one of our critical partners in emergency services... My bill at home did not go down."

PG&E is often one of the first calls firefighters make when arriving on a scene, Schapelhouman said. In August when a squirrel chewed through a power line, cutting power to 1,700 buildings and trapping people in elevators, it was PG&E that had to do the repair work on the line. Firefighters assisted people trapped in elevators or who needed assistance because of the power outage.

### Firefighters and PG&E crews work together

"From gas line breaks to fires involving the meter shut-offs to electrocutions and downed and energized power lines, it is the Fire Service that stands by until PG&E first responders can mitigate, abate or intervene so we can then do our work safely," Schapelhouman said.

The ad can be seen on most TV channels. It began airing late last year.

Schapelhouman was approached by PG&E in August to do the ad and taped it on Nov. 20 and 21. He said the filming was done with on-duty firefighters. He said emergency response was not affected by filming the ad.

Schapelhouman told PG&E he wanted to talk in the ad about the district and the utility's partnership to create the district's training facility on PG&E land along the Bayshore.

Schapelhouman said the filming of the commercial was similar to other public affairs activities of the district, such as when children visit a fire station or fire personnel participate in a community event.

The district has participated in promotional videos for Intel and other companies it partners with for its drones. And PG&E has partnered with Salinas, Auburn and Fresno firefighters to do similar ads for those regions.

# EXHIBIT 13



# Pacific Gas and Electric Company ®

| Philipp Gneuss | Hamburg, Germany | Business |
| Ricki Hoffer | Redwood City | Business, Marketing |
| Jason Lanoie | Santa Cruz | Psychology |
| Pierce McManus | Los Altos | Business, Marketing |

Pacific Gas and Electric Company

# WEAKNESSES

- Bad reputation due to past discretion
  - Questionable Sincerity of company regarding issues
- Unsatisfied consumer base
  - Poor consumer reviews
- Questionable Integrity throughout company
- Uninformed consumers
- Smart tracker

Pacific Gas and Electric Company

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 64 of 105

# MARKETING MIX

- Generalized ads that show PG&E giving back to the community, that include high executives that show that company cares

- Specified community outreach programs, and commercials specific to San Bruno, along with atonement/responsibility campaigns.

Pacific Gas and Electric Company

# PROMOTION

- Informing and educating the consumer

- Reminding the community that the company as a whole cares.

- Persuading the community that the company has changed

Pacific Gas and Electric Company

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 66 of 105

# DISTRIBUTION OF ADVERTISING

Community specific advertising

- Time and T.V show related commercials

- Press Releases

- Sponsors

Broad advertising

Commitment to safety

Environmentally conscious company

Pacific Gas and Electric Company

Clip slide

# EXHIBIT 14

## The New York Times

# *Overwhelmed or Ill Informed, 70,000 Wildfire Victims May Get Nothing*

**By Ivan Penn and Lauren Hepler**

Oct. 6, 2019

SAN FRANCISCO — After a succession of devastating wildfires in the last four years, tens of thousands of Californians — many with broken spirits, many homeless — may now lose out on compensation from the company that was to blame.

A deadline for victims to file claims is less than three weeks away. About 30,000 have done so with the help of lawyers, along with 1,500 acting on their own. But the deadline could pass without claims from as many as 70,000 others eligible for compensation.

They include Steve Kane, who fears he would take away money from those needing it more, and Kelly Boyer, who says he can't prove the value of all his losses when the town of Paradise was destroyed last year.

The filing deadline, part of the bankruptcy case of Pacific Gas & Electric, California's biggest utility, is the victims' chance to piece together at least parts of their shattered lives. The stakes are high: If people like Mr. Kane and Mr. Boyer do not file claims, investors in the utility — whose equipment has been blamed for several major fires — will retain that much more.

PG&E filed for bankruptcy protection in January as it amassed billions of dollars in potential liability for years of wildfires. It has set a target of $8.4 billion for payouts to wildfire victims, while pledging that all court-approved claims from victims will be honored.

"PG&E remains focused on doing right by the customers and communities we serve," Andrew Castagnola, a PG&E spokesman, said in a statement. The utility says it has mailed 6.2 million claim forms to possible victims of about two dozen fires, calling attention to the process through websites, email, social media, and radio and television ads.

**Subscribe to The Times**

But some lawyers for wildfire victims say the utility's bankruptcy proceeding has been used to prevent as many people as possible from filing a claim.

"They wanted to use the bankruptcy rules to their benefit to limit their liability to victims," said Mike Danko, a lawyer in the Bay Area who represents about 4,000 victims from fires in 2015, 2017 and 2018. He said the Oct. 21 deadline for claims was unduly rigid and was meant by PG&E "to end up with a smaller number."

Many wildfire victims are still displaced, sometimes living in tent cities or on the streets, often confused about the convoluted claims process and traumatized by their losses. Their failure to come forward could benefit PG&E and its investors.

"There are probably thousands, if not tens of thousands, that have had some impact from these Northern California fires that are not going to seek anything from PG&E," said Cecily Dumas, a lawyer for the Official Committee of Tort Claimants, a group appointed by the court to represent all wildfire victims in the bankruptcy.

"If people choose not to file claims in the PG&E bankruptcy case," she added, "at least they know they can."

## Weighing a 'Moral Dilemma'

Eleven months after a 100-year-old utility tower is suspected of sparking California's most devastating wildfire, known as the Camp Fire, Mr. Kane barely recognizes his quiet corner of Paradise in the Sierra Nevada foothills north of Sacramento.

The beauty of the roomy lots and old-growth pine trees that lured the retired contractor and his wife from the high desert outside Los Angeles have been replaced by trailers, scorched basketball hoops and the skeleton of a former hospital.

After a long week in limbo last November with other evacuated members of their family, the couple learned that a guesthouse, a workshop and nine other structures on the property had burned — and that insurance covered less than half the approximately $250,000 in damage. But the main house survived, and after a brief attempt at selling the property, Mr. Kane, 61, threw himself into scrubbing away ash, installing a water purification system and salvaging the property.

He did not, however, file a claim against PG&E for the roughly $150,000 in uninsured losses.

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 69 of 105

"Every time I've got to deal with it, it just brings me back to what I don't really want to think about anyway, you know?" Mr. Kane said. "When I'm working on my house, I'm not thinking about those problems."

Before he was asked whether he planned to file a claim, Mr. Kane said he was unaware he could do so without a lawyer. He said he was unsure whether he had received forms from PG&E to file a claim by mail.

But even if he had a claim form to file, Mr. Kane fears that it would take away from those who suffered more profound losses, like neighbors who lost relatives, pets, homes or businesses.

"That is where I wrestle with the moral dilemma," said Mr. Kane, who is housing some of those whose properties burned. "It's like if I join the club and then seek recovery, they're going to get less, when they need more than I need."

Such views trouble lawyers arguing for victims' interests, who have argued in court and in legal filings that victims often believe there is a lack of money to pay them because of PG&E's bankruptcy. They also say many do not understand that they can collect compensation from PG&E even if insurance companies have covered some losses, and that the payments would not force them to rebuild where they formerly lived if they had moved away or wanted to start over.

In addition, one of the lawyers said, it is a common misconception that people who do not have proof cannot file a claim. Just having to flee the fire enables a claim, the lawyer said.

"The legacy of this bankruptcy should not be that tens of thousands of underinformed, displaced and traumatized fire victims have their substantial claims precluded," Steven Skikos, one of the court-appointed lawyers representing victims' interests, said by email. "Thousands of fire victims have lost everything and now, without their knowledge or informed consent, are about to lose their opportunity to recover anything."

From interviews with wildfire victims, confusion about what is available to them appears widespread.

Helen Sedwick and her husband lost their home in Santa Rosa, near the state's wine country, in a 2017 fire. PG&E was not found responsible for the fire, but the court has allowed victims to pursue a lawsuit against the utility for damage based on evidence that suggests that the power company was at fault.

Ms. Sedwick, a lawyer, said she was filing a claim and urging other victims to do so. But she said many did not understand the process or were simply too traumatized to focus on it.

"Losing your home is profoundly disorienting," Ms. Sedwick said. "A lot of people are not filing because they are intimidated by the process. They think that because PG&E filed bankruptcy, they're broke."

## 'I Don't Really Have Any Proof'

Mr. Boyer, 49, a former construction worker whose rented trailer in Paradise was destroyed in the Camp Fire, spent the first week afterward in a tent city outside the Walmart in Chico, a nearby town. For the next 10 months, he shuffled among an organic farm, a refugee camp at the county fairgrounds and encampments along rural highways.

Life outside finally took its toll. Mr. Boyer had settled into a campsite near Butte Creek, serene but a steep 15-mile hike to and from the convenience store where he stocked up on 100 pounds of food twice a month. A cut on his toe became badly infected, and Mr. Boyer was admitted to a hospital for an amputation in August. After a few days, wary of losing his few remaining belongings, he left.

"The nurses down there are probably cussing me out, because when I left it was still an open wound," Mr. Boyer said. "I told them: 'I've got to go. I've got to get up there and check my camp. If I'm not careful, everything I own is going to be gone again.'"

After the medical scare, with his foot still in thick bandages, Mr. Boyer sought help from an old friend and a few Facebook groups for fire survivors. He soon had a 1980s-vintage recreational vehicle and a three-month offer to stay on a parcel where the owners are finishing building plans. He considers himself lucky to have shelter and hopes to take advantage of aid programs to channel his love of guitar into sound-engineering classes at Butte College.

Mr. Boyer said he did not have a lawyer and had not filed a claim against PG&E for his belongings or expensive musical equipment lost in the fire.

"See, I don't really have any proof of anything I had there," he said. "I'm wondering if it's worth the effort."

## A Looming Deadline

Any doubts, anxieties or crossed signals that limit the number of claims could benefit PG&E and its investors.

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 70 of 105

Before the 2017 wildfires, PG&E stock was trading above $70 a share, a five-year high. But with the bankruptcy and investigators' determination that the utility was responsible for the Camp Fire and several others, the stock price is barely above $10.

PG&E has proposed terms in the bankruptcy that would put its overall payments for wildfire-related losses at $20.4 billion. In addition to earmarking $8.4 billion for victims, it has committed $11 billion to insurers and $1 billion to public agencies, subject to court approval.

It is pushing to complete the Chapter 11 bankruptcy process by June 30 so it can qualify for a newly created state program that will provide utilities with a backstop against liability in future fires.

Ahead of the Oct. 21 cutoff for claims, a series of critical hearings is scheduled, starting Monday. Frank Pitre, a lawyer who represents wildfire victims, has signaled a possible move to push the deadline farther out.

"We may be coming before you and asking for an extension of time for the claims process," Mr. Pitre told the court last month. "I'm very concerned that we are not getting in the requisite claims that should come in based on what we believed, in good faith, are the number of people who have been impacted."

He said the total number, including those who had already filed claims, could be 75,000 to 100,000.

"PG&E's game is to cut the time period for victims' compensation way down," Mr. Pitre said in an interview. "That works to the advantage of PG&E and their shareholders. They want to game the system."

Asked to address the assertion, Mr. Castagnola, the company spokesman, said, "PG&E believes the Chapter 11 process will support the orderly, fair and expeditious resolution of claims, including wildfire claims."

Victims like Ms. Sedwick said that with the trauma of dealing with their losses, filing a claim was not on a lot of victims' minds. Many assumed the 13-page claim package that PG&E sent was junk mail and threw it away, she said. Others, like Mr. Kane, aren't sure they ever got it.

Mr. Kane is unsure whether he will stay in Paradise in the long term. He worries that it will remain a "trailer city," and that businesses won't return. He empathizes with those who lost everything, he said, but he hopes that the town will move forward with stricter rules for rebuilding, and he is wary of high costs for insurance, taxes and utilities.

"Life is messy," he said, "and it's not necessarily fair."

Ivan Penn reported from San Francisco, and Lauren Hepler from Paradise, Calif.

A version of this article appears in print on Oct. 7, 2019, Section B, Page 1 of the New York edition with the headline: In PG&E Bankruptcy, Victims Again in Peril

# EXHIBIT 15

```
 1        SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                  COUNTY OF SAN FRANCISCO

 3    _____

 4    Coordination Proceeding,          ) JCCP No. 4955

 5    Special Title (Rule 3.550)        )

 6                                      )

 7    CALIFORNIA NORTH BAY FIRE CASES   )

 8    _____)

 9    AND RELATED CROSS-ACTIONS.        )

10    _____)

11

12

13

14          VIDEOTAPED DEPOSITION OF JIM NOLT

15              Sacramento, California

16            Tuesday, October 8, 2019

17                    Volume I

18

19

20    Reported by:

21    CARLA SOARES

22    CSR No. 5908

23    JOB No. 3562334

24

25    PAGES 1 - 225
```

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 73 of 105

Veritext Legal Solutions
866-299-5127

```
1    was said to me, but that was the impression that I      14:58:03

2    had in my mind.

3    BY MR. CAMPORA:

4         Q    Okay.  Thank you.

5              You testified earlier you were shown a         14:58:15

6    picture -- strike that -- you watched the video of

7    the flash on somebody's phone.

8              Do you remember that?

9         A    Yes.

10        Q    Did you ever ask for a copy of the video?      14:58:25

11        A    Yes.

12        Q    Did you get one?

13        A    Yes.

14        Q    Did you put it on your computer?

15        A    Yes.                                            14:58:31

16        Q    Were you able to watch it on your

17   computer?

18        A    No.

19        Q    Do you know why?

20        A    Because when I got back to the office, I       14:58:34

21   had apparently not done it right and I didn't have

22   it.

23        Q    Okay.  Did you ask for another copy?

24        A    Yes.

25        Q    Did you get it?                                14:58:41
```

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 74
Veritext Legal Solutions
of 105
866 299-5127

```
1        A    No.                                    14:58:42

2        Q    So you asked for another copy and weren't

3   provided a copy?

4        A    Correct.

5        Q    Do you know why?                        14:58:46

6        A    No.

7        Q    Who did you ask for the copy?

8        A    John Martinez.

9        Q    And did Mr. Martinez say, "No, you can't

10  have it" or just didn't give you one?            14:58:53

11       A    Just didn't give me one.

12       Q    You have different times in your notes

13  about the time of the flash.

14            Do you understand now the flash was at

15  9:20, approximately 9:20 p.m.?                    14:59:05

16            MS. WINSOR:  Compound and vague.

17            THE WITNESS:  From -- I can't tell you

18  without looking at documents.

19  BY MR. CAMPORA:

20       Q    You can look at anything you want, sir. 14:59:18

21  It's an open book test.

22            You can look at Exhibit 83 if you want,

23  sir.  I'm sorry.  15.  Witness 83, Exhibit 15, the

24  screenshot of the flash.

25       A    I don't have that here.                 15:00:11
```

Veritext Legal Solutions
866-299-5127

```
 1              MS. WINSOR:  That was on --              15:00:12

 2              MR. CAMPORA:  Pull it up.  Can you make it

 3      any bigger?  Now come down.

 4              THE WITNESS:  You can see the date and

 5      time there.                                     15:00:24

 6              MR. CAMPORA:  Pull it down so he can see

 7      the top.

 8          Q   Do you see it says 21:20 --

 9          A   21:28 --

10      (Simultaneous colloquy - reporter interruption.)  15:00:43

11      BY MR. CAMPORA:

12          Q   Sir, we have Exhibit 83-15 on the screen.

13              Will you follow him up on the screen,

14      please?  That's okay.  He's back.

15          A   It says 21:20.                          15:00:55

16          Q   So that would be, military time,

17      9:20 p.m.?

18          A   9:20 p.m.  Yes.

19          Q   And did PG&E advise you that the fuses had

20      blown at 9:20 p.m.?                             15:01:06

21          A   I don't understand the question because I

22      never talked to PG&E.

23          Q   You got a letter, though, right, from

24      PG&E?

25              MS. WINSOR:  No.  Assumes facts.  Sorry.  15:01:21
```

Page 203

```
 1    Objection.  Assumes facts.                      15:01:23

 2            (Exhibit 0083-031 was marked for

 3         identification.)

 4    BY MR. CAMPORA:

 5       Q    Have you seen this document, sir,        15:01:49

 6    Exhibit 31?

 7       A    Maybe.

 8       Q    Do you recall seeing this document?

 9       A    I recognize the name Bruce Crane.  That's

10    what I'm focusing on at the moment.              15:02:54

11       Q    Okay.

12       A    I have a letter here from August 30, but I

13    don't have anything from November 15 yet.  This is

14    the letter to Bruce Crane.  "Dear Bruce."

15       Q    It's from Elizabeth Collier at PG&E to    15:05:03

16    Bruce Crane, acting chief counsel for the California

17    Department of Forestry and Fire Protection.  The

18    letter is dated --

19       A    No, this is Stephen Schirle.

20       Q    That's a different letter.  The Bates     15:05:15

21    number on it is CDF 0028773.

22            MS. WINSOR:  It also appears at 007052 in

23    part.

24    BY MR. CAMPORA:

25       Q    You have a file name "2018-11-15 Cal Fire  15:05:45
```

Page 204

Veritext Legal Solutions
866-299-5127

```
 1    Letter to Bruce Crane PDF."                      15:05:50

 2              Do you see that?

 3         A    Well, I see a letter to Bruce Crane here,

 4    but that's not what you're talking about here.

 5         Q    This one says November 15th.  The file    15:06:05

 6    name is "November 15th" -- "November 15th" --

 7         A    Oh, here it is.  Okay.  Yeah.  All right.

 8    There we go.

 9         Q    So when did you get this letter?

10         A    Probably December 12th -- December 4th or  15:06:32

11    so.

12         Q    Okay.  I'd like you to look at the second

13    page of the letter.  Actually, page 3 of the letter,

14    the bottom paragraph.

15              It says, "The event and interval data for  15:06:47

16    the meters at 1200 Bennett Lane and 1177 Bennett

17    Lane, provided at PGE-CF_0142683, show that the 1200

18    Bennett and 1177 Bennett meters recorded outage

19    events at 9:20 p.m. on October 8th, 2017."

20              Did I read that accurately?              15:07:11

21         A    I still haven't found where you're

22    reading.

23         Q    The bottom paragraph of the letter.  Not

24    the footnote, but the bottom paragraph.

25         A    All right.                               15:07:18
```

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 78
of 105

Veritext Legal Solutions
866-299-5127

| | | |
|---|---|---|
| 1 | Q About midway in that paragraph it says, | 15:07:20 |
| 2 | "The event and interval data for the meters at 1200 | |
| 3 | Bennett Lane and 1177 Bennett Lane, provided at | |
| 4 | PGE-CF_0-142683, show that the 1200 Bennett and 1177 | |
| 5 | Bennett meters recorded outage events at 9:20 p.m. | 15:07:39 |
| 6 | on October 8th, 2017." | |
| 7 | Did I read that accurately? | |
| 8 | A Yes. | |
| 9 | Q Then it says, "consistent with 19 other | |
| 10 | smart meters downstream of Fuse 773." | 15:07:51 |
| 11 | Do you see that? | |
| 12 | A Yes. | |
| 13 | Q So that means there were 21 smart meters | |
| 14 | that recorded outage events all at 9:20 p.m., true? | |
| 15 | A Yes. | 15:08:03 |
| 16 | Q It says "All of this data is consistent | |
| 17 | with Fuse 773 operating at 9:20 p.m. and | |
| 18 | de-energizing the residences downstream of that fuse | |
| 19 | at that time, including 1128, 1200 and 1177 Bennett | |
| 20 | Lane." | 15:08:19 |
| 21 | A Yes. | |
| 22 | Q Based on your investigation, you | |
| 23 | understand -- strike that. | |
| 24 | Based on that information, was it your | |
| 25 | understanding that there was no power on the Zink | 15:08:31 |

Page 206

Veritext Legal Solutions
866 299-5127

```
 1    property after 9:20 p.m. on October 8th?          15:08:35

 2         A    What is the Zink property?

 3         Q    1128 Bennett Lane.

 4         A    That's -- yes, that's what the data is

 5    saying.                                            15:08:58

 6         Q    Okay.  And the data also says that the

 7    fuses blew at the same time as the arcing event,

 8    true?

 9              MS. WINSOR:  Vague as to "arcing event."

10    Assumes facts.                                     15:09:10

11    BY MR. CAMPORA:

12         Q    Let's do it this way:  You looked at the

13    picture of the flash, right?

14         A    Yes.

15         Q    The flash happens at 9:20, correct?      15:09:14

16         A    Yes.

17         Q    This says that the fuse blew at 9:20,

18    correct?

19         A    Yes.

20         Q    Okay.  Did you know that when you wrote   15:09:20

21    your report in December of 2018?

22         A    Yes.

23         Q    Okay.  You make no mention of that fact.

24         A    But they were all unrelated pieces that I

25    couldn't put together into a meaningful whole.     15:09:54
```

Case: 19-30088    Doc# 7500-1    Filed: 05/22/20    Entered: 05/22/20 15:35:00    Page 80
of 105

Veritext Legal Solutions
866-299-5127

```
 1        Q    But you do know now, sitting here today,        15:09:58

 2   that there is a flash which appears to be an arcing

 3   event at 9:20, correct?

 4             MS. WINSOR:   Assumes facts.

 5             MS. NORTH:   Objection.                          15:10:07

 6             THE WITNESS:   There's a flash.

 7   BY MR. CAMPORA:

 8        Q    Okay.   And you do know that the fuses blew

 9   at 9:20, correct?

10        A    That's what the document says.                  15:10:13

11        Q    Okay.   And sitting here today, sir, do you

12   think that was just coincidence?

13             MS. NORTH:   Objection.   Argumentative.

14             THE WITNESS:   It's unlikely.

15   BY MR. CAMPORA:                                           15:10:31

16        Q    It's unlikely to be coincidence, true?

17        A    Yes.

18        Q    I want to do a couple things because the

19   jury is going to watch this, and we've been using

20   words that they don't have any idea what they are or     15:10:46

21   mean.

22             You talked earlier today about ohms.

23             Do you remember that?   You mentioned ohms.

24        A    Okay.

25        Q    Can you tell the jury what an ohm is?          15:10:54
```

Page 208

```
 1        Q   At the bottom of the page, there's a name      15:14:13

 2   Jason -- I'm going to take a guess -- Pretzlaf.

 3            Do you see that?  There's a card.

 4        A   At the bottom -- oh, the card?  Yes.

 5        Q   And you don't think that's Jason --             15:14:28

 6        A   That might be Jason, yes.

 7        Q   Okay.  And then below that I see that we

 8   have -- it says "Carl Steis" --

 9        A   Yes.

10        Q   -- from Cal Fire.                               15:14:40

11        A   Yes.

12        Q   John Martinez?

13        A   Yes.

14        Q   And you, correct?

15        A   Yes.                                            15:14:44

16        Q   What's below that?  "Agenda"?

17        A   Yes.

18        Q   What was the agenda?

19        A   To look at the smart meter readings and to

20   try to get the data out of them, and to get some        15:15:01

21   PG&E drawings, those four drawings that I used in my

22   report that we've looked at already, and then to

23   look at the fuses.

24        Q   Okay.  So they wouldn't allow you to open

25   the fuses, right?                                        15:15:27
```

Page 213

| | | |
|---|---|---|
| 1 | A    Yes, because we didn't know how to and we | 15:15:29 |
| 2 | didn't want to be destructive. | |
| 3 | Q    Did they actually give you the four | |
| 4 | drawings at that time? | |
| 5 | A    Maybe.  I don't recall. | 15:15:39 |
| 6 | Q    My recollection is, sir, that they showed | |
| 7 | them to you but they didn't provide them to you; is | |
| 8 | that right? | |
| 9 | A    That could be possible, too. | |
| 10 | Q    Did you find PG&E to be forthcoming when | 15:15:48 |
| 11 | you were dealing with them, sir? | |
| 12 | MS. NORTH:  Objection.  Argumentative. | |
| 13 | THE WITNESS:  It depends on who you're | |
| 14 | talking to when. | |
| 15 | BY MR. CAMPORA: | 15:15:59 |
| 16 | Q    Okay.  What do you mean by that? | |
| 17 | A    Sometimes they're not at all.  Sometimes | |
| 18 | they parse things agonizingly.  Sometimes they send | |
| 19 | you the wrong information and say, "We sent it to | |
| 20 | you," and then you have to prove to them that it is | 15:16:10 |
| 21 | the ten-year old data.  Sometimes they send things | |
| 22 | in such cryptic form that it's unmeaningful. | |
| 23 | It's just a miserable experience. | |
| 24 | MR. CAMPORA:  Mark that as next, please. | |
| 25 | (Exhibit 0083-033 was marked for | 15:16:28 |

```
 1            identification.)                          15:16:28

 2   BY MR. CAMPORA:

 3        Q    Have you seen Exhibit 33 before, sir?   For

 4   the record, it's CDF-TUBBS 0008141.

 5        A    Yes.                                      15:16:56

 6        Q    This is something you wrote after the

 7   meeting that we just looked at on June 27th, 2018,

 8   correct?

 9        A    Um-hum.

10        Q    Yes?                                      15:17:04

11        A    Yes.

12        Q    And it indicates in here that you were

13   hoping that the information provided by PG&E

14   information would specifically include the currently

15   represented PG&E circuit maps requested on           15:17:15

16   June 28th, 2018, specifically, and then you list

17   them; is that right?

18        A    Yeah.  Those are the four we were just

19   talking about.

20        Q    Right.  Because they didn't give them to   15:17:25

21   you, right?

22        A    Right.

23        Q    This is an example of what you were

24   talking about earlier about parsing out information

25   or not being cooperative, true?                      15:17:30
```

Page 215

Veritext Legal Solutions
866 299-5127

```
1        A    Correct.                                    15:17:32

2             MR. CAMPORA:  Next, please.

3             (Exhibit 0083-034 was marked for

4        identification.)

5    BY MR. CAMPORA:                                      15:18:17

6        Q    Showing you what we've marked as

7    Exhibit 34, CDF-TUBBS 0034983, is this a document

8    you've seen before, sir?

9        A    Yes.

10       Q    At this point you're asking at least two     15:18:29

11   questions that you needed answers for, true?

12       A    Yes.

13       Q    And you were asking Chief Martinez to get

14   this information?

15       A    Yes.                                        15:18:38

16       Q    Is this information you had expected to

17   have earlier from PG&E?

18       A    Yes.

19       Q    And again, is this an example of being

20   given partial or parsing information?                15:18:46

21       A    Yes.  Notice I was asking where physically

22   is line recloser 734.  The circuit maps that we were

23   looking at earlier would have helped that a lot.

24       Q    Okay.  But they didn't give you those

25   circuit maps --                                      15:19:01
```

Page 216

```
 1        A    No.                                            15:19:02

 2        Q    -- did they?

 3        A    No.

 4        Q    Okay.

 5        A    It is not shown on the four circuit maps       15:19:04

 6   provided.

 7        Q    I understand, and I feel your pain, sir.

 8             Is the letter that we marked previously,

 9   to your knowledge, that was to Bruce Crane, did that

10   answer the questions you had in this letter, in this    15:19:33

11   memo on the -- on Exhibit 34?

12             MS. NORTH:  Objection.  Vague.

13             THE WITNESS:  I don't think it did.  I

14   think it was giving conclusions without the data

15   that I needed to get there myself.                      15:19:49

16   BY MR. CAMPORA:

17        Q    You would rather have the data so you

18   could do your own investigation rather than getting

19   conclusions from PG&E, true?

20        A    Correct.  But on their behalf, I              15:19:58

21   understand, through my own point of view -- in this

22   day and age, I understand that it's reasonable that

23   they protect the physical -- their physical plant

24   and its locations and stuff like that.

25        Q    They could make it confidential and give      15:20:17
```

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 86
of 105
Veritext Legal Solutions
866-299-5127

|   |   |   |   |
|---|---|---|---|
| 1 | Q | What day did you do that? | 14:20:42 |
| 2 | A | Probably the 18th or the 19th. | |

3      Q    You said earlier that the fuses were

4   replaced almost immediately.

5             Do you remember that?                    14:21:03

6      A    Yes.

7      Q    The fuses were replaced before you got

8   there, true?

9      A    Yes.

10     Q    And they were not only replaced, they were   14:21:07

11  closed so that they were back in place as if nothing

12  had occurred, true?

13     A    Correct.

14     Q    And when you were present on either the

15  14th, the 18th or the 19th, were there any PG&E        14:21:15

16  employees present?

17     A    There may have been.  I just -- I don't

18  recall seeing any.

19     Q    Did any PG&E employees come to you and

20  say, "Hey, there were fuses that blew on Pole 773.     14:21:30

21  We want to tell you about that"?

22     A    No.

23     Q    When you said it was almost missed, that's

24  because the fuses had been replaced and closed so it

25  wasn't obvious they had blown, true?                   14:21:46

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 87
of 105

Veritext Legal Solutions
866 299-5127

```
 1                MS. NORTH:  Objection.  Argumentative.        14:21:49

 2                THE WITNESS:  That was my assumption yes.

 3    BY MR. CAMPORA:

 4         Q    And nobody from PG&E, to your knowledge,

 5    told anybody from Cal Fire, at least in your          14:21:53

 6    presence, that the fuses had blown, true?

 7         A    Not in my presence.  That's right.

 8         Q    And no one told you directly from PG&E

 9    that those fuses had blown, true?

10         A    That's correct.                              14:22:02

11         Q    Is it your understanding, sir, that when a

12    troubleman comes to replace fuses that are blown,

13    one of the first things he or she needs to do is

14    determine why the fuse blew?

15                MS. NORTH:  Objection.  Calls for           14:22:13

16    speculation.

17                THE WITNESS:  I do not know what their

18    standard practices are.

19                MS. WINSOR:  Foundation.

20    BY MR. CAMPORA:                                        14:22:19

21         Q    As an electrical engineer, before you

22    restored a fuse, would you want to know why the fuse

23    had blown?

24                MS. WINSOR:  Speculation.

25                THE WITNESS:  Yes.                          14:22:31
```

Page 175

Veritext Legal Solutions
866-299-5127

```
 1    BY MR. CAMPORA:                                    14:22:31

 2         Q    As a matter of safety, true?

 3         A    Yes.

 4              (Exhibit 0083-022 was marked for

 5         identification.)                              14:22:33

 6    BY MR. CAMPORA:

 7         Q    Do you see this document, sir?

 8         A    Yes.

 9         Q    It starts with an e-mail --

10              MR. WONG:  Can we just pause until we get  14:22:57

11    the document?

12              MR. CAMPORA:  I just passed down copies.

13              MS. NORTH:  We don't have them here.

14              MR. CAMPORA:  Hand them one.

15         Q    The first page of this is an e-mail, and   14:23:08

16    it goes from the earlier e-mails on the bottom to

17    the later e-mails on the top.

18              Who's Ken Miller, sir?

19         A    Ken Miller is a private fire investigator.

20         Q    Did you know Mr. Miller before this?       14:23:20

21         A    Yes.

22         Q    There's an e-mail dated October 16th,

23    2017, at 10:24 a.m.  Is this an e-mail you received

24    from Ken Miller?

25         A    Yes.                                       14:23:38
```

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 89
of 105

# EXHIBIT 16

1       SUPERIOR COURT OF THE STATE OF CALIFORNIA

2            COUNTY OF SAN FRANCISCO

3

    ---------------------------------

4  Coordination Proceeding,   ) Case No. JCCP No. 4955

5  Special Title (Rule 3.550)  )

6                    )

7  CALIFORNIA NORTH BAY FIRE  )

8  CASES                 )

    ---------------------------------)

9

10

11

12

13    VIDEOTAPED DEPOSITION OF CAL FIRE DEPUTY CHIEF

14              JEREMY MONROE

15         Sacramento, California

16      Monday, September 30, 2019

17           Volume I

18

19

20  Reported by:

21  CATHERINE A. RYAN, RMR, CRR

22  CSR No. 8239

23  Job No. 3502290

24

25  PAGES 1 - 327

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 91
of 105

Veritext Legal Solutions
866-299-5127

| | | |
|---|---|---|
| 1 | MR. CAMPORA: Exhibit -- it's Witness 78 | 14:38:39 |
| 2 | Exhibit 23. | |
| 3 | Q   Were you given these photographs as part | |
| 4 | of your investigation, sir? | |
| 5 | A   No. | 14:38:47 |
| 6 | Q   Do you see on the -- the page that says | |
| 7 | DSC0097 JPEG -- JPG -- it's this picture? | |
| 8 | MS. WELCHANS: Last page? | |
| 9 | THE WITNESS: DSC0097? | |
| 10 | BY MR. CAMPORA: | 14:39:04 |
| 11 | Q   JPG, you have? | |
| 12 | A   JPG. | |
| 13 | Q   Do you see that? | |
| 14 | A   I do. | |
| 15 | Q   Okay.  Have you ever seen a blown fuse on | 14:39:08 |
| 16 | a power pole, sir? | |
| 17 | A   I have. | |
| 18 | Q   Were you given this photograph when you | |
| 19 | were doing your investigation? | |
| 20 | A   No. | 14:39:15 |
| 21 | Q   Were you told that, on Pole 773, at the | |
| 22 | site of 1128 Bennett Lane down by the road, there | |
| 23 | was a power pole with two blown fuses on it? | |
| 24 | A   I don't recall that. | |
| 25 | Q   Okay.  Is that information you would want | 14:39:27 |

Page 225

```
 1    to have in order to do an accurate assessment of a     14:39:29

 2    cause and origin?

 3        A    Yes.

 4        Q    Were you told by anyone that a PG&E

 5    repairman had gone in and replaced those fuses prior   14:39:37

 6    to Cal Fire doing their investigation?

 7        A    I do not recall that.  I did see some

 8    activity down there with power companies, but I did

 9    not recall any specifics of what they were doing.

10        Q    Okay.  And if you were doing a full         14:39:53

11    cause-and-origin investigation, one of the things

12    you would want to know is:  Why did those fuses

13    blow, true?

14        A    Correct.

15        Q    Because it could be an arcing on a line.     14:40:03

16    It could be a line down.  It could be a cause of a

17    source of ignition, true?

18        A    Potentially.

19        Q    Do you know if Cal Fire ever spent time to

20    determine why those fuses blew?                        14:40:11

21        A    That was not the scope of our

22    investigation.  I have no idea what the first

23    primary investigation had done, so I could not

24    testify to what -- what may or may not have been

25    done.                                                  14:40:24
```

Page 226

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 93
of 105

| | | |
|---|---|---|
| 1 | Q    And you didn't know the fuses had blown, | 14:40:25 |
| 2 | so you couldn't spend any time finding out why they | |
| 3 | blew, true? | |
| 4 | A    I did not know any of the electrical | |
| 5 | components of what -- what occurred there. | 14:40:33 |
| 6 | Q    Okay.  That would be important to know in | |
| 7 | determining both cause and origin, wouldn't it? | |
| 8 | A    It would be a data point that you would | |
| 9 | want to know. | |
| 10 | MS. CORDOVA:  Do you want this mark that | 14:40:48 |
| 11 | for this deposition, Steve? | |
| 12 | MR. CAMPORA:  No, I want to keep it -- | |
| 13 | MS. CORDOVA:  Keep it -- | |
| 14 | MR. CAMPORA:  -- the exhibit it is. | |
| 15 | MS. CORDOVA:  Okay. | 14:40:52 |
| 16 | MR. CAMPORA:  What's our next exhibit | |
| 17 | number, Madam Reporter? | |
| 18 | THE REPORTER:  I don't know. | |
| 19 | MR. CAMPORA:  What's our next exhibit -- | |
| 20 | MS. CORDOVA:  You're going to be at 19. | 14:41:06 |
| 21 | MR. CAMPORA:  And witness number? | |
| 22 | MS. CORDOVA:  0079. | |
| 23 | MS. WELCHANS:  19 or 18? | |
| 24 | MR. SMITH:  18. | |
| 25 | MS. CORDOVA:  18.  My apologies. | 14:41:15 |

Page 227

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 94
of 105

```
 1        A    We -- as far as actually looking at the        14:42:12

 2   power lines themselves, the conductor -- all the

 3   appliances, no.

 4        Q    So you don't know -- you can see in this

 5   photograph there are lines that -- in the picture       14:42:23

 6   that run along the roadway, and then there are lines

 7   that go up the hill.

 8             Do you see that?

 9        A    Correct.

10        Q    You never checked those conductors going       14:42:31

11   up the hill to find out if there was any arc marks

12   on those lines, did you?

13        A    We walked that section but were not able

14   to examine the entire power line.

15        Q    So you didn't have a bucket truck or           14:42:41

16   anything to go up and look at those lines?

17        A    No.

18        Q    So you don't know whether there was an

19   arcing on there that caused the fuses to blow, do

20   you?                                                     14:42:48

21        A    Do not know.

22        Q    That would be important information if you

23   were doing a cause-and-origin investigation,

24   wouldn't it?

25             MR. ORSINI:   Objection.   Vague.             14:42:53
```

Page 229

Veritext Legal Solutions
866-299-5127

| | | |
|---|---|---|
| 1 | MS. WELCHANS: Join. | 14:42:54 |
| 2 | THE WITNESS: But, there again, that | |
| 3 | wasn't the scope of what we were asked to do. | |
| 4 | MR. CAMPORA: I understand. | |
| 5 | Q But I'm just asking you: If you | 14:43:01 |
| 6 | discovered that there was arc marks on the two lines | |
| 7 | going up the hill and you knew that two fuses blew | |
| 8 | the pole downstream, that would be important | |
| 9 | information for you to have doing a cause -- for you | |
| 10 | to have doing a cause-and-origin investigation? | 14:43:12 |
| 11 | MR. ORSINI: Objection. Vague. | |
| 12 | MS. WELCHANS: Objection. Vague. | |
| 13 | THE WITNESS: Potentially. | |
| 14 | BY MR. CAMPORA: | |
| 15 | Q Pardon me? | 14:43:17 |
| 16 | A Potentially. | |
| 17 | Q Because that might be a cause of the fire, | |
| 18 | right? | |
| 19 | MS. WELCHANS: Objection. Vague. Calls | |
| 20 | for speculation. | 14:43:21 |
| 21 | THE WITNESS: That's just more data that | |
| 22 | you would have to collect to determine that. | |
| 23 | MR. CAMPORA: Sure. | |
| 24 | THE WITNESS: I'm not going to make | |
| 25 | assumptions. | 14:43:27 |

Page 230

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 96
of 105

```
 1    BY MR. CAMPORA:                                    14:43:28

 2        Q    But you'd want to know that because you'd

 3    want to examine this area, in particular, to see if

 4    there was indicators that the fire started there,

 5    wouldn't you?                                      14:43:35

 6            MR. ORSINI:  Objection.  Vague.  Calls for

 7    speculation.

 8            MS. WELCHANS:  Join.

 9            THE WITNESS:  Once again, that would be

10    more data that would be, obviously, worth having to 14:43:41

11    analyze.

12            MR. CAMPORA:  Sure.

13        Q    But you would want the data -- you would

14    want to know if there were arc marks on those lines

15    because then you could -- you would want to do a    14:43:52

16    specific investigation in that area to determine if

17    that was an origin site, wouldn't you?

18            MR. ORSINI:  Same objections.

19            MS. WELCHANS:  Same objection:  Vague.

20    Calls for speculation.                             14:44:00

21            THE WITNESS:  Potentially.

22    BY MR. CAMPORA:

23        Q    Well --

24        A    But, there again, it wasn't in the scope

25    of what we were asked to do.                       14:44:05
```

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20   Entered: 05/22/20 15:35:00   Page 97
of 105
Veritext Legal Solutions
866 299-5127

```
 1      Q     Right.                                      14:44:06

 2            Sir, I understand you had a very limited

 3      scope with limited data given -- you were given what

 4      information somebody wanted you to have.  I

 5      understand that completely.                        14:44:13

 6            But what I'm saying, sir, is that an

 7      experienced fire investigator -- if you're doing a

 8      fire investigation and you want to know what the

 9      cause of this fire is and you want to know where it

10      started, if you learned that there were arc marks on 14:44:24

11      those lines going up that hill, as an experienced

12      investigator, you'd want to know that because then

13      you would want to do an investigation to determine

14      if you could determine that was an area of origin,

15      wouldn't you?                                      14:44:35

16            MS. WELCHANS:  Same objection --

17            MR. ORSINI:  Same objections.

18            MS. WELCHANS:  -- calls for speculation.

19      Vague.

20            THE WITNESS:  Potentially.                   14:44:40

21      BY MR. CAMPORA:

22      Q     Why do you say "potentially"?  Isn't that

23      information you'd want to have?

24      A     Likely.

25      Q     Why do you condition it, sir?  Do you --     14:44:45
```

Page 232

Veritext Legal Solutions
866-299-5127

```
 1    is it something you don't want to know?              14:44:46

 2        A    No, that's --

 3        Q    You'd want to know, don't you?

 4        A    -- that -- that's data.

 5        Q    Okay.  And you'd want to have all the data  14:44:51

 6    so you could develop the hypothesis and then test

 7    the hypothesis, true?

 8        A    Correct.

 9             MS. CORDOVA:  Now you're on Exhibit 19.

10             MR. CAMPORA:  Oh, good.  You can't see       14:45:22

11    anything.  There we go.

12             I have two documents on this -- on this

13    drive that I'll mark as the next two exhibits, and

14    I'll give the court reporter a jump drive and

15    anybody else who wants a copy, okay?                  14:45:45

16             So the first one is labeled "Monroe

17    Exhibit," and this will be Exhibit --

18             MS. CORDOVA:  19.

19             MR. CAMPORA:  -- 19 to this deposition.

20             (Exhibit 0079-019 was marked for            14:46:02

21             identification.)

22    BY MR. CAMPORA:

23        Q    You told us earlier today that you had

24    watched the -- a video from the winery.

25             Do you remember that testimony?             14:46:07
```

Page 233

| | | |
|---|---|---|
| 1 | A    I do. | 14:46:08 |
| 2 | Q    Okay.  Did you ever see a shot in the | |
| 3 | daytime to see what could be seen on that camera? | |
| 4 | A    We did proceed to that location and try to | |
| 5 | get a perspective of what the -- the camera, | 14:46:18 |
| 6 | potentially, was seeing or that visual alignment. | |
| 7 | Q    Okay.  Well, if you see the top of that | |
| 8 | picture, that's a still shot, but that's from the | |
| 9 | video camera itself, so you could look at a -- at a | |
| 10 | picture in the daytime to see what was actually in | 14:46:31 |
| 11 | the picture, right? | |
| 12 | MR. ORSINI:  I'm sorry.  What's the | |
| 13 | question? | |
| 14 | THE WITNESS:  Yeah, say again. | |
| 15 | BY MR. CAMPORA: | 14:46:39 |
| 16 | Q    The -- my question is:  Did you actually | |
| 17 | go and say, "Can we see a still shot or a daytime | |
| 18 | picture of what's on the screen of your security | |
| 19 | camera so we can see what the scope of the -- of the | |
| 20 | picture is?" | 14:46:48 |
| 21 | A    We did go over there during the day time. | |
| 22 | We tried to align ourselves exactly the angle of | |
| 23 | where that camera was to get that same perspective. | |
| 24 | Q    You're not -- you're not understanding my | |
| 25 | question. | 14:46:59 |

Page 234

Case: 19-30088   Doc# 7500-1   First Legal Solutions   Filed: 05/22/20 15:35:00   Page
Visit www.firstlegal.com
866-299-5127
100 of 105

| | | |
|---|---|---|
| 1 | Your eyeballs have a different vision -- | 14:46:59 |
| 2 | field of vision than the camera. | |
| 3 | You understand that? | |
| 4 | A    I understand that. | |
| 5 | Q    Okay.  So did you ever ask the people at | 14:47:05 |
| 6 | the winery, "Can I see a daytime picture from your | |
| 7 | security camera so I can see what the field of | |
| 8 | vision is?" | |
| 9 | A    We did not.  Not that I recall. | |
| 10 | Q    Do you see what that picture shows? | 14:47:16 |
| 11 | MS. WELCHANS:  Can you maybe make it a | |
| 12 | little bigger, Steve. | |
| 13 | MR. CAMPORA:  Maybe.  We'll see. | |
| 14 | MS. WELCHANS:  Or just maximize the | |
| 15 | exhibit. | 14:47:24 |
| 16 | MR. CAMPORA:  Hang on.  Let's just do | |
| 17 | this.  That help? | |
| 18 | MR. ORSINI:  What's the question? | |
| 19 | BY MR. CAMPORA: | |
| 20 | Q    The question is:  Do you see the hill in | 14:47:35 |
| 21 | the background of that picture? | |
| 22 | A    It appears you can see some of the hill, | |
| 23 | but it looks like it's blurred out by the sun as | |
| 24 | well. | |
| 25 | Q    Okay.  Do you think that's the hill where | 14:47:49 |

Page 235

Case: 19-30088   Doc# 7500-1   Filed: 05/22/20 15:35:00   Page
First Legal Solutions
866-291-9127
101 of 105

```
 1    not.                                                14:49:37

 2           Do you see that?

 3       A    According to this diagram, that appears to

 4    be correct.

 5       Q    And the Zink home, up on the right-hand     14:49:41

 6    hill, is clearly not in the field of vision for the

 7    camera, true?

 8       A    According to the blue lines, it appears to

 9    be outside the scope of the camera.

10       Q    Okay.  Now, you were asked, earlier today,  14:49:53

11    whether or not -- or strike that.

12           You said, earlier today, when you watched

13    the video, you didn't see a flash, and when you said

14    the video, you were talking about the video from the

15    winery.                                             14:50:08

16           Do you remember that?

17           MR. ORSINI:  Objection.  Mischaracterizes

18    his testimony.

19           THE WITNESS:  I don't recall seeing a

20    flash.                                              14:50:13

21           MR. CAMPORA:  Okay.  Well, let's watch

22    this one.  This is a clip taken from the video.  And

23    I want you to watch it and tell me if you see a

24    flash.

25           (Video played.)                              14:50:40
```

Page 238

Case: 19-30088   Doc# 7500-1   First Legal Solutions   Filed: 05/22/20 15:35:00   Page
102 of 105
1866-29-9127

| | | |
|---|---|---|
| 1 | BY MR. CAMPORA: | 14:50:46 |
| 2 | Q    Okay.  Did you see a flash? | |
| 3 | A    I did. | |
| 4 | Q    Did anyone tell you, when you were doing | |
| 5 | your work, that they had a video that showed a flash | 14:50:49 |
| 6 | at 9:20 and 52 seconds? | |
| 7 | A    Not that I recall. | |
| 8 | Q    Did anyone tell you that the fuses on the | |
| 9 | pole that -- blew when the power went out at about | |
| 10 | 9:20 and 52 seconds? | 14:51:07 |
| 11 | A    I don't recall that information. | |
| 12 | Q    That's information you'd want to have, | |
| 13 | isn't it? | |
| 14 | MR. ORSINI:  Objection.  Vague. | |
| 15 | MS. WELCHANS:  Join. | 14:51:14 |
| 16 | THE WITNESS:  Certainly that's more data. | |
| 17 | MR. CAMPORA:  Sure. | |
| 18 | Q    And that flash could be an arcing on the | |
| 19 | line, couldn't it? | |
| 20 | A    Potentially. | 14:51:22 |
| 21 | Q    You understand that when a -- those | |
| 22 | lines -- when there's an arcing or a fault on the | |
| 23 | line, there's a big flash. | |
| 24 | Do you understand that? | |
| 25 | A    I do. | 14:51:29 |

Page 239

Veritext Legal Solutions
866 299-5127

```
 1        Q      Do you understand those lines are 12,000      14:51:30

 2   volts, right?

 3        A      Correct.

 4        Q      Okay.  And as far as you know, sitting

 5   here today, Chief Martinez never told you that they     14:51:39

 6   had both a pole with blown fuses and a video that

 7   showed a flash, did he?

 8        A      No, not that I can recan call -- recan --

 9   recall specific to that information.

10        Q      That's just a picture of it, and you can      14:51:58

11   see the time on the top of the picture, if you want

12   to get closer?

13              MR. ORSINI:  "It" being the flash, Steve?

14              MR. CAMPORA:  The flash.

15        Q      Did anyone --                                 14:52:30

16              Here, you can go back.

17              MS. CORDOVA:  Yep.

18   BY MR. CAMPORA:

19        Q      You were shown this photograph earlier

20   today.  It was taken by --                               14:52:45

21              MS. WELCHANS:  Steve, can I get a copy?

22   BY MR. CAMPORA:

23        Q      -- Officer Hoskins.

24              MS. WELCHANS:  I just don't want to get in

25   your video.                                              14:52:54
```

Page 240

Case: 19-30088   Doc# 7500-1   Veritext Legal Solutions   Filed: 05/22/20 15:35:00   Page
186 of 295   800.227.8127

| | |
|---|---|
| 1 | <u>**PROOF OF SERVICE**</u> |
| | **California North Bay Fire Cases** |
| 2 | **Case No. JCCP No. 4955** |
| 3 | At the time of service, I was over 18 years of age and not a party to this action. I am |
| 4 | employed in the county where the mailing took place. My business address is 650 California Street, 26th Floor, City and County of San Francisco, CA 94108-2615. |
| 5 | On the date set forth below, I caused to be served true copies of the following document(s) described as: |
| 6 | |
| 7 | **DECLARATION OF STEVEN CAMPORA IN SUPPORT OF OPPOSITION TO PG&E'S MOTION FOR A PROTECTIVE GAG ORDER AGAINST PUBLICITY** |
| 8 | to: |
| 9 | |
| 10 | **BY ELECTRONIC SERVICE::** I electronically served the document(s) described above on the interested parties in this action pursuant to the most recent Omnibus Service List by |
| 11 | submitting an electronic version of the document(s) via file transfer protocol (FTP) to CaseHomePage through the upload feature at www.casehomepage.com. |
| 12 | I declare under penalty of perjury under the laws of the State of California that the |
| 13 | foregoing is true and correct. |
| 14 | Executed on October 17, 2019, at San Francisco, California. |
| 15 | |
| 16 | |
| 17 | _____ |
| | Ashley Freeman |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

DECLARATION OF STEVEN CAMPORA IN SUPPORT OF OPPOSITION TO PG&E'S MOTION FOR A PROTECTIVE GAG ORDER AGAINST PUBLICITY