**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
55 S Market Street, Suite 1420
San Jose, CA 95113
Telephone: 408-971-6270
Facsimile: 408-971-6271
Email: kdiemer@diemerwei.com

**WILLKIE FARR & GALLAGHER LLP**
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
       jminias@willkie.com
       bmccallen@willkie.com
       dforman@willkie.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>     -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>            **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the lead case, No. 19-30088 (DM)* | Chapter 11<br>Bankr. Case No. 19-30088 (DM)<br>(Jointly Administered)<br><br>**THE AD HOC GROUP OF SUBROGATION CLAIM HOLDERS' OMNIBUS REPLY TO PLAN CONFIRMATION OBJECTIONS**<br><br>Date:   May 27, 2020<br>Time:  10:00 a.m. (PT)<br>Place:  United States Bankruptcy Court<br>          Courtroom 17, 16th Floor<br>          San Francisco, CA 94102 |

The Ad Hoc Group of Subrogation Claim Holders (the "**Ad Hoc Subrogation Group**") in the above-captioned chapter 11 cases of PG&E Corporation and Pacific Gas and Electric Company (collectively, the "**Debtors**"), by its attorneys Willkie Farr & Gallagher LLP and Diemer & Wei, LLP, hereby submits this reply (the "**Reply**") to certain objections to confirmation of the Plan (collectively, the "**Objections**").[1] In support of this Reply, the Ad Hoc Subrogation Group respectfully represents as follows:

## PRELIMINARY STATEMENT

Since these chapter 11 cases began sixteen months ago, the parties in interest have worked tirelessly to negotiate a confirmable plan of reorganization supported by all major stakeholder constituencies, but especially victims of the devastating 2017 and 2018 Northern California wildfires. These efforts have not been in vain. After months of litigation in multiple courtrooms, countless hours of mediation, and hard-fought negotiations, the Debtors and Shareholder Proponents begin the confirmation proceedings with a plan of reorganization that is overwhelmingly supported by the Debtors' constituents and satisfies the confirmation requirements of 11 U.S.C. § 1129.

The tenor of these chapter 11 cases was very different less than a year ago in the summer of 2019. In early July, the Ad Hoc Subrogation Group and Official Committee of Tort Claimants ("**TCC**") filed motions seeking to lift the automatic stay so that a California jury could determine the Debtors' liability for the devastating 2017 Tubbs Fire. Also in July, the Debtors moved to estimate billions of dollars in liability for wildfire claims in expedited proceedings pursuant to 11 U.S.C. § 502(c), which ultimately were withdrawn to the District Court. Subsequently, the Ad Hoc Subrogation Group and a group of the Debtors' noteholders separately moved to terminate the Debtors' exclusive right to file a proposed plan of reorganization, and thus eliminate the Debtors' exclusive control over the plan process. These motions and proceedings along with the June 30, 2020 plan confirmation deadline imposed by A.B. 1054 placed considerable pressure on the Debtors and interested parties to make progress quickly.

---

[1] Capitalized terms used but not defined shall have the meanings ascribed in the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (the "**Plan**") [Docket No. 6320].

1

The Debtors and Ad Hoc Subrogation Group worked around the clock to achieve a prompt compromise, negotiating and executing the Subrogation Claims RSA, one of the cornerstones of the current Plan. The Subrogation Claims RSA resolved over $20 billion in potential unsecured claims, arising from over $15 billion of payments that Ad Hoc Subrogation Group members had already made to insured victims of the 2017 and 2018 wildfires, and billions more in reserves on account of potential future payments to insureds, and fees and interest. The Subrogation Claims RSA settled those claims at a steep discount in exchange for an aggregate $11 billion allowed claim, which would be paid in cash under the Debtors' plan. This steeply-discounted settlement helped ensure the Debtors' estates would remain solvent, all parties would get a fair settlement, and that the Debtors would meet the A.B. 1054 deadline.

The fairness of these settlements has not been lost on the actual holders of wildfire claims. The three classes of wildfire claims have voted overwhelmingly in favor of the Plan.[2] The tremendous support of the Plan is not surprising. In addition to culminating months of grueling effort on behalf of all parties, the Plan comfortably satisfies the Bankruptcy Code's Section 1129 confirmation standards. Most critically, the Plan provides for the satisfaction of the claims of individual wildfire victims, many of whom have suffered unimaginable tragedies, in a manner that has the overwhelming support of that class. While the TCC has objected to certain aspects of the Plan, that objection should be viewed in the context of an overwhelming majority of voting individual fire victims supporting the Plan. This Court should abide by the will of the Debtors' stakeholders, find the Section 1129 confirmation standards are satisfied, and confirm the Plan.

## ARGUMENT

The Ad Hoc Subrogation Group joins in the Debtors' brief in support of confirmation, and addresses below five discrete issues raised in various Objections related to Subrogation Wildfire Claims. For the reasons set forth below and in the Debtors' brief in support of confirmation, the TCC Objection, and all other Objections relating to the Plan's treatment of Subrogation Wildfire Claims

---

[2] On May 18, the Debtors issued a press release stating that the preliminary voting results on the Plan indicated "overwhelming acceptance of the Plan by the wildfire victims entitled to vote on the Plan." *See PG&E Corporation Announces Preliminary Voting Results in Plan of Reorganization*, May 18, 2020.

or their holders are without merit and should be overruled.

A. <u>The Definition Of Subrogation Wildfire Claim In The Plan Is Consistent With The RSAs</u>

The TCC's Objection with respect to the definition of "Subrogation Wildfire Claim" is meritless. A blackline highlighting the change in the current definition of "Subrogation Wildfire Claim" was filed prior to the March 10 disclosure statement hearing. *See* Dkt. No. 6218.[3] The amended definition of which the TCC now complains was prompted by arguments it raised in its objection to claims filed by Adventist Health System ("**Adventist**"). *See* Dkt. No. 5760. Specifically, the TCC argued that Adventist – which is a victim and not an insurer – should recover from the Subrogation Wildfire Trust to the extent Adventist retained any rights to insurance proceeds. The TCC's view was that Adventist was somehow simultaneously pursuing its own claims and the subrogation claims of its own insurer. *See* Dkt. No. 5760 at *6 ("Adventist Health may contend that it has an obligation to collect a distribution on its wildfire claim in the full amount of its wildfire losses, and then turn over the insurer's share of the distribution to the insurer, FM Global, in which Adventist Health may be a policyholder owner."). By the TCC's logic, this argument could presumably be applied to any other similarly situated fire victim with insurance, raising the threat of wholesale reclassification of creditors.

Of course, this was never the parties' understanding, and in fact the exact opposite was represented to the Court on multiple occasions when the TCC and other parties stated that Adventist was a Fire Victim that would recover from the Fire Victim Trust. *See* Dec. 17, 2019 Hr'g Tr. 152:4-22 (TCC counsel stating that Adventist would share in the TCC's settlement, and that to "the extent . . . the TCC did not include [Adventist] in the mediation process, . . . there was not any intent to leave Adventist out of a very difficult settlement"); *id.* 146:13-147:3 (counsel for Adventist stating without objection from the TCC that its claim would be against "the big trust" or "the thirteen-and-

---

[3] The TCC should be precluded from objecting to the definition of "Subrogation Wildfire Claim" based on its failure to raise this issue prior to the approval of the Disclosure Statement. Despite the revised definition being filed on March 10, the TCC did not object to the clarification at the hearing later that day, or in the week following when the Debtors were finalizing the eventually approved Disclosure Statement. In fact, the TCC only objected to the definition of "Subrogation Wildfire Claim" in a letter sent to the Subrogation Group on March 24, a full ten days after the clarifying definition has been proposed and subsequently approved by the court.

3

a-half-billion-dollar trust"); *id.*. 163:1-4 (counsel for the California government agencies likening their claims to Adventist, as another "very large claim[]" that is "going to be part of this fire victim trust."). Even Adventist described the TCC's position that Adventist's claims "should be classified not as a Fire Victim Claim, but as a Subrogation Wildfire Claim" as "nonsense" because "[t]he Adventist Claimants are victims of the Debtors' wrongdoing and seek to recover for their own injuries, [they are] not an insurer pressing a subrogation claim for amounts paid to its insured." *See* Dkt. No. 6174 at *9.

The change to the Plan's definition of Subrogation Wildfire Claim simply clarified that Fire Victims, like Adventist, should assert their claims against the Fire Victim Trust, and insurers (and their assignees) should assert their claims against the Subrogation Trust. The clarifying change to the definition was critical to preventing the TCC from attempting to inappropriately shift billions of dollars in individual Fire Victim claims into the Subrogation Wildfire Trust. Thus, the relevant change in the definition was made in direct response to meritless arguments the TCC advanced in contravention of the clear terms of both the Subrogation Claims RSA and Tort Claimants RSA, the then-proposed Plan and prior statements to the Court. Ultimately, however, this Court need not address whether the definition of "Subrogation Wildfire Claim" approved in the Disclosure Statement contradicts the Tort Claimants RSA. The Ad Hoc Subrogation Group takes no issue with the TCC's proposed solution to its own objection—*i.e.* approving the Fire Victim Trust's right to set off insurance recoveries.[4]

Insurers will continue to honor their contractual obligations to their insureds, as they have since the moment the tragic wildfires first affected the Fire Victims. However, the TCC's arguments that the "Subrogation RSA expressly provides for payment by the Debtors of insured claims that the Insurers have reserved for payment but have not yet paid," and that the reserves "remain the legal obligation of the Insurers" *TCC Objection* at *26, mischaracterize the Subrogation

---

[4] The Ad Hoc Subrogation Group has reserved the rights of insurers with respect to a separate issue related to Fire Victim insurance and the Fire Victim Trust – and that is with respect to any purported assignment of Fire Victim's entitlements to insurance proceeds, as further described in the reservation of rights the Ad Hoc Subrogation Group filed prior to the deadline to object to the Plan. *See* Dkt. No. 7258.

4

1  Claims RSA and misconstrue the meaning of reserves. The insurance reserves referenced in the
2  Subrogation Claims RSA do not represent obligations to policyholders, as the TCC disingenuously
3  suggests. Reserves are estimates of claims to be paid in the future. *See* Subrogation Claims RSA,
4  Dkt. No. 296-3 Ex. A at 5 (defining Reserved Claims as "***projected*** payments relating to Subrogation
5  Claims reserved but not paid, as of the date of measurement")(emphasis added); *see also Lipton v.
6  Superior Court*, 48 Cal. App. 4th 1599, 1612-1613 (1996) (reserves "represent the amount anticipated
7  to be sufficient to pay all obligations for which the insurer may be responsible under the policy with
8  respect to a particular claim . . . a particular reserve amount may be substantially more or less than
9  the amount ultimately paid on a particular claim."). When and to the extent those reserves mature
10 into claims that are due and owing, those claims will be paid, just as billions of dollars in claims have
11 already been paid by insurers to fire victims.

B. <u>The Classification Scheme in the Debtors' Plan is Proper</u>

Two objecting parties incorrectly argue that the Plan's classification scheme—which separately classifies Subrogation Wildfire Claims, Fire Victim Claims and Public Entities Wildfire Claims—renders the Plan non-confirmable because it purportedly does not provide "the same treatment for each claim or interest of a particular class" under Section 1123(a)(4). *See* Dkt. No. 7194; Dkt. No. 7316. Under Ninth Circuit law, plan proponents are given broad discretion to classify claims. *See In re City of Stockton, California*, 542 B.R. 261, 280 (9th Cir. B.A.P. 2015) ("Generally, § 1122 allows plan proponents broad discretion to classify claims and interests according to the particular facts and circumstances of each case."). Courts have held that a plan of reorganization can separately classify different groups of unsecured creditors when there is a "legitimate business or economic reason" for doing so. *In re Barakat*, 99 F.3d 1520, 1526 (9th Cir. 1996).

Here, the special nature of Fire Victim Claims was recognized at the very start of these chapter 11 cases. The United States Trustee appointed a separate Official Tort Claimants Committee consisting solely of holders of Fire Victim Claims and their representatives to represent the interests of holders of such claims. No holder of Subrogation Wildfire Claims was included on that committee, and the holders of such claims have formed their own, separate Ad Hoc Group. Moreover, there are

5

any number of legitimate reasons for the Debtors' decision to separately classify Subrogation Wildfire Claims from other classes of unsecured wildfire claims, including (i) that the Debtors have historically reached separate settlement agreements with subrogation claimholders, and (ii) the fact that the Subrogation Wildfire Claims arise from the unique legal doctrine of subrogation, which allows third parties (rather than the underlying injured party) to collect against a tortfeasor. Indeed, multiple courts have found that asserting subrogation rights alone may be reason enough to separately classify otherwise similar claims. *See, e.g. In re Chateaugay, Corp.*, 89 F.3d 942 (2d Cir. 1996) (affirming a bankruptcy court ruling to separately classify insurance subrogation claims based on paid workers' claims from the remaining unpaid workers' directly-asserted claims); *see also In re Montreal Maine & Atlantic Railway, Ltd.*, 2015 WL 7431192 (Bankr. D. Me. Oct. 9, 2015) (confirming a plan in which subrogation claims were separately classified); *In re Mesa Air Group, Inc.*, 2011 WL 182450 (Bankr. S.D.N.Y. Jan. 20, 2011) (same).

Because the Subrogation Wildfire Claims and Fire Victim Claims are permissibly separately classified, the relative treatment of those two separate classes is not governed by Section 1123(a)(4)'s same treatment within a class requirement. The comparative treatment of creditors in separate classes of unsecured claims becomes an issue only when one of the two classes rejects the plan, in which event the "cram down" requirement of Section 1129(b)(1) that the plan "does not discriminate unfairly" with respect to the dissenting class comes into play. Since both classes (Subrogation Wildfire Claims and Fire Victim Claims) have accepted the Plan (and by overwhelming margins), their comparative treatment simply is not a confirmation issue. It is of no consequence that the Subrogation Wildfire Trust and the Fire Victim Trust—which are established to pay different classes of claims—are funded with different mixes of currency. At bottom, the Objections arguing for reclassification are an expression of claimants' displeasure that the Fire Victim Trust is partially funded with Reorganized HoldCo stock. But this is not a valid objection and, in any event, is obviated by the fact that the Fire Victims have now voted overwhelmingly to support the Plan with full disclosure of its terms. Simply put, these objectors should not be allowed to repackage their "no" vote as an objection to classification and thereby override the will of the supermajority of individual

Fire Victims that have voted in favor of the Plan.

C. The Made Whole Release is a Permissible, Voluntary Release

In its Objection, the International Church of the Foursquare Gospel alone argues that the Plan's Mutual Made Whole Release imposes an impermissible third party release on individual wildfire victims who will recover from the Fire Victim Trust. *See* Docket No. 7308 ("**Objection of the Church of the Foursquare Gospel**"). That objection should be overruled. Section 4.25(f)(ii) of the Plan—which incorporates a critical term of the Subrogation Claims RSA—requires that "any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim" will be conditioned upon the claimant's execution of the Mutual Made Whole Release. The Plan includes as Exhibit C the form Mutual Made Whole Release that was negotiated by the Ad Hoc Subrogation Group, the TCC, and the same counsel for the Fire Victims who executed the Tort Claimants RSA. Critically, the settlement with the Ad Hoc Subrogation Group only requires a Mutual Made Whole Release from those Fire Victims that settle with the Fire Victim Trust. The Court previously considered, and expressed approval for, the Mutual Made Whole Release when the RSAs were approved, stating at the December 17 hearing that the Court was ". . . satisfied that the way the RSAs have played out with the releases that they're permissible under the [sic] both documents." Dec. 17, 2019 Hr'g Tr. 295:7-25. Accordingly, the Objection of the Church of the Foursquare Gospel should be overruled.

D. Exculpated Parties Need Not Be Limited To Estate Fiduciaries

This Court should also overrule the U.S. Trustee's Objection that the Plan's definition of Exculpated Parties should be limited to estate fiduciaries. It is appropriate for a plan to extend similar protection to other stakeholder groups that play a key role in the plan negotiations and the reorganization. Courts in the Ninth Circuit have recognized that exculpation clauses are valuable tools, particularly in contentious cases, such as these chapter 11 cases. *See In re Fraser's Boiler Serv., Inc.,* 593 B.R. 636, 639 (Bankr. W.D. Wash. 2018). Moreover, plans of reorganization may provide exculpation to parties beyond estate fiduciaries and their professionals. *See e.g. In re Newzoom Inc.* (Bankr. N.D. Cal.) Case No. 15-31141 (HB) (providing limited exculpation to

1  creditors). Section 10.8 of the Plan is narrowly tailored and limits the actions Consenting Creditors are exculpated from to actions in these chapter 11 cases (*e.g.* negotiating the Subrogation Claims RSA, Subrogation Wildfire Trust Agreement). Given the historic complexity of these chapter 11 cases and the critical role played by Consenting Creditors, the Plan's limited exculpation provisions should be approved.

E. The Subrogation Wildfire Trustee Can Interpret Plan Provisions Without Seeking Court Approval

Finally, to the extent there are any Objections with respect to the Subrogation Wildfire Trustee's ability to interpret provisions of the Plan relating to Subrogation Wildfire Claims or the Subrogation Wildfire Trust, such Objections should be overruled. *See, e.g.*, Dkt. Nos. 7281, 7339. Provision (k) in the Plan's "Interpretation; Application of Definitions and Rules of Construction" Section gives the Subrogation Wildfire Trustee the ability to interpret certain Plan provisions and the Subrogation Wildfire Trust documents without needing to seek court approval. Notably, (i) no holders of Subrogation Wildfire Claims have objected to this provision, so those objecting lack proper standing to raise the issue, and (ii) Section 11.1(i) of the Plan ensures that the Subrogation Wildfire Trustee could seek Bankruptcy Court guidance to the extent disputes arise relating to the interpretation of the Plan. Giving deference to the Subrogation Wildfire Trustee on matters of interpretation will not prejudice parties that do not hold Subrogation Wildfire Claims, will help limit post-confirmation litigation (and the associated depletion of trust assets available for beneficiaries) and ensure that distributions are made on account of Subrogation Wildfire Claims as quickly as possible.

## CONCLUSION

For the foregoing reasons and as addressed in the Debtors' brief in support of confirmation, all objections to confirmation of the Plan should be overruled, and the Plan should be confirmed.

Dated: May 22, 2020

**WILLKIE FARR & GALLAGHER LLP**

*/s/ Benjamin P. McCallen*
Matthew A. Feldman (*pro hac vice*)
Joseph G. Minias (*pro hac vice*)
Benjamin P. McCallen (*pro hac vice*)
Daniel I. Forman (*pro hac vice*)
787 Seventh Avenue
New York, NY 10019-6099
Telephone: (212) 728-8000
Facsimile: (212) 728-8111
Email: mfeldman@willkie.com
jminias@willkie.com
bmccallen@willkie.com
dforman@willkie.com

**DIEMER & WEI, LLP**
Kathryn S. Diemer (#133977)
55 S Market Street, Suite 1420
San Jose, CA 95113
Telephone: (408) 971-6270
Facsimile: (408) 971-6271
Email: kdiemer@diemerwei.com

*Counsel for Ad Hoc Group of Subrogation Claim Holders*