WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>     **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                          **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case) (Jointly Administered)<br><br>**DECLARATION OF JASON P. WELLS IN**<br>**SUPPORT OF CONFIRMATION OF DEBTORS'**<br>**AND SHAREHOLDER PROPONENTS' JOINT**<br>**CHAPTER 11 PLAN OF REORGANIZATION** |

*(left margin, vertical text)* **Weil, Gotshal & Manges LLP** — 767 Fifth Avenue — New York, NY 10153-0119

1

Pursuant to 28 U.S.C. § 1746, I, Jason P. Wells, hereby declare as follows under penalty of perjury:

1.    I am Executive Vice President and Chief Financial Officer for PG&E Corporation ("**PG&E Corp.**").[1]  My responsibilities include overseeing the financial activities of the enterprise, including accounting, treasury, tax, risk, business and financial planning, and investor relations.  Since 2007, I have held various positions at PG&E Corp. and Pacific Gas and Electric Company (the "**Utility**," and together with PG&E Corp., the "**Debtors**" or "**PG&E**"), including Director of Technical Accounting; Senior Director of Corporate Accounting and Assistant Controller; Vice President, Finance; Vice President, Business Finance; and Senior Vice President and Chief Financial Officer.  I have served as Chief Financial Officer of PG&E Corp. since January 2016 and in my current position at PG&E Corp. since June 2019.    Before joining PG&E, I was a senior manager at PricewaterhouseCoopers LLP.  I hold Bachelor of Science and Master of Science degrees in accounting from the University of Florida and I am a certified public accountant in the state of Florida.  I also have completed the Reactor Technology Course for Utility Executives at the Massachusetts Institute of Technology.

2.    I submit this Declaration (the "**Declaration**") in support of confirmation of the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* [Docket No. 6320] (as it may be amended, modified or supplemented, and together with any exhibits or schedules thereto, the "**Plan**").  Together with the Debtors' counsel and advisors, I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the Proposed Confirmation Order, the Memorandum, and the requirements for confirmation of the Plan pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

3.    Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, my review of relevant documents and the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan (as defined below) or the *Plan Proponents' Joint Memorandum of Law and Omnibus Reply in Support of Confirmation of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (the "**Memorandum**"), filed contemporaneously herewith, as applicable.

Debtors' books and records, my discussions with other members of the Debtors' senior management, the Debtors' legal advisors, or other professionals, information provided to me by employees working under my supervision or other employees of the Debtors, my opinion based upon my experience and knowledge related to the Debtors' operations, businesses, and financial condition of the Debtors, or upon information supplied to me by the Debtors' other professionals and advisors. If I am called upon to testify, I would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

4. Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in my prior declarations, including: the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263]; the *Declaration of Jason P. Wells in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors to Enter into Restructuring Support Agreement with the Consenting Subrogation Claimholders, (II) Approving the Terms of Settlement with Such Consenting Subrogation Claimholders, Including the Allowed Subrogation Amount, and (III) Granting Related Relief* [Docket No. 3993]; the *Declaration of Jason P. Wells in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Authorizing the Debtors and TCC to Enter Into Restructuring Support Agreement With the TCC, Consenting Fire Claimant Professionals, and Shareholder Proponents and (II) Granting Related Relief* [Docket No. 5039]; and the *Declaration of Jason P. Wells in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 363(b) and 105(a) and Fed. R. Bankr. P. 6004 and 9019 for Entry of an Order (I) Approving and Authorizing the Debtors to Enter Into Restructuring Support Agreement With Consenting Noteholders and Shareholder Proponents, and (II) Granting Related Relief* [Docket No. 5520], all of which I incorporate herein by reference.

## I.      The Plan

5. PG&E commenced these Chapter 11 Cases on January 29, 2019 in light of the extraordinary challenges that it faced relating to the catastrophic wildfires of 2017 and 2018 in Northern

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

California. Over the last sixteen months, PG&E and its advisors have worked, and continue to work, diligently, constructively, and in good faith with all relevant stakeholders, regulators, and other parties in interest to satisfactorily address the Claims against and Interests in the Debtors. As reflected in the terms of the Plan, the result of these efforts is a largely consensual, comprehensive, global restructuring that fairly and equitably addresses all of the Fire Victim Claims and other prepetition claims and equity interests, maximizes value for all parties in interest, allows the Debtors to access the Go-Forward Wildfire Fund, and ensures that the Utility will be positioned to deliver safe, clean, and reliable energy to its customers.

6. The Plan has the overwhelming support of the Fire Victims – having been accepted by more than 85% in number and amount of holders of Fire Victim Claims that have submitted valid votes on the Plan. I have been advised that the Plan has been accepted by all but one of the other classes of impaired creditors and interest holders (collectively, the "**Voting Classes**"). The sole dissenting Class, Class 10A-II, consists of holders of prepetition securities law claims related to PG&E Corp. Common Stock, which claims, I am advised, are subordinated pursuant to the provisions of the Bankruptcy Code.

7. The Plan Proponents have successfully secured support for confirmation of the Plan of the following constituencies among others:

- The Governor's Office, which has stated that the Plan is compliant with AB 1054, including in the submission to this Court [D.I. 6402 ¶ 6];

- As stated above, an overwhelming majority of the holders of Fire Victim Claims who voted to accept the Plan, including, the consideration to be transferred to the Fire Victim Trust as provided in the Plan;

- Several Public Entities in the areas in which the wildfires occurred (the "**Public Entities**");

- The Ad Hoc Group of Subrogation Claim Holders, consisting of major holders of claims arising from insurance payments made to victims in connection with the wildfires (the "**Ad Hoc Subrogation Group**");

- The Debtors' public shareholders; and

- The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company, consisting of major holders of the Utility's outstanding prepetition funded debt claims (the "**Ad Hoc Noteholders Committee**").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

8. In addition, the California Public Utilities Commission (the "**CPUC**") has issued a proposed decision that would find the Plan, with the commitments and conditions required by the CPUC, complies with AB 1054. I understand that the CPUC is expected to vote on the proposed decision on May 28, 2020.

9. A central component of the Plan is approximately $47.1 billion of capital to be provided through any combination of the Plan Financing Sources, which consists of, among other things, new credit facilities, new debt securities issued by the Debtors, new PG&E Corp. common stock, reinstatement of certain of the Utility's prepetition debt, and the exchange of certain of the Utility's prepetition debt for new debt.[2] The capital resulting from the Plan Financing Sources will allow the Debtors to timely consummate the Plan, and will position them as a stronger utility for years to come.

10. A discussion of each of the requirements for confirmation of the Plan under the Bankruptcy Code and the facts that demonstrate the satisfaction by the Plan and the Plan Proponents of each of the requirements and achievement of the objectives of chapter 11 is set forth below.

## II. Sections 1129(a)(1) and 1122: The Classification of Claims and Interests Under the Plan

11. <u>Section 1129(a)(1)</u>. Based on my review and understanding of the Plan, the events that have occurred prior to and during the Debtors' Chapter 11 Cases, and discussions I have had with the Debtors' advisors regarding the requirements of the Bankruptcy Code, the Plan appropriately classifies the Claims against and Interests in the Debtors, contains all required provisions, and otherwise satisfies all of the applicable requirements of the Bankruptcy Code as I understand them.

### A. The Plan's Classification Structure

12. <u>Section 1122(a)</u>. Article III of the Plan designates the following thirty-four (34) Classes of Claims against and Interests in the Debtors: Class 1A (HoldCo Other Secured Claims); Class 1B

---

[2] The approximately $47.1 billion of Plan Financing Sources is composed of a combination of the following expected sources: $9 billion from issuance of PG&E Corp. common stock, $4.75 billion of new PG&E Debt, $9.575 billion in Reinstated Utility Debt, and $23.775 new Utility Notes. In addition, as set forth in the Financial Projections, the Debtors project total sources of funding of approximately $59 billion, which includes the approximately $47.1 billion of estimated Plan Financing Sources, $6.75 billion in equity (issued at the Fire Victim Equity Value as provided in the Plan) transferred to the Fire Victims Trust, $2.2 billion in Insurance Proceeds, $1.6 billion in Cash, and $1.35 billion in the deferred Cash payments to be made to the Fire Victims Trust under the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(Utility Other Secured Claims); Class 2A (HoldCo Priority Non-Tax Claims); Class 2B (Utility Priority Non-Tax Claims); Class 3A (HoldCo Funded Debt Claims); Class 3B-I (Utility Impaired Senior Note Claims); Class 3B-II (Utility Reinstated Senior Note Claims); Class 3B-III (Utility Short-Term Senior Note Claims); Class 3B-IV (Utility Funded Debt Claims); Class 3B-V (Utility PC Bond (2008 F and 2010 E) Claims); Class 4A (HoldCo General Unsecured Claims); Class 4B (Utility General Unsecured Claims); Class 5A-I (HoldCo Public Entities Wildfire Claims); Class 5A-II (HoldCo Subrogation Wildfire Claims); Class 5A-III (HoldCo Fire Victim Claims); Class 5A-IV (HoldCo Ghost Ship Fire Claims); Class 5B-I (Utility Public Entities Wildfire Claims); Class 5B-II (Utility Subrogation Wildfire Claims); Class 5B-III (Utility Fire Victim Claims); Class 5B-IV (Utility Ghost Ship Fire Claims); Class 6A (HoldCo Workers' Compensation Claims); Class 6B (Utility Workers' Compensation Claims); Class 7A (HoldCo Environmental Claims); Class 7B (2001 Utility Exchange Claims); Class 8A (HoldCo Intercompany Claims); Class 8B (Utility Environmental Claims); Class 9A (HoldCo Subordinated Debt Claims); Class 9B (Utility Intercompany Claims); Class 10A-I (HoldCo Common Interests); Class 10A-II (HoldCo Rescission or Damage Claims); Class 10B (Utility Subordinated Debt Claims); Class 11A (HoldCo Other Interests); Class 11B (Utility Preferred Interests); and Class 12B (Utility Common Interests). The following describes in more detail the principal classes.

13. **General Unsecured Claims.** The General Unsecured Claims (Classes 4A and 4B) arise from ongoing commercial vendor and supplier relationships and numerous other causes of action. In the context of these Chapter 11 Cases, the General Unsecured Claims involve relatively small dollar amounts. The General Unsecured Claims include ordinary course trade and supplier claims, employee and customer claims, breach of contract and other similar normal course commercial litigation claims. Many of the General Unsecured Claims arise from existing business relations or prepetition judgments and will be evaluated, paid, and resolved in a manner distinct from any of the Fire Claims. Under the Plan, General Unsecured Claims are unimpaired because each Allowed General Unsecured Claim is to be paid in full on the Effective Date, with interest at the Federal Judgment Rate.

14. **Funded Debt Claims**. The HoldCo Funded Debt Claims (Class 3A), Utility Impaired Senior Note Claims (Class 3B-I), Utility Reinstated Senior Note Claims (Class 3B-II), Utility Short-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Term Senior Note Claims (Class 3B-III), Utility Funded Debt Claims (Class 3B-IV), and Utility PC Bond (2008 F and 2010 E) Claims (Class 3B-V) (collectively, the "**Funded Debt Claims**") are largely claims arising from either identical or almost identical financing transactions. The Plan's treatment of the Funded Debt Claims is consistent with the Court-approved Noteholder RSA, and such treatment makes legitimate business and economic sense for the Debtors as it secures, on favorable terms, certain of the financing necessary for the Debtors' successful emergence from these Chapter 11 Cases.

15. **Subrogation Wildfire Claims.** The Subrogation Wildfire Claims (Classes 5A-II and 5B-II) are held by insurance companies that have made or will make insurance payments to tort victims from the North Bay and Camp Fires. These claims will be treated in accordance with the Subrogation Claims RSA that was approved by the Bankruptcy Court, resulting in a substantial compromise of such claims.

16. **Public Entities Wildfire Claims.** The Public Entities Wildfire Claims (Classes 5A-I and 5B-I) are held by certain municipalities that are home to the Debtors' equipment and customers, and have ongoing relationships with the Debtors necessary for the safe maintenance of the Debtors' infrastructure. The Debtors have secured a settlement with each of the Public Entities that avoids the potential costs, delays, and risks associated with continued litigation with those entities.

17. **Fire Victim Claims.** The Fire Victim Claims (Classes 5A-III and 5B-III) include claims of individuals for personal injury, wrongful death, or property damage and claims of Governmental Units, arising out of the Fires (other than Public Entities Wildfire Claims, Subrogation Wildfire Claims, and Subrogation Butte Fire Claims). In addition, the Fire Victim Claims are generally unliquidated and contingent. All Fire Victim Claims are unsecured claims, and treatment of the Fire Victim Claims under the Plan is consistent with the Tort Claimants RSA approved by the Court.

18. **HoldCo Common Interests**. The HoldCo Common Interests (Class 10A-I) consists of existing publicly traded common stock of PG&E Corp. Under Section 4.13 of the Plan, each holder of a HoldCo Common Interest will retain such HoldCo Common Interest, subject to dilution from any common stock or securities linked to common stock issued under the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

19.     **HoldCo Rescission or Damages Claims and Subordinated Debt Claims**.     The HoldCo Rescission or Damages Claims (Class 10A-II) consist of Claims against the Debtors arising from purchases or acquisitions of the stock of PG&E Corp.  I am advised by counsel that these claims are subordinated under the provisions of the Bankruptcy Code.  Under Section 4.14 of the Plan, each holder of an Allowed HoldCo Rescission or Damage Claim shall receive a number of shares of New HoldCo Common Stock equal to that holder's HoldCo Rescission or Damage Claim Share of the outstanding number of shares of common stock of HoldCo as of the Petition Date, which was 526,118,408 shares.  The HoldCo Rescission or Damage Claim Share is a percentage equal to (a) the dollar amount of a holder's Allowed HoldCo Rescission or Damage Claim less any cash payments received from an Insurance Policy[3], divided by (b) $35,905,153,932, which represents HoldCo's market capitalization as of the market open on October 12, 2017, the day of the first disclosure alleged by PERA (as I was advised by my counsel), and the fully diluted shares outstanding on or around such date.  The Plan also classifies two Classes of Subordinated Debt Claims: the HoldCo Subordinated Debt Claims (Class 9A) and the Utility Subordinated Debt Claims (Class 10B) which are unimpaired and will be paid in full under the Plan.

**B.     Section 1123(a):  The Contents of the Plan**

20.     <u>Sections 1123(a)(1), (a)(2), and (a)(3).</u>  Article II of the Plan designates Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, Priority Tax Claims and other unclassified Claims.  Articles III and IV of the Plan designate the thirty-four (34) Classes of Claims and Interests and specify whether each Class of Claims and Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class.

---

[3] The D&O Liability Insurance Policies that the Debtors believe are applicable to this issue provide shared coverage to the Debtors and their directors and officers of up to $400 million (in excess of retained limits that total $15 million).  The applicable primary D&O Liability Insurance Policies are attached as Exhibit A and Exhibit B hereto.  In addition to the applicable D&O Liability Insurance Policies, the Debtors maintain coverage dedicated exclusively to the Debtors' directors and officers, which is referred to as Side A "DIC" (difference in conditions) coverage, and which is payable under each tower of the applicable D&O Liability Insurance Policies if and only if the shared coverage available under the respective tower is first exhausted and there is a non-indemnified loss.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

21.     Section 1123(a)(4).  The Claims and Interests within each Class have the same or substantially similar rights as the other Claims and Interests in that Class and will receive the same treatment under the Plan for respective Claims and Interests in the same Class.  In addition, as described above, each of the thirty-four (34) Classes of Claims and Interests differs from the Claims and Interests in each other Class in a legal or factual way, or are separated based upon other applicable criteria, including priority, the Debtors' economic or business rationale, or other special circumstances.

22.     The Plan's classification structure was not designed principally to create a consenting impaired Class and thereby manipulate the voting in favor of the Plan nor was it designed to unfairly discriminate between holders of Claims and Interests.

23.     Section 1123(a)(5).  Articles V, VI, VII, VIII, and XII and various other provisions of the Plan, as well as the exhibits thereto and the documents and agreements set forth in the Plan Supplement, provide the means for implementation of the Plan.  More specifically, the Plan provides adequate means of its implementation through, among other things:  (i) approximately $47.1 billion of capital to be provided through any combination of the Plan Financing Sources; (ii) the establishment of the Fire Victim Trust and Subrogation Wildfire Trust to administer, process, settle, resolve, satisfy, and pay Fire Victim Claims and Subrogation Wildfire Claims, respectively; (iii) the Plan Settlements; (iv) the provisions governing distributions under Article V of the Plan; (v) the assumption and rejection of executory contracts and unexpired leases; and (vi) the procedures for resolution of Disputed Claims under Article VII of the Plan.

24.     Section 1123(a)(6).  The governing corporate documents of each Debtor have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities.

25.     Section 1123(a)(7).  Section 6.11 of the Plan provides for the manner by which the composition of the boards of directors of the Reorganized Debtors will be selected, and also provides for the manner by which the composition of the boards of directors of the Reorganized Debtors will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.  As discussed below, certain members of the post-Effective Date boards of directors were identified in the Plan Supplement.  The identities and affiliations of the remaining directors of the Reorganized Debtors are not yet known, but

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the Debtors intend to file a separate notice with the Bankruptcy Court in early June 2020, setting forth the identities and affiliations of each member of the boards of directors. I believe the Plan provisions, including Section 6.11 of the Plan, governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy.

26. <u>Section 1123(a)(8).</u> The Debtors are not individuals.

## III. The Plan's Content is Permitted Under Section 1123(b)

27. I have been advised by my counsel that the Plan includes certain provisions that are not required by law but are permitted. The Debtors have determined, as fiduciaries of their estates and in the exercise of their reasonable business judgment, that each of the following permissive provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases.

### A. The Permissive Provisions of the Plan

28. <u>Section 1123(b)(1).</u> Articles III, IV, and V of the Plan describes the treatment for the Unimpaired non-voting Classes of Claims and Interests and the Impaired voting Classes of Claims and Interests.

29. <u>Section 1123(b)(2).</u> Article VIII of the Plan provides for the assumption of executory contracts and unexpired leases unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts. Exhibit A to the Plan Supplement is the Schedule of Rejected Contracts, which sets forth the executory contracts and leases the Debtors propose to reject pursuant to the Plan. In addition, Exhibit B to the Plan Supplement is the Schedule of Assumed Contracts, which sets forth the executory contracts and leases to be assumed by the Debtors under the Plan and the cure amount, if any, as well as procedures to address disputes as to cure amounts or other matters with respect to the proposed treatment of executory contracts and leases under the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

30.     Section 1123(b)(3).     In connection with confirmation of the Plan, the Debtors are seeking approval of the Public Entities Plan Support Agreements and the Wildfire OII Settlement Agreement, which have not been the subject of separate motions for approval.

### a.     The Public Entities Settlement

31.     On June 18, 2019, the Debtors and each of the Public Entities entered into those certain Public Entities Plan Support Agreements to settle and resolve all of the wildfire claims they have collectively asserted in the Chapter 11 Cases.  A true and correct copy of each Public Entities Plan Support Agreement is attached hereto as Exhibits C through H.  The material terms of the Public Entities Plan Support Agreements are substantively identical to one another and vary only with respect to the particular Public Entity as the contract counterparty and the settlement amount for each respective Public Entity.

32.     Pursuant to the Public Entities Plan Support Agreements, the Public Entities each agreed to support and vote in favor of the Plan provided that, among other things, the Public Entities Wildfire Claims be satisfied pursuant to the Plan by $1 billion in Cash, to be distributed from a trust account in accordance with the Public Entities Settlement Distribution Protocol, and the Reorganized Debtors establish a $10 million segregated defense fund for the benefit of the Public Entities.

33.     The terms of the Public Entities Plan Support Agreements and the Public Entities Settlement are incorporated into the Plan treatment of Class 5B-1 (Utility Public Entities Wildfire Claims) at Section 4.24.  As of the date hereof, each of the Public Entities Plan Support Agreements were in effect between and among the parties thereto.

34.     Each Public Entity Plan Support Agreement is the result of extensive, arm's length, and good faith negotiations among the parties with a thorough understanding of the underlying issues.  The Debtors considered many factors, including the potential costs and risks associated with litigation with the Public Entities, the benefit to the communities directly impacted by the Fires, the potential magnitude of the Claims that could be allowed, and the benefits of the Public Entities' agreement to support the Plan.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

35.     The Debtors and each Public Entity agreed that the settlement amount payable under each Public Entity Plan Support Agreement was a fair and reasonable amount of restitution for the economic damages incurred, with all other Wildfire Claims of the Public Entities being released and discharged.

36.     Entry into the Public Entities Plan Support Agreements fully resolves the Public Entities Wildfire Claims and allows the Debtors to avoid the risks and uncertainties of litigation, including the potential for greater than $1 billion in total liability and potential lengthy appeals.  The Public Entities Wildfire Claims, which may have resulted in significantly greater liabilities for the Debtors if left unresolved, are being settled for $1 billion.  Moreover, the Public Entities Settlement was the first major settlement achieved by the Debtors, and provided the initial momentum toward achieving a global consensus.

37.     Accordingly, the Debtors believe that the terms of the Public Entity Plan Support Agreements are fair and reasonable and in the best interests of the Debtors, their estates, creditors, and other stakeholders.

### b.     The Wildfire OII Settlement Agreement

38.     Following the 2017 and 2018 Wildfires, the CPUC initiated the Wildfire OII to investigate whether the Utility's electrical facilities played any role in the wildfires in the Utility's service territory in 2017 and 2018.

39.     On May 7, 2020 the CPUC issued a final decision altering and approving a $2.137 billion settlement agreement between the Utility and the CPUC's Safety and Enforcement Division, the CPUC's Office of the Safety Advocate, and the Coalition of California Utility Employees.  The $2.137 billion payment under the Wildfire OII Settlement is divided as follows:  (i) $1.823 billion in disallowances for wildfire-related expenditures; (ii) $114 million in shareholder-funded System Enhancement Initiatives and corrective actions; and (iii) $200 million fine payable to the General Fund, which shall be permanently suspended.  In addition, any tax savings associated with operating expenses incurred as part of the Financial Remedies of the Wildfire OII Settlement are to be returned to the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

benefit of ratepayers. A true and correct copy of the May 7, 2020 CPUC final decision, which annexes the Wildfire OII Settlement is attached hereto as Exhibit I.

40.     The Wildfire OII Settlement is the result of months of extensive, good faith, and informed negotiations among parties with a thorough understanding of the underlying issues. Since August 13, 2019 the Wildfire OII Settling Parties have met bilaterally or multilaterally over thirty (30) times and have filed weekly or bi-weekly joint status reports regarding settlement efforts. Prior to reaching the settlement, the Utility engaged in extensive discovery, submitted testimony, and participated in multiple hearings and status conferences before the CPUC. The Utility obtained a comprehensive understanding of the allegations made against it, assessed the strength of its litigation positions, and then entered into a settlement to resolve the Wildfire OII.

41.     In considering the Wildfire OII Settlement Agreement, the Utility assessed many factors, including the potential costs and risks associated with continued, complex, unpredictable, and costly litigation through the CPUC OII proceeding. The Utility also has carefully considered the CPUC's modifications, as set forth in the Wildfire OII Decision, to the initially proposed settlement. The Wildfire OII Settlement fully resolves the Wildfire OII, and subject to the possibility of challenges by the non-settling parties, eliminates the costs and uncertainties associated with further litigation, including the possible costs of rehearing, appeal, and additional penalties, subject to the possibility of challenges by non-settling parties, and ultimately benefits the Utility's customers through the System Enhancement Initiatives contemplated therein. The System Enhancement Initiatives include vegetation management and electric operations-focused initiatives, system wide analyses, community engagement-focused initiatives, and transparency and accountability-focused initiatives that, once implemented, will lead to safer service for the Utility's customers and reduce the Utility's exposure to future liability. Absent the settlement, the CPUC could ultimately determine that additional financial remedies or penalties in excess of what is contemplated in the Wildfire OII Settlement are warranted.

42.     In light of the foregoing facts and circumstances, the Utility determined that the Wildfire OII Settlement Agreement is in the best interest of the Debtors' estates and all stakeholders, and should be approved.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**B.** **Provisions of the Plan Permitted Under Section 1123(b)(6)**

43.     The Plan contains certain provisions for (i) distributions to holders of Claims and Interests, (ii) resolution of Disputed Claims, (iii) allowance of certain Claims, (iv) the releases, injunction, and exculpation provisions set forth in Article X of the Plan, and (v) retention of Bankruptcy Court jurisdiction.

44.     **The Debtors' Releases Under the Plan.**  Section 10.9(a) of the Plan provides for the Debtors' Releases, which are releases of claims by the Debtors, the Debtors' estates, and the Reorganized Debtors against the Released Parties.

45.     The Debtors' Releases are important to the settlements at the heart of the Plan and to securing the extensive efforts and contributions of the Released Parties to these Chapter 11 Cases, which were necessary to bring these Cases to a successful resolution—highlighted by, with Court approval of the Plan, the Debtors' successful emergence on the tight timeline imposed by AB 1054.

46.     Accordingly, I believe the Debtors' Releases are appropriate and constitute a sound exercise of the Debtors' business judgment.

47.     **The Non-Debtor Releases Under the Plan.**  Consistent with Section 10.9(c) of the Plan, the Non-Debtors' Releases under the Plan are consensual "opt-in" releases.  As stated, the Released Parties have made significant contributions to these Chapter 11 Cases, including by compromising their claims to reach settlements that furthered the resolution of these Chapter 11 Cases, financing the Debtors' operation during, and emergence from, these Chapter 11 Cases, and otherwise supporting the Debtors' intensive efforts and negotiations to build near-universal consensus behind the Plan.  It is my understanding that the releases contained in Section 10.9(c) are purely voluntary.  In addition, Section 1.180 provides that no holder of a Claim or Interest grants a release unless it affirmatively elects to do so on a Ballot.

48.     **The Exculpation Provision Under the Plan.**  Section 10.8 of the Plan provides for a release and exculpation of the Exculpated Parties, which includes estate fiduciaries and plan proponents, for claims arising out of or relating to these Chapter 11 Cases and the administration

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

thereof. The exculpation provision carves out acts or omissions that are determined in a final order to have constituted actual fraud or willful misconduct.

49.     The exculpation provision is fair and appropriate, given for valuable consideration, and in the best interests of the Debtors and all parties in interest. In addition, the exculpation provision is appropriate to protect the Exculpated Parties, who have made substantial contributions to the Debtors' reorganization, from collateral attacks related to good faith acts or omissions related to the Debtors' restructuring.

## IV.     The Other Requirements of Section 1129 of the Bankruptcy Code

50.     <u>1129(a)(2)</u>:     As more fully set forth in the Solicitation Certifications and Voting Certification, which I reviewed and informs my conclusions, I believe the Debtors comply with section 1129(a)(2), and by extension with sections 1125 and 1126 of the Bankruptcy Code, as that requirement in the Bankruptcy Code has been explained to me by my advisors. The factual basis for the Debtors' compliance with section 1125 of the Bankruptcy Code is more fully explained in the Solicitation Certifications. The factual basis for the Debtors' compliance with section 1126 of the Bankruptcy Code is more fully explained in the Voting Certification.

### A.     The Plan Was Proposed in Good Faith

51.     <u>Section 1129(a)(3)</u>. The Debtors have proposed the Plan in good faith, in consultation with their legal and financial advisors, and not by any means forbidden by law. In addition, the Plan was proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and distributions to holders of Claims against and Interests in the Debtors.

52.     Since commencing these Chapter 11 Cases, PG&E and its advisors have worked diligently and constructively with all relevant stakeholders, including the TCC, attorneys representing a significant number of the Fire Victim Claimants, the Ad Hoc Subrogation Group, the Public Entities, the Ad Hoc Noteholder Committee, PG&E's other creditors and stakeholders, the CPUC, and the Governor's Office to satisfactorily address the Claims asserted against PG&E and to resolve the Chapter 11 Cases, while also ensuring the Reorganized Debtors can fulfill their mission of safely and reliably delivering service to their customers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1       53.     The Debtors have proposed the Plan with no ulterior motives and with a good faith

2 desire to reach a resolution in the best interest of all their stakeholders. In addition, the Plan Supplement,

3 the Disclosure Statement, the Disclosure Statement Supplement, and the Solicitation Procedures were

4 each developed and proposed in good faith and in furtherance of reaching a resolution in the best

5 interests of the Debtors' stakeholders. I personally was involved in numerous aspects of the various

6 negotiations, either directly in meetings or through regular updates from the Debtors' legal and

7 financial advisors and can attest to the good faith approach of the Debtors in the administration of these

8 Chapter 11 Cases and in seeking to reach a successful and timely resolution.

9       54.     Each of the four RSAs (three of which were approved by the Court) was the culmination

10 of months of rigorous, arm's length negotiations conducted in good faith among the respective parties

11 to each RSA.

12       55.     The CPUC's proposed decision in the Plan OII,[4] the significant agreements and

13 compromises that are embodied in the Plan, and the support of the Governor's Office, the Public

14 Entities, the Ad Hoc Subrogation Group, the Ad Hoc Noteholders Committee, and the Shareholder

15 Proponents, as well as the voting on the Plan, all reflect and underscore the inherent fairness of the Plan

16 and that the Plan has been proposed in good faith and for proper purposes.

17       56.     For these and other reasons, it should be readily apparent that the Plan was proposed in

18 good faith and solely for legitimate and honest purposes. Simply put, the Plan embodies a

19 comprehensive restructuring that will fairly and equitably address all Fire Victim Claims and other

20 prepetition claims and equity interests, allow the Reorganized Debtors to access the Go-Forward

21 Wildfire Fund, and maximize value for all parties in interest.

22       **B.**     **The Plan Provides for Payment of Professional Fees and Expenses**

23       57.     Section 1129(a)(4). Section 2.2 of the Plan provides that all professional fees and

24 expenses for estate professionals must be approved by the Court as reasonable pursuant to final fee

25 applications.

26

27

28    [4] A true and correct copy of the Proposed Plan OII Decision is attached hereto as Exhibit J.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**C. The Plan Discloses How Directors, Officers, and Insiders Will be Selected**

58. <u>Section 1129(a)(5)</u>. Section 6.11 of the Plan and Exhibit G to the Plan Supplement describe the manner in which the post-Effective Date board and management of each of the Debtors will be selected, and also provide for the manner by which the composition of the boards of directors of the Reorganized Debtors will be disclosed.

59. In addition, Exhibit G to the Plan Supplement identifies which directors will continue on the boards of directors of the Reorganized Utility and of Reorganized PG&E Corp. on and after the Effective Date.

60. The identity and affiliations of the remaining directors of the Reorganized Debtors have not yet been determined. The remaining directors will be appointed consistent with the Debtors' organizational documents and applicable state and federal law. The Debtors intend to file a separate notice with the Bankruptcy Court in early June 2020, setting forth the identities and affiliations of each member of the boards of directors of the Reorganized Debtors.

**D. The Plan Does Not Contain Any Rate Changes**

61. <u>Section 1129(a)(6)</u>. The Plan does not provide for any rate changes by the Debtors. In connection with the Plan OII, and as more fully explained in the Proposed Plan OII Decision, the CPUC has preliminarily approved the Plan as satisfying the AB 1054 requirement that the Plan be neutral, on average, to ratepayers. In addition, any future rate increases will be subject to CPUC review and approval.

**E. The Plan is in the Best Interests of the Debtors' Creditors**

62. <u>Section 1129(a)(7)</u>. The factual basis for the Debtors' compliance with section 1129(a)(7) of the Bankruptcy Code is addressed in the Boken Declaration.

**F. The Plan has Been Accepted by Impaired Voting Classes**

63. <u>Section 1129(a)(8)</u>. As more fully explained in the Voting Certification, the following Classes under the Plan voted to accept the Plan: Class 5A-I (HoldCo Public Entities Wildfire Claims), Class 5A-II (HoldCo Subrogation Wildfire Claims), Class 5A-III (HoldCo Fire Victim Claims), Class 10A-I (HoldCo Common Interests), Class 3B-I (Utility Impaired Senior Note Claims), Class 3B-III

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(Utility Short-Term Senior Note Claims), Class 3B-IV (Utility Funded Debt Claims), Class 5B-I (Utility Public Entities Wildfire Claims), Class 5B-II (Utility Subrogation Wildfire Claims), and Class 5B-III (Utility Fire Victim Claims) (collectively, the "**Accepting Classes**").

64.     The holders of Claims in Class 10A-II (HoldCo Rescission or Damage Claims) are the only Class that has voted to reject the Plan.

**G.     The Plan Provides for the Payment of Allowed Priority Claims in Full**

65.     Section 1129(a)(9).     Section 2.1 of the Plan provides that holders of Allowed Administrative Expense Claims shall receive Cash in full and final satisfaction of their Allowed Administrative Expense Claims on the Effective Date or as soon as reasonably practicable thereafter, except to the extent the Debtors or Reorganized Debtors, as applicable, and a holder of an Allowed Administrative Expense Claim against a Debtor agree to less favorable treatment of such Allowed Administrative Expense Claim.

66.     Further, pursuant to Article IV of the Plan, all Allowed Priority Non-Tax Claims, unless otherwise agreed, shall receive, at the option of the Debtors or Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, including interest through the Effective Date calculated at the Federal Judgment Rate, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) other treatment that complies with section 1129(a)(9).

67.     Pursuant to Section 2.4 of the Plan and except as otherwise may be agreed, holders of Allowed Priority Tax Claims shall receive, at the option of the Debtors or Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as reasonably practicable thereafter, or (ii) Cash, in equal semi-annual installments and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable nonbankruptcy rate.  It is my understanding that all Allowed Priority Tax Claims will be treated pursuant to the clause (i), above.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**H. At Least One Class of Impaired Claims has Accepted the Plan**

68. <u>Section 1129(a)(10)</u>. As set forth above and as more fully explained in the Voting Certification, the ten Accepting Classes are impaired and have voted to accept the Plan, even excluding the acceptance of the Plan by any insiders in such Classes.

**I. The Plan is Feasible**

69. <u>Section 1129(a)(11)</u>. The Financial Projections, and the assumptions on which they are based, were filed on March 25, 2020 as Exhibit A to the Disclosure Statement Supplement and were developed using a methodical, iterative process and are based on the extensive experience of the Debtors' management and historical trends and data.

70. Based upon the Financial Projections, the claims analysis, the contemplated Plan Financing Sources, the Debtors' prior course of conduct, the Ziman Declaration, and the Boken Declaration, which I reviewed and informs my conclusions, I believe that the Reorganized Debtors will be able to meet all of their obligations and make all of the payments and distributions required under the Plan. In addition, I believe that the Reorganized Debtors will have sufficient capital and liquidity to operate their businesses and satisfy ongoing obligations as they become due. Based on this, I further believe that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization.

71. Since the filing of the updated Financial Projections on March 25, 2020, there has been no change or development that would change my conclusion that the Reorganized Debtors will be able to meet all of their obligations and make all payments and distributions required pursuant to the Plan.

**J. All Statutory Fees Have been or will be Paid**

72. <u>Section 1129(a)(12)</u>. Section 12.5 of the Plan provides that on the Effective Date, and thereafter as my be required, all statutory fees, together with interest, if any, shall be paid by each of the Debtors until the earliest to occur of the entry of (i) a final decree closing such Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such Debtor's Chapter 11 Case.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**K.     The Continuation of Retiree Benefits**

73.     <u>Section 1129(a)(13)</u>.   Section 8.5 of the Plan provides for the continuation of all Employee Benefit Plans of the Debtors in effect as of the Petition Date.   Specifically, Section 8.5 of the Plan provides that such agreements are deemed to be, and will be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to section 365 and 1123 of the Bankruptcy Code.

**L.     Additional Facts Relating to the Debtors and the Plan**

74.     <u>Section 1129(a)(14)</u>.  The Debtors are not subject to any domestic support obligations.

75.     <u>Section 1129(a)(15)</u>.  Neither of the Debtors are "individuals."

76.     <u>Section 1129(a)(16)</u>.   The Debtors are each a moneyed, business, or commercial corporation.

77.     <u>Section 1129(b)</u>.  For the reasons set forth above, and based on discussions with my advisors, I believe that the Plan does not discriminate unfairly, and is fair and equitable, with respect to Class 10A-II.

78.     <u>Section 1129(c)</u>.  The Plan is the only plan currently on file in these Chapter 11 Cases.

79.     <u>Section 1129(d)</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds.

80.     <u>Section 1129(e)</u>.  These Chapter 11 Cases are not small business cases.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 22, 2020
      San Francisco, CA.

                                    */s/ Jason P. Wells*
                                      Jason P. Wells

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119