# Exhibit J

STATE OF CALIFORNIA GAVIN NEWSOM, *Governor*

PUBLIC UTILITIES COMMISSION
505 VAN NESS AVENUE
SAN FRANCISCO, CA 94102-3298

April 20, 2020 **Agenda ID #18340**
**Ratesetting**

TO PARTIES OF RECORD IN INVESTIGATION 19-09-016:

This is the proposed decision of Administrative Law Judge Peter V. Allen. Until and unless the Commission hears the item and votes to approve it, the proposed decision has no legal effect. This item may be heard, at the earliest, at the Commissionís May 21, 2020 Business Meeting. To confirm when the item will be heard, please see the Business Meeting agenda, which is posted on the Commissionís website 10 days before each Business Meeting.

Parties of record may file comments on the proposed decision as provided in Rule 14.3 of the Commissionís Rules of Practice and Procedure.

The Commission may hold a Ratesetting Deliberative Meeting to consider this item in closed session in advance of the Business Meeting at which the item will be heard. In such event, notice of the Ratesetting Deliberative Meeting will appear in the Daily Calendar, which is posted on the Commissionís website. If a Ratesetting Deliberative Meeting is scheduled, ex parte communications are prohibited pursuant to Rule 8.2(c)(4)(B).

/s/ MICHELLE COOKE for

Anne E. Simon
Chief Administrative Law Judge

AES:avs

Attachment ALJ/PVA/avs **PROPOSED DECISION** Agenda ID #18340 **(REV. 1)**
**Ratesetting**
**5/21/2020 Item 9**

Decision **PROPOSED DECISION OF ALJ ALLEN (Mailed 4/20/2020)**

Case: 19-30088 Doc# 7510-10 Filed: 05/22/20 Entered: 05/22/20 15:54:07 Page 2 of 124

**BEFORE THE PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA**

| | |
|---|---|
| Order Instituting Investigation on the Commissionís Own Motion to Consider the Ratemaking and Other Implications of a Proposed Plan for Resolution of Voluntary Case filed by Pacific Gas and Electric Company, pursuant to Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court, Northern District of California, San Francisco Division, In re Pacific Gas and Electric Corporation and Pacific Gas and Electric Company, Case No. 19-30088. | Investigation 19-09-016 |

**DECISION APPROVING REORGANIZATION PLAN**

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 3 of 124

# TABLE OF CONTENTS

**Title**        **Page**

DECISION APPROVING REORGANIZATION PLAN ............................................................ 2̶1

Summary ................................................................................................................................. 2

1. Background ......................................................................................................................... 2
   1.1. Procedural Background ............................................................................................. 4
2. AB 1054 Scope and Schedule ............................................................................................ 10
3. PG&E Plan ......................................................................................................................... 11
4. Criteria and Factors to Consider in Analyzing the PG&E Plan ........................................ 13
5. PG&E Plan: Analysis, Conditions and Modifications ...................................................... 15
   5.1. Safety, Governance Structure and Criminal Probation ........................................... 15
      5.1.1. Safety History ............................................................................................. 15
      5.1.2. Executive Risk and Safety Officers ........................................................... 17
      5.1.3. Independent Safety Advisor ....................................................................... 20
      5.1.4. Safety and Nuclear Oversight Committee .................................................. 23
      5.1.5. Board of Directors and Holding Company .................................................. 24
      5.1.6. Approval of Senior Management ................................................................. 3̶7̶38
      5.1.7. Safety and Operational Metrics .................................................................. 38
      5.1.8. Fines and Penalties ..................................................................................... 4̶2̶43
      5.1.9. Regional Restructuring ............................................................................... 45
      5.1.10. Enhanced Oversight and Enforcement Process ........................................ 5̶1̶52
      5.1.11. Criminal Probation ................................................................................... 6̶3̶64
   5.2. Financial ................................................................................................................... 6̶4̶65
      5.2.1. Neutral, on Average, to Ratepayers ............................................................ 6̶5̶67
      5.2.2. Securitization .............................................................................................. 7̶4̶75
      5.2.3. Contributions of Ratepayers ....................................................................... 7̶7̶78
      5.2.4. Financial Condition and Capital Structure .................................................. 7̶9̶80
      5.2.5. Earnings Adjustment Mechanism ............................................................... 8̶4̶85
      5.2.6. Executive Compensation ............................................................................ 8̶5̶86
   5.3. Climate .................................................................................................................... 9̶2̶94
   5.4. Quality of Service and Quality of Management ....................................................... 9̶4̶95
   5.5. Employees and Communities ................................................................................... 9̶4̶96
   5.6. Commission Bankruptcy Costs ................................................................................ 9̶6̶97
   5.7. Other Proposals and Related Proceedings ............................................................... 9̶6̶98
6. Comments on Proposed Decision ...................................................................................... 9̶9̶101
7. Assignment of Proceeding .................................................................................................. 1̶0̶0̶107

Findings of Fact ...................................................................................................................... 1̶0̶0̶107

Conclusions of Law ................................................................................................................ 1̶0̶2̶109

ORDER .................................................................................................................................... 1̶0̶3̶110

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 4 of 124

**Appendix A** ñ Enhanced Oversight and Enforcement Process
.

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 5
of 124

## DECISION APPROVING REORGANIZATION PLAN

**Summary**

This decision approves, with conditions and modifications, the reorganization plan of Pacific Gas and Electric Company (PG&E) and its holding company PG&E Corporation (PG&E Corp.) pursuant to the requirements of Assembly Bill 1054 (Ch. 79, Stats. 2019). Changes to PG&E's governance structure and enhancements to the Commission's oversight are put in place to facilitate PG&E's ability to provide safe, reliable and affordable utility service.

The Commission expects that there will need to be further adjustments and refinements to the course charted by this decision, but with today's decision the Commission has crafted additional tools to effectively respond to new developments and make any necessary changes. The Commission has already identified a number of areas that need further analysis and development in order to be fully implemented, and those will be addressed in this or other Commission proceedings. This proceeding remains open.

## 1.  Background

Pacific Gas and Electric Company (PG&E) and its holding company PG&E Corporation (PG&E Corp.) (jointly Debtors) filed voluntary bankruptcy petitions on January 29, 2019, under Chapter 11 of the U.S. Bankruptcy Code. The Debtors' filings came after a series of major wildfires, including fires for which PG&E expected to be held liable. At the outset, the Commission acknowledges the devastation caused by these fires and the tragic losses suffered by Californians in these catastrophes. A key requirement of PG&E is to provide compensation to wildfire victims as part of any plan for reorganization in the Chapter 11 case to allow the Debtors to exit bankruptcy. (Public Utilities Code Section 3292(b)(1)(B).)

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 6 of 124

California Assembly Bill (AB) 1054 (Ch. 79, Stats. 2019) subsequently established a Wildfire Fund to pay eligible claims to victims of wildfires caused by utility infrastructure. (Public Utilities Code section 3288(b).) The fund is expected to be capitalized with approximately $21 billion in revenue contributed approximately equally from utility ratepayers and utility shareholders. (*See* Decision (D.) 19-10-056 at 34 (Rulemaking (R.) 19-07-017; October 24, 2019).) California electrical corporations, such as PG&E, can participate in the fund if they meet certain criteria. One of the criteria that PG&E must satisfy to participate in the fund is that its ìinsolvency proceedingî (*i.e.* bankruptcy) must be ìresolved pursuant to a plan or similar document not subject to a stayî by no later than June 30, 2020. (Public Utilities Code Section 3292(b).)

In addition, AB 1054 requires the Commission to complete certain tasks by June 30, 2020, including:

(C)  The commission has approved the reorganization plan and other documents resolving the insolvency proceeding, including the electrical corporationís resulting governance structure as being acceptable in light of the electrical corporationís safety history, criminal probation, recent financial condition, and other factors deemed relevant by the commission.

(D)  The commission has determined that the reorganization plan and other documents resolving the insolvency proceeding are (i) consistent with the stateís climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (ii) neutral, on average, to the ratepayers of the electrical corporation.

(E)  The commission has determined that the reorganization plan and other documents resolving the insolvency proceeding recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the commission, which may

include sharing of value appreciation. (Public Utilities
Code Section 3292(b)(1).)

In order for PG&E to meet the deadline for resolution of its bankruptcy proceeding, the Commission must make these determinations before June 30, 2020. This is a short deadline and has required the Commission to follow an aggressive schedule in this proceeding.

### 1.1. a. Procedural Background

The Commission Order Instituting Investigation (OII) for this proceeding was issued on October 4, 2019. PG&E and numerous other parties filed responses to the OII. A pre-hearing conference (PHC) was held on October 23, 2019. An Assigned Commissioner's Scoping Memo and Ruling (Scoping Memo) was issued on November 14, 2019, setting forth the schedule for the proceeding and the issues to be addressed.

At the time the PHC was held and the Scoping Memo was issued, there were two competing plans of reorganization before the Bankruptcy Court and thus pending before the Commission: one from PG&E (PG&E Plan) and one from the Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company (AHC) supported by the Official Committee of Tort Claimants of Pacific Gas and Electric Company (TCC) (TCC/AHC Plan). When the Scoping Memo was issued there was also uncertainty relating to the total amount of allowed claims PG&E must satisfy through reorganization, and it was anticipated that it could take some time to determine the amount of those claims. In order to move the proceeding forward while waiting for that information, the schedule established at that time had the Commission consider non-financial issues first, and consider financial issues later, when it was anticipated that there would be greater certainty. (Scoping Memo at 3, 9-10.)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 8 of 124

In response to disagreement among the parties about the applicability of Public Utilities Code Section 854 to the plans of reorganization, the Scoping Memo allowed for briefing on the applicability of Section 854. Parties filed briefs on that issue on November 21, 2019, and a ruling was issued on November 27, 2019 resolving the issue as follows:

The following criteria from Public Utilities Code Section 854 are made applicable to the plans of reorganization pursuant to Section 853(b)(c):

(1) Maintain or improve the financial condition of the resulting public utility doing business in the state.

(2) Maintain or improve the quality of service to public utility ratepayers in the state.

(3) Maintain or improve the quality of management of the resulting public utility doing business in the state.

(4) Be fair and reasonable to affected public utility employees, including both union and nonunion employees.

(6) [sic] Be beneficial on an overall basis to state and local economies, and to the communities in the area served by the resulting public utility.[1]

The ruling noted that while the Commission will consider each of these criteria in evaluating a reorganization plan, it is not mandatory that a reorganization plan satisfy each of these criteria.

On December 13, 2019, opening testimony on non-financial issues was served by PG&E, AHC, The Utility Reform Network (TURN), William B. Abrams (Abrams), the California Large Energy Consumers Association (CLECA), and Small Business Utility Advocates (SBUA), consistent with the schedule established in the Scoping Memo. Also, on December 13, 2019, PG&E filed a Notice of Amended Plan of Reorganization. The changes to PG&Eís Plan resulted in TCC switching its support from the AHC Plan to the PG&E Plan, and

---

[1] *Administrative Law Judgeís Ruling on Public Utilities Code Section 854* at 11-12.

clarification of the amount of claims that PG&E must satisfy through reorganization.

A Status Conference was held on December 20, 2019 to address these new developments, and how they impacted the schedule for the proceeding. A ruling issued on December 27, 2019 held that:

> Now, however, due to subsequent developments, including the Amended Plan of Reorganization from PG&E, it is no longer necessary to wait for the outcome of the estimation and Tubbs proceedings in order to address the financial issues. At a Status Conference held on December 20, 2019, there was consensus that it now makes more sense to re-combine the two separate phases into one phase addressing both financial and non-financial issues. (Administrative Law Judgeís Ruling Modifying Schedule at 3.)

That ruling accordingly established a new schedule for the proceeding. On January 16, 2020, PG&E filed a motion requesting an extension of time to serve its testimony, on the grounds that:

> The requested schedule modification would permit the parties and the Commission to consider testimony describing further developments that may result from ongoing discussions with the Ad Hoc Committee of Bondholders (AHC) regarding a potential settlement. The AHC supports the relief sought in this motion. In addition, an extension would permit the presentation of consolidated opening testimony describing any further amendments to PG&Eís Plan of Reorganization that may result from ongoing discussions with the California Governorís Office (the ìGovernorís Officeî). (PG&Eís Motion to Modify Schedule at 1.)

A ruling issued later on January 16, 2020 granted PG&Eís motion in part and modified the schedule, moving the date for PG&Eís testimony from January 22 to January 31, 2020, and moving reply testimony from February 7 to February 14, 2020.[2]

_____

[2] I.19-09-016 PG&E Bankruptcy - E-Mail Ruling Granting in Part Motion to Modify Schedule (PG&E)

On January 23, 2020, AHC filed a motion to withdraw from the proceeding, stating:

> On January 22, 2020, the Ad Hoc Committee executed a Restructuring Support Agreement (RSA) with Pacific Gas and Electric Company (PG&E) and PG&E Corporation (collectively, the ìDebtorsî). The RSA requires the Ad Hoc Committee, in relevant part, to file motion(s) for leave to withdraw all filings submitted in any proceeding before the Commission involving the Debtors and cease participation in any proceeding before the Commission involving the Debtors, as set forth in the RSA. (Motion of AHC to Withdraw at 1.)

A ruling issued on January 30, 2020 granted AHCís request to withdraw from the proceeding but denied its request to withdraw previously-filed pleadings in the proceeding.[3] As a result, only one plan ñ the PG&E Plan - remained before the Commission.

On January 31, 2020, PG&E served its opening testimony, consisting of one volume of testimony and five volumes of supporting exhibits. PG&Eís testimony was organized by chapters: Introduction; PG&Eís Plan and Financing; Ability to Raise Capital Post-Emergence; Board-Level Governance; Utility Safety and Governance; Wildfire Safety; Executive Compensation; Governance: Probation; Climate; Rates and Rate Neutrality; Fines and Penalties; and Section 854 Considerations.

Reply testimony was due to be served on February 14, 2020, but on February 10, 2020, TURN, with other parties either supporting or not opposing, requested an extension of time to serve testimony and a delay in the start of evidentiary hearings. That request was granted, moving reply testimony to February 21, 2020, and evidentiary hearings to February 25, 2020.[4]

---

[3] *Administrative Law Judgeís Ruling Granting in Part Motion to Withdraw from Proceeding* at 4-5.
[4] *Administrative Law Judgeís Ruling Modifying Schedule*, dated February 11, 2020.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 11 of 124

On February 18, 2020, an Assigned Commissioner's Ruling (ACR) set forth a set of proposals to ensure development of the record in the proceeding on issues relating to governance, management, and oversight of the Debtors.

On February 21, 2020, reply testimony was served by Natural Resources Defense Council (NRDC), Coalition of California Utility Employees (CUE), City and County of San Francisco (CCSF), TURN, Alliance for Nuclear Responsibility (A4NR), Abrams, CLECA, and SBUA. TURN also served joint testimony with the Energy Producers and Users Coalition (EPUC) and the Indicated Shippers (IS). Five northern California community choice aggregators served joint testimony: East Bay Community Energy, Peninsula Clean Energy Authority, Monterey Bay Community Power, City of San Jose (on behalf of San Jose Clean Energy) and Silicon Valley Clean Energy Authority (Joint CCAs). PG&E also served supplemental testimony including errata on February 21, 2020.

Evidentiary hearings were held in San Francisco beginning on February 25, 2020 and running through March 4, 2020.  PG&E and the other parties that served testimony were subject to cross-examination on their testimony. The procedural schedule was further modified to allow parties time to submit comments on the proposals set forth in the February 18, 2020 Assigned Commissioner's Ruling.[5]

On March 13, 2020, parties filed opening comments on the proposals in the ACR and opening briefs on the other issues.[6] Briefs were filed by A4NR, CUE, Marin Clean Energy (MCE), Joint CCAs, EPUC/IS, South San Joaquin Irrigation District (SSJID), Next Era Energy Resources LLC (Next Era), TURN, Center for Energy Efficiency and Renewable Technologies (CEERT), CLECA, CCSF, PG&E,

---

[5] *See*, *Administrative Law Judge's Ruling Confirming Modification of Procedural Schedule,* dated March 6, 2020.

[6] While each pleading contained both comments and a brief, for the sake of brevity and consistency they will be referred to in this decision as briefs.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 12 of 124

TCC, City of San Jose (San Jose), Abrams, SBUA[7] and the Commission's Public Advocates Office (Cal Advocates).

Parties were provided an opportunity to request evidentiary hearings on the proposals in the ACR, but no party requested hearings.

On March 24, 2020, PG&E filed a motion for official notice of documents filed in the Bankruptcy Court on March 20, 2020, including the "Debtors' Motion Pursuant [Ö] for Entry of an Order (I) Approving Case Resolution Contingency Process, and (II) Granting Related Relief," and "Governor Gavin Newsom's Statement in Support of Debtors' Motion Pursuant [Ö] for Entry of an Order (I) Approving Case Resolution Contingency Process, and (II) Granting Related Relief." PG&E's motion for official notice was granted on March 24, 2020, providing parties in this proceeding an opportunity to address those documents in their subsequent pleadings. On April 9, 2020, the bankruptcy court entered an Order approving the case resolution contingency process. (*Debtors' Joint Chapter 11 Plan of Reorganization*, Case: 19-30088, Doc# 6721.)

On March 26, 2020, reply briefs and reply comments[78] were filed by A4NR, CLECA, Joint CCAs, CUE, EPUC/IS, Cal Advocates, CCSF, CEERT, TCC, PG&E, TURN, Abrams,[89] and SBUA.

## 2.  AB 1054 Scope and Schedule

AB 1054 requires the Commission to examine complex and important questions relating to PG&E's plan of reorganization, including PG&E's governance structure. This is not a simple analysis, and getting it right is essential to PG&E, its customers, and California. At the same time, however, AB 1054 sets a very short deadline: for PG&E to participate in the wildfire fund, the

---

[7] SBUA was granted leave to file its brief on March 16, 2020.

[78] While each pleading contained both reply comments and a reply brief, for the sake of brevity and consistency they will be referred to in this decision as reply briefs.

[89] Abrams filed his reply brief on March 20, 2020.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 13 of 124

Bankruptcy Court and the Commission must approve the reorganization plan and other documents resolving the insolvency proceeding by June 30, 2020. As a practical matter, however, if the Commission is going to approve those documents it must do so before that date in order to coordinate with the Bankruptcy Court proceedings. As described above, this requires an accelerated procedural schedule; nevertheless, the parties submitted substantial testimony and briefing on PG&Eís plan and the ACR proposals, but the schedule does not allow for an in-depth discussion in this decision on every detail of PG&Eís plan or the various proposals to modify or add to that plan.

The result is a tension ñ how can the Commission best balance these competing needs of ensuring that the plan satisfies the requirements of AB 1054 while also meeting the deadline set in AB 1054. One party, Abrams, argued that the Commission should not feel bound by the deadline set in AB 1054, and should take as much time as it deems necessary, on the grounds that the deadline is a deadline for PG&E, not the Commission. (Transcript v. 6 at 1088.) Other parties expressed concern about the pace of the proceeding, but no other party took this position. Some other parties did recommend the Commission reject the plan, which would have a similar result. (*See*, CCSF Brief at 3-4, Joint CCA Brief at 2, 15, 19.) Those parties did, however, plead that rejection in the alternative along with proposed modifications or conditions that would enable the Commission to approve the plan.

It is clear that the intent of the legislature was to strongly incentivize resolution of PG&Eís bankruptcy and related Commission approvals by June 30, 2020.[910] Victims of the wildfires cannot receive compensation for their losses

---

[910] The recent ìCase Resolution Contingency Processî presented in the Bankruptcy Court, which provides for the commencement of a sale process if a confirmation order is not entered by June 30, 2020, appears to confirm that the Governorís Office has the same intent.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 14 of 124

until PG&E exits bankruptcy, and it is a statutory requirement for PG&E to access the wildfire fund going forward. Accordingly, the Commission has worked arduously with the assistance of parties to resolve the issues before us in this proceeding as completely as possible in the limited time available. While some issues may be able to be completely ~~resoled~~r esolved in this decision, others will need further analysis and consideration to ensure a good resolution. On those issues the Commission will take the initial steps here to begin the necessary work and provide direction and guidance, but more work will remain to be done after this decision.

## 3. PG&E Plan

PG&Eís plan has both financial and non-financial aspects. On the financial side, the plan calls for PG&E to refinance higher-cost prepetition debt with lower cost debt, resulting in potentially significant interest rate savings. In its testimony, PG&E summarizes the funding of its plan and the associated uses of that funding as follows:

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
15 of 124

TABLE 2.1: SOURCES & USES

| SOURCES | | USES | |
|---|---|---|---|
| **New Equity in PG&E Corporation** | $15.75 billion | **Fire Claims** | $24.15 billion[1] |
| New money equity raise | $9 billion | **Contribution to Wildfire Fund** | $5 billion |
| Equity issued to Fire Victim Trust | $6.75 billion | **Debtor-In-Possession Financing** | $2 billion |
| **New PG&E Corporation Debt** | $4.75 billion | **Prepetition Debt** | $22.18 billion |
| **Reinstated Utility Debt** | $9.575 billion | **Trade Claims and Other Costs** | $2.3 billion |
| **New Utility Debt** | $23.775 billion | **Accrued Interest** | $1.27 billion |
| Refinancing of Pollution Control Bonds | $0.1 billion | **Cash** | $0.75 billion |
| Noteholder RSA debt | $11.85 billion | **Total Uses** | $57.65 billion |
| New debt | $5.825 billion | | |
| Temporary Utility Debt | $6 billion | | |
| **Insurance Proceeds** | **$2.2 billion** | | |
| **Cash at Emergence** | **$1.6 billion** | | |
| **Total Sources** | **$57.65 billion** | | |

(Table 2-1 from page 2-2 of Ex. PG&E-1.)

PG&E also provides an overview of its plan in its Brief. (PG&E Brief at 15-27.) According to PG&E, its plan addresses the following elements:

1) Wildfire Claims. PG&Eís plan provides for payment of $25.5 billion~~10~~11 in settlement of Fire Claims, defined as any past, present, or future claims related to specified wildfires that occurred in Northern California in 2015 through 2018, and includes four different classes of Fire Claims: Fire Victim Claims; Public Entities Wildfire Claims; Subrogation Wildfire Claims; and Subrogation Butte Fire Claims. (PG&E Brief at 15-18.)

2) Other Claims. PG&Eís plan resolves other prepetition claims against PG&E in the following areas: Funded Debt Claims; Employee-Related Claims; General Unsecured Claims; Ghost Ship Fire Claims; Priority Tax And Priority Non-Tax Claims; Subordinated Debt Claims; Common Interests; Administrative Expense Claims; and Environmental Claims. (PG&E Brief at 19-23.)

---

~~10~~11 The $24.15 billion shown in the table does not include $1.35 billion in deferred payment to the Fire Victims Trust. (Ex. PG&E-1 at 2-2.)

3) Participation in the Wildfire Fund. PG&E believes that its plan will enable it to participate in AB 1054ís statewide Wildfire Fund upon its emergence from bankruptcy. (PG&E Brief at 23-24.)

4) Assumption of Agreements. PG&Eís plan provides for the assumption of all power purchase agreements, renewable energy power purchase agreements and Community Choice Aggregation servicing agreements, as well as all Employee Benefit Plans and Collective Bargaining Agreements. (PG&E Brief at 24-25.)

There are many other details to PG&Eís plan of reorganization; the Commissionís review here focuses on those elements of the plan required for the Commissionís approval under AB 1054.

## 4. Criteria and Factors to Consider in Analyzing the PG&E Plan

In analyzing the PG&E Plan under AB 1054 the Commission must determine whether the plan, including the resulting governance structure, is acceptable. The criteria that AB 1054 requires the Commission to consider in making that determination are PG&Eís safety history, criminal probation and recent financial condition. Under AB 1054 the Commission may also consider other factors that the Commission deems to be relevant. In addition, AB 1054 requires the Commission to determine if the plan is consistent with the stateís climate goals, is neutral, on average, to PG&E ratepayers, and recognizes the contribution of ratepayers. (Public Utilities Code Section 3292(b)(1).) These express approvals required under AB 1054 are in addition to the Commissionís general ratemaking authority: as the Bankruptcy Code explicitly recognizes, any rate change proposed in a reorganization plan must be approved by the governmental regulatory commission with proper jurisdiction. (Decision (D.) 03-12-035 at 23, quoting *In re Cajun Elec. Power Co-op., Inc.* (5th Cir. 1999) 185 F.3d 446, 453).

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 17 of 124

As this case has evolved, the Commission has identified additional factors and criteria it will consider in this proceeding. Those factors and criteria are set forth in the Order Instituting Investigation (OII) that initiated this proceeding, in the Assigned Commissioner's Scoping Memo and Ruling, in the Administrative Law Judge's Ruling on Public Utilities Code section 854 and the February 18, 2020 Assigned Commissioner's Ruling and Proposals (ACR).

Those factors are: how the plan and proposed governance structure will affect public safety on a going forward basis, both short term and long term; the ratemaking implications of the plan; whether the plan provides satisfactory resolution of claims for monetary fines or penalties for PG&E's pre-petition conduct; whether the plan maintains or improves PG&E's financial condition; whether the plan maintains or improves the quality of service to PG&E rate ratepayers; whether the plan maintains or improves the quality of management of PG&E; potential effects of the plan on local communities and PG&E employees; whether the plan is fair and reasonable to PG&E employees; and whether the plan is beneficial on an overall basis to state and local economies and to the communities in the area served by PG&E.

In addition, the parties and the February 18, 2020 ACR presented multiple proposals that would supplement PG&E's plan. Some of those fall within one or more of the above factors and criteria, while others are stand-alone proposals.

## 5. PG&E Plan: Analysis, Conditions and Modifications

Examination of PG&E's reorganization plan generally can be broken down into categories of safety-related issues, financial issues, and other issues. This decision examines the plan in that order.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 18 of 124

## 5.1. ~~a.~~ Safety, Governance Structure and Criminal Probation

In this section we consider non-financial issues relating to the reorganization plan and the resulting governance structure, including safety history, safety-related changes to PG&Eís governance structure, including ACR proposals on Executive Level Risk and Safety Officers, Independent Safety Advisor, Expanded Safety and Nuclear Oversight Committee Authority, Board of Directors, Approval of Senior Management, Safety and Operational Metrics, and Regional Restructuring. Also considered in this section are PG&Eís safety-related Fines and Penalties and Criminal Probation.

We will address safety-related issues and governance structure issues together, as the changes in governance structure are intended to improve PG&Eís safety performance, including regional restructuring. PG&Eís criminal probation is discussed here, as it stems from a safety failing that resulted in a criminal conviction.

### 5. ~~i.~~ Safety History

In order for the Commission to approve PG&Eís reorganization plan under AB 1054, the Commission must find that the reorganization plan (and other documents resolving the insolvency proceeding) is ìacceptable in light of the electrical corporationís safety history.î Somewhat oddly, PG&Eís testimony in this proceeding simply does not address its safety history. PG&Eís January 31, 2020 testimony includes two chapters that address safety: Chapter 5 ìUtility Safety and Governance,î and Chapter 6, ìWildfire Safety.î Those chapters address the activities that PG&E has undertaken or is undertaking to improve its safety record, but do not address its safety history.

It is understandable that PG&E may want to shift the focus away from the history of its recent safety performance - which has ranged from dismal to

- 15 -

abysmal - and instead seek to draw attention to its remedial efforts. At the same time, however, this is a cause for concern, as PG&E seems reluctant to take ownership of its own safety history and acknowledge its failings. PG&Eís safety history is, however, well documented elsewhere, including Commission decisions and other partiesí testimony and pleadings.

Much of the discussion of PG&Eís safety history in this proceeding started with the 2010 San Bruno gas pipeline explosion that killed 8 people, injured 58 people, and destroyed 38 homes. (*See, e.g.* Cal Advocates Brief at 17-18.) It is important to keep in mind that PG&Eís safety problems did not start then, however. There were incidents prior to 2010, such as the 2008 Rancho Cordova gas explosion that killed one person, injured five others and destroyed a house. Since 2010, there have been a series of events, both large and small, that show that PG&E has a serious safety problem that has remained unresolved, despite the imposition of massive fines by this Commission and other penalties, including a criminal conviction. PG&Eís botched demolition of its Kern Power Plant resulted in the death of a worker in 2012 and injuries to five spectators in 2013. In 2014, a PG&E gas explosion destroyed a house in Carmel, PG&Eís Metcalf Substation was burglarized, and a City of San Jose employee was injured due to PG&Eís failure to properly mark the location of its (improperly installed) underground electrical line.

Then came the fires: the 2015 Butte Fire (two deaths), the 2017 Redwood Fire (nine deaths), Atlas Fire (six deaths), and the 2018 Camp Fire (86 deaths), with tens of thousands of homes and structures destroyed and hundreds of thousands of acres burned. (*See*, Cal Advocates Brief at 17-18.)

On the witness stand, PG&E Corp. CEO Johnson was asked about PG&Eís safety history:

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 20 of 124

Q: So itís not a good safety history, is it?

A: No. It is what it is. How about that? A lot of issues, big issues. But you can characterize it however you would like. But itís plenty of the challenges in that history. (Transcript v. 1 at 55.)

When pushed, Johnson acknowledged that there were ì[S]ubstantial problems in the past of safety leading to catastrophe to fatality.î (*Id*. at 57.) But he also repeatedly sought to shift the focus back onto what he and PG&E were doing now.

This Commission has previously noted that PG&Eís top management has been resistant to acknowledging its responsibility for PG&Eís failings (*see, e.g.* D.20-02-036 at 24-25), but the bottom line for this proceeding, however, is whether the plan of reorganization (and related documents) are acceptable in light of PG&Eís safety history. Given that safety history, the key question is whether PG&Eís plan and any conditions imposed by the Commission in connection with our decision approving the plan, will improve PG&Eís safety performance. Accordingly, it is appropriate to look at the proposals before us, including those proposed by PG&E as well as those adopted from the ACR, for PG&E to improve its safety performance going forward.

### 2. ~~ii.~~ Executive Risk and Safety Officers

ACR Proposal 1 adds refinements and details to PG&Eís proposal to establish an executive-level Chief Risk Officer (CRO) and Chief Safety Officer (CSO). The ACR calls for specific lines of reporting, for the CRO to appear before the Commission or meet with Commission staff at least quarterly, plus the CSO would provide semi-annual performance reports to Commission staff. Additional requirements for appointment to the two positions were also recommended.

PG&E expressed general support for ACR Proposal 1, and agreed that the CSO should have a public safety focus as well as a workforce safety focus, and

that the CRO and CSO positions remain in place until the Commission determines they are no longer necessary. PG&E recommended that regional safety reporting should be to the CSO, not the CRO, as PG&E believes that risk should be evaluated on an enterprise and line of business perspective, while safety efforts to address those risks are more appropriate for a regional approach. (PG&E Brief at 126-129.)

Other parties were generally supportive of ACR Proposal 1, but recommended some modifications. TURN argues that from PG&Eís description, the duties of the CRO and CSO overlap, and that may result in lack of accountability and misunderstandings. TURN accordingly recommends that PG&E just have a CRO, or to have the CSO report to the CRO, rather than having two equal level senior managers. (TURN Brief at 58.)

Cal Advocates recommends that the CEO of PG&E be designated as PG&Eís ìAccountable Officerî to establish safety accountability using the same language as Canadian National Energy Board. (Cal Advocates Reply Brief at 7.) Cal Advocates also notes that PG&Eís definition of the CSO role is focused on workplace safety, rather than public safety, but instead of expanding the duties of the position, Cal Advocates recommends that PG&E have separate officers dedicated to workplace and public safety. (Cal Advocates Brief at 12.)

CCSF similarly recommended that the roles and responsibilities of the two positions be more clearly defined, and to have the CSO oversee public safety as well as workplace safety. (CCSF Brief at 22-24.)

TCC likewise believes that the CSO position needs to prioritize public safety, and TCC supports the proposalís requirement that the CRO and CSO have reporting from safety officers and employees and contractors in the field in order to identify public safety concerns in a timely manner and the ability to

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
22 of 124

report those concerns up to the Safety and Nuclear Oversight (SNO) Committees and the CEOs of both PG&E and PG&E Corporation. (TCC Brief at 19-20.)

After considering the recommendations of the parties, the Commission adopts the recommendations of ACR Proposal 1 that PG&E have a separate CRO and CSO, the CSOís duties include both public and workplace safety, and that both the CRO and CSO get direct reporting from safety officers in the field, with regional issues reported to the CSO and line of business issues reported to the CRO. Both the CRO and CSO should have regular contact with PG&E employees and contractors working in the field, and both the CRO and CSO should be empowered to report directly to the SNO Committees and CEOs of PG&E and PG&E Corp. PG&E should consult with the State regarding the appointment of the initial CRO and CSO; subsequent appointments must be approved by PG&Eís SNO Committee. The CRO and CSO will be required to provide regular periodic reports to the Commission and/or Commission staff.

Further clarification and refinement of the roles of the CRO and CSO and their reporting requirements, both to the Commission and within PG&E, is necessary, and will be addressed in the PG&E Safety Culture Investigation (I.15-08-019) or other appropriate proceeding.

### 5.  iii. Independent Safety Advisor

ACR Proposal 2 calls for PG&E to appoint an Independent Safety Advisor that would functionally act in the same capacity as the federal court monitor after the termination of the federal monitor, and would work with the CRO, CSO and PG&Eís management team and board to develop recommendations to address compliance issues and enhance PG&Eís safety performance.

PG&E supports the appointment of an Independent Safety Advisor after the termination of the federal court monitor, but opposes a determination at this

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
23 of 124

time that the Independent Safety Advisor would functionally serve in the same capacity as the federal court monitor. PG&E instead recommends that PG&E would file an advice letter four months prior to the end of the federal monitor's term proposing the function of the Independent Safety Advisor based on PG&E's experience with the current Federal Monitor and PG&E's newly created Independent Safety Oversight Committee. (PG&E Brief at 134-135.) PG&E also recommends a process for the Commission to establish a budget for the work of the Independent Safety Advisor, and that PG&E could request recovery in rates of the costs and expenses of the Independent Safety Advisor within the approved budget. (*Id*. at 135.)  PG&E also recommends that the Independent Safety Advisor position would sunset after 2025, unless the Commission extends that date.  (*Id*.)

CCSF believes that given PG&E's safety history the Commission should require a monitor rather than an advisor, and that PG&E's plans for an advisor ì[F]all short of what the Commission should require.î (CCSF Brief at 26.)

CCSF recommends that:

In light of PG&E's record, the Commission should require oversight from an independent safety monitor with authority to warn the Commission of its safety concerns, instruct PG&E to take certain actions, and recommend that the Commission step in if PG&E fails to take those actions. In order for the monitor to be effective, the Commission should be responsible for hiring and supervising the independent safety monitor, who should also report directly to the Commission. (CCSF Brief at 26.)

CCSF also opposes PG&E's recommendation that the independent safety monitor's role should end in 2025, but instead recommends that the Commission establish specific, verifiable safety standards that PG&E must meet before determining that an independent safety monitor is no longer needed. (*Id*. at 26.)

CCSF calls for the independent safety monitor, like the federal court monitor, to be able to access support from attorneys and experts as necessary, and for PG&E to provide full access to its employees, facilities and records. (*Id.* at 26-27.)

TURN, while generally supporting ACR Proposal 2, agrees with CCSF that there should be a monitor reporting to the Commission, rather than an advisor reporting to PG&E: îFirst, TURN strongly believes that the successor to the current Federal Monitor should continue to be a truly independent Monitor who is appointed by and reports to the CPUC.î (TURN Brief at 60.)

TURN also calls for more transparency regarding the monitorís work and findings, so that the public has some idea of what work the monitor is actually doing, and can have some confidence in that work.

Again, similar to CCSF, TURN argues that the new independent safety monitor should have unbridled access to PG&E documents and personnel, and ì[S]hould generally be patterned on the Federal Monitor in terms of scope of authority, staff support, and Utility payment of fees and costs.î (*Id.* at 61.)

TURN does not oppose PG&Eís proposal to have PG&E file an advice letter to propose the detailed functions of a monitor. (TURN Reply Brief at 48.) TURN opposes an automatic or default sunset of the independent safety monitor in 2025, and instead recommends that PG&E should have to demonstrate that the position is no longer needed, which PG&E could do via a Tier 3 Advice Letter that shows that PG&E has been successful at operating safely since its exit from bankruptcy and that the monitor is no longer needed. (*Id.*)

PG&E only obliquely addresses the recommendations of CCSF and TURN, but mostly just reiterates its proposal to defer defining the role of the advisor until closer to the end of the federal court monitor, at which time PG&E would

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page
25 of 124

file an advice letter ì[P]roposing the function of the Independent Safety Advisor.î (PG&E Reply Brief at 82-83.)

While the Commission finds some merit to the recommendations of CCSF and TURN, we are also persuaded by PG&E that the Commission should consider PG&Eís additional experience with both the Independent Safety Oversight Committee and the Federal Monitor at the point in time when the Commission determines the function, scope of work, and reporting requirements for this role. Accordingly, this decision directs that there will be an Independent Safety Monitor that will report to the Commission and be functionally equivalent to the federal court monitor. Other details for implementing the Independent Safety Monitor are reserved for future consideration, such as the Monitorís selection and appointment, its exact scope of duties, reporting requirements and budget and cost recovery. PG&E is directed to submit a Tier 3 Advice Letter to the Commission no later than one year before the expiration of the term of the federal court monitor, with a proposed scope of work, budget, solicitation process, and a process for selection/approval by the Commission. Energy Division will process the Tier 3 Advice Letter in consultation with the Commissionís Safety Enforcement Division and Safety Policy Division, as appropriate.

**5 .        iv. Safety and Nuclear Oversight Committee**

ACR Proposal 3 clarifies and expands the authority of the Safety and Nuclear Oversight (SNO) Committees of PG&Eís boards of directors. Specifically, the SNO Committees would have oversight over PG&Eís Wildfire Mitigation Plan, Public Safety Power Shutoff (PSPS) program, compliance with the Safety and Operational Metrics in ACR Proposal 7, periodic reporting to the boards of directors and Commission staff, and PG&Eís response to the recommendations of

the Independent Safety Advisor recommended in ACR Proposal 2. In addition, the SNO Committees would have the authority to hire third-party safety and utility operations experts. Selection of the initial members of the SNO Committees would incorporate consultation with, or approval of, the State and Commission staff.

PG&E supports this proposal for expanded oversight and reporting for the SNO Committees. PG&E agrees to consult with the State on the initial members of the reformed SNO Committees, and notes that the SNO Committees already have authority to hire third-party and utility operations experts. (PG&E Brief at 7, 98-99.) TCC ìappreciatesî PG&Eís general agreement with this ACR Proposal. (TCC Reply Brief at 23.)

TURN also generally supports this proposal, with the qualification that the SNO Committeesí periodic reporting to CPUC staff should be as transparent as possible, so that other stakeholders could have an opportunity present a potentially different perspective. (TURN Brief at 51.)

The proposal for Expanded SNO Committee Authority is adopted, with the conditions that PG&E will consult with the State on the initial members of the reformed SNO Committees and PG&E will serve reports summarizing meetings with CPUC staff to stakeholders.[11][12]

## 5.       V. Board of Directors and Holding Company

ACR Proposal 4 calls for the establishment of additional requirements applicable to the boards of directors of PG&E and PG&E Corp. in the following areas: Composition of the Boards of Directors; establishment of a Safety Subcommittee; Safety Expertise Criteria; and Director Selection Process.

Composition of the Boards of Directors

---

[11][12] Initially this can be done via electronic service to the service lists in this proceeding and in I.15-08-019, but can be revised as needed.

EPUC/IS argues that PG&Eís proposed board structure, similar to that proposed by the ACR, does not have an adequate independence or separation between the boards of PG&E and PG&E Corporation and that this is problematic:

> There exists an inherent conflict between the interests and fiduciary duties of the PG&E Corporation Board and the interests and fiduciary duties of the PG&E Utility Board. The Utility Board must be able to ìoperate independently of its Parent Company Board to provide adequate assurance that the Utility is able to meet its safety and reliability requirements and to manage its obligation of providing service at competitive rates.î (EPUC/IS Brief at 36.)

EPUC/IS argues that ìWithout a clear distinction of independence between the two Boards, there is an acute risk that the PG&E Corporation Board will act in a manner to preserve the Corporation over the Utility.î (*Id.* at 34.)

> MCE makes a similar argument:

> To the extent PG&E continues to maintain a holding company structure, the Board of Directors of PG&E Corporation and PG&E Company must reduce their overlap. The current director-sharing paradigm has placed the utility at risk as a result of the holding company inappropriately extracting value from the Utility, as they propose to do through the PG&E Plan. Preserving separate boards with separate members, until such time as the holding company is consolidated with the utility, will improve the independence of the utility Ö (MCE Brief at 45.)

> TCC agrees with EPUC/IS and MCE:

> The TCC submits that this degree of overlap is inappropriate and should be rejected Ö Members of the two Boards have different and sometimes conflicting roles, responsibilities, and duties. To have all the same individuals except PG&Eís CEO serve on the Board of both entities would invite conflicts of interest, which could well lead to the subordination of public safety interests to pecuniary interests of the parent company. (TCC Reply Brief at 24.)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 28 of 124

PG&E, on the other hand, supports the ACR's proposal that the Boards of the Utility and of PG&E Corporation be largely the same, and argues that the other parties have not shown that there is a conflict between the interests of PG&E Corporation and the Utility, and because the Utility is PG&E Corporation's only substantial asset, ì[T]he Utility and PG&E Corporation have a common interest in ensuring that the Utility is financially sound.î (PG&E Reply Brief at 65.) PG&E argues that the Commission's Holding Company conditions and Affiliate Transaction Rulesóand, in particular, the first priority conditionóaddress these same issues, and that the boards of Southern California Edison Company (SCE) and San Diego Gas & Electric Company (SDG&E) are structured the same way. (*Id.* at 66.)

While the Commission understands the basis for the argument raised by EPUC/IS, MCE and TCC, and has some appreciation for its underlying point, at this time we see little advantage (and potentially significant problems) with reconstituting the boards of directors to have completely separate membership. The composition of the boards as proposed in ACR Proposal 4 is adopted.

PG&E states that it ìis prepared to accept the ACR's proposal for longer than one-year terms with no term limits,î but expresses ìconcernsî with the proposal. PG&E's Board members currently serve one-year terms, which PG&E asserts is ìconsistent with the consensus of CalSTRS, CalPERS, and other major institutional investors that ëdirectors should be accountable to the shareholders they represent and therefore should stand for election every year.íî (PG&E Brief at 107-108.) According to PG&E, if its Board member terms were longer than one year, then PG&E would be legally required to stagger or classify its Boards, which it says institutional investor organizations disfavor. (*Id.* at 108.) While PG&E acknowledges that in the current situation there is potential benefit for

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
29 of 124

greater stability in its boards, PG&E still believes that three-year terms are too long and too different from standard practices. (*Id.*)

TCC agrees with PG&E, and states:

> One-year terms for Board members have become nearly universal among public companies and, as PG&E notes, are ìconsistent with the consensus of CalSTRS, CalPERS, and other major institutional investors that ëdirectors should be accountable to the shareholders they represent and therefore should stand for election every year.î Granting Board members three-year terms would needlessly limit accountability and delay the replacement of poorly performing Board members at a time when highly effective Board members are most vitally needed. This would not be appropriate in light of PG&Eís public safety history and criminal probation. (TCC Reply Brief at 26.)

No party expressed support for three-year board terms. PG&E provided an alternative approach, with two-year terms, with two classes of directors and a phase-out, which it argues would ì[S]trike a better balance than three-year terms between the accountability provided by one-year terms, and the stability and continuity provided by longer terms.î (PG&E Brief at 108-109.) PG&Eís proposed alternative approach is adopted.

PG&E supports ACR Proposal 4ís requirement that ìThe directors, other than the two executive officers, should be independent directors as defined by the New York Stock Exchange and the Securities and Exchange [Commission],î and notes that its Corporate Governance Guidelines already require at least 75% of the directors to be independent, and PG&Eís current Boards already satisfy the higher threshold set forth in the ACR. (PG&E Brief at 107.) There was no opposition to this proposal. This proposal is adopted.

ACR Proposal 4 requires that at least 50% of directors should be California residents at the time of their selection. PG&E doesnít directly oppose this

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
30 of 124

requirement, but seeks to condition it with the proviso that: ì[T]the Boards would retain flexibility to nominate a slate of directors with a lower percentage if the Boards conclude, and the Governorís Office agrees, doing so would result in more qualified Boards overall.î (PG&E Brief at 107.)

TURN supports this aspect of ACR Proposal 4, with the additional recommendation that preference be given to candidates who reside in PG&Eís service territory. (TURN Brief at 48.)

TCC opposes this aspect of the ACR proposal, arguing that the Commission should not adopt a strict California residency level for the Board. According to TCC:

> Adopting such a quota or requirement may contravene the goals of AB 1054 by according State residency a significance in excess of more important factors, such as an individual candidateís experience, diligence, talent, and demonstrated dedication to public safety. The Commission should not lose sight of the crucial focus of reform: PG&E must emerge from bankruptcy with a radically transformed governance structure, attitude, and operational practices that ensure public utility services are provided in a manner compatible with public safety. A California residency requirement cannot be given priority overachieving this result.

> As the TCC noted in its Opening Brief, however, there would be value in ensuring that the PG&E Boards include members located in the communities served by, and thus threatened by, PG&Eís public safety record. For this reason, the TCC continues to recommend that Commission approval of the Plan be conditioned on the PG&E Board and PG&E Corporation Board each including at least two members who reside in areas served by PG&E. (TCC Reply Brief at 25.)

MCE, on the other hand, argues that _every_ board member should reside not just in California, but within PG&Eís service territory. MCE argues that

- 27 -

PG&Eís operations have tremendous impacts on the financial wellbeing and safety of its customers. PG&Eís recent wildfires and public safety power shutoffs directly affected millions of Californians. To strengthen the incentives for the PG&E board to act in the public interest, they should be required to live in the communities they serve and impact. A director working from another state is not able to truly appreciate what it is like to experience days of smoke exposure, the palpable or realized threat of wildfires, and days without electricity from a Public Safety Power Shutoff. (MCE Brief at 45-46.)

The Joint CCAs have a similar perspective, arguing that the board should be familiar with the on-the-ground circumstances of PG&Eís customers, and that the best way for board members to gain independent knowledge of the companyís operations is for board members to reside in PG&Eís service territory. The Joint CCAs also argue that having board members living within PG&Eís service territory could help to insulate the boards from pressures from financial interests that are not aligned with the interests of PG&Eís customers and communities. The Joint CCAs recommend that the Commission should require that ìa clear majorityî of PG&Eís board members reside in its service territory. (Joint CCA Brief at 21-22.)

TCC, MCE and the Joint CCAs raise valid points. But given the size of California and the somewhat unique issues faced by both California and PG&E, the initial formulation of a minimum of 50% of board members being residents of California, with a preference for those living in PG&Eís service territory, strikes a reasonable balance. This requirement may be revisited if it appears to have a detrimental effect on the quality of the boards.

ACR Proposal 4 additionally states that: ìThere should be a presumption that the reorganized PG&E and PG&E Corporation boards of directors will be comprised of individuals not currently serving on the boards.î

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
32 of 124

PG&E strongly opposes this aspect of ACR Proposal 4, arguing that there is no evidence that any of PG&E's current directors is unqualified to serve, and that PG&E is concerned that a departure of all directors would lead to a loss of continuity and institutional knowledge which could hamper safety and other initiatives. (PG&E Brief at 110.)

TCC counters PG&E's argument:

PG&E challenges the ACR's proposed presumption that the reorganized PG&E and PG&E Corporation Boards be comprised of individuals not currently serving on either of those Boards. PG&E asserts that there is substantial evidence of the current Board members' safety experience and that mass departures would lead to a loss of ìcontinuity and institutional knowledge.î The TCC disagrees.

PG&E has not introduced evidence showing that the current members of both boards have significant and relevant public safety experience. Moreover, PG&E's claims regarding a loss of continuity and institutional knowledge ring hollow, given that the current Board members have been in place for less than a year. There is no evidence that significant turnover in Board membership would be detrimental to public safety. What is needed is a thorough house cleaning that helps ensure a transformed PG&E focused on public safety, first and foremost, upon emergence from bankruptcy. (TCC Reply Brief at 26-27, citations omitted.)

TURN takes a middle ground, arguing that: ì[D]irectors who were nominated or supported by speculative investor interests drawn to PG&E by its bankruptcy should not serve on the post-emergence Boards.î (TURN Brief at 48.)

PG&E acknowledges that it expects ìa substantial change in the Boards in 2020,î and that a number of the current directors will depart and be replaced. (PG&E Brief at 110.) But PG&E believes that some existing directors should be able to continue, and offers that those willing to continue would be vetted against the director skills matrix. (*Id*.) Because ACR Proposal 4 calls for a presumption,

rather than a requirement, one way for PG&E to rebut the presumption set forth in the ACR proposal is for potentially continuing board member to undergo a thorough review, equivalent to that of new board members. Accordingly, any potentially continuing board members must be reviewed against the director skills matrix and all other requirements applicable to new board members, including the following criteria set forth in ACR Proposal 4:

> In addition to meeting characteristics identified in PG&E's testimony for the skills matrix, candidates for the boards of directors should be evaluated on the following criteria:
>
> - The character of the candidates and their fit with the board culture such as self-awareness, integrity, ethical standards, judgment, interpersonal skills and relations, communication skills, and ability to work collaboratively with others.
>
> - Possible limitations on serial or ìprofessionalî directors, including a restriction on directors that have substantial relationships with investment funds and investors in PG&E or PG&E Corporation.
>
> - Important public policy objectives such as diversity, representation from regions PG&E serves, and commitment to California's climate change goals.

There was general support for these criteria, although PG&E expressed concerns about the restriction on directors that have substantial relationships with investment funds and investors in PG&E. (PG&E Brief at 101-102.) TCC argues that PG&E overstates the potential impact of these criteria, and that its expressed concerns are baseless. (TCC Reply Brief at 23-24.) TCC is correct, particularly since these criteria are to be used in evaluating candidates, but are not rigid prerequisites to a board appointment. These criteria are adopted as set forth above.

Safety Subcommittee

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
34 of 124

This aspect of ACR Proposal 4 calls for PG&E to constitute a ìSafety Subcommitteeî of the executive committee of the board of directors, with members having enhanced safety expertise.

PG&E opposes this proposal, arguing that it would be ìunnecessary, confusing, and redundant,î given that PG&E (based on NorthStarís recommendation) has moved to greater integration of the safety function, PG&E ìgenerally centralizes oversight of all safety issues in the SNO Committees,î and PG&E supports ACR Proposal 3 that would expand the SNO Committeesí oversight (PG&E Brief at 110-111). PG&E argues that a separate safety subcommittee would be contrary to these efforts, and could create accountability and workload management complications as well. (*Id.* at 111.)

PG&E raises valid concerns, in particular whether a separate safety subcommittee is redundant in light of the expansion of the SNO Committees. Accordingly, this decision does not adopt the proposal for the establishment of a safety subcommittee.

Safety Expertise Criteria

In this area, ACR Proposal 4 calls for the following:

The skills matrix should include additional criteria that must be met by the Chair of the Board of PG&E, the Chair of the SNO Committees, and at least one other director. Directors who meet one or more of the safety expertise criteria would serve on the Safety Subcommittees. The safety expertise criteria should include the following:

- Specific substantial expertise related to wildfire safety, wildfire prevention, and/or wildfire mitigation.
- Specific substantial expertise related to the safe operation of a natural gas distribution company.
- Specific substantial expertise related to enterprise risk management, including cyber security, and/or experience with

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 35 of 124

nuclear safety (prior to the cessation of production operations of Diablo Canyon Nuclear Power Plant in 2025).

PG&E states that it supports the adoption of safety expertise criteria, and recommends that the criteria be applied more broadly to all members of the SNO Committees. (PG&E Brief at 102-103.) But PG&E then goes on to propose an expansion of the safety expertise criteria to include other elements, including a number that are not directly safety-related, such as expertise related to management of large organizations, and expertise related to utility operations. (*Id.*)

TURN has a more detailed and prescriptive approach, arguing that the Commission should require certain percentages of the board have certain specific expertise, with mandatory Commission review of PG&Eís compliance. (TURN Brief at 42-43.)

This Commission neither wants to dilute the meaning of safety expertise nor over-focus on the precise experience held by each individual board member. Accordingly we adopt the proposal as set forth in the ACR, with two modifications: the language relating to the safety subcommittee is removed, and the 2025 expiration of the criteria for nuclear safety is removed, as Diablo Canyon will still have spent fuel storage and decommissioning operations after that date.

 Director Selection Process.

ACR Proposal 4 set out a relatively detailed proposal for ~~Commission~~ oversight of the selection of the boards of directors.

PG&E generally supports ACR Proposal 4 on this issue, with the exception of the proposed seven-year sunset date for Commission oversight. Instead, PG&E recommends a sunset at the earlier of (1) five consecutive years in which PG&E has not entered the Enhanced Oversight and Enforcement Process (steps 3 and above); or (2) if PG&E has entered and subsequently exited the Process,

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 36 of 124

PG&E has remained out of the Process for two consecutive years; or (3) the Commission has approved a change in control. (PG&E Brief at 106.)

TURN generally supports the requirements of ACR Proposal 4 in this area, but also wants PG&E's final proposed slate of directors to be subject to a transparent review and approval process, including stakeholder comment. (TURN Brief at 50.)

TCC generally opposes fixed sunset dates for board governance conditions, and argues:

> The TCC submits that Board governance conditions should remain in place until such time that the Commission makes a final, non-appealable determination that they are no longer needed to ensure public safety. Any such determination should be based upon substantial record evidence and subsequent findings that (1) PG&E's culture has changed dramatically, (2) its safety and operational history has been exemplary for such a long period that it is indisputable that it has overcome the strong presumption against it from its past record, and (3) it has controls and other safeguards in place to ensure it does not slip back into old habits. (TCC Reply Brief at 27.)

After considering party comments, this aspect of ACR Proposal 4 is adopted with one minor modification: the seven-year sunset remains in place, but can be extended if PG&E has not met the criteria set forth by TCC.

In addition to the board governance issues raised by ACR Proposal 4, the parties raised additional issues. TURN notes that because of PG&E's holding company structure, PG&E has two almost identical boards, one for PG&E the utility and one for PG&E Corp. the holding company. TURN argues that having two boards instead of one serves no purpose, and in fact results in inefficiencies. (TURN Brief at 43-44.) According to TURN:

Case: 19-30088     Doc# 7510-10     Filed: 05/22/20     Entered: 05/22/20 15:54:07     Page
37 of 124

An issue that leaps from the record of this case is whether PG&E's current holding company structure serves any useful governance purpose. In fact, the record provides substantial evidence that this structure hinders effective and efficient governance. [Ö] More importantly, the holding company creates an unnecessarily confusing management structure that results from having two CEOs with an unclear division of responsibility. (*Id.*)

On cross examination, PG&E Corp. CEO Johnson testified:

Q: Well, I feel like I've seen a statistic that 99 percent, or maybe more, of the revenues of PG&E Corporation are actually revenues of the utility. Am I on the right wavelength there?

A: Yeah. I don't know what the exact number is. But that's -- you're on the right wavelength. Yeah.

Q: So in terms of, at least, what produces revenue, the corporation is entirely dependent on -- almost entirely dependent on the utility; is that correct?

A: That is correct today, yes. (Transcript v. 1 at 67.)

TURN questions the value of PG&E's holding company structure, and supports elimination of the holding company, ì[U]nless PG&E can make a compelling showing that the Utility and its customers receive material benefits from the holding company.î (Ex. TURN-1 at 14.)

According to TURN, PG&E objects to the elimination of its holding company structure on the grounds that while it currently only has a few unregulated subsidiaries, which are inactive, a holding company structure would be useful if PG&E Corporation elects to pursue unregulated businesses. In response, TURN argues that:

In light of the companyís dismal safety record, the company should be single-mindedly focused on fixing its safety and competence problems and should not allow itself to be distracted by even considering the pursuit of unregulated

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 38 of 124

businesses. The fact that PG&E's current unregulated
subsidiaries are inactive only reinforces that there is no
current need for a holding company structure from a
governance perspective. (Ex. TURN-1 at 14-15.)

MCE also supports revocation of PG&E's holding company structure, but
on different grounds. According to MCE, PG&E has abused the holding
company structure:

PG&E's failures to comply with the Commission's holding
company requirements, including the first priority condition,
and its actions taken to aggressively decapitalize PG&E
warrant revocation of PG&E's holding company
authorization. This should be done in such a way as to avoid
undermining the claims of fire victims that are expected to
receive half of their compensation through equity in the
holding company. (MCE Brief at 27-28.)

The Joint CCAs support MCE's recommendation that the Commission
consider revoking PG&E's holding company structure, arguing that:

[T]he overwhelming bulk of evidence indicates that PG&E's
holding company structure is inappropriate to promote the
behavior needed to reform PG&E, and has been abused. The
Commission should therefore consider revoking PG&E's
holding company structure pending evidence of genuine
reform. (Joint CCA Reply Brief at 14-15.)

TCC argues that there is inadequate time in this proceeding for the
Commission to evaluate the legal and other ramifications of eliminating PG&E's
holding company in this proceeding, but the Commission can address that issue
in the PG&E Safety Culture OII (OII. 15-08-019), and the Commission should not
make any determination in this proceeding that would preclude consideration of
the issue in that proceeding. (TCC Brief at 6, 25.) Other parties similarly argue
that the Commission should not preclude issues such as this from consideration
in the PG&E Safety Culture OII. (*See, e.g.* CCSF Brief at 18.)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
39 of 124

In considering the issue of the continued existence of PG&Eís holding company structure, PG&E CEO Johnson provided some useful perspective:

> Q: Thank you. As a general matter, why -- why would a corporation use a holding company structure?
>
> A: Several reasons. One is for flexibility in pursuing myriad businesses. It gives you some flexibility on the financing options. Those would be the ñ the main two.
>
> Q: Given PG&E's current structure and reality where pretty much the only thing in the holding company is the utility, why is a holding company a good idea or appropriate for PG&E?
>
> A: So I think -- I've studied a little history. I think it was created at the time where the desire was to diversify, go broadly, those kind of things. I don't think that's going to happen anytime soon. So that reason for the holding company, I think, is not particularly strong at the moment. It does give us some financing flexibility going forward here, as we come out of bankruptcy, and so I think it is valuable in that regard.
>
> Q: I notice that some of the debt that's being issued pursuant to the plan is by the holding company. Why is that?
>
> A: So that you can -- you can achieve an appropriate capital structure at the utility, and to do that, and to have investment grade rating on the utility debt, you use -- you'd have to issue some to the holding company. (Transcript v.2 at 261-262.)

The plan of reorganization does incorporate significant use of holding company debt. While the operational value of a holding company structure for PG&E at this time is at best questionable, the use of holding company debt under the plan of reorganization does appear to have some cost benefit. Accordingly, the existing holding company structure is left in place for the time being, but the Commission may look again at this issue, taking into consideration PG&Eís

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
40 of 124

subsequent safety record.~~1213~~ In the meantime, PG&E and PG&E Corporation must ~~get~~continue to notify the Commission ~~authorization for~~of the ~~formation~~creation of ~~any~~new affiliates ~~or subsidiaries, and for~~and must promptly file a compliance plan. PG&E must provide quarterly reports to the Commission's Energy Division of the sale or encumbrance of any assets of its affiliates or subsidiaries.[14] Any sale or encumbrance of assets of affiliates or subsidiaries over which PG&E or PG&E Corporation has control and that has a value over $5 million requires prior Commission authorization. These requirements may be addressed further in I.15-08-019. Those transactions that are proposed in connection with the PG&E Plan approved in this order are approved in Section 5.2 (re financial issues) and not subject to this requirement.

### 6. ~~vi.~~ Approval of Senior Management

ACR Proposal 5 calls for senior management of PG&E to be approved by the safety subcommittee if one is established. Because this decision does not adopt the creation of a safety subcommittee, but instead adopts expansion of the authority of the SNO Committees, this proposal is modified to have senior management of PG&E be approved by the SNO Committee. That approval should come prior to full board approval. PG&E does not object to having the SNO Committee approve the executive officers prior to the full board. (PG&E Brief at 112.) No party opposed this proposal, and it is adopted as modified.

### 7. ~~vii.~~ Safety and Operational Metrics

ACR Proposal 7 calls for the development of safety and operational metrics. Under this proposal, PG&E would propose, in an appropriate proceeding, ì[A]ttainable Safety and Operational Metrics that, if achieved, would ensure that PG&E provides safe, reliable and affordable service consistent with

---

~~1213~~ This issue remains within the scope of the PG&E Safety Culture Investigation (I.15-08-019).
[14] Energy Division may direct that this report be combined with other reports it receives from PG&E.

Californiaís clean energy goals.î Because these metrics would be developed in a future proceeding, we do not finalize them here, but rather provide guidance and direction for their development.

Parties were generally supportive of developing metrics, and provided comments that both addressed the process of their development and their potential contents and structure.

Parties addressing the process for developing the metrics had a number of observations and recommendations. MCE supports the establishment of safety and operational metrics to measure PG&Eís success. MCE recommends that the development of the metrics should occur through a transparent process at the Commission, and PG&E should be precluded from defining the appropriate metrics. According to MCE, if PG&E is allowed to define the metrics, PG&E is likely to set a low bar for defining compliance with the metrics. (MCE Brief at 48-49.)

While TURN supports using appropriate metrics to track and drive PG&Eís progress toward improved safety outcomes, TURN warns that: ìHowever, the Commission should not under-estimate the challenge in choosing appropriate metrics.î (TURN Brief at 87.)  TURN supports having PG&E propose Safety and Operational Metrics in an appropriate proceeding, and recommends that if the metrics will be important to the Commissionís assessment of PG&Eís safety progress, the Commission should ensure that parties to that proceeding have adequate time for discovery, analysis and comments on PG&Eís proposed metrics. (TURN Brief at 88-89.)

In addressing the process for development of the metrics, PG&E asks:

As the purpose of the Safety and Operational Metrics would be to measure PG&Eís future progress, PG&E understands, and would request confirmation, that the adopted Safety and

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
42 of 124

Operational Metrics would measure PG&E's performance
after the Effective Date, and would not be applied to PG&E's
actions before that date. (PG&E Brief at 136.)

While any adopted metrics would be intended to measure PG&E's future

performance, the metrics themselves (and the process of their development)

could take into consideration PG&E's past performance, such as for the

development of performance baselines or other measurement criteria. This issue

can be addressed more appropriately in the proceeding to develop the metrics.

Second, PG&E appears to be requesting confirmation of the following:

Given the importance and complexity of defining the Safety
and Operational Metrics, PG&E further understands that
Commission approval of such metrics would occur after June
30, 2020, and that such approval is not required for the
Commission to approve PG&E's Plan under Section 3292.
(PG&E Brief at 137.)

PG&E is correct. We are not adopting or approving metrics here, and

doing so is not required for the Commission to approve PG&E's plan of

reorganization.[1315]

Parties also provided useful recommendations for the substance of metrics

that the Commission should keep in mind. TURN provided the following overall

guidance and recommendations:

The greater the stakes assigned to metric outcomes, the more
care needs to be taken in adopting metrics. For example, if
important financial or other outcomes will be determined by
the metrics (such as the Earnings Adjustment Mechanism in
ACR Proposal 8 or Executive Incentive Compensation), much
more care is required, for at least two reasons.

First [Ö] there is the problem of ìmanaging to the metric,î
which means that key safety issues that are not addressed by
the metrics can get ignored. The antidote to this problem is to

---

[1315] We note that PG&E is already subject to safety metrics pursuant to its wildfire mitigation
plan.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
43 of 124

adopt a diversity of broad, outcome-based metrics, rather than detailed, focused metrics. Achieving the right portfolio of metrics is challenging, to say the least.

Second, when the stakes are high for the utility, there is greater pressure to manipulate metric results in order to make safety progress look better than it really is. [Ö] [T]he antidotes for this problem are: (1) objective, not subjective, metrics; (2) clearly defined metrics that do not allow for subjective interpretation; and (3) rigorous audits by the regulators so that utilities know that manipulation will be caught and punished.

In addition, [Ö] program targets need to be distinguished from outcome-based (aka performance) metrics. Program targets measure how much work has been performed to meet targets. Assessing progress under targets can be useful, but such measures should not be confused with assessments of safety improvement. Put succinctly, getting work done is not necessarily the same as doing the right work or doing the work right, as has been shown by PG&Eís poor safety history. Well-chosen outcome-based metrics are a much better way to assess whether progress is being made in reducing safety risk. (TURN Brief at 87-88.)

TURN is critical of the proposed metrics set forth in ACR Proposal 7, however, as not meeting these criteria, and in some cases not actually constituting metrics. (*Id.* at 89-90.)

Cal Advocates supports the Commission developing organizational metrics for PG&E with the participation of parties. Cal Advocates observes that:

Inadequate metrics can create unintended results and be counter to safety. Current metrics appear to lack leading indicator organizational metrics, key to preventing organizational failure that is the root causes of catastrophic failures. (Cal Advocates Brief at 14-15.)

CCSF also supports the use of operational metrics ìthat would guide and incent the right behavior and performance by PG&E.î (CCSF Brief at 29.) CCSF

- 40 -

recommends that adopted metrics should measure and quantify improvements in system performance as part of any work progress metrics (such as tree trimming or poles replacement), and that PG&E's operational and performance metrics should be applied to PG&E's entire system, not just to high fire threat areas. While CCSF understands the need for PG&E to focus on improvements and resource commitments in fire areas, it argues that this should not come at the expense of PG&E's larger system, as old and poorly maintained equipment can fail and cause injuries and property damage anywhere. (CCSF Brief at 29.)

The recommendations of MCE, TURN, Cal Advocates and CCSF are useful, and should be considered in the proceeding that addresses the development of safety and operational metrics. Several parties made additional recommendations for issues to be considered in that proceeding; for example, MCE recommended that the Commission also consider equity and climate outcomes, and CCSF noted that PG&E must plan for emergencies other than fires, such as earthquakes. As TURN notes, the Commission will likely have a full plate just addressing the more narrowly focused safety and operational metrics teed up by the ACR Proposal. Accordingly, while we do not preclude the consideration of other types of metrics in the future proceeding, we do not endorse their consideration at this time.

PG&E makes some requests about the details of the metrics, in essence asking in advance for a determination on the substance of those metrics and their operation. Specifically, PG&E asks that the metrics at issue here ì[S]hould not be established in the same manner as other metrics that serve different purposes.î (PG&E Brief at 136.) As examples of metrics that serve different purposes, PG&E cites to executive compensation metrics and the metrics in the Wildfire Mitigation Plans and RAMP [Risk Assessment Mitigation Phase]. PG&E

additionally requests that its performance relative to the metrics be measured on an annual basis. (*Id.*) These issues are more appropriately addressed in the proceeding that develops the metrics, and we decline to address them here. The Commission will initiate a new proceeding or a track within an existing proceeding to establish the Safety and Operational Metrics with the input of parties.

### 8 . ~~viii.~~ Fines and Penalties

The OII and Scoping Memo in this proceeding identified as an issue whether PG&E's plan of reorganization provides satisfactory resolution of claims for monetary fines or penalties for PG&E's pre-petition conduct. (Scoping Memo at 6.)

PG&E argues that it does. According to PG&E, ìPG&E has fairly and expeditiously resolved Commission proceedings regarding fines and penalties in a manner that will permit PG&E to emerge from Chapter 11.î (PG&E Brief at 65.)

Under PG&E's Plan, the required ìCPUC Approvalî includes ìsatisfactory resolution of claims for monetary fines or penalties under the California Public Utilities Code (Public Utilities Code) for prepetition conduct.î (*Id.* at 66.) PG&E identifies four Commission proceedings that present claims for monetary fines or penalties. In those four proceedings, PG&E has entered into settlement agreements that would resolve those proceedings upon Commission approval, and the Commission has approved three of them. The one that remains unresolved is the Commissionís Wildfire OII (I.19-06-015), but according to PG&E, ìThe Amended Plan filed March 9, 2020 removes the ësatisfactory resolutioní of that proceeding from the CPUC Approval conditions precedent to Plan confirmation but retains it for the Plan Effective Date.î (PG&E Brief at 27.) As a result, PG&E says that: ìThe Commission need not address the final

resolution of the Wildfire OII settlement in order to determine in this proceeding that PG&Eís Plan meets the requirements of AB 1054.î (PG&E Brief at 68.)

TURN objects to this change to PG&Eís plan, arguing that ìPG&E seeks to put the Commission in an untenable positionî of having to approve the plan without knowing whether PG&E will determine that outcome is ìsatisfactoryî until several months after the Commission has to render this decision. (TURN Reply Brief at 13.) TURN asserts that the outcome of the Wildfire OII is ìparticularly germaneî to the Commissionís approvals under AB 1054. (*Id.*)

As noted above, both the OII and the Scoping Ruling identified as an issue for our determination of whether a proposed plan of reorganization provides satisfactory resolution of claims for monetary fines or penalties for PG&Eís pre-petition conduct. (*Id.*) This is separate from the condition precedent to PG&Eís plan that also requires satisfactory resolution of the Wildfire OII, and thus PG&Eís amendment changing the ìsatisfactory resolutionî date to the Plan Effective Date is not binding on the Commission. Accordingly, we find that PG&Eís plan ~~must provide~~provides satisfactory resolution of claims for monetary fines or penalties for PG&Eís pre-petition conduct, ~~and~~as the Wildfire OII ~~must be~~h as been resolved by Commission ~~decision.~~Decision (D.)20-05-019 issued May 8, 2019.

The only other party to address this issue in briefs was MCE, which makes two arguments. First, MCE cites to language in the plan relating to waiver, release and discharge of claims, and based on that argues:

> As a result, the Commission must ensure that it is able to impose and collect all fines and penalties, including with regards to the Tubbs Fire, the Kincade Fire and all other conduct, including unknown conduct that has occurred. As such, the Commission should take protective measures to ensure such fines and penalties, if appropriate, and necessary

- 43 -

investigations are not barred after PG&E emerges from bankruptcy. (MCE Brief at 42.)

Second, according to MCE:

Fines and penalties are to be included in the total capped amount of the Fire Victim Trust. This means, without Commission precautions, amounts due from PG&E would actually be taken from fire victims. [Ö] *The Commission should order PG&E to pay fines and penalties in full without reducing Fire Victims Trust amounts.* (MCE Brief at 43, emphasis in original.)

The Tubbs fire is in the scope of the Commissionís Wildfire Investigation proceeding, and accordingly will be resolved (including any fines and penalties) in the proceeding. The relationship between the fines and penalties paid by PG&E, if any, stemming from the Wildfire OII and the amounts paid to fire victims are being addressed in the Wildfire OII and the Bankruptcy Court, and need not also be addressed here.

As to other Commission investigations and proceedings, including but not limited to future investigations and proceedings the Commission may open related to the Kincade Fire or other conduct by the Debtors prior to the effective date of the plan, the plan should make clear that resolution of PG&Eís Chapter 11 cases does not preclude the Commission from imposing fines and penalties in any such investigations and proceedings pursuant to its enforcement authority. Accordingly, PG&E is ordered to modify the plan to state that neither confirmation nor consummation of the plan shall affect any pending or future Commission proceeding or investigation, including any adjudication or disposition thereof, and any liability of the Debtors or Reorganized Debtors, as applicable, arising therefrom shall not be discharged, waived, or released.

### **9** . ~~ix.~~ Regional Restructuring

In its testimony, PG&E briefly described a proposal to develop a regional restructuring plan that would result in local operating regions led by an officer of

the utility that reports directly to the CEO. (Ex. PG&E-1 at 5-35 ñ 5-36.) ACR Proposal 6 further addresses regional restructuring of PG&E, calls for PG&E to create local operating regions to bring management closer to customers, and calls for PG&E to take two interim steps: appointing regional executive officers to manage each region who report directly to the CEO and President of PG&E, and for each region to have a risk officer and safety officer that report to the Chief Risk Officer (CRO) and Chief Safety Officer (CSO.)

PG&E generally supports ACR Proposal 6, with some clarifications and qualifications. First, while PG&E supports each region having a non-executive level safety officer, PG&E opposes regional risk officers, as PG&E believes that the CRO should work with ìrisk ownersî with subject matter expertise in each line of business. According to PG&E:

> Adding an extra layer of management between the CRO and these risk owners by appointing region-specific risk personnel will detract from the CROís ability to ensure consistency across the enterprise regarding the process for evaluating risk, and at best is a redundancy that is unnecessary in light of the CROís centralized function. (PG&E Brief at 131.)

TCC supports ACR Proposal 6, noting that while it holds promise of improvements in safety and reliability, it will take years to complete. Accordingly, TCC recommends interim steps be taken, specifically the two steps called for in ACR Proposal 6: appointing regional executive officers to manage each region that report directly to the CEO and President of PG&E, and (2) providing for each region to have its own risk officer and safety officer who report to the CRO and CSO, respectively. According to TCC:

> Such interim steps would provide the wildfire victims with peace of mind that what is being done will lead to different results with respect to public safety and that corrections can be made along the way to optimize the Utilityís ability to get to a

better, safer, and more affordable system. (TCC Comments at 29.)

CLECA supports regionalization, but notes that given the size of PG&E a regional restructuring program will take time to be developed and implemented properly. Given that, CLECA has specific recommendations for its implementation:

> While developing a regional restructuring plan, PG&E must undertake interim steps to improve its organizational structure and business practices to ameliorate PG&Eís interactions with local communities and customers. Based on Ms. Yapís testimony, CLECA recommends the following steps be taken now (importantly, these do not require formal approval of regional restructuring plan and should be readily implementable):

> - installation of horizontal linkages across the organization to coordinate across the line activity areas, to ensure that adequate evaluations of safety and reliability elements are conducted in a geographically-based, community-oriented fashion;
>
> - designation of ìtroubleshootersî to meet directly with community leaders (local government officials, business owners or representatives, and first responders dealing with wildfires) to prioritize local needs and concerns about operations and maintenance practices;
>
> - allowing each Division Manager for select activity areas (Substations, Service Planning, Field Operations, Distribution Control, Field Metering, and Vegetation Management) to set priorities expenditures at the Division level that reflect the safety and reliability needs and concerns of the local communities; and
>
> - using shareholder-funded research to better understand the concerns of ratepayers in various parts of its service territory. (CLECA Brief at 13-14.)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 50 of 124

CLECA also suggests that PG&E and the Commission take more time in developing the plan for regional restructuring, so instead of requiring PG&E to file an application with a regionalization proposal by June 30, 2020, CLECA would have PG&E would present it in its 2021 GRC:

> CLECA believes that for Regional Restructuring, you want to do it once, you want to do it right, and you donít want to have to do it again. This process should not be rushed while PG&E is focused primarily on Plan confirmation and emerging from bankruptcy. [Ö] CLECA recommends the following be adopted as a condition of Plan approval:
>
> • PG&E must develop its Regional Restructuring Plan within one year of Plan approval, so that the Regional Restructuring Plan is fully reflected in PG&Eís next GRC application. (CLECA Brief at 14.)

While CLECA strongly supports the concept of regional restructuring, and agrees that initial steps in that direction should be taken now, CLECA believes that requiring an application to be filed by June 30, 2020 ì[P]recipitously and needlessly rushes the applicationís development.î As CLECA witness Yap testified:

> [Y]ouíve got 25,000 employees. And youíve got a lot of different tasks that those employees are involved. It takes a lot of thought to figure out how you actually are going to break apart whatís been centralized back into regional areas. You donít want to do this badly. That will make the problem worse. (CLECA Brief at 26, citing Transcript v.5 at 1019.)

TURN views regionalization as a ìworthwhile idea,î but raises some concerns similar to those raised by CLECA, specifically that regional restructuring should not be rushed. TURNís proposals for how to implement regionalization differ somewhat from those of CLECA, however. TURN identifies as critical some of the details to be examined, such as:

> (1) the number and boundaries of the regions; (2) how various functions will be allocated and coordinated between central and regional operations; (3) whether the electric and gas operations will have the same or different regions; (4) the cost impacts; and (5) the impact on an already top-heavy management structure. (TURN Brief at 84-85.)

Unlike CLECA, TURN supports the ACR proposal for PG&E to submit an application for approval of a regionalization plan by June 30, 2020, with the caveat that: ì[I]f PG&E needs more time to develop a quality and thoroughly considered proposal, it should be given that time.î (*Id.* at 85.)

TURN, however, disagrees with the aspect of ACR Proposal 6 that PG&E should, while its application is pending: 1) appoint regional officers to manage each region, and 2) provide for each region to have its own risk officer and safety officer. TURN believes that these requirements, particularly the first one, may result in PG&E rushing the implementation of its new regional governance structure. According to TURN:

> Appointing regional officers to manage each region requires that most of the key details of regionalization be fully determined and implemented, including the challenging task of sorting out which functions will be managed at the central and regional levels and defining new managerial responsibilities. If PG&E is not crystal clear about which managers have responsibility for which functions, TURN is concerned that key responsibilities will fall through the cracks, which can imperil safety.

> In addition, TURN believes that the application proceeding will yield important guidance for PG&E regarding how to implement regional restructuring. In fact, the proceeding is likely to result in significant changes to PG&Eís plan. It is not conducive to good management to have PG&E implement one version on the plan when it files its application, only to change key aspects of the plan after the Commission issues its decision. (TURN Brief at 85-86.)

TURN agreed with CLECA witness Yap that the task is large and that, ìYou donít want to do this badly.  That will make the problem worse.….…You

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
52 of 124

want to do it once and you want to do it well.î (TURN Brief at 86, citing Transcript v.5 at 1019-1020.)

Accordingly, TURN recommends less of an interim implementation than proposed by the ACR, and recommends more modest interim measures, such as the new regional ìtroubleshooterî positions proposed by CLECA.

Cal Advocates does not express strong support or opposition to this proposal, but makes two suggestions for implementation. First, that the location of certain California Department of Forestry and Fire Protection (Cal FIRE) Units may be a useful a starting point for how Regional Restructuring could look for PG&E, and second, that PG&E should develop a matrix that explains who reports to who ì[I]n a way that minimizes confusion within the utility, so as not to hamper safety, or decrease accountability and transparency.î (Cal Advocates Brief at 14.)

CCSF argues that PG&E has not provided any details on its regionalization plan, making it impossible for parties or the Commission to evaluate its merits, and the Commission should only approve a regional restructuring plan if PG&E can demonstrate that it will ì[B]etter enable PG&E to improve customer service and provide safe, reliable and affordable gas and electric services.î  (CCSF Brief at 22, 27-28.)

In response, PG&E states that its application:

[W]ill lay out its proposed regions, the governance structure, and categorization of functions as centrally managed, centralized functionally with regional presence, and regionally managed-answering many of the questions posed by intervenors concerning the regionalization proposal. (PG&E Reply Brief at 81.)

PG&E also states that it does not oppose the suggestion that the SNO Committee have a role in approving the delineation of the proposed regions and

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 53 of 124

division of responsibility between localized and centralized operations. (*Id.*)

PG&E's cooperation in this area is appreciated, but CCSF raises a valid point that the details of regionalization are simply not yet fleshed out. The final approval of the regional restructuring plan will occur in a separate proceeding, not here. In that proceeding, PG&E should be prepared to address the issues discussed above, along with other issues including: regional roles, responsibilities and resource allocation relative to the corporate structure; how the plan will affect various types of customers, including hard-to-reach customers, low-income and disadvantaged communities and communities that have been subjected to wildfire and/or PSPS shutoffs; how best practices will be shared between regions; costs and cost allocation of the plan; identification of services and gas and electric assets that will or will not be regionalized; how PG&E will evaluate the effectiveness of the plan; how regionalization will affect safety and PSPS impacts; and how PG&E will ensure robust communication with its customers in each region. This list is not exclusive and does not circumscribe the scope and focus of the regionalization proceeding, which will be determined in that p roceeding.[16]

PG&E is working toward meeting the June 30, 2020 deadline to file its application, and supports taking some interim steps towards regionalization while its application is pending, but with some delay:

> PG&E proposes that the interim steps towards implementing regionalization not be taken concurrently with filing the application (presumably on June 30, 2020), but rather that these interim steps begin after the conclusion of wildfire season, likely in the first quarter of 2021. To the extent this is a departure from the ACR's proposal, PG&E believes it is prudent to wait to divide its service territory into the

---

[16] In the process of developing their plan PG&E may also want to consult with the other parties that provided comments on this issue.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 54 of 124

proposed regions, and wait to appoint regional officers and
lead safety personnel in each region, until after wildfire season
so adjustments to the new structure do not pose a distraction
to the important work during wildfire season. Based on the
current timeline, barring the need for an extension of time
owing to the impact of the COVID-19 pandemic, these interim
steps would be in place by June 2021. This approach would
address CLECA's concern that PG&E could be distracted by
reorganization during wildfire season, and affords additional
time to flesh out the contours of the regionalization plan
between the filing of the application and the actual
implementation of interim steps. (PG&E Reply Brief at 82.)

This Commission appreciates CLECA's exhortation that regionalization be
done well, but has also lost patience with PG&E's incessant but unfulfilled
promises to do better tomorrow. Accordingly, the deadline for PG&E to file its
application for regionalization remains June 30, 2020, as proposed. As TURN
notes, PG&E may be given the time after filing the application to develop a more
thoroughly considered proposal, but we do not accept PG&E's proposal to delay
implementation of interim steps for a year. ~~At this time~~ PG&E shall ~~continue to~~
take steps ~~by June 30, 2020~~ so that by one year from the date of this decision it
will be able to appoint regional executive officers to manage each region and
report directly to the CEO and President of PG&E, and to appoint regional safety
officers that report to the CSO. The remaining implementation schedule,
including any interim steps, along with Cal Advocates' implementation
proposals and PG&E's argument against the creation of regional risk officers, will
be addressed in PG&E's application proceeding.

### 9. x. Enhanced Oversight and Enforcement Process

ACR Proposal 10 calls for an Enhanced Oversight and Enforcement
Process (Process) that sets forth a detailed six-step process that could ultimately
lead to the Commission placing conditions on or revoking PG&E's certificate of

public convenience and necessity (CPCN). The introduction to ACR Proposal 10 describes the Process as follows:

> The Commission should establish an Enhanced Oversight and Enforcement Process (Process) designed to provide a clear roadmap for how the Commission will closely monitor PG&Eís performance in delivering safe, reliable, affordable, clean energy.

> The Process contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics. The Process includes enhanced reporting requirements and additional monitoring and oversight. The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria. If triggered, the Process would occur in coordination with the Commissionís existing formal and informal reporting requirements and procedures and would not replace or limit the Commissionís regulatory authority including the authority to impose fines and penalties.

> If triggered, the Commission would place PG&E in the appropriate step upon the occurrence of a specified triggering event, with appropriate notification by the Commissionís Executive Director, or as otherwise provided below. The Commissionís Executive Director may move PG&E through the steps of the Process sequentially, or the Commission or its Executive Director may place PG&E in the appropriate step upon the occurrence of a specified triggering event.

All of the parties that addressed this proposal supported it, but most of them recommended modifications.

TCC points out that:

> Under the ACR Proposal, Step 2 Commission Oversight of Management and Operations would be triggered if a ìgas or electric incident occurs that results in the destruction of 1,000 o r more dwellings or commercial structures and appears to have resulted from PG&Eís failure to follow Commission rules or orders or prudent management practices.î

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
56 of 124

Similarly, Step 4 Appointment of Chief Restructuring Officer would be triggered if:

PG&E causes an electric or gas safety incident that results in the destruction of 1,000 or more dwellings or commercial structures and the Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that such event results from the willful misconduct or repeated and serious violations of Commission rules, orders or regulatory requirements.).

In light of PG&Eís bad safety history and criminal probation, the Commission needs a significantly more refined and sensitive approach. Specifically, although clearly not the intent, the optics of using the destruction of 1,000 or more dwellings or commercial structures as a triggering event for Commission oversite and management of operations is too high a threshold and sends the wrong message. (TCC Brief at 32-33, emphasis added.)

TCC goes on to argue that:

Destruction of even one or more dwellings or commercial structures should trigger full Commission review, oversight of management and operations and others actions necessary and appropriate to secure public safety. (*Id.* at 33.)

According to TCC, an incident resulting in the destruction of 1,000 or more dwellings or commercial structures that results from the willful misconduct or repeated and serious violations of Commission rules, orders or regulatory requirements should result in the imposition of much stronger consequences, potentially up to the revocation of PG&Eís certificate of public convenience and necessity. (*Id.*)

Cal Advocates makes a similar argument:

The Public Advocates Office shares Senator Hillís concern and stresses that the threshold proposed in the ACR for a triggering event leading to Step 2 actions being ìthe destruction of 1000 or more dwellings or commercial structuresî is too high and that critical failures will be

- 53 -

overlooked. The same problem exists with the 1,000 dwellings
or commercial structures requirement in Step 4. Events that
lead to the destruction of any number of dwellings as a result
of utility failings is catastrophic to the families, business
owners, and the communities affected. Setting a precise
threshold will also allow a utility to operate just shy of failure
repeatedly without triggering the next step in the process.

[Ö]

The threshold for a Commission action triggering event should be
set as the diversion from any operational norms that endanger the
public, PG&E employees, or the environment due to negligence
and/or mismanagement of resources and assets. As currently
written, a utility could destroy 999 dwellings or commercial
structure each year for three years without the second time
becoming a triggering event. (Cal Advocates Brief at 16-18.)

TCC and Cal Advocates are correct ñ destruction by PG&E of far fewer
than 1,000 buildings would be catastrophic and unacceptable. 1,000 is not a
magic number, where suddenly the consequences become serious. Instead, the
ACRís use of that number has a different purpose ñ it delineates an entirely new
and additional oversight and enforcement process for the Commission, and does
not supplant or preclude the Commission from its continuing enforcement role,
including the issuance of Orders to Show Cause and opening of investigations
through Orders Instituting Investigations. These remain primary Commission
tools for enforcing safety and compliance with the Commissionís General Orders
and other rules. The newly created process, however, provides some clarity and
certainty to how the Commission will interact with PG&E in a new process that
has not been present to date.

TURN correctly points out:

As the ACR explains, the Commission would place PG&E in
the appropriate step upon the occurrence of a specified
triggering event; PG&E would not necessarily move through
the steps sequentially. This Process would supplement the

- 54 -

Commissionís existing formal and informal reporting
requirements and procedures and would not replace or limit
the Commissionís regulatory authority, including its authority
to impose fines and penalties.

If PG&E, through failure to follow Commission rules or orders or through
imprudent management practices, destroys one or 25 or 900 houses and
structures, the Commission continues to have the ability to take appropriate
action, including the imposition of significant fines and other penalties.
Accordingly, despite the understandable feelings of dismay that come from
considering the potential for PG&E to destroy 1000 buildings, that number will
remain as a process threshold in the Enhanced Oversight and Enforcement
process that is adopted today.

In addition to its comments on that issue, Cal Advocates makes a number
of specific recommendations:

Additionally, the process for exiting Step 2 or moving towards
Step 3 lacks public transparency and accountability. Having
the items are reviewed by Commission staff and the Executive
Director rather than through a proceeding such as an Order to
Show Cause or and Order Instituting Investigation frustrates
public participation and compromises the Commissionís
review of the pertinent facts and actions.

**b) Step 3 should be combined with Step 2**

By the time a utility has met the Step 2 criteria (as modified
per the recommendation above), the Commission should have
appointed a Third-Party Monitor. If a utility has already
failed to the point where many homes and businesses have
been destroyed, or where systemic failures have not been
reported to the Commission, a Third-Party Monitor is
warranted (and may in fact be past due). Step 3 must also be
changed to include a requirement for a Third-Party Monitor
rather than a Third-Party Monitor being optional and at the
discretion of the Executive Director.

**c) Step 5 should come after Step 6**

Prior to consideration of a Receiver, the utility should be subject to the CPCN Review considered in Step 6. Step 5 should occur after Step 6 in the case that the current utility is deemed no longer the appropriate entity to operate in PG&E's current service territory.

**d) Step 5 may require a longer Receivership than 18 months**

The receiver as defined in step 5, will be subject to operating a substantial system for only 18 months. The Public Advocates Office recommends that rather than the current proposal of an 18 month receivership, the receiver should operate over a longer-term as necessary to establish the new entities that will operate in PG&E's current service territory. This will ensure the new entities provide safe and reliable service at reasonable rates. (Cal Advocates at 18-19, emphasis in original.)

TURN, in its Brief, ì[S]trongly supports the adoption of a process that provides for additional and increasing operational oversight, including a CPCN review, upon the occurrence of certain triggering events.î (TURN Brief at 94-95.)

TURN also proposes a modified version of the ACR's proposed Process:

TURN modifies the ACR proposal to include only actions that the Commission has not previously taken with respect to PG&E. TURN's proposal, presented in full below, essentially collapses the ACR's Process into the following three steps:

- TURN Step 1: Appointment of Independent Third-Party Monitor (ACR Step 3)

- TURN Step 2: Appointment of a Receiver and Chief Restructuring Officer (ACR Steps 4 and 5)

- TURN Step 3: Review of CPCN (ACR Step 6)

TURN has generally incorporated the triggering events included in the ACR proposal as follows:

- The ACR Step 1 & Step 2 ìTriggering Eventsî result in the ACR Step 3 ìActionî -Appointment of Independent Third-Party Monitor.

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 60 of 124

- The ACR Step 4 ìTriggering Eventsî result in the ACR Step 4 & 5 ìActionsî -Appointment of a Chief Restructuring Office and a Receiver, respectively.

- The ACR Step 6 ìTriggering Eventsî result in the ACR Step 6 ìActionî ñ Review of CPCN. (TURN Brief at 96.)

TURNís proposal is quite detailed, and sets forth its proposed triggering events for each step.

MCE also provided relatively detailed recommended modifications, which it summarizes as follows:

MCE recommends that the Commission:

- Expanding the focus of this enforcement beyond safety to include root causes;

- Create a ìStep 0î of permanent enhanced oversight to improve transparency, which would include the formation of an Oversight Committee and increased transparency requirements;

- Augment ìStep 4î (Chief Restructuring Officer) to also include a Commission appointed examiner;

- Modify ìStep 5î to reflect the involvement of the Federal Courts and to ensure that a receiver is broadly empowered to consider all options, including, for example, the sale of the gas business;

- Ensure the availability of ìStep 6î (Revocation of the CPCN) in the event of necessity or if other remedial steps are unfruitful. (MCE Brief at 52-53.)

CCSF argues that the process should be strengthened and expedited, and is particularly focused on the potential revocation of PG&Eís CPCN:

The ACR Proposalsí six-step enhanced oversight and enforcement mechanism, while thorough and thoughtful, would be slow to address safety deficiencies. The Commission should adopt stronger measures, quicker actions, and more consequential outcomes should PG&E fail to meet safety performance standards. In particular, the Commission

should expedite the time to initiate a proceeding to revoke PG&Eís certificate of public convenience and necessity (CPCN.) (CCSF at 22.)

According to CCSF, the proposed six-step process would take years before the Commission could initiate a proceeding to revoke PG&Eís CPCN, and even at that time the Commission would not have investigated options for what would happen if the Commission did revoke PG&Eís CPCN. Accordingly:

San Francisco believes that the Commission must begin investigating viable options to ensure continuity of gas and electric service well before the Commission reaches the point where CPCN revocation is a possibility and a different service provider is needed. (CCSF at 30.)

The Joint CCAs and TCC make some more general observations. The Joint CCAs argue that:

In the ACR, President Batjer appropriately seeks a reasonable means to ensure the Commission can act decisively if necessary to ensure public health and safety. To that end, the ACR includes a proposed Enhanced Oversight and Enforcement Process (Process) that would be triggered by specified events, such as a failure by PG&E to obtain an approved wildfire mitigation plan. The Process identifies conditions under which the Commission would take action in response to such triggers, and identifies certain appropriate actions. Certain of the actions that the ACR identifies would be precluded by the moratorium PG&E seeks under Section 1.37(c), including reviewing PG&Eís continued eligibility for a CPCN, or placing conditions on its CPCN to ensure safety compliance. Because Section 1.37 would bar the Commission from taking reasonable actions such as these, it should be rejected. (Joint CCAs at 7-8.)[1417]

---

[1417] The Comments of the Joint CCAs refer to Section 1.37(c), but it appears that they actually apply to Section 1.37(b) of the Amended Plan of Reorganization filed with the Commission on February 3, 2020. That same language now appears in Section 1.38(b) of the Amended Plan filed on March 11, 2020.

The ìmoratoriumî potentially created by the former Section 137 (now Section 138) is, according to the Joint CCAs, the following:

> PG&E CEO Johnson explains that the ìdisposition of proposals for certain potential changes to the Utilityís corporate structure and authorizations to operate as a utilityî means, to PG&E, ìa moratorium on considering those other structural alternatives for at least the proposed initial time period for the Regional Restructuring Plan,î which PG&E proposes to be at least five years or more. (Joint CCA Brief at, footnote omitted.)

While PG&E would like the cited language: ìdisposition of proposals for certain potential changes to the Utilityís corporate structure and authorizations to operate as a utility,î to result in a five year moratorium, Johnson acknowledged that: ìI would like to have five years, but the time will be whatever the Commission says the time will be.î (Transcript v.1 at 83.)  On this particular issue, however, the concept of a moratorium is not applicable, as the Enhanced Oversight and Enforcement Process proposal should be understood as superseding the proposal for periodic reviews of PG&Eís CPCN that was raised in raised in I.15-08-019 (PG&Eís safety culture OII).

TCC, in addition to its specific criticisms, makes the more general observation (similar to the one made by TURN, as discussed above) that:

> The Commission also must clarify that the Process is a guideline only and will in no way restrict the Commissionís ability to skip steps or take other remedial actions not specified in the Process where circumstances warrant. The Process should not tie the Commissionís hands in any way when it comes to the measures that might be needed to ensure public safety. (TCC Brief at 34.)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 63 of 124

TCC and TURN are correct; the specified process is not exclusive, and does not limit the Commissionís authority to take actions to ensure safe and reliable gas and electric service.

PG&E also proposes modifications to the proposed process. First and foremost is that:

> PG&E recommends that, in the Enhanced Enforcement stage of the Process, there should be a minimum time period of 12 months between steps, such that PG&E cannot be moved above Step 3 in the Process based on a failure to implement a corrective action plan before it has had at least 12 months to implement the required corrective actions and the Commission would have a meaningful opportunity to evaluate progress under the corrective action plan. Except with regard to two of the three triggering events for Step 6, the Process proposed in the ACR does not include such minimum time periods. Without them, PG&E might be moved through the higher steps of the Process, up to and including the review of PG&Eís CPCN, in a relatively short period of time. (PG&E Brief at 138.)

PG&E, like Cal Advocates, objects to the proposal to delegate to the Commissionís Executive Director the authority to move PG&E into and through the Enhanced Enforcement stage of the Process. PG&E notes that under the ACR Proposal, the Executive Director would have the authority to determine whether to move PG&E from a lower step to Steps 3 and 4 of the Process. PG&E believes that this could result in the Executive Director moving PG&E quickly through Steps 3 and 4 without due process. (*Id*. at 139.) While Cal Advocates believes having review done by staff and the Executive Director frustrates public participation, PG&E raises questions about whether the delegation of authority to the Executive Director as set out in the proposal is appropriately limited to ministerial issues, or

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 64 of 124

whether it extends too far into the area of discretionary decision making. (*Id.* at 139-144.)

In response to the recommendations of Cal Advocates and PG&E, the role of the Executive Director is modified and clarified; instead of having certain determinations that would move PG&E to certain higher steps in the process or allow PG&E to move to lower steps or exit the process be made by the Executive Director, those determinations will now be made via a Commission resolution, as described in more detail below.

Many of PG&Eís other recommendations, however, appear to be designed to either slow down the progression of this process or allow PG&E to exit the process entirely. PG&E argues in favor of slowing down the steps of the process:

> As described by Mr. Wells, a lack of certainty about the timing of the Enhanced Enforcement process will lead financial market participants to operate under the assumption that PG&E may be moved rapidly through escalating enforcement actions. This assumption will increase the perceived risk of investing in PG&E, with the result that PG&E will find it more difficult to access capital. Likewise, the prospect of accelerated enforcement actions will impact ratings agenciesí qualitative views of PG&Eís regulatory environment, depressing PG&Eís credit rating and leading to a higher cost of debt. (PG&E Brief at 138-139.)

First, we note that PG&Eís ìregulatory environmentî is the same as that of San Diego Gas & Electric Company (SDG&E), Southern California Edison (SCE) and Southern California Gas Company (SoCal Gas), who are regulated by the same agency applying the same laws and regulations. PG&E is receiving greater regulatory scrutiny regarding its safety performance solely because PG&Eís safety performance has been so abysmal. If PG&E can show that it can

consistently provide safe and reliable service, it will not require such additional scrutiny.

Second, the proposal for enhanced oversight and enforcement provides a defined course of action, with multiple steps, that provides far greater certainty than would otherwise be applicable. PG&E Corp. CEO Johnson readily acknowledged that the Commission has the authority to revoke PG&Eís CPCN: ìFirst of all, I don't quibble with the idea that the Commission has the power to review and potentially revoke, with due process, CPCNs.î (Transcript v.1 at 83.) Johnson is correct ñ the Commission can (and has) revoked CPCNs. For example, the Commission revoked the operating authority of 43 telephone corporations in 2010, and another 106 in 2012. (D.13-05-035 at 29-30.) The courts have also found that service territories are not exclusive, and the Commission can accordingly grant CPCNs to competitors of the incumbent:

> The policy as declared by the statute and applied by the Commission has never gone to the length of guaranteeing monopoly in all cases, but has at all times deemed the public interest as of paramount importance. It has announced that when an existing utility has fallen short of its full duty to the public it will not necessarily be protected against competition, and that its activities before and at the time competition knocks at the door may be taken into consideration notwithstanding protestations of better behavior in the future. The Commission has never foreclosed itself, even if it could, from acting favorably on an application for a certificate, the consideration of which is so peculiarly within its own jurisdiction. The discretion of the Commission in such matters is very broad. (*San Diego & Coronado Ferry Co. v. Railroad Com. of California*, 210 Cal. 504, 512-513 (1930).)

The Commission could institute a proceeding now or at any time to determine whether it should revoke PG&Eís CPCN. As a practical matter, however, revocation of a CPCN, particularly one of a company the size and

nature of PG&E, is a large and complex task, and is not one to be taken lightly or under a tight deadline. The proposal for Enhanced Oversight and Enforcement sets up a methodical, step-by-step system that hopefully will never reach that point, but if it does, it will be in a measured and carefully considered manner.

The Commission appreciates the thoughtful and detailed comments that the parties have provided on this proposal. Taking those comments into consideration, the Commission has modified its proposed Enhanced Oversight and Enforcement process, and adopts a revised version, attached to this decision as Appendix A.

### 5 . xi. Criminal Probation

The Commission must consider whether the plan and the resulting governance structure are acceptable in light of PG&E's criminal probation. (Public Utilities Code section 3292 (b)(1)(C).) PG&E's testimony described how it is complying with the terms of its criminal probation, and states that nothing in the reorganization plan is inconsistent with the terms of its criminal probation. (Ex. PG&E-1, Chapter 8.)

In their testimony no party to this proceeding took a clear position either in support or opposition to PG&E on this issue, and no party provided guidance as to how the Commission should apply or evaluate this criteria. The only party that addressed this in any detail in briefs was TCC, which argued that the Commission should not take off the table or place a moratorium on any of the structural alternatives being considered in PG&E's Safety Culture OII that the Commission might find appropriate to order ì[C]onsidering PG&E's criminal probation.î (TCC Brief at 6-7.) From this Commission's perspective, the status of the issues being addressed in the Safety Culture OII (discussed further below) does not affect the plan's compliance with PG&E's criminal probation.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 67 of 124

While the terms of PG&E's criminal probation include requirements that PG&E comply with Commission orders, there are other terms that are not subject to Commission direction or interpretation. Based on the record before us, and with the conditions and modifications imposed by this order including the adopted ACR proposals, we find no indication that the plan of reorganization and resulting governance structure as approved by the Commission is inconsistent with the requirements of PG&E's criminal probation. Accordingly, the Commission finds that PG&E's plan of reorganization is acceptable in light of PG&E's criminal probation.

### 2 . b. Financial

In this section we consider financial issues relating to the reorganization plan and the resulting governance structure, including ratepayer impacts, PG&E's financial condition, PG&E's proposed securitization, Cost of Capital update, and ACR Proposals on an Earnings Adjustment Mechanism and Executive Compensation.

PG&E states that its financial plan will be funded by a historic amount of new equity and low-cost debt. (PG&E Brief at 31) PG&E requests Commission authorization to issue the following debt:

1. $11.85 billion in long-term RSA refinanced debt.

2. $11.925 billion of long-term debt, including:

    a. $5.925 billion of new long-term debt.
    b. $6 billion of temporary utility debt.

3. $11.925 billion of short-term debt to temporarily finance the exit from Chapter 11 (see bullet 2 above).

    a. At any time, bullets 2 and 3 in aggregate will not exceed $11.925 billion.

4.  Increase PG&Eís post-emergence short-term debt authorization from $4 billion to $6 billion. (PG&E Brief at 72.)

In addition to the ~~totalt~~ otl $23.775 billion long-term debt PG&E is seeking authorization to issue (*see* bullets 1 and 2) and the short-term debt increase, PG&E expects to issue $9 billion of new equity to fund the plan. (PG&E Brief at 32). PG&E notes that it is seeking authorization for transactions associated with these debt issuances, such as pledging accounts receivable or other credit enhancements. (PG&E Brief at 179-180.)

PG&Eís request would result in the issuance of lower cost debt replacing higher cost pre-petition debt as part of the Noteholder RSA, to the benefit of ratepayers. PG&E ìanticipates that its post-emergence cost of debt will be significantly lower than the current 5.16% authorized by the Commission in the Cost of Capital Decision.î (PG&E Brief at 51.) To implement the lower cost of debt, PG&E proposes to file a Tier 2 Advice Letter within 30 days ~~after~~of the ~~effective date of this decision~~Effective Date of PG&Eís Plan.  (PG&E Brief at 75.) PG&E's request is granted; PG&E is authorized to issue the requested new debt and equity as described above, ~~increase its~~including the requested credit enhancements, consistent with its plan of reorganization and working capital and post-emergence short-term debt needs. PG&E is authorized to issue short-term debt post-emergence of $6 billion, which shall supersede its prior short-term debt authorization ~~from $4 billion to $6 billion, and~~ PG&E shall file a Tier 2 Advice Letter within ~~thirty~~30 days of the ~~effective date of this decision~~Effective Date of its Plan to implement the debt cost savings associated with the $11.85 billion Noteholder RSA debt.

### 1. i. Neutral, on Average, to Ratepayers

AB 1054 requires the Commission to determine that the PG&E plan of reorganization is ìneutral, on average, to the ratepayersî of PG&E. (Public Utilities Code Section 3292(b)(1)(D).) PG&E argues that its plan satisfies this requirement, as ìThere are no net increases in rates attributable to PG&Eís Plan (or the associated bankruptcy process).î (PG&E Brief at 3.)

Focusing on currently known costs that could affect rate neutrality, parties identify issues in the plan itself and PG&Eís testimony about specific costs PG&E is seeking or could seek to recover from ratepayers, now or in the future. Parties urge the Commission to exclude certain costs from rate recovery, and further argue that the Commissionís consideration of ratepayer neutrality is not just a one-time snapshot.

For example, TURN identifies four distinct categories of costs it argues the Commission should subject to the ìneutral, on averageî requirement. TURN observes that while most of the potential costs that could have an impact on rate neutrality are short-term, there are some that potentially extend farther into the future:

> Most of the categories of bankruptcy-related costs that are now and will remain subject to the ìneutral, on averageî requirement of AB 1054 include costs for which the amounts will likely be known at the time PG&E emerges from bankruptcy, or relatively soon thereafter. Such costs would include, for example, bankruptcy-related professional fees, bankruptcy-related financing fees, and pre-petition wildfire claim costs. A fourth category would include costs resulting from PG&Eís bankruptcy that may not emerge until sometime after PG&Eís emergence from bankruptcy, such as higher costs of debt that PG&Eís customers could face if the utilityís post-emergence financial condition is less rosy than PG&E predicts. (TURN Brief at 11-12.)

MCE similarly identifies certain categories of costs and calls for the Commission to:

> Define the ìground" rules for cost recovery from ratepayers including:
>
> - Prohibiting on an upfront basis certain costs ineligible for ratepayer recovery, including PG&Eís bankruptcy costs; and
> - Holding PG&E accountable to its clarifications to not recover, at minimum: (1) financing costs associated with Wildfire Fund contributions; (2) bankruptcy related professional fees; (3) equity backstop fees; (4) holding company bridge fees; and (5) 2017 and 2018 wildfire claims costs if the Commission decides to approve the $7 billion securitization proposal. (MCE Brief at 7.)

MCE requests the Commission keep this proceeding open if it approves the PG&E Plan to ensure it is neutral to ratepayers. (*Id*. at 6). Further, as CLECA puts it: ìTo meet the intent of AB 1054, ìneutral on averageî ratepayer standard thus cannot be judged in a single snapshot in time, immediately upon emergence.î (CLECA Brief at 17.)

We find TURNís approach useful and address four categories of potential costs associated with the bankruptcy as follows:

- One category of bankruptcy-related costs parties identified is higher costs of debt. Some parties raise arguments that PG&Eís underlying assumptions about its future financial outlook are too optimistic and that its debt load is too high. (*See, e.g*. MCE and A4NR.) These arguments overlap with the issue of PG&Eís post-bankruptcy financial condition, as the basic idea is that if PG&Eís financial condition in the future is worse than PG&E projects, then PG&Eís cost of debt will be higher than it otherwise would have been. But this is an indirect effect stemming from PG&Eís future financial condition, including its credit ratings and capital structure. Likewise, while the magnitude of its potential wildfire liabilities led PG&E to decide to file for

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 71 of 124

bankruptcy, the utility must raise capital sufficient to satisfy these claims and pay victims regardless of that decision. Accordingly, these arguments are more appropriately considered under the issue of PG&E's financial condition and capital structure, not under the issue of whether PG&E's plan is neutral, on average, to ratepayers.

- A second category of costs is professional fees relating to the bankruptcy, which was raised in intervenor testimony by multiple parties. In response, PG&E provided a clarification that it will not seek recovery of ìbankruptcy-related professional fees,î other than those associated with a clearly-defined subset of its overall financing. (TURN Brief at 13, citing Ex. PG&E-8.) Excluding those fees from potential rate recovery is reasonable and is most consistent with both the concept of rate neutrality and the positions of the parties, including PG&E. Accordingly, we determine that PG&E may not seek cost recovery of the costs incurred for professional fees relating to the bankruptcy, and therefore these costs do not implicate the neutral, on average, requirement.

A third source of costs identified by TURN and MCE are financing fees.

As TURN describes it:

> PG&E will also incur very substantial amounts of financing fees under its Plan of Reorganization, including items such as equity backstop fees, holding company bridge fees, and new long-term debt issuance underwriting fees. Again, the costs have a very direct nexus to PG&E's ìreorganization plan and other documents resolving the insolvency proceedingî and, therefore, are indisputably subject to the ìneutral, on averageî standard under AB 1054. (TURN Brief at 13-14.)

According to PG&E, its plan provides $1.4 billion in interest cost savings (or approximately $700 million in present value[1518]) associated with its bankruptcy financing, specifically by refinancing higher cost prepetition bonds at

---

[1518] PG&E later states that: ìDepending on the discount rate and duration of savings used, the net present value of such savings ranges from approximately $1 billion to $683 million.î (PG&E Brief at 50.)

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 72 of 124

lower rates, with the savings passed on to customers through a reduction in PG&Eís authorized cost of debt. (*Id.* at 4.) PG&E asserts that this will actually result in a rate reduction:

> The interest cost savings created by PG&Eís Plan will translate to rate reductions in the Cost of Capital update following PG&Eís emergence from bankruptcy. Based on the Noteholder RSA and anticipated interest rates for the new debt to be issued at emergence under PG&Eís Plan, the Utility anticipates that its post-emergence cost of debt will be significantly lower than the current 5.16% authorized by the Commission in the Cost of Capital Decision. Customers will experience a net rate reduction under PG&Eís Plan because the interest cost savings exceed the financing fees that PG&E seeks to recover. (PG&E Brief at 51, footnote omitted.)

TURN acknowledges that PG&E clarified that it will only seek to recover in rates:

> ì[C]ertain financing-related fees associated with the Noteholder [Restructuring Support Agreement] and debt issuance,î with an estimated total of approximately $154 million, to be amortized over the life of the debt. PG&E contends this figure is significantly less than the interest cost savings created by its Plan, such that the net result is a savings for ratepayers. PG&E states that it will not seek recovery of other financing-related fees or costs, such as equity backstop fees, holding company bridge fees, or new long-term debt issuance underwriting fees. (TURN Brief at 14, citing Ex. PG&E-8.)

Cal Advocates has a similar understanding of PG&Eís position on these claims:

> PG&E clarified that it will seek to amortize approximately $154 million in financing related fees over the life of the associated debt instruments, consistent with the recommendation of California Large Energy Consumers Association (CLECA) witness Catherine Yap. With respect to the portion of these financing fees associated with PG&Eís

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
73 of 124

Noteholder Restructuring Support Agreement, Yapís calculations show that this amortization begins at $10.6 million per year and tapers down over time. PG&E should likewise amortize the final fees associated with the remainder of its rate-base debt over the lifetime of the associated instruments. PG&E also clarified that it ìwill not seek recovery of (1) bankruptcy-related professional fees (except to the extent included within the items referenced in the foregoing paragraph [as relates to specific PG&E debt]); (2) equity backstop fees; (3) holding company bridge fees; and (4) new long-term debt issuance underwriting fees associated with the upfront Wildfire Fund contribution.î (Cal Advocates Brief at 10.)

Cal Advocates and CLECA do not object to PG&Eís proposal to recover approximately $154 million in financing related fees, and recommend that PG&E amortize those costs over the life of the debt, which PG&E says is typical and that it proposes to do. (PG&E Reply Brief at 26.)

PG&E argues that the parties that oppose its request to recover the financing fees fail to acknowledge that:

[T]he limited categories of fees designated for recovery either (1) were necessary to achieve the overall savings to customers of the Noteholder RSA; or (2) are typical issuance fees that are recoverable in the normal course of financing transactionsÖî (PG&E Reply Brief at 27.)

According to PG&E:

PG&Eís Plan will create a net decrease in rates, and PG&Eís proposalóto transfer interest rate savings to customers, and recover limited financing-related costs which made those savings possible and which would be recoverable in the normal courseóis entirely consistent with neutrality under the statute. (PG&E Reply Brief at 28.)

At this time we find that PG&Eís proposed recovery of approximately $154 million financing-related costs for the RSA is consistent with the ìneutral, on

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 74 of 124

average, to ratepayersî requirement of AB 1054, based on the projected interest costs savings to ratepayers. At the same time, however, PG&E notes that:

> Because certain of the costs that PG&E will seek to recover are associated with transactions that have not yet been consummated (such as the issuance of new debt and potential hedging transactions), the final amounts are not yet known. (PG&E Reply Brief at 27.)

Accordingly, we find that because the Commission needs to ensure that PG&Eís request for rate recovery of these costs is neutral, on average, based on the actual total costs incurred, we approve recovery of these costs subject to a condition that PG&E demonstrate they are ìneutral, on averageî at such time as PG&E requests rate recovery.

The final category of costs relates to PG&Eís payments to settle the wildfire claims. A number of parties argued that the Commission should ensure that PG&E does not get rate recovery for the costs of any wildfire claims. Cal Advocates and CLECA, for example, argue for the Commission to preclude PG&E from seeking any rate recovery for wildfire claims costs. (Cal Advocates Brief at 6, CLECA Brief at 18.)

At one point in the proceeding, there appeared to be a potential issue whether PG&E would seek to recover wildfire claims costs separate from its proposed securitization (addressed below), because PG&E stated that: ìIf the Commission approves the proposed securitization as requested, PG&E will not seek any other recovery of 2017 or 2018 wildfire claims costs. The Plan is already rate-neutral because the Plan does not propose to recover 2017 or 2018 wildfire claims costs from customers.î (PG&E Brief at 42.)

A number of parties expressed concern that the implication of this language is that if the Commission did not approve PG&Eís proposed securitization, then PG&E would potentially seek rate recovery for 2017 and 2018

wildfire claims costs. For example, TCC pointed out that PG&E stated in testimony that if the Commission does not approve securitization, PG&E may seek rate recovery of 2017/2018 wildfire claims. (TCC Brief at 18.) Cal Advocates argued that PG&Eís position was an attempt to circumvent AB 1054ís requirement of ratepayer neutrality. (Cal Advocates Brief at 3.)

Subsequently, however, as a result of developments in the Bankruptcy Court proceeding, PG&E modified its position, and stated that:

> PG&Eís Plan also is neutral because it does not raise rates to pay for wildfire claims. Even beyond the Plan itself, PG&E will file an application with the Commission for approval of a single post-emergence Securitization of approximately $7.5 billion which would be neutral, on average, to ratepayers, and also would accelerate deferred payments to the wildfire victim trust under the Plan. <u>If the Commission does not approve the Securitization, PG&E will not seek to recover in rates any portion of the amounts paid in respect of Fire Claims under t</u>he Plan. (PG&E Reply Brief at 28, emphasis added.)

Other parties have the same understanding, and concur with PG&Eís statement. (*See, e.g.* A4NR at 2-3.) For example, CUE states:

> PG&Eís plan funds the settlement of all wildfire claims through a combination of equity and shareholder-funded debt and PG&E does not seek to recover these costs through its plan. Rather, after it emerges from bankruptcy, PG&E will apply to securitize some of the debt incurred through the plan but will offset the securitization charges with bill credits so that the securitization is also rate neutral. <u>If the Commission does not approve its securitization application, PG&E will not s</u>eek recovery of 2017 and 2018 wildfire costs. (CUE Reply Brief at 5, emphasis added.)

TCC concurs:

> In addition, PG&E has now filed its March 23 Motion under which it makes important, additional concessions. Foremost, the TCC noted in its Opening Brief (TCC OB) that because

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 76 of 124

PG&E expressly left open the possibility of seeking rate recovery of costs associated with 2017/2018 wildfire claims in the event the Commission rejected its forthcoming securitization application, the Commission was not in a position to reach a determination on rate neutrality as required under AB 1054. The March 23 Motion has resolved that concern because PG&E has now made a commitment not to file for recovery of costs associated with satisfying claims from 2017 and 2018 wildfires regardless of whether PG&Eís forthcoming securitization application is approved. (TCC Reply Brief at 6, citations omitted.)

TURN has the same take on this development, and describes the impact on this proceeding as follows:

The Governorís office has achieved an outcome that removes at least one disputed issue from the table. In its opening brief, PG&E reiterated that it was at least holding open the possibility that, absent securitization, it would seek rate recovery of wildfire claims costs. Under its agreement with the Governor, PG&E now states that even without securitization, it will ìnot seek to recover in rates any portion of the amounts paid in respect of Fire Claims under the Plan.î TURN submits that the Commission should memorialize this commitment in its final decision and make it a condition of Plan approval, just to limit any possibility of future backsliding on this important point. But the issue would no longer seem be in dispute among the parties. (TURN Reply Brief at 6.)

~~With~~ PG&Eís current position on the issue of the 2017/2018 wildfire claims is that it will not seek cost recovery for wildfire claims *except* in connection with the proposed securitization (and not in the alternative if the Commission rejects it), and the Commission intends to hold PG&E to its promise. Accordingly, the Commission finds that the potential for ratepayers to bear the cost of those claims without nominal cost offsets provided by utility shareholders has been removed from PG&Eís reorganization plan. ~~Accordingly, we find that~~ PG&E may not seek

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 77 of 124

cost recovery for wildfire claims except in connection with the proposed nominally offset securitization described in the documents attached to PG&E's March 24, 2020 motion for official notice, and therefore those costs are not a factor in determining if the plan is neutral, on average, to ratepayers.

### 2. ~~ii.~~ Securitization

PG&E describes its proposed securitization as follows:

> Separate from PG&E's Plan and the plan funding, PG&E contemplates a single post emergence securitization transaction of approximately $7.5 billion for wildfire claims costs that would be rate-neutral, on average, to customers. The securitization would replace the Temporary Utility debt and is PG&E's preferred path for financing these claims costs in a cost-efficient, rate-neutral, and customer-protective manner. (PG&E Brief at 42.)

Subsequently, PG&E additionally agreed that:

> The Securitization includes offsetting credits to be funded initially from a reserve account and further funded with the value of net operating losses contributed in the year in which the net operating losses are utilized. The Securitization structure is anticipated to yield a full (nominal) offset each year to securitized charges. (PG&E Motion for Official Notice, Attachment 2 at 8.)

As described above, PG&E has revised its position on the securitization proposal to clarify that it will not seek cost recovery for the wildfire claims outside of the securitization application. With this revision, the Commission need not review PG&E's proposed securitization in this proceeding. There is now a broad consensus on this approach.

The Joint CCAs state:

> As for PG&E's planned securitization transaction, the Commission must consider such proposal pursuant to a separate application. No order in this proceeding should prejudice the Commission's separate review there. A number

of parties have discussed aspects of the securitization transaction in this proceeding. However, as PG&E has noted, it will file a separate application seeking approval of its planned securitization transaction. As other intervenors have noted, because the Commission does not have all of the information regarding that transaction in this proceeding, it cannot make reasoned decisions or conclusions at this time. The Commission should therefore defer any analysis or inferences related to that subject for consideration in the appropriate proceeding. (Joint CCA Reply Brief at 11.)

A4NR expresses a similar opinion:

A4NR continues to harbor all of the concerns about the potential securitization voiced in its Opening Brief and testimony, but agrees with the TCC Opening Brief that because ìPG&E has thus far chosen not to file its application [for securitization] Ö the Commission is left with a myriad of speculative assumptions and uncertainties.î [Ö] Not only is there an inadequate evidentiary record, there is no compelling need for the Commission to prematurely become embroiled in the multiple issues involved in determining whether a yet-to-be-filed Application meets all of the applicable legal requirements for approval. (A4NR Reply Brief at 2-3.)

The question is raised whether the requirements of AB 1054 will apply to PG&Eís separate application for securitization. PG&E argues that it does not apply, focusing on the AB 1054 requirement that ratepayer contributions should be compensated:

Second, the potential ratepayer ìrisksî of securitization described by certain intervenors do not constitute customer contributions subject to compensation because PG&Eís Plan does not include securitization. The Utilityís proposed post-emergence securitization financing will be the subject of a separate application. In any event, the proposed securitization will recognize customer ìcontributionsî because the Utility proposes to offset the securitization charges with bill credits such that the securitization is rate-neutral on averageóeven

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 79 of 124

though this approach is not required by AB 1054 because securitization is not part of PG&Eís Plan. (PG&E Brief at 65.)

Other parties disagree with PG&E, and argue vigorously that the requirements of AB 1054 should still apply. CCSF argues:

> San Francisco and other parties urged the Commission to subject PG&Eís proposal to securitize $7 billion of debt it plans to issue post-emergence to the requirements of AB 1054. Despite PG&Eís thin claims that the securitization is not part of the Plan, it is clear from the record that the securitization is essential to PG&Eís Plan. [Ö] Due to the large amount of debt (at least $9.4 billion by 2024) that PG&E treats and relies upon as effectively off of the balance sheet of the utility, it is especially crucial for the Commission to carefully consider PG&Es securitization proposal to ensure that PG&E is not shifting risks and costs to ratepayers in a manner that contravenes the requirements of AB 1054. (CCSF Reply Brief at 3-4.)

TURN, while generally more supportive of CCSF than of PG&E, states that the applicability of AB 1054 to the securitization application does not need to resolved here:

> PG&E also asks the Commission to preemptively declare that any securitization transaction could not implicate the ìcontributions of ratepayersî language of AB 1054 because that transaction was not part of PG&Eís Plan. [Ö] And given that the defining characteristic of the securitization transaction is its assignment to ratepayers cost recovery that, absent the securitization, would fall exclusively on the utility and its shareholders, there would appear to be clear ìcontributions of ratepayersî warranting compensation under the statute. However, TURN recognizes that the Commission need not determine these issues here, in the absence of an actual fully-developed securitization proposal. (TURN Reply Brief at 28-29.)

Even if TURN is correct that the Commission does not need to make a final determination here of the applicability of AB 1054 to potential future

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
80 of 124

applications, it does not matter for PG&E's securitization application. The Commission will review the proposed nominally offset securitization application in light of PG&E's commitments made in its Bankruptcy Court filings, entered into the record here via its March 24, 2020 Motion for Official Notice.

Given the close connection between the plan and the proposed securitization and PG&E's commitment that its securitization application will meet the requirements of AB 1054, including ratepayer neutrality, the securitization application should satisfy those requirements.

### 9. iii. Contributions of Ratepayers

AB 1054 requires that the Commission determine that the reorganization plan recognize the contributions of ratepayers, if any, and compensate them accordingly. (Public Utilities Code section 3292(b)(1)(E).) According to PG&E, its reorganization plan does not require any contributions from its ratepayers. PG&E states:

> PG&E has not asked customers to contribute to its Plan via increased rates or otherwise. Wildfire claims will be funded by shareholders and, as described above, PG&E has used the bankruptcy process to create savings to the benefit of customers and other stakeholders. (PG&E Brief at 63-64.)

TURN argues that the $2.2 billion of insurance proceeds that PG&E lists as a source of funds for exiting bankruptcy should be considered a ratepayer contribution, since those proceeds were available to PG&E because of ratepayer-funded wildfire liability insurance policies. (TURN Brief at 26.) But TURN goes on to distinguish between currently-apparent contributions that TURN believes should be compensated now from contributions that will emerge over time and will need to be addressed later; under this approach, TURN identifies the wildfire insurance premium expenses of approximately $500 million that enabled the collection of the $2.2 billion as a contribution that is

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
81 of 124

apparent at this time. (*Id.* at 27.) CLECA agrees in part with TURN that since the ratepayers bore the underlying costs of the insurance and the insurance proceeds are used in the plan, the ratepayers should be compensated for bearing those underlying costs. (CLECA Reply Brief at 14-16.)

The Commission does not find that ratepayersí payment of the insurance premiums results in a ratepayer contribution under AB 1054; the cost of insurance authorized for rate recovery is a legitimate cost incorporated in rates, regardless of whether a utility has declared bankruptcy, and the argument of TURN and CLECA on this issue is overbroad.

MCE and CCSF take a different approach, and identify future events or transactions, such as PG&Eís proposed securitization, that may result in a ratepayer contribution. (MCE Brief at 8-10, CCSF Brief at 5.) TURN also addresses the possibility that future events or actions by PG&E may result in a ratepayer contribution:

> For further contributions that will emerge or become more apparent over time, the Commission should establish that interested parties will have an ongoing opportunity to identify and seek to quantify such contributions, and propose an appropriate mechanism of compensating ratepayers accordingly for such contributions. The Commission may wish to further address this process in a later phase of this OII, or simply confirm here its expectation that such matters can and should be raised in addressed in future proceedings. (TURN Brief at 27.)

PG&E opposes the idea of ongoing or future review by the Commission on the issue of ratepayer contributions, arguing that because the plan itself does not ìrequireî ratepayer contributions, there is no need for ongoing review by the Commission. PG&E argues that, ìAs with the neutrality requirement, AB 1054 requires the Commission to determine by June 30, 2020 that the Plan recognizes

customer contributions, if any.î (PG&E Reply Brief at 41-42.) According to PG&E, AB 1054 could not have contemplated the ongoing review and evaluation of possible future contributions because that would make it impossible for the Commission to make its determination on this issue by June 30, 2020. (*Id.* at 42.)

The arguments of MCE are CCSF are overbroad while PG&Eís are overly narrow. Application of AB 1054 is neither a single snapshot in time nor an infinitely-applicable standard. To the extent that PG&E may seek a future ratepayer contribution that is clearly connected to the plan of reorganization, the Commission may consider arguments that the requirements of AB 1054 should apply, but we decline to find that AB 1054 creates an ongoing standard of general applicability. For the issues presented in this proceeding, the Commission does not find any contributions of ratepayers that need to be compensated.

### 5.2.4. ~~iv.~~ Financial Condition and Capital Structure

As described above, PG&Eís reorganization plan calls for the issuance of significant amounts of new lower-cost debt as well as new equity. PG&E argues that its plan will enable it to raise the debt and equity needed for it to exit bankruptcy, and provide a clear path after bankruptcy for PG&E to improve its credit rating and maintain access to capital markets. According to PG&E, the plan, by resolving PG&Eís major prepetition liabilities and refinancing high-coupon prepetition debt, will restore PG&E to a position of financial health. (PG&E Brief at 36-40.) PG&E states that it is ìconfidentî that as it emerges from bankruptcy it will be able to attract capital and maintain access to capital markets to meet its ongoing operational needs. (*Id.* at 36-37.)

PG&E states that it will emerge from bankruptcy with a balanced capital structure and will be in compliance with the regulatory capital structure authorized in D.19-12-056 if the Commission authorizes a number of adjustments

Case: 19-30088     Doc# 7510-10     Filed: 05/22/20     Entered: 05/22/20 15:54:07     Page 83 of 124

identified by PG&E to include certain items in its equity account and exclude certain charges and debts. (PG&E Brief at 42.) PG&E notes that as an alternative to its proposed adjustments, the Commission could issue PG&E a waiver from compliance with the authorized capital structure, as contemplated in A.19-02-016. (Ex. PG&E-1 at 2-21.) PG&E also points out that its first requested adjustment, exclusion of the shareholder-funded contributions to the Wildfire Fund, is addressed by Public Utilities Code Section 3292(g).[19] (PG&E Comments on Proposed Decision at 11-12.)

PG&E's business plan is based on a five-year projection and includes an assumption that newly-issued long-term debt will be secured debt. Based on its financial assumptions, PG&E projects that it will attain investment grade credit ratings for its secured debt upon emergence. (PG&E Brief at 42.) PG&E has made various statements to indicate it will seek to improve its credit ratings and underlying credit profile following its emergence from Chapter 11. PG&E states that its contemplated securitization to replace Temporary Utility debt has the potential to improve the utility's credit rating. (*Id.*) PG&E notes that it has "unambiguously committed to expeditiously delivering the Utility after emergence with respect to the $6 billion of Temporary Utility debt, either through Securitization or through the application of the monetized value of the NOLs [Net Operating Losses]." (*Id.* at 16.) PG&E has also committed that PG&E Corp. will not pay common dividends until it has recognized $6.2 billion in Non-GAAP Core Earnings, and that amount would be deployed as capital investment or reduction in debt. (PG&E Reply Brief at 16, 34.)

---

[19] Public Utilities Code Section 3292(g) states with respect to the wildfire fund that "All initial and annual contributions shall be excluded from the measurement of the authorized capital structure."

A number of parties note that PG&Eís projections for its future financial health are based on assumptions and predictions that may or may not prove to be correct, particularly relating to the amount and cost of PG&Eís debt. (*See, e.g.* A4NR, CCSF, San Jose and EPUC/IS.) As TURN puts it: ìPG&Eís Plan only works if each of a number of very aggressive and optimistic assumptions proves to be correct, not only at the time of emergence from bankruptcy, but for some time to follow.î (TURN Reply Brief at 14.)

MCE, for example, criticizes PG&Eís request for a waiver of the Commissionís capital structure requirement, less because they object to the waiver itself, but more because MCE believes that the request shows that the plan results in insufficient capitalization at the utility. According to MCE, ìThe PG&E Plan to rely on waivers means they will be financially vulnerable upon their exit from bankruptcy.î (MCE Brief at 21-23.)

EPUC/IS agrees that PG&Eís plan projects significant improvement in its credit metrics over time but notes that ìthese projections are the result of forecast reductions of significant amounts of non-traditional utility debt; *i.e.,* debt that is not used to invest in Utility rate base.î (EPUC Reply Brief at 17-18.)

Some parties primarily just note the potential for adverse impacts if PG&Eís projections prove to be over-optimistic and the utility is overleveraged, such as CCSF, which notes that increased debt leverage can lead to higher ratepayer costs and risks. (CCSF Brief at 10.) TURN also notes that PG&Eís customers could face higher costs of debt if the utilityís post-emergence financial condition is less rosy than PG&E predicts. (TURN Brief at 11-12.)

Other parties propose more specific and detailed approaches, and call for the Commission to strictly condition approval of the PG&E plan. (EPUC/IS Brief at 31; *see* also, *e.g.* Joint CCAs and CCSF.) One of the more detailed approaches is

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
85 of 124

set forth by EPUC/IS, which calls for the Commission to adopt and enforce a
series of specific financial metrics and standards. (EPUC/IS Reply Brief at 13-25.)
Noting the commitments in PG&Eís ìnew updated planî EPUC concludes that
ìPG&E must have obligations to prioritize its financial strength improvement
that are consistent with its own projections.î (EPUC/IS Reply Brief at 21.)
EPUC/IS further contends that the ìcapital structure waivers requested by PG&E
must be backed up by clear and verifiable efforts by PG&E to restore its utility
balance of debt and equity capital and eliminate the need for a waiver.î (*Id.* at
23.)

     In response to EPUC/IS, PG&E states it ìhas every intention of doing its
best to meet or exceed these projections. Yet future performance ultimately will
depend on a variety of factors, including many that are outside PG&Eís control.î
(PG&E Reply Brief at 14.)

     The partiesí concerns regarding PG&Eís future financial health are not
baseless, and this Commission does not have a crystal ball to predict the future.
At this time we cannot say with certainty that PG&Eís projections for the future
will prove to be correct or how they may prove to be incorrect, and what
Commission response may be most appropriate. The resolution of PG&Eís
application for securitization may also affect PG&Eís credit ratings and the
amount of time it may need for an ongoing capital structure waiver.
Given this inherent uncertainty, the Commission must keep a close watch on
PG&Eís financial condition, given its importance for both PG&E and its
customers. While we do not adopt the specific proposal of EPUC/IS at this time,
there is merit to the underlying idea of the Commission closely monitoring
PG&Eís actual financial metrics and imposing conditions to ensure PG&E
pursues a path to regain its authorized capital structure and reduce its debt

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page
86 of 124

burden over time. Accordingly, while acknowledging the uncertainty of predicting PG&Eís future financial condition, this Commission approves the financial elements of the reorganization plan. We deny PG&E's proposed adjustments to the calculation of its capital structure except as required by Public Utilities Code ß 3292(g), but grant PG&Eís alternative request for a temporary waiver from its authorized capital structure, which we find preferable to a hypothetical capital structure. PG&Eís capital structure waiver is subject to the following conditions:

PG&E is granted a waiver from its current authorized capital structure for a period of five years from the date of this decision. This waiver applies only to the financing in place upon PG&Eís exit from bankruptcy. Consistent with PG&Eís plan we expect PG&E to expeditiously pay down Temporary Utility debt over the projected five-year period and regain a closer alignment between aggregate utility debt and the amount of recoverable utility debt. PG&E may seek to achieve this though its securitization application, A.20-04-023 filed April 30, 2020, its commitment to use Net Operating Losses to reduce leverage, its commitment to not pay common dividends for a time, or through other forms of deleveraging it may identify in the future.

In the event PG&E requires an ongoing capital structure waiver beyond the five years granted in this decision, it is directed to file an application that shall include a deleveraging proposal to reduce non-traditional utility debt over time. The application shall include proposals to offset ratepayer impacts associated with an overleveraged capital structure.[1620]

---

[1620] For example, a potential mechanism could be to allocate the highest-cost debt to remaining debt associated with the Temporary Utility debt and allocating the lowest-cost debt to the utility recoverable debt.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 87 of 124

PG&E is directed to file a Tier 1 Advice Letter annually following this decision informing the Commission of its current capital structure and deviation from its authorized capital structure, an updated annual forecast for de-leveraging, and its current credit ratings for secured and unsecured debt. PG&E will continue to file this Advice Letter annually until directed otherwise by the Commission.

### 8 . ~~v.~~ Earnings Adjustment Mechanism

ACR Proposal 8 is for an Earnings Adjustment Mechanism:

> The Commission should consider establishing a mechanism to adjust PG&Eís earnings (revenue requirement) based on its achievement of a relevant and reasonably achievable subset of the Safety and Operational Metrics, on a sliding scale of 4 percent up or 4 percent down of earnings in a given year.

Every party that addressed ACR Proposal 8 expressed opposition to attempting to develop and implement it in this proceeding, including TCC, TURN, EPUC/IS, PG&E and Cal Advocates. Among other things, they argue that developing such a proposal and the correct metrics would be complex and resource intensive, that the potential benefits are outweighed by the risks (including possible incentives to manipulate data or misplace management focus), and that PG&E could ìmanage to the metric,î which can lead to unintended negative consequences. (*See,* TCC Brief at 30-31; TURN Brief at 90-93; EPUC/IS Brief at 37-38; PG&E Brief at 69-70.)

The parties raise valid concerns ñunless the incentive and the desired outcome are perfectly aligned, there can be undesirable consequences. Careful development of appropriate metrics that precisely align with the desired outcomes is a necessary prerequisite to the implementation of an earnings adjustment mechanism. Initiating the development of the Safety and Operational Metrics described above is a good first step in that process.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
88 of 124

The timeline of this proceeding does not permit even the initiation, much less the completion, of the complex and difficult task of establishing an earnings adjustment mechanism. Accordingly, while the Commission should continue to consider implementing a safety-based earnings adjustment mechanism in the future, either in the PG&E Safety Culture Proceeding (I.15-08-019) or another proceeding, the Commission does not adopt an earnings adjustment mechanism here.[1721]

## 8. vi. Executive Compensation

Executive Compensation is addressed in both AB 1054 and ACR Proposal 9. Public Utilities Code Section 8389(e)(4) and (e)(6) state:

> (e) The executive director of the commission shall issue a safety certification to an electrical corporation if the electrical corporation provides documentation of the following:

> [Ö]

> (4) The electrical corporation has established an executive incentive compensation structure approved by the division and structured to promote safety as a priority and to ensure public safety and utility financial stability with performance metrics, including incentive compensation based on meeting performance metrics that are measurable and enforceable, for all executive officers, as defined in Section 451.5. This may include tying 100 percent of incentive compensation to safety performance and denying all incentive compensation in the event the electrical corporation causes a catastrophic wildfire that results in one or more fatalities.

> [Ö]

> (6) (A) The electrical corporation has established a compensation structure for any new or amended contracts

---

[1721] The issue of a safety-based earnings adjustment mechanism remains within the scope of the PG&E Safety Culture Investigation (I.15-08-019).

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
89 of 124

for executive officers, as defined in Section 451.5, that is based on the following principles:

(i) (I) Strict limits on guaranteed cash compensation, with the primary portion of the executive officersí compensation based on achievement of objective performance metrics.

(II) No guaranteed monetary incentives in the compensation structure.

(ii) It satisfies the compensation principles identified in paragraph (4).

(iii) A long-term structure that provides a significant portion of compensation, which may take the form of grants of the electrical corporationís stock, based on the electrical corporationís long-term performance and value. This compensation shall be held or deferred for a period of at least three years.

(iv) Minimization or elimination of indirect or ancillary compensation that is not aligned with shareholder and taxpayer interest in the electrical corporation.

(B) The division shall approve the compensation structure of an electrical corporation if it determines the structure meets the principles set forth in subparagraph (A) and paragraph (4).

(C) It is the intent of the Legislature, in enacting this paragraph and paragraph (4), that any approved bankruptcy reorganization plan of an electrical corporation should, in regards to compensation for executive officers of the electrical corporation, comply with the requirements of those paragraphs.

In addition, ACR Proposal 9 sets forth nine components that PG&Eís executive compensation plan should include:

- Publicly disclosed compensation arrangements for executives;

- Written compensation agreements for executives;

- Guaranteed cash compensation as a percentage of total compensation that does not exceed industry norms.

- Holding or deferring the majority or super-majority of incentive compensation, in form of equity awards, for at least 3 years.

- Basing a significant component of long-term incentive compensation on safety performance, as measured by a relevant subset of by the Safety and Operational Metrics to be developed, as well as customer satisfaction, engagement, and welfare. The remaining portion may be based on financial performance or other considerations.

- Annual review of awards by an independent consultant.

ï Annual reporting of awards to the CPUC through a Tier 1 Advice Letter compliance filing.

- A presumption that a material portion of executive incentive compensation shall be withheld if the PG&E is the ignition source of a catastrophic wildfire, unless the Commission determines that it would be inappropriate based on the conduct of the utility.

- Executive officer compensation policies will include provisions that allow for restrictions, limitations, and cancellations of severance payments in the event of any felony criminal conviction related to public health and safety or financial misconduct by the reorganized PG&E, for executive officers serving at the time of the underlying conduct that led to the conviction. Implementation of this policy should take into account PG&Eís need to attract and retain highly qualified executive officers.

PG&E presented testimony on its executive compensation structure to show that it complied with the requirements of AB 1054. (Ex. PG&E-1 at 7-1 through 7-23.) A number of parties offered criticism of PG&Eís executive compensation program, including TURN, Cal Advocates, SBUA, MCE, and TCC. This section first discusses the statutory requirements, and then turns to ACR Proposal 9.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 91 of 124

The requirements set forth in the statute for the structure of an executive compensation plan are detailed and complex. Looking at some of the criticisms and concerns raised by TURN provides some perspective on how challenging a task it will be to properly develop, implement and monitor an executive compensation plan that complies with state law and policy. Among other things, TURN argues that PG&E has not provided enough information regarding the reasonableness of the numerical milestones that establish the threshold, target and maximum levels for each metric; that PG&Eís two LTIP [Long-Term Incentive Plan] public safety and reliability ëmetricsí are not metrics at all, but rather are what the Commission has called ìProgram Targets,î in that they simply measure how much work PG&E has carried out to meet self-imposed targets, rather than whether that work has met desired safety goals (citing to D.19-05-036); PG&Eís proposed STIP [Short-Term Incentive Plan] metrics need more detail and clarity to meet AB 1054ís measurable and enforceable requirements; and PG&E has failed to provide criteria or metrics for reducing or eliminating incentive compensation in response to catastrophic events. (TURN Brief at 68-79.)

TURN would also add four more components to the ACR list:

- Achievement milestones should be calibrated to incent improvement, not provide guaranteed compensation. [Ö]

- Incentive compensation should be based on outcome-based (performance) metrics, not program targets. [Ö]

- Metrics on which incentive compensation is based should be measurable, enforceable and objective and not subject to manipulation in ways that undermine the safety purpose of the metric. [Ö]

- Metrics that encourage reducing customer minutes of PSPS events are warranted to limit the harm to customers from PSPS, and should be balanced by metrics that encourage

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 92 of 124

reducing the number of ignitions that occur in locations and weather conditions that have the highest risk of catastrophic wildfires. [Ö] (*Id.* at 82.)

The criticisms of PG&E's executive compensation plan raised by TURN and other parties may have merit, but given the schedule of this proceeding, the detail and complexity of the issues, and the need to address executive compensation thoroughly and carefully, we simply cannot adequately review, analyze and resolve in this decision the issues that have been presented.

The question then becomes how to more thoroughly address executive compensation issues. TURN and Cal Advocates recommend that the Commission address PG&E's executive compensation plan in further proceedings. TURN recommends:

> The decision in this proceeding should direct PG&E to submit a revised ECP [executive compensation plan]. [Ö] The revised ECP should direct PG&E to provide workpapers and other supporting documents to show how PG&E derived the achievement milestones (threshold, target and maximum) for each metric and how achievement of different milestones affects the award of compensation. In addition, for each proposed metric, the Commission should require PG&E to provide complete definitions that prevent subjectivity and manipulation of the results. This revised ECP should be subject to further discovery and record development, perhaps in a workshop. Parties should then be given an opportunity to provide comments on the revised ECP, based on a schedule that allows sufficient time for the necessary detailed analysis and recommendations. (TURN Brief at 83.)

Cal Advocates has a similar, if less detailed, recommendation:

> To address PG&E's failure to provide detailed information to demonstrate an effective Executive Compensation program, the Public Advocates Office recommends that resolution of this proceeding include a Commission directive that the Commission keep the Safety Culture Proceeding (I.15-08-019)

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 93 of 124

active and address unresolved ACR Executive Compensation concerns in that proceeding. (Cal Advocates Reply Brief at 6.)

For purposes of this decision, we find that PG&Eís executive compensation plan minimally and conditionally satisfies the requirements of Public Utilities Code Section 8389(e)(6)(C), subject to further proceedings before this Commission. The plan will be further strengthened by the adoption of the components of the ACR Proposal 9.

Turning to ACR Proposal 9, parties who commented, including PG&E, TURN, SBUA, MCE, TCC, were largely if not completely supportive. No party opposed the proposal. PG&E agreed to all of the elements of the proposal, with two exceptions, noting that ìmost of those proposals track the structure PG&E has proposed.î (PG&E Opening Brief at 163.) TURN gave qualified or full support for the proposals, further arguing that some of the provisions should be strengthened (for example arguing that the restrictions on severance payments in the event of a felony conviction of the company should be extended to include any violations of the conditions of PG&Eís probation).

PG&E raised concerns with two provisions in the ACR Proposal 9. First, while PG&E supports the presumption that a material portion of executive incentive compensation be withheld if PG&E is the ignition source of a catastrophic wildfire, it argues that PG&E, not the Commission, should determine the applicability of this presumption and whether it should be overcome. PG&E contends that the companyís boards will have greater access to information and be better positioned to make this decision. (PG&E Brief at 166-167.)

TCC responds that leaving this decision to PG&E ìhas not worked well in the pastî and would be equivalent to ìleaving the fox to guard the henhouse considering PG&Eís long and less-than-stellar safety history.ì (TCC Reply Brief

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 94 of 124

30-31) TURN proposes a hybrid under which PG&E would make the initial determination as to whether PG&E had caused a catastrophic event that warrants reduction or elimination of incentive compensation, but that this decision would be subject to Commission review and modification. (TURN Reply Brief at 58-59.)

We agree with TURN and TCC. The Commission is in the best position to make an objective determination about whether the utilityís conduct justifies a departure from this presumption. It can best balance the interests of promoting safety and properly aligning executive incentives.

Second, PG&E objects to the requirement that its compensation policies include provisions that limit or cancel severance payments for executive officers in the event of certain felony criminal convictions by the company, on the grounds that these restrictions would apply whether or not an executive is personally liable for criminal misconduct, and would thus undermine its ability to recruit qualified leadership. The provision, however, only applies to a narrow range of the most serious corporate wrongdoing -- felony convictions related to public health and safety or financial misconduct. It also addresses PG&Eís concern directly by providing flexibility in its implementation, noting that implementation of the policy should ìtake into account PG&Eís need to attract and retain highly qualifiedî executive officers.î TURN would eliminate this flexibility, arguing that ìan executive officer who is worried about leading the company into another criminal conviction is one that should not be hired,î (TURN Opening Brief at 82.)

MCE, while supporting the ACR, argues that the long-term incentive compensation provision should be changed so that it is based on PG&Eís financial health, rather than its financial performance, and that the incentive structure should not use shareholder-focused metrics such as earnings per share.

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 95 of 124

(MCE Opening Brief at 51-52.) However, as PG&E notes, company earnings is a well-developed financial metric that is familiar to utility investors, and is also consistent with the AB 1054 requirement that the executive compensation structure be designed to promote ìfinancial stability.î[1822] (PG&E Reply Brief 106-107)

As a whole, ACR Proposal 9 will promote public accountability, independent review, and incentives that further the purposes of AB 1054, and should be adopted. In addition to implementing the components of the ACR, PG&E shall provide additional information for the further refinement of its executive compensation plan in the proceeding for the development and implementation of safety and operational metrics described above, or other proceeding as directed by the Commission.

### 5 . c. Climate

AB 1054 requires the Commission to determine if the plan of reorganization and related documents are ìconsistent with the stateís climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state.î (Public Utilities Code section 3292(b)(1)(D).

In its testimony, PG&E asserts that it has been in compliance with the stateís climate goals, including the Renewables Portfolio Standard (RPS) and procurement requirements, and will continue to do so. More specifically, PG&E points out that its plan of reorganization provides that PG&E will assume all power purchase agreements, renewable energy power purchase agreements, and Community Choice Aggregation servicing agreements. (Ex. PG&E-1 at 9-20.)

Few parties addressed this requirement of AB 1054 either in testimony or briefs. NRDC concurs with PG&E, arguing that PG&E has complied with the

---

[1822] Public Utilities Code section 8389(e)(4).

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page
96 of 124

stateís climate goals and the requirements of the RPS program, and that the plan is consistent with the stateís climate goals. (Ex. NRDC-1.)

Abrams argues that PG&Eís plan is an inadequate response to climate change, and that: ìThe plan must provide measurable climate change adaptation metrics in-line with Californiaís climate goals and tied to PG&E bottom-line financial metrics.î (Ex. Abramsñ1.) Abrams provides no detail in his testimony about how to do that, but generally seems to be focused on wildfire risk mitigation, rather than the statutory criteria. Abramsí brief reiterates the idea that the plan of reorganization must effectively address wildfire mitigation in order to be consistent with the stateís climate goals. (Abrams Brief at 8.)

Next Era believes that the plan of reorganization is consistent with the stateís climate goals:

> To be consistent with the stateís climate goals as required by PU Code Section 3292(b)(1)(D) as well as the RPS and related procurement requirements, the PG&E Plan and the Commissionís approval of the PG&E Plan must ensure that PG&E assumes all of its PPAs. The PG&E Plan and PG&Eís testimony indicate that this will occur. (Next Era Brief at 3.)

In contrast, the Joint CCAs argue that PG&E does not even need to engage in electric procurement in order to achieve the stateís climate goals. (Joint CCA Brief at 14-15.)

And TCC states: ìThe TCC submits that the effects of PG&Eís Plan are consistent with Californiaís climate goals and related California procurement requirements.î (TCC Brief at 7.)

Given that PG&Eís plan of reorganization will maintain its existing renewable energy power purchase agreements, and that its obligations under the RPS are ongoing and remain subject to the authority and direction of the Commission, the plan of reorganization satisfies the statutory requirement that it

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 97 of 124

be ìconsistent with the stateís climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state.î (Public Utilities Code section 3292(b)(1)(D).

### 5 . d. Quality of Service and Quality of Management

The Commission is considering whether PG&Eís plan of reorganization will maintain or improve the quality of service to PG&E ratepayers, and whether the plan will maintain or improve the quality of management of PG&E. Given PG&Eís recent past quality of service and management, PG&E needs to do more than maintenance, and an improvement in quality of service is necessary. Between the effort and recommendations of PG&E and the other parties and the proposals set forth in the ACR, it appears that the plan of reorganization has the potential to improve both the quality of service to PG&E ratepayers and to improve the quality of management of PG&E. The Commission will consider metrics to measure PG&Eís quality of service and quality of management in the proceeding addressing Safety and Operational Metrics described above.

### 5 . e. Employees and Communities

In evaluating the plan of reorganization the Commission is also considering the effects of the plan on PG&E employees and local communities.

As to employees, the Commission needs to consider whether the plan is fair and reasonable to affected PG&E employees. PG&E argues that:

> PG&Eís Plan is also fair to PG&Eís employees, because it provides for the assumption of various existing agreement with union and non-union employees, including collective bargaining agreements and the employee benefit plans governing employees. PG&Eís Plan also incorporates an agreement with the International Brotherhood of Electrical Workers (IBEW) to extend and enhance the IBEW collective bargaining agreements for the benefit of those employees, as

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 98 of 124

well as the overall enterprise. (PG&E Brief at 176, citing to PG&E testimony, footnotes omitted.)

CUE agrees. According to CUE: ìUndisputed record evidence shows that PG&Eís plan is fair and reasonable to employees.î (CUE Brief at 3.) CUE cites to the many problems that PG&E has had (even beyond the safety issues discussed above), and their effect on employee workload and morale, and argues that the elements of the plan of reorganization positively address those: ìIt is because of this history that PG&Eís commitments in its plan of reorganization to a four-year extension of the contract with an annual wage increase, stable healthcare costs and job security, are essential to employees.î (CUE Brief at 4.)

No party made an argument opposing the position of PG&E and CUE. Based on the record, the Commission finds that PG&Eís plan of reorganization is fair and reasonable to PG&E employees.

In general, there does not appear to be much in the reorganization plan that would specifically and directly affect local communities differently than it would affect the whole of PG&Eís service territory, except for one proposal. The aspect of the proposed reorganization of PG&E that could have an effect on local communities is the proposal for regional restructuring or regionalization, which is discussed in more detail above.

City of San Jose notes that the regionalization proposal is not detailed enough to determine if it would be beneficial to local communities. (San Jose Brief at 18-19.) CCSF makes a similar argument as well. (CCSF Brief at 27-28.) While San Jose and CCSF are correct that both PG&Eís testimony and ACR Proposal 6 require further development, based on the limited record before us it appears that regionalization has the potential for a beneficial effect on local communities by providing a management structure that is more directly connected (and hopefully more responsive) to local communities. Based on the

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 99 of 124

record, regionalization does not appear likely to have an adverse effect on local communities, and as discussed above, it is worthwhile to further develop the proposal. We do not find anything in the plan that would be uniquely detrimental to local communities, and the regionalization proposal has the potential to benefit local communities.

### 6 . f. Commission Bankruptcy Costs

PG&E is ordered to reimburse the Commission for payment of the fees and expenses incurred by the Commission for its outside counsel and financial advisor for services rendered relating to the chapter 11 cases, related proceedings and associated financings. As with other professional fees associated with the bankruptcy proceedings, PG&E similarly may not seek cost recovery of the Commissionís costs for such fees and expenses, consistent with AB 1054ís requirement that the plan be ìneutral, on average, to ratepayers.î

### 7 . g. Other Proposals and Related Proceedings

A number of parties made additional or unique proposals for the Commission to consider in this proceeding.

The Joint CCAs recommend that the Commission develop a plan to phase out PG&Eís retail electric generation service to customers, including associated procurement activities, by 2025. (Joint CCA Brief at 10-15.) As the Joint CCAs note, this issue would more appropriately be addressed in the PG&E Safety Culture OII (I.15-08-019). Accordingly, the Commission need not and does not address this recommendation here.

CCSF requests that the Commission require PG&E to undertake asset sales in order to improve its financial condition. CCSF believes that this should be done in the PG&E Safety Culture OII or another proceeding. (CCSF Brief at 4.) Accordingly, the Commission need not and does not address this request here.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 100 of 124

CEERT argues for adoption of an alternative structure for PG&E's electric distribution function, and specifically proposes that PG&E's distribution service should be restructured as an Open Access Distribution System Operator. (CEERT Brief at 6-7.) Again, this proposal was previously made in the PG&E Safety Culture OII, and would more appropriately be addressed there, and accordingly is not addressed here.

These arguments are essentially asking that issues be preserved in the PG&E Safety Culture OII, and are opposing PG&E's request for a ìmoratoriumî on the Commission's consideration of issues in that proceeding. That moratorium is focused on the most recent proposals presented in that proceeding, which are: 1) Separating PG&E into separate gas and electric utilities or selling the gas assets; 2) Establishing periodic review of PG&E's Certificate of Convenience and Necessity (CPCN); 3) Modification or elimination of PG&E Corp.'s holding company structure; and 4) Linking PG&E's rate of return or return on equity to safety performance metrics. (*See, e.g.* Ex. PG&E-1 at 1-9 ñ 1-10.) Those proposals were presented in a ruling in that proceeding issued on June 18, 2019, with party comments and reply comments filed in July and August 2019. The PG&E Safety Culture OII has largely been on hold since that time as a result of PG&E's bankruptcy.

The above parties are not alone in opposing PG&E's request for a moratorium. As TCC argues:

> The Commission should reject PG&E's repeated request that the Commission determine that it will not be forced to sell its gas business, eliminate its holding company, municipalize, or have its certificate of public convenience and necessity (CPCN) reviewed or modified (except as provided in connection with the Enhanced Regulatory Oversight and Enforcement Process proposed in the ACR). The TCC agrees with other intervenors that the Commission's order on the

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
101 of 124

Plan should not take off the table any options being considered in the Safety Culture OII (15-08-019) or, for that matter, in other or future Commission proceedings, including the possibility of ordering any other structural changes to PG&E. In fact, the CPUC should explicitly retain jurisdiction and authority to make whatever changes it finds necessary or appropriate at any time, given PG&E's far from satisfactory public safety record. This is nothing unique or unusual; as Commission knows, a basic tenet of regulation is that the Commission can neither bind itself nor future Commissions. *Order Instituting Rulemaking to Evaluate Telecommunication Corps. Serv. Quality Performance & Consider Modification to Serv. Quality Rules*, No. D.18-10-058, at 22 (CPUC Oct. 25, 2018) (ithe Commission cannot bind itself to act in a certain manner in the futureî). This tenet is particularly compelling in this instance where PG&E has yet to bring major components impacting its Plan and its future, as well as the future impact on ratepayers and the citizens of Northern California, to the Commission (*i.e.*, the Regional Reorganization Plan and its application for securitization). Likewise, there are issues that simply cannot be fully aired under the time constraints imposed by AB 1054.

PG&E is in no position to be making demands, and the Commission should not take off the table, or place a moratorium on, any of these tools that it might ultimately find appropriate to order in light of PG&E's ìsafety history, criminal probation, recent financial condition, and other factors deemed relevant by the Commission.î Section 3292(b)(1)(C). By expressly holding that its approval of the Plan is subject to, and without prejudice to, any reforms the Commission might choose to order in the Safety Culture OII (including structural reforms) and other proceedings, the Commission can make the findings required by Section 3291(b)(1)(C), without first making a final determination as to the necessity of any of those reforms. (TCC Reply Brief at 13-14, citation omitted.)

TCC is correct, and this Commission declines to place a moratorium on the

exercise of its own authority to regulate PG&E. The disposition of at least some

- 98 -

of the four proposals identified by PG&E have been addressed previously in this decision, but for clarityís sake we will summarize that disposition here. 1) Separating PG&E into separate gas and electric utilities or selling the gas assets: in June of 2019 the Commission was interested in exploring this idea, but it is less of a priority today, particularly in light of the pending regionalization. Whether or not this proposal remains within the scope of the PG&E Safety Culture OII will be determined in that proceeding. 2) Establishing periodic review of PG&Eís CPCN: this proposal has been superseded by the proposal for the Enhanced Oversight and Enforcement Process, and will be taken out of the scope of the PG&E Safety Culture OII. 3) Modification or elimination of PG&E Corp.ís holding company structure: this issue was presented in this proceeding and remains a live issue within the scope of the PG&E Safety Culture OII or other appropriate proceeding. 4) Linking PG&Eís rate of return or return on equity to safety performance metrics: this issue was presented in this proceeding and remains a live issue within the scope of the PG&E Safety Culture OII or other appropriate proceeding. This is the Commissionís ìdisposition of proposals for certain potential changes to the Utilityís corporate structure and authorizations to operate as a utility,î under Section 1.38 (Section 1.37) of the Amended Plan of Reorganization.[23]

## 6. Comments on Proposed Decision

The ALJís proposed decision was mailed to the parties in accordance with Section 311 of the Public Utilities Code, and comments were allowed under Rule 14.3 of the Commissionís Rules of Practice and Procedure. Comments were filed by ⸻ TCC, Solar Energy Industries Association, San Jose, A4NR, EPUC/IS, Joint CCAs, TURN, CLECA, Wild Tree Foundation, CEERT, SBUA,

---

[23] The Commission similarly declines to place a moratorium on the exercise of its authority on additional matters beyond the four specific issues addressed above.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
103 of 124

PG&E, CCSF, SSJID, MCE and Cal Advocates. Reply comments were filed by CLECA, EPUC/IS, A4NR, CUE, Cal Advocates, Joint CCAs, TURN, Valley Clean Energy Alliance, PG&E, American Wind Energy Association of California, CCSF, TCC, San Jose and SBUA.

TCC argues that the language of the proposed decision granting PG&E a waiver of its authorized capital structure should be modified to clarify that the waiver is limited, and applies ì[O]nly to the extent necessary to implement specific provisions of the Plan that have been reviewed and approved by the Commission and the Bankruptcy Court.î (TCC Comments at 13.) MCE supports TCCís recommendation. (MCE Comments at 7.) TCC and MCE are correct that the waiver is limited, and not general. The corresponding language has been modified to reiterate this clarification.

CEERT expresses concern that while the proposed decision generally rejects PG&Eís proposed ìmoratoriumî on certain Commission actions, the Commissionís adoption of a regional restructuring plan might result in a moratorium on proposed changes to PG&Eís safety and governance structure that are still pending in I.15-08-019. (CEERT Comments at 3-6.) To clarify, the Commissionís adoption of a regional restructuring plan does not directly or indirectly approve or otherwise result in a moratorium on Commission action or otherwise limit the Commissionís authority.

A number of parties argue that the reorganization plan should be modified to increase the amount of equity issued by PG&E from $9 billion to $12 billion, with a corresponding reduction of $3 billion in debt to be issued by PG&E Corp. (San Jose Comments at 6-7; A4NR Comments at 6-8; EPUC/IS Comments at 11-12; TURN Comments at 13-14.) These parties argue that the additional equity is available under PG&Eís equity backstop commitment letters, and that this

- 100 -

approach would reduce PG&E's debt load. PG&E responds that the equity backstop commitment letters do not support the proposed modification, and accordingly the argument is incorrect. (PG&E Reply Comments at 1.)

Contrary to what the non-PG&E parties suggest, increasing the amount of the equity backstop commitments to $12 billion from $9 billion is not consistent with the terms of the backstop commitment letters approved by the Bankruptcy Court, and would require the agreement of the parties to those letters. There is nothing in the record to show that such agreement has been obtained or would be obtainable. In addition, such a major revision to the financing structure at this late date would also likely be disruptive to the procedures of the Bankruptcy Court. Given the scant record support for the proposal and the potentially significant other problems it could cause, the proposed decision is not modified to increase the amount of equity to be issued.

Several parties wanted language to make clearer or stronger the finding that PG&E will not seek cost recovery for the 2017/2018 wildfire claims except via the proposed securitization. (*See, e.g.* Cal Advocates Comments at 5-7.) While the proposed decision appears to be clear on this point, additional language to this effect has been added to the decision.

PG&E requests clarification whether the language in the proposed decision requiring ìapproval from the Stateî for the appointment of directors is referring to the Governorís Office or the Commission. (PG&E Comments at 2-3.) To clarify, the phrase ìapproval from the Stateî on this issue refers to the Governorís Office, not the Commission.

PG&E raises practical concerns relating to the proposed decisionís requirement that it obtain Commission authorization for the formation of any affiliates or subsidiaries, or for the sale or encumbrance of any assets of its

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
105 of 124

affiliates or subsidiaries. (PG&E Comments at 4-5.) EPUC/IS opposes most of PG&E's requested changes, and argues that the Commission should retain oversight of PG&E's formation of affiliates and subsidiaries as it exits bankruptcy. (EPUC/IS Reply Comments at 5.) This requirement has been modified to only require reporting of most such transactions, and it does not apply to transactions that are proposed in connection with the PG&E Plan approved in this order.

PG&E states that it is committed to regional restructuring, and intends to file its application by the June 30, 2020 date set in the proposed decision, but observes that:

> It is not practical, however, for PG&E to appoint any of the regional vice presidents or regional safety leads by June 30. The search for such leaders is not a rapid process in any circumstance, and the challenges in recruiting qualified individuals are magnified at this time due to the COVID-19 pandemic, the pendency of PG&E's Chapter 11 Cases, and the inchoate nature of the positions to be filled. It is important that PG&E identify the right people and not rush the process simply to meet a June 30 deadline. In addition, it is difficult, if not impossible, to appoint the regional leaders before the Commission and stakeholders have a chance to review the proposed regions. (PG&E Comments at 7.)

PG&E raises a valid point, particularly since the Commission wants to ensure that the regionalization is executed with care, and with attention to the structures that are put in place. TURN agrees with PG&E on this point. (TURN Reply Comments at 2-3.) Accordingly, the deadline for PG&E to appoint its regional vice presidents and safety leads is extended to one year from the date of this decision.

SBUA calls for the Commission to impose more specific requirements on the details to be addressed in PG&E's application for regional restructuring.

(SBUA Comments at 8-10.) SBUA's request builds upon a similar request made earlier in the proceeding by CCSF. (*See*, CCSF Brief at 27-28.) The scope of the issues to be addressed in PG&E's regionalization application will be determined in that proceeding, not here. But without limiting the scope of that proceeding, the proposed decision has been modified to provide guidance as to at least some of the issues that the Commission will likely want to ensure are addressed in that proceeding.

PG&E notes that the proposed decision does not accurately reflect the proposal that it adopts regarding the timing of the filing by PG&E of an advice letter to update its cost of debt. (PG&E Comments at 9-10.) PG&E's proposal was for an advice letter to be filed "within 30 days of the Effective Date of PG&E's Plan" (which is the date of PG&E's emergence from bankruptcy), but the proposed decision, while stating that it is granting PG&E's request, instead directs that the advice letter is to be filed "30 days after the effective date of this decision." (*Id.*) This language has been corrected.

PG&E requests clarification regarding PG&E's plan to pledge the common stock of the Utility as collateral for a subset of new debt the parent will borrow as part of the Chapter 11 exit financing. (PG&E Comments at 10.) PG&E pointed out that the proposed decision did not address this issue, and requests that the Commission determine that the pledge by PG&E Corp. of its ownership interest in the utility as collateral for the debt does not require Commission approval, or to grant approval if required. (PG&E comments at 10.) A4NR opposes PG&E's request, and requests that PG&E be required to file an application seeking approval of terms of PG&E Corp. debt that "could affect utility resources." (A4NR Reply Comments at 1-2.) TURN observes that other parties raised arguments opposing PG&E's request. (TURN Reply Comments at 4-5.) To

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 107 of 124

clarify, we determine that Commission approval is not required for the pledge of utility stock at this time, but we remind PG&E that in the event of a default in which any lender seeks to acquire or control PG&E, Commission approval is required pursuant to Public Utilities Code Section 854. Public Utilities Code Section 701.5, which applies to the utility, is not implicated by the parent holding companyís pledge of utility stock as collateral for the secured debt issuance under consideration here.

PG&E also requests that we consider how provisions adopted here on future affiliate and subsidiary financial transactions would apply to components of its bankruptcy exit financing, especially those concerning accounts receivable. We clarify that approval is given for the components of the bankruptcy exit financing described by PG&E, including those relating to accounts receivable.

PG&E also seeks clarification that the Tribal Land Transfer Policy issued by the Commission on December 5, 2019 and the draft Guidelines published by Commission staff do not restrict the contemplated grant of encumbrances under the financings authorized in this decision. (PG&E Comments at 11.) Specifically, PG&E expressed concern that term ìencumbranceî in the draft Guidelines implementing the Tribal Land Transfer Policy creates some uncertainty that could undermine the secured debt transactions the Commission is authorizing. To reduce uncertainty, the Commission does not require application of the guidelines of the Tribal Land Transfer Policy to the authorized financing, including any security interests granted in connection with such transactions.

SBUA notes that the proposed decision, in addressing PG&Eís quality of service and quality of management, does not impose any additional going-forward requirements in these areas. (SBUA Comments at 12-15.) While we do not put in place SBUAís requested measures, we will modify the proposed

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page
108 of 124

decision to implement a necessary first step, which is to consider metrics to measure PG&E's quality of service and quality of management.

Some parties note that the decision's findings of fact, conclusions of law and/or ordering paragraphs are not as detailed as the text in the body of the decision, and argue that unless the findings and conclusions and ordering paragraphs are expanded to match the body of the decision, there is a risk that the decision does not actually bind PG&E. (*See*, CLECA Comments at 8; al Advocates Comments at 6-7.) This concern is misplaced. PG&E must comply with all language in a decision, not just the ordering paragraphs. PG&E can be penalized if it ì[F]ails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commissionÖî (Public Utilities Code section 2107.) [24] For an example in this proceeding, the body of this decision states: ìPG&E may not seek cost recovery for wildfire claims except in connection with the proposed nominally offset s ecuritization described in the documents attached to PG&E's March 24, 2020 motion for official notice.î PG&E must comply with this language regardless of its specific location within the decision.

Many comments either reiterated arguments previously made and considered, or raised issues outside the scope of the proceeding. No changes to the proposed decision were made in response to these comments.

## 7. Assignment of Proceeding

Marybel Batjer is the assigned Commissioner and Peter V. Allen is the assigned Administrative Law Judge in this proceeding.

---

[24] Public Utilities Code Section 2107 reads: Any public utility that violates or fails to comply with any provision of the Constitution of this state or of this part, or that fails or neglects to comply with any part or provision of any order, decision, decree, rule, direction, demand, or requirement of the commission, in a case in which a penalty has not otherwise been provided, is subject to a penalty of not less than five hundred dollars ($500), nor more than one hundred thousand dollars ($100,000), for each offense. (Emphasis added.)

**Findings of Fact**

1.   PG&E's reorganization plan and other documents resolving the insolvency proceeding, including PG&E's resulting governance structure, are acceptable in light of PG&E's safety history.

2.   PG&E's reorganization plan and other documents resolving the insolvency proceeding, including PG&E's resulting governance structure, are acceptable in light of PG&E's criminal probation.

3.   PG&E's reorganization plan and other documents resolving the insolvency proceeding, including PG&E's resulting governance structure, are acceptable in light of PG&E's recent financial condition.

4.   PG&E's reorganization plan and other documents resolving the insolvency proceeding, including PG&E's resulting governance structure, are acceptable in light of other factors deemed relevant by the Commission.

5.   The Commission has determined that the reorganization plan and other documents resolving the insolvency proceeding are consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state.

6.   The Commission has determined that the reorganization plan and other documents resolving the insolvency proceeding are neutral, on average, to the ratepayers of PG&E.

7.   The Commission has determined that the reorganization plan and other documents resolving the insolvency proceeding recognize the contributions of ratepayers, if any.

8.   PG&E has established an executive compensation structure for any new or amended contracts for executive officers, with additional requirements imposed by ACR Proposal 9.

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 110 of 124

9. Some issues raised in this proceeding are more appropriately addressed in I.15-08-019 or other proceedings.

10. Some of the proposals made in this proceeding will require additional analysis, development and refinement prior to implementation.

11. The Commission may have pending or may institute other investigations and proceedings against the Debtors arising from Debtorsí conduct prior to the effective date of the plan, including but not limited to those involving the Kincade Fire.

12. Regional restructuring of PG&E has the potential to improve safety and responsiveness to local communities.

13. An Enhanced Oversight and Enforcement process for PG&E will add clarity and certainty to the Commissionís processes for monitoring and enforcing PG&Eís safety performance.

14. PG&Eís reorganization plan calls for PG&E to issue long-term and short-term debt.

15. The Commission incurred fees and expenses for its outside counsel and financial advisor for services rendered relating to the chapter 11 cases, related proceedings and associated financings.

**Conclusions of Law**

1. PG&Eís reorganization plan and other documents resolving the insolvency proceeding, including PG&Eís resulting governance structure, comply with the requirements of Public Utilities Code Section 3292(b)(1).

2. PG&Eís executive compensation plan, as modified by ACR Proposal 9, conditionally satisfies the requirements of Public Utilities Code Section 8389(e)(6)(C).

3. Investigation 15-08-019 should remain open.

4.   As to other Commission investigations and proceedings, including but not limited to potential investigations involving the Kincade Fire, the plan should make clear that ìneither confirmation nor consummation of the plan shall affect any pending or future Commission proceeding or investigation, including any adjudication or disposition thereof, and any liability of the Debtors or Reorganized Debtors, as applicable, arising therefrom shall not be discharged, waived, or released.î

5.   Regional restructuring of PG&E should be initiated.

6.   An Enhanced Oversight and Enforcement process for PG&E should be adopted.

7.   PG&E should be granted authorization to issue long-term and short-term debt consistent with its plan of reorganization.

8.   PG&E should reimburse the Commission for the fees and expenses incurred by the Commission for its outside counsel and financial advisor for services rendered relating to the Chapter 11 cases, related proceedings and associated financings, and PG&E should not seek cost recovery of the Commissionís costs for such fees and expenses.

9.   Neither this decision nor PG&Eís reorganization plan and other documents resolving the insolvency proceeding limit or otherwise modify the Commissionís authority or jurisdiction.

# O R D E R

**IT IS ORDERED** that:

1.   Pacific Gas and Electric Companyís (PG&Eís) reorganization plan and other documents resolving the insolvency proceeding, including PG&Eís

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page
112 of 124

resulting governance structure, are approved consistent with the terms and conditions of this decision.

2. Pacific Gas and Electric Company is directed to ensure that its plan makes clear that ìneither confirmation nor consummation of the plan shall affect any pending or future Commission proceeding or investigation, including any adjudication or disposition thereof, and any liability of the Debtors or Reorganized Debtors, as applicable, arising therefrom shall not be discharged, waived, or released.î

3. Pacific Gas and Electric Company is ordered to implement regional restructuring consistent with this decision.

4. An Enhanced Oversight and Enforcement process for Pacific Gas and Electric Company is adopted consistent with this decision.

5. Pacific Gas and Electric Company is authorized to issue long-term and short-term debt consistent with its plan of reorganization.

6. Pacific Gas and Electric Company shall submit a Tier 2 Advice Letter to the Commission's Energy Division within 30 days of the ~~effective date~~Effective Date of ~~this decision~~its Plan to implement the debt cost savings associated with the $11.85 billion Noteholder Restructuring Support Agreement debt.

7. Pacific Gas and Electric Company (PG&E) shall reimburse the Commission for payment of the fees and expenses incurred by the Commission for its outside counsel and financial advisor for services rendered relating to the Chapter 11 cases, related proceedings and associated financings. PG&E may not seek cost recovery of the Commissionís costs for such fees and expenses.

8. Pacific Gas and Electric Company shall submit a Tier 3 Advice Letter to the Commission's Energy Division no later than one year before the expiration of the term of the federal court monitor, with a proposed scope of work, budget,

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 113 of 124

solicitation process for an Independent Safety Monitor, and a process for selection/approval by the Commission. Energy Division will process the Tier 3 Advice Letter in consultation with the Commissionís Safety Enforcement Division and Safety Policy Division, as appropriate.

9.   Pacific Gas and Electric Company shall annually submit to the Commissionís Energy Division a Tier 1 Advice Letter, until further direction, informing the Commission of its current capital structure and deviation from its authorized capital structure, an updated annual forecast for de-leveraging, and its current credit ratings for secured and unsecured debt.

10.   This proceeding remains open.

This order is effective today.

Dated_____, at San Francisco, California.

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page
114 of 124

**APPENDIX A**

**ENHANCED OVERSIGHT AND
ENFORCEMENT PROCESS**

**Appendix A**
**Enhanced Oversight and Enforcement Process**

The Commission adopts an Enhanced Oversight and Enforcement Process (Process) designed to provide a clear roadmap for how the Commission will closely monitor PG&Eís performance in delivering safe, reliable, affordable, clean energy.

The Process contains six steps which are triggered by specific events, some of which would rely on Safety and Operational Metrics. The Process includes enhanced reporting requirements and additional monitoring and oversight. The Process also contains provisions for PG&E to cure and permanently exit the Process if it can satisfy specific criteria. If PG&E is placed into the Process, actions taken would occur in coordination with the Commissionís existing formal and informal reporting requirements and procedures. The Process does not replace or limit the Commissionís regulatory authority, including the authority to issue Orders to Show Cause and Orders Instituting Investigations and to impose fines and penalties.

Except as otherwise provided below, a Commission Resolution would place PG&E in the appropriate step based upon the occurrence of a specified triggering event. PG&E shall report the occurrence of a triggering event to the Commissionís Executive Director no later than five business day after the date on which any member of senior management of PG&E becomes aware of the occurrence of a triggering event.[~~19~~25] PG&E should presumptively move through the steps of the Process sequentially but the Commission may place PG&E in the appropriate step upon the occurrence of a specified triggering event.

1. **Enhanced Reporting**

    **STEP 1: Enhanced Reporting**

    A. Triggering Events

        i.    PG&E fails to obtain an approved wildfire mitigation plan or fails in any material respect to comply with its regulatory reporting requirements~~:~~;

        ii.    PG&E fails to comply with, or has shown insufficient progress toward, any of the metrics (i) set forth in its approved wildfire mitigation plan including Public Safety Power Shutoffs (PSPS) protocols, (ii) resulting from its on-going safety culture assessment, (iii) contained within the approved Safety and Operational Metrics, or (iv) related to other specified safety performance goals~~:~~;

        iii.    PG&E demonstrates insufficient progress toward approved safety or risk-

---

[~~19~~25] Applicable to triggering events that are not based upon a Commission determination.

1

driven investments related to the electric and gas business.; or

iv. PG&E (or PG&E Corporation) fails in any material respect to comply with the Commissionís requirements and conditions for approval of its emergence from bankruptcy.

B. Actions During Step 1

PG&E will submit a Corrective Action Plan to the Executive Director within twenty days of a Commission Order placing PG&E into Step 1.

i. The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 1 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and include an attestation stating that it has been approved by the Chief Risk Officer (CRO).

ii. The Corrective Action Plan, including any timeframes set forth therein for the correction of the triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

iii. Commission staff will monitor PG&Eís compliance with its Corrective Action Plan based on, among other things, existing or enhanced reporting.

iv. The CRO, the Safety and Nuclear Oversight (SNO) Subcommittee, and the boards of directors shall provide reporting to the Commission as directed.

C. Performance that Results in Exit from Step 1

i. PG&E shall exit from Step 1 of the Process upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Corrective Action Plan within the required timeframe.

ii. The Commission, by Resolution, will move PG&E to Step 2 if it fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe. PG&E may remain in Step 1 if it demonstrates sufficient progress toward meeting the conditions of its Corrective Action Plan and additional time appears needed to successfully address the triggering event(s).

### Step 2: Commission Oversight of Management and Operations

A. Triggering Events

i. PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe as provided in Step 1, Section C (ii) above.;

i. A gas or electric incident occurs that results in the destruction of 1,000 or more dwellings or commercial structures and appears to have resulted from PG&Eís failure to follow Commission rules or orders or prudent management practices;

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 117 of 124

i ~~ii. A gas or electric incident occurs that results in the destruction of 1,000 or more dwellings or commercial structures and appears to have resulted from PG&E's failure to follow Commission rules or orders or prudent management practices.~~ PG&E fails to comply with electric reliability performance metrics, including standards to be developed for intentional de-energization events (i.e., PSPS) and any that may be contained within the approved Safety and Operational Metrics.~~.~~; or

iv ~~iii.~~ PG&E fails to report to the Commission a systemic electric or gas safety issue.

B. Actions During Step 2

  i. PG&E will submit a Corrective Action Plan, or updated Corrective Action Plan, to the Executive Director within twenty days of a Commission Order placing PG&E into Step 2.

  ii. The Corrective Action Plan shall be designed to correct or prevent a recurrence of the Step 2 triggering event, or otherwise mitigate an ongoing safety risk or impact, as soon as practicable and shall include an attestation stating that it has been approved by the CRO and the SNO Subcommittee.

  iii. The Corrective Action Plan, including any timeframes set forth therein for the correction or prevention of the Step 2 triggering events or mitigation of any ongoing safety risk or impact, shall be approved by the Commission or the Executive Director.

  iv. Commission staff will monitor PG&E's compliance with its Corrective Action Plan based on, among other activities, increased inspections, quarterly reports, and, to the extent applicable, spot auditing of General Rate Case, Wildfire Expense Memorandum Account, Catastrophic Events Memorandum Account, or Pipeline Safety Enhancement Plans accounts in which approved investments in wildfire mitigation, electric or gas safety are auditable.

  v. A representative of the SNO Subcommittee and the CRO shall appear quarterly before the Commission to report progress on the Corrective Action Plan and provide additional reporting as directed.

C. Performance that Results in Exit from Step 2

  i. PG&E shall exit from Step 2 upon issuance of a Commission Resolution finding that the company has met the conditions of its Step 2 Corrective Action Plan within the required timeframe. The Commission may move PG&E back to Step 1 of the Process rather than exit the process if it determines that PG&E has made sufficient progress in meeting its Step 2 Corrective Action Plan but continued enhanced reporting is needed.

  ii. The Commission, by Resolution, will move PG&E to Step 3 if PG&E fails to adequately meet the conditions of its Corrective Action Plan and additional time in Step 2 is not likely to result in the effective implementation of its

Case: 19-30088    Doc# 7510-10    Filed: 05/22/20    Entered: 05/22/20 15:54:07    Page 118 of 124

Corrective Action Plan.

## 2. Enhanced Enforcement

Steps 3 through 6 of the Process implement increasing levels of operational oversight upon occurrence of certain triggering events.

### Step 3: Appointment of Independent Third-Party Monitor

A. Triggering Events
  i. PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe, as provided in Step 2, Section C (ii); or
  ii. PG&E fails to obtain or maintain its safety certificate as provided in AB 1054.

B. Actions During Step 3
  i. The Commission's Executive Director may appoint an independent third- party monitor (Monitor), or expand the authority of any Independent Safety Monitor previously appointed by the Commission, to oversee PG&E's operations and to work with senior management to develop and implement a Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.
  ii. The Monitor will provide active, external oversight of PG&E's implementation of its Corrective Action Plan.
  iii. The Monitor will have the authority to hire third-party safety and utility operations experts to assist it with its oversight obligations.
  iv. PG&E's senior management must work jointly with the Monitor to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission). The Corrective Action Plan shall be certified by the Monitor.
  v. PG&E may request the Monitor to modify the Corrective Action Plan but must otherwise implement the plan as approved by the Monitor.
  vi. The Monitor will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.
  vii. The CRO and SNO Subcommittee will provide reporting to the Commission as required during this Step.

C. Performance that Results in Exit from Step 3
  i. PG&E shall exit from Step 3 upon issuance of a Commission Resolution finding that PG&E has met the conditions of its Step 3 Corrective Action Plan within the required timeframe. The Commission may determine that PG&E must remain in Step 1 or 2 for additional time after it confirms that PG&E has exited Step 3.

    ii.    The Commission, by Resolution, will move PG&E to Step 4 if any of the following occurs:
        a.   PG&E fails to implement the Corrective Action Plan within the timeframes required by the Monitor or the Commission's Executive Director.
        b.   The Commission determines that additional enforcement is necessary because of PG&E's systemic non-compliance or poor performance with its Safety and Operational Metrics over an extended period.

## Step 4: Appointment of a Chief Restructuring Officer

A.  Triggering Events
    i.    PG&E fails to adequately meet the conditions of its Corrective Action Plan within the required timeframe and additional time in Step 3 is not likely to result in the effective implementation of its Corrective Action Plan, as provided in Step 3, Section C (ii)(a).;

    ii.   Additional enforcement is necessary because of PG&E's systemic non-compliance or poor performance with its Safety and Operational Metrics over an extended period.;

    iii.  The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that PG&E repeatedly violated its regulatory requirements, committed gross negligence, or committed a serious violation of the law, such that such conduct in the aggregate represents a threat to public health and safety.;

    iv.  PG&E causes an electric or gas safety incident that results in the destruction of 1,000 or more dwellings or commercial structures and the Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process, that such event results from the willful misconduct or repeated and serious violations of Commission rules, orders or regulatory requirements.;

    v.   The Commission determines through an Order to Show Cause, Order Instituting Investigation, or other appropriate process that additional enforcement is necessary because the wildfire fund administrator has made a determination following a covered wildfire that PG&E is ineligible for the cap on reimbursement because its actions or inactions that resulted in a covered wildfire constituted conscious or willful disregard of the rights and safety of others.; or

    vi.  PG&E failed to obtain or maintain its safety certificate as provided in AB 1054 for a period of three consecutive years.

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 120 of 124

B.  Actions During Step 4

    i.    The Commission will require that PG&E retain a chief restructuring officer from a list of qualified candidates identified by a third-party. The chief restructuring officer will have full management responsibility for developing and directing PG&E to implement the Corrective Action Plan with reasonable timeframes to address the triggering event(s) as soon as practicable.

    ii.    The chief restructuring officer will have the authority of an executive officer of PG&E and will report to the SNO Committee on all safety issues.

    iii.    PG&E's senior management must work jointly with the chief restructuring officer to develop and implement a Corrective Action Plan including reasonable timeframes (which timeframes shall be acceptable to the Commission).

    iv.    The chief restructuring officer will have all corporate authority that can be delegated to an officer under the California Corporations Code in order to ensure that PG&E can meet its Corrective Action Plan.

    v.    The Corrective Action Plan must be certified by the chief restructuring officer.

    vi.    PG&E must otherwise implement the Corrective Action Plan as certified by the chief restructuring officer.

    vii.    The chief restructuring officer will provide quarterly reports to the Commission and to PG&E's board of directors on the progress towards implementing the Corrective Action Plan.

    viii.    The Chief Restructuring Officer will remain in place during Steps 5 and 6, if triggered.

C.  Performance that Results in Exit from Step 4

    i.    PG&E shall exit from Step 4 upon issuance of a Commission Resolution finding that it met the conditions of its Step 4 Corrective Action Plan within the required timeframe. The Commission may determine that PG&E must remain in Steps 1, 2, or 3 for additional time after PG&E has exited Step 4.

    ii.    The Commission by Resolution will move PG&E to Step 5 if the Commission finds that PG&E failed to implement the Corrective Action Plan within the timeframes required by the chief restructuring officer or the Commission.

    iii.    PG&E may remain in Step 4 if the Commission determines that additional time appears needed to successfully address the triggering event(s).

Case: 19-30088   Doc# 7510-10   Filed: 05/22/20   Entered: 05/22/20 15:54:07   Page 121 of 124

**Step 5: Appointment of a Receiver**

A. Triggering Events
    i. PG&E fails to implement its Step 4 Corrective Action Plan within the required timeframes, as provided in Step 4, Section C (ii).

B. Process
    i. The Commission will pursue the receivership remedy subject to then applicable law of the state of California. If PG&E becomes the subject of a subsequent chapter 11 case, PG&E will agree not to dispute the Commissionís or state of Californiaís authority to file a motion for the appointment of a chapter 11 trustee.
    ii. The receiver, if appointed by the Superior Court, would be empowered to control and operate PG&Eís business units in the public interest but not dispose of the operations, assets, business or PG&E stock.

C. Performance that Results in Exit from Step 5
    i. If the Commission by Resolution determines that PG&E has corrected all of the Step 5 triggering events and has remained in material compliance with Safety and Operational Metrics for a period of 18 months, the Commission may request termination of any receivership ~~At any time while the receiver is in place and to the extent permitted by then applicable law, the Commission can initiate a Step 6 enforcement action if a Step 6 triggering event has occurred.~~
    ii. At any time while the receiver is in place and to the extent permitted by then applicable law, the Commission can initiate a Step 6 enforcement action if a Step 6 triggering event has occurred.
    iii. ~~ii.~~ In the event that the Commission seeks, but is not successful in obtaining a receiver, or if the Step 5 triggering event occurs and California law does not allow for the appointment of a receiver, the Commission would determine whether PG&E shall remain in Step 4 or advance to Step 6.

**Step 6: Review of CPCN**

A. Triggering Events
    i. A receiver appointed as set forth above has determined that continuation of Receiver Oversight will not result in restoration of safe and reliable service; provided that such receiver shall have been a place for a period of at least nine (9) months before making such a determination.;
    ii. A court of applicable jurisdiction has denied the Commissionís request for a receiver made as set forth above. or the Step 5 triggering event has occurred and California law does not provide for the appointment of a receiver; or
    iii. PG&E fails adequately to address ~~all of~~ the Step 5 triggering ~~events~~event

within 18 months of imposition of Step 5 and the Commission determines that additional time in Step 5 is unlikely to result in corrective action.

B.  Process

  i.  The Commission will undertake this process subject to then applicable law of the state of California.

  ii.  The CPUC will issue an ~~order~~Order to ~~show cause~~Show Cause or Order Instituting Investigation to initiate Step 6

  iii.  As a result of the ~~order~~Order to ~~show cause~~Show Cause, the CPUC may place conditions on PG&Eís CPCN or revoke PG&Eís CPCN.

**(END OF APPENDIX A)**

Document comparison by Workshare Compare on Tuesday, May 19, 2020
12:37:40 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\avs\Desktop\I1909016 Allen Comment Dec APRIL 16 pm_.docx |
| Description | I1909016 Allen Comment Dec APRIL 16 pm_ |
| Document 2 ID | file://C:\Users\avs\Desktop\I1909016 Allen (REV 1) Agenda Dec Approving Reorganization Plan_.docx |
| Description | I1909016 Allen (REV 1) Agenda Dec Approving Reorganization Plan_ |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 141 |
| Deletions | 142 |
| Moved from | 2 |
| Moved to | 2 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 287 |