WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☑ Affects both Debtors<br><br>* *All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**DECLARATION OF JOHN BOKEN IN SUPPORT OF DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**<br><br>Date: May 27, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102 |

Pursuant to 28 U.S.C. § 1746, I, John Boken, hereby declare as follows under penalty of perjury:

1. I am a Managing Director in the Turnaround and Restructuring Services practice of AlixPartners, LLP, and affiliate of both AlixPartners, LLC and AP Services, LLC ("**APS**"), which provides interim management services to PG&E Corporation and Pacific Gas and Electric Company, as debtors and debtors-in-possession (collectively, "**PG&E**" or the "**Debtors**") in the above captioned Chapter 11 Cases (the "**Chapter 11 Cases**"). I currently serve as the Deputy Chief Restructuring Officer for the Debtors as authorized by the Court by Order dated April 9, 2019 [Docket No. 1299].

2. I have more than 29 years of corporate restructuring experience. I have led over 75 restructuring projects in a wide variety of industries, including energy, construction, health care, manufacturing, homebuilding, retail, and agriculture. In doing so, I have developed expertise in resolving day-to-day operational issues, devising business turnaround strategies, formulating debt restructuring plans, and divesting of unprofitable and/or non-strategic operations and assets. I also have significant experience designing creative solutions to the complex operating and capital structure problems that exist in large restructuring cases. I have served as Chief Restructuring Officer, and in other senior management capacities, in other large, complex chapter 11 cases. I have also assisted numerous companies in restructuring situations in an advisory capacity. Examples of situations where I have had a material leadership role in the restructuring are: President and COO of NRG Energy, CEO of Entegra Power Group, CEO of TOUSA, CRO of Flying J, CRO of Homer City Generation, CEO of SolarWorld Americas, and restructuring advisor to Southern California Edison.

3. I hold a Bachelor of Science degree in commerce-finance from the University of Santa Clara. I am a Certified Public Accountant (inactive). I am also a member of the Association of Insolvency and Restructuring Advisors, the American Bankruptcy Institute and the Turnaround Management Association. I have been a regular speaker and panelist at seminars and conferences on issues relating to financially distressed companies.

4. Prior to the Petition Date, AlixPartners, LLC was engaged to provide financial advisory and other restructuring related services to the Debtors, and I have worked with the Debtors since

November 2018. In my capacity as Deputy Chief Restructuring Officer, as well as my work with the Debtors prior to the Petition Date, I have become knowledgeable and familiar with the Debtors' day-to-day operations, business, and financial affairs. Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, including my review of relevant documents and the Debtors' books and records, my discussions with other members of the Debtors' senior management, information provided to me by APS professionals and employees of the Debtors working under my supervision, my experience and knowledge related to the Debtors' operations, businesses, and financial condition of the Debtors, or upon information supplied to me by the Debtors' other professionals and advisors. I am authorized to submit this Declaration on behalf of the Debtors. If called upon to testify, I would testify to the facts set forth in this Declaration.

5. I submit this Declaration in support of confirmation of the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* [Docket No. 6320] (as it may be amended, modified or supplemented, and together with any exhibits or schedules thereto, the "**Plan**").[1] Together with the Debtors' counsel and other advisors, I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the documents comprising the Plan Supplement, the Proposed Confirmation Order, the Memorandum, and the requirements for confirmation of the Plan pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**").

**Section 1129(a)(11): Plan Feasibility**

**a. Financial Projections**

6. APS has had a broad range of responsibilities supporting and assisting the Debtors in these Chapter 11 Cases. One area of significance for APS has been its involvement in the Debtors' process of preparing the Financial Projections attached to the Disclosure Statement (the "**Financial Projections**"). I have overseen the APS professionals who were assigned to assist the Debtors in preparing the Financial Projections and was an active participant in that process.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan or the *Plan Proponents' Joint Memorandum of Law and Omnibus Reply in Support of Confirmation of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (the "**Memorandum**"), filed contemporaneously herewith, as applicable.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

7. From the outset of these cases, the APS team has worked closely with an expansive group of PG&E personnel to facilitate the forecasting process and provide oversight and feedback throughout this very iterative effort. The principal goals of the forecasting process were to ensure that: (i) the process was comprehensive; (ii) the underlying inputs and assumptions were thoroughly researched, examined, challenged, and validated; and, (iii) the resulting Financial Projections output was supportable and able to withstand rigorous diligence from all of the key constituencies in these Chapter 11 Cases.

8. Among other factors and considerations, the combined team of PG&E personnel and APS professionals thoroughly evaluated dynamic and inter-related inputs and assumptions relating to (i) electric and gas distribution and transmission operations, (ii) power generation and supply, (iii) system reliability, (iv) capital spend and infrastructure investments, (v) safety, (vi) rate cases and cost recovery, (vii) regulatory requirements, (viii) California clean energy initiatives, (ix) public purpose programs, (x) wildfire mitigation plans, (xi) customer affordability objectives, (xii) financing needs, (xiii) management, (xiv) administrative requirements, and (xv) cost-reduction initiatives, amidst evolving and anticipated developments in the external customer, regulatory, technological, and economic environments within which the Debtors operate.

9. I believe that the process of developing the Financial Projections was comprehensive, was based on all of the relevant information that was available to the Debtors' forecasting team and APS at the time they were prepared, and that the inputs and assumptions utilized in preparing the Financial Projections were thoroughly and adequately researched and scrutinized. Based on those factors, it is my opinion that the Financial Projections reflect a reasonable and rational expectation of operational performance over the period covered thereby.

**b.  13-Week Cash Flow Analysis**

10. In addition to our assistance with the Financial Projections, APS has been principally responsible, throughout the course of these Chapter 11 Cases, for managing and maintaining the 13 week cash flow modeling, forecasting, and reporting process ("**13 WCF**") and associated intermediate-term monthly cash flow forecasting effort. I have been responsible for directing and overseeing the 13

WCF team and related modeling and forecasting activities. Throughout the nearly sixteen month duration of these Chapter 11 Cases, the APS team working on the components of the 13 WCF have developed a detailed understanding of, among other factors, the Debtors' customer receipts and vendor / supplier disbursements cycles, invoice processing and approval procedures and timetables, accounts payable system and technology interfaces, banking and treasury systems, seasonal working capital fluctuations and needs, energy procurement contract collateral requirements, and professional fees and other administrative expenses. As a result of our management of the 13 WCF process, and associated DIP financial reporting requirements, the APS team has served, and continues to serve, as a critical resource for projecting and understanding the Debtors' near-term and intermediate-term cash flow performance and liquidity needs. The outputs from this workstream were one of the essential components in developing the chapter 11 emergence sources and uses analysis setting forth how the Debtors expect to honor their obligations under the Plan.

11. Since the production and release of the Financial Projections, the global COVID-19 pandemic has resulted in some disruptions and modifications to the Debtors' operations and normal functions. APS has assisted the Debtors' management and forecasting team in assessing the pandemic's potential impact on the Debtors' financial performance, cash flows, and liquidity. Based on what we have observed and learned to date, taking into account that assessment, it is my opinion that these recent developments are not expected to have a material impact on the Financial Projections or the Debtors' ability to meet their obligations under the Plan.

**c. Claims Analysis**

12. Throughout these Chapter 11 Cases, APS has also devoted significant resources to the Claims process. Immediately after the filing, APS spearheaded the preparation of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs, which were filed with the Court on March 14, 2019 and April 15, 2019, respectively [Docket Nos. 897-908, 1459-1460], detailing all pre-petition claims that the Debtors were aware of based on their books and records. This was a significant undertaking, and served to provide the APS team with a comprehensive understanding of the nature and breadth of the vendor, customer, and legal claims attendant to the

Debtors' normal operations. Additionally, since late October 2019, once the Bar Date passed, a dedicated APS team under my supervision has been working with a broad, cross-functional team of PG&E personnel (collectively, the "**Claims Team**") to match, categorize, identify duplicates, assess, and otherwise reconcile filed and scheduled claims on a claim-by-claim basis, other than wildfire claims and funded debt claims (the liquidated amounts of funded debt claims are easily determined).

13. Excluding wildfire claims and funded debt claims, the aggregate volume of proofs of claim reviewed by the Claims Team was nearly 20,000. The Claims Team continues to evaluate and research claims.

14. The methodologies deployed by the Claims Team in this process have been expansive, highly structured, and technology driven and aided. Furthermore, the process was designed to make and did make effective use of the institutional knowledge of PG&E operational, functional, and legal personnel in the reconciliation of claims, follow-up with claimants, negotiation of settlements, and development of claims estimates for unliquidated claims.

15. As a result of this process, the Claims Team has estimated the amount of the claims required to be funded under the Plan. The Claims Team's aggregate estimate of allowed non-wildfire, non-funded debt claims is approximately $1.0 billion. Additionally, the Claims Team has estimated aggregate cure payments of approximately $230 million for contracts to be assumed upon emergence in connection with the Plan. These claims figures assume that certain claims are expected to ride through the bankruptcy and to be addressed in the ordinary course outside of the claims resolution process. Finally, in recognition that there remains some volume of claims for which the Debtors do not have sufficient information at this time to develop reasonable estimates on possible exposure, a contingency of approximately $330 million has been established, which I believe is reasonable under the facts and circumstances here. These amounts are consistent with the estimated liabilities utilized in the development and negotiation of the Plan. Furthermore, these estimates are generally consistent with accruals included in the Debtors' books and records.

16. Based on my knowledge of the facts and circumstances associated with the Claims, and my understanding of the processes and methodologies deployed by the Claims Team under my

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

supervision, it is my opinion that the current aggregate claims estimates are reasonable. Furthermore, given my understanding of both the sources for funding of the Plan obligations and the Debtors' ongoing ability to fund its working capital needs in the ordinary course, I believe that the Debtors' financial resources both at emergence and going forward will be sufficient to satisfy all claims, once allowed (including professional fees, statutory fees, and other administrative expenses), in accordance with the terms of the Plan, and to maintain ongoing operations as projected.

**Section 1129(a)(7): Best Interests of Creditors**

17. The Bankruptcy Code requires that each holder of an impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interest" test.

18. As set forth below and in the Disclosure Statement, it is my opinion that the Plan satisfies the best interest test. It is my opinion that a chapter 7 liquidation scenario is likely to result in (i) a significant impairment to the value and theoretical proceeds from the sale of the Debtors' assets due to operational and regulatory uncertainties, including the risk of exclusion from participation in the Go-Forward Wildfire Fund created under AB 1054, for at least a period of time, (ii) extensive and prolonged litigation over the process to establish the value of the Debtors' assets and how to commence a liquidation sale, (iii) a substantial increase in Claims that would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, including potential increases in the wildfire claims due to the likely termination of the various material settlement agreements associated with the Plan, (iv) the incurrence of increased costs and expenses, (v) additional delay in recoveries to creditors due to, among other factors, the unclear regulatory path to approve any transfer of assets and potential prolonged litigation on numerous issues, (vi) potential liquidity shortfalls and capital constraints that may limit or disrupt normal operations during the extended period of monetizing assets and transferring ownership.

19. In my opinion, based on the extensive involvement of the APS team in these Chapter 11 Cases, our familiarity with the Debtors' operations, assets, finances, and Claims, and for the reasons

stated above, I cannot envision a liquidation, forced sale, or state of California acquisition of PG&E that would not result in a substantial impairment to creditor and shareholder recoveries, and significantly extend the timeline for any such recoveries. As a result, and in light of the recoveries afforded to the Debtors' creditors and shareholders under the Plan, I believe that the Plan satisfies the "best interest" test.

20. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: May 22, 2020
       Los Angeles, CA.

                                                */s/ John Boken*
                                                John Boken

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119