WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors*
*and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                    **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case,*<br>*No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**PLAN PROPONENTS' JOINT MEMORANDUM OF LAW AND OMNIBUS RESPONSE IN SUPPORT OF CONFIRMATION OF DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION** |

# Table of Contents

PRELIMINARY STATEMENT ................................................................... 1

I.   BACKGROUND FACTS AND EVIDENCE IN SUPPORT OF CONFIRMATION.............. 4
     A.   Declarations and Other Evidentiary Support for Plan Confirmation............................ 4
     B.   Dates, Deadlines, and Other Filings Relevant to Plan Confirmation ........................ 5

II.  THE PLAN SATISFIES THE REQUIREMENTS OF THE BANKRUPTCY CODE
     AND SHOULD BE APPROVED .......................................................................... 6
     A.   Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the
          Bankruptcy Code ....................................................................................... 6
          1.   Section 1122: The Plan's Classification Structure is Proper .................... 7
          2.   Section 1123(a): The Plan's Content is Appropriate ............................. 9
          3.   Section 1123(b) The Plan's Content is Permitted............................. 11
     B.   Section 1129(a)(2): The Debtors have Complied with the Bankruptcy Code ............... 25
          1.   Section 1125: Postpetition Disclosure Statement and Solicitation ................... 25
          2.   Section 1126: Acceptance or Rejection of the Plan.............................. 27
     C.   Section 1129(a)(3): The Plan has been Proposed in Good Faith and is Not by any
          Means Forbidden by Law ........................................................................... 29
     D.   Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses are
          Subject to Court Approval .......................................................................... 30
     E.   Section 1129(a)(5): The Debtors have Disclosed All Necessary Information
          Regarding Directors, Officers, and Insiders .................................................... 31
     F.   Section 1129(a)(6): Approval of Any Rate Changes............................................ 32
     G.   Section 1129(a)(7): The Plan is in the Best Interest of All Holders of Claims and
          Interests ................................................................................................ 32
     H.   Section 1129(a)(8): The Plan has Been Accepted by Impaired Voting Classes............. 34
     I.   Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed
          Priority Claims ....................................................................................... 34
     J.   Section 1129(a)(10): At Least One Class of Impaired Claims has Accepted the
          Plan ..................................................................................................... 35
     K.   Section 1129(a)(11): The Plan is Feasible ...................................................... 35
          1.   The Plan Provides Adequate Means to Satisfy Claims and Fulfill the
               Debtors' Obligations Thereunder ............................................... 36
          2.   Legislative and Regulatory Feasibility ......................................... 37
     L.   Section 1129(a)(12): All Statutory Fees Have Been or Will be Paid ......................... 38
     M.   Section 1129(a)(13): Continuation of Retiree Benefits ....................................... 38
     N.   Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16): Inapplicable Provisions ............. 39
     O.   Section 1129(b): The Plan Satisfies the "Cram Down" Requirements with
          Respect to Class 10A-II (HoldCo Rescission or Damage Claims)............................ 39
     P.   Section 1129(c): The Plan is the Only Plan Currently on File ............................... 40
     Q.   Section 1129(d): The Principal Purpose of the Plan is Not the Avoidance of
          Taxes ................................................................................................... 40
     R.   Section 1129(e): Inapplicable Provision ....................................................... 40
     S.   Section 1127: Modification of the Plan ........................................................ 40

Case: 19-30088   Doc# 7528   Filed: 05/22/20   Entered: 05/22/20 16:24:53   Page 2 of
82

III.   THE PLAN SATISFIES THE LEGISLATIVE AND REGULATORY
       REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED ...................... 41
       A.    AB 1054 .......................................................................................................... 41
       B.    CPUC Approval ............................................................................................. 43

IV.    THE UNRESOLVED OBJECTIONS TO CONFIRMATION OF THE PLAN SHOULD
       BE OVERRULED ............................................................................................................ 44
       A.    The TCC Objection Should Be Overruled ...................................................... 45
       B.    The UCC Objection Should Be Overruled ..................................................... 48
             1.    Section 10.3 Does Not Impermissibly Expand Section 1141 of the
                   Bankruptcy Code ................................................................................. 49
             2.    Plan Treatment Does Not Impair Contingent Prepetition Indemnification
                   and Contribution Claims ..................................................................... 50
             3.    The Plan Does Not Prejudice Vendors and Other Creditors with Respect
                   to Assigned Claims and Causes of Action Assigned to the Fire Victims
                   Trust .................................................................................................. 56
       C.    The PERA Objection Should Be Overruled .................................................... 57
             1.    The Plan Treats HoldCo Rescission Or Damage Claims Properly ...................... 57
             2.    The Plan Does Not Discriminate Unfairly Against HoldCo Rescission Or
                   Damage Claims .................................................................................. 67

V.     CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER ............... 68

VI.    CONCLUSION ................................................................................................................... 69

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abu-Assal v. Abu-Assal*,
  No. EDCV01153GAFSGLX, 2008 WL 11336612 (C.D. Cal. Aug. 22, 2008) ..............................53

*In re Acequia, Inc.*,
  787 F.2d 1352 (9th Cir. 1986) ........................................................................................................68

*Ad Hoc Comm. of Holders of Trade Claims v. PG&E Corp.*,
  No. 20-CV-01493-HSG, 2020 WL 1865135 (N.D. Cal. Apr. 14, 2020)........................................49

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140, (Bankr. S.D.N.Y. 2007) ..........................................................................................33

*In re Aina Le'a, Inc.*,
  No. BR 17-00611, 2019 WL 2274909 (Bankr. D. Haw. May 24, 2019)........................................20

*In re Airlift Int'l*,
  761 F.2d 1503 (11th Cir. 1985) ......................................................................................................55

*In re Am. Gilsonite Co.*,
  No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) ....................................................................25

*In re Am. Solar King Corp.*,
  90 B.R. 808 (W.D. Tex. 1988)............................................................................................31, 49, 62

*In re AMR Corp.*,
  No. 11-15463 (SHL), (Bankr. S.D.N.Y. Oct. 22, 2013) ................................................................50

*In re Art & Architecture Books of the 21st Century*,
  No. 2:13-BK-14135-RK, 2016 WL 1118743 (Bankr. C.D. Cal. Mar. 18, 2016) ........................6, 30

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)........................................................................................................................32

*Billington v. Winograde (In re Hotel Mt. Lassen)*,
  207 B.R. 935 (Bankr. E.D. Cal. 1997)............................................................................................22

*In re Blue Earth, Inc.*,
  No. 16-30296-DM (Bankr. N.D. Cal. July 19, 2016) (Montali, J.) ................................................49

*In re Blue Earth, Inc. Sec. Class Action Litig.*,
  No. CV 14-08263-DSF, 2015 WL 12001274 (C.D. Cal. Nov. 3, 2015) ........................................60

*In re Breitburn Energy Partners LP*,
  No. 16-11390 (SMB) (Bankr. S.D.N.Y. March 26, 2018) [Docket No. 2387] ..........................24, 50

*In re Charter Commc'ns,*
419 B.R. 221 (Bankr. S.D.N.Y. 2009), *appeal dismissed,* 449 B.R. 14 ........................................... 31

*In re Christian Life Ctr.,*
821 F.2d 1370 (9th Cir. 1987) ....................................................................................................... 52

*In re Circle K Corp.,*
121 B.R. 257 (Bankr. D. Ariz. 1990) ............................................................................................ 66

*City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.),*
656 F.3d 82 (1st Cir. 2011) ........................................................................................................... 25

*In re Corcoran Hosp. Dist.,*
233 B.R. 449 (Bankr. E.D. Cal. 1999) .......................................................................................... 25

*In re Dant & Russell, Inc.,*
951 F.2d 246 (9th Cir. 1991) ......................................................................................................... 53

*In re Del Biaggio,*
496 B.R. 600 (Bankr. N.D. Cal. 2012) ................................................................................... 65, 67

*In re Downey Financial Corp,*
428 B.R. 595 (Bankr. D. Del. 2010) .............................................................................................. 65

*Dura Pharm., Inc. v. Broudo,*
544 U.S. 336 (2005) ....................................................................................................................... 60

*Energy Consulting & Mgmt. Sols., LLC v. W. States Equip. Co.,*
574 F. App'x 763 (9th Cir. 2014) .................................................................................................. 54

*Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton),*
542 B.R. 261 (B.A.P. 9th Cir. 2015) ............................................................................................... 7

*In re Frontier Properties,*
979 F.2d 1358 (9th Cir. 1992) ....................................................................................................... 55

*In re Genco Shipping & Trading Ltd.,*
No. 14-11108 (SHL) ...................................................................................................................... 25

*In re Halcón Res. Corp.,*
Case No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) ............................................................ 25

*In re Hassanally,*
208 B.R. 46 (B.A.P. 9th Cir. 1997) ............................................................................................... 52

*In re Hernandez,*
287 B.R. 795 (Bankr. D. Ariz. 2002) ............................................................................................ 55

*In re Hexcel Corp.,*
174 B.R. 807 (Bankr. N.D. Cal. 1994) .......................................................................................... 53

*In re Huffy Corp.*,
424 B.R. 295 (Bankr. S.D. Ohio 2010)...................................................................52

*Ivanhoe v. Bldg. and Loan Association*,
295 U.S. 243 (1935)...................................................................................................64

*Jasik v. Conrad (In re Jasik)*,
727 F.2d 1379 (5th Cir. 1984) ...............................................................................29

*In re Johns–Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*,
78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843
F.2d 636 (2d Cir. 1988).............................................................................................7

*Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*,
66 B.R. 104 (B.A.P. 9th Cir. 1986)........................................................................29

*In re JZ L.L.C.*,
371 B.R. 412 (B.A.P. 9th Cir. 2007)......................................................................55

*In re Kaiser Group Intern.*,
326 B.R. 265 (D. Del. 2005)....................................................................................62

*Kane v. Johns–Manville Corp.* (*In re Johns-Manville Corp.*),
843 F.2d 636 (2d Cir. 1988).....................................................................................36

*In re Klein Sleep Prod., Inc.*,
78 F.3d 18 (2d Cir. 1996).........................................................................................55

*In re L & J Anaheim Assocs.*,
995 F.2d 940 (9th Cir. 1993) ..................................................................................55

*In re Landmark Fence Co., Inc.*,
No. EDCV 16-1538 JGB, 2018 WL 4735709 (C.D. Cal. Sept. 28, 2018) .......51

*Lazo v. Roberts*,
No. CV15-7037-CAS(PJWx), 2016 WL 738273 (C.D. Cal. Feb. 22, 2016) ......23

*In re Lighthouse Lodge, LLC*,
No. 09-52610-RLE, 2010 WL 4053984 (Bankr. N.D. Cal. Oct. 14, 2010).........22

*In re LodgeNet Interactive Corp.*,
No. 13-10238 (SCC) ..................................................................................................25

*In re Lombard Flats, LLC*,
No. 15-CV-00870-PJH, 2016 WL 1161593 (N.D. Cal. Mar. 23, 2016)...............51

*In re M.F. Global Holdings Ltd.*,
515 B.R. 193 (Bankr. S.D.N.Y. 2014).....................................................................65

*In re Madison Hotel Assocs.*,
749 F.2d 410 (7th Cir. 1984) ................................................................ 29

*Martin v. Kane (In re A&C Props.)*,
784 F.2d 1377 (9th Cir. 1986) ........................................................ 15, 16

*In re Media Vision Tech., Inc.*,
No. 94 45107 .......................................................................................... 51

*Meritage Homes of Nev. Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC)*,
478 B.R. 403 (D. Nev. 2012) .................................................................. 23

*In re Minoco Group of Cos., Ltd.*,
799 F.2d 517 (9th Cir.1986) ................................................................... 65

*In re Moreno*,
479 B.R. 553 (Bankr. E.D. Cal. 2012) ................................................... 52

*Myers v. Martin (In re Martin)*,
91 F.3d 389 (3d Cir. 1996) ..................................................................... 15

*Nellis v. Shugrue*,
165 B.R. 115 (S.D.N.Y. 1994) ............................................................... 15

*In re Newzoom, Inc.*,
No. 15-31141 (Bankr. N.D. Cal. Dec. 11, 2015) .................................. 50

*In re Nite Lite Inns*,
17 B.R. 367 (Bankr. S.D. Cal. 1982) ..................................................... 29

*NLRB v. Bildisco*,
465 U.S. 513 (1984) .......................................................................... 54, 55

*In re Nutritional Sourcing Corp.*,
398 B.R. 816 (Bankr. D.Del. 2008) ....................................................... 15

*Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*,
692 F.3d 283 (3d Cir. 2012) ................................................................... 64

*In re Orange Country Nursery, Inc.*,
No. ED CV 18-232-DMG, 2019 WL 3973869 (C.D. Cal. Aug. 21, 2019) ................................ 62, 63

*In re Orange County Nursery, Inc.*,
479 B.R. 863 (Bankr. C.D. Cal. 2012), *withdrawn* 484 B.R. 219 (Bankr. C.D. Cal. 2012), *rev'd* 523 B.R. 692 (C.D. Cal. 2014) ................................................................... 63

*In re PPI Enterprises (U.S.), Inc.*,
324 F.3d 197 (3d Cir. 2003) ................................................................... 49

*In re Pac. Gas & Elec. Co.*,
    304 B.R. 395 (Bankr. N.D. Cal. 2004) ................................................................. 16, 20

*In re Paigah*,
    No. 09-19804, 2010 WL 4625861 (Bankr. S.D. Cal. Nov. 4, 2010) ................................. 63

*In re Peabody Energy Corp.*,
    933 F.3d 918 (8th Cir. 2019) .............................................................................. 68

*In re PG&E Corp.*,
    610 B.R. 308 (Bankr. N.D. Cal. 2019) .............................................................. 49, 53

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
    761 F.2d 1374 (9th Cir. 1985) ............................................................................. 36

*In re Planned Protective Servs., Inc.*,
    130 B.R. 94 (Bankr. C.D. Cal. 1991).................................................................... 16

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,
    390 U.S. 414 (1968)........................................................................................ 15

*In re Puchi Properties Inc.*,
    601 B.R. 677 (Bankr. D. Ariz. 2019) .................................................................. 55

*In re Qintex Entm't, Inc.*,
    950 F.2d 1492 (9th Cir. 1991) ........................................................................... 52

*Resorts Int'l v. Lowenschuss (In re Lowenschuss)*,
    67 F.3d 1394 (9th Cir. 1995) ............................................................................. 21

*In re Rexford Props. LLC*,
    558 B.R. 352 (Bankr. C.D. Cal. 2016)................................................................... 8

*Ryan v. Loui (In re Corey)*,
    892 F.2d 829 (9th Cir. 1989) ............................................................................. 29

*In re Sacred Heart Hospital of Norristown*,
    182 B.R. 413 (Bankr. E.D. Pa. 1995) .................................................................. 66

*In re Santos Borrero*,
    75 B.R. 141 (Bankr. D.P.R. 1987)...................................................................... 54

*In re Sawtooth Enters., Inc.*,
    No. 96-03050, 1999 WL 33490212 (Bankr. D. Idaho Nov. 24, 1999)............................. 54

*In re Sepulveda*,
    No. 8:13-BK-17965-SC, 2017 WL 1505216 (B.A.P. 9th Cir. Apr. 26, 2017)................... 61

*Siegel v. Fed. Home Loan Mortg. Corp.*,
    143 F.3d 525 (9th Cir. 1998) ............................................................................. 52

*In re SNTL Corp.*,
  571 F.3d 826 (9th Cir. 2009) ................................................................. 51

*In re Station Casinos*, *Inc.*,
  No. BK-09-52477, 2010 Bankr. LEXIS 5380 (Bankr. D. Nev. Aug. 27, 2010) .............................. 22

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019) ...................................................... 23

*Steelcase Inc. v. Johnston (In re Johnston)*,
  21 F.3d 323 (9th Cir. 1994) .................................................................. 7

*Matter of SteelShip Corp.*,
  576 F.2d 128 (8th Cir. 1978) ................................................................ 55

*Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988) ......................................................... 29

*Strategic Diversity, Inc. v. Alchemix Corp.*,
  666 F.3d 1197 (9th Cir. 2012) .............................................................. 61

*In re Superior Offshore Int'l*,
  591 F.3d 350 (5th Cir. 2009) ....................................................... 62, 64, 66

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ..................................................... 15, 30

*Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*,
  38 Cal. 3d 488 (1985) ...................................................................... 53

*In re Texaco Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y. 1988) .................. 30

*In re THC Fin. Corp.*,
  686 F.2d 799 (9th Cir. 1982) ........................................................... 51, 52

*In re Tops Holding II Corp.*,
  No. 18-22279, (Bankr. S.D.N.Y. November 9, 2018) [Docket No. 765] ......................... 24

*In re Touch Am. Holdings, Inc.*,
  381 B.R. 95 (Bankr. D. Del. 2008) .......................................................... 53

*In re Trigg*,
  630 F.2d 1370 (10th Cir. 1980) ............................................................. 55

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ....................... 36

*In re Ultra Petroleum*,
  913 F.3d 533 (5th Cir. 2019) .............................................................. 49

*Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
   134 B.R. 499 (Bankr. S.D.N.Y. 1991) ............................................................. 15

*In re Vitek, Inc.*,
   51 F.3d 530 (5th Cir. 1995) ............................................................................ 65

*In re W. Asbestos Co.*,
   313 B.R. 832 (Bankr. N.D. Cal. 2003) ......................................................... 22, 23

*Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*,
   465 B.R. 525 (B.A.P. 9th Cir. 2012), *aff'd, In re Loop 76, LLC,* 578 F. App'x 644
   (9th Cir. 2014) ......................................................................................... 7, 8

*In re Yellowstone Mountain Club, LLC*,
   460 B.R. 254 (Bankr. D. Mont. 2011) ......................................... 21, 22, 23, 24, 25

*In re Zenith Elecs. Corp.*,
   241 B.R. 92 (Bankr. D. Del. 1999) ................................................................ 29

**Statutes**

11 U.S.C. § 327 .................................................................................................. 31

11 U.S.C. § 328 .................................................................................................. 31

11 U.S.C. § 330 .................................................................................................. 31

11 U.S.C. § 331 ............................................................................................. 30, 31

11 U.S.C. § 365 ................................................................................. 39, 54, 55, 56

11 U.S.C. § 502(a) ............................................................................................. 51

11 U.S.C. § 502(b) ......................................................................................... 51, 62

11 U.S.C. § 502(e)(1)(B) ............................................................................. 53, 55, 57

11 U.S.C. § 503(b) ......................................................................................... 31, 35

11 U.S.C. § 507 .......................................................................................... 34, 35, 38

11 U.S.C. § 507(a)(2) ......................................................................................... 38

11 U.S.C. § 510(b) ...................................................................................... *passim*

11 U.S.C. § 524(e) ............................................................................................. 21

11 U.S.C. § 1122 ............................................................................. 6, 7, 40, 41, 67

x

11 U.S.C. § 1122(a) ....................................................................................................... 7

11 U.S.C. § 1123 ................................................................................................... *passim*

11 U.S.C. § 1123(a) .................................................................................... 9, 10, 11, 67

11 U.S.C. § 1123(a)(1) ............................................................................................ 9, 67

11 U.S.C. § 1123(a)(3) ................................................................................................... 9

11 U.S.C. § 1123(a)(5) ................................................................................................. 10

11 U.S.C. § 1123(a)(6) ................................................................................................. 11

11 U.S.C. § 1123(a)(7) ................................................................................................. 11

11 U.S.C. § 1123(b) ............................................................................... 11, 12, 13, 14, 20

11 U.S.C. § 1123(b)(1) ................................................................................................. 12

11 U.S.C. § 1123(b)(2) ........................................................................................... 12, 13

11 U.S.C. § 1123(b)(3) ........................................................................................... 13, 20

11 U.S.C. § 1123(b)(6) ................................................................................................. 20

11 U.S.C. § 1123(d) ............................................................................................... 12, 13

11 U.S.C. § 1124 ................................................................................................... 12, 49

11 U.S.C. § 1125 ..................................................................................... 5, 25, 27, 41

11 U.S.C. § 1125(a) ....................................................................................................... 5

11 U.S.C. § 1125(b) ............................................................................................... 25, 27

11 U.S.C. § 1126 ............................................................................................. 27, 28, 34

11 U.S.C. § 1126(c) ............................................................................................... 28, 34

11 U.S.C. § 1126(d) ..................................................................................................... 28

11 U.S.C. § 1126(f) ...................................................................................................... 28

11 U.S.C. § 1127 ..................................................................................................... 40, 41

11 U.S.C. § 1129 ................................................................................................... *passim*

11 U.S.C. § 1129(a)(1) ............................................................................................... 6, 7

11 U.S.C. § 1129(a)(2) ................................................................................................. 25

11 U.S.C. § 1129(a)(3) .................................................................................. 29

11 U.S.C. § 1129(a)(4) .................................................................................. 30

11 U.S.C. § 1129(a)(5) ....................................................................... 11, 31, 32

11 U.S.C. § 1129(a)(6) .................................................................................. 32

11 U.S.C. § 1129(a)(7) .............................................................................. 32, 34

11 U.S.C. § 1129(a)(8) .............................................................................. 34, 40

11 U.S.C. §  1129(a)(9) ............................................................................ 34, 35

11 U.S.C. § 1129(a)(9)(C) ............................................................................ 35

11 U.S.C. § 1129(a)(10) ........................................................................... 34, 35

11 U.S.C. § 1129(a)(11) ........................................................................... 36, 38

11 U.S.C. § 1129(a)(12) ................................................................................ 38

11 U.S.C. § 1129(a)(13) ........................................................................... 38, 39

11 U.S.C. § 1129(a)(14) ................................................................................ 39

11 U.S.C. § 1129(a)(15) ................................................................................ 39

11 U.S.C. § 1129(a)(16) ................................................................................ 39

11 U.S.C. § 1129(b) ............................................................................... *passim*

11 U.S.C. § 1129(b)(1) .................................................................................. 40

11 U.S.C. § 1129(c) ...................................................................................... 40

11 U.S.C. § 1129(d) ...................................................................................... 40

11 U.S.C. § 1129(e) ...................................................................................... 40

11 U.S.C. § 1141 ................................................................................ 48, 49, 50

11 U.S.C. § 1141(d) ...................................................................................... 50

15 U.S.C. § 78bb .......................................................................................... 61

15 U.S.C. § 78bb(a) ...................................................................................... 66

Cal. Pub. Util. Code §3292 ..................................................................... 41, 42

Cal. Pub. Util. Code § 3292(b)(1)(A)-(E) ....................................................... 42

California Civil Code § 2782 ................................................................................................. 56

California Civil Procedure Code § 877 ................................................................ 53, 54, 57

Public Utilities Code § 8389(e)(6)(C) ................................................................................ 44

Securities Act of 1933 § 5 ......................................................................................... 9, 11, 40

**Other Authorities**

Assembly Bill 1054 .................................................................................................... *passim*

Fed. R. Bankr. P. 3019 ............................................................................................................ 41

Fed. R. Bankr. P. 3020(e) .................................................................................................. 4, 69

Fed. R. Bankr. P. 9019 ............................................................................................... *passim*

Fed. R. Bankr. P. 9019(a) ....................................................................................................... 15

Fed. R. Bankr. P. 3019(a) ....................................................................................................... 41

H.R. REP. NO. 95-595 (1977) ................................................................................................... 6

S. REP. NO. 95-989 (1978) ........................................................................................................ 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and the Shareholder Proponents (as defined below) submit this joint memorandum of law and omnibus response (the "**Memorandum**") in support of confirmation of the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated May 22, 2020* [Docket No. 7521] (as it may be amended, modified or supplemented from time to time, and together with any exhibits or schedules thereto, the "**Plan**"),[1] pursuant to section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), and in reply to the various objections submitted in opposition to the Plan, and respectfully represent as follows:

**PRELIMINARY STATEMENT**

The Debtors filed these Chapter 11 Cases with the principal goal of achieving a fair, equitable, and expeditious resolution of billions of dollars in liabilities arising from the 2017 and 2018 Northern California fires (including Tubbs) and the 2015 Butte Fire. Today, the Plan Proponents are now before the Court requesting confirmation of the Plan, which is the culmination of more than sixteen months of arm's length and good faith negotiations by and among the Debtors, the Shareholder Proponents, the Debtors' key stakeholders, regulators, the Governor's Office and many other parties in interest in these Chapter 11 Cases. Perhaps most importantly, the Plan has the overwhelming support of the Fire Victims – having been accepted by more than 85% in number and amount of holders of Fire Victim Claims that submitted valid votes on the Plan. The Plan also has been accepted by all but one of the other classes of impaired creditors and interest holders (together with the Classes of Fire Victim Claims, collectively, the "**Voting Classes**"). The sole dissenting Class, Class 10A-II (HoldCo Rescission or Damage Claims), consists of holders of prepetition securities law claims related to PG&E Corp. common stock, which claims are subordinated to the level of common stock pursuant to the provisions of the Bankruptcy Code. Accordingly, the Plan has received overwhelming support, and the Debtors remain on track to meet the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Plan, the Plan Supplement (as defined below), or the Disclosure Statement (as defined below), as applicable.

June 30, 2020 deadline for Plan confirmation established under Assembly Bill 1054 ("**AB 1054**").  The following is a summary of the vote on the Plan:

| Class | % Amount Accepted | % Number Accepted | % Amount Rejected | % Number Rejected | Accept / Reject |
|---|---|---|---|---|---|
| Class 3B-I (Utility Impaired Senior Note Claims) | 99.9988% | 99.30% | 0.0012% | 0.70% | Accept |
| Class 3B-III (Utility Short-Term Senior Note Claims) | 99.98% | 96.90% | 0.02% | 3.10% | Accept |
| Class 3B-IV (Utility Funded Debt Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5A-I (HoldCo Public Entities Wildfire Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5B-I (Utility Public Entities Wildfire Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5A-II (HoldCo Subrogation Wildfire Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5B-II (Utility Subrogation Wildfire Claims) | 100% | 100% | 0% | 0% | Accept |
| Class 5A-III (HoldCo Fire Victim Claims) | 85.11% | 88.03% | 14.89% | 11.97% | Accept |
| Class 5B-III (Utility Fire Victim Claims) | 85.11% | 88.03% | 14.89% | 11.97% | Accept |
| Class 10A-I (HoldCo Common Interests) | 99.79% | N/A | 0.21% | N/A | Accept |
| Class 10A-II (HoldCo Rescission or Damage Claims) | 42.29% | 67.89% | 57.71% | 32.11% | Reject |

*See* Voting Certification at Ex. A.

Fire victims have spoken, and they have spoken loudly and resoundingly in favor of the Plan. The time has come to confirm the Plan and enable prompt distributions to holders of Fire Claims notwithstanding the ancillary and misguided objections raised by the Official Committee of Tort Claimants (the "**Tort Claimants Committee**") and a vanishingly small minority of other holders of Fire Claims.

The Plan Proponents, under the direction of this Court and with the invaluable assistance of former Bankruptcy Judge Newsome, have achieved a remarkable result — a Plan that embodies a comprehensive restructuring of the Debtors that fairly and equitably addresses all Fire Claims and other prepetition claims and equity interests, allows the Debtors to timely access the Go-Forward Wildfire Fund, has the support of the Governor's Office, complies with AB 1054, maximizes value for all parties in interest, and ensures that the Utility will be positioned to deliver safe and reliable service to its customers.

As the Court is aware, the Plan is the result of hard fought and good faith negotiations and a series of settlements between and among the Debtors and a wide array of creditor, shareholder, and governmental and regulatory constituencies. As a result of these negotiations, the Plan Proponents have successfully secured support for confirmation of the Plan from the following constituencies, among others:

- The Governor's Office, which has stated that the Plan is compliant with AB 1054;

- The Ad Hoc Group of Subrogation Claim Holders, consisting of major holders of claims arising from insurance payments made to victims in connection with the wildfires (the "**Ad Hoc Subrogation Group**");

- Several Public Entities in the areas in which the wildfires occurred (the "**Public Entities**");

- The Debtors' public shareholders;

- The Ad Hoc Committee of Senior Unsecured Noteholders of Pacific Gas and Electric Company, consisting of major holders of the Utility's outstanding prepetition funded debt claims (the "**Ad Hoc Noteholders Committee**"); and

- As stated above, an overwhelming majority of the holders of Fire Victim Claims who voted to accept the Plan, including the consideration to be transferred to the Fire Victim Trust as provided in the Plan.

In addition, the California Public Utilities Commission (the "**CPUC**") has issued a proposed decision that would find the Plan, with the commitments and conditions required by the CPUC, complies with AB 1054. The CPUC is expected to vote on the proposed decision on May 28, 2020.

As demonstrated below and in the Supporting Declarations (as defined below), the Plan satisfies all of the requirements for confirmation set forth in section 1129 of the Bankruptcy Code and, accordingly, should be confirmed. A proposed order granting such relief (the "**Proposed Confirmation Order**") will be filed in advance of the Confirmation Hearing.

The remainder of this Memorandum is divided into six sections. Section I sets forth the facts, affidavits, declarations, evidence and background information relevant for confirmation of the Plan. Section II addresses the requirements for confirmation of the Plan under the Bankruptcy Code and demonstrates how the Plan and the Plan Proponents satisfy each of the requirements and achieve the objectives of chapter 11. Section III sets forth the legislative and regulatory requirements applicable to confirmation of the Plan and the Debtors' satisfaction thereof. Section IV addresses objections to confirmation of the Plan that remain unresolved as of the date hereof. Section V addresses the Debtors' request for a waiver of the 14-day stay imposed by Rule 3020(e) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). Section VI concludes this Memorandum.

## I. BACKGROUND FACTS AND EVIDENCE IN SUPPORT OF CONFIRMATION

### A. Declarations and Other Evidentiary Support for Plan Confirmation

Except as otherwise set forth herein, the relevant facts relating to these Chapter 11 Cases and confirmation are set forth in the Plan, the *Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 6353] (and together with any exhibits or schedules thereto and the Disclosure Statement Supplement (defined below), the "**Disclosure Statement**"), and the Plan Supplement. In addition, prior to or contemporaneously with the filing of this Memorandum, the following affidavits, declarations, and certifications were filed in support of confirmation of the Plan (collectively, the "**Supporting Declarations**"):

- *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263] (the "**First Day Declaration**");

- *Declaration of Jason P. Wells in Support of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7510] (the "**Confirmation Declaration**");

- *Declaration of Kenneth Ziman in Support of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7512] (the "**Ziman Declaration**");

- *Declaration of John Boken in Support of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7514] (the "**Boken Declaration**");

- *Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast with Respect to the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7507] (the "**Voting Certification**");

- *Certificate of Service*, dated February 19, 2020, of Craig E. Johnson regarding the Fire Victim Plan Solicitation Directive [Docket No. 5839] (the "**Solicitation Directive Certification**");

- *Certificates of Service* of Christina Pullo and James Herszaft, dated April 22, 2020, May 4, 2020, May 7, 2020, May 13, 2020, and May 15, 2020, regarding the Plan, Disclosure Statement, Solicitation Packages, Confirmation Hearing Notice, and Plan Supplement [Docket Nos. 6893, 7059, 7082, 7084, 7114, 7123, 7184, 7342, 7348, 7426, and 7085] (collectively, the "**Solicitation Certifications**"); and

- *Affidavit of Publication* of Christina Pullo regarding publication of the Confirmation Hearing Notice [Docket No. 6935] (the "**Publication Affidavit**").

**B.      Dates, Deadlines, and Other Filings Relevant to Plan Confirmation**

On February 11, 2020, the Court entered an Order [Docket No. 5732] (the "**Scheduling Order**") which, among other things, established (i) May 27, 2020, as the date for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), and (ii) May 15, 2020, at 4:00 p.m. (Prevailing Pacific Time) as the deadline for (a) filing and serving objections to confirmation of the Plan (the "**Plan Objection Deadline**"), and (b) voting to accept or reject the Plan (the "**Voting Deadline**").

On March 17, 2020, the Court entered the *Order (I) Approving Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization; (II) Approving Form and Manner of Notice of Hearing on Proposed Disclosure Statement; (III) Establishing and Approving Plan Solicitation and Voting Procedures; (IV) Approving Forms of Ballots, Solicitation Packages, and Related Notices; and (V) Granting Related Relief* [Docket No. 6340] (the "**Disclosure Statement and Solicitation Procedures Order**"), which, among other things, approved the Disclosure Statement as containing "adequate information" as required under section 1125(a) of the Bankruptcy Code and approved various procedures for the solicitation, distribution, and tabulation of votes with respect to the Plan.

By Order dated March 25, 2020 [Docket No. 6483], the Court approved the *Supplement to Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 6448] (as approved by the Bankruptcy Court, the "**Disclosure Statement Supplement**"), which, among other things, updated creditors and interest holders on certain events that occurred after approval of the solicitation version of the Disclosure Statement and updated the financial projections attached as <u>Exhibit B</u> to the Disclosure Statement (the "**Financial Projections**").

On May 1, 2020, the Plan Proponents filed the *Notice of Filing Plan Supplement in Connection with Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* [Docket No. 7037] (as amended, modified, and supplemented by Docket No. 7503, and as it may be further amended, modified or supplemented from time to time, the "**Plan Supplement**").

The Plan Proponents respectfully refer the Bankruptcy Court to the Plan, the Disclosure Statement, the Disclosure Statement Supplement, the Disclosure Statement and Solicitation Procedures Order, the Plan Supplement, the Supporting Declarations, and the record of these Chapter 11 Cases for an overview of the Debtors' business and capital structure and any other relevant facts that may bear on confirmation of the Plan and approval of the matters contemplated therein. The Supporting Declarations and any testimony and other declarations that may be adduced or submitted at or in connection with the Confirmation Hearing in support of confirmation of the Plan are incorporated herein in full.

## II. THE PLAN SATISFIES THE REQUIREMENTS OF THE BANKRUPTCY CODE AND SHOULD BE APPROVED

### A. Section 1129(a)(1): The Plan Complies with the Applicable Provisions of the Bankruptcy Code

Under section 1129(a)(1) of the Bankruptcy Code, a plan must comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(1). The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code governing classification of claims and contents of the plan, respectively.[2]

---

[2] *See* H.R. REP. NO. 95-595, at 412 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963; S. REP. NO. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787; *see also In re Art & Architecture Books of the 21st Century,* No. 2:13-BK-14135-RK, 2016 WL 1118743, at *7 (Bankr. C.D. Cal. Mar. 18, 2016) ("The legislative history of section 1129(a)(1) explains that this provision encompasses the requirements of Sections 1122 and 1123 of the Bankruptcy Code, which are the substantive provisions most relevant

**1.      Section 1122: The Plan's Classification Structure is Proper**

Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).

The Plan has thirty-four (34) Classes[3] of Claims against and Interests in the Debtors and the Plan's classification scheme fully complies with section 1122 of the Bankruptcy Code.  Claims are "substantially similar" when they share the same priority and are of a similar "kind, species, or character."  *See Steelcase Inc. v. Johnston (In re Johnston)*, 21 F.3d 323, 327-28 (9th Cir. 1994); *Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 281 (B.A.P. 9th Cir. 2015) (finding that all claims in a class were "in the same spot" because they were entitled to receive the same pro rata recovery from the debtor); 7 Collier on Bankruptcy ¶ 1122.03[3] (16th ed. 2020) ("[M]ost courts have looked at the nature of the claim (e.g., senior or subordinated, secured or unsecured), and the relationship of the claim to the property of the debtor.").  The Classes in the Plan easily satisfy this standard, as all Classes consist only of claims or interests of the same priority, and Claims are further grouped together based on their common origin, facts, or theory of liability.  *See* Confirmation Declaration ¶¶ 11, 12.

Beyond the threshold requirement that claims in a class be substantially similar, the Plan Proponents have "broad discretion to classify claims and interests according to the particular facts and circumstances of each case," discretion which the Plan Proponents have fairly and equitably exercised in these Chapter 11 Cases.  *In re City of Stockton*, 542 B.R. at 280; *see also Wells Fargo Bank, N.A. v. Loop 76, LLC (In re Loop 76, LLC)*, 465 B.R. 525, 541 (B.A.P. 9th Cir. 2012) (finding "certain

in satisfying section 1129(a)(1).");  *In re Johns–Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir. 1988); *Toy & Sports Warehouse, Inc.*, 37 B.R. 141 (Bankr. S.D.N.Y. 1984); 7 Collier on Bankruptcy ¶ 1129.02[1] at 1129-17–1129-18 (16th ed. 2015).

[3] Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims are not classified and are separately treated under the Plan.  *See* Plan Art. II.

characteristics, or 'special circumstances' can distinguish unsecured claims . . . and render them dissimilar."), *aff'd, In re Loop 76, LLC,* 578 F. App'x 644 (9th Cir. 2014).

Thus, within the Plan Proponents' discretion, claims that are substantially similar may be placed "in different classes if the debtor can show a business or economic justification for doing so," which can include prior settlements and the Debtors' differing ongoing relationships with the holders of each Class of Claims. *See In re Loop 76, LLC*, 465 B.R. at 536 (citing *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996)); *see also In re City of Stockton*, 542 B.R. at 280-81 (finding separate classification of bond creditor claims "made legitimate business and economic sense" where Bankruptcy Court found such claims were given their "own unique legal rights and status" pursuant to global settlements); *In re Rexford Props. LLC*, 558 B.R. 352, 363 (Bankr. C.D. Cal. 2016) (approving separate classification of trade vendors' unsecured claims from general unsecured claims "to induce their continued support of the debtor").

Separate Classification of Fire Victim Claims, Subrogation Wildfire Claims, and Public Entities Wildfire Claims is Appropriate. With regard to unsecured Claims against the Debtors, although they share similar priority in recovery against the Debtors, the facts and circumstances of these cases, including the Debtors' entry into the Subrogation Claims RSA, Tort Claimants RSA, and Public Entities Plan Support Agreements, require and certainly merit separate classification of the Fire Victim Claims, the Subrogation Wildfire Claims, and the Public Entities Wildfire Claims. Although the losses attributable to each of the Classes can be traced back to the Fires, the legal theories of liability that form the bases of the Claims within each Class are distinct, each Class receives distributions via procedures efficiently and equitably tailored to its particular situation, and notably, each Class has accepted different treatment under the Plan pursuant to the respective settlement agreements. For example, the Claims within Class 5A-III and 5B-III (Fire Victim Claims) are all unsecured claims, arise from the same nexus of events (the Fires), are based upon tort or tort-like theories of liability, and are largely unliquidated and contingent. The claims within Classes 5A-II and 5B-II (Subrogation Wildfire Claims) all relate to insurance and subrogation-related liability triggered by the Fires. And the Claims from Classes 5A-I and 5A-II (the Public Entities Wildfire Claims) belong to the municipalities that are home to the Debtors'

equipment and customers, have ongoing relationships with the Debtors, and likewise reached a settlement with the Debtors in respect of their Fire Claims. *See* Confirmation Declaration ¶¶ 15–17.

Taken as a whole, the Plan's classification scheme provides for the best possible balance of the settlement negotiations in these Chapter 11 Cases, efficient and equitable distributions to the holders of various Claims, and the preservation of ongoing relationships with vendors and other business creditors that are important to the Debtors' ongoing operations. *See* Confirmation Declaration ¶¶ 11–19.

### 2. Section 1123(a): The Plan's Content is Appropriate

The Plan fully complies with each requirement under section 1123(a) of the Bankruptcy Code, which sets forth applicable requirements that the proponent of a chapter 11 plan must satisfy. *See* 11 U.S.C. § 1123(a).

**Section 1123(a)(1)**: The Plan designates Classes of Claims and Interests as required by section 1123(a)(1). *See* Plan, arts. II, III, and IV.

**Section 1123(a)(2) and (a)(3)**: The Plan specifies whether each Class of Claims and Interests is impaired or unimpaired under the Plan and the treatment of each such impaired Class, as required by sections 1123(a)(2) and 1123(a)(3), respectively. *See* Plan, arts. II, III, and IV.[4] As discussed in detail in Section IV below, objections to the designation of certain Claims and Interests as impaired or unimpaired under the Plan are baseless and should be overruled.

**Section 1123(a)(4)**: The Plan provides that, except as otherwise agreed to by a holder of a particular Claim or Interest, the treatment of each Claim or Interest in each particular Class is the same as the treatment of each other Claim or Interest in such Class, as required by section 1123(a)(4). *See* Plan, arts. II, III, and IV.

---

[4] Under the Plan, the 4.25% Senior Notes due August 1, 2023 and the 4.65% Senior Notes due August 1, 2028 (the "2023 and 2028 Notes") will be reinstated and collateralized with a corresponding series of the Debtor's first mortgage bonds. In connection with such reinstatement and collateralization, the Debtors anticipate (i) replacing the respective restricted CUSIP numbers on the 2023 and 2028 Notes with unrestricted CUSIP numbers on such 2023 and 2028 Notes so that they may be freely sold without restriction by the holders thereof pursuant to Rule 144 of the Securities Act of 1933, as amended, after entry of the Confirmation Order and/or (ii) consummating a registered exchange offer of the 2023 and 2028 Notes by filing with the SEC a registration statement on Form S-4 under the Securities Act of 1933, as amended, after the Effective Date.

**Section 1123(a)(5):** The Plan and related documents (including the Plan Supplement) provide "adequate means for the plan's implementation" as required by section 1123(a)(5). 11 U.S.C. § 1123(a)(5). The Plan provides adequate means of implementation of the Plan through, among other things: (i) approximately $47.1 billion of capital to be provided through any combination of (a) new credit facilities, including exit revolving loan facilities, senior term loan facilities and/or bridge loan facilities, (b) new debt securities issued by the Utility (the "**New Utility Notes**"), (c) new debt securities issued by HoldCo (the **"New Holdco Notes**" and, together with the New Utility Notes, the "New Debt Securities"), (d) issuance of new PG&E Corp. common stock ("**New HoldCo Common Stock**") or equity-linked securities pursuant to one or more public or private offerings and/or the Rights Offering (if implemented), (e) the reinstatement of certain of the Utility's prepetition debt in accordance with the existing terms of such prepetition debt, and (f) the exchange of certain of the Utility's prepetition debt for new debt (the capital sources described in the foregoing (a) through (f), collectively, the "**Plan Financing Sources**"); (ii) the establishment of the Fire Victim Trust and Subrogation Wildfire Trust to administer, process, settle, resolve, satisfy, and pay Fire Victim Claims and Subrogation Wildfire Claims, respectively; (iii) the Plan Settlements (as defined below), (iv) the provisions governing distributions under the Plan, *see* Plan, art. V; and (v) the procedures for resolution of Disputed Claims, *see* Plan, art. VII.

As described in the Disclosure Statement, as part of the financing transactions contemplated by the Plan, the Debtors expect to raise $9 billion through one or more issuances of New HoldCo Common Stock or equity-linked securities, which issuance may take the form of a Rights Offering. The Equity Backstop Commitment Letters, which were approved by the Court on March 16, 2020 [Docket No. 6321], outline the circumstances under which the Debtors, if they determine to do so, will be permitted to undertake the Rights Offering and certain terms and conditions that must be included as part of the Rights Offering. The Rights Offering Procedures, attached to the Ziman Declaration as **Exhibit A**, are customary and consistent with the terms and conditions outlined in the Equity Backstop Commitment Letters and their approval is necessary to effectuate the Rights Offering. Notably, if the Debtors determine to pursue a Rights Offering, such Rights Offering will be made available to all shareholders

as of the established record date and will be registered under the Securities Act of 1933, as amended. *See* Ziman Decl. ¶ 12. Accordingly, the Debtors seek approval of the Rights Offering Procedures through the Proposed Confirmation Order, as the Debtors believe in their sound business judgment that approval of the Rights Offering Procedures is in the Debtors' and their stakeholders' best interests and appropriate in connection with implementation of the Plan.

**Section 1123(a)(6):** The governing corporate documents of each Debtor have been or will be amended on or prior to the Effective Date to prohibit the issuance of non-voting equity securities, in accordance with section 1123(a)(6) of the Bankruptcy Code. *See* Plan Supplement, Exs I and J.

**Section 1123(a)(7):** Section 6.11 of the Plan provides for the manner by which the composition of the boards of directors of the Reorganized Debtors will be selected, and also provides for the manner by which the composition of the boards of directors of the Reorganized Debtors will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code. As discussed below, certain members of the post-Effective Date boards of directors were identified in the Plan Supplement. The identities and affiliations of the remaining directors of the Reorganized Debtors are not yet known, but the Debtors intend to file a separate notice with the Bankruptcy Court in early June 2020, setting forth the identities and affiliations of each member of the boards of directors. The Plan provisions governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with section 1123(a)(7) of the Bankruptcy Code. The Governor's Office statement that the Plan complies with AB 1054 supports the Plan's compliance with the public policy aspect of this confirmation requirement. *See* Plan § 6.11.

**Section 1123(a)(8):** Finally, section 1123(a)(8) does not apply because the Debtors are not individuals.

### 3. Section 1123(b) The Plan's Content is Permitted

#### (a) Permissive Plan Provisions

Section 1123(b) of the Bankruptcy Code sets forth the discretionary provisions that may be incorporated into a chapter 11 plan. The Debtors have determined, as fiduciaries of their estates and in

the exercise of their reasonable business judgment, that each of the discretionary provisions of the Plan is appropriate given the circumstances of these Chapter 11 Cases and consistent with section 1123(b):

**Section 1123(b)(1):** As contemplated by section 1123(b)(1) of the Bankruptcy Code and pursuant to section 1124 of the Bankruptcy Code, Classes of Claims and Interests are impaired under the Plan and subject to appropriate treatment are described in Articles III, IV, and V of the Plan.

**Section 1123(b)(2):** As contemplated by section 1123(b)(2) of the Bankruptcy Code, the Plan provides for the assumption of executory contracts and unexpired leases unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts. *See* Plan, art. VIII.

Further, section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).

Annexed as <u>Exhibit A</u> to the Plan Supplement is the Schedule of Rejected Contracts, which sets forth the executory contracts and leases to be rejected by the Debtors pursuant to the Plan. Similarly, annexed as <u>Exhibit B</u> to the Plan Supplement is the Schedule of Assumed Contracts, which sets forth the executory contracts and leases to be assumed, or assumed and assigned, by the Debtors and the cure amount, if any, as well as procedures to address disputes as to cure amounts. As of the date hereof, over 60 parties have filed formal objections with respect to the Debtors' proposed assumption or rejection of certain executory contracts and unexpired leases under the Plan, including disputes regarding the Proposed Cure Amounts (each, a "**Contract Assumption or Rejection Dispute**"). The Debtors are engaged in ongoing discussions with the various counterparties to the Contract Assumption or Rejection Disputes. To the extent the parties have been able to successfully resolve their issues, the Debtors have reflected those agreements by way of certain amendments to the Schedule of Assumed Contracts or certain revisions to the Proposed Confirmation Order. To the extent any Contract Assumption or

Rejection Disputes remain unresolved as of the date of entry of the Proposed Confirmation Order, such disputes will be resolved in accordance with Section 8.8(d) of the Plan, and the parties' rights are preserved with respect thereto. Accordingly, the Plan complies with sections 1123(b)(2) and 1123(d) of the Bankruptcy Code.

**Section 1123(b)(3):** Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Plan is premised on settlements reached with several of the Debtors' key constituencies and economic stakeholders in these Chapter 11 Cases (collectively, the "**Plan Settlements**") (*see* Plan, arts. IV and VI) and resolution of the Wildfire OII (s*ee* Plan, art. IX). As discussed below, each of the Plan Settlements and the Wildfire OII Settlement Agreement (as defined below) satisfies the standard for approval under Bankruptcy Rule 9019. The following Plan Settlements were separately brought before the Bankruptcy Court and approved pursuant to Bankruptcy Rule 9019 in advance of the Confirmation Hearing:

- Settlement of Subrogation Wildfire Claims: On December 19, 2019, the Bankruptcy Court entered an Order [Docket No. 5173] authorizing the Debtors to enter into, and approving the terms of, that certain Restructuring Support Agreement, dated as of September 22, 2019 and related settlement agreement (together, as amended and restated, and as may be further amended, restated and supplemented, the "**Subrogation Claims RSA**") with the Consenting Creditors (as defined in the Subrogation Claims RSA) and the settlements embodied therein. Among other things, pursuant to the Subrogation Claims RSA and the Plan, all Subrogation Wildfire Claims shall be channeled to and satisfied from the Subrogation Wildfire Trust to be funded by the Reorganized Debtors with Cash in the amount of $11 billion.

- Settlement of Fire Victim Claims: On December 19, 2019, the Bankruptcy Court entered an Order [Docket No. 5174] authorizing the Debtors, the Tort Claimants Committee, the Consenting Fire Claimant Professional Group, and the Shareholder Proponents to enter into, and approving the terms of, that certain Restructuring Support Agreement, dated December 6, 2019 (as amended on December 16, 2019 and as may be further amended, restated and supplemented, the "**Tort Claimants RSA**") and the settlements embodied therein. The Tort Claimants RSA provides, among other things, that, in full and final satisfaction of all Fire Victim Claims, the Debtors will fund the Fire Victim Trust, to be established for the benefit of all holders of Fire Victim Claims, with the Aggregate Fire Victim Consideration.

- Settlement with Ad Hoc Noteholders Committee: On February 5, 2020, the Bankruptcy Court entered an Order [Docket No. 5637] authorizing the Debtors, the Shareholder Proponents, and the Ad Hoc Noteholders Committee to enter into, and approving the terms of, that certain Restructuring Support Agreement, dated January 22, 2020 (as may be amended, restated and supplemented, the "**Noteholder RSA**") and the settlements embodied therein, which fully resolved all outstanding disputes with the Ad Hoc Noteholder Committee regarding the treatment of the Utility's funded debt claims under the Plan.

- Tubbs Settlements: On January 30, 2020, the Bankruptcy Court entered an Order [Docket No. 5571] approving settlements (the "**Tubbs Settlements**") entered into with the 18 elderly or infirm individual plaintiffs for whom the Court granted relief from the stay to pursue their claims relating to the Tubbs fire (including the 32 indispensable parties associated with such individuals' claims, the "**Tubbs Preference Claimants**"). Pursuant to the Tubbs Settlements, the Tubbs Preference Claimants' claims were liquidated, allowed, and are to be channeled to the Fire Victim Trust.

- Butte County DA Settlement: On April 16, 2020, the Bankruptcy Court entered an Order [Docket No. 6785] approving a plea agreement and settlement with the People of the State of California, represented by the District Attorney of Butte County (the "**Butte County DA Settlement**"). Pursuant to the Butte County DA Settlement, the Debtors have agreed to plead guilty to eighty-four counts of involuntary manslaughter, one count of unlawful starting of a fire, and a fine of approximately $4 million to fully resolve the criminal prosecution of the Debtors arising out of the 2018 Camp Fire. As the Court is aware, the Debtors have arranged for the amount of fines, penalties and assessments to be funded from interest earned on the distribution to be transferred to the Subrogation Wildfire Trust pursuant to the Plan, and provisions approving the terms of, and authorizing the Debtors to perform under, those agreements have been incorporated into the Proposed Confirmation Order.

- Governmental Fire Claims Settlements: On May 18, 2020, the Bankruptcy Court entered an Order [Docket No. 7399] approving (i) that certain settlement, entered into as of April 21, 2020, by and among the Debtors, the Tort Claimants Committee, FEMA, the SBA, and the other Federal Agencies (each as defined therein) (the "**Federal Agency Settlement**"), and (ii) that certain settlement, entered into as of April 21, 2020, by and among the Debtors, the Tort Claimants Committee, and the State Agencies (as defined therein) (the "State Agency Settlement" and, together with the Federal Agency Settlement, the "**Governmental Fire Claims Settlements**," and the various state and federal agencies parties thereto, the "**Governmental Agencies**"). The Governmental Fire Claims Settlements resolve the treatment of approximately $7.5 billion in aggregate of Fire Claims that have been asserted by the various Governmental Agencies in these Chapter 11 Cases for an allowed $1 billion Subordinated Claim (to be subordinated and junior in right of payment to all other Fire Victim Claims that may be asserted against the Fire Victim Trust) and certain additional allowed Claims that total approximately $321.3 million in the aggregate.

In addition to the foregoing Plan Settlements, which were previously brought before and approved by the Bankruptcy Court pursuant to Bankruptcy Rule 9019, the Debtors are hereby seeking approval of two additional key settlements in connection with confirmation of the Plan: (i) the Public Entities Settlement, and (ii) the Wildfire OII Settlement (each as defined below). The relevant terms of each of the Public Entities Settlement and the Wildfire OII Settlement and an explanation of how the Debtors easily satisfy the standards for approval of such agreements under section 1123(b) and Bankruptcy Rule 9019 are set forth below.

### (i)    Standard for Approval of Settlements Pursuant to Bankruptcy Rule 9019

The standard for approving settlements as part of a plan of reorganization are the same as the standards for approving settlements under Bankruptcy Rule 9019.[5]  Bankruptcy Rule 9019(a) provides "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise and settlement." Fed. R. Bankr. P. 9019(a).  This rule empowers Bankruptcy Courts to approve settlements "if they are in the best interests of the estate." *Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996).

Compromises and settlements are normal and welcomed occurrences in chapter 11 because they allow a debtor and its creditors to avoid the financial and other burdens associated with litigation over contentious issues and expedite the administration of the bankruptcy estate.  *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968); *Martin v. Kane (In re A&C Props.)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986).  The decision to approve a particular compromise lies within the sound discretion of the Court.  *In re A&C Props.*, 784 F.2d at 1380-81.  A proposed compromise and settlement should be approved when it is "fair and equitable" and "in the best interest of the [debtor's] estate." *Id.* at 1382.

The standard for approval of settlements under Bankruptcy Rule 9019 is deferential to the debtor's judgment and merely requires the Court to ensure that the settlement does not fall below the lowest point in the range of reasonableness in terms of benefits to the estate.  *See City Sanitation v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 91-92 (1st Cir. 2011) ("The task of both the bankruptcy court and any reviewing court is 'to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.' . . . If a trustee chooses to accept a less munificent sum for a good reason (say, to avoid potentially costly litigation), his judgment is entitled to some deference.") (citing *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992)); *Nellis v. Shugrue*, 165 B.R. 115, 123 (S.D.N.Y. 1994) ("The court need not decide the

---

[5] *See In re TCI 2 Holdings, LLC*, 428 B.R. 117, 135 (Bankr. D.N.J. 2010); *In re Nutritional Sourcing Corp.*, 398 B.R. 816, 832 (Bankr. D. Del. 2008).

numerous questions of law and fact raised by appellants but rather [must] canvass the issues and see whether the settlement fall[s] below the lowest point in the range of reasonableness.") (quoting *McGinnis v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)) (internal citations omitted); *see also In re Pac. Gas & Elec. Co.*, 304 B.R. 395, 417 (Bankr. N.D. Cal. 2004); *In re Planned Protective Servs., Inc.*, 130 B.R. 94, 99 n.7 (Bankr. C.D. Cal. 1991) (same).

Courts in this jurisdiction typically consider four factors in determining whether a settlement should be approved: (1) the probability of success in litigation, with due consideration for the uncertainty in fact and law; (2) the difficulties, if any, to be encountered in the matter of collecting any litigated judgment; (3) the complexity and likely duration of the litigation and any attendant expense, inconvenience, and delay; and (4) the paramount interest of the creditors and the proper deference to their reasonable views. *In re A&C Props.*, 784 F.2d at 1380. It is not necessary that the conclusions reached in the consideration of each of the above factors support the settlement, but taken as a whole, the conclusions must favor the approval of the settlement. *See In re Pac. Gas & Elec. Co.*, 304 B.R. at 417 (citing *In re WCI Cable, Inc*., 282 B.R. 457, 473-74 (Bankr. D. Or. 2002)).

### (ii)    The Public Entities Settlement Should be Approved

On June 18, 2019, the Debtors and the Public Entities[6] entered into certain *Plan Support Agreements as to Plan Treatment of Public Entities' Wildfire Claims* (the "**Public Entities Plan Support Agreements**").[7] As described in the Disclosure Statement, pursuant to the Public Entities Plan Support Agreements, the Public Entities agreed to settle and resolve all of the wildfire claims they had collectively asserted in the Chapter 11 Cases and to support and vote in favor of a chapter 11 plan proposed by the Debtors that provides that, among other things, the Public Entities Wildfire Claims will

---

[6] The "**Public Entities**" include the City of Clearlake, the City of Napa, the City of Santa Rosa, the County of Lake, the Lake County Sanitation District, the County of Mendocino, Napa County, the County of Nevada, the County of Sonoma, the Sonoma County Agricultural Preservation and Open Space District, the Sonoma County Community Development Commission, the Sonoma County Water Agency, the Sonoma Valley County Sanitation District and the County of Yuba (collectively, the "**North Bay Public Entities**"); the Town of Paradise; the County of Butte; the Paradise Recreation & Park District; the County of Yuba; and the Calaveras County Water District.

[7] The Public Entities Plan Support Agreements are attached to the Confirmation Declaration as **Exhibits C - H**.

be satisfied pursuant to the Plan with $1 billion in Cash, to be distributed from a trust account in accordance with the "Public Entities Settlement Distribution Protocol," and that the Reorganized Debtors will establish a $10 million segregated defense fund for the benefit of the Public Entities (the "**Public Entities Settlement**").  The terms of the Public Entities Plan Support Agreements and Public Entities Settlement are incorporated into the Plan treatment of Class 5B-I (Utility Public Entities Wildfire Claims).  *See* Plan §4.24.  As of the date hereof, each of the Public Entities Plan Support Agreements are in effect between and among the parties thereto.

The Debtors submit that the Public Entities Settlement is in the best interests of the Debtors' estates and all stakeholders and should be approved under Bankruptcy Rule 9019.  As set forth in the Confirmation Declaration, the Public Entities Settlement was the result of extensive, good faith, and informed negotiations among parties with a thorough understanding of the underlying issues.  *See* Confirmation Declaration ¶ 34.  In entering into the Public Entities Settlement, the Debtors considered many factors, including the potential costs and risks associated with litigation with the Public Entities, the benefit to the communities directly impacted by the Fires, the potential magnitude of the Claims that could be allowed, and the benefits attendant to the Public Entities' agreement to support the Plan in connection with the Public Entities Settlement.  *See id*.

Further, the Public Entities Settlement clearly does not fall below the lowest point in the range of reasonableness.  The Public Entity Claims, which may have resulted in significantly greater liabilities on the part of the Debtors if left unresolved, were ultimately settled for $1 billion in exchange for support of the plan of reorganization to be proposed by the Debtors.  *See id.* ¶ 35, 36.  Further, the Public Entities Settlement was the first major settlement achieved by the Debtors and provided the initial momentum toward achieving a global consensus.  *Id*.

In light of the above, the Public Entities Settlement, as incorporated into the Plan, is fair and reasonable and should be approved.

### (iii)    *The Wildfire OII Settlement Should be Approved*

As stated in the Disclosure Statement, satisfactory resolution of certain pending enforcement proceedings before the CPUC that related to prepetition conduct by the Debtors is a condition precedent

to the effectiveness of the Plan. *See* Disclosure Statement § 3.C. Of such enforcement proceedings, only one, CPUC Investigation (I.) 19-06-015 (the "**Wildfire OII**"), is pending final resolution and Bankruptcy Court approval. The Wildfire OII Decision states that upon approval by this Court of the settlement agreement, as modified by the Wildfire OII Decision, the Wildfire OII proceeding is closed.[8] *See* Wildfire OII Decision (defined below) at 85. The CPUC commenced the Wildfire OII to investigate the role the Utility's electrical facilities played in igniting wildfires in its service territory in 2017 and 2018. On December 17, 2019, the Utility, the CPUC's Safety and Enforcement Division ("**SED**"), the Coalition of California Utility Employees ("**CUE**"), and the CPUC's Office of Safety Advocates ("**OSA**") filed a motion seeking approval of a settlement agreement that would resolve the Wildfire OII. Following a CPUC review and an opportunity for parties to appeal the initial decision approving the settlement with modifications, on May 7, 2020, the CPUC issued a final decision (the "**Wildfire OII Decision**")[9] approving the settlement agreement with certain modifications (as modified, the "**Wildfire OII Settlement**").

The Wildfire OII Settlement imposes financial obligations (the "**Financial Remedies**") totaling $2.137 billion on the Utility, consisting of: (i) $1.823 billion in disallowances for wildfire-related expenditures; (ii) $114 million in shareholder-funded System Enhancement Initiatives and corrective actions; and (iii) a $200 million fine payable to the California General Fund, which shall be permanently suspended. *See* Wildfire OII Decision at 2. Additionally, any tax savings associated with operating expenses incurred as part of the Financial Remedies are to be returned to the benefit of ratepayers. *Id.*

Pursuant to the Wildfire OII Settlement, $114 million of the Financial Remedies must be used by the Utility to undertake 20 System Enhancement Initiatives and corrective actions. These initiatives are tailored to promote safer operations and enhance, among other things, the Utility's ongoing vegetation management, electric operations, community engagement, and transparency and accountability programs.

---

[8] While the non-settling parties to the Wildfire OII proceeding may file an application for rehearing with the CPUC and ultimately seek judicial review of the Wildfire OII Decision, the Debtors believe the probability that such actions would alter the terms of the Wildfire OII Decision is remote.

[9] The procedural history of the Wildfire OII is set forth in greater detail in the Wildfire OII Decision, which is attached as <u>Exhibit I</u> to the Confirmation Declaration.

The Debtors submit that the Wildfire OII Settlement is in the best interests of the Debtors' estates and should be approved pursuant to Bankruptcy Rule 9019. The Wildfire OII Settlement is the result of months of extensive, good faith, and informed negotiations among parties with a thorough understanding of the underlying issues. Prior to reaching the settlement, the Utility engaged in extensive discovery, submitted testimony, and participated in status conferences before the CPUC. The Utility obtained a comprehensive understanding of the allegations made against it, assessed the strength of its litigation positions, and then entered into the settlement to resolve the Wildfire OII. The Utility has also carefully considered the modifications to the settlement set forth in the Wildfire OII Decision and the likelihood of success if it sought rehearing or appeal of the Wildfire OII Decision. *See* Confirmation Declaration ¶ 40.

The Wildfire OII Settlement fully resolves the Wildfire OII and, subject to the possibility of challenges by the non-settling parties (*see* n.8), eliminates the costs and uncertainties associated with further litigation, including the possible costs of rehearing, appeal, and additional penalties, and ultimately benefits the Utility's customers through the System Enhancement Initiatives contemplated therein. *See* Confirmation Declaration ¶ 41. As set forth above and in more detail in the Wildfire OII Decision, the Wildfire OII Settlement contemplates Financial Remedies totaling $2.137 billion, $200 million of which is a fine payable to the California General Fund that has been permanently suspended, and the pass-through of certain tax benefits to ratepayers. The Debtors believe this result is reasonable. Absent the settlement, the CPUC could ultimately determine that additional financial remedies or penalties in excess of what is currently contemplated in the Wildfire OII Settlement are warranted.

Further, the Wildfire OII Settlement clearly does not fall below the lowest point in the range of reasonableness. Indeed, the CPUC has determined that the Wildfire OII Settlement is reasonable in light of the whole record, consistent with applicable law, and in the public interest. *See* Wildfire OII Decision at 81. Moreover, resolution of the Wildfire OII is a condition to the Effective Date and the ability of the Debtors to timely emerge from chapter 11.

In light of the above, the Wildfire OII Settlement is fair and reasonable and should be approved pursuant to Bankruptcy Rule 9019.

**Section 1123(b)(6):**  As permitted by section 1123(b)(6) of the Bankruptcy Code, a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1123(b)(6).  In accordance with section 1123(b)(6) of the Bankruptcy Code, the Plan contains certain provisions for (i) distributions to holders of Claims and Interests, (ii) resolution of Disputed Claims, (iii) allowance of certain Claims, (iv) the releases, injunction, and exculpation provisions set forth in Article X of the Plan, and (v) retention of Bankruptcy Court jurisdiction, in each case consistent with the applicable provisions of the Bankruptcy Code and Ninth Circuit law.  The Plan's releases, injunction, and exculpation provisions are separately addressed below.

### *(iv)*    *The Debtors' Releases are Appropriate and Should be Approved*

The Debtors' Releases, as provided in Section 10.9(a) of the Plan, for good and valuable consideration, are entirely appropriate, a sound exercise of the Debtors' business judgment, and should be approved.  Claims held by a debtor are property of the estate and may be released as part of a plan.  *See In re Pac. Gas & Elec.*, 304 B.R. at 416-18, n.26 ("[I]t is permissible for a plan to provide for the settlement or adjustment of any claim 'belonging to the debtor or to the estate.'").  And such a release, as part of a plan, should be approved if it represents a valid exercise of the debtors' business judgment and satisfies the fair, reasonable, and adequate standard set by Bankruptcy Rule 9019.  *See In re Pac. Gas & Elec.*, 304 B.R. at 416 ("Given that section 1123(b)(3)(A) permits a plan of reorganization to include settlements, and given the overwhelming votes in favor of the Plan, such review [under Rule 9019] might be unnecessary. Nevertheless . . . [t]he court will discuss the releases as if Rule 9019 governs"); *In re Aina Le'a, Inc.,* No. BR 17-00611, 2019 WL 2274909, at *12 (Bankr. D. Haw. May 24, 2019) ("The releases of Claims and Rights of Action by the Debtor described herein and in the Plan, in accordance with section 1123(b) of the Bankruptcy Code (the '*Debtor's Release'*), represent a valid exercise of the Debtor's business judgment under Bankruptcy Rule 9019.").

The Debtors' Releases are important to the settlements at the heart of the Plan and to securing the extensive efforts and contributions of the Released Parties to these Chapter 11 Cases, which were necessary to bring these Cases to a successful resolution—highlighted by, with Court approval of the

Plan, the Debtors' successful emergence on the tight timeline imposed by AB 1054. *See* Confirmation Declaration ¶ 45.

### (v) *The Non-Debtor Releases are Appropriate, Consensual and Should be Approved*

Additionally, the Non-Debtors' Releases are appropriate and should be approved. The Non-Debtors' Releases are entirely consensual "opt-in" releases and thus fully comply with Ninth Circuit law and section 524(e) of the Bankruptcy Code, which prohibit only nonconsensual third party releases. *See Resorts Int'l v. Lowenschuss (In re Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995). In fact, Section 10.9(c) of the Plan specifically states that except as set forth under Section 4.25(f)(ii) of the Plan, "notwithstanding any other provision of this Plan, nothing in the Plan is intended to, nor shall the Plan be interpreted to, effect a nonconsensual release by a holder of a Claim in favor of a party that is not a Debtor." And Section 1.180 also makes it perfectly clear that no holder of a Claim or Interest grants a release unless it affirmatively elects to do so on a Ballot.

The Non-Debtor Releases are fair, equitable, and permissible. *See In re Yellowstone Mountain Club, LLC,* 460 B.R. 254, 277 (Bankr. D. Mont. 2011) (same), *appeal dismissed sub nom. by Sumpter v. Yellowstone Mountain Club, LLC,* No. CV-11-66-BU-SEH, 2013 WL 2076533 (D. Mont. Mar. 6, 2013), *aff'd, Sumpter v. Yellowstone Mountain Club, LLC,* 584 F. App'x 676 (9th Cir. 2014), *appeal dismissed as moot by Blixseth v. Yellowstone Mountain Club, LLC,* 609 F. App'x 390 (9th Cir. 2015). The Released Parties have made significant contributions to the success of these Chapter 11 Cases, including, in certain instances, compromising their claims to reach settlements that furthered the resolution of these Chapter 11 Cases, financing the Debtors' operation during, and emergence from, these Chapter 11 Cases, and otherwise supporting the Debtors' intensive efforts and negotiations to build near-universal consensus behind the Plan—a result which benefits all parties in interest. *See* Confirmation Declaration at ¶ 47. The Non-Debtor Releases, again, that are entirely voluntary and consensual, thus appropriately offer certain protections to parties that constructively participated in the Debtors' restructuring, and should be approved as fair, reasonable, and equitable.

The Mutual Made-Whole Release in Section 4.25(f)(ii) of the Plan likewise operates as a consensual release, because its execution is only required as a condition to reaching a settlement with the Fire Victim Trust. In other words, insureds may voluntarily choose to continue to litigate their claim against their insurance company rather than signing the Mutual Made-Whole Release, or they may choose to sign the release pursuant to a settlement with the Fire Victim Trust. As this Court has previously recognized,

> the evolution of the releases, as they have gone through the iterations of the RSA -- excuse me, the subrogation RSA, are such that **they truly are consensual now, and they are opt in rather than opt out traps for the unwary. . . . [A] tough decision is not a coerced decision, or in my mind, a unlawful decision. So I'm satisfied that the way the RSAs have played out with the releases that they're permissible under the both documents.**

Hr'g Tr. (Dec. 17, 2019) at 294-95 (emphasis added); *see also In re Station Casinos*, *Inc*., No. BK-09-52477, 2010 Bankr. LEXIS 5380 (Bankr. D. Nev. Aug. 27, 2010); *Billington v. Winograde (In re Hotel Mt. Lassen)*, 207 B.R. 935 (Bankr. E.D. Cal. 1997).

Finally, the mutuality of the Mutual Made-Whole Release, *i.e.*, that the insurers must also release their claims against their insureds—an outcome that was reached after hard-fought negotiations and argument before this Court—ensures the Mutual Made-Whole Releases are fair, equitable and appropriate.

### (vi) The Plan Exculpation Provisions Should be Approved

Exculpation of estate fiduciaries and plan proponents is customary and permissible in chapter 11. Indeed, several Bankruptcy Courts within the Ninth Circuit have approved release or exculpation provisions that extend to the plan proponents, including non-Debtor plan proponents. *See In re Yellowstone Mountain Club,* 460 B.R. at, 277 (approving exculpation that extended to "the Debtors, Committee [of Unsecured Creditors], Credit Suisse and CrossHarbor, who all became, in essence, plan proponents"); *In re Lighthouse Lodge, LLC*, No. 09-52610-RLE, 2010 WL 4053984, at *6, *9 (Bankr. N.D. Cal. Oct. 14, 2010) ("This release of liability except from gross negligence or willful misconduct has been extended to plan proponents other than a committee."); *In re W. Asbestos Co.*, 313 B.R. 832,

846-47 (Bankr. N.D. Cal. 2003) (approving provision that released claims against the Plan Proponents other than the Debtors).

Plan exculpations may also extend to non-estate fiduciaries when the exculpated parties make substantial contributions to the reorganization, the exculpations are important to such parties' participation in the reorganization efforts, and the exculpations are limited "in both scope and time" to actions related to the chapter 11 cases. *See In re Yellowstone Mountain Club*, 460 B.R. at 272; *Meritage Homes of Nev. Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC)*, 478 B.R. 403, 415-16 (D. Nev. 2012) (approving exculpation of third party nondebtors because exculpation "sets a standard of care to be applied in the bankruptcy proceeding" and "does not improperly release third party nondebtors"); *Lazo v. Roberts*, No. CV15-7037-CAS(PJWx), 2016 WL 738273, at *7 (C.D. Cal. Feb. 22, 2016) ("Increasingly, however, [t]he trend among bankruptcy courts [more generally] has been to confirm chapter 11 plans with express discharge or indemnification provisions for nondebtors if they meet certain tailored criteria or overall necessity. This overall trend is evident in the Ninth Circuit.") (internal quotation marks and citations omitted); *see also In re Stearns Holdings, LLC*, 607 B.R. 781, 790 (Bankr. S.D.N.Y. 2019) (holding that exculpation could extend to parties "who make a substantial contribution to a debtor's reorganization and play an integral role in building consensus in support of a debtor's restructuring"). And exculpation clauses are without a doubt essential in cases like this one that are heavily litigated. *See In re Yellowstone Mountain Club*, 460 B.R. at 274 ("An exculpation clause in this case was certainly advisable given the litigious posture of the parties.").

The exculpation provision in the Plan appropriately excludes actual fraud and willful misconduct, and there is no requirement that breaches of professional duties be excluded from a plan exculpation provision. *See In re W. Asbestos Co.*, 313 B.R. at 846 (approving provision that "neither the Plan Proponents nor any of their agents, including their attorneys, shall be liable, *other than for willful misconduct*, with respect to any action or omission prior to the effective date in connection with the Debtors' operations, the Plan, or the conduct of the bankruptcy case") (emphasis added).

The exculpation provision the Court upheld in *In re Yellowstone Mountain Club* is particularly instructive. There, as here, the exculpation provision was limited both temporally and in scope to actions

related to the reorganization; specifically, "any act or omission in connection with, relating to or arising out of the Chapter 11 cases, the formulation, negotiation, implementation, confirmation or consummation of this Plan, the Disclosure Statement, or any contract, instrument, release or other agreement or document entered into during the Chapter 11 Cases or otherwise created in connection with this Plan." *Id.* at 267.   Furthermore, like here, the exculpation clause extended to major stakeholders, including the provider of debtor in possession financing and the largest creditor in the case, who had "vigorously negotiat[ed]" the plan, leading the plan to be essentially a collaborative effort, of which the exculpation was a "cornerstone." *Id.* at 277.   The exculpation clause also similarly covered the various agents, professionals, and other related parties of the exculpated parties—specifically, "with respect to each of the foregoing Persons, each of their respective directors, officers, employees, agents . . . representatives, shareholders, partners, members, attorneys, investment bankers, restructuring consultants and financial advisors." *Id.* at 267.[10]   Here, the Plan exculpation extends to the major stakeholders in this case who, respectively, provided funding for the Debtors' reorganization and collaborated with the Debtors in the countless hours of negotiation and mediation that culminated in reaching the four RSAs that became the "cornerstone[s]" of the Plan.   Finally, the exculpation in *In re Yellowstone Mountain Club* excluded only acts of willful misconduct and gross negligence.   *See id.* at 267, 276-77.

The argument that the Plan exculpation is inappropriate because it may cover certain acts occurring after the Effective Date of the Plan is unavailing.   The provisions of the Plan exculpation, which are limited to acts or omissions related to the Debtors' reorganization, provide an inherent temporal limitation.   *See In re Yellowstone Mountain Club, LLC*, 460 B.R. at 277 (finding limitation in

---

[10] Although the Plan includes some variations from the list of related parties used in *In re Yellowstone*, the Plan's list is not unique in the chapter 11 context and the intent is the same—to protect those parties who contributed to the reorganization.   *See In re Breitburn Energy Partners LP*, *Order Confirming Debtors' Third Amended Joint Chapter 11 Plan (with Technical Modifications)*, No. 16-11390 (SMB), at Exh. A, Section 1.60 (Bankr. S.D.N.Y. March 26, 2018); *In re Tops Holding II Corp.*, No. 18-22279, *Findings Of Fact, Conclusions Of Law, and Order Pursuant to Sections 1129(a) and (b) of the Bankruptcy Code and Rule 3020 of the Federal Rules of Bankruptcy Procedure Confirming Second Amended Joint Chapter 11 Plan of Reorganization of Tops Holding II Corporation and Its Affiliated Debtors*, Exh. A at Section 1.153 (Bankr. S.D.N.Y. November 9, 2018) [Docket No. 765]

exculpation clause that applied only to acts or omissions related to the reorganization was "temporal in nature" despite not providing specific deadlines for coverage). Although the Court in *In re Yellowstone Mountain Club, LLC* interpreted that inherent temporal limitation as ending at the Effective Date, a precise end date is neither appropriate nor required here, where the intricacies and complicated financing of the Debtors' emergence may necessitate that certain transactions that are integral to the Plan happen, in part, after the Effective Date.

**B.      Section 1129(a)(2): The Debtors have Complied with the Bankruptcy Code**

Section 1129(a)(2) of the Bankruptcy Code requires that plan proponents comply with the applicable provisions of the Bankruptcy Code. 11 U.S.C. § 1129(a)(2). The legislative history to section 1129(a)(2) indicates that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code.[11]

**1.      Section 1125: Postpetition Disclosure Statement and Solicitation**

Section 1125(b) of the Bankruptcy Code provides, in pertinent part, that:

> An acceptance or rejection of a plan may not be solicited after the commencement of [a] case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

By entry of the Disclosure and Solicitation Procedures Order on March 17, 2020, the Court approved the Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment regarding whether to accept or reject the Plan.

---

[11] *See, e.g., In re Corcoran Hosp. Dist.*, 233 B.R. 449, 452 (Bankr. E.D. Cal. 1999); *In re Am. Gilsonite Co.*, No. 16-12316 (CSS) (Bankr. D. Del. Dec. 12, 2016) [Docket No. 174]; *In re Halcón Res. Corp.*, Case No. 16-11724 (BLS) (Bankr. D. Del. Sept. 8, 2016) [Docket No. 200]; *In re Genco Shipping & Trading Ltd.*, No. 14-11108 (SHL) ¶ 24(d), (Bankr. S.D.N.Y. July 2, 2014) [Docket No. 322]; *In re LodgeNet Interactive Corp.*, No. 13-10238 (SCC) ¶ 33, (Bankr. S.D.N.Y. Mar. 7, 2013) [Docket No. 220].

In accordance with the Disclosure and Solicitation Procedures Order, and as set forth in the Solicitation Certifications, Prime Clerk LLC ("**Prime Clerk**"), the Court-appointed solicitation and balloting agent, on behalf of the Plan Proponents, distributed copies of the Disclosure Statement, applicable Ballots, Confirmation Hearing Notice, and other applicable notices and materials that were included in the Solicitation Packages to creditors and interest holders commencing on March 30, 2020 and was thereafter substantially completed on or about April 8, 2020. *See* Solicitation Certifications. Prime Clerk served Solicitation Packages on approximately 250,000 voting creditors and interest holders (including Fire Victims whose Law Firms instructed Prime Clerk to serve their clients solicitation materials for informational purposes only) and the Confirmation Hearing Notice on approximately 450,000 parties in total. In addition, the Debtors published the Confirmation Hearing Notice (the "**Publication Notice**") in 28 local and national publications[12] and posted copies of the Disclosure Statement and other solicitation materials on the Case Website (in both English and Spanish). *See* Publication Affidavit.

The Court-approved solicitation and voting procedures were carefully designed, specifically with respect to Fire Victim voting, and were the product of a comprehensive effort on the part of the Debtors and the Tort Claimants Committee to assure that Fire Victim Claimants were provided full and fair opportunities to vote to accept or reject the Plan. The Disclosure Statement and Solicitation Procedures Order included explicit procedures for the attorneys of Fire Victims (each, a "**Firm**") to solicit votes from their clients, including the use of Fire Victim Master Ballots. In accordance with the solicitation procedures, each Firm was required to certify it complied with applicable rules and procedures regarding securing informed consent of its Fire Victim clients with respect to each such claimant's vote on the Plan. *See* Disclosure and Solicitation Procedures Order, Exs. A, C.

In light of the COVID-19 pandemic, Prime Clerk, at the Debtors' direction, worked diligently (even after the Fire Victim Solicitation Directive deadline) with any Firms who requested to modify

---

[12] The Debtors were unable to publish the Confirmation Hearing Notice in *The Lassen County Times* in Susanville, CA, which closed its offices as a result of the COVID-19 pandemic.

their selected solicitation method to ensure prompt and proper distribution of Solicitation Packages and to provide a full and fair opportunity for all holders of Fire Victim Claims to vote on the Plan.

In addition, pursuant to the procedures approved by the Court in the Disclosure Statement and Solicitation Procedures Order, the Debtors solicited the votes of timely filed HoldCo Rescission or Damage Claims on a rolling basis as such claims were filed, through and including April 16, 2020. In accordance with the Disclosure Statement and Solicitation Procedures Order, Prime Clerk, at the Debtors' direction, mailed solicitation materials to approximately 4,000 individuals and entities that the Debtors identified as holders of potential Class 10A-II HoldCo Rescission or Damage Claims based on a review of their claims and certain supporting documentation submitted in connection therewith. Additionally, and notwithstanding the passage of the Extended Bar Date, the Debtors endeavored to provide provisional ballots to any individuals that filed late HoldCo Rescission or Damage Claims, as well as those individuals that requested (formally or informally) an extension of time to file such equity-based claims, prior to May 11, 2020 to allow such individuals an opportunity to submit ballots in advance of the May 15 Voting Deadline.

As such, the Solicitation Packages were transmitted in compliance with section 1125 of the Bankruptcy Code and the Disclosure and Solicitation Procedures Order. Further, in compliance with section 1125(b), the Plan Proponents did not solicit acceptances of the Plan from any holder of a Claim or Interest prior to entry of the Disclosure Statement and Solicitation Procedures Order.

### 2. Section 1126: Acceptance or Rejection of the Plan

Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of the Plan. Under section 1126, only holders of Allowed Claims and Interests in impaired Classes that will receive or retain property under the Plan on account of such Claims or Interests may vote to accept or reject the Plan. In accordance with section 1126 of the Bankruptcy Code, the Debtors solicited acceptances of the Plan from the holders of Claims and Interests in each of the Voting Classes that were entitled to vote to accept or reject the Plan. In accordance with Articles III and IV of the Plan, the Disclosure Statement and Solicitation Procedures Order, and section 1126(f) of the Bankruptcy Code, the Debtors did not

solicit acceptances from the holders of Claims or Interests in the Non-Voting Classes, as the holders of such Claims and Interests are not impaired under the Plan and thus are presumed to accept the Plan.

Section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of claims entitled to vote to accept or reject a plan of reorganization:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

Section 1126(d) of the Bankruptcy Code specifies the requirements for acceptance of a plan by impaired classes of interests entitled to vote to accept or reject a plan of reorganization:

> A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

11 U.S.C. § 1126(d).

Pursuant to the Scheduling Order, the Voting Deadline was May 15, 2020 at 4:00 p.m. (Prevailing Pacific Time). As set forth in the chart above, and as evidenced by the Voting Certification, the Plan has been accepted by creditors and shareholders holding Claims and Interests in Class 5A-I (HoldCo Public Entities Wildfire Claims), Class 5A-II (HoldCo Subrogation Wildfire Claims), Class 5A-III (HoldCo Fire Victim Claims), Class 10A-I (HoldCo Common Interests), Class 3B-I (Utility Impaired Senior Note Claims), Class 3B-III (Utility Short-Term Senior Note Claims), Class 3B-IV (Utility Funded Debt Claims), Class 5B-I (Utility Public Entities Wildfire Claims), Class 5B-II (Utility Subrogation Wildfire Claims), and Class 5B-III (Utility Fire Victim Claims) (collectively, the "**Accepting Classes**"). As set forth above, Class 10A-II (HoldCo Rescission or Damage Claims) is the only Voting Class that did not vote to accept the Plan.

### C.  Section 1129(a)(3): The Plan has been Proposed in Good Faith and is Not by any Means Forbidden by Law

The Debtors have satisfied section 1129(a)(3) of the Bankruptcy Code, which requires that a plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Good faith is evaluated under the totality of the circumstances. *See Jorgensen v. Fed. Land Bank of Spokane (In re Jorgensen)*, 66 B.R. 104, 108-09 (B.A.P. 9th Cir. 1986); *Jasik v. Conrad (In re Jasik)*, 727 F.2d 1379, 1383 (5th Cir. 1984). A plan has been proposed "in good faith" so long as it is reasonably likely to achieve a result consistent with the objectives and purposes of the Bankruptcy Code, and deals with creditors in a fundamentally fair manner. *See Ryan v. Loui (In re Corey)*, 892 F.2d 829, 835 (9th Cir. 1989); *In re Madison Hotel Assocs.*, 749 F.2d 410, 425 (7th Cir. 1984); *Stolrow v. Stolrow's, Inc. (In re Stolrow's Inc.)*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988); *In re Nite Lite Inns*, 17 B.R. 367, 370 (Bankr. S.D. Cal. 1982). In addition, the good faith standard requires that the plan be "proposed with honesty, good intentions and a basis for expecting that a reorganization can be effect[uated] . . . ." *See In re Zenith Elecs. Corp.*, 241 B.R. 92, 107 (Bankr. D. Del. 1999).

The Plan clearly satisfies these standards. As set forth in the Confirmation Declaration and the Disclosure Statement, and as is readily apparent based on the record of these Chapter 11 Cases, the Plan is the product of protracted and good-faith negotiations with key parties in interest and also involved the consideration of a competing plan. *See* Confirmation Declaration ¶¶ 51-56. The Plan has been proposed in good faith and is emblematic of the intent and purpose of chapter 11. It embodies a comprehensive, largely consensual restructuring that will fairly and equitably address all Fire Victim Claims and other prepetition claims and equity interests, allow the Reorganized Debtors to access the Go-Forward Wildfire Fund, maximize value for all parties in interest, and ensure that the Utility will be positioned to deliver safe and reliable service to its customers. It clearly is the best way forward for the Debtors' business, their estates and their creditors, as evidenced by the Plan voting results.

Further, the CPUC's proposed decision in the Plan OII (defined below), the significant agreements and compromises that are embodied in the Plan, and the support of the Governor's Office, the Public Entities, the Ad Hoc Subrogation Group, the Ad Hoc Noteholders Committee, and the

Shareholder Proponents, as well as the vote on the Plan, are a testament to the overall fairness of the Plan and that the Plan has been proposed in good faith and for proper purposes.

### D. Section 1129(a)(4): The Plan Provides that Professional Fees and Expenses are Subject to Court Approval

Section 1129(a)(4) requires that "any payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable." 11 U.S.C. § 1129(a)(4). Section 1129(a)(4) has been construed to require that all payments of professional fees that are made from estate assets be subject to review and approval as to their reasonableness by the Court.[13]

All payments for services provided to the Debtors during these Chapter 11 Cases must be approved by the Bankruptcy Court as reasonable in accordance with section 1129(a)(4) of the Bankruptcy Code. Pursuant to the interim compensation procedures established under section 331 of the Bankruptcy Code, the Bankruptcy Court authorized and approved the payment of certain fees and expenses of professionals retained in these Chapter 11 Cases [Docket No. 701] (the "**Interim Compensation Order**"). Section 2.2 of the Plan provides that all final requests for the payment of Professional Fee Claims "will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Interim Compensation Order, and any other prior orders of the Bankruptcy Court regarding the payment of Professionals in the Chapter 11 Cases." Plan § 2.2(a).[14]

---

[13] *See In re Art & Architecture Books of the 21st Century*, No. 2:13-BK-14135-RK, 2016 WL 1118743, *at \*15 (Bankr. C.D. Cal. Mar. 18, 2016)*; *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 145 (Bankr. D.N.J. 2010) ("Under its clear terms, 'any payment' made or to be made by the plan proponent or the debtor for services 'in or in connection with' the plan or the case must be approved by or 'subject to the approval of' the bankruptcy court as 'reasonable.'"); *In re Texaco Inc.*, 84 B.R. 893, 908 (Bankr. S.D.N.Y. 1988), *appeal dismissed,* 92 B.R. 38 (S.D.N.Y. 1988).

[14] Pursuant to the terms of the Proposed Plan OII Decision (as defined below), the Utility is required to reimburse the CPUC for payment of the fees and expenses incurred by the CPUC for its outside counsel and financial advisor for services rendered relating to the Chapter 11 Cases, related proceedings and associated financings. In compliance with the Proposed Plan OII Decision, the Proposed Confirmation Order provides the Debtors authority upon entry of the Confirmation Order to reimburse the required

All such fees and expenses, as well as all other accrued fees and expenses of professionals through the Effective Date, remain subject to final review for reasonableness by the Court under sections 327, 328, 330, 331, and 503(b) of the Bankruptcy Code.

### E. Section 1129(a)(5): The Debtors have Disclosed All Necessary Information Regarding Directors, Officers, and Insiders

Section 1129(a)(5) of the Bankruptcy Code requires that the plan proponent disclose the identity and affiliations of the proposed officers and directors of the reorganized debtors; that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy; and that there be disclosure of the identity and compensation of any insiders to be retained or employed by the reorganized debtors. *See* 11 U.S.C. § 1129(a)(5). If, at the time of confirmation, the debtor is unable to identify these individuals by name, a debtor still satisfies this requirement so long as directors will be appointed consistent with the company's organizational documents and applicable state and federal law.[15]

Section 6.11 of the Plan and Exhibit G to the Plan Supplement describe the manner in which the post-Effective Date board and management of each of the Debtors will be selected, and also provide for the manner by which the composition of the boards of directors of the Reorganized Debtors will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code. Certain members of the post-Effective Date boards of directors were identified in the Plan Supplement; however, the identities and affiliations of the remaining directors of the Reorganized Debtors have not been determined. *See* Confirmation Declaration ¶¶ 59-60. In compliance with section 1129(a)(5) of the Bankruptcy Code, the remaining directors will be appointed consistent with the Debtors' organizational documents and

---

fees and expenses of the CPUC without further review and approval by this Court, the Fee Examiner, or any other party in interest.

[15] *JPMorgan Chase Bank, N.A. V. Charter Commc'ns Operating, LLC (In re Charter Commc'ns*, 419 B.R. 221, 260 n.30 (Bankr. S.D.N.Y. 2009) ("Although section 1129(a)(5) requires the plan to identify all directors of the reorganized entity, that provision is satisfied by the Debtors' disclosure at this time of the identities of the known directors."), *appeal dismissed,* 449 B.R. 14 (S.D.N.Y. 2011), *aff'd,* 691 F.3d 476 (2d Cir. 2012); *In re Am. Solar King Corp.*, 90 B.R. 808, 815 (W.D. Tex. 1988) ("The subsection does not (and cannot) compel the debtor to do the impossible, however. If there is no proposed slate of directors as yet, there is simply nothing further for the debtor to disclose under subsection (a)(5)(A)(i).").

applicable state and federal law, and the Debtors intend to file a separate notice with the Bankruptcy Court in early June 2020, setting forth the identities and affiliations of each member of the boards of directors. As such, the Plan provisions governing the manner of selection of any officer, director, or manager under the Plan are consistent with the interests of creditors and equity security holders and with public policy in accordance with the Bankruptcy Code. *See* Plan § 6.11.

## F. Section 1129(a)(6): Approval of Any Rate Changes

Section 1129(a)(6) of the Bankruptcy Code provides that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6). As discussed below, in connection with the Plan OII, the proposed decision of the CPUC finds that the Plan satisfies the AB 1054 requirement that the Plan be neutral, on average, to ratepayers. Any future rate increases will be subject to CPUC review and approval. Accordingly, the Plan satisfies section 1129(a)(6) of the Bankruptcy Code.

## G. Section 1129(a)(7): The Plan is in the Best Interest of All Holders of Claims and Interests

Section 1129(a)(7) of the Bankruptcy Code requires:

> [w]ith respect to each impaired class of claims or interests[,] (A) each holder of a claim or interest of such class (i) has accepted the plan; or (ii) will receive or retain under the plan . . . property of a value . . . that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] . . .

11 U.S.C. § 1129(a)(7). This "best interest" test focuses on potential individual dissenting creditors rather than classes of claims. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999). It requires that each holder of a claim or equity interest either accept the plan, or receive or retain under the plan property having a present value—as of the effective date of the plan—not less than the amount such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. Under the best interest test, courts "must take into consideration the applicable rules of distribution of the estate under chapter 7, as well as the probable costs incident to such liquidation." *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 252 (Bankr. S.D.N.Y. 2007). To the

best of the Debtors' knowledge, none of the Objectors has raised any issue or attempted to argue in any of the Objections that the Plan fails to satisfy the best interest of creditors test. As set forth in Section VII.B of the Disclosure Statement, the Debtors believe that the value, if any, distributable to each Class in a chapter 7 liquidation, would be equal to, or, more likely, less than, the value of distributions under the Plan, and such distributions in a chapter 7 case would not occur for a substantial period of time, thus lowering the value one would expect to recover as of the potential chapter 7 conversion date.

As noted in the Disclosure Statement, a chapter 7 liquidation would likely result (i) in the incurrence of increased costs and expenses arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) in an erosion of asset values in the context of a forced sale or takeover, and (iii) in the substantial increase in Claims that would have to be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases. The Debtors believe the liquidation process in chapter 7 would result in a failure to meet the June 30, 2020 emergence deadline associated with AB 1054, which could significantly impact potential values recoverable in a liquidation. Further, the Governor's Office could intervene in a liquidation scenario and develop a plan for takeover by the State of California or certain Northern California Counties, which likely would depress the value realized on the Debtors' assets.

The process of liquidating the Debtors' businesses in chapter 7 would also be subject to review by numerous regulatory agencies, including the CPUC, the Federal Energy Regulatory Commission, the Nuclear Regulatory Commission and the U.S. Department of Justice, which could delay the process of receiving any significant proceeds for two years or more. In the event litigation were necessary to resolve Claims asserted in the chapter 7 case, the delay could be further prolonged and would likely involve further costs. *See* Boken Declaration ¶¶ 18-19.

In contrast, under the Plan, all funded debt and general unsecured creditors are to be paid in full, with postpetition interest, or have their Claims reinstated or replaced with new debt. In addition, all Fire Victim Claims will be channeled to and satisfied by the Fire Victim Trust in compliance with AB 1054. Lastly, holders of Interests will retain their shares, subject to dilution. Under these circumstances it is patently obvious that a liquidation under chapter 7 could not produce greater value, without even taking

into account the substantial delay involved in distributing any proceeds.  Accordingly, the Plan satisfies the requirements of section 1129(a)(7) of the Bankruptcy Code.

### H.   Section 1129(a)(8): The Plan has Been Accepted by Impaired Voting Classes

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests accept the plan, as follows: "With respect to each class of claims or interests--(A) such class has accepted the plan; or (B) such class is not impaired under the plan." 11 U.S.C. § 1129(a)(8).  Section 1126 of the Bankruptcy Code provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-third in amount and more than one-half in number of the claims in their respective class.  11 U.S.C. § 1126(c).

The holders of Claims and Interests in the ten Accepting Classes have voted to accept the Plan in accordance with section 1126 of the Bankruptcy Code.  *See* Voting Certification Ex. A.  The holders of Claims in Class 10A-II (HoldCo Rescission or Damage Claims) are the only Class that has voted to reject the Plan.  *Id*.  However, as discussed below, the Debtors have satisfied the requirements of section 1129(a)(10) of the Bankruptcy Code, and will be able to "cram down" Class 10A-II under section 1129(b) of the Bankruptcy Code.  Accordingly, the Debtors submit that they have satisfied section 1129(a)(8) of the Bankruptcy Code.

### I.   Section 1129(a)(9): The Plan Provides for Payment in Full of All Allowed Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding allowed claims entitled to priority under section 507(a) receive specified cash payments under the plan.  Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code sets forth the treatment the plan must provide.

Under Section 2.1 of the Plan, holders of Allowed Administrative Expense Claims under section 503(b) of the Bankruptcy Code shall receive Cash in full and final satisfaction of their Allowed Administrative Expense Claims on the Effective Date or as soon as reasonably practicable thereafter, except to the extent the Debtors or Reorganized Debtors, as applicable, and a holder of an Allowed Administrative Expense Claim against a Debtor agree to less favorable treatment of such Allowed

Administrative Expense Claim. *See* Plan § 2.1. Further, pursuant to Article IV of the Plan, all Allowed Priority Non-Tax Claims under section 507(a), unless otherwise agreed, shall receive, at the option of the Debtors or Reorganized Debtors, as applicable (i) Cash in an amount equal to such Allowed Priority Non-Tax Claim, including interest through the Effective Date calculated at the Federal Judgment Rate, payable on the Effective Date or as soon as reasonably practicable thereafter, or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

The Plan also satisfies the requirements of section 1129(a)(9)(C) of the Bankruptcy Code in respect of the treatment of Priority Tax Claims under section 507(a)(8). Pursuant to Section 2.4 of the Plan and except as otherwise may be agreed, holders of Allowed Priority Tax Claims shall receive, at the option of the Debtors or Reorganized Debtors, (i) Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as reasonably practicable thereafter, or (ii) Cash, in equal semi-annual installments and continuing over a period not exceeding five (5) years from and after the Petition Date, together with interest accrued thereon at the applicable nonbankruptcy rate.

Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code.

**J.      Section 1129(a)(10): At Least One Class of Impaired Claims has Accepted the Plan**

Section 1129(a)(10) of the Bankruptcy Code requires the affirmative acceptance of the Plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." 11 U.S.C. § 1129(a)(10). As set forth above and in the Voting Certification, the ten Accepting Classes are impaired and have voted to accept the Plan, excluding the acceptance of the Plan by any insiders in such Classes. Accordingly, the Plan satisfies section 1129(a)(10) of the Bankruptcy Code.

**K.      Section 1129(a)(11): The Plan is Feasible**

Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible as a condition precedent to confirmation. Specifically, it requires that confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors, unless such liquidation or reorganization is proposed in the plan. As described below, the Plan is feasible within the meaning of this provision.

The feasibility test set forth in section 1129(a)(11) requires the Court to determine whether the Plan is workable and has a reasonable likelihood of success. *See Kane v. Johns–Manville Corp.* (*In re Johns-Manville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988). The key element of feasibility is whether there is a reasonable probability that the provisions of the plan can be performed. As noted by the United States Court of Appeals for the Ninth Circuit: "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the Debtors can possibly attain after confirmation." *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (quoting 5 Collier on Bankruptcy ¶ 1129.02[11] at 1129–34 (15th ed. 1984)). However, just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility, and the mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

### 1. The Plan Provides Adequate Means to Satisfy Claims and Fulfill the Debtors' Obligations Thereunder

For purposes of determining whether the Plan satisfies the above-described feasibility standards, the Debtors have analyzed their ability to fulfill their obligations under the Plan. As part of this analysis, the Debtors, with the assistance of their financial and other advisors, have (i) reviewed the various Claims that have been filed in these Chapter 11 Cases that are to be satisfied under the Plan on and after the Effective Date, and (ii) prepared the Financial Projections for the Debtors for the annual periods from January 1, 2020 through December 31, 2024. Based on the Debtors' review of the Claims filed in these Chapter 11 Cases and their reasonable estimates, and based on a review of their books and records as to their ultimate liability on account of these Claims, the Plan has adequate means to fulfill the Debtors' obligations thereunder.

The Financial Projections, in conjunction with the claims analysis and contemplated Plan Financing Sources, demonstrate that, as set forth in the Confirmation Declaration, Ziman Declaration, and Boken Declaration, all transactions and payments required pursuant to the Plan to be made by the Reorganized Debtors will be made, and that the Reorganized Debtors will have sufficient capital and

liquidity to operate their business and satisfy ongoing obligations as they become due. *See* Confirmation Declaration ¶¶ 69-71, Ziman Declaration ¶¶ 8-16, and Boken Declaration ¶¶ 6-16. As such, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization and the Plan satisfies the feasibility requirement imposed by the Bankruptcy Code.

As set forth above and in the Plan, the Disclosure Statement, the Plan Supplement, and the Ziman Declaration, the Plan Funding and Exit Financing to be utilized to fund and finance the Debtors' emergence from chapter 11 is to come from a variety of potential sources, including reinstated bank and bond debt, exchanges of certain of the Utility's prepetition debt for new debt, bank financings, bond financings to be raised in the public markets, and the issuance of New HoldCo Common Stock or equity-linked securities either by way of a public marketed offering, private placement, Rights Offering, or by relying on the Equity Backstop Commitment Letters approved by the Court.

As is customary, obtaining these sources of capital and the related commitments will require, among other things, (i) appropriate authorizations and approvals to enter into the relevant documents and agreements and to make filings and recordings as contemplated by the Plan Funding and Exit Financing; and (ii) authorization to pay the fees and expenses, including the commitment fees, associated therewith to ensure the availability of such capital and the Debtors' timely emergence from chapter 11. *See* Ziman Declaration at ¶15. Accordingly, the Proposed Confirmation Order includes customary provisions addressing these matters. Copies of the commitment letters that have not already been approved will be filed with the Court under seal.

### 2. Legislative and Regulatory Feasibility

As discussed in greater detail in Section II below, the Plan is subject to review and approval by the CPUC. As such, the Debtors have been diligently pursuing the necessary CPUC approvals in a pending proceeding, and working cooperatively with the Governor's Office and other parties in interest to ensure that the Plan is not just financially feasible, but feasible from a regulatory perspective. Pursuant to AB 1054, the CPUC must (i) approve the Plan and other documents resolving the Utility's Chapter 11 Case, including the resulting governance structure, as being acceptable in light of the Utility's safety history, criminal probation, recent financial condition, and other factors deemed relevant

by the CPUC; (ii) determine that the Plan and other documents resolving the Chapter 11 Cases are (a) consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (b) neutral, on average, to the ratepayers of the Utility; and (iii) determine that the Plan and other documents resolving the Chapter 11 Cases recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the CPUC.  As detailed below, the CPUC has issued a proposed decision approving the Plan as being AB 1054 compliant, with a final vote on the proposed decision on May 28, 2020.  As such, the Debtors submit that the Plan is feasible from a legislative and regulatory perspective.

In light of the above, the Plan satisfies the feasibility requirement imposed by section 1129(a)(11) of the Bankruptcy Code.

### L.    Section 1129(a)(12): All Statutory Fees Have Been or Will be Paid

Section 1129(a)(12) requires the payment of "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan . . . ."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees and charges assessed against the estate under [section 1930] of title 28" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).  In accordance with sections 507 and 1129(a)(12) of the Bankruptcy Code, Section 12.5 of the Plan provides that on the Effective Date, and thereafter as my be required, such fees, together with interest, if any, shall be paid by each of the Debtors until the earliest to occur of the entry of (i) a final decree closing such Debtor's Chapter 11 Case, (ii) a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or (iii) a Final Order dismissing such Debtor's Chapter 11 Case.  *See* Plan § 12.5.

### M.    Section 1129(a)(13): Continuation of Retiree Benefits

Section 1129(a)(13) requires that:

> The plan provides for continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to section (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

11 U.S.C. § 1129(a)(13). Pursuant to the Plan, all Employee Benefit Plans of the Debtors in effect as of the Petition Date are deemed to be, and will be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to section 365 and 1123 of the Bankruptcy Code. *See* Plan § 8.5. Accordingly, the Plan satisfies the requirements of section 1129(a)(13).

### N. Sections 1129(a)(14), 1129(a)(15), and 1129(a)(16): Inapplicable Provisions

Section 1129(a)(14) of the Bankruptcy Code relates to the payment of domestic support obligations. The Debtors are not subject to any domestic support obligations and, as such, section 1129(a)(14) does not apply. *See* Confirmation Declaration ¶ 74.

Section 1129(a)(15) of the Bankruptcy Code applies only in cases in which the debtor is an "individual". The Debtors are not "individuals" and, accordingly, section 1129(a)(15) is inapplicable. *See Id.* ¶ 75.

Section 1129(a)(16) of the Bankruptcy Code applies to transfers of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. The Debtors are each a moneyed, business, or commercial corporation and, accordingly, section 1129(a)(16) is inapplicable. *See Id.* ¶ 76.

### O. Section 1129(b): The Plan Satisfies the "Cram Down" Requirements with Respect to Class 10A-II (HoldCo Rescission or Damage Claims)

Section 1129(b) of the Bankruptcy Code provides a mechanism (known colloquially as "cram down") for confirmation of a chapter 11 plan in circumstances where the plan is not accepted by all impaired classes of claims. Under section 1129(b), the court may "cram down" a plan over the dissenting vote of an impaired class or classes of claims or interests as long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes. 11 U.S.C. § 1129(b)(1).

By its express terms, section 1129(b) of the Bankruptcy Code is only applicable to a class that rejects a plan. *See* 11 U.S.C. § 1129(b)(1) ("[T]he court . . . shall confirm the plan notwithstanding the requirements of [§ 1129(a)(8)] if the plan does not discriminate unfairly, and is fair and equitable, with

respect to each class of claims or interests that is impaired under, and has not accepted, the plan.") (emphasis added).

As discussed below in Section IV in response to the PERA Objection (defined below), the Plan satisfies the requirements for "cram down" as to Class 10A-II and may be confirmed pursuant to section 1129(b) of the Bankruptcy Code.

**P.      Section 1129(c): The Plan is the Only Plan Currently on File**

The Plan is the only plan currently on file in these Chapter 11 Cases and, accordingly, section 1129(c) of the Bankruptcy Code does not apply. *See* Confirmation Declaration ¶ 78.

**Q.      Section 1129(d):  The Principal Purpose of the Plan is Not the Avoidance of Taxes**

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of section 5 of the Securities Act of 1933, and no governmental unit has objected to confirmation of the Plan on any such grounds. *See* Confirmation Declaration ¶ 79.  The Plan, therefore, satisfies the requirements of section 1129(d) of the Bankruptcy Code.

**R.      Section 1129(e):  Inapplicable Provision**

The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases." These Chapter 11 Cases are not "small business cases" as defined in the Bankruptcy Code.  Accordingly, section 1129(e) of the Bankruptcy Code is inapplicable to these cases.  *See* Confirmation Declaration ¶ 80.

**S.      Section 1127:  Modification of the Plan**

Pursuant to section 1127 of the Bankruptcy Code, a plan proponent may modify a plan at any time before confirmation so long as the plan, as modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the proponent of the modification complies with section 1125 of the Bankruptcy Code.  In addition, with respect to modifications made after acceptance but prior to confirmation of the plan, Bankruptcy Rule 3019 provides, in relevant part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity

> security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a).

As described above, the Debtors filed an amended Plan on May 22, 2020. The Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. Accordingly, the requirements of section 1127 have been satisfied. Moreover, Bankruptcy Rule 3019 is satisfied because the modifications do not impact, let alone materially impact, any creditor's or equity holder's treatment.

## III. THE PLAN SATISFIES THE LEGISLATIVE AND REGULATORY REQUIREMENTS FOR CONFIRMATION AND SHOULD BE APPROVED

### A. AB 1054

On July 12, 2019, Governor Gavin Newsom signed into law AB 1054 (defined in the Plan as the "**Wildfire Legislation**"),[16] which, among other things, establishes a statewide fund that participating utilities may access to pay for liabilities arising in connection with future wildfires occurring after July 12, 2019 (the "**Go-Forward Wildfire Fund**"). The Wildfire Legislation also provides details regarding the conditions to and costs of participating in the Go-Forward Wildfire Fund and sets the criteria by which participating utilities can access the fund. The Utility provided notice to the CPUC of its intent to participate in the Go-Forward Wildfire Fund, and on August 26, 2019, the Court issued an Order [Docket No. 3689] authorizing the Debtors to participate in the Go-Forward Wildfire Fund.

Under AB 1054, to participate in the Go-Forward Wildfire Fund, the Utility must satisfy several additional conditions. Upon emergence from chapter 11, the Utility must pay the initial and annual contributions required for participation in the Go-Forward Wildfire Fund. Additionally, the Utility must satisfy the following conditions by June 30, 2020:

> (a) The [Utility's Chapter 11 Case] has been resolved pursuant to a plan or similar document not subject to a stay.
>
> (b) The [B]ankruptcy [C]ourt or a court of competent jurisdiction, in the [Chapter 11 Cases], has determined that the resolution of the [Chapter 11 Case] provides

---

[16] This summary is qualified in its entirety by the actual text of Assembly Bill 1054, codified in, *inter alia*, Cal. Pub. Util. Code §3292.

funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying any prepetition wildfire claims asserted against the [Utility] in the [Chapter 11 Cases] in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the court through an estimation process or otherwise allowed by the court.

(c) The [CPUC] has approved the reorganization plan and other documents resolving the [Utility's Chapter 11 Cases], including the [Utility's] resulting governance structure, as being acceptable in light of the [Utility's] safety history, criminal probation, recent financial condition, and other factors deemed relevant by the [CPUC].

(d) The [CPUC] has determined that the [Utility's] reorganization plan and other documents resolving the [Chapter 11 Cases] are (i) consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (ii) neutral, on average, to the ratepayers of the [Utility].

(e) The [CPUC] has determined that the reorganization plan and other documents resolving the [Chapter 11 Cases] recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the [CPUC], which may include sharing of value appreciation.

Cal. Pub. Util. Code § 3292(b)(1)(A)-(E).

As to item (b) above, the Plan provides funding for or otherwise provides for satisfying Fire Claims asserted against the Debtors in the amounts agreed upon in the various Plan Settlements and endorsed by holders of Fire Victim Claims through their overwhelming acceptance of the Plan. As set forth above and in the Plan, Fire Claims fall into the following categories, each to be treated under the Plan in compliance with AB 1054:

- Public Entity Wildfire Claims, which are to be settled and treated under the Plan in accordance with the Public Entities Settlement and the acceptance of the Plan by Classes 5A-I and 5B-I;

- Subrogation Wildfire Claims, which are to settled and treated under the Plan in accordance with the Court-approved Subrogation Claims RSA and related settlement agreement and the acceptance of the Plan by Classes 5A-II and 5B-II;

- Fire Victim Claims, which are to be channeled to the Fire Victim Trust and treated under Plan in accordance with the Court-approved Tort Claimants RSA and the acceptance of the Plan by Classes 5A-III and 5B-III; and

- Subrogation Butte Fire Claims and other Fire Claims that are Prepetition Executed Settlement Claims, which, pursuant to the Plan, shall be Allowed in the

amount set forth in the applicable award, agreement or settlement and paid in full. *See* Plan § 1.159.

Therefore, this Court can and should determine in connection with confirmation of the Plan, that the Plan provides for satisfying any prepetition wildfire claims asserted against the Utility in the Chapter 11 Cases in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the Court through an estimation process or otherwise allowed by the Court in compliance with AB 1054.

**B.      CPUC Approval**

In light of the conditions set forth in AB 1054 and the regulatory approvals the Utility must obtain prior to, or as part of and in connection with confirmation or the effectiveness of the Plan and with respect to participation in the Go-Forward Wildfire Fund, the CPUC commenced Investigation (I.) 19-09-016, Order Instituting Investigation on the Plan (the "**Plan OII**"), on October 4, 2019, to consider the ratemaking and other implications that will result from the confirmation the Plan and other regulatory approvals necessary to resolve the Chapter 11 Cases.

On April 20, 2020, the Administrative Law Judge issued a proposed CPUC decision approving the Plan, including as being in compliance with AB 1054, with certain conditions and modifications, and on May 19, 2020 the CPUC issued a revised proposed decision also approving the Plan, including as being in compliance with AB 1054, with certain conditions and modifications (the "**Proposed Plan OII Decision**").  The Proposed Plan OII Decision determines (i) that the Plan and other documents resolving the Chapter 11 Cases are (a) consistent with the state's climate goals as required pursuant to the California Renewables Portfolio Standard Program and related procurement requirements of the state and (b) neutral, on average, to the ratepayers of the Utility; and (ii) that the Plan and other documents resolving the Chapter 11 Cases recognize the contributions of ratepayers, if any, and compensate them accordingly, each as required pursuant to AB 1054.  Additionally, the Proposed Plan OII Decision determines that the Utility's executive compensation plan, as modified by the Proposed Plan OII Decision, conditionally satisfies the requirements of Public Utilities Code Section 8389(e)(6)(C).  The Proposed Plan OII Decision also sets forth certain other compliance obligations of the Utility, with

which the Utility will comply to the extent the CPUC decision adopts those aspects of the Proposed Plan OII Decision.

On May 11, 2020, the Debtors filed comments on the Proposed Plan OII Decision proposing certain modifications and clarifications, while generally supporting its approval of the Plan. The CPUC is expected to consider the Proposed Plan OII Decision at its May 28, 2020 Business Meeting. Although the CPUC has not yet adopted the Proposed Plan OII Decision and, as such, it currently has no legal effect, the Debtors are confident that the CPUC will adopt a decision approving the Plan, complete with all findings required under AB 1054, well in advance of the June 30, 2020 deadline imposed by AB 1054. For these reasons, subject to the CPUC's scheduled vote on the Proposed Plan OII Decision on May 28, 2020, the Plan is compliant with AB 1054 and satisfies all applicable legislative and regulatory requirements and should be confirmed.

## IV. THE UNRESOLVED OBJECTIONS TO CONFIRMATION OF THE PLAN SHOULD BE OVERRULED

The Plan Proponents have worked diligently both prior to and after the Plan Objection Deadline to discuss the various issues or concerns raised by parties in interest, either informally or through filed objections to confirmation (collectively, the "**Objections**" and the parties filing such Objections, the "**Objectors**"), with regard to confirmation of the Plan. As a result of these efforts, the Plan Proponents were able, through revisions to the Plan and the Proposed Confirmation Order, to fully resolve some of the Objections and significantly narrow the scope of many of the others that remain outstanding.

Notwithstanding the Plan Proponents' best efforts to resolve all of the Objectors' issues with the Plan and Proposed Confirmation Order, certain issues remain outstanding. Accordingly, in this Section, the Plan Proponents will address, in turn, the Objections filed by (i) the Tort Claimants Committee [Docket No. 7306] (the "**TCC Objection**"), (ii) the Official Committee of Unsecured Creditors (the "**UCC**") [Docket No. 7300] (the "**UCC Objection**"), (iii) PERA [Docket No. 7296] (the "**PERA Objection**"), and (iv) the assertion raised in various Objections that the Plan "impairs" unimpaired Classes. Additionally, attached hereto as **Exhibit A**, and fully incorporated herein by reference, is a

chart (the "**Objection Summary Chart**") summarizing (i) each of the Objections and (ii) the Plan Proponents' responses thereto.

### A. The TCC Objection Should Be Overruled

Distilled to its essentials and as expressly acknowledged in the TCC Objection, the Tort Claimants Committee's objection relates *solely* to the following five (5) matters:

1.  The Schedule of Assigned Rights and Causes of Action (the "**Schedule of Assigned Claims**") that are to be assigned to the Fire Victim Trust pursuant to the Plan is inaccurate and does not conform to the Plan;

2.  The Debtors' Schedule of Retained Rights and Causes of Action (the "**Schedule of Retained Claims**") appears to retain claims that fall within the scope of claims that should be included in the Schedule of Assigned Claims;

3.  The Registration Rights Agreement being negotiated should apply equal registration rights and lock-up terms to both the Fire Victim Trust and the Equity Backstop Parties;

4.  The calculation of Normalized Estimated Net Income for 2021 under the Plan that is part of the determination of how much Reorganized PG&E stock is transferred to the Fire Victim Trust has not been agreed upon; and

5.  The definition of "Subrogation Wildfire Claim" under the Plan must be changed if the Court does not approve the insurance set off language in the Fire Victim Trust Agreement.

TCC Objection at pp 2, 30-31, Exhibit 2.

As an initial matter and as the Debtors advised the Court at the May 19, 2020 status conference, all of the foregoing objections are the subject of ongoing mediation before former Bankruptcy Judge Newsome. The Plan Proponents are optimistic that the Tort Claimants Committee's objections either will be resolved or substantially narrowed prior to the commencement of the Confirmation Hearing.

Nevertheless, the Plan Proponents will briefly address each of the objections listed above.

1.  <u>Schedule of Assigned Claims</u>. The Plan Proponents believe that their schedule accurately reflects the intent and purpose of the Tort Claimants RSA. The Debtors, as well as others, have noted a concern with the Tort Claimants Committee and the Fire Victim Trust suing the Debtors' vendors and business partners, many of which are critical to the Debtors' ongoing vegetation management and other safety related measures. In view of the fact that the Assigned Rights and Causes

of Action are not a material element of the consideration to be transferred to the Fire Victim Trust, the Debtors believe it is appropriate to address these vendor and contractor concerns.

      2.   <u>Schedule of Retained Claims</u>.  The Debtors do not believe there are any retained claims that fall within the scope of the claims to be assigned to the Fire Victim Trust.

      3.   <u>Registration Rights Agreement</u>.  As an initial matter, it is important to recognize that neither the Tort Claimants RSA nor the Plan, which has now been overwhelmingly accepted by the Fire Victims, require that the Registration Rights Agreement be acceptable to the Tort Claimants Committee or that it provide for equal registration rights and lock-up terms to both the Fire Victim Trust and the Equity Backstop Parties.  Rather, each provide for "reasonable registration rights consistent with the recommendations of the Debtors' equity underwriter and tax rules and regulations."  Plan Section 1.6.

The Tort Claimants Committee asserts that according to the publicly available registration rights agreements precedents collected and surveyed, "market practice" is that "lock-up provisions are applied on equal terms to all shareholders who are getting registration rights". TCC Objection IV.B.1. However, the factual circumstances in the precedents relied upon for this assertion, as specified in the Declaration of Brent Williams, are not analogous to this proceeding. In each of the seven precedents relied on by the Tort Claimants Committee, each of the shareholders party to the applicable registration rights agreements were similarly situated investors or creditors. In five of seven of the precedents, the shareholders were all members of the same class of claimants; in the other two precedents, the shareholders were all investment fund entities purchasing equity to provide exit financing for the respective debtors. In our case, the Equity Backstop Parties and the Fire Victim Trust are not similarly situated, and the nature of the Equity Backstop Parties' investments and the Fire Victims Trust's settlement are fundamentally different. After giving effect to the Plan, and in settlement of its claims, the Fire Victim Trust is to receive a minimum 20.9% ownership interest in Reorganized HoldCo. In contrast, even assuming the commitments under the Equity Backstop Commitment Letters are fully drawn, none of the Equity Backstop Parties are expected to own more than 10% of the outstanding shares of Reorganized HoldCo (the vast majority being expected to own less than 2%).  And, significantly, the contractual obligations of the Debtors to provide registration rights to the Fire Victim

Trust and the Backstop Parties, respectively, are dissimilar, as previously noted. As such, the precedents cited by the Tort Claimants Committee in the TCC Objection are not relevant to establish "market practice" with respect to this issue, as the circumstances here are entirely different from the "market" surveyed by the Tort Claimants Committee.

The Registration Rights Agreement that has been proposed to the Tort Claimants Committee is consistent with the recommendations of the Debtors' equity underwriter. *See* Ziman Declaration at ¶ 17. That said, negotiations with respect to that agreement continue. Again, the Debtors are optimistic that a resolution will be reached, but if not, the TCC Objection on this matter should be overruled.

4. <u>Normalized Estimated Net Income</u>. Under the express terms of the Plan, Normalized Estimated Net Income ("**NENI**") is to be determined based on various components tied to the Debtors' 2021 projected operations. Plan Section 1.143. Neither the Tort Claimants RSA nor the Plan give the Tort Claimants Committee any right to contest the calculation of NENI, and an agreed upon calculation certainly is not a condition to confirmation. NENI is the Debtors' estimate, which is the same estimate to be used for purposes of various calculations under the Backstop Commitment Letters. This is part of the treatment overwhelmingly accepted by the holders of Fire Victim Claims and there is no reason to revisit this issue.

5. <u>Definition of Subrogation Wildfire Claim</u>. This matter has already been addressed by the Court and resolved in connection with the Disclosure Statement hearing and there is no need to revisit it. The Plan Proponents understand that this objection will be addressed again in a pleading to be filed by the Ad Hoc Subrogation Claimants and, if this Court approves the Tort Claimant Committee's draft of the Fire Victim Trust Agreement and Fire Victim Claims Resolution Procedures, the objection will be moot.

As stated, mediation is ongoing. To the extent any of the Tort Claimants Committee's objections remain after that process has been concluded, they should be overruled. Simply stated, the Tort Claimants Committee's objections should not be permitted to frustrate what its constituency overwhelmingly supports.

### B. The UCC Objection Should Be Overruled

In its Objection, the UCC argues that the Plan impairs General Unsecured Claims—which are to be paid in full on the Effective Date, with postpetition interest—in various ways. First, the UCC argues that Section 10.3 of the Plan, which requires claimants to release, discharge, and waive all "Claims, Interests, rights, and liabilities" against the Debtors that arose prior to the Effective Date, expands section 1141 of the Bankruptcy Code because that section "only refers to discharge, not to a 'waiver' or 'release.'" UCC Objection ¶ 7 [Docket No. 7300]. Second, it asserts that the Plan impairs general unsecured claimants by providing, in Paragraph 13 of the executory contract Cure Notice, for a release of contingent pre-petition indemnification obligations arising under assumed executory contracts. *Id.* ¶¶ 9–11. Third, it contends that these releases will somehow prevent vendors and other creditors from asserting rights and defenses against Assigned Claims and Assigned Causes of Action prosecuted by the Fire Victim Trust. *Id.* ¶¶ 19-26. Additionally, the UCC raises eight other discrete Plan issues (the "**Remaining Plan Issues**"), many of which have been resolved. *See id.* ¶¶ 29-48. The unresolved Remaining Plan Issues, and the Plan Proponents' responses thereto, are summarized in the Objection Summary Chart.[17]

The impairment related objections are addressed below but, as a threshold matter, the UCC fails to apprehend that General Unsecured Claims are not impaired by the *Plan*. As shown below, any impact on creditors' rights is the result of operation of the *Bankruptcy Code or non-bankruptcy law*. As now well established in these Cases, impairment by the Code or operative law is not "impairment" within the meaning of section 1124 of the Bankruptcy Code. "[I]mpairment results from what a <u>plan</u> does, not from what a statute does." *In re PG&E Corp.*, 610 B.R. 308 (Bankr. N.D. Cal. 2019) (emphasis supplied) (quoting *In re Am. Solar King Corp.*, 90 B.R. 808, 819-820 (Bankr. W.D. Tex. 1988)); *accord In re Ultra Petroleum*, 913 F.3d 533, 540 (5th Cir. 2019); *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d 197, 204 (3d Cir. 2003); *Ad Hoc Comm. of Holders of Trade Claims v. PG&E Corp.*, No. 20-CV-01493-

---

[17] A number of parties, including several who are counterparties to executory contracts, have either joined in the UCC's objections or raised objections that are also propounded by the UCC. The arguments set forth here respond to all of those objections. Any Objection not addressed herein is addressed in the Objection Summary Chart.

HSG, 2020 WL 1865135, at *7 (N.D. Cal. Apr. 14, 2020) ("[T]here is no impairment where the Bankruptcy Code—and not the Debtors' Plan—modifies alleged non-bankruptcy contractual rights."). Accordingly, because the thrust of the UCC's Objection is predicated on the incorrect notion that the Plan, rather than the Bankruptcy Code or non-bankruptcy law, is the cause of any impact on the rights of General Unsecured Creditors, the UCC's Objection should be overruled.

### 1. Section 10.3 Does Not Impermissibly Expand Section 1141 of the Bankruptcy Code

The UCC, and others, first argue that Section 10.3 of the Plan impermissibly expands the scope of section 1141 of the Bankruptcy Code. *See* UCC Obj. ¶¶ 5-7. The UCC is seeing ghosts here. The Debtors are not asking unsecured creditors to provide a "general release." The Plan simply confirms that all prepetition claims that have been—or could have been—asserted against the Debtors through the Effective Date will be discharged upon the occurrence of the Effective Date by operation of the Bankruptcy Code "unless otherwise expressly provided in the [Plan]." Such a discharge means the claim is gone forever, whether a plan calls this a discharge, a release or something else. This is not a new concept, as the entire purpose of restructuring is to discharge claims. The language at issue in Section 10.3 of the Plan is expressly limited "to the fullest extent permitted by section 1141"—as the UCC concedes. Section 10.3's language is identical or nearly identical to language routinely approved in other chapter 11 cases, including by this Court. *See, e.g.*, *In re Blue Earth, Inc.*, No. 16-30296-DM, (Bankr. N.D. Cal. July 19, 2016) (Montali, J.) [Docket No. 259], at Ex. A ("Except as provided in the Bankruptcy Code, Plan, or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan shall *discharge and release* of [sic] all Claims and Interests arising or existing on or before the Effective Date"); *In re Newzoom, Inc.*, No. 15-31141 (Bankr. N.D. Cal. Dec. 11, 2015) [Docket No. 294] at ¶ 26 ("Pursuant to section 1141(d) of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan shall be in *complete satisfaction, discharge, and release, effective* as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued from and after the Petition Date, whether known or unknown . . .); *In re Breitburn Energy Partners LP*, No. 16-11390 (SMB), (Bankr. S.D.N.Y. March

26, 2018) [Docket No. 2387] at Ex. A, Section 10.4 ("Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, each holder . . . of a Claim or Existing BBEP Equity Interest and any affiliate of such holder shall be deemed to have *forever waived, released, and discharged* the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Existing BBEP Equity Interests, rights, and liabilities that arose prior to the Effective Date."); *In re AMR Corp.*, No. 11-15463 (SHL), (Bankr. S.D.N.Y. Oct. 22, 2013) [Docket No. 10367] at ¶ 62 ("Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Equity Interest and any affiliate of such holder shall be deemed to have *forever waived, released, and discharged* the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights, and liabilities that arose prior to the Effective Date.") (emphasis added throughout). And, the Plan clearly and expressly provides for the payment in full of all Administrative Expense Claims.

For the avoidance of doubt, the Plan does not and is not intended to deprive any unimpaired claimant of rights or defenses—including setoff or recoupment—to the extent they exist under applicable law. Nor does the Plan release any claims a claimant may have against a third party unless a claimant voluntarily opts into the third party release. What the discharge in Section 10.3 of the Plan does properly preclude is a claimant seeking to recover on a prepetition claim for which it did not file a proof of claim or a claim that the Bankruptcy Code disallows.

### 2. Plan Treatment Does Not Impair Contingent Prepetition Indemnification and Contribution Claims

#### (a) The Code Requires Holders of Contingent and Unliquidated Indemnification and Contribution Claimants to File Proofs of Claim.

The UCC also contends that the Plan impairs general unsecured claimants by providing for a release of contingent prepetition indemnification obligations arising under assumed executory contracts. UCC Obj. ¶¶ 9-11. This confuses impairment with the appropriate cure in the context of an assumed contract (which, as noted above, is subject to a separate, ongoing dispute resolution process). To the

extent the UCC is referring to claims not arising under an assumed contract, it is attempting to bootstrap unimpairment into reinstatement.

"An unsecured creditor . . . must file a proof of claim or interest for the claim or interest to be allowed." *In re Landmark Fence Co., Inc.*, No. EDCV 16-1538 JGB, 2018 WL 4735709, at *9 (C.D. Cal. Sept. 28, 2018) (quoting Fed. R. Bankr. P 3002(a)) *aff'd*, No. 18-56355, 2020 WL 2188733 (9th Cir. May 6, 2020); *see* 11 U.S.C. 502(a). In particular, Section 502(b) requires the filing of a timely proof of claim where "a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law." *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009); *In re THC Fin. Corp.*, 686 F.2d 799, 804 (9th Cir. 1982) (affirming order barring contingent claim as untimely filed). Thus, any creditor who failed to file a proof of claim for contingent indemnification or contribution against the Debtors will have that claim discharged by operation of the Bankruptcy Code.

Indeed, it is well established that section 502 bars a creditor from recovering on a non-contractual indemnification or contribution claim arising from prepetition events where the creditor could reasonably foresee a potential claim for indemnification or contribution from the Debtors. *See In re Media Vision Tech., Inc.*, No. 94-45107-J, 1997 WL 102469, at *7 (N.D. Cal. Feb. 27, 1997) (creditor required to file a proof of claim because it "should have at a minimum fairly contemplated being sued by others such that it would have claims for contribution and indemnity"); *In re Lombard Flats, LLC*, No. 15-CV-00870-PJH, 2016 WL 1161593, at *9 (N.D. Cal. Mar. 23, 2016) ("Because the factual allegations . . . predate the bankruptcy petition, [creditor's claim] was fairly contemplated prepetition and is subject to the discharge injunction.").

Likewise, a timely proof of claim is required for a contractual indemnification claim where contingent indemnification or contribution remains the sole outstanding performance obligation of the Debtors,[18] because the claim arises when the indemnification agreement is executed, not when the

---

[18] Section 365 governs the assumption and rejection of executory contracts. An indemnification agreement is not an executory contract where the debtor's only remaining obligation is to indemnify the nondebtor. *See In re THC Financial Corporation*, 686 F.2d 799, 804 (9th Cir. 1982) ("contracts that only require[] payment by the debtor are not executory"). Material unperformed obligations must remain for both parties for a contract to be executory. *See In re Qintex Entm't, Inc.*, 950 F.2d 1492,

obligation to indemnify accrues. *See Siegel v. Fed. Home Loan Mortg. Corp.*, 143 F.3d 525, 533 (9th Cir. 1998) (citing *In re THC Fin. Corp.*, 686 F.2d 799, 802–3 (9th Cir. 1982)); *In re Moreno*, 479 B.R. 553, 564 (Bankr. E.D. Cal. 2012) (same) (citing *In re THC*, 686 F.2d at 803–4). "It makes no difference that the duty to indemnify [accrued] after the petition was filed . . . ; the critical fact is that the claim for indemnity arose [pre-petition]." *In re Christian Life Ctr.*, 821 F.2d 1370, 1374 (9th Cir. 1987). *See also In re Huffy Corp.*, 424 B.R. 295, 305–6 (Bankr. S.D. Ohio 2010) (surveying cases to find courts "almost universally h[o]ld that a contractual right to indemnification is a prepetition contingent claim if the contract was executed before the bankruptcy filing"). Courts within the Ninth Circuit reason that, for contingent indemnification claims in particular, "[i]t is within the fair contemplation of parties entering into a contract that the other party may breach it . . . . Thus, a contingent claim arises at that point in time [of contract execution], although it may never mature." *In re Hassanally*, 208 B.R. 46, 53 (B.A.P. 9th Cir. 1997) (quoting *In re Russell*, 193 B.R. 568, 571 (Bankr. S.D. Cal. 1996)). As a result, where a counterparty has failed to timely file a proof of claim for contingent indemnity, or any contingent contractual claim, such a claim is disallowed by operation of section 502, not by the Plan.

Thus, for any common law contingent indemnification or contribution claims and any non-executory contract-based indemnification or contribution claims, a creditor who has failed to file a proof of claim for such contingent indemnification or contribution claims against the Debtors will not recover under the Plan by operation of the Bankruptcy Code. Consequently, if any of the parties objecting to the Plan's treatment of their prepetition indemnity or contribution claims have failed to file a proof of claim with respect to such a claim, with the exception of any party whose contract the Debtors are assuming, the Plan properly discharges any and all of their alleged rights of indemnity or contribution.

The fact that the Plan applies this textbook bankruptcy law does not constitute impairment.

### (b) The Disallowance of Claims Under Section 502(e) of the Bankruptcy Code Does Not Constitute Impairment.

Even if a claimant has filed a proof of claim asserting a contingent claim for indemnification or contribution, Bankruptcy Code section 502(e)(1)(B) specifically disallows any such claim for which the

1495 (9th Cir. 1991). Thus, the Plan does not impair a claim by treating it as a prepetition contingent claim subject to discharge where payment by the Debtors is the only performance outstanding.

Debtors are conceivably co-liable with the claimant.  *See In re Hexcel Corp.*, 174 B.R. 807, 811 (Bankr. N.D. Cal. 1994); *In re Dant & Russell, Inc.,* 951 F.2d 246, 248 (9th Cir. 1991); *In re Touch Am. Holdings, Inc.*, 381 B.R. 95, 107 (Bankr. D. Del. 2008) ("Courts have consistently held that 'the concept of reimbursement includes indemnity.'").  Thus, if a party is "co-liable" with the Debtors, it is the Code—not the Plan—that eliminates the party's right to receive indemnification or contribution from the Debtors.  By incorporating the Bankruptcy Code's disallowances under section 502(e)(1)(B), the Plan does not impair these contingent indemnification and contribution claims, and instead merely acknowledges what has already been done by operation of the Bankruptcy Code.  *See In re PG&E Corp.*, 610 B.R. at 315; *In re PPI Enters. (U.S.), Inc.*, 324 F.3d at 205.

Additionally, under California Civil Procedure Code § 877, the Debtors are not liable to any joint tortfeasor for contribution or indemnity where the Debtors have settled a tort claim in good faith.  *See Abu-Assal v. Abu-Assal*, No. EDCV01153GAFSGLX, 2008 WL 11336612, at *3, *6 (C.D. Cal. Aug. 22, 2008); *Tech-Bilt, Inc. v. Woodward-Clyde & Assocs.*, 38 Cal. 3d 488, 499 (1985).  Considering the Debtors' clear record of good-faith settlement with Fire Victim Claimants, a creditor seeking non-contractual indemnification or contribution from the Debtors on account of a wildfire-related claim that may be asserted against it would not be entitled to recover against the Debtors even if section 502(e) were found not to be applicable.  The Debtors' invocation of California law to preclude these types of claims is no more an impairment by the Plan than the Bankruptcy Code provisions that this Court has already held cannot constitute impairment.[19]

### (c) The Bankruptcy Code's Effect on Executory Contract Contingent Indemnity and Contribution Claims Does Not Constitute Impairment.

The UCC and certain contractors assert that Paragraph 13 of the Debtors' Cure Notice impairs contractors by releasing contingent prepetition indemnification obligations arising under assumed

---

[19] The UCC objects that the Bankruptcy Court cannot approve the Debtors' settlement with the Tort Claimants Committee (which it already has) because the settlement will impair the UCC by "triggering" California Civil Code § 877.  But section 877 strips the joint tortfeasor of the right to contribution or indemnification as a matter of state law, not the Plan.  The settlement thus does not impair the general unsecured creditors.

executory contracts. *See, e.g.*, UCC Obj. ¶ 26 [Docket No. 7300]; Davey Tree Obj. ¶ 2 [Docket No. 7304]. The Plan, however, merely recognizes that contingent indemnity claims are not permitted under the Bankruptcy Code. The Plan itself does not alter any such rights.

Section 365 of the Bankruptcy Code requires that where the Debtors assume an executory contract, they assume an "executory contract as a whole," subject to both its benefits and its burdens. *See Energy Consulting & Mgmt. Sols., LLC v. W. States Equip. Co.*, 574 F. App'x 763, 765 (9th Cir. 2014); *NLRB v. Bildisco*, 465 U.S. 513, 531 (1984). Consistent with section 365, the Debtors do not seek to cherry-pick provisions but rather are assuming specific executory contracts in their entirety. Consequently, where an executory contract that the Debtors assume contains provisions requiring that the Debtors indemnify the counterparty, such indemnification provisions will be assumed by the Debtors along with the rest of the contract, to be given full legal effect for all postpetition obligations subject to whatever defenses the Debtors may have under non-bankruptcy law going forward.

Section 365 does not, however, bar the operation of other provisions of the Code or otherwise applicable nonbankruptcy law. *See, e.g.*, *In re Sawtooth Enters., Inc.*, No. 96-03050, 1999 WL 33490212, at *4 (Bankr. D. Idaho Nov. 24, 1999) (reading Sections 348(c) and 365(d) together (citing 3 Collier on Bankruptcy ¶ 348.04 (15th Ed. Revised 1996)); *In re Santos Borrero*, 75 B.R. 141, 142 (Bankr. D.P.R. 1987) (construing Sections 348(c) and 365(d) of the Bankruptcy Code to find trustee could assume executory contract that had not expired at time of conversion of the case).[20]

---

[20] Contrary to the UCC's and Osmose Utility Service Inc.'s assertions, *see* UCC Objection [Docket No. 7300] at 2 ¶ 2, Osmose Objection [Docket No. 7320] at 6 ¶ 18, a Plan need not explicitly state that all rights of General Unsecured Claims holders "ride through" the bankruptcy unaffected to be unimpaired, nor must the Plan assume an executory contract and permit it to "ride through" the bankruptcy unaffected. *See In re Puchi Properties Inc.*, 601 B.R. 677, 685 n.6 (Bankr. D. Ariz. 2019); *In re Hernandez*, 287 B.R. 795, 800 (Bankr. D. Ariz. 2002). Indeed, assumption does not mean—and specifically precludes—that a contract "rides through" bankruptcy. *See In re JZ L.L.C.*, 371 B.R. 412, 422-24 (B.A.P. 9th Cir. 2007) (holding that under Section 365 the "basic approach[es] of assumption . . . and 'ride through' [are] alternatives" (citing *NLRB v. Bildisco*, 465 U.S. at 546 n.12)). Further, to the extent that the UCC refers to preserving rights that otherwise would be curtailed by the operation of the Code or non-bankruptcy law, providing for such rights to "ride through" the bankruptcy *unaffected* would impair them by *granting* rights not available otherwise under the Bankruptcy Code and applicable law. *See In re L & J Anaheim Assocs.*, 995 F.2d 940, 942 (9th Cir. 1993).

Upon assumption, both the Bankruptcy Code and nonbankruptcy law have a role in determining the extent of default to be cured in order for an executory contract to be assumed. Therefore, in determining the cure that may be owed to a counterparty on assumption of their executory contract, the Debtors may rely on section 502(e) to assert that prepetition claims based on contingent indemnity or contribution rights are not properly part of the assumed obligations or cure requirement. Thus, again, it is the legal effect of section 502(e)(1)(B) of the Bankruptcy Code, and not the Plan, that impacts the Debtors' obligations for prepetition claims based on contingent indemnity or contribution claims in the context of an executory contract assumption.[21]

Assumption and cure are also subject to state law and the Debtors' defenses thereunder. Concerning vegetation management and utility services in particular, California Civil Code § 2782, in conjunction with sections 2772 and 2783, prohibits certain categories of indemnification claims arising under electrical power line clearing, tree trimming, and other qualifying construction contracts, rendering such contractual indemnity provisions unenforceable under state law, independent of Section 365.[22] The Debtors' election to assume an executory contract under section of 365 of the Bankruptcy

---

[21] The Municipal Objectors cite *In re Frontier Properties*, 979 F.2d 1358, 1367 (9th Cir. 1992); *In re Airlift Int'l*, 761 F.2d 1503, 1508 (11th Cir. 1985), *In re Trigg*, 630 F.2d 1370, 1375 (10th Cir. 1980), and *Matter of SteelShip Corp.*, 576 F.2d 128, 132 (8th Cir. 1978) for the assertion that when a contract is assumed, "the debtor must perform in full, just as if the bankruptcy had not intervened." *See* Municipal Objectors' Objection at 19 [Docket No. 7231]. That statement, however, is rooted in an outdated edition of Collier on Bankruptcy, in which the treatise commented on section 70b of the Bankruptcy Act, not the Bankruptcy Code. *See In re Klein Sleep Prod., Inc.*, 78 F.3d 18, 28 (2d Cir. 1996). The cases cited by the Municipal Objectors do not stand for the premise that an assumed contract must be treated as though a bankruptcy never occurred at all, only for the uncontroversial proposition that a contract's burdens must be assumed along with its benefits. While the Debtors may have future performance obligations under an assumed contract, this does not mean that prepetition contingent indemnification claims are not subject to treatment under the Code, which clearly disallows contingent indemnification claims in which the Debtors may be co-liable.

[22] Certain unsecured creditors, including Arbor Metrics, LLC [Docket No. 7233], Asplundh Construction LLC [Docket No. 7236], and others, contended in cure objections that their contracts with the Debtors had terminated prior to the Petition Date, and therefore were erroneously listed in the Assumption Schedule, but nonetheless reserved their rights to contest the availability of indemnification claims under any contracts found to be executory. The Debtors, upon further review, have determined that they agree with these parties that their contracts were previously terminated and are not executory. In any case, however, these indemnification rights would be nullified subject to operation of the Code and state law as described above.

Code in no way cancels the effects of state law on enforcement of contractual provisions. To the contrary, such contracts are assumed in their entirety and subject to their burdens.

### 3. The Plan Does Not Prejudice Vendors and Other Creditors with Respect to Assigned Claims and Causes of Action Assigned to the Fire Victims Trust

The UCC and others also claim that Section 10.3 of the Plan and Paragraph 13 of the Cure Notice prejudice vendors and other unsecured creditors by depriving them of rights and defenses (including the alleged right to seek indemnification from the Debtors) as relates to the claims that will be assigned to the Fire Victim Trust. *See* UCC Obj. ¶¶ 19-26 [Docket No. 7300]. That is not correct. The Assigned Claims are claims that the Debtors could have asserted in their own right. Whatever rights and defenses vendors and other defendants might have had against the Debtors are preserved and remain available as rights and defenses vis-à-vis the Fire Victim Trust.

Note, however, that a vendor could never have a claim against the Debtors for indemnification or contribution as relates to a claim the Debtors may have pursued against the vendor. For example, if the Debtors sued a vendor claiming that the vendor owed the Debtors money for breach of contract and the Debtors won, the vendor would not be entitled to indemnity from the Debtors on the very claim the Debtors just won. That would make no sense. Yet that is exactly what the UCC and vendors are claiming they are losing the right to assert. To be sure, the vendors can assert whatever defenses they have to such a claim, but one of those defenses, and one of those rights if they lose, is not indemnification. Thus, the assignment of the Debtors' claims to the Fire Victim Trust changes nothing.

With respect to any "direct" claims that a third party may have against a vendor that is not derived from an assignment from the Debtors, nothing in the Plan prevents the vendor from defending itself and asserting whatever rights it believes it has against the plaintiff in that action. What the vendor cannot do is seek indemnity or contribution from the Debtors if the vendor loses an action predicated on prepetition conduct. Those claims are expressly disallowed by section 502(e), as discussed above, and may also be precluded under California Civil Procedure Code § 877. In sum, nothing in the Plan's assignment of Assigned Claims to the Fire Victim Trust operates to impair or prejudice the rights of the vendors or others who may be subject to suit on account of the Assigned Claims.

**C.      The PERA Objection Should Be Overruled**

**1.      The Plan Treats HoldCo Rescission Or Damage Claims Properly**

The HoldCo Rescission or Damage Claims are claims for damages arising from alleged violation of securities laws in connection with purchases of PG&E's common stock from April 29, 2015 through November 15, 2018 (the "**Class Period**").  According to the putative class action complaint filed by PERA, PG&E's alleged "false and misleading statements" regarding wildfire risks "caused PG&E [equity] securities to trade at artificially inflated levels."  Third Amended Consolidated Class Action Complaint For Violation Of The Federal Securities Laws ("**TAC**") ¶ 321.  *See* Adv. Proc. No. 19-03039, Docket No. 3-1.  The premise of the complaint is that "PERA purchased securities of PG&E at artificially inflated prices during the Class Period and was damaged as the result," TAC ¶ 41, and that "purchasers of PG&E securities during the Class Period suffered similar injury because of their purchases of securities at artificially inflated prices."  TAC ¶ 461.

PERA concedes that the HoldCo Rescission or Damage Claims are subject to mandatory subordination under section 510(b) of the Bankruptcy Code.  PERA Obj. at 4, 11.  Section 510(b) provides that claims such as the HoldCo Rescission or Damage Claims, if allowed,[23] "ha[ve] the same priority as common stock."  11 U.S.C. § 510(b) (subordinating claims "for damages arising from the purchase or sale of" a security of the debtor).  PERA thus agrees that, as a result, holders of Allowed HoldCo Rescission or Damage Claims, if any, must share proportionally with PG&E's common shareholders.  PERA Obj. at 11 ("Section 510(b) of the Bankruptcy Code mandates *pari passu* treatment between common stock in PG&E Corporation in Class 10A-I, denominated in shares, and Equity Rescission or Damage Claims in Class 10A-II, denominated in dollars.").

Under the Plan, PG&E common shareholders are to retain their ownership interest in PG&E, subject to dilution from any New HoldCo Common Stock issued pursuant to the Plan.  Plan § 4.13(a).

---

[23] The Plan Proponents dispute all of the alleged HoldCo Rescission or Damage Claims, which are based on the demonstrably false premise that PG&E somehow concealed the risk that it might ignite and be liable for wildfires (a) while simultaneously, repeatedly, and widely disclosing that risk, and (b) after the Butte fire (2015) and the North Bay fires (2017) actually ignited and were widely attributed to PG&E. The Plan Proponents reserve all rights with respect to these specious claims, which have yet to survive even a motion to dismiss.

Accordingly, if the HoldCo Rescission or Damage Claims ultimately are allowed, they must receive a proportionate share of the ownership interest to be retained by PG&E's common shareholders.

The question of proportionality—*i.e.*, how much property is to be allocated to holders of Allowed HoldCo Rescission or Damage Claims, if any, and how much is to be allocated to PG&E common shareholders—is complicated by the fact that HoldCo Rescission or Damage Claims, if allowed, will be denominated in dollars, not shares. One cannot simply combine dollar-denominated claims and interests reflected by a number of common shares to calculate a *pro rata* distribution from a fixed pool of consideration (here, an ownership interest in PG&E).

The Plan addresses this otherwise apples-to-oranges comparison by allocating ownership of PG&E (as diluted) amongst shareholders and holders of Allowed HoldCo Rescission or Damage Claims, if any, pursuant to their respective share of PG&E's market capitalization at the last point in time that, according to PERA's own allegations, PG&E's share price was inflated by the alleged fraud. Specifically, holders of Allowed HoldCo Rescission or Damage Claims, if any, will receive New HoldCo Common Stock equal to their HoldCo Rescission or Damage Claim Share of the number of shares of common stock outstanding on the Petition Date (526,118,408). Plan § 4.14(a). The HoldCo Rescission or Damage Claim Share is "a percentage equal to (a) the dollar amount of a holder's Allowed HoldCo Rescission or Damage Claim less any cash payments received from an Insurance Policy, divided by (b) $35,905,153,932." Plan § 1.109. $35,905,153,932 represents PG&E's market capitalization as of the market open on October 12, 2017 (the "**Pre-Disclosure Capitalization**").[24]

Under this formula, holders of Allowed HoldCo Rescission or Damage Claims will receive new common stock equal to a percentage—the HoldCo Rescission or Damage Claim Share—of the stock held by existing common shareholders. As described below, that percentage is based upon and directly tied to the alleged losses of holders of Allowed HoldCo Rescission or Damage Claims.

Although PERA concedes that "the goal of reconciling distributions between *pari passu* classes denominated in shares (Class 10A-1) and dollars (Class 10A-II) is appropriate," PERA Obj. at 11, it

---

[24] The market opening price on October 12, 2017, was $69.29, and PG&E had 518,186,664 fully diluted shares outstanding on that date.

takes issue with both the denominator and numerator of the HoldCo Rescission or Damage Claim Share. Specifically, PERA asserts that (1) PG&E's market capitalization (the denominator) should be determined as of the Petition Date instead of the date immediately prior to disclosure of PG&E's alleged fraud; and (2) insurance recoveries should not be deducted from the allowed amount of a holder's HoldCo Rescission or Damage Claim (the numerator). PERA also argues that the Plan must account for securities fraud claims against the Utility (a subsidiary of HoldCo, the entity that issued the common shares on which the HoldCo Rescission or Damage Claims are premised) even though such claims must receive the exact same treatment as the HoldCo Rescission or Damage Claims.

### (a) The Pre-Disclosure Capitalization Properly Accounts For The Losses Alleged By Holders Of HoldCo Rescission Or Damage Claims

The Pre-Disclosure Capitalization is based directly on the allegations made by PERA in its complaint and assumes the truth of those allegations, solely for purposes of providing a fair method to allocate distributions among PG&E's shareholders and holders of Allowed HoldCo Rescission or Damage Claims, if any. In its complaint, PERA alleged that October 12, 2017, was the first date on which the falsity of the alleged misstatements and omissions purportedly giving rise to the HoldCo Rescission or Damage Claims was revealed. As PERA put it, October 12, 2017, was the date of "corrective disclosure and/or materialization of concealed risk." TAC at 96; *see* TAC ¶ 246 ("it was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a major cause" of the fires); TAC ¶ 321 ("Defendants' false and misleading statements had the intended effect and caused PG&E securities to trade at artificially inflated levels throughout the Class Period, reaching as high as $71.56 per share on September 11, 2017 – a month before the truth started to emerge on October 12, 2017."); TAC ¶ 328 ("It was not until Thursday, October 12, 2017 that the market began to understand that PG&E's safety regulation violations were likely a proximate cause of the North Bay Fires"); TAC ¶ 330 ("On this news that PG&E would likely bear at least some responsibility for the fires, PG&E's stock dropped $4.65 per share, from a closing price of $69.15 on October 11 to closing price of $64.50 on October 12, or -6.7%, with unusually heavy

trading volume of almost 13 million shares (compared to a Class Period daily average trading volume of 3.5 million).").

As a consequence, according to PERA, anyone who purchased PG&E common stock in the nearly two-and-a-half years of the Class Period before October 12, 2017, did so at an "artificially inflated" price and then realized losses when, on October 12, 2017, the supposed truth was revealed and the stock price declined.[25] The Pre-Disclosure Capitalization represents PG&E's market capitalization at the last point in time at which its stock price reflected the alleged "artificially inflated" value.

The HoldCo Rescission or Damage Claim Share thus calculates a percentage ownership of PG&E based on a combination of an out-of-pocket damages theory (claims for actual realized losses in trading PG&E common stock) and a benefit-of-the-bargain measure approximating each claimant's reasonable expectancy ownership interest in PG&E had the allegedly false representations actually caused the share price to be inflated (by using the last date when the stock was supposedly fully inflated).[26] Applying the HoldCo Rescission or Damage Claim Share after accounting for insurance

---

[25] In an effort to lay claim to larger losses, PERA's complaint extends the Class Period to November 15, 2018, more than a year after the alleged corrective disclosures. This is nonsensical. If, in fact, the supposed "truth" was revealed in whole or in part on October 12, 2017, then any investor purchasing PG&E stock after that date would have – by PERA's own allegations – bought stock at a price that incorporated information from the corrective disclosures. Neither the federal securities nor bankruptcy laws were intended to provide investment insurance where, as PERA concedes, the market knew the "truth" as of October 12, 2017. *See, e.g.*, *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347-48 (2005) ("[A]llowing a plaintiff to forgo giving any indication of the economic loss and proximate cause . . . would tend to transform a private securities action into a partial downside insurance policy."); *In re Blue Earth, Inc. Sec. Class Action Litig.*, No. CV 14-08263-DSF, 2015 WL 12001274, *3 (C.D. Cal. Nov. 3, 2015) ("By ensuring that only losses actually attributable to a given misrepresentation are cognizable, the loss causation requirement ensures that the federal securities laws do not become a system of investor insurance that reimburses investors for any decline in the value of their investments.").

[26] This is consistent with the federal securities laws, which limit recovery to each investor's "actual damages." 15 U.S.C. § 78bb. Actual damages are an individual's "out-of-pocket" damages or the difference between the fair value of what was received and the fair value if there had been no fraudulent conduct (the "benefit of the bargain"). *See, e.g.*, *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1208 (9th Cir. 2012) ("The generally employed 'out-of-pocket' or 'market' measure is the difference between the fair value of what was received and the fair value of what one would have received had there been no fraudulent conduct."); *In re Sepulveda*, No. 8:13-BK-17965-SC, 2017 WL 1505216, *8 (B.A.P. 9th Cir. Apr. 26, 2017) ("The benefit-of-the-bargain measure places a defrauded plaintiff in the position he would have enjoyed had the false representation been true, awarding him the difference

payments (to avoid a double recovery), the Plan appropriately converts the HoldCo Rescission or Damages Claims into a proportionate share of PG&E equity as of the Petition Date based upon a capitalization that accounts for the alleged damages.

### (i) PG&E's Petition Date Market Capitalization Is Irrelevant

PERA takes issue with the Plan's use of the Pre-Disclosure Capitalization. It argues that "the reference to the corrective disclosures alleged in the TAC is a red herring" because Pre-Disclosure Capitalization is relevant only to quantification of the allowed amount of HoldCo Rescission or Damage Claims and not to the proportionate share of equity that such claims are entitled to receive if allowed. PERA Obj. at 12.

In so arguing, PERA ignores the function of subordination under section 510(b) and the nature of its claims. Under section 510(b), the HoldCo Rescission or Damage Claims "ha[ve] the same priority as common stock." As noted above, if they are liquidated and allowed, those claims will be denominated in dollars instead of shares and cannot be placed in the same class as the existing shares of PG&E common stock. Accordingly, the Plan must create a mechanism to provide the claims with treatment that is equivalent or similar to the treatment of the common shares—namely, retention of a percentage ownership of PG&E after dilution from the new equity interests issued pursuant to the Plan. *In re Kaiser Group Intern.*, 326 B.R. 265, 268 (D. Del. 2005) (section 510(b) "ensure[s] that [subordinated claimants] receive compensation for their claim on the same basis as the claimants who are on the level to which their claim is subordinated"); *see, e.g.*, *In re Superior Offshore Int'l*, 591 F.3d 350, 352-53 (5th Cir. 2009) (affirming confirmation of plan providing for subordinated claims and common shares to "share any surplus proceeds pro rata").

That is exactly what the Plan does: the holder of an Allowed HoldCo Rescission or Damage Claim will receive an amount of New HoldCo Common Stock equal to its share of PG&E's common stock outstanding as of the Petition Date based upon the percentage of PG&E's market capitalization at the time the stock price incorporated the alleged inflation. This is precisely how the Bankruptcy Code

in value between what he actually received and what he was fraudulently led to believe he would receive.") (quotations omitted).

mandates subordinated equity securities to be treated.  *See, e.g.*, *In re Orange Country Nursery, Inc.*, No. ED CV 18-232-DMG, 2019 WL 3973869, *5 (C.D. Cal. Aug. 21, 2019) (affirming confirmation of plan that provided for issuance of a proportionate amount of equity to "dilute the relative ownership interests of other equity holders to account for the value of [the subordinated] claim"); *Kaiser*, 326 B.R. at 268 (same); *In re American Solar King Corp.*, 90 B.R. 808, 824 (Bankr. W.D. Tex. 1988) (same).

### (ii) The Plan Is Consistent With Section 502(b) Of The Bankruptcy Code.

PERA's assertion that section 502(b) of the Bankruptcy Code somehow compels a different result reveals a fundamental misunderstanding of the Bankruptcy Code's claim allowance and subordination provisions.  Section 502(b) provides for the Court to "determine the <u>amount</u>" of a claim as of the Petition Date and "allow such claim in such <u>amount</u>."  11 U.S.C. § 502(b) (emphasis added).  Pursuant to section 502(b), the *amount* of the HoldCo Rescission or Damage Claims will be determined as of the Petition Date if and when those Claims are adjudicated and allowed.

At issue here is how such Claims, if they become allowed, are *treated* under the Plan.  As established above, section 510(b) mandates that the Claims – having been determined and allowed as of the Petition Date – be subordinated to the level of common stock.  The only logical way to effectuate that subordination is by calculating the proportionate share of PG&E's market capitalization that includes the damages alleged by PERA – *i.e.*, by determining the proportion of allegedly "inflated" capitalization (the source of the alleged damages) attributable to the entities who claim to have been damaged.  Any other methodology, including one based upon market capitalization as of the Petition Date, would massively overweight the HoldCo Rescission or Damage Claims by including the alleged losses in the numerator (the claim amount) but not the denominator (the capitalization) used to determine proportionate ownership.

The two cases cited by PERA do not support its argument.  One involved determination of a secured claim and had nothing to do with section 510(b).  *In re Paigah*, No. 09-19804, 2010 WL 4625861 (Bankr. S.D. Cal. Nov. 4, 2010).  The other was withdrawn on reconsideration and then reversed on appeal.  *In re Orange County Nursery, Inc.*, 479 B.R. 863 (Bankr. C.D. Cal. 2012), *withdrawn* 484 B.R. 219 (Bankr. C.D. Cal. 2012), *rev'd* 523 B.R. 692 (C.D. Cal. 2014).  A subsequent

appellate opinion in that case, cited above, confirms that section 510(b) operates to "dilute the relative ownership interests of other equity holders to account for the value of [the subordinated] claim." 2019 WL 3973869, at *5.[27]

**(b)    A Deduction For Insurance Is Necessary To Avoid Double Recovery And Consistent With Applicable Bankruptcy And Securities Law**

Under the Plan, the numerator of the HoldCo Rescission or Damage Claim Share for a particular claimant is reduced by "any cash payments received from an Insurance Policy." Plan § 1.109. This is done to put all claimants on a level playing field and ensure that no claimant receives more than its appropriate proportionate recovery.

In this regard, the Plan is fully consistent with the Fifth Circuit's decision in *Superior Offshore*, a case that is directly on point. In *Superior Offshore*, the debtor proposed a plan that, as here, had one class of securities fraud claimants subordinated to the level of common shareholders (Class 7) and one class of common shareholders (Class 8). 591 F.3d at 352. The plan provided for the classes to "share any surplus proceeds pro rata," but required each subordinated fraud claimant to "first look to the proceeds of the Debtor's available insurance policies for satisfaction of its Claim to the extent that such Claim is covered by insurance." *Id.* at 353 n.3. After receipt of such insurance proceeds, "[a]ny remaining unpaid Allowed Class 7 Subordinated Securities Claim shall receive a Pro-Rata share" of the assets available for distribution. *Id.* The bankruptcy court confirmed the plan and the Fifth Circuit

---

[27] The convoluted facts of *Orange County Nursery*, laid out in at least nine published opinions issued over the course of nine years (with an appeal now pending before the Ninth Circuit), are not remotely analogous to those in this case. In that case, a minority shareholder of a closely held corporation had petitioned for dissolution and won an award equal to the value of its shares. At the behest of the majority shareholder, the debtor filed for bankruptcy before paying the minority shareholder and argued that the dissolution award should be disregarded because the minority shareholder retained its minority interest. After a tortuous history of appeals and reversals, the confirmed plan ultimately provided for the minority shareholder to have a subordinated claim corresponding to the value of its equity interest as of the date of dissolution, and for such claim to share proportionally in the value of the debtor as of confirmation. 2019 WL 3973869, *1-*3. In contrast, holders of HoldCo Rescission or Damage Claims have no underlying equity interest to be valued. Rather, the function of the Plan is to convert the *damages* asserted by those holders into a proportionate share of PG&E's overall equity ownership on a basis that treats existing shareholders and subordinated claimants fairly and ratably.

affirmed. *Id*. at 353. The Plan's deduction for "cash payments received from an Insurance Policy" is substantively identical to that approved by the Fifth Circuit.

Yet, completely ignoring *Superior Offshore*, PERA argues that this so-called "Insurance Offset" is inconsistent with bankruptcy and securities law. PERA Obj. at 13-15. PERA is wrong on both accounts.

### (i)   The Insurance Offset Is Consistent With Bankruptcy Law.

PERA first asserts that "[t]he Insurance Offset violates the well-settled rule that a creditor is entitled to assert the full amount of its claim against a debtor, without reduction for amounts received from other, non-debtor sources." PERA Obj. at 14. The "rule" cited by PERA is neither "well-settled" nor applicable on the facts of this case.

PERA's argument flows from the "rarely cited" Supreme Court decision in *Ivanhoe v. Bldg. and Loan Association*, 295 U.S. 243 (1935). *Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.,* 692 F.3d 283, 295-96 (3d Cir. 2012). *Ivanhoe* and the other cases cited by PERA involve circumstances in which the "non-debtor sources" at issue were third party collateral or other assets not included as property of the bankruptcy estate. *See Ivanhoe*, 295 U.S. at 245 (proceeds from real estate that secured a bond issued by the debtor did not impact creditor's ability to assert claim for the full amount of the bond in a bankruptcy case); *In re Del Biaggio*, 496 B.R. 600, 605 (Bankr. N.D. Cal. 2012) (payments received from debtor's co-obligors did not reduce allowed amount of creditor's claim).

None of the authority cited by PERA involved a reduction in the claim to account for payments from a debtor's insurance policies. With good reason. The policies at issue here largely provide *shared coverage* to PG&E and the individual director and officers defendants whom PERA has sued.[28]

---

[28] The D&O Liability Insurance Policies that the Debtors believe are applicable to this issue provide shared coverage to the Debtors and their directors and officers of up to $400 million (in excess of retained limits that total $15 million). *See* Confirmation Declaration n.3. In addition to the applicable D&O Liability Insurance Policies, the Debtors maintain coverage dedicated exclusively to the Debtors' directors and officers, which is referred to as Side A "DIC" (difference in condition) coverage, and which is payable under each tower of the applicable D&O Liability Insurance Policies if and only all of the shared coverage available under the respective tower is first exhausted and there is a non-indemnified loss. *See id*.

Payments from those shared coverage policies reduce proceeds otherwise available to the bankruptcy estate. "[F]aced with the typical situation in which a debtor corporation's liability policies provide the debtor and thus the estate with direct coverage against third party claims, virtually every court to have considered the issue has concluded that <u>the policies and clearly the proceeds of those policies are part of debtor's bankruptcy estate</u>, irrespective of whether those policies also provide liability coverage for debtor's directors and officers." *In re Vitek, Inc*., 51 F.3d 530, 534, n.17 (5th Cir. 1995) (emphasis added); *In re Downey Financial Corp*, 428 B.R. 595, 604 (Bankr. D. Del. 2010) ("when there is coverage for both the directors and officers and the debtor, the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution) (quotation omitted); *In re M.F. Global Holdings Ltd*., 515 B.R. 193, 203 (Bankr. S.D.N.Y. 2014) (same).

This near unanimous authority includes the Ninth Circuit. *See In re Minoco Group of Cos., Ltd*., 799 F.2d 517, 519 (9th Cir.1986) (liability policies under which the debtor has or shares a right to coverage are "property of the estate" because "the debtor's estate is worth more with them than without them" and "we see no significant distinction between a liability policy that insures the debtor against claims by consumers and one that insures the debtor against claims by officers and directors"); *see also In re Circle K Corp*., 121 B.R. 257, 261 (Bankr. D. Ariz. 1990) (enjoining securities fraud action on basis that it would "affect[] debtor's property interest" in shared coverage available under director and officer insurance policies, which the court deemed a "valuable estate asset").

Given that this shared insurance is property of the estate, the Plan's Insurance Offset is appropriate and necessary because any payment from the policies is a payment of assets of the bankruptcy estate. Without a deduction for insurance payments actually received, any holder of a HoldCo Rescission or Damage Claim who recovered from the insurance impermissibly would be paid twice by the estate and receive a greater recovery than common shareholders with the same priority. *See e.g.*, *Superior Offshore,* 591 F.3d at 353-54 (deducting "proceeds of the Debtor's available insurance policies" from subordinated securities fraud claim before determining *pro rata* share of assets available for distribution to subordinated claims and shareholders); *In re Sacred Heart Hospital of Norristown,*

182 B.R. 413, 421 (Bankr. E.D. Pa. 1995) (claim of creditor who receives payment from debtor's insurance "would have to be reduced dollar for dollar by the amount of insurance proceeds received").

### (ii) *The Insurance Offset Is Consistent With Securities Law.*

PERA also argues that the Insurance Offset is inconsistent with the liability apportionment provisions of the Private Securities Litigation Reform Act ("**PSLRA**"). PERA Obj. at 15. This assertion rests on the false premise that a dollar-for-dollar reduction to account for payments actually made to a claimant from an insurance policy somehow amounts to a determination of proportionate liability amongst PG&E and the other defendants who have been sued by PERA. That's nonsense. The Plan simply reduces the allowed claim amount to account for insurance proceeds actually received from insurance policies owned by the bankruptcy estate.

PERA cites nothing to establish that this is not perfectly appropriate. Indeed, the PSLRA does not speak to sources of recovery at all, and the federal securities laws explicitly prohibit recovery in excess of actual losses whether a plaintiff recovers through one or multiple actions. 15 U.S.C. § 78bb(a) ("No person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in 1 or more actions, a total amount in excess of the actual damages to that person on account of the act complained of."). As such, nothing in the PSLRA or other securities law conflicts with governing bankruptcy law that requires the Court to deduct proceeds received from a debtor's insurance policy from the allowed amount of a claim asserted against the debtor before determining a claimant's pro rata distribution under a plan of reorganization.

### (c) The Plan Need Not "Account For" Bogus Claims Filed Against The Wrong Debtor.

Finally, PERA claims that "thousands" of purported holders of HoldCo Rescission or Damage Claims filed claims not only against PG&E Corporation – the entity that issued the common stock on which such claims are premised – but also against the Utility – a wholly owned subsidiary that did not issue common stock to the claimants. PERA Obj. at 16. PERA then argues that the Plan violates sections 1122 and 1123(a)(1) and (3) of the Bankruptcy Code because it classifies and treats only the HoldCo Rescission or Damage Claims and not the claims misfiled against the Utility.

This is makeweight. PERA "acknowledge[s] that <u>Ninth Circuit law treats claims against one</u> <u>debtor arising from purchases of the common stock of an affiliated debtor as *pari passu* with the common</u> <u>stock to which they relate (here, HoldCo common stock) and not with the common stock of the entity</u> <u>against which the claims are asserted</u>." PERA Obj. at 16 (citing *In re Del Biaggio*, 834 F.3d 1003, 1014-15 (9th Cir. 2016)) (emphasis added). In other words, the claims asserted by PERA and other securities fraud claimants must receive the exact same treatment whether asserted against PG&E Corporation (HoldCo) or its subsidiary (the Utility). The Plan provides that treatment. Nothing more is required.

### 2. The Plan Does Not Discriminate Unfairly Against HoldCo Rescission Or Damage Claims

PERA argues that the Plan violates section 1129(b) of the Bankruptcy Code because it discriminates unfairly against HoldCo Rescission or Damage Claims. PERA Obj. at 17-18. PERA alleges three forms of "discrimination."

First, PERA asserts that the HoldCo Rescission or Damage Claim Share is a form of discrimination because it does not use PG&E market capitalization as of the Petition Date. *Id.* As shown above, use of the Pre-Disclosure Capitalization is appropriate and not discriminatory. To the contrary, using Petition Date capitalization would be discriminatory against existing shareholders, who would see their interests diluted by far more than the proportionate ownership share properly attributable to the HoldCo Rescission or Damage Claims if they are allowed.

Second, PERA argues that the Insurance Offset is discriminatory. *Id.* at 18. This too is wrong for the reasons stated above. Here again, permitting holders of HoldCo Rescission or Damage Claims to recover from insurance that is an asset of the bankruptcy estate without deduction from the allowed amounts of such claims would unfairly discriminate against current shareholders by improperly diluting their interests.

Third, PERA argues that the Plan discriminates against holders of HoldCo Rescission or Damage Claims by denying them the opportunity to purchase shares through a Rights Offering "potentially" given to current shareholders. *Id.* The Disclosure Statement makes clear that a Rights Offering is just one of several potential ways that the Debtors may raise equity capital to finance the Plan. Disclosure

Statement at 31-32.  If a Rights Offering is conducted and offered to current shareholders, the offering would be made on account of the shareholders' *interests in* PG&E not any *claim against* PG&E.  Holders of HoldCo Rescission or Damage Claims do not have interests in PG&E; they merely hold claims that "have the same priority as" those interests by operation of section 510(b) of the Bankruptcy Code.  The potential to participate in a Rights Offering is not unfairly discriminatory as to those subordinated claims, which are not equity interests.

The Ninth Circuit's decision in *Acequia* is analogous.  There, the proposed plan treated two shareholders differently, giving one but not the other the right to manage the reorganized debtor.  *See, e.g.*, *In re Acequia, Inc.*, 787 F.2d 1352, 1356-57 (9th Cir. 1986).  The Ninth Circuit held that this was not unfair discrimination because the management rights were "separate from" rights arising from those associated with share ownership.  *Id.* at 1363-64; *see also, e.g.*, *In re Peabody Energy Corp.*, 933 F.3d 918, 925 (8th Cir. 2019) ("a reorganization plan may treat one set of claim holders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim") (plan properly provided rights to purchase stock in reorganized debtor to some but not all creditors where "[t]he participating creditors were investors who promised to support the plan, buy preferred stock that did not sell in the Private Placement, and backstop the Rights Offering").

Accordingly, the Plan does not unfairly discriminate as to Class 10A-II, the provisions of section 1129(b) of the Bankruptcy Code are satisfied, and the PERA Objection should be overruled.

The Plan Proponents have made every effort to appropriately address the legitimate and relevant concerns raised by the various parties in interest in these Chapter 11 Cases.  For the reasons stated above and in the Objection Summary Chart, the Plan Proponents believe that the Plan complies with and satisfies all of the requirements of section 1129 of the Bankruptcy Code and, as such, the remaining Objections should be overruled and the Plan should be confirmed.

## V.  CAUSE EXISTS TO WAIVE STAY OF PROPOSED CONFIRMATION ORDER

Bankruptcy Rule 3020(e) provides that: "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P.

3020(e).  The Debtors request that the Bankruptcy Court direct that the Confirmation Order be effective immediately upon its entry, notwithstanding the 14-day stay imposed by operation of Bankruptcy Rule 3020(e).

Under the circumstances and to conserve estate resources and fees, it is appropriate for the Bankruptcy Court to exercise its discretion to order that Bankruptcy Rule 3020(e) is not applicable and permit the Debtors to consummate the Plan and commence its implementation without delay after the entry of the Confirmation Order.  Such relief is in the best interests of the Debtors' estates and all parties in interest and will serve to expedite distributions to Fire Victims.

## VI.    **CONCLUSION**

The Plan complies with and satisfies all of the requirements of section 1129 and the other applicable sections of the Bankruptcy Code.  As such, the Objections should be overruled and the Plan should be confirmed.

Dated: May 22, 2020
        New York, New York

**WEIL, GOTSHAL & MANGES LLP**

**KELLER BENVENUTTI KIM LLP**

By:   */s/ Stephen Karotkin*
        Stephen Karotkin

*Attorneys for Debtors and Debtors in Possession*