1          UNITED STATES BANKRUPTCY COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                     -oOo-

4   In Re:                    ) Case No. 19-30088
                              ) Chapter 11
5   PG&E CORPORATION AND PACIFIC  )
    GAS AND ELECTRIC COMPANY,  ) San Francisco, California
6                              ) Thursday, May 28, 2020
                    Debtor.    ) 10:00 AM
7   _____ )
                                   CONFIRMATION HEARING
8
                  TRANSCRIPT OF PROCEEDINGS
9         BEFORE THE HONORABLE DENNIS MONTALI
               UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES (Via Zoom):
11  For the Debtor:           STEPHEN KAROTKIN, ESQ.
                              THEODORE D. TSEKERIDES, ESQ.
12                            Weil, Gotshal & Manges LLP
                              767 Fifth Avenue
13                            New York, NY 10153
                              (212)310-8000
14
    For Official Committee of  ROBERT JULIAN, ESQ.
15  Tort Claimants:           Baker Hostetler LLP
                              600 Montgomery Street
16                            Suite 3100
                              San Francisco, CA 94111
17                            (415)659-2600

18  For Fire Victim, Patricia  THOMAS TOSDAL, ESQ.
    Garrison:                 Tosdal Law Firm
19                            777 South Highway 101
                              Suite 215
20                            Solana Beach, CA 92075
                              (858)704-4710
21
    For Creditor California   CARA M. PORTER, ESQ.
22  Franchise Tax Board:      Office of the Attorney General
                              455 Golden Gate Avenue
23                            Suite 11000
                              San Francisco, CA 94102
24                            (415)510-3508

25

```
 1   For Securities Lead          ANDREW BEHLMANN, ESQ.
     Plaintiff Public Employees   Lowenstein Sandler LLP
 2   Retirement Association of    One Lowenstein Drive
     New Mexico:                  Roseland, NJ 07068
 3                                (973)597-2500

 4   For Ad Hoc Group of          BENJAMIN P. MCCALLEN, ESQ.
     Subrogation Claim Holders:   Willkie Farr & Gallagher LLP
 5                                787 Seventh Avenue
                                  New York, NY 10019
 6                                (212)728-8000

 7   For William B. Abrams,       WILLIAM B. ABRAMS
     Individual and Tubbs Fire    1519 Branch Owl Place
 8   Claimant:                    Santa Rosa, CA 95409
                                  (707)397-5727
 9
     Also Present:                Mary Wallace
10                                Individual Fire Claimant

11

12

13

14

15

16

17

18   Court Recorder:              LORENA PARADA/ANKEY THOMAS
                                  United States Bankruptcy
                                  Court
19                                450 Golden Gate Ave.
                                  San Francisco, CA 94102
20

21   Transcriber:                 COLIN RICHILANO
                                  eScribers, LLC
22                                7227 N. 16th Street
                                  Suite #207
23                                Phoenix, AZ 85020
                                  (973)406-2250
24

     Proceedings recorded by electronic sound recording;
25   transcript provided by transcription service.
```

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1     SAN FRANCISCO, CALIFORNIA, THURSDAY, MAY 28, 2020, 10 AM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  This is the bankruptcy court for the

5     Northern District of California.  Court is now in session, the

6     Honorable Dennis Montali presiding.

7            THE COURT:  Sorry, I was muted.

8            Good morning, everyone.

9            THE CLERK:  Good morning.

10           THE COURT:  Can you hear me now, Ms. Parada?

11           THE CLERK:  Yes, Your Honor, I can.  One moment while

12    I move the -- while I join counsel.

13           MR. KAROTKIN:  Good morning, Your Honor.

14           THE COURT:  Good morning.  Can you hear me all right,

15    Mr. Karotkin?

16           MR. KAROTKIN:  Yes, sir.

17           THE COURT:  Okay.  Mr. Tsekerides put his tie back on.

18           MR. TSEKERIDES:  I did, Your Honor.

19           THE CLERK:  Would you like me to join Mr. Wells now,

20    Your Honor?

21           THE COURT:  Yes.  And did you tell me Mr. Julian is

22    coming into the --

23           THE CLERK:  Yes.

24           THE COURT:  -- panel, also?  All right.

25           THE CLERK:  Yes, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1        THE COURT:  Good morning, Mr. Tosdal.  You can unmute

2    yourself.

3        MR. TOSDAL:  Good morning, Your Honor.  How are you?

4        THE COURT:  All right.  Thank you.

5        MR. TOSDAL:  Well, I took Mr. Tsekerides as my

6    tutorial model, and now he's crossed me up.

7        THE COURT:  I've still got my robe on, too.  Look it,

8    Mr. Karotkin took his coat off at long last.  Now we're getting

9    totally informal.  Wait until next week.

10        MR. KAROTKIN:  Bermuda shorts.

11        THE COURT:  All right, I can see Mr. Wells.

12        Mr. Wells, you need to unmute your microphone.

13        MR. WELLS:  Good morning, Your Honor.

14        THE COURT:  Good morning.

15        Mr. Julian?

16        MR. JULIAN:  Good morning, Your Honor.

17        THE COURT:  All right.  Mr. Wells, you don't need to

18    stand, but you need to raise your right hand and Ms. Parada

19    will swear you in.

20        (Witness sworn.)

21        THE CLERK:  Thank you.  Please state your name for the

22    record.

23        THE WITNESS:  My name is Jason Patrick (phonetic)

24    Wells.

25        THE COURT:  Thank you.  Thank you, Mr. Wells.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Mr. Karotkin or Mr. Tsekerides, anything we need to

2     talk about, or are you ready to go to the trial?

3          MR. TSEKERIDES:  We're ready to go.  I just wanted to

4     move in Mr. Wells' declaration and the exhibits.  And as I

5     mentioned yesterday, there were no objections to any of the

6     exhibits, but as a matter of formality, I did want to move

7     those into the record.

8          THE COURT:  Okay.  They'll be in evidence.

9       (Jason Well's declaration and attachments were hereby

10    received into evidence as Debtor's Exhibit, as of this date.)

11         THE COURT:  Mr. Tosdal, you were the first requester

12    and you asked for twenty-five minutes, so you're up.  This

13    is --

14         MR. TOSDAL:  Thank you, Your Honor.

15         THE COURT:  -- cross-examination.

16         MR. TOSDAL:  Can I ask --

17         THE COURT:  Cross-examination of Mr. Wells.

18         MR. TOSDAL:  Thank you.  Tom Tosdal for Patricia

19    Garrison.

20    CROSS-EXAMINATION

21    BY MR. TOSDAL:

22    Q.   Good morning, Mr. Wells.

23    A.   Good morning.

24    Q.   I'm going to ask you about the putting of the public

25    entities wildfire claims, subrogation wildfire claims, and fire

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  victims' claims into three separate classes.  You with me?

2  A.   Okay.

3  Q.   All right.  Now, the first subject is the nature of the

4  claims.  The liability claims against PG&E of those three

5  groups are virtually identical, true?

6  A.   I --

7          MR. TSEKERIDES:  Object to the form, Your Honor, to

8  the extent it calls for a legal conclusion, but I think he can

9  answer it, but --

10          THE COURT:  Okay.  You can answer if you understand

11  the question, Mr. Wells.

12  A.   I would disagree with that characterization.

13  Q.   Okay.  So all three of these groups, in their legal claims

14  against PG&E, have claimed that PG&E is liable to them for

15  negligence, correct?

16  A.   These -- these claims were filed under various theories of

17  liability, including strict liability.  And I know many were

18  filed with -- with negligence, but I can't speak to all of

19  them.

20  Q.   All right.  But is it your understanding that all three

21  groups claimed damages from PG&E for alleged negligence by

22  PG&E?  Isn't that true?

23  A.   I can't speak to every claim, but yes, many have.  Many

24  did.

25  Q.   Oh.  All right.  And that all three groups claim that PG&E

1  was liable under inverse condemnation, true?

2  A.    That's true.

3  Q.    All three groups claimed PG&E was liable for nuisance,

4  correct?

5        MR. KAROTKIN:  Your Honor, I would object.  The claims

6  have been filed and speak for themselves.  Mr. Wells is not a

7  lawyer and hasn't reviewed all the claims to see what 87,000

8  claims say.

9        THE COURT:  Well, Mr. Tosdal, what are you trying to

10  establish here?  Give me a clue as to where we're going and

11  I'll decide whether we're going to go.

12        MR. TOSDAL:  Yes.  This witness has put in a

13  declaration, Your Honor, claiming that the claims of these

14  various groups are different and, in fact, distinct.  And in

15  fact, they're virtually identical, and that's where I'm going,

16  so.

17        THE COURT:  But I mean, that's an argument.  I mean,

18  why -- the witness might slightly disagree with you, but he's

19  entitled to disagree and you're entitled to argue whether

20  that's of any legal consequence.  So I mean, I guess I'm saying

21  where are we going with the legal consequence of the question.

22        Go ahead and go a little further, but I --

23        MR. TOSDAL:  Yeah.

24        THE COURT:  -- I don't think --

25        MR. TOSDAL:  Sure.  The --

(973) 406-2250 | operations@escribers.net | www.escribers.net

1        THE COURT:  -- I don't this to be a argument.

2        MR. TOSDAL:  The legal -- I'm sorry.  The legal

3   consequence, Your Honor, in order for there to be a factual

4   predicate for an argument, there needs to be a basis in the

5   testimony and the exhibits.

6        THE COURT:  Well, there is the basis in the testimony.

7   So go ahead.  I'm letting you go forward.

8   BY MR. TOSDAL:

9   Q.   All right.  So Mr. Wells, just to bundle up my next series

10  of questions that the public entities, the subrogation

11  plaintiffs, and the individual plaintiffs all claim liability

12  by PG&E based upon nuisance, trespass, violation of Public

13  Utilities Code 2106, and violation of Health and Safety Code

14  13007, true?

15  A.   I haven't reviewed every single claim, but I know that

16  many of them have included that -- those theories of liability.

17  Q.   Those theories of liability; did I hear you correctly?

18  A.   That's right.

19  Q.   Okay.  Super.

20       Now, the claims of all three groups, meaning the -- can I

21  call subrogation subro -- meaning subro, public entities, and

22  fire victims all were disputed, correct?

23  A.   Yes.

24  Q.   Unliquidated, correct?

25       MR. TSEKERIDES:  Your Honor, I'm going to interject

1    here and I'm going to invoke the Montali relevance rule, which

2    was what would answer do to help Court make a decision.  We can

3    argue all of this next week when we take up all the legal

4    issues, but I think if we're going to spend twenty-five minutes

5    going over these issues -- I mean, people filed what they filed

6    and some claims are liquidated, some are not.  So we can argue

7    that next week, but can we get to the issue of classification

8    from a factual perspective without getting into every single

9    claim?

10            THE COURT:  Yeah.  I'm going to agree with him on

11   that, Mr. Tosdal.  I think you need to go forward.  I

12   understand your point about establishing the question, but

13   his -- Mr. Wells' declarations establish his view and the

14   company's view, and even if Mr. Wells weren't testifying, the

15   plan itself says all the things that you've just asked about,

16   and you can argue --

17            MR. TOSDAL:  Well --

18            THE COURT:  -- later that therefore -- therefore what?

19   Therefore they're not properly classified.  But it's not a fact

20   question.  It's a legal question.

21            MR. TOSDAL:  Well, I disagree, Your Honor.

22            THE COURT:  Okay.

23            MR. TOSDAL:  If I may, briefly on that is because

24   PG&E's reply says that the fire victims' claims are

25   unliquidated and contingent, but is completely silent on the

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    others.  And all --

2            THE COURT:  What difference does it make?  That

3    doesn't make a difference.  In other words, class -- if you

4    read my decision of a couple of days ago, I --

5            MR. TOSDAL:  I did.

6            THE COURT:  Whether a claim is liquidated or

7    unliquidated has nothing to do with how it's to be classified.

8    I think you're mixing what you classify with what happens when

9    there is a classified.

10           MR. TOSDAL:  Correct.

11           THE COURT:  You (indiscernible) contingent.  Mr.

12   Karotkin and I have had disagreements in the past, my view is

13   none of the claims, not a single one, is contingent, but most

14   of them are unliquidated and some of them are liquidated.  But

15   so what?  They are in a class that exists only in the

16   bankruptcy world because in state law, outside of bankruptcy,

17   for example, maybe the subrogation claims would be treated the

18   same, maybe not.  I realize that gets more complicated.

19           But let's go back to what you should be asking Mr.

20   Wells about.  I'm sustaining the objection, but let me --

21   please go forward.

22           MR. TOSDAL:  All right.  Well, Your Honor, trying to

23   make a record here.

24           THE COURT:  That's okay.  You have a right to.

25           MR. TOSDAL:  Thank you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1  BY MR. TOSDAL:

2  Q.   So Mr. Wells, in page 8, paragraph 21, line 4 through 5 of

3  your declaration, you say words to the effect that the claims

4  and interests in each class differs in a legal and factual way.

5  How do the claims and interests in the fire victims' class

6  differ from the subro class?

7         MR. KAROTKIN:  Mr. Wells -- Your Honor, I don't know

8  whether Mr. Wells has his declaration in front of him and if

9  Mr. Tosdal is referring to particular lines, I think Mr. Wells

10  should be able to look at that.

11         THE COURT:  Oh, of course.  I assumed he had it.

12         Mr. Wells, do you have your own declaration there?

13         THE WITNESS:  Yeah, but I have it set aside.  If I

14  could take a minute to turn to the page.

15         THE COURT:  And I think -- I think he was referring

16  you to page 8 at line 21, which is what I'm looking at.

17         MR. TOSDAL:  That's page 8 of the text, Your Honor,

18  not the filing page.

19         THE COURT:  Ahh.  Okay.  I think they're one page off,

20  I think.

21         Mr. Tosdal, you asked him about whatever page number

22  and convention you want, just make sure we know for the record,

23  and so he knows and I know which one you're asking.  So if

24  you're looking at the text one, that's page 8, which is page 9

25  of the filing page.

1           MR. TOSDAL:  Yes, sir.

2           THE COURT:  You got that, Mr. Wells?

3           THE WITNESS:  I do.  Yes, Your Honor.

4           MR. TSEKERIDES:  Was it line 21 or was it paragraph

5    21?

6           MR. TOSDAL:  Paragraph 21.

7           MR. TSEKERIDES:  Okay.

8           MR. TOSDAL:  Lines 4 through 5.

9    A.   I see that reference.

10   BY MR. TOSDAL:

11   Q.   Okay.  So let me repeat the question, Mr. Wells.  In your

12   declaration, at that point you indicate that the claims and

13   interests in each class differ from the other classes in a

14   legal or factual way.  Do you see that?

15   A.   I do.

16   Q.   All right.  So how do the claims and interests of the

17   subro class differ from the fire victim class in the legal or

18   factual way?

19          THE COURT:  Well, I'm going to interrupt you, Mr.

20   Tosdal, because you're confusing some bankruptcy concepts.

21   The word "interests" means --

22          MR. TOSDAL:  Could be.

23          THE COURT:  -- is an equity position.  So an interest

24   holder doesn't hold a claim, by definition.  So the issue that

25   I think you're dwelling on or focusing on has to do with where

1   the various claims have been put, not interests.  Interests are

2   the shareholders and you --

3               MR. TOSDAL:  Well --

4               THE COURT:  -- you'll notice the shareholders are

5   subject --

6               MR. TOSDAL:  Oh, I see.  Thank you, Your Honor.

7               THE COURT:  -- or supposed to be, in bankruptcy

8   matters.  Okay.

9               MR. TOSDAL:  There's a lot I have to learn about this

10  world of yours.

11              THE COURT:  That's okay.  Go ahead.  And so we're

12  just -- Mr. Wells doesn't need to focus on the interests.  He's

13  talking about claims, and then go ahead with the question.

14  BY MR. TOSDAL:

15  Q.   Do you have it in mind, sir, or do you want me to repeat

16  it?

17  A.   If you don't mind repeating it, I would appreciate it.

18  Q.   All right.  How do the claims of the subro class differ

19  from the claims of the fire victims' class in a legal or

20  factual way?

21  A.   I think a couple of things.  First, the subrogation claims

22  are an indirect result of the -- the damage from the fires.

23  The other thing that I would point to is that the subrogation

24  claims are -- are exclusively focused on property damage, and

25  claims of the -- the direct claims of the fire victims are

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    focused on property damage as well as nonproperty-related

2    claims, as well.

3    Q.   Okay.  Let's start with the second reason.  Are you aware

4    that the subrogation claims include claims for wrongful death

5    and survival?

6    A.   I'm not aware of that, specifically.

7    Q.   Okay.  And when you say the subrogation claims are

8    indirect, is it true that without the harm to the fire victim

9    there would be no subrogation claim, and the subrogation

10   plaintiff steps into the shoes of the fire victim, to the

11   extent that the subrogation insurer has paid insurance benefits

12   to that victim?

13           MR. TSEKERIDES:  Your Honor, I'm just going to object

14   to the extent it calls for a legal conclusion, but I will --

15           THE COURT:  Yeah.  Okay.

16           MR. TSEKERIDES:  -- allow it.

17           THE COURT:  Noted.

18           Go ahead, Mr. Wells.  You don't have to get a legal

19   conclusion, just --

20           THE WITNESS:  Yes, I under -- thank you, Your Honor.

21   A.   Yes.  I understand that the subrogation claims from --

22   comes from the payment to the insured party that received

23   damage.

24   Q.   Okay.  And that damage could be from property damage or

25   personal injury or death, correct?

1          MR. TSEKERIDES:  Object to the form, Your Honor.  It

2    does call for facts not in evidence; that's just Mr. Tosdal's

3    statement.

4          MR. TOSDAL:  No, it's a question, sir.

5          THE COURT:  Well, no.  I mean --

6          MR. TSEKERIDES:  Well, it's a question predicated on a

7    fact that hasn't been established.

8          MR. TOSDAL:  Well --

9          THE COURT:  Yeah.  Mr. Tosdal, you're -- Mr. Tosdal --

10         MR. TOSDAL:  This witness will establish that, so.

11         THE COURT:  No, but you said --

12         MR. TSEKERIDES:  Um-hum.

13         THE COURT:  -- Mr. Tosdal, you said twice that subro

14   claims include personal injury and wrongful death, and it's my

15   understanding that they do not.  They are only reimbursing the

16   victim for property loss.

17         MR. TOSDAL:  It depend --

18         THE COURT:  If I'm incorrect -- if I'm incorrect --

19         MR. TOSDAL:  It depends on the -- I'm sorry, Your

20   Honor.  It depends on the policy.  If you look at the

21   subrogation master complaints, it covers wrongful death and

22   survivorship.

23         THE COURT:  Okay.  I'll concede the point.  Go ahead

24   and you can ask the -- you can let --

25         Mr. Wells, you can answer the question.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1   A.   I -- I was not aware that the subrogations claim included

2   anything but property-related damage.

3   Q.   All right.  So let's go to the same question, but for the

4   public entities.  How are the public entity claims different in

5   a factual or legal way from the fire victim claims?

6   A.   Similar to my -- my previous response, I would -- I would

7   cite that the public entity claims were focused on property-

8   related damage and did not include things like personal injury

9   damage that were pursued by the individual fire victims.

10  Q.   Okay.  All right.

11       So anything else, in terms of the differences between the

12  classes in a legal or factual way, referencing paragraph 21 of

13  your declaration?

14  A.   I would also point out, it was informed by the way that we

15  have resolved these claims historically.

16  Q.   Meaning?

17  A.   Meaning, for instance, subrogation claims were represented

18  and treated differently and were settled as indistinct classes

19  in fires that -- that predated the '17 and '18 wildfires here.

20  Q.   You're referring to historical settlements with the subro

21  group in all the other fires that PG&E has started?

22            MR. TSEKERIDES:  Object to the form, Your Honor.

23            THE COURT:  No, you can answer.  Go ahead, Mr. Wells.

24  A.   I was referring to the settlement of previous subrogation

25  claims.  We had experience with a previous fire, as well as

1    other operational incidents.

2    Q.    All right.  So you're referring to settlements, right?

3    Prior settlements?

4    A.    That's right.

5    Q.    All right.  So let's switch to the next subject.  In terms

6    of who is in each class, all right, public entities' class has

7    nineteen public entities, correct?

8    A.    Yes.

9    Q.    All right.  And how many public entities are in the fire

10   victim class?  More?

11   A.    Do you -- do you mind repeating the question?

12   Q.    Sure.  How many public entities are in the fire victim

13   class?

14   A.    I don't recall.

15   Q.    More than nineteen, right?

16   A.    Yes.

17   Q.    All right.

18   A.    Substantially more.

19   Q.    Yeah.  Okay.  And so the interests of PG&E, in terms of

20   public entities being a home to their infrastructure and having

21   an ongoing relationship with the public entities, is the same

22   for the public entities in the public entities' class as it is

23   for the public entities in the fire victim class, correct?

24   A.    Not completely.

25   Q.    What's the difference?

(973)406-2250 | operations@escribers.net | www.escribers.net

1    A.    Well, we do provide energy service, gas and electric

2    service, similarly between the two classes.  We have different

3    relationships with local governments or local municipalities in

4    terms of, you know, working through, for example, things like

5    permitting or other, related governmental matters.

6    Q.    But those type of public entities that you're referring to

7    are also included in the fire victim class, correct?

8    A.    I don't recall specifically.

9    Q.    Do you argue with that statement?

10            MR. TSEKERIDES:  Again, Your Honor, if it's a fact, we

11   can argue that next week, but to ask him if he --

12            THE COURT:  Yeah.

13            MR. TSEKERIDES:  -- argues with the statement, I don't

14   think that's an appropriate question.

15            MR. TOSDAL:  I can press the witness, Your Honor.

16            THE COURT:  Yeah, but he said -- he says that he

17   doesn't recall.

18            I'll overrule it.  If you can rephrase the question or

19   ask him again, if you'd like, Mr. Tosdal.

20            MR. TOSDAL:  Sure.

21   Q.    Do you dispute the fact that the same type of interests

22   that PG&E and you say in your declaration you have with the

23   public entities in the public entity class, PG&E also has with

24   the public entities in the fire victims' class?  You just

25   said --

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    A.    As I -- I don't recall public entities being in the fire

2    victims' class.  I've looked at these as three separate classes

3    throughout the -- the case, and so I -- I don't know about

4    public entities also being in the fire victims' class.

5    Q.    Aren't there state, federal, and local agencies and public

6    entities in the fire victims' class?

7    A.    You're right.  Yes.

8    Q.    All right.  Okay.  So let's go to subrogation.

9          The subrogation class has two types in it, right?  One are

10   insurers who paid benefits to their insureds, correct?

11   A.    That's correct.

12   Q.    The other are PG&E investors who have purchased

13   subrogation claims against their own company, correct?

14   A.    I don't -- I don't know if all of -- what I would say is

15   that there are financial institutions that hold some of the

16   subrogation claims against the company, yes.

17   Q.    Yes.

18   A.    But if they all owned stock in the company, I don't recall

19   specifically.

20   Q.    Not my question, sir.  Some investors in PG&E bought

21   subrogation claims against their own company, correct?

22   A.    That is correct.

23   Q.    Yeah.  The largest of which is Baupost, B-A-U-P-O-S-T,

24   correct?

25   A.    That is correct.

1   Q.   Which holds over six billion dollars in subrogation claims

2   against the company, correct?

3   A.   I believe that's correct.

4   Q.   All right.  And Baupost also is, and has been, an

5   investor, holding many common shares in PG&E, correct?

6           MR. TSEKERIDES:  Your Honor, I am going to object at

7   this point.  I don't think that's relevant to any of the

8   discussions of the classification issue, who holds those

9   claims.  They are what they are.

10          MR. TOSDAL:  It goes to fairness, Your Honor.

11          THE COURT:  Well, it -- well, it may be broader than

12  classification, but it's within the scope of the testimony of

13  Mr. Wells, and he can be cross-examined about it, so I'll

14  overrule the objection.

15          MR. TSEKERIDES:  Very good.

16          MR. TOSDAL:  Thank you, Your Honor.

17          THE COURT:  But --

18          THE WITNESS:  I apologize.  Do you mind repeating the

19  question?

20          THE COURT:  Okay.

21          MR. TOSDAL:  Sure.  No, I don't mind.

22          Sorry.

23  Q.   Baupost owns many common shares of stock in PG&E, correct?

24  A.   They do.

25  Q.   And do you understand that Baupost bought those

1  subrogation claims at a discount, meaning less than a hundred

2  percent on the dollar?

3  A.    I do.

4  Q.    And do you understand that the lowest price by which

5  Baupost and other PG&E investors purchased shares, purchased

6  subrogation claims, was thirty or thirty-five cents on the

7  dollar, correct?

8  A.    I don't -- I do not know that specifically.

9  Q.    Um-hum.  But you do know that there was a substantial

10  discount in the purchase price by PG&E investors of subrogation

11  claims, correct?

12  A.    I have heard that those claims were sold at a substantial

13  discount.  I can't confirm the level of that discount.

14  Q.    Okay.  But that's your understanding; that there was a

15  substantial discount in the purchase of those subro claims,

16  right?

17  A.    That's right.

18  Q.    Okay.  So when this bankruptcy ends and the subro class is

19  paid eleven billion dollars cash, those PG&E investors who

20  purchased subro claims against their own company at a

21  substantial discount, stand to make a big profit, correct?

22       MR. KAROTKIN:  Your Honor, I would object.  That is

23  completely irrelevant to an issue related to confirmation of

24  the plan.

25       MR. TOSDAL:  They're earnest, Your Honor.

1           MR. KAROTKIN:  They are claims to create -- may I --

2     may I finish?  May I finish?

3           THE COURT:  Mr. Tosdal, let him finish, please.

4           MR. KAROTKIN:  There are -- as Your Honor knows better

5     than anybody, there are claims traded all of the time in

6     Chapter 11 cases, and that issue is completely irrelevant to

7     classification, and completely irrelevant to any issue under

8     Section 1129(a), and any recovery they may get on their claims

9     because they purchased them at a discount is just irrelevant.

10          THE COURT:  Well, Mr. Tosdal, let's go back to my

11    point that I made yesterday.  Why is it helpful for me to make

12    a  determination?  It is a fact of life that claims are traded

13    at discounts in lots of companies.  Why is it relevant to my

14    determination of whether this plan should be confirmed?

15          MR. TOSDAL:  Because, Your Honor, when we started this

16    case I remember you told everybody on the record, first

17    hearing, that the most important group in this case to be taken

18    care of are the fire victims.  And instead, what is happening

19    here is that the fire victims are getting stock instead of

20    cash. And the effect of that is to provide -- let me finish,

21    please -- the effect of that is to provide investors in this

22    company who have purchased subrogation claims at a discount

23    with billions of dollars of profit; that is the reality.

24    Whether it's customary for there to be a second market, I don't

25    care.

1           THE COURT:  Well, Mr. Todal, I'm going to --

2           MR. TOSDAL:  In all fairness --

3           THE COURT:  The fairness -

4           MR. TOSDAL:  Excuse me.  Let me finish.  In terms of

5    fundamental fairness.

6           THE COURT:  Mr. Tosdal, this is not relevant to this

7    issue.  This issue --

8           MR. TOSDAL:  What isn't?

9           THE COURT:  The fact that an investor, whether it be

10   Baupost or Joe Blow, bought a claim at a discount has nothing

11   to do with how that person is going to be treated -- I mean,

12   how that person will end up being treated.

13          Your argument tells me that you or your clients don't

14   like the plan.  But the plan isn't going to turn on the

15   discount rate that an investor paid or didn't pay.  I mean, the

16   fact of the matter is a subrogation creditor who didn't sell

17   his claim at a discount is going to be treated the same as a

18   speculator who bought another subrogation claim at a discount.

19   It doesn't matter.  It's irrelevant to -- it's irrelevant to

20   the analysis for bankruptcy purposes what the holder of the

21   claim bought and paid for to get the claim.

22          So I'm going to sustain the objection on that ground.

23   It's a fact.

24          MR. TOSDAL:  Let me just say one --

25          THE COURT:  And it's also a fact, and you can argue,

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  again, that the stock deal is bad and people that bought

2  stock -- bought claims at a discount shouldn't be making money.

3  I don't take a -- I don't quarrel with your argument, but it's

4  not something that has any relevance to my issue.

5         Go ahead.

6         MR. TOSDAL:  But, Your Honor, my understanding is your

7  job, at the end, is to determine if this plan is fundamentally

8  fair.

9         THE COURT:  Well, consistent with the Bankruptcy Code.

10        MR. TOSDAL:  Yes, yes.

11        THE COURT:  But I don't just make a judgement on who I

12  think made a better investment decision.

13        MR. TOSDAL:  Well, that's one way to look at it, Your

14  Honor, investment decisions.  Another way to look at it is how

15  are the people being treated?

16        THE COURT:  You know --

17        MR. TSEKERIDES:  But Your Honor, we can argue this

18  next week, but that class that Mr. Tosdal's client is in

19  overwhelmingly voted for this plan.

20        MR. TOSDAL:  Right.

21        MR. TSEKERIDES:  So the fact that his client doesn't

22  like it is really not relevant.

23        THE COURT:  Mr. Tosdal --

24        MR. TOSDAL:  Well, I appreciate that, Mr. Tsekerides.

25        THE COURT:  -- Mr. Tosdal, time out.  Hold on, hold

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    on.

2             Yesterday, I read an interesting article in the New

3    Yorker about Zoom, and --

4             MR. TOSDAL:  I read that, too.

5             THE COURT:  -- last year, some people, including a

6    member of the Golden State Warriors, bought some Zoom stock at

7    about thirty bucks a share.  You know what it's worth today?

8    A lot more, because we're here on Zoom.  And that's life in the

9    big city.  And you know what?  There's also a lot of people

10   that bought a lot of stock in Hertz last year, and where are

11   they?  It's not anything we can do anything about in this

12   bankruptcy.

13            So go ahead and go back to your questions, other

14   questions.

15            MR. TOSDAL:  All right, Your Honor.

16   BY MR. TSEKERIDES:

17   Q.   Okay.  So let's go to the final subject, okay -- Mr.

18   Wells, we forgot about you for a little bit -- and that is, you

19   were involved in the negotiations with each of these classes

20   that resulted in the settlements, correct?

21   A.   In various fashions, yes.

22   Q.   Yeah.  Were the public entities, the settling public

23   entities and the public entities' class offered stock by PG&E?

24            MR. TSEKERIDES:  Your Honor, I am going to interject

25   here.  There was a mediation in which that settlement came out

1    of and if -- I don't think Mr. Wells should be disclosing what

2    happened in the mediation.  And the fact that the deal is

3    whatever the deal is at this point, what happened to get there

4    I don't think is relevant.  And to the extent it's going to

5    disclose a mediation privilege, I think we have to tread

6    lightly there.

7              THE COURT:  I agree, Mr. Tosdal.  I'm not going to --

8    I'm not going to go into what was negotiated.  That isn't the

9    deal.  You can stick with the current deal.

10             MR. TOSDAL:  All right.  I note for Your Honor that

11   Mr. Wells' declaration says he was involved in the

12   negotiations, which does invite questions, but --

13             THE COURT:  Well, but he doesn't disclose specifics.

14   He doesn't disclose that, you know, creditor A opened with an

15   offer to buy stock, but we countered by -- offered to pay him

16   money.  I mean, he's not disclosing the details of the

17   negotiations.

18   Q.   All right.  So the fire victims' class is the only class

19   out of, what, thirty-three or thirty-four that gets stock; is

20   that correct, Mr. Wells?

21   A.   I believe that's correct, yes.

22   Q.   All right.  And once that stock is conveyed to the fire

23   victims' class, it is at risk of losing value, correct?

24             MR. TSEKERIDES:  Again, Your Honor, I'm going to

25   object.  The plan has already been voted on.  It is an

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   objection to relevancy at this point that those aren't issues

2   that will help you make a decision in this case.

3            THE COURT:  Well, I know.

4            But Mr. Tosdal, I'll tell you what.  I'll let you ask

5   that question if you'll ask if it's also at risk at going up in

6   value.

7            MR. TOSDAL:  Okay, Your Honor.  Will do.

8            THE COURT:  Okay?

9            MR. TOSDAL:  I don't think that's a risk.  That's a

10  benefit.

11           THE COURT:  (Indiscernible).

12           MR. TOSDAL:  And I'll ask him about risk.

13           THE COURT:  Mr. Wells, is it fair to say that anybody

14  who acquires PG&E stock, whether under this plan or out in Wall

15  Street in the marketplace, is taking a risk of losing value or

16  a risk of increasing value?  Isn't that the statement that's a

17  fair conclusion?

18           THE WITNESS:  That's correct, Your Honor.

19           THE COURT:  Okay.  Mr. Tosdal, what else do you want

20  to ask about it?  You have more?

21  BY MR. TOSDAL:

22  Q.   Now, I want to ask about this.  Mr. Wells, do you agree

23  with the statement of Judge Alsup that Pacific Gas & Electric

24  Company -- they're the single largest privately-owned utility

25  in America -- cannot safely deliver power to California?

1  A.    I believe we can safely deliver electricity and gas to

2  California.  We have accepted responsibility for these

3  devastating and deadly fires, but he have embarked on one of

4  the most ambitious programs to mitigate the risk of future

5  catastrophic fires.  And I believe we're seeing the results of

6  that program, and I'm confident we can provide safe service

7  going forward.

8  Q.    So you disagree with Judge Alsup on that issue, yes, Mr.

9  Wells?

10  A.    I do -- I do disagree that --

11  Q.    Okay.

12  A.    Yeah.

13  Q.    So in your view of what happens to the stock, if and when

14  there is another catastrophic PG&E fire this coming fire

15  season --

16          MR. TSEKERIDES:  Your Honor, again --

17          THE COURT:  That's irrelevant.  I'm sorry, that's

18  irrelevant.  You don't have to answer that, Mr. Wells.

19          MR. TOSDAL:  All right.

20          THE COURT:  So we're just about up.  You requested

21  twenty-five, but I have engaged in a question or two, so you

22  have a little more time if you like.

23          MR. TOSDAL:  All right.

24  Q.    One last question, Mr. Wells, if I can get it out.  How

25  many fire seasons will the fire victim trust have to hold the

1    stock it gets from this plan?

2           MR. KAROTKIN:  Your Honor, I'll object to that

3    question.  I don't even understand the question.

4           THE COURT:  I'm going to overrule the question --

5    overrule the objection because the trustee is the one who is

6    going to be holding the stocks, and Mr. Wells, as far as I

7    know, has no role to play in the disposition of the stock under

8    the plan.

9           Is that correct, Mr. Wells --

10          MR. TOSDAL:  All right.

11          THE COURT:  I'll ask.

12          Mr. Wells, you don't have any role to play, do you, in

13   what the trustee does with the stock?

14          THE WITNESS:  That's correct, Your Honor.

15          THE COURT:  Okay.  So I'm not going to let -- I'll

16   sustain the objection.

17          MR. TOSDAL:  You mean sustain, not overrule, Your

18   Honor?

19          THE COURT:  I'm sustaining.

20   Q.   Yeah.  Then that brings up the question that I was getting

21   to, which is there a registration of rights agreement in effect

22   as of today governing the sale of the stock by PG&E investors

23   as opposed to the fire victims' trust?

24   A.   I'm not aware of a registration rights agreement that

25   exists today that is an ongoing item for negotiation.

1  Q.   I didn't understand that.  There's no agreement?

2  A.   There's no agreement today.  We continue to negotiate the

3  nature of that registration rights agreement.

4          MR. TOSDAL:  Thank you, Mr. Wells.  It was a pleasure.

5          THE COURT:  Thank you, Mr. Tosdal.  It's a pleasure to

6  have you.  We're going to escort you into the audience now

7          MR. TOSDAL:  Okay.

8          THE COURT:  And Ms. Parada, let's please bring in our

9  next witnesses.

10         Thank you, Mr. Tosdal.  Have a good day.

11         MR. TOSDAL:  Thank you, Your Honor.

12         THE COURT:  Stay tuned.

13         Now, Mr. Julian, you're muted, but I assume you want

14  to stay on the screen.  And again, this is the Zoom phenomenon

15  now of people that are put on a screen that maybe don't want to

16  be.  So I'm assuming you chose to be there because of your role

17  in the case, but if you want to leave, we can take you out, or

18  if you -- whatever you like.

19         MR. JULIAN:  I'm comfortable, Your Honor.  Thank you.

20         THE COURT:  Okay.  You have to look at me this whole

21  time to see --

22         THE BAILIFF:  Your Honor, would you like me to bring

23  in Ms. Porter and Mr. --

24         THE COURT:  Yes, Ms. Porter, and then Mr. Behlmann.

25  Ms. Porter first.  Oh, you can bring them in in sequence, but

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Ms. Porter's the next attorney to ask questions.

2              Good morning, Ms. Porter.  You need to unmute

3    yourself.  Can you hear me all right?

4              MS. PORTER:  Good morning, Your Honor.  Thank you.

5              THE COURT:  Can you hear me?

6              MS. PORTER:  I can hear you, Your Honor.

7              THE COURT:  All right.  You have requested fifteen to

8    twenty minutes to question Mr. Wells, so have at it.  He's

9    there on the screen.

10             MS. PORTER:  Thank you, Your Honor.

11   CROSS-EXAMINATION

12   BY MS. PORTER:

13   Q.   Good morning, Mr. Wells.

14   A.   Good morning.

15   Q.   My name is Cora Porter, and I represent the California

16   Franchise Tax Board, who I will refer to as FTB during this

17   questioning.  I want to remind you you're still under oath, and

18   I would like to start with letting you know that today, I'm

19   going to ask you some questions regarding your understanding or

20   your knowledge of certain things, and I want to start out with

21   saying I'm not seeking any communications that you may have

22   with your attorneys; do you understand?

23   A.   I do.

24   Q.   I will refer to debtors, collectively, as PG&E.  Are you

25   all right with that?

Wells - Cross

1   A.   Yes, I am.

2   Q.   Thank you.  Are you aware that FTB filed claims as to both

3   debtors?

4   A.   I am.

5   Q.   Are you aware that FTB asserts priority tax claims at to

6   both debtors?

7   A.   I am.

8   Q.   I'd like to ask you about your declaration.  And for ease,

9   I just intended to pull it up on the screen; is that all right?

10  A.   Yes, it is.

11  Q.   Okay.  Thank you.  Okay.  So I've pulled up onto the

12  screen the declaration of Jason Wells, filed as document number

13  7510 on the docket.  Mr. Wells, do you see the declaration on

14  the screen?

15  A.   I do, thank you.

16  Q.   Do you recognize this as your declaration?

17  A.   I do.

18  Q.   Okay.  I'm going to jump to page 20 of this declaration --

19  I'm sorry, 20 of the document, which happens to be 19 on the

20  screen.  Scrolling down to the bottom, Mr. Wells, this is a

21  signature line, and there's an "F/S" with your name; do you see

22  that?

23  A.   I do.

24  Q.   Attorneys use this F/S to indicate that someone has signed

25  a wet signature.  Did you, in fact, sign a wet copy of your

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1  declaration here?

2  A.  I did.

3  Q.  Okay.  Thank you.  And did you review the declaration for

4  accuracy before you signed it?

5  A.  I did.

6  Q.  Is everything that's in this declaration true and correct

7  to the best of your knowledge?

8  A.  It is.

9  Q.  Thank you.  I'm going to move, now, to page 18, and I'm

10  going to ask you about paragraph 67 of your declaration.  Do

11  you see that on the screen there?

12          THE CLERK:  Ms. Porter?  Ms. Porter, this is --

13          MS. PORTER:  Yes?

14          THE CLERK:  This is the clerk.  I interrupt.  Judge

15  Montali has -- we've lost the connection.

16          MS. PORTER:  Okay.

17          THE CLERK:  Can you please hold your examination while

18  we get him back on?

19          MS. PORTER:  Yes.

20          THE CLERK:  Thank you.

21          MS. PORTER:  Yes, thank you.

22      (Pause.)

23          THE CLERK:  And Judge Montali is joining now.

24          THE COURT:  Yeah, I don't know what in the world

25  happened, but I got sent out there for a long time.  All right.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    I wasn't --

2            MS. PORTER:  Your Honor, where did we lose you?

3            THE COURT:  Okay.  Ms. Porter, I got kicked out of the

4    room.  It wasn't an internet issue; it was a Zoom issue, so I

5    needed to go back to -- your questions are on the electronic

6    record, but I didn't hear whatever you asked in the last two or

7    three minutes.  So if you want to restate something or rephrase

8    the question, it'll help me to --

9            MS. PORTER:  I'll summarize for Your Honor and ask Mr.

10   Wells to confirm if that's all right.

11           THE COURT:  Sure.

12           MS. PORTER:  Okay.  Thank you.  I pulled up Mr. Wells'

13   declaration; he identified it as his declaration.  We jumped to

14   the signature page to see the "F/S" that indicated he had

15   signed a wet copy.  Mr. Wells indicated that he has; he stated

16   that he has signed a wet copy.  He stated that everything

17   that -- I'm sorry -- that he reviewed the declaration for

18   accuracy before he signed it, and that everything in this

19   declaration is true and correct to the best of his knowledge.

20   BY MS. PORTER:

21   Q.   Mr. Wells, have I misstated any of that testimony?

22   A.   No, that's correct.

23           THE COURT:  Okay.  Fine.  Thank you.

24   Q.   Very good.  So I've now jumped to paragraph 67 of the

25   declaration, which on the computer screen, is page 18.  And Mr.

Wells - Cross

1    Wells, do you see paragraph 67 of your declaration?

2    A.    I do, yes.

3    Q.    And it addresses --

4          THE COURT:  Ms. Porter, let me interrupt you for a

5    minute.  You're welcome to put it on the share screen for other

6    purposes, but Mr. Wells and I, and I'm sure, counsel, all have

7    it in front of them, as well.  So I don't -- you're welcome to

8    do it the way you want.  Just be aware that he has already

9    identified that he has it with him.

10         MS. PORTER:  Yes, Your Honor.  Thank you.

11   Q.    So Mr. Wells, this paragraph 67, it addresses plan section

12   2.4, correct?

13   A.    That's correct.

14   Q.    All right.  And you testify here that it's your

15   understanding that all allowed priority tax claims under

16   section 2.4 of the plan will be treated pursuant to clause

17   romanette i above, correct?

18   A.    That is my understanding.

19   Q.    Okay.  And romanette i describes payment in cash in an

20   equal amount to allowed priority claims -- tax claims on the

21   affected date or soon thereafter, correct?

22   A.    Correct.

23   Q.    And by all allowed priority tax claims, do you include the

24   claims that are not yet due and payable by the effective date?

25   A.    No, I don't think so.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1  Q.   Okay.  So your declaration -- is your declaration accurate

2  in that it's your understanding that all allowed priority tax

3  claims will be treated pursuant to clause romanette i?

4  A.   Our intention is to pay all currently-due claims at the

5  effective date, and then continue to pay all claims as they

6  come due in the ordinary course.

7  Q.   Okay.  And so you're saying that there is a third option,

8  essentially, between romanette i and romanette ii in your

9  declaration here in the plan for paying tax claims -- allowed

10  priority tax claims in the ordinary course of business as they

11  become due and payable, correct?

12  A.   I may be misremembering, but the intention of this

13  statement and the declaration is we would pay everything that

14  we were legally obligated, and then as we emerge, we would

15  continue to pay in the ordinary course.

16  Q.   Okay.  I'd like to pull up for your review the plan.

17  Sorry about this.  Let me get to page 1.  I've put it on the

18  screen, the plans that debtors and shareholder proponents --

19  filed on May 22nd, 2020, filed as docket number 7521.  Do you

20  see that on the screen, Mr. Wells?

21  A.   I do.

22  Q.   Okay.  And are you familiar with this plan?

23  A.   I am.

24  Q.   Thank you.  So I'm going to jump to page 44 of the plan.

25  And at the bottom of the page, it includes section 2.4 of

Wells - Cross

1    priority tax claims.  Do you see that, Mr. Wells?

2    A.    I do.

3    Q.    Okay.  And in here, this provision says that PG&E will pay

4    allowed priority tax claims, either -- and in this draft, it's

5    "A, cash, an amount equal to such priority tax claims", which

6    seems to correspond with romanette i of your declaration; is

7    that correct?

8    A.    Yes.

9    Q.    Okay.  And then, "or B, cash in equal semi-annual

10   installments, et cetera, together with interest", and that

11   seems to correspond with romanette ii in your declaration,

12   correct?

13   A.    That's correct.

14   Q.    And this last sentence says, "any allowed priority tax

15   claim that is not due and payable on or before the effective

16   date shall be paid in the ordinary course of business as such

17   obligation becomes due."  Do you see that?

18   A.    I see that.  Let me -- I was just reading it.

19   Q.    Okay.  Take your time.

20   A.    I see it, yes.

21   Q.    Okay.  So then contrary to what your declaration states,

22   you do understand that some allowed priority tax claims will

23   not be paid pursuant to what is romanette i in your declaration

24   or A in the plan.  It will be paid -- if they are not due and

25   payable prior to the effective date, they will be paid in the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    ordinary course of business; is that correct?

2            MR. TSEKERIDES:  Your Honor, I object to the form.

3    It's to the statement contrary to his declaration.  She can ask

4    him a question without characterizing.

5            THE COURT:  Okay.  I'll let you answer the question,

6    Mr. Wells.

7    A.   My intention was, in the declaration, is the company would

8    pay all priority tax claims that were due, and then we would

9    continue to pay those that become due in the ordinary course.

10   Q.   Okay.  And do you intend to pay the obligations that

11   become due in your ordinary course of business with applicable

12   interest?  And by "you", I mean, does PG&E intend to?

13   A.   I don't think that they would be eligible for applicable

14   interest if we pay when it becomes due.

15           THE COURT:  Ms. Porter, would you clarify for me where

16   we're going?  If there's an inconsistency between language than

17   Mr. Wells stated in his declaration and the plan -- it seems to

18   be the plan controls.  Do you believe the plan is contrary to

19   your client's interest or contrary to the legal entitlements

20   that the board's entitled to?

21           MS. PORTER:  I do believe that the plan is contrary to

22   FTB's interest, Your Honor, yes.

23           THE COURT:  Well, no.  I'll state that again.  You

24   believe the plan has a flaw in it that --

25           MS. PORTER:  I do, Your Honor, but the flaw seems to

Wells - Cross

1  be -- there's an inconsistency between Mr. Wells' declaration

2  and the plan that I'm trying to flesh out.

3  THE COURT:  I understand, but the plan is what is the

4  operative document.  I'm asking you if, in your mind, the plan

5  is contrary to the law that the board depends upon to be

6  complied with.

7  MS. PORTER:  Yes, Your Honor.  I --

8  THE COURT:  I'll restate it this way.  Mr. Wells'

9  declaration isn't the operative document.  The plan is the

10  operative document, and if you believe that the board is not

11  being treated in accordance with law, obviously, you need to

12  say so, and you need to call it to my attention.  But which is

13  it?  Is that your point, that the plan is wrong?

14  MS. PORTER:  Your Honor, I'll reserve my legal

15  arguments for the portion of the confirmation hearing that

16  deals with legal arguments, but I'd note that this section plan

17  2.4 says that "at the option of the" -- I will find it for you

18  here -- "at the option of the debtors" -- or reorganized

19  debtors -- I'm sorry, that highlight kind of jumps the page

20  there -- but it's at their option, and Mr. Wells has testified

21  about what PG&E's option will be, but he seems to have excluded

22  the treatment that likely will be relevant to FTB's priority

23  tax claims.

24  THE COURT:  Well, let me do this.  Now, you're

25  entitled to ask questions.  That's the deal.  I'm not changing

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    the rules.  But I don't want to get bogged down on interpreting

2    Mr. Wells' declaration.  If Mr. Wells had said something that

3    you believe is contrary to the law -- and that, I'm sure, is an

4    error that is not intentional.  But more importantly, the

5    question is whether the plan is contrary to the law.  I would

6    encourage you to take up with debtor's counsel if there's a

7    clarifying point that you believe controls, and persuade

8    counsel.  Problem solved.  If not, it's for argument later.  I

9    don't think it's -- I don't think we accomplish anything by

10   having these very long documents in front of Mr. Wells and

11   asking him which one controls.  We know which one controls.

12           MS. PORTER:  Your Honor, I was not intending to ask

13   him which one controls; I was intending to ask him what his

14   understanding was as to payment of allowed priority claims that

15   come due in the ordinary course of business because it seems

16   that his declaration omitted that.

17           MR. KAROTKIN:  Your Honor, this is Mr. Karotkin from

18   Weil, Gotshal.  What difference does it make?  The plan, as you

19   said, says what it says.  It provides for the treatment of Ms.

20   Porter's client's claims.  Your Honor, is any of this --

21           THE COURT:  I think -- Ms. Porter, let's keep that in

22   mind.  I'm not going to tell you can't ask questions, but the

23   purpose of today isn't to educate Mr. Wells about an

24   inconsistency between his declaration and his plan.  I don't

25   imagine you're impeaching him or accusing him of --

Wells - Cross

1          MS. PORTER:  No, Your Honor.

2          THE COURT:  -- intentionally doing anything wrong.  So

3    let's leave it at that.  If you have any other questions to ask

4    him, please feel free to go ahead and do it.

5          MS. PORTER:  I do have some more questions, Your

6    Honor.

7          THE COURT:  Okay.

8    BY MS. PORTER:

9    Q.   Mr. Wells, thank you for your patience throughout that

10   dialogue.  I will stop the screen-share for you so you don't

11   have to stare at a bunch of words anymore.  PG&E has not

12   obtained FTB's consent to be paid in the ordinary course of

13   business, has it?

14   A.   I -- I'm not aware.

15   Q.   Okay.  And if PG&E had obtained that consent, would you be

16   aware?

17   A.   Not likely.

18   Q.   Who would be the person who would be aware?

19   A.   Either our bankruptcy professionals or the tax team that

20   remits these payments.

21   Q.   Thank you.  I want to ask you, has PG&E -- PG&E has not

22   objected to FTB's claims; is that correct?

23          MR. TSEKERIDES:  Your Honor, again.  I mean, if these

24   are -- these are issues that we can deal with either next week,

25   or frankly, through the claims reconciliation process.  I don't

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1   see what we're accomplishing here right now.

2           THE COURT:  What are we accomplishing, Ms. Porter?

3   What's going to help me make my decision today?

4           MS. PORTER:  Well, I intend to ask follow-up questions

5   to that, Your Honor.  So that one was the preliminary question,

6   which is PG&E is not a bunch of -- I can withdraw that question

7   and I will ask this one instead, Your Honor.

8           THE COURT:  Okay.

9   Q.   Mr. Wells, to your knowledge, will PG&E object to FTB's

10  claims?

11          MR. TSEKERIDES:  Your Honor, again.  That's a legal

12  question that Mr. Karotkin and the tax team have to determine

13  maybe in conjunction with Mr. Wells.  But to ask him that

14  question today, I don't think is appropriate.

15          THE COURT:  Mr. Wells --

16          MR. KAROTKIN:  It's irrelevant, Your Honor.  It's

17  irrelevant to --

18          THE COURT:  Why don't you just say -- that's okay.

19          Mr. Wells, is there any pending intention to file an

20  objection that you aware of to -- objection to the claim?

21          THE WITNESS:  Not that I'm aware of --

22          THE COURT:  Okay.

23          THE WITNESS:  -- Your Honor.

24          THE COURT:  That's enough.

25          MS. PORTER:  Thank you, Your Honor.

Wells - Cross

1    Q.   My last question is, does PG&E intend to satisfy all of

2    its valid tax obligations to FTB through this plan?

3    A.   The intention of the plan is to pay everything that we

4    owe, and then continue to pay in the ordinary course as it

5    becomes due.

6            MS. PORTER:  Thank you.  Those conclude my questions.

7    Thank you, Mr. Wells.

8            THE COURT:  Okay.  Thank you, Ms. Porter.  And I'll

9    have Ms. Parada move you back out to the attendance.

10           Mr. Bellman, you can unmute yourself, and you've asked

11   to examine Mr. Wells for fifteen to twenty minutes, so it's

12   your turn.

13           MR. BEHLMANN:  Thank you, Your Honor.  And we've --

14           THE COURT:  And state your name for the electronic

15   record, please.

16           MR. BEHLMANN:  Certainly, Your Honor.  Andrew

17   Behlmann, Lowenstein Sandler, on behalf of PERA and the other

18   securities plaintiffs.

19           Your Honor, we may end up going a few minutes over

20   twenty if that's okay with Your Honor.  I just wanted to raise

21   that at the outset.  Our questioning ended up being a little

22   bit longer than anticipated, but probably no more than twenty-

23   five minutes or so.

24           THE COURT:  No, go ahead.  Just --

25           MR. BEHLMANN:  Well, we'll see where we end up.

(973) 406-2250   operations@escribers.net | www.escribers.net

1     CROSS-EXAMINATION

2     BY MR. BEHLMANN:

3     Q.    Good morning, Mr. Wells.

4     A.    Good morning.

5     Q.    I certainly won't repeat all of the formalities that the

6     counsel before me have raised.  But you submitted a declaration

7     in support of confirmation, and I believe you said, previously,

8     you have a copy of that in front of you; is that correct?

9     A.    That is.

10    Q.    Okay.  I'm going to refer to it a few times throughout the

11    questioning.  So if you could keep that handy, that would be

12    good.

13    A.    Okay.

14    Q.    There's two debtors in these cases, correct?

15    A.    That's correct.

16    Q.    And they're PG&E corporation, which is referred to in the

17    plan as HoldCo and Pacific Gas & Electric Company, which is

18    referred to in the plan as the utility, correct?

19    A.    That's correct.

20    Q.    And those are two separate, distinct entities?

21    A.    That's correct.

22    Q.    And is it your understanding that the plan does not

23    combine the assets and liabilities of those entities into one

24    single pool for distribution purposes under the plan, correct?

25    A.    That's correct.

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

1   Q.   So if I have -- if a creditor has a claim against the

2   utility, that claim would get paid by the utility from the

3   utilities asset, correct?

4   A.   That's my understanding.

5   Q.   Okay.  Thank you.  On page 7 of your declaration -- and

6   that's -- I believe that's the page number at the top, so page

7   8 on the footer -- in paragraph 19, you refer to a term,

8   "HoldCo rescission or damages claims and subordinated debt

9   claims".  Do you see that paragraph?

10   A.   I do.

11   Q.   The first sentence refers to the "HoldCo rescission or

12   damages claims (class 10A-II)".  Are -- do you see that?

13   A.   I do.

14   Q.   Are you generally familiar with those claims?

15   A.   I'm generally familiar, yes.

16   Q.   Just in a few words, what is your general understanding of

17   what those claims are?

18   A.   They're securities claims alleging fraud for investors and

19   debt and equity securities that have lost money.

20   Q.   And specifically, the class 10A-II claims are claims based

21   on purchases of equity, correct?

22   A.   I believe that's correct, yes.

23   Q.   And that's equity of PG&E Corp?

24   A.   That's correct, yes.

25   Q.   Okay.  And you're generally familiar with the debtor's

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  proposed plan of reorganization, correct?

2  A.    I am.

3  Q.    Were you involved in the preparation of the plan?

4  A.    I was.

5  Q.    And were you involved in the preparation of the previous

6  versions of the plan?

7  A.    I was, yes.

8  Q.    Does that include the version that was filed on March 9th

9  of this year?

10 A.    Yes.

11 Q.    Okay.  Are you aware that the plan defines the term -- and

12 this is similar to the term used in your declaration but a

13 little bit different -- "HoldCo rescission or damages claim"?

14 A.    Yes.

15 Q.    And the plan classifies those claims in what is called

16 Class 10A-II?

17 A.    Yes.

18 Q.    Does that definition, the plan definition of HoldCo

19 rescission or damages claim, include claims against both

20 debtors or just one of the debtors?

21       MR. KAROTKIN:  Your Honor, it's Mr. Karotkin.  The

22 plan says what it says.  Is this a quiz as to whether he

23 understands the words, or what?

24       MR. BEHLMANN:  I'm simply trying to clarify a slight

25 inconsistency, although it is a material inconsistency, between

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Mr. Wells' declaration where he refers to these claims as

2    "claims against the debtors" as opposed to the plan

3    classification, which, as we read the plan, is strictly claims

4    against one debtor.

5              THE COURT:  Well, we're back to --

6              MR. KAROTKIN:  What's the relevance of that?

7              THE COURT:  I mean, we're back to the same situation

8    we had with the last lawyer.  Mr. Wells' declaration isn't the

9    operative document; the plan is.  And you can -- and so asking

10   him to explain the difference between his declaration and the

11   plan isn't -- other than trying to impeach his knowledge or

12   credibility, it's not doing anything else.  I mean, your point

13   is -- you will argue, if you haven't already -- I'm sure you

14   have; I haven't studied all your objections.  But if the plan

15   violates the law -- I mean, I'm sure you'll tell me.

16             MR. BEHLMANN:  Okay.  I think I can short-circuit some

17   of this particular line of questioning, then.  Thank you, Your

18   Honor.

19             THE COURT:  Okay.

20   BY MR. BEHLMANN:

21   Q.   Mr. Wells, the Class 10A-II under the plan, that does not

22   include, in your understanding, claims arising from purchases

23   of HoldCo stock against the utility -- claims against the

24   utility arising from purchases of HoldCo stock, correct?

25   A.   My understanding is it's for claims purchase of Holdco

1    stock.

2    Q.   Without regard to which debtor those claims are against?

3    A.   My understanding is it relates to the purchases of holding

4    company stock.

5    Q.   And claims against whom arising from those purchases?

6    A.   Claims against the holding company for purchases of

7    holding company stock.

8         THE COURT:  Well, Mr. Behlmann clarify something.  If

9    someone bought stock, would they have a claim against the

10   utility under --

11        MR. BEHLMANN:  Yes, Your Honor.  There are claims

12   asserted against the utility arising from purchases of HoldCo

13   stock.  That's what we're trying to get at, is that those

14   claims are not classified under the plan.  Mr. Wells'

15   declaration is a little unclear on that point because it says

16   these are claims against the debtors.

17        THE COURT:  Well, but the basic concept here is if

18   somebody bought stock -- you know the statute, the 510(b), but

19   the question you're arguing, I take it, that there may be a

20   damage claim against the utility for a plaintiff's purchase of

21   stock of the holding company.

22        MR. BEHLMANN:  That's correct, Your Honor.  And I'm

23   trying to find out if Mr. Wells knows where those claims are

24   classified and treated under the plan.

25        THE COURT:  But again, if the plan doesn't do it --

1  that plan either says that -- they're writing it correctly or

2  incorrectly, and that's a legal question.  So I don't think it

3  helps to quiz Mr. Wells about that.  So I'll sustain the

4  objection.

5          MR. BEHLMANN:  Understood.  Thank you, Your Honor.

6  Q.   Mr. Wells, paragraph 19 of your declaration, in addition

7  to describing what those claims are, also describes what the

8  holders of the allowed HoldCo rescission or damage claims are

9  supposed to receive under the plan, doesn't it?

10 A.   I -- I believe it does, yes.

11 Q.   Okay.  And part of that definition is a formula.  It's

12 the -- you described it in the declaration as being HoldCo's

13 rescission or damage claims share times 526,118,408 shares.

14 Are you familiar with that formula?

15 A.   Yes, I'm generally aware of that formula.

16 Q.   And you testified in your declaration that that number,

17 the 526,118,408 shares, represents the fully-diluted share

18 count of HoldCo on the petition of the allowed HoldCo

19 rescission or damages claims are supposed to receive under the

20 plan, doesn't it?

21 A.   I believe it does, yes.

22 Q.   Okay.  And part of that definition is a formula.  It's

23 the -- you describe it in the declaration as being the

24 holder's -- HoldCo rescission or damage claim share times

25 526,118,408 shares.  Are you familiar with that formula?

1  A.   Yes, I'm generally aware of that formula.

2  Q.   And you testified your declaration that that number, the

3  526,118,408 shares represents the fully diluted share count of

4  HoldCo on the petition date, correct?

5  A.   That's correct.

6  Q.   Do you know why the debtors used the petition date in

7  calculating that number?

8        MR. TSEKERIDES:  The only thing I'm going to caution

9  Mr. Wells, Your Honor, to the extent his knowledge is based on

10  communications with counsel, I do want him to not disclose

11  that, but if he has knowledge, and if his only knowledge is in

12  that respect, then I think you should say that.

13        THE COURT:  Okay, Mr. Wells, can you answer that way?

14        THE WITNESS:  I am generally familiar with the

15  formula.  The specifics were based on recommendations of

16  bankruptcy professionals.

17  Q.   So do you know whether the debtors considered using any

18  other date besides the petition date for that number of shares?

19  A.   I'm not aware.

20  Q.   And do you know whether the debtors ever considered using

21  any formula besides the formula that is in the plan as we see

22  it today?

23  A.   No, I'm not aware of that.

24  Q.   And you describe in your declaration the definition of

25  "HoldCo rescission or damage claim share", and that definition

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  has a few pieces.  It's about the middle of paragraph 19.  Do

2  you see that?

3  A.   I do.

4  Q.   You refer to the dollar amount of the holder's allowed

5  HoldCo rescission or damage claim.  Do you know when that

6  dollar amount is going to be determined as of, for purposes of

7  this formula?

8  A.   Not specifically, no.

9  Q.   Is it fair to say that if someone had a pre-petition

10  claim, that would be calculated as of the petition date, in

11  your understanding?

12  A.   My understanding is we have what we believe are strong

13  defenses, and so we haven't established liability.  So I -- I

14  don't know the specific date.

15  Q.   Okay.  Still in that first part, the definition refers to

16  "less any cash payments received from an insurance policy", do

17  you see that?

18  A.   I do.

19  Q.   So the formula is taking the dollar amount of the claim,

20  and deducting cash payments from an insurance policy.  Does

21  that include only cash payments received on account of the

22  claims against the debtor?

23  A.   My recollection is this is intending to reduce the claims

24  for insurance recoveries from the shared policy for D&O

25  liability insurance.

1   Q.    So the deduction would be without regard to what claims

2   those payments were on account of, correct?  Whether they were

3   on account of claims against individuals, or the debtors?

4   A.    I'm not sure I understand the distinction.  Can you --

5   Q.    So there's --

6   A.    -- reask the question?

7   Q.    Sure, so there's D&O insurance that you just described as

8   the shared D&O policies.

9   A.    Yeah.

10  Q.    And you talk about that elsewhere in the declaration.

11  This says, any cash payments received from an insurance policy,

12  and an insurance policy is a defined term that refers to the

13  debtors' insurance policies, correct?

14  A.    That's correct.

15  Q.    When you deduct cash payments received from an insurance

16  policy for purposes of this formula, the formula that computes

17  the HoldCo rescission or damage claim share, do you take into

18  account whether those insurance payments were received on

19  account of claims against the debtors or on account of claims

20  against anybody else?

21  A.    I'm not aware of that distinction.  Their purpose, as I

22  understand it of this, is if one of these claimants that

23  receive a payment, that should be deducted from what will be

24  allocated as part of this -- this formula if liability is

25  established.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  Q.   And when you say that payment, it's just a payment from an

2  insurance policy period, no distinction as to the reason why

3  the insurer paid that payment?

4  A.   I'm not sure I understand the distinction.

5  Q.   Under the formula, if an insurer -- one of the D&O

6  insurers pays a payment to a holder of an allowed rescission or

7  damages claim -- the HoldCo recession or damages claim, no

8  matter what the reason is for that payment, if the insurer pays

9  the payment, it would be deducted under this formula, correct?

10  A.   I believe that's correct.

11  Q.   Okay.  The second part of that definition, you take the

12  first part, the piece we just went through, the claim amount

13  less the insurance payments, and you divide the first part by

14  35 million -- 35,905,153,932.  We're going to round that 35.9

15  billion for future discussion so I don't have to trip over that

16  number again.  Do you know what the significance of what that

17  35.9 billion dollar number is?

18       MR. TSEKERIDES:  I'm going to object to the form, Your

19  Honor, and again caution Mr. Wells to the extent his knowledge

20  is gained by counsel.  If he could answer it otherwise, that's

21  fine, but if his knowledge is based just on advice of counsel,

22  then I'm going to ask him not to answer.

23       THE COURT:  Okay.  Mr. Wells, you've been instructed.

24  A.   My knowledge is based on the advice of counsel.

25  Q.   Understood.  Were you involved in the selection of that

1  35.9 billion dollar number?

2  A.    I was asked to confirm the company's market capitalization

3  as of that date.

4  Q.    And what date is that?

5  A.    October 12th, 2017.

6  Q.    Do you know why that date was used?

7  A.    Only based on the advice of counsel as they determined the

8  appropriate way to calculate this formula.

9  Q.    Okay.  And I'm assuming the same answer applies to why the

10  marketing opening price, as opposed to some other price on that

11  date was used.

12  A.    I'm -- I'm generally aware of the formula.  I'm -- I'm not

13  aware of -- of -- of the specifics.  This was, you know, again,

14  a formula that we -- we were provided based on the advice of

15  counsel.  I could explain what it's intending to -- to try to

16  accomplish but -- but again, I wasn't involved in the

17  specifics.

18  Q.    Okay.  Do you know whether the debtors considered using

19  the HoldCo market capitalization as of any date other than

20  October 12th for purposes of the formula?

21  A.    I'm not aware of that.

22  Q.    Are you aware that the amended plan that was filed on

23  March 9th included the same formula, but instead of using that

24  market cap -- instead of using a hard number, the 35.9 billion

25  dollar number, that version of the plan simply said the market

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    capitalization as of October 16th, 2017?

2    A.    I don't remember that specific difference.

3    Q.    Do you know, as you sit here today, without looking into

4    any reasons for the change or why that change, if I told you

5    simply for the sake of discussion that the plan was filed on

6    that date, on March 9th, and it did specify the market cap as

7    of October 16th, do you know whether HoldCo's market

8    capitalization on October 16th, 2017 was higher or lower than

9    it was at the market open on October 12th, 2017?

10   A.    I don't recall specifically.

11   Q.    You wouldn't know of any events that might have caused

12   that number to change fairly significantly between those two

13   dates?

14   A.    I believe that -- I can't remember specifically when the

15   stock started to decline after the October '17 fires, but I

16   don't -- I don't remember the specific trading pattern of the

17   stock.

18   Q.    If I told you that it was significantly lower on October

19   16th, the date that was originally used, would that sound

20   probably right in your estimation, just based on --

21          MR. TSEKERIDES:  Objection to form.

22   A.    That seems reasonable.

23   Q.    Okay.

24          MR. TSEKERIDES:  I have objection to form though.

25   Q.    Mr. Wells, as the chief financial officer of the debtors,

1    part of your job includes preparing financial projections for

2    the debtors, correct?

3    A.    That's correct.

4    Q.    And you're aware that the plan provides for the

5    reorganized debtors to issue 6.75 billion dollars of new common

6    stock in the new company, in reorganized PG&E to the Fire

7    Victim Trust, as a portion of their consideration.  Are you

8    aware of that?

9    A.    I am.

10   Q.    And you're aware that the plan calls for that 6.75 billion

11   dollar value to be determined through a concept called, "fire

12   victim equity value", correct?

13   A.    I am.

14   Q.    And what is the meaning of -- pardon me --

15          MR.  BEHLMANN:  I'll withdraw for a second.

16   Q.    The fire victim equity value means, under the plan, 14.9

17   times the "normalized estimated net income" as of a date to be

18   agreed upon between the debtors and the TCC, correct?

19   A.    That's correct.

20   Q.    And the result of that calculation, if you take normalized

21   estimated net income, whatever that winds up being, you take

22   that number on a per share basis and multiply it by 14.9,

23   that's going to give you a per share price of the stock that's

24   being issued to the Fire Victim Trust, correct?

25          MR. TSEKERIDES:  Your Honor, I am going to object at

1    this time.  This is not an objection that PERA made.  So I'm

2    trying to figure out what the relevance is to their objection

3    of Mr. Wells.

4              THE COURT:  What's the relevance, Mr. Behlmann?

5              MR.  BEHLMANN:  Your Honor, there are several places

6    in the plan where equity is being issued, and the valuation of

7    that equity is based on a specified metric, and by contrast,

8    there's a different mechanism used for the equity that's

9    proposed to be issued to Class 10A-II.  We're simply exploring

10   with Mr. Wells briefly -- again not arguing the point with

11   respect to our objection, simply raising with Mr. Wells and

12   exploring how those other valuation metrics work --

13             THE COURT:  Okay.

14             MR.  BEHLMANN:  -- for the stock that's being issue.

15             THE COURT:  I'll allow, and let you ask -- answer the

16   question, Mr. Wells.  You can answer it.

17   A.   I believe the formula is more complicated than multiplying

18   14.9 times normal estimated net income.  There's a minimum

19   ownership, and it does have to take into consideration how and

20   where we raise the other nine billion dollars for common equity

21   that we proposed in the plan.

22   BY MR.  BEHLMANN:

23   Q.   But once you go through that formula, the more complicated

24   iteration of that formula, you're going to arrive at a share

25   price that then gets divided into the 6.75 billion dollars to

1  give you a number of shares, correct?

2  A.    That's correct.

3  Q.    Subject --

4          MR. KAROTKIN:  Your Honor --

5  Q.    -- to other constraints?

6          MR. KAROTKIN:  Your Honor, this is Mr. Karotkin.

7          None of this is relevant to the treatment of the

8  HoldCo class of rescission and damage claims.  The stock going

9  to the trust is the result of a settlement that was voted on

10 under the plan.

11         The only issue with respect to the class of HoldCo

12 recession claims is whether it's an appropriate formula to

13 recognize whatever rights they have.  It has nothing to do with

14 how other stock going out under the plan is valued under

15 settlements.

16         THE COURT:  Mr. Behlmann, response?

17         MR.  BEHLMANN:  Your Honor again, we're not trying to

18 put ourselves, certainly, by any stretch of the imagination

19 into the shoes of any other class of parties under this plan.

20 We're certainly not equating ourselves to the fire victims.

21 You know, we're certainly not equating ourselves with the

22 equity backstop parties, who are also purchasing stock based on

23 a multiple of normalized estimated net income.

24         We're simply exploring the fact that this valuation

25 metric is used in the plan in various places as a means of

1   determining the value of the stock that's being issued under
2   the plan because --
3           THE COURT:  But what's the relevance of it for these
4   purposes?
5           MR.  BEHLMANN:  The relevance, Your Honor, is that our
6   class is being issued stock under the plan as consideration for
7   the claims, and we're attempting to figure out the valuation of
8   that stock.  We're attempting to ascertain a metric by which
9   that stock can be valued to determine, for purposes of
10  confirmation, among other things, whether the treatment of
11  Class 10A-II is fair and equitable under the plan.
12          MR. KAROTKIN:  Your Honor, may I respond?
13          THE COURT:  Well, I don't think you need to.  Mr.
14  Behlmann, that doesn't do it for me.  You have a right to make
15  sure you're treated fairly and equitably, but to spend time
16  trying to understand the formula that Mr. Wells has called
17  complicated, which it is, for another class that they voted
18  for, I don't think it's relevant.  So I'm going to sustain the
19  objection.
20          MR.  BEHLMANN:  All right.  So I'll streamline this
21  into one fairly simply question that I hope is not
22  controversial to anyone.
23  BY MR.  BEHLMANN:
24  Q.   Is it fair to say, Mr. Wells, that other parties are
25  either receiving or purchasing equity under the plan, and the

1    value of that equity is based on a multiple of normalized

2    estimated net income?

3         MR. KAROTKIN:  Your Honor, same objection.

4         THE COURT:  Well, you can answer that, Mr. Wells.

5    A.    That's correct.

6    Q.    Okay.  And Mr. Wells, besides the treatment of HoldCo

7    recession or damages claims in Class 10A-II, is the market

8    capitalization as of the market open on October 12th, 2017,

9    used in calculating any other distribution of equity under the

10   plan?

11   A.    No.

12   Q.    I mentioned, earlier, D&O insurance.  We have a couple of

13   quick questions pertaining to (indiscernible) declaration.

14   Let's go to page 7 on the top, or page 8 on the footer.  You

15   state in there, "The D&O liability insurance policies, the

16   debtors believe, are applicable to this issue provide shared

17   coverage to the debtors and their directors, and officers, of

18   up to 400 million dollars in excess of retained limits that

19   total fifteen million dollars".  Do you see that?

20   A.    I do.

21   Q.    But the insurers under the D&O liability insurance

22   policies haven't really told the debtors that they agree that

23   400 million dollars of insurance coverage is applicable to the

24   securities litigation, have they?

25        MR. TSEKERIDES:  Your Honor, I'm going to object again

1  to the extent that these are -- as Your Honor knows, we have

2  ongoing mediation with all parties, including the PERA parties

3  and the insurers.  To the extent that anything has come up in

4  that context, I think Mr. Behlmann should tread lightly on

5  facts that he might know or not know from the mediation.

6  Otherwise, look, it's open season, I appreciate that, but PERA

7  has been involved in those mediation sessions.

8           THE COURT:  I understand, and keep up the good work,

9  but I think Mr. Wells can say whether he has -- he is aware of

10 communications from the insurer as to coverage.  You're not

11 suggesting that's being mediated, are you?

12          MR. TSEKERIDES:  I'm not suggesting that.  If he know

13 that --

14          THE COURT:  All right.

15          MR. TSEKERIDES:  -- outside of the context of the

16 mediation, absolutely he can testify to that.

17          THE COURT:  Mr. Wells, you can answer that question,

18 but not if it's something you've gotten from the mediation.

19 A.   I don't recall specifically if there's been any -- any

20 reservation of rights that have been signaled, but -- but I

21 do -- based on my understanding, the company believes that the

22 full 400 million dollars of the policy is available.

23 BY MR.  BEHLMANN:

24 Q.   And when you say "available", what does that mean exactly?

25 A.   It means that we don't anticipate a limitation on the 400

1    million dollars, subject to that self-retained limit of fifteen

2    million.

3         THE COURT:  And Mr. Behlmann, we're getting close to

4    the time up here, so you've asked for a little more, but you

5    need to wrap it up pretty soon.

6         MR.  BEHLMANN:  Understood, Your Honor.

7    Q.   I'm not clear, Mr. Wells, on one point from the initial

8    question on D&O.  You referenced two towers of insurance in

9    your footnote 3, correct?

10   A.   That's correct.

11   Q.   And those are the -- I believe they're 2017 and 2018

12   towers?

13   A.   That's -- that's correct.

14   Q.   And you attached the primary policy from each of those

15   years to your declaration as Exhibits A and B?

16   A.   I did, yes

17   Q.   And those towers consist of additional layers of

18   insurance, correct, additional policies?

19   A.   Correct.

20   Q.   And those additional policies are issued by a number of

21   additional insurers?

22   A.   It is a common insurance tower, yes.

23   Q.   And as you sit here today, have all of the carriers in

24   both of those towers told the debtors that all 400 million

25   dollars of that coverage is available for purposes of the

1    securities litigation?

2    A.    I don't recall specifically each one of the insurance

3    companies in the tower.  I -- my recollection is it's common

4    for insurance companies to raise issues and reservation of

5    rights, but as we look at -- as we've assessed the policies, we

6    believe the full amount is available.

7    Q.    And those policies provide three types of coverage,

8    correct?

9    A.    That's my understanding.

10   Q.    Typically referred to as Side A, B, and C?

11   A.    Correct.

12   Q.    And Side A covers claims against the insured directors --

13   just generally, based on your knowledge, I'm not asking for a

14   legal conclusion or an interpretation of the policies, just

15   your general knowledge of the policies.  Side A covers claims

16   against the directors and officers of the company, it does not

17   actually indemnify, correct?

18   A.    That's correct.

19        MR. KAROTKIN:  Your Honor, the policies say what they

20   say.  This is legal argument as to what they cover or they

21   don't cover.  This is not appropriate testimony for Mr. Wells.

22        THE COURT:  I agree --

23        MR.  BEHLMANN:  Understood --

24        THE COURT:  -- Mr. Behlmann.  I'm going to sustain the

25   objection.

1        MR.   BEHLMANN:   Understood, just looking for his

2   understanding, but I'll move on.

3   BY MR.   BEHLMANN:

4   Q.    Final D&O insurance related question, Mr. Wells, just to

5   be clear, both HoldCo and the utility are insureds under Side C

6   of the policy, correct?

7        MR. KAROTKIN:  Same objection.

8        THE COURT:  Well, you can state your understanding on

9   that, Mr. Wells.

10  A.    I believe that's correct.

11  BY MR.   BEHLMANN:

12  Q.    Okay, thank you.  The last few questions, paragraph 77 on

13  page 19, that's the page number at the top again, page 20 in

14  the footer of your declaration.  I'll pause for you to get

15  there because it's a little ways back.

16  A.    I'm there, thank you.

17  Q.    Okay.  You say "for the reasons set forth above and based

18  on discussions with my advisors, I believe that the plan does

19  not discriminate unfairly, and is fair and equitable with

20  respect to Class 10A-II".  Do you see that?

21  A.    Which line is that?  I apologize, I don't see it.

22  Q.    Paragraph --

23  A.    Oh.

24  Q.    -- 77, so --

25  A.    Yeah, I see it.

1  Q.    -- page 19, lines 12 to 14.

2  A.    Yeah, I'm there.  Sorry.

3  Q.    Okay.  What is your understanding of what "discriminate

4  unfairly" means as you use it in paragraph 77?

5  A.    My apologies.  I think you have an answer that's -- that

6  we're treating -- we believe that the proposed treatment is --

7  is fair and equitable.  I'm sorry, I don't know how to restate

8  it in a different way.

9  Q.    Well, I guess two questions.  You refer to discriminate

10  unfairly, and you also refer to fair and equitable.  We'll get

11  to fair and equitable in a minute.  Just I guess very

12  generally, what do you mean by does not discriminate unfairly?

13  A.    I looked at it as are we -- are we proposing something for

14  the entirety of the class, again, that we think is -- is fair

15  and equitable.  And again, this is -- this specific aspect of

16  the -- of the plan is a very technical aspect of the plan where

17  I relied on the advice of our -- our legal professionals, which

18  is why I was comfortable with the statement.

19  Q.    And with respect to your statement that you believe that

20  the plan is fair and equitable with respect to Class 10A-II, is

21  that the same general thing?

22  A.    Yes, it is.

23  Q.    Same general meaning?  In paragraph 5, on page 2 to 3, and

24  again using the page numbers at the top, you used that same --

25  not the same, you used similar language.  You say the plan

1    "fairly and equitably addresses all of the fire victim claims,

2    and other pre-petition claims, and equity interests".  Do you

3    see that?

4    A.   I do, yes.

5    Q.   Does that include -- when you say all of their

6    pre-petition claims, does that include HoldCo recession or

7    damage claims in Class 10A-II?

8    A.   That is our belief, yes.

9    Q.   And does that mean the same thing when you say "fairly and

10   equitably addresses", does that mean the same thing as "is fair

11   and equitable with respect to", in paragraph 77?

12   A.   Yes.

13   Q.   And does that statement include claims against the utility

14   arising from the purchase of HoldCo stock?

15          MR. TSEKERIDES:  Object to the form, Your Honor.  We

16   talked about -- that's a legal argument for later, but he

17   can --

18          THE COURT:  You can answer if you understand it, Mr.

19   Wells.

20   A.   My understanding is these are claims for purchases of

21   holding company stock.  We don't have public stock for -- for

22   the utility, or -- so this is -- these are claims for holders

23   of holding company stock.

24   Q.   Holders or purchasers?

25   A.   Sorry, purchasers.

operations@escribers.net | www.escribers.net

1    Q.    So there's -- that statement does not apply to

2    purchasers -- to claims against the utility based on purchases

3    of HoldCo's public common stock?

4         MR. TSEKERIDES:  Again, same objection, Your Honor.

5    We could talk about this next week, but I don't understand

6    where we're going.

7         MR.  BEHLMANN:  I'm simply asking if his statement

8    that the plan fairly and equitably addresses all pre-petition

9    claims includes the claims that have been asserted against the

10   utility which were invited by the debtor through the extended

11   bar date order, whether it applies to those claims that have

12   been asserted against the utility arising from the purchase of

13   HoldCo stock.

14        THE COURT:  But I do think he's saying what he's

15   saying.  I mean, again he is using terms that are very

16   technical and legal in nature, and his understanding is they're

17   all accounted for.  Now your understanding may be there's

18   another type of claim that hasn't been dealt with, and that's

19   an argument you could make.

20        MR.  BEHLMANN:  Understood, and they're his words.

21   I'm just trying to find out the meaning behind his words, but I

22   think we have our answers on that.

23        THE COURT:  Okay.

24   BY MR.  BEHLMANN:

25   Q.    Final question, Mr. Wells, and I apologize for bouncing

1  around your declaration a little bit, but this is the last page

2  turn.  Paragraph 47, on page 13, again using the page numbers

3  at the tops of 14, and the footer, you state, "it is my

4  understanding that the releases contained in Section 10.9(c)

5  are purely voluntary.  In addition, Section 1.180 provides that

6  no holder of a claim or interest grants a release unless it

7  affirmatively elects to do so on a ballot".  Do you see that

8  statement?

9  A.   I do.

10 Q.   Just to be clear, is it your understanding that the plan

11 does not prevent any creditor from pursuing claims it may have

12 against any other nondebtor unless that creditor affirmatively

13 agrees to give up that right?

14      MR. TSEKERIDES:  I'm going to object to the extent it

15 calls for a legal conclusion, but if he has an understanding,

16 he can answer, but if it's based on counsel, then I'm going to

17 direct him not to answer, but if he has an understanding on his

18 own, that's fine.

19      THE COURT:  All right, Mr. Wells, do you have an

20 understanding?

21      THE WITNESS:  My understanding is based on the advice

22 of counsel.

23 Q.   Understood.  Thank you, Mr. Wells.

24      MR. BEHLMANN:  Your Honor, one quick point.  We may

25 have -- in light of some of Mr. Wells' testimony today, we may

1　have a couple of quick questions for Mr. Ziman when he

2　testifies.　I know we initially indicated that we did not

3　intend to cross Mr. Ziman.　We may need about ten minutes with

4　Mr. Ziman, if that's acceptable to Your Honor.

5　　　　　THE COURT:　Yeah, okay, I mean, look, I'll just --

6　I'll note that that may be something you want to do, and we'll

7　leave it at that for now.

8　　　　　MR. BEHLMANN:　Understood.

9　　　　　THE COURT:　Okay.

10　　　　　MR. BEHLMANN:　Thank you, Your Honor.

11　　　　　And thank you, Mr. Wells.

12　　　　　THE COURT:　Okay.　We're going to excuse you from the

13　panel.　Mr. Wells, do you need to take a break, or are you

14　willing to spend some more time without a break?

15　　　　　THE WITNESS:　Thank you, Your Honor.　I can continue.

16　　　　　THE COURT:　I didn't hear your answer.

17　　　　　THE WITNESS:　I can continue.

18　　　　　THE COURT:　How about you, Mr. Tsekerides?

19　　　　　MR. TSEKERIDES:　I'm fine.

20　　　　　THE COURT:　Mr. Karotkin?

21　　　　　MR. KAROTKIN:　I'm fine, but soon.

22　　　　　THE COURT:　Ms. Parada, is Ms. Wells available to

23　be --

24　　　　　MR. TSEKERIDES:　Wallace.

25　　　　　THE COURT:　-- (break in audio) questions?　Ms.

1    Wallace, I'm sorry.

2             THE CLERK:  Ms. Wallace is joining now, Your Honor.

3             THE COURT:  I'm sorry, I said Wells.  Mr. Wells is the

4    witness.

5             Ms. Wallace, can you hear me?

6             MS. WALLACE:  Yes, I can hear you.

7             THE COURT:  Okay.  You are entitled to ask questions

8    of Mr. Wells.  So Mr. Wells is on the -- you do not have a

9    video screen at all; is that correct?

10             MS. WALLACE:  Correct.

11             THE COURT:  Okay.  Well, Mr. Jason Wells is the

12    witness.  He is on our screen.  We can hear him and see him,

13    and he's under oath, and you may ask him questions.

14             MS. WALLACE:  Okay.

15             THE CLERK:  Your Honor, if Ms. Wallace can state her

16    appearance for the record.

17             THE COURT:  And Ms.  Wallace, state your full name

18    first.

19             MS. WALLACE:  My name is Mary Wallace.  I'm a pro

20    per -- litigant in this case, obviously representing myself,

21    and need anything else besides that?

22             Can you hear me?

23             THE COURT:  Yes.

24             MS. WALLACE:  Okay.  Was there anything -- was that

25    it?

of 121   operations@escribers.net | www.escribers.net

1          THE COURT:  Aren't you going to ask -- are you going

2     to ask questions or not?

3          MS. WALLACE:  Oh, okay.  Yeah.  Well, I had hoped to

4     have been -- I raised my hand at the beginning of this, and

5     hoped to let the -- you know, Judge, that I actually filed an

6     emergency motion probably about twenty minutes before court

7     today.  You know that last hearing, I wasn't allowed to speak

8     because of technical difficulties.

9          THE COURT:  And we told you that you can -- you have

10    an opportunity to question the witness that you didn't get to

11    speak.  You were sent that message.  I gave that.

12         MS. WALLACE:  I know.  I thought that was wonderful,

13    and I appreciate that.

14         THE COURT:  Do you want to ask Mr. Wells questions or

15    not?

16         MS. WALLACE:  Okay.  What I wanted to say is that I

17    haven't had enough time to review 898 pages and to properly

18    formulate my questions, and I was submitting a motion to allow

19    me to have more time to reviewed (sic) over 1,000 pages since

20    they were filed in the Court on May 22nd, about 4 o'clock in

21    the afternoon.

22         THE COURT:  And that's unfortunate for you, Ms.

23    Wallace, but I'm not going to give you more time, any more than

24    I gave any other creditor.  If we had not been in the shelter

25    at home, and we had had a live trial, Mr. Wells would've been

1  on the witness stand in the courtroom, and lawyers or

2  nonlawyers alike would have an obligation to be prepared to ask

3  questions.  The difference now is we're doing it on a telephone

4  or a video, but this is the time and place for Mr. Wells to

5  answer questions.

6        I understand it's a long document that he filed, but

7  this is your chance.  If you're not prepared to ask him

8  questions, then don't ask him questions.  But you have a right

9  to, and you told me the other days you wanted ten minutes, and

10 I said you could have ten minutes.  So --

11       MS. WALLACE:  So can I have ten minutes and talk about

12 something else?

13       THE COURT:  No, you have ten minutes to ask Mr. Wells

14 questions, and if you're not prepared to do it, I'm going to

15 excuse him -- well, he'll be there for another witness, but I

16 am not going to waste any more time on it, and the same is true

17 for the witnesses that are coming up tomorrow and on Monday,

18 and I'm not going to waste time if you're not in a position to

19 ask questions.

20       MS. WALLACE:  What is the normal position that the

21 rule states that if you were given an opportunity to

22 cross-examine a witness, and you got notice on one day, is

23 there a time in --

24       THE COURT:  Ms. Wallace?  Ms. Wallace, you're down to

25 about eight minutes, and if you have someone else in the room

(973) 406-2250 | operations@escribers.net | www.escribers.net

1   with you, or something that's making noise, you have to figure

2   out a way to exclude them because it's disrupting us because

3   the background sound.  I'm not going to --

4           MS. WALLACE:  There's absolutely no one here.

5           THE COURT:  Okay.  Go ahead and ask questions if you

6   want of Mr. Wells.

7           MS. WALLACE:  I'll reserve the right to questions Mr.

8   Wells later because I have nothing prepared at this time for

9   him.

10          THE COURT:  Ms. Wallace, there is no later, it's now

11  or not at all for Mr. Wells.  So we will excuse you, and let me

12  give you a heads-up now, if you give me the same response for

13  Mr. Ziman, or Mr. Boken, or Ms. Pullo, I won't waste my time,

14  we won't call any of them.

15          So if you're not going to -- in a position to ask

16  questions of those people, don't waste your time, or mine, or

17  theirs, and think you're going to be heard.

18          MS. WALLACE:  But --

19          THE COURT:  So I am going to excuse you from our

20  virtual panel now, and ask Ms. Parada to bring Mr. Abrams in.

21          All right, good morning, Mr. Abrams.

22          MR. ABRAMS:  Hello.

23          THE COURT:  Unmute your mic, please.  Just state your

24  name for the record.

25          MR. ABRAMS:  William Abrams.  Thank you, Your Honor.

Wells - Cross

1          THE COURT:  Mr. Abrams, you asked for forty-five

2    minutes.  I'm not sure I'm going to give you forty-five

3    minutes.  At the moment, I'll let you have a good portion of

4    it, so have at it.  Mr. Wells is there and has been sworn.

5          MR. ABRAMS:  Okay, thank you, Your Honor.

6    CROSS-EXAMINATION

7    BY MR. ABRAMS:

8    Q.   Good day, Mr. Wells.  I appreciate you taking the time

9    today, and certainly appreciate that we are back in this

10   position again.  My questions are going to go directly to the

11   feasibility question of the proposed plan, specifically, you

12   know, as a wildfire survivor, my questions are going to be

13   around the jury to which more wildfires caused by PG&E will or

14   will not allow the plan to be feasible.  Would you agree that

15   wildfire risks are also a risk associated with the feasibility

16   of the plan?

17         MR. TSEKERIDES:  Your Honor, I am going to note an

18   objection.  If we're talking about a legal question of

19   bankruptcy feasibility, I don't know asking Mr. Wells if he has

20   a view on whether we satisfy 1129 factors is appropriate.  So

21   if we're talking about feasibility from a bankruptcy

22   perspective, I object to the form of the question.

23         THE COURT:  Oh, all right.  Mr. Wells, can you answer

24   that question without trying to speculate on a legal

25   conclusion, but rather perhaps on a lay person or a nonlawyer's

Wells - Cross

1    point of view about the fire risk?

2           THE WITNESS:  The risk of catastrophic fires is

3    something that we are actively managing.  The combination of

4    all of the work we're doing to prevent those fires, as well as

5    the passage of Assembly Bill 1054, create the conditions that

6    would make our plan financially feasible.

7    BY MR. ABRAMS:

8    Q.   Mr. Wells, if you could turn to page 19 of your

9    declaration, lines 15 to 16, and that would be based on the

10   filed footer, you indicate there that I believe the

11   confirmation of the plan is not likely to be followed by a

12   liquidation, or the need for further reorganization; is that

13   correct?

14   A.   Are you looking at page 18 at the top, 19 at the bottom?

15   Q.   Yes.

16   A.   I see that, yes, that's my --

17   Q.   Thank you.  So is that statement correct?

18   A.   I believe it is.

19   Q.   Okay.  Would you say that catastrophic wildfires affect

20   the ability of the plan to avoid further reorganization or

21   liquidation?

22           MR. TSEKERIDES:  I'm going to object to the form.

23           THE COURT:  Understand the question, Mr. Wells?

24           THE WITNESS:  No, I don't, Your Honor.  I was going to

25   ask Mr. Abrams to repeat it, please.

Wells - Cross

1    MR. ABRAMS:  Sure.

2    THE COURT:  Rephrase, Mr. Abrams.

3    MR. ABRAMS:  Thank you.

4  BY MR. ABRAMS:

5  Q.  Do you believe that wildfire risks and PG&E's ability to

6  mitigate wildfire risks affects the degree to which they will

7  be able to forgo or avoid further reorganization or

8  liquidation?

9  A.  I think the combination of the work we're doing to

10  mitigate the risk of these future fires as well as the

11  stability from Assembly Bill 1054 makes this a true statement.

12  Q.  I'm sorry, Mr. Wells, I just want to repeat the question

13  because I'm not asking about assembly bills.  What I'm asking

14  about is specifically wildfires and specifically PG&E's ability

15  to mitigate wildfire risk.  Is that a factor in avoiding

16  further reorganization and liquidation of Pacific Gas &

17  Electric?

18    MR. KAROTKIN:  Your Honor, I --

19    MR. TSEKERIDES:  Your Honor, I --

20    MR. KAROTKIN:  -- think Mr. Wells already answered the

21  question.  Maybe Mr. Abrams doesn't like the answer, but he's

22  already answered the question.  AB 1054 happens to be terribly

23  relevant with the go-forward wildfire fund.  I think we should

24  move on.

25    THE COURT:  Well, Mr. Abrams, I did hear from Mr.

Wells - Cross

1    Wells that he believes the ability of the company to mitigate,

2    plus AB 1054, in his mind, those contribute to his opinion that

3    the company is not likely to need further financial

4    rehabilitation.  So I think Mr. Karotkin's point is well-taken,

5    and that's the answer.  And if you don't like the answer,

6    that's okay, too.  But go ahead, and if you have some follow-up

7    questions or want to --

8              MR. ABRAMS:  Sure.

9              THE COURT:  -- delve deeper, go ahead.

10             MR. ABRAMS:  Sure.  And just to be clear, Your Honor,

11   I do not believe that Mr. Wells' answer was responsive to my

12   question.

13             THE COURT:  Okay, then restate it.  That's fair.

14   You're entitled to ask him, pin him down, and see if he can be

15   more responsive.  But please understand, if he gives you the

16   same answer, I'm not going to make him say it a third time.

17   But make -- restate the question, if you will.

18             MR. ABRAMS:  Let me restate the question and perhaps

19   the form of the question.

20   BY MR. ABRAMS:

21   Q.   Yes or no?  Is wildfire risk mitigation critical to

22   avoiding further reorganization or liquidation of Pacific Gas &

23   Electric?

24             MR. TSEKERIDES:  Object to the form.  And the witness

25   should not be limited to Mr. Abram's yes or no --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1          THE COURT:  He can ask --

2          MR. TSEKERIDES:  -- to the choice.

3          THE COURT:  -- it with an explanation.

4          If you can answer the question, Mr. Wells?

5          THE WITNESS:  It's not a yes-or-no question, Your

6    Honor.  It's -- as I mentioned, the -- obviously, the -- the

7    priority of the company is to mitigate these future wildfires.

8    The State of California has recognized that California has a

9    risk with wildfires.  They passed a law to help address the

10   financial stability of all utilities in the state.  One would

11   have to look at both of those factors to answer that question.

12   BY MR. ABRAMS:

13   Q.   Mr. Wells, were the catastrophic wildfires associated with

14   2017 and 2018 factors that led to the PG&E bankruptcy?

15   A.   Yes, they were.

16   Q.   Thank you.  Mr. Wells, are you aware that there have been

17   recent reports that there is a sixty-percent increase in the

18   risk of wildfires heading into this 2020 wildfire season?

19          MR. TSEKERIDES:  Object to the form.

20          THE COURT:  Can you -- do you understand the question?

21   A.   I've not seen that specific calculation or reference.

22   BY MR. ABRAMS:

23   Q.   You have not -- sorry, you have not seen that reference by

24   the governor and others?

25   A.   The reference that I am aware of is that we have received

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    about sixty-five percent of our annual precipitation, which

2    creates the risk of a longer wildfire season.  It does not

3    necessarily speak to the likelihood of a catastrophic wildfire

4    occurring.

5    Q.   Okay, would you -- do you believe that there are other

6    experts who look at wildfire risk that might disagree with that

7    assessment?

8         MR. TSEKERIDES:  Objection to the form, Your Honor.  I

9    mean, it's not a quiz show.

10        MR. ABRAMS:  No, but it's relevant to feasibility of

11   this plan to be able to sustain --

12        THE COURT:  You can answer the question, okay?

13   A.   We have a number, as do the state and the other utilities

14   that are experts that are routinely calculating and quantifying

15   the risk of wildfires.

16   BY MR. ABRAMS:

17   Q.   Mr. Wells, are you aware that the public, ratepayers and

18   victims, are concerned regarding PG&E's ability to mitigate

19   wildfire risks relative to the plan?

20        MR. KAROTKIN:  Your Honor, what is the relevance of

21   that question, what people may be thinking about, other people?

22        MR. ABRAMS:  So I can answer that question.

23        THE COURT:  Well, no.  I'm going to overrule the

24   objection.  Let Mr. Wells answer the question.

25   A.   I don't understand the question as it relates to the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1  relevance of the plan.

2          THE COURT:  Okay.

3  A.    I do recognize that --

4          THE COURT:  Okay.  Well, then that's your answer, that

5  you don't understand the question.

6          Mr. Abrams, rephrase.  I don't fully understand the

7  question because the wildfire risk is the wildfire risk.  The

8  plan is the plan.

9          THE WITNESS:  Right.

10          THE COURT:  They don't necessarily go arm-in-arm here,

11  so --

12          MR. ABRAMS:  Sure.  So let me try to clarify the

13  question.

14  BY MR. ABRAMS:

15  Q.    Part of victim's vote for this plan, part of other

16  claimants' vote for this plan, part of the governor's support

17  of this plan and other people's support of this plan has to do

18  with the degree to which they believe and they trust that PG&E

19  is going to be able to be successful at mitigate wildfires.  Do

20  you believe that that is a fair statement?

21          THE COURT:  Well, a fair statement that other people

22  rely on or that -- a fair statement that PG&E believes it can

23  mitigate going forward?

24          MR. ABRAMS:  So my -- I was following up.  Does Mr.

25  Wells believe that it is a concern of the public and ratepayers

Wells - Cross

1   and victims and others that PG&E is ill-equipped to manage

2   wildfires risks?

3          MR. TSEKERIDES:  Your Honor, same objection that's

4   been made.  I mean, to ask Mr. Wells what other people believe

5   is not appropriate.

6          THE COURT:  Yeah, it's not appropriate, and it's

7   irrelevant.

8          Again, Mr. Abrams, you, for one, don't have a lot of

9   confidence in PG&E going forward, but that's not the point.  I

10  have to see if the bank (indiscernible) has been satisfied, and

11  it gets more than that because the governor has to be

12  satisfied.  The Public Utilities Commission has to be

13  satisfied.  And you may be unsatisfied, but if all of those

14  things come together, I then have to be persuaded, broader than

15  wildfire, that PG&E is not likely to need further

16  reorganization under the bankruptcy laws --

17         MR. ABRAMS:  Right.

18         THE COURT:  -- fires or not.  That's sort of the final

19  question that the Court has to answer, among others, when it

20  makes a decision to confirm or deny confirmation.

21         But for Mr. Wells to speculate on what he believes

22  other people believe isn't relevant.  So let's get back to your

23  questions.

24         MR. ABRAMS:  Okay.  I'll continue.

25  BY MR. ABRAMS:

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1  Q.   Are you aware that on May 7th, the California Public

2  Utilities Commission provided a report that stated that PG&E

3  ranks lower than other electrical -- electricity providers in

4  the state in terms of the ability to reduce wildfire risk?  Are

5  you aware of that?

6  A.   I am aware of that report.

7  Q.   All right.  Are you aware that also in that report, it

8  states, "Overall, PG&E does not demonstrate sufficiently that

9  it has allocated finite resources to initiatives that most

10  effectively reduce wildfire risks"?  Are you aware of that?

11  A.   I disagree with that characterization.

12  Q.   But are you aware of that characterization?

13       THE COURT:  Mr. Abrams, what is the relevance of Mr.

14  Wells being aware of the position asserted by the PUC?

15       MR. ABRAMS:  The relevance, Your Honor, is the degree

16  to which PG&E has taken on board experts that have evaluated

17  their company from the outside in terms of their feasibility to

18  be able to mitigate wildfire risks and reduce the chances of

19  restructuring and liquidation of their assets.

20       THE COURT:  Well, I mean, I have been, but PG&E is

21  trying to persuade me that it's done all the things that it

22  needs to do.  As I said a moment ago, it also has to persuade a

23  number of other authorities in different positions that makes

24  it so unique.  But if I believe they can do it, and so does the

25  PUC, and so does the governor, and so do the voters on this

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1　plan, I suspect that's all it's going to take.  But I don't

2　know what the point of asking Mr. Wells these questions are.

3　　　　　　So let's go forward.  Ask him something else.

4　　　　　　MR. ABRAMS:  Sure.

5　　　　　　THE COURT:  So back to my relevance test.  What do you

6　want him to tell me to help me make the decision that --

7　frankly, that you, I guess, want me to make, rather than what

8　he wants to make?

9　　　　　　MR. ABRAMS:  Sure.

10　　　　　　THE COURT:  Me to make?

11　　　　　　MR. ABRAMS:  My -- what I'm trying to probe around,

12　Your Honor, is the degree to which PG&E has been able to turn

13　to outside experts.  Because I believe to have a plan be

14　feasible, particularly around these complex issues, it's

15　imperative for PG&E to reach out to outside experts and to

16　receive criticism from outside organizations and incorporate

17　that into the plan.

18　　　　　　THE COURT:  Okay.  I understand you believe that, but

19　that's not the test today.  Today, you're asking Mr. Wells

20　about questions to --

21　　　　　　MR. ABRAMS:  Yes.

22　　　　　　THE COURT:  -- contrary to his declaration or perhaps

23　that should have been considered.  But to say that you believe

24　that the company should have consulted other experts, again, is

25　your opinion.  And I don't disrespect your opinion.  I don't

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    know that it's legally relevant today.

2          MR. ABRAMS:  Okay.  Yeah, I was asking Mr. Wells the

3    degree he -- which he took that on board.  But I'll leave that,

4    Your Honor, and I appreciate the redirection.

5    BY MR. ABRAMS:

6    Q.   Mr. Wells, I would like to probe a little bit around this

7    word, "likely" that you used in your declaration, in that line

8    that I just quoted.  This was mentioned earlier, but I'll

9    provided it in different context.  Judge Alsup's order

10   indicates that PG&E is ill-prepared to deal with wildfire risks

11   this summer.  How has Pacific Gas & Electric, and you

12   specifically, responded to that feedback in terms of how you're

13   looking forward?

14   A.   We are in the process of responding (break in audio)

15   feedback specifically.  To the larger point, though, in the

16   characterization of that decision by the CPUC, I think he

17   mischaracterizes our readiness for the upcoming wildfire

18   season.  We received conditional approval of our wildfire

19   mitigation plan.  We were asked to follow up and provide some

20   more specificity.  But on an overall basis, the company

21   received conditional approval that we'd be ready to manage the

22   risk of wildfires this upcoming fire season.

23   Q.   And have you -- is it PG&E's intention to comply with

24   Judge Alsup's orders to try to get PG&E back on a track of

25   safely mitigating wildfire risks?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    A.    We share a common goal.  We've raised some concerns around

2    the specific items in that order, but we absolutely share the

3    same common goal.

4    Q.    Okay.  Okay.  Are you aware that the governor and the

5    legislature have negotiated clauses that if PG&E were to cause

6    additional catastrophic wildfires, that they would have the

7    ability to intervene and reorganize Pacific Gas & Electric?

8          MR. KAROTKIN:  You Your Honor, I'm going to --

9          MR. TSEKERIDES:  I'm going to object.  Go ahead.  Go

10   ahead --

11         MR. KAROTKIN:  Sorry.

12         MR. TSEKERIDES:  -- Mr. Karotkin.

13         MR. KAROTKIN:  If he -- if Mr. Abrams is referring to

14   something specific, he should show it to the witness.

15         MR. ABRAMS:  Absolutely.  And I would have done that,

16   but my exhibits have not been yet approved by the Court, and

17   the objection deadline is due at 5 o'clock today, so I have not

18   been able to leverage the exhibits that I wanted to during this

19   cross-examination, so I'd ask for a little leeway.

20         MR. TSEKERIDES:  Your Honor, Mr. Tsekerides here.  I

21   would go even further.  I object to the line of questioning.

22   Whether or not the governor or the legislature has some plans

23   on what-ifs is not really relevant to whether or not you should

24   confirm this plan.

25         THE COURT:  Yeah.  I mean, I think that's the more

Wells - Cross

1     important question, Mr. Abrams.  Again, if I am persuaded by

2     you or others that the company is not likely to be free of

3     future reorganization or for some other reason, the plan is not

4     feasible, I will deny confirmation, and the governor and the

5     PUC and Judge Alsup are stuck with my decision.  But if I grant

6     the request to confirm the plan, and then something happens

7     after that, I can't know, and I couldn't expect Mr. Wells to

8     know what the consequence will be because I have no idea what

9     the consequence will be.

10          So I'm going to sustain Mr. Tsekerides' objection and

11    let you go forward with some more questions.

12          MR. ABRAMS:  Thank you.

13          THE COURT:  I'm going to give you about fifteen more

14    minutes, max.

15          MR. ABRAMS:  Okay.  I'll sum up with this line of

16    question just -- and then I'll move on to some other things.

17    BY MR. ABRAMS:

18    Q.   Given that the CPUC and Judge Alsup and the governor and

19    many other outside experts question the ability of PG&E to go

20    through wildfire season without additional reorganization, what

21    makes you believe that all of those outside experts are wrong

22    and PG&E is positioned to ensure that there isn't' further

23    reorganization and liquidation?

24          MR. TSEKERIDES:  I'm going to object to the form, Your

25    Honor, and also note that that assumes facts not in evidence.

Wells - Cross

1    I haven't seen anyone testify in this court as to any of the

2    facts that Mr. Abrams has just indicated.

3              MR. ABRAMS:  I just quoted some of those folks, and

4    again, there are others in my exhibits.

5              THE COURT:  Well, again, you haven't asked him a

6    specific question.  Mr. Tsekerides said he doesn't know what

7    you're referring to, what facts you're referring to, so I am

8    going to sustain the objection.

9              MR. ABRAMS:  Okay.

10   BY MR. ABRAMS:

11   Q.   Mr. Wells, in order to deal with the risks this summer for

12   wildfires and further reorganization and liquidation, how many

13   reclosers has PG&E been able to implement this year?

14   A.   I don't recall the specific number of reclosers or --

15   there are other elements of the upcoming wildfire mitigation

16   plan that we have prioritized.

17   Q.   Can you give me a rough estimate?

18   A.   I cannot because we're focused on other elements of the

19   wildfire mitigation plan that result in a greater degree of

20   risk reduction.

21   Q.   Okay.  Would Ms. Powell, as the -- who's in charge of the

22   Community Wildfire Safety Program, be more apt to be able to

23   answer those specific questions?

24   A.   She would, yes.

25   Q.   Thank you.  How many C-hooks has PG&E replaced this year?

(973) 406-2250 | operations@escribers.net | www.escribers.net

1        MR. TSEKERIDES:  Your Honor, I am going to raise a

2   relevancy objection.  I don't think this has anything to do

3   with the confirmation hearing.

4        THE COURT:  What's the relevance, Mr. Abrams?

5        MR. ABRAMS:  The relevance is if PG&E is not prepared

6   to mitigate wildfire risks, this plan is infeasible and likely

7   to lead to liquidation and a reorganization very soon.

8        THE COURT:  What's the relevance of how many hooks

9   they've replaced?

10       MR. ABRAMS:  Because the C-hooks have caused the Camp

11  Fire and other fires, and PG&E has identified them as a problem

12  in their infrastructure, a big problem.

13       THE COURT:  Okay, Mr. Wells, you can answer the

14  question if you know the answer.

15  A.   I don't recall the specific number of C-hooks because the

16  program that we've undertaken is the most comprehensive program

17  in the industry to evaluate the condition of the equipment that

18  is in high-fire-threat districts.  We've replaced that

19  equipment based on the specific condition and degradation of

20  that equipment.  I don't have the specific number that comes

21  out of those inspection programs.

22  BY MR. ABRAMS:

23  Q.   What percentage of vegetation management have you

24  completed to your target for this year?

25  A.   We completed about a third of our annual target by the end

Wells - Cross

1    of the first quarter.

2    Q.   So by -- you have no more updated numbers?

3    A.   I don't have the updated number in front of me, no.

4    Q.   Okay.

5         MR. ABRAMS:  Your Honor, I just would like to note

6    that these are very material, very critical issue to the

7    ability for this plan to be able to be sustained, and very

8    critical for the victims who understand wildfires firsthand and

9    want to be assured that PG&E's structured for success.

10        So I'll just leave that there and move on.

11        MR. TSEKERIDES:  Well, Your Honor, I object to the

12   speech by Mr. Abrams.  This is not -- he's not testifying here.

13        MR. ABRAMS:  This is not a speech.

14        THE COURT:  That's all right.  I don't mind.  He can

15   make a statement.

16        MR. TSEKERIDES:  Okay.

17   BY MR. ABRAMS:

18   Q.   I will move on to questions about the ability of the plan

19   to be funded.  How much of the feasibility of this plan is

20   contingent upon PG&E being able to secure bask top commitments?

21   A.   The plan is -- is fully committed from a financing

22   standpoint at this -- as of today.

23   Q.   So your ability to secure backstop commitments is not a --

24   does not get in the way of the feasibly of this plan?

25   A.   I respectfully don't understand the phrase, "secure

Wells - Cross

1    backstop commitments".  We have a fully committed equity

2    backstop in place.

3          THE COURT:  He said it was fully committed.  You asked

4    him about if the feasibility depends upon fully committed

5    backstops, and he said they're fully committed backstops.  So

6    that's the answer.

7          MR. ABRAMS:  Okay.

8          THE COURT:  Again, if you don't like the answer, I

9    can't change that result.

10         MR. ABRAMS:  I accept his answer.  Thank you.

11         THE COURT:  Okay.

12   BY MR. ABRAMS:

13   Q.   Are any of these backstop investors going to exceed the

14   4.75 percent and trigger a control even for the company?

15   A.   There is the potential that some of the investors, if the

16   equity is raised through the backstop agreement, could exceed

17   that 4.75-percent threshold.  However, we have trading

18   restrictions in place to prevent and limit the risk of a change

19   in control.

20   Q.   Okay.  If that is exceeded, how would that impact your

21   ability to avoid realizing net operating or losses?

22         MR. TSEKERIDES:  I'm going to object to the form, Your

23   Honor.

24         THE COURT:  Do you understand the question?

25         THE WITNESS:  I do.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1   A.    There's no -- there would be no impact.  As I mentioned,

2   we have a protective trading order in place and procedures to

3   prevent a change in control.

4   BY MR. ABRAMS:

5   Q.    Are your projections based upon pre-pandemic numbers?

6   Have you recalibrated your projections based on after the

7   COVID-19 was in full force?

8   A.    These projections were prepared prior to the COVID-19

9   pandemic.  However, we have subsequently evaluated the impact.

10  And given the constructive regulatory mechanisms here in

11  California, we don't believe that there is any material impact

12  to the financial projections we have -- we've included.

13  Q.    Okay.  On page 12 of your testimony, starting at line 15

14  and through page 13, you reference the Wildfire OII Settlement

15  Agreement.  Do you see that there?

16  A.    Yes, I do.

17  Q.    Okay.  Are you generally familiar with the 10K annual

18  report ending in fiscal year December 2019?

19  A.    Yes, I am.

20  Q.    Okay.  On note 15 of that 10K, it discusses pending

21  enforcement actions against PG&E associated with PG&E's role in

22  the 2017-2018 wildfires.  Specifically, it states, "The

23  settlement agreement stipulates that no violations have been

24  identified in the Tubbs Fire.  As a result of this finding, the

25  settlement agreement does not prevent the utility from seeking

Wells - Cross

1    recovery costs associated with the Tubbs Fire through rates."

2    Are you familiar with that?

3    A.    I am.

4         MR. TSEKERIDES:  The only point I'd make, Your

5    Honor -- I appreciate Mr. Abrams is under some constraints, and

6    typically, we would have the document handed to us.  So I'm

7    going to be relying on him actually reading that accurately.

8         MR. ABRAMS:  Thank you.  I believe I did.

9         MR. TSEKERIDES:  Okay.

10   BY MR. ABRAMS:

11   Q.    On page 12 of your testimony, specifically, you indicate

12   that the 200-million-dollar fine payable to the general fund

13   shall be permanently suspended.  Is that correct?

14   A.    That's correct.

15   Q.    Are you aware that parties to the CPUC have filed an

16   appeal challenging the legality of the nullifications of that

17   fine and the legality of disposing of PG&E's liability

18   associated with the Tubbs fire on the grounds that evidence was

19   unlawfully excluded?

20   A.    I'm not aware of any objections that have been filed after

21   this decisions has been rendered by the CPUC.

22   Q.    Okay.  If that appeal goes forward, can you please

23   describe the effects of the reinstatement of a 200-million-

24   dollar regulatory fine would have on this plan of

25   reorganization if that appeal is successful?

(973) 406-2250 | operations@escribers.net | www.escribers.net

1        MR. TSEKERIDES:  Your Honor, I am going to object.

2   That's a hypothetical.

3        THE COURT:  Oh, I think he -- I think Mr. Wells can

4   say his opinion if there's a 200-million-dollar fine

5   reinstated.

6        Go ahead, if you know --

7        MR. TSEKERIDES:  Very well.

8        THE COURT:  -- Mr. --

9   A.   I think it's important that the decision was reached after

10  lengthy comment period.  This is a final decision by the CPUC.

11  To the extent that a 200-million-dollar fine was applied, it

12  does have implications with other bankruptcy-related documents.

13  That would create a complexity.  If the question is, does the

14  company have the capacity outside of these bankruptcy documents

15  to accommodate 200 million dollars, we do.  This is a --

16       THE COURT:  Can you say --

17  A.   -- this is a very complicated area that doesn't lend

18  itself to a hypothetical.

19       THE COURT:  Okay, okay.  So your answer is, you think

20  the company does have the ability to deal with it?

21       THE WITNESS:  Financially, the company has the ability

22  to deal with it.  It does have implication to other bankruptcy-

23  related documents that would have to be considered.

24  BY MR. ABRAMS:

25  Q.   If that appeal moves forward and the ability to seek

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    recovery costs associated with the Tubbs fire through rates,

2    would that also interfere with the efficacy of this plan?

3            MR. TSEKERIDES:  Object to the form, Your Honor.

4    Calls for legal conclusion.

5            THE COURT:  You can answer.

6    A.   I don't understand the hypothetical.  The reference to the

7    recovery in rates is dealt with in a different element of this

8    plan and a different application with the CPUC.  And so these

9    concepts are not related.

10   BY MR. ABRAMS:

11   Q.   Okay.  So let me just rephrase.  If you are unable because

12   of an appeal to recover costs associated with the Tubbs Fire,

13   will that affect your ability to perform according to this plan

14   before us?

15   A.   No, it won't.

16   Q.   Thank you.  Has PG&E recorded any wildfire-claim

17   liabilities in connection with last year's Kincade fire?

18   A.   No, we have not.  Liability has not been established yet.

19   Q.   Okay.  In your 10K that I referenced, I believe you now

20   indicate that the PG&E causing the Kincade fire is reasonably

21   possible; is that correct?

22   A.   That is correct.

23   Q.   Okay.  What are the ramifications to the plan viability if

24   that fire is deemed to have been caused by PG&E and caused by

25   the jumper associated with that tower?

Wells - Cross

1  A.    There would be no impact to the plan that we've proposed

2  here.  As we disclosed in our ten-quarter -- sorry, first-

3  quarter 10Q, if the company is deemed to be the cause of the

4  Kincade fire, we would reasonably estimate the damages to be

5  about 600 million dollars before the application of insurance.

6  We had -- we have 430 million in insurance available to cover

7  those damages.  The net amount would -- would not impact the

8  feasibility of this plan.

9  Q.    Okay.  So since that 10K on page 189 had stated "cannot

10 reasonably estimate the amount or range of such possible loss",

11 would you say that that is no longer a factual statement?

12 A.    That is correct, which is why we updated that disclosure

13 as part of the quarterly reporting at the end of the first

14 quarter.

15 Q.    Okay.  In Mr. Johnson's testimony before the CPUC, he made

16 specific references to PG&E's commitment to abide by the law.

17 Do you, as the chief financial officer, similarly feel that

18 PG&E has a renewed commitment to abide by the law?

19 A.    Absolutely.

20 Q.    Okay.  How would you rate PG&E's ability to adhere to the

21 law to-date?  And the reason why -- let me just say the reason

22 why I'm asking the question is I believe historical information

23 is critical to evaluate how PG&E's going to perform moving

24 forward.  How would you evaluate PG&E's ability to adhere to

25 the law in the past?

Wells - Cross

1          MR. TSEKERIDES:  Your Honor, I am going to object to

2    the form of the question and to its relevancy to the

3    confirmation hearing.

4          THE COURT:  Oh, you can answer it, Mr. Wells.  I'm

5    going to overrule the objection.

6    A.   We've accepted responsibility for our past actions.

7    BY MR. ABRAMS:

8    Q.   So have you had the ability to obey the law and adhere to

9    the law in the recent past, say the last three years?

10         MR. TSEKERIDES:  Your Honor, same objection.  I -- you

11   know, I don't see the relevance of this.

12         THE COURT:  You can answer, Mr. Wells.

13   A.   We've accepted responsibility for our previous actions.

14   That included acknowledgement of our role -- our legal role in

15   the 2018 Camp Fire.

16   BY MR. ABRAMS:

17   Q.   With respects to Mr. Wells, it's not my question.  I'm

18   asking you to evaluate, one to a hundred, one to ten, what was

19   your -- what was the company's ability to be lawful corporate

20   citizens over the past few years?

21         THE COURT:  Okay, well, that's not relevant.  So I'll

22   sustain the objection to that.  I thought you were more talking

23   about prospective.  So I might have misunderstood your

24   questions.

25   BY MR. ABRAMS:

Wells - Cross

1    Q.    Okay, let me ask moving forward.  Mr. Wells, do you

2    believe that PG&E's ability to be lawful is going to be

3    important for this plan to be feasible, for you to be able to

4    avoid reorganization, and avoid liquidation?  Is adhering to

5    the law important for that purpose?

6              MR. TSEKERIDES:  Object to the form.

7              THE COURT:  You can answer.

8    A.    We're absolutely to adhering the law.  We've overhauled

9    our corporate ethics and compliance practices.  We have changed

10   out management of the company.  We have refreshed the board of

11   directors.  We are in the process of changing the culture of

12   the company.  We're absolutely committed to adhering to all

13   laws the company's subject to.

14   Q.    So --

15             MR. ABRAMS:  And sorry, I only have two or three more

16   questions here, Your Honor.

17   BY MR. ABRAMS:

18   Q.    So help me understand how that marries to page 28 of your

19   motion for reconsideration in front of Judge Alsup, where you

20   state, "Courts are neither experts on such matters nor

21   politically accountable for their decisions."  Does that show

22   respect for the law?

23             THE COURT:  That, I'm going to tell Mr. Wells not to

24   answer.  And that's argument and not relevant.  So I gave

25   you -- I told you I wasn't likely to give you your total forty-

Wells - Cross

1    five.  We're at about forty-five.  So I need you to just wrap

2    up your questions now, please.

3              MR. ABRAMS:  Okay.  I'll wrap up with one final

4    question, Your Honor, because I think it's relevant to how we

5    move forward with the proceeding.

6    BY MR. ABRAMS:

7    Q.   Ms. Cain, I understand, is your chief ethics and

8    compliance officer.  Would she be very knowledgeable about

9    compliance and ethics issues related to PG&E?

10   A.   Yes.

11   Q.   Thank you.  Ms. Powell, as the person in charge of

12   community wildfire safety, would she be familiar with wildfire

13   safety risks that might pose an issue for the plan?

14             MR. TSEKERIDES:  Object to the form.

15             THE COURT:  I don't understand the question.  What's

16   the question?

17   BY MR. ABRAMS:

18   Q.   Is Ms. Powell an expert on wildfire safety risks for PG&E?

19   A.   Yes.

20   Q.   Okay.

21             MR. ABRAMS:  That's all the questions I have, Your

22   Honor.  Thank you.

23             THE COURT:  Okay, thank you.

24             Mr. Tsekerides, do you wish to have redirect?  Because

25   if not --

Wells - Redirect

1      MR. TSEKERIDES:  Yeah, I think I have one question.

2  Then we can maybe excuse Mr. -- unless you have questions, Your

3  Honor.

4      THE COURT:  I was going to conclude the hearing or

5  take a break if you had a lot of questions.

6      MR. TSEKERIDES:  Just one.

7      THE COURT:  All right.  Go ahead with redirect.

8  REDIRECT EXAMINATION

9  BY MR. TSEKERIDES:

10  Q.   So Mr. Wells, Ted Tsekerides for the debtors.  In

11  paragraph 19 of your declaration -- we had some discussion

12  earlier today about formulas and insurance proceeds and the

13  like.  Do you recall that?

14  A.   I do.

15  Q.   Okay.  How this formula is intended to work and its

16  application with insurance proceeds, is that something that the

17  company's attorneys are responsible for demonstrating to the

18  Court?

19  A.   I believe it is.

20      MR. TSEKERIDES:  Okay.  Nothing further, Your Honor.

21      THE COURT:  All right.  Mr. Wells, thank you for your

22  testimony.  I'm going to exclude you.

23      And I believe, based upon our prior discussions,

24  there's nothing else to deal with today.

25      Mr. Karotkin, do you concur with that point of view

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1    here?

2              MR. KAROTKIN:  Yes, sir, I do.

3              THE COURT:  Ms. Parada?

4              MS. PARADA:  Excuse, me, Your Honor.  Mr. Tosdal and

5    Mr. McCallen have raised their hands.  Would you like me to

6    bring them in?

7              THE COURT:  Oh.  Well -- well, briefly, but --

8              MR. TSEKERIDES:  Unless it's in response to my one

9    question, they really shouldn't be.  But okay.

10             THE COURT:  All right, bring them in.

11         (Whereupon these proceedings were concluded at 12:39 PM)

12   And we can excuse Mr. Abrams just to keep the stream clear.

13             MS. PARADA:  And Mr. Behlmann has also raised a hand,

14   Your Honor.

15             THE COURT:  Mr. Tosdal, you can go ahead and unmute

16   yourself.  What did you want to say?

17             MR. TOSDAL:  Thank you, Your Honor.  I need to move

18   some of the (indiscernible) in the exhibits.  Do I do that now

19   or later, or what's your pleasure?

20             MR. TSEKERIDES:  Your Honor, if I could be heard on

21   that?

22             THE COURT:  Yes.

23             MR. TSEKERIDES:  So we did have -- we submitted an

24   objection to -- I don't recall Mr. Tosdale's in particular --

25   to the various documents.  I thought it would be best, given

(973)406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1  that it's a bench trial, that we could deal with that sort of

2  after all the witnesses and just go through --

3          THE COURT:  Yeah, that was my intent and

4  understanding.

5          MR. TOSDAL:  Fine with me, Your Honor.

6          THE COURT:  You're not asking -- you don't need any

7  more questions of Mr. Wells, Mr. Tosdal?

8          MR. TOSDAL:  No, sir.

9          THE COURT:  Okay.

10          MR. TOSDAL:  No, sir.  So we'll just deal with

11  exhibits later?

12          THE COURT:  Yeah, later.

13          MR. TOSDAL:  Thank you.

14          THE COURT:  Mr. McCallen?  State your name for the

15  record, please.

16          MR. MCCALLEN:  Good afternoon, Your Honor.  Benjamin

17  McCallen, Willkie Farr & Gallagher for the ad hoc subrogation

18  group.  Can you hear me okay, Your Honor?

19          THE COURT:  Yes.  What do you want to do?  What do you

20  want to say?

21          MR. MCCALLEN:  Sure.  So I don't have any questions.

22  I just want to clarify an issue related to the evidence in the

23  record.  During cross, Mr. Tosdal insinuated that the

24  subrogation claims included injury -- included damages for

25  personal injury or wrongful death claims.  That's not accurate,

operations@escribers.net | www.escribers.net
(973) 406-2250

Wells - Cross

1   and it's -- we only have injuries asserted for property damage

2   claims.  I'm not looking to argue this point now, Your Honor,

3   and I'm not looking to examine Mr. Wells further.  I don't

4   think he's the right witness for that.  But I do just want to

5   confirm that for plan confirmation purposes, the record

6   evidence includes the proofs of claims filed by my clients as

7   well as the subrogation RSA motion and the supporting exhibits

8   so that those are in the record, and we can argue off of those

9   if that --

10          THE COURT:  But I'm only dealing with the witness

11  today.  We've been doing this for almost two-and-a-half hours.

12  So I'm just not going to deal with anything other than Mr.

13  Wells' testimony.

14          So Mr. McCallen, your point is noted, and it's not an

15  action item for today.

16          MR. MCCALLEN:  Thank you, Your Honor.

17          THE COURT:  Okay.

18          Mr. Karotkin, once again, anything else we need to

19  deal with today?

20          MR. KAROTKIN:  No, sir.

21          THE COURT:  Okay.  I thank you all --

22          MS. PARADA:  Your Honor?

23          THE COURT:  Yes?

24          MS. PARADA:  Mr. Andrew Behlmann wanted -- has a hand

25  raised.  Would you like --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Wells - Cross

1          THE COURT:  Oh, I'm sorry.

2          MS. PARADA:  -- me to bring him in?

3          THE COURT:  You did say Mr. Behlmann.  Yes, bring him

4    back in, please.

5          MR. BEHLMANN:  Hi.  Good afternoon, Your Honor.  I had

6    actually briefly attempted to voice an objection to the one

7    redirect question by Mr. Tsekerides but realized I was not a

8    panelist.  I simply wished to object to the extent it called

9    for a legal conclusion by asking Mr. Wells to opine on whether

10   something was a factual issue or a legal issue.  I simply

11   wanted to preserve that for the record.  I have no questions on

12   recross.

13         THE COURT:  Okay.  It's preserved for the record.

14   Thank you, Mr. Behlmann.

15         MR. BEHLMANN:  Thank you, Your Honor.

16         THE COURT:  Ms. Parada, any other hands up?

17         MS. PARADA:  No, Your Honor.

18         THE COURT:  Okay.  Thank you all for your time.  Long

19   morning for us, evening or afternoon for you on the other end

20   of the country.  I'll see you tomorrow at the next phase of the

21   evidence portion of the trial.  Thank you for your day.

22         IN UNISON:  Thank you, Your Honor.

23         THE COURT:  Thanks to the staff.  Thanks you, Ms.

24   Parada and Ms. Thomas.

25         (Whereupon these proceedings were concluded.)

(973)406-2250 | operations@escribers.net | www.escribers.net

1                     I N D E X

2    WITNESS              EXAMINATION BY        PAGE

3    Patrick Wells        Mr. Tosdal            5

4    Jason Wells          Ms. Porter            31

5    Jason Wells          Mr. Behlmann          44

6    Jason Wells          Mr. Abrams            74

7    Jason Wells          Mr. Tsekerides        99

8

9

10                    E X H I B I T S

11   DEBTOR'S            DESCRIPTION            MARKED   ADMITTED

12                      Jason Wells'                     5

13                      declaration and

14                      attachments

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          C E R T I F I C A T I O N

2

3  I, Colin Richilano, certify that the foregoing transcript is a

4  true and accurate record of the proceedings.

5

6

7

8  _____

9  /s/ COLIN RICHILANO

10

11  eScribers

12  7227 N. 16th Street, Suite #207

13  Phoenix, AZ 85020

14

15  Date:  May 29, 2020

16

17

18

19

20

21

22

23

24

25

**A**

**AB (2)**
76:22;77:2
**abide (2)**
95:16,18
**ability (21)**
75:20;76:5,14;77:1;
79:18;82:4;85:7;86:19;
89:7,18,23;90:21;
93:20,21,25;94:13;
95:20,24;96:8,19;97:2
**able (12)**
11:10;76:7;79:11;
80:19;82:18;83:12;
85:18;87:13,22;89:7,
20;97:3
**above (2)**
35:17;64:17
**Abrams (78)**
73:20,21,22,25,25;
74:1,5,7;75:7,25;76:1,
2,3,4,21,25;77:8,10,18,
20;78:12,22;79:10,16,
22;80:6,12,14,24;81:8,
17,24,25;82:13,15;
83:4,9,11,21;84:2,5;
85:13,15;86:1,12,15,
17;87:2,3,9,10;88:4,5,
10,22;89:5,12,13,17;
90:7,10,12;91:4;92:5,8,
10;93:24;94:10;96:7,
16,25;97:15,17;98:3,6,
17,21;0:12
**Abram's (1)**
77:25
**absolutely (7)**
61:16;73:4;85:2,15;
95:19;97:8,12
**accept (1)**
90:10
**acceptable (1)**
69:4
**accepted (3)**
28:2;96:6,13
**accommodate (1)**
93:15
**accomplish (2)**
40:9;54:16
**accomplishing (2)**
42:1,2
**accordance (1)**
39:11
**according (1)**
94:13
**account (6)**
51:21;52:2,3,18,19,
19
**accountable (1)**
97:21
**accounted (1)**
67:17

**accuracy (2)**
33:4;34:18
**accurate (2)**
36:1;0:25
**accurately (1)**
92:7
**accusing (1)**
40:25
**acknowledgement (1)**
96:14
**acquires (1)**
27:14
**action (1)**
0:15
**actions (3)**
91:21;96:6,13
**actively (1)**
75:3
**actually (4)**
63:17;71:5;92:7;0:6
**ad (1)**
0:17
**addition (2)**
49:6;68:5
**additional (6)**
62:17,18,20,21;85:6;
86:20
**address (1)**
78:9
**addresses (5)**
35:3,11;66:1,10;67:8
**adhere (3)**
95:20,24;96:8
**adhering (3)**
97:4,8,12
**advice (6)**
53:21,24;54:7,14;
65:17;68:21
**advisors (1)**
64:18
**affect (2)**
75:19;94:13
**affected (1)**
35:21
**affects (1)**
76:6
**affirmatively (2)**
68:7,12
**afternoon (4)**
71:21;0:16,5,19
**Again (32)**
18:10,19;24:1;26:24;
28:16;30:14;38:23;
41:23;42:11;48:25;
53:16,19;54:13,16;
57:10;58:17;60:25;
64:13;65:14,15,24;
67:4,15;68:2;74:10;
81:8;83:24;86:1;87:4,
5;90:8;0:18
**against (32)**
6:4,14;19:13,16,21;
20:2;21:20;45:1;46:19;

47:2,4,23,23;48:2,5,6,
9,12,16,20;51:22;52:3,
19,20;63:12,16;66:13;
67:2,9,12;68:12;91:21
**agencies (1)**
19:5
**ago (2)**
10:4;82:22
**agree (6)**
9:10;26:7;27:22;
60:22;63:22;74:14
**agreed (1)**
56:18
**agreement (9)**
29:21,24;30:1,2,3;
90:16;91:15,23,25
**agrees (1)**
68:13
**ahead (19)**
7:22;8:7;13:11,13;
14:18;15:23;16:23;
24:5;25:13;41:4;43:24;
73:5;77:6,9;85:9,10;
93:6;99:7;0:15
**Ahh (1)**
11:19
**alike (1)**
72:2
**alleged (1)**
6:21
**alleging (1)**
45:18
**allocated (1)**
52:24;82:9
**allow (4)**
14:16;57:15;71:18;
74:14
**allowed (14)**
35:15,20,23;36:2,9;
37:4,14,22;40:14;49:8,
18;51:4;53:6;71:7
**almost (1)**
0:11
**Alsup (5)**
27:23;28:8;86:5,18;
97:19
**Alsup's (2)**
84:9,24
**although (1)**
46:25
**ambitious (1)**
28:4
**amended (1)**
54:22
**America (1)**
27:25
**among (2)**
59:10;81:19
**amount (9)**
35:20;37:5;51:4,6,
19;53:12;63:6;95:7,10
**analysis (1)**
23:20

**Andrew (2)**
43:16;0:24
**annual (3)**
79:1;88:25;91:17
**answered (2)**
76:20,22
**anticipate (1)**
61:25
**anticipated (1)**
43:22
**anymore (1)**
41:11
**apologies (1)**
65:5
**apologize (3)**
20:18;64:21;67:25
**appeal (5)**
92:16,22,25;93:25;
94:12
**appearance (1)**
70:16
**applicable (4)**
38:11,13;60:16,23
**application (3)**
94:8;95:5;99:16
**applied (1)**
93:11
**applies (2)**
54:9;67:11
**apply (1)**
67:1
**appreciate (8)**
13:17;24:24;61:6;
71:13;74:8,9;84:4;92:5
**appropriate (8)**
18:14;42:14;54:8;
58:12;63:21;74:20;
81:5,6
**approval (2)**
84:18,21
**approved (1)**
85:16
**apt (1)**
87:22
**area (1)**
93:17
**argue (11)**
7:19;9:3,6,16;18:9,
11;23:25;24:17;47:13;
0:2,8
**argues (1)**
18:13
**arguing (2)**
48:19;57:10
**argument (10)**
7:17;8:1,4;23:13;
24:3;40:8;63:20;66:16;
67:19;97:24
**arguments (2)**
39:15,16
**arising (6)**
47:22,24;48:5,12;
66:14;67:12

**arm-in-arm (1)**
80:10
**around (6)**
68:1;74:13;83:11,14,
84:6;85:1
**arrive (1)**
57:24
**article (1)**
25:2
**ascertain (1)**
59:8
**aside (1)**
11:13
**aspect (2)**
65:15,16
**Assembly (3)**
75:5;76:11,13
**asserted (5)**
48:12;67:9,12;82:14;
0:1
**asserts (1)**
32:5
**assessed (1)**
63:5
**assessment (1)**
79:7
**asset (1)**
45:3
**assets (2)**
44:23;82:19
**associated (8)**
74:15;78:13;91:21;
92:1,18;94:1,12,25
**assume (1)**
30:13
**assumed (1)**
11:11
**assumes (1)**
86:25
**assuming (2)**
30:16;54:9
**assured (1)**
89:9
**attached (1)**
62:14
**attachments (1)**
5:9
**attempted (1)**
0:6
**attempting (2)**
59:7,8
**attendance (1)**
43:9
**attention (1)**
39:12
**attorney (1)**
31:1
**attorneys (3)**
31:22;32:24;99:17
**audience (1)**
30:6
**audio (2)**
69:25;84:14

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 106
of 121

**authorities (1)**
82:23
**available (6)**
61:22,24;62:25;63:6;
69:22;95:6
**avoid (5)**
75:20;76:7;90:21;
97:4,4
**avoiding (2)**
76:15;77:22
**aware (39)**
14:3,6;16:1;29:24;
32:2,5;35:8;41:14,16,
18;42:20,21;46:11;
49:15;50:1,19,23;
52:21;54:12,13,21,22;
56:4,8,10;61:9;78:16,
25;79:17;82:1,5,6,7,10,
12,14;85:4;92:15,20

**B**

**back (15)**
3:17;10:19;22:10;
25:13;33:18;34:5;43:9;
47:5,7;64:15;74:9;
81:22;83:5;84:24;0:4
**background (1)**
73:3
**backstop (6)**
58:22;89:23;90:1,2,
13,16
**backstops (2)**
90:5,5
**bad (1)**
24:1
**BAILIFF (1)**
30:22
**ballot (1)**
68:7
**bank (1)**
81:10
**bankruptcy (16)**
3:4;10:16,16;12:20;
13:7;21:18;23:20;24:9;
25:12;41:19;50:16;
74:19,21;78:14;81:16;
93:14
**bankruptcy- (1)**
93:22
**bankruptcy-related (1)**
93:12
**bar (1)**
67:11
**based (23)**
8:12;45:20;50:9,15;
53:21,24;54:7,14;
55:20;57:7;58:22;60:1;
61:21;63:13;64:17;
67:2;68:16,21;75:9;
88:19;91:5,6;99:23
**basic (1)**
48:17

**basis (4)**
8:4,6;56:22;84:20
**bask (1)**
89:20
**Baupost (6)**
19:23;20:4,23,25;
21:5;23:10
**B-A-U-P-O-S-T (1)**
19:23
**become (3)**
36:11;38:9,11
**becomes (3)**
37:17;38:14;43:5
**beginning (1)**
71:4
**behalf (1)**
43:17
**behind (1)**
67:21
**Behlmann (45)**
30:24;43:13,16,17,
25;44:2;46:24;47:16,
20;48:8,11,22;49:5;
56:15;57:4,5,14,22;
58:16,17;59:5,14,20,
23;61:4,23;62:3,6;
63:23,24;64:1,3,11;
67:7,20,24;68:24;69:8,
10;0:13,24,3,5,14,15
**belief (1)**
66:8
**believes (4)**
61:21;77:1;80:22;
81:21
**Bellman (1)**
43:10
**bench (1)**
0:1
**benefit (1)**
27:10
**benefits (2)**
14:11;19:10
**Benjamin (1)**
0:16
**Bermuda (1)**
4:10
**besides (4)**
50:18,21;60:6;70:21
**best (3)**
33:7;34:19;0:25
**better (2)**
22:4;24:12
**big (3)**
21:21;25:9;88:12
**Bill (2)**
75:5;76:11
**billion (10)**
20:1;21:19;53:15,17;
54:1,24;56:5,10;57:20,
25
**billions (1)**
22:23
**bills (1)**

76:13
**bit (5)**
25:18;43:22;46:13;
68:1;84:6
**Blow (1)**
23:10
**Board (6)**
31:16;39:5,10;82:16;
84:3;97:10
**board's (1)**
38:20
**bogged (1)**
40:1
**Boken (1)**
73:13
**both (6)**
32:2,6;46:19;62:24;
64:5;78:11
**bottom (3)**
32:20;36:25;75:14
**bought (11)**
19:20;20:25;23:10,
18,21;24:1,2;25:6,10;
48:9,18
**bouncing (1)**
67:25
**break (5)**
69:13,14,25;84:14;
99:5
**briefly (4)**
9:23;57:10;0:7,6
**bring (8)**
30:8,22,25;73:20;
0:6,10,2,3
**brings (1)**
29:20
**broader (2)**
20:11;81:14
**bucks (1)**
25:7
**bunch (2)**
41:11;42:6
**bundle (1)**
8:9
**business (6)**
36:10;37:16;38:1,11;
40:15;41:13
**buy (1)**
26:15

**C**

**Cain (1)**
98:7
**calculate (1)**
54:8
**calculated (1)**
51:10
**calculating (3)**
50:7;60:9;79:14
**calculation (2)**
56:20;78:21
**CALIFORNIA (9)**

3:1,5;27:25;28:2;
31:15;78:8,8;82:1;
91:11
**Call (5)**
3:3;8:21;15:2;39:12;
73:14
**called (4)**
46:15;56:11;59:16;
0:8
**calls (5)**
6:8;14:14;56:10;
68:15;94:4
**came (1)**
25:25
**Camp (2)**
88:10;96:15
**Can (85)**
3:10,11,14;4:1,11;
5:16;6:8,10,8;20:9;2,6,
7,16;15:24,24,25;
16:23;18:11,18;
20:13;23:25;24:17;
25:11;26:9;28:1,6,24;
30:17,25;31:3,5,6;
33:17;38:3;41:24;42:6;
43:10;47:9,16;50:13;
52:4;57:16;59:9;60:4;
61:9,16,17;64:8;66:17,
18;68:16;69:15,17;
70:5,6,12,15,22;71:9;
72:11;74:23;77:14;
78:1,4,20;79:1;22,22;
80:22;82:24;87:17;
88:13;89:14;92:22;
93:3,16;94:5;96:4,12;
97:7;99:2;0:12,15,18,8
**cap (2)**
54:24;55:6
**capacity (1)**
93:14
**capitalization (5)**
54:2,19;55:1,8;60:8
**care (2)**
22:18,25
**carriers (1)**
62:23
**case (6)**
19:3;22:16,17;27:2;
30:17;70:20
**cases (2)**
22:6;44:14
**cash (10)**
21:19;22:20;35:19;
37:5,9;51:16,20,21;
52:11,15
**catastrophic (7)**
28:5,14;75:2,19;
78:13;79:3;85:6
**cause (2)**
85:5;95:3
**caused (5)**
55:11;74:13;88:10;
94:24,24

**causing (1)**
94:20
**caution (2)**
50:8;53:19
**cents (1)**
21:6
**certain (1)**
31:20
**Certainly (6)**
43:16;44:5;58:18,20,
21;74:9
**cetera (1)**
37:10
**challenging (1)**
92:16
**chance (1)**
72:7
**chances (1)**
82:18
**change (6)**
55:4,4,12;90:9,18;
91:3
**changed (1)**
97:9
**changing (2)**
39:25;97:11
**Chapter (1)**
22:6
**characterization (4)**
6:12;82:11,12;84:16
**characterizing (1)**
38:4
**charge (2)**
87:21;98:11
**chief (3)**
55:25;95:17;98:7
**choice (1)**
78:2
**C-hooks (3)**
87:25;88:10,15
**chose (1)**
30:16
**cite (1)**
16:7
**citizens (1)**
96:20
**city (1)**
25:9
**claim (33)**
6:23,25;8:11,15;9:9;
10:6;12:24;14:9;16:1;
23:10,17,18,21,21;
37:15;42:20;45:1,2;
46:13,19;48:9,20;
49:24;50:25;51:5,10,
19;52:17;53:7,7,12;
67:18;68:6
**claimants (1)**
52:22
**claimants' (1)**
80:16
**claimed (3)**
6:14,21;7:3

Min-U-Script®

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 107
of 121

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) authorities - claimed

**claiming (1)**
7:13
**claims (135)**
5:25,25;6:1,4,4,13,
16;7:5,7,8,13;8:20;9:6,
24;10:13,17;11:3,5;
12:12,16;13:1,13,18,
19,21,24,25,25;14:2,4,
4,7,21;15:14;16:4,5,7,
15,17,25;19:13,16,21;
20:1,9;21:1,6,11,12,15,
20;22:1,5,8,12,22;24:2;
32:2,5;35:15,20,20,23,
24;36:3,4,5,9,10;37:1,
4,5,22;38:8;39:23;
40:14,20;41:22,25;
42:10;45:8,9,12,14,17,
18,20,20;46:15,19;
47:1,2,3,22,23,25;48:2,
5,6,11,14,16,23;49:7,8,
13,19;51:22,23;52:1,3,
19,19;58:8,12;59:7;
60:7;63:12,15;66:1,2,6,
7,13,20,22;67:2,9,9,11;
68:11;0:24,25,2,6
**clarify (5)**
38:15;46:24;48:8;
80:12;0:22
**clarifying (1)**
40:7
**class (45)**
10:3,15;11:4,5,6;
12:13,17,17;13:18,19;
17:6,6,10,13,22,23;
18:7,23,24;19:2,4,6,9;
21:18;24:18;25:23;
26:18,18,23;45:12,20;
46:16;47:21;57:9;58:8,
11,19;59:6,11,17;60:7;
64:20;65:14,20;66:7
**classes (7)**
6:1;12:13;16:12,18;
18:2;19:2;25:19
**classification (5)**
9:7;20:8,12;22:7;
47:3
**classified (5)**
9:19;10:7,9;48:14,24
**classifies (1)**
46:15
**classify (1)**
10:8
**clause (2)**
35:16;36:3
**clauses (1)**
85:5
**clear (5)**
62:7;64:5;68:10;
77:10;0:12
**CLERK (15)**
3:4,9,11,19,23,25;
4:21;33:12,14,14,17,
20,23;70:2,15

**client (2)**
24:18,21
**clients (1)**
23:13;0:6
**client's (2)**
38:19;40:20
**close (1)**
62:3
**clue (1)**
7:10
**coat (1)**
4:8
**Code (3)**
8:13,13;24:9
**collectively (1)**
31:24
**combination (2)**
75:3;76:9
**combine (1)**
44:23
**comfortable (2)**
30:19;65:18
**coming (3)**
3:22;28:14;72:17
**comment (1)**
93:10
**Commission (2)**
81:12;82:2
**commitment (2)**
95:16,18
**commitments (3)**
89:20,23;90:1
**committed (6)**
89:21;90:1,3,4,5;
97:12
**common (9)**
20:5,23;56:5;57:20;
62:22;63:3;67:3;85:1,3
**communications (3)**
31:21;50:10;61:10
**Community (2)**
87:22;98:12
**companies (3)**
22:13;63:3,4
**company (33)**
19:13,16,18,21;20:2;
21:20;22:22;27:24;
38:7;44:17;48:4,6,7,
21;56:6;61:21;63:16;
66:21,23;77:1,3;78:7;
82:17;83:24;84:20;
86:2;90:14;93:14,20,
21;95:3;97:10,12
**company's (5)**
9:14;54:2;96:19;
97:13;99:17
**complaints (1)**
15:21
**completed (2)**
88:24,25
**completely (5)**
9:25;17:24;21:23;
22:6,7

**complex (1)**
83:14
**complexity (1)**
93:13
**compliance (3)**
97:9;98:8,9
**complicated (5)**
10:18;57:17,23;
59:17;93:17
**complied (1)**
39:6
**comply (1)**
84:23
**comprehensive (1)**
88:16
**computer (1)**
34:25
**computes (1)**
52:16
**concede (1)**
15:23
**concept (2)**
48:17;56:11
**concepts (2)**
12:20;94:9
**concern (1)**
80:25
**concerned (1)**
79:18
**concerns (1)**
85:1
**conclude (2)**
43:6;99:4
**concluded (2)**
0:11,25
**conclusion (9)**
6:8;14:14,19;27:17;
63:14;68:15;74:25;
94:4;0:9
**concur (1)**
99:25
**condemnation (1)**
7:1
**condition (2)**
88:17,19
**conditional (2)**
84:18,21
**conditions (1)**
75:5
**confidence (1)**
81:9
**confident (1)**
28:6
**confirm (7)**
21:13;34:10;54:2;
81:20;85:24;86:6;0:5
**confirmation (10)**
21:23;39:15;44:7;
59:10;75:11;81:20;
86:4;88:3;96:3;0:5
**confirmed (1)**
22:14
**confusing (1)**

12:20
**conjunction (1)**
42:13
**connection (2)**
33:15;94:17
**consent (2)**
41:12,15
**consequence (5)**
7:20,21;8:3;86:8,9
**consideration (3)**
56:7;57:19;59:6
**considered (5)**
50:17,20;54:18;
83:23;93:23
**consist (1)**
62:17
**consistent (1)**
24:9
**constraints (2)**
58:5;92:5
**constructive (1)**
91:10
**consulted (1)**
83:24
**contained (1)**
68:4
**context (3)**
61:4,15;84:9
**contingent (4)**
9:25;10:11,13;89:20
**continue (8)**
30:2;36:5,15;38:9;
43:4;69:15,17;81:24
**contrary (9)**
37:21;38:3,18,19,21;
39:5;40:3,5;83:22
**contrast (1)**
57:7
**contribute (1)**
77:2
**control (3)**
90:14,19;91:3
**controls (5)**
38:18;40:7,11,11,13
**controversial (1)**
59:22
**convention (1)**
11:22
**conveyed (1)**
26:22
**copy (4)**
32:25;34:15,16;44:8
**Cora (1)**
31:15
**Corp (1)**
45:23
**corporate (2)**
96:19;97:9
**corporation (1)**
44:16
**correctly (2)**
8:17;49:1
**correspond (2)**

37:6,11
**costs (3)**
92:1;94:1,12
**counsel (13)**
3:12;35:6;40:6,8;
44:6;50:10;53:20,21,
24;54:7,15;68:16,22
**count (2)**
49:18;50:3
**countered (1)**
26:15
**country (1)**
0:20
**couple (4)**
10:4;13:21;60:12;
69:1
**course (11)**
11:11;36:6,10,15;
37:16;38:1,9,11;40:15;
41:12;43:4
**Court (239)**
3:3,4,5,7,10,14,17,
21,24;4:1,4,7,11,14,17,
25;5:8,11,15,17;6:10;
7:9,17,24;8:1,6;9:2,10,
18,22;10:2,6,11,24;
11:11,15,19;12:2,19,
23;13:4,7,11;14:15,17;
15:5,9,11,13,18,23;
16:23;18:12,16;20:11,
17,20;22:3,10;23:1,3,6,
9,25;24:9,11,16,23,25;
25:5;26:7,13;27:3,8,11,
13,19;28:17,20;29:4,
11,15,19;30:5,8,12,20,
24;31:5,7;33:24;34:3,
11,23;35:4;38:5,15,23;
39:3,8,24;40:21;41:2,
7;42:2,8,15,18,22,24;
43:8,14,24;47:5,7,19;
48:8,17,25;50:13;
53:23;57:4,13,15;
58:16;59:3,13;60:4;
61:8,14,17;62:3;63:22,
24;64:8;66:18;67:14,
23;68:19;69:5,9,12,16,
18,20,22,25;70:3,7,11,
17,23;71:1,6,9,14,20,
22;72:13,24;73:5,10,
19,23;74:1,23;75:23;
76:2,25;77:9,13;78:1,3,
20;79:12,23;80:2,4,10,
21;81:6,18,19;82:13,
20;83:5,10,18,22;
85:16,25;86:13;87:1,5;
88:4,8,13;89:14;90:3,8,
11,24;93:3,8,16,19;
94:5;96:4,12,21;97:7,
23;98:15,23;99:4,7,18,
21;0:3,7,10,15,22,3,6,9,
12,14,19,10,17,21,23,1,
3,13,16,18,23
**courtroom (1)**

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 108
of 121

72:1
**Courts (1)**
97:20
**cover (3)**
63:20,21;95:6
**coverage (5)**
60:17,23;61:10;
62:25;63:7
**covers (3)**
15:21;63:12,15
**COVID-19 (2)**
91:7,8
**CPUC (7)**
84:16;86:18;92:15,
21;93:10;94:8;95:15
**create (3)**
22:1;75:5;93:13
**creates (1)**
79:2
**credibility (1)**
47:12
**creditor (6)**
23:16;26:14;45:1;
68:11,12;71:24
**critical (4)**
77:21;89:6,8;95:23
**criticism (1)**
83:16
**cross (2)**
69:3;0:23
**crossed (1)**
4:6
**cross-examination (7)**
5:15,17,20;31:11;
44:1;74:6;85:19
**cross-examine (1)**
72:22
**cross-examined (1)**
20:13
**culture (1)**
97:11
**current (1)**
26:9
**currently-due (1)**
36:4
**customary (1)**
22:24

**D**

**D&O (9)**
51:24;52:7,8;53:5;
60:12,15,21;62:8;64:4
**damage (19)**
13:22,24;14:1,23,24,
24;16:2,8,9;48:20;
49:8,13,24;50:25;51:5;
52:17;58:8;66:7;0:1
**damages (12)**
6:21;45:8,12;46:13,
19;49:19;53:7,7;60:7;
95:4,7;0:24
**date (21)**

5:10;35:21,24;36:5;
37:16,25;50:4,6,18,18;
51:10,14;54:3,4,6,11,
19;55:6,19;56:17;
67:11
**dates (1)**
55:13
**day (4)**
30:10;72:22;74:8;
0:21
**days (2)**
10:4;72:9
**deadline (1)**
85:17
**deadly (1)**
28:3
**deal (16)**
24:1;26:2,3,9,9;
39:25;41:24;84:10;
87:11;93:20,22;99:24;
0:1,10,12,19
**dealing (1)**
0:10
**deals (1)**
39:16
**dealt (2)**
67:18;94:7
**death (5)**
14:4,25;15:14,21;
0:25
**debt (2)**
45:8,19
**debtor (4)**
47:4;48:2;51:22;
67:10
**debtors (26)**
31:24;32:3,6;36:18;
39:18,19;44:14;46:20,
20;47:2;48:16;50:6,17,
20;52:3,19;54:18;
55:25;56:2,5,18;60:16,
17,22;62:24;99:10
**debtors' (1)**
52:13
**Debtor's (3)**
5:10;40:6;45:25
**December (1)**
91:18
**decide (1)**
7:11
**decision (11)**
9:2;10:4;24:12;27:2;
42:3;81:20;83:6;84:16;
86:5;93:9,10
**decisions (3)**
24:14;92:21;97:21
**declaration (63)**
5:4,9;7:13;11:3,8,12;
12:12;16:13;18:22;
26:11;32:8,12,13,16,
18;33:1,3,6,10;34:13,
13,17,19,25;35:1;36:1,
1,9,13;37:6,11,21,23;

38:3,7,17;39:1,9;40:2,
16,24;44:6;45:5;46:12;
47:1,8,10;48:15;49:6,
12,16,23;50:2,24;
52:10;60:13;62:15;
64:14;68:1;75:9;83:22;
84:7;99:11
**declarations (1)**
9:13
**decline (1)**
55:15
**deduct (1)**
52:15
**deducted (2)**
52:23;53:9
**deducting (1)**
51:20
**deduction (1)**
52:1
**deemed (2)**
94:24;95:3
**deeper (1)**
77:9
**defenses (1)**
51:13
**defined (1)**
52:12
**defines (1)**
46:11
**definition (9)**
12:24;46:18,18;
49:11,22;50:24,25;
51:15;53:11
**degradation (1)**
88:19
**degree (6)**
76:6;80:18;82:15;
83:12;84:3;87:19
**deliver (2)**
27:25;28:1
**delve (1)**
77:9
**demonstrate (1)**
82:8
**demonstrating (1)**
99:17
**Dennis (1)**
3:6
**deny (2)**
81:20;86:4
**depend (1)**
15:17
**depends (4)**
15:19,20;39:5;90:4
**describe (3)**
49:23;50:24;92:23
**described (2)**
49:12;52:7
**describes (2)**
35:19;49:7
**describing (1)**
49:7
**details (1)**

26:16
**determination (2)**
22:12,14
**determine (3)**
24:7;42:12;59:9
**determined (3)**
51:6;54:7;56:11
**determining (1)**
59:1
**devastating (1)**
28:3
**dialogue (1)**
41:10
**differ (4)**
11:6;12:13,17;13:18
**difference (7)**
10:2,3;17:25;40:18;
47:10;55:2;72:3
**differences (1)**
16:11
**different (10)**
7:14;16:4;18:2;
46:13;57:8;65:8;82:23;
84:9;94:7,8
**differently (1)**
16:18
**differs (1)**
11:4
**difficulties (1)**
71:8
**diluted (1)**
50:3
**direct (2)**
13:25;68:17
**directly (1)**
74:10
**directors (4)**
60:17;63:12,16;
97:11
**disagree (8)**
6:12;7:18,19;9:21;
28:8,10;79:6;82:11
**disagreements (1)**
10:12
**disclose (4)**
26:5,13,14;50:10
**disclosed (1)**
95:2
**disclosing (2)**
26:1,16
**disclosure (1)**
95:12
**discount (13)**
21:1,10,13,13,15,21;
22:9,22;23:10,15,17,
18;24:2
**discounts (1)**
22:13
**discriminate (4)**
64:19;65:3,9,12
**discusses (1)**
91:20
**discussion (3)**

53:15;55:5;99:11
**discussions (3)**
20:8;64:18;99:23
**disposing (1)**
92:17
**disposition (1)**
29:7
**dispute (1)**
18:21
**disputed (1)**
8:22
**disrespect (1)**
83:25
**disrupting (1)**
73:2
**distinct (2)**
7:14;44:20
**distinction (4)**
52:4,21;53:2,4
**distribution (2)**
44:24;60:9
**District (1)**
3:5
**districts (1)**
88:18
**divide (1)**
53:13
**divided (1)**
57:25
**docket (2)**
32:13;36:19
**document (8)**
32:12,19;39:4,9,10;
47:9;72:6;92:6
**documents (5)**
40:10;93:12,14,23;
0:25
**dollar (10)**
21:2,7;51:4,6,19;
53:17;54:1,25;56:11;
92:24
**dollars (14)**
20:1;21:19;22:23;
56:5;57:20,25;60:18,
19,23;61:22;62:1,25;
93:15;95:5
**done (2)**
82:21;85:15
**down (4)**
32:20;40:1;72:24;
77:14
**draft (1)**
37:4
**due (13)**
35:24;36:6,11;37:15,
17,24;38:8,9,11,14;
40:15;43:5;85:17
**during (3)**
31:16;85:18;0:23
**dwelling (1)**
12:25

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 109 of 121

## E

**earlier (3)**
60:12;84:8;99:12
**earnest (1)**
21:25
**ease (1)**
32:8
**educate (1)**
40:23
**effect (4)**
11:3;22:20,21;29:21
**effective (4)**
35:24;36:5;37:15,25
**effectively (1)**
82:10
**effects (1)**
92:23
**efficacy (1)**
94:2
**eight (1)**
72:25
**either (5)**
37:4;41:19,24;49:1;
59:25
**electric (7)**
18:1;27:23;44:17;
76:17;77:23;84:11;
85:7
**electrical (1)**
82:3
**electricity (2)**
28:1;82:3
**electronic (2)**
34:5;43:14
**elects (1)**
68:7
**element (1)**
94:7
**elements (2)**
87:15,18
**eleven (1)**
21:19
**eligible (1)**
38:13
**else (10)**
16:11;27:19;47:12;
52:20;70:21;72:12,25;
83:3;99:24;0:18
**elsewhere (1)**
52:10
**embarked (1)**
28:3
**emerge (1)**
36:14
**emergency (1)**
71:6
**encourage (1)**
40:6
**end (7)**
23:12;24:7;43:19,25;
88:25;95:13;0:19

**ended (1)**
43:21
**ending (1)**
91:18
**ends (1)**
21:18
**energy (1)**
18:1
**enforcement (1)**
91:21
**engaged (1)**
28:21
**enough (2)**
42:24;71:17
**ensure (1)**
86:22
**entirety (1)**
65:14
**entities (21)**
5:25;8:10,21;16:4;
17:7,9,12,20,21,22,23;
18:6,23,24;19:1,4,6;
25:22,23;44:20,23
**entities' (3)**
17:6,22;25:23
**entitled (6)**
7:19,19;38:20;39:25;
70:7;77:14
**entitlements (1)**
38:19
**entity (3)**
16:4,7;18:23
**equal (3)**
35:20;37:5,9
**equating (2)**
58:20,21
**equipment (3)**
88:17,19,20
**equitable (8)**
59:11;64:19;65:7,10,
11,15,20;66:11
**equitably (4)**
59:15;66:1,10;67:8
**equity (17)**
12:23;45:19,21,23;
56:12,16;57:6,7,8,20;
58:22;59:25;60:1,9;
66:2;90:1,16
**error (1)**
40:4
**escort (1)**
30:6
**essentially (1)**
36:8
**establish (3)**
7:10;9:13;15:10
**established (4)**
15:7;51:13;52:25;
94:18
**establishing (1)**
9:12
**estimate (3)**
87:17;95:4,10

**estimated (5)**
56:17,21;57:18;
58:23;60:2
**estimation (1)**
55:20
**et (1)**
37:10
**ethics (3)**
97:9;98:7,9
**evaluate (4)**
88:17;95:23,24;
96:18
**evaluated (2)**
82:16;91:9
**even (4)**
9:14;29:3;85:21;
90:14
**evening (1)**
0:19
**events (1)**
55:11
**everybody (1)**
22:16
**everyone (1)**
3:8
**evidence (8)**
5:8,10;15:2;86:25;
92:18;0:22,6,21
**exactly (1)**
61:24
**examination (2)**
33:17;99:8
**examine (2)**
43:11;0:3
**example (2)**
10:17;18:4
**exceed (2)**
90:13,16
**exceeded (1)**
90:20
**excess (1)**
60:18
**exclude (2)**
73:2;99:22
**excluded (2)**
39:21;92:19
**exclusively (1)**
13:24
**Excuse (8)**
23:4;69:12;72:15;
73:11,19;99:2;0:4,12
**Exhibit (1)**
5:10
**exhibits (10)**
5:4,6;8:5;62:15;
85:16,18;87:4;0:18,11,
7
**exists (2)**
10:15;29:25
**expect (1)**
86:7
**experience (1)**
16:25

**expert (1)**
98:18
**experts (9)**
79:6,14;82:16;83:13,
15,24;86:19,21;97:20
**explain (2)**
47:10;54:15
**explanation (1)**
78:3
**exploring (3)**
57:9,12;58:24
**extended (1)**
67:10
**extent (11)**
6:8;14:11,14;26:4;
50:9;53:19;61:1,3;
68:14;93:11;0:8

## F

**F/S (3)**
32:21,24;34:14
**fact (15)**
7:14,15;9:19;15:7;
18:10,21;22:12;23:9,
16,23,25;24:21;26:2;
32:25;58:24
**factor (1)**
76:15
**factors (3)**
74:20;78:11,14
**facts (5)**
15:2;61:5;86:25;
87:2,7
**factual (10)**
8:3;9:8;11:4;12:14,
18;13:20;16:5,12;
95:11;0:10
**fair (17)**
24:8;27:13,17;51:9;
59:11,24;64:19;65:7,
10,11,14,20;66:10;
77:13;80:20,21,22
**fairly (6)**
55:12;59:15,21;66:1,
9;67:8
**fairness (4)**
20:10;23:2,3,5
**familiar (10)**
36:22;45:14,15,25;
49:14,25;50:14;91:17;
92:2;98:12
**far (1)**
29:6
**Farr (1)**
0:17
**fashions (1)**
25:21
**feasibility (9)**
74:11,15,19,21;
79:10;82:17;89:19;
90:4;95:8
**feasible (5)**

74:14;75:6;83:14;
86:4;97:3
**feasibly (1)**
89:24
**federal (1)**
19:5
**feedback (2)**
84:12,15
**feel (6)**
41:4;95:17
**few (9)**
43:19;44:10;45:16;
51:1;64:12;96:20
**fifteen (5)**
31:7;43:11;60:19;
62:1;86:13
**figure (3)**
57:2;59:7;73:1
**file (1)**
42:19
**filed (19)**
6:16,18;7:6;9:5,5;
32:2,12;36:19,19;46:8;
54:22;55:5;71:5,20;
72:6;75:10;92:15,20;
0:6
**filing (2)**
11:18,25
**final (6)**
25:17;64:4;67:25;
81:18;93:10;98:3
**financial (7)**
19:15;55:25;56:1;
77:3;78:10;91:12;
95:17
**financially (2)**
75:6;93:21
**financing (1)**
89:21
**find (3)**
39:17;48:23;67:21
**finding (1)**
91:24
**Fine (11)**
34:23;53:21;68:18;
69:19,21;92:12,17,24;
93:4,11;0:5
**finish (5)**
22:2,2,3,20;23:4
**finite (1)**
82:9
**fire (48)**
5:25;8:22;9:24;11:5;
12:17;13:19,25;14:8,
10;16:5,9,25;17:9,12,
23;18:7,24;19:1,4,6;
22:18,19;26:18,22;
28:14,14,25,25;29:23;
56:6,11,16,24;58:20;
66:1;75:1;84:22;88:11;
91:24;92:1,18;94:1,12,
17,20,24;95:4;96:15
**fires (11)**

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 110
of 121

13:22;16:19,21;28:3,
5;55:15;75:2,4;76:10;
81:18;88:11
**first (12)**
5:11;6:3;13:21;
22:16;30:25;45:11;
51:15;53:12,13;70:18;
89:1;95:13
**first- (1)**
95:2
**firsthand (1)**
89:8
**fiscal (1)**
91:18
**five (2)**
43:23;98:1
**flaw (2)**
38:24,25
**flesh (1)**
39:2
**focus (1)**
13:12
**focused (3)**
13:24;14:1;16:7;
87:18
**focusing (1)**
12:25
**folks (1)**
87:3
**follow (1)**
84:19
**followed (1)**
75:11
**following (1)**
80:24
**follow-up (2)**
42:4;77:6
**footer (5)**
45:7;60:14;64:14;
68:3;75:10
**footnote (1)**
62:9
**force (1)**
91:7
**forgo (1)**
76:7
**forgot (1)**
25:18
**form (20)**
6:7;15:1;16:22;38:2;
53:18;55:21,24;66:15;
74:22;75:22;77:19,24;
78:19;79:8;86:24;
90:22;94:3;96:2;97:6;
98:14
**formalities (1)**
44:5
**formality (1)**
5:6
**formula (27)**
49:11,14,15,22,25;
50:1,15,21,21;51:7,19;
52:16,16,24;53:5,9;

54:8,12,14,20,23;
57:17,23,24;58:12;
59:16;99:15
**formulas (1)**
99:12
**formulate (1)**
71:18
**forth (1)**
64:17
**forty- (1)**
97:25
**forty-five (3)**
74:1,2;98:1
**forward (14)**
8:7;9:11;10:21;28:7;
80:23;81:9;83:3;84:13;
86:11;92:22;93:25;
95:24;97:1;98:5
**Franchise (1)**
31:16
**FRANCISCO (1)**
3:1
**frankly (2)**
41:25;83:7
**fraud (1)**
45:18
**free (2)**
41:4;86:2
**front (6)**
11:8;35:7;40:10;
44:8;89:3;97:19
**FTB (4)**
31:16;32:2,5;43:2
**FTB's (5)**
38:22;39:22;41:12,
22;42:9
**full (4)**
61:22;63:6;70:17;
91:7
**fully (7)**
50:3;80:6;89:21;
90:1,3,4,5
**fully-diluted (1)**
49:17
**fund (2)**
76:23;92:12
**fundamental (1)**
23:5
**fundamentally (1)**
24:7
**funded (1)**
89:19
**further (13)**
7:22;75:12,20;76:7,
16;77:3,22;81:15;
85:21;86:22;87:12;
99:20;0:3
**future (5)**
28:4;53:15;76:10;
78:7;86:3

**G**

**gained (1)**
53:20
**Gallagher (1)**
0:17
**Garrison (1)**
5:19
**gas (8)**
18:1;27:23;28:1;
44:17;76:16;77:22;
84:11;85:7
**gave (3)**
71:11,24;97:24
**general (5)**
45:16;63:15;65:21,
23;92:12
**generally (10)**
45:14,15,25;49:15;
50:1,14;54:12;63:13;
65:12;91:17
**gets (5)**
10:18;26:19;29:1;
57:25;81:11
**given (4)**
72:21;86:18;91:10;
0:25
**gives (1)**
77:15
**goal (2)**
85:1,3
**goes (2)**
20:10;92:22
**go-forward (1)**
76:23
**Golden (1)**
25:6
**Good (27)**
3:8,9,13,14;4:1,3,13,
14,16;5:22,23;20:15;
30:10;31:2,4,13,14;
34:24;44:3,4,12;61:8;
73:21;74:3,8;0:16,5
**Gotshal (1)**
40:18
**governing (1)**
29:22
**governmental (1)**
18:5
**governments (1)**
18:3
**governor (7)**
78:24;81:11;82:25;
85:4,22;86:4,18
**governor's (1)**
80:16
**grant (1)**
86:5
**grants (1)**
68:6
**greater (1)**
87:19
**ground (1)**
23:22
**grounds (1)**

92:18
**group (3)**
16:21;22:17;0:18
**groups (2)**
6:5,13,21,25;7:3,14;
8:20
**guess (4)**
7:20;65:9,11;83:7

**H**

**hand (4)**
4:18;71:4;0:13,24
**handed (1)**
92:6
**hands (2)**
0:5,16
**handy (1)**
44:11
**happened (3)**
26:2,3;33:25
**happening (1)**
22:18
**happens (5)**
10:8;28:13;32:19;
76:22;86:6
**hard (1)**
54:24
**harm (1)**
14:8
**heading (1)**
78:18
**heads-up (1)**
73:12
**Health (1)**
8:13
**hear (14)**
3:10,14;8:17;31:3,5,
6;34:6;69:16;70:5,6,
12,22;76:25;0:18
**heard (3)**
21:12;73:17;0:20
**hearing (6)**
22:17;39:15;71:7;
88:3;96:3;99:4
**Hello (1)**
73:22
**help (7)**
9:2;27:2;34:8;42:3;
78:9;83:6;97:18
**helpful (1)**
22:11
**helps (1)**
49:3
**hereby (1)**
5:9
**Hertz (1)**
25:10
**Hi (1)**
0:5
**higher (1)**
55:8
**high-fire-threat (1)**

88:18
**highlight (1)**
39:19
**historical (2)**
16:20;95:22
**historically (1)**
16:15
**hoc (1)**
0:17
**hold (6)**
12:24;19:15;24:25,
25;28:25;33:17
**HoldCo (8)**
44:17;45:8,11;46:13,
18;47:23,24,25;48:12;
49:8,18,18,24;50:4,25;
51:5;52:17;53:7;54:19;
58:8,11;60:6;64:5;
66:6,14;67:13
**HoldCo's (3)**
49:12;55:7;67:3
**holder (5)**
12:24;23:20;53:6;
68:6
**holders (3)**
49:8;66:22,24
**holder's (1)**
49:24;51:4
**holding (8)**
20:5;29:6;48:3,6,7,
21;66:21,23
**holds (1)**
20:1,8
**home (2)**
17:20;71:25
**Honor (149)**
3:11,13,18,20,25;4:3,
13,16;5:14;6:7;7:5,13;
8:3,25;9:21;10:22;
11:7;17;12:3;13:6;
14:13,20;15:1,20;
16:22;18:10,15;20:6,
10,16;21:22,25;22:4,
15;24:6,14,17;25:15,
24;26:10,24;27:7,18;
28:16;29:2,14,18;
30:11,19,22;31:4,6,10;
34:2,9;35:10;38:2,22,
25;39:7,14;40:12,17,
20;41:1,6,23;42:5,7,11,
16,23,25;43:13,16,19,
20;46:21;47:18;48:11,
22;49:5;50:9;53:19;
56:25;57:5;58:4,6,17;
59:5,12;60:3,25;61:1;
62:6;63:19;66:15;67:4;
68:24;69:4,10,15;70:2,
15;73:25;74:5,17;
75:24;76:18,19;77:10;
78:6;79:8,20;81:3;
82:15;83:12;84:4;85:8,
20;86:25;88:1;89:5,11;
90:23;92:5;93:1;94:3;

Min-U-Script®
Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 111
of 121

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(6) first - Honor

96:1,10;97:16;98:4,22;
99:3,20;0:4,14,17,20,5,
16,18,2,16,22,5,15,17,
22
**Honorable (1)**
3:6
**hooks (1)**
88:8
**hope (1)**
59:21
**hoped (2)**
71:3,5
**hours (1)**
0:11
**hundred (2)**
21:1;96:18
**hypothetical (3)**
93:2,18;94:6

**I**

**idea (1)**
86:8
**identical (2)**
6:5;7:15
**identified (4)**
34:13;35:9;88:11;
91:24
**ii (2)**
36:8;37:11
**ill-equipped (1)**
81:1
**ill-prepared (1)**
84:10
**imagination (1)**
58:18
**imagine (1)**
40:25
**impact (6)**
90:20;91:1,9,11;
95:1,7
**impeach (1)**
47:11
**impeaching (1)**
40:25
**imperative (1)**
83:15
**implement (1)**
87:13
**implication (1)**
93:22
**implications (1)**
93:12
**important (5)**
22:17;86:1;93:9;
97:3,5
**importantly (1)**
40:4
**incidents (1)**
17:1
**include (11)**
14:4;15:14;16:8;
35:23;46:8,19;47:22;

**51:21;66:5,6,13
included (8)**
8:16;16:1;18:7;
54:23;91:12;96:14;
0:24,24
**includes (4)**
36:25;56:1;67:9;0:6
**including (3)**
6:17;25:5;61:2
**income (5)**
56:17,21;57:18;
58:23;60:2
**inconsistency (5)**
38:16;39:1;40:24;
46:25,25
**incorporate (1)**
83:16
**incorrect (2)**
15:18,18
**incorrectly (1)**
49:2
**increase (1)**
78:17
**increasing (1)**
27:16
**indemnify (1)**
63:17
**indicate (5)**
12:12;32:24;75:10;
92:11;94:20
**indicated (4)**
34:14,15;69:2;87:2
**indicates (1)**
84:10
**indirect (2)**
13:22;14:8
**indiscernible (5)**
10:11;27:11;60:13;
81:10;0:18
**indistinct (1)**
16:18
**individual (2)**
8:11;16:9
**individuals (1)**
52:3
**industry (1)**
88:17
**infeasible (1)**
88:6
**informal (1)**
4:9
**information (1)**
95:22
**informed (1)**
16:14
**infrastructure (2)**
17:20;88:12
**initial (1)**
62:7
**initially (1)**
69:2
**initiatives (1)**
82:9

**injuries (1)**
0:1
**injury (5)**
14:25;15:14;16:8;
0:24,25
**insinuated (1)**
0:23
**inspection (1)**
88:21
**installments (1)**
37:10
**instance (1)**
16:17
**instead (5)**
22:18,19;42:7;54:23,
24
**institutions (1)**
19:15
**instructed (1)**
53:23
**insurance (27)**
14:11;51:16,20,24,
25;52:7,11,12,13,15,
18;53:2,13;60:12,15,
21,23;62:8,18,22;63:2,
4;64:4;95:5,6;99:12,16
**insured (2)**
14:22;63:12
**insureds (2)**
19:10;64:5
**insurer (5)**
14:11;53:3,5,8;61:10
**insurers (5)**
19:10;53:6;60:21;
61:3;62:21
**intend (5)**
38:10,12;42:4;43:1;
69:3
**intended (2)**
32:9;99:15
**intending (4)**
40:12,13;51:23;
54:15
**intent (1)**
0:3
**intention (6)**
36:4,12;38:7;42:19;
43:3;84:23
**intentional (1)**
40:4
**intentionally (1)**
41:2
**interest (7)**
12:23;37:10;38:12,
14,19,22;68:6
**interesting (1)**
25:2
**interests (11)**
11:4,5;12:13,16,21;
13:1,1,12;17:19;18:21;
66:2
**interfere (1)**
94:2

**interject (2)**
8:25;25:24
**internet (1)**
34:4
**interpretation (1)**
63:14
**interpreting (1)**
40:1
**interrupt (3)**
12:19;33:14;35:4
**intervene (1)**
85:7
**into (10)**
3:22;5:7,10;6:1;9:8;
14:10;26:8;30:6;44:23;
52:17;55:3;57:19,25;
58:19;59:21;78:18;
83:17
**inverse (1)**
7:1
**investment (2)**
24:12,14
**investor (3)**
20:5;23:9,15
**investors (10)**
19:12,20;21:5,10,19;
22:21;29:22;45:18;
90:13,15
**invite (1)**
26:12
**invited (1)**
67:10
**invoke (1)**
9:1
**involved (7)**
25:19;26:11;46:3,5;
53:25;54:16;61:7
**irrelevant (11)**
21:23;22:6,7,9;
23:19,19;28:17,18;
42:16,17;81:7
**isn't (1)**
86:22
**issue (21)**
9:7;12:24;20:8;
21:23;22:6,7;23:7,7;
24:4;28:8;34:4,4;56:5;
57:14;58:11;60:16;
89:6;98:13;0:22,10,10
**issued (6)**
56:24;57:6,9;59:1,6;
62:20
**issues (7)**
9:4,5;27:1;41:24;
63:4;83:14;98:9
**item (2)**
29:25;0:15
**items (1)**
85:2
**iteration (1)**
57:24

**J**

**Jason (4)**
4:23;5:9;32:12;
70:11
**job (2)**
24:7;56:1
**Joe (1)**
23:10
**Johnson's (1)**
95:15
**join (2)**
3:12,19
**joining (2)**
33:23;70:2
**Judge (10)**
27:23;28:8;33:14,23;
71:5;84:9,24;86:5,18;
97:19
**judgement (1)**
24:11
**Julian (5)**
3:21;4:15,16;30:13,
19
**jump (2)**
32:18;36:24
**jumped (2)**
34:13,24
**jumper (1)**
94:25
**jumps (1)**
39:19
**jury (1)**
74:13

**K**

**KAROTKIN (40)**
3:13,15,16;4:8,10;
5:1;7:5;10:12;11:7;
21:22;22:1,4;29:2;
40:17,17;42:12,16;
46:21,21;47:6;58:4,6,
6;59:12;60:3;63:19;
64:7;69:20,21;76:18,
20;79:20;85:8,11,12,
13;99:25;0:2,18,20
**Karotkin's (1)**
77:4
**keep (4)**
40:21;44:11;61:8;
0:12
**kicked (1)**
34:3
**Kincade (3)**
94:17,20;95:4
**kind (1)**
39:19
**knowledge (13)**
31:20;33:7;34:19;
42:9;47:11;50:9,11,11;
53:19,21,24;63:13,15

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 112
of 121

**knowledgeable (1)**
98:8
**knows (4)**
11:23;22:4;48:23;
61:1

## L

**language (2)**
38:16;65:25
**larger (1)**
84:15
**largest (2)**
19:23;27:24
**last (13)**
4:8;25:5,10;28:24;
34:6;37:14;43:1;47:8;
64:12;68:1;71:7;94:17;
96:9
**later (8)**
9:18;40:8;66:16;
73:8,10;0:19,11,12
**law (16)**
10:16;39:5,11;40:3,
5;47:15;78:9;95:16,18,
21,25;96:8,9;97:5,8,22
**lawful (2)**
96:19;97:2
**laws (2)**
81:16;97:13
**lawyer (2)**
7:7;47:8
**lawyers (1)**
72:1
**lay (1)**
74:25
**layers (1)**
62:17
**lead (1)**
88:7
**learn (1)**
13:9
**leave (5)**
30:17;41:3;69:7;
84:3;89:10
**led (1)**
78:14
**leeway (1)**
85:19
**legal (33)**
6:8,13;7:20,21;8:2,2;
9:3,20;11:4;12:14,17;
13:19;14:14,18;16:5,
12;38:19;39:14,16;
42:11;49:2;63:14,20;
65:17;66:16;67:16;
68:15;74:18,24;94:4;
96:14;0:9,10
**legality (2)**
92:16,17
**legally (2)**
36:14;84:1
**legislature (2)**

85:5,22
**lend (1)**
93:17
**lengthy (1)**
93:10
**less (3)**
21:1;51:16;53:13
**letting (2)**
8:7;31:18
**level (1)**
21:13
**leverage (1)**
85:18
**liabilities (2)**
44:23;94:17
**liability (13)**
6:4,17,17;8:11,16,
17;51:13,25;52:24;
60:15,21;92:17;94:18
**liable (3)**
6:14;7:1,3
**life (2)**
22:12;25:8
**light (1)**
68:25
**lightly (2)**
26:6;61:4
**likelihood (1)**
79:3
**likely (9)**
39:22;41:17;75:11;
77:3;81:15;84:7;86:2;
88:6;97:25
**limit (2)**
62:1;90:18
**limitation (1)**
61:25
**limited (1)**
77:25
**limits (1)**
60:18
**line (10)**
11:2,16;12:4;32:21;
47:17;64:21;84:7;
85:21;86:15;91:13
**lines (4)**
11:9;12:8;65:1;75:9
**liquidated (3)**
9:6;10:6,14
**liquidation (10)**
75:12,21;76:8,16;
77:22;82:19;86:23;
87:12;88:7;97:4
**litigant (1)**
70:20
**litigation (2)**
60:24;63:1
**little (11)**
7:22;25:18;28:22;
43:21;46:13;48:15;
62:4;64:15;68:1;84:6;
85:19
**live (1)**

71:25
**local (3)**
18:3,3;19:5
**long (5)**
4:8;33:25;40:10;
72:6;0:18
**longer (3)**
43:22;79:2;95:11
**Look (11)**
4:7;11:10;15:20;
24:13,14;30:20;61:6;
63:5;69:5;78:11;79:6
**looked (2)**
19:2;65:13
**looking (8)**
11:16,24;55:3;64:1;
75:14;84:13;0:2,3
**lose (1)**
34:2
**losing (2)**
26:23;27:15
**loss (2)**
15:16;95:10
**losses (1)**
90:21
**lost (2)**
33:15;45:19
**lot (6)**
13:9;25:8,9,10;81:8;
99:5
**lots (1)**
22:13
**Lowenstein (1)**
43:17
**lower (3)**
55:8,18;82:3
**lowest (1)**
21:4

## M

**makes (4)**
76:11;81:20;82:23;
86:21
**making (2)**
24:2;73:1
**manage (2)**
81:1;84:21
**management (2)**
88:23;97:10
**managing (1)**
75:3
**many (13)**
6:17,23,23;8:16;
17:9,12;20:5,23;28:25;
86:19;87:12,25;88:8
**March (3)**
46:8;54:23;55:6
**market (10)**
22:24;54:2,19,24,25;
55:6,7,9;60:7,8
**marketing (1)**
54:10

**marketplace (1)**
27:15
**marries (1)**
97:18
**Mary (1)**
70:19
**master (1)**
15:21
**material (3)**
46:25;89:6;91:11
**matter (4)**
5:6;23:16,19;53:8
**matters (1)**
13:8;18:5;97:20
**max (1)**
86:14
**MAY (24)**
3:1;9:23;20:11;22:1,
2,2,8;31:21;36:12,19;
43:19;48:19;59:12;
67:17;68:11,24,25;
69:3,6;70:13;71:20;
79:21;81:13;82:1
**maybe (6)**
10:17,18;30:15;
42:13;76:21;99:2
**McCallen (7)**
0:5,14,16,17,21,14,
16
**mean (24)**
7:17,17,20;9:5;15:5;
23:11,15;26:16;29:17;
38:12;41:23;47:7,12,
15;61:24;65:12;66:9,
10;67:15;69:5;79:9;
81:4;82:20;85:25
**meaning (8)**
8:20,21;16:16,17;
21:1;56:14;65:23;
67:21
**means (8)**
12:21;56:16;58:25;
61:25;65:4
**mechanism (1)**
57:8
**mechanisms (1)**
91:10
**mediated (1)**
61:11
**mediation (8)**
25:25;26:2,5;61:2,5,
7,16,18
**member (1)**
25:6
**mentioned (5)**
5:5;60:12;78:6;84:8;
91:1
**message (1)**
71:11
**metric (3)**
57:7;58:25;59:8
**metrics (1)**
57:12

**mic (1)**
73:23
**microphone (1)**
4:12
**middle (1)**
51:1
**might (6)**
7:18;55:11;61:5;
79:6;96:23;98:13
**million (11)**
53:14;60:18,19,23;
61:22;62:1,2,24;93:15;
95:5,6
**mind (9)**
13:15,17;17:11;
20:18,21;39:4;40:22;
77:2;89:14
**mine (1)**
73:16
**minimum (1)**
57:18
**minute (3)**
11:14;35:5;65:11
**minutes (17)**
5:12;9:4;31:8;34:7;
43:11,19,23;69:3;71:6;
72:9,10,11,13,25;74:2,
3;86:14
**mischaracterizes (1)**
84:17
**misremembering (1)**
36:12
**misstated (1)**
34:21
**misunderstood (1)**
96:23
**mitigate (11)**
28:4;76:6,10,15;
77:1;78:7;79:18;80:19,
23;82:18;88:6
**mitigating (1)**
84:25
**mitigation (4)**
77:21;84:19;87:15,
19
**mixing (1)**
10:8
**model (1)**
4:6
**moment (3)**
3:11;74:3;82:22
**Monday (1)**
72:17
**money (3)**
24:2;26:16;45:19
**Montali (4)**
3:6;9:1;33:15,23
**more (30)**
10:18;17:10,15,18;
25:8;27:20;28:22;40:4;
41:5;43:22;57:17,23;
62:4;69:14;71:19,23,
23;72:16;74:13;77:15;

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 113
of 121

81:11;84:20;85:25;
86:11,13;87:22;89:2;
96:22;97:15;0:7
**morning (19)**
3:8,9,13,14;4:1,3,13,
14,16;5:22,23;31:2,4,
13,14;44:3,4;73:21;
0:19
**most (5)**
10:13;22:17;28:4;
82:9;88:16
**motion (4)**
71:6,18;97:19;0:7
**move (12)**
3:12;5:4,6;33:9;
43:9;64:2;76:24;86:16;
89:10,18;98:5;0:17
**moves (1)**
93:25
**moving (2)**
95:23;97:1
**much (1)**
89:19
**multiple (2)**
58:23;60:1
**multiply (1)**
56:22
**multiplying (1)**
57:17
**municipalities (1)**
18:3
**muted (2)**
3:7;30:13
**myself (1)**
70:20

## N

**name (9)**
4:21,23;31:15;32:21;
43:14;70:17,19;73:24;
0:14
**nature (3)**
6:3;30:3;67:16
**necessarily (2)**
79:3;80:10
**need (21)**
4:12,17,18;5:1;9:11;
13:12;31:2;39:11,12;
59:13;62:5;69:3,13;
70:21;75:12;77:3;
81:15;98:1;0:17,6,18
**needed (1)**
34:5
**needs (2)**
8:4;82:22
**negligence (3)**
6:15,18,21
**negotiate (1)**
30:2
**negotiated (2)**
26:8;85:5
**negotiation (1)**

29:25
**negotiations (3)**
25:19;26:12,17
**neither (1)**
97:20
**net (7)**
56:17,21;57:18;
58:23;60:2;90:21;95:7
**New (3)**
25:2;56:5,6
**next (3)**
4:9;8:9;9:3,7;17:5;
18:11;24:18;30:9;31:1;
41:24;67:5;0:20
**nine (1)**
57:20
**nineteen (2)**
17:7,15
**noise (1)**
73:1
**nondebtor (1)**
68:12
**none (2)**
10:13;58:7
**nonlawyers (1)**
72:2
**nonlawyer's (1)**
74:25
**nonproperty-related (1)**
14:1
**nor (1)**
97:20
**normal (1)**
57:18;72:20
**normalized (4)**
56:17,20;58:23;60:1
**Northern (1)**
3:5
**note (7)**
26:10;39:16;69:6;
74:17;86:25;89:5;
91:20
**Noted (2)**
14:17;0:14
**notice (2)**
13:4;72:22
**nuisance (1)**
7:3;8:12
**nullifications (1)**
92:16
**number (24)**
11:21;32:12;36:19;
45:6;49:16;50:2,7,18;
53:16,17;54:1,24,25;
55:12;56:22;58:1;
62:20;64:13;79:13;
82:23;87:14;88:15,20;
89:3
**numbers (2)**
65:24;68:2;89:2;
91:5

## O

**oath (2)**
31:17;70:13
**obey (1)**
96:8
**Object (31)**
6:7;7:5;14:13;15:1;
16:22;20:6;21:22;
26:25;29:2;38:2;42:9;
53:18;56:25;60:25;
66:15;68:14;74:22;
75:22;77:24;78:19;
85:9,21;86:24;89:11;
90:22;93:1;94:3;96:1;
97:6;98:14;0:8
**objected (1)**
41:22
**objection (32)**
10:20;20:14;23:22;
27:1;29:5,16;42:20,20;
49:4;55:21,24;57:1,2,
11;59:19;60:3;63:25;
64:7;67:4;74:18;79:8,
24;81:3;85:17;86:10;
87:8;88:2;96:5,10,22;
0:24,6
**objections (3)**
5:5;47:14;92:20
**obligated (1)**
36:14
**obligation (2)**
37:17;72:2
**obligations (2)**
38:10;43:2
**obtained (2)**
41:12,15
**obviously (3)**
39:11;70:20;78:6
**occurring (1)**
79:4
**o'clock (2)**
71:20;85:17
**October (9)**
54:5,20;55:1,7,8,9,
15,18;60:8
**off (3)**
4:8;11:19;0:8
**offer (1)**
26:15
**offered (2)**
25:23;26:15
**officer (3)**
55:25;95:17;98:8
**officers (2)**
60:17;63:16
**OII (1)**
91:14
**omitted (1)**
40:16
**once (3)**
26:22;57:23;0:18

**One (36)**
3:11;10:13;11:19,23,
24;19:9;23:24;24:13;
28:3,24;29:5;40:11,11,
13;42:5,7;44:23;46:20;
47:4;52:22;53:5;59:21;
62:7;63:2;68:24;72:22;
73:4;78:10;81:8;96:18,
18;98:3;99:1,6;0:8,6
**ongoing (3)**
17:21;29:25;61:2
**only (12)**
10:15;15:15;26:18;
50:8,11;51:21;54:7;
58:11;92:4;97:15;0:1,
10
**onto (1)**
32:11
**oOo- (1)**
3:2
**open (3)**
55:9;60:8;61:6
**opened (1)**
26:14
**opening (1)**
54:10
**operating (1)**
90:21
**operational (1)**
17:1
**operative (4)**
39:4,9,10;47:9
**opine (1)**
0:9
**opinion (4)**
77:2;83:25,25;93:4
**opportunity (2)**
71:10;72:21
**opposed (1)**
29:23;47:2;54:10
**option (5)**
36:7;39:17,18,20,21
**order (7)**
3:3;8:3;67:11;84:9;
85:2;87:11;91:2
**orders (1)**
84:24
**ordinary (10)**
36:6,10,15;37:16;
38:1,9,11;40:15;41:12;
43:4
**organizations (1)**
83:16
**originally (1)**
55:19
**others (6)**
10:1;78:24;81:1,19;
86:2;87:4
**otherwise (2)**
53:20;61:6
**ourselves (3)**
58:18,20,21
**out (21)**

16:14;24:25;25:25;
26:19;27:14;28:24;
30:17;31:20;33:25;
34:3;39:2;43:9;48:23;
57:2;58:14;59:7;67:21;
73:2;83:15;88:21;
97:10
**outset (1)**
43:21
**outside (9)**
10:16;61:15;82:17;
83:13,15,16;86:19,21;
93:14
**over (6)**
9:5;20:1;43:19;
53:15;71:19;96:20
**Overall (2)**
82:8;84:20
**overhauled (1)**
97:8
**overrule (7)**
18:18;20:14;29:4,5,
17;79:23;96:5
**overwhelmingly (1)**
24:19
**owe (1)**
43:4
**own (5)**
11:12;19:13,21;
21:20;68:18
**owned (1)**
19:18
**ownership (1)**
57:19
**owns (1)**
20:23

## P

**Pacific (6)**
27:23;44:17;76:16;
77:22;84:11;85:7
**page (39)**
11:2,14,16,17,18,19,
21,24,24,25;32:18;
33:9;34:14,25;36:17,
24,25;39:19;45:5,6,6;
60:14,14;64:13,13,13;
65:1,23,24;68:1,2,2;
75:8,14;91:13,14;
92:11;95:9;97:18
**pages (2)**
71:17,19
**paid (12)**
14:11;19:10;21:19;
23:15,21;37:16,23,24,
25;41:12;45:2;53:3
**pandemic (1)**
91:9
**panel (3)**
3:24;69:13;73:20
**panelist (1)**
0:8

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 114
of 121

**Parada (15)**
3:10;4:18;30:8;43:9;
69:22;73:20;0:3,4,13,
22,24,2,16,17,24
**paragraph (19)**
11:2;12:4,6;16:12;
33:10;34:24;35:1,11;
45:7,9;49:6;51:1;
64:12,22;65:4,23;
66:11;68:2;99:11
**pardon (1)**
56:14
**part (12)**
49:11,22;51:15;
52:24;53:11,12,13;
56:1;80:15,15,16;
95:13
**particular (3)**
11:9;47:17;0:24
**particularly (1)**
83:14
**parties (6)**
58:19,22;59:24;61:2,
2;92:15
**party (1)**
14:22
**passage (1)**
75:5
**passed (1)**
78:9
**past (5)**
10:12;95:25;96:6,9,
20
**patience (1)**
41:9
**Patricia (1)**
5:18
**Patrick (1)**
4:23
**pattern (1)**
55:16
**Pause (2)**
33:22;64:14
**pay (13)**
23:15;26:15;36:4,5,
13,15;37:3;38:8,9,10,
14;43:3,4
**payable (5)**
35:24;36:11;37:15,
25;92:12
**paying (1)**
36:9
**payment (10)**
14:22;35:19;40:14;
52:23;53:1,1,3,6,8,9
**payments (9)**
41:20;51:16,20,21;
52:2,11,15,18;53:13
**pays (2)**
53:6,8
**pending (1)**
42:19;91:20
**people (12)**

9:5;24:1,15;25:5,9;
30:15;73:16;79:21,21;
80:21;81:4,22
**people's (1)**
80:17
**per (3)**
56:22,23;70:20
**PERA (4)**
43:17;57:1;61:2,6
**percent (3)**
21:2;79:1;90:14
**percentage (1)**
88:23
**perform (2)**
94:13;95:23
**perhaps (3)**
74:25;77:18;83:22
**period (2)**
53:2;93:10
**permanently (1)**
92:13
**permitting (1)**
18:5
**person (5)**
23:11,12;41:18;
74:25;98:11
**personal (4)**
14:25;15:14;16:8;
0:25
**perspective (2)**
9:8;74:22
**persuade (3)**
40:7;82:21,22
**persuaded (2)**
81:14;86:1
**pertaining (1)**
60:13
**petition (5)**
49:18;50:4,6,18;
51:10
**PG&E (66)**
6:4,14,14,21,22,25;
7:3;8:12;16:21;17:19;
18:22,23;19:12,20;
20:5,23;21:5,10,19;
25:23;27:14;28:14;
29:22;31:24;37:3;
38:12;41:11,15,21,21;
42:6,9;43:1;44:16;
45:23;56:6;74:13;
78:14;80:18,22;81:1,9,
15;82:2,8,16,20;83:12,
15;84:10,24;85:5;
86:19,22;87:13,25;
88:5,11;89:20;91:21;
94:16,20,24;95:18;
98:9,18
**PG&E's (14)**
9:24;39:21;76:5,14;
79:18;84:23;89:9;
91:21;92:17;95:16,20,
23,24;97:2
**phase (1)**

0:20
**phenomenon (1)**
30:14
**phonetic (1)**
4:23
**phrase (1)**
89:25
**piece (1)**
53:12
**pieces (1)**
51:1
**pin (1)**
77:14
**place (4)**
72:4;90:2,18;91:2
**places (2)**
57:5;58:25
**plaintiff (1)**
14:10
**plaintiffs (3)**
8:11,11;43:18
**plaintiff's (1)**
48:20
**plan (122)**
9:15;21:24;22:14;
23:14,14;24:7,19;
26:25;27:14;29:1,8;
35:11,16;36:9,16,22,
24;37:24;38:17,18,18,
21,24;39:2,3,4,9,13,16;
40:5,18,24;43:2,3;
44:17,18,22,24;46:1,3,
6,11,15,18,22;47:2,3,9,
11,14,21;48:14,24,25;
49:1,9,20;50:21;54:22,
25;55:5;56:4,10,16;
57:6,21;58:10,14,19,
25;59:2,6,11,25;60:10;
64:18;65:16,16,20,25;
67:8;68:10;74:11,14,
16;75:6,11,20;79:11,
19;80:1,8,8,15,16,17,
17;83:1,13,17;84:19;
85:24;86:3,6;87:16,19;
88:6;89:7,18,19,21,24;
92:24;94:2,8,13,23;
95:1,8;97:3;98:13;0:5
**plans (2)**
36:18;85:22
**play (2)**
29:7,12
**Please (15)**
4:21;10:21;22:3,21;
30:8;33:17;41:4;43:15;
73:23;75:25;77:15;
92:22;98:2;0:15,4
**pleasure (3)**
30:4,5;0:19
**plus (1)**
77:2
**PM (1)**
0:11
**point (25)**

9:12;12:12;13:23;
15:23;16:14;20:7;
22:11;26:3;27:1;39:13;
40:7;47:12;48:15;
57:10;62:7;68:24;75:1;
77:4;81:9;83:2;84:15;
92:4;99:25;0:2,14
**policies (11)**
52:8,13;60:15,22;
62:18,20;63:5,7,14,15,
19
**policy (11)**
15:20;51:16,20,24;
52:11,12,16;53:2;
61:22;62:14;64:6
**politically (1)**
97:21
**pool (1)**
44:24
**Porter (37)**
30:23,24,25;31:2,4,6,
10,12,15;33:12,12,13,
16,19,21;34:2,3,9,12,
20;35:4,10;38:15,21,
25;39:7,14;40:12,21;
41:1,5,8;42:2,4,25;
43:6,8
**Porter's (2)**
31:1;40:20
**portion (4)**
39:15;56:7;74:3;
0:21
**pose (1)**
98:13
**position (6)**
12:23;72:18,20;
73:15;74:10;82:14
**positioned (1)**
86:22
**positions (1)**
82:23
**possible (2)**
94:21;95:10
**potential (1)**
90:15
**Powell (3)**
87:21;98:11,18
**power (1)**
27:25
**practices (1)**
97:9
**precipitation (1)**
79:1
**predated (1)**
16:19
**predicate (1)**
8:4
**predicated (1)**
15:6
**preliminary (1)**
42:5
**pre-pandemic (1)**
91:5

**preparation (2)**
46:3,5
**prepared (6)**
72:2,7,14;73:8;88:5;
91:8
**preparing (1)**
56:1
**pre-petition (4)**
51:9;66:2,6;67:8
**preserve (1)**
0:11
**preserved (1)**
0:13
**presiding (1)**
3:6
**press (1)**
18:15
**pretty (1)**
62:5
**prevent (5)**
68:11;75:4;90:18;
91:3,25
**previous (5)**
16:6,24,25;46:5;
96:13
**previously (1)**
44:7
**price (6)**
21:4,10;54:10,10;
56:23;57:25
**primary (1)**
62:14
**Prior (4)**
17:3;37:25;91:8;
99:23
**prioritized (1)**
87:16
**priority (15)**
32:5;35:15,20,23;
36:2,10;37:1,4,5,14,22;
38:8;39:22;40:14;78:7
**privately-owned (1)**
27:24
**privilege (1)**
26:5
**pro (1)**
70:19
**probably (3)**
43:22;55:20;71:6
**probe (2)**
83:11;84:6
**Problem (3)**
40:8;88:11,12
**procedures (1)**
91:2
**proceeding (1)**
98:5
**proceedings (2)**
0:11,25
**proceeds (2)**
99:12,16
**process (3)**
41:25;84:14;97:11

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 115
of 121

**professionals (3)**
41:19;50:16;65:17
**profit (2)**
21:21;22:23
**program (4)**
28:6;87:22;88:16,16
**programs (2)**
28:4;88:21
**projections (5)**
56:1;91:5,6,8,12
**proofs (1)**
0:6
**properly (2)**
9:19;71:17
**property (5)**
13:24;14:1,24;15:16;
0:1
**property- (1)**
16:7
**property-related (1)**
16:2
**proponents (1)**
36:18
**proposed (6)**
46:1;57:9,21;65:6;
74:11;95:1
**proposing (1)**
65:13
**prospective (1)**
96:23
**protective (1)**
91:2
**provide (7)**
18:1;22:20,21;28:6;
60:16;63:7;84:19
**provided (3)**
54:14;82:2;84:9
**providers (1)**
82:3
**provides (3)**
40:19;56:4;68:5
**provision (1)**
37:3
**public (32)**
5:24;8:10,12,21;
16:4,4,7;17:6,7,9,12,
20,21,22,22,23;18:6,
23,23,24;19:1,4,5;
25:22,22,23;66:21;
67:3;79:17;80:25;
81:12;82:1
**PUC (3)**
82:14,25;86:5
**pull (2)**
32:9;36:16
**pulled (2)**
32:11;34:12
**Pullo (1)**
73:13
**purchase (6)**
21:10,15;47:25;
48:20;66:14;67:12
**purchased (6)**

19:12;21:5,5,20;
22:9,22
**purchasers (3)**
66:24,25;67:2
**purchases (9)**
45:21;47:22,24;48:3,
5,6,12;66:20;67:2
**purchasing (2)**
58:22;59:25
**purely (1)**
68:5
**purpose (3)**
40:23;52:21;97:5
**purposes (10)**
23:20;35:6;44:24;
51:6;52:16;54:20;59:4,
9;62:25;0:5
**pursuant (3)**
35:16;36:3;37:23
**pursued (1)**
16:9
**pursuing (1)**
68:11
**put (7)**
3:17;7:12;13:1;
30:15;35:5;36:17;
58:18
**putting (1)**
5:24

**Q**

**quantifying (1)**
79:14
**quarrel (1)**
24:3
**quarter (3)**
89:1;95:3,14
**quarterly (1)**
95:13
**quick (3)**
60:13;68:24;69:1
**quiz (3)**
46:22;49:3;79:9
**quoted (2)**
84:8;87:3

**R**

**raise (5)**
4:18;43:20;57:20;
63:4;88:1
**raised (7)**
44:6;71:4;85:1;
90:16;0:5,13,25
**raising (1)**
57:11
**ramifications (1)**
94:23
**range (1)**
95:10
**ranks (1)**
82:3

rate (2)
23:15;95:20
**ratepayers (2)**
79:17;80:25
**rates (3)**
92:1;94:1,7
**rather (2)**
74:25;83:7
**reach (1)**
83:15
**reached (1)**
93:9
**read (4)**
10:4;25:2,4;47:3
**readiness (1)**
84:17
**reading (2)**
37:18;92:7
**ready (3)**
5:2,3;84:21
**reality (1)**
22:23
**realize (1)**
10:18
**realized (1)**
0:7
**realizing (1)**
90:21
**really (4)**
24:22;60:22;85:23;
0:9
**reask (1)**
52:6
**reason (6)**
14:3;53:2,8;86:3;
95:21,21
**reasonable (1)**
55:22
**reasonably (3)**
94:20;95:4,10
**reasons (2)**
55:4;64:17
**recalibrated (1)**
91:6
**recall (12)**
17:14;18:8,17;19:1,
18;55:10;61:19;63:2;
87:14;88:15;99:13;
0:24
**receive (4)**
49:9,19;52:23;83:16
**received (10)**
5:10;14:22;51:16,21;
52:11,15,18;78:25;
84:18,21
**receiving (1)**
59:25
**recent (2)**
78:17;96:9
**recession (4)**
53:7;58:12;60:7;
66:6
**reclosers (2)**

87:13,14
**recognize (3)**
32:16;58:13;80:3
**recognized (1)**
78:8
**recollection (2)**
51:23;63:3
**recommendations (1)**
50:15
**reconciliation (1)**
41:25
**reconsideration (1)**
97:19
**record (15)**
4:22;5:7;10:23;
11:22,22;16:34:6;
43:15;70:16;73:24;
0:15,23,5,8,11,13
**recorded (1)**
94:16
**recover (1)**
94:12
**recoveries (1)**
51:24
**recovery (4)**
22:8;92:1;94:1,7
**recross (1)**
0:12
**redirect (4)**
98:24;99:7,8;0:7
**redirection (1)**
84:4
**reduce (4)**
51:23;82:4,10,18
**reduction (1)**
87:20
**refer (7)**
31:16,24;44:10;45:7;
51:4;65:9,10
**reference (6)**
12:9;78:21,23,25;
91:14;94:6
**referenced (2)**
62:8;94:19
**references (1)**
95:16
**referencing (1)**
16:12
**referred (3)**
44:16,18;63:10
**referring (9)**
11:9,15;16:20,24;
17:2;18:6;85:13;87:7,7
**refers (4)**
45:11;47:1;51:15;
52:12
**refreshed (1)**
97:10
**regard (2)**
48:2;52:1
**regarding (2)**
31:19;79:18
**registration (3)**

29:21,24;30:3
**regulatory (2)**
91:10;92:24
**rehabilitation (1)**
77:4
**reimbursing (1)**
15:15
**reinstated (1)**
93:5
**reinstatement (1)**
92:23
**related (8)**
16:8;18:5;21:23;
64:4;93:23;94:9;98:9;
0:22
**relates (2)**
48:3;79:25
**relationship (1)**
17:21
**relationships (1)**
18:3
**relative (1)**
79:19
**release (1)**
68:6
**releases (1)**
68:4
**relevance (16)**
9:1;24:4;47:6;57:2,
4;59:3,5;79:20;80:1;
82:13,15;83:5;88:4,5,
8;96:11
**relevancy (3)**
27:1;88:2;96:2
**relevant (16)**
20:7;22:13;23:6;
24:22;26:4;39:22;58:7;
59:18;76:23;79:10;
81:22;84:1;85:23;
96:21;97:24;98:4
**relied (1)**
65:17
**rely (1)**
80:22
**relying (1)**
92:7
**remember (4)**
22:16;55:2,14,16
**remind (1)**
31:17
**remits (1)**
41:20
**rendered (1)**
92:21
**renewed (1)**
95:18
**reorganization (14)**
46:1;75:12,20;76:7,
16;77:22;81:16;86:3,
20,23;87:12;88:7;
92:25;97:4
**reorganize (1)**
85:7

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 116
of 121

**reorganized (3)**
39:18;56:5,6
**repeat (5)**
12:11;13:15;44:5;
75:25;76:12
**repeating (3)**
13:17;17:11;20:18
**rephrase (5)**
18:18;34:7;76:2;
80:6;94:11
**replaced (3)**
87:25;88:9,18
**reply (1)**
9:24
**report (4)**
82:2,6,7;91:18
**reporting (1)**
95:13
**reports (1)**
78:17
**represent (1)**
31:15
**represented (1)**
16:17
**representing (1)**
70:20
**represents (2)**
49:17;50:3
**request (1)**
86:6
**requested (2)**
28:20;31:7
**requester (1)**
5:11
**rescission (13)**
45:8,11;46:13,19;
49:8,13,19,24;50:25;
51:5;52:17;53:6;58:8
**reservation (2)**
61:20;63:4
**reserve (2)**
39:14;73:7
**resolved (1)**
16:15
**resources (1)**
82:9
**respect (8)**
50:12;57:11;58:11;
64:20;65:19,20;66:11;
97:22
**respectfully (1)**
89:25
**respects (1)**
96:17
**respond (1)**
59:12
**responded (1)**
84:12
**responding (1)**
84:14
**response (4)**
16:6;58:16;73:12;
0:8

**responsibility (3)**
28:2;96:6,13
**responsible (1)**
99:17
**responsive (2)**
77:11,15
**restate (6)**
34:7;39:8;65:7;
77:13,17,18
**restrictions (1)**
90:18
**restructuring (1)**
82:19
**result (6)**
13:22;56:20;58:9;
87:19;90:9;91:24
**resulted (1)**
25:20
**results (1)**
28:5
**retained (1)**
60:18
**review (3)**
33:3;36:16;71:17
**reviewed (4)**
7:7;8:15;34:17;
71:19
**right (65)**
3:14,24;4:4,11,17,
18;6:3,20,25;8:9,18;
10:22,24;12:16;13:18;
16:3,10;17:2,2,4,5,6,9,
15,17;19:7,8,9;20:4;
21:16,17;24:20;25:15;
26:10,18,22;28:19,23;
29:10;31:3,7,25;32:9;
33:25;34:10;35:14;
42:1;55:20;59:14,20;
61:14;68:13,19;72:8;
73:7,21;74:23;80:9;
81:17;82:7;89:14;99:7,
21;0:10,4
**rights (6)**
29:21,24;30:3;58:13;
61:20;63:5
**risk (24)**
26:23;27:5,9,12,15,
16;28:4;74:15;75:1,2;
76:10,15;77:21;78:9,
18;79:2,6,15;80:7,7;
82:4;84:22;87:20;
90:18
**risks (13)**
74:15;76:5,6;79:19;
81:2;82:10,18;84:10,
25;87:11;88:6;98:13,
18
**robe (1)**
4:7
**role (6)**
29:7,12;30:16;91:21;
96:14,14
**romanette (8)**

35:17,19;36:3,8,8;
37:6,11,23
**room (2)**
34:4;72:25
**rough (1)**
87:17
**round (1)**
53:14
**routinely (1)**
79:14
**RSA (1)**
0:7
**rule (2)**
9:1;72:21
**rules (1)**
40:1

**S**

**safe (1)**
28:6
**safely (3)**
27:25;28:1;84:25
**Safety (5)**
8:13;87:22;98:12,13,
18
**sake (1)**
55:5
**sale (1)**
29:22
**same (23)**
10:18;16:3;17:21;
18:21;23:17;47:7;54:9,
23;60:3;64:7;65:21,23,
24,25;66:9,10;67:4;
72:16;73:12;77:16;
81:3;85:3;96:10
**SAN (1)**
3:1
**Sandler (1)**
43:17
**satisfied (3)**
81:10,12,13
**satisfy (2)**
43:1;74:20
**saying (5)**
7:20;31:21;36:7;
67:14,15
**scope (1)**
20:12
**screen (14)**
30:14,15;31:9;32:9,
12,14,20;33:11;34:25;
35:5;36:18,20;70:9,12
**screen-share (1)**
41:10
**Scrolling (1)**
32:20
**season (7)**
28:15;61:6;78:18;
79:2;84:18,22;86:20
**seasons (1)**
28:25

**second (4)**
14:3;22:24;53:11;
56:15
**Section (7)**
22:8;35:11,16;36:25;
39:16;68:4,5
**secure (3)**
89:20,23,25
**securities (5)**
43:18;45:18,19;
60:24;63:1
**seeing (1)**
28:5
**seek (1)**
93:25
**seeking (2)**
31:21;91:25
**seems (7)**
37:6,11;38:17,25;
39:21;40:15;55:22
**selection (1)**
53:25
**self-retained (1)**
62:1
**sell (1)**
23:16
**semi-annual (1)**
37:9
**sent (2)**
33:25;71:11
**sentence (2)**
37:14;45:11
**separate (3)**
6:1;19:2;44:20
**sequence (1)**
30:25
**series (1)**
8:9
**service (3)**
18:1,2;28:6
**session (1)**
3:5
**sessions (1)**
61:7
**set (2)**
11:13;64:17
**settled (1)**
16:18
**settlement (6)**
16:24;25:25;58:9;
91:14,23,25
**settlements (5)**
16:20;17:2,3;25:20;
58:15
**settling (1)**
25:22
**several (1)**
57:5
**shall (2)**
37:16;92:13
**share (13)**
25:7;35:5;49:13,17,
24;50:3,25;52:17;

56:22,23;57:24;85:1,2
**shared (3)**
51:24;52:8;60:16
**shareholder (1)**
36:18
**shareholders (2)**
13:2,4
**shares (9)**
20:5,23;21:5;49:13,
17,25;50:3,18;58:1
**shelter (1)**
71:24
**shoes (2)**
14:10;58:19
**short-circuit (1)**
47:16
**shorts (1)**
4:10
**show (3)**
79:9;85:14;97:21
**sic (1)**
71:19
**Side (4)**
63:10,12,15;64:5
**sign (1)**
32:25
**signaled (1)**
61:20
**signature (3)**
32:21,25;34:14
**signed (5)**
32:24;33:4;34:15,16,
18
**significance (1)**
53:16
**significantly (2)**
55:12,18
**silent (1)**
9:25
**Similar (3)**
16:6;46:12;65:25
**similarly (1)**
18:2;95:17
**simply (10)**
46:24;54:25;55:5;
57:9,11;58:24;59:21;
67:7;0:8,10
**single (5)**
8:15;9:8;10:13;
27:24;44:24
**sit (2)**
55:3;62:23
**situation (1)**
47:7
**six (1)**
20:1
**sixty-five (1)**
79:1
**sixty-percent (1)**
78:17
**slight (1)**
46:24
**slightly (1)**

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 117
of 121

7:18
**sold (1)**
21:12
**solved (1)**
40:8
**somebody (1)**
48:18
**someone (4)**
32:24;48:9;51:9;
72:25
**soon (4)**
35:21;62:5;69:21;
88:7
**Sorry (20)**
3:7;8:2;15:19;20:22;
28:17;32:19;34:17;
36:17;39:19;65:2,7;
66:25;70:1,3;76:12;
78:23;85:11;95:2;
97:15;0:1
**sort (2)**
81:18;0:1
**sound (2)**
55:19;73:3
**speak (6)**
6:18,23;7:6;71:7,11;
79:3
**specific (14)**
51:14;55:2,16;65:15;
78:21;85:2,14;87:6,14,
23;88:15,19,20;95:16
**specifically (17)**
14:6;18:8;19:19;
21:8;45:20;51:8;55:10,
14;61:19;63:2;74:11;
76:14,14;84:12,15;
91:22;92:11
**specificity (1)**
84:20
**specifics (4)**
26:13;50:15;54:13,
17
**specified (1)**
57:7
**specify (1)**
55:6
**speculate (2)**
74:24;81:21
**speculator (1)**
23:18
**speech (2)**
89:12,13
**spend (3)**
9:4;59:15;69:14
**stability (2)**
76:11;78:10
**staff (1)**
0:23
**stand (3)**
4:18;21:21;72:1
**standpoint (1)**
89:22
**stare (1)**

41:11
**start (3)**
14:3;31:18,20
**started (3)**
16:21;22:15;55:15
**starting (1)**
91:13
**state (18)**
4:21;10:16;19:5;
25:6;38:23;43:14;
60:15;64:8;68:3;70:15,
17;73:23;78:8,10;
79:13;82:4;97:20;0:14
**stated (5)**
34:15,16;38:17;82:2;
95:9
**statement (20)**
15:3;18:9,13;27:16,
23;36:13;38:3;65:18,
19;66:13;67:1,7;68:8;
75:17;76:11;80:20,21,
22;89:15;95:11
**states (4)**
37:21;72:21;82:8;
91:22
**statute (1)**
48:18
**Stay (2)**
30:12,14
**steps (1)**
14:10
**stick (1)**
26:9
**still (3)**
4:7;31:17;51:15
**stipulates (1)**
91:23
**stock (44)**
19:18;20:23;22:19;
24:1,2;25:6,10,23;
26:15,19,22;27:14;
28:13;29:1,7,13,22;
47:23,24;48:1,4,7,9,13,
18,21;55:15,17;56:6,
23;57:14;58:8,14,22;
59:1,6,8,9;66:14,21,21,
23;67:3,13
**stocks (1)**
29:6
**stop (1)**
41:10
**stream (1)**
0:12
**streamline (1)**
59:20
**Street (1)**
27:15
**stretch (1)**
58:18
**strict (1)**
6:17
**strictly (1)**
47:3

**strong (1)**
51:12
**structured (1)**
89:9
**stuck (1)**
86:5
**studied (1)**
47:14
**subject (7)**
6:3;13:5;17:5;25:17;
58:3;62:1;97:13
**submitted (2)**
44:6;0:23
**submitting (1)**
71:18
**subordinated (1)**
45:8
**subro (10)**
8:21,21;11:6;12:17;
13:18;15:13;16:20;
21:15,18,20
**subrogation (30)**
5:25;8:10,21;10:17;
13:21,23;14:4,7,9,9,11,
21;15:21;16:17,24;
19:8,9,13,16,21;20:1;
21:1,6,10;22:22;23:16,
18;0:17,24,7
**subrogations (1)**
16:1
**subsequently (1)**
91:9
**substantial (4)**
21:9,12,15,21
**Substantially (1)**
17:18
**success (1)**
89:9
**successful (2)**
80:19;92:25
**sufficiently (1)**
82:8
**suggesting (2)**
61:11,12
**sum (1)**
86:15
**summarize (1)**
34:9
**summer (2)**
84:11;87:11
**Super (1)**
8:19
**support (3)**
44:7;80:16,17
**supporting (1)**
0:7
**supposed (3)**
13:7;49:9,19
**Sure (22)**
7:25;11:22;17:12;
18:20;20:21;34:11;
35:6;40:3;47:13,15;
52:4,7;53:4;59:15;

74:2;76:1;77:8,10;
80:12;83:4,9;0:21
**survival (1)**
14:5
**survivor (1)**
74:12
**survivorship (1)**
15:22
**suspect (1)**
83:1
**suspended (1)**
92:13
**sustain (10)**
23:22;29:16,17;49:3;
59:18;63:24;79:11;
86:10;87:8;96:22
**sustained (1)**
89:7
**sustaining (2)**
10:20;29:19
**swear (1)**
4:19
**switch (1)**
17:5
**sworn (2)**
4:20;74:4

**T**

**talk (4)**
5:2;52:10;67:5;
72:11
**talked (1)**
66:16
**talking (4)**
13:13;74:18,21;
96:22
**target (2)**
88:24,25
**Tax (18)**
31:16;32:5;35:15,20,
23;36:2,9,10;37:1,4,5,
14,22;38:8;39:23;
41:19;42:12;43:2
**TCC (1)**
56:18
**team (2)**
41:19;42:12
**technical (1)**
65:16;67:16;71:8
**Ted (1)**
99:10
**telephone (1)**
72:3
**tells (1)**
23:13
**ten (6)**
69:3;72:9,10,11,13;
96:18
**ten-quarter (1)**
95:2
**term (4)**
45:7;46:11,12;52:12

**terms (9)**
16:11;17:5,19;18:4;
23:4;67:15;82:4,17;
84:12
**terribly (1)**
76:22
**test (2)**
83:5,19
**testified (3)**
39:20;49:16;50:2
**testifies (1)**
69:2
**testify (3)**
35:14;61:16;87:1
**testifying (2)**
9:14;89:12
**testimony (11)**
8:5,6;20:12;34:21;
63:21;68:25;91:13;
92:11;95:15;99:22;
0:13
**Thanks (2)**
0:23,23
**theirs (1)**
73:17
**theories (3)**
6:16;8:16,17
**thereafter (1)**
35:21
**therefore (3)**
9:18,18,19
**thinking (1)**
79:21
**third (3)**
36:7;77:16;88:25
**thirty (2)**
21:6;25:7
**thirty-five (1)**
21:6
**thirty-four (1)**
26:19
**thirty-three (1)**
26:19
**Thomas (1)**
0:24
**though (2)**
55:24;84:15
**thought (3)**
71:12;96:22;0:25
**three (12)**
6:1,4,13,20,25;7:3;
8:20;19:2;34:7;63:7;
96:9;97:15
**threshold (1)**
90:17
**throughout (3)**
19:3;41:9;44:10
**THURSDAY (1)**
5:1
**tie (1)**
3:17
**times (5)**
44:10;49:13,24;

56:17;57:18

**Todal (1)**
23:1
**to-date (1)**
95:21
**today (24)**
25:7;29:22,25;30:2;
31:18;40:23;42:3,14;
50:22;55:3;62:23;
68:25;71:7;74:9;83:19,
19;84:1;85:17;89:22;
99:12,24;0:11,15,19
**together (2)**
37:10;81:14
**told (8)**
22:16;55:4,18;60:22;
62:24;71:9;72:9;97:25
**Tom (1)**
5:18
**tomorrow (2)**
72:17;0:20
**took (3)**
4:5,8;84:3
**top (6)**
45:6;60:14;64:13;
65:24;75:14;89:20
**tops (1)**
68:3
**Tosdal (95)**
4:1,3,5;5:11,14,16,
18,18,21;7:9,12,23,25;
8:2,8;9:11,17,21,23;
10:5,10,22,25;11:1,9,
17,21;12:1,6,8,10,20,
22;13:3,6,9,14;15:4,8,
9,9,10,13,17,19;18:15,
19,20;20:10,16,21;
21:25;22:3,10,15;23:2,
4,6,8,24;24:6,10,13,20,
23,24,25;25:4,15;26:7,
10;27:4,7,9,12,19,21;
28:19,23;29:10,17;
30:4,5,7,10,11;0:4,15,
17,5,7,8,10,13,23
**Tosdale's (1)**
0:24
**Tosdal's (2)**
15:2;24:18
**total (2)**
60:19;97:25
**totally (1)**
4:9
**tower (3)**
62:22;63:3;94:25
**towers (4)**
62:8,12,17,24
**track (1)**
84:24
**traded (2)**
22:5,12
**trading (3)**
55:16;90:17;91:2
**tread (2)**

26:5;61:4
**treated (11)**
10:17;16:18;23:11,
12,17;24:15;35:16;
36:3;39:11;48:24;
59:15
**treating (1)**
65:6
**treatment (6)**
39:22;40:19;58:7;
59:10;60:6;65:6
**trespass (1)**
8:12
**trial (4)**
5:2;71:25;0:1,21
**trigger (1)**
90:14
**trip (1)**
53:15
**true (10)**
6:5,22;7:1,2;8:14;
14:8;33:6;34:19;72:16;
76:11
**trust (5)**
28:25;29:23;56:7,24;
58:9;80:18
**trustee (1)**
29:5,13
**try (3)**
54:15;80:12;84:24
**trying (14)**
7:9;10:22;39:2;
46:24;47:11;48:13,23;
57:2;58:17;59:16;
67:21;74:24;82:21;
83:11
**Tsekerides (80)**
3:17,18;4:5;5:1,3;
6:7;8:25;12:4,7;14:13,
16;15:1,6,12;16:22;
18:10,13;20:6,15;
24:17,21,24;25:16,24;
26:24;28:16;38:2;
41:23;42:11;50:8;
53:18;55:21,24;56:25;
60:25;61:12,15;66:15;
67:4;68:14;69:18,19,
24;74:17;75:22;76:19;
77:24;78:2,19;79:8;
81:3;85:9,12,20,20;
86:24;87:6;88:1;89:11,
16;90:22;92:4,9;93:1,
7;94:3;96:1,10;97:6;
98:14,24;99:1,6,9,10,
20;0:8,20,23,7
**Tsekerides' (1)**
86:10
**Tubbs (5)**
91:24;92:1,18;94:1,
12
**tuned (1)**
30:12
**turn (6)**

11:14;23:14;43:12;
68:2;75:8;83:12
**tutorial (1)**
4:6
**twenty (4)**
31:8;43:11,20;71:6
**twenty- (1)**
43:22
**twenty-five (3)**
5:12;9:4;28:21
**twice (1)**
15:13
**two (10)**
18:2;19:9;28:21;
34:6;44:14,20;55:12;
62:8;65:9;97:15
**two-and-a-half (1)**
0:11
**type (3)**
18:6,21;67:18
**types (2)**
19:9;63:7
**Typically (2)**
63:10;92:6

**U**

**Um-hum (2)**
15:12;21:9
**unable (1)**
94:11
**unclear (1)**
48:15
**under (32)**
6:16;7:1;14:20;22:7;
27:14;29:7;31:17;
35:15;44:24;47:21;
48:10,14,24;49:9,19;
53:5,9;56:16;58:10,14,
14,19;59:1,6,11,25;
60:9,21;64:5;70:13;
81:16;92:5
**understands (1)**
46:23
**Understood (8)**
49:5;53:25;62:6;
63:23;64:1;67:20;
68:23;69:8
**undertaken (1)**
88:16
**unfairly (4)**
64:19;65:4,10,12
**unfortunate (1)**
71:22
**unique (1)**
82:24
**UNISON (1)**
0:22
**unlawfully (1)**
92:19
**unless (4)**
68:6,12;99:2;0:8
**Unliquidated (4)**

8:24;9:25;10:7,14
**unmute (6)**
4:1,12;31:2;43:10;
73:23;0:15
**unsatisfied (1)**
81:13
**up (30)**
4:6;5:12;8:9;9:3;
23:12;27:5;28:20;
29:20;32:9,11;34:12;
36:16;40:6;43:19,21,
25;56:21;60:18;61:3,8;
62:4,5;68:13;72:17;
80:24;84:19;86:15;
98:2,3;0:16
**upcoming (3)**
84:17,22;87:15
**updated (3)**
89:2,3;95:12
**upon (7)**
8:12;39:5;56:18;
89:20;90:4;91:5;99:23
**use (2)**
32:24;65:4
**used (11)**
46:12;50:6;54:6,11;
55:19;57:8;58:25;60:9;
65:24,25;84:7
**using (8)**
50:17,20;54:18,23,
24;65:24;67:15;68:2
**Utilities (6)**
8:13;45:3;78:10;
79:13;81:12;82:2
**utility (16)**
27:24;44:18;45:2,2;
47:23,24;48:10,12,20;
64:5;66:13,22;67:2,10,
12;91:25

**V**

**valid (1)**
43:2
**valuation (4)**
57:6,12;58:24;59:7
**value (9)**
26:23;27:6,15,16;
56:11,12,16;59:1;60:1
**valued (2)**
58:14;59:9
**various (6)**
6:16;7:14;13:1;
25:21;58:25;0:25
**vegetation (1)**
88:23
**version (2)**
46:8;54:25
**versions (1)**
46:6
**viability (1)**
94:23
**victim (16)**

12:17;14:8,10,12;
15:16;16:5;17:10,12,
23;18:7;28:25;56:7,12,
16,24;66:1
**victims (9)**
8:22;13:25;16:9;
22:18,19;58:20;79:18;
81:1;89:8
**victims' (11)**
6:1;9:24;11:5;13:19;
18:24;19:2,4,6;26:18,
23;29:23
**victim's (1)**
80:15
**video (2)**
70:9;72:4
**view (7)**
9:13,14;10:12;28:13;
74:20;75:1;99:25
**violates (1)**
47:15
**violation (2)**
8:12,13
**violations (1)**
91:23
**virtual (1)**
73:20
**virtually (2)**
6:5;7:15
**voice (1)**
0:6
**voluntary (1)**
68:5
**vote (2)**
80:15,16
**voted (4)**
24:19;26:25;58:9;
59:17
**voters (1)**
82:25

**W**

**Wait (1)**
4:9
**Wall (1)**
27:14
**Wallace (24)**
69:24;70:1,2,5,6,10,
14,15,17,19,19,24;
71:3,12,16,23;72:11,
20,24,24;73:4,7,10,18
**wants (1)**
83:8
**Warriors (1)**
25:6
**waste (4)**
72:16,18;73:13,16
**way (16)**
11:4;12:14,18;13:20;
16:5,12,14;24:13,14;
35:8;39:8;50:13;54:8;
65:8;73:2;89:24

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 119
of 121

**ways (1)**
64:15
**week (7)**
4:9;9:3,7;18:11;
24:18;41:24;67:5
**Weil (1)**
40:18
**welcome (2)**
35:5,7
**Wells (143)**
3:19;4:11,12,13,17,
24,25;5:17,22;6:11;
7:6;8:9;9:14;10:20;
11:2,7,8,9,12;12:2,11;
13:12;14:18;15:25;
16:23;20:13;25:18;
26:1,20;27:13,22;28:9,
18,24;29:6,9,12;30:4;
31:8,13;32:12,13,20;
34:10,15,21;35:1,6,11;
36:20;37:1;38:6,17;
39:20;40:2,10,23;41:9;
42:9,13,15,19;43:7,11;
44:3;47:21;48:23;49:3,
6;50:9,13;53:19,23;
55:25;57:3,10,11,16;
59:16,24;60:4,6;61:9,
17;62:7;63:21;64:4,9;
66:19;67:25;68:19,23;
69:11,13,22;70:3,3,8,8,
11;71:14,25;72:4,13;
73:6,8,11;74:4,8,19,23;
75:8,23;76:12,20;77:1;
78:4,13,16;79:17,24;
80:25;81:4,21;82:14;
83:2,19;84:2,6;86:7;
87:11;88:13;93:3;96:4,
12,17;97:1,23;99:10,
21;0:7,3,9
**Wells' (13)**
5:4;9:13;26:11;
34:12;39:1,8;40:2;
47:1,8;48:14;68:25;
77:11;0:13
**Well's (1)**
5:9
**well-taken (1)**
77:4
**weren't (1)**
9:14
**wet (4)**
32:25,25;34:15,16
**what-ifs (1)**
85:23
**What's (9)**
17:25;42:3;47:6;
57:4;59:3;88:4,8;
98:15;0:19
**Whereupon (2)**
0:11,25
**whole (1)**
30:20
**who's (1)**

87:21
**wildfire (33)**
5:25,25;74:12,15;
76:5,6,15,23;77:21;
78:18;79:2,3,6,19;80:7,
7;81:15;82:4,10,18;
84:10,17,18,25;86:20;
87:15,19,22;88:6;
91:14;98:12,12,18
**wildfire-claim (1)**
94:16
**wildfires (16)**
16:19;74:13;75:19;
76:14;78:7,9,13,18;
79:15;80:19;81:2;
84:22;85:6;87:12;89:8;
91:22
**William (1)**
73:25
**willing (1)**
69:14
**Willkie (1)**
0:17
**winds (1)**
56:21
**wish (1)**
98:24
**wished (1)**
0:8
**withdraw (2)**
42:6;56:15
**within (1)**
20:12
**without (9)**
9:8;14:8;38:4;48:2;
52:1;55:3;69:14;74:24;
86:20
**Witness (34)**
4:20,23;7:12,18;
11:13;12:3;14:20;
15:10;18:15;20:18;
27:18;29:14;42:21,23;
50:14;68:21;69:15,17;
70:4,12;71:10;72:1,15,
22;75:2,24;77:24;78:5;
80:9;85:14;90:25;
93:21;0:4,10
**witnesses (3)**
30:9;72:17;0:2
**wonderful (1)**
71:12
**word (2)**
12:21;84:7
**words (7)**
10:3;11:3;41:11;
45:16;46:23;67:20,21
**work (5)**
57:12;61:8;75:4;
76:9;99:15
**working (1)**
18:4
**world (3)**
10:16;13:10;33:24

**worth (1)**
25:7
**wrap (3)**
62:5;98:1,3
**writing (1)**
49:1
**wrong (3)**
39:13;41:2;86:21
**wrongful (4)**
14:4;15:14,21;0:25

**Y**

**year (7)**
25:5,10;46:9;87:13,
25;88:24;91:18
**years (3)**
62:15;96:9,20
**year's (1)**
94:17
**yes-or-no (1)**
78:5
**yesterday (3)**
5:5;22:11;25:2
**Yorker (1)**
25:3

**Z**

**Ziman (4)**
69:1,3,4;73:13
**Zoom (5)**
25:3,6,8;30:14;34:4

**1**

**1 (1)**
36:17
**1,000 (1)**
71:19
**1.180 (1)**
68:5
**10 (1)**
3:1
**10.9c (1)**
68:4
**1054 (4)**
75:5;76:11,22;77:2
**10A-II (10)**
45:12,20;46:16;
47:21;57:9;59:11;60:7;
64:20;65:20;66:7
**10K (4)**
91:17,20;94:19;95:9
**10Q (1)**
95:3
**11 (1)**
22:6
**1129 (1)**
74:20
**1129a (1)**
22:8
**12 (3)**

65:1;91:13;92:11
**12:39 (1)**
0:11
**12th (4)**
54:5,20;55:9;60:8
**13 (2)**
68:2;91:14
**13007 (1)**
8:14
**14 (2)**
65:1;68:3
**14.9 (3)**
56:16,22;57:18
**15 (3)**
75:9;91:13,20
**16 (1)**
75:9
**16th (4)**
55:1,7,8,19
**17 (2)**
16:19;55:15
**18 (4)**
16:19;33:9;34:25;
75:14
**189 (1)**
95:9
**19 (9)**
32:19;45:7;49:6;
51:1;64:13;65:1;75:8,
14;99:11

**2**

**2 (1)**
65:23
**2.4 (4)**
35:12,16;36:25;
39:17
**20 (3)**
32:18,19;64:13
**200 (1)**
93:15
**200-million- (1)**
92:23
**200-million-dollar (3)**
92:12;93:4,11
**2017 (7)**
54:5;55:1,8,9;60:8;
62:11;78:14
**2017-2018 (1)**
91:22
**2018 (3)**
62:11;78:14;96:15
**2019 (1)**
91:18
**2020 (3)**
3:1;36:19;78:18
**21 (6)**
11:2,16;12:4,5,6;
16:12
**2106 (1)**
8:13
**22nd (1)**

36:19;71:20
**28 (2)**
3:1;97:18

**3**

**3 (2)**
62:9;65:23
**35 (1)**
53:14
**35,905,153,932 (1)**
53:14
**35.9 (4)**
53:14,17;54:1,24

**4**

**4 (3)**
11:2;12:8;71:20
**4.75 (1)**
90:14
**4.75-percent (1)**
90:17
**400 (5)**
60:18,23;61:22,25;
62:24
**430 (1)**
95:6
**44 (1)**
36:24
**47 (1)**
68:2

**5**

**5 (4)**
11:2;12:8;65:23;
85:17
**510b (1)**
48:18
**526,118,408 (1)**
49:13,17,25;50:3

**6**

**6.75 (3)**
56:5,10;57:25
**600 (1)**
95:5
**67 (4)**
33:10;34:24;35:1,11

**7**

**7 (2)**
45:5;60:14
**7510 (1)**
32:13
**7521 (1)**
36:19
**77 (4)**
64:12,24;65:4;66:11
**7th (1)**

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 120
of 121

82:1

## 8

**8 (6)**
11:2,16,17,24;45:7;
60:14
**87,000 (1)**
7:7
**898 (1)**
71:17

## 9

**9 (1)**
11:24
**9th (3)**
46:8;54:23;55:6

Case: 19-30088    Doc# 7665    Filed: 05/29/20    Entered: 05/29/20 18:23:56    Page 121
of 121