1       UNITED STATES BANKRUPTCY COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3                   -oOo-

4  In Re:                    ) Case No. 19-30088
                             ) Chapter 11
5  PG&E CORPORATION AND PACIFIC   )
   GAS AND ELECTRIC COMPANY   ) San Francisco, California
6                             ) Friday, May 29, 2020
                   Debtors.   ) 10:00 AM
7  _____   )
                                  CONFIRMATION HEARING
8
                   TRANSCRIPT OF PROCEEDINGS
9        BEFORE THE HONORABLE DENNIS MONTALI
             UNITED STATES BANKRUPTCY JUDGE
10
   APPEARANCES (Via Zoom):
11 For the Debtors:          STEPHEN KAROTKIN, ESQ.
                             RICHARD W. SLACK, ESQ.
12                           THEODORE E. TSEKERIDES, ESQ.
                             Weil, Gotshal, & Manges, LLP
13                           767 Fifth Avenue
                             New York, NY 10153
14                           (212)310-8000

15 For Official Committee of  ROBERT A. JULIAN, ESQ.
   Tort Claimants:           Baker and Hostetler LLP
16                           600 Montgomery Street
                             Suite 3100
17                           San Francisco, CA 94111
                             (415)659-2600
18
   For United States of      MATTHEW J. TROY, ESQ.
19 America:                  United States
                             Department of Justice
20                           Civil Division
                             P.O. Box 875 Ben Franklin Station
21                           Washington, DC 20044-0875

22 For Securities Lead        MICHAEL S. ETKIN, ESQ.
   Plaintiff Public Employees Lowenstein Sandler LLP
23 Retirement Association of  One Lowenstein Drive
   New Mexico:               Roseland, NJ 07068
24                           (973)597-2500

25

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

1  For Andy R. Vara, United        GREG M. ZIPES, ESQ.
   States Trustee:                 United States
2                                  Department of Justice
                                   Office of the U.S. Trustee
3                                  450 Golden Gate Avenue
                                   Suite 05-0153
4                                  San Francisco, CA 94102
                                   (415)705-3333
5
   For William B. Abrams,          WILLIAM B. ABRAMS
6  Individual and Tubbs Fire       1519 Branch Owl Place
   Claimant:                       Santa Rosa, CA 95409
7                                  (707)397-5727

8  Also Present:                   Mary Wallace
                                   Individual Fire Claimant
9

10

11

12

13

14

15

16

17
   Court Recorder:                 LORENA PARADA/ANKEY THOMAS
18                                 United States Bankruptcy
                                   Court
19                                 450 Golden Gate Ave.
                                   San Francisco, CA 94102
20

21 Transcriber:                    eScribers, LLC
                                   7227 N. 16th Street
22                                 Suite #207
                                   Phoenix, AZ 85020
23                                 (973)406-2250

24 Proceedings recorded by electronic sound recording;
   transcript provided by transcription service.
25

PG&E Corporation and Pacific Gas and Electric Company

1       SAN FRANCISCO, CALIFORNIA, FRIDAY, MAY 29, 2020, 10:00 AM

2                                   -oOo-

3         (Call to order of the Court.)

4               THE CLERK:  This is the bankruptcy court for the

5    Northern District of California.  Court is now in session.  The

6    Honorable Dennis Montali presiding.

7               THE COURT:  Good morning, Ms. Parada.  Can you see me

8    and hear me?

9               THE CLERK:  Good morning, Your Honor.  Yes, I can.

10              THE COURT:  All right.  Good morning.

11              THE CLERK:  I'm bringing counsel in now.

12              THE COURT:  Yes, please.  Good morning, Mr. Karotkin.

13              MR. KAROTKIN:  Good morning, Your Honor.

14              MR. SLACK:  Good morning, Your Honor.

15              THE COURT:  Mr. Slack has his coat on, but he -- yeah,

16   that's all right.  I've got my uniform on again.

17              Mr. Tsekerides, good morning.

18              MR. TSEKERIDES:  Good morning.

19              THE COURT:  I can't hear you very well.  Are you all

20   hearing Mr. Tsekerides well?  Ms. Parada, can you?

21              THE CLERK:  Yes, Your Honor.

22              MR. TSEKERIDES:  Let me try that again.

23              THE COURT:  Yes, that's a little better.

24              MR. TSEKERIDES:  Better?

25              THE COURT:  Yeah, better.  There's Ms. Pullo.  Good

PG&E Corporation and Pacific Gas and Electric Company

1    morning.

2              MS. PULLO:  Good morning.

3              THE CLERK:  Would you like me to bring in Ms. Wallace,

4    Your Honor?

5              THE COURT:  Yes, please.  And I'm going to make a

6    couple of announcements while we're doing that, and I have a

7    couple -- good morning, Mr. Julian.

8              MR. JULIAN:  Good morning.

9              THE COURT:  -- a couple of questions for you in a

10   moment, Mr. Karotkin, but a couple of announcements.  Hopefully

11   later today, but possibly not until tomorrow, I expect to have

12   an order issued regarding the disagreement between the TCC and

13   Mr. Abrams about exhibits and witnesses.  And probably on

14   Sunday, but maybe Monday, I will have a second order that will

15   be responsive to the statement filed yesterday by Mr. Karotkin

16   or the debtor, I can't remember who signed it, concerning

17   timing for the debtors' opening arguments, and I will be making

18   some time allocations and indications of things, and maybe even

19   frame a couple of questions in an order that I intend to issue

20   on no later than Monday.

21             And just a reminder, we have one witness scheduled on

22   Monday.  We have no PG&E calendar on Tuesday.  Believe it or

23   not, I have a calendar on another matter, and I expect that I,

24   at least, or perhaps lots of other counsel, will want to be

25   gathering their thoughts and preparing their arguments, and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    we'll start the argument session on the morning of Wednesday

2    the 3rd.

3            And for those of you that are -- you'll remember,

4    there's a motion on the calendar for the 4th regarding request

5    for appointment of an examiner.  I may move that time slightly

6    but the plan will be to start with that hearing -- and when I

7    say move it, it might move by a half-an-hour, nothing more --

8    and then we will go directly into the next phase, whatever

9    we're doing next on the oral arguments.  And then once I hear

10   the request from the various counsel about estimated times, I

11   will be more specific about that.

12           The other thing is really more about me and my staff.

13   Those of you that have tolerated me for all of this case and

14   for all the years before that, think I'm old-fashioned because

15   I like chambers copies.  Well, the stay-at-home order and COVID

16   has changed everything, and my staff that does go into our

17   building tells me we have mountains of chambers copies, all

18   designated for me, not for any of the other judges.  So guess

19   what, you're off the hook, no chambers copies anymore, at least

20   until we're back to normal, whenever that is, and there's no

21   punishment if you send them, but they're going directly into

22   recycling.

23           Now questions.  Mr. Karotkin, you told me you wanted

24   about two-and-a-half hours on argument.  I assume that's for

25   opening, and that you're just reserving for now any closing

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   arguments, right?

2         MR. KAROTKIN:  Yes, sir, that would be to address our

3   burden, as well as the objections.

4         THE COURT:  Yeah, I mean after you hearing the timing,

5   I assume you'll give me an estimate of what time you want for

6   closing.

7         And the other question for you is, are you

8   anticipating filing an update on the schedule or the table of

9   pending objections?

10        MR. KAROTKIN:  Yes, we will do that, sir.

11        THE COURT:  When?

12        MR. KAROTKIN:  We'll try to do that by Monday.

13        THE COURT:  Okay.  Yeah, I mean, well again, this

14  helps me not only to prepare, but also to figure out how

15  critical it is for counsel who want to argue.  So the best --

16  the sooner the better, but do what you can do.  I mean, I can

17  only do so much, and you can only do so much.

18        MR. KAROTKIN:  Yes, sir.  Thank you.

19        THE COURT:  All right.  Ms. Parada, I see you've

20  brought Ms. Wallace into the room.  Ms. Wallace, or -- can you

21  hear me, Ms. Wallace?  All right.  Ms. Parada, can you unmute

22  her?  There.  Ms. Wallace, can you hear me?

23        No, now she's muted again.  Ms. Parada, are you

24  unmuting?  Can you unmute her or does she have to?

25        THE CLERK:  No, Your Honor, I can only request that

1   she unmute herself.

2          THE COURT:  All right.  Now, Ms. Wallace --

3          MS. WALLACE:  Can you hear me?

4          THE COURT:  Can you hear me now, Ms. Wallace?

5          MS. WALLACE:  I can hear you.

6          THE COURT:  Okay.  At your request, Ms. Pullo is back

7   to be questioned.  Ms. Pullo is on the screen.  You can't see

8   her if you're not looking at a video, but she see me, and she

9   can hear me and you.  She was previously sworn as a witness, so

10  I am not going to ask her to take the oath again.  I'm going to

11  permit you to go ahead and ask her questions.  And my

12  recollection is you requested I think ten minutes, or maybe

13  fifteen, but I will let you go ahead.  So please proceed.

14      (Witness previously sworn.)

15          MS. WALLACE:  Good morning, everyone, and good

16  morning, Ms. Pullo.  My name is Mary Wallace.  I'm a pro per

17  litigant in this case.  I lost my property in Magalia ,

18  California due to the 2018 Camp Fire.  I may go over -- a

19  little over my estimate of my ten minutes, I'll be as

20  respectful as I can of the Court's time.

21          And if I experience any technical difficulties, Judge,

22  Helen Sedwick is on the call, who has a copy of my questions.

23  Would she be able to complete the questions for me?

24          THE COURT:  Well, let's see how well you're doing, and

25  let's worry about that later.  Go ahead and --

Pullo - Direct

1    MS. WALLACE:  Oh --

2    THE COURT:  -- ask your questions.

3    MS. WALLACE:  -- okay.

4              RESUMED CROSS-EXAMINATION

5  BY MS. WALLACE:

6  Q.   So my first question is in reference to page 1, line 22 to

7  28 regarding solicitation of votes, and tabulation of votes.

8  Is it your duty or responsibility to make sure all fire victims

9  receive ballot packages?

10 A.   Which documents are we referring to?

11 Q.   The ballot packet, Ms. --

12    THE COURT:  I think she's referring to your

13 declaration, Ms. Pullo.  You had it with you the other day.

14    THE WITNESS:  Okay.

15    THE COURT:  Do you have it again today?

16    THE WITNESS:  Yes, I do.

17    THE COURT:  Ms. Wallace, say again, the page number.

18    MS. WALLACE:  It's page 1, line 22 to 28 regarding

19 solicitation of votes, and tabulation of votes.

20    THE COURT:  All right.  Did you understand the

21 question, Ms. Pullo?

22    THE WITNESS:  Can you please repeat the question?

23 BY MS. WALLACE:

24 Q.   Is it your duty or responsibility to make sure all fire

25 victims receive ballot packages?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1    A.   It is Prime Clerk's duty to comply with the solicitation

2    procedures order, and send materials to all those entitled to

3    receive ballot packages.

4    Q.   So that would be a yes?

5            MR. SLACK:  Objection to the form, Your Honor.

6            THE COURT:  Well, she answered the question.  That's

7    the answer.

8            MS. WALLACE:  Okay.

9            THE COURT:  I'll leave it at that.

10           MS. WALLACE:  Okay, thank you.

11   BY MS. WALLACE:

12   Q.   Do you have 100 percent certainty that all fire victim

13   claimants received their ballot packages before the betting --

14   voting deadline?

15   A.   I have my certificate of service saying that we sent out

16   the back -- ballot packages to all those entitled to receive

17   ballot packages.

18   Q.   How would a fire victim determine whether his or her vote

19   was accurately counted?

20   A.   We complied with the solicitation procedures order to

21   tabulate all valid ballots received, and that is reflected in

22   my vote declaration.

23   Q.   The next series of questions is referencing page 5,

24   line -- number -- paragraph number 8, 1 through 10.  And it is

25   in regards to -- was in accordance with solicitation

Pullo - Direct

1  procedures.

2          THE COURT:  Do you have that reference, Ms. Pullo?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Sorry, what's the question, Ms.

5  Wallace?

6  BY MS. WALLACE:

7  Q.   Were you or Prime Clerk ever informed that many never

8  received the ballots at all?

9  A.   We received requests for people requesting replacement

10 ballots.

11 Q.   But did you -- the question was ever -- were you informed

12 that they didn't receive the ballots at all?

13         MR. SLACK:  Objection to the form.

14         THE COURT:  Well, Ms. Wallace, she just answered the

15 question.  She said "we", meaning her company, received

16 requests for replacement.  So if --

17         MS. WALLACE:  Okay.

18         THE COURT:  -- go ahead.  And if you want to follow-up

19 on a question, you're welcome to ask her more specifically

20 about what she --

21 BY MS. WALLACE:

22 Q.   Do you know how many people had never -- did not receive

23 their ballots?

24         MR. SLACK:  Objection to the form.

25         THE COURT:  Ms. Parada, I just lost my video.  Can you

(973)406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1    hear me?

2           THE CLERK:  Yeah, yes, Your Honor, I can hear you and

3    see you.

4           THE COURT:  Let's see what's going on with my -- well,

5    I am glad you can see --

6           MR. KAROTKIN:  Not now.

7           MR. SLACK:  Not anymore.

8           THE CLERK:  No.  One moment while we connect Judge

9    Montali.

10          THE COURT:  All right.  After that -- sorry, everyone.

11   I have no idea what happened.  I didn't disconnect on my own

12   like I did last time.

13          Ms. Wallace, can you hear me?

14          MS. WALLACE:  Yes, I can, sir.

15          THE COURT:  All right.  I apologize to everybody.  I

16   don't know what happened, but I think you were asking Ms. Pullo

17   about did they get requests for replacement ballots.  So go

18   ahead and restate the question.  I don't expect you to remember

19   everything that I can't -- when I wasn't there.

20   BY MS. WALLACE:

21   Q.   Yes.  I think I was asking of those that didn't receive

22   the ballot, do you know how many receive a ballot?

23   A.   I only know of people that made requests for replacement

24   ballots.

25   Q.   And do you know how many made requests for replacement

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  ballots?

2  A.    We probably received about -- I'd be speculating.  I don't

3  know how exactly how many.

4  Q.    Ten, twenty, thirty, 100?

5  A.    I would say maybe -- maybe 100 to 150.

6  Q.    Were you informed, and had reasonable knowledge that some

7  were receiving the voting package as late as May 20th?

8  A.    I -- we received inquiries from people stating that they

9  had just received voting packages.

10  Q.    That's after the voting deadline?

11  A.    Yes, we received some inquiries saying -- stating that.

12  Q.    Do you know how many inquiries you received?

13  A.    A handful after the voting deadline.

14  Q.    So a half-a-dozen people, five people?

15  A.    I'd be speculating, but it was not an un -- a high amount.

16  Q.    Do you know why some people received their package after

17  the voting deadline?

18  A.    I can only say that we sent out the materials.  I can't

19  speculate as to why people didn't receive them.

20  Q.    So you don't know how many received their packages after

21  the voting deadline.

22      Were you informed and had reasonable knowledge that I

23  repeatedly requested information from you and, in fact, did not

24  receive the plan and voting package until after the voting

25  deadline?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  A.  I know that you requested materials, you received them

2  electronically, and we sent out the materials in accordance

3  with the solicitation procedures.  I, as reflected in the

4  certificate of service, we did send hard copy materials, but I

5  can't speculate as to why you didn't receive them.

6  Q.  Do you know that, on my original proof of claim, I stated

7  that I wanted all documents received in writing?

8  A.  Yes.

9  Q.  But you decided to send it electronically?

10      MR. SLACK:  Objection to the form.

11      THE COURT:  You can answer, Ms. Pullo.

12  A.  We sent you hard copy versions of the materials, as

13  reflected in the certificate of service.  In addition to that,

14  we also sent them electronically.

15  BY MS. WALLACE:

16  Q.  Do you know when I received that certificate of service?

17      MR. SLACK:  Objection to the form.

18      THE COURT:  Ms. Wallace, you wouldn't have received

19  the certificate of service.

20      MS. WALLACE:  Okay.  Okay.  Sorry, I can rephrase

21  that.

22  BY MS. WALLACE:

23  Q.  Do you know that I received my voting package on May 16th?

24  A.  I was not aware of when you received your package.

25  Q.  And are you aware that I received that package directly

of 92 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  from Ankey?

2      THE COURT:  Ms. Wallace.  Ms. Wallace, you need to

3  clarify, understand something.  When somebody -- we all know

4  this from experience, when you mail something, you know when

5  you mail it.  You have no way of knowing when it was received

6  unless you had some sort of return receipt indication.  So when

7  you asked Ms. Pullo if she knows when you received a hard copy,

8  there's no way she could possibly know, but if she sent you

9  something electronically, perhaps she could say when that was

10 sent but beyond that, and it doesn't matter when and how Ms.

11 Pullo wouldn't know why and when someone in my staff sent you

12 something.  So let's stick with what Ms. Pullo can tell you she

13 knows, or doesn't know.

14      MS. WALLACE:  Thank you.

15 BY MS. WALLACE:

16 Q.  Was there anything in the plan or solicitation procedures

17 that required this information be sent out no later than April

18 8th?

19      MR. SLACK:  Objection to the form.

20      THE COURT:  Do you understand the question, Ms. Pullo?

21      THE WITNESS:  I believe so.

22 A.  The solicitation order required that we send out the

23 materials by March 31st, or as soon as reasonably practical

24 thereafter.

25 BY MS. WALLACE:

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1   Q.   Okay.  And you're -- do you have knowledge or should have

2   knowledge that I received verification of my claim -- well, I

3   guess I asked that before.

4           THE COURT:  Ms. Wallace, let's ask -- if you want to

5   ask your questions, ask about things generally.  You well-

6   established that you didn't get something, and efforts were

7   made to give you something late.  So if you got your vote in,

8   there's no harm, no foul for you, and you're welcome to ask Ms.

9   Pullo other questions about generally, but it doesn't help

10  anything to have further discussion about your particular

11  situation.

12          MS. WALLACE:  So not receiving it wouldn't be

13  considered strict adherent -- would be considered strictly

14  adherent to the retention orders in the solicitation --

15          THE COURT:  Ms. Wallace, you're entitled to make

16  arguments at a later date.  Today, you're entitled to ask Ms.

17  Pullo questions, not ask me questions, and they're legitimate

18  questions but you're supposed to ask what Ms. Pullo can tell

19  you about it, not what I have to deal with as legal

20  consequences.

21          MS. WALLACE:  Thank you.

22  BY MS. WALLACE:

23  Q.   If many of the fire claimants never received the plan and

24  voting ballots, is that considered strictly adhering to the

25  solicitation plan?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1        MR. SLACK:  Objection, Your Honor.

2        THE COURT:  Again, Ms. Wallace, you're making what's

3   more of a rhetorical argument.  Ms. Wallace isn't supposed to

4   give her legal opinions on whether her company complied as a

5   legal matter.  She said what the company did as a practical

6   matter.  It complied with the Court's order and mailed things

7   out.

8        Again, I'll repeat, something being mailed out doesn't

9   mean somebody received it necessarily.  So go ahead, and again,

10  I delayed you with the interruption but I want you to focus any

11  remaining questions on Ms. Pullo, otherwise, I'm going to let

12  her go, and let you -- we'll call the next witness.

13  BY MS. WALLACE:

14  Q.   Okay.  I'd like to ask you some questions about your

15  duties, specifically in reference to the retention orders that

16  authorized Prime Clerk to assist the debtors with, among other

17  things, a service and distribution of solicitation materials

18  and tabulation of votes cast to accept or reject the plan.

19  It's on page 2, lines 6 through 20.

20       THE COURT:  Okay.  Go ahead and ask the question.  She

21  has the document.

22  BY MS. WALLACE:

23  Q.   In the retention orders, is Prime Clerk's duty only to the

24  debtor PG&E?

25       THE COURT:  That's a legal conclusion.  You don't have

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  to answer that, Ms. Pullo.

2  Q.   Do you have the same duty to the fire victims?

3          THE COURT:  You don't have to answer that question,

4  Ms. Pullo.

5  BY MS. WALLACE:

6  Q.   If the retention orders were not carried out properly, are

7  there any provisions to correct the deficiencies, and if so,

8  what are they?

9  A.   That's a -- is that a legal question, as well?

10          THE COURT:  Well, answer it as best you can.  If you,

11  or your company learned that there has been a mistake, what do

12  you do about it?

13  A.   We fix it, and remedy as soon as possible.

14  BY MS. WALLACE:

15  Q.   And how do you fix it, and remedy --

16          MR. SLACK:  Objection, Your Honor.

17          THE COURT:  You can answer.  Go ahead, Ms. Pullo.

18  A.   It -- it depends on what we are fixing -- what the issue

19  is.

20  BY MS. WALLACE:

21  Q.   In Exhibit B-1 to your declarations, you list 978 ballots

22  for fire victims that were not counted because they arrived

23  after the deadline.  Does that number sound right to you?

24  A.   That sounds -- that sounds correct.

25  Q.   Is this a typical proportion for late ballots?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  A.    Given the size of this case, yes, it's not atypical.

2  Q.    Can you tell me how many of these ballot packages were

3  sent via USPS mail to fire victims?

4  A.    All of the solicitation packages were mailed by First

5  Class mail, as in accordance with the certificate of service

6  that was -- that I filed.

7  Q.    All -- I'm sorry, I didn't hear what you said.  All of the

8  what?

9  A.    All of the direct fire victim claim solicitation packages

10 were mailed via First Class mail as detailed in the certificate

11 of service.

12 Q.    Did Prime Clerk bring to PG&E or the Court's attention,

13 the volume of calls and emails it was receiving from victims

14 who had not received ballots?

15           MR. SLACK:  Objection, Your Honor.

16           THE COURT:  Say again, Mr. Slack?

17           MR. SLACK:  I'm objecting, Your Honor.  I don't think

18 there's evidence as to whether or not actually fire victims did

19 or didn't receive it, you know, the packages, and there's an

20 assumption of fact that's not in evidence.

21           THE COURT:  Okay.  Ms. Wallace, I'll ask you to

22 restate the question, and again, you can't pursue facts that

23 aren't necessarily established.  So you can ask her what

24 might've happened about something, but you can't just refer to

25 something that you don't -- no proof that it did happen, follow

Pullo - Direct

1  me?

2       MS. WALLACE:  Right.  And I do have proof that it did

3  happen because I have knowledge of dozens of people that never

4  received a ballot.

5       THE COURT:  Well, that's not with -- that doesn't --

6  that's not the point.  If you have knowledge of people who

7  didn't receive the ballots, that's your knowledge, and what you

8  do about it is another matter, but it's not something Ms. Pullo

9  can know.  She cannot know what you have knowledge of, and if

10  you ask her about something you have knowledge of, she can't

11  know.  So let's -- I'm going to give you a couple of more

12  minutes to ask her what she knows, or is in a position to know

13  whether, including she might say, I don't know but she would be

14  in a position to know whether she doesn't know it.

15       MS. WALLACE:  Thank you.

16  BY MS. WALLACE:

17  Q.   Did Prime Clerk notify the Court that I had called and

18  sent emails several times to Prime Clerk and had not receive a

19  proof of claim, or a voting package?

20  A.   No, I did not email the Court about your correspondence.

21  Q.   Does Prime Clerk ship out all the ballot packages itself

22  or does it use subcontractors?

23  A.   We have a -- a vendor that sends out all of our mail.

24  Q.   So that vendor would be called a subcontractor, or a

25  vendor, or that -- they equal the same?

Pullo - Direct

1          THE COURT:  Well, Ms. Wallace, she said it's a vendor.

2    So it doesn't matter whether it's a vendor or a subcontractor.

3    It's someone that their company used to send the mail out.  So

4    that's an answer.  Go ahead.  And if you have a follow-up about

5    that, you can ask it.

6    BY MS. WALLACE:

7    Q.   Do the vendors notify that -- did the vendor notify that

8    it was delayed in performing the mailing due to COVID-19 or any

9    other reason?

10   A.   The mailing went out in accordance with the court-approved

11   deadlines.  So we -- there was no delay from a mailing

12   perspective related to that.

13   Q.   So those that received their voting packages deadline

14   aren't considered -- are considered okay?

15          THE COURT:  Okay, Ms. Wallace.  I'm going to conclude

16   the deposition - the questions now, because it's obvious to me

17   that you are frustrated by --

18          MS. WALLACE:  I only have a couple of more questions.

19          THE COURT:  -- it's obvious to me that you are

20   frustrated by the fact that you didn't get your materials on

21   time, and maybe you were taken care of, and you're undoubtedly

22   upset and frustrated that some other people perhaps never got

23   their votes counted, and that's unfortunate, but it's not

24   anything to question Ms. Pullo about.  You can argue about it

25   to me, and see, and tell me what I should do about it, but not

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1    thing morning.

2             MS. WALLACE:  But -- but --

3             THE COURT:  I'll let you ask two more questions, and

4    then we're going to conclude with Ms. Pullo.

5    BY MS. WALLACE:

6    Q.   Do you know Josh Karotkin?

7    A.   Yes.

8    Q.   And what is his relationship to Prime Clerk?

9    A.   He is an employee of Prime Clerk.

10   Q.   Do you know his title?

11   A.   Director.

12   Q.   Do you know Stephen Karotkin?

13   A.   Yes.

14   Q.   Do you know the relationship between Stephen Karotkin and

15   PG&E?

16   A.   He is their counsel.

17   Q.   Do you know that Josh Karotkin is the son of Stephen

18   Karotkin?

19   A.   I do.

20            MR. SLACK:  Your Honor, I mean, I gave some leeway,

21   but I don't see why this is relevant to anything in this case.

22            MS. WALLACE:  It's relevant in the fact that it's --

23   that possibly a reasonable person may see a conflict of

24   interest, that the father is a lead attorney for PG&E and the

25   son is director of the company that's in charge of counting the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1  ballots.

2          THE COURT:  Okay.  All right.  I'll accept that, if

3  that's the fact, but again there's nothing Ms. -- excuse me,

4  Ms. Pullo can do about it.

5  BY MS. WALLACE:

6  Q.   Can you verify under penalty of perjury that all claimants

7  received the plan and voting package with adequate time to

8  review, and vote for the voting deadline?

9          MR. SLACK:  Objection, Your Honor.

10         THE COURT:  Yeah, sustained.  She's filed her

11  declaration.  I'm going to conclude the --

12         MS. WALLACE:  Okay, I'm almost done.  I just have --

13         THE COURT:  No, you are -- no, Ms. Wallace, you are

14  done.  I'm going to conclude this phase of the examination.

15  I'm going to excuse Ms. Pullo.  I'm going to call the next

16  witness, and you're entitled to ask the next witness questions.

17  That's Mr. Boken, and you asked to ask him questions, and I'm

18  going to let you do it.

19         MS. WALLACE:  So I can't say what I would wish to

20  happen from this irregularity in the voting?

21         THE COURT:  Ms. Wallace, I said more than three times

22  in this call, you can express yourself to me through the proper

23  channels, file something, take positions, make whatever you

24  want, and ask me to consider what I should do, but that's not

25  for you to be questioning Ms. Pullo.  That's all.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    I'm not closing you off from your views, or your

2  entitled to -- your entitlement to express yourself.  This is

3  going to waste time asking Ms. Pullo questions that aren't

4  relevant to her testimony.  So I'm going to conclude her.

5    Ms. Pullo, thank you for being here again.  I'll

6  excuse you.

7    And Ms. Parada, I'll ask you to move Mr. Boken into

8  the room, and after he is sworn, I will let Ms. Wallace be the

9  first questioner because she had asked to ask him questions, as

10  well.

11    MS. WALLACE:  Yes, Your Honor.  Thank you for that.

12  I'm not in a position right now; I didn't have time to prepare

13  for pretty much based on the 1,000 pages of whatever to be --

14  ask appropriate questions but I may reserve the right to ask

15  them after I hear his testimony.

16    THE COURT:  Okay.  You don't -- again, as I explained

17  yesterday, everyone including you, and all the lawyers, and me,

18  we all are operating under tight time schedules, and I wish it

19  were different, but it isn't.  So you have the right to decline

20  to ask Mr. Boken questions, and that's okay.  Now do you also

21  take the same view for Monday?  Will you want to or decline to

22  ask questions of Mr. Ziman?

23    MS. WALLACE:  I would like to reserve asking questions

24  to Mr. Ziman?

25    THE COURT:  Okay.  Well, you made the request for it,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Pullo - Direct

1   and that'll be honored.  I'm going to go ahead and let you stay

2   on to listen to the testimony today if you wish, but I'm going

3   to move you out of our electronic courtroom.  And again, we

4   weren't able to see you, but it doesn't matter, you

5   participated, and we'll just proceed there.

6           So with that, I see you, Mr. Boken, I presume.

7           MR. BOKEN:  Good morning.

8           THE COURT:  Ms. Parada, will you swear Mr. Boken in,

9   please?

10      (Witness sworn.)

11          THE CLERK:  Please raise your right hand.

12          THE CLERK:  Thank you.  Please state your name for the

13  record.

14          MR. BOKEN:  John Boken.

15          MR. SLACK:  Your Honor, Richard Slack from Weil,

16  Gotshal for the debtors.  The next witness, as we all know, is

17  Mr. Boken.  He's a managing director at AlixPartners, and we

18  would ask that his declaration be admitted into evidence at

19  this time.

20          THE COURT:  One of the things I'm going to clarify in

21  the order that I'm about to issue is that we don't have to do

22  that.  His declarations are considered in and evidence, unless

23  there were objections.

24          But before we proceed, Mr. Tsekerides, do you want to

25  stay on the -- in the courtroom, and Mr. Julian, you do both

Pullo - Direct

1  today, right?

2          MR. TSEKERIDES:  If that's okay.

3          THE COURT:  Okay.  All right.

4          Mr. Boken, I believe we need to bring the next

5  questioner in, who -- Ms. Parada, I believe that's -- well,

6  you'll remind me, Mr. Abrams, right?

7          THE CLERK:  Yes, Your Honor, I will bring him in.

8          Mr. Abrams is joining now.

9          THE COURT:  Good morning, Mr. Abrams again.

10          MR. ABRAMS:  Good morning, Your Honor.

11          THE COURT:  Can you hear me?  I think --

12          MR. ABRAMS:  Yes.

13          THE COURT:  Let me just check my notes to make sure.

14  Yeah, you -- I believe you asked for fifteen minutes; is that

15  right?  Am I -- recall that correctly?

16          MR. ABRAMS:  I thought it was twenty-five, but I'll be

17  concise.

18          THE COURT:  I'll give you twenty, how that's for --

19  I'm going to -- I'm in a compromising mood.

20          MR. ABRAMS:  All right.

21          THE COURT:  Go ahead.  Thank you, Mr. --

22          MR. ABRAMS:  Thank -- thank you, Your Honor.  I

23  appreciate that.

24                    CROSS-EXAMINATION

25  BY MR. ABRAMS:

1   Q.   Mr. Boken, I appreciate you joining to answer questions

2   regarding your work for Pacific Gas and Electric Company.  If

3   you could start out first by explaining what you were employed

4   to do by Pacific Gas and Electric.  And if you could,

5   differentiate between your work, and the work of Mr. Ziman, who

6   will be brought before the Court on Monday.

7   A.   Yes.  So AlixPartners was retained as restructuring

8   advisors, myself and a colleague, Jim Mesterharm were appointed

9   chief restructuring officer and deputy chief restructuring

10  officer.  Our responsibilities were in an overall capacity to

11  manage many of the day-to-day financial aspects of the Chapter

12  11 case.  That includes liquidity management, cash forecasting,

13  assistance in developing the business plan, claims management,

14  and activities associated with complying with Chapter 11

15  requirements, and the U.S. Trustee reporting requirements.

16  Q.   Okay.  Thank you.  Can you give me a sense of the

17  deliverables that your organization provided to Pacific Gas and

18  Electric?  Were these reports, plans?  What was -- what were

19  those deliverables?

20  A.   The number of work products that come out of our

21  responsibilities initially the filing of the statements and

22  schedules or schedules and assets and liabilities, and

23  statements of financial affairs, which were compiled and filed

24  in the early stages of the case.  I think it was in the March

25  or April time frame.  And then along the way, we produced in

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    conjunction with PG&E, materials like the financial forecast,

2    which was included in the disclosure statement.  We had

3    responsibility for producing weekly reports on liquidity and

4    cash management to the debtor-in-possession financing

5    lender/agent, and then a series of ad hoc analyses and reports,

6    depending on what particular work stream were involved in.

7    Q.   Okay.  Thank you.  In your declaration on page 3, lines 5

8    and 6, you state that you -- "including other members of the

9    debtors' senior management".  So can you describe this senior

10   management folks that you worked with, consulted, in your work?

11   A.   Yes.  One of our principal contacts was the chief

12   financial officer, Jason Wells, and then working beneath him,

13   but still part of senior management, was the treasurer.

14   Initially that was Nick Bijur, now that's an individual by the

15   name of Mari Becker.  We've also got --

16           THE COURT:  Excuse me, Mr. Boken.  Would you restate

17   that second person in the treasurer's position?  I just didn't

18   get the name.

19           THE WITNESS:  Mari Becker.  She's now the current

20   treasurer of the company.

21           And a whole host of other people in the senior

22   management team, John Simon, on the legal side, Janet Loduca,

23   also on the legal side.  There has been changeover, as I

24   believe you're aware in the CEO, the utilities CEO, the head of

25   the gas operations and electric operations, these were all

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  individuals both prior, and current, who are part of the senior

2  management team, who we have had regular interaction with.

3  BY MR. ABRAMS:

4  Q.  Thank you.  As part of those discussions, did you have

5  interactions regarding your work with Ms. Powell, the vice

6  president of Wildfire Safety?

7  A.  We have had discussions, meetings with the team that leads

8  the wildfire safety, including Ms. Powell, yes.

9  Q.  Including Ms. Powell, okay.  And that was regarding the

10 plan of reorganization?

11 A.  Those interactions with Ms. Powell would've been around

12 the wildfire mitigation plan, and in the cost associated with

13 the wildfire mitigation plan as we were assisting the company

14 in developing the financial projections.

15 Q.  Okay.  Would you say that wildfire mitigation is a central

16 component to the degree to which Pacific Gas and Electric will

17 be able to remain viable, and not go into further

18 restructuring?

19 A.  The wildfire mitigation plan is an important element of

20 how the company operates and expects to operate going forward.

21 Q.  Thank you.  In the course of your work, did you, regarding

22 the plan of reorganization, work with Julie Kane, the senior

23 vice president, and chief ethics and compliance officer?

24 A.  We did have some degree of interaction with Ms. Kane.  I

25 would say it would be -- I would classify that as moderate.

1    Q.   Moderate, okay.  On page 8, line 19, you indicate that you

2    did an analysis of Section 1129(a)(11), plan feasibility.  Do

3    you see that there?

4    A.   I'm looking at page 8, 19, and it's a blank.  I'm not sure

5    what --

6         MR. KAROTKIN:  Perhaps Mr. Abrams, if you referred to

7    paragraph numbers, it might be easier.

8    BY MR. ABRAMS:

9    Q.   Sure, it's between paragraph 5 and paragraph 6.

10        MR. KAROTKIN:  Yes, sir --

11        THE COURT:  Do you see that, Mr. -- Mr. Boken, do you

12   see that page?

13        THE WITNESS:  I do, yes.

14        THE COURT:  Okay.

15   A.   And I'm sorry, what was the question again?

16   BY MR. ABRAMS:

17   Q.   So, just bringing your attention to that section.  And

18   given your work on this, and your expert opinion, did you

19   assess that this plan is feasible based on Section 1129(a)(11)?

20   A.   I think what the statement is saying is I'm -- I'm

21   familiar with the requirements for confirmation of the plan.

22   Our responsibility or -- was with respect to providing an

23   opinion with respect to certain aspects of plan feasibility,

24   and particularly, whether the financial projections were

25   reasonable and rationale -- or reasonable and rational, and

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    whether the company had the adequate resources to implement the

2    plan.  Both of those points, I've expressed my opinion in the

3    declaration.

4    Q.   Okay.  Thank you.  So you did not, yourself or your

5    company, make an assessment of whether PG&E does or does not

6    comply with Section 1129(a)(11)?

7    A.   Well, Section 1129 is -- got many aspects to it.  We, of

8    course, work with Weil, Gotshal on the plan of reorganization,

9    and so we -- we were a component of the process of putting

10   together the plan, and the plan confirmation brief that argues

11   that the company is in -- or does meet the requirements for

12   confirmation of the plan under Section 1129.

13   Q.   Okay.  Thank you.  At the CPUC hearing on March the 2nd,

14   which is one of the exhibits that the debtors did not object

15   to, on page 884, lines 23 through 28, I asked Mr. Kane, "Ms.

16   Kane as part of your responsibilities, do you have any ethical

17   oversight associated with the bankruptcy process and the plan

18   of reorganizations?"

19          Her answer to that was, "No, specifically" -- or I'm

20   sorry, "Not specifically, no."

21          Do you consider ethical issues of Pacific Gas and

22   Electric as central to whether they will be able to continue

23   without further reorganization?

24   A.   Not sure how -- how to answer that.

25          THE COURT:  Well, then that's your answer.  Mr.

1    Abrams, it is difficult to talk about to a witness about

2    something somebody else said and then to ask what he thinks

3    about the relevance, or the legal significance of what that

4    other person said.

5          I mean, if you want to just ask Mr. Boken more

6    specifically, you may do so, but it's a -- he can't answer the

7    question because I can't understand the question.

8          MR. ABRAMS:  All right.

9          THE COURT:  So let's try it again.

10         MR. ABRAMS:  All right.  I -- I apologize, Your Honor,

11   part of what you stated --

12         THE COURT:  I'll cut you off.  You can ask him if he

13   thinks that the company has an obligation to comply with

14   ethical obligations under the law, I'm sure I know the answer,

15   but you could ask him that, or something like that.  But

16   seriously --

17         MR. ABRAMS:  Yeah.

18         THE COURT:  -- you've got to figure out why one

19   witness would know what another witness meant.

20         MR. ABRAMS:  Right, and all I was indicating was that

21   he indicated that he consulted with Ms. Kane on a moderate

22   level.  So the fact that she said, no, she didn't have any

23   input regarding the plan, seems to me to be important, but I'll

24   move on.

25         THE COURT:  Well, you can ask him what he consulted

1  with her about.  I mean, I doubt that what Mr. Boken was

2  involved with was ethics.  That's usually for ethical, not that

3  Mr. Boken isn't ethical, but is for ethics specialists, or

4  lawyers, it's not for a financial analyst.

5  BY MR. ABRAMS:

6  Q.   So -- I'll move on.  So to the degree to which as we've

7  seen in terms of the history of PG&E, with their falsifications

8  of documents, with locate and mark, with the manslaughter

9  charges, just yesterday Judge Alsup said that PG&E is a

10  recalcitrant criminal.  Given all of that, in terms of the

11  financial impacts of that, can PG&E continue in that direction

12  without further reorganization, and without being -- facing

13  other consequences that would mean the dissolving of Pacific

14  Gas and Electric?

15          MR. SLACK:  Objection, Your Honor.

16          THE COURT:  Just said -- I know what your objection

17  is, but go ahead, and state it for what --

18          MR. SLACK:  Your Honor, there's a couple of things.

19  First off, there are facts that are predicate there that are

20  not in evidence here.  And second, Your Honor, it doesn't make

21  any sense given what he asked.

22          THE COURT:  Okay.  I'm going to sustain the objection.

23  Mr. Abrams, again, you're welcome to ask him if he believes

24  that the company will likely need further reorganization, but

25  to bring in highly publicized statements in the media yesterday

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1  from Judge Alsup, is not something that I expect Mr. Boken to

2  be even -- I don't even know if he's aware of it.  So why don't

3  you rephrase the question.

4            MR. ABRAMS:  Okay.  I will rephrase the question.

5            THE COURT:  In terms of -- wait, in terms of what he

6  says in his declaration, his assignment was in his opinion.

7            MR. ABRAMS:  Right, yes.  I understand.

8  BY MR. ABRAMS:

9  Q.   In regarding compliance with 1129(a)(11), do you believe

10  that following the law and PG&E not getting into further legal

11  problems is important for them to avoid further restructuring?

12  A.   I think it's important for PG&E to act in a responsible

13  manner in accordance with their fiduciary duties, in order to

14  proceed.

15  Q.   So is that -- so I'm sorry, I did not understand the

16  answer.  So do you feel that complying with the laws is

17  important for how PG&E can avoid further restructuring or not?

18            MR. SLACK:  Objection, Your Honor.

19            THE COURT:  You can answer, Mr. Boken, if you have an

20  opinion on that.

21  A.   I believe that PG&E, the officers, and directors, and

22  employees operating consistent with their fiduciary duties and

23  operating the business in a safe and responsible manner is

24  important for PG&E to be successful going forward.

25  BY MR. ABRAMS:

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Q.   Okay.  Can you explain to me how you assessed the wildfire

2    mitigation plan component of PG&E's activities into how the

3    financials were structured and, specifically, how you are going

4    to -- how PG&E's going to be able to reduce the risk of

5    wildfire given the financials associated with this

6    restructuring?

7              MR. SLACK:  Objection, Your Honor.

8              THE COURT:  Well, it's kind of a complicated question.

9    Mr. Boken, do you understand the question?

10             THE WITNESS:  I don't.  I felt like there was at least

11   two, and maybe three questions in there.

12             THE COURT:  Okay.  Well, then the objection is

13   sustained.  Rephrase the question, Mr. Abrams.  Break it into

14   pieces.  When you ask a compound question, it gets more

15   confusing.  Just ask specific questions, and he'll answer.

16   BY MR. ABRAMS:

17   Q.   What about this plan of reorganization directly addresses

18   wildfire mitigation efforts of Pacific Gas and Electric?

19             MR. SLACK:  Your Honor, I'm also going to object there

20   because it's -- that's beyond the scope of precisely what Mr.

21   Boken put in his declaration, which was focused, as I think

22   Your Honor recognized a couple of minutes ago, on the financial

23   aspects and the projections, and this goes far beyond that.

24             THE COURT:  Well, it probably does, but this is an

25   awkward arrangement, so I'm going to let him answer.  You can

1    answer that question, Mr. Boken.  Do you want to hear it again?

2            THE WITNESS:  Yes, please.

3            THE COURT:  Okay, restate the question, Mr. Abrams.

4            MR. ABRAMS:  Yes.

5    BY MR. ABRAMS:

6    Q.   What specifically in the plan of reorganization addresses

7    the wildfire mitigation activities of Pacific Gas and Electric?

8    A.   I think two factors are important.  Included in the

9    company's financial projections, are significant annual

10   investment in the Wildfire Mitigation Plan.  I believe that

11   number annually, when you combine operating expenses and

12   capital expenditures, is about 3.5 billion dollars -- upwards

13   of 3.5 billion dollars.  And the second factor that's an

14   important component of this plan is the company's ability to

15   participate in the wildfire -- the go-forward wildfire fund

16   which was established under AB 1054.

17   Q.   Okay.  Are you aware of the total settlement associated

18   with this particular restructuring, the damages that are paid

19   out to victims associated with the fires?

20           THE COURT:  Well, what are you -- I mean, are you

21   asking him about the treatment for the victims or the total

22   settlement?  Remember, there are tens of billions of dollars of

23   other claims being dealt with under the plan also, so what are

24   you asking him?

25           MR. ABRAMS:  Totally.

1          THE COURT:  What?  Both?

2          MR. ABRAMS:  Totally, Your Honor, yes, both.

3          THE COURT:  All right.  Mr. Boken?

4   A.    I am aware of the claims that are being addressed under

5   the Chapter 11 plan, yes.

6   BY MR. ABRAMS:

7   Q.    Okay.  So what is -- are you asking, what is that number?

8          MR. SLACK:  Objection, Your Honor.

9          THE COURT:  Well, what's the objection?

10         MR. SLACK:  Well, I'm not sure what that number is

11  asking for, and I want to -- I think we need to clarify exactly

12  what numbers we're asking Mr. Boken to --

13         THE COURT:  Yeah.

14         MR. SLACK:  -- testify about.

15         THE COURT:  That's a fair point.

16         Mr. Abrams, if you look at Mr. Boken's declaration,

17  you won't see the kind of breakdown of numbers that you'll see

18  in Mr. Ziman's declaration.  So I'm not sure I know what you're

19  asking.  So again, if you can be more specific, I'll see if he

20  can answer, but it might be more of a question for the next

21  witness, next -- on Monday.

22         MR. ABRAMS:  And if Mr. Boken doesn't under -- doesn't

23  know the answer, that -- then he doesn't know the answer, and

24  he can say that he doesn't know the answer.  I'm asking do you

25  understand the total amount of damages associated with this

1    restructuring that PG&E will have to pay to all claimants?

2            MR. SLACK:  Does he mean under the plan or  what do

3    you mean?

4            MR. ABRAMS:  Yes.

5    BY MR. ABRAMS:

6    Q.   Under the plan of reorganization associated with this

7    bankruptcy, what is the total number of damages for the

8    claimants?

9            THE COURT:  Okay, Mr. Abrams.  The word "damages"

10   triggers --

11           MR. ABRAMS:  Okay.

12           THE COURT:  -- a reaction.  So --

13           MR. ABRAMS:  Total number of --

14           THE COURT:  I'll ask him the question for you.

15           Mr. Boken, have you seen Mr. Ziman's declaration?

16           THE WITNESS:  I have.

17           THE COURT:  And did you notice that, as I recall, he

18   breaks down into various pieces, subrogation eleven fire

19   victims, 13.5, et cetera.  Can you -- with that kind of frame

20   of reference, can you answer Mr. Abrams' question?

21           THE WITNESS:  My recollection, and I believe this is

22   in the disclosure statement, there is a sources and uses

23   analysis, and the uses aggregates the total amount of claims

24   that will be satisfied, that could be funded debt claims, it

25   could be Wildfire claims, it could be ordinary vendor claims,

1    and my recollection, I haven't committed it precisely to

2    memory, is that aggregate number is somewhere in the range of

3    fifty-nine billion dollars.

4    BY MR. ABRAMS:

5    Q.    Thank you.  Are you aware that the Wildfire Fund is

6    twenty-one billion dollars for all of California utilities or

7    the majority of California utilities?  Are you aware of that?

8         THE COURT:  Yeah, Mr. Abrams, I'm going to interrupt.

9    That's really not relevant to this witness' testimony.  You and

10   I and everybody who reads the newspaper knows that kind of

11   number, but it's not relevant to what Mr. Boken's testifying

12   to.

13        MR. ABRAMS:  What I'm trying -- and I appreciate that.

14   I'll say a different question.

15   BY MR. ABRAMS:

16   Q.    There's a delta between the number that you just stated,

17   fifty-some-odd billion dollars and twenty-one billion dollars,

18   and the degree to which that twenty-one billion dollars will

19   support Pacific Gas and Electric, if they cause more

20   catastrophic wildfires as soon as this summer.  What I'm trying

21   to understand is, how much is the plan of reorganization

22   reliant upon that twenty-one billion dollars, and the degree to

23   which it's sufficient?  Can you please articulate why you feel

24   that the reliance on the twenty-one billion dollars is

25   sufficient for Pacific Gas and Electric to remain viable?

1          MR. SLACK:  Objection, Your Honor.

2          THE COURT:  I will overrule.  You can answer that, if

3     you know the answer, or have an opinion, Mr. Boken.

4     A.   I don't think anybody has made any sort of statement that

5     the Wildfire Fund is going to be sufficient for any of the

6     California IOUs that are -- that participate in that fund, or

7     will participate in that fund.

8          That's subject to a whole number of factors that none

9     of us know, like what future wildfires, what the volume, and --

10    and magnitude of future wildfires are going to be.

11         What's important for PG&E is the two items I

12    mentioned earlier, they have a very robust Wildfire Mitigation

13    Plan, and the company is making significant investments on a

14    year over year basis throughout the horizon of the financial

15    forecast, to help mitigate the occurrence of wildfires that --

16    as a result of PG&E equipment.

17         Secondarily, the Wildfire Mitigation or the Go

18    Forward Wildfire Fund is -- has been deemed by a number of

19    parties including the Governor, to be a potentially effective

20    tool to support the utilities in addressing potential wildfire

21    damages going forward.

22    BY MR. ABRAMS:

23    Q.   Okay.  Thank you.  I have three more questions.  These are

24    all very specific question related to page 5 of your

25    declaration, and your statement that, "Recent developments are

1    not accepted to have a material impact on the financial

2    projections or the debtors' ability to meet their obligations

3    under the plan specific to COVID."

4            THE COURT:  Are you --

5    BY MR. ABRAMS:

6    Q.   Do you see that section?

7            THE COURT:  -- referring to paragraph 11?

8            MR. ABRAMS:  I am referring to page 3 --

9            THE COURT:  Well --

10           MR. ABRAMS:  -- sorry, let me just pull out -- sorry,

11   page 5 --

12           THE COURT:  Paragraph 11, right?

13           MR. ABRAMS:  Yes, paragraph 11, yes.

14           THE COURT:  Mr. Boken, do you have your own

15   declaration there?

16           THE WITNESS:  I do, yes.

17           THE COURT:  Okay.  Go ahead.

18           MR. ABRAMS:  Thank you.

19   BY MR. ABRAMS:

20   Q.   In PG&E's May 1st earnings statement related to COVID-19,

21   the statement read, "Will" --

22           THE COURT:  Wait, wait.  I thought you were asking a

23   question about what he said in this declaration.

24           MR. ABRAMS:  I am in relationship to the May 1st

25   earnings statement.

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE COURT:  But there's nothing about the May 1st

2    earnings statement in this declaration.

3    BY MR. ABRAMS:

4    Q.   So your declaration appears to conflict with the May 1st

5    earnings statement that states, "Will continue to result in

6    workplace disruptions both in personal -- personnel

7    availability, and deployment".  Can you explain that difference

8    between the statement in the May 1st earnings report, and your

9    declaration?

10          MR. SLACK:  Objection to the form, Your Honor.

11          THE COURT:  You can answer the question, Mr. Boken, if

12   you understand the question.

13   A.   I think I understand it.  I don't see any conflict between

14   the two.  There is disruption, I will acknowledge that in the

15   day-to-day operations.  That does not necessarily mean that

16   that will have a material effect on the company's ability to

17   either meet its obligations under the plan or it will have a

18   material effect on the financial projections over the life of

19   the projection period.

20   BY MR. ABRAMS:

21   Q.   Will it have a material effect on Pacific Gas and

22   Electric's mobilization of personnel to address Wildfire

23   Mitigation?

24   A.   I don't know one way or the other whether it will or not.

25   Q.   Okay.  Do you think that the Pacific Gas and Electric

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Power Shutoffs and evaluations might be more problematic during

2    a COVID period than it was for last year?

3            MR. SLACK:  Objection, Your Honor.  Calls for

4    speculation.

5            THE COURT:  Yeah, sustained.  This is not within his

6    scope of -- which all of us could know the answer to those

7    questions but how can Mr. Boken be expected to know that?  He

8    can't know that.

9    BY MR. ABRAMS:

10   Q.   So in terms of financial projections, did you account for

11   the degree to which these elements affected the financial

12   projections and how, so did you take the impacts of COVID, and

13   power shut-offs with the increased wildfire danger, and fold

14   them into your analyses, and if so, please explain and

15   similarly, did you account for the degree to which the Wildfire

16   Fund support your analyses and if so, please explain the

17   financial impacts associated with those elements?

18           THE COURT:  It's a compound question.  I will

19   interpose an objection and sustain it.  You can ask him a

20   simple question.  You can't put fifteen different concepts --

21           MR. ABRAMS:  All right.

22           THE COURT:  -- into one question.

23           MR. ABRAMS:  Fair enough.  I apologize, I -- for that.

24   BY MR. ABRAMS:

25   Q.   So let me break this down then.  How in your financial

1 analysis did you fold in these personnel impacts of COVID in

2 terms of your financial projections associated with this plan

3 of reorganization?

4      MR. SLACK:  Your Honor, I object because it assumes

5 that there are employee dislocations, et cetera, that are not

6 in evidence.

7      THE COURT:  Well, I'm going to overrule that

8 objection.  Mr. Boken a moment ago said he did not say, and

9 he's very much aware of the rest of it -- as the rest of us are

10 about COVID, that he said he did not believe it would impact

11 the particulars that he was focusing on.

12      Mr. Boken, is that correct, did I restate it

13 correctly?

14      THE WITNESS:  I believe you did, Your Honor.

15      THE COURT:  And do you have any -- did Mr. Abrams ask

16 it in a way that would cause you to change your prior answer?

17      THE WITNESS:  What I can say is in our analysis, which

18 we did in conjunction with the company, is we looked at what

19 the impact of COVID has been up to as recently as we did the

20 analysis, that was somewhat quantifiable, and what the impact

21 would be on earnings, cash flow, and the company's ability, you

22 know, to -- like on capital expenditures, and that sort of

23 thing.

24      We did not project out whether COVID -- when COVID

25 would expect to abate to the point that things could get back

1   to some state of normalcy, or whether it would have any

2   particular impact on PS events, or other developments, so I

3   don't have an ability to answer it the way he's asked the

4   question, other than what I've just stated.

5           THE COURT:  All right.  Thank you.

6           MR. ABRAMS:  Thank you.

7           THE COURT:  Anything else, Mr. Abrams?

8   BY MR. ABRAMS:

9   Q.   Yes, just further breaking down that compound question.

10  Power shutoffs, how were power shutoffs accounted for -- future

11  power shutoffs accounted for in your financial analysis of the

12  plan of reorganization?

13  A.   Well, I'm not sure exactly how to answer it, so let me

14  tell you what I can state clearly, which is the CPUC, I believe

15  it's Tariff Rule 14, a policy that indicates that to the extent

16  that PG&E is acting responsibly, and I forget the other

17  terminology, that it is not subject to liability associated

18  with PSPS.

19  Q.   So that was not -- so an analysis of how power shutoffs

20  affect you, you didn't include that in your analysis?

21  A.   We have components of our financial -- of the company's

22  financial forecast that does provide some contingency for

23  emergency response, and other activities that could be

24  associated with PSPS events, but we do not have liabilities

25  embedded in our forecast for PSPS events for the reason I just

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    stated.

2    Q.   So the fines and penalties that have occurred in the past

3    from the CPUC, you have not included future -- the possibility,

4    the risk of future penalties regarding PSPS events from

5    regulatory bodies?

6            MR. SLACK:  Your Honor, I would object.  He's assuming

7    there were -- this question assumes there were prior penalties

8    for PSPS.  I don't believe that's in evidence.

9            THE COURT:  All right.  I'll sustain the objection.

10           I mean, Mr. Abrams, again, you're going into a lot of

11   things that I don't even know about.  I -- I'm not aware of

12   prior penalties for power shutoffs.  So --

13           MR. ABRAMS:  I am, Your Honor, but I will move on.  I

14   just wanted to understand the degree to which Mr. Boken, in his

15   financial analyses, thought about these things that could

16   materially affect the financial outlook.  But I'll --

17           THE COURT:  But --

18           MR. ABRAMS:  -- leave it there.

19           THE COURT:  But in fairness to him, he answered it.

20   He said there was some contingency reserved.  Not the question

21   of liability for making the power shutoffs, but the

22   interruptions that follow if there is a power shutoff.  And I

23   believe his testimony was, it doesn't significantly impact the

24   plan performance.

25           Again, you and I can't know what tomorrow will bring

1   about power shutoffs.  But the current state of affairs, the

2   testimony says that, in his opinion, the plan -- the company

3   will be able to form under the plan.

4           MR. ABRAMS:  Thank you.

5           THE COURT:  That's a 1129(a)(11) ultimate question.

6           MR. ABRAMS:  Thank you, Your Honor.

7           Last question, if I can.

8   BY MR. ABRAMS:

9   Q.   So you know, I know, financial -- I'm not a CFA myself,

10  but I do understand that financial analyses look at risks,

11  different scenarios, A and a B and a C, those types of things.

12  And what I'm trying to understand here is the degree to which

13  your financial analyses looked at the risks associated with

14  wildfires in terms of your calculations.

15          So as an example, a twenty-percent increase in wildfire

16  risks this summer leads to this financial projection; a sixty-

17  percent increase in wildfire potential leads to that financial

18  projection.

19          How did you account for the risks of catastrophic

20  wildfires caused by PG&E equipment in your financial analyses?

21          MR. SLACK:  Your Honor, objection to the question.

22          THE COURT:  Can you answer that question, Mr. Boken?

23  A.   What I can say -- first, let me clarify.  I'm not a CFA,

24  and our -- when you refer to financial analysis, I'm not sure

25  exactly what you're referring to.  We prepared, with the

1    company, a set of financial projections.  The objective of the

2    financial projections was to present what we, collectively,

3    felt was a reasonable and rational representation of what the

4    company's expected performance would be over the next -- over

5    the five-year forecast period.

6          That takes into account a lot of different factors.  The

7    issue that you've just brought up is mitigated for the

8    reasons -- not mitigated completely -- nobody can completely

9    mitigate wildfire risk -- but it's mitigated substantially by

10   the robust wildfire mitigation plan and the investments the

11   company is making and the existence of the AB 1054 go-forward

12   wildfire fund.

13   Q.   So just a quick, short clarifying question.

14              THE COURT:  Final question.

15              MR. ABRAMS:  Final question.  Final, final.

16   Q.   In your analyses associated with the plan of

17   reorganization, did you not account for varying levels of

18   wildfires to occur this summer and the next summer?  Did you

19   not have two fires with X amount of damage versus fifty fires

20   and this amount of damage?  Did you have no variation in terms

21   of your analyses regarding wildfire implications?

22              MR. SLACK:  I object to the form of the question, Your

23   Honor.

24              THE COURT:  You can give an answer, Mr. Boken.

25   A.   In any scenario where we put together financial analyses,

1    we take into account numerous factors and potential

2    circumstances.  In this situation, we are confident -- I am

3    confident; my colleagues are confident; the company is

4    confident -- that the company has sufficient resources coming

5    in through the plan of reorganization financing process, post-

6    emergence financing, and access to capital markets, to not only

7    fund the plan, fund its operations going forward, but to

8    address unknown contingencies that we can't predict at this

9    time.

10   Q.    In fairness, Mr. Boken, I -- let me ask it very

11   specifically, because, perhaps, I didn't.  Do you have a low

12   and a medium and a high in terms of wildfire impacts on your

13   financial analysis or some breakdown in terms of that:  worst

14   case scenario, best case scenario, anything like that in terms

15   of how you looked at the impacts of the plan of reorganization?

16            MR. SLACK:  Your Honor, we're -- I'm going to object

17   again.  I think this is the same question that was just

18   answered.  And of course, the last question was supposed to be

19   his last question.  So --

20            THE COURT:  You can answer -- you can answer that

21   question if you -- if you know, then answer, if you have an

22   answer, Mr. Boken.

23   A.    We prepared, with the company, a financial projection,

24   which is included in the disclosure statement.  We do not have

25   alternative financial projections.

1    Q.    Thank you.

2              MR. ABRAMS:  Thank you, Your Honor.

3              Thank you, Mr. Boken.  I appreciate your time.

4              THE COURT:  Okay.  Thank you, Mr. Abrams.  I'm going

5    to excuse you from the virtual courtroom now and bring in our

6    next questioner.  Thank you.

7              Which I believe is Mr. Troy, right, Ms. Parada?

8              THE CLERK:  Yes, Your Honor.  One moment.

9              And Your Honor, I received a message from Mr. Gregory

10   Zipes that he would like to question this witness.  And he's

11   raised a hand.

12             THE COURT:  So Mr. Zipes from the U.S. Trustee?

13             THE CLERK:  Yes.

14             THE COURT:  Well, I'll see if there's any objection,

15   but let's deal with Mr. Troy now.

16             Good morn -- or good afternoon, Mr. Troy.  You need to

17   unmute yourself.

18             Mr. Troy, you have to unmute your microphone.

19             There you go.

20             MR. TROY:  Hi, Your Honor.

21             THE COURT:  Can you hear me?  Can you hear me?

22             MR. TROY:  Yes.

23             THE COURT:  All right.

24             MR. TROY:  Yes.

25             THE COURT:  All right.  It's your turn to examine Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1  Boken.

2          MR. TROY:  Okay.

3  CROSS-EXAMINATION

4  BY MR. TROY:

5  Q.   Mr. Boken, good afternoon.  I am Matthew Troy, a trial

6  attorney with the United States Department of Justice, Civil

7  Division, representing various federal agencies in this case.

8          I assume you are familiar, as you indicated in your

9  declaration, with the plan supplement?

10 A.   Yes.

11 Q.   Is that correct?

12 A.   Yes.

13         THE COURT:  I'm sorry; what happened?  Did you say

14 yes, Mr. Boken?

15         THE WITNESS:  I did, yes.

16         THE COURT:  Mr. Troy, did you not hear that?

17         MR. TROY:  Yes, I did.  It just -- there was a glitch

18 on my end, Your Honor; I apologize.

19 Q.   Okay.  So my first question is, with respect to the claims

20 team, did the claims team prepare Schedule B to the plan

21 supplement?  And Schedule B was the list of executory contracts

22 and unexpired leases to be assumed by the debtor.

23 A.   Yes.

24 Q.   Okay.  What did the claims team do to prepare Schedule B?

25 A.   The process started back last year when we originally

Boken - Cross

1    prepared the schedule of contracts that was attached to the

2    statement of financial affairs.  Then we went through a process

3    of reviewing the agreements and contracts and making a

4    determination, in conjunction with PG&E Legal and Weil,

5    Gotshal, as to which agreements were qualified as executory

6    contracts and which agreements were not executory contracts,

7    and then proceeded from there.

8    Q.    Okay.  Was Schedule B something that the claims team

9    prepared, or was that an existing schedule in PG&E's files?

10   A.    It did not exist prior to this process, no.

11   Q.    Okay.  So what exactly did the claims team review to

12   generate -- and I'm -- well, let me back up.

13         So did the claims team create Schedule B?

14   A.    Yes.

15   Q.    Okay.  So in creating Schedule B, what did the claims team

16   do, precisely?  What did they look at at PG&E to compile and

17   produce Schedule B?

18   A.    Well, I think that's the answer earl -- or the question

19   that was asked earlier.  But the -- we accumulated or created a

20   process by which we attempted to identify all of the agreements

21   that existed within PG&E, originally.  This was in preparing

22   Schedule G, originally, to the statement of financial affairs.

23         Then there was a process which the -- the claims team,

24   which included PG&E Legal, reviewed the vast majority of those

25   agreements and made a determination as to what qualifies as an

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    executory contract and what was not an executory contract.  And

2    so that was how the schedule -- I forgot the reference that you

3    just gave -- Schedule B, that the plan supplement was

4    developed.

5    Q.   Okay.  And what exactly were the processes that you -- the

6    claims team employed to ascertain whether or not an instrument

7    was an executory contract or not?

8    A.   They reviewed the vast majority of the individual

9    contracts.  Many of them, it was quite clear that they were

10   executory contracts.  If there was some question as to whether

11   something qualified as an executory contract, as defined, then

12   either or both of PG&E Legal or Weil, Gotshal helped make that

13   legal determination about whether something that wasn't

14   abundantly clear to the nonlawyers whether something was a

15   executory contract or not.

16   Q.   Okay.  How many times did the claims team make the

17   determination that an instrument was not an executory contract

18   and should not be on Schedule B?

19   A.   I think that the numbers go something like this.  I think

20   when you started back at the Schedule G information, you had

21   something like 75,000 contracts and agreements.  There were a

22   number of contracts and agreements that expired over the course

23   of the bankruptcy.  I think that number was 27- or 28,000.

24   Then there was another 29- or 30,000 that were deemed to be

25   nonexecutory contracts.

Boken - Cross

1  So what's left out of that -- and I don't know if this

2  math all works perfectly, because I'm just doing it by

3  memory -- that the list of executory contracts that exists now

4  in the plan supplement is a number that's right around 17,000.

5  Q.   So if I understood correctly, I believe your answer was

6  approximately 29- to 30,000 instruments were determined not to

7  be executory and, thus, not placed on Schedule B?

8  A.   That's correct.

9  Q.   Okay.  What did the claims team do to determine the

10  estimated aggregate cure payment amount that you recite in your

11  declaration, which, if you recall, is 230 million dollars?

12  A.   Yes.  That was essentially a fact-based math exercise, so

13  they went back to the company's books and records related to

14  each one of those counterparties and then determined what

15  amounts were owed pre-petition to those parties.  And that's

16  how the number was aggregated.

17  Q.   Okay.  So I don't want to pull up the schedule because of

18  its size and length and share it here.  But if you can recall,

19  in the schedule, the far-right column is cure amount.  The

20  total number of pages of Schedule B is something like over

21  1,800 pages or close to that.  If you were to aggregate and add

22  up all the amounts in the cure amounts column of Schedule B,

23  would that equal approximately 230 million?

24  A.   It should, yes.

25  THE COURT:  Mr. Troy --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    Q.   Okay.

2         THE COURT:  Mr. Troy, I need to interrupt you for a

3    minute.  I haven't studied all of the objections that are

4    coming up.  Is this a specific issue?  Is the government

5    concerned about an inadequate cure figure, or why -- I didn't

6    know that DOJ had an issue on confirmation that wasn't -- well,

7    that was related to this.  What are we -- what's the purpose of

8    this discussion?

9         MR. TROY:  Your Honor, I'm just trying to -- I don't -

10   - the United States doesn't have a specific objection with a

11   particular cure amount listed on Schedule B.  It has an

12   objection to all of it, because, based on my reading of

13   Schedule B, there are no cure amounts for anything -- for any

14   instrument that appears to be one in which the United States is

15   the nondebtor counterparty.

16        MR. TSEKERIDES:  Your Honor, it's Ted Tsekerides.

17        MR. TROY:  The problem the United States is having,

18   Your Honor, is even identifying what these instruments are,

19   because there is so little information given on Schedule B to

20   ascertain what the agreement is for most of the entries that

21   would appear to indicate that a United States agency is the

22   nondebtor counterparty.

23        The obje -- we did file a cure objection objecting to

24   all of the cure amounts listed for the United States, which I

25   think -- I haven't -- I don't want to quote it for certainty,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    because it's a lengthy document, but I think every cure amount

2    listed for a United Stages agency is zero or a blank number.

3              THE COURT:  Well, Mr. Tsekerides, can you -- again,

4    I -- the government may have every right to raise these issues.

5    The question is, should we be wasting time on it now?  What --

6    what's your --

7              MR. TSEKERIDES:  Well, that -- sorry, Your Honor.  Ted

8    Tsekerides for the --

9              THE COURT:  You --

10             MR. TSEKERIDES:  -- debtors.

11             THE COURT:  Okay.

12             MR. TSEKERIDES:  That's exactly -- that was exactly my

13   point, that I thought that we had determined at the

14   beginning -- prior to the confirmation hearing, sorry, that

15   executory contract issues were going to be dealt with either

16   after confirmation, or there is one sort of legal issue that

17   we'll deal with at confirmation that was in our statement.

18             But just from listening to the questioning, this seems

19   to be going to the very issues we were going to put off until

20   later.  So I'm trying to understand why we're talking about

21   this now.  In fact, the statement that we filed yesterday

22   indicated that the -- we have a process that we're going to be

23   putting forward or have suggested on the executory contracts.

24             THE COURT:  So that -- well, that's what I thought,

25   too, Mr. Troy.  Again -- and I'm not suggesting that you can't

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    examine Mr. Boken at some other point.  But is this really

2    something that needs to take up our attention now?

3            MR. TROY:  Well, Your Honor, I -- ultimately, probably

4    not.  But what was not clear to me was what the process was

5    that the debtors were actually proposing to address this issue.

6    It's been somewhat of a fluid situation from the time that the

7    schedule has been filed and continuing up until yesterday.  So

8    that's why I wasn't quite sure -- and still, I'm not entirely

9    clear what the process is for resolving what could be a

10   substantial dispute or what could be not a substantial dispute.

11           But while the witness was here today and available --

12   and I indicated I'd only have about ten minutes, and I really

13   have about two more questions -- I figured I'd take my chances

14   cross-examining --

15           THE COURT:  Well --

16           MR. TROY:  -- him about the schedule.

17           THE COURT:  Well, two things.  First of all, I'll

18   certainly let you ask him a couple more questions.  But you

19   could have a hundred more questions, if you want, if it's an

20   issue that can be dealt with later.  And because of the squeeze

21   of time and the many, many objections and the pressure of the

22   deadlines, I think Mr. Karotkin confirmed to me and confirmed

23   yesterday in writing that the debtor, at least, is willing to

24   deal with all the executory contract issues post-confirmation.

25           And if there's a counterparty that says, no, we've got

Boken - Cross

1   to deal with it before, then I -- I'm not going to say no.  But

2   I didn't think that there was an issue from your point of view.

3              I'll tell you what.  Why don't you ask the last couple

4   of questions, and we'll conclude your examination?  But I'll

5   just make it clear that, if there's a need to take some further

6   discovery in the future, post-confirmation, of course, your

7   position's protected.

8              Is that good enough for now?

9              MR. TROY:  Thank you, Your Honor.

10             THE COURT:  Okay.

11             MR. TROY:  I appreciate it, Your Honor.  I have two

12  more questions.

13  BY MR. TROY:

14  Q.   Mr. Boken, I believe you said you had your declaration in

15  front of you, right?

16  A.   Yes.

17  Q.   If you would just turn to paragraph 15 of your

18  declaration.  You mentioned that there is a 330-million-dollar

19  contingency that your claims team determined.  My question was,

20  does the 330 million relate to the 1 billion estimate for

21  allowed nonwildfire, nonfunded debt claims, or does it relate

22  to the 230 million aggregated cure payments?

23  A.   It would relate to all claims, so -- including cure

24  payments.  So any -- anywhere where our number, for one reason

25  or another -- or another, turns out to be less than what the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   actual is, the contingency's intended to be there as a -- as

2   one method of backstop.

3   Q.   It's a contingency that could be used to address the 1

4   billion estimate or the 230 million estimate?

5   A.   Both.

6   Q.   Both, essentially; is that right?

7   A.   Yes.

8   Q.   Okay.

9        MR. TROY:  I have no further questions, Your Honor.

10  Thank you.

11       THE COURT:  Thank you, Mr. Troy.  We'll excuse you

12  from the courtroom.

13       Ms. Parada, let's bring in Mr. Zipes and Mr. Etkin,

14  and I'll verify from them what their requests are.

15       THE CLERK:  Yes, Your Honor.

16   (Pause.)

17       THE COURT:  I see Mr. Zipes on the screen.

18       Mr. Zipes, can you hear me?

19       MR. ZIPES:  Yes, I can, Your Honor.  Can you hear me?

20       THE COURT:  Yes.  So during the prior testimony, my

21  courtroom deputy told me you wanted to be heard.  I didn't know

22  if the debtors' counsel knew about your request or have a

23  position on it.

24       What is it you want to do?  And we'll see if the other

25  side has any objection.

PG&E Corporation, et al.

1           MR. ZIPES:  Sure, Your Honor.  Greg Zipes from the

2 U.S. Trustee's Office.  We did have a question for the debtors

3 that we've -- we sent emails to debtors' counsel.  We were

4 hoping to get clarification on certain fees in connection with

5 the financial projections.  And we did not get an answer on

6 that.  So I wouldn't have very many questions for this witness.

7           THE COURT:  Okay.  So --

8           MR. ZIPES:  But on the other hand, I do think he's --

9           THE COURT:  -- Mr. Tsekerides, is there any objection

10 if we would -- after Mr. Etkin's done that Mr. Zipes asked some

11 questions?

12           MR. TSEKERIDES:  I think that's more appropriate for

13 Mr. Slack, but I'll let him --

14           THE COURT:  Oh, I'm sorry.  Yeah.

15           MR. TSEKERIDES:  That's okay.

16           MR. KAROTKIN:  Well, I --

17           MR. TSEKERIDES:  Or Mr. Karotkin, apparently.

18           MR. KAROTKIN:  Yes.  I don't understand what this has

19 to do with Mr. Boken's testimony or, frankly, what Mr. Zipes is

20 talking about.

21           THE COURT:  Well, I got three lawyers arguing the

22 position, and I thought Mr. Slack -- I mean, Mr. Zipes, you

23 want to ask Mr. Boken some questions that are something he

24 would know about and something that's embraced within his

25 declaration?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation, et al.

1      MR. ZIPES:  We believe -- so Your Honor -- and we did

2  send emails to debtors' counsel.  We have had some issues --

3      THE COURT:  Which counsel --

4      MR. ZIPES:  -- getting communications back.

5      THE COURT:  Which specific counsel did you send an

6  email to?

7      MR. ZIPES:  We sent them to every -- the various

8  attorneys at Weil and also the --

9      THE COURT:  How much time -- how much time do you

10  think you need to ask questions?

11      MR. ZIPES:  I only need a few minutes, Your Honor,

12  honestly.  It's -- these are just specific questions that we

13  had based on filings that were made --

14      THE COURT:  Okay.  I'll come back to that.

15      MR. ZIPES:  -- earlier this week.

16      THE COURT:  I'll come back to that.

17      Mr. Etkin, I apologize to you.  I believe I had

18  originally told my courtroom deputy to have you come after Mr.

19  Abrams, and I called Mr. Troy.

20      How much time do you need?

21      MR. ETKIN:  I believe I need about fifteen to twenty

22  minutes, at the most, Your Honor.

23      THE COURT:  And Mr. Slack or whoever is going to

24  speak, are you anticipating any redirect?

25      MR. SLACK:  Your Honor, at this time, no, but

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    obviously, we'll see what Mr. Etkin asks.

2           THE COURT:  Okay.  I'm just trying to figure out when

3    to break.  I don't know about the rest of you, but having sat

4    in long, long trials, I find sitting in much short trials in

5    front of the computer to be more difficult.

6           I'll tell you what.  Mr. Etkin, I'm going to go ahead

7    and let you have your fifteen minutes.

8           And Mr. Zipes, maybe you can do, during the fifteen

9    minutes, some email exchanges with somebody and work something

10   out.  But I probably will let you ask questions when we come

11   back.

12          But I'm going to let -- and I'm going to take you out

13   of the courtroom for now.  You'll be able to hear this.  We'll

14   bring you back in when Mr. Etkin's finished.

15          MR. ZIPES:  Thank you, Your Honor.

16          THE COURT:  All right.  Mr. Etkin, you're up.  And Mr.

17   Boken is on the screen, and he's been sworn.

18          MR. ETKIN:  Thank you, Your Honor.

19   CROSS-EXAMINATION

20   BY MR. ETKIN:

21   Q.   Mr. Boken, I represent the Public Employees Retirement

22   Association of New Mexico, which the lead plaintiff in pending

23   securities litigation and a claimant in the Chapter 11, as well

24   as certain other securities claimants.

25          And I assume you still have your declaration in front of

Boken - Cross

1    you, because that's going to be the focus of my questions.

2    A.    I do, yes.

3    Q.    Thank you.  Mr. Boken, at paragraph 4 of your declaration,

4    you indicate that you began your engagement with the debtors in

5    November of 2018.  See that?

6    A.    Yes, I do.

7    Q.    Now, were you aware, in the months prior to the petition

8    date, of the pendency of the securities litigation involving

9    PG&E, holdco, and the utility?

10   A.    I was not specifically aware of it at the outset of our

11   engagement, no.

12   Q.    When did you first become aware of it?

13   A.    I can't recall, precisely.

14   Q.    And you also indicate, at paragraph 5 of your declaration,

15   that you're familiar with the terms and provisions of the plan;

16   is that correct?

17   A.    Yes.

18   Q.    And I think you even testified that you were involved, to

19   some extent, in the drafting of the plan; is that right?

20   A.    We were consulted, yes, by Weil on aspects of which we had

21   knowledge to help put together the plan, yes.

22   Q.    Thank you.  Are you familiar with the classes of claims

23   set forth in the current version of the plan?

24   A.    I'm generally familiar.  I don't -- without having the

25   plan in front of me, I haven't committed to memory all of the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    claims classifications.

2    Q.   Well, let's just go through a couple of things rather than

3    go through the exercise of putting the plan in front of you and

4    see what you can recall.

5         Are you familiar with the classification of holdco

6    subordinated debt claims under the plan, which is Class 9A?

7    A.   I'm familiar with those claims, yes.

8    Q.   Okay.

9    A.   Generally familiar, I should say, with those claims.

10   Q.   And are you familiar with the treatment of those claims

11   under the plan?

12   A.   Off the top of my head, I don't recall the treatment of

13   the claims.

14   Q.   Do you recall that they're deemed to be unimpaired under

15   the plan?

16   A.   I don't recall that, specifically.

17   Q.   Okay.  And what about utility subordinated debt claims?

18             THE COURT:  Okay.  You're -- Mr. Etkin, I lost your

19   question there.  Say that again.

20             MR. ETKIN:  I'm sorry.

21   Q.   What about utility subordinated debt claims in Class 10B;

22   do you have some familiarity with what those are?

23   A.   I'm generally familiar with the nature of the claims, yes.

24   Q.   And the treatment of those claims, any recollection?

25   A.   I don't recall, specifically.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    Q.    Okay.  And what about holdco rescission or damage claims,

2    10 A(II), under the plan?

3    A.    I'm generally familiar with the nature of those claims.

4    Q.    Okay.  Before I get back into that, Mr. Boken, just a

5    quick question on the section of your declaration regarding

6    financial projections.  Those financial projections include the

7    projections for 2021; is that right?

8    A.    That's correct.

9    Q.    And are you aware that those projections for 2021 are part

10   of the determination of what's been referred to as normalized

11   estimated net income in terms of figuring out stock values

12   and -- for the TCC stock and the equity backstop commitment

13   parties under the plan?

14   A.    I am familiar that that's a component of the calculation,

15   yes.

16   Q.    Were you involved in putting together the concept of

17   normalized estimated net income?

18   A.    I was not.

19   Q.    Okay.  And do you have any sense, one way or the other, as

20   to whether that's an appropriate metric?

21           MR. SLACK:  Objection.

22   A.    I don't have the -- sorry.

23   Q.    Okay.

24           THE COURT:  I'm sorry --

25   Q.    Moving --

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    THE COURT:  -- Mr. Slack -- excuse me.  Mr. Slack, did

2  you interpose an objection?  I --

3    MR. SLACK:  I did, Your Honor.

4    THE COURT:  But he kind of answered the question, in a

5  way.

6    MR. SLACK:  He did.

7    THE COURT:  Okay.  Then I'll overrule the objection.

8    MR. ETKIN:  And I'm moving on, Your Honor, so --

9  Q.   I'd like to move to paragraph 12 of your declaration, Mr.

10  Boken.

11  A.   Yes.

12  Q.   And particularly, you indicate that you and the claims

13  team have been working on claims analysis since October of

14  2019, once the bar date had passed, in your words?

15  A.   That's correct.

16  Q.   Are you aware of the fact that the bar date was extended

17  for certain claimants in connection with the purchase of equity

18  or debt securities from either of the debtors -- of either of

19  the debtors, to April 16th --

20  A.   I am aware of that, yes.

21  Q.   -- of 2020?

22    In terms of that process -- that review process, did you

23  review any of those claims that were filed prior to the April

24  16th extended bar date?

25  A.   I'm sorry, which claims?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    Q.    The rescission and dam -- or damage claims that are the

2    subject of the extended bar date order and proof of claim?

3    A.    I don't recall the timing of when we would have reviewed

4    claims.  It's possible that some of the rescission and damage

5    claims were -- the review process started prior to the extended

6    bar date for those claims.

7    Q.    In paragraph 13 of your declaration, you indicate that you

8    reviewed -- or the claims team reviewed nearly 20,000 proofs of

9    claim.  Were any of the claims filed in connection with the

10   extended bar date part of that review?

11   A.    I believe that that 20,000 does include those claims, yes.

12   Q.    And are you aware of how many of those claims -- and

13   specifically, I'm referring to the holdco subordinated debt

14   claims and the utility subordinated debt claims -- how many of

15   those claims were reviewed?

16   A.    I don't recall the specific number of those claims, no.

17   Q.    Do you know how many of those claims were actually filed

18   and made available to the claims team for review?

19   A.    I don't have the specific numbers, no.

20   Q.    Would the number approximately 1,600 ring a bell?  That

21   was placed on the record by debtors' counsel at a conference

22   before the Court.

23   A.    If debtors' counsel put that number forward -- and I know

24   that they're familiar with those claims -- I have no reason to

25   suggest that it's any -- a number any different than that.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1   Q.   And moving on to paragraph 14 of your declaration.  You

2   talk about methodologies deployed in terms of the claims

3   analysis.  Were those methodologies that are set forth in

4   paragraph 14 of your declaration deployed in connection with

5   holdco subordinated debt claims?

6   A.   There were different methodologies deployed relating to

7   each -- to different categories and types of claims.  So the

8   same methodologies were not deployed to all claims; however,

9   all the claims were reviewed in one manner or another.

10  Q.   What was the methodology employed in connection with your

11  analysis of the holdco subordinated debt claims or the utility

12  subordinated debt claims?

13  A.   Principally, we consulted with legal counsel, both in-

14  house at PG&E and Weil, Gotshal, on the nature and substance of

15  those claims in the aggregate in order to inform us and -- as

16  to what and how they ought to be addressed in our estimate.

17  Q.   Okay.  And you say at paragraph 15 that you and your

18  claims team ended up estimating the amount of claims required

19  to be funded under the plan.  And that would include, based

20  upon what you just testified to, the holdco subordinated debt

21  claims and the utility subordinated debt claims.  Is that

22  right?

23  A.   The analysis did include evaluating those claims, yes.

24  Q.   And you came up with an estimate of approximately one

25  billion dollars for allowed nonwildfire, nonfunded debt claims;

Boken - Cross

1  see that in paragraph 15?

2  A.    Yes.

3  Q.    What portion of that one billion dollars estimate was

4  attributed to the holdco subordinated debt claims or the

5  utility subordinated debt claims?

6  A.    There is no amount included in that provision for either

7  holdco equity claims or holdco debt -- or debt claims.

8  Q.    Yeah.  Just for purposes of clarity in my question, I'm

9  not talking about equity --

10  A.    Okay.

11  Q.    -- rescission or damage claims.  I'm talking about the

12  holdco debt or the utility debt subordinated --

13  A.    Right.

14  Q.    -- claims separately classified under the plan.

15  A.    Thank you for the --

16  Q.    So --

17  A.    -- clarification.

18  Q.    So your testimony is that, out of the one-billion-dollar

19  estimate, zero is estimated in connection with those two

20  classifications of claims under the plan?

21  A.    We do not have sufficient information to make an estimate

22  on those claims, and so the one-billion-dollar estimate for

23  nonwildfire, nonfunded debt claims does not include anything

24  for those claims.

25  Q.    Okay.  And outside of conversations with debtors' counsel,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    what other efforts were made to come up with any estimation of

2    those claims which, under the plan, would have to be paid in

3    full if allowed?

4    A.   Based on discussions with counsel, which was our primary

5    interface on this, we did not do any additional substantive

6    analysis on those claims.

7    Q.   And I think you testified a few minutes ago about the 330-

8    million-dollar contingency set forth in paragraph 15 --

9    A.   Yes.

10   Q.   -- of your declaration.  And you had testified that that

11   was a contingency available for claims in excess of the 1

12   billion and also with respect to claims in excess of the 230

13   million in terms of cure amounts; is that right?

14   A.   Yes.  And just to clarify, it's also to address claims for

15   which we did not have sufficient information to develop a

16   reasonable estimate at this time.

17   Q.   So by just testifying to that, is that intended to cover

18   holdco's subordinated debt claims and utility subordinated debt

19   claims?

20   A.   The contingency is not specifically designated for any

21   types of claims.  It is a contingency to address uncertainties

22   about claims that have been filed that have yet to be

23   liquidated, for one reason for another.

24   Q.   In terms of -- in terms of reviewing those claims that

25   came in in connection with the extended bar date, based upon

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    the purchase of debt securities, did you take into account any

2    liquidated amounts that may have been listed in connection with

3    those proofs of claim?

4    A.    I'm not sure I understand the question.  Can you restart

5    it again --

6    Q.    Well, if a proof -- let me try to help.  If a proof of

7    claim came in with respect to the extended bar date relating to

8    the purchase of debt securities, and the claimant listed, for

9    example, that it's -- his or her claim was ten million dollars,

10   was that -- as opposed to an unliquidated amount, was that

11   taken into consideration with respect to your analysis?

12   A.    Yes, we did review the amounts that may have been asserted

13   in a claim, as well as claims that were unliquidated.  We

14   looked at them in their entirety as to the nature of the claim.

15   We did not -- it wasn't particularly important to us what the

16   amount was asserted at.  It was -- it was -- the legal

17   assessment of what the company's exposure may be under those

18   claims was the -- the key influencer on how we developed our

19   estimates relative to these claims.

20   Q.    And I would have to presume then that the legal estimate

21   was zero since there was nothing attributed to those claims

22   with respect to the billion-dollar estimate?

23   A.    Well, the debtor has publicly stated that it does not

24   believe that those claims have any merit.  So that was part of

25   the process of determining that we did not feel it was

(973) 406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    reasonable or necessary at this time to include any estimate

2    for those claims.

3    Q.   But in terms of the debtors' obligations under the plan,

4    which, in terms of those claims, is an obligation to pay them

5    in full, if allowed, would it change your assessment or any of

6    the statements that you make in your declaration if those

7    claims were to turn out to be in the hundreds of millions of

8    dollars, hypothetically?

9    A.   It would not -- it would not change the statement in my

10   declaration to say that the company has the resources to both

11   implement the plan and to meet its obligations on a going-

12   forward basis.

13   Q.   And I take that to mean that that would include any

14   ultimate liability in connection with the holdco or utility

15   subordinated debt claims?

16   A.   Any liability that would arise after resolution, where

17   PG&E would be deemed to be liable and after the application of

18   appropriate insurance proceeds.

19          THE COURT:  So we're a little past fifteen minutes.

20   You about done?

21          MR. ETKIN:  Close to done, Your Honor.

22          THE COURT:  Okay.

23   Q.   So just to clarify, Mr. Boken.  So to the extent that any

24   of these claims were filed in liquidated amounts by claimants,

25   the amounts set forth were effectively ignored in terms of

(973)406-2250 | operations@escribers.net | www.escribers.net

Boken - Cross

1    coming up with your estimate?

2         MR. KAROTKIN:  I object to the question, Your Honor.

3    He already answered that question, and he's characterizing it

4    inappropriately.

5         THE COURT:  Yeah.  I think -- I don't mind an --

6    asking the same question, but he didn't say "ignored".  He

7    said, you know, take -- treat it as zero reserve for his

8    purposes.  That's not the same as ignoring.

9         MR. ETKIN:  I appreciate the help, Your Honor.

10        THE COURT:  Well --

11        MR. ETKIN:  That's -- that -- that's fine.  Let's ask

12   it that way.

13   Q.   So none of those claims with liquidated amounts were

14   factored in with respect to those liquidated amounts in

15   connection with your estimate?

16   A.   When we developed the estimates, we tried to make an

17   assessment as to what may materialize as an allowed claim.  And

18   based on consultations with counsel, we didn't think it was

19   necessary or -- at this time to conclude any -- to provide any

20   specific estimates for those claims, regardless of what might

21   have been asserted on the claim.

22   Q.   But again, you believe that if that judgment turns out to

23   be incorrect, that the debtor would still be -- the debtors

24   would still be in a position to satisfy their obligations with

25   respect to those claims, as set forth in the current version of

PG&E Corporation and Pacific Gas and Electric Company

1     the plan?

2     A.    I believe the company has sufficient resources coming in

3     through the plan and post-emergence and in addition access to

4     resources going forward to address any contingencies beyond

5     which we provided for in the claims estimates in my

6     declaration.

7                 MR. ETKIN:  I have no further questions, Your Honor.

8                 THE COURT:  Okay.  Thank you, Mr. Etkin.

9                 MR. ETKIN:  Thank you, Mr. Boken.

10                THE COURT:  Thank you.

11                THE WITNESS:  Thank you.

12                THE COURT:  Okay.  Ms. Parada, would you bring Mr.

13    Zipes back in and excuse Mr. Etkin?

14          Okay.  Mr. Zipes, you said you only have a few

15    questions.  And that's about all the time I have for you,

16    because you were unexpected to be here.

17                MR. ZIPES:  Yes.

18                THE COURT:  So you didn't make any progress in the

19    last fifteen minutes, did you?

20                MR. ZIPES:  Your Honor, we -- I reemailed the

21    question, and I don't know if the debtors -- it might just be

22    easier to ask the question now of the witness.

23                THE COURT:  Okay.  Go ahead and ask the question.

24                MR. SLACK:  Your Honor, can I be heard just for a

25    second, just to lodge --

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Yes.

2    MR. SLACK:  -- an objection for the record --

3    THE COURT:  Yes, that's fine.

4    MR. SLACK:  -- which is, if you look at the objection

5  that was filed by the U.S. Trustee, it doesn't relate to fees.

6  There's nothing in it about this subject.  It goes entirely

7  beyond their objection.  And so the fact that not only was this

8  not identified, but then is outside the scope of their

9  objection, we think makes this questioning inappropriate.

10    THE COURT:  Well, it may be.  I -- again, I'm in this

11  is awkward situation.  In the time I might be able to figure

12  out the answer, I'm just going to let him ask the question.

13    MR. KAROTKIN:  Your Honor, can I interject something

14  that's --

15    THE COURT:  No, I just got to move it forward on this.

16  I can't -- Mr. Karotkin, I just can't do it --

17    MR. KAROTKIN:  Well, I think I can short circuit this

18  pretty easily.

19    THE COURT:  That's okay.

20    MR. KAROTKIN:  I'm sorry.  I apologize.  The --

21    THE COURT:  Go ahead.

22    MR. KAROTKIN:  I think what Mr. Zipes is asking

23  about -- because I know the email has just sent me again -- is

24  fee lenders that were filed under seal in the last two or three

25  days.  And so I think that's what he's asking questions about,

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    is -- he can correct me if I'm wrong -- but it's with respect

2    to three fee letters which were recently filed under seal.

3            THE COURT:  Well, is that the subject matter of your

4    question, Mr. Zipes?

5            MR. ZIPES:  Yes, Your Honor.  And the debtors had

6    filed these motions to seal just --

7            THE COURT:  Okay.  But I haven't --

8            MR. ZIPES:  -- this week.  So we did have some

9    questions.

10           THE COURT:  Yeah, I haven't looked at any of that

11    stuff.  So I think that in view of what Mr. Karotkin says,

12    here's what I'm going to do.  I'm going to err on the side of

13    caution here and say it's not appropriate to ask questions, not

14    because you didn't designate it but because I don't know what

15    the seal was.  If it's just information that you believe the

16    U.S. Trustee should be entitled to, maybe Mr. Karotkin and you

17    can work out an agreement where he can provide you with the

18    information under some sort of protective circumstance.  That's

19    what the U.S. Trustee has done in countless other cases.

20           If it really becomes necessary for you to ask

21    questions, I'll have to inquire in a -- inquire Mr. Boken to

22    make himself available again.  There are very few advantages to

23    shelter at home and the COVID crisis, but one of the real

24    advantages is most witnesses have no excuse other than to just

25    be available for a question or two.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      So Mr. Boken, we may impose upon you to come back

2  and -- to "come back" to the virtual courtroom and answer

3  questions.

4      Mr. Karotkin, you persuaded me -- you interrupted me

5  politely and persuaded me to do what I'm doing.  So I'm going

6  to try to persuade you to work something out with Mr. Zipes on

7  your own to see if they can put this bed -- this baby to rest.

8      MR. KAROTKIN:  I was just going to say the same thing,

9  Your Honor.  We will endeavor to do that, and I'm quite

10  confident we can work it out.

11      THE COURT:  Okay.  Okay, Mr. Zipes.  Thank you.

12      MR. ZIPES:  And Your Honor, I very much appreciate

13  this.  The reason that we did think it was relevant to ask

14  questions today is because the fees do go to feasibility.  And

15  Your Honor, I heard what you said, so I'm good.

16      THE COURT:  If you really have a reason to ask this

17  witness some questions, I'll make him -- we'll make it work.

18      Mr. Slack --

19      MR. ZIPES:  Thank you, Your Honor.

20      THE COURT:  -- if you tell me you want any redirect, I

21  might tell you we're going to take a break.  But if you don't

22  have redirect, I -- that's good news.

23      What's your pleasure?

24      MR. SLACK:  I do not have any redirect, Your Honor.

25      THE COURT:  Okay.  Mr. Boken, thank you for making

PG&E Corporation and Pacific Gas and Electric Company

1    yourself available and testifying.

2            Thank you all, counsel.

3            I will conclude the hearing and look forward to our

4    next session, which is Monday, 10 o'clock our time.  Stay tuned

5    for whatever happens between now and then.

6            Thank you.  Have a good day.

7            MR. KAROTKIN:  Have a good weekend.

8            IN UNISON:  Thank you, Your Honor.

9            THE COURT:  Mr. Karotkin, any final -- something you

10   need to say?

11           MR. KAROTKIN:  No, no.  I said, have a good weekend.

12           THE COURT:  Okay.  All right.  Thank you all.

13           Thank you, Ms. Parada and Ms. Thomas for your

14   assistance.  And I'm going to conclude the meeting.

15           THE CLERK:  Thank you, Your Honor.

16           IN UNISON:  Thank you.

17       (Whereupon these proceedings were concluded)

18

19

20

21

22

23

24

25

of 92 | operations@escribers.net | www.escribers.net
(973) 406-2250

1                              I N D E X

2    WITNESS            EXAMINATION BY      PAGE

3    Christina Pullo    Ms. Wallace          8

4    John Boken         Mr. Abrams          25

5    John Boken         Mr. Troy            50

6    John Boken         Mr. Etkin           61

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 19-30088   Doc# 7701   Filed: 06/01/20   Entered: 06/01/20 16:03:12   Page 78
of 92
(973) 406-2250 | operations@escribers.net | www.escribers.net

1       C E R T I F I C A T I O N

2

3    I, Linda Ferrara, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7

8    _____

9    /s/ LINDA FERRARA, CET-656

10

11   eScribers

12   7227 N. 16th Street, Suite #207

13   Phoenix, AZ 85020

14

15   Date:  June 1, 2020

16

17

18

19

20

21

22

23

24

25

## A

**AB (2)**
35:16;47:11
**abate (1)**
43:25
**ability (5)**
35:14;40:2;41:16;
43:21;44:3
**able (8)**
7:23;24:4;28:17;
30:22;34:4;46:3;61:13;
74:11
**Abrams (72)**
4:13;25:6,8,9,10,12,
16,20,22,25;28:3;29:6,
8,16;31:1,8,10,17,20;
32:5,23;33:4,7,8,25;
34:13,16;35:3,4,5,25;
36:2,6,16,22;37:4,5,9,
11,13;38:4,8,13,15;
39:22;40:5,8,10,13,18,
19,24;41:3,20;42:9,21,
23,24;43:15;44:6,7,8;
45:10,13,18;46:4,6,8;
47:15;49:2,4;60:19
**Abrams' (1)**
37:20
**abundantly (1)**
52:14
**accept (2)**
16:18;22:2
**accepted (1)**
40:1
**access (2)**
48:6;73:3
**accordance (5)**
9:25;13:2;18:5;
20:10;33:13
**account (7)**
42:10,15;46:19;47:6,
17;48:1;70:1
**accounted (2)**
44:10,11
**accumulated (1)**
51:19
**accurately (1)**
9:19
**acknowledge (1)**
41:14
**act (1)**
33:12
**acting (1)**
44:16
**activities (4)**
26:14;34:2;35:7;
44:23
**actual (1)**
58:1
**actually (3)**
18:18;56:5;66:17
**ad (1)**

27:5
**add (1)**
53:21
**addition (2)**
13:13;73:3
**additional (1)**
69:5
**address (8)**
6:2;41:22;48:8;56:5;
58:3;69:14,21;73:4
**addressed (2)**
36:4;67:16
**addresses (1)**
34:17;35:6
**addressing (1)**
39:20
**adequate (2)**
22:7;30:1
**adherent (2)**
15:13,14
**adhering (1)**
15:24
**admitted (1)**
24:18
**advantages (2)**
75:22,24
**advisors (1)**
26:8
**affairs (4)**
26:23;46:1;51:2,22
**affect (2)**
44:20;45:16
**affected (1)**
42:11
**afternoon (2)**
49:16;50:5
**again (33)**
3:16,22;6:13,23;
7:10;8:15,17;16:2,8,9;
18:16,22;22:3;23:5,16;
24:3;25:9;29:15;31:9;
32:23;35:1;36:19;
45:10,25;48:17;55:3,
25;63:19;70:5;72:22;
74:10,23;75:22
**agencies (1)**
50:7
**agency (2)**
54:21;55:2
**aggregate (4)**
38:2;53:10,21;67:15
**aggregated (2)**
53:16;57:22
**aggregates (1)**
37:23
**ago (3)**
34:22;43:8;69:7
**agreement (2)**
54:20;75:17
**agreements (7)**
51:3,5,6,20,25;52:21,
22
**ahead (16)**

7:11,13,25;10:18;
11:18;16:9,20;17:17;
20:4;24:1;25:21;32:17;
40:17;61:6;73:23;
74:21
**AII (1)**
64:2
**AlixPartners (2)**
24:17;26:7
**allocations (1)**
4:18
**allowed (5)**
57:21;67:25;69:3;
71:5;72:17
**almost (1)**
22:12
**along (1)**
26:25
**Alsup (2)**
32:9;33:1
**alternative (1)**
48:25
**among (1)**
16:16
**amount (13)**
12:15;36:25;37:23;
47:19,20;53:10,19;
54:11;55:1;67:18;68:6;
70:10,16
**amounts (12)**
53:15,22,22;54:13,
24;69:13;70:2,12;
71:24,25;72:13,14
**analyses (10)**
27:5;42:14,16;45:15;
46:10,13,20;47:16,21,
25
**analysis (16)**
39:2;37:23;43:1,17,
20;44:11,19,20;46:24;
48:13;65:13;67:3,11,
23;69:6;70:11
**analyst (1)**
32:4
**Ankey (1)**
14:1
**announcements (2)**
4:6,10
**annual (1)**
35:9
**annually (1)**
35:11
**answered (6)**
9:6;10:14;45:19;
48:18;65:4;72:3
**anticipating (2)**
6:8;60:24
**anymore (2)**
5:19;11:7
**apologize (6)**
11:15;31:10;42:23;
50:18;60:17;74:20
**apparently (1)**

59:17
**appear (1)**
54:21
**appears (2)**
41:4;54:14
**application (1)**
71:17
**appointed (1)**
26:8
**appointment (1)**
5:5
**appreciate (7)**
25:23;26:1;38:13;
49:3;57:11;72:9;76:12
**appropriate (5)**
23:14;59:12;64:20;
71:18;75:13
**approximately (4)**
53:6,23;66:20;67:24
**April (4)**
14:17;26:25;65:19,
23
**argue (2)**
6:15;20:24
**argues (1)**
30:10
**arguing (1)**
59:21
**argument (3)**
5:1,24;16:3
**arguments (5)**
4:17,25;5:9;6:1;
15:16
**arise (1)**
71:16
**around (2)**
28:11;53:4
**arrangement (1)**
34:25
**arrived (1)**
17:22
**articulate (1)**
38:23
**ascertain (2)**
52:6;54:20
**aspects (5)**
26:11;29:23;30:7;
34:23;62:20
**asserted (3)**
70:12,16;72:21
**assess (1)**
29:19
**assessed (1)**
34:1
**assessment (4)**
30:5;70:17;71:5;
72:17
**assets (1)**
26:22
**assignment (1)**
33:6
**assist (1)**
16:16

**assistance (1)**
26:13;77:14
**assisting (1)**
28:13
**associated (14)**
26:14;28:12;30:17;
34:5;35:17,19;36:25;
37:6;42:17;43:2;44:17,
24;46:13;47:16
**Association (1)**
61:22
**assume (4)**
5:24;6:5;50:8;61:25
**assumed (1)**
50:22
**assumes (2)**
43:4;45:7
**assuming (1)**
45:6
**assumption (1)**
18:20
**attached (1)**
51:1
**attempted (1)**
51:20
**attention (3)**
18:12;29:17;56:2
**attorney (2)**
21:24;50:6
**attorneys (1)**
60:8
**attributed (2)**
68:4;70:21
**atypical (1)**
18:1
**authorized (1)**
16:16
**availability (1)**
41:7
**available (6)**
56:11;66:18;69:11;
75:22,25;77:1
**avoid (2)**
33:11,17
**aware (17)**
13:24,25;27:24;33:2;
35:17;36:4;38:5,7;
43:9;45:11;62:7,10,12;
64:9;65:16,20;66:12
**awkward (1)**
34:25;74:11

## B

**B-1 (1)**
17:21
**baby (1)**
76:7
**back (17)**
5:20;7:6;9:16;43:25;
50:25;51:12;52:20;
53:13;60:4,14,16;
61:11,14;64:4;73:13;

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 80
of 92

76:1,2
**backstop (2)**
58:2;64:12
**ballot (12)**
8:9,11,25;9:3,13,16,
17;11:22,22;18:2;19:4,
21
**ballots (14)**
9:21;10:8,10,12,23;
11:17,24;12:1;15:24;
17:21,25;18:14;19:7;
22:1
**bankruptcy (4)**
3:4;30:17;37:7;
52:23
**bar (8)**
65:14,16,24;66:2,6,
10;69:25;70:7
**based (8)**
23:13;29:19;54:12;
60:13;67:19;69:4,25;
72:18
**basis (2)**
39:14;71:12
**Becker (2)**
27:15,19
**become (1)**
62:12
**becomes (1)**
75:20
**bed (1)**
76:7
**began (1)**
62:4
**beginning (1)**
55:14
**believes (1)**
32:23
**bell (1)**
66:20
**beneath (1)**
27:12
**best (3)**
6:15;17:10;48:14
**better (4)**
3:23,24,25;6:16
**betting (1)**
9:13
**beyond (5)**
14:10;34:20,23;73:4;
74:7
**Bijur (1)**
27:14
**billion (14)**
35:12,13;38:3,6,17,
17,18,22,24;57:20;
58:4;67:25;68:3;69:12
**billion-dollar (1)**
70:22
**billions (1)**
35:22
**blank (2)**
29:4;55:2

**bodies (1)**
45:5
**Boken (53)**
22:17;23:7,20;24:6,
7,8,14,14,17;25:4;26:1;
27:16;29:11;31:5;32:1,
3;33:1,19;34:9,21;
35:1;36:3,12,22;37:15;
39:3;40:14;41:11;42:7;
43:8,12;45:14;46:22;
47:24;48:10,22;49:3;
50:1,5,14;56:1;57:14;
59:23;61:17,21;62:3;
64:4;65:10;71:23;73:9;
75:21;76:1,25
**Boken's (1)**
36:16;38:11;59:19
**books (1)**
53:13
**both (11)**
24:25;28:1;30:2;
36:1,2;41:6;52:12;
58:5,6;67:13;71:10
**Break (4)**
34:13;42:25;61:3;
76:21
**breakdown (2)**
36:17;48:13
**breaking (1)**
44:9
**breaks (1)**
37:18
**brief (1)**
30:10
**bring (10)**
4:3;18:12;25:4,7;
32:25;45:25;49:5;
58:13;61:14;73:12
**bringing (1)**
3:11;29:17
**brought (3)**
6:20;26:6;47:7
**building (1)**
5:17
**burden (1)**
6:3
**business (2)**
26:13;33:23

**C**

**calculation (1)**
64:14
**calculations (1)**
46:14
**calendar (3)**
4:22,23;5:4
**CALIFORNIA (6)**
3:1,5;7:18;38:6,7;
39:6
**Call (5)**
3:3;7:22;16:12;
22:15,22

**called (3)**
19:17,24;60:19
**calls (2)**
18:13;42:3
**came (3)**
67:24;69:25;70:7
**Camp (1)**
7:18
**Can (86)**
3:7,9,20;6:16,16,17,
20,21,22,24,25;7:3,4,5,
9,20:8:22;10:25;11:2,
5,13,14;12:18;13:11,
20;14:12;15:18;17:10,
17;18:2,23;19:9;20:5,
24;22:4,6,22;25:11;
26:16;27:9;31:12,25;
32:11;33:17,19;34:1,
25;36:19,20,24;37:19,
20;38:23;39:2;41:7,11;
42:7,19;43:17;44:14;
46:7,22,23;47:8,24;
48:20,20;49:21,21;
53:18;55:3;56:20;
58:18,19,19;61:8;63:4;
70:4;73:24;74:13,17;
75:1,17,17;76:7,10
**capacity (1)**
26:10
**capital (3)**
35:12;43:22;48:6
**care (1)**
20:21
**carried (1)**
17:6
**case (9)**
5:13;7:17;18:1;
21:21;26:12,24;48:14,
14;50:7
**cases (1)**
75:19
**cash (3)**
26:12;27:4;43:21
**cast (1)**
16:18
**catastrophic (2)**
38:20;46:19
**categories (1)**
67:7
**cause (2)**
38:19;43:16
**caused (1)**
46:20
**caution (1)**
75:13
**central (3)**
28:15;30:22
**CEO (2)**
27:24,24
**certain (4)**
29:23;59:4;61:24;
65:17
**certainly (1)**

56:18
**certainty (2)**
9:12;54:25
**certificate (7)**
9:15;13:4,13,16,19;
18:5,10
**cetera (1)**
37:19;43:5
**CFA (2)**
46:9,23
**chambers (2)**
5:15,17,19
**chances (1)**
56:13
**change (3)**
43:16;71:5,9
**changed (1)**
5:16
**changeover (1)**
27:23
**channels (1)**
22:23
**Chapter (4)**
26:11,14;36:5;61:23
**characterizing (1)**
72:3
**charge (1)**
21:25
**charges (1)**
32:9
**check (1)**
25:13
**chief (2)**
26:9,9;27:11;28:23
**circuit (1)**
74:17
**circumstance (1)**
75:18
**circumstances (1)**
48:2
**Civil (1)**
50:6
**claim (13)**
13:6;15:2;18:9;
19:19;66:2,9;70:3,7,9,
13,14;72:17,21
**claimant (2)**
61:23;70:8
**claimants (8)**
9:13;15:23;22:6;
37:1,8;61:24;65:17;
71:24
**claims (101)**
26:13;35:23;36:4;
37:23,24,25,25;50:19,
20,24;51:8,11,13,15,
23;52:6,16;53:9;57:19,
21,23;62:22;63:1,6,7,9,
10,13,17,21,23,24;
64:1,3;65:12,13,23,25;
66:1,4,5,6,8,9,11,12,14,
14,15,16,17,18,24;
67:2,5,7,8,9,11,12,15,

18,18,21,21,23,25;
68:4,5,7,7,11,14,20,22,
23,24;69:2,6,11,12,14,
18,19,21,22,24;70:13,
18,19,21,24;71:2,4,7,
15,24;72:13,20,25;73:5
**clarification (2)**
59:4;68:17
**clarify (6)**
14:3;24:20;36:11;
46:23;69:14;71:23
**clarifying (1)**
47:13
**clarity (1)**
68:8
**Class (4)**
18:5,10;63:6,21
**classes (1)**
62:22
**classification (1)**
63:5
**classifications (2)**
63:1;68:20
**classified (1)**
68:14
**classify (1)**
28:25
**clear (5)**
52:9,14;56:4,9;57:5
**clearly (1)**
44:14
**CLERK (23)**
3:4,9,11,21;4:3;6:25;
10:7;11:2,8;16:16;
18:12;19:17,18,21;
21:8;9:24:11,12;25:7;
49:8,13;58:15;77:15
**Clerk's (2)**
9:1;16:23
**close (2)**
53:21;71:21
**closing (3)**
5:25;6:6;23:1
**coat (1)**
3:15
**colleague (1)**
26:8
**colleagues (1)**
48:3
**collectively (1)**
47:2
**column (2)**
53:19,22
**combine (1)**
35:11
**coming (4)**
48:4;54:4;72:1;73:2
**commitment (1)**
64:12
**committed (2)**
31:1;62:25
**communications (1)**
60:4

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 81
of 92

**company (25)**
10:15;16:4,5;17:11;
20:3;21:25;26:2;27:20;
28:13,20;30:1,5,11;
31:13;32:24;39:13;
43:18;46:2;47:1,11;
48:3,4,23;71:10;73:2
**company's (8)**
35:9,14;41:16;43:21;
44:21;47:4;53:13;
70:17
**compile (1)**
51:16
**compiled (1)**
26:23
**complete (1)**
7:23
**completely (2)**
47:8,8
**compliance (2)**
28:23;33:9
**complicated (1)**
34:8
**complied (3)**
9:20;16:4,6
**comply (3)**
9:1;30:6;31:13
**complying (2)**
26:14;33:16
**component (5)**
28:16;30:9;34:2;
35:14;64:14
**components (1)**
44:21
**compound (3)**
34:14;42:18;44:9
**compromising (1)**
25:19
**computer (1)**
61:5
**concept (1)**
64:16
**concepts (1)**
42:20
**concerned (1)**
54:5
**concerning (1)**
4:16
**concise (1)**
25:17
**conclude (9)**
20:15;21:4;22:11,14;
23:4;57:4;72:19;77:3,
14
**concluded (1)**
77:17
**conclusion (1)**
16:25
**conference (1)**
66:21
**confident (5)**
48:2,3,3,4;76:10
**confirmation (7)**

29:21;30:10,12;54:6;
55:14,16,17
**confirmed (2)**
56:22,22
**conflict (3)**
21:23;41:4,13
**confusing (1)**
34:15
**conjunction (3)**
27:1;43:18;51:4
**connect (1)**
11:8
**connection (10)**
59:4;65:17;66:9;
67:4,10;68:19;69:25;
70:2;71:14;72:15
**consequences (2)**
15:20;32:13
**consider (2)**
22:24;30:21
**consideration (1)**
70:11
**considered (6)**
15:13,13,24;20:14,
14;24:22
**consistent (1)**
33:22
**consultations (1)**
72:18
**consulted (5)**
27:10;31:21,25;
62:20;67:13
**contacts (1)**
27:11
**contingencies (2)**
48:8;73:4
**contingency (8)**
44:22;45:20;57:19;
58:3;69:8,11,20,21
**contingency's (1)**
58:1
**continue (3)**
30:22;32:11;41:5
**continuing (1)**
56:7
**contract (8)**
52:1,1,7,11,15,17;
55:15;56:24
**contracts (2)**
50:21;51:1,3,6,6;
52:9,10,21,22,25;53:3;
55:23
**conversations (1)**
68:25
**copies (3)**
5:15,17,19
**copy (4)**
7:22;13:4,12;14:7
**correctly (3)**
25:15;43:13;53:5
**correspondence (1)**
19:20
**cost (1)**

28:12
**counsel (17)**
3:11;4:24;5:10;6:15;
21:16;58:22;59:3;60:2,
3,5;66:21,23;67:13;
68:25;69:4;72:18;77:2
**counted (3)**
9:19;17:22;20:23
**counterparties (1)**
53:14
**counterparty (3)**
54:15,22;56:25
**counting (1)**
21:25
**countless (1)**
75:19
**couple (12)**
4:6,7,9,10,19;19:11;
20:18;32:18;34:22;
56:18;57:3;63:2
**course (3)**
28:21;30:8;48:18;
52:22;57:6
**Court (185)**
3:3,4,5,7,10,12,15,
19,23,25;4:5,9;6:4,11,
13,19;7:2,4,6,24;8:2,
12,15,17,20;9:6,9;10:2,
4,14,18,25;11:4,10,15;
13:11,18;14:2,20;15:4,
15;16:2,20,25;17:3,10,
17;18:16,21;19:5,17,
20;20:1,15,19;21:3;
22:2,10,13,21;23:16,
25;24:8,20;25:3,9,11,
13,18,21;26:6,27:16;
29:11,14;30:25;31:9,
12,18,25;32:16,22;
33:5,19;34:8,12,24;
35:3,20;36:1,3,9,13,15;
37:9,12,14,17;38:8;
39:2;40:4,7,9,12,14,17,
22;41:1,11;42:5,18,22;
43:7,15;44:5,7;45:9,17,
19;46:5,22;47:14,24;
48:20;49:4,12,14,21,
23,25;50:13,16;53:25;
54:2;55:3,9,11,24;
56:15,17;57:10;58:11,
17,20;59:7,9,14,21;
60:3,5,9,14,16,23;61:2,
16;63:18;64:24;65:1,4,
7;66:22;71:19,22;72:5,
10;73:8,10,12,18,23;
74:1,3,10,15,19,21;
75:3,7,10;76:11,16,20,
25;77:9,12
**court-approved (1)**
20:10
**courtroom (8)**
24:3,25;49:5;58:12,
21;60:18;61:13;76:2
**Court's (3)**

7:20;16:6;18:12
**cover (1)**
69:17
**COVID (10)**
5:15;40:3;42:2,12;
43:1,10,19,24,24;75:23
**COVID-19 (2)**
20:8;40:20
**CPUC (7)**
30:13;44:14;45:3
**create (1)**
51:13
**created (1)**
51:19
**creating (1)**
51:15
**criminal (1)**
32:10
**crisis (1)**
75:23
**critical (1)**
6:15
**CROSS-EXAMINATION (4)**
8:4;25:24;50:3;
61:19
**cross-examining (1)**
56:14
**cure (12)**
53:10,19,22;54:5,11,
13,23,24;55:1;57:22,
23;69:13
**current (5)**
27:19;28:1;46:1;
62:23;72:25
**cut (1)**
31:12

**D**

**dam (1)**
66:1
**damage (6)**
47:19,20;64:1;66:1,
4;68:11
**damages (5)**
35:18;36:25;37:7,9;
39:21
**danger (1)**
42:13
**date (10)**
15:16;62:8;65:14,16,
24;66:2,6,10;69:25;
70:7
**day (2)**
8:13;77:6
**days (1)**
74:25
**day-to-day (2)**
26:11;41:15
**deadline (9)**
9:14;12:10,13,17,21,
25;17:23;20:13;22:8
**deadlines (2)**

20:11;56:22
**deal (5)**
15:19;49:15;55:17;
56:24;57:1
**dealt (3)**
35:23;55:15;56:20
**debt (26)**
37:24;57:21;63:6,17,
21;65:18;66:13,14;
67:5,11,12,20,21,25;
68:4,5,7,7,12,12,23;
69:18,18;70:1,8;71:15
**debtor (6)**
4:16;16:24;50:22;
56:23;70:23;72:23
**debtor-in-possession (1)**
27:4
**debtors (12)**
16:16;24:16;30:14;
55:10;56:5;59:2;62:4;
65:18,19;72:23;73:21;
75:5
**debtors' (8)**
4:17;27:9;40:2;
58:22;59:3;60:2;66:21,
23;68:25;71:3
**decided (1)**
13:9
**declaration (34)**
8:13;9:22;22:11;
24:18;27:7;30:3;33:6;
34:21;36:16,18;37:15;
39:25;40:15,23;41:2,4,
9;50:9;53:11;57:14,18;
59:25;61:25;62:3,14;
64:5;65:9;66:7;67:1,4;
69:10;71:6,10;73:6
**declarations (2)**
17:21;24:22
**decline (2)**
23:19,21
**deemed (4)**
39:18;52:24;63:14;
71:17
**deficiencies (1)**
17:7
**defined (1)**
52:11
**degree (9)**
28:16,24;32:6;38:18,
22;42:11,15;45:14;
46:12
**delay (1)**
20:11
**delayed (2)**
16:10;20:8
**deliverables (2)**
26:17,19
**delta (1)**
38:16
**Dennis (1)**
3:6
**Department (1)**

50:6
**depending (1)**
27:6
**depends (1)**
17:18
**deployed (4)**
67:2,4,6,8
**deployment (1)**
41:7
**deposition (1)**
20:16
**deputy (3)**
26:9;58:21;60:18
**describe (1)**
27:9
**designate (1)**
75:14
**designated (2)**
5:18;69:20
**detailed (1)**
18:10
**determination (5)**
51:4,25;52:13,17;
64:10
**determine (2)**
9:18;53:9
**determined (4)**
53:6,14;55:13;57:19
**determining (1)**
70:25
**develop (1)**
69:15
**developed (3)**
52:4;70:18;72:16
**developing (2)**
26:13;28:14
**developments (2)**
39:25;44:2
**difference (1)**
41:7
**different (8)**
23:19;38:14;42:20;
46:11;47:6;66:25;67:6,
7
**differentiate (1)**
26:5
**difficult (2)**
31:1;61:5
**difficulties (1)**
7:21
**direct (1)**
18:9
**direction (1)**
32:11
**directly (4)**
5:8,21;13:25;34:17
**Director (3)**
21:11,25;24:17
**directors (1)**
33:21
**disagreement (1)**
4:12
**disclosure (3)**

27:2;37:22;48:24
**disconnect (1)**
11:11
**discovery (1)**
57:6
**discussion (2)**
15:10;54:8
**discussions (3)**
28:4;7;69:4
**dislocations (1)**
43:5
**dispute (2)**
56:10,10
**disruption (1)**
41:14
**disruptions (1)**
41:6
**dissolving (1)**
32:13
**distribution (1)**
16:17
**District (1)**
3:5
**Division (1)**
50:7
**document (2)**
16:21;55:1
**documents (1)**
8:10;13:7;32:8
**DOJ (1)**
54:6
**dollars (15)**
35:12,13,22;38:3,6,
17,17,18,22,24;53:11;
67:25;68:3;70:9;71:8
**done (6)**
22:12,14;59:10;
71:20,21;75:19
**doubt (1)**
32:1
**down (3)**
37:18;42:25;44:9
**dozens (1)**
19:3
**drafting (1)**
62:19
**due (2)**
7:18;20:8
**during (3)**
42:1;58:20;61:8
**duties (3)**
16:15;33:13,22
**duty (5)**
8:8,24;9:1;16:23;
17:2

**E**

**earl (1)**
51:18
**earlier (3)**
39:12;51:19;60:15
**early (1)**

26:24
**earnings (6)**
40:20,25;41:2,5,8;
43:21
**easier (2)**
29:7;73:22
**easily (1)**
74:18
**effect (3)**
41:16,18,21
**effective (1)**
39:19
**effectively (1)**
71:25
**efforts (3)**
15:6;34:18;69:1
**either (6)**
41:17;52:12;55:15;
65:18,18;68:6
**Electric (12)**
26:2,4,18;27:25;
28:16;30:22;32:14;
34:18;35:7;38:19,25;
41:25
**Electric's (1)**
41:22
**electronic (1)**
24:3
**electronically (4)**
13:2,9,14;14:9
**element (1)**
28:19
**elements (2)**
42:11,17
**eleven (1)**
37:18
**else (2)**
31:2;44:7
**email (4)**
19:20;60:6;61:9;
74:23
**emails (4)**
18:13;19:18;59:3;
60:2
**embedded (1)**
44:25
**embraced (1)**
59:24
**emergence (1)**
48:6
**emergency (1)**
44:23
**employed (3)**
26:3;52:6;67:10
**employee (1)**
21:9;43:5
**employees (2)**
33:22;61:21
**end (1)**
50:18
**endeavor (1)**
76:9
**ended (1)**

67:18
**engagement (2)**
62:4,11
**enough (2)**
42:23;57:8
**entirely (2)**
56:8;74:6
**entirety (1)**
70:14
**entitled (7)**
9:2,16;15:15,16;
22:16;23:2;75:16
**entitlement (1)**
23:2
**entries (1)**
54:20
**equal (2)**
19:25;53:23
**equipment (2)**
39:16;46:20
**equity (4)**
64:12;65:17;68:7,9
**err (1)**
75:12
**essentially (2)**
53:12;58:6
**established (3)**
15:6;18:23;35:16
**estimate (17)**
6:5;7:19;57:20;58:4,
4;67:16,24;68:3,19,21,
22;69:16;70:20,22;
71:1;72:1,15
**estimated (5)**
5:10;53:10;64:11,17;
68:19
**estimates (4)**
70:19;72:16,20;73:5
**estimating (1)**
67:18
**estimation (1)**
69:1
**et (2)**
37:19;43:5
**ethical (5)**
30:16,21;31:14;32:2,
3
**ethics (3)**
28:23;32:2,3
**Etkin (18)**
58:13;60:17,21;61:1,
6,16,18,20;63:18,20;
65:8;71:21;72:9,11;
73:7,8,9,13
**Etkin's (2)**
59:10;61:14
**evaluating (1)**
67:23
**evaluations (1)**
42:1
**even (4)**
4:18;33:2,2;45:11;
54:18;62:18

**events (4)**
44:2,24,25;45:4
**everybody (2)**
11:15;38:10
**everyone (3)**
7:15;11:10;23:17
**evidence (7)**
18:18,20;24:18,22;
32:20;43:6;45:8
**exactly (8)**
12:3;36:11;44:13;
46:25;51:11;52:5;
55:12,12
**examination (2)**
22:14;57:4
**examine (2)**
49:25;56:1
**examiner (1)**
5:5
**example (2)**
46:15;70:9
**excess (2)**
69:11,12
**exchanges (1)**
61:9
**excuse (9)**
22:3,15;23:6;27:16;
49:5;58:11;65:1;73:13;
75:24
**executory (15)**
50:21;51:5,6;52:1,1,
7,10,11,15,17;53:3,7;
55:15,23;56:24
**exercise (2)**
53:12;63:3
**Exhibit (1)**
17:21
**exhibits (2)**
4:13;30:14
**exist (1)**
51:10
**existed (1)**
51:21
**existence (1)**
47:11
**existing (1)**
51:9
**exists (1)**
53:3
**expect (5)**
4:11,23;11:18;33:1;
43:25
**expected (2)**
42:7;47:4
**expects (1)**
28:20
**expenditures (2)**
35:12;43:22
**expenses (1)**
35:11
**experience (2)**
7:21;14:4
**expert (1)**

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 83
of 92

29:18
expired (1)
52:22
explain (4)
34:1;41:7;42:14,16
explained (1)
23:16
explaining (1)
26:3
exposure (1)
70:17
express (2)
22:22;23:2
expressed (1)
30:2
extended (7)
65:16,24;66:2,5,10;
69:25;70:7
extent (1)
44:15;62:19;71:23

F

facing (1)
32:12
fact (9)
12:23;18:20;20:20;
21:22;22:3;31:22;
55:21;65:16;74:7
fact-based (1)
53:12
factor (1)
35:13
factored (1)
72:14
factors (4)
35:8;39:8;47:6;48:1
facts (2)
18:22;32:19
fair (2)
36:15;42:23
fairness (2)
45:19;48:10
falsifications (1)
32:7
familiar (13)
29:21;50:8;62:15,22,
24;63:5,7,9,10,23;64:3,
14;66:24
familiarity (1)
63:22
far (1)
34:23
far-right (1)
53:19
father (1)
21:24
feasibility (3)
29:2,23;76:14
feasible (1)
29:19
federal (1)
50:7

fee (2)
74:24;75:2
feel (3)
33:16;38:23;70:25
fees (3)
59:4;74:5;76:14
felt (2)
34:10;47:3
few (4)
60:11;69:7;73:14;
75:22
fiduciary (2)
33:13,22
fifteen (8)
7:13;25:14;42:20;
60:21;61:7,8;71:19;
73:19
fifty (1)
47:19
fifty-nine (1)
38:3
fifty-some-odd (1)
38:17
figure (5)
6:14;31:18;54:5;
61:2;74:11
figured (1)
56:13
figuring (1)
64:11
file (1)
22:23;54:23
filed (15)
4:15;18:6;22:10;
26:23;55:21;56:7;
65:23;66:9,17;69:22;
71:24;74:5,24;75:2,6
files (1)
51:9
filing (2)
6:8;26:21
filings (1)
60:13
Final (5)
47:14,15,15,15;77:9
financial (41)
26:11,23;27:1,12;
28:14;29:24;32:4,11;
34:22;35:9;39:14;40:1;
41:18;42:10,11,17,25;
43:2;44:11,21,22;
45:15,16;46:9,10,13,
16,17,20,24;47:1,2,25;
48:13,23,25;51:2,22;
59:5;64:6,6
financials (2)
34:3,5
financing (3)
27:4;48:5,6
find (1)
61:4
fine (2)
72:11;74:3

fines (1)
45:2
finished (1)
61:14
Fire (12)
7:18;8:8,24;9:12,18;
15:23;17:2,22;18:3,9,
18;37:18
fires (3)
35:19;47:19,19
first (10)
8:6;18:4,10;23:9;
26:3;32:19;46:23;
50:19;56:17;62:12
five (1)
12:14
five-year (1)
47:5
fix (2)
17:13,15
fixing (1)
17:18
flow (1)
43:21
fluid (1)
56:6
focus (2)
16:10;62:1
focused (1)
34:21
focusing (1)
43:11
fold (2)
42:13;43:1
folks (1)
27:10
follow (2)
18:25;45:22
following (1)
33:10
follow-up (6)
10:18;20:4
forecast (5)
27:1;39:15;44:22,25;
47:5
forecasting (1)
26:12
forget (1)
44:16
forgot (1)
52:2
form (9)
9:5;10:13,24;13:10,
17;14:19;41:10;46:3;
47:22
forth (5)
62:23;67:3;69:8;
71:25;72:25
forward (11)
28:20;33:24;39:18,
21;48:7;55:23;66:23;
71:12;73:4;74:15;77:3
foul (1)

15:8
frame (3)
4:19;26:25;37:19
FRANCISCO (1)
3:1
frankly (1)
59:19
FRIDAY (1)
3:1
front (5)
57:15;61:5,25;62:25;
63:3
frustrated (3)
20:17,20,22
full (2)
69:3;71:5
fund (10)
35:15;38:5;39:5,6,7,
18;42:16;47:12;48:7,7
funded (2)
37:24;67:19
further (12)
15:10;28:17;30:23;
32:12,24;33:10,11,17;
44:9;57:5;58:9;73:7
future (6)
39:9,10;44:10;45:3,
4;57:6

G

Gas (13)
26:2,4,17;27:25;
28:16;30:21;32:14;
34:18;35:7;38:19,25;
41:21,25
gathering (1)
4:25
gave (2)
21:20;52:3
generally (6)
15:5,9;62:24;63:9,
23;64:3
generate (1)
51:12
gets (2)
34:14
Given (6)
18:1;29:18;32:10,21;
34:5;54:19
glad (1)
11:5
glitch (1)
50:17
goes (2)
34:23;74:6
go-forward (2)
35:15;47:11
going- (1)
71:11
Good (26)
3:7,9,10,12,13,14,17,
18,25;4:2,7,8;7:15,15;

15:8
24:7;25:9,10;49:16,16;
50:5;57:8;76:15,22;
77:6,7,11
Gotshal (5)
24:16;30:8;51:5;
52:12;67:14
government (2)
54:4;55:4
Governor (1)
39:19
Greg (1)
59:1
Gregory (1)
49:9
guess (2)
5:18;15:3

H

half-a-dozen (1)
12:14
half-an-hour (1)
5:7
hand (3)
24:11;49:11;59:8
handful (1)
12:13
happen (2)
18:25;19:3;22:20
happened (4)
11:11,16;18:24;
50:13
happens (1)
77:5
hard (2)
13:4,12;14:7
harm (1)
15:8
head (2)
27:24;63:12
hear (22)
3:8,19;5:9;6:21,22;
7:3,4,5,9;11:1,2,13;
18:7;23:15;25:11;35:1;
49:21,21;50:16;58:18,
19;61:13
heard (3)
58:21;73:24;76:15
hearing (6)
3:20;5:6;6:4;30:13;
55:14;77:3
Helen (1)
7:22
help (5)
15:9;39:15;62:21;
70:6;72:9
helped (1)
52:12
helps (1)
6:14
here's (1)
75:12
herself (1)

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 84
of 92

7:1
**Hi (1)**
49:20
**high (2)**
12:15;48:12
**highly (1)**
32:25
**himself (1)**
75:22
**history (1)**
32:7
**hoc (1)**
27:5
**holdco (12)**
62:9;63:5;64:1;
66:13;67:5,11,20;68:4,
7,7,12;71:14
**holdco's (1)**
69:18
**home (1)**
75:23
**honestly (1)**
60:12
**Honor (79)**
3:9,13,14,21;4:4;
6:25;9:5;11:2;16:1;
17:16;18:15,17;21:20;
22:9;23:11;24:15;25:7,
10,22;31:10;32:15,18,
20;33:18;34:7,19,22;
36:2,8;39:1;41:10;
42:3;43:4,14;45:6,13;
46:6,21;47:23;48:16;
49:2,8,9,20;50:18;54:9,
16,18;55:7;56:3;57:9,
11;58:9,15,19;59:1;
60:1,11,22,25;61:15,
18;65:3,8;71:21;72:2,
9;73:7,20,24;74:13;
75:5;76:9,12,15,19,24;
77:8,15
**Honorable (1)**
3:6
**honored (1)**
24:1
**hook (1)**
5:19
**Hopefully (1)**
4:10
**hoping (1)**
59:4
**horizon (1)**
39:14
**host (1)**
27:21
**hours (1)**
5:24
**house (1)**
67:14
**hundred (1)**
56:19
**hundreds (1)**
71:7

**hypothetically (1)**
71:8

**I**

**I'm (1)**
22:15
**idea (1)**
11:11
**identified (1)**
74:8
**identify (1)**
51:20
**identifying (1)**
54:18
**ignored (2)**
71:25;72:6
**ignoring (1)**
72:8
**impact (6)**
40:1;43:10,19,20;
44:2;45:23
**impacts (6)**
32:11;42:12,17;43:1;
48:12,15
**implement (2)**
30:1;71:11
**implications (1)**
47:21
**important (10)**
28:19;31:23;33:11,
12,17,24;35:8,14;
39:11;70:15
**impose (1)**
76:1
**in- (1)**
67:13
**inadequate (1)**
54:5
**inappropriate (1)**
74:9
**inappropriately (1)**
72:4
**include (8)**
44:20;64:6;66:11;
67:19,23;68:23;71:1,
13
**included (6)**
27:2;35:8;45:3;
48:24;51:24;68:6
**includes (1)**
26:12
**including (7)**
19:13;23:17;27:8;
28:8,9;39:19;57:23
**income (2)**
64:11,17
**incorrect (1)**
72:23
**increase (2)**
46:15,17
**increased (1)**
42:13

**indicate (6)**
29:1;54:21;62:4,14;
65:12;66:7
**indicated (4)**
31:21;50:8;55:22;
56:12
**indicates (1)**
44:15
**indicating (1)**
31:20
**indication (1)**
14:6
**indications (1)**
4:18
**individual (2)**
27:14;52:8
**individuals (1)**
28:1
**influencer (1)**
70:18
**inform (1)**
67:15
**information (8)**
12:23;14:17;52:20;
54:19;68:21;69:15;
75:15,18
**informed (4)**
10:7,11;12:6,22
**initially (2)**
26:21;27:14
**input (1)**
31:23
**inquire (2)**
75:21,21
**inquiries (3)**
12:8,11,12
**instrument (3)**
52:6,17;54:14
**instruments (2)**
53:6;54:18
**insurance (1)**
71:18
**intend (1)**
4:19
**intended (2)**
58:1;69:17
**interaction (2)**
28:2,24
**interactions (2)**
28:5,11
**interest (1)**
21:24
**interface (1)**
69:5
**interject (1)**
74:13
**interpose (2)**
42:19;65:2
**interrupt (2)**
38:8;54:2
**interrupted (1)**
76:4
**interruption (1)**

16:10
**interruptions (1)**
45:22
**into (19)**
5:8,16,21;6:20;23:7;
24:18;28:17;33:10;
34:2,13;37:18;42:14,
22;45:10;47:6;48:1;
64:4;70:1,11
**investment (1)**
35:10
**investments (2)**
39:13;47:10
**involved (4)**
27:6;32:2;62:18;
64:16
**involving (1)**
62:8
**IOUs (1)**
39:6
**irregularity (1)**
22:20
**issue (10)**
4:19;17:18;24:21;
47:7;54:4,6;55:16;
56:5,20;57:2
**issued (1)**
4:12
**issues (6)**
30:21;55:4,15,19;
56:24;60:2
**items (1)**
39:11

**J**

**Janet (1)**
27:22
**Jason (1)**
27:12
**Jim (1)**
26:8
**John (2)**
24:14;27:22
**joining (2)**
25:8;26:1
**Josh (2)**
21:6,17
**Judge (4)**
7:21;11:8;32:9;33:1
**judges (1)**
5:18
**judgment (1)**
72:22
**Julian (3)**
4:7,8;24:25
**Julie (1)**
28:22
**Justice (1)**
50:6

**K**

**Kane (5)**
28:22,24;30:15,16;
31:21
**Karotkin (34)**
3:12,13;4:10,15;
5:23;6:2,10,12,18;
11:6;21:6,12,14,17,18;
29:6,10;56:22;59:16,
17,18;72:2;74:13,16,
17,20,22;75:11,16;
76:4,8;77:7,9,11
**key (1)**
70:18
**kind (5)**
34:8;36:17;37:19;
38:10;65:4
**knew (1)**
58:22
**knowing (1)**
14:5
**knowledge (10)**
12:6,22;15:1,2;19:3,
6,7,9,10;62:21
**knows (4)**
14:7,13;19:12;38:10

**L**

**last (9)**
11:12;42:2;46:7;
48:18,19;50:25;57:3;
73:19;74:24
**late (3)**
12:7;15:7;17:25
**later (7)**
4:11,20;7:25;14:17;
15:16;55:20;56:20
**law (2)**
31:14;33:10
**laws (1)**
33:16
**lawyers (3)**
23:17;32:4;59:21
**lead (2)**
21:24;61:22
**leads (3)**
28:7;46:16,17
**learned (1)**
17:11
**leases (1)**
50:22
**least (4)**
4:24;5:19;34:10;
56:23
**leave (2)**
9:9;45:18
**leeway (1)**
21:20
**left (1)**
53:1
**legal (17)**
15:19;16:4,5,25;
17:9;27:22,23;31:3;

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 85
of 92

33:10;51:4,24;52:12,
  13;55:16;67:13;70:16,
  20
**legitimate (1)**
  15:17
**lender/agent (1)**
  27:5
**lenders (1)**
  74:24
**length (1)**
  53:18
**lengthy (1)**
  55:1
**less (1)**
  57:25
**letters (1)**
  75:2
**level (1)**
  31:22
**levels (1)**
  47:17
**liabilities (2)**
  26:22;44:24
**liability (4)**
  44:17;45:21;71:14,
  16
**liable (1)**
  71:17
**life (1)**
  41:18
**likely (1)**
  32:24
**line (4)**
  8:6,18;9:24;29:1
**lines (3)**
  16:19;27:7;30:15
**liquidated (5)**
  69:23;70:2;71:24;
  72:13,14
**liquidity (2)**
  26:12;27:3
**list (3)**
  17:21;50:21;53:3
**listed (5)**
  54:11,24;55:2;70:2,8
**listen (1)**
  24:2
**listening (1)**
  55:18
**litigant (1)**
  7:17
**litigation (2)**
  61:23;62:8
**little (4)**
  3:23;7:19;54:19;
  71:19
**locate (1)**
  32:8
**lodge (1)**
  73:25
**Loduca (1)**
  27:22
**long (2)**

61:4,4
**look (5)**
  36:16;46:10;51:16;
  74:4;77:3
**looked (5)**
  43:18;46:13;48:15;
  70:14;75:10
**looking (2)**
  7:8;29:4
**lost (3)**
  7:17;10:25;63:18
**lot (2)**
  45:10;47:6
**lots (1)**
  4:24
**low (1)**
  48:11

## M

**Magalia (1)**
  7:17
**magnitude (1)**
  39:10
**mail (7)**
  14:4,5;18:3,5,10;
  19:23;20:3
**mailed (4)**
  16:6,8;18:4,10
**mailing (3)**
  20:8,10,11
**majority (3)**
  38:7;51:24;52:8
**makes (1)**
  74:9
**making (7)**
  4:17;16:2;39:13;
  45:21;47:11;51:3;
  76:25
**manage (1)**
  26:11
**management (8)**
  26:12,13;27:4,9,10,
  13,22;28:2
**managing (1)**
  24:17
**manner (3)**
  33:13,23;67:9
**manslaughter (1)**
  32:8
**many (19)**
  10:7,22;11:22,25;
  12:3,12,20;15:23;18:2;
  26:11;30:7;52:9,16;
  56:21,21;59:6;66:12,
  14,17
**March (3)**
  14:23;26:24;30:13
**Mari (2)**
  27:15,19
**mark (1)**
  32:8
**markets (1)**

48:6
**Mary (1)**
  7:16
**material (4)**
  40:1;41:16,18,21
**materialize (1)**
  72:17
**materially (1)**
  45:16
**materials (10)**
  9:2;12:18;13:1,2,4,
  12;14:23;16:17;20:20;
  27:1
**math (2)**
  53:2,12
**matter (8)**
  4:23;14:10;16:5,6;
  19:8;20:2;24:4;75:3
**Matthew (1)**
  50:5
**MAY (20)**
  3:1;5:5;7:18;12:7;
  13:23;21:23;23:14;
  31:6;40:20,24;41:1,4,
  8;55:4;70:2,12,17;
  72:17;74:10;76:1
**maybe (9)**
  4:14,18;7:12;12:5,5;
  20:21;34:11;61:8;
  75:16
**mean (15)**
  6:4,13,16;16:9;
  21:20;31:5;32:1,13;
  35:20;37:2,3;41:15;
  45:10;59:22;71:13
**meaning (1)**
  10:15
**meant (1)**
  31:19
**media (1)**
  32:25
**medium (1)**
  48:12
**meet (4)**
  30:11;40:2;41:17;
  71:11
**meeting (1)**
  77:14
**meetings (1)**
  28:7
**members (1)**
  27:8
**memory (3)**
  38:2;53:3;62:25
**mentioned (2)**
  39:12;57:18
**merit (1)**
  70:24
**message (1)**
  49:9
**Mesterharm (1)**
  26:8
**method (1)**

58:2
**methodologies (4)**
  67:2,3,6,8
**methodology (1)**
  67:10
**metric (1)**
  64:20
**Mexico (1)**
  61:22
**microphone (1)**
  49:18
**might (9)**
  5:7;19:13;29:7;
  36:20;42:1;72:20;
  73:21;74:1;76:21
**might've (1)**
  18:24
**million (7)**
  53:11,23;57:20,22;
  58:4;69:13;70:9
**million-dollar (1)**
  69:8
**millions (1)**
  71:7
**mind (1)**
  72:5
**minute (1)**
  54:3
**minutes (13)**
  7:12,19;19:12;25:14;
  34:22;56:12;60:11,22;
  61:7,9;69:7;71:19;
  73:19
**mistake (1)**
  17:11
**mitigate (2)**
  39:15;47:9
**mitigated (3)**
  47:7,8,9
**mitigation (12)**
  28:12,13,15,19;34:2,
  18;35:7,10;39:12,17;
  41:23;47:10
**mobilization (1)**
  41:22
**moderate (3)**
  28:25;29:1;31:21
**moment (4)**
  4:10;11:8;43:8;49:8
**Monday (8)**
  4:14,20,22;6:12;
  23:21;26:6;36:21;77:4
**Montali (2)**
  3:6;11:9
**months (1)**
  62:7
**mood (1)**
  25:19
**more (22)**
  5:7,11,12;10:19;
  16:3;19:11;20:18;21:3;
  22:21;31:5;34:14;
  36:19,20;38:19;39:23;

42:1;56:13,18,19;
  57:12;59:12;61:5
**morn (1)**
  49:16
**morning (19)**
  3:7,9,10,12,13,14,17,
  18;4:1,2,7,8;5:1;7:15,
  16;21:1;24:7;25:9,10
**most (3)**
  54:20;60:22;75:24
**motion (1)**
  5:4
**motions (1)**
  75:6
**mountains (1)**
  5:17
**move (10)**
  5:5,7,7;23:7;24:3;
  31:24;32:6;45:13;65:9;
  74:15
**Moving (3)**
  64:25;65:8;67:1
**much (10)**
  6:17,17;23:13;38:21;
  43:9;60:9,9,20;61:4;
  76:12
**muted (1)**
  6:23
**myself (2)**
  26:8;46:9

## N

**name (4)**
  7:16;24:12;27:15,18
**nature (4)**
  63:23;64:3;67:14;
  70:14
**nearly (1)**
  66:8
**necessarily (3)**
  16:9;18:23;41:15
**necessary (3)**
  71:1;72:19;75:20
**need (12)**
  14:2;25:4;32:24;
  36:11;49:16;54:2;57:5;
  60:10,11,20,21;77:10
**needs (1)**
  56:2
**net (2)**
  64:11,17
**New (1)**
  61:22
**news (1)**
  76:22
**newspaper (1)**
  38:10
**next (14)**
  5:8,9,9;23:16:12;
  22:15,16;24:16;25:4;
  36:20,21;47:4,18;49:6;
  77:4

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 86
of 92

**Nick (1)**
27:14
**nobody (1)**
47:8
**nondebtor (2)**
54:15,22
**none (2)**
39:8;72:13
**nonexecutory (1)**
52:25
**nonfunded (3)**
57:21;67:25;68:23
**nonlawyers (1)**
52:14
**nonwildfire (3)**
57:21;67:25;68:23
**normal (1)**
5:20
**normalcy (1)**
44:1
**normalized (2)**
64:10,17
**Northern (1)**
3:5
**notes (1)**
25:13
**notice (1)**
37:17
**notify (3)**
19:17;20:7,7
**November (1)**
62:5
**number (26)**
8:17;9:24,24;17:23;
26:20;35:11;36:7,10;
37:7,13;38:2,11,16;
39:8,18;52:22,23;53:4,
16,20;55:2;57:24;
66:16,20,23,25
**numbers (5)**
29:7;36:12,17;52:19;
66:19
**numerous (1)**
48:1

## O

**oath (1)**
7:10
**obje (1)**
54:23
**object (7)**
30:14;34:19;43:4;
45:6;47:22;48:16;72:2
**objecting (2)**
18:17;54:23
**Objection (38)**
9:5;10:13,24;13:10,
17;14:19;16:1;17:16;
18:15;22:9;32:15,16,
22;33:18;34:7,12;36:8,
9;39:1;41:10;42:3,19;
43:8;45:9;46:21;49:14;

54:10,12,23;58:25;
59:9;64:21;65:2,7;
74:2,4,7,9
**objections (5)**
6:3,9;24:23;54:3;
56:21
**objective (1)**
47:1
**obligation (2)**
31:13;71:4
**obligations (6)**
31:14;40:2;41:17;
71:3,11;72:24
**obvious (2)**
20:16,19
**obviously (1)**
61:1
**occur (1)**
47:18
**occurred (1)**
45:2
**occurrence (1)**
39:15
**o'clock (1)**
77:4
**October (1)**
65:13
**off (6)**
5:19;23:1;31:12;
32:19;55:19;63:12
**Office (1)**
59:2
**officer (4)**
26:9,10;27:12;28:23
**officers (1)**
33:21
**old-fashioned (1)**
5:14
**once (2)**
5:9;65:14
**one (20)**
4:21;11:8;24:20;
27:11;30:14;31:18;
41:24;42:22;49:8;
53:14;54:14;55:16;
57:24;58:2;64:19;67:9,
24;68:3;69:23;75:23
**one-billion-dollar (2)**
68:18,22
**only (13)**
6:14,17,17,25;11:23;
12:18;16:23;20:18;
48:6;56:12;60:11;
73:14;74:7
**oOo- (1)**
3:2
**opening (2)**
4:17;5:25
**operate (1)**
28:20
**operates (1)**
28:20
**operating (4)**

23:18;33:22,23;
35:11
**operations (4)**
27:25,25;41:15;48:7
**opinion (7)**
29:18,23;30:2;33:6,
20;39:3;46:2
**opinions (1)**
16:4
**opposed (1)**
70:10
**oral (1)**
5:9
**order (13)**
3:3;4:12,14,19;5:15;
9:2,20;14:22;16:6;
24:21;33:13;66:2;
67:15
**orders (4)**
15:14;16:15,23;17:6
**ordinary (1)**
37:25
**organization (1)**
26:17
**original (1)**
13:6
**originally (4)**
50:25;51:21,22;
60:18
**otherwise (1)**
16:11
**ought (1)**
67:16
**out (33)**
6:14;9:15;12:18;
13:2;14:17,22;16:7,8;
17:6;19:21,23;20:3,10;
24:3;26:3,20;31:18;
35:19;40:10;43:24;
53:1;57:25;61:2,10,12;
64:11;68:18;71:7;
72:22;74:12;75:17;
76:6,10
**outlook (1)**
45:16
**outset (1)**
62:10
**outside (2)**
68:25;74:8
**over (8)**
7:18,19;39:14;41:18;
47:4,4;52:22;53:20
**overall (1)**
26:10
**overrule (3)**
39:2;43:7;65:7
**oversight (1)**
30:17
**owed (1)**
53:15
**own (3)**
11:11;40:14;76:7

23:18;33:22,23;

## P

**Pacific (12)**
26:2,4,17;28:16;
30:21;32:13;34:18;
35:7;38:19,25;41:21,
25
**package (8)**
12:7,16,24;13:23,24,
25;19:19;22:7
**packages (14)**
8:9,25;9:3,13,16,17;
12:9,20;18:2,4,9,19;
19:21;20:13
**packet (1)**
8:11
**page (13)**
8:6,17,18;9:23;
16:19;27:7;29:1,4,12;
30:15;39:24;40:8,11
**pages (3)**
23:13;53:20,21
**paid (2)**
35:18;69:2
**Parada (13)**
3:7,20;6:19,21,23;
10:25;23:7;24:8;25:5;
49:7;58:13;73:12;
77:13
**paragraph (17)**
9:24;29:7,9,9;40:7,
12,13;57:17;62:3,14;
65:9;66:7;67:1,4,17;
68:1;69:8
**part (2)**
27:13;28:1,4;30:16;
31:11;64:9;66:10;
70:24
**participate (3)**
35:15;39:6,7
**participated (1)**
24:5
**particular (5)**
15:10;27:6;35:18;
44:2;54:11
**particularly (3)**
29:24;65:12;70:15
**particulars (1)**
43:11
**parties (3)**
39:19;53:15;64:13
**passed (1)**
65:14
**past (2)**
45:2;71:19
**Pause (1)**
58:16
**pay (2)**
37:1;71:4
**payment (1)**
53:10
**payments (2)**

57:22,24
**penalties (4)**
45:2,4,7,12
**penalty (1)**
22:6
**pendency (1)**
62:8
**pending (2)**
6:9;61:22
**people (12)**
10:9,22;11:23;12:8,
14,14,16,19;19:3,6;
20:22;27:21
**per (1)**
7:16
**percent (2)**
9:12;46:17
**perfectly (1)**
53:2
**performance (2)**
45:24;47:4
**performing (1)**
20:8
**perhaps (5)**
4:24;14:9;20:22;
29:6;48:11
**period (3)**
41:19;42:2;47:5
**perjury (1)**
22:6
**permit (1)**
7:11
**person (2)**
21:23;27:17;31:4
**personal (1)**
41:6
**personnel (3)**
41:6,22;43:1
**perspective (1)**
20:12
**persuade (1)**
76:6
**persuaded (2)**
76:4,5
**petition (1)**
62:7
**PG&E (28)**
4:22;16:24;18:12;
21:15,24;27:1;30:5;
32:7,9,11;33:10,12,17,
21,24;37:1;39:11,16;
44:16;46:20;51:4,16,
21,24;52:12;62:9;
67:14;71:17
**PG&E's (4)**
34:2,4;40:20;51:9
**phase (2)**
5:8;22:14
**pieces (2)**
34:14;37:18
**placed (2)**
53:7;66:21
**plaintiff (1)**

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 87
of 92

61:22
**plan (70)**
5:6;12:24;14:16;
15:23,25;16:18;22:7;
26:13;28:10,12,13,19,
22;29:2,19,21,23;30:2,
8,10,10,12,17;31:23;
34:2,17;35:6,10,14,23;
36:5;37:2,6;38:21;
39:13;40:3;41:17;43:2;
44:12;45:24;46:2,3;
47:10,16;48:5,7,15;
50:9,20;52:3;53:4;
62:15,19,21,23,25;
63:3,6,11,15;64:2,13;
67:19;68:14,20;69:2;
71:3,11;73:1,3
**plans (1)**
26:18
**please (11)**
3:12;4:5;7:13;8:22;
24:9,11,12;35:2;38:23;
42:14,16
**pleasure (1)**
76:23
**point (6)**
19:6;36:15;43:25;
55:13;56:1;57:2
**points (1)**
30:2
**policy (1)**
44:15
**politely (1)**
76:5
**portion (1)**
68:3
**position (7)**
19:12,14;23:12;
27:17;58:23;59:22;
72:24
**positions (1)**
22:23
**position's (1)**
57:7
**possibility (1)**
45:3
**possible (2)**
17:13;66:4
**possibly (3)**
4:11;14:8;21:23
**post- (1)**
48:5
**post-confirmation (2)**
56:24;57:6
**post-emergence (1)**
73:3
**potential (3)**
39:20;46:17;48:1
**potentially (1)**
39:19
**Powell (4)**
28:5,8,9,11
**Power (10)**

42:1,13;44:10,10,11,
19;45:12,21,22;46:1
**practical (2)**
14:23;16:5
**precisely (4)**
34:20;38:1;51:16;
62:13
**predicate (1)**
32:19
**predict (1)**
48:8
**prepare (4)**
6:14;23:12;50:20,24
**prepared (4)**
46:25;48:23;51:1,9
**preparing (2)**
4:25;51:21
**pre-petition (1)**
53:15
**present (1)**
47:2
**president (2)**
28:6,23
**presiding (1)**
3:6
**pressure (1)**
56:21
**presume (2)**
24:6;70:20
**pretty (2)**
23:13;74:18
**previously (2)**
7:9,14
**primary (1)**
69:4
**Prime (10)**
9:1;10:7;16:16,23;
18:12;19:17,18,21;
21:8,9
**principal (1)**
27:11
**Principally (1)**
67:13
**prior (10)**
28:1;43:16;45:7,12;
51:10;55:14;58:20;
62:7;65:23;66:5
**pro (1)**
7:16
**probably (5)**
4:13;12:2;34:24;
56:3;61:10
**problem (1)**
54:17
**problematic (1)**
42:1
**problems (1)**
33:11
**procedures (5)**
9:2,20;10:1;13:3;
14:16
**proceed (4)**
7:13;24:5;24,33:14

**proceeded (1)**
51:7
**proceedings (1)**
77:17
**proceeds (1)**
71:18
**process (15)**
30:9,17;48:5;50:25;
51:2,10,20,23;55:22;
56:4,9;65:22,22;66:5;
70:25
**processes (1)**
52:5
**produce (1)**
51:17
**produced (1)**
26:25
**producing (1)**
27:3
**products (1)**
26:20
**progress (1)**
73:18
**project (1)**
43:24
**projection (4)**
41:19;46:16,18;
48:23
**projections (17)**
28:14;29:24;34:23;
35:9;40:2;41:18;42:10,
12;43:2;47:1,2;48:25;
59:5;64:6,6,7,9
**proof (7)**
13:6;18:25;19:2,19;
66:2;70:6,6
**proofs (2)**
66:8;70:3
**proper (1)**
22:22
**properly (1)**
17:6
**property (1)**
7:17
**proportion (1)**
17:25
**proposing (1)**
56:5
**protected (1)**
57:7
**protective (1)**
75:18
**provide (3)**
44:22;72:19;75:17
**provided (2)**
26:17;73:5
**providing (1)**
29:22
**provision (1)**
68:6
**provisions (2)**
17:7;62:15
**PS (1)**

44:2
**PSPS (5)**
44:18,24,25;45:4,8
**Public (1)**
61:21
**publicized (1)**
32:25
**publicly (1)**
70:23
**pull (2)**
40:10;53:17
**Pullo (29)**
3:25;4:2;7:6,7,16;
8:13,21;10:2;11:16;
13:11;14:7,11,12,20;
15:9,17,18;16:11;17:1,
4,17;19:8;20:24;21:4;
22:4,15,25;23:3,5
**punishment (1)**
5:21
**purchase (3)**
65:17;70:1,8
**purpose (1)**
54:7
**purposes (2)**
68:8;72:8
**pursue (1)**
18:22
**put (7)**
34:21;42:20;47:25;
55:19;62:21;66:23;
76:7
**putting (4)**
30:9;55:23;63:3;
64:16

**Q**

**qualified (2)**
51:5;52:11
**qualifies (1)**
51:25
**quantifiable (1)**
43:20
**questioner (3)**
23:9;25:5;49:6
**quick (2)**
47:13;64:5
**quite (3)**
52:9;56:8;76:9
**quote (1)**
54:25

**R**

**raise (2)**
24:11;55:4
**raised (1)**
49:11
**range (1)**
38:2
**rather (1)**
63:2

**rationable (1)**
29:25
**rational (2)**
29:25;47:3
**reaction (1)**
37:12
**read (1)**
40:21
**reading (1)**
54:12
**reads (1)**
38:10
**real (1)**
75:23
**really (6)**
5:12;38:9;56:1,12;
75:20;76:16
**reason (7)**
20:9;44:25;57:24;
66:24;69:23;76:13,16
**reasonable (8)**
12:6,22;21:23;29:25,
25;47:3;69:16;71:1
**reasonably (1)**
14:23
**reasons (1)**
47:8
**recalcitrant (1)**
32:10
**recall (12)**
25:15;37:17;53:11,
18;62:13;63:4,12,14,
16,25;66:3,16
**receipt (1)**
14:6
**receive (14)**
8:9,25;9:3,16;10:12,
22;11:21,22;12:19,24;
13:5;18:19;19:7,18
**received (29)**
9:13,21;10:8,9,15;
12:2,8,9,11,12,16,20;
13:1,7,16,18,23,24,25;
14:5,7;15:2,23;16:9;
18:14;19:4;20:13;22:7;
49:9
**receiving (3)**
12:7;15:12;18:13
**Recent (1)**
39:25
**recently (2)**
43:19;75:2
**recite (1)**
53:10
**recognized (1)**
34:22
**recollection (4)**
7:12;37:21;38:1;
63:24
**record (3)**
24:13;66:21;74:2
**records (1)**
53:13

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 88
of 92

**recycling (1)**
  5:22
**redirect (4)**
  60:24;76:20,22,24
**reduce (1)**
  34:4
**reemailed (1)**
  73:20
**refer (2)**
  18:24;46:24
**reference (5)**
  8:6;10:2;16:15;
  37:20;52:2
**referencing (1)**
  9:23
**referred (2)**
  29:6;64:10
**referring (6)**
  8:10,12;40:7,8;
  46:25;66:13
**reflected (3)**
  9:21;13:3,13
**regarding (13)**
  4:12;5:4;8:7,18;
  26:2;28:5,9,21;31:23;
  33:9;45:4;47:21;64:5
**regardless (1)**
  72:20
**regards (1)**
  9:25
**regular (1)**
  28:2
**regulatory (1)**
  45:5
**reject (1)**
  16:18
**relate (4)**
  57:20,21,23;74:5
**related (5)**
  20:12;39:24;40:20;
  53:13;54:7
**relating (2)**
  67:6;70:7
**relationship (3)**
  21:8,14;40:24
**relative (1)**
  70:19
**relevance (1)**
  31:3
**relevant (6)**
  21:21,22;23:4;38:9,
  11;76:13
**reliance (1)**
  38:24
**reliant (1)**
  38:22
**remain (2)**
  28:17;38:25
**remaining (1)**
  16:11
**remedy (2)**
  17:13,15
**remember (4)**

  4:16;5:3;11:18;
  35:22
**remind (1)**
  25:6
**reminder (1)**
  4:21
**reorganization (15)**
  28:10,22;30:8,23;
  32:12,24;34:17;35:6;
  37:6;38:21;43:3;44:12;
  47:17;48:5,15
**reorganizations (1)**
  30:18
**repeat (2)**
  8:22;16:8
**repeatedly (1)**
  12:23
**rephrase (1)**
  13:20;33:3,4;34:13
**replacement (5)**
  10:9,16;11:17,23,25
**report (1)**
  41:8
**reporting (1)**
  26:15
**reports (3)**
  26:18;27:3,5
**represent (1)**
  61:21
**representation (1)**
  47:3
**representing (1)**
  50:7
**request (6)**
  5:4,10;6:25;7:6;
  23:25;58:22
**requested (3)**
  7:12;12:23;13:1
**requesting (1)**
  10:9
**requests (5)**
  10:9,16;11:17,23,25;
  58:14
**required (3)**
  14:17,22;67:18
**requirements (4)**
  26:15,15;29:21;
  30:11
**rescission (4)**
  64:1;66:1,4;68:11
**reserve (3)**
  23:14,23;72:7
**reserved (1)**
  45:20
**reserving (1)**
  5:25
**resolution (1)**
  71:16
**resolving (1)**
  56:9
**resources (5)**
  30:1;48:4;71:10;
  73:2,4

**respect (10)**
  29:22,23;50:19;
  69:12;70:7,11,22;
  72:14,25;75:1
**respectful (1)**
  7:20
**response (1)**
  44:23
**responsibilities (3)**
  26:10,21;30:16
**responsibility (4)**
  8:8,24;27:3;29:22
**responsible (2)**
  33:12,23
**responsibly (1)**
  44:16
**responsive (1)**
  4:15
**rest (4)**
  43:9,9;61:3;76:7
**restart (1)**
  70:4
**restate (5)**
  11:18;18:22;27:16;
  35:3;43:12
**restructuring (9)**
  26:7,9,9;28:18;
  33:11,17;34:6;35:18;
  37:1
**result (2)**
  39:16;41:5
**RESUMED (1)**
  8:4
**retained (1)**
  26:7
**retention (4)**
  15:14;16:15,23;17:6
**Retirement (1)**
  61:21
**return (1)**
  14:6
**review (8)**
  22:8;51:11;65:22,23;
  66:5,10,18;70:12
**reviewed (7)**
  51:24;52:8;66:3,8,8,
  15;67:9
**reviewing (2)**
  51:3;69:24
**rhetorical (1)**
  16:3
**Richard (1)**
  24:15
**right (44)**
  3:10,16;6:1,19,21;
  7:2;8:20;11:10,15;
  17:23;19:2;22:2;23:12,
  14,19;24:11;25:1,3,6,
  15,20;31:8,10,20;33:7;
  36:3;40:12;42:21;44:5;
  45:9;49:7,23,25;53:4;
  55:4;57:15;58:6;61:16;
  62:19;64:7;67:22;

  68:13;69:13;77:12
**ring (1)**
  66:20
**risk (3)**
  34:4;45:4;47:9
**risks (4)**
  46:10,13,16,19
**robust (2)**
  39:12;47:10
**room (2)**
  6:20;23:8
**Rule (1)**
  44:15

## S

**safe (1)**
  33:23
**Safety (2)**
  28:6,8
**same (8)**
  17:2;19:25;23:21;
  48:17;67:8;72:6,8;76:8
**SAN (1)**
  3:1
**sat (1)**
  61:3
**satisfied (1)**
  37:24
**satisfy (1)**
  72:24
**saying (3)**
  9:15;12:11;29:20
**scenario (3)**
  47:25;48:14,14
**scenarios (1)**
  46:11
**schedule (25)**
  6:8;50:20,21,24;
  51:1,8,9,13,15,17,22;
  52:2,3,18,20;53:7,17,
  19,20,22;54:11,13,19;
  56:7,16
**scheduled (1)**
  4:21
**schedules (3)**
  23:18;26:22,22
**scope (3)**
  34:20;42:6;74:8
**screen (3)**
  7:7;58:17;61:17
**seal (4)**
  74:24;75:2,6,15
**second (5)**
  4:14;27:17;32:20;
  35:13;73:25
**Secondarily (1)**
  39:17
**Section (8)**
  29:2,17,19;30:6,7,
  12;40:6;64:5
**securities (6)**
  61:23,24;62:8;65:18;

  70:1,8
**Sedwick (1)**
  7:22
**seems (2)**
  31:23;55:18
**send (8)**
  5:21;9:2;13:4,9;
  14:22;20:3;60:2,5
**sends (1)**
  19:23
**senior (6)**
  27:9,9,13,21;28:1,22
**sense (3)**
  26:16;32:21;64:19
**sent (14)**
  9:15;12:18;13:2,12,
  14;14:8,10,11,17;18:3;
  19:18;59:3;60:7;74:23
**separately (1)**
  68:14
**series (2)**
  9:23;27:5
**seriously (1)**
  31:16
**service (8)**
  9:15;13:4,13,16,19;
  16:17;18:5,11
**session (3)**
  3:5;5:1;77:4
**set (6)**
  47:1;62:23;67:3;
  69:8;71:25;72:25
**settlement (2)**
  35:17,22
**several (1)**
  19:18
**share (1)**
  53:18
**shelter (1)**
  75:23
**ship (1)**
  19:21
**short (3)**
  47:13;61:4;74:17
**shutoff (1)**
  45:22
**Shutoffs (8)**
  42:1;44:10,10,11,19;
  45:12,21;46:1
**shut-offs (1)**
  42:13
**side (4)**
  27:22,23;58:25;
  75:12
**signed (1)**
  4:16
**significance (1)**
  31:3
**significant (2)**
  35:9;39:13
**significantly (1)**
  45:23
**similarly (1)**

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 89
of 92

42:15
**Simon (1)**
27:22
**simple (1)**
42:20
**sitting (1)**
61:4
**situation (4)**
15:11;48:2;56:6;
74:11
**sixty- (1)**
46:16
**size (2)**
18:1;53:18
**SLACK (49)**
3:14,15;9:5;10:13,
24;11:7;13:10,17;
14:19;16:1;17:16;
18:15,16,17;21:20;
22:9;24:15,15;32:15,
18;33:18;34:7,19;36:8,
10,14;37:2;39:1;41:10;
42:3;43:4;45:6;46:21;
47:22;48:16;59:15,22;
60:23,25;64:21;65:1,1,
3,6;73:24;74:2,4;
76:18,24
**slightly (1)**
5:5
**solicitation (13)**
8:7,19;9:1,20,25;
13:3;14:16,22;15:14,
25;16:17;18:4,9
**somebody (4)**
14:3;16:9;31:2;61:9
**someone (2)**
14:11;20:3
**somewhat (2)**
43:20;56:6
**somewhere (1)**
38:2
**son (2)**
21:17,25
**soon (3)**
14:23;17:13;38:20
**sooner (1)**
6:16
**Sorry (18)**
10:4;11:10;13:20;
18:7;29:15;30:20;
33:15;40:10,10;50:13;
55:7,14;59:14;63:20;
64:22,24;65:25;74:20
**sort (6)**
14:6;39:4;43:22;
55:16;75:18
**sound (1)**
17:23
**sounds (2)**
17:24,24
**sources (1)**
37:22
**speak (1)**

60:24
**specialists (1)**
32:3
**specific (12)**
5:11;34:15;36:19;
39:24;40:3;54:4,10;
60:5,12;66:16,19;
72:20
**specifically (13)**
10:19;16:15;30:19,
20;31:6;34:3;35:6;
48:11;62:10;63:16,25;
66:13;69:20
**speculate (2)**
12:19;13:5
**speculating (2)**
12:2,15
**speculation (1)**
42:4
**squeeze (1)**
56:20
**staff (3)**
5:12,16;14:11
**stages (2)**
26:24;55:2
**start (3)**
5:1,6;26:3
**started (3)**
50:25;52:20;66:5
**state (6)**
24:12;27:8;32:17;
44:1,14;46:1
**stated (6)**
13:6;31:11;38:16;
44:4;45:1;70:23
**statement (18)**
4:15;27:2;29:20;
37:22;39:4,25;40:20,
21,25;41:2,5,8;48:24;
51:2,22;55:17,21;71:9
**statements (4)**
26:21,23;32:25;71:6
**states (7)**
41:5;50:6;54:10,14,
17,21,24
**stating (2)**
12:8,11
**stay (3)**
24:1,25;77:4
**stay-at-home (1)**
5:15
**Stephen (3)**
21:12,14,17
**stick (1)**
14:12
**still (5)**
27:13;56:8;61:25;
72:23,24
**stock (2)**
64:11,12
**stream (1)**
27:6
**strict (1)**

15:13
**strictly (2)**
15:13,24
**structured (1)**
34:3
**studied (1)**
54:3
**stuff (1)**
75:11
**subcontractor (2)**
19:24;20:2
**subcontractors (1)**
19:22
**subject (5)**
39:8;44:17;66:2;
74:6;75:3
**subordinated (16)**
63:6,17,21;66:13,14;
67:5,11,12,20,21;68:4,
5,12;69:18,18;71:15
**subrogation (1)**
37:18
**substance (1)**
67:14
**substantial (2)**
56:10,10
**substantially (1)**
47:9
**substantive (1)**
69:5
**successful (1)**
33:24
**sufficient (7)**
38:23,25;39:5;48:4;
68:21;69:15;73:2
**suggest (1)**
66:25
**suggested (1)**
55:23
**suggesting (1)**
55:25
**summer (4)**
38:20;46:16;47:18,
18
**Sunday (1)**
4:14
**supplement (4)**
50:9,21;52:3;53:4
**support (3)**
38:19;39:20;42:16
**supposed (3)**
15:18;16:3;48:18
**sure (14)**
8:8,24;25:13;29:4,9;
30:24;31:14;36:10,18;
44:13;46:24;56:8;59:1;
70:4
**sustain (3)**
32:22;42:19;45:9
**sustained (3)**
22:10;34:13;42:5
**swear (1)**
24:8

**sworn (5)**
7:9,14;23:8;24:10;
61:17

**T**

**table (1)**
6:8
**tabulate (1)**
9:21
**tabulation (3)**
8:7,19;16:18
**talk (2)**
31:1;67:2
**talking (4)**
55:20;59:20;68:9,11
**Tariff (1)**
44:15
**TCC (2)**
4:12;64:12
**team (19)**
27:22;28:2,7;50:20,
20,24;51:8,11,13,15,
23;52:6,16;53:9;57:19;
65:13;66:8,18;67:18
**technical (1)**
7:21
**Ted (2)**
54:16;55:7
**tells (1)**
5:17
**ten (5)**
7:12,19;12:4;56:12;
70:9
**tens (1)**
35:22
**terminology (1)**
44:17
**terms (21)**
32:7;10;33:5,5;
42:10;43:2;46:14;
47:20;48:12,13,14;
62:15;64:11;65:22;
67:2;69:13,24,24;71:3,
4,25
**testified (4)**
62:18;67:20;69:7,10
**testify (1)**
36:14
**testifying (3)**
38:11;69:17;77:1
**testimony (9)**
23:4,15;24:2;38:9;
45:23;46:2;58:20;
59:19;68:18
**that'll (1)**
24:1
**thereafter (1)**
14:24
**thirty (1)**
12:4
**Thomas (1)**
77:13

**thought (6)**
25:16;40:22;45:15;
55:13,24;59:22
**thoughts (1)**
4:25
**three (6)**
22:21;34:1;39:23;
59:21;74:24;75:2
**throughout (1)**
39:14
**thus (1)**
53:7
**tight (1)**
23:18
**times (4)**
5:10;19:18;22:21;
52:16
**timing (3)**
4:17;6:4;66:3
**title (1)**
21:10
**today (7)**
4:11;8:15;15:16;
24:2;25:1;56:11;76:14
**together (4)**
30:10;47:25;62:21;
64:16
**told (3)**
5:23;58:21;60:18
**tolerated (1)**
5:13
**tomorrow (2)**
4:11;45:25
**tool (1)**
39:20
**top (1)**
63:12
**total (7)**
35:17,21;36:25;37:7,
13,23;53:20
**Totally (2)**
35:25;36:2
**treasurer (2)**
27:13,20
**treasurer's (1)**
27:17
**treat (1)**
72:7
**treatment (4)**
35:21;63:10,12,24
**trial (1)**
50:5
**trials (2)**
61:4,4
**tried (1)**
72:16
**triggers (1)**
37:10
**Troy (25)**
49:7,15,16,18,20,22,
24;50:2,4,5,16,17;
53:25;54:2,9,17;55:25;
56:3,16;57:9,11,13;

58:9,11;60:19
**Trustee (5)**
26:15;49:12;74:5;
75:16,19
**Trustee's (1)**
59:2
**try (5)**
3:22;6:12;31:9;70:6;
76:6
**trying (6)**
38:13,20;46:12;54:9;
55:20;61:2
**Tsekerides (18)**
3:17,18,20,22,24;
24:24;25:2;54:16,16;
55:3,7,8,10,12;59:9,12,
15,17
**Tuesday (1)**
4:22
**tuned (1)**
77:4
**turn (3)**
49:25;57:17;71:7
**turns (2)**
57:25;72:22
**twenty (3)**
12:4;25:18;60:21
**twenty-five (1)**
25:16
**twenty-one (5)**
38:6,17,18,22,24
**twenty-percent (1)**
46:15
**two (12)**
21:3;34:11;35:8;
39:11;41:14;47:19;
56:13,17;57:11;68:19;
74:24;75:25
**two-and-a-half (1)**
5:24
**types (3)**
46:11;67:7;69:21
**typical (1)**
17:25

**U**

**ultimate (2)**
46:5;71:14
**ultimately (1)**
56:3
**un (1)**
12:15
**uncertainties (1)**
69:21
**under (27)**
22:6;23:18;30:12;
31:14;35:16,23;36:4,
22;37:2,6;40:3;41:17;
46:3;63:6,11,14;64:2,
13;67:19;68:14,20;
69:2;70:17;71:3;74:24;
75:2,18

**understood (1)**
53:5
**undoubtedly (1)**
20:21
**unexpected (1)**
73:16
**unexpired (1)**
50:22
**unfortunate (1)**
20:23
**uniform (1)**
3:16
**unimpaired (1)**
63:14
**UNISON (2)**
77:8,16
**United (7)**
50:6;54:10,14,17,21,
24;55:2
**unknown (1)**
48:8
**unless (2)**
14:6;24:22
**unliquidated (2)**
70:10,13
**unmute (5)**
6:21,24;7:1;49:17,18
**unmuting (1)**
6:24
**up (13)**
43:19;47:7;51:12;
53:17,22;54:4;56:2,7;
61:16;67:18,24;69:1;
72:1
**update (1)**
6:8
**upon (4)**
38:22;67:20;69:25;
76:1
**upset (1)**
20:22
**upwards (1)**
35:12
**use (1)**
19:22
**used (2)**
20:3;58:3
**uses (2)**
37:22,23
**USPS (1)**
18:3
**usually (1)**
32:2
**utilities (4)**
27:24;38:6,7;39:20
**utility (10)**
62:9;63:17,21;66:14;
67:11,21;68:5,12;
69:18;71:14

**V**

**valid (1)**

9:21
**values (1)**
64:11
**variation (1)**
47:20
**various (4)**
5:10;37:18;50:7;
60:7
**varying (1)**
47:17
**vast (2)**
51:24;52:8
**vendor (7)**
19:23,24,25;20:1,2,
7;37:25
**vendors (1)**
20:7
**verification (1)**
15:2
**verify (2)**
22:6;58:14
**version (2)**
62:23;72:25
**versions (1)**
13:12
**versus (1)**
47:19
**via (2)**
18:3,10
**viable (2)**
28:17;38:25
**vice (2)**
28:5,23
**victim (3)**
9:12,18;18:9
**victims (10)**
8:8,25;17:2,22;18:3,
13,18;35:19,21;37:19
**video (2)**
7:8;10:25
**view (3)**
23:21;57:2;75:11
**views (1)**
23:1
**virtual (2)**
49:5;76:2
**volume (2)**
18:13;39:9
**vote (4)**
9:18,22;15:7;22:8
**votes (6)**
8:7,7,19,19;16:18;
20:23
**voting (16)**
9:14;12:7,9,10,13,17,
21,24,24;13:23;15:24;
19:19;20:13;22:7,8,20

**W**

**wait (3)**
33:5;40:22,22
**Wallace (68)**

4:3;6:20,20,21,22;
7:2,3,4,5,15,16;8:1,3,5,
17,18,23;9:8,10,11;
10:5,6,14,17,21;11:13,
14,20;13:15,18,20,22;
14:2,2,14,15,25;15:4,
12,15,21,22;16:2,3,13,
22;17:5,14,20;18:21;
19:2,15,16;20:1,6,15,
18;21:2,5,22;22:5,12,
13,19,21;23:8,11,23
**waste (1)**
23:3
**wasting (1)**
55:5
**way (9)**
14:5,8;26:25;41:24;
43:16;44:3;64:19;65:5;
72:12
**Wednesday (1)**
5:1
**week (2)**
60:15;75:8
**weekend (2)**
77:7,11
**weekly (1)**
27:3
**Weil (7)**
24:15;30:8;51:4;
52:12;60:8;62:20;
67:14
**welcome (3)**
10:19;15:8;32:23
**well- (1)**
15:5
**Wells (1)**
27:12
**weren't (1)**
24:4
**what's (10)**
10:4;11:4;16:2;36:9;
39:11;53:1;54:7;55:6;
64:10;76:23
**whenever (1)**
5:20
**Whereupon (1)**
77:17
**whole (2)**
27:21;39:8
**Wildfire (30)**
28:6,8,12,13,15,19;
34:1,5,18;35:7,10,15,
15;37:25;38:5;39:5,12,
17,18,20;41:22;42:13,
15;46:15,17;47:9,10,
12,21;48:12
**wildfires (7)**
38:20;39:9,10,15;
46:14,20;47:18
**willing (1)**
56:23
**wish (3)**
22:19;23:18;24:2

**within (3)**
42:5;51:21;59:24
**without (4)**
30:23;32:12,12;
62:24
**witness (33)**
4:21;7:9,14;8:14,16,
22;10:3;14:21;16:12;
22:16,16;24:10,16;
27:19;29:13;31:1,19,
19;34:10;35:2;36:21;
37:16,21;40:16;43:14,
17;49:10;50:15;56:11;
59:6;73:11,22;76:17
**witness' (1)**
38:9
**witnesses (2)**
4:13;75:24
**word (1)**
37:9
**words (1)**
65:14
**work (7)**
26:2,5,5,20;27:6,10;
28:5,21,22;29:18;30:8;
61:9;75:17;76:6,10,17
**worked (1)**
27:10
**working (2)**
27:12;65:13
**workplace (1)**
41:6
**works (1)**
53:2
**worry (1)**
7:25
**worst (1)**
48:13
**writing (2)**
13:7;56:23
**wrong (1)**
75:1

**Y**

**year (4)**
39:14,14;42:2;50:25
**years (1)**
5:14
**yesterday (7)**
4:15;23:17;32:9,25;
55:21;56:7,23

**Z**

**zero (4)**
55:2;68:19;70:21;
72:7
**Ziman (2)**
23:22,24;26:5
**Ziman's (2)**
36:18;37:15
**Zipes (31)**

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 91
of 92

49:10,12;58:13,17,
18,19;59:1,1,8,10,19,
22;60:1,4,7,11,15;61:8,
15;73:13,14,17,20;
74:22;75:4,5,8;76:6,11,
12,19

**1**

**1 (6)**
8:6,18;9:24;57:20;
58:3;69:11
**1,000 (1)**
23:13
**1,600 (1)**
66:20
**1,800 (1)**
53:21
**10 (3)**
9:24;64:2;77:4
**100 (3)**
9:12;12:4,5
**1054 (2)**
35:16;47:11
**10B (1)**
63:21
**11 (7)**
26:12,14;36:5;40:7,
12,13;61:23
**1129 (2)**
30:7,12
**1129a11 (5)**
29:2,19;30:6;33:9;
46:5
**12 (1)**
65:9
**13 (1)**
66:7
**13.5 (1)**
37:19
**14 (3)**
44:15;67:1,4
**15 (4)**
57:17;67:17;68:1;
69:8
**150 (1)**
12:5
**16th (3)**
13:23;65:19,24
**17,000 (1)**
53:4
**19 (2)**
29:1,4
**1st (5)**
40:20,24;41:1,4,8

**2**

**2 (1)**
16:19
**20 (1)**
16:19
**20,000 (2)**
66:8,11
**2018 (2)**
7:18;62:5
**2019 (1)**
65:14
**2020 (2)**
3:1;65:21
**2021 (2)**
64:7,9
**20th (1)**
12:7
**22 (2)**
8:6,18
**23 (1)**
30:15
**230 (5)**
53:11,23;57:22;58:4;
69:12
**27- (1)**
52:23
**28 (3)**
8:7,18;30:15
**28,000 (1)**
52:23
**29 (1)**
3:1
**29- (2)**
52:24;53:6
**2nd (1)**
30:13

**3**

**3 (2)**
27:7;40:8
**3.5 (2)**
35:12,13
**30,000 (2)**
52:24;53:6
**31st (1)**
14:23
**330 (1)**
57:20
**330- (1)**
69:7
**330-million-dollar (1)**
57:18
**3rd (1)**
5:2

**4**

**4 (1)**
62:3
**4th (1)**
5:4

**5**

**5 (6)**
9:23;27:7;29:9;
39:24;40:11;62:14

**6**

**6 (3)**
16:19;27:8;29:9

**7**

**75,000 (1)**
52:21

**8**

**8 (3)**
9:24;29:1,4
**884 (1)**
30:15
**8th (1)**
14:18

**9**

**978 (1)**
17:21
**9A (1)**
63:6

Case: 19-30088    Doc# 7701    Filed: 06/01/20    Entered: 06/01/20 16:03:12    Page 92
of 92

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net