1              UNITED STATES BANKRUPTCY COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                          -oOo-

4   In Re:                      ) Case No. 19-30088
                                ) Chapter 11
5   PG&E CORPORATION AND PACIFIC )
    GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                ) Monday, June 1, 2020
                    Debtors.     ) 10:00 AM
7   _____ )
                                  ) CONFIRMATION HEARING
8
                    TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE DENNIS MONTALI
                UNITED STATES BANKRUPTCY JUDGE
10
    APPEARANCES (Via Zoom):
11  For the Debtors:            STEPHEN KAROTKIN, ESQ.
                                THEODORE E. TSEKERIDES, ESQ.
12                              Weil, Gotshal, & Manges, LLP
                                767 Fifth Avenue
13                              New York, NY 10153
                                (212)310-8000
14
    For Official Committee of   ROBERT A. JULIAN, ESQ.
15  Tort Claimants:             Baker and Hostetler LLP
                                600 Montgomery Street
16                              Suite 3100
                                San Francisco, CA 94111
17                              (415)659-2600

18  For William B. Abrams,      WILLIAM B. ABRAMS
    Individual and Tubbs Fire   1519 Branch Owl Place
19  Claimant:                   Santa Rosa, CA 95409
                                (707)397-5727
20
    For Various Fire            JEREMIAH HALLISEY, ESQ.
21  Claimants:                  Hallisey and Johnson PC
                                465 California Street
22                              Suite 405
                                San Francisco, CA 94104
23                              (415)433-5300

24

25

(973)406-2250 | operations@escribers.net | www.escribers.net

1

2   Also Present:            Mary Wallace, Pro Se
                                     Individual Fire Claimant

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   Court Recorder:          LORENA PARADA/ANKEY THOMAS
                                     United States Bankruptcy
Court
19                                      450 Golden Gate Ave.
                                     San Francisco, CA 94102

20

21   Transcriber:              SHARONA SHAPIRO
                                     eScribers, LLC
22                                      7227 N. 16th Street
                                     Suite #207
23                                      Phoenix, AZ 85020
                                     (973)406-2250

24

25   Proceedings recorded by electronic sound recording;
  transcript provided by transcription service.

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1     SAN FRANCISCO, CALIFORNIA, MONDAY, JUNE 1, 2020, 10:00 AM

2                              -oOo-

3        (Call to order of the Court.)

4            THE CLERK:  This is the bankruptcy court for the

5     Northern District of California.  Court is now in session, the

6     Honorable Dennis Montali presiding.

7            THE COURT:  Good morning.  Can you hear me, Ms.

8     Parada?

9            THE CLERK:  Good morning, Your Honor.  I can hear you,

10    but I cannot see you.

11           I see you now.

12           THE COURT:  You can see me with a new look now.

13           THE CLERK:  Yes.  One moment while I get the

14    participants.

15           Mr. Karotkin is joining.

16           THE COURT:  Good morning, Mr. Karotkin.  Can you hear

17    me?

18           MR. KAROTKIN:  Yes, sir.  Did you move?

19           THE COURT:  Well, I won't tell you.  I can't answer to

20    that question.

21           Mr. Tsekerides, can you hear me today?

22           MR. TSEKERIDES:  I can.  Good morning, Your Honor.

23           THE COURT:  Good morning.  You're in a different

24    location.

25           Mr. Julian, can you hear me?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      MR. JULIAN:  Good morning, Your Honor.

2      THE COURT:  Okay.

3      MR. JULIAN:  I should put a courtroom background

4  behind me.

5      THE COURT:  You can do that.

6      Oh, Ms. Wallace, we have you on the screen today.  Ms.

7  Wallace, good morning, you need to unmute yourself, please.

8      Ms. Wallace, can you hear me?  You need to unmute your

9  microphone.  There you go.  Can you hear me?

10      MS. WALLACE:  Can you hear me?

11      THE COURT:  Yes.

12      MS. WALLACE:  Can -- can --

13      THE COURT:  All right.  Thank you.

14      MS. WALLACE:  Good morning.  Hello, everyone.

15      THE COURT:  All right.  Ms. Parada, would you call the

16  people?  Well, you've called the court, I guess.

17      Mr. [Zye'-man], good morning.

18      MR. ZIMAN:  Good morning, Your Honor.  Actually, Your

19  Honor, it's Mr. [Zee'-man].

20      THE COURT:  Mr. Ziman, would you raise your right hand

21  and Ms. Parada will swear you in.

22      (Witness sworn.)

23      THE CLERK:  Thank you.  Please state your first and

24  last name for the record.

25      THE WITNESS:  Kenneth Ziman, Z-I-M-A-N.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1          THE CLERK:  Thank you.

2          THE COURT:  All right.  Ms. Wallace, you had made a

3  request over the weekend, but for today's purposes, I have you

4  down for ten minutes to question Mr. Ziman.  Do you still wish

5  to do that?

6          MS. WALLACE:  Yes, I do, sir.

7          THE COURT:  All right.  I don't intend to act on your

8  request for a fifteen-day continuance.  That's just not

9  practical.  I understand you are inconvenienced by the volume

10  of materials and so on with these matters.  If I put this case

11  on hold for fifteen days, it would probably be a guarantee that

12  AB 1054 will not be complied with.

13          So your request is denied, but your request to examine

14  Mr. Ziman is granted.  And I'm going to let you go first, and

15  you have ten minutes, so please proceed.

16          MS. WALLACE:  Thank you, sir.  Good morning.  I'm

17  trying to find -- there you are.

18  CROSS-EXAMINATION

19  BY MS. WALLACE:

20  Q.   Hi.  How are you?

21  A.   Very well.  Thank you.

22  Q.   My name is Mary Wallace, and I'm a Camp Fire survivor.  I

23  lost my home, all my belongings, all my community.  And I'm

24  here today as a pro per litigant representing my interest in my

25  claim.  So I have a couple of questions for you.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  Mr. Ziman, in paragraph 9 of your declarations, you state that

2  debtors expect to have commitments for nearly all of the

3  approximately fifty-four billion of debt and equity financing

4  for emergence financing.  To your knowledge, has anything

5  changed that affects that expectation?

6  A.    Well, no, I think it's more than just an expectation at

7  this point, though.  When I prepared this declaration, the

8  company had not yet received six billion dollars of term loan

9  commitments, what's referred to as the temporary utility debt.

10 Since the filing of this declaration they have in fact received

11 those commitments.  So when I said that the commitments were

12 expected, I think they're actually being realized now.  So the

13 company does have those commitments in place.

14 Q.    And what are those commitments, from who?

15 A.    Specifically the temporary utility debt was committed to

16 by a number of banks --

17 Q.    Okay.

18 A.    -- for six billion dollars.

19 Q.    Thank you.  Can you explain, in laymen terms, what a

20 commitment means?

21 A.    A commitment is a promise.  It's a promise, in this case,

22 by a bank to provide capital on certain terms and conditions

23 specified in the commitment letter and related agreements.

24 Q.    So it would mean that the -- is the financing guaranteed,

25 or are there any outstanding contingencies?

Ziman - Cross

1  A.    No, there are conditions to be satisfied in each of the

2  different commitment agreements.  And so there's the bank

3  commitment agreement, there's certain -- there's revolving

4  credit commitments that provide working capital to the company.

5  There are conditions of notes.  The principal condition in

6  the -- the bank debt agreements is that the plan be confirmed,

7  that the plan go effective, and that there be nine billion

8  dollars of equity invested into the company.

9  Q.    So I guess what you said, there are a lot of contingencies

10  and they haven't been worked out, that might affect the

11  outcome.

12        MR. TSEKERIDES:  Your Honor, I think she's

13  misquoting --

14  A.    Well, that's not exactly what I said.  I think what I said

15  was that each of the agreements have their own conditions to

16  funding.  Those conditions are specified in the agreements.  I

17  believe the agreements are now a matter of public record, so

18  anyone can go and read what those conditions are.  I'm not -- I

19  cannot recite for you, off of memory, all of the conditions to

20  each of the agreements.

21  Q.    But they're in public records somewhere?

22  A.    Yes, they are.

23  Q.    Like, in this case?

24  A.    Yes, they've all been, I believe --

25  Q.    Okay.

Ziman - Cross

1  A.    The commitments themselves or summaries of those

2  commitments have been filed in the bankruptcy pleading.

3  Q.    Thank you.  In paragraph 8, lines 16 to 18, you wrote:

4  "The final equity backstop commitment letters, which were

5  approved by the Court on March 16, 2020, the debtors will raise

6  the nine billion of equity financing either by way of a public

7  market offering, a rights offering, or relying on backstop

8  commitments."  Could you explain what backstop commitments are?

9          MR. TSEKERIDES:  Your Honor, I would note for the

10  record --

11  A.    I'm sorry, you're in paragraph --

12          MR. TSEKERIDES:  Hold on, Mr. Ziman.

13          THE COURT:  Mr. Ziman, wait one second.

14          Go ahead, Mr. Tsekerides, say again?

15          MR. TSEKERIDES:  I'll just note for the record, I

16  don't know what declaration Ms. Wallace is referring to.  The

17  witness has, I know, the one that was filed in connection with

18  the confirmation hearing, but it sounds like she may be reading

19  from a different document.

20          THE COURT:  Well, can you clarify, Ms. Wallace?  Are

21  you referring to document 7512 that Mr. Ziman filed on --

22          MS. WALLACE:  Yes.

23          THE COURT:  -- on May 22nd?

24          MS. WALLACE:  Yes, I am.

25          THE COURT:  Okay.  Mr. Ziman, you've got that document

Ziman - Cross

1    in front of you?

2           THE WITNESS:  I do have that document, but that's not

3    paragraph 8.  I just don't know what paragraph Ms. Wallace was

4    referring to.

5           THE COURT:  Okay.  Ms. Wallace, I'm looking at

6    paragraph 8, and that's got the general total estimate of

7    around fifty-nine billion, but I don't see the specific one.

8    Is there another paragraph that you had in mind?

9           MS. WALLACE:  Well, I apologize --

10          UNIDENTIFIED SPEAKER:  Ms. Wallace, are you referring

11   to paragraph 11?

12          THE COURT:  Ms. Wallace, don't apologize; just go

13   ahead and take a moment and make sure you know what you're

14   referring to so you can ask him.  Paragraph 11 does reference

15   the nine-billion-dollar equity financing and references the

16   backstop, so is that the one you mean?

17          MS. WALLACE:  I think so.

18          THE COURT:  Okay.  So --

19   A.   I apologize; can you ask the question again?

20   BY MS. WALLACE:

21   Q.   Could you explain what the backstop commitments are?

22   A.   Sure.  The backstop commitments came before the Court for

23   approval, I believe, back in March.  They are a collection of

24   letters that are virtually identical, if not identical, from

25   fifty-eight parties that, in the aggregate, provide for

Ziman - Cross

1  commitments to fund equity on certain terms and conditions, and

2  that also permit the company, under certain terms and

3  conditions, to raise that equity from other parties.

4  Q.   And have those terms and conditions been met?

5  A.   Well, there are certain conditions that can't be met until

6  the case confirmation order is entered and more time passes,

7  but right now those remain in full force and effect.

8  Q.   In paragraph 16 you state that you believe debtors will

9  have the necessary sources of financing to move from Chapter

10  11.  What do you mean by "a timely manner"?

11  A.   Well, my reference of "timely manner" there is prior to

12  June 30th, which is the requirement under AB 1054.

13  Q.   So everything in relationship to this deal is going to be

14  in place by June 30th?

15  A.   Well, it could be in place before June 30th; it depends on

16  when the Court enters the confirmation order and the company

17  goes to market.  But it's -- it's all set up to happen in

18  advance of the required June 30th deadline, yes.

19  Q.   Does PG&E have the cash right now to fund the fire

20  victim's trust?

21  A.   No, the fire -- the proceeds to fund the Fire Victim

22  Trust, that cash proceeds, is part of the financing to be

23  raised, you know, and the exit financing that we're talking

24  about.

25  Q.   So it's not really there yet, but will be?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1 A.    We expect it to be.  Again, it goes back to the

2 commitments and the conditions being satisfied, but we have

3 every expectation that they will.

4 Q.    Does your conclusion change if the effective date of the

5 plan is later, such as December 2020?

6 A.    If the effective date is later?  Well, the commitments

7 have an expiry date to them.  There are certain -- again, going

8 back to the terms of the commitments and there being certain

9 terms and conditions.  For instance, the debt commitments have

10 a condition that the debt has to -- I'm sorry, that the

11 effective date has to occur within sixty days of the entry of

12 the confirmation order.  So if the confirmation order, you

13 know, were entered tomorrow, that would -- that would allow the

14 debt commitments to expire, or the debt commitments could

15 expire sixty days later unless they were further extended.

16 Q.    So what happens to the deal if it expires and they can't

17 do it?

18 A.    Well, that's a --

19         MR. TSEKERIDES:  I would object to the form.

20 A.    I don't think there's an expectation --

21         MR. TSEKERIDES:  I would object to the form, Your

22 Honor.

23         THE COURT:  Well, that's okay; he can answer the

24 question.

25         Go ahead, Mr. Ziman.

Ziman - Cross

1   A.   Yeah, that's speculation.  There's no reason to think

2   today that we're going to need to worry about what happens

3   sixty days after confirmation when there's an expectation that

4   we could emerge before that.

5   Q.   Well, okay.  Did you assume that PG&E would not cause a

6   major fire before the financing date?  And by a major fire, I

7   mean one that damages more than 500 dwellings or commercial

8   structures?

9   A.   There is a condition in the -- certainly in the equity

10  commitments.  I believe it's paragraph -- it's mirrored in the

11  debt commitments that the -- a fire caused by PG&E's equipment

12  would give rise to a potential termination right in favor of

13  the debt commitment.

14  Q.   So going into the next season of the fire season, this

15  could be, you know, something that could cause a great concern

16  if that, in fact, did happen.

17          MR. TSEKERIDES:  Object to the form.  You can answer.

18  A.   Again, you know --

19  Q.   Okay.

20  A.   -- I think the expectation is the company will emerge

21  within the next several weeks, provided the confirmation order

22  is entered.  So I don't think the company shares the concern

23  that you're articulating because it really supposes that this

24  drags on for some much longer period of time.

25  Q.   Well, that's comforting.  Thank you.  Finally, I have two

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  questions about registration rights.  And after these two

2  questions, I'll ask my final question.  In paragraph 17 you

3  mention a registration rights agreement.  Under the agreement

4  provided to the TCC, how long will it be before the trust could

5  start selling stock?

6       MR. JULIAN:  Objection.

7  A.   I think --

8       MR. JULIAN:  Okay.  I have an objection, Your Honor.

9       THE COURT:  Go ahead, what's the objection?

10       MR. JULIAN:  The agreement is not in evidence, and the

11  agreement was exchanged in mediation, and the mediation order

12  of Judge Newsome that we filed last night precludes the parties

13  from discussing it.  I can't discuss it, and I don't think the

14  witness should be able to discuss it either.

15       THE COURT:  Okay, Ms. Wallace, I have to respect the

16  mediation privilege.  These are -- they are questions, but at

17  the moment there's no answer, and I'd like to know as much as

18  you would like to know, but I can't make the witnesses answer

19  at this point.  I think it's something that it's very much a

20  moving target and I can't expect Mr. Ziman to answer the

21  question this morning.

22       MS. WALLACE:  Thank you.  Is it possible to ask why

23  they are not divulged?

24       THE COURT:  Say again the question?

25       MS. WALLACE:  Well, it kind of seems like they're kind

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    of a secret or something, and if people are making deals about

2    this, maybe somebody should know besides -- I guess it doesn't

3    make sense to me, but I'll move --

4        THE COURT:  Ms. Wallace, let me clarify.  I share with

5    you your concern, but what we just heard from counsel for the

6    committee, and I'm aware of, there is ongoing mediation with

7    Judge Newsome and representatives of the company and

8    representatives of the fire victims, and I assume,

9    representatives of others, and under the mediation tradition

10   and principles, those are confidential.  But when there's a

11   resolution, in some fashion, I would expect it to become

12   public.

13       So it isn't a secret deal; it is negotiations.  If I

14   may say, there is a room where it's happening, but it hasn't

15   happened yet.  And you and I aren't in that room yet.  But the

16   goal will be that there will be an agreement.  And I

17   understand, and I'm taking a moment to make sure you understand

18   it, because you express the frustration of hundreds if not

19   thousands of fire victims of wanting to know what the deal is.

20   And at the moment, I take the representation of counsel that

21   there isn't a deal but there's going to be one.  And that's the

22   best I can do at this point.

23       MS. WALLACE:  Wow.  Thank you.  That doesn't quite

24   make sense to me, but I accept that.

25   BY MS. WALLACE:

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    Q.   The next question, and then my final:  How long would it

2    take the trust to complete the sale of all the stocks?

3              THE WITNESS:  I'm sorry; my camera froze up for a

4    moment, and so I apologize; I might have missed a little bit of

5    that.

6              THE COURT:  Well, I think she was asking, and I don't

7    know that you know, but if you do know, how long would it take

8    for the trust to sell the stock, to liquidate the equity stock

9    that it's going to --

10   A.   Well, that's not for me to decide.  That's for the

11   trustees of the trust to decide, subject to the terms of any

12   agreement that might restrict the time in which they could do

13   that.

14             THE COURT:  Okay, Ms. Wallace, that's the answer.  Mr.

15   Ziman wasn't hired and his declaration doesn't go to that

16   question.

17             MS. WALLACE:  Okay.

18             THE COURT:  Let me tell you ahead of time that later

19   in this week we're going to hear closing arguments from Mr.

20   Karotkin and others for the debtor, and I expect that they will

21   address -- maybe they won't have the answers, but they will

22   address in more detail these kinds of questions that you're

23   asking.

24             MS. WALLACE:  Thank you, which brings a question

25   directly possibly to the Court.  The closing arguments and

Ziman - Cross

1    the -- the trial starts Wednesday, and I believe that we're

2    attempting to get it finished by Friday, but I'm not real sure

3    on that.  And I just wanted to make sure that, as a pro per

4    litigant and a party to this case, that I will be able to

5    participate, as a participant, to either make opening or

6    closing arguments or anything else in between.  Is that

7    correct?

8         THE COURT:  Well, it's not exactly correct, but it's

9    not exactly wrong.  The trial is underway right now; this is

10   the trial.  And when Mr. Ziman is finished, that will be what

11   we call the close of testimony, and there'll be a one-day

12   break.  And on Wednesday, the debtors' lawyers will start their

13   closing argument, which will mean Mr. Karotkin and others will

14   summarize what the evidence, both the testimony and the

15   voluminous record, lead to their request that I confirm the

16   plan.

17        There will then be response arguments, either

18   supporting or opposing the plan, so that counsel, or pro se

19   parties who are entitled to argue, can argue their positions.

20   And then the final phase of that portion will be what's closing

21   argument.  Again, the debtors get to open and close, and the

22   people on the other side are in the middle.  So if you're going

23   to oppose the plan, you're in the middle.

24        Now, later today it is my expectation to issue another

25   order, and you're entitled to, obviously, see that order as

Ziman - Cross

1    soon as it's out, that will be more specific in terms of the

2    timing and responsive to the requests of parties who want to be

3    heard.  And my hope is that, by close of business of Friday of

4    this week, the matter will be submitted to me for decision.  So

5    in other words, the evidence is in, the written declarations

6    are in, the arguments for and against are in, and the ball's in

7    my court.

8            Thank you for participating and --

9            MS. WALLACE:  Oh, and my last question.

10           THE COURT:  Well, okay, I thought you had that -- I

11   thought that was your last question.  Go ahead with your last

12   question.

13           MS. WALLACE:  I had two questions, and I said I had

14   one.  And this is to Mr. Ziman, just you know, something that's

15   important to me.

16   BY MS. WALLACE:

17   Q.   If you lost your entire community and this deal was

18   offered to you, would you think it was fair?

19           THE COURT:  I'm going to instruct him --

20           MR. TSEKERIDES:  He shouldn't answer.

21           THE COURT:  -- that he shouldn't answer that question.

22   It's a good question, as a person and as a fire survivor, but

23   it's not important for this trial.  Mr. Ziman was engaged to do

24   what his declaration describes what his duties were, so --

25           MS. WALLACE:  Thank you.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1          THE COURT:  Okay.  Do you have a final question?

2          MS. WALLACE:  That was it.

3          THE COURT:  Okay.  Thank you, Ms. Wallace.

4          MS. WALLACE:  Thank you.

5          THE COURT:  We're going to move you out of the

6   participant's panel now, just for convenience.  Thank you,

7   again.

8          Mr. Julian, I believe you have asked for twenty

9   minutes; do you still wish to examine the declarant?

10         MR. JULIAN:  Yes, Your Honor.

11         THE COURT:  Okay.  Go for it.

12  CROSS-EXAMINATION

13  BY MR. JULIAN:

14  Q.   Good morning, Mr. Ziman.

15  A.   Good morning.

16  Q.   Would you please to turn to page 17 of your declaration?

17  That's the paragraph where you gave some testimony about the

18  registration rights agreement.  I don't want to go into the

19  substance; I merely want to talk about the foundation for your

20  testimony.

21  A.   Sure.

22  Q.   If you would let me know when you get to paragraph 17, I'd

23  appreciate it.

24  A.   I'm there.

25  Q.   All right.  Mr. Ziman, you testified that the debtors and

Ziman - Cross

1   their advisors have engaged in negotiations with the tort

2   claimant's committee and its advisors with respect to a

3   registration rights agreement relating to the shares to be

4   transferred to the Fire Victim Trust pursuant to the plan,

5   correct?

6   A.   Yes.

7   Q.   Now, those negotiations have taken place recently in

8   connection with a mediation, correct?

9   A.   That's my understanding; I'm not a participant in the

10  mediation.

11  Q.   And your understanding is that the mediation was taking

12  place in connection with oversight by Judge Newsome, correct?

13  A.   Yes.

14  Q.   All right.  And did you participate in any of the

15  negotiations at all on the phone?

16  A.   With the -- in the mediation process?  No.  But I've had

17  conversations about the registration rights agreement with

18  representatives of the TCC and the -- the trusts and with my

19  colleagues on behalf of the company.

20  Q.   And you understand that Judge Newsome's mediation order

21  precludes us from discussing mediation negotiations outside the

22  mediation, correct?

23  A.   That's my general understanding.  I'll take your

24  representation that that's what it says.

25  Q.   All right.  Now, let's go back to paragraph 17 of your

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    declaration.  In the second sentence, and final sentence, you

2    testified: "The proposed agreement provided to the tort

3    claimants committee is consistent with the recommendation of

4    the debtors' underwriter", correct?

5    A.    Correct.

6    Q.    Now, the proposed registration rights agreement --

7          MR. JULIAN:  I'll strike the question.

8    Q.    You would expect that any proposed registration rights

9    agreement dealing with Fire Victim Trust would be between the

10   debtors on one side and the Fire Victim Trust on the other

11   side, correct?

12   A.    Yes.

13   Q.    And you have not attached the proposed agreement to your

14   declaration; is that true?

15   A.    That's correct.

16   Q.    And do you also understand that Judge Newsome's mediation

17   order precludes us, generally, from discussing the terms of the

18   proposed registration rights agreement that was circulated in

19   the mediation outside the mediation; is that right?

20   A.    Yes.

21   Q.    Okay.  And to your knowledge, the Fire Victim Trust has

22   not approved the proposed registration rights agreement; is

23   that right?

24   A.    That's correct.

25   Q.    And similarly, the TCC, my client, also has not approved

Ziman - Cross

1    the proposed registration rights agreement; is that right?

2    A.    There is no agreement, correct.

3    Q.    And in the final sentence that I just read from paragraph

4    17, you referred to the debtors' underwriter's recommendations,

5    correct?

6    A.    I do.

7    Q.    Who was the debtors' underwriter to which you referred?

8    A.    Goldman Sachs and JPMorgan are the lead underwriters.  The

9    full underwriting syndicate includes several other banks, but

10   those two are the active ones.

11   Q.    Who was the single underwriter who provided the

12   recommendation to which you referred in paragraph 17?

13   A.    You know, I don't think the singular is actually right

14   there, in hindsight; I think it was a collective recommendation

15   by both Goldman Sachs and JPMorgan.

16   Q.    Did you provide --

17         THE COURT:  Mr. Ziman, if you would just repeat that;

18   I didn't follow you.

19         THE WITNESS:  I'm sorry, Your Honor.  I said it was a

20   collective recommendation by Goldman Sachs and JPMorgan.

21         THE COURT:  Thank you.

22   Q.    Thank you.  And did you read the collective recommendation

23   by JPMorgan and Goldman Sachs in that regard?

24   A.    Isn't that what I said?  Yeah, I think so.

25   Q.    Yeah, you read it yourself?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1   A.   Oh, no, I don't know -- did I read it?  Did I read the

2   agreement when it went across, or did I read it -- I don't know

3   that there's a --

4   Q.   Yes, let me rephrase it, Mr. Ziman.  Did you read any

5   recommendations by Goldman Sachs and JPMorgan with respect to

6   what the registration rights agreement should contain?

7   A.   I'm not aware that there's a writing to that effect that I

8   would read, other than what's in the agreement.

9   Q.   You're not aware of any recommenda -- well, your testimony

10  says that the registration rights agreement circulated in

11  mediation was consistent with recommendations made by the

12  underwriter.

13  A.   Right.

14  Q.   My question is:  Is there a separate set of

15  recommendations by the underwriter with respect to the

16  registration rights agreement?

17  A.   I'm not aware of that, no.

18  Q.   And similarly, you're not aware of any recommendations by

19  Goldman Sachs or JPMorgan with respect to registration rights

20  being delivered to the TCC or the Fire Victim Trust, correct?

21  A.   Well --

22        MR. TSEKERIDES:  Object to the form, Your Honor.

23  A.   -- not directly, no.

24        THE WITNESS:  I'm sorry, Your Honor.

25        THE COURT:  What was the objection, Mr. Tsekerides?

Ziman - Cross

1    MR. TSEKERIDES:  It was to the form of the question,

2  Your Honor.

3    THE COURT:  You can -- well, he answered it.

4  A.   Right, so I think -- I'm not aware of -- I think I lost my

5  train of thought.  I'm sorry, Mr. Julian, could you just ask

6  that one more time?

7  Q.   Sure.  You're not aware of any written recommendations,

8  separate from whatever's in the proposed agreement, that have

9  been given to the Fire Victim Trust or the TCC?

10 A.   No, but I -- no, but I -- with the qualification that that

11 agreement was sent across some time ago.  And I'm aware that --

12 again, without going into the substance, there's been a back-

13 and-forth, and I believe that back-and-forth has advanced since

14 that original form.  So the extent that the back-and-forth also

15 reflects the input from the underwriters, that's different,

16 right, that it's, you know --

17 Q.   The back-and-forth occurred in connection with these

18 negotiations that we discussed, correct?

19 A.   Correct.

20 Q.   Thank you.  Let's switch gears.  Have the debtors reached

21 agreement with the majority of the backstop parties on the

22 content of a registration rights agreement with the backstop

23 parties?

24 A.   To my knowledge, there is no registration rights agreement

25 with the backstop parties.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    Q.   Have the debtors sent any outline of a proposed

2    registration rights agreement for the backstop parties to the

3    TCC?

4    A.   No, but again, that's because there is no registration

5    rights agreement with the backstop parties.

6    Q.   Okay.  But the debtors propose entering into one with the

7    backstop parties at some point, correct?

8    A.   Not that I'm aware of, no.  The obligation, under the

9    backstop commitment letter, if the backstop is funded, that the

10   backstop parties would be the beneficiaries of shelf

11   registration where the company would put up a singular

12   registration statement that would permit the resale of all of

13   the shares sold in the backstop.  That does not provide

14   registration rights to the backstop parties.  That's just to --

15   Q.   That registration --

16   A.   -- register the --

17   Q.   That registration statement has not been agreed upon

18   between the debtors and the backstop parties yet?

19   A.   No, I don't think this is controversial, though; I think

20   it's a pretty standard form.

21   Q.   But none of those forms have been delivered to the TCC for

22   approval, correct?

23   A.   Not that I'm aware.

24        MR. TSEKERIDES:  Object to the form, Your Honor.

25        THE COURT:  Hold on.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1        MR. TSEKERIDES:  Object to the form.

2   Q.   You're not aware that the form exists?

3        THE COURT:  You can answer.

4   A.   I don't know if anything's been delivered.

5        MR. JULIAN:  Thank you, Your Honor.  I'll pass the

6   witness.

7        THE COURT:  All right.  Thank you, Mr. Julian.

8        Ms. Parada, will you bring Mr. Abrams in?

9        THE COURT:  Good morning, Mr. Abrams.

10       MR. ABRAMS:  Good morning.

11       THE COURT:  Unmute yourself.  All right.  You

12  requested twenty minutes to examine Mr. Ziman, so you may

13  proceed.

14       MR. ABRAMS:  Good morning, Your Honor.  Thanks very

15  much.  I also had some procedural questions I was hoping to

16  address at the last hearing, so I tried to raise my Zoom hand.

17  So for a later time, if there's time and the Court permits, I

18  have some questions later on.

19       THE COURT:  Well, let's stick with the examination of

20  the witness for now.

21       MR. ABRAMS:  Yes, thank you, Your Honor.

22  CROSS-EXAMINATION

23  BY MR. ABRAMS:

24  Q.   Good morning, Mr. Ziman.  How are you?

25  A.   I'm fine, Mr. Abrams.  Thank you.  How are you?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    Q.   Good.  Thank you.  I'm going to ask some questions

2    regarding your declaration, specifically around the feasibility

3    of the plan getting funded and then also to what degree it

4    talks to the viability of PG&E after bankruptcy.  On page 3 of

5    your declaration, paragraph 4, you describe how Lazard is a

6    longtime advisor to PG&E Corporation.  Given this long-term

7    relationship that you have with PG&E, would you consider

8    yourself impartial or an independent expert?

9    A.   No, I think I work for the company.  I'm the company's

10   banker.

11   Q.   Okay.  Thank you.  Given this, and that, as you described,

12   you're not independent, wouldn't you expect that victims who

13   are trying to evaluate this plan might turn to a different

14   expert that probably has an impartial view of the plan for an

15   evaluation of the financials?

16        MR. TSEKERIDES:  Object to the form and on relevancy

17   grounds, Your Honor.

18        THE COURT:  Yeah, I'm going to sustain that objection.

19   Mr. Abrams, the victims and individuals and anyone else are and

20   were free to consult their own experts.  Mr. Ziman is the

21   debtors' expert.  I expect him to be an advocate for the

22   debtor.

23        MR. ABRAMS:  Understood, Your Honor.  I was just

24   trying to ask, per his testimony, as stating that he's an

25   expert, where that is coming from, so --

Ziman - Cross

1    THE COURT:  And I understand, but I'm telling you that

2    he is not somebody else's expert; he's the debtors' expert.

3    MR. ABRAMS:  Right.

4    THE COURT:  So go ahead.

5    MR. ABRAMS:  Thank you.

6    Q.   So Ms. Wallace, in her cross-examination, asked you about

7    the implications of fires, in terms of the commitment of

8    backstop agreements and the ability to fund the trust, and you

9    had indicated that you didn't think that there was an

10   expectation that that would be a problem.  So I just want to

11   understand that a little further.  When you say there isn't an

12   expectation, is that probable, likely?  How did you evaluate

13   that in terms of an expectation?

14   MR. TSEKERIDES:  Your Honor, I object to the form.  I

15   mean, that's like seven questions in there, and preamble.

16   THE COURT:  All right.  Simplify the question, please.

17   Q.   So --

18   THE COURT:  Yeah, Mr. Abrams, you got it, right?

19   MR. ABRAMS:  Yeah, I got it, right.  Thank you.  So

20   let me try to simplify the question.

21   Q.   As an example -- so for the Kincade fire, it was deemed

22   that that is not probable, therefore it was not reportable.

23   What I'm trying to understand is the degree to which your

24   expectation that there won't be fires and therefore there won't

25   be an issue in terms of funding the trust, is that -- how did

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    you evaluate that in terms of likelihood?

2            MR. TSEKERIDES:  Same objection, Your Honor, as to

3    form and also assumes facts and mischaracterizes the testimony

4    as well.

5            THE COURT:  Sustained.

6    Q.   Please elaborate on what you mean by "expectation"

7    regarding the funding of the trust.

8    A.   Okay.  Well, I'm happy to.  I think that the question that

9    Ms. Wallace asked was more around the timing issue, whether the

10   occurrence of a fire could have an impact.  And I think my

11   answer was that that's not -- it's not in the projection that

12   there's going to be a fire at any point in the company's

13   future.

14       The other witnesses have testified, and it's much more

15   their expertise than mine, but what I've consistently heard is

16   the company spent a lot of money both to mitigate the

17   occurrence of a fire and the impact of a fire if one were to

18   occur.  So I think the debt providers and the capital providers

19   have nonetheless conditioned their commitments on there not

20   being a fire prior to the time they fund.  So if there were a

21   fire, there would be an opportunity by those capital providers

22   to reconsider their willingness to fund in which case that

23   could impact the plan going effective and being funded.

24       But in my mind, when I said expectation it was, more or

25   less, that's not in the projections.  So it seems to me that if

(973)406-2250 | operations@escribers.net | www.escribers.net

1     there's a fire before the effective date, there could be a

2     problem, you know, but that would be what it will be.

3     Hopefully it will not occur, and the effective date will occur,

4     capital will come in it won't be -- you know, and we won't have

5     an issue that it's not coming in because of the occurrence of a

6     fire in advance.

7     Q.   Given that you've stated that the fires could get in the

8     way of this, and that there -- don't you think that it would be

9     prudent of the Court to understand the degree to which a fire

10    could risk this deal from coming to fruition in terms of

11    understanding the degree to which PG&E has mitigated their fire

12    risks?  How else could the Court assess the risk of a fire

13    imploding this deal without delving into that further?

14          MR. TSEKERIDES:  Your Honor, objection to form.  If he

15    has a question of the witness to elicit a factual statement,

16    can we have that instead of just what you think is important?

17          THE COURT:  Sustained.  You need to rephrase the

18    question for what this question can tell us about, Mr. Abrams,

19    not what I might want to know.

20          MR. ABRAMS:  Right.

21    Q.   So according to this --

22          THE COURT:  Mr. Abrams, let me interrupt by telling

23    you that if there is a major fire before the effective date, I

24    presume then I will learn and you will learn whether the

25    funding sources have declared a condition that relieves them of

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    their obligation or not.  And sadly enough -- well, hopefully

2    that doesn't happen.  If there's a fire a day after the

3    effective date, it's a -- it's a different situation, but the

4    plan will be effective, under my scenario.  If there's a fire

5    after that, what happens happens.  It's not something that I or

6    the bankruptcy laws are going to anticipate or have to deal

7    with.

8            MR. ABRAMS:  Thank you.  Let me rephrase the question.

9            THE COURT:  Okay.

10   Q.   The backstop parties felt it was important for them to put

11   a clause in the agreement that, if there were fires of a

12   substantial size, that they would have an out.  Given that,

13   wouldn't it be prudent to understand, not whether they happen,

14   they happen, or they don't, they don't, but the degree to which

15   there is a risk?  So is that a ten-percent risk that there's a

16   fire, or is that a ninety-percent risk there's a fire, because

17   the backstop parties evaluated that risk and put that in the

18   clause.  Wouldn't it be prudent, similar to how the backstop

19   parties did this, that other parties might want to assess that

20   risk in determining the feasibility of the plan?

21           MR. TSEKERIDES:  Your Honor, I'm going to object to

22   relevancy, and it's getting argumentative.  We're not having

23   question and answer now; we're having argument.

24           THE COURT:  Sustained.  Again, Mr. Abrams, by

25   argumentative, it means you can make an argument about it.

Ziman - Cross

1  You're not really arguing in a literal sense, but it's an

2  argumentative question.  That isn't the question; whether

3  somebody else should have done something or would have done

4  something isn't the point.  The documents that Mr. Ziman has

5  described, and they're in the record, tell us, under certain

6  circumstances, when various parties are free and free of their

7  obligations.  And it's not a question of predicting whether

8  there'll be a fire; it's question of what are their rights

9  versus their obligations, if there is a fire, a minor fire, a

10  major fire, no fire.  So --

11           MR. ABRAMS:  Very well.

12           THE COURT:  -- let's go back to the questions for the

13  witness.

14           MR. ABRAMS:  Sure.

15  Q.   On page 4 of your declaration, line 18, which is in

16  paragraph 9(a), you reference the arrangements to the

17  noteholder RSA that was approved by the bankruptcy court on

18  February 4th; do you see that there?

19  A.   Yes.

20  Q.   Did this arrangement with the noteholders include security

21  for their -- in terms of their investment before the noteholder

22  RSA could be executed?

23  A.   I'm not sure I understand the question.

24           THE COURT:  Okay.

25  Q.   Did the noteholders get security with that agreement,

Ziman - Cross

1    securitize their investment, asset liens?

2    A.    The treatment for the debt represented under the

3    noteholder RSA is reinstatement for a portion and then

4    refinancing for a portion.  The refinan -- both will end up

5    being secured, but yes, by first mortgage bonds, on the same

6    basis that the new -- the new bonds being issued will be

7    secured.

8    Q.    Thank you.  So I want to understand how this squares with

9    something that came up in the February 4th hearing around the

10   noteholder RSA.  And this is in the transcript, on page 14,

11   lines 6 through 9, where Judge Montali stated:  "This group is

12   senior unsecured creditors".  Unsecured means no liens.

13           MR. TSEKERIDES:  I'm going to object to the form.

14   Q.    Why --

15           THE COURT:  I don't even know what the question is.

16   Mr. Abrams, you need to ask Mr. Ziman if he even has that

17   transcript in front of him.  You can't ask him about it if he

18   doesn't have it in front of him.  So you're just reading the

19   transcript, so what? &&&

20           MR. ABRAMS:  I'm getting to my question.  So let me --

21   let me just finish here.

22   Q.    So why would the debtors and the bondholders, at the time

23   of the RSA, lead the Court to think that there were no asset

24   liens, when, in fact, there were?

25           MR. TSEKERIDES:  Object to the form and assumes facts

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    and assumes accusations against the noteholders and the

2    debtors.  But --

3            THE COURT:  Do you know that -- the answer, Mr. Ziman?

4    A.   Well, I don't think that there was a representation in

5    what you're reading as to the treatment of the claims under the

6    proposed -- the plan to be proposed, consistent with the RSA.

7    I think that's an accurate representation of the status of

8    those claims on a pre-petition basis, that they were all

9    unsecured.

10           I think how you're treating the claims is a different

11   issue.  I don't know that that's captured by the quotation that

12   you read.

13   Q.   Okay.  On page 5 of your declaration, lines 5 through 6,

14   you indicate that the company has no reason to believe it will

15   not be able to successfully raise this debt in the public debt

16   markets.  Do you see that there?

17   A.   Could you give me a paragraph number, please?

18   Q.   Page 5, line 5 through 6.  I can try to pull that up.

19           MR. TSEKERIDES:  Mr. Abrams, when you say "page 5",

20   are you referring to the 5 of 7 or the 5 of the actual

21   document?

22           MR. ABRAMS:  Thank you.  I'm referring to the stamped

23   footer.

24           THE COURT:  Well, why don't you give him a paragraph

25   number?

Ziman - Cross

1    Q.    Okay, 5 through 6.  That would be paragraph 9(c).

2    A.    Yes, I see the -- the language.

3    Q.    Thank you.  In the February 28th hearing, at the CPUC --

4    and this is page 602, lines 6 through 10 -- Mr. Wells stated:

5    "No, I don't think that the individuals that executed the TC --

6    executed the TCC did so at a time with an understanding of the

7    terms of the noteholder RSA.  It was done well before."

8        Given this, doesn't this put victims at a substantial

9    disadvantage regarding how they will be able to negotiate

10   terms?

11   A.    Is there a question?

12   Q.    Yes.  Does the --

13           MR. TSEKERIDES:  I object to the form.

14   A.    -- fact -- does the fact that the -- that the TCC RSA came

15   first and was executed and then the noteholder RSA came second,

16   does that not hinder the TCC in their negotiations?

17           MR. TSEKERIDES:  Object to the form.

18           THE COURT:  I don't understand that.  I'm going to

19   sustain the objection.  I mean, if -- Mr. Abrams, the facts are

20   that there was a chronology that you described, you can ask him

21   what consequences, if he's aware, but I don't want to have a

22   debate about which one came first.  We know which one came

23   first.

24           MR. ABRAMS:  Okay.

25   Q.    On page 5, lines 1 through 4 of your declaration, it

Ziman - Cross

1    states 10.7 billion of bond financing proceeds -- proceeds,

2    sorry, which are to be raised in the public debt markets

3    immediately following entry of the proposed confirmation order,

4    the company has no reason to believe it will not be able to

5    successfully raise the debt in the public debt markets.

6         My question is, what if the bond credit rating is a junk

7    bond rating like the expectation for the issuer credit rating;

8    how will that affect your ability to secure the 10.7 billion in

9    financing?

10   A.   Well, first of all, the bonds being issued at the holding

11   company are what's called high-yield debt, it's not investment-

12   grade debt.  Second, we have every reason to believe, based on

13   engagement with the rating agencies, that the debt to be issued

14   at the operating company, the opco debt, will, in fact, obtain

15   an investment-grade debt rating.

16        So I don't -- you know, you assume that that's not going

17   to happen, and my understanding is it will happen.

18   Q.   Thank you.  I'm not assuming one way or the other, my

19   question is "if".  So whether you think that's a ten percent

20   chance or a two percent chance, if it receives a junk bond

21   status, would that affect your ability to secure the funds?

22            MR. TSEKERIDES:  Object to the form, Your Honor.  By

23   definition, that calls for speculation.

24            THE COURT:  You can answer that, Mr. Ziman.

25   A.   It would affect the cost of the funds.  But I would note,

Ziman - Cross

1    candidly, that the TCC -- I'm sorry, not the TCC -- the

2    noteholder RSA is conditioned on the debt being issued by the

3    operating company being investment grade.  And as I said in my

4    prior answer, we have every expectation that that debt will be

5    investment grade.

6        So would the debt be available?  Potentially.  Would it

7    have other consequences if the debt were not to be rated

8    investment grade?  Yes, it would.

9    Q.   Thank you.  I appreciate that clarification.

10       Similarly, would that credit rating affect your ability to

11   secure the 3.5 billion utility revolving credit facility you

12   mention in paragraph 4, line 6 of your declaration?

13   A.   I don't know the conditions of that facility.  My

14   expectation is that -- it's conditioned on my expectation.  My

15   understanding it's conditioned upon all the other debt pieces

16   being in place.  I do not know offhand whether that has a

17   ratings condition tied to it specifically.

18   Q.   By how much does this plan increase the amount of debt

19   PG&E takes on?

20   A.   Over what?

21   Q.   Over before bankruptcy?

22   A.   Before bankruptcy, the company had approximately 21.5

23   billion dollars of debt; on emergence, the company will have --

24   between the utility and the holding company -- approximately 38

25   billion dollars of debt.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  Q.   How much additional interest on this debt will PG&E take

2  on, and over what period of time?

3  A.   I don't know that off the top of my head.

4  Q.   If that -- those payment on interest are over-burdensome,

5  is your expectation that PG&E would ask the CPUC to raise

6  rates, or would that be precluded, based on AB 1054?

7          MR. TSEKERIDES:  Object to the form, Your Honor.

8  Calls for speculation.

9          THE COURT:  Sustained.  That's speculation.  I'm not

10  going to let him -- that's not the point.  I'm sustaining the

11  objection, Mr. Abrams.

12          MR. ABRAMS:  Okay, thank you.

13  Q.   On paragraph 15 of your declaration you talk about the

14  need to obtain appropriate authorization.  What are the

15  appropriate authorizations that you reference?  Can you define

16  what those are?

17  A.   My ex -- this refers to authorization of the Court to

18  enter into agreements that are outside the ordinary course of

19  business, which I would assume the confirmation order would

20  provide.  And of course, it would be necessary corporate

21  governance, you know, authorizations, board approval, et

22  cetera.

23  Q.   Okay.  On page 5, lines 12 through 14, you state "6.7

24  billion of such nominal equity capital will be issued at fire

25  victim equity value to the fire victim trust, pursuant to the

Ziman - Cross

1    plan."  Can you please explain to me what "fire victim equity

2    value" means?

3    A.    It's a defined term.  I don't know the words exactly, but

4    essentially there was an agreed upon multiple of 14.9 times,

5    you know, by earnings per share or earnings, to derive the --

6    how you value the 6.75.  We calculate the number of shares

7    required to be delivered to the trust under the terms of that

8    agreement.

9    Q.    Okay.  So your understanding is that 14.9 multiple --

10   multiplier is the fire victim equity value?

11   A.    I don't know that that's the value itself, but I think

12   that's a very relevant component along with normalized net

13   income or what people have -- normalized estimated net income,

14   or NENI, that people have otherwise testified of.

15   Q.    Okay.  On page 13 of your declaration at the bottom of

16   page 5 leading into page 6, it states that "the debtors are

17   focused on raising the nine billion of equity capital at the

18   best possible price."

19       Will this raising of nine billion have time limits in

20   terms of the stock offering?

21           MR. TSEKERIDES:  Object to the form.

22   A.    I'm not sure I under --

23           THE COURT:  I'm sorry, I didn't hear the objection,

24   Mr. Tsekerides.

25           MR. TSEKERIDES:  The objection was to form.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1          THE COURT:  You can answer that, Mr. Ziman.

2          THE WITNESS:  Well, I don't understand the question,

3   Your Honor.  I'm sorry.

4          THE COURT:  Okay.  Then I'll sustain the objection.

5          Go ahead and restate it, Mr. --

6          MR. ABRAMS:  Okay.  And let me -- let me restate,

7   because I -- let me repeat it, because I was perhaps talking a

8   little too fast.

9   Q.   Will this raising of the nine billion have a time limit in

10  terms of the stock offering?  In other words, will you do that

11  immediately, or is that over time?  What's the time period for

12  raising that nine billion?

13  A.   So I think -- let me see if I can answer you.  Like the

14  debt agreements, the equity backstop commitment letters have a

15  sixty-day clock in which to effect -- by which they would

16  terminate, post-confirmation, if the offering -- if they had

17  not been provided.  So there's a sixty-day window in which an

18  offering, you know, could be done, while the equity backstop

19  commitments are still there as a backstop, to the extent that

20  an equity offering wasn't accomplished.

21          I think the expectation right now is that the company

22  would seek to go to market, as I indicated earlier, you know,

23  shortly following the raising of the debt.  So you have a

24  sequence of a confirmation order being entered, the debt being

25  raised into escrow, and then going forward with an equity

Ziman - Cross

1    offer.

2    Q.   Thank you.  Will the buyers of this stock through this

3    offering be able to sell the stock at their discretion, or will

4    there be contingencies about when and how they can sell the

5    stock?

6         MR. TSEKERIDES:  I'm going to object to the form, but

7    I would say if Mr. Ziman understands -- I don't understand the

8    question, but if Mr. Ziman does --

9         THE COURT:  Do you understand the question?

10        THE WITNESS:  I believe I do.  I can answer, Your

11   Honor, if that's okay?

12        THE COURT:  Okay.

13   A.   Yeah.  I believe that for the most part, buyers of the

14   stock will not be subject to a restriction on when they could

15   be sold.

16   Q.   Thank you.  Will the shareholder proponents be able to

17   freely -- freely sell their stock, upon the exit of bankruptcy?

18   A.   By shareholder proponents, you're referring to Knighthead

19   and its affiliates, and Abrams Capital and its affiliates?

20   Q.   Yes.

21   A.   To the extent that they are existing stockholders, and

22   you're referring to the stock that they currently hold in the

23   company, they could sell it today, and they could sell it right

24   after emergence freely, yes.

25   Q.   Thank you.  Is your expectation that the victims holding

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    twenty-one percent shares, would be able to sell their stock

2    freely when they want to, given that the other two classes of

3    shareholders that we just described are free to buy and sell?

4    A.   Well, I think this starts to tread on ground that Mr.

5    Julian cautioned we shouldn't go into.  But there's a

6    discussion ongoing about a right -- you know, there being a

7    registration rights agreement and a lockup on the fire victims'

8    trust ability to sell.

9    Q.   Okay.  And I certainly don't want to impede on -- on the

10   negotiations, so I wouldn't want you to speak to anything

11   that's happening in the negotiation rooms, and I'm certainly

12   under no obligation associated with those negotiations.

13        So please help me understand this.  Is your expectation --

14   the negotiations aside on the registration rights agreement, is

15   the debtors' -- is PG&E's expectation that those twenty-one

16   percent shares, you know, as was stated to me by Mr. Wells at

17   the CPUC, will be held over time and not have the freedom and

18   flexibility that those other groups of shareholders seem to

19   have?

20        MR. TSEKERIDES:  Object to the form, Your Honor.  If

21   he wants to ask a direct question without referencing other

22   people's testimony, that's fine.  But I don't think it's

23   appropriate to --

24        MR. ABRAMS:  The debtors did not object to me

25   leveraging that testimony as an exhibit.  I still have not

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  gotten a ruling on whether that can be used as an exhibit.  So

2  I'd ask for a little leeway on that point, please.

3          THE COURT:  No --

4          MR. TSEKERIDES:  Whether or not you -- sorry, go

5  ahead, Your Honor.

6          THE COURT:  No, I'm not going to -- I'm not going to

7  give you leeway, and I'm not dealing with rulings on your

8  exhibits.  The question is whether that's a question; and I'm

9  going to sustain the objection.  And we're getting close to

10  your deadline -- well, we're past your deadline.  I'm going to

11  give you a couple more minutes to conclude the questions, Mr.

12  Abrams.

13          MR. ABRAMS:  Thank you.  I've got about three more

14  questions.

15          THE COURT:  All right.

16  Q.   On page 6, paragraph 17 of your declaration, you indicate

17  that the registration rights agreement related to the shares is

18  still under negotiations, which of course, we've already

19  identified.

20          MR. ABRAMS:  Let me skip that.  I'll strike that

21  question.

22  Q.   I'm going to now turn to the victims' trust agreement.  Is

23  that completed or is that still under negotiations, as far as

24  you know?

25          MR. TSEKERIDES:  I'm going to object to the form.  I

Ziman - Cross

1   think that's well outside the scope of anything Mr. Ziman

2   testified about.  But obviously if he knows --

3           THE COURT:  No, sustained.

4           MR. TSEKERIDES:  Okay.

5   Q.   Mr. Ziman, if PG&E is found to have caused the Kincade

6   fire or it's found that it's probable that they caused the

7   Kincade fire, could that hinder the financing that you describe

8   in your declaration?

9   A.   Well, I think the company believes that even if it were

10  held to be the cause of the fire, that the access to -- it has

11  access to sufficient insurance proceeds.  You know, that

12  presumably -- that -- well, that would help to defray those

13  costs.

14      I think that your -- there are a bunch of facts that would

15  go into any determination as to whether or not it rose to the

16  level that would give rise to a termination under the

17  commitment agreements, both the equity and the debt.

18      So I can't answer the --

19  Q.   So --

20  A.   -- question directly.  I'd say that it -- you know, it

21  depends, but the company does have access to liability

22  insurance to cover any damages to which it would be liable on

23  the Kincade fire that makes us believe we're going to be able

24  to satisfy any conditions relating to that.

25  Q.   So would you say that it's a risk, but it's -- I guess,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    what you're saying -- so you would say it is a risk?

2              MR. TSEKERIDES:  Object to the form.

3              THE COURT:  You can go ahead.  Finish the question,

4    Mr. Abrams.

5    Q.   Would you say that that is a risk?

6              UNIDENTIFIED SPEAKER:  Your Honor, a risk to what?

7              THE WITNESS:  Yeah.

8              MR. ABRAMS:  A risk to the financing.

9              THE COURT:  Well, I'll tell you what, Mr. Abrams.  Let

10   me try rephrasing the question.

11             Mr. Ziman, if tomorrow there was a determination by

12   CAL FIRE or some other appropriate agency that said PG&E caused

13   Kincade, in your opinion, would that impact negatively on the

14   company's prospects for which you've testified that the

15   financing and the plan's exit strategies are feasible?

16             THE WITNESS:  I'd say -- would it impact it, Your

17   Honor?  Depending upon, you know, again, what other facts were

18   disclosed in that determination -- in that determination by CAL

19   FIRE that you hypothesized.  It would be speculation to say

20   what that impact would be.

21             As I said, the company --

22             THE COURT:  Well, let me -- but would your opinion be

23   that the plan is not feasible if there is just that

24   determination?

25             THE WITNESS:  No, that would not be my opinion, Your

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    Honor.

2            THE COURT:  Okay.

3            Mr. Abrams, go ahead, and I'm going to let you ask

4    your final question or two, and then we're going to conclude

5    your testimony -- your examination.

6            MR. ABRAMS:  Thank you.

7    BY MR. ABRAMS:

8    Q.   So PG&E is currently on probation, and if there are

9    violations or continued violations of that probation, could

10   those probation violations affect the ability of the company to

11   finance this plan?

12           MR. TSEKERIDES:  Again, Your Honor, object to the

13   form.  Calls for speculation.

14           THE COURT:  If you know the answer, Mr. Ziman.

15   A.   I'm not aware of the impact of probation violations on the

16   plan.

17           MR. ABRAMS:  Okay.  Okay, so I do have -- sorry, a

18   couple more questions here that I'm -- I'll try to get through

19   very quickly.

20   Q.   And this refers to page 2, line 17 and 18, and where you

21   talk to your twenty-five years of experience as a bankruptcy

22   lawyer.  And specifically, what I'm trying to inquire around,

23   because I see some -- let me just ask the question.

24           So relative to that, did the company contemplate with the

25   reorganization tying investment mechanisms or debt

Ziman - Cross

1    classifications that would provide a greater return for

2    investments into risk mitigation?

3    A.    I don't know that I --

4           MR. TSEKERIDES:  I'm going to -- yeah.

5           THE COURT:  Do you understand the question, Mr. Ziman?

6           THE WITNESS:  No, not at all.

7           THE COURT:  I don't either, Mr. Abrams.  So try again.

8           MR. ABRAMS:  All right, let me try again.

9    Q.    So I'm trying to understand the degree to which this

10   reorganization has different financial mechanisms associated

11   with investments than it did prior to bankruptcy.

12          THE COURT:  Well, that's rather obvious.  That's why

13   we're here.  So you're stating the obvious.

14          MR. ABRAMS:  Well, I guess my question is, Your Honor,

15   is that given this is a reorganization, what I'm asking is, I

16   haven't seen additional financial mechanisms that would provide

17   a greater return for investmentors who, say, invested in

18   specific technology to mitigate wildfires or to innovate the

19   grid, as opposed to just a general shares in PG&E.

20          And so what I'm looking at is for some -- if the

21   witness understands if there were more creative, if you will,

22   investment mechanisms that were put into this plan that would

23   target investments towards the risks that PG&E faces?

24          MR. TSEKERIDES:  Your Honor, I --

25          THE COURT:  Do you understand the question, Mr. Ziman?

Ziman - Cross

1          THE WITNESS:  No, I still don't understand the

2    question, Your Honor.

3          THE COURT:  Mr. Abrams, you're beating this thing to

4    death.  Mr. Ziman is an expert and he is testifying on why the

5    company's present plan is financially feasible.  He isn't hired

6    and wasn't engaged to come up with alternatives of what might

7    be a different alternative for an investment goal.

8          This is a company in bankruptcy trying to get out of

9    bankruptcy, and that's what this entire trial and entire

10   inquiry is about.  And that's what his testimony is about.

11         So your questions about what might be some other

12   alternatives, is just not on point.  So I'm going to give you

13   one more question for Mr. Ziman.

14   Q.   Mr. Ziman, as an investment banker and someone who has

15   twenty-five years of bankruptcy experience, per your

16   declaration, do you believe that a plan can be feasible if it

17   does not directly address the risks that a company faces?

18         MR. TSEKERIDES:  Object to the form.  And it assumes

19   that the plan doesn't do that, but --

20         THE COURT:  You can answer the question, Mr. Ziman.

21   A.   No, I think a plan needs to take into account the

22   circumstances of the company that's the subject of the plan.

23         THE COURT:  Okay.

24   Q.   Are fires a major risk for PG&E?

25         THE COURT:  Well, that's obvious, Mr. Abrams.  Again,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    that's why we're here.  So you don't have to ask him a question

2    we all know the answer to.  Fires are a major risk to PG&E,

3    period.

4            MR. ABRAMS:  Yes, and I'm asking for -- yes, I'm

5    asking for clarification on that, because we have yet, in this

6    proceeding, had any witness come forward from the debtor to

7    describe how the company is addressing that number-one risk to

8    the efficacy of the plan, so I want --

9            MR. TSEKERIDES:  Your Honor --

10           THE COURT:  -- to probe in that area so the Court can

11   understand that those risks have or have not been addressed by

12   this plan.

13           THE COURT:  That --

14           MR. TSEKERIDES:  Your Honor, I strongly disagree with

15   what he just said, and I think it's time to move on to another

16   examiner.  But the witnesses have testified to that point.

17           THE COURT:  Mr. Abrams, that will be presented to me

18   by those who have asked to argue against the plan.  It's not

19   appropriate for you to ask questions further of Mr. Ziman on

20   that point.

21           If you -- I don't -- if you're going to make an

22   argument, you can make that argument.  But I'm going to

23   conclude your examination of Mr. Ziman, at this point.

24           Now, you said had -- you said you had a couple of

25   procedural question, but I have one question for Mr. Ziman

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  myself.

2          So Mr. Ziman, the question that I'm going to ask you

3  about is probably the very question that Ms. Wallace asked you

4  about.  So I'm looking at your June 22nd -- excuse me, May 22nd

5  declaration at paragraph 9(c).  And I think that's the very

6  paragraph that she asked you about before.

7          And I was fascinated by a double negative that said

8  that the company has no reason to believe it will not be able

9  to successfully raise the debt.  No reason to believe it will

10  not.  I want to turn that question around to say does it have

11  reason to believe that it will?  Can you reaffirm that?  Will

12  you reverse the double negative and say the company has reason

13  to believe that it will be able to raise this debt?

14          THE WITNESS:  Yes.  The company has every reason to

15  believe that it will be able to raise that debt in the public

16  markets.

17          THE COURT:  Okay.  I'm going to -- I'm going to pause

18  here for a moment.

19          During the course of the testimony, I see two persons

20  who raised their hands, Ms. Lisa Vonatrod (ph.), and Mr. Robert

21  Rentz.  Neither of them have previously identified themselves

22  as wanting to question the witness, and I'm not going to call

23  upon them to interrupt the procedures.

24          I do see Mr. Behlmann has raised his hand, and he

25  was -- did indicate earlier a possibility of asking a question.

Ziman - Cross

1    So Ms. Parada, please bring Mr. Behlmann into the courtroom or

2    the panelists.

3            And then I want to see if there's been a request by

4    Mr. Hallisey, because I don't see him on the attendee list.

5    And if he is in attendance, he needs to raise his hand, at this

6    point.  I see Jerimiah -- Jerimiah.  Is that Mr. Hallisey?

7            All right, and then Ms. Parada, please bring him into

8    the panel also.  The other persons, however, I'm not going to

9    recognize at this point.

10            MR. TSEKERIDES:  And Your Honor, just for the record,

11    Ted Tsekerides, again, for the debtors, we did object to Mr.

12    Haillsey's --

13            THE COURT:  Oh, I understand.

14            MR. TSEKERIDES:  Okay.

15            THE COURT:  I understand that you did.  And I'll come

16    to that in a minute.

17            All right, Mr. Hallisey, you were required -- you were

18    required to put your last name on also.  It isn't a quiz here,

19    it's for purposes of the record.  I understand and recognize

20    your first name, but you need to take yourself off of mute so

21    you can be heard.  So could you take yourself off of mute,

22    please?

23            Okay, Mr. Behlmann, okay --

24            MR. HALLISEY:  Sorry, Your Honor.

25            THE COURT:  Okay, are you using the video, Mr.

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    Hallisey?

2          MR. HALLISEY:  I should be.  Where's the video on

3    this?

4          THE COURT:  Well, you have to know where the video is

5    on --

6          MR. HALLISEY:  I'm sorry, I'm used to using an Apple

7    computer and --

8          THE COURT:  You either make the video -- you don't

9    have to be on the video.  Now, you --

10         MR. HALLISEY:  I'll put it on.  I'll put it on.

11         THE COURT:  You were late in asking to examine the

12   witness, and the company objected.  Why are you submitting a

13   request so late, and why should I -- why should I consider your

14   request to examine the witness?

15         MR. HALLISEY:  Well, we've been participating as a

16   member -- representing a member of the TCC.

17         THE COURT:  Yeah, I know that.  But that's not the

18   point.  You didn't -- I issued an order.  I put down specific

19   time limits.  And lots and lots of people responded, and you

20   didn't.  So at the last minute I get this:  I want forty-five

21   minutes.  Why should I give you four minutes if you can't even

22   comply with that simple procedure?

23         MR. HALLISEY:  Well, I apologize for not complying,

24   but I've made the request in the hope that you would entertain

25   it.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1          THE COURT:  Why should I do it?  Why is it necessary

2   to do it, at this point?

3          MR. HALLISEY:  Well, I suppose that I've spent a

4   considerable amount of time on this issue.  I suppose other

5   people have too.  I think I have something to contribute as far

6   as cross-examination is concerned.

7          THE COURT:  Can you be more specific on what you need

8   to dwell on?  Mr. Ziman's declaration is pretty comprehensive.

9   What is it that you need to --

10          MR. HALLISEY:  Well, I mean, everyone else is -- I

11   haven't really had any -- haven't heard any other questions

12   that are similar to the ones I'm planning to ask.

13          THE COURT:  Mr. Behlmann, would you unmute yourself

14   for a minute?  And you had previously indicate a possible

15   examination.  What is your request today?  How much time do you

16   have in mind, and what do you need?

17          MR. BEHLMANN:  Your Honor, I believe we would need

18   somewhere between ten and fifteen minutes, and we will

19   certainly try to keep it towards the ten end of that range, if

20   possible.

21          THE COURT:  All right, I'll give you each ten minutes.

22   We're on a very tight schedule.

23          So I'm going to let you go first, Mr. Behlmann.  I'll

24   give you ten minute with Mr. Ziman, and Mr. Hallisey, I'll give

25   you ten minutes after that.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1          Mr. Abrams, I know you have some procedural questions.

2     I want to stick with the witness testimony for now, so I'm

3     going to move you out of the participants' panel just to take

4     you off the screen.  I'll bring you back in to clarify the

5     question you have, a little bit later.

6          All right, Mr. Behlmann?

7          MR. BEHLMANN:  Thank you very much, Your Honor.

8     CROSS-EXAMINATION

9     BY MR. BEHLMANN:

10    Q.   Good morning, Mr. Ziman.  Some of the background-type

11    questions we had have been dealt with in other folks'

12    questioning, so I'll try to skip that, to the greatest extent

13    possible and reduce any duplication.

14         You testified that there's, I believe, nine billion

15    dollars of fresh equity capital being raised by the debtors in

16    conjunction with the plan; is that correct?

17    A.   Yes.

18    Q.   And that the debtors have three methods of doing that.

19    They have a public offering, a rights offering, or drawing on

20    backstop commitments, correct?

21    A.   Correct.  I mean, there's some ancillary methods that can

22    be used alongside them, but you know, for instance, a pipe

23    investment or things like that.  But yes, that's generally

24    correct.

25    Q.   And do you know at this point what combination of those

1    methods the debtors intend to use in conjunction with

2    confirmation?

3    A.    Well, I think we'd like to avoid drawing on the backstop,

4    since it's the most dilutive expensive capital.  So we're

5    focused on either the ability to do a public offering or a

6    rights offering.

7    Q.    And in the public offering, you testified earlier this

8    morning in response to a question by Mr. Julian on behalf of

9    the TCC, that the debtors are working with Goldman Sachs and

10   JPMorgan as the under -- the primary underwriters of the public

11   equity offering; is that correct?

12   A.    Yeah, I refer to them as the lead active underwriters.

13   Q.    And has -- in working with the lead active underwriters,

14   has Lazard developed an estimate of what the public offering

15   price per share would be in a public equity offering under the

16   plan?

17   A.    No, I think it's too early to know that.

18   Q.    Okay.  And so the underwriters have presumably not

19   developed a range that they've disclosed to you, either?

20   A.    Correct.

21   Q.    Do you know how the price will be determined, ultimately?

22   A.    Well, a price in a public offering -- I'm -- I'm not an

23   equity capital markets banker.  I was not an equity capital

24   markets lawyer in my prior career.  I have a general

25   understanding of how, you know, an offering is priced, but

Ziman - Cross

1    that's really a lay understanding.

2          That said, you know, generally that requires the building

3    of a book, you know, and the taking of orders by the

4    underwriters, to figure out the range in which the book could

5    be filled, right, to create enough demand that you can then --

6    you can sell all the equity you're trying to sell within a

7    certain price range.

8          That said, there are limitations in our backstop

9    commitment letters for thresholds in the backstop commitment

10   letter that limits the price at which equity can be sold under

11   various circumstances.

12   Q.   And are those prices fixed prices, or are they based on

13   some other metric?

14          MR. TSEKERIDES:  Your Honor, I do need to jump in

15   here.  Mr. Behlmann asked similar questions of Mr. Wells where

16   he was trying to get to the valuation of the stock, and you

17   said, Your Honor, that that doesn't do it for me; they have the

18   right to ask about being treated fairly and equitably, but to

19   spend time understanding formulas or pricing for other people

20   is not relevant.

21          So I'm trying to understand what -- if Mr. Behlmann is

22   just trying to do that again with a different witness, on what

23   was already found to not be relevant, then I object on

24   relevancy grounds, and we should move on to something else.

25          THE COURT:  Why is it relevant, Mr. Behlmann?

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    MR. BEHLMANN:  Your Honor, the currency in which our

2  claims are proposed to be paid under the plan is equity in the

3  debtor.  We're trying to understand from Mr. Ziman, who is the

4  debtors' banker, presumably coordinating all the moving pieces

5  of the equity being offered under the plan, we're trying to

6  understand from him what's out there and how it's going to be

7  valued, to understand the relative value of the currency with

8  which we are proposed to be paid under the plan.

9    MR. TSEKERIDES:  Apples and oranges, Your Honor.  Very

10  same question they were asking Mr. Wells that you sustained the

11  objection on.

12    MR. BEHLMANN:  It's all common equity.

13    THE COURT:  I'll tell you what.  I'll run the risk of

14  being inconsistent.  I'll let -- I'll overrule the objection

15  and let Mr. Ziman answer that question if he can.

16    THE WITNESS:  What question is pending?

17    THE COURT:  Restate the question, then, Mr. Behlmann.

18  BY MR. BEHLMANN:

19  Q.   I think we had actually gotten past the previous question.

20  Is the equity valuation -- you mentioned that there are

21  thresholds in the backstop commitment letters.  Are those

22  thresholds based on a fixed price or are those thresholds based

23  on some metric, be it a multiple or otherwise -- something

24  other than just a fixed price?

25  A.   They're based on a metric, a multiple.

Ziman - Cross

1    Q.   And what is that multiple?

2    A.   For which threshold?

3    Q.   Well, I guess any of them.  I'm not intimately familiar

4    with the thresholds in the backstop commitment agreements.

5         Let me ask this question a slightly different way.  The

6    multiples that are used in those thresholds, what are they

7    multiples of?

8    A.   They're price-to-earnings.

9    Q.   Price-to-earnings.  And is that expressed in the form of

10   normalized estimated net income, the defined term?

11   A.   Well, the earnings pieces are assessed through using the

12   normalized estimated net income, yes.

13   Q.   Okay.  So that is a component of the metric that's used in

14   valuing PG&E stock for purposes of the backstop commitment

15   agreements?

16   A.   Yes.

17   Q.   You mentioned earlier, I believe, that the debtors intend

18   to use the rights-offering mechanism as part of the equity

19   offering under the plan; is that correct?

20   A.   That's not quite correct, no.  What I said was that --

21   Q.   But they would like to, I think you said?

22   A.   Well, no.  I think I said that we would -- you know,

23   that -- the best way to raise equity is through a public market

24   offering.  It's usually the most efficient; it's what the

25   capital markets know.  Anything else, you know, is I would say,

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    not as good, just simply put, right?  Or -- and so a rights

2    offering is an option that's available to the company under the

3    backstop commitment letters, to raise equity in the event that

4    we cannot raise at the right threshold in the permitted

5    market -- permitted equity offering, per those agreements.

6    Q.   And do you know, at this point, whether the debtors intend

7    ultimately to use the rights offering mechanism as a component

8    of the equity raise?

9    A.   No, I don't.

10   Q.   Okay.  But if they do, you're familiar, I assume, with the

11   rights-offering procedures that are attached to your

12   declaration as Exhibit A?

13   A.   I am.

14   Q.   And those rights-offering procedures state that the --

15   that the price per share at which the rights-offering

16   participants may buy shares will be announced in the future,

17   correct?

18   A.   I believe that's right.  Yes.

19   Q.   Do you know when that might happen?

20   A.   I think the procedures set forth the timing as to which,

21   you know, once a rights offering is determined to be a path to

22   be used, when that announcement would be made.  But I can't

23   tell you when the determination to use or not use a rights

24   offering would be made, as of right now.

25   Q.   And I assume as you sit here today, you do not have an

Ziman - Cross

1    estimate of what the share price would be in the rights

2    offering?

3    A.    No, I don't.

4    Q.    Do you know how the share price in the rights offering

5    will ultimately be determined?

6    A.    Yes, it's a multiple applied to NENI, normalized estimated

7    net income.

8    Q.    Okay.  And that's the same normalized estimated net income

9    that's used in the backstop agreements, as well?

10   A.    Correct.

11   Q.    And is that the same normalized estimated net income

12   that's also used to value the -- pardon me -- to calculate the

13   fire victim equity value out of the plan?

14   A.    Well, it's defined with exactly the same words.

15   Q.    Okay.

16   A.    But it exists in two different agreements.

17   Q.    Okay.  Slightly different issue with respect to the

18   subscription-rights agreements.  The subscription rights that

19   are being offered under the rights offering, again, if the

20   debtors use the rights offering, those are going to be

21   transferrable; aren't they?

22   A.    Yeah, it's intended that they would be registered and able

23   to be transferred on the New York Stock Exchange.

24   Q.    Okay.  And assuming that they are transferred on the --

25   transferrable on the New York Stock Exchange, they'll have a

Ziman - Cross

1   trading price just like any other publicly traded security?

2   A.   They would have a trading price.  I'm not sure if it's

3   like any other registered security, but they'd have a trading

4   price.

5   Q.   Okay.  So assuming the debtors are correct, a rights

6   offering participant who receives subscription rights under the

7   rights offering through the plan could then turn around, again,

8   assuming that the debtors are correct that those will be

9   transferrable on the NYSE -- could turn around and sell them

10  for cash on the NYSE?

11          MR. TSEKERIDES:  Your Honor, I'll renew an objection.

12  I have no idea what -- how this is relevant to Mr. Ziman's

13  declaration which goes to plan funding and feasibility?  What

14  does this have to do with that?

15          THE COURT:  Well, Mr. Behlmann, why don't you answer

16  that for me?

17          MR. BEHLMANN:  Sure, I will gladly answer that, Your

18  Honor.  And actually, I was at the very last question on this

19  topic anyway, so.

20          The reason that's relevant is part of our objection is

21  that the rights offering rights -- the subscription rights

22  themselves, are value that is being made available to Class

23  10A-I, and that that value is therefore discriminatory vis-a-

24  vis Class 10A-II who are receiving only shares pursuant to a

25  formula which has other issues that we'll obviously get into in

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1    detail at oral argument.

2            But we've raised this in our written objection, that

3    the rights offering rights are an item of value.  They're

4    something that has option value.  And I'm simply exploring with

5    Mr. Ziman the method in which folks will be able to realize

6    that value other than putting cash out and exercising --

7            THE COURT:  All right, I'll allow --

8            MR. BEHLMANN:  -- shares.

9            THE COURT:  -- overrule the objection.  Mr. Ziman can

10   answer that question.

11   A.   Right.  Whether a right has value is a function of what

12   the right, you know, entitles the holder to do.  So as an

13   example, if there was a right to buy stock at twenty dollars

14   that was trading at five dollars, that would impact the value.

15        You know, but otherwise, rights may -- as you just said in

16   your remarks -- may have option value for the whole.

17   BY MR. BEHLMANN:

18   Q.   Thank you.  The so-called holdco rescission or damage

19   claim for Class 10A-II --

20   A.   I'm sorry, Mr. Behlmann, your mic went out right when you

21   were speaking.

22   Q.   The so-called holdco rescission or damage claims in Class

23   10A-II under the plan; are you familiar with those?

24           THE COURT:  Yeah, Mr. Behlmann, we're getting a lot of

25   interference on your end, I think.  I'm hearing the problem

Ziman - Cross

1    too.  Is your mic --

2           MR. BEHLMANN:  I have -- bear with me for one second.

3           THE WITNESS:  Well, that's better.

4           MR. BEHLMANN:  I have muted and unmuted myself and

5    switched from my AirPods from my MacBook microphone.  Sorry

6    about that, Mr. Ziman and Your Honor.

7           THE COURT:  Okay.

8    Q.   Mr. Ziman, are you familiar with the so-called holdco

9    rescission or damage claims in Class 10A-II under the plan?

10   A.   I've read the plan in the past.

11   Q.   So you're aware --

12   A.   Not that -- I do not have intimate familiarity with those

13   claims.

14   Q.   Okay.  Are you aware, though, that the holders of those

15   claims are receiving equity under the plan?

16   A.   Yes.

17   Q.   And are you aware of how the equity that the holders of

18   those claims are receiving is going to be calculated under the

19   plan?

20   A.   I understand there's a formula.  That --

21   Q.   Do you -- sorry, go ahead.  I didn't mean to interrupt.

22   A.   Well, there's a formula for how that -- how the claim is

23   translated into shares of equity.

24   Q.   Are you familiar with that formula?

25   A.   In the vaguest sense, yes.

Ziman - Cross

1   Q.   Were you involved in the creation of that formula?

2   A.   I was not; no.

3   Q.   And do you know whether that formula uses normalized

4   estimated net income, which I believe you also referred to as

5   NENI, as a metric in determining the number of shares that

6   would be distributed on account of a particular Class 10A-II

7   claim?

8   A.   I don't believe it does; no.

9          THE COURT:  Mr. Behlmann, you're muted.

10         MR. BEHLMANN:  All sorts of audio problems today.

11         THE COURT:  You're just about done your time too, so.

12         MR. BEHLMANN:  I believe I'm out of time, and I

13  believe that is the extent of my questions for Mr. Ziman.

14         So I thank you, Your Honor, for your indulgence.

15         THE COURT:  Okay, thank you, Mr. Behlmann.  Thank you.

16         Ms. Parada, you can remove Mr. Behlmann from the

17  participants panel, and Mr. Hallisey, you have ten minutes to

18  examine the witness.

19         MR. HALLISEY:  Your Honor, I'm objecting to the time

20  limit, but let's not waste more time.

21  CROSS-EXAMINATION

22  BY MR. HALLISEY:

23  Q.   The Kincade fire was asked a question.  What happens, for

24  example -- the insurance is, I think 480 million or 460 million

25  dollars.  Let's assume there's a judgment of 600 million -- and

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1   I think Mr. Wells said it was not material -- what if there's a

2   billion or a two-billion-dollar punitive damages judgment; will

3   that affect your view of the viability of the plan?

4          MR. TSEKERIDES:  I'm going to object to the form, Your

5   Honor.

6          THE COURT:  You can answer if you -- Mr. Ziman?

7   A.   This company will have significant working capital lines

8   available to it, as contemplated, more than five -- about five

9   billion dollars' worth of working capital.  The companies also

10  will be a participant in the capital markets.

11         I think, you know, there's no expectation on the company's

12  part that it's going to suffer the type of damage that you, you

13  know, speculated on in your question.  But nonetheless, should

14  that occur, the company has the capacity to deal with it.

15  Q.   All right.  And the pre-petition debt is about twenty-

16  three -- it was twenty-three billion; is that correct?

17  A.   The pre-petition debt was, I believe, closer to 21.5

18  billion.

19  Q.   All right.  And was that unsecured?

20  A.   Yes, it was unsecured debt.

21  Q.   And now, how much debt will be unsecured going forward?

22  A.   Well, the holding company debt that's contemplated, the

23  4.75 billion, will be unsecured debt -- well, technically it's

24  secured by the stock of utility.  So none.  All thirty-eight

25  billion dollars will have access to security.

Ziman - Cross

1   Q.   And the holding company, are they borrowing more money

2   that you've made in addition in recent days?

3   A.   I'm not sure if --

4          MR. TSEKERIDES:  Objection to form.

5          THE COURT:  If he understands?

6          MR. HALLISEY:  All right, I'll withdraw the question.

7   Q.   Is the COVID-19 virus going to affect the financial

8   outlook of the company?

9   A.   I think Mr. Boken testified that while the virus is not

10  without its impacts, it doesn't have any material impact on

11  projections the company made in connection with

12  (indiscernible).

13  Q.   Okay.  And the decline in demand of -- for electricity,

14  the product you're selling, is that -- it's been the most since

15  1949, according to the Energy Information Agency -- is that

16  going to have an effect?

17  A.   Again, that's not really my area of expertise.  I'd have

18  to rely on the others -- Mr. Boken, Mr. Wells, who I think both

19  spoke to those issues.

20  Q.   And there's some requirements in California for various

21  renewable targets that many of them kick in in 2030.  Is that

22  going to have an effect, if there's a material increase in

23  self-generation, in your outlook?

24  A.   Yeah, I can't answer that question, because I don't have a

25  foundation in the things you're referring to.

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  Q.   Okay.  And the -- in the backstop, the fee for the

2  backstop is somewhere -- it has a minimum floor of 750 million

3  and a maximum at about a billion-five, at today's prices; is

4  that correct?  The fee?

5  A.   That's not correct.  No.  The backstop fee has a

6  minimum -- I think it's 763 million dollars.

7  Q.   All right.

8  A.   And it's payable in shares.

9  Q.   All right.

10  A.   Though the -- you know, the value of those shares will be

11  determined -- you know, certainly the trading value will be

12  determined upon, you know, the -- the date they're traded.

13  Right?  So I can't tell you what the price the stock will be on

14  the -- on any given date.

15  Q.   All right, well, say at present prices, it's around seven

16  something, right?  763 is the minimum, and it could go up to, I

17  think, there's a cap of a billion-five?

18  A.   I don't understand the reference to a cap, sir.  It's

19  shares of stock.  It's --

20  Q.   Right, well --

21  A.   -- shares of stock.  They could -- the share -- the price

22  of the shares can go wherever the markets take them.

23  Q.   At present prices, what could be the maximum that they

24  could receive in shares?

25  A.   Again, it's -- it's payable in shares, sir.  It's the

(973) 406-2250 | operations@escribers.net | www.escribers.net

Ziman - Cross

1  number of shares.

2  Q.   All right.  Okay.  And how -- what sort of fees is Lazard

3  making in this transaction?  Is it -- have you -- if there's a

4  restructuring fee you wanted twenty-five million?

5  A.   Yeah, the terms of our engagement are set forth in our

6  engagement letter, which was attached to the fee letter.  So

7  there is --

8  Q.   And --

9  A.   -- there are fees for different events, and there are

10 credits against those events, per the terms of that letter,

11 plus, in fact, there's an overall cap in our fee.

12 Q.   And what --

13 A.   Corporate --

14 Q.   -- is the overall cap?

15 A.   I believe the overall cap is about 36.5 or 37 million

16 dollars.

17 Q.   All right.  And then how much per -- how much has been

18 spent on professional fees this year, for between legal and

19 accounting fees and consulting fees?

20       MR. TSEKERIDES:  Your Honor, I object on relevancy

21 grounds.  I don't know where we're going --

22 Q.   Is it over a billion dollars?

23       THE COURT:  Sustained.  Objection sustained.

24       MR. HALLISEY:  Well I -- Your Honor, he's familiar --

25 all right, I'll withdraw the question.

Ziman - Cross

1          THE COURT:  Mr. Hallisey, the objection is sustained,

2    you can -- let's move on.

3          MR. HALLISEY:  All right, I will.  I will.

4    Q.   And the shareholder group -- pardon me -- the victims are

5    going to be -- receive shares that's valued at fourteen-point-

6    something -- a multiple; is that correct?

7          MR. TSEKERIDES:  Your Honor, I object.  The plan

8    speaks for itself as to how the shares are valued.

9          THE COURT:  That's true.  That is -- it's a -- he's

10   laying a foundation.

11         MR. HALLISEY:  He's already testified --

12         THE COURT:  Mr. Hallisey, that's been established over

13   and over again.  What do you want to ask the witness?

14         MR. HALLISEY:  All right.

15   Q.   And what's Southern California Edison's multiple?

16   A.   I don't know what the exact multiple is today.

17   Q.   Is it -- you've done work for Southern Cal Edison in the

18   past or Edison International?

19   A.   I have not; no.

20   Q.   All right.  So does 10.5 times multiple sound in the

21   ballpark of today's prices?

22         MR. TSEKERIDES:  Object to the form, Your Honor.  No

23   foundation.

24         THE COURT:  Do you know the answer, Mr. Ziman?

25         THE WITNESS:  Your Honor, I have a general

Ziman - Cross

1    understanding based on information provided me by others.

2    A.    But -- you know, so it would be somewhere in the twelve to

3    twelve-and-a-half range where Edison is currently trading, when

4    other people might say it's fourteen.  It all depends on what

5    you think they -- you know, the equity they have to issue to

6    deal with problems that are unquantified, as of now.

7    Q.    Well, what multiple is it trading at now?

8    A.    Again --

9         THE COURT:  Mr. Hallisey -- Mr. Hallisey --

10   A.    -- that --

11        THE COURT:  -- that's irrelevant.  Mr. Ziman, you

12   don't have to answer that.  It's irrelevant.

13        Mr. Hallisey the formula is what it is in this case.

14   If there's a problem with it, that's to be a matter of legal

15   argument.  But it's not for this witness to speculate on the

16   difference between SoCal Edison and PG&E's multiples here.

17        Any more questions?

18        MR. HALLISEY:  Well, it doesn't look that way, Your

19   Honor, the way it's going.  No.

20        THE COURT:  I'm sorry, I couldn't hear you.  No more

21   questions?

22        MR. HALLISEY:  It doesn't appear so; no.

23        THE COURT:  Okay, thank you, sir.  I appreciate your

24   time.

25        You can -- Ms. Parada, let's take Mr. Hallisey out of

PG&E Corporation and Pacific Gas and Electric Company

1    the panel and bring Mr. Abrams back for a question that he

2    wanted to clarify.

3            Okay.

4            MR. ABRAMS:  Okay.

5            THE COURT:  Mr. Abrams, you had a question.  We're

6    finished with the examination.  What was your question?

7            MR. ABRAMS:  Thank you, Your Honor.  I had two

8    questions.  The first is, and Mr. Wells, in his testimony

9    indicated that Ms. Powell, who understand wildfire mitigation

10   issues and how that'll affect the plan, as well as Ms. Kane,

11   who is the chief ethics and compliance officer, had information

12   that he was not able to provide.

13           I am concerned that this witness list is so narrow

14   that it will not give the Court sufficient information

15   regarding the feasibility of the plan, and I would ask that

16   those witnesses please be called.

17           THE COURT:  Okay.  Again, you seem to misunderstand

18   something.  The debtor has the burden to prove its case.  If a

19   persuasive argument is made on closing or in the argument phase

20   that the debtor failed to carry its burden, the consequences

21   will be adverse to the debtor, period.  It's the debtors' job

22   and the debtors' lawyers' job to figure out what witnesses they

23   need to prove their case.  It is not your -- you, as an

24   opponent, aren't supposed to say what they should have put on.

25           They called four witnesses, those are their witnesses,

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   period.  What's next?

2            MR. ABRAMS:  So as adverse -- so to help substantiate

3   my arguments, Your Honor --

4            THE COURT:  I want to know what your next question for

5   today is?

6            MR. ABRAMS:  Okay, so my question is to being able to

7   call those witnesses for my purposes.

8            The second question I have, Your Honor, is the TCC

9   witnesses that they have put forward are -- they seem to

10  indicate -- that are very relevant to this case, put four

11  declarations regarding plan feasibility.  And so how is it that

12  those are relevant for the TCC to ask question on, but totally

13  irrelevant for someone like myself to ask questions on, when

14  the bulk of their declarations are very pointedly related to

15  the feasibility of the plan?

16           THE COURT:  I'm going to let Mr. Karotkin or Mr.

17  Tsekerides answer that question.  And we're going to excuse Mr.

18  Ziman.  He doesn't need to be here any longer.  His testimony

19  is over and he can --

20           MR. ZIMAN: Thank you, Your Honor.

21           THE COURT:  Thank you for your testimony.  We're going

22  to take you off the panel for now.

23           Mr. Karotkin, Mr. Tsekerides, would you like to try to

24  respond to Mr. Abrams' question, because I'm not going to?

25           MR. TSEKERIDES:  Yes, if he can restate it.  I thought

PG&E Corporation and Pacific Gas and Electric Company

1    it was really directed at Mr. Julian, but if he can restate the

2    question, I can attempt to answer it.

3           THE COURT:  Well, I was going to let Mr. Julian answer

4    it too.  But why don't -- Mr. Julian, do you want to try to

5    answer the question here?

6           MR. JULIAN:  Can Mr. Abrams restate the question?

7           THE COURT:  All right, say it again.

8           MR. ABRAMS:  Sure.  I can go into more specifics as

9    well, but there were two TCC witnesses, Mr. Richardson and a

10   Mr. Campora, that the TCC --

11          THE COURT:  No, you asked for them, and they -- and I

12   excluded them.

13          MR. ABRAMS:  They put forward --

14          THE COURT:  I issued an order they're not going to be

15   called as witnesses.

16          MR. ABRAMS:  I understand, Your Honor.  What I'm

17   asking is -- is they put forward declarations that talked about

18   the very direct relevancy of their declarations to plan

19   feasibility.  So how is it that they put forward declarations

20   about the feasibility of the plan, and they were seen as

21   relevant to plan confirmation, yet the TCC objects to them

22   being used as witnesses?  They're -- they're arguing relevancy

23   on side, and then they're -- when I call them they're

24   irrelevant.  To me, that does not make any sense.

25          THE COURT:  Okay, this is not efficient to have this

PG&E Corporation and Pacific Gas and Electric Company

1    discussion.  But Mr. Julian, do you want to respond, please,

2    since you were the one that opposed the request to have those

3    two people testify?

4          MR. JULIAN:  Sure.  We submitted the declarations of

5    Richardson to authenticate documents.  We submitted a

6    declaration of Brent Williams with respect to a matter that I

7    believe is going to go to -- that is being resolved in

8    mediation.  And so I'm not going to pursue that matter anymore

9    in argument.

10         And then we filed a declaration of Jerry Bloom.  And

11   what Mr. Abrams is talking about is something completely

12   different.  Mr. Abrams submitted declarations of Mr. Campora,

13   who we did not submit a declaration on.  And you ruled

14   correctly, I believe, that he couldn't call Mr. Campora as a

15   direct witness.  And you ruled correctly, I believe that

16   there's no question to ask Mr. Richardson, because there's no

17   question about the authenticity of documents.  So I think --

18         THE COURT:  That's the answer, Mr. Abrams.  You might

19   not -- again, you might not like it, but that's the answer.

20   I'm not --

21         MR. ABRAMS:  I object to the very limited witness list

22   provided by the TCC and the debtor.  I do not think it provides

23   a fulsome view of the feasibility of the plan.  But I'll leave

24   it at that, Your Honor.

25         THE COURT:  Then if you -- again, I will repeat what

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   I've said many times.  People who have asked to argue will be

2   allowed to argue.  People who haven't asked to argue won't be

3   allowed to argue.  And when arguers are arguing, they can try

4   to persuade me that the side that had the burden failed to

5   carry the burden.

6       I don't know -- it's that simple.  Okay?  And if you

7   believe that there is an absence of testimony that would have

8   been necessary to reach the result that you apparently are

9   still opposing, then you make that argument, if you requested

10  time to argue.  If you didn't request time to argue, you're not

11  going to argue.  But that's, again, not for today.

12      We are going to conclude this phase of the trial; and

13  the testimony of witnesses for this confirmation trial is now

14  complete.  And I'm going to conclude the matter unless debtors'

15  counsel or TCC counsel wants to raise anything further for

16  today.

17      Mr. Karotkin?

18      MR. KAROTKIN:  I had nothing further.  I don't know if

19  Mr. Tsekerides does.

20      THE COURT:  Okay, Mr. Tsekerides?

21      MR. TSEKERIDES:  I don't, Your Honor, unless you

22  wanted to talk about the process for Wednesday.  But I assumed

23  your order tomorrow would address that.

24      THE COURT:  Well, Mr. Karotkin, I -- and for either of

25  you, I was going to raise this morning -- I mean, this case is

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    so interesting, because every time I turn around there's a new

2    filing.  But this morning, I believe, you filed a document

3    called plan proponents' joint statement regarding closing

4    arguments.

5         I've already prepared and am almost prepared to issue

6    a schedule for the arguments.  And it's inconsistent with what

7    you proposed today.  So you'll have to trust me.  And I won't

8    deny this or anything.  I'll just be getting an order out this

9    afternoon that you have and we all have until Wednesday to

10   refocus on the argument.  And that's what we'll do.

11        MR. TSEKERIDES:  And we did file that in accordance

12   with Your Honor's order.

13        THE COURT:  No, no, you did.  Nothing is -- I'm not

14   criticizing you.  I just -- one of the things that I did over

15   the weekend was go through the requests for examination of

16   witnesses and figure out what am I going to do and how are we

17   going to make it work and how am I going to accommodate the

18   requesters and at the same time get my job done of figuring out

19   an outcome here, in the time that I have.

20        So I finally believe I've come to an ability to carry

21   my end of it, so you'll see from --

22        MR. TSEKERIDES:  Very good.

23        THE COURT:  -- what I'll be expecting of you all.

24        Mr. Julian, anything that you want to raise?

25        MR. JULIAN:  No, Your Honor.

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  Okay.  Thank you all.  We're going to

2   conclude this phase of the hearing.  Appreciate your help.

3          Thanks to the courtroom staff, Ms. Parada and Ms.

4   Thomas.  And thank you all.  Talk to you on Wednesday.

5          MR. TSEKERIDES:  Thank you, Your Honor.

6          THE COURT:  Thank you.

7      (Whereupon these proceedings were concluded at 11:39 AM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2                          I N D E X

3

4   WITNESS              EXAMINATION BY      PAGE

5   Kenneth Ziman        Ms. Wallace          5

6   Kenneth Ziman        Mr. Julian          18

7   Kenneth Ziman        Mr. Abrams          25

8   Kenneth Ziman        Mr. Behlmann        53

9   Kenneth Ziman        Mr. Hallisey        63

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

1

2                        C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7

8

9    _____

10   /s/ SHARONA SHAPIRO, CET-492

11

12   eScribers

13   7227 N. 16th Street, Suite #207

14   Phoenix, AZ 85020

15

16   Date:  June 2, 2020

17

18

19

20

21

22

23

24

25

**&**

**&&& (1)**
32:19

**[**

**[Zee'-man] (1)**
4:19
**[Zye'-man] (1)**
4:17

**A**

**AB (3)**
5:12;10:12;37:6
**ability (8)**
27:8;35:8,21;36:10;
41:8;45:10;54:5;75:20
**able (16)**
13:14;16:4;33:15;
34:9;35:4;40:3,16;
41:1;43:23;49:8,13,15;
59:22;61:5;70:12;71:6
**Abrams (63)**
25:8,9,10,14,21,23,
25;26:19,23;27:3,5,18,
19;29:18,20,22;30:8,
24;31:11,14;32:16,20;
33:19,22;34:19,24;
37:11,12;39:6;40:19;
41:24;42:12,13,20;
44:4,8,9;45:3,6,7,17;
46:7,8,14;47:3,25;48:4,
17;53:1;70:1,4,5,7;
71:2,6;72:6,8,13,16;
73:11,12,18,21
**Abrams' (1)**
71:24
**absence (1)**
74:7
**accept (1)**
14:24
**access (4)**
43:10,11,21;64:25
**accommodate (1)**
75:17
**accomplished (1)**
39:20
**accordance (1)**
75:11
**according (2)**
29:21;65:15
**account (1)**
47:21;63:6
**accounting (1)**
67:19
**accurate (1)**
33:7
**accusations (1)**
33:1
**across (2)**

22:2;23:11
**act (1)**
5:7
**active (3)**
21:10;54:12,13
**actual (1)**
33:20
**Actually (5)**
4:18;6:12;21:13;
56:19;60:18
**addition (1)**
65:2
**additional (2)**
37:1;46:16
**address (5)**
15:21,22;25:16;
47:17;74:23
**addressed (1)**
48:11
**addressing (1)**
48:7
**advance (2)**
10:18;29:6
**advanced (1)**
23:13
**adverse (2)**
70:21;71:2
**advisor (1)**
26:6
**advisors (2)**
19:1,2
**advocate (1)**
26:21
**affect (9)**
7:10;35:8,21,25;
36:10;45:10;64:3;65:7;
70:10
**affects (1)**
6:5
**affiliates (2)**
40:19,19
**afternoon (1)**
75:9
**again (29)**
8:14;9:19;11:1,7;
12:18;13:24;16:21;
18:7;23:12;24:4;30:24;
44:17;45:12;46:7,8;
47:25;50:11;55:22;
59:19;60:7;65:17;
66:25;68:13;69:8;
70:17;72:7;73:19,25;
74:11
**against (4)**
17:6;33:1;48:18;
67:10
**agencies (1)**
35:13
**agency (2)**
44:12;65:15
**aggregate (1)**
9:25
**ago (1)**

23:11
**agreed (2)**
24:17;38:4
**agreement (37)**
7:3;13:3,3,10,11;
14:16;15:12;18:18;
19:3,17;20:2,6,9,13,18,
22;21:1,2;22:2,6,8,10,
16;23:8,11,21,22,24;
24:2,5;30:11;31:25;
38:8;41:7,14;42:17,22
**agreements (17)**
6:23;7:2,6,15,16,17,
20;27:8;37:18;39:14;
43:17;57:4,15;58:5;
59:9,16,18
**ahead (12)**
8:14;9:13;11:25;
13:9;15:18;17:11;27:4;
39:5;42:5;44:3;45:3;
62:21
**AirPods (1)**
62:5
**allow (2)**
11:13;61:7
**allowed (2)**
74:2,3
**almost (1)**
75:5
**along (1)**
38:12
**alongside (1)**
53:22
**alternative (1)**
47:7
**alternatives (2)**
47:6,12
**amount (2)**
36:18;52:4
**ancillary (1)**
53:21
**and-forth (1)**
23:13
**announced (1)**
58:16
**announcement (1)**
58:22
**answered (1)**
23:3
**anticipate (1)**
30:6
**anymore (1)**
73:8
**anything's (1)**
25:4
**apologize (5)**
9:9,12,19;15:4;51:23
**apparently (1)**
74:8
**appear (1)**
69:22
**Apple (1)**
51:6

**Apples (1)**
56:9
**applied (1)**
59:6
**appreciate (4)**
18:23;36:9;69:23;
76:2
**appropriate (5)**
37:14,15;41:23;
44:12;48:19
**approval (3)**
9:23;24:22;37:21
**approved (1)**
8:5;20:22,25;31:17
**approximately (3)**
6:3;36:22,24
**area (2)**
48:10;65:17
**argue (10)**
16:19,19;48:18;74:1,
2,2,3,10,10,11
**arguers (1)**
74:3
**arguing (3)**
31:1;72:22;74:3
**argument (13)**
16:13,21;30:23,25;
48:22,22;61:1;69:15;
70:19,19;73:9;74:9;
75:10
**argumentative (3)**
30:22,25;31:2
**arguments (8)**
15:19,25;16:6,17;
17:6;71:3;75:4,6
**around (10)**
9:7;26:2;28:9;32:9;
45:22;49:10;60:7,9;
66:15;75:1
**arrangement (1)**
31:20
**arrangements (1)**
31:16
**articulating (1)**
12:23
**aside (1)**
41:14
**assess (2)**
29:12;30:19
**assessed (1)**
57:11
**asset (2)**
32:1,23
**associated (2)**
41:12;46:10
**assume (7)**
12:5;14:8;35:16;
37:19;58:10,25;63:25
**assumed (1)**
74:22
**assumes (4)**
28:3;32:25;33:1;
47:18

**assuming (4)**
35:18;59:24;60:5,8
**attached (1)**
20:13;58:11;67:6
**attempt (1)**
72:2
**attempting (1)**
16:2
**attendance (1)**
50:5
**attendee (1)**
50:4
**audio (1)**
63:10
**authenticate (1)**
73:5
**authenticity (1)**
73:17
**authorization (2)**
37:14,17
**authorizations (2)**
37:15,21
**available (4)**
36:6;58:2;60:22;
64:8
**avoid (1)**
54:3
**aware (16)**
14:6;22:7,9,17,18;
23:4,7,11;24:8,23;
25:2;34:21;45:15;
62:11,14,17

**B**

**back (7)**
9:23;11:1,8;19:25;
31:12;53:4;70:1
**back- (1)**
23:12
**back-and-forth (3)**
23:13,14,17
**background (1)**
4:3
**background-type (1)**
53:10
**backstop (37)**
8:4,7,8;9:16,21,22;
23:21,22,25;24:2,5,7,9,
9,10,13,14,18;27:8;
30:10,17,18;39:14,18,
19;53:20;54:3;55:8,9;
56:21;57:4,14;58:3;
59:9;66:1,2,5
**ballpark (1)**
68:21
**ball's (1)**
17:6
**bank (3)**
6:22;7:2,6
**banker (1)**
26:10;47:14;54:23;
56:4

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 79
of 91

**bankruptcy (13)**
3:4;8:2;26:4;30:6;
31:17;36:21,22;40:17;
45:21;46:11;47:8,9,15
**banks (2)**
6:16;21:9
**based (7)**
35:12;37:6;55:12;
56:22,22,25;69:1
**basis (2)**
32:6;33:8
**bear (1)**
62:2
**beating (1)**
47:3
**become (1)**
14:11
**behalf (1)**
19:19;54:8
**behind (1)**
4:4
**Behlmann (29)**
49:24;50:1,23;52:13,
17,23;53:6,7,9;55:15,
21,25;56:1,12,17,18;
60:15,17;61:8,17,20,
24;62:2,4;63:9,10,12,
15,16
**believes (1)**
43:9
**belongings (1)**
5:23
**beneficiaries (1)**
24:10
**besides (1)**
14:2
**best (3)**
14:22;38:18;57:23
**better (1)**
62:3
**billion (24)**
6:3,8,18;7:7,8:6;9:7;
35:1,8;36:11,23,25;
37:24;38:17,19;39:9,
12;53:14;64:2,9,16,18,
23,25;67:22
**billion-five (2)**
66:3,17
**bit (2)**
15:4;53:5
**Bloom (1)**
73:10
**board (1)**
37:21
**Boken (2)**
65:9,18
**bond (4)**
35:1,6,7,20
**bondholders (1)**
32:22
**bonds (3)**
32:5,6;35:10
**book (2)**

55:3,4
**borrowing (1)**
65:1
**both (6)**
16:14;21:15;28:16;
32:4;43:17;65:18
**bottom (1)**
38:15
**break (1)**
16:12
**Brent (1)**
73:6
**bring (5)**
25:8;50:1,7;53:4;
70:1
**brings (1)**
15:24
**building (1)**
55:2
**bulk (1)**
71:14
**bunch (1)**
43:14
**burden (4)**
70:18,20;74:4,5
**business (2)**
17:3;37:19
**buy (3)**
41:3;58:16;61:13
**buyers (2)**
40:2,13

**C**

**CAL (3)**
44:12,18;68:17
**calculate (2)**
38:6;59:12
**calculated (1)**
62:18
**CALIFORNIA (4)**
3:1,5;65:20;68:15
**Call (7)**
3:3;4:15;16:11;
49:22;71:7;72:23;
73:14
**called (6)**
4:16;35:11;70:16,25;
72:15;75:3
**calls (3)**
35:23;37:8;45:13
**came (6)**
9:22;32:9;34:14,15,
22,22
**camera (1)**
15:3
**Camp (1)**
5:22
**Campora (3)**
72:10;73:12,14
**Can (63)**
3:7,9,12,16,21,22,25;
4:5,8,9,10,12,12;6:19;

7:18;8:20;9:14,19;
11:23;12:17;14:22;
16:19;23:3;25:3;29:16,
18;30:25;33:18;34:20;
35:24;37:15;38:1;39:1,
13;40:4,10;42:1;44:3;
47:16,20;48:10,22;
49:11;50:21;52:7;
53:21;55:5,6,10;56:15;
61:9;63:16;64:6;66:22;
68:2;69:25;71:19,25;
72:1,2,6,8;74:3
**candidly (1)**
36:1
**cap (5)**
66:17,18;67:11,14,
15
**capacity (1)**
64:14
**capital (16)**
6:22;7:4;28:18,21;
29:4;37:24;38:17;
40:19;53:15;54:4,23,
23;57:25;64:7,9,10
**captured (1)**
33:11
**career (1)**
54:24
**carry (3)**
70:20;74:5;75:20
**case (11)**
5:10;6:21;7:23;10:6;
16:4;28:22;69:13;
70:18,23;71:10;74:25
**cash (4)**
10:19,22;60:10;61:6
**cause (3)**
12:5,15;43:10
**caused (4)**
12:11;43:5,6;44:12
**cautioned (1)**
41:5
**certain (9)**
6:22;7:3;10:1,2,5;
11:7,8;31:5;55:7
**certainly (5)**
12:9;41:9,11;52:19;
66:11
**cetera (1)**
37:22
**chance (2)**
35:20,20
**change (1)**
11:4
**changed (1)**
6:5
**Chapter (1)**
10:9
**chief (1)**
70:11
**chronology (1)**
34:20
**circulated (2)**

20:18;22:10
**circumstances (3)**
31:6;47:22;55:11
**claim (4)**
5:25;61:19;62:22;
63:7
**claimants (1)**
20:3
**claimant's (1)**
19:2
**claims (9)**
33:5,8,10;56:2;
61:22;62:9,13,15,18
**clarification (2)**
36:9;48:5
**clarify (4)**
8:20;14:4;53:4;70:2
**Class (6)**
60:22,24;61:19,22;
62:9;63:6
**classes (1)**
41:2
**classifications (1)**
46:1
**clause (2)**
30:11,18
**CLERK (5)**
3:4,9,13;4:23;5:1
**client (1)**
20:25
**clock (1)**
39:15
**close (4)**
16:11,21;17:3;42:9
**closer (1)**
64:17
**closing (7)**
15:19,25;16:6,13,20;
70:19;75:3
**colleagues (1)**
19:19
**collection (1)**
9:23
**collective (3)**
21:14,20,22
**combination (1)**
53:25
**comforting (1)**
12:25
**coming (3)**
26:25;29:5,10
**commercial (1)**
12:7
**commitment (17)**
6:20,21,23;7:2,3;8:4;
12:13;24:9;27:7;39:14;
43:17;55:9,9;56:21;
57:4,14;58:3
**commitments (25)**
6:2,9,11,11,13,14;
7:4;8:1,2,8;8:9;22:22;
10:1;11:2,6,8,9,14,14;
12:10,11;28:19;39:19;

53:20
**committed (1)**
6:15
**committee (3)**
14:6;19:2;20:3
**common (1)**
56:12
**community (2)**
5:23;17:17
**companies (1)**
64:9
**company (43)**
6:8,13;7:4,8;10:2,16;
12:20,22;14:7;19:19;
24:11;26:9;28:16;
33:14;35:4,11,14;36:3,
22,23,24;39:21;40:23;
43:9,21;44:21;45:10,
24;47:8,17,22;48:7;
49:8,12,14;51:12;58:2;
64:7,14,22;65:1,8,11
**company's (5)**
26:9;28:12;44:14;
47:5;64:11
**complete (2)**
15:2;74:14
**completed (1)**
42:23
**completely (1)**
73:11
**compliance (1)**
70:11
**complied (1)**
5:12
**comply (1)**
51:22
**complying (1)**
51:23
**component (3)**
38:12;57:13;58:7
**comprehensive (1)**
52:8
**computer (1)**
51:7
**concern (3)**
12:15,22;14:5
**concerned (2)**
52:6;70:13
**conclude (6)**
42:11;45:4;48:23;
74:12,14;76:2
**concluded (1)**
76:7
**conclusion (1)**
11:4
**condition (5)**
7:5;11:10;12:9;
29:25;36:17
**conditioned (4)**
28:19;36:2,14,15
**conditions (15)**
6:22;7:1,5,15,16,18,
19;10:1,3,4,5;11:2,9;

36:13;43:24
**confidential (1)**
14:10
**confirm (1)**
16:15
**confirmation (13)**
8:18;10:6,16;11:12,
12;12:3,21;35:3;37:19;
39:24;54:2;72:21;
74:13
**confirmed (1)**
7:6
**conjunction (2)**
53:16;54:1
**connection (5)**
8:17;19:8,12;23:17;
65:11
**consequences (3)**
34:21;36:7;70:20
**consider (2)**
26:7;51:13
**considerable (1)**
52:4
**consistent (3)**
20:3;22:11;33:6
**consistently (1)**
28:15
**consult (1)**
26:20
**consulting (1)**
67:19
**contain (1)**
22:6
**contemplate (1)**
45:24
**contemplated (2)**
64:8,22
**content (1)**
23:22
**contingencies (3)**
6:25;7:9;40:4
**continuance (1)**
5:8
**continued (1)**
45:9
**contribute (1)**
52:5
**controversial (1)**
24:19
**convenience (1)**
18:6
**conversations (1)**
19:17
**coordinating (1)**
56:4
**corporate (2)**
37:20;67:13
**Corporation (1)**
26:6
**correctly (2)**
73:14,15
**cost (1)**
35:25

**costs (1)**
43:13
**counsel (5)**
14:5,20;16:18;74:15,
15
**couple (4)**
5:25;42:11;45:18;
48:24
**course (4)**
37:18,20;42:18;
49:19
**Court (158)**
3:3,4,5,7,12,16,19,
23;4:2,5,11,13,15,16,
20;5:2,7;8:5,13,20,23,
25;9:5,12,18,22;10:16;
11:23;13:9,15,24;14:4;
15:6,14,18,25;16:8;
17:7,10,19,21;18:1,3,5,
11;21:17,21;22:25;
23:3;24:25;25:3,7,9,11,
17,19;26:18;27:1,4,16,
18;28:5;29:9,12,17,22;
30:9,24;31:12,17,24;
32:15,23;33:3,24;
34:18;35:24;37:9,17;
38:23;39:1,4;40:9,12;
42:3,6,15;43:3;44:3,9,
22;45:2,14;46:5,7,12,
25;47:3,20,23,25;
48:10,10,13,17;49:17;
50:13,15,25;51:4,8,11,
17;52:1,7,13,21;55:25;
56:13,17;60:15;61:7,9,
24;62:7;63:9,11,15;
64:6;65:5;67:23;68:1,
9,12,24;69:9,11,20,23;
70:5,14,17;71:4,16,21;
72:3,7,11,14,25;73:18,
25;74:20,24;75:13,23;
76:1,6
**courtroom (3)**
4:3;50:1;76:3
**cover (1)**
43:22
**COVID-19 (1)**
65:7
**CPUC (3)**
34:3;37:5;41:17
**create (1)**
55:5
**creation (1)**
63:1
**creative (1)**
46:21
**credit (5)**
7:4;35:6,7;36:10,11
**creditors (1)**
32:12
**credits (1)**
67:10
**criticizing (1)**
75:14

**CROSS-EXAMINATION (7)**
5:18;18:12;25:22;
27:6;52:6;53:8;63:21
**currency (2)**
56:1,7
**currently (3)**
40:22;45:8;69:3

# D

**damage (4)**
61:18,22;62:9;64:12
**damages (3)**
12:7;43:22;64:2
**date (11)**
11:4,6,7,11;12:6;
29:1,3,23;30:3;66:12,
14
**day (1)**
30:2
**days (5)**
5:11;11:11,15;12:3;
65:2
**deadline (3)**
10:18;42:10,10
**deal (11)**
10:13;11:16;14:13,
19,21;17:17;29:10,13;
30:6;64:14;69:6
**dealing (2)**
20:9;42:7
**deals (1)**
14:1
**dealt (1)**
53:11
**death (1)**
47:4
**debate (1)**
34:22
**debt (45)**
6:3,9,15;7:6;11:9,10,
14,14;12:11,13;28:18;
32:2;33:15,15;35:2,5,5,
11,12,13,14,15;36:2,4,
6,7,15,18,23,25;37:1;
39:14,23,24;43:17;
45:25;49:9,13,15;
64:15,17,20,21,22,23
**debtor (8)**
15:20;26:22;48:6;
56:3;70:18,20,21;
73:22
**debtors (24)**
6:2;8:5;10:8;16:21;
18:25;20:10;23:20;
24:1,6,18;32:22;33:2;
38:16;41:24;50:11;
53:15,18;54:1,9;57:17;
58:6;59:20;60:5,8
**debtors' (11)**
16:12;20:4;21:4,7;
26:21;27:2;41:15;56:4;
70:21,22;74:14

**December (1)**
11:5
**decide (2)**
15:10,11
**decision (1)**
17:4
**declarant (1)**
18:9
**declaration (26)**
6:7,10;8:16;15:15;
17:24;18:16;20:1,14;
26:2,5;31:15;33:13;
34:25;36:12;37:13;
38:15;42:16;43:8;
47:16;49:5;52:8;58:12;
60:13;73:6,10,13
**declarations (9)**
6:1;17:5;71:11,14;
72:17,18,19;73:4,12
**declared (1)**
29:25
**decline (1)**
65:13
**deemed (1)**
27:21
**define (1)**
37:15
**defined (3)**
38:3;57:10;59:14
**definition (1)**
35:23
**defray (1)**
43:12
**degree (6)**
26:3;27:23;29:9,11;
30:14;46:9
**delivered (4)**
22:20;24:21;25:4;
38:7
**delving (1)**
29:13
**demand (2)**
55:5;65:13
**denied (1)**
5:13
**Dennis (1)**
3:6
**deny (1)**
75:8
**Depending (1)**
44:17
**depends (3)**
10:15;43:21;69:4
**derive (1)**
38:5
**describe (3)**
26:5;43:7;48:7
**described (4)**
26:11;31:5;34:20;
41:3
**describes (1)**
17:24
**detail (2)**

15:22;61:1
**determination (6)**
43:15;44:11,18,18,
24;58:23
**determined (5)**
54:21;58:21;59:5;
66:11,12
**determining (2)**
30:20;63:5
**developed (2)**
54:14,19
**difference (1)**
69:16
**different (15)**
3:23;7:2;8:19;23:15;
26:13;30:3;33:10;
46:10;47:7;55:22;57:5;
59:16,17;67:9;73:12
**dilutive (1)**
54:4
**direct (3)**
41:21;72:18;73:15
**directed (1)**
72:1
**directly (4)**
15:25;22:23;43:20;
47:17
**disadvantage (1)**
34:9
**disagree (1)**
48:14
**disclosed (2)**
44:18;54:19
**discretion (1)**
40:3
**discriminatory (1)**
60:23
**discuss (2)**
13:13,14
**discussed (1)**
23:18
**discussing (3)**
13:13;19:21;20:17
**discussion (2)**
41:6;73:1
**distributed (1)**
63:6
**District (1)**
3:5
**divulged (1)**
13:23
**document (6)**
8:19,21,25;9:2;
33:21;75:2
**documents (3)**
31:4;73:5,17
**dollars (13)**
6:8,18;7:8;36:23,25;
53:15;61:13,14;63:25;
64:25;66:6;67:16,22
**dollars' (1)**
64:9
**done (7)**

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 81
of 91

31:3,3;34:7;39:18;
63:11;68:17;75:18
**double (2)**
49:7,12
**down (2)**
5:4;51:18
**drags (1)**
12:24
**drawing (2)**
53:19;54:3
**duplication (1)**
53:13
**During (1)**
49:19
**duties (1)**
17:24
**dwell (1)**
52:8
**dwellings (1)**
12:7

**E**

**earlier (4)**
39:22;49:25;54:7;
57:17
**early (1)**
54:17
**earnings (3)**
38:5,5;57:11
**Edison (3)**
68:17,18;69:3,16
**Edison's (1)**
68:15
**effect (5)**
10:7;22:7;39:15;
65:16,22
**effective (10)**
7:7;11:4,6,11;28:23;
29:1,3,23;30:3,4
**efficacy (1)**
48:8
**efficient (2)**
57:24;72:25
**either (9)**
8:6;13:14;16:5,17;
46:7;51:8;54:5,19;
74:24
**elaborate (1)**
28:6
**electricity (1)**
65:13
**elicit (1)**
29:15
**else (7)**
16:6;26:19;29:12;
31:3;52:10;55:24;
57:25
**else's (1)**
27:2
**emerge (2)**
12:4,20
**emergence (3)**

6:4;36:23;40:24
**end (4)**
32:4;52:19;61:25;
75:21
**Energy (1)**
65:15
**engaged (3)**
17:23;19:1;47:6
**engagement (3)**
35:13;67:5,6
**enough (2)**
30:1;55:5
**enter (1)**
37:18
**entered (4)**
10:6;11:13;12:22;
39:24
**entering (1)**
24:6
**enters (1)**
10:16
**entertain (1)**
51:24
**entire (3)**
17:17;47:9,9
**entitled (2)**
16:19,25
**entitles (1)**
61:12
**entry (2)**
11:11;35:3
**equipment (1)**
12:11
**equitably (1)**
55:18
**equity (40)**
6:3;7:8;8:4,6;9:15;
10:1,3;12:9;15:8;
37:24,25;38:1,10,17;
39:14,18,20,25;43:17;
53:15;54:11,15,23,23;
55:6,10;56:2,5,12,20;
57:18,23;58:3,5,8;
59:13;62:15,17,23;
69:5
**escrow (1)**
39:25
**essentially (1)**
38:4
**established (1)**
68:12
**estimate (3)**
9:6;54:14;59:1
**estimated (7)**
38:13;57:10,12;59:6,
8,11;63:4
**et (1)**
37:21
**ethics (1)**
70:11
**evaluate (3)**
26:13;27:12;28:1
**evaluated (1)**

30:17
**evaluation (1)**
26:15
**even (4)**
32:15,16;43:9;51:21
**event (1)**
58:3
**events (2)**
67:9,10
**everyone (2)**
4:14;52:10
**evidence (3)**
13:10;16:14;17:5
**ex (1)**
37:17
**exact (1)**
68:16
**exactly (5)**
7:14;16:8,9;38:3;
59:14
**examination (6)**
25:19;45:5;48:23;
52:15;70:6;75:15
**examine (6)**
5:13;18:9;25:12;
51:11,14;63:18
**examiner (1)**
48:16
**example (3)**
27:21;61:13;63:24
**Exchange (2)**
59:23,25
**exchanged (1)**
13:11
**excluded (1)**
72:12
**excuse (2)**
49:4;71:17
**executed (4)**
31:22;34:5,6,15
**exercising (1)**
61:6
**exhibit (3)**
41:25;42:1;58:12
**exhibits (1)**
42:8
**existing (1)**
40:21
**exists (2)**
25:2;59:16
**exit (3)**
10:23;40:17;44:15
**expect (8)**
6:2;11:1;13:20;
14:11;15:20;20:8;
26:12,21
**expectation (23)**
6:5,6;11:3,20;12:3,
20;16:24;27:10,12,13,
24;28:6,24;35:7;36:4,
14,14;37:5;39:21;
40:25;41:13,15;64:11
**expected (1)**

6:12
**expecting (1)**
75:23
**expensive (1)**
54:4
**experience (2)**
45:21;47:15
**expert (7)**
26:8,14,21,25;27:2,
2;47:4
**expertise (2)**
28:15;65:17
**experts (1)**
26:20
**expire (2)**
11:14,15
**expires (1)**
11:16
**expiry (1)**
11:7
**explain (4)**
6:19;8:8;9:21;38:1
**exploring (1)**
61:4
**express (1)**
14:18
**expressed (1)**
57:9
**extended (1)**
11:15
**extent (5)**
23:14;39:19;40:21;
53:12;63:13

**F**

**faces (2)**
46:23;47:17
**facility (2)**
36:11,13
**fact (7)**
6:10;12:16;32:24;
34:14,14;35:14;67:11
**facts (5)**
28:3;32:25;34:19;
43:14;44:17
**factual (1)**
29:15
**failed (2)**
70:20;74:4
**fair (1)**
17:18
**fairly (1)**
55:18
**familiar (6)**
57:3;58:10;61:23;
62:8,24;67:24
**familiarity (1)**
62:12
**far (2)**
42:23;52:5
**fascinated (1)**
49:7

**fashion (1)**
14:11
**fast (1)**
39:8
**favor (1)**
12:12
**feasibility (9)**
26:2;30:20;60:13;
70:15;71:11,15;72:19,
20;73:23
**feasible (4)**
44:15,23;47:5,16
**February (1)**
31:18;32:9;34:3
**fee (6)**
66:1,4,5;67:4,6,11
**fees (5)**
67:2,9,18,19,19
**felt (1)**
30:10
**fifteen (2)**
5:11;52:18
**fifteen-day (1)**
5:8
**fifty-eight (1)**
9:25
**fifty-four (1)**
6:3
**fifty-nine (1)**
9:7
**figure (3)**
55:4;70:22;75:16
**figuring (1)**
75:18
**file (1)**
75:11
**filed (6)**
8:2,17,21;13:12;
73:10;75:2
**filing (2)**
6:10;75:2
**filled (1)**
55:5
**final (8)**
8:4;13:2;15:1;16:20;
18:1;20:1;21:3;45:4
**Finally (1)**
12:25;75:20
**finance (1)**
45:11
**financial (3)**
46:10,16;65:7
**financially (1)**
47:5
**financials (1)**
26:15
**financing (14)**
6:3,4,24;8:6;9:15;
10:9,22,23;12:6;35:1,
9;43:7;44:8,15
**find (1)**
5:17
**fine (2)**

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 82
of 91

25:25;41:22
**finish (2)**
32:21;44:3
**finished (3)**
16:2,10;70:6
**Fire (52)**
5:22;10:19,21,21;
12:6,6,11,14;14:8,19;
17:22;19:4;20:9,10,21;
22:20;23:9;27:21;
28:10,12,17,17,20,21;
29:1,6,9,11,12,23;30:2,
4,16,16;31:8,9,9,10,10;
37:24,25;38:1,10;41:7;
43:6,7,10,23;44:12,19;
59:13;63:23
**fires (6)**
27:7,24;29:7;30:11;
47:24;48:2
**first (10)**
4:23;5:14;32:5;
34:15,22,23;35:10;
50:20;52:23;70:8
**five (3)**
61:14;64:8,8
**fixed (3)**
55:12;56:22,24
**flexibility (1)**
41:18
**floor (1)**
66:2
**focused (2)**
38:17;54:5
**folks (1)**
61:5
**folks' (1)**
53:11
**follow (1)**
21:18
**following (2)**
35:3;39:23
**footer (1)**
33:23
**force (1)**
10:7
**form (32)**
11:19,21;12:17;
22:22;23:1,14;24:20,
24;25:1,2;26:16;27:14;
28:3;29:14;32:13,25;
34:13,17;35:22;37:7;
38:21,25;40:6;41:20;
42:25;44:2;45:13;
47:18;57:9;64:4;65:4;
68:22
**forms (1)**
24:21
**formula (7)**
60:25;62:20,22,24;
63:1,3;69:13
**formulas (1)**
55:19
**forth (2)**

58:20;67:5
**forty-five (1)**
51:20
**forward (7)**
39:25;48:6;64:21;
71:9;72:13,17,19
**found (3)**
43:5,6;55:23
**foundation (4)**
18:19;65:25;68:10,
23
**four (3)**
51:21;70:25;71:10
**fourteen (1)**
69:4
**fourteen-point- (1)**
68:5
**FRANCISCO (1)**
3:1
**free (4)**
26:20;31:6,6;41:3
**freedom (1)**
41:17
**freely (4)**
40:17,17,24;41:2
**fresh (1)**
53:15
**Friday (2)**
16:2;17:3
**front (3)**
9:1;32:17,18
**froze (1)**
15:3
**fruition (1)**
29:10
**frustration (1)**
14:18
**full (2)**
10:7;21:9
**fulsome (1)**
73:23
**function (1)**
61:11
**fund (6)**
10:1,19,21;27:8;
28:20,22
**funded (3)**
24:9;26:3;28:23
**funding (5)**
7:16;27:25;28:7;
29:25;60:13
**funds (2)**
35:21,25
**further (6)**
11:15;27:11;29:13;
48:19;74:15,18
**future (2)**
28:13;58:16

**G**

**gave (1)**
18:17

**gears (1)**
23:20
**general (5)**
9:6;19:23;46:19;
54:24;68:25
**generally (3)**
20:17;53:23;55:2
**given (9)**
23:9;26:6,11;29:7;
30:12;34:8;41:2;46:15;
66:14
**gladly (1)**
60:17
**goal (2)**
14:16;47:7
**goes (3)**
10:17;11:1;60:13
**Goldman (7)**
21:8,15,20,23;22:5,
19;54:9
**Good (22)**
3:7,9,16,22,23;4:1,7,
14,17,18;5:16;17:22;
18:14,15;25:9,10,14,
24;26:1;53:10;58:1;
75:22
**governance (1)**
37:21
**grade (4)**
35:12;36:3,5,8
**granted (1)**
5:14
**great (1)**
12:15
**greater (2)**
46:1,17
**greatest (1)**
53:12
**grid (1)**
46:19
**ground (1)**
41:4
**grounds (3)**
26:17;55:24;67:21
**group (2)**
32:11;68:4
**groups (1)**
41:18
**guarantee (1)**
5:11
**guaranteed (1)**
6:24
**guess (6)**
4:16;7:9;14:2;43:25;
46:14;57:3

**H**

**Haillsey's (1)**
50:12
**Hallisey (29)**
50:4,6,17,24;51:1,2,
6,10,15,23;52:3,10,24;

63:17,19,22;65:6;
67:24;68:1,3,11,12,14;
69:9,9,13,18,22,25
**hand (4)**
4:20;25:16;49:24;
50:5
**hands (1)**
49:20
**happen (8)**
10:17;12:16;30:2,13,
14;35:17,17;58:19
**happened (1)**
14:15
**happening (2)**
14:14;41:11
**happens (5)**
11:16;12:2;30:5,5;
63:23
**happy (1)**
28:8
**head (1)**
37:3
**hear (11)**
3:7,9,16,21,25;4:8,9,
10;15:19;38:23;69:20
**heard (5)**
14:5;17:3;28:15;
50:21;52:11
**hearing (6)**
8:18;25:16;32:9;
34:3;61:25;76:2
**held (2)**
41:17;43:10
**Hello (1)**
4:14
**help (4)**
41:13;43:12;71:2;
76:2
**Hi (1)**
5:20
**high-yield (1)**
35:11
**hinder (2)**
34:16;43:7
**hindsight (1)**
21:14
**hired (2)**
15:15;47:5
**hold (4)**
5:11;8:12;24:25;
40:22
**holdco (3)**
61:18,22;62:8
**holder (1)**
61:12
**holders (2)**
62:14,17
**holding (5)**
35:10;36:24;40:25;
64:22;65:1
**home (1)**
5:23
**Honor (68)**

3:9,22;4:1,18,19;
7:12;8:9;11:22;13:8;
18:10;21:19;22:22,24;
23:2;24:24;25:5,14,21;
26:17,23;27:14;28:2;
29:14;30:21;35:22;
37:7;39:3;40:11;41:20;
42:5;44:6,17;45:1,12;
46:14,24;47:2;48:9,14;
50:10,24;52:17;53:7;
55:14,17;56:1,9;60:11,
18;62:6;63:14,19;64:5;
67:20,24;68:7,22,25;
69:19;70:7;71:3,8,20;
72:16;73:24;74:21;
75:25;76:5
**Honorable (1)**
3:6
**Honor's (1)**
75:12
**hope (2)**
17:3;51:24
**Hopefully (2)**
29:3;30:1
**hoping (1)**
25:15
**hundreds (1)**
14:18
**hypothesized (1)**
44:19

**I**

**idea (1)**
60:12
**identical (2)**
9:24,24
**identified (2)**
42:19;49:21
**immediately (2)**
35:3;39:11
**impact (9)**
28:10,17,23;44:13,
16,20;45:15;61:14;
65:10
**impacts (1)**
65:10
**impartial (2)**
26:8,14
**impede (1)**
41:9
**implications (1)**
27:7
**imploding (1)**
29:13
**important (4)**
17:15,23;29:16;
30:10
**include (1)**
31:20
**includes (1)**
21:9
**income (8)**

Case: 19-30088   Doc# 7710   Filed: 06/02/20   Entered: 06/02/20 07:43:29   Page 83
of 91

38:13,13;57:10,12;
59:7,8,11;63:4
**inconsistent (2)**
56:14;75:6
**inconvenienced (1)**
5:9
**increase (2)**
36:18;65:22
**independent (2)**
26:8,12
**indicate (5)**
33:14;42:16;49:25;
52:14;71:10
**indicated (2)**
27:9;39:22;70:9
**indiscernible (1)**
65:12
**individuals (2)**
26:19;34:5
**indulgence (1)**
63:14
**Information (4)**
65:15;69:1;70:11,14
**innovate (1)**
46:18
**input (1)**
23:15
**inquire (1)**
45:22
**inquiry (1)**
47:10
**instance (2)**
11:9;53:22
**instead (1)**
29:16
**instruct (1)**
17:19
**insurance (3)**
43:11,22;63:24
**intend (4)**
5:7;54:1;57:17;58:6
**intended (1)**
59:22
**interest (3)**
5:24;37:1,4
**interesting (1)**
75:1
**interference (1)**
61:25
**International (1)**
68:18
**interrupt (3)**
29:22;49:23;62:21
**intimate (1)**
62:12
**intimately (1)**
57:3
**into (19)**
7:8;12:14;18:18;
23:12;24:6;29:13;
37:18;38:16;39:25;
41:5;43:15;46:2,22;
47:21;50:1,7;60:25;

62:23;72:8
**invested (2)**
7:8;46:17
**investment (10)**
31:21;32:1;36:3,5,8;
45:25;46:22;47:7,14;
53:23
**investment- (1)**
35:11
**investment-grade (1)**
35:15
**investmentors (1)**
46:17
**investments (3)**
46:2,11,23
**involved (1)**
63:1
**irrelevant (4)**
69:11,12;71:13;
72:24
**issue (9)**
16:24;27:25;28:9;
29:5;33:11;52:4;59:17;
69:5;75:5
**issued (7)**
32:6;35:10,13;36:2;
37:24;51:18;72:14
**issuer (1)**
35:7
**issues (3)**
60:25;65:19;70:10
**item (1)**
61:3

### J

**Jerimiah (2)**
50:6,6
**Jerry (1)**
73:10
**job (3)**
70:21,22;75:18
**joining (1)**
3:15
**joint (1)**
75:3
**JPMorgan (7)**
21:8,15,20,23;22:5,
19;54:10
**Judge (6)**
13:12;14:7;19:12,20;
20:16;32:11
**judgment (2)**
63:25;64:2
**Julian (23)**
3:25;4:1,3;13:6,8,10;
18:8,10,13;20:7;23:5;
25:5,7;41:5;54:8;72:1,
3,4,6;73:1,4;75:24,25
**jump (1)**
55:14
**JUNE (6)**
3:1;10:12,14,15,18;

49:4
**junk (2)**
35:6,20

### K

**Kane (1)**
70:10
**Karotkin (10)**
3:15,16,18;15:20;
16:13;71:16,23;74:17,
18,24
**keep (1)**
52:19
**Kenneth (1)**
4:25
**kick (1)**
65:21
**Kincade (6)**
27:21;43:5,7,23;
44:13;63:23
**kind (2)**
13:25,25
**kinds (1)**
15:22
**Knighthead (1)**
40:18
**knowledge (3)**
6:4;20:21;23:24
**knows (1)**
43:2

### L

**language (1)**
34:2
**last (9)**
4:24;13:12;17:9,11,
11;25:16;50:18;51:20;
60:18
**late (2)**
51:11,13
**later (8)**
11:5,6,15;15:18;
16:24;25:17,18;53:5
**laws (1)**
30:6
**lawyer (2)**
45:22;54:24
**lawyers (1)**
16:12
**lawyers' (1)**
70:22
**lay (1)**
55:1
**laying (1)**
68:10
**laymen (1)**
6:19
**Lazard (3)**
26:5;54:14;67:2
**lead (5)**
16:15;21:8;32:23;

54:12,13
**leading (1)**
38:16
**learn (2)**
29:24,24
**leave (1)**
73:23
**leeway (2)**
42:2,7
**legal (2)**
67:18;69:14
**less (1)**
28:25
**letter (6)**
6:23;24:9;55:10;
67:6,6,10
**letters (6)**
8:4;9:24;39:14;55:9;
56:21;58:3
**level (1)**
43:16
**leveraging (1)**
41:25
**liability (1)**
43:21
**liable (1)**
43:22
**liens (3)**
32:1,12,24
**likelihood (1)**
28:1
**likely (1)**
27:12
**limit (2)**
39:9;63:20
**limitations (1)**
55:8
**limited (1)**
73:21
**limits (3)**
38:19;51:19;55:10
**line (4)**
31:15;33:18;36:12;
45:20
**lines (7)**
8:3;32:11;33:13;
34:4,25;37:23;64:7
**liquidate (1)**
15:8
**Lisa (1)**
49:20
**list (3)**
50:4;70:13;73:21
**literal (1)**
31:1
**litigant (2)**
5:24;16:4
**little (5)**
15:4;27:11;39:8;
42:2;53:5
**loan (1)**
6:8
**location (1)**

3:24
**lockup (1)**
41:7
**long (3)**
13:4;15:1,7
**longer (2)**
12:24;71:18
**long-term (1)**
26:6
**longtime (1)**
26:6
**look (2)**
3:12;69:18
**looking (3)**
9:5;46:20;49:4
**lost (3)**
5:23;17:17;23:4
**lot (3)**
7:9;28:16;61:24
**lots (2)**
51:19,19

### M

**MacBook (1)**
62:5
**major (6)**
12:6,6;29:23;31:10;
47:24;48:2
**majority (1)**
23:21
**makes (1)**
43:23
**making (2)**
14:1;67:3
**manner (2)**
10:10,11
**many (2)**
65:21;74:1
**March (2)**
8:5;9:23
**market (5)**
8:7;10:17;39:22;
57:23;58:5
**markets (9)**
33:16;35:2,5;49:16;
54:23,24;57:25;64:10;
66:22
**Mary (1)**
5:22
**material (1)**
64:1;65:10,22
**materials (1)**
5:10
**matter (3)**
7:17;17:4;69:14;
73:6,8;74:14
**matters (1)**
5:10
**maximum (2)**
66:3,23
**may (8)**
8:18,23;14:14;25:12;

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 84
of 91

49:4;58:16;61:15,16
**maybe (2)**
14:2;15:21
**mean (12)**
6:24;9:16;10:10;
12:7;16:13;27:15;28:6;
34:19;52:10;53:21;
62:21;74:25
**means (4)**
6:20;30:25;32:12;
38:2
**mechanism (2)**
57:18;58:7
**mechanisms (4)**
45:25;46:10,16,22
**mediation (17)**
13:11,11,16;14:6,9;
19:8,10,11,16,20,21,
22;20:16,19,19;22:11;
73:8
**member (2)**
51:16,16
**memory (1)**
7:19
**mention (2)**
13:3;36:12
**mentioned (2)**
56:20;57:17
**merely (1)**
18:19
**met (2)**
10:4,5
**method (1)**
61:5
**methods (3)**
53:18,21;54:1
**metric (5)**
55:13;56:23,25;
57:13;63:5
**mic (2)**
61:20;62:1
**microphone (2)**
4:9;62:5
**middle (2)**
16:22,23
**might (12)**
7:10;15:4,12;26:13;
29:19;30:19;47:6,11;
58:19;69:4;73:18,19
**million (7)**
63:24,24,25;66:2,6;
67:4,15
**mind (3)**
9:8;28:24;52:16
**mine (1)**
28:15
**minimum (3)**
66:2,6,16
**minor (1)**
31:9
**minute (4)**
50:16;51:20;52:14,
24

**minutes (11)**
5:4,15;18:9;25:12;
42:11;51:21,21;52:18,
21,25;63:17
**mirrored (1)**
12:10
**mischaracterizes (1)**
28:3
**misquoting (1)**
7:13
**missed (1)**
15:4
**misunderstand (1)**
70:17
**mitigate (2)**
28:16;46:18
**mitigated (1)**
29:11
**mitigation (2)**
46:2;70:9
**moment (7)**
3:13;9:13;13:17;
14:17,20;15:4;49:18
**MONDAY (1)**
3:1
**money (2)**
28:16;65:1
**Montali (2)**
3:6;32:11
**more (21)**
6:6;10:6;12:7;15:22;
17:1;23:6;28:9,14,24;
42:11,13;45:18;46:21;
47:13;52:7;63:20;64:8;
65:1;69:17,20;72:8
**morning (22)**
3:7,9,16,22,23;4:1,7,
14,17,18;5:16;13:21;
18:14,15;25:9,10,14,
24;53:10;54:8;74:25;
75:2
**mortgage (1)**
32:5
**most (4)**
40:13;54:4;57:24;
65:14
**move (8)**
3:18;10:9;14:3;18:5;
48:15;53:3;55:24;68:2
**moving (2)**
13:20;56:4
**much (12)**
12:24;13:17,19;
25:15;28:14;36:18;
37:1;52:15;53:7;64:21;
67:17,17
**multiple (11)**
38:4,9;56:23,25;
57:1;59:6;68:6,15,16,
20;69:7
**multiples (3)**
57:6,7;69:16
**multiplier (1)**

38:10
**mute (2)**
50:20,21
**muted (2)**
62:4;63:9
**myself (3)**
49:1;62:4;71:13

**N**

**name (4)**
4:24;5:22;50:18,20
**narrow (1)**
70:13
**nearly (1)**
6:2
**necessary (4)**
10:9;37:20;52:1;
74:8
**need (14)**
4:7,8;12:2;29:17;
32:16;37:14;50:20;
52:7,9,16,17;55:14;
70:23;71:18
**needs (2)**
47:21;50:5
**negative (2)**
49:7,12
**negatively (1)**
44:13
**negotiate (1)**
34:9
**negotiation (1)**
41:11
**negotiations (12)**
14:13;19:1,7,15,21;
23:18;34:16;41:10,12,
14;42:18,23
**Neither (1)**
49:21
**NENI (3)**
38:14;59:6;63:5
**net (8)**
38:12,13;57:10,12;
59:7,8,11;63:4
**new (6)**
3:12;32:6,6;59:23,
25;75:1
**Newsome (3)**
13:12;14:7;19:12
**Newsome's (2)**
19:20;20:16
**next (5)**
12:14,21;15:1;71:1,4
**night (1)**
13:12
**nine (7)**
7:7;8:6;38:17,19;
39:9,12;53:14
**nine-billion-dollar (1)**
9:15
**ninety-percent (1)**
30:16

**nominal (1)**
37:24
**none (2)**
24:21;64:24
**nonetheless (2)**
28:19;64:13
**normalized (8)**
38:12,13;57:10,12;
59:6,8,11;63:3
**Northern (1)**
3:5
**note (3)**
8:9,15;35:25
**noteholder (7)**
31:17,21;32:3,10;
34:7,15;36:2
**noteholders (3)**
31:20,25;33:1
**notes (1)**
7:5
**number (6)**
6:16;33:17,25;38:6;
63:5;67:1
**number-one (1)**
48:7
**NYSE (2)**
60:9,10

**O**

**object (30)**
11:19,21;12:17;
22:22;24:24;25:1;
26:16;27:14;30:21;
32:13,25;34:13,17;
35:22;37:7;38:21;40:6;
41:20,24;42:25;44:2;
45:12;47:18;50:11;
55:23;64:4;67:20;68:7,
22;73:21
**objected (1)**
51:12
**objecting (1)**
63:19
**Objection (22)**
13:6,8,9;22:25;
26:18;28:2;29:14;
34:19;37:11;38:23,25;
39:4;42:9;56:11,14;
60:11,20;61:2,9;65:4;
67:23;68:1
**objects (1)**
72:21
**obligation (3)**
24:8;30:1;41:12
**obligations (2)**
31:7,9
**obtain (2)**
35:14;37:14
**obvious (3)**
46:12,13;47:25
**obviously (3)**
16:25;43:2;60:25

**occur (5)**
11:11;28:18;29:3,3;
64:14
**occurred (1)**
23:17
**occurrence (3)**
28:10,17;29:5
**off (6)**
7:19;37:3;50:20,21;
53:4;71:22
**offer (1)**
40:1
**offered (3)**
17:18;56:5;59:19
**offering (33)**
8:7,7;38:20;39:10,
16,18,20;40:3;53:19,
19;54:5,6,7,11,14,15,
22,25;57:19,24;58:2,5,
7,21,24;59:2,4,19,20;
60:6,7,21;61:3
**offhand (1)**
36:16
**officer (1)**
70:11
**once (1)**
58:21
**One (20)**
3:13;8:13,17;9:7,16;
12:7;14:21;17:14;
20:10;23:6;24:6;28:17;
34:22,22;35:18;47:13;
48:25;62:2;73:2;75:14
**one-day (1)**
16:11
**ones (2)**
21:10;52:12
**ongoing (2)**
14:6;41:6
**only (1)**
60:24
**oOo- (1)**
3:2
**opco (1)**
35:14
**open (1)**
16:21
**opening (1)**
16:5
**operating (2)**
35:14;36:3
**opinion (1)**
44:13,22,25
**opponent (1)**
70:24
**opportunity (1)**
28:21
**oppose (1)**
16:23
**opposed (2)**
46:19;73:2
**opposing (2)**
16:18;74:9

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 85
of 91

**option (3)**
58:2;61:4,16
**oral (1)**
61:1
**oranges (1)**
56:9
**order (19)**
3:3;10:6,16;11:12,
12;12:21;13:11;16:25,
25;19:20;20:17;35:3;
37:19;39:24;51:18;
72:14;74:23;75:8,12
**orders (1)**
55:3
**ordinary (1)**
37:18
**original (1)**
23:14
**others (5)**
14:9;15:20;16:13;
65:18;69:1
**otherwise (3)**
38:14;56:23;61:15
**out (17)**
7:10;17:1;18:5;
30:12;47:8;53:3;55:4;
56:6;59:13;61:6,20;
63:12;69:25;70:22;
75:8,16,18
**outcome (2)**
7:11;75:19
**outline (1)**
24:1
**outlook (2)**
65:8,23
**outside (4)**
19:21;20:19;37:18;
43:1
**outstanding (1)**
6:25
**over (11)**
5:3;36:20,21;37:2;
39:11;41:17;67:22;
68:12,13;71:19;75:14
**overall (3)**
67:11,14,15
**over-burdensome (1)**
37:4
**overrule (2)**
56:14;61:9
**oversight (1)**
19:12
**own (2)**
7:15;26:20

**P**

**page (15)**
18:16;26:4;31:15;
32:10;33:13,18,19;
34:4,25;37:23;38:15,
16,16;42:16;45:20
**paid (2)**

56:2,8
**panel (6)**
18:6;50:8;53:3;
63:17;70:1;71:22
**panelists (1)**
50:2
**Parada (9)**
3:8;4:15,21;25:8;
50:1,7;63:16;69:25;
76:3
**paragraph (27)**
6:1;8:3,11;9:3,3,6,8,
11,14;10:8;12:10;13:2;
18:17,22;19:25;21:3,
12;26:5;31:16;33:17,
24;34:1;36:12;37:13;
42:16;49:5,6
**pardon (2)**
59:12;68:4
**part (5)**
10:22;40:13;57:18;
60:20;64:12
**participant (4)**
16:5;19:9;60:6;
64:10
**participants (3)**
3:14;58:16;63:17
**participants' (1)**
53:3
**participant's (1)**
18:6
**participate (2)**
16:5;19:14
**participating (2)**
17:8;51:15
**particular (1)**
63:6
**parties (19)**
9:25;10:3;13:12;
16:19;17:2;23:21,23,
25;24:2,5,7,10,14,18;
30:10,17,19,19;31:6
**party (1)**
16:4
**pass (1)**
25:5
**passes (1)**
10:6
**past (4)**
42:10;56:19;62:10;
68:18
**path (1)**
58:21
**pause (1)**
49:17
**payable (2)**
66:8,25
**payment (1)**
37:4
**pending (1)**
56:16
**people (12)**
4:16;14:1;16:22;

38:13,14;51:19;52:5;
55:19;69:4;73:3;74:1,2
**people's (1)**
41:22
**per (10)**
5:24;16:3;26:24;
38:5;47:15;54:15;58:5,
15;67:10,17
**percent (4)**
35:19,20;41:1,16
**perhaps (1)**
39:7
**period (6)**
12:24;37:2;39:11;
48:3;70:21;71:1
**permit (2)**
10:2;24:12
**permits (1)**
25:17
**permitted (2)**
58:4,5
**person (1)**
17:22
**persons (2)**
49:19;50:8
**persuade (1)**
74:4
**persuasive (1)**
70:19
**PG&E (17)**
10:19;12:5;26:4,6,7;
29:11;36:19;37:1,5;
43:5;44:12;45:8;46:19,
23;47:24;48:2;57:14
**PG&E's (3)**
12:11;41:15;69:16
**ph (1)**
49:20
**phase (4)**
16:20;70:19;74:12;
76:2
**phone (1)**
19:15
**pieces (3)**
36:15;56:4;57:11
**pipe (1)**
53:22
**place (6)**
6:13;10:14,15;19:7,
12;36:16
**plan (53)**
7:6,7;11:5;16:16,18,
23;19:4;26:3,13,14;
28:23;30:4,20;33:6;
36:18;38:1;44:23;
45:11,16;46:22;47:5,
16,19,21,22;48:8,12,
18;53:16;54:16;56:2,5,
8;57:19;59:13;60:7,13;
61:23;62:9,10,15,19;
64:3;68:7;70:10,15;
71:11,15;72:18,20,21;
73:23;75:3

**planning (1)**
52:12
**plan's (1)**
44:15
**pleading (1)**
8:2
**please (15)**
4:7,23;5:15;18:16;
27:16;28:6;33:17;38:1;
41:13;42:2;50:1,7,22;
70:16;73:1
**plus (1)**
67:11
**point (18)**
6:7;13:19;14:22;
24:7;28:12;31:4;37:10;
42:2;47:12;48:16,20,
23;50:6,9;51:18;52:2;
53:25;58:6
**pointedly (1)**
71:14
**portion (3)**
16:20;32:3,4
**positions (1)**
16:19
**possibility (1)**
49:25
**possible (5)**
13:22;38:18;52:14,
20;53:13
**possibly (1)**
15:25
**post-confirmation (1)**
39:16
**potential (1)**
12:12
**Potentially (1)**
36:6
**Powell (1)**
70:9
**practical (1)**
5:9
**preamble (1)**
27:15
**precluded (1)**
37:6
**precludes (3)**
13:12;19:21;20:17
**predicting (1)**
31:7
**prepared (3)**
6:7;75:5,5
**pre-petition (3)**
33:8;64:15,17
**present (3)**
47:5;66:15,23
**presented (1)**
48:17
**presiding (1)**
3:6
**presumably (3)**
43:12;54:18;56:4
**presume (1)**

29:24
**pretty (2)**
24:20;52:8
**previous (1)**
56:19
**previously (2)**
49:21;52:14
**price (6)**
38:18;54:15,21,22;
55:7,10;56:22,24;
58:15;59:1,4;60:1,2,4;
66:13,21
**priced (1)**
54:25
**prices (6)**
55:12,12;66:3,15,23;
68:21
**price-to-earnings (2)**
57:8,9
**pricing (1)**
55:19
**primary (1)**
54:10
**principal (1)**
7:5
**principles (1)**
14:10
**prior (5)**
10:11;28:20;36:4;
46:11;54:24
**privilege (1)**
13:16
**pro (3)**
5:24;16:3,18
**probable (3)**
27:12,22;43:6
**probably (3)**
5:11;26:14;49:3
**probation (4)**
45:8,9,10,15
**probe (1)**
48:10
**problem (4)**
27:10;29:2;61:25;
69:14
**problems (2)**
63:10;69:6
**procedural (3)**
25:15;48:25;53:1
**procedure (1)**
51:22
**procedures (4)**
49:23;58:11,14,20
**proceed (2)**
5:15;25:13
**proceeding (1)**
48:6
**proceedings (1)**
76:7
**proceeds (5)**
10:21,22;35:1,1;
43:11
**process (2)**

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 86
of 91

19:16;74:22
**product (1)**
65:14
**professional (1)**
67:18
**projection (1)**
28:11
**projections (2)**
28:25;65:11
**promise (2)**
6:21,21
**proponents (2)**
40:16,18
**proponents' (1)**
75:3
**propose (1)**
24:6
**proposed (15)**
20:2,6,8,13,18,22;
21:1;23:8;24:1;33:6,6;
35:3;56:2,8;75:7
**prospects (1)**
44:14
**prove (2)**
70:18,23
**provide (9)**
6:22;7:4;9:25;21:16;
24:13;37:20;46:1,16;
70:12
**provided (7)**
12:21;13:4;20:2;
21:11;39:17;69:1;
73:22
**providers (3)**
28:18,18,21
**provides (1)**
73:22
**prudent (3)**
29:9;30:13,18
**public (16)**
7:17,21;8:6;14:12;
33:15;35:2,5;49:15;
53:19;54:5;7,10,14,15,
22;57:23
**publicly (1)**
60:1
**pull (1)**
33:18
**punitive (1)**
64:2
**purposes (4)**
5:3;50:19;57:14;
71:7
**pursuant (3)**
19:4;37:25;60:24
**pursue (1)**
73:8
**put (18)**
4:3;5:10;24:11;
30:10,17;34:8;46:22;
50:18;51:10,10,18;
58:1;70:24;71:9,10;
72:13,17,19

**putting (1)**
61:6

**Q**

**qualification (1)**
23:10
**quickly (1)**
45:19
**quite (2)**
14:23;57:20
**quiz (1)**
50:18
**quotation (1)**
33:11

**R**

**raise (18)**
4:20;8:5;10:3;25:16;
33:15;35:5;37:5;49:9,
13,15;50:5;57:23;58:3,
4,8;74:15,25;75:24
**raised (7)**
10:23;35:2;39:25;
49:20,24;53:15;61:2
**raising (5)**
38:17,19;39:9,12,23
**range (5)**
52:19;54:19;55:4,7;
69:3
**rated (1)**
36:7
**rates (1)**
37:6
**rather (1)**
46:12
**rating (6)**
35:6,7,7,13,15;36:10
**ratings (1)**
36:17
**reach (1)**
74:8
**reached (1)**
23:20
**read (11)**
7:18;21:3,22,25;
22:1,1,2,4,8;33:12;
62:10
**reading (3)**
8:18;32:18;33:5
**reaffirm (1)**
49:11
**real (1)**
16:2
**realize (1)**
61:5
**realized (1)**
6:12
**really (7)**
10:25;12:23;31:1;
52:11;55:1;65:17;72:1
**reason (10)**

12:1;33:14;35:4,12;
49:8,9,11,12,14;60:20
**receive (2)**
66:24;68:5
**received (2)**
6:8,10
**receives (2)**
35:20;60:6
**receiving (3)**
60:24;62:15,18
**recent (1)**
65:2
**recently (1)**
19:7
**recite (1)**
7:19
**recognize (2)**
50:9,19
**recommenda (1)**
22:9
**recommendation (5)**
20:3;21:12,14,20,22
**recommendations (6)**
21:4;22:5,11,15,18;
23:7
**reconsider (1)**
28:22
**record (8)**
4:24;7:17;8:10,15;
16:15;31:5;50:10,19
**records (1)**
7:21
**reduce (1)**
53:13
**refer (1)**
54:12
**reference (5)**
9:14;10:11;31:16;
37:15;66:18
**references (1)**
9:15
**referencing (1)**
41:21
**referred (5)**
6:9;21:4,7,12;63:4
**referring (10)**
8:16,21;9:4,10,14;
33:20,22;40:18,22;
65:25
**refers (2)**
37:17;45:20
**refinan (1)**
32:4
**refinancing (1)**
32:4
**reflects (1)**
23:15
**refocus (1)**
75:10
**regard (1)**
21:23
**regarding (6)**
26:2;28:7;34:9;

70:15;71:11;75:3
**register (1)**
24:16
**registered (2)**
59:22;60:3
**registration (26)**
13:1,3;18:18;19:3,
17;20:6,8,18,22;21:1;
22:6,10,16,19;23:22,
24;24:2,4,11,12,14,15,
17;41:7,14;42:17
**reinstatement (1)**
32:3
**related (3)**
6:23;42:17;71:14
**relating (2)**
19:3;43:24
**relationship (2)**
10:13;26:7
**relative (2)**
45:24;56:7
**relevancy (6)**
26:16;30:22;55:24;
67:20;72:18,22
**relevant (9)**
38:12;55:20,23,25;
60:12,20;71:10,12;
72:21
**relieves (1)**
29:25
**rely (1)**
65:18
**relying (1)**
8:7
**remain (1)**
10:7
**remarks (1)**
61:16
**remove (1)**
63:16
**renew (1)**
60:11
**renewable (1)**
65:21
**Rentz (1)**
49:21
**reorganization (3)**
45:25;46:10,15
**repeat (3)**
21:17;39:7;73:25
**rephrase (3)**
22:4;29:17;30:8
**rephrasing (1)**
44:10
**reportable (1)**
27:22
**representation (4)**
14:20;19:24;33:4,7
**representatives (4)**
14:7,8,9;19:18
**represented (1)**
32:2
**representing (2)**

5:24;51:16
**request (12)**
5:3,8,13,13;16:15;
50:3;51:13,14,24;
52:15;73:2;74:10
**requested (2)**
25:12;74:9
**requesters (1)**
75:18
**requests (2)**
17:2;75:15
**required (4)**
10:18;38:7;50:17,18
**requirement (1)**
10:12
**requirements (1)**
65:20
**requires (1)**
55:2
**resale (1)**
24:12
**rescission (3)**
61:18,22;62:9
**resolution (1)**
14:11
**resolved (1)**
73:7
**respect (7)**
13:15;19:2;22:5,15,
19;59:17;73:6
**respond (2)**
71:24;73:1
**responded (1)**
51:19
**response (2)**
16:17;54:8
**responsive (1)**
17:2
**restate (6)**
39:5,6;56:17;71:25;
72:1,6
**restrict (1)**
15:12
**restriction (1)**
40:14
**restructuring (1)**
67:4
**result (1)**
74:8
**return (2)**
46:1,17
**reverse (1)**
49:12
**revolving (2)**
7:3;36:11
**Richardson (3)**
72:9;73:5,16
**right (63)**
4:13,15,20;5:2,7;
10:7,19;12:12;16:9;
18:25;19:14,25;20:19,
23;21:1,13;22:13;23:4,
16;25:7,11;27:3,16,18,

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 87
of 91

19;29:20;39:21;40:23;
41:6;42:15;46:8;50:7,
17;52:21;53:6;55:5,18;
58:1,4,18,24;61:7,11,
11,12,13,20;64:15,19;
65:6;66:7,9,13,15,16,
20;67:2,17,25;68:3,14,
20;72:7
**rights (44)**
  8:7;13:1,3;18:18;
19:3,17;20:6,8,18,22;
21:1;22:6,10,16,19;
23:22,24;24:2,5,14;
31:8;41:7,14;42:17;
53:19;54:6;58:1,7,21,
23;59:1,4,18,19,20;
60:5,6,7,21,21,21;61:3,
3,15
**rights-offering (4)**
  57:18;58:11,14,15
**rise (2)**
  12:12;43:16
**risk (17)**
  29:10,12;30:15,15,
16,17,20;43:25;44:1,5,
6,8;46:2;47:24;48:2,7;
56:13
**risks (4)**
  29:12;46:23;47:17;
48:11
**Robert (1)**
  49:20
**room (2)**
  14:14,15
**rooms (1)**
  41:11
**rose (1)**
  43:15
**RSA (10)**
  31:17,22;32:3,10,23;
33:6;34:7,14,15;36:2
**ruled (2)**
  73:13,15
**ruling (1)**
  42:1
**rulings (1)**
  42:7
**run (1)**
  56:13

## S

**Sachs (7)**
  21:8,15,20,23;22:5,
19;54:9
**sadly (1)**
  30:1
**sale (1)**
  15:2
**Same (7)**
  28:2;32:5;56:10;
59:8,11,14;75:18
**SAN (1)**

3:1
**satisfied (2)**
  7:1;11:2
**satisfy (1)**
  43:24
**saying (1)**
  44:1
**scenario (1)**
  30:4
**schedule (2)**
  52:22;75:6
**scope (1)**
  43:1
**screen (2)**
  4:6;53:4
**se (1)**
  16:18
**season (2)**
  12:14,14
**second (6)**
  8:13;20:1;34:15;
35:12;62:2;71:8
**secret (2)**
  14:1,13
**secure (3)**
  35:8,21;36:11
**secured (3)**
  32:5,7;64:24
**securitize (1)**
  32:1
**security (5)**
  31:20,25;60:1,3;
64:25
**seek (1)**
  39:22
**seem (3)**
  41:18;70:17;71:9
**seems (2)**
  13:25;28:25
**self-generation (1)**
  65:23
**sell (12)**
  15:8;40:3,4,17,23,
23;41:1,3,8;55:6,6;
60:9
**selling (2)**
  13:5;65:14
**senior (1)**
  32:12
**sense (5)**
  14:3,24;31:1;62:25;
72:24
**sent (2)**
  23:11;24:1
**sentence (3)**
  20:1,1;21:3
**separate (2)**
  22:14;23:8
**sequence (1)**
  39:24
**session (1)**
  3:5
**set (4)**

10:17;22:14;58:20;
67:5
**seven (2)**
  27:15;66:15
**several (2)**
  12:21;21:9
**share (7)**
  14:4;38:5;54:15;
58:15;59:1,4;66:21
**shareholder (3)**
  40:16,18;68:4
**shareholders (2)**
  41:3,18
**shares (23)**
  12:22;19:3;24:13;
38:6;41:1,16;42:17;
46:19;58:16;60:24;
61:8;62:23;63:5;66:8,
10,19,21,22,24,25;
67:1;68:5,8
**shelf (1)**
  24:10
**shortly (1)**
  39:23
**side (5)**
  16:22;20:10,11;
72:23;74:4
**significant (1)**
  64:7
**similar (3)**
  30:18;52:12;55:15
**similarly (3)**
  20:25;22:18;36:10
**simple (2)**
  51:22;74:6
**Simplify (2)**
  27:16,20
**simply (2)**
  58:1;61:4
**single (1)**
  21:11
**singular (2)**
  21:13;24:11
**sit (1)**
  58:25
**situation (1)**
  30:3
**six (2)**
  6:8,18
**sixty (3)**
  11:11,15;12:3
**sixty-day (2)**
  39:15,17
**size (1)**
  30:12
**skip (1)**
  42:20;53:12
**slightly (2)**
  57:5;59:17
**SoCal (1)**
  69:16
**so-called (3)**
  61:18,22;62:8

**sold (3)**
  24:13;40:15;55:10
**somebody (3)**
  14:2;27:2;31:3
**someone (2)**
  47:14;71:13
**somewhere (4)**
  7:21;52:18;66:2;
69:2
**soon (1)**
  17:1
**sorry (18)**
  8:11;11:10;15:3;
21:19;22:24;23:5;35:2;
36:1;38:23;39:3;42:4;
45:17;50:24;51:6;
61:20;62:5,21;69:20
**sort (1)**
  67:2
**sorts (1)**
  63:10
**sound (1)**
  68:20
**sounds (1)**
  8:18
**sources (2)**
  10:9;29:25
**Southern (2)**
  68:15,17
**speak (1)**
  41:10
**SPEAKER (2)**
  9:10;44:6
**speaking (1)**
  61:21
**speaks (1)**
  68:8
**specific (5)**
  9:7;17:1;46:18;
51:18;52:7
**Specifically (4)**
  6:15;26:2;36:17;
45:22
**specifics (1)**
  72:8
**specified (2)**
  6:23;7:16
**speculate (1)**
  69:15
**speculated (1)**
  64:13
**speculation (6)**
  12:1;35:23;37:8,9;
44:19;45:13
**spend (1)**
  55:19
**spent (3)**
  28:16;52:3;67:18
**spoke (1)**
  65:19
**squares (1)**
  32:8
**staff (1)**

76:3
**stamped (1)**
  33:22
**standard (1)**
  24:20
**start (2)**
  13:5;16:12
**starts (2)**
  16:1;41:4
**state (5)**
  4:23;6:1;10:8;37:23;
58:14
**stated (4)**
  29:7;32:11;34:4;
41:16
**statement (2)**
  24:12,17;29:15;75:3
**states (2)**
  35:1;38:16
**stating (2)**
  26:24;46:13
**status (2)**
  33:7;35:21
**stick (2)**
  25:19;53:2
**still (8)**
  5:4;18:9;39:19;
41:25;42:18,23;47:1;
74:9
**stock (21)**
  13:5;15:8,8;38:20;
39:10;40:2,3,5,14,17,
22;41:1;55:16;57:14;
59:23,25;61:13;64:24;
66:13,19,21
**stockholders (1)**
  40:21
**stocks (1)**
  15:2
**strategies (1)**
  44:15
**strike (2)**
  20:7;42:20
**strongly (1)**
  48:14
**structures (1)**
  12:8
**subject (3)**
  15:11;40:14;47:22
**submit (1)**
  73:13
**submitted (4)**
  17:4;73:4,5,12
**submitting (1)**
  51:12
**subscription (3)**
  59:18;60:6,21
**subscription-rights (1)**
  59:18
**substance (2)**
  18:19;23:12
**substantial (2)**
  30:12;34:8

Case: 19-30088   Doc# 7710   Filed 06/02/20   Entered 06/02/20 07:43:29   Page 88
of 91

substantiate (1)
71:2
successfully (3)
33:15;35:5;49:9
suffer (1)
64:12
sufficient (2)
43:11;70:14
summaries (1)
8:1
summarize (1)
16:14
supporting (1)
16:18
suppose (2)
52:3,4
supposed (1)
70:24
supposes (1)
12:23
sure (15)
9:13,22;14:17;16:2,
3;18:21;23:7;31:14,23;
38:22;60:2,17;65:3;
72:8;73:4
survivor (2)
5:22;17:22
sustain (1)
26:18;34:19;39:4;
42:9
Sustained (9)
28:5;29:17;30:24;
37:9;43:3;56:10;67:23,
23;68:1
sustaining (1)
37:10
swear (1)
4:21
switch (1)
23:20
switched (1)
62:5
sworn (1)
4:22
syndicate (1)
21:9

**T**

talk (5)
18:19;37:13;45:21;
74:22;76:4
talked (1)
72:17
talking (3)
10:23;39:7;73:11
talks (1)
26:4
target (2)
13:20;46:23
targets (1)
65:21
TC (1)

34:5
TCC (21)
13:4;19:18;20:25;
22:20;23:9;24:3,21;
34:6,14,16;36:1,1;
51:16;54:9;71:8,12;
72:9,10,21;73:22;
74:15
technically (1)
64:23
technology (1)
46:18
Ted (1)
50:11
telling (2)
27:1;29:22
temporary (2)
6:9,15
ten (9)
5:4,15;35:19;52:18,
19,21,24,25;63:17
ten-percent (1)
30:15
term (3)
6:8;38:3;57:10
terminate (1)
39:16
termination (2)
12:12;43:16
terms (23)
6:19,22;10:1,2,4;
11:8,9;15:11;17:1;
20:17;27:7,13,25;28:1;
29:10;31:21;34:7,10;
38:7,20;39:10;67:5,10
testified (11)
18:25;20:2;28:14;
38:14;43:2;44:14;
48:16;53:14;54:7;65:9;
68:11
testify (1)
73:3
testifying (1)
47:4
testimony (18)
16:11,14;18:17,20;
22:9;26:24;28:3;41:22,
25;45:5;47:10;49:19;
53:2;70:8;71:18,21;
74:7,13
Thanks (2)
25:14;76:3
that'll (1)
70:10
therefore (3)
27:22,24;60:23
there'll (1)
16:11;31:8
thirty-eight (1)
64:24
Thomas (1)
76:4
though (4)

6:7;24:19;62:14;
66:10
thought (4)
17:10,11;23:5;71:25
thousands (1)
14:19
three (3)
42:13;53:18;64:16
threshold (1)
57:2;58:4
thresholds (6)
55:9;56:21,22,22;
57:4,6
tied (1)
36:17
tight (1)
52:22
timely (2)
10:10,11
times (3)
38:4;68:20;74:1
timing (3)
17:2;28:9;58:20
today (14)
3:21;4:6;5:24;12:2;
16:24;40:23;52:15;
58:25;63:10;68:16;
71:5;74:11,16;75:7
today's (3)
5:3;66:3;68:21
tomorrow (3)
11:13;44:11;74:23
top (1)
37:3
topic (1)
60:19
tort (2)
19:1;20:2
total (1)
9:6
totally (1)
71:12
towards (2)
46:23;52:19
traded (2)
60:1;66:12
trading (7)
60:1,2,3;61:14;
66:11;69:3,7
tradition (1)
14:9
train (1)
23:5
transaction (1)
67:3
transcript (1)
32:10,17,19
transferrable (3)
59:21,25;60:9
transferred (3)
19:4;59:23,24
translated (1)
62:23

tread (1)
41:4
treated (1)
55:18
treating (1)
33:10
treatment (2)
32:2;33:5
trial (7)
16:1,9,10;17:23;
47:9;74:12,13
tried (1)
25:16
true (2)
20:14;68:9
trust (20)
10:20,22;13:4;15:2,
8,11;19:4;20:9,10,21;
22:20;23:9;27:8,25;
28:7;37:25;38:7;41:8;
42:22;75:7
trustees (1)
15:11
trusts (1)
19:18
try (11)
27:20;33:18;44:10;
45:18;46:7,8;52:19;
53:12;71:23;72:4;74:3
trying (13)
5:17;26:13,24;27:23;
45:22;46:9;47:8;55:6,
16,21,22;56:3,5
Tsekerides (63)
3:21,22;7:12;8:9,12,
14,15;11:19,21;12:17;
17:20;22:22,25;23:1;
24:24;25:1;26:16;
27:14;28:2;29:14;
30:21;32:13,25;33:19;
34:13,17;35:22;37:7;
38:21,24,25;40:6;
41:20;42:4,25;43:4;
44:2;45:12;46:4,24;
47:18;48:9,14;50:10,
11,14;55:14;56:9;
60:11;64:4;65:4;67:20;
68:7,22;71:17,23,25;
74:19,20,21;75:11,22;
76:5
turn (7)
18:16;26:13;42:22;
49:10;60:7,9;75:1
twelve (1)
69:2
twelve-and-a-half (1)
69:3
twenty (3)
18:8;25:12;61:13
twenty- (1)
64:15
twenty-five (3)
45:21;47:15;67:4

twenty-one (2)
41:1,15
twenty-three (1)
64:16
two (12)
12:25;13:1;17:13;
21:10;35:20;41:2;45:4;
49:19;59:16;70:7;72:9;
73:3
two-billion-dollar (1)
64:2
tying (1)
45:25
type (1)
64:12

**U**

ultimately (3)
54:21;58:7;59:5
under (29)
10:2;12:13:3;14:9;
24:8;30:4;31:5;32:2;
33:5;38:7,22;41:12;
42:18,23;43:16;54:10,
15;55:10;56:2,5,8;
57:19;58:2;59:19;60:6;
61:23;62:9,15,18
understands (3)
40:7;46:21;65:5
Understood (1)
26:23
underway (1)
16:9
underwriter (5)
20:4;21:7,11;22:12,
15
underwriters (7)
21:8;23:15;54:10,12,
13,18;55:4
underwriter's (1)
21:4
underwriting (1)
21:9
UNIDENTIFIED (2)
9:10;44:6
unless (3)
11:15;74:14,21
unmute (4)
4:7,8;25:11;52:13
unmuted (1)
62:4
unquantified (1)
69:6
Unsecured (7)
32:12,12;33:9;64:19,
20,21,23
up (8)
10:17;15:3;24:11;
32:4,9;33:18;47:6;
66:16
upon (7)
24:17;36:15;38:4;

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 89
of 91

40:17;44:17;49:23;
66:12
**use (6)**
54:1;57:18;58:7,23,
23;59:20
**used (9)**
42:1;51:6;53:22;
57:6,13;58:22;59:9,12;
72:22
**uses (1)**
63:3
**using (3)**
50:25;51:6;57:11
**usually (1)**
57:24
**utility (5)**
6:9,15;36:11,24;
64:24

**V**

**vaguest (1)**
62:25
**valuation (2)**
55:16;56:20
**value (18)**
37:25;38:2,6,10,11;
56:7;59:12,13;60:22,
23;61:3,4,6,11,14,16;
66:10,11
**valued (3)**
56:7;68:5,8
**valuing (1)**
57:14
**various (3)**
31:6;55:11;65:20
**versus (1)**
31:9
**viability (2)**
26:4;64:3
**Victim (12)**
10:21;19:4;20:9,10,
21;22:20;23:9;37:25,
25;38:1,10;59:13
**victims (7)**
14:8,19;26:12,19;
34:8;40:25;68:4
**victims' (2)**
41:7;42:22
**victim's (1)**
10:20
**video (5)**
50:25;51:2,4,8,9
**view (3)**
26:14;64:3;73:23
**violations (4)**
45:9,9,10,15
**virtually (1)**
9:24
**virus (2)**
65:7,9
**vis (1)**
60:24

**vis-a- (1)**
60:23
**volume (1)**
5:9
**voluminous (1)**
16:15
**Vonatrod (1)**
49:20

**W**

**wait (1)**
8:13
**Wallace (41)**
4:6,7,8,10,12,14;5:2,
6,16,19,22;8:16,20,22,
24;9:3,5,9,10,12,17,20;
13:15,22,25;14:4,23,
25;15:14,17,24;17:9,
13,16,25;18:2,3,4;27:6;
28:9;49:3
**wants (2)**
41:21;74:15
**waste (1)**
63:20
**way (7)**
8:6;29:8;35:18;57:5,
23;69:18,19
**Wednesday (5)**
16:1,12;74:22;75:9;
76:4
**week (2)**
15:19;17:4
**weekend (2)**
5:3;75:15
**weeks (1)**
12:21
**Wells (7)**
34:4;41:16;55:15;
56:10;64:1;65:18;70:8
**whatever's (1)**
23:8
**what's (4)**
6:9;13:9;16:20;22:8;
35:11;39:11;56:6;
68:15;71:1
**Where's (1)**
51:2
**Whereupon (1)**
76:7
**wherever (1)**
66:22
**whole (1)**
61:16
**wildfire (1)**
70:9
**wildfires (1)**
46:18
**Williams (1)**
73:6
**willingness (1)**
28:22
**window (1)**

39:17
**wish (2)**
5:4;18:9
**withdraw (2)**
65:6;67:25
**within (3)**
11:11;12:21;55:6
**without (4)**
23:12;29:13;41:21;
65:10
**Witness (36)**
4:22,25;8:17;9:2;
13:14;15:3;21:19;
22:24;25:6,20;29:15;
31:13;39:2;40:10;44:7,
16,25;46:6,21;47:1;
48:6;49:14,22;51:12,
14;53:2;55:22;56:16;
62:3;63:18;68:13,25;
69:15;70:13;73:15,21
**witnesses (14)**
13:18;28:14;48:16;
70:16,22,25,25;71:7;9;
72:9,15,22;74:13;
75:16
**words (4)**
17:5;38:3;39:10;
59:14
**work (3)**
26:9;68:17;75:17
**worked (1)**
7:10
**working (5)**
7:4;54:9,13;64:7,9
**worry (1)**
12:2
**worth (1)**
64:9
**Wow (1)**
14:23
**writing (1)**
22:7
**written (3)**
17:5;23:7;61:2
**wrong (1)**
16:9
**wrote (1)**
8:3

**Y**

**year (1)**
67:18
**years (2)**
45:21;47:15
**York (1)**
59:23,25

**Z**

**ZIMAN (58)**
4:18,20,25;5:4,14;
6:1;8:12,13,21,25;

11:25;13:20;15:15;
16:10;17:14,23;18:14,
25;21:17;22:4;25:12,
24;26:20;31:4;32:16;
33:3;35:24;39:1;40:7,
8;43:1,5;44:11;45:14;
46:5,25;47:4,13,14,20;
48:19,23,25;49:2;
52:24;53:10;56:3,15;
61:5,9;62:6,8;63:13;
64:6;68:24;69:11;
71:18,20
**Z-I-M-A-N (1)**
4:25
**Ziman's (2)**
52:8;60:12
**Zoom (1)**
25:16

**1**

**1 (2)**
3:1;34:25
**10 (1)**
34:4
**10.5 (1)**
68:20
**10.7 (2)**
35:1,8
**1054 (3)**
5:12;10:12;37:6
**10A-I (1)**
60:23
**10A-II (5)**
60:24;61:19,23;62:9;
63:6
**11 (3)**
9:11,14;10:10
**11:39 (1)**
76:7
**12 (1)**
37:23
**13 (1)**
38:15
**14 (2)**
32:10;37:23
**14.9 (2)**
38:4,9
**15 (1)**
37:13
**16 (3)**
8:3,5;10:8
**17 (8)**
13:2;18:16,22;19:25;
21:4,12;42:16;45:20
**18 (3)**
8:3;31:15;45:20
**1949 (1)**
65:15

**2**

**2 (1)**

45:20
**2020 (3)**
3:1;8:5;11:5
**2030 (1)**
65:21
**21.5 (2)**
36:22;64:17
**22nd (3)**
8:23;49:4,4
**28th (1)**
34:3

**3**

**3 (1)**
26:4
**3.5 (1)**
36:11
**30th (4)**
10:12,14,15,18
**36.5 (1)**
67:15
**37 (1)**
67:15
**38 (1)**
36:24

**4**

**4 (4)**
26:5;31:15;34:25;
36:12
**4.75 (1)**
64:23
**460 (1)**
63:24
**480 (1)**
63:24
**4th (2)**
31:18;32:9

**5**

**5 (11)**
33:13,13,18,18,19,
20,20;34:1,25;37:23;
38:16
**500 (1)**
12:7

**6**

**6 (8)**
32:11;33:13,18;34:1,
4;36:12;38:16;42:16
**6.7 (1)**
37:23
**6.75 (1)**
38:6
**600 (1)**
63:25
**602 (1)**
34:4

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(12) use - 602

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 90
of 91

**7**

**7 (1)**
  33:20
**750 (1)**
  66:2
**7512 (1)**
  8:21
**763 (2)**
  66:6,16

**8**

**8 (3)**
  8:3;9:3,6

**9**

**9 (2)**
  6:1;32:11
**9a (1)**
  31:16
**9c (2)**
  34:1;49:5

Case: 19-30088    Doc# 7710    Filed: 06/02/20    Entered: 06/02/20 07:43:29    Page 91
of 91