UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

-oOo-

| | |
|---|---|
| In Re: | ) Case No. 19-30088-DM |
| | ) Chapter 11 |
| PG&E CORPORATION AND PACIFIC | ) |
| GAS AND ELECTRIC COMPANY, | ) San Francisco, California |
| | ) Wednesday, June 3, 2020 |
| Debtors. | ) 10:00 AM |
| ______________________________ | ) |
| | CLOSING ARGUMENTS |
| | CONFIRMATION HEARING |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENNIS MONTALI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES (Via Zoom):

| | |
|---|---|
| For the Debtors: | STEPHEN KAROTKIN, ESQ.<br>THEODORE E. TSEKERIDES, ESQ.<br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, NY 10153<br>(212)310-8000 |
| For PG&E Shareholders: | JAMES O. JOHNSTON, ESQ.<br>Jones Day<br>555 South Flower Street<br>50th Floor<br>Los Angeles, CA 90071<br>(213)489-3939 |
| For Ad Hoc Committee of Senior Unsecured Noteholders: | DAVID H. BOTTER, ESQ.<br>Akin Gump Strauss Hauer & Feld LLP<br>One Bryant Park<br>New York, NY 10036<br>(212)872-1000 |
| For Ad Hoc Group of Subrogation Claim Holders: | MATTHEW A. FELDMAN, ESQ.<br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, NY 10019<br>(212)728-8000 |

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

| | |
|---|---|
| For Ad Hoc Committee of Holders of Trade Claims: | MICHAEL S. NEUMEISTER, ESQ.<br>Gibson, Dunn & Crutcher LLP<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>(213)229-7000 |
| For AT&T Corp.: | BENJAMIN MINTZ, ESQ.<br>Arnold & Porter Kaye Scholer LLP<br>250 West 55th Street<br>New York, NY 10019<br>(212)836-8000 |
| For Adventist Health System/West and Feather River Hospital: | REBECCA J. WINTHROP, ESQ.<br>Norton Rose Fulbright US LLP<br>555 South Flower Street<br>Forty-first Floor<br>Los Angeles, CA 90071<br>(213)892-9200 |
| For Oklahoma Firefighters Pension and Retirement System: | DANIEL E. BARENBAUM, ESQ.<br>Berman Tabacco<br>44 Montgomery Street<br>Suite 650<br>San Francisco, CA 94104<br>(415)433-3200 |
| For Daniel Franklin and Ravin Skondin: | ESTELA O. PINO, ESQ.<br>Pino & Associates<br>1520 Eureka Road<br>Suite 101<br>Roseville, CA 95661<br>(916)641-2288 |
| For Anthony Gantner, et al.: | ROBERT G. HARRIS, ESQ.<br>Binder & Malter LLP<br>2775 Park Avenue<br>Santa Clara, CA 95050<br>(408)295-1700 |
| For Andy R. Vara, United States Trustee: | TIMOTHY S. LAFFREDI, AUST<br>Office of the U.S. Trustee<br>450 Golden Gate Avenue<br>Fifth Floor<br>Suite 05-0153<br>San Francisco, CA 94102<br>(415)705-3333 |

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

For California State Agencies: PAUL J. PASCUZZI, ESQ.
Felderstein Fitzgerald Willoughby Pascuzzi & Rios LLP
500 Capitol Mall
Suite 2250
Sacramento, CA 95814
(916)329-7400

For California Franchise Tax Board: CARA M. PORTER, ESQ.
Office of the Attorney General
455 Golden Gate Avenue
Suite 11000
San Francisco, CA 94102
(415)510-3508

For Various Fire Claimants: JEREMIAH F. HALLISEY, ESQ.
Hallisey & Johnson
465 California Street
Suite 405
San Francisco, CA 94104
(415)433-5300

For GER Hospitality, LLC: FRANCIS O. SCARPULLA, ESQ.
Law Offices of Francis O. Scarpulla
456 Montgomery Street
17th Floor
San Francisco, CA 94104
(415)788-7210

For SLF Fire Victim Claimants: RICHARD A. MARSHACK, ESQ.
Marshack Hays LLP
870 Roosevelt
Irvine, CA 92620
(949)333-7777

For Fire Victim, Patricia Garrison: THOMAS TOSDAL, ESQ.
Tosdal Law Firm
777 South Highway 101
Suite 215
Solano Beach, CA 92075
(858)704-4709

For Official Committee of Unsecured Creditors: GREGORY A. BRAY, ESQ.
Milbank LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
(424)386-4000

For Executive Committee Appointed by the California Superior Court in the North Bay Fire Cases: KHALDOUN A. BAGHDADI, ESQ.
Walkup, Melodia, Kelly & Schoenberger
650 California
San Francisco, CA 94108
(415)889-2919

Also Present: WILLIAM B. ABRAMS
Individual Fire Claimant

Eric Carlson
Individual Fire Claimant

Mary Wallace
Individual Fire Claimant

Court Recorder: LORENA PARADA/ANKEY THOMAS
United States Bankruptcy Court
450 Golden Gate Avenue
San Francisco, CA 94102

Transcriber: COLIN RICHILANO
eScribers, LLC
7227 North 16th Street
Suite #207
Phoenix, AZ 85020
(973)406-2250

Proceedings recorded by electronic sound recording; transcript provided by transcription service.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

SAN FRANCISCO, CALIFORNIA, WEDNESDAY, JUNE 3, 2020, 10:00 AM

-oOo-

(Call to order of the Court.)

THE COURT REPORTER: This is the bankruptcy court for the Northern District of California. Court is now in session, the Honorable Dennis Montali presiding. Matter of PG&E Corporation.

One moment, Your Honor, while I bring in counsel.

THE COURT: Can you hear me all right?

THE COURT REPORTER: Yes, Your Honor. Mr. Karotkin is joining.

THE COURT: Okay.

THE COURT REPORTER: And Mr. Tsekerides is also joining.

THE COURT: Good morning, Mr. Karotkin.

MR. KAROTKIN: Good morning, Your Honor. How are you?

THE COURT: Or good afternoon, I should say.

Mr. Tsekerides, good afternoon.

MR. TSEKERIDES: Good afternoon, Your Honor.

THE COURT: Ms. Parada, those are the only two counsel coming in to begin with, correct?

THE COURT REPORTER: I believe so. Yes, Your Honor.

THE COURT: All right.

All right. Mr. Karotkin or both of you, which of you, let's confirm again you -- oop, lost the picture. What

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 5 of 207

happened?

MR. TSEKERIDES: Well, we see you, Your Honor.

MR. KAROTKIN: Yes. We can see you.

THE COURT: Yeah, okay. No, I -- there we go. Excuse me. One second. A little adjustment here. Okay.

You had previously indicated a desire for two-and-a-half hours, and that was before we talked about or we had the discussion about changing the sequence. Is that still your estimate for this morning or today?

MR. KAROTKIN: Your Honor, I'm having a hard time getting back to the screen. I don't know if you can hear me?

THE COURT: Yeah, I can hear you.

MR. KAROTKIN: I'm not the most technologically --

THE COURT: Can you hear me all right?

MR. KAROTKIN: I can hear you, but I can't see anybody.

THE COURT: Well, the only people to see are me and Mr. Tsekerides.

MR. KAROTKIN: No, no, I realize that. But somehow I've lost the screen. Let me -- hold on a minute. I apologize. I don't know how to fix it.

THE COURT: Well, we'll give you a moment to fix it, but do you still want to have the two-and-a-half hours?

MR. KAROTKIN: No, I don't believe we'll need -- I think it would be probably closer to two hours, between myself

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company and Mr. Johnston.

THE COURT: Okay. Let me just go through a couple of housekeeping chores for the benefit of everyone else.

So the original plan was to give the debtors' counsel two-and-a-half hours. If they take less time, that's fine, but whenever debtors' counsel finish their opening argument, I'm going to take a forty-five-minute break for everyone's convenience, regardless of what the time is. And so from a technical point of view, the Zoom screen from the Court will be running. It will be open, but it won't be recording. So it will just be dead image. It will be the logo of the Court, or something of that nature.

Those of you who are sticking around, you can leave it on and go about your business or leave it on and sit there and watch the screen for forty-five minutes or you can log out, if you wish. And when we break, I'll announce the resume time, so add forty-five minutes, and you'll just need to log in by that time. I'm going to stick as closely as I can to the schedule, just because a lot of people have wanted to be heard, so that's the plan.

If during the argument I turn my camera off so you just see my name, that doesn't mean I'm ignoring you. I might just stand up and stretch my legs or something, but I'm still listening. If for some reason there's a disconnect, I'll be in touch with my courtroom deputy. And she'll get the message;

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

she's very good at that. And so I don't know whether we'll need to do that or not.

Now, I have received several requests for alteration of the schedule, and to the extent that I'm able to accommodate people, I will. And based upon the time that Mr. Karotkin and Mr. Tsekerides conclude and when we take our break, I might very well look at the list for the speakers tomorrow and move them up to today, if that's convenient. I won't penalize someone who can't do it, but my intention is to be economical, in part so that I can accommodate others who, for whatever reason, aren't going to be -- or didn't come in and didn't participate or didn't give me a heads-up that they were going to participate.

So with that, unless either of you counsel have any questions, I'm prepared to shut up and listen for your argument. So please proceed, unless you want to raise any preliminary matters.

MR. KAROTKIN: No, sir. We're prepared to proceed.

THE COURT: Okay. Thank you.

MR. KAROTKIN: Okay. For the record, Your Honor, good morning and afternoon, as appropriate. Stephen Karotkin, Weil, Gotshal & Manges, for the debtors.

First, Your Honor, I want to take the opportunity to thank you on behalf of the debtors and my firm and the Jones Day firm for accommodating us with this confirmation hearing

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 8 of 207

PG&E Corporation and Pacific Gas and Electric Company during these very trying times. It is very, very much appreciated by all of us, particularly in view of the impending deadlines under AB 1054.

As you know, Your Honor, we're before you today with respect to a plan that's the culmination of literally months of hard-fought, good faith negotiations that has the overwhelming support of virtually all constituencies. Your Honor, you, who presided over these proceedings, know better than anyone, perhaps, the complexities involved in these cases -- these unprecedented cases, and the plan is, indeed, a remarkable achievement, given those complexities, the number of different constituencies and interests represented in these cases, including the CPUC and the Governor's Office, and the need to achieve a successful reorganization in the time necessary to meet the June 30th AB 1054 deadline that is so critical, Your Honor, to all parties in these cases.

Perhaps most importantly, Your Honor, consistent with the concern you have expressed, since the inception of these cases, the plan before you today has the overwhelming support of the fire victims in addition, Your Honor, to the support of the Governor's Office, the CPUC, and I would note it has received all CPUC approvals, and that plan before you today, Your Honor, is fully compliant with AB 1054, all of which -- all of those approvals and support serve to ensure expedited distributions, Your Honor, to fire victims. And that, Your

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Honor, is the principal goal that these debtors have expressed since these cases were commenced last January and since we first appeared before Your Honor.

And as both Mr. Ziman and Mr. Wells testified during the evidentiary portion of these proceedings, all of the financing -- all of the financing, necessary for the plan to go effective is fully committed. Therefore, if Your Honor is inclined to confirm this plan, it is ready for prompt consummation and prompt distributions to creditors and, particularly, Your Honor, to the fire victim trusts.

THE COURT: Clarify one point, though. I went back and reread the statement filed by the governor and asked myself, if I do sign an order confirming the plan, doesn't it still depend upon one more response from the governor?

MR. KAROTKIN: It does, Your Honor, and we have been working with the Governor's Office. The Governor's Office has been reviewing the documents, has been giving its input, to the extent that it has input, on certain of the documents necessary to implement the plan, but we are working virtually on a daily basis with the Governor's Office and at least to my knowledge, everything is moving smoothly in that regard.

THE COURT: And is that -- is that the last of the predicates, the CPUC, the Bankruptcy Court, and the governor? Is there any other regulatory or authority that has to weigh in on this?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: No, sir. In fact, I think we may have advised you already, to the extent that we needed FERC approval, we do have that.

THE COURT: Okay. I lost that in the shuffle somewhere. Okay.

MR. KAROTKIN: Okay. So as I indicated, Your Honor, as both Mr. Ziman and Mr. Wells testified, all of the financing is necessary to implement the plan and, as demonstrated in -- I'm sorry.

In the absence of confirmation, the results are Draconian. It's plainly evident, Your Honor, that if this plan is not confirmed and not permitted to go forward, distributions to fire victims and others will be delayed for months or, more likely, years and the critical protections and benefits of AB 1054 and the go-forward wildfire fund will be lost.

As demonstrated in the voting certification filed by Prime Clerk, all voting classes but one have voted overwhelmingly to accept the plan. It wasn't even close. The only rejecting class, as Your Honor knows, is the statutorily subordinated class of disputed PG&E equity rescission and damage claims, which incidentally, Your Honor, voted overwhelmingly by number to accept the plan, and one creditor, asserting quite a large claim, turned the tide on the amount. And I will note to you there is only one claimant before the Court in that class, only one, that is objecting to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company confirmation of the plan.

As we have further demonstrated in our memorandum and will address later in our opening statement, with respect to that rejecting class, Section 1129(b) of the Bankruptcy Code has been satisfied as to that subordinated class. That rejection is no impediment to confirmation and cannot frustrate, and should not be allowed, Your Honor, to frustrate the consensus that has been achieved under the auspices of this Court and with the invaluable assistance of former Bankruptcy Judge Newsome.

The declarations the plan proponents have filed are memorandum in support of confirmation and in opposition to the objections. The uncontroverted -- and I want to emphasize, Your Honor, uncontroverted, testimony before the Court and, in fact, Your Honor, the entire record of these proceedings demonstrate that the plan complies with all of the requirements for confirmation under Section 1129, 1129(a) of the Bankruptcy Code, and as I indicated, to the extent required, 1129(b) of the Bankruptcy Code.

And Your Honor, certain disgruntled fire victims and some fire victims' attorneys, who incidentally represent literally only a handful of fire claimants, have provided no evidence -- and I emphasize, Your Honor, no evidence nor, for that matter, any basis to silence the voices of the literally, Your Honor, tens of thousands of fire victims who have spoken

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

so loudly in favor of the plan and who are waiting for the distributions so that they can continue to rebuild their lives and their communities after these devastating fires.

As Your Honor knows, in connection with our reply to the objections and our memorandum in support of confirmation, we also filed a chart that summarizes the objections that were filed, as well as our responses.

THE COURT: You haven't updated -- but you haven't updated that chart, have you?

MR. KAROTKIN: We have not, Your Honor, because --

THE COURT: Okay.

MR. KAROTKIN: -- in fact, we have been working, up until about fifteen minutes --

THE COURT: That's fine. The more -- the more you get resolved the better. I don't care about the chart.

MR. KAROTKIN: Okay. And I will go through that with you so we can level-set where we are today. That chart indicated that some items had already been resolved, and there have been additional resolutions of outstanding objections. As you well know, because I believe you signed an order yesterday, all but one of the objections filed by the tort claimants' committee have been withdrawn, and I am also pleased to report that I believe we have resolved all but one of the objections filed by the UCC. And I'm sure that Mr. Bray or someone will correct me if I misstate that, but I think I'm accurate in that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

regard.

I think you will note that immediately prior to the start of this hearing, BOK (sic), the indenture trustee, withdrew its objection because that has been resolved, as well, and I believe in a minute or so I'll go through some other items that have been resolved, as well.

As you noted in your order yesterday or the day before on scheduling, I believe you said you were deferring consideration of executory contract issues. And I think you also said in connection with that, that would include issues with respect to indemnification and contribution as well. I was a little confused by your docket order yesterday. Or in fact, there were two of them that seemed to conflict with this because I think you may have raised issues with respect to that.

I think that the UCC -- you permitted the UCC to file a surreply brief that raised some of those issues as well, and it would be -- it would be our request, based on that submission and based on what we thought was our understanding of your ruling that to the extent you wanted to address those issues, perhaps, I don't know whether it was outside the context of executory contracts or exactly what you had in mind, we would suggest deferring that until Friday rather than addressing that today.

THE COURT: Well, let me explain because if I've

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

created a confusion, I apologize, but I've just been deluged with stuff to keep up with, and you and your teams of thousand of people have overwhelmed me and my four staff; two law clerks, two courtroom staff. And so when I saw the objections and the request to participate and so on, there seemed to be so many that related to cure that I overlooked, for the time being, the fact that part of cure is the indemnification and contribution issue.

MR. KAROTKIN: Yes.

THE COURT: And so that, in my thinking, was not that it wasn't important and critical, it was -- it seemed like the cure issue was so discrete, but it starts to bleed over into some of these other issues. And there I was, whatever day it was, I've lost track of days, I just couldn't keep up with it. Then many of the lawyers who are still responding and want to be heard have weighed in on this subject of the discharge and the scope of this thing. And so pretty soon what starts as a simple cure question becomes much more of a difficult issue, and that implicates 502(e) and what have you. So I need some help and we need to work together there, and maybe Friday would be the time to do it. So let's -- I apologize if I've confused you. It's that I'm just confused by the moving targets here, so we'll come back to it when convenient. Okay?

MR. KAROTKIN: Okay. Thank you, sir.

THE COURT: That work? Okay.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 15 of 207

MR. KAROTKIN: Yes, sir. Yes, sir.

THE COURT: And excuse me, any of the counsel who will be arguing later today or tomorrow morning can raise that issue also and clarify it.

MR. KAROTKIN: Okay. Thank you, sir.

Immediately prior to the hearing that started at 1 o'clock, I believe -- and I can't confirm that because I haven't been able to look at my emails with the docket, that we did file a draft -- a draft, and let me emphasize, a draft, of an amended plan, which has certain revisions in the plan to address how we have resolved certain objections and how we think, by modifying certain language in the plan, we can resolve certain objections. And it might be helpful -- I don't know if you have access to that --

THE COURT: I don't. And again, this is a technical matter, but I -- in order to make this Zoom work for me at home, I cannot be at the same time on the court secure internet system, so I'm docket-free.

MR. KAROTKIN: Well, I think that by reason of those modifications to the plan, we have addressed, as I said, most of the -- all but one of the UCC objections. I believe we have addressed the objections raised by the ad hoc trade committee, in large part. I believe that we have addressed all of the objections filed by what I'll call the Adventist Group other than -- and let me be clear, other than -- because I spoke with

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

Mr. Mintz just before the hearing, other than issues they have with respect to the documentation of the fire claimants' trust agreement and trust resolution procedures. But all other matters with respect to the provisions in the plan relating to discharge, releases, and those items, have been resolved by the proposed language that we filed earlier today.

And I believe, Your Honor, that those modifications to the plan largely address -- we feel, in fact, they largely address all of the issues that have been raised with respect to Section 10.3 and the scope of the discharge; Section 6.1, which has been focused on, which we have deleted entirely from the plan; the interpretation section, Your Honor, which was raised by Adventist and others, and by you, by the way.

THE COURT: My late night attack on you, right?

MR. KAROTKIN: Yeah, I guess. You disturbed me right before I went to sleep last night, Your Honor. I'm not going to forgive you for that one. But we have eliminated the language in the interpretation provision that I think was causing issues for people, so I think that we have made a lot of progress addressing and I think, really, from our perspective, disposing of those issues. You will note that with respect to Section 10.3 of the plan, it has been changed. And I think it might be helpful for me to even -- I know you don't have it before you, but perhaps to even read that language to you.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

That language says, "Upon the effective date and in consideration of the distributions to be made hereunder, except as otherwise expressly provided herein, the debtors shall be discharged to the fullest extent permitted by Section 1141 of the Bankruptcy Code", and then there are other provisos that I don't believe anyone objected to, with respect to Kincade and certain items like that, and we did add to the remainder of that provision the language that had been requested by Ms. Winthrop, on behalf of her client and their group. So --

THE COURT: Let me interrupt you a minute, Mr. Karotkin, and offer the following. And the way we're scheduled, in the afternoon today, Ms. Winthrop is on the list and several of the other counsel for the groups. And to the extent that I was able to divide the thing, it was mostly, not entirely, people that have objected that aren't fire claimant issues, though Ms. Winthrop and her cocounsel obviously are, but their objections were significant. And they will have an opportunity, when they speak, to confirm your view. I'm not going to try to digest something that you just read to me. During the mid --

MR. KAROTKIN: No, no.

THE COURT: -- during the midday break, I will be able to get a copy of that and least look at it in hardcopy. And to the extent that you're able to do it, it would be helpful to me if you can kind of update the grid, the table, overnight or

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

between today and tomorrow.

MR. KAROTKIN: Right.

THE COURT: And then I, based upon your time estimates and whatever we have to do, we will figure out if anybody wants to take issue with you after they've had an opportunity to see what you've filed, and we'll make it work. And similarly, we'll make work what you suggested about having to -- to where to place the arguments on the executory contract issues.

MR. KAROTKIN: Okay.

THE COURT: Okay? Good.

MR. KAROTKIN: Thank you, sir. And we apologize for not being able to get you that chart earlier or to --

THE COURT: You don't have to apologize. I don't need anything more.

MR. KAROTKIN: Okay. Well, but we have been working hard to try to limit the issues that you do have to decide, so. So let me proceed, and I think perhaps it makes most sense, for purposes of this morning, to start with the release exculpation and discharge provisions because that seems to have attracted a lot of attention.

And as I said earlier, Your Honor, we believe that, particularly with the modifications that we've made to the plan, that these objections, to the extent relevant, have been addressed. You will be able to look at them and the other parties will be able to look at them. We believe, in fact,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that the original provisions were quite customary, but again, in an effort to resolve objections, we have made modifications and, again, we can look at those later, but let me start with the releases.

And first, to be perfectly clear, Your Honor, there are no involuntary, third-party releases in this plan. None. It could not be clearer. In fact, Your Honor, if you may recall, we covered this a few months ago in connection with hearings on the disclosure statement and the prior iteration of the plan that was filed. The plan was modified to be strictly in compliance with the law in this circuit. The only third-party releases in this plan are purely an affirmative opt-in. It could not be clearer in both the disclosure statement, the plan, and the ballots; fully consistent with Ninth Circuit law.

But again, to make it even clearer, in section 10.9 -- excuse me -- which deals with third-party releases and has clarifying language, we have revised it to include all of the language that has been suggested by the Adventist Group, and I think, as you noted in your docket order, I believe, last evening. All of that language that they have requested in section 10.9(c) has been added. So I think that would dispose of any objection to the third-party releases.

We have also made it clear --

THE COURT: Excuse me, but you haven't heard from the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

U.S. Trustee, by any chance, yet, I take it?

MR. KAROTKIN: I have not.

THE COURT: Okay.

MR. KAROTKIN: Now, the U.S. Trustee has not --

THE COURT: Yeah, that's understandable.

MR. KAROTKIN: Yeah. I mean, I assume they haven't seen the language yet --

THE COURT: Right.

MR. KAROTKIN: -- because we just filed it, but no, we have not. We have not heard from the U.S. Trustee.

THE COURT: Okay. Well, they'll have an opportunity to be heard, too.

MR. KAROTKIN: We have also made it clear, in the proposed confirmation order, that neither the plan nor the confirmation order affects any valid right, such as setoff or recoupment, addressing many of the objections that were raised, nor will the plan or the confirmation prevent any party from raising -- and it does not prevent for a waiver or a release of any rights or defenses that could be asserted by, for example, a contract counterparty or any other party if they were sued by the fire victims trust. The fire victim trust, to the extent it's getting an assignment of our causes of action, is getting an assignment of what rights we have, subject to all defenses that the other parties would have to assert against us. It couldn't be any other way, and we have clarified that.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

With respect to the discharge issue, again, which is really -- excuse me -- quite a large part of the remaining objections. I said as -- what I did say is, in response to the language -- I'm sorry -- in response to the objections, we have modified section 10.3 to be entirely consistent with the statutory language of Section 1141. You will see those words; other people can see those words. We think that properly addresses the scope of the discharge in section 10.3 of the plan. Corresponding language would be included in the confirmation order.

And with respect to the issues raised by the governmental units with respect to Section 10.13, again, Your Honor, we believe that the original language we had was quite customary, language we have agreed to on other occasions with governmental units. Nevertheless, nevertheless, as you will note, in the amended plan that we have filed, we have modified that language, making it clear that it covers affirmative defenses, rights of set-off, eminent domain, which was raised by a number of parties. Eminent domain is one of the listed items in paragraph 10.13. And in addition, we have made it clear, to the extent that it wasn't clear, I'm not sure it wasn't clear, that nothing will prevent or enjoin a governmental unit from asserting those rights enumerated in section 10.13 in the appropriate forum, outside of the bankruptcy court, if they so -- if they so choose.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 22 of 207

I know that Your Honor referred, in your docket order, to some proposed language that was, I believe, filed by the North -- I'm trying to remember exactly.

THE COURT: NCPA was the most outspoken in court.

MR. KAROTKIN: Yeah. And I will confess, Your Honor, I tried read that provision and I couldn't get through it. It was the most convoluted provision I've ever seen. You criticized me the other day for double-negatives. I think this had triple-negatives. I think that, Your Honor, if you really read the language that some of these parties are proposing, what they're effectively proposing, Your Honor, is that section 10.13 effectively exempt them entirely from the effects of this Chapter 11 case. That as far as they're concerned, ignore the Chapter 11 and any rights and causes of action or any claims they have are -- simply ride through. That's not what happens, and that's not how it works. As I said, the language has been modified to appropriately address their legitimate concerns.

And this is not an issue of reinstating those claims. This is an issue of what's appropriate under the Bankruptcy Code -- what's appropriate, Your Honor -- what is appropriate for the reorganized debtors -- the reorganized debtors, to be faced with, in terms of ongoing liabilities not addressed in the Chapter 11. And again, from the perspective of the reorganized debtors and the perspective of their future shareholders -- and Your Honor, that includes the fire victim

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

trust, twenty percent or more shareholder -- there has to be clarity coming out of the confirmation order as to what liabilities potentially survive. That's critical to the ongoing business, critical to the fire victims, who are going to be depending on this stock and the liquidation and monetization of this stock for their recovery, and moreover, Your Honor, it's also important -- as Mr. Ziman testified the other day, there is going to be an equity offering made, assuming you confirm this plan, an equity offering, a market offering to purchase equity to fund the plan.

Mind you, we have the backstop, so there's no issue as to whether we have the money, but there will be a marketed offering, mostly likely, to try to raise that money at better prices. And all of those people who might participate in that marketing offering -- there are 300 people on this phone, I believe. All of those people are listening to this hearing and they're interested in what liabilities this reorganized debtor is going to be saddled with, and that is why we have been very careful as to what is in section 10.13. We believe it is entirely appropriate. It goes beyond what is customary.

And I will say, Your Honor, one thing that -- you sent that docket order out late last night here on the east coast, and I will say, one thing that kept me up last night is the reference that you had in that docket order in number -- paragraph number 2, with respect to proposed language of 10.13

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 24 of 207

by NCPA, where you said, what's objectionable about that to all governmental units, and then you said, or as to all parties?

THE COURT: I did say that. I --

MR. KAROTKIN: Yes. And I will say that I was very surprised by that. I don't think that it in any way should go beyond governmental units. And in effect, if it were to do so, Your Honor, I think that we would be confusing reinstatement with unimpairment, and that is not what the statute says. Unimpairment is unimpairment, reinstatement is reinstatement, and I think that that issue, Your Honor, was addressed in connection with the post-petition interest hearings before you, where the argument was made that unimpairment means reinstatement, with respect to interest.

You appropriately rejected that in your decision, and for that type of provision to extend beyond governmental units would be a serious mistake, in my view, and would inappropriately expand what rights unimpaired creditors have and what claims they could potentially assert subsequent to this Chapter 11 being concluded and the effective date of the plan, and would be entirely inappropriate.

But as I said, we have modified 10.3, we have modified 10.9, we have modified 10.13, and we believe that those provisions appropriately reflect the scope of discharge in these cases and clarify third-party releases, reserve rights of setoff and recoupment, reserve defenses, with respect to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

litigation that may be brought against claimants, and address the concerns raised by the parties as to those objections, as well as the interpretation section of the plan.

And we would ask you, Your Honor, to take a look at those provisions. We will be prepared to address any issues that the other parties may raise with respect to those issues, and I would now like to move on to the exculpation provision, which also has been raised, I don't think very seriously by anybody, but section 10.8 of the plan is the exculpation provision and is set forth in our memorandum.

That again, I hate to belabor the point, but another customary provision, I'm sure you have seen it many times. It's appropriately circumscribed. It applies only to estate fiduciaries and certain other parties who are instrumental to the negotiation and formulation of the plan and building the consensus that has been achieved in these cases, as set forth in our memorandum. The provision is entirely consistent with applicable law in this circuit and the provisions are appropriately limited to exculpation, solely with respect to actions taken in connection with the administration of the Chapter 11 cases, not any pre-petition conduct, and those provisions expressly exclude fraud and willful misconduct.

And I will note that the section 10.13 proposed by -- I keep forgetting the name of the party -- Northern California Power --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: NCPA. We'll call it NCPA.

MR. KAROTKIN: -- would even eliminate that protection. Again, for no reason and totally inappropriate, as the way I read. Why --

THE COURT: Why doesn't it -- why does it exonerate garden-variety negligence? I mean, there's --

MR. KAROTKIN: In connection with -- in connection with the administration of the case.

THE COURT: Right.

MR. KAROTKIN: It's limited to activities in connection with the administration of this case. Again, there's nothing --

THE COURT: I know, but the point is this is consistent with all of my thinking for years and years and years about employment of professionals and why the investment bankers don't like me --

MR. KAROTKIN: Right.

THE COURT: -- because I don't like indemnity against negligence. So why should the exculpation clause have a carve-out for gross negligence, but not for negligence?

MR. KAROTKIN: Again, Your Honor, this goes beyond just professionals. This goes for members of the creditors -- members of the tort committee, officers and directors --

THE COURT: Oh, I know.

MR. KAROTKIN: -- anyone involved in the negotiation.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 27 of 207

Your Honor, again, this is customary language. This is not something we invented for this case. This is language that has been accepted in confirmation orders entered by courts around the country. I wouldn't be surprised if you've accepted that language in confirmation orders that you have entered.

THE COURT: Probably did it in the first case here.

MR. KAROTKIN: Probably. Again, we're not asking for anything unusual, but we think these people are entitled to protection from lawsuits with respect to what they did in -- what activities they undertook in this case to get to the consensus we've reached, and I'll leave it at that.

And quickly, with respect to the tort committee objection, the remaining tort committee objection. And -- excuse me -- again, as we noted, Your Honor, that as a result of stipulation entered into between the plan proponents and the fire claimants' committee, all but one of those objections has been resolved.

THE COURT: Is the remaining one really an objection or is it just something that just needs to be taken care of? In other words --

MR. KAROTKIN: Well, let me try to explain.

THE COURT: -- let me put it this way. Could I confirm this plan if that rights agreement matter is still unresolved?

MR. KAROTKIN: I think you could. I don't think the

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 28 of 207

PG&E Corporation and Pacific Gas and Electric Company

plan could go effective without it being resolved, necessarily. I think that -- I think that I was advised that ongoing negotiations with respect to that registration rights agreement are taking place and, in fact, I'm advised that yesterday and last evening there was quite a long negotiation session that I'm told was constructive. I am hopeful -- although I can't be sure that that will be resolved consensually in short order, but I would suggest we defer further consideration of that, if necessary, until Friday, when perhaps we have more visibility on exactly what's happening here.

THE COURT: Well, I hit -- in my wisdom, I put Mr. Julian on to argue on Friday anyway, so I'm going to hope that he's off negotiating and mediating and doing the right thing. So okay. It's deferred. Your point is that maybe I could confirm the plan, but if the plan couldn't become effective, obviously, that's kind of a Pyrrhic victory. So let's just not worry about it this morning.

MR. KAROTKIN: Okay. Thank you.

Now, I'd like to turn briefly, Your Honor, to the provisions of Section 1129(a) and the evidence before the Court with respect to compliance with those sections. Mr. Wells' declaration addressed each of the requirements of Section 1129(a) and the declarations of Mr. Boken, Mr. Ziman, Ms. Pullo, complimented Mr. Wells' declaration. And taken together, Your Honor, they demonstrate compliance with all of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

those provisions. That evidence is before the Court and, again, that evidence is not controverted.

I don't think, Your Honor, it's necessary to touch on all of the elements of 1129(a)(1). They are set forth in detail in the declarations as well as in our memorandum in support of confirmation, but I would like to touch on certain of the more well-known requirements in Section 1129(a), more specifically, good faith classification, feasibility, solicitation, and the best-interest of creditors test. And I will try to go through those relatively quickly, and first starting, Your Honor, with good faith.

And I think with respect to the issue of good faith, the record of these cases -- and Your Honor, you're closer to this than anybody -- including the settlements negotiated and approved with the subrogation claimants, with the tort claimant committee, with the noteholders and the noteholder RSA, the support of the Governor's office, the settlements with the DOJ and the California State entities with respect to their claims in these cases, the CPUC approval of the plan, all of those items, Your Honor, and again the entire record of this case demonstrate that the plan satisfies the good faith requirement.

It's the product of arm's length and good faith negotiations as demonstrated in the declarations, satisfies the requirements of AB 1054. Perhaps most importantly, as I emphasized earlier, will expedite distribution to wildfire

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

victims and will result in the debtors being able to participate in the go forward Wildfire Fund assuring -- I'm sorry -- assuring, as well as in connection with the wildfire mitigation plans and expenditures -- the billions of dollars of expenditures that were testified to, assuring the long-term viability of these debtors going forward.

The plan certainly is consistent with the objectives of Chapter 11, and deals with creditors in a fundamentally fair manner as evidenced, Your Honor, by the overwhelming vote in favor of the plan by those classes. Under these circumstances, we believe our burden as to good faith has easily been satisfied.

With respect to classification, the evidence, principally Mr. Wells' declaration, also demonstrates that the plan's classification is proper. As this Court is well aware, plan proponents -- and the law is clear in this circuit, plan proponents have broad discretion to classify claims and interests, and claims, despite being substantially similar, and indeed, arising from the same underlying circumstances may be classified separately. There's no dispute about that.

All that is required under the applicable law, Your Honor, is a business or economic justification to do so, which has been demonstrated in Mr. Wells' declaration and in the dynamics in negotiating history of these cases.

As the number one --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: I think to some extent, I've already agreed with you on that point insofar as the objectors on the trust documents. Admittedly, that doesn't -- it didn't involve other objectors and they didn't participate, but I think I essentially agreed with that conclusion, didn't I?

MR. KAROTKIN: Yes, I think you did.

THE COURT: Yeah, right. Okay.

MR. KAROTKIN: And I thank you for helping me in that regard.

Again, as noted by Mr. Wells in his declaration, the subrogation claims have a different legal basis for liability than the other claims that are held by insurance companies and financial institutions, and the debtors, as he testified, historically have negotiated separately with subrogation claimants in addressing their liability with wildfires pre-petition. Their claims are not unliquidated, and do not have the aspects of personal injury and property damage that makes up the fire victim class, and in fact, the separate nature of the fire victim class, Your Honor, has been recognized since the inception of these cases with the appointment of the TCC as a statutory committee with no members -- no subrogation claimants as members, and with no fiduciary duty as to subrogation claimants.

The public entity claims are also distinct, they are the major -- they are held by the major municipalities that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

          PG&E Corporation and Pacific Gas and Electric Company were devastated by the fires, and those other municipalities with which the debtors have ongoing relationships and critical ongoing relationships with respect to their equipment. Their rebuild efforts, and also PSPS coordination going forward. Their claims are logically distinct from other so-called public entities, like for example, the State of California and the DOJ. Those claims are not damage claims, but more reimbursement types of claims for monies expended by those agencies either on victims or to put out the fires or -- including, for example, CAL FIRE and the efforts it made in connection with the pre-petition fires.

I would say, Your Honor, taken as a whole, the plan classification recognizes these differences as they were reflected, Your Honor, in the actual negotiations that enfolded in these cases and resulted in the consensus before you.

With respect to feasibility, 1129(a)(11), again I don't want to repeat the standards. I'm sure you're well aware of it, but feasibility addresses whether the plan has a reasonable -- reasonable likelihood of success, not a guarantee of success. As the case law indicates, Your Honor, speculative prospects of failure cannot defeat feasibility, and the mere prospect of uncertainty cannot defeat confirmation on feasibility grounds.

The evidence on feasibility before Your Honor is uncontroverted. Mr. Wells, Mr. Boken, Mr. Ziman, their

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company declarations taken together demonstrate that not only do the debtors have the committed financing to emerge from Chapter 11, they have the financial resources to meet their obligations as demonstrated by the financial projections which were included in the disclosure statement.

I think, more importantly, or to emphasize that, Your Honor, the testimony of all three of those individuals plainly showed that the debtors will have more than adequate resources to address all contingencies, including potential wildfire liability by reason of -- as Mr. Ziman testified, and I believe Mr. Wells, as well, by reason of a five billion dollars working capital facility that will be in effect on the effective date of the plan, by reason of insurance coverage that Mr. Wells testified to with respect to the Kincaid fire, if -- and of course this has not been determined yet -- if it is determined that the debtors have liability with respect to that fire, and Your Honor, also by reason of the debtors' ability to participate in the go-forward wildfire fund. So going forward, there is plenty of protection and assets and insurance in the go-forward wildfire fund to address contingencies.

The testimony was also uncontroverted that the debtors have implemented and continue to implement programs and initiatives and spent billions of dollars to mitigate fire risks, which together with, again, participation in the wildfire fund, will minimize the financial risk to the debtors

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company on an ongoing basis after their emerging from Chapter 11.

The testimony, Your Honor, was also uncontroverted, and was clear, that in the unlikely event that the rescission and damage claims -- and I'm now talking not about the equity and rescission damage claims, but the debtor rescission and damage claims, that in the unlikely event they are allowed -- and Your Honor, I would note, that will be quite -- if that ever happens, that will be quite a number of months from now, or perhaps longer. And if they are allowed, which the debtors believe are unlikely, and Your Honor, if those claims exceed insurance coverage, again unlikely, the reorganized debtor will have more than adequate resources including the reserve contingency testified to by Mr. Boken, which I believe was in excess of 300 million dollars, and as testified by Mr. Ziman, the five-billion-dollar post-petition working capital facility, as well -- again, as well as testified to by both Mr. Ziman, and Mr. Wells, access to the capital markets going forward if it is necessary.

There is more than ample resources to address these contingencies in the unlikely event that they arise. That is not an impediment to confirmation. It is not an impediment to a determination by Your Honor that this plan is feasible.

As we indicated in our memorandum, the plan is also feasible from a regulatory perspective. As you know, the plan has been approved by the CPUC. It does have the support of the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Governor's Office. It is fully compliant with AB 1054. It is ready to move forward. It has the committed financing, and these cases are poised, Your Honor, for distributions to begin to wildfire victims and to other claimants who are entitled to those --

THE COURT: On the subject of AB 1054, is it your expectation that the -- either the conclusion to law or the order will make this court's determination that 1054 had been complied with, or is that simply deferred to the governor?

MR. KAROTKIN: No, that's --

THE COURT: Or is it both. Pardon me?

MR. KAROTKIN: As I understand it, Your Honor, there is one determination that you have to make.

THE COURT: Okay. Well, I mean, I think both have to make it. I mean, if I --

MR. KAROTKIN: I don't think the governor has to make any determinations. I think that's with the CPUC, and I believe that those determinations have already been made.

THE COURT: Okay.

MR. KAROTKIN: And if I'm mistaken --

THE COURT: One --

MR. KAROTKIN: -- I will correct it.

THE COURT: This is slightly out of order, but one determination that I don't make is what Judge Donato's supposed to do. And at least as of this morning, I didn't see anything

on the docket. So can I make -- can I confirm the plan before we hear from him on that issue?

MR. KAROTKIN: I believe you can. I believe you can, Your Honor. I believe you can confirm the plan. I don't believe that that's a prerequisite to confirmation in view of the plan, in view of the flag -- sorry, in view of the fact that the plan has been accepted by the wildfire claimants.

THE COURT: Okay. Well, I don't know -- obviously, Judge Donato and I don't communicate. I suspect he's going to issue a ruling one of these days, and he, like me, and like everyone else, is inconvenienced by the shelter in place and all the other things that are going on, including downtown San Francisco, like downtown New York --

MR. KAROTKIN: Yes, sir.

THE COURT: -- but that I presume he'll issue something in due course, and fairly soon.

MR. KAROTKIN: Okay. With respect to another item under Section 1129(a), which is solicitation, again the testimony is uncontroverted. Ms. Pullo's declaration in cross-examination testimony plainly demonstrates that the solicitation of votes on the plan was conducted in strict compliance with the solicitation procedures and the disclosure statement, each of which were approved by the Court after numerous hearings.

The votes were properly tabulated and the results were

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company certified to the Court. Your Honor, you've already addressed and rejected a prior motion to designate votes, and no evidence has been presented -- no evidence that in any way undermines the integrity of the solicitation and voting process.

And I think it's important to mention a couple of things in that regard that were raised by Mr. Abrams and by Ms. Wallace in connection with Ms. Pullo's testimony, and I think that, as I go through it, Your Honor, these items will plainly demonstrate the complete lack of substance to their challenges to the voting process and that they raised unfounded allegations simply because they don't like the fact -- they don't like the plan treatment, and that it was overwhelmingly accepted by their constituency.

First, Your Honor, and I really don't want to belabor these points but I think it's important to advise the Court of what's going on. As demonstrated in our recent pleading in opposition to the motion through the examiner, which was filed last evening, Mr. Abrams' insinuations that Prime Clerk had a conflict of interest because Duff & Phelps, its owner, is a PG&E shareholder, is absolutely preposterous. And Mr. Abrams must have known that when he raised that issue, and I'll tell you why, because number one, the Duff & Phelps entity that at one time owned stock of PG&E was a complete separate and distinct entity.

Number two, and I am quite sure Mr. Abrams must've

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company known this, as well, that unrelated entity had disposed of its PG&E stock a year before the Chapter 11 case was commenced. So not only was it unrelated, that entity didn't own, and disposed of all of its stock a year before the case was commenced. Now, how that could be any evidence of a conflict or how Mr. Abrams could raise that as a conflict, I think, goes to the bona fides of his objections to confirmation.

But more personal to me, Your Honor, and to my personal integrity are Ms. Wallace's allegations regarding my son, who works at Prime Clerk. The least bit of due diligence by Ms. Wallace would have revealed to her that this relationship was fully disclosed in my firm's retention application at the inception of this case and in Prime Clerk's retention application. Your Honor, these types of insinuations should not be tolerated.

Again, Your Honor, the undisputed and uncontroverted evidence -- and I emphasize evidence, demonstrates full compliance with your approved solicitation procedures, solicitation procedures developed collaboratively with the TCC, as the fiduciary, for fire claimants. There is no basis for any other conclusion.

We would like to --

THE COURT: Well, Mr. Karotkin, during the questioning and the argument by Ms. Wallace, I was surprised to hear about the statement about your son, and I had in my mind, and I

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

thought he must -- meaning you, must've disclosed it, and of course you did. And I verified it, and you verified it, and well, I'm glad you did. So to me, it's a closed subject. If Ms. Wallace or anyone else wants to revisit it, they'll -- I can't prevent them, but I'm not going to do anything about it because you've made the disclosures, and I'm satisfied, so.

MR. KAROTKIN: Thank you, sir. I appreciate that.

With respect to the best interest test, Your Honor, as you noted, I believe, during the hearing to consider approval of the disclosure statement, there's no possible dispute about this issue in these cases, and although I know it's a requirement that must be satisfied for confirmation, for obvious reasons, no party -- no party has raised any issue with respect to compliance with the best interest of creditor's test under Section 1129(a)(7).

Nevertheless, Mr. Boken's declaration fully covers the issue, and suffice it to say, as set forth in his declaration, as well as in the disclosure statement, a Chapter 7 liquidation hearing would be so value destructive to all parties-in-interest, and so time consuming in view of, among other things, all of the regulatory approvals that would be required to dispose of these assets, that any distributions would not only be substantially less, they likely would not take place for years, and I mean several years.

And with the loss of the ability to participate in the

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 40 of 207

go-forward Wildfire Fund, and the additional claims that would be asserted based on -- under those circumstances, the termination of all of the restructuring support agreements, all of the RSA, satisfaction of the best interest test is not even a close call, particularly, Your Honor, as you know, where most of the claims here are being paid in full with interest or reinstated. So I don't even think that's an issue.

Lastly, just very quickly, as I said, I've addressed the discharge, and the exculpation and the relief provisions, and I think as I've said, we've addressed those in our revised -- in the proposed revisions to the plan.

THE COURT: What about my earlier of the two docket texts, saying why are we even worrying about Rule 9019 and compromise, when we have a consensual -- I mean, a binding plan on nonvoting classes?

MR. KAROTKIN: I think, Your Honor, as I mentioned earlier, that particular language was in Section 6.1 of the plan, which I think I told you we have --

THE COURT: Okay.

MR. KAROTKIN: -- deleted entirely.

THE COURT: You did tell me, but remember I haven't had a chance to match it up. I take your word for it, that's fine.

MR. KAROTKIN: I know. Yes, I was just -- I was trying to just tell you we did address that point --

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Right, right.

MR. KAROTKIN: -- that you had raised.

And lastly, before I turn the proceedings over to -- well, actually two last things before I turn the proceedings over to Mr. Johnston, certain fire victims have raised objections to confirmation based on allegations relating to the consideration to be transferred to the fire victim trust under the plan, and I think it's sufficient to say that the disclosure statement more than adequately described the consideration to be transferred to the trust under the plan, including the stock element of that consideration and a detailed discussion in a number of places as to its potential fluctuation in value.

The class of fire victims has voted overwhelmingly to accept the plan, and I believe that dispenses with those allegations or those objections.

And lastly, the objection filed by the California State Franchise Tax Board. First, we have made a number -- or a few modifications to the plan to address their concerns. We think that fully addresses their concerns and that those claims are properly treated under the plan. Frankly, Your Honor, I was surprised that they could possibly have any objections to confirmation. If there are any remaining objections they have after they review this language, I know that they will have an opportunity to speak, and I would just say we would reserve --

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

rather than get into that now, we would reserve rebuttal to just address that. I think that that should be easily disposed of.

THE COURT: Well, I have Ms. Porter from the Franchise Tax Board on the speakers' list for tomorrow.

MR. KAROTKIN: Yes.

THE COURT: And if she still has an issue, you'll have an opportunity to respond.

I would like you to go back for a minute. I understand what's at issue, and what's been resolved procedurally between the debtors and the TCC as far as the formulation -- the so-called valuation formula for determining the value of the stock, and -- but you would be -- I think the parties who are paying attention to this case would be well served if you would just give a brief summary, not of what the outcome's going to be, but how it's going to be resolved. Do you understand my point?

MR. KAROTKIN: I think you're talking about what people are calling NENI?

THE COURT: What's going to be arbitrated, and what's at issue --

MR. KAROTKIN: Right, okay.

THE COURT: -- and how -- in other words, there's been a lot of discussion, and you're aware, I'm sure, of people that have taken great umbrage with the suggestion that 6.75 billion

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

dollars' worth of stock is going into the trust, and you have over -- many times made the point that it's a formula.

MR. KAROTKIN: Right.

THE COURT: And what I read from the stipulation between the debtors and the TCC is that dispute about the formula is going to be resolved by someone else. And all I would like you to do is summarize briefly -- I mean, you know, I'm talking about two minutes -- as to what issues have been teed up and are going to be resolved by that process. Can you do that?

MR. KAROTKIN: I think I can. Can you give me one second?

THE COURT: Sure.

MR. KAROTKIN: Okay. Under the plan, there is a term called, "aggregate fire victim consideration", which is the defined term for what is to be transferred to the Fire Victim Trust pursuant to the plan. And one of those elements in subsection C of that defined term is 6.75 billion in new HoldCo common stock issued at, defined term, "fire victim equity value".

And "fire victim equity value" is a defined term under the plan, which means, and I'm quoting from Section 1.81 of the plan, which means, 14.9 multiplied by the, again defined term, "normalized estimated net income" as of a date to be agreed upon among the parties to the tort claimants' RSA. So

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

              PG&E Corporation and Pacific Gas and Electric Company normalized estimated net income is what people commonly refer to as NENI. And normalized -- of course, then there's another definition for normalized estimated net income in the plan.

THE COURT: Yeah, I don't -- Mr. Karotkin, I don't need you to go and read the definition, just in a laymen's sense, how is it going to be resolved?

MR. KAROTKIN: Oh, it's going to be -- the parties have agreed to have that submitted to binding arbitration commencing next week. I believe it's already been set for Monday and Tuesday of next week, before one of the JAMS arbitrators that has been agreed to. I forgot the --

THE COURT: I think it's Mr. Mayer (sic).

MR. KAROTKIN: Meyer, Meyer, Meyer.

THE COURT: Yes.

MR. KAROTKIN: Yes, before Mr. Meyer. It will be submitted to him to make a decision that will be binding.

THE COURT: But am I understanding that Mr. Meyer will make a decision. The two sides have agreed to be bound, and that decision will plug in the number to do the math --

MR. KAROTKIN: Yes.

THE COURT: -- to lead to the result?

MR. KAROTKIN: Yes, sir.

THE COURT: Okay. That's --

MR. KAROTKIN: Exactly.

THE COURT: -- all I wanted you to explain.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: Okay.

THE COURT: That's all I was looking for --

MR. KAROTKIN: Right.

THE COURT: That's what I understood to be the case, but because this is one of those things that I think is a combination of complex financial terms and complex legal terminology, but I'd like -- I want it translated to, at the end of the day, the arbitrator will say, X is the number that pegs, in a laymen's term, the value of the stock going into the trust.

MR. KAROTKIN: I think that's right, Your Honor. I think that may be said a little differently --

THE COURT: Okay.

MR. KAROTKIN: -- is that when Mr. Meyer has rendered his decision, that amount will be easily calculated.

THE COURT: Okay, good enough.

MR. KAROTKIN: Okay. But I believe, unless I've missed something, that would complete my portion, and I would turn the microphone over to Mr. Johnston, who was going to address the cramdown issues.

THE COURT: Okay. I thought Mr. Tsekerides wants to be heard, but if not --

MR. TSEKERIDES: Well, the only thing I -- Your Honor, the only thing I was going to say is -- Ted Tsekerides for the debtors.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

I was going to deal with the things that we're putting off until Friday. So if it's all right, I'm just going to turn my video off.

THE COURT: That's fine.

MR. TSEKERIDES: Okay.

THE COURT: Goodbye.

MR. TSEKERIDES: Bye.

THE COURT: All right. Ms. Parada, we'll bring in Mr. Johnston, and I guess we don't need to have Mr. Tsekerides on the panel.

Mr. Johnston, can you hear me and see me?

MR. JOHNSTON: I can hear you, Your Honor. Good morning.

THE COURT: Good morning. Okay. Your turn to join Mr. Karotkin on the opening arguments.

MR. JOHNSTON: Okay. Jim Johnston of Jones Day on behalf of the shareholder proponents.

I apologize for the glare on me, the side of the screen there. I've got my camera angled as far away from the window as possible, but hopefully you can see me okay.

Your Honor, the shareholder proponents obviously support the plan, and we do urge you to confirm it for all the reasons that Mr. Karotkin stated. This morning I'm going to talk about the securities fraud equity claims that are classified in the Class 10A-II of the plan.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Mr. Karotkin stole my thunder a bit, but I do think it's worth, at the outset, reiterating two points. The first is that Class 10A-II voted to accept the plan by number. Of the claimants who voted, more than 67 percent cast ballots in favor of the plan.

However, because the tabulation methodology required the debtors to count the face amounts of proofs of claim in this class, many of which, I have to say, bear no relation whatsoever to any potential actual allowed claim, a few large holders caused the class to reject by amount. I think it was fifty-eight percent to forty-two percent.

Second point worth noting at the outset is that the treatment of this class drew exactly one and only one objection by the Public Employees Association of New Mexico, or PERA. PERA likes to hold itself out as the "lead" plaintiff in a class action, when in fact no class has been certified. PERA acts on behalf of itself, and only itself.

And PERA's latest proof of claim, which was filed pursuant to the extended bar date procedures that Your Honor adopted, asserts a claim in the amount of 119,134 dollars. So although you will undoubtedly hear about hundreds of millions, or even billions of dollars of alleged claim, that should give you an idea of what we're actually dealing with here; a single objector with a disputed claim for about 120,000 in alleged losses.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 48 of 207

So let's talk about that objection. For a bankruptcy nerd like me, Class 10A-II actually presents an interesting issue. Everyone agrees that the claims in Class 10A-II are subordinated by operation of Section 510(b) of the Bankruptcy Code, to the level of PG&E common stock.

THE COURT: Well, PERA doesn't question that. They accept that.

MR. JOHNSTON: Agreed.

THE COURT: Yeah.

MR. JOHNSTON: And so, in the words of the statute, their claim, and the other claims in this class has the "same priority as common stock". The challenge is figuring out what that means in the context of a solvent debtor. Normally, the subordination issue is easy to deal with because equity's out of the money. And when equity's out of the money, the 510(b) claims are out of the money, so there's nothing to do.

And fortunately for all concerned, that's not the case here. We have a solvent debtor. So we have to figure out how subordinated securities fraud claims denominated in dollars, are to share with existing common stockholders whose interests are counted in shares.

There are a handful of cases that have dealt with 510(b) claims against a solvent debtor. They say that the plan of the solvent debtor should provide for the 510(b) claims to share proportionately with equity, and you can see that in the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

American Solar King case, 90 B.R. 808, where the existing equity retained interest and new shares were issued to the fraud claimant. Same thing happened in Kaiser, 326 B.R. 265, and in Orange County Nursery, 2019 Westlaw 3973869.

But none of those questions provide any relevant guidance for how the fraud claimant must share with equity. So I submit we're running on a pretty open field here, and you do have a fair bit of discretion to achieve an equitable result.

So let me explain what the plan does, first.

THE COURT: Well, can I interrupt for just a second? Is that something that's a confirmation issue? I mean, I'll listen to your argument, and I'm sure I'll hear from the other side, but I don't have to decide that exact answer now, do I?

MR. JOHNSTON: You have to decide whether the plan's treatment of Class 10A-II is appropriate under the Bankruptcy Code because an objection has been lodged to that treatment.

THE COURT: Well, but appropriate isn't the test. Is it fair and equitable?

MR. JOHNSTON: Fair and equitable is not the test, and there has been no fair and equitable objection raised. There has been an unfair discrimination objection raised, which I will touch upon.

THE COURT: Okay.

MR. JOHNSTON: But the primary objection raised by PERA, which we will get into, has to do with the sharing



eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

formula under the plan, the question that I'm setting up here, which is how does equity share with the 510(b) subordinated claims.

THE COURT: Okay.

MR. JOHNSTON: Okay. So our plan proceeds from the premise that the proportionate sharing among the 510(b) fraud claimant and the shareholders, has to be determined with reference to a baseline. PG&E's market capitalization that includes both the intrinsic value of PG&E and the "artificially inflated value" that serves as the premise for the fraud claim.

In essence, the fraud seeks to -- excuse me, the plan seeks to give the fraud claimants, like PERA, the benefit of their bargain by restoring them to the position of what they say they thought they were buying when they invested in PG&E stock. And I think the best way to understand this is visually, so I've got a demonstrative that I can pull up on the screen, which I will do so.

THE COURT: Okay. Go ahead.

MR. JOHNSTON: Got it. Let me know if you can see it, if you need me to amplify it.

THE COURT: I can see it.

MR. JOHNSTON: Okay. And we can put this on the docket after the argument today.

So the first slide here -- it's two slides. The first one gives some context. The pie on the left here is the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

pre-disclosure capitalization. It's PG&E's market capitalization right before what PERA says is the first disclosure of the alleged fraud on October 12, 2017.

Now October 12, 2017 is a date that comes straight from PERA's complaint. The complaint alleges that, despite the 2007 Witch Fire started by San Diego Gas and Electric and despite the 2015 Butte Fire started by PG&E and despite the ignition of the North Bay Fires four days earlier and despite multiple, repeated risk disclosures in PG&E's securities filing, "it was not until Thursday, October 12, 2017, that the market began to understand that PG&E's safety regulation violations were a likely major cause of the fires".

They're saying they just began to learn on October 12. That quote's straight from PERA's amended complaint at paragraph 246. And you can see many similar allegations about October 12 called out on pages 59 to 60 of our brief which quotes other passages directly from the complaint.

So PG&E's pre-disclosure market capitalization is the baseline or the denominator for the plan-sharing formula.

THE COURT: And I can't see the number on the screen.

MR. JOHNSTON: Okay.

THE COURT: Maybe if you can try expanding a bit. All right, right there -- no, there you go. Oh, no to the left, where that little plus line.

MR. JOHNSTON: Oh, that one.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, read me that number --

MR. JOHNSTON: Want --

THE COURT: -- they were -- are those numbers in your brief?

MR. JOHNSTON: They're --

THE COURT: Okay, that's thirty-five billion?

MR. JOHNSTON: There you go.

THE COURT: That's thirty-five billion?

MR. JOHNSTON: It is, right.

THE COURT: Thirty-five billion, right?

MR. JOHNSTON: That -- it is 35.9 billion dollars.

THE COURT: Okay.

MR. JOHNSTON: That is the denominator in the plan-sharing formula which because we like to use the maximum number of words possible for every concept, the plan calls the HoldCo rescission or damage claim share. Today I'm just going to call that the formula, or the plan formula.

So the formula has the denominator equal to the capitalization of PG&E immediately before the alleged fraud allegedly was revealed. That's the pie on the left, PG&E's market capitalization when the market opened on October 12, 2017, roughly 35.9 billion dollars. That pie includes PG&E's intrinsic value, and whatever portion of the capitalization was "artificially inflated".

Now you see the orange slice there in that pie on the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

left of roughly 6 billion dollars?

THE COURT: I do.

MR. JOHNSTON: That's the market capitalization that PG&E lost from the market open on October 12 to the market close on October 13, the period immediately after PERA says the alleged fraud was revealed. Hold that thought and I will get back to it in a minute.

Now look at the pie on the right. That is PG&E's market capitalization on the petition date, roughly 7.3 billion dollars. It's much smaller, nearly five times so, and note that the orange slice is gone. Why is that? That's because the alleged fraud, the value that went down after the disclosures were made, is gone. There's no more "artificially inflated value" because the proverbial cat was let out of the bag.

THE COURT: Well, there was also major fires including the Camp Fire two weeks -- two months prior, right?

MR. JOHNSTON: Very much so, Your Honor, and that -- when these claims are actually adjudicated, that's one of the reasons why these claims are going to completely fall apart.

But the point to be made here is that as of the petition date, all of the disclosures that PERA said should've been made, and that were allegedly omitted, or misstated, were made. They were made by the close of the class period on November 15, 2018, before the petition date.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

So the question before us was how that orange slice representing value lost to alleged fraud can share proportionally with existing shareholders who've already seen their interest shrink from the pie on the left, to the pie on the right?

What the plan does, and what we submit is the only logical and fair way to effectuate subordination, is to go back to the point in time when the orange slice was actually part of the pie. So the plan calculates the proportionate share of PG&E's market capitalization that includes the damages alleged by PERA in its complaint, the capitalization immediately before the fraud was disclosed -- the alleged fraud.

Any other methodology including one based on market capitalization as of the petition date, as PERA urges, would massively overweight the fraud claims by including the alleged fraud losses in the numerator, which is the amount of the claim, but not in the denominator to determine proportionate ownership. And the second page of my demonstrative shows this. Let me get there, okay.

So what we have here is a hypothetical claimant who buys at the opening price on October 12, 2017, right before the alleged disclosure of fraud, and then sells the very next day. Keep in mind that this purchase is made four days after the North Bay Fires ignited on October 8, but our hypothetical claimant goes ahead and makes a big purchase of PG&E common

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

stock on October 12, and then turns around and sells the next day.

We're obviously using very large numbers here, a hundred million share purchase. We did that just so the graphics are actually readable, the numbers scale down proportionally as the share purchases scale down.

This hypothetical claimant lost about 1.15 billion dollars on a two-day trade, which is about 3.22 percent of the market capitalization on the day the claimant made its investment in PG&E. You can see that little 3.22 percent wedge.

Under the plan, the claimant will receive 3.22 percent of the share base as of the petition date, exactly what the claimant bargained for when it bought the stock. Under PERA's methodology, which seeks to use capitalization as of the petition date, the claimant would receive a whopping 18.31 percent of the share base as of the petition date. That's nearly six times more. The claim would dilute common shareholders by a factor of six. So that orange wedge goes from a modest slice to a glutinous wedge.

With PERA's proposal, you'd have a shareholder who thought it was buying 3.22 percent of the company, winding up with 18.31 percent of the company before dilution of the new stock under the plan. I submit that is self-evidently wrong, and that's especially true when you compare the fraud claimant

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company to shareholders generally.

In PERA's world, the fraud claimant gets a massive share of petition date ownership at the expense of all common shareholders, but those common shareholders already suffered massive value losses as the PG&E share price declined in the years prior to bankruptcy, as we saw in the first slide.

As the first page shows -- I'll put it back up -- the shareholder stake was already devalued by a factor of five between the time of the alleged fraud and the petition date, and now PERA would devalue them further by a factor of six.

THE COURT: Wait, repeat that please. I -- why was it diluted by a factor of five?

MR. JOHNSTON: It's -- that's showing --

THE COURT: I'm missing --

MR. JOHNSTON: -- that's showing the difference between the pie on the left, and the pie on the right. At the time the alleged fraud was disclosed, the capitalization was thirty-five billion dollars. If you take a --

THE COURT: Okay.

MR. JOHNSTON: -- shareholder as of that date, and compare its proportionate interest in the company, or its value, and then compare it to the pie on the right, it went down nearly five times.

THE COURT: But if there was no fraud at all, the same 35.9 would have gone down to seven because of the fires.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. JOHNSTON: That's correct.

THE COURT: Right?

MR. JOHNSTON: And that's what --

THE COURT: My thought --

MR. JOHNSTON: -- we --

THE COURT: It's the circumstances out in the world, and the fires, and whoever -- you know, whatever other market forces existed, that made that big blue pie become a small blue pie, so it would've gone down regardless of the fraud.

I guess I'm still not connecting the dots here, and I will concede to you I haven't studied your brief, and I will study the brief again on this point. But you want me to conclude that the damages are based upon the situation that -- well, I guess I'm having trouble knowing for sure how I get to what you had in the second slide that shows that there's a damage that represents three percent of the equity. So repeat that to me again. Do I have that right?

MR. JOHNSTON: So yes, the second slide, I put it back up. We're dealing with a hypothetical here, a hypothetical claimant, who lost roughly 1.15 billion dollars from the date that the fraud was disclosed to the date that the shareholder sold -- that the claimant sold its claim.

THE COURT: But some of the --

MR. JOHNSTON: So it's --

THE COURT: -- claimants didn't sell their claims.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

That's --

MR. JOHNSTON: That's right.

THE COURT: Right.

MR. JOHNSTON: What the methodology here is trying to do is approximate the amount of alleged fraud in the system, and --

THE COURT: Well, but --

MR. JOHNSTON: -- then use that as the baseline for sharing.

THE COURT: Help me understand it a little more specifically. Let's have two purchasers, and they each bought a hundred million dollars, or you could make a -- I mean, I don't care, a hundred shares, it doesn't matter, and let's get scaled down, if two of them each bought a hundred shares on October 12th, and one of them sold a hundred shares on October 13th, that person suffered a market loss of eight dollars per share. The other one suffered a market loss of, you know, five times that, right? So therefore --

MR. JOHNSTON: Correct.

THE COURT: So therefore, what? Do I value it differently based upon their sale price or based upon the damage that they're alleging on the date they bought it, and therefore -- and other people bought at different times.

MR. JOHNSTON: Right. No, you don't value it at all. Those two claimants, those two examples that the shareholder

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

who didn't sell, to the extent that that shareholder is asserting a claim and the claim gets proven and allowed, simply has a much larger claim, right, as opposed to suffering a five dollar or eight dollar diminution in share price, that claimant went down much farther, so the amount of its claim, the numerator in the formula becomes much bigger, and they get a bigger share of the equity that's being shared with existing shareholders now.

THE COURT: Only if they were defrauded.

MR. JOHNSTON: Oh, correct, and --

THE COURT: Okay.

MR. JOHNSTON: -- this is -- that's why I prefaced my statement as saying they have to prove their claim and that claim has to be allowed.

THE COURT: But doesn't every claimant then have to prove when he or she bought the shares?

MR. JOHNSTON: Yes, they have to prove that in the context of proving up their claim. But my point simply was for purposes of the plan formula, you don't need to do that.

THE COURT: What do I need to do?

MR. JOHNSTON: Okay --

THE COURT: Just let's do it that way because let me tell you, I haven't paid much attention to this, it's not that it's not important, it's terribly important, but what's my job as far as the confirmation? Do I pick your chart versus their

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

chart? Is that what it comes down to?

MR. JOHNSTON: No, because their chart is not in our plan. We are asking you to confirm our plan. If they -- if you determine that the methodology in our plan is incorrect, we would consider your guidance and decide how to amend the plan.

THE COURT: So you think, again, this is something that has to be resolved as part of the confirmation process?

MR. JOHNSTON: I think that the formula for determining how subordinated equity fraud claims are going to participate in equity under the plan have to be determined because that is a component of the treatment of those claims.

THE COURT: Well, it seems to me that the choices are the first date, the petition date, the last day of the class, or whenever date a particular claimant made its purchase decision.

MR. JOHNSTON: We --

THE COURT: There seems to be about four different choices. I mean, there are three different finite choices, and a fourth category is dependent upon when the claimant made the decision to buy in the first place.

MR. JOHNSTON: And we can't have the fourth category because that would require a different sharing formula for each and every securities fraud claimant whose claims, if they are to be allowed, won't all be allowed at the same time, and likely won't be allowed for a number of months, if not years,

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

because this litigation hasn't even gotten off the ground yet.

THE COURT: Okay. I got it. I got your point.

MR. JOHNSTON: Let me --

THE COURT: But Mr. Johnston, what I think you should do is, obviously, PERA's counsel and I will quickly get a transcript of this colloquy but you should put your two charts on an exhibit that you file. I don't mean a trial exhibit, I mean file something on the docket that attaches them, and then PERA's counsel or I can easily reproduce them and study them.

MR. JOHNSTON: Yes, we will do that this afternoon.

THE COURT: Okay. Well, all right, so go ahead with your argument.

MR. JOHNSTON: Let me confront PERA's argument. So first, PERA argued that, despite what I referred to as an absurd result of the petition date capitalization, that Section 502(b) of the Bankruptcy Code requires use of the petition date capitalization as the formula's denominator because the statute provides for claims to be determined as of the petition date.

I submit, Your Honor, that that totally misapprehends Section 502. Under Section 502, if they can be proven, the securities fraud claims will be determined and allowed as of the petition date. Nothing in the plan changes that. The issue here is how to treat those claims if and when they're allowed.

As Your Honor noted in your recent opinion regarding

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the Fire Trust procedures, allowance and treatment are entirely different issues, and PERA simply conflates them.

I've got two more points on the formula denominator before I move on to the numerator, which was also subject to an objection. First, it was pointed out in cross-examination of Mr. Wells that an earlier version of the plan we filed on March 9 used PG&E's market capitalization on October 16, 2017, rather than the October 12, 2017 date that's in the current version of the plan.

As I mentioned, the stock price dropped between October 12 and October 16, and the insinuation, I guess, is that we somehow monkeyed around with the numbers to make the denominator greater than it should be.

PERA never said anything about this in its objection, notwithstanding its cross-examination, and despite the insinuation, the simplest answer here is the correct one, which is simply that we made a mistake. We meant to write October 12, the date before the alleged disclosures that corrected the fraud, the date that's in PERA's complaint, but in our haste to get that particular version of the plan out the door, it wound up as October 16th. It was a typographical error. We noticed the mistake, and we corrected it a week later in the March 16th version of the plan which is the version that was disseminated to creditors.

THE COURT: And what does the class action allege as

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the start date?

MR. JOHNSTON: October -- oh, the class period is October 12th, 2017.

THE COURT: So your date, you're saying you made a four-day error, but the date you uses is the date that the class plaintiffs themselves have used, right?

MR. JOHNSTON: Yes, I misspoke. That's not the start of the class period, but as you'll see from our brief, and we have a number of quotes, October 12, 2017 is the date that the class plaintiff says is the date of the first alleged corrective disclosure, the date that the "alleged fraud" started to be revealed.

THE COURT: Okay.

MR. JOHNSTON: There were also some questions on cross-examination of Mr. Ziman asking why the formula for Class 10A-II does not use normalized estimated net income, or NENI, to determine how many shares should go to the securities fraud claimants, and here again, I guess the suggestion is that the securities fraud claimants somehow are disadvantaged or discriminated by this.

PERA also didn't say anything about this in its objection, and for good reason. NENI is used in the calculation of new shares to be issued for specific purposes under the plan, for the new equity purchases, and to the fire victim trust. NENI is irrelevant to the question here, which

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company is what proportion, if any, of the common shareholder ownership as of the petition date should be allocated to fraud claimants like PERA prior to any dilution from those new shares. NENI has nothing to do with it. It's an apples to oranges comparison.

Okay, let's move from the denominator to the numerator in the plan formula. As we explained in our brief, the plan provides for insurance proceeds received by fraud claimants to be deducted from their claim amount before calculating their sharing with shareholders.

Even though everyone seems to be objecting to everything in this case, Your Honor, I was surprised to see this point draw an objection. It's textbook bankruptcy law that payment from insurance reduces the allowed amount of a claim against the estate. You held as much in your ruling regarding the Fire Trust procedures.

Payment to a fraud claimant from insurance is the same as payment from the estate. Without a deduction, the fraud claimant would receive a double recovery, and that's why the only case to have considered the issue in the context of a securities claim subordinated under Section 510(b), the Fifth Circuit's decision in Superior Offshore, that's 591 F.3D 350, approved a plan with an insurance deduction identical to that in this case.

Despite what PERA's objection says, this was not an

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Ivanhoe collateral source issue. The insurance here is property of the estate, and it's available to the estate to pay claim. You heard Mr. Wells testify to that. Payment from the insurance depletes the estate and it's no different than a direct payment from the estate. Claimant who receives that insurance has the allowed amount of its claim go down on a dollar-for-dollar basis.

THE COURT: But is it --

MR. JOHNSTON: And this is not --

THE COURT: But I -- the reason I distinguished Ivanhoe was because in Ivanhoe you had multiple wrongdoers. Here, we have alleged multiple wrongdoers, don't we?

MR. JOHNSTON: Well, we do --

THE COURT: And the insurance is substituting the alleged wrongdoing of an officer or director. But in my ruling for the subrogation, there was no wrongdoing by the insurer. The insurer is protecting the beneficiary of the insurance, the homeowner who lost his home. There's no comparable person in this case.

MR. JOHNSTON: No, I submit, Your Honor, that this case is even more clear, because the insurance is an asset of the estate, where --

THE COURT: Well, it may be an asset of the estate, but it's there to pay the liability of the insured officer or director, in case that officer or director makes a mistake.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. JOHNSTON: It's shared coverage, Your Honor. It's also there to pay the liability of the debtors, themselves.

THE COURT: Okay, okay. But -- that's right, but the point is there is no third-party contractual relationship between the insurer and the person who suffers the harm. In other words, just like the person who owned his home, who lost his house, is not a wrongdoer and has a contractual right to be paid by his insurer. That's why I set the offset. That, to me, is why I distinguished Ivanhoe.

You think that that distinction that I drew said we're not going to count Ivanhoe for the fire thing -- fire victims, applies here. And I guess I don't understand that theory.

MR. JOHNSTON: Okay. Perhaps it applies under a different theory.

THE COURT: Well

MR. JOHNSTON: Which is, as I stated, that what you're getting here is not payment from a guarantor. It's not payment from collateral owned by a third party. It's payment from the estate. It's payment from an asset of the estate. And that is why there is no collateral source. There is no Ivanhoe issue.

THE COURT: And does the Sequoia Offshore say that? Does the -- the Superior Offshore --

MR. JOHNSTON: Superior.

THE COURT: Superior, does the Superior Offshore case come out that same way?

MR. JOHNSTON: No, it wasn't challenged. It simply applied the formula.

THE COURT: Okay.

MR. JOHNSTON: I think it was clear enough to the litigants in that case that they accepted the insurance deduction without even challenging it.

THE COURT: Well, maybe they'll accept it here. I don't know.

MR. JOHNSTON: Well, they've objected.

THE COURT: Again, I haven't -- I just haven't memorized all the objections.

MR. JOHNSTON: Right. That's why I'm raising it, Your Honor, because it is subject to an objection.

Okay, unless you have questions about the formula, I'll move away from the way the plan calculates the sharing to address PERA's two other objections

THE COURT: Okay, go ahead.

MR. JOHNSTON: Okay. First is the argument that there's something wrong with the plan's failure to classify securities fraud claims against the utility, as opposed to PG&E Corporation.

Your Honor, the utility didn't issue any common stock. The Class 10A-II claims all arise from the purchase of PG&E Corporation stock. That's HoldCo stock, in the parlance of the plan. It's really impossible to see how there could be any

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

claim at all against the utility relating to alleged securities fraud involving HoldCo stock. But even if there was, and PERA has asserted one. Even if the claim PERA filed against the utility were valid, PERA concedes that the claim would be subordinated to the level of equity of PG&E Corporation. That concession is right there on page 16 of its -- of PERA's objection.

PERA agrees, in other words, that any claim against the utility would receive -- has to receive, the exact same treatment as that provided under the plan. So I submit there can't be a confirmation objection where the plan provides exactly the treatment provided for in the statute.

So the only thing that I can think PERA is getting at here is that it's suggesting that it's somehow entitled to separate recovery on two claims: one against the HoldCo, as issuer of the common stock, and one against its affiliate, the utility.

Your Honor, the Ninth Circuit law is directly to the contrary. I'll refer you first to a case PERA actually cited in its brief when making its concession, which is In re: Del Biaggio, 834 F.3d 2003.

THE COURT: I know it well

MR. JOHNSTON: Yeah, so I was going to say, I know you're familiar with it because you applied it in your work a couple years ago.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Well, I applied Judge Carlson's decision, not the circuit decision.

MR. JOHNSTON: So the circuit decision held consistently, I think, that claims arising from the purchase of equity of an affiliate of the debtor are subordinated to the level of equity of the affiliate.

The circuit held that such claims effectively become claims against the affiliate, not the particular debtor. And in the words of the circuit, in applying Section 510(b), the court must "superimpose the capital structure of the affiliate onto that of the debtor".

I think that concept becomes crystal clear when you look at the case that the Ninth Circuit was citing, which is a Lehman Brothers decision out of the Second Circuit, 808 F.3d 942. Lehman had facts that are comparable to this case. A claimant alleged fraud relating to securities of Lehman Holdings, which is the parent corporation in the position of HoldCo, here.

But a claimant asserted a claim against Lehman International, a subsidiary in the position of the utility here. The Second Circuit held that the claim against the subsidiary should be treated as if it were a claim against the parent, as if the parent's capital structure were superimposed on the utility. And you can find that in the discussion at pages 950 to 951 of that position.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 70 of 207

So the same applies to PERA's alleged claim against the subsidiary utility, here. Basically, if there's a claim against the utility, the capital structure of HoldCo, the entity that issued the common stock, must be superimposed onto the utility, which did not issue the common stock. So the fraud claim against the utility becomes a fraud claim against HoldCo and is treated as such. Your Honor, that's exactly what our plan does here. So this objection to the alleged lack of treatment or classification of a claim against the utility fails.

Okay, last point. As we noted at the outset, the class did reject the plan and there's been an argument that the plan fails 1129(b) with respect to the treatment of Class 10A-II because it unfairly discriminates. And the complaint is that the securities fraud claims are not entitled to participate in a potential rights offering under the plan. Only existing shareholders are.

As we pointed out in our brief, the rights offering, if it occurs, and it very well may not, as Mr. Karotkin described, it will be offered to existing shareholders on account of their status as shareholders. The plan's proponents determined that it would make no sense to offer rights to a group of claimants who not only have no current equity stake in the enterprise, but who also have chosen to sue it for fraud. That's hardly the constituency you want to offer to buy new

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

equity in a reorganized debtor. And it wasn't unfairly discriminatory not to make that offer.

The Ninth Circuit's decision in Acequia is on-point here. That's at 787 F.2d 1352.

THE COURT: What's the name, again?

MR. JOHNSTON: Acequia. I think that's how you pronounce it.

THE COURT: Oh, Acequia. I know that one.

MR. JOHNSTON: Okay. It's the first one, not the second one. And in that case, the circuit concluded that there was no unfair discrimination in a plan that treated two shareholders differently, giving one, but not the other, the right to manage the reorganized debtor. The circuit held that management rights were "separate from" rights arising from those associated with share ownership.

THE COURT: Well, but that deals with different shareholders. Here, we don't have different shareholders. We have existing shareholders and plaintiffs.

MR. JOHNSTON: Agreed, which is a further distinguishing factor

THE COURT: Right.

MR. JOHNSTON: I think the argument being made is that somehow, because the fraud claimants are subordinated to the level of shareholders, that they have to receive this opportunity or otherwise, it's unfair discrimination.

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

The Eighth Circuit's decision in Peabody Energy, very recent, it's from last year, at 933 F.3d 918, is another similar decision. In that case, the circuit affirmed a plan that provided rights to purchase stock in the reorganized debtor to some creditors, but not all creditors, similar to the rights offering here.

The Eighth Circuit held "a reorganization plan may treat one set of claim holders more favorably than another, so long as the treatment is not for the claim, but for distinct, legitimate rights for contributions from the favored group, separate from the claim".

Here, the plan gives participation rights in the rights offering, if it occurs to shareholders on account of their existing ownership stake, their willingness to step up and be owners of the enterprise. A fraud claimant like PERA has no ownership stake. It's trying to block the reorganization, not facilitate it --

THE COURT: I don't know if the -- Mr. Johnston, the fire victims don't have a current ownership stake, either. So why do they get rights?

MR. JOHNSTON: The -- the fire victims are being delivered stock as consideration -- as treatment for their claims under the plan.

THE COURT: No, but --

MR. JOHNSTON: They're not getting registration rights

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

like the -- excuse me, they're not getting a getting a rights offering to buy new stock.

THE COURT: Okay, okay. So we can divide the world into three bundles. We have PERA, et al., as nonshareholders who are going to be treated as shareholders, if they have net valid claims. We have the existing shareholders and we have the fire survivors, who are going to become shareholders as part of the plan.

So you're saying it's not discriminatory to give rights to the existing equity and the fire victims, but decline them to the fraud claimants? Is that your point?

MR. JOHNSTON: No. The plan will give the fraud claimants equity --

THE COURT: Yes, I understand

MR. JOHNSTON: -- under the formula that we described. What the plan does not do is give the fraud claimants the right to purchase additional equity, separate and apart from the equity being delivered under the plan.

MR. KAROTKIN: Your Honor, if I can clarify, the rights would be given -- if there is a rights offering, and that's by no means certain, only to existing holders of record prior to the effective date of -- on a date prior to the effective date of the plan.

The Fire Victim Trust will not get stock until the effective date of the plan. Nor, for that matter, would any of

escribers (973)406-2250 | operations@escribers.net | www.escribers.net

these claimants, assuming they could even prove their claims. So it's quite logical that they shouldn't participate in a rights offering, if it ever happens.

THE COURT: Okay. Mr. Johnston, you were getting ready to wrap up, and I'm getting ready to wrap you up only because we're almost to the two-hour mark.

MR. JOHNSTON: I have two more sentences. And it goes to the unfair discrimination and I just wanted to remind you, as we talked about earlier, that PERA and the fraud claimants get one hundred cent dollars from any and all available insurance off the top.

Shareholders obviously don't get that. So by allocating insurance to the fraud claims, we submit that the plan discriminates in favor of PERA, not against it.

THE COURT: But they might be recovering the insurance because they proved that the office of the directors were liable for their mischief. Again, we're back to the complexities of the layers of insurance. But if Director A affirmatively defrauded somebody, he or she should be held liable. But insurance will pay that liability.

MR. JOHNSTON: But under the -- an underlying premise of the plans treatment of the claims is that the claimants have established an allowed claim against PG&E.

THE COURT: No, I understand that.

MR. JOHNSTON: And by definition, that means that they

escribers (973)406-2250 | operations@escribers.net | www.escribers.net

suffered harm from PG&E and the insurance is PG&E's to satisfy that claim.

THE COURT: Well, okay. I gotcha. Okay

MR. JOHNSTON: So Your Honor, I submit for all of these reasons that we rehash the plan's treatment of Class 10A-II as appropriate and should be confirmed

THE COURT: So to summarize, again, because I've already said I just can't keep up with all the stuff being filed at this point, your argument goes to your portion of the trial brief or your joint brief with the debtors. And that lays out how I should fashion the -- or prove the methodology that's proposed in the plan for treatment of whatever allowed claim, whether it's just one claimant or 2,000 or 5,000 claimants. If I make that decision and that holds up, that's how those people, once they know their claim, will get their stock determined, with or without credits for the insurance? In other words, if you are right that you first look to the insurance, then that might be the end of it. But if I disagree with you, it's the former, using the little slice of the pie, not the -- I'm sorry, the big slice of the pie in a bigger pie, than the market value on the petition date that you describe, right?

MR. JOHNSTON: Correct.

THE COURT: Okay.

MR. JOHNSTON: We are asking you to put your stamp of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

approval on the formula in the plan for the treatment of these claimants.

THE COURT: Yeah. I apologize for asking you a compound question. Okay. Thank you, Mr. Johnston. I appreciate your argument.

MR. JOHNSTON: Thank you.

THE COURT: Okay. So Mr. Karotkin, do you want to say anything further or are you ready to, in effect, close your opening argument?

MR. KAROTKIN: We are ready to close our opening argument.

THE COURT: Okay. So let me look at my schedule and make some adjustments here. I said to everyone I would take a forty-five-minute break. I'm going to cheat a little bit. By my watch or my clock here, it's a few minutes before noon our time. I will resume this hearing at 12:45 San Francisco time. So that's about fifty-two minutes from now.

And as I said at the outset of the hearing, if people observing the trial or the argument want to just leave your computer on, and you'll probably see our logo with the name of the court. But if you want to log out, you should log back in before 12:45.

And at that time, by my calculation, I am scheduled to hear first from Mr. Botter. And then my order that was issued yesterday amended the sequence there. Again, not that anybody

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

cares, but Mr. Winsberg is on that list, and he independently has asked to be moved later. So he's on for the next day.

And so I'm not going to tell you exactly when -- well, let me say this. I intend to stick with the time allocations, but we're a tiny bit ahead of schedule. And maybe some of the lawyers will not need the time they wanted, based on the concessions or stipulations that have been made. So I will give a heads up to Mr. Laffredi, Mr. Troy, Mr. Pascuzzi, Ms. Porter; you are all the first four people for tomorrow. I may call upon you to make your argument this afternoon.

Now, I will concede, if you have personal commitments or plans or something where it's impossible, I'm not going to punish you. But what I'd like you to do is between now and 12:45, if you are unavailable to be called in that sequence this afternoon, to send an email to my courtroom deputy and so we'll be aware of it.

Now, I also will add that I may not get through all four of those people. I'm not going to turn this into a marathon. And the time I allowed for this afternoon, without even getting to tomorrow's schedule is pretty significant. But it may well be that we don't need all that time.

So we'll leave it at that. I will look forward to seeing you at 12:45. Thank you for your arguments, Mr. Karotkin, Mr. Johnston. And I'm going to leave my program running, but I'm going to turn my video off.

MR. JOHNSTON: Thank you, Your Honor.

THE COURT: Thank you.

(Recess)

THE CLERK: The court is back in session, Your Honor. We're recording. Would you like me to bring in Mr. Botter?

THE COURT: Yes, can you hear me all right?

THE CLERK: Yes. Yes, I can.

Mr. Botter is joining.

THE COURT: All right. Good afternoon, Mr. Botter. Can you hear me all right?

MR. BOTTER: I can, Your Honor. Can you hear me, as well?

THE COURT: Yes. All right, let me make a couple of announcements. We've had some developments during the noon hour. I've received requests from Mr. Gorton, on behalf of himself, and Mr. Glassman, and Mr. Tredinnick. They have asked to move their argument to Friday, because they want to absorb some of the new filings. I'm going to grant their request, in part, at the moment. I'll move them off of today. Whether we do something on Friday or have to shuffle them tomorrow, I'll have to stay -- hold out on that.

I previously indicated that Mr. Winsberg was coming off of our afternoon list and moving him to tomorrow. And also, Mr. Troy indicated that he was unable to move up on the list for today. So I'm going to assume that I will be able to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company call upon the following counsel in order, after the agenda for today: Mr. Laffredi, Mr. Pascuzzi, and Ms. Porter. And you can -- we'll come back to you later if there's an issue in that.

And I've thought about the discussion I had with Mr. Karotkin during the break, and I think what will work is the following, and I'll stay open to contrary views if this conflicts with someone else. But on the 28th, in document 7633, Mr. Karotkin indicated to me that the plan proponents intended to have the Court address now, meaning today, disputes relating to indemnification and contribution claims arising under executory contracts to be assumed.

I responded to that in my order of yesterday. I forgot the docket number; not important. And I said that I needed to defer that issue and said that I simply was not able to deal with indemnity and contribution claims. And again, as I said this morning, those are -- as they're linked to executory contracts being assumed, if there are -- and that's what the context is.

Now, what I think will work, and I'll throw this out -- I don't need a response from anyone today -- I am reasonably sure that based upon the developments that have happened, that a few things are slightly different. I doubt that Mr. Julian needs sixty minutes on Friday to tell me there's one open item. I'm not going to say he can't have his

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

time, but I believe that he will not need all that time.

And I don't know whether every counsel who wishes to argue today or tomorrow is going to need all the time. But I'm reasonably sure and confident that at least I can deal with the executory contract matters on Friday. And so here is what I'll go, by way of a tentative agenda for Friday. So the published agenda had Mr. Etkin and others from the plaintiff's securities group first with a large chunk of time, Mr. Julian second with another large chunk. Again, if Mr. Julian really needs his hour, I'm not going to deny it to him, but I believe I can anticipate he doesn't need that time.

And I'm going to give the debtors thirty minutes to make whatever portion of oral argument they wish to make that was on the topic that they deferred -- that I deferred over their objection. So that is the indemnification and contribution.

Then, I will allow an hour for counsel to respond to that. And then, to the extent that the debtors' counsel, whether it's Mr. Karotkin or others -- and again, I'm not excluding Mr. Johnston, if he's going to have any closing argument -- they can have an additional period of time to respond to the indemnity and contribution arguments that counsel will make adverse to them.

So that's a little vague, but let me tell you what I have in mind. I'm going to see how we're doing today, and I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

probably will issue a docket text later today that will instruct counsel who wish to be heard on the indemnification and contribution issue to send an email saying what they want.

Now, I don't want anybody sending emails to anybody yet. We opened up a mailbox for getting the arguers over the weekend, in order -- a mailbox that is only dedicated for other things. And suddenly, people are using it for other purposes. So I want to discuss with my own staff this afternoon how we are going to manage identifying who wishes to be heard on this identification -- excuse me -- indemnification and contribution issue.

So to summarize, later today I hope to post something that will invite counsel who wish to be heard and narrow the focus, counsel, not on rejected contracts and not on cures of assumed contracts, but on the narrower issue of the debtors' position on indemnification and contribution.

I will then look at the responses that come in and sometime tomorrow, I will make either an announcement or yet another docket text with a little more specificity. And it may well be that I just opened up a period of time for all counsel who have indicated a desire to be heard on that subject.

You all have gotten the message from me over and over again that I don't want repetition. You are all generally complying with that and I appreciate it. I'm trying my best to make sure we get all the arguments done by close-of-business

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Friday, but I'm also not going to deprive anyone of an opportunity to be heard.

So let's leave it at that for now. And even if you don't -- if you disagree with what I said or you're confused, I'll try to take it up later. It may well be that tomorrow morning, after the motion regarding examiner but before the resumption of oral argument, I'll have a discussion with Mr. Karotkin about any clarifications or refinements to the schedule I want.

So again, now that, I'm ready to go in a moment with you, Mr. Botter. But I will just simply say that if we make faster track time through the afternoon because of developments, I'm going to continue down the list, but I'm not going to punish anyone who can't be there when you didn't expect to be there. We'll just do our best and try to make this work efficiently.

So Mr. Botter, you are -- you have ten minutes to -- and you were going to be Mr. Stamer. You have to do a Mr. Stamer look-alike.

MR. BOTTER: I don't know that I can do a Mr. Stamer look-alike, Your Honor. But I'll do my best imitation of him, although that may not work as well.

Good afternoon, Your Honor. For the record, David Botter of Akin Bump Strauss Hauer & Feld on behalf of the ad hoc committee of unsecured noteholders. First, Your Honor, I

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company wanted to thank you very much for the opportunity to speak today. And I also wanted to say thank you to Your Honor and to your staff for all of the Court's efforts during the past sixteen months. It has been much appreciated. Thank you, Your Honor.

THE COURT: Thank you. I'll thank you on behalf of all of my staff.

MR. BOTTER: It has been a pleasure. Thank you, again. Your Honor, I do not plan to use the full ten minutes allotted, but there are a few brief comments I would like to make in support of confirmation of the debtors' amended plan.

As Your Honor's aware, the ad hoc committee consists of institutions that hold over twelve billion dollars of the total twenty billion dollars of outstanding utility senior notes claims. The ad hoc committee has been a very active participant since the commencement of these cases and has worked very hard to bring about a successful conclusion to these cases.

As we have said numerous times before, many of the members of the ad hoc committee are California-based institutions that have been investors in PG&E for years and have substantial interest in the company's long-term success. As Your Honor is also well-aware, these cases have been extraordinarily hard fought and at times, contentious.

Through the painstaking process that has unfolded over

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

the past sixteen months, however, the pieces are now in place to confirm this plan and ensure that the debtors exit from Chapter 11 and qualify for participation in the go-forward Wildfire Fund. Your Honor, we heard Mr. Ziman's testimony on Monday. The debtors expect to emerge from Chapter 11 within several weeks of the confirmation order being entered. And Mr. Karotkin made that same point at the beginning of this hearing.

Your Honor, the ad hoc committee believes that it is critical the debtors obtain all the necessary financing and exit from Chapter 11 as soon as possible, because we all know the risks that arise if the debtors don't emerge before the onset of the next wildfire season.

Your Honor, we have heard the debtors loud and clear and we trust that they will keep the parties and interests informed on a timely basis on their progress towards the effective date. With all that being said, Your Honor, the ad hoc committee fully supports confirmation of the amended plan and requests that the Court enter an order confirming the plan.

With that, Your Honor, we're done. Thank you very much, again.

THE COURT: Thank you, Mr. Botter. I appreciate your comments.

All right, we're going to excuse Mr. Botter from the panel and bring in Mr. Feldman.

Hello, Mr. Feldman; can you hear me

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. FELDMAN: I can hear you fine, Your Honor. Are you able to hear me?

THE COURT: Fine. You look like you're at your office, rather than your home.

MR. FELDMAN: Well, this is my home office, so --

THE COURT: Oh, your home office, okay.

MR. FELDMAN: Very similar to my office office.

Your Honor, I'm going to try not to repeat things that have been said previously, but we also -- for the record, Matthew Feldman on behalf of the ad hoc group of subrogation claimants. We also, Your Honor, want to thank yourself and your staff for the terrific job that you've done, particularly over the last three months, during this very difficult time for our country and for the world. So thank you, again, Your Honor.

THE COURT: Thank you. I appreciate your comments and so do my staff.

MR. FELDMAN: Your Honor, we also strongly support confirmation of the plan. The debtors and the shareholder proponents have presented a plan that is overwhelmingly supported by the debtors' constituents, satisfies the confirmation requirements of 1129, and allows the debtors to meet the all-important June 30th, 2020 deadline imposed by AB 1054. And so we would urge the Court to conclude the hearing as quickly as reasonable and promptly enter a confirmation

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

order.

Your Honor, the plan incorporates the terms of the subrogation claims RSA. We are satisfied that it does so honorably and correctly. The ad hoc group is comprised of approximately 110 institutions that are collectively owed approximately twenty billion dollars of claims. As the Court is aware, they have compromised their claims for an eleven billion dollar claim to be paid in cash under the plan, a substantial discount to the face amount of the claims. They have already paid out billions of dollars in excess of that to the victims and will continue to fund the victims and look forward to this case being over so that the victims can get additional funding.

Your Honor, I want to make -- I want to respond to three-and-a-half objections that have been raised that impact the subrogation group. And I'm going to start with the half, because I believe it's been resolved. Your Honor --

THE COURT: Isn't a half an objection rounded up to a whole objection?

MR. FELDMAN: If the objection still stands, it's a whole objection, but I think it's been resolved. But since we're going in the order we're going, I just want to mention it. As the Court probably is aware and remembers, the plan definition of subrogation wildfire claims became an issue with the TCC. Our understanding is based on the stipulation that

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company was filed and entered into, that the TCC's objection to the definition of subrogation wildfire claims has, in fact, been withdrawn.

It was also mooted by the Court in connection with your memorandum decision over the Adventist group's related objection. So we think that issue is put to bed. If somehow it comes back when Mr. Julian speaks, we'd be happy to address it from our perspective, but I don't want to take up the Court's time anticipating an argument I don't expect to be made.

THE COURT: I thought it was resolved too, but that's fine. Mr. Julian will let us know if we're in error

MR. FELDMAN: Exactly, Your Honor. The second item I want to address is the classification scheme under the plan. There are two objecting parties to the classification scheme who incorrectly argue that the plan's separate classification of subrogation wildfire claims, fire victim claims, and public entity wildfire claims renders the plan nonconfirmable because it purportedly does not provide the same treatment for each claim as they argue is required under Section 1123(a)(4).

This is really a misunderstanding, Your Honor, of the governing law, which is Section 1122 of the Bankruptcy Code, which allows similarly situated claims to be classified together, but does not, under all circumstance, require that they be classified together. And in fact, if there are

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

              legitimate business or economic reasons for separate classification, then that is appropriate under Section 1122.

As this Court can take notice, there were multiple legitimate reasons for separate classification, including, as identified by Mr. Wells, the debtors have historically reached separate settlements with subrogation claim holders and the subrogation wildfire claims arise from a unique legal doctrine of subrogation, not as direct claims against the company.

And the Court, in fact, has already -- as I think Your Honor alluded to this morning -- has already recognized the classification scheme is appropriate for the fire victims in your ruling related to the objections under Section 1123(a)(4) that were raised by the business claimants' group, the Adventist group, if you will. And so I believe this issue, again, has largely been dealt with by the Court. But we wanted to emphasize that 1122 really should be the governing principal here, Your Honor.

THE COURT: Well, again, this is one of these instances where the economy of trying to identify legal issues worked for the people who participated. But those who didn't participate certainly have the right to preserve their argument. And anyone who are on my argument list, if they wish to revisit it, they're welcome to. But I thought that my decision should be dispositive, unless somebody persuades me that I have to change my legal conclusion about it.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. FELDMAN: Well, Your Honor, if you're inclined to change your legal conclusion, I'd like another chance to argue with Your Honor as to why you were right the first time.

THE COURT: Well, let me use this opportunity to say something to everyone. I haven't thought through exactly how I'm going to articulate my ultimate ruling. I know the debtors have obviously proposed findings and conclusions and a proposed order, but to some extent, all of us who had the brilliant idea to break these things out into things in steps, like inverse condemnation and post-petition interests. And here now, to some extent, some of these classifications, I don't intend to revisit them other than just to cite where they have been dealt with previously.

So unless somebody changes my mind on classification, I think the finished product that I produce will just cite in a footnote or a reference to the ruling on such-and-such a date, such-and-such a docket. Just so you know, that was just a -- just to give you a heads up, and everyone else, what my plan is, as far as I'm going to go about concluding this matter.

Okay, back to the merits.

MR. FELDMAN: Thank you, Your Honor. I want to address one more factual issue related to classification. I listened carefully to Mr. Tosdal's cross-examination of Jason Wells the other day, where he cited to the idea that the subrogation claims, in fact, included personal injury and other

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company nonproperty damage claims. That's, in fact, not correct. And Mr. Tosdal referenced a complaint in the state court where it seems to suggest somehow that those claims are being asserted by subrogation claimants.

And just to give the Court a little context on this -- and the complaint itself is in the record of the cases, I'm not going to read it verbatim. But I am going to read footnote 1 to the complaint. And the complaint, Your Honor, included 283 paragraphs of claims. But paragraph 1 of the master -- footnote 1 of the master complaint said, and I'm quoting, "Many of the individual plaintiffs are insured with one or more of the subrogation plaintiffs, and therefore, subrogation plaintiffs stand in the shoes of their insurance under the law of subrogation."

To make it easier on the Court, subrogation plaintiffs have mirrored the master complaint of the individual plaintiffs where possible. The individual plaintiffs' master complaint, second cause of action, wrongful death, third cause of action, survival actions, seventh cause of action, premises liability, and eleventh cause of action, negligent infliction of emotional distress, have been omitted from this master complaint as not applying to the subrogation plaintiffs.

So I think if Mr. Tosdal went back and actually took another look at the complaint and looked at footnote 1, he would see that, in fact, we are carved out of anything but

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

property causes of action in that complaint, because that is all we have in our class on the causes of action.

THE COURT: But isn't it also the law? Your clients are in the business of insuring property, not when someone suffers a personal injury or wrongful death. You don't insure that kind of liability.

MR. FELDMAN: It is correct, Your Honor. And just to make the point one step further, in all of the proofs of claim that are filed in this case, which I think the Court is permitted to take judicial notice of, the proofs of claim filed by subrogation claimants are limited to property damage, Your Honor. So I just wanted to make that clarification because I frankly thought it was left open the other day --

THE COURT: Okay. It was

MR. FELDMAN: -- since Mr. Wells had not been fully prepared for that question. Your Honor, the last issue that -- two more issues I want to identify, on the made-whole release, Your Honor, again, Mr. Karotkin covered a lot of this this morning, in terms of the third-party releases under the plan. But what he did not cover was the made-whole release. And I just want to remind the Court that in response to Your Honor's concerns earlier on in the case, where this ended was that [phone ringing] --

THE COURT: Turn your phone off

MR. FELDMAN: I apologize for that, Your Honor. I

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 92 of 207

don't know how to turn that phone off. Where this ended was the made-whole release will be granted to the extent a party chooses to settle with the victims trust. But parties, of course, retained their rights to go forward and litigate the amount of their claim, to liquidate their claim in whatever court of competent jurisdiction they choose to bring it in. And in that circumstance, they're not required to sign a made-whole release --

THE COURT: That's what I thought, too. And I believe you pointed it out in your response that only one objector has flagged the made-whole. And I don't know whether they're pursuing that any further. But that was my understanding, too.

MR. FELDMAN: It is the International Church of Foursquare Gospel.

THE COURT: Well, there are a number of claimants that are represented by that counsel. But yes, I understand that. Okay, the last point? Because I'm --

MR. FELDMAN: Yes, and the last point, Your Honor, is the exculpation which, again, you sparred with Mr. Karotkin. But I want to address the question you raised about negligence. First of all, this is an ordinary course provision that is contained in a lot of plans, including many that Your Honor has previously approved. And I'm happy to cite to them, but I don't think that's fair to Your Honor, so I'm not going to do it.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

But I do want to raise -- I do want to address the point of negligence. I think there's a compelling reason, Your Honor, not to include -- not to carve negligence out of the exculpation, because it invites litigation. And if we had a rule like the British have, where the loser pays, then it might be appropriate to say if you really think you have a negligence claim, bring it on. And if you're wrong, you're wrong. It's going to cost you money.

But if you carve negligence out, you're essentially giving people a free option to go try to hold up people. And I think it really runs counter to public policy that you want to encourage lawyers and bankers and committee members to participate in a bankruptcy case in a way that they think provides the best services to their constituents, which I believe is why gross negligence, willful misconduct is appropriately carved out and negligence is not. And we would urge the Court not to change that language and to confirm the plan. Because I think if the Court were to make that change, this would not be the last conversation we have about exculpation.

THE COURT: Okay, thank you, Mr. Feldman.

MR. FELDMAN: Thank you.

THE COURT: All right, appreciate your comments. All right, I'm going to excuse you from our panel and bring in the next counsel. I believe it's Mr. Neumeister.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 94 of 207

Mr. Neumeister, I can see your name on the screen and you're -- you just unmuted yourself. Can you hear me

MR. NEUMEISTER: I can. Can you see me now?

THE COURT: You are fine. All right, good afternoon. You have fifteen minutes, if you wish.

MR. NEUMEISTER: Thank you, Your Honor. For the record, Mike Neumeister, Gibson, Dunn & Crutcher, on behalf of the ad hoc committee of holders of trade claims. And I do want to reiterate the thanks others have kind of bestowed on you and your staff for the work you've done in this case and over the last several months. It is very impressive.

THE COURT: Thank you, thank you

MR. NEUMEISTER: Your Honor, I won't need fifteen minutes. We did see the debtors' revisions to the plan this morning. They sent them over an hour or so before they filed them to us. We have reviewed them, and I think Mr. Karotkin is largely correct, that I think it does resolve most of our concerns. We are still reviewing the revisions with our client. And shortly after receiving those revisions, we did reach out to -- or I did reach out to counsel for the debtors to discuss one or two additional changes that we would like.

So Your Honor, I'm happy to discuss those with you now. But I think, frankly, if I had another day or two to work with the debtors' counsel, we could likely resolve all of our issues with minor tweaks of the plan.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Works for me. When you manage a case of this size, you don't want -- you want things to get resolved, not presented.

MR. NEUMEISTER: Thank you. So I would just reserve the right to speak tomorrow or Friday, whatever works with your schedule. But I think we'll largely get there.

THE COURT: Okay. That's all we need. Okay, thank you for your participation, and we're going to excuse you from the panel now.

MR. NEUMEISTER: Thank you.

THE COURT: And I'm not going to say that to everybody who leaves. Everybody understands the methodology here, so when you come off the screen it's not because I'm throwing you out of the courtroom.

THE CLERK: Your Honor, who would you like me to bring in? Ms. Winthrop?

THE COURT: Well, I think -- let's bring in, yeah, Ms. Winthrop and Mr. Mintz, and we'll see how they want to share their time. I didn't know how they wanted to break it down.

THE CLERK: Ms. Winthrop is joining now.

THE COURT: Ms. Winthrop, I can see your name on the screen. You need to unmute and, if you're participating by video, to activate your video.

I see Mr. Mintz. Good afternoon, Mr. Mintz. Can you hear me?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. MINTZ: Yes, I can, Your Honor. Good afternoon. Can you hear me?

THE COURT: I can. Do you know if -- do you know if Ms. Winthrop's joining us?

MR. MINTZ: She is joining. I was going to begin, though. But I don't know if we want to wait until she's able to join.

THE COURT: Well, let's wait one second in case she's in the middle of clicking buttons. There she is.

MR. MINTZ: There she is

THE COURT: You're on camera, Ms. Winthrop. Good afternoon.

MS. WINTHROP: Good afternoon, Your Honor. My apologies for the delay. Having a little technical difficulties, here.

THE COURT: I have to give you a little story from one of my daughters, who's a photographer. She says people that have the bright light behind them have the witness protection program look. So you've got the witness protection program look now. You've not anymore. How are you and Mr. Mintz dividing up your time?

MS. WINTHROP: Mr. Mintz is going to lead the charge and then I will bat cleanup, Your Honor.

THE COURT: Mr. Mintz, you and Ms. Winthrop have twenty minutes to share

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 97 of 207

MR. MINTZ: Well, Your Honor, I'm not going to use it because, similar to the last panelist, I'm going to ask that we defer on certain issues. So let me tell you where we are and if Your Honor is pleased with me pushing off some issues, I think we may make some further progress in working through things.

So first of all, Your Honor, with respect to the issues that Mr. Karotkin discussed this morning regarding the drafting issues with respect to the plan and the concerns we raised about a few of the provisions, including I think it was 10.3 and 10.9 in the interpretation provision of the plan.

We have worked through those languages with the debtor. They sent over language to us. And the version of the plan that was filed this morning reflected those changes, although there was one additional change we requested that was made around the time that that version of the plan got filed. So there is an additional tweak that the debtors have agreed to that will be reflected to resolve those draft and concerns.

The second aspect, and what we reserve time for, was in respect of Your Honor's memorandum opinion that addressed the concerns we raised around the trust documents. And again, Your Honor, we thank you for allotting that time in advance of confirmation. We think it was very helpful to the process because by virtue of your ruling, we've been engaged with the TCC and the trustee on trying to implement the changes and deal

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

with the issues consistent with Your Honor's ruling.

We've made progress in that regard and we exchanged drafts with the TCC and the trustee over the last twenty-four, forty-eight hours, and we've been engaged in conversations with them. We think that another twenty-four, forty-eight hours, we should be able to hopefully resolve the drafting issues and incorporate the ruling that Your Honor made. So I would ask to defer on those issues until Friday, with the expectation and hope that we can work through those issues and if there's any remaining unresolved issues, we could then address those on Friday.

THE COURT: Well, again, as with my earlier comments, I only -- there's only so much time in Friday. But we'll make it work. And if we have to add more time, we're going to do it. And this is -- I'm glad that -- are you able to report that you're dealing with all the open items that were in my decision? I mean, a couple of them were done deals, but a couple of them were invitations to work something out. So are they all -- all the latter on the table, being worked on?

MR. MINTZ: Yeah, everything is on the table and we're working through all of those issues. The report I got back from the counsel for the trustee is that they got back our language last night. They're working through it. They said they had some drafting issues, some language changes they wanted to make, and they had to consult with their own clients.

escribers (973)406-2250 | operations@escribers.net | www.escribers.net

But it seems like we're heading towards a resolution of those issues. I'm hopeful that we can. And if there's anything that, you know, any lingering issues, those would be the subject of what we like to come back to you with. And we're hopeful that we can resolve this through putting our heads together and drafting our way to a solution.

THE COURT: Okay. Well, you may know that in the order that I issued on -- it seems like last month; it was actually yesterday -- I have scheduled a very short segment for Mr. Molton (phonetic), trustee's counsel, on Friday. And that would be a good opportunity, in any event, for -- if the trustee's counsel can say that all these loose ends have been tied together, that's a good status report. And if there's still matters for debate and decision, we'll talk about -- we'll either talk about them on the merits or talk about when we have to talk about them. Good. I think --

MR. MINTZ: That sounds good, Your Honor.

THE COURT: That's all you got?

MR. MINTZ: That's all I have, thank you

THE COURT: Well, Ms. Winthrop said she's batting cleanup. I'm not sure what she's going to do. But thank you, Mr. Mintz.

We'll call on Ms. Winthrop now.

MS. WINTHROP: Thirty seconds, Your Honor. I echo Mr. Mintz' comments that we have made some progress, but there's

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

still work to be done. As with Mr. Feldman, it is my understanding that the TCC has withdrawn its argument with respect to the definition of subro claim. If that turns out to be not -- not to be the case, that would be an additional issue. And of course, Adventist Health is excepted from the made-whole provision.

And then finally, one last reservation: an executory -- minor executory contract issue popped up this morning. It's not the time to address those issues. We're working with the debtor. But I expect to reserve on that, as well.

THE COURT: Okay, thank you very much.

MS. WINTHROP: Thank you, Your Honor.

THE COURT: All right. By my box score, we're supposed to hear from Mr. Carlson next.

Ms. Parada, is Mr. Carlson -- oh, there he is. Okay. We're running way ahead of schedule. Great.

Mr. Carlson, you need to unmute your microphone, and I presume it'll activate the video here in a moment.

MR. CARLSON: Your Honor, can you hear me

THE COURT: Yes, sir. I can hear you now, Mr. Carlson. Are you using a video or just audio?

MR. CARLSON: I am using video. I'm not sure why it's not showing up.

THE COURT: Well, go down to the lower left-hand of

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

your screen and --

MR. CARLSON: How's that?

THE COURT: There you go. Now you're on video.

MR. CARLSON: There we go.

THE COURT: Okay. You asked for -- or I gave you two minutes. You're welcome to give me your two minutes, please

MR. CARLSON: Well, Your Honor, I appreciate the time, very much. Just to shake your memory loose a little bit, I filed --

THE CLERK: Excuse me, Your Honor.

Mr. Carlson, please state your appearance for the record.

THE COURT: Yeah, just restate your name.

MR. CARLSON: This is Eric Carlson, representing both my wife and I.

THE COURT: Thank you. Okay, thank you, Mr. Carlson.

MR. CARLSON: I filed an objection -- three objections. They were all the same, basically. One was that the disclosure statement hearing, one, was a joinder to the business claimants' objection. And then for this hearing, I filed the same objection roughly again.

And my issues, one of them has been resolved, Your Honor. The first one, with respect to the material changes to the trust after confirmation, I believe you resolved that. And so that, I think, has been taken care of. The second objection

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that I have has to do with the trustee's ability to override without any judicial review. Very similar to the business claimant's issue.

Unfortunately, I can't get the attention of either the debtor or the TCC or their attorneys, so I was forced to come to you today. In your order, your memorandum of opinion, docket number 7597, you lay out that the order confirming the plan should include specific language assuring this preserved right of objectors to seek judicial de novo review after they have exhausted the remedies under the CRP.

The Court expects counsel for the debtors, the TCC, trustee, and the objectors to make efforts to agree. I have attempted -- I believe that I should be included in that definition of objectors. I don't believe your definition and your memorandum of opinion includes us. And I'd like to be included.

THE COURT: I think, Mr. Carlson -- I'm not trying to minimize the importance of this to you, but I think you have to understand the way these things play out. Objectors, as defined, was defined because of a stipulation that came along from Adventist and Comcast and AT&T and a few other smaller claimants who are entities. And those group (sic) of people, they formed a group which were conveniently called "Objectors", and that's why the mem. dec. and the arguments and the hearing all was on those people.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

You and your wife are objectors with a -- not a capital O, but an objector -- a little O because you objected, and in my mind, are -- you preserved your right. But when I, in my memorandum decision, directed objectors and the trustee and the TCC to work together, I frankly was only focusing on those parties who had participated in that discrete argument. It wasn't an intentional oversight of you. It was just -- you weren't on the radar screen as a party who entered into the stipulation that led to the dispute, and should do -- excuse me, to the discrete issues.

So I would simply say that you've heard Ms. Winthrop and Mr. Mintz tell me, just before you spoke, that there's a lot of discussion going on about resolving things that are consistent with my ruling. And I haven't heard from the TCC today, and I won't hear from them today necessarily, and I haven't heard from the trustee, but there's certainly -- my intention is you need to be invited to the discussion, but no one excluded you by -- in any way that I can think of, intentionally. Now, I think and I don't -- I'm not going to -- I'm not going to speak for anyone else. If someone said, let's keep Mr. Carlson out, I'd -- that's not -- I wasn't the one. You weren't in the discussion as a defined Objector with a capital O for the people that presented the argument.

So why don't we leave it at this. You heard and I heard that maybe by Friday I'm going to hear a resolution of

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

these issues. I would expect that because my comments are being heard by hundreds of people, the lawyer for the trustee probably would be a good person for you to send an email to and ask to have a dialogue. It may well be that everything that you're concerned about is being dealt with.

That's the best I can do for you at this point, but I wanted you to understand that it wasn't an intention to exclude you from the discussion. It was just background that I gave you.

MR. CARLSON: I appreciate that, Your Honor. Thank you very much.

THE COURT: Okay.

MR. CARLSON: I recognize my position in this, and I -- I'm just trying to defend our place and would like to just participate in that and get it resolved, and I believe that we can.

THE COURT: Yes, and I certainly respect your position, too. And you are entitled to the same treatment, frankly, that everyone else who filed an objection and persuaded me to rule the way I ruled, so it works.

All right, let's leave it at that for now, Mr. Carlson. I will -- let me close the subject by saying you've heard me say I expect to hear from the trustee's counsel on Friday. One of the things that I'll expect him to do is to say that he reached out and had a conversation with Eric Carlson

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

and either resolved things or didn't, and we'll take it from there. My guess is that it'll get resolved.

All right, thank you for your comments and your participation.

MR. CARLSON: Thank you, Your Honor.

THE COURT: All right, so you can -- Ms. Parada, you can excuse Mr. Carlson. I believe Mr. Barenbaum is up next.

MR. BARENBAUM: Good afternoon, Your Honor.

THE COURT: Mr. Barenbaum, good afternoon.

MR. BARENBAUM: Good afternoon. Daniel Barenbaum on behalf of the Oklahoma Firefighters Pension and Retirement System, OKFPRS. Thank you for permitting me the time to offer a brief argument today.

THE COURT: Yes, sir.

MR. BARENBAUM: I, too, hope not to use my full ten minutes.

OKFPRS is a shareholder. It's also the plaintiff in a derivative action called Oklahoma Firefighters Pension Retirement System v. Chu (phonetic). That case is stayed and pending before the Honorable Edward Davila in the Northern District of California.

At the outset, I'm not here to argue about whether a third-party release is appropriate here. There are other objections that tackle that, and I'm going to leave that to them to argue. What I'm here to talk about is fairness and the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

equity of assignment of causes of action against the former officers and directors.

And I think with regard to the release, it's enough for me to say that these releases are being offered to officers and directors for no obvious legitimate purpose, which I will get to, and that it's not enough for the debtors to simply claim business judgment without offering support. These are, by definition, former officers and directors no longer affiliated with the debtors. They have no common business interest with the debtors.

Factually, here's what is relevant. In the schedule of assignment of rights and causes of action, there are a host of third-party causes of action that are assigned to the fire victims trust. That's Exhibit E to plan supplement, which is docket number 7037. There are two pages of possible claims for vendors and other third parties.

And then on the third page there's one paragraph, and that's paragraph 2 on page 1936 that says that "any and all rights, claims, causes of action against any former directors and officers of the debtors solely to the extent of any directors' and officers' Side B insurance coverage".

And that's really what I'm here to talk about today. There is no explanation for that limitation to Side B insurance coverage. The plan appears to release officers and directors beyond that. The definition of released parties and releasing

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company parties includes officers and directors, and that has been in every draft, including the draft that was sent around this morning.

There's also no explanation about whether Side B insurance was the only insurance available, and whether there's also Side A or Side C; however, the declaration of Jason Wells speaks to that. This is docket number 7510.

Mr. Wells was cross-examined a few days ago, and at footnote 3, he talks about D&O liability insurance policies and says that there is availability up to 400 million dollars and that the primary D&O policies are attached as Exhibit A and B to his declaration. He also says that in addition to those that there's Side A DIC coverage, which is difference-in-conditions coverage.

So we've seen those attached policies now. They appear to include Side A and Side C, now that I've reviewed them, but to the best of my understanding, they're incomplete; one, because they do not add up to nearly 400 million, and two, because there's no Side A DIC policy there. So we know that Side B coverage is here and is available, and it's only that Side B coverage that's the subject of the assignment. It's not clear why the rest is included. Certain --

THE COURT: I need to clarify something. Are you complaining about the fact that there's a limited assignment to the trust or the fact that the company is releasing these

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

former officers and directors for liability in excess of whatever coverage there is? There are two different issues here, right?

MR. BARENBAUM: Yeah, there are two different issues. I just want to --

THE COURT: So which one are you complaining about?

MR. BARENBAUM: It's primarily the assignment, but the flip side of the coin is the release that comes with it because anything that's not assigned really --

THE COURT: Well, I -- yeah, but here's what I'm confused about. If the debtors and the TCC negotiated what was the bundle of rights being assigned, I -- and here's where I'm confused.

MR. BARENBAUM: Um-hum.

THE COURT: If they negotiated it and that bundle was incomplete, maybe what you're complaining about is there should be more going to the trust. But if you're saying that no, what the debtor shouldn't be doing is releasing its former officers, then why do you care? So why do you care if the debtor releases its officers if your client has a claim against somebody? Nobody's taking your claim and getting rid of your claim.

MR. BARENBAUM: Right. So I mean, first of all, I'm not here to argue that, as a claimant, OKFPRS is injured itself, but it's a position that OKFPRS believed in strongly

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

from the start. It's why it brought its derivative action in the first place. And there is a host of value that is being released without either being assigned -- which I understand is the point that you're raising -- or otherwise being provided in some way to creditors. It's not --

THE COURT: But I'm sorry to beat this to death because I want to -- I didn't focus on it. If you're not harmed, if your client isn't harmed, and the company chooses to release its former officers and at the same time is passing off to the trust the insured claims against those officers, it seems to me that just as a matter of principle -- perhaps your client doesn't like it, but there's no harm, no foul --

MR. BARENBAUM: Well, first --

THE COURT: -- in front of you.

MR. BARENBAUM: Sorry, Your Honor. (Indiscernible).

THE COURT: No, that -- go ahead.

MR. BARENBAUM: It's -- first of all, from -- it's not just that they're providing it up until the insured amount. It appears that other parts of the insurance are not covered, the Side A or the Side C insurance. So it's not simply releasing directors who might have liability out of their own pocket, though that's certainly part of it. But ultimately there's a disclosure statement and then there's a plan, and that's what we review and consider. And from the perspective of my client, it's problematic that the company is holding onto that value

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

and not providing it to creditors or otherwise explaining why there's some sort of business judgment that would allow it to simply release those --

THE COURT: But again, who would they give it to if they wanted to give it to somebody? They made a bargain with the victims.

MR. BARENBAUM: Yeah.

THE COURT: And the bargain has a price on it, and they didn't -- you and I weren't in the room.

MR. BARENBAUM: Right.

THE COURT: But if the victims trust could have hung in there for more value, they would have or might have.

MR. BARENBAUM: Might have.

THE COURT: And if -- there was a bargain, a give-and-ask, and a result, and it sounds to me like what you're really saying is maybe the debtor should have given more to the victims, but that's -- that's interesting but I can't do anything about it. How could I fix the problem for you and your client?

MR. BARENBAUM: Well, I mean, I think ultimately, it's up to the debtors to show that it's a fair and equitable plan that they're presenting and to amend it if need be. They've amended it several times; they speak to that as in their omnibus brief, they amended again, I believe, yesterday. And they're talking about amending further, and then ultimately,

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

it's up to Your Honor following Section 1129 to determine whether the plan is fair and equitable.

THE COURT: Okay.

MR. BARENBAUM: I'm raising the issue for you.

THE COURT: I got it, Mr. Barenbaum. Thank you very much. Is that -- I think that's your point.

MR. BARENBAUM: Thank you, Your Honor. That is my point.

THE COURT: All right, before you leave, I'll just invite Mr. Karotkin when he's making his closings on Friday to address this if he chooses to. If he doesn't choose to, that's okay, too. I appreciate your comments. Thank you, sir.

MR. BARENBAUM: Thank you, Your Honor.

THE COURT: Now, by my list, Mr. Gorton asked to be rescheduled. Mr. Glassman did.

Mr. Silfen had asked to be a witness -- I mean, an arguer, but I believe his client has settled. So Ms. Parada, did you -- well, Mr. Silfen, if you are expecting to be heard, it's time for you to come forth, but if you're not, you can simply raise your hand and say you don't expect that, and I'll just let that hang out there.

And Ms. Parada, is Ms. Pino in the attendees?

THE CLERK: Yes, Your Honor. She requests -- I'll bring her in. She requested to trail Mr. Tredinnick and Glassman. I'm bringing her in now.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 112 of 207

THE COURT: Okay, and Ms. Parada, if you do get a hand up from Mr. Silfen, which I don't think you will, but if you do, you can let me know.

All right, good afternoon, Ms. Pino. I hope this worked for your personal schedule.

MS. PINO: Your Honor, being moved up has not worked for my special -- my schedule. I have a CourtCall appearance in the Eastern District at 1:30, and I would request that in light of the changes made to the plan, especially the deletion of 6.1 and the change to 10.6, the injunction, that I'd be allowed to speak after Mr. Gorton and Mr. Tredinnick tomorrow.

THE COURT: Yeah, I thought your conflict from the scheduling was for tomorrow, not today. Did I miss -- what?

MS. PINO: It is for today. I have a hearing in front of Judge Klein, and my associate is place-holding until I get called on CourtCall.

THE COURT: Well, you send Judge Klein my best regards and tell him I'm hanging onto you here for another thirty seconds. I thought I adjusted for it, too, and I was accommodating you. I'm sorry. I will -- I'm still not -- we'll let -- if you get the call from CourtCall, I'll let you go immediately, but I don't understand your point.

Your point seems to be more your clients are complaining that they're not being -- they're unimpaired but there's no outlet for them to vindicate their rights. I would

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

think that's the end of the story. If the plan is confirmed and they're unimpaired, they're free to prosecute their claims on their own. What else is there to complain about?

MS. PINO: I don't think the plan provides for that, Your Honor. I think what Mr. Gorton refers to in his brief as the word salad, if you connect all the dots in the plan, it does not provide for that. In fact, in their summary to plan objections, docket number 7528-1, at docket page 17, which is page 16 of the actual document, I think the debtor basically concedes my point -- is that the debtors will be in control of how this claim is allowed, and unlike the workers' compensation claimants who are able to proceed as if they case had not been commenced, the tort claimants that are treated as general unsecured claims are held hostage to the claims objection process as posited by the debtor in Section 7.

THE COURT: That's not my understanding. My understanding, and I'll state it and then Mr. Karotkin, later, can weigh in on this. My understanding, since your client happens to be the victim of a fire, but not the fires that are in the fire victims class, so it's unfortunate that your client suffered a fire loss, but it could have been any kind of contract -- any kind of thing that their claims are unimpaired and therefore, come confirmation of the plan, they're free to pursue their remedies when and if they choose to. And so that's why, at least when I read your opposition, I was frankly

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 114 of 207

confused.

We'll defer it for now. I'm going to ask Mr. Karotkin to communicate with you directly, offline, if that is the case, and if I have interpreted correctly, he can confirm it to you. If he thinks it's an open issue, I'll let you come back in. And I apologize for misunderstanding your own schedule, so let's leave it at that. Mr. Karotkin's got the homework assignment to figure out if there's a misunderstanding as to where your client is because I think that Mr. Gorton's position and the various entities that he -- it's a much different situation. None of them are representing a tort victim who is not in the class of fire victims. So --

MS. PINO: Yes.

THE COURT: -- we'll leave it at that for now. Thank you, Ms. Pino.

MS. PINO: And thank you for accommodating my schedule, Your Honor.

THE COURT: Well, I didn't do very well at it.

MS. PINO: Oh --

THE COURT: Say hello to Judge Klein, all right.

MS. PINO: I will. I will certainly do that. Thank you.

THE COURT: All right, Ms. Parada. I believe we have Mr. Harris. Is that correct?

THE CLERK: Yes, Your Honor. I will search for him

now.

(Pause.)

THE COURT: Mr. Harris, you need to unmute yourself. So Mr. Harris, it's nice to see you.

MR. HARRIS: Good afternoon, Your Honor.

THE COURT: The next time you log in on Zoom, you have to put your first and last name, not your email address.

MR. HARRIS: My apologies.

THE COURT: So see how my first and last name appears? That's how all the others do it, and that's just for the record. Anyway, go ahead, and you have ten minutes to make your presentation. I've read your opposition.

MR. HARRIS: Thank you, Your Honor, Robert Harris at Binder & Malter appearing for Plaintiff Anthony Gantner individually and on behalf of all those similarly situated.

Thank you first, Your Honor, for allowing me to bat clean up. I will be brief in the spirit of the afternoon.

THE COURT: You're not going to be cleaning up. We have a number of others up and -- coming up to bat, after all, it turns out, with the schedule being changed. Go ahead.

MR. HARRIS: In our objection, docket number 7263, which challenged the plan for failure to address with some clarity that referenced damage claims from PSPS events are not to be discharged and that the successor entity will pay them if they're allowed.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

We also objected because 10.3 of the plan was overly narrow and would arguably have barred the appeal of Your Honor's order of dismissal, as well as later potential prosecution of an admin claim.

We read the plan amendment, and because the language in 10.3 has been broadened and no longer stands as an obstacle to prosecuting the appeal and a potential future claim, should Your Honor be overturned, our challenge to 10.3 has been resolved.

Given a moment to make a record, I believe that the first point was resolved as well, Your Honor. In the summary chart of objections to confirmation of the plan, the debtor characterized my client's objection as saying the plan should specifically state that the Public Safety Power Shutoff claims are administrative expense claims that are not subject to discharge.

PG&E helpfully offered this response in its chart of objections, "PSPS claims will be treated in accordance with the plan. If they are sustained and determined to be administrative expense claims, they will be treated as such." We assume, therefore, from this response that PG&E agrees that the plan is not inconsistent with the disclosure statement it references, the PSPS claims, and whatever the plan says, it does not preclude allowance of PSPS damage claims as administrative, should they be allowed.

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 117 of 207

I would ask Mr. Karotkin for some confirmation of this understanding, and if that is given, we have no further objection.

THE COURT: Well, okay. And again, I'm not going to ask him to do it on this record because we're taking all the arguments, but he can do it offline, and if that's satisfactory, that's good for me.

But let's make sure I'm clear. I dismissed your client's claim, and obviously, he has appealed that. And if that decision is reversed and your client has a claim, it -- to me, there's simply no doubt about it. The whole point of it is that it rose after the petition date. So even though it's kind of an unusual type of claim, it's no different from any other garden-variety tort claim or contract claim. Why is there any question in your mind that your client would, A, not be stayed by any automatic stay at least to prosecute the claim, and there's no question about it beyond that.

MR. HARRIS: Well --

THE COURT: In other words -- and if your client gets a recovery, is there any doubt that the law and the plan allows or obligates the debtor to pay it?

MR. HARRIS: Your Honor, we think in this case it'll be the reorganized debtor. But the plan of --

THE COURT: Yes, of course, you're correct.

MR. HARRIS: -- the plan says that. And frankly, it

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

was -- the problem in 10.3 was in terms of references to post-petition claims. There was only a reference to the post-petition fire claims, which was inconsistent with 2.1. We were looking for them to have a parallel change. They've made that.

THE COURT: Okay.

MR. HARRIS: So we're fine with that, and we appreciate it. Your Honor, I want to take a minute and thank you for all of your efforts and those of your staff in this case. I know it sounds redundant, but it really was an amazing endeavor for such a small staff and court to take on a case like this, so kudos to you all, and here is to hoping there will not be a PG&E III.

THE COURT: Well, thanks for the thanks. We're not done yet, and I love the props being piled on. We'll take all the compliments we can get this afternoon if criticisms are withheld.

Let me ask you, Mr. Harris, to do the same thing that I asked Ms. Pino to do, and that is if you get an offline communication confirming from Mr. Karotkin or anyone else in his firm confirming what we've talked about, you can simply -- you don't have to make another appearance. You can just withdraw your objection or do something. And Mr. Karotkin's been very good about keeping the score sheet up to date on the pending objections, and if yours is withdrawn, that'll be the end of it. So, good enough?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. HARRIS: I will do that, and Mr. Karotkin was very responsive when I emailed him before the hearing, so thank you.

THE COURT: Well, don't give him any more props. I want the props today.

Okay, we're going to excuse you, and I'm not -- we've finished our schedule for all of today, and we're going to go to tomorrow.

So I'm going to start on the list. And let's check my list here. By my calculation, I have Mr. Laffredi. Mr. Troy is being passed because he wanted to be heard tomorrow. Mr. Pascuzzi, Ms. Porter, Mr. -- oh, I'm sorry. Mr. Winsberg was moved over to tomorrow. And after Ms. Porter I had Mr. Scarpulla and Mr. Hallisey. So that'll be the plan for now. We'll take another check after we've called those names to see who's up and who wants to be heard.

So Ms. Parada, do you have Mr. Laffredi?

THE CLERK: Mr. Laffredi is joining now, Your Honor.

THE COURT: Okay, Mr. Laffredi, I see your name. I see your face. Now you need to unmute yourself. Good afternoon.

MR. LAFFREDI: Good afternoon, Your Honor. Can you hear me?

THE COURT: Yes, I can.

MR. LAFFREDI: All right.

THE COURT: Okay, you have ten minutes, Mr. Laffredi.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. LAFFREDI: Great, thank you, Your Honor. I don't think I'm going to use nearly -- much of that at all.

We haven't had a whole lot of time, obviously, to review the changes that were made to the plan as of this morning, but based on our review, it appears that our objections to the release provisions have been resolved. So I think at this point, the only thing that's left over that still remains in our objection is with regard to the exculpation provisions, and I really don't have a whole lot to add on top of what was in our brief, but I can highlight the three remaining points.

The first is that it appears that the exculpation provision extends to acts that would be beyond the effective date of the plan, and so we want to make sure that the exculpation provision is temporally tied to the bankruptcy case. The second --

THE COURT: So effective date, right?

MR. LAFFREDI: Right.

THE COURT: Effective date or confirmation date?

MR. LAFFREDI: Effective date.

THE COURT: Okay.

MR. LAFFREDI: The second, Your Honor, is with regard to a breach of professional conduct in addition to Your Honor's comments this morning about negligence. We think that the exculpation provision should carve out breach of professional

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

duties as well.

THE COURT: Well, but for whom? In other words, let's start with lawyers. They're easy. But what about someone who is not a lawyer, someone who is on the board, someone who is a member of a committee and makes an innocent error, but nevertheless a negligent error? I've been -- as you know, I'm very rigid on professionals, but I don't know that the law seems to recognize that exculpation is appropriate for people otherwise.

MR. LAFFREDI: Well, and I think the law also provides that these exculpation provisions should not include that as well, so we are just wanting to make sure that people who are -- that professional -- breach of professional duties is not somehow immune from anybody who may have a claim.

THE COURT: Well, let's test it this way. Let's suppose there are two people who are doing something in connection with the plan. One's a lawyer and he or she is doing law work, and the other is a nonlawyer who is doing work but not one that is governed by rules of professional conduct. If the lawyer makes an error, the lawyer, under a negligence standard, may be liable and may have a malpractice consequence. If the individual makes an error, it's an innocent error but, like any other employee or third-party agent, there isn't necessarily liability.

MR. LAFFREDI: Well, if they have a -- if they have a

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 122 of 207

fiduciary obligation and they breached that, that also should not be included.

THE COURT: Well, okay, but then it seems to me that you're saying that if there's an independent obligation, it's some other kind.

MR. LAFFREDI: Right.

THE COURT: But if somebody's doing a relatively not -- I don't want to sound like I'm minimizing the roles of other people, and I'm not, but somebody's doing something that is not governed by any traditional body of law that professionals, whether they be lawyers or doctors or other kinds of professionals, are not governed by professional standards, it seems to me those are normally included with the exculpation.

I'm not asking you to change your mind. I just want to see if you acknowledge at least the distinction there.

MR. LAFFREDI: Right.

THE COURT: Okay.

MR. LAFFREDI: And I'm trying to think of when -- if there was not a fiduciary obligation and not a professional obligation, I'm trying to think of an example of what that would -- where that would come into play in this case.

THE COURT: Oh, I can think of a lot, but let's leave it at that.

MR. LAFFREDI: All right, okay. I appreciate it, Your

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

Honor.

THE COURT: All right, anything further?

MR. LAFFREDI: The last objection is with regard to nonestate fiduciaries. We understand that estate fiduciaries are appropriate to include in an exculpation provision, but the plan includes a whole list of other nonestate fiduciaries that would be included. And part of our concern there is that there may be others out there who may have claims against these nonestate fiduciaries, and if this exculpation provision is allowed, they may be deprived of due process in prosecuting any claims that they may have against those parties. So that's --

THE COURT: Say it again, they may be what?

MR. LAFFREDI: I'm sorry. They may be deprived of any due process that they may have and any claims that they might want to bring against these non-estate fiduciaries if this exculpation provision is allowed.

THE COURT: Okay. Thank you very much.

MR. LAFFREDI: That's really it, but I did have one final comment, and my colleague brought this up the other day during cross-examination with regard to the aggregate cost of exit financing, and I understand from Mr. Karotkin that the debtors have this information available, so we would just ask that that information be disclosed. Not getting into the weeds of exactly what fees are going where, but just the aggregate overall amount. And I understand Mr. Karotkin has that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

information.

THE COURT: Okay. Well, he can communicate that separately. All right?

MR. LAFFREDI: Thank you, Your Honor.

THE COURT: Thank you, Mr. Laffredi. I appreciate your comments.

MR. LAFFREDI: Thank you.

THE COURT: All right. Mr. Pascuzzi should be up next.

Mr. Pascuzzi, good afternoon.

MR. PASCUZZI: Thank you, Your Honor. Good afternoon.

THE COURT: You have 20 minutes.

MR. PASCUZZI: Thank you. Paul Pascuzzi for the California State Agencies listed at docket -- in our objection, at docket 7281, Your Honor. We're cocounsel with the California Attorney General's office.

Your Honor, starting with our first objection dealing with the discharge and release provisions, we do appreciate the debtors' revisions that were circulated shortly before the hearing started today. I'm sure they were prompted by the Court's docket entry, so we appreciate that as well.

Our concern, Your Honor, was that the plan could be interpreted to provide the debtors some sort of general release of unknown claims that goes beyond a discharge of claims that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

they're entitled to under 1141.

Your Honor, my clients come from the perspective of regulating the debtor and will be regulating the post-confirmation debtors, so these are particularly concerning issues to us, and we're still reviewing the changes to the plan, and I will address those with the debtors if there are other issues.

One issue that I do know still remains deals with plan Section 10.9(e), and that section is titled Waiver of Statutory Limitations on Releases. It is basically our well known California Civil Code Section 1542 Waiver. It applies to releasing parties and those are not defined term releasing parties under the plan; it's a small R, small P. Given that the plan has now been revised to be clear that there are no involuntary releases and there's only a discharge of the debtors under 1141, that Section 10.9(e) really should be limited to releasing parties as that term is defined under the Plan. Capital R --

THE COURT: Wait. Did I -- I lost your sound. Wait. Ms. -- can you hear Mr. Pascuzzi?

THE CLERK: No, Your Honor, I cannot. I can hear you. I cannot hear Mr. Pascuzzi.

THE COURT: Mr. Pascuzzi. We can't hear you Mr. Pascuzzi.

MR. PASCUZZI: Can you hear me now, Your Honor?

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 126 of 207

THE COURT: Okay. Yeah. Better. Now we can hear you. What happened?

MR. PASCUZZI: Okay. I don't know.

THE COURT: Okay.

MR. PASCUZZI: Sorry.

THE COURT: Okay. You said, 10.9(e) should be limited to the capital R releasing parties.

MR. PASCUZZI: Right. As it's defined in the plan because those are specific parties who, under the plan, have either signed a ballot giving a release or otherwise specified parties who have agreed to a release.

Your Honor, so we'll look at the revisions to 10.3 and figure out if there are any issues, but I do know there's that issue.

Your Honor, the other issue we raised and talked about a little bit today was 10.13, the special provisions for governmental units. First of all, I wanted to respond to something that Mr. Karotkin mentioned characterizing what we had in our suggested revision to 10.13 as looking for all government claims to be reinstated, and that's not what 10.13 is directed to. 10.13 applies to post-confirmation issues and matters that are not claims and rights against nondebtors, and for the most part, the revisions we were asking for in 10.13 were caused by the debtors overbroad release satisfaction settlement and waiver language.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

But we did propose something different than what the debtors have in their draft revisions today, so we will look at it. I also note that there were several other government parties that were interested in Section 10.13 of the plan, such as the federal agencies, the Pension Benefit Guarantee Corporation, and Mr. Gorton's clients, Mr. Tredinnick's clients, so I think it would do best for us to group with them and figure out what further changes to Section 10.13 will be needed, and then we can revisit that issue. I don't want to just pepper Your Honor with a bunch of different changes and versions of that section. We should be able to coordinate.

THE COURT: Especially since I haven't even seen them yet, right? Yeah, okay. Well, I'm not surprised at your request, so to the extent that you want to reserve further discussion, you should hook up with those four counsel that you identified, or I think you identified all four of them: Glassman, Gordon, and Tredinnick and -- oh, I'm sorry -- three of them. And I don't know that the Pension Benefit Guarantee Corporation has been heard from.

And Mr. Troy, of course, is not here this afternoon because he's going to be participating tomorrow so --

MR. PASCUZZI: Yes. This --

THE COURT: -- you've got to pass to check in with those other people.

MR. PASCUZZI: Thank you, Your Honor. And Mr. Troy

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company joined in our objection, and the PBGC had separately contacted us about that particular section. So I know they have an interest. That's why I mentioned it.

Your Honor, the next item I wanted to mention was one of our objections had to do with kind of clarifying how -- any disputes over administrative claims would be resolved. The plan provides that administrative claims are not discharged. There were revisions to that part of Section 10.3 as well that dealt with the fire claims basically being dealt with in nonbankruptcy court. I think that should also be with respect to any other claims that arose post-petition. They should be dealt with in the otherwise appropriate nonbankruptcy form, and that's what we had proposed in our objection, so that had not been addressed by the revisions as well.

Your Honor, one other very important part of our objections I wanted to briefly mention, because we do discuss it in our papers very well, is the fact that the fire victim trust agreement and the claims resolution procedures do not recognize the government settlements that this Court has approved, both the State agency settlement and the federal government settlement of the fire claims. You might recall you approved that shortly before the deadline for objections and the voting.

The fire victim trust agreement mentions Court-approved settlements only one time and it mentions it in the

(973) 406-2250 | operations@escribers.net | www.escribers.net

context of putting the assets into the fire victim trust agreement for the purpose of paying fire claims and settlements, but there are whole separate provisions in the trust agreement that deal with claims and how they're dealt with, and there's nothing in there recognizing that the trustee and the claims administrator are basically bound by our settlement agreements and have to perform those settlement agreements in accordance with their terms.

THE COURT: But you say performance, they just have to pay, right? Is there any performance other than pay?

MR. PASCUZZI: There is no performance other than paying, Your Honor. There's also specifically negotiated and carefully crafted releases already in our settlement agreements. So requiring us to sign further releases in order to get paid pursuant to our settlement agreements is inappropriate. So we raised those issues in our pleading. We had contacted the TCC counsel about these issues before we filed our objection and hadn't heard back. The debtors, in their response and in speaking with them, do not have any objections to our proposed revisions that were attached as Exhibit 9 to our objection, so I just want to make sure those are dealt with. We didn't settle our claims and go through some very difficult mediation and documentation to then be put through the claims resolution procedures and redetermine how much our claims are or have to sign new releases that are

already in our settlement agreements. So that's very important, Your Honor.

THE COURT: You had any discussion with the trustees' counsel?

MR. PASCUZZI: Your Honor, when we were negotiating the settlement agreements, trustees' counsel were on a couple of different phone calls that we had. I know that Mr. Goodman, for the tort committee, was speaking with them because a lot of what we had to put in our settlement agreement, they needed to understand. The settlement agreements actually say they're binding on the trustee and the claims administrator, so they had their chance to negotiate things but I have not heard from them since our objection was filed.

THE COURT: This strikes me as more of a drafting or communication glitch. I hope I'm right. I mean, I invite Mr. Julian and Mr. Molton to be prepared to discuss this with you between now and Friday, and then on Friday when they're speaking -- unless it comes tomorrow, but it'll probably be Friday -- to make sure this is flagged. It may be a non-issue. We'll find out.

MR. PASCUZZI: I hope so, Your Honor. And I point out that the tort committee, in a couple of their pleadings, docket 7509 and 7522, respond to the fire victims who are questioning the amount for the trust by basically saying it's a Court-approved settlement agreement, and it's res judicata and it

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

can't be changed and it can't be attacked and it's binding on everybody. So I think that argument works here for me as well.

Your Honor, another issue that we wanted to raise was the retention of jurisdiction provisions of the plan in Section 11.1. The beginning of Section 11.1 basically grants the Court exclusive jurisdiction post-confirmation for all matters arising under or arising out of or related to the Chapter 11 cases in the plan, and as we noted, the close nexus test is the test in the 9th Circuit regarding the bankruptcy court's jurisdiction, and I don't think there's any sense of the word exclusive in that context, so there is a provision buried at the end of the plan that says that nothing in this plan expands the Court's exclusive jurisdiction beyond that provided by applicable law but that basically also presumes there is exclusive jurisdiction to begin with.

So that provision is just improper and should not be approved.

THE COURT: What would be the fix?

MR. PASCUZZI: I think the fix, Your Honor, is to say that the plan -- the Court retains jurisdiction to the fullest extent provided by law.

THE COURT: That's very clever, isn't it.

MR. PASCUZZI: Speaking of Judge Klein, that's what he always says to put in there because then you've got it as much as it's there.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

But Your Honor, then I guess, lastly, I wanted to mention that the changes to the plan interpretation provisions that showed up in the draft plan the debtors filed this morning, that was in that clause J that you had issued a docket text question about why should the debtors interpretation of the plan control and supplant judicial review, I think they deleted that so as long as that stays deleted, that deals with our issue there, of course.

THE COURT: Well, deletions count and you can't delete something and then put it back in after the hearing, so.

MR. PASCUZZI: I would think so. And then, Your Honor, just because the changes to the plan will also require changes to the confirmation order, we reserve the right to review that and comment on that to make sure we have consistent issues.

Your Honor, the other thing is Plan Section 8.2(e), this deals with -- it's an executory contract provision, but it deals with the effect of assuming the contract. So I don't know if the Court wants to deal with that issue right now, but it's the provision of the plan that says that the assumption of an executory contract basically is a full release and settlement of any claims and causes of action against the debtors, arising under any assumed contract any time before the assumption, and we objected to that.

I mean, if a debtor assumes a contract, and it takes

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company with all the benefits and the burdens -- and as I understand Section 365, there's a provision for curing defaults -- but if you cure a default, that does not basically release the debtors of any and all claims that arise under the contract. It deals with defaults.

THE COURT: What about (indiscernible) claims that existed on that date?

MR. PASCUZZI: What about -- I'm sorry?

THE COURT: What about claims that were in contemplation that could have been asserted, much like you have when there's a discharge? I mean, isn't this similar to the issue when there's a discharge? It could be a simple individual in Chapter 7. The discharge claims that are in fair contemplation, not things that they've never even materialized. You're not being -- I mean, this operation 8.2.E. doesn't just discharge somebody that doesn't even exist, does it?

MR. PASCUZZI: Your Honor, the definition of causes of action, which is included in 8.2 includes unknown claims, unforeseen claims, so it does go beyond the fair contemplation limitation. And my argument is even -- to answer your question -- but in my argument is even more than that. I don't think assuming a contract and curing a default discharges anything with respect to the contract other than it cures defaults. So --

THE COURT: Suppose you had a commercial tenant who

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

had violated an hours of operation clause, but also hadn't paid the rent, and that debtor filed -- that tenant filed bankruptcy and moved to assume the lease, and the landlord says, well, you've got to pay me my back rent. Period. And so the debtor pays the back rent and assumes. Don't you think that resolves any pre-existing claim for a nonmonetary breach?

MR. PASCUZZI: Your Honor, if there was a breach, I think -- a lease, Your Honor, is not a good example, with all due respect, because --

THE COURT: But it's my example.

MR. PASCUZZI: But that -- and okay. Then it is a good example. But I think with nonmonetary defaults under the lease, there's case law out there about that. So incurable, nonmonetary defaults under a lease that can't be cured, you can still assume a lease under that scenario.

But let's say there's a contract that says, I'm delivering goods to the debtor over a period of a year, and at the end of the year, we're going to true-up who owes who what. And in the middle of the year, the debtor -- the other party files bankruptcy and there's no default right now, but at the end of the year, when we true-up after the contract's assumed, there might be some more money owed.

I don't think the debtor can strip off any and all rights under that contract to true-up something that is not a default under the contract by this provision in 8.2.E. I

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

think, under 365, the debtor is entitled to cure the default and then the contract goes through all benefits and all burdens.  It can't get basically, a 1542 waiver and release just because it assumes the contract.

THE COURT:  Okay.  Let's leave it at that for now. I'll hear from the other side when they have their closing argument.

MR. PASCUZZI:  Okay.  I believe that is all I have, Your Honor.

THE COURT:  Okay.

MR. PASCUZZI:  Thank you.

THE COURT:  Mr. Pascuzzi, thank you very much.

I'm going to declare a ten-minute personal convenience break for anyone and everyone.  I'm going to turn off my video and we'll be back in a little bit -- in about ten or eleven minutes, and we're ready to go with Ms. Porter, I believe, and then Mr. Winsberg after a ten-minute recess.  Thank you.

(Whereupon a recess was taken)

THE COURT:  I'm ready.  Thank you.

THE CLERK:  I'll bring Mr. Karotkin in.

THE COURT:  Okay.  We're back on.  Can you hear me, Mr. Karotkin?

MR. KAROTKIN:  Yes.  Yes, sir, I can.  Can you hear me?

THE COURT:  Yeah.  Okay.  So before we broke -- or as

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 136 of 207

I was breaking, I made an error. I said we're going to hear from Mr. Winsberg. Mr. Winsberg had asked to go later on in the list after Mr. Bray, and so I will correct that.

And Mr. Karotkin, you wanted to get my attention, so -- you got everything solved? You got everything negotiated during the break?

MR. KAROTKIN: I just wanted to make some clarification with respect to Mr. Pascuzzi, but he and I exchange emails. He hurt my feelings by not advising the people that many of his objections have been resolved. So I wanted to clarify that. But he mentioned to me that he had advised the Court so no need to address it.

THE COURT: Okay. But while you're here, I'm going to edit something I said before because we are moving much more quickly than I anticipated when I did the schedule. And so even when I broke after the lunch break, I said I was going to sort of figure out and ask people to communicate with my staff about who wants to speak when.

I wonder whether you agree with me, Mr. Karotkin -- and you need to unmute yourself -- can I burden you to sort of coordinate who wants to be heard and when because you are first line of defense here with things getting resolved, and we don't need to have lawyers contacting my staff and staff contacting me and my schedule -- adjusting the schedule if there are things all resolved.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

So here's my proposal. You can turn me down; I won't take it personally, is that when we break today, and I'll make an announcement about that in a little while, I will invite people who have moved their speaking because they want to review the drafts, or people, for the various reasons we talked about, to communicate it with you. Presumably, they will email you (indiscernible), and then tomorrow after the motion regarding the examiner, you can tell me what you've got resolved. In other words, I don't mean you can tell me -- of course you can tell me what you've resolved on the merits, but what you are proposing as far as a schedule, because here I deferred a bunch of people, assuming we were going to go all the way to mid-day Friday, and it's clear we're not going to have to go to mid-day Friday. I want to use as much of today as I can, and then there will be some speakers left tomorrow. But if I hear from you in the morning about what you have discussed with time allocations, I can ask if anybody has any problem with that, and we can then zero in on what would be the agenda for the rest of tomorrow and also for Friday.

That work for you?

MR. KAROTKIN: It works for me, Your Honor, if the burden is upon them to contact us because it would be too difficult for us to be reaching out individually to everybody.

THE COURT: Right. And I'll make that clear in a moment, or I'll make it clear right now. So whether a certain

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

lawyer who thought maybe it's resolved but weren't sure, or certain others -- like I'll use Mr. Gorton as the leader, but he's the spokesperson for several lawyers representing similarly situated clients, and in many respects, Mr. Pascuzzi is similar and Mr. Troy, all of them, they may or may not need to be heard further, and because I promised to make sure we come back to deal with this issue of indemnification and contribution claims, that's got to be dealt with also.

So I guess what I'm saying is I will not be inviting lawyers who want to be heard and argue on any of these subjects to contact my staff, but rather to contact you, Mr. Karotkin. Or if you want to delegate it to someone under your direction, feel free to do so if you have a victim in mind, and then you'll use your judgment -- and it's only a judgment. I'm not going to put an incredible burden on you, nor am I going to take away the right of anybody who doesn't agree with you, to try me. But you're the scheduler, if you will, for the arguments that are either being moved off of the current list or need to come on the list because they were taken off the list by me because they relate to a contribution or indemnification. And you tell me tomorrow. If you put something on the docket, I'll be able to look at it. But one way or the other, we'll have a discussion and by mid-morning tomorrow. I ought to be able to at least go through a time line for who else is going to present their argument during the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

balance of tomorrow and who should be anticipating doing that on Friday.

Okay? Is that all right?

MR. KAROTKIN: Yes, sir.

THE COURT: Okay. Okay. I'm going to move you out of the panel again and ask Ms. Parada to bring Ms. Porter in.

Good afternoon, Ms. Porter.

MS. PORTER: Good afternoon, Your Honor.

THE COURT: It's good to see you again.

MS. PORTER: Thank you. You too.

THE COURT: You have ten minutes.

MS. PORTER: Thank you, Your Honor.

THE CLERK: Ten minutes?

THE COURT: Yes.

MS. PORTER: Cara Porter for the California Franchise Tax Board. Your Honor, FTB raised three main objections to confirmation. The first of which was regarding interest on allowed priority tax claims. Your Honor, debtors have proposed an amendment to the plan, Section 2.4, which would cure our objection. The additional language that they proposed to add as to payment of allowed priority tax claims that are paid in the ordinary course of business. The additional language would be together with any interest due at the applicable nonbankruptcy rate resolved FTB's objection to that particular issue.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Right. Thank you.

MS. PORTER: The second issue we raised was with regard to the discharge, and Mr. Pascuzzi has already addressed Section 10.13. That is a section in which FTB does have an interest, and I have spoken with Mr. Pascuzzi offline with regard to that. As a governmental unit, FTB we'd like to participate in the discussions and further resolution of the issues regarding 10.13 to the extent that FTB needs to weigh in.

For Your Honor, any further, I'd like to come back on Friday. However, I'm hopeful that I won't need to do that.

THE COURT: You need to make sure Mr. Karotkin understands you still want to be heard, and we'll take that up tomorrow and schedule it, as necessary.

MS. PORTER: Yes, Your Honor. Very good.

THE COURT: And the third one?

MS. PORTER: The third issue is with regard to the plan's use of the term "restitution". As we've explained in our objection, which is in document 7280, Your Honor, certain payments that are characterized as restitution may be deductible as tax deductions, and FTB is concerned that the use of such current restitution in the plan here would be determinative.

And debtors admit, Your Honor, that the term "restitution" is a prerequisite as the identification of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

payments as restitution is a prerequisite for tax deductibility, but it is not determinative, and debtors agreement to that idea, that concept, is in the chart accompanying their response to the objections to claim, docket number 7528-1 at page 6 of 21. So Your Honor, FTB requests the clarification in the plan confirmation order that any reference --

THE COURT: Lost your sound. Ms. Parada, did you hear her?

THE CLERK: No, Your Honor. I don't hear Ms. Porter.

THE COURT: Okay. So I don't know --

MS. PORTER: I'm sorry.

THE COURT: -- there's lawyers --

MS. PORTER: Am I back?

THE COURT: I'm worried about the lawyers representing the State of California. They keep going --

MS. PORTER: My apologies, Your Honor.

I was saying that FTB requests a clarification in the order for confirming plan that any references to payments as quote/unquote restitution are not determinative for deductibility purposes. And because debtors admit such term is not determinative, there should be no problem with the order confirming plan stating as such, or indicating their agreement to that concept.

THE COURT: Okay. We'll put that on Mr. Karotkin's

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

to-do list, to indicate whether he agrees with you or if not, it's an issue that I guess I'll have to decide if there's no agreement.

MS. PORTER: Yes, Your Honor.

THE COURT: Okay.

MS. PORTER: Thank you, Your Honor.

THE COURT: Thank you, Ms. Porter. I appreciate your time.

MS. PORTER: Thank you.

THE COURT: All right. Ms. Parada, I think I want to bring Mr. Scarpulla and Mr. Hallisey in together and then they can tell me how they want to divide their time.

Okay. Mr. Scarpulla, I see your name on the screen. It looks like you need to unmute your microphone.

And same to you, Mr. Hallisey. You need to unmute your microphone.

Okay. Mr. Scarpulla, you've done it, but you haven't turned your video on. There we go.

Mr. Hallisey, how --

All right. Good afternoon to both of you.

MR. HALLISEY: Good afternoon, Your Honor. I hope you note my name. My full name is at the bottom.

THE COURT: I gotcha there.

I don't see Mr. Scarpulla on the screen, though. Mr. Scarpulla, what's your camera pointing at?

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. SCARPULLA: Your Honor, I don't know why it's not showing up because it shows that I have video and I have unmuted it.

THE COURT: Well, move your laptop top up and down and see if we see something else in the room. There you go.

MR. SCARPULLA: There you go. There you go.

THE COURT: All right. Now, how have you two gentleman divided your time?

MR. SCARPULLA: Mr. Hallisey is going to address Your Honor right now. But we haven't had a chance to even -- we're working on our closing statement, even as we speak, so we'd like to stick with tomorrow, but --

THE COURT: But this is --

MR. HALLISEY: And we'll work the time out. We won't need more than twenty minutes so --

THE COURT: Well, I can't promise you tomorrow. I did originally, but let's go with now, Mr. Hallisey. Let's see what you can do in your --

MR. HALLISEY: Could I ask a question first? There's apparently an arbitration. At the beginning of the hearing you indicated it was a binding arbitration on a couple of the issues that we have been complaining about for seven months or so. And is that arbitration binding or not? The order is a little bit unclear. It talks about arbitration, I think, in two or three occasions, but it doesn't say whether it is or is

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

not.

THE COURT: Well, the way --

MR. HALLISEY: And it simply an --

THE COURT: The way Mr. Karotkin explained it to me is that the TCC and the debtors resolved several of their differences. One of them --

MR. HALLISEY: Right.

THE COURT: One of them has to do with calculating the amount that is plugged into this formula which is called normalized net income, or whatever the acronym is, that is a multiple of a number of factors. And that is going to be arbitrated, and apparently next week, with Mr. Meyer of JAMS, and the TCC and the debtors have agreed to be bound by his determination of that formula. That's the only thing that they explained to me is being arbitrated. There may be other things that are being arbitrated, but that's the only thing that is the subject of, I'm told.

MR. HALLISEY: Well, isn't the registration rights being arbitrated also?

THE COURT: Well, I'm told that the registration rights are continuing to be negotiated through the mediation process. So again, I'll repeat that the TCC and debtors have agreed to a binding arbitration of what will allow a determination of the dollar amount to fix for the share value.

I'll tell you what, Mr. Hallisey, I invite you to

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

discuss that more specifically with Mr. Karotkin or perhaps with Mr. Julian. I don't feel comfortable enough to understand it to try to explain it.

MR. HALLISEY: I understand.

THE COURT: No, but the point is that until last night, I guess, the TCC had several significant objections. They've resolved all but one of them. And the one that is unresolved at the moment is the rights agreement. But what's resolved and -- about to be resolved through the arbitration process is the plug-in for this number to calculate what is the share price.

Again, I don't want to -- don't quote me; I might be using the wrong term, but it's to resolve and bind both sides as to what the figure is. So you take that up with them offline, and I'm sure they can explain it to you much more clearly than I can.

MR. HALLISEY: All right, thanks.

THE COURT: So for now, you need to tell me why -- I assume you're still appearing in opposition to confirmation of the plan. That's what I want you to address, or if you believe that the plan should be confirmed with changes then tell me that. Those are the three choices I gave you. If there's a fourth choice called "none of the above", give me the "none of the above".

MR. HALLISEY: Well, we're prepared to do that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

tomorrow, Your Honor, and request that we go over until tomorrow.

THE COURT: Well, okay, but I'm going to put you both all the way over to tomorrow because, as I say, I moved this up -- I'll do it; I'll take you both off, and we'll leave you on for tomorrow. I don't know when. It'll prob --

MR. HALLISEY: That's all right, Your Honor.

THE COURT: It'll probably be --

MR. HALLISEY: Whatever's convenient with you.

THE COURT: Well, I hope you heard me have the discussion with Mr. Karotkin. There are some very fluid issues that relate to, particularly, governmental agencies who are digesting the amendments that were filed just within hours, and a group of them are trying to work things out. And what Mr. Karotkin is going to do is he's going to collect estimates and who wants to be heard when. And I will assume -- I have reserved for his -- his, Mr. Karotkin's penciling in a schedule, that you two gentlemen will have twenty minutes sometime tomorrow.

MR. HALLISEY: Right, and we're flexible as to when it is.

THE COURT: Okay. We'll leave it at that. Thank you both. We'll excuse you for now.

MR. SCARPULLA: Thank you, Your Honor.

THE COURT: And Mr. Marshack is next up.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

THE CLERK: Your Honor, Mr. Karotkin would like to be heard. Would you like me to bring him in?

THE COURT: Let's keep him in here for a while.

THE CLERK: Mr. Marshack is joining now.

THE COURT: Mr. Marshack, can you unmute yourself and turn on your video?

And Ms. Parada, are you bringing Mr. Karotkin back?

THE CLERK: I will do so now. One moment, Your Honor.

THE COURT: Okay. Mr. Karotkin, can you hear me?

MR. KAROTKIN: Yes, sir.

THE COURT: Okay. You asked to come back in.

MR. KAROTKIN: Yes, I'm sorry. I didn't want to interrupt but on the issue of --

THE COURT: Wait, I can't hear you now.

MR. KAROTKIN: Hello?

THE COURT: Go ahead.

MR. KAROTKIN: Can you hear me now?

THE COURT: Yes, sir.

MR. KAROTKIN: Okay. On the issue of the arbitration which you were just talking about, just to be clear, there was a stipulation filed with Your Honor yesterday, which you approved, which has the precise wording of what is going to be arbitrated. And if people will look at that, there will be no mistake about what is being arbitrated with respect to that matter.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Okay. That's fine. I remember that. Again, I can't keep track of all of these documents. Can you remind me of the docket number of the order?

MR. KAROTKIN: I will shortly. I don't have it in front of me, but it was --

THE COURT: Oh, I might --

MR. KAROTKIN: -- entered yesterday --

THE COURT: I might have it here.

MR. KAROTKIN: It was entered yesterday afternoon. Well --

THE COURT: No, I know that.

MR. KAROTKIN: Okay.

THE COURT: I just -- well, I tell you what, Mr. Karotkin, why don't you just send an email to the two counsel that were just on and just say that the issue being arbitrated can be found in document number such-and-such, and --

MR. KAROTKIN: Will do.

THE COURT: -- they can read it from there. And I presume you can respond to a question or two if they want some clarification.

Now, do you want to stay on the screen for a while, or shall I let you out again?

Mr. Marshack's on your side, so maybe you don't need to listen to him. What's your pleasure?

MR. KAROTKIN: Whatever your pleasure, Your Honor.

I'm happy to --

THE COURT: No, it's your pleasure. You can go off if you want. I'm not going to interrupt you. I'm not going to call on you. Okay.

MR. MARSHACK: He may want to respond to something I have to say.

MR. KAROTKIN: Then I'll go off.

MR. MARSHACK: Your Honor, I want to note that Mr. Karotkin got quite the haircut, and let's just hope that Governor Cuomo is not in the audience today.

THE COURT: Well, the governor's brother got a haircut the other day that looked like he was attacked by savages. But Mr. Marshack --

MR. KAROTKIN: I was concerned that my hair was interfering with the internet connections in the United States.

THE COURT: I'll show you my hair.

Mr. Marshack, you are substituting in place of Mr. Singleton, and you have ten minutes. What can I do for you?

MR. MARSHACK: I do, Your Honor, but we prefer to go tomorrow. We're not quite ready yet. We are going to wait for all of these presentations.

I will give a preview, and the preview is this. So many things have been resolved that we don't have any objections, and we just want to let the Court know, one, you guys have done a terrific job. You've done a terrific job of

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

pivoting. The debtor has done a terrific job of managing these issues, and we fully support confirmation.

Having said that, I think Mr. Singleton and I were looking at regrouping tonight because we were on tomorrow's agenda. So how would you like to handle this? I don't know that we're going to be adding anything tomorrow, but I don't know what Mr. Singleton has on his mind.

THE COURT: How can I say this politely? I don't want to hear from people that don't help me with my decision-making. If you are going to come on and tell me nice things about me or my staff or my haircut, I'm still going to decline the invitation at this point because I'm trying to get through this day.

So let's do this. You and a number of other people are on Wednesday afternoon because you originally scheduled for late Thursday morning, and we just moved this thing up. But if I end up with so many people that I can't make it work, I can't make it work. So I'm going to just take you at your offer to roll it over to tomorrow, and I might hold you to a much shorter period of time. It really depends on what other people want to do. So --

MR. MARSHACK: Your Honor, you have my commitment that it will be -- if I appear -- if I appear, it will be under two minutes.

THE COURT: Okay. Thank you, Mr. Marshack.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. MARSHACK: Thank you.

THE COURT: I appreciate your comments.

All right. For my notes -- here, let me read the following. According to my notes -- Ms. Parada, you can excuse Mr. Marshack -- I'm going to call the following in order: Mr. Tosdal, Mr. Finestone (phonetic), and then I'm going to ask Mr. Bray if he wants to reserve and argue tomorrow. And I will then decide what to do after that.

So Mr. Tosdal, and then Mr. Finestone coming up next, please.

Good afternoon, Mr. Tosdal.

MR. TOSDAL: Good afternoon, Your Honor.

THE COURT: I can hear you. All right.

MR. TOSDAL: There you are.

THE COURT: You have fifteen minutes. Good afternoon. Nice to see you.

MR. TOSDAL: Thank you, Your Honor, you've got a full day.

THE COURT: That's what I get the big bucks for.

MR. TOSDAL: Yeah, I guess.

THE COURT: You need to tell me what you want me to do, and --

MR. TOSDAL: I will, indeed. Tom Tosdal for Patricia Garrison.

Ms. Garrison has two objections, Your Honor. The

first is to classification, and with regard to that objection, she requests that you deny confirmation of the plan. The gist of the objection is that the three separate classes denoted with the number 5, the public entity wildfire claims, subrogation and wildfire claims, and the fire victim claims should, under the law, have been put into one class with equal treatment with regard to the proportion of stock and cash concerning the respective funds.

And so really the goal here is to shift stock to the other two groups and shift cash, not entirely but proportionately, to the fire victim claimants.

THE COURT: Do you think she would do better that way?

MR. TOSDAL: Pardon?

THE COURT: Do you think she would do better if we put all three in one class and --

MR. TOSDAL: Well --

THE COURT: Remember --

MR. TOSDAL: It's my understanding that there can be subclasses with different funding amounts for each subclass.

THE COURT: But what's the difference between three classes and three subclasses? It's --

MR. TOSDAL: Well, because the treatment is, as I understand it, supposed to be equal amongst the subclasses in terms of proportionality.

THE COURT: But I don't think the statute even thinks

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 153 of 207

about subclasses. Subclasses is a lawyer invention, and the statute says you can classify claims. But more importantly, what would I do, if you were right, with the subrogation people who have, they say, voluntarily reduced their claim by forty-five percent or nine billion dollars?

MR. TOSDAL: Well, that's what they say, Your Honor, but let's take a look at the fire victims claims. As of today, there has been no estimation of the amount of the fire victims claims.

THE COURT: Well, we're just waiting for Judge Donato to do it, though, aren't we?

MR. TOSDAL: Well, but Your Honor doesn't know what he's going to do. I sure don't know what he's going to do, and he doesn't done it yet.

THE COURT: But I asked Mr. Karotkin earlier today -- I don't know if you were on the line -- can I confirm this plan without a decision from Judge Donato, and Mr. Karotkin thought I could. I personally don't imagine he's going to wait, but I don't have any discussions with him so I don't know what his agenda is. But my point is he will issue an order that will peg a number, some number --

MR. TOSDAL: Yes.

THE COURT: Then he can -- obviously the debtor and others have urged him to make it thirteen-and-a-half billion.

MR. TOSDAL: I understand that, Your Honor, but he

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

hasn't done that yet, and he's asked for evidence of the fire victim damages.

THE COURT: Okay.

MR. TOSDAL: And he hasn't gotten it yet. And so I don't know what Judge Donato's going to do, and I don't know that anybody on this screen knows what Judge Donato's going to do.

THE COURT: Okay. But your argument is that there should be three pots, all called one class, but with three subclasses.

MR. TOSDAL: Yes.

THE COURT: Okay.

MR. TOSDAL: And that there should be proportionality with regard to the stock and cash in each -- as to each group because I think the evidence is very strong that the claims are substantially similar. They all arise from the same fires; they all claim property damage. According to Mr. Wells' testimony, the liability claims are essentially the same. They're all disputed claims. And so what --

THE COURT: Well, they're not all -- excuse me, they're not all disputed claims. They're not all disputed at all; a lot of them have been settled.

MR. TOSDAL: Okay. But what's remaining, which is the bulk of it, are disputed.

THE COURT: Okay.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. TOSDAL: They started out disputed. There's been a settlement, and I'll get to that. But they started out disputed. Okay. I see what you're saying.

THE COURT: Some of them didn't even start out disputed; some of them were liquidated because they were settlements from the Butte fire, but that's a small percentage.

MR. TOSDAL: Very small, comparatively.

THE COURT: But they're still in the same class. In other words, a victim who suffered in the Butte fire who never got paid, but has a stipulated judgment for 100,000 dollars, is still waiting to get paid. A victim from a camp fire, who suffered similar damages, is sitting there with an unliquidated, presumably still disputed claim. So there's no way, at the moment, they're going to be -- there's a way to treat them the same. Ultimately, hopefully they will be treated the same. Anyway, go ahead.

MR. TOSDAL: All right. Okay. So what counsel said this morning is that the subrogation claims are a different legal basis. And respectfully to him, that is just entirely legally incorrect because the subrogation insurers stand in the shoes of their insured fire victims and assert the same type of claims -- not the same type -- assert the same claims against the tortfeaser, PG&E, recoverable up to the level of their payments. So that argument doesn't make sense.

The other comment by counsel this morning was that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

there was no personal injury claims in subrogation and public entity classes but they were possible in the fire victim classes, which is true, but there's been no evidence as to how many personal injury claims have in fact been made. The fact that they can be made is one thing, but the fact as to whether they have been made is what matters. And we have no evidence from Mr. Wells, or anybody else, as to how many have been made. I'm sure some have, but --

THE COURT: I'm not following. Therefore, what? We know how many claims have been filed by fire victims.

MR. TOSDAL: Right.

THE COURT: And although you and I haven't looked at all 80,000 of them, one could determine which of them include claims for personal injury or wrongful death. So it's ascertainable, at least the claim, maybe not the amounts, but the existence of the claims is a knowable fact.

MR. TOSDAL: That's right, but it's not known in this proceeding. That's my point.

THE COURT: But why does it need to be known? Why does it need to be known --

MR. TOSDAL: Because --

THE COURT: -- under the current plan?

MR. TOSDAL: Because you have to determine whether the claims are substantially similar, and if a claim isn't made, it doesn't go into the matrix.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

THE COURT: Mr. Tosdal, if it isn't made, it's not going to participate. So if there's a victim out there who particularly had notice, suffered a personal injury and didn't file a claim, that person's out -- out.

MR. TOSDAL: Right, but --

THE COURT: But so therefore there's no need to know what that person's claim is.

MR. TOSDAL: I'm not asking what that person's claim is.

THE COURT: Okay.

MR. TOSDAL: What I'm talking about is the substantial similarity of claims.

THE COURT: Okay.

MR. TOSDAL: Okay? And so the standard is not identify of claims. It's substantial similarity. And so I take my guidance from a case that I'm sure you've committed to memory, not out of love but having read it 5,000 times, which is the Dow Corning case. And the bankruptcy court in that case, at page 658, said, "All breast implant claims are substantially similar. All are unsecured, unliquidated, and disputed tort claims arising out of the manufacture and sale of breast implants." So what they had in Dow Corning, as you and counsel know well, were three experts who went through the claims in exquisite detail differentiating between domestic and international -- excuse me -- international claimants.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

We just don't have that here. We have Mr. Wells, who is not an attorney, did his best, I'm sure, to distinguish between the claims but really was unable to distinguish between the claims among the three classes. So I submit that based upon the evidence that you have before you, the claims of the three groups are substantially similar.

And if Your Honor has any question about the liability claims, I would offer Garrison Exhibits 5 through 7, which are the sort of the predicate to the bankruptcy claims, which are the master complaints in the North Bay fire litigation for the three groups, which are virtually identical in their claims of liability against PG&E.

So then we get to the second prong, and that is that the debtor and the plan proponents have not established a legitimate business or economic reason for different treatment of the classes. The counsel offered this morning that the subrogation crew -- excuse me -- subrogation plaintiffs were not members of the TCC. Well, they didn't want to be. They had their own group. I don't think that matters. Counsel submitted this morning that major municipalities -- that the public entity group contained major municipalities harmed by the fires and to the exclusion of other claimants who were paid to -- who made claims for putting out the fires. There's no evidence of that either. You've got sixty-two cities, I'm told, in the Fire Victim's class, and nineteen separate

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

groups --

THE COURT: Well, you say -- excuse me. You're saying there's no evidence, but I've approved settlements that essentially resolves them. I've approved a comprehensive settlement with FEMA and the California comparable agency and a separate one with a number of the Butte entities. So what is to say there's no evidence? The debtor has agreed to certain amounts of liabilities. Why do I need more evidence than the creditor accepting the concession by the debtor? That's better than evidence.

MR. TOSDAL: Because they're -- sorry. Because there will be more in the fire victim class, and again, the --

THE COURT: If you -- well, I'm sorry. Go ahead. What public entities are in the fire victims class?

MR. TOSDAL: Well, I'm told that there's sixty-two -- and I've seen the list -- sixty-two claiming cities.

THE COURT: Okay.

MR. TOSDAL: And more claiming counties. And Mr. Wells admitted that there are many more public entities in the fire victim class than there are in the public entity wildfire claim class. That's an admission --

THE COURT: You may be correct. I might have jumped the gun in saying that. Okay. I understand that, so.

MR. TOSDAL: That's an admission he made on pages 6 through 8 of his testimony.

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

Okay. So anyway, I think that what this really boils down to is the fact that these classes are created because they're separate settlements, separate settlements with the public entity wildfire claim group, separate settlements with subro, and then with the TCC where everybody else was lumped into the fire victim class.

But I submit to Your Honor that just the fact of a separate settlement is not good enough to create a class. And the reason for that flows from case law, but it's also in the doctrine of equal treatment. If a group -- if a debtor and a group can get around the doctrine of equal treatment by the mere fact of the settlement, then there's going to be (break in audio) by virtue of people just getting around what the law requires in terms of equal treatment.

So I looked at the one mass tort case that seemed to deal with this, Dow Corning. Dow Corning doesn't say that a settlement alone is good enough to create a separate class. The cases cited by debtor and the subrogation group either don't have an issue with regard to a separate subrogation class such as the Montreal and Mesa Air cases. And the other cases all have some very additional substantial reason why there's a separate class permissible. For example, the Chateauguay case, there was union trouble for one class, no union trouble for another. The Lube case, there was a third-party guarantee for one class, not for the other. And the Stockton case, there was

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

a different securing collateral.

So what I'm saying here, Your Honor, is that there is -- the only credible -- I mean, credible business and economic justification for the separate classification that I see here in the evidence is separate settlements, and that, under the law, does not provide a legitimate reason for separate classifications.

THE COURT: So your time is almost up. What would you have me do? Deny confirmation?

MR. TOSDAL: On that. But Your Honor, I --

THE COURT: I mean, I --

MR. TOSDAL: -- do have --

THE COURT: -- I can't redo the plan. I can tweak it. I can say, I got to change paragraph this or that, but you want me to fundamental -- dismember this plan and --

MR. TOSDAL: Yes.

THE COURT: -- then what happens?

MR. TOSDAL: Well, I mean, then it goes to, I think -- you wouldn't have to revote the fire victim class because they do better, but you would have to revote the 115 --

THE COURT: When would Ms. Garrison likely see some money?

MR. TOSDAL: I'm not sure she's going to see money under this plan, frankly, Your Honor.

THE COURT: Well --

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. TOSDAL: Because we're going to get to the second objection, and I have my fifteen minutes, but a lot of time has been consumed in colloquy with Your Honor.

THE COURT: I know. And that's one of the rules. But I'm going to give you a little leeway, but you tell me why is that a good thing for her for me to deny confirmation?

MR. TOSDAL: Because Ms. Garrison and her fellow Camp Fire community members have suffered a lot, and Ms. Garrison feels that she is getting the short end of the deal. And this goes to the second objection that had been posed by Ms. Garrison for which there is a fix without denial. And that second objection is the fundamental unfairness of this plan in two respects.

Number one is that investors in Pacific Gas & Electric Company purchased subrogation claims against their own company and stand to make hundreds of millions if not billions of dollars in profit off of this bankruptcy, while the fire victims have to take the risk of stock. Now, you say -- or you told me in my examination of Mr. Wells that, okay, well, that's traditional. Well, this is not a traditional case. This is a case involving human beings who have lost, many of them, everything and (break in audio). The idea of Wall Street profiting off of this and pushing the risk onto fire victims is fundamentally unfair.

And then the second aspect of her objection is that

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

fire victims and Ms. Garrison don't even know what the deal is. There was something that happened with Mr. Ziman's cross-examination that snapped my head back, and I'm sure Your Honor noticed it as well. There is no registration of rights agreement in place, and Mr. Ziman, on page 15 of the transcript of his testimony, responded to Your Honor's question about how long will it take the trust to sell stock. And Mr. Ziman's answer was, "Well, it's up to the trustee subject to the terms of any agreement that would restrict the trustee's time to do that." Well, that's brand new to me, and it's brand new to Ms. Garrison. Is there in the works a deal whereby the fire victims are going to have to hold on to their stock for a period of time before they can sell it?

And so it is fundamentally unfair for there to be profit-taking by Wall Street on the backs of fire victims, and it is fundamentally unfair for the fire victims to not even know what the deal is. And the fix for the latter, without a revote, without risking 1054 and all the other stuff, is that there be an amendment to the plan with a registration of rights agreement that the fire victims consent to, that at least the fire victims will know when they can get their money.

Thank you, Your Honor.

THE COURT: Okay. Thank you, Mr. Tosdal. I appreciate your argument, and I'll leave it at that for now.

Next on my list is Mr. Finestone.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

THE CLERK: Your Honor, I received a message from Mr. Finestone, and he indicated he is not available.

THE COURT: Okay. Would you bring Mr. --

MR. TOSDAL: May --

THE COURT: -- Bray into the -- oh, I'm sorry. Did Mr. Tosdal want to say something more?

THE CLERK: No. I don't believe so.

THE COURT: Bring Mr. Bray in for a minute. I want to see what his pleasure is.

THE CLERK: Mr. Bray is joining now.

THE COURT: Mr. Bray, I can see your name, but you need to unmute and activate your video.

There you go. Good afternoon.

MR. BRAY: Sorry about that, Your Honor. Good afternoon. Gregory Bray, Milbank LLP.

THE COURT: Now, we've got you down for fifty minutes, and I'm not trying to shortchange you, and I'm prepared to move you to tomorrow if that's better for you. If you're ready to go today, I'll let you do it, but if you do, I'm going to give you the full time, but I probably will make you the final arguer today. So what's your pleasure?

MR. BRAY: A clarification, Your Honor. First, if I'm going to argue substantively, I prefer to do it tomorrow, but I have a clarification or question for you. You clearly stated that the indemnification contribution issues that arise out of

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

executory contracts you want to defer to Friday. We've also raised the same issue in respect of general unsecured claimants. In the sur-reply you allowed us to file, we fleshed that issue out, and I'm just trying to understand if you consider those issues -- you want to hear them argued together, which I think makes sense because the arguments are very similar. They're not identical, but they involve 502 and there are some similarity there, so if we argue them separately, there will be overlap on the argument, and I'm prepared to do that tomorrow if you like, or I'm also prepared to just simply argue it all in a bundle together on Friday, whatever is your pleasure.

THE COURT: Well, first of all, if you heard me say it earlier today, when I went through the original objections last weekend, there were so many that were cure-related that in my mind, it makes sense to defer them, not only because it's a discrete question, but secondly, Mr. Karotkin conceded that they could be dealt with post-confirmation or later, not under -- not an AB-1054 clock-ticking.

But then he made a good point that he wanted to deal with contribution indemnity, and I said no. That's part of the bundle that relates to executory contracts, and I just couldn't prepare for it. But I did allow you to file your sur-reply, I did read your argument, and I assumed that you wanted to deal with the 502(e) issue. And in one of my two docket texts that

escribers (973) 406-2250 | operations@escribers.net | www.escribers.net

I disrupted Mr. Karotkin's evening relaxation, I said that I wanted him to talk about the 502 issue and what's the outcome of it.

And so the question is which makes sense? Does 502 -- is that a discrete package or should it be discussed in the context of assumption of contracts because it's not limited to assumption of contract, right?

MR. BRAY: Agreed.

THE COURT: Yeah. So what would be most efficient, from your point of view?

MR. BRAY: My sense is it probably makes most sense to argue the issues together at once, only because otherwise, I'm afraid there will be some level of redundancy. And again, I'm trying to be respectful of the Court's time and your desire not to hear the same thing twice. We could certainly separate them and go that route. I just think that there might be some overlap. I'm willing to go whichever way the Court prefers.

THE COURT: It isn't just my time. It's just comprehending all these issues.

MR. BRAY: Yeah.

THE COURT: Mr. Karotkin, it sounds to me like the better approach here is to let Mr. Bray package up all of his arguments, including 502, whether they belong with the executory contracts or some other concept; it's one legal analysis. Don't you agree?

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

MR. KAROTKIN: If you're saying we should do them together, like Mr. Bray suggested, I would agree with that.

THE COURT: So here's what I propose. We have a few other people and maybe -- well, wait a minute. Mr. Winsberg wanted to follow you, Mr. Bray, but that was going to be tomorrow. I mean, I'm dealing in tomorrow. That's what this stay-at-home does to all of us. I don't know what day it is.

MR. BRAY: I understand.

THE COURT: So it's tomorrow already. But I think what I'd like to do, perhaps, is then pass for you and maybe let Mr. Abrams have his time now. And then I'll add you to the list of people that I want Mr. Karotkin to suggest a sequencing for the bulk of tomorrow and whatever we need to do on Friday.

MR. BRAY: That's fine, Your Honor. And the only other thing I would say then is that Mr. Karotkin stated correctly that we have, I believe, resolved a number of other open issues. We have seen some of the proposed changes in a draft, not all of them. And I don't know when we'll see the rest. I mean, obviously, they've got a lot to do. So at some point, we may need to be heard about disagreements over -- hopefully, we won't -- over what we agreed to or the actual words. I'm hopeful that won't happen, but that would be the only other thing I think we would need to speak to.

THE COURT: Okay. Then we'll leave it at this way.

Mr. Karotkin, put Mr. Bray on your homework assignment

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

to work out and make me a suggested agenda for whoever we don't finish today, including the people that we've talked about getting in there. So I don't know if Mr. Winsberg is even listening today, but we're marking him for tomorrow at some point and Mr. Troy at some point.

And so Mr. Bray, I'm going to excuse you for now and call on Mr. Abrams and let him make his argument because he's got a thirty-minute allocation.

And my personal plan is to conclude today by about 4 o'clock. Again, if this were a real court, I'd be going much longer, but as I said, to me -- earlier -- and I don't know what you counsel think, but I find this to be more demanding and more difficult just from an overall labor effort than the regular court. In the court, I can get up and look at other people and make faces.

So Ms. Parada, would you bring Mr. Abrams in?

THE CLERK: Yes, Your Honor. Mr. Tsekerides has raised his hand. Would you like me to bring him now or after Mr. Abrams?

THE COURT: Yes. Yes. No. Bring him in, please.

THE CLERK: Okay. One moment.

THE COURT: Mr. Tsekerides, you raised your hand?

MR. TSEKERIDES: Yes, well, I'm sorry Mr. Bray left, but I did want to address that briefly. I do think it makes a lot of sense to have the 502(e) and the indemnity issues

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company together, so if the UCC argues tomorrow, then I can address those on Friday during that thirty-minute time frame that Your Honor spoke about earlier today. I think that makes a lot of sense.

THE COURT: Well, this is all very fluid. You and your partner there and the other panel should put your heads together and come up with what works best that gives your opponents their opportunity to be heard but works efficiently so that I can do my job. As I say, lawyers are always polite to say it's too much of a burden on you, Judge. It's your time. The time is not the issue. It's just absorbing all the arguments and keeping track of them. So we'll defer to that.

Okay. Thank you, then.

MR. TSEKERIDES: Judge, thank you.

THE COURT: So we're going to go -- we'll go with Mr. Abrams. And for planning purposes, on my list, I have Ms. Wallace, Ms. Cabraser, Mr. Pitre, and Mr. Campora, Mr. Kelly, Mr. Skikos. I don't know how many of those we're going to get to, but I'm going to try to stick with the maximum times.

And Mr. Abrams, who I see on the screen, unmute yourself, Mr. Abrams. I'm going to give you thirty minutes, and you're up to bat. Good afternoon.

MR. ABRAMS: Good afternoon, Your Honor. I am unprepared to talk to this today. I was on the schedule for very late tomorrow, and I was relying on understanding the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

TCC's position. I reached out to them for a meet-and-confer, didn't have that happen, and so really just not prepared to go through all my arguments at this moment. I apologize, Your Honor, but because of the schedule, that's how I situated myself.

THE COURT: I can't criticize somebody who was given a timetable and then has it moved up, so I'll excuse you, and we'll come up with -- but again, I don't know where you'll be in the queue tomorrow to be ready. So be ready to present your case at some point tomorrow. I can't make it perfect. I got to do my best.

MR. ABRAMS: Absolutely. And I will work with that. Thank you, Your Honor.

THE COURT: All right. Ms. Parada, please bring in Ms. Wallace.

Ms. Wallace, I see your name, but you need to unmute yourself and activate your camera.

All right. Can you hear me, Ms. Wallace? Well, there you go.

MS. WALLACE: I think I can, Your Honor.

THE COURT: All right. Tip your screen a little bit. I can only see the top of your head. There you go. Good afternoon.

MS. WALLACE: Hi there, Judge. How are you?

THE COURT: I'm fine. Thank you. You have five

eScribers (973)406-2250 | operations@escribers.net | www.escribers.net

minutes to make your presentation.

MS. WALLACE: And I'm not ready. I'm not scheduled till tomorrow after Will (phonetic), three or four names down, so.

THE COURT: I can't promise you that I'm going to be able to do it. I understand your point. I won't --

MS. WALLACE: Yeah. I mean, I was scheduled for tomorrow.

THE COURT: I know you were. I'm not going to treat you any differently from anyone else. I'm not going to say you can't. I'm just saying, I can't promise you how much time there will be. It would be dishonest for me to hold you to a time and then tell you you got to do it a day earlier. So you told me that you weren't ready. I'll take your word for it. I'm just saying I don't know how much flexibility we'll have tomorrow, so be ready tomorrow when you get told what the schedule is. Okay?

MS. WALLACE: Thank you.

THE COURT: All right. Thank you.

All right. Let's do this so as to save time. I'm going to ask for counsel to raise your hand on the Zoom screen if you want to be heard today. Ms. Cabraser, Mr. Pitre, Mr. Campora, Mr. Kelly, Mr. Skikos. And I would say that I suspect that all of you are supporting confirmation, so I don't think you need a lot of time to prepare, and I will be less persuaded

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

that you have to have a whole day tomorrow to prepare, but raise your hand if you want to and you're ready to make your argument today.

THE CLERK: Excuse me, Your Honor. I received a communication regarding Ms. Cabraser, Pitre, Campora, Kelly, Skikos. They're not prepared to go forward today and request some time tomorrow.

THE COURT: Well, they may not get any time tomorrow, but we'll see what we do. Okay. All right. Well --

THE CLERK: Mr. Khaldoun Baghdadi has raised a hand. Would you like me to bring him in?

THE COURT: All right. Bring him in, please.

Good afternoon, Mr. Baghdadi. You need to unmute yourself.

MR. BAGHDADI: Good afternoon, Your Honor. Thank you for allowing me to come in. I just wanted to speak on behalf of those last group of panelists.

THE COURT: Well, if you speak on their behalf, they might get cut out tomorrow, so --

MR. BAGHDADI: Well, that's why I'm going to be brief, Your Honor. The reason why I was asked to email the Court on their behalf, Mr. Kelly is my partner, and they're also all representatives of members of the TCC. We are still in negotiations with the debtor and with the plan proponents. We are hopeful that we'll be able to resolve those issues, and so

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

I can't envision we'll take five slots as necessary, so -- due to the unavailability, but I'm hopeful we'll be able to condense it down, and we'll work with Mr. Karotkin on the schedule. And I just wanted to let the Court know and to thank you for your time.

THE COURT: That's good news. Keep up the good work. Good luck. Tell your colleagues to bring home the bacon. Thank you.

MR. BAGHDADI: Thank you, sir.

THE COURT: Mr. Karotkin?

MR. KAROTKIN: Yes, sir.

THE COURT: I think we're out of work for today. Since I can't sell the rest of Wednesday to the Thursday customers, I don't know how I can get any of the Friday customers. So I guess we should adjourn unless there's something else you want me to take up.

MR. KAROTKIN: No. I would just ask, in connection with your request that people contact us about scheduling, that when they do so, they identify the issues that they want to speak on and the amount of time they believe they need so we can try to coordinate that as you requested. And I would ask if they could please, when they send an email, send it to myself, Mr. Tsekerides, and Ms. Liou, and I think everybody should have those email addresses.

THE COURT: Okay. I'll just state it -- let's see.

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

One second here. We have 230 -- 287 people on this call. So I get -- we probably got most of the people that want to be heard, and again, I can't fault any of them for not wanting to be heard today when they expected to be heard tomorrow. But we're going to -- we're juggling the schedule, and I'm going to stick with the times for people that are identified on there then. For example, the last group that I mentioned and certainly Mr. Abrams. For him and Ms. Wallace, they're really is a question of preparing.

For the various counsel who were scheduled today, it's a good thing that they want more time because, Mr. Karotkin, you and your clients have made it more enticing for them to get around to your way of thinking or you around to their way of thinking.

So everyone on the call, I'm sticking with the stated times in my order of yesterday, but for those parties who wish to be added to the list because of the contribution and indemnity issues that are keyed to assumption of contracts, and to the extent that there's some overlap in (break in audio) issues, my expectation is to have all of you notify Mr. Karotkin, Mr. Tsekerides, and Ms. Liou that you wish to be heard and how much time your estimate is.

Again, I'll repeat. I don't want the lawyers who have already had their time allocations to just tell them the same thing. I don't want them to bury them in email. And at the

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

conclusion of the hearing on the examiner motion tomorrow, which that starts at 9:30 -- I haven't given time allocations to anybody, but I'm not going to spend a huge amount of time. My guess is I won't take more than twenty or thirty minutes per side, but I haven't had the time to do any tentative ruling or anything. I haven't even had time to read all the filings, but that's how I'll be spending the evening.

And I will hear from Mr. Karotkin with a suggested timetable to complete what we need to do either today or tomorrow, and with that --

MR. KAROTKIN: One more thing, Your Honor?

THE COURT: Yes, sir.

MR. KAROTKIN: If I could interrupt. And in connection with those requests, if we could ask -- and I think you suggested this -- Mr. Gorton, Mr. Glassman, Mr. Tredinnick to coordinate because I think that their pleadings are largely the same as --

THE COURT: I think they already indicated a willingness to do that. I think the earlier communication that came -- I believe it came from Mr. Gorton, but again, I -- my staff is keeping me informed through my phone here, but I think they're working pretty much in hand anyway. So I think you can -- you've got some efficiencies there already.

MR. KAROTKIN: Okay. And one last thing. I think that in view of the scheduling and how we have managed to

accelerate things a bit, my suggestion is that with respect to Mr. Etkin and his colleagues, that that be moved to the last item on Thursday, and then on Friday, we would have Mr. Julian in closing and Mr. Molton.

THE COURT: Well, let's do this. I don't want to take time now to hear from them. They've heard your request. If you can -- if you are able to put it all into a proposed agenda that restates it, you can put it out there, and they have until 10 o'clock or 10:30 tomorrow morning to weigh in on it, and I'll devote a few minutes right at the outset -- or excuse me -- right at the conclusion of the examiner motion to listen to everybody about scheduling.

So I'll certainly -- remember, I gave Mr. Etkin, et al., a long period of time, and clearly, that's still a very, very unresolved and significant issue. So I'll try to accommodate that schedule, but you need to let them -- part of the process.

And it seems to me it'll work too, if we can --

MR. KAROTKIN: Okay. Thank you.

THE COURT: Okay. Thank you, everyone. Have a nice evening, and I'll look forward to talking to you tomorrow.

I'm going to conclude the hearing. Thank you to Ms. Parada and Ms. Thomas for -- my staff today.

Good evening.

(Whereupon these proceedings were concluded)

eScribers (973) 406-2250 | operations@escribers.net | www.escribers.net

C E R T I F I C A T I O N

I, Colin Richilano, certify that the foregoing transcript is a true and accurate record of the proceedings.

________________________________________

/s/ COLIN RICHILANO

eScribers

7227 N. 16th Street, Suite #207

Phoenix, AZ 85020

Date:  June 4, 2020

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 178 of 207

[

**[phone (1)**
92:23

A

**AB (8)**
9:3,15,23;11:14;30:24;36:1,6;86:23
**AB-1054 (1)**
166:19
**ability (3)**
34:17;40:25;103:1
**able (23)**
8:4;16:8;18:14,22,24;19:12,24,25;31:1;79:25;80:15;86:2;97:6;99:6,15;114:12;128:11;139:22,24;172:6;173:25;174:2;177:7
**above (2)**
146:23,24
**Abrams (14)**
38:6,20,25;39:5;168:11;169:7,16,19;170:16,20,21,23;171:12;175:8
**Abrams' (1)**
38:18
**absence (1)**
11:10
**absolutely (2)**
38:20;171:12
**absorb (1)**
79:17
**absorbing (1)**
170:11
**absurd (1)**
62:15
**accelerate (1)**
177:1
**accept (6)**
11:18,22;42:15;48:3;49:7;68:7
**accepted (5)**
28:3,4;37:7;38:13;68:5
**accepting (1)**
160:9
**access (2)**
16:14;35:17
**accommodate (3)**
8:4,10;177:16
**accommodating (3)**
8:25;113:20;115:16
**accompanying (1)**
142:4
**accordance (2)**
117:18;130:8
**According (2)**
152:4;155:17
**account (2)**
71:21;73:13
**accurate (1)**
13:25
**Acequia (3)**
72:3,6,8
**achieve (2)**
9:14;50:8
**achieved (2)**
12:8;26:16
**achievement (1)**
9:11
**acknowledge (1)**
123:16
**acronym (1)**
145:10
**action (18)**
21:22;23:14;48:16;63:25;91:18,18,19,20;92:1,2;106:18;107:1,12,13,19;110:1;133:22;134:18
**actions (2)**
26:20;91:19
**activate (4)**
96:23;101:19;165:12;171:17
**active (1)**
84:15
**activities (2)**
27:10;28:10
**acts (2)**
48:17;121:13
**actual (4)**
33:14;48:9;114:9;168:21
**actually (10)**
42:4;48:23;49:2;54:19;55:8;56:5;69:19;91:23;100:9;131:10
**ad (10)**
16:22;83:24;84:12,15,20;85:8,16;86:10;87:4;95:8
**add (8)**
7:17;18:7;78:17;99:14;108:18;121:9;140:20;168:11
**added (2)**
20:22;175:17
**adding (1)**
151:6
**addition (4)**
9:20;22:20;108:12;121:23
**additional (12)**
13:19;41:1;74:17;81:21;87:13;95:21;98:15,17;101:4;140:20,22;161:21
**address (33)**
12:3;14:20;16:11;17:8,9;23:17;26:1,5;34:9,20;35:19;41:25;42:19;43:2;46:20;68:16;80:10;88:7,14;90:22;93:20;94:1;99:10;101:9;112:11;116:7,22;126:6;137:12;144:9;146:20;169:24;170:1
**addressed (13)**
16:20,22,23;19:24;23:22;25:10;29:22;38:1;41:8,10;98:20;129:14;141:3
**addresses (4)**
22:8;33:18;42:20;174:24
**addressing (4)**
14:24;17:20;21:16;32:15
**adequate (2)**
34:8;35:12
**adequately (1)**
42:9
**adjourn (1)**
174:15
**adjudicated (1)**
54:19
**adjusted (1)**
113:19
**adjusting (1)**
137:24
**adjustment (1)**
6:5
**adjustments (1)**
77:13
**admin (1)**
117:4
**administration (3)**
26:20;27:8,11
**administrative (5)**
117:15,20,25;129:6,7
**administrator (2)**
130:6;131:11
**admission (2)**
160:21,24
**admit (2)**
141:24;142:21
**admitted (1)**
160:19
**Admittedly (1)**
32:3
**adopted (1)**
48:20
**advance (1)**
98:22
**Adventist (7)**
16:24;17:13;20:19;88:5;89:14;101:5;103:21
**adverse (1)**
81:23
**advise (1)**
38:15
**advised (4)**
11:2;29:2,4;137:12
**advising (1)**
137:9
**affects (1)**
21:15
**affiliate (5)**
69:16;70:5,6,8,10
**affiliated (1)**
107:9
**affirmative (2)**
20:12;22:17
**affirmatively (1)**
75:19
**affirmed (1)**
73:3
**afraid (1)**
167:13
**afternoon (47)**
5:17,18,19;8:21;18:12;62:10;78:10,15,19;79:9,23;82:8;83:12,23;95:4;96:24;97:1,12,13;106:8,9,10;113:4;116:5,17;119:15;120:20,21;125:10,12;128:20;140:7,8;143:20,21;149:9;151:15;152:11,12,15;165:13,15;170:22,23;171:23;173:13,15
**again (66)**
5:25;16:15;20:1,3,16;22:1,12;23:23;26:11;27:3,11,21;28:1,7,14;30:2,20;32:10;33:16;34:24;35:11,16;37:18;39:16;44:23;58:12,17;61:6;64:18;68:10;72:5;75:17;76:7;77:25;80:16;81:9,19;82:23;83:10;84:9;85:20;86:14;89:15,18;92:18;93:19;98:21;99:12;102:21;111:4,24;118:4;124:12;140:6,9;145:22;146:12;149:2,22;160:12;167:13;169:10;171:8;175:3,23;176:20
**against (35)**
21:24;26:1;27:18;49:23;65:15;68:20;69:1,3,8,15,16;70:8,19,21,22;71:1,3,6,6,9;75:14,23;89:8;107:1,19;109:20;110:10;124:8,11,15;127:22;133:22;156:22;159:12;163:15
**agencies (4)**
33:9;125:15;128:5;147:12
**agency (2)**
129:20;160:5
**agenda (8)**
80:1;81:6,7;138:19;151:5;154:20;169:1;177:7
**agent (1)**
122:23
**aggregate (3)**
44:15;124:20,24
**ago (3)**
20:8;69:25;108:8
**agree (5)**
103:12;137:19;139:16;167:25;168:2
**agreed (16)**
22:14;32:2,5;44:24;45:8,11,18;49:8;72:19;98:17;127:11;145:13,23;160:7;167:8;168:21
**agreement (16)**
17:3;28:23;29:3;129:18,24;130:2,4;131:9,25;142:3,23;143:3;146:8;164:5,9,20
**agreements (8)**
41:3;130:7,8,14,15;131:1,6,10
**agrees (4)**
49:3;69:8;117:21;143:1
**ahead (12)**
51:18;55:25;62:11;68:17;78:5;101:17;110:16;116:11,20;148:16;156:16;160:13
**Air (1)**
161:20
**Akin (1)**
83:24
**al (2)**
74:4;177:14
**allegations (5)**
38:11;39:9;42:6,16;52:15
**allege (1)**
63:25
**alleged (23)**
48:22,24;52:3;53:19;54:6,12;55:2,10,12,15,22;57:9,17;59:5;63:18;64:10,11;66:12,15;69:1;70:16;71:1,8
**allegedly (2)**
53:20;54:23
**alleges (1)**
52:5
**alleging (1)**
59:22
**all-important (1)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 179 of 207

86:23
**allocated (1)**
65:2
**allocating (1)**
75:13
**allocation (1)**
169:8
**allocations (4)**
78:4;138:17;175:24;176:2
**allotted (1)**
84:10
**allotting (1)**
98:22
**allow (4)**
81:17;111:2;145:23;166:23
**allowance (2)**
63:1;117:24
**allowed (25)**
12:7;35:6,9;48:9;60:2,14;61:24,24,25;62:21,24;65:14;66:6;75:23;76:12;78:19;113:11;114:11;116:25;117:25;124:10,16;140:18,21;166:3
**allowing (2)**
116:16;173:16
**allows (3)**
86:22;88:23;118:20
**alluded (1)**
89:10
**almost (2)**
75:6;162:8
**alone (1)**
161:17
**along (1)**
103:20
**alteration (1)**
8:3
**although (6)**
29:6;40:11;48:21;83:22;98:15;157:12
**always (2)**
132:24;170:9
**amazing (1)**
119:9
**amend (2)**
61:5;111:22
**amended (8)**
16:10;22:16;52:14;77:25;84:11;85:17;111:23,24
**amending (1)**
111:25
**amendment (3)**
117:5;140:19;164:19
**amendments (1)**
147:13
**American (1)**
50:1
**among (4)**
40:20;44:25;51:6;159:4
**amongst (1)**
153:23
**amount (20)**
11:23;46:15;48:10,20;55:16;59:5;60:5;65:9,14;66:6;87:9;93:5;110:18;124:25;131:24;145:9,24;154:8;174:20;176:3
**amounts (4)**
48:7;153:19;157:15;160:8
**ample (1)**
35:19
**amplify (1)**
51:20
**analysis (1)**
167:25
**angled (1)**
47:19
**announce (1)**
7:16
**announcement (2)**
82:18;138:3
**announcements (1)**
79:14
**Anthony (1)**
116:14
**anticipate (1)**
81:11
**anticipated (1)**
137:15
**anticipating (2)**
88:9;140:1
**anymore (1)**
97:20
**apart (2)**
54:20;74:17
**apologies (3)**
97:14;116:8;142:17
**apologize (10)**
6:21;15:1,21;19:11,13;47:18;77:3;92:25;115:6;171:3
**apparently (2)**
144:20;145:12
**appeal (2)**
117:2,7
**appealed (1)**
118:9
**appear (3)**
108:16;151:23,23
**appearance (3)**
102:11;113:7;119:21
**appeared (1)**
10:3
**appearing (2)**
116:14;146:19
**appears (5)**
107:24;110:19;116:9;121:5,12
**apples (1)**
65:4
**applicable (4)**
26:18;31:21;132:14;140:23
**application (2)**
39:13,14
**applied (3)**
68:2;69:24;70:1
**applies (6)**
26:13;67:12,13;71:1;126:11;127:21
**applying (2)**
70:9;91:22
**appointment (1)**
32:20
**appreciate (17)**
40:7;77:5;82:24;85:21;86:16;94:23;102:7;105:10;112:12;119:7;123:25;125:5,19,22;143:7;152:2;164:24
**appreciated (2)**
9:2;84:4
**approach (1)**
167:22
**appropriate (16)**
8:21;22:24;23:19,20,20;24:20;50:15,17;76:6;89:2,11;94:6;106:23;122:8;124:5;129:12
**appropriately (6)**
23:17;25:14,23;26:13,19;94:16
**approval (4)**
11:3;30:19;40:9;77:1
**approvals (3)**
9:22,24;40:21
**approved (14)**
30:15;35:25;37:23;39:18;65:23;93:23;129:20,22,25;131:25;132:17;148:22;160:3,4
**approximate (1)**
59:5
**approximately (2)**
87:5,6
**arbitrated (8)**
43:20;145:12,15,16,19;148:23,24;149:15
**arbitration (8)**
45:8;144:20,21,23,24;145:23;146:9;148:19
**arbitrator (1)**
46:8
**arbitrators (1)**
45:11
**arguably (1)**
117:2
**argue (14)**
29:12;81:3;88:16,20;90:2;106:22,25;109:24;139:10;152:7;165:23;166:8,11;167:12
**argued (2)**
62:14;166:5
**arguer (2)**
112:17;165:21
**arguers (1)**
82:5
**argues (1)**
170:1
**arguing (1)**
16:3
**argument (41)**
7:6,21;8:16;25:12;39:24;50:12;51:23;62:12,13;68:18;71:12;72:22;76:9;77:5,9,11,19;78:10;79:17;81:13,21;83:7;88:9;89:22,22;101:2;104:6,23;106:13;132:2;134:20,21;136:7;139:25;155:8;156:24;164:24;166:9,24;169:7;173:3
**arguments (12)**
19:8;47:15;78:23;81:22;82:25;103:24;118:6;139:18;166:6;167:23;170:12;171:3
**arise (7)**
35:20;68:23;85:11;89:7;134:4;155:16;165:25
**arising (8)**
31:19;70:4;72:14;80:11;132:7,7;133:23;158:21
**arm's (1)**
30:22
**arose (1)**
129:11
**around (11)**
7:13;28:3;56:1;63:12;98:16,21;108:2;161:11,13;175:13,13
**articulate (1)**
90:6
**artificially (3)**
51:9;53:24;54:13
**ascertainable (1)**
157:15
**aspect (2)**
98:19;163:25
**aspects (1)**
32:17
**assert (4)**
21:24;25:18;156:21,22
**asserted (6)**
21:19;41:2;69:3;70:19;91:3;134:10
**asserting (3)**
11:23;22:23;60:2
**asserts (1)**
48:20
**asset (3)**
66:21,23;67:19
**assets (3)**
34:19;40:22;130:1
**assigned (4)**
107:13;109:9,12;110:3
**assignment (9)**
21:22,23;107:1,12;108:21,24;109:7;115:8;168:25
**assistance (1)**
12:9
**associate (1)**
113:15
**associated (1)**
72:15
**Association (1)**
48:14
**assume (7)**
21:6;79:25;117:21;135:3,15;146:19;147:16
**assumed (6)**
80:12,18;82:15;133:23;135:21;166:24
**assumes (3)**
133:25;135:5;136:4
**assuming (5)**
24:9;75:1;133:18;134:22;138:12
**assumption (5)**
133:20,24;167:6,7;175:18
**assuring (4)**
31:2,3,5;103:8
**AT&T (1)**
103:21
**attached (3)**
108:11,15;130:20
**attaches (1)**
62:8
**attack (1)**
17:14
**attacked (2)**
132:1;150:12
**attempted (1)**
103:13
**attendees (1)**
112:22
**attention (5)**
19:20;43:14;60:23;103:4;137:4
**Attorney (2)**
125:17;159:2
**attorneys (2)**
12:21;103:5

**attracted (1)**
19:19
**audience (1)**
150:10
**audio (4)**
101:22;161:13;163:22;175:19
**auspices (1)**
12:8
**authority (1)**
10:24
**automatic (1)**
118:16
**availability (1)**
108:10
**available (6)**
66:2;75:10;108:5,20;124:22;165:2
**aware (7)**
31:15;33:17;43:24;78:16;84:12;87:7,23
**away (3)**
47:19;68:15;139:16

**B**

**back (31)**
6:11;10:11;15:23;43:9;54:7;55:7;57:7;58:18;75:17;77:21;79:4;80:3;88:7;90:20;91:23;99:21,22;100:4;115:5;130:18;133:10;135:4,5;136:15,21;139:7;141:10;142:14;148:7,11;164:3
**background (1)**
105:8
**backs (1)**
164:15
**backstop (1)**
24:11
**bacon (1)**
174:7
**bag (1)**
54:15
**Baghdadi (5)**
173:10,13,15,20;174:9
**balance (1)**
140:1
**ballot (1)**
127:10
**ballots (2)**
20:14;48:4
**bankers (2)**
27:16;94:12
**bankruptcy (24)**
5:4;10:23;12:4,9,17,19;18:5;22:25;23:19;49:1,4;50:15;57:6;62:16;65:13;88:22;94:13;121:15;132:9;135:2,20;158:18;159:9;163:17
**bar (1)**
48:19
**Barenbaum (21)**
106:7,8,9,10,10,15;109:4,7,14,23;110:13,15,17;111:7,10,13,20;112:4,5,7,13
**bargain (4)**
51:13;111:5,8,14
**bargained (1)**
56:14
**barred (1)**
117:2
**base (2)**
56:13,17
**based (15)**
8:5;14:18,19;19:3;41:2;42:6;55:13;58:13;59:21,21;78:6;80:22;87:25;121:5;159:4
**baseline (3)**
51:8;52:19;59:8
**Basically (12)**
71:2;102:18;114:9;126:10;129:9;130:6;131:24;132:5,14;133:21;134:3;136:3
**basis (8)**
10:20;12:24;32:11;35:1;39:20;66:7;85:15;156:19
**bat (4)**
97:23;116:16,19;170:22
**batting (1)**
100:20
**Bay (3)**
52:8;55:24;159:10
**bear (1)**
48:8
**beat (1)**
110:6
**became (1)**
87:24
**become (4)**
29:15;58:8;70:7;74:7
**becomes (4)**
15:18;60:6;70:12;71:6
**bed (1)**
88:6
**began (2)**
52:11,13
**begin (4)**
5:21;36:3;97:5;132:15
**beginning (3)**
85:7;132:5;144:20
**behalf (14)**
8:24;18:9;47:17;48:17;79:15;83:24;84:6;86:10;95:7;106:11;116:15;173:16,18,22
**behind (1)**
97:18
**beings (1)**
163:21
**belabor (2)**
26:11;38:14
**believes (1)**
85:8
**belong (1)**
167:23
**beneficiary (1)**
66:17
**benefit (4)**
7:3;51:12;128:5,18
**benefits (3)**
11:14;134:1;136:2
**best (15)**
40:8,14;41:4;51:15;82:24;83:15,21;94:14;105:6;108:17;113:17;128:7;159:2;170:7;171:11
**best-interest (1)**
30:9
**bestowed (1)**
95:9
**better (10)**
9:8;13:15;24:13;127:1;153:12,14;160:9;162:20;165:18;167:22
**beyond (10)**
24:20;25:6,15;27:21;107:25;118:17;121:13;125:25;132:13;134:19
**Biaggio (1)**
69:21
**big (4)**
55:25;58:8;76:20;152:19
**bigger (3)**
60:6,7;76:20
**billion (19)**
34:11;43:25;44:18;53:6,8,10,11,22;54:1,9;56:7;57:18;58:20;84:13,14;87:6,8;154:5,24
**billions (5)**
31:4;34:23;48:22;87:10;163:16
**bind (1)**
146:13
**Binder (1)**
116:14
**binding (8)**
41:14;45:8,16;131:11;132:1;144:21,23;145:23
**bit (12)**
39:10;48:1;50:8;52:22;77:14;78:5;102:8;127:16;136:15;144:24;171:21;177:1
**bleed (1)**
15:12
**block (1)**
73:16
**blue (2)**
58:8,8
**Board (4)**
42:18;43:5;122:4;140:16
**body (1)**
123:10
**boils (1)**
161:1
**BOK (1)**
14:3
**Boken (3)**
29:23;33:25;35:13
**Boken's (1)**
40:16
**bona (1)**
39:6
**both (15)**
5:24;10:4;11:7;20:13;35:16;36:11,14;51:9;102:14;129:20;143:20;146:13;147:3,5,23
**Botter (12)**
77:24;79:5,8,9,11;83:11,17,20,24;84:8;85:21,23
**bottom (1)**
143:22
**bought (6)**
56:14;59:11,14,22,23;60:16
**bound (3)**
45:18;130:6;145:13
**box (1)**
101:14
**BR (2)**
50:1,3
**brand (2)**
164:10,10
**Bray (21)**
13:24;137:3;152:7;165:5,8,10,11,14,15,22;167:8,11,20,22;168:2,5,8,14,25;169:6,23
**breach (5)**
121:23,25;122:13;135:6,7
**breached (1)**
123:1
**break (15)**
7:7,16;8:6;18:22;77:14;80:6;90:9;96:19;136:14;137:6,16;138:2;161:12;163:22;175:19
**breaking (1)**
137:1
**breast (2)**
158:19,22
**brief (19)**
14:17;43:15;52:16;53:4;58:11,12;64:8;65:7;69:20;71:18;76:10,10;84:10;106:13;111:24;114:5;116:17;121:10;173:20
**briefly (4)**
29:19;44:7;129:16;169:24
**bright (1)**
97:18
**brilliant (1)**
90:8
**bring (25)**
5:8;47:8;79:5;84:17;85:24;93:6;94:7,24;96:15,17;112:24;124:15;136:20;140:6;143:11;148:2;165:3,8;169:16,18,20;171:14;173:11,12;174:7
**bringing (2)**
112:25;148:7
**British (1)**
94:5
**broad (1)**
31:17
**broadened (1)**
117:6
**broke (2)**
136:25;137:16
**brother (1)**
150:11
**Brothers (1)**
70:14
**brought (3)**
26:1;110:1;124:19
**bucks (1)**
152:19
**building (1)**
26:15
**bulk (2)**
155:24;168:13
**Bump (1)**
83:24
**bunch (2)**
128:10;138:12
**bundle (4)**
109:12,15;166:11,22
**bundles (1)**
74:4
**burden (5)**
31:11;137:20;138:22;139:15;170:10
**burdens (2)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 181 of 207

134:1;136:3
**buried (1)**
132:11
**bury (1)**
175:25
**business (14)**
7:14;24:4;31:22;89:1,13;92:4;102:20;103:2;107:7,9;111:2;140:22;159:15;162:3
**Butte (4)**
52:7;156:6,9;160:6
**buttons (1)**
97:9
**buy (3)**
61:20;71:25;74:2
**buying (2)**
51:14;56:22
**buys (1)**
55:21
**Bye (1)**
47:7

## C

**Cabraser (3)**
170:17;172:22;173:5
**CAL (1)**
33:10
**calculate (1)**
146:10
**calculated (1)**
46:15
**calculates (2)**
55:9;68:15
**calculating (2)**
65:9;145:8
**calculation (3)**
64:23;77:23;120:9
**CALIFORNIA (13)**
5:1,5;26:24;30:18;33:6;42:17;106:21;125:15,17;126:11;140:15;142:16;160:5
**California-based (1)**
84:20
**Call (14)**
5:3;16:24;27:1;41:5;53:17;78:10;80:1;100:23;113:21;150:4;152:5;169:7;175:1,15
**called (10)**
44:15;52:16;78:14;103:23;106:18;113:16;120:14;145:9;146:23;155:9
**calling (1)**
43:19
**calls (2)**
53:15;131:7
**came (3)**
103:20;176:20,20
**camera (5)**
7:21;47:19;97:11;143:25;171:17
**Camp (3)**
54:17;156:11;163:7
**Campora (3)**
170:17;172:23;173:5
**Can (148)**
5:9;6:3,11,12,14,15;7:13,15,18;8:10;13:2,17;16:3,12;18:25;20:3;22:7;37:1,1,3,3,4;44:9,11,11;47:11,12,20;49:25;50:10;51:16,19,21,22;52:15,22;55:2;56:10;62:9,20;69:13;70:24;74:3,19;79:6,7,10,11,11;80:3;81:4,10,21;83:20;85:25;86:1;87:12;89:3;95:1,2,3,3;96:21,24;97:1,2,3;99:9;100:2,5,12;101:20,21;104:18;105:6,16;106:6,7;112:19;113:3;114:18;115:4;118:6;119:15,20,21;120:21,23;121:10;123:23;125:2;126:20,21,25;127:1;128:9;135:14,23;136:21,23,23;137:20;138:1,8,9,10,15,17,18;143:12;144:18;146:15,16;148:5,9,17;149:2,16,18,19;150:2,18;151:8;152:4,13;153:18;154:2,16,23;157:5;161:11;162:13,14;164:13,21;165:11;169:14;170:1,9;171:18,20,22;174:14,21;176:23;177:7,8,18
**capital (10)**
34:12;35:15,17;70:10,23;71:3;104:2,23;126:18;127:7
**capitalization (18)**
51:8;52:1,2,18;53:19,21,23;54:3,9;55:10,11,14;56:9,15;57:17;62:15,17;63:7
**Cara (1)**
140:15
**care (6)**
13:15;28:19;59:13;102:25;109:19,19
**careful (1)**
24:19
**carefully (2)**
90:23;130:13
**cares (1)**
78:1
**Carlson (22)**
101:15,16,18,20,22,23;102:2,4,7,11,14,14,16,17;103:17;104:21;105:10,13,22,25;106:5,7
**Carlson's (1)**
70:1
**carve (3)**
94:3,9;121:25
**carved (2)**
91:25;94:16
**carve-out (1)**
27:20
**case (56)**
23:13;27:8,11;28:2,6,10;30:20;33:20;39:2,4,13;43:14;46:4;49:17;50:1;65:12,20,24;66:19,21,25;67:24;68:5;69:19;70:13,15;72:10;73:3;87:12;92:9,22;94:13;95:10;96:1;97:8;101:4;106:19;114:12;115:3;118:22;119:9,10;121:16;123:22;135:13;158:16,18,19;161:9,15,22,24,25;163:20,21;171:10
**cases (25)**
9:9,10,12,16,19;10:2;25:24;26:16,21;30:13,19;31:24;32:20;33:15;36:3;40:11;49:22;84:16,18,23;91:6;132:8;161:18,20,20
**cash (4)**
87:8;153:7,10;155:14
**cast (1)**
48:4
**cat (1)**
54:14
**category (2)**
61:19,21
**cause (5)**
52:12;91:18,18,19,20
**caused (2)**
48:10;127:24
**causes (10)**
21:22;23:14;92:1,2;107:1,12,13,19;133:22;134:17
**causing (1)**
17:19
**cent (1)**
75:10
**certain (17)**
10:18;12:20;16:10,11,12,13;18:7;26:14;30:6;42:5;74:21;98:3;108:22;138:25;139:2;141:19;160:7
**certainly (9)**
31:7;89:21;104:16;105:17;110:22;115:21;167:15;175:8;177:13
**certification (1)**
11:16
**certified (2)**
38:1;48:16
**challenge (2)**
49:12;117:8
**challenged (2)**
68:1;116:22
**challenges (1)**
38:9
**challenging (1)**
68:6
**chance (5)**
21:1;41:22;90:2;131:12;144:10
**change (9)**
89:25;90:2;94:17,18;98:15;113:10;119:4;123:15;162:14
**changed (3)**
17:22;116:20;132:1
**changes (17)**
62:22;90:14;95:21;98:14,25;99:24;102:23;113:9;121:4;126:5;128:8,10;133:2,12,13;146:21;168:17
**changing (1)**
6:8
**Chapter (15)**
23:13,14,23;25:19;26:21;31:8;34:2;35:1;39:2;40:18;85:3,5,10;132:7;134:13
**characterized (2)**
117:13;141:20
**characterizing (1)**
127:18
**charge (1)**
97:22
**chart (11)**
13:6,9,15,17;19:12;60:25;61:1,2;117:12,17;142:3
**charts (1)**
62:6
**Chateauguay (1)**
161:22
**cheat (1)**
77:14
**check (3)**
120:8,14;128:23
**choice (1)**
146:23
**choices (4)**
61:12,18,18;146:22
**choose (4)**
22:25;93:6;112:11;114:24
**chooses (3)**
93:3;110:8;112:11
**chores (1)**
7:3
**chosen (1)**
71:24
**Chu (1)**
106:19
**chunk (2)**
81:8,9
**Church (1)**
93:13
**circuit (17)**
20:11,15;26:18;31:16;69:18;70:2,3,7,9,13,14,21;72:10,13;73:3,7;132:9
**Circuit's (3)**
65:22;72:3;73:1
**circulated (1)**
125:20
**circumscribed (1)**
26:13
**circumstance (2)**
88:24;93:7
**circumstances (4)**
31:10,19;41:2;58:6
**cite (3)**
90:12,15;93:23
**cited (3)**
69:19;90:24;161:18
**cities (2)**
159:24;160:16
**citing (1)**
70:13
**Civil (1)**
126:11
**claim (79)**
11:23;48:7,9,18,20,22,24;49:11;51:10;53:16;55:17;56:18;58:22;60:2,2,3,5,13,14,18;65:9,15,21;66:3,6;69:1,3,4,8;70:19,21,22;71:1,2,6,6,9;73:8,9,11;75:23;76:2,13,15;87:8;88:20;89:6;92:8,10;93:5,5;94:7;101:3;107:7;109:20,21,22;114:11;117:4,7;118:9,10,13,14,14,16;122:14;135:6;142:4;154:4;155:17;156:13;157:15,24;158:4,7,8;160:21;161:4
**claimant (30)**
11:24;18:15;30:15;50:3,6;51:7;55:20,25;56:7,9,12,14,16,25;57:2;58:20,22;60:4,15;61:14,19,23;65:17,19;66:5;70:16,19;73:15;76:13;109:24

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 182 of 207

**claimants (38)**
12:22;26:1;30:15;32:15,22,23;36:4;37:7;39:20;48:4;51:12;58:25;59:25;64:18,19;65:2,8;71:23;72:23;74:11,13,16;75:1,9,22;76:14;77:2;86:11;91:4;92:11;93:15;103:22;114:12,13;153:11;158:25;159:22;166:3
**claimants' (6)**
13:21;17:2;28:16;44:25;89:13;102:20
**claimant's (1)**
103:3
**claiming (2)**
160:16,18
**claims (150)**
11:21;23:14,18;25:18;30:18;31:17,18;32:11,12,16,24;33:5,7,7,8;35:4,5,6,10;41:1,6;42:20;47:24;49:3,11,16,19,23,24;51:3;54:19,20;55:15;58:25;61:9,11,23;62:18,21,23;68:20,23;69:15;70:4,7,8;71:15;73:23;74:6;75:1,13,22;80:11,16;84:15;87:3,6,7,9,24;88:2,17,17,18,23;89:7,8;90:25;91:1,3,9;95:8;107:15,19;110:10;114:2,14,14,22;116:23;117:14,15,18,20,23,24;119:2,3;124:8,11,14;125:25,25;127:20,22;129:6,7,9,11,18,21;130:2,4,6,22,24,25;131:11;133:22;134:4,6,9,13,18,19;139:8;140:18,21;153:4,5,5;154:2,7,9;155:15,18,19,21;156:18,22,22;157:1,4,10,14,16,24;158:12,15,19,21,24;159:3,4,5,8,9,11,23;163:15
**clarification (7)**
92:12;137:8;142:6,18;149:20;165:22,24
**clarifications (1)**
83:8
**clarified (1)**
21:25
**Clarify (6)**
10:11;16:4;25:24;74:19;108:23;137:11
**clarifying (2)**
20:18;129:5
**clarity (2)**
24:2;116:23
**class (51)**
11:19,20,25;12:4,5;32:18,19;42:14;47:25;48:3,8,10,13,16,16;49:2,3,11;50:15;54:24;61:13;63:25;64:2,6,8,10,15;68:23;71:12,13;76:5;92:2;114:20;115:12;153:6,15;155:9;156:8;159:25;160:12,14,20,21;161:6,8,17,19,22,23,25;162:19
**classes (10)**
11:17;31:10;41:15;153:3,21;157:2,3;159:4,16;161:2
**classification (15)**
30:8;31:13,15;33:13;71:9;88:14,15,16;89:2,4,11;90:14,22;153:1;162:4
**classifications (2)**
90:11;162:7
**classified (4)**
31:20;47:25;88:23,25
**classify (3)**
31:17;68:19;154:2
**clause (3)**
27:19;133:4;135:1
**clean (1)**
116:17
**cleaning (1)**
116:18
**cleanup (2)**
97:23;100:21
**clear (21)**
16:25;20:5,24;21:13;22:17,21,21,22;31:16;35:3;66:21;68:4;70:12;85:13;108:22;118:8;126:14;138:13,24,25;148:20
**clearer (3)**
20:7,13,16
**clearly (3)**
146:16;165:24;177:14
**Clerk (25)**
11:17;38:18;39:10;79:4,7;96:15,20;102:10;112:23;115:25;120:17;126:21;136:20;140:13;142:10;148:1,4,8;165:1,7,10;169:17,21;173:4,10
**clerks (1)**
15:4
**Clerk's (1)**
39:13
**clever (1)**
132:22
**clicking (1)**
97:9
**client (14)**
18:9;95:19;109:20;110:8,12,24;111:19;112:17;114:18,20;115:9;118:10,15,19
**clients (8)**
92:3;99:25;113:23;126:2;128:6,7;139:4;175:12
**client's (2)**
117:13;118:9
**clock (1)**
77:15
**clock-ticking (1)**
166:19
**close (8)**
11:18;41:5;54:5,24;77:8,10;105:22;132:8
**closed (1)**
40:3
**closely (1)**
7:18
**close-of-business (1)**
82:25
**closer (2)**
6:25;30:13
**closing (4)**
81:20;136:6;144:11;177:4
**closings (1)**
112:10
**coast (1)**
24:22
**cocounsel (2)**
18:16;125:16
**Code (10)**
12:4,18,19;18:5;23:20;49:5;50:16;62:16;88:22;126:11
**coin (1)**
109:8
**collaboratively (1)**
39:19
**collateral (4)**
66:1;67:18,20;162:1
**colleague (1)**
124:19
**colleagues (2)**
174:7;177:2
**collect (1)**
147:15
**collectively (1)**
87:5
**colloquy (2)**
62:6;163:3
**combination (1)**
46:6
**Comcast (1)**
103:21
**comfortable (1)**
146:2
**coming (5)**
5:21;24:2;79:22;116:19;152:9
**commenced (4)**
10:2;39:2,4;114:13
**commencement (1)**
84:16
**commencing (1)**
45:9
**comment (3)**
124:19;133:14;156:25
**comments (12)**
84:10;85:22;86:16;94:23;99:12;100:25;105:1;106:3;112:12;121:24;125:6;152:2
**commercial (1)**
134:25
**commitment (1)**
151:22
**commitments (1)**
78:11
**committed (4)**
10:7;34:2;36:2;158:16
**committee (19)**
13:22;16:22;27:23;28:12,13,16;30:16;32:21;83:25;84:12,15,20;85:8,17;94:12;95:8;122:5;131:8,22
**common (14)**
44:19;49:5,12,20;55:25;56:18;57:3,4;65:1;68:22;69:16;71:4,5;107:9
**commonly (1)**
45:1
**communicate (5)**
37:9;115:3;125:2;137:17;138:6
**communication (4)**
119:19;131:15;173:5;176:19
**communities (1)**
13:3
**community (1)**
163:8
**companies (1)**
32:12
**company (9)**
56:22,23;57:21;89:8;108:25;110:8,25;163:15,15
**company's (1)**
84:22
**comparable (3)**
66:18;70:15;160:5
**comparatively (1)**
156:7
**compare (3)**
56:25;57:21,22
**comparison (1)**
65:5
**compelling (1)**
94:2
**compensation (1)**
114:11
**competent (1)**
93:6
**complain (1)**
114:3
**complaining (5)**
108:24;109:6,16;113:24;144:22
**complaint (17)**
52:5,5,14,17;55:11;63:19;71:14;91:2,6,8,8,10,16,17,21,24;92:1
**complaints (1)**
159:10
**complete (4)**
38:9,23;46:18;176:9
**completely (1)**
54:20
**complex (2)**
46:6,6
**complexities (3)**
9:9,11;75:18
**compliance (6)**
20:11;29:21,25;37:22;39:18;40:14
**compliant (2)**
9:23;36:1
**complied (1)**
36:9
**complies (1)**
12:16
**complimented (1)**
29:24
**compliments (1)**
119:15
**complying (1)**
82:24
**component (1)**
61:11
**compound (1)**
77:4
**comprehending (1)**
167:19
**comprehensive (1)**
160:4
**comprised (1)**
87:4
**compromise (1)**
41:14
**compromised (1)**
87:7
**computer (1)**
77:20
**concede (2)**
58:11;78:11
**conceded (1)**
166:17
**concedes (2)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 183 of 207

69:4;114:10
**concept (5)**
53:15;70:12;142:3,24;167:24
**concern (3)**
9:18;124:7;125:23
**concerned (5)**
23:13;49:17;105:5;141:21;150:14
**concerning (2)**
126:4;153:8
**concerns (9)**
23:17;26:2;42:19,20;92:22;95:18;98:9,18,21
**concession (3)**
69:6,20;160:9
**concessions (1)**
78:7
**conclude (5)**
8:6;58:13;86:24;169:9;177:22
**concluded (3)**
25:19;72:10;177:25
**concluding (1)**
90:19
**conclusion (8)**
32:5;36:7;39:21;84:17;89:25;90:2;176:1;177:11
**conclusions (1)**
90:7
**condemnation (1)**
90:10
**condense (1)**
174:3
**conditions (1)**
108:14
**conduct (3)**
26:21;121:23;122:19
**conducted (1)**
37:21
**confess (1)**
23:5
**confident (1)**
81:4
**confirm (15)**
5:25;10:8;16:7;18:18;24:9;28:23;29:15;37:1,4;47:22;61:3;85:2;94:17;115:4;154:16
**confirmation (48)**
8:25;11:10;12:1,6,12,17;13:5;21:14,15,17;22:10;24:2;28:3,5;30:6;33:22;35:21;37:5;39:7;40:12;42:6,23;50:11;60:25;61:7;69:11;84:11;85:6,17;86:19,22,25;98:23;102:24;114:23;117:12;118:1;121:19;126:4;133:13;140:17;142:6;146:19;151:2;153:2;162:9;163:6;172:24
**confirmed (4)**
11:12;76:6;114:1;146:21
**confirming (7)**
10:13;85:18;103:7;119:19,20;142:19,23
**conflates (1)**
63:2
**conflict (5)**
14:13;38:19;39:5,6;113:12
**conflicts (1)**
80:8
**confront (1)**
62:13
**confused (7)**
14:12;15:21,22;83:4;109:11,13;115:1
**confusing (1)**
25:7
**confusion (1)**
15:1
**connect (1)**
114:6
**connecting (1)**
58:10
**connection (15)**
13:4;14:10;20:8;25:11;26:20;27:7,7,11;31:3;33:11;38:7;88:4;122:17;174:17;176:14
**connections (1)**
150:15
**consensual (1)**
41:14
**consensually (1)**
29:7
**consensus (4)**
12:8;26:16;28:11;33:15
**consent (1)**
164:20
**consequence (1)**
122:21
**consider (4)**
40:9;61:5;110:24;166:5
**consideration (8)**
14:9;18:2;29:8;42:7,10,11;44:15;73:22
**considered (1)**
65:20
**consistent (9)**
9:17;20:14;22:5;26:17;27:14;31:7;99:1;104:14;133:14
**consistently (1)**
70:4
**consists (1)**
84:12
**constituencies (2)**
9:7,12
**constituency (2)**
38:13;71:25
**constituents (2)**
86:21;94:14
**constructive (1)**
29:6
**consult (1)**
99:25
**consumed (1)**
163:3
**consuming (1)**
40:20
**consummation (1)**
10:9
**contact (4)**
138:22;139:11,11;174:18
**contacted (2)**
129:1;130:17
**contacting (2)**
137:23,23
**contained (2)**
93:22;159:21
**contemplation (3)**
134:10,14,19
**contentious (1)**
84:24
**context (10)**
14:22;49:13;51:25;60:18;65:20;80:19;91:5;130:1;132:11;167:6
**contingencies (3)**
34:9,20;35:20
**contingency (1)**
35:13
**continue (4)**
13:2;34:22;83:13;87:11
**continuing (1)**
145:21
**contract (21)**
14:9;19:8;21:20;81:5;101:8;114:22;118:14;133:17,18,21,23,25;134:4,22,23;135:16,24,25;136:2,4;167:7
**contracts (10)**
14:22;80:12,18;82:14,15;166:1,22;167:6,24;175:18
**contract's (1)**
135:21
**contractual (2)**
67:4,7
**contrary (2)**
69:19;80:7
**contribution (14)**
14:11;15:8;80:11,16;81:16,22;82:3,10,16;139:8,20;165:25;166:21;175:17
**contributions (1)**
73:10
**control (2)**
114:10;133:6
**controverted (1)**
30:2
**convenience (2)**
7:8;136:13
**convenient (3)**
8:8;15:23;147:9
**conveniently (1)**
103:23
**conversation (2)**
94:19;105:25
**conversations (1)**
99:4
**convoluted (1)**
23:7
**coordinate (4)**
128:11;137:21;174:21;176:16
**coordination (1)**
33:4
**copy (1)**
18:23
**Corning (4)**
158:18,22;161:16,16
**Corporation (7)**
5:7;68:21,24;69:5;70:17;128:6,19
**corrected (2)**
63:18,22
**corrective (1)**
64:11
**correctly (3)**
87:4;115:4;168:16
**Corresponding (1)**
22:9
**cost (2)**
94:8;124:20
**counsel (40)**
5:8,20;7:4,6;8:14;16:2;18:13;62:5,9;80:1;81:2,17,18,23;82:2,13,14,20;93:16;94:25;95:20,24;99:22;100:10,12;103:11;105:23;128:15;130:17;131:4,6;149:14;156:17,25;158:23;159:16,19;169:12;172:21;175:10
**count (3)**
48:7;67:11;133:9
**counted (1)**
49:21
**counter (1)**
94:11
**counterparty (1)**
21:20
**counties (1)**
160:18
**country (2)**
28:4;86:14
**County (1)**
50:4
**couple (9)**
7:2;38:5;69:25;79:13;99:17,18;131:6,22;144:21
**course (12)**
34:15;37:16;40:2;45:2;93:4,21;101:5;118:24;128:20;133:8;138:10;140:22
**Court (468)**
5:3,4,4,5,9,10,12,13,15,17,20,22,23;6:4,12,14,17,22;7:2,9,11;8:19;10:11,22,23;11:4,25;12:9,14;13:8,11,14;14:25;15:10,25;16:2,15,17;17:14;18:10,22;19:3,10,13;20:25;21:3,5,8,11;22:25;23:4,4;25:3;27:1,5,9,13,18,24;28:6,18,22;29:11,20;30:1;31:15;32:1,7;36:6,11,14,19,21,23;37:8,15,23;38:1,15;39:23;41:12,19,21;42:1;43:4,7,20,23;44:4,13;45:4,12,14,17,21,23,25;46:2,4,13,16,21;47:4,6,8,14;49:6,9;50:10,17,23;51:4,18,21;52:20,22;53:1,3,6,8,10,12;54:2,16;57:11,14,19,24;58:2,4,6,23,25;59:3,7,10,20;60:9,11,15,20,22;61:6,12,17;62:2,4,11;63:25;64:4,13;66:8,10,14,23;67:3,15,21,24;68:3,7,10,17;69:22;70:1,10;72:5,8,16,21;73:18,24;74:3,14;75:4,15,24;76:3,7,24;77:3,7,12,21;79:2,4,6,9,13;80:10;84:6;85:18,21;86:3,6,16,24;87:6,18,23;88:4,11;89:3,9,15,18;90:4;91:2,5,15;92:3,9,14,21,24;93:6,9,15;94:17,18,21,23;95:4,12;96:1,7,11,17,21;97:3,8,11,16,24;99:12;100:7,18,20;101:12,14,21,25;102:3,5,13,16;103:11,17;105:12,17;106:6,9,14;108:23;109:6,10,15;110:6,14,16;111:4,8,11,14;112:3,5,9,14;113:1,12,17;114:16;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 184 of 207

115:14,18,20,23;116:3,6,9,18;118:4,19,24;119:5,10,13;120:3,18,23,25;121:17,19,21;122:2,15;123:3,7,18,23;124:2,12,17;125:2,5,8,13;126:19,23;127:1,4,6;128:12,23;129:10,19;130:9;131:3,14;132:5,18,20,22;133:9,19;134:6,9,25;135:10;136:5,10,12,19,21,25;137:12,13;138:24;140:5,9,11,14;141:1,12,16;142:8,11,13,15,25;143:5,7,10,23;144:4,7,13,16;145:2,4,8,20;146:5,18;147:3,8,10,22,25;148:3,5,9,11,14,16,18;149:1,6,8,11,13,18;150:2,11,16,24;151:8,25;152:2,13,15,19,21;153:12,14,17,20,25;154:10,15,23;155:3,8,12,20,25;156:4,8;157:9,12,19,22;158:1,6,10,13,18;160:2,13,17,22;162:8,11,13,17,21,25;163:4;164:23;165:3,5,8,11,16;166:13;167:9,17,18,21;168:3,9,24;169:10,14,14,20,22;170:5,15;171:6,14,21,25;172:5,9,19;173:8,12,18,21;174:4,6,10,12,25;176:12,18;177:5,20
**Court- (2)**
129:24;131:24
**CourtCall (3)**
113:7,16,21
**courtroom (4)**
7:25;15:4;78:15;96:14
**courts (1)**
28:3
**court's (7)**
36:8;84:3;88:9;125:22;132:9,13;167:14
**cover (1)**
92:20
**coverage (10)**
34:13;35:11;67:1;107:21,24;108:13,14,20,21;109:2
**covered (3)**
20:8;92:18;110:19
**covers (2)**
22:17;40:16
**CPUC (7)**
9:13,21,22;10:23;30:19;35:25;36:17
**crafted (1)**
130:13
**cramdown (1)**
46:20
**create (2)**
161:8,17
**created (2)**
15:1;161:2
**credible (2)**
162:3,3
**creditor (2)**
11:22;160:9
**creditors (10)**
10:9;25:17;27:22;30:9;31:8;63:24;73:5,5;110:5;111:1
**creditor's (1)**
40:14
**credits (1)**
76:16
**crew (1)**
159:17
**critical (7)**
9:15;11:14;15:11;24:3,4;33:2;85:9
**criticisms (1)**
119:15
**criticize (1)**
171:6
**criticized (1)**
23:8
**cross- (1)**
164:2
**cross-examination (6)**
37:20;63:5,15;64:15;90:23;124:20
**cross-examined (1)**
108:8
**CRP (1)**
103:10
**Crutcher (1)**
95:7
**crystal (1)**
70:12
**culmination (1)**
9:5
**Cuomo (1)**
150:10
**cure (7)**
15:6,7,12,18;134:3;136:1;140:19
**cured (1)**
135:14
**cure-related (1)**
166:15
**cures (2)**
82:14;134:23
**curing (2)**
134:2,22
**current (6)**
63:8;71:23;73:19;139:18;141:22;157:22
**customary (5)**
20:1;22:14;24:20;26:12;28:1
**customers (2)**
174:14,15
**cut (1)**
173:19

## D

**D&O (2)**
108:9,11
**daily (1)**
10:19
**damage (14)**
11:21;32:17;33:7;35:4,5,6;53:16;58:16;59:22;91:1;92:11;116:23;117:24;155:17
**damages (4)**
55:10;58:13;155:2;156:12
**Daniel (1)**
106:10
**date (52)**
18:1;25:19;34:12;44:24;48:19;52:4;54:9,22,25;55:14;56:13,16,17;57:3,9,20;58:20,21;59:22;61:13,13,14;62:15,16,18,22;63:8,18,19;64:1,4,5,5,9,10,11;65:2;74:22,22,23,25;76:21;85:16;90:16;118:12;119:23;121:14,17,19,19,20;134:7
**daughters (1)**
97:17
**David (1)**
83:23
**Davila (1)**
106:20
**Day (22)**
8:25;14:7;15:13;23:8;24:8;46:8;47:16;55:22;56:2,9;61:13;78:2;90:24;92:13;95:23;124:19;150:12;151:13;152:18;168:7;172:13;173:1
**days (5)**
15:14;37:10;52:8;55:23;108:8
**de (1)**
103:9
**dead (1)**
7:11
**deadline (3)**
9:15;86:23;129:22
**deadlines (1)**
9:3
**deal (15)**
47:1;49:14;80:16;81:4;98:25;130:4;133:19;139:7;161:16;163:9;164:1,11,17;166:20,24
**dealing (5)**
48:23;58:19;99:16;125:18;168:6
**deals (9)**
20:17;31:8;72:16;99:17;126:8;133:7,17,18;134:4
**dealt (11)**
49:22;89:15;90:12;105:5;129:9,9,12;130:4,22;139:8;166:18
**death (4)**
91:18;92:5;110:6;157:14
**debate (1)**
100:14
**debtor (40)**
24:17;35:5,11;49:13,18,23,24;70:5,8,11;72:1,13;73:5;98:13;101:10;103:5;109:18,19;111:16;114:9,15;117:12;118:21,23;126:3;133:25;135:2,4,17,19,23;136:1;151:1;154:23;159:14;160:7,9;161:10,18;173:24
**debtors (62)**
8:22,24;10:1;18:3;23:21,21,24;31:1,6;32:13;33:2;34:2,8,16,21,25;35:9;43:11;44:5;46:25;48:7;67:2;76:10;81:12;85:2,5,9,11,13;86:19,22;89:5;90:6;95:20;98:17;103:11;107:6,9,10,20;109:11;111:21;114:10;124:22;125:24;126:4,6,16;127:24;128:2;130:18;133:3,5,23;134:3;140:18;141:24;142:2,21;145:5,13,22
**debtors' (10)**
7:4,6;34:17;81:18;82:15;84:11;86:21;95:14,24;125:20
**dec (1)**
103:24
**decide (6)**
19:16;50:13,14;61:5;143:2;152:8
**decision (23)**
25:14;45:16,18,19;46:15;61:15,20;65:22;70:1,2,3,14;72:3;73:1,3;76:14;88:5;89:24;99:17;100:14;104:4;118:10;154:17
**decision-making (1)**
151:9
**declaration (10)**
29:22,24;31:14,23;32:10;37:19;40:16,17;108:6,12
**declarations (5)**
12:11;29:23;30:5,23;34:1
**declare (1)**
136:13
**decline (2)**
74:10;151:11
**declined (1)**
57:5
**dedicated (1)**
82:6
**deducted (1)**
65:9
**deductibility (2)**
142:2,21
**deductible (1)**
141:21
**deduction (3)**
65:18,23;68:6
**deductions (1)**
141:21
**default (5)**
134:3,22;135:20,25;136:1
**defaults (5)**
134:2,5,24;135:12,14
**defeat (2)**
33:21,22
**defend (1)**
105:14
**defense (1)**
137:22
**defenses (4)**
21:19,23;22:18;25:25
**defer (8)**
29:8;80:15;98:3;99:8;115:2;166:1,16;170:12
**deferred (5)**
29:14;36:9;81:14,14;138:12
**deferring (2)**
14:8,23
**defined (11)**
44:16,18,19,21,23;103:20,20;104:22;126:12,17;127:8
**definition (11)**
45:3,5;75:25;87:24;88:2;101:3;103:14,14;107:8,25;134:17
**defrauded (2)**
60:9;75:19
**Del (1)**
69:20

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 185 of 207

**delay (1)**
97:14
**delayed (1)**
11:13
**delegate (1)**
139:12
**delete (1)**
133:9
**deleted (4)**
17:11;41:20;133:7,7
**deletion (1)**
113:9
**deletions (1)**
133:9
**delivered (2)**
73:22;74:18
**delivering (1)**
135:17
**deluged (1)**
15:1
**demanding (1)**
169:12
**demonstrate (5)**
12:16;29:25;30:21;34:1;38:9
**demonstrated (7)**
11:8,16;12:2;30:23;31:23;34:4;38:16
**demonstrates (3)**
31:14;37:20;39:17
**demonstrative (2)**
51:16;55:18
**denial (1)**
163:11
**Dennis (1)**
5:6
**denominated (1)**
49:19
**denominator (8)**
52:19;53:13,18;55:17;62:17;63:3,13;65:6
**denoted (1)**
153:3
**deny (4)**
81:10;153:2;162:9;163:6
**depend (1)**
10:14
**dependent (1)**
61:19
**depending (1)**
24:5
**depends (1)**
151:20
**depletes (1)**
66:4
**deprive (1)**
83:1
**deprived (2)**
124:10,13
**deputy (2)**
7:25;78:15
**derivative (2)**
106:18;110:1
**describe (1)**
76:21
**described (3)**
42:9;71:20;74:15
**designate (1)**
38:2
**desire (3)**
6:6;82:21;167:14
**despite (8)**
31:18;52:5,7,7,8;62:14;63:15;65:25
**destructive (1)**
40:19
**detail (2)**
30:5;158:24
**detailed (1)**
42:12
**determination (6)**
35:22;36:8,13,24;145:14,24
**determinations (2)**
36:17,18
**determinative (4)**
141:23;142:2,20,22
**determine (6)**
55:17;61:4;64:17;112:1;157:13,23
**determined (9)**
34:15,15;51:7;61:10;62:18,21;71:22;76:16;117:19
**determining (2)**
43:12;61:9
**devalue (1)**
57:10
**devalued (1)**
57:8
**devastated (1)**
33:1
**devastating (1)**
13:3
**developed (1)**
39:19
**developments (3)**
79:14;80:22;83:13
**devote (1)**
177:10
**dialogue (1)**
105:4
**DIC (2)**
108:13,19
**Diego (1)**
52:6
**difference (2)**
57:15;153:20
**difference-in- (1)**
108:13
**differences (2)**
33:13;145:6
**different (23)**
9:11;32:11;59:23;61:17,18,22;63:2;66:4;67:14;72:16,17;80:23;109:2,4;115:10;118:13;128:1,10;131:7;153:19;156:18;159:15;162:1
**differentiating (1)**
158:24
**differently (4)**
46:12;59:21;72:12;172:10
**difficult (5)**
15:18;86:13;130:23;138:23;169:13
**difficulties (1)**
97:15
**digest (1)**
18:19
**digesting (1)**
147:13
**diligence (1)**
39:10
**dilute (1)**
56:18
**diluted (1)**
57:12
**dilution (2)**
56:23;65:3
**diminution (1)**
60:4
**direct (2)**
66:5;89:8
**directed (2)**
104:4;127:21
**direction (1)**
139:12
**directly (3)**
52:17;69:18;115:3
**director (4)**
66:15,25,25;75:18
**directors (10)**
27:23;75:16;107:2,5,8,19,24;108:1;109:1;110:21
**directors' (1)**
107:21
**disadvantaged (1)**
64:19
**disagree (2)**
76:18;83:4
**disagreements (1)**
168:20
**discharge (17)**
15:16;17:5,10;19:19;22:1,8;25:23;41:9;117:16;125:19,25;126:15;134:11,12,13,16;141:3
**discharged (3)**
18:4;116:24;129:7
**discharges (1)**
134:22
**disclosed (6)**
39:12;40:1;55:12;57:17;58:21;124:23
**disclosure (13)**
20:9,13;34:5;37:22;40:10,18;42:9;52:3;55:22;64:11;102:19;110:23;117:22
**disclosures (5)**
40:6;52:9;54:13,22;63:18
**disconnect (1)**
7:24
**discount (1)**
87:9
**discrete (5)**
15:12;104:6,10;166:17;167:5
**discretion (2)**
31:17;50:8
**discriminated (1)**
64:20
**discriminates (2)**
71:14;75:14
**discrimination (4)**
50:21;72:11,25;75:8
**discriminatory (2)**
72:2;74:9
**discuss (6)**
82:8;95:21,22;129:16;131:16;146:1
**discussed (3)**
98:8;138:17;167:5
**discussion (14)**
6:8;42:12;43:24;70:24;80:5;83:7;104:13,17,22;105:8;128:15;131:3;139:23;147:11
**discussions (2)**
141:7;154:19
**disgruntled (1)**
12:20
**dishonest (1)**
172:12
**dismember (1)**
162:15
**dismissal (1)**
117:3
**dismissed (1)**
118:8
**dispenses (1)**
42:15
**dispose (2)**
20:22;40:22
**disposed (3)**
39:1,3;43:2
**disposing (1)**
17:21
**dispositive (1)**
89:24
**dispute (4)**
31:20;40:10;44:5;104:9
**disputed (11)**
11:20;48:24;155:19,21,21,24;156:1,3,5,13;158:21
**disputes (2)**
80:10;129:6
**disrupted (1)**
167:1
**disseminated (1)**
63:23
**distinct (4)**
32:24;33:5;38:24;73:9
**distinction (2)**
67:10;123:16
**distinguish (2)**
159:2,3
**distinguished (2)**
66:10;67:9
**distinguishing (1)**
72:20
**distress (1)**
91:21
**distribution (1)**
30:25
**distributions (7)**
9:25;10:9;11:12;13:2;18:2;36:3;40:22
**District (3)**
5:5;106:21;113:8
**disturbed (1)**
17:15
**divide (3)**
18:14;74:3;143:12
**divided (1)**
144:8
**dividing (1)**
97:21
**docket (29)**
14:12;16:8;20:20;23:1;24:22,24;37:1;41:12;51:23;62:8;80:14;82:1,19;90:17;103:7;107:15;108:7;114:8,8;116:21;125:15,16,22;131:22;133:4;139:22;142:4;149:3;166:25
**docket-free (1)**
16:18
**doctors (1)**
123:11
**doctrine (3)**
89:7;161:10,11
**document (4)**
80:8;114:9;141:19;149:16
**documentation (2)**
17:2;130:23
**documents (5)**
10:17,18;32:3;98:21;149:2
**DOJ (2)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 186 of 207

30:17;33:7
**dollar (4)**
60:4,4;87:8;145:24
**dollar-for-dollar (1)**
66:7
**dollars (25)**
31:4;34:11,23;35:14;48:20,22;49:19;53:11,22;54:1,10;56:8;57:18;58:20;59:12,16;75:10;84:13,14;87:6,10;108:10;154:5;156:10;163:17
**dollars' (1)**
44:1
**domain (2)**
22:18,19
**domestic (1)**
158:24
**Donato (3)**
37:9;154:10,17
**Donato's (3)**
36:24;155:5,6
**done (13)**
82:25;85:19;86:12;95:10;99:17;101:1;119:14;143:17;150:25,25;151:1;154:14;155:1
**door (1)**
63:20
**dots (2)**
58:10;114:6
**double (1)**
65:19
**double-negatives (1)**
23:8
**doubt (3)**
80:23;118:11,20
**Dow (4)**
158:18,22;161:16,16
**down (19)**
54:12;56:5,6;57:23,25;58:9;59:14;60:5;61:1;66:6;83:13;96:19;101:25;138:1;144:4;161:2;165:16;172:3;174:3
**downtown (2)**
37:12,13
**Draconian (1)**
11:11
**draft (9)**
16:9,9,9;98:18;108:2,2;128:2;133:3;168:18
**drafting (5)**
98:9;99:6,24;100:6;131:14
**drafts (2)**
99:3;138:5
**draw (1)**
65:13
**drew (2)**
48:13;67:10
**dropped (1)**
63:10
**due (7)**
37:16;39:10;124:10,14;135:9;140:23;174:1
**Duff (2)**
38:19,22
**Dunn (1)**
95:7
**during (15)**
7:21;9:1;10:4;18:20,22;39:23;40:9;79:14;80:6;84:3;86:13;124:20;137:6;139:25;170:2
**duties (2)**
122:1,13
**duty (1)**
32:22
**dynamics (1)**
31:24

**E**

**earlier (17)**
17:6;19:12,21;30:25;41:12,17;52:8;63:6;75:9;92:22;99:12;154:15;166:14;169:11;170:3;172:13;176:19
**easier (1)**
91:15
**easily (4)**
31:11;43:2;46:15;62:9
**east (1)**
24:22
**Eastern (1)**
113:8
**easy (2)**
49:14;122:3
**echo (1)**
100:24
**economic (4)**
31:22;89:1;159:15;162:4
**economical (1)**
8:9
**economy (1)**
89:19
**edit (1)**
137:14
**Edward (1)**
106:20
**effect (4)**
25:6;34:12;77:8;133:18
**effective (14)**
10:7;18:1;25:19;29:1,15;34:12;74:22,23,25;85:16;121:13,17,19,20
**effectively (3)**
23:11,12;70:7
**effects (1)**
23:12
**effectuate (1)**
55:7
**efficiencies (1)**
176:23
**efficient (1)**
167:9
**efficiently (2)**
83:16;170:8
**effort (2)**
20:2;169:13
**efforts (5)**
33:4,10;84:3;103:12;119:8
**eight (2)**
59:16;60:4
**Eighth (2)**
73:1,7
**either (14)**
8:14;33:9;36:7;73:19;82:18;100:15;103:4;106:1;110:3;127:10;139:18;159:24;161:18;176:9
**Electric (2)**
52:6;163:14
**element (1)**
42:11
**elements (2)**
30:4;44:17
**eleven (2)**
87:7;136:15
**eleventh (1)**
91:20
**eliminate (1)**
27:2
**eliminated (1)**
17:17
**else (16)**
7:3;37:11;40:4;44:6;80:8;90:18;104:20;105:19;114:3;119:19;139:25;144:5;157:7;161:5;172:10;174:16
**email (10)**
78:15;82:3;105:3;116:7;138:6;149:14;173:21;174:22,24;175:25
**emailed (1)**
120:2
**emails (3)**
16:8;82:4;137:9
**emerge (3)**
34:2;85:5,11
**emerging (1)**
35:1
**eminent (2)**
22:18,19
**emotional (1)**
91:20
**emphasize (6)**
12:13,23;16:9;34:6;39:17;89:16
**emphasized (1)**
30:25
**employee (1)**
122:23
**Employees (1)**
48:14
**employment (1)**
27:15
**encourage (1)**
94:12
**end (9)**
46:8;76:18;114:1;119:25;132:12;135:18,21;151:17;163:9
**endeavor (1)**
119:10
**ended (2)**
92:22;93:1
**ends (1)**
100:12
**Energy (1)**
73:1
**enfolded (1)**
33:14
**engaged (2)**
98:24;99:4
**enjoin (1)**
22:22
**enough (8)**
46:16;68:4;107:3,6;119:25;146:2;161:8,17
**ensure (2)**
9:24;85:2
**enter (2)**
85:18;86:25
**entered (8)**
28:3,5,15;85:6;88:1;104:8;149:7,9
**enterprise (2)**
71:24;73:15
**enticing (1)**
175:12
**entire (2)**
12:15;30:20
**entirely (11)**
17:11;18:15;22:5;23:12;24:20;25:20;26:17;41:20;63:1;153:10;156:19
**entities (7)**
30:18;33:6;103:22;115:10;160:6,14,19
**entitled (7)**
28:8;36:4;69:14;71:15;105:18;126:1;136:1
**entity (13)**
32:24;38:22,24;39:1,3;71:4;88:18;116:24;153:4;157:2;159:21;160:20;161:4
**entry (1)**
125:22
**enumerated (1)**
22:23
**envision (1)**
174:1
**equal (6)**
53:18;153:6,23;161:10,11,14
**equipment (1)**
33:3
**equitable (6)**
50:8,18,19,20;111:21;112:2
**equity (27)**
11:20;24:8,9,10;35:4;44:19,21;47:24;49:25;50:2,6;51:2;58:16;60:7;61:9,10;64:24;69:5;70:5,6;71:23;72:1;74:10,13,17,18;107:1
**equity's (2)**
49:14,15
**Eric (2)**
102:14;105:25
**error (9)**
63:21;64:5;88:12;122:5,6,20,22,22;137:1
**especially (3)**
56:25;113:9;128:12
**essence (1)**
51:11
**essentially (4)**
32:5;94:9;155:18;160:4
**established (2)**
75:23;159:14
**estate (12)**
26:13;65:15,18;66:2,2,4,5,22,23;67:19,19;124:4
**estimate (2)**
6:9;175:22
**estimated (4)**
44:24;45:1,3;64:16
**estimates (2)**
19:3;147:15
**estimation (1)**
154:8
**et (2)**
74:4;177:13
**Etkin (3)**
81:7;177:2,13
**even (33)**
11:18;17:23,24;20:16;27:2;41:4,7,13;48:22;62:1;65:11;66:21;68:6;69:2,3;75:1;78:20;83:3;118:12;128:12;134:14,

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 187 of 207

16,20,21;137:16;
144:10,11;153:25;
156:4;164:1,16;169:3;
176:6
**evening (7)**
20:21;29:5;38:18;
167:1;176:7;177:21,24
**event (4)**
35:3,6,20;100:11
**events (1)**
116:23
**everybody (7)**
96:11,12;132:2;
138:23;161:5;174:23;
177:12
**everyone (11)**
7:3;37:11;49:3;
65:11;77:13;90:5,18;
105:19;136:14;175:15;
177:20
**everyone's (1)**
7:7
**evidence (23)**
12:23,23;29:20;30:1,
2;31:13;33:24;38:2,3;
39:5,17,17;155:1,15;
157:3,6;159:5,24;
160:3,7,8,10;162:5
**evidenced (1)**
31:9
**evident (1)**
11:11
**evidentiary (1)**
10:5
**exact (2)**
50:13;69:9
**exactly (12)**
14:22;23:3;29:10;
45:24;48:13;56:13;
69:12;71:7;78:3;88:13;
90:5;124:24
**examination (2)**
163:19;164:3
**examiner (5)**
38:17;83:6;138:8;
176:1;177:11
**example (9)**
21:19;33:6,10;
123:21;135:8,10,12;
161:22;175:7
**examples (1)**
59:25
**exceed (1)**
35:10
**except (1)**
18:2
**excepted (1)**
101:5
**excess (3)**
35:14;87:10;109:1
**exchange (1)**
137:9
**exchanged (1)**
99:2
**exclude (2)**
26:22;105:7
**excluded (1)**
104:18
**excluding (1)**
81:20
**exclusion (1)**
159:22
**exclusive (4)**
132:6,11,13,15
**exculpation (19)**
19:18;26:7,9,19;
27:19;41:9;93:19;94:4,
20;121:8,12,15,25;
122:8,11;123:14;
124:5,9,16
**Excuse (26)**
6:4;16:2;20:17,25;
22:2;28:14;51:11;74:1;
82:10;85:23;94:24;
96:8;102:10;104:9;
106:7;120:5;147:23;
152:4;155:20;158:25;
159:17;160:2;169:6;
171:7;173:4;177:10
**executory (13)**
14:9,22;19:8;80:12,
18;81:5;101:8,8;
133:17,21;166:1,22;
167:24
**exempt (1)**
23:12
**exhausted (1)**
103:10
**exhibit (5)**
62:7,7;107:14;
108:11;130:21
**Exhibits (1)**
159:8
**exist (1)**
134:16
**existed (2)**
58:8;134:7
**existence (1)**
157:16
**existing (11)**
49:20;50:1;55:3;
60:7;71:17,20;72:18;
73:14;74:6,10,21
**exit (3)**
85:2,10;124:21
**exonerate (1)**
27:5
**expand (1)**
25:17
**expanding (1)**
52:22
**expands (1)**
132:12
**expect (8)**
83:15;85:5;88:9;
101:10;105:1,23,24;
112:20
**expectation (3)**
36:7;99:8;175:20
**expected (1)**
175:4
**expecting (1)**
112:18
**expects (1)**
103:11
**expedite (1)**
30:25
**expedited (1)**
9:24
**expended (1)**
33:8
**expenditures (2)**
31:4,5
**expense (3)**
57:3;117:15,20
**experts (1)**
158:23
**explain (6)**
14:25;28:21;45:25;
50:9;146:3,15
**explained (4)**
65:7;141:18;145:4,
15
**explaining (1)**
111:1
**explanation (2)**
107:23;108:4
**expressed (2)**
9:18;10:1
**expressly (2)**
18:3;26:22
**exquisite (1)**
158:24
**extend (1)**
25:15
**extended (1)**
48:19
**extends (1)**
121:13
**extent (22)**
8:4;10:18;11:2;
12:18;14:20;18:4,14,
24;19:23;21:21;22:21;
32:1;60:1;81:18;90:8,
11;93:2;107:20;
128:14;132:21;141:8;
175:19
**extraordinarily (1)**
84:24

**F**

**F2d (1)**
72:4
**F3D (4)**
65:22;69:21;70:14;
73:2
**face (3)**
48:7;87:9;120:19
**faced (1)**
23:22
**faces (1)**
169:15
**facilitate (1)**
73:17
**facility (2)**
34:12;35:15
**fact (30)**
11:1;12:15;13:12;
14:13;15:7;17:8;19:25;
20:7;29:4;32:18;37:6;
38:11;48:16;88:2,25;
89:9;90:25;91:1,25;
108:24,25;114:7;
129:17;157:4,4,5,16;
161:2,7,12
**factor (5)**
56:19;57:8,10,12;
72:20
**factors (1)**
145:11
**facts (1)**
70:15
**factual (1)**
90:22
**Factually (1)**
107:11
**fails (2)**
71:10,13
**failure (3)**
33:21;68:19;116:22
**fair (11)**
31:8;50:8,18,19,20;
55:7;93:24;111:21;
112:2;134:13,19
**fairly (1)**
37:16
**fairness (1)**
106:25
**faith (7)**
9:6;30:8,11,12,21,
22;31:11
**fall (1)**
54:20
**familiar (1)**
69:24
**far (6)**
23:13;43:11;47:19;
60:25;90:19;138:11
**farther (1)**
60:5
**fashion (1)**
76:11
**faster (1)**
83:12
**fault (1)**
175:3
**favor (4)**
13:1;31:10;48:5;
75:14
**favorably (1)**
73:8
**favored (1)**
73:10
**feasibility (6)**
30:8;33:16,18,21,23,
24
**feasible (2)**
35:22,24
**federal (2)**
128:5;129:20
**feel (3)**
17:8;139:13;146:2
**feelings (1)**
137:9
**feels (1)**
163:9
**fees (1)**
124:24
**Feld (1)**
83:24
**Feldman (19)**
85:24,25;86:1,5,7,10,
18;87:20;88:13;90:1,
21;92:7,15,25;93:13,
18;94:21,22;101:1
**fellow (1)**
163:7
**FEMA (1)**
160:5
**FERC (1)**
11:2
**few (11)**
20:8;42:19;48:9;
77:15;80:23;84:10;
98:10;103:21;108:8;
168:3;177:10
**fides (1)**
39:6
**fiduciaries (6)**
26:14;124:4,4,6,9,15
**fiduciary (4)**
32:22;39:20;123:1,
20
**field (1)**
50:7
**fifteen (5)**
13:13;95:5,13;
152:15;163:2
**Fifth (1)**
65:21
**fifty (1)**
165:16
**fifty-eight (1)**
48:11
**fifty-two (1)**
77:17
**figure (7)**
19:4;49:18;115:8;
127:13;128:8;137:17;
146:14
**figuring (1)**
49:12
**file (7)**
14:16;16:9;62:7,8;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 188
of 207

158:4;166:3,23
**filed (38)**
10:12;11:16;12:11;13:6,7,21,24;16:24;17:6;19:6;20:10;21:9;22:16;23:2;38:17;42:17;48:18;63:6;69:3;76:9;88:1;92:9,10;95:15;98:14,16;102:9,17,21;105:19;130:18;131:13;133:3;135:2,2;147:13;148:21;157:10
**files (1)**
135:20
**filing (1)**
52:10
**filings (2)**
79:18;176:6
**final (2)**
124:19;165:20
**finally (1)**
101:7
**financial (5)**
32:13;34:3,4,25;46:6
**financing (7)**
10:6,6;11:7;34:2;36:2;85:9;124:21
**find (3)**
70:24;131:20;169:12
**findings (1)**
90:7
**fine (12)**
7:5;13:14;41:23;47:4;86:1,3;88:12;95:4;119:6;149:1;168:14;171:25
**Finestone (4)**
152:6,9;164:25;165:2
**finish (2)**
7:6;169:2
**finished (2)**
90:15;120:6
**finite (1)**
61:18
**fire (84)**
9:20,25;10:10;11:13;12:20,21,22,25;17:2;18:15;21:21,21;23:25;24:4;28:16;32:18,19;33:10;34:14,16,23;39:20;42:5,7,14;44:15,16,19,21;52:6,7;54:17;63:1;64:24;65:16;67:11,11;73:19,21;74:7,10,24;88:17;89:11;107:13;114:19,20,21;115:12;119:3;129:9,17,21,24;130:1,2;131:23;153:5,11;154:7,8;155:1;156:6,9,11,21;157:2,10;159:10,25;160:12,14,20;161:6;162:19;163:8,17,23;164:1,11,15,16,20,21
**Firefighters (2)**
106:11,18
**fires (14)**
13:3;33:1,9,11;52:8,12;54:16;55:24;57:25;58:7;114:19;155:16;159:22,23
**firm (3)**
8:24,25;119:20
**firm's (1)**
39:12
**First (48)**
8:23;10:3;20:5;28:6;30:10;38:14;42:18;48:2;50:9;51:24,24;52:2;57:6,7;61:13,20;62:14;63:5;64:10;68:18;69:19;72:9;76:17;77:24;78:9;81:8;83:25;90:3;93:21;98:7;102:23;109:23;110:2,13,17;116:7,9,16;117:11;121:12;125:18;127:17;137:21;140:17;144:19;153:1;165:22;166:13
**five (10)**
34:11;54:10;57:8,12,23;59:17;60:3;154:5;171:25;174:1
**five-billion-dollar (1)**
35:15
**fix (8)**
6:21,22;111:18;132:18,19;145:24;163:11;164:17
**flag (1)**
37:6
**flagged (2)**
93:11;131:19
**fleshed (1)**
166:3
**flexibility (1)**
172:15
**flexible (1)**
147:20
**flip (1)**
109:8
**flows (1)**
161:9
**fluctuation (1)**
42:13
**fluid (2)**
147:11;170:5
**focus (2)**
82:14;110:7
**focused (1)**
17:11
**focusing (1)**
104:5
**follow (1)**
168:5
**following (7)**
18:11;80:1,7;112:1;152:4,5;157:9
**footnote (5)**
90:16;91:7,10,24;108:9
**forced (1)**
103:5
**forces (1)**
58:8
**forgetting (1)**
26:24
**forgive (1)**
17:17
**forgot (2)**
45:11;80:14
**form (1)**
129:12
**formed (1)**
103:23
**former (8)**
12:9;76:19;107:1,8,19;109:1,18;110:9
**formula (22)**
43:12;44:2,6;51:1;52:19;53:14,17,17,18;60:6,19;61:8,22;63:3;64:15;65:7;68:2,14;74:15;77:1;145:9,14
**formula's (1)**
62:17
**formulation (2)**
26:15;43:12
**forth (5)**
26:10,16;30:4;40:17;112:19
**fortunately (1)**
49:17
**forty- (1)**
154:4
**forty-eight (2)**
99:4,5
**forty-five (2)**
7:15,17
**forty-five-minute (2)**
7:7;77:14
**forty-two (1)**
48:11
**forum (1)**
22:24
**forward (12)**
11:12;31:2,6;33:4;34:18;35:17;36:2;78:22;87:12;93:4;173:6;177:21
**fought (1)**
84:24
**foul (1)**
110:12
**found (1)**
149:16
**four (9)**
15:3;52:8;55:23;61:17;78:9,18;128:15,16;172:3
**four-day (1)**
64:5
**Foursquare (1)**
93:14
**fourth (3)**
61:19,21;146:23
**frame (1)**
170:2
**Franchise (3)**
42:18;43:4;140:15
**FRANCISCO (3)**
5:1;37:13;77:16
**Frankly (8)**
42:21;92:13;95:23;104:5;105:19;114:25;118:25;162:24
**fraud (52)**
26:22;47:24;49:19;50:3,6;51:6,10,11,12;52:3;53:19;54:6,12;55:2,12,12,15,16,22;56:25;57:2,9,17,24;58:9,21;59:5;61:9,23;62:21;63:19;64:11,17,19;65:2,8,17,18;68:20;69:2;70:16;71:6,6,15,24;72:23;73:15;74:11,12,16;75:9,13
**free (4)**
94:10;114:2,23;139:13
**Friday (33)**
14:23;15:20;29:9,12;47:2;79:17,20;80:24;81:5,6;83:1;96:5;99:8,11,13;100:10;104:25;105:24;112:10;131:17,17,19;138:13,14,19;140:2;141:11;166:1,11;168:13;170:2;174:14;177:3
**front (3)**
110:14;113:14;149:5
**frustrate (2)**
12:7,7
**FTB (7)**
140:16;141:4,6,8,21;142:5,18
**FTB's (1)**
140:24
**full (8)**
39:17;41:6;84:9;106:15;133:21;143:22;152:17;165:20
**fullest (2)**
18:4;132:20
**fully (10)**
9:23;10:7;20:14;36:1;39:12;40:16;42:20;85:17;92:15;151:2
**fund (9)**
11:15;24:10;31:2;34:18,20,25;41:1;85:4;87:11
**fundamental (2)**
162:15;163:12
**fundamentally (4)**
31:8;163:24;164:14,16
**funding (2)**
87:13;153:19
**funds (1)**
153:8
**further (17)**
12:2;29:8;57:10;72:19;77:8;92:8;93:12;98:5;111:25;118:2;124:2;128:8,14;130:14;139:6;141:7,10
**future (2)**
23:24;117:7

## G

**Gantner (1)**
116:14
**garden-variety (2)**
27:6;118:14
**Garrison (9)**
152:24,25;159:8;162:21;163:7,8,11;164:1,11
**Gas (2)**
52:6;163:14
**gave (4)**
102:5;105:8;146:22;177:13
**general (3)**
114:13;125:24;166:2
**generally (2)**
57:1;82:23
**General's (1)**
125:17
**gentleman (1)**
144:8
**gentlemen (1)**
147:18
**gets (3)**
57:2;60:2;118:19
**Gibson (1)**
95:7
**gist (1)**
153:2
**give-and- (1)**
111:14
**given (8)**
9:11;74:20;111:16;117:10;118:2;126:13;171:6;176:2
**gives (3)**
51:25;73:12;170:7

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 189 of 207

**giving (4)**
10:17;72:12;94:10;127:10
**glad (2)**
40:3;99:15
**glare (1)**
47:18
**Glassman (5)**
79:16;112:15,25;128:17;176:15
**glitch (1)**
131:15
**glutinous (1)**
56:20
**goal (2)**
10:1;153:9
**goes (12)**
24:20;27:21,22;39:6;55:25;56:19;75:7;76:9;125:25;136:2;162:18;163:10
**go-forward (5)**
11:15;34:18,20;41:1;85:3
**Good (70)**
5:15,16,17,18,19;8:1,20;9:6;19:10;30:8,11,12,21,22;31:11;46:16;47:12,14;64:22;79:9;83:23;95:4;96:24;97:1,11,13;100:11,13,16,17;105:3;106:8,9,10;113:4;116:5;118:7;119:23,25;120:19,21;125:10,11;135:8,12;140:7,8,9;141:15;143:20,21;152:11,12,15;161:8,17;163:6;165:13,14;166:20;170:22,23;171:22;173:13,15;174:6,6,7;175:11;177:24
**Goodbye (1)**
47:6
**Goodman (1)**
131:7
**goods (1)**
135:17
**Gordon (1)**
128:17
**Gorton (7)**
79:15;112:14;113:11;114:5;139:2;176:15,20
**Gorton's (2)**
115:9;128:6
**Gospel (1)**
93:14
**gotcha (2)**
76:3;143:23
**Gotshal (1)**
8:22
**governed (3)**
122:19;123:10,12
**governing (2)**
88:22;89:16
**government (4)**
127:20;128:3;129:19,21
**governmental (9)**
22:12,15,23;25:2,6,15;127:17;141:6;147:12
**governor (6)**
10:12,14,23;36:9,16;150:10
**Governor's (8)**
9:13,21;10:16,16,20;30:17;36:1;150:11
**grant (1)**
79:18
**granted (1)**
93:2
**grants (1)**
132:5
**graphics (1)**
56:5
**great (3)**
43:25;101:17;121:1
**greater (1)**
63:13
**Gregory (1)**
165:15
**grid (1)**
18:25
**gross (2)**
27:20;94:15
**ground (1)**
62:1
**grounds (1)**
33:23
**Group (24)**
16:24;18:9;20:19;71:23;73:10;81:8;86:10;87:4,16;89:13,14;103:22,23;128:7;147:14;155:14;159:19,21;161:4,10,11,18;173:17;175:7
**groups (5)**
18:13;153:10;159:6,11;160:1
**group's (1)**
88:5
**guarantee (4)**
33:19;128:5,18;161:24
**guarantor (1)**
67:17
**guess (15)**
17:15;47:9;58:10,14;63:11;64:18;67:12;106:2;133:1;139:9;143:2;146:6;152:20;174:15;176:4
**guidance (3)**
50:6;61:5;158:16
**gun (1)**
160:23
**guys (1)**
150:25

## H

**hair (2)**
150:14,16
**haircut (3)**
150:9,11;151:11
**half (3)**
6:7;87:16,18
**Hallisey (19)**
120:13;143:11,15,19,21;144:9,14,17,19;145:3,7,18,25;146:4,17,25;147:7,9,20
**hand (8)**
112:20;113:1;169:18,22;172:21;173:2,10;176:22
**handful (2)**
12:22;49:22
**handle (1)**
151:5
**hang (1)**
112:21
**hanging (1)**
113:18
**happen (2)**
168:22;171:2
**happened (5)**
6:1;50:3;80:23;127:2;164:2
**happening (1)**
29:10
**happens (5)**
23:15;35:8;75:3;114:19;162:17
**happy (4)**
88:7;93:23;95:22;150:1
**hard (4)**
6:10;19:16;84:17,24
**hardcopy (1)**
18:23
**hard-fought (1)**
9:6
**hardly (1)**
71:25
**harm (3)**
67:5;76:1;110:12
**harmed (3)**
110:8,8;159:21
**Harris (14)**
115:24;116:3,4,5,8,13,13,21;118:18,22,25;119:6,17;120:1
**haste (1)**
63:19
**hate (1)**
26:11
**Hauer (1)**
83:24
**head (2)**
164:3;171:22
**heading (1)**
100:1
**heads (4)**
78:8;90:18;100:6;170:6
**heads-up (1)**
8:12
**Health (1)**
101:5
**hear (51)**
5:9;6:11,12,14,15;37:2;39:24;47:11,12;48:21;50:12;77:24;79:6,10,11;85:25;86:1,2;95:2;96:25;97:2;101:15,20,21;104:15,25;105:23;120:22;126:20,21,22,23,25;127:1;136:6,21,23;137:1;138:16;142:8,10;148:9,14,17;151:9;152:13;166:5;167:15;171:18;176:8;177:6
**heard (43)**
7:19;15:16;20:25;21:10,12;46:22;66:3;82:2,9,13,21;83:2;85:4,13;104:11,14,16,24,25;105:2,23;112:18;120:10,15;128:19;130:18;131:12;137:21;139:6,10;141:13;147:10,16;148:2;166:13;168:20;170:8;172:22;175:3,4,4,22;177:6
**hearing (21)**
8:25;14:3;16:6;17:1;24:16;40:9,19;77:16,18;85:7;86:24;102:19,20;103:24;113:14;120:2;125:21;133:10;144:20;176:1;177:22
**hearings (3)**
20:9;25:11;37:24
**held (10)**
32:12,25;65:15;70:3,7,21;72:13;73:7;75:19;114:14
**Hello (3)**
85:25;115:20;148:15
**help (3)**
15:20;59:10;151:9
**helpful (4)**
16:13;17:23;18:24;98:23
**helpfully (1)**
117:17
**helping (1)**
32:8
**herein (1)**
18:3
**here's (5)**
107:11;109:10,12;138:1;168:3
**hereunder (1)**
18:2
**Hi (1)**
171:24
**highlight (1)**
121:10
**himself (1)**
79:16
**historically (2)**
32:14;89:5
**history (1)**
31:24
**hit (1)**
29:11
**hoc (10)**
16:22;83:25;84:12,15,20;85:8,17;86:10;87:4;95:8
**hold (9)**
6:20;48:15;54:6;79:21;84:13;94:10;151:19;164:12;172:12
**HoldCo (8)**
44:18;53:16;68:24;69:2,15;70:18;71:3,7
**holders (5)**
48:10;73:8;74:21;89:6;95:8
**holding (1)**
110:25
**Holdings (1)**
70:17
**holds (1)**
76:14
**home (7)**
16:17;66:18;67:6;86:4,5,6;174:7
**homeowner (1)**
66:18
**homework (2)**
115:7;168:25
**Honor (268)**
5:8,10,16,19,22;6:2,10;8:20,23;9:4,7,16,17,20,23,25;10:1,3,7,10,15;11:6,11,19,21;12:7,14,15,20,23,25;13:4,10;17:7,12,16;19:21;20:5,7;22:13;23:1,5,9,11,20,25;24:7,21;25:7,10;26:4;27:21;28:1,14;29:19,25;30:3,11,13,20;31:9,22;32:19;33:12,14,20,24;34:7,17;35:2,7,10,22;36:3,12;37:4;38:1,8,14;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 190 of 207

39:8,14,16;40:8;41:5, 16;42:21;46:11,23; 47:12,21;48:19;54:18; 62:19,25;65:12;66:20; 67:1;68:13,22;69:18; 71:7;74:19;76:4;79:1, 4,11;83:21,23,25;84:2, 5,9,23;85:4,8,13,16,19; 86:1,8,11,15,18;87:2, 14,17;88:13,21;89:10, 17;90:1,3,21;91:8; 92:7,12,16,18,25; 93:18,22,24;94:3;95:6, 13,22;96:15;97:1,13, 23;98:1,4,7,22;99:7; 100:17,24;101:13,20; 102:7,10,23;105:10; 106:5,8;110:15;112:1, 7,13,23;113:6;114:5; 115:17,25;116:5,13,16; 117:8,11;118:22; 119:7;120:17,21; 121:1,22;124:1;125:4, 11,16,18,23;126:2,21, 25;127:12,15;128:10, 25;129:4,15;130:12; 131:2,5,21;132:3,19; 133:1,12,16;134:17; 135:7,8;136:9;138:21; 140:8,12,16,18;141:10, 15,19,24;142:5,10,17; 143:4,6,21;144:1,10; 147:1,7,24;148:1,8,21; 149:25;150:8,19; 151:22;152:12,17,25; 154:6,12,25;159:7; 161:7;162:2,10,24; 163:3;164:3,22;165:1, 14,22;168:14;169:17; 170:3,23;171:4,13,20; 173:4,15,21;176:11
**Honorable (2)** 5:6;106:20
**honorably (1)** 87:4
**Honor's (7)** 84:12;92:21;98:20; 99:1;117:3;121:23; 164:6
**hook (1)** 128:15
**hope (10)** 29:12;82:12;99:9; 106:15;113:4;131:15, 21;143:21;147:10; 150:9
**hopeful (7)** 29:6;100:2,5;141:11; 168:22;173:25;174:2
**hopefully (4)** 47:20;99:6;156:15; 168:21
**hoping (1)** 119:11
**host (2)** 107:12;110:2
**hostage (1)** 114:14
**hour (4)** 79:15;81:10,17; 95:15
**hours (8)** 6:7,23,25;7:5;99:4,5; 135:1;147:13
**house (1)** 67:7
**housekeeping (1)** 7:3
**How's (1)** 102:2
**huge (1)** 176:3
**human (1)** 163:21
**hundred (6)** 56:4;59:12,13,14,15; 75:10
**hundreds (3)** 48:21;105:2;163:16
**hung (1)** 111:11
**hurt (1)** 137:9
**hypothetical (5)** 55:20,24;56:7;58:19, 19

**I**

**idea (5)** 48:23;90:8,24;142:3; 163:22
**identical (3)** 65:23;159:11;166:7
**identification (2)** 82:10;141:25
**identified (4)** 89:5;128:16,16; 175:6
**identify (4)** 89:19;92:17;158:15; 174:19
**identifying (1)** 82:9
**ignited (1)** 55:24
**ignition (1)** 52:8
**ignore (1)** 23:13
**ignoring (1)** 7:22
**II (2)** 71:14;76:6
**III (1)** 119:12
**image (1)** 7:11
**imagine (1)** 154:18
**imitation (1)** 83:21
**immediately (6)** 14:2;16:6;53:19; 54:5;55:11;113:22
**immune (1)** 122:14
**impact (1)** 87:15
**impediment (3)** 12:6;35:21,21
**impending (1)** 9:2
**implant (1)** 158:19
**implants (1)** 158:22
**implement (4)** 10:19;11:8;34:22; 98:25
**implemented (1)** 34:22
**implicates (1)** 15:19
**importance (1)** 103:18
**important (9)** 15:11;24:7;38:5,15; 60:24,24;80:14; 129:15;131:2
**importantly (4)** 9:17;30:24;34:6; 154:2
**imposed (1)** 86:23
**impossible (2)** 68:25;78:12
**impressive (1)** 95:11
**improper (1)** 132:16
**inappropriate (3)** 25:20;27:3;130:16
**inappropriately (1)** 25:17
**inception (3)** 9:18;32:20;39:13
**incidentally (2)** 11:21;12:21
**inclined (2)** 10:8;90:1
**include (8)** 14:10;20:18;94:3; 103:8;108:16;122:11; 124:5;157:13
**included (11)** 22:9;34:4;90:25; 91:8;103:13,16; 108:22;123:2,13; 124:7;134:18
**includes (8)** 23:25;51:9;53:22; 55:10;103:15;108:1; 124:6;134:18
**including (16)** 9:13;30:14;33:10; 34:9;35:12;37:12; 42:11;54:16;55:13,15; 89:4;93:22;98:10; 108:2;167:23;169:2
**income (5)** 44:24;45:1,3;64:16; 145:10
**incomplete (2)** 108:17;109:16
**inconsistent (2)** 117:22;119:3
**inconvenienced (1)** 37:11
**incorporate (1)** 99:7
**incorporates (1)** 87:2
**incorrect (2)** 61:4;156:20
**incorrectly (1)** 88:16
**incredible (1)** 139:15
**incurable (1)** 135:13
**indeed (3)** 9:10;31:19;152:23
**indemnification (10)** 14:11;15:7;80:11; 81:15;82:2,10,16; 139:7,21;165:25
**indemnity (6)** 27:18;80:16;81:22; 166:21;169:25;175:18
**indenture (1)** 14:3
**independent (1)** 123:4
**independently (1)** 78:1
**indicate (1)** 143:1
**indicated (12)** 6:6;11:6;12:18; 13:18;35:23;79:22,24; 80:9;82:21;144:21; 165:2;176:18
**indicates (1)** 33:20
**indicating (1)** 142:23
**Indiscernible (3)** 110:15;134:6;138:7
**individual (5)** 91:11,16,17;122:22; 134:13
**individually (2)** 116:15;138:23
**individuals (1)** 34:7
**inflated (3)** 51:10;53:24;54:14
**infliction (1)** 91:20
**information (3)** 124:22,23;125:1
**informed (2)** 85:15;176:21
**initiatives (1)** 34:23
**injunction (1)** 113:10
**injured (1)** 109:24
**injury (7)** 32:17;90:25;92:5; 157:1,4,14;158:3
**innocent (2)** 122:5,22
**input (2)** 10:17,18
**insinuation (2)** 63:11,16
**insinuations (2)** 38:18;39:14
**insofar (1)** 32:2
**instances (1)** 89:19
**institutions (4)** 32:13;84:13,21;87:5
**instruct (1)** 82:2
**instrumental (1)** 26:14
**insurance (31)** 32:12;34:13,19; 35:11;65:8,14,17,23; 66:1,4,6,14,17,21;68:5; 75:11,13,15,18,20; 76:1,16,18;91:13; 107:21,23;108:5,5,9; 110:19,20
**insure (1)** 92:5
**insured (5)** 66:24;91:11;110:10, 18;156:21
**insurer (4)** 66:16,17;67:5,8
**insurers (1)** 156:20
**insuring (1)** 92:4
**integrity (2)** 38:4;39:9
**intend (2)** 78:4;90:11
**intended (1)**

80:10
**intention (3)**
8:9;104:17;105:7
**intentional (1)**
104:7
**intentionally (1)**
104:19
**interest (17)**
25:11,13;38:19;40:8,14,20;41:4,6;50:2;55:4;57:21;84:22;107:10;129:3;140:17,23;141:5
**interested (2)**
24:17;128:4
**interesting (2)**
49:2;111:17
**interests (5)**
9:12;31:18;49:20;85:14;90:10
**interfering (1)**
150:15
**International (4)**
70:20;93:13;158:25,25
**internet (2)**
16:17;150:15
**interpretation (6)**
17:12,18;26:3;98:11;133:2,5
**interpreted (2)**
115:4;125:24
**interrupt (5)**
18:10;50:10;148:13;150:3;176:13
**into (20)**
15:12;28:15;43:1;44:1;46:9;50:25;74:4;78:18;88:1;90:9;104:8;123:22;124:23;130:1;145:9;153:6;157:25;161:6;165:5;177:7
**intrinsic (2)**
51:9;53:23
**invaluable (1)**
12:9
**invented (1)**
28:2
**invention (1)**
154:1
**inverse (1)**
90:9
**invested (1)**
51:14
**investment (2)**
27:15;56:10
**investors (2)**
84:21;163:14
**invitation (1)**
151:12
**invitations (1)**
99:18
**invite (5)**
82:13;112:10;131:15;138:3;145:25
**invited (1)**
104:17
**invites (1)**
94:4
**inviting (1)**
139:9
**involuntary (2)**
20:6;126:15
**involve (2)**
32:3;166:7
**involved (2)**
9:9;27:25
**involving (2)**
69:2;163:21
**irrelevant (1)**
64:25
**issue (71)**
15:8,12,18;16:3;19:5;22:1;23:18,19;24:11;25:10;30:12;37:2,10,15;38:21;40:11,13,17;41:7;43:7,10,21;49:3,14;50:11;62:23;65:20;66:1;67:20;68:22;71:5;80:3,15;82:1,3,11,15;87:24;88:6;89:14;90:22;92:16;101:5,8;103:3;112:4;115:5;126:8;127:14,15;128:9;132:3;133:8,19;134:12;139:7;140:25;141:2,17;143:2;148:13,19;149:15;154:20;161:19;166:2,4,25;167:2;170:11;177:15
**issued (7)**
44:19;50:2;64:23;71:4;77:24;100:8;133:4
**issuer (1)**
69:16
**issues (62)**
14:9,10,14,17,21;15:13;17:1,9,19,21;18:16;19:8,16;22:11;26:5,6;44:8;46:20;63:2;89:19;92:17;95:25;98:3,4,8,9;99:1,6,8,9,10,21,24;100:2,3;101:9;102:22;104:10;105:1;109:2,4;126:5,7;127:13,21;130:16,17;133:15;141:8;144:22;147:11;151:2;165:25;166:5;167:12,19;168:17;169:25;173:25;174:19;175:18,20
**item (5)**
37:17;80:25;88:13;129:4;177:3
**items (8)**
13:18;14:6;17:5;18:7;22:20;30:20;38:8;99:16
**iteration (1)**
20:9
**Ivanhoe (6)**
66:1,11,11;67:9,11,20

**J**

**JAMS (2)**
45:10;145:12
**January (1)**
10:2
**Jason (2)**
90:23;108:6
**Jim (1)**
47:16
**job (6)**
60:24;86:12;150:25,25;151:1;170:9
**Johnston (89)**
7:1;42:5;46:19;47:9,11,12,16,16;49:8,10;50:14,19,24;51:5,19,22;52:21,25;53:2,5,7,9,11,13;54:3,18;57:13,15,20;58:1,3,5,18,24;59:2,4,8,19,24;60:10,12,17,21;61:2,8,16,21;62:3,4,10,13;64:2,7,14;66:9,13,20;67:1,13,16,23;68:1,4,9,12,18;69:23;70:3;72:6,9,19,22;73:18,21,25;74:12,15;75:4,7,21,25;76:4,23,25;77:4,6;78:24;79:1;81:20
**join (2)**
47:14;97:7
**joinder (1)**
102:19
**joined (1)**
129:1
**joining (9)**
5:11,14;79:8;96:20;97:4,5;120:17;148:4;165:10
**joint (1)**
76:10
**Jones (2)**
8:24;47:16
**Judge (15)**
12:10;36:24;37:9;70:1;113:15,17;115:20;132:23;154:10,17;155:5,6;170:10,14;171:24
**judgment (5)**
107:7;111:2;139:14,14;156:10
**judicata (1)**
131:25
**judicial (4)**
92:10;103:2,9;133:6
**juggling (1)**
175:5
**Julian (9)**
29:12;80:24;81:8,9;88:7,12;131:16;146:2;177:3
**jumped (1)**
160:22
**JUNE (3)**
5:1;9:15;86:23
**jurisdiction (7)**
93:6;132:4,6,10,13,15,20
**justification (2)**
31:22;162:4

**K**

**Kaiser (1)**
50:3
**Karotkin (160)**
5:10,15,16,24;6:3,10,13,15,19,24;8:5,18,20,21;10:15;11:1,6;13:10,12,16;15:9,24;16:1,5,19;17:15;18:11,21;19:2,9,11,15;21:2,4,6,9,13;23:5;25:4;27:2,7,10,17,21,25;28:7,21,25;29:18;32:6,8;36:10,12,16,20,22;37:3,14,17;39:23;40:7;41:16,20,24;42:2;43:6,18,22;44:3,11,14;45:4,7,13,15,20,22,24;46:1,3,11,14,17;47:15,23;48:1;71:19;74:19;77:7,10;78:24;80:6,9;81:19;83:8;85:7;92:18;93:19;95:16;98:8;112:10;114:17;115:2;118:1;119:19;120:1;124:21,25;127:18;136:20,22,23;137:4,7,19;138:21;139:11;140:4;141:12;145:4;146:1;147:11,15;148:1,7,9,10,12,15,17,19;149:4,7,9,12,14,17,25;150:7,9,14;154:15,17;166:17;167:21;168:1,12,15,25;174:3,10,11,17;175:11,21;176:8,11,13,24;177:19
**Karotkin's (5)**
115:7;119:22;142:25;147:17;167:1
**keep (11)**
15:2,14;26:24;55:23;76:8;85:14;104:21;142:16;148:3;149:2;174:6
**keeping (3)**
119:23;170:12;176:21
**Kelly (4)**
170:17;172:23;173:5,22
**kept (1)**
24:23
**keyed (1)**
175:18
**Khaldoun (1)**
173:10
**Kincade (1)**
18:6
**Kincaid (1)**
34:14
**kind (9)**
18:25;29:16;92:6;95:9;114:21,22;118:12;123:5;129:5
**kinds (1)**
123:12
**King (1)**
50:1
**Klein (4)**
113:15,17;115:20;132:23
**knowable (1)**
157:16
**knowing (1)**
58:14
**knowledge (1)**
10:20
**known (6)**
38:21;39:1;126:10;157:17,19,20
**knows (3)**
11:19;13:4;155:6
**kudos (1)**
119:11

**L**

**labor (1)**
169:13
**lack (2)**
38:9;71:8
**Laffredi (25)**
78:8;80:2;120:9,16,17,18,21,24,25;121:1,18,20,22;122:10,25;123:6,17,19,25;124:3,13,18;125:4,5,7
**landlord (1)**
135:3
**language (34)**
16:12;17:6,18,25;18:1,8;20:18,19,21;21:7;22:4,6,9,13,14,17;

23:2,10,16;24:25;28:1, 2,5;41:17;42:24;94:17; 98:13;99:23,24;103:8; 117:5;127:25;140:20, 22
**languages (1)** 98:12
**laptop (1)** 144:4
**large (7)** 11:23;16:23;22:2; 48:9;56:3;81:8,9
**largely (6)** 17:8,8;89:15;95:17; 96:6;176:16
**larger (1)** 60:3
**last (32)** 10:2,22;17:16;20:20; 24:22,23;29:5;38:18; 42:4;61:13;71:11;73:2; 86:13;92:16;93:17,18; 94:19;95:11;98:2;99:3, 23;100:8;101:7;116:7, 9;124:3;146:5;166:14; 173:17;175:7;176:24; 177:2
**Lastly (4)** 41:8;42:3,17;133:1
**late (4)** 17:14;24:22;151:16; 170:25
**later (13)** 12:3;16:3;20:3; 63:22;78:2;80:3;82:1, 12;83:5;114:17;117:3; 137:2;166:18
**latest (1)** 48:18
**latter (2)** 99:19;164:17
**law (25)** 15:3;20:11,15;26:18; 31:16,21;33:20;36:7; 65:13;69:18;88:22; 91:13;92:3;118:20; 122:7,10,18;123:10; 132:14,21;135:13; 153:6;161:9,13;162:6
**lawsuits (1)** 28:9
**lawyer (7)** 105:2;122:4,17,20, 20;139:1;154:1
**lawyers (12)** 15:15;78:6;94:12; 122:3;123:11;137:23; 139:3,10;142:13,15; 170:9;175:23
**lay (1)** 103:7
**layers (1)** 75:18
**laymen's (2)** 45:5;46:9
**lays (1)** 76:11
**lead (3)** 45:21;48:15;97:22
**leader (1)** 139:2
**learn (1)** 52:13
**lease (5)** 135:3,8,13,14,15
**least (11)** 10:20;18:23;36:25; 39:10;81:4;114:25; 118:16;123:16;139:24; 157:15;164:20
**leave (19)** 7:13,14;28:11;77:19; 78:22,24;83:3;104:24; 105:21;106:24;112:9; 115:7,14;123:23; 136:5;147:5,22; 164:24;168:24
**leaves (1)** 96:12
**led (1)** 104:9
**leeway (1)** 163:5
**left (10)** 51:25;52:23;53:20; 54:1;55:4;57:16;92:13; 121:7;138:15;169:23
**left-hand (1)** 101:25
**legal (8)** 32:11;46:6;89:7,19, 25;90:2;156:19;167:24
**legally (1)** 156:20
**legitimate (7)** 23:17;73:10;89:1,4; 107:5;159:15;162:6
**legs (1)** 7:23
**Lehman (4)** 70:14,15,16,19
**length (1)** 30:22
**less (3)** 7:5;40:23;172:25
**level (6)** 49:5;69:5;70:6; 72:24;156:23;167:13
**level-set (1)** 13:17
**liabilities (4)** 23:22;24:3,17;160:8
**liability (16)** 32:11,15;34:10,16; 66:24;67:2;75:20; 91:19;92:6;108:9; 109:1;110:21;122:24; 155:18;159:7,12
**liable (3)** 75:17,20;122:21
**light (2)** 97:18;113:9
**likelihood (1)** 33:19
**likely (7)** 11:14;24:13;40:23; 52:12;61:25;95:24; 162:21
**likes (1)** 48:15
**limit (1)** 19:16
**limitation (2)** 107:23;134:20
**Limitations (1)** 126:10
**limited (7)** 26:19;27:10;92:11; 108:24;126:17;127:6; 167:6
**line (4)** 52:24;137:22; 139:25;154:16
**lingering (1)** 100:3
**linked (1)** 80:17
**Liou (2)** 174:23;175:21
**liquidate (1)** 93:5
**liquidated (1)** 156:5
**liquidation (2)** 24:5;40:18
**list (22)** 8:7;18:12;43:5;78:1; 79:23,25;83:13;89:22; 112:14;120:8,9;124:6; 137:3;139:18,19,20; 143:1;160:16;164:25; 168:12;170:16;175:17
**listed (2)** 22:19;125:15
**listen (4)** 8:15;50:12;149:24; 177:11
**listened (1)** 90:23
**listening (3)** 7:24;24:16;169:4
**literally (3)** 9:5;12:22,24
**litigants (1)** 68:5
**litigate (1)** 93:4
**litigation (4)** 26:1;62:1;94:4; 159:10
**little (21)** 6:5;14:12;46:12; 52:24;56:10;59:10; 76:19;77:14;81:24; 82:19;91:5;97:14,16; 102:8;104:2;127:16; 136:15;138:3;144:24; 163:5;171:21
**lives (1)** 13:2
**LLP (1)** 165:15
**lodged (1)** 50:16
**log (5)** 7:15,17;77:21,21; 116:6
**logical (2)** 55:7;75:2
**logically (1)** 33:5
**logo (2)** 7:11;77:20
**long (5)** 29:5;73:9;133:7; 164:7;177:14
**longer (4)** 35:9;107:8;117:6; 169:11
**long-term (2)** 31:5;84:22
**look (25)** 8:7;16:8;18:23; 19:24,25;20:3;26:4; 54:8;70:13;76:17; 77:12;78:22;82:17; 86:3;87:11;91:24; 97:19,20;127:12; 128:2;139:22;148:23; 154:7;169:14;177:21
**look-alike (2)** 83:19,21
**looked (4)** 91:24;150:12; 157:12;161:15
**looking (4)** 46:2;119:4;127:19; 151:4
**looks (1)** 143:14
**loose (2)** 100:12;102:8
**loser (1)** 94:5
**loss (4)** 40:25;59:16,17; 114:21
**losses (3)** 48:25;55:16;57:5
**lost (14)** 5:25;6:20;11:4,15; 15:14;54:4;55:2;56:7; 58:20;66:18;67:6; 126:19;142:8;163:21
**lot (18)** 7:19;17:19;19:20; 43:24;92:18;93:22; 104:13;121:3,9; 123:23;131:8;155:22; 163:2,8;168:19; 169:25;170:3;172:25
**loud (1)** 85:13
**loudly (1)** 13:1
**love (2)** 119:14;158:17
**lower (1)** 101:25
**Lube (1)** 161:24
**luck (1)** 174:7
**lumped (1)** 161:5
**lunch (1)** 137:16

## M

**made- (1)** 93:7
**made-whole (5)** 92:17,20;93:2,11; 101:6
**mailbox (2)** 82:5,6
**main (1)** 140:16
**major (6)** 32:25,25;52:12; 54:16;159:20,21
**makes (13)** 19:17;32:17;55:25; 66:25;122:5,20,22; 166:6,16;167:4,11; 169:24;170:3
**making (3)** 22:17;69:20;112:10
**malpractice (1)** 122:21
**Malter (1)** 116:14
**manage (3)** 72:13;82:9;96:1
**managed (1)** 176:25
**management (1)** 72:14
**managing (1)** 151:1
**Manges (1)** 8:22
**manner (1)** 31:9

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 193 of 207

**manufacture (1)**
158:21
**many (22)**
15:6,15;21:16;26:12;44:2;48:8;52:15;64:17;84:19;91:10;93:22;137:10;139:4;150:23;151:17;157:4,7,10;160:19;163:21;166:15;170:18
**marathon (1)**
78:19
**March (2)**
63:6,22
**mark (1)**
75:6
**market (19)**
24:9;51:8;52:1,11,18;53:21,21;54:3,4,4,9;55:10,13;56:9;58:7;59:16,17;63:7;76:21
**marketed (1)**
24:12
**marketing (1)**
24:15
**markets (1)**
35:17
**marking (1)**
169:4
**Marshack (12)**
147:25;148:4,5;150:5,8,13,17,19;151:22,25;152:1,5
**Marshack's (1)**
149:23
**mass (1)**
161:15
**massive (2)**
57:2,5
**massively (1)**
55:15
**master (6)**
91:9,10,16,17,21;159:10
**match (1)**
41:22
**material (1)**
102:23
**materialized (1)**
134:14
**math (1)**
45:19
**matrix (1)**
157:25
**Matter (9)**
5:6;12:24;16:16;28:23;59:13;74:25;90:19;110:11;148:25
**matters (8)**
8:17;17:4;81:5;100:14;127:22;132:6;157:6;159:19
**Matthew (1)**
86:10
**maximum (2)**
53:14;170:19
**may (39)**
11:1;14:14;20:7;26:1,6;31:19;46:12;66:23;71:19;73:7;78:9,17,21;82:19;83:5,22;98:5;100:7;105:4;122:14,21,21;124:8,8,10,11,12,13,14;131:19;139:5,5;141:20;145:15;150:5;160:22;165:4;168:20;173:8
**maybe (13)**
15:20;29:14;52:22;68:7;78:5;104:25;109:16;111:16;139:1;149:23;157:15;168:4,10
**Mayer (1)**
45:12
**mean (28)**
7:22;21:6;27:6;36:14,15;40:24;41:14;44:7;50:11;59:12;61:18;62:7,8;99:17;109:23;111:20;112:16;131:15;133:25;134:11,15;138:9;162:3,11,18;168:6,19;172:7
**meaning (2)**
40:1;80:10
**means (6)**
25:12;44:22,23;49:13;74:21;75:25
**meant (1)**
63:17
**mediating (1)**
29:13
**mediation (2)**
130:23;145:21
**meet (3)**
9:15;34:3;86:23
**meet-and-confer (1)**
171:1
**mem (1)**
103:24
**member (1)**
122:5
**members (9)**
27:22,23;32:21,22;84:20;94:12;159:18;163:8;173:23
**memorandum (12)**
12:2,12;13:5;26:10,17;30:5;35:23;88:5;98:20;103:6,15;104:4
**memorized (1)**
68:11
**memory (2)**
102:8;158:17
**mention (5)**
38:5;87:22;129:4,16;133:2
**mentioned (6)**
41:16;63:10;127:18;129:3;137:11;175:7
**mentions (2)**
129:24,25
**mere (2)**
33:21;161:12
**merits (3)**
90:20;100:15;138:10
**Mesa (1)**
161:20
**message (3)**
7:25;82:22;165:1
**methodology (7)**
48:6;55:13;56:15;59:4;61:4;76:11;96:12
**Mexico (1)**
48:14
**Meyer (7)**
45:13,13,13,15,17;46:14;145:12
**microphone (4)**
46:19;101:18;143:14,16
**mid (1)**
18:20
**midday (1)**
18:22
**mid-day (2)**
138:13,14
**middle (2)**
97:9;135:19
**mid-morning (1)**
139:23
**might (21)**
7:22;8:6;16:13;17:23;24:14;75:15;76:18;94:5;110:21;111:12,13;124:14;129:21;135:22;146:12;149:6,8;151:19;160:22;167:16;173:19
**Mike (1)**
95:7
**Milbank (1)**
165:15
**million (5)**
35:14;56:4;59:12;108:10,18
**millions (2)**
48:21;163:16
**mind (12)**
14:22;24:11;39:25;55:23;81:25;90:14;104:3;118:15;123:15;139:13;151:7;166:16
**minimize (2)**
34:25;103:18
**minimizing (1)**
123:8
**minor (2)**
95:25;101:8
**Mintz (16)**
17:1;96:18,24,24;97:1,5,10,20,22,24;98:1;99:20;100:17,19,22;104:12
**Mintz' (1)**
100:25
**minute (8)**
6:20;14:5;18:10;43:9;54:7;119:7;165:8;168:4
**minutes (33)**
7:15,17;13:13;44:8;77:15,17;80:24;81:12;83:17;84:9;95:5,14;97:25;102:6,6;106:16;116:11;120:25;125:13;136:16;140:11,13;144:15;147:18;150:18;151:24;152:15;163:2;165:16;170:21;172:1;176:4;177:10
**mirrored (1)**
91:16
**misapprehends (1)**
62:19
**mischief (1)**
75:17
**misconduct (2)**
26:22;94:15
**miss (1)**
113:13
**missed (1)**
46:18
**missing (1)**
57:14
**misspoke (1)**
64:7
**misstate (1)**
13:25
**misstated (1)**
54:23
**mistake (5)**
25:16;63:17,22;66:25;148:24
**mistaken (1)**
36:20
**misunderstanding (3)**
88:21;115:6,8
**mitigate (1)**
34:23
**mitigation (1)**
31:4
**modest (1)**
56:20
**modifications (5)**
16:20;17:7;19:22;20:2;42:19
**modified (7)**
20:10;22:5,16;23:17;25:21,21,22
**modifying (1)**
16:12
**Molton (3)**
100:10;131:16;177:4
**moment (12)**
5:8;6:22;79:19;83:10;101:19;117:10;138:25;146:8;148:8;156:14;169:21;171:3
**Monday (2)**
45:10;85:5
**monetization (1)**
24:6
**money (10)**
24:12,13;49:15,15,16;94:8;135:22;162:22,23;164:21
**monies (1)**
33:8
**monkeyed (1)**
63:12
**Montali (1)**
5:6
**month (1)**
100:8
**months (11)**
9:5;11:13;20:8;35:8;54:17;61:25;84:4;85:1;86:13;95:11;144:22
**Montreal (1)**
161:20
**mooted (1)**
88:4
**more (54)**
10:14;11:13;13:14,14;15:18;19:14;24:1;29:9;30:7,7;33:7;34:6,8;35:12,19;39:8;42:9;48:4;54:13;56:18;59:10;63:3;66:21;73:8;75:7;82:19;90:22;91:11;92:17;99:14;109:17;111:12,16;113:23;120:3;131:14;134:21;135:22;137:14;144:15;146:1,15;154:2;160:8,12,18,19;165:6;169:12,13;175:11,12;176:4,11
**moreover (1)**
24:6
**morning (30)**
5:15,16;6:9;8:21;16:3;19:18;29:17;36:25;47:13,14,23;80:17;83:6;89:10;92:19;95:15;98:8,14;101:9;108:3;121:5,24;133:4;138:16;151:16;156:18,25;159:16,20;177:9
**most (13)**
6:13;9:17;16:20;19:17;23:4,7;30:24;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 194 of 207

41:5;95:17;127:23;
167:9,11;175:2
**mostly (2)**
18:14;24:13
**motion (6)**
38:2,17;83:6;138:7;
176:1;177:11
**move (12)**
8:7;26:7;36:2;63:4;
65:6;68:15;79:17,19,
24;140:5;144:4;165:17
**moved (10)**
78:2;113:6;120:12;
135:3;138:4;139:18;
147:4;151:16;171:7;
177:2
**moving (4)**
10:21;15:22;79:23;
137:14
**much (34)**
9:1;15:18;54:10,18;
60:3,5,6,23;65:15;84:1,
4;85:20;99:13;101:12;
102:8;105:11;112:6;
115:10;121:2;124:17;
130:25;132:24;134:10;
136:12;137:14;138:14;
146:15;151:19;169:10;
170:10;172:11,15;
175:22;176:22
**multiple (5)**
52:9;66:11,12;89:3;
145:11
**multiplied (1)**
44:23
**municipalities (4)**
32:25;33:1;159:20,
21
**must (6)**
38:21;40:1,12;50:6;
70:10;71:4
**must've (2)**
38:25;40:1
**myself (4)**
6:25;10:13;171:5;
174:23

**N**

**name (15)**
7:22;26:24;72:5;
77:20;95:1;96:21;
102:13;116:7,9;
120:18;143:13,22,22;
165:11;171:16
**names (2)**
120:14;172:3
**narrow (2)**
82:13;117:2
**narrower (1)**
82:15
**nature (2)**
7:12;32:18
**NCPA (4)**
23:4;25:1;27:1,1
**nearly (5)**
54:10;56:18;57:23;
108:18;121:2
**necessarily (3)**
29:1;104:15;122:24
**necessary (10)**
9:14;10:6,18;11:8;
29:9;30:3;35:18;85:9;
141:14;174:1
**need (54)**
6:24;7:17;8:2;9:13;
15:19,20;19:13;45:5;
47:9;51:20;60:19,20;
78:6,21;80:21;81:1,3,
11;95:13;96:7,22;
101:18;104:17;108:23;
111:22;116:3;120:19;
137:12,20,23;139:5,19;
141:11,12;143:14,15;
144:15;146:18;149:23;
152:21;157:19,20;
158:6;160:8;165:12;
168:13,20,23;171:16;
172:25;173:13;174:20;
176:9;177:16
**needed (4)**
11:2;80:15;128:9;
131:9
**needs (4)**
28:19;80:24;81:9;
141:8
**negligence (13)**
27:6,19,20,20;93:20;
94:2,3,6,9,15,16;
121:24;122:20
**negligent (2)**
91:20;122:6
**negotiate (1)**
131:12
**negotiated (7)**
30:14;32:14;109:11,
15;130:12;137:5;
145:21
**negotiating (3)**
29:13;31:24;131:5
**negotiation (3)**
26:15;27:25;29:5
**negotiations (5)**
9:6;29:3;30:23;
33:14;173:24
**neither (1)**
21:14
**NENI (6)**
43:19;45:2;64:16,22,
25;65:3
**nerd (1)**
49:2
**net (6)**
44:24;45:1,3;64:16;
74:5;145:10
**Neumeister (8)**
94:25;95:1,3,6,7,13;
96:4,10
**nevertheless (4)**
22:15,15;40:16;
122:6
**New (14)**
37:13;44:18;48:14;
50:2;56:23;64:23,24;
65:3;71:25;74:2;79:18;
130:25;164:10,10
**news (1)**
174:6
**Newsome (1)**
12:10
**next (16)**
45:9,10;55:22;56:1;
78:2;85:12;94:25;
101:15;106:7;116:6;
125:9;129:4;145:12;
147:25;152:9;164:25
**nexus (1)**
132:8
**nice (4)**
116:4;151:10;
152:16;177:20
**night (6)**
17:14,16;24:22,23;
99:23;146:6
**nine (1)**
154:5
**nineteen (1)**
159:25
**Ninth (4)**
20:15;69:18;70:13;
72:3
**Nobody's (1)**
109:21
**nonbankruptcy (3)**
129:10,12;140:24
**nonconfirmable (1)**
88:18
**nondebtors (1)**
127:22
**None (5)**
20:6;50:5;115:11;
146:23,23
**nonestate (3)**
124:4,6,9
**non-estate (1)**
124:15
**non-issue (1)**
131:19
**nonlawyer (1)**
122:18
**nonmonetary (3)**
135:6,12,14
**nonproperty (1)**
91:1
**nonshareholders (1)**
74:4
**nonvoting (1)**
41:15
**noon (2)**
77:15;79:14
**nor (5)**
12:23;21:14,17;
74:25;139:15
**normalized (6)**
44:24;45:1,2,3;
64:16;145:10
**Normally (2)**
49:13;123:13
**North (4)**
23:3;52:8;55:24;
159:10
**Northern (3)**
5:5;26:24;106:20
**note (11)**
9:21;11:24;14:2;
17:21;22:16;26:23;
35:7;54:10;128:3;
143:22;150:8
**noted (8)**
14:7;20:20;28:14;
32:10;40:9;62:25;
71:11;132:8
**noteholder (1)**
30:16
**noteholders (2)**
30:16;83:25
**notes (3)**
84:15;152:3,4
**notice (3)**
89:3;92:10;158:3
**noticed (2)**
63:21;164:4
**notify (1)**
175:20
**noting (1)**
48:12
**notwithstanding (1)**
63:15
**November (1)**
54:25
**novo (1)**
103:9
**number (39)**
9:11;11:22;22:19;
24:24,25;31:25;35:8;
38:22,25;42:12,18;
45:19;46:8;48:3;52:20;
53:1,15;61:25;64:9;
80:14;93:15;103:7;
107:15;108:7;114:8;
116:19,21;142:5;
145:11;146:10;149:3,
16;151:14;153:4;
154:21,21;160:6;
163:14;168:16
**numbers (4)**
53:3;56:3,5;63:12
**numerator (4)**
55:16;60:6;63:4;
65:6
**numerous (2)**
37:24;84:19
**Nursery (1)**
50:4

**O**

**objected (6)**
18:6,15;68:9;104:2;
117:1;133:24
**objecting (3)**
11:25;65:11;88:15
**objection (56)**
14:4;20:23;28:13,13,
18;42:17;48:13;49:1;
50:16,20,21,24;63:5,
14;64:22;65:13,25;
68:13;69:7,11;71:8;
81:15;87:18,19,20,21;
88:1,6;102:17,20,21,
25;105:19;114:14;
116:21;117:13;118:3;
119:22;121:8;124:3;
125:15,18;129:1,13;
130:18,21;131:13;
140:20,24;141:19;
153:1,3;163:2,10,12,25
**objectionable (1)**
25:1
**objections (47)**
12:13;13:5,6,19,21,
23;15:4;16:11,13,21,
22,24;18:17;19:23;
20:2;21:16;22:3,4;
26:2;28:16;39:7;42:6,
16,22,23;68:11,16;
87:15;89:12;102:18;
106:24;114:8;117:12,
18;119:24;121:6;
129:5,16,22;130:20;
137:10;140:16;142:4;
146:6;150:24;152:25;
166:14
**objectives (1)**
31:7
**objector (4)**
48:24;93:10;104:2,
22
**objectors (9)**
32:2,4;103:9,12,14,
19,23;104:1,4
**obligates (1)**
118:21
**obligation (4)**
123:1,4,20,21
**obligations (1)**
34:3
**observing (1)**
77:19
**obstacle (1)**
117:6
**obtain (1)**
85:9
**obvious (2)**
40:13;107:5

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 195 of 207

**obviously (12)**
18:16;29:16;37:8;47:21;56:3;62:5;75:12;90:7;118:9;121:3;154:23;168:19
**occasions (2)**
22:14;144:25
**occurs (2)**
71:19;73:13
**o'clock (3)**
16:7;169:10;177:9
**October (22)**
52:3,4,10,13,16;53:21;54:4,5;55:21,24;56:1;59:15,15;63:7,8,11,11,17,21;64:2,3,9
**off (23)**
7:21;29:13;47:2,3;62:1;75:11;78:25;79:19,23;92:24;93:1;96:13;98:4;110:9;135:23;136:14;139:18,19;147:5;150:2,7;163:17,23
**offer (7)**
18:11;71:22,25;72:2;106:12;151:18;159:8
**offered (4)**
71:20;107:4;117:17;159:16
**offering (13)**
24:8,9,10,13,15;71:16,18;73:6,13;74:2,20;75:3;107:7
**Office (14)**
9:13,21;10:16,16,20;30:17;36:1;75:16;86:4,5,6,7,7;125:17
**officer (3)**
66:15,24,25
**officers (12)**
27:23;107:2,4,8,20,24;108:1;109:1,18,20;110:9,10
**officers' (1)**
107:21
**offline (5)**
115:3;118:6;119:18;141:5;146:15
**offset (1)**
67:8
**Offshore (4)**
65:22;67:21,22,24
**OKFPRS (4)**
106:12,17;109:24,25
**Oklahoma (2)**
106:11,18
**omitted (2)**
54:23;91:21
**omnibus (1)**
111:24
**once (2)**
76:15;167:12
**One (99)**
5:8;6:5;10:11,14;11:17,22,24,25;13:21,23;16:21;17:17;22:19;24:21,23;28:16,18;31:25;36:13,21,23;37:10;38:22,23;44:11,17;45:10;46:5;48:13,13;51:25;52:25;54:19;55:13;59:15,17;63:16;69:3,15,16;72:8,9,10,12;73:8;75:10;76:13;80:25;89:18;90:22;91:11;92:8;93:10;95:21;97:8,16;98:15;101:7;102:18,19,22,23;104:18,21;105:24;107:17;108:18;109:6;122:19;124:18;126:8;129:4,15,25;139:22;141:16;145:6,8;146:7,7;148:8;150:24;153:6,15;155:9;157:5,13;160:6;161:15,23,25;163:4,14;166:25;167:24;169:21;175:1;176:11,24
**One's (1)**
122:17
**ongoing (6)**
23:22;24:4;29:2;33:2,3;35:1
**only (43)**
5:20;6:17;11:19,24,25;12:22;20:11;26:13;34:1;39:3;40:22;46:23,24;48:13,17;55:6;60:9;65:20;69:13;71:17,23;74:21;75:5;82:6;93:10;99:13,13;104:5;108:5,20;119:2;121:7;126:15;129:25;139:14;145:14,16;162:3;166:16;167:12;168:14,23;171:22
**on-point (1)**
72:3
**onset (1)**
85:12
**onto (5)**
70:11;71:4;110:25;113:18;163:23
**oOo- (1)**
5:2
**oop (1)**
5:25
**open (9)**
7:10;50:7;54:4;80:7,25;92:13;99:16;115:5;168:17
**opened (3)**
53:21;82:5,20
**opening (6)**
7:6;12:3;47:15;55:21;77:9,10
**operation (3)**
49:4;134:15;135:1
**opinion (4)**
62:25;98:20;103:6,15
**opponents (1)**
170:8
**opportunity (12)**
8:23;18:18;19:5;21:11;42:25;43:8;72:25;83:2;84:1;90:4;100:11;170:8
**opposed (2)**
60:3;68:20
**opposition (5)**
12:12;38:17;114:25;116:12;146:19
**opt-in (1)**
20:13
**option (1)**
94:10
**oral (2)**
81:13;83:7
**Orange (6)**
50:4;53:25;54:11;55:1,8;56:19
**oranges (1)**
65:4
**order (40)**
5:3;10:13;13:20;14:7,12;16:16;20:20;21:14,15;22:10;23:1;24:2,22,24;29:7;36:8,23;77:24;80:1,13;82:6;85:6,18;87:1,22;90:8;100:8;103:6,7;117:3;130:14;133:13;142:6,19,22;144:23;149:3;152:5;154:20;175:16
**orders (2)**
28:3,5
**ordinary (2)**
93:21;140:22
**original (4)**
7:4;20:1;22:13;166:14
**originally (2)**
144:17;151:15
**others (11)**
8:10;11:13;17:13;81:7,19;95:9;116:10,19;124:8;139:2;154:24
**otherwise (8)**
18:3;72:25;110:4;111:1;122:9;127:10;129:12;167:12
**ought (1)**
139:24
**out (74)**
7:15;19:4;24:2,22;33:9;36:23;48:15;49:12,14,15,16,18;52:16;54:14;58:6;63:5,20;67:25;70:14;71:18;76:11;77:21;79:21;80:21;87:10;90:9;91:25;93:10;94:3,9,16;95:20,20;96:14;99:18;101:3;103:7,19;104:21;105:25;110:21;112:21;115:8;116:20;121:25;124:8;127:13;128:8;131:20,21;132:7;135:13;137:17;138:23;140:5;144:14;147:14;149:22;156:1,2,4;158:2,4,4,17,21;159:23;165:25;166:4;169:1;171:1;173:19;174:12;177:8
**outcome (1)**
167:2
**outcome's (1)**
43:16
**outlet (1)**
113:25
**outset (6)**
48:2,12;71:11;77:18;106:22;177:10
**outside (2)**
14:21;22:24
**outspoken (1)**
23:4
**outstanding (2)**
13:19;84:14
**over (28)**
9:8;15:12;42:3,5;44:2;46:19;81:14;82:5,22,22;84:13,25;86:13;87:12;88:5;95:10,15;98:13;99:3;120:12;121:7;129:6;135:17;147:1,4;151:19;168:20,21
**overall (2)**
124:25;169:13
**overbroad (1)**
127:24
**overlap (3)**
166:9;167:17;175:19
**overlooked (1)**
15:6
**overly (1)**
117:1
**overnight (1)**
18:25
**override (1)**
103:1
**oversight (1)**
104:7
**overturned (1)**
117:8
**overweight (1)**
55:15
**overwhelmed (1)**
15:3
**overwhelming (3)**
9:6,19;31:9
**overwhelmingly (5)**
11:18,22;38:12;42:14;86:20
**owed (2)**
87:5;135:22
**owes (1)**
135:18
**own (8)**
39:3;82:8;99:25;110:21;114:3;115:6;159:19;163:15
**owned (3)**
38:23;67:6,18
**owner (1)**
38:19
**owners (1)**
73:15
**ownership (7)**
55:18;57:3;65:1;72:15;73:14,16,19

**P**

**Pacific (1)**
163:14
**package (2)**
167:5,22
**page (10)**
55:18;57:7;69:6;107:17,18;114:8,9;142:5;158:19;164:5
**pages (4)**
52:16;70:25;107:15;160:24
**paid (11)**
41:6;60:23;67:8;87:8,10;130:15;135:1;140:21;156:10,11;159:22
**painstaking (1)**
84:25
**panel (6)**
47:10;85:24;94:24;96:9;140:6;170:6
**panelist (1)**
98:2
**panelists (1)**
173:17
**papers (1)**
129:17
**Parada (17)**
5:20;47:8;101:16;106:6;112:17,22;113:1;115:23;120:16;140:6;142:8;143:10;148:7;152:4;169:16;171:14;177:23
**paragraph (7)**
22:20;24:25;52:15;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 196 of 207

91:9;107:17,18;162:14
**paragraphs (1)**
91:9
**parallel (1)**
119:4
**Pardon (2)**
36:11;153:13
**parent (2)**
70:17,23
**parent's (1)**
70:23
**parlance (1)**
68:24
**part (15)**
8:10;15:7;16:23;22:2;55:8;61:7;74:8;79:19;110:22;124:7;127:23;129:8,15;166:21;177:16
**participant (1)**
84:16
**participate (16)**
8:12,13;15:5;24:14;31:2;32:4;34:18;40:25;61:10;71:16;75:2;89:21;94:13;105:15;141:7;158:2
**participated (2)**
89:20;104:6
**participating (2)**
96:22;128:21
**participation (5)**
34:24;73:12;85:3;96:8;106:4
**particular (6)**
41:17;61:14;63:20;70:8;129:2;140:24
**particularly (8)**
9:2;10:10;19:22;41:5;86:12;126:4;147:12;158:3
**parties (28)**
9:16;19:25;21:24;22:19;23:10;25:2;26:2,6,14;43:14;44:25;45:7;85:14;88:15;93:3;104:6;107:16,25;108:1;124:11;126:12,13,17;127:7,9,11;128:4;175:16
**parties-in- (1)**
40:19
**partner (2)**
170:6;173:22
**parts (1)**
110:19
**party (9)**
21:17,20;26:24;40:13,13;67:18;93:2;104:8;135:19
**Pascuzzi (35)**
78:8;80:2;120:11;125:8,10,11,14,14;126:20,22,23,24,25;127:3,5,8;128:22,25;130:11;131:5,21;132:19,23;133:11;134:8,17;135:7,11;136:8,11,12;137:8;139:4;141:3,5
**pass (2)**
128:23;168:10
**passages (1)**
52:17
**passed (1)**
120:10
**passing (1)**
110:9
**past (2)**
84:3;85:1
**Patricia (1)**
152:23
**Paul (1)**
125:14
**Pause (1)**
116:2
**pay (9)**
66:2,24;67:2;75:20;116:24;118:21;130:10,10;135:4
**paying (3)**
43:14;130:2,12
**payment (10)**
65:14,17,18;66:3,5;67:17,17,18,19;140:21
**payments (4)**
141:20;142:1,19;156:24
**pays (2)**
94:5;135:5
**PBGC (1)**
129:1
**Peabody (1)**
73:1
**peg (1)**
154:21
**pegs (1)**
46:9
**penalize (1)**
8:8
**penciling (1)**
147:17
**pending (2)**
106:20;119:24
**Pension (4)**
106:11,18;128:5,18
**people (53)**
6:17;7:19;8:5;15:3;17:19;18:15;22:7;24:14,15,16;28:8;43:19,24;45:1;59:23;76:15;77:18;78:9,18;82:7;89:20;94:10,10;97:17;103:22,25;104:23;105:2;122:8,12,16;123:9;128:24;137:10,17;138:4,5,12;148:23;151:9,14,17,20;154:3;161:13;168:4,12;169:2,15;174:18;175:1,2,6
**pepper (1)**
128:10
**per (2)**
59:16;176:4
**PERA (27)**
48:14,15,16;49:6;50:25;51:12;52:2;54:5,22;55:11,14;57:10;62:14;63:2,14;64:21;65:3;69:2,3,4,8,13,19;73:15;74:4;75:9,14
**PERA's (14)**
48:18;52:5,14;56:14,21;57:2;62:5,9,13;63:19;65:25;68:16;69:6;71:1
**percent (12)**
24:1;48:4,11,11;56:8,10,12,17,22,23;58:16;154:5
**percentage (1)**
156:6
**perfect (1)**
171:10
**perfectly (1)**
20:5
**perform (1)**
130:7
**performance (3)**
130:9,10,11
**perhaps (12)**
9:9,17;14:21;17:24;19:17;29:9;30:24;35:9;67:13;110:11;146:1;168:10
**period (11)**
54:5,24;64:2,8;81:21;82:20;135:4,17;151:20;164:13;177:14
**permissible (1)**
161:22
**permitted (4)**
11:12;14:16;18:4;92:10
**permitting (1)**
106:12
**person (5)**
59:16;66:18;67:5,6;105:3
**personal (13)**
32:17;39:8,9;78:11;90:25;92:5;113:5;136:13;157:1,4,14;158:3;169:9
**personally (2)**
138:2;154:18
**person's (3)**
158:4,7,8
**perspective (7)**
17:21;23:23,24;35:24;88:8;110:24;126:2
**persuaded (2)**
105:20;172:25
**persuades (1)**
89:24
**petition (20)**
32:16;54:9,22,25;55:14;56:13,16,17;57:3,9;61:13;62:15,16,18,22;65:2;76:21;118:12;119:2,3
**PG&E (25)**
5:6;11:20;38:20,23;39:2;49:5;51:9,14;52:7;53:19;54:4;55:25;56:10;57:5;68:20,23;69:5;75:23;76:1;84:21;117:17,21;119:12;156:23;159:12
**PG&E's (11)**
51:8;52:1,9,11,18;53:20,22;54:8;55:10;63:7;76:1
**Phelps (2)**
38:19,22
**phone (5)**
24:15;92:24;93:1;131:7;176:21
**phonetic (4)**
100:10;106:19;152:6;172:3
**photographer (1)**
97:17
**pick (1)**
60:25
**picture (1)**
5:25
**pie (16)**
51:25;53:20,22,25;54:8;55:4,4,9;57:16,16,22;58:8,9;76:19,20,20
**pieces (1)**
85:1
**piled (1)**
119:14
**Pino (11)**
112:22;113:4,6,14;114:4;115:13,15,16,19,21;119:18
**Pitre (3)**
170:17;172:22;173:5
**pivoting (1)**
151:1
**place (10)**
19:8;29:4;37:11;40:23;61:20;85:1;105:14;110:2;150:17;164:5
**place-holding (1)**
113:15
**places (1)**
42:12
**plainly (4)**
11:11;34:7;37:20;38:8
**plaintiff (4)**
48:15;64:10;106:17;116:14
**plaintiffs (9)**
64:6;72:18;91:11,12,13,15,16,22;159:17
**plaintiffs' (1)**
91:17
**plaintiff's (1)**
81:7
**plan (219)**
7:4,20;9:5,10,19,22;10:6,8,13,19;11:8,11,18,22;12:1,11,16;13:1;16:10,10,12,20;17:4,8,12,22;19:23;20:6,10,10,12,14;21:14,17;22:9,16;24:9,10;25:20;26:3,9,15;28:15,23;29:1,15,15;30:19,21;31:7,10,16,16;33:12,18;34:13;35:22,23,24;37:1,4,6,7,21;38:12;41:11,14,18;42:8,10,15,19,21;44:14,17,22,23;45:3;47:22,25;48:3,5;49:23;50:9;51:1,5,11;53:15,17;55:6,9;56:12,24;60:19;61:3,3,4,5,10;62:22;63:6,9,20,23;64:24;65:7,7,23;68:15,25;69:10,11;71:8,12,13,16;72:11;73:3,7,12,23;74:8,12,16,18,23,25;75:14;76:12;77:1;80:9;84:9,11;85:2,17,18;86:19,20;87:2,8,23;88:14,18;90:18;92:19;94:18;95:14,25;98:9,11,14,16;103:8;107:14,24;110:23;111:21;112:2;113:9;114:1,4,6,7,23;116:22;117:1,5,12,13,19,22,23;118:20,23,25;120:13;121:4,14;122:17;124:6;125:23;126:6,8,13,14,18;127:8,9;128:4;129:7;132:4,8,12,12,20;133:2,3,6,12,16,20;140:19;141:22;142:6,19,23;146:20,21;153:2;154:16;157:22;159:14;162:13,15,24;163:12;164:19;169:9;173:24
**planning (1)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 197 of 207

170:16

**plans (4)**
31:4;75:22;78:12;
93:22

**plan's (7)**
31:15;50:14;68:19;
71:21;76:5;88:16;
141:18

**plan-sharing (2)**
52:19;53:14

**play (2)**
103:19;123:22

**pleading (2)**
38:16;130:16

**pleadings (2)**
131:22;176:16

**please (9)**
8:16;57:11;102:6,11;
152:10;169:20;171:14;
173:12;174:22

**pleased (2)**
13:22;98:4

**pleasure (7)**
84:8;149:24,25;
150:2;165:9,21;166:12

**plenty (1)**
34:19

**plug (1)**
45:19

**plugged (1)**
145:9

**plug-in (1)**
146:10

**plus (1)**
52:24

**pocket (1)**
110:21

**point (47)**
7:9;10:11;26:11;
27:13;29:14;32:2;
41:25;43:17;44:2;
48:12;54:21;55:8;
58:12;60:18;62:2;
65:13;67:4;71:11;
74:11;76:9;85:7;92:8;
93:17,18;94:2;105:6;
110:4;112:6,8;113:22,
23;114:10;117:11;
118:11;121:7;131:21;
146:5;151:12;154:20;
157:18;166:20;167:10;
168:20;169:5,5;
171:10;172:6

**pointed (3)**
63:5;71:18;93:10

**pointing (1)**
143:25

**points (4)**
38:15;48:2;63:3;
121:11

**poised (1)**
36:3

**policies (3)**

108:9,11,15

**policy (2)**
94:11;108:19

**polite (1)**
170:9

**politely (1)**
151:8

**popped (1)**
101:8

**Porter (24)**
43:4;78:9;80:2;
120:11,12;136:16;
140:6,7,8,10,12,15,15;
141:2,15,17;142:10,12,
14,17;143:4,6,7,9

**portion (5)**
10:5;46:18;53:23;
76:9;81:13

**posed (1)**
163:10

**posited (1)**
114:15

**position (10)**
51:13;70:17,20,25;
82:16;105:13,18;
109:25;115:9;171:1

**possible (7)**
40:10;47:20;53:15;
85:10;91:17;107:15;
157:2

**possibly (1)**
42:22

**post (1)**
82:12

**post- (3)**
119:1,2;126:3

**post-confirmation (3)**
127:21;132:6;166:18

**post-petition (4)**
25:11;35:15;90:10;
129:11

**potential (6)**
34:9;42:12;48:9;
71:16;117:3,7

**potentially (2)**
24:3;25:18

**pots (1)**
155:9

**Power (2)**
26:25;117:14

**pre- (1)**
32:15

**precise (1)**
148:22

**preclude (1)**
117:24

**predicate (1)**
159:9

**predicates (1)**
10:23

**pre-disclosure (2)**
52:1,18

**pre-existing (1)**

135:6

**prefaced (1)**
60:12

**prefer (2)**
150:19;165:23

**prefers (1)**
167:17

**preliminary (1)**
8:17

**premise (3)**
51:6,10;75:21

**premises (1)**
91:19

**prepare (3)**
166:23;172:25;173:1

**prepared (11)**
8:15,18;26:5;92:16;
131:16;146:25;165:17;
166:9,10;171:2;173:6

**preparing (1)**
175:9

**pre-petition (2)**
26:21;33:11

**preposterous (1)**
38:20

**prerequisite (3)**
37:5;141:25;142:1

**present (2)**
139:25;171:9

**presentation (2)**
116:12;172:1

**presentations (1)**
150:21

**presented (4)**
38:3;86:20;96:3;
104:23

**presenting (1)**
111:22

**presents (1)**
49:2

**preserve (1)**
89:21

**preserved (2)**
103:8;104:3

**presided (1)**
9:8

**presiding (1)**
5:6

**Presumably (2)**
138:6;156:13

**presume (3)**
37:15;101:19;149:19

**presumes (1)**
132:14

**pretty (4)**
15:17;50:7;78:20;
176:22

**prevent (4)**
21:17,18;22:22;40:5

**preview (2)**
150:22,22

**previously (5)**
6:6;79:22;86:9;

90:13;93:23

**price (7)**
55:21;57:5;59:21;
60:4;63:10;111:8;
146:11

**prices (1)**
24:14

**primarily (1)**
109:7

**primary (2)**
50:24;108:11

**Prime (4)**
11:17;38:18;39:10,
13

**principal (2)**
10:1;89:16

**principally (1)**
31:14

**principle (1)**
110:11

**prior (9)**
14:2;16:6;20:9;38:2;
54:17;57:6;65:3;74:22,
22

**priority (3)**
49:12;140:18,21

**prob (1)**
147:6

**probably (12)**
6:25;28:6,7;77:20;
82:1;87:23;105:3;
131:18;147:8;165:20;
167:11;175:2

**problem (4)**
111:18;119:1;
138:18;142:22

**problematic (1)**
110:25

**procedurally (1)**
43:11

**procedures (9)**
17:3;37:22;39:18,19;
48:19;63:1;65:16;
129:18;130:24

**proceed (4)**
8:16,18;19:17;
114:12

**proceeding (1)**
157:18

**proceedings (6)**
9:8;10:5;12:15;42:3,
4;177:25

**proceeds (2)**
51:5;65:8

**process (12)**
38:4,10;44:9;61:7;
84:25;98:23;114:15;
124:10,14;145:22;
146:10;177:17

**produce (1)**
90:15

**product (2)**
30:22;90:15

**professional (7)**
121:23,25;122:13,
13,19;123:12,20

**professionals (5)**
27:15,22;122:7;
123:11,12

**profit (1)**
163:17

**profiting (1)**
163:23

**profit-taking (1)**
164:15

**program (3)**
78:24;97:19,19

**programs (1)**
34:22

**progress (5)**
17:20;85:15;98:5;
99:2;100:25

**projections (1)**
34:4

**promise (3)**
144:16;172:5,11

**promised (1)**
139:6

**prompt (2)**
10:8,9

**prompted (1)**
125:21

**promptly (1)**
86:25

**prong (1)**
159:13

**pronounce (1)**
72:7

**proof (1)**
48:18

**proofs (3)**
48:7;92:8,10

**proper (1)**
31:15

**properly (3)**
22:7;37:25;42:21

**property (6)**
32:17;66:2;92:1,4,
11;155:17

**proponents (11)**
12:11;28:15;31:16,
17;47:17,21;71:21;
80:9;86:20;159:14;
173:24

**proportion (2)**
65:1;153:7

**proportionality (2)**
153:24;155:13

**proportionally (2)**
55:3;56:6

**proportionate (4)**
51:6;55:9,17;57:21

**proportionately (2)**
49:25;153:11

**proposal (2)**
56:21;138:1

Case: 19-30088    Doc# 7784    Filed: 06/04/20    Entered: 06/04/20 18:41:03    Page 198
of 207

**propose (2)**
128:1;168:3
**proposed (15)**
17:6;21:14;23:2;24:25;26:23;41:11;76:12;90:7,7;129:13;130:20;140:18,20;168:17;177:7
**proposing (3)**
23:10,11;138:11
**props (3)**
119:14;120:3,4
**prosecute (2)**
114:2;118:16
**prosecuting (2)**
117:7;124:10
**prosecution (1)**
117:4
**prospect (1)**
33:22
**prospects (1)**
33:21
**protecting (1)**
66:17
**protection (5)**
27:3;28:9;34:19;97:18,19
**protections (1)**
11:14
**prove (5)**
60:13,16,17;75:1;76:11
**proved (1)**
75:16
**proven (2)**
60:2;62:20
**proverbial (1)**
54:14
**provide (6)**
49:24;50:5;88:19;114:7;125:24;162:6
**provided (8)**
12:22;18:3;69:10,12;73:4;110:4;132:13,21
**provides (7)**
62:18;65:8;69:11;94:14;114:4;122:10;129:7
**providing (2)**
110:18;111:1
**proving (1)**
60:18
**provision (24)**
17:18;18:8;23:6,7;25:15;26:7,10,12,17;93:21;98:11;101:6;121:13,15,25;124:5,9,16;132:11,16;133:17,20;134:2;135:25
**provisions (19)**
17:4;19:19;20:1;25:23;26:5,18,22;29:20;30:1;41:9;98:10;121:6,9;122:11;125:19;127:16;130:3;132:4;133:2
**provisos (1)**
18:5
**PSPS (5)**
33:4;116:23;117:18,23,24
**public (13)**
32:24;33:5;48:14;88:17;94:11;117:14;153:4;157:1;159:21;160:14,19,20;161:4
**published (1)**
81:6
**pull (1)**
51:16
**Pullo (1)**
29:24
**Pullo's (2)**
37:19;38:7
**punish (2)**
78:13;83:14
**purchase (9)**
24:10;55:23,25;56:4;61:14;68:23;70:4;73:4;74:17
**purchased (1)**
163:15
**purchasers (1)**
59:11
**purchases (2)**
56:6;64:24
**purely (1)**
20:12
**purportedly (1)**
88:19
**purpose (2)**
107:5;130:2
**purposes (6)**
19:18;60:19;64:23;82:7;142:21;170:16
**pursuant (3)**
44:17;48:19;130:15
**pursue (1)**
114:24
**pursuing (1)**
93:12
**pushing (2)**
98:4;163:23
**put (24)**
28:22;29:11;33:9;51:22;57:7;58:18;62:6;76:25;88:6;116:7;130:23;131:9;132:24;133:10;139:15,21;142:25;147:3;153:6,14;168:25;170:6;177:7,8
**putting (4)**
47:1;100:5;130:1;159:23
**Pyrrhic (1)**
29:16

## Q

**qualify (1)**
85:3
**queue (1)**
171:9
**quickly (6)**
28:12;30:10;41:8;62:5;86:25;137:15
**quite (11)**
11:23;20:1;22:2,13;29:5;35:7,8;38:25;75:2;150:9,20
**quote (1)**
146:12
**quote/unquote (1)**
142:20
**quotes (2)**
52:17;64:9
**quote's (1)**
52:14
**quoting (2)**
44:22;91:10

## R

**radar (1)**
104:8
**raise (10)**
8:16;16:3;24:13;26:6;39:6;94:1;112:20;132:3;172:21;173:2
**raised (32)**
14:14,17;16:22;17:9,12;21:16;22:11,18;26:2,8;38:6,10,21;40:13;42:2,5;50:20,21,24;87:15;89:13;93:20;98:10,21;127:15;130:16;140:16;141:2;166:2;169:18,22;173:10
**raising (4)**
21:18;68:12;110:4;112:4
**rate (1)**
140:24
**rather (5)**
14:23;43:1;63:7;86:4;139:11
**re (1)**
69:20
**reach (2)**
95:20,20
**reached (4)**
28:11;89:5;105:25;171:1
**reaching (1)**
138:23
**read (18)**
17:24;18:19;23:6,10;27:4;44:4;45:5;53:1;91:7,7;114:25;116:12;117:5;149:18;152:3;158:17;166:24;176:6
**readable (1)**
56:5
**ready (17)**
10:8;36:2;75:5,5;77:8,10;83:10;136:16,19;150:20;165:18;171:9,9;172:2,14,16;173:2
**real (1)**
169:10
**realize (1)**
6:19
**really (24)**
17:20;22:2;23:9;28:18;38:14;68:25;81:9;88:21;89:16;94:6,11;107:22;109:9;111:15;119:9;121:9;124:18;126:16;151:20;153:9;159:3;161:1;171:2;175:8
**reason (16)**
7:24;8:11;16:19;27:3;34:10,11,13,17;64:22;66:10;94:2;159:15;161:9,21;162:6;173:21
**reasonable (3)**
33:19,19;86:25
**reasonably (2)**
80:22;81:4
**reasons (7)**
40:13;47:23;54:20;76:5;89:1,4;138:5
**rebuild (2)**
13:2;33:4
**rebuttal (1)**
43:1
**recall (2)**
20:8;129:21
**receive (6)**
56:12,16;65:19;69:9,9;72:24
**received (6)**
8:3;9:22;65:8;79:15;165:1;173:4
**receives (1)**
66:5
**receiving (1)**
95:19
**recent (3)**
38:16;62:25;73:2
**Recess (3)**
79:3;136:17,18
**recognize (3)**
105:13;122:8;129:19
**recognized (2)**
32:19;89:10
**recognizes (1)**
33:13
**recognizing (1)**
130:5
**record (13)**
8:20;12:15;30:13,20;74:21;83:23;86:9;91:6;95:7;102:12;116:11;117:10;118:5
**recording (2)**
7:10;79:5
**recoupment (2)**
21:16;25:25
**recoverable (1)**
156:23
**recovering (1)**
75:15
**recovery (4)**
24:6;65:19;69:15;118:20
**redetermine (1)**
130:24
**redo (1)**
162:13
**reduced (1)**
154:4
**reduces (1)**
65:14
**redundancy (1)**
167:13
**redundant (1)**
119:9
**refer (2)**
45:1;69:19
**reference (5)**
24:24;51:8;90:16;119:2;142:7
**referenced (2)**
91:2;116:23
**references (3)**
117:23;119:1;142:19
**referred (2)**
23:1;62:14
**refers (1)**
114:5
**refinements (1)**
83:8
**reflect (1)**
25:23
**reflected (3)**
33:14;98:14,18
**regard (17)**
10:21;14:1;32:9;38:6;99:2;107:3;121:8,22;124:3,20;141:3,6,17;153:1,7;155:14;161:19
**regarding (10)**
39:9;62:25;65:16;83:6;98:8;132:9;138:8;140:17;141:8;173:5
**regardless (2)**
7:8;58:9
**regards (1)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 199 of 207

113:17
**registration (6)**
29:3;73:25;145:18, 20;164:4,19
**regrouping (1)**
151:4
**regular (1)**
169:14
**regulating (2)**
126:3,3
**regulation (1)**
52:11
**regulatory (3)**
10:24;35:24;40:21
**rehash (1)**
76:5
**reimbursement (1)**
33:8
**reinstated (2)**
41:7;127:20
**reinstatement (4)**
25:7,9,9,13
**reinstating (1)**
23:18
**reiterate (1)**
95:9
**reiterating (1)**
48:2
**reject (2)**
48:10;71:12
**rejected (3)**
25:14;38:2;82:14
**rejecting (2)**
11:19;12:4
**rejection (1)**
12:6
**relate (2)**
139:20;147:12
**related (5)**
15:6;88:5;89:12; 90:22;132:7
**relates (1)**
166:22
**relating (5)**
17:4;42:6;69:1; 70:16;80:11
**relation (1)**
48:8
**relationship (2)**
39:12;67:4
**relationships (2)**
33:2,3
**relatively (2)**
30:10;123:7
**relaxation (1)**
167:1
**release (21)**
19:18;21:18;92:17, 20;93:2,8;106:23; 107:3,24;109:8;110:9; 111:3;121:6;125:19, 24;127:10,11,24; 133:21;134:3;136:3
**released (2)**
107:25;110:3
**releases (15)**
17:5;20:4,6,12,17, 23;25:24;92:19;107:4; 109:20;126:10,15; 130:13,14,25
**releasing (8)**
107:25;108:25; 109:18;110:20;126:12, 12,17;127:7
**relevant (3)**
19:23;50:5;107:11
**relief (1)**
41:9
**relying (1)**
170:25
**remainder (1)**
18:7
**remaining (7)**
22:2;28:13,18;42:23; 99:10;121:11;155:23
**remains (2)**
121:8;126:8
**remarkable (1)**
9:10
**remedies (2)**
103:10;114:24
**remember (5)**
23:3;41:21;149:1; 153:17;177:13
**remembers (1)**
87:23
**remind (3)**
75:8;92:21;149:3
**rendered (1)**
46:14
**renders (1)**
88:18
**rent (3)**
135:2,4,5
**reorganization (3)**
9:14;73:7,17
**reorganized (9)**
23:21,21,24;24:17; 35:11;72:1,13;73:4; 118:23
**repeat (6)**
33:17;57:11;58:16; 86:8;145:22;175:23
**repeated (1)**
52:9
**repetition (1)**
82:23
**reply (1)**
13:4
**report (4)**
13:22;99:15,21; 100:13
**REPORTER (4)**
5:4,10,13,22
**represent (1)**
12:21
**representatives (1)**
173:23
**represented (2)**
9:12;93:16
**representing (5)**
55:2;102:14;115:11; 139:3;142:15
**represents (1)**
58:16
**reproduce (1)**
62:9
**request (9)**
14:18;15:5;79:18; 113:8;128:14;147:1; 173:6;174:18;177:6
**requested (5)**
18:8;20:21;98:15; 112:24;174:21
**requests (8)**
8:3;79:15;85:18; 112:23;142:5,18; 153:2;176:14
**require (3)**
61:22;88:24;133:12
**required (6)**
12:18;31:21;40:21; 48:6;88:20;93:7
**requirement (2)**
30:21;40:12
**requirements (5)**
12:16;29:22;30:7,24; 86:22
**requires (2)**
62:16;161:14
**requiring (1)**
130:14
**reread (1)**
10:12
**res (1)**
131:25
**rescheduled (1)**
112:15
**rescission (5)**
11:20;35:3,5,5;53:16
**reservation (1)**
101:7
**reserve (11)**
25:24,25;35:12; 42:25;43:1;96:4;98:19; 101:10;128:14;133:13; 152:7
**reserved (1)**
147:17
**resolution (6)**
17:3;100:1;104:25; 129:18;130:24;141:7
**resolutions (1)**
13:19
**resolve (9)**
16:13;20:2;95:17,24; 98:18;99:6;100:5; 146:13;173:25
**resolved (42)**
13:15,18,23;14:4,6; 16:11;17:5;28:17;29:1, 7;43:10,16;44:6,9; 45:6;61:7;87:17,21; 88:11;96:2;102:22,24; 105:15;106:1,2;117:9, 11;121:6;129:6; 137:10,22,25;138:9,10; 139:1;140:24;145:5; 146:7,9,9;150:23; 168:16
**resolves (2)**
135:5;160:4
**resolving (1)**
104:13
**resources (4)**
34:3,8;35:12,19
**respect (45)**
9:5;12:3;14:11,14; 17:2,4,9,22;18:6;22:1, 11,12;24:25;25:13,25; 26:6,19;28:9,12;29:3, 21;30:12,18;31:13; 33:3,16;34:14,16; 37:17;40:8,14;71:13; 98:7,9,20;101:3; 102:23;105:17;129:10; 134:23;135:9;137:8; 148:24;166:2;177:1
**respectful (1)**
167:14
**respectfully (1)**
156:19
**respective (1)**
153:8
**respects (2)**
139:4;163:13
**respond (8)**
43:8;81:17,22;87:14; 127:17;131:23;149:19; 150:5
**responded (2)**
80:13;164:6
**responding (1)**
15:15
**response (10)**
10:14;22:3,4;80:21; 92:21;93:10;117:17, 21;130:19;142:4
**responses (2)**
13:7;82:17
**responsive (1)**
120:2
**rest (4)**
108:22;138:19; 168:19;174:13
**restate (1)**
102:13
**restates (1)**
177:8
**restitution (6)**
141:18,20,22,25; 142:1,20
**restoring (1)**
51:13
**restrict (1)**
164:9
**restructuring (1)**
41:3
**result (6)**
28:14;31:1;45:21; 50:8;62:15;111:15
**resulted (1)**
33:15
**results (2)**
11:10;37:25
**resume (2)**
7:16;77:16
**resumption (1)**
83:7
**retained (2)**
50:2;93:4
**retains (1)**
132:20
**retention (3)**
39:12,14;132:4
**Retirement (2)**
106:11,19
**revealed (4)**
39:11;53:20;54:6; 64:12
**reversed (1)**
118:10
**review (9)**
42:24;103:2,9; 110:24;121:4,5;133:6, 14;138:5
**reviewed (2)**
95:16;108:16
**reviewing (3)**
10:17;95:18;126:5
**revised (3)**
20:18;41:11;126:14
**revision (1)**
127:19
**revisions (12)**
16:10;41:11;95:14, 18,19;125:20;127:12, 23;128:2;129:8,14; 130:20
**revisit (4)**
40:4;89:23;90:12; 128:9
**revote (3)**
162:19,20;164:18
**rid (1)**
109:21
**ride (1)**
23:15
**right (120)**
5:9,23,24;6:14; 17:14,15;19:2;21:8,15; 27:9,17;29:13;32:7; 42:1,1;43:22;44:3; 46:3,11;47:2,8;52:2,23, 23;53:9,10;54:8,17;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 200 of 207

55:5,21;57:16,22;58:2,17;59:2,3,18,24;60:3;62:11;64:6;67:3,7;68:12;69:6;72:13,21;74:16;76:17,22;79:6,9,10,13;85:23;89:21;90:3;94:23,24;95:4;96:5;101:14;103:9;104:3;105:21;106:3,6;109:3,23;111:10;112:9;113:4;115:20,23;120:24;121:17,18;123:6,17,25;124:2;125:3,8;127:8;128:13;130:10;131:15;133:13,19;135:20;138:24,25;139:16;140:3;141:1;143:10,20;144:7,10;145:7;146:17;147:7,20;152:3,13;154:3;156:17;157:11,17;158:5;167:7;171:14,18,21;172:19,20;173:9,12;177:10,11
**rights (38)**
21:19,23;22:18,23;23:14;25:17,24;28:23;29:3;71:16,18,22;72:14,14;73:4,6,10,12,13,20,25;74:1,10,20,20;75:3;93:4;107:12,19;109:12;113:25;127:22;135:24;145:18,21;146:8;164:4,19
**rigid (1)**
122:7
**ringing] (1)**
92:23
**risk (4)**
34:25;52:9;163:18,23
**risking (1)**
164:18
**risks (2)**
34:24;85:11
**Robert (1)**
116:13
**roles (1)**
123:8
**roll (1)**
151:19
**room (2)**
111:9;144:5
**rose (1)**
118:12
**roughly (5)**
53:22;54:1,9;58:20;102:21
**rounded (1)**
87:18
**route (1)**
167:16
**RSA (4)**
30:16;41:4;44:25;87:3
**Rule (3)**
41:13;94:5;105:20
**ruled (1)**
105:20
**rules (2)**
122:19;163:4
**ruling (12)**
14:20;37:10;65:15;66:15;89:12;90:6,16;98:24;99:1,7;104:14;176:5
**running (4)**
7:10;50:7;78:25;101:17
**runs (1)**
94:11

## S

**saddled (1)**
24:18
**safety (2)**
52:11;117:14
**salad (1)**
114:6
**sale (2)**
59:21;158:21
**same (30)**
16:17;31:19;49:11;50:3;57:24;61:24;65:17;67:25;69:9;71:1;85:7;88:19;102:18,21;105:18;110:9;119:17;143:15;155:16,18;156:8,15,16,21,22,22;166:2;167:15;175:24;176:17
**SAN (4)**
5:1;37:12;52:6;77:16
**satisfaction (2)**
41:4;127:24
**satisfactory (1)**
118:7
**satisfied (5)**
12:5;31:12;40:6,12;87:3
**satisfies (3)**
30:21,23;86:21
**satisfy (1)**
76:1
**savages (1)**
150:12
**save (1)**
172:20
**saw (2)**
15:4;57:6
**saying (21)**
41:13;52:13;60:13;64:4;74:9;82:3;105:22;109:17;111:16;117:13;123:4;131:24;139:9;142:18;156:3;160:2,23;162:2;168:1;172:11,15
**scale (2)**
56:5,6
**scaled (1)**
59:14
**Scarpulla (10)**
120:13;143:11,13,17,24,25;144:1,6,9;147:24
**scenario (1)**
135:15
**schedule (27)**
7:18;8:4;77:12;78:5,20;83:9;96:6;101:17;107:11;113:5,7;115:6,17;116:20;120:6;137:15,24,24;138:11;141:14;147:18;170:24;171:4;172:17;174:4;175:5;177:16
**scheduled (7)**
18:12;77:23;100:9;151:15;172:2,7;175:10
**scheduler (1)**
139:17
**scheduling (5)**
14:8;113:13;174:18;176:25;177:12
**scheme (3)**
88:14,15;89:11
**scope (4)**
15:17;17:10;22:8;25:23
**score (2)**
101:14;119:23
**screen (19)**
6:11,20;7:9,15;47:19;51:17;52:20;95:1;96:13,22;102:1;104:8;143:13,24;149:21;155:6;170:20;171:21;172:21
**search (1)**
115:25
**season (1)**
85:12
**second (25)**
6:5;44:12;48:12;50:10;55:18;58:15,18;70:14,21;72:10;81:8;88:13;91:18;97:8;98:19;102:25;121:16,22;141:2;159:13;163:1,10,12,25;175:1
**secondly (1)**
166:17
**seconds (2)**
100:24;113:19
**Section (54)**
12:4,17;17:10,10,12,22;18:4;20:16,22;22:5,6,8,12,24;23:11;24:19;26:3,9,23;29:20,22;30:7;37:18;40:15;41:17;44:22;49:4;62:15,20,20;65:21;70:9;88:20,22;89:2,12;112:1;114:15;126:9,9,11,16;128:4,8,11;129:2,8;132:4,5;133:16;134:2;140:19;141:4,4
**sections (1)**
29:21
**secure (1)**
16:17
**securing (1)**
162:1
**securities (13)**
47:24;49:19;52:9;61:23;62:21;64:17,19;65:21;68:20;69:1;70:16;71:15;81:7
**seeing (1)**
78:23
**seek (1)**
103:9
**seeks (3)**
51:11,12;56:15
**seemed (4)**
14:13;15:5,11;161:15
**seems (13)**
19:19;61:12,17;65:11;91:3;100:1,8;110:11;113:23;122:8;123:3,13;177:18
**segment (1)**
100:9
**self-evidently (1)**
56:24
**sell (5)**
58:25;60:1;164:7,13;174:13
**sells (2)**
55:22;56:1
**send (7)**
78:15;82:3;105:3;113:17;149:14;174:22,22
**sending (1)**
82:4
**senior (1)**
84:14
**sense (12)**
19:17;45:6;71:22;132:10;156:24;166:6,16;167:4,11,11;169:25;170:4
**sent (4)**
24:21;95:15;98:13;108:2
**sentences (1)**
75:7
**separate (25)**
32:18;38:23;69:15;72:14;73:11;74:17;88:16;89:1,4,6;130:3;153:3;159:25;160:6;161:3,3,4,8,17,19,22;162:4,5,7;167:15
**separately (5)**
31:20;32:14;125:3;129:1;166:8
**sequence (3)**
6:8;77:25;78:14
**sequencing (1)**
168:12
**Sequoia (1)**
67:21
**serious (1)**
25:16
**seriously (1)**
26:8
**serve (1)**
9:24
**served (1)**
43:15
**serves (1)**
51:10
**services (1)**
94:14
**session (3)**
5:5;29:5;79:4
**set (7)**
26:10,16;30:4;40:17;45:9;67:8;73:8
**setoff (2)**
21:15;25:25
**set-off (1)**
22:18
**setting (1)**
51:1
**settle (2)**
93:3;130:22
**settled (2)**
112:17;155:22
**settlement (18)**
127:25;129:20,21;130:7,7,13,15;131:1,6,9,10,25;133:22;156:2;160:5;161:8,12,17
**settlements (12)**
30:14,17;89:6;129:19,25;130:3;156:6;160:3;161:3,3,4;162:5
**seven (2)**
57:25;144:22
**seventh (1)**
91:19
**several (10)**
8:3;18:13;40:24;85:6;95:11;111:23;128:3;139:3;145:5;146:6

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 201 of 207

**shake (1)**
102:8
**shall (2)**
18:3;149:22
**share (21)**
49:20,25;50:6;51:2;53:16;55:2,9;56:4,6,13,17;57:3,5;59:17;60:4,7;72:15;96:18;97:25;145:24;146:11
**shared (2)**
60:7;67:1
**shareholder (13)**
24:1;38:20;47:17,21;56:21;57:8,20;58:21;59:25;60:1;65:1;86:19;106:17
**shareholders (22)**
23:25;51:7;55:3;56:19;57:1,4,4;60:8;65:10;71:17,20,21;72:12,17,17,18,24;73:13;74:5,6,7;75:12
**shares (9)**
49:21;50:2;59:13,14,15;60:16;64:17,23;65:3
**sharing (6)**
50:25;51:6;59:9;61:22;65:10;68:15
**sheet (1)**
119:23
**shelter (1)**
37:11
**shift (2)**
153:9,10
**shoes (2)**
91:13;156:21
**short (3)**
29:7;100:9;163:9
**shortchange (1)**
165:17
**shorter (1)**
151:20
**shortly (4)**
95:19;125:20;129:22;149:4
**show (2)**
111:21;150:16
**showed (2)**
34:8;133:3
**showing (4)**
57:13,15;101:24;144:2
**shows (4)**
55:18;57:7;58:15;144:2
**shrink (1)**
55:4
**shuffle (2)**
11:4;79:20
**shut (1)**
8:15
**Shutoff (1)**
117:14
**sic (3)**
14:3;45:12;103:22
**side (19)**
47:18;50:13;107:21,23;108:4,6,6,13,16,16,19,20,21;109:8;110:20,20;136:6;149:23;176:5
**sides (2)**
45:18;146:13
**sign (4)**
10:13;93:7;130:14,25
**signed (2)**
13:20;127:10
**significant (4)**
18:17;78:20;146:6;177:15
**silence (1)**
12:24
**Silfen (3)**
112:16,18;113:2
**similar (15)**
31:18;52:15;73:3,5;86:7;98:2;103:2;134:11;139:5;155:16;156:12;157:24;158:20;159:6;166:7
**similarity (3)**
158:12,15;166:8
**similarly (4)**
19:6;88:23;116:15;139:4
**simple (2)**
15:18;134:12
**simplest (1)**
63:16
**simply (19)**
23:15;36:9;38:11;60:2,18;63:2,17;68:1;80:15;83:11;104:11;107:6;110:20;111:3;112:20;118:11;119:20;145:3;166:10
**single (1)**
48:23
**Singleton (3)**
150:18;151:3,7
**sit (1)**
7:14
**sitting (1)**
156:12
**situated (4)**
88:23;116:15;139:4;171:4
**situation (2)**
58:13;115:11
**six (3)**
56:18,19;57:10
**sixteen (2)**
84:4;85:1
**sixty (1)**
80:24
**sixty-two (3)**
159:24;160:15,16
**size (1)**
96:2
**Skikos (3)**
170:18;172:23;173:6
**sleep (1)**
17:16
**slice (7)**
53:25;54:11;55:1,8;56:20;76:19,20
**slide (4)**
51:24;57:6;58:15,18
**slides (1)**
51:24
**slightly (2)**
36:23;80:23
**slots (1)**
174:1
**small (6)**
58:8;119:10;126:13,13;156:6,7
**smaller (2)**
54:10;103:21
**smoothly (1)**
10:21
**snapped (1)**
164:3
**so-called (2)**
33:5;43:12
**Solar (1)**
50:1
**sold (3)**
58:22,22;59:15
**solely (2)**
26:19;107:20
**solicitation (7)**
30:9;37:18,21,22;38:4;39:18,19
**solution (1)**
100:6
**solved (1)**
137:5
**solvent (4)**
49:13,18,23,24
**somebody (7)**
75:19;89:24;90:14;109:21;111:5;134:16;171:6
**somebody's (2)**
123:7,9
**somehow (8)**
6:19;63:12;64:19;69:14;72:23;88:6;91:3;122:14
**someone (10)**
8:9;13:24;44:6;80:8;92:4;104:20;122:3,4,4;139:12
**sometime (2)**
82:18;147:19
**somewhere (1)**
11:5
**son (2)**
39:10,25
**soon (3)**
15:17;37:16;85:10
**sorry (20)**
11:9;22:4;31:3;37:6;76:20;110:6,15;113:20;120:11;124:13;127:5;128:17;134:8;142:12;148:12;160:11,13;165:5,14;169:23
**sort (5)**
111:2;125:24;137:17,20;159:9
**sound (3)**
123:8;126:19;142:8
**sounds (4)**
100:17;111:15;119:9;167:21
**source (2)**
66:1;67:20
**sparred (1)**
93:19
**speak (13)**
18:18;42:25;84:1;96:5;104:20;111:23;113:11;137:18;144:11;168:23;173:16,18;174:20
**speakers (2)**
8:7;138:15
**speakers' (1)**
43:5
**speaking (5)**
130:19;131:8,18;132:23;138:4
**speaks (2)**
88:7;108:7
**special (2)**
113:7;127:16
**specific (3)**
64:23;103:8;127:9
**specifically (5)**
30:8;59:11;117:14;130:12;146:1
**specificity (1)**
82:19
**specified (1)**
127:10
**speculative (1)**
33:20
**spend (1)**
176:3
**spending (1)**
176:7
**spent (1)**
34:23
**spirit (1)**
116:17
**spoke (3)**
16:25;104:12;170:3
**spoken (2)**
12:25;141:5
**spokesperson (1)**
139:3
**staff (17)**
15:3,4;82:8;84:3,7;86:12,17;95:10;119:8,10;137:17,23,23;139:11;151:11;176:21;177:23
**stake (5)**
57:8;71:23;73:14,16,19
**Stamer (3)**
83:18,19,20
**stamp (1)**
76:25
**stand (4)**
7:23;91:13;156:20;163:16
**standard (2)**
122:21;158:14
**standards (2)**
33:17;123:13
**stands (2)**
87:20;117:6
**start (10)**
14:3;19:18;20:3;64:1,7;87:16;110:1;120:8;122:3;156:4
**started (7)**
16:6;52:6,7;64:12;125:21;156:1,2
**starting (2)**
30:11;125:18
**starts (3)**
15:12,17;176:2
**State (11)**
30:18;33:6;42:18;91:2;102:11;114:17;117:14;125:15;129:20;142:16;174:25
**stated (5)**
47:23;67:16;165:24;168:15;175:15
**statement (15)**
10:12;12:3;20:9,14;34:5;37:23;39:25;40:10,18;42:9;60:13;102:19;110:23;117:22;144:11
**States (1)**
150:15
**stating (1)**
142:23
**status (2)**
71:21;100:13
**statute (6)**
25:8;49:10;62:17;69:12;153:25;154:2
**statutorily (1)**
11:19
**statutory (3)**
22:6;32:21;126:9

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 202 of 207

**stay (4)**
79:21;80:7;118:16;149:21
**stay-at-home (1)**
168:7
**stayed (2)**
106:19;118:15
**stays (1)**
133:7
**step (2)**
73:14;92:8
**Stephen (1)**
8:21
**steps (1)**
90:9
**stick (5)**
7:18;78:4;144:12;170:19;175:6
**sticking (2)**
7:13;175:15
**still (25)**
6:8,23;7:23;10:14;15:15;28:23;43:7;58:10;87:20;95:18;100:14;101:1;113:20;121:7;126:5,8;135:15;141:13;146:19;151:11;156:8,11,13;173:23;177:14
**stipulated (1)**
156:10
**stipulation (6)**
28:15;44:4;87:25;103:20;104:9;148:21
**stipulations (1)**
78:7
**stock (35)**
24:5,6;38:23;39:2,4;42:11;43:13;44:1,19;46:9;49:5,12;51:15;56:1,14,24;63:10;68:22,24,24;69:2,16;71:4,5;73:4,22;74:2,24;76:16;153:7,9;155:14;163:18;164:7,12
**stockholders (1)**
49:20
**Stockton (1)**
161:25
**stole (1)**
48:1
**story (2)**
97:16;114:1
**straight (2)**
52:4,14
**Strauss (1)**
83:24
**Street (2)**
163:22;164:15
**stretch (1)**
7:23
**strict (1)**
37:21
**strictly (1)**
20:10
**strikes (1)**
131:14
**strip (1)**
135:23
**strong (1)**
155:15
**strongly (2)**
86:18;109:25
**structure (3)**
70:10,23;71:3
**studied (1)**
58:11
**study (2)**
58:12;62:9
**stuff (3)**
15:2;76:8;164:18
**subclass (1)**
153:19
**subclasses (6)**
153:19,21,23;154:1,1;155:10
**subject (13)**
15:16;21:23;36:6;40:3;63:4;68:13;82:21;100:4;105:22;108:21;117:15;145:17;164:8
**subjects (1)**
139:10
**submission (1)**
14:19
**submit (10)**
50:7;55:6;56:24;62:19;66:20;69:10;75:13;76:4;159:4;161:7
**submitted (3)**
45:8,16;159:20
**subordinated (10)**
11:20;12:5;49:4,19;51:2;61:9;65:21;69:5;70:5;72:23
**subordination (2)**
49:14;55:7
**subro (2)**
101:3;161:5
**subrogation (33)**
30:15;32:11,14,21,23;66:16;86:10;87:3,16,24;88:2,17;89:6,7,8;90:25;91:4,12,12,14,15,22;92:11;153:5;154:3;156:18,20;157:1;159:17,17;161:18,19;163:15
**subsection (1)**
44:18
**subsequent (1)**
25:18
**subsidiary (3)**
70:20,22;71:2
**substance (1)**
38:9
**substantial (5)**
84:22;87:9;158:11,15;161:21
**substantially (6)**
31:18;40:23;155:16;157:24;158:20;159:6
**substantively (1)**
165:23
**substituting (2)**
66:14;150:17
**success (3)**
33:19,20;84:22
**successful (2)**
9:14;84:17
**successor (1)**
116:24
**such-and-such (3)**
90:16,17;149:16
**suddenly (1)**
82:7
**sue (1)**
71:24
**sued (1)**
21:20
**suffered (9)**
57:4;59:16,17;76:1;114:21;156:9,12;158:3;163:8
**suffering (1)**
60:3
**suffers (2)**
67:5;92:5
**suffice (1)**
40:17
**sufficient (1)**
42:8
**suggest (4)**
14:23;29:8;91:3;168:12
**suggested (7)**
19:7;20:19;127:19;168:2;169:1;176:8,15
**suggesting (1)**
69:14
**suggestion (3)**
43:25;64:18;177:1
**summarize (3)**
44:7;76:7;82:12
**summarizes (1)**
13:6
**summary (3)**
43:15;114:7;117:11
**superimpose (1)**
70:10
**superimposed (2)**
70:23;71:4
**Superior (5)**
65:22;67:22,23,24,24
**supplant (1)**
133:6
**supplement (1)**
107:14
**support (15)**
9:7,19,20,24;12:12;13:5;30:6,17;35:25;41:3;47:22;84:11;86:18;107:7;151:2
**supported (1)**
86:21
**supporting (1)**
172:24
**supports (1)**
85:17
**suppose (2)**
122:16;134:25
**supposed (3)**
36:24;101:15;153:23
**sure (32)**
13:24;22:21;26:12;29:7;33:17;38:25;43:24;44:13;50:12;58:14;80:22;81:4;82:25;100:21;101:23;118:8;121:14;122:12;125:21;130:21;131:19;133:14;139:1,6;141:12;146:15;154:13;157:8;158:16;159:2;162:23;164:3
**surprised (6)**
25:5;28:4;39:24;42:22;65:12;128:13
**surreply (1)**
14:17
**sur-reply (2)**
166:3,23
**survival (1)**
91:19
**survive (1)**
24:3
**survivors (1)**
74:7
**suspect (2)**
37:9;172:23
**sustained (1)**
117:19
**system (4)**
16:18;59:5;106:12,19

**T**

**table (3)**
18:25;99:19,20
**tabulated (1)**
37:25
**tabulation (1)**
48:6
**tackle (1)**
106:24
**talk (10)**
47:24;49:1;100:14,15,15,16;106:25;107:22;167:2;170:24
**talked (6)**
6:7;75:9;119:20;127:15;138:5;169:2
**talking (7)**
35:4;43:18;44:8;111:25;148:20;158:11;177:21
**talks (2)**
108:9;144:24
**targets (1)**
15:22
**Tax (7)**
42:18;43:5;140:16,18,21;141:21;142:1
**TCC (21)**
32:20;39:19;43:11;44:5;87:25;98:25;99:3;101:2;103:5,11;104:5,14;109:11;130:17;145:5,13,22;146:6;159:18;161:5;173:23
**TCC's (2)**
88:1;171:1
**teams (1)**
15:2
**technical (3)**
7:9;16:15;97:14
**technologically (1)**
6:13
**Ted (1)**
46:24
**teed (1)**
44:9
**temporally (1)**
121:15
**ten (9)**
83:17;84:9;106:15;116:11;120:25;136:15;140:11,13;150:18
**tenant (2)**
134:25;135:2
**ten-minute (2)**
136:13,17
**tens (1)**
12:25
**tentative (2)**
81:6;176:5
**term (13)**
44:14,16,18,19,21,23;46:9;126:12,17;141:18,24;142:21;146:13
**termination (1)**
41:3
**terminology (1)**
46:7
**terms (9)**
23:22;46:6;87:2;92:19;119:1;130:8;153:24;161:14;164:8
**terribly (1)**
60:24

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 203 of 207

**terrific (4)**
86:12;150:25,25;151:1
**test (9)**
30:9;40:8,14;41:4;50:17,19;122:15;132:8,9
**testified (10)**
10:4;11:7;24:7;31:5;32:13;34:10,14;35:13,14,16
**testify (1)**
66:3
**testimony (11)**
12:14;34:7,21;35:2;37:19,20;38:7;85:4;155:18;160:25;164:6
**textbook (1)**
65:13
**texts (2)**
41:13;166:25
**thanks (4)**
95:9;119:13,13;146:17
**that'll (2)**
119:24;120:13
**theory (2)**
67:12,14
**Therefore (9)**
10:7;59:18,20,23;91:12;114:23;117:21;157:9;158:6
**thinking (4)**
15:10;27:14;175:13,14
**third (6)**
67:18;91:18;107:16,17;141:16,17
**third-party (11)**
20:6,12,17,23;25:24;67:4;92:19;106:23;107:13;122:23;161:24
**thirteen-and-a-half (1)**
154:24
**thirty (5)**
81:12;100:24;113:18;170:21;176:4
**thirty-five (4)**
53:6,8,10;57:18
**thirty-minute (2)**
169:8;170:2
**Thomas (1)**
177:23
**though (8)**
10:11;18:16;65:11;97:6;110:22;118:12;143:24;154:11
**thought (17)**
14:19;40:1;46:21;51:14;54:6;56:22;58:4;80:5;88:11;89:23;90:5;92:13;93:9;113:12,19;139:1;154:17
**thousand (1)**
15:2
**thousands (1)**
12:25
**three (22)**
34:7;58:16;61:18;74:4;86:13;102:17;121:10;128:17;140:16;144:25;146:22;153:3,15,20,21;155:9,9;158:23;159:4,6,11;172:3
**three-and-a-half (1)**
87:15
**throw (1)**
80:20
**throwing (1)**
96:13
**thunder (1)**
48:1
**Thursday (4)**
52:10;151:16;174:13;177:3
**tide (1)**
11:23
**tied (2)**
100:13;121:15
**till (1)**
172:3
**timely (1)**
85:15
**times (15)**
9:1;26:12;44:2;54:10;56:18;57:23;59:18,23;84:19,24;111:23;158:17;170:19;175:6,16
**timetable (2)**
171:7;176:9
**tiny (1)**
78:5
**Tip (1)**
171:21
**titled (1)**
126:9
**today (56)**
6:9;8:8;9:4,19,22;13:17;14:24;16:3;17:6;18:12;19:1;51:23;53:16;79:19,25;80:2,10,21;81:3,25;82:1,12;84:2;103:6;104:15,15;106:13;107:22;113:13,14;120:4,6;125:21;127:16;128:2;138:2,14;150:10;154:7,15;165:19,21;166:14;169:2,4,9;170:3,24;172:22;173:3,6;174:12;175:4,10;176:9;177:23
**to-do (1)**
143:1
**together (17)**
15:20;29:25;34:1,24;88:24,25;100:6,13;104:5;140:23;143:11;166:5,11;167:12;168:2;170:1,7
**told (9)**
29:6;41:18;145:17,20;159:25;160:15;163:19;172:14,16
**tolerated (1)**
39:15
**Tom (1)**
152:23
**tomorrow (61)**
8:7;16:3;19:1;43:5;78:9;79:20,23;81:3;82:18;83:5;96:5;113:11,13;120:7,10,12;128:21;131:18;138:7,15,19;139:21,24;140:1;141:14;144:12,16;147:1,2,4,6,19;150:20;151:6,19;152:7;165:18,23;166:10;168:6,6,9,13;169:4;170:1,25;171:9,10;172:3,8,16,16;173:1,7,8,19;175:4;176:1,10;177:9,21
**tomorrow's (2)**
78:20;151:4
**tonight (1)**
151:4
**took (1)**
91:23
**top (4)**
75:11;121:9;144:4;171:22
**topic (1)**
81:14
**tort (13)**
13:21;27:23;28:12,13;30:15;44:25;114:13;115:11;118:14;131:8,22;158:21;161:15
**tortfeaser (1)**
156:23
**Tosdal (49)**
91:2,23;152:6,9,11,12,14,17,20,23,23;153:13,16,18,22;154:6,12,22,25;155:4,11,13,23;156:1,7,17;157:11,17,21,23;158:1,5,8,11,14;160:11,15,18,24;162:10,12,16,18,23;163:1,7;164:23;165:4,6
**Tosdal's (1)**
90:23
**total (1)**
84:14
**totally (2)**
27:3;62:19
**touch (4)**
7:25;30:3,6;50:22
**towards (2)**
85:15;100:1
**track (4)**
15:14;83:12;149:2;170:12
**trade (3)**
16:22;56:8;95:8
**traditional (3)**
123:10;163:20,20
**trail (1)**
112:24
**transcript (2)**
62:6;164:5
**transferred (3)**
42:7,10;44:16
**translated (1)**
46:7
**treat (4)**
62:23;73:8;156:15;172:9
**treated (9)**
42:21;70:22;71:7;72:11;74:5;114:13;117:18,20;156:16
**treatment (24)**
38:12;48:13;50:15,16;61:11;63:1;69:10,12;71:9,13;73:9,22;75:22;76:5,12;77:1;88:19;105:18;153:7,22;159:15;161:10,11,14
**Tredinnick (5)**
79:16;112:24;113:11;128:17;176:15
**Tredinnick's (1)**
128:6
**trial (3)**
62:7;76:10;77:19
**tried (1)**
23:6
**triple-negatives (1)**
23:9
**trouble (3)**
58:14;161:23,23
**Troy (7)**
78:8;79:24;120:9;128:20,25;139:5;169:5
**true (2)**
56:25;157:3
**true-up (3)**
135:18,21,24
**trust (30)**
17:2,3;21:21,21;24:1;32:3;42:7,10;44:1,17;46:10;63:1;64:25;65:16;74:24;85:14;93:3;98:21;102:24;107:14;108:25;109:17;110:10;111:11;129:18,24;130:1,4;131:24;164:7
**trustee (14)**
14:3;21:1,4,10;98:25;99:3,22;103:12;104:4,16;105:2;130:5;131:11;164:8
**trustees' (2)**
131:3,6
**trustee's (5)**
100:10,12;103:1;105:23;164:9
**trusts (1)**
10:10
**try (15)**
18:19;19:16;24:13;28:21;30:10;52:22;83:5,15;86:8;94:10;139:17;146:3;170:19;174:21;177:15
**trying (17)**
9:1;23:3;41:25;59:4;73:16;82:24;89:19;98:25;103:17;105:14;123:19,21;147:14;151:12;165:17;166:4;167:14
**Tsekerides (18)**
5:13,18,19;6:2,18;8:6;46:21,23,24;47:5,7,9;169:17,22,23;170:14;174:23;175:21
**Tuesday (1)**
45:10
**turn (14)**
7:21;29:19;42:3,4;46:19;47:2,14;78:18,25;92:24;93:1;136:14;138:1;148:6
**turned (2)**
11:23;143:18
**turns (3)**
56:1;101:3;116:20
**tweak (2)**
98:17;162:13
**tweaks (1)**
95:25
**twelve (1)**
84:13
**twenty (7)**
24:1;84:14;87:6;97:25;144:15;147:18;176:4
**twenty-four (2)**
99:3,5
**twice (1)**
167:15
**two (45)**
5:20;6:25;14:13;15:3,4;38:25;41:12;42:4;44:8;45:18;48:2;

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 204 of 207

51:24;54:17,17;59:11, 14,25,25;62:6;63:3; 68:16;69:15;72:11; 75:7;88:15;92:17; 95:21,23;102:5,6; 107:15;108:18;109:2, 4;122:16;144:7,25; 147:18;149:14,19; 151:23;152:25;153:10; 163:13;166:25
**two-and-a- (1)** 6:6
**two-and-a-half (2)** 6:23;7:5
**two-day (1)** 56:8
**two-hour (1)** 75:6
**type (4)** 25:15;118:13; 156:21,22
**types (2)** 33:8;39:14
**typographical (1)** 63:21

**U**

**UCC (5)** 13:24;14:16,16; 16:21;170:1
**ultimate (1)** 90:6
**ultimately (4)** 110:22;111:20,25; 156:15
**umbrage (1)** 43:25
**Um-hum (1)** 109:14
**unable (2)** 79:24;159:3
**unavailability (1)** 174:2
**unavailable (1)** 78:14
**uncertainty (1)** 33:22
**unclear (1)** 144:24
**uncontroverted (7)** 12:13,14;33:25; 34:21;35:2;37:19; 39:16
**under (62)** 9:3;12:8,17;23:19; 31:10,21;37:18;40:15; 41:2;42:7,10,21;44:14, 21;50:15;51:1;56:12, 14,24;61:10;62:20; 64:24;65:21;67:13; 69:10;71:16;73:23; 74:15,18;75:21;80:12; 87:8;88:14,20,24;89:2, 12;91:13;92:19; 103:10;122:20;126:1, 13,16,17;127:9;132:7; 133:23;134:4;135:12, 14,15,24,25;136:1; 139:12;151:23;153:6; 157:22;162:6,24; 166:19
**underlying (2)** 31:19;75:21
**undermines (1)** 38:3
**understandable (1)** 21:5
**understands (2)** 96:12;141:13
**understood (1)** 46:4
**undertook (1)** 28:10
**undisputed (1)** 39:16
**undoubtedly (1)** 48:21
**unfair (7)** 50:21;72:11,25;75:8; 163:24;164:14,16
**unfairly (2)** 71:14;72:1
**unfairness (1)** 163:12
**unfolded (1)** 84:25
**unforeseen (1)** 134:19
**unfortunate (1)** 114:20
**Unfortunately (1)** 103:4
**unfounded (1)** 38:10
**unimpaired (4)** 25:17;113:24;114:2, 22
**unimpairment (4)** 25:8,9,9,12
**union (2)** 161:23,23
**unique (1)** 89:7
**unit (2)** 22:23;141:6
**United (1)** 150:15
**units (6)** 22:12,15;25:2,6,15; 127:17
**unknown (2)** 125:25;134:18
**unless (8)** 8:14,16;46:17;68:14; 89:24;90:14;131:18; 174:15
**unlike (1)** 114:11
**unlikely (5)** 35:3,6,10,11,20
**unliquidated (3)** 32:16;156:13;158:20
**unmute (12)** 96:22;101:18;116:3; 120:19;137:20;143:14, 15;148:5;165:12; 170:20;171:16;173:13
**unmuted (2)** 95:2;144:3
**unprecedented (1)** 9:10
**unprepared (1)** 170:24
**unrelated (2)** 39:1,3
**unresolved (4)** 28:24;99:10;146:8; 177:15
**unsecured (4)** 83:25;114:14; 158:20;166:2
**unusual (2)** 28:8;118:13
**up (72)** 7:23;8:8,15;13:12; 15:2,14;24:23;32:18; 41:22;44:9;51:1,16; 56:22;57:7;58:19; 60:18;63:21;73:14; 75:5,5;76:8,14;78:8; 79:24;82:5,20;83:5; 87:18;88:8;90:18; 94:10;97:21;101:8,24; 106:7;108:10,18; 110:18;111:21;112:1; 113:2,6;116:17,18,19, 19;119:23;120:15; 124:19;125:8;128:15; 133:3;141:13;144:2,4; 146:14;147:5,25; 151:16,17;152:9; 156:23;162:8;164:8; 167:22;169:14;170:7, 22;171:7,8;174:6,16
**update (1)** 18:25
**updated (2)** 13:8,9
**upon (15)** 8:5;10:14;18:1;19:3; 44:25;50:22;58:13; 59:21,21;61:19;78:10; 80:1,22;138:22;159:5
**urge (3)** 47:22;86:24;94:17
**urged (1)** 154:24
**urges (1)** 55:14
**use (15)** 53:14;56:15;59:8; 62:16;64:16;84:9;90:4; 98:1;106:15;121:2; 138:14;139:2,14; 141:18,21
**used (3)** 63:7;64:6,22
**uses (1)** 64:5
**using (6)** 56:3;76:19;82:7; 101:22,23;146:13
**utility (14)** 68:20,22;69:1,4,9, 17;70:20,24;71:2,3,5,6, 9;84:14

**V**

**vague (1)** 81:24
**valid (3)** 21:15;69:4;74:6
**valuation (1)** 43:12
**value (21)** 40:19;42:13;43:13; 44:20,21;46:9;51:9,10; 53:23;54:12,14;55:2; 57:5,22;59:20,24; 76:21;110:2,25; 111:12;145:24
**various (3)** 115:10;138:5;175:10
**vendors (1)** 107:16
**verbatim (1)** 91:7
**verified (2)** 40:2,2
**version (7)** 63:6,8,20,23,23; 98:13,16
**versions (1)** 128:11
**versus (1)** 60:25
**viability (1)** 31:6
**victim (30)** 10:10;21:21;23:25; 32:18,19;42:7;44:15, 16,19,21;64:25;74:24; 88:17;114:19;115:11; 129:17,24;130:1; 139:13;153:5,11; 155:2;156:9,11;157:2; 158:2;160:12,20; 161:6;162:19
**victims (41)** 9:20,25;11:13;12:20, 25;21:21;24:4;31:1; 33:9;36:4;42:5,14; 67:11;73:19,21;74:10; 87:11,11,12;89:11; 93:3;107:14;111:6,11, 17;114:20;115:12; 131:23;154:7,8; 156:21;157:10;160:14; 163:18,23;164:1,12,15, 16,20,21
**victims' (1)** 12:21
**Victim's (1)** 159:25
**victory (1)** 29:16
**video (13)** 47:3;78:25;96:23,23; 101:19,22,23;102:3; 136:14;143:18;144:2; 148:6;165:12
**view (10)** 7:9;9:2;18:18;25:16; 37:5,6,6;40:20;167:10; 176:25
**views (1)** 80:7
**vindicate (1)** 113:25
**violated (1)** 135:1
**violations (1)** 52:12
**virtually (3)** 9:7;10:19;159:11
**virtue (2)** 98:24;161:13
**visibility (1)** 29:9
**visually (1)** 51:16
**voices (1)** 12:24
**voluntarily (1)** 154:4
**vote (1)** 31:9
**voted (5)** 11:17,21;42:14;48:3, 4
**votes (3)** 37:21,25;38:2
**voting (5)** 11:16,17;38:4,10; 129:23

**W**

**Wait (9)** 57:11;97:6,8;126:19, 19;148:14;150:20; 154:18;168:4
**waiting (3)**

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 205 of 207

13:1;154:10;156:11
**waiver (5)**
21:18;126:9,11;
127:25;136:3
**Wall (2)**
163:22;164:15
**Wallace (14)**
38:7;39:11,24;40:4;
170:17;171:15,16,18,
20,24;172:2,7,18;175:8
**Wallace's (1)**
39:9
**wants (9)**
19:4;40:4;46:21;
120:15;133:19;137:18,
21;147:16;152:7
**watch (2)**
7:15;77:15
**way (33)**
17:13;18:11;21:25;
25:5;27:4;28:22;38:3;
51:15;55:7;60:22;
67:25;68:15;81:6;
94:13;100:6;101:17;
103:19;104:18;105:20;
110:5;122:15;138:13;
139:23;145:2,4;147:4;
153:12;156:14,14;
167:17;168:24;175:13,
13
**wedge (3)**
56:11,19,20
**WEDNESDAY (3)**
5:1;151:15;174:13
**weeds (1)**
124:23
**week (4)**
45:9,10;63:22;
145:12
**weekend (2)**
82:6;166:15
**weeks (2)**
54:17;85:6
**weigh (4)**
10:24;114:18;141:8;
177:9
**weighed (1)**
15:16
**Weil (1)**
8:21
**welcome (2)**
89:23;102:6
**well-aware (1)**
84:23
**well-known (1)**
30:7
**Wells (18)**
10:4;11:7;32:10;
33:25;34:11,13;35:17;
63:6;66:3;89:5;90:24;
92:15;108:6,8;157:7;
159:1;160:19;163:19
**Wells' (5)**
29:21,24;31:14,23;
155:17
**weren't (5)**
104:8,22;111:9;
139:1;172:14
**Westlaw (1)**
50:4
**Whatever's (1)**
147:9
**what's (18)**
23:19,20;25:1;29:10;
38:16;43:10,10,20,20;
60:24;72:5;143:25;
146:8;149:24;153:20;
155:23;165:21;167:2
**whatsoever (1)**
48:9
**whenever (2)**
7:6;61:14
**whereby (1)**
164:11
**Whereupon (2)**
136:18;177:25
**whichever (1)**
167:17
**whole (10)**
33:12;87:19,21;93:8;
118:11;121:3,9;124:6;
130:3;173:1
**whopping (1)**
56:16
**who's (2)**
97:17;120:15
**whose (2)**
49:20;61:23
**who've (1)**
55:3
**wife (2)**
102:15;104:1
**wildfire (22)**
11:15;30:25;31:2,3;
34:9,18,20,25;36:4;
37:7;41:1;85:4,12;
87:24;88:2,17,18;89:7;
153:4,5;160:20;161:4
**wildfires (1)**
32:15
**willful (2)**
26:22;94:15
**willing (1)**
167:17
**willingness (2)**
73:14;176:19
**winding (1)**
56:22
**window (1)**
47:20
**Winsberg (8)**
78:1;79:22;120:11;
136:17;137:2,2;168:4;
169:3
**Winthrop (16)**
18:9,12,16;96:16,18,
20,21;97:11,13,22,24;
100:20,23,24;101:13;
104:11
**Winthrop's (1)**
97:4
**wisdom (1)**
29:11
**wish (8)**
7:16;81:13;82:2,13;
89:22;95:5;175:16,21
**wishes (2)**
81:2;82:9
**Witch (1)**
52:6
**withdraw (1)**
119:22
**withdrawn (4)**
13:22;88:3;101:2;
119:24
**withdrew (1)**
14:4
**withheld (1)**
119:16
**within (2)**
85:5;147:13
**without (12)**
29:1;65:18;68:6;
76:16;78:19;103:2;
107:7;110:3;154:17;
163:11;164:17,18
**witness (3)**
97:18,19;112:16
**wonder (1)**
137:19
**word (4)**
41:22;114:6;132:10;
172:14
**wording (1)**
148:22
**words (15)**
22:6,7;28:20;43:23;
49:10;53:15;67:6;69:8;
70:9;76:17;118:19;
122:2;138:9;156:9;
168:22
**work (30)**
15:20,25;16:16;19:6,
7;69:24;80:6,20;83:16,
22;95:10,23;99:9,14,
18;101:1;104:5;
122:18,18;138:20;
144:14;147:14;151:17,
18;169:1;171:12;
174:3,6,12;177:18
**worked (6)**
84:17;89:20;98:12;
99:19;113:5,6
**workers' (1)**
114:11
**working (12)**
10:16,19;13:12;
19:15;34:11;35:15;
98:5;99:21,23;101:10;
144:11;176:22
**works (10)**
23:16;39:10;96:1,5;
105:20;132:2;138:21;
164:11;170:7,8
**world (4)**
57:2;58:6;74:3;
86:14
**worried (1)**
142:15
**worry (1)**
29:17
**worrying (1)**
41:13
**worth (3)**
44:1;48:2,12
**wound (1)**
63:20
**wrap (2)**
75:5,5
**write (1)**
63:17
**wrong (5)**
56:24;68:19;94:7,7;
146:13
**wrongdoer (1)**
67:7
**wrongdoers (2)**
66:11,12
**wrongdoing (2)**
66:15,16
**wrongful (3)**
91:18;92:5;157:14

### Y

**year (7)**
39:2,4;73:2;135:17,
18,19,21
**years (10)**
11:14;27:14,14,15;
40:24,24;57:6;61:25;
69:25;84:21
**yesterday (12)**
13:20;14:7,12;29:4;
77:25;80:13;100:9;
111:24;148:21;149:7,
9;175:16
**York (1)**
37:13

### Z

**zero (1)**
138:18
**Ziman (10)**
10:4;11:7;24:7;
29:23;33:25;34:10;
35:14,16;64:15;164:5
**Ziman's (3)**
85:4;164:2,7
**Zoom (4)**
7:9;16:16;116:6;
172:21

### 1

**1 (5)**
16:6;91:7,9,10,24
**1.15 (2)**
56:7;58:20
**1.81 (1)**
44:22
**1:30 (1)**
113:8
**10 (1)**
177:9
**10.13 (17)**
22:12,20,24;23:12;
24:19,25;25:22;26:23;
127:16,19,20,21,23;
128:4,8;141:4,8
**10.3 (12)**
17:10,22;22:5,8;
25:21;98:11;117:1,6,8;
119:1;127:12;129:8
**10.6 (1)**
113:10
**10.8 (1)**
26:9
**10.9 (3)**
20:16;25:22;98:11
**10.9c (1)**
20:22
**10.9e (3)**
126:9,16;127:6
**10:30 (1)**
177:9
**100,000 (1)**
156:10
**1054 (10)**
9:3,15,23;11:15;
30:24;36:1,6,8;86:24;
164:18
**10A- (2)**
71:13;76:5
**10A-II (7)**
47:25;48:3;49:2,3;
50:15;64:16;68:23
**11 (13)**
23:13,14,23;25:19;
26:21;31:8;34:2;35:1;
39:2;85:3,5,10;132:7
**11.1 (2)**
132:5,5
**110 (1)**
87:5
**1122 (3)**
88:22;89:2,16
**1123a4 (2)**
88:20;89:12
**1129 (3)**
12:17;86:22;112:1
**1129a (5)**
12:17;29:20,23;30:7;
37:18

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 206 of 207

**1129a1 (1)**
30:4
**1129a11 (1)**
33:16
**1129a7 (1)**
40:15
**1129b (3)**
12:4,18;71:13
**1141 (4)**
18:4;22:6;126:1,16
**115 (1)**
162:20
**119,134 (1)**
48:20
**12 (13)**
52:3,4,10,13,16;
53:21;54:4;55:21;56:1;
63:8,11,18;64:9
**12:45 (4)**
77:16,22;78:14,23
**120,000 (1)**
48:24
**12th (2)**
59:15;64:3
**13 (1)**
54:5
**1352 (1)**
72:4
**13th (1)**
59:16
**14.9 (1)**
44:23
**15 (2)**
54:25;164:5
**1542 (2)**
126:11;136:3
**16 (4)**
63:7,11;69:6;114:9
**16th (2)**
63:21,22
**17 (1)**
114:8
**18.31 (2)**
56:16,23
**1936 (1)**
107:18

**2**

**2 (2)**
24:25;107:18
**2,000 (1)**
76:13
**2.1 (1)**
119:3
**2.4 (1)**
140:19
**20 (1)**
125:13
**2003 (1)**
69:21
**2007 (1)**
52:6
**2015 (1)**
52:7
**2017 (9)**
52:3,4,10;53:22;
55:21;63:7,8;64:3,9
**2018 (1)**
54:25
**2019 (1)**
50:4
**2020 (2)**
5:1;86:23
**21 (1)**
142:5
**230 (1)**
175:1
**246 (1)**
52:15
**265 (1)**
50:3
**283 (1)**
91:8
**287 (1)**
175:1
**28th (1)**
80:8

**3**

**3 (2)**
5:1;108:9
**3.22 (4)**
56:8,10,12,22
**300 (2)**
24:15;35:14
**30th (2)**
9:15;86:23
**326 (1)**
50:3
**35.9 (3)**
53:11,22;57:25
**350 (1)**
65:22
**365 (2)**
134:2;136:1
**3973869 (1)**
50:4

**4**

**4 (1)**
169:9
**400 (2)**
108:10,18

**5**

**5 (2)**
153:4;159:8
**5,000 (2)**
76:13;158:17
**502 (6)**
62:20,20;166:7;
167:2,4,23
**502b (1)**
62:16
**502e (3)**
15:19;166:25;169:25
**510b (8)**
49:4,15,23,24;51:2,
6;65:21;70:9
**59 (1)**
52:16
**591 (1)**
65:22

**6**

**6 (3)**
54:1;142:5;160:24
**6.1 (3)**
17:10;41:17;113:10
**6.75 (2)**
43:25;44:18
**60 (1)**
52:16
**658 (1)**
158:19
**67 (1)**
48:4

**7**

**7 (4)**
40:18;114:15;
134:13;159:8
**7.3 (1)**
54:9
**7037 (1)**
107:15
**7263 (1)**
116:21
**7280 (1)**
141:19
**7281 (1)**
125:16
**7509 (1)**
131:23
**7510 (1)**
108:7
**7522 (1)**
131:23
**7528-1 (2)**
114:8;142:5
**7597 (1)**
103:7
**7633 (1)**
80:9
**787 (1)**
72:4

**8**

**8 (2)**
55:24;160:25
**8.2 (1)**
134:18
**8.2e (3)**
133:16;134:15;
135:25
**80,000 (1)**
157:13
**808 (2)**
50:1;70:14
**834 (1)**
69:21

**9**

**9 (2)**
63:7;130:21
**9:30 (1)**
176:2
**90 (1)**
50:1
**9019 (1)**
41:13
**918 (1)**
73:2
**933 (1)**
73:2
**942 (1)**
70:15
**950 (1)**
70:25
**951 (1)**
70:25
**9th (1)**
132:9

Case: 19-30088 Doc# 7784 Filed: 06/04/20 Entered: 06/04/20 18:41:03 Page 207 of 207