WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel:     (415) 496-6723
Fax:     (415) 636-9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br>Debtors. | Civil Case No. 19-05257 (JD)<br>Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST** |

PG&E Corporation and Pacific Gas and Electric Company (together, "**PG&E**" or the "**Debtors**") and the Official Committee of Tort Claimants (the "**TCC**") jointly submit this statement pursuant to the Court's May 21, 2020 request in connection with the *Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a) and 502(c) to Establish Estimated Amount of Fire Victim Claims For All Purposes of the Chapter 11 Cases*, Dkt. No. 286 (March 20, 2020) (the "**Estimation Approval Motion**").

On March 20, 2020, the Debtors filed the Estimation Approval Motion, asking this Court to issue an order estimating the aggregate Fire Victim Claims at the amount agreed to by the Debtors, the TCC and attorneys representing over 70% of Fire Victims in the Tort Claimant RSA, as amended, as the Aggregate Fire Victim Consideration amount, for all purposes in the Debtors' chapter 11 cases (including, without limitation, for purposes of establishing the aggregate amount to be funded by the Debtors to the Fire Victim Trust under the Plan), and concluding the estimation proceedings.[1] The Debtors and the TCC (together, the "**Parties**") subsequently submitted a stipulated proposed order to this effect on May 20, 2020. (Dkt. No. 367-1). On May 21, 2020, this Court held a hearing on the Estimation Approval Motion (the "**May 21 Hearing**"). During that hearing, the Court asked the Parties to provide the Court with a written statement outlining the information and data used to reach the Aggregate Fire Victim Consideration. (*See* May 21, 2020 Hr'g Tr. at 35:3-14.) The Debtors and the TCC submit this statement in response to the Court's request. Before doing so, the Debtors and the TCC first address the form of order requested by the Estimation Approval Motion.

## I.  **The Requested Relief**

The Estimation Approval Motion before the Court was required pursuant to the Tort Claimant RSA, which the Bankruptcy Court approved by order entered on December 19, 2019. (Bankr. Dkt. No. 5173). Pursuant to the Tort Claimant RSA as approved by the Bankruptcy Court, the parties to the Tort Claimant RSA were required to seek an order from this Court "which shall provide for the aggregate estimation and aggregate allocation of the Fire Victim Claims in the amount of the Aggregate Fire Victim Consideration for all purposes in these Chapter 11 Cases". (Bankr. Dkt.

---

[1] Capitalized terms not defined herein shall have the meanings assigned to them in the Estimation Approval Motion.

Case: 19-30088   Doc# 7820-1   Filed: 06/08/20   Entered: 06/08/20 11:11:51   Page 2 of 12

1    No. 5038-1, at 3.)   Two critical definitional issues are reflected in that provision that were discussed

2    during the May 21 Hearing before this Court.

3              *First*, although the Court referenced during the May 21 Hearing the possibility of

4    estimating the Fire Victim Claims at a particular number, that is not the relief requested in the

5    Estimation Approval Motion and it is not the estimated value that has been agreed upon by the parties

6    to the Tort Claimant RSA.  As required by the Tort Claimant RSA, the Estimation Approval Motion

7    requests estimation at the agreed Aggregate Fire Victim Consideration.  That amount includes not only

8    cash of $6.75 billion, but also $6.75 billion in stock valued pursuant to a specified formula, and certain

9    assigned claims that the Fire Victim Trust can pursue on behalf of the wildfire victims that otherwise

10   would have remained the property of the Debtors.  The TCC believes those assigned claims have

11   significant value.[2]  No party to these proceedings has agreed that the estimated value of the Fire Victim

12   Claims is equal to a particular number, such as $13.5 billion.  Instead, the parties carefully negotiated

13   a mix of consideration that could be worth more or less than that number depending on fluctuations in

14   stock value and the value of any recoveries on the assigned claims.  The settlement of the parties to

15   the stipulated Aggregate Fire Victim Consideration provides a factual and evidentiary basis for this

16   Court to estimate the Fire Victim Claims at that mix of consideration, particularly as supplemented by

17   the information set forth below providing a detailed background as to how the parties to the Tort

18   Claimant RSA arrived at that estimate.  By contrast, there is nothing in the record that would support

19   estimation of the Fire Victim Claims (or any subset of them) at a specified dollar amount.

20             As the Court itself has noted, these proceedings have always been about estimating the

21   *aggregate* overall amount of the wildfire claims.  That is exactly what is represented in the agreed-

22   upon defined term *Aggregate* Fire Victim Consideration.  Given the complex and variable nature of

23   certain components of that definition, it is not possible to reduce it to a precise legally binding number

24   — the $13.5 billion number is illustrative, but the actual value of the consideration could be higher or

25

26   [2] The TCC apparently is not alone in this belief.  Three Federal agencies—the Department of
     Agriculture, the Department of the Interior and HUD—agreed to have their combined claim for $117
27   million paid *solely* from recoveries in litigation of those claims.  (Bankr. Dkt. No. 7399-1.)

28

lower.  That is the bargain struck by the parties and thus the relief sought is tied to the defined term Aggregate Fire Victim Consideration, which incorporates certain variables.  Accordingly, the Debtors and the TCC respectfully request that the Court estimate the Fire Victim Claims at the Aggregate Fire Victim Consideration consistent with the Tort Claimant RSA.  However, if the Court declines to estimate the Fire Victim Claims at the Aggregate Fire Victim Consideration consistent with the Tort Claimant RSA, the Debtors and the TCC request that the Court deem both the Estimation Approval Motion and the Debtors' initial motion to estimate claims withdrawn and dismiss these proceedings without entering an estimation order.

*Second*, the Estimation Approval Motion requests an estimate of the aggregate value of the Fire Victim Claims.  That is the estimate required by the Tort Claimant RSA.  "Fire Victim Claims" is defined in the Tort Claimant RSA as any claim against the Debtors arising out of the wildfires at issue in these estimation proceedings "that is not a Public Entities Wildfire Claim or a Subrogation Wildfire Claim."[3]  (*See* Exhibit A to Tort Claimant RSA, Bankr. Dkt. No. 5038-1.)  In other words, the agreed valuation of the claims at issue in this motion relates to *all* Fire Victim Claims (personal injury or otherwise, and whether liquidated, or non-contingent), excluding only the Subrogation Claims and Public Entity Wildfire Claims.  This includes claims that certain parties now claim may be liquidated, because the purpose of the settlement is to establish Plan treatment for the entire class of Fire Victim Claims.  Whether or not any particular claim is liquidated or non-contingent, the aggregate amount of all claims is not.  An estimation of only a subset of the Fire Victim Claims— *e.g.*, any estimation only of those claims that are not individually liquidated—at the Aggregate Fire Victim Consideration would overstate the value of that subset of claims pursuant to the parties' agreement.  In other words, the parties have agreed that *all* Fire Victim Claims are valued at the Aggregate Fire Victim Consideration; there is no record to support the estimation of some subset of

---

[3] Public Entity Claims are those claims held by a specified subset of local government entities that were settled prior to the withdrawal of the reference.  While the Subrogation Claims were initially included in the withdrawal of reference, they are no longer a part of these proceedings since those claims also have been settled at an allowed amount of $11 billion with such settlement to be implemented pursuant to the Plan.

those claims at that aggregate value.  To the extent that the Court believes that it is somehow precluded from estimating all Fire Victim Claims at the Aggregate Fire Victim Consideration, the Parties submit that any order should state as follows (edits as compared to the form of the proposed order in **bold**):

> Subject to the Bankruptcy Court confirming the Plan and the occurrence of the Effective Date of the Plan, the estimated aggregate amount of **all contingent or unliquidated** Fire Victim Claims is the Aggregate Fire Victim Consideration (as such term is defined above) as agreed upon by the Parties in the Tort Claimant RSA, **less the value of any Fire Victim Claims that are either non-contingent or liquidated as of the date hereof,** for all purposes in the Debtors' Chapter 11 cases (including, without limitation, for distribution to the Fire Victim Trust under the Plan).  **This order is not intended to and does not affect the classification or treatment of any claim under the Plan.  The Court does not express any view as to which Fire Victim Claims are non-contingent or liquidated.**

## II.   The Basis for the Agreement to the Aggregate Fire Victim Consideration

As explained by counsel for the Debtors and the TCC during the May 21 Hearing, the Aggregate Fire Victim Consideration was reached through extensive, arm's-length, good faith negotiations and mediation sessions conducted with the assistance of a court-appointed mediator that spanned several weeks.  While the specific communications made in these mediation sessions remain subject to mediation confidentiality, as a general matter, the Debtors, the Shareholder Proponents of the Plan, the TCC and attorneys representing over 70% of individual holders of Fire Victim Claims extensively negotiated the value of the Fire Victim Claims based on the substantial body of data regarding these claims and prior settlements available to the parties.  This included information submitted by wildfire claimants as part of the Debtors' chapter 11 proceedings, substantial discovery from both the underlying state court proceedings (including from the Tubbs Cases, defined below, for which the Bankruptcy Court lifted the bankruptcy stay to allow a trial to proceed in state court) and the estimation proceedings before this Court, extensive historical settlement data from the Debtors' previous wildfire-related settlements, as well as a wide variety of public data (including insurance data) regarding the losses suffered by wildfire claimants.  In addition, the Parties had access to PG&E's estimates of potential losses reflected in the Debtor's financial accounting accruals.

During the settlement negotiations, the Parties had available to them extensive regression analyses conducted by economic experts that analyzed past settlement data and isolated past settlement amounts for specific categories of damages that could then be applied to the wildfire claims at issue.  This data was supplemented by opinions from highly qualified subject matter experts who considered, among other things, the ways in which the 2017 and 2018 wildfires were both similar and different from the circumstances underlying prior settlements.  These experts also offered expertise on the likely magnitude of damages for specific categories of damages as well as issues related to the likelihood of liability with regard to each wildfire.  At the time of the settlement, these opinions were well-developed and the Parties were just a week away from exchanging expert reports in the estimation proceedings, which were to establish a basis for the Court to determine the potential damages and likelihood of liability with respect to the wildfires in order to establish the aggregate amount of Fire Victim Claims.  As explained in more detail below, this information provided the Parties with a substantial basis for negotiating and arriving at the Aggregate Fire Victim Consideration.

The Aggregate Fire Victim Consideration was informed by the Parties' consideration of a wide variety of data that was used to assess potential damages in numerous loss and damages categories.  This included analysis of the following data provided in connection with the bankruptcy and state court proceedings:

- Data from over 75,000 individual wildfire-related proof of claim forms filed in the Debtors' chapter 11 proceedings, including data concerning the number of individuals claiming loss, the location of the claimed loss, the types of economic and non-economic losses claimed, types of asserted losses suffered and valuation of losses (where available);

- Data from over 500 subrogation insurer proof of claim forms and their attachments filed in the Debtors' chapter 11 proceedings, including information regarding the total amount of insurance payments already paid and reserved in connection with the wildfires, as well as the individual payments received by insureds on an address-by-address basis in connection with the wildfires;

- Data provided by the individual wildfire claimants through a database managed by Brown Greer, including detailed information regarding the reported damages of over 25,000 individual wildfire claimants in a variety of categories including business losses, real and personal property losses, personal injury losses and insurance

coverage as well as information regarding the address and insurance information for additional claimants[4];

- Discovery of PG&E and individual wildfire claimant documents and data that occurred in connection with the state court Judicial Council Coordination Proceedings, the Debtors' chapter 11 estimation proceedings and the preference cases arising out of the Tubbs fire that were set for trial in the Superior Court for the State of California (the "**Tubbs Cases**");

- Over 130 depositions of PG&E employees, wildfire claimants, first responders and other third parties in connection with the state court Judicial Council Coordination Proceedings, the Debtors' chapter 11 estimation proceedings and the Tubbs Cases; and

- Mediation materials, including discovery, exchanged in connection with the cases arising from the 2015 Butte Fire that had not yet been settled.

The Parties also had access to and considered the following public and proprietary data:

- CAL FIRE data regarding the wildfires, including data regarding fire perimeters, number of acres burned, the number of injuries and deaths, the addresses and parcel numbers of specific structures that were damaged or destroyed, as well as the level of damage incurred for each structure;

- Mapping data reflecting fire-specific information, including the fire perimeter, spread of the fire, type of land covered by the fire, burn severity, properties within the fire perimeter and other information relevant to damages;

- Public and proprietary data regarding the properties in the fire perimeter, including census data, county assessor data and property values data, including market data from real estate transactions;

- Public data regarding rebuilding costs;

- Public data regarding cost of remediating smoke and soot damage;

- Public data regarding the value of personal property;

- Public and proprietary data concerning business revenue, number of employees and industry-specific profit margins;

- Government and third-party data on wages;

---

[4] In the state court Judicial Council Coordination Proceedings, the Court appointed Brown Greer to collect and organize case-specific, damages-related information related to all claims filed in the coordinated proceedings.  Pursuant to agreement of the Parties, that portal was maintained and updated after the filing of the Debtors' chapter 11 cases to collect and organize damages-related information for certain wildfire claimants.

- Government and other public data concerning agricultural commodities in the fire perimeter, including the prices of agricultural commodities and other information relevant to damages;

- Government data concerning economic costs associated with various types of personal injuries;

- Findings of various regulatory agencies regarding the extent of losses suffered;

- Public and proprietary data regarding the extent of insurance coverage with regard to the specific wildfires; and

- The Debtors' publicly filed accounting charges taken to accrue for the Fire Victim Claims.

The Parties moreover had access to and considered the following data regarding past settlements:

- Data from the Debtors' settlements with over 1,500 individual and subrogation plaintiffs in litigation arising from the 2015 Butte Fire, including information regarding the Debtors' allocation of final settlement amounts across various categories of damages, plaintiffs' demands, and all documents exchanged between the parties as part of the mediations that preceded the settlements;

- Other historical settlements involving the Debtors;

- Historical wildfire settlements involving other California utilities; and

- Jury verdicts and settlements for specific categories of damages, including personal injury, wrongful death and attorney's fees.

Additionally, the attorneys who represented 70% of the wildfire victims included attorneys who had led litigation against the Debtors in previous cases, including in the Butte Fire state court litigation, and had represented plaintiffs in the North Bay Fires Judicial Council Coordination Proceedings, as well as in connection with the Camp Fire. These attorneys had direct knowledge of the value of past settlements, how those settlements were reached, and how prior cases and individual damages components were assessed and valued, thereby providing the Parties and the mediator the benefit of their previous experience.

In connection with these estimation proceedings, the Parties commissioned subject matter damages experts to analyze and opine on the value of the wildfire claims losses in numerous

JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN
RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST
CIVIL CASE NO. 19-05257 (JD)

Case: 19-30088   Doc# 7820-1   Filed: 06/08/20   Entered: 06/08/20 11:11:51   Page 8
of 12

categories of damages.  In their initial disclosures in connection with these proceedings, the Debtors

disclosed a list of thirteen experts to opine on the following subject matter areas relevant to damages:

- Real property losses;
- Personal property losses;
- Relocation expenses;
- Business losses;
- Agricultural losses, including vineyard-related losses;
- Forest and timber losses;
- Other vegetation and tree losses;
- Erosion-related losses;
- Infrastructure losses;
- Personal injury losses;
- Wrongful death;
- Emotional distress damages;
- Wildfire smoke inhalation;
- Post-traumatic stress disorder;
- Availability of punitive damages;
- Attorney's fees;
- Standard insurance industry practices, as those practices relate to the validity of benchmarks for uninsured losses and to the average value of various categories of losses;
- Statistical methods employed in estimating damages, including sampling methodology and extrapolation from sample data; and
- Overall damages estimate.

The TCC disclosed a list of six damages experts to opine on the following subject matter areas related

to damages:

- Costs of rebuilding structures impacted by fires;
- Forestry and vegetation losses;

---

JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN
RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST
CIVIL CASE NO. 19-05257 (JD)

8

- Erosion damages;

- Geotechnical issues;

- Physical injury damages;

- Emotional distress damages; and

- Overall damages estimate.

In addition to these damages experts, the Parties commissioned numerous experts to assess and opine on the Debtors' likelihood of liability in order to further assist with their evaluation of damages, including experts in utility industry practice, vegetation management, metallurgy, fire cause and origin and electrical engineering.

The Parties' experts performed extensive work matching, analyzing and interpreting the various data sources. For example, the Parties' economic experts conducted extensive regression analyses of past settlement data that isolated settlement values for different categories of damages. This involved a detailed analysis of the components of prior settlements. It also involved an analysis of the specific circumstances of the prior settlements and a comparison of those circumstances to the 2017 and 2018 wildfires in order to ensure that the experience of past settlement was properly applied to the 2017 and 2018 wildfires. The Parties' subject matter experts also performed work that assessed the actual losses suffered by claimants for the 2017 and 2018 wildfires and issues bearing on the likelihood of liability with respect to each fire. Because expert reports were due to be submitted in the estimation proceedings one week after the settlement was reached, all of this data and analysis, including the data on prior settlements, was well developed and available to the Parties during their negotiation of the Aggregate Fire Victim Consideration.

In short, while the task of agreeing on a number for the Fire Victim Claims was extraordinarily complex and challenging, the settlement process was rigorous and supported by extensive data and expert analysis to complement the skilled legal and litigation analysis on the part of both the Debtors and the TCC.

JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN
RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST
CIVIL CASE NO. 19-05257 (JD)

Case: 19-30088   Doc# 7820-1   Filed: 06/08/20   Entered: 06/08/20 11:11:51   Page 10
of 12

9

1

* * * *

2       In light of the foregoing, the Debtors and the TCC submit that the Aggregate Fire

3   Victim Consideration is an appropriate estimation of the aggregate amount of the Fire Victim Claims

4   and respectfully request that the Court enter an order estimating the aggregate Fire Victim Claims at

5   the Aggregate Fire Victim Consideration, as described in the Tort Claimant RSA, as amended, for all

6   purposes of the Debtors' chapter 11 cases and to conclude these estimation proceedings.  If the Court

7   declines to estimate the Fire Victim Claims at the Aggregate Fire Victim Consideration, the Debtors

8   and the TCC respectfully request that the Court deem both the Estimation Approval Motion and the

9   Debtors' initial motion to estimate claims withdrawn and dismiss these proceedings without entering

10  an estimation order.

11

12  Dated: May 26, 2020

13                                   **WEIL, GOTSHAL & MANGES LLP**
                                     **CRAVATH, SWAINE & MOORE LLP**
14                                   **KELLER BENVENUTTI KIM LLP**

15                                   /s/ *Kevin J. Orsini*
                                     Kevin J. Orsini
16

17
                                     *Attorneys for Debtors and Debtors in Possession*
18

19                                   **BAKER & HOSTETLER LLP**

20                                   /s/ *Robert A. Julian*
21                                   Robert A. Julian
                                     Kimberly S. Morris
22                                   David J. Richardson

23

24                                   *Attorney for The Official Committee of Tort*
                                     *Claimants*
25

26

27

28
___
JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN
RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST
CIVIL CASE NO. 19-05257 (JD)

10

1    "Pursuant to Local Rule 5-1(i)(3), I, Thomas B. Rupp, attest that concurrence in filing this

2    document has been obtained from the other signatories."

3

4    KELLER BENVENUTTI KIM LLP

5

6    */s/ Thomas B. Rupp*

7    Thomas B. Rupp

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATEMENT OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF TORT CLAIMANTS IN
RESPONSE TO THE COURT'S MAY 21, 2020 REQUEST
CIVIL CASE NO. 19-05257 (JD)