**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

## Exhibit C

**Amended and Restated Organizational Documents of the Utility**

**<u>Exhibit C-1</u>**

**Amended and Restated Articles of Incorporation of the Utility**
**(Amends and Supersedes Exhibit J-1 to the Plan Supplement filed May 1, 2020 [Docket No. 7037])**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

AMENDED AND RESTATED
ARTICLES OF INCORPORATION
OF
PACIFIC GAS AND ELECTRIC COMPANY

ANDREW M. VESEY and BRIAN M. WONG certify that:

1.        They are the Chief Executive Officer and President, and the Vice President, Deputy General Counsel and Corporate Secretary, respectively, of Pacific Gas and Electric Company, a California corporation (the "Utility"), and have the power to act on behalf of the Utility pursuant to the order confirming the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated May 22, 2020 [Bankruptcy Docket No. 7521] (the "Plan"), entered on [●], 2020 by the United States Bankruptcy Court for the Northern District of California Case No. 19-30088, the Hon. Dennis Montali judge presiding [Bankruptcy Docket No. [●]].

2.        The Articles of Incorporation of the Utility, as amended to the date of the filing of this certificate, including the amendments set forth herein but not separately filed (and with the omissions required by Section 910 of the California Corporations Code), are amended and restated as follows:

FIRST:  That the name of said corporation shall be

PACIFIC GAS AND ELECTRIC COMPANY.

SECOND:  The purpose of the Utility is to engage in any lawful act or activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business or the practice of a profession permitted to be incorporated by the California Corporations Code.

The right is reserved to this corporation to amend the whole or any part of these Articles of Incorporation in any respect not prohibited by law.

THIRD:  That this corporation shall have perpetual existence.

FOURTH:  The Board of Directors (the "Board") by a vote of two-thirds of the whole Board may appoint from the directors an Executive Committee, which Committee may exercise such powers as may lawfully be conferred upon it by the Bylaws of the Utility; provided, that the powers of the Executive Committee may not supersede the powers and responsibilities delegated to the Safety and Nuclear Oversight Committee in accordance with the charter of the Safety and Nuclear Oversight Committee.  Such Committee may prescribe rules for its own government and its meetings may be held at such places within or without California as said Committee may determine or authorize.

FIFTH:  The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.

1

**SIXTH**:  The Utility is authorized to provide indemnification of agents (as defined in Section 317 of the California Corporations Code) through bylaws, resolutions, agreements with agents, vote of shareholders or disinterested directors, or otherwise, in excess of the indemnification otherwise permitted by Section 317 of the California Corporations Code, subject only to the applicable limits set forth in Section 204 of the California Corporations Code.

**SEVENTH**:  The total number of shares which the Utility is authorized to issue is eight hundred eighty-five million (885,000,000) of the aggregate par value of six billion eight hundred seventy-five million dollars ($6,875,000,000).  All of these shares shall have full voting rights. The Utility shall not issue nonvoting equity securities (as such term is defined in Section 101(16) of the United States Bankruptcy Code ("Bankruptcy Code")) to the extent prohibited by Section 1123(a)(6) of the Bankruptcy Code for so long as such Section 1123(a)(6) is in effect and applicable to the Utility.

Said eight hundred eighty-five million (885,000,000) shares shall be divided into three classes, designated as common stock, first preferred stock and $100 first preferred stock.  Eight hundred million (800,000,000) of said shares shall be common stock, of the par value of $5 per share, seventy-five million (75,000,000) of said shares shall be first preferred stock, of the par value of $25 per share, and ten million (10,000,000) of said shares shall be $100 first preferred stock, of the par value of $100 per share.

FIRST PREFERRED STOCK
AND $100 FIRST PREFERRED STOCK

The first preferred stock and $100 first preferred stock each shall be divided into series. The first series of first preferred stock shall consist of four million two hundred eleven thousand six hundred sixty-two (4,211,662) shares and be designated as Six Per Cent First Preferred Stock.  The second series of first preferred stock shall consist of one million one hundred seventy-three thousand one hundred sixty-three (1,173,163) shares and be designated as Five and One-Half Per Cent First Preferred Stock.  The third series of first preferred stock shall consist of four hundred thousand (400,000) shares and be designated as Five Per Cent First Preferred Stock.  The fourth series of first preferred stock shall consist of one million seven hundred seventy eight thousand one hundred seventy two (1,778,172) shares and be designated as 5% Redeemable First Preferred Stock.  The fifth series of first preferred stock shall consist of nine hundred thirty four thousand three hundred twenty two (934,322) shares and be designated as 5% Redeemable First Preferred Stock, Series A.  The sixth series of first preferred stock shall consist of seven hundred ninety three thousand thirty one (793,031) shares and be designated as 4.80% Redeemable First Preferred Stock.  The seventh series of first preferred stock shall consist of six hundred eleven thousand one hundred forty two (611,142) shares and be designated as 4.50% Redeemable First Preferred Stock.  The eighth series of first preferred stock shall consist of four hundred eighteen thousand two hundred ninety one (418,291) shares and be designated as 4.36% Redeemable First Preferred Stock.  The foregoing series of first preferred stock shall have no conversion rights.

The remainder of said first preferred stock, viz., 64,680,217 shares, and all of the $100 first preferred stock may be issued in one or more additional series, as determined from time to time by the Board.  Except as provided herein, the Board is hereby authorized to determine or

2

alter the rights, preferences, privileges and restrictions granted to or imposed upon the first preferred stock or $100 first preferred stock or any series thereof with respect to any wholly unissued series of first preferred stock or $100 first preferred stock, and to fix the number of shares of any series of first preferred stock or $100 first preferred stock and the designation of any such series of first preferred stock or $100 first preferred stock. The Board, within the limits and restrictions stated in any resolution or resolutions of the Board originally fixing the number of shares constituting any series, may increase or decrease (but not below the number of shares of such series then outstanding) the number of shares of any series subsequent to the issue of shares of that series.

The owners and holders of shares of said first preferred stock and $100 first preferred stock, when issued as fully paid, are and shall be entitled to receive, from the date of issue of such shares, out of funds legally available therefor, cumulative preferential dividends, when and as declared by the Board, at the following rates upon the par value of their respective shares, and not more, viz.: Six per cent (6%) per year upon Six Per Cent First Preferred Stock; five and one-half per cent (5-1/2%) per year upon Five and One-Half Per Cent First Preferred Stock; five per cent (5%) per year upon Five Per Cent First Preferred Stock; and upon the shares of each additional series of said first preferred stock and of each series of $100 first preferred stock the dividend rate fixed therefor, and such dividends on both classes of first preferred stock and $100 first preferred stock shall be declared and shall be either paid or set apart for payment before any dividend upon the shares of common stock shall be either declared or paid. The dividend rate shall be five per cent (5%) per year upon 5% Redeemable First Preferred Stock; five per cent (5%) per year upon 5% Redeemable First Preferred Stock, Series A; four and eight tenths per cent (4.80%) per year upon 4.80% Redeemable First Preferred Stock; four and one-half per cent (4.50%) per year upon 4.50% Redeemable First Preferred Stock; four and thirty six hundredths per cent (4.36%) per year upon 4.36% Redeemable First Preferred Stock.

Upon the liquidation or dissolution of this corporation at any time and in any manner, the owners and holders of shares of said first preferred stock and $100 first preferred stock issued as fully paid will be entitled to receive an amount equal to the par value of such shares plus an amount equal to all accumulated and unpaid dividends thereon to and including the date fixed for such distribution or payment before any amount shall be paid to the holders of said common stock.

If any share or shares of first preferred stock and $100 first preferred stock shall at any time be issued as only partly paid, the owners and holders of such partly paid share or shares shall have the right to receive dividends and to share in the assets of this corporation upon its liquidation or dissolution in all respects like the owners and holders of fully paid shares of first preferred stock and $100 first preferred stock, except that such right shall be only in proportion to the amount paid on account of the subscription price for which such partly paid share or shares shall have been issued.

The unissued shares of said first preferred stock and $100 first preferred stock may be offered for subscription or sale or in exchange for property and be issued from time to time upon such terms and conditions as said Board shall prescribe.

3

The first three series of said first preferred stock, namely, the Six Per Cent First Preferred Stock, the Five and One-Half Per Cent First Preferred Stock, and the Five Per Cent First Preferred Stock, are not subject to redemption. The redemption price of the 5% Redeemable First Preferred Stock shall be $26.75 per share; the redemption price of the 5% Redeemable First Preferred Stock, Series A shall be $26.75 per share; the redemption price of the 4.80% Redeemable First Preferred Stock shall be $27.25 per share; the redemption price of the 4.50% Redeemable First Preferred Stock shall be $26.00 per share; and the redemption price of the 4.36% Redeemable First Preferred Stock shall be $25.75 per share.

Any or all shares of each series of said first preferred stock and $100 first preferred stock other than said first three series of first preferred stock may be redeemed at the option of this corporation, at any time or from time to time, at the redemption price fixed for such series together with accumulated and unpaid dividends at the rate fixed therefor to and including the date fixed for redemption. If less than all the outstanding shares of any such series are to be redeemed; the shares to be redeemed shall be determined pro rata or by lot in such manner as the Board may determine.

Unless the certificate of determination for any series of the first preferred stock or the $100 first preferred stock shall otherwise provide, notice of every such redemption shall be published in a newspaper of general circulation in the City and County of San Francisco, State of California, and in a newspaper of general circulation in the Borough of Manhattan, City and State of New York, at least once in each of two (2) successive weeks, commencing not earlier than sixty (60) nor later than thirty (30) days before the date fixed for redemption; successive publications need not be made in the same newspaper. A copy of such notice shall be mailed within the same period of time to each holder of record, as of the record date, of the shares to be redeemed, but the failure to mail such notice to any shareholder shall not invalidate the redemption of such shares.

From and after the date fixed for redemption, unless default be made by this corporation in paying the amount due upon redemption, dividends on the shares called for redemption shall cease to accrue, and such shares shall be deemed to be redeemed and shall be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with respect thereto except the right to receive from this corporation upon surrender of their certificates the amount payable upon redemption without interest. Or, if this corporation shall deposit, on or prior to the date fixed for redemption, with any bank or trust company in the City and County of San Francisco, having capital, surplus and undivided profits aggregating at least five million dollars ($5,000,000), as a trust fund, a sum sufficient to redeem the shares called for redemption, with irrevocable instructions and authority to such bank or trust company to publish or complete the publication of the notice of redemption (if this corporation shall not have theretofore completed publication of such notice), and to pay, on and after the date fixed for redemption, or on and after such earlier date as the Board may determine, the amount payable upon redemption of such shares, then from and after the date of such deposit (although prior to the date fixed for redemption) such shares shall be deemed to be redeemed; and dividends on such shares shall cease to accrue after the date fixed for redemption. The said deposit shall be deemed to constitute full payment of the shares to their respective holders and from and after the date of such deposit the shares shall be no longer outstanding, and the holders thereof shall cease to be shareholders with respect to such shares and shall have no rights with

4

respect thereto except the right to receive from said bank or trust company the amount payable upon redemption of such shares, without interest, upon surrender of their certificates therefor, and except, also, any right which such shareholders may then have to exchange or convert such shares prior to the date fixed for redemption. Any part of the funds so deposited which shall not be required for redemption payments because of such exchange or conversion shall be repaid to this corporation forthwith. The balance, if any, of the funds so deposited which shall be unclaimed at the end of six (6) years from the date fixed for redemption shall be repaid to this corporation together with any interest which shall have been allowed thereon; and thereafter the unpaid holders of shares so called for redemption shall have no claim for payment except as against this corporation.

All shares of the first preferred stock and $100 first preferred stock shall rank equally with regard to preference in dividend and liquidation rights, except that shares of different classes or different series thereof may differ as to the amounts of dividends or liquidation payments to which they are entitled, as herein set forth.

COMMON STOCK

When all accrued dividends upon all of the issued and outstanding shares of the first preferred stock and $100 first preferred stock of this corporation shall have been declared and shall have been paid or set apart for payment, but not before, dividends may be declared and paid, out of funds legally available therefor, upon all of the issued and outstanding shares of said common stock.

Upon the liquidation or dissolution of this corporation, after the owners and holders of such first preferred stock and $100 first preferred stock shall have been paid the full amount to which they shall have been entitled under the provisions of these Articles of Incorporation, the owners and holders of such common stock shall be entitled to receive and to have paid to them the entire residue of the assets of this corporation in proportion to the number of shares of said common stock held by them respectively.

If any share or shares of common stock shall at any time be issued as only partly paid, the owners and holders of such partly paid share or shares shall have the right to receive dividends and to share in the assets of this corporation upon its liquidation or dissolution in all respects like the owners and holders of fully paid shares of common stock, except that such right shall be only in proportion to the amount paid on account of the subscription price for which such partly paid share or shares shall have been issued.

The unissued shares of said common stock may be offered for subscription or sale or in exchange for property and be issued from time to time upon such terms and conditions as the Board may prescribe.

PROHIBITION AGAINST ASSESSMENTS

Shares of such stock, whether first preferred, $100 first preferred stock or common stock, the subscription price of which shall have been paid in full, whether such price be par or more or less than par, shall be issued as fully paid shares and shall never be subject to any call or assessment for any purpose whatever. Shares of such stock, whether first preferred, $100 first

5

preferred stock or common stock, a part only of the subscription price of which shall have been paid, shall be subject to calls for the unpaid balance of the subscription price thereof. But no call made on partly paid first preferred stock, partly paid $100 first preferred stock or partly paid common stock shall be recoverable by action or be enforceable otherwise than by sale or forfeiture of delinquent stock in accordance with the applicable provisions of the Corporations Code of California.

If at any time, whether by virtue of any amendment of these Articles of Incorporation or any amendment or change of the law of the State of California relating to corporations or otherwise, any assessment shall, in any event whatever, be levied and collected on any subscribed and issued shares of said first preferred stock or $100 first preferred stock after the subscription price thereof shall have been paid in full, the rights of the owners and holders thereof to receive dividends and their rights to share in the assets upon the liquidation or dissolution of this corporation shall, immediately upon the payment of such assessment and by virtue thereof, be increased in the same ratio as the total amount of the assessment or assessments so levied and collected shall bear to the par value of such shares of first preferred stock or $100 first preferred stock.

RESERVES

The Board shall, notwithstanding the foregoing provisions of these Articles of Incorporation, have authority from time to time to set aside, out of the profits arising from the business of this corporation, such reasonable sums as may in their judgment be necessary and proper for working capital and for usual reserves and surplus.

**EIGHTH:**

**Restrictions on Transfer of Securities**. To ensure the preservation of certain tax attributes for the benefit of the corporation and its shareholders, certain restrictions on the transfer of Utility Securities (as defined below) are hereby established as more fully set forth in this **Article EIGHTH**.

(a)     Definitions. For purposes of this **Article EIGHTH**, the following terms shall have the meanings indicated (and any references to any portions of Treasury Regulation Sections 1.382-2T, 1.382-3, 1.382-4 and 1.1502-92 shall include any successor provisions):

"Acquiring Group" means any group of Persons where one or more Persons in such group acquires or seeks to acquire beneficial ownership of HoldCo Securities and one or more other Persons in such group also acquires or seeks to acquire beneficial ownership of Company Group Securities other than HoldCo Securities (other than an indirect acquisition solely as a result of the acquisition of HoldCo Securities), such as outstanding shares of Utility Preferred Stock, pursuant to a plan or arrangement within the meaning of Treasury Regulations Section 1.1502-92(c)(3)(i).

"Agent" means an agent designated by the Board.

6

"Company Group" means HoldCo and its consolidated subsidiaries for U.S. federal income tax purposes.

"Company Group Securities" means (i) HoldCo Securities, (ii) Utility Securities (other than Utility Securities held by the Corporation), and (iii) any other interests of a member of the Company Group designated as stock by the Board as disclosed in a United States Securities and Exchange Commission (the "SEC") filing by HoldCo.

"Excess Securities" means Utility Securities that are the subject of the Prohibited Transfer.

"HoldCo" means PG&E Corporation.

"HoldCo Charter" means the Amended and Restated Articles of Incorporation of HoldCo.

"HoldCo Securities" means (i) shares of common stock issued by HoldCo, (ii) shares of Preferred Stock issued by HoldCo (other than preferred stock described in Section 1504(a)(4) of the Tax Code) and (iii) any other interest designated as "stock" of HoldCo by the Board of HoldCo, as disclosed in a United States Securities and Exchange Commission filing by HoldCo.

"Percentage Stock Ownership" means the greater of the percentage stock ownership interest in HoldCo or Utility of any Person for purposes of Section 382 of the Tax Code as determined in accordance with Treasury Regulation Sections 1.382-2T(g), (h), (j) and (k) and 1.382-4 (*i.e.*, the constructive ownership and attribution rules of the regulations); provided, that (1) if any Person is a member of an Acquiring Group, such Person's Percentage Stock Ownership in HoldCo shall take into account any ownership of additional shares of stock treated as issued by HoldCo under Treasury Regulations section 1.1502-92 as a result of the Acquiring Group's planned or actual acquisition of Company Group Securities (applying such sections with reference to HoldCo as the common parent, including under supplemental rules for determining an ownership change and treating HoldCo as having "actual knowledge" of all plans and acquisitions of Company Group Securities for purposes of applying Treasury Regulations Section 1.1502-92(c)(2)(iii)), (2) for purposes of applying Treasury Regulation Section 1.382-2T(k)(2), Utility shall be treated as having "actual knowledge" of the beneficial ownership of all outstanding Company Group Securities that would be attributed to any individual or entity, and (3) for the sole purpose of determining the Percentage Stock Ownership of any Person that is an entity (and not for the purpose of determining the Percentage Stock Ownership of any other Person), the Company Group Securities held by such Person shall not be treated as no longer owned by such Person pursuant to Treasury Regulation Section 1.382-2T(h)(2)(i)(A).

"Person" means any individual, partnership, joint venture, limited liability company, firm, corporation, unincorporated association or organization, trust or other entity, provided, that, for all purposes of this **Article EIGHTH**, any group of such "Persons" having a formal or informal understanding among themselves to make a "coordinated acquisition" of shares within the meaning of Treasury Regulation Section 1.382-3(a)(1) or who are otherwise treated as an "entity" within the meaning of Treasury Regulation Section 1.382-3(a)(1) shall be

7

treated as an "entity," and references to any entity shall include any successor (by merger or otherwise) of any such entity.

"Prohibited Distributions" means any dividends or other distributions that were received by the Purported Transferee from Utility with respect to the Excess Securities received by a Purported Transferee.

"Prohibited Transfer" means any purported Transfer of Utility Securities to the extent that such Transfer is prohibited and/or void under this **Article EIGHTH**.

"Restriction Release Date" means the earliest of:

(i)     the repeal, amendment or modification of section 382 of the Tax Code (and any comparable successor provisions) in such a way as to render the restrictions imposed by section 382 of the Tax Code no longer applicable to Utility;

(ii)     the beginning of a taxable year of the Company Group (or any successor thereof) in which the Board determined that no Tax Benefits are available;

(iii)     the date selected by the Board if the Board determines that the limitation amount imposed by Section 382 of the Tax Code as of such date in the event of an "ownership change" of Utility (as defined in Section 382 of the Tax Code and Treasury Regulation sections 1.1502-91 *et seq.*) would not be materially less than the net operating loss carryforwards or "net unrealized built-in loss" (within the meaning of Section 382 of the Tax Code and Treasury Regulation Sections 1.1502-91 *et seq.*) of Utility; and

(iv)     the date selected by the Board if the Board determines that it is in the best interests of Utility's shareholders for the restrictions set forth in section (b) of this **Article EIGHTH** to be removed or released.

"Substantial Shareholder" means a Person with a Percentage Stock Ownership of 4.75% or more.

"Tax Benefit" means any net operating loss carryovers, capital loss carryovers, excess interest deduction carryovers, general business credit carryovers, alternative minimum tax credit carryovers and foreign tax credit carryovers, as well as any loss or deduction attributable to a "net unrealized built-in loss" within the meaning of Section 382 of the Tax Code, of the Company Group or any member thereof.

"Tax Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Transfer" means the acquisition, directly or indirectly, of ownership of Utility Securities by any means – including, without limitation, (i) the creation or grant of any pledge (or other security interest), right or option with respect to Utility Securities, including an option within the meaning of Treasury Regulation Section 1.382-4(d)(9), (ii) the exercise of any such pledge, right or option, or (iii) any other transaction treated under the applicable rules under Section 382 of the Tax Code as a direct or indirect acquisition (including the acquisition of an

8

ownership interest in a Substantial Shareholder), underline provided, that "Transfer" shall not include any such acquisition unless, as a result, there would be an increase in any Person's Percentage Stock Ownership.

"Utility" means Pacific Gas and Electric Company.

"Utility Preferred Stock" means preferred stock issued by Utility (other than preferred stock described in Section 1504(a)(4) of the Tax Code).

"Utility Securities" means (i) shares of common stock issued by Utility, (ii) shares of Utility Preferred Stock, and (iii) any other interest designated as "stock" of Utility by the Board, as disclosed in an SEC filing by Utility.

(b)      Prohibited Transfers.  Any attempted Transfer of Utility Securities prior to the Restriction Release Date, or any attempted Transfer of Utility Securities pursuant to an agreement entered into prior to the Restriction Release Date, shall be prohibited and void *ab initio* insofar as it purports to transfer ownership or rights in respect of such Utility Securities to the purported transferee of a Prohibited Transfer (a "Purported Transferee") to the extent that, as a result of such Transfer (or any series of Transfers of which such Transfer is a part), either (1) any Person shall become a Substantial Shareholder other than by reason of Treasury Regulation Section 1.382-2T(j)(3) or any successor to such regulation or (2) the Percentage Stock Ownership interest of any Substantial Shareholder shall be increased.  Nothing in this **Article EIGHTH** shall preclude the settlement of any transaction with respect to Utility Securities entered into through the facilities of a national securities exchange; provided, however, that such a transaction shall still constitute a Prohibited Transfer and the Utility Securities and parties involved in such transaction shall remain subject to the provisions of this **Article EIGHTH** in respect of such transaction.  In the event that there is an attempted concurrent Transfer of both HoldCo Securities and Utility Securities that would be a Prohibited Transfer hereunder and under the HoldCo Charter (as determined without regard to this sentence), the Prohibited Transfer provisions hereunder shall be applied first rendering such attempted Transfer of the Utility Securities null and void to the extent necessary.

(c)      Exceptions; Authorized Transfers.

(i)      The restrictions set forth in section (b) of this **Article EIGHTH** shall not apply to an attempted Transfer (1) if the transferor or the transferee obtains the prior written approval of the Board or a duly authorized committee thereof in accordance with section (c)(ii) of this **Article EIGHTH** below, or (2) if such Transfer is (A) made as part of certain transactions approved by the Board in accordance with section (c)(iii) of this **Article EIGHTH**, (B) to HoldCo or Utility, or (C) to a designee of the State of California in connection with a sale required by the Enhanced Regulatory Reporting and Enforcement Process (as set forth in Appendix A to the California Public Utilities Commission decision in I.19-09-016).

(ii)      The restrictions contained in this **Article EIGHTH** are for the purposes of reducing the risk that any "ownership change" (as defined in Section 382 of the Tax Code) with respect to the Company Group may limit the Company Group's ability to utilize its Tax Benefits. In connection therewith, and to provide for effective policing of these provisions, any Person or

9

Acquiring Group that desires to acquire Utility Securities in an otherwise Prohibited Transfer (a "Requesting Person") shall, prior to the date of such transaction for which the Requesting Person seeks authorization (the "Proposed Transaction"), request in writing (a "Request") that the Board review the Proposed Transaction and authorize or not authorize the Proposed Transaction in accordance with this section (c) of this **Article EIGHTH**. A Request shall be mailed or delivered to the Secretary of Utility at Utility's principal place of business. Such Request shall be deemed to have been received by Utility when actually received by Utility. A Request shall include: (1) the name, address and telephone number of the Requesting Person; (2) the Percentage Stock Ownership of HoldCo then beneficially owned by the Requesting Person (without regard to the ownership of any Company Group Securities other than HoldCo Securities), the then number and percentage (by class) of any Company Group Securities (other than HoldCo Securities) beneficially owned by the Requesting Person, and the then number and percentage (by class) of any Company Group Securities beneficially owned by any Acquiring Group of which the Requesting Person is a member (and the names and relationships of the Persons within the Acquiring Group); (3) a reasonably detailed description of the Proposed Transaction or Proposed Transactions for which the Requesting Person seeks authorization; and (4) a request that the Board authorize the Proposed Transaction pursuant to this section (c) of this **Article EIGHTH**. The Board shall respond to each Request within 20 business days of receiving such Request, and the failure of the Board to respond during such 20 business day period shall be deemed to be a consent to the Transfer; provided, that, the Board may respond by requesting additional information, indicating it requires additional time to consider the Request or in another reasonable manner. The Board shall authorize a Proposed Transaction unless the Board determines in good faith that the Proposed Transaction, considered alone or with other transactions (including, without limitation, past, concurrent, contemplated or anticipated transactions (whether by Utility or HoldCo, or by another Person pursuant to a Request or otherwise, whether or not the transaction was a Prohibited Transfer), and transactions involving Company Group Securities (including issuances and redemptions) not currently contemplated but which, in the business judgment of the Board, Utility or HoldCo should retain the flexibility to pursue) would create a material risk that the Tax Benefits may be jeopardized as a result of the application of Sections 382 and 383 of the Tax Code, allowing for a reasonable margin of safety; provided, that if multiple Requests are submitted to the Board at approximately the same time and all such Requests would not be approved pursuant to this sentence, the Board may determine any reasonable method to apply the provisions of this sentence to such Requests. Any determination by the Board not to authorize a Proposed Transaction shall cause such Proposed Transaction to continue to be treated as a Prohibited Transfer. The Board may impose any conditions that it deems reasonable and appropriate in connection with authorizing any Proposed Transaction, including requiring an affidavit or representations from such Requesting Person or opinions of counsel to be rendered by counsel selected by the Requesting Person (and reasonably acceptable to the Board), in each case, as to such matters as the Board may reasonably determine with respect to the preservation of the Tax Benefits. Any Requesting Person who makes a Request to the Board shall reimburse Utility, within 30 days of demand therefor, for all reasonable out-of-pocket costs and expenses incurred by Utility with respect to any Proposed Transaction, including, without limitation, Utility's reasonable costs and expenses incurred in determining whether to authorize the Proposed Transaction, which costs may include, but are not limited to, any expenses of counsel and/or tax advisors engaged by the Board to advise the Board or deliver an opinion thereto. The Board may require, as a condition to its consideration of the

10

Request, that the Requesting Person execute an agreement in form and substance satisfactory to Utility providing for the reimbursement of such costs and expenses. Any authorization of the Board hereunder may be given prospectively or retroactively.

(iii)     The Board may determine that the restrictions set forth in section (b) of this **Article EIGHTH** shall not apply to any particular transaction or transactions, whether or not a request has been made to the Board, including a Request pursuant to this section (c) of this **Article EIGHTH**, subject to any conditions that it deems reasonable and appropriate in connection therewith. Any determination of the Board hereunder may be made prospectively or retroactively.

(iv)     The Board or any committee of the Board, to the fullest extent permitted by law, may exercise the authority granted by this **Article EIGHTH** through duly authorized officers or agents of Utility. Nothing in this section (c) of this **Article EIGHTH** shall be construed to limit or restrict the Board in the exercise of its fiduciary duties under applicable law.

(d)     Legend; Notation. The Board may require that any certificates representing shares of Utility Securities issued prior to the Restriction Release Date shall contain a conspicuous legend in substantially the following form, evidencing the restrictions set forth in this **Article EIGHTH**:

"THE AMENDED AND RESTATED ARTICLES OF INCORPORATION OF THE UTILITY, AS THE SAME MAY BE AMENDED AND RESTATED FROM TIME TO TIME (THE "ARTICLES OF INCORPORATION"), CONTAIN CERTAIN RESTRICTIONS PROHIBITING THE TRANSFER (AS DEFINED IN THE ARTICLES OF INCORPORATION) OF UTILITY SECURITIES (AS DEFINED IN THE ARTICLES OF INCORPORATION) WITHOUT PRIOR AUTHORIZATION IN ACCORDANCE WITH THE ARTICLES OF INCORPORATION IF SUCH TRANSFER MAY AFFECT THE PERCENTAGE OF STOCK OF UTILITY (WITHIN THE MEANING OF SECTION 382 OF THE INTERNAL REVENUE CODE OF 1986, AS AMENDED FROM TIME TO TIME AND THE TREASURY REGULATIONS PROMULGATED THEREUNDER) THAT IS TREATED AS OWNED BY A "SUBSTANTIAL SHAREHOLDER" AS DEFINED IN THE ARTICLES OF INCORPORATION. A COMPLETE AND CORRECT COPY OF THE ARTICLES OF INCORPORATION SHALL BE FURNISHED FREE OF CHARGE TO THE HOLDER OF RECORD OF THIS CERTIFICATE UPON WRITTEN REQUEST TO THE SECRETARY OF THE UTILITY."

Utility shall have the power to make appropriate notations upon its stock transfer records and to instruct any transfer agent, registrar, securities intermediary or depository with respect to the requirements of this **Article EIGHTH** for any uncertificated Utility Securities or Utility Securities held in an indirect holding system, and Utility shall provide notice of the

11

restrictions on transfer and ownership to holders of uncertificated shares in accordance with applicable law.

(e)     Treatment of Excess Securities.

(i)     No officer, employee or agent of Utility shall record any Prohibited Transfer, and the Purported Transferee shall not be recognized as a shareholder of Utility for any purpose whatsoever in respect of the Excess Securities. Until the Excess Securities are acquired by another Person in a Transfer that is not a Prohibited Transfer, the Purported Transferee shall not be entitled with respect to such Excess Securities to any rights of shareholders of Utility, including, without limitation, the right to vote such Excess Securities and to receive dividends or distributions, whether liquidating or otherwise, in respect thereof, if any. Once the Excess Securities have been acquired in a Transfer that is not a Prohibited Transfer, Utility Securities shall cease to be Excess Securities. For this purpose, any transfer of Excess Securities not in accordance with the provisions of this section (e) of this **Article EIGHTH** shall also be a Prohibited Transfer.

(ii)     If the Board determines that a Transfer of Utility Securities constitutes a Prohibited Transfer pursuant to section (b) of this **Article EIGHTH**, then, upon written demand by Utility, the Purported Transferee shall transfer or cause to be transferred any certificate or other evidence of ownership of the Excess Securities within the Purported Transferee's possession or control, together with any Prohibited Distributions, to the Agent. The Agent shall thereupon sell to a buyer or buyers, which may include Utility, the Excess Securities transferred to it in one or more arm's-length transactions (over the NASDAQ or another national securities exchange on which Utility Securities may be traded, if possible, or otherwise privately); provided, however, that the Agent shall use reasonable efforts to effect such sale or sales in an orderly fashion and shall not be required to effect any such sale within any specific time frame if, in the Agent's discretion, such sale or sales would disrupt the market for Utility Securities or otherwise would adversely affect the value of Utility Securities. If the Purported Transferee has resold the Excess Securities before receiving Utility's demand to surrender Excess Securities to the Agent, the Purported Transferee shall be deemed to have sold the Excess Securities for the Agent, and shall be required to transfer to the Agent any Prohibited Distributions and proceeds of such sale, except to the extent that Utility grants written permission to the Purported Transferee to retain all or a portion of such sales proceeds to the extent not exceeding the amount that the Purported Transferee would have received from the Agent pursuant to section (e)(iii) of this **Article EIGHTH** if the Agent rather than the Purported Transferee had resold the Excess Securities.

(iii)     The Agent shall apply any proceeds or any other amounts received by it in accordance with section (e)(ii) of this **Article EIGHTH** as follows: (A) first, such amounts shall be paid to the Agent to the extent necessary to cover its reasonable costs and expenses incurred in connection with its duties hereunder; (B) second, any remaining amounts shall be paid to the Purported Transferee, up to the amount paid by the Purported Transferee for the Excess Securities (or in the case of any Prohibited Transfer by gift, devise or inheritance or any other Prohibited Transfer without consideration, the fair market value, (1) calculated on the basis of the closing market price for Utility Securities on the day before the Prohibited Transfer, (2) if Utility Securities are not listed or admitted to trading on any stock exchange but are traded in the

12

over-the-counter market, calculated based upon the difference between the highest bid and lowest asked prices, as such prices are reported by the relevant inter-dealer quotation service or any successor system on the day before the Prohibited Transfer or, if none, on the last preceding day for which such quotations exist, or (3) if Utility Securities are neither listed nor admitted to trading on any stock exchange nor traded in the over-the-counter market, then as determined in good faith by the Board), which amount (or fair market value) shall be determined at the discretion of the Board; and (C) third, any remaining amounts, subject to the limitations imposed by the following proviso, shall be paid to one or more organizations qualifying under Section 501(c)(3) of the Tax Code (or any comparable successor provision) selected by the Board; provided, however, that if the Excess Securities (including any Excess Securities arising from a previous Prohibited Transfer not sold by the Agent in a prior sale or sales) represent a 4.75% or greater Percentage Stock Ownership, then any such remaining amounts to the extent attributable to the disposition of the portion of such Excess Securities exceeding a 4.75% Percentage Stock Ownership interest shall be paid to two or more organizations qualifying under Section 501(c)(3) of the Tax Code selected by the Board, such that no organization qualifying under Section 501(c)(3) of the Tax Code shall be deemed to possess a Percentage Stock Ownership in excess of 4.75%. The recourse of any Purported Transferee in respect of any Prohibited Transfer shall be limited to the amount payable to the Purported Transferee pursuant to clause (B) of the preceding sentence. In no event shall the proceeds of any sale of Excess Securities pursuant to this section (e) of this **Article EIGHTH** inure to the benefit of Utility.

        (iv)     In the event of any Transfer that does not involve a transfer of Utility Securities within the meaning of the laws of the State of California, but that would cause a Substantial Shareholder to violate any restriction on Transfer provided for in section (b) of this **Article EIGHTH**, the application of sections (e)(ii) and (e)(iii) of this **Article EIGHTH** shall be modified as described in this section (e)(iv) of this **Article EIGHTH**. In such case, no such Substantial Shareholder shall be required to dispose of any interest that is not a Utility Security, but such Substantial Shareholder and/or any Person or Acquiring Group whose ownership of Utility Securities is attributed to or taken into account with respect to such Substantial Shareholder shall, in the case of section (e)(ii) of this **Article EIGHTH**, be deemed to have disposed of and shall be required to dispose of sufficient Utility Securities (which Utility Securities shall be disposed of in the inverse order in which they were acquired) to cause such Substantial Shareholder, following such disposition, not to be in violation of this **Article EIGHTH**. Such disposition or process shall be deemed to occur simultaneously with the Transfer giving rise to the application of this provision, and such number of Utility Securities that are deemed to be disposed of shall be considered Excess Securities and shall be disposed of through the Agent as provided in sections (e)(ii) and (e)(iii) of this **Article EIGHTH**, except that the maximum aggregate amount payable either to such Substantial Shareholder, or to such other Person or Acquiring Group that was the direct holder of such Excess Securities, in connection with such sale shall be the fair market value of such Excess Securities at the time of the purported Transfer. All such reasonable expenses incurred by the Agent in disposing of such Excess Securities shall be paid out of any amounts due such Substantial Shareholder or such other Person or Acquiring Group. The purpose of this section (e)(iv) of this **Article EIGHTH** is to extend the restrictions in sections (b) and (e)(ii) of this **Article EIGHTH** to situations in which there is a Prohibited Transfer without a direct Transfer of Securities, and this section (e)(iv) of this **Article EIGHTH**, along with the other provisions of this **Article EIGHTH**, shall

13

be interpreted to produce the same results, with differences as the context requires, as a direct Transfer of Utility Securities.

(v)     If the Purported Transferee fails to surrender the Excess Securities or the proceeds of a sale thereof to the Agent within 30 days from the date on which Utility makes a written demand pursuant to section (e)(ii) of this **Article EIGHTH**, then Utility shall use its best efforts to enforce the provisions hereof, including the institution of legal proceedings to compel the surrender.  Nothing in this section (e)(v) of this **Article EIGHTH** shall (A) be deemed to be inconsistent with any Transfer of the Excess Securities provided in this **Article EIGHTH** to be void *ab initio*, or (B) preclude Utility in its discretion from immediately instituting legal proceedings without a prior demand.  The Board or a committee thereof may authorize such additional actions as it deems advisable to give effect to the provisions of this **Article EIGHTH**.

(vi)     Utility shall make the written demand described in section (e)(ii) of this **Article EIGHTH** within 30 days of the date on which the Board determines that the attempted Transfer would result in Excess Securities; provided, however, that, if Utility makes such demand at a later date, the provisions of this **Article EIGHTH** shall apply nonetheless.  No failure by Utility to act within the time periods set forth in section (e) of this **Article EIGHTH** shall constitute a waiver or loss of any right of Utility under this **Article EIGHTH**.

(f)     Obligation to Provide Information.  Any Person that is a beneficial, legal or record holder of Utility Securities or a member of an Acquiring Group, and any proposed transferor or transferee and any Person controlling, controlled by or under common control with the proposed transferor or transferee, shall as and to the extent reasonably requested in writing by Utility, use commercially reasonable efforts promptly to provide such information Utility may request as may be necessary from time to time in order to determine compliance with this **Article EIGHTH** or the status of the Tax Benefits.  For the avoidance of doubt, notwithstanding anything to the contrary in this section (f) of this **ARTICLE EIGHTH**, in no event will any Person have any obligation to provide any such information that such Person determines, in its reasonable judgment, it is legally or contractually prohibited from disclosing; provided, that the Board may decline to authorize a Proposed Transaction, notwithstanding any provision of section (c)(ii) of this **ARTICLE EIGHTH** to the contrary, if any Requesting Person does not provide any information reasonably requested by Utility.

(g)     Board Authority.

(i)     The Board or any committee thereof shall have the power to interpret or determine in its sole discretion all matters necessary for assessing compliance with this **Article EIGHTH**, including, without limitation, (i) the identification of Substantial Shareholders or Acquiring Groups, (ii) whether a Transfer is a Prohibited Transfer, (iii) whether to exempt a Transfer from the restrictions of section (b) of this **Article EIGHTH**, (iv) the Percentage Stock Ownership of any Substantial Shareholder, (v) whether an instrument constitutes a Utility Security or a Company Group Security, (vi) the amount (or fair market value) due to a Purported Transferee pursuant to clause (B) of section (e)(iii) of this **Article EIGHTH**, and (vii) any other matters which the Board or such committee determines to be relevant; and the good faith determination of the Board or such committee on such matters shall be conclusive and binding for all the purposes of this **Article EIGHTH**.

(ii)    In addition, the Board or any committee thereof may, to the extent permitted by law, from time to time establish, modify, amend or rescind bylaws, regulations and procedures of Utility not inconsistent with the provisions of this **Article EIGHTH** for purposes of determining whether any Transfer of Utility Securities would jeopardize the Company Group's ability to preserve and use the Tax Benefits and for the application, administration and implementation of this **Article EIGHTH**.

(iii)    Nothing contained in this **Article EIGHTH** shall limit the authority of the Board or a committee thereof to take such other action to the extent permitted by law as it deems necessary or advisable to protect the Company Group and Utility's shareholders in preserving the Tax Benefits, including the implementation of restrictions on dispositions or sales of Utility Securities that result in a decrease of a Substantial Shareholder's Percentage Stock Ownership. Without limiting the generality of the foregoing, in the event of a change in law making one or more of the following actions necessary or desirable, the Board or any committee thereof may, by adopting a written resolution, (A) modify the ownership interest percentage in Utility or the Persons covered by this **Article EIGHTH,** (B) modify the definitions of any terms set forth in this **Article EIGHTH** or (C) modify the terms of this **Article EIGHTH** as appropriate, in each case, in order to prevent an ownership change for purposes of Section 382 of the Tax Code as a result of any changes in applicable Treasury Regulations or otherwise; provided, however, that the Board or committee shall not cause there to be such modification unless it determines, by adopting a written resolution, that such action is reasonably necessary or advisable to preserve the Tax Benefits or that the continuation of these restrictions is no longer reasonably necessary for the preservation of the Tax Benefits. Shareholders of Utility shall be notified of such determination through a filing with the SEC or such other method of notice as Utility deems appropriate.

(iv)    In the case of an ambiguity in the application of any of the provisions of this **Article EIGHTH**, including any definition used herein, the Board shall have the power to determine the application of such provisions. In the event this **Article EIGHTH** requires an action by the Board but fails to provide specific guidance with respect to such action, the Board or any committee thereof shall have the power to determine the action to be taken. All such actions, calculations, interpretations and determinations that are done or made by the Board in good faith shall be conclusive and binding on Utility, the Agent and all other parties for all other purposes of this **Article EIGHTH**. The Board may delegate all or any portion of its duties and powers under this **Article EIGHTH** to a committee of the Board as it deems necessary or advisable, and the Board and such committee may exercise the authority granted by this **Article EIGHTH** through duly authorized officers or agents of Utility. Nothing in this **Article EIGHTH** shall be construed to limit or restrict the Board in the exercise of its fiduciary duties under applicable law.

(h)    Reliance. To the fullest extent permitted by law, Utility and the members of the Board or any committee thereof shall be fully protected in relying in good faith upon the information, opinions, reports or statements of the chief executive officer, the chief financial officer, the chief accounting officer, the Secretary or the corporate controller of Utility or of Utility's legal counsel, independent auditors, transfer agent, investment bankers or other employees and agents in making the determinations and findings contemplated by this **Article EIGHTH**, and the members of the Board shall not be responsible for any good faith errors made

15

in connection therewith. For purposes of determining the existence and identity of, and the amount of any Utility Securities owned by any shareholder, Utility is entitled to rely on the existence and absence of filings of Schedule 13D, 13F or 13G under the Securities Exchange Act of 1934, or similar statements, reports or other filings, as of any date, subject to its actual knowledge of the ownership of Utility Securities.

(i)    <u>Benefits of this Article EIGHTH</u>. Nothing in this **Article EIGHTH** shall be construed to give to any Person other than Utility, the Agent and members of the Board and any committee thereof any legal or equitable right, remedy or claim under this **Article EIGHTH**. This **Article EIGHTH** shall be for the sole and exclusive benefit of Utility, the Agent and members of the Board and any such committee thereof.

(j)    <u>Severability</u>. The purpose of this **Article EIGHTH** is to facilitate the Company Group's ability to maintain or preserve its Tax Benefits. If any provision of this **Article EIGHTH** or the application of any such provision to any Person or under any circumstance shall be held invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this **Article EIGHTH**.

(k)    <u>Waiver</u>. With regard to any power, remedy or right provided herein or otherwise available to Utility or the Agent under this **Article EIGHTH**, (i) no waiver will be effective unless expressly contained in a writing signed by the waiving party, and (ii) no alteration, modification or impairment will be implied by reason of any previous waiver, extension of time, delay or omission in exercise, or other indulgence.

3.    In accordance with Section 1401 of the California Corporations Code, provision for making the foregoing amendment and restatement of the Articles of Incorporation of the Corporation is contained in the order confirming the Plan, entered on [●], 2020 by the United States Bankruptcy Court for the Northern District of California Case No. 19-30088, the Hon. Dennis Montali judge presiding [Bankruptcy Docket No. [●]], having jurisdiction over a proceeding for the reorganization of the Corporation in the matter of In re: PG&E Corporation and Pacific Gas and Electric Company.

We further declare under penalty of perjury under the laws of the State of California that the matters set forth in this certificate are true and correct of our own knowledge.

Date: [●], 2020

_____
ANDREW M. VESEY
Chief Executive Officer and President


_____
BRIAN M. WONG
Vice President, Deputy General Counsel and
Corporate Secretary

16

**Exhibit C-2**

**Amended and Restated Bylaws of the Utility**
**(Amends and Supersedes Exhibit J-2 to the Plan Supplement filed May 1, 2020 [Docket No. 7037])**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Bylaws**
of
**Pacific Gas and Electric Company (the "Utility")**
Amended and Restated as of [●], 2020 ("Effective Date")

# ARTICLE I
## SHAREHOLDERS.

1.     **Place of Meeting.**  Meetings of the shareholders shall be held at such place, within or without the State of California, as may be designated from time to time by the Board of Directors (the "Board").

A meeting of the shareholders may be conducted, in whole or in part, by electronic transmission by and to the Utility or by electronic video screen communication if: (a) the Utility implements reasonable measures to provide shareholders (in person or by proxy) a reasonable opportunity to participate in the meeting and to vote on matters submitted to the shareholders, and (b) the Utility maintains a record of the vote or action and any shareholder votes or other shareholder actions taken at the meeting by means of electronic transmission to the Utility or electronic video screen communication.

Any request by the Utility to a shareholder under Section 20(b) of the California Corporations Code for consent to conduct a meeting of shareholders by electronic transmission must include a notice that, absent consent of the shareholder, the meeting will be held at a physical location.

2.     **Annual Meetings.**  The first annual meeting of shareholders following the Effective Date is designated to take place on the date and at the time determined by the Board, which date must be within 15 months of the Effective Date.  Thereafter, the annual meeting of shareholders must be held each year on a date and at a time designated by the Board.

Written notice of the annual meeting shall be given not less than ten (or, if sent by third-class mail, thirty) nor more than sixty days prior to the date of the meeting to each shareholder entitled to vote thereat.  The notice shall state the place (if any), date, and hour of such meeting, the means of electronic transmission by and to the Utility or electronic video screen communication (if any) by which shareholders may participate in that meeting, and those matters which the Board, at the time of mailing, intends to present for action by the shareholders.

Notice of any meeting of the shareholders shall be given by mail, electronic transmission, or other written communication to each holder of record of the stock entitled to vote thereat, at his address, as it appears on the books of the Utility.

For purposes of this Section 2 only, "electronic transmission" from the Utility means a communication (a) delivered by (i) facsimile telecommunication or electronic mail when directed to the facsimile number or electronic mail address, respectively, for that shareholder on record with the Utility, (ii) posting on an electronic message board or network which the Utility has designated for those communications, together with a separate notice to the recipient of the

posting, which transmission shall be validly delivered upon the later of the posting or delivery of the separate notice thereof, or (iii) other means of electronic communication, (b) to a shareholder who has provided an unrevoked consent to the use of those means of transmission for such communications, and (c) that creates a record that is capable of retention, retrieval, and review, and that may thereafter be rendered into clearly legible tangible form. In addition, the consent to an electronic transmission by the Utility to an individual shareholder shall be preceded by or include a clear written statement to the shareholder as to: (a) any right of the recipient to have the record provided or made available on paper or in non-electronic form, (b) whether the consent applies only to that transmission, to specified categories of communications, or to all communications from the Utility, and (c) the procedures the recipient must use to withdraw consent.

At an annual meeting of shareholders, only such business shall be conducted as shall have been properly brought before the annual meeting. To be properly brought before an annual meeting, business must be (a) specified in the notice of the annual meeting (or any supplement thereto) given by or at the direction of the Board, or (b) otherwise properly brought before the annual meeting by a shareholder. Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at an annual meeting except in accordance with the procedures set forth in this Section 2.

For business to be properly brought before an annual meeting by a shareholder, including the nomination of any person (other than a person nominated by or at the direction of the Board) for election to the Board, the shareholder must have given timely and proper written notice to the Corporate Secretary of the Utility pursuant to this Section 2.

To be timely, the shareholder's written notice must be received at the principal executive office of the Utility not more than 120 days and not less than ninety days before the anniversary date of the prior year's annual meeting of shareholders; provided, however, that if the annual meeting to which the shareholder's written notice relates is to be held on a date that differs by more than thirty days from the date of the last annual meeting of shareholders, the shareholder's written notice to be timely must be so received not later than the close of business on the tenth day following the date on which public disclosure of the date of the annual meeting is made or given to shareholders. In the case of the first annual meeting of shareholders to be held after the Effective Date, the shareholder's written notice to be timely must be so received not later than the close of business on the tenth day following the date on which public disclosure of the date of the annual meeting is made or given to shareholders. Any shareholder's written notice that is delivered after the close of business (5:00 p.m. local time) will be considered received on the following business day. As used in these Bylaws, "public disclosure" shall include disclosure in a press release or in a document publicly filed by the Utility with the United States Securities and Exchange Commission ("SEC") pursuant to Section 13, 14, or 15(d) of the Securities Exchange Act of 1934 (and its successors) (the "Exchange Act") and the rules and regulations promulgated thereunder.

To be proper, the shareholder's written notice must set forth as to each matter the shareholder proposes to bring before the annual meeting (a) a brief description of the business desired to be brought before the annual meeting and the reasons for conducting such business at the annual meeting, (b) the text of the proposal or business to be brought before the annual

2

meeting (including the text of any resolutions proposed for consideration, and in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment), (c) the name and address of the shareholder as they appear on the Utility's books, and the name and address of any of its Associated Persons (defined below), (d) the class and number of shares of the Utility that are beneficially owned or held of record by the shareholder or any of its Associated Persons, and a description of all Disclosable Interests (defined below) (i) held by the shareholder or any of its Associated Persons or (ii) to which any of them is a party, (e) a description of all agreements, arrangements, or understandings between or among (i) such shareholder, (ii) any Associated Person, and/or (iii) any other person or persons (naming such person or persons), in each case relating to the business to be brought before the annual meeting or pursuant to which such business is to be proposed by such shareholder, (f) any material interest of the shareholder or Associated Parties in such business, and (g) other such information concerning the shareholder, any of its Associated Persons, and such item of business as would be required under the rules of the SEC in a proxy statement soliciting proxies in support of the item of business proposed to be brought before the annual meeting; provided, however, that the disclosures required by this Section 2 shall not include any disclosures with respect to any broker, dealer, commercial bank, trust company, or similar nominee solely as a result of such entity being the shareholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner or beneficial owners.

In addition, if the shareholder's written notice relates to the nomination at the annual meeting of any person for election to the Board, such notice to be proper must also set forth (a) the name, age, business address, and residence address of each person to be so nominated, (b) the principal occupation or employment of each such person, (c) the number of shares of capital stock of the Utility beneficially owned by each such person and any and all Disclosable Interests held by each such person to which each such person is a party, (d) a description of all agreements, arrangements, or understandings (including compensation) between or among (i) such shareholder, (ii) each nominee, (iii) any Associated Person, and/or (iv) any other person or persons (naming such person or persons), in each case relating to the nomination or pursuant to which the nomination or nominations are to be made by such shareholder and/or relating to the candidacy or service of the nominee as a director of the Utility, (e) a representation that the shareholder is a holder of record of stock of the Utility entitled to vote at such meeting and intends to appear in person or by proxy at the meeting to propose such nomination, (f) a representation as to whether the shareholder or the beneficial owner, if any, intends or is part of a group that intends to (i) to deliver a proxy statement and/or form of proxy to holders of at least the percentage of the Utility's outstanding capital stock required to elect the nominee, or (ii) otherwise to solicit proxies from shareholders in support of such nomination, (g) such other information concerning each such person as would be required under the rules of the SEC in a proxy statement soliciting proxies for the election of such person as a director, and accompanied by a consent, signed by each such person, to serve as a director of the Utility if elected, and (h) if any such nominee, the shareholder nominating the nominee, or any such Associated Person expresses an intention or recommendation that the Utility enter into a strategic transaction, any material interest in such transaction of each such proposed nominee, shareholder, or Associated Person, including without limitation, any equity interests or any Disclosable Interests held by each such nominee, shareholder, or Associated Person in any other person, the value of which interests could reasonably be expected to be materially affected by such transaction. In addition,

3

such notice must contain a written and signed representation and agreement of each such nominee, pursuant to which such nominee represents and agrees that he or she (a) is not and will not become a party to any agreement, arrangement or understanding with, and has not given any commitment or assurance to, any person or entity as to how such nominee, if elected as a director, will act or vote on any issue or question or that could reasonably be expected to limit or interfere with such nominee's ability to comply with his or her fiduciary duties under applicable law that has not been disclosed to the Utility, (b) is not and will not become a party to any agreement, arrangement, or understanding with any person or entity other than the Utility with respect to any direct or indirect compensation, reimbursement, or indemnification in connection with service or action as a director that has not been disclosed to the Utility, and (c) if elected as a director, will comply with all of the Utility's then existing corporate governance, conflict of interest, confidentiality, and stock ownership and trading policies, codes, and guidelines and any other Utility policies, codes, and guidelines applicable to directors. To be proper notice, the shareholder's notice also must include a written questionnaire completed by the proposed nominee with respect to the background and qualifications of such proposed nominee (which form of questionnaire shall be provided by the Corporate Secretary upon request).

The Utility may require any proposed nominee to furnish such other information as it may reasonably require to determine (a) the eligibility of such proposed nominee to serve as a director of the Utility, and (b) whether such nominee qualifies as an "independent director" or "audit committee financial expert" under applicable law, securities exchange rule or regulation, or any publicly disclosed corporate governance guideline or committee charter of the Utility.

In addition, for a shareholder's written notice to the Corporate Secretary to be proper and timely, a shareholder providing notice of any business (including the nomination of any person for election to the Board) proposed to be made at any annual meeting shall further update and supplement such notice, if necessary, so that the information provided or required to be provided in such notice pursuant to this Section 2 shall be true and correct as of the record date for the meeting and as of the date that is ten business days prior to the meeting or any adjournment or postponement thereof. Such update and supplement (or, if applicable, written confirmation that the information provided in such notice is still true and correct as of the applicable date) shall be delivered to, or mailed to and received by, the Corporate Secretary at the principal executive office of the Utility no later than five business days after the record date for the meeting (in the case of the update and supplement required to be made as of the record date), and no later than eight business days prior to the date for the meeting or, if practicable, any adjournment or postponement thereof and, if not practicable, on the first practicable date prior to the date to which the meeting has been adjourned or postponed (in the case of the update and supplement required to be made as of ten business days prior to the meeting or any adjournment or postponement thereof). A shareholder, in his or her initial written notice of any business to the Corporate Secretary, shall confirm his or her intention to update and supplement such notice as required herein.

Nothing in these Bylaws shall be deemed to affect any rights of a shareholder to request inclusion of proposals in the Utility's proxy statement pursuant to Rule 14a-8 under the Exchange Act. Notwithstanding anything in these Bylaws to the contrary, except for proposals properly and timely made in accordance with Rule 14a-8 under the Exchange Act and included

4

in the notice of annual meeting given by or at the direction of the Board, no business shall be conducted at any annual meeting except in accordance with the procedures set forth in this Section 2.

As used in this Section 2, "Associated Person" shall mean (a) the beneficial owner or beneficial owners on whose behalf the written notice of business proposed to be brought before the annual meeting is made, if different from the shareholder proposing such business, and (b) each "affiliate" or "associate" (each within the meaning of Rule 12b-2 under the Exchange Act for purposes of these Bylaws) of each such shareholder or beneficial owner.

As used in this Section 2, "Disclosable Interest" shall mean any agreement, arrangement, or understanding (including but not limited to any derivatives, swaps, long or short positions, options, warrants, convertible securities, stock appreciation or similar rights, hedging transactions, and borrowed or loaned shares that are held or have been entered into, directly or indirectly, by or on behalf of such shareholder, the nominee proposed by such shareholder, as applicable, or any such Associated Person), the effect or intent of which is to mitigate loss to, manage the risk or benefit of share price changes for, provide the opportunity to profit from share price changes to, or maintain, increase, or decrease the voting power of, such shareholder, proposed nominee, as applicable, or any such Associated Person, with respect to shares of stock of the Utility; provided, however, that Disclosable Interests shall not include any such disclosures with respect to any broker, dealer, commercial bank, trust company, or similar nominee solely as a result of such entity being the shareholder directed to prepare and submit the notice required by these Bylaws on behalf of a beneficial owner or beneficial owners.

3.     **Special Meetings.**  (a)  Special meetings of the shareholders shall be called by the Corporate Secretary or an Assistant Corporate Secretary at any time on order of the Board, the Chairperson of the Board, the Vice Chairperson, the Chairperson of the Executive Committee, the Chief Executive Officer, or the President.  Special meetings of the shareholders shall also be called by the Corporate Secretary or an Assistant Corporate Secretary upon the written request of holders of shares entitled to cast not less than ten percent of the votes at the meeting measured as of the record date established pursuant to Article I, Section 3(b) of these Bylaws (such request, a "Special Meeting Request").

(b)     Any shareholder seeking to submit a Special Meeting Request must deliver a notice to the Corporate Secretary which requests the Board to set a record date for determining shareholders entitled to request a special meeting under Section 600(d) of the California Corporations Code (a "Record Date Request").  Such Record Date Request must state (i) a brief description of the purpose of the meeting and (ii) the class and number of shares of the Utility that are beneficially owned by the requesting shareholder. Within twenty-eight days of receiving the Record Date Request in the proper form, the Board shall set a record date for the requesting of a special meeting in accordance with Section 701 of the California Corporations Code.  If the Board fails to set a record date within such twenty-eight-day period, the record date for determining shareholders entitled to request a special meeting for the matters disclosed in the Record Date Request shall be the close of business on the twenty-eighth day after the date such Record Date Request is received by the Corporate Secretary (or, if such twenty-eighth day is not a business day, the first business day thereafter).

5

(c)     A Special Meeting Request shall be in writing, shall be delivered to the Chairperson of the Board, the Vice Chairperson of the Board, the Chairperson of the Executive Committee, the Chief Executive Officer, the President, or the Corporate Secretary, and shall state (i) the purposes of the meeting, (ii) the business proposed to be transacted at such meeting and the reasons for conducting such business at the meeting, and (iii) if such request is made by a shareholder, the text of the proposal or business to be brought before the meeting (including the text of any resolutions proposed for consideration, and in the event that such business includes a proposal to amend these Bylaws, the language of the proposed amendment).  In connection with any special meeting of the shareholders called in accordance with the provisions of this Section 3, upon written request in proper form sent pursuant to Section 601(c) of the California Corporations Code (or any successor provision) by the person or persons (other than the Board) calling such meeting, it shall be the duty of the Corporate Secretary, subject to the immediately succeeding sentence, to cause notice of such meeting to be given in accordance with Article I, Section 2, Paragraph 3 of these Bylaws as promptly as reasonably practicable and, in connection therewith, to establish the place and, subject to Section 601(c) of the California Corporations Code (or any successor provision), the date and hour of such meeting.

(d)     To be in proper form, any Record Date Request or Special Meeting Request submitted by or on behalf of a shareholder or shareholders shall include the information required in Article I, Section 2 of these Bylaws.  Within five business days after receiving such a shareholder request, the Board shall determine whether such shareholder or shareholders have satisfied the requirements for requesting a record date or calling a special meeting of the shareholders in accordance with the provisions of this Section 4, and shall notify the requesting party or parties of its finding.

4.     **Determination of Proper Business.**  Each of the Board, the Chairperson of the Board, the lead director, and the presiding officer of any annual or special meeting of shareholders shall have the power to determine whether business was properly and timely proposed in accordance with the provisions of this Article I, and if any of them should determine that such business is not in compliance with Article I, the presiding officer of the annual or special meeting of shareholders shall have the authority to declare at the meeting that any such business was not properly and timely brought before the meeting and shall not be transacted. Notwithstanding the foregoing provisions of this Article I, unless otherwise required by law, if the shareholder (or a qualified representative of the shareholder) does not appear at the annual or special meeting of shareholders to present a nomination or other proposed business (including any proposal included in the Utility's proxy materials pursuant to and in compliance with Rule 14a-8 under the Exchange Act), such nomination shall be disregarded or such proposed business shall not be transacted, as the case may be, notwithstanding that proxies in respect of such vote may have been received by the Utility.

5.     **Voting at Meetings.**  At any meeting of the shareholders, each holder of record of stock shall be entitled to vote in person or by proxy (as defined in Section 178 of the California Corporations Code).

Case: 19-30088    Doc# 7841-3    Filed: 06/08/20    Entered: 06/08/20 21:45:01    Page 25 of 33

6.      **No Cumulative Voting.** No shareholder of the Utility shall be entitled to cumulate his or her voting power.

7.      **Qualified Representatives.** For purposes of this Article I, to be a "qualified representative" of the shareholder, a person must be a duly authorized officer, manager, or partner of such shareholder or must be authorized by a writing executed by such shareholder or an electronic transmission delivered by such shareholder to act for such shareholder as proxy at the applicable annual or special meeting of shareholders and such person must produce such writing or electronic transmission, or a reliable reproduction of the writing or electronic transmission, along with personal identification demonstrating the representative's identity, and in a format acceptable to the Utility, at the applicable annual or special meeting.

### ARTICLE II
### DIRECTORS.

1.      **Number and Composition.**

(a)      The Board shall consist of such number of directors, not fewer than twelve (12) nor more than sixteen (16); provided that from and after the Effective Date until December 31, 2020, such minimum number of directors shall be nine (9). The exact number of directors shall be within the limits specified above, fixed from time to time by the Board.

(b)      In accordance with Section 301.5 of the California Corporations Code, the Board of this Utility shall be divided into two classes, designated Class A and Class B (each, a "Class"). The composition of the Classes shall be as follows:

(i)      At the Effective Date, the directors in Class A shall be composed of a number of directors that is half of the Board, as fixed by the Board at the Effective Date (or, if such number of directors is fixed at an odd number, half of such fixed number, rounded down to the nearest whole number) (the "Class A Directors") who shall serve as directors for an initial term that will expire upon the annual meeting of shareholders that occurs in 2021 (the "2021 Meeting"). Successors to the Class A Directors who are elected to the Board at the 2021 Meeting shall be elected as Class A Directors for a term that will expire upon the annual meeting of shareholders in 2023 (the "2023 Meeting"). Any successors to Class A Directors whose term expires at the 2023 Meeting shall be elected for one year terms.

(ii)      At the Effective Date, the directors in Class B shall be composed of a number of directors that is half of the Board, as fixed by the Board at the Effective Date (or, if such number of directors is fixed at an odd number, half of such fixed number, rounded up to the nearest whole number) (the "Class B Directors") who shall serve as directors for an initial term that will expire upon the annual meeting of shareholders that occurs in 2022 (the "2022 Meeting"). Successors to the Class B Directors who are elected to the Board at the 2022 Meeting shall be elected as Class B Directors for a term that will expire upon the

7

annual meeting of shareholders in 2024 (the "2024 Meeting"). Any successors to Class B Directors whose term expires at the 2024 Meeting shall be elected for one year terms.

        (iii)    Any director appointed to the Board prior to the 2024 Meeting to fill a vacancy caused by the death or resignation of a director will be in the same Class as the director whose death or resignation created such vacancy.

        (iv)    In accordance with Section 301.5(b) of the California Corporations Code, if, prior to the 2024 Meeting, the Board increases the number of directors, the directors appointed or elected to fill the vacancies thereby created shall be allocated by the Board to a Class so as to keep the two Classes as close to equal in number as possible.

After the 2024 meeting, the Board will no longer be so divided into classes and all directors will serve approximately one year terms that shall expire upon the following annual meeting of shareholders in accordance with Section 301 of the California Corporations Code.

2.    **Powers.**  Subject to the provisions of the California General Corporation Law and any limitations in the Articles of Incorporation relating to action required to be approved by the shareholders or by the outstanding shares, or by a less than majority vote of a class or series of preferred shares, the business and affairs of the Utility will be managed and all corporate powers will be exercised by or under the direction of the Board.

3.    **Committees.**  The Board may, by resolution adopted by a majority of the authorized number of directors, designate and appoint one or more committees as the Board deems appropriate, each consisting of two or more directors, to serve at the pleasure of the Board; provided, however, that, as required by this Utility's Articles of Incorporation, the members of the Executive Committee (should the Board designate an Executive Committee) must be appointed by the affirmative vote of two-thirds of the authorized number of directors. Any such committee, including the Executive Committee, shall have the authority to act in the manner and to the extent provided in the resolution of the Board designating such committee and may have all the authority of the Board, except with respect to the matters set forth in Section 311 of the California Corporations Code.  Notwithstanding any of the foregoing, the powers granted to the Executive Committee may not supersede the powers or responsibilities granted to the Safety and Nuclear Oversight Committee in accordance with the charter of the Safety and Nuclear Oversight Committee.

4.    **Time and Place of Directors' Meetings.**  Regular meetings of the Board shall be held on such days and at such times and at such locations as shall be fixed by resolution of the Board, or designated by the Chairperson of the Board or, in his absence, the Vice Chairperson, the Chief Executive Officer, or the President of the Utility and contained in the notice of any such meeting.  Notice of meetings shall be delivered personally or sent by mail or electronic transmission at least seven days in advance unless otherwise authorized.

5.    **Special Meetings.**  The Chairperson of the Board, the Vice Chairperson, the Chairperson of the Executive Committee, the Chief Executive Officer, the President, or any five

directors may call a special meeting of the Board at any time. Notice of the time and place of special meetings shall be given to each director by the Corporate Secretary. Such notice shall be delivered personally or by telephone (or other system or technology designed to record and communicate messages, including facsimile, electronic mail, or other such means) to each director at least forty-eight hours in advance of such meeting, or sent by first-class mail or electronic transmission, postage prepaid, at least four days in advance of such meeting.

6. **Quorum.** A quorum for the transaction of business at any meeting of the Board or any committee thereof shall consist of one-third of the authorized number of directors or committee members, or two, whichever is larger.

7. **Action by Consent.** Any action required or permitted to be taken by the Board may be taken without a meeting if all directors individually or collectively consent in writing to such action and if the number of members of the Board serving at the time constitutes a quorum. Such written consent or consents shall be filed with the minutes of the proceedings of the Board.

8. **Meetings by Conference Telephone.** Any meeting, regular or special, of the Board or of any committee of the Board, may be held by conference telephone, electronic video screen communication, or electronic transmission by or to the corporation. Participation in a meeting through the use of conference telephone or electronic video screen communication constitutes presence in person at that meeting as long as all members participating in the meeting are able to hear one another. Participation in a meeting through electronic transmission by and to the Utility (other than conference telephone and electronic video screen communication) constitutes presence in person at that meeting if both of the following apply: (a) each member participating in the meeting can communicate with all of the other members concurrently; and (b) each member is provided the means of participating in all matters before the board, including, without limitation, the capacity to propose, or to interpose an objection to, a specific action to be taken by the Corporation.

9. **Majority Voting.** In any uncontested election, nominees receiving the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present (which shares voting affirmatively also constitute at least a majority of the required quorum) shall be elected. In any election that is not an uncontested election, the nominees receiving the highest number of affirmative votes of the shares entitled to be voted for them, up to the number of directors to be elected by those shares, shall be elected; votes against a director and votes withheld shall have no legal effect.

For purposes of these Bylaws, "uncontested election" means an election of directors of the Utility in which, at the expiration of the times fixed under Article I, Section 2 of these Bylaws requiring advance notification of director nominees, or for special meetings, at the time notice is given of the meeting at which the election is to occur, the number of nominees for election does not exceed the number of directors to be elected by the shareholders at that election.

If an incumbent director fails, in an uncontested election, to receive the vote required to be elected in accordance with this Article II, Section 9, then, unless the incumbent director has earlier resigned, the term of such incumbent director shall end on the date that is the earlier of (a)

9

ninety (90) days after the date on which the voting results are determined pursuant to Section 707 of the California Corporations Code, or (b) the date on which the Board selects a person to fill the office held by that director in accordance with the procedures set forth in these Bylaws and Section 305 of the California Corporations Code.

10. **Certain Powers Reserved to the Shareholders.** So long as PG&E Corporation shall hold the majority of the outstanding shares of the Utility, PG&E Corporation may require the written consent of the PG&E Corporation Chairperson of the Board or the PG&E Corporation Chief Executive Officer to enter into and execute any transaction or type of transaction identified by the Board of PG&E Corporation as a "Designated Transaction." For purposes of this Section 10, a Designated Transaction shall be any transaction or type of transaction identified in a duly adopted resolution of the Board of PG&E Corporation as requiring the written consent of the PG&E Corporation Chairperson of the Board or the PG&E Corporation Chief Executive Officer pursuant to this Section 10. Notwithstanding the foregoing, nothing in this Section 10 shall limit the power of the Utility to enter into or execute any transaction or type of transaction prior to the receipt by the Corporate Secretary of the Utility of the resolution designating such transaction or type of transaction as a Designated Transaction pursuant to this Section 10.

## ARTICLE III
## OFFICERS.

1. **Officers.** The officers of the Utility shall be elected by the Board and include a President, a Corporate Secretary, a Treasurer, or other such officers as required by law; provided, that, any officer who will be an "executive officer," as such term is defined in Rule 3b-7 under the Exchange Act, shall be recommended for election to the Board by action of the Safety and Nuclear Oversight Committee. The Board also may elect one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and such other officers as may be appropriate, including the offices described below. Any number of offices may be held by the same person.

2. **Chairperson (or Chair) of the Board.** The Chairperson of the Board shall be a member of the Board and preside at all meetings of the shareholders, of the directors, and of the Executive Committee in the absence of the Chairperson of that Committee. The Chairperson of the Board shall have such duties and responsibilities as may be prescribed by the Board or these Bylaws. The Chairperson of the Board shall have authority to sign on behalf of the Utility agreements and instruments of every character, and in the absence or disability of the Chief Executive Officer, shall exercise the Chief Executive Officer's duties and responsibilities.

3. **Vice Chairperson (or Vice Chair).** The Vice Chairperson may be, but is not required to be, a member of the Board and shall have such duties and responsibilities as may be prescribed by the Board, the Chairperson of the Board, or these Bylaws. If the Vice Chairperson is a member of the Board, then (a) in the absence of the Chairperson of the Board, the Vice Chairperson shall preside at all meetings of the Board and of the shareholders; and (b) in the absence of the Chairperson of the Executive Committee and the Chairperson of the Board, the Vice Chairperson shall preside at all meetings of the Executive Committee. The Vice Chairperson shall have authority to sign on behalf of the Utility agreements and instruments of every character.

10

4. **Chairperson (or Chair) of the Executive Committee.** The Chairperson of the Executive Committee shall be a member of the Board and preside at all meetings of the Executive Committee. The Chairperson of the Executive Committee shall aid and assist the other officers in the performance of their duties and shall have such other duties as may be prescribed by the Board or these Bylaws.

5. **Chief Executive Officer.** The Chief Executive Officer shall have such duties and responsibilities as may be prescribed by the Board, the Chairperson of the Board, or these Bylaws. If there be no Chairperson of the Board, the Chief Executive Officer shall also exercise the duties, responsibilities, authority, and powers of that office, including the authority to further delegate such duties, responsibilities, authority, and powers (subject to any specific delegation limitations established by the Board). The Chief Executive Officer shall have authority to sign on behalf of the Utility agreements and instruments of every character. In the absence or disability of the President, the Chief Executive Officer shall exercise the President's duties and responsibilities.

6. **President.** The President shall have such duties and responsibilities as may be prescribed by the Board, the Chairperson of the Board, the Chief Executive Officer, or these Bylaws. If there be no Chief Executive Officer, the President shall also exercise the duties, responsibilities, authority, and powers of that office, including the authority to further delegate such duties, responsibilities, authority, and powers (subject to any specific delegation limitations established by the Board). The President shall have authority to sign on behalf of the Utility agreements and instruments of every character. Notwithstanding the foregoing, the Board may from time to time, at its discretion and through a formal action of the Board that is duly noted in a Board resolution or the Board's meeting minutes, confer the powers and duties of the office of President upon and among one or more designated officers, whether or not any of such officers shall have the title of President.

7. **Vice Presidents.** Each Vice President shall have such duties and responsibilities as may be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or these Bylaws. Each Vice President's authority to sign agreements and instruments on behalf of the Utility shall be as prescribed by the Board. The Board of the Utility, the Chairperson of the Board of the Utility, the Vice Chairperson of this Utility, or the Chief Executive Officer of PG&E Corporation may confer a special title upon any Vice President.

8. **Chief Risk Officer**. The Board may, and unless and until otherwise authorized by the California Public Utilities Commission (the "CPUC"), shall, appoint a Chief Risk Officer to be the enterprise risk officer for the Company with oversight of risk assessment and mitigation. Any candidate for the Chief Risk Officer shall be approved by the Safety and Nuclear Oversight Committee prior to appointment by the Board. The Chief Risk Officer shall be empowered to report directly to the Chief Executive Officer, Safety and Nuclear Oversight Committee and Audit Committee, in each case, of the Company and PG&E Corporation. The Chief Risk Officer shall be responsible for oversight of risks associated with the Company's operations and the environment related to public safety, including, but not limited to, nuclear risk, wildfire risk and risks of other natural disasters as well as new strategic risks confronting utilities. The Chief Risk Officer shall render to the Chief Executive Officer, Safety and Nuclear

11

Oversight Committee and Audit Committee (in each case, of the Company and PG&E Corporation) such periodic reporting as may be required by them. The Chief Risk Officer shall periodically render reports to or appear in front of the CPUC in such periods and in such manner required by the CPUC.

Subject to any requirements of the CPUC, the Chief Risk Officer shall have such other duties as may from time to time be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson of the Board, the Chief Executive Officer, the President, the Safety and Nuclear Oversight Committee, the Audit Committee or these Bylaws.

9. **Chief Safety Officer**. The Board may, and unless and until otherwise authorized by the CPUC, shall, appoint a Chief Safety Officer to be responsible for the oversight of the enterprise-wide safety program, including workplace safety and public safety. Any candidate for the Chief Safety Officer shall be approved by the Safety and Nuclear Oversight Committee prior to appointment by the Board. The Chief Safety Officer shall be empowered to report to the Chief Executive Officer and Safety and Nuclear Oversight Committee, in each case, of the Company and PG&E Corporation. The Chief Safety Officer shall periodically render to the CPUC reports relating to public safety in such periods as required by the CPUC.

Subject to any requirements of the CPUC, the Chief Safety Officer shall have such other duties as may from time to time be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson of the Board, the Chief Executive Officer, the President, the Safety and Nuclear Oversight Committee or these Bylaws.

10. **Corporate Secretary.** The Corporate Secretary shall attend all meetings of the Board and the Executive Committee, and all meetings of the shareholders, and the Corporate Secretary shall record the minutes of all proceedings in books to be kept for that purpose. The Corporate Secretary shall be responsible for maintaining a proper share register and stock transfer books for all classes of shares issued by the Utility. The Corporate Secretary shall give, or cause to be given, all notices required either by law or these Bylaws. The Corporate Secretary shall keep the seal of the Utility in safe custody, and shall affix the seal of the Utility to any instrument requiring it and shall attest the same by the Corporate Secretary's signature.

The Corporate Secretary shall have such other duties as may be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or these Bylaws.

The Assistant Corporate Secretaries shall perform such duties as may be assigned from time to time by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or the Corporate Secretary. In the absence or disability of the Corporate Secretary, the Corporate Secretary's duties shall be performed by an Assistant Corporate Secretary.

11. **Treasurer.** The Treasurer shall have custody of all moneys and funds of the Utility, and shall cause to be kept full and accurate records of receipts and disbursements of the Utility. The Treasurer shall deposit all moneys and other valuables of the Utility in the name and to the credit of the Utility in such depositaries as may be designated by the Board or any

12

employee of the Utility designated by the Board. The Treasurer shall disburse such funds of the Utility as have been duly approved for disbursement.

The Treasurer shall perform such other duties as may from time to time be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or these Bylaws.

The Assistant Treasurer shall perform such duties as may be assigned from time to time by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or the Treasurer. In the absence or disability of the Treasurer, the Treasurer's duties shall be performed by an Assistant Treasurer.

12.     **General Counsel.** The General Counsel shall be responsible for handling on behalf of the Utility all proceedings and matters of a legal nature. The General Counsel shall render advice and legal counsel to the Board, officers, and employees of the Utility, as necessary to the proper conduct of the business. The General Counsel shall keep the management of the Utility informed of all significant developments of a legal nature affecting the interests of the Utility.

The General Counsel shall have such other duties as may from time to time be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or these Bylaws.

13.     **Controller.** The Controller shall be responsible for maintaining the accounting records of the Utility and for preparing necessary financial reports and statements, and the Controller shall properly account for all moneys and obligations due the Utility and all properties, assets, and liabilities of the Utility. The Controller shall render to the officers such periodic reports covering the result of operations of the Utility as may be required by them or any one of them.

The Controller shall have such other duties as may from time to time be prescribed by the Board, the Chairperson of the Board, the Vice Chairperson, the Chief Executive Officer, the President, or these Bylaws. The Controller shall be the principal accounting officer of the Utility, unless another individual shall be so designated by the Board.

### ARTICLE IV
### MISCELLANEOUS.

1.     **Record Date.** The Board may fix a time in the future as a record date for the determination of the shareholders entitled to notice of and to vote at any meeting of shareholders, or entitled to receive any dividend or distribution, or allotment of rights, or to exercise rights in respect to any change, conversion, or exchange of shares. The record date so fixed shall be not more than sixty nor less than ten days prior to the date of such meeting nor more than sixty days prior to any other action for the purposes for which it is so fixed. When a record date is so fixed, only shareholders of record on that date are entitled to notice of and to vote at the meeting, or entitled to receive any dividend or distribution, or allotment of rights, or to exercise the rights, as the case may be.

13

2. **Certificates; Direct Registration System.** Shares of the Utility's capital stock may be certificated or uncertificated, as provided under California law. Any certificates that are issued must be signed in the name of the Utility by the Chairperson of the Board, the Vice Chairperson of the Board, the President, or a Vice President and by the Chief Financial Officer, an Assistant Treasurer, the Secretary, or any Assistant Secretary, certifying the number of shares and the class or series of shares owned by the shareholder. Any or all of the signatures on the certificate may be a facsimile. In case any officer, Transfer Agent, or Registrar who has signed or whose facsimile signature has been placed upon a certificate ceases to be such officer, Transfer Agent, or Registrar before such certificate is issued, it may be issued by the Utility with the same effect as if such person were an officer, Transfer Agent, or Registrar at the date of issue. The Utility may adopt a system of issuance, recordation and transfer of its shares by electronic or other means not involving any issuance of certificates in accordance with Section 416 of the California Corporations Code.

Transfers of shares of stock of the Utility must be made by the Transfer Agent and Registrar on the books of the Utility after receipt of a request with proper evidence of succession, assignment, or authority to transfer by the record holder of such stock, or by an attorney lawfully constituted in writing, and in the case of stock represented by a certificate, upon surrender of the certificate. Subject to the foregoing, the Board has power and authority to make such rules and regulations as it may deem necessary or appropriate concerning the issue, transfer, and registration of shares of stock of the Utility, and to appoint and remove Transfer Agents and Registrars of transfers.

3. **Lost Certificates.** Any person claiming a certificate of stock to be lost, stolen, mislaid, or destroyed shall make an affidavit or affirmation of that fact and verify the same in such manner as the Board may require, and shall, if the Board so requires, give the Utility, its Transfer Agents, Registrars, and/or other agents a bond of indemnity in form approved by counsel, and in amount and with such sureties as may be satisfactory to the Corporate Secretary of the Utility, before a new certificate (or uncertificated shares in lieu of a new certificate) may be issued of the same tenor and for the same number of shares as the one alleged to have been lost, stolen, mislaid, or destroyed.

## ARTICLE V
## AMENDMENTS.

1. **Amendment by Shareholders.** Except as otherwise provided by law, these Bylaws, or any of them, may be amended or repealed or new Bylaws adopted by the affirmative vote of a majority of the outstanding shares entitled to vote at any regular or special meeting of the shareholders.

**Amendment by Directors.** To the extent provided by law, these Bylaws, or any of them, may be amended or repealed or new Bylaws adopted by resolution adopted by a majority of the members of the Board; provided, however, that amendments to Article II, Sections 9 and 10 of these Bylaws, and any other Bylaw provision that implements a majority voting standard for director elections (excepting any amendments intended to conform those Bylaw provisions to changes in applicable laws) shall be amended by the shareholders of the Utility as provided in Article V, Section 1.