1                  UNITED STATES BANKRUPTCY COURT

2                  NORTHERN DISTRICT OF CALIFORNIA

3                              -oOo-

4    In Re:                      ) Case No. 19-30088-DM
                                 ) Chapter 11
5    PG&E CORPORATION AND PACIFIC )
     GAS AND ELECTRIC COMPANY     ) San Francisco, California
6                                 ) Friday, June 5, 2020
                        Debtors.  ) 9:30 AM
7    _____ )
                                    ORAL ARGUMENT RE CONFIRMATION
8                                   HEARING

9                      TRANSCRIPT OF PROCEEDINGS
                  BEFORE THE HONORABLE DENNIS MONTALI
10                  UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES (Via Zoom):
     For the Debtors:            STEPHEN KAROTKIN, ESQ.
12                               Weil, Gotshal & Manges LLP
                                 767 Fifth Avenue
13                               New York, NY 10153
                                 (212)310-8000
14
     For the United States of    MATTHEW J. TROY, ESQ.
15   America:                    United States Department of
                                 Justice - Civil Division
16                               P.O. Box 875 Ben Franklin Station
                                 Washington, DC 20044
17                               (202)305-2419

18   For California State        PAUL J. PASCUZZI, ESQ.
     Agencies:                   Felderstein Fitzgerald Willoughby
19                               Pascuzzi & Rios LLP
                                 500 Capitol Mall
20                               Suite 2250
                                 Sacramento, CA 95814
21                               (916)329-7400

22   For Municipal Objectors:    MARK GORTON, ESQ.
                                 Boutin Jones Inc.
23                               555 Capitol Mall
                                 Suite 1500
24                               Sacramento, CA 95814
                                 (916)321-4444

25

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

| | | |
|---|---|---|
| 1 | For the City and County of San Francisco: | EDWARD J. TREDINNICK, ESQ. Greene Radovsky Malone Share & Hennigh LLP |
| 2 | | |
| 3 | | 1 Front Street Suite 3200 San Francisco, CA 94111 |
| 4 | | (415) 981-1400 |
| 5 | For South San Joaquin Irrigation District: | PAUL R. GLASSMAN, ESQ. Stradling Yocca Carlson & Rauth, P.C. |
| 6 | | |
| 7 | | 10100 Wilshire Boulevard 4th Floor Santa Monica, CA 90401 |
| 8 | | (424) 214-7021 |
| 9 | For Fire Victim Trustee: | DAVID J. MOLTON, ESQ. Brown Rudnick LLP |
| 10 | | 7 Times Square New York, NY 10036 |
| 11 | | (212) 209-4800 |
| 12 | For AT&T Corp.: | BENJAMIN MINTZ, ESQ. Arnold & Porter Kaye Scholer LLP |
| 13 | | 250 West 55th Street New York, NY 10019 |
| 14 | | (212) 836-8000 |
| 15 | For Adventist Health System/West and Feather River Hospital: | REBECCA J. WINTHROP, ESQ. Norton Rose Fulbright US LLP |
| 16 | | 555 South Flower Street Forty-First Floor |
| 17 | | Los Angeles, CA 90071 (213) 892-9200 |
| 18 | | |
| 19 | For Various Fire Claimants: | MICHAEL A. KELLY, ESQ. Walkup, Melodia, Kelly & Schoenberger |
| 20 | | 650 California Street San Francisco, CA 94108 |
| 21 | | (415) 889-2919 |
| 22 | For North Bay Fire Victims: | STEVEN SKIKOS, ESQ. Skikos Crawford Skikos & Joseph |
| 23 | | One Sansome Street Suite 2830 |
| 24 | | San Francisco, CA 94104 (415) 546-7300 |
| 25 | | |

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1   For Public Employees       MICHAEL S. ETKIN, ESQ.
     Retirement Association of   ANDREW BEHLMANN, ESQ.
 2   New Mexico:                 Lowenstein Sandler LLP
                                 One Lowenstein Drive
 3                               Roseland, NJ 07068
                                 (973)597-2500
 4
     For Official Committee of   ROBERT A. JULIAN, ESQ.
 5   Tort Claimants:             LAUREN T. ATTARD, ESQ.
                                 Baker & Hostetler LLP
 6                               600 Montgomery Street
                                 Suite 3100
 7                               San Francisco, CA 94111
                                 (415)659-2600
 8
     For PG&E Shareholders:      JAMES O. JOHNSTON, ESQ.
 9                               Jones Day
                                 555 South Flower Street
10                               50th Floor
                                 Los Angeles, CA 90071
11                               (213)489-3939

12

13

14

15

16

17   Court Recorder:            LORENA PARADA/ANKEY THOMAS
                                United States Bankruptcy
18                              Court
                                450 Golden Gate Avenue
19                              San Francisco, CA 94102

20
     Transcriber:               LINDA FERRARA
21                              eScribers, LLC
                                7227 North 16th Street
22                              Suite #207
                                Phoenix, AZ 85020
23                              (973)406-2250

24   Proceedings recorded by electronic sound recording;
     transcript provided by transcription service.
25
```

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    SAN FRANCISCO, CALIFORNIA, FRIDAY, JUNE 5, 2020, 9:30 AM

2                       -oOo-

3    (Call to order of the Court.)

4        THE CLERK: -- California, court is now in session.

5 The Honorable Dennis Montali presiding.

6        One moment, Your Honor, while I bring in Mr. Karotkin.

7 Mr. Karotkin is joining.

8        THE COURT:  Good morning, Mr. Karotkin.  Sorry about

9 the delay.

10       MR. KAROTKIN:  Good morning, Your Honor.

11       THE COURT:  I can't blame your client for whatever

12 went wrong today.  What do you have in store for me for this

13 morning?

14       MR. KAROTKIN:  Well, Your Honor, I wish I could tell

15 you that we have finalized the agreement with the UCC, but we

16 have not.  We still have some open issues that we have not

17 resolved, but I know that you have other things on the schedule

18 this morning to begin with, and I think the PERA argument, as

19 well as Mr. Julian.  I would suggest that after those two

20 items, it would probably be time for a recess in any event

21 where we can regroup, and after that, give you a further update

22 as to where we are on that if that works for you.

23       THE COURT:  Well, what have you heard from the

24 municipal governmental agencies?  I know Mr. Troy wants to

25 speak.  Do you know -- anyone else contacted you about speaking

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    this morning?

2            MR. KAROTKIN:  I know Mr. Troy wants to speak.  We

3    have furnished some additional modifications to Mr. Pascuzzi

4    and his group, and which I think includes Mr. Troy.  I think we

5    have made progress with those.  I thought Mr. Troy wanted to

6    address the trust documents but I don't want to speak for him.

7            THE COURT:  Okay, let's do this.  I know Mr. Etkin and

8    his colleagues for the securities group are definitely

9    scheduled to speak, and I'm going to do this, I have a brief

10   statement to make, or a point -- a question to put to Mr.

11   Etkin.  In fact, having my technical hang-ups today, I'm going

12   to make sure I can share my screen with you, and I'm going to

13   share.

14           All right, so Mr. Etkin, I hope you can hear this but

15   I -- during the evening, I thought about presenting a question

16   to you, and then I'm going to have a question for Mr. Johnston,

17   whoever is going to speak later for the equity group.

18           So this is a brief hypothetical.  I'm an old

19   hypothetical person.  I'll just summarize it.  It changes the

20   facts to simplify it.  What it says is two different people buy

21   stock just before the class period date.  You'll see I just had

22   them each buy 1,000 shares.  I made up a price, not necessarily

23   the case but around what I heard about.  They each paid seventy

24   bucks.  They each paid 7,000 dollars, and days later, the

25   market learned about the problems, and "Mr. A" bailed out and

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    sold his stock, oddly enough on January 29th of 2018, and he

2    sold them for sixty dollars, so he lost ten dollars a share or

3    1,000 dollars.

4         I'm going to stop right there and suggest it was just

5    a coincidence in my hypothetical that one year later, the

6    company filed bankruptcy, and I believe there could be little

7    doubt that Mr. A's loss, assume -- by the way, this assumes

8    that he can prove that PG&E is culpable -- not distinguished

9    between PG&E or officers and directors, but that he can

10   establish a valid claim for damages of 1,000 dollars because he

11   lost ten dollars a share.

12        So a year later, the company files bankruptcy.  He has

13   a liquidated claim of 1,000 dollars.  To me, that is consistent

14   with the law that says on the petition date, you find out what

15   the amount of someone's claim is, and that's Mr. A's claim.

16        In the meantime, of course, the shares dropped down to

17   fourteen dollars.  PG&E filed bankruptcy.  "Mr. B's" still in

18   the game.  He's still playing the game.  He's in for the long

19   haul, but by then the stock is down to fourteen dollars.  So he

20   has a fifty-six dollar paper loss, but I'll assume that because

21   he could've gotten out at sixty dollars, the same time A got

22   out, I think that the best I could give him is the same 1,000

23   dollar claim because he didn't -- he wasn't defrauded when the

24   stock went from sixty to fourteen, he was playing the game.  He

25   was into -- as an investor.

PG&E Corporation and Pacific Gas and Electric Company

1    So now he has filed -- now he says I have a claim, and

2    it seems to me it is inescapable that both A and B have 1,000

3    dollar damage claims.  Mr. B happens to still own stock.

4    So I put in summary form, the equation, the fraction

5    that Mr. Johnston had yesterday.  I simplified it, but I said

6    if we follow his theory, we go back to the day when the market

7    dropped, and A -- by the way, that stays on the left, it says

8    526 shares, it should say -- there's a --

9    AUTOMATED VOICE:  Okay.  I found this on the web, if

10   we go back to the date.

11   THE COURT:  What is going on -- there's Siri is

12   talking to me.

13   I made a mistake when I did that.  I left out an "M",

14   so it should say 526 million shares, and doing the fraction,

15   that would put his value in the stock at a lower number, the

16   way Mr. Johnston argued, and using your number of a much lower

17   denominator, there would be a much higher result.

18   So I just want you to figure out when it's your turn

19   to argue, how you would explain why I shouldn't assume that's

20   the case.  It's inconceivable to me that the two investors

21   would get different amounts of shares when their damage for the

22   fraud is the same.  That's your question.  You'll have time to

23   answer it in your argument.

24   My question for Mr. Johnston and the shareholders is

25   not written out, it's this.  They make the argument in the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    briefs that there should be a credit against any claim for

2    insurance recoveries by the investor, and they say that's

3    really because the insurance belongs to the debtor.  It's

4    property of the estate.

5          The problem I have with that theory, as I read the

6    briefs last night, and reflected on this is that is

7    inconsistent with the idea that 510(b) doesn't allow debtors to

8    pay money.  It tells debtors to issue stock to 510(b)

9    claimants.  And so I don't think the proponents necessarily can

10   have it both ways.  You can't say that well, if there's

11   insurance that will be paid in money to the victim, that should

12   offset the victim's claim.  I say "victim", I mean the

13   defrauded investor.  But it seems to me that that's

14   inconsistent with the notion that the debtor is paying value

15   because it's only allowed to distribute to 510(b) claimants,

16   equity along the lines equivalent to the other equity.

17         So that's for later.  I'm going to close the

18   hypothetical off the screen, and I'm going to not ask you to

19   necessarily even to respond to these things until it's your

20   turn to argue.

21         So with that, Ms. Parada, I would like you to bring

22   Mr. Troy in, and then in the meantime, if there are any counsel

23   for municipalities, or anyone else who had been promised an

24   opportunity to speak, put up your hand on the raise hand

25   function, and I'll attempt to recognize you, and then if there

        PG&E Corporation and Pacific Gas and Electric Company

1    are -- nobody else shows up that way, we'll go to Mr. Etkin and

2    his side.

3            Okay, good morning, Mr. Troy.  Sorry about the delay

4    here.

5            MR. TROY:  No problem, Your Honor.  Good morning.

6            Mr. Karotkin is correct with respect to the

7    outstanding objection on the requested inserts to the Fire

8    Victim Trust agreement and the claims under the Rules of

9    Procedures.  Those -- we have worked on some of that last night

10   with the counsel to the trustee -- to the trust, I don't think

11   we're there yet, and so we do need some time to address it but

12   Mr. Pascuzzi and I talked this morning, and at the appropriate

13   time, he will address that with the Court.

14           THE COURT:  Okay.  Well, let's see, is this Mr.

15   Pascuzzi raising his hand?  Let me just find out.  Well, I see

16   several people are, and one of them is Mr. Pascuzzi, and Mr.

17   Tredinnick, and Mr. Gorton.  So I'll come to the other folks,

18   but for now, Ms. Parada, let's bring Mr. Pascuzzi, Mr.

19   Tredinnick, and Mr. Gorton into the room all together.

20           And Mr. Troy, do you want to -- are you going to be

21   saying anything more?  Do you plan on saying anything more

22   right now?

23           MR. TROY:  I might, Your Honor, but I'm going to let

24   Mr. Pascuzzi and the others take the lead.

25           THE COURT:  Okay.  I'll leave you there too, then.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          MR. TROY:  Thank you, Your Honor.

2          THE COURT:  Good morning, Mr. Pascuzzi.

3          MR. PASCUZZI:  Good morning, Your Honor.  Paul

4    Pascuzzi for the California State Agencies.

5          THE COURT:  Okay.  Hold on.  Wait until the other

6    folks come in.  All right, Mr. Gorton?  Good morning.  Can you

7    hear me?

8          MR. GORTON:  Good morning, yes, sir.

9          THE COURT:  All right.  Mr. Tredinnick, I see your

10   name on the screen.  You need to unmute yourself, and turn on

11   your video.

12         Good morning, Mr. Tredinnick.  Can you hear me?

13         MR. TREDINNICK:  Yes, I can, Your Honor.

14         THE COURT:  Okay.

15         MR. TREDINNICK:  Can you hear me?

16         THE COURT:  Yes, fine.  Thanks.

17         All right, Mr. Pascuzzi, you have the floor.

18         MR. PASCUZZI:  So Your Honor, I'll just inventory what

19   is resolved and not resolved from our perspective.  I saw that

20   the debtors filed an updated chart just a few minutes ago, and

21   I took a quick look at it, and I think there's a few

22   inaccuracies in it.

23         I think that with regard to plan Section 8.2(e) which

24   deals with the effect of the assumption of executory contracts,

25   that is not resolved.  I think Mr. Gorton and Mr. Tredinnick

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company
may want to address that a little bit.

1

2    The famous 10.13, which is the special provisions for
3    governmental units, we had made some tweaks to the version of
4    that that was in the draft plan that was filed earlier in the
5    week, and sent that to the debtors, and my understanding is
6    they are still reviewing it.  I've been coordinating with Mr.
7    Troy, Mr. Gorton, Mr. Tredinnick, the Pension Benefit Guaranty
8    Corporation, and others on that, so we're waiting to hear back
9    from the debtors on that, and if there's some issues on that,
10   we would like to be heard but the chart says that's resolved
11   and it is not resolved.

12   THE COURT:  Well, go back to 8.2 -- 8.2(e), do you
13   think that's still up for discussion among the counsel as well,
14   both of them still in play?

15   MR. PASCUZZI:  Yes.

16   THE COURT:  I mean, in --

17   MR. PASCUZZI:  Yes, Your Honor.  I mean, I've already
18   addressed it.  Mr. Troy's already addressed it.  So I'm not
19   asking to reargue anything on that, but I don't think Mr.
20   Gorton or Mr. Tredinnick have had their turn.

21   THE COURT:  No, that's fine, and I'm happy to listen
22   to them.  My point is, I'll listen to them, but if there's
23   still some back and forth going on, I don't want to pass that
24   up either.  So --

25   MR. PASCUZZI:  Well, I think the debtors had made a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1 proposal to us, and we responded this morning that it was not

2 acceptable. I think they know what we want, and I think

3 they've told us they're not going to give us what we want, so -

4 -

5 THE COURT: On both sections, on both 10.3 (sic) and

6 8.2 or only 8.23 -- (e)?

7 MR. PASCUZZI: 8.2(e) is what I'm speaking to, Your

8 Honor.

9 THE COURT: Okay.

10 MR. PASCUZZI: I think that's something you have to

11 decide.

12 THE COURT: All right.

13 MR. PASCUZZI: 10.13, we're waiting to hear --

14 MR. KAROTKIN: Your Honor?

15 MR. PASCUZZI: -- to hear back from the debtors.

16 THE COURT: Mr. Karotkin?

17 MR. KAROTKIN: Your Honor, I'm sorry. I know we sent

18 Mr. Pascuzzi and his group, including Mr. Gorton, and Mr.

19 Tredinnick, proposed revisions to 8.2(e), I believe last night.

20 We heard back from him about an hour ago that 8.2(e) was not

21 acceptable but no response as to how it could be modified to be

22 acceptable. We think it is perfectly proper, and in full

23 compliance with the statute, and we're prepared to rely on that

24 and argue on that.

25 If Mr. Pascuzzi and his colleagues have suggested

PG&E Corporation and Pacific Gas and Electric Company

1    revisions, we would be happy to consider them, but the only

2    response was no, and frankly, I don't understand -- maybe we

3    can't resolve it, maybe we can, but I thought we went a long

4    way to address their concerns, and we think it's appropriate.

5            THE COURT:  Okay.

6            MR. KAROTKIN:  So 10.13, immediately before we got on

7    the call, and I know they haven't had a chance to review it, we

8    did send proposed revised language to 10.13, but I do know they

9    have not had time to look at that.

10           THE COURT:  Okay, well I haven't --

11           MR. KAROTKIN:  But I think that addresses their

12   concerns.

13           THE COURT:  Needless to say --

14           MR. KAROTKIN:  Well, hopefully, they will agree.

15           THE COURT:  -- I haven't had time to look at anything.

16   I was busy trying to get my screen to work, and to do my

17   hypothetical for the securities folks.

18           Mr. Gorton, you've been patient.  What can I -- what

19   do you have to say to me?

20           MR. GORTON:  Well, Mr. Pascuzzi's been in front

21   herding cats here, and I want to -- I appreciate that, and I

22   think Mr. Karotkin's observation that we haven't had an

23   opportunity to review what we just got is accurate.

24           I would at some point, like an opportunity to address

25   the Court, but I think it's also convenient and efficient for

PG&E Corporation and Pacific Gas and Electric Company

1    us to try to get these issues resolved before we close.

2              THE COURT:  Oh, yeah, I agree, and maybe -- again, I'm

3    not telling you what to do, or what not to do, but we're going

4    to go after you all finish here, and there's going to be a

5    fairly long segment on the securities litigation, which I don't

6    imagine concerns you, and so maybe that's a time for all of you

7    to go back and forth offline, and if you reach a resolution,

8    that's fine, if not, that's what I'm here to try to resolve.

9    So I'll do it.

10             MR. KAROTKIN:  Your Honor, one point of clarification.

11             THE COURT:  Yes.

12             MR. KAROTKIN:  My colleague, Ms. Liou, just emailed me

13   and said she is sending those proposals now.  I thought they

14   had gone out before the hearing, but she is sending them now.

15             THE COURT:  Okay.

16             MR. KAROTKIN:  I apologize for that.

17             THE COURT:  Okay.  Mr. Gorton, anything more for now,

18   or shall we call on Mr. --

19             MR. GORTON:  Your Honor, I think it's best.  We'll

20   just wait until we see what we've got, and then we can recap

21   what's really at issue.

22             THE COURT:  Okay.

23             MR. GORTON:  Thank you.

24             MR. PASCUZZI:  Your Honor?

25             THE COURT:  Yes, Mr. Pascuzzi?

PG&E Corporation and Pacific Gas and Electric Company

1      MR. PASCUZZI:  I'm sorry, I wasn't finished with my

2  inventory of what had --

3      THE COURT:  Oh.

4      MR. PASCUZZI:  -- been resolved because I think that

5  10. -- there were some minor changes to 10.3 with the

6  discharge.  I think that is resolved, and I think that the

7  debtors had agreed to, in 10.9(e) change the "releasing

8  parties" to capital R, capital P, Releasing Parties, so I think

9  that is resolved.

10      I think that the retention of jurisdiction issue in

11  plan Section 11.1 is not resolved.

12      And then we had all reserved our rights with regard to

13  executory contracts, and the current version of the

14  confirmation order at paragraph 34 does reserve those rights,

15  and that is fine with us, and -- because we have filed a cure

16  dispute that would reserve our rights at docket number 7276.

17      So I believe there does not need to be any further

18  issues with regard to executory contract cure amount issues on

19  that.

20      And then as Mr. Troy mentioned, we would like to

21  address the Fire Victim Trust and claims resolution procedures

22  issues.  I don't know if you want me to do that now or not.

23      THE COURT:  Well, what do you want to do?  I mean, Mr.

24  Tredinnick hasn't had a chance to say a word.  Are you going to

25  be the spokesman for the whole group on the trust document?

PG&E Corporation and Pacific Gas and Electric Company

1          MR. PASCUZZI:  Just with respect to the government,

2    Mr. Troy and I, on the -- recall, Your Honor, you had approved

3    settlements with the government things.

4          THE COURT:  Yes.

5          MR. PASCUZZI:  I think the other issues with Adventist

6    and other parties, those aren't our issues.

7          THE COURT:  Let me ask Mr. Tredinnick if he wants to

8    weigh in, and then perhaps we'll come back to you and see if it

9    you want to talk about the trust issues.

10         Mr. Tredinnick, are you on board with everybody, or

11   what's your pleasure?

12         MR. TREDINNICK:  Yes, Your Honor, I believe we -- our

13   objections are down to the executory contract issues, the

14   8.2(e) and also we were concerned with the indemnity

15   contribution issues that apparently are being worked out with

16   the UCC.  We also have an issue -- we had a concern about that.

17         So I think our issues are in process, and seem like

18   they're still being discussed.  So if we can get them worked

19   out, I think then we would not be making any other arguments

20   with respect to the plan.

21         The other issues had been resolved with the other

22   resolutions that have been talked about today.

23         THE COURT:  Okay.  Mr. Karotkin, I recall yesterday

24   when Mr. Bray was speaking that the indemnity and contribution

25   piece of the executory contract had been resolved; isn't that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    correct?

2            MR. KAROTKIN:  It was -- no, that's not correct.  It

3    was resolved subject to appropriate documentation --

4            THE COURT:  Oh, okay.

5            MR. KAROTKIN:  -- (indiscernible).

6            THE COURT:  Well, so it's still in play.  Again, I

7    can't keep track of it, it's such a moving target.  But before

8    we conclude the arguments today, I'm probably going to have a

9    double-check on what's pending and what isn't.  And Mr.

10   Karotkin's duty is to keep me honest, so I'll know what I'm

11   supposed to be deciding, and what I don't have to decide.  Mr.

12   --

13           MR. GORTON:  Your Honor, Mark Gorton?

14           THE COURT:  Yes.

15           MR. GORTON:  There is also an open issue on -- that

16   the municipal objectors raised on 10.9(f) of the scope of that

17   injunction.

18           THE COURT:  10.9(f)?

19           MR. GORTON:  Yes, Your Honor.

20           THE COURT:  And what are -- is that in discussion with

21   the parties or not?

22           MR. GORTON:  It was simply raised in the brief because

23   the scope was beyond, and so it has not -- the proposal was to

24   take the expansive language out of it, or actually to delete it

25   in my objection.  I said simply delete it, but we've not had a

PG&E Corporation and Pacific Gas and Electric Company

1  discussion about modifying that document -- that provision.

2  THE COURT:  Okay.  All right.  So I've at least --

3  unless there's a change, it looks to me like that's one of the

4  open items that --

5  MR. GORTON:  Thank you.

6  THE COURT:  -- I'm going to have to decide.  Okay.

7  Thanks very much.

8  Let me, Mr. Pascuzzi?

9  MR. TREDINNICK:  Your Honor?  Your Honor?

10  THE COURT:  Yes.

11  MR. TREDINNICK:  If I, again, just make one point.

12  Mr. Glassman, who represents the Southern San Joaquin

13  Irrigation District, had -- was trying to raise his hand.  I

14  think he has an issue with respect to eminent domain issues,

15  and he sent me an email, said he wanted to address the Court,

16  as well.  So --

17  THE COURT:  He's also raised his hand.  He's actually

18  apparently raised his hand twice.  I don't know how to do it --

19  MR. TREDINNICK:  Okay.

20  THE COURT:  -- with someone who has --

21  MR. TREDINNICK:  I just wanted to --

22  THE COURT:  -- raised his hand twice.

23  Ms. Parada, let's --

24  MR. TREDINNICK:  I'm raising my hand for him, as well,

25  so --

PG&E Corporation and Pacific Gas and Electric Company

1      THE COURT:  Ms. Parada, let's bring both of Mr.

2  Glassman into the room for now, along with -- while the other

3  counsel are still here, as well, please.

4      MR. PASCUZZI:  Yeah.

5      THE CLERK:  Mr. Glassman is joining now.  Mr.

6  Glassman, please state your appearance, and unmute your

7  microphone.

8      THE COURT:  Mr. Glassman, you need to unmute.

9      MR. GLASSMAN:  Hello?

10      THE COURT:  Oh, okay.

11      MR. GLASSMAN:  I'm sorry.  Paul Glassman of Stradling

12  Yocca Carlson and Rauth, appearing for the South San Joaquin

13  Irrigation District.

14      THE COURT:  And was I correct, Mr. Glassman, you put

15  your hand -- you put two hands up, right, or you -- there was

16  some --

17      MR. GLASSMAN:  Yes, I had -- because I didn't get

18  through on one device, Your Honor.  I tried a second one, as

19  well, and that's the reason why there were two devices.

20      THE COURT:  And then you got --

21      MR. GLASSMAN:  It really --

22      THE COURT:  -- then you got Mr. Tredinnick to do your

23  heavy lifting for you.

24      MR. GLASSMAN:  And I appreciate that.

25      THE COURT:  That's pretty --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. GLASSMAN:  So the most important thing, I just

2  wanted to make sure I could get on because this is my first

3  video, even though I've prepared for many.  So I think our

4  concerns have been covered.  We still have the open issues, as

5  well, particularly in the area of eminent domain, but the open

6  provisions are the same for us.  That is the 8.2(e), and the

7  10.9(f), 10.13.

8    THE COURT:  But if you're -- they're fine.  I remember

9  in your objection, I believe you stood out alone in terms of

10 the eminent domain; is that an open issue that I will have to

11 decide?

12   MR. GLASSMAN:  Well, I'm hopeful that that would be

13 resolved.  In the papers that were filed by the debtors and

14 their chart, they said that the -- our eminent domain actions

15 which are two actions involving litigation -- let me just

16 explain that for a moment.

17   My client had for many years, been seeking to acquire

18 certain retail electric assets from PG&E through the exercise

19 of their eminent domain power.

20   THE COURT:  Right.

21   MR. GLASSMAN:  And there's litigation -- which came

22 before the Court on a relief from stay, and there was a

23 stipulation to lift the stay.  There's two lawsuits, one

24 involving eminent domain action brought by the district, the

25 other involving an action for declaratory relief by PG&E

PG&E Corporation and Pacific Gas and Electric Company

1  regarding a local agency formation and administrative

2  proceeding, or lack of action.  So the effect of discharge to

3  my client was a very live controversy of real consequence, not

4  a hypothetical issue.

5          Now in the papers that the debtors filed, they

6  indicated that the district's eminent domain and LAFCo actions

7  were not claims under Section 101.5 of the Bankruptcy Code, and

8  therefore we not subject to the discharge under 10.3 of the

9  plan.  We agree with that, of course, but we were concerned

10  that it didn't go far enough because of the provisions in the

11  plan throughout the plan, that purport to discharge matters

12  that are not claims.

13          If Mr. Karotkin could verify, and finding that those

14  actions are in fact not subject to any of the plan discharge

15  release, and so forth, provisions, that would help advance our

16  issues quite a bit.  And so the problem is there's now these

17  other provisions in the plan, some of which have been

18  eliminated, such as 6.1, and --

19          MR. KAROTKIN:  Your Honor, can I interrupt?

20          THE COURT:  Sure.  Again, Mr. Karotkin, just --

21          MR. KAROTKIN:  I mean, if Mr. Pascuzzi is speaking for

22  Mr. Glassman with respect to his eminent domain issue, as to

23  how Section 10.13 should be revised yet once again to address

24  these special interests, the thing we sent out a few minutes

25  ago -- first of all, it addressed eminent domain to begin with,

PG&E Corporation and Pacific Gas and Electric Company

1  so I'm not sure I understand the problem.  They requested a few

2  additional words.  I don't know if those were Mr. Glassman's

3  words or somebody else's words in the eminent domain section

4  but if they look at what we emailed to them a little while ago

5  from my partner, Ms. Liou, I believe we accepted their language

6  on that, and I don't know why or how, at this point, it

7  possibly could be an issue.

8         THE COURT:  Well, maybe one of the issues is things

9  are just happening too fast and people can't read emails while

10  they're doing other things.

11         I thought Mr. Glassman and his client's matters were

12  rather unique on the eminent domain.  I could be wrong, and

13  maybe the other counsel have similarly-situated clients, and

14  problems but Mr. Glassman was up-front about these two specific

15  matters.

16         Mr. Glassman, are you able to work -- zero in on the -

17  - whatever Ms. Liou for the debtors sent you in the last little

18  while, and --

19         MR. GLASSMAN:  I will take a look at that, Your Honor,

20  but Your Honor is correct that we had unique issues, but also a

21  very real controversy on our eminent domain action, but also

22  it's an issue generally for others in -- other governmental

23  units, as well, and we were both speaking on their behalf with

24  regard to our group, and others, such as the City of San

25  Francisco, and Mr. Gorton's client, Valley Clean Energy, that

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  have issues, and so we were really raising issues in two

2  capacities, but our main focus, of course, was resolving our

3  particular actions.

4          And so again, on that issue, I will be asking that

5  that -- because there's so many provisions in the plan as the

6  Court is now aware, that could potentially release claims, and

7  there could be some inconsistencies and such, that there be

8  some clear statement in the plan -- I'm sorry, in the either

9  plan or confirmation order regarding our issue because it seems

10  to be conceded by Mr. Karotkin, but yet it's not clear because

11  all of these various relief provisions, and that go beyond

12  releasing claims, and they talk about releasing the causes of

13  action which in addition to the comments Mr. Troy made, and Mr.

14  Pascuzzi made regarding the scope of causes of action, it also

15  includes power, such as powers of eminent domain, and such,

16  inchoate rights and interests, which is how the courts describe

17  eminent domain.

18          So having something clear to exclude that would go a

19  long way towards advancing the issue.

20          THE COURT:  Okay.

21          MR. KAROTKIN:  Again --

22          MR. GLASSMAN:  I will take --

23          MR. KAROTKIN:  -- again, Your Honor --

24          MR. GLASSMAN:  -- that up with Mr. -- I will take that

25  up with Mr. Karotkin.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. KAROTKIN:  Your Honor, if he just looks at the new

2    language, it's absolutely clear, and I think we should move on.

3        THE COURT:  Mr. Karotkin, you're expecting too much of

4    me, and perhaps some of these other people.  We just can't -- I

5    can't, and I'll say some of these counsel, just can't process

6    these things in real time.  So --

7        MR. KAROTKIN:  I'm not -- Your Honor, I'm not asking

8    you to agree with us, I'm just saying let us -- let Mr.

9    Glassman look at what we sent --

10       MR. GLASSMAN:  Okay.

11       MR. KAROTKIN:  -- and if there's still an issue, we

12   can address it later.

13       THE COURT:  I'll do that.

14       MR. KAROTKIN:  Okay.

15       MR. GLASSMAN:  Okay.  And we also have --

16       MR. KAROTKIN:  (Indiscernible) argue (indiscernible).

17       MR. GLASSMAN:  -- many executory contracts as well.

18       THE COURT:  Okay.

19       MR. GLASSMAN:  That's a secondary issue for our

20   client.  We have those issues, as well.

21       THE COURT:  Mr. Glassman, what I'm going to do is I'm

22   going to put the burden on Mr. Karotkin.  He's been very good

23   about a lot of balls in the air that he's juggled, like a

24   magician, or whatever -- whoever juggles things, and later

25   today, or early this afternoon, or sometime, he will keep me in

PG&E Corporation and Pacific Gas and Electric Company

1    informed as to what's open and what's resolved.  And so for

2    now, I'm going to just trust that the system will work, and you

3    and others will have an opportunity to reflect on what you --

4    what's being proposed.

5            I'm going to come back to Mr. Pascuzzi in a moment,

6    but I notice now with the hands going up, Mr. Abrams, I'm not

7    going to hear from Mr. Abrams at this point on anything, and

8    Ms. Cheever, I don't know why her hand -- or why she's there.

9    Mr. Kelly, I know, wished to be heard, but not on this subject.

10           Mr. Mintz, I'm going to ask you to lower your hand if

11   you want to be heard about something other than what I'm

12   talking to these counsel, all of whom represent governmental

13   agencies, and then raise it again if you want to be heard

14   later.

15           And Mr. Bray, the same I think is true with you.

16   You've just put up your hand.  I just can't juggle everybody,

17   and if you have something to add on that subject, okay -- well,

18   he took his hand down.  All right.

19           I'm going to let -- Mr. Glassman, Mr. Troy, Mr.

20   Gorton, and Mr. Tredinnick, I'm going to ask them to be put

21   back in the audience, and I'm going to let Mr. Pascuzzi make

22   his presentation or his argument about the trust issue.

23           MR. PASCUZZI:  Thank you, Your Honor.

24           THE COURT:  Okay.  Ready?

25           MR. PASCUZZI:  Yes, Your Honor.  Thank you.  So we did

PG&E Corporation and Pacific Gas and Electric Company

1    have a call yesterday, late afternoon with the attorneys for

2    the Trustee, and the attorneys for the tort committee on the

3    Fire Victim Trust agreement and claims resolution procedures

4    issues that the United States and the California State agencies

5    have.

6         The issue, I think, is -- you'll probably hear from

7    them later -- they want us to sign a release, an additional

8    release to the release that's already in both the federal

9    settlement agreement, and the California State agency

10   settlement agreement, and the releases in those agreements

11   already, that have already been approved by the Court, were

12   specifically negotiated and so I'd point the Court to Sections

13   2.2(h), as in hat, and 2 --

14        THE COURT:  2.2(h) of the trust agreement?

15        MR. PASCUZZI:  Of the settlement agreements.

16        THE COURT:  Of the government's settlement agreement.

17   What's the docket number?

18        MR. PASCUZZI:  Docket number 7399-2 is the California

19   one, and I think 7399-1 is probably the federal one.  That's

20   your order approving our settlement agreements.

21        THE COURT:  Okay.

22        MR. PASCUZZI:  And they're attached.  So 2.2(h) as in

23   hat, and 2.2(e) as in Edward, have the releases that we

24   specifically negotiated, heavily negotiated.  It took weeks and

25   mediation to get those agreements done.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    I would also point out that the Fire Victim Trust

2    agreement itself has substantial protections for the Trustee,

3    and the claims administrator, and that -- the current version

4    of that is attached to the plan supplement as Exhibit D, at

5    docket number 7037, and I would point the Court to Sections 5.4

6    and 5.5 of the Fire Victim Trust agreement.

7    Basically, they say the standard of care for the

8    trustee and the claims administrator is very, very low, no

9    willful misconduct, bad faith or fraud, and Section 5.7 of the

10   trust agreement, the trust indemnifies the trustee, and the

11   claims administrator, and I'm sure they will have insurance.

12   So additional releases are just not necessary, in

13   addition to the fact that they're not included -- there are

14   specifically negotiated releases in our court approved

15   settlement agreements.  And again, I would refer the Court to

16   the tort committee's argument about the res judicata effect of

17   settlement agreements, and you can't change them after the fact

18   at docket numbers 7509, and 7522, which I had raised that in my

19   other argument, Your Honor.

20   So --

21   THE COURT:  Well, hold on Mr. Pascuzzi.  While Mr.

22   Molton, trustee's counsel, has raised his hand.  So maybe he

23   can shed some light on this.  So, Ms. Parada, bring Mr. Molton

24   in please, and go ahead, Mr. Pascuzzi, if you have some other

25   thoughts.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          MR. PASCUZZI:  Not that --

2          THE COURT:  Do you want to wait and hear what Mr.

3   Molton has to say?

4          MR. PASCUZZI:  Yeah, that was all I had, Your Honor.

5          THE COURT:  All right, hold on.

6          MR. PASCUZZI:  We'd urge the Court to stick to our

7   settlement agreements and not require anything further.

8          THE COURT:  Well, is this one of those things where

9   everybody wants double -- you know, belts and suspenders, and

10  the other side says belts is good enough; I don't want to give

11  you suspenders?  Is this a game of chicken here?  Is it a big

12  deal for the two agencies, federal and state, to say the same

13  thing again?

14         MR. MOLTON:  Well, it isn't, Your Honor.  By the way,

15  Your Honor, first before -- my name is David Molton.  First

16  time here, last day of this hearing, but it's a pleasure --

17         THE COURT:  Maybe, maybe it's the last day.

18         MR. MOLTON:  It's a pleasure to be in front of you

19  finally, Judge.  I'm with Brown Rudnick, and we're counsel as

20  you know, to the Trustee, Judge Trotter, and the claims

21  administrator, Kathy Yanni.

22         It's not the same thing.  Mr. Pascuzzi has identified

23  the issues, but he hasn't really did so with specificity.  And

24  if you mind, Your Honor, I'll take just a few minutes to go

25  through what I think is what the issue here.  Mr. --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Okay, but Mr. Molton, you have to

2  understand, I went through the trust agreement two weeks ago.

3  I haven't touched it, and it isn't even within arm's reach of

4  me now.  So you can say what you want but I just can't keep up

5  with you on this either.

6    MR. MOLTON:  I understand.

7    THE COURT:  Okay.

8    MR. MOLTON:  How about I keep at the 50,000-foot

9  level, Judge, just to give some counterpoints to what my

10  friend, Ms. Pascuzzi has argued?  Okay?

11    THE COURT:  Yes, sir.

12    MR. MOLTON:  Okay.  In any event, what we're asking

13  for, Judge, is what every fire victim claimant which includes

14  the government entities which have been channeled to the trust,

15  and take through the trust, what they are required to provide

16  the trustee before they receive a distribution, and that is not

17  just a release of the trust, which is what Mr. Pascuzzi refers

18  to in the two government agreements, the California government

19  agreement, entity agreement, and the FEMA, the federal, et al

20  agreement.

21    In there, they have a release of the trust, but they

22  don't have a release of the trustee, the claims administrator,

23  and the claims administrator and the trustee's advisors, all of

24  which, Judge, in a case like this is an unremarkable ask from

25  the government.  So it's a different sort of release, and it's

PG&E Corporation and Pacific Gas and Electric Company

1     one that we're asking for from every other fire victim

2     claimant.

3            And I do want to note that --

4            THE COURT:  Is that true?  Now let me clarify that.

5     So an individual who has a 5,000 dollar minor damage claim, who

6     is going to get 5,000 or 4,000 or whatever, will sign a similar

7     release in favor of Justice Trotter and Ms. Yanni --

8            MR. MOLTON:  Yes.

9            THE COURT:  -- and everybody else --

10           MR. MOLTON:  Yes, it's --

11           THE COURT:  -- on that --

12           MR. MOLTON:  Yes, Judge.  There are two different sort

13    of releases appended to the trust agreement.  I believe, one is

14    for entities, and one is for individuals, but they contain the

15    same release of the indemnified trust parties which includes

16    his Honor Justice Trotter, as well as Kathy Yanni, and their

17    advisors.

18           It's true that 2.2(e) of the California Entity

19    Agreement, and 2.2(g), they're exactly similar agreements.  In

20    a section called "Trust Administration" provide a hands-off

21    that the government entities are hands-off for how the trust

22    operates, but it provides an exception, "except if they fail to

23    perform the payment obligations," then of certain sections of

24    that agreement, they could come to Your Honor and seek

25    enforcement.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1        Moreover, they retain the same rights under those

2   agreements as any other fire victim claimant to contest Judge

3   Trotter's administration of the Fire Victim Trust.  As I said,

4   the release that the government entities gave in this agreement

5   that was negotiated, we weren't a party to it, Judge, the

6   trustee wasn't a party to it, releases the trust with respect

7   to the government entity claims against -- which are channeled

8   into the trust, and --

9        THE COURT:  No, I understand.  I understand the

10  background.

11       MR. MOLTON:  It doesn't release Judge Trotter for his

12  conduct.

13       And I want to go into that what -- these are very

14  complex agreements.  I won't pretend to be able to understand

15  them all, and I'm not going to take you through the weeds on

16  them, but every element of the consideration involved in these

17  agreements requires Judge Trotter's judgment.

18       Number one, on the California -- CalFire, they get

19  their first seventy million dollars of earned interest on that

20  --

21       THE COURT:  Yeah, Mr. Molton, I know that background.

22       MR. MOLTON:  Okay.

23       THE COURT:  Just deal --

24       MR. MOLTON:  But --

25       THE COURT:  -- with the immediate issue today.  Just

PG&E Corporation and Pacific Gas and Electric Company

1 tell me again. Mr. Pascuzzi gave me some cites, but I want to

2 make sure I got the right thing. Tell me, from your point of

3 view, what specific document do you want Trotter and Yanni to

4 sign? I mean, excuse me, the agencies to sign, is that 2.2 of

5 the settlement or is it a different paragraph of the trust?

6          MR. MOLTON: It's a --

7          THE COURT: What document?

8          MR. MOLTON: Judge, it's the trust agreement that Mr.

9 Pascuzzi related to you. There are two appendix -- there's a

10 number of appendixes to that, but two of -- I think exhibits --

11 I don't want to get it wrong. I don't have it in front of me.

12 But two of the appendixes or two of the schedules or two of the

13 exhibits there are the entity release and the individual

14 release.

15          THE COURT: Okay.

16          MR. MOLTON: We're asking them --

17          THE COURT: That's good enough. I have a hard copy of

18 it sitting two feet away from me --

19          MR. MOLTON: Yeah.

20          THE COURT: -- but I'm not going to try to read it

21 now.

22          MR. MOLTON: No, I don't -- but just three points,

23 Judge. Monetation strategy that Judge Trotter has to institute

24 regarding the monetation of the stock yet --

25          THE COURT: No, I get it. You've given me background

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    that I know.

2        MR. MOLTON:  Okay, so he's just --

3        THE COURT:  It doesn't matter.  The point is you and

4    the trustee want Mr. Pascuzzi and the feds to sign something.

5    I've got to look and see what they're asked to decide --

6        MR. MOLTON:  Yeah, sure.

7        THE COURT:  -- and decide whether or not they're

8    required or not.  That's all.

9        MR. MOLTON:  We duly respect, Judge.  We think it's an

10   unremarkable ask, one that every other fire victim is being

11   asked to do.  Thank you.

12       THE COURT:  Mr. Pascuzzi, from an administrative point

13   of view, just dealing with multiple agencies, and I would

14   imagine Mr. Troy would have maybe even the same problem, is

15   there an internal administrative problem of processing

16   something like this, or does it take some senior executive to

17   make substantive decisions to sign something like this?

18       MR. PASCUZZI:  Your Honor, it is very problematic, and

19   that's why it was a specifically negotiated issue when we

20   negotiated these agreements.  The releases were specifically

21   negotiated, and lawyers from the Trustee's counsel, Brown

22   Rudnick firm, were involved in the negotiations of this

23   agreement, and the Section 3.11 of the settlement agreement

24   says the trustee is bound by the settlement agreement, and that

25   what they want us to sign is a two-and-a-half page general

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    release, as you -- a government entity giving a general release

2    to anybody is a very big problem.

3             THE COURT:  Okay, let's leave it at that.  Let's leave

4    it at that because I've got to go back -- I have been putting

5    off other matters.  I'm going to tell Mr. Molton, and you Mr.

6    Pascuzzi, if there's any chance of reaching an agreement

7    between now and sometime later, do so.  If not, I'll just make

8    a decision on it.  It seems to me, I just have to decide

9    whether it's a reasonable requirement of the agency, or it's an

10   unreasonable demand of the trustee, and it's that simple.  I

11   don't think I'm going to blow the whole giant settlement up in

12   flames.  I just have to make a decision one way or the other.

13            MR. PASCUZZI:  Your Honor, to have to release a third-

14   party to get paid out of the bankruptcy is a problem.  Thank

15   you.

16            THE COURT:  Okay.  Mr. Molton, I was expecting you,

17   and will invite you back if you want to make some general

18   comments to help me in terms of where we go, but not now.  I

19   need to deal with the other matters.

20            MR. MOLTON:  We understand, Your Honor, and I

21   understand you have other matters teed up right now.  Thank

22   you.

23            THE COURT:  Okay.  Thank you.

24            So Ms. Parada, let's remove these two counsel out, and

25   let me look at the -- well, I see one hand up, but it's not a

PG&E Corporation and Pacific Gas and Electric Company

1   name I recognize, so I'm not going to recognize that person.

2          Mr. Karotkin, you've been quiet for the last ten

3   minutes.  You've got fifteen emails telling you that

4   something's been solved and resolved, or no change?

5          MR. KAROTKIN:  No, no change.

6          THE COURT:  Okay.  Then what do you have on your list,

7   other than my turning to the securities claims issues?

8          MR. KAROTKIN:  I think there --

9          THE COURT:  Anyone else that you think is expecting to

10  be heard, and I understand Mr. Bray and others are -- that's

11  still in play, but --

12         MR. KAROTKIN:  I know Mr. Julian, I believe --

13         THE COURT:  Well, yeah, he's going to come later, I

14  believe.

15         MR. KAROTKIN:  Yes, he will.

16         THE COURT:  My intention is to get Mr. Etkin, and then

17  Mr. Julian, and then at some point then your side, and the

18  shareholders have the -- essentially the closing, but obviously

19  this is not going in accordance with the traditional format.

20         MR. KAROTKIN:  Okay.

21         THE COURT:  Okay.

22         MR. KAROTKIN:  I'm not aware of anything other than

23  Mr. Etkin, and then Mr. Julian, and then to the extent there

24  are still issues with the trust agreements, I think that was --

25         THE COURT:  Do you want to stay on the panel here, or

PG&E Corporation and Pacific Gas and Electric Company

1    do you want to be put back in the audience?

2              MR. KAROTKIN:  I don't mind staying, if you don't mind

3    looking at me.

4              THE COURT:  Well --

5              THE CLERK:  Excuse me, Your Honor?

6              THE COURT:  Yes.

7              THE CLERK:  Mr. Skikos, Mr. Mintz, and Mr. Kelly, have

8    raised hands.

9              THE COURT:  Okay.

10             MR. KAROTKIN:  Your Honor, actually I did neglect to

11   mention, we talked about this yesterday, that Mr. Skikos and

12   Mr. Kelly had asked for five minutes in connection with the

13   trust documents, I believe.  And I think Mr. Mintz is speaking

14   on behalf of the -- what I'll call the Adventist group on that

15   issue, as well.

16             THE COURT:  Okay.  Okay.  Why don't you stay on the

17   screen after all, Mr. Karotkin?  Then bring those three in

18   please, Ms. Parada?

19             THE CLERK:  And Ms. Winthrop has now also wished to

20   join.

21             THE COURT:  Winthrop, Mintz, Kelly, Skikos, all of

22   them.

23             Good morning, Mr. Skikos.  Need to tilt your screen a

24   little bit and unmute yourself.  There you go.  Thank you.

25             THE CLERK:  And Mr. Skikos, please state your

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   appearance for the record.

2          MR. SKIKOS:  Good morning.  Steve Skikos.

3          THE COURT:  And Mr. Mintz, same.  Your name.  I know

4   it, but say it again.

5          MR. MINTZ:  Benjamin Mintz from Arnold & Porter.

6   Counsel for AT&T.

7          THE COURT:  And same, Mr. Kelly.  Would you unmute and

8   state your appearance and then Ms. Winthrop do the same please?

9          MR. KELLY:  Yes, Your Honor.  Michael Kelly, Walkup,

10  Melodia, Kelly and Schoenberger.

11         THE COURT:  He never went -- I'm not picking you up

12  very good volume, Mr. Kelly.  Can you get closer to your

13  microphone?

14         MR. KELLY:  Try that, Your Honor.  Is that better?

15         THE COURT:  That's good.

16         MR. KELLY:  All right.  Thank you.  Michael Kelly on

17  behalf of approximately 1,000 of my individual clients.

18         THE COURT:  And Ms. Winthrop.  Unmute.  Unmute, Ms.

19  Winthrop and state your name.

20         MS. WINTHROP:  I'm sorry, Your Honor.  It muted itself

21  this time.

22         Good morning, Your Honor.  Rebecca Winthrop of Norton

23  Rose Fulbright on behalf of Adventist Health System/West and

24  Feather River Hospital.

25         THE COURT:  I can't fault anyone this morning since I

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   managed to get my thing not to go out on myself.

2       Okay.  Let's start with Mr. Mintz and Ms. Winthrop

3   because I -- this may be a follow-up from what we were talking

4   about yesterday, and then I'll come back to the other two.

5       Mr. Mintz?

6       MR. MINTZ:  Thank Your Honor, and I'll be very brief.

7   We just wanted to report that we are continuing to work with

8   the trustee and the TCC on language revisions to the trust

9   documents to reflect Your Honor's order -- memorandum opinion.

10  Substantial progress in the regard, but we are still working

11  with them on further revisions.  We hope that we will be able

12  to resolve all those issues and not have to bring anything to

13  Your Honor's attention.  But we're not in a position to say

14  that yet today.  The group of us have work -- committed to

15  working over this weekend to try to finalize that language and

16  be in a position to either have a resolution or an issue or two

17  to bring to Your Honor's attention by Monday or so.

18      THE COURT:  Okay.  Thanks very much.  Keep up the good

19  work.

20      Ms. Winthrop?  Same thing or different?

21      MS. WINTHROP:  Your Honor, just that we are making

22  progress and we reserve judgment until we've had a chance to go

23  through those documents.

24      UNIDENTIFIED SPEAKER:  Your Honor, may I interject

25  something?  We received from Mr. Mintz this morning some

escribers
(973)406-2250 | operations@escribers.net | www.escribers.net

        PG&E Corporation and Pacific Gas and Electric Company

1    revised language to the trust agreement that affects the

2    debtors which we really haven't had a chance to review, so we

3    may have some issues as well.

4            THE COURT:  Okay.  Keep at it.

5            Okay.  Mr. Mintz, Ms. Winthrop, unless you want to

6    stick around, we'll put you back out in the audience, and then

7    I'll let Mr. Skikos and Mr. Kelly -- I don't imagine -- well, I

8    don't know -- well, I don't know if -- go ahead.  Why don't you

9    -- I don't know what they're going to say so we'll leave you

10   here in case you want to respond.

11           Mr. Skikos, but -- I thought I was going to hear from

12   you yesterday so why don't you go first today?

13           MR. SKIKOS:  Sure, Your Honor, unless Mr. Kelly wants

14   to go first.

15           MR. KELLY:  Your Honor, may I go because I think Mr.

16   Skikos may have something to add to mine.

17           THE COURT:  Okay.

18           MR. KELLY:  And first of all, I appreciate the Court's

19   deferring me until today.  I was tied up on a matter in Judge

20   Tighe's court yesterday.  I intended to speak in concert with

21   Mr. Pitre.  I appreciate the Court's deference.  I have

22   prepared remarks which I promise will be less than five

23   minutes.

24           I want to make clear this morning, Your Honor, that I

25   speak on behalf of a thousand individual clients, not in my

PG&E Corporation and Pacific Gas and Electric Company

1    capacity as lead counsel in the JCCP, nor as an attorney

2    representing one of the members of the TCC.

3            And I speak this morning, Your Honor, in opposition to

4    any plan confirmation that does not incorporate fair

5    registration rights for the victims.

6            Mr. Karotkin spoke passionately both Wednesday in his

7    initial closing and yesterday in opposing Ms. Kane's motion

8    about the critical importance to his clients and individual

9    fire victims getting their money quickly.  And with respect to

10   Mr. Karotkin, talk is cheap, Your Honor, particularly in this

11   case where this same mantra of paying the victims promptly and

12   fully has been mouthed since October of 2017, but no victim has

13   yet been paid and there is no guarantee of speedy payment or

14   that it will ever occur.

15           The single most controversial aspect of this plan for

16   the last eight months as the Court knows and remains the

17   uncertainty regarding --

18           THE COURT:  Can you hear me?

19           MR. KELLY:  Yes, Your Honor.

20           THE COURT:  Isn't it highly likely if the plan is

21   confirmed and becomes effective that at least cash payments

22   will start fairly quickly?

23           MR. KELLY:  Yes, Your Honor.  But if the Court will

24   permit me to complete these prepared remarks, I believe you

25   will see that my focus is on the stock.

(971) 224-X operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  I know.

2          MR. KELLY:  And the cash represents only one half.

3          THE COURT:  Well, I know that, but you made a

4    statement that nothing is going to go to the victims.  I just

5    want to clarify.

6          MR. KELLY:  No, Your Honor.  I said nothing had been

7    paid to date and there is no guarantee so far of speedy payment

8    or payment (indiscernible).

9          THE COURT:  Go ahead with your comments.

10         MR. KELLY:  The single most controversial aspect of

11   this plan for the last eight months has been and remains the

12   uncertainty regarding the value of the stock acquired by the

13   individual victims while subrogation claimants and financial

14   backers of the plan get one hundred percent in cash.

15         By design, this aspect of the plan in its most optimal

16   form contains great risk to the victims.  Make no mistake, this

17   Court's actions in confirming this plan will be judged in years

18   to come based on whether the Court did everything that could be

19   done to protect the value of the stock which the individual

20   victims were required to accept.  And this Court should not

21   confirm a plan where that risk of stock value loss is clearly

22   and avoidably increased by the refusal of the proponents to

23   guarantee in a publicly disclosed, unambiguous writing not to

24   disadvantage the fire victims in their ability to sell stock by

25   a mutually agreeable formula relating to all parties.

escribers
(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          We should not confuse efforts with results.  Putting a

2     lot of time and effort into a plan to protect the individual

3     victims which cannot be executed will be a failure.  Whether

4     the plan looks good on paper is irrelevant if in execution, it

5     results in a failure to compensate the heirs of those burned to

6     death and the thousands of homeowners, renters, small business

7     owners, and community members who have been forced to accept

8     fifty percent of their gross compensation in stock.

9          That stock value must be safeguarded by this Court and

10    maximized if the plan is to succeed.  Thomas Edison said,

11    "Having a vision for what you want is not enough.  Vision

12    without execution is a hallucination."  The reorganization plan

13    that makes promises which cannot be kept or which are not kept

14    and which is structured in a way that invites failure in the

15    execution is not a plan that should be confirmed.

16         This Court betrays the individual fire victims by

17    approving and confirming a plan which permits the debtor to

18    carry out stock sales by its financial backers, institutional

19    investors, and backstop parties before the victims or which

20    delays the victims' ability to liquidate their stock at optimal

21    value when the trust actually needs the money.

22         The moms and dads, brothers and sisters, aunts and

23    uncles who have lost loved ones as well as their homes,

24    businesses, and treasured possessions are entitled to have this

25    Court do everything in its power to make the goals stated by

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  Mr. Karotkin a reality.

2          That is only accomplished by this Court mandating a

3  fair and victim-sensitive process for stock liquidation via an

4  approved registration rights agreement.  Without a public,

5  fair, and court-approved binding registration rights agreement

6  that protects the victims' economic rights, the plan should not

7  be confirmed.  Consigning this issue to be negotiated in a back

8  room without Court approval undermines the public's trust in

9  this Court and does a disservice to the victims.

10         We trust that the Court will respect these concerns,

11  and will withhold confirmation until either an agreeable

12  registration rights agreement is in place or itself craft a

13  registration rights agreement consistent with Mr. Pitre's

14  request yesterday and Mr. Skikos' views this morning.

15         The Court will recall yesterday that Mr. Pitre did

16  suggest that this Court could require a one-sentence provision

17  on restrictions relative to when shares of stock can be sold.

18  The terms should be the same for fire victims and the backstop

19  parties.  A level playing field for all.

20         Thank you for listening, Your Honor.

21         THE COURT:  Thank you, Mr. Kelly.  Appreciate your

22  comments.

23         Mr. Skikos?

24         MR. SKIKOS:  Thank Your Honor.  Steve Skikos.  First,

25  I have to echo Ms. Winthrop and Mr. Mintz that we are making

PG&E Corporation and Pacific Gas and Electric Company

1  progress.  You don't have to worry about me saying anything
2  there.
3          Second, with respect to the concerns raised by Mr.
4  Abrams, Ms. Wallace, Ms. Sedwick -- and I listened carefully
5  yesterday, and I've been in front of this Court nine times, and
6  in nine times that we've been talking together, we've talked
7  about one basic issues, which is the meaningful inclusion of
8  the fire victims in the process.  And whether it's the fire
9  victim database or the notice program or the bar date or the
10  voting, it's -- our discussions have always been about
11  including the fire victims in the process, informing them, and
12  empowering them to make meaningful decisions.  They can be
13  trusted with information.
14          And in this particular case, no one is -- there's some
15  misunderstandings out there.  Plan confirmation order does not
16  establish with certainty that the fire victims are going to be
17  paid.  It's a major step.  The same conversation you and I had
18  on February 11th, and there's only one plan on which to vote.
19  There's never been more than one plan before this Court.
20          And because of the 1054 deadlines, we have an
21  imperfect set of information in front of Your Honor that cannot
22  answer Ms. Wallace's questions or Mr. Abrams' concerns.  For
23  example, Ms. Wallace questions -- which are legitimate -- when
24  she's going to get paid.  What's her discount?  How much?
25  When's the trust going to be funded?  All these things are

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    legitimate concerns.

2           But I have to agree with Mr. Karotkin that absent

3    confirmation, the results would be draconian.  He said the

4    distribution to the fire victims and the other claimants would

5    be delayed for months and years, and that includes the

6    insurance companies and the bond holders and the backstop

7    parties with their fees and the other creditors.

8           And so we don't want to take the overwhelming risk of

9    failure, which is what Mr. Karotkin said yesterday.  And so

10   your decision on plan confirmation -- you've asked us to take

11   one of three paths:  yes, no, or add something to the

12   confirmation that would make it better.

13          And so we have been under subject of confidential

14   mediation for months on major issues, and the votes was (sic)

15   going on at the exact same time and that's unfortunate.

16          But Your Honor doesn't have access to the (break in

17   audio) discussing (break in audio).

18          THE COURT:  Your voice is dropping off.  I can (break

19   in audio).

20          MR. SKIKOS:  I said, Your Honor doesn't have access to

21   the information that we've been discussing in these

22   confidential mediations.

23          THE COURT:  Right.

24          MR. SKIKOS:  Neither do the fire victims.  And so your

25   decision on plan confirmation is very similar to what the fire

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    victims had to vote on, which is imperfect information with

2    limited choices.

3           And as Mr. Kelly said, and he actually said this to me

4    last night, this case is not about plan confirmation.  I think

5    everybody wants a plan confirmed, including Mr. Abrams.

6    Including Mr. Tosdal and the Kanes and Scarpulla and Hallisey.

7    They all want it confirmed.  What they want is the reduction of

8    risk, and so there are two important dates that I would like to

9    give Your Honor.

10          The first date is Thanksgiving 2020 and the second

11   date is December 31st, 2021.  Thanksgiving 2020 is the date the

12   fire victim trust should be -- I mean, we should know if the

13   fire victim trust is funded.  We should know the value of the

14   fire victim stock.  We know if the safety changes that Mr.

15   Orsini has been working on are going to work.  We will know if

16   there's another massive fire or huge blackouts.  And by

17   December 31st, 2021, we're going to know the impact of this

18   plan.  We're going to know the legacy of this (break in audio).

19          We're going to know the disposition of the stock.

20   We're going to know the claims process and the payments to the

21   fire victims and hopefully, they'll be paid in full by then.

22          Hopefully, we will be able to answer Mary Wallace's

23   questions by then, affirmatively and practically.  And we will

24   know the impact of this plan on other utilities, the rate

25   payers, the citizens of California, and god forbid, another set

PG&E Corporation and Pacific Gas and Electric Company

1    of fire victims.

2           So I have two simple ways that we can, without

3    disrupting the plan, help empower fire victims to at least know

4    what's going on.  Number one, the plan confirmation order

5    should require that the debtor set forth a tentative emergent

6    date and funding schedule.

7           I'm so deep in the registration rights mediations.  I

8    know all the messes of that.  But it's not too hard to say what

9    the tentative emergent state is and the funding schedule.  And

10   here's why.  People's lives are on hold.  They can't -- they

11   have -- they're in the process of rebuilding their homes and

12   their lives and there are critical benefits under 1054 that are

13   available to protect the parties in this case, and the risks

14   and consequences of failing to meet 1054 are so great that we

15   can't take that chance that they don't emerge before the next

16   major fire.  They may not be emerging for years.  And Mr.

17   Karotkin's statements about an overwhelming and draconian risk

18   come true, not because we didn't confirm the plan, but because

19   we didn't successfully emerge.

20          And I'm not going to go into Judge Alsup's orders or

21   the Cal Fire -- you know this history better than anybody.

22   You've had these hearings -- you've had this bankruptcy and the

23   previous bankruptcy.  No one needs to lecture you on this

24   company.

25          What we need to do though is make sure that we don't

PG&E Corporation and Pacific Gas and Electric Company

1  come into a situation where the fire victims would have done

2  better under Chapter 7 than they would have here under your

3  best-interest tests.  What we need to do is tell the fire

4  victim community a schedule.  This is what we plan on doing.

5  This is not too much to ask.

6  The second thing is the plan confirmation order shall

7  provide a clear schedule of rights, restrictions, and blackouts

8  for both the fire victim trust and the backstop shareholders

9  for this Court's approval.  So the Court maintains jurisdiction

10  over the approval of the terms and it's up to the Court to

11  ensure that this is fair to the fire victims and the backstop

12  shareholders.

13  Now, there's one exception to that, and that is if

14  there was an arbitration on this particular issue, but we

15  haven't agreed to.

16  So I'm going to try and define some terms so they're

17  clear.  Restrictions and blackouts.  It has to be transparent

18  to the fire victims in clear language, no double negatives, so

19  that they can understand it, and there are only two questions

20  to make this simple to understand.  For how many years will it

21  take for the fire victims and/or backstop parties to dispose of

22  the stock that is the result of the plan.

23  And the second question is what is the assignment of

24  risk for the upcoming fire seasons.  Because the primary goal

25  of this bankruptcy is to provide prompt and expeditious payment

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  to the fire victims.  We've heard that since April of 2019.

2  We've heard that during these closings.  And that's wonderful.

3  And let's presume that to be true and I really believe that Mr.

4  Karotkin and Mr. Orsini really want that to happen.

5          But there's a second part of it, and we have to be

6  honest about the other part of this.  The shareholders are

7  preserving their equity.  They are -- they've purchased and

8  they're going to cash out on the subrogation claim.  Fine.

9  They made a great procedural maneuver.  They've got the control

10  of negotiations with the governors and with the fire victims

11  and they've given themselves a huge backstop.

12          And let's be honest about this case.  This case

13  settled -- we talked about this on February 11th.  This case

14  settled because Your Honor sent estimation to Judge Donato.

15  Your Honor sent Tubbs to the state court for discovery.  Your

16  Honor moved the bar date after Judge Donato when they reported

17  that there was only going to be forty to fifty percent

18  participation and Judge Donato said it would be a heart-

19  breaking shame -- you did this.  You lifted exclusivity.  The

20  bondholders came in, and they tried to take over the company,

21  and the shareholders then came to us.

22          And what I'm saying here is very simple.  We can be

23  trusting.  We can be compliant.  We can want the plan

24  confirmed.  But let's not undisclose the most important issues

25  left in this case which is how long is it going to take for the

PG&E Corporation and Pacific Gas and Electric Company

1    fire victims to dispose of this stock.

2        Once we know that -- and remember, the fire victims

3    never voted on this issue.  It's been subject to confidential

4    mediation.  Once we know that and it's transparent, we should

5    be able to get this done and hopefully by Thanksgiving of this

6    year, everybody will be looking back at this bankruptcy and

7    saying, great job.

8        Thank Your Honor.

9        THE COURT:  Mr. Skikos, I've got no questions.

10       If the mediation concludes successfully, and my

11   understanding is there will be a rights agreement.  Right?

12       MR. SKIKOS:  Yes.

13       THE COURT:  Okay.  And presumably, I have to approve

14   it.  Maybe I don't have to approve it, but there will be one

15   that will be the product of negotiations among the principal

16   players.  Obviously, you know who they are.  I don't need to

17   know.  And presumably, that document will answer many of the

18   questions that you've just put in category 1 of the two

19   questions.

20       But category 2, what was the assignment of risk to the

21   victims, I'm not sure how anybody knows that.  That's the kind

22   of thing that Mr. Abrams talked about yesterday.  The risk to

23   the victims is the risk to all of us in Northern California.

24   It had nothing to do with the rights agreement, right?

25       MR. SKIKOS:  No, no.  That's not true.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  Okay.

2          MR. SKIKOS:  Let me answer that.

3          THE COURT:  Well, then, maybe I was -- you were

4    focusing on -- I was thinking of fire risk.  You were thinking

5    of what?  The risk of being stuck --

6          MR. SKIKOS:  The comparative sell-off risk.

7          THE COURT:  Okay.

8          MR. SKIKOS:  So if there's a fire, God forbid, in

9    November of 2020 and the backstop shareholders have

10   successfully left and the fire victims are restricted or cannot

11   sell during a fire -- it has nothing to do with the actual risk

12   of fire.

13         THE COURT:  Okay.  Then, I got it.  But yesterday, I

14   don't know if you were participating or off doing something

15   else.  It doesn't matter.  I think it was yesterday.  It might

16   have been Wednesday.  I've lost track of days.  Mr. Karotkin,

17   in response to a question of mine said, well, I could confirm

18   the plan even in the absence of a rights agreement, but the

19   effective date wouldn't happen.  And I made the observation,

20   then what's the point of having a confirmed plan?

21         In other words, AB 1054 is a pretty clear -- not a

22   hundred percent clear -- deadline of June 30th.  So that is a

23   message to me as the presiding bankruptcy judge.  I need to

24   sign an order prior to June 30th.  But what is the meaning of

25   that order if there's no effective rights agreement and

(973) 406-2250 | operations@escribers.net | www.escribers.net

                PG&E Corporation and Pacific Gas and Electric Company

1    therefore the plan never has an effective date.

2               MR. SKIKOS:  Well, the -- so first, you can confirm

3    the plan without a registration rights agreement.

4               THE COURT:  Correct.

5               MR. SKIKOS:  I think that's pretty clear.

6               Second, we have to get this thing done.  We have to

7    get this thing done now so that it can be -- so that they can

8    do their rights offering.  And I won't go into the details of

9    all --

10              THE COURT:  No, but you're going around in circles.

11   Pretend it's June 30th.  Leave aside the bankruptcy fine points

12   about finality versus appeals.  Let's just say that by June

13   30th, I, as the presiding bankruptcy judge, has done what the

14   State of California through AB 1054 has said needs to be done

15   for triggering their go-forward fund, et cetera, et cetera.

16              But then on July blank or August blank, there is not

17   effective date.  I'm not sure what happens.  But if there's not

18   right to agreement, there's no effective date.  Agree?

19              MR. SKIKOS:  I think there's two issues here.  First,

20   the word "exit" under 1054.  "Exit" under 1054 has a specific

21   definition.  And then the second, if there's no rights --

22              THE COURT:  By the way, the Bankruptcy Code, as I

23   recall, doesn't define "exit".

24              MR. SKIKOS:  Right.

25              THE COURT:  It's not a bankruptcy term.

(972) 786-2155   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. SKIKOS:  I learned that as a young bankruptcy

2  lawyer that "exit" is not a bankruptcy term, but it seems to be

3  interpreted as emergence.

4    So we all want emergence before -- you know, before

5  the next fire, and certainly before June 30th.  The question of

6  the registration rights agreement is they need that in order to

7  do the offering.  So we have to get that done.

8    THE COURT:  I know that.

9    MR. SKIKOS:  I can't control the date that that's

10  done.  And I know we're all working very hard.  There was a

11  call last night.  But I don't have a specific answer to your

12  question if it's not done.  We either go to arbitration on

13  Monday or Tuesday or Wednesday with Judge -- with Mr. Meyer or

14  Judge Meyer.  Or we come to you right now.  But it has to be

15  done now.

16    THE COURT:  Well, okay.  Let's hope that that that

17  arbitration sets the state to do whatever would be done

18  consensually, because I'm not sure what I could do or would be

19  asked to do.

20    But let's defer that.  I got your point.  You made it

21  clear to -- from -- to me at least what you think is so

22  critical for the victims, and I certainly -- you say it as a

23  lawyer.  Ms. Wallace says it as a victim yesterday or survivor

24  -- better term.  And Ms. Sedwick, to some extent, who -- other

25  -- I got the message, Mr. Abrams.  Those are all three

PG&E Corporation and Pacific Gas and Electric Company

1    outspoken people and you are a good -- Mr. Kelly, a good

2    spokesperson for them.

3           And I appreciate your comments.

4           So let's conclude it at that unless any of you have

5    anything further to say at this point.  I'm going to look at my

6    watch here.  Yeah.  I'm going to probably take a short break

7    and then go to the next thing that's on our agenda.

8           So I'll let you all go.

9           MR. SKIKOS:  Thank you, Your Honor.

10          THE COURT:  Thank you for your time.

11          All right.  And Ms. Parada, let's move all the

12   speakers out except Mr. Karotkin.  Let me just check the --

13   okay.  I think -- let me just think about them here for a

14   minute.

15          I'm going to take a ten-minute break for everyone's

16   convenience where -- it's a little early, but then when we come

17   back, I will call on Mr. Etkin or whomever from his firm or his

18   side of this case who are going to make the argument.  I

19   authorized them -- or allocated them an hour and I gave them a

20   homework assignment, and I know Mr. Etkin has a PowerPoint.

21          So as we did yesterday, I'm going to just turn off my

22   mic and my video and leave the thing running and hopefully,

23   keep my internet connection, and we'll see you all at 11 IR

24   (phonetic) time.  2 o'clock New York time.

25          Thank you.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          (Whereupon a recess was taken)

2               THE COURT:  And bring Mr. Etkin in, please.

3               THE CLERK:  Yes, Your Honor.  Mr. Etkin is joining.

4               Mr. Etkin, please unmute your microphone and state

5     your appearance.

6               MR. ETKIN:  Yes.  Good afternoon, at least here, Your

7     Honor.  Michael Etkin, Lowenstein Sandler for the securities

8     plaintiffs.

9               I -- yeah.

10              THE COURT:  Did Mr. Behlmann want in also?

11              MR. ETKIN:  Your Honor, I was going to ask.  Actually,

12    the game plan here is Mr. Behlmann will be taking most of the -

13    - making most of the argument.  I have some remarks, closing

14    remarks at the end.  Mr. Behlmann will be going through the

15    PowerPoint, and I'd also, with the Court's permission, ask the

16    Court to bring Mr. Dubbs in as a participant.  There are no

17    plans currently for him to present, but I think just in case

18    there are questions or other things come up during the course

19    of the argument, we would appreciate it if he could be brought

20    into the room as well.

21              THE COURT:  All right.  Ms. Parada, would you bring

22    Mr. Behlmann in and do you have the other person?

23              MR. ETKIN:  Mr. Dubbs, Your Honor.

24              THE COURT:  Yeah.  I don't know if he is -- Ms.

25    Parada, do you have him on the list?

escribers
(973) 406- operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE CLERK:  No, Your Honor.  I do not see -- Dubbs,

2  you said?  D-U-B-B-S?

3    MR. ETKIN:  Yes.  Thomas Dubbs.

4    THE COURT:  Wait.  Let's get Mr. Behlmann.  Would

5  unmute, Mr. Behlmann, and make your appearance?

6    MR. BEHLMANN:  Good morning, Your Honor.

7    THE COURT:  Mr. Behlmann.

8    MR. BEHLMANN:  Andrew Behlmann.

9    THE COURT:  Okay.  We don't see -- Ms. Parada can keep

10  track of who is on the attendance, and so can I, actually.  And

11  I don't -- what's Mr. Dubbs first name?

12    MR. ETKIN:  Thomas, Your Honor.

13    THE COURT:  Because our little list of hands that go

14  up is by first names.  And now -- no, I don't see him.  But if

15  he joins -- if he -- (indiscernible)

16    THE CLERK:  Excuse me, Your Honor.  I see a hand

17  raised with just the letter "T".

18    THE COURT:  Well.

19    MR. ETKIN:  He may not -- Your Honor, he might not

20  have identified himself fully by name.

21    THE COURT:  Okay.  Let's -- Mr. Tubbs, if you are the

22  person who is identifying yourself as "T", lower your hand.

23    All right.  Bring him in, please, Ms. Parada.  I guess

24  that's the -- he did, but he didn't put his name up.

25    MR. ETKIN:  Apologies, Your Honor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  You don't have to apologize for somebody

2    else.

3    MR. ETKIN:  Well, part of our team, Your Honor, so I

4    take responsibility.

5    THE COURT:  Ms. Parada, while we're waiting, when Mr.

6    Etkin was speaking, his voice was breaking up a little.

7    THE CLERK:  I'm sorry, Your Honor, your voice --

8    THE COURT:  And then we --

9    THE CLERK:  -- your -- your connection --

10   THE COURT:  -- hearing him clearly or was it a problem

11   on my end?

12   THE CLERK:  Mr. Etkin was breaking up --

13   THE COURT:  My connection is bad now?  Okay.  Hold on.

14   I don't know why this keep happening to me today.  Well, this

15   thing is real quirky today.  Let's give it a try.

16   Mr. Behlmann, you have an hour allocated and I'm going

17   to try to listen without -- see if I can hear you, so go ahead

18   and you have the floor.  And I guess you got the question I put

19   out to you -- the hypothetical I put to you before, right?

20   MR. BEHLMANN:  I do, Your Honor.  And if it's

21   acceptable to Your Honor, I think that that hypothetical

22   dovetails nicely with our discussion about the distribution

23   formula with comes a little bit later in our presentation.  If

24   it's okay with you, we can address it then or we can address it

25   now.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  All yours.  You got the hour.

2          MR. BEHLMANN:  Thank you, Your Honor.  Just so you

3    know, we're going to deal with the hypothetical, but we'll deal

4    with it in a little bit once we get to that point in the

5    presentation.

6          Good morning, your Honor.  As I mentioned before,

7    Andrew Behlmann, Lowenstein Sandler on behalf of the Public

8    Employees Retirement Association of New Mexico, which is also

9    referred to in this case as PERA.

10          PERA is the court-appointed lead plaintiff in a

11    federal securities litigation that's pending in this district

12    before Judge Davila.

13          Very quickly, Judge, who is PERA?  PERA is the

14    administrator of retirement funds of public employees in the

15    State of New Mexico.  PERA provides benefits to over 40,000

16    retirees, beneficiaries, and co-payees and has over 50,000

17    active members at this time.  PERA's participants, Your Honor,

18    include state, county, and municipal employees, police,

19    firefighters, judges, magistrates, and legislators.  All public

20    employees, obviously, as you'd expect by the name.

21          Your Honor, we want to spend maybe a minute clearing

22    up a couple of misconceptions that have been created by the

23    plan proponents.  One is regarding PERA's claim.  As Mr.

24    Johnson pointed out on Wednesday morning, PERA did file a proof

25    of claim in response to the extended bar date notice that was

PG&E Corporation and Pacific Gas and Electric Company

1  claim number 101691, asserting a claim of about 119,000

2  dollars.

3  We, as counsel, did not file that claim. That was

4  filed directly. However, the equity plan proponents, the one

5  and only constituency in this case that has an actual economic

6  incentive to disenfranchise class 10A-II forgot to mention on

7  Wednesday morning in trying to downplay PERA's role that PERA

8  already had a proof of claim on file. That's claim number

9  71345. That was file in advance of the general bar date in

10  October 2019, Your Honor.

11  That proof of claim included a schedule of PERA's

12  transactions in PG&E public securities during the class period,

13  which included, among other things, purchases during the class

14  period of 364,557 shares of PG&E common stock at an aggregate

15  price of over $22.2 million.

16  So obviously, PERA's claim in class 10A-II is quite

17  significant, and it's certainly not a bit player with respect

18  to class 10A-II. We're here for real purposes.

19  THE COURT: But still, it's still presently an equity

20  holder then also, right?

21  MR. BEHLMANN: As I understand, Your Honor, it not any

22  longer.

23  THE COURT: Okay.

24  MR. BEHLMANN: Second, Your Honor, just wanted to

25  clear up briefly PERA's role as the lead plaintiff in the

PG&E Corporation and Pacific Gas and Electric Company
securities litigation.  There has been some insinuation during
the course of the case that PERA was a, quote, self-appointed
lead plaintiff.  I believe that came up in an earlier hearing.
That's entirely correct.  PERA did voluntarily choose to file a
lawsuit, and it did voluntarily move for appointment as lead
plaintiff in the securities litigation.  Several cases were
consolidated into the case that's not pending before Judge
Davila, and there were six competing motions filed seeking
appointment as lead plaintiff.  The other movants ultimately
withdrew their motions, and PERA was appointed on an
uncontested basis, but the fact remains that PERA was appointed
lead plaintiff in the securities litigation by an order of the
district court, pursuant to the PSLRA.

Strictly in the context of these Chapter 11 cases,
Your Honor, in light of the denial of the Rule 7023 motion,
it's fair to say that PERA is acting primarily on its own
behalf at the moment.  As I mentioned before, PERA has a fairly
substantial class 10A-II claim.

PERA is also acting on its own behalf though without
losing sight of its role and its duties as lead plaintiff in
the securities litigation because it remains that PERA is the
lead plaintiff in the securities litigation

Those duties include safeguarding the rights and
claims of thousands of absent class members including the
nearly 7,000 proofs of claim that have been filed so far since

PG&E Corporation and Pacific Gas and Electric Company

1    the extended bar date to protect those folks' rights from being

2    disenfranchised by the plan as well as PERA's own rights.

3        A little bit about the securities litigation just to

4    set the table, claims that we're dealing with and the claims

5    that we're talking about.  Your Honor, PERA asserts claims in

6    the securities litigation and through its proofs of claim in

7    class 10A-II against the debtors under the Securities Exchange

8    Act of 1934.  It asserts those claims against both the debtors

9    and outside the context of this bankruptcy class obviously

10   against certain of the current and former officers and

11   directors of the debtors.

12       There's three additional named plaintiffs in the

13   securities litigation.  They're public and union retirement

14   funds that assert claims under the Securities Act of 1933

15   against each of the debtors as well as certain of their current

16   and former Ds and Os and the underwriters of certain of their

17   public notes offerings.

18       The claims and the securities litigation, Your Honor,

19   and this is an important piece to note that we'll touch on a

20   little bit later in some detail and you'll see why it's

21   important -- claims in the securities litigation are asserted

22   on behalf of a class of purchasers -- a proposed class that has

23   not yet been certified because motions to dismiss are still

24   pending -- purchasers to the debtors' public securities between

25   April 29th, 2015 and November 15th, 2018 inclusive.  That's

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1     about a three-and-a-half year class period.

2          Motions to dismiss the securities litigation were

3     fully briefed in January of this year.  The third amended

4     complaint is quite lengthy and quite extensive, so those

5     motions to dismiss are still pending awaiting decision before

6     Judge Davila.

7          Briefly, with respect to PERA's confirmation

8     objection, Your Honor, and if I may, with the Court's

9     permission, we filed a set of demonstrative slides that both

10    summarize certain pieces of our argument and summarize certain

11    things that are already in the record in the case at docket

12    number 7791 (break in audio) ask to just share those on the

13    screen now for Your Honor's benefit and for the benefit of all

14    participants.

15          THE COURT:  (Break in audio).

16          THE CLERK:  Excuse me, Your Honor.  Your voice is

17    cutting in and out.

18          THE COURT:  Now can you hear me?  Hear me?

19          THE CLERK:  Yes.

20          THE COURT:  Okay.

21          MR. BEHLMANN:  Your Honor, I have those available on

22    the system to share if it would be acceptable to the Court.

23          THE COURT:  (Break in audio).  Okay.  Wait a minute

24    then.  It's the audio.

25          Ms. Parada (break in audio) a problem with the voice?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE CLERK:  Yes.  I'm having trouble hearing you.

2          MR. BEHLMANN:  Your screen appears to be frozen as

3     well, Your Honor.

4          THE COURT:  (Break in audio) have to try again.  Mr.

5     Behlmann to wait and I'm going to try to re -- re -- to attach

6     them to a document that you just filed so it's on the docket

7     because we have -- we're recording this as our own internal

8     record, but to the extent that you want to use the

9     demonstrative as the record, put them on the docket.  I'm going

10    to stay without a video here for a while so I can listen to the

11    argument.  So go ahead and resume, and I'm certainly not going

12    to hold any time against you because of my break -- because of

13    my confusion here.

14         MR. BEHLMANN:  I appreciate that, Your Honor.  I

15    certainly understand the difficulties of the remote procedure.

16         Your Honor, we did actually -- we filed these in

17    advance of the hearing at docket number 7791 so they are in the

18    docket with a notice.

19         Your Honor, we have four principal areas of concern

20    with respect to the plan its current form.  I want to make one

21    thing clear though, before we delve into those issues.  And

22    Your Honor had asked parties in one of your docket text orders

23    to make this point clear.  We want to make it clear up front.

24    We do not oppose confirmation of this plan as a general matter.

25    We recognize the importance, the significance, and the urgency

PG&E Corporation and Pacific Gas and Electric Company

1     of confirming this plan, funding the fire victim trust, and

2     getting PG&E out of Chapter 11 by the AB 1054 deadline.

3            We're not here today to try to hold any of that up.

4     But the momentum of the case doesn't mean that the plan has to

5     be confirmed as is.  There are a few specific problems that we

6     discussed in our pleadings, and we'll address in a little more

7     detail today in light of the testimony, the opening arguments,

8     and the debtors and other plan proponents' confirmation brief.

9            We believe all the issues we're about to address can

10    and indeed must be fixed before the plan can be confirmed.  As

11    Your Honor will see, we think the fixes are pretty

12    straightforward.  For each of these issues, we're going to

13    propose a specific fix that we think your Honor can implement

14    without much friction and get the plan confirmed.

15           So first, Your Honor, is the plan injunction.  Second

16    is the classification and treatment of precision or damage

17    claims against the utility.  Third is the distribution formula.

18    You won't be surprised to hear, Your Honor, particular in light

19    of the opening argument from the plan proponents that that does

20    have a number of moving pieces and we will address Your Honor's

21    hypothetical in connection with that discussion.  And finally,

22    (indiscernible), which obviously ties into the distribution

23    formula because class 10A-II is an impaired, nonaccepting class

24    because the class voted to reject the plan.

25           So first the plan injunction.  Nobody in the virtual

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    courtroom, Your Honor, disputes that nonconsensual third-party

2    releases are unequivocally, categorically forbidden as a matter

3    of law in the Ninth Circuit.  That's clear.

4         The plan makes that clear.  Mr. Wells' direct

5    testimony in support of confirmation makes that clear.  And

6    frankly, Mr. Karotkin's opening argument makes that clear.  Mr.

7    Karotkin specifically said on Monday, there are no -- quote,

8    there are no involuntary third-party releases in this plan.

9    None.  It could not be clearer.  End quote.

10        Quote, the only third-party releases in this plan are

11   purely an affirmative opt-in.  Close quote.

12        So it's clear that the third-party release is within

13   the boundaries of Ninth Circuit law.  What is in issue for

14   today, though, and predominantly from PERA's perspective and

15   from the perspective of class 10A-II and the other folks with

16   claims against the nondebtors that are involved in the

17   securities litigation is that the plan injunction cannot --

18   although it appears to attempt to -- enjoin nondebtor third

19   parties such as PERA and the other securities plaintiffs from

20   pursuing certain claims against other debtor third parties such

21   as the individual defendants in the securities litigation.

22        Your Honor, the injunction in Article 10.6 of the plan

23   says, in pertinent part, that if you hold, held, or may hold a

24   claim against or interest in the debtors -- which obviously

25   folks that hold claim in 10A-II fit into several of those

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  categories -- you're permanently enjoined from taking any

2  action, quote, affecting directly or indirectly a debtor, a

3  reorganized debtor, or an estate or the property of any of the

4  foregoing.

5        There is a leading qualifier in there that should

6  dispose of this issue.  There -- the permanent injunction

7  that's contained in Article 10.6 by its terms applies to those

8  parties, quote, with respect to any such claim or interest.

9        The problem from our perspective, Your Honor, is the

10  debtors have previously taken the position elsewhere in this

11  bankruptcy case much earlier that the claims asserted in the

12  securities litigation against the nondebtor defendants and in

13  particular, the directors and officers, are effectively claims

14  against the debtors.

15        The debtors, Your Honor, have chosen to assume their

16  pre-petition indemnification obligations to current and former

17  Ds and Os to the plan, so it's not a stretch to see that

18  argument coming up in the future that if you're suing a D and O

19  to whom the debtors have assumed indemnification obligations,

20  then, that lawsuit is a claim that could impact the property of

21  the reorganized debtors.  The reorganized debtors, in theory,

22  might have to pay out in that indemnity claim that they've

23  chosen to assume.

24        If the plan injunction were applied to the claims

25  asserted against the nondebtor defendants in the securities

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  litigation, it would create the same net effect as an

2  impermissible, nonconsensual third party release.  It would

3  render claims of nondebtors against other nondebtors dead in

4  the water.

5      Your Honor, we believed at the disclosure statement

6  stage that this was simply -- this was just a drafting

7  ambiguity.  And we raised this issue at the disclosure

8  statement stage.  Unfortunately, the debtors did not fix it

9  then and the can got kicked down the road, so here we are

10  today.

11      If the debtors aren't trying to conduct an end-run

12  around the prohibition on nonconsensual third-party releases

13  through the injunction, which is something that American

14  Hardwoods said a plan cannot do in the Ninth Circuit, the plan

15  needs to say so or the confirmation order needs to say so.

16  It's really that simple.

17      And from our perspective, the fix is very, very

18  simple.  It's just an insertion into the confirmation order,

19  Your Honor.  It's one paragraph -- it's barely even a

20  paragraph; it's one sentence that simply carves the securities

21  litigation claims against the nondebtors out of the scope of

22  the plan injunction so that no party can come in down the road

23  and say, Your Honor, these claims potentially impact the

24  reorganized debtors; we want you to freeze them; we want you to

25  put them on hold.  The release can't do that; we don't think

PG&E Corporation and Pacific Gas and Electric Company

1    the plan injunction should be able to do that, either.

2        Our second issue, Your Honor, is the classification

3    and treatment or lack thereof of claims other than the Class

4    10A-II HoldCo rescission or damage claims arising from the

5    purchase of common stock of HoldCo.  The issue is that the plan

6    specifically classifies rescission or damage claims against

7    HoldCo arising from the purchase of common stock of HoldCo

8    during the class period.

9        What the plan does not deal with are similar claims,

10   so claims against the utility, against Pacific Gas & Electric

11   Company, based on statements, misstatements by the utility's

12   own personnel that are not overlapping -- certain of them do

13   not overlap with PG&E Corporation, the HoldCo -- that in turn

14   artificially increase the price of PG&E Corporation common

15   stock which was then purchased by class members during the

16   class period.  That is an entirely separate class of claims.

17       Those claims, Your Honor, are asserted in the third

18   amended complaint that's on file in the securities litigation.

19   They're incorporated by reference into the completely separate

20   proof of claim that PERA filed against the utility that

21   incorporates, by reference, the allegations from the third

22   amended complaint.  So we took those; we imported them into the

23   proof of claim.  That proof of claim is asserted against each

24   of the debtors, both the utility and HoldCo.

25       The debtors --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Mr. Behlmann, what about you --

2    MR. BEHLMANN:  Yes, Your Honor?

3    THE COURT:  Even in your brief, you acknowledge the

4  Ninth Circuit Del Biaggio decision; it seems to close the door

5  and say it's effectively a claim against HoldCo.

6    MR. BEHLMANN:  Your Honor, yes and no.  And the plan

7  proponents would certainly have Your Honor believe that by

8  virtue of Del Biaggio and by virtue of the Lehman decision that

9  was adopted in Del Biaggio that those claims just sort of

10  magically fold into the other claims that exist against HoldCo.

11    But the situation here is a little different.  They

12  are -- under Del Biaggio, those claims are hypothetically sort

13  of superimposed on HoldCo's capital structure for purpose of

14  determining the priority of those claims.  But these two

15  debtors are not substantively consolidated.  So --

16    THE COURT:  They weren't in Del Biaggio.

17    MR. BEHLMANN:  But here, we've got separate

18  independent claims arising from independent misstatements

19  against each of the debtors.  They're two totally separate

20  claims.  They happen to have the same priority, so if you pick

21  up the 510(b) claim against the utility and you bring it over

22  to HoldCo, it has the same priority as HoldCo common stock.

23  But nothing about that changes the legal reality that it is a

24  separate and independent claim.  It is a claim that stands on

25  its own.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  What's the remedy?  What do you get if you

2    win?

3    MR. BEHLMANN:  Well, Your Honor, the plan -- so two

4    things.  I believe the plan proponents have articulated a

5    concern that classifying and treating these claims could result

6    in a double recovery.  We don't think that's correct.

7    Ultimately, the amount of a given claim is a fact for

8    determination sometime down the road.  I think you heard Mr.

9    Johnston say on Monday -- Monday morning? -- Monday morning

10   that that's not going to occur for at least months after

11   confirmation if it gets through.

12   THE COURT:  That's not answering my question.  How do

13   you have an equity claim against somebody that doesn't have any

14   equity?  Just --

15   MR. BEHLMANN:  510(b), Your Honor, expressly

16   contemplates that prospect.  If you look at the plain language

17   of 510(b), it subordinates claims not only against a debtor

18   arising from the purchase or sale of a security of that debtor

19   but of a purchase or sale of a security of an affiliate of the

20   debtor.

21   THE COURT:  I know.

22   MR. BEHLMANN:  So here -- it's a claim against --

23   THE COURT:  That's exactly -- excuse me.  That's

24   exactly what Del Biaggio says.  The decision goes through the

25   cases and adopts the Second Circuit interpretation of this

PG&E Corporation and Pacific Gas and Electric Company

1   notion of superimposing the situation on the corporate entity.

2   Obviously, we have two corporations here. Del Biaggio was an

3   individual. But the same concept was to take an equity claim

4   and move it to an equity claim against the corporate entity. I

5   don't know how -- I mean, I understand what you're trying to

6   say. I don't know how there's any option but to follow the

7   holding of that binding decision. Why isn't that decision

8   controlling on this issue?

9        MR. BEHLMANN: Because the claims we're talking about,

10  Your Honor, are a very specific subset of the claims that have

11  been asserted. There are claims that have been asserted

12  against only the utility. There are claims that have been

13  asserted against HoldCo, there are claims that have been

14  asserted against the utility, and there are claims that have

15  been asserted against both.

16       If a claim was asserted against HoldCo, obviously we

17  know it's a claim again HoldCo. If a claim has been asserted

18  against both, I would say that fits into Your Honor's

19  hypothetical scenario, based on Del Biaggio, where that

20  collapses into a single claim.

21       But if there's a completely separate claim against the

22  utility, that claim doesn't vanish once you superimpose it onto

23  the HoldCo's capital structure. That claim still exists as a

24  separate claim. You're just using the capital structure of

25  HoldCo to determine where it lands in the priority waterfall.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1       THE COURT:  Okay.  Suppose the district judge or

2   somebody determines that the utility owes 1,000 dollars to PERA

3   for the claim against the utility and it's expressed as

4   dollars.  What happens to that thousand-dollar claim under the

5   plan?

6       MR. BEHLMANN:  Well, under the current form of the

7   plan, nothing would happen.  Under the current form of the

8   plan --

9       THE COURT:  It's treated as equity, isn't it?

10      MR. BEHLMANN:  Well, it's not under the current form

11  of the plan.  Under the current form of the plan, that claim

12  doesn't exist because the definition of HoldCo rescission or

13  damage claims includes only claims asserted against HoldCo.

14  There's no reference anywhere in the plan to what happens to

15  similar claims that are asserted against the utility.

16      THE COURT:  So what does the law do?  Okay, in my

17  hypothetical, you just got a thousand-dollar judgment against

18  the utility that must be treated under 510(b).  Where do we put

19  it?

20      MR. BEHLMANN:  That's a great question, Your Honor.

21      THE COURT:  Mr. Behlmann, even if your literal reading

22  of the definitions is true, it's got to be somewhere, right?

23  So doesn't it -- isn't the only place it can be as an

24  additional equity participation in HoldCo?

25      MR. BEHLMANN:  Well, that, Your Honor, actually goes

(972) 503-0550   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    to your exact suggested fix which is simply to modify the

2    definition of HoldCo rescission or damage claim to add to that

3    definition any claim against HoldCo or the utility subject to

4    subordination.  If it's subject to subordination under Section

5    510(b) --

6            THE COURT:  So I take it -- okay.  So your proposed

7    1.108 would just add those three words, and so in (break in

8    audio) --

9            MR. BEHLMANN:  I'm not able to hear you, Your Honor.

10   I apologize.

11           THE COURT:   (Break in audio)

12           MR. BEHLMANN:  I apologize, Your Honor.  Your audio

13   and video are both frozen at the moment.

14           THE COURT:  I (break in audio).

15           THE CLERK:  Your Honor, I'm not -- you're cutting --

16   your sound is frozen; so is your video.  I cannot hear you.

17           MR. BEHLMANN:  Understood, Your Honor.  Thank you, and

18   I'm sorry about the technical difficulties.

19           So Your Honor, we believe the fix is truly that

20   simple:  just adding the reference to claims against the

21   utility to the definition of HoldCo rescission or damage

22   claims.  That puts them all at the same level of priority,

23   subjects them all to the distribution formula, and that

24   determination that I mentioned earlier of whether a claim is

25   truly against HoldCo, truly against the utility, or if it's a

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   claim against both, that's a determination that doesn't have to

2   be made today, and it doesn't have to be made for quite some

3   time until the time of allowance of one of these claims.

4          So that, I think, Your Honor, is probably the simplest

5   and most elegant fix for this concern.  And all we're trying to

6   do through this fix is simply acknowledge what 510(b) says and

7   what 510(b) does.  This is just a claim against one of the

8   debtors, the utility, arising from the purchase of a security

9   of an affiliate of that debtor.  And we believe this fixes

10  that.

11         The next issue, Your Honor, and this is the --

12  certainly the largest from a volume of information perspective

13  of our issues today -- is the distribution formula.  As Your

14  Honor's well aware, the plan provides for holders of Class 10A-

15  II claims that are allowed to receive new common stock in

16  reorganized PG&E.  And the fundamental dispute between us and

17  the plan proponents is what value do you use, what metric do

18  you use to allocate those shares such that the recovery by

19  Class 10A-II is truly a pari passu pro rata recovery with Class

20  10A-I.

21         We agree with the plan proponents on at least one

22  thing, and that is that under Section 510(b) of the Bankruptcy

23  Code, Class 10A-II claims have the same priority as HoldCo

24  common stock.  What we don't seem to agree on is what that

25  actually means in practice.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    The factor that makes implementing pari passu

2    treatment between Class 10A-I equity interests and Class 10A-II

3    claims is that the claims are denominated in dollars whereas

4    the interest are denominated in shares.  There are situations

5    where that allocation is not so difficult.  In a situation

6    where there's a pot of cash left over, for instance, to

7    distribute to equity, you simply take the value of that pot of

8    cash and use that as a proxy for the value of equity.  Now

9    you've got equity stated in dollars and you undertake a simple

10    pro rata allocation between dollars and dollars.

11    The problem here is that existing equity interests are

12    simply being reinstated.  I'll use "problem" lightly because

13    from a global perspective, it's a wonderful thing that PG&E is

14    coming out of bankruptcy a solvent company with publicly traded

15    stock that's actually trading today higher than it was on the

16    petition date.

17    So because existing equity interests are being

18    reinstated, there's one important result:  if I own 1,000

19    shares of PG&E stock when I go to bed the night before the

20    effective date, I'm going to wake up on the effective date and

21    I still own 1,000 shares of PG&E stock.  From that standpoint,

22    nothing has changed about my ownership.  Obviously, I now own

23    1,000 shares of stock of a vastly different PG&E.  There are

24    more equity holders; there will be more shares outstanding, but

25    that equity will also be worth more.  Equity's going to have a

PG&E Corporation and Pacific Gas and Electric Company

1  smaller proportional piece of a much, much bigger pie. That,

2  Your Honor, is what makes the pro rata analysis a little more

3  complicated and a little more difficult.

4      So since 10A-II is getting shares of stock, you have

5  to work in one direction, which is you're starting with an

6  allowed damage claim amount, and you're converting it into a

7  number of shares. The formula that the debtors have proposed

8  in the plan -- the equity plan proponents have proposed in the

9  plan takes the claim amount, deducts insurance recoveries,

10  which is an issue we'll talk about on the back end of this

11  particular discussion, divides it by the market capitalization

12  as of October 12th, 2017 -- a completely different date; the

13  claim is valued as of the petition date. I believe the parties

14  are unanimous on that point. The value of the claim is --

15      THE COURT: I've got to stop you. I've got to stop

16  you.

17      MR. BEHLMANN: Yes, Your Honor.

18      THE COURT: It is true; claims are valued as of the

19  petition date. This is (break in audio) claim. In other

20  words, your numerator is the claim. Leaving aside insurance,

21  you're telling me that this formula gets you to the

22  distribution, but you've already got the claim allowed. How

23  did it get allowed? It got allowed in my hypothetical by -- I

24  told you, it's 1,000 dollars. In your hypothetical, it's some

25  other figure. You've got to get over that obstacle to tell me

PG&E Corporation and Pacific Gas and Electric Company

1   why we're going up to the petition date formula to find out

2   what the allowed claim is when we already figured out what the

3   allowed claim is in my hypothetical or in fact there'll be an

4   allowed claim somewhere else.  And the beauty of my

5   hypothetical is investor B is still a shareholder, even though

6   he may have gotten defrauded; investor A is not a shareholder

7   and may've gotten defrauded.  Do we treat them the same way?

8          MR. BEHLMANN:  Well, Your Honor, that's an interesting

9   question.  And there's actually, I think, two questions within

10  the question.  There's the issue of the claim amount and

11  there's the issue of the treatment of the claim once you

12  arrived at a claim amount.  And the way I understand your

13  hypothetical, it's really just an issue of damages

14  determination at the time of allowance, not an issue of

15  treatment because the only difference between A and B is

16  whether they have actually realized their damages.  Investor

17  A --

18          THE COURT:  No, that's not -- no, that's not true.

19  It's they both got defrauded on the same day.  A bailed out and

20  got a thousand-dollar claim because of his damage; B rode

21  through as an equity holder, but he got the same damage because

22  he could've mitigated his damage by selling the stock the same

23  day A did, but he didn't.  So how do you blame the wrongdoer

24  for the failure -- that's the wrong word -- for the fact that

25  the victim didn't mitigate his damage by selling the stock.

PG&E Corporation and Pacific Gas and Electric Company

1    The same damage might've been there under other

2   circumstances, but that's my point.  You take your example up

3   to the petition date because you think that somehow the fraud

4   was the cog that led to this change in result.  But it didn't.

5   The fraud is when it happened.  And as Mr. Johnston argued, he

6   picked the date; you can take issue with the date, but you

7   didn't have ongoing fraud.  The securities laws protects

8   defrauded people, not defrauded people that stay in as

9   investors.

10    MR. BEHLMANN:  So a couple things, Your Honor.  Number

11   one, as alleged in the third amended complaint in the

12   securities litigation and as we'll discuss in a little bit,

13   there were actually nine -- the October 12th drop in the stock

14   price, the equity plan proponents would have Your Honor believe

15   that once that occurred, that was it.  Fraud was over, stock

16   price then reflect -- after that point reflected every fact

17   existing in the world, and the fraud was over.

18    In reality, Your Honor, there were nine successive

19   stock drops over the course of the class period.  And in your

20   hypothetical, Your Honor, there were six more after investor A

21   fortuitously sold his shares.  So there was, in fact -- there

22   are, in fact, allegations of an ongoing fraud.

23    THE COURT:  But not all the way up to the petition

24   date.  In other words, I'll change the hypothetical and give

25   you eight more frauds, if you like, and eight different dates.

PG&E Corporation and Pacific Gas and Electric Company

1    And one of my concerns is I don't know that October 12 is the

2    right either.  But I don't now that the petition date is the

3    right answer because it can't possibly be because the stock was

4    dropping, dropping, dropping and that was not a measure of

5    fraud.

6         MR. BEHLMANN:  And that, Your Honor, actually goes to

7    one of the proposed fixes that we will discuss towards the end

8    of the distribution formula discussion.

9         THE COURT:  Okay.

10        MR. BEHLMANN:  I think we have a couple of potential

11   solutions to the petition date question that may be palatable

12   to Your Honor.  But one thing I will say about investor A and

13   investor B is that these really are two separate issues.  The

14   determination of whether -- of what investor A's claim is and

15   what investor B's claim is is determined under the federal

16   securities laws.  If the securities laws say, when you take the

17   facts and run them through the analysis, that investor A and

18   investor B have the exact same damages, then that is their

19   claim amount.

20        None of that impacts, though, what the relative

21   treatment of their claim should be.  And that goes to the point

22   I believe Mr. Johnston made when Your Honor suggested on Monday

23   the four possible other alternative dates besides this

24   seemingly arbitrary October 12th date.  The fourth suggestion

25   Your Honor made was the date of an individual investor's

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  decision to purchase, so the dates that they bought stock.  So

2  here it would be -- and I apologize; I'm looking to my notes

3  from your hypothetical this morning -- October 1, 2017.  The

4  reason Mr. Johnston posited to Your Honor that that doesn't

5  work here is that there would then have to be a separate

6  calculation for -- a totally separate distribution formula,

7  effectively, for each and every member of class 10A-II.

8            THE COURT:  Well, no.  You know what, if there were no

9  510(b), there would have to be different determinations of the

10  damage of the client, and so that's nothing new.  It's just --

11  the only -- it gets complicated because of 510(b) and the need

12  to turn dollars into stock, but if we have nine different

13  events of fraud, we have nine different claims that are a

14  measure of damages, too, so --

15            MR. BEHLMANN:  Well, there's a little more to it than

16  that, though, Your Honor, because there were 896 trading days

17  during the class period.  It was a little over a three-and-a-

18  half year class period.  People bought stock on every single

19  one of those 896 trading days, and the formula would

20  effectively differ for everybody, but the prices on those days

21  are already calculated.  They're already taken into account in

22  the allowed claim amount.

23            That determination is where the stock price, when they

24  bought and when they sold, and frankly, with respect to Mr. B,

25  if they sold, is already taken into account in the allowed

PG&E Corporation and Pacific Gas and Electric Company

1   claim amount.  There are rubrics under the federal securities

2   laws for determining what the amount of someone's damages is,

3   and all the facts and circumstances of a given party's

4   purchases, sales and securities they still hold get run through

5   those formulas and yield an allowed claim amount at the end of

6   the day.

7       Once Your Honor reaches that claim amount, the factor

8   then is to turn that, as Your Honor noted, into a number of

9   shares.  What the --

10      THE COURT:  Okay, so Mr. Behlmann, suppose before

11  bankruptcy there were nine different lawsuits by nine different

12  investors, and nine different judgments for nine different

13  amounts, and then there's a bankruptcy.  Would you trade all

14  nine damage amounts under the same formula, as a petition date

15  formula for distribution?  Because we have nine different

16  allowed claims, and if it were a money case, if it were not a

17  510(b) case, those nine plaintiffs would have allowed claims.

18  They would presumably share pro rata based upon the amount of

19  their claims.

20      But the sharing is determined at the petition date.

21  The allowances occurred determined in fact, in each of the

22  judgments for the nine plaintiffs, or in my hypothetical two,

23  or in the real world here, maybe a thousand.

24      MR. BEHLMANN:  Well, and the difference there, Your

25  Honor, I think, is that there are -- there would be nine

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    different sets of facts and circumstances alleged.  But if all

2    nine cases alleged essentially the same facts and

3    circumstances, the same course of fraud, and you just happened

4    to have nine different people filing lawsuits, then --

5              THE COURT:  But why?  If you have nine --

6              MR. BEHLMANN:  -- presumably they would all get the

7    same treatment.

8              THE COURT:  -- no, no.  They would all get the same

9    treatment but they would all have different damage amounts.

10             MR. BEHLMANN:  Absolutely, and same is true here.

11             THE COURT:  Okay, so --

12             MR. BEHLMANN:  The allowed claim amount in that top

13   left bracket is going to change for every Class 10A-II claim.

14             THE COURT:  -- but that's my point that I made and the

15   reason why I did my simple hypothetical.  I believe that you

16   are conflating when you determine the amount of the claim with

17   when you determine the treatment of the claim, and so in my

18   hypothetical, there are two times you measure the claim of the

19   damage.

20             In the example you gave of nine, there are nine times,

21   but by the time of the petition, you have nine liquidated

22   claims and they all are perhaps different amounts, but how

23   they're treated is the same.  In other words, so what is the

24   right way to do the formula?

25             The -- Mr. Johnston has the most favorable formula

PG&E Corporation and Pacific Gas and Electric Company

1   because he has the highest -- he had a low numerator and the

2   highest denominator.  That's a great way to get a small

3   fraction.  You want to have a smaller denominator, which is a

4   great way to get a larger fraction.

5       But I don't know that necessarily either one is the

6   right one.  And I know your cases don't seem to give us any

7   guidance.  The capital -- the Fist Surger (phonetic) doesn't

8   tell us.  Does any case tell us how to do it?

9       MR. BEHLMANN:  Unfortunately, Your Honor, no.  I

10  believe we -- one point, we do agree with the equity plan

11  proponents on is that we've not found any reported case that

12  deals with this issue directly because the circumstance where

13  you've got a debtor that's so solvent that equity is being

14  reinstated, and not only is it being reinstated, but it's being

15  reinstated and continuing to trade at a higher price than it

16  traded on the petition date.  That doesn't happen too often,

17  Your Honor.

18      That's a -- it's a great problem to have from the

19  standpoint of the economic stakeholders of PG&E, but it's a

20  difficult problem to have from all of our standpoint, as we sit

21  here in the virtual courtroom, because this is somewhat

22  unprecedented.  I think if it would be okay with Your Honor, I

23  think the solution here might be to go through a little bit

24  more of our presentation and get to some of our suggested

25  fixes.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      THE COURT:  Okay.

2      MR. BEHLMANN:  Because I think once we point out to

3  Your Honor what the fundamental problem is with this 35.9

4  billion-dollar number, which is our real issue here, what this

5  formula does in that when you divide by a market cap and

6  multiply by the number of shares outstanding, if you collapse

7  that formula, all you're really doing is dividing by the stock

8  price as of a particular date.  There's a little bit of

9  rounding error because of the fully diluted number of shares

10  changes a little bit over the class period, but plus or minus a

11  relatively insignificant amount, you're just dividing by the

12  stock price.

13      So the stock -- the opening stock price on October

14  12th, the number that the equity plan proponents would have

15  Your Honor use, I believe, was $69.29.  What this formula does

16  when you collapse the petition date share count with the

17  October 12th market cap, this formula says every $68.25 of net

18  damages on a Class 10A-II claim equals one share of new PG&E

19  common stock.

20      We think that that -- the choice of that date, that

21  October 12th date is problematic because it was essentially

22  arbitrary.  As Your Honor noted, that is a date where the stock

23  price, as we mentioned in our brief as well, was near its class

24  period zenith.  I think the highest the stock price ever went

25  intraday during the class period was about seventy-one dollars.

PG&E Corporation and Pacific Gas and Electric Company

1    And they're using a stock price of $69.29.

2            THE MONITOR:  Excuse me, excuse me, Mr. Behlmann.  It

3    appears we've lost Judge Montali.

4            MR. BEHLMANN:  Oh, no.

5            THE MONITOR:  Yes, one moment while he tries to

6    rejoin.  I'll stop the recording momentarily.

7            I'm sorry, counsel, Judge Montali is not able to

8    connect and he will take his lunch recess now and resume at

9    12:45.  And he will try to reconnect in a different location at

10   that time.  You can log out and then log back in at 12:45, or

11   you can mute your video and your audio, and then we'll just

12   patch everyone back in at that time.

13           MR. BEHLMANN:  Thank you.

14           THE MONITOR:  Thank you.

15           (Whereupon a recess was taken)

16           THE MONITOR:  We're recording now, Your Honor.

17           THE COURT:  All right.  I'm sorry, gentlemen.  I seem

18   to be in the habit of apologizing for my Internet service.  I

19   can't blame anybody, so Mr. Karotkin, I hope we're not messing

20   up your Friday afternoon.

21           MR. KAROTKIN:  Do I have to answer that question?

22           THE COURT:  No, and Mr. Behlmann, I've lost track of

23   time.  And the last thing we were talking about is, before my

24   problems went on, is you had described the many trading days

25   and the many events occurred, and there we were.  So pick it up

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    where you want to.  I think I'm going to be able to make it

2    through the rest of the afternoon here.

3         MR. BEHLMANN:  Okay, I certainly hope so, and I'm glad

4    you were able to get the issues worked out, Your Honor.

5         So just to quickly recap, the whole purpose of this

6    formula, as we all know, is to convert a claim that's in

7    dollars into a number of shares.  The basis that was given by

8    the plan proponents for the choice of the October 12th date --

9    which we assert was an arbitrary date that they then reverse-

10   engineered an explanation for so that they could use a really

11   high stock price -- the fundamental basis that they've given

12   for that, though, is the supposed benefit of the bargain theory

13   that they're trying to give investors that bought during the

14   class period the benefit of the bargain.

15        Two things about that, Your Honor; number one, there

16   were 896 trading days during the class period.  People bought

17   before October 12th.  People bought on October 12.  People

18   bought after October 12th of 2017.  And as we'll talk about for

19   a brief moment in a little bit, there were six more -- pardon

20   me, eight more drops in the stock price after October 12th,

21   2017.  None of that is accounted for in the selection of the

22   date or in the supposed benefit of the bargain theory.

23        Your Honor, in DCD Programs, Ltd. v. Leighton, 90 F.3d

24   1442, 9th Circuit 1996, the 9th Circuit said that the benefit

25   of the bargain measure of damages allows a plaintiff to recover

PG&E Corporation and Pacific Gas and Electric Company

1    the difference between what the plaintiff expected and what he

2    would receive had the defendant's representations been true,

3    and the amount the plaintiff actually received.

4         That's essentially the basis that we heard Mr.

5    Johnston say, and that we read in a little bit less detail in

6    the plan proponent's brief, Your Honor, as being given for this

7    choice of October 12th, that Judge, we're trying to give all

8    these folks the benefit of the bargain, what they bargained

9    for.

10         The 9th Circuit went on to say, quote, "However, this

11   Court has never held that such damages are permissible under

12   Rule 10b-5," period, end quote.  This is simply a theory that

13   has no bearing on this case.  It has no relevance.  It has no

14   merit.  It's not useful for calculating damages.  It's not a

15   reasonable basis for the choice of October 12th.  It's just a

16   basis that sounded good to sell Your Honor on that date.

17         In their demonstratives, and this is a -- the bottom

18   of the screen is a duplicate of the demonstrative that was used

19   by Mr. Johnston on Monday.  They presented Your Honor with a

20   pie chart that showed the supposed true value of PG&E stock on

21   10-12-17 at the market open, and then the little slice of pie

22   that's pulled out is the amount the stock dropped between that

23   morning and the close of trading on the following day.

24         And they claim that that's it; that was the inflation.

25   Once that happened, fraud was over, stock price reflected the

PG&E Corporation and Pacific Gas and Electric Company

1  value, nothing more to see here, let's all move on.  Here's the

2  problem with that, Your Honor.  There were that loss (sic).

3  And again, this entire pie on all of these slides starts from

4  the 35.9 billion-dollar number as of 10-12-2017, and then goes

5  through and deducts out in little slices the stock drops on

6  each of the subsequent dates alleged in the securities

7  litigation.

8       There were nine of them, Your Honor.  And as time went

9  on, they chipped away and chipped away and chipped away and

10  chipped away, and finally, you get to the end of the class

11  period, the final drop.  And then you're left with using the

12  terminology of the plan proponents, the fair value, what they

13  call the real value of PG&E, of only seven billion dollars.

14  The rest of that 35.9 was chipped away.  It wasn't just one

15  occurrence.  It wasn't just one instance.  It was an ongoing

16  series as the fraud unwound, to put that simply.

17       This line chart, Your Honor, reflects the same thing

18  as the preceding nine pie charts.  It just puts it all on one

19  continuum.  You start at October 12th, 2017.  Stock dropped,

20  and it dropped again eight more times after that, bringing it

21  to the end of the class period.  Stock is -- I don't know if my

22  pointer shows up through the Zoom system, but where the stock

23  ended up (indiscernible) class period.

24       So how do we fix the formula, Your Honor?  We've

25  suggested pretty strongly that October 12th is a --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT: (Indiscernible), Mr. Behlmann, just one

2  question. Go back to the prior chart, please. The -- I'm not

3  interpreting the chart the way I maybe should. What's the

4  price on the day of the ninth loss, November 15th, 2018?

5    MR. BEHLMANN: Your Honor, the closing price on the

6  day of the 9th loss was $17.74. That is the end of the class

7  period. It opened in the morning at $24.01 and closed in the

8  evening at $17.74.

9    THE COURT: Okay, I'm getting a lot of feedback from

10 you now, I think, unless it's mine again.

11    Ms. Parada, do you hear Mr. Behlmann clearly or do you

12 pick up some static from him?

13    THE MONITOR: No, I'm hearing some noise, like the

14 microphone is hitting something.

15    THE COURT: Okay, but Mr. Behlmann, I can finally

16 blame somebody else. It's okay, but there is a lot of

17 feedback. Something might be brushing against your microphone

18 or something.

19    MR. BEHLMANN: Bear with me for one second, Your

20 Honor. I'm on these little air pods. I will switch back to --

21 okay. Can you hear me better now, Your Honor?

22    THE COURT: Yes, better.

23    MR. BEHLMANN: Okay. Wonderful. So the -- after the

24 ninth loss, after the 11/15/2018 loss, the closing stock price

25 at the end of that day was $17.74, Your Honor.

PG&E Corporation and Pacific Gas and Electric Company

1      And if I may move ahead in the demonstratives a little

2   bit, that is one of the options that Your Honor suggested on

3   Monday, and we took that to heart.  We made a series of

4   suggestions on this slide of how we believe Your Honor could

5   fix the formula.  We've asserted in our papers why we believe

6   the petition date market capitalization, and thus the petition

7   date stock price is the right number to divide into the damage

8   number to get to a number of shares.  We hear Your Honor.  We

9   understand.  We'll leave that as it is in our papers.

10      The other two options, I think, may be somewhat more

11   palatable to the Court.  Option number 2 is the end of the

12   class period.  It was one of the options Your Honor suggested

13   on Monday.  That's an important date, Your Honor, because as of

14   that date, the fraud had all occurred, and the fraud had all

15   unwound.  As of the end of the class period, everything that's

16   alleged in the third amended complaint had happened.  All of

17   the fraud-related disclosures had occurred, and the stock price

18   had fallen as far as it was going to fall during the class

19   period.

20      We think that makes a lot of sense, Your Honor.  We

21   recognize that between that date and the petition date, the

22   stock continued to fall, ultimately closing at about twelve

23   dollars the day before the petition date.  Using the market

24   capitalization or the stock price at the end of the class

25   period ignores all of that.  It just stops at the end of the

PG&E Corporation and Pacific Gas and Electric Company

1    class period and says the fraud is over; we're going to use

2    that stock price.  And that's going to be the basis for the

3    fair and equitable allocation between class 10A-I and Class

4    10A-II.

5          The third option, Your Honor, is to come up with a

6    share price.  All we're doing with this formula is dividing

7    damages by a share price to get to a number of shares.  We're

8    perfectly willing, as we sit here today, Your Honor, to go to

9    mediation before Judge Newsome and try to reach agreement with

10   the plan proponents on what that share price should be, whether

11   it's based on a multiple of many, whether it's based on

12   something else, whether it's some stock price during the course

13   of the class period, frankly, Your Honor, whether it's some

14   other metric that Judge Newsome comes up with that none of us

15   had thought of as we sit here today.  We think that's a fair

16   and equitable option.

17         What we submit is not a fair and equitable option and

18   is not a legally permissible approach to confirm the plan is to

19   use this formula as is.  It's simply arbitrary.  It is

20   engineered for no other purpose than to drive down the number

21   of shares that are available to Class 10A-II.

22         THE COURT:  Let's go back to something we touched on

23   before the break:  whether it's two investors, per my

24   hypothetical, or nine investors per the way you played it out

25   in the chart.  All 9 of them or all 2 of them or all 4,000 of

PG&E Corporation and Pacific Gas and Electric Company

1    them need to have their claims determined somewhere along the

2    line because it doesn't matter what their claims are in a

3    formula if they don't have claims, and so it would strike me

4    that the people that bought stock after eight drops might be

5    less likely to prove their case than the person who bought

6    stock on the first -- before the first drop.

7         But what I'm really troubled by is why, if they're

8    nine start -- drops, why is it proper to ultimately have a

9    formula that treats my hypothetical Mr. A who bailed out five

10   days into the -- or whatever, a month after he bought with the

11   people that rode the stock all the way.  They can end up with a

12   completely disparate amount of dollar damage per share, right?

13        MR. BEHLMANN:  They could end up with greater damages

14   than someone that sold during the class period, but Your Honor,

15   whether those damages are allowable and how those damages are

16   calculated is purely a function of the federal securities laws,

17   and that's accounted for entirely in the calculation of

18   damages.  If they had --

19        THE COURT:  But it's something that has to come before

20   you plug in the formula.  In fact, even the Fifth Circuit case,

21   the one that I read last night whose name escapes me --

22        MR. BEHLMANN:  Superior Offshore?

23        THE COURT:  Yeah, Superior.  The court just said, oh,

24   we'll deal with that later.  It's okay to leave it unresolved

25   because there was no formula, there was no methodology at all

PG&E Corporation and Pacific Gas and Electric Company

1   as there is proposed here.

2          What would happen if I did that?  What if I said let's

3   wait and figure out what the dollar damage claims are, again,

4   leaving aside insurance and leaving aside the question of Del

5   Biaggio, just focusing on why do we have to know this formula

6   until we know what the claims are?

7          MR. BEHLMANN:  Your Honor, that's an interesting

8   question.  The numerator of the formula you're obviously not

9   going to know until we know what the claims are.  The

10  denominator of the formula, I guess, if Your Honor is

11  suggesting that we come back before Your Honor at sometime in

12  the future and try to hammer out what an appropriate

13  denominator is, potentially, that's a second logical step after

14  mediation with Judge Newsome.  Frankly, I think I'd be fairly

15  optimistic that if we mediated this issue with Judge Newsome,

16  we'd probably eventually reach agreement on a stock price, plug

17  it into the formula, and move along from this issue.

18         THE COURT:  Well, look.  If I thought that there was

19  some mediation tomorrow with Judge Newsome on this issue, I'd

20  say fine.  But I'm not in touch with him and don't intend to

21  be.  And it would seem to me that whether it's the debtor or

22  the shareholder proponents, doesn't matter what's on the other

23  side.  You have somebody on your side.  Somebody has to agree

24  to go do it.  I'm not going to order anybody to do it right

25  now.  But obviously, if they want to mediate it, they can

PG&E Corporation and Pacific Gas and Electric Company

1    mediate it.

2          And I agree.  Mediation might solve the whole problem.

3    But I have to assume there won't be mediation, and therefore, I

4    have to come up with a formula.  And after looking at your

5    chart, I've got nine different -- eleven different dates to

6    pick or none of the above.  I mean, I've got petition date.

7    I've got nine different drop dates.  I've got this artificial

8    October 12th date, and I suppose I've got 824 other dates, too,

9    from when all the people purchased.  But that's not very

10   efficient.  So I'm kind of figuring -- not sure what to do.

11         MR. BEHLMANN:  Certainly, Your Honor.  And if I may, I

12   think the simplest solution that we would suggest would be to

13   use the market capitalization and stock price as of the end of

14   the class period because by that point, all the fraud has

15   occurred.  Everyone that was ever going to buy their shares

16   during the class period had bought their shares.  All of the

17   facts and circumstances are taken into account.

18         Absent that, I think, reading between the lines, which

19   may be dangerous, I think your question is ultimately whether

20   this issue has to be determined prior to confirmation of the

21   plan, as a prerequisite to confirmation of the plan.  We think

22   it could certainly be resolved if we were to go mediate, and we

23   have not spoken to the debtors and the other plan proponents

24   about whether they would be willing to.  We think it certainly

25   could be resolved in advance of confirmation.

PG&E Corporation and Pacific Gas and Electric Company

1    If ultimately it cannot, if the choice is a truly

2  binary choice between using $68.25 to one share or deferring

3  the issue for another day, I think in that instance, I think

4  deferring the issue for another day is, frankly, probably the

5  best option.

6    THE COURT:  Well --

7    MR. BEHLMANN:  We don't think you go there --

8    THE COURT:  -- let me make a couple of statements

9  here.  Judges all act differently.  I don't discuss anything

10  with a mediator.  But the one communication I had with Judge

11  Newsome about this issue was one sentence in an order that I

12  issued before the decision on the class motion -- class claim

13  motion and said that I'm adding to your list, Judge Newsome, is

14  meet and confer and see if you can negotiate or mediate with

15  the security claimants.  Period, end of subject.

16    So I don't know whether -- and I don't want you to

17  tell me -- I don't know whether there's been ongoing mediation

18  or not.  And certainly, if the plan proponents and/or debtors

19  on the one hand, and your side on the other want to do it, they

20  can do it.  And that's just where I am.

21    And so the third suggestion is a great suggestion if

22  everyone agrees.  The deferral, I suspect that Mr. Johnston and

23  I recall Mr. Bennett (phonetic) at a prior hearing would

24  probably tell me they have to pin this down because it's going

25  to affect when they go to the market.  Well, the way to solve

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      that problem, I supposed, is to do the way personal injury

2      lawyers negotiate.  You negotiate a high-low bracket, and

3      therefore, you can bracket the maximum number of shares coming

4      out one way or the smallest number of shares coming out another

5      way.  But that all presumes that there's liability determined.

6              Anyway, go ahead.

7              MR. BEHLMANN:  Certainly.

8              THE COURT:  I'm thinking allowed.

9              MR. BEHLMANN:  And again, Your Honor, that's

10     absolutely right.  The reality is that before any shares are

11     going to be issued, claims have to be allowed.  And as Mr.

12     Johnson noted, and as I've probably said a few too many times

13     today, that's not going to happen for quite some time.

14              I think we've pretty much addressed our concerns with

15     the formula, Your Honor, as it regards the denominator issue.

16     The one other issue we have with the distribution formula is,

17     and we asserted this in our papers, and it was discussed in the

18     opening arguments from the other parties on Monday -- is the

19     insurance offset.

20              The plan calls for all insurance proceeds, or all

21     proceeds of all capital I Insurance policies, which are defined

22     in the planas policies that were issued to the debtors or that

23     provide coverage to the debtors, specifically including D&O

24     policies.  Any payments from those policies to a holder of a

25     Class 10A-II claim are essentially treated as a distribution on

PG&E Corporation and Pacific Gas and Electric Company

1    account of that Class 10A-II claim.

2         But as we know, the D&O policies provide coverage

3    first to the Ds and Os.  They provide coverage under Side A.

4    They provide indemnification coverage under Side B for claims

5    against the Ds and Os.

6         And third, under Side C, the policies provide coverage

7    to the debtor.  This offset applies irrespective of where that

8    coverage comes from, so if I -- your hypothetical investor A

9    has sued the debtor and has filed a complaint against the

10   debtor, and has sued a director and officer, and received 100

11   dollars from the insurance policy on account of the claim

12   against the director and officer.  The plan treats that as a

13   payment on account of the claim against the debtor.

14        And Your Honor, we believe that Ivanhoe says that does

15   not work.  The most -- probably the most glaring example is

16   under a Side A policy that provides no coverage to the debtors

17   whatsoever, no Side C coverage at all, nothing to the entity.

18   Even a payment under that policy would be treated by this

19   formula as a payment on account of a claim against the debtor.

20        THE COURT:  I know, but suppose our investor A got a

21   judgment of 100 dollars against all defendants; all defendants,

22   or at least the debtor and one nondebtor defendant.  Wouldn't

23   in fact the insurance be paid out of the columns or the towers

24   that cover the debtor?

25        MR. BEHLMANN:  Two things, Your Honor.  First,

(975) 666-2610 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   investor A is not going to get a judgment against the debtor

2   because the debtor is in bankruptcy and he has filed his proof

3   of claim against the debtor.

4           THE COURT:  But that's the (indiscernible) --

5           MR. BEHLMANN:  But B, in the hypothetical, let's just

6   (indiscernible) --

7           THE COURT:  -- what if there was relief from stay to

8   do that?

9           MR. BEHLMANN:  Okay, sure.  Let's assume that A has

10  that judgment against both defendants.  In that instance, I

11  guess a plausible case could be made that some portion of the

12  insurance proceeds were attributable to the debtors.  How much

13  is a factor of the securities laws.  That's dealt with in our

14  brief.

15          We discussed the manner in which that gets calculated,

16  and to the extent that payment was made on account of a claim

17  against the debtor, then we understand that v dot. What we

18  don't understand is to the extent that payment is on account of

19  the claim against the individual, deducting that as though it

20  was a payment on account of the claim against the debtor.

21          THE COURT:  Are you familiar with my ruling a couple

22  weeks ago in the subrogation dispute in Ivanhoe v. the

23  California (indiscernible).

24          MR. BEHLMANN:  Yes.

25          THE COURT:  And you are aware of how that came out?

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. BEHLMANN:  Yes, Your Honor.  We're in a slightly

2    different boat, obviously.

3    THE COURT:  Well, I know that, and I wasn't going to

4    ask you to tell me why the Ivanhoe choice versus the Geller

5    choice, which is what I went, and let the fire trustee offset

6    against the corporate claimants.  Which rule would apply under

7    the securities laws, and why?

8    MR. BEHLMANN:  We would --

9    THE COURT:  Excuse me, with the debtor taking the

10   position that it is the beneficiary of both of the insurance

11   policies.

12   MR. BEHLMANN:  -- well, Your Honor, I don't think

13   there's any dispute that the debtors are insured under the D&O

14   policies, other than the Side A.  Side-A-only policies, there's

15   no dispute.  Those don't provide coverage to the debtor at all.

16   But as to the policies that provide Side A and Side B and Side

17   C coverage, we would assert that the distinction is a little

18   more granular than just whether someone isn't insured.  And

19   following Ivanhoe, we would take the position, and we have

20   taken the position, that if an insurer is paying the claim

21   against someone other than the debtor, that that doesn't count

22   as a payment by the debtor.

23   THE COURT:  But again, we're back -- you're assuming

24   that the debtor -- I'm assuming the debtor has insurance, and

25   in Ivanhoe, that wasn't the case.  The plaintiff in Ivanhoe, or

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    that alignment of parties, has two defendants to look to, and

2    the principle there is don't let the defendant off the hook

3    until the point is made whole, which is not the same in the

4    subrogation context.

5              So this seems like it's more like the subrogation

6    (indiscernible) because of the presence of insurance.

7              MR. BEHLMANN:  Well, the subrogation context would

8    require that we were drawing our own insurance.  So if we had

9    an insurance policy that insured us against losses and PG&E

10   stock --

11             THE COURT:  No, no.  I didn't mean to say that you had

12   that kind of insurance.  What I'm saying is the principle that

13   was operative, and that influenced my decision in that case, is

14   that the insurance part, the insurer and the fire victim have a

15   contractual relationship, and the fire victim is not a

16   wrongdoer.

17             In the Ivanhoe situation, and I think in this

18   situation, under the allegations, the debtor and the officers

19   are wrongdoers, and so if you do a pure Ivanhoe analysis, maybe

20   you're right, but what's different is the source of payment,

21   for the most part, is the debtor's own insurance.

22             So, okay, the -- go ahead.  That's what I'm struggling

23   with, and that's what I think Mr. Johnston made in point of

24   this brief, at least.

25             MR. BEHLMANN:  Understood, Your Honor, and I think

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    that's a call that we're just going to have to leave to Your

2    Honor's discretion.

3         We've presented our point, and we will -- but I think

4    that the one distinction that absolutely unequivocally has to

5    be made, even if Your Honor determines that the debtors are

6    right and that a payment from a shared policy is in fact

7    deductible from the claim against the debtor, any payment from

8    a Side A policy, we believe, needs to be off limits because

9    those policies do not provide any coverage to the debtor

10   whatsoever.

11        There's no set of circumstances under which the debtor

12   isn't insured under the Side A policies.  We believe that

13   that -- that the rules, the Ivanhoe rules, should extend to any

14   payments from the insurance on behalf of the individual Ds and

15   Os, but we can't really say much more than that.  That's our --

16        THE COURT:  But if a plaintiff in Purro's (phonetic)

17   position actually went to trial in a class action, I guess that

18   actually happens now and then, if it actually went to trial and

19   got a judgment, it wouldn't care who paid it.

20        And in this case, unless your claims are

21   astronomical -- I realize you allege they are -- this seems

22   like a nonissue because if you make a judgment, if you get a

23   judgment, excuse me, the debtor is probably going to be able to

24   satisfy the judgment.  They certainly have said so in their

25   testimony, in terms of contingencies and their expectations of

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    that, so again, I'm wondering if this is really a nonissue at

2    the end of the day.  But anyways, let's go ahead and get to

3    your other points.

4            MR. BEHLMANN:  Certainly, Your Honor, and this is

5    actually the final point of our confirmation objection.  At the

6    conclusion of this point, as my partner Mr. Etkin mentioned at

7    the beginning, he'd like to make a brief wrap-up closing to

8    sort of tie all of this together and put it all into context.

9            So the final issue, Your Honor, is obviously Class

10   10A-II rejected the plan.  In our view, the plan unfairly

11   discriminates against Class 10A-II.  Very briefly, with respect

12   to rejection, Your Honor, the debtors and the equity plan

13   proponents both tried to paint a slightly different picture of

14   what rejection means in this context.  They suggested that the

15   class accepted by number but rejected by dollar amounts.

16           Mr. Karotkin opined on whether one large creditor may

17   have swayed that number.  There's no evidence in the record

18   with respect to which specific creditors voted, so I don't

19   think that statement should really get any credence.  But

20   either way, it doesn't matter.

21           Under 11 (26)(c), the class voted to reject the plan,

22   therefore the cramdown requirements of 11(29)(b) are invoked.

23   And the debtors have the burden of satisfying the cramdown

24   rules.  They have to show that the plan is fair and equitable.

25   It has to satisfy the absolute priority rule.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    That's fairly easy here because Class 10A-II is pari

2    passu with common equity.  There is no junior class to us.  We

3    acknowledge that.  But the plan also cannot unfairly

4    discriminate against Class 10A-II.  That's where we think this

5    plan in its current form, without the few tweaks we've

6    mentioned, and then one more, falls apart.

7    Holders of existing common equity interests are

8    getting two things under the plan.  Number one, they're

9    retaining their interests.  Their interests are subject to

10   dilution by new equity issued under the plan, but it is worth

11   mentioning that that equity that they hold is now going to have

12   significantly less debt sitting in front of them in the form of

13   fire victim claims.

14   All the fire victim claims are removed from the

15   capital structure and funneled into the fire victim trust,

16   which is probably a significant part of why the stock is

17   trading today actually higher than it was on the petition date.

18   So these folks are going to basically come out of

19   bankruptcy with -- they're unequivocally going to come out of

20   bankruptcy with the same shares they started with, in the same

21   number.  They will face, for instance, dilution in terms of

22   voting, but economically they're still going to hold the same

23   number of shares, and as of right now, those shares are

24   essentially in the same boat they were in at the petition date.

25   Second, existing equity holders are also receiving, or

(973) 406-2250 operations@escribers.net | www.escribers.net

                PG&E Corporation and Pacific Gas and Electric Company

1   are probably receiving -- we've heard testimony that it's still

2   a little bit in flux -- subscription rights to buy additional

3   stock and reorganize PG&E through the rights offering.  As we

4   know from Mr. Ziman's declaration and his testimony, those

5   rights are expected to trade on the NYSE, and thus they are a

6   valuable consideration.

7                They are an element of value being provided to

8   existing equity holders.  They received them.  They may choose

9   not to exercise them, but they unequivocally have value.  Mr.

10  Ziman's testimony, we believe, supports that.  And there's

11  ample case law that supports that.

12               Just a couple of quick examples; Washington Mutual,

13  442 B.R. 314, Bankruptcy District of Delaware, 2011, the Court

14  rejected a planned proponent's argument that a rights offering

15  had no value, nothing that even if the eligible offerees had

16  the right to subscribe to their stock at par, the right to buy

17  into the company has an inherent option value that includes the

18  upside if the company is successful.  The Court in that case

19  did not put a numerical value on the rights offering but did

20  say that the particular claimant that was excluded had to be

21  permitted to participate.

22               One other example, Breitburn Energy Partners LP, 582

23  B.R. 321, Bankruptcy SDNY, 2018; the Court overruled an

24  objection by a pro se party who essentially argued that

25  eligibility to participate in a rights offering did not provide

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  him with equal value to others in his class because of the fact

2  that he was unwilling or unable to participate.

3         In rejecting that argument and overruling that

4  objection, the Court implicitly held that the rights offering

5  had value.  Getting the rights has value.  These are something

6  that existing equity holders are getting as a kicker on top of

7  their existing stock, and that (indiscernible) --

8         THE COURT:  Did either of those cases involve Class

9  (10)(b)?

10         MR. BEHLMANN:  I do not believe so, Your Honor, no.

11         THE COURT:  Well, then that's probably a significant

12  difference, isn't it?

13         MR. BEHLMANN:  No, I don't think that's a difference

14  at all because --

15         THE COURT:  Well, it's an artificial yet congressional

16  manner of turning in money, judgment or a potential money and

17  equity.  It's sort of once you're an equity holder, you're

18  always an equity holder.  But that's hardly the same as

19  excluding somebody who might otherwise think you have the right

20  to sustain your rights.

21         MR. BEHLMANN:  One critical distinction, Your Honor,

22  is that 5(10)(b) does not necessarily turn money into equity or

23  vice-versa; 5(10)(b) simply says that claims arising from the

24  purchase of common stock have the same priority as common

25  stock.  So just --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  No, that's --

2          MR. BEHLMANN:  -- (indiscernible) where there was a

3    bucket of cash to distribute to existing equity holders, you

4    wouldn't be turning claims into equity at all.  You'd be going

5    in the other direction.  But I think the distinction doesn't

6    necessarily matter in the context of unfair discrimination

7    because the -- reduced to its simplest terms, you've got two

8    classes of statutorily identical priority, and they're getting

9    disproportionate recoveries on their claims and interests.

10         THE COURT:  -- well, are they getting it on account of

11   their claim and interest, or are they getting it because of

12   some other situation?  In other words, is the -- is it a plan

13   issue or is it something that just parallels the plan and goes

14   through with the fact that you're a shareholder but not because

15   it's a treatment of your interest?

16         MR. BEHLMANN:  Well, it is structured as a piece of

17   the treatment of their interest, Your Honor, and therefore we

18   believe it's subject to the cramdown provisions.  They're

19   getting these rights by virtue of their role as stockholders.

20   There's nothing special that they have to do to qualify to

21   receive the subscription rights.  Importantly -- pardon me one

22   second -- okay.

23         All the Court has before Your Honor are conclusory

24   assertions that the plan does not unfairly discriminate Class

25   10A-II, not just with respect to the rights offering, but with

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   respect to all of the pieces that we've talked about; the

2   formula, the denominator and the formula, the insurance offset

3   in the formula, and the rights offering.  The conclusory

4   assertions that the debtors have made in their confirmation

5   brief that the plan does not unfairly discriminate are not

6   enough to satisfy the debtor's burden.

7           With respect to the rights offering, Your Honor, we're

8   not asking to participate in the rights offering necessarily.

9   Mr. Johnston gave a lengthy dissertation on Monday about the

10  fact that the plan proponents don't want creditors like PERA to

11  buy stock and reorganize companies because we, quote, sued the

12  debtors for fraud.  One minor flaw in that is they supposedly

13  don't want us to buy stock, yet their proposed treatment of our

14  claims is to give us stock.  But that's not necessarily what

15  we're asking, Your Honor.

16          All we're asking is simply that in addition to

17  correcting the two issues that we see with the formula, the

18  denominator and the insurance offset, that there be some value

19  provided to Class 10A-II that tops up the proportionate value

20  they're receiving to be on par with Class 10(a)(1), to have a

21  true pari passu pro rata recovery with Class 10(a)(1).

22          THE COURT:  Oh, in other words, and I'm going back to

23  my original hypothetical. If investor A has a thousand-dollar

24  claim, you want him or her to get whatever a thousand-dollar

25  claim is worth in equity and rights, and since maybe he doesn't

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    want the rights, maybe he needs to just get a little more

2    equity.  Were you saying that's the true (indiscernible)?

3          MR. BEHLMANN:  From a -- the standpoint of parity,

4    from the standpoint of pari passu treatment, all I'm saying is

5    that whatever the holder of that claim is getting as a

6    proportion of the value of their claim should be equivalent to

7    the proportion equity is getting of the value of its equity.

8          THE COURT:  I'll put it a different way.  Suppose you

9    are a securities claimant and I am a shareholder, and I have --

10   and under the -- what if we had this magic formula, your dollar

11   claim is worth a hundred shares, and I have a hundred shares,

12   but I'm going to get fifty more shares under the rights

13   offering.  You want -- you don't want the rights.  You just

14   want some increase in the number of shares you have to

15   compensate you to match my hundred shares, plus the rights.

16         MR. BEHLMANN:  That, Your Honor, would be one form of

17   currency.  Just to be crystal clear, though, we're not asking

18   for the fifty shares that you're getting in that scenario.

19   We're asking for value in some form, some form of currency,

20   whether it's stock, whether it's cash, whatever, that is

21   equivalent to the value of the right that you're getting to buy

22   those fifty shares, which as we know, those rights are going to

23   trade on the NYSE.  They're going to have a determinable value.

24         THE COURT:  But there's simply not -- and this is

25   again first impression.  Nobody known to report a case, if

PG&E Corporation and Pacific Gas and Electric Company

1      you're aware of, is even up to this kind of problem, right?

2              MR. BEHLMANN:  No reported case that I'm aware of has

3      dealt with this issue in the specific context we're in right

4      now.  That is correct.

5              THE COURT:  Where's that media there when I need them?

6      Okay.

7              MR. BEHLMANN:  We agree, Your Honor.  With that, I

8      believe I'm going to turn it over to Mr. Etkin for the closing

9      and summation of everything we've talked about.

10             THE COURT:  Okay, but Mr. Behlmann, before you leave,

11     you get the award for the courteous lawyer who was frustrated

12     by the Judge who keeps losing his Internet connection.  So

13     thank you.

14             MR. BEHLMANN:  I appreciate that, Your Honor.

15             THE COURT:  Thank you for your patience.  And we're

16     going to -- well, you want to -- we'll take you out of the --

17     no, we'll leave you in the participation room in case there's a

18     follow-up question.

19             Mr. Etkin, I thought you were going to do the leg work

20     today, but your partner did the work.

21             MR. ETKIN:  I'm sorry, Your Honor?

22             THE COURT:  I said I thought you were going to do the

23     heavy lifting today, but your partner did it all, so you're --

24             MR. ETKIN:  My partner did the heavy lifting, and it

25     was particularly heavy today that he managed to get through the

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   technological issues of no fault of anyone, so I admire him for

2   that as well, as well as the heavy lifting that he did with

3   respect to the argument.  And I appreciate the Court's patience

4   with respect to that as well.  So Your Honor, I just wanted to

5   wrap up with a few words, very short, maybe about five minutes.

6           Your Honor, since the outset of these cases, the

7   debtors have and continue to alter and manipulate the optics

8   with respect to the significance and merits of the rescission

9   or damage claims in this case.  We obviously have our own view,

10  and it's a very different view than the debtors on the merits,

11  but that's an issue for another day.

12          The debtors have actually at times shown disdain for

13  investors, who have collectively lost billions of dollars in

14  connection with their purchases of securities of the debtors.

15  While the debtor's efforts to resolve disputes regarding the

16  plan with selective constituencies have taken place, no effort

17  has been made by the debtors to engage with us.  All we have

18  gotten is essentially the back of their hand.

19          Our goal, Your Honor, has never been to scuttle

20  confirmation of the plan.  And we've been involved in this case

21  in the beginning, kicking and screaming with respect to the 105

22  injunction motion, but we've been involved in this case from

23  the onset.

24          We understand its importance in the larger picture,

25  but we are part of a meaningful constituency in this case, and

operations@escribers.net | www.escribers.net
(973) 406-2250

PG&E Corporation and Pacific Gas and Electric Company

1    actually, the Court has recognized the rights of that

2    constituency by extending the bar date and allowing injured

3    investors to file proofs of claim based upon the debtor's due

4    process violations in failing to notify these investors of the

5    original bar date.

6         Thousands, Your Honor, if not tens of thousands of

7    those investors spoke up and filed claims.  And those who are

8    entitled to, able to, and chose to, voted to reject the Plan as

9    a class.  Your Honor, this isn't horseshoes.  It doesn't matter

10   how close you get, one way or the other.  Many thousands --

11        THE COURT:  (Indiscernible).  It's not like a national

12   election, right, you can't win the popular vote and win the

13   election.

14        MR. ETKIN:  Pretty much the same thing, Your Honor,

15   but I don't want to go there.  I should point out, however,

16   that we could easily point to the obvious timing and notice

17   problems that we've raised previously to Your Honor as the

18   reasons that thousands actually didn't vote, but that's not the

19   issue.

20        Our objections to the plan are specific, and they're

21   tailored, and importantly, they are for the most part fixable.

22   And Mr. Behlmann has identified very well how those issues can

23   be fixed.

24        And just as you've suggested in the past, Your Honor,

25   and the debtors have offered to do with others, most of these

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   issues can be resolved through language in the confirmation

2   order, focused changes in the plan, further discussion, or

3   perhaps, as was suggested, mediation with the help of Judge

4   Newsome, who seems to have had a good track record in that

5   regard.  But none of that has happened to date, and here we

6   are.

7           Yes, Your Honor, we represent PERA and the other

8   institutional claimants identified in our objection, but as

9   we've pointed out in several of our pleadings, and as Mr.

10  Behlmann alluded to a little earlier, despite the absence of a

11  certified class, PERA has been appointed lead plaintiff by the

12  District Court, and Labaton, Mr. Dubbs' firm, has been

13  appointed lead counsel by the same Court.

14          Rule 23 and the relevant case law imposed fiduciary

15  duties to the putative class, which would include those who

16  filed rescission or damage claims in this case.  Lead

17  plaintiffs and -- lead plaintiff and lead counsel are very

18  cognizant of those fiduciary obligations.

19          So we are here not only on behalf of our individual

20  clients, who themselves lost millions of dollars in pension

21  fund value, but to fulfill those fiduciary obligations to our

22  broader constituency.  We stand ready to engage with the plan

23  proponents to attempt to resolve these issues in good faith,

24  but if those efforts prove unsuccessful or none of that does

25  take place, this Court can and ultimately make the call.

PG&E Corporation and Pacific Gas and Electric Company

1    To recap, Your Honor, with respect to the scope of the

2  plan injunction, I don't even know why that's an issue.  It's

3  such an easy fix.  We just want to make sure that the intent of

4  that provision is not to take a back door and attain what the

5  Ninth Circuit precludes, which is a release of our claims

6  against nondebtor defendants.  Simple language in the

7  confirmation order can deal with that.

8    As to the formula to convert allowed Class 10(2)(a)

9  claims in cash to shares that reorganized PG&E, including the

10  extent of any appropriate insurance offset, we've provided

11  several alternatives.  Mr. Behlmann focused on the price at the

12  end of the class period, which takes into account all of the

13  drops in stock that are alleged in the complaint.  And it also

14  takes into account all of the purchasers of securities during

15  the class period that could have a claim.  In our view, it's an

16  elegant solution and an appropriate one.

17    THE COURT:  But your colleague didn't necessarily

18  cancel then quit.  What about you?  Isn't it a windfall for the

19  early people to get the method of moral value just because of

20  the -- if the denominator gets smaller, the fraction gets

21  bigger.

22    MR. ETKIN:  Yeah, it's not a windfall, Your Honor,

23  because if someone hypothetically has a lower claim, their

24  claim amount, that's going to be taken into account in the

25  formula, and they will get less shares based upon the fact that

PG&E Corporation and Pacific Gas and Electric Company

1     they have a smaller claim. So --

2          THE COURT: But that's because you're basing upon your

3     familiarity and Mr. Behlmann's familiarity with the securities

4     law formulations to figure out the damage claim, right?

5          MR. ETKIN: Well, that's correct, and that's --

6          THE COURT: Okay.

7          MR. ETKIN: -- and Your Honor, you were focusing on

8     that, and rightly so, because you can't determine how many

9     shares anyone's going to get under any formula until they have

10     an allowed claim, either by virtue of settlement or by virtue

11     of having a court of competent jurisdiction make that

12     determination.

13          THE COURT: No, but I think you and Mr. Behlmann have

14     done a slight pivot in the sense that your brief stressed

15     petition date because, quote, that's when you figure out an

16     allowance of claims, but that's not the point. You've pivoted

17     a little bit from the petition date back to the last day of the

18     class. I realize there was not a lot of time between them, but

19     conceptually, it's a different approach. Isn't it?

20          MR. ETKIN: It's a different approach, Your Honor, and

21     I plead guilty to having pivoted, but we like to think that we

22     hear the words that are being directed at us, and we'd like to

23     think that we give that some thought and react to it.

24          And we heard, Your Honor, when Your Honor said

25     earlier -- well, first of all, we heard Your Honor's suggestion

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   as to that as a possibility in connection with the debtor's

2   opening.  We heard Your Honor earlier today when you indicated

3   that the October 12th date is at the apex and the petition date

4   is maybe at its lowest or close to its lowest, so you both

5   maybe have ulterior motives in choosing those dates for

6   purposes of the formula.

7           And as courts have a tendency to do, and as this Court

8   has had admirably a tendency to do, is you try to think about

9   Solomon and how Solomon would have handled it.

10          THE COURT:  And I'm, Mr. Etkin, and I'm pussycat

11  compared to my colleague Judge Newsome.  If I turn you loose on

12  him, you're going to have hands full.  I'm easy.

13          MR. ETKIN:  Well, that's okay, Your Honor.  That's

14  what -- maybe that's what we need, but in any event, yes, we

15  pivoted because on reflection, after hearing that suggestion

16  and Your Honor's comments, that date just makes sense in terms

17  of what's trying to be -- what should be, what people should be

18  trying to accomplish, which is to select a date that

19  encompasses all of the stock drops and encompasses all of the

20  purchases during the class period.  So we believe that, and we

21  are not afraid to say so.

22          The bottom line, Your Honor, is that regardless of

23  where this lands, we believe that the plan proponent's formula

24  as discussed by Mr. Behlmann just doesn't work.  It's designed

25  for one thing and one thing only.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    It's curious, Your Honor, that the -- and I know this

2    was addressed by the plan proponents, but in the March version

3    of the plan, there was even a different date, a date that would

4    have created perhaps a little bit more in the way of stock

5    under the plan proponent's formula.  But lo and behold, that

6    date disappeared, and the October 12th date was inserted for

7    the latest iteration of the plan.

8    As to the rights offering, Your Honor, and the

9    discriminatory impact as Mr. Behlmann described, the fact is

10   that we don't know at this point, and that's another -- that's

11   not a pivot; that's just the fact.  We don't know at this point

12   whether a rights offering will happen or not, but if it does,

13   cases are clear that there's value attached to that; 5(10)(b)

14   is clear that 5(10)(b) claimants, or rescission or damage

15   claimants must be treated pari passu.  So the idea of getting

16   additional value to a class that should be treated pari passu

17   with rescission or damage claims just is offensive to the

18   requirements for cramdown.

19   THE COURT:  And you're -- I think you're just about

20   (indiscernible).

21   MR. ETKIN:  And I'm just about done, Your Honor.  I'm

22   not going to go over the issue of the claims against the

23   utility that was discussed by Mr. Behlmann, a lively discussion

24   between you and him.  But again, Your Honor, the issues are

25   discrete.  And they're bona fide issues, with respect to the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    plan, that impact our claims and the claims of the thousands of

2    others in Class 10A-II.

3           Those issues can and should be fixed.  The plan

4    proponents would prefer to try to delegitimize these issues or

5    invent the conversion formula that, as we've indicated, was

6    engineered to minimize Class 10A-II recoveries with no real

7    legal or factual basis.  You have not seen any evidence

8    whatsoever, Your Honor, in terms of trying to indicate how

9    their formula results in pari passu treatment with the holders

10   of stock.  And as Your Honor has said several times, although

11   we've been trying to be helpful in terms of coming up with

12   fixes, it's not necessarily our burden to do so.  This is the

13   debtor's plan, and to the extent there are problems with it, we

14   feel that we've identified those problems.

15          We're asking the Court to at the very least recognize

16   and do something to resolve those issues.

17          THE COURT:  Okay, (indiscernible).

18          MR. ETKIN:  So with that, Your Honor --

19          THE COURT:  Thank you for your presentation.  I want

20   to --

21          MR. ETKIN:  -- thank you.  We appreciate you.

22          THE COURT:  -- okay, have a nice weekend.  I'm going

23   to move you both out of the panel now and find out --

24          MR. BEHLMANN:  Thank you, Your Honor.

25          THE COURT:  -- thank you, have a good weekend.

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. ETKIN:  Well, Your Honor, before you do, just one

2  housekeeping matter.

3    THE COURT:  Yes.

4    MR. ETKIN:  We submitted our list of exhibits.  The

5  debtor objected to all of them; some on relevancy grounds, some

6  on the basis that they came in after we had the chance to see

7  the confirmation brief and the declarations.  We'll leave that

8  to you.  That's part of your determination, Your Honor.

9    THE COURT:  Well, yeah, I put it in a prior order

10  rather than just dealing with the evidentiary objections to

11  exhibits and testimony and whatever as part of the ruling.

12  Okay, it --

13    MR. ETKIN:  And that's fine, but I didn't want to let

14  that slip by.

15    THE COURT:  Okay.

16    MR. ETKIN:  I think you also mentioned that you wanted

17  to at least hear something about it, so that we leave in your

18  more-than-capable hands.

19    THE COURT:  Okay, thank you.

20    MR. ETKIN:  Thank you again, Your Honor.

21    THE COURT:  All right, I'm going to excuse you and Mr.

22  Donaldson and Mr. Behlmann.

23    Mr. Karotkin, I apologize to you also for my end of

24  the mix-up today.  Hopefully, the delay let you get some more

25  things solved.

PG&E Corporation and Pacific Gas and Electric Company

1          MR. KAROTKIN:  No need to apologize, sir.  I think we

2   did get a couple of things resolved.  Unfortunately, we have

3   not been able to resolve what we have been discussing with the

4   unsecured creditor's committee, not yet.  But I think going to

5   some of the other issues Mr. Pascuzzi and Mr. Gorton and Mr.

6   Glassman have raised, I think -- and I know they will correct

7   me if I'm wrong -- that Section 10.13 has been resolved with

8   the proposed revisions we have made, with one additional

9   revision.  I believe Section 11.1 has been resolved, which is

10  extension of jurisdiction.  We resolved it without your

11  participation.

12          So I think that --

13          THE COURT:  Wasn't it 8.3, 3(e) -- or I got the wrong

14  number, but 8.2(e).

15          MR. KAROTKIN:  No, it was the 8.2; 8.2(e) is still not

16  resolved, and I believe Mr. Gorton mentioned something about

17  10.9(f) was not resolved.  We believe that the proposed manner

18  in which we would resolve -- I'm sorry, which we would revise

19  8.2(e), that we have sent to them, which they rejected, should

20  be approved by Your Honor, and that 10.9(f) we believe is

21  appropriate as written.  So we can discuss those later, if

22  you'd like, because I don't think those will be resolved.

23          And I think with that, that addresses their objections

24  other than to the extent they may have executory contract

25  issues.  But I believe that addresses their objections.

(972) 687-8880 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    THE COURT:  Okay, and switching gears slightly, and

2  maybe they want to be heard, maybe not, but what's your

3  pleasure now, given the interruptions we had and the delays,

4  about the rest of today and closing final argument?  I presume

5  you and Mr. Johnston want to.  What's your pleasure?

6    MR. KAROTKIN:  Well, Your Honor, I think that Mr.

7  Julian had reserved some (indiscernible) --

8    THE COURT:  (Indiscernible), yes, I'm sorry.

9    MR. KAROTKIN:  -- (indiscernible), so I think it would

10  be appropriate for him to go forward first.  I think that with

11  respect to the issues we're discussing with the UCC,

12  unfortunately we don't think they will be resolved today, and

13  we may have to carry that until Monday and have more

14  discussions over the weekend on those issues.  We hate to do

15  that, but we just think that we're going -- we're not from our

16  perspective, at least, we're not going to be in a position to

17  finalize that today.

18    But Mr. Johnston can speak for himself.  I believe

19  that he may have some response to Mr. Etkin and Mr. Behlmann.

20  And then I would like to, of course, address some of the

21  comments by the objectors that were made in the last couple of

22  days in response to some of those arguments, relatively

23  briefly, and then make a brief closing statement at the end of

24  the proceedings.

25    THE COURT:  Well, do you want to do that this

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  afternoon, or do you want to pencil in Monday?  I don't

2  particularly like the idea of a weekend session, but if

3  necessary, we'll do it.  But if there's -- and again, well,

4  I'll tell you want.  You were going to try to give me a better

5  sense about the timetable that you expect me to follow.

6        So let's skip for the moment open issues, a 2-to-9

7  Johnston response to this afternoon.  If the matter were

8  submitted at this moment, 2 o'clock, 10 to 2 in San Francisco

9  on June 5th, what would be my homework assignment from you,

10  assuming I'm going to confirm the plan, that must be met best -

11  - absolute has to be met?

12        MR. KAROTKIN:  Your Honor, I think that for the

13  purposes of the equity and debt raises, and in view of the

14  markets and the fact that July, most of July, is a blackout

15  period of the debtors because, I believe, of earnings

16  statements -- and I could be wrong about the reason, but it is

17  a blackout period -- that the intention would be to do the

18  equity raise in June, and therefore, if you are inclined --

19        THE COURT:  Wait, equity raise when?

20        MR. KAROTKIN:  In June, immediately starting upon

21  entry of your order.

22        THE COURT:  Oh, okay.

23        MR. KAROTKIN:  In June.  The intention is to raise all

24  the capital as quickly as possible so we can go effective as

25  quickly as possible.  That's the current plan, is to do it as

PG&E Corporation and Pacific Gas and Electric Company

1    quickly as possible.  And I said that (indiscernible) --

2          THE COURT:  Okay, is that the -- we've got the June 30

3    deadline for maybe 1054.

4          MR. KAROTKIN:  Okay, and I'd like to address that

5    because I think that there's some confusion about what needs to

6    be done by June 30th.  And I think for purposes of compliance

7    with AB 1054, you would have to enter the confirmation order on

8    or before June 30th.  It does not mean, Your Honor -- and I

9    think that the governor's office essentially has confirmed this

10   with the contingency -- I forgot the exact name of it -- the

11   contingency process that was approved by Your Honor.

12         THE COURT:  The contingency, yeah, the contingency

13   plan, yes.

14         MR. KAROTKIN:  Which provides that the effective date

15   can occur -- the effective date can occur after June 30th, as

16   long as the confirmation order is entered on or before June

17   30th.

18         THE COURT:  Entered doesn't -- it doesn't have to

19   become final -- be final by then.

20         MR. KAROTKIN:  It doesn't have to become final, but we

21   would ask, Your Honor, that upon entry of the order -- and we

22   did request this in our memorandum, is that you would waive

23   compliance with rule -- Bankruptcy Rule 3020(e), which provides

24   for the stay -- the 14-day stay.

25         THE COURT:  Yeah.

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MR. KAROTKIN:  And that can be waived under the rule.

2    The rule provides that that can be waived.

3    THE COURT:  So I know that.  I know that, but my point

4    is, again --

5    MR. KAROTKIN:  Now, I'm going to give you a date, if

6    you're looking for a date.

7    THE COURT:  No.  You're making it clear that, in terms

8    of following the commitment that I've made, I have to sign an

9    order by close of business on June 30th.  Now, obviously, I'm

10   much more inclined to do it much earlier, but I can't just do

11   it tomorrow --

12   MR. KAROTKIN:  No.

13   THE COURT:  -- I have to think about this.

14   MR. KAROTKIN:  But I'd --

15   THE COURT:  Okay.

16   MR. KAROTKIN:  -- like to address that further in

17   terms of the --

18   THE COURT:  Yeah.

19   MR. KAROTKIN:  -- of the financing -- the equity

20   raised and the debt raised.  I'm being told by the capital

21   markets folks and the people raising this money is that it

22   would be very important to that exercise and that endeavor, in

23   order to get this plan effective as soon as possible, taking

24   into account what I indicated about the July blackout, that if

25   you are going to enter an order confirming the plan, that it be

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    entered, preferably, by the end of next week.  If you could --

2         THE COURT:  Well, that's the -- you mean a week from

3    today?

4         MR. KAROTKIN:  Yes, a week from today.  And I think it

5    could slip a day or two after that, but -- and again, I don't

6    like to put this kind of pressure on you, but that is what I'm

7    being told by the capital markets folks.

8         THE COURT:  Well, Mr. Karotkin, you're the guy that's

9    given me a 50-page order.  I'm a proponent of one-sentence

10   orders.  But I may make a choice or a decision later to, you

11   know, issue some sort of a memorandum to explain myself later.

12   I can do that.  From what you're telling me is the people that

13   are going to be putting out the money want a signature on the

14   line from the presiding judge, and the sooner the better, but

15   they don't care if I spend twenty pages after that explaining

16   myself, right?

17        MR. KAROTKIN:  Well, I think that's correct, although

18   I do think there are some provisions in the order which address

19   the financing that may be important to the financing raise, as

20   well.  So --

21        THE COURT:  No, I'm being semi-facetious that I may

22   not sign the exact order you prepare, but I'm not going to do a

23   one-liner.  I understand the importance of this.  But my point

24   is let's take -- let's take the argument that you just heard,

25   you personally weren't involved in it.  I'm sure you're aware

PG&E Corporation and Pacific Gas and Electric Company

1  of it, but obviously it's Mr. Johnston's -- you know, his ball.

2  The whole discussion of the conversion and the offsets and all

3  those other things, those are, what, two or three first

4  impression issues, and I owe it to the parties and appellate

5  court and anyone to explain myself, but I can explain myself

6  after I've issued an order that says my decision is A, B, C.

7  And --

8         MR. KAROTKIN:  Certainly, on that point, Your Honor.

9         THE COURT:  Yeah.

10         MR. KAROTKIN:  Certainly, on that point, yes.

11         THE COURT:  There are a few others in there.  There

12  are -- you know, you've been very helpful in keeping track of

13  the objections, but there are still some objections.

14         MR. KAROTKIN:  Yes.

15         THE COURT:  There -- and I'm not talking about the

16  things that we heard from Mr. Bray and Mr. Gorton, I'm talking

17  about things, for example, that we heard earlier about does

18  the -- show the three -- you know, the three kind of fire

19  victim claims -- government, subro, and real fire victims --

20  shouldn't they be treated one class?  I mean, obviously if I

21  accept that argument, the plan is probably dead.  But if I

22  reject that argument, I owe it to the litigants to explain my

23  reasoning, but I don't have to explain it in detail in an

24  order, because if I sign an order that says objection's

25  overruled, plan confirmed, I'm doing the judicial act without

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    elaborating, which is my preference, but I think I know the

2    point.

3              MR. KAROTKIN:  Okay.

4              THE COURT:  So whether I can do it by the 12th or not,

5    that remains to be seen.  Okay.  Did you want to elaborate more

6    on that whole question?

7              MR. KAROTKIN:  Not at the moment, sir.  I think -- no,

8    nothing more on that particular point.

9              THE COURT:  And I want to make sure I'm clear, too.

10   The blackout that you described is not a PSP, it's --

11             MR. KAROTKIN:  Right.

12             THE COURT:  -- a securities law matter that the

13   company, in connection with its own quarterly reporting --

14             MR. KAROTKIN:  Yes.

15             THE COURT:  -- then when it's --

16             MR. KAROTKIN:  Its earnings -- the earnings, there's

17   a -- but I'm told --

18             THE COURT:  Well, I mean --

19             MR. KAROTKIN:  I'm probably not the best person to

20   explain this, but --

21             THE COURT:  No, I'm not either, but it's a function of

22   when you're going to market --

23             MR. KAROTKIN:  Yes.

24             THE COURT:  -- to equity and you're out there,

25   things -- so the securities laws require, and the people that

PG&E Corporation and Pacific Gas and Electric Company

1    know that area of the law say there's this real -- it's a

2    security's lawyer's blackout.

3            MR. KAROTKIN:  Yes, sir.

4            THE COURT:  Okay.  Okay.  Okay.  What is your pleasure

5    in terms of timing if we -- if you're suggesting that maybe

6    there should be a further hearing on Monday from the OCC or

7    others, and certainly, Mr. Julian needs to have a chance to be

8    heard, and Mr. Johnston, but I want to -- I want you to take

9    the lead here and tell me what is the most efficient way to

10   proceed today, and if necessary, over the weekend, and

11   certainly on Monday?

12           MR. KAROTKIN:  I think that we ought to try to get as

13   much done as we can today, and I think that if Mr. Julian

14   should be ready to go forward with his argument today, he

15   should do so, and whatever else we can accomplish today with

16   leaving the issue with the UCC for Monday probably makes the

17   most sense, and then I'm prepared to address the objections

18   today, also, if need be, and make a short closing statement on

19   Monday after everything else is concluded.

20           THE COURT:  Mr. Julian, if you're in the audience, can

21   you raise your hand, and I see -- oh, yeah.  Okay.

22           Ms. Parada, would you bring Mr. Johnston and Mr.

23   Julian in to the participant's panel.  I see Teresa MacDonald

24   (phonetic).  I'm not going to call on her at the moment.  I'll

25   come back to that later.

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    MS. PARADA:  Mr. Julian, please state your appearance

2  for the record.

3    MR. JULIAN:  Good afternoon, Your Honor.  Robert

4  Julian of Baker and Hostetler, appearing on behalf of the Tort

5  Committee.

6    THE COURT:  Good afternoon, Mr. Julian.

7    Mr. Johnston, state your appearance.

8    MR. JOHNSTON:  Good afternoon, Your Honor.  Jim

9  Johnston on behalf of the shareholder proponents.

10    THE COURT:  Okay.  Let's go in reverse order.

11    Mr. Johnston, what's your pleasure in terms of timing?

12    MR. JOHNSTON:  I just wanted to say, Your Honor, that

13  I do have a fair bit to say in response to Mr. Behlmann and Mr.

14  Etkin's arguments.  I'm prepared to do that at your

15  convenience, whether that's --

16    THE COURT:  Okay.

17    MR. JOHNSTON:  -- you know, late this afternoon, over

18  the weekend, or Monday morning.

19    THE COURT:  How much time do you need?

20    MR. JOHNSTON:  I think probably thirty to forty-five

21  minutes.

22    THE COURT:  Okay.  Mr. Julian, what's your pleasure?

23    MR. JULIAN:  I have an hour, Your Honor, to address,

24  essentially, seven important issues raised by some of the

25  objectors, as well as the TCC, and we've been going for a long

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    time, and I have a PowerPoint presentation to present, so my

2    only question is, you know, do you want Mr. Johnston to go

3    first?  Do you want me to start on Monday fresh for you?  I'm

4    at your availability here.

5          MR. JOHNSTON:  And, Your Honor, if I may be heard on

6    that?  I do think it makes sense to have all of the objecting

7    or commenting comments come out before the debtors close, and I

8    view my argument as part of the debtors' close.

9          MR. JULIAN:  That's fine.

10          THE COURT:  Yeah, that's fine with me.

11          Mr. Julian, I'm the one that's caused some of the

12    problems today because of my faulty internet.  I'm prepared to

13    give you your hour right now if you want and --

14          MR. JULIAN:  Sure.

15          THE COURT:  -- then take a short break and have Mr.

16    Johnston and Mr. Karotkin conclude for the day.

17          I mean, Mr. Karotkin, can you -- if Mr. Johnston

18    estimates an hour, can you, say, do you share in another half

19    an hour so between you, an hour?  Is that too much?  Or too

20    little?  Or enough?

21          MR. KAROTKIN:  I think that probably would be

22    sufficient.  I might run over a little bit, but I think that

23    would be sufficient.

24          THE COURT:  Okay.  Okay.  All right.  Let us try that.

25    I'm going to let Mr. Julian go forward.  And, let me just --

(972) 406-2190 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    hold on one second, Mr. Julian.

2         Yeah, Ms. Attard is with you, right, Mr. Julian?  So

3    she -- okay.

4         MR. JULIAN:  Yes, Your Honor, Ms. Attard is going to

5    control the PowerPoint, yes.

6         THE COURT:  Yeah, bring her into the room, please.

7         Ms. MacDonald, I'm not going to call on you for the

8    time being, so don't even think about it.

9         All right.  Ms. Attard --

10        MR. JOHNSTON:  Your Honor, Jim Johnston here.  May I

11   drop off the panel while Mr. Julian is going?

12        THE COURT:  Yes.  Sure.

13        MR. JOHNSTON:  Thank you.

14        THE COURT:  So -- all right.  Ms. Attard, would you

15   state your name on the record?

16        MS. ATTARD:  Good afternoon, Your Honor.  My name is

17   Lauren Attard.  I'm from Baker Hostetler, and we represent the

18   TCC.

19        THE COURT:  Thank you.  All right.

20        Mr. Karotkin, do you want to stay on the screen, or do

21   you want to go in hiding?

22        MR. KAROTKIN:  No, I'm okay.  Thank you.

23        THE COURT:  Okay.  You're on, Mr. Julian and Ms.

24   Attard.

25        MR. JULIAN:  May it please the Court, again, Robert

escribers
(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    Julian of Baker Hostetler, appearing on behalf of the Official

2    Committee of Tort Claimants.

3         Thank you, Your Honor, for the time today.  I'd like

4    to start off by informing you and the parties that the TCC

5    supports the debtors' plan so long as it provides equal

6    registration rights to all new shareholders who are entitled to

7    those rights, and complies with the tort claimants RSA

8    settlement, which Your Honor approved, and which has been

9    supported by eighty percent of the voting victims.

10        THE COURT:  You don't take a position on the

11   securities plaintiffs and their entitlement or claim under the

12   rights agreement, do you?

13        MR. JULIAN:  We do have one presentation for you on

14   that, which essentially tracks section 510(b) of the code, Your

15   Honor.

16        THE COURT:  Okay.

17        MR. JULIAN:  But we're not there yet.

18        THE COURT:  Okay.

19        MR. JULIAN:  Before I get into registration rights,

20   Ms. Attard, if you'd take that off so I could address

21   everything else.

22        Your Honor, I want to -- on behalf of the TCC and the

23   70,000-plus victims that the TCC represents, we want to thank

24   you for keeping the fire victims interest at the forefront of

25   this Court's case administration, both in terms of your

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    pronouncements from the bench as to the tone of this case, and

2    also for your significant rulings which have advanced this

3    case, many of which were subject to your discretion and you

4    didn't have to do.

5         And because, Your Honor, there have been some

6    objections raised to the wisdom of your rulings and the RSA,

7    which forms the basis of the plan, I think it's very important

8    to go through what I believe are seven of your important

9    rulings, which will allow the construct and place in context

10   some of the arguments that I'm going to make today about the

11   registration rights and the stock.

12        Your Honor, before the hearing last summer on relief

13   from stay on Tubbs, the -- I never received and offered to

14   settle this case for greater than 3.5 to four billion dollars.

15   And Your Honor made three rulings which advanced the case and

16   forced the debtors, in our view, to come up with their

17   September plan, which proposed around eight billion dollars for

18   the victims.

19        The first, you granted relief from stay for Tubbs,

20   which was -- which produced a lot of evidence, including the

21   video of the PG&E fire -- PG&E pole exploding minutes before

22   the fire started -- the Tubbs fire.

23        Second, you did not grant the debtors' estimation

24   motion wherein they asked Your Honor to order dozens of mini

25   trials of cause for causation on each of the multiple fires

(970) 494-0111 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    involved in this case.

2           And third, you ordered withdrawal of the reference,

3    which ended up putting the estimate on case in front of Judge

4    Donato who did two things that were important for us and

5    established the basis for the RSA.

6           First, Judge Donato rejected the debtors request to

7    have these mini trials.  And second, Judge Donato adopted our

8    proposal that the best benchmark for settle -- for estimation

9    was the debtors' settlement history, both in terms of the Butte

10   2015 fire, as well as the San Bruno conflagration, which also

11   resulted in wrongful death and personal injury claims, as well

12   as property damage.

13          With that background in mind, we filed a motion to

14   terminate exclusivity to join with the debtors because, after

15   all, eight billion dollars was nowhere close to where we

16   thought the value should be.  And it's very important to note

17   that the bondholder plan with whom we joined provided several

18   things that the debtors were not providing to us.  And again,

19   this is very important to show why the current RSA structure

20   and the current plan is fair to the victims.

21          First, the dollar amount of the settled wildfire

22   victims' claims was increased to 13.5 billion dollars.

23          Second, the debtors matched the bondholder plan in

24   providing an assignment of claims and causes of action against

25   third-party contractors and the like who were a significant

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   factor in causing the fires and causing the debtors to incur

2   this 13.5-billion-dollar liability.

3          Third, the plan -- the bondholder plan, and eventually

4   this plan provided an assignment of rights, contract rights,

5   and policy rights that the debtors enjoyed.  And it's very

6   important to note there, Your Honor, that many of these

7   third-party contractors indemnified PG&E for the 13.5 billion

8   dollars that PG&E is liable for on the plan, and so that

9   contract right for indemnification has been assigned to the

10  victim trust, too, as well as PG&E's (break in audio) rights

11  under insurance policies that cover those third-party

12  contractors.  So we have a large bundle of rights that's not

13  limited to just the 13.5 billion dollars in stock and cash.

14         And that was a close call.  I remember you saying to

15  Ms. Dumas, I won't give you what you want on exclusivity unless

16  you give me what you want on mediation.  And it was a tense

17  exchange, but an important one, and you gave us what you want.

18  And I must tell you, Your Honor, I sat in those mediations with

19  Judge Newsome, and the thirteen fire -- outside fire

20  professionals, whom you've known or heard from in this case,

21  and that was a turning point in this case.  It really was.  As

22  well as the exposure of the Tubbs evidence to the bondholders,

23  to the shareholder plan proponents, and the debtors, which

24  showed, in my opinion, that the Tubbs liability was a -- was

25  not a close call at all.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    In fact, I was going to spend two hours on estimation

2  in front of Judge Donato if that had gone to trial.  The

3  evidence was so clear in my view.  All these things helped to

4  drive the values up to the 13.5, plus the assignment of claims.

5    And then something very important happened in the

6  subro settlement.  You said two things which were important to

7  us, and which actually framed some of my arguments today about

8  registration rights.  First one I objected to, the fact that if

9  the subro settlement resulted in an all cash payment to subro,

10  that would mean, and I predicted this, Your Honor, at the time

11  in September and October, that there would not be enough cash

12  left in the case and we would end up being probably forced to

13  taking fifty percent cash and fifty percent stock.

14    And Your Honor asked us the rhetorical question in one

15  of those hearings, isn't that stock the indubitable equivalent

16  of cash?  The indubitable equivalent, Your Honor, is going to

17  come up in this oral argument today several times because

18  although I know you are borrowing a bankruptcy term of art from

19  cash collateral disputes; I understood your point.  I also

20  understood your point that, look, eleven billion dollars sounds

21  like a good settlement to me, Mr. Julian.  I'm inclined to

22  approve it.  You didn't do it.  You held back.

23    And you held back until you then appointed -- here's

24  order number six that you made that I think was very important,

25  you appointed Judge Newsome to be the mediator to bring the

PG&E Corporation and Pacific Gas and Electric Company

1    debtors and equity into our court to see if something could be

2    forced.  There was no 13.5 on the table from the debtors at

3    that time to us until you brought in Judge Newsome, who, as you

4    can imagine -- I can't say what happened, but I think his

5    reputation stands firm that he probably bashed some heads

6    together to help bring apart -- together what we have wrought

7    here.  And by the way, he is attending today's Zoom conference,

8    I believe.  You can bring him in if you want.

9         THE COURT:  I won't bring him in.  I wouldn't think of

10   that.

11        MR. JULIAN:  Your Honor, that was order number six.

12   And what that did is that set up order number seven, which was

13   your approval of the RSA.  And the approval of the RSA was very

14   important.  And so what I'd like to do now, after giving the

15   background, I'd like to identify the seven questions that I'm

16   going to answer today.

17        And the first one is what are the benefits of the RSA

18   settlement that caused the victims to vote for the settlement

19   so overwhelmingly?

20        The second is going to be why is the plan feasible?

21   Some of our minority groups or victims have raised feasibility.

22        The third is why is the PG&E stock an attractive

23   investment, provided we get the registration rights agreement

24   that's equal to all other shareholders?

25        The fourth is -- this is very important, Your Honor.

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    This will establish a lot of my argument today.  Why must the

2    confirmation order confirm the TCC's right to approve a

3    registration rights agreement as guaranteed by the RSA

4    settlement that you approved, and why must those registration

5    rights be equal to those granted to all other shareholders,

6    which I will address today, is the most fundamental protection

7    of the victims that the Court can address in the seven days of

8    confirmation hearings.

9            The fifth question is going to be what's the impact of

10   estimation?

11           The sixth, I'm going to respond, like Mr. Karotkin

12   will be to some individual objections to the plan.

13           And the seventh is, Your Honor, how can the TCC assist

14   the Court and the parties on the voting issues raised recently

15   in the motion for an examiner?  I'm going to have a very

16   constructive approach for you to consider if Your Honor wants

17   to adopt it involving the fact that the TCC has conducted its

18   own investigation and can file its report for Your Honor if

19   Your Honor so chooses.

20           Your Honor, let me go back to the major question,

21   which Mr. Abrams and many victims who don't like this plan have

22   raised.  What are the benefits of the RSA settlement that

23   caused the victims to vote for the settlement so

24   overwhelmingly, eighty-eight percent?

25           First of all, the dollar amount alone of the cash and

1    PG&E Corporation and Pacific Gas and Electric Company

2    stock consideration was considerably more than the last

3    September offer of 8 billion dollars.  There's now 13.5 billion

4    dollars of cash and stock.  The third is, the claims that were

5    assigned to us are significant.  They are against all tree

6    trimmers, consultants who advised on risk management, PSPS, the

7    actual tower that failed -- there's documentary evidence that

8    one of the consultants actually was on the email that said that

9    the tower on that line (break in audio) high risk of failure.

10         These claims are very important to us, Your Honor.

11   And they are so important that they helped resolve a large

12   dispute in this case already.  Let me explain that to you.  And

13   it's important for the victims who take shots at the RSA to

14   know this.

15         You may recall, Your Honor, that 6 billion dollars

16   plus of federal and state government claims were thrown into

17   the victim pot, and we and the outside lawyers -- the thirteen

18   outside lawyers who signed the RSA with the TCC -- drew a line

19   in the sand on no payments coming out of the 13.5-billion-

20   dollar corpus to those federal government claims.  And with the

21   help of Judge Newsome, as you know, the result out of the

22   mediation on those government claims was that those federal

23   agency claims are going to be resolved by receiving a portion

24   of some of the third-party contractor claims that are assigned

25   to the victim trust.  So already, they've been important.  And

26   of course, that was a domino effect in the mediation that

PG&E Corporation and Pacific Gas and Electric Company

1    resulted in all of the government claims being wiped out in

2    sharing from the 13.5-billion-dollar corpus.

3          The second is we have the rights in insurance

4    policies, which as I've mentioned, some of these consultants

5    have a vast amount of insurance coverage themselves.  And if

6    they have indemnified PG&E for the 13.5 billion dollars, as

7    some of them have, you can see that we almost have a double

8    payment there, adding to the 13.5.

9          Which raises a good point, I might say

10   parenthetically, getting ahead of myself, as to why some of

11   these so-called indemnity claims of the tree trimmer contracts

12   cannot recover against PG&E.  PG&E has already paid,

13   essentially, twice to the victims.  They've paid the 13.5, and

14   they're paying their indemnification rights for the 13.5

15   against the tree trimmers and the consultants.  It's a large

16   pool of assets that's coming into the victim trust that needs

17   to get liquidated.

18          The other item that we received in this order is --

19   I'm going to show you in my PowerPoint in a moment -- is that

20   the RSA terms sheet guarantees to the TCC and the outside

21   thirteen consenting professional law firms consent rights to

22   two things:  the form and content of the confirmation order and

23   the debt and equity financing documents, which include the

24   registration rights.

25          This is an important right that we bargained for.  It

(972) 931-2799 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    mirrors what the backstop parties did, as we're going to show

2    you, in their financing letter.  They also have acceptance

3    rights, that they have to accept their backstop financing

4    registration rights agreement, too.  So everyone's been treated

5    equally here in writing, but it's going to be very important

6    for us to request Your Honor to put that in your confirmation

7    order, as I'll show you in a moment in our PowerPoint.

8         And its important -- the registration rights that was

9    guaranteed to us in the amendment number 1 to the RSA's

10   settlement is going to do away with the SEC rule which would

11   lock up the Fire Victim Trustfor anywhere from five to six

12   years in liquidating its stock.

13        You can imagine how important this was to us when we

14   negotiated the RSA to put that into the RSA document, that we

15   have the right to accept this document because, Your Honor,

16   let's be honest about this.  Is locking us up for five to six

17   years and liquidating our stock the indubitable equivalent of

18   paying 11 billion bucks to the subro shareholders?  I mean,

19   come on.  That's the fight I had -- the argument I had with you

20   in September, and we're going to -- we're going to ask now if

21   we have indubitable equivalent rights in this confirmation

22   order with respect to registration rights.

23        The other thing we obtained in the RSA was a right to

24   terminate this plan unless the plan goes into effect by August

25   29.  We're very glad to hear Mr. Karotkin's words today that --

(972) 406-4900 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    and I know we worked very closely with him lately.  They are

2    working very hard to get this IPO out, this public offering out

3    in the -- started in June.  And so I believe this August 29

4    date is not going to be an issue.

5         And last, but not least, the RSA provided something

6    very important to the group of thirteen plaintiffs' lawyers,

7    who represent approximately seventy percent of the filed claims

8    in this case, which is that it provides the victim trust with

9    an oversight committee comprised of many of these lawyers to

10   represent the large bulk of victims in this case, with

11   oversight over the trusteeing and the claims administration

12   process.  In short, the victims themselves in this case, Your

13   Honor, have control and oversight over their own destiny in

14   Fire Victim Trustadministration.  That is something that did

15   not exist in the September 2019 plan offered by the debtors,

16   which was filed with the Court.

17        So this is why this RSA settlement was so important.

18   Frankly, I think what those group of thirteen lawyers did and

19   the Baker team who negotiated that, I think this settlement is

20   brilliant.  I really do, and I think that these protections are

21   very important to enforce here in this plan and in the

22   confirmation order.

23        The second question I'd like to address, Your Honor,

24   is in response to many of the fire victims who have questioned

25   feasibility.  Well, heck.  You know, I've questioned

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    feasibility, too. As you remember, back on April 7, when I

2    asked for supplemental disclosure on many of these issues, as

3    you know, we were being careful. We wanted to make sure that

4    those supplemental disclosures went out to the people.

5          I might even add that one of the lawyers in this case,

6    Mikal Watts, who represents over 16,000 fire victims, took the

7    transcript of that hearing wherein I disclosed all these many

8    things that we wanted to make sure the victims knew about and

9    actually sent it out to all his victims. And there were town

10   halls that discussed the issues. I have no doubt that there

11   was adequate information to all of the victims in that regard.

12         But one of the issues that has come up repeatedly

13   since then is plan feasibility, both as to wildfire risk and as

14   to financing risk. And I'd like to address this. I know Mr.

15   Karotkin's going to do it. He addressed it somewhat in his

16   opening. We stand firm with the debtors in this regard.

17         Look at what this debtor has accomplished during this

18   Chapter 11 case with respect to wildfire risk. First of all,

19   they have a vastly improved wildfire mitigation plan, enhanced

20   monitoring, enhanced tree trimming, and enhanced hardening.

21         I know this of my own personal knowledge, with my

22   house at 1,000 feet above the town of Sonoma. I can't tell

23   you, but I think four different occasions, I've seen the PG&E

24   guys come by and handle the pole across the street from me,

25   changing out transformers. After the PSPS events of last year,

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    the helicopters with their LIDAR function have come by, run the

2    whole tower behind me.  We have PG&E folks walking the lines

3    after every PSPS before they re-hook it up.  And I can say that

4    I'm very proud of PG&E's attempt to improve what has been a bad

5    program before the Chapter 11 plan.

6         Secondly, we have Judge Alsup in there for another

7    year and a half.  He is -- as you know, he has said another

8    fire's not going to happen on his watch.  He is doing

9    everything possible to bring PG&E in probation to make sure

10   that they are continually improving their monitoring.  We had a

11   recent issue with another C-hook issue up in the

12   Caribou-Palermo line.  Our expert spotted the issue, we brought

13   it to Judge Alsup's attention.  PG&E has responded favorably to

14   that, and there are more hearings coming.  I am convinced Judge

15   Alsup is a huge improvement and oversight for wildfire risk.

16        Also, we have a monitor in Judge Alsup's jurisdiction

17   who is overseeing PG&E on a daily basis with their counsel.

18   And two other very important protections for the victims and

19   PG&E and its ratepayers, Your Honor, and employees,  one is

20   PSPS.  I mentioned that briefly.

21        Look, this is obvious to me.  You've got directors and

22   officers who know that their insurance is nowhere close to

23   protecting them if there's -- if they fail on another PSPS

24   event.  We have a very conservative PSPS program by PG&E.  Mr.

25   Orsini's documentation in the recent PSPS class-action

(973) 406-2250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    litigation showed that when those PSPS decisions were made last

2    year, representatives of governors and PUCs were in the room,

3    making the decision.  The State of California, the Governor's

4    Office, the PUC -- PG&E's highest officials are all over this

5    issue, and I have no doubt that they are going to be very

6    conservative in so-called pulling the plug in a PSPS in order

7    to avoid wildfires next year.

8         And last but not least, we have the 21-billion-dollar

9    wildfire fund which, as you know, as has been mentioned so many

10   times, cannot benefit PG&E unless we have this plan confirmed

11   by June 30.  And as proof of all this, as you heard by equity

12   plaintiff's counsel just a moment ago, the markets have reacted

13   favorably.  The markets went down right after the Tubbs ruling.

14   The markets went down -- PG&E stock went down after the

15   termination of exclusivity.  And now, with all this news of the

16   backstop parties' financing commitment coming into place, Mr.

17   Ziman's and other -- Mr. Wells' testimony that all the

18   financing is in place, and with this very good wildfire

19   mitigation plan in place, plus the PUC's approval, plus the

20   governor's approval, we see the market reacting favorably to

21   the stock.

22        And so we think that there's very little wildfire

23   risk -- not very little, but greatly improved risk management

24   for wildfire risk.  Financial risk.  I just mentioned that

25   they're fully committed.  They are now not reliant on the

(973)406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  speculative PUC approval of securitization because they've got

2  that 6-billion-dollar bridge line in case securitization

3  doesn't happen.  And because of this, the governor finally came

4  on board, and so did the PUC.  So we have a good feasibility in

5  this case to answer the questions posed by Mr. Abrams and the

6  like.

7          The third question that I'd like to address is why is

8  the PG&E stock an attractive investment, especially for us,

9  should we get equal rights -- registration rights like all the

10  other shareholders are getting, which is a fundamental

11  requirement of a good faith standard in confirmation, state law

12  requirements, and feasibility?

13          First of all, Your Honor, we have a strong, safe,

14  recapitalized company.  As I mentioned, we have the strength of

15  the wildfire safety, wildfire mitigation, the wildfire fund,

16  PSPS, and we've got a completely recapitalized company with the

17  PUC's support.  It's an excellent investment choice, from our

18  view.

19          And last but not least -- this is very important --

20  think about it.  This utility -- I have to be careful with the

21  words I use -- but it has, in layman's terms, a virtual

22  monopoly on the biggest energy market in the fifth-largest

23  economy in the world, at least the fifth-largest economy before

24  the coronavirus hit.  I'm not sure where we rate right now.

25  But it has been reported in many financial magazines that

PG&E Corporation and Pacific Gas and Electric Company

1       California's the fifth-largest economy.

2              And let's face it, PG&E has a greater chunk of that

3       energy market, which is guaranteed revenue stream.  It's a

4       guaranteed revenue stream for the future.  All investors --

5       pension funds, mutual funds, long-term investors -- we believe

6       are going to want to invest in this company.

7              The alternative to not confirming the plan, I might

8       add, looking at the stock value, is, you know, fire risk

9       liability, which primes the victims with years of delay.  And

10      so I think that the alternative would be very bad for the stock

11      value, certainly.

12             The fourth question I want to answer is -- I'll go

13      right to my PowerPoint, Your Honor.  Your Honor, do you want to

14      take a break, or are we fine to --

15             THE COURT:  No.

16             MR. JULIAN:  -- keep going?

17             THE COURT:  No, I'm fine.

18             MR. JULIAN:  All right.  Well, I'd like to bring up a

19      PowerPoint.  We will file this with the Court.  And I'd like to

20      give you some background on the registration rights.  First,

21      I'd like to summarize it, but then I'd like next to go to about

22      three things:  the textual basis for our argument in the RSA,

23      the basis for my saying the backstop parties have registration

24      rights agreements, too, in their financing letter -- the only

25      evidence in the case that shows that the rights have to be

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   equal -- that's Brent Williams' declaration -- and then I'll

2   sum up with some argument and propose a form of order for you

3   on this, which we believe is very important to do what you've

4   done in your first seven orders that benefitted the victims.

5          This is going to be our request number 8th in this

6   case to help the victims, and we hope you'll look kindly on it,

7   just as you did in the first seven times.

8          Your Honor, the victims, we believe, cannot be treated

9   equally with the other claimants being paid in cash unless the

10  Fire Victim Trustcan liquidate stock within a reasonable time.

11  This is because the Fire Victim Trustcannot liquidate their

12  stock without a registration rights agreement.  That's because,

13  as I'm going to explain in a moment, under the SEC rules,

14  there's a lockup period which requires staged selling of

15  certain amounts over various quarters, which, if you add it all

16  up, amounts to about five to six years, arguably.

17         Third, the equity backstop parties' financing letters

18  state that they must have a registration rights agreement, too.

19  You may recall that Mr. Ziman did not recall that, but we're

20  going to show you in this PowerPoint excerpts from the

21  financing letters actually on file in the bankruptcy court

22  docket that show that they backstop parties have registration

23  rights agreements, too, and they get to consent to, just like

24  us.  And so our point is going to be, you know, fairness is

25  fairness, but sauce for the goose should be sauce for the

PG&E Corporation and Pacific Gas and Electric Company

1   gander here.

2         THE COURT:  Let me interrupt you and ask this.  This

3   overview, this -- is this -- this is not a verbatim from the

4   RSA, but these points are reflected in the RSA?

5         MR. JULIAN:  We're coming to that, Your Honor.  Yes,

6   I'm going to have quotes for you in the next -- succeeding

7   slides.

8         THE COURT:  Okay.

9         MR. JULIAN:  Yeah, the RSA settlement states that

10   these equity documents must be reasonable and the TCC must

11   consent to them.

12         Fifth, the TCC, as you know, has not consented to

13   date.  And so we're going to propose that the Court's order

14   should confirm that the plan will not become effective unless

15   the TCC consents to --

16         THE COURT:  Well, I think Mr. Karotkin said yesterday

17   that he agreed without one that a plan would not become

18   effective.  So do you agree with that?

19         MR. JULIAN:  Yes.  And I think because -- I'm going to

20   come to this in a moment, but I believe it's a feasibility

21   issue.  And so that's why I think your order has to show two

22   things.  And I'll show you in the order -- in a moment.  The

23   two things are that the victims' stock must be treated equally

24   with the backstop parties' stock when it comes to registration

25   rights, and our consent rights under the RSA must be preserved.

(973) 406-2250  operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    I think that's a confirmation issue.  It's a confirmation issue

2    to preserve those points, but it can be done later.

3            And the reason for this is point 7.  The victims' RSA

4    settlement would be violated otherwise, and the victims'

5    recovery will be placed at risk.  And after all, this case is

6    all about the victims, supposedly.  So now it's time for

7    everyone to put, so to speak, their money and their promises

8    where they have been in the past.  So if we could go to the

9    next slide, I'd like to give you -- start giving you the

10   textual background on this.

11           The disclosure statement in this case states that the

12   fire victims' trust is considered an affiliate.  If it's

13   considered an affiliate because of its large holdings in excess

14   of twenty-one percent, its stock is deemed restricted.  And

15   besides, there's no dispute in this case that the stock that

16   the victims will get is restricted -- must be registered, and

17   the registration rights agreement must address the time,

18   volume, and manner of the sale of the stock.  If you'll go to

19   the next slide?

20           Under Rule 144 -- hold on, Your Honor.  I have to move

21   this to the side.

22           Under Rule 144, if an investor owns restrictive

23   securities, it must hold the securities for six months before

24   it begins to sell them and essentially is locked up while it's

25   an affiliate for every three months.  Every three months, it

PG&E Corporation and Pacific Gas and Electric Company

1   can sell at most one percent -- not one percent of its

2   holdings, but one percent of the company's outstanding shares.

3           So for example, if we end up having twenty-four

4   percent of the stock and the one percent rule applied, you

5   could have essentially five to six years.  There are blackout

6   periods, too, which can extend the period.  If you're no longer

7   an affiliate, you can move it up.  But essentially, we're

8   looking at five to six years, arguably, of locking up this

9   stock, where the victims' trustee would not be able to

10  liquidate it, and the victims would have to wait too long.

11          And let me tell you my view of this.  We have one of

12  the best mass tort trustees and claims administrators around.

13  We've got Justice Trotter and Kathy Yanni.  You know, this is

14  not Justice Trotter's first rodeo.  He's done these fire victim

15  cases before.  And Justice Trotter's going to have financial

16  advisors and investment bankers.  They're not going to sell all

17  this stuff at once.  It's not to their benefit to sell it all

18  at once.  They're going to want to stage it in accordance with

19  their fiduciary duties to maximize the recoveries.  It doesn't

20  benefit them to dump it.  It doesn't benefit the market to dump

21  it.  They're going to do the right thing.

22          I prefer a registration rights agreement that simply

23  gives them the discretion.  But I can't tell you what's been

24  going on in mediation.  But there's an inference here, Your

25  Honor.  This has been going on for three months.  Is this

(972) 591-2500 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   good-faith negotiation over registration rights agreement, or

2   has it been a lockup of Mr. Julian being able to explain to the

3   public he knew what's going on?  I think the inference is

4   clear.

5           Let's go to the next slide.  Let's talk about what the

6   RSA really does say.  There are two key requirements for

7   registration rights agreement for the Fire Victim Trustin the

8   RSA.  One's in the RSA itself, and one's in amendment number 1.

9   Let's take amendment number 1 first.

10          Amendment number 1 essentially says that there must be

11  a reasonable agreement recommended by the debtors' underwriter.

12  So you start at the baseline.  The baseline is, what are the

13  basic terms that we want PG&E to propose for registration

14  rights agreement?  And that's in section 1.6 of amendment 1 to

15  the RSA.  And essentially, what that says is that there must be

16  a reasonable registration rights agreement consistent with the

17  recommendation of the debtors' underwriter.

18          Once we have that basic set of recommendations from

19  the debtors' underwriter, we go to condition number 2, which is

20  in the term sheet to the RSA.  And that term sheet states, at

21  page 48 of the RSA, that there are conditions to effectiveness

22  of the plan, two of them.  The confirmation order -- yes, Your

23  Honor, your order itself and all definitive documents relating

24  to the plan:  capitalization, equity, and debt financing shall

25  be in form and substance reasonably acceptable to the plan

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   proponents and the requisite fire claimant professionals, which

2   are defined to be, as I'll show you in a moment, the TCC and a

3   majority of the outside thirteen professionals who represent

4   the seventy percent of the victims.

5        So what is the shareholder plan proponents' response

6   to my point that there are two requirements in the RSA?  They

7   say that there's only one requirement, the fist one.  They say,

8   you know, once an underwriter gives us a recommendation, that's

9   it.  Slam dunk, cram it down your throat.  That's the real

10  cram-down going on behind the scenes in this case.  And they

11  say that because it's an amendment to the RSA.

12       So their theory is while the RSA comes up with the

13  broad-brushed power in our hands that the TCC, just like the

14  backstop parties, have consent rights to the definitive

15  documents for capitalization, equity, and debt financing, that

16  when we clarify that in amendment number 1, that the

17  registration rights has to be -- also have recommendations from

18  the debtors' underwriters, that our consent rights in the

19  RSA -- the broad consent rights suddenly went away.  And that's

20  not true because of the next slide.

21       As the next slide shows, the RSA amendment itself says

22  it does not constitute a waiver of any rights or claims related

23  to the RSA in all parties.  That means the debtors, the

24  shareholder proponents, and the TCC and the outside

25  professionals agreed that we reserve any and all rights not

(972) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   expressly amended or modified.  And when we agreed that an

2   underwriter could make recommendations -- basic

3   recommendations, that clause that I just showed you a moment

4   ago did not expressly amend or modify the TCCs and the outside

5   professionals' overall consent rights to the confirmation order

6   and the equity in debt financing agreements.

7        So you heard Mr. Ziman testify.  He didn't recall a

8   registration rights agreement requirement for backstop parties.

9   And you heard Mr. Pitre, Mr. Kelly, and Mr. Skikos say whatever

10  registration rights they get, we should get, as a matter of

11  fairness, right?  So let's see what the backstop parties'

12  financing letter agreements actually say.  And that's in the

13  next slide.

14       That backstop letter commitment -- there's a example

15  at docket number 6013-3, at page 6, states that reorganized

16  holdco -- that's the PG&E holding company -- will enter into a

17  registration rights agreement with the backstop parties which

18  shall otherwise be in form and substance reasonably acceptable

19  to the holders of a majority of the aggregate backstop

20  commitments.

21       A couple of things here.  First, it exists; second,

22  you'll note a common-sense requirement that these commercial

23  parties have reasonable consent rights to the registration

24  rights agreement, just like the TCC and the outside

25  professionals do.  We negotiated for it.  We have the same

PG&E Corporation and Pacific Gas and Electric Company

1   consent rights, or similar, that the backstop parties do.  And

2   so the question is, when you have -- the first question is,

3   should we be guaranteed in the confirmation order that we have

4   our consent rights?  The answer is yes, as I'll point out in a

5   moment.  It's a state law contract right we have.  It's a

6   condition of this plan that the debtor already agreed to.

7            THE COURT:  Mr. Julian, I need to interrupt you with

8   something.  I didn't anticipate this lengthy discussion.  And I

9   welcome it, but I'm trying to absorb it all because I haven't

10  had any reason to go back and look at these documents in the

11  past.

12           But more importantly is are you advocating something

13  that is opposed by anyone?  In other words, at the end of this

14  argument, is someone going to get up and say, Julian's full of

15  bologna; we don't have to do what he says?  I didn't anticipate

16  that, so I'm not sure --

17           MR. JULIAN:  Your Honor --

18           THE COURT:  -- I'm not sure what the -- I appreciate

19  the education, but I don't know what the advocacy is all about

20  here.  Tell me what -- the context of this argument.

21           MR. JULIAN:  Yes.  I believe the shareholder plan

22  proponents oppose the condition that we have to consent and

23  oppose equal rights for backstop parties and us, or I wouldn't

24  be making this argument.  Again, I can't go into what's going

25  on in the mediation, but you can --

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          THE COURT:  I know you --

2          MR. JULIAN:  -- let me just say it.  It's disputed.

3          THE COURT:  -- can't.  I know you can't and I'm not

4    asking you, but you have to understand, because I respect the

5    mediation, I don't know until this very moment that this is

6    opposed.  What I knew two days ago -- or three is that the TCC

7    and the debtors had settled four or five issues, and the

8    mediation was going forward on the backstop -- I mean, excuse

9    me, not backstop, the registration.  And that's fine.  That's

10   fine with me.  But I didn't understand that this is then going

11   to be framed in terms of will I be asked to rule that I will

12   only approve a plan that includes the consent of the TCC or

13   will I hear on the other side that I can approve the plan that

14   doesn't have the consent of the TCC?  I'm sorry, I'm misstating

15   it.

16          MR. JULIAN:  I --

17          THE COURT:  Will I approve a plan that has

18   registration terms that haven't been agreed to by the TCC?  I

19   don't -- I still don't know what the rules are here.

20          MR. JULIAN:  Well, we're going to hear from Mr.

21   Bennett and Mr. Karotkin, possibly.  Maybe they've given in on

22   this.  But we address this in our confirmation brief, docket

23   7306.

24          THE COURT:  I know, but Mr. Julian, I cannot -- I

25   can't keep track of hundreds and hundreds of pages coming in

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    like this --

2            MR. JULIAN:  But that's the purpose of --

3            THE COURT:  -- which ones are at issue and which ones

4    are not at issue.

5            MR. JULIAN:  This is an issue, Your Honor.  And

6    it's --

7            THE COURT:  (Indiscernible)?

8            MR. JULIAN:  -- it's going to be resolved by our

9    confirmation order at the end of this plan.

10            THE COURT:  Okay.  But I want you to understand

11    something, too.  I'm not here to nag you.  I'm trying to say

12    this:  there's a document that's being negotiated called a

13    registration rights agreement.  I, a judge, am being told if

14    there's no agreement, I have to make a decision.  Well, how do

15    I make a decision that imposes upon someone an agreement that

16    he doesn't want to sign?  So I just -- I hope there is a

17    resolution that's done in the mediation because I don't know

18    what I'm supposed to do otherwise.  And I believe that Mr.

19    Karotkin said yesterday that even if I do confirm the plan,

20    that it may not become effective if there is not a registration

21    rights agreement, and I certainly assume that meant agreed to

22    by the TCC.

23            MR. JULIAN:  Your Honor, I --

24            MR. KAROTKIN:  Your Honor, can I interject?

25            THE COURT:  Yes, I think so, if you can clarify this.

PG&E Corporation and Pacific Gas and Electric Company

1      Let me -- let's take the slide down, please, Ms.

2   Attard.

3      Okay, and -- all right, go ahead, Mr. Karotkin.

4      MR. KAROTKIN:  First of all, we are hopeful that the

5   mediation will result in an acceptable registration rights

6   agreement, and that, obviously, is the first priority.

7   However, if there is no agreement, the way we understand the

8   documents is that all that is required is a registration rights

9   agreement that is compliant with the requirements set forth in

10  Section 1.6 of the plan, the same language that Mr. Julian just

11  discussed and put up on the screen, as well as the provisions

12  of the RSA.  And if that type of agreement is presented and it

13  meets those requirements, then the Court can say that the

14  requirement that there be a registration rights agreement has

15  been satisfied for purposes of confirmation of the plan.

16     And I know Mr. Julian thinks he has unilateral rights

17  to either accept or reject that agreement.  That is not what

18  the documents say.  The documents provide a standard for what

19  is a reasonable registration rights agreement.  And to the

20  extent they have consent rights, any consent rights, even if

21  they had them, would have to be within those standards set

22  forth in the plan and in the RSA.  Otherwise, it would not be

23  reasonable.

24     Now, again, we're hopeful we can resolve these issues.

25  And by the way, they don't have any consent rights over the

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1  equity backstop agreement.

2       THE COURT:  You just told me a little while ago that I

3  had got one week to sign this order.  I can't know that --

4  whether there is -- I can't even understand the issue that I

5  have to decide in that kind of time frame when the first

6  present -- first heads-up I have about this is this discussion.

7       MR. KAROTKIN:  Okay.  Your Honor, --

8       THE COURT:  And I've got to be honest with you, I

9  don't -- I'll do what I'm asked to do, but I got to know what

10  I'm supposed to do.

11       MR. JULIAN:  May I continue?

12       MR. KAROTKIN:  May I just say one last thing?

13       THE COURT:  Yes.

14       MR. KAROTKIN:  We understand that.  As I said, we're

15  involved in mediation.  Hopefully, it will be resolved and you

16  won't have to address it.  It also is possible, although I

17  don't want to commit to it now, that this issue can be

18  something that can be addressed either consensually or by Your

19  Honor in a decision subsequent to the entry of the confirmation

20  order so we don't run into a problem with AB 1054, but prior to

21  the effective date.

22       THE COURT:  Well, I'm going to put that on your to-do

23  list, Mr. Julian.  If there's not agreement between now and,

24  you know, middle of next week, if you're willing to defer that

25  in the way that Mr. Karotkin said, I'll do it.  And if it's

PG&E Corporation and Pacific Gas and Electric Company

1   something that you feel it's important that be presented to me

2   and make a decision, you've just got to -- you've got to focus

3   me on what I've got to go look at.  I mean, seriously --

4           MR. JULIAN:  I'm trying to do that.

5           THE COURT:  -- the last time I looked at the RSA was

6   the day I approved it how many months ago?  So I just -- okay?

7   So all right.

8           Well, go ahead back to your presentation, okay?

9           MR. JULIAN:  Your Honor, you have been done a

10  disservice in the fact that we have been locked up in a

11  mediation from telling you about the dispute.  In my view, this

12  was calculated, okay?

13          THE COURT:  Okay.

14          MR. JULIAN:  So let's just move on.  What I'm trying

15  to do is show you that there is a dispute, and I'm giving you

16  the tools to solve it easily.

17          THE COURT:  I know, but you have to, in other words,

18  give me the break that -- knowing I've just now been presented

19  with the issue.

20          MR. JULIAN:  That's why we're going to file this

21  PowerPoint so you can take it home over the weekend.

22          THE COURT:  File this afternoon.  I already am home.

23  I'll print it out this evening if you file it.

24          MR. JULIAN:  We will do so, Your Honor.

25          So there are two ways to resolve this.  One is in

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    response to Mr. Karotkin's view that all they have to do is go

2    to their underwriter and say, what do you recommend, and they

3    can cram it down our throats, I gave you two sentences from the

4    RSA.  If your confirmation order just quotes the sentences from

5    the RSA that I'm going to show you in a moment in a proposed

6    order, we're going to be happy, halfway.  The only other choice

7    is to come back in here on a TRO right before the backstop

8    party funds, and that's not going to be a good way to litigate

9    this.

10           THE COURT:  No, that is not -- that's not a good idea.

11           MR. JULIAN:  The best way to litigate this is to -- to

12   resolve this is to have that mediation, resolve it like my

13   partners are trying to do with -- there's a whole group of

14   people, Your Honor, the fire victim trust, TCC, the shareholder

15   plan proponents, equity plan proponents, and the debtors are

16   all working very hard on this with their financial advisors.

17           But the second way to resolve it if it doesn't resolve

18   that way is to put into the confirmation order two sentences

19   that I'm going to come to in a moment.  The first sentence,

20   I've already told you about.  It has to do with consent rights.

21           The second one is a very simple concept.  It's what

22   Mr. Pitre and Mr. Kelly and Mr. Skikos were talking about.  And

23   that is that, look, as a matter of fairness, all you have to

24   rule is that all shareholders have the same rights.  You can

25   rule that.  And I'm going to show you why.  We're the only ones

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    who put in evidence on this.

2          THE COURT:  Am I correct, though, the backstop parties

3    at the moment aren't shareholders, are they?

4          MR. JULIAN:  No, but if they become shareholders, then

5    they are shareholders subject to their own registration rights

6    agreement.

7          THE COURT:  Well, I understand, but it's a bit

8    circular, isn't it?  I can't order somebody to have equal

9    rights with someone who doesn't have that status at the time

10   I'm making the order.

11         MR. JULIAN:  Yes, you can, because the documents are

12   the debtors' documents.

13         THE COURT:  Well, okay.

14         MR. JULIAN:  All right.  So we see that in the

15   document filed in front of Your Honor, which the debtors asked

16   you to approve, you have already approved a financing letter

17   that's in front of you that says reorganized holdco will enter

18   into registration rights agreements with the backstop parties.

19   And so that's --

20         THE COURT:  I understand that.  But Mr. Julian, I hate

21   to beat this to death, but I'm flying blind here.  I'm reading

22   one sentence that doesn't say anything about the TCC.

23         MR. JULIAN:  Yes, and I'm going -- yes, and so now,

24   I'm going to get to that.

25         THE COURT:  Okay.

PG&E Corporation and Pacific Gas and Electric Company

1      MR. JULIAN:  If you'll go to the next slide?

2      THE COURT:  Because -- all right.  I know you are.

3  But holdco and the backstop parties are not at odds with one

4  another.

5      MR. JULIAN:  Correct.  But you can direct the debtor

6  that whatever rights they grant to the backstop parties, they

7  must grant to us.  You can direct the debtor to do that.

8      THE COURT:  Maybe I can.

9      MR. JULIAN:  And that's -- look what Mr. Williams

10  testified, our financial advisor.  He put into his declaration

11  undisputed testimony, the comparable agreements -- the

12  comparable agreements are in the next slide.  They're in six

13  bankruptcy cases that he reviewed.  The comparable agreements

14  demonstrate by their terms that when a company requires a

15  lockup provision, that the lockup provision terms must apply

16  equally across all investors receiving stock in the offering.

17  All.  And these other bankruptcy cases, the leading bankruptcy

18  cases in the nation in which this happened, none of the

19  comparable agreements required a lockup for certain investors

20  while exempting others.  And none of them established a

21  different lockup across differently situated investors.

22      Let me go to the next slide and show you the cases

23  that this occurred in.  Weatherford International, Southern

24  District of Texas; Avaya, Southern District of New York;

25  Caesars, bankruptcy case.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1      THE COURT:  I can read them.  I mean, I can read them.

2  That doesn't mean anything to me.  It's --

3      MR. JULIAN:  Well --

4      THE COURT:  -- you're just telling me five other

5  bankruptcy cases.  What -- I mean, therefore what?  It's his --

6      MR. JULIAN:  His --

7      THE COURT:  -- (indiscernible).

8      MR. JULIAN:  May I answer the question?  His testimony

9  is not disputed by any other evidence in the record, that in

10  the leading bankruptcy cases, shareholders did not get

11  disparate back rights.

12      Why should the backstop parties, who come in here and

13  put up nine billion dollars or two billion dollars, depending

14  on the IPO offering, get to sell their stock within two months,

15  whereas the Fire Victim Trusthas to wait five years to

16  liquidate everything?  That's just unfair, Your Honor.  It

17  would be immoral.

18      And I made a prediction back in October; I said, Your

19  Honor, if you just hold off on the subro settlement, I can

20  basically guarantee you we might have a settlement tonight or

21  tomorrow.  You held off on that subro settlement.  You didn't

22  approve it that day back then and, lo and behold, that week we

23  had a settlement.  I'm making the same prediction to you now.

24  We've been in this case now for a year and a half.

25      THE COURT:  Go ahead.

PG&E Corporation and Pacific Gas and Electric Company

1      MR. JULIAN:  If you give us this order, that I'm going

2  to show you in a moment, that guarantees us equal rights with

3  everybody else and guarantees our consent rights under the RSA,

4  we will get our registration rights agreement in the next five

5  days, and you won't even have me coming in --

6      THE COURT:  Mr. Julian, come on, move on.  I don't

7  want to look at these other cases; they don't mean anything to

8  me.  Let me speed you up.

9      MR. JULIAN:  All right.  Let's go to the next slide.

10  Let's go to the next slide.  Let me go back here to one slide

11  there to the -- let me go to the next slide, please, Lauren.

12      You are correct, Your Honor.  Your memory is correct

13  about yesterday.  Mr. Karotkin tried to correct Mr. Pitre, but

14  this is what the transcript actually shows.  You said:  "Could

15  I confirm this plan if that rights agreement matter is still

16  unresolved?"  And Mr. Karotkin said, "I think you could.  I

17  don't think the plan could go effective without it being

18  resolved, necessarily."  So that's our point.

19      THE COURT:  And I think my next line after that was,

20  well, what's the point; it would kind of gut the whole thing,

21  right?  Something like that.

22      MR. JULIAN:  That's why I think it's a good-faith,

23  state law, and feasibility issue.

24      Let's go to the next slide.

25      Here's what we want you to do in your confirmation

PG&E Corporation and Pacific Gas and Electric Company

1    order, enforcing the RSA and guaranteeing us equal rights.

2    I'll go over it slowly.

3          THE COURT:  I can read it.  You don't have to read it.

4          MR. JULIAN:  All right.  It essentially says, pursuant

5    to those two sentences in the PowerPoint that we quote from the

6    RSA in amendment 1, that the tort committee and the other

7    professionals must accept reasonable registration rights

8    agreements.

9          And the last sentence is important.  It's what Mr.

10   Skikos, Mr. Pitre, and Mr. Kelly were talking about, with which

11   I concur:  "All registration rights agreements with the various

12   shareholders must contain the same rights and limitations just

13   like in those other six bankruptcy cases that Mr. Williams

14   surveyed."

15         And the debtors' only response in their confirmation

16   briefs to those six cases is the following.  "In those cases

17   the shareholders were similar, but in this case we have

18   backstop parties and fire victims."  You know, that's a

19   distinction without a difference for two reasons.  The idea of

20   similar stock offerings refers to preferred stock versus common

21   stock; that's number one.

22         Number two, we have similarly-situated shareholders in

23   this sense.  The debtors are financing their payment of the

24   6.75 billion of cash to the fire victims with stock, and

25   they're financing the payment for that with stock to the

PG&E Corporation and Pacific Gas and Electric Company

1    backstop parties.  It's a swap.  And so there's even a greater

2    connection in this case than the other six cases.  There's an

3    absolute quid pro quo connection between us and the backstop

4    parties dealing with the same bundle of rights and cash and

5    stock.

6         So for those reasons we believe if you put these two

7    sentences in your confirmation order you will do two things.

8    One, you will enforce the RSA settlement; two, you will make it

9    in good faith, because it's fair with everybody else and comply

10   with the industry standard and the other bankruptcy cases; and

11   three -- here's your answer to your question, Your Honor -- you

12   will make this confirmation order feasible.

13        You raised a very good question:  How can I get around

14   the AB 1054 June 30 date if I let you decide whether you're

15   producing a registration rights agreement on July 1?  You put

16   in your order now, these two sentences, basically, that we have

17   consent rights, just like the backstop parties do and just like

18   the RSA says, and that our -- whatever they give to the

19   backstop parties they have to give us, and I can guarantee you

20   this thing is over.

21        THE COURT:  Mr. Julian?  Mr. Julian, I've got to --

22   again, if I sound impatient, I'm really not trying to be.  I'm

23   trying to keep from being overloaded with stuff I have to keep

24   track of.  So please listen carefully.

25        If the other side, which I'm going to assume are the

(973)406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    two groups of parties proposing the plan, the debtor and the

2    shareholder group, if they agree to this language, it's going

3    to take me about ten seconds to say I'll sign it.  If they

4    don't agree to it, I have to work my way through to see if

5    you're entitled to it over their objections or not.

6         And when I'm told I've got to sign an order by next

7    Friday, I say, fine, okay, if I can do it, I'll do it; if I

8    can't, I can't.  But before next Friday, and once you tell me

9    there's been no consent, I've got to have at least a little bit

10   of time to look at this document to make sure I know what these

11   terms mean, to make sure I know what the underlying documents

12   say.  And the fact that I approved them a year ago is of no

13   consequence.  And I simply can't do it if it -- and you make it

14   sound so simple when it's not simple.

15        And I'm not going to mess up the mediation by

16   announcing during this hearing a ruling on something I'm not in

17   a position to announce.  And I realize that if I said here's my

18   take on this to A or B, that might influence people, but that's

19   not my role because it would be irresponsible for me to give

20   you an indication if I agree with you or not on this setting.

21        I certainly agree with you about the emotions and the

22   good faith and the expectations and what all these other very

23   good lawyers and you yourself have said.  But that's not the

24   point; it's whether the law and the documents permit your

25   interpretation versus Mr. Karotkin's.  So I'm not asking for

(972) 406-1250   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    sympathy; I'm asking for just an opportunity to do what you are

2    asking me to do if there isn't the preferable resolution by way

3    of a mediated solution.  Okay?

4            MR. JULIAN:  Thank you, Your Honor, and that's why I

5    think there is freedom and safety if you just adopt the two

6    sentences in the RSA term sheet and the amendment that we have

7    in this order.

8            THE COURT:  So what I want from you or Ms. Attard is

9    today, on the docket, I want these slides, and I want -- I

10   don't want a brief, I don't want thirty pages with table of

11   authorities; I want a cross-reference, perhaps marked up.  You

12   can take a marking pen and mark up the actual document numbers.

13   And again, for my sake, because I'm all by myself in my

14   sheltered home with my laptop, I need to be able to go right to

15   the document, not a cite to Mr. Richardson's declaration, which

16   I then have to go find and find the exhibit to his declaration

17   that has the exhibit to the document.

18           And if it comes down to just simply looking at this

19   paragraph or that paragraph, I will do my best to see whether I

20   agree with you or disagree.  And even if I disagree with you,

21   as a legal matter, doesn't mean I disagree with you with all

22   the objective and emotional things that you've said.  Because

23   you're preaching to the choir.  But that doesn't mean I'm going

24   to be unfaithful to my oath to the rights of other litigants

25   like the debtors and the proponents, okay?

PG&E Corporation and Pacific Gas and Electric Company

1    I don't want to make a speech.  I need you to go on.

2  You asked for an hour; you're almost up to an hour.  Take a few

3  more minutes, and then we'll take a break.  Okay.  I'd like you

4  to finish your presentation if you can.

5    MR. JULIAN:  Thank you, Your Honor.  We will file both

6  a PowerPoint and the two documents and highlight them for you

7  as you requested.  I think it'll be easy to follow.

8    If I could go to the next slide, I'd like to address

9  some of the other objections in the case.  Some people objected

10  to the 1141 discharge.  I think the debtors have responded.

11  I'd just to say that, from our view -- this is a speech for the

12  record -- the plan, we believe, preserves the TCC's and the

13  fire victims' argument that if a tree trimmer or consultant did

14  not file an indemnity claim in this case, they are not going to

15  be able, under 1141, to assert that as a setoff in the fire

16  victims' later lawsuit against them.

17    And here's the reason why, Your Honor.  This is a

18  hundred-percent case.  If anyone had a claim against the

19  debtors, if any tree trimmer or consultant or professional, who

20  we may end up suing, had a claim against the estate, and they

21  had filed it, they'd be paid in a hundred cent dollars.  And so

22  if they failed to pursue that, then they shouldn't be able to

23  go against the Fire Victim Trustand reduce it or even go

24  against the debtor because the debtor will have ended up paying

25  twice for it.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1          Next slide, please.

2          We also support the debtors' position that exculpation

3    should exculpate ordinary negligence.  In your order issued on

4    December 22, 2003 in PG&E 1, at paragraph 26, the exculpation

5    clause that you approved there included ordinary negligence

6    and --

7          THE COURT:  You're going to make sure I'm consistent,

8    right?

9          MR. JULIAN:  Yes, Your Honor.  Well, we think you were

10   right.  I agree with Mr. Karotkin that this is usual, time-

11   tested, and true, and it's also important in this case to note

12   that the exculpation extends to the TCC and its members and

13   lawyers and representatives.  And it's very important, Your

14   Honor, for me especially, because I worked with these folks for

15   a long time, to point out that the representatives of the TCC,

16   who negotiated the RSA and negotiated the mediated results,

17   were the lawyers for individual members on the TCC.  And when

18   they went to those meetings they do so as representatives of

19   the TCC.  And so, in my view, they are included within the

20   exculpation as representatives as well as lawyers.  And we will

21   document that properly within the TCC to make sure we have the

22   predicate established for the full exculpation for everyone

23   here.

24          If I could go to the next slide.  You asked me a

25   question about the securities litigation, Your Honor.  Boy, I

operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    could probably talk for an hour-and-a-half on this, just like,

2    Mr. Etkin did, but I'm not going to.  I will only say that we

3    are going to request, and we will submit a proposed language

4    for your confirmation order that says that the securities

5    plaintiffs' claims are subordinated, which the plan already

6    says.  I do admit the plan already says they are subordinated

7    under 510(b).  But we also need this in your order, that any

8    stock issued to them may not dilute the percentage of stock

9    owned by the fire victim trust.

10        THE COURT:  Well, I think you're mixing two concepts

11   because you can reduce -- you can dilute without reducing

12   percentage, right --

13        MR. JULIAN:  Well, here's the point.

14        THE COURT:  -- because it just dilutes everybody else.

15        MR. JULIAN:  But it comes out of old equity; it

16   doesn't come out of us.  Otherwise --

17        THE COURT:  Well, I understand that.

18        MR. JULIAN:  Right.

19        THE COURT:  And you don't have to state the obvious.

20   But to me the sentence is internally inconsistent because this

21   is something that Mr. Richardson, I think, raised months ago.

22   And I wondered why is he making such a big deal of this.  If

23   there's a guarantee that the TCC will get -- and I believe it

24   was, what, 20.1 or 21 point something -- then the way you deal

25   with it is you dilute the other eighty percent.  It's that

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    simple, so --

2          MR. JULIAN:  We're in agreement.

3          THE COURT:  Okay.  Then I don't need to have an order

4    to state the order must do what it has to do.  I mean, the

5    concept is the same we're talking about.  Is this a

6    controversy?  I haven't heard any argument from the securities

7    plaintiffs.  The debtor and the proponents aren't fighting this

8    provision, are they?

9          MR. JULIAN:  When the -- yes and no.  When the

10   argument shifted --

11         THE COURT:  Well, I'll make your life easy.  This is

12   easy.

13         MR. JULIAN:  Thank you.

14         THE COURT:  I'll do it this way but not with the

15   inconsistent concepts.  I'll do this provision with the concept

16   being consistent.

17         MR. JULIAN:  Your comments on the record -- your

18   ruling on the record, so to speak, is fine with me, Your Honor.

19         THE COURT:  Okay.

20         MR. JULIAN:  We can go to the next slide.  We prepared

21   this for you just so you could see that the question raised

22   earlier as to whether or not the government settlements were

23   binding on the trustee, that clause is in the settlement

24   agreement itself.  I understand the argument morphed a little

25   bit today to something else, but I just wanted you to know that

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   the clause is in the settlement agreements themselves that

2   they're binding.

3          Next slide, please.

4          THE COURT:  Wait a minute.  Well, I believe it's the

5   trustee's lawyer that wants belts and suspenders here for the

6   reason that he said this morning.

7          MR. JULIAN:  Well, there are two questions presented,

8   fairly.  The first question, raise by Mr. Pascuzzi was whether

9   the settlement was binding on the trustee.  The second point,

10  raised by the fire victim trustee, in my view, is a very simple

11  one:  Can the fire victim trustee and its oversight committee

12  amend a trust agreement to provide for anything?  The answer is

13  yes.  And if they want a release for themselves because some

14  litigation happens later on, in my view, that's perfectly

15  within their business judgment.  But so I just think there are

16  two different issues for Your Honor.  One is --

17         THE COURT:  But I think I dealt with the trustee's

18  authority with the ruling that I made a couple weeks ago with

19  the trust objection.  And I believe I insisted on some court

20  oversight if there is --

21         MR. JULIAN:  Yes.

22         THE COURT:  -- some variation in the material.

23         MR. JULIAN:  I understand that.

24         And then last but not least, let's see; I think I have

25  one more slide here.  Yes, you asked about estimation.  So the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    debtors requested two orders, as you may recall, in the RSA.

2    One was a 9019 settlement order, which you granted on, I think

3    it was December 16th, and then a backup order.

4         Let me explain why the debtors were being careful in

5    asking for two orders. One is under AB-1054, the fire victims

6    have to be treated fairly either in a settlement agreement --

7    it doesn't say settlement agreement -- but then says their

8    claims are paid according to an agreement or according to the

9    value estimated, essentially, was what it means.

10        So the debtors and the shareholder plan proponents

11   tried to be careful. They went for both types of orders. They

12   only needed one. So they already had complied with AB-1054 by

13   getting the 9019 settlement order in which Your Honor approved,

14   basic construct of RSA settlement, as being fair and reasonable

15   and proper in this case. So later on, they went forward to get

16   sort of a belt-and-suspenders estimation order. We don't have

17   that entered by Judge Donato yet.

18        I will tell you that one of the issues raised is that

19   some of the parties -- you know, they think they're smarter

20   than Mr. Orsini and me -- they want an estimation order that

21   just says 13.5 on it. And Mr. Richardson and I and Mr. Orsini,

22   we correctly note that the true value here is not just 13.5 of

23   cash and stock but it's cash and stock, it's the assigned

24   claims, it's the assigned rights, it the assigned policies, a

25   whole bundle of rights which have great value.

PG&E Corporation and Pacific Gas and Electric Company

1    So we have asked Judge Donato to estimate in that type

2 of framework.  If he's uncomfortable doing that, we've simply

3 pointed out that we have our 9019.  My only point to you is in

4 view of the settlement order, we don't think an estimation

5 order, a pendency can hold up this plan confirmation.  But we

6 haven't heard from Judge Donato yet on that.  And I just wanted

7 you to know our position on that.

8    THE COURT:  Yesterday -- did you hear that suggestion

9 yesterday that some people believe that Judge Donato should be

10 requested to dismiss this case?  Is that still on the table?

11    MR. JULIAN:  I've heard that.  Mr. Orsini and I have

12 not requested that.  We have asked him to enter the estimation

13 order the way I mentioned.

14    THE COURT:  No.  I know you haven't talked -- no.

15 Well, I read the transcript of the hearing the other day, on

16 the 30th or 28th or whatever it was, in front of Donato.  But I

17 believe Mr. Marshack, yesterday, said he had discussed with

18 both official committees a prospective suggestion that Judge

19 Donato not do anything.  Again, I'm not taking a position on

20 this.  Is this slide an action item for me?

21    MR. JULIAN:  No.  It's information because you asked

22 the question.  I'm answering the question.

23    THE COURT:  Okay.  But answer it lay terms again.

24 Suppose the rights thing is resolved, suppose we get all these

25 other belt-and-suspenders taken care of, and I sign the order,

PG&E Corporation and Pacific Gas and Electric Company

1    but Judge Donato hasn't signed his order.  What happens?  What

2    happens on Friday?  What happens to the funding?  What happens

3    to the effective date in your mind?

4             MR. JULIAN:  Yeah.  I do have a position on that, Your

5    Honor, but I'd like to hear from Mr. Karotkin first on that

6    because it is being discussed amongst both firms.

7             THE COURT:  Well, I'll just make this proposal.  I'm

8    steadfast in not even interjecting myself or attempting to

9    interject myself before Judge Donato.  I don't believe that's

10   appropriate.  But if Judge Donato perhaps needs to be reminded

11   that he should do something more quickly, I'm not bashful about

12   telling him -- particularly if I am going to sign my order, to

13   say, by the way, they're waiting for you order.

14            But sometimes it's be careful what you ask for.  So

15   I'll -- look, you don't have to respond, Mr. Julian.  You, the

16   debtors' lawyer, and if there's anyone else that wants me to be

17   involved in at least judge-to-judge, on-the-record-kind of way

18   asking something to happen, all you have to do is ask me.  And

19   I'll --

20            MR. JULIAN:  We'll get back to you, Your Honor.

21            THE COURT:  Okay.

22            MR. JULIAN:  But in our position, the plan can go

23   effective without the estimation order because you've approved

24   the settlement as fair and reasonable under 9019.

25            Last slide, Your Honor, last but not least, we believe

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    that the confirmation order should simply confirm that it does

2    not release the insurers of any of their obligations to the

3    fire victims.  This is important because, Your Honor,

4    representations were made to you when you approved the

5    subrogation settlement, that there was 3.6 billion dollars in

6    reserves ready to be paid out to the fire victims.  And Your

7    Honor, I must tell you, you know, we all took that into account

8    when we settled at the 13.5 billion dollar number plus the

9    assigned rights and claims.  The 3.6 billion of extra,

10   additional reserves has to come in.

11          Now, I'm not asking you to order that, but we do want

12   the confirmation order just to simply recite that nothing in

13   the confirmation order shall be deemed to release any insurer

14   of their contractual or common law obligations.  We do have

15   that one narrow release that the TCC and the fire victim

16   professional negotiated with subro.  We stand by it.  We think

17   it was a good compromise in mediation.  And that is of record

18   in this case.  But otherwise --

19          THE COURT:  Has Mr. --

20          MR. JULIAN:  -- we think.

21          THE COURT:  Has Mr. Feldman agree to this position?

22          MR. JULIAN:  We're going to run it by him, Your Honor.

23          THE COURT:  Well, again, it's like so many other

24   things.  If he agrees to it, you won't get any resistance from

25   me.  And if he doesn't agree, I don't know whether it's

(973) operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1   appropriate or not, but I probably would want to make sure that

2   he has been heard on the subject, so --

3           MR. JULIAN:  Yes, Your Honor.  Absolutely --

4           THE COURT:  Mr. Julian, it sounds pretty bland or

5   benign.  But again, what would I know?

6           MR. JULIAN:  Your Honor, that concludes my remarks.

7   Once again, I want to thank you and just reiterate that your

8   seven rulings that you made, that I outlined before, are very

9   similar, I think, to the request we make today for the fire

10  victims with respect for registration rights:  enforcing simply

11  the words in the RSA settlement agreement that we negotiated

12  and that you approved; and secondly, making sure that whatever

13  rights are given to any other shareholders are given to us.

14          THE COURT:  Okay.  Thank you for your very thorough

15  presentation, Mr. Julian.

16          MR. JULIAN:  Thank you, Your Honor.

17          Mr. Karotkin, I don't know about you, but I'm kind of

18  overloaded.  How are you doing?

19          MR. KAROTKIN:  Yeah.  I'm kind of overloaded too.

20          THE COURT:  Well, I had in mind perhaps hearing from

21  you and Mr. Johnston based upon the kind of stuff that Mr.

22  Julian just talked about.  Again, I wish and hope that there is

23  a successful resolution.  But I feel at a point where --

24  whether I'm physically tired, I'm not.  I'm just sort of

25  mentally trying to keep track of all these things.  And your

(973) 406-2250 operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    closing argument and Mr. Johnston's argument, particularly on

2    the issues that are framed in the security --

3            MR. JULIAN:  Oh, Your Honor --

4            THE COURT:  -- are important, and I don't want -- I

5    don't want to give them a short shrift.

6            Yes, Mr. Julian?

7            MR. JULIAN:  I apologize.  I forgot.  There was one

8    thing I wanted to help out with.  You had a motion for an

9    examiner.  I just wanted to inform you that, again, whether you

10   appoint an examiner in subject to your discretion, but I wanted

11   you to know that when these voting complaints came up about

12   irregularities, we established a Baker review team, due

13   diligence team, to work Mr. Karotkin's firm and Prime Clerk.

14           Mr. Karotkin's firm and Prime Clerk turned over all

15   documents that we requested in order to investigate whether

16   there were irregularities on a systemic basis and whether that

17   affected the vote.  We've gone through 75 percent of the data

18   turned over by Weil, Gotshal, and Prime Clerk.  And our

19   preliminary conclusion was that we didn't see anything that we

20   believed affected the 66 percent threshold though.

21           We obviously wanted to go through it some more, but if

22   Your Honor wanted to, in response to the questions raised by

23   victims -- they weren't necessarily asking for an examiner.

24   They just wanted to know what the answer to the question was.

25   If Your Honor wants us to, the TCC would be happy to conclude

(972) 498-8080   operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    its investigation and file a report with the Court in case Your

2    Honor doesn't want to go through the expense and bureaucracy of

3    having an examiner in the case.

4              THE COURT:  Well --

5              MR. JULIAN:  We are fiduciaries to all the victims,

6    and we will give a proper report if Your Honor requests us to

7    do so.

8              THE COURT:  Well, there weren't -- a couple of quick

9    responses.  I was, frankly, surprised that I didn't hear from

10   you in a formal sense from the TCC in response to the motion.

11   And I was also, for other reasons, surprised that I didn't hear

12   from the United States trustee, but that's a different issue.

13   And I took the matter under advisement, and if I choose to

14   order one, I don't get to select the one anyway.  The US

15   Trustee has to do the selection.

16             But I think it would have been helpful if what you

17   just said was stated on the record.  So I'd appreciate if you

18   would -- not a tonight, panicked, Friday-night thing.  You got

19   to deal with high priorities.  But next week, I really think it

20   would be helpful if you would put something on the docket that

21   summarizes what you just said.

22             And I will make a decision regardless of what you just

23   said.  In other words, I will decide whether I think there

24   should be an examiner or not.  And if I think there should be,

25   the examiner and Baker & Hostetler and you should probably

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    coordinate.  If I decide no, for whatever reason, then maybe

2    you could perform a wonderfully valuable service for the people

3    that want the answers to the question and don't -- and that was

4    the thrust of several of the people that spoke yesterday.  So

5    you don't need to respond.  I'm not mad at you.  You've had

6    your hands full.

7          MR. JULIAN:  Well, I would like to inform you.  So on

8    the day that the response was due, we weren't through enough

9    data.  We continued our response.  And so then I was not called

10   into the courtroom on that motion, and so I raised my hand at

11   the end -- you may remember -- but I got caught up in the Will

12   Abrams and everybody else.  And you had asked me not to come

13   into the courtroom.  So I was ready to report to you.

14         But Your Honor, it's an important point.  We are

15   prepared to file something.  And I note Mr. Karotkin's comments

16   and his point.  He didn't say it explicitly, but I think he

17   said it impliedly.  When you get someone like a special

18   prosecutor or examiner into a case, they become their own sort

19   of bureaucracy and they have to justify themselves, so to

20   speak.

21         And I do see Mr. Karotkin's point that there could be

22   delay in the case because of that.  Because the TCC represents

23   the interest of all fire victims and is a fiduciary, we are

24   happy to continue our due diligence and file a report.  I will

25   file a preliminary report on Monday or Tuesday as you

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    requested.

2           THE COURT:  I took the matter under advisement the way

3    I did.  The fact that I might have missed you on your hand-

4    raising thing, I know you too well and you're too thorough and

5    your firm is too thorough.  I would have assumed that you would

6    have filed something if you wanted to take a position.  And to

7    be honest with you, I probably thought that your nonfiling was

8    a statement of no position.  And so it's okay.  It's fine what

9    you did.

10          What I'm getting at is that I'm still going to make a

11   decision up or down based upon the arguments that were placed

12   on the record yesterday or whenever it was.  And I'll also tell

13   you that as much as I'm concerned about some of the things that

14   were raised by some of the people who spoke, in terms of

15   priorities, we've got some higher priorities to deal with.  You

16   do.  I do.  Mr. Karotkin does.

17          And I just don't have drafting a decision on the

18   examiner motion on my top of the list, especially with what

19   we've talked about in the last couple of hours.  So you go

20   ahead and file something.  The motion for the examiner will

21   stay submitted.  I will get to it when I can.  And that's

22   what'll happen just like any other ruling.  Okay.

23          MR. JULIAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Karotkin, I think you were just

25   agreeing with me that you're tired.  And I'm tired.  And so I'm

PG&E Corporation and Pacific Gas and Electric Company

1    inclined to think that if I can get my internet to work, we

2    should just conclude these matters on Monday.  And sort of in

3    reverse order, you and Mr. Johnston as the closers, if you

4    will, but before that, Mr. Bray or any of the counsel for some

5    of the points that are still open and maybe still will get

6    resolved.

7         I mean, look, we got the short list of what was not

8    resolved today by the various paragraphs that were mentioned.

9    Based upon your comments, I believe I would be safe in -- if I

10   do make the decision to order the plan confirmed by next

11   Friday, I think I would be safe in not closing the loop on each

12   and every item that's open.  I mean, I don't think that whether

13   paragraph such-and-such that deals with eminent domain is going

14   to impact the financing efforts once there's an order.  But

15   again, that's just a risk I take.

16        MR. KAROTKIN:  I can confirm that eminent domain has

17   been resolved, so you can sleep easy tonight.

18        THE COURT:  Say that again, please.

19        MR. KAROTKIN:  I can confirm that eminent domain has

20   been resolved, so you can rest easy tonight.

21        THE COURT:  Okay.  But you know what I meant.

22        MR. KAROTKIN:  I do.  I do.

23        THE COURT:  I think points like Mr. Julian's point

24   and -- well, I mean, obviously, Mr. Julian's point is a

25   significant one.  Well, I'm actually going to ask you a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    question again in just a minute.  I was just reflecting it has

2    been a long day even with my interruptions, and I don't even

3    know, for example, if the securities litigation issue, which

4    are critical issues, are so time sensitive.  And I can take my

5    chances on that.

6         But now I want to go back to my finished product.  You

7    and I never met before last January 29th, but you've learned a

8    little about my style, and I've learned a lot about yours.  I

9    prefer to have reasoned decisions in the form of memoranda and

10   sometimes intentionally not signing an order.  Would it suffice

11   for the marketplace and, to term loosely, the money-raisers to

12   have a memorandum that isn't technically an order that

13   indicates that if I'm satisfied, I will sign a confirmation

14   order?  Or do they actually have a real -- real order have to

15   be signed?

16        MR. KAROTKIN:  Your Honor, I'm not exactly sure.  I

17   would like to -- if I could have the opportunity to speak with

18   them over the weekend.

19        THE COURT:  Okay.

20        MR. KAROTKIN:  I could let you know first thing Monday

21   morning.

22        THE COURT:  Well, keep in mind again that, I mean,

23   when we get down to paragraph 41 and paragraph -- so the

24   paragraphs that were mentioned about the securities thing, and

25   some of the things that are literally not significant -- I

(973) 406-2250 | operations@escribers.net | www.escribers.net

PG&E Corporation and Pacific Gas and Electric Company

1    mean, look, they're significant in everyone's case, but they're

2    not significant in these big ticket items.  So when you tell me

3    that eminent domain's resolved, that's fine, but that still

4    means it's going to be reflected somewhere in an order.

5         So it would seem to me that those are the kinds of

6    things that don't have to have the word order on it, but the

7    word order often triggers appeal times.  And I believe that if

8    I sign an order confirming the plan, that triggers appeal

9    rights.  And I don't know that you want appeal rights -- well,

10   I don't know.

11        I'll tell you what.  If I issue a memorandum that

12   says, based upon this and this and this, I will do something,

13   if that is enough to set things in motion that have to be dealt

14   with in such a time-sensitive basis, then it makes it a little

15   easier for all of us to end up with a real order that then

16   triggers the appeal events, satisfies AB-1054, and gets done on

17   a more deliberate basis.  Why don't you put that on your list

18   of things to get to get back to me on when we talk on Monday?

19        MR. KAROTKIN:  I have it.  Thank you, sir.

20        THE COURT:  You want me to -- well, okay.  In another

21   situation or circumstances, not because it's Friday afternoon

22   or evening in New York or so vitally urgent that I had to

23   impose on everyone to work on Saturday or Sunday in court, I

24   would do that.  I think I can risk that, give everyone their

25   lives to lead and just resume hearing the confirmation at 9:30

PG&E Corporation and Pacific Gas and Electric Company

1   on Monday morning with the understanding that --

2           Again, Mr. Karotkin, I'll ask you to be in touch with

3   the other principal counsel so that Mr. Bray particularly, any

4   of the other counsel that we heard from this morning want to be

5   heard, and then you and Mr. Johnson will have the opportunity

6   to make your closing arguments.

7           I still, once again, have hands up from Ms. McDonell

8   and Mr. Abrams.  I'm simply not going to deal with them today.

9   I don't mean to be rude to them.  I simply have my hands full,

10  and I cannot take the time to deal with them today.  I'll do my

11  best to hear from them on Monday.

12          All right.  So unless either of you principal counsel

13  have any objections, I'm going to thank you for your long day

14  and wish you a productive weekend.  I can't just say a happy,

15  fun weekend.  Go get your job done, Mr. Julian.  Get that thing

16  mediated.  Send my regards to Judge Newsome.

17          MR. JULIAN:  He's listening right now, Your Honor.

18  Guy --

19          THE COURT:  I wouldn't know.  I'm not even look -- I

20  didn't ask him to put up his hand.  Tell him I've identified

21  him as my secret weapon.  I've threatened to turn him loose on

22  some other cases too, so.  All right.  Thank you all for your

23  time.  Thank you to my staff, Ms. Parada, Ms. Thomas.  Thank

24  you everyone for participating.  Stay well.  I'll look forward

25  to Monday morning.

PG&E Corporation and Pacific Gas and Electric Company

1          MR. KAROTKIN:  Thank you.

2          THE COURT:  And Mr. Julian, I'll look forward to

3    something from you and your colleagues on the docket as quickly

4    as this evening so I can start to review them, okay?

5          MR. JULIAN:  Thank you, Your Honor.

6          MR. KAROTKIN:  Thank you.

7          THE COURT:  Thank you very much.

8          (Whereupon these proceedings were concluded)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1       C E R T I F I C A T I O N

2

3    I, Linda Ferrara, certify that the foregoing transcript is a

4    true and accurate record of the proceedings.

5

6

7        *Linda Ferrara*

8    _____

9
     /s/ LINDA FERRARA
10

11
     eScribers
12
     7227 N. 16th Street, Suite #207
13
     Phoenix, AZ 85020
14

15
     Date:  June 8, 2020
16

17

18

19

20

21

22

23

24

25

(973) 406-2250 operations@escribers.net | www.escribers.net

# #

**#207 (1)**
188:12

# $

**$17.74 (3)**
89:6,8,25
**$22.2 (1)**
59:15
**$24.01 (1)**
89:7
**$68.25 (2)**
84:17;95:2
**$69.29 (2)**
84:15;85:1

# /

**/s/ (1)**
188:9

# A

**AB (6)**
51:21;52:14;64:2;
122:7;158:20;166:14
**AB-1054 (3)**
174:5,12;185:16
**ability (2)**
41:24;42:20
**able (18)**
22:16;31:14;38:11;
46:22;50:5;68:1;73:9;
85:7;86:1,4;101:23;
111:8;119:3;150:9;
151:2;168:14;169:15,
22
**above (2)**
94:6;142:22
**Abrams (10)**
25:6,7;44:4;46:5;
50:22;53:25;137:21;
145:5;181:12;186:8
**Abrams' (1)**
44:22
**absence (2)**
51:18;112:10
**absent (3)**
45:2;60:24;94:18
**absolute (3)**
102:25;121:11;166:3
**absolutely (5)**
24:2;82:10;96:10;
101:4;178:3
**absorb (1)**
154:9
**accept (7)**
41:20;42:7;125:21;
140:3,15;157:17;165:7
**acceptable (8)**

12:2,21,22;57:21;
62:22;151:25;153:18;
157:5
**acceptance (1)**
140:2
**accepted (2)**
22:5;102:15
**access (2)**
45:16,20
**accomplish (2)**
115:18;127:15
**accomplished (2)**
43:2;142:17
**accordance (2)**
35:19;150:18
**according (2)**
174:8,8
**account (16)**
80:21,25;94:17;97:1,
11,13,19;98:16,18,20;
106:10;113:12,14,24;
123:24;177:7
**accounted (2)**
86:21;92:17
**accurate (2)**
13:23;188:4
**acknowledge (3)**
69:3;74:6;103:3
**acquire (1)**
20:17
**acquired (1)**
41:12
**across (3)**
142:24;162:16,21
**Act (4)**
61:8,14;95:9;125:25
**acting (2)**
60:16,19
**action (10)**
20:24,25;21:2;22:21;
23:13,14;66:2;101:17;
133:24;175:20
**actions (6)**
20:14,15;21:6,14;
23:3;41:17
**active (1)**
58:17
**actual (4)**
51:11;59:5;138:6;
168:12
**actually (32)**
17:24;18:17;36:10;
42:21;46:3;55:11;
56:10;63:16;72:25;
74:25;75:15;77:9,16;
78:13;79:6;87:3;
101:17,18,18;102:5;
103:17;110:12;111:1,
18;135:7;138:7;142:9;
147:21;153:12;164:14;
183:25;184:14
**add (8)**
25:17;39:16;45:11;

73:2,7;142:5;146:8;
147:15
**adding (3)**
73:20;95:13;139:8
**addition (3)**
23:13;27:13;107:16
**additional (10)**
5:3;22:2;26:7;27:12;
61:12;72:24;104:2;
116:16;119:8;177:10
**address (31)**
5:6;9:11,13;11:1;
13:4,24;15:21;18:15;
21:23;24:12;57:24,24;
64:6,9,20;120:20;
122:4;123:16;124:18;
127:17;128:23;131:20;
137:6,7;141:23;
142:14;145:7;149:17;
155:22;158:16;169:8
**addressed (7)**
11:18,18;21:25;
96:14;116:2;142:15;
158:18
**addresses (3)**
13:11;119:23,25
**adequate (1)**
142:11
**Administration (4)**
30:20;31:3;131:25;
141:11
**administrative (3)**
21:1;33:12,15
**administrator (7)**
27:3,8,11;28:21;
29:22,23;58:14
**administrators (1)**
150:12
**admirably (1)**
115:8
**admire (1)**
110:1
**admit (1)**
171:6
**adopt (2)**
137:17;168:5
**adopted (2)**
69:9;133:7
**adopts (1)**
70:25
**advance (4)**
21:15;59:9;63:17;
94:25
**advanced (2)**
132:2,15
**advancing (1)**
23:19
**Adventist (3)**
16:5;36:14;37:23
**advised (1)**
138:5
**advisement (2)**
180:13;182:2

**advisor (1)**
162:10
**advisors (4)**
29:23;30:17;150:16;
160:16
**advocacy (1)**
154:19
**advocating (1)**
154:12
**affect (1)**
95:25
**affected (2)**
179:17,20
**affecting (1)**
66:2
**affects (1)**
39:1
**affiliate (6)**
70:19;74:9;149:12,
13,25;150:7
**affirmative (1)**
65:11
**affirmatively (1)**
46:23
**afraid (1)**
115:21
**afternoon (14)**
24:25;26:1;55:6;
85:20;86:2;121:1,7;
128:3,6,8,17;130:16;
159:22;185:21
**again (47)**
14:2;17:6;18:11;
21:20,23;23:4,21,23;
25:13;27:15;28:13;
32:1;37:4;63:4;71:17;
88:3,20;89:10;93:3;
96:9;99:23;102:1;
108:25;116:24;118:20;
121:3;123:4;124:5;
130:25;133:18;154:24;
157:24;166:22;168:13;
175:19,23;177:23;
178:5,7,22;179:9;
183:15,18;184:1,22;
186:2,7
**against (76)**
8:1;31:7;61:7,8,10,
15;63:12;64:17;65:16,
20,24;66:12,14,25;
67:3,21;68:6,10,10,20,
23;69:5,10,19,21;
70:13,17,22;71:4,12,
13,14,15,16,18,21;
72:3,13,15,17;73:3,20,
25,25;74:1,7;89:19,17;
97:5,9,12,13,19,21;
98:1,3,10,17,19,20;
99:6,21;100:9;101:7;
102:11;103:4;113:6;
116:22;133:24;138:4;
139:12,15;169:16,18,
20,23,24

**advisor (1)**

**agencies (7)**
4:24;10:4;25:13;
26:4;28:12;32:4;33:13
**agency (4)**
21:1;26:9;34:9;
138:22
**agenda (1)**
54:7
**aggregate (2)**
59:14;153:19
**ago (14)**
10:20;12:20;21:25;
22:4;29:2;98:22;
144:12;153:4;155:6;
158:2;159:6;167:12;
171:21;173:18
**agree (21)**
13:14;14:2;21:9;
24:8;45:2;52:18;74:21,
24;83:10;93:23;94:2;
109:7;148:18;167:2,4,
20,21;168:20;170:10;
177:21,25
**agreeable (2)**
41:25;43:11
**agreed (2)**
15:7;48:15;148:17;
152:25;153:1;154:6;
155:18;156:21
**agreeing (1)**
182:25
**agreement (77)**
4:15;9:8;26:3,9,10,
14,16;27:2,6,10;29:2,
19,19,20;30:13,19,24;
31:4;32:8;33:23,23,24;
34:6;39:1;43:4,5,12,
13;50:11,24;51:18,25;
52:3,18;53:6;91:9;
93:16;131:12;136:23;
137:3;140:4;147:12,
18;149:17;150:22;
151:1,7,11,14,16;
153:8,17,24;156:13,14,
15,21;157:6,7,9,12,14,
17,19;158:1,23;161:6;
164:4,15;166:15;
172:2,24;173:12;
174:6,7,8;178:11
**agreements (26)**
26:10,15,20,25;
27:15,17;28:7;29:18;
30:19;31:2,14,17;
33:20;35:24;146:24;
147:23;153:6,12;
161:18;162:11,12,13,
19;165:8,11;173:1
**agrees (2)**
95:22;177:24
**ahead (14)**
27:24;39:8;41:9;
57:17;63:11;90:1;96:6;
100:22;102:2;139:10;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 189
of 219

157:3;159:8;163:25;
182:20
**air (2)**
24:23;89:20
**al (1)**
29:19
**alignment (1)**
100:1
**allegations (3)**
68:21;78:22;100:18
**allege (1)**
101:21
**alleged (6)**
78:11;82:1,2;88:6;
90:16;113:13
**allocate (1)**
74:18
**allocated (2)**
54:19;57:16
**allocation (3)**
75:5,10;91:3
**allow (2)**
8:7;132:9
**allowable (1)**
92:15
**allowance (3)**
74:3;77:14;114:16
**allowances (1)**
81:21
**allowed (19)**
8:15;74:15;76:6,22,
23,23;77:2,3,4;80:22,
25;81:5,16,17;82:12;
96:8,11;113:8;114:10
**allowing (1)**
111:2
**allows (1)**
86:25
**alluded (1)**
112:10
**almost (2)**
139:7;169:2
**alone (2)**
20:9;137:25
**along (4)**
8:16;19:2;92:1;
93:17
**Alsup (2)**
143:6,15
**Alsup's (3)**
47:20;143:13,16
**alter (1)**
110:7
**alternative (3)**
79:23;146:7,10
**alternatives (1)**
113:11
**although (5)**
65:18;117:10;
124:17;135:18;158:16
**always (2)**
44:10;105:18
**ambiguity (1)**

**67:7**
**amend (2)**
153:4;173:12
**amended (6)**
62:3;68:18,22;78:11;
90:16;153:1
**amendment (10)**
140:9;151:8,9,10,14;
152:11,16,21;165:6;
168:6
**American (1)**
67:13
**among (3)**
11:13;50:15;59:13
**amongst (1)**
176:6
**amount (24)**
6:15;15:18;70:7;
76:6,9;77:10,12;79:19;
80:22;81:1,2,5,7,18;
82:12,16;84:11;87:3,
22;92:12;113:24;
133:21;137:25;139:5
**amounts (8)**
7:21;81:13,14;82:9,
22;102:15;147:15,16
**ample (1)**
104:11
**analysis (3)**
76:2;79:17;100:19
**and/or (2)**
48:21;95:18
**Andrew (2)**
56:8;58:7
**announce (1)**
167:17
**announcing (1)**
167:16
**anticipate (2)**
154:8,15
**anyways (1)**
102:2
**apart (2)**
103:6;136:6
**apex (1)**
115:3
**Apologies (1)**
56:25
**apologize (8)**
14:16;57:1;73:10,12;
80:2;118:23;119:1;
179:7
**apologizing (1)**
85:18
**apparently (2)**
16:15;18:18
**appeal (4)**
185:7,8,9,16
**appeals (1)**
52:12
**appearance (7)**
19:6;37:1,8;55:5;
56:5;128:1,7

**appearing (3)**
19:12;128:4;131:1
**appears (3)**
63:2;65:18;85:3
**appellate (1)**
125:4
**appended (1)**
30:13
**appendix (1)**
32:9
**appendixes (2)**
32:10,12
**applied (2)**
66:24;150:4
**applies (2)**
66:7;97:7
**apply (2)**
99:6;162:15
**appoint (1)**
179:10
**appointed (6)**
60:10,11;112:11,13;
135:23,25
**appointment (2)**
60:5,9
**appreciate (13)**
13:21;19:24;39:18,
21;43:21;54:3;55:19;
63:14;109:14;110:3;
117:21;154:18;180:17
**approach (4)**
91:18;114:19,20;
137:16
**appropriate (10)**
9:12;13:4;17:3;
93:12;113:10,16;
119:21;120:10;176:10;
178:1
**approval (8)**
43:8;48:9,10;136:13,
13;144:19,20;145:1
**approve (9)**
50:13,14;135:22;
137:2;155:12,13,17;
161:16;163:22
**approved (16)**
16:2;26:11;27:14;
43:4;119:20;122:11;
131:8;137:4;159:6;
161:16;167:12;170:5;
174:13;176:23;177:4;
178:12
**approving (2)**
26:20;42:17
**approximately (2)**
37:17;141:7
**April (3)**
49:1;61:25;142:1
**arbitrary (4)**
79:24;84:22;86:9;
91:19
**arbitration (3)**
48:14;53:12,17

**area (2)**
20:5;127:1
**areas (1)**
63:19
**arguably (2)**
147:16;150:8
**argue (4)**
7:19;8:20;12:24;
24:16
**argued (4)**
7:16;29:10;78:5;
104:24
**argument (37)**
4:18;7:23,25;25:22;
27:16,19;54:18;55:13,
19;62:10;63:11;64:19;
65:6;66:18;104:14;
105:3;110:3;120:4;
124:24;125:21,22;
127:14;129:8;135:17;
137:1;140:19;146:22;
147:2;154:14,20,24;
169:13;172:6,10,24;
179:1,1
**arguments (10)**
16:19;17:8;64:7;
96:18;120:22;128:14;
132:10;135:7;182:11;
186:6
**arising (6)**
68:4,7;69:18;70:18;
74:8;105:23
**arm's (1)**
29:3
**Arnold (1)**
37:5
**around (7)**
5:23;39:6;52:10;
67:12;132:17;150:12;
166:13
**arrived (1)**
77:12
**art (1)**
135:18
**Article (2)**
65:22;66:7
**articulated (1)**
70:4
**artificial (2)**
94:7;105:15
**artificially (1)**
68:14
**A's (3)**
6:7,15;79:14
**aside (4)**
52:11;76:20;93:4,4
**aspect (3)**
40:15;41:10,15
**assert (2)**
61:14;86:9;99:17;
169:15
**asserted (16)**
61:21;66:11,25;

68:17,23;71:11,11,13,
14,15,16,17;72:13,15;
90:5;96:17
**asserting (1)**
59:1
**assertions (2)**
106:24;107:4
**asserts (2)**
61:5,8
**assets (2)**
20:18;139:16
**assigned (7)**
134:9;138:4,23;
174:23,24,24;177:9
**assignment (7)**
48:23;50:20;54:20;
121:9;133:24;134:4;
135:4
**assist (1)**
137:13
**Association (1)**
58:8
**assume (9)**
6:7,20;7:19;66:15,
23;94:3;98:9;156:21;
166:25
**assumed (2)**
66:19;182:5
**assumes (1)**
6:7
**assuming (3)**
99:23,24;121:10
**assumption (1)**
10:24
**astronomical (1)**
101:21
**AT&T (1)**
37:6
**attach (1)**
63:5
**attached (3)**
26:22;27:4;116:13
**attain (1)**
113:4
**Attard (10)**
130:2,4,9,14,16,17,
24;131:20;157:2;168:8
**attempt (4)**
8:25;65:18;112:23;
143:4
**attempting (1)**
176:8
**attendance (1)**
56:10
**attending (1)**
136:7
**attention (3)**
38:13,17;143:13
**attorney (1)**
40:1
**attorneys (2)**
26:1,2
**attractive (2)**

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 190
of 219

136:22;145:8
**attributable (1)**
98:12
**audience (4)**
25:21;36:1;39:6;
127:20
**audio (18)**
45:17,17,19;46:18;
62:12,15,23,24,25;
63:4;73:8,11,12,14;
76:19;85:11;134:10;
138:8
**August (3)**
52:16;140:24;141:3
**aunts (1)**
42:22
**authorities (1)**
168:11
**authority (1)**
173:18
**authorized (1)**
54:19
**AUTOMATED (1)**
7:9
**availability (1)**
129:4
**available (3)**
47:13;62:21;91:21
**Avaya (1)**
162:24
**avoid (1)**
144:7
**avoidably (1)**
41:22
**awaiting (1)**
62:5
**award (1)**
109:11
**aware (7)**
23:6;35:22;74:14;
98:25;109:1,2;124:25
**away (8)**
32:18;88:9,9,9,10,
14;140:10;152:19
**AZ (1)**
188:13

**B**

**back (46)**
7:6,10;11:8,12,23;
12:15,20;14:7;16:8;
25:5,21;34:4,17;36:1;
38:4;39:6;43:7;50:6;
54:17;76:10;85:10,12;
89:2,20;91:22;93:11;
99:23;107:22;110:18;
113:4;114:17;127:25;
135:22,23;137:20;
142:1;154:10;159:8;
160:7;163:11,18,22;
164:10;176:20;184:6;
185:18

**backers (2)**
41:14;42:18
**background (7)**
31:10,21;32:25;
133:13;136:15;146:20;
149:10
**backstop (37)**
42:19;43:18;45:6;
48:8,11,21;49:11;51:9;
140:1,3;144:16;
146:23;147:17,22;
148:24;152:14;153:8,
11,14,17,19;154:1,23;
155:8,9;158:1;160:7;
161:2,18;162:3,6;
163:12;165:18;166:1,
3,17,19
**backup (1)**
174:3
**bad (4)**
27:9;57:13;143:4;
146:10
**bailed (1)**
5:25;77:19;92:9
**Baker (6)**
128:4;130:17;131:1;
141:19;179:12;180:25
**ball (1)**
125:1
**balls (1)**
24:23
**bankers (1)**
150:16
**bankruptcy (38)**
6:6,12,17;21:7;
34:14;47:22,23;48:25;
50:6;51:23;52:11,13,
22,25;53:1,2;61:9;
66:11;74:22;75:14;
81:11,13;98:2;103:19,
20;104:13,23;122:23;
135:18;147:21;162:13,
17,17,25;163:5,10;
165:13;166:10
**bar (7)**
44:9;49:16;58:25;
59:9;61:1;111:2,5
**barely (1)**
67:19
**bargain (5)**
86:12,14,22,25;87:8
**bargained (2)**
87:8;139:25
**based (12)**
41:18;68:11;71:19;
81:18;91:11,11;111:3;
113:25;178:21;182:11;
183:9;185:12
**baseline (2)**
151:12,12
**bashed (1)**
136:5
**bashful (1)**

176:11
**basic (5)**
44:7;151:13,18;
153:2;174:14
**Basically (4)**
27:7;103:18;163:20;
166:16
**basing (1)**
114:2
**basis (17)**
60:11;86:7,11;87:4,
15,16;91:2;117:7;
118:6;132:7;133:5;
143:17;146:22,23;
179:16;185:14,17
**Bear (1)**
89:19
**bearing (1)**
87:13
**beat (1)**
161:21
**beauty (1)**
77:4
**become (7)**
122:19,20;148:14,
17;156:20;161:4;
181:18
**becomes (1)**
40:21
**bed (1)**
75:19
**begin (2)**
4:18;21:25
**beginning (2)**
102:7;110:21
**begins (1)**
149:24
**behalf (15)**
22:23;36:14;37:17,
23;39:25;58:7;60:17,
19;61:22;101:14;
112:19;128:4,9;131:1,
22
**behind (2)**
143:2;152:10
**Behlmann (99)**
55:10,12,14,22;56:4,
5,6,7,8,8;57:16,20;
58:2,7;59:21,24;62:21;
63:2,5,14;69:1,2,6,17;
70:3,15,22;71:9;72:6,
10,20,21,25;73:9,12,
17;76:17;77:8;78:10;
79:6,10;80:15;81:10,
24;82:6,10,12;83:9;
84:2;85:2,4,13,22;
86:3;89:1,5,11,15,19,
23;92:13,22;93:7;
94:11;95:7;96:7,9;
97:25;98:5,9,24;99:1,8,
12;100:7,25;102:4;
105:10,13,21;106:2,16;
108:3,16;109:2,7,10,

14;111:22;112:10;
113:11;114:13;115:24;
116:9,23;117:24;
118:22;120:19;128:13
**Behlmann's (1)**
114:3
**behold (1)**
116:5;163:22
**belongs (1)**
8:3
**belt-and-suspenders (2)**
174:16;175:25
**belts (1)**
28:9,10;173:5
**bench (1)**
132:1
**benchmark (1)**
133:8
**beneficiaries (1)**
58:16
**beneficiary (1)**
99:10
**Benefit (12)**
11:7;62:13,13;86:12,
14,22,24;87:8;144:10;
150:17,20,20
**benefits (4)**
47:12;58:15;136:17;
137:22
**benefitted (1)**
147:4
**benign (1)**
178:5
**Benjamin (1)**
37:5
**Bennett (2)**
95:23;155:21
**besides (2)**
79:23;149:15
**best (10)**
6:22;14:19;95:5;
121:10;126:19;133:8;
150:12;160:11;168:19;
186:11
**best-interest (1)**
48:3
**betrays (1)**
42:16
**better (9)**
37:14;45:12;47:21;
48:2;53:24;89:21,22;
121:4;124:14
**beyond (2)**
17:23;23:11
**Biaggio (9)**
69:4,8,9,12,16;
70:24;71:2,19;93:5
**big (4)**
28:11;34:2;171:22;
185:2
**bigger (2)**
76:1;113:21
**biggest (1)**

145:22
**billion (19)**
88:13;132:14,17;
133:15,22;134:7,13;
135:20;138:2,2,14;
139:6;140:18;163:13,
13;165:24;177:5,8,9
**billion-dollar (2)**
84:4;88:4
**billions (1)**
110:13
**binary (1)**
95:2
**binding (5)**
43:5;71:7;172:23;
173:2,9
**bit (23)**
11:1;21:16;36:24;
57:23;58:4;59:17;61:3,
20;78:12;83:23;84:8,
10;86:19;87:5;90:2;
104:2;114:17;116:4;
128:13;129:22;161:7;
167:9;172:25
**blackout (6)**
121:14;117;123:24;
126:10;127:2;150:5
**blackouts (5)**
46:16;48:7,17
**blame (4)**
4:11;77:23;85:19;
89:16
**bland (1)**
178:4
**blank (2)**
52:16,16
**blind (1)**
161:21
**blow (1)**
34:11
**board (2)**
16:10;145:4
**boat (2)**
99:2;103:24
**bologna (1)**
154:15
**bona (1)**
116:25
**bond (1)**
45:6
**bondholder (3)**
133:17,23;134:3
**bondholders (2)**
49:20;134:22
**borrowing (1)**
135:18
**both (30)**
7:2;8:10;11:14;12:5,
5;19:1;22:23;26:8;
40:6;48:8;61:8;62:9;
68:24;71:15,18;73:13;
74:1;77:19;98:10;
99:10;102:13;115:4;

Min-U-Script®

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 191
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(3) attributable - both

117:23;131:25;133:9;
142:13;169:5;174:11;
175:18;176:6
**bottom (2)**
87:17;115:22
**bought (11)**
80:1,18,24;86:13,16,
17,18;92:4,5,10;94:16
**bound (1)**
33:24
**boundaries (1)**
65:13
**Boy (1)**
170:25
**BR (2)**
104:13,23
**bracket (3)**
82:13;96:2,3
**Bray (6)**
16:24;25:15;35:10;
125:16;183:4;186:3
**break (23)**
45:16,17,18;46:18;
54:6,15;62:12,15,23,
25;63:4,12;73:7,11,14;
76:19;91:23;129:15;
134:10;138:8;146:14;
159:18;169:3
**breaking (3)**
49:19;57:6,12
**Breitburn (1)**
104:22
**Brent (1)**
147:1
**bridge (1)**
145:2
**brief (18)**
5:9,18;17:22;38:6;
64:8;69:3;84:23;86:19;
87:6;98:14;100:24;
102:7;107:5;114:14;
118:7;120:23;155:22;
168:10
**briefed (1)**
62:3
**briefly (5)**
59:25;62:7;102:11;
120:23;143:20
**briefs (3)**
8:1,6;165:16
**brilliant (1)**
141:20
**bring (21)**
4:6;8:21;9:18;19:1;
27:23;36:17;38:12,17;
55:2,16,21;56:23;
69:21;127:22;130:6;
135:25;136:6,8,9;
143:9;146:18
**bringing (1)**
88:20
**broad (1)**
152:19

**broad-brushed (1)**
152:13
**broader (1)**
112:22
**brothers (1)**
42:22
**brought (4)**
20:24;55:19;136:3;
143:12
**Brown (2)**
28:19;33:21
**Bruno (1)**
133:10
**brushing (1)**
89:17
**B's (2)**
6:17;79:15
**bucket (1)**
106:3
**bucks (2)**
5:24;140:18
**bulk (1)**
141:10
**bundle (3)**
134:12;166:4;174:25
**burden (4)**
24:22;102:23;107:6;
117:12
**bureaucracy (2)**
180:2;181:19
**burned (1)**
42:5
**business (3)**
42:6;123:9;173:15
**businesses (1)**
42:24
**busy (1)**
13:16
**Butte (1)**
133:9
**buy (8)**
5:20,22;94:15;104:2,
16;107:11,13;108:21

**C**

**Caesars (1)**
162:25
**Cal (1)**
47:21
**calculated (4)**
80:21;92:16;98:15;
159:12
**calculating (1)**
87:14
**calculation (2)**
80:6;92:17
**CalFire (1)**
31:18
**CALIFORNIA (14)**
4:1,4;10:4;26:4,9,18;
29:18;30:18;31:18;
46:25;50:23;52:14;

98:23;144:3
**California's (1)**
146:1
**Call (14)**
4:3;13:7;14:18;26:1;
36:14;53:11;54:17;
88:13;101:1;112:25;
127:24;130:7;134:14,
25
**called (3)**
30:20;156:12;181:9
**calls (1)**
96:20
**came (8)**
20:21;49:20,21;60:3;
98:25;118:6;145:3;
179:11
**can (125)**
4:21;5:12,14;6:8,9;
8:9;10:6,12,13,15;13:3,
18;14:20;16:18;21:19;
24:12;27:23;29:4;
37:12;40:18;43:17;
44:12;45:18;47:2;
48:19;49:22,23,23;
52:2,7,7;56:9,10;57:17,
24,24;62:18;63:10;
64:9,10,13;67:9,22;
72:23;78:6;85:10,11;
89:15,21;92:11;93:25;
95:14,20;96:3;111:22;
112:1,25;113:7;117:3;
119:21;120:18;121:24;
122:15,15;123:1,2;
124:12;125:5;126:4;
127:13,15,20;129:17,
18;136:4,8;137:7,13,
18;139:7;140:13;
143:3;149:2;150:1,6,7;
154:25;155:13;156:24,
25;157:13,24;158:17,
18;159:21;160:3,24;
161:11;162:5,7,8;
163:1,1,19;165:3;
166:13,19;167:7;
168:12;169:4;171:11,
11;172:20;173:11;
175:5;176:22;182:21;
183:1,16,17,19,20;
184:4;185:24;187:4
**cancel (1)**
113:18
**cap (2)**
84:5,17
**capacities (1)**
23:2
**capacity (1)**
40:1
**capital (11)**
15:8,8;69:13;71:23,
24;83:7;96:21;103:15;
121:24;123:20;124:7
**capitalization (6)**

76:11;90:6,24;94:13;
151:24;152:15
**care (4)**
27:7;101:19;124:15;
175:25
**careful (5)**
142:3;145:20;174:4,
11;176:14
**carefully (2)**
44:4;166:24
**Caribou-Palermo (1)**
143:12
**Carlson (1)**
19:12
**carry (2)**
42:18;120:13
**carves (1)**
67:20
**case (83)**
5:23;7:20;29:24;
39:10;40:11;44:14;
46:4;47:13;49:12,12,
13,25;54:18;55:17;
58:9;59:5;60:2,7;
62:11;64:4;66:11;
81:16,17;83:8,11;
87:13;92:5,20;98:11;
99:25;100:13;101:20;
104:11,18;108:25;
109:2,17;110:9,20,22,
25;112:14,16;131:25;
132:1,3,14,15;133:1,3;
134:20,21;135:12;
138:11;141:8,10,12;
142:5,18;145:2,5;
146:25;147:6;149:5,
11,15;152:10;162:25;
163:24;165:17;166:2;
169:9,14,18;170:11;
174:15;175:10;177:18;
180:1,3;181:18,22;
185:1
**cases (22)**
60:6,14;70:25;82:2;
83:6;105:8;110:6;
116:13;150:15;162:13,
17,18,22;163:5,10;
164:7;165:13,16,16;
166:2,10;186:22
**cash (22)**
40:21;41:2,14;49:8;
75:6,8;106:3;108:20;
113:9;134:13;135:9,
11,13,16,19;137:25;
138:3;147:9;165:24;
166:4;174:23,23
**categorically (1)**
65:2
**categories (1)**
66:1
**category (2)**
50:18,20
**cats (1)**

13:21
**caught (1)**
181:11
**causation (1)**
132:25
**cause (1)**
132:25
**caused (3)**
129:11;136:18;
137:23
**causes (3)**
23:12,14;133:24
**causing (2)**
134:1,1
**cent (1)**
169:21
**certain (11)**
20:18;30:23;61:10,
15,16;62:10,10;65:20;
68:12;147:15;162:19
**certainly (12)**
53:5,22;59:17;63:11,
15;69:7;74:12;86:3;
94:11,22,24;95:18;
96:7;101:24;102:4;
125:8,10;127:7,11;
146:11;156:21;167:21
**certainty (1)**
44:16
**certified (2)**
61:23;112:11
**certify (1)**
188:3
**cetera (2)**
52:15,15
**chance (8)**
13:7;15:24;34:6;
38:22;39:2;47:15;
118:6;127:7
**chances (1)**
184:5
**change (8)**
15:7;18:3;27:17;
35:4,5;78:4,24;82:13
**changed (1)**
75:22
**changes (6)**
5:19;15:5;46:14;
69:23;84:10;112:2
**changing (1)**
142:25
**channeled (2)**
29:14;31:7
**Chapter (5)**
48:2;60:14;64:2;
142:18;143:5
**chart (9)**
10:20;11:10;20:14;
87:20;88:17;89:2,3;
91:25;94:5
**charts (1)**
88:18
**cheap (1)**

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 192 of 219

40:10
**check (1)**
54:12
**Cheever (1)**
25:8
**chicken (1)**
28:11
**chipped (5)**
88:9,9,9,10,14
**choice (11)**
84:20;86:8;87:7,15;
95:1,2;99:4,5;124:10;
145:17;160:6
**choices (1)**
46:2
**choir (1)**
168:23
**C-hook (1)**
143:11
**choose (3)**
60:4;104:8;180:13
**chooses (1)**
137:19
**choosing (1)**
115:5
**chose (1)**
111:8
**chosen (2)**
66:15,23
**chunk (1)**
146:2
**circles (1)**
52:10
**Circuit (10)**
65:3,13;67:14;69:4;
70:25;86:24,24;87:10;
92:20;113:5
**circular (1)**
161:8
**circumstance (1)**
83:12
**circumstances (7)**
78:2;81:3;82:1,3;
94:17;101:11;185:21
**cite (1)**
168:15
**cites (1)**
32:1
**citizens (1)**
46:25
**City (1)**
22:24
**claim (114)**
6:10,13,15,15,23;
7:1;8:1,12;30:5;49:8;
58:23,25;59:1,1,3,8,8,
11,16;60:18,25;61:6;
65:24,25;66:8,20,22;
68:20,23,23;69:5,21,
24,24;70:7,13,22;71:3,
4,16,17,17,20,21,22,23,
24;72:3,4,11;73:2,3,24;
74:1,7;76:6,9,13,14,19,

20,22;77:2,3,4,10,11,
12,20;79:14,15,19,21;
80:22;81:1,5,7;82:12,
13,16,17,18;84:18;
86:6;87:24;95:12;
96:25;97:1,11,13,19;
98:3,16,19,20;99:20;
101:7;106:11;107:24,
25;108:5,6,11;111:3;
113:15,23,24;114:1,4,
10;131:11;169:14,18,
20
**claimant (5)**
29:13;30:2;31:2;
104:20;108:9;152:1
**claimants (12)**
8:9,15;41:13;45:4;
95:15;99:6;112:8;
116:14,15;131:2,7;
147:9
**claims (118)**
7:3;9:8;15:21;21:7,
12;23:6,12;26:3;27:3,
8,11;28:20;29:2,23;
31:7;35:7;46:20;60:24;
61:4,4,5,8,14,18,21;
64:17;65:16,20;66:11,
13,24;67:3,21,23;68:3,
4,6,9,10,16,17;69:9,10,
12,14,18,20;70:5,17;
71:9,10,11,12,13,14;
72:13,13,15;73:20,22;
74:3,15,23;75:3,3;
76:18;80:13;81:16,17,
19;82:22;92:1,2,3;
93:3,6,9;96:11;97:4;
101:20;103:13,14;
105:23;106:4,9;
107:14;110:9;111:7;
112:16;113:5,9;
114:16;116:17,22;
117:1,1;125:19;
133:11,22,24;135:4;
138:3,9,15,19,21,22,
23;139:1,11;141:7,11;
150:12;152:22;171:5;
174:8,24;177:9
**clarification (1)**
14:10
**clarify (4)**
30:4;41:5;152:16;
156:25
**class (85)**
5:21;59:6,12,13,16,
18;60:18,24;61:7,9,22,
22;62:1;64:23,23,24;
65:15;68:3,8,15,16,16;
74:14,19,19,23;75:2,2;
78:19;80:7,17,18;
82:13;84:10,18,23,25;
86:14,16;88:10,21,23;
89:6;90:12,15,18,24;
91:1,3,3,13,21;92:14;

94:14,16;95:12,12;
96:25;97:1;101:17;
102:9,11,15,21;103:1,
2,4;105:1,8;106:24;
107:19,20,21;111:9;
112:11,15;113:8,12,15;
114:18;115:20;116:16;
117:2,6;125:20
**class-action (1)**
143:25
**classes (1)**
106:8
**classification (2)**
64:16;68:2
**classifies (1)**
68:6
**classifying (1)**
70:5
**clause (4)**
153:3;170:5;172:23;
173:1
**Clean (1)**
22:25
**clear (28)**
23:8,10,18;24:2;
39:24;48:7,17,18;
51:21,22;52:5;53:21;
59:25;63:21,23,23;
65:3,4,5,6,12;108:17;
116:13,14;123:7;
126:9;135:3;151:4
**clearer (1)**
65:9
**clearing (1)**
58:21
**clearly (3)**
41:21;57:10;89:11
**CLERK (19)**
4:4;19:5;36:5,7,19,
25;55:3;56:1,16;57:7,
9,12;62:16,19;63:1;
73:15;179:13,14,18
**client (6)**
4:11;20:17;21:3;
22:25;24:20;80:10
**clients (5)**
22:13;37:17;39:25;
40:8;112:20
**client's (1)**
22:11
**close (14)**
8:17;14:1;65:11;
69:4;87:23;111:10;
115:4;123:9;129:7,8;
133:15;134:14,25;
143:22
**closed (1)**
89:7
**closely (1)**
141:1
**closer (1)**
37:12
**closers (1)**

94:14,16;95:12,12;
**closing (14)**
35:18;40:7;55:13;
89:5,24;90:22;102:7;
109:8;120:4,23;
127:18;179:1;183:11;
186:6
**closings (1)**
49:2
**Code (4)**
21:7;52:22;74:23;
131:14
**cog (1)**
78:4
**cognizant (1)**
112:18
**coincidence (1)**
6:5
**collapse (2)**
84:6,16
**collapses (1)**
71:20
**collateral (1)**
135:19
**colleague (3)**
14:12;113:17;115:11
**colleagues (3)**
5:8;12:25;187:3
**collectively (1)**
110:13
**columns (1)**
97:23
**coming (12)**
66:18;75:14;96:3,4;
117:11;138:18;139:16;
143:14;144:16;148:5;
155:25;164:5
**commenting (1)**
129:7
**comments (11)**
23:13;34:18;41:9;
43:22;54:3;115:16;
120:21;129:7;172:17;
181:15;183:9
**commercial (1)**
153:22
**commit (1)**
158:17
**commitment (3)**
123:8;144:16;153:14
**commitments (1)**
153:20
**committed (2)**
38:14;144:25
**committee (7)**
26:2;119:4;128:5;
131:2;141:9;165:6;
173:11
**committees (1)**
175:18
**committee's (1)**
27:16
**common (14)**

183:3
**closing (14)**
35:18;40:7;55:13;
89:5,24;90:22;102:7;
109:8;120:4,23;
127:18;179:1;183:11;
186:6
**closings (1)**
49:2
**Code (4)**
21:7;52:22;74:23;
131:14
**cog (1)**
78:4
**cognizant (1)**
112:18
**coincidence (1)**
6:5
**collapse (2)**
84:6,16
**collapses (1)**
71:20
**collateral (1)**
135:19
**colleague (3)**
14:12;113:17;115:11
**colleagues (3)**
5:8;12:25;187:3
**collectively (1)**
110:13
**columns (1)**
97:23
**coming (12)**
66:18;75:14;96:3,4;
117:11;138:18;139:16;
143:14;144:16;148:5;
155:25;164:5
**commenting (1)**
129:7
**comments (11)**
23:13;34:18;41:9;
43:22;54:3;115:16;
120:21;129:7;172:17;
181:15;183:9
**commercial (1)**
153:22
**commit (1)**
158:17
**commitment (3)**
123:8;144:16;153:14
**commitments (1)**
153:20
**committed (2)**
38:14;144:25
**committee (7)**
26:2;119:4;128:5;
131:2;141:9;165:6;
173:11
**committees (1)**
175:18
**committee's (1)**
27:16
**common (14)**

59:14;68:5,7,14;
69:22;74:15,24;84:19;
103:2,7;105:24,24;
165:20;177:14
**common-sense (1)**
153:22
**communication (1)**
95:10
**community (2)**
42:7;48:4
**companies (2)**
45:6;107:11
**company (14)**
6:6,12;47:24;49:20;
68:11;75:14;104:17,
18;126:13;145:14,16;
146:6;153:16;162:14
**company's (1)**
150:2
**comparable (4)**
162:11,12,13,19
**comparative (1)**
51:6
**compared (1)**
115:11
**compensate (2)**
42:5;108:15
**compensation (1)**
42:8
**competent (1)**
114:11
**competing (1)**
60:8
**complaint (7)**
62:4;68:18,22;78:11;
90:16;97:9;113:13
**complaints (1)**
179:11
**complete (1)**
40:24
**completely (5)**
68:19;71:21;76:12;
92:12;145:16
**complex (1)**
31:14
**compliance (3)**
12:23;122:6,23
**compliant (2)**
49:23;157:9
**complicated (2)**
76:3;80:11
**complied (1)**
174:12
**complies (1)**
131:7
**comply (1)**
166:9
**comprised (1)**
141:9
**compromise (1)**
177:17
**conceded (1)**
23:10

**concept (4)**
71:3;160:21;172:5,
15
**concepts (2)**
171:10;172:15
**conceptually (1)**
114:19
**concern (4)**
16:16;63:19;70:5;
74:5
**concerned (3)**
16:14;21:9;182:13
**concerns (10)**
13:4;12;14:6;20:4;
43:10;44:3,22;45:1;
79:1;96:14
**concert (1)**
39:20
**conclude (5)**
17:8;54:4;129:16;
179:25;183:2
**concluded (2)**
127:19;187:8
**concludes (2)**
50:10;178:6
**conclusion (2)**
102:6;179:19
**conclusory (2)**
106:23;107:3
**concur (1)**
165:11
**condition (3)**
151:19;154:6,22
**conditions (1)**
151:21
**conduct (2)**
31:12;67:11
**conducted (1)**
137:17
**confer (1)**
95:14
**conference (1)**
136:7
**confidential (3)**
45:13,22;50:3
**confirm (13)**
41:21;47:18;51:17;
52:2;91:18;121:10;
137:2;148:14;156:19;
164:15;177:1;183:16,
19
**confirmation (59)**
15:14;23:9;40:4;
43:11;44:15;45:3,10,
12,25;46:4;47:4;48:6;
62:7;63:24;64:8;65:5;
67:15,18;70:11;94:20,
21,25;102:5;107:4;
110:20;112:1;113:7;
118:7;122:7,16;137:2,
8;139:22;140:6,21;
141:22;145:11;149:1,
1;151:22;153:5;154:3;

**consolidated (2)**
60:7;69:15
**constituencies (1)**
110:16
**constituency (4)**
59:5;110:25;111:2;
112:22
**constitute (1)**
152:22
**construct (2)**
132:9;174:14
**constructive (1)**
137:16
**consultant (2)**
169:13,19
**consultants (4)**
138:5,7;139:4,15
**contacted (1)**
4:25
**contain (2)**
30:14;165:12
**contained (1)**
66:7
**contains (1)**
41:16
**contemplates (1)**
70:16
**content (1)**
139:22
**contest (1)**
31:2
**context (10)**
60:14;61:9;100:4,7;
102:8,14;106:6;109:3;
132:9;154:20
**contingencies (1)**
101:25
**contingency (4)**
122:10,11,12,12
**continually (1)**
143:10
**continue (3)**
110:7;158:11;181:24
**continued (2)**
90:22;181:9
**continuing (2)**
38:7;83:15
**continuum (1)**
88:19
**contract (7)**
15:18;16:13,25;
119:24;134:4,9;154:5
**contractor (1)**
138:23
**contractors (3)**
133:25;134:7,12
**contracts (4)**
10:24;15:13;24:17;
139:11
**contractual (2)**
100:15;177:14
**contribution (2)**
16:15,24

**control (4)**
49:9;53:9;130:5;
141:13
**controlling (1)**
71:8
**controversial (2)**
40:15;41:10
**controversy (3)**
21:3;22:21;172:6
**convenience (2)**
54:16;128:15
**convenient (1)**
13:25
**conversation (1)**
44:17
**conversion (1)**
117:5;125:2
**convert (2)**
86:6;113:8
**converting (1)**
76:6
**convinced (1)**
143:14
**coordinate (1)**
181:1
**coordinating (1)**
11:6
**co-payees (1)**
58:16
**copy (1)**
32:17
**coronavirus (1)**
145:24
**corporate (3)**
71:1,4;99:6
**Corporation (3)**
11:8;68:13,14
**corporations (1)**
71:2
**corpus (2)**
138:19;139:2
**correcting (1)**
107:17
**correctly (1)**
174:22
**counsel (23)**
8:22;9:10;11:13;
19:3;22:13;24:5;25:12;
27:22;28:19;33:21;
34:24;37:6;40:1;59:3;
85:7;112:13,17;
143:17;144:12;183:4;
186:3,4,12
**count (2)**
84:16;99:21
**counterpoints (1)**
29:9
**county (1)**
58:18
**couple (12)**
58:22;78:10;79:10;
95:8;98:21;104:12;
119:2;120:21;153:21;

173:18;180:8;182:19
**course (10)**
6:16;21:9;23:2;
55:18;60:2;78:19;82:3;
91:12;120:20;138:25
**Court (418)**
4:3,4,8,11,23;5:7;
7:11;9:13,14,25;10:2,5,
9,14,16;11:12,16,21;
12:5,9,12,16;13:5,10,
13,15,25;14:2,11,15,
17,22,25;15:3,23;16:4,
7,23;17:4,6,14,18,20;
18:2,6,10,15,17,20,22;
19:1,8,10,14,20,22,25;
20:8,20,22;21:20,22;8:
23:6,20;24:3,13,18,21;
25:24;26:11,12,14,16,
21;27:5,14,15,21;28:2,
5,6,8,17;29:1,7,11;
30:4,9,11;31:9,21,23,
25;32:7,15,17,20,25;
33:3,7,12;34:3,16,23;
35:6,9,13,16,21,25;
36:4,6,9,16,21;37:3,7,
11,15,18,25;38:18;
39:4,17,20;40:16,18,
20,23;41:1,3,9,18,20;
42:9,16,25;43:2,8,9,10,
15,16,21;44:5,19;
45:18,23;48:9,10;
49:15;50:9,13;51:1,3,7,
13;52:4,10,22,25;53:8,
16;54:10;55:2,10,16,
21,24;56:4,7,9,13,18,
21;57:1,5,8,10,13;58:1;
59:19,23;60:13;62:15,
18,20,22,23;63:4;69:1,
3,16;70:1,12,21,23;
72:1,9,16,21;73:6,11,
14;76:15,18;77:18;
78:23;79:9;80:8;81:10;
82:5,8,11,14;84:1;
85:17,22;87:11;89:1,9,
15,22;90:11;91:22;
92:19,23,23;93:18;
95:6,8;96:8;97:20;
98:4,7,21,25;99:3,9,23;
100:11;101:16;104:13,
18,23;105:4,8,11,15;
106:1,10,23;107:22;
108:8,24;109:5,10,15,
22;111:1,11;112:12,13,
25;113:17;114:2,6,11,
13;115:7,10;116:19;
117:15,17,19,22,25;
118:3,9,15,19,21;
119:13;120:1,8,25;
121:19,22;122:2,12,18,
25;123:3,7,13,15,18;
124:2,8,21;125:5,9,11,
15;126:4,9,12,15,18,
21,24;127:4,20;128:6,

**confirmed (14)**
40:21;42:15;43:7;
46:5,7;49:24;51:20;
64:5,10,14;122:9;
125:25;144:10;183:10
**confirming (6)**
41:17;42:17;64:1;
123:25;146:7;185:8
**conflagration (1)**
133:10
**conflating (1)**
82:16
**confuse (1)**
42:1
**confusion (2)**
63:13;122:5
**congressional (1)**
105:15
**connect (1)**
85:8
**connection (11)**
36:12;54:23;57:9,13;
64:21;109:12;110:14;
115:1;126:13;166:2,3
**consensually (2)**
53:18;158:18
**consent (21)**
139:21;147:23;
148:11,25;152:14,18,
19;153:5,23;154:1,4,
22;155:12,14;157:20,
20,25;160:20;164:3;
166:17;167:9
**consented (1)**
148:12
**consenting (1)**
139:21
**consents (1)**
148:15
**consequence (2)**
21:3;167:13
**consequences (1)**
47:14
**conservative (2)**
143:24;144:6
**consider (2)**
13:1;137:16
**considerably (1)**
138:1
**consideration (3)**
31:16;104:6;138:1
**considered (2)**
149:12,13
**Consigning (1)**
43:7
**consistent (5)**
6:13;43:13;151:16;
170:7;172:16

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 194
of 219

10,16,19,22;129:10,15,
24;130:6,12,14,19,23,
25;131:10,16,18;136:1,
9;137:7,14;141:16;
146:15,17,19;147:21;
148:2,8,16;154:7,18;
155:1,3,17,24;156:3,7,
10,25;157:13;158:2,8,
13,22;159:5,13,17,22;
160:10;161:2,7,13,20,
25;162:2,8;163:1,4,7,
25;164:6,19;165:3;
166:21;168:8;170:7;
171:10,14,17,19;172:3,
11,14,19;173:4,17,19,
22;175:8,14,23;176:7,
21;177:19,21,23;178:4,
14,20;179:4;180:1,4,8;
182:2,24;183:18,21,23;
184:19,22;185:20,23;
186:19;187:2,7
**court-appointed (1)**
58:10
**court-approved (1)**
43:5
**courteous (1)**
109:11
**courtroom (4)**
65:1;83:21;181:10,
13
**courts (2)**
23:16;115:7
**Court's (9)**
39:18,21;41:17;48:9;
55:15;62:8;110:3;
131:25;148:13
**cover (2)**
97:24;134:11
**coverage (12)**
96:23;97:2,3,4,6,8,
16,17;99:15,17;101:9;
139:5
**covered (1)**
20:4
**craft (1)**
43:12
**cram (2)**
152:9;160:3
**cramdown (4)**
102:22,23;106:18;
116:18
**cram-down (1)**
152:10
**create (1)**
67:1
**created (2)**
58:22;116:4
**credence (1)**
102:19
**credit (1)**
8:1
**creditor (1)**
102:16

**creditors (3)**
45:7;102:18;107:10
**creditor's (1)**
119:4
**critical (5)**
40:8;47:12;53:22;
105:21;184:4
**cross-reference (1)**
168:11
**crystal (1)**
108:17
**culpable (1)**
6:8
**cure (2)**
15:15,18
**curious (1)**
116:1
**currency (2)**
108:17,19
**current (14)**
15:13;27:3;61:10,15;
63:20;66:16;72:6,7,10,
11;103:5;121:25;
133:19,20
**currently (1)**
55:17
**cutting (2)**
62:17;73:15

## D

**D&O (3)**
96:23;97:2;99:13
**dads (1)**
42:22
**daily (1)**
143:17
**damage (28)**
7:3,21;30:5;64:16;
68:4,6;72:13;73:2,21;
76:6;77:20,21,22,25;
78:1;80:10;81:14;82:9,
19;90:7;92:12;93:3;
110:9;112:16;114:4;
116:14,17;133:12
**damages (15)**
6:10;77:13,16;79:18;
80:14;81:2;84:18;
86:25;87:11,14;91:7;
92:13,15,15,18
**dangerous (1)**
94:19
**data (2)**
179:17;181:9
**database (1)**
44:9
**date (79)**
5:21;6:14;7:10;41:7;
44:9;46:10,11,11;47:6;
49:16;51:19;52:1,17,
18;53:9;58:25;59:9;
61:1;75:16,20,20;
76:12,13,19;77:1;78:3,

6,6,24;79:2,11,24,25;
81:14,20;83:16;84:8,
16,20,21,22;86:8,9,22;
87:16;90:6,7,13,14,21,
21,23;94:6,8;103:17,
24;111:2,5;112:5;
114:15,17;115:3,3,16,
18;116:3,3,6,6;122:14,
15;123:5,6;141:4;
148:13;158:21;166:14;
176:3;188:15
**dates (9)**
46:8;78:25;79:23;
80:1;88:6;94:5,7,8;
115:5
**David (1)**
28:15
**Davila (3)**
58:12;60:8;62:6
**day (24)**
7:6;28:16,17;77:19,
23;81:6;87:23;89:4,6,
25;90:23;95:3,4;102:2;
110:11;114:17;124:5;
129:16;159:6;163:22;
175:15;181:8;184:2;
186:13
**days (12)**
5:24;51:16;80:16,19,
20;85:24;86:16;92:10;
120:22;137:7;155:6;
164:5
**DCD (1)**
86:23
**dead (2)**
67:3;125:21
**deadline (3)**
51:22;64:2;122:3
**deadlines (1)**
44:20
**deal (14)**
28:12;31:23;34:19;
58:3,3;68:9;92:24;
113:7;171:22,24;
180:19;182:15;186:8,
10
**dealing (4)**
33:13;61:4;118:10;
166:4
**deals (3)**
10:24;83:12;183:13
**dealt (4)**
98:13;109:3;173:17;
185:13
**death (3)**
42:6;133:11;161:21
**debt (7)**
103:12;121:13;
123:20;139:23;151:24;
152:15;153:6
**debtor (45)**
8:3,14;42:17;47:5;
65:20;66:2,3;70:17,18,

20;74:9;83:13;93:21;
97:7,9,10,13,19,22,24;
98:1,2,3,17,20;99:9,15,
21,22,24,24;100:18;
101:7,9,11,23;118:5;
142:17;154:6;162:5,7;
167:1;169:24,24;172:7
**debtors (76)**
8:7,8;10:20;11:5,9,
25;12:15;15:7;20:13;
21:5;22:17;39:2;61:7,
8,11,15;64:8;65:24;
66:10,14,15,19,21,21;
67:8,11,24;68:24,25;
69:15,19;74:8;76:7;
94:23;95:18;96:22,23;
97:16;98:12;99:13;
101:5;102:12,23;
107:4,12;110:7,10,12,
14,17;111:25;121:15;
129:7;132:16;133:6,
14,18,23;134:1,5,23;
136:1,2;141:15;
142:16;152:23;155:7;
160:15;161:15;165:23;
168:25;169:10,19;
174:1,4,10
**debtors' (13)**
61:24;129:8;131:5;
132:23;133:9;151:11,
17,19;152:18;161:12;
165:15;170:2;176:16
**debtor's (6)**
100:21;107:6;
110:15;111:3;115:1;
117:13
**December (4)**
46:11,17;170:4;
174:3
**decide (11)**
12:11;17:11;18:6;
20:11;33:5,7;34:8;
158:5;166:14;180:23;
181:1
**deciding (1)**
17:11
**decision (24)**
34:8,12;45:10,25;
62:5;69:4,8;70:24;
71:7,7;80:1;95:12;
100:13;124:10;125:6;
144:3;156:14,15;
158:19;159:2;180:22;
182:11,17;183:10
**decisions (4)**
33:17;44:12;144:1;
184:9
**declaration (5)**
104:4;147:1;162:10;
168:15,16
**declarations (1)**
118:7
**declaratory (1)**

20:74:9;83:13;93:21;
97:7,9,10,13,19,22,24;
98:1,2,3,17,20;99:9,15,
21,22,24,24;100:18;
101:7,9,11,23;118:5;
142:17;154:6;162:5,7;
167:1;169:24,24;172:7

20:25
**deductible (1)**
101:7
**deducting (1)**
98:19
**deducts (2)**
76:9;88:5
**deemed (2)**
149:14;177:13
**deep (1)**
47:7
**defendant (2)**
97:22;100:2
**defendants (8)**
65:21;66:12,25;
97:21,21;98:10;100:1;
113:6
**defendant's (1)**
87:2
**defer (2)**
53:20;158:24
**deference (1)**
39:21
**deferral (1)**
95:22
**deferring (3)**
39:19;95:2,4
**define (2)**
48:16;52:23
**defined (2)**
96:21;152:2
**definitely (1)**
5:8
**definition (5)**
52:21;72:12;73:2,3,
21
**definitions (1)**
72:22
**definitive (2)**
151:23;152:14
**defrauded (7)**
6:23;8:13;77:6,7,19;
78:8,8
**Del (9)**
69:4,8,9,12,16;
70:24;71:2,19;93:4
**Delaware (1)**
104:13
**delay (5)**
4:9;9:3;118:24;
146:9;181:22
**delayed (1)**
45:5
**delays (2)**
42:20;120:3
**delegitimize (1)**
117:4
**delete (2)**
17:24,25
**deliberate (1)**
185:17
**delve (1)**
63:21

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 195
of 219

**demand (1)**
34:10
**demonstrate (1)**
162:14
**demonstrative (3)**
62:9;63:9;87:18
**demonstratives (2)**
87:17;90:1
**denial (1)**
60:15
**Dennis (1)**
4:5
**denominated (2)**
75:3,4
**denominator (9)**
7:17;83:2,3;93:10,
13;96:15;107:2,18;
113:20
**depending (1)**
163:13
**describe (1)**
23:16
**described (3)**
85:24;116:9;126:10
**design (1)**
41:15
**designed (1)**
115:24
**despite (1)**
112:10
**destiny (1)**
141:13
**detail (4)**
61:20;64:7;87:5;
125:23
**details (1)**
52:8
**determinable (1)**
108:23
**determination (8)**
70:8;73:24;74:1;
77:14;79:14;80:23;
114:12;118:8
**determinations (1)**
80:9
**determine (4)**
71:25;82:16,17;
114:8
**determined (6)**
79:15;81:20,21;92:1;
94:20;96:5
**determines (2)**
72:2;101:5
**determining (2)**
69:14;81:2
**device (1)**
19:18
**devices (1)**
19:19
**differ (1)**
80:20
**difference (6)**
77:15;81:24;87:1;

**different (38)**
5:20;7:21;29:25;
30:12;32:5;38:20;
69:11;75:23;76:12;
78:25;80:9,12,13;
81:11,11,12,12,15;
82:1,4,9,22;85:9;94:5,
5,7;99:2;100:20;
102:13;108:8;110:10;
114:19,20;116:3;
142:23;162:21;173:16;
180:12
**differently (2)**
95:9;162:21
**difficult (3)**
75:5;76:3;83:20
**difficulties (2)**
63:15;73:18
**diligence (2)**
179:13;181:24
**dilute (3)**
171:8,11,25
**diluted (1)**
84:9
**dilutes (1)**
171:14
**dilution (2)**
103:10,21
**direct (3)**
65:4;162:5,7
**directed (1)**
114:22
**direction (2)**
76:5;106:5
**directly (1)**
59:4;66:2;83:12
**director (2)**
97:10,12
**directors (4)**
6:9;61:11;66:13;
143:21
**disadvantage (1)**
41:24
**disagree (3)**
168:20,20,21
**disappeared (1)**
116:6
**discharge (6)**
15:6;21:2,8,11,14;
169:10
**disclosed (2)**
41:23;142:7
**disclosure (4)**
67:5,7;142:2;149:11
**disclosures (2)**
90:17;142:4
**discount (1)**
44:24
**discovery (1)**
49:15
**discrete (1)**
116:25

**discretion (4)**
101:2;132:3;150:23;
179:10
**discriminate (3)**
103:4;106:24;107:5
**discriminates (1)**
102:11
**discrimination (1)**
106:6
**discriminatory (1)**
116:9
**discuss (4)**
78:12;79:7;95:9;
119:21
**discussed (10)**
16:18;64:6;96:17;
98:15;115:24;116:23;
142:10;157:11;175:17;
176:6
**discussing (4)**
45:17,21;119:3;
120:11
**discussion (12)**
11:13;17:20;18:1;
57:22;64:21;76:11;
79:8;112:2;116:23;
125:2;154:8;158:6
**discussions (2)**
44:10;120:14
**disdain (1)**
110:12
**disenfranchise (1)**
59:6
**disenfranchised (1)**
61:2
**dismiss (4)**
61:23;62:2,5;175:10
**disparate (2)**
92:12;163:11
**dispose (2)**
48:21;50:1;66:6
**disposition (1)**
46:19
**disproportionate (1)**
106:9
**dispute (9)**
15:16;74:16;98:22;
99:13,15;138:11;
149:15;159:11,15
**disputed (2)**
155:2;163:9
**disputes (3)**
65:1;110:15;135:19
**disrupting (1)**
47:3
**dissertation (1)**
107:9
**disservice (2)**
43:9;159:10
**distinction (5)**
99:17;101:4;105:21;
106:5;165:19
**distinguished (1)**

6:8
**distribute (3)**
8:15;75:7;106:3
**distribution (13)**
29:16;45:4;57:22;
64:17,22;73:23;74:13;
76:22;79:8;80:6;81:15;
96:16,25
**District (10)**
18:13;19:13;20:24;
58:11;60:13;72:1;
104:13;112:12;162:24,
24
**district's (1)**
21:6
**divide (2)**
84:5;90:7
**divides (1)**
76:11
**dividing (3)**
84:7,11;91:6
**docket (17)**
15:16;26:17,18;27:5,
18;62:1,1;63:6,9,17,18,
22;147:22;153:15;
155:22;168:9;180:20;
187:3
**document (15)**
15:25;18:1;32:3,7;
50:17;63:6;140:14,15;
156:12;161:15;167:10;
168:12,15,17;170:21
**documentary (1)**
138:6
**documentation (2)**
17:3;143:25
**documents (18)**
5:6;36:13;38:9,23;
139:23;148:10;151:23;
152:15;154:10;157:8,
18,18;161:11,12;
167:11,24;169:6;
179:15
**dollar (12)**
6:20,23;7:3;30:5;
92:12;93:3;102:15;
108:10;133:21;137:25;
138:19;177:8
**dollars (43)**
5:24;6:2,2,3,10,11,
13,17,19,21;31:19;
59:2;72:2,4;75:3,9,10,
10;76:24;80:12;84:25;
86:7;88:13;90:23;
97:11,21;110:13;
112:20;132:14,17;
133:15,22;134:8,13;
135:20;138:2,3,14;
139:6;163:13,13;
169:21;177:5
**domain (17)**
18:14;20:5,10,14,19,
24;21:6,22,25;22:3,12,

21;23:15,17;183:13,16,
19
**domain's (1)**
185:3
**domino (1)**
138:25
**Donaldson (1)**
118:22
**Donato (16)**
49:14,16,18;133:4,6,
7;135:2;174:17;175:1,
6,9,16,19;176:1,9,10
**done (22)**
26:25;41:19;48:1;
50:5;52:6,7,13,14;53:7,
10,12,15,17;114:14;
116:21;122:6;127:13;
147:4;149:2;150:14;
156:17;159:9;185:16;
186:15
**door (2)**
69:4;113:4
**dot (1)**
98:17
**double (4)**
28:9;48:18;70:6;
139:7
**double-check (1)**
17:9
**doubt (3)**
6:7;142:10;144:5
**dovetails (1)**
57:22
**down (18)**
6:16,19;16:13;25:18;
67:9,22;70:8;91:20;
95:24;144:13,14,14;
152:9;157:1;160:3;
168:18;182:11;184:23
**downplay (1)**
59:7
**dozens (1)**
132:24
**draconian (2)**
45:3;47:17
**draft (1)**
11:4
**drafting (2)**
67:6;182:17
**drawing (1)**
100:8
**drew (1)**
138:17
**drive (2)**
91:20;135:4
**drop (5)**
78:13;88:11;92:6;
94:7;130:11
**dropped (5)**
6:16;7:7;87:22;
88:19,20
**dropping (4)**
45:18;79:4,4,4

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 196
of 219

**drops (7)**
78:19;86:20;88:5;
92:4,8;113:13;115:19
**Ds (5)**
61:16;66:17;97:3,5;
101:14
**Dubbs (5)**
55:16,23;56:1,3,11
**Dubbs' (1)**
112:12
**D-U-B-B-S (1)**
56:2
**due (4)**
111:3;179:12;181:8,
24
**duly (1)**
33:9
**Dumas (1)**
134:15
**dump (2)**
150:20,20
**dunk (1)**
152:9
**duplicate (1)**
87:18
**during (21)**
5:15;49:2;51:11;
55:18;59:12,13;60:1;
68:8,15;80:17;84:25;
86:13,16;90:18;91:12;
92:14;94:16;113:14;
115:20;142:17;167:16
**duties (4)**
60:20,23;112:15;
150:19
**duty (1)**
17:10

**E**

**earlier (10)**
11:4;60:3;66:11;
73:24;112:10;114:25;
115:2;123:10;125:17;
172:22
**early (3)**
24:25;54:16;113:19
**earned (1)**
31:19
**earnings (3)**
121:15;126:16,16
**easier (1)**
185:15
**easily (2)**
111:16;159:16
**easy (8)**
103:1;113:3;115:12;
169:7;172:11,12;
183:17,20
**echo (1)**
43:25
**economic (3)**
43:6;59:5;83:19

**economically (1)**
103:22
**economy (3)**
145:23,23;146:1
**Edison (1)**
42:10
**education (1)**
154:19
**Edward (1)**
26:23
**effect (6)**
10:24;21:2;27:16;
67:1;138:25;140:24
**effective (19)**
40:21;51:19,25;52:1,
17,18;75:20,20;
121:24;122:14,15;
123:23;148:14,18;
156:20;158:21;164:17;
176:3,23
**effectively (4)**
66:13;69:5;80:7,20
**effectiveness (1)**
151:21
**efficient (3)**
13:25;94:10;127:9
**effort (2)**
42:2;110:16
**efforts (4)**
42:1;110:15;112:24;
183:14
**eight (9)**
40:16;41:11;78:25,
25;86:20;88:20;92:4;
132:17;133:15
**eighty (2)**
131:9;171:25
**eighty-eight (1)**
137:24
**either (17)**
11:24;23:8;29:5;
38:16;43:11;53:12;
68:1;79:2;83:5;102:20;
105:8;114:10;126:21;
157:17;158:18;174:6;
186:12
**elaborate (1)**
126:5
**elaborating (1)**
126:1
**election (2)**
111:12,13
**electric (2)**
20:18;68:10
**elegant (2)**
74:5;113:16
**element (2)**
31:16;104:7
**eleven (2)**
94:5;135:20
**eligibility (1)**
104:25
**eligible (1)**

104:15
**eliminated (1)**
21:18
**else (19)**
4:25;8:23;9:1;30:9;
35:9;51:15;57:2;77:4;
89:16;91:12;127:15,
19;131:21;164:3;
166:9;171:14;172:25;
176:16;181:12
**else's (1)**
22:3
**elsewhere (1)**
66:10
**email (2)**
18:15;138:7
**emailed (2)**
14:12;22:4
**emails (2)**
22:9;35:3
**emerge (2)**
47:15,19
**emergence (2)**
53:3,4
**emergent (2)**
47:5,9
**emerging (1)**
47:16
**eminent (18)**
18:14;20:5,10,14,19,
24;21:6,22,25;22:3,12,
21;23:15,17;183:13,16,
19;185:3
**emotional (1)**
168:22
**emotions (1)**
167:21
**Employees (5)**
58:8,14,18,20;
143:19
**empower (1)**
47:3
**empowering (1)**
44:12
**encompasses (2)**
115:19,19
**end (31)**
55:14;57:11;65:9;
76:10;79:7;81:5;87:12;
88:10,21;89:6,25;
90:11,15,24,25;92:11,
13;94:13;95:15;102:2;
113:12;118:23;120:23;
124:1;135:12;150:3;
154:13;156:9;169:20;
181:11;185:15
**endeavor (1)**
123:22
**ended (3)**
88:23;133:3;169:24
**end-run (1)**
67:11
**Energy (4)**

22:25;104:22;
145:22;146:3
**enforce (2)**
141:21;166:8
**enforcement (1)**
30:25
**enforcing (2)**
165:1;178:10
**engage (2)**
110:17;112:22
**engineered (3)**
86:10;91:20;117:6
**enhanced (3)**
142:19,20,20
**enjoin (1)**
65:18
**enjoined (1)**
66:1
**enjoyed (1)**
134:5
**enough (10)**
6:1;21:10;28:10;
32:17;42:11;107:6;
129:20;135:11;181:8;
185:13
**ensure (1)**
48:11
**enter (5)**
122:7;123:25;
153:16;161:17;175:12
**entered (4)**
122:16,18;124:1;
174:17
**entire (1)**
88:3
**entirely (5)**
60:4;68:16;92:17
**entities (4)**
29:14;30:14,21;31:4
**entitled (4)**
42:24;111:8;131:6;
167:5
**entitlement (1)**
131:11
**entity (8)**
29:19;30:18;31:7;
32:13;34:1;71:1,4;
97:17
**entry (3)**
121:21;122:21;
158:19
**equal (10)**
105:1;131:5;136:24;
137:5;145:9;147:1;
154:23;161:8;164:2;
165:1
**equally (4)**
140:5;147:9;148:23;
162:16
**equals (1)**
84:18
**equation (1)**
7:4

**equitable (4)**
91:3,16,17;102:24
**equity (60)**
5:17;8:16,16;49:7;
59:4,19;70:13,14;71:3,
4;72:9,24;75:2,7,8,9,
11,17,24,25;76:8;
77:21;78:14;83:10,13;
84:14;102:12;103:2,7,
10,11,25;104:8;105:6,
17,17,18,22;106:3,4;
107:25;108:2,7,7;
121:13,18,19;123:19;
126:24;136:1;139:23;
144:11;147:17;148:10;
151:24;152:15;153:6;
158:1;160:15;171:15
**Equity's (1)**
75:25
**equivalent (7)**
8:16;108:6,21;
135:15,16;140:17,21
**error (1)**
84:9
**escapes (1)**
92:21
**eScribers (1)**
188:11
**especially (3)**
145:8;170:14;182:18
**essentially (19)**
35:18;82:2;84:21;
87:4;96:25;103:24;
104:24;110:18;122:9;
128:24;131:14;139:13;
149:24;150:5,7;
151:10,15;165:4;174:9
**establish (3)**
6:10;44:16;137:1
**established (4)**
133:5;162:20;
170:22;179:12
**estate (3)**
8:4;66:3;169:20
**estimate (2)**
133:3;175:1
**estimated (1)**
174:9
**estimates (1)**
129:18
**estimation (11)**
49:14;132:23;133:8;
135:1;137:10;173:25;
174:16,20;175:4,12;
176:23
**et (3)**
29:19;52:15,15
**Etkin (44)**
5:7,11,14;9:1;35:16,
23;54:17,20;55:2,3,4,6,
7,11,23;56:3,12,19,25;
57:3,6,12;102:6;109:8,
19,21,24;111:14;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 197
of 219

113:22;114:5,7,20;
115:10,13;116:21;
117:18,21;118:1,4,13,
16,20;120:19;171:2
**Etkin's (1)**
128:14
**even (29)**
8:19;20:3;29:3;
33:14;51:18;67:19;
69:3;72:21;77:5;92:20;
97:18;101:5;104:15;
109:1;113:2;116:3;
130:8;142:5;156:19;
157:20;158:4;164:5;
166:1;168:20;169:23;
176:8;184:2,2;186:19
**evening (5)**
5:15;89:8;159:23;
185:22;187:4
**event (4)**
4:20;29:12;115:14;
143:24
**events (4)**
80:13;85:25;142:25;
185:16
**eventually (2)**
93:16;134:3
**everybody (11)**
16:10;25:16;28:9;
30:9;46:5;50:6;80:20;
164:3;166:9;171:14;
181:12
**everyone (8)**
85:12;94:15;95:22;
149:7;170:22;185:23,
24;186:24
**everyone's (3)**
54:15;140:4;185:1
**evidence (9)**
102:17;117:7;
132:20;134:22;135:3;
138:6;146:25;161:1;
163:9
**evidentiary (1)**
118:10
**exact (5)**
45:15;73:1;79:18;
122:10;124:22
**exactly (1)**
30:19;70:23,24;
184:16
**examiner (10)**
137:15;179:9,10,23;
180:3,24,25;181:18;
182:18,20
**example (9)**
44:23;78:2;82:20;
97:15;104:22;125:17;
150:3;153:14;184:3
**examples (1)**
104:12
**excellent (1)**
145:17

**except (2)**
30:22;54:12
**exception (2)**
30:22;48:13
**excerpts (1)**
147:20
**excess (1)**
149:13
**Exchange (2)**
61:7;134:17
**exclude (1)**
23:18
**excluded (1)**
104:20
**excluding (1)**
105:19
**exclusivity (4)**
49:19;133:14;
134:15;144:15
**exculpate (1)**
170:3
**exculpation (5)**
170:2,4,12,20,22
**excuse (1)**
32:4;36:5;56:16;
62:16;70:23;85:2,2;
99:9;101:23;118:21;
155:8
**executed (1)**
42:3
**execution (3)**
42:4,12,15
**executive (1)**
33:16
**executory (7)**
10:24;15:13,18;
16:13,25;24:17;119:24
**exempting (1)**
162:20
**exercise (3)**
20:18;104:9;123:22
**Exhibit (3)**
27:4;168:16,17
**exhibits (4)**
32:10,13;118:4,11
**exist (3)**
69:10;72:12;141:15
**existing (9)**
75:11,17;78:17;
103:7,25;104:8;105:6,
7;106:3
**exists (2)**
71:23;153:21
**exit (4)**
52:20,20,23;53:2
**expansive (1)**
17:24
**expect (2)**
58:20;121:5
**expectations (2)**
101:25;167:22
**expected (2)**
87:1;104:5

**expecting (3)**
24:3;34:16;35:9
**expeditious (1)**
48:25
**expense (1)**
180:2
**expert (1)**
143:12
**explain (12)**
7:19;20:16;124:11;
125:5,5,22,23;126:20;
138:11;147:13;151:2;
174:4
**explaining (1)**
124:15
**explanation (1)**
86:10
**explicitly (1)**
181:16
**exploding (1)**
132:21
**exposure (1)**
134:22
**expressed (1)**
72:3
**expressly (3)**
70:15;153:1,4
**extend (2)**
101:13;150:6
**extended (2)**
58:25;61:1
**extending (1)**
111:2
**extends (1)**
170:12
**extension (1)**
119:10
**extensive (1)**
62:4
**extent (9)**
35:23;53:24;63:8;
98:16,18;113:10;
117:13;119:24;157:20
**extra (1)**
177:9

## F

**F3d (1)**
86:23
**face (2)**
103:21;146:2
**fact (28)**
5:11;21:14;27:13,17;
60:11;70:7;77:3,24;
78:16,21,22;81:21;
92:20;97:23;101:6;
105:1;106:14;107:10;
113:25;116:9,11;
121:14;135:1,8;
137:17;159:10;167:12;
182:3
**factor (4)**

75:1;81:7;98:13;
134:1
**facts (6)**
5:20;79:17;81:3;
82:1,2;94:17
**factual (1)**
117:7
**fail (2)**
30:22;143:23
**failed (2)**
138:6;169:22
**failing (2)**
47:14;111:4
**failure (6)**
42:3,5,14;45:9;
77:24;138:8
**fair (15)**
40:4;43:3,5;48:11;
60:16;88:12;91:3,15,
17;102:24;128:13;
133:20;166:9;174:14;
176:24
**fairly (7)**
14:5;40:22;60:17;
93:14;103:1;173:8;
174:6
**fairness (4)**
147:24,25;153:11;
160:23
**faith (5)**
27:9;112:23;145:11;
166:9;167:22
**fall (2)**
90:18,22
**fallen (1)**
90:18
**falls (1)**
103:6
**familiar (1)**
98:21
**familiarity (2)**
114:3,3
**famous (1)**
11:2
**far (4)**
21:10;41:7;60:25;
90:18
**fast (1)**
22:9
**fault (2)**
37:25;110:1
**faulty (1)**
129:12
**favor (1)**
30:7
**favorable (1)**
82:25
**favorably (3)**
143:13;144:13,20
**feasibility (8)**
136:21;141:25;
142:1,13;145:4,12;
148:20;164:23

**feasible (2)**
136:20;166:12
**Feather (1)**
37:24
**February (2)**
44:18;49:13
**federal (11)**
26:8,19;28:12;29:19;
58:11;79:15;81:1;
92:16;138:15,19,21
**feds (1)**
33:4
**feedback (2)**
89:9,17
**feel (3)**
117:14;159:1;178:23
**fees (1)**
45:7
**feet (2)**
32:18;142:22
**Feldman (1)**
177:21
**FEMA (1)**
29:19
**Ferrara (2)**
188:3,9
**few (11)**
10:20,21;21:24;22:1;
28:24;64:5;96:12;
103:5;110:5;125:11;
169:2
**fide (1)**
116:25
**fiduciaries (1)**
180:5
**fiduciary (5)**
112:14,18,21;
150:19;181:23
**field (1)**
43:19
**fifteen (1)**
35:3
**Fifth (3)**
92:20;137:9;148:12
**fifth-largest (3)**
145:22,23;146:1
**fifty (7)**
42:8;49:17;108:12,
18;22;135:13,13
**fifty-six (1)**
6:20
**fight (1)**
140:19
**fighting (1)**
172:7
**figure (5)**
7:18;76:25;93:3;
114:4,15
**figured (1)**
77:2
**figuring (1)**
94:10
**file (20)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) Etkin's - file
Page 198

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 198
of 219

58:24;59:3,8,9;60:4;
68:18;111:3;137:18;
146:19;147:21;159:20,
22,23;169:5,14;180:1;
181:15,24,25;182:20
**filed (25)**
6:6,17;7:1;10:20;
11:4;15:15;20:13;21:5;
59:4;60:8,25;62:9;
63:6,16;68:20;97:9;
98:2;111:7;112:16;
133:13;141:7,16;
161:15;169:21;182:6
**files (1)**
6:12
**filing (1)**
82:4
**final (7)**
88:11;102:5,9;120:4;
122:19,19,20
**finality (1)**
52:12
**finalize (2)**
38:15;120:17
**finalized (1)**
4:15
**finally (5)**
28:19;64:21;88:10;
89:15;145:3
**financial (7)**
41:13;42:18;144:24;
145:25;150:15;160:16;
162:10
**financing (20)**
123:19;124:19,19;
139:23;140:2,3;
142:14;144:16,18;
146:24;147:17,21;
151:24;152:15;153:6,
12;161:16;165:23,25;
183:14
**find (6)**
6:14;9:15;77:1;
117:23;168:16,16
**finding (1)**
21:13
**fine (19)**
10:16;11:21;14:8;
15:15;20:8;49:8;52:11;
93:20;118:13;129:9,
10;146:14,17;155:9,
10;167:7;172:18;
182:8;185:3
**finish (2)**
14:4;169:4
**finished (2)**
15:1;184:6
**Fire (90)**
9:7;15:21;26:3;27:1,
6;29:13;30:1;31:2,3;
33:10;40:9;41:24;
42:16;43:18;44:8,8,11,
16;45:4,24,25;46:12,

13,14,16,21;47:1,3,16,
21;48:1,3,8,11,18,21,
24;49:1,10;50:1,2;
51:4,8,10,11,12;53:5;
64:1;99:5;100:14,15;
103:13,14,15;125:18,
19;131:24;132:21,22,
22;133:10;134:19,19;
140:11;141:14,24;
142:6;146:8;147:10,
11;149:12;150:14;
151:7;152:1;160:14;
163:15;165:18,24;
169:13,15,23;171:9;
173:10,11;174:5;
177:3,6,15;178:9;
181:23
**firefighters (1)**
58:19
**fires (2)**
132:25;134:1
**fire's (1)**
143:8
**firm (8)**
33:22;54:17;112:12;
136:5;142:16;179:13,
14;182:5
**firms (2)**
139:21;176:6
**first (48)**
20:2;21:25;28:15,15;
31:19;39:12,14,18;
43:24;46:10;52:2,19;
56:11,14;64:15,25;
92:6,6;97:3,25;108:25;
114:25;120:10;125:3;
129:3;132:19;133:6,
21;135:8;136:17;
137:25;142:18;145:13;
146:20;147:4,7;
150:14;151:9;153:21;
154:2;157:4,6;158:5,6;
160:19;173:8;176:5;
184:20
**Fist (2)**
83:7;152:7
**fit (1)**
65:25
**fits (1)**
71:18
**five (13)**
36:12;39:22;92:9;
110:5;140:11,16;
147:16;150:5,8;155:7;
163:4,15;164:4
**fix (10)**
64:13;67:8,17;73:1,
19;74:5,6;88:24;90:5;
113:3
**fixable (1)**
111:21
**fixed (3)**
64:10;111:23;117:3

**fixes (5)**
64:11;74:9;79:7;
83:25;117:12
**flames (1)**
34:12
**flaw (1)**
107:12
**floor (2)**
10:17;57:18
**flux (1)**
104:2
**flying (1)**
161:21
**focus (3)**
23:2;40:25;159:2
**focused (2)**
112:2;113:11
**focusing (1)**
51:4;93:5;114:7
**fold (1)**
69:10
**folks (11)**
9:17;10:6;13:17;
65:15,25;87:8;103:18;
123:21;124:7;143:2;
170:14
**folks' (1)**
61:1
**follow (4)**
7:6;71:6;121:5;
169:7
**following (4)**
87:23;99:19;123:8;
165:16
**follow-up (2)**
38:3;109:18
**forbid (2)**
46:25;51:8
**forbidden (1)**
65:2
**forced (4)**
42:7;132:16;135:12;
136:2
**forefront (1)**
131:24
**foregoing (2)**
66:4;188:3
**forgot (3)**
59:6;122:10;179:7
**form (17)**
7:4;41:16;63:20;
72:6,7,10,11;103:5,12;
108:16,19,19;139:22;
147:2;151:25;153:18;
184:9
**formal (1)**
180:10
**format (1)**
35:19
**formation (1)**
21:1
**former (3)**
61:10,16;66:16

**forms (1)**
132:7
**formula (50)**
41:25;57:23;64:17,
23;73:23;74:13;76:7,
21;77:1;79:8;80:6,19;
81:14,15;82:24,25;
84:5,7,15,17;86:6,6;
88:24;90:5;91:6,19;
92:3,9,20,25;93:5,8,10,
17;94:4;96:15,16;
97:19;107:2,2,3,17;
108:10;113:8,25;
114:9;115:6,23;116:5;
117:5,9
**formulas (1)**
81:5
**formulations (1)**
114:4
**forth (6)**
11:23;14:7;21:15;
47:5;157:9,22
**fortuitously (1)**
78:21
**forty (1)**
49:17
**forty-five (1)**
128:20
**forward (7)**
120:10;127:14;
129:25;155:8;174:15;
186:24;187:2
**found (2)**
7:9;83:11
**four (5)**
63:19;79:23;132:14;
142:23;155:7
**fourteen (3)**
6:17,19,24
**fourth (3)**
79:24;136:25;146:12
**fraction (5)**
7:4,14;83:3,4;113:20
**frame (1)**
158:5
**framed (3)**
135:7;155:11;179:2
**framework (1)**
175:2
**FRANCISCO (3)**
4:1;22:25;121:8
**frankly (8)**
13:2;65:6;80:24;
91:13;93:14;95:4;
141:18;180:9
**fraud (8)**
7:22;27:9;78:3,5,7,
15,17,22;79:5;80:13;
82:3;87:25;88:16;
90:14,14;91:1;94:14;
107:12
**fraud-related (1)**
90:17

**frauds (1)**
78:25
**freedom (1)**
168:5
**freeze (1)**
67:24
**fresh (1)**
129:3
**friction (1)**
64:14
**FRIDAY (7)**
4:1;85:20;167:7,8;
176:2;183:11;185:21
**Friday-night (1)**
180:18
**friend (1)**
29:10
**front (7)**
13:20;28:18;32:11;
44:5;21;63:23;103:12;
133:3;135:2;161:15,
17;175:16
**frozen (3)**
63:2;73:13,16
**frustrated (1)**
109:11
**Fulbright (1)**
37:23
**fulfill (1)**
112:21
**full (7)**
12:22;46:21;115:12;
154:14;170:22;181:6;
186:9
**fully (5)**
40:12;56:20;62:3;
84:9;144:25
**fun (1)**
186:15
**function (4)**
8:25;92:16;126:21;
143:1
**fund (4)**
52:15;112:21;144:9;
145:15
**fundamental (5)**
74:16;84:3;86:11;
137:6;145:10
**funded (2)**
44:25;46:13
**funding (4)**
47:6,9;64:1;176:2
**funds (5)**
58:14;61:14;146:5,5;
160:8
**funneled (1)**
103:15
**furnished (1)**
5:3
**further (8)**
4:21;15:17;28:7;
38:11;54:5;112:2;
123:16;127:6

Min-U-Script®

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 199
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(11) filed - further

**future (3)**
66:18;93:12;146:4

**G**

**game (5)**
6:18,18,24;28:11;
55:12
**gander (1)**
148:1
**Gas (1)**
68:10
**gave (7)**
31:4;32:1;54:19;
82:20;107:9;134:17;
160:3
**gears (1)**
120:1
**Geller (1)**
99:4
**general (5)**
33:25;34:1,17;59:9;
63:24
**generally (1)**
22:22
**gentlemen (1)**
85:17
**gets (7)**
70:11;76:21;80:11;
98:15;113:20,20;
185:16
**giant (1)**
34:11
**given (12)**
32:25;49:11;70:7;
81:3;86:7,11;87:6;
120:3;124:9;155:21;
178:13,13
**gives (2)**
150:23;152:8
**giving (4)**
34:1;136:14;149:9;
159:15
**glad (2)**
86:3;140:25
**glaring (1)**
97:15
**Glassman (30)**
18:12;19:2,5,6,8,9,
11,11,14,17,21,24;
20:1,12,21;21:22;
22:11,14,16,19;23:22,
24;24:9,10,15,17,19,
21;25:19;119:6
**Glassman's (1)**
22:2
**global (1)**
75:13
**goal (2)**
48:24;110:19
**goals (1)**
42:25
**god (2)**

46:25;51:8
**goes (7)**
70:24;72:25;79:6,21;
88:4;106:13;140:24
**go-forward (1)**
52:15
**Good (44)**
4:8,10;9:3,5;10:2,3,
6,8,12;24:22;28:10;
32:17;36:23;37:2,12,
15,22;38:18;42:4;54:1,
1;55:6;56:6;58:6;
87:16;112:4,23;
117:25;128:3,6,8;
130:16;135:21;139:9;
144:18;145:4,11;
160:8,10;166:9,13;
167:22,23;177:17
**good-faith (2)**
151:1;164:22
**goose (1)**
147:25
**Gorton (23)**
9:17,19;10:6,8,25;
11:7,20;12:18;13:18,
20;14:17,19,23;17:13,
13,15,19,22;18:5;
25:20;119:5,16;125:16
**Gorton's (1)**
22:25
**Gotshal (1)**
179:18
**government (16)**
16:1,3;29:14,18,18,
25;30:21;31:4,7;34:1;
125:19;138:15,19,21;
139:1;172:22
**governmental (4)**
4:24;11:3;22:22;
25:12
**government's (1)**
26:16
**governor (1)**
145:3
**governors (2)**
49:10;144:2
**governor's (3)**
122:9;144:3,20
**grant (3)**
132:23;162:6,7
**granted (2)**
132:19;137:5;174:2
**granular (1)**
99:18
**great (10)**
41:16;47:14;49:9;
50:7;72:20;83:2,4,18;
95:21;174:25
**greater (4)**
92:13;132:14;146:2;
166:1
**greatly (1)**
144:23

**gross (1)**
42:8
**grounds (1)**
118:5
**group (12)**
5:4,8,17;12:18;
15:25;22:24;36:14;
38:14;141:6,18;
160:13;167:2
**groups (2)**
136:21;167:1
**guarantee (6)**
40:13;41:7,23;
163:20;166:19;171:23
**guaranteed (5)**
137:3;140:9;146:3,4;
154:3
**guaranteeing (1)**
165:1
**guarantees (3)**
139:20;164:2,3
**Guaranty (1)**
11:7
**guess (5)**
56:23;57:18;93:10;
98:11;101:17
**guidance (1)**
83:7
**guilty (1)**
114:21
**gut (1)**
164:20
**guy (2)**
124:8;186:18
**guys (1)**
142:24

**H**

**habit (1)**
85:18
**half (5)**
41:2;80:18;129:18;
143:7;163:24
**halfway (1)**
160:6
**Hallisey (1)**
46:6
**halls (1)**
142:10
**hallucination (1)**
42:12
**hammer (1)**
93:12
**hand (22)**
8:24,24;9:15;18:13,
17,18,22,24;19:15;
25:8,10,16,18;27:22;
34:25;56:16,22;95:19;
110:18;127:21;181:10;
186:20
**hand- (1)**
182:3

**handle (1)**
142:24
**handled (1)**
115:9
**hands (10)**
19:15;25:6;36:8;
56:13;115:12;118:18;
152:13;181:6;186:7,9
**hands-off (2)**
30:20,21
**hang-ups (1)**
5:11
**happen (12)**
49:4;51:19;69:20;
72:7;83:16;93:2;96:13;
116:12;143:8;145:3;
176:18;182:22
**happened (8)**
78:5;82:3;87:25;
90:16;112:5;135:5;
136:4;162:18
**happening (2)**
22:9;57:14
**happens (10)**
7:3;52:17;72:4,14;
101:18;173:14;176:1,
2,2,2
**happy (6)**
11:21;13:1;160:6;
179:25;181:24;186:14
**hard (5)**
32:17;47:8;53:10;
141:2;160:16
**hardening (1)**
142:20
**hardly (1)**
105:18
**Hardwoods (1)**
67:14
**hat (2)**
26:13,23
**hate (1)**
120:14;161:20
**haul (1)**
6:19
**heads (1)**
136:5
**heads-up (1)**
158:6
**Health (1)**
37:23
**hear (31)**
5:14;10:7,12,15;
11:8;12:13,15;25:7;
26:6;28:2;39:11;40:18;
57:17;62:18,18;64:18;
73:9,16;89:11,21;90:8;
114:22;118:17;140:25;
155:13,20;175:8;
176:5;180:9,11;186:11
**heard (32)**
4:23;5:23;11:10;
12:20;25:9,11,13;

35:10;49:1,2;70:8;
87:4;104:1;114:24,25;
115:2;120:2;124:24;
125:16,17;127:8;
129:5;134:20;144:11;
153:7,9;172:6;175:6,
11;178:2;186:4,5
**hearing (16)**
14:14;28:16;57:10;
60:3;63:1,17;89:13;
95:23;115:15;127:6;
132:12;142:7;167:16;
175:15;178:20;185:25
**hearings (4)**
47:22;135:15;137:8;
143:14
**heart (1)**
90:3
**heart- (1)**
49:18
**heavily (1)**
26:24
**heavy (5)**
19:23;109:23,24,25;
110:2
**heck (1)**
141:25
**heirs (1)**
42:5
**held (6)**
65:23;87:11;105:4;
135:22,23;163:21
**helicopters (1)**
143:1
**Hello (1)**
19:9
**help (8)**
21:15;34:18;47:3;
112:3;136:6;138:20;
147:6;179:8
**helped (2)**
135:3;138:10
**helpful (4)**
117:11;125:12;
180:16,20
**herding (1)**
13:21
**here's (8)**
47:10;88:1;135:23;
164:25;166:11;167:17;
169:17;171:13
**hiding (1)**
130:21
**high (3)**
86:11;138:8;180:19
**higher (5)**
7:17;75:15;83:15;
103:17;182:15
**highest (4)**
83:1,2;84:24;144:4
**highlight (1)**
169:6
**high-low (1)**

Min-U-Script®

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 200
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(12) future - high-low

96:2
**highly (1)**
40:20
**himself (2)**
56:20;120:18
**history (2)**
47:21;133:9
**hit (1)**
145:24
**hitting (1)**
89:14
**Hold (19)**
10:5;27:21;28:5;
47:10;57:13;63:12;
64:3;65:23,23,25;
67:25;81:4;103:11,22;
130:1;149:20,23;
163:19;175:5
**HoldCo (25)**
68:4,5,7,7,13,24;
69:5,10,22,22;71:13,
16,17,25;72:12,13,24;
73:2,3,21,25;74:23;
153:16;161:17;162:3
**HoldCo's (2)**
69:13;71:23
**holder (6)**
59:20;77:21;96:24;
105:17,18;108:5
**holders (10)**
45:6;74:14;75:24;
103:7,25;104:8;105:6;
106:3;117:9;153:19
**holding (2)**
71:7;153:16
**holdings (2)**
149:13;150:2
**home (3)**
159:21,22;168:14
**homeowners (1)**
42:6
**homes (2)**
42:23;47:11
**homework (2)**
54:20;121:9
**honest (6)**
17:10;49:6,12;
140:16;158:8;182:7
**Honor (322)**
4:6,10,14;9:5,23;
10:1,3,13,18;11:17;
12:8,14,17;14:10,19,
24;16:2,12;17:13,19;
18:9,9;19:18;21:19;
22:19,20;23:23;24:1,7;
25:23,25;27:19;28:4,
14,15,24;30:16,24;
33:18;34:13,20;36:5,
10;37:9,14,20,22;38:6,
21,24;39:13,15,24;
40:3,10,19,23;41:6;
43:20,24;44:21;45:16,
20;46:9;49:14,15,16;

50:8;54:9;55:3,7,11,
23;56:1,6,12,16,19,25;
57:3,7,20,21;58:2,6,17,
21;59:10,21,24;60:15;
61:5,18;62:8,16,21;
63:3,14,16,19,22;
64:11,13,15,18;65:1,
22;66:9,15;67:5,19,23;
68:2,17;69:2,6,7;70:3,
15;71:10;72:20,25;
73:9,12,15,17,19;74:4,
11;76:2,17;77:8;78:10,
14,18,20;79:6,12,22,
25;80:4,16;81:7,8,25;
83:9,17,22;84:3,15,22;
85:16;86:4,15,23;87:6,
16,19;88:2,8,17,24;
89:5,20,21,25;90:2,4,8,
12,13,20;91:5,8,13;
92:14;93:7,10,11;
94:11;96:9,15;97:14,
25;99:1,12;100:25;
101:5;102:4,9,12;
105:10,21;106:17,23;
107:7,15;108:16;
109:7,14,21;110:4,6,
19;111:6,9,14,17,24;
112:7;113:1,22;114:7,
20,24,24;115:2,13,22;
116:1,8,21,24;117:8,
10,18,24;118:1,8,20;
119:20;120:6;121:12;
122:8,11,21;125:8;
128:3,8,12,23;129:5;
130:4,10,16;131:3,8,
15,22;132:5,12,15,24;
134:6,18;135:10,14,16;
136:11,25;137:13,16,
18,19,20;138:9,14;
140:6,15;141:13,23;
143:19;145:13;146:13,
13;147:8;148:5;
149:20;150:25;151:23;
154:17;156:5,23,24;
158:7,19;159:9,24;
160:14;161:15;163:16,
19;164:12;166:11;
168:4;169:5,17;170:9,
14,25;172:18;173:16;
174:13;176:5,20,25;
177:3,7,22;178:3,6,16;
179:3,22,25;180:2,6;
181:14;182:23;184:16;
186:17;187:5
**Honorable (1)**
4:5
**Honor's (10)**
38:9,13,17;62:13;
64:20;71:18;74:14;
101:2;114:25;115:16
**hook (1)**
100:2
**hope (8)**

5:14;38:11;53:16;
85:19;86:3;147:6;
156:16;178:22
**hopeful (3)**
20:12;157:4,24
**hopefully (7)**
13:14;46:21,22;50:5;
54:22;118:24;158:15
**horseshoes (1)**
111:9
**Hospital (1)**
37:24
**Hostetler (4)**
128:4;130:17;131:1;
180:25
**hour (11)**
12:20;54:19;57:16;
58:1;128:23;129:13,
18,19,19;169:2,2
**hour-and-a-half (1)**
171:1
**hours (2)**
135:1;182:19
**house (1)**
142:22
**housekeeping (1)**
118:2
**huge (3)**
46:16;49:11;143:15
**hundred (6)**
41:14;51:22;108:11,
11,15;169:21
**hundred-percent (1)**
169:18
**hundreds (2)**
155:25,25
**hypothetical (28)**
5:18,19;6:5;8:18;
13:17;21:4;57:19,21;
58:3;64:21;71:19;
72:17;76:23,24;77:3,5,
13;78:20,24;80:3;
81:22;82:15,18;91:24;
92:9;97:8;98:5;107:23
**hypothetically (2)**
69:12;113:23

**I**

**idea (5)**
8:7;116:15;121:2;
160:10;165:19
**identical (1)**
106:8
**identified (6)**
28:22;56:20;111:22;
112:8;117:14;186:20
**identify (1)**
136:15
**identifying (1)**
56:22
**ignores (1)**
90:25

**II (1)**
74:15
**imagine (5)**
14:6;33:14;39:7;
136:4;140:13
**immediate (1)**
31:25
**immediately (2)**
13:6;121:20
**immoral (1)**
163:17
**impact (8)**
46:17,24;66:20;
67:23;116:9;117:1;
137:9;183:14
**impacts (1)**
79:20
**impaired (1)**
64:23
**impatient (1)**
166:22
**imperfect (2)**
44:21;46:1
**impermissible (1)**
67:2
**implement (1)**
64:13
**implementing (1)**
75:1
**implicitly (1)**
105:4
**impliedly (1)**
181:17
**importance (4)**
40:8;63:25;110:24;
124:23
**important (43)**
20:1;46:8;49:24;
61:19,21;75:18;90:13;
123:22;124:19;128:24;
132:7,8;133:4,16,19;
134:6,17;135:5,6,24;
24;139:25;140:5,8,13;
141:6,17,21;143:18;
145:19;147:3;159:1;
165:9;170:11,13;
177:3;179:4;181:14
**Importantly (3)**
106:21;111:21;
154:12
**imported (1)**
68:22
**impose (1)**
185:23
**imposed (1)**
112:14
**imposes (1)**
156:15
**impression (2)**
108:25;125:4
**improve (1)**
143:4

**improved (2)**
142:19;144:23
**improvement (1)**
143:15
**improving (1)**
143:10
**inaccuracies (1)**
10:22
**incentive (1)**
59:6
**inchoate (1)**
23:16
**inclined (4)**
121:18;123:10;
135:21;183:1
**include (5)**
58:18;60:23;112:15;
139:23
**included (5)**
27:13;59:11,13;
170:5,19
**includes (8)**
5:4;23:15;29:13;
30:15;45:5;72:13;
104:17;155:12
**including (8)**
12:18;44:11;46:5,6;
60:24;96:23;113:9;
132:20
**inclusion (1)**
44:7
**inclusive (1)**
61:25
**inconceivable (1)**
7:20
**inconsistencies (1)**
23:7
**inconsistent (4)**
8:7,14;171:20;
172:15
**incorporate (1)**
40:4
**incorporated (1)**
68:19
**incorporates (1)**
68:21
**increase (2)**
68:14;108:14
**increased (2)**
41:22;133:22
**incur (1)**
134:1
**indeed (1)**
64:10
**indemnification (5)**
66:16,19;97:4;134:9;
139:14
**indemnified (3)**
30:15;134:7;139:6
**indemnifies (1)**
27:10
**indemnity (5)**
16:14,24;66:22;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 201
of 219

139:11;169:14
**independent (3)**
69:18,18,24
**indicate (1)**
117:8
**indicated (4)**
21:6;115:2;117:5;
123:24
**indicates (1)**
184:13
**indication (1)**
167:20
**indirectly (1)**
66:2
**indiscernible (24)**
17:5;24:16,16;41:8;
56:15;64:22;88:23;
89:1;98:4,6,23;100:6;
105:7;106:2;108:2;
111:11;116:20;117:17;
120:7,8,9;122:1;156:7;
163:7
**individual (17)**
30:5;32:13;37:17;
39:25;40:8;41:13,19;
42:2,16;65:21;71:3;
79:25;98:19;101:14;
112:19;137:12;170:17
**individuals (1)**
30:14
**indubitable (4)**
135:15,16;140:17,21
**industry (1)**
166:10
**inescapable (1)**
7:2
**inference (2)**
150:24;151:3
**inflation (1)**
87:24
**influence (1)**
167:18
**influenced (1)**
100:13
**inform (2)**
179:9;181:7
**information (7)**
44:13,21;45:21;46:1;
74:12;142:11;175:21
**informed (1)**
25:1
**informing (2)**
44:11;131:4
**inherent (1)**
104:17
**initial (1)**
40:7
**injunction (12)**
17:17;64:15,25;
65:17,22;66:6,24;
67:13,22;68:1;110:22;
113:2
**injured (1)**

111:2
**injury (2)**
96:1;133:11
**inserted (1)**
116:6
**insertion (1)**
67:18
**inserts (1)**
9:7
**insignificant (1)**
84:11
**insinuation (1)**
60:1
**insisted (1)**
173:19
**instance (5)**
75:6;88:15;95:3;
98:10;103:21
**institute (1)**
32:23
**institutional (2)**
42:18;112:8
**insurance (30)**
8:2,3,11;27:11;45:6;
76:9,20;93:4;96:19,20,
21;97:11,23;98:12;
99:10,24;100:6,8,9,12,
14,21;101:14;107:2,
18;113:10;134:11;
139:3,5;143:22
**insured (4)**
99:13,18;100:9;
101:12
**insurer (3)**
99:20;100:14;177:13
**insurers (1)**
177:2
**intend (1)**
93:20
**intended (1)**
39:20
**intent (1)**
113:3
**intention (3)**
35:16;121:17,23
**intentionally (1)**
184:10
**interest (9)**
31:19;65:24;66:8;
75:4;106:11,15,17;
131:24;181:23
**interesting (2)**
77:8;93:7
**interests (9)**
21:24;23:16;75:2,11,
17;103:7,9,9;106:9
**interject (3)**
38:24;156:24;176:9
**interjecting (1)**
176:8
**internal (2)**
33:15;63:7
**internally (1)**

171:20
**International (1)**
162:23
**internet (5)**
54:23;85:18;109:12;
129:12;183:1
**interpretation (2)**
70:25;167:25
**interpreted (1)**
53:3
**interpreting (1)**
89:3
**interrupt (3)**
21:19;148:2;154:7
**interruptions (2)**
120:3;184:2
**into (57)**
6:25;9:19;19:2;31:8,
13;42:2;47:20;48:1;
52:8;55:20;60:7;63:21;
64:22;65:25;67:18;
68:19,22;69:10;71:18,
20;76:80;112,21,25;
81:8;86:7;90:7;92:10;
93:17;94:17;102:8;
103:15;104:17;105:22;
106:4;113:12,14,24;
123:24;130:6;131:19;
136:1;138:15;139:16;
140:14,24;144:16;
153:16;154:24;158:20;
160:18;161:18;162:10;
177:7;181:10,13,18
**intraday (1)**
84:25
**invent (1)**
117:5
**inventory (2)**
10:18;15:2
**invest (1)**
146:6
**investigate (1)**
179:15
**investigation (2)**
137:18;180:1
**investment (4)**
136:23;145:8,17;
150:16
**investor (18)**
6:25;8:2,13;77:5,6,
16;78:20;79:12,13,14,
15,17,18;97:8,20;98:1;
107:23;149:22
**investors (16)**
7:20;42:19;78:9;
81:12;86:13;91:23,24;
110:13;111:3,4,7;
146:4,5;162:16,19,21
**investor's (1)**
79:25
**invite (1)**
34:17
**invites (1)**

42:14
**invoked (1)**
102:22
**involuntary (1)**
65:8
**involve (1)**
105:8
**involved (9)**
31:16;33:22;65:16;
110:20,22;124:25;
133:1;158:15;176:17
**involving (4)**
20:15,24,25;137:17
**IPO (2)**
141:2;163:14
**IR (1)**
54:23
**irregularities (2)**
179:12,16
**irrelevant (1)**
42:4
**irrespective (1)**
97:7
**irresponsible (1)**
167:19
**Irrigation (2)**
18:13;19:13
**issue (77)**
8:8;14:21;15:10;
16:16;17:15;18:14;
20:10;21:4,22;22:7,22;
23:4,9,19;24:11,19;
25:22;26:6;28:25;
31:25;33:19;36:15;
38:16;43:7;48:14;50:3;
65:13;66:6;67:7;68:2,
5;71:8;74:11;76:10;
77:10,11,13,14;78:6;
83:12;84:4;93:15,17,
19;94:20;95:3,4,11;
96:15,16;102:9;
106:13;109:3;110:11;
111:19;113:2;116:22;
124:11;127:16;141:4;
143:11,11,12;144:5;
148:21;149:1,1;156:3,
4,5;158:4,17;159:19;
164:23;180:12;184:3;
185:11
**issued (7)**
95:12;96:11,22;
103:10;125:6;170:3;
171:8
**issues (64)**
4:16;11:9;14:1;
15:18,18,22;16:5,6,9,
13,15,17,21;18:14;
20:4;21:16;22:8,20;
23:1,1,24;26:24;
28:23;35:7,24;38:12;
39:3;44:7;45:14;49:24;
52:19;63:21;64:9,12;
74:13;79:13;86:4;

107:17;110:1;111:22;
112:1,23;116:24,25;
117:3,4,16;119:5,25;
120:11,14;121:6;
125:4;128:24;137:14;
142:2,10,12;155:7;
157:24;173:16;174:18;
179:2;184:4
**item (3)**
139:18;175:20;
183:12
**items (3)**
4:20;18:4;185:2
**iteration (1)**
116:7
**Ivanhoe (9)**
97:14;98:22;99:4,19,
25,25;100:17,19;
101:13

**J**

**January (3)**
6:1;62:3;184:7
**JCCP (1)**
40:1
**Jim (2)**
128:8;130:10
**Joaquin (2)**
18:12;19:12
**job (2)**
50:7;186:15
**Johnson (3)**
58:24;96:12;186:5
**Johnston (35)**
5:16;7:5,16,24;70:9;
78:5;79:22;80:4;82:25;
87:5,19;95:22;100:23;
107:9;120:5,18;121:7;
127:8,22;128:7,8,9,11,
12,17,20;129:2,5,16,
17;130:10,10,13;
178:21;183:3
**Johnston's (2)**
125:1;179:1
**join (2)**
36:20;133:14
**joined (1)**
133:17
**joining (3)**
4:7;19:5;55:3
**joins (1)**
56:15
**Judge (64)**
28:19,20;29:9,13,24;
30:12;31:2,5,11,17;
32:8,23,23;33:9;39:19;
47:20;49:14,16,18;
51:23;52:13;53:13,14;
58:12,13;60:7;62:6;
72:1;85:3,7;87:7;91:9,
14;93:14,15,19;95:10,
13;109:12;112:3;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 202
of 219

115:11;124:14;133:3,
6,7;134:19;135:2,25;
136:3;138:20;143:6,
13,14,16;156:13;
174:17;175:1,6,9,18;
176:1,9,10;186:16
**judged (1)**
41:17
**judges (2)**
58:19;95:9
**judge-to-judge (1)**
176:17
**judgment (12)**
31:17;38:22;72:17;
97:21;98:1,10;101:19,
22,23,24;105:16;
173:15
**judgments (2)**
81:12,22
**judicata (1)**
27:16
**judicial (1)**
125:25
**juggle (1)**
25:16
**juggled (1)**
24:23
**juggles (1)**
24:24
**Julian (114)**
4:19;35:12,17,23;
120:7;127:7,13,20,23;
128:1,3,4,6,22,23;
129:9,11,14,25;130:1,
2,4,11,23,25;131:1,13,
17,19;135:21;136:11;
146:16,18;148:5,9,19;
151:2;154:7,17,21;
155:2,16,20,24;156:2,
5,8,23;157:10,16;
158:11,23;159:4,9,14,
20,24;160:11;161:4,11,
14,20,23;162:1,5,9;
163:3,6,8;164:1,6,9,22;
165:4;166:21,21;
168:4;169:5;170:9;
171:13,15,18;172:2,9,
13,17,20;173:7,21,23;
175:11,21;176:4,15,20,
22;177:20,22;178:3,4,
6,15,16,22;179:3,6,7;
180:5;181:7;182:23;
186:15,17;187:2,5
**Julian's (3)**
154:14;183:23,24
**July (5)**
52:16;121:14,14;
123:24;166:15
**JUNE (20)**
4:1;51:22,24;52:11,
12;53:5;121:9,18,20,
23;122:2,6,8,15,16;
123:9;141:3;144:11;

166:14;188:15
**junior (1)**
103:2
**jurisdiction (5)**
15:10;48:9;114:11;
120:10;143:16
**Justice (5)**
30:7,16;150:13,14,
15
**justify (1)**
181:19

**K**

**Kanes (1)**
46:6
**Kane's (1)**
40:7
**Karotkin (121)**
4:6,7,8,10,14;5:2;
9:6;12:14,16,17;13:6,
11,14;14:10,12,16;
16:23;17:2,5;21:13,19,
20,21;23:10,21,23,25;
24:1,3,7,11,14,16,22;
35:2,5,8,12,15,20,22;
36:2,10,17;40:6,10;
43:1;45:2,9;49:4;
51:16;54:12;65:7;
85:19,21;102:16;
118:23;119:1,15;
120:6,9;121:12,20,23;
122:4,14,20;123:1,5,
12,14,16,19;124:4,8,
17;125:8,10,14;126:3,
7,11,14,16,19,23;
127:3,12;129:16,17,21;
130:20,22;137:11;
148:16;155:21;156:19,
24;157:3,4;158:7,12,
14,25;164:13,16;
170:10;176:5;178:17,
19;182:16,24;183:16,
19,22;184:16,20;
185:19;186:2;187:1,6
**Karotkin's (12)**
13:22;17:10;47:17;
65:6;140:25;142:15;
160:1;167:25;179:13,
14;181:15,21
**Kathy (3)**
28:21;30:16;150:13
**keep (16)**
17:7,10;24:25;29:4,
8;38:18;39:4;54:23;
56:9;57:14;146:16;
155:25;166:23,23;
178:25;184:22
**keeping (2)**
125:12;131:24
**keeps (1)**
109:12
**Kelly (27)**

25:9;36:7,12,21;
37:7,9,9,10,12,14,16,
16;39:7,13,15,18;
40:19,23;41:2,6,10;
43:21;46:3;54:1;153:9;
160:22;165:10
**kept (2)**
42:13,13
**key (1)**
151:6
**kicked (1)**
67:9
**kicker (1)**
105:6
**kicking (1)**
110:21
**kind (11)**
50:21;94:10;100:12;
109:1;124:6;125:18;
158:5;164:20;178:17,
19,21
**kindly (1)**
147:6
**kinds (1)**
185:5
**knew (3)**
142:8;151:3;155:6
**knowing (1)**
159:18
**knowledge (1)**
142:21
**known (2)**
108:25;134:20
**knows (2)**
40:16;50:21

**L**

**Labaton (1)**
112:12
**lack (2)**
21:2;68:3
**LAFCo (1)**
21:6
**lands (2)**
71:25;115:23
**language (14)**
13:8;17:24;22:5;
24:2;38:8,15;39:1;
48:18;70:16;112:1;
113:6;157:10;167:2;
171:3
**laptop (1)**
168:14
**large (6)**
102:16;134:12;
138:10;139:15;141:10;
149:13
**larger (2)**
83:4;110:24
**largest (1)**
74:12
**last (30)**

8:6;9:9;12:19;22:17;
28:16,17;35:2;40:16;
41:11;46:4;53:11;
85:23;92:21;114:17;
120:21;132:12;138:1;
141:5;142:25;144:1,8;
145:19;158:12;159:5;
165:9;173:24;176:25,
25;182:19;184:7
**late (2)**
26:1;128:17
**lately (1)**
141:1
**later (22)**
5:17,24;6:5,12;8:17;
24:12,24;25:14;26:7;
34:7;35:13;57:23;
61:20;92:24;119:21;
124:10,11;127:25;
149:2;169:16;173:14;
174:15
**latest (1)**
116:7
**Lauren (2)**
130:17;164:11
**law (7)**
6:14;65:3,13;72:16;
104:11;112:14;114:4;
126:12;127:1;139:21;
145:11;154:5;164:23;
167:24;177:14
**laws (8)**
78:7;79:16,16;81:2;
92:16;98:13;99:7;
126:25
**lawsuit (3)**
60:5;66:20;169:16
**lawsuits (3)**
20:23;81:11;82:4
**lawyer (5)**
53:2,23;109:11;
173:5;176:16
**lawyers (12)**
33:21;96:2;138:16,
17;141:6,9,18;142:5;
167:23;170:13,17,20
**lawyer's (1)**
127:2
**lay (1)**
175:23
**layman's (1)**
145:21
**lead (17)**
9:24;40:1;58:10;
59:25;60:3,5,9,12,20,
22;112:11,13,16,17,17;
127:9;185:25
**leading (3)**
66:5;162:17;163:10
**learned (4)**
5:25;53:1;184:7,8
**least (20)**
18:2;40:21;47:3;

8:6;9:9;12:19;22:17;
28:16,17;35:2;40:16;
41:11;46:4;53:11;
85:23;92:21;114:17;
120:21;132:12;138:1;
141:5;142:25;144:1,8;
145:19;158:12;159:5;
165:9;173:24;176:25,
25;182:19;184:7
**leave (13)**
9:25;34:3,3;39:9;
52:11;54:22;90:9;
92:24;101:1;109:10,
17;118:7,17
**Leaving (4)**
76:20;93:4,4;127:16
**lecture (1)**
47:23
**led (1)**
78:4
**left (8)**
7:7,13;49:25;51:10;
75:6;82:13;88:11;
135:12
**leg (1)**
109:19
**legacy (1)**
46:18
**legal (3)**
69:23;117:7;168:21
**legally (1)**
91:18
**legislators (1)**
58:19
**legitimate (2)**
44:23;45:1
**Lehman (1)**
69:8
**Leighton (1)**
86:23
**lengthy (3)**
62:4;107:9;154:8
**less (5)**
39:22;87:5;92:5;
103:12;113:25
**letter (6)**
56:17;140:2;146:24;
153:12,14;161:16
**letters (2)**
147:17,21
**level (3)**
29:9;43:19;73:22
**liability (4)**
96:5;134:2,24;146:9
**liable (1)**
134:8
**LIDAR (1)**
143:1
**life (1)**
172:11
**lift (1)**
20:23
**lifted (1)**
49:19
**lifting (4)**
19:23;109:23,24;

Min-U-Script®

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 203
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(15) judged - lifting

110:2
**light (4)**
27:23;60:15;64:7,18
**lightly (1)**
75:12
**likely (1)**
40:20;92:5
**limitations (1)**
165:12
**limited (2)**
46:2;134:13
**limits (1)**
101:8
**Linda (2)**
188:3,9
**line (9)**
88:17;92:2;115:22;
124:14;138:8,17;
143:12;145:2;164:19
**lines (3)**
8:16;94:18;143:2
**Liou (3)**
14:12;22:5,17
**liquidate (5)**
42:20;147:10,11;
150:10;163:16
**liquidated (3)**
6:13;82:21;139:17
**liquidating (2)**
140:12,17
**liquidation (1)**
43:3
**list (9)**
35:6;55:25;56:13;
95:13;118:4;158:23;
182:18;183:7;185:17
**listen (5)**
11:21,22;57:17;
63:10;166:24
**listened (1)**
44:4
**listening (2)**
43:20;186:17
**literal (1)**
72:21
**literally (1)**
184:25
**litigants (2)**
125:22;168:24
**litigate (2)**
160:8,11
**litigation (27)**
14:5;20:15,21;58:11;
60:1,6,12,21,22;61:3,6,
13,18,21;62:2;65:17,
21;66:12;67:1,21;
68:18;78:12;88:7;
144:1;170:25;173:14;
184:3
**little (43)**
6:6;11:1;22:4,17;
36:24;54:16;56:13;
57:6,23;58:4;61:3,20;

64:6;69:11;76:2,3;
78:12;80:15,17;83:23;
84:8,10;86:19;87:5,21;
88:5;89:20;90:1;99:17;
104:2;108:1;112:10;
114:17;116:4;129:20,
22;144:22,23;158:2;
167:9;172:24;184:8;
185:14
**live (1)**
21:3
**lively (1)**
116:23
**lives (3)**
47:10,12;185:25
**lo (2)**
116:5;163:22
**local (1)**
21:1
**location (1)**
85:9
**lock (1)**
140:11
**locked (2)**
149:24;159:10
**locking (2)**
140:16;150:8
**lockup (6)**
147:14;151:2;
162:15,15,19,21
**log (2)**
85:10,10
**logical (1)**
93:13
**long (12)**
6:18;13:3;14:5;
23:19;49:25;122:16;
128:25;131:5;150:10;
170:15;184:2;186:13
**longer (2)**
59:22;150:6
**long-term (1)**
146:5
**look (28)**
10:21;13:9,15;22:4,
19;24:9;33:5;34:25;
54:5;70:16;93:18;
100:1;135:20;142:17;
143:21;147:6;154:10;
159:3;160:23;162:9;
164:7;167:10;176:15;
183:7;185:1;186:19,
24;187:2
**looked (1)**
159:5
**looking (8)**
36:3;50:6;80:2;94:4;
123:6;146:8;150:8;
168:18
**looks (3)**
18:3;24:1;42:4
**loop (1)**
183:11

**loose (2)**
115:11;186:21
**loosely (1)**
184:11
**losing (2)**
60:20;109:12
**loss (8)**
6:7,20;41:21;88:2;
89:4,6,24,24
**losses (1)**
100:9
**lost (8)**
6:2,11;42:23;51:16;
85:3,22;110:13;112:20
**lot (9)**
24:23;42:2;89:9,16;
90:20;114:18;132:20;
137:1;184:8
**loved (1)**
42:23
**low (2)**
27:8;83:1
**Lowenstein (2)**
55:7;58:7
**lower (5)**
7:15,16;25:10;56:22;
113:23
**lowest (2)**
115:4,4
**LP (1)**
104:22
**Ltd (1)**
86:23
**lunch (1)**
85:8

**M**

**MacDonald (2)**
127:23;130:7
**mad (1)**
181:5
**magazines (1)**
145:25
**magic (1)**
108:10
**magically (1)**
69:10
**magician (1)**
24:24
**magistrates (1)**
58:19
**main (1)**
23:2
**maintains (1)**
48:9
**major (4)**
44:17;45:14;47:16;
137:20
**majority (2)**
152:3;153:19
**makes (11)**
42:13;65:4,5,6;75:1;

76:2;90:20;115:16;
127:16;129:6;185:14
**making (11)**
16:19;38:21;43:25;
55:13;123:7;144:3;
154:24;161:10;163:23;
171:22;178:12
**managed (2)**
38:1;109:25
**management (2)**
138:5;144:23
**mandating (1)**
43:2
**maneuver (1)**
49:9
**manipulate (1)**
110:7
**manner (4)**
98:15;105:16;
119:17;149:18
**mantra (1)**
40:11
**many (23)**
20:3,17;23:5;24:17;
48:20;50:17;85:24,25;
91:11;96:12;111:10;
114:8;132:3;134:6;
137:21;141:9,24;
142:2,7;144:9;145:25;
159:6;177:23
**March (1)**
116:2
**Mark (2)**
17:13;168:12
**marked (1)**
168:11
**market (15)**
5:25;7:6;76:11;84:5,
17;87:21;90:6,23;
94:13;95:25;126:22;
144:20;145:22;146:3;
150:20
**marketplace (1)**
184:11
**markets (6)**
121:14;123:21;
124:7;144:12,13,14
**marking (1)**
168:12
**Marshack (1)**
175:17
**Mary (1)**
46:22
**mass (1)**
150:12
**massive (1)**
46:16
**match (1)**
108:15
**matched (1)**
133:23
**material (1)**
173:22

**matter (19)**
33:3;39:19;51:15;
63:24;65:2;92:2;93:22;
102:20;106:6;111:9;
118:2;121:7;126:12;
153:10;160:23;164:15;
168:21;180:13;182:2
**matters (7)**
21:11;22:11,15;34:5,
19,21;183:2
**maximize (1)**
150:19
**maximized (1)**
42:10
**maximum (1)**
96:3
**may (37)**
11:1;38:3,24;39:3,
15,16;47:16;56:19;
62:8;65:23;77:6;79:11;
90:1,10;94:11,19;
102:16;104:8;119:24;
120:13,19;124:10,19,
21;129:5;130:10,25;
138:14;147:19;156:20;
158:11,12;163:8;
169:20;171:8;174:1;
181:11
**maybe (30)**
13:2,3;14:2,6;22:8,
13;27:22;28:17,17;
33:14;50:14;51:3;
58:21;81:23;89:3;
100:19;107:25;108:1;
110:5;115:4,5,14;
120:2,2;122:3;127:5;
155:21;162:8;181:1;
183:5
**may've (1)**
77:7
**McDonell (1)**
186:7
**mean (34)**
8:12;11:16,17;15:23;
21:21;32:4;46:12;64:4;
71:5;94:6;100:11;
122:8;124:2;125:20;
126:18;129:17;135:10;
140:18;155:8;159:3;
163:1,2,5;164:7;
167:11;168:21,23;
172:4;183:7,12,24;
184:22;185:1;186:9
**meaning (1)**
51:24
**meaningful (3)**
44:7,12;110:25
**means (5)**
74:25;102:14;
152:23;174:9;185:4
**meant (2)**
156:21;183:21
**meantime (2)**

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 204
of 219

6:16;8:22
**measure (4)**
79:4;80:14;82:18;
86:25
**media (1)**
109:5
**mediate (4)**
93:25;94:1,22;95:14
**mediated (4)**
93:15;168:3;170:16;
186:16
**mediation (25)**
26:25;45:14;50:4,10;
91:9;93:14,19;94:2,3;
95:17;112:3;134:16;
138:21,25;150:24;
154:25;155:5,8;
156:17;157:5;158:15;
159:11;160:12;167:15;
177:17
**mediations (3)**
45:22;47:7;134:18
**mediator (2)**
95:10;135:25
**meet (2)**
47:14;95:14
**meetings (1)**
170:18
**meets (1)**
157:13
**Melodia (1)**
37:10
**member (1)**
80:7
**members (7)**
40:2;42:7;58:17;
60:24;68:15;170:12,17
**memoranda (1)**
184:9
**memorandum (5)**
38:9;122:22;124:11;
184:12;185:11
**memory (1)**
164:12
**mentally (1)**
178:25
**mention (2)**
36:11;59:6
**mentioned (17)**
15:20;58:6;60:17;
73:24;84:23;102:6;
103:6;118:16;119:16;
139:4;143:20;144:9,
24;145:14;175:13;
183:8;184:24
**mentioning (1)**
103:11
**merit (1)**
87:14
**merits (2)**
110:8,10
**mess (1)**
167:15

**message (2)**
51:23;53:25
**messes (1)**
47:8
**messing (1)**
85:19
**met (3)**
121:10,11;184:7
**method (1)**
113:19
**methodology (1)**
92:25
**metric (2)**
74:17;91:14
**Mexico (2)**
58:8,15
**Meyer (2)**
53:13,14
**mic (1)**
54:22
**Michael (3)**
37:9,16;55:7
**microphone (5)**
19:7;37:13;55:4;
89:14,17
**middle (1)**
158:24
**might (16)**
9:23;51:15;56:19;
66:22;83:23;89:17;
92:4;94:2;105:19;
129:22;139:9;142:5;
146:7;163:20;167:18;
182:3
**might've (1)**
78:1
**Mikal (1)**
142:6
**million (3)**
7:14;31:19;59:15
**millions (1)**
112:20
**mind (7)**
28:24;36:2,2;133:13;
176:3;178:20;184:22
**mine (3)**
39:16;51:17;89:10
**mini (2)**
132:24;133:7
**minimize (1)**
117:6
**minor (3)**
15:5;30:5;107:12
**minority (1)**
136:21
**Mintz (13)**
25:10;36:7,13,21;
37:3,5,5;38:2,5,6,25;
39:5;43:25
**minus (1)**
84:10
**minute (5)**
54:14;58:21;62:23;

173:4;184:1
**minutes (10)**
10:20;21:24;28:24;
35:3;36:12;39:23;
110:5;128:21;132:21;
169:3
**mirrors (1)**
140:1
**misconceptions (1)**
58:22
**misconduct (1)**
27:9
**missed (1)**
182:3
**misstatements (2)**
68:11;69:18
**misstating (1)**
155:14
**mistake (2)**
7:13;41:16
**misunderstandings (1)**
44:15
**mitigate (1)**
77:25
**mitigated (1)**
77:22
**mitigation (3)**
142:19;144:19;
145:15
**mixing (1)**
171:10
**mix-up (1)**
118:24
**modifications (1)**
5:3
**modified (2)**
12:21;153:1
**modify (2)**
73:1;153:4
**modifying (1)**
18:1
**Molton (28)**
27:22,23;28:3,14,15,
18;29:1,6,8,12;30:8,10,
12;31:11,21,22,24;
32:6,8,16,19,22;33:2,6,
9;34:5,16,20
**moment (25)**
4:6;20:16;25:5;
60:17;73:13;85:5;
86:19;121:6,8;126:7;
127:24;139:19;140:7;
144:12;147:13;148:20,
22;152:2;153:3;154:5;
155:5;160:5,19;161:3;
164:2
**momentarily (1)**
85:6
**momentum (1)**
64:4
**moms (1)**
42:22
**Monday (27)**

38:17;53:13;65:7;
70:9,9,9;79:22;87:19;
90:3,13;96:18;107:9;
120:13;121:1;127:6,
11,16,19;128:18;
129:3;181:25;183:2;
184:20;185:18;186:1,
11,25
**Monetation (2)**
32:23,24
**money (11)**
8:8,11;40:9;42:21;
81:16;105:16,16,22;
123:21;124:13;149:7
**money-raisers (1)**
184:11
**MONITOR (6)**
85:2,5,14,16;89:13;
143:16
**monitoring (2)**
142:20;143:10
**monopoly (1)**
145:22
**Montali (3)**
4:5;85:3,7
**month (1)**
92:10
**months (12)**
40:16;41:11;45:5,14;
70:10;149:23,25,25;
150:25;159:6;163:14;
171:21
**moral (1)**
113:19
**more (39)**
9:21,21;14:17;44:19;
64:6;75:24,24,25;76:2,
3;78:20,25;80:15;
83:24;86:19,20;88:1,
20;90:10;99:18;100:5;
101:15;103:6;108:1,
12;116:4;118:24;
120:13;123:10;126:5,
8;138:1;143:14;
154:12;169:3;173:25;
176:11;179:21;185:17
**Moreover (1)**
31:1
**more-than-capable (1)**
118:18
**morning (37)**
4:8,10,13,18;5:1;9:3,
5,12;10:2,3,6,8,12;
12:1;36:23;37:2,22,25;
38:25;39:24;40:3;
43:14;56:6;58:6,24;
59:7;70:9,9;80:3;
87:23;89:7;128:18;
173:6;184:21;186:1,4,
25
**morphed (1)**
172:24
**most (19)**

20:1;40:15;41:10,15;
49:24;55:12,13;74:5;
82:25;97:15,15;
100:21;111:21,25;
121:14;127:9,17;
137:6;150:1
**motion (14)**
40:7;60:15;95:12,13;
110:22;132:24;133:13;
137:15;179:8;180:10;
181:10;182:18,20;
185:13
**motions (5)**
60:8,10;61:23;62:2,5
**motives (1)**
115:5
**mouthed (1)**
40:12
**movants (1)**
60:9
**move (12)**
24:2;54:11;60:5;
71:4;88:1;90:1;93:17;
117:23;149:20;150:7;
159:14;164:6
**moved (1)**
49:16
**moving (2)**
17:7;64:20
**much (22)**
7:16,17;18:7;24:3;
38:18;44:24;48:5;
64:14;66:11;76:1,1;
96:14;98:12;101:15;
111:14;123:10,10;
127:13;128:19;129:19;
182:13;187:7
**multiple (3)**
33:13;91:11;132:25
**multiply (1)**
84:6
**municipal (3)**
4:24;17:16;58:18
**municipalities (1)**
8:23
**must (24)**
42:9;64:10;72:18;
116:15;121:10;134:18;
137:1,4;147:18;
148:10,10,23,25;
149:16,17,23;151:10,
15;162:7,15;165:7,12;
172:4;177:7
**mute (1)**
85:11
**muted (1)**
37:20
**Mutual (2)**
104:12;146:5
**mutually (1)**
41:25
**myself (9)**
38:1;124:11,16;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 205
of 219

125:5,5;139:10;
168:13;176:8,9

## N

**nag (1)**
156:11
**name (1)**
10:10;28:15;35:1;
37:3,19;56:11,20,24;
58:20;92:21;122:10;
130:15,16
**named (1)**
61:12
**names (1)**
56:14
**narrow (1)**
177:15
**nation (1)**
162:18
**national (1)**
111:11
**near (1)**
84:23
**nearly (1)**
60:25
**necessarily (12)**
5:22;8:9,19;83:5;
105:22;106:6;107:8,
14;113:17;117:12;
164:18;179:23
**necessary (3)**
27:12;121:3;127:10
**need (24)**
9:11;10:10;15:17;
19:8;34:19;36:23;
47:25;48:3;50:16;
51:23;53:6;80:11;92:1;
109:5;115:14;119:1;
127:18;128:19;154:7;
168:14;169:1;171:7;
172:3;181:5
**needed (1)**
174:12
**Needless (1)**
13:13
**needs (11)**
42:21;47:23;52:14;
67:15,15;101:8;108:1;
122:5;127:7;139:16;
176:10
**negatives (1)**
48:18
**neglect (1)**
36:10
**negligence (2)**
170:3,5
**negotiate (3)**
95:14;96:2,2
**negotiated (17)**
26:12,24,24;27:14;
31:5;33:19,20,21;43:7;
140:14;141:19;153:25;

156:12;170:16,16;
177:16;178:11
**negotiation (1)**
151:1
**negotiations (3)**
33:22;49:10;50:15
**Neither (1)**
45:24
**net (2)**
67:1;84:17
**new (11)**
24:1;54:24;58:8,15;
74:15;80:10;84:18;
103:10;131:6;162:24;
185:22
**news (1)**
144:15
**Newsome (14)**
91:9,14;93:14,15,19;
95:11,13;112:4;
115:11;134:19;135:25;
136:3;138:20;186:16
**next (33)**
47:15;53:5;54:7;
74:11;124:1;144:7;
146:21;148:6;149:9,
19;151:5;152:20,21;
153:13;158:24;162:1,
12,22;164:4,9,10,11,
19,24;167:6,8;169:8;
170:1,24;172:20;
173:3;180:19;183:10
**nice (1)**
117:22
**nicely (1)**
57:22
**night (7)**
8:6;9:9;12:19;46:4;
53:11;75:19;92:21
**nine (28)**
44:5,6;78:13,18;
80:12,13;81:11,11,12,
12,14,15,17,22,25;
82:2,4,5,20,20,21;88:8,
18;91:24;92:8;94:5,7;
163:13
**Ninth (7)**
65:3,13;67:14;69:4;
89:4,24;113:5
**nobody (3)**
9:1;64:25;108:25
**noise (1)**
89:13
**nonaccepting (1)**
64:23
**nonconsensual (3)**
65:1;67:2,12
**nondebtor (5)**
65:18;66:12,25;
97:22;113:6
**nondebtors (4)**
65:16;67:3,3,21
**None (9)**

65:9;79:20;86:21;
91:14;94:6;112:5,24;
162:18,20
**nonfiling (1)**
182:7
**nonissue (2)**
101:22;102:1
**nor (1)**
40:1
**Northern (1)**
50:23
**Norton (1)**
37:22
**note (8)**
30:3;61:19;133:16;
134:6;153:22;170:11;
174:22;181:15
**noted (1)**
81:8;84:22;96:12
**notes (2)**
61:17;80:2
**notice (5)**
25:6;44:9;58:25;
63:18;111:16
**notify (1)**
111:4
**notion (2)**
8:14;71:1
**November (3)**
51:9;61:25;89:4
**nowhere (1)**
133:15;143:22
**number (53)**
7:15,16;15:16;26:17,
18;27:5;31:18;32:10;
47:4;59:1,8;62:12;
63:17;64:20;76:7;
78:10;81:8;84:4,6,9,
14;86:7,15;88:4;90:7,
8,8,11;91:7,20;96:3,4;
102:15,17;103:8,21,23;
108:14;119:14;135:24;
136:11,12;140:9;
147:5;151:8,9,10,19;
152:16;153:15;165:21,
22;177:8
**numbers (2)**
27:18;168:12
**numerator (3)**
76:20;83:1;93:8
**numerical (1)**
104:19
**NYSE (2)**
104:5;108:23

## O

**oath (1)**
168:24
**objected (3)**
118:5;135:8;169:9
**objecting (1)**
129:6

**objection (9)**
9:7;17:25;20:9;62:8;
102:5;104:24;105:4;
112:8;173:19
**objections (13)**
16:13;111:20;
118:10;119:23,25;
125:13,13;127:17;
132:6;137:12;167:5;
169:9;186:13
**objection's (1)**
125:24
**objective (1)**
168:22
**objectors (3)**
17:16;120:21;128:25
**obligations (7)**
30:23;66:16,19;
112:18,21;177:2,14
**observation (2)**
13:22;51:19
**obstacle (1)**
76:25
**obtained (1)**
140:23
**obvious (3)**
111:16;143:21;
171:19
**obviously (21)**
35:18;50:16;58:20;
59:16;61:9;64:22;
65:24;71:2,16;75:22;
93:8,25;99:2;102:9;
110:9;123:9;125:1,20;
157:6;179:21;183:24
**OCC (1)**
127:6
**occasions (1)**
142:23
**occur (4)**
40:14;70:10;122:15,
15
**occurred (7)**
78:15;81:21;85:25;
90:14,17;94:15;162:23
**occurrence (1)**
88:15
**o'clock (2)**
54:24;121:8
**October (24)**
40:12;59:10;76:12;
78:13;79:1,24;80:3;
84:13,17,21;86:8,17,
17,18,20;87:7,15;
88:19,25;94:8;115:3;
116:6;135:11;163:18
**oddly (1)**
6:1
**odds (1)**
162:3
**off (12)**
8:18;34:5;45:18;
51:14;54:21;100:2;

**objection (9)**
101:8;130:11;131:4,
20;163:19,21
**offensive (1)**
116:17
**offer (1)**
138:2
**offered (3)**
111:25;132:13;
141:15
**offerees (1)**
104:15
**offering (17)**
52:8;53:7;104:3,14,
19,25;105:4;106:25;
107:3,7,8;108:13;
116:8,12;141:2;
162:16;163:14
**offerings (2)**
61:17;165:20
**office (2)**
122:9;144:4
**officer (2)**
97:10,12
**officers (5)**
6:9;61:10;66:13;
100:18;143:22
**Official (2)**
131:1;175:18
**officials (1)**
144:4
**offline (1)**
14:7
**offset (7)**
8:12;96:19;97:7;
99:5;107:2,18;113:10
**offsets (1)**
125:2
**Offshore (1)**
92:22
**often (2)**
83:16;185:7
**old (2)**
5:18;171:15
**once (19)**
21:23;50:2,4;58:4;
71:22;77:11;78:15;
81:7;84:2;87:25;
105:17;150:17,18;
151:18;152:8;167:8;
178:7;183:14;186:7
**One (125)**
4:6;6:5;9:16;14:10;
18:3,11;19:18,18;
20:23;22:8;26:19,19;
28:8;30:1,13,14;31:18;
33:10;34:12,25;40:2;
41:2,14;44:7,14,18,19;
45:11;47:4,23;48:13;
50:14;58:23;59:4;
63:20,22;67:19,20;
74:3,7,21;75:18;76:5;
78:11;79:1,7,12;80:19;
83:5,6,10;84:18;85:5;

Min-U-Script®
Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 206
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(18) nag - One

86:15;88:14,15,18;
89:1,19;90:2,12;92:21;
95:2,10,11,19;96:4,16;
97:22;101:4;102:16;
103:6,8;104:22;
105:21;106:21;107:12;
108:16;111:10;113:16;
115:25,25;118:1;
119:8;125:20;129:11;
130:1;131:13;134:17;
135:8,14;136:17;
138:7;142:5,12;
143:19;148:17;150:1,
1,2,4,11;152:7,7;158:3,
12;159:25;160:21;
161:22;162:3;164:10;
165:21;166:8;173:11,
16,25;174:2,5,12,18;
177:15;179:7;180:14,
14;183:25
**one-liner (1)**
124:23
**ones (4)**
42:23;156:3,3;
160:25
**one's (2)**
151:8,8
**one-sentence (2)**
43:16;124:9
**ongoing (4)**
78:7,22;88:15;95:17
**only (30)**
8:15;12:6;13:1;41:2;
43:2;44:18;48:19;
49:17;59:5;65:10;
70:17;71:12;72:13,23;
77:15;80:11;83:14;
88:13;112:19;115:25;
129:2;146:24;152:7;
155:12;160:6,25;
165:15;171:2;174:12;
175:3
**onset (1)**
110:23
**on-the-record-kind (1)**
176:17
**onto (1)**
71:22
**oOo- (1)**
4:2
**open (11)**
4:16;17:15;18:4;
20:4,5,10;25:1;87:21;
121:6;183:5,12
**opened (1)**
89:7
**opening (7)**
64:7,19;65:6;84:13;
96:18;115:2;142:16
**operates (1)**
30:22
**operative (1)**
100:13

**opined (1)**
102:16
**opinion (2)**
38:9;134:24
**opportunity (7)**
8:24;13:23,24;25:3;
168:1;184:17;186:5
**oppose (1)**
63:24;154:22,23
**opposed (2)**
154:13;155:6
**opposing (1)**
40:7
**opposition (1)**
40:3
**optics (1)**
110:7
**optimal (2)**
41:15;42:20
**optimistic (1)**
93:15
**opt-in (1)**
65:11
**option (7)**
71:6;90:11;91:5,16,
17;95:5;104:17
**options (3)**
90:2,10,12
**oral (1)**
135:17
**order (103)**
4:3;15:14;23:9;
26:20;38:9;44:15;47:4;
48:6;51:24,25;53:6;
60:12;67:15,18;93:24;
95:11;112:2;113:7;
118:9;121:21;122:7,
16,21;123:9,23,25;
124:9,18,22;125:6,24,
24;128:10;132:24;
135:24;136:11,12;
137:2;139:18,22;
140:7,22;141:22;
144:6;147:2;148:13,
21,22;151:22,23;
153:5;154:3;156:9;
158:3,20;160:4,6,18;
161:8,10;164:1;165:1;
166:7,12,16;167:6;
168:7;170:3;171:4,7;
172:3,4;174:2,3,13,16,
20;175:4,5,13,25;
176:1,12,13,23;177:1,
11,12,13;179:15;
180:14;183:3,10,14;
184:10,12,14,14;185:4,
6,7,8,15
**ordered (1)**
133:2
**orders (7)**
47:20;63:22;124:10;
147:4;174:1,5,11
**ordinary (2)**

170:3,5
**original (2)**
107:23;111:5
**Orsini (5)**
46:15;49:4;174:20,
21;175:11
**Orsini's (1)**
143:25
**Os (5)**
61:16;66:17;97:3,5;
101:15
**others (12)**
9:24;11:8;22:22,24;
25:3;35:10;105:1;
111:25;117:2;125:11;
127:7;162:20
**otherwise (7)**
105:19;149:4;
153:18;156:18;157:22;
171:16;177:18
**ought (1)**
127:12
**out (74)**
5:25;6:14,21,22;
7:13,18,25;9:15;14:14;
16:15,19;17:24;20:9;
21:24;27:1;34:14,24;
38:1;39:6;42:18;44:15;
49:8;54:12;57:19;
58:24;62:17;64:2;
66:22;67:21;75:14;
77:1,2,19;84:2;85:10;
86:4;87:22;88:5;91:24;
92:9;93:3,12;96:4,4;
97:23;98:25;103:18,
19;109:16;111:15;
112:9;114:4,15;
117:23,23;124:13;
126:24;129:7;138:18,
20;139:1;141:2,2;
142:4,9,25;154:4;
159:23;170:15;171:15,
16;175:3;177:6;179:8
**outlined (1)**
178:8
**outset (1)**
110:6
**outside (9)**
61:9;134:19;138:16,
17;139:20;152:3,24;
153:4,24
**outspoken (1)**
54:1
**outstanding (4)**
9:7;75:24;84:6;
150:2
**over (36)**
38:15;48:10;49:20;
58:15,16;59:15;69:21;
75:6;76:25;78:15,17,
19;80:17;84:10;87:25;
91:1;109:8;116:22;
120:14;127:10;128:17;

129:22;141:11,13;
142:6;144:4;147:15;
151:1;157:25;159:21;
165:2;166:20;167:5;
179:14,18;184:18
**overall (1)**
153:5
**overlap (1)**
68:13
**overlapping (1)**
68:12
**overloaded (3)**
166:23;178:18,19
**overruled (2)**
104:23;125:25
**overruling (1)**
105:3
**overseeing (1)**
143:17
**oversight (6)**
141:9,11,13;143:15;
173:11,20
**overview (1)**
148:3
**overwhelming (2)**
45:8;47:17
**overwhelmingly (2)**
136:19;137:24
**owe (2)**
125:4,22
**owes (1)**
72:2
**own (19)**
7:3;60:16,19;61:2;
63:7;68:12;69:25;
75:18,21,22;100:8,21;
110:9;126:13;137:18;
141:13;142:21;161:5;
181:18
**owned (1)**
171:9
**owners (1)**
42:7
**ownership (1)**
75:22
**owns (1)**
149:22

**P**

**Pacific (1)**
68:10
**page (3)**
33:25;151:21;153:15
**pages (3)**
124:15;155:25;
168:10
**paid (17)**
5:23,24;8:11;34:14;
40:13;41:7;44:17,24;
46:21;97:23;101:19;
139:12,13;147:9;
169:21;174:8;177:6

**paint (1)**
102:13
**palatable (1)**
79:11;90:11
**panel (4)**
35:25;117:23;
127:23;130:11
**panicked (1)**
180:18
**paper (2)**
6:20;42:4
**papers (5)**
20:13;21:5;90:5,9;
96:17
**par (2)**
104:16;107:20
**Parada (18)**
8:21;9:18;18:23;
19:1;27:23;34:24;
36:18;54:11;55:21,25;
56:9,23;57:5;62:25;
89:11;127:22;128:1;
186:23
**paragraph (10)**
15:14;32:5;67:19,20;
168:19,19;170:4;
183:13;184:23,23
**paragraphs (2)**
183:8;184:24
**parallels (1)**
106:13
**pardon (2)**
86:19;106:21
**parenthetically (1)**
139:10
**pari (8)**
74:19;75:1;103:1;
107:21;108:4;116:15,
16;117:9
**parity (1)**
108:3
**part (12)**
49:5,6;57:3;65:23;
100:14,21;103:16;
110:25;111:21;118:8,
11;129:8
**participant (1)**
55:16
**participants (2)**
58:17;62:14
**participant's (1)**
127:23
**participate (4)**
104:21,25;105:2;
107:8
**participating (2)**
51:14;186:24
**participation (4)**
49:18;72:24;109:17;
119:11
**particular (9)**
23:3;44:14;48:14;
64:18;66:13;76:11;

Min-U-Script®

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 207
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(19) one-liner - particular

84:8;104:20;126:8
**particularly (7)**
20:5;40:10;109:25;
121:2;176:12;179:1;
186:3
**Parties (43)**
15:8,8;16:6;17:21;
30:15;41:25;42:19;
43:19;45:7;47:13;
48:21;63:22;65:19,20;
66:8;76:13;96:18;
100:1;125:4;131:4;
137:14;140:1;146:23;
147:22;152:14,23;
153:8,17,23;154:1,23;
161:2,18;162:3,6;
163:12;165:18;166:1,
4,17,19;167:1;174:19
**parties' (4)**
144:16;147:17;
148:24;153:11
**partner (5)**
22:5;102:6;109:20,
23,24
**Partners (2)**
104:22;160:13
**party (7)**
31:5,6;34:14;67:2,
22;104:24;160:8
**party's (1)**
81:3
**Pascuzzi (54)**
5:3;9:12,15,16,18,
24;10:2,3,4,17,18;
11:15,17,25;12:7,10,
13,15,18,25;14:24,25;
15:1,4;16:1,5;18:8;
19:4;21:21;23:14;25:5,
21,23,25;26:15,18,22;
27:21,24;28:1,4,6,22;
29:10,17;32:1,9;33:4,
12,18;34:6,13;119:5;
173:8
**Pascuzzi's (1)**
13:20
**pass (1)**
11:23
**passionately (1)**
40:6
**passu (8)**
74:19;75:1;103:2;
107:21;108:4;116:15,
16;117:9
**past (3)**
111:24;149:8;154:11
**patch (1)**
85:12
**paths (1)**
45:11
**patience (2)**
109:15;110:3
**patient (1)**
13:18

**Paul (2)**
10:3;19:11
**pay (2)**
8:8;66:22
**payers (1)**
46:25
**paying (6)**
8:14;40:11;99:20;
139:14;140:18;169:24
**payment (19)**
30:23;40:13;41:7,8;
48:25;97:13,18,19;
98:16,18,20;99:22;
100:20;101:6,7;135:9;
139:8;165:23,25
**payments (5)**
40:21;46:20;96:24;
101:14;138:18
**pen (1)**
168:12
**pencil (1)**
121:1
**pendency (1)**
175:5
**pending (5)**
17:9;58:11;60:7;
61:24;62:5
**Pension (3)**
11:7;112:20;146:5
**people (28)**
5:20;9:16;22:9;24:4;
54:1;78:8,8;80:18;
82:4;86:16,17,17;92:4,
11;94:9;113:19;
115:17;123:21;124:12;
126:25;142:4;160:14;
167:18;169:9;175:9;
181:2,4;182:14
**People's (1)**
47:10
**per (3)**
91:23,24;92:12
**PERA (23)**
4:18;58:9,10,13,13,
15,24;59:7;60:2,4,10,
11,16,17,19,21;61:5;
65:19;68:20;72:2;
107:10;112:7,11
**PERA's (9)**
58:17,23;59:7,11,16,
25;61:2;62:7;65:14
**percent (19)**
41:14;42:8;49:17;
51:22;131:9;135:13,
13;137:24;141:7;
149:14;150:1,1,2,4,4;
152:4;171:25;179:17,
20
**percentage (2)**
171:8,12
**perfectly (3)**
12:22;91:8;173:14
**perform (2)**

30:23;181:2
**perhaps (8)**
16:8;24:4;82:22;
112:3;116:4;168:11;
176:10;178:20
**period (36)**
5:21;59:12,14;62:1;
68:8,16;78:19;80:17,
18;84:10,24,25;86:14,
16;87:12;88:11,21,23;
89:7;90:12,15,19,25;
91:1,13;92:14;94:14,
16;95:15;113:12,15;
115:20;121:15,17;
147:14;150:6
**periods (1)**
150:6
**permanent (1)**
66:6
**permanently (1)**
66:1
**permissible (2)**
87:11;91:18
**permission (2)**
55:15;62:9
**permit (2)**
40:24;167:24
**permits (1)**
42:17
**permitted (1)**
104:21
**person (6)**
5:19;35:1;55:22;
56:22;92:5;126:19
**personal (3)**
96:1;133:11;142:21
**personally (1)**
124:25
**personnel (1)**
68:12
**perspective (8)**
10:19;65:14,15;66:9;
67:17;74:12;75:13;
120:16
**pertinent (1)**
65:23
**petition (24)**
6:14;75:16;76:13,19;
77:1;78:3,23;79:2,11;
81:14,20;82:21;83:16;
84:16;90:6,6,21,23;
94:6;103:17,24;
114:15,17;115:3
**PG&E (44)**
6:8,9,17;20:18,25;
59:12,14;64:2;68:13,
14;74:16;75:13,19,21,
23;83:19;84:18;87:20;
88:13;100:9;104:3;
113:9;132:21,21;
134:7,8;136:22;139:6,
12,12;142:23;143:2,9,
13,17,19,24;144:10,14;

145:8;146:2;151:13;
153:16;170:4
**PG&E's (3)**
134:10;143:4;144:4
**Phoenix (1)**
188:13
**phonetic (5)**
54:24;83:7;95:23;
101:16;127:24
**physically (1)**
178:24
**pick (4)**
69:20;85:25;89:12;
94:6
**picked (1)**
78:6
**picking (1)**
37:11
**picture (2)**
102:13;110:24
**pie (5)**
76:1;87:20,21;88:3,
18
**piece (4)**
16:25;61:19;76:1;
106:16
**pieces (3)**
62:10;64:20;107:1
**pin (1)**
95:24
**Pitre (6)**
39:21;43:15;153:9;
160:22;164:13;165:10
**Pitre's (1)**
43:13
**pivot (2)**
114:14;116:11
**pivoted (3)**
114:16,21;115:15
**place (8)**
43:12;72:23;110:16;
112:25;132:9;144:16,
18,19
**placed (2)**
149:5;182:11
**plain (1)**
70:16
**plaintiff (15)**
58:10;59:25;60:3,6,
9,12,20,22;86:25;87:1,
3;99:25;101:16;
112:11,17
**plaintiffs (8)**
55:8;61:12;65:19;
81:17,22;112:17;
131:11;172:7
**plaintiffs' (2)**
141:6;171:5
**plaintiff's (1)**
144:12
**plan (195)**
9:21;10:23;11:4;
15:11;16:20;21:9,11,

11,14,17;23:5,8,9;27:4;
40:4,15,20;41:11,14,
15,17,21;42:2,4,10,12,
15,17;43:6;44:15,18,
19;45:10,25;46:4,5,18,
24;47:3,4,18;48:4,6,22;
49:23;51:18,20;52:1,3;
55:12;58:23;59:4;61:2;
63:20,24;64:1,4,8,10,
14,15,19,24,25;65:4,8,
10,17,22;66:17,24;
67:14,14,22;68:1,5,9;
69:6;70:3,4;72:5,7,8,
11,11,14;74:14,17,21;
76:8,8,9;78:14;83:10;
84:14;86:8;87:6;88:12;
91:10,18;94:21,21,23;
95:18;96:20;97:12;
102:10,10,12,21,24;
103:3,5,8,10;106:12,
13,24;107:5,10;110:16,
20;111:8,20;112:2,22;
113:2;115:23;116:2,3,
5,7;117:1,3,13;121:10,
25;122:13;123:23,25;
125:21,25;131:5;
132:7,17;133:17,20,23;
134:3,3,4,8,23;136:20;
137:12,21;140:24,24;
141:15,21;142:13,19;
143:5;144:10,19;
146:7;148:14,17;
151:22,24,25;152:5;
154:6,21;155:12,13,17;
156:9,19;157:10,15,22;
160:15,15;164:15,17;
167:1;169:12;171:5,6;
174:10;175:5;176:22;
183:10;185:8
**planas (1)**
96:22
**planned (1)**
104:14
**plans (1)**
55:17
**plausible (1)**
98:11
**play (3)**
11:14;17:6;35:11
**played (1)**
91:24
**player (1)**
59:17
**players (1)**
50:16
**playing (3)**
6:18,24;43:19
**plead (1)**
114:21
**pleadings (2)**
64:6;112:9
**please (19)**
19:3,6;27:24;36:18,

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(20) particularly - please

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 208
of 219

25;37:8;55:2,4;56:23;
89:2;128:1;130:6,25;
157:1;164:11;166:24;
170:1;173:3;183:18
**pleasure (8)**
16:11;28:16,18;
120:3,5;127:4;128:11,
22
**plug (3)**
92:20;93:16;144:6
**plus (7)**
84:10;108:15;135:4;
138:15;144:19,19;
177:8
**pods (1)**
89:20
**point (65)**
5:10;11:22;13:24;
14:10;18:11;22:6;25:7;
26:12;27:1,5;32:2;
33:3,12;35:17;51:20;
53:20;54:5;58:4;63:23;
76:14;78:2,16;79:21;
82:14;83:10;84:2;
94:14;100:3,23;101:3;
102:5,6;111:15,16;
114:16;116:10,11;
123:3;124:23;125:8,
10;126:2,8;134:21;
135:19,20;139:9;
147:24;149:3;152:6;
154:4;164:18,20;
167:24;170:15;171:13,
24;173:9;175:3;
178:23;181:14,16,21;
183:23,24
**pointed (3)**
58:24;112:9;175:3
**pointer (1)**
88:22
**points (7)**
32:22;52:11;102:3;
148:4;149:2;183:5,23
**pole (2)**
132:21;142:24
**police (1)**
58:18
**policies (15)**
96:21,22,24,24;97:2,
6;99:11,14,14,16;
101:9,12;134:11;
139:4;174:24
**policy (7)**
97:11,16,18;100:9;
101:6,8;134:5
**pool (1)**
139:16
**popular (1)**
111:12
**Porter (1)**
37:5
**portion (2)**
98:11;138:22

**posed (1)**
145:5
**posited (1)**
80:4
**position (18)**
38:13,16;66:10;
99:10,19,20;101:17;
120:16;131:10;167:17;
170:2;175:7,19;176:4,
22;177:21;182:6,8
**possessions (1)**
42:24
**possibility (1)**
115:1
**possible (7)**
79:23;121:24,25;
122:1;123:23;143:9;
158:16
**possibly (3)**
22:7;79:3;155:21
**pot (3)**
75:6,7;138:16
**potential (2)**
79:10;105:16
**potentially (3)**
23:6;67:23;93:13
**power (4)**
20:19;23:15;42:25;
152:13
**PowerPoint (12)**
54:20;55:15;129:1;
130:5;139:19;140:7;
146:13,19;147:20;
159:21;165:5;169:6
**powers (1)**
23:15
**practically (1)**
46:23
**practice (1)**
74:25
**preaching (1)**
168:23
**preceding (1)**
88:18
**precision (1)**
64:16
**precludes (1)**
113:5
**predicate (1)**
170:22
**predicted (1)**
135:10
**prediction (2)**
163:18,23
**predominantly (1)**
65:14
**prefer (3)**
117:4;150:22;184:9
**preferable (1)**
168:2
**preferably (1)**
124:1
**preference (1)**

126:1
**preferred (1)**
165:20
**preliminary (2)**
179:19;181:25
**prepare (1)**
124:22
**prepared (9)**
12:23;20:3;39:22;
40:24;127:17;128:14;
129:12;172:20;181:15
**pre-petition (1)**
66:16
**prerequisite (1)**
94:21
**presence (1)**
100:6
**present (3)**
55:17;129:1;158:6
**presentation (10)**
25:22;57:23;58:5;
83:24;117:19;129:1;
131:13;159:8;169:4;
178:15
**presented (6)**
87:19;101:3;157:12;
159:1,18;173:7
**presenting (1)**
5:15
**presently (1)**
59:19
**preserve (1)**
149:2
**preserved (1)**
148:25
**preserves (1)**
169:12
**preserving (1)**
49:7
**presiding (4)**
4:5;51:23;52:13;
124:14
**pressure (1)**
124:6
**presumably (4)**
50:13,17;81:18;82:6
**presume (2)**
49:3;120:4
**presumes (1)**
96:5
**pretend (2)**
31:14;52:11
**pretty (8)**
19:25;51:21;52:5;
64:11;88:25;96:14;
111:14;178:4
**previous (1)**
47:23
**previously (2)**
66:10;111:17
**price (30)**
5:22;59:15;68:14;
78:14,16;80:23;83:15;

84:8,12,13,23,24;85:1;
86:11,20;87:25;89:4,5,
24;90:7,17,24;91:2,6,7,
10,12;93:16;94:13;
113:11
**prices (1)**
80:20
**primarily (1)**
60:16
**primary (1)**
48:24
**Prime (3)**
179:13,14,18
**primes (1)**
146:9
**principal (4)**
50:15;63:19;186:3,
12
**principle (2)**
100:2,12
**print (1)**
159:23
**prior (6)**
51:24;89:2;94:20;
95:23;118:9;158:20
**priorities (3)**
180:19;182:15,15
**priority (10)**
69:14,20,22;71:25;
73:22;74:23;102:25;
105:24;106:8;157:6
**pro (7)**
74:19;75:10;76:2;
81:18;104:24;107:21;
166:3
**probably (26)**
4:20;17:8;26:6,19;
54:6;74:4;93:16;95:4,
24;96:12;97:15;
101:23;103:16;104:1;
105:11;125:21;126:19;
127:16;128:20;129:21;
135:12;136:5;171:1;
178:1;180:25;182:7
**probation (1)**
143:9
**problem (21)**
8:5;9:5;21:16;22:1;
33:14,15;34:2,14;
57:10;62:25;66:9;
75:11,12;83:18,20;
84:3;88:2;94:2;96:1;
109:1;158:20
**problematic (2)**
33:18;84:21
**problems (8)**
5:25;22:14;64:5;
85:24;111:17;117:13,
14;129:12
**procedural (1)**
49:9
**procedure (1)**
63:15

**Procedures (1)**
9:9;15:21;26:3
**proceed (1)**
127:10
**proceeding (1)**
21:2
**proceedings (3)**
120:24;187:8;188:4
**proceeds (3)**
96:20,21;98:12
**process (10)**
16:17;24:5;43:3;
44:8;11;46:20;47:11;
111:4;122:11;141:12
**processing (1)**
33:15
**produced (1)**
132:20
**producing (1)**
166:15
**product (2)**
50:15;184:6
**productive (1)**
186:14
**professional (3)**
139:21;169:19;
177:16
**professionals (6)**
134:20;152:1,3,25;
153:25;165:7
**professionals' (1)**
153:5
**program (3)**
44:9;143:5,24
**Programs (1)**
86:23
**progress (4)**
5:5;38:10,22;44:1
**prohibition (1)**
67:12
**promise (1)**
39:22
**promised (1)**
8:23
**promises (2)**
42:13;149:7
**prompt (1)**
48:25
**promptly (1)**
40:11
**pronouncements (1)**
132:1
**proof (8)**
58:24;59:8,11;68:20,
23,23;98:2;144:11
**proofs (3)**
60:25;61:6;111:3
**proper (4)**
12:22;92:8;174:15;
180:6
**properly (1)**
170:21
**property (4)**

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 209
of 219

8:4;66:3,20;133:12
**proponent (1)**
124:9
**proponents (34)**
8:9;41:22;58:23;
59:4;64:19;69:7;70:4;
74:17,21;76:8;78:14;
83:11;84:14;86:8;
88:12;91:10;93:22;
94:23;95:18;102:13;
107:10;112:23;116:2;
117:4;128:9;134:23;
152:1,24;154:22;
160:15,15;168:25;
172:7;174:10
**proponents' (2)**
64:8;152:5
**proponent's (4)**
87:6;104:14;115:23;
116:5
**proportion (2)**
108:6,7
**proportional (1)**
76:1
**proportionate (1)**
107:19
**proposal (4)**
12:1;17:23;133:8;
176:7
**proposals (1)**
14:13
**propose (4)**
64:13;147:2;148:13;
151:13
**proposed (15)**
12:19;13:8;25:4;
61:22;73:6;76:7,8;
79:7;93:1;107:13;
119:8,17;132:17;
160:5;171:3
**proposing (1)**
167:1
**prosecutor (1)**
181:18
**prospect (1)**
70:16
**prospective (1)**
175:18
**protect (4)**
41:19;42:2;47:13;
61:1
**protecting (1)**
143:23
**protection (1)**
137:6
**protections (3)**
27:2;141:20;143:18
**protects (2)**
43:6;78:7
**proud (1)**
143:4
**prove (3)**
6:8;92:5;112:24

**provide (15)**
29:15;30:20;48:7,25;
96:23;97:2,3,4,6;99:15,
16;101:9;104:25;
157:18;173:12
**provided (7)**
104:7;107:19;
113:10;133:17;134:4;
136:23;141:5
**provides (9)**
30:22;58:15;74:14;
97:16;122:14,23;
123:2;131:5;141:8
**providing (2)**
133:18,24
**provision (7)**
18:1;43:16;113:4;
162:15,15;172:8,15
**provisions (10)**
11:2;20:6;21:10,15,
17;23:5,11;106:18;
124:18;157:11
**proxy (1)**
75:8
**PSLRA (1)**
60:13
**PSP (1)**
126:10
**PSPS (10)**
138:5;142:25;143:3,
20,23,24,25;144:1,6;
145:16
**public (10)**
43:4;58:7,14,19;
59:12;61:13,17,24;
141:2;151:3
**publicly (2)**
41:23;75:14
**public's (1)**
43:8
**PUC (3)**
144:4;145:1,4
**PUCs (1)**
144:2
**PUC's (2)**
144:19;145:17
**pulled (1)**
87:22
**pulling (1)**
144:6
**purchase (7)**
68:5,7;70:18,19;
74:8;80:1;105:24
**purchased (3)**
49:7;68:15;94:9
**purchasers (3)**
61:22,24;113:14
**purchases (4)**
59:13;81:4;110:14;
115:20
**pure (1)**
100:19
**purely (2)**

65:11;92:16
**purport (1)**
21:11
**purpose (4)**
69:13;86:5;91:20;
156:2
**purposes (5)**
59:18;115:6;121:13;
122:6;157:15
**Purro's (1)**
101:16
**pursuant (2)**
60:13;165:4
**pursue (1)**
169:22
**pursuing (1)**
65:20
**pussycat (1)**
115:10
**put (38)**
5:10;7:4,15;8:24;
19:14,15;24:22;25:16,
20;36:1;39:6;50:18;
56:24;57:18,19;63:9;
67:25;72:18;88:16;
102:8;104:19;108:8;
118:9;124:6;140:6,14;
149:7;157:11;158:22;
160:18;161:1;162:10;
163:13;166:6,15;
180:20;185:17;186:20
**putative (1)**
112:15
**puts (2)**
73:22;88:18
**putting (1)**
34:4;42:1;124:13;
133:3

## Q

**qualifier (1)**
66:5
**qualify (1)**
106:20
**quarterly (1)**
126:13
**quarters (1)**
147:15
**quick (3)**
10:21;104:12;180:8
**quickly (9)**
40:9,22;58:13;86:5;
121:24,25;122:1;
176:11;187:3
**quid (1)**
166:3
**quiet (1)**
35:2
**quirky (1)**
57:15
**quit (1)**
113:18

65:11;92:16
**quite (6)**
21:16;59:16;62:4,4;
74:2;96:13
**quo (1)**
166:3
**quote (12)**
60:2;65:7,9,10,11;
66:2,8;87:10,12;
107:11;114:15;165:5
**quotes (2)**
148:6;160:4

## R

**raise (9)**
8:24;18:13;25:13;
121:18,19,23;124:19;
127:21;173:8
**raised (28)**
17:16,22;18:17,18,
22;27:18,22;36:8;44:3;
56:17;67:7;111:17;
119:6;123:20,20;
128:24;132:6;136:21;
137:14,22;166:13;
171:21;172:21;173:10;
174:18;179:22;181:10;
182:14
**raises (2)**
121:13;139:9
**raising (5)**
9:15;18:24;23:1;
123:21;182:4
**rata (5)**
74:19;75:10;76:2;
81:18;107:21
**rate (2)**
46:24;145:24
**ratepayers (1)**
143:19
**rather (2)**
22:12;118:10
**Rauth (1)**
19:12
**re (2)**
63:5,5
**reach (4)**
14:7;29:3;91:9;
93:16
**reaches (1)**
81:7
**reaching (1)**
34:6
**react (1)**
114:23
**reacted (1)**
144:12
**reacting (1)**
144:20
**read (10)**
8:5;22:9;32:20;87:5;
92:21;163:1,1;165:3,3;
175:15

**reading (3)**
72:21;94:18;161:21
**Ready (5)**
25:24;112:22;
127:14;177:6;181:13
**real (15)**
21:3;22:21;24:6;
57:15;59:18;81:23;
84:4;88:13;117:6;
125:19;127:1;152:9;
184:14,14;185:15
**reality (4)**
43:1;69:23;78:18;
96:10
**realize (3)**
101:21;114:18;
167:17
**realized (1)**
77:16
**really (22)**
8:3;14:21;19:21;
23:1;28:23;39:2;49:3,
4;67:16;77:13;79:13;
84:7;86:10;92:7;
101:15;102:1,19;
134:21;141:20;151:6;
166:22;180:19
**reargue (1)**
11:19
**reason (9)**
19:19;80:4;82:15;
121:16;149:3;154:10;
169:17;173:6;181:1
**reasonable (12)**
34:9;87:15;147:10;
148:10;151:11,16;
153:23;157:19,23;
165:7;174:14;176:24
**reasonably (2)**
151:25;153:18
**reasoned (1)**
184:9
**reasoning (1)**
125:23
**reasons (4)**
111:18;165:19;
166:6;180:11
**Rebecca (1)**
37:22
**rebuilding (1)**
47:11
**recall (10)**
16:2,23;43:15;52:23;
95:23;138:14;147:19,
19;153:7;174:1
**recap (3)**
14:20;86:5;113:1
**recapitalized (2)**
145:14,16
**receive (4)**
29:16;74:15;87:2;
106:21
**received (6)**

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 210
of 219

38:25;87:3;97:10;
104:8;132:13;139:18
**receiving (5)**
103:25;104:1;
107:20;138:22;162:16
**recent (2)**
143:11,25
**recently (1)**
137:14
**recess (4)**
4:20;55:1;85:8,15
**recite (1)**
177:12
**recognize (6)**
8:25;35:1,1;63:25;
90:21;117:15
**recognized (1)**
111:1
**recommend (1)**
160:2
**recommendation (2)**
151:17;152:8
**recommendations (4)**
151:18;152:17;
153:2,3
**recommended (1)**
151:11
**reconnect (1)**
85:9
**record (16)**
37:1;62:11;63:8,9;
102:17;112:4;128:2;
130:15;163:9;169:12;
172:17,18;177:17;
180:17;182:12;188:4
**recording (3)**
63:7;85:6,16
**recover (2)**
86:25;139:12
**recoveries (5)**
8:2;76:9;106:9;
117:6;150:19
**recovery (5)**
70:6;74:18,19;
107:21;149:5
**reduce (2)**
169:23;171:11
**reduced (1)**
106:7
**reducing (1)**
171:11
**reduction (1)**
46:7
**refer (1)**
27:15
**reference (5)**
68:19,21;72:14;
73:20;133:2
**referred (1)**
58:9
**refers (2)**
29:17;165:20
**reflect (3)**

25:3;38:9;78:16
**reflected (5)**
8:6;78:16;87:25;
148:4;185:4
**reflecting (1)**
184:1
**reflection (1)**
115:15
**reflects (1)**
88:17
**refusal (1)**
41:22
**regard (8)**
10:23;15:12,18;
22:24;38:10;112:5;
142:11,16
**regarding (8)**
21:1;23:9,14;32:24;
40:17;41:12;58:23;
110:15
**regardless (2)**
115:22;180:22
**regards (2)**
96:15;186:16
**registered (1)**
149:16
**registration (52)**
40:5;43:4,5,12,13;
47:7;52:3;53:6;131:6,
19;132:11;135:8;
136:23;137:3,4;
139:24;140:4,8,22;
145:9;146:20,23;
147:12,18,22;148:24;
149:17;150:22;151:1,
7,13,16;152:17;153:8,
10,17,23;155:9,18;
156:13,20;157:5,8,14,
19;161:5,18;164:4;
165:7,11;166:15;
178:10
**regroup (1)**
4:21
**re-hook (1)**
143:3
**reinstated (5)**
75:12,18;83:14,14,
15
**reiterate (1)**
178:7
**reject (5)**
64:24;102:21;111:8;
125:22;157:17
**rejected (5)**
102:10,15;104:14;
119:19;133:6
**rejecting (1)**
105:3
**rejection (2)**
102:12,14
**rejoin (1)**
85:6
**related (2)**

32:9;152:22
**relating (2)**
41:25;151:23
**relationship (1)**
100:15
**relative (2)**
43:17;79:20
**relatively (2)**
84:11;120:22
**release (26)**
21:15;23:6;26:7,8,8;
29:17,21,22,25;30:7,
15;31:4,11;32:13,14;
34:1,1,13;65:12;67:2,
25;113:5;173:13;
177:2,13,15
**releases (11)**
26:10,23;27:12,14;
30:13;31:6;33:20;65:2,
8,10;67:12
**releasing (4)**
15:7,8;23:12,12
**relevance (1)**
87:13
**relevancy (1)**
118:5
**relevant (1)**
112:14
**reliant (1)**
144:25
**relief (6)**
20:22,25;23:11;98:7;
132:12,19
**rely (1)**
12:23
**remains (5)**
40:16;41:11;60:11,
21;126:5
**remarks (5)**
39:22;40:24;55:13,
14;178:6
**remedy (1)**
70:1
**remember (5)**
20:8;50:2;134:14;
142:1;181:11
**reminded (1)**
176:10
**remote (1)**
63:15
**remove (1)**
34:24
**removed (1)**
103:14
**render (1)**
67:3
**renters (1)**
42:6
**reorganization (1)**
42:12
**reorganize (2)**
104:3;107:11
**reorganized (8)**

66:3,21,21;67:24;
74:16;113:9;153:15;
161:17
**repeatedly (1)**
142:12
**report (8)**
38:7;108:25;137:18;
180:1,6;181:13,24,25
**reported (4)**
49:16;83:11;109:2;
145:25
**reporting (1)**
126:13
**represent (6)**
25:12;112:7;130:17;
141:7;10;152:3
**representations (2)**
87:2;177:4
**representatives (5)**
144:2;170:13,15,18,
20
**representing (1)**
40:2
**represents (5)**
18:12;41:2;131:23;
142:6;181:22
**reputation (1)**
136:5
**request (7)**
43:14;122:22;133:6;
140:6;147:5;171:3;
178:9
**requested (8)**
9:7;22:1;169:7;
174:1;175:10,12;
179:15;182:1
**requests (1)**
180:6
**require (5)**
28:7;43:16;47:5;
100:8;126:25
**required (5)**
29:15;33:8;41:20;
157:8;162:19
**requirement (6)**
34:9;145:11;152:7;
153:8,22;157:14
**requirements (7)**
102:22;116:18;
145:12;151:6;152:6;
157:9,13
**requires (3)**
31:17;147:14;162:14
**requisite (1)**
152:1
**res (1)**
27:16
**rescission (9)**
68:4,6;72:12;73:2,
21;110:8;112:16;
116:14,17
**reserve (4)**
15:14,16;38:22;

152:25
**reserved (2)**
15:12;120:7
**reserves (2)**
177:6,10
**resistance (1)**
177:24
**resolution (7)**
14:7;15:21;26:3;
38:16;156:17;168:2;
178:23
**resolutions (1)**
16:22
**resolve (15)**
13:3;14:8;38:12;
110:15;112:23;117:16;
119:3,18;138:10;
157:24;159:25;160:12,
12,17,17
**resolved (38)**
4:17;10:19,19,25;
11:10,11;14:1;15:4,6,9,
11;16:21,25;17:3;
20:13;25:1;35:4;94:22,
25;112:1;119:2,7,9,10,
16,17,22;120:12;
138:22;156:8;158:15;
164:18;175:24;183:6,
8,17,20;185:3
**resolving (1)**
23:2
**respect (31)**
9:6;16:1,20;18:14;
21:22;31:6;33:9;40:9;
43:10;44:3;59:17;62:7;
63:20;66:8;80:24;
102:11,18;106:25;
107:1,7;110:3,4,8,21;
113:1;116:25;120:11;
140:22;142:18;155:4;
178:10
**respond (5)**
8:19;39:10;137:11;
176:15;181:5
**responded (3)**
12:1;143:13;169:10
**response (16)**
12:21;13:2;51:17;
58:25;120:19,22;
121:7;128:13;141:24;
152:5;160:1;165:15;
179:22;180:10;181:8,9
**responses (1)**
180:9
**responsibility (1)**
57:4
**rest (4)**
86:2;88:14;120:4;
183:20
**restricted (3)**
51:10;149:14,16
**restrictions (3)**
43:17;48:7,17

Case: 19-30088   Doc# 7843   Filed: 06/09/20   Entered: 06/09/20 07:34:06   Page 211
of 219

**restrictive (1)**
149:22
**result (7)**
7:17;48:22;70:5;
75:18;78:4;138:20;
157:5
**resulted (3)**
133:11;135:9;139:1
**results (5)**
42:1,5;45:3;117:9;
170:16
**resume (3)**
63:11;85:8;185:25
**retail (1)**
20:18
**retain (1)**
31:1
**retaining (1)**
103:9
**retention (1)**
15:10
**retirees (1)**
58:16
**Retirement (3)**
58:8,14;61:13
**revenue (2)**
146:3,4
**reverse (2)**
128:10;183:3
**reverse- (1)**
86:9
**review (5)**
13:7,23;39:2;179:12;
187:4
**reviewed (1)**
162:13
**reviewing (1)**
11:6
**revise (1)**
119:18
**revised (3)**
13:8;21:23;39:1
**revision (1)**
119:9
**revisions (5)**
12:19;13:1;38:8,11;
119:8
**rhetorical (1)**
135:14
**Richardson (2)**
171:21;174:21
**Richardson's (1)**
168:15
**right (84)**
5:14;6:4;9:22;10:6,9,
17;12:12;18:2;19:15;
20:20;25:18;28:5;32:2;
34:21;37:16;45:23;
50:11,24;52:18,24;
53:14;54:11;55:21;
56:23;57:19;59:20;
72:22;79:2,3;82:24;
83:6;85:17;90:7;92:12;

93:24;96:10;100:20;
101:6;103:23;104:16,
16;105:19;108:21;
109:1,3;111:12;114:4;
118:21;124:16;126:11;
129:13,24;130:2,9,14,
19;134:9;137:2;
139:25;140:15,23;
144:13;145:24;146:13,
18;150:21;153:11;
154:5;157:3;159:7;
160:7;161:14;162:2;
164:9,21;165:4;
168:14;170:8,10;
171:12,18;186:12,17,
22
**rightly (1)**
114:8
**rights (139)**
15:12,14,16;23:16;
31:1;40:5;43:4,5,6,12,
13;47:7;48:7;50:11,24;
51:18,25;52:3,8,21;
53:6;60:23;61:1,2;
104:2,3,5,14,19,25;
105:4,5,20;106:19,21,
25;107:3,7,8,25;108:1,
12,13,15,22;111:1;
116:8,12;131:6,7,12,
19;132:11;134:4,4,5,
10,12;135:8;136:23;
137:3,5;139:3,14,21,
24;140:3,4,8,21,22;
145:9,9;146:20,24,25;
147:12,18,23;148:25,
25;149:17;150:22;
151:1,7,14,16;152:14,
17,18,19,22,25;153:5,
8,10,17,23,24;154:1,4,
23;156:13,21;157:5,8,
14,16,19,20,20,25;
160:20,24;161:5,9,18;
162:6;163:11;164:2,3,
4,15;165:1,7,11,12;
166:4,15,17;168:24;
174:24,25;175:24;
177:9;178:10,13;
185:9,9
**risk (27)**
41:16,21;45:8;46:8;
47:17;48:24;50:20,22,
23;51:4,5,6,11;138:5,8;
142:13,14,18;143:15;
144:23,23,24,24;146:8;
149:5;183:15;185:24
**risks (1)**
47:13
**River (1)**
37:24
**road (3)**
67:9,22;70:8
**Robert (2)**
128:3;130:25

**rode (2)**
77:20;92:11
**rodeo (1)**
150:14
**role (5)**
59:7,25;60:20;
106:19;167:19
**room (7)**
9:19;19:2;43:8;
55:20;109:17;130:6;
144:2
**Rose (1)**
37:23
**rounding (1)**
84:9
**RSA (50)**
131:7;132:6;133:5,
19;136:13,13,17;137:3,
22;138:12,17;139:20;
140:14,14,23;141:5,17;
146:22;148:4,4,9,25;
149:3;151:6,8,8,15,20,
21;152:6,11,12,19,21,
23;157:12,22;159:5;
160:4,5;164:3;165:1,6;
166:8,18;168:6;
170:16;174:1,14;
178:11
**RSA's (1)**
140:9
**rubrics (1)**
81:1
**rude (1)**
186:9
**Rudnick (2)**
28:19;33:22
**Rule (16)**
60:15;87:12;99:6;
102:25;112:14;122:23,
23;123:1,2;140:10;
149:20,22;150:4;
155:11;160:24,25
**Rules (6)**
9:8;101:13,13;
102:24;147:13;155:19
**ruling (7)**
98:21;118:11;
144:13;167:16;172:18;
173:18;182:22
**rulings (5)**
132:2,6,9,15;178:8
**run (6)**
79:17;81:4;129:22;
143:1;158:20;177:22
**running (1)**
54:22

**S**

**safe (3)**
145:13;183:9,11
**safeguarded (1)**
42:9

**safeguarding (1)**
60:23
**safety (3)**
46:14;145:15;168:5
**sake (1)**
168:13
**sale (3)**
70:18,19;149:18
**sales (2)**
42:18;81:4
**same (54)**
6:21,22;7:22;20:6;
25:15;28:12;22;30:15;
31:1;33:14;37:3,7,8;
38:20;40:11;43:18;
44:17;45:15;67:1;
69:20,22;71:3;73:22;
74:23;77:7,19,21,22;
78:1;79:18;81:14;82:2,
3,7,8,10,23;88:17;
100:3;103:20,20,22,24;
105:18,24;111:14;
112:13;153:25;157:10;
160:24;163:23;165:12;
166:4;172:5
**SAN (6)**
4:1;18:12;19:12;
22:24;121:8;133:10
**sand (1)**
138:18
**Sandler (2)**
55:7;58:7
**sat (1)**
134:18
**satisfied (2)**
157:15;184:13
**satisfies (1)**
185:16
**satisfy (3)**
101:24;102:25;107:6
**satisfying (1)**
102:23
**Saturday (1)**
185:23
**sauce (2)**
147:25,25
**saw (1)**
10:19
**saying (11)**
9:21,21;24:8;44:1;
49:22;50:7;100:12;
108:2,4;134:14;146:23
**Scarpulla (1)**
46:6
**scenario (2)**
71:19;108:18
**scenes (1)**
152:10
**schedule (6)**
4:17;47:6,9;48:4,7;
59:11
**scheduled (1)**
5:9

**schedules (1)**
32:12
**Schoenberger (1)**
37:10
**scope (5)**
17:16,23;23:14;
67:21;113:1
**screaming (1)**
110:21
**screen (11)**
5:12;8:18;10:10;
13:16;36:17,23;62:13;
63:2;87:18;130:20;
157:11
**scuttle (1)**
110:19
**SDNY (1)**
104:23
**se (1)**
104:24
**seasons (1)**
48:24
**SEC (2)**
140:10;147:13
**second (27)**
19:18;44:3;46:10;
48:6;23:49:5;52:6,21;
59:24;64:15;68:2;
70:25;89:19;93:13;
103:25;106:22;130:1;
132:23;133:7,23;
136:20;139:3;141:23;
153:21;160:17,21;
173:9
**secondary (1)**
24:19
**Secondly (2)**
143:6;178:12
**seconds (1)**
167:3
**secret (1)**
186:21
**Section (15)**
10:23;15:11;21:7,23;
22:3;27:9;30:20;33:23;
73:4;74:22;119:7,9;
131:14;151:14;157:10
**sections (4)**
12:5;26:12;27:5;
30:23
**securities (52)**
5:8;13:17;14:5;35:7;
55:7;58:11;59:12;60:1,
6,12,21,22;61:3,6,7,13,
14,18,21,24;62:2;
65:17,19,21;66:12,25;
67:20;68:18;78:7,12;
79:16,16;81:1,4;88:6;
92:16;98:13;99:7;
108:9;110:14;113:14;
114:3;126:12,25;
131:11;149:23,23;
170:25;171:4;172:6;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(24) restrictive - securities
Page 212
of 219

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06

184:3,24
**securitization (2)**
145:1,2
**security (5)**
70:18,19;74:8;95:15;
179:2
**security's (1)**
127:2
**Sedwick (2)**
44:4;53:24
**seek (1)**
30:24
**seeking (2)**
20:17;60:8
**seem (6)**
16:17;74:24;83:6;
85:17;93:21;185:5
**seemingly (1)**
79:24
**seems (9)**
7:2;8:13;23:9;34:8;
53:2;69:4;100:5;
101:21;112:4
**segment (1)**
14:5
**select (2)**
115:18;180:14
**selection (2)**
86:21;180:15
**selective (1)**
110:16
**self-appointed (1)**
60:2
**sell (8)**
41:24;51:11;87:16;
149:24;150:1,16,17;
163:14
**selling (3)**
77:22,25;147:14
**sell-off (1)**
51:6
**semi-facetious (1)**
124:21
**send (2)**
13:8;186:16
**sending (2)**
14:13,14
**senior (1)**
33:16
**sense (8)**
90:20;114:14;
115:16;121:5;127:17;
129:6;165:23;180:10
**sensitive (1)**
184:4
**sent (10)**
11:5;12:17;18:15;
21:24;22:17;24:9;
49:14,15;119:19;142:9
**sentence (6)**
67:20;95:11;160:19;
161:22;165:9;171:20
**sentences (7)**

160:3,4,18;165:5;
166:7,16;168:6
**separate (10)**
68:16,19;69:17,19,
24;71:21,24;79:13;
80:5,6
**September (5)**
132:17;135:11;
138:2;140:20;141:15
**series (2)**
88:16;90:3
**seriously (1)**
159:3
**service (2)**
85:18;181:2
**session (2)**
4:4;121:2
**set (11)**
44:21;46:25;47:5;
61:4;62:9;101:11;
136:12;151:18;157:9,
21;185:13
**setoff (1)**
169:15
**sets (2)**
53:17;82:1
**setting (1)**
167:20
**settle (1)**
132:14;133:8
**settled (5)**
49:13,14;133:21;
155:7;177:8
**settlement (45)**
26:9,10,15,16,20;
27:15,17;28:7;32:5;
33:23,24;34:11;
114:10;131:8;133:9;
135:6,9,21;136:18,18;
137:4,22,23;140:10;
141:17,19;148:9;
149:4;163:19,20,21,23;
166:8;172:23;173:1,9;
174:2,6,7,13,14;175:4;
176:24;177:5;178:11
**settlements (2)**
16:3;172:22
**seven (9)**
88:13;128:24;132:8;
136:12,15;137:7;
147:4,7;178:8
**seventh (1)**
137:13
**seventy (4)**
5:23;31:19;141:7;
152:4
**seventy-one (1)**
84:25
**several (9)**
9:16;60:6;65:25;
112:9;113:11;117:10;
133:17;135:17;181:4
**shall (5)**

14:18;48:6;151:24;
153:18;177:13
**shame (1)**
49:19
**share (15)**
5:12,13;6:2,11;
62:12,22;81:18;84:16,
18;91:6,7,10;92:12;
95:2;129:18
**shared (1)**
101:6
**shareholder (13)**
77:5,6;93:22;106:14;
108:9;128:9;134:23;
152:5,24;154:21;
160:14;167:2;174:10
**shareholders (21)**
7:24;35:18;48:8,12;
49:6,21;51:9;131:6;
136:24;137:5;140:18;
145:10;160:24;161:3,
4,5;163:10;165:12,17,
22;178:13
**shares (42)**
5:22;6:16;7:8,14,21;
43:17;59:14;74:18;
75:4,19,21,23,24;76:4,
7;78:21;81:9;84:6,9;
86:7;90:8;91:7,21;
94:15,16;96:3,4,10;
103:20,23,23;108:11,
11,12,14,15,18,22;
113:9,25;114:9;150:2
**sharing (2)**
81:20;139:2
**shed (1)**
27:23
**sheet (4)**
139:20;151:20,20;
168:6
**sheltered (1)**
168:14
**shifted (1)**
172:10
**short (7)**
54:6;110:5;127:18;
129:15;141:12;179:5;
183:7
**shots (1)**
138:12
**show (16)**
102:24;125:18;
133:19;139:19;140:1,
7;147:20,22;148:21,
22;152:2;159:15;
160:5,25;162:22;164:2
**showed (4)**
87:20;134:24;144:1;
153:3
**shown (1)**
110:12
**shows (5)**
9:1;88:22;146:25;

152:21;164:14
**shrift (1)**
179:5
**sic (3)**
12:5;45:14;88:2
**side (21)**
9:2;28:10;35:17;
54:18;93:23,23;95:19;
97:3,4,6,16,17;99:14,
16,16,16;101:8,12;
149:21;155:13;166:25
**Side-A-only (1)**
99:14
**sight (1)**
60:20
**sign (19)**
26:7;30:6;32:4,4;
33:4,17,25;51:24;
123:8;124:22;125:24;
156:16;158:3;167:3,6;
175:25;176:12;184:13;
185:8
**signature (1)**
124:13
**signed (3)**
138:17;176:1;184:15
**significance (2)**
63:25;110:8
**significant (10)**
59:17;103:16;
105:11;132:2;133:25;
138:4;183:25;184:25;
185:1,2
**significantly (1)**
103:12
**signing (1)**
184:10
**similar (9)**
30:6,19;45:25;68:9;
72:15;154:1;165:17,
20;178:9
**similarly-situated (2)**
22:13;165:22
**simple (15)**
34:10;47:2;48:20;
49:22;67:16,18;73:20;
75:9;82:15;113:6;
160:21;167:14,14;
172:1;173:10
**simplest (3)**
74:4;94:12;106:7
**simplified (1)**
7:5
**simplify (1)**
5:20
**simply (23)**
17:22,25;67:6,20;
73:1;74:6;75:7,12;
87:12;88:16;91:19;
105:23;107:16;108:24;
150:22;167:13;168:18;
175:2;177:1,12;
178:10;186:8,9

**single (4)**
40:15;41:10;71:20;
80:18
**Siri (1)**
7:11
**sisters (1)**
42:22
**sit (3)**
83:20;91:8,15
**sitting (2)**
32:18;103:12
**situated (1)**
162:21
**situation (8)**
48:1;69:11;71:1;
75:5;100:17,18;
106:12;185:21
**situations (1)**
75:4
**six (15)**
60:8;78:20;86:19;
135:24;136:11;140:11,
16;147:16;149:23;
150:5,8;162:12;
165:13,16;166:2
**sixth (1)**
137:11
**sixty (3)**
6,2,21,24
**Skikos (32)**
36:7,11,21,23,25;
37:2,2;39:7,11,13,16;
43:23,24,24;45:20,24;
50:9,12,25;51:2,6,8;
52:2,5,19,24;53:1,9;
54:9;153:9;160:22;
165:10
**Skikos' (1)**
43:14
**skip (1)**
121:6
**Slam (1)**
152:9
**sleep (1)**
183:17
**slice (1)**
87:21
**slices (1)**
88:5
**slide (24)**
90:4;149:9,19;151:5;
152:20,21;153:13;
157:1;162:1,12,22;
164:9,10,10,11,24;
169:8;170:1,24;
172:20;173:3,25;
175:20;176:25
**slides (4)**
62:9;88:3;148:7;
168:9
**slight (1)**
114:14
**slightly (3)**

Min-U-Script®

Case: 19-30088   Doc# 7843   Filed: 06/09/20   Entered: 06/09/20 07:34:06   Page 213
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(25) securitization - slightly

99:1;102:13;120:1
**slip (2)**
  118:14;124:5
**slowly (1)**
  165:2
**small (2)**
  42:6;83:2
**smaller (4)**
  76:1;83:3;113:20;
  114:1
**smallest (1)**
  96:4
**smarter (1)**
  174:19
**so-called (2)**
  139:11;144:6
**sold (7)**
  6:1,2;43:17;78:21;
  80:24,25;92:14
**Solomon (2)**
  115:9,9
**solution (4)**
  83:23;94:12;113:16;
  168:3
**solutions (1)**
  79:11
**solve (3)**
  94:2;95:25;159:16
**solved (2)**
  35:4;118:25
**solvent (2)**
  75:14;83:13
**somebody (9)**
  22:3;57:1;70:13;
  72:2;89:16;93:23,23;
  105:19;161:8
**somehow (1)**
  78:3
**someone (9)**
  18:20;92:14;99:18,
  21;113:23;154:14;
  156:15;161:9;181:17
**someone's (2)**
  6:15;81:2
**something's (1)**
  35:4
**sometime (4)**
  24:25;34:7;70:8;
  93:11
**sometimes (2)**
  176:14;184:10
**somewhat (3)**
  83:21;90:10;142:15
**somewhere (4)**
  72:22;77:4;92:1;
  185:4
**Sonoma (1)**
  142:22
**soon (1)**
  123:23
**sooner (1)**
  124:14
**Sorry (15)**

4:8;9:3;12:17;15:1;
  19:11;23:8;37:20;57:7;
  73:18;85:7,17;109:21;
  119:18;120:8;155:14
**sort (11)**
  29:25;30:12;69:9,12;
  102:8;105:17;124:11;
  174:16;178:24;181:18;
  183:2
**sound (3)**
  73:16;166:22;167:14
**sounded (1)**
  87:16
**sounds (2)**
  135:20;178:4
**source (1)**
  100:20
**South (1)**
  19:12
**Southern (3)**
  18:12;162:23,24
**speak (14)**
  4:25;5:2,6,9,17;8:24;
  39:20,25;40:3;120:18;
  149:7;172:18;181:20;
  184:17
**SPEAKER (1)**
  38:24
**speakers (1)**
  54:12
**speaking (7)**
  4:25;12:7;16:24;
  21:21;22:23;36:13;
  57:6
**special (4)**
  11:2;21:24;106:20;
  181:17
**specific (10)**
  22:14;32:3;52:20;
  53:11;64:5,13;71:10;
  102:18;109:3;111:20
**specifically (8)**
  26:12,24;27:14;
  33:19,20;65:7;68:6;
  96:23
**specificity (1)**
  28:23
**speculative (1)**
  145:1
**speech (2)**
  169:1,11
**speed (1)**
  164:8
**speedy (2)**
  40:13;41:7
**spend (3)**
  58:21;124:15;135:1
**spoke (4)**
  40:6;111:7;181:4;
  182:14
**spoken (1)**
  94:23
**spokesman (1)**

15:25
**spokesperson (1)**
  54:2
**spotted (1)**
  143:12
**staff (1)**
  186:23
**stage (3)**
  67:6,8;150:18
**staged (1)**
  147:14
**stakeholders (1)**
  83:19
**stand (3)**
  112:22;142:16;
  177:16
**standard (4)**
  27:7;145:11;157:18;
  166:10
**standards (1)**
  157:21
**standpoint (5)**
  75:21;83:19,20;
  108:3,4
**stands (2)**
  69:24;136:5
**start (9)**
  38:2;40:22;88:19;
  92:8;129:3;131:4;
  149:9;151:12;187:4
**started (3)**
  103:20;132:22;141:3
**starting (2)**
  76:5;121:20
**starts (1)**
  88:3
**State (26)**
  10:4;19:6;26:4,9;
  28:12;36:25;37:8,19;
  47:9;49:15;52:14;
  53:17;55:4;58:15,18;
  128:1,7;130:15;
  138:15;144:3;145:11;
  147:18;154:5;164:23;
  171:19;172:4
**stated (3)**
  42:25;75:9;180:17
**statement (10)**
  5:10;23:8;41:4;67:5,
  8;102:19;120:23;
  127:18;149:11;182:8
**statements (4)**
  47:17;68:11;95:8;
  121:16
**States (6)**
  26:4;148:9;149:11;
  151:20;153:15;180:12
**static (1)**
  89:12
**status (1)**
  161:9
**statute (1)**
  12:23

**statutorily (1)**
  106:8
**stay (14)**
  20:22,23;35:25;
  36:16;63:10;78:8;98:7;
  122:24,24;130:20;
  132:13,19;182:21;
  186:24
**staying (1)**
  36:2
**stays (1)**
  7:7
**steadfast (1)**
  176:8
**step (2)**
  44:17;93:13
**Steve (2)**
  37:2;43:24
**stick (2)**
  28:6;39:6
**still (36)**
  4:16;6:17,18;7:3;
  11:6,13,14,23;16:18;
  17:6;19:3;20:4;24:11;
  35:11,24;38:10;59:19,
  19;61:23;62:5;71:23;
  75:21;77:5;81:4;
  103:22;104:1;119:15;
  125:13;155:19;164:15;
  175:10;182:10;183:5,
  5;185:3;186:7
**stipulation (1)**
  20:23
**stock (124)**
  5:21;6:1,19,24;7:3,
  15;8:8;32:24;40:25;
  41:12,19,21,24;42:8,9,
  18,20;43:3,17;46:14,
  19;48:22;50:1;59:14;
  68:5,7,15;69:22;74:15,
  24;75:15,19,21,23;
  76:4;77:22,25;78:13,
  15,19;79:3;80:1,12,18,
  23;84:7,12,13,13,19,
  22,24;85:1;86:11,20;
  87:20,22,25;88:5,19,
  21,22;89:24;90:7,17,
  22,24;91:2,12;92:4,6,
  11;93:16;94:13;
  100:10;103:16;104:3,
  16;105:7,24,25;107:11,
  13,14;108:20;113:13;
  115:19;116:4;117:10;
  132:11;134:13;135:13,
  15;136:22;138:1,3;
  140:12,17;144:14,21;
  145:8;146:8,10;
  147:10,12;148:23,24;
  149:14,15,18;150:4,9;
  162:16;163:14;165:20,
  20,21,24,25;166:5;
  171:8,8;174:23,23
**stockholders (1)**

106:19
**stood (1)**
  20:9
**stop (4)**
  6:4;76:15,15;85:6
**stops (1)**
  90:25
**store (1)**
  4:12
**Stradling (1)**
  19:11
**straightforward (1)**
  64:12
**strategy (1)**
  32:23
**stream (2)**
  146:3,4
**street (2)**
  142:24;188:12
**strength (1)**
  145:14
**stressed (1)**
  114:14
**stretch (1)**
  66:17
**Strictly (1)**
  60:14
**strike (1)**
  92:3
**strong (1)**
  145:13
**strongly (1)**
  88:25
**structure (5)**
  69:13;71:23,24;
  103:15;133:19
**structured (2)**
  42:14;106:16
**struggling (1)**
  100:22
**stuck (1)**
  51:5
**stuff (3)**
  150:17;166:23;
  178:21
**style (1)**
  184:8
**subject (16)**
  17:3;21:8,14;25:9,
  17;45:13;50:3;73:3,4;
  95:15;103:9;106:18;
  132:3;161:5;178:2;
  179:10
**subjects (1)**
  73:23
**submit (2)**
  91:17;171:3
**submitted (3)**
  118:4;121:8;182:21
**subordinated (2)**
  171:5,6
**subordinates (1)**
  70:17

Min-U-Script®

Case: 19-30088   Doc# 7843   Filed: 06/09/20   Entered: 06/09/20 07:34:06   Page 214
of 219

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.com

(26) slip - subordinates

subordination (2)
73:4,4
subro (9)
125:19;135:6,9,9;
140:18;163:19,21;
177:16
subrogation (7)
41:13;49:8;98:22;
100:4,5,7;177:5
subscribe (1)
104:16
subscription (2)
104:2;106:21
subsequent (2)
88:6;158:19
subset (1)
71:10
substance (2)
151:25;153:18
substantial (3)
27:2;38:10;60:18
substantive (1)
33:17
substantively (1)
69:15
succeed (1)
42:10
succeeding (1)
148:6
successful (2)
104:18;178:23
successfully (3)
47:19;50:10;51:10
successive (1)
78:18
such-and-such (1)
183:13
suddenly (1)
152:19
sued (3)
97:9,10;107:11
suffice (1)
184:10
sufficient (2)
129:22,23
suggest (4)
4:19;6:4;43:16;
94:12
suggested (10)
12:25;73:1;79:22;
83:24;88:25;90:2,12;
102:14;111:24;112:3
suggesting (2)
93:11;127:5
suggestion (7)
79:24;95:21,21;
114:25;115:15;175:8,
18
suggestions (1)
90:4
suing (2)
66:18;169:20
Suite (1)

sum (1)
147:2
summarize (4)
5:19;62:10,10;
146:21
summarizes (1)
180:21
summary (1)
7:4
summation (1)
109:9
summer (1)
132:12
Sunday (1)
185:23
superimpose (1)
71:22
superimposed (1)
69:13
superimposing (1)
71:1
Superior (2)
92:22,23
supplement (1)
27:4
supplemental (2)
142:2,4
support (3)
65:5;145:17;170:2
supported (1)
131:9
supports (2)
104:10,11;131:5
Suppose (7)
72:1;81:10;94:8;
97:20;108:8;175:24,24
supposed (7)
17:11;86:12,22;
87:20;96:1;156:18;
158:10
supposedly (2)
107:12;149:6
sure (32)
5:12;20:2;21:20;
22:1;27:11;32:2;33:6;
39:13;47:25;50:21;
52:17;53:18;94:10;
98:9;113:3;124:25;
126:9;129:14;130:12;
142:3,8;143:9;145:24;
154:16,18;167:10,11;
170:7,21;178:1,12;
184:16
Surger (1)
83:7
surprised (3)
64:18;180:9,11
surveyed (1)
165:14
survivor (1)
53:23
suspect (1)

95:22
suspenders (3)
28:9,11;173:5
sustain (1)
105:20
swap (1)
166:1
swayed (1)
102:17
switch (1)
89:20
switching (1)
120:1
sympathy (1)
168:1
system (3)
25:2;62:22;88:22
System/West (1)
37:23
systemic (1)
179:16

**T**

table (4)
61:4;136:2;168:10;
175:10
tailored (1)
111:21
talk (8)
16:9;23:12;40:10;
76:10;86:18;151:5;
171:1;185:18
talked (11)
9:12;16:22;36:11;
44:6;49:13;50:22;
107:1;109:9;175:14;
178:22;182:19
talking (12)
7:12;25:12;38:3;
44:6;61:5;71:9;85:23;
125:15,16;160:22;
165:10;172:5
target (1)
17:7
TCC (35)
38:8;40:2;128:25;
130:18;131:4,22,23;
137:13,17;138:17;
139:20;148:10,12,15;
152:2,13,24;153:24;
155:6,12,14,18;156:22;
160:14;161:22;170:12,
15,17,19,21;171:23;
177:15;179:25;180:10;
181:22
TCCs (1)
153:4
TCC's (2)
137:2;169:12
team (4)
57:3;141:19;179:12,
13

technical (2)
5:11;73:18
technically (1)
184:12
technological (1)
110:1
teed (1)
34:21
telling (7)
14:3;35:3;76:21;
124:12;159:11;163:4;
176:12
tells (1)
8:8
ten (4)
6:2,11;35:2;167:3
tendency (2)
115:7,8
ten-minute (1)
54:15
tens (1)
111:6
tense (1)
134:16
tentative (2)
47:5,9
Teresa (1)
127:23
term (8)
52:25;53:2,24;
135:18;151:20,20;
168:6;184:11
terminate (2)
133:14;140:24
termination (1)
144:15
terminology (1)
88:12
terms (28)
20:9;34:18;43:18;
48:10,16;66:7;101:25;
103:21;106:7;115:16;
117:8,11;123:7,17;
127:5;128:11;131:25;
133:9;139:20;145:21;
151:13;155:11,18;
162:14,15;167:11;
175:23;182:14
tested (1)
170:11
testified (1)
162:10
testify (1)
153:7
testimony (10)
64:7;65:5;101:25;
104:1,4,10;118:11;
144:17;162:11;163:8
tests (1)
48:3
Texas (1)
162:24
textual (2)

146:22;149:10
Thanks (3)
10:16;18:7;38:18
Thanksgiving (3)
46:10,11;50:5
theory (7)
7:6;8:5;66:21;86:12,
22;87:12;152:12
therefore (8)
21:8;52:1;94:3;96:3;
102:22;106:17;121:18;
163:5
there'll (1)
77:3
thereof (1)
68:3
thinking (3)
51:4,4;96:8
third (18)
62:3;64:17;65:18,20;
67:2;68:17,21;78:11;
90:16;91:5;95:21;97:6;
133:2;134:3;136:22;
138:3;145:7;147:17
third- (1)
34:13
third-party (9)
65:1,8,10,12;67:12;
133:25;134:7,11;
138:23
thirteen (4)
134:19;138:16;
139:21;141:6,18;152:3
thirty (2)
128:20;168:10
Thomas (4)
42:10;56:3,12;
186:23
thorough (3)
178:14;182:4,5
though (13)
20:3;47:25;60:19;
63:21;65:14;77:5;
79:20;80:16;86:12;
98:19;108:17;161:2;
179:20
thought (13)
5:5,15;13:3;14:13;
22:11;39:11;91:15;
93:18;109:19,22;
114:23;133:16;182:7
thoughts (1)
27:25
thousand (2)
39:25;81:23
thousand-dollar (5)
72:4,17;77:20;
107:23,24
thousands (7)
42:6;60:24;111:6,6,
10,18;117:1
threatened (1)
186:21

**three (16)**
32:22;36:17;45:11;
53:25;61:12;73:7;
125:3,18,18;132:15;
146:22;149:25,25;
150:25;155:6;166:11
**three-and-a- (1)**
80:17
**three-and-a-half (1)**
62:1
**threshold (1)**
179:20
**throat (1)**
152:9
**throats (1)**
160:3
**throughout (1)**
21:11
**thrown (1)**
138:15
**thrust (1)**
181:4
**thus (2)**
90:6;104:5
**ticket (1)**
185:2
**tie (1)**
102:8
**tied (1)**
39:19
**ties (1)**
64:22
**Tighe's (1)**
39:20
**tilt (1)**
36:23
**time- (1)**
170:10
**times (12)**
44:5,6;82:18,20;
88:20;96:12;110:12;
117:10;135:17;144:10;
147:7;185:7
**time-sensitive (1)**
185:14
**timetable (1)**
121:5
**timing (3)**
111:16;127:5;128:11
**tired (3)**
178:24;182:25,25
**today (52)**
4:12;5:11;16:22;
17:8;24:25;31:25;
38:14;39:12,19;57:14,
15;64:3,7;65:14;67:10;
74:2,13;75:15;91:8,15;
96:13;103:17;109:20,
23,25;115:2;118:24;
120:4,12,17;124:3,4;
127:10,13,14,15,18;
129:12;131:3;132:10;
135:7,17;136:16;

137:1,6;140:25;168:9;
172:25;178:9;183:8;
186:8,10
**today's (1)**
136:7
**to-do (1)**
158:22
**together (5)**
9:19;44:6;102:8;
136:6,6
**told (9)**
12:3;76:24;123:20;
124:7;126:17;156:13;
158:2;160:20;167:6
**tomorrow (3)**
93:19;123:11;163:21
**tone (1)**
132:1
**tonight (4)**
163:20;180:18;
183:17,20
**took (9)**
10:21;25:18;26:24;
68:22;90:3;142:6;
177:7;180:13;182:2
**tools (1)**
159:16
**top (3)**
82:12;105:6;182:18
**tops (1)**
107:19
**tort (7)**
26:2;27:16;128:4;
131:2,7;150:12;165:6
**Tosdal (1)**
46:6
**totally (2)**
69:19;80:6
**touch (3)**
61:19;93:20;186:2
**touched (2)**
29:3;91:22
**towards (2)**
23:19;79:7
**tower (3)**
138:6,8;143:2
**towers (1)**
97:23
**town (2)**
142:9,22
**track (9)**
17:7;51:16;56:10;
85:22;112:4;125:12;
155:25;166:24;178:25
**tracks (1)**
131:14
**trade (4)**
81:13;83:15;104:5;
108:23
**traded (2)**
75:14;83:16
**trading (7)**
75:15;80:16,19;

85:24;86:16;87:23;
103:17
**traditional (1)**
35:19
**transactions (1)**
59:12
**transcript (4)**
142:7;164:14;
175:15;188:4
**transformers (1)**
142:25
**transparent (2)**
48:17;50:4
**treasured (1)**
42:24
**treat (1)**
77:7
**treated (12)**
72:9;18;82:23;96:25;
97:18;116:15,16;
125:20;140:4;147:8;
148:23;174:6
**treating (1)**
70:5
**treatment (14)**
64:16;68:3;75:2;
77:11,15;79:21;82:7,9,
17;106:15,17;107:13;
108:4;117:9
**treats (2)**
92:9;97:12
**Tredinnick (21)**
9:17,19;10:9,12,13,
15,25;11:7,20;12:19;
15:24;16:7,10,12;18:9,
11,19,21,24;19:22;
25:20
**tree (6)**
138:4;139:11,15;
142:20;169:13,19
**trial (3)**
101:17,18;135:2
**trials (2)**
132:25;133:7
**tried (5)**
19:18;49:20;102:13;
164:13;174:11
**tries (1)**
85:5
**triggering (1)**
52:15
**triggers (3)**
185:7,8,16
**trimmer (3)**
139:11;169:13,19
**trimmers (2)**
138:5;139:15
**trimming (1)**
142:20
**TRO (1)**
160:7
**Trotter (7)**
28:20;30:7,16;31:11;

32:3,23;150:13
**Trotter's (4)**
31:3,17;150:14,15
**trouble (1)**
63:1
**troubled (1)**
92:7
**Troy (16)**
4:24;5:2,4,5;8:22;
9:3,5,20,23;10:1;11:7;
15:20;16:2;23:13;
25:19;33:14
**Troy's (1)**
11:18
**true (18)**
25:15;30:4,18;47:18;
49:3;50:25;72:22;
76:18;77:18;82:10;
87:2,20;107:21;108:2;
152:20;170:11;174:22;
188:4
**truly (5)**
73:19,25,25;74:19;
95:1
**trust (50)**
5:6;9:8,10;15:21,25;
16:9;25:2,22;26:3,14;
27:1,6,10,10;29:2,14,
15,17,21;30:13,15,20,
21;31:3,6,8;32:5,8;
35:24;36:13;38:8;39:1;
42:21;43:8,10;44:25;
46:12,13;48:8;64:1;
103:15;134:10;138:24;
139:16;141:8;149:12;
160:14;171:9;173:12,
19
**Trustadministration (1)**
141:14
**Trustand (1)**
169:23
**Trustcan (1)**
147:10
**Trustcannot (1)**
147:11
**trusted (1)**
44:13
**trustee (21)**
9:10;26:2;27:2,8,10;
28:20;29:16,22;31:6;
33:4,24;34:10;38:8;
99:5;150:9;172:23;
173:9,10,11;180:12,15
**trusteeing (1)**
141:11
**trustees (1)**
150:12
**trustee's (5)**
27:22;29:23;33:21;
173:5,17
**Trustfor (1)**
140:11
**Trusthas (1)**

163:15
**Trustin (1)**
151:7
**trusting (1)**
49:23
**try (19)**
14:1,8;32:20;37:14;
38:15;48:16;57:15,17;
63:4,5;64:3;85:9;91:9;
93:12;115:8;117:4;
121:4;127:12;129:24
**trying (20)**
13:16;18:13;59:7;
67:11;71:5;74:5;86:13;
87:7;115:17,18;117:8,
11;154:9;156:11;
159:4,14;160:13;
166:22,23;178:25
**Tubbs (8)**
49:15;56:21;132:13,
19,22;134:22,24;
144:13
**Tuesday (2)**
53:13;181:25
**turn (12)**
7:18;8:20;10:10;
11:20;54:21;68:13;
80:12;81:8;105:22;
109:8;115:11;186:21
**turned (2)**
179:14,18
**turning (4)**
35:7;105:16;106:4;
134:21
**tweaks (2)**
11:3;103:5
**twelve (1)**
90:22
**twenty (1)**
124:15
**twenty-four (1)**
150:3
**twenty-one (1)**
149:14
**twice (4)**
18:18,22;139:13;
169:25
**two (76)**
4:19;5:20;7:20;
19:15,19;20:15,23;
22:14;23:1;28:12;29:2,
18;30:12;32:9,10,12,
12,12,18;34:24;38:4,
16;46:8;47:2;48:19;
50:18;52:19;69:14,19;
70:3;71:2;77:9;79:13;
81:22;82:18;86:15;
90:10;91:23;97:25;
100:1;103:8;106:7;
107:17;124:5;125:3;
133:4;135:1,6;139:22;
143:18;148:21,23;
151:6,22;152:6;155:6;

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 216
of 219

159:25;160:3,18;
163:13,14;165:5,19,22;
166:6,7,8,16;167:1;
168:5;169:6;171:10;
173:7,16;174:1,5
**two-and-a-half (1)**
33:25
**type (2)**
157:12;175:1
**types (1)**
174:11

**U**

**UCC (4)**
4:15;16:16;120:11;
127:16
**ulterior (1)**
115:5
**ultimately (7)**
60:9;70:7;90:22;
92:8;94:19;95:1;
112:25
**unable (1)**
105:2
**unambiguous (1)**
41:23
**unanimous (1)**
76:14
**uncertainty (2)**
40:17;41:12
**uncles (1)**
42:23
**uncomfortable (1)**
175:2
**uncontested (1)**
60:11
**under (57)**
9:8;21:7,8;31:1;
45:13;47:12;48:2,2;
52:20,20;61:7,14;
69:12;72:4,6,7,10,11,
18;73:4;74:22;78:1;
79:15;81:1,14;87:11;
97:3,4,6,16,18;99:6,13;
100:18;101:11,12;
102:21;103:8,10;
108:10,12;114:9;
116:5;123:1;131:11;
134:11;147:13;148:25;
149:20,22;164:3;
169:15;171:7;174:5;
176:24;180:13;182:2
**underlying (1)**
167:11
**undermines (1)**
43:8
**Understood (4)**
73:17;100:25;
135:19,20
**undertake (1)**
75:9
**underwriter (6)**

151:11,17,19;152:8;
153:2;160:2
**underwriters (2)**
61:16;152:18
**undisclose (1)**
49:24
**undisputed (1)**
162:11
**unequivocally (4)**
65:2;101:4;103:19;
104:9
**unfair (2)**
106:6;163:16
**unfairly (4)**
102:10;103:3;
106:24;107:5
**unfaithful (1)**
168:24
**unfortunate (1)**
45:15
**Unfortunately (4)**
67:8;83:9;119:2;
120:12
**UNIDENTIFIED (1)**
38:24
**unilateral (1)**
157:16
**union (1)**
61:13
**unique (2)**
22:12,20
**United (2)**
26:4;180:12
**units (2)**
11:3;22:23
**unless (12)**
18:3;39:5,13;54:4;
89:10;101:20;134:15;
140:24;144:10;147:9;
148:14;186:12
**unmute (9)**
10:10;19:6,8;36:24;
37:7,18,18;55:4;56:5
**unprecedented (1)**
83:22
**unreasonable (1)**
34:10
**unremarkable (2)**
29:24;33:10
**unresolved (2)**
92:24;164:16
**unsecured (1)**
119:4
**unsuccessful (1)**
112:24
**unwilling (1)**
105:2
**unwound (2)**
88:16;90:15
**up (86)**
5:22;8:24;9:1;11:13,
24;19:15;23:24,25;
25:6,16;29:4;34:11,21,

25;37:11;38:18;39:19;
48:10;55:18;56:14,24;
57:6,12;58:22;59:25;
60:3;63:23;64:3;66:18;
69:21;75:20;77:1;78:2,
23;85:20,25;88:22,23;
89:12;91:5,14;92:11,
13;94:4;107:19;109:1;
110:5;111:7;117:11;
132:16;133:3;135:4,
12,17;136:12;140:11,
16;142:12;143:3,11;
146:18;147:2,16;
149:24;150:3,7,8;
152:12;154:14;157:11;
159:10;163:13;164:8;
167:15;168:11,12;
169:2,20,24;175:5;
179:11;181:11;182:11;
185:15;186:7,20
**upcoming (1)**
48:24
**update (1)**
4:21
**updated (1)**
10:20
**up-front (1)**
22:14
**upon (11)**
81:18;111:3;113:25;
114:2;121:20;122:21;
156:15;178:21;182:11;
183:9;185:12
**upside (1)**
104:18
**urge (1)**
28:6
**urgency (1)**
63:25
**urgent (1)**
185:22
**use (11)**
63:8;74:17,18;75:8,
12;84:15;86:10;91:1,
19;94:13;145:21
**used (1)**
87:18
**useful (1)**
87:14
**using (6)**
7:16;71:24;85:1;
88:11;90:23;95:2
**usual (1)**
170:10
**utilities (1)**
46:24
**utility (18)**
64:17;68:10,20,24;
69:21;71:12,14,22;
72:2,3,15,18;73:3,21,
25;74:8;116:23;145:20
**utility's (1)**
68:11

**V**

**valid (1)**
6:10
**Valley (1)**
22:25
**valuable (2)**
104:6;181:2
**value (41)**
7:15;8:14;41:12,19,
21;42:9,21;46:13;
74:17;75:7,8;76:14;
87:20;88:1,12,13;
104:7,9,15,17,19;
105:1,5,5;107:18,19;
108:6,7,19,21,23;
112:21;113:19;116:13,
16;133:16;146:8,11;
174:9,22,25
**valued (2)**
76:13,18
**values (1)**
135:4
**vanish (1)**
71:22
**variation (1)**
173:22
**various (4)**
23:11;147:15;
165:11;183:8
**vast (1)**
139:5
**vastly (2)**
75:23;142:19
**verbatim (1)**
148:3
**verify (1)**
21:13
**version (4)**
11:3;15:13;27:3;
116:2
**versus (4)**
52:12;99:4;165:20;
167:25
**via (1)**
43:3
**vice-versa (1)**
105:23
**victim (46)**
8:11,12;9:8;15:21;
26:3;27:1,6;29:13;
30:1;31:2,3;33:10;
40:12;44:9;46:12,13,
14;48:4,8;53:23;64:1;
77:25;100:14,15;
103:13,14,15;125:19;
134:10;138:16,24;
139:16;140:11;141:8,
14;147:10,11;150:14;
151:7;160:14;163:15;
169:23;171:9;173:10,
11;177:15

**victims (72)**
40:5,9,11;41:4,13,16,
20,24;42:3,16,19;43:9,
18;44:8,11,16;45:4,24;
46:1,21;47:1,3;48:1,11,
18,21;49:1,10;50:1,2,
21,23;51:10;53:22;
125:19;131:9,23,24;
132:18;133:20;136:18,
21;137:7,21,23;
138:12;139:13;141:10,
12,24;142:6,8,9,11;
143:18;146:9;147:4,6,
8;149:6,16;150:10;
152:4;165:18,24;
174:5;177:3,6;178:10;
179:23;180:5;181:23
**victims' (10)**
42:20;43:6;133:22;
148:23;149:3,4,12;
150:9;169:13,16
**victim's (1)**
8:12
**victim-sensitive (1)**
43:3
**video (8)**
10:11;20:3;54:22;
63:10;73:13,16;85:11;
132:21
**view (19)**
32:3;33:13;102:10;
110:9,10;113:15;
121:13;129:8;132:16;
135:3;145:18;150:11;
159:11;160:1;169:11;
170:19;173:10,14;
175:4
**views (1)**
43:14
**violated (1)**
149:4
**violations (1)**
111:4
**virtual (3)**
64:25;83:21;145:21
**virtue (5)**
69:8;8;106:19;
114:10,10
**Vision (2)**
42:11,11
**vitally (1)**
185:22
**VOICE (6)**
7:9;45:18;57:6,7;
62:16,25
**volume (3)**
37:12;74:12;149:18
**voluntarily (2)**
60:4,5
**vote (7)**
44:18;46:1;111:12,
18;136:18;137:23;
179:17

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 217
of 219

**voted (5)**
50:3;64:24;102:18,
21;111:8
**votes (1)**
45:14
**voting (5)**
44:10;103:22;131:9;
137:14;179:11

## W

**Wait (11)**
10:5;14:20;28:2;
56:4;62:23;63:5;93:3;
121:19;150:10;163:15;
173:4
**waiting (4)**
11:8;12:13;57:5;
176:13
**waive (1)**
122:22
**waived (2)**
123:1,2
**waiver (1)**
152:22
**wake (1)**
75:20
**walking (1)**
143:2
**Walkup (1)**
37:9
**Wallace (3)**
44:4,23;53:23
**Wallace's (2)**
44:22;46:22
**wants (10)**
4:24;5:2;16:7;28:9;
39:13;46:5;137:16;
173:5;176:16;179:25
**Washington (1)**
104:12
**watch (2)**
54:6;143:8
**water (1)**
67:4
**waterfall (1)**
71:25
**Watts (1)**
142:6
**way (44)**
6:7;7:7,16;9:1;13:4;
23:19;28:14;34:12;
42:14;52:22;77:7,12;
78:23;82:24;83:2,4;
89:3;91:24;92:11;
95:25;96:1,4,5;102:20;
108:8;111:10;116:4;
127:9;136:7;157:7,25;
158:25;160:8,11,17,18;
167:4;168:2;171:24;
172:14;175:13;176:13,
17;182:2
**ways (3)**

8:10;47:2;159:25
**weapon (1)**
186:21
**Weatherford (1)**
162:23
**web (1)**
7:9
**Wednesday (5)**
40:6;51:16;53:13;
58:24;59:7
**weeds (1)**
31:15
**week (8)**
11:5;124:1,2,4;
158:3,24;163:22;
180:19
**weekend (11)**
38:15;117:22,25;
120:14;121:2;127:10;
128:18;159:21;184:18;
186:14,15
**weeks (4)**
26:24;29:2;98:22;
173:18
**weigh (1)**
16:8
**Weil (1)**
179:18
**welcome (1)**
154:9
**Wells' (2)**
65:4;144:17
**weren't (6)**
31:5;69:16;124:25;
179:23;180:8;181:8
**what'll (1)**
182:22
**what's (25)**
14:21;16:11;17:9;
25:1,1,4;26:17;44:24;
47:4;51:20;56:11;70:1;
89:3;93:22;100:20;
115:17;120:2,5;
128:11,22;137:9;
150:23;151:3;154:24;
164:20
**whatsoever (3)**
97:17;101:10;117:8
**whenever (1)**
182:12
**When's (1)**
44:25
**whereas (2)**
75:3;163:15
**wherein (2)**
132:24;142:7
**Where's (1)**
109:5
**Whereupon (3)**
55:1;85:15;187:8
**whole (11)**
15:25;34:11;86:5;
94:2;100:3;125:2;

126:6;143:2;160:13;
164:20;174:25
**whomever (1)**
54:17
**whose (1)**
92:21
**wildfire (12)**
133:21;142:13,18,
19;143:15;144:9,18,22,
24;145:15,15,15
**wildfires (1)**
144:7
**willful (1)**
27:9
**Williams (2)**
162:9;165:13
**Williams' (1)**
147:1
**willing (3)**
91:8;94:24;158:24
**win (1)**
70:2;111:12,12
**windfall (2)**
113:18,22
**Winthrop (12)**
36:19,21;37:8,18,19,
20,22;38:2,20,21;39:5;
43:25
**wiped (1)**
139:1
**wisdom (1)**
132:6
**wish (3)**
4:14;178:22;186:14
**wished (2)**
25:9;36:19
**withdrawal (1)**
133:2
**withdrew (1)**
60:10
**withhold (1)**
43:11
**within (9)**
29:3;65:12;77:9;
147:10;157:21;163:14;
170:19,21;173:15
**without (18)**
42:12;43:4,8;47:2;
52:3;57:17;60:19;
63:10;64:14;103:5;
119:10;125:25;147:12;
148:17;164:17;165:19;
171:11;176:23
**wondered (1)**
171:22
**wonderful (3)**
49:2;75:13;89:23
**wonderfully (1)**
181:2
**wondering (1)**
102:1
**word (5)**
15:24;52:20;77:24;

185:6,7
**words (18)**
22:2,3,3;51:21;73:7;
76:20;78:24;82:23;
106:12;107:22;110:5;
114:22;140:25;145:21;
154:13;159:17;178:11;
180:23
**work (17)**
13:16;22:16;25:2;
38:7,14,19;46:15;76:5;
80:5;97:15;109:19,20;
115:24;167:4;179:13;
183:1;185:23
**worked (6)**
9:9;16:15,18;86:4;
141:1;170:14
**working (6)**
38:10,15;46:15;
53:10;141:2;160:16
**works (1)**
4:22
**world (3)**
78:17;81:23;145:23
**worry (1)**
44:1
**worth (4)**
75:25;103:10;
107:25;108:11
**wrap (1)**
110:5
**wrap-up (1)**
102:7
**writing (2)**
41:23;140:5
**written (2)**
7:25;119:21
**wrong (7)**
4:12;22:12;32:11;
77:24;119:7,13;121:16
**wrongdoer (2)**
77:23;100:16
**wrongdoers (1)**
100:19
**wrongful (1)**
133:11
**wrought (1)**
136:6

## Y

**Yanni (5)**
28:21;30:7,16;32:3;
150:13
**year (12)**
6:5,12;50:6;62:1,3;
80:18;142:25;143:7;
144:2,7;163:24;167:12
**years (12)**
20:17;41:17;45:5;
47:16;48:20;140:12,
17;146:9;147:16;
150:5,8;163:15

**yesterday (25)**
7:5;16:23;26:1;
36:11;38:4;39:12,20;
40:7;43:14,15;44:5;
45:9;50:22;51:13,15;
53:23;54:21;148:16;
156:19;164:13;175:8,
9,17;181:4;182:12
**yield (1)**
81:5
**Yocca (1)**
19:12
**York (3)**
54:24;162:24;185:22
**young (1)**
53:1

## Z

**zenith (1)**
84:24
**zero (1)**
22:16
**Ziman (2)**
147:19;153:7
**Ziman's (3)**
104:4,10;144:17
**Zoom (2)**
88:22;136:7

## 1

**1 (11)**
50:18;80:3;140:9;
151:8,9,10,14;152:16;
165:6;166:15;170:4
**1,000 (13)**
5:22;6:3,10,13,22;
7:2;37:17;72:2;75:18,
21,23;76:24;142:22
**1.108 (1)**
73:7
**1.6 (2)**
151:14;157:10
**10 (2)**
15:5;121:8
**10.13 (7)**
11:2;12:13;13:6,8;
20:7;21:23;119:7
**10.3 (3)**
12:5;15:5;21:8
**10.6 (2)**
65:22;66:7
**10.9e (1)**
15:7
**10.9f (5)**
17:16,18;20:7;
119:17,20
**100 (2)**
97:10,21
**101.5 (1)**
21:7
**10-12-17 (1)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(30) voted - 10-12-17

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 218
of 219

87:21
**10-12-2017 (1)**
88:4
**101691 (1)**
59:1
**102a (1)**
113:8
**105 (1)**
110:21
**1054 (12)**
44:20;47:12,14;
51:21;52:14,20,20;
64:2;122:3,7;158:20;
166:14
**10A- (1)**
74:14
**10a1 (2)**
107:20,21
**10A-I (3)**
74:20;75:2;91:3
**10A-II (28)**
59:6,16,18;60:18;
61:7;64:23;65:15,25;
68:4;74:19,23;75:2;
76:4;80:7;82:13;84:18;
91:4,21;96:25;97:1;
102:10,11;103:1,4;
106:25;107:19;117:2,6
**10b (1)**
105:9
**10b-5 (1)**
87:12
**11 (7)**
54:23;60:14;64:2;
102:21;140:18;142:18;
143:5
**11.1 (2)**
15:11;119:9
**11/15/2018 (1)**
89:24
**1129b (1)**
102:22
**1141 (2)**
169:10,15
**119,000 (1)**
59:1
**11th (2)**
44:18;49:13
**12 (2)**
79:1;86:17
**12:45 (2)**
85:9,10
**12th (18)**
76:12;78:13;79:24;
84:14,17,21;86:8,17,
18,20;87:7,15;88:19,
25;94:8;115:3;116:6;
126:4
**13.5 (13)**
133:22;134:7,13;
135:4;136:2;138:2;
139:6,8,13,14;174:21,
22;177:8

**13.5-billion- (1)**
138:18
**13.5-billion-dollar (2)**
134:2;139:2
**144 (2)**
149:20,22
**1442 (1)**
86:24
**14-day (1)**
122:24
**15th (2)**
61:25;89:4
**16,000 (1)**
142:6
**16th (2)**
174:3;188:12
**1933 (1)**
61:14
**1934 (1)**
61:8
**1996 (1)**
86:24

**2**

**2 (8)**
26:13;50:20;54:24;
90:11;91:25;121:8,8;
151:19
**2.2 (1)**
32:4
**2.2e (2)**
26:23;30:18
**2.2g (1)**
30:19
**2.2h (3)**
26:13,14,22
**20.1 (1)**
171:24
**2003 (1)**
170:4
**2011 (1)**
104:13
**2015 (2)**
61:25;133:10
**2017 (6)**
40:12;76:12;80:3;
86:18,21;88:19
**2018 (4)**
6:1;61:25;89:4;
104:23
**2019 (3)**
49:1;59:10;141:15
**2020 (5)**
4:1;46:10,11;51:9;
188:15
**2021 (2)**
46:11,17
**21 (1)**
171:24
**21-billion-dollar (1)**
144:8
**22 (1)**

170:4
**23 (1)**
112:14
**26 (1)**
170:4
**26c (1)**
102:21
**28th (1)**
175:16
**29 (2)**
140:25;141:3
**29th (3)**
6:1;61:25;184:7
**2-to-9 (1)**
121:6

**3**

**3.11 (1)**
33:23
**3.5 (1)**
132:14
**3.6 (2)**
177:5,9
**30 (3)**
122:2;144:11;166:14
**3020e (1)**
122:23
**30th (11)**
51:22,24;52:11,13;
53:5;122:6,8,15,17;
123:9;175:16
**314 (1)**
104:13
**31st (2)**
46:11,17
**321 (1)**
104:23
**34 (1)**
15:14
**35.9 (3)**
84:3;88:4,14
**364,557 (1)**
59:14
**3e (1)**
119:13

**4**

**4,000 (2)**
30:6;91:25
**40,000 (1)**
58:15
**41 (1)**
184:23
**442 (1)**
104:13
**48 (1)**
151:21

**5**

**5 (1)**

4:1
**5,000 (2)**
30:5,6
**5.4 (1)**
27:5
**5.5 (1)**
27:6
**5.7 (1)**
27:9
**50,000 (1)**
58:16
**50,000-foot (1)**
29:8
**50-page (1)**
124:9
**510b (20)**
8:7,8,15;69:21;
70:15,17;72:18;73:5;
74:6,7,22;80:9,11;
81:17;105:22,23;
116:13,14;131:14;
171:7
**526 (2)**
7:8,14
**582 (1)**
104:22
**5th (1)**
121:9

**6**

**6 (2)**
138:14;153:15
**6.1 (1)**
21:18
**6.75 (1)**
165:24
**6013-3 (1)**
153:15
**66 (1)**
15:14
**6-billion-dollar (1)**
145:2

**7**

**7 (3)**
48:2;142:1;149:3
**7,000 (2)**
5:24;60:25
**70,000-plus (1)**
131:23
**7023 (1)**
60:15
**7037 (1)**
27:5
**71345 (1)**
59:9
**7227 (1)**
188:12
**7276 (1)**
15:16
**7306 (1)**

155:23
**7399-1 (1)**
26:19
**7399-2 (1)**
26:18
**75 (1)**
179:17
**7509 (1)**
27:18
**7522 (1)**
27:18
**7791 (2)**
62:12;63:17

**8**

**8 (2)**
138:2;188:15
**8.2 (3)**
11:12;12:6;119:15
**8.23 (1)**
12:6
**8.2e (10)**
10:23;11:12;12:7,19,
20;16:14;20:6;119:14,
15,19
**8.3 (1)**
119:13
**824 (1)**
94:8
**85020 (1)**
188:13
**896 (3)**
80:16,19;86:16
**8th (1)**
147:5

**9**

**9 (1)**
91:25
**9:30 (2)**
4:1;185:25
**90 (1)**
86:23
**9019 (4)**
174:2,13;175:3;
176:24
**9th (4)**
86:24,24;87:10;89:6

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(31) 10-12-2017 - 9th

Case: 19-30088    Doc# 7843    Filed: 06/09/20    Entered: 06/09/20 07:34:06    Page 219
of 219