WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice*)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice*)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice*)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, AMENDED EQUITY BACKSTOP COMMITMENT DOCUMENTS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED PREMIUMS AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>**[Related to Docket Nos. 4446, 5267, 6013, 6321]**<br><br>Date:   June 16, 2020<br>Time:   10:00 a.m. (Pacific Time)<br>Place:  **Telephonic or Video Appearances Only**<br>   United States Bankruptcy Court<br>   Courtroom 17, 16th Floor<br>   San Francisco, CA 94102<br><br>Objection Deadline:  June 15, 2020, 12:00 p.m. (Pacific Time) |

## Purpose of the Amendment[1]

On June 8, 2020, the Debtors announced a comprehensive equity raise strategy and simultaneously entered into Consents with certain Backstop Parties to, among other things, amend the Approved Equity Backstop Commitment Letters. Today, the Debtors obtained all the remaining Consents from the Backstop Parties. The Debtors agreed to amend the Approved Equity Backstop Commitment Letters because they have concluded, in an exercise of their business judgment, that doing so is in the best interest of their estates and all stakeholders. Specifically, the Consents and the Amended Equity Backstop Commitment Letters should maximize the chance that the Debtors will raise the equity financing contemplated by the Plan through a Market Offering (including through the "PIPE" investment announced yesterday) rather than by drawing on the backstop commitments. A Market Offering would allow the Debtors to raise equity financing at a higher price per share than drawing on the backstop, accelerate the transition of the shareholder base to more natural, long-term utility investors and better position the Reorganized Debtors in the capital markets going forward. This would benefit all stakeholders, including the Fire Victim Trust.

Importantly, the proposed amendments will have no impact on the percentage of New HoldCo Common Stock that will be owned by the Fire Victim Trust upon consummation of the Plan. This is true even after accounting for the Additional Backstop Commitment Share Premium, which is only payable in shares of New HoldCo Common Stock, and only if a Market Offering is consummated and the Effective Date of the Plan occurs.

## The Motion

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this motion (the "**Motion**"), pursuant to sections 105(a), 363(b), 503(b) and 507(a)(2) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and the Court's *Order (i) Approving Terms of, and Debtors' Entry into and Performance Under,*

---

[1] Capitalized terms used in the following section shall have the meanings ascribed to such terms in this Motion.

*Equity Backstop Commitment Letters and (ii) Authorizing Incurrence, Payment and Allowance of Related Premiums and Expenses as Administrative Expense Claims* [Docket No. 6321] (the "**Approval Order**"), for entry of an order (i) approving the terms of, and the Debtors' entry into and performance under, the Amended Equity Backstop Commitment Documents (as defined below) and (ii) authorizing the incurrence, payment and allowance of the Additional Backstop Commitment Share Premium (as defined below) as an administrative expense claim.

In support of the Motion, the Debtors respectfully submit the Declaration of Kenneth S. Ziman (the "**Ziman Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein with respect to the Amended Equity Backstop Commitment Documents is attached to this Motion as **Exhibit A** (the "**Proposed Order**").

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ v

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    JURISDICTION ..................................................................................... 3

III.   BACKGROUND ..................................................................................... 3

     A.     The Approved Equity Backstop Commitment Letters and Subsequent Market Conditions ............................................................................... 3

     B.     The Consents and the Amended Equity Backstop Commitment Letters ....................... 5

     C.     Redline of Certain Key Terms and Provisions of the Approved Equity Backstop Commitment Letters through the Amended Equity Backstop Commitment Letters and Summary of Certain Key Terms and Provisions of the Consents ............................ 8

IV.   BASIS FOR RELIEF REQUESTED ....................................................... 12

     A.     Entry into the Amended Equity Backstop Commitment Documents is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates. ............................................................................... 12

     B.     Payment and Allowance of the Additional Backstop Share Premium as an Administrative Expense Claim Should Be Approved Because It Is a Fair, Reasonable and Essential Term of the Consents. ............................................................... 14

V.    WAIVER OF BANKRUPTCY RULE 6004(h) ....................................... 15

VI.   NOTICE ............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re AbitibiBowater Inc.*,
  418 B.R. 815 (Bankr. D. Del. 2009) ................................................................. 12

*In re Adelphia Commc'ns Corp.*,
  No. 02-41729 (REG), 2004 WL 1634538 (Bankr. S.D.N.Y. June 22, 2004) ..................................... 3

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*,
  60 B.R. 612 (Bankr. S.D.N.Y. 1986) ................................................................. 13

*Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*,
  293 B.R. 455 (B.A.P. 8th Cir. 2003) ................................................................. 12

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ................................................................. 12

*Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*,
  107 F.3d 558 (8th Cir. 1997) ................................................................. 12

*In re Hexion Holdings LLC*,
  No. 19-10684 (KG), (Bankr. D. Del. May 15, 2019) ................................................................. 14

*In re Integrated Resources, Inc.*,
  147 B.R. 650 (Bankr. S.D.N.Y. 1992) ................................................................. 12

*In re Montgomery Ward Holding Corp.*,
  242 B.R. 147 (D. Del. 1999) ................................................................. 12

*In re MPM Silicones, LLC*,
  No. 14-22503 (RDD) (Bankr. S.D.N.Y. June 23, 2014) ................................................................. 14

*In re Pacific Drilling S.A.*,
  No. 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 25, 2018) ................................................................. 14

*In re Robles*,
  No. 14-51812 (ASW), 2014 WL 3715092 (Bankr. N.D. Cal. July 24, 2014) ................................................................. 12

*Smith v. Van Gorkom*,
  488 A.2d 858 (Del. 1985) ................................................................. 12

*In re Station Casinos, Inc.*,
  No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447 (Bankr. D. Nev. Feb. 2, 2010) ................................................................. 12

*In re Ultra Petroleum Corp.*,
  No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) ................................................................. 3

*In re Utah 7000, L.L.C.*,
No. 08-21869 (JB), 2008 WL 2654919 (Bankr. D. Utah July 3, 2008) ...........................................3

**Statutes & Rules**

11 U.S.C. § 105 ...................................................................................................................13, 14

11 U.S.C. § 105(a) ...............................................................................................................12, 14

11 U.S.C. § 362 ...........................................................................................................................14

11 U.S.C. § 363 ...........................................................................................................................14

11 U.S.C. § 363(b) ..............................................................................................................12, 14

11 U.S.C. § 363(b)(1) .................................................................................................................12

11 U.S.C. § 503 ...........................................................................................................................14

11 U.S.C. § 507 ...........................................................................................................................14

11 U.S.C. § 507(a)(2) .................................................................................................................15

28 U.S.C. § 157 .............................................................................................................................3

28 U.S.C. § 157(b) ........................................................................................................................3

28 U.S.C. § 1334 ...........................................................................................................................3

28 U.S.C. § 1408 ...........................................................................................................................3

28 U.S.C. § 1409 ...........................................................................................................................3

Fed. R. Bankr. P. 2002 ...............................................................................................................16

Fed. R. Bankr. P. 6004(h) ..........................................................................................................15

Rule 5011-1(a) ..............................................................................................................................3

**Other Authorities**

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*,
General Order 24 (N.D. Cal.)......................................................................................................3

United States Constitution Article III ........................................................................................4

**MEMORANDUM OF POINTS AND AUTHORITIES**[2]

## I. PRELIMINARY STATEMENT

As described in the Disclosure Statement, in order to finance the transactions contemplated by the Plan, the Debtors expect to raise $9 billion though one or more issuances of New HoldCo Common Stock or equity-linked securities. The Debtors have previously announced that this equity raise could take a variety of forms, including one or more Market Offerings, a Rights Offering and/or a drawing under the existing equity backstop commitment letters, previously approved by the Court (the "**Approved Equity Backstop Commitment Letters**").

The Approved Equity Backstop Commitment Letters outline the circumstances and manner in which the Debtors are permitted to undertake these offerings and include certain pricing requirements for conducting a Market Offering and a Rights Offering. Under their current terms: (a) in order to undertake a Market Offering, such an offering would need to be priced at or above approximately $18-19 per share; (b) in the case of a Rights Offering, the subscription price (*i.e.*, the price a rightsholder would pay to acquire a share of New HoldCo Common Stock pursuant to its subscription rights) would be set at approximately $11-12 per share; and (c) in the event of draw on the backstop, shares would be issued at approximately $7.50 per share. (Ziman Decl. ¶ 8.)

Since the Approved Equity Backstop Commitment Letters were negotiated and approved, the COVID-19 pandemic has negatively impacted the utility sector and the capital markets as a whole. (*Id.* ¶ 9.) This market impact has resulted in a recent trading price of PG&E Corp. common stock in the $11-12 range.[3] At that trading range, the Approved Equity Backstop Commitment Letters would not permit the Debtors to undertake a Market Offering. (*Id.*) Further, a Rights Offering would likely not be successful with PG&E Corp. common stock in that trading range, because a subscription price roughly equal to, if not below, the current trading price would not be sufficiently compelling to investors to raise

---

[2]     Capitalized terms used herein not otherwise defined have the meanings given to them in the *Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 6322] (a solicitation version of which is filed at Docket No. 6353 and as supplemented on March 25, 2020 [Docket No. 6483], including any exhibits and schedules thereto and as further amended, supplemented, or modified, the "**Disclosure Statement**").

[3]     PG&E Corp. common stock closed at $12.57 on June 8, 2020, following the public announcement in the morning June 8th of the proposed amendment contemplated hereby and the Debtors' comprehensive equity raise strategy.

$9 billion of equity capital. (*Id.* ¶ 9.) Thus, absent the proposed amendments to the Approved Equity Backstop Commitment Letters described below, the Debtors would be left to draw on the backstop at approximately $7.50 per share—a significant discount to current trading levels and, more importantly, at a lower price than they believe would be achievable in a Market Offering unconstrained by the terms of the Approved Backstop Commitment Letters. (*Id.*)

These conditions led the Debtors, in an exercise of their business judgment, to negotiate Consents with the Backstop Parties to: (a) amend the Approved Equity Backstop Commitment Letters to give the Debtors the flexibility to pursue a Market Offering under current market conditions by removing the minimum pricing tiers related to a Market Offering or Rights Offering and (b) obtain commitments from the Backstop Parties to purchase up to $522,727,273 of New HoldCo Common Stock under the Greenshoe Backstop (as defined below) at a price no less favorable than the price of the stock to be sold in the PIPE (as defined and described below). The removal of the minimum pricing tiers will allow the Debtors to undertake a Market Offering at any price above the price at which shares would be sold to the Backstop Parties. (*Id.* ¶ 11.) As the Court is aware, the Debtors have also reached an agreement with five institutional investors for the sale of $3.25 billion of New HoldCo Common Stock in a private investment in public equity transaction (the "**PIPE**"). The PIPE is conditioned on a successful completion of a public equity offering (*i.e.*, a Market Offering), which is not possible absent the proposed amendments. (*Id.* ¶ 16.)

It is critical to note that approval of the Consents and the Amended Equity Backstop Commitment Letters, and avoiding a draw under the existing Approved Equity Backstop Commitment Letters, *will have **no impact** on the percentage of New HoldCo Common Stock that will be owned by the Fire Victim Trust upon consummation of the Plan*. In addition, it should enhance the value of the shares to be transferred to the Fire Victim Trust, even after accounting for the Additional Backstop Commitment Share Premium, if it becomes payable. (*Id.* ¶ 10.)

By this Motion, the Debtors seek approval of the terms of, and their entry into and performance under, the Amended Equity Backstop Commitment Documents, including the payment of the Additional Backstop Commitment Share Premium provided for therein. Under the Bankruptcy Code, the decision of a debtor-in-possession to obtain financing commitments is entitled to deference under

the business judgment rule. *See, e.g.*, *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2004 WL 1634538, at *2 (Bankr. S.D.N.Y. June 22, 2004); *In re Ultra Petroleum Corp.*, No. 16-32202 (MI) (Bankr. S.D. Tex. Feb. 13, 2017) (ECF No. 1126); *In re Utah 7000, L.L.C.*, No. 08-21869 (JB), 2008 WL 2654919, at *2–3 (Bankr. D. Utah July 3, 2008). The soundness of the Debtors' business judgment is amply demonstrated here, where the Consents and the Amended Equity Backstop Commitment Letters amend and supplement the terms of the Approved Equity Backstop Commitment Letters to enable the Debtors to obtain equity financing proceeds on substantially more beneficial terms than what is likely to be achievable under the Approved Equity Backstop Commitment Letters. Regardless of which equity raise approach is ultimately utilized, the Amended Equity Backstop Commitment Letters continue to provide the Debtors with a commitment for the full amount of equity financing necessary to consummate the Plan. (Ziman Decl. ¶ 13.)

## II. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors submit that the Court may enter the Proposed Order as a final order consistent with Article III of the United States Constitution.

## III. BACKGROUND

### A. The Approved Equity Backstop Commitment Letters and Subsequent Market Conditions

As noted at the outset, the Approved Equity Backstop Commitment Letters delineate the terms and minimum pricing thresholds above which the Debtors would be permitted to undertake a Market Offering or a Rights Offering (in lieu of drawing on the backstop itself). The pricing for the backstop is substantially lower than these thresholds. Consistent with the Debtors' proposed capital structure, the Approved Equity Backstop Commitment Letters require the Backstop Parties to purchase up to $9 billion in New HoldCo Common Stock, on the terms and subject to the conditions thereof, at a price per share that would imply a price-to-earnings multiple of approximately 8.8x (as adjusted as of

the date hereof pursuant to the terms of the Approved Equity Backstop Commitment Letters) based on Normalized Estimated Net Income for 2021, or approximately $7.50 per share. (Ziman Decl. ¶ 8.) In order to undertake a Rights Offering or a Market Offering instead of drawing on the backstop, the offering must be accomplished at higher multiples, 10.6x and 13.5x, respectively(each as adjusted as of the date hereof pursuant to the terms of the Approved Equity Backstop Commitment Letters), corresponding to a Rights Offering subscription price of approximately $11-12 per share and a minimum price threshold of $18-19 per share in order to undertake a Market Offering. (*Id*.) In the event that the Debtors are not able to sell equity at prices that meet these multiples, they would need to draw on the backstop to fund the Plan. (*Id*.) While the availability of the backstop commitments has been an important foundation upon which the Plan was built, drawing upon the backstop commitments would not be the best means to raise the equity financing needed to fund the Plan under current market conditions.

Due to the market impact brought about by the COVID-19 pandemic and the levels at which PG&E Corp. common stock has traded since the approval of the Approved Equity Backstop Commitment Letters, a Market Offering at the $18-19 price threshold provided for in the Approved Equity Backstop Commitment Letters is not possible. (*Id*. ¶¶ 8, 9.) Further, because the Approved Equity Backstop Commitment Letters also specify the subscription price for any Rights Offering, which would under current terms be fixed at approximately $11-12, the Debtors face the very real prospect of being unable to raise $9 billion of equity proceeds through a Rights Offering. (*Id*.) It is expected that, in the event that an amendment to the Approved Equity Backstop Commitment Letters is not approved, the high likelihood of a highly dilutive draw on the backstop would put significant downward pressure on the price of PG&E Corp. common stock, making a draw on the backstop at approximately $7.50 per share inevitable. (*Id*. ¶ 9.)

Thus, based upon the current and expected circumstances, it is apparent that absent the approval the proposed amendments to the Approved Equity Backstop Commitment Letters, the need to draw on the backstop for some portion or all of the $9 billion to be raised is inevitable. (*Id*.) Although drawing on the backstop is expressly contemplated by the Plan and the Tort Claimants RSA, and its availability provides the assurance for the necessary Plan funding, the Debtors and their financial

advisors believe that market conditions would permit the Debtors to raise the $9 billion of equity proceeds through Market Offerings at a price higher than the Backstop Price, and that such an offering would be in the best interests of the Debtors' estates and all stakeholders including the Fire Victim Trust. (*Id*. ¶ 10.) Specifically, as announced yesterday, the Debtors have obtained investment commitments of $3.25 billion through the PIPE at a price significantly higher than the Backstop Price and plan to raise $5.75 billion through public offerings of New HoldCo Common Stock and equity-linked securities at prices also expected to be significantly higher than the Backstop Price. (*Id*. ¶ 15.) To do so, however, the Debtors require amendment of the Approved Equity Backstop Commitment Letters.

### B. The Consents and the Amended Equity Backstop Commitment Letters

In May 2020, the Debtors began a dialogue with certain Backstop Parties regarding amendments to the Approved Equity Backstop Commitment Letters to permit a Market Offering in light of current market conditions. (*Id*. ¶ 11.) Following extensive negotiations with such Backstop Parties, the negotiations resulted in the proposed form of the Consents and the Amended Equity Backstop Commitment Letters.[4] (*Id*.)

The Consents and the Amended Equity Backstop Commitment Letters accommodate a Market Offering by removing minimum pricing tiers related to a Market Offering or Rights Offering, thereby lowering the price at which the Debtors may undertake a Market Offering and refresh certain termination events, including, among others, termination events relating to the Backstop Parties' approval of certain previously implemented changes to the Plan. (*Id*.) The Consents also provide for the Greenshoe Backstop and for the payment of the Additional Backstop Commitment Share Premium. (*Id*.) On June 8, 2020, the Debtors entered into the Consents with a substantial majority of the Backstop Parties, and obtained all the remaining Consents on June 9, 2020.

---

[4] The pertinent consents (each in substantially the form attached to this Motion as **Exhibit B**, and collectively, the "**Consents**") include substantive terms, as well as (i) the amended and restated equity backstop commitment letters executed by PG&E Corp. (each in substantially the form attached to this Motion as **Exhibit C**, and collectively, the "**Amended Equity Backstop Commitment Letters**") and (ii) the term sheet describing the greenshoe backstop, attached hereto as **Exhibit D** (the "**Greenshoe Backstop Term Sheet**"). The Amended Equity Backstop Commitment Letters, together with the Consents and the Greenshoe Backstop Term Sheet, are collectively referred to herein as the "**Amended Equity Backstop Commitment Documents**". A redline showing changes in the form of the Amended Equity Backstop Commitment Letters compared to the form of the Approved Equity Backstop Commitment Letters is attached to this Motion as **Exhibit E**.

(*Id.* ¶ 15.)  A copy of the Amended Equity Backstop Commitment Letter was filed prior to market open on June 8, 2020 in an 8-K in which the Debtors also announced that they reached an agreement with five institutional investors for the sale of $3.25 billion of New HoldCo Common Stock in the PIPE.  The PIPE is conditioned on a successful completion of a public equity offering, which is not possible absent the proposed amendments.  (*Id.* ¶ 16.)

Pursuant to the Amended Equity Backstop Commitment Letters, certain parties (collectively, the "**Backstop Parties**") remain severally committed to purchase up to $9 billion[5] in New HoldCo Common Stock (collectively, the "**Equity Backstop Commitments**") on the Effective Date.  In addition, under the Consents the Backstop Parties will now also be severally committed to purchase up to $522,727,273 of New HoldCo Common Stock to backstop a "greenshoe" option to purchase additional shares to be provided to the underwriters in connection with a public offering of New HoldCo Common Stock or equity-linked securities (collectively, the "**Greenshoe Backstop**")[6], each on the terms and subject to the conditions set forth in the Consents.  Notably, under all circumstances, the Consents and the Amended Equity Backstop Commitment Letters ensure that the Debtors will have access to the full amount of equity financing necessary to consummate the Plan.  (*Id.* ¶ 13.)

Based on the advice of the Debtors' equity underwriters and Lazard, the Debtors have determined that a successful underwritten offering of New HoldCo Common Stock or equity-linked securities will require a customary "greenshoe" option to be provided to the underwriters, which would permit the underwriters to purchase an additional 10% of the securities issued in such offering at any time in the 30 days following the consummation of the offering.  (*Id.* ¶ 12.)  Greenshoes are employed in virtually all public primary and follow-on equity offerings (*i.e.*, equity offerings where the company, as compared with a shareholder, is selling stock) to provide price stability and liquidity, and to help

---

[5]     The Amended Equity Backstop Commitment Letters provide that the Backstop Parties severally commit to purchase up to $12 billion in New HoldCo Common Stock, subject to certain reductions.  As is the case with the existing Approved Equity Backstop Commitment Letters, $9 billion of new money equity is expected to be raised in accordance with the Plan based on the Debtors' proposed capital structure and other capital sources.

[6]     A "greenshoe" is market parlance for an underwriter's option to purchase additional shares in a public equity offering.  The term is derived from the name of the first company that employed the technique, Green Shoe Manufacturing (now called Stride Rite Corporation).

ensure the overall success of such equity offerings. They do so by allowing equity underwriters the option to sell more shares, or "short"[7], up to a specified percentage (typically 10-15% of the shares being issued) in response to strong investor demand, which sales the underwriters are able to cover by purchasing greenshoe shares from the issuing company at the offering price. Conversely, if demand is lower than anticipated, the equity underwriters can support the offering share price by purchasing the amount of those additional shares in the market. The underwriters may choose to exercise any or all of the greenshoe at any time in the 30 days following the consummation of the offering, or may choose not to exercise the greenshoe altogether.

Because the Debtors require that a specified amount of equity proceeds be available on the Effective Date and do not want to sell more equity than is contemplated by the Plan, the Greenshoe Backstop provides that the consenting Backstop Parties will, unless the greenshoe is exercised in full prior to the Effective Date, pre-fund $522,727,273 (the maximum amount that could be raised under the greenshoe granted to the equity underwriters) to ensure that the $9 billion of equity proceeds contemplated by the Plan will be available on the Effective Date. (*Id.*) If the greenshoe is exercised at any time after the closing of the Market Offering, the Debtors will repay all or a portion of the pre-funded amounts with the proceeds of such exercise of the greenshoe without any additional fee. (*Id.*) At the end of the greenshoe option period (up to 30 days post Effective Date), the Debtors will issue New HoldCo Common Stock at the PIPE price to the applicable Backstop Parties for the portion of the greenshoe not exercised by the equity underwriters. (*Id.*) This arrangement enables PG&E Corp. to reduce dilution of its common stock while still being able to include a greenshoe as part of the offering. (*Id.*)

The Consents and the Amended Equity Backstop Commitment Letters are expected to allow the Debtors to raise the contemplated $9 billion of equity proceeds at a higher price per share than the Backstop Price, resulting in less dilution to existing shareholders than they would otherwise experience. (*Id.* ¶ 13.) Subject to the price obtained in the underwritten public offering, the proposed PIPE investment is for up to $10.50 per share—significantly higher than the approximately $7.50

---

[7]    Short sales involve the sale by the underwriters of a greater aggregate amount of equity than they are required to purchase in the offering.

Backstop Price. (*Id.*) The Debtors and their financial advisors estimate that the approval of the amendment would save the Debtors from having to issue at least 300 million shares of New HoldCo Common Stock, even after accounting for the Additional Backstop Commitment Share Premium, as compared to issuing shares at the Backstop Price under the Approved Equity Backstop Commitment Letters. (*Id.*) In ownership terms, this likely prevents at least 2% dilution for existing non-backstop shareholders relative to the Debtors' drawing on the existing backstop, and preserves approximately $900 million of equity value, and potentially more, for these shareholders. (*Id.*) Further, this reduced dilution will better position the Reorganized Debtors to obtain future equity financing at a higher multiple, which is in the interest of all stakeholders. (*Id.*)

In return for the significant benefits that the Consents and the Amended Equity Backstop Commitment Letters confer upon the Debtors and all stakeholders, the consenting Backstop Parties will be entitled to receive their share of a fixed additional commitment premium of 50 million shares of New HoldCo Common Stock (the "**Additional Backstop Commitment Share Premium**") payable on the Effective Date, but *only* in the event that the Debtors consummate a Market Offering. (*Id.* ¶ 14.) The Additional Backstop Commitment Share Premium, if it becomes payable, is fair and reasonable under the circumstances and in the best interests of the Debtors' estates and all stakeholders. (*Id.*)

C. **Redline of Certain Key Terms and Provisions of the Approved Equity Backstop Commitment Letters through the Amended Equity Backstop Commitment Letters and Summary of Certain Key Terms and Provisions of the Consents**

A redline of certain key terms and provisions of the Amended Equity Backstop Commitment Letters as compared to the Approved Equity Backstop Commitment Letters follows:[8]

| Amended Equity Backstop Commitment Letters (Redlined) | |
|---|---|
| **Equity Backstop Commitments** *See* Form of Amended Equity Backstop Commitment Letters § 2(a); Exhibit A | In the aggregate, the Backstop Parties have severally committed to fund up to $12 billion to PG&E Corp. on the Effective Date to finance the payments contemplated by the Plan, in consideration of the issuance of New HoldCo Common Stock to the Backstop Parties on the Effective Date, subject to the terms and conditions set forth in |

---

[8] This summary is qualified in its entirety by reference to the provisions of the Amended Equity Backstop Commitment Letters. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Amended Equity Backstop Commitment Letters, the Amended Equity Backstop Commitment Letters shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Amended Equity Backstop Commitment Letters.

| | |
|---|---|
| to Form of Amended Equity Backstop Commitment Letters. | each Amended Equity Backstop Commitment Letter. The price at which any such new shares would be issued to the Backstop Parties (the "**Backstop Price**") would equal (a) 10 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple, **the "Backstop Multiple"**), *times* (b) PG&E Corp.'s consolidated Normalized Estimated Net Income, *divided by* (c) the number of fully diluted shares of PG&E Corp. that will be outstanding on the Effective Date (assuming the Equity Backstop Commitments are fully drawn). |
| **Equity Offerings**<br>*See* Form of Amended Equity Backstop Commitment Letters § 1(a). | Permitted Equity Offering. Subject to an aggregate cap of $12 billion of net cash proceeds, PG&E Corp. will be permitted to conduct any primary offering of its common stock **(or rights, equity forward contracts or other equity-linked instruments),** including public offerings and private placements in order to finance the Plan, as long as the Implied P/E Multiple for such offering ~~equals or exceeds 13.5 (subject to upward adjustment based on changes in the Applicable Utility Index Multiple, the "**Permitted Equity Offering Threshold**").~~<br><br>~~Rights Offering. If PG&E Corp. conducts an equity offering with an Implied P/E Multiple of at least 12 (subject to downward adjustment based on changes in the Applicable Utility Index Multiple, the "**Rights Offering Minimum Multiple**") but less than the Permitted Equity Offering Threshold, then PG&E Corp. must structure such equity offering so that at least 80% of the aggregate cash proceeds are raised through a rights offering to holders of shares of common stock of PG&E Corp. (the "**Rights Offering**"). Rights issued to PG&E Corp. shareholders in a Rights Offering would have an exercise price equal to the per share price implied by the Rights Offering Minimum Multiple. If PG&E Corp. conducts a Rights Offering, it would also be permitted to raise up to 20% of the aggregate cash proceeds through another form of primary equity offering, subject to the approval of a majority of the holders of Equity Backstop Commitments as to the identity of the purchaser in such other equity offering if it is not a broadly syndicated underwritten public offering.~~ **the Backstop Multiple.**<br><br>Equity Backstop Funding. If PG&E Corp. is unable to conduct an equity offering with an Implied P/E Multiple ~~at least equal to~~**greater than** ~~the Rights Offering Minimum~~**Backstop** Multiple, then PG&E Corp. would be required to draw upon the Equity Backstop Commitments. |
| **Termination Events**<br>*See* Form of Amended Equity Backstop Commitment Letters §§ 5–6. | Backstop Parties. The Backstop Parties may terminate the Amended Equity Backstop Commitment Letters if, among other things: (i) the Plan (including as may be amended, modified or otherwise changed) filed by the Debtors does not include Knighthead and Abrams as plan proponents and is not in a form acceptable to each of Knighthead and Abrams, or does not provide for substantially the same classification and treatment, including releases, of all Claims ~~(other than Holdco Fire Victim Claims and Utility Fire Victim Claims and Utility PC Bond (2008 F and 2010 E) Claims, as long as such Utility PC Bond (2008 F and 2010 E) Claims are paid in Cash or debt securities)~~ as provided in the Debtors' Joint Chapter 11 Plan |

of Reorganization filed with the Bankruptcy Court on ~~January 31~~**May 22**, 2020; (ii) the Court has not entered an order approving the Amended Equity Backstop Commitment Letters on or before ~~March 15~~**June 30**, 2020; (iii) **after May 22, 2020,** the Plan is amended, modified or changed without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed), or any plan supplement or other plan document is filed or finalized without the consent of entities holding a majority of the Equity Backstop Commitments (not to be unreasonably withheld, conditioned or delayed); (iv) the Confirmation Order has not been entered by the Court on or before June 30, 2020; (v) the Effective Date has not occurred on or before 60 days after entry of the Confirmation Order; (vi) the Debtors have failed to perform any of their obligations in the Amended Equity Backstop Commitment Letters, which failure to perform would give rise to the failure of certain conditions precedent; (vii) wildfires occur in the Utility's service area in 2019 that damage or destroy in excess of 500 dwellings or commercial structures ("**Structures**") in the aggregate that are asserted to arise out of the Debtors' activities; (viii) wildfires occur in the Utility's service area in 2020 that damage or destroy in excess of 500 Structures in the aggregate at a time when the portion of the Utility's system at the location of such wildfire was not successfully de-energized; (ix) the Debtors' aggregate liability with respect to prepetition wildfire-related claims is determined to exceed $25.5 billion; (x) the CPUC fails to issue all necessary approvals prior to June 30, 2020; (xi) there is in effect an order or law permanently prohibiting the consummation of the Plan; (xii) at any time after the first day of the confirmation hearing, either asserted administrative expense claims in the Chapter 11 Cases exceed $250 million, excluding the Excluded Administrative Expense Claims, or the Debtors have reserved for and/or paid more than $250 million in the aggregate for administrative expense claims, excluding the Excluded Administrative Expense Claims; (xiii) the Utility does not participate in the Go-Forward Wildfire Fund; (xiv) the Court at any time determines that the Debtors are insolvent; (xv) the Debtors or any of their subsidiaries enter into any Tax Benefits Monetization Transaction, and the net cash proceeds thereof to the Debtors (or such subsidiary) are less than $3 billion (excluding $1.35 billion of tax benefits utilized in the Plan); or (xvi) the Plan, any plan supplement or any plan document has been amended, modified or changed, in each case without the consent of the entities holding at least 66 2/3% of the Aggregate Equity Backstop Commitments to include a process for transferring the license and operating assets of the Utility to the State of California or a third party (a "**Transfer**") or PG&E effects a Transfer other than pursuant to the Plan (such termination right, the "**Transfer Termination Right**"), **it being agreed that the Backstop Party consents to the Case Resolution Contingency Process and the terms of the purchase option as set forth in the Debtors' Motion for Entry of an Order Approving the Case Resolution Contingency Process and Granting Related Relief filed with the Bankruptcy Court on March 20, 2020 [Docket No. 6398]**.

PG&E Corp. Among other circumstances, PG&E Corp. may terminate an Amended Equity Backstop Commitment Letter in the

|  | event (i) the applicable Backstop Party repudiates, invalidly purports to terminate or fails to fund its Amended Equity Backstop Commitment when required; (ii) of certain proposals to acquire at least 50% of the outstanding shares of PG&E Corp. common stock; and (iii) the aggregate amount of commitments falls below $12 billion provided that the PG&E shall use commercially reasonable efforts to obtain replacement commitments within 14 days of the termination. |

Certain key terms and provisions of the Consents are summarized as follows:[9]

| Consents | |
| --- | --- |
| **Additional Backstop Commitment Share Premium;** *See* **Consents § 3.** | **The Debtors agree to pay to each Backstop Party that executed the Consents agreeing to the Amended Equity Backstop Commitment Letters, subject to the conditions set forth in Section 4 of the Consents , an additional backstop commitment share premium of (a) 50,000,000 shares, *multiplied by* (b) the Backstop Party's Forward Contract Purchase Commitment, _divided by_ (c) the Maximum Forward Contract Amount.** |
| **Forward Purchase Contract** *See* **Consents § 2; Greenshoe Backstop Term Sheet.** | **In connection with any underwritten public offering (an "Underwritten Offering") of (x) shares of New HoldCo Common Stock or (y) securities convertible into any such shares or other equity-linked securities where the underlying security is New HoldCo Common Stock ("Other Equity Securities"), PG&E Corp. will enter into an underwriting agreement with the representatives of the underwriters for each Underwritten Offering, pursuant to which the underwriters for each Underwritten Offering may have the option to purchase additional shares of New HoldCo Common Stock (the "Option Shares") and additional Other Equity Securities (together with the Option Shares, the "Option Securities"), as applicable. In connection with any Underwritten Offering, PG&E Corp. expects to enter into one or more redeemable forward stock purchase contracts upon the terms and conditions set forth on the Redeemable Forward Stock Purchase Contract, which is Exhibit B to the Consents (the "Forward Contract"), pursuant to which those Backstop Parties that have executed the Consents will agree to purchase shares of New HoldCo Common Stock for an aggregate amount equal to the aggregate gross proceeds that would be received by the Debtors from the sale of all Option Securities that the underwriters of the Underwritten Offerings have the option to purchase (the "Forward Contract Purchase Price"). In no event will the Forward Contract Purchase Price exceed $522,727,273 (the "Maximum Forward Contract Amount").** |

---

[9]     This summary is qualified in its entirety by reference to the provisions of the Consents. To the extent that any discrepancies exist between the summary described in this Motion and the terms of the Consents, the Consents shall govern. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Consents.

## IV. BASIS FOR RELIEF REQUESTED

### A. Entry into the Amended Equity Backstop Commitment Documents is a Sound Exercise of the Debtors' Business Judgment and is in the Best Interests of Their Estates.

Section 363(b)(1) of the Bankruptcy Code provides that a debtor in possession, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate". 11 U.S.C. § 363(b)(1). "Such use, sale or lease must be based upon a debtor's sound business judgment. The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'" *In re Station Casinos, Inc.*, No. BK-09-52477 (GWZ), 2010 Bankr. LEXIS 5447, at *7 (Bankr. D. Nev. Feb. 2, 2010) (quoting *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992)).

Courts emphasize that the business judgment rule is not an onerous standard and may be satisfied "as long as the proposed action *appears* to enhance the debtor's estate". *Crystalin, L.L.C. v. Selma Props. Inc. (In re Crystalin, L.L.C.)*, 293 B.R. 455, 464 (B.A.P. 8th Cir. 2003) (emphasis in original, alterations and internal quotation marks omitted) (quoting *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 566 n.16 (8th Cir. 1997)); *see also In re AbitibiBowater Inc.*, 418 B.R. 815, 831 (Bankr. D. Del. 2009) (stating the business judgment standard is "not a difficult standard to satisfy"). Once a debtor articulates a valid business justification, a presumption arises that the debtor's decision was made on an informed basis, in good faith and with the belief that the decision was in the best interests of the debtor's estate. *In re Integrated Resources, Inc.*, 147 B.R. 650, 656 (Bankr. S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

Section 105(a) of the Bankruptcy Code also provides in relevant part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]". 11 U.S.C. § 105(a); *see also In re Excel Innovations, Inc*., 502 F.3d 1086, 1093 (9th Cir. 2007); *In re Robles*, No. 14-51812 (ASW), 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014). Together, sections 363(b) and 105(a) of the Bankruptcy Code give the Court sufficient authority to grant the relief requested herein. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (stating courts should permit use of assets outside the ordinary course of business if "sound

business purpose justifies such actions"); *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns- Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct.").

The relief sought by this Motion easily satisfies these standards.

As noted above, the market dislocation driven by COVID-19 combined with the minimum price thresholds in the Approved Equity Backstop Commitment Letters constrain the optimum manner in which the Debtors may raise the $9 billion of equity proceeds contemplated by the Plan, and virtually ensure that the existing backstop commitments will be drawn. (Ziman Decl. ¶ 9.) The Debtors and their financial advisors expect that the $9 billion of equity proceeds could be obtained at a higher price per share through a Market Offering as contemplated by the Amended Equity Backstop Commitment Letters relative to what would be achievable under the existing Approved Equity Backstop Commitment Letters, which would inure to the benefit of the Debtors' estates and all stakeholders, including the Fire Victim Trust. (*Id.* ¶ 10.) Completing a Market Offering would minimize dilution to existing shareholders and allow the Reorganized Debtors to have greater capacity to obtain future equity financing at improved multiples. (*Id.* ¶ 13.)

Most importantly, a Market Offering would maximize the value of New HoldCo Common Stock, including the New HoldCo Common Stock to be issued to the Fire Victim Trust under the Plan. And the amendment and the Additional Backstop Commitment Share Premium have no impact whatsoever on the percentage of New HoldCo Common Stock the Fire Victim Trust will own upon consummation of the Plan. (*Id.* ¶ 10.) Although the Debtors would incur certain additional non-cash costs to obtain these benefits, namely the Additional Backstop Commitment Share Premium, which is payable only in shares of New HoldCo Common Stock and only if a Market Offering is consummated, the Debtors, in consultation with their financial advisors, have determined that the benefits to the estates substantially outweigh these non-cash costs. (*Id.* ¶ 14.)

Under these circumstances, the Debtors' decision to amend the Approved Equity Backstop Commitment Letters to obtain significant flexibility to benefit all stakeholders plainly constitutes a valid exercise of the Debtors' business judgment. *See, e.g.*, *In re Hexion Holdings LLC*,

No. 19-10684 (KG), at 4 (Bankr. D. Del. May 15, 2019) (ECF No. 367) ("The Equity Backstop Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363 of the Bankruptcy Code."); *In re Pacific Drilling S.A.*, No. 17-13193 (MEW), at 2 (Bankr. S.D.N.Y. Sept. 25, 2018) (ECF No. 616) ("The Debtors are authorized, pursuant to sections 105(a), 362, 363, 503, and 507 of the Bankruptcy Code, to enter into the Equity Commitment Agreement."); and *In re MPM Silicones, LLC*, No. 14-22503 (RDD), at 5 (Bankr. S.D.N.Y. June 23, 2014) (ECF No. 509) ("The Backstop Commitment Agreement and the terms and provisions included therein are approved in their entirety pursuant to sections 105 and 363(b) of the Bankruptcy Code . . . ."). The relief sought herein is consistent with the relief sought and obtained in respect of Approved Equity Backstop Commitment Letters, and the Debtors respectfully request the Court similarly grant the relief sought herein.

### B. Payment and Allowance of the Additional Backstop Share Premium as an Administrative Expense Claim Should Be Approved Because It Is a Fair, Reasonable and Essential Term of the Consents.

The Additional Backstop Commitment Share Premium is necessary, fair and reasonable compensation for the Backstop Parties' agreement to amend the terms of the commitments they have agreed to provide. (Ziman Decl. ¶ 14.) Absent the Debtors' agreement to pay the Additional Backstop Commitment Share Premium, the Backstop Parties would not have been willing to enter into the Amended Equity Backstop Commitment Letters. (*Id.*) The Additional Backstop Commitment Share Premium is *only* payable in shares of New HoldCo Common Stock, and *only* if a Market Offering is consummated and the Effective Date of the Plan occurs. The Additional Backstop Commitment Share Premium also has *no* impact on the percentage of New HoldCo Common Stock that will be owned by the Fire Victim Trust upon consummation of the Plan. (*Id.* ¶ 10.)

For these reasons, the Debtors determined, in their business judgment and in consultation with their advisors, that their agreements to pay the Additional Backstop Commitment Share Premium were essential and an appropriate means to obtain the Amended Equity Backstop Commitment Letters. (*Id.*) Compared to the substantial value provided by the Amended Equity Backstop Commitment Letters, the Additional Backstop Commitment Share Premium is a reasonable use of estate resources and should be accorded administrative expense priority under section 507(a)(2) of the Bankruptcy Code. The

Additional Backstop Commitment Share Premium is an actual and necessary cost, not only for preserving the Debtors' estates, but also for maximizing their value and enhancing overall stakeholder recoveries. The Court approved administrative expense priority status for all fees, premiums, indemnities, costs and expenses in respect of the Approved Equity Backstop Commitment Letters, and the Debtors respectfully request the same treatment for the Additional Backstop Commitment Share Premium under the Consents for the reasons set forth above.

For the foregoing reasons, the Debtors respectfully submit that approval of the Amended Equity Backstop Commitment Documents is in the best interest of their estates and an appropriate exercise of their business judgment.

## V.  WAIVER OF BANKRUPTCY RULE 6004(h)

To implement the foregoing, the Debtors respectfully request the waiver of the 14-day stay under Bankruptcy Rule 6004(h). Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise". Fed. R. Bankr. P. 6004(h). For the reasons described above, the relief requested herein allows the Debtors to achieve greater certainty around the financing of their Debtors' Plan.

## VI.  NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to the Official Committee of Tort Claimants; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor-in-possession financing facilities; (xii) counsel for the Backstop Parties; and (xiii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002 (collectively, the "**Notice Parties**"). The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors.

1      WHEREFORE the Debtors respectfully request entry of the proposed order granting
2  (i) the relief requested herein and (ii) such other and further relief as the Court may deem just and
3  appropriate.
4
5  Dated:  June 9, 2020
6                                              **WEIL, GOTSHAL & MANGES LLP**
                                               **CRAVATH, SWAINE & MOORE LLP**
7                                              **KELLER BENVENUTTI KIM LLP**
8
9                                                  /s/ Paul H. Zumbro
                                                  Paul H. Zumbro
10
11
                                               *Attorneys for Debtors and Debtors in Possession*
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28