| | |
|---|---|
| WEIL, GOTSHAL & MANGES LLP<br>Stephen Karotkin (*pro hac vice*)<br>(stephen.karotkin@weil.com)<br>Theodore E. Tsekerides (*pro hac vice*)<br>(theodore.tsekerides@weil.com)<br>Richard W. Slack (*pro hac vice*)<br>(richard.slack@weil.com)<br>Jessica Liou (*pro hac vice*)<br>(jessica.liou@weil.com)<br>Matthew Goren (*pro hac vice*)<br>(matthew.goren@weil.com)<br>767 Fifth Avenue<br>New York, NY 10153-0119<br>Tel: 212 310 8000<br>Fax: 212 310 8007 | CRAVATH, SWAINE & MOORE LLP<br>Paul H. Zumbro (*pro hac vice*)<br>(pzumbro@cravath.com)<br>Kevin J. Orsini (*pro hac vice*)<br>(korsini@cravath.com)<br>Omid H. Nasab (*pro hac vice*)<br>(onasab@cravath.com)<br>825 Eighth Avenue<br>New York, NY 10019<br>Tel: 212 474 1000<br>Fax: 212 474 3700 |

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY**<br><br>**Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>Chapter 11 (Lead Case) (Jointly Administered)<br><br>**DECLARATION OF KENNETH S. ZIMAN IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND PERFORMANCE UNDER, AMENDED EQUITY BACKSTOP COMMITMENT DOCUMENTS AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE OF RELATED PREMIUMS AS ADMINISTRATIVE EXPENSE CLAIMS**<br><br>Date: June 16, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: **Telephonic or Video Appearances Only**<br>United States Bankruptcy Court<br>Courtroom 17, 16th Floor<br>San Francisco, CA 94102<br>Obj. Deadline: June 15, 2020, 12:00 p.m. (PDT) |

I, Kenneth S. Ziman, hereby declare under penalty of perjury as follows:

1. I am a Managing Director in the Restructuring Group at Lazard Frères & Co. LLC ("**Lazard**"), an investment banking firm that has its principal office at 30 Rockefeller Plaza, New York, New York 10112. Lazard is the primary U.S. operating subsidiary of a preeminent international investment banking, financial advisory, and asset management firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for over 165 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees and buyers in chapter 11 cases. Since 1990, Lazard professionals have been involved in over 250 restructurings, representing over $1 trillion in debtor assets.

2. At Lazard, I specialize in advising public and private companies and creditor groups in complex financial restructurings and in raising capital for, selling, or acquiring financially distressed businesses. I have nearly 30 years of experience in corporate finance and restructuring. I joined Lazard in March 2016 after a more than 25-year career as a bankruptcy and restructuring lawyer, previously as a partner at Simpson Thacher & Bartlett LLP and most recently as the Deputy Practice Leader of Skadden, Arps, Slate, Meagher & Flom LLP's Corporate Restructuring department. Throughout my career I have represented debtors, individual creditors, official creditors' committees, unofficial bondholder committees, and other parties in interest in numerous in-court and out-of-court restructurings and recapitalizations involving companies in multiple industries, including those of Takata Corporation, Cobalt International Energy, Inc., ManorCare Inc., SunEdison, Inc., CGG Holdings (U.S.) Inc., Millennium Health, LLC, Dendreon Corporation, Exide Technologies, Savient Pharmaceuticals, Inc., Energy Future Holdings Corporation, Residential Capital, LLC, Select Staffing, iPayment, Inc. and MF Global Holdings

1

Ltd. I have submitted declarations and/or affidavits or have had testimony proffered in CGG, SunEdison and GCX Limited, among other cases.

3. I graduated from Colgate University with a B.A. and I have a law degree from the University of Pennsylvania Law School.

4. Lazard is a long-time advisor to PG&E Corporation ("**PG&E Corp.**"), and its primary operating subsidiary, Pacific Gas and Electric Company (the "**Utility**"; together with PG&E Corp., "**PG&E**", the "**Company**" or the "**Debtors**"), with the initial engagement for advisory services starting in 2011. Since that time, Lazard has provided financial advisory and investment banking services to PG&E with respect to a variety of matters, including, without limitation: analysis of the financial condition of the Company, evaluation of potential transactions that the Company may pursue, assessment of financing options, and shareholder advisory services. Given Lazard's long history with PG&E, Lazard has significant familiarity with and knowledge of the Debtors' business, operations, and financial challenges.

5. Lazard currently serves as investment banker to the Debtors in their Chapter 11 Cases. In such capacity, Lazard assists the Company in its assessment of the Company's ability to raise capital and its evaluation of the sources of financing required in order to successfully emerge from chapter 11. During the course of these cases, Lazard has engaged in dialogue with the legal counsel and advisors to a number of significant shareholders, including in regards to their willingness to invest in the Company to finance its emergence from chapter 11.

6. I submit this Declaration (the "**Declaration**") in support of the *Debtors' Motion for Entry of an Order (i) Approving Terms of, and Debtors' Entry into and Performance Under, Amended Equity Backstop Commitment Documents and (ii) Authorizing Incurrence, Payment and Allowance of Related Premiums as Administrative Expense Claims* (the "**Motion**").[1]

7. Except as otherwise indicated, the facts set forth in this Declaration (or incorporated by reference herein) are based upon my personal knowledge, including my review of relevant

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

2

documents and the Debtors' books and records, information provided to me by employees working under my supervision, my experience and knowledge related to the Debtors' operations, businesses, and financial condition, and information supplied to me by the Debtors and the Debtors' other professionals and advisors. If I am called upon to testify, I would testify competently to the facts set forth herein. I am authorized to submit this Declaration on behalf of the Debtors.

8. As previously set forth in the *Declaration of Kenneth S. Ziman in Support of Debtors' Second Amended Motion for Entry of Orders (i) Approving Terms of, and Debtors' Entry into and Performance Under, Equity Backstop Commitment Letters, (ii) Approving Terms of, and Debtors' Entry into and Performance Under, Debt Financing Commitment Letters and (iii) Authorizing Incurrence, Payment and Allowance of Related Fees and/or Premiums, Indemnities, Costs and Expenses as Administrative Expense Claims* dated March 2, 2020 [Docket No. 6014], Lazard participated in the negotiations resulting in the Approved Equity Backstop Commitment Letters. The Approved Equity Backstop Commitment Letters outline the circumstances under which the Debtors are permitted to undertake the equity offerings contemplated by the Plan and include certain pricing requirements for conducting a Market Offering and a Rights Offering. Specifically, the Approved Equity Backstop Commitment Letters require the Backstop Parties to purchase up to $9 billion in New HoldCo Common Stock, on the terms and subject to the conditions thereof, at a price per share that would imply a price-to-earnings multiple of approximately $8.8x^2$ based on Normalized Estimated Net Income for 2021, or approximately $7.50 per share. Only in the event that the price-to-earnings multiple implied by an equity raise is equal to or exceeds $13.5x^2$ corresponding to a minimum price threshold of approximately $18-19 per share, can the Debtors pursue a Market Offering (*i.e.*, raise equity at best terms and structure available in the market). If the price-to-earnings multiple implied by an equity raise is less than $13.5x^2$ but equals or exceeds $10.6x^2$, then the Debtors must attempt to raise

---

[2] As adjusted as of the date hereof pursuant to the terms of the Approved Equity Backstop Commitment Letters.

3

at least 80% of equity proceeds through a Rights Offering, but have discretion about how to raise the other 20%. To that end, the Rights Offering subscription price would be set at approximately $11-12 per share as determined by a formula pursuant to the Approved Equity Backstop Commitment Letters. In the event that the Debtors are not able to sell equity at prices that meet these Market Offering and Rights Offering multiples, they would need to draw on the backstop, subject to the satisfaction or waiver of the conditions in the Approved Equity Backstop Commitment Letters.

9. The COVID-19 pandemic has negatively impacted the utility sector and the capital markets as a whole. This market impact has resulted in a recent trading price of PG&E Corp. common stock in the $11-12 range. At that trading range, a Market Offering would not be possible under the Approved Equity Backstop Commitment Letters, and the Debtors would only be permitted to undertake a Rights Offering with a subscription price roughly equal, if not below, the current trading price, which would not be sufficiently compelling to investors to raise $9 billion of equity capital. It is expected that, in the event that an amendment to the Approved Equity Backstop Commitment Letters is not approved, the high likelihood of a highly dilutive draw on the backstop (compared to an alternative capital raise) would put significant downward pressure on the price of PG&E Corp. common stock, making a draw on the backstop at approximately $7.50 per share inevitable. Thus, absent the proposed amendments to the Approved Equity Backstop Commitment Letters, the Debtors would be left to draw on the backstop at approximately $7.50 per share—a significant discount to current trading levels and, more importantly, at a lower price than they believe would be achievable in a Market Offering unconstrained by the terms of the Approved Equity Backstop Commitment Letters.

10. In light of the foregoing, the Debtors determined that it would be in all stakeholders' interests to amend the Approved Equity Backstop Commitment Letters to permit the Debtors to raise the $9 billion of equity proceeds through Market Offerings at a higher price than a backstop draw under the Approved Equity Backstop Commitment Letters. Such Market Offerings would maximize the value of New HoldCo Common Stock, including the New HoldCo Common Stock

4

to be issued to the Fire Victim Trust under the Plan, even after accounting for the Additional Backstop Commitment Share Premium, if it becomes payable, and would be in the best interests of the Debtors' estates and all stakeholders. The proposed amendment, including the Additional Backstop Commitment Share Premium, has no impact whatsoever on the percentage of New HoldCo Common Stock the Fire Victim Trust will own upon consummation of the Plan.

11. In May 2020, the Debtors began a dialogue with certain Backstop Parties regarding amendments to the Approved Equity Backstop Commitment Letters to permit a Market Offering in light of current market conditions. Following extensive negotiations with such Backstop Parties, the negotiations resulted in the proposed form of the Consents and the Amended Equity Backstop Commitment Letters. The Consents and the Amended Equity Backstop Commitment Letters accommodate a Market Offering by removing the minimum pricing tiers related to a Market Offering or Rights Offering, thereby lowering the price at which the Debtors may undertake a Market Offering to any price greater than the Backstop Price, provide for the Greenshoe Backstop from the Backstop Parties to backstop a customary greenshoe option and refresh certain termination events, including, among others, termination events relating to the Backstop Parties' approval of certain previously implemented changes to the Plan and CPUC proceedings. In consideration for this accommodation, the Consents provide for the payment of the Additional Backstop Share Premium of 50 million shares of New HoldCo Common Stock. The terms of the Amended Equity Backstop Commitment Letters significantly enhance the Debtors' flexibility in financing their emergence from the Chapter 11 Cases, while increasing overall equity value and protecting current and future shareholder value.

12. Based on the advice of the Debtors' equity underwriters and Lazard, the Debtors have determined that a successful underwritten offering of New HoldCo Common Stock or equity-linked securities will require a customary "greenshoe" option to be provided to the underwriters. This option would permit the underwriters to purchase an additional 10% of the securities issued in such offering at any time in the 30 days following the consummation of the offering. Greenshoes are employed in virtually all public primary and follow-on equity offerings (*i.e.*, equity offerings

5

Case: 19-30088    Doc# 7849    Filed: 06/09/20    Entered: 06/09/20 13:36:30    Page 6 of 10

where the company, as compared with a shareholder, is selling stock) to provide price stabilization by the underwriters. At a high-level, when a greenshoe is exercised, the issuing company sells additional shares and receives additional proceeds. Here, the Debtors have a specific proceeds target ($9 billion) that needs to be available on the Effective Date and do not want to sell additional equity at today's prices. To balance these needs and limitations, the Greenshoe Backstop provides that the consenting Backstop Parties will, unless the greenshoe is exercised in full prior to the Effective Date. pre-fund $522,727,273 (the maximum amount that could be raised under the greenshoe granted to the equity underwriters) to ensure the Debtors have the $9 billion of equity proceeds contemplated by the Plan in hand on the Effective Date. If the greenshoe is exercised at any time after the closing of the Market Offering, the Debtors will repay all or a portion of the pre-funded amounts with the proceeds of such exercise of the greenshoe without any additional fee. At the end of the greenshoe option period (up to 30 days post Effective Date), the Debtors will issue New HoldCo Common Stock at the PIPE price to the applicable Backstop Parties for the portion of the greenshoe not exercised by the equity underwriters. This arrangement enables PG&E Corp. to reduce dilution of its common stock while still being able to include a greenshoe as part of the offering.

13. Collectively, the changes reflected in the Consents and the Amended Equity Backstop Commitment Letters are expected to allow the Debtors to raise the contemplated $9 billion of equity proceeds at a higher price per share than the Backstop Price, resulting in less dilution to existing shareholders than they would otherwise experience even after accounting for the Additional Backstop Commitment Share Premium. Subject to the price obtained in the underwritten public offering, the proposed PIPE investment (as described below) is for up to $10.50 per share—significantly higher than the approximately $7.50 Backstop Price. Lazard estimates that the approval of the Amended Equity Backstop Commitment Documents would save the Debtors from having to issue at least 300 million shares of New HoldCo Common Stock, even after accounting for the Additional Backstop Commitment Share Premium, as compared to issuing shares at the Backstop Price under the Approved Equity Backstop Commitment Letters. In

6

ownership terms, this likely prevents at least 2% dilution for existing non-backstop shareholders relative to the Debtors' drawing on the existing backstop and preserves approximately $900 million of equity value, and potentially more, for shareholders. Completing a Market Offering would also allow the Reorganized Debtors to have greater capacity to obtain future equity financing at improved multiples and minimize the dilutive effect of future equity issuances. In addition, a Market Offering would accelerate the transition of the shareholder base to more natural, long-term utility investors. Notably, under all circumstances, the Consents and the Amended Equity Backstop Commitment Letters ensure that the Debtors will have access to the full amount of equity financing necessary to consummate the Plan.

14. Under the Consents, the consenting Backstop Parties will be entitled to receive their share of the Additional Backstop Commitment Share Premium of a fixed 50 million shares of New HoldCo Common Stock payable on the Effective Date, but only in the event that the Debtors consummate a Market Offering. The Additional Backstop Commitment Share Premium is fair and reasonable under the circumstances given the substantial benefits of effecting a Market Offering, and in the best interests of the Debtors' estates and their stakeholders. Absent the Debtors' agreement to pay the Additional Backstop Commitment Share Premium, the Backstop Parties would not have been willing to enter into the Amended Equity Backstop Commitment Letters or to provide the Greenshoe Backstop. The Debtors and Lazard determined that the benefits to the estates substantially outweigh the cost associated with the Amended Equity Backstop Commitment Letters.

15. On June 8, 2020, the Debtors announced a comprehensive equity raise strategy and simultaneously entered into the Consents with a substantial majority of the Backstop Parties. On June 9, 2020, the Debtors obtained all the remaining Consents from the Backstop Parties. The Debtors' equity raise strategy includes an agreement with five institutional investors for the sale of $3.25 billion of New HoldCo Common Stock in the PIPE and raising $5.75 billion through public offerings of New HoldCo Common Stock and equity-linked securities, each at prices expected to be significantly higher than the Backstop Price.

16. Prompt approval of the Amended Equity Backstop Documents is vital because the Amended Equity Backstop Documents allow the Debtors to undertake their equity raise strategy, and the Debtors have a limited window to raise the funds contemplated by the Plan. Under the terms of the Approved Equity Backstop Commitment Letters, the Debtors have 60 days from the entry of the Confirmation Order to effect the Plan, including to raise $9 billion of equity financing, and under the terms of the $3.25 billion PIPE announced yesterday, the Debtors have until July 22, 2020 (45 days from June 7, 2020) to consummate the PIPE. The PIPE is conditioned on a successful completion of a public equity offering, which is not possible absent the proposed amendments. Accordingly, it is critical to obtain prompt approval to maximize the likelihood of a successful Market Offering. The Debtors intend to begin the marketing process for the equity offering shortly after entry of the approval order.

I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: June 9, 2020

_____
Kenneth S. Ziman