WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (415) 636-9251

*Attorneys for Debtors
and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>   **- and -**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                 **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>(Lead Case) (Jointly Administered)<br><br>**MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) FOR AN ORDER AUTHORIZING THE UTILITY TO (I) ENTER INTO LEASE AND PURCHASE OPTION AGREEMENT FOR OAKLAND HEADQUARTERS AND (II) GRANTING RELATED RELIEF**<br><br>Date:  June 30, 2020<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  (Telephonic or Video Conference)<br>      United States Bankruptcy Court<br>      Courtroom 17, 16th Floor<br>      San Francisco, CA 94102<br><br>**Objections Due**:    June 23, 2020<br>                        4:00 p.m. (Pacific Time) |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Pacific Gas and Electric Company (the "**Utility**"), as debtor and debtor in possession (collectively, with PG&E Corporation ("**PG&E Corp.**"), "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this motion (the "**Motion**"), pursuant to sections 363 and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for an order (i) authorizing the Utility to enter into (a) an agreement to enter into a lease and purchase option agreement with TMG Bay Area Investments II, LLC ("**TMG BAI**"), an affiliate of leading Bay Area property developer, TMG Partners R.E., LLC ("**TMG**"), and (b) subject to the satisfaction of certain conditions, to enter into a lease and purchase option agreement with BA2 300 Lakeside LLC ("**Landlord**") for that certain property located at 300 Lakeside Drive, Oakland, California (the "**Lakeside Building**"), and (ii) granting related relief.

In support of the Motion, the Utility submits the Declaration of Tara Agid, the Senior Director of Corporate Real Estate Strategy and Services at the Debtors (the "**Agid Declaration**"), the Declaration of Robert S. Kenney, the Vice President of Regulatory Affairs at the Debtors ("**Kenney Declaration**"), and the Declaration of Michael W. Welch, a Managing Director of Integra Realty Resources (the "**Welch Declaration**"), filed contemporaneously herewith. A proposed form of order granting the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

As part of executing its vision for a comprehensively transformed PG&E, the Debtors have made a number of commitments to better-position PG&E to serve California for the long term, including commitments to change how the company is organized so that it can deliver improved safety and operational performance and lower its overall cost structure for customers. In furtherance of these commitments, the Debtors plan to move forward with a lease and option to acquire an existing building in Oakland that will enable it to consolidate various Bay Area locations into one Bay Area headquarters that is considerably less expensive, more productive, and ultimately would replace its current, less efficient San Francisco General Office headquarters complex (the "**SFGO**").

The Oakland lease and purchase option begins the implementation of a two-stage real estate strategy designed to provide significant benefits to the Utility and its key stakeholders, including significant long-term cost savings for its customers (including, subject to CPUC approval, the gain on sale of the SFGO), and a more productive, collaborative workspace for employees that brings them together across the Bay Area. Moving forward in this manner will (i) reduce the Utility's real estate operating and capital costs relative to its current facility costs over the life of a more efficient headquarters, (ii) enable the Utility to consolidate several different corporate offices into one anchor location in an improved work environment promoting greater communication and efficiency, and (iii) allow the Utility to monetize its existing headquarters in the near-future and return the net gain on the sale to its customers in the form of meaningful rate reductions. Agid Decl. ¶¶ 4, 26–33; Kenney Decl. ¶¶ 8–9.

This real estate strategy is the culmination of many years of work by the Debtors exploring options to optimize, and monetize, their real estate portfolio to meet the Debtors' needs for the future. The specifics of the first stage, the Oakland lease and purchase option, have been heavily negotiated by the Debtors and their advisors, undergone detailed evaluation by the Debtors' employees and advisors, an independent third-party expert, and the subcommittee on real estate matters established by the Utility's Board of Directors (the "**Real Estate Subcommittee**"). The final terms of the potential transaction have been approved by the Real Estate Subcommittee and the Utility's Board. Agid Decl. ¶¶ 35–40.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

By this motion, the Utility seeks Court authorization to move forward with the first stage of the Utility's real estate strategy: entry into an Agreement to Enter into Lease and Purchase Option (the "**Agreement**") with TMG BAI, and after the satisfaction of certain conditions precedent (discussed below), its entry into a form of agreed upon Office Lease (the "**Lease and Purchase Option Agreement**," and collectively, with the Agreement, the "**Agreements**") with Landlord, who will acquire the Lakeside Building and redevelop it to the Utility's specifications.  *See* Agid Decl., Ex. A.[1]

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY  10153-0119

---

[1] A redacted version of the Agreements is being filed with the Motion on the public docket to protect commercially sensitive information.  The Debtors are separately moving to file the fully unredacted version of the Agreements under seal.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.     JURISDICTION

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.     BACKGROUND

On January 29, 2019, the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in either of the Chapter 11 Cases.  The Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

On February 12, 2019, the United States Trustee (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Creditors Committee**").  On February 15, 2019, the U.S. Trustee appointed an Official Committee of Tort Claimants (the "**Tort Claimants Committee**").

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263].

## III.     THE UTILITY'S REAL ESTATE STRATEGY

### A.     The Utility's Historical Efforts to Monetize the SFGO Complex and Improve Its Workspace for Employees

Since the early 2000s, the Utility has been evaluating the strategy and potential impact of monetizing the SFGO complex because it is not ideally structured for the Utility's operations and, as a result, is occupied less efficiently and is expensive to maintain.[2]  Agid. Decl. ¶ 5.  Many of the Utility's

---

[2] The SFGO complex consists of: (i) 77 Beale Street ("**77 Beale**"); (ii) 215 Market Street ("**215 Market**"); (iii) 245 Market Street ("**245 Market**"); and (iv) 45 Beale Street ("**45 Beale**").  Agid Decl. ¶ 4 n.3.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

General Office employees commute to the SFGO from the East Bay area, where the cost of living is far more affordable than in San Francisco. *Id.* In addition, the costs of maintaining a headquarters in downtown San Francisco have continued to increase, reflecting both the growth of the local real estate market and significant costs the Utility would face to upgrade and maintain the SFGO complex. *Id.* ¶¶ 5, 28. As a result, it became apparent that the SFGO complex is no longer suited to the Utility's changing needs.

The Utility most recently began evaluating a number of specific options to monetize the SFGO, including a full or partial sale of the SFGO complex, in early 2018, and engaged a partnership consisting of TMG and a large national real estate company, two of the region's top developers with over 30 years of extensive and specialized experience renovating and managing properties in the San Francisco Bay Area, through a competitive request-for-proposal process to assist in evaluating strategic real estate opportunities for SFGO and east bay properties. *Id.* ¶ 6.

In September 2018, the Utility's CEO and senior leadership approved entering into contract negotiations with TMG and its large national real estate company partner for a project to explore moving the Utility's headquarters from the SFGO complex to the East Bay area, where the Utility already has leased a number of offices to accommodate the large number of its employees who live in the area, and where the cost of commercial real estate is generally lower compared to the historically high costs in downtown San Francisco. *Id.* Through this project, the Utility sought to find a new headquarters that would permit improvements to its employees' workspace, increase collaboration and productivity, improve team adjacencies, and allow the Utility to consolidate the SFGO and certain other East Bay area offices into a new headquarters. *Id.*

By mid-2019, however, the Utility had been unable to locate a satisfactory property in the East Bay area that could meet the Utility's various business needs. *See id.* ¶ 7. The Utility therefore considered several alternatives to an East Bay relocation, and in late 2019, the Utility began preparations for a partial sale of its 77 Beale Street building and a redevelopment and consolidation into its 245 Market Street building within the SFGO (the **"Sale and Redevelopment Option"**), which at the time represented the most cost-effective option for the Utility. *Id.* ¶ 8. However, this alternative still presented several significant shortcomings. *Id.* First, the building was too small (600,000 sq. ft.) to meet

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

the programmatic objectives for re-housing all the SFGO employees. *Id.* Further, the irregular shape of the building exacerbated the occupancy deficit. *Id.* Also, as a historic building, it had unique maintenance costs and was approaching the need for significant systems upgrades (which were last done following the 1990 earthquake), and the consolidation would require "swing space" that would be highly disruptive and costly, as well as new interior improvements to maximize occupancy. *Id.* Lastly, the employees that could not be housed in 245 Market due to size limitations would need to be housed elsewhere. *Id.*

Conversely, the Utility also considered selling 245 Market and consolidating into 77 Beale, but that approach was even more disadvantageous because: (i) the 77 Beale property (1.1m square feet) was too large for the Utility's footprint; (ii) 77 Beale required significant capital improvements to its structure and systems for long-term occupancy, the construction of which would be highly disruptive to the company's operations and would require the company moving into "swing space" for the duration of the work; and (iii) post-structural work, all new interior improvements would be required, making this alternative not cost-effective nor meeting programmatic objectives. *Id.* ¶ 9. Thus, although the Sale and Redevelopment Option appeared to be a potentially cost-effective option for the Utility at that time, it did not fully address the goal of consolidating the SFGO employees or additional locations into one central location, and in fact created the need to lease even more office space in the East Bay. *Id.*

In late November 2019, a 7.16 acre city block (the "**Oakland Property**"), on which the Lakeside Building is situated, came on the market for sale. *Id.* ¶ 10. Built in 1960, with an infrastructure renovation in 2004 and an exterior renovation in 2014, the Lakeside Building is a 28-story building with approximately 910,000 rentable square feet. *Id.*; Welch Decl. ¶ 21. TMG approached the Utility to present the Lakeside Building as a potential East Bay solution. Agid Decl. ¶ 10. The Utility quickly investigated and determined that the Lakeside Building would provide the Utility with significantly greater economic benefits and lower execution risk than the Sale and Redevelopment Option. *Id.* The Utility further determined that the Lakeside Building would be able to offer sufficient capacity to house approximately 4,500 PG&E employees following scheduled renovations, thereby permitting the consolidation of a number of the Utility's offices in the East Bay area with its San Francisco workforce in an integrated, flexible workplace more appropriate to the culture of the reimagined PG&E. *Id.* In

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

short, the Utility and TMG determined that the Lakeside Building would be an ideal replacement for the SFGO complex.

The Utility's senior leadership approved the business case for pursuing a transaction, and following the approval of the Utility's board of directors (the "**Board**") in January 2020, the Utility entered into a non-binding letter of intent with TMG to explore a transaction at the Lakeside Building (the "**Letter of Intent**"). *Id.* ¶ 11. The Letter of Intent contemplated a potential transaction whereby TMG would acquire the Oakland Property and enter into a long-term lease with the Utility for the Lakeside Building with an option for the Utility to acquire the Lakeside Building in 2023. *Id.* As part of the contemplated transaction, TMG would redevelop the Lakeside Building to the Utility's specifications, and the Utility would start to occupy the Lakeside Building in phases, beginning in 2022. *Id.*

The Utility intends to use the Lakeside Building as its new company headquarters, where it can consolidate approximately 4,500 employees currently located in the SFGO and at least two satellite offices in the East Bay area together to improve its workplace adjacencies and opportunities for collaboration. *Id.* ¶ 26. The renovation of the Lakeside Building is scheduled to begin in 2022. *Id.* As space becomes available following the expiration of existing tenants' leases and the completion of renovations, the Utility will commence occupation of the Lakeside Building in phases. *Id.* It is currently anticipated 3,200 employees will be relocated to the Lakeside Building by early 2023, approximately 600 employees in 2025, with the balance of the space to be made available for an additional 600 employees beginning in 2026. *Id.*

### B. The Agreements[3]

On February 14, 2020, TMG was selected as the buyer of the Oakland Property, and on February 28, 2020, TMG BAI, entered into a purchase and sale agreement (the "**PSA**") with the owner of the Oakland Property. *Id.* ¶ 14. Following TMG BAI's entry into the PSA, the Utility and TMG entered negotiations to document the transaction contemplated in the Letter of Intent. *Id.* ¶ 15.

---

[3] The summaries of the terms of the Agreement, the Lease and Purchase Option Agreement, and related documentation (collectively, the "**Oakland Transaction Documents**") in this Motion are qualified in their entirety by reference to the provisions of the Oakland Transaction Documents. To the extent that any discrepancies exist between the summaries described in this Motion and the terms of the Oakland Transaction Documents, the Oakland Transaction Documents shall govern.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

On June 5, 2020, the Utility and TMG BAI entered into the Agreement. *Id.* Pursuant to the Agreement, the Utility agreed to enter into the Lease and Purchase Option Agreement contingent upon the satisfaction of the following conditions: (i) the closing under the PSA (which TMG BAI must pursue subject to certain conditions); (ii) entry of an order by the Bankruptcy Court authorizing the Utility's entry into the Agreements; and (iii) the issuance to the Utility of a title insurance policy and the Utility's approval of any material changes to the Lakeside Building. *Id.* No provision of the Agreement is binding on the Utility prior to Bankruptcy Court approval, except that the Utility is obligated to pursue Bankruptcy Court approval in good faith. *Id.* ¶ 18.

Upon Bankruptcy Court approval, the Utility will be bound to execute the Lease and Purchase Option Agreement (subject to the occurrence of the conditions precedent discussed above). *Id.* ¶ 19. Under the Lease and Purchase Option Agreement, Landlord shall grant the Utility (i) the right to use and occupy the Lakeside Building after the redevelopment, subject to the rights of the existing tenants and existing leases, and (ii) the option to purchase and acquire title to the Lakeside Building, including the improvements thereon (the "**Purchase Option**") for a set purchase price (the "**Purchase Price**").[4] *Id.*

Pursuant to the Lease and Purchase Option Agreement, the Utility will occupy portions of the Lakeside Building as the redevelopment is completed and floors become available for the Utility to occupy. *Id.* ¶ 20. The Utility negotiated a favorable lease rate at $57/sq. ft., which is below market rates even accounting for COVID-19 conditions. *Id.* Additionally, the Utility negotiated for TMG to provide the entire cost of the renovations to the Lakeside Building, including the seismic and other custom tenant improvements that the Utility may elect to implement, without any upfront cost by the Utility. *Id.* These allowances are atypical in the market and highly favorable for the Utility's cash flow management, as it avoids the need for immediate cash investment. *Id.*

Instead, the estimated building improvement costs are built into the Purchase Option, which the Utility may exercise during the Option Period (defined below). *Id.* ¶ 21. Specifically, the Purchase Price is an all-in cost of up to $892 million, which includes: an acquisition cost of $420 million

---

[4] Pursuant to the terms of the Lease and Purchase Option Agreement, Landlord is required to create a legal parcel that contains the Lakeside Building that can be sold to the Utility in compliance with the California Subdivision Map Act. Agid Decl. ¶ 19 n.4.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(constituting an allocation of a portion of TMG's purchase price on the full project to the Lakeside Building); required code improvements and base building improvement costs of $141 million; allowances of $160 million (i.e., $230 per rentable square foot) for the Utility's specific tenant improvements for information technology, security, floor arrangements, and seismic work; and development fees, carry costs, and transaction fees and costs of $171 million. *Id.* By agreeing in advance to a fixed purchase price that includes the estimated costs of improvements, the Utility takes on zero risk of cost over-run on the scope of landlord work, which is instead borne entirely by the developer. *Id.* Further, the Utility and Landlord will share fifty-percent (50%) of the savings on base building costs. *Id.* Moreover, if the Utility spends less than the $160 million in tenant improvements, the $892 million Purchase Price will be reduced on a dollar-for-dollar basis. *Id.* This structure permits the Utility to purchase a "build-to-suit" building without any responsibility for capital expenditures necessary to complete the building upgrades prior to exercising the Purchase Option. *Id.*

Upon executing the Lease and Option Agreement, the Utility will be required to issue two $75 million letters of credit in favor of Landlord (the "**Option Payment LC**," and the "**Security Deposit LC**," and together, the "**Letters of Credit**"). *Id.* ¶ 22. Landlord will not be permitted to draw down on either of the Letters of Credit unless the Utility defaults on its obligations as tenant or chooses not to exercise the Purchase Option. *Id.* If the Utility chooses not to exercise the Purchase Option but has an investment grade rating at that time, the Option Payment LC will be reduced to $50 million, which Landlord will be entitled to draw and retain, and the Security Deposit LC will be returned. *Id.* If the Utility is not investment grade at that time, Landlord may draw on the Letters of Credit in full. *Id.* In the event the option is not exercised as a result of: (a) the Subdivision not occurring by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision); (b) a major casualty or condemnation; or (c) Landlord breaches a material covenant that impacts the value of the property, Landlord will not be able to draw on either Letter of Credit, the full Option Payment LC will be returned to the Utility and the Security Deposit LC will be returned if the Utility is investment grade at that time or retained as a security deposit (subject to reductions over time) if the Utility is not investment grade at that time. *Id.* In addition, if the Utility chooses not to exercise the option, the cost of seismic improvements over $8 million will be

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

amortized into the ongoing rent (as set out in further detail below). *Id.* If, in any event, the Utility elects to exercise the Purchase Option, both letters of credit will be released back to the Utility, and the Utility will enter into a Purchase Agreement (the "**Purchase Agreement**") in the form contained in Exhibit I to the Lease and Purchase Option Agreement.[5] *Id.*

The key provisions of the Lease and Purchase Option Agreement are set forth below:

| Lease and Purchase Option Agreement Summary Chart | |
| --- | --- |
| Premises | Approximately 910,146 rentable square feet (the "**Premises**"), which will be delivered to the Utility in two phases ("**Phase A**" and "**Phase B**", respectively, and each a "**Phase**"). Each of Phase A and Phase B consist of separately demised spaces (each, a "**Sub-Phase**"). The Utility will occupy each Sub-Phase as it becomes available all in general accordance with a schedule set forth in the Lease and Purchase Option Agreement. |
| | Landlord is responsible for performing structural base building and landlord work to the Lakeside Building (subject to a limit of $38 million for seismic work) and other work to ready the Premises for the tenant improvements at its cost and expenses. The tenant improvements for the Premises will be constructed by Landlord but will be at Tenant's cost and expense, subject to the Tenant Improvement Allowance described below. |
| Rent | The base rent is $57 per year per rentable square foot, as increased by; (i) amortized additional tenant improvement allowance as described below; (ii) amortized seismic costs above $8 million but only after the Option Period has expired, and (iii) annually by 3% increases. Rent for each Sub-Phase commences upon the delivery of each Sub-Phase. |
| | The Utility shall also pay (i) its pro rata share of increases in operating expenses over the base year (2022), (ii) its pro rata share of increases in real property taxes over the base year; (iii) costs to maintain the Premises; and (iv) costs to maintain base building systems exclusively serving the Premises. |
| Term | The term of the Lease and Purchase Option Agreement (the "**Term**") begins upon the date of delivery of the first Sub-Phase which is expected to occur in early 2022 and runs for 34 years and 11 months. |
| Tenant Improvements | Landlord is responsible for performing all structural work and other work necessary to ready the Lakeside Building for the certain agreed-upon customized improvements (the "**Tenant Improvements**") at the Utility's expense. |
| | Landlord shall deliver each portion of the Phase A Premises and Phase B Premises with the Tenant Improvements substantially completed pursuant to final plans and specifications consistent with the Utility's balanced workplace standard (which will include current COVID considerations) and mutually approved by Landlord and the Utility. |

---

[5] Although circumstances may change, and the Utility will make the determination at the appropriate time, the Utility anticipates that it will exercise the Purchase Option. Agid Decl. ¶ 22.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| Tenant Improvement Allowance | Landlord will contribute a tenant improvement allowance equal to $90 per rentable square foot, which may be increased to an amount up to $230 per rentable square foot at the Utility's election. In the event the Utility elects to increase the tenant improvement allowance, base rent will be increased by an amortization of such additional amount (over twenty years at 7%). |
| Assignment and Subletting | The Utility can transfer its obligations under the Lease and Purchase Option Agreement to affiliates without Landlord's consent, and can sublease the Premises to third parties subject to the Landlord's consent, which shall not be unreasonably withheld, and any necessary regulatory approval. |
| Subdivision Requirement | The Lease and Purchase Option Agreement requires Landlord to pursue the approvals required to create a subdivision of the Project to create a legal parcel that contains the Lakeside Building (the "**Property**") that can be sold to the Utility in compliance with the California Subdivision Map Act, including any lot line adjustment, subdivision or parcel map (the "**Subdivision**"). In connection with the Subdivision, the Lease and Purchase Option Agreement: <br><br> a) requires Landlord to provide the Utility with regular updates on progress and drafts of all submittals and provide the Utility with prior notice of completion of the Subdivision; <br><br> b) provides the Utility approval rights over any actions or documentation that would be required to implement and complete the Subdivision that will (i) bind the Utility or the Property after Closing (defined below), or (ii) adversely impact costs or obligations for which the Utility is responsible under the Lease and Purchase Option Agreement or the Purchase Agreement (defined below); and <br><br> c) provides the Utility a right to take over the Subdivision process at Landlord's expense in the event Landlord has not completed the Subdivision by March 31, 2023. |
| Purchase Option | The Lease and Purchase Option Agreement shall grant to Tenant an option to purchase the Property (the "**Purchase Option**"). |
| Option Payment Letter of Credit | In consideration for the Purchase Option, on execution of the Lease and Purchase Option Agreement, the Utility will provide Landlord with a $75 million letter of credit. <br><br> After the Option Period, Landlord can draw on and retain the full amount of the letter of credit if the Utility does not exercise the Purchase Option, does not close on the purchase of the Property after exercising Purchase Option, or if there is a termination of the Lease and Purchase Option Agreement following a default by the Utility, unless: <br><br> a) the Subdivision does not occur by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision); <br><br> b) A major casualty or condemnation occurs; or <br><br> c) Landlord breaches a material covenant that impacts the value of the Property to the Utility. |

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| | If at the time that Landlord's right to draw on the Option Payment Letter of Credit is triggered the Utility is Investment Grade, then Landlord shall be entitled to draw only $50,000,000 on the Option Payment Letter of Credit. |
| Option Period & Option Exercise | The Purchase Option may be exercised between: twenty-four months after the execution of the Lease; and nine months thereafter, each of which shall be subject to extension for completion of the Subdivision process, extension for satisfaction of certain conditions, and acceleration in the event of certain casualty or condemnation.<br><br>Should the Utility not exercise the Purchase Option during the Option Period, the Purchase Option automatically terminates. If the Purchase Option terminates, the Lease and Purchase Option Agreement will remain in full force and effect. |
| Purchase Price | The purchase price for the Property if the Utility exercises the Purchase Option is $892 million (the "**Purchase Price**"), subject to the following adjustments:<br><br>a) decreased for any Phase A tenant improvement costs below $230 per rentable square foot of Phase A paid for by Landlord;<br><br>b) decreased for the difference between actual seismic costs and $38 million;<br><br>c) decreased by 50% of any cost savings in base building and landlord work completed by Landlord and 100% of the budgeted amount for any base building work that has not yet been completed at Closing;<br><br>d) increased or decreased for standard credits, debits, adjustments for prorations, and any outstanding amounts owed by or to the Utility under the Lease and Purchase Option Agreement; and<br><br>e) credits related to any prior casualties or condemnation of the Property prior to the Closing |
| Security Deposit Letter of Credit | Upon execution of the Lease, the Utility shall provide Landlord with a $75,000,000 letter of credit as protection for the full and faithful performance by the Utility of all of its obligations under the Lease.<br><br>If the Purchase Option Period expires and the Utility does not exercise the Purchase Option, the Security Deposit Letter of Credit shall be returned within ninety (90) days so long as (i) the Utility is Investment Grade, (ii) there is no Event of Default that has not been cured, and (iii) Landlord does not otherwise have a right to draw on the Security Deposit Letter of Credit, and then and, thereafter, there shall be no requirement for a Security Deposit (or Security Deposit Letter of Credit) under the Lease.<br><br>If the Utility is not Investment Grade and the Utility does not exercise the Purchase Option, Closing does not occur, or a default on the Utility's obligations with respect to the Purchase Option occurs, Landlord shall be permitted to draw upon the Security Deposit Letter of Credit, unless:<br><br>a) the Subdivision does not occur by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision); |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Lease and Purchase Option Agreement Summary Chart |
|---|

| | |
|---|---|
| | b) A major casualty or condemnation occurs; or<br><br>c) Landlord breaches a material covenant that impacts the value of the Property to the Utility,<br><br>in which case Landlord shall continue to hold the Security Deposit Letter of Credit for the balance of the Lease Term; provided that the Security Deposit Letter of Credit Amount may be reduced from time to time upon the satisfaction of certain conditions. |
| Conditions to Closing | The Utility's consummation of the purchase of the Property is subject to, among other things, the satisfaction or waiver of customary closing conditions, and delivery of customary documents, lack of material adverse changes in the Property, and Landlord not being in breach of any of its covenants contained in the Purchase Agreement or in the Lease and Purchase Option Agreement, such as not committing any of the following without approval of the Utility:<br><br>a) entering into, or amending or modifying, any material agreements, including any leases that will be binding on the Property or the Utility following closing;<br><br>b) intentionally subjecting the Property to any lien or other encumbrance; and<br><br>c) instituting or affirmatively consenting to any governmental legal action relating to the Lakeside Building. |
| Failure to Close | If the Utility exercises the Purchase Option but Closing fails to occur as a result of a failure of a condition to Closing where there has not been a breach by either party, the Purchase Option shall be reinstated and the Option Period shall be extended until that condition is satisfied or waived.<br><br>If Landlord breaches its covenants, the Utility shall have the option of: (i) extending the Option Period to allow Landlord to cure the breach, or commencing and filing an action for specific performance in the appropriate court; or (ii) after an opportunity to cure, bringing an action against Landlord and pursuing all available damages, including consequential damages arising out of or in connection with such breach.<br><br>In the event of a casualty or condemnation prior to the Closing: (i) if a casualty will take longer than eighteen months to restore; Landlord can terminate the Lease and Purchase Option Agreement in which case the Utility can either exercise the Purchase Option and receive a credit in the amount of the insurance proceeds arising from the casualty or condemnation or terminate and receive a return of the Letter of Credit; (ii) if a casualty will take longer than eighteen months to restore or there is insufficient insurance proceeds and Landlord does not elect to terminate or if there is a significant condemnation, the Utility can either exercise the Purchase Option and receive a credit in the amount of the insurance or condemnation proceeds or terminate and receive a return of the Letter of Credit; (iii) in all other cases the Lease and Purchase Option Agreement and Purchase Option remain in place according to their terms; Landlord will restore and any remaining insurance/condemnation proceeds will be credit at Closing. |
| Post-Closing Liabilities | After Closing, Landlord shall indemnify the Utility for any breach of the covenants contained in the Lease and Purchase Option Agreement or the Purchase Agreement relating to the condition of the Property, subject to |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Lease and Purchase Option Agreement Summary Chart |
|---|
| | a twelve (12) month survival period, a minimum threshold amount of $500,000 and a maximum liability of 1.5% of the Purchase Price. |

*See* Agid Decl. ¶ 23.

## IV.  RELIEF REQUESTED

Pursuant to Sections 363(b)(1) and 105(a) of the Bankruptcy Code, the Utility seeks an order (i) authorizing the Utility to enter into the Agreements, and (ii) granting related relief.

## V.  THIS COURT SHOULD APPROVE ENTRY INTO THE AGREEMENTS AS A SOUND EXERCISE OF THE UTILITY'S BUSINESS JUDGMENT

The Utility has decided, based on its reasonable business judgment, to pursue the present transaction because it provides a significant and unique opportunity to right-size its operations into a more flexible, less expensive, sustainable workplace and consolidate its corporate functions to further the execution of its long-term goals: public and workforce safety, reliability, affordability, and customer welfare.  As outlined above, the Utility has been considering options to monetize the SFGO complex for many years both to reduce costs for customers and to improve its headquarters workspace to bring disparate teams of employees together and has further analyzed various alternative transactions during this time.  That analysis has been revisited and scrutinized, and the Debtors have determined that entry into the Lease and Purchase Option Agreement provides substantially greater economic benefits to the Utility and its customers than any other viable option.  *See* Agid Decl. ¶¶ 35–41.

These economic benefits, coupled together with conservative estimates of the projected net gain on sale of the SFGO, will allow the Utility to reduce costs and return significant savings to customers.  *See id.* ¶¶ 28–30, 35–37.  Moreover, having considered the impact of the COVID-19 pandemic on the costs and benefits of the Oakland transaction, including the costs of remaining in the SFGO complex, the substantial financial benefits of monetizing it, the unique suitability of the Lakeside Building, and the Utility's long time horizon, the Utility does not believe that it should abandon this opportunity because of the current circumstances.  *Id.* ¶¶ 39–40.  Were it to do so, it is highly unlikely that the Utility would find a suitable replacement for the Lakeside Building in the foreseeable future.  *Id.* ¶ 40.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Accordingly, the Court should approve the Utility's entry into the Agreements.

**A.  The Business Judgment Standard Applies**

Pursuant to section 363(b)(1), the debtor in possession may use, sell, or lease, other than in the ordinary course of business, property of the estate. *See* 11 U.S.C. § 363(b)(1).  Courts within the Ninth Circuit and nationally have authorized debtors to use estate property to enter into real estate leases pursuant to section 363(b). *See In re Metabolife International, Inc.*, No. 05-6040-H11 (Bankr. S.D. Cal. Oct. 12, 2005) [Docket No. 364] (authorizing entry into a new office and warehouse lease); *In re Pacific 9 Transportation, Inc.*, No. 2:16-bk-15447-WB (Bankr. C.D. Cal. Sept. 25, 2017) [Docket No. 478] (authorizing entry into agreements to lease office premises and license parking space); *In re Quanta Technologies, L.L.C.*, No. 4:13-bk-05391-BMW (Bankr. D. Ariz. May 23, 2014) [Docket No. 138] (authorizing entry into a lease of commercial real property); *In re WineCare Storage LLC*, No. 13-10268 (Bankr. S.D.N.Y. June 24, 2013) [Docket No. 115] (authorizing entry into a warehouse lease); *In re Coach Am Group Holdings Corp.,* No. 12-10010 (KG) (Bankr. D. Del. Aug. 22, 2012) [Docket No. 1016] (authorizing entry into a lease of premises previously rented prepetition on more favorable terms); *In re Academy Floral Corp.*, No. 13-13414 (SHL) (Bankr. S.D.N.Y. Feb. 24, 2014) [Docket No. 28] (authorizing entry into replacement lease for business premises).  The use, sale or lease of estate property outside the ordinary course of business is permissible where there is a good business reason for doing so. *In re Ernst Home Ctr., Inc.*, 209 B.R. 974, 979 (Bankr. W.D. Wash. 1997) (debtor's decision to enter into a transaction outside of the ordinary course under section 363(b)(1) must be based on "its reasonable business judgment"), *appeal dismissed sub nom. BC Brickyard Assocs., Ltd. v. Ernst Home Ctr., Inc. (In re Ernst Home Ctr., Inc.)*, 221 B.R. 243 (B.A.P. 9th Cir. 1998).

Once the debtor has articulated a valid business purpose, courts consider whether relief is justified under the business judgment rule.  The business judgment rule requires a debtor to establish a valid business justification and good faith. *In re Alaska Fishing Adventure, LLC*, 594 B.R. 883, 887 (Bankr. D. Alaska 2018); *see also Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.*), 242 B.R. 147, 153 (D. Del. 1999).  "The business judgment rule 'is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company.'"

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *see also FDIC. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (compliance with the business judgment rule assumes "directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). It is clear that Courts should not "substitute their own business judgment for that of the Debtors'." *In re Metaldyne Corp.*, 409 B.R. 661, 667 (Bankr. S.D.N.Y. 2009). Instead, a debtor, as trustee "has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to 'great judicial deference' as long as a sound business reason is given." *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) (rejecting a challenge to a trustee's sale of assets on grounds of insufficient investigation of an alternative transaction). "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence," and "[parties] opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *In re Integrated Res., Inc.*, 147 B.R. at 656. Courts construing California law have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enters., LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

Additionally, the Court has authority under section 105(a) of the Bankruptcy Code to grant this Motion. Section 105(a) of the Bankruptcy Code authorizes the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Code]." 11 U.S.C. § 105(a); *Solidus Networks, Inc. v. Excel Innovations, Inc. (In re Excel Innovations, Inc.)*, 502 F.3d 1086, 1093 (9th Cir. 2007); *Saxman v. Dep't of Educ. (In re Saxman)*, 325 F.3d 1168, 1174 (9th Cir. 2003); *Havelock v. Taxel (In re Pace)*, 67 F.3d 187, 193 (9th Cir. 1995); *see also In re Robles*, No. 14-51812-ASW, 2014 WL 3715092, at *1 (Bankr. N.D. Cal. July 24, 2014).

**B.     Entry into the Agreements Represents a Sound Exercise of the Utility's Business Judgment**

*1.     The Agreements Provide Substantial Financial Benefits to the Utility and Ratepayers*

The Utility has weighed the benefits and risks of entering into the Agreements and, on an overall basis, the Utility expects to realize substantial economic benefits from the transaction as compared to remaining as owner of, and continuing to occupy, the SFGO complex (the "**Status Quo Scenario**").  Specifically, the Utility expects to incur substantially lower capital and operating expenses to develop and maintain the Lakeside Building compared to projected costs of maintaining the SFGO complex, as well as various other leased properties that will otherwise be consolidated.  Agid Decl. ¶¶ 28–30.  Moreover, leasing, with an option to ultimately acquire, the Lakeside Building will give the Utility time to market and sell the SFGO—prime San Francisco real estate that no longer suits the size, scope, and nature of the Utility's operations.  In sum, a long-term cost-benefit analysis indicates that this proposed transaction will result in substantial savings to customers on a present value basis compared to the Status Quo Scenario, including an expected savings to customers from the gain on sale of the SFGO, which is expected to be substantial.  *Id.* ¶ 30.

*a.     The Lakeside Building Will Require Lower Ongoing Capital and Operating Expenditure than the SFGO Complex*

If the Utility continues to stay in the SFGO complex, it will require substantial capital expenditure in excess of $400 million in the near-to-medium term to ensure a safe and functional headquarters for the Utility in a manner that complies with current local regulations that are imposed in connection with any significant upgrades.  *Id.* ¶ 29.  This expenditure would include extensive repairs to the building facades and seismic hardening, as well as general building investment and maintenance.  *Id.* In addition, much of the anticipated capital expenditure would require partial vacation of the SFGO complex while work is carried out.  *Id.*  Taking into account the age and physical size of the multi-building SFGO complex, as well as the projected relocation expenses and disruption to the Utility's

business and workforce, the necessary capital expenditure needed to renovate the SFGO complex is estimated to cost substantially more over a 40-year period than the estimated capital expenditure for the Lakeside Building following its redevelopment. *Id.*

In contrast, the Utility will not incur any additional renovation costs by entering into the Agreements because the upgrades to the Lakeside Building are included as part of the "build-to-suit" developer arrangement reflected in the Agreements. *Id.* ¶ 28. Moreover, these upgrades are projected to result in lower costs to maintain on a long-term basis than the entirety of the SFGO complex. *Id.* And, as noted above, the Lakeside Building's ability to accommodate a larger headcount will permit the Utility to consolidate certain additional East Bay office locations, thereby avoiding the lease and operating expenditure costs and periodic capital upgrades associated with those premises as well. *Id.* Collectively, the Utility anticipates that these aspects of the Lakeside Building transaction alone will allow it to realize substantial cost savings compared to the Status Quo Scenario. *Id.* ¶ 30.

### b. The Utility Anticipates Monetizing the SFGO Complex for a Substantial Amount

In the second stage of its real estate strategy, the Utility intends to market and complete the sale of the SFGO complex in the near-term, for which it will seek approval from the California Public Utilities Commission (the "**CPUC**"). *Id.* ¶ 12; Kenney Decl. ¶¶ 5–7. Accordingly, while negotiating the terms of the Agreements, the Utility also conducted substantial due diligence on a potential sale of the SFGO to ascertain the projected costs and benefits of the real estate strategy as a whole. In January 2020, Cushman & Wakefield, the Utility's contracted real estate consultants, provided the Utility with a broker opinion of value (the "**Broker Opinion**"). Agid Decl. ¶ 12. Given the historically favorable values in the downtown San Francisco area, which are in large part driven by the explosive growth of the technology sector, the Utility expected to receive historically favorable value from the sale of the SFGO. *Id.* The Utility also requested Jones Lang LaSalle ("**JLL**") to provide an appraisal of the SFGO complex for further assurance (the "**Appraisal**"). *Id.* Both the broker opinion of value and formal appraisal supported the Utility's assumptions regarding the value of the SFGO complex. *Id.*

In addition, and given that the JLL appraisal was prepared prior to the recent market volatility and uncertainty due to the COVID-19 pandemic, the Utility asked JLL to prepare a sensitivity analysis of their appraisal in light of current market conditions and projections. *Id.* ¶ 13. In their

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

appraisal sensitivity analysis dated May 4, 2020 (the "**Appraisal Sensitivity Analysis**," and, together with the Appraisal, the "**Appraisals**"), JLL advised that even with the uncertainties presented by the COVID-19 pandemic, the Utility could still expect to obtain an amount near the range of prior estimates from the sale of the SFGO under certain recovery scenarios. *Id.*

Although entering into the Lease and Purchase Option Agreement prior to the sale of the SFGO complex exposes the Utility to some real estate market risk, the Utility believes that risk is substantially outweighed by the risks the Utility would face if it sold the SFGO complex prior to securing a replacement premises. *Id.* ¶ 40. Particularly, the Utility believes that the risks of (i) serious operational risks for the Utility if it was not able to locate suitable premises after a sale and any leaseback of the SFGO complex, or if there is a mismatch between the SFGO complex leaseback terms and the availability of new premises, (ii) not being able to locate suitable premises for the Utility at an appropriate price with the unique benefits of the Lakeside Building (set out in further detail below), and (iii) the Utility being in a weaker commercial position with a seller or lessor of a replacement headquarters premises once it has committed to sell and vacate the SFGO complex, outweigh the real estate market risk of entering into the Lease and Purchase Option Agreement. *Id.*

### c. *The Real Estate Strategy is Likely to Produce a Substantial Net Financial Benefit*

Even if the Utility ultimately sells the SFGO at the low-end of JLL's sensitivity range, the projected sale proceeds, coupled with the cost savings benefits described above, will produce a substantial net benefit to customers based on a long-term cost-benefit analysis, assuming the Utility exercises its Purchase Option. *Id.* ¶ 30. If it does not exercise the Purchase Option, and instead enters into a long-term lease, the Utility will still realize a significant overall financial benefit. *Id.* Although the Utility anticipates that it will exercise the Purchase Option, the structure of the Lease and Purchase Option Agreement gives the Utility valuable flexibility to pursue whichever option it deems most beneficial over the course of the Option Period, both of which are preferable to maintaining the status quo.

Additionally, the Lease and Purchase Option Agreement is structured to provide significant cash flow benefits and risk mitigation in both the phase-in and purchase option structure. Financing the acquisition of the Lakeside Building through the Lease and Purchase Option Agreement

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

requires no upfront cash outlay for renovations or improvements during the pendency of these chapter 11 cases and post-emergence. *Id.* ¶ 20. All the work and cost of building upgrades and renovating it to meet the specific needs of the Utility's business will be borne by the Landlord. *Id.* This work will be carried out by an experienced partner, TMG, a developer with over 30 years of extensive and specialized experience renovating and managing properties in the San Francisco Bay Area. *Id.* ¶ 6. Furthermore, because the Utility is not required to exercise the Purchase Option, the Lease and Purchase Option Agreement affords the Utility the flexibility to make decisions regarding the property in accordance with its operational needs and financial circumstances at the end of the Purchase Option Period, rather than forcing the Utility to develop strategies contingent on an obligation to purchase a property now.

### 2. The Lakeside Building is Particularly Suitable for the Utility's Unique Business Needs.

In addition to the tangible financial benefits discussed above, the Lease and Purchase Option Agreement provides the Utility with the ability to occupy and option to purchase a property that meets the Utility's unique needs. In addition to the need to accommodate thousands of employees, the Utility has numerous specialized requirements for its headquarters to meet its information technology, seismic resilience, communications, and security needs, which would require extensive modifications to any existing office building. *Id.* ¶ 27. The Lakeside Building provides the Utility with sufficient floor space to accommodate approximately 4,500 employees, and the scheduled redevelopment by Landlord provides the perfect opportunity to implement the Utility's required modifications, that will include health and safety considerations, such as worker densities, due to COVID-19. *Id.* Additionally, through the Tenant Improvements, the Utility will have an active role in designing the telecommunications and heightened security infrastructure necessary for its complex operations. *Id.* ¶ 33.

The Utility is making significant changes, including to its safety culture, and this move, which will bring disparate offices together, will further its efforts to achieve these commitments and promote the Utility's work environment, retention, recruitment, and sustainability goals. *Id.* ¶ 31. The Lakeside Building's optimally sized floor plates and overall large square footage makes it an ideal locale for implementing the state-of-the art workspace design and planning around "The Way We Work," which has been validated in a number of the Utility's other offices, and which will be updated to address any safety and health considerations from COVID-19. *Id.* The layout will permit full team adjacencies

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

in its floorplan, and is expected to provide a substantially more productive workspace for the Utility's employees. *Id.*

Moreover, the Lakeside Building is two blocks away from a BART stop, fulfilling the Utility's key requirement that its new headquarters be accessible by mass transit. *Id.* The Utility expects that the Lakeside Building will be quicker, easier, and cheaper to access for the majority of the Utility's existing employees, some of whom have significant commutes to the SFGO complex in the downtown San Francisco area. *Id.* Additionally, the proximity of gyms and daycare centers will provide employees with larger range of choice in healthcare and child services, thereby offering employees an easier means to achieve work-life balance. *Id.* ¶ 33. The Utility expects that this combination of improved workspace design and easier accessibility of the Lakeside Building will provide numerous intangible benefits to the Utility through increased employee productivity, morale and retention, increasing the attractiveness of the Utility as an employer, and will be a reflection of a reimagined PG&E as the Utility emerges from chapter 11. *Id.* ¶¶ 4, 10, 31–33.

The Utility has been considering available properties in the East Bay area for some time. *Id.* ¶ 34. Most properties in the Oakland market are either (i) too small to accommodate the Utility's employees relocating from SFGO in a single building (there is an extremely limited supply of space in excess of 20,000 square feet); or (ii) much larger, new build properties which are (or would be in the case of new developments) more expensive than the Lakeside Building. *Id.* The Utility expects that a new development which would meet its size requirement would be substantially more expensive than the proposed acquisition of the Lakeside Building. *Id.* The difficulties of finding an appropriate space in the East Bay area are compounded when the Utility's preference for its headquarters to be accessible by mass transit are considered. *Id.* A small number of new developments in the Oakland market have been announced for future occupancy, however, the cost of new builds is significantly more expensive than renovated space on a per square foot basis, and new developments may present additional risk related to construction costs and delivery timing. *Id.*

## C. The Terms of the Agreements Are Reasonable and Do Not Expose the Utility to Unnecessary Risk

The Agreements are the product of substantial arm's-length negotiations, wherein both the Utility and Landlord made concessions. *Id.* ¶ 24. The Utility engaged in a robust evaluation process,

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

employing experienced third-party professionals. *Id.* These professionals assisted and advised the Utility in negotiating or evaluating the transaction, providing current information on market trends, the building purchase price, base building improvements, tenant improvements, closing and financing costs, and seismic upgrades. *Id.* Among these professionals, the Utility engaged third party engineers to perform a seismic review of the Oakland Property and to assist with diligence of redevelopment costs. *Id.*

As a result of negotiations, the Utility obtained several concessions to minimize the risk associated with the transaction, including but not limited to:

- relieving the Utility of the need to provide any cash up front to the Landlord to enter the Lease and Purchase Option Agreement, and substantially reducing the risks that the Utility was exposed to;

- provisions which permit the Utility to take over the Subdivision to ensure it is completed in a timely manner, and does not impede the Utility from exercising its Purchase Option;

- agreement that the Utility will receive a fifty-percent (50%) abatement in the base rent in the event there is a delay in the Utility' ability to occupy the Premises, which accordingly will allow the Utility to mitigate the cost of rent should it need to holdover in the SFGO, reducing the risk that delays with the construction process may delay the Utility's occupancy of the Lakeside Building; and

- caps on the total costs for construction incorporated into the Purchase Price, other than tenant improvements undertaken at the Utility's direction, while retaining the ability to receive credits against the Purchase Price if these costs are lower than estimated, mitigating the risk of higher than expected construction costs while retaining the upside of any savings achieved.

*Id.* ¶ 25.

While no transaction of this nature is without risk, the Utility has engaged in extensive arm's length negotiations to mitigate to the greatest extent possible any existing risks. And, in light of the substantial benefits of the proposed transaction – including its positive impact on positioning the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Utility for the decades to come, the Debtors believe entry into the Agreements is a sound exercise of business judgment. *Id.* ¶ 41.

### D. The Cost of the Lease and Purchase Option Agreement is Fair and Reasonable

The Utility has analyzed the cost of the ongoing rent under the Lease and Purchase Option Agreement with reference to the rental market in the Oakland area, and believes that the cost of the rent under the Lease and Purchase Option Agreement is reasonable. *Id.* ¶ 38; Welch Decl. ¶ 26. The proposed purchase price of the property is fair and reasonable based on market considerations, renovations, and the customization to the Utility. Welch Decl. ¶ 31. The price to exercise the Purchase Option is based upon (i) Landlord's price to acquire the Oakland Property, apportioned to the portion of the land on which the Lakeside Building is situated and which will be transferred to the Utility, and (ii) the cost of the redevelopment of the Lakeside Building to the Utility's specifications, as adjusted to reflect the actual costs incurred by Landlord. Agid Decl. ¶ 21; Welch Decl. ¶¶ 33–34. The Utility undertook diligence on the redevelopment costs, including through the engagement of consultant engineers. Agid Decl. ¶ 24. The Utility has evaluated the proposed deal and determined that the pricing is within the range expected for buildings of similar size with comparable amenities and with other large scale, customized construction projection. Agid Decl. ¶ 36; Welch Decl. ¶¶ 31–35. As noted above, the Utility's analysis of the East Bay real estate market over a number of years has indicated that the choice of alternative premises that could accommodate the Utility's size and location needs are limited to proposed new developments and therefore would be substantially more expensive. Agid Decl. ¶¶ 7, 34.

In light of the recent COVID-19 pandemic, the Utility considered whether the costs of the rent and the Purchase Option remained appropriate. *Id.* ¶ 39. Given the unique benefits of the Lakeside Building, the risk of development being borne by the Landlord, that no up-front cash payment is required to secure the Purchase Option, the flexibility in the timeline for the sale of the SFGO complex, the fact that the Utility expects to remain in the Oakland Property for decades, and the substantial cushion in the economics of the transaction, the Utility remains of the view that it is in the best interests of the Utility to proceed with the transaction. Agid Decl. ¶ 39; Welch Decl. ¶¶ 41–44.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**E. The Utility's Decision to Enter into the Agreements is the Product of Substantial Due Diligence During Which the Utility Engaged Numerous Advisors, Considered Viable Alternatives, and Deliberated Various Issues to Reach an Informed Decision That is in the Best Interests of the Company and its Stakeholders**

The Utility and TMG negotiated the deal in good faith and at arm's length. The terms of the Agreements were negotiated by experienced real estate professionals and the Debtors' senior real estate executives over the course of four months, and the process was overseen by the Real Estate Subcommittee. Agid Decl. ¶ 35. The Real Estate Subcommittee consists of three Board members, the Utility CEO, the Utility's real estate representatives, and an AlixPartners consultant. *Id.* The Real Estate Subcommittee considered the transaction in detail at a number of meetings from January through May, prior to the transaction being presented to and approved by the Utility's Board of Directors on June 4, 2020. *Id.* Both the Real Estate Subcommittee and the Board considered and deliberated (i) the economic benefits of the transaction to the Utility and its customers and (ii) the suitability of the Oakland Property and the benefits to the Utility and its employees of a more flexible, functional workplace location that would reduce commuting costs and expenses for most employees. *Id.* They reviewed the material terms of the deal, risks and benefits of entry into the Agreements, key assumptions regarding the economic benefits of the transaction, and impact of the newly passed Proposition E ballot initiative, the Broker Opinion, the Appraisal, and the Appraisal Sensitivity Analysis. *Id.* Finally, the Utility and the Real Estate Subcommittee took into account COVID-19's potential impact on the San Francisco office market. *Id.*

Throughout the process, the Utility was represented and advised by numerous legal, financial, real estate, and other professionals on the merits and terms of the transaction. *Id.* ¶ 36. In addition, to separately consider the reasonableness of the transaction, the Utility also received the opinion of an independent real estate expert, Michael Welch, to evaluate the terms and structure of the proposed transaction based on his experience in the industry; his review of the pertinent documents, as well as materials regarding sales of comparable properties; and the market for commercial property leases in the Oakland CBD; discussions with the Utility's executives; and other independent research and analysis undertaken by Mr. Welch. *Id.*; *see* Welch Decl. ¶¶ 4–14. Mr. Welch expressed to the Real Estate Subcommittee his opinion that the terms of the Lease and Purchase Option Agreement are within the range of reasonableness for the lease and potential acquisition of a commercial property of this type by

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

a company of comparable size and need to the Utility. Agid Decl. ¶ 36; Welch Decl. ¶ 15. Mr. Welch further opined that the Broker Opinion, the Appraisal, and the Appraisal Sensitivity Analysis reasonably reflected the approximate sale price for the SFGO. Agid Decl. ¶ 36; Welch Decl. ¶ 38. Finally, Mr. Welch explained that it is reasonable, based on his experience, to believe that COVID-19 would not have a material negative impact to the Utility's overall real estate strategy. Agid Decl. ¶ 36; Welch Decl. ¶¶ 41–44.

The Debtors have determined that, in their business judgment, the Utility's entry into the Agreements is in the best interests of the Utility's estate, its creditors, shareholders and all other parties in interest. The Lease and Purchase Option Agreement will ultimately enhance the Utility's ability to more efficiently operate its business and permit substantial financial benefits to accrete to the Utility and ratepayers. For the foregoing reasons and pursuant to this Court's authority and discretion under sections 363(b)(1) and 105(a) of the Bankruptcy Code, the Court should authorize the Utility to enter the Agreements.

## VI. REQUEST FOR BANKRUPTCY RULE 6004(h) WAIVER

To permit the Utility to enter into the Agreement, obtain the benefits and protections contained therein, and satisfy a condition for entry into the Lease and Purchase Option Agreement as soon as possible, the Debtors request a waiver of the 14-day stay of an order authorizing the use, sale, or lease of property outside the ordinary course of business under Bankruptcy Rule 6004(h), and that the Court find that ample cause exists to grant a waiver of Bankruptcy Rule 6004(h).

## VII. NOTICE

Notice of this Motion will be provided to (i) the U.S. Trustee (Attn: Andrew Vara, Esq. and Timothy Laffredi, Esq.); (ii) counsel to the Creditors Committee; (iii) counsel to Tort Claimants Committee; (iv) the Securities and Exchange Commission; (v) the Internal Revenue Service; (vi) the Office of the California Attorney General; (vii) the California Public Utilities Commission; (viii) the Nuclear Regulatory Commission; (ix) the Federal Energy Regulatory Commission; (x) the Office of the United States Attorney for the Northern District of California; (xi) counsel for the agent under the Debtors' debtor in possession financing facility; (xii) TMG BAI and Landlord; and (xiii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy

Rule 2002. Based on the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required and the requirements of Bankruptcy Rule 6004(a) have been satisfied.

No previous request for the relief sought herein has been made by the Utility to this or any other court.

WHEREFORE the Utility respectfully requests entry of the Proposed Order granting (i) the relief requested herein as a sound exercise of the Utility's business judgment and in the best interests of the Utility, its estates, creditors, shareholders, and all other parties in interest, and (ii) such other and further relief as the Court may deem just and appropriate.

Dated: June 9, 2020

**WEIL, GOTSHAL & MANGES LLP**

**KELLER BENVENUTTI KIM LLP**

By:     /s/ *Jessica Liou*
          Jessica Liou

*Attorneys for Debtors*
*and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119