WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    - and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                  **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br>(Lead Case) (Jointly Administered)<br><br>**DECLARATION OF TARA AGID IN SUPPORT OF THE MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) FOR AN ORDER AUTHORIZING THE UTILITY TO (I) ENTER INTO LEASE AND PURCHASE OPTION AGREEMENT FOR OAKLAND HEADQUARTERS AND (II) GRANTING RELATED RELIEF**<br><br>Date:   June 30, 2020<br>Time:  10:00 a.m. (Pacific Time)<br>Place:  (Telephonic or Video Conference)<br>        United States Bankruptcy Court<br>        Courtroom 17, 16th Floor<br>        San Francisco, CA 94102<br><br>**Objections Due**:    June 23, 2020,<br>                        4:00 pm (Pacific Time) |

I, Tara Agid, pursuant to section 1746 of title 28 of the United States Code, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information and belief:

1. I am the Senior Director of Corporate Real Estate Strategy and Services at Pacific Gas and Electric Company (the "**Utility**," and together with PG&E Corporation, "**PG&E**" or the "**Debtors**") and have served in my current role since 2017. I am authorized to submit this Declaration (the "**Declaration**") on behalf of the Debtors in support of their HQ Lease and Purchase Option Motion (the "**Motion**").[1] The facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, and information provided to me by the Debtors' other employees or the Debtors' legal, restructuring, or other advisors. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2. I joined the Utility in August 1995, and since then I have managed and overseen various strategic, infrastructure, and technology projects and operational programs for our customer service, generation, and electric and gas operations businesses, including developing a new project governance model that lowered utility project costs by 18%, and serving as a key member of the Board of Directors strategic offsite preparation team by providing macro- and microeconomic industry analysis. In my capacity as Senior Director of Corporate Real Estate, I am responsible for governing, planning, acquiring, designing, constructing, operating and maintaining approximately 8 million square feet of owned and leased facilities over the Utility's 72,000 square mile service territory. These facilities include, but are not limited to, large and small office buildings, industrial service centers, grid control centers, data centers, customer retail centers, call centers, warehouses, vehicle maintenance garages, construction and equipment yards, and meeting and training facilities. In my current role, I have successfully developed and established a comprehensive corporate real estate strategy, commissioned a number of large, critical real estate projects, implemented best-in-class workplace design and mobility standards, and negotiated a multi-million dollar strategic alliance partner contract. Recently, I have been executing bankruptcy related real estate matters, including a significant lease assumption analysis and rejection strategy. I hold a Masters in Business

---

[1] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Administration from the School of Economics and Business Administration at Saint Mary's College of California, as well as a bachelor's degree in Business Administration from California State University-Sacramento and project management professional certification from the Project Management Institute.

3.     I am knowledgeable and familiar with the Agreement to Enter into Lease and Purchase Option (the "**Agreement**"), which contemplates, after the satisfaction of certain conditions precedent, the entry into a form of agreed upon Office Lease with Landlord (the "**Lease and Purchase Option Agreement**," and, together, with the Agreement, the "**Agreements**") proposed between the Utility and BA2 300 Lakeside LLC ("**Landlord**"), an affiliate of leading Bay Area property developer, TMG Partners R.E., LLC ("**TMG**") for that certain property located at 300 Lakeside Drive, Oakland, California (the "**Lakeside Building**").[2]  I was personally involved in the negotiations of the Agreements, and I am also knowledgeable and familiar with the process leading up to the decision made by the Utility's board of directors (the "**Board**") to enter into the Agreements on June 4, 2020.

4.     The Lease and Purchase Option Agreement is the first step in the implementation of a real estate strategy that is part of the Debtors' broader vision for a reimagined company and will provide numerous benefits to the Utility and its customers.  By entering into the Lease and Purchase Option Agreement, the Utility will begin the important long-awaited process of selling its costly and underutilized General Office complex in downtown San Francisco (the "**SFGO**") and relocating its corporate headquarters to the Lakeside Building, where it expects to pay substantially less in operating costs and other expenses than at the SFGO.[3]  After entering into the Agreements and selling the SFGO complex, the Utility expects to realize a substantial financial benefit, which the Utility anticipates returning to its customers.

---

[2] A true and correct copy of the Agreement is attached as Exhibit A hereto. A true and correct copy of the Lease and Purchase Option Agreement is attached as Exhibit A to the Agreement.

[3] The SFGO complex consists of: (i) 77 Beale Street ("**77 Beale**"); (ii) 215 Market Street ("**215 Market**"); (iii) 245 Market Street ("**245 Market**"); and (iv) 45 Beale Street ("**45 Beale**").

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**A.      The Utility's Historical Efforts to Monetize the SFGO Complex**

5.      The Utility has previously evaluated the strategy and potential impact of monetizing the SFGO because it is not ideally structured for the Utility's operations and, as a result, is occupied less efficiently and is also expensive to maintain.  In addition to the earthquake risks that became apparent in 1989 (and which the Utility has been addressing in many of its facilities as needed since then), many of the Utility's General Office employees commute to the SFGO from the East Bay area, where the cost of living is far more affordable than in downtown San Francisco.  Moreover, the costs of maintaining a headquarters in San Francisco have continued to increase due to both the growth of the local real estate market and significant costs the Utility would face to upgrade and maintain the SFGO complex.  In light of these practical realities, the Utility first sought to facilitate a relocation to the East Bay area in the early 2000s, when it sold the air rights to the SFGO.  Unfortunately, a variety of other factors hindered the Utility's efforts at that time.

6.      The Utility revitalized its efforts to monetize the SFGO in early 2018 and engaged a partnership consisting of TMG and a large national real estate company, two of the region's top developers with over 30 years of extensive and specialized experience renovating and managing properties in the San Francisco Bay Area, through a competitive request-for-proposal process to assist in evaluating strategic real estate opportunities for SFGO and east bay properties.  In September 2018, the Utility's CEO and senior leadership approved entering into contracting negotiations with TMG and its large national real estate company partner for a project to explore moving the Utility's headquarters from the SFGO complex to the East Bay area, nearer to where many of the Utility's employees live and where the Utility has leased several separate offices that could be consolidated into a new headquarters.  By engaging in this project, the Utility sought to find a new headquarters that would permit improvements to its employees' workspace, increase collaboration and productivity, improve team adjacencies, and allow the Utility to consolidate the SFGO and certain East Bay office locations into a single headquarters.  However, the project was put on hold in November 2018.

7.      Following the Utility's entry into chapter 11, the Utility recommenced its evaluation of options for SFGO relocation and monetization.  By mid-2019, however, the Utility could

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

not locate a satisfactory property in the East Bay that could meet the Utility's various business needs. The Utility needed a property with access to public transportation and with approximately 900,000 square feet to consolidate employee functions currently housed in San Francisco and certain East Bay locations and which met the Utility's other requirements, including a central location within its service area, the ability to be developed to meet its seismic and safety requirements, and easily accessible by employees. New build premises were more costly, would take longer to execute than a renovation of an existing property, and had a higher degree of uncertainty associated with achieving timely project approvals and cost overrun risks.

8.    Given the challenges in finding an East Bay property, the Utility considered alternatives to an East Bay relocation.  For example, the Utility considered selling the 77 Beale building and consolidating into 245 Market following renovations (the "**Sale and Redevelopment Option**").  However, this alternative presented several significant shortcomings.  First, the building was too small (600,000 sq. ft.) to meet the programmatic objectives for re-housing all the SFGO employees.  Further, the irregular shape of the building exacerbated the occupancy deficit.  Also, as a historic building, it had significant unique maintenance costs and was approaching the need for significant systems upgrades (which were last done following the 1990 earthquake), and the consolidation would also require "swing space" that would be highly disruptive and costly, as well as new interior improvements to maximize occupancy.  Lastly, the employees that could not be housed in 245 Market due to size limitations would need to be housed elsewhere.

9.    Conversely, the Utility also considered selling 245 Market and consolidating into 77 Beale, but that approach was even more disadvantageous because: (i) the 77 Beale property (1.1m square feet) was too large for the Utility's footprint; (ii) 77 Beale required significant capital improvements to its structure and systems for long-term occupancy, the construction of which would be highly disruptive to the company's operations and would require the company moving into "swing space" for the duration of the work; and (iii) post-structural work, all new interior improvements would be required, making this alternative not cost-effective nor meeting programmatic objectives. Thus, although the Sale and Redevelopment Option appeared to be a potentially cost-effective option for the Utility at that time, it did not fully address the goal of consolidating the SFGO employees or

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

additional locations into one central location, and in fact created the need for new space requirements in the East Bay.

10. Then, in late November 2019, a 7.16 acre city block (the "**Oakland Property**"), on which the Lakeside Building is situated, went up for sale. In addition to the approximately 910,000 rentable square feet within the 28-story Lakeside Building, the Oakland Property has a 5-story parking facility and certain other 3-story mixed-use office and retail buildings. TMG approached the Utility to present the Lakeside Building as a potential East Bay solution. The Utility quickly investigated whether the Lakeside Building would be a suitable replacement for the SFGO complex and concluded that the Lakeside Building would provide the Utility with significantly greater economic benefits and lower execution risk than the Sale and Redevelopment Option. The Utility further determined that the Lakeside Building would be able to offer sufficient capacity to house approximately 4,500 PG&E employees following scheduled renovations, thereby permitting the consolidation of a number of the Utility's offices in the East Bay area with its San Francisco workforce in an integrated, flexible workplace more appropriate to the culture of the reimagined PG&E.

11. The Utility's senior leadership approved the business case for pursuing a transaction, and after obtaining approval from the Board in January 2020, the Utility entered into a non-binding letter of intent with TMG to explore a transaction at the Lakeside Building (the "**Letter of Intent**"). The Letter of Intent contemplated a transaction where TMG would acquire the Oakland Property and enter into a lease with the Utility for the Lakeside Building with an option for the Utility to acquire the Lakeside Building in 2023. Following acquisition, TMG would redevelop the Lakeside Building to the Utility's specifications, and the balance of the Oakland Property would be retained by TMG. Under the proposed build-out plan, the Utility would begin to occupy Lakeside Building in phases, beginning in 2022.

12. While the Lakeside Building would be redeveloped for the Utility, the Utility could market and complete the sale of the SFGO complex in the near-term (subject to the satisfaction of certain conditions, including CPUC approval). The Utility requested Cushman & Wakefield, the Utility's real estate consultants, to provide a broker opinion of value for the SFGO (the "**Broker Opinion**"). Given the historically favorable values in the downtown San Francisco area, which are

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

in large part driven by the explosive growth of the technology sector, the Utility expected to receive historically favorable value from the sale of the SFGO. The Utility also requested that Jones Lang LaSalle ("**JLL**") provide an appraisal of the SFGO complex for further assurance (the "**Appraisal**"). Both the broker opinion of value and formal appraisal supported the Utility's assumptions regarding the value of the SFGO complex.

13. In addition, and given that the JLL appraisal was prepared prior to the recent market volatility and uncertainty due to the COVID-19 pandemic, the Utility asked JLL to prepare a sensitivity analysis of their appraisal in light of current market conditions and projections. In their appraisal sensitivity analysis dated May 4, 2020 (the "**Appraisal Sensitivity Analysis**," and, together with the Appraisal, the "**Appraisals**"), JLL advised that even with the uncertainties presented by the COVID-19 pandemic, the Utility could still expect to obtain an amount near the range of prior estimates from the sale of the SFGO under certain recovery scenarios.

14. On February 14, 2020, TMG was selected as the buyer of the Oakland Property, and on February 28, 2020, TMG BAI Area Investments II, LLC ("**TMG BAI**"), an affiliate of TMG, entered into a purchase and sale agreement ("**PSA**") with the current owner of the Oakland Property. Landlord is a wholly owned subsidiary of TMG BAI, and TMG BAI intends for Landlord to ultimately acquire the Oakland Property pursuant to the terms of the PSA.

**B.** **Terms of the Agreement**

15. Following TMG BAI's entry into the PSA, the Utility and TMG proceeded to negotiate the terms of the transaction contemplated in the Letter of Intent. On June 5, 2020, the Utility and TMG BAI entered into the Agreement. Pursuant to the Agreement, TMG BAI agrees to cause Landlord, and the Utility agrees to enter into the Lease and Purchase Option Agreement contingent solely upon the satisfaction of the following conditions: (i) the closing under the PSA (which TMG BAI must pursue subject to the conditions set out below); (ii) entry of an order by the Bankruptcy Court authorizing the Utility's entry into the Agreement and the Lease and Purchase Option Agreement that is not stayed; and (iii) the issuance to the Utility of a title insurance policy and the Utility's approval of any material changes to the Lakeside Building.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

16.     Under the Agreement, TMG BAI must pursue the closing under the PSA subject only to: (i) entry of an order by the Bankruptcy Court authorizing the Utility's entry into the Agreement and the Lease and Purchase Option Agreement that is not appealed; (ii) PG&E's performance under the Agreement to Lease; (iii) no prior termination of the Agreement to Lease; (iv) performance by Seller under the PSA; (v) closing on financing meeting certain minimum conditions (which they must use commercially reasonable efforts to pursue); and (v) there being no material adverse change in the condition of the Lakeside Building.

17.     Unless the Utility and TMG BAI otherwise agree in writing, the Agreement shall automatically terminate (i) if the Lease and Purchase Option Agreement has not been entered into (other than as a result of either party wrongfully refusing to do so after all conditions specified above have been satisfied) by December 15, 2020; (ii) upon entry of an order by the Bankruptcy Court denying the Utility's motion to authorize its entry into the Agreement and the Lease and Purchase Option Agreement; or (iii) if the PSA is terminated prior to closing thereunder.

18.     No provision of the Agreement is binding on the Utility until Bankruptcy Court approval is obtained but will be binding on the Utility after Bankruptcy Approval.  The Utility and TMG BAI shall indemnify each other for any losses, costs or damages arising from its breach of any term of the Agreement; *provided, however*, that neither party shall be liable for more than $5,000,000 in damages for breach of the Agreement.

**C.     Terms of the Lease and Purchase Option Agreement**

19.     Upon Bankruptcy Court approval, the Utility will be bound to execute the Lease and Purchase Option Agreement (subject to the occurrence of the conditions precedent discussed above).  Under the Lease and Purchase Option Agreement, Landlord shall grant the Utility (i) the exclusive right to use and occupy the Lakeside Building, subject to the rights of the existing tenants and existing leases, and (ii) the option to purchase and acquire title to the Lakeside Building, including the improvements thereon (the "**Purchase Option**") for a set purchase price (the "**Purchase Price**").[4]

---

[4] Pursuant to the terms of the Lease and Purchase Option Agreement, Landlord is required to create a legal parcel that contains the Lakeside Building that can be sold to the Utility in compliance with the California Subdivision Map Act.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

20.     Pursuant to the Lease and Purchase Option Agreement, the Utility will occupy portions of the Lakeside Building as the redevelopment is completed and floors become available for the Utility to occupy.  The Utility negotiated a favorable lease rate at $57/sq. ft., which is below market rates even accounting for COVID-19 conditions.  Additionally, the Utility negotiated for TMG to provide the entire cost of the renovations to the Lakeside Building, including the seismic and other custom tenant improvements that the Utility may elect to implement, without any upfront cost by the Utility.  These allowances are atypical in the market and highly favorable for the Utility's cash flow management, as it avoids the need for immediate cash investment.

21.     Instead, the estimated building improvement costs are built into the Purchase Option, which the Utility may exercise during the Option Period (defined below).  Specifically, the Purchase Price is an all-in cost of up to $892 million, which includes: an acquisition cost of $420 million (constituting an allocation of a portion of TMG's purchase price on the full project to the Lakeside Building); required code improvements and base building improvement costs of $141 million; allowances of $160 million (i.e., $230 per rentable square foot) for the Utility's specific tenant improvements for information technology, security, floor arrangements, and seismic work; and development fees, carry costs, and transaction fees and costs of $171 million.  By agreeing in advance to a fixed purchase price that includes the estimated costs of improvements, the Utility takes on zero risk of cost over-run on the scope of landlord work, which is instead borne entirely by the developer.  Further, the Utility and Landlord will share fifty-percent (50%) of the savings on base building improvement costs.  Moreover, if the Utility spends less than the $160 million in tenant improvements, the $892 million Purchase Price will be reduced on a dollar-for-dollar basis.  This structure permits the Utility to purchase a "build-to-suit" building without any responsibility for capital expenditures necessary to complete the building upgrades prior to exercising the Purchase Option.

22.     Upon executing the Lease and Option Agreement, the Utility will be required to issue two $75 million letters of credit in favor of Landlord (the "**Option Payment LC**," and the "**Security Deposit LC**," and together, the "**Letters of Credit**").  Landlord will not be permitted to draw down on either of the Letters of Credit unless the Utility defaults in its obligations as tenant or chooses not to exercise the Purchase Option.  If the Utility chooses not to exercise the Purchase Option

but has an investment grade rating at that time, the Option Payment LC will be reduced to $50 million, which the Landlord will be entitled to draw and retain, and the Security Deposit LC will be returned. If the Utility is not investment grade at that time, Landlord may draw on the Letters of Credit in full. In the event the option is not exercised as a result of: (a) the Subdivision not occurring by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision); (b) a major casualty or condemnation; or (c) Landlord breaches a material covenant that impacts the value of the property, Landlord will not be able to draw on either Letter of Credit, the full Option Payment LC will be returned to the Utility and the Security Deposit LC will be returned if the Utility is investment grade at that time or retained as a security deposit (subject to reductions over time) if the Utility is not investment grade at that time. In addition, if the Utility chooses not to exercise the option, the cost of seismic improvements over $8 million will be amortized into the ongoing rent (as set out in further detail below).  If, in any event, the Utility elects to exercise the Purchase Option, both letters of credit will be released back to the Utility, and the Utility will enter into a Purchase Agreement (the "**Purchase Agreement**") in the form contained in Exhibit I to the Lease and Purchase Option Agreement.  Although circumstances may change, and the Utility will make the determination at the appropriate time, the Utility anticipates that it will exercise the Purchase Option.

23. The key provisions of the Lease and Purchase Option Agreement are as follows:

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| Premises | Approximately 910,146 rentable square feet (the "**Premises**"), which will be delivered to the Utility in two phases ("**Phase A**" and "**Phase B**", respectively, and each a "**Phase**").  Each of Phase A and Phase B consist of separately demised spaces (each, a "**Sub-Phase**").  The Utility will occupy each Sub-Phase as it becomes available all in general accordance with a schedule set forth in the Lease and Purchase Option Agreement.<br><br>Landlord is responsible for performing structural base building and landlord work to the Lakeside Building (subject to a limit of $38 million for seismic work) and other work to ready the Premises for the tenant improvements at its cost and expenses.  The tenant improvements for the Premises will be constructed by Landlord but will be at Tenant's cost and expense, subject to the Tenant Improvement Allowance described below. |
| Rent | The base rent is $57 per year per rentable square foot, as increased by; (i) amortized additional tenant improvement allowance as described below; |

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| | (ii) amortized seismic costs above $8 million but only after the Option Period has expired, and (iii) annually by 3% increases. Rent for each Sub-Phase commences upon the delivery of each Sub-Phase. |
| | The Utility shall also pay (i) its pro rata share of increases in operating expenses over the base year (2022), (ii) its pro rata share of increases in real property taxes over the base year; (iii) costs to maintain the Premises; and (iv) costs to maintain base building systems exclusively serving the Premises. |
| Term | The term of the Lease and Purchase Option Agreement (the "**Term**") begins upon the date of delivery of the first Sub-Phase which is expected to occur in early 2022 and runs for 34 years and 11 months. |
| Tenant Improvements | Landlord is responsible for performing all structural work and other work necessary to ready the Lakeside Building for the certain agreed-upon customized improvements (the "**Tenant Improvements**") at the Utility's expense. |
| | Landlord shall deliver each portion of the Phase A Premises and Phase B Premises with the Tenant Improvements substantially completed pursuant to final plans and specifications consistent with the Utility's balanced workplace standard and mutually approved by Landlord and the Utility. |
| Tenant Improvement Allowance | Landlord will contribute a tenant improvement allowance equal to $90 per rentable square foot, which may be increased to an amount up to $230 per rentable square foot at the Utility's election. In the event the Utility elects to increase the tenant improvement allowance, base rent will be increased by an amortization of such additional amount (over twenty years at 7%). |
| Assignment and Subletting | The Utility can transfer its obligations under the Lease and Purchase Option Agreement to affiliates without Landlord's consent and can sublease the Premises to third parties subject to the Landlord's consent, which shall not be unreasonably withheld, and any necessary regulatory approval. |
| Subdivision Requirement | The Lease and Purchase Option Agreement requires Landlord to pursue the approvals required to create a subdivision of the Project to create a legal parcel that contains the Lakeside Building (the "**Property**") that can be sold to the Utility in compliance with the California Subdivision Map Act, including any lot line adjustment, subdivision or parcel map (the "**Subdivision**"). In connection with the Subdivision, the Lease and Purchase Option Agreement:<br><br>a) requires Landlord to provide the Utility with regular updates on progress and drafts of all submittals and provide the Utility with prior notice of completion of the Subdivision; |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| | b) provides the Utility approval rights over any actions or documentation that would be required to implement and complete the Subdivision that will (i) bind the Utility or the Property after Closing (defined below), or (ii) adversely impact costs or obligations for which the Utility is responsible under the Lease and Purchase Option Agreement or the Purchase Agreement (defined below); and<br><br>c) provides the Utility a right to take over the Subdivision process at Landlord's expense in the event Landlord has not completed the Subdivision by March 31, 2023. |
| Purchase Option | The Lease and Purchase Option Agreement shall grant to Tenant an option to purchase the Property (the "**Purchase Option**"). |
| Option Payment Letter of Credit | In consideration for the Purchase Option, on execution of the Lease and Purchase Option Agreement, the Utility will provide Landlord with a $75 million letter of credit.<br><br>After the Option Period, Landlord can draw on and retain the full amount of the letter of credit if the Utility does not exercise the Purchase Option, does not close on the purchase of the Property after exercising Purchase Option, or if there is a termination of the Lease and Purchase Option Agreement following a default by the Utility, unless:<br><br>a) the Subdivision does not occur by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision);<br><br>b) A major casualty or condemnation occurs; or<br><br>c) Landlord breaches a material covenant that impacts the value of the Property to the Utility.<br><br>If at the time that Landlord's right to draw on the Option Payment Letter of Credit is triggered the Utility is Investment Grade, then Landlord shall be entitled to draw only $50,000,000 on the Option Payment Letter of Credit. |
| Option Period & Option Exercise | The Purchase Option may be exercised between: twenty-four months after the execution of the Lease; and nine months thereafter, each of which shall be subject to extension for completion of the Subdivision process, extension for satisfaction of certain conditions and acceleration in the event of certain casualty or condemnation.<br><br>Should the Utility not exercise the Purchase Option during the Option Period, the Purchase Option automatically terminates. If the Purchase Option terminates, the Lease and Purchase Option Agreement will remain in full force and effect. |
| Purchase Price | The purchase price for the Property if the Utility exercises the Purchase Option is $892 million (the "**Purchase Price**"), subject to the following adjustments: |

| Lease and Purchase Option Agreement Summary Chart | |
|---|---|
| | a) decreased for any Phase A tenant improvement costs below $230 per rentable square foot of Phase A paid for by Landlord; |
| | b) decreased for the difference between actual seismic costs and $38 million; |
| | c) decreased by 50% of any cost savings in base building and landlord work completed by Landlord and 100% of the budgeted amount for any base building work that has not yet been completed at Closing; |
| | d) increased or decreased for standard credits, debits, adjustments for prorations, and any outstanding amounts owed by or to the Utility under the Lease and Purchase Option Agreement; and |
| | e) credits related to any prior casualties or condemnation of the Property prior to the Closing |
| Security Deposit Letter of Credit | Upon execution of the Lease, the Utility shall provide Landlord with a $75,000,000 letter of credit as protection for the full and faithful performance by the Utility of all of its obligations under the Lease. |
| | If the Purchase Option Period expires and the Utility does not exercise the Purchase Option, the Security Deposit Letter of Credit shall be returned within ninety (90) days so long as (i) the Utility is Investment Grade, (ii) there is no Event of Default that has not been cured, and (iii) Landlord does not otherwise have a right to draw on the Security Deposit Letter of Credit, and then and, thereafter, there shall be no requirement for a Security Deposit (or Security Deposit Letter of Credit) under the Lease. |
| | If the Utility is not Investment Grade and the Utility does not exercise the Purchase Option, Closing does not occur, or a default on the Utility's obligations with respect to the Purchase Option occurs, Landlord shall be permitted to draw upon the Security Deposit Letter of Credit, unless: |
| | a) the Subdivision does not occur by January 31, 2025 (notwithstanding the protections built into the Lease and Purchase Option Agreement, including the right of the Utility to take over the Subdivision); |
| | b) A major casualty or condemnation occurs; or |
| | c) Landlord breaches a material covenant that impacts the value of the Property to the Utility, |
| | in which case Landlord shall continue to hold the Security Deposit Letter of Credit for the balance of the Lease Term; provided that the Security Deposit Letter of Credit Amount may be reduced from time to time upon the satisfaction of certain conditions. |
| Conditions to Closing | The Utility's consummation of the purchase of the Property is subject to, among other things, the satisfaction or waiver of customary closing conditions, and delivery of customary documents, lack of material adverse changes in the Property, and Landlord not being in breach of any of its covenants contained in the Purchase Agreement or in the |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

| Lease and Purchase Option Agreement Summary Chart |
|---|

| | |
|---|---|
| | Lease and Purchase Option Agreement, such as not committing any of the following without approval of the Utility: <br><br> a) entering into, or amending or modifying, any material agreements, including any leases that will be binding on the Property or the Utility following closing; <br><br> b) intentionally subjecting the Property to any lien or other encumbrance; and <br><br> c) instituting or affirmatively consenting to any governmental legal action relating to the Lakeside Building. |
| Failure to Close | If the Utility exercises the Purchase Option but Closing fails to occur as a result of a failure of a condition to Closing where there has not been a breach by either party, the Purchase Option shall be reinstated and the Option Period shall be extended until that condition is satisfied or waived. <br><br> If Landlord breaches its covenants, the Utility shall have the option of: (i) extending the Option Period to allow Landlord to cure the breach, or commencing and filing an action for specific performance in the appropriate court; or (ii) after an opportunity to cure, bringing an action against Landlord and pursuing all available damages, including consequential damages arising out of or in connection with such breach. <br><br> In the event of a casualty or condemnation prior to the Closing: (i) if a casualty will take longer than eighteen months to restore; Landlord can terminate the Lease and Purchase Option Agreement in which case the Utility can either exercise the Purchase Option and receive a credit in the amount of the insurance proceeds arising from the casualty or condemnation or terminate and receive a return of the Letter of Credit; (ii) if a casualty will take longer than eighteen months to restore or there is insufficient insurance proceeds and Landlord does not elect to terminate or if there is a significant condemnation, the Utility can either exercise the Purchase Option and receive a credit in the amount of the insurance or condemnation proceeds or terminate and receive a return of the Letter of Credit; (iii) in all other cases the Lease and Purchase Option Agreement and Purchase Option remain in place according to their terms; Landlord will restore and any remaining insurance/condemnation proceeds will be credit at Closing. |
| Post-Closing Liabilities | After Closing, Landlord shall indemnify the Utility for any breach of the covenants contained in the Lease and Purchase Option Agreement or the Purchase Agreement relating to the condition of the Property, subject to a twelve (12) month survival period, a minimum threshold amount of $500,000 and a maximum liability of 1.5% of the Purchase Price. |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

24.     The Agreements are the product of substantial arms-length negotiations. The Utility engaged in a robust evaluation process, employing experienced third party professionals. These professionals assisted the Utility in negotiating or evaluating the real estate strategy, providing current information on market trends, or conducting estimates of the purchase price, base building improvements, tenant improvements, closing and financing costs, and seismic upgrades. Among these professionals, the Utility engaged third party engineers to perform a seismic review of the Oakland Property and to assist with diligence of redevelopment costs.

25.     As a result of the negotiations, the Utility obtained several concessions to minimize the risks associated with the real estate strategy, including, but not limited to: relieving the Utility of the need to provide any cash up front to the Landlord to enter the Lease and Purchase Option Agreement and substantially reducing the risks the Utility was exposed to; provisions which permit the Utility to take over the Subdivision to ensure it is completed in a to ensure it is completed in a timely manner, and does not impede the Utility from exercising its Purchase Option; reaching an agreement that the Utility will receive a fifty-percent (50%) abatement in the base rent in the event there is a delay in the Utility's ability to occupy the Premises, which would allow the Utility to mitigate the cost of rent should they need to holdover in the SFGO; and capping the total costs for construction incorporated into the Purchase Price, other than tenant improvements undertaken at the Utility's direction, while retaining the ability to receive credits against the Purchase Price if these costs are lower than estimated, mitigating the risk of higher than expected construction costs while retaining the upside of any savings achieved.

**D.     The Lakeside Building's Unique Benefits**

26.     The Utility intends to use the Lakeside Building as its new company headquarters, where it will consolidate approximately 4,400 employees who currently are spread across the SFGO and at least two satellite offices: 3401 Crow Canyon and 1850 Gateway Blvd (the "**Leased Office Spaces**"). The development of the Lakeside Building is scheduled to begin in 2022. Once floors become available following the expiration of existing tenants' leases and the completion of redevelopment works, the Utility will commence occupation of the Lakeside Building in phases. The Utility currently plans to move 3,200 employees into the Lakeside Building in 2023, 600

employees in 2025, with the balance of the space to be made available for another 600 employees beginning in 2026.

27.     The Lease and Purchase Option Agreement provides the Utility with the ability to occupy and option to purchase a property which meets the Utility's unique needs.  In addition to the need to accommodate thousands of employees, the Utility has numerous specialized requirements for its headquarters to meet its information technology, seismic resilience, communications, and security needs, which would require extensive modifications to any existing office building.  The Lakeside Building will provide the Utility with sufficient floor space to accommodate its employees, and the redevelopment by Landlord will allow the Utility's required modifications to be completed.

28.     By entering into the Lease and Purchase Option Agreement and moving its corporate headquarters to the Lakeside Building, the Utility will realize a substantial reduction in operating costs compared to maintaining the status quo at the SFGO complex.  As part of the "build-to-suit" developer arrangement in the Lease and Purchase Option Agreement, TMG will significantly upgrade the Lakeside Building's infrastructure, which ultimately will allow the Utility to pay significantly lower maintenance costs over the long-term compared to what it would pay to maintain the current aging, multi-building SFGO complex in downtown San Francisco.  Moreover, the Lakeside Building offers sufficient overall capacity to consolidate several different corporate offices into one anchor location, and because of its convenient location, there will be no need to continue leasing the Leased Office Spaces.

29.     In contrast, merely maintaining the status quo at the SFGO would require a significant capital investment.  If the Utility continues to stay in the SFGO complex, it will likely require substantial capital expenditure in excess of $400 million in the near-to-medium term to ensure a safe and functional headquarters for the Utility in a manner that complies with current local regulations that are imposed in connection with any significant upgrades.  This expenditure includes extensive repairs to the building facades and seismic hardening, as well as general building investment and maintenance.  Given the larger overall physical size of the SFGO complex, the fact it is a multi-building complex, and the age of the buildings, necessary capital expenditure for the SFGO Complex is estimated to cost substantially more over a 40-year period than the estimated capital expenditure

for the Lakeside Building following its redevelopment. In addition to the costs of upgrades imposed by complying with local law and regulations upon renovations, the Utility would incur millions of dollars in costs to renovate the SFGO, and, in doing so, the Utility would cause disruption just to retrofit the interior spaces for optimal occupancy. The Utility also would need to incur costs to temporarily relocate many of its employees, who cannot be present during the requisite seismic testing and retrofit construction.

30. On balance, relocating the Utility's corporate headquarters to the Lakeside Building on a permanent basis now is a far more cost-effective option through which the Utility expects to realize substantial cost savings compared to what it expects to spend if it were to maintain the status quo and remain in the costly and less efficiently occupied SFGO complex and the Leased Office Spaces. The Utility conducted extensive diligence and compared the estimated costs that it expects to incur by maintaining the status quo with the costs of relocation, and based on a long-term cost-benefit analysis, the proposed real estate strategy will result in a significant financial benefit over the next forty years that it expects to pass along to its customers, including an expected savings to customers from the gain on sale of the SFGO, which is expected to be substantial. Moreover, based on the Utility's financial projections, the Utility is likely to realize a significant financial benefit from the transaction regardless of whether the Utility decides to exercise the Purchase Option or instead remain in a long-term lease.

31. The Lakeside Building also offers unique tangible and intangible benefits that will promote the Utility's work environment, retention, recruitment, and sustainability goals. The Lakeside Building's optimally sized floor plates and overall large square footage makes it an ideal locale for implementing the state-of-the art workspace design and planning around "The Way We Work," which has been validated in a number of the Utility's other offices, and which will be updated to address any safety and health considerations from COVID-19. The layout also will permit full team adjacencies in its floorplan, and is expected to provide a substantially more productive workspace for the Utility's employees. Additionally, the Lakeside Building is conveniently located only two blocks away from a BART station, which will provide a quicker, easier, cheaper, and more environmentally conscious commute for most of the Utility's existing and future employees, many of

whom cannot afford to live in downtown San Francisco or continue driving in from surrounding areas. Because of the Lakeside Building's physical layout and location, the Utility will be able to consolidate its workforce that is currently spread across the SFGO and the Leased Office Spaces, thereby allowing the Utility to save substantial leasing expenses and other related maintenance costs going forward.

32.     Relatedly, the fact that more employees may work from home on a more frequent basis after the COVID-19 pandemic could lead to even greater cost savings due to the Lakeside Building's unique features. As previously noted, the Lakeside Building's ideal location makes it readily accessible to many of the Utility's employees, including those who work at office locations other than the SFGO or the Leased Office Spaces. Therefore, to the extent the Utility has more available capacity at the Lakeside Building than is currently expected, it likely will be able to consolidate additional offices by folding those workforces into the Lakeside Building as well, thereby reducing even greater leasing and maintenance costs. As a result, the Lakeside Building's unique physical features gives the Utility valuable flexibility to reduce unnecessary expenses regardless of the COVID-19 pandemic's impact on daily work life in the future.

33.     Further, the Utility will have an active role, through the Tenant Improvements, in designing the telecommunications and heightened security infrastructure necessary for its complex operations. This is particularly ideal for absorbing and consolidating all three currently disparate campuses into one, single building. Moreover, the two daycare centers and four gyms located within half-a-mile of the Lakeside Building will offer employees an easier means to achieve work-life balance. In sum, these unique locational features will help preserve the Utility's ability to retain and attract the top-talent from both the urban and suburban markets while fostering a collaborative and productive work environment and promoting sustainability.

34.     The Utility has been considering available properties in the East Bay area for some time. Most properties in the Oakland market are either: (i) too small to accommodate the Utility's employees relocating from SFGO in a single building (there is an extremely limited supply of space in excess of 20,000 square feet); or (ii) much larger, new build properties which are (or would be in the case of new developments) more expensive than and take longer to execute than the Lakeside Building. The Utility estimates that a new development which would meet its size requirement would

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

be significantly more expensive than the proposed acquisition of the Lakeside Building. The difficulties of finding an appropriate space in the East Bay area are compounded when the Utility's preference for its headquarters to be accessible by mass transit are considered. The Lakeside Building present a unique combination of appropriate size and value for the Utility. A small number of new developments in the Oakland market have been announced for future occupancy, however, the cost of new builds is significantly more expensive than renovated space on a per square foot basis, and new developments may present additional risk related to construction costs and delivery timing.

### E. Subcommittee and Board Approval Process

35. On May 28, 2020, the Utility's corporate Real Estate Subcommittee determined that the Lease and Purchase Option Agreement should be presented to the Board for approval. The Real Estate Subcommittee consists of three Board members (including the Chairs of the Finance and Compensation Committees of the Board), the Utility CEO, the Utility's real estate representatives, and an AlixPartners consultant. The Real Estate Subcommittee considered the transaction in detail at a number of meetings from January through May, prior to the transaction being presented to and approved by the Utility's Board of Directors on June 4, 2020.[5] Both the Real Estate Subcommittee and the Board considered and deliberated (i) the economic benefits of the transaction to the Utility and its customers and (ii) the suitability of the Oakland Property and the benefits to the Utility and its employees of a more flexible, functional workplace location that would reduce commuting costs and expenses for most employees. They reviewed the material terms of the deal, risks and benefits of entry into the Agreements, key assumptions regarding the economic benefits of the transaction, the impact of the newly passed Proposition E ballot initiative, and the Broker Opinion, the Appraisal and the Appraisal Sensitivity Analysis. Finally, the Board and the Real Estate Subcommittee took into account COVID-19's potential impact on the San Francisco office market.

36. The Utility was represented and advised by numerous legal, financial, real estate, and other professionals on the merits and terms of the transaction. The subcommittee also received the opinion of an independent real estate expert, Michael Welch, who provided an

---

[5] The chair of the board of directors for PG&E Corporation also attended the Real Estate Subcommittee meetings.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

independent assessment of the terms and structure of the proposed Oakland transaction based on: his experience in the industry; his review of the pertinent documents, as well as materials regarding sales of comparable properties and the market for commercial property leases in the Oakland CBD; discussions with the Utility's principals; and other independent research and analysis. Mr. Welch expressed to the subcommittee his opinion that the terms of the Lease and Purchase Option Agreement are within the range of reasonableness for the lease and potential acquisition of a commercial property of this type by a company of comparable size and need to the Utility. Mr. Welch further opined that the Broker Opinion, the Appraisal, and the Appraisal Sensitivity Analysis are reasonable projections for the approximate sale price for the SFGO. Finally, Mr. Welch explained that it is reasonable, based on his experience, to believe that COVID-19 would not have a material negative impact to the Utility's overall real estate strategy.

37.     On June 4, 2020, the corporate real estate subcommittee presented its recommendation to the Board. The Board concluded that the Agreements likely would provide substantial financial benefits to both the Utility and ratepayers. The Board concurred that the Lease and Purchase Option Agreement would facilitate the Utility's desire to monetize the SFGO complex for the benefit of the ratepayers and relocate into cost-effective and efficient space suited to facilitating greater coordination and collaboration among employees. After reviewing the Broker Opinion and the Appraisals and considering Mr. Welch's opinion, the Board agreed that the Utility could operate the headquarters in Oakland at lower costs than operating and maintaining the SFGO complex.

38.     The Board also concluded that the Lakeside Building's unique physical features and location presented a favorable business opportunity that would strengthen the Utility's position upon emergence from bankruptcy. The Board agreed that relocating to the Lakeside Building would allow the Utility to significantly lower its operating costs over the years to come. The Utility is making significant changes, including to its safety culture, and this move, which will bring separate offices together under one roof, will further these efforts. The Lakeside Building's unique physical properties also make it ideal for the Utility to implement its state-of-the-art "The Way We Work" workplace design protocol, which has been validated in a number of the Utility's other offices. The Board further acknowledged the benefit of consolidating the Utility's employees and real estate assets

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

into a single headquarters that is ideally located on the BART line, where many of its employees could easily commute. The Utility also analyzed the cost of the ongoing rent under the Lease and Purchase Option Agreement with reference to the rental market in the Oakland area, and concluded that the cost of the rent under the Lease and Purchase Option Agreement is fair and reasonable based on market considerations, renovations, and the customization to the Utility.

39.     The Board also considered whether the COVID-19 pandemic might adversely affect the net value of the real estate strategy, including the impact on the San Francisco corporate real estate market. The Board recognized that the length and degree of COVID-19's effect on the real estate market were not readily ascertainable, but concluded that any such effects were likely to subside within an acceptable period and, as a result, the Board estimated that the Utility could still sell the SFGO for an acceptable price in the near future to substantially contribute to the Utility achieving substantial economic benefits that will be passed on to ratepayers. The Board also considered whether the costs of the rent and the Purchase Option for the Oakland Property remained appropriate. The Board considered the relative cost of the next known available project on the BART Line, which far exceeded the Utility's budget, and also heard from Mr. Welch, who stated that, based on his experience, the costs of the rent remained within the range of reasonableness notwithstanding the effects of the COVID-19 pandemic. Based on the unique costs and benefits that the Lakeside Building offered, and the length of the Utility's search for a suitable long-term premises, the Board ultimately determined that the temporary uncertainties presented by COVID-19 did not justify abandoning this favorable opportunity in hopes of possibly finding a suitable alternative location at a marginally better price.

40.     Although it recognized that entering into the Lease and Purchase Option Agreement prior to the sale of the SFGO Complex exposes the Utility to some real estate market risk, the Board ultimately concluded that any such risk is substantially outweighed by the risks the Utility would face if it sold the SFGO complex prior to securing a replacement premises. Particularly, the Board concluded that the risks of (i) serious operational risks for the Utility if it was not able to locate suitable premises after a sale and any leaseback of the SFGO complex, or if there is a mismatch between the SFGO complex leaseback terms and the availability of new premises, (ii) not being able

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

1  to locate suitable premises for the Utility at an appropriate price with the unique benefits of the

2  Lakeside Building, and (iii) the Utility being in a weaker commercial position with a seller or lessor

3  of a replacement headquarters premises once it has committed to sell and vacate the SFGO complex,

4  outweigh the real estate market risk of entering into the Lease and Purchase Option Agreement.

5        41.    In sum, I expect the proposed transaction to present substantial benefits to both

6  the Utility and ratepayers. While no transaction of this nature is without risk, the Utility has engaged

7  in extensive arm's length negotiations to mitigate to the greatest extent possible any existing risks.

8  And, in light of the substantial benefits of the proposed transaction – including its positive impact on

9  positioning the Utility for the decades to come, I believe entry into the Agreements is a sound exercise

10  of business judgment.

11        Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true

12  and correct.

13  Dated:  June 9, 2020
         San Francisco, California

14                             */s/ Tara Agid*

15                             Tara Agid
                           Senior Director of Corporate Real Estate

16                             Pacific Gas and Electric Company

17

18

19

20

21

22

23

24

25

26

27

28