WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors
and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>         **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☒ Affects Pacific Gas and Electric Company<br>☐ Affects both Debtors<br><br>* All papers shall be filed in the Lead Case, No. 19-30088 (DM). | Bankruptcy Case No. 19-30088 (DM)<br>(Lead Case) (Jointly Administered)<br><br>**DECLARATION OF MICHAEL WELCH IN SUPPORT OF THE MOTION OF THE DEBTORS PURSUANT TO 11 U.S.C. §§ 363 AND 105(a) FOR AN ORDER AUTHORIZING THE UTILITY TO (I) ENTER INTO LEASE AND PURCHASE OPTION AGREEMENT FOR OAKLAND HEADQUARTERS AND (II) GRANTING RELATED RELIEF**<br><br>Date: June 30, 2020<br>Time: 10:00 a.m. (Pacific Time)<br>Place: (Telephonic or Video Conference)<br>    United States Bankruptcy Court<br>    Courtroom 17, 16th Floor<br>    San Francisco, CA 94102<br><br>**Objections Due**: June 23, 2020,<br>         4:00 p.m. (Pacific Time) |

Pursuant to 28 U.S.C. § 1746, I, Michael Welch, hereby declare as follows under penalty of perjury:

## I. INTRODUCTION

1. I am a Managing Director of Integra Realty Resources Houston, which is the Houston office of Integra Realty Resources, Inc. ("**Integra**"), America's largest independent valuation firm, which provides world-class, comprehensive commercial real estate market research, valuation, and advisory services. I submit this Declaration in support of the *Motion of the Debtors' Pursuant to 11 U.S.C. §§ 363 and 105(a) for an Order Authorizing the Utility to (i) Enter in to Lease and Purchase Option Agreement, and (ii) Granting Related Relief* (the "**HQ Lease and Purchase Option Motion**").[1]

2. Weil, Gotshal and Manges LLP ("**Weil**") retained Integra to assist Weil in advising the Debtors in connection with the HQ Lease and Purchase Option Motion, including providing an independent evaluation of the terms and structure of a proposed transaction whereby the Utility would lease with an option to purchase a new headquarters in Oakland to replace the Debtors' San Francisco General Office complex (the "**SFGO**").

3. This Declaration is based upon my personal knowledge of the matters set forth herein, my review of relevant documents, information provided to me by employees of the Debtors or their advisors, my prior experience in the valuation of real property, and independent research I have undertaken relevant to the issues at hand. I reserve the right to update and supplement this Declaration as additional information and materials are provided or otherwise made available to me. If called upon to testify, I would testify competently to the opinions and supporting facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

## II. EXPERIENCE & QUALIFICATIONS

4. I have over 30 years of experience in the valuation of real property, including commercial, retail, office, multi-family, industrial, residential, and special-purpose properties in markets throughout the United States and globally. Throughout my career, I have conducted thousands of real estate valuations, and have been involved in appraisal matters and project management in all

---

[1] Capitalized terms used in this Declaration but not otherwise defined have the meaning ascribed to them in the HQ Lease and Purchase Option Motion.

fifty states. I am currently licensed as a Certified General Real Estate Appraiser in a number of states, including California.

5. Since November 2019, I have served as a Managing Director at Integra. Integra is a multi-faceted valuation and consulting firm with experience in properties including office buildings, single-family and multi-family residential, single and multi-tenant retail centers, industrial facilities, subdivisions, billboard valuation, convenience stores/service stations, infrastructure, and mini-warehouse facilities. I am routinely called upon to provide appraisal advice and consulting services as well as expert witness testimony on real estate projects and transactions throughout the United States.

6. From October 2016–November 2019, I served as the head of Valuation and Advisory Services for Jones Lang LaSalle ("**JLL**"). At JLL, I focused on the formation, implementation, and expansion of JLL's national valuation and advisory services strategy. I also served on its Global Valuation Board, overseeing international portfolio work and shaping the vision for global valuations. JLL is an internationally recognized real estate professional services and management company that possesses a wealth of experience in providing real estate services. At no time prior to this engagement have I provided services to either of the Debtors.

7. Prior to joining JLL, I worked for Integra. I first joined Integra as a Senior Analyst in 1990. In 1997, I developed and headed Integra's litigation department, which assisted clients, including financial institutions, insurance companies, law firms, governmental entities, oil companies, developers, and private property owners in matters including general commercial litigation, property partitioning, estate tax matters, environmental contamination, and eminent domain cases. In 2011, I was elected to Integra's Board of Directors. In 2013, I was elected Vice Chairman of the Board, and, in 2015, I was elected Chairman of the Board and Chief Executive Officer.

8. I am a Member of, and hold professional designations from, among other professional organizations, the International Right of Way Association, the Appraisal Institute, and the Royal Institute of Chartered Surveyors. Additionally, I am a former member of the Appraisal

Foundation Industry Advisory Council, which is the entity that helps determine the governing and licensing standards for appraisers within the United States.

9. I have a Bachelor's Degree from the University of Houston.

10. I have testified as an expert at trial or by deposition in federal and state courts throughout the United States during the previous 4 years, a listing of which is attached as **Appendix 1**. I have authored one publication in the last 10 years, a copy of which is attached as **Appendix 2**. In addition, I co-authored chapter 1 of *Corridor Valuation: An Overview and New Alternatives*, which was jointly published in 2019 by the Appraisal Institute, the Appraisal Institute of Canada, and the International Right of Way Association.

11. My education, professional experience, and qualifications are set forth in my curriculum vitae, which is attached as **Appendix 3**.

12. The information that I relied upon or otherwise considered in forming the opinions set forth in this Declaration is listed in **Appendix 4**.

13. My compensation for work performed in connection with this matter is $750 per hour.

14. The opinions presented in this Declaration are the result of the information available to me as of the date of this analysis.

### III. SUMMARY OF OPINIONS

15. The terms of the Agreement to Enter into Lease and Purchase Option, dated June 5, 2020, by and between TMG Bay Area Investments II, LLC ("**TMG BAI**"), an affiliate of TMG Partners R.E. ("**TMG**"), and the Utility (the "**Agreement**") and the Office Lease attached to the Agreement as Exhibit A between BA2 300 Lakeside LLC ("**Landlord**") and the Utility, to lease 300 Lakeside Drive, Oakland (the "**Lakeside Building**"), located on a 7.16 acre city block (the "**Oakland Property**") (the "**Lease and Purchase Option Agreement**") are within the range of reasonableness for the lease and potential acquisition of a commercial property of this type (Class A) by a company of comparable size and need to the Utility.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

16. The economic terms of the proposed Agreement and Lease and Purchase Option Agreement are within the range expected for buildings of similar size with comparable amenities and with other large scale, customized construction projects.

17. In particular, should the Utility elect to exercise the Purchase Option, the proposed purchase price of the Lakeside Building is fair and reasonable based on market considerations, renovations, and the customization to the Utility.

18. In addition to the economics of the Agreement and Lease and Purchase Option Agreement, I understand that there are several intangible factors, which are important to the Utility, the local communities, and the Utility's customers that further support the reasonableness of the Agreement and the Lease and Purchase Option Agreement.

### IV. METHODOLOGY AND BASIS FOR OPINIONS

19. The Utility's current headquarters, the SFGO complex, consists of three buildings in downtown San Francisco: (i) 77 Beale Street ("**77 Beale**"), (ii) 215–245 Market Street (the "**Market Street Buildings**"), and (iii) 45 Beale Street ("**45 Beale**"). 77 Beale is a 33-story office tower, built in 1971, that contains 935,005 square feet of rentable area. The Market Street Buildings consist of two predominant buildings: (a) the historic 16-story Matson Building at 215 Market Street, completed in 1925, with a 7-story annex building added in 1947, and (b) the original PG&E headquarters, completed in 1925, with a 13-story annex added in 1947. Together, the Market Street Buildings contain 460,587 rentable square feet, including over 15,000 square feet of ground-floor retail space. 45 Beale, completed in 1968, is situated on the interior of the SFGO complex campus and contains 68,238 rentable square feet. In total, there is 1,463,830 rentable square feet in the SFGO complex. Based on my discussions with the Debtors' employees, I understand that a large portion of the rentable square feet in the SFGO complex is currently underutilized and not usable by the Utility without renovation and redevelopment.

20. To maintain its headquarters at the SFGO complex, I understand that the Utility would have to allocate significant capital over the next 5-7 years toward improvements, including for base building renovations, façade upgrades, and seismic work.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### A. The Terms of the Agreement and the Lease and Purchase Option Agreement

21. Built in 1960, with an infrastructure renovation in 2004 and an exterior renovation in 2014, the Lakeside Building is a 28-story building with approximately 910,000 rentable square feet. Pursuant to the terms of the Lease and Purchase Option Agreement, Landlord will perform all improvements to the Lakeside Building as part of a turn-key, build-to-suit model for base building and landlord work to prepare for tenant improvements. Landlord will act as construction manager for the Utility's desired tenant improvements, the cost of which will be covered by a tenant improvement allowance provided by Landlord.

22. Under the Agreement, which is subject to Bankruptcy Court approval and Landlord's acquisition of the Oakland Property, among other things, Landlord and the Utility will enter into the Lease and Purchase Option Agreement. And under the Lease and Purchase Option Agreement, the Utility will become the tenant of the Lakeside Building, as space becomes available at the expiration of existing leases. Although the term of the Lease and Purchase Option Agreement runs for 34 years and 11 months, the Lease will also provide the Utility the right to purchase the Oakland Property (the "**Purchase Option**") exercisable within approximately 2-3 years of the execution of the Lease and Purchase Option Agreement.

23. The rentable space in the Lakeside Building will be provided to the Utility in two phases ("**Phase A**" and "**Phase B**"), each of which consist of separately demised spaces (each, a "**Sub-Phase**"). The Utility will occupy each Sub-Phase as it becomes available and improvements thereto are completed by Landlord. The rent commencement for each space begins upon the delivery date of the first Sub-Phase, which is expected to occur in early 2022.

24. To meet the Utility's needs, Landlord will construct a series of required code improvements, base building improvements, seismic investments—*e.g.*, life safety related seismic investments, façade cleaning and sealing, restroom and HVAC system upgrades, an update to, and expansion of, the fire suppression system, and demolition of existing tenant improvements (the "**Base Building and Landlord Improvements**"). Landlord will also construct improvements that are Utility-

specific requirements for occupying the space (the "**Tenant Improvements**"). These improvements are built into the Purchase Price and/or rental rate.

25. Under the Lease and Purchase Option Agreement, Landlord will contribute a tenant improvement allowance equal to $90 per rentable square foot, which may be increased to an amount up to $230 per rentable square foot at the Utility's election. In the event the Utility elects to increase the tenant improvement allowance, base rent will be increased by an amortization of such additional amount over $90 per rentable square foot (over twenty years at 7%).

26. Once the Base Building and Landlord Improvements and the Tenant Improvements, among other things, have been implemented, under the Lease and Purchase Option Agreement, the base rent will be $57 per year per rentable square foot that includes tenant improvements at $90 per square foot, as increased: (i) by amortized additional tenant improvement allowance, (ii) by amortized seismic costs above $8M but only after the Purchase Option has expired, and (iii) annually by 3%. Rent for each Sub-Phase commences upon the delivery of each Sub-Phase and the Utility will pay (i) its pro rata share of increases in operating expenses over the base year (2022), (ii) its pro rata share of increases in real property taxes over the base year, (iii) costs to maintain the Premises, and (iii) costs to maintain base building systems exclusively serving the Premises. I understand that the utility costs will be paid by the Utility and are estimated to be initially approximately $4 per year per rentable square foot. Based on my experience and a review of comparables, the base rent, even as adjusted for utility costs, is well within the range of reasonableness for a commercial Class A property of this size in the Oakland market, especially when taking into account the considerable amount of customization that will be necessary before the Utility can occupy the premises.

27. The Lease and Purchase Option Agreement requires Landlord to pursue the approvals required to create a subdivision of the Project to create a legal parcel that contains the Lakeside Building (the "**Lakeside Building Property**") that can be sold to the Utility in compliance with the California Subdivision Map Act, including any lot line adjustment, subdivision or parcel map (the "**Subdivision**"). Under the Lease and Purchase Option Agreement, the Utility may exercise the

Purchase Option during the period commencing on the later of (i) twenty-four months after the execution date of the Lease, or (ii) the completion of the Subdivision, and extending for a period of at least nine months (the "**Option Period**"), as may be extended to allow satisfaction of the conditions to Closing.

28. Assuming that the Utility proceeds with the Purchase Option, the purchase price for the Lakeside Building Property has been agreed to in the amount of $892 million (the "**Purchase Price**"). I understand from the Utility that Purchase Price is comprised of several key components, including $420 million for the Utility's allocated portion of the building acquisition cost, $141 million in Base Building and Landlord Improvements, $160 million in Utility-specific Tenant Improvements (*i.e.*, $230 per square foot), and $171 million in carry costs, development fees, and other transaction related expenses. When completed, the $892 million Purchase Price would represent what amounts to a turn-key space that is built to the Utility's unique and long term needs as a headquarters location.

29. The Purchase Price is subject to a number of adjustments including: (i) decreased for any Phase A tenant improvement costs below $230 per rentable square foot of Phase A paid for by Landlord; (ii) decreased for the difference between actual seismic costs and $38 million; (iii) decreased by 50% of any cost savings in Base Building and Landlord Improvements other than seismic work completed by Landlord and 100% of the budgeted amount for any Base Building and Landlord Improvements other than seismic work that has not yet been completed at Closing; (iv) increased or decreased for any outstanding amounts owed by or to the Utility under the Lease and Purchase Option Agreement; (v) increased or decreased by standard credits, debits and adjustments for prorations; and (vi) credits related to any prior casualties or condemnation of the Lakeside Building Property prior to the Closing.

30. I understand that over the course of the negotiations with TMG, the Utility obtained certain specific terms that contribute to making the Lease and Purchase Agreement as a whole fall within the range of reasonableness for a transaction of this type. These terms include, but are not limited to:

- Provisions which permit the Utility to take over the Subdivision to ensure it is completed in a timely manner, and does not impede the Utility from exercising its Purchase Option;

- Agreement that the Utility will receive an abatement in the base rent in the event there is a delay in the Utility's ability to occupy the Premises together with a 50% rent credit for each day of delay, which will allow the Utility to mitigate the cost of rent should it need to holdover in the SFGO complex, mitigating the risk that delays with vacation of existing tenants and the construction process may delay the Utility's occupancy of the Lakeside Building; and

- Caps on the total costs for construction incorporated into the Purchase Price, other than tenant improvements undertaken at the Utility's direction, while retaining the ability to receive credits against the Purchase Price if these costs are lower than estimated, mitigating the risk of higher than expected construction costs while retaining the upside of any savings achieved.

**B.     Reasonableness of Exercising the Purchase Option**

31.     Based on my experience in the industry, review of the documents, materials regarding sales of comparable properties, and my own independent research and analysis of the relevant markets, it is my opinion that the Purchase Price, if the Purchase Option is exercised, is within the range of reasonableness for a Class A property, to be used as a corporate headquarters, in the Oakland Central Business District Area for the following reasons.

32.     The Lakeside Building is close to one million square feet of rentable office space in very close proximity to a major public transit line.  Occupying this property will allow the Utility to consolidate its employees, currently spread across five different office buildings, in three locations, into one building.  Moreover, in addition to the services performed by Landlord—and the extrinsic benefits that inure to the Utility through this transaction, described below—it is reasonable for the Utility to pay what would be the upper-range of market value for this property after accounting for the full amount of Tenant Improvements.  Of course, if less than $160 million is spent on Utility-specific

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Tenant Improvements, the Purchase Price would be less than $892 million. There are very few commercial buildings of this size in Oakland; most are far smaller. In addition, the size of building that suits the Utility's needs are seldom available. In fact, I understand that there is currently no other commercial property available that has enough square footage to accommodate the approximately 4,500 employees the Utility envisions moving into the Lakeside Building, nor will there be for several years.

33. The Purchase Price includes the Landlord's cost to acquire the property but to which is added various costs necessary to bring the building up to specifications necessary for Utility's use of the premises. I understand that these include, but are not limited to, tailoring the property's floor space in accordance with the Utility's balanced workplace standard, *i.e.*, "*The Way We Work*," providing workspace with a variety of activity-based work environments, installing high-speed fiber optic wiring to accommodate the Utility's trading floor, and the heightened security infrastructure necessary for the Utility's complex operations. Setting aside new construction, the majority of those costs are unavoidable no matter where the Utility's operations are headquartered.

34. In fact, through the proposed Agreement and Lease and Purchase Option Agreement, the Utility is essentially retrofitting a commercial space with a 1960 vintage to include all of the state-of-the-art of technological, safety, and design specifications available in newly constructed commercial real estate. But because the "bones" of the building are nearly 60 years old, the Utility is able to do so at a steep discount to newly developed alternatives. The Purchase Price also reflects work by the Landlord in developing the property, acting as construction manager and undertaking the work necessary to perform all necessary improvements.

35. The Purchase Price is also reasonable given that the only real alternative would be new construction. In that respect, I understand that there are limited commercial buildings of sufficient size and suitable location to accommodate the Utility's needs and are within the Utility's budget.

### C. Reasonableness of the Sale of the SFGO

36. I understand that the Utility is not currently seeking Court approval for any sale of its SFGO complex, but such a sale is part of the Utility's plan in the near term. I was also asked as part of my assignment for Weil to evaluate and give my opinion with respect to the appraised value of the SFGO complex set forth in Cushman & Wakefield's January 2020 Broker Opinion of Value (the "**Broker Opinion**"), JLL's March 4, 2020 Appraisal of PG&E Headquarters (the "**Appraisal**"), and JLL's May 4 2020 supplement thereto (the "**Appraisal Supplement**"). Based on my experience and a thorough review of the Broker Opinion, the Appraisal, the Appraisal Supplement, and my own independent research and analysis of the relevant markets, I believe the amounts reflected in those documents with respect to the SFGO complex valuation are reasonable and support the Utility's decision to proceed with the Agreement and Lease and Purchase Option Agreement.

37. After entering into the Agreement and Lease and Purchase Option Agreement, the Utility anticipates marketing and selling the SFGO complex in the near-term, to take advantage of historically favorable values in the downtown San Francisco area. The Utility anticipates that the sale of SFGO complex will result in substantial net gains to the Utility.

38. Based on my experience, review of the relevant materials, including the C&W Broker Opinion, the JLL Appraisal, the Appraisal Supplement, conversations with executives at the Utility, and my own independent research and analysis of the relevant markets, I believe the assumptions and expected savings relating to the anticipated sale of the SFGO complex are reasonable.

### D. Intangible Factors Also Support the Utility's Decision

39. Based on my conversations with executives at the Utility, certain intangible factors—that do not directly affect the economics of the deal—are important to the Utility and support its decision to proceed with the Agreement and the Lease and Purchase Option Agreement. For example, relocating the Utility's headquarters to the Lakeside Building will allow the Utility to consolidate, in one building, employees currently located in the three buildings comprising the SFGO complex as well as two other large office buildings in the San Francisco Bay Area. In addition, a significant portion of the Utility's 4,000 employees will have a similar or better commute because 70%

of employees live in a location with easy access to BART. Furthermore, the large 30,000 square foot floorplates of the Lakeside Building will allow the Utility to implement its "*The Way We Work*" workplace design protocol, which features modern, flexible, balanced workspace, centered on activity-based work environments and enhances collaboration and connectivity between the Utility's employees. According to the Utility, these and certain other intangible factors will result in increased employee productivity, morale, and retention, which will, in turn, increase the attractiveness of the Utility as an employer.

40. Companies frequently consider these types of intangible factors when deciding whether to relocate their headquarters. Although the intangible factors may not directly affect the economics of a contemplated relocation, they are nevertheless reasonable for a company to consider. Based on my experience, the intangible factors that the Utility is considering are reasonable and support the Utility's decision to proceed with the Agreement and Lease and Purchase Option Agreement.

V. **UNCERTAINTY OF MARKET CONDITIONS RESULTING FROM COVID-19**

41. At this time, it is uncertain whether or to what extent COVID-19 will have a lasting impact on the value of real estate in San Francisco and Oakland. With that said, as of this writing, major stock indices have rapidly returned to near pre-COVID-19 levels. The majority of States have reopened some portion or all of their economies, unemployment rates have stabilized, and there is growing optimism that mitigating treatments and potential vaccines for COVID-19 are showing promise. These factors appear to have bolstered consumer and user confidence and offers support for the assertion that the economic impacts from COVID-19 will be shorter in duration than worst case scenarios. Accordingly, based on my experience over the last 30 years, it is reasonable to believe that there will be a "deep-V" shaped recovery in connection with COVID-19. A "deep-V" shaped recovery is a type of economic recession in which the economic charts reflect a relatively sharp decline in metrics followed by a relatively sharp rise back to their previous levels.

42. To the extent that COVID-19 does result in a "deep-V" recession and recovery in the Oakland market, there is unlikely to be any material negative impact to the Utility proceeding with the contemplated Agreement and Lease and Purchase Option Agreement of the Lakeside Building.

In addition, to the extent COVID-19 does result in a "deep-V" recession and recovery in the San Francisco market, there should not be any material negative impact to the value of the SFGO complex, given its locational strength.

43. To the extent that the economic impact of COVID-19 is more severe than anticipated and there is *not* a relatively sharp rise back to pre-COVID-19 levels, proceeding with the contemplated Agreement and Lease and Purchase Option Agreement of the Lakeside Building is still reasonable. This is because, in real estate, value inures to the strongest properties in any given real estate market. The Lakeside Building and the SFGO complex represent some of the strongest properties in the Oakland and San Francisco markets. Accordingly, even if the real estate market was generally depressed, the Lakeside Building and the SFGO complex are more likely to retain their value relative to other, lesser quality properties.

44. The Lease and Purchase Option Agreement contemplates a 34 year 11 month holding period, which would mitigate any potential short term impact to pricing relative to COVID-19 effects. Furthermore, if the Utility were to exercise the Purchase Option, any short term negative impacts would be mitigated over the life expectancy of its tenancy in the Oakland Property.

## VI. COMPENSATION

45. No portion of the compensation or reimbursement paid or payable to Integra is dependent upon the opinions offered in this Declaration, the outcome of any litigation relating to the HQ Lease and Purchase Option Motion, or the transactions contemplated therein.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 9, 2020,
       Houston, Texas.

                                                                                       /s/ Michael Welch
                                                                                          Michael Welch

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119