Richard A. Lapping (SBN 107496)
TRODELLA & LAPPING, LLP
540 Pacific Avenue
San Francisco, CA 94133-4608
Telephone: (415) 399-1015
Email: rich@trodellalapping.com[1]

Jeremiah F. Hallisey (SBN 40001)
Karen J. Chedister (SBN 99473)
HALLISEY AND JOHNSON PC
465 California St, Ste 405
San Francisco, CA 94104
Telephone: (415) 433—5300
Email: jfhallisey@gmail.com
kchedister@h-jlaw.com

Quentin L. Kopp (SBN 25070)
Daniel S. Mason (SBN 54065)
Thomas W. Jackson (SBN 107608)
FURTH SALEM MASON & LI LLP
640 Third Street, 2nd Floor
Santa Rosa, CA 95404-4445
Telephone: (707) 244-9422
Email: quentinlkopp@gmail.com
dmason@fsmllaw.com
tjackson@fsmllaw.com

Francis O. Scarpulla (SBN 41059)
Patrick B. Clayton (SBN 240191)
Law Offices of Francis O. Scarpulla
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Tel: (415) 788-7210
Email: fos@scarpullalaw.com
pbc@scarpullalaw.com

*[Attorneys for clients as listed on signature page]*

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Debtors. | Bankruptcy Case<br><br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**CERTAIN FIRE VICTIMS' PROPOSED MODIFICATIONS TO DEBTORS' PLAN AND CONFIRMATION ORDER** |

---

[1] Associated as co-counsel on behalf of the claimants/creditors herein.

# I
# PRELIMINARY STATEMENT

This pleading is filed to protect the rights of individuals and businesses, as well as other entities that were damaged by the northern California wildfires in 2015, 2017 and 2018, specifically for the over 9,900 fire victims whose votes were not counted by Prime Clerk, as well as for the 6,109 victims who rejected the settlement. As this Court has stated on several occasions, it is the fire victims who require primary consideration in this bankruptcy and who should be fully compensated for their losses; they are the ones this Court has promised to protect above all others.

These fire victims are neither rich nor powerful – unlike the hedge funds that comprise the leadership of the Equity, Noteholder, and Subrogation Claims Groups. The fire victims are ordinary people who, through no fault of their own, lost their homes, all of their worldly possessions, their schools, their houses of worship, their medical facilities, their communities and, for many of them, 128 loved ones – 85 of whom perished because of PG&E's criminal conduct that caused the 2018 Camp Fire, for which PG&E, a previously-convicted felon, has pleaded guilty to another 85 separate felonies. Additionally, the PG&E-caused wildfires burned approximate 435,000 acres and destroyed about 28,000 structures.

These fire victims were told all along that PG&E was going to transfer $13.5 billion into a fund from which their damages would be satisfied before the year's end. In fact, most of these fire victims were urged to vote to accept an otherwise flawed plan because that would be the only way they would be compensated.

But that is not what is going to happen and the Debtors unwillingness to revisit the settlement with the fire victims is part of an ongoing effort by pre-petition equity-owning hedge funds to preserve pre-petition equity value by forcing the fire victims to accept PG&E equity at an above-market valuation, which has the same effect as reducing the aggregate claim amount owed to the fire victims. As an illustrative example, selling equity to the fire victims at 14.9x when that equity is only worth 10.0x has the same effect of issuing equity at 10.0x for claims totaling only $4.53 billion (33.3% less than $6.75 billion).

Case: 19-30088    Doc# 7935    Filed: 06/14/20    Entered: 06/14/20 09:48:32    Page 2 of 13

In the Debtors' recent filings regarding the Backstop Amendments, the Debtors outline how the likely range of implied price-to-earnings ratio ("P/E") multiple of the 2021 Normalized Estimation Net Income (the "NENI") for the equity in the reorganized Debtors is between 8.8x and 10.6x. Meanwhile, however, the fire victims are being forced to accept equity valued at a multiple of 14.9x, some 41%-69% higher than the Debtors' investment banker's current estimate of the market valuation multiple. This means that current equity is doing nothing less than profiting from the sale of equity to the fire victims at an above market price-to-earnings multiple of 14.9x, which has the same effect as reducing the aggregate amount of fire victims' claims to well below the agreed amount of $13.5 billion.

The Debtors have responded to criticism of the settlement agreement with the Official Committee of Tort Claimants (the "TCC") (the "TCC RSA") by saying that the 14.9x is a fair multiple, that the fire victims can benefit from appreciation in the value of the stock, and that the vote by the Fire Victims validates the Debtors' proposed plan of reorganization. However, these assertions are simply untrue.

A. **The Fire Victims are Being Forced to Pay an Equity Valuation Multiple of 14.9x the 2021 NENI, Which By the Debtors' Own Statements is as much as 69% Above Market.**

If one were to assume that it was not the intention of the Debtors to profit by selling stock at above-market values to the fire victims, then it would be reasonable to assume that all parties to the Debtors' recent proposed amendments to the Approved Equity Backstop Commitment Letters (the "Backstop Amendments") prove that this multiple is most definitely not fair now. In fact, the Debtors' motion and the declaration submitted in support of it by the Debtors' own investment banker points to a likely valuation multiple range of 8.8x to 10.6x for the exit equity raise. How is it then that having the fire victims pay 14.9x, some 41%-69% above market, for their valid claims is fair or just? How is it that this was contemplated at the time the TCC RSA was entered into?

///

///

///

B. **The Fire Victim Trust is a Vehicle Meant to Facilitate the Quick Payment of Fire Victim Claims, not Provide an Investment Vehicle for Fire Victims or Raise Equity for PG&E that the Debtors are Either Unwilling or Unable to Raise for Themselves.**

The Fire Victim Trust is merely a vehicle to facilitate the payment of fire victim claims. The additional steps of having to receive and then liquidate PG&E equity not only complicate this, but also expose the fire victims to substantial risks of receiving less value than their claims and long delays before receiving payment due to selling restrictions on the Fire Victim Equity intended for the benefit of the Debtors, the pre-petition equity holders, and the exit equity buyers. The notion that the fire victims agreed to the settlement in the hopes of having the opportunity to benefit from owning stock that could appreciate over time is simply false. If allowed, the fire victims would demand the immediate liquidation and payment of their claims. Buying and holding PG&E stock for a profit was never the intention, is potentially infeasible, and – based on the current state of the markets – is unlikely to result in a profit, as the stock will have to appreciate substantially to achieve a value equal to the agreed settlement amount of $13.5 billion.

C. **The Vote by the Victims to Accept the Settlement in the Absence of Any Alternative Only Proves the Victims Want and Need Compensation Now.**

Many fire victims have been waiting two years or more since PG&E-related wildfires changed their lives forever. Given that many need compensation as soon as possible to pay bills and/or start rebuilding their lives, these fire victims can neither afford nor want to take the risk of getting nothing or having to wait any longer to receive compensation for their respective losses.

Finally, even if one were to believe that the valuation multiple of 14.9 used for Fire Victim Equity was fair at the time the TCC RSA was entered into, and that the fire victims would be able to benefit from appreciation in the value of the stock over time, the world has changed and neither of these assertions are true today. One need only look at the Debtors' filings related to the Backstop Amendments and the declaration in support of the Backstop Amendments submitted by the Debtors' investment banker (the "Ziman Declaration") to see that the capital markets – and how the markets are valuing utilities – have changed dramatically since the time the TCC RSA was entered into due to the ongoing COVID-19 pandemic and the associated disruption in the capital markets.

- 3 -

CERTAIN FIRE VICTIMS' PROPOSED MODIFICATIONS TO DEBTORS' PLAN AND CONFIRMATION ORDER, USBC Case No. 19-30088

Case: 19-30088    Doc# 7935    Filed: 06/14/20    Entered: 06/14/20 09:41:32    Page 4 of 13

Despite all of the aforementioned issues, the Debtors would have this Court believe that the fire victims are getting what they bargained for and that's that. Concurrently, however, the Debtors are now in front of the Court arguing that the equity capital markets have changed so materially that the Debtors need to amend the Approved Equity Backstop Commitment Letters and pay the Equity Backstop Parties an additional 50 million shares worth approximately $600 million.[2] How can it be that the situation has changed so materially for the Debtors, but not for the fire victims whose compensation is to include a large ownership stake in the reorganized Debtors?

It now appears a certainty that the consideration offered by the Debtors and accepted by the Official Committee of Tort Claimants is insufficient to make the promise of quick and full payment of the fire victims' claims come true – and no one really seems to care – none of the hedge funds or subrogation entities rely on PG&E for their energy needs as they are all from either the East Coast or otherwise outside the PG&E service area and, therefore, do not particularly care if PG&E is able to honor its commitment to the victims and communities savaged by the PG&E-related wildfires and/or if it survives as a viable utility. These hedge funds, which on the whole acquired the equity, debt, and other claims, such as the subrogation claims, of PG&E after the wildfires in the fall of 2017 and after PG&E began to exhibit signs of financial distress resulting from the wildfires and the associated liability claims, are now simply going to liquidate their respective holdings upon PG&E's exit from bankruptcy and head back to Wall Street, taking with them billions of dollars in profits and leaving behind a utility hobbled by a debt load approaching twice the amount it had when it entered bankruptcy and by infrastructure in need of tens of billions of dollars in upgrades and repairs to reduce the ongoing risk of causing wildfires — the very issue that led to PG&E being forced to file bankruptcy in the first place.

There is only one person left that can assure that these ordinary people, these fire victims, receive what they are owed – and that one person is The Honorable Dennis Montali.

Therefore, it is for these victims that we respectfully urge this Court to approve the Plan, but only with certain "fixes" so that these ordinary people have a chance to start rebuilding their

---

[2] Based on a closing price of $12.05 on June 11, 2020.

lives.

## II
## INTRODUCTION

Certain Fire Victims ("Victims") in this Chapter 11 bankruptcy proceeding submit their proposed modifications to the Debtors' and Shareholder Proponents' Draft Joint Chapter 11 Plan of Reorganization Dated June 7, 2020 (Dkt. No. 7037) ("Plan Supplement"), and proposed confirmation order ("Order"). The Victims respectfully suggest that these modifications should be included within any confirmed Plan and associated Order.

## III
## PROPOSED AMENDMENTS

**A.   Fire Victims' Consideration**

The Victims were promised $13.5 billion in consideration for their losses. There are several ways to guarantee that they get what they were promised.

*Proposed Fix: (1) Require that the Debtors deposit $13.5 billion in cash into the Fire Victims' Trust ("Trust") on the effective date, which could be accomplished by either increasing the debt, by selling additional equity, and/or requiring the current bondholders to convert debt to equity; or (2) Treat all similarly-situated unsecured unliquidated creditors the same, as is required by Bankruptcy Code Sections 1129(a)(1), (a)(7), 1123(a)(4), and 1122, and have a single fund of both cash and stock to be distributed proportionately to all unsecured creditors, as awarded by Judge Trotter and Ms. Yanni, but paying the Victims ahead of the other claimants.*

If neither of these two Fixes is acceptable to the Court, then we suggest the following alternatives.

**B.   Liquidate the Holding Company**

The Victims are entitled to at least $13.5 billion in real value, but the current Plan does not guarantee them that amount.

*Proposed Fix: The Victims would receive a recovery substantially better under a liquidation scenario than under the Debtors' proposed plan of reorganization.*

*The nature of the Debtors' primary business – electric and gas utility service – and the fact that the primary asset of the holding company, PG&E Corporation, is the equity in its utility*

*subsidiary, Pacific Gas & Electric Company, suggest that the liquidation value of the Debtors as a going concern can be quickly and reasonably estimated.*

*With the capital structure and rates of the utility already approved by the CPUC, the liquidation of the holding company could be achieved by selling all of the equity in the holding company via a public or private equity offering or via a sale to a third-party, which could include a control premium over an equity offering. Nonetheless, assuming an equity offering is pursued – something the Debtors are in the process of executing and something on which the Debtors and their advisors have recently submitted statements about the likely valuation to be realized for the equity in the reorganized PG&E Corp. Specifically, the Debtors' recent motion to approve the Backstop Amendments and the new declaration submitted by Mr. Ziman (Doc. No. 7849), the Debtors' investment banker, in support of the Backstop Amendments have stated that the likely valuation range for such equity is a multiple of between 8.8x to 10.6x the 2021 normalized estimated net income.*

*Estimated normalized net income for 2021 is $2.04 billion as was stated in the Debtors' recent filings. However, in a liquidation scenario, one may question whether $4.75 billion of holding company high yield debt could be raised. While eliminating the holding company high yield debt could result in several benefits, such as improving the entity's ability to pay dividends and the multiples at which the equity may be valued, elimination of this debt would definitely negate the need to pay holding company interest and principal payments. Assuming an incremental $150 million of estimated net income due to reduced interest expense at the holding company brings the total estimated net income for 2021 to $2.19 billion. Applying the aforementioned price-to-earnings multiple range of 8.8x to 10.6x included in the Debtors' recent filings to $2.19 billion in adjusted 2021 normalized estimated net income implies an equity value of a debt-free holding company of between $19.3 billion and $23.2 billion. Adding $33.4 billion of debt to be raised at the utility and $3.8 billion of exiting cash and insurance proceeds brings the total adjusted sources to $56.5 billion to $60.4 billion, as compared to the $59 billion described in the Debtors plan of reorganization. Subtracting the $5 billion contribution due to the state wildfire fund and assuming another $5 billion in*

Case: 19-30088    Doc# 7935    Filed: 06/14/20    Entered: 06/14/20 09:41:32    Page 7 of 13

*administrative and other priority claims leaves between $46.5 billion and $50.4 billion to pay unsecured claims totaling $49.0 billion, which are comprised primarily of unsecured debt claims, wildfire liability claims, and subrogation claims. This <u>implies a liquidation recovery of between 95% and 100% for these three creditor groups</u>, respectively, under a liquidation scenario in the form of cash or cash and stock. However, while the unsecured debt holders and subrogation claim holders currently expected to receiving a 100% recovery under the proposed plan of reorganization in the form of cash or cash and new secured debt, the wildfire victims are expected to receive a recovery of <u>between 80% and 86%</u> based on the assumed P/E multiple put forth by the Debtors, <u>implying a Fire Victim Equity Value of between $4.0 billion and $4.8 billion</u>.*[3]

If the fix of liquidating the holding company is unacceptable to the Court, we suggest the following alternatives.

**C.     The Cash Payments**

Under the Plan, there is to be a payment of $13.5 billion into the Trust to satisfy all of the claims of all of the fire victims. Of that total amount, half is to be contributed in cash and half is payable in stock in the new company emerging from bankruptcy. The cash payments are to be paid in three installments: $5.4 billion is to be paid by August 29, 2020 (but that might be extended to December 31, 2020); $600 million is payable on June 15, 2021 (without interest or security); the final payment of $750 million is payable on June 15, 2022 (without interest or security). The latter two payments are to be repaid through the cash realization of tax benefits to be generated by assumed net operating losses ("NOLs"). However, there is no guarantee that such cash tax benefits from the NOLs will ever be realized. The Victims previously-filed objections explain the problems with the NOLs. *See* Dkt. 7316.

*Proposed Fix:* Any Order should include a provision that guarantees that the Victims receive cash in the total amount of $6.75 billion, even if that means there has to be an additional

---

[3] Based on an equity valuation multiple of 8.8x to 10.6x, as stated in the Debtors filings related to the Backstop Amendments and assumes that fire victims receive 22.19% of the equity in the reorganized Debtors and that there is no discount applied to the value of the deferred cash payments that have no interest or security.

- 7 -

CERTAIN FIRE VICTIMS' PROPOSED
MODIFICATIONS TO DEBTORS' PLAN AND
CONFIRMATION ORDER

Case: 19-30088    Doc# 7935    Filed: 06/14/20    Entered: 06/14/20 09:41:32    Page 8 of 13

*amount transferred to the Trust if it runs out of funds and there are still claims to be paid.*

D.     **The Stock Payments**

Half of the $13.5 billion in consideration is to be paid in stock in the new PG&E as it emerges from bankruptcy. However, as is now clear from the Debtors' own statements, the amount of stock that is being transferred into the Trust does is not worth $6.75 billion in value. (Doc. No. 7316.)

*Proposed Fix: Any Order should include a provision that guarantees that the amount of stock transferred to the Trust ends up having a real cash value of $6.75 billion. This can be accomplished in a number of ways : (1) prohibit the current equity holders from disposing of their stock until after the Trust sells the shares it will hold and require that any shortfall be made up with either cash or stock equivalents; and/or (2) require that any NENI be such that the value of the shares have the equivalent of $6.75 billion in cash; and/or (3) require that any registration rights agreement be on terms no less favorable than those given Equity Backstop Parties; and/or (4) increase the number of shares to be transferred to the Fire Victim Trust such that the value of the equity to be conveyed is equal to $6.75 billion. The exact number of shares and the timing of such transfer can be determined in short order, well in advance of the exit equity financing, removing any uncertainty around this issue and enabling the Debtors to be successful inP their capital raising efforts. The Debtors' will undoubtedly push back on this, but the primary, if not only, group to be impacted by this incremental share issuance are the holders of existing, pre-petition equity, which are currently expected to recover over $6 billion of value even though the pre-petition equity is junior to the claims of the fire victims.[4]*

E.     **Establish the Amount of Damages Suffered by the Victims**

Currently, there is no estimate of the amount of damages PG&E caused the Victims. There is no admissible evidence before this Court that would permit such a finding. There was no evidence offered by the Debtors or the TCC to the Federal District Court charged with estimation as to the amount of damages suffered by the Victims.

There was, however, evidence that the real property damages for the Camp Fire and

---

[4] Based on a closing price of $12.05 on June 11, 2020.

Sonoma and Napa fires exceed $37 billion. The California Insurance Commissioner reports insurance payments of $13 billion, leaving over $24 billion in property damage claims alone. In addition to the real property damages claims, there are 16 other categories of damages identified by the TCC and the Debtors as reported to Judge Donato: (1) personal property losses; (2) relocation expenses; (3) business losses; (4) agricultural losses, including vineyard-related losses; (5) forest and timber losses; (6) other vegetation and tree losses; (7) erosion-related losses; (8) infrastructure losses; (9) personal injury losses; (10) wrongful death; (11) emotional distress damages; (12) wildfire smoke inhalation; (13) post-traumatic stress disorder; (14) geotechnical issues; (15) availability of punitive damages; and (16) attorneys' fees.

Thus, there is no evidence in the record here or in the District Court to establish any estimate of the damages included in the fire victim claims. There was only the fact of a settlement between the Debtors and the TCC for $13.5 billion which, when subjected to certain conditions, turns out to be significantly less than that amount.

The only protection for the 9,900 class members whose votes were not counted as well as for the 6,109 dissenting class members, is the "best interest of the creditors" test embodied in Section 1129(a)(7) of the Bankruptcy Code, and which requires that a nonaccepting creditor receive value as of the effective date that is not less than the amount he or she would receive if the debtor were liquidated under Chapter 7 on that date.

While liquidation in a Chapter 7 proceeding is not desirable given the critical function and services the utility provides to the customers and communities it serves, the impact can be estimated; it has not been. (*See*, Boken Declaration, ¶ 18, Dkt. No. 7514.) Thus, the liquidation value, an important right and the sole statutory protection for dissenting class members, has not been established, and has been effectively written out of the statutory requirements for confirmation.

Therefore, the value of what a dissenting creditor will receive has not been established.

*Proposed Fix: Require that evidence be submitted to show the total amount of damages to the Victims. This evidence is readily available in the form of expert reports that both the Debtors and the TCC have informed the Court they possess. Additionally, require that the Tubbs*

*settlements, which have been kept secret, be placed in the record so that this Court has some information about how much various tort claims were worth for settlement purposes, which can then be applied to the total number of each different tort claim so settled. Another way to estimate the damages to the Victims is to do an analysis of the liquidation value of the Debtors as a going concern and then assure the Victims that they will receive that amount into the Trust.*

F.  **Include a "True-Up"**

*The Victims, uniquely and unlike any other class, are left with all the risk of deferred cash payments and of stock ownership, including overleveraging the company and other changes not disclosed to the class in the disclosure statement.*

*Proposed Fix: Require that if the Trust proves to be underfunded, as a result of the inadequate value of the stock or the gross underestimation of the claim amounts, that the Debtors be required to contribute additional funding paid into the Trust. This Court should retain jurisdiction to order a true-up proceeding to ensure that Victims receive $13.5 billion in actual value as they were promised. A true-up several years down the road is a small price for the shareholders to pay to preserve their equity.*

G.  **Subrogation Claims**

*There is a probability that certain subrogation wildfire claims will be shifted to the Trust and thereby reduce the amount available to the Victims themselves.*

*Proposed Fix: (1) restore the definition of "Subrogation wildfire Claim" that existed when the RSA was entered into to prevent any shift of those subrogation claims into the Trust; and (2) require the subrogation group to contribute $3 billion of the $11 billion in cash and receive stock in that amount, so that the Victims get an additional $3 billion in cash and their stock is reduced by $3 billion.*

## IV
## CONCLUSION

The Victims deserve better than this flawed Plan. And, as we have said, only this Court can protect these Victims.

Dated: June 14, 2020          By:   /s/ Richard A. Lapping
                                                  Richard A. Lapping

| | |
|---|---|
| 1 | Richard A. Lapping (SBN 107496) |
| 2 | TRODELLA & LAPPING, LLP |
|   | 540 Pacific Avenue |
| 3 | San Francisco, CA 94133-4608 |
|   | Telephone: (415) 399-1015 |
| 4 | Email: rich@trodellalapping.com |

Co-Counsel for Creditors
Karen Roberds and Anita Freeman,
for themselves and on behalf of all others
similarly situated

Francis O. Scarpulla (SBN 41059)
Patrick B. Clayton (SBN 240191)
LAW OFFICES OF FRANCIS O. SCARPULLA
456 Montgomery Street, 17th Floor
San Francisco, CA 94104
Telephone: (415) 788-7210
Email: fos@scarpullalaw.com
         pbc@scarpullalaw.com

Attorneys for Creditors
GER Hospitality, LLC, Adolfo Veronese, Richard Carpeneti, Romana Bracco, Jeanette Smylie, Mark Baker, June Stewart, and Joseph P. Russoniello

Jeremiah F. Hallisey (SBN 40001)
Karen J. Chedister (SBN 99743)
HALLISEY & JOHNSON, PC
465 California Street, Suite 405
San Francisco, CA 94104
Telephone: (415) 433-5300
Email: jfhallisey@gmail.com

Attorneys for William, Ming, and Fuguan O'Brien, Kye Heinstein Michael Heinstein, Karen Roberds, Anita Freeman, William N. Steel

Quentin L. Kopp (SBN 25070)
Daniel S. Mason (SBN 54065)
Thomas W. Jackson (SBN 107608)
FURTH SALEM MASON & LI LLP
640 Third Street, 2nd Floor
Santa Rosa, CA 95404-4445
Telephone: (707) 244-9422
Email: quentinlkopp@gmail.com
         dmason@fsmllaw.com
         tjackson@fsmllaw.com

Attorneys for Ken Born, Christine Born, Cathy Ference, William Ference, Allen Goldberg, Robert Johnson, Patricia Goodberg, Paul Goodberg, Terence Redmond, Melissa Redmond, Rita Godward, and Sonoma Court Shops, Inc.

# CERTIFICATE OF SERVICE

I, Francis O. Scarpulla, declare as follows:

I am a citizen of the United States and over the age of eighteen (18) years and not a party to the within action. My business address is 456 Montgomery Street, 17th Floor, San Francisco, CA 94014.

On June 14, 2020, I served document(s) described as:

**CERTAIN FIRE VICTIMS' PROPOSED MODIFICATIONS TO DEBTORS' PLAN AND CONFIRMATION ORDER**

on the interested parties in this action as follows:

[ ] BY MAIL: Service was accomplished by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, addressed as set forth above.

[X] BY E-MAIL/NEF: Service was accomplished through the Notice of Electronic Filing ("NEF") for all parties and counsel who are registered ECF Users and those identified below:

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. This declaration was executed on June 14, 2020 at San Francisco, California.

          /s/ Francis O. Scarpulla
          Francis O. Scarpulla