1   Theresa Ann McDonald

2   5044 Russell Drive

3   Paradise, CA 95969

4   Phone Number 530-636-3148

5   Tmcdonald120@yahoo.com

6

7                    **UNITED STATES BANKRUPTCY COURT**

8                            **NORTHERN DISTRICT**

9                     **(SAN FRANCISCO DIVISION)**

10  In re:

11  PG&E CORPORATION                              Bankruptcy Case

12                                                No. 19-30088-DM

13        -and-                                   Chapter 11

14                                                (Lead Case)

15  PG&E GAS AND ELECTRIC COMPANY                 (Jointly Administered) Case

16        Debtors                                 No. 19-30088-D

17        vs

18  Theresa Ann McDonald                          Proof of Claim 54975

19        Creditor                                Filed October 21, 2019

20                                                Camp Fire

21                                                Judge:  Honorable Dennis Montali

22

23                                                Emergency Pleading to Record

24                                                Details of Objection to Confirmation

25                                                of Case No. 19-30088-DM

26

27                                                Relief Requested:  Consider the

28                                                Fairness of the Objections I raise

1   and the Possibility of Implementing

2   the Proposed Solutions Before

3   Issuing A Decision to Confirm the

4   Proposed Plan

5

6   I am a fire claimant in the above referenced case. I lost my home at 5044 Russell Drive,

7   Paradise, CA on November 8, 2018 during the Camp Fire. My Proof of Claim Number is 54975.

8   I first indicated my objection to PG&E's settlement offer by voting to reject the Plan.

9   The following is a list of just a few of the reasons why I object to the Confirmation of the

10  *Amended Chapter 11 Plan Debtor's and Shareholder Proponents' Joint Chapter 11 Plan of*

11  *Reorganization Dated May 22, 2020* (the Plan) (Document 7521), and the associated documents

12  that are an integral part of the feasibility of the Plan, including the eight *Supplements To Plan*

13  *Supplement....*

14

15  First: I object to the Confirmation of the Plan because even as of June 14, 2020 it is not a

16  finalized document. The Debtors and Shareholder Proponents retain their right to modify the

17  plan.

18

19  "Subject to the Certain Consent Rights set forth in Article I of this

20  Plan, the Plan may be amended, modified, or supplemented by

21  the Plan Proponents, in the manner provided for by section 1127

22  of the Bankruptcy Code or as otherwise permitted by law without

23  additional disclosure pursuant to section 1125 of the Bankruptcy

24  Code, except as the Bankruptcy Court may otherwise direct, so

25  long as such action does not materially and adversely affect the

26  treatment of holders of Claims or Interests hereunder. The Plan

27  Proponents may institute proceedings in the Bankruptcy Court to

28  remedy any defect or omission or reconcile any inconsistencies in

29  the Plan or the Confirmation Order with respect to such matters

30  as may be necessary to carry out the purposes and effects of the

31  Plan and any holder of a Claim or Interest that has accepted the

32  Plan shall be deemed to have accepted the Plan as so amended,

modified, or supplemented. Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims or Interests." (Document 7521, Section 12.6 page 92 of 107) (Apparently unchanged in Document 7937, page 94 of 212)

Why do I object to Section 12.6? Under Article I the term Effective Date is defined as:

"...a Business Day on or after the Confirmation Date selected by the Debtors, on which the conditions to the effectiveness of the Plan specified in Section 9.2 hereof have been satisfied or effectively waived in accordance with the terms hereof." (Document 7521, Paragraph 1.58) (Apparently unchanged in Document 7937)

Section 9.2 lists fifteen (15) different requirements that must be met prior to the Effective Date of the Plan. The last of those requirements is:

*"The Plan shall not have been materially amended, altered, or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 12.6 of the Plan."* (Document 7521, Section 9.2(o)) (Apparently unchanged in Document 7937)

This is just one example of the types of pitfalls the Plan is riddled with. The Debtors and Shareholder Proponents can modify the Plan without the Bankruptcy Court's approval until the Effective Date. The Effective Date is dependent upon 15 requirements, one of which is that the Plan has not been amended, altered, or modified from the Plan as confirmed by the Confirmation Order unless such amendment, alteration, or modification is made before the Effective Date. Combined, the ability of the Debtors and Shareholder Proponents to amend, alter, or modify the Plan **AFTER** it is confirmed by the Confirmation Order, without the Bankruptcy Court's approval or order is unlimited until the Effective Date, and they determine the Effective Date.

1    Granted, Section 12.6 limits the Plan Proponents to, "appropriate technical adjustments

2    and modifications to the Plan" without an order or approval of the Bankruptcy Court, and only if,

3    "such technical adjustments and modifications do not materially and adversely affect the

4    treatment of holders of Claims or Interests." However, I was unable to find definitions for

5    "technical adjustments and modifications" or "adverse affect on the treatment of holders of

6    Claims or Interests"; neither was I able to find anything that defined who was responsible for

7    determining if an adjustment or modification was of a technical nature or if such change had an

8    adverse affect on the treatment of holders of Claims or Interests.

9    Evidence of the problem this fluidity creates for the Court can be found in Document

10   7936, the *Trade Committee's Joinder To The Official Committee Of Unsecured Creditors'*

11   *Statement In Response To Plan Proponents' Response And Proposed Modification [DI 7896]*

12   *And Objection To The Notice Of Filing of Seventh Supplement To Plan Supplement In*

13   *Connection With The Debtors' And Shareholder Proponents' Joint Chapter 11 Plan Of*

14   *Reorganization [D.I. 7894].*

16   *"Specifically, the Debtors, through the Seventh Plan Supplement*

17   *and proposed changes to the Confirmation Order…, have*

18   *unilaterally determined that they should be given fifteen (15)*

19   *business days from the entry of the Confirmation Order to*

20   *determine whether executor contracts or leases should be*

21   *assumed or rejected, when under this Court's Disclosure*

22   *Statement (defined below) and the Plan itself, the deadline to*

23   *make that decision has already passed."*(Document 7936, page 2

24   of 7, lines 14-22)

25   To summarize my first objection: The Plan is full of complicated language that appears

26   to have the intention of allowing the Debtors and Shareholder Proponents the freedom to make

27   changes with no oversight by the Court or anyone else. So far as I could tell they are not

28   required to provide notice of any such changes to the Fire Claimants, so we won't have the

29   information we would need to lodge a complaint or appeal with the Bankruptcy Court, or any

30   other State or Federal Court. Claimants are completely unprotected.

1 **Second:** I object to the fact that the Court never received information it stated was an

2 important safe-guard to the rights of the Fire Victims. As the Court wrote in its

3 *Recommendation For Withdrawal Of Reference Of Proceeding In Part*:

4

5 "The Debtors are expected to propose reorganization plans that

6 will involve a limited or 'capped' fund for distribution to the

7 wildfire victims and their insurers after plan confirmation and thus

8 provide for the discharge of preconfirmation wildfire liabilities.

9 Consequently, the estimation of the amount of money to be

10 capped is critical for a variety of reasons; in particular it is

11 necessary to assure that the amount is reasonably likely to

12 provide for full satisfaction of the victims' claims for which it is

13 established." (Document 3648, page 4 of 8, lines 13-21)

14 As I pointed out in an earlier pleading, (Document 7820, page 3, lines 10-11), those

15 words are still true. The Debtors did propose a reorganization plan that involves a limited fund

16 for distribution to wildfire victims. And it is still important for this Court to be assured that the

17 limited amount is likely to provide full satisfaction of the victims' claims. This Court has no

18 data on which to base such an assurance.

19 The Federal District Court of Northern California elected not to provide this Court with

20 the requested Estimation of Claims (Document 7858). However, that Court's decision does not

21 negate this Court's obligation to be aware of an estimated total claims amount in order to

22 determine whether or not the proposed $13.5 billion offered to Fire Victims is a fair and

23 equitable amount. The existence of a full cash offer of $11 billion dollars to the Subrogation

24 claimants makes it even more imperative that the Court have a means of making that

25 determination. The rights that are the subject of the Subrogation Rights Settlement Agreement

26 only exist in California law after the insured has been made whole.

27 As I pointed out in a separate earlier pleading (Document 7890) which has not yet been

28 ruled upon:

29 "During the settlement negotiations the Parties had available to

30 them extensive regression analyses conducted by economic

experts that analyzed past settlement data and isolated past
settlement amounts for specific categories of damages that could
then be applied to the wildfire claims at issue.  This data was
supplemented by opinions from highly qualified subject matter
experts who considered, among other things, the ways in which
the 2017 and 2018 wildfires were both similar and different from
the circumstances underlying prior settlements.  These experts
also offered expertise on the likely magnitude of damages for
specific categories of damages as well as issues related to the
likelihood of liability with regard to each wildfire.  At the time of
the settlement, these opinions were well-developed and the
Parties were just a week away from exchanging expert reports in
the estimation proceedings, **which were to establish a basis for
the Court to determine the potential damages and likelihood of
liability with respect to the wildfires in order to establish the
aggregate amount of Fire Victim Claims.  As explained in more
detail below, this information provided the Parties with a
substantial basis for negotiating and arriving at the Aggregate
Fire Victim Consideration."** (Federal District Court for Northern
California Civil Case 3:19-cv-05257-JD Document Number 378,
page 5, lines 1-13) (Emphasis mine)

The Court does not have a duty to satisfy itself that the Fire Victims are willing to accept
$13.5 billion in settlement; it has a duty to determine that the settlement is fair and equitable.
The Court does not have a duty to accept a **negotiated Aggregate Fire Victim Consideration;**
it has an obligation to determine an **amount that is reasonably likely to provide for full
satisfaction of the victims' claims.**

That duty is even greater because of the power given to the Fire Victim Trust Trustee to
determine "the allowed amount" of victims' claims, thereby again causing the **actual amount** of
damages to be uncalculated and unestimated.  Ignoring the obligation to make a good faith effort
to estimate the true amount of total claims opens the door to appeal and could make the award of
$11 billion in the Subrogation Rights Settlement a violation of California law.

The Debtors tried to get around the need to produce an amount of actual claims by
convincing District Court Judge James Donato that by voting to accept the Plan, which includes

1  a Made Whole Release, the Fire Victims voluntarily gave up their right to full compensation in

2  the event the $13.5 billion were to fall short of that mark.

3  "12.    Consistent with the foregoing, it is expressly understood

4  and agreed by claimant that claimant is waiving and releasing all

5  known or unknown claims under the Made Whole Doctrine.  It is

6  expressly understood and agreed by insurer that insurer is waiving

7  and releasing all known or unknown claims under the Made

8  Whole Doctrine as to claimant." (Document 7521, Exhibit C,

9  Mutual Made Whole Release, page 106 of 107)

10

11  Fire Victims were offered only one option, one that **requires** them to surrender the very

12  valuable right to be Made Whole before their insurer can proceed against the guilty third party

13  for compensation of paid claims.  Most Fire Victims are not attorneys.  I would argue that

14  relatively few people understood the clause, or even managed to get that far in trying to read the

15  complex and convoluted document we were sent.  And I would argue that because the Plan is

16  dependent upon the Mutual Made Whole Release for the legality of both the Fire Victims

17  Settlement Agreement and the Subrogation Rights Settlement Agreement, the Court has an even

18  greater duty to examine the relationship between the amount needed to fully compensate the Fire

19  Victims and the $13.5 billion settlement amount that is being offered.

20  The Federal and State Agreements (Document 7399) will strip away $117 million of the

21  value of the "Rights and Causes of Action" and $204.3 million of the Interest and Excess

22  Monetization that might otherwise be expected to increase the value of the $13.5 billion

23  settlement amount offered to the remaining Fire Victims.  Those agreements did not exist at the

24  time the Plan was submitted to Fire Victims for acceptance or rejection.  The Court needs to also

25  consider that Fire Victims had no reason to suspect that there were still huge governmental

26  claims being included within the Fire Victim Trust after all the publicity surrounding the

27  agreements by FEMA to subrogate its claim and the removal of other governmental claims from

28  the Fire Victim Trust.

**Third:** I object to the fact that the Subrogation Claimants are getting $11 billion in cash on the Effective Date and the Fire Victims will have to wait years to get their final payments. The Subrogation Claimants are insurance companies or investment groups that are perfectly capable of carrying large investments for a substantial period of time. The Fire Victim Claimants are mostly people, many of whom have already been waiting for almost 5 years to receive a settlement. The Subrogation Claimants need their cash to increase their profit margin. Most Fire Victims need the cash to rebuild – to rebuild a primary home, possibly rental income property, maybe a small business store front. At least in Paradise the need for the capital infusion is desperate. People are still living in recreational vehicles, some living in their cars 18 months after the fire because there are so few affordable homes or apartments for them to buy or rent.

Even with the $5.4 billion of starting cash, it is going to take time to earn the $115.3 million in interest payable to CAL FIRE. Even with the Registration Rights Agreement, it is going to take time to sell off $6.75 billion in stock without driving the per-share value down. Any Excess Monetization of such sales is not quickly available for distribution to the Fire Victims. The first $89 million of gains on the sale of the stock are restricted to the State Agencies, so there will be less cash available to distribute to the Fire Victims. The terms of the State Agencies Settlement Agreement make it very clear that the professionals who negotiated those agreements expect the Fire Victim Trust to be around for many years.

**Fourth:** I object to the secrecy that has surrounded the entire bankruptcy proceedings. I am a Party, but I was excluded. I want to know why the attorneys who were supposed to be representing the individual fire victims allowed the Plan and its associated documents to ever reach the Court. How in the name of whatever deity a person may recognize did the reportedly skilled and experienced attorneys of the TCC allow companies and corporations to be served a feast in a palace while human victims stood hungry and homeless? How were settlement amounts reached, and what did the underlying data show? And how can this Court even consider confirming a Plan that puts profits for some ahead of justice for so many innocents.

Insurance companies are in the business of taking risks, and any investment group that purchased subrogation rights did so willingly and with the knowledge that there could be delays

1  in getting a return on that investment.  No one will ever convince me that any individual who had

2  to flee the inferno that was Paradise on November 8, 2018, wanted that experience.

3  Maybe we should have known what was coming, but we didn't.  I don't know how many

4  times I told people I wasn't that worried about fire because if my house burned the whole town

5  would be threatened, and there was no way the professionals would allow that to happen.  I guess

6  my faith in the government employees who were supposed to prevent the disaster was misplaced.

7  I can only hope that my faith in the Courts is not misplaced as well.

8  The Debtors point to the high percentage of fire victims who accepted the plan.  I point

9  out that they were not offered any alternative that would let them start to move forward.  I would

10  also point out that thousands of us **rejected** the Plan and even more of us never got an

11  opportunity to vote because Prime Clerk and their agents took over 6 weeks to deliver

12  solicitation packets, or couldn't find us when packets were returned.  Maybe the fact that so

13  many could not be found (was any real attempt made?) will give the Court some idea of the

14  nomadic existence we've been reduced to since the fires.  We are trying so hard to find new

15  homes, don't condemn us to more years of waiting.

16  No one should have to accept the idea that a dividend paid or bonus received is more

17  important than the over 100 lives lost in the fires for which this proceeding is supposed to

18  determine compensation.  No one should have to accept the idea that profit is more important

19  than justice.  The Court's purpose is justice, and sometimes that means protecting the innocents

20  from the decisions of those who are supposed to represent them.

21  # SOLUTIONS:

22  **First:**  Require PG&E to provide the Court with semi-final documents.  Not just a semi-final

23  version of the Plan but also a semi-final version of each of the various settlement agreements,

24  registration rights agreements, schedules, claims resolution procedures, supplements and

25  anything else that they want to have part of their Reorganization Plan.

26  Any issues that are still undecided or incomplete should be decided by the Court, and

27  those changes should be incorporated into the final version of each document.  Only then will the

1  Court have the ability to review a complete roadmap to the reorganization and make an informed

2  decision whether or not to confirm the Plan. The Plan cannot remain a moving target.

3

4  **Second:** Require the Debtors and the TCC to produce all the final reports and expert opinions

5  and every bit of actual data they claimed they looked at and considered as the foundation for

6  their determination that $13.5 billion was a suitable amount to fund the Fire Victim Trust. Turn

7  that data over to an independent expert in order to obtain the Estimation of Claims that the

8  Federal District Court of Northern California did not provide this Court. Only then will the

9  Court be able to determine if $13.5 billion is an amount likely to make fire victims whole and

10  only then will the Court be able to determine if it can legally confirm a plan that provides $11

11  billion in cash to subrogation claimants.

12

13  **Third:** Forget about the artificial June 30, 2020, deadline. Forget about AB 1054 and the Go

14  Forward Wildfire Fund. Meeting that deadline is not the Court's job. It was PG&E's job, and

15  once again they failed.

16  The legislature can extend that date if necessary, but they can't do the Court's job. The

17  Court's job is to balance the rights and needs of the injured parties against the wisdom and

18  benefit of having PG&E emerge from a bankruptcy proceeding as a viable corporation, able to

19  provide power in a safe manner and still have a profitable future. Do not let the political

20  pressure that is being applied with such a heavy hand damage the longstanding history of

21  integrity and independence that the Courts have maintained.

22  PG&E could have wrapped this proceeding up a month ago, two months ago. Instead

23  they dragged their feet. Now they are trying to force the Court to a rushed decision in order to

24  meet a deadline that was honestly only ever of importance to them. Please do not let PG&E, the

25  State Legislature and the Governor push this Court into a hurried decision that is more likely to

26  be appealed.

27  Order the delivery of the information that apparently was available and that the Federal

28  District Court should have been given 6 months ago. Have the analysis done to arrive at a

1  legitimate, calculated Estimate of Claims, not one that is simply the maximum amount PG&E

2  was willing to forfeit.

3      Take the time needed to weigh the facts of the case, and render a fair and equitable

4  ruling, not the hastily constructed Confirmation Order PG&E is trying to force the Court into,

5  one that will be immediately appealed because it was based on urgency not justice.

6

7  **Fourth:** Shine a bright light on the proceedings of this case. The Court can expose the end

8  result of confidential mediation sessions without revealing the arguments and discussions that

9  resulted in those bargains. Make a reasonable level of summarized data available to not only the

10 Claimants, but to the general public as part of the record of this Court. Continuing to conceal all

11 the actual data involved in this case makes it **appear** that the Court is shielding PG&E, and that

12 weakens the public perception of the Judicial Branch as an independent and impartial guardian of

13 the law.

14

## In Conclusion:

16     I object to the Court being asked to confirm a Plan that is still not finalized. I object to

17 the Court being asked to issue a Confirmation Order when the Debtors and the TCC have

18 withheld the information the Court needs to determine if the Plan is fair to the Fire Victims. I

19 object to the attempt to rush the Court into make a ruling before it takes the time needed to study

20 finalized documents before making a decision. That decision will have a dramatic impact on so

21 many lives, the lives of everyone who is forced to depend on PG&E for power. And more than

22 anything else I object to the veil of secrecy that has been allowed to surround what is supposed to

23 be a proceeding of public record, especially since that veil has eroded the public's perception of

24 the Judiciary as a strong guardian of the law, immune to political pressure and absolutely not for

25 sale to anyone for any price.

26

27     *Theresa Ann McDonald*