

<u>EXHIBIT A</u>

FILED
06/04/20
04:59 PM

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE

STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company for (1) Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et seq. | A.20-04-023<br>(Filed April 30, 2020) |

**PROTEST OF THE CITY AND COUNTY OF SAN FRANCISCO TO THE APPLICATION OF PACIFIC GAS AND ELECTRIC COMPANY FOR (1) ADMINISTRATION OF STRESS TEST METHODOLOGY AND (2) DETERMINATION THAT $7.5 BILLION OF 2017 CATASTROPHIC WILDFIRE COSTS AND EXPENSES ARE STRESS TEST COSTS THAT MAY BE FINANCED THROUGH ISSUANCE OF RECOVERY BONDS PURSUANT TO 451.2(C) AND SECTION 850 ET SEQ.**

June 4, 2020

DENNIS J. HERRERA
City Attorney
THERESA L. MUELLER
Chief Energy and Telecommunications Deputy
SUZY HONG
Deputy City Attorney

Attorneys for
CITY AND COUNTY OF SAN FRANCISCO
City Hall Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4700
E-Mail: suzy.hong@sfcityatty.org

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................1

II. BACKGROUND .................................................................................................2

III. GROUNDS FOR PROTEST ...............................................................................3

    A. The Application Does Not Meet the Requirements of AB 1054 .................3

        1. The proposed securitization transaction is not neutral, on average, to ratepayers ..........................................................................4

        2. The proposed transaction does not adequately recognize ratepayer contributions and compensate ratepayers accordingly.....6

    B. The Application Does Not Meet the Requirements of Public Utilities Code Section 451.2, as Implemented by Commission Decision 19-06-027 ......................................................................................................7

        1. The Stress Test methodology requires consideration of asset sales in determining both the Excess Cash available to a utility and whether the Commission should apply a Regulatory Adjustment to the Customer Harm Threshold ................................7

        2. Other potential issues under Section 451.2 and D. 19-06-027 ........9

            a. Whether PG&E is eligible to access the Stress Test............9

            b. Whether PG&E has proposed adequate ratepayer protection measures ...........................................................10

IV. THE ISSUANCE OF RECOVERY BONDS BASED ON THE PROPOSED TRANSACTION WOULD NOT BE CONSISTENT WITH THE PUBLIC INTEREST AS REQUIRED BY PUBLIC UTILITIES CODE SECTION 850.1......................................................................................................................10

V. THE APPLICATION'S TREATMENT OF DEPARTING MUNICIPAL CUSTOMERS MUST BE CLARIFIED SO AS NOT TO UNREASONABLY INTERFERE WITH THE CONSTITUTIONAL AND STATUTORY RIGHTS OF PUBLIC ENTITIES TO PROVIDE UTILITY SERVICE .............................12

VI. EFFECT OF THE APPLICATION ON PROTESTANT.....................................13

VII. PROCEDURAL SCHEDULE, NEED FOR HEARINGS, AND CATEGORIZATION OF PROCEEDING .......................................................13

    A. Need for Hearing..........................................................................................13

        1. Issues to be considered and facts at evidentiary hearing ...............13

    B. Proposed Schedule .......................................................................................13

    C. Proposed Categorization ..............................................................................14

    D. Service List ..................................................................................................14

VIII. CONCLUSION...................................................................................................15

BEFORE THE PUBLIC UTILITIES COMMISSION OF THE

STATE OF CALIFORNIA

| | |
|---|---|
| In the Matter of the Application of Pacific Gas and Electric Company for (1) Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et seq. | A.20-04-023 (Filed April 30, 2020) |

**PROTEST OF THE CITY AND COUNTY OF SAN FRANCISCO TO THE APPLICATION OF PACIFIC GAS AND ELECTRIC COMPANY FOR (1) ADMINISTRATION OF STRESS TEST METHODOLOGY AND (2) DETERMINATION THAT $7.5 BILLION OF 2017 CATASTROPHIC WILDFIRE COSTS AND EXPENSES ARE STRESS TEST COSTS THAT MAY BE FINANCED THROUGH ISSUANCE OF RECOVERY BONDS PURSUANT TO 451.2(C) AND SECTION 850 ET SEQ.**

**I.     INTRODUCTION**

Pursuant to Rule 2.6 of the Rules of Practice and Procedure of the California Public Utilities Commission ("Commission"), the City and County of San Francisco ("San Francisco") submits this protest to the Application of Pacific Gas and Electric Company for (1) Administration of Stress Test Methodology Developed Pursuant to Public Utilities Code Section 451.2(b) and (2) Determination That $7.5 Billion of 2017 Catastrophic Wildfire Costs and Expenses Are Stress Test Costs That May Be Financed Through Issuance of Recovery Bonds Pursuant to Section 451.2(c) and Section 850 et seq. ("Application"). Pacific Gas & Electric Company (PG&E") filed the Application on April 30, 2020. Notice of the Application first appeared in the Commission's Daily Calendar on May 5, 2020. Rule 2.6 provides that protests to an application be filed within 30 days of the date the notice of the filing of an application first appears in the Daily Calendar. Therefore, this protest is timely filed.

II. BACKGROUND

San Francisco protests the Application on the following grounds:

- The proposed securitization transaction does not meet the requirements of AB 1054.
- The Application does not meet the requirements of Public Utilities Code section 451.2[1] and Commission Decision (D.) 19-06-027 implementing section 451.2.
- The proposed issuance of recovery bonds does not satisfy the requirements of Public Utilities Code Section 850.1(a)(1)(A)(ii) because it is not consistent with the public interest.
- The Application's treatment of departing municipal customers must be clarified so as not to unreasonably interfere with the constitutional and statutory authority of public entities to provide utility service.

This list of issues is not exhaustive and San Francisco reserves its right to propose additional issues for consideration as it continues to review the Application and Prepared Testimony ("Testimony") and conducts discovery.

The Application stems from PG&E's bankruptcy plan of reorganization, which the Commission recently approved in I.19-09-016. As part of its reorganization plan, PG&E proposed to issue $6 billion in "Temporary Utility Debt" upon emergence from bankruptcy to pay wildfire claims.[2] The Application proposes a $7.5 billion securitization, which would be used to retire the $6 billion in Temporary Utility Debt and accelerate a portion of payments to be made to a Fire Victim Trust established to pay the claims of victims of PG&E wildfires in 2015, 2017, and 2018.[3]

Although the Application is closely connected to the reorganization plan that the Commission has already approved, Commission approval of this Application should not be a foregone conclusion. As the Commission stated in its decision approving the reorganization plan, "[n]either this decision nor PG&E's reorganization plan and other documents resolving the insolvency proceeding limit or

---

[1] All statutory references are to the Public Utilities Code unless otherwise stated.
[2] Application, at 3.
[3] *Id.*, at 37.

Case: 19-30088    Doc# 7950-1    Filed: 06/15/20    Entered: 06/15/20 11:26:17    Page 4 of 17

otherwise modify the Commission's authority or jurisdiction."[4] Further, while the Governor has voiced support for the proposed securitization in concept, his statement made clear that the securitization must still "meet all legal requirements as determined by the CPUC…"[5] As set forth in greater detail below, the Application does not meet all applicable legal requirements.

III. **GROUNDS FOR PROTEST**

A. **The Application Does Not Meet the Requirements of AB 1054**

While PG&E makes almost no mention of it, the Application is subject to the requirements of AB 1054. This issue was explicitly addressed by the Commission in its decision regarding PG&E's bankruptcy reorganization plan because PG&E had raised the prospect of this Application in connection with its reorganization plan. According to that decision:

> The Commission will review the proposed nominally offset securitization application in light of PG&E's commitments made in its Bankruptcy Court filings, entered into the record here via its March 24, 2020 Motion for Official Notice.
>
> Given the close connection between the [bankruptcy reorganization] plan and the proposed securitization and PG&E's commitment that its securitization application will meet the requirements of AB 1054, including ratepayer neutrality, the securitization application should satisfy those requirements.[6]

Under AB 1054, the Commission must determine whether PG&E's bankruptcy reorganization plan and other documents resolving the insolvency proceeding are (i) neutral, on average, to ratepayers, and (ii) recognize the contributions of ratepayers, if any, and compensate them accordingly through mechanisms approved by the Commission, which may include sharing of value appreciation.[7] The Application does not meet either of these requirements of AB 1054. Instead, the proposed securitization requires ratepayers to pay actual debt service on securities issued to fund wildfire claims

---

[4] D.20-05-053, at 121, Conclusion of Law 9.

[5] Governor Gavin Newsom's Statement in Support of Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Approving Case Resolution Contingency Process and (II) Granting Related Relief, at 4 ¶ 5 (Docket #6402 of the U.S. Bankruptcy Court, District of Northern California, Case 19-30088, *In re PG&E Corporation*).

[6] D.20-05-053, at 85.

[7] Public Utilities Code § 3292(b)(1)(D), (E).

while promising reimbursement based solely on PG&E's optimistic "expectations" regarding its future financial performance, without any guarantee of realizing such reimbursement. In other words, PG&E's proposal asks the Commission to exchange definite, non-modifiable rate payments for rosy promises, all while demanding that the Commission abdicate any future ratemaking role with respect to such required rate payments without regard to the actual outcome of such "expectations."

### 1. The proposed securitization transaction is not neutral, on average, to ratepayers

The basic structure of the proposed securitization will result in an irrevocable, non-bypassable customer charge (fixed recovery charge or "FRC"), which PG&E expects to offset with proceeds ("Customer Credits") from a Customer Credit Trust ("Trust").[8] However, if the Trust does not perform as anticipated, ratepayers will still be liable for the fixed recovery charge and neither ratepayers nor the Commission will have any recourse against PG&E or the Trust if the Customer Credits generated by the Trust are insufficient to completely offset the FRCs paid by ratepayers.

According to PG&E's Testimony, PG&E's failure to provide the Customer Credit would not:

- Change the obligations of consumers to pay FRCs; or
- Allow the CPUC to (i) adjust, amend or modify the FRCs, recovery costs, recovery property or the Recovery Bonds authorized by the Financing Order; (ii) rescind, alter or amend the Financing Order; (iii) revalue or revise for ratemaking purposes the recovery costs or the costs of recovering, financing, or refinancing the recovery costs; or (iv) in any way reduce or impair the value of recovery property either directly or indirectly by taking FRCs into account when setting other rates for PG&E.[9]

Thus, the linchpin of the proposed securitization is an asymmetry between the fixed recovery charges that are guaranteed to be paid by ratepayers and the non-guaranteed Customer Credits. This lopsided structure, by its nature, disadvantages ratepayers and is, therefore, not ratepayer neutral. Further, according to PG&E, there is likely nothing PG&E can do to address this disparity:

> the structure of the Customer Credit cannot require a guarantee from PG&E. In the event that PG&E were to guarantee the Customer Credit mechanism, S&P Global Ratings (S&P) would likely treat it as an enforceable contractual commitment and, therefore, the Securitization would be on-credit and the forecasted improvement in financial metrics would not occur. This would

---

[8] Application, at 9.

[9] Testimony, at 6-17, line 28 through 6-18, line 8.

preclude accelerating PG&E's path back to an investment-grade issuer credit rating.[10]

In addition to not being neutral to ratepayers, the proposed securitization could violate PG&E's commitment not to seek recovery of wildfire claims costs from ratepayers.[11] If the amount of Customer Credits is insufficient to fully offset the fixed recovery charges paid by ratepayers, ratepayers would still be ultimately and irrevocably liable for paying the securitized wildfire claims costs. This result is inconsistent with PG&E's pledge that ratepayers not be responsible for wildfire claims costs.

PG&E "expects"[12] that Customer Credits will offset the fixed recovery charges paid by ratepayers. PG&E's expectations do not provide sufficient basis for the Commission to determine that the proposed transaction is neutral, on average, to ratepayers pursuant to AB 1054. PG&E's expectations regarding the availability of Customer Credits are based on numerous assumptions, including the value of the Net Operating Losses ("NOLs"), the ability to monetize the NOLs that will be needed to provide income to the Trust, the timing of such monetizations, and the performance of the Trust's proposed investment portfolio.[13] There are significant questions concerning the assumptions that PG&E relies on. For example, if PG&E could so easily monetize the NOLs to fund the Trust, then why is the proposed securitization necessary? Instead, PG&E should seek to directly securitize the assets that are being contributed to the Trust, most notably the NOLs, to amortize the $6 billion in Temporary Utility Debt rather than replace that debt through the proposed ratepayer-supported securitization. Alternatively, PG&E could seek to amortize the Temporary Utility Debt over time from the anticipated cashflows from monetization of NOLs. In fact, PG&E has already

---

[10] *Id.*, at 1-8, lines 12-18.

[11] Application, at 7, citing to Debtors' Motion Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 for Entry of an Order (I) Approving Case Resolution Contingency Process, and (II) Granting Related Relief, at 18-19 ("Case Resolution Contingency Process") (Docket #6398 of the U.S. Bankruptcy Court, District of Northern California, Case 19-30088, *In re PG&E Corporation*). ("If the CPUC does not grant approval of the Securitization, the Reorganized Utility will not seek to recover in rates any portion of the amounts paid in respect of Fire Claims under the Plan.").

[12] *See*, Application, at 9-10.

[13] *See*, Testimony, Ch. 6.

agreed to the latter in the event the Commission does not approve the Application. According to the Case Resolution Contingency Process agreed to by PG&E and the Governor's office:

> <u>Net Operating Losses</u>. The Debtors' payment of wildfire claims under the Plan will result in substantial net operating losses ("NOLs"). Consistent with the Debtors' financial projections provided in the Disclosure Statement, the Reorganized Utility agrees to use cash flows generated by application of these NOLs in future years in connection with the Securitization. **If this Securitization is not approved or consummated, the Reorganized Utility agrees to use these cash flows to amortize the $6 billion in Temporary Utility Debt** . . . .[14]

These alternatives are more likely to meet the AB 1054 requirement of ratepayer neutrality than PG&E's proposed securitization because they would not require ratepayers to bear irrevocable, non-bypassable fixed recovery charges without any guarantee of offsetting Customer Credits.

Finally, San Francisco also has concerns about: (i) whether the NOLs should be considered shareholder contributions or whether they should be used to benefit ratepayers in the first instance rather than being used to offset fixed recovery charges paid by ratepayers;[15] (ii) whether the Trust is "bankruptcy-remote" such that the Trust and Customer Credits would be protected in the event PG&E decides to file for bankruptcy again;[16] and (iii) even if the Trust is "bankruptcy-remote", whether the NOLs would survive a future bankruptcy such that assets in the Trust had any value.

### 2. The proposed transaction does not adequately recognize ratepayer contributions and compensate ratepayers accordingly

Due to the fundamental inequality between the fixed recovery charges that are guaranteed to be paid by ratepayers versus the non-guaranteed Customer Credits, the proposed securitization also fails

---

[14] Case Resolution Contingency Process, at 19.

[15] D.20-05-019 (approving with modifications a settlement agreement regarding penalties for PG&E's 2017 and 2018 wildfires), at 82, Ordering Paragraph 1(b) ("Any tax savings (i.e., financial benefits) associated with the financial obligations for operating expenses in the settlement agreement, as modified by this decision, shall be returned for the benefit of ratepayers once PG&E has realized the savings."); D.19-06-027, at 34 (a Stress test application must "consider and adjust for any tax consequences of the relief sought under the Stress Test, with the Commission maintaining appropriate remedies to address and preserve for ratepayers (without duplication) such tax benefits associated with losses from events that give rise to the Stress Test application. Our intent is that a utility should not capture any tax benefit and those should be applied against the relief the utility is requesting from ratepayers.")

[16] Testimony, at 3-5, line 32 through 3-6, line 33.

to recognize the contributions of ratepayers and compensate them accordingly, as required by AB 1054.

PG&E proposes to "share" with ratepayers 25% of any Trust surplus, which PG&E "expects" to be significant.[17]  The expectation of a benefit to customers in an unknown amount is insufficient basis for the Commission to determine that the proposed transaction provides fair compensation to ratepayers in light of their significant contribution.  PG&E is proposing to rebuild its credit rating on the backs of ratepayers.  Despite what PG&E would have the Commission believe,[18] using ratepayer money to boost PG&E's credit rating is more of a benefit to PG&E and its shareholders than it is to ratepayers.  Ratepayers' contributions toward improving PG&E's credit rating must be recognized and compensated by PG&E in accordance with AB 1054.

### B. The Application Does Not Meet the Requirements of Public Utilities Code Section 451.2, as Implemented by Commission Decision 19-06-027

#### 1. The Stress Test methodology requires consideration of asset sales in determining both the Excess Cash available to a utility and whether the Commission should apply a Regulatory Adjustment to the Customer Harm Threshold

Commission Decision 19-06-027 implements Public Utilities Code section 451.2 and adopts a "Stress Test" methodology for determining the maximum amount a utility can pay without harming ratepayers or materially impacting its ability to provide adequate and safe service (the "Customer Harm Threshold").  Imprudently incurred 2017 wildfire costs that are disallowed for recovery in rates should not exceed the Customer Harm Threshold.  In the event that they do, a utility may apply for a financing order pursuant to Public Utilities Code section 850 et seq.[19]

While there are various steps in the Stress Test methodology, San Francisco focuses here on two factors: (i) whether the utility has Excess Cash available to satisfy disallowed wildfire costs[20]; and

---

[17] Application, at 10.

[18] *Id.*

[19] Section 451.2.  Section 451.2 also allows a utility to apply for a financing order for 2017 wildfire costs that are just and reasonable, but PG&E has waived its ability to assert that any of the costs associated with prepetition wildfires are just and reasonable (Application, at 10).

[20] D.19-06-027, Attachment A, "Stress Test Methodology" (May 24, 2019), at 11.

(ii) whether the Commission should use its discretion to adjust the Customer Harm Threshold up or down by a maximum of 20% of the Customer Harm Threshold or 5% of disallowed costs.[21] This Regulatory Adjustment ensures that the utility "considers other business opportunities that could be leveraged by the corporation to pay wildfire liabilities before filing an application, but also maintains predictable outcomes by constraining the total amount of the adjustment."[22] Asset sales are a key consideration under both of these factors.

According to D.19-06-027, in determining whether the utility has Excess Cash available to satisfy disallowed wildfire costs:

> . . . asset sales are intended to capture identifiable cash proceeds from pending and rate mitigating asset sales. The excess cash component shall also consider prudent alternatives available to the utility to monetize non-core assets as determined to be in the best interest of ratepayers. **The utility shall provide a detailed analysis and explanation of the potential opportunities to effectuate ratepayer mitigating non-core asset sales.** The analysis of ratepayer mitigating non-core asset sales will consider the market environment implications of forced sales of assets and the implications of such asset sales on the Customer Harm Threshold as well as the utility's access to capital on acceptable terms.[23]

With respect to the Regulatory Adjustment component, D. 19-06-027 states, "the Commission may consider potential asset sales in the Regulatory Adjustment (both used and useful as well as non-revenue generating assets where the value of the asset is not clearly defined at the time of the Stress Test."[24] Further, D.19-06-027 states:

> **We agree with the Staff Proposal to have the Commission consider every reasonable opportunity at the utility's considered disposal to satisfy disallowed wildfire costs, or to otherwise access capital on reasonable terms, is a fair and necessary part of setting the Regulatory Adjustment**. . . . Parties may litigate all of the reasonable opportunities at the time of a Stress Test application. **Applications made pursuant to § 451.2(b) shall include a complete accounting of every reasonable opportunity the utility considered to satisfy disallowed wildfire costs, or to otherwise access capital on reasonable terms. This could include, for example: asset sales not already included in the excess cash calculation (both used and useful as well as non-

---

[21] D.19-06-027, at 36.

[22] D. 19-06-027, Attachment A, at 12.

[23] D.19-06-027, at 32.

[24] *Id.*

8

> **revenue generating assets where the value of the asset is not clearly defined at the time of the Stress Test); . . .**[25]

San Francisco recently made a serious offer to PG&E to purchase electric utility assets serving San Francisco. Offers were also made to PG&E by the Nevada Irrigation District, the South San Joaquin Irrigation District, and Valley Clean Energy (see Attachment A). PG&E rejected those offers (see Attachment B).

PG&E cannot meet the requirements of D.19-60-027 without a detailed and thorough analysis and accounting of the opportunities presented by these local government entities. But instead, PG&E's Testimony consists of dismissive assertions (without any analysis or mention of the offers made by local government entities) that PG&E has no material non-core assets,[26] that "there would be no net benefit to customers from such sales,"[27] and that "to the extent that PG&E could use other opportunities to raise capital to fund disallowed wildfire costs, that is irrelevant…"[28] This is inadequate to meet the requirements of D.19-06-027.

2. **Other potential issues under Section 451.2 and D. 19-06-027**

San Francisco has also identified other potential issues concerning the Application's compliance with section 451.2 and D.19-06-027:

a. *Whether PG&E is eligible to access the Stress Test*

There is a fundamental question regarding whether PG&E should even be able to access the Stress Test. According to D.19-06-027:

> An electrical corporation that has filed for relief under chapter 11 of the Bankruptcy Code may not access the Stress Test to recover costs in an application under Section 451.2(b), because the Commission cannot determine the essential components of the corporation's financial status. Any reorganization plan of an electrical corporation in a chapter 11 case confirmed by the Bankruptcy Court and approved by the Commission in the future will inevitably address all pre-petition debts, including 2017 wildfire costs, in the bankruptcy process.[29]

---

[25] *Id*., at 38-39.

[26] Testimony, at 5-42, line 5-11.

[27] *Id*., at 5-45, line 8.

[28] *Id*., at 5-44, lines 12-14.

[29] D. 19-06-027, at 26.

This language indicates that the Commission intended for a utility that filed for bankruptcy to address 2017 wildfire costs through the bankruptcy process **rather than through application of the Stress Test**.

         b.  *Whether PG&E has proposed adequate ratepayer protection measures*

Decision 19-06-027 requires that the Application include ratepayer protection measures aimed at mitigating harm to ratepayers.[30] PG&E has proposed both the Customer Credits and 25% share of Trust surplus as ratepayer protection measures.[31] As discussed above, there are questions concerning:

- whether the NOLs that will be used to fund the Customer Credit Trust are properly considered shareholder contributions;
- whether Customer Credits will be sufficient to completely offset fixed recovery charges paid by ratepayers, and what, if any, recourse is available to ratepayers in the event that the amount of Customer Credits proves to be deficient;
- whether a 25% share of Trust surplus is adequate to mitigate harm to ratepayers; and
- whether the Trust and Customer Credits are "bankruptcy-remote" and whether the NOLs themselves would survive a future bankruptcy

These questions all raise significant concerns regarding whether PG&E has proposed adequate ratepayer protection measures as required by D.19-06-027.

## IV. THE ISSUANCE OF RECOVERY BONDS BASED ON THE PROPOSED TRANSACTION WOULD NOT BE CONSISTENT WITH THE PUBLIC INTEREST AS REQUIRED BY PUBLIC UTILITIES CODE SECTION 850.1

Public Utilities Code section 850.1 states that the Commission shall issue a financing order pursuant to section 451.2(c) if the issuance of the recovery bonds, including the imposition and collection of fixed recovery charges, is consistent with the public interest. The proposed securitization transaction is not in the public interest because in the event that PG&E declares bankruptcy again (which it has already done twice in the past two decades), securitization bondholders would continue to be paid while PG&E's creditors, including victims of future fires or other disasters caused by

---

[30] *Id.*, at 47.

[31] Application, at 27-31.

Case: 19-30088  Doc# 7950-1  Filed: 06/15/20  Entered: 06/15/20 11:26:17  Page 12 of 17

PG&E, must fight over PG&E's other assets. This is because the securitization bondholders continued receipt of fixed recovery charges from ratepayers would be irrevocably guaranteed through the financing order, even during the pendency of a bankruptcy, whereas payment of creditor claims in bankruptcy would have no such guarantee. Moreover, in order to effectuate the proposed securitization, the stream of non-bypassable charges must not be subject to claims of other creditors in a PG&E bankruptcy. Therefore, that portion of the amounts paid by PG&E customers would belong to the securitization bondholders and would not be available to PG&E's unsecured creditors.

The proposed securitization is also not in the public interest because the primary beneficiaries are PG&E shareholders, who will benefit at the expense of ratepayers. Shareholders stand to gain the most from transferring the risk of the eventual monetization of the NOLs to ratepayers. Shareholders ultimately bear the responsibility for the wildfire claims costs that the Temporary Utility Debt (which the proposed securitization would replace) will fund. PG&E has identified its NOLs as the primary source of repayment for such liability. However, instead of directly securitizing or otherwise monetizing these NOLs upfront, PG&E asks that ratepayers assume the full future risk of their realization as evidenced by the creation of the Customer Credit Trust and the contribution of these NOLs to it. This primarily protects shareholders from the future volatility and significant uncertainty related to the realization of these NOLs, and fully exposes ratepayers to these risks. While this may expedite PG&E's path to an investment grade rating, a direct securitization of these NOLs should similarly expedite it. Further, the proposed transaction would limit PG&E's ability to take on additional ratepayer charge securitization debt in the future as the rating agencies limit total capacity. Historically, securitizations have been used to benefit ratepayers, but ratepayers' opportunity to access this tool in the future will likely be greatly diminished.

Finally, and perhaps most importantly, the proposed securitization results in a "rubber stamp" Commission approval of non-bypassable charges necessary to pay the bonds. If electricity consumption is less than anticipated, the non-bypassable fixed recovery charges would need to be increased and the Commission would have no ability to determine whether such rate increases are just and reasonable. Abdication of the Commission's rate oversight is not in the public interest.

V. **THE APPLICATION'S TREATMENT OF DEPARTING MUNICIPAL CUSTOMERS MUST BE CLARIFIED SO AS NOT TO UNREASONABLY INTERFERE WITH THE CONSTITUTIONAL AND STATUTORY RIGHTS OF PUBLIC ENTITIES TO PROVIDE UTILITY SERVICE**

As discussed above, San Francisco has submitted an offer to PG&E to purchase electric distribution assets in order for San Francisco to expand its existing municipal utility to provide utility service to all of its constituents. San Francisco continues to pursue municipalization. The Application includes a so-called protection against municipalization whereby the Commission would seemingly condition approval of such a transaction on continued payment of fixed recovery charges.[32] However, the Application is not clear regarding whether departing municipal customers who would continue to pay the fixed recovery charges would also continue to receive Customer Credits. There does not appear to be any discussion of a means or methodology for departing municipal customers to continue to receive the Customer Credits, which raises the concern that those customers will be responsible for paying the fixed recovery charges, but will not receive associated credits. Further, relieving the Trust of the obligation to make Customer Credit payments to departing municipal customers would increase the amount of projected Trust "surplus" on a dollar for dollar basis, 75% of the benefit of which would go to PG&E shareholders. This outcome would be unfair and unnecessary and would unreasonably interfere with the constitutional and statutory rights of public entities to provide utility service.[33] This issue can be addressed by: (i) clarifying that departing municipal customers who continue to pay the fixed recovery charges will also continue to receive Customer Credits, and (ii) developing an equitable mechanism for that to take place.

In addition, PG&E requests that, pursuant to sections 851 and 854, the Commission condition approval of any future municipalization on commitments to continue funding the Customer Credit. PG&E's request for a determination in the context of this proceeding regarding issues to be addressed

---

[32] *Id.*, at 30.

[33] *See*, Cal. Const. Art. XI, sec. 9 (local governments have the right to provide electric service) and Art. I, sec. 19 (local governments have the right to take property by eminent domain).; *also see*, California Water Code section 22115 (irrigation districts may provide for the generation, transmission, distribution, sale, and lease of electric power) and California Water Code section 22456 and California Code of Civil Procedure section 1240.020 (irrigation districts are vested with authority to exercise the power of eminent domain).

by the Commission under sections 851 and 854 is premature. The Commission can address such issues in the context of a future application pursuant to sections 851 and 854 as it has done in the past.

## VI.   EFFECT OF THE APPLICATION ON PROTESTANT

San Francisco has a strong interest in protecting the ratepayers within its community. The Application affects most of PG&E's ratepayers, including PG&E ratepayers located in San Francisco, regardless of whether they take gas and electric service solely from PG&E or are customers of the City's CCA, CleanPowerSF. Further, as described above, San Francisco remains dedicated to pursuing municipalization, and has an interest in making sure that the proposed transaction does not interfere with the City's constitutional authority to provide utility service to its constituents.

## VII.   PROCEDURAL SCHEDULE, NEED FOR HEARINGS, AND CATEGORIZATION OF PROCEEDING

### A.   Need for Hearing

San Francisco agrees with PG&E that hearings will be necessary.

#### 1.   Issues to be considered and facts at evidentiary hearing

The issues to considered, as well as the areas of fact and law that substantiate this protest, have been set forth above. As noted, the list of issues described above is not exhaustive and San Francisco reserves its right to propose additional issues for consideration and further develop the relevant facts and law as it conducts discovery and continues its review of the Application and testimony.

### B.   Proposed Schedule

There appears to be an inconsistency in PG&E's proposed schedule. PG&E states that it will emerge from bankruptcy at the end of August and that its emergence from bankruptcy will be a useful opportunity for "updating the assessment of the utility's financial health before the record is submitted for decision."[34] However, under PG&E's proposed schedule, intervenor testimony is due a full month

---

[34] Application, at 21.

before this milestone.[35] Nor will intervenors have the opportunity to adequately cross-examine PG&E witnesses regarding a post-emergence updated assessment of the utility's financial health since PG&E's emergence from bankruptcy is expected to take place only a few days before PG&E's proposed date for evidentiary hearings.[36] There are several possible ways to address this. The schedule could allow intervenors to submit testimony after PG&E's emergence from bankruptcy or at least much closer in time to the date of PG&E's expected emergence from bankruptcy and adjust the remaining schedule accordingly, or allow a supplemental round of testimony and evidentiary hearings (if necessary) after PG&E's emergence from bankruptcy.

**C.   Proposed Categorization**

San Francisco agrees with PG&E that the Application should be categorized as a ratesetting proceeding.

**D.   Service List**

San Francisco requests that the following individual be added to the Service List for this proceeding as a Party:

Suzy Hong
Deputy City Attorney
Office of the City Attorney
City Hall Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4700
E-Mail: suzy.hong@sfcityatty.org

---

[35] *Id.*, at 45.

[36] *Id.*

San Francisco also requests that the following individual be added to the Service List for this proceeding as Information Only:

Grace Kay
Legislative & Regulatory Compliance
San Francisco Public Utilities Commission
525 Golden Gate Avenue, 7th Floor
San Francisco, CA 94102
Telephone: (415) 554-3129
E-mail: gkay@sfwater.org

## VIII. CONCLUSION

San Francisco appreciates the opportunity to submit this protest to the Application, and looks forward to working with the Commission and other stakeholders to determine whether the proposed securitization meets all applicable legal requirements, in particular those meant to protect ratepayers.

Dated: June 4, 2020

Respectfully submitted,

DENNIS J. HERRERA
City Attorney
THERESA L. MUELLER
Chief Energy and Telecommunications Deputy
SUZY HONG
Deputy City Attorney

By: /s/ *Suzy Hong*
  SUZY HONG

Attorneys for

CITY AND COUNTY OF SAN FRANCISCO
City Hall Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4682
Telephone: (415) 554-4700
E-Mail: suzy.hong@sfcityatty.org