Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
Kimberly S. Morris (SBN 249933)
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com
Email: kmorris@bakerlaw.com

Elizabeth A. Green (*pro hac vice*)
BAKER & HOSTETLER LLP
200 South Orange Avenue, Suite 2300
Orlando, FL 32801
Telephone: 407.649.4036
Facsimile: 407.841.0168
Email: egreen@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel to the Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION**<br><br>     -and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                              Debtors.<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**FINAL REPORT OF OFFICIAL COMMITTEE OF TORT CLAIMANTS' INVESTIGATION OF VOTING RESULTS** |

**TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE:**

The Official Committee of Tort Claimants (the "**TCC**") submits the following report of its investigation into the solicitation and tabulation of fire victim votes.

## I. INTRODUCTION

Some fire victims have filed papers and contacted the TCC with complaints about the Debtors' solicitation and tabulation of votes from the fire victim class. The complainants allege, among other claims: victim's non-receipt of voting ballots and disclosure materials before the voting deadline; receipt of voting ballots and disclosure materials too close to the voting deadline; receipt of duplicative ballots for the same claimant; receipt of solicitation materials from the incorrect law firm; issues with submission of votes in connection with the Master Ballot process; and the alleged failure of Prime Clerk to respond to fire victim inquiries. In response to these inquiries, and even before certain fire victims filed their motion for the appointment of an examiner, the TCC undertook an examination of Debtors' solicitation and tabulation of votes to determine if evidence existed of significant voting issues that the TCC's counsel and consultants believed would have affected the two-thirds threshold required for approval of Debtors' Plan of Reorganization ("**Plan**") by the fire victim class.

To conduct this investigation, the TCC's counsel and consultants made a number of assumptions about the voting data – even if those assumptions were extreme – in order to stress test the voting results. For example, assumptions that certain fire victims' votes were intended to be cast differently, or that all blank votes should in fact be counted as votes to reject the plan, were made as part of this stress test analysis. The TCC's counsel and consultants did not uncover any evidence in the investigation that would support these assumptions as being true, and they were made for the sole purpose of testing the voting data. However, and as detailed below, even if all of the assumptions detailed in this report were presumed to be true, the TCC's counsel and consultants believe the two-thirds threshold required for Plan approval by the fire victim class would have been met. Disregarding the assumptions and speculation detailed in this report, we did not see any evidence that would invalidate the 88% vote in this case.

## II. SUMMARY OF INVESTIGATION:

In connection with its examination, the TCC's counsel and consultants reviewed publicly available data, including the following:

- Motion to Appoint an Examiner of Voting Procedural Irregularities Pursuant to Section 1104(c) of the Bankruptcy Code and Bankruptcy Rule 2007.1, filed on May 25, 2020 [Dkt. No. 7568] ("**Examiner Motion**"), and all pleadings associated with the Examiner Motion.

- Order (1) Approving Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization; (II) Approving Form and Manner of Notice of Hearing on Proposed Disclosure Statement; (III) Establishing and Approving Plan Solicitation and Voting Procedures; (IV) Approving Forms of Ballots, Solicitation Packages, and Related Notices; and (V) Granting Related Relief, filed March 17, 2020 [Dkt. No. 6340] ("**Solicitation Procedures Order**").

- Declaration of Christina Pullo of Prime Clerk LLC Regarding Solicitation of Votes and Tabulation of Ballots Cast with Respect to the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization, filed May 22, 2020 ("**Pullo Declaration**") as well as exhibits attached thereto [Dkt. No. 7507].

- Certificate of Service of Christina Pullo in connection with individual fire claimant ballots ("**Pullo Certification**") as well as exhibits attached thereto [Dkt. No. 6893].

- Christina Pullo's testimony before the Court.

- Filings in the TK Holdings Inc. ("**Takata**") matter.

The TCC's counsel and consultants also reviewed the following additional sources of information provided by Debtors in response to the TCC's requests for information:

- Master Ballot Data (Votes Submitted by Master Ballot data), in native format.
- Master Ballot Solicitation Data, in native format.
- Prime Clerk Solicitation Data (Exhibits D, H, U and V to the Pullo Certification, Dkt. No. 6893), in native format.
- Law firm directive client lists by law firms, in native format.

- Data relating to supplemental email service of solicitation materials (Exhibits AA and CC to the Pullo Certification, Dkt. No. 6893), in native format.
- Examples of Solicitation Material sent to Master Ballot clients of law firms that elected to have Prime Clerk send solicitation materials (but not ballots) to their fire victim clients for informational purposes only.
- Debtors Law Firm Directory by Solicitation Method with Acknowledgement of Receipt, in native format.
- Report of Undeliverable Mail, in native format.

The TCC's counsel and consultants also conducted multiple interviews with Prime Clerk and counsel for Debtors about the solicitation and tabulation process and the data provided in connection with that process. The Debtors and Prime Clerk responded to all of the TCC's requests for data and made representatives from Prime Clerk available to the TCC's counsel and consultants when requested in order to answer all questions in connection with this investigation.

The TCC's counsel and consultants also compared the publicly available data and the data provided by Debtors, to the TCC's own participation data relating to the fire victim claims, including data detailing possible duplication of claimant information, in order to conduct the analysis detailed below. All of this information was considered and used in connection with the analysis detailed below.

### III.   ANALYSIS:

The TCC's counsel and consultants consolidated and reviewed all of the solicitation and tabulation data provided by Debtors, via the Court's docket, and in response to the TCC's requests as detailed above ("**Ballot Data**"), and performed the following analysis:

1. Validation of the final number of tabulated ballots to accept or reject the Plan;
2. Stress-testing the final tabulation of ballots based on various assumptions to assess whether the outcome of the vote to accept or reject the Plan would have changed based on the inclusion of defective ballots or the exclusion of potentially duplicate ballots in the final tabulation of votes;
3. Calculations to evaluate voting response rates based on methods of solicitation; and

4. Review of the available data to determine whether evidence existed of possible non-compliance with the Solicitation Procedures Order.

It is important to note that the TCC's counsel and consultants did not perform any analysis concerning how individual law firms interacted with the clients they represent. In connection with its analysis, TCC's counsel and consultants also considered information gathered from interviews with Prime Clerk and counsel for PG&E. The analysis and findings detailed herein are limited to the procedures and results described below.

### IV. SUMMARY OF FINDINGS:

#### A. Finding 1: The data validates Debtors' tabulation of fire victims' votes.

The TCC's counsel and consultants were able to: a) identify all 51,040 approved ballots in the Ballot Data; b) validate the Class 5A-III and 5B-III voting results of 88.03% accept and 11.97% reject; and c) confirm the reported acceptance of the Plan, as reflected in Exhibit A of the Pullo Declaration [Dkt. No. 7507].

#### B. Finding 2: The defective ballots, if tabulated, would not have affected the Debtors meeting the two-thirds threshold required for acceptance of the Plan.

The TCC's counsel and consultants were able to identify in the Ballot Data all ballots cast that Prime Clerk determined to be defective and were therefore not tabulated. Defective ballots primarily consist of ballots received after the voting deadline, were unsigned, contained votes to both accept and reject the Plan on the same ballot, or did not contain a vote to accept or reject the Plan (including Master Ballots that contained blank votes). *See* Pullo Declaration at Exhibit B-1 [Dkt. No. 7507]. The following stress-tests were performed to examine the possible effect of these ballots on the overall vote when relying upon the stated assumptions:

1. Analysis of Defective Ballots with a Vote:

- If all defective ballots that indicated accept or reject are included in the voting results as cast, in addition to the approved ballots, the outcome of the vote would be: 87.96% accept and 12.04% reject, or a decrease of 0.07% of the accept votes. The Plan would be accepted.

- If all defective ballots that indicated accept or reject are included in the voting results as reject, in addition to the approved ballots, the outcome of the vote would be: 84.90% accept and 15.10% reject, or a decrease of 3.13% of the accept votes. The Plan would be accepted. This analysis is based on the assumption that all defective ballots to accept the Plan were intended to be submitted as ballots to reject the Plan and is made for the sole purpose of stress-testing the voting results. The TCC's counsel and consultants have no reason to believe that fire claimants who submitted defective ballots to accept the Plan intended to submit a ballot to reject the Plan and believe it would be unreasonable to accept this assumption as true based upon their review of facts and data analyzed in this investigation.

2. Analysis of Defective Ballots Without a Vote or With Both an Accept/Reject Vote:
   - If all defective ballots that either: (a) did not vote to accept or reject the Plan, or (b) voted to both accept and reject the Plan (collectively the "**blank ballots**") are included in the voting results as reject, in addition to the approved ballots, the outcome of the vote would be 75.02% accept and 24.98% reject, or a decrease of 13.01% of accept votes. The Plan would be accepted. This analysis is based on the assumption that all blank ballots were intended to be submitted as votes to reject the Plan and is made for the sole purpose of stress-testing the voting results. The TCC's counsel and consultants have no reason to believe that every blank ballot submitted to Prime Clerk was intended to be a vote to reject the Plan. Further, the TCC's counsel and consultants believe it would be unreasonable to accept this assumption as true based upon their review of facts and data analyzed in this investigation, including the fact that more than 90% of the blank ballots were submitted via Master Ballots. Multiple law firms selecting the Master Ballot Solicitation Method informed counsel for the TCC that they submitted blank votes on their Master Ballot if they did not receive a vote from their client before the deadline to submit their Master Ballot.

3. Analysis of All Defective Ballots (*i.e.*, with a vote and blank ballots):

- If all defective ballots that: (a) indicated accept or reject are included in the voting results as cast; (b) did not vote to accept or reject the Plan are included in the voting results as reject; and (c) voted to both accept and reject the Plan are included in the voting results as reject, in addition to the approved ballots, the outcome of the vote would be 75.35% accept and 24.65% reject, or a decrease of 12.68% of accept votes. The Plan would be accepted. This analysis is based on the assumption that all blank ballots were intended to be submitted as votes to reject the Plan and is made for the sole purpose of stress-testing the voting results. The TCC's counsel and consultants have no reason to believe that every blank ballot submitted to Prime Clerk was intended to be a vote to reject the Plan. Further, the TCC's counsel and consultants believe it would be unreasonable to accept this assumption as true based upon their review of facts and data analyzed in this investigation, including the fact that more than 90% of the blank ballots were submitted via Master Ballots. Multiple law firms selecting the Master Ballot Solicitation Method informed counsel for the TCC that they submitted blank votes on their Master Ballot if they did not receive a vote from their client before the deadline to submit their Master Ballot.

- If all defective ballots that: (a) indicated accept or reject are included in the voting results as reject; (b) did not vote to accept or reject the Plan are included in the voting results as reject; and (c) voted to both accept and reject the Plan are included in the voting results as reject, in addition to the approved ballots, the outcome of the vote would be 72.73% accept and 27.27% reject, or a decrease of 15.30% of accept votes. The Plan would be accepted. This analysis is based on the assumptions that 1) defective ballots to accept the Plan were intended to be submitted as ballots to reject the Plan; and 2) all blank ballots were intended to be submitted as votes to reject the Plan are made for the sole purpose of stress-testing the voting results. The TCC's counsel and consultants have no reason to believe that fire claimants who submitted defective ballots to accept the Plan intended to submit a ballot to reject

the Plan or that every blank ballot submitted to Prime Clerk was intended to be a vote to reject the Plan. Further, the TCC's counsel and consultants believe that it would be unreasonable to accept these multiple assumptions as true based on the facts and data analyzed in this investigation, including the fact that more than 90% of the blank ballots were submitted via Master Ballots. Multiple law firms selecting the Master Ballot Solicitation Method informed counsel for the TCC that they submitted blank votes on their Master Ballot if they did not receive a vote from their client before the deadline to submit their Master Ballot.

### C. Finding 3: Duplication of votes, if any, would not have affected the Debtors meeting the two-thirds threshold required for acceptance of the Plan

The TCC's counsel and consultants analyzed the Ballot Data in multiple ways to identify potential duplication in the approved ballots, including exact name matching, analyzing Prime Clerk unique identifiers assigned to claimants, and by comparing the Ballot Data to the TCC's fire claimant participation data developed during the estimation proceedings. The TCC's participation data includes claimant level information that identifies claimants who have potentially filed multiple claims in the bankruptcy, appear to be associated with multiple law firms, or otherwise may potentially have duplicative claims. It is important to note that the TCC has not discussed its developed data set or the potential duplication identified therein, or in the Ballot Data, with fire claimants or their counsel to confirm whether claims that appear duplicative were in fact submitted by the same fire claimant. Therefore, the potential duplication numbers identified below likely include false positives and the analysis is dependent upon the assumption that each potential duplicate is in fact a duplicate vote that warrants exclusion. The following stress-tests were performed to examine the possible effect of potentially duplicate ballots on the overall vote:

1. Analysis of Potential Duplicate Ballot based on Claimant Name

- If all approved ballots associated with an exact claimant name appearing more than once in the Ballot Data are excluded, the outcome of the vote would be 87.91% accept and 12.09% reject, or a decrease of 0.12% of accept votes. The Plan would be accepted.

2. Analysis of Potential Duplicate Ballots based on Claimant Name and Prime Clerk Unique Identification Number

- We understand that Prime Clerk assigned a unique identification number to each claimant based in part on claimant name, address and proof of claim number. If all approved ballots associated with claimant and unique identification number combinations that appear more than once are excluded, the outcome of the vote would be 88.09% accept and 11.91% reject, or an increase of 0.06% of accept votes. The Plan would be accepted.

3. Analysis of Potential Duplicate Ballots based on TCC Developed Data Set

- When comparing the Ballot Data to the TCC's developed data set, we were able to identify all approved ballots associated with a claimant the TCC identified as potentially duplicative of another claimant. If all approved ballots associated with claimants indicated as potentially duplicative within the TCC developed data set are excluded, the outcome of the vote would be 87.89% accept and 12.11% reject, or a decrease of 0.14% of accept votes. The Plan would be accepted.

4. Analysis of All Potential Duplicate Ballots

- If all approved ballots identified under any of the above referenced de-duplication methods are excluded, the outcome of the vote would be 87.70% accept and 12.30% reject, or a decrease of 0.33% of accept votes. The Plan would be accepted.

**D. Finding 4: Combining the effects of the defective and potentially duplicative ballots would not have affected the Debtors meeting the two-thirds threshold required for acceptance of the Plan.**

The TCC's counsel and consultants combined the effects of the defective vote analysis detailed in Section B, above, with the effects of the duplicative vote analysis detailed in Section C, above, and conducted the following stress-test to examine the possible effect on the overall vote when relying upon the stated assumptions:

- If: (a) defective ballots indicated accept or reject are included in the voting results as cast; (b) defective ballots that did not vote to accept or reject the Plan are included in the voting results as reject; (c) defective ballots that voted to both accept and

reject the Plan are included in the voting results as reject; and (d) all categories of potentially duplicative approved ballots are excluded, in addition to the approved ballots, the outcome of the vote would be 72.53% accept and 27.47% reject, or a decrease of 15.50% of accept votes. The Plan would be accepted. This analysis is based on the same assumptions and is subject to the same caveats as detailed in Sections B and C above.

### E. Finding 5: The TCC's counsel and consultants did not observe any evidence to support the allegation that Prime Clerk or Debtors failed to comply with the Solicitation Procedures Order.

The TCC's counsel and consultants did not observe any evidence in the Ballot Data or in Prime Clerk's solicitation procedures as described in both Court filings and in interviews of Prime Clerk and Debtors that supports the allegation that Prime Clerk or Debtors failed to comply with the Solicitation Procedures Order or otherwise engaged in any wrongdoing. The following analysis and data points support this conclusion:

- Evidence in Support of Compliance with Solicitation Procedures Order: Ms. Pullo of Prime Clerk provided certifications under penalty of perjury, as well as sworn written and oral testimony to this Court that she, Prime Clerk and Debtors complied with their obligations under the Solicitation Procedures Order in sending solicitation materials to the fire victims. The TCC's counsel and consultants have not uncovered any evidence in the materials it reviewed to contradict her testimony or otherwise call into question her credibility.

- Overall Participation Rate: The overall voting participation rate in the solicitation process based solely on the number of ballots issued by Prime Clerk via all solicitation methods and the number of ballots submitted by fire claimants to Prime Clerk via all solicitation methods[1] is 52.4%. However, this calculation may understate the participation rate based on Prime Clerk representatives explaining they erred on the side of sending multiple solicitation packages.

---

[1] When calculating participation rates, both approved and defective ballots are included.

- Participation Rate By Solicitation Method: The voting participation rate for fire claimants solicited via the Direct Solicitation Method (35%) was lower than the participation rate for the Master Ballot Solicitation Method (66%). However, the direct solicitation response rate is still higher than historical programs of comparable format and size. For comparison purposes, TCC's counsel and consultants reviewed publicly available data relating to the solicitation of tort claimant votes in the Takata matter which we have been informed involved approximately 60,000 voting packets sent with a participation rate of approximately 14%, or less than half of the participation rate of the directly solicited claimants here. Further, the active participation of fire victims' attorneys could explain the higher response rate for the Master Ballot Solicitation Method.

- Supplemental Non-Mandated Solicitation: In addition to complying with the requirements of the Solicitation Procedures Order, Prime Clerk sent at least 73,000 emails containing solicitation materials to fire claimants who included an email address on their proof of claim form.

- COVID-19 Changes: According to Prime Clerk, prior to sending out solicitation materials and after the deadline for law firms to select their solicitation method from the Solicitation Procedures Order, Prime Clerk provided law firms, with an opportunity to change their chosen solicitation method due to the possible impact of COVID-19 on the solicitation process. As a result, and based on information provided by Prime Clerk, approximately 15,000 additional solicitation packages were mailed directly to claimants as opposed to being routed through their law firms which could have led to additional delay.

- Low Mail Return Rate: As part of the direct solicitation process, Prime Clerk mailed 51,529 packages. As of May 31, 2020 approximately 1,758, or 3.4%, were returned to Prime Clerk as undeliverable. Based on discussions with Prime Clerk and Debtors, it is our understanding that: (a) of the 1,758 undeliverable solicitation packages, 1,493, or 85% were sent to claimants that also received a solicitation package by email; (b) Prime

1      Clerk undertook efforts to identify an alternative mailing address and resend the package for the 1,758 undeliverable packages, wherever practicable; and (c) of the 1,758 undeliverable packages, 773, or 44% were sent to claimants who submitted a vote. The email outreach may have mitigated the consequences of returned solicitation packages resulting from wrong mailing addresses.

- Replacement Ballot Requests: According to Prime Clerk, if a fire claimant requested a replacement solicitation package or ballot, Prime Clerk would send hard copy and/or electronic copies of the materials to the fire victim.

## V.  CONCLUSION

The TCC's counsel and consultants have investigated the complaints relating to voting that came to their attention and have not identified any evidence of a significant voting issue in the data or other information considered during its analysis. Even if all of the measurable defective and potentially duplicative ballots were presumed to be cast against the Plan, an assumption that is not supported by any data or facts reviewed in connection with this investigation, the TCC believes the two-thirds threshold required for Plan approval by the fire victim class would have been met. TCC's counsel and consultants also have not found any factual support for the allegation that Prime Clerk or Debtors did not comply with their obligations under the Solicitation Procedures Order. Disregarding the assumptions and speculation detailed in this report, we did not see any evidence that would invalidate the 88% vote in this case.

Dated: June 19, 2020                              Respectfully submitted,

                                                  BAKER & HOSTETLER LLP

                                                  By:  */s/ Kimberly S. Morris*
                                                       Robert A. Julian
                                                       Kimberly S. Morris

                                                  *Counsel to the Official Committee of Tort Claimants*