Robert A. Julian (SBN 88469)
Cecily A. Dumas (SBN 111449)
BAKER & HOSTETLER LLP
600 Montgomery Street, Suite 3100
San Francisco, CA 94111-2806
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: rjulian@bakerlaw.com
Email: cdumas@bakerlaw.com

Eric E. Sagerman (SBN 155496)
David J. Richardson (SBN 168592)
Lauren T. Attard (SBN 320898)
BAKER & HOSTETLER LLP
11601 Wilshire Blvd., Suite 1400
Los Angeles, CA 90025-0509
Telephone: 310.820.8800
Facsimile: 310.820.8859
Email: esagerman@bakerlaw.com
Email: drichardson@bakerlaw.com
Email: lattard@bakerlaw.com

*Counsel for Official Committee of Tort Claimants*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>-and-<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br>                              Debtors.<br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>■ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**RESPONSE TO WILLIAM B. ABRAMS' MOTION FOR RECONSIDERATION OF THE ORDER APPROVING THE PARTIES' STIPULATION REGARDING THE REGISTRATION RIGHTS AGREEMENT [Dkt. No. 7919, 7974]** |

The Official Committee of Tort Claimants (the "**TCC**") in the above-captioned chapter 11 cases PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**"), hereby responds to the motion ("**Motion**"), filed by William B. Abrams ("**Mr. Abrams**"), for reconsideration of this Court's order [Dkt. No. 7919] approving a stipulation among the parties regarding a registration rights agreement ("**Registration Rights Agreement**").

## RESPONSE

1. **Mr. Abrams does not have standing to contest the Registration Rights Agreement.** Under the Court-approved Tort Claimants RSA, the only parties who have standing to approve or reject a registration rights agreement are the TCC and the Consenting Fire Claimant Professional Group. The Tort Claimants RSA provides that "[a]ll definitive documents relating to the Plan, capitalization, equity and debt financing shall be in form and substance reasonably acceptable to the Plan Proponents and the Requisite Consenting Fire Claimant Professionals." *See* Tort Claimants RSA, Dkt. No. 5038-1 at 48. The first amendment to the RSA identifies the registration rights agreement as one of those documents relating to the equity financing. Tort Claimants RSA Amendment, Dkt. No. 5143-1 at 2. "Requisite Consenting Fire Claimant Professionals" is defined as a simple majority vote by the TCC and a simple majority vote of the Consenting Fire Claimant Professional Group. *Id.* at 3. On December 19, 2020 the Court approved the Tort Claimants RSA, and that agreement is now binding on all parties in this case. *See* Dkt. No. 5174. The court-approved Tort Claimants RSA, which is incorporated into the Plan approved by 88% of fire claimants, vests the right to accept or reject a registration rights agreement only in the TCC and the Consenting Fire Claimant Professional Group, not Mr. Abrams. The parties did not need Court approval for the Registration Rights Agreement under the RSA. The parties could have entered into this Registration Rights Agreement two weeks after the confirmation order was entered, and not had the Court approve it, and the agreement would be effective without Mr. Abrams ever knowing about it or objecting to it. Accordingly, Mr. Abrams does not have standing under the RSA to object to the registration rights agreement.

2. **Mr. Abram's objection is barred by the Court's order approving the RSA terms as being in the best interest of the parties in these cases.** On December 19, 2020, the Court approved the terms of the Tort Claimants RSA under Bankruptcy Rule 9019 settlement approval standards. *See* Dkt. No. 5174. Mr. Abrams' current objection reads like an objection to the wisdom of vesting the consent rights to the registration rights agreement solely in the discretion of the TCC and the Consenting Fire Claimant Professional Group. The RSA specifically provides that a registration rights agreement is effective once the TCC and the Consenting Fire Claimant Professional Group agrees with it. *See* supra at ¶ 1. Bankruptcy Rule 9019 required Mr. Abrams to object to the TCC's and the Consenting Fire Claimant Professional Group's exclusive approval rights of the registration rights agreement when the Court considered to approve those terms in December. *See, e.g., Red River Res., Inc. v. Collazo*, No. 14-CV-04961-JCS, 2015 WL 1846498, at *9 (N.D. Cal. Apr. 8, 2015) (holding that all parties to a bankruptcy are bound by a settlement order). Mr. Abrams failed to object to those terms, and the Court approved the RSA including but not limited to the terms that vest the approval rights exclusively in the TCC and the Consenting Fire Claimant Professional Group. *See* Mr. Abrams' Objection, Dkt. 5139, and Amended Motion for Reconsideration, Dkt. No. 5533. Accordingly, Mr. Abrams' objection now is untimely and is barred by the Court's prior 9019 approval order. *See* Dkt. No. 5174.

3. **There is no evidence that the TCC accepted the registration rights agreement outside of its authority in the RSA**. As the Court is aware from reports by counsel during the past three months, the Registration Rights Agreement was negotiated at arms-length among the TCC, the Trustee and the Plan Proponents over a period of more than three months. There were numerous highly specialized lawyers and financial advisors representing each of the parties involved. The TCC believes the Registration Rights Agreement represents a "market" appropriate agreement that favorably resolves all of the important but highly technical issues while balancing the Debtors' need to sell common stock to exit chapter 11. The Registration Rights Agreement strikes that balance.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4. **Mr. Abrams does not object to specific terms in the Registration Rights Agreement.** Mr. Abrams does not carry his reconsideration burden. He does not cite any provision in the Registration Rights Agreement that should not have been approved or why. For example, in paragraph 3 of the Motion, Mr. Abrams argues that Royal Bank of Canada has conflicts of interest. This statement is irrelevant. Royal Bank of Canada has not been selected as an advisor under the Registration Rights Agreement. Rather, the Registration Rights Agreement states only that PG&E will not object if the Fire Victim Trustee at some point decides that he wants to use the Royal Bank of Canada to sell Fire Victim Trust stock. *See* Registration Rights Agreement, Dkt. No. 7913-2, at 8, section 2.01(d). Royal Bank of Canada was the TCC's expert on negotiation of the Registration Rights Agreement. Mr. Abrams has not explained what conflict could exist after confirmation or why the Trustee is unable to make an informed decision regarding the Fire Victim Trust's professionals.

5. **The percentage and value of the stock is not a term of the Registration Rights Agreement.** The Motion, particularly at paragraphs 5 and 6, appears to focus on the amount of the stock issued initially to the Fire Victim Trust. The Registration Rights Agreement has nothing to do with the amount of stock issued to the Fire Victim Trust. The Plan, rather than the Registration Rights Agreement, involves the amount and the formula for issuance of that stock.

6. **Mr. Abrams' explanation of the impact of other shareholders' actions is inaccurate.** In paragraph 6, Mr. Abrams also states that "The only shareholders who benefit from these contorted arrangements are the current shareholders given that it gives their stock a significant market advantage to be able to sell and trade during the 90-day lockup period when other shareholders like the victims are forced to hold." This statement is misdirected. It is typically the case that stockholders who already hold freely tradeable shares, or unrestricted shares, can continue to trade those shares freely unless they give that right up in exchange for getting something else. *See, e.g.*, Securities and Exchange Commission, Exchange Act Release No. 34-85503, dated Apr. 3, 2019, at 5 (explaining that unrestricted shares "are not subject to resale restrictions"). On the other hand, a 90-day lockup for large holders of newly-issued shares is very typical to help stabilize the market and thus enhance market value. *See, e.g.,* Anna T. Pinedo, Market Trends 2018/19:

- 4 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Lock-Up Agreements, Lexis Practice Advisor, *available at* https://www.mayerbrown.com/-/media/files/perspectives-events/publications/2019/12/market-trends-201819-lockup-agreements.pdf. The market standard lockup period is intended to allow PG&E to raise money in the market which benefits the Fire Victim Trust as much as any shareholder. Here, after an initial lockup, the Trustee has wide discretion to liquidate the stock on his own timetable, based on advice of his professionals, to maximize the value obtained liquidating the stock for the victims. In fact, as described below, the Fire Victim Trust has market appropriate rights based on the amount of stock he will have to sell. In addition, the Fire Victim Trust has negotiated the right to receive equal treatment if other parties receive more favorable terms. *See* Order, Dkt. No. 7918, at ¶ 3.

7. **Mr. Abrams' complaints about wildfire safety are irrelevant to the terms of a registration rights agreement.** In paragraph 7, Mr. Abrams argues that the Registration Rights Agreement does not protect victims from the financial risks of another wildfire. However, no registration rights agreement ever protects explicitly against extraneous influences in the market. Rather, the Registration Rights Agreement gives the Fire Victim Trust the flexibility to hold and sell as appropriate based on the price available in the market. Without the Registration Rights Agreement, the Fire Victim Trust would have to wait 180 days to make any sale. *See* 17 C.F.R. § 230.144. But, here, after the initial 90 days that would be typical for stabilization of the market after a successful offering, the Fire Victim Trust has mechanisms it can use for large dispositions of stock. *See,* Registration Rights Agreement at section 2.01, "Shelf Registration," and section 2.02, "Piggyback Offerings." On the other hand, the new PIPE investors have the same 90-day lockup but, unlike the Fire Victim Trust, do not share some of the benefits under the Registration Rights Agreement for demand underwritten offerings or to piggyback on follow-on PG&E offerings. Likewise, the registration rights agreement for the Backstop Parties does not include demand or piggyback rights. Registration Rights Agreement, at 11, section 2.01(h); *see also* Stipulation, Dkt. No. 7913, at ¶ 3. The TCC approved this Registration Rights Agreement because it protects the Fire Victim Trust and is in the best interest of fire victims.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8. **Mr. Abrams does not object to the NENI stipulation**. Mr. Abrams' Motion does not expressly object to the Parties' stipulation on NENI or provide any explanation why it is the subject of his motion. Accordingly, the TCC does not address that stipulation in this response.

## CONCLUSION

For the reasons stated above, the TCC requests the Court to deny the relief requested by Mr. Abrams' Motion. The TCC has no objection to Mr. Abrams' motion to shorten time for consideration of this Motion.

Dated: June 25, 2020

                                        BAKER & HOSTETLER LLP

                                        By:   */s/ Robert A. Julian*
                                                    Robert A. Julian

                                        *Counsel for the Official Committee of Tort Claimants*