# EXHIBIT B



Signed and Filed: June 17, 2020

_DENNIS MONTALI_
DENNIS MONTALI
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>        - and -<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>      Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and<br>    Electric Company<br>☒ Affects both Debtors<br><br>* All papers shall be filed in<br>the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088-DM<br><br>Chapter 11<br><br>Jointly Administered |

**MEMORANDUM DECISION – CONFIRMATION OF DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION**

## I. INTRODUCTION

These cases are among the most complex in U.S. bankruptcy history. They involve difficult legal, financial, practical and personal issues. They were filed because of overwhelming damage claims following the devasting 2015 – 2018 Northern California

-1-

wildfires, leaving thousands of victims who suffered from those
wildfires owed billions of dollars, plus thousands more of
traditional non-fire creditors of various types, also owed
billions of dollars.

There is no need to elaborate in detail. All of the
victims, all of the over sixteen million PG&E customers in
Northern California, indeed all of Northern California if not
the rest of the country, know the story. The issue before the
court comes down to one critical question: whether to confirm
the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan
of Reorganization ("the Plan"). If so, there are still steps
necessary to implement that Plan to make it effective. Doing
so, however, is one more important step toward facilitating the
process of paying those victims and creditors. If the court does
not confirm the Plan, the only option appears to be leaving the
Debtors where they have been for the last seventeen months.
Leaving tens of thousands of fire survivors, contract parties,
lenders, general creditors, allegedly defrauded investors,
equity owners and countless others with no other options on the
horizon is not an acceptable alternative.

For the reasons that follow, the court will confirm the
Plan.

## II.  OVERVIEW OF DECISION

Debtors have made a convincing case for confirmation of the
Plan.  To satisfy the June 30, 2020, deadline of AB 1054, the
court will set forth the necessary elements of its decision to
confirm the Plan and to dispose of objections to it.  Later this

-2-

```
 1  week, it will hold a hearing to settle any final adjustments
 2  necessary for it to enter its Order Confirming Chapter 11 Plan
 3  ("OCP").[1]
 4       Debtors filed extensive exhibits to support confirmation.
 5  In addition, they filed the following sworn statements in lieu
 6  of direct oral testimonies:  Declaration of Christina Pullo
 7  (Dkt. #7507) ("Pullo Dec"); Declaration of Jason P. Wells (Dkt.
 8  #7510) ("Wells Dec"); Declaration of John Boken (Dkt. #7514)
 9  ("Boken Dec"); and Declaration of Kenneth S. Ziman (Dkt. #7512)
10  ("Ziman Dec"), and in conjunction with the Pullo Dec, Wells Dec
11  and Boken Dec, the "Supporting Declarations".
12       Having considered the Supporting Declarations, the exhibits
13  and the arguments of counsel at the confirmation trial held
14  between May 27 and June 8, 2020, the court concludes that the
15  Plan should be confirmed.
16  //
17  //
18  //
19  //
20  //
21  _____
22  [1]   The following discussion constitutes the court's findings of
       fact and conclusions of law in narrative form as authorized by
23     Fed. R. Bankr. P. 7052(a).  Appellate courts in the Ninth
       Circuit review decisions "with special scrutiny" when a trial
24     court "engage[s] in the regrettable practice of adopting the
       findings drafted by the prevailing party wholesale." *Stormans,
25     Inc. v. Wiesman*, 794 F.3d 1064, 1075 (9th Cir. 2015), *citing
       Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d
26     727, 733 (9th Cir. 2006), and *Sealy, Inc. v. Easy Living, Inc.*,
27     743 F.2d 1378, 1385 (9th Cir. 1984).  Consequently, the court
       sees no need for adopting verbatim Debtors' proposed findings of
28     fact and conclusions of law.
```

-3-

### III. COMPLIANCE WITH BANKRUPTCY CODE SECTION 1129(a) AND (b)[2]

The following are factual determinations the court must make, together with legal conclusions the court must draw, as a predicate to issuance of the OCP that will follow.

The Debtors have the burden of proving satisfaction of the applicable elements of section 1129(a) and (b) by a preponderance of the evidence and have satisfied that burden.

The Disclosure Statement,[3] the Disclosure Statement Supplement, the Plan, the Disclosure Statement and Solicitation Procedures Order, the Solicitation Packages, the Ballots (including, without limitation, the Direct Fire Claim Ballots and the Fire Victim Master Ballots), the Notices of Non-Voting Status, and the Confirmation Hearing Notice, have been transmitted, served, and published in compliance with the Disclosure Statement and Solicitation Procedures Order, the Rules, the Bankruptcy Local Rules, and the Scheduling Order. Such transmittal, service, and publication were adequate and sufficient, and no other or further notice is or shall be required.

The Plan Proponents (and, as applicable, each of their respective Representatives) participated in good faith in negotiating at arm's length the Plan and all contracts,

---

[2]  Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037 (the "Rules").

[3]  All capitalized terms used throughout have the meanings set forth in the underlying documents that appear throughout the record of this case; for brevity they are not redefined here.

-4-

instruments, releases, agreements, and documents related to, or necessary to, implement, effectuate, and consummate the Plan, including the Plan Settlements, Plan Documents, and all contracts, instruments, agreements, and documents to be executed and delivered in connection with the Plan.

As shown by the Pullo Dec, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Rules, and the Solicitation Procedures as approved by the Court.

The Plan complies in all respects with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1122 and 1123. In addition to providing for Administrative Expense Claims, Professional Fee Claims, DIP Facility Claims, and Priority Tax Claims, the Plan designates thirty (30) Classes of Claims and four (4) Classes of Interests. The Claims or Interests placed in each Class are substantially similar to other Claims or Interests, as the case may be. Valid business, factual, and legal reasons exist for separately classifying the various Classes of Claims or Interests. Such Classes do not unfairly discriminate between holders of Claims and Interests. The Plan satisfies section 1122 and 1123(a)(1).

Article III of the Plan identifies the Unimpaired "Non-Voting Classes":

> Class 1A (HoldCo Other Secured Claims), Class 2A (HoldCo Priority Non-Tax Claims), Class 3A (HoldCo Funded Debt Claims), Class 4A (HoldCo General Unsecured Claims), Class 5A-IV (HoldCo Ghost Ship Fire Claims), Class 6A (HoldCo Workers' Compensation Claims), Class 7A (HoldCo Environmental Claims), Class 8A (HoldCo

-5-

Intercompany Claims), Class 9A (HoldCo Subordinated Debt Claims), Class 11A (HoldCo Other Interests), Class 1B (Utility Other Secured Claims), Class 2B (Utility Priority Non-Tax Claims), Class 3B-II (Utility Reinstated Senior Note Claims), Class 3B-V (Utility PC Bond (2008 F and 2010 E) Claims), Class 4B (Utility General Unsecured Claims), Class 5B-IV (Utility Ghost Ship Fire Claims), Class 6B (Utility Workers' Compensation Claims), Class 7B (2001 Utility Exchange Claims), Class 8B (Utility Environmental Claims), Class 9B (Utility Intercompany Claims), Class 10B (Utility Subordinated Debt Claims), Class 11B (Utility Preferred Interests), and Class 12B (Utility Common Interests).

Article III of the Plan identifies the Impaired "Voting Classes":

Class 5A-I (HoldCo Public Entities Wildfire Claims), Class 5A-II (HoldCo Subrogation Wildfire Claims), Class 5A-III (HoldCo Fire Victim Claims), Class 10A-I (HoldCo Common Interests), Class 10A-II (HoldCo Rescission or Damage Claims), Class 3B-I (Utility Impaired Senior Note Claims), Class 3B-III (Utility Short-Term Senior Note Claims), Class 3B-IV (Utility Funded Debt Claims), Class 5B-I (Utility Public Entities Wildfire Claims), Class 5B-II (Utility Subrogation Wildfire Claims), and Class 5B-III (Utility Fire Victim Claims).

Article IV of the Plan specifies the treatment of Claims and Interests in such Voting Classes. The Plan complies with section 1123(a)(3).

The Plan provides for the same treatment by the Debtors for each Claim or Interest in each respective Class, unless the holder of a particular Claim or Interest has agreed to less favorable treatment of such Claim or Interest. The Plan complies with section 1123(a)(4).

-6-

The Wells Dec, the Boken Dec, the Ziman Dec, the Debtors'
exhibits, and the record establish the following: the Plan, the
Plan Documents, and the various documents and agreements set
forth in the Plan Supplement and the Exhibits to the Plan
provide adequate and proper means for the Plan's implementation,
including, without limitation, (i) the imposition of the
Channeling Injunction, (ii) the establishment and funding of the
Fire Victim Trust, the Subrogation Wildfire Trust, and the
Public Entities Segregated Defense Fund, (iii) payment in Cash
in satisfaction of the Public Entities Wildfire Claims, (iv) the
issuance of the New Utility Funded Debt Exchange Notes, the New
Utility Long-Term Notes, and the New Utility Short-Term Notes,
the Plan Funding Documents (as defined below), and Debt Backstop
Approval Order, or any similar approvals granted following the
conclusion of trial, as applicable, (v) the issuances and
incurrences necessary to obtain or effectuate the Plan Funding
or the Exit Financing, the Plan Funding Documents, and Debt
Backstop Approval Order or any similar approvals granted
following the conclusion of trial, as applicable, and (vi) the
offer, sale, distribution, and issuance of any equity
securities, equity forward contracts or other equity-linked
securities necessary to obtain any of the Plan Funding or as
otherwise contemplated by the Plan, the Backstop Commitment
Letters, or the Equity Backstop Approval Order, as applicable
(including, without limitation, to authorize and reserve for
issuance New HoldCo Common Stock to be issued pursuant to any
such transaction or upon the exercise, conversion or settlement

-7-

1   of any such equity forward contracts or other equity-linked
 2   securities).  The Plan complies with section 1123(a)(5).

 3        The certificates of incorporation, articles of
 4   incorporation, bylaws, limited liability company agreement or
 5   similar governing documents, as applicable, of each Debtor have
 6   been or will be amended on or prior to the Effective Date to
 7   prohibit the issuance of nonvoting equity securities in
 8   accordance with section 1123(a)(6).

 9        To the extent known and determined, the identity and
10   affiliation of the persons who will serve as members of the New
11   Board have been disclosed in the Plan Supplement [and on the
12   record of the Confirmation Hearing], with the identities of the
13   remaining members of the boards of directors or managers of the
14   Reorganized Debtors to be disclosed, together with their
15   affiliations, on or before the Effective Date as provided in
16   Exhibit G of the Plan Supplement, which sets forth who shall
17   serve as officers of the Reorganized Debtors (as may be modified
18   pursuant to the Plan Supplement).  The Plan Proponents have
19   established that the appointment to, or continuance in, such
20   positions of such persons is consistent with the interests of
21   the holders of Claims against and Interests in the Debtors and
22   public policy.  Additionally, the Subrogation Wildfire Trust
23   Agreement and the Fire Victim Trust Agreement, attached as
24   Exhibits C and D, respectively, to the Plan Supplement, name the
25   Subrogation Wildfire Trustee and the Fire Victim Trustee,
26   respectively.  The Plan satisfies sections 1123(a)(7) and
27   1129(a)(5).

28

                                 -8-

The provisions of the Plan, including, without limitation, approval of the Public Entities Plan Support Agreements, are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.  The Court's prior approvals of the settlements embodied in the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Federal Agency Settlement, and the State Agency Settlement remain in full force and effect.  The Plan satisfies section 1123(b).

The Plan is dated and identifies the entities submitting the Plan as proponents, thereby satisfying Rule 3016(a).

The Plan is in accord with applicable provisions of Title 11, as required by section 1129(a)(1).

The Plan Proponents have proposed the Plan in accord with the provisions of Title 11, in good faith and not by any means forbidden by law, as required by sections 1129(a)(2) and (3).

Any payment made or to be made by any of the Debtors for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases has been approved by, or is subject to the approval of, the Court as reasonable.  Pursuant to the decision of the California Public Utilities Commission (the "CPUC" or the "Commission") in I.19-09-016 [approving the Plan], the Utility shall reimburse the Commission for payment of the fees and expenses incurred by the Commission for its outside counsel and financial advisor for services rendered relating to the Chapter 11 Cases, related proceedings and associated financings, and will not seek cost recovery of the Commission's costs for such fees and expenses.  Such reimbursement for fees and expenses

-9-

1    incurred by the Commission shall not be subject to any further
2    approval or review for reasonableness by the Court, the fee
3    examiner for the Chapter 11 Cases, or any other party in
4    interest.  The foregoing constitute compliance with section
5    1129(a)(4).

6         The CPUC has approved the Plan as satisfying the Wildfire
7    Legislation (AB 1054) requirement that it be neutral, on
8    average, to ratepayers.  Any future rate increases will be
9    subject to CPUC review processes and are not a result of the
10   Plan.  The Federal Energy Regulatory Commission has likewise
11   consented to the Plan with respect to the treatment of the FERC
12   Tariff Rate Proceedings.  The Plan satisfies section 1129(a)(6).

13        The Disclosure Statement, the Disclosure Statement
14   Supplement, the Plan, the Plan Supplement, the Boken Dec, and
15   the other evidence proffered or adduced at the Confirmation
16   Hearing (i) are persuasive and credible, (ii) have not been
17   controverted by other evidence, and (iii) establish that each
18   holder of an impaired Claim or Interest either has accepted the
19   Plan or will receive or retain under the Plan, on account of
20   such Claim or Interest, property of a value, as of the Effective
21   Date, that is not less than the amount such holder would receive
22   or retain if the Debtors were liquidated under chapter 7 of the
23   Bankruptcy Code on such date.  The Plan satisfies section
24   1129(a)(7).

25        The Non-Voting Classes are Unimpaired under the Plan and
26   are presumed to have accepted the Plan pursuant to section
27   1126(f).  As reflected in the Pullo Dec and Voting
28   Certification, Classes 5A-I (HoldCo Public Entities Wildfire

-10-

Claims), 5A-II (HoldCo Subrogation Wildfire Claims), 5A-III
(HoldCo Fire Victim Claims), 10A-I (HoldCo Common Interests),
3B-I (Utility Impaired Senior Note Claims), 3B-II (Utility
Reinstated Senior Note Claims), 3B-IV (Utility Funded Debt
Claims), 5B-I (Utility Public Entities Wildfire Claims), 5B-II
(Utility Subrogation Wildfire Claims), and 5B-III (Utility Fire
Victim Claims) have voted to accept the Plan.

The treatment of Administrative Expense Claims and Priority
Non-Tax Claims pursuant to Sections 2.1, 2.2, 2.3, 4.2, and 4.17
of the Plan, respectively, satisfies the requirements of
sections 1129(a)(9)(A) and (B).  The treatment of Priority Tax
Claims pursuant to Section 2.4 of the Plan satisfies the
requirements of section 1129(a)(9)(C).

Classes 5A-I (HoldCo Public Entities Wildfire Claims), 5A-
II (HoldCo Subrogation Wildfire Claims), 5A-III (HoldCo Fire
Victim Claims), 10A-I (HoldCo Common Interests), 3B-I (Utility
Impaired Senior Note Claims), 3B-III (Utility Short-Term Senior
Note Claims), 3B-IV (Utility Funded Debt Claims), 5B-I (Utility
Public Entities Wildfire Claims), 5B-II (Utility Subrogation
Wildfire Claims), and 5B-III (Utility Fire Victim Claims) are
Impaired under the Plan and have accepted the Plan, determined
without including any acceptance of the Plan by any insider.
The Plan complies with section 1129(a)(10).

The evidence proffered or adduced at the Confirmation
Hearing establishes that the Plan, subject to the occurrence of
the Effective Date, is feasible and that confirmation of the
Plan is not likely to be followed by liquidation, or the need
for further financial reorganization of the Debtors or the

-11-

1  Reorganized Debtors.  The Plan complies with section
2  1129(a)(11).

3       All fees payable under section 1930 of chapter 123 of title
4  28 of the United States Code, as determined by the Court, have
5  been paid or will be paid pursuant to Section 12.5 of the Plan.
6  Pursuant to Section 12.5 of the Plan, on the Effective Date, and
7  thereafter as may be required, such fees, together with
8  interest, if any, pursuant to section 3717 of title 31 of the
9  United States Code, shall be paid by each of the Debtors.  The
10 Plan complies with section 1129(a)(12).

11      Pursuant to Section 8.5 of the Plan, all Employee Benefit
12 Plans are deemed to be, and shall be treated as, executory
13 contracts under the Plan and, on the Effective Date, shall be
14 assumed pursuant to sections 365 and 1123.  All outstanding
15 payments which are accrued and unpaid as of the Effective Date
16 pursuant to the Employee Benefit Plans shall be made by the
17 Reorganized Debtors on the Effective Date or as soon as
18 practicable thereafter and, therefore, the Plan satisfies the
19 requirements of section 1129(a)(13).

20      The Debtors are not required by a judicial or
21 administrative order, or by statute, to pay any domestic support
22 obligations, and therefore, section 1129(a)(14) is inapplicable.

23      The Debtors are not individuals, and therefore, section
24 1129(a)(15) is inapplicable.

25      Each of the Debtors is a moneyed, business, or commercial
26 corporation or trust, and therefore, section 1129(a)(16) is
27 inapplicable.

28

-12-

Section 1129(a)(8) has not been satisfied with respect to Class 10A-II. This discussion will be completed in the OCP or other order once the court is advised as to the outcome of the mediation referred to in Section IV, B.

The Plan is the only Plan currently on file, and therefore, section 1129(c) is inapplicable.

The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933, thereby satisfying section 1129(d).

## IV.   DISCUSSION OF OBSTACLES TO CONFIRMATION

### A.   Registration Rights Agreement

A major issue of contention and distress with numerous fire survivors and others was the lack of detail about the ability of the Fire Victim Trustee to monetize any of the Trust's share of Debtor PG&E Corporation's publicly traded stock in the future. The court was reluctant to oversee an exercise in futility, namely confirming a Plan doomed to fail within weeks by not becoming effective.

The Plan Proponents, the TCC and the Trustee, with the invaluable assistance of Judge Randall Newsome as court-appointed mediator, resolved their differences, agreed upon crucial elements defining how to value Effective Date equity to be issued to the Trust and the equitable means of protecting the Fire Victim Trust, the diluted old equity and the new equity under various circumstances. These have been embodied in, among other documents, the Order Approving the Parties' Joint Stipulation Regarding the Registration Rights Agreement and

-13-

1 | Related Agreement of the Fire Victim Trust (Dkt. #7918) and the
2 | Order Approving the Parties' Joint Stipulation Regarding
3 | Normalized Estimated Net Income (Dkt. #7919).

### B. Securities Claim Litigation

As of the date of this Memorandum Decision, the parties are engaged in mediation regarding this matter.  The court will issue an appropriate order later.

### C. Objection by Mr. William B. Abrams

During the course of these cases, creditor William B. Abrams has been an active and passionate advocate for the rights of fire victims like himself.  He has filed multiple objections to confirmation of the Plan asserting, among other things, that that the Plan is not feasible as Debtors will lack financial viability to perform it.  He has steadfastly argued that the Plan was not proposed in good faith and "has been leveraged for the primary purposes of investor short-term payouts at the detriment of plan integrity."  He has observed that throughout the case, "the Debtors had every intention of leveraging the victim trust agreement, the registration rights agreement and the 'hush and gag' clauses within the TCC RSA to undermine the agreed $13.5B victim settlement and to make certain material changes to the financing of their plan."

For the reasons stated elsewhere in this Memorandum Decision, the court has determined that the Plan is feasible and thus will OVERRULE Mr. Abrams' feasibility argument on the basis of the powerful and virtually uncontroverted evidence presented by the Debtors.  And while the court appreciates Mr. Abrams'

-14-

concerns about the fairness of the negotiated Plan, it disagrees
with him that the TCC has been "hushed and gagged" about
deficiencies.  To the contrary, the TCC has appeared and
challenged provisions of the Plan that it finds problematic, but
it nonetheless supports confirmation.

As to Mr. Abrams' concerns that investors have highjacked
the plan process, the court notes that multiple parties have
participated in this case, including separate groups of
unsecured creditors represented by the OCUC and the TCC.  These
various parties have actively and consistently acted to protect
their own constituencies' interests.  The mediator was able to
get all these parties to reach agreements satisfactory to each
of them.  That mediation was not controlled by equity holders;
they were just one group of many participating in the process.

Finally, Mr. Abrams' contentions that the Plan is
detrimental to the fire victims is belied by the overwhelming
acceptance of the Plan by these creditors.  Mr. Abrams' desire
for a better PG&E, for a better environment and a better
Northern California, safe from wildfires, while aspirational and
well-intended, is not something the Bankruptcy Code or this
court can deliver.

The court therefore OVERRULES Mr. Abrams' objections to
confirmation.

### D.  Objection by Oklahoma Firefighters Pension and Retirement System.

The Oklahoma Firefighters Pension and Retirement System
("OFPRS") objects to the release of Debtors' unassigned claims
and causes of action against former officers and directors.  In

-15-

particular, OFPRS contends that Debtors' assignment of certain
claims and causes of action to creditors is too narrow, as
section 1.8 of the Plan limits the recovery for such claims
"solely to the extent of any directors and officers' Side B
Insurance Coverage." OFPRS asserts that this provision
constitutes an improper discharge. The court disagrees.

As the court discusses elsewhere, this court's decision in
*PG&E I* allows a debtor to confirm a plan that releases its
claims against third parties. Here, Debtor has agreed to carve
out of the Plan's release provisions and to assign to creditors
certain of its claims against third parties, on the condition
that any recovery on these claims would be limited to its Side B
Insurance Coverage. Debtor did not propose this restriction in
a vacuum; rather, the parties in the mediated settlement
involving Debtors, the TCC, the OCC and others agreed that
liability would be limited to Side B Insurance Coverage.
Furthermore, OFPRS's class (Class 10A-I -- Holdco Common
Interests) voted overwhelmingly to accept the Plan,
notwithstanding the limitation on the source of recovery.
Accordingly, the court hereby OVERRULES the objection filed by
OFPRS.

### E.   Objections by the OCUC and Others

Over the last few weeks, Plan Proponents, the OCUC and
other objecting parties have filed a flurry of documents
relating to the OCUC's initial objection (Dkt. #7300) to
confirmation. At a hearing on June 16, 2020, counsel for
Debtors indicated that the parties have resolved most of the

-16-

contested matters, with three remaining issues requiring
resolution by the court.  The following are the court's
decisions on them.

              1.   Modification of Plan Section 8.2(e).

The OCUC contends that the Plan Proponents have improperly
designated General Unsecured Claims (as defined in the Plan) as
unimpaired.  In particular, the OCUC asserts that Section 8.2(e)
and corresponding Paragraph 34(d) of the proposed OCP
impermissibly provide for a broad and automatic disallowance of
prepetition indemnification or contribution claims arising from
the rejection or assumption of executory contracts, even when an
affected creditor has filed a proof of claim asserting such a
contingent claim.  As the OCUC stated in its response filed on
June 11, 2020 (Dkt. #7896):

> [T]he Debtors' proposed modifications to
> Section 8.2(e) of the Plan and Paragraph 34(d) of
> the Confirmation Order continue to refer to the
> "full release and satisfaction of any Claims against
> any Debtor or defaults by any Debtor . . . arising
> under any assumed executory contract or unexpired
> lease." *See* Debtors' Response at 4-5 (emphasis
> added). *This is contrary to Bankruptcy Code section
> 365(b)(1)(A), which is expressly limited to
> "defaults."*

*Id.* (emphasis added).

Debtors, on the other hand, argue that defaults should be
handled in a manner consistent with section 365, alluding to
comments made by the court at a hearing on June 4.  Nonetheless,
Debtors modified Section 8.2(e) of the Plan and Paragraph 34(d)
of the proposed OCP as follows:

-17-

Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims ~~and Causes of Action~~ against any Debtor or defaults by any Debtor arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease, whether monetary or nonmonetary, ~~including all Claims arising under sections 503(b)(9) or 546(c) of the Bankruptcy Code, any defaults of provisions restricting the change in control or ownership interest composition, or any other bankruptcy related defaults. Any proofs of Claim filed with respect to executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court~~ to the fullest extent permitted under applicable law.

*See* Plan Proponents' Response filed on June 14, 2020 (Dkt. #7939 at pgs. 2-3). To the extent a particular assignment of a claim is not "permitted under applicable law," an unsecured creditor retains its right to assert that defense.

The OCUC objected to this proposed modification, contending that Debtors were wrongfully attempting to assume the benefits of executory contracts without assuming their burdens, citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984); *Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358, 1367 (9th Cir. 1992) ("the cost of assumption is nothing short of complete mutuality and requires performance in full just as if bankruptcy had not intervened.") (internal quotation omitted).[4]

---

[4] Citing First Circuit law, the OCUC also argued that section 502(e)(1)(B) is applicable only when an estate is insolvent. *Juniper Dev. Grp. v. Kahn (In re Hemingway*

-18-

The problem arises upon consideration of the consequences of a debtor's assumption of an executory contract, whether under section 365 or as part of a plan as contemplated by section 1123(b)(2). Rejection is easy to apply, and the concepts are well established. But assumption is permissible whether or not there has been a default. If the former, section 365(a) operates (with certain exceptions); if the latter, the debtor must cure defaults, provide compensation and/or provide adequate assurances, etc. *See* sections 365(b)(A)-(C).

The Plan, in Section 8.2, sets forth how <u>monetary</u> defaults must be dealt with. To be consistent with section 1124, particularly with assumed contracts on which there are no defaults, the counterparty must be afforded all of the rights preserved for it under the "cure", "reinstate", and "compensate" (twice) provisions of subsections (A)-(D) and the "not otherwise alter" provisions of subsection (E). Debtors' proposed "release and satisfaction" and "or nonmonetary" revisions to section 8.2(e) and Paragraph 34(d) of the OCP are too ambiguous, particularly since assumption includes executory contracts having no extant defaults. The OCUC's insistence on the precise

---

*Transport, Inc.*), 993 F.2d 915, 923 (1st Cir. 1993) ("The sole purpose served by section 502(e)(1)(B) is to preclude redundant recoveries on identical claims against *insolvent* estates in violation of the fundamental Code policy fostering equitable distribution among all creditors of the same class") (emphasis added).

This court disagrees. Nothing in the plain language of section 502(e)(1) limits its applicability to insolvent estates. Furthermore, the court could not locate any Ninth Circuit cases that hold that solvent debtors cannot object to the allowance of claims.

-19-

1  language of section 365, and the court's appreciation of section
2  1124, should control.  Counsel should meet and confer on
3  appropriate language for the OCP.

### 2.   Definition of Fire Claim

5      The OCUC also objects to the definition of "Fire Claim,"
6  contending that Debtors must clarify that claims for
7  indemnification and contribution against Debtors asserted by
8  providers of goods and services are not Fire Claims (and are
9  thus not channeled to the Fire Victim Trust).  Otherwise, the
10  claims of those providers of goods and services are impaired.

11      The definition is clear.  A claim asserted by a provider of
12  goods and services, whether or not a counterparty to an assumed
13  executory contract, that suffered damages from the Fires (as
14  defined in Section 1.86), is impaired and should be channeled to
15  the Fire Victims Trust.   If its damages were not caused by or
16  "in any way arising out of the Fires" (See Section 1.78), but
17  arise out of the rejection of an executory contract or are part
18  of the cure of an assumed one, they should be dealt with under
19  Article VIII of the Plan and section 365.

20      The court agrees with Debtors that "in the unlikely event
21  that a dispute arises," a court can resolve them.   But it is
22  best to avoid ambiguity before the problem arises.  Counsel for
23  Debtors and the OCUC should also meet and confer on appropriate
24  clarifying language for the OCP, consistent with this ruling.

### 3.   Deadline for the Assumption and Rejection of Executory and Unexpired Leases

27      The OCUC and others object to what the Debtors call a
28  "modest" request for an extension of fifteen additional business

days to amend their schedules to assume or reject executory
contracts. While it is regrettable that this request has become
necessary, the press of the business of confirmation is heavy
even for the Debtors and their attorneys. The impact on
opponents is slight, and the discrete and possibly indefensible
question of whether to move a contract being assumed to one
being rejected is more disappointing to the counterparty than
its burden in calculating its damages. The converse is more
problematical, but not something any party who does business
with Debtors cannot handle. Because of the obvious solvency of
the Debtors, the court does not worry that this slight
adjustment to the timing for a very particular issue would have
altered any counterparty's decision to object to confirmation.

For consistency, the Debtors' requested extension and the
additional time for responses should be the same: thirty days
(calendar, not business) both ways. Debtors should upload an
order granting these extensions or include them in the OCP.

### F. Exculpation and Release Clauses

The United States Trustee and others object to certain
release and exculpation provisions of the Plan.

> 1. Release of Claims Held by Debtors (Plan Section 10.9(a))

Section 10.9(a) releases certain rights and causes of
action held by Debtors, excluding the Assigned Rights and Causes
of Action defined in section 1.8 of the Plan. Multiple parties
objected to these releases. Significantly, Debtors are not
releasing all claims against the released parties, but only
those claims that it will continue to hold as of and after the

-21-

Effective Date.  Consequently, Section 10.9(a) is not "a broad
sweeping provision that seeks to discharge or release nondebtors
from any and all claims that belong to others."  *Blixseth v.
Credit Suisse (In re Blixseth)*, No. 16-35304, 2020 WL 3089263,
at \*5 (9th Cir. June 11, 2020).  As noted by the Ninth Circuit
in *Blixseth,* "a discharge in bankruptcy does not extinguish the
debt itself but merely releases the debtor from personal
liability.... The debt still exists, however, and can be
collected from any other entity that may be liable."  *Id.* at 6.
*Id.* at \*5-6, *citing Landsing Diversified Props.-II v. First
Nat'l Bank & Tr. Co. of Tulsa (In re W. Real Estate Fund)*, 922
F.2d 592, 600 (10th Cir. 1990) (alteration in original) (*quoting
In re Lembke*, 93 B.R. 701, 702 (Bankr. D.N.D. 1988)); *see also
Lewis v. Scott (In re Lewis)*, 97 F.3d 1182, 1185 (9th Cir.
1996).

Moreover, this court has previously held that claims held
by a debtor are property of the estate and may be released as
part of a plan.  *See In re Pac. Gas & Elec.*, 304 B.R. 395, 416-
18, n.26 ("*PG&E I*") ("it is permissible for a plan to provide
for the settlement or adjustment of any claim 'belonging to the
debtor or to the estate.'").  That said, such a release by
Debtors of claims belonging to them can be approved only if it
represents a valid exercise of their business judgment and
satisfies the fair, reasonable, and adequate standard set by
Rule 9019, as defined by the Ninth Circuit in *Martin v. Kane (In
re A&C Props.)*, 784 F.2d 1377, 1381 (9th Cir. 1986).  *PG&E I,*

-22-

304 B.R. at 416.[5]  Nonetheless, this court also acknowledged in *PG&E I* that a Rule 9019 review may not be necessary when creditors have overwhelmingly voted in favor of the plan; here, however, some of the objecting creditors hold unimpaired claims and thus were unable to vote on the plan.  Section 10.9(a) does not compel third parties to release whatever claims they could assert, individually or collectively, against the Released Parties.  Such third parties can still pursue whatever claims they may have against the Released Parties.

In light of the foregoing, the court OVERRULES the objections to the release set forth in section 10.9(a) of the Plan.

### 2.  Release of Claims Held by Non-Debtors (Plan Section 10.9(b)

Section 10.9(b) of the Plan provides that Releasing Parties (defined in Section 1.180 as the Debtors, the Reorganized Debtors, and "any holder of a Claim or Interest that is solicited and voluntarily indicates on a duly completed Ballot [that it] opts into granting such releases") have released Debtors and other non-debtor parties identified in section 1.179.

---

[5]  Debtors have not demonstrated how the proposed releases set forth in section 10.9(a) satisfy the requirements set forth in *A&C Propertiess* for determining whether a settlement is fair and reasonable under Rule 9019.  The factors to be weighed by a court include: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.  *Id.*

-23-

304 B.R. at 416.[5]  Nonetheless, this court also acknowledged in *PG&E I* that a Rule 9019 review may not be necessary when creditors have overwhelmingly voted in favor of the plan; here, however, some of the objecting creditors hold unimpaired claims and thus were unable to vote on the plan.  Section 10.9(a) does not compel third parties to release whatever claims they could assert, individually or collectively, against the Released Parties.  Such third parties can still pursue whatever claims they may have against the Released Parties.

In light of the foregoing, the court OVERRULES the objections to the release set forth in section 10.9(a) of the Plan.

### 2.  Release of Claims Held by Non-Debtors (Plan Section 10.9(b)

Section 10.9(b) of the Plan provides that Releasing Parties (defined in Section 1.180 as the Debtors, the Reorganized Debtors, and "any holder of a Claim or Interest that is solicited and voluntarily indicates on a duly completed Ballot [that it] opts into granting such releases") have released Debtors and other non-debtor parties identified in section 1.179.

---

[5]  Debtors have not demonstrated how the proposed releases set forth in section 10.9(a) satisfy the requirements set forth in *A&C Propertiess* for determining whether a settlement is fair and reasonable under Rule 9019.  The factors to be weighed by a court include: (a) the probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.  *Id.*

-23-

1  Multiple parties have objected to this provision,
2  contending that it is an improper release of claims held by
3  non-debtors.  The proposed release, however, is not universal or
4  mandated.  Rather, it requires the non-debtor parties to
5  affirmatively opt-in to a release of their claims.  As releases
6  in Section 10.9(b) are consensual and require an affirmative
7  opt-in by the affected creditor, the court determines that such
8  releases do not violate section 524(e), which prohibits only
9  nonconsensual third-party releases.  Consensual third-party
10 releases do not run afoul of section 524(e) or governing Ninth
11 Circuit law such *as Resorts Int'l v. Lowenschuss (In re*
12 *Lowenschuss)*, 67 F.3d 1394, 1401-02 (9th Cir. 1995).

13     Section 524(e)  provides that "[e]xcept as provided in
14 subsection (a)(3) of this section, discharge of a debt of the
15 debtor does not affect the liability of any other entity on, or
16 the property of any other entity for, such debt."  While the
17 Ninth Circuit stated in *Lowenschuss* that it "has repeatedly
18 held, without exception, that [section] 524(e) precludes
19 bankruptcy courts from discharging the liabilities of non-
20 debtors," those holdings arose in cases where voting creditors
21 did not affirmatively opt to discharge non-debtors.  In these
22 cases, creditors or classes of creditors were deemed to have
23 consented to releases of third parties simply by voting in favor
24 of the plan or by not voting at all.  As this court observed in
25 *PG&E I*, *Lowenschuss* is inapplicable when a non-debtor has
26 consented to the third-party release:

27     This court is bound by, and does not question, the
28     legal principle set forth in *Lowenschuss*, in *In re*

-24-

> *American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir.
> 1989), and in *Underhill v. Royal*, 769 F.2d 1426, 1432
> (9th Cir. 1985) that liabilities of nondebtors cannot
> be discharged through a plan.  This legal principle,
> however, is inapplicable here because (unlike in
> Lowenschuss, American Hardwoods, and Underhill ) the
> Plan does not discharge or release nondebtors from
> claims that belong to others (except the Commission,
> which has consented to the release).

*PG&E I*, 304 B.R. at 418 n.26.  *See also In re Station Casinos,
Inc.,* No. 09-52477, 2011 WL 6813607 (Bankr. D. Nev. June 08,
2011) ("A release of non-debtor third parties voluntarily and
knowingly given by a creditor or equity holder in connection
with a chapter 11 plan does not implicate the concerns regarding
third party releases discussed by the Ninth Circuit Court of
Appeals in *Lowenschuss*).  The court concludes that *Lowenschuss*
does not bar the voluntary opt-in releases contained in the Plan
and therefore OVERRULES objections to these provisions.

### 3.  Exculpation Provisions

Multiple parties, including the United States Trustee,
objected to provisions exculpating non-debtors for actions taken
in the course of the plan approval process.  The Ninth Circuit
rejected similar objections in the *Blixseth*.  The court held
that section 524(e) does not bar an exculpation clause
protecting "various participants in the Plan approval process."
*Blixseth*, 2020 WL 3089263, at *5.  Citing *In re PWS Holding
Corp.*, 228 F.3d 224, 245-46 (3d Cir. 2000), the Ninth Circuit
observed:.

> Consistent with our analysis, the Third Circuit has
> upheld an exculpation clause similar to the one here
> at issue. *PWS*, 228 F.3d at 245-46. In doing so, the
> court took into account that the exculpated non-

-25-

debtors there were members of the creditors' committee
and related professionals and individuals. At the same
time, and more broadly, *PWS* stated that "Section
524(e), by its terms, *only* provides that a discharge
of the debtor does not affect the liability of
nondebtors on claims by third parties against them *for
the debt discharged in bankruptcy,*" *id.* at 245
(emphasis added), and held that the partial
exculpation for acts committed during the process of
developing and confirming a Chapter 11 plan did not
"affect the liability of another entity on a debt of
the debtor within the meaning of § 524(e)," *id.* at
247.

*Blixseth*, 2020 WL 3089263, at *6.

In concluding that the Bankruptcy Code does not prohibit an
exculpation clause protecting various parties who participated
in the approval process, the Ninth Circuit held that any such
exculpation clause should relate only to that process. *Id.* at
*5. Section 10 covers a lot of players, a number of documents
and a number of events and activities. That reach is consistent
with the complexities and difficulties of these cases, and
comports with the contours of such a provision as recognized in
*Blixseth.* The court OVERRULES these objections.

**G. Objections by Patricia Garrison, et. al.**

Creditor Patricia Garrison (Dkts. #7194, #7378), along with
the parties that joined her (Dkts. #7309, #7451), objected on
the grounds that the Plan impermissibly classified fire victims
in different classes and that she has not been dealt with in
good faith as required by section 1129(a)(3). Because the
subject claims all arise from fires, Ms. Garrison believes they
should be in the same class.

Section 1122(a) requires that a claim must be placed in a
particular class only if the claim is substantially similar to

-26-

other claims in the class. Further, claims that are similar may be placed into separate classes "if the debtor can show a business or economic justification for doing so." *In re Loop 76, LLC*, 465 B.R. 525, 536 (9th Cir. BAP 2012), aff'd, 578 F. App'x 644 (9th Cir. 2014) (citing *Barakat v. Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir.1996). Debtors have separated these claims into three categories: Fire Victim Claims, Subrogation Wildfire Claims, and Public Entities Wildfire Claims. They argue that separate classification is necessary because, specific to the Subrogation Wildfire Claims, those claims are based on different legal theories of liability. Further, each class receives distributions through different procedures tailored to that class, and the classes have accepted different treatment pursuant to executed settlement agreements. For these reasons, Debtors have provided an adequate business justification for separate classification and the court OVERRULES Ms. Garrison on this point.

In addition, Ms. Garrison's second argument fails. A plan is proposed in good faith, in part, if creditors have been dealt with in a fundamentally fair manner. *See* section 1129(a)(3); *In re Stolrow's Inc.*, 84 B.R. 167, 172 (9th Cir. BAP 1988) (citing *In re Jorgensen*, 66 B.R. 104, 109 (9th Cir. BAP 1986). Debtors assert that fundamental fairness has been achieved here as the Plan consists of a mostly consensual resolution that addresses all claims and reflects considerable negotiation and agreement with all major parties. As such, the court agrees with Debtors that the Plan has been proposed in good faith.

The court OVERRULES these objections.

-27-

### H.   Objections by Anita Freeman, GER Hospitality, LLC, et al.

Creditors Anita Freeman, GER Hospitality, LLC, et al. filed a joint objection (Dkt. #7316) raising a number of issues that have mostly been dealt with in other parts of this Memorandum Decision.  In this section, the court addresses a specific component of this objection, namely the split of consideration between stock and cash to fire victims.  Ms. Freeman asserts that fire victims are impermissibly being treated differently from other creditors as they are receiving a distribution that includes shares of stock.  The court iterates that this treatment was agreed upon by the parties in the Tort Claimants RSA, and that fire victims voted in favor of this treatment.  As stated immediately above, the court has already found that separate classification of the different types of fire victims is permissible, and Ms. Freeman offers nothing to show that the separate treatment is discriminatory, or that the accepted treatment by the class is somehow impermissible.

As such, differing treatment is not an issue and the OVERRULES the objections on this point.

One final thought about these objections is in order.  From comments made at the confirmation trial by Ms. Freeman's counsel, and thereafter in a post-confirmation CERTAIN FIRE VICTIMS PROPOSED MODIFICATIONS TO DEBTORS PLAN AND CONFIRMATION ORDER (Dkt. #7935), it is apparent that the real objection here is that there should have been a better outcome, whether with more money, more stock, less involvement by hedge funds or even liquidation.  The court ignored those proposed modifications and

-28-

OVERRULES these objections now.  The impaired classes have voted for the present Plan, and to sustain these objections would be to ignore the wishes of that very strong majority.

## I.  Brief Summary of Prior Rulings

Several parties have raised objections related to issues that have been dealt with previously in this case.  In this section, the court will dispose of the objections that have already been adjudicated by this court.

The court incorporates by reference its Memorandum Decision Regarding Postpetition Interest (Dkt. #5226) and its Interlocutory Order Regarding Postpetition Interest (Dkt. #5669).  As postpetition interest is provided for in the Plan as required, this decision effectively overrules all objections which raise improper payment of postpetition interest, including the UCC (Dkt. #7300), the Ad Hoc Trade Claim Holders (Dkt. #7288), and Mizuho Bank, Ltd (Dkt. #7221).  Any other objections not specifically listed here are also OVERRULED on this point.

The court incorporates by reference its Memorandum Decision on Inverse Condemnation (Dkt. #4895) and accompanying order (Dkt. #4949).  Any objections not specifically listed here are OVERRULED on this point.  The remaining "Issue 2" (*see* the Corrected Joint Statement, Dkt. #7875) will be dealt with by separate order or in the OCP.

Finally, the court incorporates by reference its prior decision regarding challenges to the Fire Victims Trust Agreement and the Claims Resolution Procedures, namely, the Memorandum on Objection of Adventist Health, A&T, Paradise

-29-

Entities and Comcast to Trust Documents (Dkt. #7597). Parties
including the SLF Fire Victims Group (Dkt. #7544), Mary Wallace
(Dkt. #7367),[6] Helen Sedwick (Dkt. #7377), the International
Church of the Foursquare Gospel (Dkt. #7308), Eric and Julie
Carlson (Dkt. #7363),[7] and Karl Knight (Dkt. #7366) all objected
to confirmation on grounds that were already dealt with by this
court's decision and are OVERRULED, setting aside any objections
related to the aforementioned "Issue 2" (*see* the Corrected Joint
Statement, Dkt. #7875) which will be dealt with by separate
order or in the OCP. Any other objections not specifically
listed here are also OVERRULED on this point.

**J.    Remaining Objections**

Any objections to confirmation not dealt with specifically
in this Memorandum Decision, or reserved for further order, are
OVERRULED. Objections to the admissibility of any evidence
offered in connection with the confirmation trial will be the
subject of a separate order to be issued prior to or
concurrently with the OCP.

//

//

//

---

[6]    Ms. Wallace also objected on the ground that she did not
have adequate time to vote for the Plan. The court accepts
Debtors' representation that she was sent the relevant materials
in early April and OVERRULES this objection.

[7]    Creditors here also asserted that they should be permitted
to vet Trust Oversight Committee members as they are appointed,
and the court OVERRULES this objection as there is no legal
basis for the court to order this.

-30-

## V. CONCLUSION

The court intends to issue the OCP on Friday, June 19, 2020, after counsel for the Debtors has had an opportunity to revise it in accordance with any provisions of the Memorandum Decision and any developments occurring before then. To that end, it has scheduled a hearing on **June 19, 2020, at 12:00 Noon** to resolve any remaining disagreements about the form of the OCP. Participation at the hearing will be limited to counsel for the Plan Proponents, the two Official Committees and any party to the reserved disputes identified in this Memorandum Decision.

**END OF MEMORANDUM DECISION**