**Entered on Docket**
**June 20, 2020**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



Signed and Filed: June 20, 2020

WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Theodore E. Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Richard W. Slack (*pro hac vice*)
(richard.slack@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Attorneys for Debtors and Debtors in Possession*

JONES DAY
Bruce S. Bennett (SBN 105430)
(bbennett@jonesday.com)
Joshua M. Mester (SBN 194783)
(jmester@jonesday.com)
James O. Johnston (SBN 167330)
(jjohnston@jonesday.com)
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2300
Tel: 213 489 3939
Fax: 213 243 2539

*Attorneys for Shareholder Proponents*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case<br>No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**ORDER CONFIRMING DEBTORS' AND SHAREHOLDER PROPONENTS' JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED JUNE 19, 2020** |

WHEREAS, on March 16, 2020, PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" and together with PG&E Corp., the "**Debtors**"), as debtors and debtors in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), and certain funds and accounts managed or advised by Abrams Capital Management, L.P. and certain funds and accounts managed or advised by Knighthead Capital Management, LLC (the "**Shareholder Proponents**"), collectively as "proponents of the plan" within the meaning of section 1129 of title 11 of the United States Code (the "**Bankruptcy Code**"), filed the *Debtors' and Shareholder Proponents Joint Plan of Chapter 11 Reorganization Dated March 16, 2020* [Docket No. 6320] (as thereafter amended on May 22, 2020 [Docket No. 7521], June 19, 2020 [Docket No. 8048], and as may be further modified, amended, or supplemented from time to time, and together with all exhibits and schedules thereto, the "**Plan**");[1]

WHEREAS, on February 10, 2020, Prime Clerk LLC (the "**Solicitation Agent**") on behalf of the Plan Proponents, caused the Fire Victim Plan Solicitation Directive to be transmitted to certain law firms as set forth in the *Certificate of Service* of Craig E. Johnson regarding the Fire Victim Plan Solicitation Directive [Docket No. 5839] (the "**Solicitation Directive Certification**");

WHEREAS, by Order dated February 11, 2020 [Docket No. 5732] (the "**Scheduling Order**"), the Court, among other things, established (i) May 27, 2020, as the date for the commencement of the hearing to consider confirmation of the Plan (the "**Confirmation Hearing**"), and (ii) May 15, 2020, at 4:00 p.m. (Prevailing Pacific Time) as the deadline for (a) filing and serving objections to confirmation of the Plan (the "**Plan Objection Deadline**") and (b) impaired creditors and interest holders in the voting Classes to submit votes to accept or reject the Plan (the "**Voting Deadline**");

WHEREAS, on March 16, 2020, the Court entered (i) an Order [Docket No. 6321] (the "**Equity Backstop Approval Order**"), which among other things, (a) approved the terms of, and the Debtors' entry into and performance under, the Backstop Commitment Letters with the Backstop

---

[1] Capitalized terms used herein not otherwise defined have the meanings given to them in the Plan, a copy of which is annexed hereto as **Exhibit A**, or the Confirmation Memorandum (defined below), as applicable.

-2-

Parties, and (b) authorized the incurrence, payment and allowance of all Equity Backstop Obligations (as defined in the Equity Backstop Approval Order) as administrative expense claims, and (ii) an Order [Docket No. 6323] (the "**Debt Backstop Approval Order**"), which among other things, (a) approved the terms of, and the Debtors' entry into and performance under, the Debt Financing Commitment Letters (as defined in the Debt Backstop Approval Order), and (b) authorized the incurrence, payment and allowance of all Debt Commitment Obligations (as defined in the Debt Backstop Approval Order) as administrative expense claims;

WHEREAS, on June 16, 2020, the Court entered an Order [Docket No. 7972] (the "**Amended Equity Backstop Approval Order**"), which among other things, (i) approved the terms of, and the Debtors' entry into and performance under, the Amended Equity Backstop Commitment Documents (as defined in the Motion, dated June 9, 2020 [Docket No. 7848] (the "**Amended Equity Backstop Approval Motion**")) with the Backstop Parties, and (ii) authorized the incurrence, payment and allowance of the Additional Backstop Commitment Share Premium (as defined in the Amended Equity Backstop Approval Motion) as an administrative expense claim;

WHEREAS, on March 17, 2020, the Court entered an Order [Docket No. 6340] (together with all schedules and exhibits thereto, the "**Disclosure Statement and Solicitation Procedures Order**"), which among other things, (i) approved the *Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (a solicitation version of which is filed at Docket No. 6353, including any exhibits and schedules thereto and as further amended, supplemented, or modified, the "**Disclosure Statement**") as containing adequate information as provided under section 1125 of the Bankruptcy Code, (ii) approved the form and manner of notice of hearing on the proposed Disclosure Statement, (iii) approved the procedures for (a) soliciting and tabulating votes to accept or reject the Plan, including procedures for the solicitation of votes from the holders of Fire Victim Claims and the establishment of a Record Date for voting on the Plan and serving related notices, and (b) voting to accept or reject the Plan, including procedures for the solicitation of votes from holders of Fire Victim Claims and the electronic submission of votes, (iv) approved (a) the forms of Ballots and Solicitation Packages (each as defined in the Disclosure

-3-

Statement and Solicitation Procedures Order) and procedures for the distribution thereof, including the form of master ballot for the submission of votes to accept or reject the Plan by attorneys representing multiple holders of Fire Victim Claims and related solicitation directive form and solicitation procedures for holders of Fire Victim Claims, and (b) the form of Notice of Non-Voting Status to be sent to holders of Claims and Interests that are Unimpaired under the Plan and who are, pursuant to section 1126(f) of the Bankruptcy Code, conclusively presumed to accept the Plan or are otherwise deemed not entitled to vote on the Plan, and (v) approving the form and manner of the Confirmation Hearing Notice (as defined in the Disclosure Statement and Solicitation Procedures Order);

WHEREAS, on March 25, 2020, the Court entered an Order approving the *Supplement to Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 6483] (the "**Disclosure Statement Supplement**");

WHEREAS, commencing on March 30, 2020, the Solicitation Agent, on behalf of the Plan Proponents, caused the Solicitation Packages (as defined in the Disclosure Statement and Solicitation Procedures Order) to be transmitted to all creditors and interest holders in strict compliance with the Solicitation Procedures as set forth in the *Certificate of Service* of Christina Pullo regarding the Plan, Disclosure Statement, Disclosure Statement Supplement, Solicitation Packages, and notice of the Confirmation Hearing [Docket No. 6893] and supplemental Certificates of Service filed at Docket Nos. 7059, 7082, 7084, 7114, 7123, 7184, 7342, 7348, and 7426 (collectively, the "**Solicitation Certifications**"), and the foregoing service, including, without limitation, the service of Solicitation Packages, Ballots, Direct Fire Victim Ballots, and Fire Victim Master Ballots to the holders of Fire Victim Claims and HoldCo Rescission or Damage Claims, as applicable, is adequate as provided by Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**");

WHEREAS, the Debtors caused the Confirmation Hearing Notice to be served on all parties in accordance with the applicable provisions of the Bankruptcy Code and Bankruptcy Rules and as set forth in the Disclosure Statement and Solicitation Procedures Order, as evidenced by the

-4-

Solicitation Certifications and the *Affidavit of Publication* of Christina Pullo regarding publication of the Confirmation Hearing Notice [Docket No. 6935] (the "**Publication Affidavit**");

WHEREAS, the Debtors caused the Confirmation Hearing Notice to be published once in each of: *The Wall Street Journal (National Edition)*, *USA Today*, *The Los Angeles Times*, *San Francisco Chronicle*, *The Bakersfield Californian*, *The Fresno Bee*, *The Modesto Bee*, *The Sacramento Bee*, *The Press Democrat*, *The San Jose Mercury News*, *The East Bay Times*, *The Record*, *The Paradise Post*, *The Chico Enterprise Record*, *The San Francisco Examiner*, *The Record Searchlight*, *The Red Bluff Daily News*, *The Times Standard*, *The Ukiah Daily Journal*, *The Union*, *The Napa Valley Register*, *The Trinity Journal in Weaverville*, *The Mad River Union in Arcata*, *The Del Norte Triplicate in Crescent City*, *The Mount Shasta Herald in Mount Shasta*, *The Siskiyou Daily News in Yreka*, *The Modoc County Record in Alturas*, *The Ferndale Enterprise in Fortuna*, and *The Marin Independent Journal*; and posted an electronic copy of the Confirmation Hearing Notice on the Case Website, all in accordance with the Disclosure and Solicitation Procedures Order, as evidenced by the Publication Affidavit;

WHEREAS, on April 9, 2020, the Court entered the *Order Pursuant to 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019 (I) Approving Case Resolution Contingency Process and (II) Granting Related Relief* [Docket No. 6721], which was amended and superseded by the Order entered on April 24, 2020 [Docket No. 6937] (the "**CRCP Order**");

WHEREAS, on May 1, 2020, the Debtors filed their Plan Supplement in connection with the Plan [Docket No. 7037] (together with all exhibits and schedules thereto, as supplemented on May 22, 2020 [Docket No. 7503], May 24, 2020 [Docket No. 7563], June 2, 2020 [Docket No. 7712], June 5, 2020 [Docket No. 7810], June 8, 2020 [Docket No. 7841], June 10, 2020 [Docket No. 7879], June 11, 2020 [Docket No. 7894], and June 12, 2020 [Docket No. 7929], and as it may be further amended, modified, or supplemented from time to time, the "**Plan Supplement**");

WHEREAS, the Debtors transmitted or caused to be transmitted notices of the proposed treatment of executory contracts and unexpired leases under the Plan to all applicable contract and lease counterparties, as evidenced by the *Certificate of Service* of Jamie B. Herszaft [Docket No.

-5-

7085], the *Certificate of Service* of Andrew G. Vignali [Docket No. 7639], the *Certificate of Service* of Sonia Akter [Docket No. 7883], and the *Certificate of Service* of Alain B. Francoeur [Docket No. 7906], and the *Certificate of Service* of Andrew G. Vignali [Docket No. 7982];

WHEREAS, on May 22, 2020, the Plan Proponents filed their *Joint Memorandum of Law and Omnibus Response in Support of Confirmation of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7528] (the "**Confirmation Memorandum**");

WHEREAS, the Confirmation Hearing was held on May 27, 2020, May 28, 2020, May 29, 2020, June 1, 2020, June 3, 2020, June 4, 2020, June 5, 2020, June 8, 2020, and June 19, 2020;

WHEREAS, the Court has considered all the proceedings held before the Court, the compromises and settlements embodied in and contemplated by the Plan, including without limitation, the settlements embodied in the Public Entities Plan Support Agreements, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Federal Agency Settlement and the State Agency Settlement (collectively, the "**Plan Settlements**"), the process contained in the CRCP Order, and the evidence regarding confirmation of the Plan, and taken judicial notice of the documents and pleadings filed in these Chapter 11 Cases;

WHEREAS, the Court made certain findings of fact and conclusions of law on the record of the Confirmation Hearing, and such findings and conclusions will be deemed to be incorporated herein in their entirety;

WHEREAS, on June 11, 2020, the Court entered the *Order Approving Plan Funding Transactions and Documents in Connection with Confirmation of Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated May 22, 2020* [Docket No. 7909] (the "**Financing Approval Order**"), which is part of and fully incorporated into this Confirmation Order;

WHEREAS, on June 12, 2020, the Court entered the *Order Approving the Parties' Joint Stipulation Regarding the Registration Rights Agreement and Related Agreements of the Fire Victim*

*Trust (Docket No. 7913)* [Docket No. 7918], which is part of and fully incorporated into this Confirmation Order;

WHEREAS, on June 12, 2020, the Court entered the *Order Approving the Parties' Joint Stipulation Regarding Normalized Estimated Net Income (Docket No. 7914)* [Docket No. 7919], which is part of and fully incorporated into this Confirmation Order;

WHEREAS, on June 17, 2020, the Court entered the *Memorandum Decision – Confirmation of Debtors' and Shareholders' Joint Chapter 11 Plan of Reorganization* [Docket No. 8001] (the "**Memorandum Decision**"),[2] which is part of and fully incorporated into this Confirmation Order;

WHEREAS, the Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal. Feb. 22, 2016), and Bankruptcy Local Rule 5011-1(a); and this is a core proceeding pursuant to 28 U.S.C. § 157(b); and venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and

WHEREAS, the Court takes judicial notice of the official docket of the Chapter 11 Cases maintained by the Clerk of the Court and/or its duly appointed agent, including, without limitation, all pleadings and other documents filed, all orders entered, and the evidence and arguments made, proffered, or adduced at the hearings held before the Court during the pendency of the Chapter 11 Cases, including, but not limited to, the hearings to consider the adequacy of the Disclosure Statement, the Disclosure Statement Supplement, the Solicitation Procedures, the Solicitation Packages, and the Disclosure Statement and Solicitation Procedures Order entered in connection therewith.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. <u>Confirmation.</u>

   a.    The Plan, annexed hereto as **<u>Exhibit A</u>**, is approved, as modified herein, and

---

[2] The reference in the Memorandum Decision to the *Memorandum on Objection of Adventist Health, AT&T, Paradise Entities and Comcast to Trust Documents* entered on May 26, 2020 [Docket No. 7597] refers to such decision as it was supplemented on the record of the hearing on June 11, 2020.

-7-

confirmed under section 1129 of the Bankruptcy Code. The terms of the Plan, all exhibits thereto, the Plan Supplement, the Financing Approval Order, and the Memorandum Decision are incorporated by reference into and are an integral part of the Plan and this Confirmation Order.

b. The documents contained in the Plan Supplement and exhibits to the Plan, and any amendments, modifications, and supplements thereto, and the execution, delivery, and performance thereof by the Debtors, are authorized and approved. The parties to the documents contained in the Plan Supplement and exhibits to the Plan may exchange signature pages prior to the Effective Date, as necessary or appropriate, to be held in escrow on the condition that such signature pages shall not be released from escrow until the Effective Date.

c. All documents necessary to implement the Plan, including without limitation, the exhibits to the Plan, the Plan Supplement, the Plan Documents, the Plan Funding Documents, and all other relevant and necessary documents shall, upon completion of documentation and execution, be valid, binding, and enforceable agreements and not be in conflict with any federal or state law.

2. <u>Plan Modifications and Amendments.</u>

a. All modifications and amendments made to the Plan and on the record at the Confirmation Hearing do not materially and adversely affect the treatment of holders of Claims or Interests under the Plan and comply with section 1127 of the Bankruptcy Code, and therefore, no additional disclosure or further solicitation is required. The Plan Proponents may institute proceedings in the Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or this Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as so amended, modified, or supplemented. Prior to the Effective Date, the Plan Proponents may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not materially and adversely affect the treatment of holders of Claims and Interests; *provided, further,* that no party may make material modifications or amendments to the Plan and the documents

-8-

contained in the Plan Supplement (as amended, modified or supplemented) that are inconsistent with the Plan, this Confirmation Order, or the Bankruptcy Code without approval of the Bankruptcy Court.

b.     Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Plan or Plan Documents, including any amendments or modifications thereto, shall be in form and substance acceptable to the Governor of the State of California (the "**Governor's Office**") as of the Effective Date.

3.     Compromises and Settlements.  The compromises and settlements set forth in the Plan and/or described in the Confirmation Memorandum, including, without limitation, the Plan Settlements, the Public Entities Plan Support Agreements and the Wildfire OII Settlement, are the product of good faith, arm's-length negotiations, and to the extent not already approved, are approved and will be effective immediately and binding on all parties in interest.

4.     Wildfire Legislation (A.B. 1054) Compliance.

a.     The Debtors' insolvency proceeding is resolved pursuant to the Plan and is not subject to a stay.

b.     The resolution of these proceedings provides funding or establishes reserves for, provides for assumption of, or otherwise provides for satisfying all prepetition wildfire claims asserted against the Debtors in the Chapter 11 Cases in the amounts agreed upon in any pre-insolvency proceeding settlement agreements or any post-insolvency settlement agreements, authorized by the Court through an estimation process or otherwise allowed by the Court, in satisfaction of California Public Utilities Code section 3292(b)(1)(B), enacted through Wildfire Legislation (A.B. 1054), through the payment of the consideration on account of the Fire Victim Claims as provided in the Plan and in the Tort Claimants RSA, payment of the consideration on account of the Subrogation Wildfire Claims as provided in the Plan and in the Subrogation Claims RSA, and payment of the consideration on account of the Public Entities Wildfire Claims as provided in the Plan and in the Public Entities Plan Support Agreements, in each case in restitution and in full and final satisfaction, settlement, release, and discharge of such claims.  The foregoing

-9-

settlements embodied in the Plan were accepted by the relevant holders of Fire Claims in Classes 5A-I (HoldCo Public Entities Wildfire Claims), 5A-II (HoldCo Subrogation Wildfire Claims), 5A-III (HoldCo Fire Victim Claims), 5B-I (Utility Public Entities Wildfire Claims), 5B-II (Utility Subrogation Wildfire Claims), and 5B-III (Utility Fire Victim Claims).

5.   <u>Plan Classification Controlling.</u>   The classification of Claims and Interests for purposes of the distributions to be made under the Plan shall be governed solely by the terms of the Plan.  For the avoidance of doubt, any Claims arising out of the 2015 Butte fires that are the subject of fully effective, valid and enforceable prepetition settlement agreements with the Debtor(s) are, and shall be treated as, Prepetition Executed Settlement Claims under the Plan.

6.   <u>Solicitation of Votes.</u>  Based on the record before the Court in these Chapter 11 Cases, the Plan Proponents and their directors, officers, employees, members, agents, advisors, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code and in compliance with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Disclosure Statement and Solicitation Procedures Order, in connection with all their respective activities relating to the solicitation of acceptances or rejections of the Plan (including, without limitation, with respect to the solicitation of votes of holders of Fire Victim Claims and HoldCo Rescission or Damage Claims) and their participation in the activities described in section 1125 of the Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code.  Such solicitation, including with respect to the third-party injunction, Channeling Injunction, third-party release, and exculpation provisions of the Plan, also satisfies the requirements of due process.

7.   <u>Binding Effect.</u>  Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of this Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under this Plan and whether such holder has accepted the Plan.

-10-

8. <u>Vesting of Assets.</u>  Pursuant to Section 10.2 of the Plan, upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors shall vest in the Reorganized Debtors, as applicable, free and clear of all Claims, Liens, charges, and other interests, except as otherwise provided in the Plan or in this Confirmation Order. The Reorganized Debtors may operate their businesses and use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as otherwise provided in the Plan or this Confirmation Order.

9. <u>Distributions.</u>  Pursuant to Section 5.1 of the Plan, except as otherwise provided in the Plan or in this Confirmation Order, the Wildfire Trust Agreements, or the Claims Resolution Procedures, the Disbursing Agent shall make all distributions to the appropriate holders of Allowed Claims, or such other persons designated by the Plan, in accordance with the terms of the Plan. Pursuant to Section 5.6 of the Plan, Fire Claims subject to the Channeling Injunction shall not be administered by the Disbursing Agent and shall instead be administered by the Wildfire Trusts.

10. <u>No Postpetition or Default Interest on Claims.</u>  Pursuant to Section 5.3 of the Plan, except as otherwise specifically provided for in the Plan or this Confirmation Order, or another order of the Court or required by the Bankruptcy Code, postpetition and/or default interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

11. <u>Date of Distributions.</u>  Pursuant to Section 5.4 of the Plan, unless otherwise provided in the Plan, the Wildfire Trust Agreements, or the Claims Resolution Procedures, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon as reasonably practicable thereafter; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine appropriate. Holders of Fire Claims subject to the Claims Resolution Procedures shall receive distributions in accordance with the applicable Claims Resolution Procedures.

12. <u>Disbursing Agent.</u>  Pursuant to Section 5.6 of the Plan, except as otherwise provided

-11-

in the Plan or the Wildfire Trust Agreements, all distributions under the Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor, on and after the Effective Date as provided therein. Pursuant to Section 5.14 of the Plan, the Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by further order of the Court (including any order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of this Plan.

13. <u>Satisfaction of Claims.</u> Unless otherwise provided by the Plan, any distributions and deliveries made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

14. <u>Setoffs and Recoupment.</u>

a. Pursuant to Section 5.13 of the Plan, each Debtor or Reorganized Debtor, as applicable, or such Entity's successor or designee, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim; provided, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any Claims, rights, or Causes of Action that any such entity or it successor or designee may possess against such holder.

b. Except as provided in Section 10.7 of the Plan, any rights of setoff or recoupment or defenses thereto held by any Entity are expressly retained and preserved, subject to any applicable limitations of the Bankruptcy Code.

15. <u>Restructuring Transactions; Effectuating Documents.</u>

a. Following the Confirmation Date or as soon as reasonably practicable thereafter, the

-12-

Debtors or the Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan or to obtain any of the Plan Funding and Exit Financing (collectively, the "**Restructuring Transactions**"), including (i) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, (iii) the amendment, restatement, and, to the extent applicable, the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution, or bylaws pursuant to applicable state or federal law, (iv) the execution and delivery of the Plan Documents, (v) the issuance of securities (including, without limitation, pursuant to the Plan Funding Transactions (as defined in the Financing Approval Order)), all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule (except such filings, approvals and authorizations as may be required, necessary or desirable for offerings of securities not exempt from the Securities Act pursuant to section 1145 of the Bankruptcy Code), (vi) such other transactions that are necessary or appropriate to implement the Plan in a tax efficient manner, (vii) the cancellation of existing securities, (viii) the negotiation, preparation, execution, delivery of and performance under the Plan Funding Documents, prior to, on or after the Effective Date, to the extent necessary or appropriate to effectuate any of the Plan Funding Transactions, in each case without notice, hearing, or further order of the Court, and (ix) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

      b.      The Indenture of Mortgage, entered into by Pacific Gas and Electric Company and The Bank of New York Mellon Trust Company, N.A., as trustee, as may be amended or supplemented from time to time (the "**FMB Indenture**") shall (i) describe the properties to be

-13-

encumbered by the lien of the FMB Indenture by any of the following methods: Assessor's Parcel Number, or by Instrument Number (or Book and Page Number) of the instrument conveying such property to Debtor (or its predecessor), or by metes and bounds, or by reference to a parcel map, or by other legally sufficient means; (ii) be presented to the various Recorders' Offices in the California counties where property of the Debtor is to be encumbered by the lien of the Indenture; and (iii) when so presented to such Recorders' Offices, then such Recorders' Offices are instructed and directed to accept such FMB Indenture for recording, and such Indenture shall be recorded and indexed against the subject properties in the appropriate real property records maintained by such Recorders' Offices.

c.     Each officer, or member of the board of directors, of the Debtors is (and each officer, or member of the board of directors of the Reorganized Debtors shall be) authorized to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the securities issued pursuant to the Plan and any Plan Funding Transactions in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the stockholders or directors of the Debtors or Reorganized Debtors) except for those expressly required pursuant to the Plan.

d.     Any of the (i) respective chairperson of the board of directors, president, any vice president and (ii) any of the respective corporate secretary, chief financial officer, treasurer or any assistant secretary or assistant secretary of each Debtor are authorized to sign and file with the California Secretary of State an officer's certificate with respect to the amended and restated articles of incorporation of such Debtor, substantially in the form provided in Exhibits B-1 and C-1 of the Plan Supplement filed on June 8, 2020 [Docket No. 7841] (the "**New Articles**") without the need for any further action of the respective board of directors or shareholders of the Debtors.

e.     All matters provided for in the Plan involving the corporate structure of the Debtors

-14-

or Reorganized Debtors, or any corporate action required by the Debtors or Reorganized Debtors in connection therewith, including, but not limited to, (i) the amendment and restatement of the articles of incorporation of each of the Debtors or Reorganized Debtors, substantially in the form set forth in the New Articles, (ii) the amendment and restatement of the bylaws of each of the Debtors or Reorganized Debtors, substantially in the form set forth in Exhibits B-2 and C-2 of the Plan Supplement filed on June 8, 2020 [Docket No. 7841] (the "**New Bylaws**"), (iii) the establishment of a classified board of directors as substantially set forth in the New Bylaws, (iv) the establishment of restrictions on the transfer of certain securities of the Debtors and Reorganized Debtors (the "**NOL Transfer Restrictions**"), substantially in the form set forth in the New Articles (which NOL Transfer Restrictions may be implemented with like effectiveness in either the New Articles or New Bylaws on or prior to the Effective Date), and, (v) pursuant to and subject to Paragraph 21 below, the selection and appointment of the New Board, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the stockholders or directors of the Debtors or Reorganized Debtors, and with like effect as though such action had been taken unanimously by the stockholders of the Debtors and Reorganized Debtors.

     f.    Upon the certification of the New Articles by the California Secretary of State, the Debtors (or, if applicable, the Reorganized Debtors) shall provide notice of the NOL Transfer Restrictions to all registered holders of shares of common stock of each of the Debtors in accordance with California Corporation Code Section 422(c) and California Commercial Code Section 8204(2). Upon receipt of such notice, the NOL Transfer Restrictions shall become binding and effective with respect to all shares of common stock of each of the Debtors held by such registered holders.

     16.    <u>Continued Corporate Existence and Certain CPUC Matters.</u>

     a.    Pursuant to Section 6.3 of the Plan, except as otherwise provided in the Plan or in this Confirmation Order, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized. On and after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Debtor, each Reorganized Debtor may, in its sole

-15-

discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate. The Reorganized Debtors shall not amend their articles of incorporation, bylaws, or other governing documents in any manner inconsistent with the Plan or this Confirmation Order. The first annual meeting of the shareholders of the Reorganized Debtors shall be held on a date and at a time that is within fifteen (15) months of the certification of their respective amended and restated articles of incorporation by the California Secretary of State, as such date and time shall be designated by the New Boards of the respective Reorganized Debtors.

b. The Utility will comply with and implement the provisions of the CPUC Assigned Commissioner's Ruling dated February 18, 2020 ("**ACR**"), to the extent adopted by, and as modified by, the decision of the California Public Utilities Commission (the "**CPUC**" or the "**Commission**") in I.19-09-016 approving the Plan (the "**CPUC Decision**") (except insofar as such provisions are in the future waived, modified or terminated by the CPUC). Except as expressly stated in the CPUC Decision or this paragraph, the provisions of the ACR regarding selection of members of the Boards,[3] responsibilities of Board committees,[4] and Board approvals of senior management,[5] will in any event expire on the earliest of (i) a continuous period of five years in which the Reorganized Utility has not entered Part II of the Enhanced Regulatory Oversight and Enforcement Process (as set forth in Appendix A to the CPUC Decision), (ii) a continuous period of two years in which the Reorganized Utility, having exited Part II of the Enhanced Regulatory Oversight and Enforcement Process, has not re-entered Part II, or (iii) the date on which the CPUC has approved a change in control of the Reorganized Debtors and associated termination of the Enhanced Regulatory Oversight and Enforcement Process. Notwithstanding the foregoing, the provision in the ACR regarding residency of directors[6] shall apply to the directors as of the Effective Date.

---

[3] ACR Proposal 4.
[4] ACR Proposals 2, 3, 10.
[5] ACR Proposals 1, 5.
[6] ACR Proposal 4.

-16-

c.      Pursuant to the CPUC Decision, the Utility will seek to implement a regional restructuring plan.  The Utility will file an application with the CPUC by June 30, 2020 regarding its proposed restructuring, and will take interim steps in furtherance of its proposed regional restructuring.

17.      Subrogation Wildfire Trust.

a.      Establishment of the Subrogation Wildfire Trust. (i) The Plan Proponents are authorized to establish and implement the Subrogation Wildfire Trust in accordance with the terms of this Confirmation Order, the Plan, and the Subrogation Wildfire Trust Agreement, and (ii) the Subrogation Wildfire Trustee is authorized to carry out the purposes of the Subrogation Wildfire Trust, as set forth in and subject to the Plan and the Subrogation Wildfire Trust Agreement.  Funding of the Subrogation Wildfire Trust as provided herein and in the Plan shall be in restitution and in full and final satisfaction, release, and discharge of all Subrogation Wildfire Claims.  In accordance with the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claim Allocation Agreement, each of which shall become effective as of the Effective Date, the Subrogation Wildfire Trust shall administer, process, settle, resolve, liquidate, satisfy, and pay all Subrogation Wildfire Claims. On the Effective Date, all Subrogation Wildfire Claims shall be channeled to the Subrogation Wildfire Trust and shall be subject to the Channeling Injunction.

b.      Qualified Settlement Fund.  Each trust comprising the Subrogation Wildfire Trust is intended to be treated, and shall be reported, as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable; *provided, however*, that the Reorganized Debtors may elect to treat any trust comprising the Subrogation Wildfire Trust as a "grantor trust" for U.S. federal income tax purposes, in which case each such trust shall be treated consistently for state and local tax purposes, to the extent applicable.  The Subrogation Wildfire Trustee and all holders of Subrogation Wildfire Claims shall report consistently with the foregoing.   The Subrogation Wildfire Trustee shall be the "administrator," within the meaning of Treasury Regulations Section 1.468B-2(k)(3), of the Subrogation Wildfire Trust and, in such capacity, the Subrogation Wildfire Trustee shall be

-17-

responsible for filing all tax returns of the Subrogation Wildfire Trust and, out of the assets of the Subrogation Wildfire Trust, the payment of any taxes due with respect to trust assets or otherwise imposed on the Subrogation Wildfire Trust (including any tax liability arising in connection with the distribution of trust assets), and shall be permitted to sell any assets of the Subrogation Wildfire Trust to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale).

c.      Subrogation Wildfire Trustee.  The Subrogation Wildfire Trust shall be governed by the Subrogation Wildfire Trust Agreement and administered by the Subrogation Wildfire Trustee. The powers and duties of the Subrogation Wildfire Trustee shall be as described in Section 6.5 of the Plan and shall include, but shall not be limited to, those responsibilities vested in the Subrogation Wildfire Trustee pursuant to the terms of the Subrogation Wildfire Trust Agreement, or as may be otherwise necessary and proper to (i) make distributions to holders of Subrogation Wildfire Claims in accordance with the terms of the Plan, this Confirmation Order, the Subrogation Wildfire Trust Agreement, and the Subrogation Wildfire Claim Allocation Agreement, and (ii) carry out the provisions of the Plan and this Confirmation Order relating to the Subrogation Wildfire Trust and the Subrogation Wildfire Claims.

d.      Subrogation Wildfire Trust Advisory Board.  The Subrogation Wildfire Trust Advisory Board shall be appointed on the Effective Date. The rights and responsibilities of the Subrogation Wildfire Trust Advisory Board shall be set forth in the Subrogation Wildfire Trust Agreement and Section 6.6 of the Plan. The Subrogation Wildfire Trust Advisory Board shall, as and when requested by the Subrogation Wildfire Trustee, or as is otherwise either (i) required under the Plan, this Confirmation Order, or the Subrogation Wildfire Trust Agreement, or (ii) contemplated by the Subrogation Wildfire Claim Allocation Agreement, consult with and advise the Subrogation Wildfire Trustee as to the administration and management of the Subrogation Wildfire Trust in accordance with the terms of the Plan, this Confirmation Order, and/or the Subrogation Wildfire Trust Agreement.

e.      Costs and Expenses of the Subrogation Wildfire Trust.  The Subrogation Wildfire

-18-

Trust shall pay all expenses of the Subrogation Wildfire Trust from the assets of the Subrogation Wildfire Trust, as provided in the Subrogation Wildfire Trust Agreement.

f.    Assignment of Rights. Nothing in this Confirmation Order, the Plan, or any of the Plan Documents shall be construed as addressing the merits of any purported assignment of rights to insurance policy proceeds, and each insurer's rights and defenses with respect to (a) any assignment of any insurance policies, and (b) any entitlements to insurance proceeds, are hereby expressly reserved.

g.    Subrogation Wildfire Trust Escrow Agreement.    The Debtors and Ad Hoc Subrogation Group have agreed as follows, which agreement is hereby approved by the Court, and the Debtors are hereby authorized and directed to take all actions set forth below to implement such agreement:

i.    Within two (2) business days of the Confirmation Date, the Debtors shall advance $5,000,000 in cash (the "**Trustee Advance**") of the $11,000,000,000 subrogation claims recovery by wire transfer to Willkie Farr & Gallagher LLP ("**Willkie**"), pursuant to wiring instructions to be provided by Willkie. Willkie shall use the Trustee Advance solely to pay the fees and expenses of the future Subrogation Wildfire Trustee incurred prior to the Effective Date of the Plan, and any unused portion of the Trustee Advance will be transferred to the Subrogation Wildfire Trust on the Effective Date of the Plan. If the Effective Date of the Plan does not occur, then such unused portion shall be returned to the Debtors.

ii.    On the Effective Date of the Plan, the Debtors shall (i) fund $100,000,000 to the Subrogation Wildfire Trust, and (ii) place the remaining $10,895,000,000 (the "**Subrogation Escrow Funds**") in a segregated escrow or similar account (the "**Subrogation Escrow Account**"), established and owned by the Subrogation Wildfire Trust for the benefit of holders of Subrogation Wildfire Claims, which will be held at a financial institution reasonably acceptable to the Ad Hoc Subrogation Group and the Debtors (the "**Subrogation Escrow Agent**"), subject to an escrow agreement mutually acceptable to the Ad Hoc Subrogation Group and the Debtors (the "**Subrogation Escrow Agreement**"). The Subrogation Escrow Funds shall be held in the

-19-

Subrogation Escrow Account in trust for the Subrogation Wildfire Trust beneficiaries and shall not be subject to any claim, lien or encumbrance of any kind.

iii.     The Subrogation Escrow Funds shall be held in the Subrogation Escrow Account for the lesser of (i) fifteen (15) calendar days, or (ii) the amount of time needed to earn an amount in interest or appreciation on the Subrogation Escrow Funds equal to $3,986,950 (the "**Holding Period**").  The Subrogation Escrow Agent shall provide the Subrogation Trustee with written notice of the termination of the Holding Period within one (1) business day thereof. Immediately upon the conclusion of the Holding Period and without further action or notice required to be provided by the Reorganized Debtors or the Ad Hoc Subrogation Group, the Subrogation Escrow Agent shall transfer $10,895,000,000, plus any interest or appreciation accrued or earned in excess of $3,986,950 (the "**Butte Settlement Payment**") to the Subrogation Wildfire Trust.  The remaining balance of the Subrogation Escrow Funds shall be paid by the Subrogation Escrow Agent in accordance with the Court's *Order Pursuant to 11 U.S.C. §§ 105(a) and 363(b) and Fed. R. Bankr. P. 9019 Approving (I) Debtors' Agreement and Settlement with People of the State of California and (II) Granting Related Relief* [Docket No. 6785].  In the event the remaining balance of the Subrogation Escrow Funds is insufficient to pay the Butte Settlement Payment in full, the Reorganized Debtors shall be solely responsible for any such shortfall, and under no circumstances shall less than $10,895,000,000 be transferred to the Subrogation Wildfire Trust at the conclusion of the Holding Period in accordance with the Subrogation Escrow Agreement.

iv.     The Subrogation Escrow Funds may only be invested in U.S. Federal Government securities with a term of one year or less or other short-term fixed income assets as approved by the Ad Hoc Subrogation Group in its sole discretion.  The Reorganized Debtors shall be solely responsible for the payment of any and all fees, expenses, taxes or other costs associated with the Subrogation Escrow Funds and the Escrow Agent and no such fees, expenses, taxes or other costs shall be deducted from the Escrow Funds (or any interest or appreciation earned thereon).

18.     Fire Victim Trust.

a.     Establishment of the Fire Victim Trust.  (i) The Plan Proponents are authorized to

-20-

establish and implement the Fire Victim Trust in accordance with the terms of this Confirmation Order, the Plan, the Fire Victim Trust Agreement and the Fire Victim Claims Resolution Procedures (the Fire Victim Trust Agreement together with the Fire Victim Claims Resolution Procedures, the "**Fire Victim Trust Documents**"), and (ii) the Fire Victim Trustee is authorized to carry out the purposes of the Fire Victim Trust, as set forth in and subject to the Plan, this Confirmation Order, and the Fire Victim Trust Documents.  The Fire Victim Trust shall, among other tasks described in the Plan or the Fire Victim Trust Documents, administer, process, settle, resolve, liquidate, satisfy, and pay all Fire Victim Claims, and prosecute or settle all Assigned Rights and Causes of Action. On the Effective Date, all Fire Victim Claims shall be channeled to the Fire Victim Trust and shall be subject to the Channeling Injunction. The Fire Victim Trust shall be funded with the Aggregate Fire Victim Consideration.  Funding of the Fire Victim Trust as provided herein and in the Plan shall be in restitution and full and final satisfaction, release, and discharge of all Fire Victim Claims. To the extent, if any, a holder of a Fire Victim Claim asserts damages against the Debtors or the Fire Victim Trust for amounts covered by a policy of insurance, the Fire Victim Trust may receive a credit against the Fire Victim Claim of any such holder, its predecessor, successor, or assignee, for insurance coverage amounts as provided in the Plan, this Confirmation Order and the Fire Victim Trust Documents.  In addition, coverage provisions of any insurance policy for losses resulting from a Fire and any funds received by any holder of a Fire Victim Claim, net of attorney's fees, shall satisfy, to the extent applicable, any amounts of restitution the Debtors or Reorganized Debtors might be subject to under Cal. Penal Code § 1202.4.

b.    <u>Qualified Settlement Fund.</u>  The Fire Victim Trust shall qualify as a "qualified settlement fund" for U.S. federal income tax purposes and shall be treated consistently for state and local tax purposes, to the extent applicable; provided, however, that the Reorganized Debtors may elect to treat any trust comprising the Fire Victim Trust as a "grantor trust" for U.S. federal income tax purposes, in which case each such trust shall be treated consistently for state and local tax purposes, to the extent applicable. The Fire Victim Trustee and all holders of Fire Victim Claims shall report consistently with the foregoing.  The Fire Victim Trustee shall be the "administrator,"

-21-

within the meaning of Treasury Regulations Section 1.468B-2(k)(3), of the Fire Victim Trust and, in such capacity, the Fire Victim Trustee shall be responsible for filing all tax returns of the Fire Victim Trust and, out of the assets of the Fire Victim Trust, the payment of any taxes due with respect to trust assets or otherwise imposed on the Fire Victim Trust (including any tax liability arising in connection with the distribution of trust assets), shall be permitted to sell any assets of the Fire Victim Trust to the extent necessary to satisfy such tax liability (including any tax liability arising in connection with such sale).

c.     _Fire Victim Trust Documents._     On the Effective Date, the Fire Victim Trust Documents shall become effective.

d.     _Fire Victim Trust Administration._  No parties other than holders of Fire Victim Claims shall have a right or involvement in the Fire Victim Trust Documents, the administration of the Fire Victim Trust, the selection of the Fire Victim Trustee, settlement fund administrator, claims administrator, or the Fire Victim Trust Oversight Committee.  The Fire Victim Claims shall be administered by the Fire Victim Trustee, Claims Administrator, and the Fire Victim Trust Oversight Committee, as set forth in the Fire Victim Trust Documents, the Plan, and this Confirmation Order, independent of the Debtors and/or Reorganized Debtors, as applicable.  The Fire Victim Claims shall be administered, allocated and distributed in accordance with applicable ethical rules and subject to adequate informed consent procedures. The Fire Victim Trustee shall receive settlement allocations consistent with Rule 1.8(g) of the Model Rules of Professional Conduct. The rules and procedures governing the administration and allocation of the funds from the Fire Victim Trust shall be objectively and consistently applied and transparent.  No party other than holders of Fire Victim Claims, including but not limited to the Debtors, the Reorganized Debtors, and any holders of Claims or Interests other than holders of Fire Victim Claims, shall have any rights to any of the proceeds in the Fire Victim Trust, or any clawback or reversionary interest of any of the consideration (whether Cash or otherwise) allocated to any of the holders of Fire Victim Claims generally or in the total amount funded to the Fire Victim Trust.

e.     _Fire Victim Trustee and Claims Administrator._

-22-

i.      From and after the entry of this Confirmation Order, the beneficial interests in the Fire Victim Trust held by Beneficial Owners (as defined in the Fire Victim Trust Agreement), including a Fire Victim Claim, are not negotiable and shall be non-transferable other than if transferred by will, intestate succession, or otherwise by operation of law.  Additionally, the holder of any interest in the Fire Victim Trust may assign, convey or otherwise transfer its interest in the Fire Victim Trust, including a Fire Victim Claim, to its successor by merger, consolidation, or by purchase or transfer of substantially all of the assets of the holder of the interests in the Fire Victim Trust. Moreover, any and all Fire Victim Trust Interests (as defined in the Fire Victim Trust Agreement) shall not be listed for trading on any national securities exchange and the Fire Victim Trustee shall not take any action the purpose of which is, or which would be in support of, the establishment of an active trading market in the beneficial interests in the Fire Victim Trust.  No voluntary transfer of a beneficial interest in the Fire Victim Trust shall be effective or binding upon the Fire Victim Trust or the Fire Victim Trustee for any purpose, except as otherwise set forth in the Fire Victim Trust Agreement.  In the case of a deceased individual Beneficial Owner, his or her executor or administrator shall provide written notice to the Fire Victim Trustee and deliver to the Fire Victim Trustee such documentation necessary to evidence the transfer by operation of law and identify the proper Person to succeed to such decedent's interests. The Fire Victim Trustee may fully rely on any such evidence provided by a purported executor or administrator and shall have no duty to investigate.

ii.      The Fire Victim Trust shall be governed by the Fire Victim Trust Documents, the Plan and this Confirmation Order, and administered by the Fire Victim Trustee, Claims Administrator, and Fire Victim Trust Oversight Committee. The power, rights, and responsibilities of the Fire Victim Trustee, Claims Administrator, and Fire Victim Trust Oversight Committee shall be as provided in the Fire Victim Trust Agreement and consistent with Sections 6.7 and 6.8 of the Plan and shall include the authority and responsibility to, among other things, take the actions set forth in Sections 6.7 and 6.8 of the Plan.  Notwithstanding anything to the contrary in the Fire Victim Trust Documents, the Parties to the State Agency Settlement [Docket No. 7399-2] and the Federal

-23-

Agency Settlement [Docket No. 7399-1] shall not be required to execute a Claimant Release and Indemnification in Connection with the Fire Victim Trust Award (as defined in the Fire Victim Trust Agreement).

iii.    The Fire Victim Trustee will be appointed as the representative of each of the Debtors' estates pursuant to section 1123(a)(5), (a)(7), and (b)(3)(B) of the Bankruptcy Code and as such will be vested with the authority and power (subject to the Fire Victim Trust Agreement, the Plan, and this Confirmation Order) to, among other things: (i) administer, object to or settle Fire Victim Claims; (ii) make distributions to holders of Fire Victim Claims in accordance with the terms of the Fire Victim Trust Documents, the Plan, and this Confirmation Order; and (iii) carry out the provisions of the Plan and this Confirmation Order related to the Fire Victim Trust and the Fire Victim Claims, including but not limited to prosecuting or settling all Assigned Rights and Causes of Action in his or her capacity as a trustee for the benefit of holders of Fire Victim Claims.

iv.    Justice John K. Trotter, Jr. shall be the Fire Victim Trustee and Cathy Yanni shall be the Claims Administrator in accordance with the Fire Victim Trust Documents.

f.    <u>Fire Victim Trust Oversight Committee.</u>  The Fire Victim Trust Oversight Committee shall be appointed on or before the Effective Date and will be announced in a filing by the Fire Victim Trust with the Court and by a post on the Fire Victim Trust's website.  The Fire Victim Trust Oversight Committee shall consist of members selected and appointed by the Consenting Fire Claimant Professionals and the Tort Claimants Committee.  The rights and responsibilities of the Fire Victim Trust Oversight Committee shall be as set forth in Section VI of the Fire Victim Trust Agreement.

g.    <u>Assigned Rights and Causes of Action.</u>  Unless otherwise expressly provided under the Plan, on the Effective Date, all Assigned Rights and Causes of Action will vest in the Fire Victim Trust.  On and after the Effective Date, the transfer of the Assigned Rights and Causes of Action to the Fire Victim Trust will be deemed final and irrevocable and distributions may be made from the Fire Victim Trust.  The Fire Victim Trustee shall have the express authority and standing necessary to take all actions to prosecute or settle, as set forth in the Fire Victim Trust Documents, the Plan,

-24-

and this Confirmation Order, any and all Assigned Rights and Causes of Action, including the ability to seek non-privileged discovery from the Reorganized Debtors in accordance with applicable law and consistent with the terms of Section 10.14 of the Plan. The definition of Assigned Rights and Causes of Action in the Plan controls in any conflict between that definition and the Schedule of Retained Rights and Causes of Action previously filed as part of the Plan Supplement [Docket No. 7037]. The Court shall retain jurisdiction post-confirmation to resolve any dispute that may arise regarding the Schedule of Assigned Rights and Causes of Action and the Schedule of Retained Rights and Causes of Action. All rights and defenses of any Entity with respect to any Assigned Right and Cause of Action asserted by the Fire Victim Trust against such Entity may be asserted against the Fire Victim Trust, including seeking discovery from the Reorganized Debtors in accordance with applicable law. If the Effective Date has not occurred by August 29, 2020, and if the Tort Claimants RSA's automatic termination that is triggered by such an event has been waived pursuant to Section 3(a)(ii) of the Tort Claimants RSA, the Fire Victim Trustee shall be granted standing by the Debtors, so long as such waiver is in effect, to pursue any and all Assigned Rights and Causes of Action prior to the Effective Date. Immediately upon termination of such waiver, such standing shall terminate and all rights to pursue the Assigned Rights and Causes of Action shall automatically revert to the Debtors.

h. <u>Funding on the Effective Date.</u> On the Effective Date of the Plan: (i) the Debtors shall fund $5.4 billion in cash less any amounts as provided in the orders appointing Cathy Yanni and Justice John K. Trotter, entered at Docket Nos. 6759 and 6760 respectively, to the Fire Victim Trust by wiring instructions to be provided to the Debtors by the Fire Victim Trustee no less than two (2) business days prior to the Effective Date; and (ii) the Debtors or Reorganized Debtors, as applicable, shall transfer to the Fire Victim Trust the New HoldCo Common Stock as provided in Sections 4.7 and 4.26 of the Plan. Justice John K. Trotter may take such action prior to the Effective Date as he determines necessary or appropriate to allow the Fire Victim Trust to be able to receive the foregoing funding on the Effective Date, including, without limitation, filing the certificate of trust and other documentation with the appropriate governmental entities, obtaining a tax identification number,

-25-

and completing "Know Your Customer" documentation at the applicable financial institutions.

      i.     <u>Offsets for Fire Victim Insurance Recoveries.</u>  For the reasons set forth in the *Memorandum on Objection of Adventist Health, AT&T, Paradise Entities and Comcast to Trust Documents* entered on May 26, 2020 [Docket No. 7597], the process for assessing future offsets for available insurance recoveries set forth in Section 2.6 of the Fire Victim Trust Agreement is reasonable, proper and necessary and is approved in all respects.

      j.     <u>Approval of Tax Benefit Payment Agreement</u>.  On and after the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall be authorized to execute, deliver, enter into, and perform under the Tax Benefit Payment Agreement.

      k.     <u>Court Review of Claims.</u>  Notwithstanding anything to the contrary in the Plan, this Confirmation Order, or the Fire Victim Trust Documents, only the parties who timely submitted an objection to the Fire Victim Trust Documents as noted herein[7] shall have the right to seek court review in accordance with Section IX of the Fire Victim Claims Resolution Procedures.

      l.     <u>Modifications to Fire Victim Trust Documents.</u>  Notwithstanding anything to the contrary in the Plan, this Confirmation Order or the Fire Victim Trust Documents, any material amendment or modification of the Fire Victim Trust Documents that is inconsistent with the terms of the Plan, this Confirmation Order or the Bankruptcy Code, shall be subject to approval of the Court.

      m.     <u>Attorneys' Fees.</u>  Notwithstanding anything to the contrary in the Plan, this Confirmation Order or the Fire Victim Trust Documents, nothing shall preclude a holder of a Fire Victim Claim from recovering attorneys' fees in accordance with California law in connection with

---

[7] The parties who timely submitted objections to the Fire Victim Trust Documents are listed as follows: Adventist Health System/West and Feather River d/b/a Adventist Health Feather River, Paradise Unified School District, Northern Recycling and Waste Services, LLC/Northern Holdings, LLC, Napa County Recycling & Waste Services, LLC/Napa Recycling & Waste Services, LLC, Christian & Missionary Alliance Church of Paradise, d/b/a Paradise Alliance Church, Paradise Irrigation District, AT&T Corp. and all affiliates, and Comcast Cable Communications, LLC and all affiliates [Docket Nos. 7072 and 7121], Butte County Mosquito and Vector Control District [Docket No. 7145], Eric and Julie Carlson [Docket Nos. 7207 and 7363], Karl Knight [Docket No. 7366], and Mary Kim Wallace [Docket No. 7367].

its Fire Victim Claim asserted against the Fire Victim Trust.

n.  <u>Assumed Executory Contracts.</u>  The Fire Victim Trust shall not have any rights of the Debtors or Reorganized Debtors under any executory contract or unexpired lease that is assumed under section 365 of the Bankruptcy Code pursuant to the Plan or during the Chapter 11 Cases, except to the extent that an Assigned Right or Cause of Action arises under such an assumed executory contract or assumed unexpired lease. The Debtors' or Reorganized Debtors' assumption of an executory contract or unexpired lease shall not impair or diminish an Assigned Right or Cause of Action that arises under such assumed executory contract or assumed unexpired lease.

o.  <u>Costs and Expenses of the Fire Victim Trust.</u>  Except as otherwise provided in Subparagraph h of this Paragraph 18, the Fire Victim Trust shall pay all expenses of the Fire Victim Trust from the assets of the Fire Victim Trust, as provided in the Fire Victim Trust Documents and under no circumstances shall any such expenses be paid by the Reorganized Debtors.

19.  <u>Public Entities Segregated Defense Fund.</u>  On the Effective Date, the Reorganized Debtors shall fund the Public Entities Segregated Defense Fund in accordance with the terms of the Public Entities Plan Support Agreements.  The Public Entities Segregated Defense Fund shall be maintained by the Reorganized Debtors until the later of (i) the expiration of the applicable statute of limitations period for any and all Public Entities Third Party Claims and (ii) the conclusion of all litigation, including appeals, involving the Public Entities Third Party Claims.

20.  <u>Go-Forward Wildfire Fund.</u>

a.  On or about the Effective Date, the Debtors shall contribute, in accordance with the Wildfire Legislation (A.B. 1054), an initial contribution of approximately $4.8 billion and first annual contribution of approximately $193 million, to the Go-Forward Wildfire Fund in order to secure the participation of the Reorganized Debtors therein.

b.  The Reorganized Debtors shall also be responsible for ongoing funding commitments to the Go-Forward Wildfire Fund as required by the terms thereof and the Wildfire Legislation (A.B. 1054).

21.  <u>Officers and Boards of Directors.</u>

-27-

a. The composition of the New Boards has been disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.

b. Except as otherwise provided in the Plan Supplement, or disclosed to the Court at the Confirmation Hearing, the officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.[8]

c. Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of the respective Reorganized Debtor on and after the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director will be deemed to have resigned or shall otherwise cease to be a director of the applicable Debtor on the Effective Date.

d. Commencing on the Effective Date, the directors of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

22. <u>Management Incentive Plan.</u> On or after the Effective Date, the Management Incentive Plan may be established and implemented at the discretion of the New Board and in compliance with the Wildfire Legislation (A.B. 1054).

23. <u>Cancellation of Existing Securities and Agreements.</u>

a. Pursuant to Section 6.13 of the Plan, except for the purpose of enabling holders of Allowed Claims to receive a distribution under the Plan as provided therein and except as otherwise set forth in the Plan, the Plan Supplement or this Confirmation Order, on the Effective Date, all agreements, instruments, and other documents evidencing any prepetition Claim or any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. For

---

[8] The identities of the Chief Safety Officer and the Chief Risk Officer of the Reorganized Debtors must be acceptable to the Governor's Office as of the Effective Date.

-28-

the avoidance of doubt, in accordance with Sections 4.13, 4.15, 4.19, 4.33, and 4.34 of the Plan, none of the HoldCo Common Interests, the HoldCo Other Interests, the Utility Reinstated Senior Note Documents, the Utility Preferred Interests, or the Utility Common Interests shall be cancelled pursuant to the Plan. The holders of, or parties to, such cancelled instruments, Securities, and other documentation shall have no rights arising from or related to such instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.

b. Except as otherwise set forth in the Plan or in this Confirmation Order, the Funded Debt Trustees shall be released and discharged from all duties and responsibilities under the applicable Funded Debt Documents; provided that, notwithstanding the releases in Article X of the Plan, entry of this Confirmation Order, or the occurrence of the Effective Date, each of the Funded Debt Documents or agreements that governs the rights of the holder of a Claim shall continue in effect to the extent necessary to: (i) enforce the rights, Claims, and interests of the Funded Debt Trustees thereto vis-a-vis any parties other than the Released Parties; (ii) allow the holders of Allowed Funded Debt Claims, Utility Senior Note Claims, or Utility PC Bond (2008 F and 2010 E) Claim, as applicable, to receive distributions under the Plan, to the extent provided for under the Plan; (iii) appear to be heard in the Chapter 11 Cases or in any proceedings in the Court or any other court; (iv) preserve any rights of the Funded Debt Trustees to payment of fees, expenses, and indemnification obligations from or on any money or property to be distributed in respect of the Allowed Funded Debt Claims, Utility Senior Note Claims and Utility PC Bond (2008 F and 2010 E) Claims, solely to the extent provided in the Plan, including permitting the Funded Debt Trustees to maintain, enforce, and exercise a Charging Lien against such distributions; and (v) enforce any obligation owed to the Funded Debt Trustees under the Plan. For the avoidance of doubt, on and after the Effective Date, the Utility Senior Notes Trustee shall not be released from any duty or responsibility under or arising from the Utility Reinstated Senior Note Documents.

c. On the Effective Date, the DIP Facility Agents and the DIP Facility Lenders, and their respective agents, successors, and assigns shall be automatically and fully discharged of all of their duties and obligations associated with the DIP Facility Documents (other than any cooperation

-29-

obligations customarily contained in pay-off letters or similar arrangements, to the extent applicable).  The commitments and obligations, if any, of the DIP Facility Lenders to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Credit Agreement shall fully terminate and be of no further force or effect on the Effective Date. To the extent that any provision of the DIP Facility Documents or DIP Facility Order are of a type that survives repayment of the subject indebtedness, such provisions shall remain in effect notwithstanding satisfaction of the DIP Facility Claims.

24.    Cancellation of Certain Existing Security Agreements.    Promptly following the payment in full or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

25.    Issuance of New HoldCo Common Stock.    On and after the Confirmation Date, HoldCo and Reorganized HoldCo, as applicable, shall be authorized to issue, or cause to be issued, subject to the occurrence of the Effective Date, the New HoldCo Common Stock in accordance with the Plan and the Plan Documents, including, without limitation, all New HoldCo Common Stock contemplated to be issued in connection with the Plan Funding Transactions, all without the need for any further corporate or shareholder action.  All of the New HoldCo Common Stock so issued shall be duly authorized, validly issued, and fully paid and non-assessable.

26.    Approval of Rights Offering Procedures.    The Rights Offering Procedures, substantially in the form attached hereto as **Exhibit B**, and the execution, delivery, and performance thereof by the Debtors, are authorized and approved.

27.    Approval of Rights Offering.  If applicable, following effectiveness of an appropriate registration statement registering the offer, issuance and distribution of Securities pursuant to the

-30-

Rights Offering under the Securities Act, the Debtors shall, if they determine to implement the same, commence and consummate the Rights Offering in accordance therewith. New HoldCo Common Stock shall be issued to each holder of subscription rights that exercises its respective subscription rights pursuant to the Rights Offering Procedures and the Plan. The consummation of the Rights Offering shall be conditioned on the occurrence of the Effective Date. Amounts held by the subscription agent with respect to the Rights Offering prior to the Effective Date shall not be entitled to any interest on account of such amounts and no holder of subscription rights participating in the Rights Offering shall have any rights in New HoldCo Common Stock until the Rights Offering is consummated.

28.     Plan Proponent Reimbursement.   On the Effective Date, the Reorganized Debtors shall reimburse the Shareholder Proponents for their out-of-pocket expenses (excluding any professional fees) incurred in connection with the furtherance of the Debtors' reorganization, which in the aggregate shall not exceed $150,000.

29.     Treatment of Utility Senior Note Trustee.   Notwithstanding anything to the contrary in the Plan, on the Effective Date, the Reorganized Debtors shall pay to the Utility Senior Note Trustee, $5,000,000 (the "**Utility Senior Note Trustee Fee Payment**") in satisfaction of fees, costs, expenses, charges, disbursements, advancements and indemnities incurred by the Utility Senior Note Trustee in accordance with the Utility Senior Note Documents through the Effective Date of the Plan (the "**Utility Senior Note Trustee Fees**").   To the extent that the Utility Senior Note Trustee Fee Payment does not satisfy all Utility Senior Note Trustee Fees in full, the Utility Senior Note Trustee is authorized and permitted to recover and satisfy all remaining Utility Senior Note Trustee Fees through its Charging Lien against distributions on account of the Utility Impaired Senior Note Claims and Utility Short-Term Senior Note Claims, in accordance with the Plan and the Utility Impaired Senior Note Documents and the Utility Short-Term Senior Note Documents, respectively. The Plan Proponents shall not contest, challenge, dispute or object to the Utility Senior Note Trustee Fees, or directly or indirectly, cause any person or entity to object to or challenge, the Utility Senior Note Trustee Fees, for any reason or on any grounds, including but not limited to the reasonableness

-31-

of such Utility Senior Note Trustee Fees.

30. <u>Securities Act Registrations or Exemptions.</u>

a. Pursuant to Section 6.19 of the Plan, the offer, sale, distribution and issuance of (a) the New HoldCo Common Stock (to be issued (A) to the Fire Victim Trust, (B) as Equity Commitment Premium as defined in and pursuant to the Backstop Commitment Letters, or (C) as Additional Backstop Commitment Share Premium as defined in and pursuant to the Amended Equity Backstop Commitment Documents), New Utility Funded Debt Exchange Notes, New Utility Long-Term Notes and New Utility Short-Term Notes, shall be exempt from registration under (i) the Securities Act of 1933 and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities (collectively, the "**Registration Requirements**"), pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, (b) any Securities issued in a private transaction shall be exempt from the Registration Requirements pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and (c) (w) New Holdco Common Stock pursuant to a Rights Offering or underwritten primary or secondary public equity offering, (x) equity-linked securities pursuant to a public offering, (y) the First Mortgage Bonds (as defined in the Plan Supplement [Docket No. 7037]) and (z) the Secured Notes (as defined in the Plan Supplement [Docket No. 7037]) shall be registered under the Securities Act pursuant to an appropriate registration statement. Any offer, issuance and distribution of Securities pursuant to any Backstop Commitment Letter shall be exempt from registration pursuant to section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder.

b. Pursuant to section 1145 of the Bankruptcy Code, any securities issued under the Plan that are exempt from such registration pursuant to section 1145(a) of the Bankruptcy Code will be freely tradable by the recipients thereof, subject to (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933, (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments,

-32-

(iii) the restrictions, if any, on the transferability of such securities and instruments, including any restrictions on the transferability under the terms of the New Organizational Documents, (iv) any applicable procedures of DTC, and (v) applicable regulatory approval.

31. <u>Claims Resolution Procedures Approved.</u>  Except as otherwise provided herein, the procedures for resolving Disputed Claims set forth in Article VII of the Plan are fair and reasonable and are hereby approved. On and after the Effective Date, the Subrogation Wildfire Trustee shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Subrogation Wildfire Claims without approval of the Court pursuant to the Subrogation Wildfire Trust Agreement and the Subrogation Wildfire Claim Allocation Agreement.  On and after the Effective Date, the Fire Victim Trustee shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Fire Victim Claims without approval of the Court pursuant to the Fire Victim Trust Documents.

32. <u>Assumption or Rejection of Executory Contracts and Unexpired Leases.</u>

a. Pursuant to Section 8.1 of the Plan, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such executory contract or unexpired lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to assume, assume and assign, or reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts.

b. Pursuant to section 8.1(b) of the Plan, as of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all power purchase agreements, renewable energy power purchase agreements, and Community Choice Aggregation servicing agreements of the Debtors shall be deemed assumed.

c. Except with respect to any timely filed Contract Assumption or Rejection Dispute that remains unresolved as of the date hereof, and subject to the occurrence of the Effective Date, entry

-33-

of this Confirmation Order shall constitute approval of the assumptions, assumptions and assignments, or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in, and be fully enforceable by, the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

d.     Notwithstanding Section 8.8(a) of the Plan, the Debtors shall have thirty (30) calendar days from the Confirmation Date to file amendments to the Schedule of Assumed Contracts (as defined in the Plan Supplement) and Schedule of Rejected Contracts, to remove executory contracts and unexpired leases previously listed on the Schedule of Assumed Contracts and to add executory contracts and unexpired leases to the Schedule of Rejected Contracts. Any objection of a counterparty to an executory contract or unexpired lease that is added to the Schedule of Rejected Contracts or removed from the Schedule of Assumed Contracts pursuant to this subparagraph shall have thirty (30) calendar days from the date on which notice of such removal or addition is served on the counterparty to file an objection thereto, which objection may be resolved either consensually without further order of the Court, or, after notice and an opportunity to be heard, by a Final Order of the Court, with any rejection deemed approved as of the Effective Date. The rejection of any executory contract or unexpired lease added to the Schedule of Rejected Contracts pursuant to this subparagraph shall be deemed approved by the Court as of the Effective Date if an objection to the addition of such executory contract or unexpired lease is not timely filed as provided above. For the avoidance of doubt, the counterparty to an executory contract or unexpired lease that is added to the Schedule of Rejected Contracts shall have thirty (30) calendar days to file a claim for rejection damages following the later of (i) the Effective Date and (ii) if a timely objection to rejection is filed and is not consensually resolved by the parties, the entry of an order approving the rejection of such executory contract or unexpired lease. Nothing in this Paragraph 32(d) shall amend, modify, or supersede the provisions of Section 8.1(b) of the Plan or Paragraph 43 of this Confirmation Order.

33.    <u>Cure Payments and Cure Notices.</u> Pursuant to Section 8.2 of the Plan, any defaults

-34-

under an assumed or assumed and assigned executory contract or unexpired lease, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount, as reflected in the applicable cure notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. Pursuant to Section 8.2(b) of the Plan, the Debtors distributed, or caused to be distributed, at least fourteen (14) days before the deadline set to file objections to confirmation of the Plan, assumption and cure notices to the applicable third parties. Any counterparty to an executory contract or unexpired lease that failed to object timely to the proposed assumption, assumption and assignment, or Cure Amount, is hereby deemed to have assented to such assumption, assumption and assignment, or Cure Amount. Notwithstanding anything herein or in the Plan to the contrary, (i) in the event that any executory contract or unexpired lease is removed from the Schedule of Rejected Contracts, a cure notice with respect to such executory contract or unexpired lease will be sent promptly to the counterparty thereof and a noticed hearing set to consider whether such executory contract or unexpired lease can be assumed or assumed and assigned, as applicable, and (ii) the right of any counterparty or holder of a Claim for a Cure Amount to investigate and/or challenge the calculation of interest with respect to any applicable Cure Amount, consistent with the Plan, is preserved.

34. <u>Determination of Cure Disputes.</u>

a. Pursuant to Section 8.2(c) of the Plan, in the event of an unresolved dispute regarding (i) any Cure Amount, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the executory contract or unexpired lease to be assumed, or (iii) any other matter pertaining to assumption, assumption and assignment, or the Cure Amounts required by section 365(b)(1) of the Bankruptcy Code (each, a "**Cure Dispute**"), such Cure Dispute shall be resolved by a Final Order of the Court, which may be entered after the Effective Date.

b. Except as otherwise provided in this Confirmation Order, any issues with respect to timely filed Cure Disputes will be preserved and may be resolved in due course either consensually

-35-

without further order of the Court, or, after notice and an opportunity to be heard, by a Final Order of the Court, which may be entered after the Effective Date.

c.      If the Court makes a determination regarding any Cure Dispute (including, without limitation that the Cure Amount is greater than the amount set forth in the applicable cure notice), as set forth in Section 8.8(a) of the Plan, the Debtors or Reorganized Debtors, as applicable, shall have the right to alter the treatment of such executory contract or unexpired lease, including, without limitation, to add such executory contract or unexpired lease to the Schedule of Rejected Contracts, in which case such executory contract or unexpired lease shall be deemed rejected as of the Effective Date.

d.      Pursuant to Section 8.2(e) of the Plan, assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any defaults by any Debtor arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease to the fullest extent permitted under applicable law.

35.      <u>Rejection Damages Claims.</u>

a.      Pursuant to Section 8.3 of the Plan, in the event that the rejection of an executory contract or unexpired lease under the Plan results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not evidenced by a timely filed proof of Claim prior to the Plan Proponents' filing of the Plan, shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors, or their respective estates, properties or interests in property, unless a proof of Claim is filed with the Court and served upon the Debtors or the Reorganized Debtors, as applicable, no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts or order of the Court.

b.      Except with respect to the objection filed by the City of Lafayette [Docket No. 7269] (the "**Lafayette Rejection Dispute**" and, together with the Cure Disputes, collectively, the "**Contract Assumption or Rejection Disputes**") and the unexpired leases and executory contracts

-36-

added to the Schedule of Rejected Contracts pursuant to Paragraph 32(d) hereof, the rejection of all leases and contracts identified in the Schedule of Rejected Contracts is hereby approved. The Lafayette Rejection Dispute shall either be consensually resolved by the parties or submitted to the Court for resolution pursuant to a Final Order, after appropriate notice and an opportunity to be heard, and all parties' rights are reserved with respect thereto.

36. _D&O Indemnification Obligations._ Pursuant to Section 8.4 of the Plan, any and all obligations of the Debtors pursuant to their corporate charters, agreements, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents (including all Indemnification Obligations) to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall remain in full force and effect to the maximum extent permitted by applicable law and shall not be discharged, impaired, or otherwise affected by this Plan. All such obligations shall be deemed and treated as executory contracts that are assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any Claim based on the Debtors' obligations in Section 8.4 of the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code or otherwise.

37. _Treatment of Certain Claims and Obligations._

a. Paragraph 13 of the Notice of the Schedule of Assumed Contracts (as defined in the Plan Supplement) filed with the Plan Supplement on May 1, 2020 [Docket No. 7037] shall be deleted.

b. A claim asserted by a provider of goods and services, whether or not a counterparty to an assumed executory contract, that suffered damages from the Fires (as defined in Section 1.86 of the Plan), is impaired and should be channeled to the Fire Victim Trust. If its damages were not caused by or "in any way arising out of the Fires" (_See_ Section 1.78 of the Plan), but arise out of the rejection of an executory contract or are part of the cure of an assumed one, they should be dealt with under Article VIII of the Plan and section 365 of the Bankruptcy Code.

-37-

38. <u>Employee Benefit Plans.</u>

a.      Pursuant to Section 8.5 of the Plan, as of the Effective Date, all Employee Benefit Plans are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.  All outstanding payments which are accrued and unpaid as of the Effective Date pursuant to the Employee Benefit Plans shall be made by the Reorganized Debtors on the Effective Date or as soon as practicable thereafter.

b.      The deemed assumption of the Employee Benefit Plans pursuant to Section 8.5 of the Plan shall result in the full release and satisfaction of any Claims and Causes of Action against any Debtor or defaults by any Debtor arising under any Employee Benefit Plan at any time before the Effective Date. Any proofs of Claim filed with respect to an Employee Benefit Plan shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Court.

c.      Notwithstanding anything to the contrary in the Plan or this Confirmation Order, the Reorganized Debtors shall continue and assume the Pacific Gas and Electric Company Retirement Plan (the "**Defined Benefit Plan**") subject to the Employee Retirement Income Security Act, the Internal Revenue Code, and any other applicable law, including (i) the minimum funding standards in 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083 and (ii) premiums under 29 U.S.C. §§ 1306 and 1307.  All proofs of claim filed by the Pension Benefit Guaranty Corporation with respect to the Defined Benefit Plan are deemed withdrawn on the Effective Date.

d.      <u>Collective Bargaining Agreements.</u>  Pursuant to Section 8.6 of the Plan, on or prior to the Effective Date, and subject to the occurrence of the Effective Date, the Debtors shall assume the Collective Bargaining Agreements.  The prepetition grievance claims set out in the letter from the Debtors to IBEW Local 1245 dated May 15, 2020 shall be resolved in the ordinary course of business in accordance with the terms of the Collective Bargaining Agreements, and all parties reserve their rights with respect thereto.

39. <u>Worker's Compensation Insurance Program.</u>  The Reorganized Debtors have elected to self-insure their workers' compensation liabilities with the authority of the Director (the

-38-

"**Director**") of the Department of Industrial Relations (in accordance with section 3701 of the California Labor Code) (the "**Self-Insurance Program**") and participate in the Alternative Security Plan (as established pursuant to section 3701.8 of the California Labor Code) (the "**ASP**") upon emergence from these Chapter 11 Cases. The Director and CSISF have authorized such participation contingent on the Reorganized Debtors' ongoing compliance with the foregoing provisions of the California Labor Code. The following provisions of this Confirmation Order shall govern the Reorganized Debtors' transition from participation in accordance with the agreements and orders reflected in paragraph 4 of the DIP Facility Order to participation in the Self-Insurance Program and the ASP in accordance with applicable law under the foregoing provisions of the California Labor Code after the occurrence of the Effective Date:

a. Notwithstanding the entry of this Confirmation Order, until the occurrence of the Effective Date, the provisions of the DIP Facility Order shall continue to govern and the "CSISF Liens" as defined in the DIP Facility Order and the CSISF Cash Collateral posted pursuant to paragraphs 4(b)(i) and (iv) of the DIP Facility Order shall remain in place.

b. Upon the occurrence of the Effective Date, and upon the posting of the required amount of the security deposit, if any, as determined by the Director and CSISF in accordance with section 3701 of the California Labor Code, the CSISF Liens shall be automatically released in accordance with paragraph (b)(vi) of the DIP Facility Order. All CSISF Cash Collateral currently held by CSISF and the Director shall be maintained and shall be applied toward the security deposit, if any, required to be posted by the Reorganized Debtors. To the extent such CSISF Cash Collateral is in excess of the amount of such security deposit, such excess shall be promptly returned to the Reorganized Debtors. Neither the Plan nor this Confirmation Order alters the rights of CSISF and the Director with respect to the Reorganized Debtors' continued participation in the Self-Insurance Program and the ASP after the Effective Date.

40. <u>Insurance Policies.</u> Pursuant to Section 8.7 of the Plan, all Insurance Policies (including D&O Liability Insurance Policies and tail coverage liability insurance), surety bonds, and indemnity agreements entered into in connection with surety bonds to which any Debtor is a

-39-

party as of the Effective date shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.

41.     _Insurance Neutrality._

a.     Nothing contained in the Plan, the Plan Documents, or this Confirmation Order shall in any way operate to impair, alter, supplement, change, expand, decrease, or modify, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying, (i) the rights, obligations, or defenses of any of the Insurers[9] under any Insurance Policy, including but not limited to any duty that an Insurer has to pay claims and any right of an Insurer to seek payment or reimbursement from the Debtors or the Reorganized Debtors in connection with any claims paid pursuant to the Insurance Policies, irrespective of whether such claims arose, or any facts and circumstances in connection with such claims occurred, prior to the Effective Date, or (ii) the rights, obligations, or defenses of the Debtors or Reorganized Debtors or any other insureds under any Insurance Policy, including but not limited to any right to the payment of claims by an Insurer and any defense to an Insurer seeking payment or reimbursement from the Debtors or Reorganized Debtors in connection with any claims paid pursuant to the Insurance Policies, irrespective of whether such claims arose, or any facts and circumstances in connection with such claims occurred, prior to the Effective Date. For all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies and governing law shall control.

b.     None of (i) the Court's approval of the Plan or the Plan Documents, (ii) this Confirmation Order or any findings and conclusions entered with respect to confirmation, nor (iii) any estimation or valuation of any Fire Claims, either individually or in the aggregate in the Chapter 11 Cases, shall, with respect to any Insurer, constitute a trial or hearing on the merits or an adjudication or judgment with respect to any Fire Claim or Insurance Policy.

42.     _Underwriters Proofs of Claim._  Nothing in the Plan, the Plan Supplement (including, without limitation, paragraph 13 of the notice of the Schedule of Assumed Contracts (as defined in

---

[9] "**Insurer**" shall have the meaning set forth in section 23 of the California Insurance Code.

-40-

the Plan Supplement [Docket No. 7037])), the Plan Documents, or this Confirmation Order shall be deemed to disallow or constitute an objection to the proofs of claim (collectively, the "**Underwriter Proofs of Claim**") filed by or on behalf of the non-debtor parties (collectively, the "**Underwriters**") to (i) that certain Underwriting Agreement dated as of February 23, 2016 among Pacific Gas and Electric Company and the representatives party thereto, as representatives of the underwriters named therein, relating to $600,000,000 aggregate principal amount of 2.95% Senior Notes due March 1, 2026, (ii) that certain Underwriting Agreement dated as of November 28, 2016 among Pacific Gas and Electric Company and the representatives party thereto, as representatives of the underwriters named therein, relating to $400,000,000 aggregate principal amount of 4.00% Senior Notes due December 1, 2046 and $250,000,000 aggregate principal amount of Floating Rate Senior Notes due November 30, 2017 and (iii) that certain Underwriting Agreement dated as of March 7, 2017 among Pacific Gas and Electric Company and the representatives party thereto, as representatives of the underwriters named therein, relating to $400,000,000 aggregate principal amount of 3.30% Senior Notes due March 15, 2027 and $200,000,000 aggregate principal amount of 4.00% Senior Notes due December 1, 2046, provided, however, that all rights and defenses of (i) the Underwriters with respect to the Underwriter Proofs of Claim and (ii) the Debtors or Reorganized Debtors with respect to the Underwriter Proofs of Claim, are, in each case, preserved. For the avoidance of doubt, no objection may be asserted to the Underwriter Proofs of Claim based on the contention that the Plan, the Plan Supplement (including, without limitation, paragraph 13 of the notice of the Schedule of Assumed Contracts [Docket No. 7037]), the Plan Documents or this Confirmation Order had disallowed the Underwriter Proofs of Claim.

43. <u>Energy Procurement Agreements.</u> On the Effective Date, all Energy Procurement Agreements are hereby assumed pursuant to Article VIII of the Plan. Notwithstanding the assumption of any Energy Procurement Agreement[10] pursuant to Article VIII of the Plan, the rights

---

[10] For the purposes of this Confirmation Order, "**Energy Procurement Agreement**" means any (i) power purchase agreements; (ii) interconnection, transmission, or metering and related agreements; (iii) an agreement for the supply, transportation or storage of natural gas; (iv) an agreement with

-41-

of the Debtors or Reorganized Debtors, as applicable, and any non-Debtor party to an Energy Procurement Agreement arising under any Energy Procurement Agreement with respect to the resolution of disputes, claims or adjustments, including with respect to inadvertent overpayments and set-off and recoupment rights, regardless of whether such invoices or disputes relate to the period prior to or after the Effective Date, shall not be discharged, released, or deemed satisfied and shall be unaffected by the Plan or this Confirmation Order and remain in full force and effect between the parties thereto. The parties to any such Energy Procurement Agreements shall attempt to resolve any Claims, Causes of Action or defaults in the ordinary course; provided that if no such resolution is reached within forty-five (45) days following the entry of the Confirmation Order, either party may submit the dispute to the Court; provided further, that the failure of either party to submit to the Court any such dispute following the expiration of such 45 day period shall not result in the discharge, release, or deemed satisfaction of the disputed amount. The parties agree to submit to the jurisdiction of the Court to resolve any Claims, Causes of Action or defaults relating to the assumption of Energy Procurement Agreements by the Debtors; provided, however, that the exercise of any such jurisdiction shall not extend to any future disputes or claims arising under or related to any Energy Procurement Agreements that are unrelated to the assumption by the Debtors of such Energy Procurement Agreements and curing of any defaults as a result thereof.

a. <u>Henrietta D Energy Storage LLC.</u> Notwithstanding anything in the Plan or this Confirmation Order to the contrary, the rights of the Debtors and Henrietta D Energy Storage LLC ("**Henrietta**") with respect to that certain Energy Storage Agreement, dated November 4, 2015 (the "**ESA**"), by and between Henrietta and the Utility shall not be diminished, modified, or altered in any way by reason of the Plan or entry of this Confirmation Order, including with respect to any

---

providers of renewable portfolio standard shaping and firming; (v) capacity storage agreements; (vi) agreements for electrical standby service, (vii) generator facilities agreements; (viii) agreements to purchase or sell renewable energy credits, resource adequacy or renewable energy from or to the Debtors; or (ix) any other agreement related to the procurement or provision of products, commodities, and services related to electricity or natural gas to customers or gas-fired power plants (including agreements with electric generators and renewable energy generators), as well as all amendments, supplements, schedules and exhibits to each of the foregoing agreements.

determination regarding the validity and amount of proof of Claim No. 79294 filed by Henrietta (the "**Henrietta Claim**"). In accordance with the Court's Order Approving Corrected Stipulation Between Debtor Pacific Gas and Electric Company and Henrietta D Energy Storage LLC for Limited Relief from the Automatic Stay, dated January 10, 2020 [Docket No. 5349] (the "**Stipulated Order**"), the parties shall utilize the dispute resolution processes articulated in Article 22 of the ESA to resolve their dispute regarding the validity of the Henrietta Claim and the outcome of that process will be binding upon the Parties. In accordance with the Stipulated Order, in the event that the dispute resolution processes articulated in Article 22 of the ESA, or a settlement, results in Henrietta having a claim against the Utility, that claim shall be treated as an allowed general unsecured claim in the Utility's chapter 11 case and receive payment as such in accordance with the terms of the Plan.

44. _Ruby Transportation Service Agreement._ Ruby Pipeline, L.L.C. ("**Ruby**") and the Utility are parties to Transportation Service Agreement ("**TSA**") No. 61009000 and TSA No. 61014000, both dated December 11, 2009, and applicable to Rate Schedule FT of Ruby's FERC Gas Tariff (the "**Ruby Agreements**") which Ruby Agreements, subject to the occurrence of the Effective Date, shall be assumed under, and in accordance with, the terms of the Plan and this Confirmation Order and, pending approval from the CPUC and FERC, shall be modified by agreement of the parties. Notwithstanding anything in the Plan that could be construed to the contrary, it is the intention of Ruby and the Utility that all claims and defenses of each of the parties related to the credit support issues and most favored nations provisions raised pre-petition and as set forth in that certain standstill letter dated January 23, 2019 are preserved pending CPUC and FERC's approval of the modifications to the Ruby Agreements.

45. _Debtors' Reservation of Rights._

a. Except as explicitly provided in the Plan or in this Confirmation Order, nothing herein or in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

-43-

b.      Nothing in the Plan or in this Confirmation Order will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

46.     <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements.</u> Pursuant to Section 8.9 of the Plan, unless otherwise provided in the Plan, each executory contract or unexpired lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such executory contract or unexpired lease, and executory contracts and unexpired leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

47.     <u>Case Resolution Contingency Process.</u>

a.      The Debtors shall comply with the terms of the Case Resolution Contingency Process, as approved by and defined under the CRCP Order.  If the Effective Date of the Plan does not occur by September 30, 2020, the Debtors will appoint a Chief Transition Officer, as defined in the Case Resolution Contingency Process.  If (a) the Chief Transition Officer is not appointed or retained as set forth above and in the Case Resolution Contingency Process, or (b) the Effective Date has not occurred by December 31, 2020, the Debtors shall pursue a Sale Process as defined and set forth in the Case Resolution Contingency Process.

b.      The Utility, the California Governor's Office of Emergency Services ("**Cal OES**"), or another state agency or instrumentality shall contract or retain the Operational Observer (as defined in the CRCP Order) and the Utility shall pay (or, if Cal OES or any other state agency or instrumentality has previously paid, reimburse) the fees, costs and expenses of the Operational Observer. The Utility will not seek cost recovery of such fees, costs and expenses.  Such reimbursement for fees, costs and expenses incurred for the Operational Observer shall not be subject to any further approval or review for reasonableness by the Court, the fee examiner for the Chapter 11 Cases, or any other party in interest.

-44-

c.     The Debtors shall comply with the following additional commitments agreed to in connection with the *Case Resolution Contingency Process Motion* [Docket No. 6398] (the "**CRCP Motion**").  In particular:

    i.     Reorganized HoldCo shall not pay common dividends until it has recognized $6.2 billion in Non-GAAP Core Earnings[11] after the Effective Date.  The first $6.2 billion in Non-GAAP Core Earnings after the Effective Date shall be used to make capital investments or to permanently repay outstanding debt of the Reorganized Debtors.

    ii.     The Reorganized Utility shall not seek to recover Fire Victims Claims Costs in rates other than through its proposed Securitization (as defined in the CRCP Motion).

    iii.     If, pursuant to the Enhanced Regulatory Oversight and Enforcement Process, the Commission revokes the Utility's certificate of public convenience and necessity ("**CPCN**") for the provision of electrical and gas service, then the state of California (acting itself or through its designee) shall have the right to purchase all of the issued and outstanding equity interests of the Reorganized Utility (including common stock and any options or other equity awards issued or granted by the Reorganized Utility) or any of its successors.  In that event, the Reorganized Debtors (or any successors) and the shareholders of the Reorganized Debtors are authorized and directed to cooperate in and to transfer such equity interests to the State of California (acting itself or through its designee), at an aggregate price to the holders of such equity interests equal to (i) the estimated one-year forward income computed by reference to rate base times equity ratio times return on equity (in each case as authorized by the CPUC and FERC), multiplied by (ii) the average one-year forward Price to Earnings ratio of the utilities then comprising the Philadelphia Utilities Index ("**PHLX**"), multiplied by 0.65 (the "**Purchase Price**").  The Reorganized Debtors (their successors and shareholders) are authorized and directed to complete such transfer as soon as the Purchase Price is deposited as provided under the applicable law of the State of California and all applicable requirements of law are met.

    iv.     The Reorganized Utility shall use the cash flows resulting from use of the net operating losses that result from payment of wildfire claims under the Plan in connection with the Securitization; however, if the Securitization is not approved or consummated, the Reorganized Utility shall use these cash flows to amortize the $6 billion in Temporary Utility Debt (as defined in the CRCP Motion).

---

[11] "**Non-GAAP Core Earnings**" means GAAP earnings adjusted for those non-core items identified in the Disclosure Statement.  Exhibit B, p. 168 [Docket No. 6353].  The non-core items identified in the Disclosure Statement are Bankruptcy and Legal Costs; Investigation Remedies and Delayed Cost Recovery; GT&S Capital Audit; Amortization of Wildfire Insurance Fund Contribution; and Net Securitization Inception Charge.  *Id*. at 174.

     v.     Until the sunset date set forth in the CPUC Decision, the Reorganized Debtors shall use the skills matrix for nominating director candidates for election to the respective boards of directors, and in the event the Reorganized Debtors wish to modify the skills matrix, shall file a Tier 2 advice letter, giving the CPUC the opportunity to disapprove any such amendment.

     vi.     As a condition to the occurrence of the Effective Date, which condition may be waived with the consent of the Plan Proponents and the Governor's Office, the secured debt to be issued in connection with the funding of the Plan shall receive an investment grade rating from at least one of Standard & Poor's or Moody's by the Effective Date.

48.    <u>Releases, Exculpations, and Injunctions.</u>

a.    The Court has core jurisdiction under sections 157(a) and (b) and 1334(a) and (b) of title 28 of the United States Code and authority under sections 105 and 1141 of the Bankruptcy Code to approve the injunctions, stays, releases, and exculpations set forth in the Plan, including in Sections 4.6, 4.7, 4.25, 4.26, and 10.3-10.9 of the Plan, and in this Confirmation Order.

b.    Based upon the record of the Chapter 11 Cases, the representations of the parties, and/or the evidence proffered, adduced, and/or, presented at the Confirmation Hearing, the release, stay, exculpation, and injunction (including the Channeling Injunction) provisions contained in the Plan, including those set forth in Sections 4.6, 4.7, 4.25, 4.26, and 10.3-10.9 thereof, and in this Confirmation Order, are fair and equitable, consistent with the Bankruptcy Code and applicable law, are given for valuable consideration, and are in the best interests of the Debtors and their chapter 11 estates, and are approved and shall be effective and binding on all persons and entities.

c.    The Channeling Injunction contained in Sections 4.6, 4.7, 4.25, 4.26, and 10.7 of the Plan, and in this Confirmation Order, which was adequately disclosed and explained on the relevant Ballots, in the Disclosure Statement, and in the Plan, is essential to effectuate the Plan and essential to the Debtors' reorganization efforts and is to be implemented in accordance with the Plan, the Subrogation Claims RSA, the Tort Claimants RSA, and this Confirmation Order.  Pursuant to the Channeling Injunction set forth in Sections 4.6, 4.7, 4.25, 4.26, and 10.7 of the Plan, and section 105(a) of the Bankruptcy Code, and as more fully set forth in Section 10.7 of the Plan and in this Confirmation Order, all Entities that have held or asserted, or that hold or assert any Subrogation Wildfire Claim or Fire Victim Claim shall be permanently and forever stayed, restrained, and

-46-

enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Debtor or Reorganized Debtor or its assets and properties with respect to any Fire Claims.

49. **Discharge of the Debtors. Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise expressly provided in the Plan or in this Confirmation Order, the Debtors shall be discharged to the fullest extent permitted by section 1141 of the Bankruptcy Code;** *provided, however***, that any liability of the Debtors arising from any fire or any other act or omission occurring after the Petition Date, including the Kincade Fire, that has not been satisfied in full as of the Effective Date shall not be discharged, waived, or released. In addition, (a) from and after the Effective Date neither the automatic stay nor any other injunction entered by the Bankruptcy Court shall restrain the enforcement or defense of any claims for fires or any other act or omission occurring after the Petition Date, including the Kincade Fire or the Lafayette fire, in any court that would otherwise have jurisdiction if the Chapter 11 Cases had not been filed and (b) no claims for fires or any other act or omission or motions for allowance of claims for fires or any act or omission occurring after the Petition Date need to be filed in the Chapter 11 Cases. Upon the Effective Date, all holders of Claims against or Interests in the Debtors shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or Interest in the Debtors.**

50. <u>Term of Injunctions or Stays</u>. Unless otherwise provided in the Plan, this Confirmation Order, or another Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. The Trading Order shall remain enforceable as to transfers through the Effective Date with respect to those persons having "beneficial ownership" of "PG&E Stock" (as such terms are defined in Trading Order). Accordingly, the Trading Order has no applicability or effect with respect to the trading of

-47-

stock of Reorganized HoldCo on and after the Effective Date.

51. **Injunction Against Interference with the Plan. Upon entry of this Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; provided, that nothing in the Plan or in this Confirmation Order shall preclude, limit, restrict or prohibit any party in interest from seeking to enforce the terms of the Plan, this Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.**

52. **Injunction.**

a. **Except as otherwise provided in the Plan or in this Confirmation Order, as of the entry of this Confirmation Order but subject to the occurrence of the Effective Date, all Entities who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a**

-48-

Debtor, a Reorganized Debtor, or an estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, that nothing contained herein shall preclude such Entities who have held, hold, or may hold Claims against a Debtor or an estate from exercising their rights, or obtaining benefits, pursuant to and consistent with the terms of the Plan, this Confirmation Order, or any other agreement or instrument entered into or effectuated in connection with the consummation of the Plan.

b. **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest will be deemed to have affirmatively and specifically consented to be bound by this Plan, including the injunctions set forth in the immediately preceding paragraph hereof.**

c. For the avoidance of doubt, nothing in Section 10.6 of the Plan shall enjoin the continued prosecution or resolution of *In re PG&E Corp. Securities Litigation*, No. 18-3509 (N.D. Cal.) (the "**Securities Action**") against any non-Debtor defendant, except (a) with respect to any claim by any Releasing Party, and (b) to the extent that some or all of the claims asserted in the Securities Action are determined by an unstayed order of a court of competent jurisdiction to be derivative claims belonging to the Debtors, such argument and any opposition thereto being fully preserved.

53. **CHANNELING INJUNCTION.**

a. **The sole source of recovery for holders of Subrogation Wildfire Claims and Fire Victim Claims shall be from the Subrogation Wildfire Trust and the Fire Victim Trust, as applicable. The holders of such Claims shall have no recourse to or Claims whatsoever against the Debtors or the Reorganized Debtors or their assets and properties. Consistent with the foregoing, all Entities that have held or asserted, or that hold or assert any Subrogation**

-49-

**Wildfire Claim or Fire Victim Claim shall be permanently and forever stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery from any Debtor or Reorganized Debtor or its assets and properties with respect to any Fire Claims, including all of the following actions:**

i. **commencing, conducting, or continuing, in any manner, whether directly or indirectly, any suit, action, or other proceeding of any kind in any forum with respect to any such Fire Claim, against or affecting any Debtor or Reorganized Debtor, or any property or interests in property of any Debtor or Reorganized Debtor with respect to any such Fire Claim;**

ii. **enforcing, levying, attaching, collecting or otherwise recovering, by any manner or means, or in any manner, either directly or indirectly, any judgment, award, decree or other order against any Debtor or Reorganized Debtor or against the property of any Debtor or Reorganized Debtor with respect to any such Fire Claim;**

iii. **creating, perfecting, or enforcing in any manner, whether directly or indirectly, any Lien of any kind against any Debtor or Reorganized Debtor or the property of any Debtor or Reorganized Debtor with respect to any such Fire Claims;**

iv. **asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, whether directly or indirectly, against any obligation due to any Debtor or Reorganized Debtor or against the property of any Debtor or Reorganized Debtor with respect to any such Fire Claim; and**

v. **taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan Documents, with respect to any such Fire Claim.**

b. <u>Reservations.</u> Notwithstanding anything to the contrary in Section 10.7 of the Plan, this Channeling Injunction shall not enjoin:

i. the rights of holders of Subrogation Wildfire Claims and Fire Victim Claims to the treatment afforded them under the Plan, including the right to assert such Claims in accordance with the applicable Wildfire Trust Agreements solely against the applicable Wildfire Trust whether or

-50-

not there are funds to pay such Fire Claims; and

    ii.    the Wildfire Trusts from enforcing their rights under the Wildfire Trust Agreements.

    c.    **Modifications. There can be no modification, dissolution, or termination of the Channeling Injunction, which shall be a permanent injunction.**

    d.    **No Limitation on Channeling Injunction. Nothing in the Plan, this Confirmation Order, or the Wildfire Trust Agreements shall be construed in any way to limit the scope, enforceability, or effectiveness of the Channeling Injunction provided for in the Plan and in this Confirmation Order.**

    e.    <u>Bankruptcy Rule 3016 Compliance</u>. The Debtors' compliance with the requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan provides for an injunction against conduct not otherwise enjoined under the Bankruptcy Code.

54.    **Exculpation.  Pursuant to Section 10.8 of the Plan, notwithstanding anything in the Plan or this Confirmation Order to the contrary, and to the maximum extent permitted by applicable law, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g), no Exculpated Party[12] shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the Plan Funding, the DIP Facilities, the Disclosure Statement, the Plan, the Restructuring Transactions, the Wildfire Trusts (including the Plan Documents, the Claims Resolution Procedures and the Wildfire Trust Agreements), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or**

---

[12] For the avoidance of doubt, the defined terms "Exculpated Parties" and "Released Parties" each include, in addition to current and former directors, the directors named on Exhibit A of the Plan Supplement filed on June 10, 2020 [Docket No. 7879].

confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees; the issuance of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

55.      **Releases by the Debtors.** As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g) of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors, the implementation of the Restructuring, and except as otherwise provided in the Plan or in this Confirmation Order, the Released Parties are deemed forever released and discharged, to the maximum extent permitted by law and unless barred by law, by the Debtors, the Reorganized Debtors, and the Debtors' estates, in each case on behalf of themselves and their respective successors, assigns,

-52-

and representatives and any and all other Entities who may purport to assert any Cause of Action derivatively, by or through the foregoing Entities, from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, or liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Debtors' estates, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or the Debtors' estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Fires, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facilities, the Plan Funding, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the negotiation, formulation, or preparation of the Disclosure Statement and the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Claims Resolution Procedures, the Wildfire Trust Agreements, Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, and the Exit Financing Documents), the solicitation of votes with respect to the Plan, any membership (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees, or any other act or omission, transaction, agreement, event, or other occurrence, and in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.

-53-

56. **Releases by Holders of Claims and Interests. As of and subject to the occurrence of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g) of the Plan, for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in this Confirmation Order, the Released Parties, are deemed forever released and discharged, to the maximum extent permitted by law and unless barred by law, by the Releasing Parties from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Fires, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facilities, the Plan Funding, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Public Entities Plan Support Agreement, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the negotiation, formulation, or preparation of the Disclosure Statement, the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Claims Resolution**

-54-

Casse 19-30088 Doc# 8053 Filed 06/20/20 Entered 06/20/20 15:08:57 Page 54 of 69

Procedures, the Wildfire Trust Agreements, Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, and the Exit Financing Documents), the solicitation of votes with respect to the Plan, any membership in (including, but not limited to, on an *ex officio* basis), participation in, or involvement with the Statutory Committees, or any other act or omission, transaction, agreement, event, or other occurrence, and in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding the above, the holders of Environmental Claims, Workers' Compensation Claims and 2001 Utility Exchange Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan; and nothing in the Plan or this Confirmation Order shall be deemed to impose a release by holders of Fire Victim Claims of insurance claims arising under their insurance policies against holders of Subrogation Wildfire Claims, other than any rights such holder may elect to release as part of any settlement as set forth in Section 4.25(f)(ii) of the Plan.

57. **Made-Whole Agreement.** Except with respect to any settlement or other agreement regarding the Fire Victim Claims asserted by Adventist Health System/West, Feather River Hospital d/b/a Adventist Health Feather River and the parties to the State Agency Settlement [Docket No. 7399-2] and the Federal Agency Settlement [Docket No. 7399-1], any settlement or other agreement with any holder or holders of a Fire Victim Claim that fixes the amount or terms for satisfaction of such Claim, including by a post-Effective Date trust established for the resolution and payment of such Claim, shall contain as a condition to such settlement or other agreement that the holder or holders of such Claim contemporaneously execute and deliver a release and waiver of any potential made-whole claims against present and former holders of Subrogation Wildfire Claims, which release shall be substantially in the form attached to the Plan as **Exhibit C** thereto.

58. **Release of Liens.** Except as otherwise specifically provided in the Plan, this Confirmation Order, or in any contract, instrument, release, or other agreement or document

-55-

created pursuant to the Plan, including the Exit Financing Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Court and without any action or filing being required to be made by the Debtors.

59.     **Effectiveness of Releases.** As further provided in Section 10.9(e) of the Plan, the releases contained in Article X of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

60.     **Injunction Related to Releases and Exculpation.** The commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including, the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan shall be permanently enjoined. For the avoidance of doubt, this injunction shall not apply to the rights of the Fire Victim Trust to prosecute and settle any Assigned Rights and Causes of Action solely to the extent provided for in the Plan. Notwithstanding the above, the holders of Environmental Claims, Workers' Compensation Claims and 2001 Utility Exchange Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan.

61.     No Release or Exculpation of Assigned Rights and Causes of Action. Notwithstanding any other provision of the Plan, including anything in Section 10.8 and/or 10.9 thereof, the releases, discharges, and exculpations contained in this Plan shall not release, discharge, or exculpate any Person from the Assigned Rights and Causes of Action.

-56-

62.     <u>Subordination.</u>     The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim (other than any DIP Facility Claims) or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

63.     <u>Retention of Causes of Action / Reservation of Rights.</u>

a.     Pursuant to Section 10.11 of the Plan, except as otherwise provided in Section 10.9 thereof, nothing in the Plan or in this Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights or Causes of Action that the Debtors or the Reorganized Debtors may have or which the Reorganized Debtors may choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including (i) any and all Claims against any Person or Entity, to the extent such Person or Entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, the Reorganized Debtors, or their officers, directors, or representatives and (ii) for the turnover of any property of the Debtors' estates.

b.     Nothing in the Plan or in this Confirmation Order shall be deemed to be a waiver or relinquishment of any rights or Causes of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim left Unimpaired by the Plan. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Claim left Unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Cases had not been commenced.

c.     The Reorganized Debtors reserve and shall retain the applicable Causes of Action notwithstanding the rejection of any executory contract or unexpired lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors in accordance with the terms of the Plan. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

d.     Notwithstanding anything to the contrary in the Plan, no claims shall be brought under section 547 of the Bankruptcy Code to recover any payments made to any Person or Entity as a result of damages caused by wildfires.

64.    AT&T.

a.     Notwithstanding anything in the Plan or the Channeling Injunction to the contrary, but subject to the limitations under the Bankruptcy Code, any right of setoff or recoupment that AT&T Corporation or its affiliates ("**AT&T**") may be entitled to assert against the Debtors or Reorganized Debtors shall be preserved, and all rights of the Debtors and Reorganized Debtors to object to or challenge the assertion of any such right by AT&T shall be preserved.

b.     Any executory contracts or unexpired leases between the Debtors and AT&T shall be deemed assumed on the Effective Date pursuant to Section 8.1 of the Plan; *provided, however*, notwithstanding the provisions of Section 8.2 of the Plan, AT&T shall have until the date that is forty-five (45) calendar days following entry of this Confirmation Order (or such later date agreed to by the Plan Proponents (or following the Effective Date, the Reorganized Debtors) and AT&T) to object to the proposed Cure Amount with respect to any such executory contracts or unexpired leases (and any such Cure Dispute shall be governed by, and be subject to, the provisions of Article VIII of the Plan).

65.    Special Provisions for Governmental Units.

-58-

a.      Solely with respect to Governmental Units, nothing in the Plan or this Confirmation Order shall limit or expand the scope of discharge, release, or injunction to which the Debtors or the Reorganized Debtors are entitled under the Bankruptcy Code. Further, nothing in the Plan or this Confirmation Order, including Sections 10.8 and 10.9 of the Plan, shall discharge, release, enjoin, or otherwise bar (i) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date, (ii) any liability to a Governmental Unit that is not a Claim, (iii) any affirmative defense, valid right of setoff or recoupment of a Governmental Unit, (iv) any police or regulatory action by a Governmental Unit (except with respect to any monetary amount related to any matter arising prior to the Petition Date), (v) any action to exercise the power of eminent domain and any related or ancillary power or authority of a Governmental Unit, (vi) any environmental liability to a Governmental Unit that the Debtors, the Reorganized Debtors, any successors thereto, or any other Person or Entity may have as an owner or operator of real property after the Confirmation Date, or (vii) any liability to a Governmental Unit on the part of any Persons or Entities other than the Debtors or the Reorganized Debtors, except that nothing in Section 10.13 of the Plan or in this Paragraph 65 shall affect the exculpation in Section 10.8 of the Plan and Paragraph 54 of this Confirmation Order or the Debtors' releases in Section 10.9 of the Plan and Paragraph 55 of this Confirmation Order.  Nothing in the Plan or this Confirmation Order shall enjoin or otherwise bar any Governmental Unit from asserting or enforcing, outside the Bankruptcy Court, any of the matters set forth in clauses (i) through (vii) above.  Nothing in the Plan or this Confirmation Order shall affect the treatment of Environmental Claims and Environmental Performance Obligations as specified in Sections 4.10 and 4.30 of the Plan.

b.      The identification of amounts paid under the Plan and this Confirmation Order as "restitution" does not preempt the California Franchise Tax Board's rights of review and determination as to the deductibility of such amounts as having been paid in restitution for California franchise tax purposes.

66.     <u>Special Provisions for CPUC.</u> Notwithstanding anything in the Plan or this

-59-

Confirmation Order to the contrary, any Claim of the CPUC shall be deemed satisfied and discharged as of the Effective Date in consideration of the distributions to be made under the Plan, provided that (a) confirmation and consummation of the Plan shall not affect any CPUC proceeding or investigation regarding pre-petition conduct that is pending as of the Plan Confirmation Date and listed on the Schedule of Pending Investigations (attached as **Exhibit C** hereto), or (b) any CPUC proceeding or investigation regarding postpetition conduct, or (c) any proceeding or investigation with respect to the Kincade Fire (it being understood that, in connection with such proceeding or investigation, the CPUC may investigate pre-petition and post-petition conduct, but the CPUC may impose penalties only for post-petition acts or omissions), whether or not pending as of the Plan Confirmation Date, including any adjudication or disposition thereof, and any liability of the Debtors or Reorganized Debtors, as applicable, arising therefrom shall not be discharged, waived, or released pursuant to the Plan or this Confirmation Order.

67. <u>Governmental Performance Obligations.</u>

a. Nothing in this Confirmation Order, the Plan or the Plan Documents discharges, exculpates, absolves or releases the Debtors, the Reorganized Debtors, any Released Party, any non-debtor, or any other Person from any Environmental Claims held by any Governmental Unit or Environmental Performance Obligations to any Governmental Unit or impairs the ability of any Governmental Unit to pursue any Environmental Claims or Environmental Performance Obligations, or any claim, liability, right, defense, or Cause of Action under any Environmental Law against any Debtor, Reorganized Debtor, any Released Party, or any other Person.

b. All Environmental Claims held by any Governmental Unit or Environmental Performance Obligations to any Governmental Unit shall survive the Chapter 11 Cases as if they had not been commenced and be determined in the ordinary course of business, including in the manner and by the administrative or judicial tribunals in which such Environmental Claims or Environmental Performance Obligations would have been resolved or adjudicated if the Chapter 11 Cases had not been commenced; *provided*, that nothing in this Confirmation Order, the Plan, or the Plan Documents shall alter any legal or equitable rights or defenses of the Debtors or the

-60-

Reorganized Debtors under non-bankruptcy law with respect to any such Environmental Claims or Environmental Performance Obligations. For the avoidance of doubt, the Debtors and the Reorganized Debtors shall not raise the discharge injunction as a defense to the Environmental Claims or Environmental Performance Obligations.

c.  Nothing in this Confirmation Order, the Plan, or the Plan Documents authorizes the transfer or sale of any governmental licenses, permits, registrations, authorizations or approvals, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements under the law governing such transfers.

d.  Notwithstanding anything in this Confirmation Order, the Plan, or the Plan Documents, the listing of a matter as an "executory contract" or an "unexpired lease" in the Debtors' schedules or Plan Documents (a "**Potentially Assumed Contract/Lease**") is without prejudice to any contention by any Governmental Unit that the matter is not in fact an executory contract or unexpired lease as set forth in section 365 of the Bankruptcy Code. With respect to any Cure Amount for a Potentially Assumed Contract/Lease for which the United States or any department, agency, or instrumentality of the State of California (collectively, the "**Governmental Parties**") is listed as the Non-Debtor Counterparty, all parties reserve all rights to dispute such Cure Amount. If any Governmental Party disputes (i) that any Potentially Assumed Contract/Lease is in fact an executory contract or unexpired lease or (ii) any Cure Amount, such Governmental Party shall have no later than ninety (90) days after the Confirmation Date (or such later date as may be mutually agreed upon between the applicable Governmental Party and the Debtors or Reorganized Debtors) to file and serve an objection setting forth such dispute, and any such dispute shall be resolved by the Bankruptcy Court.

e.  Nothing in this Confirmation Order, the Plan, or the Plan Documents shall affect or impair the United States' or any department, agency, or instrumentality of the State of California's rights and defenses of setoff and recoupment, or their ability to assert setoff or recoupment against the Debtors or the Reorganized Debtors and such rights and defenses are expressly preserved, all subject to the limitations in the Bankruptcy Code, if any.

-61-

f.      Nothing in this Confirmation Order, the Plan, or the Plan Documents impairs, precludes, resolves, exculpates, enjoins or releases any obligation or liability to a Governmental Unit on the part of any non-Debtor.

g.      Nothing in this Confirmation Order, the Plan, or Plan Documents shall discharge, release, enjoin, or otherwise bar (i) any obligation or liability to a Governmental Unit that is not a Claim, or (ii) any liability of the Debtors or the Reorganized Debtors to a Governmental Unit arising on or after the Confirmation Date.  Notwithstanding any other provision in this Confirmation Order, the Plan, or the Plan Documents, nothing relieves the Debtors or the Reorganized Debtors from their obligations to comply with the Communications Act of 1934, as amended, and the rules, regulations and orders promulgated thereunder by the Federal Communications Commission ("**FCC**").  No transfer of any FCC license or authorization held by the Debtors or transfer of control of the Debtors or transfer of control of an FCC licensee controlled by the Debtors shall take place prior to the issuance of FCC regulatory approval for such transfer pursuant to applicable FCC regulations.  The FCC's rights and powers to take any action pursuant to its regulatory authority including, but not limited to, imposing any regulatory conditions on any of the above described transfers, are fully preserved, and nothing herein shall proscribe or constrain the FCC's exercise of such power or authority.

h.      Nothing in this Confirmation Order, the Plan or the Plan Documents relieves the Debtors or the Reorganized Debtors from their obligations to comply with the Atomic Energy Act of 1954, as amended, and the rules, regulations and orders promulgated thereunder by the United States Nuclear Regulatory Commission (the "**NRC**").

i.      The rights, duties and obligations of the Debtors under the 2003 Watershed Lands Obligations[13] shall be preserved and are unaffected by the Plan or this Confirmation Order,

---

[13] "**2003 Watershed Lands Obligations**" means the outstanding obligations of the Utility pursuant to the *Order Confirming Plan of Reorganization Under Chapter 11 of the Bankruptcy Code for Pacific Gas and Electric Company Proposed by Pacific Gas and Electric Company, PG&E Corporation and the Official Committee of Unsecured Creditors Dated July 31, 2003, as Modified* [Docket No. 14272], entered on December 22, 2003, in *In re Pacific Gas and Electric Company*,

-62-

notwithstanding anything to the contrary contained therein or herein.

      j.    To the extent that any non-Debtor party to the FERC Tariff Rate Proceedings[14] is entitled to a refund from the Debtors or Reorganized Debtors pursuant to such proceedings, such refund obligation shall be an ongoing regulatory obligation of the Reorganized Debtors not subject to discharge or release by the Plan or this Confirmation Order, notwithstanding anything to the contrary contained therein or herein. All rights of such non-Debtor parties, the Debtors and/or the Reorganized Debtors to prosecute, defend, or appeal a finding of the FERC Tariff Rate Proceedings are preserved and may be exercised as if the Chapter 11 Cases had not been commenced.

      k.    The proceeds of the DWR Bond Charge[15] do not constitute property of the Debtors'

---

Case No. 01-30923 DM (Bankr. N.D. Cal.) to permanently protect the beneficial public values associated with certain land identified in that certain Settlement Agreement, dated December 19, 2003 and approved in CPUC Decision 03-12-035, among the Debtors and CPUC, and the related Stipulation Resolving Issues Regarding the Land Conservation Commitment that has not been made subject to a conservation easement or donated in accordance with the obligations set forth therein, which includes, for the avoidance of doubt, the Watershed Lands (as defined in and identified by the Settlement Agreement).

[14] "**FERC Tariff Rate Proceedings**" means the pending TO Rate Revision Cases filed by PG&E at FERC seeking increases to its proposed electricity transmission rates in 2016, 2017, and 2018 and bearing FERC Docket Nos. ER16-2320-000, ER17-2154-000, and ER19-13-000, respectively, in which certain non-Debtor parties may receive refunds in amounts to be later determined by FERC.

[15] "**DWR Bond Charge**" means the charge imposed by the CPUC upon customers in the service areas of California's investor-owned utilities, as more fully defined in CPUC-DWR Rate Agreement, which is based on an estimate of the revenue needed to pay for DWR Bond Related Costs and the aggregate amount of electric power used by customers. The DWR Bond Charge is the property of DWR for all purposes under California law, and any funds the Utility received from customers as the billing and collection agent for the DWR Bond Charge are held in trust for the benefit of DWR, as provided by and consistent with Section 5.1(b) of the CPUC-DWR Rate Agreement, California Water Code section 80112, and applicable CPUC decisions and orders. The DWR Bond Charge does not include the Wildfire Fund Charge that the Utility collects from customers and remits to DWR, as more fully defined by the CPUC in its Decision on October 24, 2019 in D1910056, and other applicable CPUC decisions and orders.

"**DWR Bond Related Costs**" means the Bond Related Costs described in the CPUC-DWR Rate Agreement.

"**CPUC-DWR Rate Agreement**" means the agreement dated March 8, 2002 between the CPUC and DWR relating to the establishment of DWR's revenue requirements and charges in connection with power sold by DWR under Division 27, commencing with section 80000, of the California Water Code.

"**DWR**" means the California Department of Water Resources.

estates. Notwithstanding anything in the Plan or this Confirmation Order to the contrary, DWR shall be entitled to pursue any Claim against or otherwise exercise any rights against the Debtors and Reorganized Debtors in respect of the proceeds of the DWR Bond Charge as if the Chapter 11 Cases had not been commenced; *provided that* any such action shall be subject to the terms of the CPUC-DWR Rate Agreement, applicable CPUC decisions and orders, the California Water Code, and any other applicable law.

68. <u>Exchange Operators.</u> The rights, duties and obligations of the Utility and the Reorganized Utility, as applicable, under its agreements with the California Independent System Operator Corporation and ICE NGX Canada Inc. (and certain of its affiliates and subsidiaries) and any tariffs incorporated therein, regardless of whether arising prior to or after the Petition Date or the Effective Date, shall be unaffected by the Plan or this Confirmation Order notwithstanding anything to the contrary contained therein.

69. <u>Exemption from Transfer Taxes.</u> Pursuant to section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any Security or property under the Plan or in connection with the transactions contemplated thereby, the creation, filing, or recording of any mortgage, deed of trust, or other security interest, the making, assignment, filing, or recording of any lease or sublease, or the making or delivery of any deed, bill of sale, or other instrument of transfer under, in furtherance of, or in connection with the Plan, or any agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated in the Plan, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing a stamp tax or similar tax, to the maximum extent provided by section 1146(a) of the Bankruptcy Code. To the maximum extent provided by section 1146(a) of the Bankruptcy Code and applicable nonbankruptcy law, the Restructuring Transactions shall not be taxed under any law imposing a stamp tax or similar tax.

70. <u>Final Fee Applications.</u>

a. Pursuant to Section 2.2 of the Plan, all final requests for the payment of Professional Fee Claims against a Debtor, including any Professional Fee Claim incurred during the period from

-64-

the Petition Date through and including the Effective Date, must be filed and served on the Reorganized Debtors no later than sixty (60) days after the Effective Date. All such final requests will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Interim Compensation Order, and any other prior orders of the Court regarding the payment of Professionals in the Chapter 11 Cases, and once approved by the Bankruptcy Court, promptly paid in Cash in the Allowed amount from the Professional Fee Escrow Account. If the Professional Fee Escrow Account is insufficient to fund the full Allowed amount of all Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims will be allocated among and paid in full in Cash directly by the Reorganized Debtors.

b. Prior to the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount. Such funds shall not be considered property of the estates of the Debtors or the Reorganized Debtors. Any amounts remaining in the Professional Fee Escrow Account after payment in full of all Allowed Professional Fee Claims shall promptly be paid to the Reorganized Debtors without any further action or order of the Court.

c. No later than ten (10) Business Days prior to the Effective Date, each Professional shall provide the restructuring advisors for the Debtors with an estimate of its unpaid Professional Fee Claims incurred in rendering services to the Debtors or their estates before and as of the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of fees and expenses that are the subject of the Professional's final request for payment of its Professional Fee Claims whether from the Professional Fee Escrow Account or, if insufficient, from the Reorganized Debtors. If a Professional does not timely provide an estimate as set forth above, the Debtors or Reorganized Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for purposes of funding the Professional Fee Escrow Account. The total amount of Professional Fee Claims estimated pursuant to this Section shall comprise the Professional Fee Reserve Amount. The Professional Fee Reserve Amount, as well as the return of any excess funds in the Professional Fee Escrow Account after all Allowed Professional Fee Claims have been paid in full, shall be

-65-

allocated to the applicable Debtor for whose benefit such Professional Fees Claims were incurred.

d.      Except as otherwise specifically provided in the Plan or in this Confirmation Order, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

71.      Fair and Equitable; No Unfair Discrimination.  Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to Class 10A-II (HoldCo Rescission or Damage Claims), the Plan is confirmable because the Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Class.  Based on the Disclosure Statement, the Disclosure Statement Supplement, the Confirmation Memorandum, the *Declaration of Jason P. Wells in Support of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Docket No. 7510], the *Plan Proponents' Joint Submission of Amended Plan and Confirmation Order Language Partially Resolving Confirmation Objection of the Public Employee Retirement Association of New Mexico* [Docket No. 8016], the *Notice of Withdrawal of Securities Lead Plaintiff's Objections to Confirmation Except for the Determination of the Appropriate Insurance Deduction to be Applied to Allowed HoldCo Rescission or Damage Claims* [Docket No. 8017], the record of the Confirmation Hearing held on June 19, 2020, and the evidence proffered, adduced, or presented by the Debtors at the Confirmation Hearing, the Plan does not discriminate unfairly and is fair and equitable with respect to Class 10A-II (HoldCo Rescission or Damage Claims) as required by section 1129(b) of the Bankruptcy Code. Accordingly, upon confirmation of the Plan and the occurrence of the Effective Date, the Plan shall be binding on the members of Class 10A-II (HoldCo Rescission or Damage Claims).

-66-

72. <u>Effectiveness of Order Upon Entry.</u> Notwithstanding the applicability of Bankruptcy Rule 3020(e), the terms and conditions of the Confirmation Order shall be immediately effective and enforceable upon its entry.

73. <u>Actions Taken Prior to Reversal or Modification of Order.</u> If any or all of the provisions of the Confirmation Order are hereafter reversed, modified, or vacated by subsequent order of the Bankruptcy Court or any other court, such reversal, modification, or vacatur shall not affect the validity of the acts or obligations incurred or undertaken pursuant to, under, or in connection with the Plan prior to the Debtors' receipt of written notice of such Order. Notwithstanding any such reversal, modification, or vacatur of the Confirmation Order, any such act or obligation incurred or undertaken pursuant to, and in reliance on, the Confirmation Order prior to the effective date of such reversal, modification, or vacatur shall be governed in all respects by the provisions of the Confirmation Order and the Plan and all related documents or any amendments or modifications thereto.

74. <u>Non-Occurrence of the Effective Date.</u>  If the Effective Date does not occur on or before December 31, 2020, then: (a) the Plan will be null and void in all respects; and (b) nothing contained in the Plan or the Disclosure Statement shall: (i) constitute a waiver or release of any Claims, Interests, or Causes of Action by any Entity; (ii) prejudice in any manner the rights of any Debtor or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking of any sort by any Debtor or any other Entity.

75. <u>Substantial Consummation.</u> On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127 of the Bankruptcy Code.

76. <u>Dissolution of Statutory Committees.</u>  Pursuant to Section 12.1 of the Plan, on the Effective Date, the Statutory Committees shall dissolve, the current and former members of the Statutory Committees, including any ex officio members, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities and obligations related to and arising from and in connection with the Chapter 11 Cases, except for the limited purpose of (i) prosecuting requests for allowances of

-67-

compensation and reimbursement of expenses incurred prior to the Effective Date and objecting to any such requests filed by other Professionals, including any appeals in connection therewith, (ii) having standing and a right to be heard in connection with any pending litigation, including appeals, to which such committee is a party, or (iii) prosecuting any appeals of this Confirmation Order.

77. <u>Service of Notice of the Confirmation Order.</u> Pursuant to Bankruptcy Rules 2002(f)(7) and 3020(c), the Plan Proponents are directed to serve promptly after the occurrence of the Effective Date, a notice of the entry of this Confirmation Order, which shall include notice of this Confirmation Order and notice of the Effective Date (the "**Notice of Effective Date**"), on all parties that received notice of the Confirmation Hearing; provided, however, that the Plan Proponents shall be obligated to serve the Notice of Effective Date only on the record holders of Claims or Interests as of the Confirmation Date; provided, further, that the Plan Proponents shall not be required to serve the Notice of Effective Date on any holder of Claims or Interests where the prior service of the notice of the Confirmation Hearing was returned as undeliverable and no forwarding address has been provided.

78. <u>Jurisdiction.</u> The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Confirmation Order and as provided in Section 11.1 of the Plan.

79. <u>Severability.</u> Each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified except in accordance with the terms of the Plan; and (c) nonseverable and mutually dependent.

80. <u>Conflict Between Plan and Confirmation Order.</u> If there is any direct conflict between the terms of the Plan and the Confirmation Order, the terms of the Confirmation Order shall control.

81. <u>Reference.</u> The failure specifically to include or reference any particular provision of the Plan or any related agreement in this Confirmation Order shall not diminish or impair the efficacy of such provision or related agreement, it being the intent of the Court that the Plan is confirmed in its entirety, the Plan and such related agreements are approved in their entirety, and

-68-

1   the Plan Supplement is incorporated herein by reference.

2

3

4                                    **END OF ORDER**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                        -69-