ROPES & GRAY LLP
Rocky C. Tsai (CA Bar No. 221452)
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 315-6369
Facsimile: (415) 315-6350
Email: rocky.tsai@ropesgray.com

ROPES & GRAY LLP
Andrew G. Devore (*pro hac vice* requested)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Email: andrew.devore@ropesgray.com

ROPES & GRAY LLP
Gregg M. Galardi (*pro hac vice* requested)
Keith H. Wofford (*pro hac vice* requested)
Daniel G. Egan (*pro hac vice* requested)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090
Email: gregg.galardi@ropesgray.com
         keith.wofford@ropesgray.com
         daniel.egan@ropesgray.com

*Counsel to Elliott Management Corporation, on behalf of itself and
certain funds and accounts managed, advised, or sub-advised by it*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>    **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                     Reorganized Debtors.<br><br><br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case<br>No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**MOTION OF ELLIOTT MANAGEMENT CORPORATION FOR (I) ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND (II) TO THE EXTENT NECESSARY, RECONSIDERATION AND RELIEF FROM THE CONFIRMATION ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)**<br><br><u>**Hearing**</u><br>Date:    August 25, 2020<br>Time:    10:00 a.m. (Pacific Time)<br>Place:  **Telephonic or Video Appearances Only**<br>         Courtroom 17<br>         450 Golden Gate Ave, 16th Floor<br>         San Francisco, CA 94102<br><br><u>Objection Deadline</u>:  August 11, 2020 at 4:00 p.m. (Pacific Time) |

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| JURISDICTION | | 2 |
| BACKGROUND | | 2 |
| | A. The Debtors' Original Chapter 11 Plan and Backstop Commitments | 2 |
| | B. The Noteholder RSA and Backstop Commitment "Best Efforts" Obligation to Elliott | 3 |
| | C. The Amended Plan and Confirmation Hearing | 5 |
| | D. The Debtors' Breach of the Noteholder RSA Immediately Prior To, and Following, the Confirmation Hearing | 5 |
| ARGUMENT | | 7 |
| | A. Elliott is Entitled to an Allowed Administrative Expense Claim for Damages Caused by the Debtors' Breach of the Noteholder RSA | 7 |
| | i. The Debtors Breached the Noteholder RSA | 9 |
| | ii. Elliott Incurred Damages of up to 19.8 Million Shares as a Result of the Debtors' Breach of the Noteholder RSA | 11 |
| | B. The Plan's Exculpation and Release Provisions Do Not Bar Elliott's Administrative Expense Claim | 11 |
| | C. Reconsideration of the Confirmation Order is Appropriate to the Extent Necessary to Allow Elliott to Pursue Its Administrative Expense Claim | 12 |
| CONCLUSION | | 17 |

i

Elliott Management Corporation, on behalf of itself and certain funds and accounts managed, advised, or sub-advised by it ( "Elliott"), by and through its undersigned counsel, Ropes & Gray LLP, hereby submits this motion (the "Motion") (i) for allowance and payment of an administrative expense claim pursuant to section 503(b)(1) of title 11 of the United States Code (the "Bankruptcy Code") against and by the Debtors for damages arising out of the Debtors' breach of the Noteholder RSA (as defined herein) and (ii) to the extent necessary, for reconsideration, pursuant to Rule 60 of the Federal Rules of Civil Procedure (the "Federal Rules"), as incorporated by Rule 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), of the *Order Confirming Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8053] (the "Confirmation Order") to the limited extent that the Court determines that the exculpation and release provisions contained in the Confirmation Order and the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8048] (the "Amended Plan")[1] limit or preclude Elliott from pursuing an administrative expense claim. In support hereof, Elliott respectfully represents as follows:

## PRELIMINARY STATEMENT

1. Elliott entered into the Noteholder RSA with the Debtors on January 22, 2020 to support the Amended Plan. While Elliott fully complied with its obligations, the Debtors failed to live up to their side of the bargain. The Debtors were obligated to use "best efforts" to cause the Backstop Parties to provide rights to Elliott as a Consenting Noteholder with respect to up to $2 billion of backstop equity commitments, including all backstop commitment premiums associated therewith. But the Debtors breached their "best efforts" obligation and Elliott received none of the backstop rights.

2. In or around May 2020, the Debtors sought *new* commitments from *new* financing parties and paid Backstop Parties hundreds of millions of dollars of additional "consent fees" in an arrangement that effectively reduced the Backstop Parties' prior commitments. None of this

---

[1]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them by the Amended Plan.

1

was even disclosed until *after* the evidentiary record at the confirmation hearing had closed and while Elliott was prohibited from objecting to the Amended Plan. In so doing, the Debtors breached their contractual obligations under the Noteholder RSA to undertake any effort, much less "best efforts," to cause the Backstop Parties to provide existing backstop rights to Elliott.

3.     The Debtors' breach resulted in damages to Elliott of up to 19.8 million shares attributable to the backstop commitment premium with respect to the $2 billion in commitments, with a value of approximately $250 million as of June 8, 2020. Because the Debtors breached their contractual obligations under the Noteholder RSA and concealed that breach until after the evidence had closed with respect to the confirmation hearing, Elliott is now entitled to seek payment of this administrative expense claim.

### JURISDICTION

4.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409. The bases for the relief requested herein are section 503(b) of the Bankruptcy Code, Federal Rule 60, and Bankruptcy Rule 9024.

### BACKGROUND

**A.     The Debtors' Original Chapter 11 Plan and Backstop Commitments**

5.     On December 12, 2019, the Debtors, together with the owners of certain funds and accounts managed by Abrams Capital Management, LP and Knighthead Capital Management, LLP (the "Shareholder Proponents") as co-proponents, filed a joint chapter 11 plan of reorganization with respect to the Debtors. [Dkt. No 5101]. The original plan contemplated multiple sources of funding to satisfy the Debtors' obligations thereunder, including (a) the issuance of up to $12 billion in reorganized PG&E common stock (the "New Common Stock"), and (b) the incurrence of up to $34.35 billion in new senior debt obligations.

2

6. In connection with the contemplated issuance of New Common Stock, the Debtors entered into backstop commitment letters with various third parties, including the Shareholder Proponents (collectively, the "Backstop Parties"), pursuant to which the Backstop Parties severally committed to purchase up to $12 billion in New Common Stock on the effective date of the chapter 11 plan, subject to the terms and conditions set forth in the backstop commitment letters. [Dkt. No. 5267].

**B. The Noteholder RSA and Backstop Commitment "Best Efforts" Obligation to Elliott**

7. At that time, the Ad Hoc Committee of Senior Unsecured Noteholders (the "Ad Hoc Noteholder Committee") had a competing chapter 11 plan on file after this Court terminated the Debtors' exclusivity periods in October 2019. [Dkt. No. 4257]. Following extensive negotiations, the Debtors, the Shareholder Proponents, and certain holders of the Utility's funded debt claims that were members of the Ad Hoc Noteholder Committee (the "Consenting Noteholders"), including Elliott, entered into a Restructuring Support Agreement, dated as of January 22, 2020 (the "Noteholder RSA"), pursuant to which all parties agreed to support a single, amended chapter 11 plan on the terms and conditions set forth in the Noteholder RSA. [Dkt. No. 5519].

8. Pursuant to the Noteholder RSA, the Debtors and Shareholder Proponents agreed to, among other things, file an amended chapter 11 plan consistent with a term sheet attached to the Noteholder RSA, and Elliott agreed to, among other things, support confirmation of the amended plan and not (a) object to or take any action to interfere with the confirmation or implementation of the amended plan, (b) file any pleading in the chapter 11 cases unless such pleading was previously authorized by the Debtors and Shareholder Proponents, or (c) otherwise take any action that would interfere with, delay, impede, or postpone the confirmation, consummation, or implementation of the amended plan.

9. A critical component of the bargained-for consideration for Elliott's agreement under the Noteholder RSA was the Debtors' express agreement to use "best efforts" to cause Backstop Parties to provide to Elliott, as a Consenting Noteholder, the Backstop Parties' rights

3

under backstop commitment letters relating to up to $2 billion of commitments. Specifically, Section 3(a)(iv) of the Noteholder RSA provides that the Debtors shall, and shall direct their attorneys, advisors, and agents to:

> use their best efforts, which shall not require the Debtors to pay any consideration, breach any obligations, or otherwise violate the terms of any Backstop Commitment Letter, to cause various Backstop Parties to transfer (whether by assignment, participation, or otherwise) to Consenting Noteholders that were parties to the AHC Commitment Letter and any Consenting Noteholders that were offered the opportunity to participate in any subsequent commitment in connection with the Alternative Plan, their rights (subject to Section 7 hereof) (including the right to receive fees thereunder) and obligations under applicable Backstop Commitment Letters relating to up to $2 billion of commitments.

Noteholder RSA § 3(a)(iv). Pursuant to Section 3(a)(iv), the Debtors' best efforts obligation was a continuing obligation of the Debtors "for the duration of the Support Period," which is defined as the period running from the date of execution of the Noteholder RSA through the effective date of the amended chapter 11 plan. The Debtors' commitment to use best efforts was a significant inducement for Elliott to enter into the Noteholder RSA given the substantial fees and attractive valuation thresholds in the equity commitment.

10. On January 27, 2020, the Debtors filed a motion seeking approval of the Noteholder RSA. In the motion, the Debtors touted the substantial benefits that such agreement provided to the estates and all stakeholders and acknowledged that "pursuant to the Noteholder RSA, the Debtors have agreed to use their best efforts to provide certain Consenting Noteholders an opportunity to participate in up to $2.0 billion of the $12.0 billion equity backstop." [Dkt. No. 5519]. On February 5, 2020, the Court entered an order approving and authorizing the Debtors to enter into the Noteholder RSA, finding that the Debtors' entry into the Noteholder RSA was "in the best interests of the Debtors, their estates, creditors, shareholders, and all other parties in interest." [Dkt. No. 5637].

4

**C.      The Amended Plan and Confirmation Hearing**

11.      On January 31, 2020, the Debtors and the Shareholder Proponents filed a revised chapter 11 plan in accordance with the Noteholder RSA. [Dkt. Nos. 5590]. Such plan was further amended and revised, including by the Amended Plan filed on June 19, 2020. [Dkt. Nos. 6320, 7521, and 8048].

12.      The Amended Plan preserves all Administrative Expense Claims against the Debtors and provides that all Administrative Expense Claims shall be paid in full by the Debtors or Reorganized Debtors. The Amended Plan expressly provides that:

> For the avoidance of doubt, no Administrative Expense Claims shall be discharged pursuant to the Plan, other than Allowed Administrative Expense Claims that have been paid in Cash or otherwise satisfied in the ordinary course in an amount equal to the Allowed amount of such Claim on or prior to the Effective Date.

[Amended Plan § 2.1]. Notwithstanding the Amended Plan's unequivocal preservation of all Administrative Expense Claims, the Amended Plan purports to provide certain releases and exculpations in favor of the Debtors, including releases for claims and causes of action relating to or arising out of, among other things, the Noteholder RSA. [*Id.* §§ 10.8 and 10.9].

13.      The objection deadline for the Amended Plan was May 15, 2020, and a hearing to consider confirmation of the Amended Plan commenced on May 27, 2020 and concluded on June 8, 2020 (the "Confirmation Hearing"). Consistent with its obligations under the Noteholder RSA, Elliott did not object to the Amended Plan and supported confirmation thereof.

**D.      The Debtors' Breach of the Noteholder RSA Immediately Prior To, and Following, the Confirmation Hearing**

14.      On June 8, 2020—after the evidentiary record for the confirmation hearing had closed—the Debtors publicly announced in SEC filings significant amendments to the backstop.[2] On June 9, 2020, the day after the hearing on confirmation of the Amended Plan concluded, the

---

[2]      The Debtors filed the Form 8-K announcing the amended backstop commitments on June 8, 2020, the last day of closing arguments for the Confirmation Hearing and after the evidentiary record had closed.

5

Debtors filed a motion seeking approval of amended backstop commitment documents with certain of the Backstop Parties (the "June 9 Backstop Motion"). [Dkt. No. 7848]. In the June 9 Backstop Motion, the Debtors disclosed that since at least May the Debtors were discussing with Backstop Parties ways to restructure the backstop commitments. [*Id.* p. 5]. The Debtors noted that on June 8, 2020, following extensive negotiations, they obtained consents from a substantial majority of the Backstop Parties, and obtained all remaining consents on June 9, 2020. [*Id.*; Dkt. No. 7849 ¶ 15].

15. The June 9 Backstop Motion was filed well after the objection deadline for the Plan (and its exculpation and release provisions) had passed, and after the period for discovery and the evidentiary record for the Confirmation Hearing had been closed.

16. Rather than use their best efforts, or any efforts for that matter, to cause the Backstop Parties to provide backstop rights to Elliott while restructuring the backstop commitments leading up to the June 9 Backstop Motion, the Debtors instead entered into amended equity backstop commitment letters (the "Amended Backstop Letters") pursuant to which "certain parties (collectively, the "Backstop Parties") remain severally committed to purchase up to $12 billion in New HoldCo Common Stock (collectively, the "Equity Backstop Commitments") on the Effective Date." [*Id.* p. 6].

17. A form Amended Backstop Letter was attached to the June 9 Backstop Motion, but did not include signature pages nor other indication of who the "certain" backstop parties were that remained. It is therefore unclear whether the "certain parties" that committed to the amended backstop were the same Backstop Parties that were committed under the original backstop commitment letters, or whether the Debtors gave new parties access to the backstop instead of providing for participation to Elliott.

18. In connection with these consents, the Debtors announced that they also obtained new investment commitments of $3.25 billion through a private investment in public equity (PIPE) transaction with several investment parties (some which were previously not disclosed as Backstop Parties) and reduced the public offering of New Common Stock to $5.75 billion. [*Id.* p. 5].

6

Consequently, the Backstop Parties' commitment obligations were effectively reduced to $5.75 billion given the then-likelihood of completing a market offering. Notwithstanding the reduced commitment obligations, the Debtors agreed under the Amended Backstop Letters to provide "the consenting Backstop Parties" an additional backstop commitment premium of 50 million shares of New Common Stock, bringing the total backstop commitment premium to 169 million shares of New Common Stock having an aggregate value of more than $1.5 billion. [*Id.* p. 8].

19.　Despite the Debtors' "best efforts" obligations to Elliott under the Noteholder RSA, the Debtors made no mention in the June 9 Backstop Motion or the supporting declaration of *any* effort to cause the Backstop Parties to provide their rights under any of the backstop commitment letters to Elliott. It is readily apparent that the Debtors did nothing to seek to have the Backstop Parties provide backstop rights to Elliott in the May and June period leading up to the June 8 amended backstop commitment. Neither the Debtors nor any Backstop Party even contacted Elliott, its advisors, or the Ad Hoc Noteholder Committee or its advisors, concerning this overhaul of the backstop to inquire if Elliott would participate in the backstop under the original economics or on more favorable terms to the amended backstop.

20.　The Debtors filed the June 9 Backstop Motion the day after the conclusion of the Confirmation Hearing and well after Elliott's objection deadline. A hearing on the June 9 Backstop Motion was held on shortened notice, and on June 16, 2020 the Court entered an order granting the June 9 Backstop Motion. [Dkt. No. 7848]. On June 20, 2020, the Court entered the Confirmation Order. [Dkt. No. 8053].

## ARGUMENT

**A.　Elliott is Entitled to an Allowed Administrative Expense Claim for Damages Caused by the Debtors' Breach of the Noteholder RSA**

21.　Section 503(b)(1)(A) of the Bankruptcy Code provides, in pertinent part, that "there shall be allowed administrative expenses . . . including – (1)(A) the actual, necessary costs and expenses of preserving the estate . . . ." 11 U.S.C. § 503(b)(1)(A). To establish an administrative expense claim under this provision, a claimant must show (a) a postpetition transaction between

7

the claimant and the estate and (b) a benefit to the estate. *See, e.g.*, *Abercrombie v. Hayden Corp.* *(In re Abercrombie)*, 139 F.3d 755, 757 (9th Cir. 1998).

22. As applicable here, damages arising out of a debtor's postpetition breach of a postpetition contract are afforded administrative priority under section 503(b)(1). *See Elliott v. Four Seasons Props. (In re Frontier Props., Inc.)*, 979 F.2d 1358, 1367 (9th Cir. 1992); *see also Devan v. Simon DeBartolo Grp., L.P. (In re Merry-Go-Round Enters., Inc.)*, 180 F.3d 149, 158 (4th Cir. 1999) (granting landlord an administrative claim for damages on account of the debtor's postpetition breach of a postpetition lease); *United Trucking Serv., Inc. v. Trailer Rental Co. (In re United Trucking Serv., Inc.)*, 851 F.2d 159, 162 (6th Cir. 1988) (finding "priority as an administrative expense is appropriate for [a] claim reflecting post-petition breach of contract"). As one court has explained:

> The policy behind treating claims arising from post-petition breaches as administrative expenses is clear. The debtor in possession or trustee by assuming or entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors.

*GATX Leasing Corp. v. Airlift Int'l, Inc. (In re Airlift Int'l, Inc.)*, 761 F.2d 1503, 1509 (11th Cir. 1985). In addition, administrative expense priority for claims arising from breaches of the Debtors' postpetition contractual obligations is consistent with the express terms of the Amended Plan, which defines Administrative Expense Claims as including for "any . . . obligations incurred or assumed by one or more of the Debtors, as a debtor in possession, during the Chapter 11 Cases." Amended Plan § 1.4.

23. The Debtors' entry into the Noteholder RSA with Elliott constitutes a postpetition transaction between Elliott and the estates. In addition, this Court has already found, and the Debtors cannot legitimately dispute, that the Noteholder RSA conferred a substantial benefit on the estates. Indeed, in their motion seeking approval of the Noteholder RSA, the Debtors argued to this Court that the Noteholder RSA was in the estates' best interests and provided "significant benefits" because of, among other things, the "substantial economic and plan process benefits" it provided, the global consensus that the Noteholder RSA allowed the estates to achieve, and the

8

more than $1 billion in cost savings on long-term debt that the Noteholder RSA allowed the Debtors to realize. [Dkt. No. 5519]. Thus, Elliott satisfies the threshold test for administrative priority under section 503(b)(1).

### i.    *The Debtors Breached the Noteholder RSA*

24.     Elliott has a valid claim for breach of the Noteholder RSA against the Debtors. Under California law, which governs the Noteholder RSA, the elements for breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Glob. Hawk Ins. Co. (RRG) v. Wesco Ins. Co.*, 424 F. Supp. 3d 848, 853–54 (C.D. Cal. 2019) (quoting *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821, 124 Cal.Rptr.3d 256, 250 P.3d 1115 (2011)).

25.     Each of these elements is satisfied here. *First*, the Noteholder RSA is a valid, postpetition contract between the Debtors and, among others, Elliott and has been approved by the Court. *Second*, Elliott performed all of its obligations under the Noteholder RSA, including by supporting the Amended Plan and not objecting to confirmation thereof. In addition, Elliott was ready, willing and able to provide backstop commitments with respect to up to $2 billion of an equity offering of New Common Stock on the economic terms set forth in the backstop commitment letters prior to the June amendment.

26.     *Third*, the Debtors breached their obligations under Section 3(a)(iv) of the Noteholder RSA by failing to use their best efforts to cause the Backstop Parties to provide to Elliott their rights under the backstop commitment letters. The Debtors had an affirmative obligation to act with diligence and use the means at their disposal to cause the Backstop Parties to transfer their rights, but failed to take the necessary action to do so. *See California Pines Prop. Owners Ass'n v. Pedotti*, 206 Cal. App. 4th 384, 394–95 (2012) (best efforts "requires a party to make such efforts as are reasonable in light of that party's ability and the means at its disposal and of the other party's justifiable expectations"); *Samica Enters., LLC v. Mail Boxes Etc. USA, Inc.*, 637 F.Supp.2d 712, 717 (C.D. Cal. 2008) (best efforts "is a standard that has diligence at its essence").

9

27.     The June 9 Backstop Motion made clear that the Debtors had encountered a significant obstacle under the existing backstop commitment documents and that some solution was needed to permit the Debtors to move forward with their equity raise strategy and consummate the Amended Plan.  At that time, it was incumbent upon the Debtors to fulfill their contractual and fiduciary obligations to explore all viable options to obtain the best economic terms available to consummate an equity offering and obtain necessary funding to consummate the Amended Plan. These required efforts included seeking, with best efforts, to determine if Elliott would be willing to adopt the existing backstop terms and to cause the Backstop Parties to provide to Elliott the rights and obligations under the backstop commitment letters with respect to $2 billion of commitments.

28.     Yet, the June 9 Backstop Motion and accompanying declaration make no mention of **any** efforts, let alone best efforts, by the Debtors to cause the Backstop Parties to provide such rights to Elliott.  Indeed, if the Debtors intended to make any effort to cause the Backstop Parties to provide backstop rights to Elliott during the May through June period during which the Debtors materially enhanced the backstop, the first step the Debtors would logically take is to contact Elliott and test its willingness to accept the backstop and, when confirmed, make an effort to cause Backstop Parties to transfer such rights. The Debtors' failure to even take that minor incremental step demonstrates that the Debtors failed to undertake their more substantial contractual commitment to undertake best efforts.  Instead, it is apparent from the June 9 Backstop Motion that the Debtors focused their efforts on an amendment to the existing backstop commitment letters with the Backstop Parties (or a subset thereof) to obtain *new* commitments with *new* backstop parties (the $3.25 billion PIPE commitments), to the *exclusion* of Elliott.  In short, and for reasons only known to the Debtors, the Debtors excluded Elliott from any potential (and likely less costly) solution, and thereby breached their obligations under Section 3(a)(iv) of the Noteholder RSA.

Case: 19-30088     Doc# 8536     Filed: 07/24/20     Entered: 07/27/20 07:45:17     Page 12 of 19

### ii. Elliott Incurred Damages of up to 19.8 Million Shares as a Result of the Debtors' Breach of the Noteholder RSA

29.     Elliott was damaged as a result of the Debtors' breach of the Noteholder RSA in the amount of up to 19.8 million shares attributable to the backstop commitment premium with respect to the $2 billion in commitments the Debtors failed to cause to be provided to Elliott, with a value of approximately $250 million.[3]  The precise amount of damages will be set at an evidentiary hearing on this application, after discovery, in accordance with the applicable Federal Rules of Bankruptcy Procedure.  *See* FED. R. BANKR. P. 9014.

30.     Accordingly, Elliott is entitled to an allowed Administrative Expense Claim against the Debtors and Reorganized Debtors under section 503(b) of the Bankruptcy Code in an amount to be determined, with such Administrated Expense Claim to be paid in full in accordance with Section 2.1 of the Amended Plan.

### B.     The Plan's Exculpation and Release Provisions Do Not Bar Elliott's Administrative Expense Claim

31.     The Amended Plan and Confirmation Order provide for a third party release and an exculpation in favor of the Debtors and Reorganized Debtors for certain claims and causes of action based on or relating to these chapter 11 cases and various transactions involving the Debtors prior to and during these cases.  *See* Amended Plan §§ 10.8 and 10.9(b); Confirmation Order ¶¶ 54 and 56.  Specifically, the exculpation provision provides for a release and exculpation of the Debtors for any claim related to "the negotiation and pursuit of . . . the Noteholder RSA," Amended Plan § 10.8, and the release provision purports to release the Debtors from any claim "based on or relating to . . . the Noteholder RSA," *id.* § 10.9(b).  Critically, however, pursuant to the express terms of the Amended Plan, such release and exculpation provisions do not preclude

---

[3]     The approximately $250 million of damages to Elliott are based on the equity commitment premium on $2 billion of backstop commitments that the Debtors were obligated to seek to be provided to Elliott and potentially other Consenting Noteholders, reflecting 16.67% of the total backstop. The total backstop commitment premium (under the original backstop) was 119 million shares of New Common Stock, of which 19.8 million shares (16.67%) are attributable to the $2 billion of commitments currently at issue. At a price per share of $12.57 on June 8, 2020, the date the amended backstop was announced, such premium attributable to $2 billion of commitments had a value of approximately $249 million. This amount is for illustrative purposes only, and the precise amount of damages will be established at an evidentiary hearing, including with respect to any subsequent increase in value.

Case: 19-30088     Doc# 8536     Filed: 07/24/20     Entered: 07/27/20 07:45:17     Page 13 of 19

Administrative Expense Claims, such as Elliott's Administrative Expense Claim for the Debtors' postpetition, pre-Effective Date breach of the Noteholder RSA. *See* Amended Plan § 2.1 ("For the avoidance of doubt, no Administrative Expense Claims shall be discharged pursuant to the Plan . . ."); *id.* § 10.9 (the releases are subject to "all rights that remain from and after the Effective Date to enforce this Plan and the Plan Documents").

32.     Accordingly, Elliott respectfully submits that the release and exculpation provisions of the Amended Plan and Confirmation Order do not preclude Elliott from pursuing its Administrative Expense Claim against the Debtors and Reorganized Debtors.

**C.      Reconsideration of the Confirmation Order is Appropriate to the Extent Necessary to Allow Elliott to Pursue Its Administrative Expense Claim**

33.     Solely out of an abundance of caution, if and to the extent the Court determines that the Amended Plan's release and exculpation provisions would limit or otherwise preclude Elliott's administrative expense claim against the Debtors for breach of the Noteholder RSA, notwithstanding Section 2.1 of the Amended Plan's express preservation of all Administrative Expense Claims, Elliott submits that reconsideration of the Confirmation Order for the limited purpose of allowing Elliott to pursue its Administrative Expense Claim for damages arising from the Debtors' breach of the Noteholder RSA is appropriate.

34.     Under Federal Rule 60(b), as made applicable to these cases by Bankruptcy Rule 9024, a court may grant relief from an order or proceeding upon a showing of (1) mistake, surprise, or excusable neglect, (2) newly discovered evidence, (3) fraud, (4) a void judgment, (5) a satisfied or discharged judgment, or (6) any other reason that justifies relief. *See* Fed. R. Civ. P. 60(b). A court "may properly reconsider and grant relief from a final judgment or order pursuant to Rule 60(b) if it '(1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law.'" *Pierce v. Obama*, No. 14-cv-0691, 2014 WL 4959030, *1 (Bankr. S.D. Cal. Oct. 1, 2014) (quoting *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993)).

35.     Courts generally look at four factors in determining whether excusable neglect exists under Federal Rule 60(b)(1): (a) the danger of prejudice to the opposing party; (b) the length of the delay and its potential impact on the proceedings; (c) the reason for the delay; and (d) whether the movant acted in good faith. *See Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261 (9th Cir. 2010) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)). Ultimately, "the determination is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs.*, 507 U.S. at 395.

36.     In addition, courts "ha[ve] discretion to correct a judgment for mistake or inadvertence, either on the part of counsel or the court itself" under Federal Rule 60(b)(1). *Fid. Fed. Bank, FSB v. Durga Ma Corp.*, 387 F.3d 1021, 1024 (9th Cir. 2004); *Liberty Mutual Ins. Co. v. E.E.O.C.*, 691 F.2d 438, 441 (9th Cir. 1982) (errors of law may be corrected by the court under Rule 60(b)(1)). Reconsideration is also appropriate under Federal Rule 60(b)(6) "where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Ultimately, "Rule 60(b) is meant to be remedial in nature and therefore must be liberally applied." *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984) (citing *Butner v. Neustadter*, 324 F.2d 783, 786 (9th Cir. 1963)).

37.     Whether viewed as mistake, excusable neglect, or another reason justifying relief, reconsideration is appropriate to the extent necessary under the circumstances to modify the release and exculpation provisions of the Confirmation Order and Amended Plan to the limited extent that they are deemed to preclude Elliott from pursuing an Administrative Expense Claim based on the Debtors' breach of the Noteholder RSA.

38.     New developments and revelations by the Debtors, not before this Court or known to Elliott at the time of the Confirmation Hearing with respect to the Amended Plan, revealed that the Debtors failed to comply with their obligations under the Noteholder RSA. One day after the Confirmation Hearing record was closed, the Debtors filed the June 9 Backstop Motion disclosing that a major impediment existed to the Debtors' ability to proceed with a rights or market offering

under the terms of the existing backstop commitment documents, and that the Debtors had revisited those backstop commitments. Instead of attempting to find a solution through causing the Backstop Parties to provide their commitment rights to Elliott, the Debtors instead negotiated *new* commitments by *new* financing parties, effectively reduced the existing backstop commitments, and obligated themselves to hundreds of millions of dollars of value for an increased backstop commitment premium for such consents. At that time, the Debtors were bound by a contractual commitment under the Noteholder RSA to cause the existing Backstop Parties to provide their rights under the backstop commitment letters to Elliott. However, the Debtors made no effort to do so.

39.     At the time these facts were publicly revealed, Elliott had no ability to object to the release and exculpation provisions in the Amended Plan for two separate reasons: (1) the objection deadline for the Amended Plan had passed weeks earlier on May 15, 2020; and (2) the record for the Confirmation Hearing on the Amended Plan had closed the day before.[4]

40.     It would be improper, inequitable and manifestly unjust for the Confirmation Order and Amended Plan to release and exculpate the Debtors for contractual breaches, the facts surrounding which were not revealed by the Debtors until *after* conclusion of the Confirmation Hearing, when the confirmation order was under advisement by the Court and when Elliott could not object to the exculpation and release provisions. Such far-reaching releases and exculpations would improperly shield debtors from eleventh hour breaches that, as here, are not apparent until after parties in interest are already time barred from objecting to a plan.

41.     Accordingly, to the extent the release and exculpation provisions apply, which they do not, reconsideration under Federal Rule 60(b) is warranted under the unique circumstances present here, including the Debtors' non-disclosure of pertinent facts surrounding their failure to use best efforts until after the conclusion of the Confirmation Hearing, and Elliott's contractual

---

[4]     The Debtors and Shareholder Proponents would also likely have argued that Elliott was bound not to object under the Noteholder RSA. Elliott's only potentially available remedy for the Debtors' breach under the Noteholder RSA was to terminate the Noteholder RSA, which required at least 10 days' advance notice to the Debtors to become effective. Thus, under no circumstance could Elliott have timely objected to the Amended Plan's release and exculpation provision after having learned of the breach on June 9.

14

obligations that, at the time, precluded Elliott from opposing the Amended Plan or entry of the Confirmation Order. Such limited relief would not prejudice other stakeholders in these cases whose rights under the Amended Plan—including all rights to receive a distribution on account of allowed claims—would remain unaffected by the narrow relief sought herein. In addition, the relief would not prejudice the Debtors or Reorganized Debtors as they would simply be required to compensate a contract counterparty for damages caused by the Debtors' breach of a postpetition contractual obligation, which is an obligation the Debtors' expressly contemplated would constitute an Administrative Expense Claim under Sections 1.4 and 2.1 of the Amended Plan.

### NOTICE

42. Notice of this Motion will be provided to: (i) the Reorganized Debtors, c/o PG&E Corporation and Pacific Gas and Electric Company, PO Box 770000, 77 Beale Street, San Francisco, CA 94105 (Attn: Janet Loduca, Esq.); (ii) counsel for the Reorganized Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Stephen Karotkin, Esq., Jessica Liou, Esq., and Matthew Goren, Esq.) and Keller & Benvenutti LLP, 650 California Street, Suite 1900, San Francisco, CA 94108 (Attn: Tobias Keller, Esq. and Jane Kim, Esq.); (iii) counsel for the administrative agent under the Debtors' postpetition financing facility, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038 (Attn: Kristopher M. Hansen, Esq., Erez E. Gilad, Esq., and Matthew G. Garofalo, Esq.) and 2029 Century Park East, Los Angeles, CA 90067 (Attn: Frank A. Merola, Esq.); (iv) counsel for the collateral agent under the Debtors' postpetition financing facility, Davis Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017 (Attn: Eli J. Vonnegut, Esq., David Schiff, Esq., and Timothy Graulich, Esq.); (v) counsel to the California Public Utilities Commission, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Alan W. Kornberg, Esq., Brian S. Hermann, Esq., Walter R. Rieman, Esq., Sean A. Mitchell, Esq., and Neal P. Donnelly, Esq.); (vi) the Office of the United States Trustee for Region 17, 450 Golden Gate Avenue, 5th Floor, Suite #05-0153, San Francisco, CA 94102 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (vii) U.S. Nuclear Regulatory Commission, Washington, DC 20555-0001 (Attn:

15

General Counsel); (viii) counsel for United States on behalf of the Federal Energy Regulatory Commission, U.S. Department of Justice, 1100 L Street, NW, Room 7106, Washington DC 20005 (Attn: Danielle A. Pham, Esq.); (ix) counsel for the Official Committee of Unsecured Creditors, Milbank LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Dennis F. Dunne, Esq. and Sam A. Khalil, Esq.) and 2029 Century Park East, 33rd Floor, Los Angeles, CA 90067 (Attn: Paul S. Aronzon, Esq., Gregory A. Bray, Esq., and Thomas R. Kreller, Esq.); (x) counsel for the Official Committee of Tort Claimants, Baker & Hostetler LLP, 11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90025 (Attn: Eric Sagerman, Esq. and Cecily Dumas, Esq.); and (xi) those persons who have formally appeared in these chapter 11 cases and requested service pursuant to Bankruptcy Rule 2002. Elliott respectfully submits that no further notice is required.

[*Text Continues on the Next Page*]

## CONCLUSION

43. For the foregoing reasons, the Court should (a) grant Elliott an Allowed Administrative Expense Claim for damages arising from the Debtors' breach of the Noteholder RSA, (b) to the extent necessary, reconsider and modify the release and exculpation provisions of the Confirmation Order and Amended Plan for the limited purpose of allowing Elliott to pursue its Administrative Expense Claim, and (c) grant Elliott such other and further relief as the Court deems just and proper.

Dated: July 24, 2020

**ROPES & GRAY LLP**

By:   /s/ Rocky C. Tsai

Rocky C. Tsai (CA Bar No. 221452)
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 315-6369
Facsimile: (415) 315-6350

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (*pro hac vice* requested)
Keith H. Wofford (*pro hac vice* requested)
Daniel G. Egan (*pro hac vice* requested)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090

-and-

**ROPES & GRAY LLP**
Andrew G. Devore (*pro hac vice* requested)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel to Elliott Management Corporation, on behalf of itself and certain funds and accounts managed, advised, or sub-advised by it*

17