WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice*)
(stephen.karotkin@weil.com)
Richard W. Slack (pro hac vice)
(richard.slack@weil.com)
Theodore Tsekerides (*pro hac vice*)
(theodore.tsekerides@weil.com)
Jessica Liou (*pro hac vice*)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice*)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER BENVENUTTI KIM LLP
Tobias S. Keller (#151445)
(tkeller@kbkllp.com)
Peter J. Benvenutti (#60566)
(pbenvenutti@kbkllp.com)
Jane Kim (#298192)
(jkim@kbkllp.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: (415) 496-6723
Fax: (650) 636 9251

*Attorneys for Debtors and Reorganized Debtors*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>      **Debtors.**<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**REORGANIZED DEBTORS' INITIAL OPPOSITION TO ELLIOTT MANAGEMENT CORPORATION'S MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND RECONSIDERATION OF CONFIRMATION ORDER AND RELATED JOINDERS**<br><br>**Related to Dkt. Nos.:** 8536, 8663, 8704, 8746<br><br>**Date:** October 13, 2020<br>**Time:** 10:00 a.m. (Pacific Time)<br>**Place:** Video Conference<br>**Response Deadline:** September 14, 2020 |

**Table of Contents**

Page

I. PRELIMINARY STATEMENT ..................................................................1

II. BACKGROUND .....................................................................................4

III. ARGUMENT ..........................................................................................7

    A. The Exculpation and Release Provisions of the Plan Mandate that the Noteholder Motion be Summarily Denied...........................................7

        1. Section 10.8 of the Plan Expressly Precludes the Noteholder Claims...7

            a. By its Plain Language, Section 10.8, and Not Section 2.1, Governs the Treatment of the Noteholder Claims ...................8

            b. The Noteholder Claimants' Construction of the Plan Would Render the Exculpation Provisions Meaningless.....................9

            c. Additional Principles of Contractual Interpretation Prohibit the Court from Adopting the Noteholder Claimants' Interpretation of the Exculpation Provision.....................................10

        2. The Noteholder Claims Have Been Released Under Section 10.9(b) of the Plan...........................................................................11

    B. The Noteholder Claimants Have Waived the Noteholder Claims .................12

    C. The Court Should Not Reconsider the Confirmation Order or Modify the Plan Under Federal Rule 60(b) ...............................................................16

        1. The Requirements of Section 1127(b) Cannot Be Met.......................16

        2. Reconsideration is Not Warranted Even Applying Federal Rule 60(b) ...............................................................................18

            a. The Noteholder Claimants Have Provided No Evidence of Excusable Neglect, Nor is There Any......................................20

            b. There is No Newly Discovered Evidence to Support Reconsideration......................................................................21

            c. There are No Extraordinary Circumstances to Warrant Reconsideration of the Confirmation Order ...........................22

IV. RESERVATION OF RIGHTS ...............................................................24

V. CONCLUSION.......................................................................................24

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AAA Nev. Ins. Co. v. Vinh Chau*,
No. 2:08-cv-00827-RCJ-LRL, 2010 WL 1756986 (D. Nev. Apr. 30, 2010) ......................19

*In re Antiquities of Nevada, Inc.*,
173 B.R. 926 (B.A.P. 9th Cir. 1994)..................................................................................16

*Arnett Facial Reconstruction Courses, Inc. v. Patterson Dental Supply, Inc.*,
No. CV 11-06929 CBM (EX), 2013 WL 12246259 (C.D. Cal. Apr. 8, 2013).....................22

*In re Arriva Pharm., Inc.*,
456 B.R 419 (Bankr. N.D. Cal. 2011) ...............................................................................13

*Arteaga v. Superior Court*,
No. C-93-20907 RMW, 1994 LEXIS 12454 (N.D. Cal. July 11, 1994) .............................18

*Barboza v. Cal. Ass'n of Prof'l Firefighters*,
No. CIV. S–08–519 FCD/GGH, 2009 WL 2500767 (E.D. Cal. Aug. 14, 2009) ...............18

*In re Bellingham Ins. Agency, Inc.*,
702 F.3d 553 (9th Cir. 2012) ...........................................................................................13

*Beverly v. Network Sols., Inc.*,
No. C-98-0337-VRW, 1998 WL 917526 (N.D. Cal. Dec. 30, 1998)..................................19

*Brisbane Lodging, L.P. v. Webcor Builders, Inc.*,
216 Cal. App. 4th 1249 (2013) ........................................................................................16

*Cal. Dep't of Toxic Substances Control v. Alco Pacific, Inc.*,
508 F.3d 930 (9th Cir. 2007) ...........................................................................................19

*California v. Summer Del Caribe, Inc.*,
821 F. Supp. 574 (N.D. Cal. 1993) ...................................................................................19

*In re Calpine Corp.*,
No. 05–60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008) ......................17

*In re Cellular 101, Inc.*,
539 F.3d 1150 (9th Cir. 2008) .........................................................................................14

*In re Contessa Liquidating Co., Inc.*,
No. 2:11-BK-13454-PC, 2012 WL 2153271 (Bankr. C.D. Cal. June 13, 2012)...............20

*Corex Corp. v. United States*,
638 F.2d 119 (9th Cir. 1981) ...........................................................................................22

*In re Daewoo Motor Am., Inc.*,
488 B.R. 418 (C.D. Cal. 2011) ........................................................................17

*In re Elec. Maint. & Constr., Inc.*,
No. 8:11–BK–18670–CED, 2016 WL 2985025 (Bankr. M.D. Fla. May 19, 2016) ...........17

*In re Enewally*,
368 F.3d 1165 (9th Cir. 2004) ........................................................................13

*Espinosa v. United Student Aid Funds*,
553 F.3d 1193 (9th Cir. 2008) ........................................................................18

*Falk v. Allen*,
739 F.2d 461 (9th Cir. 1984) ........................................................................18

*Fantasyland Video, Inc. v. County of San Diego*,
505 F.3d 996 (9th Cir. 2007) ........................................................................23

*Feature Realty, Inc. v. City of Spokane*,
331 F.3d 1082 (9th Cir. 2003) ........................................................................22

*Flake v. United States*,
No. CIV-93-0306-PHX-SMM, 1995 WL 819183 (D. Ariz. Dec. 7, 1995) ........................18

*Fletcher v. Baca*,
No. CV 07-4180, 2014 WL 12856062 (C.D. Cal. June 25, 2014) ..............................21

*Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*,
764 F.2d 604 (9th Cir. 1985) ........................................................................21

*GenCorp, Inc. v. Am. Int'l Underwriters*,
178 F.3d 804 (6th Cir. 1999) ........................................................................23

*Gregorian v. Izvestia*,
871 F.2d 1515 (9th Cir. 1989) ........................................................................22

*In re Gutierrez*,
No. NC-17-1350-KuFB, 2019 WL 406632 (B.A.P. 9th Cir. Jan. 31, 2019) ......................20

*Guzik Tech. Enterprises, Inc. v. W. Digital Corp.*,
No. 5:11-CV-03786-PSG, 2014 WL 12465441 (N.D. Cal. Mar. 21, 2014) ......................15

*Harvest v. Castro*,
531 F.3d 737 (9th Cir. 2008) ........................................................................23

*Idaho v. Shoshone-Bannock Tribes*,
465 F.3d 1095 (9th Cir. 2006) ........................................................................10

*In re iE, Inc.*,
BAP No. CC-19-1307-FLTa, 2020 WL 3547928 (B.A.P. 9th Cir. June 22, 2020) ...........17

*Kilopass Tech. Inc. v. Sidense Corp.*,
　No. C 10-02066 SI, 2012 WL 1901198 (N.D. Cal. May 24, 2012)......................................23

*In re Lee*,
　No. CC-15-1240-DTaKu, 2016 Bankr. WL 1450210 (B.A.P. 9th Cir. Apr. 11, 2016) .......21

*In re Logan Place Properties, Ltd.*,
　327 B.R. 811 (Bankr. S.D. Tex. 2005) ..............................................................................17

*Moore v. Mortgage Elec. Registration Sys.*,
　650 Fed. Appx. 406 (9th Cir. 2016)...................................................................................19

*Murphy v. DirecTV, Inc.*,
　724 F.3d 1218 (9th Cir. 2013) ...........................................................................................11

*In re Nations First Capital, LLC*,
　No. EC-19-1201-GLB, 2020 Bankr. WL 3071983 (B.A.P. 9th Cir. June 5, 2020)..............23

*In re Pac. Gas & Elec. Co.*,
　331 B.R. 915 (Bankr. N.D. Cal. 2005) ..............................................................................20

*In re Pardee*,
　193 F.3d 1083 (9th Cir. 1999) ...................................................................................14, 21

*Pinel v. Aurora Loan Servs., LLC*
　814 F. Supp. 2d 930 (N.D. Cal. 2011) ................................................................................9

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
　507 U.S. 380 (1993)...........................................................................................................20

*Progressive West Ins. Co. v. Bun Bun Tran*,
　No. 07-CV-1999 JAH(POR), 2008 WL 11508656 (S.D. Cal. Nov. 20, 2008) ...................19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
　566 U.S. 639 (2012)...........................................................................................................10

*In re Rickel & Assocs.*,
　260 B.R. 673 (Bankr. S.D.N.Y. 2001) ...............................................................................17

*Saavedra v. Eli Lilly & Co.*,
　No 2:12-cv-09366-SVW-MAN, 2018 WL 5904801 (C.D. Cal. July 19, 2018)..................23

*Safeway Stores v. Nat'l Union Fire Ins. Co.*,
　No. C-88-3440-DLJ, 1993 WL 739643 (N.D. Cal. Feb. 4, 1993).......................................22

*U.S. v. Olano*,
　507 U.S. 725 (1993)...........................................................................................................13

*In re Valence Tech. Sec. Lit.*,
　No. C-95-20459-JW, 1995 WL 798927 (N.D. Cal. Sept. 19, 1995) ..................................18

*In re Vencor, Inc.*,
   284 B.R. 79 (Bankr. D. Del. 2002) ........................................................................17

*In re Walker*,
   332 B.R. 820 (Bankr. D. Nev. 2005) ...................................................................21

*In re Wrightwood Guest Ranch, LLC*,
   896 F.3d 1109 (9th Cir. 2018) ............................................................................13

**Statutes**

Bankruptcy Code § 524(e) ..........................................................................................9

Bankruptcy Code § 1127(b) ...................................................................4, 16, 17, 18

Cal. Civ. Proc. Code § 1858 .......................................................................................9

Cal. Civ. Proc. Code § 1859 .....................................................................................10

PG&E Corporation and Pacific Gas and Electric Company, as reorganized debtors (collectively, the "**Debtors**" and as reorganized pursuant to the Plan,[1] the "**Reorganized Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), respectfully submit this initial opposition (the "**Initial Opposition**") to the *Motion of Elliott Management Corporation for (I) Allowance and Payment of Administrative Expense Claim and (II) to the Extent Necessary, Reconsideration and Relief from the Confirmation Order Pursuant to Federal Rule of Civil Procedure 60(b)*, dated July 24, 2020 [Dkt. No. 8536] (the "**Noteholder Motion**"), filed by Elliott Management Corporation ("**Elliott**"), and the related joinders to the Noteholder Motion [Dkt. Nos. 8663 and 8704] (together, the "**Joinders**", and the entities filing the Joinders, together with Elliott, the "**Noteholder Claimants**"). The Reorganized Debtors submit this Initial Opposition in accordance with the Court's *Order Regarding Scheduling with Respect to Elliott Management Corporation Motion for Allowance and Payment of Administrative Claim and Related Joinders*, dated August 11, 2020 [Dkt. No. 8746] (the "**Scheduling Order**").

## I.   PRELIMINARY STATEMENT

In direct contravention of the express release and exculpation provisions of the Plan, the Noteholder Claimants seek in the Noteholder Motion to recover approximately $250 million[2] based on an alleged breach by the Debtors of Section 3(a)(iv) of the Noteholder RSA (the "**Noteholder Claims**").[3] The Noteholder Motion, which is devoid of any supporting declaration or evidentiary record, is premised on completely unsubstantiated allegations asserting that, in connection with the June 2020 amendment to the Backstop Commitment Letters (the "**Backstop Amendment**"), the

---

[1] "**Plan**" means the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8048] (as may be further modified, amended or supplemented from time to time, and together with any exhibits or schedules thereto, the "**Plan**"), as confirmed by the Court by Order dated June 20, 2020 [Dkt. No. 8053] (the "**Confirmation Order**"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

[2] Notably, this $250 million would be borne exclusively by existing equity holders of the Reorganized Debtors, with in excess of twenty-two percent (22%) of this amount being borne by the Fire Victim Trust.

[3] "**Noteholder RSA**" means the Restructuring Support Agreement, dated January 22, 2020, among the Debtors, the Shareholder Proponents, and certain members of the Ad Hoc Committee of Senior Unsecured Noteholders (such members, the "**Consenting Noteholders**", and such committee, the "**Ad Hoc Noteholder Committee**"). Each of the Noteholder Claimants is a Consenting Noteholder, *i.e.*, is a party to the Noteholder RSA.

Debtors failed to use their "best efforts" to cause the Backstop Parties to voluntarily transfer to the Noteholder Claimants, for no consideration whatsoever, $2 billion of the Backstop Parties' admittedly valuable rights under the terms of the Backstop Commitment Letters approved by the Court on March 13, 2020, including the rights to receive the fees that already had been earned and were fully vested (approximately 90% of the total backstop fees).

On June 9, 2020, the Debtors filed a motion (the "**Backstop Amendment Motion**") seeking approval of the Backstop Amendment, on notice to, among others, the Noteholder Claimants. On June 16, 2020, after a hearing, the Court granted the Backstop Amendment Motion. Conveniently omitted from the Noteholder Motion is any mention of the fact that no Noteholder Claimant (or any other Consenting Noteholder, for that matter) raised any objection to the Backstop Amendment Motion. In fact, no Noteholder Claimant even requested to be heard at the hearing to consider approval of the Backstop Amendment Motion. Rather, the Noteholder Claimants, for strategic reasons known only to them, waited until July 24, 2020—nearly seven weeks after the Debtors filed the Backstop Amendment Motion, more than one month after the Court entered the Confirmation Order, and more than three weeks after the Plan Effective Date—to file the Noteholder Motion and raise their allegations for the first time.

The Noteholder Motion must be summarily denied for several reasons.

The exculpation provisions of Section 10.8 of the Plan (and the corresponding provisions of the Confirmation Order) expressly preclude the relief requested in the Noteholder Motion. Section 10.8 specifically states that the Debtors and Reorganized Debtors are "released and exculpated" from any claims in connection with or arising under, among other things, *the Noteholder RSA*, *the Exit Financing Documents*, *the Backstop Commitment Letters*, or *the Plan Funding*. It is incontrovertible that those agreements and matters are the sole genesis of the Noteholder Claims. The argument by the Noteholder Claimants that the specific provisions of the exculpation provision are somehow trumped by Section 2.1 of the Plan, which relates to the "discharge" of Administrative Expense Claims, is expressly belied by the plain language of Section 10.8, which states it shall apply: "Notwithstanding anything [in the Plan] to the contrary." Thus, neither Section 2.1 nor any

other provision of the Plan overrides or precludes the explicit exculpation and release of the Noteholder Claims as provided for in Article 10 of the Plan.

The release provisions of Section 10.9(b) of the Plan (and the corresponding provisions of the Confirmation Order) also preclude the relief requested in the Noteholder Motion. The plain language of Section 10.9(b) expressly provides that the Debtors and Reorganized Debtors are "forever released and discharged" by the Releasing Parties (which defined term specifically includes the Consenting Noteholders, and in turn, the Noteholder Claimants) from any claims based on or relating to, among other things, *the Noteholder RSA*, *the Exit Financing Documents*, or *the Backstop Commitment Letters*. Again, the Noteholder Claims fall squarely and indisputably within this release provision.

The Noteholder Claimants' attempt to avoid the express terms of the Plan and Confirmation Order must be rejected. Indeed, to determine that all Administrative Expense Claims are somehow exempt from the customary Plan provisions that expressly release and exculpate certain specified Administrative Expense Claims would not only be completely irrational, it would render those provisions utterly meaningless as to the Debtors and Reorganized Debtors. Moreover, that both the release and exculpation provisions expressly and explicitly release and exculpate claims arising out of the Noteholder RSA and the Backstop Commitment Letters further supports the inescapable conclusion that Section 2.1 cannot operate to preserve claims arising out of those same agreements.[4]

The Noteholder Motion also must be summarily denied because the Noteholder Claimants waived their claims by not taking any steps to object to the Backstop Amendment Motion or otherwise protect their alleged rights before the Backstop Amendment was approved, the Confirmation Order was entered, or the Plan was consummated. Having sat on their alleged rights while the Plan went effective and a multitude of transactions—including the funding billions of dollars of new debt and equity investments—were consummated, all based on the effectiveness of

---

[4] In addition, the Consenting Noteholders, including all of the Noteholder Claimants, are also Exculpated Parties and Released Parties who enjoy the benefits of Sections 10.8 and 10.9(b) of the Plan. Under the tortured interpretation advanced by the Noteholder Claimants, if they had breached the Noteholder RSA, any resulting claims would be exculpated and released, while claims arising out of breaches by the Debtors of the Noteholder RSA would be preserved as Administrative Expense Claims pursuant to Section 2.1 of the Plan. This would be an absurd and illogical result, and confirms that the Noteholder Claimants' reliance on Section 2.1 of the Plan must be rejected.

the terms and provisions of the Plan and the Confirmation Order, the Noteholder Claimants cannot now come forward and assert the Noteholder Claims. The detriment and prejudice to all other parties in interest including, in particular, to the Fire Victim Trust, is manifest, and this type of calculated conduct should not be countenanced.

Further, any attempt by the Noteholder Claimants to invoke Federal Rule 60(b) to reconsider the Confirmation Order similarly must be rejected. Courts routinely have held that Rule 60(b) cannot be used to modify plan confirmation orders in contravention of the limitations set forth in section 1127(b) of the Bankruptcy Code. Specifically, a confirmed chapter 11 plan cannot be modified unless the request to modify is made by the debtor or a plan proponent *and* the plan has not been substantially consummated. Here, the Noteholder Claimants meet neither of these conditions and, therefore, their Rule 60(b) request, on this basis alone, must be denied. Moreover, even if Rule 60(b) applied to the Confirmation Order, the Noteholder Claimants have not sustained and cannot sustain their burden for the extraordinary remedy of reconsideration where there is no excusable neglect, no new evidence, nor any reason whatsoever why the Noteholder Claimants sat on their rights for nearly seven weeks.

## II.    **BACKGROUND**

The Court approved the Noteholder RSA on February 5, 2020. *See* Dkt. No. 5637. Section 3(a)(iv) of that agreement provides that, during the Support Period (as defined in the Noteholder RSA), the Debtors shall:

> [U]se their best efforts, which shall not require the Debtors to pay any consideration, breach any obligations, or otherwise violate the terms of any Backstop Commitment Letter, to cause various Backstop Parties to transfer (whether by assignment, participation, or otherwise) to Consenting Noteholders that were parties to the AHC Commitment Letter [(as defined in the Noteholder RSA)] and any Consenting Noteholders that were offered the opportunity to participate in any subsequent commitment in connection with the Alternative Plan, their rights (subject to Section 7 hereof) (including the right to receive fees thereunder) and obligations under applicable Backstop Commitment Letters relating to up to $2 billion of commitments.

The Noteholder RSA was negotiated among sophisticated parties and provides explicit terms by which those parties can terminate the agreement, including terms addressing the timing of any termination notice, cure periods, and the effective date of termination. *See* Noteholder RSA § 5.

The parties also negotiated for the right, upon breach, to bring a motion or other action for injunctive relief, which is not bound by any time restrictions. *See id.* § 11.

In addition, pursuant to the terms of the Noteholder RSA, the Plan Proponents filed an amended plan of reorganization on January 31, 2020, which incorporated the terms set forth in the Noteholder RSA and included the exculpation and release provisions contained in Sections 10.8 and 10.9(b) of the Plan, all of which were agreed to by the Noteholder Claimants.[5]

Although not relevant to the determination of this Initial Opposition, the undisputed evidence will show that, in accordance with Section 3(a)(iv) of the Noteholder RSA, in late January 2020, the Debtors and their advisors solicited the Backstop Parties as to their willingness to transfer their interests under the Backstop Commitment Letters to the Consenting Noteholders. Certain Backstop Parties stated they were willing to transfer approximately $250 million in backstop commitments, but the Consenting Noteholders, including the Noteholder Claimants, declined this offer.

On March 2, 2020, the Debtors sought Court approval of the Backstop Commitment Letters. *See* Dkt. No. 6013 (the "**Backstop Approval Motion**"). The Court approved the Backstop Commitment Letters on March 13, 2020. *See* Dkt. No. 6321. On April 30, 2020, pursuant to the terms of the Backstop Commitment Letters, the Backstop Parties became entitled to ninety percent (90%) of the Equity Commitment Premiums (as defined in the Backstop Approval Motion), regardless of whether a subsequent termination event occurred. *See* Backstop Approval Motion at 20. Thus, at that time, it became economically irrational for any Backstop Party to voluntarily transfer or assign its backstop commitment, for no consideration, to the Consenting Noteholders or any other entity.

The Debtors filed the Backstop Amendment Motion on June 9, 2020. *See* Dkt. No. 7848. The Backstop Amendment was agreed to by all of the existing Backstop Parties. As further detailed in the Backstop Amendment Motion, *the Debtors* (not the Backstop Parties) required the Backstop Amendment to address the following items: (i) required consents of the Backstop Parties to certain

---

[5] *See Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization*, dated January 31, 2020 [Dkt. No. 5590].

amendments made to the Plan, in order to ensure the continued effectiveness and enforceability of the backstop commitments for the benefit of the Plan Proponents, and to ensure the availability of the Plan Funding; and (ii) certain amendments to the Backstop Commitment Letters, in order to allow the Plan Proponents to pursue a market offering of stock of Reorganized PG&E—which included a separate offering of equity (the "**PIPE Transaction**")—that was not permissible under the then-existing terms of the Backstop Commitment Letters.  The Backstop Amendment enabled the Plan Proponents to avoid calling on the backstop commitments and instead raise equity capital for the Plan Funding at a higher price than the "backstop price" under the Backstop Commitment Letters.

Notably, at the time the Debtors were negotiating the Backstop Amendment, they were bound by the terms and conditions of the Backstop Commitment Letters, as approved by the Court. The Debtors had no right to unilaterally terminate or amend the Backstop Commitment Letters, had no right to seek replacement or alternative Backstop Parties or backstop commitments, and had no right to "*cause* the Backstop Parties to provide to [the Noteholder Claimants] the rights and obligations under the Backstop Commitment Letters," as the Noteholder Motion states.  *See* Noteholder Motion ¶ 27 (emphasis added); Dkt. No. 6013-3 (Form of Equity Backstop Commitment Letter).  Simply stated, at the time the Debtors were negotiating the Backstop Amendment in early June 2020, the Backstop Parties had valuable, vested, Court-approved rights, including the entitlement to fees and the right to purchase equity of the Reorganized Debtors at a substantial discount, all with no obligation of any kind to agree to any amendments to the Backstop Commitment Letters, and with no obligation or economic reason whatsoever to transfer those highly valuable rights for no consideration.

The Court approved the Backstop Amendment at a hearing held on June 16, 2020.  The hearing was on notice to all parties in interest, including all Consenting Noteholders.  No Noteholder Claimants nor any other Consenting Noteholders objected to the Backstop Amendment Motion, either in writing or at the hearing.

The Backstop Amendment did not result in the addition of any new Backstop Parties or the transfer of any backstop commitments.  *See* Backstop Amendment Motion at 5-6.  Moreover, the

PIPE Transaction was not, as the Noteholder Claimants well know, a part of the backstop commitments. Rather, it was an entirely different financing mechanism and an element of the marketed equity offering made possible by the Backstop Amendment. *See id.* at 2. The Debtors, therefore, had no obligations under the Noteholder RSA to use best efforts to include any Consenting Noteholder in the PIPE Transaction.

The Confirmation Hearing began on May 27, 2020, and concluded on June 19, 2020. On June 20, 2020, the Court entered the Confirmation Order. The Effective Date of the Plan occurred on July 1, 2020. At no time during the Confirmation Hearing or prior to the entry of the Confirmation Order or the occurrence the Plan Effective Date did any Noteholder Claimant, or any other Consenting Noteholder, object to confirmation of the Plan or raise any issue with respect to the Noteholder RSA, the Backstop Amendment, or the Plan becoming effective. Similarly, at no time during the Confirmation Hearing or prior to the Plan Effective Date did any Noteholder Claimant, or any other Consenting Noteholder, send a notice of termination under the Noteholder RSA, declare a breach, or seek injunctive relief as permitted under the Noteholder RSA. Nor did any Noteholder Claimant at any time send any notice of asserted breach of the Noteholder RSA related to the unfounded Noteholder Claims. Instead, nearly seven weeks after the Debtors filed the Backstop Amendment Motion, the Noteholder Claimants filed the Noteholder Motion.

### III. ARGUMENT

**A.**      **The Exculpation and Release Provisions of the Plan Mandate that the Noteholder Motion be Summarily Denied**

As set forth above, the exculpation and release provisions of the Plan squarely apply to the Noteholder Claims and mandate that the relief requested in the Noteholder Motion be summarily denied. As acknowledged by the Noteholder Claimants, *see* Noteholder Motion ¶ 31, these Plan provisions expressly cover all claims arising from the Noteholder RSA. The Noteholder Claimants' attempt to avoid these provisions is misguided and must be rejected.

#### 1. Section 10.8 of the Plan Expressly Precludes the Noteholder Claims

Section 10.8 of the Plan expressly and indisputably exculpates and releases the Debtors and Reorganized Debtors from any liability for the Noteholder Claims. Pursuant to Section 10.8, the Exculpated Parties, which include the Debtors and the Reorganized Debtors, are:

> *Notwithstanding anything herein to the contrary . . . released and
> exculpated from, any Claim*, Interest, obligation, suit, judgment, damage,
> debt, right, Cause of Action, loss, remedy, or liability for any claim . . . *in
> connection with or arising out of the administration of the Chapter 11
> Cases . . . the Backstop Commitment Letters . . . the Noteholder RSA, the
> Exit Financing Documents, the Plan Funding . . . or any agreement,
> transaction, or document related to any of the foregoing* . . . the funding
> of this Plan . . . the administration of this Plan or the property to be
> distributed under this Plan . . . [and] the issuance of Securities under or in
> connection with this Plan . . . .

(emphasis added).  The Noteholder Claims clearly arise from and relate to the Noteholder RSA, the

Backstop Commitment Letters, the Exit Financing Documents, the Plan Funding, the funding of the

Plan, and the issuance of Securities in connection with the Plan, and thus indisputably fall within

the scope of Section 10.8.

The Noteholder Claimants do not and, indeed, cannot dispute that Section 10.8 directly

applies to the Noteholder Claims.  Instead, in a futile attempt to avoid these provisions, the

Noteholder Claimants argue that Section 2.1 of the Plan, which references the *discharge* of

Administrative Expenses Claims—providing that "no Administrative Expense Claims shall be

discharged pursuant to the Plan, other than Allowed Administrative Expense Claims that have been

paid in Cash or otherwise satisfied in the ordinary course in an amount equal to the Allowed amount

of such Claim on or prior to the Effective Date"—somehow overrides the specific terms of Section

10.8 of the Plan.  The Noteholder Claimants' argument fails for several reasons.

a.  *By its Plain Language, Section 10.8, and Not Section 2.1, Governs*
*the Treatment of the Noteholder Claims*

Section 10.8 of the Plan easily dispenses with the argument advanced by the Noteholder

Claimants with respect to Section 2.1, as the very first words of Section 10.8 state that the

exculpation and release provisions thereof apply *"[n]otwithstanding anything herein to the*

*contrary*."  As set forth in Article I of the Plan, the word "herein" refers "to the Plan as a whole and

not to any particular section, subsection, or clause contained therein."  Dkt. No. 8048 at 36.  In other

words, the plain language of the Plan unequivocally dictates that Section 10.8, and not Section 2.1

or any other provision of the Plan, controls and governs the treatment of the specific claims

identified therein—including the specific and categorical exculpation and release of the Noteholder

Claims.  Moreover, even if Section 2.1 were not completely overridden by the express terms of

Section 10.8, Section 2.1 does not and logically cannot operate as a wholesale allowance of all

claims that may arise postpetition; and Section 10.8 expressly provides that the Noteholder Claims are to be disallowed as exculpated and released.

        *b.*    *The Noteholder Claimants' Construction of the Plan Would Render the Exculpation Provisions Meaningless*

In addition to the plain, unequivocal and controlling language of Section 10.8 that bars the Noteholder Claims, the Noteholder Claimants' reading of the Plan would render the exculpation provided under Section 10.8 of the Plan meaningless as to the Debtors and Reorganized Debtors and, thus, must be rejected for that reason as well.

As is customary with chapter 11 plans, Section 10.8 provides for exculpation with respect to claims arising in connection with the Reorganized Debtors' restructuring and the administration of the Chapter 11 Cases.[6]  Given that Section 10.8 applies only to claims that are related in some manner to the administration of the Chapter 11 Cases, the claims against the Reorganized Debtors to which it is directed necessarily would constitute Administrative Expense Claims, whether or not allowable.  Accordingly, to adopt the arguments advanced by the Noteholder Claimants and determine that Administrative Expense Claims are carved-out from Section 10.8 by Section 2.1 of the Plan would eviscerate the entire exculpation clause and render Section 10.8 meaningless as to the Debtors and Reorganized Debtors.  This result is not only illogical but also would be contrary to basic contractual interpretation principles under governing California law.  *See Pinel v. Aurora Loan Servs.*, LLC, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) ("Courts must interpret contractual language in a manner [that] gives force and effect to every provision, and not in a way [that] renders some clauses nugatory, inoperative or meaningless.") (internal quotations omitted); Cal. Civ. Proc. Code § 1858 (West) ("In the construction of a statute or instrument, the office of the Judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all.").

---

[6] Indeed, this limited scope is a reason that the Court approved Section 10.8 over certain objections to the Confirmation Order in which interested parties contended that the exculpation of certain non-debtors for actions taken in connection with the Chapter 11 Cases violates section 524(e) of the Bankruptcy Code.  *See Memorandum Decision*, dated June 17, 2020 [Dkt. No. 8001], at 25-26.

       *c.*     *Additional Principles of Contractual Interpretation Prohibit the*
                 *Court from Adopting the Noteholder Claimants' Interpretation of the*
                 *Exculpation Provision*

Additional contractual interpretation principles dictate that Section 10.8 of the Plan must be read to exculpate and release the Noteholder Claims. First, Section 10.8 of the Plan refers specifically to the very agreement (the Noteholder RSA) out of which the Noteholder Claims arise, and further explicitly lists various other items and agreements to which the Noteholder Claims are directly related, including the Backstop Commitment Letters and the Plan Funding. *See supra* at 7-8. On the other hand, Section 2.1 contains no reference to any agreement, event, or other occurrence that relates in any way to the Noteholder Claims. Further, Section 2.1 speaks only to the discharge of Administrative Expense Claims, and not to the validity, viability, or allowance of such claims. The provision that more precisely addresses the Noteholder Claims, Section 10.8 of the Plan, must control. *See, e.g., RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.") (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)); *Idaho v. Shoshone-Bannock Tribes*, 465 F.3d 1095, 1099 (9th Cir. 2006) ("Specific terms of a contract govern inconsistent, more general terms."); Cal. Civ. Proc. Code § 1859 (West) ("In the construction of . . . the instrument the intention of the parties, is to be pursued, if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent will control a general one that is inconsistent with it.").

Second, the exculpation and release granted to the Debtors, Reorganized Debtors, and other parties under Section 10.8 of the Plan specifically excludes from its purview "the Assigned Rights and Causes of Action" which were assigned to the Fire Victim Trust under the Plan, but *does not* provide a similar carve-out for Administrative Expense Claims—which makes sense because, as noted above, claims against a debtor covered by a chapter 11 plan's exculpation are by their very nature Administrative Expense Claims and, thus, to include such a carve-out would create the proverbial exception that swallows the rule. The inclusion of a carve-out for one type of claim coupled with the omission of an exclusion for Administrative Expense Claims further confirms that Section 10.8 applies to, and was intended to apply to, Administrative Expense Claims within the

purview of Section 10.8, as the Noteholder Claims plainly are. *See, e.g., Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) ("The California Supreme Court has observed that . . . mention of one matter implies the exclusion of all others.") (internal quotations omitted).

Thus, in addition to the express language of Section 10.8 that provides that Section 10.8 applies notwithstanding any other provision of the Plan and that is, itself, dispositive of the issue, general principles of contractual interpretation also require that the Noteholder Claimants' argument relying on Section 2.1 of the Plan be rejected.

### 2. The Noteholder Claims Have Been Released Under Section 10.9(b) of the Plan

In addition to the Plan's release and exculpation of the Debtors and Reorganized Debtors under Section 10.8, Section 10.9(b) of the Plan also releases them from any liability for the Noteholder Claims. Pursuant to Section 10.9(b), Released Parties, which include the Debtors and Reorganized Debtors, are:

> *[D]eemed forever released and discharged* . . . by the Releasing Parties [(which include the Noteholder Claimants)] from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever . . . whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise . . . *based on or relating to, or in any manner arising from, in whole or in part*, the Debtors . . . the Chapter 11 Cases, the subject matter of, or the transactions or events giving rise to any Claim or Interest that is treated under the Plan . . . *the business or contractual arrangements between any Debtors and any Released Party . . . the Plan Funding . . . the Backstop Commitment Letters . . . the Noteholder RSA* . . . or any other act or omission, transaction, agreement, event, or other occurrence . . . ."

(emphasis added). Again, the Noteholder Claims plainly and indisputably fall within the scope of Section 10.9(b) of the Plan, as they arise from, are based on, and relate to the events and agreements specifically and expressly listed therein, including the Noteholder RSA and the Backstop Commitment Letters.

Section 10.9(b) both discharges and releases claims. As discussed above, Section 2.1 of the Plan only refers to discharge. Section 2.1 logically cannot and does not operate as a wholesale allowance of any and all potential Administrative Expense Claims, including those otherwise specifically disallowed or released pursuant to other provisions of the Plan. Rather, the only logical

meaning of Section 2.1 is that, to the extent an Administrative Expense Claim is otherwise viable, valid and allowed, it will not be subject to the discharge provisions of the Plan.

In addition, the same canons of contractual interpretation noted above in connection with the Plan's exculpation provisions apply with equal force to the release provisions of Section 10.9(b) of the Plan. First, Section 10.9(b) expressly addresses and applies to claims arising under or relating to the Noteholder RSA, the Backstop Commitment Letters, and certain other agreements and transactions which encompass the Noteholder Claims, while Section 2.1 does not specifically mention them at all. The Noteholder Claimants' assertion that Section 2.1 controls to the exclusion of Section 10.9(b) is, thus, contrary to settled principles of construction because it would nullify the more specific provisions of Section 10.9(b). *See supra* at 10.

Second, the Noteholder Claimants' proposed reading of the Plan would similarly render numerous express terms of Section 10.9(b) inoperative, because Section 10.9(b) releases a number of categories of claims that expressly relate to certain postpetition agreements, such as the Noteholder RSA, and the only claims against the Debtors and Reorganized Debtors that could conceivably arise from those agreements would constitute Administrative Expense Claims. Thus, a determination that Section 2.1 controls and that all Administrative Expense Claims are preserved would nullify the inclusion of these categories of claims in Section 10.9(b) as against the Debtors and Reorganized Debtors, contrary to California law. *See supra* at 9.

Finally, similar to the argument with respect to Section 10.8 of the Plan, the inclusion in Section 10.9(b) of certain carve-outs while omitting a carve-out for Administrative Expense Claims further confirms that Section 10.9(b) applies to Administrative Expense Claims within its scope. *See supra* at 10-11.

### B. The Noteholder Claimants Have Waived the Noteholder Claims

The Noteholder Claimants have waived their right to assert the Noteholder Claims. As demonstrated above and what is not subject to dispute is that the Noteholder Claimants did not take *any* steps whatsoever to assert or otherwise protect the purported Noteholder Claims during the three weeks between the filing of the Backstop Amendment Motion on June 9, 2020 and when the Plan, along with the release and exculpation provisions, went effective on July 1, 2020. Indeed, despite

having full knowledge on June 9, 2020 that no Backstop Commitments would be assigned to them, the Noteholder Claimants, which constitute among the most sophisticated and experienced entities in the distressed debt arena:

- Did not object to the Backstop Amendment Motion;

- Did not object to entry of the Confirmation Order;

- Did not object to the Plan becoming effective with the full force and effect of the release and exculpation provisions (which specifically cover the Noteholder RSA) to which they agreed and now seek to avoid;

- Did not send a notice of termination of the Noteholder RSA;

- Did not deliver any asserted notice of breach under the Noteholder RSA;

- Did not seek injunctive relief as permitted under the Noteholder RSA; and

- Waited almost two months to file the Noteholder Motion.

None of these facts can be disputed.  As a result, the Noteholder Claimants are now barred from bringing the Noteholder Claims.  One Court in this District aptly framed the analysis following confirmation of a chapter 11 plan as follows:  "Bankruptcy Courts generally take a dim view of parties in interest who, for tactical or opportunistic reasons 'lay in the weeds' through confirmation, only to emerge later and bedevil previously confirmed plans."  *In re Arriva Pharm., Inc.*, 456 B.R 419, 427 (Bankr. N.D. Cal. 2011) (quoting *In re Ali Props., Inc.*, 334 B.R. 455, 461 (Bankr. D. Kan. 2005)).  Those are precisely the circumstances here.

"The consequences of a litigant sandbagging the court—remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor—can be severe."  *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 570 (9th Cir. 2012) (quoting *Stern v. Marshall*, 564 U.S. 462, 482 (2011)).  Courts routinely find claims waived or forfeited where a party fails to object or otherwise raise them with the Court.  *See, e.g.*, *In re Wrightwood Guest Ranch, LLC*, 896 F.3d 1109, 1113 (9th Cir. 2018) (holding that administrative creditors "forfeited their claims regarding the propriety of the [Bankruptcy Court's 9019] settlement order" where they did not object to a 9019 motion); *In re Enewally*, 368 F.3d 1165, 1173 (9th Cir. 2004) ("Bank waived any objection to the bankruptcy court's valuation by failing to contest it before the bankruptcy court."); *see also U.S. v. Olano*, 507 U.S. 725, 731 (1993) ("'No procedural principle is more familiar to this Court than that

a constitutional right,"' or a right of any other sort, "'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it."); *In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (holding that party waived its right to assert a defense where it had not raised it prior to entry of final order); *In re Pardee*, 193 F.3d 1083, 1086 (9th Cir. 1999) (holding that a creditor "cannot later complain about a certain provision contained in a confirmed plan" where the creditor had notice and "fail[ed] to protect its interests by timely objecting").

Any argument by the Noteholder Claimants that the Noteholder RSA prevented them from pursuing or even raising the Noteholder Claims prior to the Plan Effective Date of July 1, 2020 must be rejected, and is not relevant in any event. Pursuant to Section 5(b)(i) of the Noteholder RSA, the Noteholder Claimants could have issued a notice of termination of the Noteholder RSA due to the Debtors' alleged breach, and in doing so acted to protect any interest they thought they had well in advance of the entry of the order approving the Backstop Amendment, the entry of the Confirmation Order, and the Plan Effective Date of July 1, 2020. The Noteholder Claimants had over *three weeks* to send a notice of termination to the Debtors, allow the Reorganized Debtors the requisite ten (10) days to cure the alleged breach, terminate the Noteholder RSA, and pursue the Noteholder Claims. *See* Noteholder RSA § 5(b). None of the Noteholder Claimants took even the first step of issuing a termination notice. As such, they cannot credibly claim that the ten (10) day cure period prevented them from protecting their rights. In light of their conscious decision to not issue a notice of termination or otherwise attempt to protect their alleged rights, and to lay in the weeds since June 9, 2020, *i.e.*, for nearly seven weeks, the Noteholder Claimants have waived their rights.

Further, upon becoming aware of the Backstop Amendment on June 9, 2020, if the Noteholder Claimants believed the Debtors were in breach of the Noteholder RSA, they could have issued a notice of termination and sought injunctive relief in order to remedy that alleged breach or to prevent the exculpation and release provisions under the Plan from going effective as to the Noteholder Claims. *See* Noteholder RSA § 11 ("The Parties understand and agree that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief

. . . as a remedy of any such breach.").  Instead, the Noteholder Claimants did absolutely nothing; they sat on their rights for weeks, while the Backstop Amendment was approved, the Confirmation Order was entered, the Plan became effective, and thousands of transactions took place in connection with the consummation of the Plan, all in reliance thereon.  Now the Noteholder Claimants seek to impose a $250 million liability on the backs of the stockholders of the Reorganized Debtors, including the Fire Victim Trust.

Notably, the Noteholder Claimants clearly knew how to seek to protect their rights under the Noteholder RSA if they believed the Debtors were in breach.  As the Court is well-aware, the Ad Hoc Noteholder Committee, representing the interests of and comprised of these same Noteholder Claimants, previously did just that in connection with the Debtors' motion in April, 2020 to approve the Debtors' agreement with the Governors' Office—the Case Resolution Contingency Process [Dkt. No. 6398] (the "**Case Resolution Contingency Motion**").  There, the Ad Hoc Noteholder Committee filed under seal a motion seeking authority to enforce the Noteholder RSA.[7]  The Noteholder Claimants could have similarly sought relief from the Court here, but did nothing.

Finally, even if, *arguendo*, the Noteholder Claimants are correct that the Noteholder RSA precluded them from raising the Noteholder Claims prior to the Plan Effective Date (which it did not), that does nothing to alter the undisputed fact that Sections 10.8 and 10.9(b) of the Plan categorically exculpate and release the Debtors and Reorganized Debtors from liability for the Noteholder Claims.  As stated, the Noteholder Claimants are sophisticated parties who negotiated the Noteholder RSA with the advice of experienced counsel and agreed to all of the terms and provisions of the Plan.  They must live with the terms of that agreement, including any restrictions as to the timing of seeking relief, regardless of whether they now believe those terms to be unfair or improvident.  *See*, *e.g.*, *Guzik Tech. Enterprises, Inc. v. W. Digital Corp.*, No. 5:11-CV-03786-PSG, 2014 WL 12465441, at \*6 (N.D. Cal. Mar. 21, 2014) (enforcing a contract where plaintiff "may have entered into a bad deal" and noting that "there is a difference between a bad deal and an

---

[7] *See Motion of the Ad Hoc Committee of Senior Unsecured Noteholders for Enforcement of the Noteholder RSA and Noteholder RSA Letter Agreement*, filed April 1, 2020 [Dkt. Nos. 6586-6592].

unenforceable one"); *Brisbane Lodging, L.P. v. Webcor Builders, Inc.*, 216 Cal. App. 4th 1249, 1261 (2013) ("[W]e conclude that sophisticated parties should be allowed to strike their own bargains and knowingly and voluntarily contract in a manner in which certain risks are eliminated and, concomitantly, rights are relinquished.").

The Noteholder Claimants could have and should have raised their allegations of breach of the Noteholder RSA, including by issuing a notice of termination, before the Backstop Amendment was approved, the Confirmation Order was entered, and the Plan was consummated. They did not. The Noteholder Claims are now waived.

### C. The Court Should Not Reconsider the Confirmation Order or Modify the Plan Under Federal Rule 60(b)

Recognizing that the relief requested in the Noteholder Motion is expressly precluded by the exculpation and release provisions of the Plan, the Noteholder Motion seeks "to modify the release and exculpation provisions of the Confirmation Order and [Plan] to the limited extent that they are deemed to preclude [the Noteholder Claimants] from pursuing an Administrative Expense Claim based on the Debtors' breach of the Noteholder RSA." Noteholder Motion ¶ 37.

The Noteholder Claimants have not satisfied and cannot satisfy the burden for this extraordinary relief. First, relief under Federal Rule 60(b) is not available where, as here, the movant cannot meet the requirements for modifying a plan post-confirmation under section 1127(b) of the Bankruptcy Code. Second, even if section 1127(b) did not preclude the Plan and Confirmation Order modifications sought by the Noteholder Claimants, the Noteholder Claimants have failed to meet their heavy burden to demonstrate that modification of the Plan or Confirmation Order, and, in particular, the exculpation and release provisions thereof, is appropriate under Rule 60(b).

#### 1. The Requirements of Section 1127(b) Cannot Be Met.

"The post-confirmation modification of a plan is governed by 11 U.S.C. § 1127(b)." *In re Antiquities of Nevada, Inc.*, 173 B.R. 926, 928 (B.A.P. 9th Cir. 1994). Section 1127(b) provides, in relevant part, that "*[t]he proponent of a plan or the reorganized debtor* may modify such plan at any time after confirmation of such plan and *before* substantial consummation of such plan." 11 U.S.C. § 1127(b) (emphasis added). Thus, to modify a plan post-confirmation, the movant must (1) be a plan proponent or the reorganized debtor, *and* (2) seek modification *before* the plan is

substantially consummated. *See In re Elec. Maint. & Constr., Inc.*, No. 8:11–BK–18670–CED, 2016 WL 2985025, at *4 (Bankr. M.D. Fla. May 19, 2016) ("Under § 1127(b), only the plan proponent or the reorganized debtor may seek modification of a plan after confirmation . . . because [movant] is neither the plan proponent nor the reorganized debtor, it lacks standing under § 1127(b) to seek modification of Debtor's confirmed plan."); *In re Calpine Corp.*, No. 05–60200 (BRL), 2008 WL 207841, at *6 (Bankr. S.D.N.Y. Jan. 24, 2008) ("As the [movants] were not the proponents of the confirmed Plan, they are not authorized under Section 1127(b) to modify the confirmed Plan."); *In re iE, Inc.*, BAP No. CC-19-1307-FLTa, 2020 WL 3547928, at *5 (B.A.P. 9th Cir. June 22, 2020) ("Because the plan has been substantially consummated, it cannot be modified.").

Additionally, Courts have held that section 1127(b) "provides the exclusive means by which to modify a plan" and a Court cannot broaden that relief even if the conditions of Federal Rule 60(b) are otherwise met. *See, e.g.*, *In re Logan Place Properties, Ltd.*, 327 B.R. 811, 812-14 (Bankr. S.D. Tex. 2005) (finding movant could not modify plan under Rule 60(b) because movant was not a plan proponent as required under section 1127(b), and holding that section 1127 is "the exclusive means by which a plan can be modified"); *In re Daewoo Motor Am., Inc.*, 488 B.R. 418, 426 (C.D. Cal. 2011) ("[T]he Court agrees with the analysis in *Logan*. Section 1127 is the exclusive means by which to modify a plan."); *In re Vencor, Inc.*, 284 B.R. 79, 85 (Bankr. D. Del. 2002) (denying relief under Rule 60(b) where "[s]uch a modification may not be requested by anyone other than the plan proponent, the Debtors in this case, and may not be made after the plan has been substantially consummated, as it has been in this case."); *In re Rickel & Assocs.*, 260 B.R. 673, 678 (Bankr. S.D.N.Y. 2001) ("Rule 60(b) cannot be invoked to bypass § 1127(b).") (citing *In re Newport Harbor Assocs.*, 589 F.2d 20, 23 (1st Cir. 1978)).

Neither prong of section 1127(b) is satisfied here. Indeed, the Noteholder Claimants do not even address the issue. First, the Noteholder Claimants are not plan proponents. Second, the Plan was substantially consummated as of the Effective Date, July 1, 2020—twenty-three (23) days

*before* the Noteholder Motion was filed.[8]  Accordingly, the Noteholder Claimants cannot satisfy section 1127(b).  Their failure to do so forecloses relief under Federal Rule 60(b).

### 2. Reconsideration is Not Warranted Even Applying Federal Rule 60(b)

Even if the Noteholder Claimants could satisfy the requirements under section 1127(b), reconsideration still would be unwarranted under Federal Rule 60(b).  Contrary to the Noteholder Claimants' assertion, *see* Noteholder Motion ¶ 36,[9] reconsideration of a final order is an "extraordinary remedy to be used sparingly in the interests of finality and conservation of judicial resources."  *Barboza v. Cal. Ass'n of Prof'l Firefighters*, No. CIV. S–08–519 FCD/GGH, 2009 WL 2500767, at *1 (E.D. Cal. Aug. 14, 2009) (quoting *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000)); *see also Espinosa v. United Student Aid Funds*, 553 F.3d 1193, 1199 (9th Cir. 2008) ("Rule 60(b) authorizes relief in only the most exceptional of cases.") (quoting *Gaydos v. Guidant Corp. (In re Guidant Corp. Implantable Defibrillators Products Liability Litig.)*, 496 F.3d 863, 866 (8th Cir.2007)); *Arteaga v. Superior Court*, No. C-93-20907 RMW, 1994 LEXIS 12454, at *8 (N.D. Cal. July 11, 1994) ("Motions for reconsideration should not be frequently made or freely granted.  They are not a substitute for appeal or a means of attacking some perceived error of the court."); *Flake v. United States*, No. CIV-93-0306-PHX-SMM, 1995 WL 819183, at *1 (D. Ariz. Dec. 7, 1995) ("[M]otions to reconsider are appropriate only in rare circumstances."); *In re Valence Tech. Sec. Lit.*, No. C-95-20459-JW, 1995 WL 798927, at *2 (N.D. Cal. Sept. 19, 1995) ("The party moving for reconsideration must show more than a disagreement with the court's

---

[8] *See Notice of Entry of Confirmation Order and Occurrence of Effective Date of Debtors' And Shareholder Proponents' Joint Chapter 11 Plan of Reorganization Dated June 19, 2020* [Dkt. No. 8252], ¶ 2 ("The Effective Date of the Plan occurred on July 1, 2020, and as a result, the Plan has been substantially consummated.").

[9] The Noteholder Claimants mistakenly rely on *Falk v. Allen*, 739 F.2d 461, 463 (9th Cir. 1984), for their assertion that reconsideration should be "liberally applied."  Noteholder Motion at 13.  In *Falk*, the Ninth Circuit assessed a request for reconsideration of entry of a default judgment in a landlord-tenant dispute.  *See* 739 F.2d at 463.  In granting reconsideration, that Court stated that "judgment by default is a drastic step appropriate only in extreme circumstances; a case should, whenever possible, be decided on the merits," and then applied unique factors it deemed should be evaluated specifically in the context of "considering a motion to reopen a *default judgment* under Rule 60(b)." *Id.* (emphasis added).  The Noteholder Claimants' request here that the Court reconsider the final Confirmation Order—which was negotiated for and litigated by highly sophisticated parties and professionals for months and under which billions of dollars have been distributed—can hardly be more dissimilar.

decision; the court should not grant the motion unless there is a need to correct a clear error of law or prevent manifest injustice.").

Under Federal Rule 60(b), courts may reconsider final judgments, orders, or proceedings "only upon a showing of (1) mistake, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud; (4) a void judgment; (5) a satisfied or discharged judgment; or (6) extraordinary circumstances which would justify relief." *Moore v. Mortgage Elec. Registration Sys.*, 650 Fed. Appx. 406, 408 (9th Cir. 2016) (citations omitted). To succeed on a motion to reconsider, a party must "set forth 'facts or law of a strongly convincing nature to induce the court to reverse its prior decision.'" *California v. Summer Del Caribe, Inc.*, 821 F. Supp. 574, 578 (N.D. Cal. 1993) (quoting *Steiny & Co. v. Local Union 6, IBEW*, No. C-91-0155-DLJ, 1991 WL 516835, at *5 (N.D. Cal. Dec. 19, 1991)), abrogated on other grounds as recognized by, *Cal. Dep't of Toxic Substances Control v. Alco Pacific, Inc.*, 508 F.3d 930, 940 (9th Cir. 2007); *Beverly v. Network Sols., Inc.*, No. C-98-0337-VRW, 1998 WL 917526, at *4 (N.D. Cal. Dec. 30, 1998) ("[T]o justify reconsideration based on an error of law or on the need to prevent a manifest injustice, the moving party must demonstrate clear error.") (internal quotations omitted). The Noteholder Claimants plainly have not carried and cannot carry this heavy burden.

Indeed, the Noteholder Claimants have not even attempted to satisfy their *prima facie* evidentiary burden that modification of the Plan is warranted. *See AAA Nev. Ins. Co. v. Vinh Chau*, No. 2:08-cv-00827-RCJ-LRL, 2010 WL 1756986, at *2 (D. Nev. Apr. 30, 2010) ("The party seeking Rule 60(b) relief bears the burden of proving that the prerequisites for such relief are satisfied, which are limited to the narrow grounds enumerated in the Rule.") (citing *United Student Funds, Inc. v. Wylie (In re Wylie)*, 349 B.R. 204, 209 (B.A.P. 9th Cir.2006)); *see also* Dkt. Nos. 5766, 6582, and 8478 (orders denying motions for reconsideration). Given that the Noteholder Claimants have provided no evidence of any kind in support of the Noteholder Motion, it is now too late for the Noteholder Claimants to attempt to meet their burden in their reply or otherwise. *See Progressive West Ins. Co. v. Bun Bun Tran*, No. 07-CV-1999 JAH(POR), 2008 WL 11508656, at *3 n.3 (S.D. Cal. Nov. 20, 2008) (refusing to consider evidence in support of movant's Rule 60(b) motion where first submitted with movant's reply brief).

**a.** _The Noteholder Claimants Have Provided No Evidence of Excusable Neglect, Nor is There Any_

Reconsideration under Federal Rule 60(b)(1) is unavailable. Under the seminal _Pioneer_ test for determining "excusable neglect," courts weigh the following four factors: "(1) the danger of prejudice to the nonmovant, (2) the length of the delay and its potential impact on judicial proceedings, (3) the reason for the delay, including whether it was within the reasonable control of the movant, and (4) whether the movant acted in good faith." _In re Gutierrez_, No. NC-17-1350-KuFB, 2019 WL 406632, at *7 (B.A.P. 9th Cir. Jan. 31, 2019) (citing _Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship_, 507 U.S. 380, 395 (1993)); _see also In re Pac. Gas & Elec. Co._, 331 B.R. 915, 919 (Bankr. N.D. Cal. 2005) ("Balancing these factors is not a mathematical test, and the court is not obligated to give equal weight to them."). The Noteholder Claimants cite the _Pioneer_ factors but, not surprisingly, fail to analyze how any of them weigh in favor of reconsideration. It is the Noteholder Claimants' burden to establish excusable neglect through facts, and they have plainly not done so. Notably, the Noteholder Claimants have not submitted _any_ evidence in support of the Noteholder Motion, and that forecloses relief under Federal Rule 60(b)(1). _See In re Contessa Liquidating Co., Inc._, No. 2:11-BK-13454-PC, 2012 WL 2153271, at *5 (Bankr. C.D. Cal. June 13, 2012) ("The burden of presenting facts demonstrating excusable neglect is on the movant.").

In any event, no excusable neglect exists and the potential prejudice to the Reorganized Debtors and all other parties in interest, including the tens of thousands of Fire Victims and other stakeholders, investors, and lenders who have relied on the Plan and Confirmation Order, is considerable given that the Noteholder Claimants failed to object to approval of the Backstop Amendment Motion or to, indeed, even raise their concerns or allegations prior to the entry of the Confirmation Order and the occurrence of the Plan Effective Date. _See Pac. Gas & Elec. Co._, 331 B.R. at 918 (weighing the first _Pioneer_ factor in PG&E's favor "since it is entitled to finality and to be able to rely on the fact that [the movant] did not timely file a proof of claim").

As detailed above and what cannot be disputed is that:

- The Noteholder Claimants were fully aware of their purported claims at the latest when the Backstop Amendment Motion was filed on June 9, 2020;

- The Noteholder Claimants did not object or express any opposition to the approval of the Backstop Amendment Motion;

- The Noteholder Claimants remained completely silent during the numerous hearings in connection with confirmation of the Plan held after June 9, 2020 on June 11, 16, and 19, 2020; and

- The Noteholder Claimants gave no notice of the Noteholder Claims prior to the Order approving the Backstop Amendment, the entry of the Confirmation Order, and the occurrence of the Plan Effective Date.

Throughout this period, the Noteholder Claimants "could have or should have" raised the Noteholder Claims, but they opted to remain silent—to their peril. *See In re Pardee*, 193 F.3d at 1087. Everything was in their control. The Noteholder Claimants, apparently for their own strategic reasons, did nothing, and raised their purported claims for the first time on July 24, 2020.

There is no excusable neglect among these sophisticated parties and, accordingly, Federal Rule 60(b)(1) provides no basis for reconsideration of the Confirmation Order.

> b.    *There is No Newly Discovered Evidence to Support Reconsideration*

Reconsideration under Federal Rule 60(b)(2) is also unavailable because the Noteholder Claimants have presented no newly discovered evidence. "Under Ninth Circuit case law, to prevail under Civil Rule 60(b)(2), [the movant is] required to show: that the evidence relied on in fact constitutes 'newly discovered evidence' within the meaning of Civil Rule 60(b), that [the movant] exercised due diligence to discover the evidence, and that the newly discovered evidence must be of 'such magnitude that production of it earlier would have been likely to change the disposition of the case.'" *In re Lee*, No. CC-15-1240-DTaKu, 2016 Bankr. WL 1450210, at *8 (B.A.P. 9th Cir. Apr. 11, 2016) (quoting *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003)); *see also Frederick S. Wyle Prof'l Corp. v. Texaco, Inc.*, 764 F.2d 604, 609 (9th Cir. 1985) ("[T]he movant is obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing.") (internal quotations and emphasis omitted).

Of course, facts are not "newly discovered" if, as here, they were known to movant when the order subject to reconsideration was issued. *Fletcher v. Baca*, No. CV 07-4180, 2014 WL 12856062, at *2 (C.D. Cal. June 25, 2014) (denying reconsideration under Federal Rule 60(b)(2) where evidence "existed well before judgment was entered"); *see In re Walker*, 332 B.R. 820, 831 (Bankr. D. Nev. 2005) (denying movant relief under Federal Rule 60(b)(2) where purportedly new

facts were known to him or "could have been known with only the slightest diligence"); *Safeway Stores v. Nat'l Union Fire Ins. Co.*, No. C-88-3440-DLJ, 1993 WL 739643, at *2 (N.D. Cal. Feb. 4, 1993) ("If the evidence was previously available, the motion fails as a matter of law."); *Arnett Facial Reconstruction Courses, Inc. v. Patterson Dental Supply, Inc.*, No. CV 11-06929 CBM (EX), 2013 WL 12246259, at *3 (C.D. Cal. Apr. 8, 2013) ("Evidence discovered prior to issuance of the Court's August 10 Order is not 'new.'"); *Feature Realty, Inc. v. City of Spokane*, 331 F.3d 1082, 1093 (9th Cir. 2003) (denying reconsideration under Federal Rule 60(b)(2) where counsel received new information eight days before entry of judgment and holding "[e]vidence in the possession of the party before the judgment was rendered is not newly discovered.") (internal quotations omitted).

Here, contrary to the Noteholder Claimants' assertion that "[n]ew developments and revelations" were unknown to them at the time of the Confirmation Hearing, *see* Noteholder Motion ¶ 38, the facts that form the basis of the Noteholder Claims were *all* known at least as of the filing of the Backstop Amendment Motion on June 9, 2020 and clearly well before entry of the Confirmation Order on June 20, 2020. Specifically, the Backstop Amendment Motion was filed on June 9, 2020, prior to (a) the June 16, 2020 hearing on the Backstop Amendment Motion; (b) several additional hearings regarding confirmation of the Plan; and (c) entry of the Confirmation Order on June 20, 2020. Moreover, the Plan's release and exculpation provisions, as agreed to by the Noteholder Claimants in connection with the Noteholder RSA, had been on file since January 2020. Simply stated, there is no newly discovered evidence to warrant reconsideration under Federal Rule 60(b)(2).

> c. *There are No Extraordinary Circumstances to Warrant Reconsideration of the Confirmation Order*

Reconsideration under Federal Rule 60(b)(6) is also unavailable. First, the case law makes clear that the Noteholder Claimants cannot seek relief under Federal Rule 60(b)(6) on the same factual basis for which they seek relief pursuant to any other subsection of Rule 60(b). *See Corex Corp. v. United States*, 638 F.2d 119, 121 (9th Cir. 1981) ("It is established that clause (6) and the preceding clauses are mutually exclusive; a motion brought under clause (6) must be for some reason other than the five reasons preceding it under the rule."), impliedly overruled on other grounds by, *Gregorian v. Izvestia*, 871 F.2d 1515, 1516 (9th Cir. 1989). Accordingly, Federal Rule

60(b)(6) is not available to the Noteholder Claimants.  However, even if the Court were to consider relief under Rule 60(b)(6), the Noteholder Claimants have not and cannot demonstrate any basis for relief thereunder.

Reconsideration under Federal Rule 60(b)(6) is for truly "extraordinary" circumstances and is to be "used sparingly as an equitable remedy to prevent manifest injustice." *Fantasyland Video, Inc. v. County of San Diego*, 505 F.3d 996, 1005 (9th Cir. 2007) (internal quotations omitted); *see also Harvest v. Castro*, 531 F.3d 737, 749 (9th Cir. 2008) ("A party moving for relief under Rule 60(b)(6) must demonstrate both injury and circumstances beyond his control that prevented him from proceeding with the action in a proper fashion.") (internal quotations omitted); *Saavedra v. Eli Lilly & Co.*, No 2:12-cv-09366-SVW-MAN, 2018 WL 5904801, at *7 (C.D. Cal. July 19, 2018) (finding that even a change in the law at issue as a result of the Supreme Court's resolution of a circuit split was "not considered sufficiently extraordinary to warrant Rule 60(b)(6) relief").[10]

Here, there were no extraordinary circumstances or circumstances beyond the Noteholder Claimants' control.  It is incontrovertible that the Noteholder Claimants had more than ample opportunity to raise any asserted breach of the Noteholder RSA prior to approval of the Backstop Amendment Motion, entry of the Confirmation Order, and the Plan Effective Date.  However, they made the strategic decision to remain silent until July 24, 2020.  Whatever the reasons, relief under Federal Rule 60(b) is not available to a disappointed litigant "where a litigant seeks to avoid the consequences of a strategic choice that he later regrets."  *Saavedra,* 2018 WL 5905801, at *9; *see also GenCorp, Inc. v. Am. Int'l Underwriters*, 178 F.3d 804, 834 (6th Cir. 1999) (finding that reconsideration based on amendments the movant made to a settlement agreement after the lower court's decision, which were "certainly within [movant's] power and control . . . to revise . . . prior to the lower court's ruling," would serve no purpose other than to correct a "poor strategic decision"); *Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066 SI, 2012 WL 1901198, at *4 (N.D. Cal. May 24, 2012) ("The Court finds that the rule does not apply where the 'new material fact' is merely a party's attempt to undo a strategic position for which it has been penalized.").

---

[10] And "[n]either the policy of adjudicating cases on their merits, nor [a party's] potential meritorious claim are sufficient to constitute extraordinary circumstances." *In re Nations First Capital, LLC,* No. EC-19-1201-GLB, 2020 Bankr. WL 3071983, at *6 (B.A.P. 9th Cir. June 5, 2020).

Accordingly, for the aforementioned reasons, the Noteholder Claimants' request for reconsideration should be denied.

### IV.     <u>RESERVATION OF RIGHTS</u>

In accordance with the Scheduling Order, any arguments, opposition, objections or defenses to the Noteholder Motion or the Joinders not asserted by the Reorganized Debtors herein are expressly preserved, to be raised later in the proceedings with respect to the Noteholder Motion, if necessary.

### V.     <u>CONCLUSION</u>

For the reasons set forth herein, the Noteholder Motion and Joinders should be denied.

Dated: August 26, 2020

**WEIL, GOTSHAL & MANGES LLP**

**KELLER BENVENUTTI KIM LLP**

By: * /s/ Richard Slack*       
             Richard W. Slack

*Attorneys for Debtors and Reorganized Debtors*