James Mesterharm
AP SERVICES, LLC
909 Third Avenue
New York, NY 10022
(212) 490-2500
jmesterharm@alixpartners.com

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>- and -<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*\* All papers shall be filed in the Lead Case, No. 19-30088 (DM).* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**APPLICATION OF AP SERVICES, LLC FOR APPROVAL OF SUCCESS FEE**<br><br>Hearing Date: TBD<br>Hearing Location: U.S. Bankruptcy Court<br>Courtroom 17, 16th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Objection Deadline:<br>**September 21, 2020 at 4:00p.m (Pacific Time)** |

Pursuant to this Court's *Order Authorizing Debtors to Employ and Retain AP Services, LLC and to Provide a Chief Restructuring Officer, Deputy Chief Restructuring Officer and Additional Personnel for the Debtors Nunc Pro Tunc to the Petition Date* (the "Retention Order") [Docket No. 1299], attached hereto as Exhibit A, section 330 of Title 11 of the United States Code (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), AP Services, LLC ("APS"), hereby submits this application (the "Application") for allowance of a success fee (the "Success Fee") in the amount of $8,000,000.00. The engagement letter dated January 25, 2019, between APS, on the one hand, and PG&E Corporation and Pacific Gas and Electric Company, on the other hand ("Company" or "Debtors") attached hereto as Exhibit B (the "Engagement Letter"), provides for payment of a Success Fee in the event the Debtors complete a Transaction (as defined below). In furtherance of this Application, APS respectfully submits the Declaration of James Mesterharm in support of Application of AP Services, LLC for Approval of a Success Fee, attached hereto as Exhibit C (the "Mesterharm Declaration"), and further represents:

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.      JURISDICTION**

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "Bankruptcy Local Rules").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**II.     BASIS FOR RELIEF**

The statutory basis for the relief requested in this Application is Bankruptcy Code Sections 330 and 331.

**III.    RETENTION OF APS**

On January 29, 2019 (the "Petition Date"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code in this Court.

On March 13, 2019, the Debtors filed the *Application of Debtors Pursuant to 11 U.S.C. §§ 363(b) and 105(a) for Authority to Employ and Retain AP Services, LLC to Provide a Chief Restructuring Officer, Deputy Chief Restructuring Officer, and Additional Personnel for the Debtors Nunc Pro Tunc to the Petition Date* [Docket No. 867] (the "Retention Application"). The Retention Application and Engagement Letter provide, among other things, for James Mesterharm to serve as the Debtors' Chief Restructuring Officer ("CRO"), and John Boken to serve as the Debtors' Deputy Chief Restructuring Officer ("DCRO").

On April 4, 2019, this Court entered the Retention Order, thereby authorizing the Debtors' retention and payment of fees and expenses to APS pursuant to the Engagement Letter and Retention Application.

IV.  **BACKGROUND AND SUCCESS FEE TERMS**

The factual background relating to the Debtors' commencement of these chapter 11 proceedings is set forth in detail in the *Amended Declaration of Jason P. Wells in Support of First Day Motions and Related Relief* [Docket No. 263].

Throughout these chapter 11 cases, APS has been paid standard hourly fees for Mr. Mesterharm, Mr. Boken and APS personnel providing services in these cases, and APS has been reimbursed for expenses incurred in connection with services provided to the Debtors. APS has filed required compensation and staffing reports related to these fees and expenses as outlined in the Retention Order.

In addition to the hourly fees described above, pursuant to the Engagement Letter and Retention Application, the Debtors agreed to pay APS a Success Fee as set forth below:

**Success Fee**. In these Chapter 11 Cases, the Debtors and APS have agreed on a contingent incentive compensation (the "Success Fee"). Subject to Court approval, the Debtors have agreed to pay APS the Success Fee in the amount of $8,000,000 upon the occurrence of a "Transaction." For purposes of the CRO Engagement Letter, a "Transaction" shall mean (i) completion of a restructuring through confirmation of a chapter 11 plan of reorganization, (ii) the consummation of any material recapitalization or debt restructuring of the Debtors, or (iii) consummation of one or more transactions, in any form, that effectively transfers a significant portion of the business as a going concern to another entity or entities or that results in a change in structure of the Board of Directors of PG&E Corp.

Notwithstanding the foregoing, should a Transaction first occur after 18 months from the Petition Date (the "**Target Date**"), the Success Fee shall be reduced by 10% of the monthly fees earned for each whole calendar month between the Target Date and the actual date of the Transaction. However, after applying the reduction, the Success Fee will in no event be less than $4,000,000. The Success Fee shall be due and payable immediately upon the occurrence of a Transaction. APS understands and agrees that the Success Fee are not being pre-approved and remain subject to Court approval. While APS is not seeking pre-approval of the Success Fees, APS wishes to advise the Court at this time that the Success Fees were negotiated as part of the overall agreement for compensation in connection with the services to be provided to the Debtors in these Chapter 11 cases. The Debtors understand and have acknowledged that the Success Fee is an integral part of APS's compensation for the engagement and that the structure and amount of the success fee is reasonable.

The Success Fee is intended to compensate and reward APS not only for taking a leadership role in these chapter 11 cases, but also for driving the engagement successfully and preserving and maximizing the value of the Debtors' estates throughout the post-petition restructuring process. It is important to note that the Success Fee was negotiated as part of the overall agreement for the CRO and DCRO services of Mr. Mesterharm, Mr. Boken, respectively, and the services of other APS personnel.

## V. BASIS FOR RELIEF

APS's services were vital to the Debtors' ability to achieve confirmation of the Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization dated June 19, 2020 (the "Plan") on June 20, 2020, and to substantially consummate the Plan on the Effective Date of July 1, 2020. APS, Mr. Mesterharm, and Mr. Boken were tasked with an expansive range of responsibilities in this demanding and contentious case, all of which required significant coordination with the Debtors' management and personnel, Board of Directors, legal advisors, and investment bankers, along with the Company's extensive set of creditor, customer, regulatory, governmental, and equity stakeholders, to bring about the remarkable, consensual resolution of these chapter 11 cases.

It is clear that the Debtors' ability to confirm the Plan within 18 months of the chapter 11 filings, and to achieve an Effective Date less than two weeks thereafter, was a product of significant collaboration, compromise, and both professional and personal commitment between and among a very broad group of individuals, advisors, and constituencies. The APS team, Mr. Mesterharm, and Mr. Boken were key contributors to this extraordinary collaboration and accomplishment, which resulted in Plan funding in excess of $56 billion (including approximately $21 billion in exchanged and reinstated debt), initial Effective Date distributions of nearly $32 billion in cash and equity, and the preservation of pre-petition equity interests.

**Critical Interim Management Roles**

The ability of Mr. Mesterharm and Mr. Boken to assume interim management roles as CRO and DCRO, respectively, and to commit their full-time attention to the Debtors, was crucial to the success of these cases. The enormity and extraordinary complexity of the Debtors' cases and restructuring issues, including deep-rooted community, justice, regulatory, and governmental concerns about the Company's safety record and its impact on the populations it serves, has been well documented. Additionally, it is without question that the Company's commercial, industrial, and residential customers, and the local economies in its service territories, are nearly wholly reliant on the day-to-day energy services that the Debtors provide and the intricate, integrated process by which those services are delivered. Taking these factors into account, at the outset of these cases it was of cardinal importance that the Debtors supplement their management team with restructuring expertise to ensure that: (i) day-to-day operations would continue uninterrupted and undistracted; (ii) the restructuring process could be effectively driven, controlled, and facilitated; and, (iii) the intersection of those concurrent efforts and priorities were productively managed. Mr. Mesterharm and Mr. Boken stepped into their interim management roles, with the support of other senior APS colleagues and a broad, skilled team, to fill the Debtors' need for deeply experienced, steady restructuring leadership and resources.

In their restructuring leadership roles as part of the Debtors' senior management team, Mr. Mesterharm and Mr. Boken served as the hub of a vast scope of restructuring activity and workstreams that required significant internal and external coordination and communication. In addition to the Bankruptcy Court and the United States Trustee, the range of external formal and informal creditor constituencies, stakeholders, and other interested parties with which the Debtors' needed to interact regularly on restructuring issues was prodigious, and included the following:

- Official Committee of Tort Claimants
- Official Committee of Unsecured Creditors
- Ad-Hoc Bondholder Group
- Ad-Hoc Group of Subrogation Claimants
- Ad-Hoc Group of Equity Holders

| | |
|---|---|
| 1 | • DIP Lenders |
| 2 | • California Public Utilities Commission ("CPUC") |
| 3 | • California Governor's Office |
| 4 | • United States District Court, Northern District of California – Judge William Alsup |
| 5 | • Federal Energy Regulatory Commission |
| 6 | • Power Purchase Agreement Counterparties |
| 7 | • Community Choice Aggregators |
| 8 | • Customer Advocacy and Public Interest Groups |
| 9 | • Unions |

While the coordination, communications, interactions, and negotiations with counsel, financial advisors, and principals of these external parties was a shared responsibility of the Company's outside restructuring counsel (Weil, Gotshal & Manges LLP, Cravath, Swaine & Moore LLP, and Keller Benvenutti Kim LLP), investment bankers (Lazard Freres & Co. LLC, ("Lazard")), regulatory counsel (Munger, Tolles & Olson LLP), the Debtors' senior management and Board of Directors, and selected other Company representatives, Mr. Mesterharm and Mr. Boken, and the APS team, were central to that process throughout the cases. Not surprisingly, the interests and objectives of each of these external parties were frequently in conflict, particularly so in a situation where the markets perceived that value remained in pre-petition equity. The carefully crafted and remarkable resolution of these cases was in large part due to the success of the balancing act of managing and addressing these competing priorities, to which process Mr. Mesterharm and Mr. Boken were integral.

Mr. Mesterharm and Mr. Boken, with the support of their APS colleagues, played a vital role in ensuring that the interactions and negotiations with these parties were grounded in consistent and reliable information, qualitative analysis, and objective perspective. Additionally, under the direction of Mr. Mesterharm and Mr. Boken in their management capacities, the APS team took on or shared the responsibility for assessing the financial viability, feasibility, and economic impact of countless restructuring approaches, settlement proposals, and funding alternatives, in many instances in conjunction and collaboration with the Lazard team and

Company personnel. The reliable and timely information and analyses for which Mr. Mesterharm and Mr. Boken were responsible for directing and producing substantially contributed to the development of the holistic solution reflected in the Plan, and, importantly, the Debtors' ability to emerge from chapter 11 within 18 months of the filings.

It is important to note that the restructuring process was impacted and influenced by numerous significant challenges throughout the duration of these cases, including: (i) significant senior management turnover both prior and subsequent to the filings of these chapter 11 cases; (ii) a complete replacement of the Board of Directors in April 2019; (iii) enactment of California Assembly Bill 1054 in July 2019 ("AB 1054"), establishing the need for the Company to confirm a plan of reorganization by June 30, 2020 in order to participate in the state-wide Go Forward Wildfire Fund, established as a protection against future wildfire liabilities, and critically important both to the Debtors' future and to stakeholder recoveries; (iv) the promotion and ultimate filing of a competing plan of reorganization by a significant economic stakeholder; and, (v) global shelter-in-place orders implemented in March 2020 that directly impacted the Debtors' operations and cash flows, created unprecedented obstacles to the delivery of energy and services to the Company's customer base, and threatened the Debtors' Plan timetable. Mr. Mesterharm and Mr. Boken drew on their extensive restructuring leadership experience, particularly in large complex cases where circumstances rarely remain static, to help ensure that these challenges were addressed, priorities were maintained, and the restructuring process continued without interruption.

Throughout this process, Mr. Mesterharm, Mr. Boken, and their APS colleagues earned the confidence and respect of the Debtors' senior management team, the Board of Directors, and a wide swath of Company personnel. Furthermore, external constituency advisors and principals developed an appreciation for the objectivity, consistency, and reliability of the information and perspective that was brought forth by Mr. Mesterharm and Mr. Boken, which was instrumental to developing the trust that was necessary for the Plan to come together in a timely manner.

**Broad Scope of Essential Restructuring Services**

Under the direction of Mr. Mesterharm and Mr. Boken, the APS team took on a broad scope of direct responsibilities as well as coordination of other restructuring-related activities. Among the more significant areas and workstreams where APS assumed a leadership role or had material involvement were: (i) liquidity forecasting, cash management, and DIP financing; (ii) working with counterparties to ensure stability of fuel supply and electric power generation required to serve end customers; (iii) development of the five year business plan, financial forecast, and assumptions; (iv) identification, design, implementation and achievement of enterprise-wide spend reduction, operational efficiency, and liquidity enhancement initiatives; (v) design and negotiation of management and employee incentive plans; (vi) vendor management; (vii) executory contract assumption / rejection analysis and contract counterparty negotiations; (viii) creditor constituency and stakeholder due diligence and reporting, including providing detailed customer rate forecasts to the Company's principal regulator (CPUC) and the California Governor's Office; (ix) compliance and reporting relating to First Day Orders, United States Trustee, and Court filings (including Statements of Financial Affairs, Schedules of Assets and Liabilities, and Monthly Operating Reports); (x) development and implementation of policies and procedures for improved operating compliance; (xi) restructuring strategy development and Plan negotiations; (xii) Plan funding alternatives and scenario analysis; (xiii) claims administration, management, negotiation, and settlement; and, (xiv) planning, coordination, and implementation of Effective Date transactions and distributions. Given the size and complexity of the Debtors' cases, each one of these workstreams was a significant undertaking, time sensitive, and critical to progressing the cases, keeping constituencies informed, maximizing the value of the Debtors' estates, and facilitating a timely resolution.

While the criteria for APS to be eligible for a Success Fee was based solely on timing for the occurrence of a "Transaction", which definition included the confirmation of a chapter 11 plan of reorganization, APS submits that the Debtors' estates benefited substantially and tangibly from the services and results achieved by the APS team. Amongst the entirety of the comprehensive scope of APS's responsibilities in the Debtors' case, likely the workstream that generated the most

measurable and material incremental value to the Debtors' estates relates to APS's leadership of the process of developing the Debtors' five year business plan and financial forecast (the "Forecast"). More specifically, as an extension of APS's efforts in the Forecast process, the APS team played a pivotal leadership role in identifying and pursuing extensive spend reduction, operational efficiency, and liquidity enhancement initiatives that became a necessary and critical foundation of the Forecast assumptions.

**Leadership of Forecast and Business Plan Development Process**

With respect to the Forecast, APS took on the lead role in: (i) coordinating assumptions and input from the Company's line of business teams and significant functional operational units; (ii) testing the reasonableness and completeness of the principal assumptions; (iii) preparing and analyzing various alternative Forecast scenarios and revisions; and, (iv) creating detailed Forecast and business plan output materials for review internally and with stakeholder advisors. The Forecast process, under the leadership of the APS team, was designed to create a work product that would: (i) demonstrate the viability and sustainability of the business; (ii) quantify the income and cash flow generating prospects and expectations for the operation; (iii) provide a basis for valuing the Debtors' estates; and, (iv) support restructuring negotiations on a feasible and financially sound chapter 11 plan of reorganization.

The Forecast was of paramount importance to the cases. At the inception of the process, shortly after the Debtors' chapter 11 filing in late January 2019, there was a high degree of skepticism and uncertainty from nearly all stakeholders that the Debtors had the financial capacity and cash flow generating ability to design and finance an exit from chapter 11 that would satisfy wildfire claims and other pre-petition obligations and avoid burdening its customers with those costs, much less retain value for pre-petition equity interests. This skepticism was particularly acute amongst wildfire victims, certain groups of debtholders, customer advocates, the CPUC, and the California Governor's office.

From the inception of the Forecast process in early 2019, it was clear that the Debtors were facing a host of unique and extraordinary operational and financial challenges that would have a material impact on its costs and capital requirements in both the immediate term and for many

years into the future. It was expected that these challenges would be particularly significant during the course of the five-year Forecast period.

The Debtors' business plan highlighted a number of key operational objectives, including: (i) renewing its commitment to ensure effective stewardship of, and governance over, the Company's responsibilities to its customers, employees, contractors, service communities, regulators, and other stakeholders; (ii) prioritizing operational safety and reliability; (iii) continuing to help California meet its clean energy goals; and, (iv) enhancing and expanding the Company's ability to provide customers with safe, reliable, clean, and affordable energy. As the Forecast assumptions were being developed, it became evident that achieving the Company's operational objectives enterprise-wide over the Debtors' vast service territory would result in substantial investment in the Company's infrastructure as well as increases to the Company's cost of delivering service to its customers, unless extensive spend reductions could be identified and pursued. The Debtors' recognized that it was unreasonable to assume that those substantial actual and anticipated cost increases could be passed on to customers unabated while maintaining an affordable rate structure.

The Forecast process served to both highlight and quantify these increased and incremental costs, which were specifically driven by, among other factors: (i) the need for expanded infrastructure upgrade and investment; (ii) increasing wildfire mitigation costs; (iii) new laws and regulations; (iv) incremental Federal probation requirements; (v) investments to reduce the scope and duration of PSPS (Public Safety Power Shutdown) events; (vi) incremental network and technology upgrades; and, (vii) general cost increases. Additional cost pressures emerged as the case progressed and incremental financial requirements, demands, and expectations were introduced.

**Spend Reduction Initiatives**

In order to ensure that its business plan objectives could be met, while maintaining affordability for its customers, it was clear that the Company needed to undertake a refreshed, objective assessment of its cost structure and how it had historically operated and funded all aspects of the process of delivering energy and services to its customers. In response to this

challenge, with support and guidance from Jason Wells, the Debtors' Chief Financial Officer, APS mobilized dedicated teams of experienced consultants to work with the Company to identify, investigate, quantify, and pursue opportunities for cost reductions, operational efficiencies, and liquidity enhancements. A critical aspect of this mandate was that the Company's commitments to safety, compliance, and its environmental responsibilities to customers, employees, contractors, service communities, and other stakeholders were not to be sacrificed in any way in order to achieve cost reductions or other efficiencies.

As this dynamic, interactive, and Company-wide mandate evolved, it became known as the Spend Reduction Initiatives program. Given the importance of maintaining customer affordability, the Debtors' determined that a challenging, but reasonable, goal for customer rate CAGR (Compound Annual Growth Rate) over the five-year Forecast horizon was 4.0 percent. In order to achieve that goal, taking into account actual and anticipated cost increases, the APS team and the Debtors identified that the Company would need to generate annual aggregate reductions in operating (non-capital) and capital costs and liquidity generating initiatives of approximately $1 billion per year from the Spend Reduction Initiatives throughout the Forecast period.

The APS team championed the Spend Reduction Initiatives process. An extensive portfolio of opportunities have been identified, investigated, and pursued in this process, which kicked off in the late summer of 2019, accelerated into 2020, and remains ongoing. The opportunities were aggregated into three principal categories: (i) Process Redesign, which included, among other activities, supplier contract renegotiations, long-term work planning and strategic sourcing, supplier contract management and administration, contractor productivity, unit costing, insource / outsource mix, and double-time management; (ii) Energy Costs; and, (iii) Real Estate and Other, which included assessment of the Debtors' San Francisco headquarters and other real estate holdings. APS established and provided resource leadership for a Program Management Office to drive and manage the Spend Reduction Initiatives process, stimulate internal focus and discipline, work through resistance and implementation challenges, and drive accountability and realization of the anticipated benefits of each individual opportunity. On many of the specific Spend Reduction Initiatives, APS personnel have been active contributors or are leading the efforts

to capture the benefits of the initiatives.

The results achieved to date have been remarkable. The Debtors are on track to reach their 2020 goal of cost reductions and operational efficiencies for the year of more than $900 million. Furthermore, significant measurable progress has been made on longer-term opportunities, which are expected to drive comparable incremental results in 2021 and beyond.

The role of the APS team in this process and level of accomplishment cannot be understated. The sense of urgency that the APS team promoted and applied throughout the process, and the resulting early successes, provided the Debtors with the confidence to embed the Spend Reduction Initiatives assumptions in the Forecast. Furthermore, the substance and success of these initiatives ultimately proved persuasive in addressing many of the key objections from the CPUC and the California Governor's Office regarding the potential customer rate impact of incremental investments in system safety and reliability. It is important to note that both securing a formal statement from the California Governor's Office that the Plan was AB 1054 compliant and obtaining CPUC approval of the Plan were necessary prerequisites to Plan confirmation. The processes associated with meeting those requirements were advanced in part as a result of the Company's demonstrated progress on strengthening its go-forward business. The Spend Reduction Initiatives have been, and will continue to be, a tangible and measurable component of that sustained progress.

Finally, the substantive analysis, output, and progress from the process facilitated the Company's and APS's efforts to demonstrate to the Debtors' Board of Directors, along with advisors to its various stakeholder groups (including prospective investors), that the Forecast reflected a reasonable, achievable estimate of the financial performance of the Company over the five year Forecast horizon. Ultimately, the Forecast became a critical element of the Debtors' Disclosure Statement, as well as a central component of the solicitation materials for the debt and equity raises that were essential to funding the Plan.

## VI. LEGAL STANDARD

Performance fees or success fees are normal parts of compensation for turnaround firms and management restructuring consulting firms and are standard for APS' engagements of this type, both

inside and outside of bankruptcy courts.[1] Indeed, APS and other similar firms price their engagements to include performance or success fees as part of the total compensation packages for such engagements. Thus, APS and other turnaround and management restructuring firms rely upon and take into account the negotiated performance or success fee when accepting engagements.

Performance or success fees are typical in restructuring cases because clients appreciate an approach which aligns the interests of the client with the interests of its advisor. In colloquial terms, success fees demonstrate that a turnaround firm, such as APS, has "skin in the game" along with the company undergoing the turnaround. This alignment of interests inures to the overall benefit of a debtor, as well as its estate and creditors. Without that demonstrated alignment of interests, such a client might be reluctant to reach out for critical leadership and specialized guidance from seasoned turnaround and management restructuring firms like APS. As a result, the absence of specialized top-management leadership would decrease the likelihood of a successful outcome of that client's bankruptcy.

Similarly, success fees are a vital and inseparable component of the overall compensation model for turnaround and crisis management firms like APS, and denial of such fees in cases such as these, where the concrete achievement of one of the stated goals outlined at the outset of APS' engagement has occurred, would ill-serve restructurings generally and potentially produce undesirable results. Some firms would simply decline challenging engagements and others would adjust their compensation model by increasing their monthly and/or hourly fees.[2] In recognition of these realities, courts routinely authorize and approve the payment of performance fees and

---

[1] While success fees for lawyers and accountants are rarely sought or granted, success fees are a standard component of compensation for turnaround management, restructuring and consulting firms and investment banking firms. APS is neither a law firm nor an accounting firm. APS is, among other things, a firm that specializes in supplying senior executives on an interim basis to financially troubled companies. As such, payment of the Success Fee to APS is consistent with industry practice in and out of bankruptcy cases.

[2] The former is not an acceptable result, as it would deny distressed companies the necessary services of firms like APS that specialize in supplying senior executives to financially troubled companies and that have earned a national and international reputation for their expertise in financial reorganizations and restructurings of troubled companies. The latter also is not a desirable result, as it would needlessly result in increased fees during the pendency of the case, without such fees being tied to performance-based criteria and the outcome of the case itself (measuring success against alternative outcomes and relative distributable value yields).

success fees upon a clear and demonstrable showing of management expertise that is transformative, in terms of business viability, capital structure fit and value generation. This reasoning is precisely applicable to the engagement of APS by the Debtors in these chapter 11 cases.

The marketplace ordinarily compensates restructuring advisors with both a salary component, based on hours worked, and a performance-based success fee. As the Bankruptcy Court in the Southern District of Ohio held in *In re Cardinal Indus., Inc.*, 151 B.R. 843 (Bankr. S.D. Ohio 1993) (Chapter 11 operating trustee awarded APS a fee of $2.1 million plus a success fee of 50,000 shares of stock):

> Performance-based or success-factor bonuses are a normal part of compensation arrangements for management restructure consultants and … such bonuses generally far exceed the time value of the consultant's services on a lodestar basis. Indeed, the time value component is referred to as the base salary, apparently payable to the consultant even if success is not achieved.

151 B.R. at 847. *See also, In re Busy Beaver Building Center, Inc*., 19 F.3d 833 (3rd Cir. 1993) (the basis for requested compensation should be based on the market rate that professional would charge and collect from a client in a non-bankruptcy setting); *In re UDC Homes, Inc*., 203 B.R. 218 (Bankr. D. Del. 1996). Courts review transaction fees or success fees under the "reasonableness standard" of section 330 of the Bankruptcy Code. *In re Northwest Airlines Corporation*, 400 B.R. 393 (Bankr. S.D.N.Y. 2009); *In re XO Communications, Inc.*, 398 B.R. 106 (Bankr. S.D.N.Y. 2008). In considering a success fee, courts consider (i) whether the financial advisor's services were necessary and beneficial to the debtors' estates at the time the services were rendered; and (ii) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases outside of bankruptcy. *XO Communications*, 398 B.R. at 113. In determining the reasonableness of a success fee and whether the services were necessary and beneficial to the debtor's estate, courts will look "at the nexus between what was achieved, *i.e.*, the restructuring of

the debt, and the impact of the advisor's effort in that regard." *Id*. at 116.

When Congress passed the Bankruptcy Reform Act of 1978, it decided to remove the "spirit of frugality" as a factor in bankruptcy fees. The standard is now the cost of comparable services in a non-bankruptcy setting. Inasmuch as success fees are a normal part of the fee structures of APS and other turnaround and management restructuring firms, both within and outside of bankruptcy, approval of the Success Fee is appropriate to assure comparable compensation for comparable services.

Recent bankruptcy cases involving success fees awarded to APS serving as interim management include the following:

- Aegerion Pharmaceuticals, Inc., a chapter 11 case in the Southern District of New York before Martin Glenn. In 2019, APS was awarded a success fee of $500,000.00 [Case No. 19-11632, Docket No. 406].

- Sungard Availability Capital Services, a chapter 11 case in the Southern District of New York before Robert D. Drain. In 2019, APS was awarded a success fee of $1,250,000.00 [Case No. 19-22915, Docket No. 115]

- Aceto Corporation, a chapter 11 case in the District of New Jersey before Judge Vincent F. Papalia. In 2019, APS was awarded a success fee of $1,000,000.00 [Case No. 19-13448, Docket No. 683]

- Westinghouse Electric Company, a chapter 11 case in the Southern District of New York before Judge Michael E. Wiles. In 2018, APS was awarded a success fee of $7,500,000.00 [Case No. 17-10751, Docket No. 3633].

- VER Technologies Holdco, LLC, a chapter 11 case in the District of Delaware before Judge Kevin Gross. In 2018, APS was awarded a success fee of $750,000.00 [Case No. 18-1083, Docket No. 881].

- Oldapco, Inc. f//k/a Appvion, Inc., a chapter 11 case in the District of Delaware before Judge Kevin J. Carey. In 2018, APS was awarded a success fee of $628,125 [Case No. 17-12082, Docket No. 1070].

- BCBG Max Azria Global Holdings, LLC, a chapter 11 case in the Southern District of New York before Judge Shelley C. Chapman. In 2017, APS was awarded a success fee of $909,000.00 [Case No. 17-10466, Docket No. 711].

- The Gymboree Corporation, a chapter 11 case in the Eastern District of Virginia before Judge Keith L. Phillips. In 2017, APS was awarded a success fee of $1,250,000.00 [Case No. 17-32986, Docket No. 853]

- Primorsk International Shipping Limited, a chapter 11 case in the Southern District of New York before Judge Martin Glenn. In 2016, APS was

- awarded a success fee of $500,000.00 [Case No. 16-10073, Docket No. 315].

- <u>Nautilus Holdings Limited</u>, a chapter 11 case in the Southern District of New York before Judge Robert D. Drain. In 2015, APS was awarded a success fee of $2,256,021.00. [Case No. 14-22885, Docket No. 376].

- <u>USEC Inc.</u>, a chapter 11 case in the District of Delaware before Judge Christopher S. Sontchi. In 2014, APS was awarded a success fee of $500,000.00. [Case No. 14-10475, Docket No. 619].

- <u>Synagro Technologies Inc.</u>, a chapter 11 case in the District of Delaware before Judge Brendan L. Shannon. In 2013, AlixPartners was awarded a success fee of $350,000.00. [Case No. 13-11041 Docket No. 907].

- <u>Eastman Kodak Company</u>, a chapter 11 case in the Southern District of New York before Judge Gropper. In 2013, the Bankruptcy Court approved a contingent success fee of $3,000,000.00 [Case No. 12-10202, Docket No. 5271].

- <u>Bearing Point</u>, a Chapter 11 case in the Southern District of New York before Judge Gerber. In 2009, the Bankruptcy Court approved a contingent success fee of $4,500,000.00. [Case No. 09-10691, Docket No. 1296].

- <u>Lyondell Chemical Co.</u>, a chapter 11 case in the Southern District of New York before Judge Gerber. In 2010, the Bankruptcy Court approved a contingent success fee of $7,000,000.00 [Case No. 09-10023 Docket No. 4814].

- <u>General Motors Corporation n/k/a Motors Liquidation Company</u>, a Chapter 11 case in the Southern District of New York before Judge Gerber. APS was crisis manager to the Debtors, and in 2009, the Bankruptcy Court approved the retention of APS which included several success fee components. The Court approved a $13,000,000.00 success fee for work that was completed in the months leading up to the bankruptcy filing. Of that amount, $6,500,000.00 was approved and paid in 2009 and $6,500,000.00 was approved and paid in 2010. Additional success fees were approved and earned based on the achievement of various objectives including confirmation of a Plan of Liquidation and reduction in claims. [Case No. 09-50026, Docket No. 2949].

In determining the reasonableness of fee awards under section 330, courts consider whether the services provided are "services which are reasonably likely to benefit the debtors' estates." *In re Residential Capital, LLC*, 504 B.R. 358, 366 (Bankr. S.D.N.Y. 2014) (quoting *In re Angelika Films 57th Inc.*, 227 B.R. 29, 42 (Bankr. S.D.N.Y. 1998)). *See also In re Ames Dep't Stores, Inc.*, 76 F.3d 66, 71-72 (2d Cir. 1996).

Additionally, "[w]hen a court conducts a section 330 review of fees that only are compensable if a specific result is achieved, it must find that the work was beneficial when rendered and [therefore] must look to the nexus between the work done and the results achieved." *XO Communications*, 398 B.R. at 113-14. Thus, the "reasonableness standard" analysis required by section 330 allows the court to consider "the nexus between the tasks performed and the results achieved," as well as the "impact of the advisor's effort in that regard." *Residential Capital, LLC*, 504 B.R. at 367 (citations omitted).

In short, performance fees or success fees are a normal part of compensation for firms such as APS, which provided interim management services to the Debtors, and may be approved on that basis. The services provided by APS resulted in tangible, measurable and significant incremental value to the Debtors, their lenders and their estates.

As set forth above, the leadership and contributions of Mr. Mesterharm, Mr. Boken and the APS personnel were key enablers of the successful outcome and recovery within these chapter 11 cases and the work performed by APS professionals was unquestionably exceptional. As such, the amount of the Success Fee in these cases is reasonable pursuant to the standards outlined in section 330 of the Bankruptcy Code and should be approved.

## VII. NOTICE

Notice of the Application has been or will be provided to those parties entitled to receive notice hereof in accordance with any applicable order of this Court.

## VIII. CONCLUSION

To summarize, the Engagement Letter provides for the payment of the Success Fee based upon defined criteria. The defined criteria have been attained. Fees such as the Success Fee are a normal part of the compensation structure of APS and other similar firms both inside and outside of bankruptcy. APS played a pivotal role in the positive outcome of these chapter 11 cases. Accordingly, the approval of the Success Fee is warranted and appropriate.

WHEREFORE APS respectfully requests that this Court enter an order, substantially in the form of the proposed Order attached hereto as **Exhibit D**, awarding APS its Success Fee in the amount of $8,000,000, and such other or further relief as is just or appropriate.

Dated: August 31, 2020

Respectfully submitted,

By: */s/James Mesterharm*
Name: James Mesterharm
Title: Authorized Representative