**Exhibit B-1**

**CRO Engagement Letter**

# APServices

Mr. John Simon  
Interim Chief Executive Officer  
PG&E Corporation  
77 Beale Street  
San Francisco, CA 94105

January 25, 2019

Mr. Steven Malnight  
Senior Vice President, Energy Supply and Policy  
Pacific Gas and Electric Company  
77 Beale Street  
San Francisco, CA 94105

**Re: Agreement for the Provision of Interim Management Services**

Dear Mr. Simon and Mr. Malnight:

This letter, together with the attached Schedule(s) and General Terms and Conditions, sets forth the agreement ("Agreement") between AP Services, LLC, a Michigan limited liability company ("APS"), PG&E Corporation, and Pacific Gas and Electric Company (the "Utility") for the engagement of APS to provide interim management services to the Company. PG&E Corporation and the Utility are referred to together as "PG&E" or the "Company."

This letter supersedes the agreement between PG&E Corporation and AlixPartners, LLC dated December 4, 2018 (the "Initial Engagement Letter"). All defined terms shall have the meanings ascribed to them in this letter and in the attached Schedule(s) and General Terms and Conditions. The Company and APS are each a "party," and together the "parties."

APS understands that PG&E Corporation and the Utility each plan to file for protection under Chapter 11 of the United States Bankruptcy Code on January 29, 2019.

The engagement of APS, including any APS employees who serve in Executive Officer positions, shall be under the supervision of both the PG&E Corporation Chief Executive Officer and the PG&E Corporation Chief Financial Officer.

**Objective and Tasks**

Subject to (i) APS's internal approval from its Risk Management Committee, (ii) confirmation that the Company has a Directors and Officers Liability insurance policy in accordance with Section 7 of the General Terms and Conditions regarding Directors and Officers Liability Insurance coverage, and (iii) a copy of the signed Board of Directors' resolutions (or similar document) as official confirmation of the appointments, APS will provide James Mesterharm to serve as PG&E Corporation's and the Utility's Chief Restructuring Officer ("CRO") and John Boken to serve as PG&E Corporation's and the Utility's Deputy Chief Restructuring Officer ("Deputy CRO"), both reporting to the PG&E Corporation Chief Executive Officer and the PG&E Corporation Chief Financial Officer. Pending compliance with the foregoing conditions, Mr. Mesterharm and Mr. Boken will consult with the Company and its senior management team in an advisory capacity only.

Case: 19-30088  Doc# 8936-2  Filed: 08/31/20  Entered: 08/31/20 15:03:22  Page 2
Case: 19-30088  Doc# 867-2  Filed: 03/13/19  Entered: 03/13/19 18:54:25  Page 2 of 14

AP Services, LLC / 909 Third Avenue / New York, NY 10022 / T +1 212 490 2500 / F +1 212 490 1344 / APS.com

# APServices

Mr. John Simon and Mr. Steven Malnight
January 25, 2019
Page 2 of 13

Once the above conditions have been met, Mr. Mesterharm and Mr. Boken will, in their respective roles, work collaboratively with the senior management team, the respective Boards of Directors of PG&E Corporation and the Utility, and other Company professionals, to assist the Company in evaluating and implementing strategic and tactical options through the restructuring process. Tasks may include working with the Company to do the following:

### *Restructuring*

- Work with the Company and its team to further identify and implement both short-term and long-term liquidity generating and cost reduction initiatives.
- Assist the Company in connection with the Company's development of its revised business plan, and such other related forecasts as may be required by the bank lenders in connection with negotiations or by the Company for other corporate purposes.
- Assist Company management and its professionals specifically assigned to sourcing, negotiating and implementing any financing, including DIP and exit financing facilities, in conjunction with the Plan of Reorganization and the overall restructuring.
- Assist management of the Company in the design and implementation of a restructuring strategy designed to maximize enterprise value, taking into account the unique interests of all constituencies.
- Work with senior management to negotiate and implement restructuring initiatives and evaluate strategic alternatives.

### *Communication with Outsiders*

- Assist in negotiations with stakeholders and their representatives.
- Assist in negotiations with potential acquirers of Company assets.
- Assist in communication and/or negotiation with outside constituents including the banks, committees, stakeholders and their advisors.

### *Bankruptcy Case Management*

- Assist in managing the "working group" professionals who are assisting the Company in the reorganization process or who are working for the Company's various stakeholders to improve coordination of their effort and individual work product to be consistent with the Company's overall restructuring goals.
- Assist in obtaining and presenting information required by parties in interest in the Company's bankruptcy process including official committees appointed by the United States Bankruptcy Court (the "Court") and the Court itself.
- Assist the Company in other business and financial aspects of a Chapter 11 proceeding, including, but not limited to, development of a Disclosure Statement and Plan of Reorganization.

- Assist with the preparation of the statement of affairs, schedules and other regular reports required by the Court as well as providing assistance in such areas as testimony before the Court on matters that are within APS's areas of expertise.
- Assist as requested in managing any litigation that may be brought against the Company in the Court.
- Assist as requested in analyzing preferences and other avoidance actions.
- Manage the claims and claims reconciliation processes.
- Assist the Company with electronic data collection.

### *Finance and Cash Management*

- Assist the Company and its management in developing and maintaining a short-term cash flow forecasting tool and related methodologies and to assist with planning for alternatives as requested by the Company.
- Assist the Company in developing an actual to forecast variance reporting mechanism including written explanations of key differences.

### *Miscellaneous*

- Assist with such other matters as may be requested that fall within APS's expertise and that are mutually agreeable.

### Staffing

Jim Mesterharm and John Boken will be the managing directors responsible for the overall engagement. They will be assisted by a staff of consultants at various levels who have a wide range of skills and abilities related to this type of assignment. In addition, APS has relationships with, and may periodically use, independent contractors with specialized skills and abilities to assist in this engagement. Independent contractors and agents will be subject to confidentiality obligations as least as stringent as those applicable to APS. We will periodically review the staffing levels to determine the proper mix for this assignment. We will only use the necessary staff required to complete the requested or planned tasks.

### Timing, Fees and Retainer

APS will commence this engagement upon the Company's filing for Chapter 11 and after receipt of a copy of the Agreement executed by the Company and confirmation of the Company's compliance with the requirements set forth in the first paragraph of the Objective and Tasks section above.

The Company shall compensate APS for its services, and reimburse APS for expenses, as set forth on Schedule 1.

# APServices

Mr. John Simon and Mr. Steven Malnight
January 25, 2019
Page 4 of 13

Upon the effectiveness of this Agreement, the Company expressly agrees it approves the transfer of any unapplied retainer under the Initial Engagement Letter to be held by APS in accordance with this Agreement.

\* \* \*

The Company will promptly apply to the Court to obtain approval of APS's retention and retainer nunc pro tunc to the date of filing. APS acknowledges that its retention and the terms thereof are subject to Court approval.

If these terms meet with your approval, please sign and return the enclosed copy of the Agreement.

We look forward to working with you.

Sincerely yours,

AP SERVICES, LLC

*[signature]*
James Mesterharm

*[signature]*
John Boken

Acknowledged and Agreed to:

PG&E CORPORATION

By: _____*[signature]*_____
    John R. Simon

Its: Interim Chief Executive Officer

Dated: _____1/29/19_____

PACIFIC GAS AND ELECTRIC COMPANY

By: _____
Steven E. Malnight

Its: Senior Vice President, Energy Supply and Policy

Dated: 28 January 2019

# APServices

## Schedule 1

## Fees and Expenses

1. **Fees:** APS's fees will be based on the hours spent by APS personnel at APS's hourly rates, which are:

   | | |
   |---|---|
   | Managing Director | $990 - $1,165 |
   | Director | $775 - $945 |
   | Senior Vice President | $615 - $725 |
   | Vice President | $440 - $600 |
   | Consultant | $160 - $435 |
   | Paraprofessional | $285 - $305 |

   APS reviews and revises its billing rates on January 1 of each year.

2. **Success Fee:** In addition to hourly fees, APS will be compensated for its efforts by the payment of a success fee. The Company understands and acknowledges that the success fee is an integral part of APS's compensation for the engagement and that the structure and amount of the success fee is reasonable.

   The Company will pay APS a success fee in the amount of $8M upon the occurrence of a Transaction (the "Success Fee"). A "Transaction" shall mean (i) completion of a restructuring through confirmation of a Chapter 11 Plan of Reorganization, (ii) the consummation of any material recapitalization or debt restructuring of the Company, or (iii) consummation of one or more transactions, in any form, that effectively transfers a significant portion of the business as a going concern to another entity or entities or that results in a change in structure of the board of directors.

   Notwithstanding the foregoing, should a Transaction first occur after 18 months from a Chapter 11 filing date (the "Target Date"), the Success Fee shall be reduced by 10% of the monthly fees earned for each whole calendar month between the Target Date and the actual date of the Transaction. However, after applying the reduction, the Success Fee will in no event be no less than $4M. The Success Fee shall be due and payable immediately upon the occurrence of a Transaction.

AP Services, LLC / 909 Third Avenue / New York, NY 10022 / T +1 212 490 2500 / F +1 212 490 1344 / APS.com

**AP**Services

3. **Expenses:** In addition to the Fees set forth in this Schedule, the Company shall pay directly, or reimburse APS upon receipt of periodic billings, for all reasonable out-of-pocket expenses incurred in connection with this assignment, such as travel, lodging and meals.

4. **Break Fee:** APS does not require a break fee in connection with this engagement.

5. **Retainer:** The Company approves the transfer of any unapplied retainer that exists under the Initial Engagement Letter as of the filing date to be applied against Fees and expenses as set forth in this Schedule and in accordance with Section 2 of the General Terms and Conditions.

6. **Payment:** APS will submit monthly invoices for services rendered and expenses incurred. All invoices shall be due and payable immediately upon receipt. No discount is provided for prompt payment, and none shall be taken.



## Schedule 2

### Processing, Personal Data and Data Subjects

In connection with this Agreement, APS will not be receiving any Personal Data subject to the General Data Protection Regulation (*(EU) 2016/679*) (the "GDPR") or any applicable legislation implementing any provisions of the GDPR as may be enacted time to time (together the "Data Protection Legislation").

These General Terms and Conditions ("Terms") are incorporated into the Agreement to which these Terms are attached. In case of conflict between the wording in the letter and/or schedule(s) and these Terms, the wording of the letter and/or schedule(s) shall prevail.

### Section 1. Company Responsibilities

The Company will undertake responsibilities as set forth below:

1. Provide reliable and accurate detailed information, materials, documentation and
2. Make decisions and take future actions, as the Company determines in its sole discretion, on any recommendations made by APS in connection with this Agreement.

APS's delivery of the services and the fees charged are dependent on (i) the Company's timely and effective completion of its responsibilities; and (ii) timely decisions and approvals made by the Company's management.

In connection with any Chapter 11 filing, the Company shall apply promptly to the Bankruptcy Court for approval of the Company's retention of APS under the terms of the Agreement. The form of retention application and proposed order shall be reasonably acceptable to APS. APS shall have no obligation to provide any further services if the Company becomes a debtor under the Bankruptcy Code unless APS's retention under the terms of the Agreement is approved by a final order of the Bankruptcy Court reasonably acceptable to APS. The Company shall assist, or cause its counsel to assist, with filing, serving and noticing of papers related to APS's fee and expense matters.

### Section 2. Retainer, Billing, Payments and Taxes

**Retainer.** Upon execution of the Agreement, the Company shall promptly pay APS the agreed-upon advance retainer as set forth on Schedule 1. Invoices shall be offset against the retainer. Payments of invoices will be used to replenish the retainer to the agreed-upon amount. Any unearned portion of the retainer will be applied against the final invoice or returned to the Company at the end of the engagement.

**Billing and Payments.** All payments to be made to APS shall be due and payable upon delivery of invoice via wire transfer to APS's bank account, as shown on the invoice. All amounts invoiced are based on services rendered and expenses incurred to date, and are not contingent upon future services or Work Product (as defined below), or the outcome of any case or matter. "Fees," as used in this Agreement, shall include all amounts payable by the Company to APS in accordance with Schedule 1, including any success fee or break fee, but excluding reimbursable expenses.

If the Company becomes a debtor under the Bankruptcy Code, due to the ordinary course and unavoidable reconciliation of fees and submission of expenses immediately prior to, and subsequent to, the date of filing, APS may have incurred but not billed fees and reimbursable expenses which relate to the prepetition period. APS will seek Court approval to apply the Retainer to these amounts.

**Taxes.** APS's fees are exclusive of taxes or similar charges, which shall be the responsibility of the Company (other than taxes imposed on APS's income generally). If APS's fees are subject to any taxes, such as State sales tax, Goods and Services Tax/Harmonized Sales Tax or Value Added Tax, then APS will include such taxes on its invoices as separate line items.

### Section 3. Relationship of the Parties

The parties intend that an independent contractor relationship will be created by the Agreement. As an independent contractor, APS will have complete and exclusive charge of the management and operation of its business, including hiring and paying the wages and other compensation of all its employees and agents, and paying all bills, expenses and other charges incurred or payable with respect to the operation of its business. Employees of APS will not be entitled to receive from the Company any vacation pay, sick leave, retirement, pension or social security benefits, workers' compensation, disability, unemployment insurance benefits or any other employee benefits. APS will be responsible for all employment, withholding, income and other taxes incurred in connection with the operation and conduct of its business.

If APS finds it desirable to augment its consulting staff with independent contractors (an "I/C") in this case, (i) APS will file, and require the I/C to file, 2014 affidavits indicating that the I/C has reviewed the list of the interested parties in this case, disclosing the I/C's relationships, if any, with the interested parties and indicating that the I/C is disinterested; (ii) the I/C must remain disinterested during the time that APS is involved in providing services on behalf of the Company; and (iii) the I/C must represent that he/she will not work for the Company or other parties in interest in this case during the time APS is involved in providing services to the Company.

APS's standard practice is to charge for an I/C's services at the rate equal to the compensation provided by APS to such I/C.

APS is not an accounting firm and does not give accounting advice or guidance. While APS's work may involve analysis of accounting, business and other related records, this engagement does not constitute an audit in accordance with either generally accepted auditing standards or the standards of the Public Company Accounting Oversight Board or any other similar governing body.

APS is not authorized to practice law or provide legal advice. No services provided under this Agreement

are intended to be, nor should be construed to be, legal services.

**Section 4. Confidentiality**

Each party shall use reasonable efforts, but in no event less effort than it would use to protect its own confidential information, to keep confidential all non-public confidential or proprietary information obtained from the other party during the performance of APS's services hereunder (the "Confidential Information"), and neither party will disclose any Confidential Information to any other person or entity. "Confidential Information" includes the terms of this Agreement, non-public confidential and proprietary data, plans, reports, schedules, drawings, accounts, records, calculations, specifications, flow sheets, computer programs, source or object codes, results, models or any work product relating to the business of either party, its subsidiaries, distributors, affiliates, vendors, customers, employees, contractors and consultants.

The foregoing is not intended to prohibit, nor shall it be construed as prohibiting, APS from making such disclosures of Confidential Information that APS reasonably believes are required by law or any regulatory requirement or authority, to clear client conflicts. APS may also disclose Confidential Information to its partners, directors, officers, employees, independent contractors and agents who have a need to know the Confidential Information as it relates to the services being provided under this Agreement, provided APS is responsible for any breach of these confidentiality obligations by any such parties. APS may make reasonable disclosures of Confidential Information to third parties, such as the Company's suppliers and/or vendors, in connection with the performance of APS's obligations and assignments hereunder, provided APS reasonably believes that such third party is bound by confidentiality obligations. In addition, APS will have the right to disclose to any person that it provided services to the Company or its affiliates and a general description of such services, but shall not provide any other information about its involvement with the Company. The obligations of the parties under this Section 4 shall survive the end of any engagement between the parties for a period of three (3) years.

Work Product (as defined in Section 5) may contain APS proprietary information or other information that is deemed to be Confidential Information for purposes of this Agreement. Therefore, the parties acknowledge and agree that (i) all information (written or oral), including advice and Work Product (as defined in Section 5) generated by APS in connection with this engagement is intended solely for the benefit and use of the Company in connection with this Agreement, and (ii) no such information shall be used for any other purpose, disseminated to any third parties, or quoted or referred to with or without attribution to APS at any time in any manner or for any purpose without APS's prior approval (not to be unreasonably withheld or delayed), except as required by law or any regulatory requirement or authority.

Because of the nature of the services provided by APS, from time to time, APS professionals may concurrently represent clients that are adverse to each other, or which may be viewed by clients to be adverse. Despite any such concurrent representation, each APS team shall strictly preserve all client confidences, and not disseminate such information externally, except pursuant to the terms of this engagement letter, or to any APS professionals that are currently working for an entity adverse to the Company. The Company agrees that it does not consider such concurrent representation of the Company and any adversary to be inappropriate and, therefore, waives any objections to any such present or future concurrent representation.

**Section 5. Intellectual Property**

All analyses, final reports, presentation materials, and other work product (other than any Engagement Tools, as defined below) that APS creates or develops specifically for the Company and delivers to the Company as part of this engagement (collectively known as "Work Product") shall be owned by the Company and shall constitute Company Confidential Information as defined above. APS may retain copies of the Work Product and any Confidential Information necessary to support the Work Product subject to its confidentiality obligations in this Agreement.

All methodologies, processes, techniques, ideas, concepts, know-how, procedures, software, tools, templates, models, utilities and other intellectual property that APS has created, acquired or developed or will create, acquire or develop (collectively, "Engagement Tools"), are, and shall be, the sole and exclusive property of APS. The Company shall not acquire any interest in the Engagement Tools other than a limited, worldwide, perpetual, non-transferable license to use the Engagement Tools to the extent they are contained in the Work Product.

The Company acknowledges and agrees, except as otherwise set forth in this Agreement, that any Engagement Tools provided to the Company are provided "as is" and without any warranty or condition of any kind, express, implied or otherwise, including, implied warranties of merchantability or fitness for a particular purpose.

**Section 6. Framework of the Engagement**

The Company acknowledges that it is retaining APS solely to assist and advise the Company as described in the Agreement. This engagement shall not constitute an audit, review or compilation, or any other type of financial statement reporting engagement.

**Section 7. Indemnification and Other Matters**

The Company shall indemnify, hold harmless and defend APS and its affiliates and its and their partners, directors, officers, employees and agents (collectively, the "APS Parties") from and against all claims, liabilities, losses, expenses and damages arising out of or in connection with the engagement of APS that is the subject of the Agreement. The Company shall pay damages and expenses as

incurred, including reasonable legal fees and disbursements of counsel. If, in the opinion of counsel, representing both parties in the matter covered by this indemnification creates a potential conflict of interest, the APS Parties may engage separate counsel to represent them at the Company's expense.

In addition to the above indemnification, APS employees serving as directors or officers of the Company or affiliates will receive the benefit of the most favorable indemnification provisions provided by the Company to its directors, officers and any equivalently placed employees, whether under the Company's charter or by-laws, by contract or otherwise.

The Company shall specifically include and cover employees and agents serving as directors or officers of the Company or affiliates from time to time with direct coverage under the Company's policy for liability insurance covering its directors, officers and any equivalently placed employees ("D&O insurance"). Prior to APS accepting any officer position, the Company shall, at the request of APS, provide APS a copy of its current D&O policy, a certificate(s) of insurance evidencing the policy is in full force and effect, and a copy of the signed board resolutions and any other documents as APS may reasonably request evidencing the appointment and coverage of the indemnitees. The Company will maintain such D&O insurance coverage for the period through which claims can be made against such persons. The Company disclaims a right to distribution from the D&O insurance coverage with respect to such persons. In the event that the Company is unable to include APS employees and agents under the Company's policy or does not have first dollar coverage acceptable to APS in effect for at least $10 million (e.g., there are outstanding or threatened claims against officers and directors alleging prior acts that may give rise to a claim), APS may, at its option, attempt to purchase a separate D&O insurance policy that will cover APS employees and agents only. The cost of the policy shall be invoiced to the Company as an out-of-pocket expense. If APS is unable or unwilling to purchase such D&O insurance, then APS reserves the right to terminate the Agreement.

The Company's indemnification obligations in this Section 7 shall be primary to, and without allocation against, any similar indemnification obligations that APS may offer to its personnel generally, and the Company's D&O insurance coverage for the indemnitees shall be specifically primary to, and without allocation against, any other valid and collectible insurance coverage that may apply to the indemnitees (whether provided by APS or otherwise).

APS is not responsible for any third-party products or services separately procured by the Company. The Company's sole and exclusive rights and remedies with respect to any such third party products or services are against the third-party vendor and not against APS, whether or not APS is instrumental in procuring such third-party product or service.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, these indemnification provisions are subject to modification as may be stated within the Bankruptcy Court's retention order.

**Section 8. Governing Law and Arbitration**

The Agreement is governed by and shall be construed in accordance with the laws of the State of New York with respect to contracts made and to be performed entirely therein and without regard to choice of law or principles thereof.

Any controversy or claim arising out of or relating to the Agreement, or the breach thereof, shall be settled by arbitration. Each party shall appoint one non-neutral arbitrator. The two party arbitrators shall select a third arbitrator. If within 30 days after their appointment the two party arbitrators do not select a third arbitrator, the third arbitrator shall be selected by the American Arbitration Association (AAA). The arbitration shall be conducted in New York, New York under the AAA's Commercial Arbitration Rules, and the arbitrators shall issue a reasoned award. The arbitrators may award costs and attorneys' fees to the prevailing party. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

Notwithstanding the foregoing, APS may in its sole discretion proceed directly to a court of competent jurisdiction to enforce the terms of this Agreement for any claim (and any subsequent counter claim) against the Company relating to either (i) the non-payment of Fees or expenses due under this Agreement, or (ii) the non-performance of obligations under Section 7.

In the event the Company files under Chapter 11, the Company and APS agree that the Bankruptcy Court shall have exclusive jurisdiction over any and all matters arising under or in connection with this Agreement.

In any court proceeding arising out of this Agreement, the parties hereby waive any right to trial by jury.

**Section 9. Termination and Survival**

The Agreement may be terminated at any time by written notice by one party to the other; provided, however, that notwithstanding such termination APS will be entitled to any Fees and expenses due under the provisions of the Agreement (for fixed fee engagements, fees will be pro rata based on the amount of time completed). Such payment obligation shall inure to the benefit of any successor or assignee of APS.

Additionally, unless the Agreement is terminated by the Company due to APS's material breach (and such material breach continues after 30 days' written notice thereof and opportunity to cure), APS shall remain entitled to the success fee(s), if any, that otherwise would be payable during the 12 months after the date of termination of the Agreement.

Sections 2, 4, 5, 7, 8, 9, 10, 11, 12 and 13 of these Terms, the provisions of Schedule 1 and the obligation to pay accrued fees and expenses shall survive the expiration or termination of the Agreement.

### Section 10. Non-Solicitation of Employees

The Company acknowledges and agrees that APS has made a significant monetary investment recruiting, hiring and training its personnel. During the term of this Agreement and for a period of two years after the final invoice is rendered by APS with respect to this engagement (the "Restrictive Period"), the Company and its affiliates agree not to directly or indirectly hire, contract with, or solicit the employment of any of APS's Managing Directors, Directors, or other employees/contractors.

If during the Restrictive Period the Company or its affiliates directly or indirectly hires or contracts with any of APS's Managing Directors, Directors, or other employees/contractors in violation of the preceding paragraph, the Company agrees to pay to APS as liquidated damages and not as a penalty the sum total of: (i) for a Managing Director, $1,000,000; (ii) for a Director, $500,000; and (iii) for any other employee/contractor, $250,000. The Company acknowledges and agrees that liquidated damages in such amounts are (x) fair, reasonable and necessary under the circumstances to reimburse APS for the costs of recruiting, hiring and training its employees as well as the lost profits and opportunity costs related to such personnel, and to protect the significant investment that APS has made in its Managing Directors, Directors, and other employees/ consultants; and (y) appropriate due to the difficulty of calculating the exact amount and value of that investment.

### Section 11. Limit of Liability

THE APS PARTIES SHALL NOT BE LIABLE TO THE COMPANY, OR ANY PARTY ASSERTING CLAIMS ON BEHALF OF THE COMPANY, EXCEPT FOR DIRECT DAMAGES FOUND IN A FINAL DETERMINATION TO BE THE DIRECT RESULT OF THE GROSS NEGLIGENCE, BAD FAITH, SELF-DEALING OR INTENTIONAL MISCONDUCT OF APS. THE APS PARTIES SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL OR SPECIAL DAMAGES, LOST PROFITS, LOST DATA, REPUTATIONAL DAMAGES, PUNITIVE DAMAGES OR ANY OTHER SIMILAR DAMAGES UNDER ANY CIRCUMSTANCES, EVEN IF THEY HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE APS PARTIES' AGGREGATE LIABILITY, WHETHER IN TORT, CONTRACT, OR OTHERWISE, IS LIMITED TO THE AMOUNT OF FEES PAID TO APS FOR SERVICES UNDER THIS AGREEMENT (OR IF THE CLAIM ARISES FROM AN ADDENDUM TO THIS AGREEMENT, UNDER THE APPLICABLE ADDENDUM) (THE "LIABILITY CAP"). The Liability Cap is the total limit of the APS Parties' aggregate liability for any and all claims or demands by anyone pursuant to this Agreement, including liability to the Company, to any other parties hereto, and to any others making claims relating to the work performed by APS pursuant to this Agreement. Any such claimants shall allocate any amounts payable by the APS Parties among themselves as appropriate, but if they cannot agree on the allocation it will not affect the enforceability of the Liability Cap. Under no circumstances shall the aggregate of all such allocations or other claims against the APS Parties pursuant to this Agreement exceed the Liability Cap.

APS acknowledges that, during the pendency of any Bankruptcy Court approved retention, the Liability Cap may be subject to modification as may be stated within the Bankruptcy Court's retention order.

### Section 12. General

**Equitable Remedies.** Each party acknowledges and agrees that money damages alone may not be an adequate remedy for a breach of the Agreement. Each party agrees that the non-breaching party shall have the right to seek a restraining order and/or an injunction for any breach of the Agreement. If any provision of the Agreement is found to be invalid or unenforceable, then it shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable.

**Related Matters.** If an APS Party is required by applicable law, legal process or government action to produce information or testimony as a witness with respect to this Agreement, the Company shall reimburse APS for any professional time and expenses (including reasonable external and internal legal costs) incurred to respond to the request, except in cases where an APS Party is a party to the proceeding or the subject of the investigation.

**Severability.** If any portion of the Agreement shall be determined to be invalid or unenforceable, the remainder shall be valid and enforceable to the maximum extent possible.

**Entire Agreement.** This Agreement, including the letter, the Terms and the schedule(s), contains the entire understanding of the parties relating to the services to be rendered by APS and supersedes any other communications, agreements, understandings, representations, or estimates among the parties

(relating to the subject matter hereof) with respect to such services, The Agreement, including the letter, the Terms and the schedule(s), may not be amended or modified in any respect except in a writing signed by the parties. APS is not responsible for performing any services not specifically described herein or in a subsequent writing signed by the parties.

**Joint and Several.** If there is more than one party to this Agreement, the Company shall cause each other entity which is included in the definition of Company to be jointly and severally liable for the Company's liabilities and obligations set forth in this Agreement.

**Third-Party Beneficiaries.** The indemnitees shall be third-party beneficiaries with respect to Section 7 hereof.

**Notices.** All notices required or permitted to be delivered under the Agreement shall be sent, if to APS, to:

AP Services, LLC
2000 Town Center, Suite 2400
Southfield, MI 48075
Attention: General Counsel

and if to the Company, to the address set forth in the Agreement, to the attention of the Company's General

Counsel, or to such other name or address as may be given in writing to APS. All notices under the Agreement shall be sufficient only if delivered by overnight mail. Any notice shall be deemed to be given only upon actual receipt.

**Section 13. Data Protection**

All capitalised terms used in this Section and not otherwise defined in this Agreement shall have the meanings given to them in the General Data Protection Regulation ((*EU*) *2016/679*) (the "**GDPR**") and all applicable legislation implementing any provisions of the GDPR as may be enacted from time to time (together the "**Data Protection Legislation**").

The parties acknowledge and agree that, in performing services pursuant to this Agreement, APS may from time to time be required to Process certain Personal Data on behalf of the Company. In such cases: (1) the Company will ensure that it is lawfully permitted to transfer the Personal Data to APS for the purposes of APS performing services under this Agreement; and (2) APS shall (i) act as the Company's Processor for the purposes of the Data Protection Legislation; (ii) only Process such Personal Data in accordance with the Company's written instructions (including when making an international transfer of Personal Data) unless required to do so by law; (iii) implement appropriate technical and organisational measures to reasonably protect that Personal Data against unauthorized or unlawful Processing and accidental, unauthorised or unlawful loss, destruction, alteration, damage, disclosure or access; and (iv) obtain commitments from all APS's personnel who have access to and/or Process such Personal Data to keep such Personal Data confidential.

If APS is Processing Personal Data relating to individuals located in the EU or otherwise subject to the Data Protection Legislation, (x) APS and the Company shall each comply with all relevant provisions of the Data Protection Legislation, and (y) the nature and extent of such Processing shall be set out in Schedule 2 of this Agreement. APS shall, in relation to any Personal Data processed by APS in connection with this Agreement: (1) at the Company's cost, assist the Company in complying with its obligations as the Controller (or as Processor, as the case may be) of the Personal Data, to respond to requests from Data Subjects exercising their rights set out in Articles 12 to 22 of the GDPR; (2) notify the Company without undue delay on becoming aware of a Personal Data Breach; (3) upon termination or expiration of this Agreement, at the written direction of the Company either delete or return any Personal Data and any copies thereof to the Company (except to the extent APS is required by law to retain such Personal Data, and except for Personal Data located on APS's disaster recovery or backup systems where it will be destroyed upon the normal expiration of the backup files); and (4) maintain appropriate records to demonstrate compliance with this Section.

APS is part of an international business, headquartered in the United States of America ("US"). APS may in the ordinary course of its business, including the performance of the services under this Agreement, transfer Personal Data received outside the US to its US-based affiliates. APS's US-based affiliates are certified under the EU-US Privacy Shield framework and any transfer of Personal Data from outside the US to its US-based affiliates will be transferred subject to, and in accordance with, the Privacy Shield requirements. APS's entities located in the EU have also entered into standard data protection clauses (in accordance with Article 46.2 (c) of the GDPR) with their non-EU-based affiliates. The Company acknowledges and agrees that APS, as reasonably required for the performance of the services pursuant to this Agreement, be permitted to transfer Personal Data to its affiliates, subject to, and in accordance with, the Privacy Shield requirements and/or the aforementioned standard data protection clauses. Except as allowed above, APS shall not transfer any Personal Data received in the EU and subject to the Data Protection Legislation outside of the European Economic Area without the prior written consent of the Company.

The Company consents to APS appointing third party Processors of Personal Data under this Agreement. APS confirms that it will enter into a written agreement with any third-party Processor prior to supplying them with the Personal Data, incorporating terms which are substantially similar to those set forth in this Section. As between the Company and APS, APS shall remain fully liable for all acts or omissions of any third-party Processor appointed by APS pursuant to this paragraph.