| | |
|---|---|
| 1 | **LABATON SUCHAROW LLP** |
| 2 | Thomas A. Dubbs |
| | Carol C. Villegas |
| 3 | Jeffrey A. Dubbin (SBN 287199) |
| | 140 Broadway |
| 4 | New York, New York 10005 |

**LABATON SUCHAROW LLP**
Thomas A. Dubbs
Carol C. Villegas
Jeffrey A. Dubbin (SBN 287199)
140 Broadway
New York, New York 10005

*Lead Counsel to Lead Plaintiff and the Proposed Class*

**MICHELSON LAW GROUP**
Randy Michelson (SBN 114095)
220 Montgomery Street, Suite 2100
San Francisco, California 94104

*Local Bankruptcy Counsel to Lead Plaintiff and the Proposed Class*

**LOWENSTEIN SANDLER LLP**
Michael S. Etkin (*pro hac vice*)
Andrew Behlmann (*pro hac vice*)
Scott Cargill
Colleen Maker
One Lowenstein Drive
Roseland, New Jersey 07068

*Special Bankruptcy Counsel to Lead Plaintiff and the Proposed Class*

*Additional counsel listed on Exhibit A*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

In re:

PG&E CORPORATION

- and –

PACIFIC GAS AND ELECTRIC COMPANY,

Debtors.

☒ Affects Both Debtors
☐ Affects PG&E Corporation
☐ Affects Pacific Gas and Electric Company

Case No. 19-30088 (DM) (Lead Case)

Chapter 11

(Jointly Administered)

**SECURITIES LEAD PLAINTIFF'S MOTION PURSUANT TO BANKRUPTCY CODE SECTIONS 503(B)(3)(D) AND 503(B)(4) FOR ALLOWANCE AND PAYMENT OF FEES AND EXPENSES**

Date:      TBD
Time:      TBD
Before:    (Telephonic Appearances Only)
           United States Bankruptcy Court
           Courtroom 17, 16th Floor
           San Francisco, California 94102

**Objection Deadline:** September 18, 2020, 4:00 PM (PT)

# TABLE OF CONTENTS

**PAGES**

PRELIMINARY STATEMENT ...................................................................................................1

    A.    Overview of Lead Plaintiff's Substantial Contributions to the Fairness of the
Chapter 11 Proceedings ...........................................................................................1

    B.    Lead Plaintiff Successfully Defeated Debtors' Requested Preliminary
Injunction ................................................................................................................2

    C.    Lead Plaintiff Vindicated Class Members' Constitutional Right to Adequate
Notice of the Bar Date ............................................................................................2

    D.    Lead Plaintiff and Counsel Spearheaded Class Claim Filing Efforts ...........................3

    E.    Lead Plaintiff Protected Class Members' Claims from Interference by Other
Stakeholders ............................................................................................................3

    F.    Lead Plaintiff Contributed Meaningfully to the Confirmation Process ........................4

    G.    Lead Plaintiff's Efforts Provided a Necessary, Distinct, and Substantial
Contribution .............................................................................................................4

BACKGROUND .......................................................................................................................5

    A.    The Securities Litigation ..........................................................................................5

    B.    The Chapter 11 Cases ..............................................................................................5

    C.    The First 105 Action ................................................................................................6

    D.    The Third Amended Complaint .................................................................................6

    E.    The Second 105 Action ............................................................................................7

    F.    The Bar Date and Bar Date Notices ..........................................................................7

    G.    Lead Plaintiff Timely Files Class Claims and a Motion to Invoke Bankruptcy
Rule 7023 ................................................................................................................9

    H.    The TCC's Motion for Derivative Standing ............................................................14

    I.    Chapter 11 Plan and Disclosure Statement ..............................................................15

    J.    The Debtors' Motion to Approve Procedures for Omnibus Objections to
Claims ...................................................................................................................17

    K.    Fees Incurred by Lead Plaintiff ...............................................................................19

        1.    Labaton .......................................................................................................20

        2.    Lowenstein ..................................................................................................20

|   | 3. | Michelson | 20 |
|---|----|-----------|----|
|   | 4. | Expenses | 20 |

ARGUMENT ..................................................................................................................21

I. LEAD PLAINTIFF MADE A SUBSTANTIAL CONTRIBUTION TO THE CHAPTER 11 CASES. ...............................................................................................21

    1. Lead Plaintiff's actions conferred a substantial benefit on the thousands of Class members who ultimately filed proofs of claim. ................................22

    2. Lead Plaintiff's contributions to these Chapter 11 Cases were not made with an expectation of payment from the Debtors' estates. ...........................24

    3. Lead Plaintiff's actions throughout the Chapter 11 Cases conferred a direct, significant, and demonstrable benefit on the Debtors' estates. ............25

    4. The benefits provided to the Debtors' estates by Lead Plaintiff's actions far exceed the costs for which Lead Plaintiff seeks payment. ........................26

    5. Lead Plaintiff's Actions Were Not Duplicative of Those Taken by Other Parties in These Chapter 11 Cases ...............................................................27

II. THE FEES AND EXPENSES INCURRED BY LEAD PLAINTIFF IN PROVIDING A SUBSTANTIAL CONTRIBUTION ARE REASONABLE. .................27

CONCLUSION ...............................................................................................................28

Public Employees Retirement Association of New Mexico ("Lead Plaintiff"), the court-appointed lead plaintiff in the securities class action captioned as *In re PG&E Corporation Securities Litigation*, Case No. 18-03509 (the "Securities Litigation") pending in the U.S. District Court for the Northern District of California (the "District Court"), as lead plaintiff for the proposed class it represents in the Securities Litigation (the "Class")[1] and as a creditor in the chapter 11 bankruptcy cases (the "Chapter 11 Cases") of the above-captioned reorganized debtors (the "Debtors"), hereby submits this motion (the "Motion") pursuant to sections 503(b)(3)(D) and 503(b)(4) of title 11 of the United States Code (the "Bankruptcy Code") seeking allowance and payment of an administrative expense claim for the professional fees and expenses incurred by Lead Plaintiff's professionals in the Chapter 11 Cases.[2]  In support of the Motion, Lead Plaintiff respectfully states as follows:

## PRELIMINARY STATEMENT

Lead Plaintiff made a substantial contribution to the Debtors' bankruptcy estates through its successful efforts to protect the rights of thousands of investors in the Debtors' publicly traded securities, who the Debtors have attempted to marginalize from the outset of these Chapter 11 Cases.  Lead Plaintiff provided the lone voice that successfully vindicated the rights of its constituency to protect the possibility of any recovery from the Debtors.  Through this Motion, Lead Plaintiff requests that the Court allow it an administrative expense claim, pursuant to sections 503(b)(3) and (4) of the Bankruptcy Code, for the professional fees and expenses incurred by Lead Plaintiff's professionals in connection with those efforts.

A. **Overview of Lead Plaintiff's Substantial Contributions to the Fairness of the Chapter 11 Cases**

From the outset of these Chapter 11 Cases, the Debtors have pursued a strategy to sideline Lead Plaintiff and disenfranchise the Class members to which Lead Plaintiff owes

---

[1]  The Class is defined as those all persons and entities who, during the period from April 29, 2015 through November 15, 2018, inclusive (the "Class Period"), purchased or otherwise acquired publicly traded PG&E securities and were damaged thereby.  TAC (defined below), ¶ 11.

[2]  As set forth below, Lead Plaintiff requests that any payment pursuant to this Motion be made directly to its counsel.

fiduciary obligations.  The Debtors have consistently taken positions hostile to the procedural and substantive due process rights of Lead Plaintiff and the Class, and they sought rulings to diminish the rights of the Class members.  Indeed, it was not until March 9, 2020 that the Debtors' plan even specifically acknowledged the existence of claims against the Debtors' estates by Class members who purchased the Debtors' equity securities, classifying these claims in the amended Plan that day, as a direct result of Lead Plaintiff's efforts.  In addition to disputing the validity of such claims, Debtors further worked to deny Class members' receipt of even the minimum, Constitutionally-required notice necessary to assert and pursue their claims against the Debtors' estates and vote on the Plan.

### B. Lead Plaintiff Successfully Defeated Debtors' Requested Preliminary Injunction

Barely two weeks after filing these Chapter 11 Cases, one of the Debtors' first priorities was to attempt to enjoin Lead Plaintiff and Class members from pursuing their independent claims in the Securities Litigation directly against forty-two *non-debtor* defendants, of which only five were current officers or directors of the Debtors.  Following months of related discovery and motion practice, the Court properly concluded that the Debtors failed to meet their heavy burden to establish a basis to enjoin the Securities Litigation in the District Court.

### C. Lead Plaintiff Vindicated Class Members' Constitutional Right to Adequate Notice of the Bar Date

The Debtors next sought to avoid providing Class members their fundamental right to notice of the Bar Date and opportunity to file claims against the Debtors' estates.  Indeed, when the Debtors sent the original bar date notice to other creditors, it specifically stated that holders of the Debtors' equity interests (a group that includes Class members who still hold stock) "*need not file a proof of claim*."  Lead Plaintiff elicited sworn testimony of the Debtors' own claims and noticing agent that the Debtors had made no meaningful attempt to provide actual notice of the bar date to members of the Class.  As a result of Lead Plaintiff's efforts to correct this significant defect, the Court expressly found that the Debtors provided Constitutionally defective notice of the bar date to Class members.  In an attempt to remedy the Debtors' failures to provide due process, Lead Plaintiff filed a motion seeking application of Bankruptcy Rule 7023 to a

proof of claim Lead Plaintiff timely filed on behalf of the Class (the "Class Proof of Claim").

The Debtors vehemently opposed Lead Plaintiff's Rule 7023 motion, but offered no appropriate remedy for Class members, who were known creditors. Lead Plaintiff, for the benefit of the thousands of Class members who would be disenfranchised by the Debtors' efforts, expended significant resources in response to the Debtors' opposition to the Rule 7023 Motion and the Class Proof of Claim.

### D. Lead Plaintiff and Counsel Spearheaded Class Claim Filing Efforts

After ultimately deciding against applying Rule 7023 (acknowledging that it was a "close call"), the Court, in direct response to the positions advocated by Lead Plaintiff, ordered that the bar date be extended for members of the Class, and directed the Debtors to provide them with actual notice of the extended bar date. Solely because of Lead Plaintiff's efforts, Class members were provided with a specially drafted bar date notice (prepared by the Debtors with Lead Plaintiff's input) and an opportunity to file proofs of claim. As a direct result of Lead Plaintiff's actions, Class members filed over seven thousand proofs of claim (reflecting an even greater number of actual claims, after accounting for bulk and joint proofs of claim), representing more than $6 billion of liquidated damages. Lead Counsel, in particular, was instrumental in responding to many inquiries from Class members, many of whom independently were clients in other matters. Without Lead Plaintiff's and Counsel's contributions to these Chapter 11 Cases, thousands of claimants never would have received any notice of the bar date, much less an opportunity to assert claims against the Debtors.

### E. Lead Plaintiff Protected Class Members' Claims from Interference by Other Stakeholders

Lead Plaintiff also contributed to creditors and the estates by successfully defending the rights of Class members from proposed litigation by the Official Committee of Tort Claimants (the "TCC"). The TCC, with the support of the Debtors, sought standing to initiate an adversary proceeding and seek a declaration that the direct claims asserted by Lead Plaintiff and the Class in the Securities Litigation – *even those asserted against the Debtors themselves* – were actually derivative claims that the Court should rule belonged to the Debtors' estates. These claims, the

TCC asserted, should therefore be among those assigned to a trust established for the benefit of tort claimants. After extensive motion practice, the Court ultimately denied the TCC's standing motion, but not before Lead Plaintiff was required to expend significant resources litigating these issues in order to protect the rights of Class members from being commandeered by the TCC.

**F.     Lead Plaintiff Contributed Meaningfully to the Confirmation Process**

Lead Plaintiff also made significant and substantial contributions with respect to disclosure statement and plan confirmation matters. The Debtors' initial versions of their Joint Chapter 11 Plan of Reorganization (the "Plan") omitted any reference to the prima facie valid claims asserted by Lead Plaintiff and Class members that purchased the Debtors' securities during the Class Period. Even by reading the Plan and accompanying disclosure statement, Class members had no way to determine how their claims would be classified or treated under the Plan – the most basic of flaws for any disclosure statement and plan. Again, Lead Plaintiff alone acted to remedy this defect, by both (a) negotiating modifications of the Plan and Disclosure Statement wherever possible, and (b) prosecuting objections with respect to matters that could not be resolved consensually. Lead Plaintiff's efforts on behalf of Class members culminated in its participation during multiple days of the contested confirmation hearing.

Ultimately, Lead Plaintiff was able to consensually resolve most of these issues through a process mediated by Retired Judge Randall J. Newsome. At the end of that process, Debtors consented to materially improve Class members' treatment under the Plan, and the Court recognized Lead Plaintiff's counsel for its zealous advocacy on behalf of the Class.

**G.     Lead Plaintiff's Efforts Provided a Necessary, Distinct, and Substantial Contribution**

Lead Plaintiff's efforts provided a substantial contribution to the Debtors' estates by giving a voice to the thousands of Class members that the Debtors initially sought to marginalize, when no other party in these Chapter 11 Cases was willing to advocate on behalf of the Class members. Indeed, both implicitly and explicitly, thousands of Class members deferred to Lead Plaintiff's advocacy in ensuring that they were provided with adequate notice of the bar date, a process to assert their claims, and equitable treatment of their claims under the Plan.

No official committee represented such interests, and indeed, as noted above, the TCC took positions directly adverse to the interests of Class members throughout the case and during the Plan confirmation process. As such, the contributions made by Lead Plaintiff to advance the Chapter 11 Cases were not duplicative of the efforts of any other party. Rather, Lead Plaintiff was the *only* party willing to step up and protect not only its own interests, but those of thousands of absent Class members. With no other party in these Chapter 11 Cases willing to advocate for, or even protect, the interests of Class members, Lead Plaintiff filled the void and made a substantial contribution to the Debtors' estates for a substantial and otherwise completely disenfranchised class of creditors.

Lead Plaintiff's contributions fostered and enhanced the progress of the Debtors' reorganization by protecting the rights of a large creditor constituency that otherwise would have been denied any meaningful participation in this Chapter 11 Cases. Ultimately, the Debtors accepted a number of Lead Plaintiff's suggested modifications and the process benefitted from all of Lead Plaintiff's contributions detailed herein. Accordingly, this Court should find that Lead Plaintiff has made a substantial contribution to the Debtors' estates and should award Lead Plaintiff an administrative expense claim for payment of its fees and expenses in the amounts set forth below.

## BACKGROUND

### A. The Securities Litigation

The initial complaint in the Securities Litigation was filed on June 12, 2018. [SL ECF No. 1]. On September 10, 2018, the District Court consolidated the Securities Litigation and appointed Lead Plaintiff as lead plaintiff and Labaton Sucharow LLP ("Labaton") as Lead Counsel for the Class. [SL ECF No. 62]. Pursuant to that order, Lead Plaintiff filed a second amended complaint on December 14, 2018. [SL ECF No. 95].

### B. The Chapter 11 Cases

On January 29, 2019, the Debtors filed these Chapter 11 Cases. As a result, the Securities Litigation was automatically stayed solely with respect to the Debtors pursuant to section 362(a) of the Bankruptcy Code. Lead Plaintiff, through Labaton as Lead Counsel,

retained Lowenstein Sandler LLP ("Lowenstein") as special bankruptcy counsel and the Michelson Law Group ("Michelson") to act as local bankruptcy counsel in these Chapter 11 Cases.

**C.     The First 105 Action**

Barely two weeks into the Chapter 11 Cases, on February 15, 2019, the Debtors filed an adversary proceeding [Adv. Pro. No. 19-03006] (the "First 105 Action") and motion seeking to enjoin continued prosecution of the Securities Litigation and other lawsuits against various non-Debtor defendants pursuant to section 105 of the Bankruptcy Code.

On February 22, 2019, the Securities Act Plaintiffs filed a class action styled as *York County v. Rambo*, Case No. 19-994 (N.D. Cal.) (the "York County Action"), asserting claims under the Securities Act of 1933 (the "Securities Act") against certain of the Debtors' then-current and former directors and officers, as well as the underwriters of certain of the Debtors' notes offerings.

On May 2, 2019, this Court entered an agreed order (the "Stipulated Dismissal Order") [Adv. Pro. No. 19-03006 ECF No. 44], dismissing Lead Plaintiff from the First 105 Action and establishing a timeline for the Debtors to file a new adversary proceeding solely against Lead Plaintiff and renew their request to enjoin the continued prosecution of the Securities Litigation against the non-Debtor defendants therein after Lead Plaintiff filed its Third Amended Complaint (the "TAC"). On May 7, 2019, the District Court consolidated the York County Action with the Securities Litigation and authorized Lead Plaintiff to file the TAC [SL ECF No. 117]

**D.     The Third Amended Complaint**

On May 28, 2019, Lead Plaintiff filed the TAC [SL ECF No. 121]. The TAC asserts claims against eighteen of the Debtors' current and former directors and officers (the "Individual Defendants") and twenty-four investment banks that underwrote the Debtors' notes offerings (the "Underwriter Defendants" and, together with the Individual Defendants, the "Non-Debtor Defendants"). But for the imposition of the automatic stay, the Securities Litigation would have proceeded against the Debtors, alongside the Non-Debtor Defendants. The TAC asserts that PG&E's false and misleading statements proximately caused investors in its publicly traded

securities to suffer significant losses as the true nature and extent of PG&E's responsibility for the Northern California wildfires emerged. The Class is comprised of investors who acquired the Debtors' securities during the Class Period (unlike the speculators that purchased PG&E stock immediately prior to and during the bankruptcy) and suffered losses as a result of the Debtors' and the Non-Debtor Defendants' alleged false statements and omissions and other conduct, which inflated the price of the Debtors' securities.

### E. The Second 105 Action

As contemplated by the Stipulated Dismissal Order, after Lead Plaintiff filed the TAC, the Debtors commenced a new adversary proceeding (the "Second 105 Action") [Adv. Pro. No. 19-03039] and filed a new motion (the "Second 105 Motion") seeking to preliminarily and permanently enjoin the prosecution of the Securities Litigation against the Non-Debtor Defendants. On July 18, 2019, Lead Plaintiff filed its opposition to the Second 105 Motion [Adv. Pro. No. 19-03039 ECF No. 12]. After extensive briefing and oral argument, the Court entered an order denying the Second 105 Motion [ECF No. 23] on August 28, 2019. In finding that the Debtors had "not carried their heavy burden to justify enjoining defendants," this Court held that the "best the Debtors have to offer at this point is that prosecution might be costly to them, their insurers or both. That is not enough. Nor is it enough to justify injunctive relief by asking 'what's the harm?'" *Id*. at 2.

### F. The Bar Date and Bar Date Notices

On July 1, 2019, the Court entered an order (the "Bar Date Order") [ECF No. 2806] that, among other things, (i) established October 21, 2019 as the last date for holders of claims against the Debtors to file proofs of claim in respect thereof (the "Bar Date"), and (ii) approved various forms of notice of the Bar Date (collectively, the "Bar Date Notices"), including the "Standard Bar Date Notice" [ECF No. 2806 Ex. B-1] for creditors other than customers and wildfire victims, along with specialized notices for wildfire victims and customers [ECF No. 2806 Exs. B-2 and B-3].

The Bar Date Order directed the Debtors to mail the Bar Date Notices to several categories of creditors and to post each of the Bar Date Notices on the Debtors' website. Bar

Date Order, ¶¶ 8-11.  Members of the Class *were not* among the categories of creditors who were to receive the Bar Date Notices pursuant to the Bar Date Order.  *Id.*  Indeed, although Class members included investors who purchased PG&E stock during the Class Period and still hold that stock, the Bar Date Order expressly *excluded "any person or entity that holds an equity security interest in the Debtors*" from the categories of individuals and entities to whom the Debtors were required to mail the Standard Bar Date Notice.  *Id.* ¶ 8(b) (emphasis added).

The Standard Bar Date Notice did not mention the Securities Litigation, the Class, or the Class Period at all.  Nor did it provide any indication that members of the Class might hold claims against the Debtors and therefore need to file proofs of claim (although doing so would have had little if any effect because, as discussed below, the Debtors did not mail the Standard Bar Date Notice to members of the Class).  The only language in the Standard Bar Date Notice even tangentially related to the need for members of the Class to file proofs of claim was an ambiguous statement under the boldfaced heading of "**WHO NEED <u>NOT</u> FILE A PROOF OF CLAIM**".

The Bar Date Order directed the Debtors to mail the Standard Bar Date Notice to, among other categories of creditors, "all parties actually known to the Debtors as having claims or potential claims against either of the Debtors (but excluding holders of Fire Claims) which, for the avoidance of doubt, *excludes any person or entity that holds an equity security interest in the Debtors*. . . ." and "all parties to pending litigation against the Debtors as of the date of entry of this Order (other than holders of Fire Claims) . . . ."  *Id.* ¶¶ 8(b), (e) (emphasis added).

Lead Plaintiff and members of the Class were known prepetition creditors of the Debtors entitled to actual notice of the Bar Date as a matter of due process.  However, the Bar Date Order did not direct the Debtors to undertake, nor had the Debtors undertaken, any efforts whatsoever to identify the members of the Class and provide the Standard Bar Date Notice (or any other actual notice of the Bar Date) to them.  Moreover, the Bar Date Order expressly provided that the Debtors were *not* required to serve the Standard Bar Date Notice on then-current holders of the Debtors' equity securities, a group that included Class members who still happened to hold the Debtors' stock.

The Bar Date Order also approved a "Supplemental Notice Plan" pursuant to which the Debtors sought to provide notice to unknown creditors via newspaper publication, digital advertising, television and radio advertising, e-mail, and claim service centers. *See* Bar Date Order, ¶¶ 2, 12-14; Bar Date Motion [ECF No. 1784] at 23-26; Reply [ECF No. 2646] at 15-20. The Supplemental Notice Plan was, as with any publication notice, sufficient at most only as to *unknown* creditors, primarily wildfire victims. *See, e.g.*, Reply [ECF No. 2646] at 15 ("The Debtors' Supplemental Notice Plan is reasonably calculated to provide adequate notice of the Bar Date **to unknown claimants**, including Unknown Wildfire Claimants . . . .") (emphasis added). Publication notice, such as the Supplemental Notice Plan, is Constitutionally inadequate for providing notice to known creditors such as members of the Class.

The Debtors' motion to establish the Bar Date, their reply in further support thereof, and the various supporting declarations filed in connection therewith [ECF Nos. 1786, 1787, 2642, 2643] said ***absolutely nothing*** about the Securities Litigation, sending the Bar Date Notices (or any other form of actual notice) to the members of the Class, or any other efforts by the Debtors, their claims and noticing agent, or anyone else to provide notice of the Bar Date to the members of the Class – because there were no such efforts.

### G. Lead Plaintiff Timely Files Class Claims and a Motion to Invoke Bankruptcy Rule 7023

Lead Plaintiff timely filed proofs of claim both individually and on behalf of the Class ("Class Claims"). The Class Claims, Nos. 72193 and 72273, assert claims against the Debtors based on the allegations and claims in the TAC in the Securities Litigation. On December 9, 2019, Lead Plaintiff filed a motion pursuant to Bankruptcy Rules 7023 and 9014(a) and (c) ("7023 Motion"). The 7023 Motion requested that this Court enter an order directing that Rule 7023 apply to the Class Claims against each of the Debtors, and setting a briefing schedule and hearing date for a class certification motion pursuant to Fed. R. Civ. P. 23.

After significant litigation, supplemental briefing and multiple hearings, on February 24, 2020, this Court issued its decision, stating that while it would deny the 7023 Motion, it instead would extend the Bar Date for individual members of the Class. This Court analyzed the 7023

Motion under the three factors set forth in *In re Musicland Holding Corp.*, 362 B.R. 644, 654 (Bankr. S.D.N.Y. 2014). This Court found that the first factor, "whether the class was certified pre-petition," did not weigh against granting the 7023 Motion because Class members were unable to seek class certification in the Securities Litigation while motions to dismiss remained pending before the District Court in that case.

The Court found that the second *Musicland* factor, "whether members of the putative class received notice of the bar date," weighed "heavily in favor" of granting the 7023 Motion. The Court found that Class members did not receive actual written notice of the bar date, and rejected the Debtors' argument that Class members were "unknown" creditors who were not entitled to actual notice. Because Class members were known creditors entitled to actual written notice, and because the Debtors failed to provide such notice, the Court concluded that this factor also weighed in favor of granting the 7023 Motion.

The Court determined that the final *Musicland* factor, "whether class certification will adversely affect the administration of the estate," was a "close call" but ultimately sided with Debtors, stating that "[a]t this juncture, it appears granting the Motion may result in more chaos than certainty." The Court noted that Class members were prejudiced here by the "anomal[y]" of a legislative deadline for Plan confirmation and concluded that denying the 7023 Motion and that extending the bar date to allow Class members to file proofs of claim was "poised to generate less (but likely some) chaos."

At the February 26, 2020, hearing to consider the 7023 Motion, the Lead Plaintiff argued in favor of the administrative manageability of curing the Due Process concerns at issue through class certification briefing that could otherwise proceed in a timely manner. As Lead Counsel proposed during the hearing:

> MR. DUBBS: Well, what I'm trying to -- now, in terms of the timeline, all of the major law firms on the other side have class-action departments that do this stuff routinely. And they know us, and we know them. We can make a motion for class certification within two to three weeks. We can get this [class certification motion] teed up for Your Honor in less than a month. . . . Now, they have their defenses and have put forward their defenses, but they're very experienced at this, and this can be done very, very

1    quickly, and Your Honor can decide this up or down very, very
     quickly."

2    Transcript of February 26, 2020 Hearing, pp. 67:23-68:16.  In response, Debtors' counsel argued

3    that such briefing could not avoid imperiling confirmation by the A.B. 1054 deadline given the

4    late February date.  *Id.* at (MR. SLACK: "[T]he defendants' counsel believes that there are very

5    significant challenges to class certification that are going to require more than just, you know, a

6    couple of days of discovery and a month of briefing.").  Ultimately, Class Counsel's experience

7    with providing class-wide notice was instrumental to crafting the form and substance of the

8    notice of the extended Bar Date:

9            THE COURT: This is not -- as I said in my docket text, this is not
10           a notice of a class settlement. This is a question of a notice of a –

11           MR. DUBBS: It's not a notice of –

12           THE COURT: -- bankruptcy claim.

13           MR. DUBBS: -- a class settlement but, if you give -- if the
14           requirement is to give actual notice to people that we know are out
             there, then there's an established way to do that. That is
15           (indiscernible) point. . . . I'm not making a legal point. If –

16           THE COURT: Where do I find that? Where do –

17           MR. DUBBS: You find that by issuing an order to all of the
18           broker-dealers and giving them specific time and information to do
             what they're supposed to do, and class counsel bug them to make
19           sure that it's being done, so that the maximum -- you'll never give a
             hundred-percent notice, but we'll give very, very high level of
20           notice, if they do that. And that's -- I mean, this is – that's what
             should have been done before, but it wasn't.

21   Transcript of February 26, 2020 Hearing, pp. 74:4-23.  The Court instructed Debtors' counsel to

22   consult with Lead Plaintiff concerning the form and substance of the notice of the extended bar

23   date that the Class members would receive, as well as provide comments to the bar date notice

24   claim form itself:

25           THE COURT: Okay. I'm not ready. I don't want to take the argument
26           today. So, Mr. Etkin, you don't need to state your appearance. As long as
             you're here on the line. Here's my thinking on the subject. I want to
27           explain one thing that may be obvious, but the reason why it was
             important to me to put more information in the stuff about it -- in the

opening part of the notice -- *was because I worried about people who were getting their very first notice of not having a context. Like, why am I getting this proof of claim, and what am I supposed to make of it?* And so neither of you, apparently, had a problem with what I added in there, a little language about impaired/not impaired and these other deadlines. *My preference would be for counsel to work on an agreed form, and if you can do it on your own, I'm happy to wait and take your advice on that. If you think it would be constructive, I could have a meet and confer as long as you want it or as short as you want it. I could have a hearing at 2 o'clock this afternoon, or I could just let you work it out. I'm really up to having your agreement what to do*, but maybe would be to have a hearing either later today or tomorrow, by phone, and I would just decide any matters that aren't resolved. But if you got it all resolved, we don't have to have a hearing. So, Mr. Karotkin, any preference of how to do that, and then I'll ask Mr. Etkin the same thing?

* * *

THE COURT: Yes. Well, I know you have time pressures, and that's why I thought -- and I have time pressures, not only what I worked on this morning, but I haven't even had a chance to look at these. *And one of the things that I don't want to waste my time is trying to work my way through a redline if both sides have agreed to a solution. Mr. Etkin, is that agreeable to you, to work it for the rest of today, if necessary, and have a telephone hearing our time tomorrow morning if there's still a dispute*, and then I will simply listen to brief argument and make a decision on items that are still in dispute? That work for you?

Transcript of February 26, 2020 Hearing, pp. 111:25-114:7.

On February 27, 2020, the Court issued an order (the "7023 Denial / Extended Bar Date Order") [ECF No. 5943] denying the 7023 Motion, but extending the Bar Date to April 16, 2020, solely with respect to persons or entities that purchased or acquired the listed publicly traded PG&E debt or equity securities during the Class Period and who may have securities law claims against the Debtors for rescission or damages.  The 7023 Denial / Extended Bar Date Order attached a notice and claim form that was to be served upon Class members, both directly and through nominees (the same procedure the Debtors should have employed in connection with the original Bar Date, but later claimed was infeasible in their opposition to the 7023 Motion), which incorporated extensive revisions that Lead Plaintiff's counsel provide to the Debtors.

Following entry of the 7023 Denial / Extended Bar Date Order, Labaton undertook a robust outreach process to contact Class members, to whom Labaton and PERA owe a fiduciary

duty, to advise them of the extended bar date and the need to file a claim form in order to assert their claims against the Debtors in the bankruptcy. Utilizing Labaton's existing relationships with prominent institutions and firms, Labaton attorneys performed broad outreach through phone calls and Zoom video calls to reach as many potential claimants as possible and to help them understand the importance of filing a claim in these Chapter 11 Cases.

In addition to explaining the unique mechanics of the proof of claim form, including the need to file a separate proof of claim against both HoldCo and the Utility, Labaton also explained the unique circumstances of these Chapter 11 Cases. Many Class members erroneously believed that there was no value in filing a bankruptcy claim, based on past experiences where bankrupt companies lacked sufficient assets for a distribution to holders of common stock (with which Class 10A-II claims are pari passu) to receive any recovery whatsoever, much less a material recovery. By contrast, PG&E is solvent *and* the Plan provides for a distribution on account of allowed Class 10A-II claims. In addition, many Class members expected their custodian banks to file claim forms on their behalf (which would be standard practice in administering claims for settled securities class actions, as opposed to bankruptcies). Here, however, most custodian banks refused to file these claims for their clients, on the grounds that filing proofs of claim in bankruptcy is different than submitting securities litigation settlement claim forms. The fact that custodian banks would not be filing these claim forms was *not* readily communicated to many claimants. Labaton was able to explain this to claimants and encourage them to file the claims themselves.

Without this effort, which was conducted over a very compressed period of time, many claims would not have been filed, resulting in these claimants being disenfranchised. Labaton's efforts ultimately resulted in at least 7,041 **claims** being filed with a reported value of **over $6 billion**.[3] Even after the proofs of claim were submitted, Labaton continued its broad outreach to

---

[3] As listed on Prime Clerk's schedule of Rescission or Damage Claims, *see https://restructuring.primeclerk.com/pge/Home-ClaimInfo?RescissionorDamage=MTY*. However, the total number of claims, and the value of such claims, are much higher than the amounts listed because many claimants filed joint or "bulk" claims and/or indicated an "unliquidated" or unknown amount for their claim, which may make the amount of total claims well **in excess of $10 billion**.

Case: 19-30088   Doc# 8950   Filed: 08/31/20   Entered: 08/31/20 17:12:32   Page 16 of 31

keep Class members updated on the revised Plan, the voting and confirmation process, and the post-bankruptcy claims process.

**H.** **The TCC's Motion for Derivative Standing**

On February 28, 2020, the TCC filed its *Motion for Standing to Prosecute Claims of the Debtors' Estate* (the "TCC Standing Motion") [ECF 5972]. Through the Motion, the TCC requested derivative standing from this Court to commence an adversary proceeding against potentially thousands of Class members seeking (i) a declaration that the Securities Litigation claims and the Class Claims were derivative claims, rather than direct shareholder claims, and are property of the Debtors' estates, (and thus should be included in the causes of action assigned to the fire victims trust established under the Plan), and (ii) a preliminary and permanent judgment enjoining further prosecution of the Class Claims and the Securities Litigation by Class members. Nearly a month after the TCC Standing Motion was filed, the Debtors filed a stipulation between the TCC and the Debtors [ECF No. 6435], through which the Debtors, subject to Court approval, purported to confer standing upon the TCC to commence and prosecute the proposed Adversary Proceeding described in the Motion.

Not only was the TCC Standing Motion fatally flawed by attempting to mischaracterize the direct claims that Class members held against the Debtors and Non-Debtors as derivative claims, but it is telling that the TCC, and the Debtors, were willing to treat Lead Plaintiff as the representative for all Class members only when it was convenient for the TCC and the Debtors to do so. Notably, the proposed draft complaint attached to the TCC Standing Motion did not name as defendants all of the Class members. Rather, the draft complaint named only Lead Plaintiff and the Securities Act Plaintiffs, through which the TCC sought an injunction that would somehow bind all individual Class members and adjudicate their rights, without actually naming and serving each of them as a party to the litigation.

As with the Debtors' earlier motion to enjoin the Securities Litigation against the Non-Debtor Defendants, Lead Plaintiff again was required to expend significant resources to litigate the TCC Standing Motion in order to protect the interests of the Class members from attack by another party in interest. Drawing on Labaton's knowledge of the Securities laws and extensive

experience with securities class actions, Lead Plaintiff acted to protected Class members' claims from interference by the TCC:

> MR. DUBBIN: . . . I was going to participate to talk about the derivative versus direct case law or answer any additional questions that Your Honor may have.
> . . .
> THE COURT: You have thirty minutes if you want, but you don't have to use it.
> MR. DUBBIN: Well, I will just say one more thing . . . just point out that notwithstanding anything in the colloquy so far, [the] TCC cites no case law holding that claims pled under Rule 10(b)(5) [sic] are derivative claims, [which] are the claims at issue that PERA asserts here and in the district court in front of Judge Davila, and that leaves the TCC with no colorable basis for the adversary proceeding.

Transcript of April 14, 2020 Hearing, p. 54:1-19. After extensive briefing, Lead Plaintiff was again successful in vindicating the rights of Class members. On April 15, 2020, the day after the hearing, this Court issued its *Order Denying Motion for Standing to Prosecute Claims of the Debtors' Estates* [ECF 6773]. Among the reasons given for the denial of the TCC Standing Motion, this Court noted that it "remains convinced that granting the Motion will compound an already complicated situation presented by the pending motions to dismiss before District Judge Davila and the possibility of inconsistent outcomes." *Id*. at 2.

## I. Chapter 11 Plan and Disclosure Statement

The Debtors filed their initial Plan on September 9, 2019, which was subsequently amended on numerous occasions prior to and during the Plan confirmation hearing. On March 6, 2020, Lead Plaintiff filed its *Objection to (I) Solicitation Procedures Motion and (II) Approval of Proposed Disclosure Statement for Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* (the "DS Objection") [ECF 6144]. On May 15, 2020, Lead Plaintiff filed its *Objection to Confirmation of Debtors' and Shareholders Proponents' Joint Chapter 11 Plan of Reorganization Dated March 16, 2020* (the "Confirmation Objection") [ECF 7296].

Through both the DS Objection, and the Confirmation Objection, coupled with extensive negotiations with the Debtors, Lead Plaintiff was able to achieve material improvements to the treatment of Class members through the Plan. Specifically, through Lead Plaintiff's advocacy,

the Debtors agreed to the following modifications:

- Establishment of separate classification and treatment for Class members that held the Debtors' equity securities and those that asserted securities claims for rescission or damage that were subordinated pursuant to 11 U.S.C. § 510(b);

- Extension of the deadline for Class members to vote on the Plan;

- Modification to the Plan voting procedures to allow for temporary allowance of Class member claims under Bankruptcy Rule 3018; and

- Modification to the Plan injunction provision to ensure that it does not operate as an impermissible nonconsensual third-party release in favor of Non-Debtor Defendants.

One of Lead Plaintiff's primary objections to confirmation of the Plan was that the Plan did not treat Class 10A-II claims pari passu with common stock in HoldCo, even though Class 10A-II claims are deemed by section 510(b) of the Bankruptcy Code to have the same priority as common stock. In the last version of the Plan the Debtors filed prior to the confirmation hearing, holders of Class 10A-II claims were entitled to receive shares in the reorganized Debtors based upon a formula that converted approximately $68 of damages into one share of stock (trading at approximately $11 per share at the time of the confirmation hearing).

Following the relevant portion of the confirmation hearing, the Debtors, their co-plan proponents, and Lead Plaintiff participated in mediation with Retired Bankruptcy Judge Newsome with respect to the treatment of Class 10A-II claims. Through that mediation, the fixed $68 per share formula proposed by the Debtors was replaced with a sliding scale that converted damages arising from purchases of the Debtors' common stock into shares of stock in the reorganized Debtors based on a sliding scale from $32.50 to $65.00 per share, a drastic improvement over the formula originally proposed by the Debtors and their co-Plan proponents.[4]

During the confirmation hearing, the Court recognized Lead Plaintiff's efforts throughout the weeks-long confirmation process, which included Lead Plaintiff's cross-examination of

---

[4] The only issue that Lead Plaintiff was unable to consensually resolve through mediation or otherwise was the "Insurance Deduction" calculation in the Plan. The Court ultimately ruled in favor of the Debtors with respect to Lead Plaintiff's confirmation objection and that matter is currently the subject of an appeal taken by Lead Plaintiff. Lead Plaintiff is *not* seeking payment of legal fees in connection with that appeal through this Motion.

witnesses and supplemental submissions:

> THE COURT: But it's a compromise. That's why you compromised it. Mr. Etkin, that's why you compromised it, and you did the right thing because, if you didn't compromise it and I had gone with Mr. Johnston's theory, you know what the formula would be. And if I'd gone with your theory, he knows what the formula would be. You compromised the formula, you compromised the treatment methodology without giving up the right of a particular claim to be stand -- its claim is what it is.

Transcript from June 19, 2020 Hearing; pp. 26:24-27:7 (emphasis added).

> [THE COURT:] I'm sorry, Mr. Etkin, if I came out the wrong side on your end, but I appreciate your efforts and what you've done. And so I'm going to consider this a closed issue and congratulate you and Mr. Johnston and your clients and Judge Newsome for helping us get this one under the wraps too, or … solve the problems.

Transcript of June 19, 2020 Hearing, p. 43:3-9 (emphasis added).

**J.      The Debtors' Motion to Approve Procedures for Omnibus Objections to Claims**

On June 3, 2020, the Debtors filed their *Motion for Order Approving (A) Procedures for Filing Omnibus Objections to Claims and (B) the Form and Manner of the Notice of Omnibus Objections* [ECF 7758] (the "Claims Procedures Motion").  Through the Claims Procedures Motion, the Debtors sought an order granting them authority to file omnibus objections to claims on additional grounds beyond those set forth in Bankruptcy Rule 3007(d); modifying the claim objection procedures set forth in Bankruptcy Rule 3007(e); permitting them to deviate from the requirements of the Local Bankruptcy Rules of this District concerning claims objections; and approving the form and manner of notice of the omnibus objections to be served.

Lead Plaintiff filed a limited objection to the Claims Procedures Motion on June 17, 2020 [ECF No. 7995], objecting to the Debtors' request to be excused from stating the legal and/or factual grounds for objecting to claims in an omnibus objection and the proposed requirements that a claimant subject to an omnibus objection submit a declaration in connection with its response thereto and both file its response with the Court *and* separately serve the response on counsel to the Debtors.

On June 22, 2020, the Debtors filed a reply [ECF No. 8059] in further support of the

Claims Procedures Motion. The Debtors conceded that they would support all omnibus objections with one or more declarations and withdrew their proposed requirement that all claimants both file and serve their responses on Debtors' counsel. However, the Debtors were unwilling to withdraw their proposed requirement that a claimant's response be accompanied by a declaration under penalty of perjury concerning the facts relevant to the response, along with documentation and other evidence.

The same day, the Court issued its *Tentative Ruling Regarding Claims Objection Procedures* [ECF 8070]. The tentative ruling announced "that all concessions made by the Debtors in favor of objecting parties appear to be appropriate . . . ." *Id.* at 2. The tentative ruling further stated that, absent the Debtors presenting compelling reasons otherwise, the Court was inclined to strike the Debtors' proposed requirements for claimants to submit evidentiary documentation with their responses to omnibus claim objections. *Id.*

On June 24, 2020, the Court held a hearing on the Claims Procedure Motion. In colloquy between the Court and counsel to Lead Plaintiff during the hearing, it became apparent to the Court that the thousands of proofs of claim filed by Class members, the bases for all of which are set forth in the TAC, should not be addressed through the omnibus objections procedures. Over resistance by the Debtors, the Court ordered that proofs of claim filed by Class members be excluded from the omnibus claims objection procedures in order to allow the parties the opportunity to develop a separate, more appropriate collective procedure for addressing Class members' proofs of claim.

> [THE COURT:] So look, can we say this, Mr. Benvenutti, that at least for the short term, ***the procedures we're talking about do not involve the securities claims?*** And that's something that's got to be dealt with on a macro basis at some point down the road. Is that a fair way to think about it?
>
> MR. BENVENUTTI: Your Honor, I don't have authority to say that, but I think that's consistent with the way that we've handled it up to this point, again, with the proviso that, if I depart this hearing and find out from my colleagues that I have misspoken on that subject, we will be back in front of you promptly.

THE COURT: Yeah, but look, let's face it, whether we have "scream or die" or we have noticed hearing or we have some other procedure, *it's not constructive for you to be sending out objections to claims to 6,000 investors who have filed things that said that they were defrauded when there's got to be some way to get your arms around it, whether it's further mediation or some sort of other kind of thing.*

I'll stay off that subject for now. Mr. Etkin was unsuccessful in getting his class through the claim process. He was partially successful or successful in getting the extended claim deadline. *He's got 6,000 folks that have filed claims that at least contend that they're owed money, and whether they have one lawyer or 6,000 of them representing themselves is for another day.*

But it seems like, if you're able to at least say for today's purposes, everything we're talking about will not be dealing with the securities claim until there's been some further discussion, I think that might be constructive. I mean, I'm not trying to ask you to give up a procedural point, but this is -- put on me as case management, and I don't want to try to case manage securities litigation on the fly here like this.

MR. BENVENUTTI: Your Honor*, that's not a concession I can make at this point. I'm sorry, I just can't.*

THE COURT: Well, *it's a concession that I can make*.

Transcript of June 24, 2020 Hearing; p.19:14-20:24 (emphasis added).

## K.     Fees Incurred by Lead Plaintiff

In connection with these Chapter 11 Cases, Labaton, as Lead Counsel, and Lead Plaintiff retained Lowenstein as lead bankruptcy counsel and Michelson as local bankruptcy counsel. Labaton, Lowenstein, and Michelson each maintained detailed written records of the time expended by their respective attorneys and paraprofessionals in the provision of their professional services to Lead Plaintiff in connection with these Chapter 11 Cases. These time records were generated contemporaneously with the performance of the professional services described therein and in the ordinary course of their respective firms.[5]     The individual time

---

[5]     References to specific creditors or clients other than Lead Plaintiff, or otherwise to privileged information or attorney work product, have been removed from certain time entries and replaced with generic references where appropriate.

records were recorded by the attorney or paraprofessional who rendered the services described in the time record.[6]

### 1. Labaton

Attached hereto as **Exhibit B** is the Declaration of Thomas A. Dubbs in support of this Motion, which attaches as an exhibit the time records maintained by Labaton for the hours worked and expenses incurred for which Lead Plaintiff seeks payment herein. Labaton attorneys and paraprofessionals expended 2,562.2 hours of legal services, for a total charge of $1,762,023.00, calculated in accordance with Labaton's normal hourly rates in effect at the time the services were rendered.

### 2. Lowenstein

Attached hereto as **Exhibit C** is the Declaration of Michael S. Etkin in support of this Motion, which attaches the time records maintained by Lowenstein for the hours worked and expenses incurred for which Lead Plaintiff seeks payment herein. Lowenstein attorneys and paraprofessionals expended 3,428.20 hours of legal services, for a total charge of $2,748,617.50, calculated in accordance with Lowenstein's normal hourly rates in effect at the time the services were rendered.

### 3. Michelson

Attached hereto as **Exhibit D** is the Declaration of Randy Michelson in support of this Motion, which attaches the time records maintained by Michelson for the hours worked and expenses incurred for which Lead Plaintiff seeks payment herein. Michelson attorneys expended 186.6 hours of legal services, for a total charge of $110,631.25, calculated at or below Michelson's normal hourly rates in effect at the time the services were rendered.

### 4. Expenses

Attached hereto as **Exhibit E** is a schedule of expenses incurred by Lead Plaintiff in

---

[6] Lead Plaintiff does not seek reimbursement for all of the fees and expenses incurred by its professionals in connection with the Chapter 11 Cases. Rather, Lead Plaintiff has limited this request to only those fees and expenses arising from the activities that conferred a benefit on the Class as a whole, and excluded fees and expenses relating only to Lead Plaintiff's own claims.

connection with these Chapter 11 Cases, totaling $168,725.70, for which Lead Plaintiff seeks payment. Such expenses include the fees and expenses of Michelson, billed as an expense to Labaton, as well as the expenses incurred by Lowenstein.

Accordingly, though this Motion, Lead Plaintiff seeks reimbursement of $4,510,640.50 in legal fees and $168,725.70 in expenses.

## ARGUMENT

## I. LEAD PLAINTIFF MADE A SUBSTANTIAL CONTRIBUTION TO THE CHAPTER 11 CASES.

Section 503(b)(3)(D) of the Bankruptcy Code provides for the allowance as an administrative expense of:

> "the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by – a creditor…in making a substantial contribution in a case under chapter 9 or 11 of this title"

Bankruptcy Code § 503(b)(4), in turn, provides for the allowance as an administrative claim of:

> reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph . . . (D) of paragraph (3) of this subsection, based upon the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title, the reimbursement for actual, necessary expenses incurred by such attorney . . . .

"A creditor seeking administrative priority for its legal fees and costs bears the burden of proof to demonstrate that the creditor has made a substantial contribution to the estate." *In re Mortgages Ltd.*, 2010 WL 6259981, at *7 (B.A.P. 9th Cir. Aug. 4, 2010). Although "substantial contribution" is not defined by the Bankruptcy Code, courts consider several factors in determining whether a substantial contribution has been made. *See In re Garcia*, 2016 WL 7324153, at *7 (Bankr. E.D. Cal. Dec. 14, 2016). "The principal test for substantial contribution under § 503(b)(3)(D) is the extent of the benefit to the estate." *In re SONICblue, Inc.*, 422 B.R. 204, 212 (N.D. Cal. 2009); *In re Cellular 101, Inc.*, 377 F.3d 1092, 1096-97 (9th Cir. 2004). Courts have held that a substantial contribution includes services that "foster and enhance, rather than retard or interrupt, the progress of reorganization." *SONICblue*, 422 B.R. at 213. Courts

have also considered the following in determining whether a substantial contribution has been made:

    i. Whether the services were undertaken solely for the benefit of the party itself or for the benefit of all parties in the case;

    ii. Whether the services were actions that would have been taken by the party on its own, behalf, absent an expectation of reimbursement from the estate;

    iii. Whether the party can demonstrate that its actions provided direct, significant, and demonstrable benefit to the estate;

    iv. Whether the benefit conferred upon the estate exceeds the costs sought to obtain that benefit; and

    v. Whether the actions were duplicative of those being taken by other parties in the cases, such as the debtor, a trustee or an official committee.

*In re 1250 Oceanside Partners*, 519 B.R. 802, 807 (Bankr. D. Haw. 2014); *Garcia*, 2016 WL 7324153, at \*7-\*8; Collier on Bankruptcy § 503.10 (16th Ed. 2019).

    The issue of whether Lead Plaintiff, through its actions in these Chapter 11 Cases, made a substantial contribution to the Debtors' estates is a question of fact as to which Lead Plaintiff bears the burden of proof by a preponderance of the evidence. *See 1250 Oceanside*, 519 B.R. at 806; *SONICblue*, 422 B.R. at 204.

###         1.   *Lead Plaintiff's actions conferred a substantial benefit on the thousands of Class members who ultimately filed proofs of claim.*

    Courts have held that a creditor's actions that benefit only the creditor itself, and not the estate, do not constitute a substantial contribution under section 503(b)(3)(D). *In re Consol. Bancshares, Inc.*, 785 F.2d 1249, 1253 (5th Cir. 1986). Courts of Appeals are split regarding whether a creditor has made a substantial contribution when it acts out of self-interest while also conferring a benefit on the estate at the same time. *Cf. In re Celotex Corp.*, 227 F.3d 1336, 1338 (11th Cir. 2000) ("Examining a creditor's intent unnecessarily complicates the analysis of whether a contribution of considerable value or worth has been made."), *with Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("'[S]ubstantial contribution' should be applied in a manner that excludes reimbursement in connection with activities of creditors . . . which are designed primarily to serve their own interests.").

The Ninth Circuit has declined to choose between these competing approaches and recognizes that "the existence of self-interest cannot in and of itself preclude reimbursement" *In re Cellular 101, Inc.*, 377 F.3d 1092 at 1098, quoting *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3rd Cir. 1997); *see also In re Mortgages Ltd.*, 2010 WL 6259981, at *8 (9th Cir. BAP Aug. 4, 2010)("We reject Trustee's argument that substantial contribution claims must be denied if the creditor acted primarily in its own interest, even if the creditor provided a demonstrable benefit to the estate, as that is not the law in our circuit"); *In re The Legacy Estate Grp., LLC*, 2006 WL 3392068, at *2 (Bankr. N.D. Cal. Nov. 20, 2006)("Self-interest does not alone prohibit allowance of administrative fees").

The record in these Chapter 11 Cases is clear that the actions taken by Lead Plaintiff were intended to, and in fact did, benefit all members of the Class. But for Lead Plaintiff's contributions, the Debtors (and later, the TCC and plan co-proponents) would have successfully denied the Class members their procedural and substantive due process rights to participate in the Debtors' reorganization. Not only were Lead Plaintiff's interests aligned with those of Class members, but Lead Plaintiff also had a fiduciary obligation, in its role as court-appointed lead plaintiff, to protect the interests of the Class members under applicable law. *See, e.g., Eubank v. Pella Corp.*, 753 F.3d 718, 723-24 (7th Cir. 2014) ("Class representatives are . . .fiduciaries of the class members. . . ."); *Schick v. Berg*, 2004 WL 856298, *4 (S.D.N.Y. Apr. 20, 2004) ("The general rule is that the named plaintiff and counsel bringing the action stand as fiduciaries for the entire class, commencing with the filing of a class complaint."); *cf. In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").

Lead Plaintiff's substantial contribution on behalf of all Class members is perhaps best illustrated by this Court's own comments during the hearing to establish omnibus claims procedures. In response to the Debtors' counsel arguments that Lead Plaintiff's attorneys only represented Lead Plaintiff, and not other Class members, this Court observed:

THE COURT: Well, it doesn't any more than it gave him an

opportunity to do all that he did on the plan issues and the mediation and all the things that you personally perhaps were not in the frontier of the lawyers on the other side, but certainly Mr. Johnston and others on the proponents side is well aware of Mr. Etkin's role. **And I'm not there to tell Mr. Etkin what he can or can't do. The fact is I wouldn't want 6,000 pro se parties on this call trying to each argue why their claims are valid when one lawyer, who you may not think much of the merits of his claim, but at least he speaks for the issues that are involved**. So look, can we say this, Mr. Benvenutti, that at least for the short term, the procedures we're talking about do not involve the securities claims? And that's something that's got to be dealt with on a macro basis at some point down the road. Is that a fair way to think about it?

Transcript from June 24, 2020 Hearing; p.19:3-18 (emphasis added).

THE COURT: I think you're overstating your case, Mr. Benvenutti. **I have been dealing with Mr. Etkin and the constituency for whom he speaks for a long, long time. And maybe you haven't, but I have**. And I'm not going to criticize you or say that you can -- I'm not going to criticize you or him either for not raising it. **I raise it because I know about these folks, and I've dealt with them over and over again. I dealt with them from the first start of the case. I dealt with them when they had the class claim motion. I dealt with them when we did the estimation and the new deadline. I dealt with them as a confirmation issue. And I'm not going to -- they're not going to go away.**

Transcript from June 24, 2020 Hearing; p.40:12-24 (emphasis added).

Whether the Debtors acknowledge it or not, Lead Plaintiff has made substantial contributions throughout these Chapter 11 Cases on behalf of thousands of Class members. These contributions have existed both behind the scenes and in plain sight. They are undeniable. This Court has recognized Lead Plaintiff in this pivotal role of giving a collective voice to the interests of literally thousands of Class members with billions of dollars in losses. Accordingly, this factor weighs heavily in favor of finding that Lead Plaintiff has made a substantial contribution to these Chapter 11 Cases.

### 2. Lead Plaintiff's contributions to these Chapter 11 Cases were not made with an expectation of payment from the Debtors' estates.

As explained above, given Lead Plaintiff's role as named court-appointed lead plaintiff for the Class, Lead Plaintiff owes fiduciary obligations to the Class members. The Debtors undertook substantial efforts throughout these Chapter 11 Cases to deny Class members Constitutionally required notice of the bar date, ignore or simply bury their claims, and dispose

of their claims through the Plan process, all in violation of the Class members' due process rights. Lead Plaintiff stood up for Class members' rights and provided a powerful voice for a constituency that the Debtors sought to summarily disenfranchise. Lead Plaintiff took these actions for the benefit of absent Class members, not because it expected payment from the Debtors' estates. As such, this factor also weighs heavily in favor of the relief Lead Plaintiff seeks through this Motion.

### 3. Lead Plaintiff's actions throughout the Chapter 11 Cases conferred a direct, significant, and demonstrable benefit on the Debtors' estates.

"Rather than a 'net benefit' approach, courts review independently each of a claimant's activities to then decide whether that activity benefitted the estates sufficiently to award the claimant expenses incurred for that activity." *Mortgages*, 2010 WL 6259981, at *8. "[T]he applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estates and the creditors." *Legacy*¸ 2006 WL 3392068, at *2.

As summarized above and detailed in the attached contemporaneous time records of Labaton, Lowenstein, and Michelson, it was *solely* through Lead Plaintiff's active participation in these Chapter 11 Cases that thousands of Class members were able to, among other things:

- continue prosecution of the Securities Litigation against the Non-Debtor Defendants;

- receive Constitutionally required actual notice of the bar date (which the Debtors had previously failed to provide);

- have an opportunity to file proofs of claim against the Debtors;

- have their claims appropriately classified and treated under the Plan;

- meaningfully participate in the Plan confirmation process in a manner that materially enhanced the treatment of Class members.

These actions clearly fall under the definition of a "substantial contribution" for purposes of section 503(b)(3). *See In re White Mountain Comm. Hospital, Inc.*, 2006 WL 6811025, at *6 (9th Cir. BAP Mar. 21, 2006) ("Substantial contribution requires contribution which provides tangible benefits to the bankruptcy estate and the other unsecured creditors.") (internal citations omitted). In the final analysis, with these significant contributions, including Lead Plaintiff's substantive confirmation objection and the resolutions through negotiation and mediation to

which the Debtors ultimately agreed, the Plan was confirmed without being subject to the risks attendant to the issues raised, litigated, and resolved by Lead Plaintiff.

**4.** ***The benefits provided to the Debtors' estates by Lead Plaintiff's actions far exceed the costs for which Lead Plaintiff seeks payment.***

By any objective metric, the benefits Lead Plaintiff's actions provided throughout these Chapter 11 Cases to thousands of Class members, as creditors of the Debtors' estates, dwarf the administrative expense claim sought herein. For example, but for the contributions of Lead Plaintiff by filing the Class Claim, litigating the 7023 Motion, and ultimately having the bar date extended to allow for the filing of individual Class member claims, tens of thousands of known creditors would never have received notice of the bar date or been provided an opportunity to assert claims. As a direct result of Lead Plaintiff's actions, Class members filed over *seven thousand* proofs of claim representing an even greater number of individual claims (when taking bulk or joint claims into account), representing over $6 billion in aggregate claims. The holders of those claims will now have an opportunity to receive a distribution if such claims are ultimately allowed. Those claimants whose claims are based upon purchases of the Debtors' debt securities are required to be paid in full if their claims are allowed. Similarly, the enhancements and modifications to the Plan negotiated by Lead Plaintiff inured to the benefit of Class members and included an increased distribution on account of claims arising from purchases of the Debtors' stock during the Class Period.

Finally, as this Court has recognized, Lead Plaintiff has provided a strong, collective voice on behalf of Class members from the outset of these Chapter 11 Cases, enabling issues relevant to the Class to be resolved in an orderly and productive manner. *See* June 24, 2020 Transcript at p. 19 ("The fact is I wouldn't want 6,000 pro se parties on this call each argue why their claims are valid when one lawyer…at least speaks for the issues that are involved."). Accordingly, the focus and efficiency Lead Plaintiff has brought to these Chapter 11 Cases in providing a mechanism for thousands of claimants to assert claims and receive appropriate treatment under the confirmed Plan exponentially exceeds the amount of payment requested herein.

### 5. Lead Plaintiff's actions were not duplicative of those taken by other parties in these Chapter 11 Cases

No other party in these Chapter 11 Cases duplicated the actions taken by Lead Plaintiff. To the contrary, numerous other major constituencies sought to trample on the rights of Class members at every turn. The Debtors, and later their co-Plan proponents, sought to completely disenfranchise the Class both substantively and procedurally. The interests of the Class were completely abandoned by the Creditors' Committee and were the target of complex, baseless litigation and consistent criticism initiated by the TCC. Indeed, it was only through Lead Plaintiff's efforts that the Debtors and other parties in interest were forced to recognize and address the rights and interests of Class members, a process that will now continue post-confirmation and throughout the claims reconciliation process.

## II. THE FEES AND EXPENSES INCURRED BY LEAD PLAINTIFF IN PROVIDING A SUBSTANTIAL CONTRIBUTION ARE REASONABLE.

Once a court has determined that a creditor has made a substantial contribution to the reorganization process and the progress of the Chapter 11 case, "the remaining issue is whether counsel's fees are reasonable and the expenses actual and necessary." *See* SONICblue, 422 B.R. at 214. The professional fees sought herein are based upon the normal hourly rates of Labaton, Lowenstein, and Michelson, respectively. Similarly, the expenses for which Lead Plaintiff seeks payment were reasonably incurred in direct connection with, and were essential to, the substantial contribution that Lead Plaintiff made in these Chapter 11 Cases. The fees and expenses sought are commensurate with the complexity of these Chapter 11 Cases, the legal issues involved, the dollar amounts in dispute, the skill of Lead Plaintiff's counsel, and the benefit to the estates obtained for such services. Moreover, the rates for the attorneys and paraprofessionals employed by Labaton, Lowenstein, and Michelson are reasonable and customary in those firms' respective practice areas. Accordingly, Lead Plaintiff respectfully submits that the fees sought herein are "reasonable compensation for professional services rendered" within the meaning of section 503(b)(4).

*[ signature page follows ]*

**CONCLUSION**

For all of the foregoing reasons, Lead Plaintiff respectfully requests that this Court enter an Order granting the Motion and allowing as administrative expenses the fees and expenses incurred by Labaton, Lowenstein, and Michelson, in the respective amounts set forth above, and granting such other and further relief as may be just and proper.

Dated: August 31, 2020

**LOWENSTEIN SANDLER LLP**
**MICHELSON LAW GROUP**

By:   */s/ Randy Michelson*
Randy Michelson (SBN 114095)

*Bankruptcy Counsel to Lead Plaintiff and the Class*

-28-