ROPES & GRAY LLP
Rocky C. Tsai (CA Bar No. 221452)
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 315-6369
Facsimile: (415) 315-6350
Email: rocky.tsai@ropesgray.com

ROPES & GRAY LLP
Andrew G. Devore (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050
Email: andrew.devore@ropesgray.com

ROPES & GRAY LLP
Gregg M. Galardi (admitted *pro hac vice*)
Keith H. Wofford (admitted *pro hac vice*)
Daniel G. Egan (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile:  (212) 596-9090
Email: gregg.galardi@ropesgray.com
        keith.wofford@ropesgray.com
        daniel.egan@ropesgray.com

*Counsel to Elliott Management Corporation, on behalf of itself and
certain funds and accounts managed, advised, or sub-advised by it*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>     **-and-**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                    Reorganized Debtors.<br><br><br><br>☐ Affects PG&E Corporation<br><br>☐ Affects Pacific Gas and Electric Company<br><br>☒ Affects both Debtors<br><br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Bankruptcy Case No. 19-30088 (DM)<br><br>Chapter 11<br><br>(Lead Case)<br><br>(Jointly Administered)<br><br>**ELLIOTT MANAGEMENT CORPORATION'S RESPONSE TO REORGANIZED DEBTORS' INITIAL OPPOSITION TO MOTION FOR (I) ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND (II) TO THE EXTENT NECESSARY, RECONSIDERATION AND RELIEF FROM THE CONFIRMATION ORDER PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 60(b)**<br><br>**Hearing**<br>Date:    October 13, 2020<br>Time:    10:00 a.m. (Pacific Time)<br>Place:   **Telephonic or Video Appearances Only**<br>          Courtroom 17<br>          450 Golden Gate Ave, 16th Floor<br>          San Francisco, CA 94102 |

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT...................................................................................................... 1

RESPONSE.................................................................................................................................... 3

I.     ELLIOTT'S ADMINISTRATIVE EXPENSE CLAIM IS PRESERVED
AND PAYABLE UNDER THE PLAN AND APPLICABLE LAW ...................... 3

     A.     Elliott's Administrative Expense Claim Is Not Exculpated Under
The Plan ................................................................................................................ 3

     B.     Elliott's Administrative Expense Claim Is Not Released Under The
Plan ........................................................................................................................ 5

     C.     The Debtors' Interpretation of the Exculpation and Release
Provisions Would Bar All Administrative Expense Claims........................ 6

II.     ELLIOTT HAS NOT WAIVED CLAIMS FOR BREACH OF THE
NOTEHODLER RSA, AND THE DEBTORS' INVOCATION OF
WAIVER, AT A MINIMUM, RAISES DISPUTED FACTUAL ISSUES ............. 8

III.     LIMITED RECONSIDERATION OF THE CONFIRMATION ORDER
UNDER FED. R. CIV. P. 60(b) IS AVAILABLE, ALTERNATIVE
RELIEF ................................................................................................................ 12

     A.     Rule 60(b) Permits Limited Reconsideration of the Confirmation
Order ................................................................................................................... 12

     B.     Relief Under Fed. R. Civ. P. 60(b) Requires Resolution of Disputed
Factual Issues Not Properly Raised At This Stage Under the
Scheduling Order ............................................................................................... 13

CONCLUSION............................................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 401 East 89th Street Owners Inc.*,
223 B.R. 75 (Bankr. S.D.N.Y. 1998)......................................................................12

*Ah Quin v. County of Kauai Dept. of Transp.*,
733 F.3d 267 (9th Cir. 2013) ...............................................................................6

*Ahanchian v. Xenon Pictures, Inc.*,
624 F.3d 1253 (9th Cir. 2010) ............................................................................14

*In re Arriva Pharm., Inc.*,
456 B.R. 419 (Bankr. N.D. Cal. 2011) .................................................................11

*Ashker v. Sayre*,
No. 05-03759, 2010 WL 476634 (N.D. Cal. Feb. 4, 2010) ................................10

*In re Aureal, Inc.*,
No. 00-42104, 2006 WL 2355022 (Bankr. N.D. Cal. Aug. 14, 2006) ...................7

*In re Bellingham Ins. Agency, Inc.*,
702 F.3d 553 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v.
Arkison*, 573 U.S. 25 (2014) ...............................................................................11

*In re Calpine Corp.*,
No. 05-60200 (BRL), 2008 WL 207841 (Bankr. S.D.N.Y. Jan. 24, 2008)............13

*In re BNW, Inc.*,
201 B.R. 838 (Bankr. S.D. Ala. 1996) ..................................................................12

*In re Cellular 101, Inc.*,
539 F.3d 1150 (9th Cir. 2008) .............................................................................11

*In re Daewoo Motor Am., Inc.*,
488 B.R. 418 (C.D. Cal. 2011) ............................................................................13

*In re Elec. Maint. & Constr., Inc.*,
No. 8:11-BK-18670-CED, 2016 WL 2985025 (Bankr. M.D. Fla. May 19,
2016) .....................................................................................................................13

*In re Enewally*,
368 F.3d 1165 (9th Cir. 2004) .............................................................................11

*From the Future, LLC v. Flowers*,
No. 06-cv-00203, 2009 WL 10709083 (D. Nev. Apr. 20, 2009)..........................10

i

*Galarpe v. United Airlines, Inc.*,
    No. 17-cv-06514, 2018 WL 1586202 (N.D. Cal. Apr. 2, 2018)................................9

*In re Railworks Corp.*,
    387 B.R. 156 (Bankr. D. Md. 2008) ...................................................................4

*In re Hechinger Inv. Co. of Del.*,
    298 F.3d 219 (3d Cir. 2002)................................................................................7

*In re iE, Inc.*,
    BAP No. CC-19-1307-FLTa, 2020 WL 3547928 (B.A.P. 9th Cir. June 22,
    2020) ...............................................................................................................13

*In re Joseph Edward Co., Inc.*,
    357 B.R. 441 (Bankr. E.D. Ky. 2006) ...............................................................12

*In re Logan Place Props., Ltd.*,
    327 B.R. 811 (Bankr. S.D. Tex. 2005) ..............................................................13

*Miller v. U.S. (In re Miller)*,
    253 B.R. 455 (Bankr. N.D. Cal. 2000) ................................................................7

*Nichols v. Northwestern Mutual Life Ins. Co.*,
    487 Fed. Appx. 339 (9th Cir. 2012)....................................................................8

*In re Eagle-Picher Indus., Inc.*,
    270 B.R. 842 (Bankr. S.D. Ohio 2001)................................................................4

*In re Pardee*,
    193 F.3d 1083 (9th Cir. 1999) ..........................................................................11

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
    507 U.S. 380 (1993)..........................................................................................14

*In re Poteet Const. Co., Inc.*,
    122 B.R. 616 (Bankr. S.D. Ga. 1990) ...............................................................13

*In re Red Mountain Machinery Co.*,
    448 B.R. 1 (Bankr. D. Ariz. 2011).......................................................................7

*In re Rickel & Assocs.*,
    260 B.R. 673 (Bankr. S.D.N.Y. 2001)...............................................................13

*U.S. v. Olano*,
    507 U.S. 725 (1993)..........................................................................................11

*U.S. v. Root*,
    No. 2:14-CR-0001-TOR-2, 2016 WL 4205358 (E.D. Wash. July 1, 2016)...........14

*United States v. Alpine Land & Reservoir Co.*,
    984 F.2d 1047 (9th Cir. 1993) ...................................................................................14

*In re Vencor, Inc.*,
    284 B.R. 79 (Bankr. D. Del. 2002) .............................................................................13

*In re Wrightwood Guest Ranch, LLC*,
    896 F.3d 1109 (9th Cir. 2018) ....................................................................................11

**Statutes**

11 U.S.C. § 503(a) ...........................................................................................................9

11 U.S.C. § 506(b)(6) .......................................................................................................8

Cal. Civil Code § 1654.......................................................................................................7

Cal. Code Civ. P. § 337......................................................................................................9

Elliott Management Corporation, on behalf of itself and certain funds and accounts managed, advised, or sub-advised by it ("Elliott"), hereby submits this response to the initial opposition [Dkt. No. 8864] (the "Initial Opposition" or "Initial Opp.") filed by PG&E Corporation and Pacific Gas and Electric Company (collectively, the "Debtors" or the "Reorganized Debtors") to the *Motion of Elliott Management Corporation for (I) Allowance and Payment of Administrative Expense Claim and (II) to the Extent Necessary, Reconsideration and Relief from the Confirmation Order Pursuant to Federal Rule of Civil Procedure 60(b)*, dated July 24, 2020 [Dkt. No. 8536] (the "Motion"). In support hereof, Elliott respectfully represents as follows:

## PRELIMINARY STATEMENT

1. After Elliott filed its Motion for payment of an Administrative Expense Claim resulting from the Debtors' breach of the Noteholders RSA (which other Consenting Noteholders later joined), Elliott promptly served discovery requests on the Debtors related to specific factual issues raised by the Motion that are currently unknown to Elliott. Instead of responding to discovery, the Debtors sought to bifurcate proceedings, staying discovery to permit initial resolution of the Debtors' purported "legal" defenses to the Motion. The initial scheduling order governing the Motion provides that the Court is to first hear the Debtors' opposition that is solely "directed to the face of the Motion . . . based on facts set forth in the Motion . . . or otherwise not in dispute." [Dkt. No. 8746] (the "Scheduling Order") ¶ 2.

2. In apparent recognition that the law is not on their side, the Debtors inject numerous disputed factual issues into their Initial Opposition that go to the merits of Elliott's breach of contract claim. For example, the Debtors attempt to excuse their failure to undertake their best efforts obligations, claiming that it would have been "economically irrational for any Backstop Party to voluntarily transfer or assign its backstop commitment." Initial Opp. at 5; *see also id.* at 6. This, of course, is a disputed factual issue that goes to the heart of the merits of the Motion, and Elliott will demonstrate at an evidentiary hearing that, had the Debtors fulfilled their contractual obligations, backstop rights would have been transferred to Elliott. If anything, the Debtors' focus on pure speculation as to the economic incentives of the Backstop Parties—instead of chronicling

Case: 19-30088    Doc# 9032    Filed: 09/14/20    Entered: 09/14/20 13:20:49    Page 6 of 24

any attempts by the Debtors to fulfill their best efforts obligations—is a tacit admission that the Debtors failed to use *any* efforts to cause the Backstop Parties to transfer backstop equity commitments to Elliott, let alone their best efforts.

3.      Similarly, the Debtors assert that the PIPE transaction was "an entirely different financing mechanism" (Initial Opp. at 7), notwithstanding that the PIPE transaction included certain original Backstop Parties and effectively reduced the Backstop Parties' commitment obligations.  The negotiation of the two cannot be artificially separated, as the Debtors would have the Court believe.  As alleged in the Motion, the Debtors overhauled the backstop with the PIPE transaction without ever contacting Elliott, its advisors, or the Ad Hoc Noteholder Committee or its advisors, to inquire if Elliott would participate in the backstop under the original economics or on more favorable terms to the amended backstop, all in breach of the Debtors' best efforts obligations under the Noteholder RSA.  *See* Motion ¶¶ 18-19.  The Debtors go so far as asserting that Elliott failed to meet its "evidentiary burden" (Initial Opp. at 25) for alternative relief under Federal Rule 60(b), before any discovery is conducted into the background of the relationship between the Amended Backstop and PIPE transaction and the Debtors' concealment of the transaction until after the record of the confirmation hearing closed.

4.      Under the Scheduling Order, none of these disputed factual issues are to be resolved before discovery at this phase of consideration of the Motion.  Instead, the only arguments in the Initial Opposition that go to the "face of the Motion" that are proper for resolution now are whether the Plan's exculpation and release provisions preclude Elliott's claims as set forth in the Motion. As set forth in detail below, neither the exculpation nor release provisions preclude Elliott's claim as a matter of law.  Instead, the Debtors' arguments are dependent on misleading quotations and use of ellipses to omit key limitations that demonstrate the inapplicability of the release and exculpation provisions to Elliott's administrative expense claim.

5.      There is simply no legal basis to preclude the Motion as a matter of law.  The Debtors' Initial Opposition must be rejected, and the Motion must be considered on the merits after full and fair discovery.

Case: 19-30088   Doc# 9032   Filed: 09/14/20   Entered: 09/14/20 13:20:49   Page 7 of 24

**RESPONSE**

## I. ELLIOTT'S ADMINISTRATIVE EXPENSE CLAIM IS PRESERVED AND PAYABLE UNDER THE PLAN AND APPLICABLE LAW

6. Elliott's Administrative Expense Claim is expressly preserved under Section 2.1 of the Plan. Section 2.1 provides that, "[f]or the avoidance of doubt, *no Administrative Expense Claims shall be discharged pursuant to the Plan*." Plan § 2.1 (emphasis added) (excerpted in full in Appendix A hereto). In an attempt to circumvent not only this express preservation of administrative expense claims, but also the requirement to pay all administrative expense claims in full pursuant to sections 503(b) and 1129(a)(9)(A) of the Bankruptcy Code, the Debtors rely on strained interpretations and misleading quotations of the Plan's exculpation and release provisions. Neither bars Elliott's administrative expense claim, nor could they under applicable law.

### A. Elliott's Administrative Expense Claim Is Not Exculpated Under The Plan

7. The Debtors assert that Elliott's administrative expense claim "clearly arise[s] from and relate[s] to the Noteholder RSA . . . and thus indisputably fall[s] within the scope of [the exculpation provision] of Section 10.8." Initial Opp. At 7. But that is not what the plain language of Section 10.8 provides. Using strategically placed ellipses, the Debtors omit critical language making clear that Elliott's Administrative Expense Claim is outside the scope of the Plan's exculpation provision. Section 10.8 expressly limits any exculpation concerning the Noteholder RSA to claims and liability relating ***only*** to "the negotiation and pursuit of" the Noteholder RSA, and further limits the exculpation only to what is "permitted by applicable law." Specifically, Section 10.8 of the Plan expressly provides as follows (excerpted in full in Appendix A hereto):

> Exculpation. Notwithstanding anything herein to the contrary, ***and to the maximum extent permitted by applicable law***, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g), no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; ***the negotiation and pursuit of*** the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, ***the***

*Noteholder RSA*, the Exit Financing Documents, the Plan Funding, the DIP Facilities, the Disclosure Statement, the Plan, . . . or any agreement, transaction, or document related to any of the foregoing . . .

Plan § 10.8 (emphasis added).

8.     There are at least two fundamental flaws in the Debtors' interpretation of Section 10.8. First, Elliott's Administrative Expense Claim does not arise out of the Debtors' "negotiation and pursuit of" the Noteholder RSA. This language would exculpate claims, for example, against the Debtors for any alleged negligent misrepresentation in negotiating the Noteholder RSA and other restructuring documents, or against the Debtors' fiduciaries for pursuing such agreements. But it does not, by its terms, cover any claims for subsequent breach of the Noteholder RSA *after* such agreement had been negotiated, pursued, and fully executed.

9.     The Debtors' Initial Opposition does not even address this limitation in Section 10.8. Instead, the Debtors resort to various misplaced arguments concerning contractual interpretation. Initial Opp. at 8-11. But under the plain language of the contract, the scope of the exculpation could not be clearer—the exculpation is limited to the "negotiation and pursuit of . . . the Noteholder RSA." This express limitation is unequivocal, and the Debtors' efforts to expand the scope of the exculpation beyond its express terms must be rejected. *See, e.g.*, *In re Railworks Corp.*, 387 B.R. 156, 162 (Bankr. D. Md. 2008) ("The Court interprets the Plan according to its plain meaning."); *In re Eagle-Picher Indus., Inc.*, 270 B.R. 842, 844 (Bankr. S.D. Ohio 2001) ("[T]he court has no alternative but to interpret the plan in accordance with [its] plain meaning.").[1]

10.     Second, the exculpation is limited by applicable law, which includes the Bankruptcy Code. Under section 1129(a)(9)(A) of the Bankruptcy Code, all administrative expense claims under section 503(b) *must* be paid in cash the full, allowed amount of such claim under any chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(A). Indeed, the Debtors represented to this Court that "the Plan satisfies the requirements of section 1129(a)(9) of the Bankruptcy Code" because "holders of Allowed Administrative Expense Claims under section 503(b) of the

---

[1] The Debtors point to several additional doctrines of construction, which, as the Additional RSA Noteholders address, instead undermine the Debtors' interpretation. *See* Additional RSA Noteholders Response at 5-6.

4

Bankruptcy Code shall receive Cash in full and final satisfaction of their Allowed Administrative Expense Claims on the Effective Date or as soon as reasonably practicable thereafter." [Dkt. No. 7528] at pp. 34-35. The Debtors cannot now reverse course and contend that the exculpation provision overrides Section 2.1 and bars Elliott's Administrative Expense Claim. Such a reading is unsupported by Section 10.8 of the Plan and, taken literally, would bar all administrative expense claims contrary to applicable law. Rather, each provision of Sections 2.1 and 10.8 must be given meaning and, thus, Elliott's Administrative Expense Claim must be resolved on the merits.

## B. Elliott's Administrative Expense Claim Is Not Released Under The Plan

11. Nor does the third-party release provision of the Plan preclude Elliott's Administrative Expense Claim. When purporting to quote the release language in Section 10.9(b), the Debtors again use ellipses to omit key language that makes clear that the release is subject to—and does not override—Plan provisions governing the treatment of claims, including Administrative Expense Claims.

12. Section 10.9(b) (excerpted in full in Appendix A hereto) begins as follows:

> <u>Releases by Holders of Claims and Interests</u>. As of and subject to the occurrence of the Effective Date, ***except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents***, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g), for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, ***and except as otherwise provided in the Plan or in the Confirmation Order***, the Released Parties, are deemed forever released and discharged, ***to the maximum extent permitted by law*** and unless barred by law, by the Releasing Parties from any and all claims . . . based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Fires, the Chapter 11 Cases . . . .

Plan § 10.9(b) (emphasis added).

13. The language "except as otherwise provided in the Plan" means that the release provision is thus expressly subject to Section 2.1 of the Plan, which preserves and addresses the treatment of Administrative Expense Claims. And if there was any doubt, Section 2.1 provides that "*[f]or the avoidance of doubt*, no Administrative Expense Claims shall be discharged pursuant

to the Plan . . . ." Plan § 2.1 (emphasis added). But that is exactly what the Debtors argue—that Elliott's Administrative Expense Claim was released under the Plan. That is not and cannot be the case under the plain language of the Plan.

14.    Additionally, under its terms, the third-party release may not exceed the "extent permitted by law." As set forth above, applicable law includes the Bankruptcy Codes' requirement to pay all administrative expense claims in full. The third-party release cannot be interpreted to release administrative expense claims when it is expressly subject to applicable law.

15.    The Debtors' argument that Elliott's Administrative Expense Claim is subject to the third-party release is also contrary to their prior representations to this Court. In responding to plan confirmation objections regarding the scope of the release and discharge language of the Plan, the Debtors acknowledged that the language was limited by applicable law, including section 1141 of the Bankruptcy Code. The Debtors represented that "the Plan clearly and expressly provides for the payment in full of *all* Administrative Expense Claims." [Dkt. No. 7528] p. 50 (emphasis added). The Debtors cannot take a contrary position here. *See Ah Quin v. County of Kauai Dept. of Transp.*, 733 F.3d 267, 270 (9th Cir. 2013) ("Judicial estoppel . . . protects the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.").

## C.    The Debtors' Interpretation of the Exculpation and Release Provisions Would Bar All Administrative Expense Claims

16.    The Debtors' contention that Administrative Expense Claims are not discharged, but nonetheless released and exculpated, is too cute by half. The third-party release provision broadly refers to any claim "based on or relating to, or in any manner arising from, in whole or in part, the Debtors" (Plan § 10.9(b)), and the exculpation provision similarly refers to claims "arising out of the administration of the Chapter 11 Cases" (*Id.* § 10.8). If Administrative Expense Claims are not preserved by the carve-outs detailed above, such extraordinarily broad release and exculpation language would lead to the nonsensical result of releasing and exculpating *all* Administrative Expense Claims. As the Additional RSA Noteholders address, the Debtors'

interpretation would impermissibly expand the exculpation provision beyond what is permitted in the Ninth Circuit. *See* Additional RSA Noteholders Response at 6-7. Indeed, under the Debtors' interpretation of the third-party release and exculpation, every Administrative Expense Claim by a professional in these cases, and even Administrative Expense Claims of ordinary course suppliers, would have been released and not entitled to any payment. The Debtors (and their professionals) have not offered any explanation as to how Elliott's Administrative Expense Claim is subject to the third-party release and exculpation, but professional and ordinary course Administrative Expense Claims are not.

17. There is simply no principled distinction under the language of Sections 10.8 and 10.9(b) to single out Elliott's Administrative Expense Claim as released and exculpated. The "except as otherwise provided in the Plan," "except for the rights . . . to enforce the Plan," and "to the maximum extent permitted by law" language—which the Debtors entirely ignore in their Initial Opposition—is essential to preserve the rights of *all* Administrative Expense Claimants and avoid rendering Section 2.1 meaningless. Any contrary reading would run afoul of black-letter bankruptcy law. *See In re Hechinger Inv. Co. of Del.*, 298 F.3d 219, 224 (3d Cir. 2002) ("[A] court cannot confirm a distribution plan unless the plan provides full cash payment of all § 503(b) administrative expense claims or the claim holder agrees to different treatment."); *In re Red Mountain Machinery Co.*, 448 B.R. 1, 16 (Bankr. D. Ariz. 2011) ("The Code unequivocally requires that administrative expenses be paid in full, in cash, on the effective date of the plan."); *In re Aureal, Inc.*, No. 00-42104, 2006 WL 2355022, *1 n.2 (Bankr. N.D. Cal. Aug. 14, 2006) ("In a chapter 11 case, the plan must provide for payment in full of all administrative claims on the effective date of the plan unless the holder of the claim agrees otherwise.").[2]

18. The Debtors also argue that Section 2.1 cannot "operate as a wholesale allowance" of all Administrative Expense Claims and, thus, Sections 10.8 and 10.9(b) override Section 2.1.

---

[2] As set forth herein, the Plan unambiguously preserves Elliott's Administrative Expense Claim, but to the extent the Plan is found to be ambiguous, such ambiguity should be resolved against the Debtors as the plan proponent. *See Miller v. U.S. (In re Miller)*, 253 B.R. 455, 459 (Bankr. N.D. Cal. 2000) ("The ambiguity in the plan should be resolved against the Debtor because [the] Debtor drafted the plan."); Cal. Civil Code § 1654 ("[T]he language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.").

Initial Opp. at 8-9. The Debtors misstate the argument. First, nowhere has Elliott suggested that Section 2.1 operates as a wholesale allowance of all Administrative Expense Claims. Rather, Administrative Expense Claims—which are defined in the Plan as claims "arising on or before the Effective Date that [are] *allowable* under section 503(b) of the Bankruptcy Code" (Plan § 1.4)— are preserved under Section 2.1 of the Plan, as are the Debtors' rights to contest the allowance of such claims under Sections 7.1 and 7.2. If, as here, there is a dispute over an asserted Administrative Expense Claim, the Court will determine whether there is a valid, allowable Administrative Expense Claim on the merits. *See* Plan § 1.7 (defining "Allowed" Claims as including any Claim that is "Allowed pursuant to Final Order"); *id.* § 11.1(d) (the Court retains jurisdiction to "consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim").

19. Finally, contrary to the Debtors' assertions, providing Allowed Administrative Expense Claims and other Allowed Claims with the express treatment set forth in the Plan would not render the exculpation and release provisions meaningless. For example, the third-party release and exculpation provisions would still cover, among other claims, (a) any postpetition claims not satisfying the section 503(b) standard, (b) claims not timely filed by an applicable bar date or claims for amounts that exceed a statutory limit (e.g., 11 U.S.C. § 506(b)(6)), (c) claims against officers, directors, equity holders, professionals, or any of the countless other non-Debtor Exculpated Parties and Released Parties, and (d) claims relating to the negotiation or pursuit of the Noteholder RSA and the various other postpetition restructuring agreements.

## II. ELLIOTT HAS NOT WAIVED CLAIMS FOR BREACH OF THE NOTEHODLER RSA, AND THE DEBTORS' INVOCATION OF WAIVER, AT A MINIMUM, RAISES DISPUTED FACTUAL ISSUES

20. The Debtors raise the doctrine of waiver to preclude Elliott from asserting an administrative expense claim based on the Debtors' failure to comply with their contractual obligations. But waiver is an affirmative defense that cannot be decided as a matter of law without a proper factual inquiry, and is thus improperly raised at this stage in contravention of the Scheduling Order. *See, e.g.*, *Nichols v. Northwestern Mutual Life Ins. Co.*, 487 Fed. Appx. 339,

8

341 (9th Cir. 2012) ("Waiver is an affirmative defense, upon which [the party asserting such affirmative defense] bears the burden of proof"); *Galarpe v. United Airlines, Inc.*, No. 17-cv-06514, 2018 WL 1586202, *5 (N.D. Cal. Apr. 2, 2018) ("[F]act based affirmative defenses cannot properly be resolved on a motion to dismiss.").

21.     To the extent the Debtors' Initial Opposition seeks a determination of waiver as a matter of law based on undisputed facts, such argument plainly fails. There is no doctrine, and the Debtors cite no case law, that requires a contract counterparty to seek an injunction to enforce the contract, or to risk breach of the contract (as would have occurred if Elliott objected to the Plan or June 9 Backstop Motion) in order to preserve a contractual claim for monetary damages. This is particularly true here, since no administrative claim bar date was established under the Plan or otherwise by the Court. Thus, under applicable California law, Elliott had four years to assert its breach of contract claim. *See* Cal. Code Civ. P. § 337. Filing a damages claim within weeks of notice of the breach clearly does not constitute waiver.

22.     The Debtors' argument that Elliott was required to object to the Plan to preserve its damages claim is baseless. Elliott was under no obligation to object to the Plan because the Plan expressly preserves its rights to seek allowance and payment of an Administrative Expense Claim. In accordance with Section 2.1 of the Plan and section 503(b) of the Bankruptcy Code, Elliott had and continues to have the right to request allowance of an Administrative Expense Claim, which must be paid in full. Elliott acted expeditiously by filing the Motion within 30 days after the Plan Effective Date and, because the Plan does not establish any bar date for Administrative Expense Claims, the Debtors cannot legitimately contend that Elliott's request for an Allowed Administrative Expense Claim is untimely. *See* 11 U.S.C. § 503(a) ("An entity may timely file a request for payment of an administrative expense").

23.     Moreover, at the time the Debtors decided to finally announce their complete overhaul of the backstop, the plan objection deadline had long passed, the confirmation hearing record had closed, and Elliott was practically (since the objection deadline had passed and the record closed) and contractually (under the terms of the Noteholder RSA) precluded from

objecting to the Plan and Confirmation Order. As the Debtors recognize, the Noteholder RSA provides for a 10-day cure period following the delivery of a notice of termination before Consenting Noteholders could terminate the Noteholder RSA. *See* Noteholder RSA § 5(b). Given the last minute nature of the Debtors' actions that occurred behind the scenes, Elliott simply had no opportunity to object or seek relief prior to the Plan being confirmed, nor would Elliott have been required to even if it could have. The Debtors are the ones whose actions demonstrated an effort to strategically conceal their breach of the Noteholder RSA until the eleventh hour, and they cannot now shift responsibility for their concealment onto Elliott.

24. The Debtors' argument that Elliott waived its Administrative Expense Claim by not objecting to the June 9 Backstop Motion is equally misguided. The Debtors do not explain what action Elliott was required to take and the basis for such obligation (whether by law or by contract) to object to the June 9 Backstop Motion. As a contractual counterparty, the law does not prohibit the Debtors from breaching the Noteholder RSA and pursuing the Amended Backstop and PIPE transaction. *See, e.g.*, *From the Future, LLC v. Flowers*, No. 06-cv-00203, 2009 WL 10709083, *5 (D. Nev. Apr. 20, 2009) (recognizing that the law does not prohibit a party from breaching a contract if it determines the benefits of breaching outweigh the costs). But the Debtors' actions cannot negate a subsequent claim for damages. Nor did the Debtors' pursuit of the June 9 Backstop Motion in breach of the Noteholder RSA require Elliott to itself breach the Noteholder RSA and object to the June 9 Backstop Motion. Indeed, the Noteholder RSA required ten days' notice of termination before Elliott would have been permitted to object, and the June 9 Backstop Motion was heard on only seven days' notice.

25. The Debtors also suggest that Elliott could have attempted to block the June 9 Backstop Motion by seeking unspecified injunctive relief. The Debtors confuse the two separate remedies of injunction and monetary damages. The law imposes no requirement for a contract counterparty to seek an injunction to preserve its damages remedy. *See, e.g.*, *Ashker v. Sayre*, No. 05-03759, 2010 WL 476634, *4 (N.D. Cal. Feb. 4, 2010) ("For breach of contract, a plaintiff can

choose the remedy of specific performance or monetary damages.") (citing *Union Oil Co. of Cal. v. Greka Energy Corp.,* 165 Cal.App.4th 129, 135, 80 Cal.Rptr.3d 738 (2008)).

26. Each of the cases cited by the Debtors in support of their waiver argument is entirely inapposite. None of the cases cited by the Debtors involves any comparable situation where the debtor withheld pertinent facts giving rise to a breach of a material postpetition contract until *after* conclusion of a confirmation hearing. Nor do any of the Debtors' cases stand for the proposition that a party can waive its monetary damages claim by failing to seek an alternative injunctive remedy or object to other actions taken in breach of contract. *See U.S. v. Olano*, 507 U.S. 725, 731 (1993) (considering the standard of review applicable to a criminal defendant who did not object to the presence of alternate jurors during deliberations until appeal); *In re Wrightwood Guest Ranch, LLC*, 896 F.3d 1109, 1114 (9th Cir. 2018) (bankruptcy court approval of settlement affirmed where appellants, which were law firms representing parties below, opposed the settlement on behalf of their clients but never objected or appeared at the hearing below on behalf of themselves); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 570 (9th Cir. 2012), *aff'd sub nom. Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014) (denying motion to vacate judgment for lack of subject matter jurisdiction where the movant "fully litigated the fraudulent conveyance action before the bankruptcy and the district court, without so much as a peep about Article III"); *In re Cellular 101, Inc.*, 539 F.3d 1150, 1155 (9th Cir. 2008) (holding that debtor could not raise argument in its second appeal that it could have, but did not, raise in its first appeal); *In re Enewally*, 368 F.3d 1165, 1173 (9th Cir. 2004) (finding that issues not raised in trial court cannot be raised for the first time on appeal); *In re Pardee*, 193 F.3d 1083, 1086 (9th Cir. 1999) (granting motion to enforce plan discharge where creditor sought to collect on a discharged claim following the bankruptcy); *In re Arriva Pharm., Inc.*, 456 B.R. 419, 426 (Bankr. N.D. Cal. 2011) (precluding license agreement counterparty from asserting damages for a prepetition breach when the license agreement was assumed under section 365 with a finding that the debtor had satisfied the cure requirement).

27. The Debtors have not presented any valid basis, based on undisputed facts, for this Court to conclude that Elliott has waived its Administrative Expense Claim as a matter of law.

Case: 19-30088    Doc# 9032    Filed: 09/14/20    Entered: 09/14/20 13:20:49    Page 16 of 24

## III. LIMITED RECONSIDERATION OF THE CONFIRMATION ORDER UNDER FED. R. CIV. P. 60(b) IS AVAILABLE, ALTERNATIVE RELIEF

28.     Elliott submits that the Confirmation Order and Plan clearly and unambiguously preserve Elliott's Administrative Expense Claim and, thus, reconsideration of the Confirmation Order is not necessary to allow Elliott to proceed on such claim.  To the extent the Court concludes otherwise, however, this is the classic circumstance where Federal Rule 60(b) relief is required.  The Debtors concealed their breach until after the confirmation record had closed when Elliott was precluded from objecting to release and exculpation provisions that would, under the Debtors' construction, impermissibly preclude administrative expense claims the law requires to be paid in full.  The Debtors have not presented any valid basis for denial of such relief as a matter of law.

### A.     Rule 60(b) Permits Limited Reconsideration of the Confirmation Order

29.     The Debtors' initial argument that a creditor cannot obtain relief from a plan confirmation order under Federal Rule 60 is incorrect and should be rejected.  Bankruptcy Rule 9024 expressly provides that Federal Rule 60 "applies in cases under the Bankruptcy Code."[3]  The Debtors' argument has no support in the Bankruptcy Code, Bankruptcy Rules, or the Federal Rules.

30.     Courts have recognized Federal Rule 60(b) as a valid means for creditors and interest holders to obtain relief from confirmation orders.  *See In re Joseph Edward Co., Inc.*, 357 B.R. 441, 445 (Bankr. E.D. Ky. 2006) (granting creditor relief from confirmation order injunction pursuant to Federal Rule 60(b)); *In re 401 East 89th Street Owners Inc.*, 223 B.R. 75, 79 (Bankr. S.D.N.Y. 1998) (granting interest holder relief from confirmation order under Federal Rule 60(b) and finding that "[n]otwithstanding the finality of an order of confirmation, it may be affected by relief granted under Fed. R. Civ. P. 60(b), for Fed. R. Bankr. P. 9024 makes Rule 60 applicable to bankruptcy cases"); *see also In re BNW, Inc.*, 201 B.R. 838, 846-47 (Bankr. S.D. Ala. 1996) (recognizing Federal Rule 60(b) as an avenue for setting aside a confirmation order); *In re Poteet*

---

[3]  The one limitation in Bankruptcy Rule 9024 relevant to confirmation orders is that "a complaint to revoke an order confirming a plan may be filed only within the [180-day time period] allowed by § 1144." Fed. R. Bankr. P. 9024. Elliott, however, is not asking this Court to revoke the Confirmation Order under section 1144.  Rather, Elliott is seeking narrow relief under Federal Rule 60(b) from the release and exculpation provisions to the limited extent that they are deemed by the Court to preclude Elliott from pursuing its Administrative Expense Claim.

Case: 19-30088   Doc# 9032   Filed: 09/14/20   Entered: 09/14/20 13:20:49   Page 17 of 24

*Const. Co., Inc.*, 122 B.R. 616, 618 (Bankr. S.D. Ga. 1990) ("Rule 60(b) is available to relieve a party or a party's legal representative from the affects of an order of confirmation").

31.     Most of the cases cited by the Debtors in support of their argument that section 1127 is the exclusive means to obtain relief from a confirmation order do not even address a request under Federal Rule 60(b) and thus are inapposite. *See In re Elec. Maint. & Constr., Inc.*, No. 8:11-BK-18670-CED, 2016 WL 2985025, *4 (Bankr. M.D. Fla. May 19, 2016) (denying motion to compel a debtor to modify a confirmed plan); *In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, *6 (Bankr. S.D.N.Y. Jan. 24, 2008) (denying motion for stay of confirmation order pending appeal); *In re iE, Inc.*, BAP No. CC-19-1307-FLTa, 2020 WL 3547928, *5 (B.A.P. 9th Cir. June 22, 2020) (addressing equitable mootness); *In re Daewoo Motor Am., Inc.*, 488 B.R. 418, 426 (C.D. Cal. 2011) (affirming denial of motion to extend the term of a creditor trust).  Other cases cited by the Debtors even recognize that courts have granted just the type of relief sought here.  *See In re Logan Place Props., Ltd.*, 327 B.R. 811, 812-14 (Bankr. S.D. Tex. 2005) (recognizing that "[i]ndeed, some courts have reviewed and altered orders of confirmation under Rule 60(b)"); *In re Rickel & Assocs.*, 260 B.R. 673, 678 (Bankr. S.D.N.Y. 2001) (recognizing that "a court can modify a confirmation order under Rule 60(b)," but denying motion where *the debtor* sought modification of the confirmation order after substantial consummation).[4]

32.     In short, there is no legal basis to preclude the alternative request for relief under Federal Rule 60(b) as a matter of law.

**B.     Relief Under Fed. R. Civ. P. 60(b) Requires Resolution of Disputed Factual Issues Not Properly Raised At This Stage Under the Scheduling Order**

33.     Not only is there no legal basis to preclude Elliott's alternative request for relief under Federal Rule 60(b), consideration of the disputed factual issues raised by the Debtors' Initial

---

[4]  The Debtors cite one case suggesting that Federal Rule 60(b) relief was not available to creditors seeking to modify a release provision in a plan.  *In re Vencor, Inc.*, 284 B.R. 79 (Bankr. D. Del. 2002) (denying request to modify confirmation order as untimely under section 1144).  That case is distinguishable.  *Vencor* dealt with releases of prepetition claims against the debtor, and not, as here, postpetition administrative expense claims that cannot, as a matter of law, be released in a plan without consent.  In any event, this single decision is not binding and is contrary to the plain language of Bankruptcy Rule 9024 and Federal Rule 60.

Opposition that go to the merits of such relief cannot under the Scheduling Order be decided at this stage of the Motion before discovery. In ruling on a motion for reconsideration under Federal Rule 60(b), a court must consider all relevant facts and circumstances and apply such facts and circumstances to the relevant factors for Federal Rule 60(b) relief. *See, e.g.*, *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993) (a court must "tak[e] account of all relevant circumstances" in considering a request for relief under Federal Rule 60(b)(1)); *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1261-63 (9th Cir. 2010) (finding that the lower court abused its discretion in denying a Federal Rule 60(b) motion without considering all facts and applying those facts to the relevant factor test).

34. As set forth in the Motion, courts consider four factors in determining whether excusable neglect exists under Federal Rule 60(b)(1): (a) the danger of prejudice to the opposing party; (b) the length of the delay and its potential impact on the proceedings; (c) the reason for the delay; and (d) whether the movant acted in good faith. *See Pioneer*, 507 U.S. at 395. This "requires the Court to equitably consider all relevant circumstances surrounding the reasons for the mistake." *U.S. v. Root*, No. 2:14-CR-0001-TOR-2, 2016 WL 4205358, *3 (E.D. Wash. July 1, 2016) (citing *Pincay v. Andrews*, 389 F.3d 853 (9th Cir. 2004)). In addition, in assessing whether relief is warranted under Federal Rule 60(b)(6), courts must assess whether "extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993).

35. These are inherently fact-intensive inquiries that must be determined on a full record. At this stage of the proceedings, the Debtors are only permitted to raise defenses "directed to the face of the Motion" and facts not in dispute. Scheduling Order ¶ 2. Elliott has alleged sufficient facts in the Motion establishing a basis for limited relief from the Confirmation Order under Federal Rule 60(b), including that (a) the Debtors first disclosed facts and circumstances giving rise to Elliott's Administrative Expense Claim on June 9, 2020, (b) the objection deadline for Plan confirmation had passed several weeks earlier on May 15, 2020, (c) the record for the

Confirmation Hearing had already closed by the time the Debtors filed the June 9 Backstop Motion, and (d) the Noteholder RSA precluded Elliott from objecting to Plan confirmation.[5]

36.     Contrary to the Scheduling Order, the Debtors introduce numerous disputed factual issues in their Initial Opposition in an effort to defeat Elliott's request for Federal Rule 60(b) relief not as a legal matter, but on the merits.  For example, the Debtors include (a) unsupported, conclusory statements regarding the "potential prejudice" to the Reorganized Debtors and other parties in interest if the Motion is granted, (b) speculation as to supposed "strategic reasons" why Elliott did not oppose Plan confirmation or the June 9 Backstop Motion (notwithstanding it was contractually prohibited from doing so), and (c) false assertions that Elliott "had more than ample opportunity to raise any asserted breach" prior to approval of the June 9 Backstop Motion and confirmation of the Plan.  Initial Opp. 20-23.  These assertions, each of which Elliott disputes, are not to be considered by the Court at this stage of the Motion under the Scheduling Order.

37.     As set forth in the Motion and as will be demonstrated by Elliott at an evidentiary hearing on the merits, the Debtors breached their contractual obligations under the Noteholder RSA and concealed pertinent facts surrounding that breach until Elliott could not object to the release and exculpation provisions of the Confirmation Order.  The Debtors cannot escape liability for such breach by attempting to shift blame for their own tactics onto Elliott.  To the extent the release and exculpation provisions apply, reconsideration under Federal Rule 60(b) is appropriate.

## CONCLUSION

38.     For the foregoing reasons, the Court should (a) deny the Debtors' request to disallow Elliott's Administrative Expense Claim as a matter of law, (b) establish a schedule for discovery, briefing, and an evidentiary hearing to consider the Motion on the merits, and (c) grant Elliott such other and further relief as the Court deems just and proper.

---

[5]     The Debtors' repeated reference to Elliott's purported failure to object to the June 9 Backstop Motion is equally misplaced.  Elliott is not seeking reconsideration of the order approving the June 9 Backstop Motion.  Elliott's request is limited to the release and/or exculpation provisions in the Confirmation Order, to the extent applicable.

Case: 19-30088    Doc# 9032    Filed: 09/14/20    Entered: 09/14/20 13:20:49    Page 20 of 24

Dated: September 14, 2020

**ROPES & GRAY LLP**

By: ___*/s/ Rocky C. Tsai*___

Rocky C. Tsai (CA Bar No. 221452)
3 Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 315-6369
Facsimile: (415) 315-6350

-and-

**ROPES & GRAY LLP**
Gregg M. Galardi (admitted *pro hac vice*)
Keith H. Wofford (admitted *pro hac vice*)
Daniel G. Egan (admitted *pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

-and-

**ROPES & GRAY LLP**
Andrew G. Devore (admitted *pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, MA 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel to Elliott Management Corporation, on behalf of itself and certain funds and accounts managed, advised, or sub-advised by it*

16

# Appendix A

## Complete Excerpts of Plan Sections 2.1, 10.8 and 10.9(b)
### (emphasis added)

2.1    Administrative Expense Claims. In full and final satisfaction, settlement, release, and discharge of any Allowed Administrative Expense Claim against a Debtor, except to the extent the Debtors or Reorganized Debtors, as applicable, and a holder of an Allowed Administrative Expense Claim against a Debtor agrees to a less favorable treatment of such Administrative Expense Claim, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction, settlement, and discharge of such Allowed Administrative Expense Claim, an amount in Cash equal to the Allowed amount of such Administrative Expense Claim; provided that any Allowed Administrative Expense Claim that is not due and payable prior to the Effective Date, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities. ***For the avoidance of doubt, no Administrative Expense Claims shall be discharged pursuant to the Plan***, other than Allowed Administrative Expense Claims that have been paid in Cash or otherwise satisfied in the ordinary course in an amount equal to the Allowed amount of such Claim on or prior to the Effective Date.

\* \* \*

10.8    Exculpation. Notwithstanding anything herein to the contrary, and ***to the maximum extent permitted by applicable law***, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g), no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, Interest, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, remedy, or liability for any claim (including, but not limited to, any claim for breach of any fiduciary duty or any similar duty) in connection with or arising out of the administration of the Chapter 11 Cases; ***the negotiation and pursuit*** of the Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, ***the Noteholder RSA***, the Exit Financing Documents, the Plan Funding, the DIP Facilities, the Disclosure Statement, the Plan, the Restructuring Transactions, the Wildfire Trusts (including the Plan Documents, the Claims Resolution Procedures and the Wildfire Trust Agreements), or any agreement, transaction, or document related to any of the foregoing, or the solicitation of votes for, or confirmation of, this Plan; the funding of this Plan; the occurrence of the Effective Date; the administration of this Plan or the property to be distributed under this Plan; any membership in (including, but not limited to, on an ex officio basis), participation in, or involvement with the Statutory Committees; the issuance

of Securities under or in connection with this Plan; or the transactions in furtherance of any of the foregoing; except for Claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan. The Exculpated Parties and each of their respective affiliates, agents, directors, officers, employees, advisors, and attorneys have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distributions pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan, including the issuance of Securities thereunder. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability.

\* \* \*

10.9    (b) Releases by Holders of Claims and Interests. As of and subject to the occurrence of the Effective Date, ***except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents***, and except for the Assigned Rights and Causes of Action solely to the extent preserved by Section 10.9(g), for good and valuable consideration, the adequacy of which is hereby confirmed, including, the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, ***and except as otherwise provided in the Plan or in the Confirmation Order***, the Released Parties, are deemed forever released and discharged, ***to the maximum extent permitted by law*** and unless barred by law, by the Releasing Parties from any and all claims, interests, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, and any claims for breach of any fiduciary duty (or any similar duty), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates (to the extent such affiliates can be bound) would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Fires, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facilities, the Plan Funding, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Public Entities Plan Support Agreement, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, the Exit Financing Documents, the

negotiation, formulation, or preparation of the Disclosure Statement, the Plan and related agreements, instruments, and other documents (including the Plan Documents, the Claims Resolution Procedures, the Wildfire Trust Agreements, Public Entities Plan Support Agreements, the Backstop Commitment Letters, the Subrogation Claims RSA, the Tort Claimants RSA, the Noteholder RSA, and the Exit Financing Documents), the solicitation of votes with respect to the Plan, any membership in (including, but not limited to, on an ex officio basis), participation in, or involvement with the Statutory Committees, or any other act or omission, transaction, agreement, event, or other occurrence, and in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding the above, the holders of Environmental Claims, Workers' Compensation Claims and 2001 Utility Exchange Claims retain the right to assert such Claims against the Reorganized Debtors in accordance with the terms of the Plan; and nothing herein shall be deemed to impose a release by holders of Fire Victim Claims of insurance claims arising under their insurance policies against holders of Subrogation Wildfire Claims, other than any rights such holder may elect to release as part of any settlement as set forth in Section 4.25(f)(ii) hereof.