| | |
|---|---|
| Craig Goldblatt (*Pro Hac Vice* admitted)<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>1875 Pennsylvania Ave., NW<br>Washington DC 20036<br>Telephone: 202.663.6000<br>Facsimile: 202.663.6363<br>craig.goldblatt@wilmerhale.com<br><br>Philip D. Anker (*Pro Hac Vice* admitted)<br>Allyson Pierce (Cal. Bar. No. 325060)<br>WILMER CUTLER PICKERING HALE AND DORR LLP<br>250 Greenwich Street<br>New York, NY 10007<br>Telephone: 202.230.8800<br>Facsimile: 202.230.8888<br>philip.anker@wilmerhale.com<br>allyson.pierce@wilmerhale.com<br><br>*Counsel to Canyon, Citadel, Davidson Kempner, Farallon, Sculptor, and Värde, on behalf of themselves, and/or certain funds and accounts managed, advised, or sub-advised by them* | David P. Simonds (Cal. Bar No. 214499)<br>Edward J. McNeilly (Cal. Bar No. 314588)<br>HOGAN LOVELLS US LLP<br>1999 Avenue of the Stars, Suite 1400<br>Los Angeles, California 90067<br>Telephone: 310.785.4600<br>Facsimile: 310.785.4601<br>david.simonds@hoganlovells.com<br>edward.mcneilly@hoganlovells.com<br><br>Michael C. Hefter (*Pro Hac Vice* pending)<br>Matthew Ducharme (*Pro Hac Vice* pending)<br>HOGAN LOVELLS US LLP<br>390 Madison Avenue<br>New York, New York 10017<br>Telephone: 212.918.3000<br>Facsimile: 212.918.3100<br>michael.hefter@hoganlovells.com<br>matthew.ducharme@hoganlovells.com<br><br>*Counsel to PIMCO, as investment adviser or manager for certain funds and accounts* |

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>PG&E CORPORATION,<br><br>- and –<br><br>PACIFIC GAS AND ELECTRIC COMPANY,<br><br>Reorganized Debtors.<br><br>☐ Affects PG&E Corporation<br>☐ Affects Pacific Gas and Electric Company<br>☒ Affects both Debtors<br><br>*All papers shall be filed in the Lead Case, No. 19-30088 (DM)* | Case No. 19-30088 (DM)<br>Chapter 11<br>(Lead Case)<br>(Jointly Administered)<br><br>**ADDITIONAL RSA NOTEHOLDERS' RESPONSE TO THE REORGANIZED DEBTORS' INITIAL OPPOSITION TO ELLIOTT MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND RECONSIDERATION OF CONFIRMATION ORDER AND RELATED JOINDERS**<br><br>Related to Dkt. Nos.: 8536, 8663, 8704, 8864 |

**Hearing**
Date: October 13, 2020
Time: 10:00 a.m. (PT)
Place: Telephone or Video Appearances Only

**Reply Deadline:** September 25, 2020

**TABLE OF CONTENTS**

ARGUMENT ............................................................................................................................ 4

I. THE TERMS OF THE PLAN EXPRESSLY PRESERVE, RATHER THAN PRECLUDE, THE ADDITIONAL RSA NOTEHOLDERS' ADMINISTRATIVE EXPENSE CLAIM. .......................................................................................................... 4

    A. By Its Plain Terms, Section 10.8 Of The Plan Does Not Exculpate The Debtors From Liability On The Consenting Noteholders' Administrative Expense Claim. 4

    B. The Consenting Noteholders' Administrative Expense Claim Falls Under The Exceptions In Section 10.9(B) Of The Plan And Is Therefore Not Subject To Release ................................................................................................................... 7

II. THE DEBTORS' REMAINING ARGUMENTS ARE UNAVAILING. ........................ 10

RESERVATION OF RIGHTS .............................................................................................. 12

CONCLUSION ..................................................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*,
    855 P.2d 1263 (Cal. 1993)..........................................................................................9

*Blixseth v. Credit Suisse*,
    961 F.3d 1074 (9th Cir. 2020)..............................................................................7, 10

*Gerwer v. Salzman (In re Gerwer)*,
    253 B.R. 66 (B.A.P. 9th Cir. 2000)..........................................................................6

*Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*,
    193 F.3d 1083 (9th Cir. 1999)................................................................................11

*Lowery v. Channel Commc'ns, Inc. (In re Cellular 101, Inc.)*,
    539 F.3d 1150 (9th Cir. 2008)................................................................................11

*Pinel v. Aurora Loan Servs., LLC*,
    814 F. Supp. 2d 930 (N.D. Cal. 2011).....................................................................5

*Reid & Hellyer, APC v. Laski (In re Wrightwood Guest Ranch, LLC)*,
    896 F.3d 1109 (9th Cir. 2018)................................................................................11

*Reserve Ins. Co. v. Pisciotta*,
    640 P.2d 764 (Cal. 1982)........................................................................................9

*United States v. Olano*,
    507 U.S. 725 (1993)..............................................................................................11

*Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*,
    527 F.3d 959 (9th Cir. 2008)...................................................................................9

**STATUTES**

11 U.S.C. § 1129............................................................................................................3, 4, 8

Cal. Civ. Code § 1638.........................................................................................................6, 9

Cal. Civ. Code § 1643............................................................................................................9

Cal. Civ. Proc. Code § 1858..................................................................................................5

**RULES**

Fed. R. Civ. P. 60.................................................................................................................11

Canyon Capital Advisors LLC ("Canyon"), Citadel Advisors LLC ("Citadel"), Davidson Kempner Capital Management LP ("Davidson Kempner"), Farallon Capital Management, L.L.C. ("Farallon"), Sculptor Master Fund, Ltd., Sculptor Enhanced Master Fund, Ltd., Sculptor Credit Opportunities Master Fund, Ltd., Sculptor GC Opportunities Master Fund, Ltd., Sculptor SC II, LP (collectively, "Sculptor"), and Värde Partners, Inc. ("Värde"), on behalf of themselves, and/or certain funds and accounts managed, advised, or sub-advised by them, as well as Pacific Investment Management Company LLC, as investment adviser or manager for certain funds and accounts that were Consenting Noteholders ("PIMCO" and, together with Canyon, Citadel, Davidson Kempner, Farallon, Sculptor, and Värde, the "Additional RSA Noteholders"), hereby respond to the *Reorganized Debtors' Initial Opposition to Elliott Management Corporation's Motion for Allowance and Payment of Administrative Expense Claim and Reconsideration of Confirmation Order and Related Joinders* [Dkt. No. 8864] (the "Initial Opposition"), filed August 26, 2020, by PG&E Corporation and Pacific Gas and Electric Company (collectively, the "Debtors" and, as reorganized pursuant to the Plan,[1] the "Reorganized Debtors"). The Additional RSA Noteholders join in the response to the Initial Opposition filed by Elliott Management Company ("Elliott"). They submit this further response only to emphasize a few, dispositive points.

The administrative expense claim asserted by the Additional RSA Noteholders, as well as Elliott (collectively, the "Consenting Noteholders"), is simple and straightforward. The Debtors made a written promise to the Consenting Noteholders in the Noteholder RSA. They undertook to use not merely commercially reasonable efforts, but "best efforts," to enable the Consenting

---

[1] The term "Plan" refers to the *Debtors' and Shareholder Proponents' Joint Chapter 11 Plan of Reorganization* [Dkt. No. 8048], dated June 19, 2020, as confirmed by this Court on June 20, 2020 [Dkt. No. 8053]. Capitalized terms referenced but not defined herein shall have their respective meanings as set forth in the Plan.

1

Noteholders to participate in the backstop for the Debtors' exit financing. But, as far as the Additional RSA Noteholders have been able to determine, the Debtors never so much as lifted a finger to provide that opportunity. The Consenting Noteholders have collectively suffered damages of no less than approximately $250 million on account of the Debtors' failure to comply with their "best efforts" obligation. The Consenting Noteholders' claim for damages arising out of the Debtors' breach of a post-petition contract, like any other claim for the Debtors' breach of a post-petition agreement, is an administrative expense claim in bankruptcy, which under the Plan must be paid in full by the Reorganized Debtors. That claim, asserted only a few weeks after the Debtors emerged from bankruptcy [Dkt. Nos. 8536, 8663, 8704], is timely. Indeed, neither the Plan nor any order of this Court set *any* bar date for the filing of administrative expense claims.

The Reorganized Debtors' principal response is extraordinary: They claim that the exculpation and release provided in the Plan relieve them of their obligation to honor these administrative expense claims (even if the claims are otherwise allowed) and, presumably, other post-petition promises they made. The Plan, in fact, says just the opposite—though one would not know that from reading the Debtors' Initial Opposition, which uses selective ellipses in quoting from the Plan in an apparent effort to alter its plain terms.

Not only is the Debtors' argument contrary to the actual words of the Plan, it also makes no sense. Substantively, the Debtors' promise in the Noteholder RSA to make best efforts to include the Consenting Noteholders in the backstop, in exchange for the Consenting Noteholders' support for the Debtors' reorganization, is no different from the promises the Debtors made during the bankruptcy case to pay their vendors for goods and services that were delivered on a post-petition basis. No one would read the Plan to excuse the Debtors from their

2

obligations, expressly preserved under the Plan as required for confirmation under Section 1129 of the Bankruptcy Code, to pay a post-petition administrative expense for goods or services that were delivered before the Effective Date, but that remained unpaid as of the Effective Date. Despite all of the bluster and feigned indignation reflected in the Initial Opposition, there simply is no reason why the Debtors' promises in the Noteholder RSA should be treated any differently.

The Debtors' other arguments fare no better. Although they acknowledge that their Initial Opposition is the equivalent of a motion to dismiss or motion for judgment on the pleadings,[2] they argue disputed issues of fact and matters that have no legal relevance. Much of what the Debtors argue is false or misleading, and none of it is proper at this preliminary stage in the proceedings.[3] In the final analysis, all of the Debtors' obfuscation cannot change the simple, dispositive point: the Plan expressly preserves the Consenting Noteholders' rights to assert their administrative expense claim. The Court should deny the Debtors' Initial Objection, and direct the parties expeditiously to proceed with discovery, so this matter can be tried and adjudicated without further delay.

---

[2] *See* August 7, 2020 Status Conference at 24:34 [Dkt. No. 8715] ("Just so it's clear, our response will be based on the law and the undisputed facts[.]"); *see also Order Regarding Scheduling with Respect to Elliott Management Corporation Motion for Allowance and Payment of Administrative Claim and Related Joinders* [Dkt. No. 8746] (the "Scheduling Order") ¶ 2 ("The Court shall first hear an opposition to the Motion by the Reorganized Debtors raising defenses directed to the face of the Motion (including the Joinders and any Additional Joinders) based on facts set forth in the Motion, the Joinders, and any Additional Joinders, or otherwise not in dispute, and applicable law.").

[3] For example, the Debtors repeatedly assert that, if allowed, the Consenting Noteholders' administrative expense claim will reduce the value of the equity held by the company's current shareholders, including the Fire Victims Trust. *See, e.g.*, Initial Opposition at 1 n.2, 4, 15. The identity of the Reorganized Debtors' shareholders and any impact the Consenting Noteholders' claim might have on the value of the Reorganized Debtors' equity have no relevance to the legal issues presented. The argument is also misleading. The Debtors do not disclose that the common stock of the Reorganized Debtors has a market capitalization of about $19 billion. Holding the Debtors to their legally binding contractual promises will not materially affect the value of the Reorganized Debtors' equity.

3

# ARGUMENT

## I. THE TERMS OF THE PLAN EXPRESSLY PRESERVE, RATHER THAN PRECLUDE, THE ADDITIONAL RSA NOTEHOLDERS' ADMINISTRATIVE EXPENSE CLAIM.

The Debtors' main argument is that the exculpation and release provisions in the Plan give the Debtors truly extraordinary relief: complete immunity from having to pay an administrative expense claim even if that claim were determined to be entirely valid and notwithstanding that the Bankruptcy Code obligates a Chapter 11 debtor to pay its administrative expenses in full in cash to emerge from bankruptcy. 11 U.S.C. § 1129(a)(9)(A). Not surprisingly, the Plan says nothing of the kind.

### A. By Its Plain Terms, Section 10.8 Of The Plan Does Not Exculpate The Debtors From Liability On The Consenting Noteholders' Administrative Expense Claim

According to the Debtors, the Plan's exculpation provision frees them from any liability for their breach during the bankruptcy case of a contract they entered into during the bankruptcy case, even though under settled law that liability would be an administrative expense of their estates. Such a provision would, of course, have made the Plan un-confirmable as a matter of law. *See* 11 U.S.C. § 1129(a)(9)(A). It should come as little surprise, therefore, that the exculpation provision does not say what the Debtors claim it says.

As Elliott notes in its response (at pp. 3-4), the Plan's exculpation provision includes a critical limitation, one that the Debtors (through their misleading use of ellipses) have omitted from the block quote contained in their brief. *See* Initial Opposition at 8. Specifically, the exculpation clause relieves the exculpated parties from liability arising only out of "***the negotiation and pursuit*** of . . . the Noteholder RSA." It does not exculpate them at all for their

4

***breach*** of the Noteholder RSA. Plan, art. X, § 10.8 (emphasis added).[4] Plan, art. X, § 10.8 (emphasis added).

Thus, the Debtors' assertion that "Section 10.8 specifically states that the Debtors and Reorganized Debtors are 'released and exculpated' from any claims in connection with or arising under, among other things, ***the Noteholder RSA***" (Initial Opposition at 2) is simply false. By its terms, Section 10.8 exculpates and releases the Debtors and the Reorganized Debtors only from claims arising out of "the negotiation and pursuit" of the Noteholder RSA, not from claims arising out of the Debtors' subsequent breach of the Noteholder RSA. That distinction is dispositive. The Consenting Noteholders are not asserting that the Debtors are liable for negotiating and pursuing, or even entering into, the Noteholder RSA. They are asserting that the Debtors are liable for breaching the Noteholder RSA.

Not only is the Debtors' argument contrary to the plain wording of Section 10.8, but the standard rules of contract construction the Debtors cite underscore the point. For example, the Debtors note that contracts should be interpreted so as to give "force and effect to every provision," and that courts are to take care "not to insert what has been omitted, or to omit what has been inserted." Initial Opposition at 9 (citing *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011); Cal. Civ. Proc. Code § 1858)). These principles are, of course, black letter law.[5] But they undermine, rather than support, the Debtors' arguments. Section 10.8 specifies that only claims relating to the "negotiation and pursuit" of the Noteholder RSA, not claims arising out of its breach, are subject to exculpation. It is the Debtors who have chosen—through the use of ellipses in their Initial Objection—to "omit what has been inserted"

---

[4] In its response, filed contemporaneously herewith, Elliott provides the full text of Section 10.8 in an appendix. Rather that repeat the text here, the Additional RSA Noteholders refer the Court to that appendix.

[5] The Plan is governed by the laws of the State of California. Plan, art. XII, § 12.10.

5

in the actual exculpation clause set forth in the Plan. All of this is contrary to the basic principle that contractual provisions should be read to give effect to their actual words. *See* Cal. Civ. Code § 1638; *see also Gerwer v. Salzman (In re Gerwer)*, 253 B.R. 66, 73 (B.A.P. 9th Cir. 2000).

The other principles of contract interpretation that the Debtors cite are either irrelevant or, again, doom their argument. Of course, where there is a conflict between two provisions in a contract, the more specific will usually be read to control over the more general. *See* Initial Opposition at 10. But here there is no conflict. The provision that the Debtors say is more specific (Section 10.8) does not exculpate the Debtors for liability for their breach of the Noteholder RSA, and the provision that the Debtors say is more general (Section 2.1, the provision requiring the Debtors to pay their administrative expenses in full) is to the same effect. Similarly, the Debtors point to the presumption that when a contract includes a carve-out for one type of claim, but omits the same carve-out for another type of claim, the drafters must have intended the disparate treatment. *Id.* That, too, is correct. But it only reinforces that the drafters of the Plan must have intended to limit the exculpation clause to cover only claims arising out of the "negotiation and pursuit" of the Noteholder RSA, and not claims arising out of the breach of the Noteholder RSA, as the drafters included the former type of claim in Section 10.8, but omitted the latter. The Debtors note that "sophisticated parties" must be held to their actions. Initial Opposition at 15. The Debtors—companies worth billions of dollars, represented by a leading law firm with an international reputation for representing debtors in large Chapter 11 cases—drafted the Plan and, as they state, "must live with [its] terms." *Id.*

Finally, the Debtors' reading of the Plan—under which an exculpation provision would free the Debtors from any and all responsibility for payment of administrative expenses arising out of their own post-petition breach of a post-petition agreement—would be contrary to settled

6

bankruptcy law and thus would conflict with the exculpation's express qualification that it applies only "to the maximum extent permitted by applicable law." Plan, art. X, § 10.8. As the Ninth Circuit has explained, the traditional role of exculpation clauses is not to protect Chapter 11 debtors—such a debtor typically receives a discharge at the end of a chapter 11 case—but rather to protect other participants in the bankruptcy case, such as the debtor's officers and professionals, from subsequent litigation arising out of their conduct during the bankruptcy. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020). Such clauses permit parties-in-interest "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id*. To the extent an exculpation provision properly protects the debtor itself at all, it logically would be limited to claims against the debtor arising out of its pursuit and negotiation of a restructuring support agreement, and not extend to claims arising out of the debtor's own breach of that agreement.

### B. The Consenting Noteholders' Administrative Expense Claim Falls Under The Exceptions In Section 10.9(B) Of The Plan And Is Therefore Not Subject To Release

The Debtors' argument about the release provision contained in Section 10.9(b) of the Plan is similarly misleading and misguided. If one were to read only the language set out in the Debtors' Initial Opposition (at 11), one might think that any "Releasing Party" (which includes any creditor that votes in favor of the Plan) was waiving the right to recover on *any* administrative claim, including an ordinary commercial claim to be paid for goods or services provided to the Debtors during the bankruptcy case. But, not surprisingly, that is not at all what the Plan actually provides. Rather, as explained in Elliott's response (at pp. 5-6), the release provisions contain two exceptions—which the Debtors again chose to omit in their Initial Opposition (at 11) through the use of ellipses—that make clear that the Consenting Noteholders'

7

administrative expense claims are not released. By its express terms, the Plan does *not* release (1) any rights "to enforce the Plan" or (2) any claims that are "otherwise provided in the Plan." Plan, art. X, § 10.8.[6] This is dispositive. The Plan specifically preserves the right of post-petition creditors to file administrative expense claims, and requires the Reorganized Debtors to pay all such claims if they are otherwise allowable. *See* Plan, art. II, § 2.1 (providing that administrative claims that are not liquidated as of the Effective Date "shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business" and emphasizing "[f]or the avoidance of doubt," that "no Administrative Expense Claims shall be discharged pursuant to the Plan" unless they are paid in full); *id.,* art. VII, § 7.2 (providing for the resolution of "Disputed Administrative Expense Claims" on or after the Effective Date of the Plan).

Thus, administrative expense claims, including those of the Consenting Noteholders, fall within both of the exceptions set forth in Section 10.9(b). Indeed, even if the release provision did not include either of those two exceptions, it (like the exculpation provision) applies by its terms "only to the maximum extent permitted by law." The Bankruptcy Code, of course, requires that a debtor pay its administrative expenses in full as a condition for confirmation of a plan and the debtor's emergence from bankruptcy. 11 U.S.C. § 1129(a)(9)(A).

The Debtors argue that reading the Plan to mean what it says would amount to a "wholesale allowance of any and all potential Administrative Expense Claims" and would "nullify the more specific provisions of Section 10.9(b)." Initial Opposition at 11-12. None of that is correct, or even plausible. The Consenting Noteholders are not arguing that the Plan

---

[6] Elliott has set forth the full text of Section 10.9(b) in an appendix to its response. Instead of repeating the text here, the Additional RSA Noteholders refer the Court to that appendix.

8

allows their administrative expense claim, just that the Plan does not bar it. And it is the Debtors' reading of Section 10.9(b)—their elimination of the two "except" clauses through another selective use of ellipses—that would produce extraordinary and illogical results. The Debtors' construction of Section 10.9(b) would mean that all Releasing Parties would have released their right to any of the recoveries to which they are otherwise entitled under the Plan.

Such a reading of the Plan would be contrary to well-established rules requiring courts to construe commercial agreements reasonably to make sense and to avoid interpretations that result in absurdity. *See* Cal. Civ. Code §§ 1638, 1643; *see also Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.*, 855 P.2d 1263, 1271 (Cal. 1993) ("Courts will not adopt a strained or absurd interpretation in order to create an ambiguity where none exists.") (quoting *Reserve Ins. Co. v. Pisciotta*, 640 P.2d 764, 767-68 (Cal. 1982)). Further, the Debtors' reading of the Plan would be antithetical to the purpose of requiring debtors to pay allowed administrative expense claims under the Bankruptcy Code. *See, e.g.*, *Wolkowitz v. FDIC (In re Imperial Credit Indus., Inc.)*, 527 F.3d 959, 975 (9th Cir. 2008) (noting that administrative expense priority exists for the purpose of "encourag[ing] third parties to contract with the bankruptcy estate for the benefit of the estate as a whole.") (citation omitted).

The Debtors do not suggest any reason why the Consenting Noteholders' claim for damages arising out of the Debtors' post-petition breach of the Noteholder RSA is analytically any different from a claim by a vendor (who happened to have voted to accept the Plan in respect of any pre-petition claim it held and was therefore a "Releasing Party") for the Debtors' post-petition breach of their agreement made to pay the vendor who delivered goods or services that the Debtor ordered. The Plan cannot be read—consistent with its words, basic bankruptcy law, or ordinary common sense—to bar such a claim.

9

Finally, the Debtors are simply wrong in arguing that the Plan must be read contrary to its plain meaning because the release would serve no purpose if it did not bar otherwise allowable administrative expense claims asserted against the Debtors. As with exculpation provisions, release provisions are often included in bankruptcy plans, not to benefit the debtor, but instead to protect non-debtor parties, such as the debtor's officers and directors and estate professionals, for actions they took during the course of the bankruptcy process. *Blixseth*, 961 F.3d at 1084. A debtor, after all, will obtain a discharge upon plan confirmation, but third parties will not. 11 U.S.C. § 1141(d) (confirmation of a plan "discharges the debtor"). This Plan is no different. Its release protects the "Released Parties," a term defined under the Plan to include numerous non-debtors, including the officers, directors, agents, financial advisors, and attorneys for the Debtors, the Tort Claimants Committee, the DIP Lenders, and the like. Plan § 1.179. There is thus no reason to read the Plan contrary to its plain meaning; read in accord with its actual words, the release continues to do substantial work.

## II. THE DEBTORS' REMAINING ARGUMENTS ARE UNAVAILING.

The Debtors' remaining arguments all start from the premise that the Plan operates to cut off the Consenting Noteholders' rights to pursue their claims for breach of the Noteholder RSA. Because, for the reasons described above, the Plan does nothing of the sort, none of the Debtors' remaining arguments adds anything to the analysis.

For example, the Debtors contend that the Consenting Noteholders "sat on their rights" (*see* Initial Opposition at 15), by not raising an objection to the Plan or otherwise coming forward before the Plan went effective to assert their claim for breach. As the Plan, fairly read, did not release administrative expense claims, there was no reason or obligation for the Consenting Noteholders to object to the Plan. And, while many plans of reorganization include a

Case: 19-30088    Doc# 9034    Filed: 09/14/20    Entered: 09/14/20 15:13:56    Page 14 of 18

bar date for the assertion of administrative expense claims, this Plan does not. By asserting their administrative expense claim now, the Consenting Noteholders are thus simply seeking to enforce their rights in the manner contemplated by the Plan. No one has "sat" on any rights.

The cases cited by the Debtors in the Initial Opposition (at 13-14) are thus inapposite. For example, in *Great Lakes Higher Educ. Corp. v. Pardee (In re Pardee)*, 193 F.3d 1083, 1086 (9th Cir. 1999), the court held that a creditor had failed to protect its interest by not objecting to a plan provision that purported to discharge post-petition interest before confirmation. Here, the right to assert this administrative expense claim is not only *not* barred by the terms of the Plan, as explained in detail, *supra*, but is expressly preserved. See Plan, art. II, § 2.1; art. VII, § 7.2; art. I, § 1.4. Moreover, three of the Debtors' cases concerned a party's "failure to make [a] timely assertion of the right[.]" *United States v. Olano*, 507 U.S. 725, 731 (1993). *See also Reid & Hellyer, APC v. Laski (In re Wrightwood Guest Ranch, LLC)*, 896 F.3d 1109, 1114 (9th Cir. 2018); *Lowery v. Channel Commc'ns, Inc. (In re Cellular 101, Inc.)*, 539 F.3d 1150, 1155 (9th Cir. 2008). Here, in contrast, there is no bar date for administrative expense claims, and no suggestion that the Consenting Noteholders have brought their claim outside any applicable statute of limitations. The Additional RSA Noteholders' claim cannot, therefore, be deemed "untimely."

The Debtors' final argument (Initial Opposition at 16-24) that Fed. R. Civ. P. 60 provides no basis to modify this Court's Confirmation Order is likewise beside the point. For the reasons described above, nothing in the Plan or this Court's Order confirming it operates to bar the assertion of the Consenting Noteholders administrative expense claim for breach of the Noteholder RSA. There is accordingly no need for the Court to consider if Rule 60 would

11

provide a basis to modify the Confirmation Order if the Plan purported to bar the Consenting Noteholders' right to seek payment of their administrative expense claim.

In any event, any argument that the Consenting Noteholders "sat on their rights," and any factual allegation the Debtors present with respect to the applicability of Rule 60, raise issues of disputed fact, and are not ripe for resolution at this preliminary stage in the proceedings.

## RESERVATION OF RIGHTS

In accordance with the Scheduling Order, the Additional RSA Noteholders reserve their right to assert any arguments, opposition, objections or defenses with regard to the Elliott Motion and the Joinders, and reserve their rights with respect to discovery on any issues.

## CONCLUSION

For the reasons stated, the Court should deny the Debtors' Initial Opposition and direct the parties forthwith to proceed with discovery.

Respectfully Submitted,

Dated: September 14, 2020          By:   */s/ Craig Goldblatt*

                                            Craig Goldblatt (*Pro Hac Vice* admitted)
                                            **WILMER CUTLER PICKERING HALE**
                                               **AND DORR LLP**
                                            1875 Pennsylvania Ave., NW
                                            Washington DC 20036
                                            Telephone: 202.663.6000
                                            Facsimile: 202.663.6363
                                            craig.goldblatt@wilmerhale.com

                                            Philip D. Anker (*Pro Hac Vice* admitted)
                                            Allyson Pierce (Cal. Bar. No. 325060)
                                            **WILMER CUTLER PICKERING HALE**
                                              **AND DORR LLP**
                                            250 Greenwich Street
                                            New York, NY 10007
                                            Telephone: 202.230.8800
                                            Facsimile: 202.230.8888

philip.anker@wilmerhale.com
allyson.pierce@wilmerhale.com

*Counsel to Canyon, Citadel, Davidson Kempner, Farallon, Sculptor, and Värde, on behalf of themselves, and/or certain funds and accounts managed, advised, or sub-advised by them*

*- and -*

By:  /s/ David P. Simonds

David P. Simonds (Cal. Bar No. 214499)
Edward J. McNeilly (Cal. Bar No. 314588)
**HOGAN LOVELLS US LLP**
1999 Avenue of the Stars, Suite 1400
Los Angeles, California 90067
Telephone: 310.785.4600
Facsimile: 310.785.4601
david.simonds@hoganlovells.com
edward.mcneilly@hoganlovells.com

Michael C. Hefter (*Pro Hac Vice* pending)
Matthew Ducharme (*Pro Hac Vice* pending)
**HOGAN LOVELLS US LLP**
390 Madison Avenue
New York, New York 10017
Telephone: 212.918.3000
Facsimile: 212.918.3100
michael.hefter@hoganlovells.com
matthew.ducharme@hoganlovells.com

*Counsel to PIMCO, as investment adviser or manager for certain funds and accounts*

13

# CERTIFICATE OF SERVICE

I, Craig Goldblatt, declare as follows:

I am a citizen of the United States and over the age of eighteen (18) years and not a party to the within action. My business address is at Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue NW, Washington, DC 20006.

On September 14, 2020, I served document(s) described as:

**ADDITIONAL RSA NOTEHOLDERS' RESPONSE TO THE REORGANIZED DEBTORS' INITIAL OPPOSITION TO ELLIOTT MOTION FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM AND RECONSIDERATION OF CONFIRMATION ORDER AND RELATED JOINDERS**

on the interested parties in this action as follows:

[ ] BY MAIL: Service was accomplished by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, addressed as set forth above.

[X] BY E-MAIL/NEF: Service was accomplished through the Notice of Electronic Filing ("NEF") for all parties and counsel who are registered ECF Users and those identified below:

I declare under penalty of perjury under the laws of the United States of America that the above is true and correct. This declaration was executed on September 14, 2020 in Chevy Chase, Maryland.

*/s/ Craig Goldblatt*
Craig Goldblatt